# EXHIBIT C

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

---

# FORM 8-K

---

### CURRENT REPORT
### Pursuant to Section 13 or 15(d)
### of the Securities Exchange Act of 1934

---

### Date of Report: June 30, 2020
### (Date of earliest event reported)

---

| Commission File Number | Exact Name of Registrant as specified in its charter | State or Other Jurisdiction of Incorporation or Organization | IRS Employer Identification Number |
|---|---|---|---|
| 001-12609 | PG&E CORPORATION | California | 94-3234914 |
| 001-02348 | PACIFIC GAS AND ELECTRIC COMPANY | California | 94-0742640 |



| | |
|---|---|
| **77 BEALE STREET** | **77 BEALE STREET** |
| **P.O. BOX 770000** | **P.O. BOX 770000** |
| **SAN FRANCISCO, California 94177** | **SAN FRANCISCO, California 94177** |
| (Address of principal executive offices) (Zip Code) | (Address of principal executive offices) (Zip Code) |
| **(415) 973-1000** | **(415) 973-7000** |
| (Registrant's telephone number, including area code) | (Registrant's telephone number, including area code) |

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b)

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common stock, no par value | PCG | The New York Stock Exchange |
| First preferred stock, cumulative, par value $25 per share, 5% series A redeemable | PCG-PE | NYSE American LLC |
| First preferred stock, cumulative, par value $25 per share, 5% redeemable | PCG-PD | NYSE American LLC |
| First preferred stock, cumulative, par value $25 per share, 4.80% redeemable | PCG-PG | NYSE American LLC |
| First preferred stock, cumulative, par value $25 per share, 4.50% redeemable | PCG-PH | NYSE American LLC |
| First preferred stock, cumulative, par value $25 per share, 4.36% series A redeemable | PCG-PI | NYSE American LLC |
| First preferred stock, cumulative, par value $25 per share, 6% nonredeemable | PCG-PA | NYSE American LLC |
| First preferred stock, cumulative, par value $25 per share, 5.50% nonredeemable | PCG-PB | NYSE American LLC |
| First preferred stock, cumulative, par value $25 per share, 5% nonredeemable | PCG-PC | NYSE American LLC |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

| | | |
|---|---|---|
| Emerging growth company | PG&E Corporation | ☐ |
| Emerging growth company | Pacific Gas and Electric Company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act.

| | |
|---|---|
| PG&E Corporation | ☐ |
| Pacific Gas and Electric Company | ☐ |

**Explanatory Note**

As previously disclosed, on January 29, 2019, PG&E Corporation (the "Corporation") and its subsidiary, Pacific Gas and Electric Company (the "Utility" and, together with the Corporation, the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 ("Chapter 11") of the United States Code in the U.S. Bankruptcy Court for the Northern District of California (the "Bankruptcy Court"). The Debtors' Chapter 11 cases were jointly administered under the caption In re: PG&E Corporation and Pacific Gas and Electric Company, Case No. 19-30088 (DM) (the "Chapter 11 Cases"). On June 19, 2020, the Debtors, certain funds and accounts managed or advised by Abrams Capital Management, L.P., and certain funds and accounts managed or advised by Knighthead Capital Management, LLC filed the Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization dated June 19, 2020 [Docket No. 8048] with the Bankruptcy Court (as may be further modified, amended, or supplemented from time to time and, together with all exhibits and schedules thereto, the "Plan"). On June 20, 2020, the Bankruptcy Court entered an order [Docket No. 8053] confirming the Plan (the "Confirmation Order"), which incorporates the Bankruptcy Court's prior order approving the Plan funding transactions and documents [Docket No. 7909].

On July 1, 2020 (the "Effective Date"), the Debtors consummated their reorganization pursuant to the Plan. This Current Report on Form 8-K contains summary descriptions of certain documents and agreements to which the Debtors became a party pursuant to the Plan in connection with the Debtors' emergence from the Chapter 11 Cases, certain agreements that were terminated pursuant to the Plan, and certain other information related to the Debtors' emergence from Chapter 11. The descriptions in this Current Report on Form 8-K are qualified in their entirety by reference to the Confirmation Order, which is incorporated herein by reference to Exhibit 2.1 to the Debtors' Current Report on Form 8-K filed June 24, 2020, and to the other exhibits to this Current Report on Form 8-K. All capitalized terms used but not defined herein have the meaning s as set forth in the Plan.

**Item 1.01.     Entry into a Material Definitive Agreement.**

*Tax Benefits Payment Agreement with Fire Victim Trust*

On the Effective Date, pursuant to the Plan, the Utility entered into a tax benefits payment agreement (the "Tax Benefits Payment Agreement") with the Fire Victim Trust, pursuant to which the Utility agreed to pay to the Fire Victim Trust in cash an aggregate amount of $1.35 billion, comprising (i) up to $650 million of Tax Benefits for fiscal year 2020 to be paid on or before January 15, 2021 (the "First Payment Date") and (ii) up to $700 million of Tax Benefits for fiscal year 2021 to be paid on or before January 15, 2022, plus the amount of any shortfall of the payments owed on the First Payment Date. In the event that Tax Benefits in fiscal year 2020 exceed $650 million, the Reorganized Utility will use such excess Tax Benefits to prepay the amount of Tax Benefits to be paid for fiscal year 2021. In the event that payments from the Tax Benefits Payment Agreement received on or before the First Payment Date are less than $650 million, the Reorganized Utility will deliver to the Fire Victim Trust a letter of credit in an amount equal to such shortfall, which letter of credit may be presented to the issuing bank for payment to the Fire Victim Trust on January 18, 2022 to the extent that any amounts remain owing to the Fire Victim Trust under the Tax Benefits Payment Agreement on that date. In the event there is a change of control as defined within the meaning of section 382 of the Internal Revenue Code after the Effective Date, all such payments described in (i) and (ii) will become automatically due and payable within fifteen days of such change in control (and the letter of credit, if issued, may be drawn); and in the event that the Reorganized Utility obtains financing that monetizes or is otherwise secured by any Tax Benefits, the Reorganized Utility will use the first $1.35 billion in proceeds of such financing to make all payments described in (i) and (ii) to the Fire Victim Trust on January 15, 2021. The Tax Benefits Payment Agreement is attached as Exhibit 10.1 hereto and incorporated herein by reference.

*Registration Rights Agreement with Fire Victim Trust*

As previously disclosed in Item 8.01 of the Debtors' Current Report on Form 8-K filed on June 12, 2020, the Debtors and the Tort Claimants Committee agreed on a form of registration rights agreement to be entered into between the Corporation and the Fire Victim Trust on the Effective Date.

On the Effective Date, the Corporation and the Fire Victim Trust entered into the registration rights agreement (the "Registration Rights Agreement"). Pursuant to the terms of the Registration Rights Agreement:

- the Corporation is required (i) to file a registration statement shortly following the Effective Date to effect the registration of the Fire Victim Trust Shares and (ii) to cause such registration statement to be declared effective within 20 days thereafter;

- subject to customary suspension rights, the Corporation is required to use commercially reasonable best efforts to cause such registration statement to remain continuously effective under, and properly amended, supplemented and replaced as required by, the Securities Act of 1933, as amended (the "Securities Act"), until the date as of which there are no longer "registrable securities" (as defined in the Registration Rights Agreement) outstanding;

- subject to certain limitations, the Fire Victim Trust has the right (i) to require the Corporation to assist the Fire Victim Trust with effecting periodic underwritten offerings of Fire Victim Trust Shares and (ii) to include Fire Victim Trust Shares in offerings of common stock by the Corporation (whether for the account of the Corporation or any other equity holder);

- subject to certain requirements, the Fire Victim Trust will agree to a customary lock-up not to exceed 90 days following offerings of common stock by the Corporation (whether for the account of the Corporation, the Fire Victim Trust or otherwise); and

- subject to certain exceptions, the Fire Victim Trust agrees that all Common Stock held by the Fire Victim Trust in excess of 9.9% of the outstanding common stock of the Corporation as of any applicable record date for voting will, with respect to all matters subject to a vote of the shareholders other than matters directly related to the natural environment or safety, be cast in the same proportion as the votes of all other shareholders of the Corporation.

The Corporation is required to pay its fees and expenses incident to its registration obligations under the Registration Rights Agreement, including fees and expenses for one counsel for the Fire Victim Trust (subject to a cap) in connection with the initial registration and each assisted underwritten offering, but excluding any underwriting discounts or commissions or fees and expenses of the Fire Victim Trust. The Registration Rights Agreement also contains customary indemnification and contribution provisions. The Registration Rights Agreement is attached as Exhibit 10.2 hereto and incorporated herein by reference.

*New Utility Debt*

On the Effective Date, pursuant to the Plan, the Utility issued $11.85294 billion of its first mortgage bonds in order to refinance certain of its pre-petition senior unsecured debt, as described below.

The Utility issued $875 million aggregate principal amount of 3.45% first mortgage bonds due 2025 and $875 million aggregate principal amount of 3.75% first mortgage bonds due 2028 (together, the "New Short-Term Bonds"), in satisfaction of all claims arising out of the following series of the Utility's pre-petition senior notes (the "Short-Term Senior Notes"):

- $400 million aggregate principal amount of 2.45% Senior Notes due 2022;

- $300 million aggregate principal amount of 4.25% Senior Notes due 2021;

- $250 million aggregate principal amount of 3.25% Senior Notes due 2021; and

- $800 million aggregate principal amount of 3.50% Senior Notes due 2020.

The Utility issued $3.1 billion aggregate principal amount of 4.55% first mortgage bonds due 2030 and $3.1 billion aggregate principal amount of 4.95% first mortgage bonds due 2050 (together, the "New Long-Term Bonds"), in satisfaction of all claims arising out of the following series of the Utility's pre-petition senior notes (the "Long-Term Senior Notes"):

- $500 million aggregate principal amount of 5.125% Senior Notes due 2043;

- $800 million aggregate principal amount of 5.40% Senior Notes due 2040;

- $550 million aggregate principal amount of 6.25% Senior Notes due 2039;

- $950 million aggregate principal amount of 5.80% Senior Notes due 2037;

- $3.0 billion aggregate principal amount of 6.05% Senior Notes due 2034; and

- $400 million aggregate principal amount of 6.35% Senior Notes due 2038.

The Utility issued $1.95147 billion aggregate principal amount of 3.15% first mortgage bonds due 2026 and $1.95147 billion aggregate principal amount of 4.50% first mortgage bonds due 2040 (together, the "Funded Debt Exchange Bonds"), in satisfaction of all claims arising out of the following (the "Funded Debt"):

- Borrowings plus interest, fees and other expenses arising under or in connection with the Second Amended and Restated Credit Agreement dated as of April 27, 2015, among the Utility, as borrower, the several lenders party thereto and Citibank N.A., as administrative agent;

- Borrowings plus interest, fees and other expenses arising under or in connection with the Term Loan Agreement dated as of February 23, 2018, among the Utility, as borrower, The Bank of Tokyo-Mitsubishi UFJ, Ltd., as administrative agent and a lender, and U.S. Bank National Association, as a lender; and

- Obligations pursuant to certain reimbursement agreements in respect of letters of credit provided by commercial banks in support of certain of the Utility's pollution control bonds.

The New Short-Term Bonds, the New Long-Term Bonds and the Funded Debt Exchange Bonds (collectively, the "New Mortgage Bonds") were issued under the Indenture of Mortgage, dated as of June 19, 2020 (the "Base Mortgage Indenture"), between the Utility and The Bank of New York Mellon Trust Company, N.A., as trustee (the "Mortgage Trustee"), as previously amended and supplemented, and as amended and supplemented by the Second Supplemental Indenture, dated as of July 1, 2020 (the "Second Supplemental Indenture"), relating to the Senior Notes Collateral Bonds (as defined below), the Third Supplemental Indenture, dated as of July 1, 2020 (the "Third Supplemental Indenture"), relating to the New Short-Term Bonds and the New Long-Term Bonds, the Fourth Supplemental Indenture, dated as of July 1, 2020 (the "Fourth Supplemental Indenture"), relating to the Funded Debt Exchange Bonds, and the Fifth Supplemental Indenture, dated as of July 1, 2020 (the "Fifth Supplemental Indenture"), relating to the Credit Agreement Collateral Bonds (as defined below) (the Base Mortgage Indenture, as so amended and supplemented, the "Mortgage Indenture").

The New Mortgage Bonds are secured by a first lien, subject to permitted liens, on substantially all of the Utility's real property and certain tangible property related to its facilities. The New Mortgage Bonds are the Utility's senior obligations and rank equally in right of payment with the Utility's other existing or future first mortgage bonds issued under the Mortgage Indenture.

The Mortgage Indenture contains covenants that limit the Utility's ability to, among other things, create liens on mortgaged property, withdraw cash held by the Mortgage Trustee and merge with or consolidate with another person, or convey, otherwise transfer or lease all or substantially all of its mortgaged property.

The Utility may redeem each series of New Mortgage prior to maturity, in whole or in part, at a "make-whole" redemption price set forth in the applicable supplemental indenture, except that during a specified period prior to maturity specified in the applicable supplemental indenture, the Utility may redeem each series, in whole or in part, at a redemption price equal to 100% of the principal amount thereof, plus accrued and unpaid interest to, but not including, the redemption date.

The foregoing descriptions of the New Mortgage Bonds are qualified in their entirety by reference to the full text of the Mortgage Indenture, which was filed as Exhibit 4.1 to the Debtors' Current Report on Form 8-K filed on June 19, 2020, to the Third Supplemental Indenture (with respect to the New Short-Term Bonds and the New Long-Term Bonds), which is attached as Exhibit 4. 1 hereto, and to the Fourth Supplemental Indenture (with respect to the Funded Debt Exchange Bonds), which is attached as Exhibit 4. 2 hereto.

*Reinstated Senior Notes*

On the Effective Date, pursuant to the Plan, the Utility reinstated $9.575 billion aggregate principal amount of the following series of its pre-petition senior unsecured notes on their contractual terms (the "Reinstated Senior Notes"):

- $850 million aggregate principal amount of 3.95% Senior Notes due 2047;

- $600 million aggregate principal amount of 4.00% Senior Notes due 2046;

- $450 million aggregate principal amount of 4.25% Senior Notes due 2046;

- $600 million aggregate principal amount of 4.30% Senior Notes due 2045;

- $675 million aggregate principal amount of 4.75% Senior Notes due 2044;

- $375 million aggregate principal amount of 4.60% Senior Notes due 2043;

- $400 million aggregate principal amount of 4.45% Senior Notes due 2042;

- $350 million aggregate principal amount of 3.75% Senior Notes due 2042;

- $250 million aggregate principal amount of 4.50% Senior Notes due 2041;

- $300 million aggregate principal amount of 4.65% Senior Notes due 2028;

- $400 million aggregate principal amount of 3.30% Senior Notes due 2027;

- $1.15 billion aggregate principal amount of 3.30% Senior Notes due 2027;

- $600 million aggregate principal amount of 2.95% Senior Notes due 2026;

- $600 million aggregate principal amount of 3.50% Senior Notes due 2025;

- $450 million aggregate principal amount of 3.75% Senior Notes due 2024;

- $350 million aggregate principal amount of 3.40% Senior Notes due 2024;

- $300 million aggregate principal amount of 3.85% Senior Notes due 2023;

- $500 million aggregate principal amount of 4.25% Senior Notes due 2023; and

- $375 million aggregate principal amount of 3.25% Senior Notes due 2023.

On the Effective Date, each series of Reinstated Senior Notes was collateralized by the Utility's delivery of a first mortgage bond in a corresponding principal amount (the "Senior Notes Collateral Bonds") to the applicable trustee for the benefit of the holders of the Reinstated Senior Notes. As a result, the Reinstated Senior Notes are the Utility's senior obligations and rank equally in right of payment with its other existing or future first mortgage bonds issued under the Mortgage Indenture.

In connection with the reinstatement and collateralization of the Reinstated Senior Notes, the Utility entered into (i) the Thirtieth Supplemental Indenture, dated as of July 1, 2020, to the Amended and Restated Indenture, dated as of April 22, 2005, between the Utility and BOKF, N.A., as trustee, (ii) the First Supplemental Indenture, dated as of July 1, 2020, to the Indenture, dated as of November 29, 2017, between the Utility and BOKF, N.A., as trustee, and (iii) the Second Supplemental Indenture, dated as of July 1, 2020, to the Indenture, dated as of August 6, 2018, between the Utility and BOKF, N.A., as trustee (together, the "Reinstated Notes Supplemental Indentures"). The Senior Notes Collateral Bonds were issued under the Second Supplemental Indenture to the Mortgage Indenture.

The Utility may redeem each series of Reinstated Senior Notes prior to maturity, in whole or in part, at a "make-whole" redemption price set forth in the applicable supplemental indenture, except that during a period prior to maturity specified in the applicable supplemental indenture, the Utility may redeem each series of Reinstated Senior Notes, in whole or in part, at a redemption price equal to 100% of the principal amount thereof, plus accrued and unpaid interest to, but not including, the redemption date.

The foregoing description of the Reinstated Senior Notes is qualified in its entirety by reference to the full text of (i) the relevant unsecured indentures and supplemental indentures that established the terms of the Reinstated Senior Notes, which have been filed as exhibits to the Debtors' filings with the Securities and Exchange Commission under the Securities Exchange Act of 1934, as amended, (ii) the Reinstated Notes Supplemental Indentures, which are attached as Exhibits 4.3, 4.4 and 4.5 hereto and (iii) the Second Supplemental Indenture, which is attached as Exhibit 4.6 hereto.

*Utility Revolving Credit Agreement and Term Loan Credit Agreement*

On the Effective Date, the Utility entered into a $3.5 billion revolving credit agreement (the "Utility Revolving Credit Agreement") with JPMorgan Chase Bank, N.A. and Citibank, N.A. as co-administrative agents and Citibank, N.A., as the designated agent. The Utility Revolving Credit Agreement has a maturity date three years after its effective date, subject to two one-year extensions at the option of the Utility.

Borrowings under the Utility Revolving Credit Agreement will bear interest based on the Utility's election of either (1) LIBOR plus an applicable margin of 1.375% to 2.50% based on the Utility's credit rating or (2) the base rate plus an applicable margin of 0.375% to 1.50% based on the Utility's credit rating. In addition to interest on outstanding principal under the Utility Revolving Credit Agreement, the Utility is required to pay a commitment fee to the lenders in respect of the unutilized commitments thereunder, ranging from 0.25% to 0.50% per annum depending on the Utility's credit rating. The Utility Revolving Credit Agreement has a letter of credit sublimit in an amount of approximately $1.25 billion. The Utility may also pay customary letter of credit fees based on letters of credit issued under the Utility Revolving Credit Agreement.

The Utility's obligations under the Utility Revolving Credit Agreement are secured by the issuance of a first mortgage bond, issued pursuant to the Fifth Supplemental Indenture to the Mortgage Indenture, secured by a first lien on substantially all of the Utility's real property and certain tangible personal property related to its facilities, subject to certain exceptions, and which will rank *pari passu* with the Utility's other first mortgage bonds.

The Utility Revolving Credit Agreement includes usual and customary provisions for revolving credit agreements of this type, including covenants limiting, with certain exceptions, (1) liens, (2) indebtedness, (3) sale and leaseback transactions, and (4) other fundamental changes. In addition, the Utility Revolving Credit Agreement will require that the Utility maintain a ratio of total consolidated debt to consolidated capitalization of at most 65% as of the end of each fiscal quarter.

In the event of a default by the Utility under the Utility Revolving Credit Agreement, including cross-defaults relating to specified other debt of the Utility or any of its significant subsidiaries in excess of $200 million, the designated agent may, with the consent of the required lenders (or upon the request of the required lenders, shall), declare the amounts outstanding under the Utility Revolving Credit Agreement, including all accrued interest, payable immediately. For events of default relating to insolvency, bankruptcy or receivership, the amounts outstanding under the Utility Revolving Credit Agreement become payable immediately.

The Utility may voluntarily repay outstanding loans under the Utility Revolving Credit Agreement at any time without premium or penalty, other than customary "breakage" costs with respect to eurodollar rate loans. Any voluntary prepayments made by the Utility will not reduce the commitments under the Utility Revolving Credit Agreement.

In addition, on the Effective Date, the Utility obtained a $3.0 billion secured term loan under a term loan credit agreement (the "Utility Term Loan Credit Agreement") with JPMorgan Chase Bank, N.A., as administrative agent, the other lenders from time to time party thereto. The facilities under the Utility Term Loan Credit Agreement consist of a $1.5 billion 364-day term loan facility (the "Utility 364-Day Term Loan Facility") and a $1.5 billion 18-month term loan facility (the "Utility 18-Month Term Loan Facility"). The maturity date for the 364-Day Term Loan Facility is 364 days after the effective date of the Utility Term Loan Credit Agreement and the maturity date for the 18-Month Term Loan Facility is eighteen months after the effective date of the Utility Term Loan Credit Agreement.

Borrowings under the Utility Term Loan Credit Agreement will bear interest based on the Utility's election of either (1) LIBOR plus an applicable margin of 2.00% with respect to the 364-Day Term Loan Facility and 2.25% with respect to the 18-Month Term Loan Facility, or (2) the base rate plus an applicable margin of 1.00% with respect to the 364-Day Term Loan Facility and 1.25% with respect to the Utility 18-Month Term Loan Facility.

The Utility's obligations under the Utility Term Loan Credit Agreement are secured by the issuance of a first mortgage bond, issued pursuant to the Fifth Supplemental Indenture to the Mortgage Indenture, secured by a first lien on substantially all of the Utility's real property and certain tangible personal property related to its facilities, subject to certain exceptions, and which will rank *pari passu* with the Utility's other first mortgage bonds.

The Utility Term Loan Credit Agreement includes usual and customary provisions for term loan agreements of this type, including covenants limiting, with certain exceptions, (1) liens, (2) indebtedness, (3) sale and leaseback transactions, and (4) other fundamental changes. In addition, the Utility Term Loan Credit Agreement will require that the Utility maintain a ratio of total consolidated debt to consolidated capitalization of at most 65% as of the end of each fiscal quarter.

In the event of a default by the Utility under the Utility Term Loan Credit Agreement, including cross-defaults relating to specified other debt of the Utility or any of its significant subsidiaries in excess of $200 million, the administrative agent may, with the consent of the required lenders (or upon the request of the required lenders, shall), declare the amounts outstanding under the Utility Term Loan Credit Agreement, including all accrued interest, payable immediately. For events of default relating to insolvency, bankruptcy or receivership, the amounts outstanding under the Utility Term Loan Credit Agreement become payable immediately.

The Utility is required to prepay outstanding term loans under the Utility Term Loan Credit Agreement (with all outstanding term loans made under the Utility 364-Day Term Loan Facility being paid first), subject to certain exceptions, with 100% of the net cash proceeds of certain securitization transactions. The Utility may voluntarily repay outstanding loans under the Utility Term Loan Credit Agreement at any time without premium or penalty, other than customary "breakage" costs with respect to eurodollar rate loans.

The foregoing descriptions of the Utility Revolving Credit Agreement and the Utility Term Loan Credit Agreement are qualified in their entirety by reference to the full text of (i) the Utility Revolving Credit Agreement and the Utility Term Loan Credit Agreement, which are attached as Exhibit 10.3 and Exhibit 10.4, respectively, hereto and incorporated by reference herein and (ii) the Fifth Supplemental Indenture, which is attached as Exhibit 4.7 hereto and incorporated by reference herein.

The lenders under the Utility Revolving Credit Agreement and the Utility Term Loan Credit Agreement and/or their affiliates have in the past provided, and may in the future provide, investment banking, underwriting, lending, commercial banking and other advisory services to the Corporation and the Utility. Such lenders have received, and may in the future receive, customary compensation from the Corporation and the Utility for such services.

*Corporation Revolving Credit Agreement*

On the Effective Date, the Corporation entered into a $500 million revolving credit agreement (the "Corporation Revolving Credit Agreement") with JPMorgan Chase Bank, N.A. as administrative agent and collateral agent, and the lenders from time to time party thereto. The Corporation Revolving Credit Agreement has a maturity date three years after its effective date, subject to two one-year extensions at the option of the Corporation.

Borrowings under the Corporation Revolving Credit Agreement will bear interest based on the Corporation's election of either (1) LIBOR plus an applicable margin of 3.00% to 4.25% based on the Corporation's credit rating or (2) the base rate plus an applicable margin of 2.00% to 3.25% based on the Corporation's credit rating. In addition to interest on outstanding principal under the Corporation Revolving Credit Agreement, the Corporation is required to pay a commitment fee to the lenders in respect of the unutilized commitments thereunder, ranging from 0.50% to 0.75% per annum depending on the Corporation's credit rating.

The Corporation's obligations under the Corporation Revolving Credit Agreement are secured by a pledge of the Corporation's ownership interest in 100% of the shares of common stock of the Utility.

The Corporation Revolving Credit Agreement includes usual and customary provisions for revolving credit agreements of this type, including covenants limiting, with certain exceptions, (1) liens, (2) indebtedness, (3) sale and leaseback transactions, (4) investments, (5) dispositions, (6) changes in the nature of business, (7) transactions with affiliates, (8) burdensome agreements, (9) restricted payments and (10) other fundamental changes. In addition, the Corporation Revolving Credit Agreement will require that the Corporation (1) maintain a ratio of total consolidated debt to consolidated capitalization of at most 70% as of the end of each fiscal quarter and (2) if revolving loans are outstanding as of the end of a fiscal quarter, a ratio of adjusted cash to fixed charges, as of the end of such fiscal quarter, of at least 150% prior to the date that the Corporation first declares a cash dividend on its common stock and at least 100% thereafter.

In the event of a default by the Corporation under the Corporation Revolving Credit Agreement, including cross-defaults relating to specified other debt of the Corporation or any of its significant subsidiaries in excess of $200 million, the administrative agent may, with the consent of the required lenders (or upon the request of the required lenders, shall), declare the amounts outstanding under the Corporation Revolving Credit Agreement, including all accrued interest, payable immediately. For events of default relating to insolvency, bankruptcy or receivership, the amounts outstanding under the Corporation Revolving Credit Agreement become payable immediately.

The Corporation may voluntarily repay outstanding loans under the Corporation Revolving Credit Agreement at any time without premium or penalty, other than customary "breakage" costs with respect to eurodollar rate loans. Any voluntary prepayments made by the Corporation will not reduce the commitments under the Corporation Revolving Credit Agreement.

The foregoing description of the Corporation Revolving Credit Agreement is qualified in its entirety by reference to the full text of the Corporation Revolving Credit Agreement, which is attached as Exhibit 10.5 hereto and incorporated by reference herein.

The lenders under the Corporation Revolving Credit Agreement and/or their affiliates have in the past provided, and may in the future provide, investment banking, underwriting, lending, commercial banking and other advisory services to the Corporation and the Utility. Such lenders have received, and may in the future receive, customary compensation from the Corporation and the Utility for such services.

**Item 1.02.      Termination of a Material Definitive Agreement.**

*Debtor-in-Possession Credit Agreement*

On the Effective Date, the Senior Secured Superpriority Debtor-in-Possession Credit, Guaranty and Security Agreement, dated as of February 1, 2019, among the Utility, the Corporation, JPMorgan Chase Bank, N.A., as administrative agent, Citibank, N.A., as collateral agent, and the lenders and issuing banks party thereto was paid in full and terminated.

*Debt Instruments and Credit Agreements*

On the Effective Date, by operation of the Plan, all outstanding obligations under the Short-Term Senior Notes, the Long-Term Senior Notes and the Funded Debt were cancelled and the applicable agreements governing such obligations were terminated.

On the Effective Date, the following credit agreements were paid in full by the Corporation and terminated:

- the Second Amended and Restated Credit Agreement, dated as of April 27, 2015, among PG&E Corporation, as borrower, the several lenders party thereto and Bank of America, N.A., as administrative agent; and

- $350 million of borrowings, plus interest, fees and other expenses arising under or in connection with the Term Loan Agreement, dated as of April 16, 2018, among PG&E Corporation, as borrower, the several lenders party thereto and Mizuho Bank Ltd., as administrative agent.

**Item 2.03.      Creation of a Direct Financial Obligation or an Obligation under an Off-Balance Sheet Arrangement of a Registrant.**

The information set forth above in Item 1.01 under the headings "New Utility Debt," "Reinstated Senior Notes," "Utility Revolving Credit Agreement and Term Loan Credit Agreement" and "Corporation Revolving Credit Agreement" is hereby incorporated into this Item 2.03 by reference.

**Item 3.02.      Unregistered Sales of Equity Securities.**

*Issuance to the Fire Victim Trust Pursuant to the Plan*

On the Effective Date, pursuant to the Plan, the Utility entered into an assignment agreement with the Fire Victim Trust, pursuant to which the Utility agreed to transfer to the Fire Victim Trust on the Effective Date 476,995,175 shares (such shares, the "Fire Victim Trust Shares") of common stock of the Corporation, no par value (the "Common Stock"). The transfer of shares of Common Stock to the Fire Victim Trust was exempt from registration under the Securities Act pursuant to section 1145 of the Bankruptcy Code, as approved by the Bankruptcy Court in the Order dated June 16, 2020 [Docket No. 7972].

If, as of the later of (i) the first business day following July 25, 2020 and (ii) the last Mandatory Redemption Settlement Date (as defined in each of the prepaid forward stock purchase agreements between the Corporation and certain investors) (such later date, the "Settlement Date"), the Corporation has issued any additional equity units to the underwriters of the Equity Units Offering (the "Option Securities"), the Debtors will issue an additional number of shares of Common Stock to the Fire Victim Trust such that the Fire Victim Trust would own 22.19% of Common Stock based on the number of fully diluted shares of the Corporation (using the treasury stock method) that would have been outstanding as of the Effective Date assuming all the equity transactions specified in the Plan were consummated on the Effective Date and all the Option Securities issued by the Settlement Date were issued on the Effective Date, subject to a cap of 748,415 additional shares.

*Issuance to Certain Investors Pursuant to the Investment Agreement*

As previously disclosed, on June 7, 2020, the Corporation entered into an investment agreement (the "Investment Agreement") with certain investors (the "Investors") relating to the issuance and sale to the Investors of an aggregate of $3.25 billion of Common Stock. On the Effective Date, pursuant to the terms of the Investment Agreement, the Corporation issued to the Investors 342,105,261 shares of Common Stock. This issuance and sale was exempt from registration under the Securities Act pursuant to Section 4(a)(2) of the Securities Act.

*Issuance to the Backstop Parties Pursuant to the Backstop Commitment Letters*

As previously disclosed, the Corporation agreed to issue shares of Common Stock to certain investors (the "Backstop Parties") as commitment premiums pursuant to Amended and Restated Chapter 11 Plan Backstop Commitment Letters and prepaid forward contracts.

On the Effective Date, the Corporation issued to the Backstop Parties 169,000,016 shares of Common Stock. This issuance and sale was exempt from registration under the Securities Act pursuant to section 1145 of the Bankruptcy Code, as approved by the Bankruptcy Court in the Order dated June 16, 2020 [Docket No. 7972].

*Contribution to the Utility Pursuant to the Plan*

On the Effective Date, the Corporation made an equity contribution of $12.9 billion in cash, along with the Fire Victim Trust Shares, to the Utility, which used the funds to satisfy and discharge certain liabilities of the Debtors under the Plan and transferred the Fire Victim Trust Shares to the Fire Victim Trust as described above. The Corporation's cash equity contribution was funded by proceeds from the financing transactions described herein. This equity issuance to the Corporation by the Utility was exempt from registration under the Securities Act pursuant to Section 4(a)(2) of the Securities Act.

## Item 3.03.    Material Modifications to Rights of Security Holders.

The information set forth above in Item 1.01 under the heading "Reinstated Senior Notes" is hereby incorporated into this Item 3.03 by reference.

On the Effective Date, the Corporation entered into the Pledge Agreement, dated as of July 1, 2020 (the "Pledge Agreement"), among the Corporation, JPMorgan Chase Bank, N.A., as collateral agent, revolving administrative agent and term administrative agent, The Bank of New York Mellon Trust Company, N.A. and the secured representatives party thereto from time to time. Pursuant to the Pledge Agreement, the Corporation pledged its ownership interest in 100% of the shares of common stock of the Utility, in order to secure its obligations under (i) the Corporation Revolving Credit Agreement, (ii) the $2.75 billion Term Loan Credit Agreement, dated as of June 23, 2020, among the Corporation, JPMorgan Chase Bank, N.A., as administrative agent and collateral agent, and the lenders from time to time party thereto (the "Corporation Term Loan Credit Agreement") and (iii) the Corporation's $1,000,000,000 aggregate principal amount of 5.00% Senior Secured Notes due July 1, 2028 and $1,000,000,000 aggregate principal amount of 5.250% Senior Secured Notes due July 1, 2030.

The foregoing description of the Pledge Agreement is qualified in its entirety by reference to the full text of the Pledge Agreement, which is attached as Exhibit 4.8 hereto and incorporated by reference herein.

## Item 5.02.    Departure of Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.

*Departure and Appointment of Directors*

As previously disclosed in Item 5.02 of the Debtors' Current Report on Form 8-K filed on June 24, 2020, in connection with the implementation of the Plan, the Debtors announced that certain members of the board of directors for each of the Debtors would cease to serve on the board of directors for each of the Debtors and new directors would be appointed.

On the Effective Date, Richard R. Barrera, Nora Mead Brownell, Fred J. Fowler, Michael J. Leffell, Meridee A. Moore, Eric D. Mullins, Kristine M. Schmidt, Alejandro D. Wolff and William D. Johnson ceased to serve on the board of directors for each of the Debtors. Also on the Effective Date, Rajat Bahri, Kerry W. Cooper, Jessica L. Denecour, Mark E. Ferguson III, Robert C. Flexon, William Craig Fugate, Arno L. Harris, Michael R. Niggli, Jr., Dean L. Seavers, Oluwadara J. Treser and Benjamin F. Wilson were appointed to the board of the Corporation and Rajat Bahri, Kerry W. Cooper, Mark E. Ferguson III, William Craig Fugate, Arno L. Harris, Dean L. Seavers, Oluwadara J. Treseder and Benjamin F. Wilson were appointed to the board of the Utility.

Jessica L. Denecour, Robert C. Flexon and Michael R. Niggli, Jr. serve on the boards of directors of other entities that are utilities or that do business with the Utility. In order to serve on the board of the Utility, the Federal Energy Regulatory Commission ("FERC") must grant a waiver of section 305 of the Federal Power Act, which, among other things, prohibits persons from concurrently holding positions as director of two or more public utilities or from concurrently holding the

positions of director of a public utility and a company supplying electrical equipment to such public utility, unless authorized by FERC. These three individuals have filed with FERC a request for waivers to allow them to sit on the board of the Utility (collectively, "Waiver Application"), as well as a motion for expedited consideration of the Waiver Application. Jessica Denecour, Robert Flexon and Michael Niggli will not be seated on the board of the Utility pending resolution of the matters that are the subject of the Waiver Application.

On June 30, 2020, Dominique Mielle resigned from the boards of directors of the Debtors. On June 30, 2020, the Debtors reached an agreement with representatives of the Governor of the State of California to appoint Filsinger Energy Partners, a consulting firm, as an operational observer until September 30, 2020. Ms. Mielle resigned in connection with the previously disclosed board transition and the implementation of the Plan, as well as a disagreement with the Debtors over whether to enter into such agreement related to the operational observer. Ms. Mielle served as Chair of the Audit Committee of the boards of directors of the Debtors. A copy of the written correspondence from Ms. Mielle concerning the circumstances surrounding her resignation is attached to this Current Report on Form 8-K as Exhibit 99.1.

### Item 8.01.    Other Events.

*Equity Offerings*

As previously disclosed, on June 25, 2020, the Corporation priced a public offering of 423,372,629 shares of Common Stock (the "Shares") at a public offering price of $9.50 per share (the "Common Stock Offering"). In addition, on June 25, 2020, the Corporation priced a public offering of 14,545,455 equity units (the "Equity Units"), with each Equity Unit having a stated amount of $100.00 (the "Equity Units Offering" and, together with the Common Stock Offering, the "Equity Offerings"). Each Equity Unit offered is comprised of (i) a prepaid forward stock purchase contract (each, a "Purchase Contract") of the Corporation and (ii) a 1/48,000th undivided beneficial ownership interest in specified zero-coupon U.S. treasury securities (the "Treasury Strips") maturing on a quarterly basis from, and including, August 15, 2020 through, and including, August 15, 2023 (each, a "Treasury Strip Component").

The Common Stock Offering and the Equity Units Offering closed on July 1, 2020, and the Corporation issued and sold a total of 423,372,629 shares of its common stock and 14,545,455 Equity Units. The offering and sale of the Shares and Equity Units were made pursuant to the Corporation's Registration Statement on Form S-3 (File No. 333-236629-01).

*Equity Units*

The Corporation issued the Equity Units and Purchase Contracts under the Purchase Contract and Unit Agreement dated as of July 1, 2020 (the "Purchase Contract Agreement"), between the Corporation and The Bank of New York Mellon Trust Company, N.A., as purchase contract agent (the "Purchase Contract Agent"), and as attorney-in-fact for holders of Purchase Contracts. On any business day during the period beginning on, and including, the business day immediately following July 1, 2020 to, but excluding, the second scheduled trading day immediately preceding August 16, 2023, a holder of 48,000 Equity Units (or any integral multiple thereof) will have the right to withdraw the Treasury Strips evidenced by such Equity Units and hold the underlying Purchase Contracts separately rather than in the form of Equity Units (any such purchase contract, a "Separate Purchase Contract").

The foregoing description of the Equity Units and the following descriptions the Purchase Contracts and the Treasury Strips are summaries and are not meant to be complete descriptions of the Equity Units, the Purchase Contracts and the Treasury Strips. Each summary is qualified in its entirety by the Purchase Contract Agreement (including the forms of Equity Unit and Purchase Contract) and the Custodial Agreement (as defined below), as applicable, which are filed as Exhibits 4.9, 4.10, 4.11 and 4.12, respectively, to this Current Report on Form 8-K and are incorporated herein by reference.

*Purchase Contracts*

Unless settled early at the holder option, for each Purchase Contract the Corporation will deliver to holders on August 16, 2023 a number of shares of its Common Stock. The number of shares of common stock issuable upon settlement of each Purchase Contract will be determined as follows:

- if the Applicable Market Value (as defined below) of the common stock is greater than the threshold appreciation price (approximately $11.6375), then the holder will receive 8.5929 shares of common stock for each Purchase Contract (the "Minimum Settlement Rate");

- if the Applicable Market Value of the common stock is greater than or equal to the reference price (approximately $9.5000) but less than or equal to the threshold appreciation price, then the holder will receive a number of shares of common stock for each Purchase Contract equal to the Equity Unit stated amount of $100, divided by the Applicable Market Value; and

- if the Applicable Market Value of the common stock is less than the reference price, then the holder will receive 10.5263 shares of common stock for each Purchase Contract (the "Maximum Settlement Rate").

The "Applicable Market Value" means the arithmetic average of the VWAPs (as defined in the Purchase Contract Agreement) per share of the Corporation's common stock on each of the 20 consecutive trading days beginning on, and including, the 21st scheduled trading day immediately preceding August 16, 2023. The Minimum Settlement Rate and the Maximum Settlement Rate are each subject to adjustment as set forth in the Purchase Contract Agreement.

At any time prior to 5:00 p.m., New York City time, on the second scheduled trading day immediately preceding August 16, 2023, a holder of 48,000 Equity Units (or any integral multiple thereof) or a holder of one or more Separate Purchase Contracts, may elect to settle such Equity Units or Separate Purchase Contracts early and receive a number of shares of common stock per Purchase Contract equal to the Minimum Settlement Rate.

In addition, at any time prior to the second scheduled trading day immediately preceding August 16, 2023, if a "Fundamental Change" (as defined in the Purchase Contract Agreement) occurs, a holder of 48,000 Equity Units (or any integral multiple thereof) or a holder of one or more Separate Purchase Contracts, may elect to settle such Equity Units or Separate Purchase Contracts early and receive a number of shares of common stock per Purchase Contract equal to the "Fundamental Change Early Settlement Rate" as defined in, and in accordance with, the Purchase Contract Agreement. In either case, upon early settlement at a holder's election of a Purchase Contracts held as components of Equity Units, the Custodian (as defined below) will deliver the Treasury Strips evidenced by those Equity Units on the second business day following the applicable early settlement date.

*Treasury Strips*

The Treasury Strips underlying the Equity Units will be held by The Bank of New York Mellon Trust Company, N.A., as agent for the holders of Equity Units (the "Custodian"), and will be subject to the terms of the Custodial Agreement dated as of July 1, 2020 (the "Custodial Agreement"), between the Custodian and Purchase Contract Agent. The Custodian will, upon instructions from the Purchase Contract Agent, forward to each holder of Equity Units the amount it receives from the U.S. government in respect of each Treasury Strip underlying the Equity Units owned by such holder on the business day immediately following the date such Treasury Strip matures on February 15, May 15, August 15 and November 15 of each year, with such payments commencing on, and including, August 17, 2020, and ending on, and including, August 16, 2023. The Corporation expects that the amount payable per Equity Unit per full quarter as described in the immediately preceding sentence will be equal to $1.3750, which represents an annual rate of return on the stated amount per Equity Unit of 5.50%. The Corporation expects that the amount payable per Equity Unit on August 17, 2020 will be equal to $0.6875.

The Corporation will have no obligation, responsibility or liability with respect to the purchase of Treasury Strips and their delivery into the custody of the Custodian, the performance or non-performance of the duties of the Custodian or any payment of the Treasury Strips Components.

*Release of Debt Proceeds from Escrow*

As previously disclosed in Item 8.01 of the Debtors' Current Report on Form 8-K filed on June 19, 2020, on such date the Utility completed the sale of $8,925,000,000 aggregate principal amount of first mortgage bonds in a registered offering. As previously disclosed in Item 8.01 of the Debtors' Current Report on Form 8-K filed on June 23, 2020, on such date (i) the Corporation completed the sale of $2,000,000,000 aggregate principal amount of senior secured notes in a registered offering and (ii) the Corporation obtained a $2.75 billion secured term loan under the Corporation Term Loan Credit Agreement. The proceeds of these transactions (along with certain other funds provided by the Corporation and the Utility) were deposited into separate escrow accounts pursuant to separate escrow agreements. On the Effective Date, the Corporation and the Utility submitted release requests to the escrow agent, certifying that the escrow release provisions had occurred, and the proceeds and other amounts held in the escrow accounts were released to the Corporation and the Utility.

*Funding of the Public Entities Segregated Defense Fund*

On the Effective Date, the Debtors funded the Public Entities Segregated Defense Fund in accordance with the terms of the Public Entities Plan Support Agreements, as previously disclosed in Item 1.01 of the Debtors' Current Report on Form 8-K filed June 19, 2020 and also made a payment of $1.0 billion in cash to the public entities who are party to the Public Entities Plan Support Agreements.

*Funding of Subrogation Wildfire Trust*

On the Effective Date, the Debtors funded $100 million to the Subrogation Wildfire Trust and placed $10.895 million in a segregated escrow account established and owned by the Subrogation Wildfire Trust for the benefit of holders of Subrogation Wildfire Claims.

*Contribution to Go-Forward Wildfire Fund*

On the Effective Date, the Debtors contributed, in accordance with AB 1054, an initial contribution of approximately $4.8 billion and first annual contribution of approximately $193 million to the Go-Forward Wildfire Fund to secure participation of the Reorganized Debtors therein.

**Item 9.01.    Financial Statements and Exhibits.**

(d) Exhibits

| Exhibit Number | Description |
| --- | --- |
| 4.1 | Third Supplemental Indenture, dated as of July 1, 2020, to the Indenture of Mortgage, between Pacific Gas and Electric Company and The Bank of New York Mellon Trust Company, N.A., as trustee (including forms of the New Short-Term Bonds and the New Long-Term Bonds) |
| 4.2 | Fourth Supplemental Indenture, dated as of July 1, 2020, to the Indenture of Mortgage, between Pacific Gas and Electric Company and The Bank of New York Mellon Trust Company, N.A., as trustee (including forms of the Funded Debt Exchange Bonds) |
| 4.3 | Thirtieth Supplemental Indenture, dated as of July 1, 2020, to the Amended and Restated Indenture, dated as of April 22, 2005, between Pacific Gas and Electric Company and BOKF, N.A., as trustee (including forms of certain series of Reinstated Senior Notes) |
| 4.4 | First Supplemental Indenture, dated as of July 1, 2020, to the Indenture, dated as of November 29, 2017, between Pacific Gas and Electric Company and BOKF, N.A., as trustee (including forms of certain series of Reinstated Senior Notes) |
| 4.5 | Second Supplemental Indenture, dated as of July 1, 2020, to the Indenture, dated as of August 6, 2018, between Pacific Gas and Electric Company and BOKF, N.A., as trustee (including forms of certain series of Reinstated Senior Notes) |
| 4.6 | Second Supplemental Indenture, dated as of July 1, 2020, to the Indenture of Mortgage, between Pacific Gas and Electric Company and The Bank of New York Mellon Trust Company, N.A., as trustee (including forms of the Senior Notes Collateral Bonds) |
| 4.7 | Fifth Supplemental Indenture, dated as of July 1, 2020, to the Indenture of Mortgage, between Pacific Gas and Electric Company and The Bank of New York Mellon Trust Company, N.A., as trustee (including forms of the Credit Agreement Collateral Bonds) |
| 4.8 | Pledge Agreement, dated as of July 1, 2020, among PG&E Corporation, JPMorgan Chase Bank, N.A., as collateral agent, revolving administrative agent and term administrative agent, The Bank of New York Mellon Trust Company, N.A., and the secured representatives party thereto from time to time |
| 4.9 | Purchase Contract and Unit Agreement, dated July 1, 2020, between the Corporation and The Bank of New York Mellon Trust Company, N.A., as purchase contract agent and attorney-in-fact for the holders from time to time as provided therein |
| 4.10 | Form of Equity Unit (included in Exhibit 4.9) |
| 4.11 | Form of Purchase Contract (included in Exhibit 4.9) |
| 4.12 | Custodial Agreement, dated July 1, 2020, between The Bank of New York Mellon Trust Company, N.A., as purchase contract agent and The Bank of New York Mellon Trust Company, N.A., as custodian |
| 5.1 | Opinion of Hunton Andrews Kurth LLP |
| 5.2 | Opinion of Hunton Andrews Kurth LLP |
| 5.3 | Opinion of Cravath, Swaine & Moore LLP |
| 10.1 | Tax Benefits Payment Agreement between the Corporation and the Fire Victim Trust, dated July 1, 2020 |
| 10.2 | Registration Rights Agreement between the Fire Victim Trust and the Corporation, dated July 1, 2020 |
| 10.3 | Credit Agreement, dated as of July 1, 2020, among Pacific Gas and Electric Company, the several lenders from time to time party thereto, JPMorgan Chase Bank, N.A. and Citibank, N.A., as co-administrative agents, and Citibank, N.A., as designated agent. |
| 10.4 | Term Loan Credit Agreement, dated as of July 1, 2020, among Pacific Gas and Electric Company, the several lenders from time to time party thereto and JPMorgan Chase Bank, N.A., as administrative agent. |

| 10.5 | Credit Agreement, dated as of July 1, 2020, among PG&E Corporation, the several lenders from time to time party thereto, JPMorgan Chase Bank, N.A., as administrative agent, and JPMorgan Chase Bank, N.A., as collateral agent. |
| 23.1 | Consent of Hunton Andrews Kurth LLP (included in Exhibit 5.1) |
| 23.2 | Consent of Hunton Andrews Kurth LLP (included in Exhibit 5.2) |
| 23.3 | Consent of Cravath, Swaine & Moore LLP (included in Exhibit 5.3) |
| 99.1 | Written correspondence from Dominique Mielle concerning her resignation |
| 104 | Cover Page Interactive Data File - the cover page XBRL tags are embedded within the Inline XBRL document |

**Forward-Looking Statements**

This Current Report on Form 8-K includes forward-looking statements that are not historical facts, including statements about the beliefs, expectations, estimates, future plans and strategies of the Corporation and the Utility, including but not limited to the Plan and related financings and agreements. These statements are based on current expectations and assumptions, which management believes are reasonable, and on information currently available to management, but are necessarily subject to various risks and uncertainties. In addition to the risk that these assumptions prove to be inaccurate, factors that could cause actual results to differ materially from those contemplated by the forward-looking statements include factors disclosed in the Corporation and the Utility's Annual Report on Form 10-K for the year ended December 31, 2019, their Quarterly Report on Form 10-Q for the quarter ended March 31, 2020 and their subsequent reports filed with the Securities and Exchange Commission. The Corporation and the Utility undertake no obligation to publicly update or revise any forward-looking statements, whether due to new information, future events or otherwise, except to the extent required by law.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrants have duly caused this report to be signed on their behalf by the undersigned thereunto duly authorized.

**PG&E CORPORATION**

Date: July 2, 2020

By: /s/ JASON P. WELLS

Name: Jason P. Wells
Title: Executive Vice President and Chief Financial Officer

**PACIFIC GAS AND ELECTRIC COMPANY**

Date: July 2, 2020

By: /s/ JANET C. LODUCA

Name: Janet C. Loduca
Title: Senior Vice President and General Counsel

**Exhibit 4.1**

TO BE RECORDED AND WHEN
RECORDED RETURN TO:

Hunton Andrews Kurth LLP
550 South Hope Street, Suite 2000
Los Angeles, CA 90071
Attention: Robert M. Johnson, Esq.

---

**THIRD SUPPLEMENTAL INDENTURE**

**DATED AS OF JULY 1, 2020**

**SUPPLEMENT TO INDENTURE OF MORTGAGE**
**DATED AS OF JUNE 19, 2020**

———————————————

**PACIFIC GAS AND ELECTRIC COMPANY**
**ISSUER (MORTGAGOR)**

**AND**

**THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A.,**
**TRUSTEE (MORTGAGEE)**

———————————————

**TABLE OF CONTENTS**

| | PAGE |
|---|---|
| ARTICLE I DEFINITIONS | 2 |
| ARTICLE II ESTABLISHMENT OF 3.75% First Mortgage Bond due 2028 | 2 |
| ARTICLE III ESTABLISHMENT OF 3.45% First Mortgage Bond due 2025 | 3 |
| ARTICLE IV ESTABLISHMENT OF 4.95% First Mortgage Bond due 2050 | 3 |
| ARTICLE V ESTABLISHMENT OF 4.55% First Mortgage Bond due 2030 | 4 |
| ARTICLE VI issue of Exchange mortgage bondS | 4 |
| ARTICLE VII Global BONDS; Appointment of Depositary for Global BONDS | 4 |
| ARTICLE VIII No Sinking Fund | 5 |
| ARTICLE IX Paying Agent and Bond Registrar | 5 |
| ARTICLE X Trustee | 5 |
| ARTICLE XI MISCELLANEOUS | 5 |

EXHIBIT A FORM OF 3.75% FIRST MORTGAGE BOND DUE 2028
EXHIBIT B FORM OF 3.45% FIRST MORTGAGE BOND DUE 2025
EXHIBIT C FORM OF 4.95% FIRST MORTGAGE BOND DUE 2050
EXHIBIT D FORM OF 4.55% FIRST MORTGAGE BOND DUE 2030

i

**THIRD SUPPLEMENTAL INDENTURE**, dated as of July 1, 2020 (this "SUPPLEMENTAL INDENTURE"), by and between **PACIFIC GAS AND ELECTRIC COMPANY**, a California corporation (the "COMPANY"), and **THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A.**, a national banking association organized under the laws of the United States of America, as Trustee under the Mortgage Indenture (as hereinafter defined) (the "TRUSTEE").

## RECITALS OF THE COMPANY

A. The Company and the Trustee are parties to that certain Indenture of Mortgage, dated as of June 19, 2020 (together with all indentures supplemental thereto, the "MORTGAGE INDENTURE"), providing for the issuance by the Company of Bonds (as defined in the Mortgage Indenture) from time to time.

B. Under the Mortgage Indenture, the Company is authorized to issue unlimited series of Bonds and establish one or more series of Bonds at any time in accordance with the provisions of the Mortgage Indenture, and the terms of such series of Bonds may be described by a supplemental indenture executed by the Company and the Trustee.

C. The Company has heretofore executed and delivered to the 2005 Unsecured Note Trustee (as defined below) an Indenture, dated as of April 22, 2005 (the "Original 2005 Unsecured Indenture" and, as previously amended and supplemented, the "2005 Unsecured Indenture") between the Company and BOKF, N.A., as successor trustee (the "2005 Unsecured Note Trustee") pursuant to which the following series of unsecured notes have been issued:

(i) 2.45% Senior Notes due 2022 (the "2.45% Senior Notes due 2022");

(ii) 4.25% Senior Notes due 2021 (the "4.25% Senior Notes due 2021");

(iii) 3.25% Senior Notes due 2021 (the "3.25% Senior Notes due 2021");

(iv) 3.50% Senior Notes due 2020 (the "3.50% Senior Notes due 2020" and, collectively with the 2.45% Senior Notes due 2022, the 4.25% Senior Notes due 2021 and the 3.25% Senior Notes due 2021, the "Short-Term Exchange Notes");

(v) 5.125% Senior Notes due 2043 (the "5.125% Senior Notes due 2043");

(vi) 5.40% Senior Notes due 2040 (the "5.40% Senior Notes due 2040");

(vii) 6.25% Senior Notes due 2039 (the "6.25% Senior Notes due 2039");

(viii) 5.80% Senior Notes due 2037 (the "5.80% Senior Notes due 2037");

(ix) 6.05% Senior Notes due 2034 (the "6.05% Senior Notes due 2034"); and

(x) 6.35% Senior Notes due 2038 (the "6.35% Senior Notes due 2038" and, collectively with the 5.125% Senior Notes due 2043, the 5.40% Senior Notes due 2040, the 6.25% Senior Notes due 2039, the 5.80% Senior Notes due 2037 and the 6.05% Senior Notes due 2034, the "Long-Term Exchange Notes", and together with the Short-Term Exchange Notes, the "Exchange Notes").

D. Section 14.01(f) of the Mortgage Indenture provides that the Company and the Trustee may enter into an indenture supplemental to the Mortgage Indenture to establish the form or terms of Bonds of any series as contemplated by Sections 2.01 and 3.01 of the Mortgage Indenture.

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 19 of 1367

E. The Company desires in and by this Supplemental Indenture (i) to create two (2) series of Bonds designated as 3.75% First Mortgage Bond Due 2028 and 3.45% First Mortgage Bond Due 2025 (collectively, the "Short-Term Exchange Mortgage Bonds"), in the forms set forth in Exhibit A and Exhibit B, respectively, attached hereto, to be issued under the Mortgage Indenture and each such series of Short-Term Exchange Mortgage Bonds is to be in the aggregate of the outstanding principal amount of the applicable series of the Short-Term Exchange Notes, (ii) to create two (2) series of Bonds designated as 4.95% First Mortgage Bond Due 2050 and 4.55% First Mortgage Bond Due 2030 (collectively, the "Long-Term Exchange Mortgage Bonds" and, together with the Short-Term Exchange Mortgage Bonds, the "Exchange Mortgage Bonds"), in the forms set forth in Exhibit C and Exhibit D, respectively, attached hereto, to be issued under the Mortgage Indenture and each such series of Long-Term Exchange Mortgage Bonds is to be in the aggregate of the outstanding principal amount of the applicable series of the Long-Term Exchange Notes, (iii) to designate such series of Exchange Mortgage Bonds and set forth the maturity date or dates, interest rate or rates and establish the form or terms of such Exchange Mortgage Bonds and (iv) to deliver such series of Exchange Mortgage Bonds to the applicable holders of the Exchange Notes.

F. The execution and delivery of this Supplemental Indenture has been authorized by a Board Resolution (as defined in the Mortgage Indenture).

G. Concurrent with the execution hereof, the Company has caused its counsel to deliver to the Trustee an Officer's Certificate and Opinion of Counsel (as defined in the Mortgage Indenture) pursuant to Section 14.03 of the Mortgage Indenture.

H. The Company has done all things necessary to make this Supplemental Indenture a valid agreement of the Company in accordance with its terms.

**NOW**, **THEREFORE**, the Company and the Trustee agree, for the benefit of each other and the equal and proportionate benefit of all Holders of Exchange Mortgage Bonds, as follows:

## ARTICLE I

## DEFINITIONS

Unless the context otherwise requires, capitalized terms used but not defined herein have the meaning set forth in the Mortgage Indenture.

The words "herein," "hereof" and "hereunder" and other words of similar import refer to this Supplemental Indenture as a whole and not to any particular Article, Section or other subdivision.

## ARTICLE II

## ESTABLISHMENT OF 3.75% FIRST MORTGAGE BOND DUE 2028

SECTION 1. There is hereby created a twenty-sixth series of Bonds to consist of one Bond issued under and secured by the Mortgage Indenture, to be designated as "3.75% First Mortgage Bond Due 2028" of the Company ("Bond of the Twenty-Sixth Series"). The Bond of the Twenty-Sixth Series shall be fully registered in the name of and delivered to the holders from time to time of the Short-Term Exchange Notes.

(a) The Bond of the Twenty-Sixth Series shall be initially issued in the aggregate principal amount of $875,000,000.

(b) The Bond of the Twenty-Sixth Series shall be dated July 1, 2020. The Bond of the Twenty-Sixth Series shall mature on July 1, 2028, subject to prior redemption.

(c) Interest will accrue on the unpaid portion of the principal of the Bond of the Twenty-Sixth Series from its issue date until the entire principal amount of the Bond of the Twenty-Sixth Series is paid. The Bond of the Twenty-Sixth Series shall bear interest at the rate of 3.75% per annum.

(d) The payment or payments of the principal of and premium, if any, on the Bond of the Twenty-Sixth Series is as set forth in Exhibit A hereto.

2

(e) The Bond of the Twenty-Sixth Series shall be subject to redemption at the times and in the amounts as set forth in Exhibit A hereto.

SECTION 2. The form of the Bond of the Twenty-Sixth Series is set forth in Exhibit A hereto and is hereby incorporated herein and made a part hereof.

### ARTICLE III

### ESTABLISHMENT OF 3.45% FIRST MORTGAGE BOND DUE 2025

SECTION 1. There is hereby created a twenty-seventh series of Bonds to consist of one Bond issued under and secured by the Mortgage Indenture, to be designated as "3.45% First Mortgage Bond Due 2025" of the Company ("Bond of the Twenty-Seventh Series"). The Bond of the Twenty-Seventh Series shall be fully registered in the name of and delivered to the holders from time to time of the Short-Term Exchange Notes

(a) The Bond of the Twenty-Seventh Series shall be initially issued in the aggregate principal amount of $875,000,000.

(b) The Bond of the Twenty-Seventh Series shall be dated July 1, 2020. The Bond of the Twenty-Seventh Series shall mature on July 1, 2025, subject to prior redemption.

(c) Interest will accrue on the unpaid portion of the principal of the Bond of the Twenty-Seventh Series from its issue date until the entire principal amount of the Bond of the Twenty-Seventh Series is paid. The Bond of the Twenty-Seventh Series shall bear interest at the rate of 3.45% per annum.

(d) The payment or payments of the principal of and premium, if any, on the Bond of the Twenty-Seventh Series is as set forth in Exhibit B hereto.

(e) The Bond of the Twenty-Seventh Series shall be subject to redemption at the times and in the amounts as set forth in Exhibit B hereto.

SECTION 2. The form of the Bond of the Twenty-Seventh Series is set forth in Exhibit B hereto and is hereby incorporated herein and made a part hereof.

### ARTICLE IV

### ESTABLISHMENT OF 4.95% FIRST MORTGAGE BOND DUE 2050

SECTION 1. There is hereby created a twenty-eighth series of Bonds to consist of one Bond issued under and secured by the Mortgage Indenture, to be designated as "4.95% First Mortgage Bond Due 2050" of the Company ("Bond of the Twenty-Eighth Series"). The Bond of the Twenty-Eighth Series shall be fully registered in the name of and delivered to the holders from time to time of the Long-Term Exchange Notes.

(a) The Bond of the Twenty-Eighth Series shall be initially issued in the aggregate principal amount of $3,100,000,000.

(b) The Bond of the Twenty-Eighth Series shall be dated July 1, 2020. The Bond of the Twenty-Eighth Series shall mature on July 1, 2050, subject to prior redemption.

(c) Interest will accrue on the unpaid portion of the principal of the Bond of the Twenty-Eighth Series from its issue date until the entire principal amount of the Bond of the Twenty-Eighth Series is paid. The Bond of the Twenty-Eighth Series shall bear interest at the rate of 4.95% per annum.

(d) The payment or payments of the principal of and premium, if any, on the Bond of the Twenty-Eighth Series shall be equal to the principal of and premium is as set forth in Exhibit C hereto.

(e) The Bond of the Twenty-Eighth Series shall be subject to redemption at the times and in the amounts as set forth in Exhibit C hereto.

SECTION 2. The form of the Bond of the Twenty-Eighth Series is set forth in Exhibit C hereto and is hereby incorporated herein and made a part hereof.

# ARTICLE V

## ESTABLISHMENT OF 4.55% FIRST MORTGAGE BOND DUE 2030

SECTION 1. There is hereby created a twenty-ninth series of Bonds to consist of one Bond issued under and secured by the Mortgage Indenture, to be designated as "4.55% First Mortgage Bond Due 2030" of the Company ("Bond of the Twenty-Ninth Series"). The Bond of the Twenty-Ninth Series shall be fully registered in the name of and delivered to the holders from time to time of the Long-Term Exchange Notes.

(a) The Bond of the Twenty-Ninth Series shall be initially issued in the aggregate principal amount of $3,100,000,000.

(b) The Bond of the Twenty-Ninth Series shall be dated July 1, 2020. The Bond of the Twenty-Ninth Series shall mature on July 1, 2030, subject to prior redemption.

(c) Interest will accrue on the unpaid portion of the principal of the Bond of the Twenty-Ninth Series from its issue date until the entire principal amount of the Bond of the Twenty-Ninth Series is paid. The Bond of the Twenty-Ninth Series shall bear interest at the rate of 4.55% per annum.

(d) The payment or payments of the principal of and premium, if any, on the Bond of the Twenty-Ninth Series shall be equal to the principal of and premium is as set forth in Exhibit D hereto.

(e) The Bond of the Twenty-Ninth Series shall be subject to redemption at the times and in the amounts as set forth in Exhibit D hereto.

SECTION 2. The form of the Bond of the Twenty-Ninth Series is set forth in Exhibit D hereto and is hereby incorporated herein and made a part hereof.

# ARTICLE VI

## ISSUE OF EXCHANGE MORTGAGE BONDS

SECTION 1. Each series of the Exchange Mortgage Bonds may be executed, authenticated and delivered as permitted by the provisions of Section 5.02, 5.03 or 5.04 of the Mortgage Indenture.

# ARTICLE VII

## GLOBAL BONDS; APPOINTMENT OF DEPOSITARY FOR GLOBAL BONDS

The Exchange Mortgage Bonds shall be issued in the form of one or more permanent Global Bonds as provided in Section 3.14 of the Mortgage Indenture and deposited with, or on behalf of, the Depositary or with the Trustee, as custodian for the Depositary, duly executed by the Company and authenticated by the Trustee as hereinafter provided.

The Company hereby initially appoints The Depository Trust Company ("DTC") to act as the Depositary with respect to all Exchange Mortgage Bonds, and the Exchange Mortgage Bonds shall initially be registered in the name of Cede & Co., as the nominee of DTC.

4

None of the Company, the Trustee, any Paying Agent or any Bond Registrar will have any responsibility or liability for any aspect of Depositary records relating to, or payments made on account of, beneficial ownership interests in a Global Bond or for maintaining, supervising or reviewing any Depositary records relating to such beneficial ownership interests, or for transfers of beneficial interests in the Exchange Mortgage Bonds or any transactions between the Depositary and beneficial owners.

## ARTICLE VIII

### NO SINKING FUND

No sinking fund is provided for any of the Exchange Mortgage Bonds.

## ARTICLE IX

### PAYING AGENT AND BOND REGISTRAR

The Trustee is hereby appointed as initial Paying Agent and initial Bond Registrar for the Exchange Mortgage Bonds.

## ARTICLE X

### TRUSTEE

SECTION 1. The Trustee shall not be responsible in any manner whatsoever for or in respect of the validity or sufficiency of this Supplemental Indenture or the due execution hereof by the Company, or for or in respect of the recitals and statements contained herein, all of which recitals and statements are made solely by the Company.

Except as herein otherwise provided, no duties, responsibilities or liabilities are assumed, or shall be construed to be assumed, by the Trustee by reason of this Supplemental Indenture other than as set forth in the Mortgage Indenture; and this Supplemental Indenture is executed and accepted on behalf of the Trustee, subject to all the terms and conditions set forth in the Mortgage Indenture, as fully to all intents as if the same were herein set forth at length.

## ARTICLE XI

### MISCELLANEOUS

SECTION 1. Except insofar as herein otherwise expressly provided, all the provisions, definitions, terms and conditions of the Mortgage Indenture, as amended, shall be deemed to be incorporated in, and made a part of, this Supplemental Indenture; and the Mortgage Indenture as supplemented and amended by this Supplemental Indenture is in all respects ratified and confirmed; and the Mortgage Indenture and this Supplemental Indenture shall be read, taken and construed as one and the same instrument.

SECTION 2. Nothing in this Supplemental Indenture is intended, or shall be construed to give to any person or corporation, other than the parties hereto and the holders of the Exchange Mortgage Bonds issued and to be issued under and in respect of this Supplemental Indenture, or under any covenant, condition or provision herein contained, all the covenants, conditions and provisions of this Supplemental Indenture being intended to be, and being, for the sole and exclusive benefit of the parties hereto and of the holders of the Exchange Mortgage Bonds issued and to be issued under the Mortgage Indenture and secured thereby.

SECTION 3. All covenants, stipulations and agreements in this Supplemental Indenture contained by or on behalf of the Company shall bind and (subject to the provisions of the Mortgage Indenture) inure to the benefit of its successors and assigns, whether so expressed or not.

5

SECTION 4. The headings of the several Articles of this Supplemental Indenture are inserted for convenience of reference, and shall not be deemed to be any part hereof.

SECTION 5. This Supplemental Indenture shall be effective upon the execution and delivery hereof by each of the parties hereto.

SECTION 6. This Supplemental Indenture may be executed in any number of counterparts, and each of such counterparts shall together constitute but one and the same instrument. Delivery of an executed Supplemental Indenture by one party to the other may be made by facsimile, electronic mail (including any electronic signature complying with the New York Electronic Signatures and Records Act (N.Y. State Tech. §§ 301-309), as amended from time to time, or other applicable law) or other transmission method, and the parties hereto agree that any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

SECTION 7. The laws of the State of New York shall govern this Supplemental Indenture and the Exchange Mortgage Bonds, without giving effect to applicable principles of conflicts of law to the extent that the application of the laws of another jurisdiction would be required thereby.

SECTION 8. In case any provision in this Supplemental Indenture or the Exchange Mortgage Bond shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

**IN WITNESS WHEREOF**, the parties hereto have caused this Supplemental Indenture to be duly executed by their respective officers hereunto duly authorized, all as of the day and year first above written.

<div align="right">

**PACIFIC GAS AND ELECTRIC COMPANY,**
as Issuer (Mortgagor)

By: /s/ Margaret K. Becker
Name: Margaret K. Becker
Title: Senior Director and Treasurer

**THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A.,**
as Trustee (Mortgagee)

By: /s/ Charles G. Nelson
Name: Charles G. Nelson
Title: Vice President

</div>

[Signature Page to Supplemental Indenture]

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA        }
                           }
COUNTY OF SAN              }
FRANCISCO

On June 4, 2020, before me, Jolie F. Ocampo, personally appeared Margaret K. Becker, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

/s/ Jolie F. Ocampo
Signature

Jolie Franchesca Ocampo
Notary Public – California
San Francisco County
Commission #2221172
My Comm. Expires Dec. 6, 2021

(Seal)

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF FLORIDA       }

                                     }

COUNTY OF DUVAL       }

On June 30, 2020, before me, Joshua P. Kakareka, personally appeared Charles G. Nelson, a Vice President of The Bank of New York Mellon Trust Company, N.A. and who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

/s/ Joshua P. Kakareka
Joshua P. Kakareka
Notary Public
State of Florida
Comm# GG931852
Expires 11/13/2023

(Seal)

**EXHIBIT A**

**[FORM OF BOND OF THE TWENTY-SIXTH SERIES]**

**[FORM OF FACE OF BOND]**

THIS BOND IS A GLOBAL BOND WITHIN THE MEANING OF THE MORTGAGE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF A DEPOSITARY (AS DEFINED IN THE MORTGAGE INDENTURE) OR A NOMINEE THEREOF. THIS GLOBAL BOND IS EXCHANGEABLE FOR BONDS REGISTERED IN THE NAME OF ANY PERSON OTHER THAN SUCH DEPOSITARY OR ITS NOMINEE ONLY IN LIMITED CIRCUMSTANCES DESCRIBED IN THE MORTGAGE INDENTURE AND, UNLESS AND UNTIL IT IS EXCHANGED IN WHOLE OR IN PART FOR BONDS IN CERTIFICATED FORM, THIS GLOBAL BOND MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY, OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY, OR BY THE DEPOSITARY OR ANY SUCH NOMINEE TO A SUCCESSOR DEPOSITARY OR A NOMINEE OF SUCH SUCCESSOR DEPOSITARY.

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE COMPANY (AS DEFINED BELOW) OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY BOND ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

THE FOLLOWING SUMMARY OF TERMS IS SUBJECT TO THE INFORMATION SET FORTH ON THE REVERSE HEREOF:

| | | |
|---|---|---|
| PRINCIPAL AMOUNT:<br>$_____ | ORIGINAL ISSUE DATE:<br>July 1, 2020 | INTEREST RATE:<br>3.75% |
| MATURITY DATE:<br>July 1, 2028 | INTEREST PAYMENT DATES:<br>January 1 and July 1 of each year, commencing<br>January 1, 2021 | THIS BOND IS A:<br>☒ Global Book-Entry Bond<br>☐ Certificated Bond |

REGISTERED OWNER: Cede & Co., as nominee of The Depository Trust Company

A-1

3.75% FIRST MORTGAGE BOND DUE 2028

No. _____                                                    Principal Amount: $_____

CUSIP No: _____

PACIFIC GAS AND ELECTRIC COMPANY, a corporation duly organized and existing under the laws of the State of California (herein called the "Company," which term includes any successor Person pursuant to the applicable provisions of the Mortgage Indenture hereinafter referred to), for value received, hereby promises to pay to Cede & Co., as nominee for The Depository Trust Company, or registered assigns, the Principal Amount stated above on the Maturity Date stated above, and to pay interest thereon from and including July 2, 2020 or, in the case of a 3.75% First Mortgage Bond Due 2028 issued upon the registration of transfer or exchange, from and including the most recent Interest Payment Date to which interest has been paid or duly provided for, semi-annually in arrears on the Interest Payment Dates set forth above and on the Maturity Date stated above, commencing January 1, 2021, at the rate of 3.75% per annum until the principal hereof is paid or made available for payment). The interest so payable, and punctually paid or duly provided for, on any Interest Payment Date will, as provided in such Mortgage Indenture, be paid to the Person in whose name this 3.75% First Mortgage Bond Due 2028 (this "Bond") (or one or more Predecessor Bonds) is registered at the close of business on the Regular Record Date for such interest, which shall be the 15th day of the month next preceding such Interest Payment Date; provided, however, that interest payable at the Maturity Date or on a Redemption Date will be paid to the Person to whom principal is payable. Any such interest not so punctually paid or duly provided for will forthwith cease to be payable to the Holder on such Regular Record Date and may either be paid to the Person in whose name this Bond (or one or more Predecessor Bonds) is registered at the close of business on a Special Record Date for the payment of such Defaulted Interest to be fixed by the Trustee, notice whereof shall be given to Holders of Bonds of this series not less than 10 days prior to such Special Record Date, or be paid at any time in any other lawful manner not inconsistent with the requirements of the Mortgage Indenture and any securities exchange, if any, on which the Bonds of this series may be listed, and upon such notice as may be required by any such exchange, all as more fully provided in said Mortgage Indenture.

Payments of interest on this Bond will include interest accrued to but excluding the respective Interest Payment Dates. Interest payments for this Bond shall be computed and paid on the basis of the 360-day year of twelve 30-day months and will accrue from July 2, 2020 or from the most recent Interest Payment Date to which interest has been paid or duly provided for. In the event that any date on which interest is payable on this Bond (other than the Maturity Date) is not a Business Day, then payment of the interest payable on such date will be made on the next succeeding day that is a Business Day (and without any interest or payment in respect of any such delay) with the same force and effect as if made on the date the payment was originally payable. If the Maturity Date falls on a day that is not a Business Day, the payment of principal, premium, if any, and interest may be made on the next succeeding Business Day, and no interest on such payment shall accrue for the period from and after maturity.

Payment of principal of, premium, if any, and interest on the Bonds of this series shall be made in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts. Payments of principal of, premium, if any, and interest on the Bonds of this series represented by a Global Bond shall be made by wire transfer of immediately available funds to the Holder of such Global Bond, provided that, in the case of payments of principal and premium, if any, such Global Bond is first surrendered to the Paying Agent. If any of the Bonds of this series are no longer represented by a Global Bond, (i) payments of principal, premium, if any, and interest due on the Maturity Date or earlier redemption of such Bonds shall be made at the office of the Paying Agent upon surrender of such Bonds to the Paying Agent, and (ii) payments of interest shall be made, at the option of the Company, subject to such surrender where applicable, (A) by check mailed to the address of the Person entitled thereto as such address shall appear in the Bond Register or (B) by wire transfer to registered Holders of at least $10,000,000 in principal amount of Bonds at such place and to such account at a banking institution in the United States as such Holders may designate in writing to the Trustee at least sixteen (16) days prior to the date for payment.

A-2

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 29
of 1367

REFERENCE IS HEREBY MADE TO THE FURTHER PROVISIONS OF THIS BOND SET FORTH ON THE REVERSE HEREOF, WHICH FURTHER PROVISIONS SHALL FOR ALL PURPOSES HAVE THE SAME EFFECT AS IF SET FORTH AT THIS PLACE.

A-3

Unless the certificate of authentication hereon has been executed by the Trustee referred to on the reverse hereof by manual signature, this Bond shall not be entitled to any benefit under the Mortgage Indenture or be valid or obligatory for any purpose.

**IN WITNESS WHEREOF**, the Company has caused this instrument to be duly executed.

Dated: _____

<div align="right">

**PACIFIC GAS AND ELECTRIC COMPANY**

By _____

By _____

</div>

A-4

**TRUSTEE'S CERTIFICATE OF AUTHENTICATION**

This is one of the Bonds of the series designated as Bonds of the Twenty-Sixth Series referred to in the within-mentioned Mortgage Indenture.

_____

_____,

As Trustee

By _____

Authorized Signatory

A-5

**[FORM OF REVERSE OF BOND OF THE TWENTY-SIXTH SERIES]**

This 3.75% First Mortgage Bond due 2028 is one of a duly authorized issue of Bonds of the Company (the "<u>Bonds</u>"), issued and issuable in one or more series under and equally secured by an Indenture of Mortgage, dated as of June 19, 2020 (such Indenture of Mortgage as originally executed and delivered and as supplemented or amended from time to time thereafter, together with any constituent instruments establishing the terms of particular Bonds, being herein called the "<u>Mortgage Indenture</u>"), between the Company and The Bank of New York Mellon Trust Company, N.A., as Trustee (herein called the "<u>Trustee</u>," which term includes any successor trustee under the Mortgage Indenture), and reference is hereby made to the Mortgage Indenture for a description of the property mortgaged, pledged and held in trust, the nature and extent of the security and the respective rights, limitations of rights, duties and immunities of the Company, the Trustee and the Holders of Bonds thereunder and of the terms and conditions upon which Bonds are, and are to be, authenticated and delivered. The acceptance of this Bond shall be deemed to constitute the consent and agreement by the Holder hereof to all of the terms and provisions of the Mortgage Indenture.

Subject to the terms and conditions of the Mortgage Indenture, the Bonds of this series are also redeemable at the option of the Company ("<u>Optional Redemption</u>"), in whole or in part, at any time after the Original Issue Date and prior to the Maturity Date, at a redemption price equal to the greater of:

(a) 100% of the principal amount of the Bonds of this series to be redeemed; or

(b) as determined by the Independent Investment Banker, the sum of the present values of the Remaining Scheduled Payments on the Bonds of this series to be so redeemed (not including any portion of such payments of interest accrued to the Redemption Date) discounted to the Redemption Date on a semi-annual basis (assuming a 360-day year consisting of twelve 30-day months) at the Adjusted Treasury Rate, plus 0.25%,

plus, in either of the above cases, accrued and unpaid interest on the principal amount of the Bonds of this series being redeemed to but not including the Redemption Date.

For the purposes of this Bond:

"Adjusted Treasury Rate" means, with respect to any Redemption Date on which any Bonds are being redeemed:

(a) the yield, under the heading which represents the average for the immediately preceding week, appearing in the most recently published statistical release designated "H.15(519) Selected Interest Rates" or any successor publication that is published weekly by the Board of Governors of the Federal Reserve System and that establishes yields on actively traded United States treasury securities adjusted to constant maturity under the caption "Treasury Constant Maturities" for the maturity corresponding to the Comparable Treasury Issue (if no maturity is within three months before or after the Remaining Life, yields for the two published maturities most closely corresponding to the Comparable Treasury Issue will be determined and the Adjusted Treasury Rate will be interpolated or extrapolated from such yields on a straight line basis, rounding to the nearest month); or

(b) if such release (or any successor publication) is not published during the week preceding the calculation date or does not contain such yields, the rate per annum equal to the semi-annual equivalent yield to maturity of the Comparable Treasury Issue (expressed as a percentage of its principal amount) equal to the Comparable Treasury Price for such Redemption Date.

The Adjusted Treasury Rate will be calculated on the third Business Day preceding the Redemption Date.

"Business Day" means any day, other than a Saturday or Sunday, which is not a day on which banking institutions or trust companies in (i) any place of payment or other location specified in the Bonds or the Mortgage Indenture or (ii) the location of the Company's principal place of business or the Corporate Trust Office of the Trustee, are generally authorized or required by law, regulation or executive order to remain closed, except as may be otherwise specified as contemplated by the Mortgage Indenture.

"Comparable Treasury Issue" means the United States Treasury security selected by the Independent Investment Banker as having a maturity comparable to the Remaining Life of the Bonds to be redeemed that would be utilized, at the time of selection and in accordance with customary financial practice, in pricing new issues of corporate debt securities of comparable maturity to the Remaining Life of the Bonds to be redeemed.

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 33 of 1367

"Comparable Treasury Price" means, with respect to any Redemption Date on which the Bonds are being redeemed, (a) the average of five (5) Reference Treasury Dealer Quotations for such Redemption Date, after excluding the highest and lowest Reference Treasury Dealer Quotations, or (b) if the Independent Investment Banker obtains fewer than five (5) such Reference Treasury Dealer Quotations, the average of all quotations obtained.

"Dealer" means a primary U.S. Government Securities dealer in the United States.

"Independent Investment Banker" means a Dealer appointed by the Company.

"Reference Treasury Dealer" means Barclays Capital Inc., J.P. Morgan Securities LLC, the Independent Investment Banker and Dealers acceptable to the Independent Investment Banker and their respective successors; provided, however, that if any of the foregoing shall cease to be a Dealer, the Company will select a substitute Dealer.

"Reference Treasury Dealer Quotations" means, with respect to each Reference Treasury Dealer and any Redemption Date, the average, as determined by the Independent Investment Banker, of the bid and asked prices for the Comparable Treasury Issue (expressed in each case as a percentage of its principal amount) quoted in writing to the Independent Investment Banker at 5:00 p.m., New York City time, on the third Business Day preceding such Redemption Date.

"Remaining Life," as of any date of calculation, means the remaining term of the Bonds.

"Remaining Scheduled Payments" means, with respect to the Bonds that the Company is redeeming, the remaining scheduled payments of principal and interest that would be due after the applicable Redemption Date if such Bond were not redeemed. However, if the Redemption Date is not a scheduled Interest Payment Date with respect to that Bond, the amount of the next succeeding scheduled interest payment on that Bond will be reduced by the amount of interest accrued on such Bond to the Redemption Date.

"U.S. Government Securities" means securities which are (a) direct obligations of the United States of America for the payment on which its full faith and credit is pledged or (b) obligations of a Person controlled or supervised by and acting as an agency or instrumentality of the United States of America the payment of which is unconditionally guaranteed as a full faith and credit obligation of the United States of America, and which in the case of (a) and (b) are not callable or redeemable at the option of the issuer thereof, and shall also include a depository receipt issued by a bank or trust company as custodian with respect to any such U.S. Government Security or a specific payment of interest on or principal of any such U.S. Government Security held by such custodian for the account of the holder of a depository receipt, provided that (except as required by law) such custodian is not authorized to make any deduction from the amount payable to the holder of such depository receipt from any amount received by the custodian in respect of the U.S. Government Security evidenced by such depository receipt.

Interest installments whose Stated Maturity is on or prior to such Redemption Date will be payable to Holders of such Bonds of this series, or one or more Predecessor Bonds, of record at the close of business on the relevant Record Dates referred to on the face hereof, all as provided in the Mortgage Indenture.

In the case of an Optional Redemption, notice of redemption will be in writing and sent not less than 30 days nor more than 60 days prior to the Redemption Date to each Holder of Bonds of this series to be redeemed at the Holder's registered address. If money sufficient to pay the redemption price of all Bonds of this series (or portions thereof) to be redeemed on the Redemption Date is deposited with the Paying Agent or the Trustee on or prior to the Redemption Date, from and after such Redemption Date such Bonds or portions thereof shall cease to bear interest. The Bonds of this series in denominations larger than $1,000 in principal amount may be redeemed in part but only in integral multiples of $1,000.

In the event of redemption of this Bond in part only, a new Bond or Bonds of this series and of like tenor for the unredeemed portion hereof will be issued in the name of the Holder hereof upon the surrender hereof.

A-7

As provided in the Mortgage Indenture and subject to certain limitations therein set forth, this Bond or any portion of the principal amount hereof will be deemed to have been paid for all purposes of the Mortgage Indenture and to be no longer Outstanding thereunder, and the Company's entire indebtedness in respect thereof will be satisfied and discharged, if there has been irrevocably deposited with the Trustee or any Paying Agent (other than the Company), in trust, money in an amount which will be sufficient and/or Eligible Obligations, the principal of and interest on which when due, without regard to any reinvestment thereof, will provide moneys which, together with money, if any, deposited with or held by the Trustee or such Paying Agent, will be sufficient to pay when due the principal of and premium, if any, and interest on this Bond when due.

If an Event of Default shall occur and be continuing, the Trustee or the Holders of not less than 25% in aggregate principal amount of the Bonds then Outstanding, considered as one class, may declare the principal amount of all Bonds then Outstanding to be due and payable immediately by notice in writing to the Company (and to the Trustee if given by Holders); *provided*, *however*, that with respect to certain Events of Default relating to bankruptcy, insolvency and similar events, the principal amount of all Bonds then Outstanding shall be due and payable immediately without further action by the Trustee or the Holders.

The Mortgage Indenture permits, with certain exceptions as therein provided, the Company and the Trustee to enter into one or more supplemental indentures for the purpose of adding any provisions to, or changing in any manner or eliminating any of the provisions of, the Mortgage Indenture with the consent of the Holders of not less than a majority in aggregate principal amount of the Bonds at the time Outstanding, considered as one class; *provided*, *however*, that if there shall be Bonds of more than one series Outstanding under the Mortgage Indenture and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such series, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all series so directly affected, considered as one class, shall be required; and *provided*, *further*, that if the Bonds of any series shall have been issued in more than one Tranche and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such Tranches, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all Tranches so directly affected, considered as one class, shall be required; and *provided*, *further*, that the Mortgage Indenture permits the Company and the Trustee to enter into one or more supplemental indentures for certain purposes without the consent of any Holders of Bonds. The Mortgage Indenture also contains provisions permitting the Holders of a majority in aggregate principal amount of Bonds, on behalf of the Holders of all such Bonds, to waive certain past defaults under the Mortgage Indenture and their consequences. Any such consent or waiver by the Holder of this Bond shall be conclusive and binding upon such Holder and upon all future Holders of this Bond and of any Bond issued upon the registration of transfer hereof or in exchange herefor or in lieu hereof, whether or not notation of such consent or waiver is made upon this Bond.

As provided in and subject to the provisions of the Mortgage Indenture, the Holder of this Bond shall not have the right to institute any proceeding with respect to the Mortgage Indenture or for the appointment of a receiver or trustee or for any other remedy thereunder, unless such Holder shall have previously given the Trustee written notice of a continuing Event of Default, the Holders of at least 25% in aggregate principal amount of the Bonds at the time Outstanding shall have made written request to the Trustee to institute proceedings in respect of such Event of Default as Trustee and offered the Trustee reasonable indemnity, and the Trustee shall not have received from the Holders of at least a majority in aggregate principal amount of Bonds at the time Outstanding a direction inconsistent with such written request, and shall have failed to institute any such proceeding for 60 days after receipt of such notice, request and offer of indemnity. The foregoing shall not apply to any suit instituted by the Holder of this Bond for the enforcement of any payment of principal hereof or any premium or interest hereon on or after the respective due dates expressed herein.

No reference herein to the Mortgage Indenture and no provision of this Bond or of the Mortgage Indenture shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal of and any premium and interest on this Bond at the times, place and rate, and in the coin or currency, herein prescribed.

A-8

As provided in the Mortgage Indenture and subject to certain limitations therein set forth, the transfer of this Bond is registrable in the Bond Register, upon surrender of this Bond for registration of transfer at the office or agency of the Company in any place where the principal of and any premium and interest on this Bond are payable, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Company, the Trustee or the Bond Registrar, as the case may be, duly executed by the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new Bonds of this series and of like tenor, of authorized denominations and for the same aggregate principal amount, will be issued to the designated transferee or transferees.

The Bonds of the Twenty-Sixth Series are issuable only in registered form without coupons in denominations of $1,000 and any integral multiple thereof. As provided in the Mortgage Indenture and subject to certain limitations therein set forth, Bonds of this series are exchangeable for a like aggregate principal amount of Bonds of this series and of like tenor of a different authorized denomination, as requested by the Holders surrendering the same.

No service charge shall be made for any such registration of transfer or exchange, but the Company may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

The Company shall not be required to execute or to provide for the registration of the transfer of or the exchange of (A) any Bond of this series during a period of 15 days immediately preceding the date notice is to be given identifying the serial numbers (or with respect to Global Bonds, CUSIP numbers) of the Bonds of this series called for redemption, or (B) any Bond of this series selected for redemption in whole or in part, except the unredeemed portion of any Bond of this series being redeemed in part.

Prior to due presentment of this Bond for registration of transfer, the Company, the Trustee and any agent of the Company or the Trustee may treat the Person in whose name this Bond is registered as the owner hereof for all purposes, whether or not this Bond is overdue, and neither the Company, the Trustee nor any such agent shall be affected by notice to the contrary.

This Bond shall be governed by, and construed and enforced in accordance with, the laws of the State of New York without regard to the principles of conflicts of laws thereunder, except to the extent that the Trust Indenture Act shall be applicable.

As provided in the Mortgage Indenture, no recourse shall be had for the payment of the principal of, premium, if any, or interest with respect to this Bond, or any part thereof, or for any claim based hereon or otherwise in respect hereof, or of the indebtedness represented hereby, or upon any obligation, covenant or agreement under the Mortgage Indenture, against any incorporator, shareholder, officer or director, as such, past, present or future, of the Company or of any predecessor or successor corporation (either directly or through the Company or a predecessor or successor corporation), whether by virtue of any constitutional provision, statute or rule of law or by the enforcement of any assessment or penalty or otherwise; it being expressly agreed and understood that the Mortgage Indenture and all the Bonds are solely corporate obligations and that any such personal liability is hereby expressly waived and released as a condition of, and as part of the consideration for, the execution of the Mortgage Indenture and the issuance of this Bond.

All terms used in this Bond which are not defined herein shall have the meanings assigned to them in the Mortgage Indenture.

A-9

**ASSIGNMENT FORM**

To assign this Bond, fill in the form below: (I) or (we) assign and transfer this Bond to

_____

(Insert assignee's soc. sec. or tax I.D. no.)

_____

_____

_____

_____

(Print or type assignee's name, address and zip code)

and irrevocably appoint _____

to transfer this Bond on the books of the Company. The agent may substitute another to act for him.

Date: _____

Your signature: _____
(Sign exactly as your name appears on the face of this Bond)

Tax Identification No.:

SIGNATURE GUARANTEE:

_____

Signatures must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Bond Registrar, which requirements include membership or participation in the Security Transfer Agent Medallion Program ("STAMP") or such other "signature guarantee program" as may be determined by the Bond Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

A-10

**EXHIBIT B**

**[FORM OF BOND OF THE TWENTY-SEVENTH SERIES]**

**[FORM OF FACE OF BOND]**

THIS BOND IS A GLOBAL BOND WITHIN THE MEANING OF THE MORTGAGE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF A DEPOSITARY (AS DEFINED IN THE MORTGAGE INDENTURE) OR A NOMINEE THEREOF. THIS GLOBAL BOND IS EXCHANGEABLE FOR BONDS REGISTERED IN THE NAME OF ANY PERSON OTHER THAN SUCH DEPOSITARY OR ITS NOMINEE ONLY IN LIMITED CIRCUMSTANCES DESCRIBED IN THE MORTGAGE INDENTURE AND, UNLESS AND UNTIL IT IS EXCHANGED IN WHOLE OR IN PART FOR BONDS IN CERTIFICATED FORM, THIS GLOBAL BOND MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY, OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY, OR BY THE DEPOSITARY OR ANY SUCH NOMINEE TO A SUCCESSOR DEPOSITARY OR A NOMINEE OF SUCH SUCCESSOR DEPOSITARY.

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE COMPANY (AS DEFINED BELOW) OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY BOND ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

THE FOLLOWING SUMMARY OF TERMS IS SUBJECT TO THE INFORMATION SET FORTH ON THE REVERSE HEREOF:

| PRINCIPAL AMOUNT: | ORIGINAL ISSUE DATE: | INTEREST RATE: |
|---|---|---|
| $_____ | July 1, 2020 | 3.45% |
| MATURITY DATE: | INTEREST PAYMENT DATES: | THIS BOND IS A: |
| July 1, 2025 | January 1 and July 1 of each year, commencing January 1, 2021 | ☒ Global Book-Entry Bond<br>☐ Certificated Bond |

REGISTERED OWNER: Cede & Co., as nominee of The Depository Trust Company

A-1

No. _____                                                                                   Principal Amount: $_____

CUSIP No: _____

    PACIFIC GAS AND ELECTRIC COMPANY, a corporation duly organized and existing under the laws of the State of California (herein called the "Company," which term includes any successor Person pursuant to the applicable provisions of the Mortgage Indenture hereinafter referred to), for value received, hereby promises to pay to Cede & Co., as nominee for The Depository Trust Company, or registered assigns, the Principal Amount stated above on the Maturity Date stated above, and to pay interest thereon from and including July 2, 2020 or, in the case of a 3.45% First Mortgage Bond Due 2025 issued upon the registration of transfer or exchange, from and including the most recent Interest Payment Date to which interest has been paid or duly provided for, semi-annually in arrears on the Interest Payment Dates set forth above and on the Maturity Date stated above, commencing January 1, 2021 at the rate of 3.45% per annum until the principal hereof is paid or made available for payment). The interest so payable, and punctually paid or duly provided for, on any Interest Payment Date will, as provided in such Mortgage Indenture, be paid to the Person in whose name this 3.45% First Mortgage Bond Due 2025 (this "Bond") (or one or more Predecessor Bonds) is registered at the close of business on the Regular Record Date for such interest, which shall be the 15th day of the month next preceding such Interest Payment Date; provided, however, that interest payable at the Maturity Date or on a Redemption Date will be paid to the Person to whom principal is payable. Any such interest not so punctually paid or duly provided for will forthwith cease to be payable to the Holder on such Regular Record Date and may either be paid to the Person in whose name this Bond (or one or more Predecessor Bonds) is registered at the close of business on a Special Record Date for the payment of such Defaulted Interest to be fixed by the Trustee, notice whereof shall be given to Holders of Bonds of this series not less than 10 days prior to such Special Record Date, or be paid at any time in any other lawful manner not inconsistent with the requirements of the Mortgage Indenture and any securities exchange, if any, on which the Bonds of this series may be listed, and upon such notice as may be required by any such exchange, all as more fully provided in said Mortgage Indenture.

    Payments of interest on this Bond will include interest accrued to but excluding the respective Interest Payment Dates. Interest payments for this Bond shall be computed and paid on the basis of the 360-day year of twelve 30-day months and will accrue from July 2, 2020 or from the most recent Interest Payment Date to which interest has been paid or duly provided for. In the event that any date on which interest is payable on this Bond (other than the Maturity Date) is not a Business Day, then payment of the interest payable on such date will be made on the next succeeding day that is a Business Day (and without any interest or payment in respect of any such delay) with the same force and effect as if made on the date the payment was originally payable. If the Maturity Date falls on a day that is not a Business Day, the payment of principal, premium, if any, and interest may be made on the next succeeding Business Day, and no interest on such payment shall accrue for the period from and after maturity.

    Payment of principal of, premium, if any, and interest on the Bonds of this series shall be made in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts. Payments of principal of, premium, if any, and interest on the Bonds of this series represented by a Global Bond shall be made by wire transfer of immediately available funds to the Holder of such Global Bond, provided that, in the case of payments of principal and premium, if any, such Global Bond is first surrendered to the Paying Agent. If any of the Bonds of this series are no longer represented by a Global Bond, (i) payments of principal, premium, if any, and interest due on the Maturity Date or earlier redemption of such Bonds shall be made at the office of the Paying Agent upon surrender of such Bonds to the Paying Agent, and (ii) payments of interest shall be made, at the option of the Company, subject to such surrender where applicable, (A) by check mailed to the address of the Person entitled thereto as such address shall appear in the Bond Register or (B) by wire transfer to registered Holders of at least $10,000,000 in principal amount of Bonds at such place and to such account at a banking institution in the United States as such Holders may designate in writing to the Trustee at least sixteen (16) days prior to the date for payment.

A-2

REFERENCE IS HEREBY MADE TO THE FURTHER PROVISIONS OF THIS BOND SET FORTH ON THE REVERSE HEREOF, WHICH FURTHER PROVISIONS SHALL FOR ALL PURPOSES HAVE THE SAME EFFECT AS IF SET FORTH AT THIS PLACE.

A-3

Unless the certificate of authentication hereon has been executed by the Trustee referred to on the reverse hereof by manual signature, this Bond shall not be entitled to any benefit under the Mortgage Indenture or be valid or obligatory for any purpose.

**IN WITNESS WHEREOF**, the Company has caused this instrument to be duly executed.

Dated: _____

**PACIFIC GAS AND ELECTRIC COMPANY**

By _____

By _____

A-4

**TRUSTEE'S CERTIFICATE OF AUTHENTICATION**

This is one of the Bonds of the series designated as Bonds of the Twenty-Seventh Series referred to in the within-mentioned Mortgage Indenture.

_____

_____,

As Trustee

By _____

Authorized Signatory

A-5

This 3.45% First Mortgage Bond due 2025 is one of a duly authorized issue of Bonds of the Company (the "Bonds"), issued and issuable in one or more series under and equally secured by an Indenture of Mortgage, dated as of June 19, 2020 (such Indenture of Mortgage as originally executed and delivered and as supplemented or amended from time to time thereafter, together with any constituent instruments establishing the terms of particular Bonds, being herein called the "Mortgage Indenture"), between the Company and The Bank of New York Mellon Trust Company, N.A., as Trustee (herein called the "Trustee," which term includes any successor trustee under the Mortgage Indenture), and reference is hereby made to the Mortgage Indenture for a description of the property mortgaged, pledged and held in trust, the nature and extent of the security and the respective rights, limitations of rights, duties and immunities of the Company, the Trustee and the Holders of Bonds thereunder and of the terms and conditions upon which Bonds are, and are to be, authenticated and delivered. The acceptance of this Bond shall be deemed to constitute the consent and agreement by the Holder hereof to all of the terms and provisions of the Mortgage Indenture.

Subject to the terms and conditions of the Mortgage Indenture, the Bonds of this series are also redeemable at the option of the Company ("Optional Redemption"), in whole or in part, at any time after the Original Issue Date and prior to the Maturity Date, at a redemption price equal to the greater of:

(a) 100% of the principal amount of the Bonds of this series to be redeemed; or

(b) as determined by the Independent Investment Banker, the sum of the present values of the Remaining Scheduled Payments on the Bonds of this series to be so redeemed (not including any portion of such payments of interest accrued to the Redemption Date) discounted to the Redemption Date on a semi-annual basis (assuming a 360-day year consisting of twelve 30-day months) at the Adjusted Treasury Rate, plus 0.25%,

plus, in either of the above cases, accrued and unpaid interest on the principal amount of the Bonds of this series being redeemed to but not including the Redemption Date.

For the purposes of this Bond:

"Adjusted Treasury Rate" means, with respect to any Redemption Date on which any Bonds are being redeemed:

(a) the yield, under the heading which represents the average for the immediately preceding week, appearing in the most recently published statistical release designated "H.15(519) Selected Interest Rates" or any successor publication that is published weekly by the Board of Governors of the Federal Reserve System and that establishes yields on actively traded United States treasury securities adjusted to constant maturity under the caption "Treasury Constant Maturities" for the maturity corresponding to the Comparable Treasury Issue (if no maturity is within three months before or after the Remaining Life, yields for the two published maturities most closely corresponding to the Comparable Treasury Issue will be determined and the Adjusted Treasury Rate will be interpolated or extrapolated from such yields on a straight line basis, rounding to the nearest month); or

(b) if such release (or any successor publication) is not published during the week preceding the calculation date or does not contain such yields, the rate per annum equal to the semi-annual equivalent yield to maturity of the Comparable Treasury Issue (expressed as a percentage of its principal amount) equal to the Comparable Treasury Price for such Redemption Date.

The Adjusted Treasury Rate will be calculated on the third Business Day preceding the Redemption Date.

"Business Day" means any day, other than a Saturday or Sunday, which is not a day on which banking institutions or trust companies in (i) any place of payment or other location specified in the Bonds or the Mortgage Indenture or (ii) the location of the Company's principal place of business or the Corporate Trust Office of the Trustee, are generally authorized or required by law, regulation or executive order to remain closed, except as may be otherwise specified as contemplated by the Mortgage Indenture.

"Comparable Treasury Issue" means the United States Treasury security selected by the Independent Investment Banker as having a maturity comparable to the Remaining Life of the Bonds to be redeemed that would be utilized, at the time of selection and in accordance with customary financial practice, in pricing new issues of corporate debt securities of comparable maturity to the Remaining Life of the Bonds to be redeemed.

A-6

"Comparable Treasury Price" means, with respect to any Redemption Date on which the Bonds are being redeemed, (a) the average of five (5) Reference Treasury Dealer Quotations for such Redemption Date, after excluding the highest and lowest Reference Treasury Dealer Quotations, or (b) if the Independent Investment Banker obtains fewer than five (5) such Reference Treasury Dealer Quotations, the average of all quotations obtained.

"Dealer" means a primary U.S. Government Securities dealer in the United States.

"Independent Investment Banker" means a Dealer appointed by the Company.

"Reference Treasury Dealer" means Barclays Capital Inc., J.P. Morgan Securities LLC, the Independent Investment Banker and Dealers acceptable to the Independent Investment Banker and their respective successors; provided, however, that if any of the foregoing shall cease to be a Dealer, the Company will select a substitute Dealer.

"Reference Treasury Dealer Quotations" means, with respect to each Reference Treasury Dealer and any Redemption Date, the average, as determined by the Independent Investment Banker, of the bid and asked prices for the Comparable Treasury Issue (expressed in each case as a percentage of its principal amount) quoted in writing to the Independent Investment Banker at 5:00 p.m., New York City time, on the third Business Day preceding such Redemption Date.

"Remaining Life," as of any date of calculation, means the remaining term of the Bonds.

"Remaining Scheduled Payments" means, with respect to the Bonds that the Company is redeeming, the remaining scheduled payments of principal and interest that would be due after the applicable Redemption Date if such Bond were not redeemed. However, if the Redemption Date is not a scheduled Interest Payment Date with respect to that Bond, the amount of the next succeeding scheduled interest payment on that Bond will be reduced by the amount of interest accrued on such Bond to the Redemption Date.

"U.S. Government Securities" means securities which are (a) direct obligations of the United States of America for the payment on which its full faith and credit is pledged or (b) obligations of a Person controlled or supervised by and acting as an agency or instrumentality of the United States of America the payment of which is unconditionally guaranteed as a full faith and credit obligation of the United States of America, and which in the case of (a) and (b) are not callable or redeemable at the option of the issuer thereof, and shall also include a depository receipt issued by a bank or trust company as custodian with respect to any such U.S. Government Security or a specific payment of interest on or principal of any such U.S. Government Security held by such custodian for the account of the holder of a depository receipt, provided that (except as required by law) such custodian is not authorized to make any deduction from the amount payable to the holder of such depository receipt from any amount received by the custodian in respect of the U.S. Government Security evidenced by such depository receipt.

Interest installments whose Stated Maturity is on or prior to such Redemption Date will be payable to Holders of such Bonds of this series, or one or more Predecessor Bonds, of record at the close of business on the relevant Record Dates referred to on the face hereof, all as provided in the Mortgage Indenture.

In the case of an Optional Redemption, notice of redemption will be in writing and sent not less than 30 days nor more than 60 days prior to the Redemption Date to each Holder of Bonds of this series to be redeemed at the Holder's registered address. If money sufficient to pay the redemption price of all Bonds of this series (or portions thereof) to be redeemed on the Redemption Date is deposited with the Paying Agent or the Trustee on or prior to the Redemption Date, from and after such Redemption Date such Bonds or portions thereof shall cease to bear interest. The Bonds of this series in denominations larger than $1,000 in principal amount may be redeemed in part but only in integral multiples of $1,000.

In the event of redemption of this Bond in part only, a new Bond or Bonds of this series and of like tenor for the unredeemed portion hereof will be issued in the name of the Holder hereof upon the surrender hereof.

A-7

As provided in the Mortgage Indenture and subject to certain limitations therein set forth, this Bond or any portion of the principal amount hereof will be deemed to have been paid for all purposes of the Mortgage Indenture and to be no longer Outstanding thereunder, and the Company's entire indebtedness in respect thereof will be satisfied and discharged, if there has been irrevocably deposited with the Trustee or any Paying Agent (other than the Company), in trust, money in an amount which will be sufficient and/or Eligible Obligations, the principal of and interest on which when due, without regard to any reinvestment thereof, will provide moneys which, together with money, if any, deposited with or held by the Trustee or such Paying Agent, will be sufficient to pay when due the principal of and premium, if any, and interest on this Bond when due.

If an Event of Default shall occur and be continuing, the Trustee or the Holders of not less than 25% in aggregate principal amount of the Bonds then Outstanding, considered as one class, may declare the principal amount of all Bonds then Outstanding to be due and payable immediately by notice in writing to the Company (and to the Trustee if given by Holders); *provided, however,* that with respect to certain Events of Default relating to bankruptcy, insolvency and similar events, the principal amount of all Bonds then Outstanding shall be due and payable immediately without further action by the Trustee or the Holders.

The Mortgage Indenture permits, with certain exceptions as therein provided, the Company and the Trustee to enter into one or more supplemental indentures for the purpose of adding any provisions to, or changing in any manner or eliminating any of the provisions of, the Mortgage Indenture with the consent of the Holders of not less than a majority in aggregate principal amount of the Bonds at the time Outstanding, considered as one class; *provided, however,* that if there shall be Bonds of more than one series Outstanding under the Mortgage Indenture and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such series, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all series so directly affected, considered as one class, shall be required; and *provided, further,* that if the Bonds of any series shall have been issued in more than one Tranche and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such Tranches, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all Tranches so directly affected, considered as one class, shall be required; and *provided, further,* that the Mortgage Indenture permits the Company and the Trustee to enter into one or more supplemental indentures for certain purposes without the consent of any Holders of Bonds. The Mortgage Indenture also contains provisions permitting the Holders of a majority in aggregate principal amount of Bonds, on behalf of the Holders of all such Bonds, to waive certain past defaults under the Mortgage Indenture and their consequences. Any such consent or waiver by the Holder of this Bond shall be conclusive and binding upon such Holder and upon all future Holders of this Bond and of any Bond issued upon the registration of transfer hereof or in exchange herefor or in lieu hereof, whether or not notation of such consent or waiver is made upon this Bond.

As provided in and subject to the provisions of the Mortgage Indenture, the Holder of this Bond shall not have the right to institute any proceeding with respect to the Mortgage Indenture or for the appointment of a receiver or trustee or for any other remedy thereunder, unless such Holder shall have previously given the Trustee written notice of a continuing Event of Default, the Holders of at least 25% in aggregate principal amount of the Bonds at the time Outstanding shall have made written request to the Trustee to institute proceedings in respect of such Event of Default as Trustee and offered the Trustee reasonable indemnity, and the Trustee shall not have received from the Holders of at least a majority in aggregate principal amount of Bonds at the time Outstanding a direction inconsistent with such written request, and shall have failed to institute any such proceeding for 60 days after receipt of such notice, request and offer of indemnity. The foregoing shall not apply to any suit instituted by the Holder of this Bond for the enforcement of any payment of principal hereof or any premium or interest hereon on or after the respective due dates expressed herein.

No reference herein to the Mortgage Indenture and no provision of this Bond or of the Mortgage Indenture shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal of and any premium and interest on this Bond at the times, place and rate, and in the coin or currency, herein prescribed.

A-8

As provided in the Mortgage Indenture and subject to certain limitations therein set forth, the transfer of this Bond is registrable in the Bond Register, upon surrender of this Bond for registration of transfer at the office or agency of the Company in any place where the principal of and any premium and interest on this Bond are payable, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Company, the Trustee or the Bond Registrar, as the case may be, duly executed by the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new Bonds of this series and of like tenor, of authorized denominations and for the same aggregate principal amount, will be issued to the designated transferee or transferees.

The Bonds of the Twenty-Seventh Series are issuable only in registered form without coupons in denominations of $1,000 and any integral multiple thereof. As provided in the Mortgage Indenture and subject to certain limitations therein set forth, Bonds of this series are exchangeable for a like aggregate principal amount of Bonds of this series and of like tenor of a different authorized denomination, as requested by the Holders surrendering the same.

No service charge shall be made for any such registration of transfer or exchange, but the Company may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

The Company shall not be required to execute or to provide for the registration of the transfer of or the exchange of (A) any Bond of this series during a period of 15 days immediately preceding the date notice is to be given identifying the serial numbers (or with respect to Global Bonds, CUSIP numbers) of the Bonds of this series called for redemption, or (B) any Bond of this series selected for redemption in whole or in part, except the unredeemed portion of any Bond of this series being redeemed in part.

Prior to due presentment of this Bond for registration of transfer, the Company, the Trustee and any agent of the Company or the Trustee may treat the Person in whose name this Bond is registered as the owner hereof for all purposes, whether or not this Bond is overdue, and neither the Company, the Trustee nor any such agent shall be affected by notice to the contrary.

This Bond shall be governed by, and construed and enforced in accordance with, the laws of the State of New York without regard to the principles of conflicts of laws thereunder, except to the extent that the Trust Indenture Act shall be applicable.

As provided in the Mortgage Indenture, no recourse shall be had for the payment of the principal of, premium, if any, or interest with respect to this Bond, or any part thereof, or for any claim based hereon or otherwise in respect hereof, or of the indebtedness represented hereby, or upon any obligation, covenant or agreement under the Mortgage Indenture, against any incorporator, shareholder, officer or director, as such, past, present or future, of the Company or of any predecessor or successor corporation (either directly or through the Company or a predecessor or successor corporation), whether by virtue of any constitutional provision, statute or rule of law or by the enforcement of any assessment or penalty or otherwise; it being expressly agreed and understood that the Mortgage Indenture and all the Bonds are solely corporate obligations and that any such personal liability is hereby expressly waived and released as a condition of, and as part of the consideration for, the execution of the Mortgage Indenture and the issuance of this Bond.

All terms used in this Bond which are not defined herein shall have the meanings assigned to them in the Mortgage Indenture.

A-9

## ASSIGNMENT FORM

To assign this Bond, fill in the form below: (I) or (we) assign and transfer this Bond to

_____

(Insert assignee's soc. sec. or tax I.D. no.)

_____

_____

_____

_____

(Print or type assignee's name, address and zip code)

and irrevocably appoint _____

to transfer this Bond on the books of the Company. The agent may substitute another to act for him.

Date: _____

Your signature: _____

(Sign exactly as your name appears on the face of this Bond)

Tax Identification No.:

SIGNATURE GUARANTEE:

_____

Signatures must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Bond Registrar, which requirements include membership or participation in the Security Transfer Agent Medallion Program ("STAMP") or such other "signature guarantee program" as may be determined by the Bond Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

A-10

EXHIBIT C

**[FORM OF BOND OF THE TWENTY-EIGHTH SERIES]**

**[FORM OF FACE OF BOND]**

THIS BOND IS A GLOBAL BOND WITHIN THE MEANING OF THE MORTGAGE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF A DEPOSITARY (AS DEFINED IN THE MORTGAGE INDENTURE) OR A NOMINEE THEREOF. THIS GLOBAL BOND IS EXCHANGEABLE FOR BONDS REGISTERED IN THE NAME OF ANY PERSON OTHER THAN SUCH DEPOSITARY OR ITS NOMINEE ONLY IN LIMITED CIRCUMSTANCES DESCRIBED IN THE MORTGAGE INDENTURE AND, UNLESS AND UNTIL IT IS EXCHANGED IN WHOLE OR IN PART FOR BONDS IN CERTIFICATED FORM, THIS GLOBAL BOND MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY, OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY, OR BY THE DEPOSITARY OR ANY SUCH NOMINEE TO A SUCCESSOR DEPOSITARY OR A NOMINEE OF SUCH SUCCESSOR DEPOSITARY.

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE COMPANY (AS DEFINED BELOW) OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY BOND ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

THE FOLLOWING SUMMARY OF TERMS IS SUBJECT TO THE INFORMATION SET FORTH ON THE REVERSE HEREOF:

| PRINCIPAL AMOUNT: | ORIGINAL ISSUE DATE: | INTEREST RATE: |
|---|---|---|
| $_____ | July 1, 2020 | 4.95% |
| MATURITY DATE: | INTEREST PAYMENT DATES: | THIS BOND IS A: |
| July 1, 2050 | January 1 and July 1 of each year, commencing January 1, 2021 | ☒ Global Book-Entry Bond ☐ Certificated Bond |

REGISTERED OWNER: Cede & Co., as nominee of The Depositary Trust Company

<div align="center">

**PACIFIC GAS AND ELECTRIC COMPANY**

**4.95% FIRST MORTGAGE BOND DUE 2050**

</div>

No. _____                                                                                    Principal Amount: $_____

CUSIP No: _____

PACIFIC GAS AND ELECTRIC COMPANY, a corporation duly organized and existing under the laws of the State of California (herein called the "Company," which term includes any successor Person pursuant to the applicable provisions of the Mortgage Indenture hereinafter referred to), for value received, hereby promises to pay to Cede & Co., as nominee for The Depositary Trust Company, or registered assigns, the Principal Amount stated above on the Maturity Date stated above, and to pay interest thereon from and including July 2, 2020 or, in the case of a 4.95% First Mortgage Bond Due 2050 issued upon the registration of transfer or exchange, from and including the most recent Interest Payment Date to which interest has been paid or duly provided for, semi-annually in arrears on the Interest Payment Dates set forth above and on the Maturity Date stated above, commencing January 1, 2021, at the rate of 4.95% per annum until the principal hereof is paid or made available for payment). The interest so payable, and punctually paid or duly provided for, on any Interest Payment Date will, as provided in such Mortgage Indenture, be paid to the Person in whose name this 4.95% First Mortgage Bond Due 2050 (this "Bond") (or one or more Predecessor Bonds) is registered at the close of business on the Regular Record Date for such interest, which shall be the December 15 and June 15 preceding such Interest Payment Date; provided, however, that interest payable at the Maturity Date or on a Redemption Date will be paid to the Person to whom principal is payable. Any such interest not so punctually paid or duly provided for will forthwith cease to be payable to the Holder on such Regular Record Date and may either be paid to the Person in whose name this Bond (or one or more Predecessor Bonds) is registered at the close of business on a Special Record Date for the payment of such Defaulted Interest to be fixed by the Trustee, notice whereof shall be given to Holders of Bonds not less than 10 days prior to such Special Record Date, or be paid at any time in any other lawful manner not inconsistent with the requirements of the Mortgage Indenture and any securities exchange, if any, on which the Senior Notes may be listed, and upon such notice as may be required by any such exchange, all as more fully provided in said Mortgage Indenture.

Payments of interest on this Bond will include interest accrued to but excluding the respective Interest Payment Dates. Interest payments for this Bond shall be computed and paid on the basis of the 360-day year of twelve 30-day months and will accrue from July 2, 2020 or from the most recent Interest Payment Date to which interest has been paid or duly provided for. In the event that any date on which interest is payable on this Senior Note (other than the Maturity Date) is not a Business Day then payment of the interest payable on such date will be made on the next succeeding day that is a Business Day (and without any interest or payment in respect of any such delay) with the same force and effect as if made on the date the payment was originally payable. If the Maturity Date falls on a day that is not a Business Day, the payment of principal, premium, if any, and interest may be made on the next succeeding Business Day, and no interest on such payment shall accrue for the period from and after maturity.

Payment of principal of, premium, if any, and interest on the Bonds shall be made in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts. Payments of principal of, premium, if any, and interest on the Bonds represented by a Global Bond shall be made by wire transfer of immediately available funds to the Holder of such Global Bond, provided that, in the case of payments of principal and premium, if any, such Global Bond is first surrendered to the Paying Agent. If any of the Senior Notes are no longer represented by a Global Bond, (i) payments of principal, premium, if any, and interest due on the Maturity Date or earlier redemption of such Bonds shall be made at the office of the Paying Agent upon surrender of such Senior Notes to the Paying Agent, and (ii) payments of interest shall be made, at the option of the Company, subject to such surrender where applicable, (A) by check mailed to the address of the Person entitled thereto as such address shall appear in the Bond Register or (B) by wire transfer to registered Holders of at least $10,000,000 in principal amount of Bonds at such place and to such account at a banking institution in the United States as such Holders may designate in writing to the Trustee at least sixteen (16) days prior to the date for payment.

REFERENCE IS HEREBY MADE TO THE FURTHER PROVISIONS OF THIS BOND SET FORTH ON THE REVERSE HEREOF, WHICH FURTHER PROVISIONS SHALL FOR ALL PURPOSES HAVE THE SAME EFFECT AS IF SET FORTH AT THIS PLACE.

Unless the certificate of authentication hereon has been executed by the Trustee referred to on the reverse hereof by manual signature, this Bond shall not be entitled to any benefit under the Mortgage Indenture or be valid or obligatory for any purpose.

**IN WITNESS WHEREOF**, the Company has caused this instrument to be duly executed.

Dated: _____

<div style="text-align:right">

**PACIFIC GAS AND ELECTRIC COMPANY**

By _____

By _____

</div>

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 50 of 1367

**TRUSTEE'S CERTIFICATE OF AUTHENTICATION**

This is one of the Bonds of the series designated as Bonds of the Twenty-Eighth Series referred to in the within-mentioned Mortgage Indenture.

_____

_____,

As Trustee

By _____

Authorized Signatory

This 4.95% First Mortgage Bond due 2050 is one of a duly authorized issue of Bonds of the Company (the "Bonds"), issued and issuable in one or more series under and equally secured by an Indenture of Mortgage, dated as of June 19, 2020 (such Indenture of Mortgage as originally executed and delivered and as supplemented or amended from time to time thereafter, together with any constituent instruments establishing the terms of particular Bonds, being herein called the "Mortgage Indenture"), between the Company and The Bank of New York Mellon Trust Company, N.A., as Trustee (herein called the "Trustee," which term includes any successor trustee under the Mortgage Indenture), and reference is hereby made to the Mortgage Indenture for a description of the property mortgaged, pledged and held in trust, the nature and extent of the security and the respective rights, limitations of rights, duties and immunities of the Company, the Trustee and the Holders of Bonds thereunder and of the terms and conditions upon which Bonds are, and are to be, authenticated and delivered. The acceptance of this Bond shall be deemed to constitute the consent and agreement by the Holder hereof to all of the terms and provisions of the Mortgage Indenture.

Subject to the terms and conditions of the Mortgage Indenture, the Bonds are redeemable at the option of the Company ("Optional Redemption"), in whole or in part, (a) at any time prior to January 1, 2050 (the date that is six months prior to the Maturity Date) at a Redemption Price equal to the greater of:

(a) 100% of the principal amount of the Bonds to be redeemed; or

(b) as determined by the Quotation Agent, the sum of the present values of the Remaining Scheduled Payments of principal and interest on the Bonds to be redeemed (not including any portion of payments of interest accrued as of the Redemption Date), calculated as if the Maturity Date of the Bonds was January 1, 2050 (the date that is six months prior to the Maturity Date), discounted to the Redemption Date on a semi-annual basis at the Adjusted Treasury Rate, plus 20 basis points,

plus, in either of the above cases, accrued and unpaid interest thereon to but not including the Redemption Date; and (b) at any time on or after January 1, 2050 (the date that is six months prior to the Maturity Date) at 100% of the principal amount of the Bonds to be redeemed, plus accrued and unpaid interest thereon to but not including the Redemption Date.

For purposes of this Bond:

"Adjusted Treasury Rate" means, with respect to any Redemption Date on which the Bonds are being redeemed pursuant to the redemption terms of a Bond, the rate per annum equal to the semiannual equivalent yield to maturity of the Comparable Treasury Issue, assuming a price for the Comparable Treasury Issue (expressed as a percentage of its principal amount) equal to the Comparable Treasury Price for such Redemption Date.

"Business Day" means any day that is not a day on which banking institutions in New York City are authorized or required by law or regulation to close.

"Comparable Treasury Issue" means the United States Treasury security selected by the applicable Quotation Agent as having a maturity comparable to the remaining term of this Bond, assuming, for such purpose, that this Bond matured on January 1, 2050 (the date that is six months prior to the Maturity Date), that would be used, at the time of the selection and in accordance with customary financial practice, in pricing new issues of corporate debt securities of comparable maturity to the remaining term of this Bond to be redeemed.

"Comparable Treasury Price" means, with respect to any Redemption Date on which the Bonds are being redeemed pursuant to the redemption terms of a Bond, (a) the average of the Reference Treasury Dealer Quotations for such Redemption Date, after excluding the highest and lowest of the Reference Treasury Dealer Quotations; or (b) if the Company obtains fewer than four Reference Treasury Dealer Quotations, the average of all Reference Treasury Dealer Quotations so received.

"Primary Treasury Dealer" means a primary dealer in U.S. Government Securities.

"Quotation Agent" means the Reference Treasury Dealer appointed by the Company in respect of the Bonds.

"Reference Treasury Dealer", means (1) Barclays Capital Inc., BofA Securities, Inc., Citigroup Global Markets Inc., Goldman Sachs & Co. LLC and J.P. Morgan Securities LLC, and their respective successors, unless any of them ceases to be a Primary Treasury Dealer, in which case the Company shall substitute another Primary Treasury Dealer; and (2) any other Primary Treasury Dealer selected by the Company.

"Reference Treasury Dealer Quotations" means, the average, as determined by the Company, of the bid and asked prices for the Comparable Treasury Issue (expressed in each case as a percentage of its principal amount) quoted in writing to the Company by that Reference Treasury Dealer at 5:00 p.m., New York City time, on the third Business Day preceding such Redemption Date.

"Remaining Scheduled Payments" means, with respect to the Bonds that the Company is redeeming pursuant to the redemption terms of a Bond, the remaining scheduled payments of principal and interest that would be due after the applicable Redemption Date if the Bond were not redeemed. However, if the Redemption Date is not a scheduled Interest Payment Date with respect to the Bond, the amount of the next succeeding scheduled interest payment on the Bond will be reduced by the amount of interest accrued on the Bond to the Redemption Date.

"U.S. Government Securities" means securities which are (a) direct obligations of the United States of America for the payment on which its full faith and credit is pledged or (b) obligations of a person controlled or supervised by and acting as an agency or instrumentality of the United States of America the payment of which is unconditionally guaranteed as a full faith and credit obligation of the United States of America, and which in the case of (a) and (b) are not callable or redeemable at the option of the issuer thereof, and shall also include a depository receipt issued by a bank or trust company as custodian with respect to any such U.S. Government Security or a specific payment of interest on or principal of any such U.S. Government Security held by such custodian for the account of the holder of a depository receipt, provided that (except as required by law) such custodian is not authorized to make any deduction from the amount payable to the holder of such depository receipt from any amount received by the custodian in respect of the U.S. Government Security evidenced by such depository receipt.

Interest installments whose Stated Maturity is on or prior to such Redemption Date will be payable to Holders of such Bonds of this series, of record at the close of business on the relevant Record Dates referred to on the face hereof, all as provided in the Mortgage Indenture.

In the case of an Optional Redemption, notice of redemption will be in writing and sent not less than 10 days nor more than 60 days prior to the Redemption Date to each Holder of Bonds to be redeemed at the Holder's registered address; provided, however, that such notice need not state the dollar amount of the Redemption Price if such dollar amount has not been determined as of the date such notice is being given to the Holders of the Bonds being redeemed. If money sufficient to pay the Redemption Price of the Bonds (or portions thereof) to be redeemed on the Redemption Date is deposited with the Paying Agent or the Trustee on or prior to the Redemption Date, from and after such Redemption Date such Bond or portions thereof shall cease to bear interest. Bonds of this series in denominations larger than $100,000 in principal amount may be redeemed in part but only in integral multiples of $1,000.

In the event of redemption of this Bond in part only, a new Bond or Bonds of this series and of like tenor for the unredeemed portion hereof will be issued in the name of the Holder hereof upon surrender hereof.

As provided in the Mortgage Indenture and subject to certain limitations therein set forth, this Bond or any portion of the principal amount hereof will be deemed to have been paid for all purposes of the Mortgage Indenture and to be no longer Outstanding thereunder, and the Company's entire indebtedness in respect thereof will be satisfied and discharged, if there has been irrevocably deposited with the Trustee or any Paying Agent (other than the Company), in trust, money in an amount which will be sufficient and/or Eligible Obligations, the principal of and interest on which when due, without regard to any reinvestment thereof, will provide moneys which, together with money, if any, deposited with or held by the Trustee or such Paying Agent, will be sufficient to pay when due the principal of and premium, if any, and interest on this Bond when due.

If an Event of Default shall occur and be continuing, the Trustee or the Holders of not less than 25% in aggregate principal amount of the Bonds then Outstanding, considered as one class, may declare the principal amount of all Bonds then Outstanding to be due and payable immediately by notice in writing to the Company (and to the Trustee if given by Holders); *provided*, *however*, that with respect to certain Events of Default relating to bankruptcy, insolvency and similar events, the principal amount of all Bonds then Outstanding shall be due and payable immediately without further action by the Trustee or the Holders.

The Mortgage Indenture permits, with certain exceptions as therein provided, the Company and the Trustee to enter into one or more supplemental indentures for the purpose of adding any provisions to, or changing in any manner or eliminating any of the provisions of, the Mortgage Indenture with the consent of the Holders of not less than a majority in aggregate principal amount of all Bonds then Outstanding, considered as one class; *provided*, *however*, that if there shall be Bonds of more than one series Outstanding under the Mortgage Indenture and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such series, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all series so directly affected, considered as one class, shall be required; and *provided*, *further*, that if the Bonds of any series shall have been issued in more than one Tranche and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such Tranches, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all Tranches so directly affected, considered as one class, shall be required; and *provided*, *further*, that the Mortgage Indenture permits the Company and the Trustee to enter into one or more supplemental indentures for certain purposes without the consent of any Holders of Bonds. The Mortgage Indenture also contains provisions permitting the Holders of a majority in aggregate principal amount of Bonds, on behalf of the Holders of all such Bonds, to waive certain past defaults under the Mortgage Indenture and their consequences. Any such consent or waiver by the Holder of this Bond shall be conclusive and binding upon such Holder and upon all future Holders of this Bond and of any Bond issued upon the registration of transfer hereof or in exchange herefor or in lieu hereof, whether or not notation of such consent or waiver is made upon this Bond.

As provided in and subject to the provisions of the Mortgage Indenture, the Holder of this Bond shall not have the right to institute any proceeding with respect to the Mortgage Indenture or for the appointment of a receiver or trustee or for any other remedy thereunder, unless such Holder shall have previously given the Trustee written notice of a continuing Event of Default, the Holders of at least 25% in aggregate principal amount of the Bonds at the time Outstanding shall have made written request to the Trustee to institute proceedings in respect of such Event of Default as Trustee and offered the Trustee reasonable indemnity, and the Trustee shall not have received from the Holders of at least a majority in aggregate principal amount of Bonds at the time Outstanding a direction inconsistent with such written request, and shall have failed to institute any such proceeding for 60 days after receipt of such notice, request and offer of indemnity. The foregoing shall not apply to any suit instituted by the Holder of this Bond for the enforcement of any payment of principal hereof or any premium or interest hereon on or after the respective due dates expressed herein.

No reference herein to the Mortgage Indenture and no provision of this Bond or of the Mortgage Indenture shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal of and any premium and interest on this Bond at the times, place and rate, and in the coin or currency, herein prescribed.

As provided in the Mortgage Indenture and subject to certain limitations therein set forth, the transfer of this Bond is registrable in the Bond Register, upon surrender of this Bond for registration of transfer at the office or agency of the Company in any place where the principal of and any premium and interest on this Bond are payable, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Company, the Trustee or the Bond Registrar, as the case may be, duly executed by the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new Bonds of this series and of like tenor, of authorized denominations and for the same aggregate principal amount, will be issued to the designated transferee or transferees.

The Bonds of the Twenty-Eighth Series are issuable only in registered form without coupons in denominations of $1,000 and any integral multiple thereof. As provided in the Mortgage Indenture and subject to certain limitations therein set forth, Bonds of this series are exchangeable for a like aggregate principal amount of Bonds of this series and of like tenor of a different authorized denomination, as requested by the Holders surrendering the same.

The Company shall not be required to execute or to provide for the registration of the transfer of or the exchange of (A) any Bond of this series during a period of 15 days immediately preceding the date notice is to be given identifying the serial numbers (or with respect to Global Bonds, CUSIP numbers) of the Bonds of this series called for redemption, or (B) any Bond of this series selected for redemption in whole or in part, except the unredeemed portion of any Bond of this series being redeemed in part.

No service charge shall be made for any such registration of transfer or exchange, but the Company may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

Prior to due presentment of this Bond for registration of transfer, the Company, the Trustee and any agent of the Company or the Trustee may treat the Person in whose name this Bond is registered as the owner hereof for all purposes, whether or not this Bond is overdue, and neither the Company, the Trustee nor any such agent shall be affected by notice to the contrary.

This Bond shall be governed by, and construed and enforced in accordance with, the laws of the State of New York without regard to the principles of conflicts of laws thereunder, except to the extent that the Trust Indenture Act shall be applicable.

As provided in the Mortgage Indenture, no recourse shall be had for the payment of the principal of, premium, if any, or interest with respect to this Bond, or any part thereof, or for any claim based hereon or otherwise in respect hereof, or of the indebtedness represented hereby, or upon any obligation, covenant or agreement under the Mortgage Indenture, against any incorporator, shareholder, officer or director, as such, past, present or future, of the Company or of any predecessor or successor corporation (either directly or through the Company or a predecessor or successor corporation), whether by virtue of any constitutional provision, statute or rule of law or by the enforcement of any assessment or penalty or otherwise; it being expressly agreed and understood that the Mortgage Indenture and all the Bonds are solely corporate obligations and that any such personal liability is hereby expressly waived and released as a condition of, and as part of the consideration for, the execution of the Mortgage Indenture and the issuance of this Bond.

All terms used in this Bond which are not defined herein shall have the meanings assigned to them in the Mortgage Indenture.

**ASSIGNMENT FORM**

To assign this Bond, fill in the form below: (I) or (we) assign and transfer this Bond to

_____

(Insert assignee's soc. sec. or tax I.D. no.)

_____

_____

_____

_____

(Print or type assignee's name, address and zip code)

and irrevocably appoint _____

to transfer this Bond on the books of the Company. The agent may substitute another to act for him.

Date: _____

Your signature: _____

(Sign exactly as your name appears on the face of this Bond)

Tax Identification No.:

SIGNATURE GUARANTEE:

_____

Signatures must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Bond Registrar, which requirements include membership or participation in the Security Transfer Agent Medallion Program ("STAMP") or such other "signature guarantee program" as may be determined by the Bond Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

<div align="center">

**EXHIBIT D**

**[FORM OF BOND OF THE TWENTY-NINTH SERIES]**

**[FORM OF FACE OF BOND]**

</div>

THIS BOND IS A GLOBAL BOND WITHIN THE MEANING OF THE MORTGAGE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF A DEPOSITARY (AS DEFINED IN THE MORTGAGE INDENTURE) OR A NOMINEE THEREOF. THIS GLOBAL BOND IS EXCHANGEABLE FOR BONDS REGISTERED IN THE NAME OF ANY PERSON OTHER THAN SUCH DEPOSITARY OR ITS NOMINEE ONLY IN LIMITED CIRCUMSTANCES DESCRIBED IN THE MORTGAGE INDENTURE AND, UNLESS AND UNTIL IT IS EXCHANGED IN WHOLE OR IN PART FOR BONDS IN CERTIFICATED FORM, THIS GLOBAL BOND MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY, OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY, OR BY THE DEPOSITARY OR ANY SUCH NOMINEE TO A SUCCESSOR DEPOSITARY OR A NOMINEE OF SUCH SUCCESSOR DEPOSITARY.

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE COMPANY (AS DEFINED BELOW) OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY BOND ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

THE FOLLOWING SUMMARY OF TERMS IS SUBJECT TO THE INFORMATION SET FORTH ON THE REVERSE HEREOF:

| | | |
|---|---|---|
| PRINCIPAL AMOUNT: | ORIGINAL ISSUE DATE: | INTEREST RATE: |
| $_____ | July 1, 2020 | 4.55% |
| MATURITY DATE: | INTEREST PAYMENT DATE: | THIS BOND IS A: |
| July 1, 2030 | January 1 and July 1 of each year, commencing January 1, 2021 | ☒ Global Book-Entry Bond<br>☐ Certificated Bond |

REGISTERED OWNER: Cede & Co., as nominee of The Depositary Trust Company

<div align="center">

**PACIFIC GAS AND ELECTRIC COMPANY**

4.55% FIRST MORTGAGE BOND DUE 2030

</div>

No. _____                                                                                          Principal Amount: $_____
CUSIP No: _____

PACIFIC GAS AND ELECTRIC COMPANY, a corporation duly organized and existing under the laws of the State of California (herein called the "Company," which term includes any successor Person pursuant to the applicable provisions of the Mortgage Indenture hereinafter referred to), for value received, hereby promises to pay to Cede & Co., as nominee for The Depositary Trust Company, or registered assigns, the Principal Amount stated above on the Maturity Date stated above, and to pay interest thereon from and including July 2, 2020 or, in the case of a 4.55% First Mortgage Bond Due 2030 issued upon the registration of transfer or exchange, from and including the most recent Interest Payment Date to which interest has been paid or duly provided for, semi-annually in arrears on the Interest Payment Dates set forth above and on the Maturity Date stated above, commencing January 1, 2021, at the rate of 4.55% per annum until the principal hereof is paid or made available for payment). The interest so payable, and punctually paid or duly provided for, on any Interest Payment Date will, as provided in such Mortgage Indenture, be paid to the Person in whose name this 4.55% First Mortgage Bond Due 2030 (this "Bond") (or one or more Predecessor Bonds) is registered at the close of business on the Regular Record Date for such interest, which shall be the December 15 and June 15 preceding such Interest Payment Date; provided, however, that interest payable at the Maturity Date or on a Redemption Date will be paid to the Person to whom principal is payable. Any such interest not so punctually paid or duly provided for will forthwith cease to be payable to the Holder on such Regular Record Date and may either be paid to the Person in whose name this Bond (or one or more Predecessor Bonds) is registered at the close of business on a Special Record Date for the payment of such Defaulted Interest to be fixed by the Trustee, notice whereof shall be given to Holders of Bonds not less than 10 days prior to such Special Record Date, or be paid at any time in any other lawful manner not inconsistent with the requirements of the Mortgage Indenture and any securities exchange, if any, on which the Senior Notes may be listed, and upon such notice as may be required by any such exchange, all as more fully provided in said Mortgage Indenture.

Payments of interest on this Bond will include interest accrued to but excluding the respective Interest Payment Dates. Interest payments for this Bond shall be computed and paid on the basis of the 360-day year of twelve 30-day months and will accrue from July 2, 2020 or from the most recent Interest Payment Date to which interest has been paid or duly provided for. In the event that any date on which interest is payable on this Senior Note (other than the Maturity Date) is not a Business Day then payment of the interest payable on such date will be made on the next succeeding day that is a Business Day (and without any interest or payment in respect of any such delay) with the same force and effect as if made on the date the payment was originally payable. If the Maturity Date falls on a day that is not a Business Day, the payment of principal, premium, if any, and interest may be made on the next succeeding Business Day, and no interest on such payment shall accrue for the period from and after maturity.

Payment of principal of, premium, if any, and interest on the Bonds shall be made in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts. Payments of principal of, premium, if any, and interest on the Bonds represented by a Global Bond shall be made by wire transfer of immediately available funds to the Holder of such Global Bond, provided that, in the case of payments of principal and premium, if any, such Global Bond is first surrendered to the Paying Agent. If any of the Senior Notes are no longer represented by a Global Bond, (i) payments of principal, premium, if any, and interest due on the Maturity Date or earlier redemption of such Bonds shall be made at the office of the Paying Agent upon surrender of such Senior Notes to the Paying Agent, and (ii) payments of interest shall be made, at the option of the Company, subject to such surrender where applicable, (A) by check mailed to the address of the Person entitled thereto as such address shall appear in the Bond Register or (B) by wire transfer to registered Holders of at least $10,000,000 in principal amount of Bonds at such place and to such account at a banking institution in the United States as such Holders may designate in writing to the Trustee at least sixteen (16) days prior to the date for payment.

REFERENCE IS HEREBY MADE TO THE FURTHER PROVISIONS OF THIS BOND SET FORTH ON THE REVERSE HEREOF, WHICH FURTHER PROVISIONS SHALL FOR ALL PURPOSES HAVE THE SAME EFFECT AS IF SET FORTH AT THIS PLACE.

Unless the certificate of authentication hereon has been executed by the Trustee referred to on the reverse hereof by manual signature, this Bond shall not be entitled to any benefit under the Mortgage Indenture or be valid or obligatory for any purpose.

**IN WITNESS WHEREOF**, the Company has caused this instrument to be duly executed.

Dated: _____

<div align="right">

**PACIFIC GAS AND ELECTRIC COMPANY**

By _____

By _____

</div>

**TRUSTEE'S CERTIFICATE OF AUTHENTICATION**

This is one of the Bonds of the series designated as Bonds of the Twenty-Ninth Series referred to in the within-mentioned Mortgage Indenture.

_____

_____,

As Trustee

By _____

Authorized Signatory

## [FORM OF REVERSE OF BOND OF THE TWENTY-NINTH SERIES ]

This 4.55% First Mortgage Bond due 2030 is one of a duly authorized issue of Bonds of the Company (the "Bonds"), issued and issuable in one or more series under and equally secured by an Indenture of Mortgage, dated as of June 19, 2020 (such Indenture of Mortgage as originally executed and delivered and as supplemented or amended from time to time thereafter, together with any constituent instruments establishing the terms of particular Bonds, being herein called the "Mortgage Indenture"), between the Company and The Bank of New York Mellon Trust Company, N.A., as Trustee (herein called the "Trustee," which term includes any successor trustee under the Mortgage Indenture), and reference is hereby made to the Mortgage Indenture for a description of the property mortgaged, pledged and held in trust, the nature and extent of the security and the respective rights, limitations of rights, duties and immunities of the Company, the Trustee and the Holders of Bonds thereunder and of the terms and conditions upon which Bonds are, and are to be, authenticated and delivered. The acceptance of this Bond shall be deemed to constitute the consent and agreement by the Holder hereof to all of the terms and provisions of the Mortgage Indenture.

Subject to the terms and conditions of the Mortgage Indenture, the Bonds are redeemable at the option of the Company ("Optional Redemption"), in whole or in part, (a) at any time prior to January 1, 2030 (the date that is six months prior to the Maturity Date) at a Redemption Price equal to the greater of:

(a) 100% of the principal amount of the Bonds to be redeemed; or

(b) as determined by the Quotation Agent, the sum of the present values of the Remaining Scheduled Payments of principal and interest on the Bonds to be redeemed (not including any portion of payments of interest accrued as of the Redemption Date), calculated as if the Maturity Date of the Bonds was January 1, 2030 (the date that is six months prior to the Maturity Date), discounted to the Redemption Date on a semi-annual basis at the Adjusted Treasury Rate, plus 20 basis points,

plus, in either of the above cases, accrued and unpaid interest thereon to but not including the Redemption Date; and (b) at any time on or after January 1, 2030 (the date that is six months prior to the Maturity Date) at 100% of the principal amount of the Bonds to be redeemed, plus accrued and unpaid interest thereon to but not including the Redemption Date.

For purposes of this Bond:

"Adjusted Treasury Rate" means, with respect to any Redemption Date on which the Bonds are being redeemed pursuant to the redemption terms of a Bond, the rate per annum equal to the semiannual equivalent yield to maturity of the Comparable Treasury Issue, assuming a price for the Comparable Treasury Issue (expressed as a percentage of its principal amount) equal to the Comparable Treasury Price for such Redemption Date.

"Business Day" means any day that is not a day on which banking institutions in New York City are authorized or required by law or regulation to close.

"Comparable Treasury Issue" means the United States Treasury security selected by the applicable Quotation Agent as having a maturity comparable to the remaining term of this Bond, assuming, for such purpose, that this Bond matured on January 1, 2030 (the date that is six months prior to the Maturity Date), that would be used, at the time of the selection and in accordance with customary financial practice, in pricing new issues of corporate debt securities of comparable maturity to the remaining term of this Bond to be redeemed.

"Comparable Treasury Price" means, with respect to any Redemption Date on which the Bonds are being redeemed pursuant to the redemption terms of a Bond, (a) the average of the Reference Treasury Dealer Quotations for such Redemption Date, after excluding the highest and lowest of the Reference Treasury Dealer Quotations; or (b) if the Company obtains fewer than four Reference Treasury Dealer Quotations, the average of all Reference Treasury Dealer Quotations so received.

"Primary Treasury Dealer" means a primary dealer in U.S. Government Securities.

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 61 of 1367

"Quotation Agent" means the Reference Treasury Dealer appointed by the Company in respect of the Bonds.

"Reference Treasury Dealer", means Barclays Capital Inc., BofA Securities, Inc., Citigroup Global Markets Inc., Goldman Sachs & Co. LLC and J.P. Morgan Securities LLC, and their respective successors, unless any of them ceases to be a Primary Treasury Dealer, in which case the Company shall substitute another Primary Treasury Dealer; and (2) any other Primary Treasury Dealer selected by the Company.

"Reference Treasury Dealer Quotations" means, the average, as determined by the Company, of the bid and asked prices for the Comparable Treasury Issue (expressed in each case as a percentage of its principal amount) quoted in writing to the Company by that Reference Treasury Dealer at 5:00 p.m., New York City time, on the third Business Day preceding such Redemption Date.

"Remaining Scheduled Payments" means, with respect to the Bonds that the Company is redeeming pursuant to the redemption terms of a Bond, the remaining scheduled payments of principal and interest that would be due after the applicable Redemption Date if the Bond were not redeemed. However, if the Redemption Date is not a scheduled Interest Payment Date with respect to the Bond, the amount of the next succeeding scheduled interest payment on the Bond will be reduced by the amount of interest accrued on the Bond to the Redemption Date.

"U.S. Government Securities" means securities which are (a) direct obligations of the United States of America for the payment on which its full faith and credit is pledged or (b) obligations of a person controlled or supervised by and acting as an agency or instrumentality of the United States of America the payment of which is unconditionally guaranteed as a full faith and credit obligation of the United States of America, and which in the case of (a) and (b) are not callable or redeemable at the option of the issuer thereof, and shall also include a depository receipt issued by a bank or trust company as custodian with respect to any such U.S. Government Security or a specific payment of interest on or principal of any such U.S. Government Security held by such custodian for the account of the holder of a depository receipt, provided that (except as required by law) such custodian is not authorized to make any deduction from the amount payable to the holder of such depository receipt from any amount received by the custodian in respect of the U.S. Government Security evidenced by such depository receipt.

Interest installments whose Stated Maturity is on or prior to such Redemption Date will be payable to Holders of such Bonds of this series, of record at the close of business on the relevant Record Dates referred to on the face hereof, all as provided in the Mortgage Indenture.

In the case of an Optional Redemption, notice of redemption will be in writing and sent not less than 10 days nor more than 60 days prior to the Redemption Date to each Holder of Bonds to be redeemed at the Holder's registered address; provided, however, that such notice need not state the dollar amount of the Redemption Price if such dollar amount has not been determined as of the date such notice is being given to the Holders of the Bonds being redeemed. If money sufficient to pay the Redemption Price of the Bonds (or portions thereof) to be redeemed on the Redemption Date is deposited with the Paying Agent or the Trustee on or prior to the Redemption Date, from and after such Redemption Date such Bond or portions thereof shall cease to bear interest. Bonds of this series in denominations larger than $100,000 in principal amount may be redeemed in part but only in integral multiples of $1,000.

In the event of redemption of this Bond in part only, a new Bond or Bonds of this series and of like tenor for the unredeemed portion hereof will be issued in the name of the Holder hereof upon surrender hereof.

As provided in the Mortgage Indenture and subject to certain limitations therein set forth, this Bond or any portion of the principal amount hereof will be deemed to have been paid for all purposes of the Mortgage Indenture and to be no longer Outstanding thereunder, and the Company's entire indebtedness in respect thereof will be satisfied and discharged, if there has been irrevocably deposited with the Trustee or any Paying Agent (other than the Company), in trust, money in an amount which will be sufficient and/or Eligible Obligations, the principal of and interest on which when due, without regard to any reinvestment thereof, will provide moneys which, together with money, if any, deposited with or held by the Trustee or such Paying Agent, will be sufficient to pay when due the principal of and premium, if any, and interest on this Bond when due.

If an Event of Default shall occur and be continuing, the Trustee or the Holders of not less than 25% in aggregate principal amount of the Bonds then Outstanding, considered as one class, may declare the principal amount of all Bonds then Outstanding to be due and payable immediately by notice in writing to the Company (and to the Trustee if given by Holders); *provided*, *however*, that with respect to certain Events of Default relating to bankruptcy, insolvency and similar events, the principal amount of all Bonds then Outstanding shall be due and payable immediately without further action by the Trustee or the Holders.

The Mortgage Indenture permits, with certain exceptions as therein provided, the Company and the Trustee to enter into one or more supplemental indentures for the purpose of adding any provisions to, or changing in any manner or eliminating any of the provisions of, the Mortgage Indenture with the consent of the Holders of not less than a majority in aggregate principal amount of the Bonds at the time Outstanding, considered as one class; *provided*, *however*, that if there shall be Bonds of more than one series Outstanding under the Mortgage Indenture and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such series, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all series so directly affected, considered as one class, shall be required; and *provided*, *further*, that if the Bonds of any series shall have been issued in more than one Tranche and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such Tranches, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all Tranches so directly affected, considered as one class, shall be required; and *provided*, *further*, that the Mortgage Indenture permits the Company and the Trustee to enter into one or more supplemental indentures for certain purposes without the consent of any Holders of Bonds. The Mortgage Indenture also contains provisions permitting the Holders of a majority in aggregate principal amount of Bonds, on behalf of the Holders of all such Bonds, to waive certain past defaults under the Mortgage Indenture and their consequences. Any such consent or waiver by the Holder of this Bond shall be conclusive and binding upon such Holder and upon all future Holders of this Bond and of any Bond issued upon the registration of transfer hereof or in exchange herefor or in lieu hereof, whether or not notation of such consent or waiver is made upon this Bond.

As provided in and subject to the provisions of the Mortgage Indenture, the Holder of this Bond shall not have the right to institute any proceeding with respect to the Mortgage Indenture or for the appointment of a receiver or trustee or for any other remedy thereunder, unless such Holder shall have previously given the Trustee written notice of a continuing Event of Default, the Holders of at least 25% in aggregate principal amount of the Bonds at the time Outstanding shall have made written request to the Trustee to institute proceedings in respect of such Event of Default as Trustee and offered the Trustee reasonable indemnity, and the Trustee shall not have received from the Holders of at least a majority in aggregate principal amount of Bonds at the time Outstanding a direction inconsistent with such written request, and shall have failed to institute any such proceeding for 60 days after receipt of such notice, request and offer of indemnity. The foregoing shall not apply to any suit instituted by the Holder of this Bond for the enforcement of any payment of principal hereof or any premium or interest hereon on or after the respective due dates expressed herein.

No reference herein to the Mortgage Indenture and no provision of this Bond or of the Mortgage Indenture shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal of and any premium and interest on this Bond at the times, place and rate, and in the coin or currency, herein prescribed.

As provided in the Mortgage Indenture and subject to certain limitations therein set forth, the transfer of this Bond is registrable in the Bond Register, upon surrender of this Bond for registration of transfer at the office or agency of the Company in any place where the principal of and any premium and interest on this Bond are payable, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Company, the Trustee or the Bond Registrar, as the case may be, duly executed by the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new Bonds of this series and of like tenor, of authorized denominations and for the same aggregate principal amount, will be issued to the designated transferee or transferees.

The Bonds of the Twenty-Ninth Series are issuable only in registered form without coupons in denominations of $1,000 and any integral multiple thereof. As provided in the Mortgage Indenture and subject to certain limitations therein set forth, Bonds of this series are exchangeable for a like aggregate principal amount of Bonds of this series and of like tenor of a different authorized denomination, as requested by the Holders surrendering the same.

The Company shall not be required to execute or to provide for the registration of the transfer of or the exchange of (A) any Bond of this series during a period of 15 days immediately preceding the date notice is to be given identifying the serial numbers (or with respect to Global Bonds, CUSIP numbers) of the Bonds of this series called for redemption, or (B) any Bond of this series selected for redemption in whole or in part, except the unredeemed portion of any Bond of this series being redeemed in part.

No service charge shall be made for any such registration of transfer or exchange, but the Company may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

Prior to due presentment of this Bond for registration of transfer, the Company, the Trustee and any agent of the Company or the Trustee may treat the Person in whose name this Bond is registered as the owner hereof for all purposes, whether or not this Bond is overdue, and neither the Company, the Trustee nor any such agent shall be affected by notice to the contrary.

This Bond shall be governed by, and construed and enforced in accordance with, the laws of the State of New York without regard to the principles of conflicts of laws thereunder, except to the extent that the Trust Indenture Act shall be applicable.

As provided in the Mortgage Indenture, no recourse shall be had for the payment of the principal of, premium, if any, or interest with respect to this Bond, or any part thereof, or for any claim based hereon or otherwise in respect hereof, or of the indebtedness represented hereby, or upon any obligation, covenant or agreement under the Mortgage Indenture, against any incorporator, shareholder, officer or director, as such, past, present or future, of the Company or of any predecessor or successor corporation (either directly or through the Company or a predecessor or successor corporation), whether by virtue of any constitutional provision, statute or rule of law or by the enforcement of any assessment or penalty or otherwise; it being expressly agreed and understood that the Mortgage Indenture and all the Bonds are solely corporate obligations and that any such personal liability is hereby expressly waived and released as a condition of, and as part of the consideration for, the execution of the Mortgage Indenture and the issuance of this Bond.

All terms used in this Bond which are not defined herein shall have the meanings assigned to them in the Mortgage Indenture.

**ASSIGNMENT FORM**

To assign this Bond, fill in the form below: (I) or (we) assign and transfer this Bond to

_____

_____

(Insert assignee's soc. sec. or tax I.D. no.)

_____

_____

_____

_____

(Print or type assignee's name, address and zip code)

and irrevocably appoint _____

to transfer this Bond on the books of the Company. The agent may substitute another to act for him.

Date: _____

Your signature: _____
(Sign exactly as your name appears on the face of this Bond)

Tax Identification No.:

SIGNATURE GUARANTEE:

_____

Signatures must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Bond Registrar, which requirements include membership or participation in the Security Transfer Agent Medallion Program ("STAMP") or such other "signature guarantee program" as may be determined by the Bond Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

**Exhibit 4.2**

TO BE RECORDED AND WHEN
RECORDED RETURN TO:

Hunton Andrews Kurth LLP
550 South Hope Street, Suite 2000
Los Angeles, CA 90071
Attention: Robert M. Johnson, Esq.

**FOURTH SUPPLEMENTAL INDENTURE**

**DATED AS OF JULY 1, 2020**

**SUPPLEMENT TO INDENTURE OF MORTGAGE**
**DATED AS OF JUNE 19, 2020**

———————————————

**PACIFIC GAS AND ELECTRIC COMPANY**
**ISSUER (MORTGAGOR)**

**AND**

**THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A.,**
**TRUSTEE (MORTGAGEE)**

———————————————

# TABLE OF CONTENTS

|  | PAGE |
|---|---|
| ARTICLE I DEFINITIONS | 2 |
| ARTICLE II ESTABLISHMENT OF 3.15% FIRST MORTGAGE BOND DUE 2026 | 2 |
| ARTICLE III ESTABLISHMENT OF 4.50% FIRST MORTGAGE BOND DUE 2040 | 2 |
| ARTICLE IV ISSUE OF FUNDED DEBT MORTGAGE BONDS | 3 |
| ARTICLE V GLOBAL BONDS; APPOINTMENT OF DEPOSITARY FOR GLOBAL BONDS | 3 |
| ARTICLE VI NO SINKING FUND | 3 |
| ARTICLE VII PAYING AGENT AND BOND REGISTRAR | 3 |
| ARTICLE VIII TRUSTEE | 4 |
| ARTICLE IX MISCELLANEOUS | 4 |

EXHIBIT A FORM OF 3.15% FIRST MORTGAGE BOND DUE 2026
EXHIBIT B FORM OF 4.50% FIRST MORTGAGE BOND DUE 2040

i

**FOURTH SUPPLEMENTAL INDENTURE**, dated as of July 1, 2020 (this "<u>SUPPLEMENTAL INDENTURE</u>"), by and between **PACIFIC GAS AND ELECTRIC COMPANY**, a California corporation (the "<u>COMPANY</u>"), and **THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A.**, a national banking association organized under the laws of the United States of America, as Trustee and Mortgagee under the Mortgage Indenture (as hereinafter defined) (the "<u>TRUSTEE</u>").

## RECITALS OF THE COMPANY

A. The Company and the Trustee are parties to that certain Indenture of Mortgage, dated as of June 19, 2020 (together with all indentures supplemental thereto, the "<u>MORTGAGE INDENTURE</u>"), providing for the issuance by the Company of Bonds (as defined in the Mortgage Indenture) from time to time.

B. Under the Mortgage Indenture, the Company is authorized to issue unlimited series of Bonds and establish one or more series of Bonds at any time in accordance with the provisions of the Mortgage Indenture, and the terms of such series of Bonds may be described by a supplemental indenture executed by the Company and the Trustee.

C. Section 14.01(f) of Mortgage Indenture provides that the Company and the Trustee may enter into an indenture supplemental to the Mortgage Indenture to establish the form or terms of Bonds of any series as contemplated by Sections 2.01 and 3.01 of the Mortgage Indenture.

D. The Company and PG&E Corporation previously filed voluntary petitions for relief (the "<u>Chapter 11 Cases</u>") under Chapter 11 of the United States Bankruptcy Code (the "<u>Bankruptcy Code</u>") in the U.S. Bankruptcy Court for the Northern District of California (the "<u>Bankruptcy Court</u>") on January 29, 2019.

E. The Company and PG&E Corporation previously filed the *Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization* dated March 16, 2020 (as may be amended, modified or supplemented, the "<u>Plan of Reorganization</u>") with the Bankruptcy Court, which contemplates certain transactions that must be consummated prior to the effectiveness of the Plan of Reorganization and the Company's and PG&E Corporation's emergence from the Chapter 11 Cases.

F. Implementation of the Plan of Reorganization by the Company requires the issuance of an equal amount of two (2) series of Funded Debt Mortgage Bonds (as defined below) to holders of claims relating to the Company's credit facilities and certain of the Company's Pollution Control Bonds, in each case, existing prior to the Chapter 11 Cases (collectively, the "<u>Pre-Petition Holders</u>").

G. The Company desires in and by this Supplemental Indenture (i) to create two (2) series of Bonds designated as 3.15% First Mortgage Bond Due 2026 and 4.50% First Mortgage Bond Due 2040 (collectively, the "<u>Funded Debt Mortgage Bonds</u>"), in the forms set forth in Exhibit A and Exhibit B, respectively, attached hereto, to be issued under the Mortgage Indenture, (ii) to designate such series of Funded Debt Mortgage Bonds and set forth the maturity date or dates, interest rate or rates and establish the form or terms of such Funded Debt Mortgage Bonds and (iii) to deliver such series of Funded Debt Mortgage Bonds to the applicable Pre-Petition Holders.

H. The execution and delivery of this Supplemental Indenture has been authorized by a Board Resolution (as defined in the Mortgage Indenture).

I. Concurrent with the execution hereof, the Company has caused its counsel to deliver to the Trustee an Officer's Certificate and Opinion of Counsel (as defined in the Mortgage Indenture) pursuant to Section 14.03 of the Mortgage Indenture.

J. The Company has done all things necessary to make this Supplemental Indenture a valid agreement of the Company in accordance with its terms.

**NOW, THEREFORE,** the Company and the Trustee agree, for the benefit of each other and the equal and proportionate benefit of all Pre-Petition Holders, as follows:

1

# ARTICLE I

## DEFINITIONS

Unless the context otherwise requires, capitalized terms used but not defined herein have the meaning set forth in the Mortgage Indenture.

The words "herein," "hereof" and "hereunder" and other words of similar import refer to this Supplemental Indenture as a whole and not to any particular Article, Section or other subdivision.

# ARTICLE II

## ESTABLISHMENT OF 3.15% FIRST MORTGAGE BOND DUE 2026

SECTION 1. There is hereby created a Thirtieth series of Bonds to consist of one or more Bonds issued under and secured by the Mortgage Indenture, to be designated as "3.15% First Mortgage Bond Due 2026" of the Company ("Bonds of the Thirtieth Series"). The Bonds of the Thirtieth Series shall be fully registered in the name of Cede & Co., as the nominee of DTC.

(a) The Bonds of the Thirtieth Series shall be initially issued in the aggregate principal amount of $1,951,470,000.

(b) The Bonds of the Thirtieth Series shall be dated July 1, 2020. The Bonds of the Thirtieth Series shall mature on January 1, 2026, subject to prior redemption.

(c) Interest will accrue on the unpaid portion of the principal of the Bonds of the Thirtieth Series from its issue date until the entire principal amount of the Bonds of the Thirtieth Series is paid. The Bonds of the Thirtieth Series shall bear interest at the rate of 3.15% per annum.

(d) The payment or payments of the principal of and premium, if any, on the Bonds of the Thirtieth Series is as set forth in Exhibit A hereto.

(e) The Bonds of the Thirtieth Series shall be subject to redemption at the times and in the amounts as set forth in Exhibit A hereto.

SECTION 2. The form of the Bonds of the Thirtieth Series is set forth in Exhibit A hereto and is hereby incorporated herein and made a part hereof.

# ARTICLE III

## ESTABLISHMENT OF 4.50% FIRST MORTGAGE BOND DUE 2040

SECTION 1. There is hereby created a Thirty-First series of Bonds to consist of one or more Bonds issued under and secured by the Mortgage Indenture, to be designated as "4.50% First Mortgage Bond Due 2040" of the Company ("Bonds of the Thirty-First Series"). The Bonds of the Thirtieth Series shall be fully registered in the name of Cede & Co., as the nominee of DTC.

(a) The Bonds of the Thirty-First Series shall be initially issued in the aggregate principal amount of $1,951,470,000.

(b) The Bonds of the Thirty-First Series shall be dated July 1, 2020. The Bonds of the Thirty-First Series shall mature on July 1, 2040, subject to prior redemption.

2

(c) Interest will accrue on the unpaid portion of the principal of the Bonds of the Thirty-First Series from its issue date until the entire principal amount of the Bonds of the Thirty-First Series is paid. The Bonds of the Thirty-First Series shall bear interest at the rate of 4.50% per annum.

(d) The payment or payments of the principal of and premium, if any, on the Bonds of the Thirty-First Series is as set forth in Exhibit B hereto.

(e) The Bonds of the Thirty-First Series shall be subject to redemption at the times and in the amounts as set forth in Exhibit B hereto.

SECTION 2. The form of the Bonds of the Thirty-First Series is set forth in Exhibit B hereto and is hereby incorporated herein and made a part hereof.

## ARTICLE IV

### ISSUE OF MORTGAGE BONDS

SECTION 1. Each series of the Funded Debt Mortgage Bonds may be executed, authenticated and delivered as permitted by the provisions of Section 5.02, 5.03 or 5.04 of the Mortgage Indenture.

## ARTICLE V

### GLOBAL BONDS; APPOINTMENT OF DEPOSITARY FOR GLOBAL BONDS

The Funded Debt Mortgage Bonds shall be issued in the form of one or more permanent Global Bonds as provided in Section 3.14 of the Mortgage Indenture and deposited with, or on behalf of, the Depositary or with the Trustee, as custodian for the Depositary, duly executed by the Company and authenticated by the Trustee as hereinafter provided.

The Company hereby initially appoints The Depository Trust Company ("DTC") to act as the Depositary with respect to all Funded Debt Mortgage Bonds, and the Funded Debt Mortgage Bonds shall initially be registered in the name of Cede & Co., as the nominee of DTC.

None of the Company, the Trustee, any Paying Agent or any Bond Registrar will have any responsibility or liability for any aspect of Depositary records relating to, or payments made on account of, beneficial ownership interests in a Global Bond or for maintaining, supervising or reviewing any Depositary records relating to such beneficial ownership interests, or for transfers of beneficial interests in the Funded Debt Mortgage Bonds or any transactions between the Depositary and beneficial owners.

## ARTICLE VI

### NO SINKING FUND

No sinking fund is provided for any of the Funded Debt Mortgage Bonds.

## ARTICLE VII

### PAYING AGENT AND BOND REGISTRAR

The Trustee is hereby appointed as initial Paying Agent and initial Bond Registrar for the Funded Debt Mortgage Bonds.

3

# ARTICLE VIII

## TRUSTEE

SECTION 1. The Trustee shall not be responsible in any manner whatsoever for or in respect of the validity or sufficiency of this Supplemental Indenture or the due execution hereof by the Company, or for or in respect of the recitals and statements contained herein, all of which recitals and statements are made solely by the Company.

Except as herein otherwise provided, no duties, responsibilities or liabilities are assumed, or shall be construed to be assumed, by the Trustee by reason of this Supplemental Indenture other than as set forth in the Mortgage Indenture; and this Supplemental Indenture is executed and accepted on behalf of the Trustee, subject to all the terms and conditions set forth in the Mortgage Indenture, as fully to all intents as if the same were herein set forth at length.

# ARTICLE IX

## MISCELLANEOUS

SECTION 1. Except insofar as herein otherwise expressly provided, all the provisions, definitions, terms and conditions of the Mortgage Indenture, as amended, shall be deemed to be incorporated in, and made a part of, this Supplemental Indenture; and the Mortgage Indenture as supplemented and amended by this Supplemental Indenture is in all respects ratified and confirmed; and the Mortgage Indenture and this Supplemental Indenture shall be read, taken and construed as one and the same instrument.

SECTION 2. Nothing in this Supplemental Indenture is intended, or shall be construed to give to any person or corporation, other than the parties hereto and the holders of the Funded Debt Mortgage Bonds issued and to be issued under and in respect of this Supplemental Indenture, or under any covenant, condition or provision herein contained, all the covenants, conditions and provisions of this Supplemental Indenture being intended to be, and being, for the sole and exclusive benefit of the parties hereto and of the holders of the Funded Debt Mortgage Bonds issued and to be issued under the Mortgage Indenture and secured thereby.

SECTION 3. All covenants, stipulations and agreements in this Supplemental Indenture contained by or on behalf of the Company shall bind and (subject to the provisions of the Mortgage Indenture) inure to the benefit of its successors and assigns, whether so expressed or not.

SECTION 4. The headings of the several Articles of this Supplemental Indenture are inserted for convenience of reference, and shall not be deemed to be any part hereof.

SECTION 5. This Supplemental Indenture shall be effective upon the execution and delivery hereof by each of the parties hereto.

SECTION 6. This Supplemental Indenture may be executed in any number of counterparts, and each of such counterparts shall together constitute but one and the same instrument. Delivery of an executed Supplemental Indenture by one party to the other may be made by facsimile, electronic mail (including any electronic signature complying with the New York Electronic Signatures and Records Act (N.Y. State Tech. §§ 301-309), as amended from time to time, or other applicable law) or other transmission method, and the parties hereto agree that any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

SECTION 7. The laws of the State of New York shall govern this Supplemental Indenture and the Funded Debt Mortgage Bonds, without giving effect to applicable principles of conflicts of law to the extent that the application of the laws of another jurisdiction would be required thereby.

4

SECTION 8. In case any provision in this Supplemental Indenture or the Funded Debt Mortgage Bond shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

IN WITNESS WHEREOF, the parties hereto have caused this Fourth Supplemental Indenture to be duly executed as of the day and year first above written.

PACIFIC GAS AND ELECTRIC COMPANY,
as Issuer (Mortgagor)

By:   /s/ Margaret K. Becker
Name:  Margaret K. Becker
Title:   Senior Director and Treasurer

THE BANK OF NEW YORK MELLON TRUST
COMPANY, N.A.,
as Trustee (Mortgagee)

By:   /s/ Charles G. Nelson
Name:  Charles G. Nelson
Title:   Vice President

[Signature Page to Supplemental Indenture]

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA }
}
COUNTY OF SAN FRANCISCO }

On June 4, 2020, before me, Jolie F. Ocampo, personally appeared Margaret K. Becker, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

/s/ Jolie F. Ocampo
Signature

Jolie Franchesca Ocampo
Notary Public – California
San Francisco County
Commission #2221172
My Comm. Expires Dec. 6, 2021

(Seal)

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF FLORIDA      }
                                 }
COUNTY OF DUVAL      }

On June 30, 2020, before me, Joshua P. Kakareka, personally appeared Charles G. Nelson, a Vice President of the Bank of New York Mellon Trust Company, N.A. and who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

/s/ Joshua P. Kakareka
Joshua P. Kakareka
Notary Public
State of Florida
Comm# GG931852
Expires 11/13/2023

(Seal)

**[FORM OF BONDS OF THE THIRTIETH SERIES]**

**[FORM OF FACE OF BOND]**

THIS BOND IS A GLOBAL BOND WITHIN THE MEANING OF THE MORTGAGE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF A DEPOSITARY (AS DEFINED IN THE MORTGAGE INDENTURE) OR A NOMINEE THEREOF. THIS GLOBAL BOND IS EXCHANGEABLE FOR BONDS REGISTERED IN THE NAME OF ANY PERSON OTHER THAN SUCH DEPOSITARY OR ITS NOMINEE ONLY IN LIMITED CIRCUMSTANCES DESCRIBED IN THE MORTGAGE INDENTURE AND, UNLESS AND UNTIL IT IS EXCHANGED IN WHOLE OR IN PART FOR BONDS IN CERTIFICATED FORM, THIS GLOBAL BOND MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY, OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY, OR BY THE DEPOSITARY OR ANY SUCH NOMINEE TO A SUCCESSOR DEPOSITARY OR A NOMINEE OF SUCH SUCCESSOR DEPOSITARY.

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE COMPANY (AS DEFINED BELOW) OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY BOND ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

THE FOLLOWING SUMMARY OF TERMS IS SUBJECT TO THE INFORMATION SET FORTH ON THE REVERSE HEREOF:

| | | |
|---|---|---|
| PRINCIPAL AMOUNT: | ORIGINAL ISSUE DATE: | INTEREST RATE: |
| $_____ | July 1, 2020 | 3.15% |
| MATURITY DATE: | INTEREST PAYMENT DATES: | THIS BOND IS A: |
| January 1, 2026 | January 1 and July 1 of each year, commencing January 1, 2021 | [X] Global Book-Entry Bond<br>[   ] Certificated Bond |

REGISTERED OWNER: Cede & Co., as nominee of The Depository Trust Company

A-1

No. _____                                                                    Principal Amount: $_____

CUSIP No: _____

PACIFIC GAS AND ELECTRIC COMPANY, a corporation duly organized and existing under the laws of the State of California (herein called the "Company," which term includes any successor Person pursuant to the applicable provisions of the Mortgage Indenture hereinafter referred to), for value received, hereby promises to pay to Cede & Co., as nominee for The Depository Trust Company, or registered assigns, the Principal Amount stated above on the Maturity Date stated above, and to pay interest thereon from and including July 2, 2020 or, in the case of a 3.15% First Mortgage Bond Due 2026 issued upon the registration of transfer or exchange, from and including the most recent Interest Payment Date to which interest has been paid or duly provided for, semi-annually in arrears on the Interest Payment Dates set forth above and on the Maturity Date stated above, commencing January 1, 2021, at the rate of 3.15% per annum until the principal hereof is paid or made available for payment. The interest so payable, and punctually paid or duly provided for, on any Interest Payment Date will, as provided in such Mortgage Indenture, be paid to the Person in whose name this 3.15% First Mortgage Bond Due 2026 (this "Bond") (or one or more Predecessor Bonds) is registered at the close of business on the Regular Record Date for such interest, which shall be the 15th day of the month next preceding such Interest Payment Date; provided, however, that interest payable at the Maturity Date or on a Redemption Date will be paid to the Person to whom principal is payable. Any such interest not so punctually paid or duly provided for will forthwith cease to be payable to the Holder on such Regular Record Date and may either be paid to the Person in whose name this Bond (or one or more Predecessor Bonds) is registered at the close of business on a Special Record Date for the payment of such Defaulted Interest to be fixed by the Trustee, notice whereof shall be given to Holders of Bonds of this series not less than 10 days prior to such Special Record Date, or be paid at any time in any other lawful manner not inconsistent with the requirements of the Mortgage Indenture and any securities exchange, if any, on which the Bonds of this series may be listed, and upon such notice as may be required by any such exchange, all as more fully provided in said Mortgage Indenture.

Payments of interest on this Bond will include interest accrued to but excluding the respective Interest Payment Dates. Interest payments for this Bond shall be computed and paid on the basis of the 360-day year of twelve 30-day months and will accrue from July 2, 2020 or from the most recent Interest Payment Date to which interest has been paid or duly provided for. In the event that any date on which interest is payable on this Bond (other than the Maturity Date) is not a Business Day, then payment of the interest payable on such date will be made on the next succeeding day that is a Business Day (and without any interest or payment in respect of any such delay) with the same force and effect as if made on the date the payment was originally payable. If the Maturity Date falls on a day that is not a Business Day, the payment of principal, premium, if any, and interest may be made on the next succeeding Business Day, and no interest on such payment shall accrue for the period from and after maturity.

Payment of principal of, premium, if any, and interest on the Bonds of this series shall be made in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts. Payments of principal of, premium, if any, and interest on the Bonds of this series represented by a Global Bond shall be made by wire transfer of immediately available funds to the Holder of such Global Bond, provided that, in the case of payments of principal and premium, if any, such Global Bond is first surrendered to the Paying Agent. If any of the Bonds of this series are no longer represented by a Global Bond, (i) payments of principal, premium, if any, and interest due on the Maturity Date or earlier redemption of such Bonds shall be made at the office of the Paying Agent upon surrender of such Bonds to the Paying Agent, and (ii) payments of interest shall be made, at the option of the Company, subject to such surrender where applicable, (A) by check mailed to the address of the Person entitled thereto as such address shall appear in the Bond Register or (B) by wire transfer to registered Holders of at least $10,000,000 in principal amount of Bonds at such place and to such account at a banking institution in the United States as such Holders may designate in writing to the Trustee at least sixteen (16) days prior to the date for payment.

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 77 of 1367

REFERENCE IS HEREBY MADE TO THE FURTHER PROVISIONS OF THIS BOND SET FORTH ON THE REVERSE HEREOF, WHICH FURTHER PROVISIONS SHALL FOR ALL PURPOSES HAVE THE SAME EFFECT AS IF SET FORTH AT THIS PLACE.

A-3

Unless the certificate of authentication hereon has been executed by the Trustee referred to on the reverse hereof by manual or electronic signature, this Bond shall not be entitled to any benefit under the Mortgage Indenture or be valid or obligatory for any purpose.

IN WITNESS WHEREOF, the Company has caused this instrument to be duly executed.

Dated: _____

                                            PACIFIC GAS AND ELECTRIC COMPANY

                                            By _____

                                            By _____

A-4

**TRUSTEE'S CERTIFICATE OF AUTHENTICATION**

This is one of the Bonds of the series designated as Bonds of the Thirtieth Series referred to in the within-mentioned Mortgage Indenture.

THE BANK OF NEW YORK MELLON TRUST
COMPANY, N.A., as Trustee

By _____
　　　　　　　　　　　Authorized Signatory

Dated:

A-5

This 3.15% First Mortgage Bond due 2026 is one of a duly authorized issue of Bonds of the Company (the "Bonds"), issued and issuable in one or more series under and equally secured by an Indenture of Mortgage, dated as of June 19, 2020 (such Indenture of Mortgage as originally executed and delivered and as supplemented or amended from time to time thereafter, together with any constituent instruments establishing the terms of particular Bonds, being herein called the "Mortgage Indenture"), between the Company and The Bank of New York Mellon Trust Company, N.A., as Trustee (herein called the "Trustee," which term includes any successor trustee under the Mortgage Indenture), and reference is hereby made to the Mortgage Indenture for a description of the property mortgaged, pledged and held in trust, the nature and extent of the security and the respective rights, limitations of rights, duties and immunities of the Company, the Trustee and the Holders of Bonds thereunder and of the terms and conditions upon which Bonds are, and are to be, authenticated and delivered. The acceptance of this Bond shall be deemed to constitute the consent and agreement by the Holder hereof to all of the terms and provisions of the Mortgage Indenture.

Subject to the terms and conditions of the Mortgage Indenture, the Bonds of this series are also redeemable at the option of the Company ("Optional Redemption"), in whole or in part, at any time after the Original Issue Date and prior to the Maturity Date, at a redemption price equal to the greater of:

(a) 100% of the principal amount of the Bonds of this series to be redeemed; or

(b) as determined by the Independent Investment Banker, the sum of the present values of the Remaining Scheduled Payments on the Bonds of this series to be so redeemed (not including any portion of such payments of interest accrued to the Redemption Date) discounted to the Redemption Date on a semi-annual basis (assuming a 360-day year consisting of twelve 30-day months) at the Adjusted Treasury Rate, plus 0.25%,

plus, in either of the above cases, accrued and unpaid interest on the principal amount of the Bonds of this series being redeemed to but not including the Redemption Date.

For the purposes of this Bond:

"Adjusted Treasury Rate" means, with respect to any Redemption Date on which any Bonds are being redeemed:

(a) the yield, under the heading which represents the average for the immediately preceding week, appearing in the most recently published statistical release designated "H.15(519) Selected Interest Rates" or any successor publication that is published weekly by the Board of Governors of the Federal Reserve System and that establishes yields on actively traded United States treasury securities adjusted to constant maturity under the caption "Treasury Constant Maturities" for the maturity corresponding to the Comparable Treasury Issue (if no maturity is within three months before or after the Remaining Life, yields for the two published maturities most closely corresponding to the Comparable Treasury Issue will be determined and the Adjusted Treasury Rate will be interpolated or extrapolated from such yields on a straight line basis, rounding to the nearest month); or

(b) if such release (or any successor publication) is not published during the week preceding the calculation date or does not contain such yields, the rate per annum equal to the semi-annual equivalent yield to maturity of the Comparable Treasury Issue (expressed as a percentage of its principal amount) equal to the Comparable Treasury Price for such Redemption Date.

The Adjusted Treasury Rate will be calculated on the third Business Day preceding the Redemption Date.

"Business Day" means any day, other than a Saturday or Sunday, which is not a day on which banking institutions or trust companies in (i) any place of payment or other location specified in the Bonds or the Mortgage Indenture or (ii) the location of the Company's principal place of business or the Corporate Trust Office of the Trustee, are generally authorized or required by law, regulation or executive order to remain closed, except as may be otherwise specified as contemplated by the Mortgage Indenture.

A-6

"Comparable Treasury Issue" means the United States Treasury security selected by the Independent Investment Banker as having a maturity comparable to the Remaining Life of the Bonds to be redeemed that would be utilized, at the time of selection and in accordance with customary financial practice, in pricing new issues of corporate debt securities of comparable maturity to the Remaining Life of the Bonds to be redeemed.

"Comparable Treasury Price" means, with respect to any Redemption Date on which the Bonds are being redeemed, (a) the average of five (5) Reference Treasury Dealer Quotations for such Redemption Date, after excluding the highest and lowest Reference Treasury Dealer Quotations, or (b) if the Independent Investment Banker obtains fewer than five (5) such Reference Treasury Dealer Quotations, the average of all quotations obtained.

"Dealer" means a primary U.S. Government Securities dealer in the United States.

"Independent Investment Banker" means a Dealer appointed by the Company.

"Reference Treasury Dealer" means Barclays Capital Inc., J.P. Morgan Securities LLC, the Independent Investment Banker and Dealers acceptable to the Independent Investment Banker and their respective successors; provided, however, that if any of the foregoing shall cease to be a Dealer, the Company will select a substitute Dealer.

"Reference Treasury Dealer Quotations" means, with respect to each Reference Treasury Dealer and any Redemption Date, the average, as determined by the Independent Investment Banker, of the bid and asked prices for the Comparable Treasury Issue (expressed in each case as a percentage of its principal amount) quoted in writing to the Independent Investment Banker at 5:00 p.m., New York City time, on the third Business Day preceding such Redemption Date.

"Remaining Life," as of any date of calculation, means the remaining term of the Bonds.

"Remaining Scheduled Payments" means, with respect to the Bonds that the Company is redeeming, the remaining scheduled payments of principal and interest that would be due after the applicable Redemption Date if such Bond were not redeemed. However, if the Redemption Date is not a scheduled Interest Payment Date with respect to that Bond, the amount of the next succeeding scheduled interest payment on that Bond will be reduced by the amount of interest accrued on such Bond to the Redemption Date.

"U.S. Government Securities" means securities which are (a) direct obligations of the United States of America for the payment on which its full faith and credit is pledged or (b) obligations of a Person controlled or supervised by and acting as an agency or instrumentality of the United States of America the payment of which is unconditionally guaranteed as a full faith and credit obligation of the United States of America, and which in the case of (a) and (b) are not callable or redeemable at the option of the issuer thereof, and shall also include a depository receipt issued by a bank or trust company as custodian with respect to any such U.S. Government Security or a specific payment of interest on or principal of any such U.S. Government Security held by such custodian for the account of the holder of a depository receipt, provided that (except as required by law) such custodian is not authorized to make any deduction from the amount payable to the holder of such depository receipt from any amount received by the custodian in respect of the U.S. Government Security evidenced by such depository receipt.

Interest installments whose Stated Maturity is on or prior to such Redemption Date will be payable to Holders of such Bonds of this series, or one or more Predecessor Bonds, of record at the close of business on the relevant Record Dates referred to on the face hereof, all as provided in the Mortgage Indenture.

In the case of an Optional Redemption, notice of redemption will be in writing and sent not less than 30 days nor more than 60 days prior to the Redemption Date to each Holder of Bonds of this series to be redeemed at the Holder's registered address. If money sufficient to pay the redemption price of all Bonds of this series (or portions thereof) to be redeemed on the Redemption Date is deposited with the Paying Agent or the Trustee on or prior to the Redemption Date, from and after such Redemption Date such Bonds or portions thereof shall cease to bear interest. The Bonds of this series in denominations larger than $1,000 in principal amount may be redeemed in part but only in integral multiples of $1,000.

In the event of redemption of this Bond in part only, a new Bond or Bonds of this series and of like tenor for the unredeemed portion hereof will be issued in the name of the Holder hereof upon the surrender hereof.

A-7

As provided in the Mortgage Indenture and subject to certain limitations therein set forth, this Bond or any portion of the principal amount hereof will be deemed to have been paid for all purposes of the Mortgage Indenture and to be no longer Outstanding thereunder, and the Company's entire indebtedness in respect thereof will be satisfied and discharged, if there has been irrevocably deposited with the Trustee or any Paying Agent (other than the Company), in trust, money in an amount which will be sufficient and/or Eligible Obligations, the principal of and interest on which when due, without regard to any reinvestment thereof, will provide moneys which, together with money, if any, deposited with or held by the Trustee or such Paying Agent, will be sufficient to pay when due the principal of and premium, if any, and interest on this Bond when due.

If an Event of Default shall occur and be continuing as provided in the Mortgage Indenture, the Trustee or the Holders of not less than 25% in aggregate principal amount of Bonds then Outstanding, considered as one class, may declare the principal amount of all Bonds then Outstanding to be due and payable immediately by notice in writing to the Company (and to the Trustee if given by Holders); *provided, however*, that with respect to certain Events of Default relating to bankruptcy, insolvency and similar events, the principal amount of all Bonds then Outstanding shall be due and payable immediately without further action by the Trustee or the Holders.

The Mortgage Indenture permits, with certain exceptions as therein provided, the Company and the Trustee to enter into one or more supplemental indentures for the purpose of adding any provisions to, or changing in any manner or eliminating any of the provisions of, the Mortgage Indenture with the consent of the Holders of not less than a majority in aggregate principal amount of the Bonds at the time Outstanding, considered as one class; *provided, however*, that if there shall be Bonds of more than one series Outstanding under the Mortgage Indenture and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such series, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all series so directly affected, considered as one class, shall be required; and *provided, further*, that if the Bonds of any series shall have been issued in more than one Tranche and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such Tranches, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all Tranches so directly affected, considered as one class, shall be required; and *provided, further*, that the Mortgage Indenture permits the Company and the Trustee to enter into one or more supplemental indentures for certain purposes without the consent of any Holders of Bonds. The Mortgage Indenture also contains provisions permitting the Holders of a majority in aggregate principal amount of Bonds, on behalf of the Holders of all such Bonds, to waive certain past defaults under the Mortgage Indenture and their consequences. Any such consent or waiver by the Holder of this Bond shall be conclusive and binding upon such Holder and upon all future Holders of this Bond and of any Bond issued upon the registration of transfer hereof or in exchange herefor or in lieu hereof, whether or not notation of such consent or waiver is made upon this Bond.

As provided in and subject to the provisions of the Mortgage Indenture, the Holder of this Bond shall not have the right to institute any proceeding with respect to the Mortgage Indenture or for the appointment of a receiver or trustee or for any other remedy thereunder, unless such Holder shall have previously given the Trustee written notice of a continuing Event of Default, the Holders of at least 25% in aggregate principal amount of the Bonds at the time Outstanding shall have made written request to the Trustee to institute proceedings in respect of such Event of Default as Trustee and offered the Trustee reasonable indemnity, and the Trustee shall not have received from the Holders of at least a majority in aggregate principal amount of Bonds at the time Outstanding a direction inconsistent with such written request, and shall have failed to institute any such proceeding for 60 days after receipt of such notice, request and offer of indemnity. The foregoing shall not apply to any suit instituted by the Holder of this Bond for the enforcement of any payment of principal hereof or any premium or interest hereon on or after the respective due dates expressed herein.

No reference herein to the Mortgage Indenture and no provision of this Bond or of the Mortgage Indenture shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal of and any premium and interest on this Bond at the times, place and rate, and in the coin or currency, herein prescribed.

As provided in the Mortgage Indenture and subject to certain limitations therein set forth, the transfer of this Bond is registrable in the Bond Register, upon surrender of this Bond for registration of transfer at the office or agency of the Company in any place where the principal of and any premium and interest on this Bond are payable, duly

A-8

endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Company, the Trustee or the Bond Registrar, as the case may be, duly executed by the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new Bonds of this series and of like tenor, of authorized denominations and for the same aggregate principal amount, will be issued to the designated transferee or transferees.

The Bonds of the Thirtieth Series are issuable only in registered form without coupons in denominations of $1,000 and any integral multiple of $1 thereof. As provided in the Mortgage Indenture and subject to certain limitations therein set forth, Bonds of this series are exchangeable for a like aggregate principal amount of Bonds of this series and of like tenor of a different authorized denomination, as requested by the Holders surrendering the same.

No service charge shall be made for any such registration of transfer or exchange, but the Company may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

The Company shall not be required to execute or to provide for the registration of the transfer of or the exchange of (A) any Bond of this series during a period of 15 days immediately preceding the date notice is to be given identifying the serial numbers (or with respect to Global Bonds, CUSIP numbers) of the Bonds of this series called for redemption, or (B) any Bond of this series selected for redemption in whole or in part, except the unredeemed portion of any Bond of this series being redeemed in part.

Prior to due presentment of this Bond for registration of transfer, the Company, the Trustee and any agent of the Company or the Trustee may treat the Person in whose name this Bond is registered as the owner hereof for all purposes, whether or not this Bond is overdue, and neither the Company, the Trustee nor any such agent shall be affected by notice to the contrary.

This Bond shall be governed by, and construed and enforced in accordance with, the laws of the State of New York without regard to the principles of conflicts of laws thereunder, except to the extent that the Trust Indenture Act shall be applicable.

As provided in the Mortgage Indenture, no recourse shall be had for the payment of the principal of, premium, if any, or interest with respect to this Bond, or any part thereof, or for any claim based hereon or otherwise in respect hereof, or of the indebtedness represented hereby, or upon any obligation, covenant or agreement under the Mortgage Indenture, against any incorporator, shareholder, officer or director, as such, past, present or future, of the Company or of any predecessor or successor corporation (either directly or through the Company or a predecessor or successor corporation), whether by virtue of any constitutional provision, statute or rule of law or by the enforcement of any assessment or penalty or otherwise; it being expressly agreed and understood that the Mortgage Indenture and all the Bonds are solely corporate obligations and that any such personal liability is hereby expressly waived and released as a condition of, and as part of the consideration for, the execution of the Mortgage Indenture and the issuance of this Bond.

All terms used in this Bond which are not defined herein shall have the meanings assigned to them in the Mortgage Indenture.

A-9

**ASSIGNMENT FORM**

To assign this Bond, fill in the form below: (I) or (we) assign and transfer this Bond to_____

_____
(Insert assignee's soc. sec. or tax I.D. no.)

_____
_____
_____
_____
_____
(Print or type assignee's name, address and zip code)

and irrevocably appoint _____ to transfer this Bond on the books of the Company. The agent may substitute another to act for him.

Date: _____

Your signature: _____
(Sign exactly as your name appears on the face of this Bond)

Tax Identification No.:

SIGNATURE GUARANTEE:

_____

Signatures must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Bond Registrar, which requirements include membership or participation in the Security Transfer Agent Medallion Program ("STAMP") or such other "signature guarantee program" as may be determined by the Bond Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended

.

A-10

**[FORM OF BONDS OF THE THIRTY-FIRST SERIES]**

**[FORM OF FACE OF BOND]**

THIS BOND IS A GLOBAL BOND WITHIN THE MEANING OF THE MORTGAGE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF A DEPOSITARY (AS DEFINED IN THE MORTGAGE INDENTURE) OR A NOMINEE THEREOF. THIS GLOBAL BOND IS EXCHANGEABLE FOR BONDS REGISTERED IN THE NAME OF ANY PERSON OTHER THAN SUCH DEPOSITARY OR ITS NOMINEE ONLY IN LIMITED CIRCUMSTANCES DESCRIBED IN THE MORTGAGE INDENTURE AND, UNLESS AND UNTIL IT IS EXCHANGED IN WHOLE OR IN PART FOR BONDS IN CERTIFICATED FORM, THIS GLOBAL BOND MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY, OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY, OR BY THE DEPOSITARY OR ANY SUCH NOMINEE TO A SUCCESSOR DEPOSITARY OR A NOMINEE OF SUCH SUCCESSOR DEPOSITARY.

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE COMPANY (AS DEFINED BELOW) OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY BOND ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

THE FOLLOWING SUMMARY OF TERMS IS SUBJECT TO THE INFORMATION SET FORTH ON THE REVERSE HEREOF:

PRINCIPAL AMOUNT:  ORIGINAL ISSUE DATE:  INTEREST RATE:
$_____  July 1, 2020  4.50%

MATURITY DATE:  INTEREST PAYMENT DATES:  THIS BOND IS A:
July 1, 2040  January 1 and July 1 of each year, commencing January 1, 2021  [X] Global Book-Entry Bond
[   ] Certificated Bond

REGISTERED OWNER: Cede & Co., as nominee of The Depository Trust Company

A-1

No. _____                                                          Principal Amount: $_____

CUSIP No: _____

   PACIFIC GAS AND ELECTRIC COMPANY, a corporation duly organized and existing under the laws of the State of California (herein called the "Company," which term includes any successor Person pursuant to the applicable provisions of the Mortgage Indenture hereinafter referred to), for value received, hereby promises to pay to Cede & Co., as nominee for The Depository Trust Company, or registered assigns, the Principal Amount stated above on the Maturity Date stated above, and to pay interest thereon from and including July 2, 2020 or, in the case of a 4.50% First Mortgage Bond Due 2040 issued upon the registration of transfer or exchange, from and including the most recent Interest Payment Date to which interest has been paid or duly provided for, semi-annually in arrears on the Interest Payment Dates set forth above and on the Maturity Date stated above, commencing January 1, 2021, at the rate of 4.50% per annum until the principal hereof is paid or made available for payment. The interest so payable, and punctually paid or duly provided for, on any Interest Payment Date will, as provided in such Mortgage Indenture, be paid to the Person in whose name this 4.50% First Mortgage Bond Due 2040 (this "Bond") (or one or more Predecessor Bonds) is registered at the close of business on the Regular Record Date for such interest, which shall be the December 15 and June 15 preceding such Interest Payment Date; provided, however, that interest payable at the Maturity Date or on a Redemption Date will be paid to the Person to whom principal is payable. Any such interest not so punctually paid or duly provided for will forthwith cease to be payable to the Holder on such Regular Record Date and may either be paid to the Person in whose name this Bond (or one or more Predecessor Bonds) is registered at the close of business on a Special Record Date for the payment of such Defaulted Interest to be fixed by the Trustee, notice whereof shall be given to Holders of Bonds of this series not less than 10 days prior to such Special Record Date, or be paid at any time in any other lawful manner not inconsistent with the requirements of the Mortgage Indenture and any securities exchange, if any, on which the Bonds of this series may be listed, and upon such notice as may be required by any such exchange, all as more fully provided in said Mortgage Indenture.

   Payments of interest on this Bond will include interest accrued to but excluding the respective Interest Payment Dates. Interest payments for this Bond shall be computed and paid on the basis of the 360-day year of twelve 30-day months and will accrue from July 2, 2020 or from the most recent Interest Payment Date to which interest has been paid or duly provided for. In the event that any date on which interest is payable on this Bond (other than the Maturity Date) is not a Business Day, then payment of the interest payable on such date will be made on the next succeeding day that is a Business Day (and without any interest or payment in respect of any such delay) with the same force and effect as if made on the date the payment was originally payable. If the Maturity Date falls on a day that is not a Business Day, the payment of principal, premium, if any, and interest may be made on the next succeeding Business Day, and no interest on such payment shall accrue for the period from and after maturity.

   Payment of principal of, premium, if any, and interest on the Bonds of this series shall be made in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts. Payments of principal of, premium, if any, and interest on the Bonds of this series represented by a Global Bond shall be made by wire transfer of immediately available funds to the Holder of such Global Bond, provided that, in the case of payments of principal and premium, if any, such Global Bond is first surrendered to the Paying Agent. If any of the Bonds of this series are no longer represented by a Global Bond, (i) payments of principal, premium, if any, and interest due on the Maturity Date or earlier redemption of such Bonds shall be made at the office of the Paying Agent upon surrender of such Bonds to the Paying Agent, and (ii) payments of interest shall be made, at the option of the Company, subject to such surrender where applicable, (A) by check mailed to the address of the Person entitled thereto as such address shall appear in the Bond Register or (B) by wire transfer to registered Holders of at least $10,000,000 in principal amount of Bonds at such place and to such account at a banking institution in the United States as such Holders may designate in writing to the Trustee at least sixteen (16) days prior to the date for payment.

A-2

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 87 of 1367

REFERENCE IS HEREBY MADE TO THE FURTHER PROVISIONS OF THIS BOND SET FORTH ON THE REVERSE HEREOF, WHICH FURTHER PROVISIONS SHALL FOR ALL PURPOSES HAVE THE SAME EFFECT AS IF SET FORTH AT THIS PLACE.

A-3

Unless the certificate of authentication hereon has been executed by the Trustee referred to on the reverse hereof by manual or electronic signature, this Bond shall not be entitled to any benefit under the Mortgage Indenture or be valid or obligatory for any purpose.

IN WITNESS WHEREOF, the Company has caused this instrument to be duly executed.

Dated: _____

PACIFIC GAS AND ELECTRIC COMPANY

By _____

By _____

A-4

**TRUSTEE'S CERTIFICATE OF AUTHENTICATION**

This is one of the Bonds of the series designated as Bonds of the Thirty-First Series referred to in the within-mentioned Mortgage Indenture.

THE BANK OF NEW YORK MELLON TRUST
COMPANY, N.A., as Trustee

By _____
                        Authorized Signatory

Dated:

A-5

This 4.50% First Mortgage Bond due 2040 is one of a duly authorized issue of Bonds of the Company (the "Bonds"), issued and issuable in one or more series under and equally secured by an Indenture of Mortgage, dated as of June 19, 2020 (such Indenture of Mortgage as originally executed and delivered and as supplemented or amended from time to time thereafter, together with any constituent instruments establishing the terms of particular Bonds, being herein called the "Mortgage Indenture"), between the Company and The Bank of New York Mellon Trust Company, N.A., as Trustee (herein called the "Trustee," which term includes any successor trustee under the Mortgage Indenture), and reference is hereby made to the Mortgage Indenture for a description of the property mortgaged, pledged and held in trust, the nature and extent of the security and the respective rights, limitations of rights, duties and immunities of the Company, the Trustee and the Holders of Bonds thereunder and of the terms and conditions upon which Bonds are, and are to be, authenticated and delivered. The acceptance of this Bond shall be deemed to constitute the consent and agreement by the Holder hereof to all of the terms and provisions of the Mortgage Indenture.

Subject to the terms and conditions of the Mortgage Indenture, the Bonds of this series are also redeemable at the option of the Company ("Optional Redemption"), in whole or in part, at any time prior to January 1, 2040 (the date that is six months prior to the Maturity Date), at a redemption price equal to the greater of:

(a) 100% of the principal amount of the Bonds of this series to be redeemed; or

(b) as determined by the Quotation Agent, the sum of the present values of the Remaining Scheduled Payments of principal and interest on the Bonds to be redeemed (not including any portion of payments of interest accrued as of the Redemption Date), calculated as if the Maturity Date of the Bonds was January 1, 2040 (the date that is six months prior to the Maturity Date), discounted to the Redemption Date on a semi-annual basis at the Adjusted Treasury Rate, plus 20 basis points,

plus, in either of the above cases, accrued and unpaid interest thereon to but not including the Redemption Date; and (b) at any time on or after January 1, 2040 (the date that is six months prior to the Maturity Date) at 100% of the principal amount of the Bonds to be redeemed, plus accrued and unpaid interest thereon to but not including the Redemption Date.

For purposes of this Bond:

"Adjusted Treasury Rate" means, with respect to any Redemption Date on which the Bonds are being redeemed pursuant to the redemption terms of a Bond, the rate per annum equal to the semiannual equivalent yield to maturity of the Comparable Treasury Issue, assuming a price for the Comparable Treasury Issue (expressed as a percentage of its principal amount) equal to the Comparable Treasury Price for such Redemption Date.

"Business Day" means any day that is not a day on which banking institutions in New York City are authorized or required by law or regulation to close.

"Comparable Treasury Issue" means the United States Treasury security selected by the applicable Quotation Agent as having a maturity comparable to the remaining term of this Bond, assuming, for such purpose, that this Bond matured on January 1, 2040, (the date that is six months prior to the Maturity Date)), that would be used, at the time of the selection and in accordance with customary financial practice, in pricing new issues of corporate debt securities of comparable maturity to the remaining term of this Bond to be redeemed.

"Comparable Treasury Price" means, with respect to any Redemption Date on which the Bonds are being redeemed pursuant to the redemption terms of a Bond, (a) the average of the Reference Treasury Dealer Quotations for such Redemption Date, after excluding the highest and lowest of the Reference Treasury Dealer Quotations; or (b) if the Company obtains fewer than four Reference Treasury Dealer Quotations, the average of all Reference Treasury Dealer Quotations so received.

"Primary Treasury Dealer" means a primary dealer in U.S. Government Securities.

"Quotation Agent" means the Reference Treasury Dealer appointed by the Company in respect of the Bonds.

A-6

"Reference Treasury Dealer", means (1) Barclays Capital Inc., BofA Securities, Inc., Citigroup Global Markets Inc., Goldman Sachs & Co. LLC and J.P. Morgan Securities LLC, and their respective successors, unless any of them ceases to be a Primary Treasury Dealer, in which case the Company shall substitute another Primary Treasury Dealer; and (2) any other Primary Treasury Dealer selected by the Company.

"Reference Treasury Dealer Quotations" means, the average, as determined by the Company, of the bid and asked prices for the Comparable Treasury Issue (expressed in each case as a percentage of its principal amount) quoted in writing to the Company by that Reference Treasury Dealer at 5:00 p.m., New York City time, on the third Business Day preceding such Redemption Date.

"Remaining Scheduled Payments" means, with respect to the Bonds that the Company is redeeming pursuant to the redemption terms of a Bond, the remaining scheduled payments of principal and interest that would be due after the applicable Redemption Date if the Bond were not redeemed. However, if the Redemption Date is not a scheduled Interest Payment Date with respect to the Bond, the amount of the next succeeding scheduled interest payment on the Bond will be reduced by the amount of interest accrued on the Bond to the Redemption Date.

"U.S. Government Securities" means securities which are (a) direct obligations of the United States of America for the payment on which its full faith and credit is pledged or (b) obligations of a person controlled or supervised by and acting as an agency or instrumentality of the United States of America the payment of which is unconditionally guaranteed as a full faith and credit obligation of the United States of America, and which in the case of (a) and (b) are not callable or redeemable at the option of the issuer thereof, and shall also include a depository receipt issued by a bank or trust company as custodian with respect to any such U.S. Government Security or a specific payment of interest on or principal of any such U.S. Government Security held by such custodian for the account of the holder of a depository receipt, provided that (except as required by law) such custodian is not authorized to make any deduction from the amount payable to the holder of such depository receipt from any amount received by the custodian in respect of the U.S. Government Security evidenced by such depository receipt.

Interest installments whose Stated Maturity is on or prior to such Redemption Date will be payable to Holders of such Bonds of this series, of record at the close of business on the relevant Record Dates referred to on the face hereof, all as provided in the Mortgage Indenture.

In the case of an Optional Redemption, notice of redemption will be in writing and sent not less than 10 days nor more than 60 days prior to the Redemption Date to each Holder of Bonds to be redeemed at the Holder's registered address; provided, however, that such notice need not state the dollar amount of the Redemption Price if such dollar amount has not been determined as of the date such notice is being given to the Holders of the Bonds being redeemed. If money sufficient to pay the Redemption Price of the Bonds (or portions thereof) to be redeemed on the Redemption Date is deposited with the Paying Agent or the Trustee on or prior to the Redemption Date, from and after such Redemption Date such Bond or portions thereof shall cease to bear interest. Bonds of this series in denominations larger than $100,000 in principal amount may be redeemed in part but only in integral multiples of $1,000.

In the event of redemption of this Bond in part only, a new Bond or Bonds of this series and of like tenor for the unredeemed portion hereof will be issued in the name of the Holder hereof upon the surrender hereof.

As provided in the Mortgage Indenture and subject to certain limitations therein set forth, this Bond or any portion of the principal amount hereof will be deemed to have been paid for all purposes of the Mortgage Indenture and to be no longer Outstanding thereunder, and the Company's entire indebtedness in respect thereof will be satisfied and discharged, if there has been irrevocably deposited with the Trustee or any Paying Agent (other than the Company), in trust, money in an amount which will be sufficient and/or Eligible Obligations, the principal of and interest on which when due, without regard to any reinvestment thereof, will provide moneys which, together with money, if any, deposited with or held by the Trustee or such Paying Agent, will be sufficient to pay when due the principal of and premium, if any, and interest on this Bond when due.

If an Event of Default shall occur and be continuing as provided in the Mortgage Indenture, the Trustee or the Holders of not less than 25% in aggregate principal amount of Bonds then Outstanding, considered as one class, may declare the principal amount of all Bonds then Outstanding to be due and payable immediately by notice in

A-7

writing to the Company (and to the Trustee if given by Holders); *provided*, *however*, that with respect to certain Events of Default relating to bankruptcy, insolvency and similar events, the principal amount of all Bonds then Outstanding shall be due and payable immediately without further action by the Trustee or the Holders.

The Mortgage Indenture permits, with certain exceptions as therein provided, the Company and the Trustee to enter into one or more supplemental indentures for the purpose of adding any provisions to, or changing in any manner or eliminating any of the provisions of, the Mortgage Indenture with the consent of the Holders of not less than a majority in aggregate principal amount of the Bonds at the time Outstanding, considered as one class; *provided*, *however*, that if there shall be Bonds of more than one series Outstanding under the Mortgage Indenture and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such series, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all series so directly affected, considered as one class, shall be required; and *provided*, *further*, that if the Bonds of any series shall have been issued in more than one Tranche and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such Tranches, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all Tranches so directly affected, considered as one class, shall be required; and *provided*, *further*, that the Mortgage Indenture permits the Company and the Trustee to enter into one or more supplemental indentures for certain purposes without the consent of any Holders of Bonds. The Mortgage Indenture also contains provisions permitting the Holders of a majority in aggregate principal amount of Bonds, on behalf of the Holders of all such Bonds, to waive certain past defaults under the Mortgage Indenture and their consequences. Any such consent or waiver by the Holder of this Bond shall be conclusive and binding upon such Holder and upon all future Holders of this Bond and of any Bond issued upon the registration of transfer hereof or in exchange herefor or in lieu hereof, whether or not notation of such consent or waiver is made upon this Bond.

As provided in and subject to the provisions of the Mortgage Indenture, the Holder of this Bond shall not have the right to institute any proceeding with respect to the Mortgage Indenture or for the appointment of a receiver or trustee or for any other remedy thereunder, unless such Holder shall have previously given the Trustee written notice of a continuing Event of Default, the Holders of at least 25% in aggregate principal amount of the Bonds at the time Outstanding shall have made written request to the Trustee to institute proceedings in respect of such Event of Default as Trustee and offered the Trustee reasonable indemnity, and the Trustee shall not have received from the Holders of at least a majority in aggregate principal amount of Bonds at the time Outstanding a direction inconsistent with such written request, and shall have failed to institute any such proceeding for 60 days after receipt of such notice, request and offer of indemnity. The foregoing shall not apply to any suit instituted by the Holder of this Bond for the enforcement of any payment of principal hereof or any premium or interest hereon on or after the respective due dates expressed herein.

No reference herein to the Mortgage Indenture and no provision of this Bond or of the Mortgage Indenture shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal of and any premium and interest on this Bond at the times, place and rate, and in the coin or currency, herein prescribed.

As provided in the Mortgage Indenture and subject to certain limitations therein set forth, the transfer of this Bond is registrable in the Bond Register, upon surrender of this Bond for registration of transfer at the office or agency of the Company in any place where the principal of and any premium and interest on this Bond are payable, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Company, the Trustee or the Bond Registrar, as the case may be, duly executed by the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new Bonds of this series and of like tenor, of authorized denominations and for the same aggregate principal amount, will be issued to the designated transferee or transferees.

The Bonds of the Thirty-First Series are issuable only in registered form without coupons in denominations of $1,000 and any integral multiple of $1 thereof. As provided in the Mortgage Indenture and subject to certain limitations therein set forth, Bonds of this series are exchangeable for a like aggregate principal amount of Bonds of this series and of like tenor of a different authorized denomination, as requested by the Holders surrendering the same.

No service charge shall be made for any such registration of transfer or exchange, but the Company may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

A-8

The Company shall not be required to execute or to provide for the registration of the transfer of or the exchange of (A) any Bond of this series during a period of 15 days immediately preceding the date notice is to be given identifying the serial numbers (or with respect to Global Bonds, CUSIP numbers) of the Bonds of this series called for redemption, or (B) any Bond of this series selected for redemption in whole or in part, except the unredeemed portion of any Bond of this series being redeemed in part.

Prior to due presentment of this Bond for registration of transfer, the Company, the Trustee and any agent of the Company or the Trustee may treat the Person in whose name this Bond is registered as the owner hereof for all purposes, whether or not this Bond is overdue, and neither the Company, the Trustee nor any such agent shall be affected by notice to the contrary.

This Bond shall be governed by, and construed and enforced in accordance with, the laws of the State of New York without regard to the principles of conflicts of laws thereunder, except to the extent that the Trust Indenture Act shall be applicable.

As provided in the Mortgage Indenture, no recourse shall be had for the payment of the principal of, premium, if any, or interest with respect to this Bond, or any part thereof, or for any claim based hereon or otherwise in respect hereof, or of the indebtedness represented hereby, or upon any obligation, covenant or agreement under the Mortgage Indenture, against any incorporator, shareholder, officer or director, as such, past, present or future, of the Company or of any predecessor or successor corporation (either directly or through the Company or a predecessor or successor corporation), whether by virtue of any constitutional provision, statute or rule of law or by the enforcement of any assessment or penalty or otherwise; it being expressly agreed and understood that the Mortgage Indenture and all the Bonds are solely corporate obligations and that any such personal liability is hereby expressly waived and released as a condition of, and as part of the consideration for, the execution of the Mortgage Indenture and the issuance of this Bond.

All terms used in this Bond which are not defined herein shall have the meanings assigned to them in the Mortgage Indenture.

<div align="center">A-9</div>

**ASSIGNMENT FORM**

To assign this Bond, fill in the form below: (I) or (we) assign and transfer this Bond to_____

_____
(Insert assignee's soc. sec. or tax I.D. no.)

_____

_____

_____

_____
(Print or type assignee's name, address and zip code)

and irrevocably appoint _____ to transfer this Bond on the books of the
Company. The agent may substitute another to act for him.

Date: _____

Your signature: _____
(Sign exactly as your name appears on the face of this Bond)

Tax Identification No.:

SIGNATURE GUARANTEE:

_____
Signatures must be guaranteed by an "eligible guarantor
institution" meeting the requirements of the Bond Registrar,
which requirements include membership or participation in
the Security Transfer Agent Medallion Program ("STAMP")
or such other "signature guarantee program" as may be
determined by the Bond Registrar in addition to, or in
substitution for, STAMP, all in accordance with the Securities
Exchange Act of 1934, as amended.

A-10

Exhibit 4.3

**Thirtieth Supplemental Indenture**

**Dated as of July 1, 2020**

**Supplement to the Amended and Restated Indenture**

**Dated as of April 22, 2005**

———————————

**PACIFIC GAS AND ELECTRIC COMPANY**

**Issuer**

**and**

**BOKF, N.A.**

**Trustee**

———————————

# TABLE OF CONTENTS

RECITALS OF THE COMPANY ... 1

ARTICLE ONE RELATION TO INDENTURE; ADDITIONAL DEFINITIONS ... 5

Section 101   Relation to Indenture ... 5
Section 102   Additional Definitions ... 5

ARTICLE TWO AMENDMENT OF SIXTEENTH SUPPLEMENTAL INDENTURE AND THE 4.50% SENIOR NOTES DUE 2041 ... 5

Section 201   Exhibit A of the Sixteenth Supplemental Indenture ... 5
Section 202   The Sixteenth Supplemental Indenture (Amended) ... 5
Section 203   Section 207 of the Sixteenth Supplemental Indenture (Amended) ... 5
Section 204   The Sixteenth Supplemental Indenture (Amended 209) ... 6
Section 205   The Sixteenth Supplemental Indenture (Amended 210) ... 7
Section 206   The Sixteenth Supplemental Indenture (Amended 211) ... 9
Section 207   The Sixteenth Supplemental Indenture (Amended 212) ... 10
Section 208   The Sixteenth Supplemental Indenture (Amended 213) ... 10
Section 209   Bond Exchange ... 10

ARTICLE THREE AMENDMENT OF SEVENTEENTH SUPPLEMENTAL INDENTURE AND THE 4.45% SENIOR NOTES DUE 2042 ... 11

Section 301   Exhibit A of the Seventeenth Supplemental Indenture ... 11
Section 302   The Seventeenth Supplemental Indenture (Amended) ... 11
Section 303   Section 207 of the Seventeenth Supplemental Indenture ... 11
Section 304   The Seventeenth Supplemental Indenture (Amended 209) ... 12
Section 305   The Seventeenth Supplemental Indenture (Amended 210) ... 13
Section 306   The Seventeenth Supplemental Indenture (Amended 211) ... 15
Section 307   The Seventeenth Supplemental Indenture (Amended 212) ... 16
Section 308   The Seventeenth Supplemental Indenture (Amended 213) ... 16
Section 309   Bond Exchange ... 16

ARTICLE FOUR AMENDMENT OF THE EIGHTEENTH SUPPLEMENTAL INDENTURE AND THE 3.75% SENIOR NOTES DUE 2042 ... 17

Section 401   Exhibit B of the Eighteenth Supplemental Indenture (Replaced) ... 17
Section 402   The Eighteenth Supplemental Indenture (Amended) ... 17
Section 403   Section 307 of the Seventeenth Supplemental Indenture (Amended) ... 17
Section 404   The Eighteenth Supplemental Indenture (Amended 309) ... 18
Section 405   The Eighteenth Supplemental Indenture (Amended 310) ... 19
Section 406   The Eighteenth Supplemental Indenture (Amended 311) ... 21
Section 407   The Eighteenth Supplemental Indenture (Amended 312) ... 22
Section 408   The Eighteenth Supplemental Indenture (Amended 313) ... 22
Section 409   Bond Exchange ... 22

i

**ARTICLE FIVE AMENDMENT OF THE NINETEENTH SUPPLEMENTAL INDENTURE, THE 3.25% SENIOR NOTES DUE 2023 AND THE 4.60% SENIOR NOTES DUE 2043** ... 23

| Section 501 | Exhibit A and Exhibit B of the Nineteenth Supplemental Indenture | 23 |
| Section 502 | The Nineteenth Supplemental Indenture (Amended) | 23 |
| Section 503 | Section 207 of the Nineteenth Supplemental Indenture (Amended) | 23 |
| Section 504 | The Nineteenth Supplemental Indenture (Amended 209) | 24 |
| Section 505 | The Nineteenth Supplemental Indenture (Amended 210) | 25 |
| Section 506 | The Nineteenth Supplemental Indenture (Amended 211) | 27 |
| Section 507 | The Nineteenth Supplemental Indenture (Amended 212) | 28 |
| Section 508 | The Nineteenth Supplemental Indenture (Amended 213) | 28 |
| Section 509 | Bond Exchange | 28 |
| Section 510 | Section 307 of the Nineteenth Supplemental Indenture (Amended) | 29 |
| Section 511 | The Nineteenth Supplemental Indenture (Amended 309) | 30 |
| Section 512 | The Nineteenth Supplemental Indenture (Amended 310) | 31 |
| Section 513 | The Nineteenth Supplemental Indenture (Amended 311) | 33 |
| Section 514 | The Nineteenth Supplemental Indenture (Amended 312) | 33 |
| Section 515 | The Nineteenth Supplemental Indenture (Amended 313) | 34 |
| Section 516 | Bond Exchange | 34 |

**ARTICLE SIX AMENDMENT OF THE TWENTIETH SUPPLEMENTAL INDENTURE AND THE 3.85% SENIOR NOTES DUE 2023** ... 34

| Section 601 | Exhibit A of the Twentieth Supplemental Indenture (Replaced A-6) | 34 |
| Section 602 | The Twentieth Supplemental Indenture (Amended) | 34 |
| Section 603 | Section 207 of the Twentieth Supplemental Indenture (Amended) | 35 |
| Section 604 | The Twentieth Supplemental Indenture (Amended 209) | 35 |
| Section 605 | The Twentieth Supplemental Indenture (Amended 210) | 37 |
| Section 606 | The Twentieth Supplemental Indenture (Amended 211) | 39 |
| Section 607 | The Twentieth Supplemental Indenture (Amended 212) | 39 |
| Section 608 | The Twentieth Supplemental Indenture (Amended 213) | 40 |
| Section 609 | Bond Exchange | 40 |

**ARTICLE SEVEN AMENDMENT OF THE TWENTY-FIRST SUPPLEMENTAL INDENTURE, THE 3.75% SENIOR NOTES DUE 2024 AND THE 4.75% SENIOR NOTES DUE 2044** ... 40

| Section 701 | Exhibit A and Exhibit B of the Twenty-First Supplemental Indenture (Amended) | 40 |
| Section 702 | The Twenty-First Supplemental Indenture (Amended) | 40 |
| Section 703 | Section 207 of the Twenty-First Supplemental Indenture (Amended) | 41 |
| Section 704 | The Twenty-First Supplemental Indenture (Amended 209) | 42 |
| Section 705 | The Twenty-First Supplemental Indenture (Amended 210) | 43 |
| Section 706 | The Twenty-First Supplemental Indenture (Amended 211) | 45 |
| Section 707 | The Twenty-First Supplemental Indenture (Amended 212) | 45 |
| Section 708 | The Twenty-First Supplemental Indenture (Amended 213) | 46 |

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 98 of 1367

| | | |
|---|---|---|
| Section 709 | Bond Exchange | 46 |
| Section 710 | Section 307 of the Twenty-First Supplemental Indenture (Amended 307) | 46 |
| Section 711 | The Twenty-First Supplemental Indenture (Amended 309) | 47 |
| Section 712 | The Twenty-First Supplemental Indenture (Amended 310) | 48 |
| Section 713 | The Twenty-First Supplemental Indenture (Amended 311) | 50 |
| Section 714 | The Twenty-First Supplemental Indenture (Amended 312) | 51 |
| Section 715 | The Twenty-First Supplemental Indenture (Amended 313) | 51 |
| Section 716 | Bond Exchange | 51 |

**ARTICLE EIGHT AMENDMENT OF THE TWENTY-THIRD SUPPLEMENTAL INDENTURE AND THE 3.40% SENIOR NOTES DUE 2024    52**

| | | |
|---|---|---|
| Section 801 | Exhibit A of the Twenty-Third Supplemental Indenture | 52 |
| Section 802 | The Twenty-Third Supplemental Indenture | 52 |
| Section 803 | Section 207 of the Twenty-Third Supplemental Indenture (Amended) | 52 |
| Section 804 | The Twenty-Third Supplemental Indenture (Amended 209) | 53 |
| Section 805 | The Twenty-Third Supplemental Indenture (Amended 210) | 54 |
| Section 806 | The Twenty-Third Supplemental Indenture (Amended 211) | 56 |
| Section 807 | The Twenty-Third Supplemental Indenture (Amended 212) | 57 |
| Section 808 | The Twenty-Third Supplemental Indenture (Amended 213) | 57 |
| Section 809 | Bond Exchange | 57 |

**ARTICLE NINE AMENDMENT OF THE TWENTY-FOURTH SUPPLEMENTAL INDENTURE AND THE 4.30% SENIOR NOTES DUE 2045    58**

| | | |
|---|---|---|
| Section 901 | Exhibit A of the Twenty-Fourth Supplemental Indenture | 58 |
| Section 902 | The Twenty-Fourth Supplemental Indenture | 58 |
| Section 903 | Section 207 of the Twenty-Fourth Supplemental Indenture (Amended) | 58 |
| Section 904 | The Twenty-Fourth Supplemental Indenture (Amended 209) | 59 |
| Section 905 | The Twenty-Fourth Supplemental Indenture (Amended 210) | 60 |
| Section 906 | The Twenty-Fourth Supplemental Indenture (Amended 211) | 62 |
| Section 907 | The Twenty-Fourth Supplemental Indenture (Amended 212) | 63 |
| Section 908 | The Twenty-Fourth Supplemental Indenture (Amended 213) | 63 |
| Section 909 | Bond Exchange | 63 |

**ARTICLE TEN AMENDMENT OF THE TWENTY-FIFTH SUPPLEMENTAL INDENTURE AND THE 3.50% SENIOR NOTES DUE 2025    64**

| | | |
|---|---|---|
| Section 1001 | Exhibit A of the Twenty-Fifth Supplemental Indenture | 64 |
| Section 1002 | The Twenty-Fifth Supplemental Indenture | 64 |
| Section 1003 | Section 207 of the Twenty-Fifth Supplemental Indenture | 64 |
| Section 1004 | The Twenty-Fifth Supplemental Indenture (Amended 209) | 65 |
| Section 1005 | The Twenty-Fifth Supplemental Indenture (Amended 210) | 66 |
| Section 1006 | The Twenty-Fifth Supplemental Indenture (Amended 211) | 68 |
| Section 1007 | The Twenty-Fifth Supplemental Indenture (Amended 212) | 69 |
| Section 1008 | The Twenty-Fifth Supplemental Indenture (Amended 213) | 69 |
| Section 1009 | Bond Exchange | 69 |

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 99
of 1367

ARTICLE ELEVEN AMENDMENT OF THE TWENTY-SIXTH SUPPLEMENTAL INDENTURE AND THE 4.25% SENIOR NOTES DUE 2046   70

Section 1101   Exhibit B of the Twenty-Sixth Supplemental Indenture   70
Section 1102   The Twenty-Sixth Supplemental Indenture   70
Section 1103   Section 307 of the Twenty-Sixth Supplemental Indenture   70
Section 1104   The Twenty-Sixth Supplemental Indenture (Amended 309)   71
Section 1105   The Twenty-Sixth Supplemental Indenture (Amended 310)   72
Section 1106   The Twenty-Sixth Supplemental Indenture (Amended 311)   74
Section 1107   The Twenty-Sixth Supplemental Indenture (Amended 312)   75
Section 1108   The Twenty-Sixth Supplemental Indenture (Amended 313)   75
Section 1109   Bond Exchange   75

ARTICLE TWELVE AMENDMENT OF THE TWENTY-SEVENTH SUPPLEMENTAL INDENTURE AND THE 2.95% SENIOR NOTES DUE 2026   76

Section 1201   Exhibit A of the Twenty-Seventh Supplemental Indenture   76
Section 1202   The Twenty-Seventh Supplemental Indenture (Amended)   76
Section 1203   Section 207 of the Twenty-Seventh Supplemental Indenture   76
Section 1204   The Twenty-Seventh Supplemental Indenture (Amended 209)   77
Section 1205   The Twenty-Seventh Supplemental Indenture (Amended 210)   78
Section 1206   The Twenty-Seventh Supplemental Indenture (Amended 211)   80
Section 1207   The Twenty-Seventh Supplemental Indenture (Amended 212)   81
Section 1208   The Twenty-Seventh Supplemental Indenture (Amended 213)   81
Section 1209   Bond Exchange   81

ARTICLE THIRTEEN AMENDMENT OF THE TWENTY-EIGHTH SUPPLEMENTAL INDENTURE AND THE 4.00% SENIOR NOTES DUE 2046   82

Section 1301   Exhibit B of the Twenty-Eighth Supplemental Indenture   82
Section 1302   The Twenty-Eighth Supplemental Indenture   82
Section 1303   Section 307 of the Twenty-Eighth Supplemental Indenture   82
Section 1304   The Twenty-Eighth Supplemental Indenture (Amended 309)   83
Section 1305   The Twenty-Eighth Supplemental Indenture (Amended 310)   84
Section 1306   The Twenty-Eighth Supplemental Indenture (Amended 311)   86
Section 1307   The Twenty-Eighth Supplemental Indenture (Amended 312)   87
Section 1308   The Twenty-Eighth Supplemental Indenture (Amended 313)   87
Section 1309   Bond Exchange   87

ARTICLE FOURTEEN AMENDMENT OF THE TWENTY-NINTH SUPPLEMENTAL INDENTURE AND THE 3.30% SENIOR NOTES DUE 2027   88

Section 1401   Exhibit A of the Twenty-Ninth Supplemental Indenture   88
Section 1402   The Twenty-Ninth Supplemental Indenture   88

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 100 of 1367

Section 1403    Section 207 of the Twenty-Ninth Supplemental Indenture                88
Section 1404    The Twenty-Ninth Supplemental Indenture (Amended 209)                89
Section 1405    The Twenty-Ninth Supplemental Indenture (Amended 210)                90
Section 1406    The Twenty-Ninth Supplemental Indenture (Amended 211)                92
Section 1407    The Twenty-Ninth Supplemental Indenture (Amended 212)                93
Section 1408    The Twenty-Ninth Supplemental Indenture (Amended 213)                93
Section 1409    Bond Exchange                                                         93

ARTICLE FIFTEEN PAYING AGENT, TRANSFER AGENT AND BOND REGISTRAR                       94

Section 1501    Paying Agent, Transfer Agent and Bond Registrar                      94

ARTICLE SIXTEEN MISCELLANEOUS PROVISIONS                                              94

Section 1601    Concerning the Trustee                                               94
Section 1602    Application of Thirtieth Supplemental Indenture                       94
Section 1603    Effective Date of Thirtieth Supplemental Indenture                    94
Section 1604    Governing Law                                                         94
Section 1605    Counterparts                                                          95

v

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page
101 of 1367

THIRTIETH SUPPLEMENTAL INDENTURE, dated as of July 1, 2020 (this "Thirtieth Supplemental Indenture"), by and between **PACIFIC GAS AND ELECTRIC COMPANY**, a corporation duly organized and existing under the laws of the State of California (the "Company" or the "Issuer"), and **BOKF, N.A.**, a national banking association organized and existing under the laws of the United States of America, as successor Trustee under the Base Indenture (as hereinafter defined) (the "Trustee").

## RECITALS OF THE COMPANY

A.    The Company and the Trustee are parties to that certain Indenture, dated as of April 22, 2005 (the "Base Indenture"), as supplemented by the First Supplemental Indenture, dated as of March 13, 2007 (the "First Supplemental Indenture"), the Second Supplemental Indenture, dated as of December 4, 2007 (the "Second Supplemental Indenture"), the Third Supplemental Indenture, dated as of March 3, 2008 (the "Third Supplemental Indenture"), the Fourth Supplemental Indenture, dated as of October 21, 2008 (the "Fourth Supplemental Indenture"), the Fifth Supplemental Indenture, dated as of November 18, 2008 (the "Fifth Supplemental Indenture"), the Sixth Supplemental Indenture, dated as of March 6, 2009 (the "Sixth Supplemental Indenture"), the Seventh Supplemental Indenture, dated as of June 11, 2009 (the "Seventh Supplemental Indenture"), the Eighth Supplemental Indenture, dated as of November 18, 2009 (the "Eighth Supplemental Indenture"), the Ninth Supplemental Indenture, dated as of April 1, 2010 (the "Ninth Supplemental Indenture"), the Tenth Supplemental Indenture, dated as of September 15, 2010 (the "Tenth Supplemental Indenture"), the Eleventh Supplemental Indenture, dated as of October 12, 2010 (the "Eleventh Supplemental Indenture"), the Twelfth Supplemental Indenture, dated as of November 18, 2010 (the "Twelfth Supplemental Indenture"), the Thirteenth Supplemental Indenture, dated as of May 13, 2011 (the "Thirteenth Supplemental Indenture"), the Fourteenth Supplemental Indenture, dated as of September 12, 2011 (the "Fourteenth Supplemental Indenture"), the Fifteenth Supplemental Indenture, dated as of November 22, 2011 (the "Fifteenth Supplemental Indenture"), the Sixteenth Supplemental Indenture, dated as of December 1, 2011 (the "Sixteenth Supplemental Indenture"), the Seventeenth Supplemental Indenture, dated as of April 16, 2012 (the "Seventeenth Supplemental Indenture"), the Eighteenth Supplemental Indenture, dated as of August 16, 2012 (the "Eighteenth Supplemental Indenture"), the Nineteenth Supplemental Indenture, dated as of June 14, 2013 (the "Nineteenth Supplemental Indenture"), the Twentieth Supplemental Indenture, dated as of November 12, 2013 (the "Twentieth Supplemental Indenture"), the Twenty-First Supplemental Indenture, dated as of February 21, 2014 (the "Twenty-First Supplemental Indenture"), the Twenty-Second Supplemental Indenture, dated as of May 12, 2014 (the "Twenty-Second Supplemental Indenture"), the Twenty-Third Supplemental Indenture, dated as of August 18, 2014 (the "Twenty-Third Supplemental Indenture"), the Twenty-Fourth Supplemental Indenture, dated as of November 6, 2014 (the "Twenty-Fourth Supplemental Indenture"), the Twenty-Fifth Supplemental Indenture, dated as of June 12, 2015 (the "Twenty-Fifth Supplemental Indenture"), the Twenty-Sixth Supplemental Indenture, dated as of November 5, 2015 (the "Twenty-Six Supplemental Indenture"), the Twenty-Seventh Supplemental Indenture, dated as of March 1, 2016 (the "Twenty-Seventh Supplemental Indenture"), the Twenty-Eighth Supplemental Indenture, dated as of December 1, 2016 (the "Twenty-Eighth Supplemental Indenture"), the Twenty-Ninth Supplemental Indenture, dated as of March 10, 2017 (the "Twenty-Ninth Supplemental Indenture") and this Thirtieth Supplemental Indenture, dated as of July 1, 2020 (this "Thirtieth Supplemental Indenture" and together with the Base Indenture, the First

Supplemental Indenture, the Second Supplemental Indenture, the Third Supplemental Indenture, the Fourth Supplemental Indenture, the Fifth Supplemental Indenture, the Sixth Supplemental Indenture, the Seventh Supplemental Indenture, the Eighth Supplemental Indenture, the Ninth Supplemental Indenture, the Tenth Supplemental Indenture, the Eleventh Supplemental Indenture, the Twelfth Supplemental Indenture, the Thirteenth Supplemental Indenture, the Fourteenth Supplemental Indenture, the Fifteenth Supplemental Indenture, the Sixteenth Supplemental Indenture, the Seventeenth Supplemental Indenture, the Eighteenth Supplemental Indenture, the Nineteenth Supplemental Indenture, the Twentieth Supplemental Indenture, the Twenty-First Supplemental Indenture, the Twenty-Second Supplemental Indenture, the Twenty-Third Supplemental Indenture, the Twenty-Fourth Supplemental Indenture, the Twenty-Fifth Supplemental Indenture, the Twenty-Sixth Supplemental Indenture, the Twenty-Seventh Supplemental Indenture, the Twenty-Eighth Supplemental Indenture and the Twenty-Ninth Supplemental Indenture, the "Indenture"), which supplements, amends and restates that certain Indenture of Mortgage, dated as of March 11, 2004, as supplemented by the First Supplemental Indenture thereto, dated as of March 23, 2004 and the Second Supplemental Indenture thereto, dated as of April 12, 2004, providing for the issuance by the Company of an unlimited number of series of Bonds (as defined in the Base Indenture) from time to time.

B. The following supplemental indentures have been previously executed and delivered to the Trustee, which supplemental indentures established the terms of the following series of Bonds outstanding under the Indenture as of the date hereof:

a. The Sixteenth Supplemental Indenture providing for the issuance of $250,000,000 in aggregate principal amount of the Company's 4.50% Senior Notes due 2041 (the "4.50% Senior Notes due 2041");

b. The Seventeenth Supplemental Indenture providing for the issuance of $400,000,000 in aggregate principal amount of the Company's 4.45% Senior Notes due 2042 (the "4.45% Senior Notes due 2042");

c. The Eighteenth Supplemental Indenture providing for the issuance of $350,000,000 in aggregate principal amount of the Company's 3.75% Senior Notes due 2042 (the "3.75% Senior Notes due 2042");

d. The Nineteenth Supplemental Indenture providing for the issuance of (i) $375,000,000 in aggregate principal amount of the Company's 3.25% Senior Notes due 2023 (the "3.25% Senior Notes due 2023") and (ii) $375,000,000 in aggregate principal amount of the Company's 4.60% Senior Notes due 2043 (the "4.60% Senior Notes due 2043");

e. The Twentieth Supplemental Indenture providing for the issuance of $300,000,000 in aggregate principal amount of the Company's 3.85% Senior Notes due 2023 (the "3.85% Senior Notes due 2023");

f. The Twenty-First Supplemental Indenture providing for (i) the issuance of $450,000,000 in aggregate principal amount of the Company's 3.75% Senior Notes

2

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 103 of 1367

due 2024 (the "3.75% Senior Notes due 2024"), (ii) the issuance of $450,000,000 in aggregate principal amount of the Company's 4.75% Senior Notes due 2044 (the "4.75% Senior Notes due 2044") and (iii) the additional issuance of $225,000,000 in aggregate principal amount of the 4.75% Senior Notes due 2044;

g.    The Twenty-Third Supplemental Indenture providing for the issuance of $350,000,000 in aggregate principal amount of the Company's 3.40% Senior Notes due 2024 (the "3.40% Senior Notes due 2024");

h.    The Twenty-Fourth Supplemental Indenture providing for (i) the issuance of $500,000,000 in aggregate principal amount of the Company's 4.30% Senior Notes due 2045 (the "4.30% Senior Notes due 2045") and (ii) the additional issuance of $100,000,000 in aggregate principal amount of the 4.30% Senior Notes due 2045;

i.    The Twenty-Fifth Supplemental Indenture providing for (i) the issuance of $400,000,000 in aggregate principal amount of the Company's 3.50% Senior Notes due 2025 (the "3.50% Senior Notes due 2025") and (ii) the additional issuance of $200,000,000 in aggregate principal amount of the 3.50% Senior Notes due 2025;

j.    The Twenty-Sixth Supplemental Indenture providing for the issuance of $450,000,000 in aggregate principal amount of the Company's 4.25% Senior Notes due 2046 (the "4.25% Senior Notes due 2046");

k.    The Twenty-Seventh Supplemental Indenture providing for the issuance of $600,000,000 in aggregate principal amount of the Company's 2.95% Senior Notes due 2026 (the "2.95% Senior Notes due 2026");

l.    The Twenty-Eighth Supplemental Indenture providing for (i) the issuance of $400,000,000 in aggregate principal amount of the Company's 4.00% Senior Notes due 2046 (the "4.00% Senior Notes due 2046") and (ii) the additional issuance of $200,000,000 in aggregate principal amount of the 4.00% Senior Notes due 2046; and

m.    The Twenty-Ninth Supplemental Indenture providing for the issuance of $400,000,000 in aggregate principal amount of the Company's 3.30% Senior Notes due 2027 (the "3.30% Senior Notes due 2027").

C.    Under Section 7.07(a) of the Base Indenture, the Company covenanted that it will not issue, incur, assume or permit to exist any Debt if such Debt is secured by a Lien on any Principal Property (whether such Principal Property was owned at March 11, 2004 or thereafter acquired), unless the Company provides that Outstanding Bonds will be equally and ratably secured with such secured Debt, subject to certain exceptions set forth in the Base Indenture.

D.    Under Section 13.01(b) of the Base Indenture, without the consent of any Holders, the Company and the Trustee, at any time and from time to time, may enter into one or more indentures supplemental thereto to add one or more covenants of the Company or other provisions

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 104 of 1367

for the benefit of all Holders or for the benefit of the Holders of, or to remain in effect only so long as there shall be Outstanding, Bonds of one or more specified series, or one or more specified Tranches thereof; or to surrender any right or power therein conferred upon the Company.

E.    The Company intends to execute and deliver that certain Second Supplemental Indenture, dated as of July 1, 2020 (the "Second Supplemental Mortgage Indenture") to the Indenture of Mortgage, dated as of June 19, 2020, between the Company and The Bank of New York Mellon Trust Company, N.A., as trustee (the "Mortgage Bond Trustee") (such Indenture of Mortgage, as previously and hereinafter supplemented, the "Mortgage Indenture"), pursuant to which the Company intends to issue first mortgage bonds thereunder secured by a lien on and security interest in certain property of the Company as provided in the Mortgage Indenture (the "Mortgaged Property").

F.    The Company desires to amend the Sixteenth Supplemental Indenture, the Seventeenth Supplemental Indenture, the Eighteenth Supplemental Indenture, the Nineteenth Supplemental Indenture, the Twentieth Supplemental Indenture, the Twenty-First Supplemental Indenture, the Twenty-Third Supplemental Indenture, the Twenty-Fourth Supplemental Indenture, the Twenty-Fifth Supplemental Indenture, the Twenty-Sixth Supplemental Indenture, the Twenty-Seventh Supplemental Indenture, the Twenty-Eighth Supplemental Indenture and the Twenty-Ninth Supplemental Indenture and each of the 4.50% Senior Notes due 2041, the 4.45% Senior Notes due 2042, the 3.75% Senior Notes due 2042, the 3.25% Senior Notes due 2023, the 4.60% Senior Notes due 2043, the 3.85% Senior Notes due 2023, the 3.75% Senior Notes due 2024, the 4.75% Senior Notes due 2044, the 3.40% Senior Notes due 2024, the 4.30% Senior Notes due 2045, the 3.50% Senior Notes due 2025, the 4.25% Senior Notes due 2046, the 2.95% Senior Notes due 2026, the 4.00% Senior Notes due 2046 and the 3.30% Senior Notes due 2027 (collectively, the "Secured Bonds") to set forth the terms upon which the Company shall issue such first mortgage bonds to the Trustee as collateral security for the payment of the Secured Bonds.

G.    The execution and delivery of this Thirtieth Supplemental Indenture has been authorized by a Board Resolution (as defined in the Base Indenture).

H.    Concurrent with the execution hereof, the Company has caused its counsel to deliver to the Trustee an Opinion of Counsel (as defined in the Base Indenture) pursuant to Section 13.03 of the Base Indenture, together with the documents required under Section 1.02 of the Base Indenture.

I.    The Company has done all things necessary to make this Thirtieth Supplemental Indenture a valid agreement of the Company, in accordance with its terms.

J.    NOW, THEREFORE, the Company and the Trustee agree, for the benefit of each other and for the equal and proportionate benefit of Holders of the Secured Bonds with respect to all provisions herein applicable to each such series of Secured Bonds, as follows:

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 105 of 1367

# ARTICLE ONE

## RELATION TO INDENTURE; ADDITIONAL DEFINITIONS

Section 101    <u>Relation to Indenture</u>. This Thirtieth Supplemental Indenture constitutes an integral part of the Indenture.

Section 102    <u>Additional Definitions</u>. Unless the context otherwise requires, capitalized terms used but not defined herein have the meaning set forth in the Base Indenture; provided, however, that, where a term is defined both in this Thirtieth Supplemental Indenture and in the Indenture, the meaning given to such term in this Thirtieth Supplemental Indenture shall control for purposes of this Thirtieth Supplemental Indenture and the Base Indenture.

The words "herein," "hereof" and "hereunder" and other words of similar import refer to this Thirtieth Supplemental Indenture as a whole and not to any particular Article, Section or other subdivision.


# ARTICLE TWO

## AMENDMENT OF SIXTEENTH SUPPLEMENTAL INDENTURE AND THE 4.50% SENIOR NOTES DUE 2041

Section 201    <u>Exhibit A of the Sixteenth Supplemental Indenture</u>. Exhibit A of the Sixteenth Supplemental Indenture is hereby replaced with Exhibit A-1 to this Thirtieth Supplemental Indenture.

Section 202    <u>The Sixteenth Supplemental Indenture (Amended)</u>. The Sixteenth Supplemental Indenture is hereby amended by amending and restating the defined terms "Indenture," "Sixteenth Supplemental Indenture" and "4.50% Senior Notes" as follows:

"Indenture" means the Base Indenture, as amended and/or supplemented from time to time.

"4.50% Senior Notes" is replaced with "4.50% Senior Notes due 2041".

"Sixteenth Supplemental Indenture" means the Sixteenth Supplemental Indenture between the Company and The Bank of New York Mellon Trust Company, N.A. (as predecessor trustee), dated as of December 1, 2011, as amended by the Thirtieth Supplemental Indenture by and between the Company and the Trustee, dated as of July 1, 2020, as may be further amended and or supplemented from time to time.

Section 203    <u>Section 207 of the Sixteenth Supplemental Indenture (Amended)</u>. Section 207 of the Sixteenth Supplemental Indenture is hereby amended and restated as follows:

"Section 207 <u>Global Securities; Appointment of Depositary for Global Securities</u>.

5

The 4.50% Senior Notes due 2041 shall be issued in the form of one or more permanent Global Bonds as provided in Section 3.13 of the Base Indenture and deposited with, or on behalf of, the Depositary, or with the Trustee, as custodian for the Depositary, duly executed by the Company and authenticated by the Trustee.

Each Global Bond shall represent such of the 4.50% Senior Notes due 2041 as shall be specified therein and shall each provide that it shall represent the aggregate principal amount of 4.50% Senior Notes due 2041 from time to time endorsed thereon and that the aggregate principal amount of 4.50% Senior Notes due 2041 represented thereby may from time to time be reduced or increased, as appropriate, to reflect exchanges or redemptions. Any endorsement of a Global Bond to reflect the amount, or any increase or decrease in the aggregate principal amount, of 4.50% Senior Notes due 2041 represented thereby shall be reflected by the Trustee on Schedule B attached to the 4.50% Senior Notes due 2041 and made by the Trustee in accordance with written instructions or such other written form of instructions as is customary for the Depositary, from the Depositary or its nominee on behalf of any Person having a beneficial interest in the Global Bond.

The Company hereby initially appoints The Depository Trust Company ("DTC") to act as the Depositary with respect to all 4.50% Senior Notes due 2041, and the 4.50% Senior Notes due 2041 shall initially be registered in the name of Cede & Co., as the nominee of DTC.

The Company and DTC have executed a Blanket Letter of Representations, and the Trustee is hereby authorized, in connection with any successor nominee for DTC or any successor Depositary, to enter into appropriate or comparable arrangements, if necessary, and shall have the same rights with respect to its actions thereunder as it has with respect to its actions under the Indenture.

Section 204    The Sixteenth Supplemental Indenture (Amended 209). The Sixteenth Supplemental Indenture is hereby amended by the addition of Section 209 thereto, to read as follows:

"Section 209    Collateral Security for the 4.50% Senior Notes due 2041.

(a)    For the purpose of providing collateral security for the obligations of the Company with respect to the 4.50% Senior Notes due 2041, the Company shall issue and deliver the 4.50% First Mortgage Bond, Collateral Series due 2041 (the "4.50% Collateral Mortgage Bonds due 2041") to the Trustee pursuant to the Second Supplemental Indenture, dated as of July 1, 2020 (the "Second Supplemental Mortgage Indenture") to the Indenture of Mortgage, dated as of June 19, 2020, between the Company and The Bank of New York Mellon Trust Company, N.A., as trustee (the "Mortgage Bond Trustee") (such Indenture of Mortgage, as previously and hereinafter supplemented, (including by the Second Supplemental Mortgage Indenture) is hereinafter referred to as the "Mortgage Indenture"). For the avoidance of doubt, any amounts received by the Trustee with respect to the 4.50% Collateral Mortgage Bonds due 2041 will be applied to satisfy any obligations under the 4.50% Senior Notes due 2041 in accordance with the Indenture and not any other Bonds

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 107 of 1367

outstanding under the Indenture. In connection with the delivery of the 4.50% Collateral Mortgage Bonds due 2041 to the Trustee, the Company shall (i) deliver to the Trustee an Officer's Certificate stating that (A) the Company has duly executed and the Mortgage Bond Trustee has duly authenticated the 4.50% Collateral Mortgage Bonds due 2041 in the aggregate principal amount of $250,000,000 and (B) the Company has delivered the 4.50% Collateral Mortgage Bonds due 2041 to the Trustee in the aggregate principal amount of $250,000,000, (ii) provide to the Trustee (or permit the Trustee to rely upon) an Opinion of Counsel, satisfactory in form and substance to the Trustee, regarding the due execution, delivery, issuance, validity and enforceability of the 4.50% Collateral Mortgage Bonds due 2041, and that the Mortgage Indenture creates a valid and enforceable lien on the Property Additions (as defined in the Mortgage Indenture) made the subject of the 4.50% Collateral Mortgage Bonds due 2041, subject to no prior Lien (as defined in the Mortgage Indenture) to the knowledge of such counsel, except for Permitted Liens (as defined in the Mortgage Indenture), and (iii) deliver to the Trustee a copy of the Mortgage Indenture, including the Second Supplemental Mortgage Indenture, certified by the Secretary or an Assistant Secretary of the Company.

(b)    The 4.50% Collateral Mortgage Bonds due 2041 shall be fully registered in the name of the Trustee. Until the 4.50% Collateral Mortgage Bonds due 2041 are released in accordance with Section 211 of this Sixteenth Supplemental Indenture, the Trustee shall hold the 4.50% Collateral Mortgage Bonds due 2041 in trust for the benefit of the Holders from time to time of the 4.50% Senior Notes due 2041 as security for any and all obligations of the Company with respect to the 4.50% Senior Notes due 2041, including but not limited to, (1) the full and prompt payment of the principal of and premium, if any, on the 4.50% Senior Notes due 2041 when and as the same shall become due and payable in accordance with the terms and provisions of the Indenture or the 4.50% Senior Notes due 2041, either at the stated maturity thereof, upon acceleration of the maturity thereof or upon redemption, and (2) the full and prompt payment of any interest on the 4.50% Senior Notes due 2041, when and as the same shall become due and payable in accordance with the terms and provisions of the Indenture or the 4.50% Senior Notes due 2041.

(c)    The Company acknowledges and agrees that, solely for administrative purposes, the Trustee will establish an account in the name of the Company for the custody and safekeeping of 4.50% Collateral Mortgage Bonds due 2041 delivered to the Trustee."

Section 205    The Sixteenth Supplemental Indenture (Amended 210). The Sixteenth Supplemental Indenture is hereby amended by the addition of Section 210 thereto, to read as follows:

"Section 210    Actions with Respect to 4.50% Collateral Mortgage Bonds due 2041.

(a)    Except for the safe custody of any 4.50% Collateral Mortgage Bonds due 2041 in its possession and the accounting for moneys actually received by it with respect to the 4.50% Collateral Mortgage Bonds due 2041, the Trustee shall have no duty to act, consent or request any action of any Person in connection with the 4.50% Collateral Mortgage Bonds due 2041 unless the Trustee shall have received (i) written direction from

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 108 of 1367

the holders of at least a majority in aggregate principal amount of the Secured Bonds then outstanding voting as a single class and (ii) indemnity or security satisfactory to it against any liabilities that may be incurred by it in connection therewith; *provided, however,* that in no event shall the Trustee have any duty to attend meetings of bondholders under the Mortgage Indenture, or to ascertain or take action with respect to voting, consents, waivers, amendments or any other matters relative to the 4.50% Collateral Mortgage Bonds due 2041 and/or the Mortgage Indenture. The Trustee shall have no duty to ascertain or inquire into or verify the performance or observance of any covenants, conditions or agreements on the part of the Company or the Mortgage Bond Trustee with respect to the 4.50% Collateral Mortgage Bonds due 2041. The Trustee will not be required to take any action that is contrary to applicable law or any provision of the Indenture, the 4.50% Collateral Mortgage Bonds due 2041 or the Mortgage Indenture or that, in the opinion of the Trustee, otherwise subjects it to liability; *provided, however*, that, subject to the foregoing limitations and any other protections that the Trustee may have under the Indenture, including without limitation its right to indemnification for actions taken at the direction of the holders, the Trustee shall vote or give any such consent or instruction as it may be directed to do so by the holders of a majority in principal amount of the 4.50% Senior Notes due 2041, unless the vote or consent is with respect to matters which under the Mortgage Indenture require the vote or consent of the holders of a greater percentage in principal amount of the 4.50% Collateral Mortgage Bonds due 2041, in which case such direction must be from holders of such greater percentage in principal amount of the 4.50% Senior Notes due 2041.

(b)     To the extent that any consent or instruction from the Trustee and/or the holders of the 4.50% Senior Notes due 2041 is required with respect to the 4.50% Collateral Mortgage Bonds due 2041 and/or the Mortgage Indenture, the Trustee shall not have any duty or obligation to determine whether such consent or instruction is required nor any duty or obligation to give or otherwise solicit such consent or instructions; *provided, however,* that if the Trustee receives any written notices with respect to the 4.50% Collateral Mortgage Bonds due 2041, it shall promptly transmit such notices to the holders of the 4.50% Senior Notes due 2041 in accordance with the Indenture.

(c)     It is expressly understood and agreed by the Company (and, with respect to any holder of 4.50% Senior Notes due 2041, by holding such 4.50% Senior Notes due 2041 such holder shall be deemed to have agreed) that the Trustee shall not be responsible for any recital, statement, representation, or warranty (whether written or oral) made by any Person in or in connection with the Indenture or the Mortgage Indenture or any certificate or other document referred to or provided for in, or received by it under, the Indenture or the Mortgage Indenture (other than those statements, representations or warranties that are expressly made by the Trustee, if any), or for the value, validity, effectiveness, genuineness, enforceability, or sufficiency of the 4.50% Collateral Mortgage Bonds due 2041, the Mortgage Indenture, or any other document referred to or provided for therein or for any failure by the Company, the Mortgage Bond Trustee or any other Person to perform any of its obligations hereunder or thereunder.

Case: 19-30088     Doc# 9156-3     Filed: 09/28/20     Entered: 09/28/20 16:25:53     Page 109 of 1367

(d)  Whether or not expressly provided herein, the rights, privileges, protections, immunities, indemnities and benefits given to the Trustee pursuant to the Indenture shall apply to any action taken by the Trustee in accordance with the terms of the 4.50% Collateral Mortgage Bonds due 2041 and/or the Mortgage Indenture.

(e)  If an Event of Default under the Indenture occurs and is continuing with respect to the 4.50% Senior Notes due 2041 and the 4.50% Senior Notes due 2041 have been accelerated as a consequence of such Event of Default, the Trustee may and, subject to Section 9.02 of the Indenture, upon receipt of written instructions of holders of not less than a majority in principal amount of the 4.50% Senior Notes due 2041, and receipt of indemnity to its satisfaction, shall exercise such other rights as it shall possess under the Mortgage Indenture as a holder of the 4.50% Collateral Mortgage Bonds due 2041.

(f)  With the written consent of the holders of a majority in aggregate principal amount of the outstanding 4.50% Senior Notes due 2041, the Trustee may consent to modifications, amendments, or supplements to (or provide waivers in respect of) the 4.50% Collateral Mortgage Bonds due 2041 and/or the Mortgage Indenture; provided, however, that without the written consent of each holder of a 4.50% Senior Note due 2041, the Trustee shall not consent to any modification, amendment or supplement to (or provide waivers in respect of) the 4.50% Collateral Mortgage Bonds due 2041 and/or the Mortgage Indenture that have the effect of (A) (i) extending the fixed maturity of the 4.50% Collateral Mortgage Bonds due 2041, (ii) changing any terms of any sinking fund or analogous fund or conversion rights with respect to the 4.50% Collateral Mortgage Bonds due 2041, (iii) reducing the rate or extending the time of payment of interest on the 4.50% Collateral Mortgage Bonds due 2041, or reducing the principal amount of the 4.50% Collateral Mortgage Bonds due 2041, or (iv) limiting the right of the Trustee (as the holder of the 4.50% Collateral Mortgage Bonds due 2041) to institute suit for the enforcement of payment of principal of or premium, if any, or interest on the 4.50% Collateral Mortgage Bonds due 2041 in accordance with the terms thereof, or (B) reducing the percentage of Bonds (as defined in the Mortgage Indenture), the holders of which are required to consent to any such supplement, amendment and/or waiver, or (C) permitting the creation by the Company of any Senior Lien (as such term is defined in the Mortgage Indenture) in accordance with the Mortgage Indenture."

Section 206    The Sixteenth Supplemental Indenture (Amended 211). The Sixteenth Supplemental Indenture is hereby amended by the addition of Section 211 thereto, to read as follows:

"Section 211    Release of Liens in Respect of 4.50% Collateral Mortgage Bonds due 2041; Change of Amounts. (a) Upon Company Request and the Trustee's receipt of an Officer's Certificate and an Opinion of Counsel from the Company certifying that all conditions to the satisfaction and discharge of the Indenture with respect to the 4.50% Senior Notes due 2041 (but, for avoidance of doubt, not any other series of Bonds then outstanding under the Indenture) in accordance with Section 8.02 of the Base Indenture have been satisfied, the Trustee shall be deemed not to hold a lien on the 4.50% Collateral Mortgage Bonds due 2041 on behalf of the holders of the 4.50% Senior Notes due 2041 and the

9

Trustee shall, upon written request of the Company, deliver to the Company the 4.50% Collateral Mortgage Bonds due 2041, together with such appropriate instruments of transfer or release (in form and substance reasonably satisfactory to the Trustee) as may be reasonably requested by the Company (and at the expense of the Company) to release such lien. All the 4.50% Collateral Mortgage Bonds due 2041 delivered to the Company in accordance with this Section 211 shall be delivered by the Company to the Mortgage Bond Trustee for cancellation.

(b) Following any partial payment, redemption or retirement of the 4.50% Senior Notes due 2041, the Company shall promptly furnish to the Trustee an Officer's Certificate certifying as to such payment, redemption or retirement and the principal amount of the 4.50% Senior Notes due 2041 outstanding following such change in aggregate principal amount and directing the Trustee to deliver the 4.50% Collateral Mortgage Bonds due 2041 then held by the Trustee to the Mortgage Bond Trustee in exchange for 4.50% Collateral Mortgage Bonds due 2041 in a principal amount equal to the current outstanding aggregate principal amount so certified in the Officer's Certificate."

Section 207    The Sixteenth Supplemental Indenture (Amended 212). The Sixteenth Supplemental Indenture is hereby amended by the addition of Section 212 thereto, to read as follows:

"Section 212    Delivery of Non-Payment Notice to Mortgage Bond Trustee. If payment of the principal of, premium, if any, or interest on the 4.50% Senior Notes due 2041 has not been fully paid, deemed to have been paid or otherwise satisfied and discharged when due, the Trustee, acting at the written direction of Holders of a majority in aggregate principal amount of the outstanding 4.50% Senior Notes due 2041, shall deliver a written notice to the Mortgage Bond Trustee stating the amount of such non-payment and that such payment remains unpaid on the date of such notice (which notice shall be given by the Trustee within five Business Days of such direction; *provided, however*, that failure by the Trustee to give such notice shall not affect in any way the Company's obligation to pay such amount)."

Section 208    The Sixteenth Supplemental Indenture (Amended 213). The Sixteenth Supplemental Indenture is hereby amended by the addition of Section 213 thereto, to read as follows:

"Section 213    No Transfer of 4.50% Collateral Mortgage Bonds due 2041. The Company shall cause all of the 4.50% Collateral Mortgage Bonds due 2041 to be issued and registered in the name of the Trustee. Except (i) as otherwise permitted by the Indenture or (ii) in connection with an assignment to a successor trustee in accordance with the Indenture, the Trustee shall not sell, assign or transfer the 4.50% Collateral Mortgage Bonds due 2041."

Section 209    Bond Exchange. The Company desires to exchange the original Global Bond representing the 4.50% Senior Notes due 2041, dated December 1, 2011 (the "Original Global Bond") for the amended and restated Global Bond set forth in Exhibit A-1 hereto (which

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 111 of 1367

is hereby incorporated herein and made a part hereof) (the "Amended and Restated Global 4.50% Senior Notes due 2041") incorporating the amendments effected by this Thirtieth Supplemental Indenture in accordance with Section 13.06 of the Base Indenture. In connection therewith, the Company has delivered to the Trustee (i) a Company Request for the authentication and delivery of the Amended and Restated Global 4.50% Senior Notes due 2041 and the cancellation of the Original Global Bond, along with an Officer's Certificate and Opinion of Counsel required by the Indenture, and (ii) the Amended and Restated Global 4.50% Senior Note due 2041 representing the 4.50% Senior Notes due 2041 in the aggregate principal amount of $250,000,000. Upon receipt of the deliverables required by the Indenture, the Trustee shall authenticate the Amended and Restated Global 4.50% Senior Notes due 2041 to be exchanged for the Original Global Bond, cancel the Original Global Bond and deliver the cancelled Original Global Bond to the Company in accordance with the instructions set forth in the Company Request.

## ARTICLE THREE
## AMENDMENT OF SEVENTEENTH SUPPLEMENTAL INDENTURE AND THE 4.45% SENIOR NOTES DUE 2042

Section 301    Exhibit A of the Seventeenth Supplemental Indenture. Exhibit A of the Seventeenth Supplemental Indenture is hereby replaced with Exhibit A-2 to this Thirtieth Supplemental Indenture.

Section 302    The Seventeenth Supplemental Indenture (Amended). The Seventeenth Supplemental Indenture is hereby amended by amending and restating the defined terms "Indenture," "Seventeenth Supplemental Indenture" and "4.45% Senior Notes" as follows:

"Indenture" means the Base Indenture, as amended and/or supplemented from time to time.

"4.45% Senior Notes" is replaced with "4.45% Senior Notes due 2042".

"Seventeenth Supplemental Indenture" means this Seventeenth Supplemental Indenture between the Company and The Bank of New York Mellon Trust Company, N.A. (as predecessor trustee), dated as of April 16, 2012, as amended by the Thirtieth Supplemental Indenture by and between the Company and the Trustee, dated as of July 1, 2020, as may be further amended and or supplemented from time to time.

Section 303    Section 207 of the Seventeenth Supplemental Indenture. Section 207 of the Seventeenth Supplemental Indenture is hereby amended and restated as follows:

"Section 207 Global Securities; Appointment of Depositary for Global Securities.

The 4.45% Senior Notes due 2042 shall be issued in the form of one or more permanent Global Bonds as provided in Section 3.13 of the Indenture and deposited with, or on behalf of, the Depositary, or with the Trustee, as custodian for the Depositary, duly executed by the Company and authenticated by the Trustee.

11

Each Global Bond shall represent such of the 4.45% Senior Notes due 2042 as shall be specified therein and shall each provide that it shall represent the aggregate principal amount of 4.45% Senior Notes due 2042 from time to time endorsed thereon and that the aggregate principal amount of 4.45% Senior Notes due 2042 represented thereby may from time to time be reduced or increased, as appropriate, to reflect exchanges or redemptions. Any endorsement of a Global Bond to reflect the amount, or any increase or decrease in the aggregate principal amount, of 4.45% Senior Notes due 2042 represented thereby shall be reflected by the Trustee on Schedule B attached to the 4.45% Senior Notes due 2042 and made by the Trustee in accordance with written instructions or such other written form of instructions as is customary for the Depositary, from the Depositary or its nominee on behalf of any Person having a beneficial interest in the Global Bond.

The Company hereby initially appoints The Depository Trust Company ("DTC") to act as the Depositary with respect to all 4.45% Senior Notes due 2042, and the 4.45% Senior Notes due 2042 shall initially be registered in the name of Cede & Co., as the nominee of DTC.

The Company and DTC have executed a Blanket Letter of Representations, and the Trustee is hereby authorized, in connection with any successor nominee for DTC or any successor Depositary, to enter into appropriate or comparable arrangements, if necessary, and shall have the same rights with respect to its actions thereunder as it has with respect to its actions under the Indenture."

Section 304    The Seventeenth Supplemental Indenture (Amended 209). The Seventeenth Supplemental Indenture is hereby amended by the addition of Section 209 thereto, to read as follows:

"Section 209    Collateral Security for the 4.45% Senior Notes due 2042.

(a)    For the purpose of providing collateral security for the obligations of the Company with respect to the 4.45% Senior Notes due 2042, the Company shall issue and deliver the 4.45% First Mortgage Bond, Collateral Series due 2042] (the "4.45% Collateral Mortgage Bonds due 2042") to the Trustee pursuant to the Second Supplemental Indenture, dated as of July 1, 2020 (the "Second Supplemental Mortgage Indenture") to the Indenture of Mortgage, dated as of June 19, 2020, between the Company and The Bank of New York Mellon Trust Company, N.A., as trustee (the "Mortgage Bond Trustee") (such Indenture of Mortgage, as previously and hereinafter supplemented, (including by the Second Supplemental Mortgage Indenture) is hereinafter referred to as the "Mortgage Indenture"). For the avoidance of doubt, any amounts received by the Trustee with respect to the 4.45% Collateral Mortgage Bonds due 2042 will be applied to satisfy any obligations under the 4.45% Senior Notes due 2042 in accordance with the Indenture and not any other Bonds outstanding under the Indenture. In connection with the delivery of the 4.45% Collateral Mortgage Bonds due 2042 to the Trustee, the Company shall (i) deliver to the Trustee an Officer's Certificate stating that (A) the Company has duly executed and the Mortgage Bond Trustee has duly authenticated the 4.45% Collateral Mortgage Bonds due 2042 in the aggregate principal amount of $400,000,000 and (B) the Company has delivered the 4.45%

12

Collateral Mortgage Bonds due 2042 to the Trustee in the aggregate principal amount of $400,000,000, (ii) provide to the Trustee (or permit the Trustee to rely upon) an Opinion of Counsel, satisfactory in form and substance to the Trustee, regarding the due execution, delivery, issuance, validity and enforceability of the 4.45% Collateral Mortgage Bonds due 2042, and that the Mortgage Indenture creates a valid and enforceable lien on the Property Additions (as defined in the Mortgage Indenture) made the subject of the 4.45% Collateral Mortgage Bonds due 2042, subject to no prior Lien (as defined in the Mortgage Indenture) to the knowledge of such counsel, except for Permitted Liens (as defined in the Mortgage Indenture), and (iii) deliver to the Trustee a copy of the Mortgage Indenture, including the Second Supplemental Mortgage Indenture, certified by the Secretary or an Assistant Secretary of the Company.

(b)     The 4.45% Collateral Mortgage Bonds due 2042 shall be fully registered in the name of the Trustee. Until the 4.45% Collateral Mortgage Bonds due 2042 are released in accordance with Section 211 of this Seventeenth Supplemental Indenture, the Trustee shall hold the 4.45% Collateral Mortgage Bonds due 2042 in trust for the benefit of the Holders from time to time of the 4.45% Senior Notes due 2042 as security for any and all obligations of the Company with respect to the 4.45% Senior Notes due 2042, including but not limited to, (1) the full and prompt payment of the principal of and premium, if any, on the 4.45% Senior Notes due 2042 when and as the same shall become due and payable in accordance with the terms and provisions of the Indenture or the 4.45% Senior Notes due 2042, either at the stated maturity thereof, upon acceleration of the maturity thereof or upon redemption, and (2) the full and prompt payment of any interest on the 4.45% Senior Notes due 2042, when and as the same shall become due and payable in accordance with the terms and provisions of the Indenture or the 4.45% Senior Notes due 2042.

(c)     The Company acknowledges and agrees that, solely for administrative purposes, the Trustee will establish an account in the name of the Company for the custody and safekeeping of 4.45% Collateral Mortgage Bonds due 2042 delivered to the Trustee."

Section 305     The Seventeenth Supplemental Indenture (Amended 210). The Seventeenth Supplemental Indenture is hereby amended by the addition of Section 210 thereto, to read as follows:

"Section 210     Actions with Respect to 4.45% Collateral Mortgage Bonds due 2042.

(a)     Except for the safe custody of any 4.45% Collateral Mortgage Bonds due 2042 in its possession and the accounting for moneys actually received by it with respect to the 4.45% Collateral Mortgage Bonds due 2042, the Trustee shall have no duty to act, consent or request any action of any Person in connection with the 4.45% Collateral Mortgage Bonds due 2042 unless the Trustee shall have received (i) written direction from the holders of at least a majority in aggregate principal amount of the Bonds then outstanding voting as a single class and (ii) indemnity or security satisfactory to it against any liabilities that may be incurred by it in connection therewith; *provided, however,* that in no event shall the Trustee have any duty to attend meetings of bondholders under the Mortgage Indenture, or to ascertain or take action with respect to voting, consents, waivers,

13

Case: 19-30088     Doc# 9156-3     Filed: 09/28/20     Entered: 09/28/20 16:25:53     Page 114 of 1367

amendments or any other matters relative to the 4.45% Collateral Mortgage Bonds due 2042 and/or the Mortgage Indenture. The Trustee shall have no duty to ascertain or inquire into or verify the performance or observance of any covenants, conditions or agreements on the part of the Company or the Mortgage Bond Trustee with respect to the 4.45% Collateral Mortgage Bonds due 2042. The Trustee will not be required to take any action that is contrary to applicable law or any provision of the Indenture, the 4.45% Collateral Mortgage Bonds due 2042 or the Mortgage Indenture or that, in the opinion of the Trustee, otherwise subjects it to liability; *provided, however*, that, subject to the foregoing limitations and any other protections that the Trustee may have under the Indenture, including without limitation its right to indemnification for actions taken at the direction of the holders, the Trustee shall vote or give any such consent or instruction as it may be directed to do so by the holders of a majority in principal amount of the 4.45% Senior Notes due 2042, unless the vote or consent is with respect to matters which under the Mortgage Indenture require the vote or consent of the holders of a greater percentage in principal amount of the 4.45% Collateral Mortgage Bonds due 2042, in which case such direction must be from holders of such greater percentage in principal amount of the 4.45% Senior Notes due 2042.

(b)    To the extent that any consent or instruction from the Trustee and/or the holders of the 4.45% Senior Notes due 2042 is required with respect to the 4.45% Collateral Mortgage Bonds due 2042 and/or the Mortgage Indenture, the Trustee shall not have any duty or obligation to determine whether such consent or instruction is required nor any duty or obligation to give or otherwise solicit such consent or instructions; *provided, however*, that if the Trustee receives any written notices with respect to the 4.45% Collateral Mortgage Bonds due 2042, it shall promptly transmit such notices to the holders of the 4.45% Senior Notes due 2042 in accordance with the Indenture.

(c)    It is expressly understood and agreed by the Company (and, with respect to any holder of 4.45% Senior Notes due 2042, by holding such 4.45% Senior Notes due 2042 such holder shall be deemed to have agreed) that the Trustee shall not be responsible for any recital, statement, representation, or warranty (whether written or oral) made by any Person in or in connection with the Indenture or the Mortgage Indenture or any certificate or other document referred to or provided for in, or received by it under, the Indenture or the Mortgage Indenture (other than those statements, representations or warranties that are expressly made by the Trustee, if any), or for the value, validity, effectiveness, genuineness, enforceability, or sufficiency of the 4.45% Collateral Mortgage Bonds due 2042, the Mortgage Indenture, or any other document referred to or provided for therein or for any failure by the Company, the Mortgage Bond Trustee or any other Person to perform any of its obligations hereunder or thereunder.

(d)    Whether or not expressly provided herein, the rights, privileges, protections, immunities, indemnities and benefits given to the Trustee pursuant to the Indenture shall apply to any action taken by the Trustee in accordance with the terms of the 4.45% Collateral Mortgage Bonds due 2042 and/or the Mortgage Indenture.

14

(e)    If an Event of Default under the Indenture occurs and is continuing with respect to the 4.45% Senior Notes due 2042 and the 4.45% Senior Notes due 2042 have been accelerated as a consequence of such Event of Default, the Trustee may and, subject to Section 9.02 of the Indenture, upon receipt of written instructions of holders of not less than a majority in principal amount of the 4.45% Senior Notes due 2042, and receipt of indemnity or security to its satisfaction, shall exercise such other rights as it shall possess under the Mortgage Indenture as a holder of the 4.45% Collateral Mortgage Bonds due 2042.

(f)    With the written consent of the holders of a majority in aggregate principal amount of the outstanding 4.45% Senior Notes due 2042, the Trustee may consent to modifications, amendments, or supplements to (or provide waivers in respect of) the 4.45% Collateral Mortgage Bonds due 2042 and/or the Mortgage Indenture; provided, however, that without the written consent of each holder of a 4.45% Senior Note due 2042, the Trustee shall not consent to any modification, amendment or supplement to (or provide waivers in respect of) the 4.45% Collateral Mortgage Bonds due 2042 and/or the Mortgage Indenture that have the effect of (A) (i) extending the fixed maturity of the 4.45% Collateral Mortgage Bonds due 2042, (ii) changing any terms of any sinking fund or analogous fund or conversion rights with respect to the 4.45% Collateral Mortgage Bonds due 2042, (iii) reducing the rate or extending the time of payment of interest on the 4.45% Collateral Mortgage Bonds due 2042, or reducing the principal amount of the 4.45% Collateral Mortgage Bonds due 2042, or (iv) limiting the right of the Trustee (as the holder of the 4.45% Collateral Mortgage Bonds due 2042) to institute suit for the enforcement of payment of principal of or premium, if any, or interest on the 4.45% Collateral Mortgage Bonds due 2042 in accordance with the terms thereof, or (B) reducing the percentage of Bonds (as defined in the Mortgage Indenture), the holders of which are required to consent to any such supplement, amendment and/or waiver, or (C) permitting the creation by the Company of any Senior Lien (as such term is defined in the Mortgage Indenture) in accordance with the Mortgage Indenture."

Section 306    The Seventeenth Supplemental Indenture (Amended 211). The Seventeenth Supplemental Indenture is hereby amended by the addition of Section 211 thereto, to read as follows:

"Section 211    Release of Liens in Respect of 4.45% Collateral Mortgage Bonds due 2042; Change of Amounts.

(a) Upon Company Request and the Trustee's receipt of an Officer's Certificate and an Opinion of Counsel from the Company certifying that all conditions to the satisfaction and discharge of the Indenture with respect to the 4.45% Senior Notes due 2042 (but, for avoidance of doubt, not any other series of Bonds then outstanding under the Indenture) in accordance with Section 8.02 of the Base Indenture have been satisfied, the Trustee shall be deemed not to hold a lien on the 4.45% Collateral Mortgage Bonds due 2042 on behalf of the holders of the 4.45% Senior Notes due 2042 and the Trustee shall, upon written request of the Company, deliver to the Company the 4.45% Collateral Mortgage Bonds due 2042, together with such appropriate instruments of transfer or release

15

(in form and substance reasonably satisfactory to the Trustee) as may be reasonably requested by the Company (and at the expense of the Company) to release such lien. All the 4.45% Collateral Mortgage Bonds due 2042 delivered to the Company in accordance with this Section 211 shall be delivered by the Company to the Mortgage Bond Trustee for cancellation.

(b) Following any partial payment, redemption or retirement of the 4.45% Senior Notes due 2042, the Company shall promptly furnish to the Trustee an Officer's Certificate certifying as to such payment, redemption or retirement and the principal amount of the 4.45% Senior Notes due 2042 outstanding following such change in aggregate principal amount and directing the Trustee to deliver the 4.45% Collateral Mortgage Bonds due 2042 then held by the Trustee to the Mortgage Bond Trustee in exchange for 4.45% Collateral Mortgage Bonds due 2042 in a principal amount equal to the current outstanding aggregate principal amount so certified in the Officer's Certificate."

Section 307    The Seventeenth Supplemental Indenture (Amended 212). The Seventeenth Supplemental Indenture is hereby amended by the addition of Section 212 thereto, to read as follows:

"Section 212    Delivery of Non-Payment Notice to Mortgage Bond Trustee. If payment of the principal of, premium, if any, or interest on the 4.45% Senior Notes due 2042 has not been fully paid, deemed to have been paid or otherwise satisfied and discharged when due, the Trustee, acting at the written direction of Holders of a majority in aggregate principal amount of the outstanding 4.45% Senior Notes due 2042, shall deliver a written notice to the Mortgage Bond Trustee stating the amount of such non-payment and that such payment remains unpaid on the date of such notice (which notice shall be given by the Trustee within five Business Days of such direction; *provided, however*, that failure by the Trustee to give such notice shall not affect in any way the Company's obligation to pay such amount)."

Section 308    The Seventeenth Supplemental Indenture (Amended 213). The Seventeenth Supplemental Indenture is hereby amended by the addition of Section 213 thereto, to read as follows:

"Section 213    No Transfer of 4.45% Collateral Mortgage Bonds due 2042. The Company shall cause all of the 4.45% Collateral Mortgage Bonds due 2042 to be issued and registered in the name of the Trustee. Except (i) as otherwise permitted by the Indenture or (ii) in connection with an assignment to a successor trustee in accordance with the Indenture, the Trustee shall not sell, assign or transfer the 4.45% Collateral Mortgage Bonds due 2042."

Section 309    Bond Exchange. The Company desires to exchange the original Global Bond representing the 4.45% Senior Notes due 2042, dated August 16, 2012 (the "Original Global Bond") for the amended and restated Global Bond set forth in Exhibit A-2 hereto (which is hereby incorporated herein and made a part hereof) (the "Amended and Restated Global 4.45% Senior Notes due 2042") incorporating the amendments effected by this Thirtieth Supplemental Indenture

16

in accordance with Section 13.06 of the Base Indenture. In connection therewith, the Company has delivered to the Trustee (i) a Company Request for the authentication and delivery of the Amended and Restated Global 4.45% Senior Notes due 2042 and the cancellation of the Original Global Bond, along with an Officer's Certificate and Opinion of Counsel required by the Indenture, and (ii) the Amended and Restated Global 4.45% Senior Notes due 2042 representing the 4.45% Senior Notes due 2042 in the aggregate principal amount of $400,000,000. Upon receipt of the deliverables required by the Indenture, the Trustee shall authenticate the Amended and Restated Global 4.45% Senior Notes due 2042 to be exchanged for the Original Global Bond, cancel the Original Global Bond and deliver the cancelled Original Global Bond to the Company in accordance with the instructions set forth in the Company Request.

<div align="center">

ARTICLE FOUR

AMENDMENT OF THE EIGHTEENTH SUPPLEMENTAL INDENTURE AND THE 3.75% SENIOR NOTES DUE 2042

</div>

Section 401    <u>Exhibit B of the Eighteenth Supplemental Indenture (Replaced)</u>. Exhibit B of the Eighteenth Supplemental Indenture is hereby replaced with Exhibit A-3 to this Thirtieth Supplemental Indenture.

Section 402    <u>The Eighteenth Supplemental Indenture (Amended)</u>. The Eighteenth Supplemental Indenture is hereby amended by amending and restating the defined terms "Indenture," "Eighteenth Supplemental Indenture" and "3.75% Senior Notes" as follows:

"Indenture" means the Base Indenture, as amended and/or supplemented from time to time.

"3.75% Senior Notes" is replaced with "3.75% Senior Notes due 2042".

"Eighteenth Supplemental Indenture" means this Eighteenth Supplemental Indenture between the Company and The Bank of New York Mellon Trust Company, N.A. (as predecessor trustee), dated as of August 16, 2012, as amended by the Thirtieth Supplemental Indenture by and between the Company and the Trustee, dated as of July 1, 2020, as may be further amended and or supplemented from time to time.

Section 403    <u>Section 307 of the Seventeenth Supplemental Indenture (Amended)</u>. Section 307 of the Seventeenth Supplemental Indenture is hereby amended and restated as follows:

"Section 307 <u>Global Securities; Appointment of Depositary for Global Securities</u>.

The 3.75% Senior Notes due 2042 shall be issued in the form of one or more permanent Global Bonds as provided in Section 3.13 of the Indenture and deposited with, or on behalf of, the Depositary, or with the Trustee, as custodian for the Depositary, duly executed by the Company and authenticated by the Trustee.

<div align="center">17</div>

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 118 of 1367

Each Global Bond shall represent such of the 3.75% Senior Notes due 2042 as shall be specified therein and shall each provide that it shall represent the aggregate principal amount of 3.75% Senior Notes due 2042 from time to time endorsed thereon and that the aggregate principal amount of 3.75% Senior Notes due 2042 represented thereby may from time to time be reduced or increased, as appropriate, to reflect exchanges or redemptions. Any endorsement of a Global Bond to reflect the amount, or any increase or decrease in the aggregate principal amount, of 3.75% Senior Notes due 2042 represented thereby shall be reflected by the Trustee on Schedule B attached to the 3.75% Senior Notes due 2042 and made by the Trustee in accordance with written instructions or such other written form of instructions as is customary for the Depositary, from the Depositary or its nominee on behalf of any Person having a beneficial interest in the Global Bond.

The Company hereby initially appoints The Depository Trust Company ("DTC") to act as the Depositary with respect to all 3.75% Senior Notes due 2042, and the 3.75% Senior Notes due 2042 shall initially be registered in the name of Cede & Co., as the nominee of DTC.

The Company and DTC have executed a Blanket Letter of Representations, and the Trustee is hereby authorized, in connection with any successor nominee for DTC or any successor Depositary, to enter into appropriate or comparable arrangements, if necessary, and shall have the same rights with respect to its actions thereunder as it has with respect to its actions under the Indenture.

Section 404   The Eighteenth Supplemental Indenture (Amended 309). The Eighteenth Supplemental Indenture is hereby amended by the addition of Section 309 thereto, to read as follows:

"Section 309   Collateral Security for the 3.75% Senior Notes due 2042.

(a)   For the purpose of providing collateral security for the obligations of the Company with respect to the 3.75% Senior Notes due 2042, the Company shall issue and deliver the 3.75% First Mortgage Bond, Collateral Series due 2042] (the "3.75% Collateral Mortgage Bonds due 2042") to the Trustee pursuant to the Second Supplemental Indenture, dated as of July 1, 2020 (the "Second Supplemental Mortgage Indenture") to the Indenture of Mortgage, dated as of June 19, 2020, between the Company and The Bank of New York Mellon Trust Company, N.A., as trustee (the "Mortgage Bond Trustee") (such Indenture of Mortgage, as previously and hereinafter supplemented, (including by the Second Supplemental Mortgage Indenture) is hereinafter referred to as the "Mortgage Indenture"). For the avoidance of doubt, any amounts received by the Trustee with respect to the 3.75% Collateral Mortgage Bonds due 2042 will be applied to satisfy any obligations under the 3.75% Senior Notes due 2042 in accordance with the Indenture and not any other Bonds outstanding under the Indenture. In connection with the delivery of the 3.75% Collateral Mortgage Bonds due 2042 to the Trustee, the Company shall (i) deliver to the Trustee an Officer's Certificate stating that (A) the Company has duly executed and the Mortgage Bond Trustee has duly authenticated the 3.75% Collateral Mortgage Bonds due 2042 in the aggregate principal amount of $350,000,000 and (B) the Company has delivered the 3.75%

18

Collateral Mortgage Bonds due 2042 to the Trustee in the aggregate principal amount of $350,000,000, (ii) provide to the Trustee (or permit the Trustee to rely upon) an Opinion of Counsel, satisfactory in form and substance to the Trustee, regarding the due execution, delivery, issuance, validity and enforceability of the 3.75% Collateral Mortgage Bonds due 2042, and that the Mortgage Indenture creates a valid and enforceable lien on the Property Additions (as defined in the Mortgage Indenture) made the subject of the 3.75% Collateral Mortgage Bonds due 2042, subject to no prior Lien (as defined in the Mortgage Indenture) to the knowledge of such counsel, except for Permitted Liens (as defined in the Mortgage Indenture), and (iii) deliver to the Trustee a copy of the Mortgage Indenture, including the Second Supplemental Mortgage Indenture, certified by the Secretary or an Assistant Secretary of the Company.

(b)     The 3.75% Collateral Mortgage Bonds due 2042 shall be fully registered in the name of the Trustee. Until the 3.75% Collateral Mortgage Bonds due 2042 are released in accordance with Section 311 of this Eighteenth Supplemental Indenture, the Trustee shall hold the 3.75% Collateral Mortgage Bonds due 2042 in trust for the benefit of the Holders from time to time of the 3.75% Senior Notes due 2042 as security for any and all obligations of the Company with respect to the 3.75% Senior Notes due 2042, including but not limited to, (1) the full and prompt payment of the principal of and premium, if any, on the 3.75% Senior Notes due 2042 when and as the same shall become due and payable in accordance with the terms and provisions of the Indenture or the 3.75% Senior Notes due 2042, either at the stated maturity thereof, upon acceleration of the maturity thereof or upon redemption, and (2) the full and prompt payment of any interest on the 3.75% Senior Notes due 2042, when and as the same shall become due and payable in accordance with the terms and provisions of the Indenture or the 3.75% Senior Notes due 2042.

(c)     The Company acknowledges and agrees that, solely for administrative purposes, the Trustee will establish an account in the name of the Company for the custody and safekeeping of 3.75% Collateral Mortgage Bonds due 2042 delivered to the Trustee."

Section 405     The Eighteenth Supplemental Indenture (Amended 310). The Eighteenth Supplemental Indenture is hereby amended by the addition of Section 310 thereto, to read as follows:

"Section 310     Actions with Respect to 3.75% Collateral Mortgage Bonds due 2042.

(a)     Except for the safe custody of any 3.75% Collateral Mortgage Bonds due 2042 in its possession and the accounting for moneys actually received by it with respect to the 3.75% Collateral Mortgage Bonds due 2042, the Trustee shall have no duty to act, consent or request any action of any Person in connection with the 3.75% Collateral Mortgage Bonds due 2042 unless the Trustee shall have received (i) written direction from the holders of at least a majority in aggregate principal amount of the Bonds then outstanding voting as a single class and (ii) indemnity or security satisfactory to it against any liabilities that may be incurred by it in connection therewith; *provided, however,* that in no event shall the Trustee have any duty to attend meetings of bondholders under the Mortgage Indenture, or to ascertain or take action with respect to voting, consents, waivers,

19

amendments or any other matters relative to the 3.75% Collateral Mortgage Bonds due 2042 and/or the Mortgage Indenture. The Trustee shall have no duty to ascertain or inquire into or verify the performance or observance of any covenants, conditions or agreements on the part of the Company or the Mortgage Bond Trustee with respect to the 3.75% Collateral Mortgage Bonds due 2042. The Trustee will not be required to take any action that is contrary to applicable law or any provision of the Indenture, the 3.75% Collateral Mortgage Bonds due 2042 or the Mortgage Indenture or that, in the opinion of the Trustee, otherwise subjects it to liability; *provided, however*, that, subject to the foregoing limitations and any other protections that the Trustee may have under the Indenture, including without limitation its right to indemnification for actions taken at the direction of the holders, the Trustee shall vote or give any such consent or instruction as it may be directed to do so by the holders of a majority in principal amount of the 3.75% Senior Notes due 2042, unless the vote or consent is with respect to matters which under the Mortgage Indenture require the vote or consent of the holders of a greater percentage in principal amount of the 3.75% Collateral Mortgage Bonds due 2042, in which case such direction must be from holders of such greater percentage in principal amount of the 3.75% Senior Notes due 2042.

(b)    To the extent that any consent or instruction from the Trustee and/or the holders of the 3.75% Senior Notes due 2042 is required with respect to the 3.75% Collateral Mortgage Bonds due 2042 and/or the Mortgage Indenture, the Trustee shall not have any duty or obligation to determine whether such consent or instruction is required nor any duty or obligation to give or otherwise solicit such consent or instructions; *provided, however*, that if the Trustee receives any written notices with respect to the 3.75% Collateral Mortgage Bonds due 2042, it shall promptly transmit such notices to the holders of the 3.75% Senior Notes due 2042 in accordance with the Indenture.

(c)    It is expressly understood and agreed by the Company (and, with respect to any holder of 3.75% Senior Notes due 2042, by holding such 3.75% Senior Note due 2042 such holder shall be deemed to have agreed) that the Trustee shall not be responsible for any recital, statement, representation, or warranty (whether written or oral) made by any Person in or in connection with the Indenture or the Mortgage Indenture or any certificate or other document referred to or provided for in, or received by it under, the Indenture or the Mortgage Indenture (other than those statements, representations or warranties that are expressly made by the Trustee, if any), or for the value, validity, effectiveness, genuineness, enforceability, or sufficiency of the 3.75% Collateral Mortgage Bonds due 2042, the Mortgage Indenture, or any other document referred to or provided for therein or for any failure by the Company, the Mortgage Bond Trustee or any other Person to perform any of its obligations hereunder or thereunder.

(d)    Whether or not expressly provided herein, the rights, privileges, protections, immunities, indemnities and benefits given to the Trustee pursuant to the Indenture shall apply to any action taken by the Trustee in accordance with the terms of the 3.75% Collateral Mortgage Bonds due 2042 and/or the Mortgage Indenture.

20

(e)   If an Event of Default under the Indenture occurs and is continuing with respect to the 3.75% Senior Notes due 2042 and the 3.75% Senior Notes due 2042 have been accelerated as a consequence of such Event of Default, the Trustee may and, subject to Section 9.02 of the Indenture, upon receipt of written instructions of holders of not less than a majority in principal amount of the 3.75% Senior Notes due 2042, and receipt of indemnity or security to its satisfaction, shall exercise such other rights as it shall possess under the Mortgage Indenture as a holder of the 3.75% Collateral Mortgage Bonds due 2042.

(f)   With the written consent of the holders of a majority in aggregate principal amount of the outstanding 3.75% Senior Notes due 2042, the Trustee may consent to modifications, amendments, or supplements to (or provide waivers in respect of) the 3.75% Collateral Mortgage Bonds due 3.75% Senior Note due 2042 and/or the Mortgage Indenture; provided, however, that without the written consent of each holder of a 3.75% Senor Note due 2042, the Trustee shall not consent to any modification, amendment or supplement to (or provide waivers in respect of) the 3.75% Collateral Mortgage Bonds due 2042 and/or the Mortgage Indenture that have the effect of (A) (i) extending the fixed maturity of the 3.75% Collateral Mortgage Bonds due 2042, (ii) changing any terms of any sinking fund or analogous fund or conversion rights with respect to the 3.75% Collateral Mortgage Bonds due 2042, (iii) reducing the rate or extending the time of payment of interest on the 3.75% Collateral Mortgage Bonds due 2042, or reducing the principal amount of the 3.75% Collateral Mortgage Bonds due 2042, or (iv) limiting the right of the Trustee (as the holder of the 3.75% Collateral Mortgage Bonds due 2042) to institute suit for the enforcement of payment of principal of or premium, if any, or interest on the 3.75% Collateral Mortgage Bonds due 2042 in accordance with the terms thereof, or (B) reducing the percentage of Bonds (as defined in the Mortgage Indenture), the holders of which are required to consent to any such supplement, amendment and/or waiver, or (C) permitting the creation by the Company of any Senior Lien (as such term is defined in the Mortgage Indenture) in accordance with the Mortgage Indenture."

Section 406   <u>The Eighteenth Supplemental Indenture (Amended 311)</u>. The Eighteenth Supplemental Indenture is hereby amended by the addition of Section 311 thereto, to read as follows:

"Section 311   <u>Release of Liens in Respect of 3.75% Collateral Mortgage Bonds due 2042; Change of Amounts</u>.

(a) Upon Company Request and the Trustee's receipt of an Officer's Certificate and an Opinion of Counsel from the Company certifying that all conditions to the satisfaction and discharge of the Indenture with respect to the 3.75% Senior Notes due 2042 (but, for avoidance of doubt, not any other series of Bonds then outstanding under the Indenture) in accordance with Section 8.02 of the Base Indenture have been satisfied, the Trustee shall be deemed not to hold a lien on the 3.75% Collateral Mortgage Bonds due 2042 on behalf of the holders of the 3.75% Senior Notes due 2042 and the Trustee shall, upon written request of the Company, deliver to the Company the 3.75% Collateral Mortgage Bonds due 2042, together with such appropriate instruments of transfer or release

21

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 122 of 1367

(in form and substance reasonably satisfactory to the Trustee) as may be reasonably requested by the Company (and at the expense of the Company) to release such lien. All the 3.75% Collateral Mortgage Bonds due 2042 delivered to the Company in accordance with this Section 311 shall be delivered by the Company to the Mortgage Bond Trustee for cancellation.

(b) Following any partial payment, redemption or retirement of the 3.75% Senior Notes due 2042, the Company shall promptly furnish to the Trustee an Officer's Certificate certifying as to such payment, redemption or retirement and the principal amount of the 3.75% Senior Notes due 2042 outstanding following such change in aggregate principal amount and directing the Trustee to deliver the 3.75% Collateral Mortgage Bonds due 2042 then held by the Trustee to the Mortgage Bond Trustee in exchange for 3.75% Collateral Mortgage Bonds due 2042 in a principal amount equal to the current outstanding aggregate principal amount so certified in the Officer's Certificate."

Section 407   The Eighteenth Supplemental Indenture (Amended 312). The Eighteenth Supplemental Indenture is hereby amended by the addition of Section 312 thereto, to read as follows:

"Section 312   Delivery of Non-Payment Notice to Mortgage Bond Trustee. If payment of the principal of, premium, if any, or interest on the 3.75% Senior Notes due 2042 has not been fully paid, deemed to have been paid or otherwise satisfied and discharged when due, the Trustee, acting at the written direction of Holders of a majority in aggregate principal amount of the outstanding 3.75% Senior Notes due 2042, shall deliver a written notice to the Mortgage Bond Trustee stating the amount of such non-payment and that such payment remains unpaid on the date of such notice (which notice shall be given by the Trustee within five Business Days of such direction; *provided, however*, that failure by the Trustee to give such notice shall not affect in any way the Company's obligation to pay such amount)."

Section 408   The Eighteenth Supplemental Indenture (Amended 313). The Eighteenth Supplemental Indenture is hereby amended by the addition of Section 313 thereto, to read as follows:

"Section 313   No Transfer of 3.75% Collateral Mortgage Bonds due 2042. The Company shall cause all of the 3.75% Collateral Mortgage Bonds due 2042 to be issued and registered in the name of the Trustee. Except (i) as otherwise permitted by the Indenture or (ii) in connection with an assignment to a successor trustee in accordance with the Indenture, the Trustee shall not sell, assign or transfer the 3.75% Collateral Mortgage Bonds due 2042."

Section 409   Bond Exchange. The Company desires to exchange the original Global Bond representing the 3.75% Senior Notes due 2042, dated August 16, 2012 (the "Original Global Bond") for the amended and restated Global Bond set forth in Exhibit A-3 hereto (which is hereby incorporated herein and made a part hereof) (the "Amended and Restated Global 3.75% Senior Notes due 2042") incorporating the amendments effected by this Thirtieth Supplemental Indenture

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 123 of 1367

in accordance with Section 13.06 of the Base Indenture. In connection therewith, the Company has delivered to the Trustee (i) a Company Request for the authentication and delivery of the Amended and Restated Global 3.75% Senior Notes due 2042 and the cancellation of the Original Global Bond, along with an Officer's Certificate and Opinion of Counsel required by the Indenture, and (ii) the Amended and Restated Global 3.75% Senior Notes due 2042 representing the 3.75% Senior Notes due 2042 in the aggregate principal amount of $350,000,000. Upon receipt of the deliverables required by the Indenture, the Trustee shall authenticate the Amended and Restated Global 3.75% Senior Notes due 2042 to be exchanged for the Original Global Bond, cancel the Original Global Bond and deliver the cancelled Original Global Bond to the Company in accordance with the instructions set forth in the Company Request.

<div align="center">

ARTICLE FIVE

AMENDMENT OF THE NINETEENTH SUPPLEMENTAL INDENTURE, THE 3.25% SENIOR NOTES DUE 2023 AND THE 4.60% SENIOR NOTES DUE 2043

</div>

Section 501    Exhibit A and Exhibit B of the Nineteenth Supplemental Indenture. Exhibit A and Exhibit B of the Nineteenth Supplemental Indenture are hereby replaced with Exhibit A-4 and A-5 to this Thirtieth Supplemental Indenture.

Section 502    The Nineteenth Supplemental Indenture (Amended). The Nineteenth Supplemental Indenture is hereby amended by amending and restating the defined terms "Indenture," "Nineteenth Supplemental Indenture," "3.25% Senior Notes" and "4.60% Senior Notes" as follows:

"Indenture" means the Base Indenture, as amended and/or supplemented from time to time.

"3.25% Senior Notes" is replaced with "3.25% Senior Notes due 2023".

"4.60% Senior Notes" is replaced with "4.60% Senior Notes due 2043".

"Nineteenth Supplemental Indenture" means this Nineteenth Supplemental Indenture between the Company and The Bank of New York Mellon Trust Company, N.A. (as predecessor trustee), dated as of June 14, 2013, as amended by the Thirtieth Supplemental Indenture by and between the Company and the Trustee, dated as of July 1, 2020, as may be further amended and or supplemented from time to time.

Section 503    Section 207 of the Nineteenth Supplemental Indenture (Amended). Section 207 of the Nineteenth Supplemental Indenture is hereby amended and restated as follows:

"Section 207 Global Securities; Appointment of Depositary for Global Securities.

The 3.25% Senior Notes due 2023 shall be issued in the form of one or more permanent Global Bonds as provided in Section 3.13 of the Indenture and deposited with, or on behalf of, the Depositary, or with the Trustee, as custodian for the Depositary, duly executed by the Company and authenticated by the Trustee.

<div align="center">23</div>

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 124 of 1367

Each Global Bond shall represent such of the 3.25% Senior Notes due 2023 as shall be specified therein and shall each provide that it shall represent the aggregate principal amount of 3.25% Senior Notes due 2023 from time to time endorsed thereon and that the aggregate principal amount of 3.25% Senior Notes due 2023 represented thereby may from time to time be reduced or increased, as appropriate, to reflect exchanges or redemptions. Any endorsement of a Global Bond to reflect the amount, or any increase or decrease in the aggregate principal amount, of 3.25% Senior Notes due 2023 represented thereby shall be reflected by the Trustee on Schedule B attached to the 3.25% Senior Notes due 2023 and made by the Trustee in accordance with written instructions or such other written form of instructions as is customary for the Depositary, from the Depositary or its nominee on behalf of any Person having a beneficial interest in the Global Bond.

The Company hereby initially appoints The Depository Trust Company ("DTC") to act as the Depositary with respect to all 3.25% Senior Notes due 2023, and the 3.25% Senior Notes due 2023 shall initially be registered in the name of Cede & Co., as the nominee of DTC.

The Company and DTC have executed a Blanket Letter of Representations, and the Trustee is hereby authorized, in connection with any successor nominee for DTC or any successor Depositary, to enter into appropriate or comparable arrangements, if necessary, and shall have the same rights with respect to its actions thereunder as it has with respect to its actions under the Indenture.

Section 504    The Nineteenth Supplemental Indenture (Amended 209). The Nineteenth Supplemental Indenture is hereby amended by the addition of Section 209 thereto, to read as follows:

"Section 209    Collateral Security for the 3.25% Senior Notes due 2023.

(a)    For the purpose of providing collateral security for the obligations of the Company with respect to the 3.25% Senior Notes due 2023, the Company shall issue and deliver the 3.25% First Mortgage Bond, Collateral Series due 2023 (the "3.25% Collateral Mortgage Bonds due 2023") to the Trustee pursuant to the Second Supplemental Indenture, dated as of July 1, 2020 (the "Second Supplemental Mortgage Indenture") to the Indenture of Mortgage, dated as of June 19, 2020, between the Company and The Bank of New York Mellon Trust Company, N.A., as trustee (the "Mortgage Bond Trustee") (such Indenture of Mortgage, as [previously and] hereinafter supplemented, (including by the Second Supplemental Mortgage Indenture) is hereinafter referred to as the "Mortgage Indenture"). For the avoidance of doubt, any amounts received by the Trustee with respect to the 3.25% Collateral Mortgage Bonds due 2023 will be applied to satisfy any obligations under the 3.25% Senior Notes due 2023 in accordance with the Indenture and not any other Bonds outstanding under the Indenture. In connection with the delivery of the 3.25% Collateral Mortgage Bonds due 2023 to the Trustee, the Company shall (i) deliver to the Trustee an

24

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 125 of 1367

Officer's Certificate stating that (A) the Company has duly executed and the Mortgage Bond Trustee has duly authenticated the 3.25% Collateral Mortgage Bonds due 2023 in the aggregate principal amount of $375,000,000 and (B) the Company has delivered the 3.25% Collateral Mortgage Bonds due 2023 to the Trustee in the aggregate principal amount of $375,000,000, (ii) provide to the Trustee (or permit the Trustee to rely upon) an Opinion of Counsel, satisfactory in form and substance to the Trustee, regarding the due execution, delivery, issuance, validity and enforceability of the 3.25% Collateral Mortgage Bonds due 2023, and that the Mortgage Indenture creates a valid and enforceable lien on the Property Additions (as defined in the Mortgage Indenture) made the subject of the 3.25% Collateral Mortgage Bonds due 2023, subject to no prior Lien (as defined in the Mortgage Indenture) to the knowledge of such counsel, except for Permitted Liens (as defined in the Mortgage Indenture), and (iii) deliver to the Trustee a copy of the Mortgage Indenture, including the Second Supplemental Mortgage Indenture, certified by the Secretary or an Assistant Secretary of the Company.

(b)     The 3.25% Collateral Mortgage Bonds due 2023 shall be fully registered in the name of the Trustee. Until the 3.25% Collateral Mortgage Bonds due 2023 are released in accordance with Section 211 of this Nineteenth Supplemental Indenture, the Trustee shall hold the 3.25% Collateral Mortgage Bonds due 2023 in trust for the benefit of the Holders from time to time of the 3.25% Senior Notes due 2023 as security for any and all obligations of the Company with respect to the 3.25% Senior Notes due 2023, including but not limited to, (1) the full and prompt payment of the principal of and premium, if any, on the 3.25% Senior Notes due 2023 when and as the same shall become due and payable in accordance with the terms and provisions of the Indenture or the 3.25% Senior Notes due 2023, either at the stated maturity thereof, upon acceleration of the maturity thereof or upon redemption, and (2) the full and prompt payment of any interest on the 3.25% Senior Notes due 2023, when and as the same shall become due and payable in accordance with the terms and provisions of the Indenture or the 3.25% Senior Notes due 2023.

(c)     The Company acknowledges and agrees that, solely for administrative purposes, the Trustee will establish an account in the name of the Company for the custody and safekeeping of 3.25% Collateral Mortgage Bonds due 2023 delivered to the Trustee."

Section 505     The Nineteenth Supplemental Indenture (Amended 210). The Nineteenth Supplemental Indenture is hereby amended by the addition of Section 210 thereto, to read as follows:

"Section 210     Actions with Respect to 3.25% Collateral Mortgage Bonds due 2023.

(a)     Except for the safe custody of any 3.25% Collateral Mortgage Bonds due 2023 in its possession and the accounting for moneys actually received by it with respect to the 3.25% Collateral Mortgage Bonds due 2023, the Trustee shall have no duty to act, consent or request any action of any Person in connection with the 3.25% Collateral Mortgage Bonds due 2023 unless the Trustee shall have received (i) written direction from the holders of at least a majority in aggregate principal amount of the Bonds then outstanding voting as a single class and (ii) indemnity or security satisfactory to it against

25

Case: 19-30088     Doc# 9156-3     Filed: 09/28/20     Entered: 09/28/20 16:25:53     Page 126 of 1367

any liabilities that may be incurred by it in connection therewith; *provided, however,* that in no event shall the Trustee have any duty to attend meetings of bondholders under the Mortgage Indenture, or to ascertain or take action with respect to voting, consents, waivers, amendments or any other matters relative to the 3.25% Collateral Mortgage Bonds due 2023 and/or the Mortgage Indenture. The Trustee shall have no duty to ascertain or inquire into or verify the performance or observance of any covenants, conditions or agreements on the part of the Company or the Mortgage Bond Trustee with respect to the 3.25% Collateral Mortgage Bonds due 2023. The Trustee will not be required to take any action that is contrary to applicable law or any provision of the Indenture, the 3.25% Collateral Mortgage Bonds due 2023 or the Mortgage Indenture or that, in the opinion of the Trustee, otherwise subjects it to liability*; provided, however*, that, subject to the foregoing limitations and any other protections that the Trustee may have under the Indenture, including without limitation its right to indemnification for actions taken at the direction of the holders, the Trustee shall vote or give any such consent or instruction as it may be directed to do so by the holders of a majority in principal amount of the 3.25% Senior Notes due 2023, unless the vote or consent is with respect to matters which under the Mortgage Indenture require the vote or consent of the holders of a greater percentage in principal amount of the 3.25% Collateral Mortgage Bonds due 2023, in which case such direction must be from holders of such greater percentage in principal amount of the 3.25% Senior Notes due 2023.

(b)    To the extent that any consent or instruction from the Trustee and/or the holders of the 3.25% Senior Notes due 2023 is required with respect to the 3.25% Collateral Mortgage Bonds due 2023 and/or the Mortgage Indenture, the Trustee shall not have any duty or obligation to determine whether such consent or instruction is required nor any duty or obligation to give or otherwise solicit such consent or instructions; *provided, however,* that if the Trustee receives any written notices with respect to the 3.25% Collateral Mortgage Bonds due 2023, it shall promptly transmit such notices to the holders of the 3.25% Senior Notes due 2023 in accordance with the Indenture.

(c)    It is expressly understood and agreed by the Company (and, with respect to any holder of 3.25% Senior Notes due 2023, by holding such 3.25% Senior Notes due 2023 such holder shall be deemed to have agreed) that the Trustee shall not be responsible for any recital, statement, representation, or warranty (whether written or oral) made by any Person in or in connection with the Indenture or the Mortgage Indenture (other than those statements, representations or warranties that are expressly made by the Trustee, if any), or any certificate or other document referred to or provided for in, or received by it under, the Indenture or the Mortgage Indenture, or for the value, validity, effectiveness, genuineness, enforceability, or sufficiency of the 3.25% Collateral Mortgage Bonds due 2023, the Mortgage Indenture, or any other document referred to or provided for therein or for any failure by the Company, the Mortgage Bond Trustee or any other Person to perform any of its obligations hereunder or thereunder.

(d)    Whether or not expressly provided herein, the rights, privileges, protections, immunities, indemnities and benefits given to the Trustee pursuant to the Indenture shall apply to any action taken by the Trustee in accordance with the terms of the 3.25% Collateral Mortgage Bonds due 2023 and/or the Mortgage Indenture.

<div align="center">26</div>

(e)   If an Event of Default under the Indenture occurs and is continuing with respect to the 3.25% Senior Notes due 2023 and the 3.25% Senior Notes due 2023 have been accelerated as a consequence of such Event of Default, the Trustee may and, subject to Section 9.02 of the Indenture, upon receipt of written instructions of holders of not less than a majority in principal amount of the 3.25% Senior Notes due 2023, and receipt of indemnity or security to its satisfaction, shall exercise such other rights as it shall possess under the Mortgage Indenture as a holder of the 3.25% Collateral Mortgage Bonds due 2023.

(f)   With the written consent of the holders of a majority in aggregate principal amount of the outstanding 3.25% Senior Notes due 2023, the Trustee may consent to modifications, amendments, or supplements to (or provide waivers in respect of) the 3.25% Collateral Mortgage Bonds due 2023 and/or the Mortgage Indenture; provided, however, that without the written consent of each holder of a 3.25% Senior Note due 2023, the Trustee shall not consent to any modification, amendment or supplement to (or provide waivers in respect of) the 3.25% Collateral Mortgage Bonds due 2023 and/or the Mortgage Indenture that have the effect of (A) (i) extending the fixed maturity of the 3.25% Collateral Mortgage Bonds due 2023, (ii) changing any terms of any sinking fund or analogous fund or conversion rights with respect to the 3.25% Collateral Mortgage Bonds due 2023, (iii) reducing the rate or extending the time of payment of interest on the 3.25% Collateral Mortgage Bonds due 2023, or reducing the principal amount of the 3.25% Collateral Mortgage Bonds due 2023, or (iv) limiting the right of the Trustee (as the holder of the 3.25% Collateral Mortgage Bonds due 2023) to institute suit for the enforcement of payment of principal of or premium, if any, or interest on the 3.25% Collateral Mortgage Bonds due 2023 in accordance with the terms thereof, or (B) reducing the percentage of Bonds (as defined in the Mortgage Indenture), the holders of which are required to consent to any such supplement, amendment and/or waiver, or (C) permitting the creation by the Company of any Senior Lien (as such term is defined in the Mortgage Indenture) in accordance with the Mortgage Indenture."

Section 506   <u>The Nineteenth Supplemental Indenture (Amended 211)</u>. The Nineteenth Supplemental Indenture is hereby amended by the addition of Section 211 thereto, to read as follows:

"Section 211   <u>Release of Liens in Respect of 3.25% Collateral Mortgage Bonds due 2023; Change of Amounts</u>.

(a) Upon Company Request and the Trustee's receipt of an Officer's Certificate and an Opinion of Counsel from the Company certifying that all conditions to the satisfaction and discharge of the Indenture with respect to the 3.25% Senior Notes due 2023 (but, for avoidance of doubt, not any other series of Bonds then outstanding under the Indenture) in accordance with Section 8.02 of the Base Indenture have been satisfied, the Trustee shall be deemed not to hold a lien on the 3.25% Collateral Mortgage Bonds due

27

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 128 of 1367

2023 on behalf of the holders of the 3.25% Senior Notes due 2023 and the Trustee shall, upon written request of the Company, deliver to the Company the 3.25% Collateral Mortgage Bonds due 2023, together with such appropriate instruments of transfer or release (in form and substance reasonably satisfactory to the Trustee) as may be reasonably requested by the Company (and at the expense of the Company) to release such lien. All the 3.25% Collateral Mortgage Bonds due 2023 delivered to the Company in accordance with this Section 211 shall be delivered by the Company to the Mortgage Bond Trustee for cancellation.

(b) Following any partial payment, redemption or retirement of the 3.25% Senior Notes due 2023, the Company shall promptly furnish to the Trustee an Officer's Certificate certifying as to such payment, redemption or retirement and the principal amount of the 3.25% Senior Notes due 2023 outstanding following such change in aggregate principal amount and directing the Trustee to deliver the 3.25% Collateral Mortgage Bonds due 2023 then held by the Trustee to the Mortgage Bond Trustee in exchange for 3.25% Collateral Mortgage Bonds due 2023 in a principal amount equal to the current outstanding aggregate principal amount so certified in the Officer's Certificate."

Section 507    The Nineteenth Supplemental Indenture (Amended 212). The Nineteenth Supplemental Indenture is hereby amended by the addition of Section 212 thereto, to read as follows:

"Section 212    Delivery of Non-Payment Notice to Mortgage Bond Trustee. If payment of the principal of, premium, if any, or interest on the 3.25% Senior Notes due 2023 has not been fully paid, deemed to have been paid or otherwise satisfied and discharged when due, the Trustee, acting at the written direction of Holders of a majority in aggregate principal amount of the outstanding 3.25% Senior Notes due 2023, shall deliver a written notice to the Mortgage Bond Trustee stating the amount of such non-payment and that such payment remains unpaid on the date of such notice (which notice shall be given by the Trustee within five Business Days of such direction; *provided, however*, that failure by the Trustee to give such notice shall not affect in any way the Company's obligation to pay such amount)."

Section 508    The Nineteenth Supplemental Indenture (Amended 213). The Nineteenth Supplemental Indenture is hereby amended by the addition of Section 213 thereto, to read as follows:

"Section 213    No Transfer of 3.25% Collateral Mortgage Bonds due 2023. The Company shall cause all of the 3.25% Collateral Mortgage Bonds due 2023 to be issued and registered in the name of the Trustee. Except (i) as otherwise permitted by the Indenture or (ii) in connection with an assignment to a successor trustee in accordance with the Indenture, the Trustee shall not sell, assign or transfer the 3.25% Collateral Mortgage Bonds due 2023."

Section 509    Bond Exchange. The Company desires to exchange the original Global Bond representing the 3.25% Senior Notes due 2023, dated June 14, 2013 (the "Original Global

28

Bond") for the amended and restated Global Bond set forth in Exhibit A-4 hereto (which is hereby incorporated herein and made a part hereof) (the "Amended and Restated Global 3.25% Senior Notes due 2023") incorporating the amendments effected by this Thirtieth Supplemental Indenture in accordance with Section 13.06 of the Base Indenture. In connection therewith, the Company has delivered to the Trustee (i) a Company Request for the authentication and delivery of the Amended and Restated Global 3.25% Senior Notes due 2023 and the cancellation of the Original Global Bond, along with an Officer's Certificate and Opinion of Counsel required by the Indenture, and (ii) the Amended and Restated Global 3.25% Senior Notes due 2023 representing the 3.25% Senior Notes due 2023 in the aggregate principal amount of $375,000,000. Upon receipt of the deliverables required by the Indenture, the Trustee shall authenticate the Amended and Restated Global 3.25% Senior Notes due 2023 to be exchanged for the Original Global Bond, cancel the Original Global Bond and deliver the cancelled Original Global Bond to the Company in accordance with the instructions set forth in the Company Request.

Section 510    Section 307 of the Nineteenth Supplemental Indenture (Amended). Section 307 of the Nineteenth Supplemental Indenture is hereby amended and restated as follows:

"Section 307 Global Securities; Appointment of Depositary for Global Securities.

The 4.60% Senior Notes due 2043 shall be issued in the form of one or more permanent Global Bonds as provided in Section 3.13 of the Indenture and deposited with, or on behalf of, the Depositary, or with the Trustee, as custodian for the Depositary, duly executed by the Company and authenticated by the Trustee.

Each Global Bond shall represent such of the 4.60% Senior Notes due 2043 as shall be specified therein and shall each provide that it shall represent the aggregate principal amount of 4.60% Senior Notes due 2043 from time to time endorsed thereon and that the aggregate principal amount of 4.60% Senior Notes due 2043 represented thereby may from time to time be reduced or increased, as appropriate, to reflect exchanges or redemptions. Any endorsement of a Global Bond to reflect the amount, or any increase or decrease in the aggregate principal amount, of 4.60% Senior Notes due 2043 represented thereby shall be reflected by the Trustee on Schedule B attached to the 4.60% Senior Notes due 2043 and made by the Trustee in accordance with written instructions or such other written form of instructions as is customary for the Depositary, from the Depositary or its nominee on behalf of any Person having a beneficial interest in the Global Bond.

The Company hereby initially appoints The Depository Trust Company ("DTC") to act as the Depositary with respect to all 4.60% Senior Notes due 2043, and the 4.60% Senior Notes due 2043 shall initially be registered in the name of Cede & Co., as the nominee of DTC.

The Company and DTC have executed a Blanket Letter of Representations, and the Trustee is hereby authorized, in connection with any successor nominee for DTC or any successor Depositary, to enter into appropriate or comparable arrangements, if necessary, and shall have the same rights with respect to its actions thereunder as it has with respect to its actions under the Indenture."

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 130 of 1367

Section 511    <u>The Nineteenth Supplemental Indenture (Amended 309)</u>. The Nineteenth Supplemental Indenture is hereby amended by the addition of Section 309 thereto, to read as follows:

"Section 309    <u>Collateral Security for the 4.60% Senior Notes due 2043</u>.

(a)    For the purpose of providing collateral security for the obligations of the Company with respect to the 4.60% Senior Notes due 2043, the Company shall issue and deliver the 4.60% First Mortgage Bond, Collateral Series due 2043 (the "4.60% Collateral Mortgage Bonds due 2043") to the Trustee pursuant to the Second Supplemental Mortgage Indenture. For the avoidance of doubt, any amounts received by the Trustee with respect to the 4.60% Collateral Mortgage Bonds due 2043 will be applied to satisfy any obligations under the 4.60% Senior Notes due 2043 in accordance with the Indenture and not any other Bonds outstanding under the Indenture. In connection with the delivery of the 4.60% Collateral Mortgage Bonds due 2043 to the Trustee, the Company shall (i) deliver to the Trustee an Officer's Certificate stating that (A) the Company has duly executed and the Mortgage Bond Trustee has duly authenticated the 4.60% Collateral Mortgage Bonds due 2043 in the aggregate principal amount of $375,000,000 and (B) the Company has delivered the 4.60% Collateral Mortgage Bonds due 2043 to the Trustee in the aggregate principal amount of $375,000,000, (ii) provide to the Trustee (or permit the Trustee to rely upon) an Opinion of Counsel, satisfactory in form and substance to the Trustee, regarding the due execution, delivery, issuance, validity and enforceability of the 4.60% Collateral Mortgage Bonds due 2043, and that the Mortgage Indenture creates a valid and enforceable lien on the Property Additions (as defined in the Mortgage Indenture) made the subject of the 4.60% Collateral Mortgage Bonds due 2043, subject to no prior Lien (as defined in the Mortgage Indenture) to the knowledge of such counsel, except for Permitted Liens (as defined in the Mortgage Indenture), and (iii) deliver to the Trustee a copy of the Mortgage Indenture, including the Second Supplemental Mortgage Indenture, certified by the Secretary or an Assistant Secretary of the Company.

(b)    The 4.60% Collateral Mortgage Bonds due 2043 shall be fully registered in the name of the Trustee. Until 4.60% the Collateral Mortgage Bonds due 2043 are released in accordance with Section 311 of this Nineteenth Supplemental Indenture, the Trustee shall hold the 4.60% Collateral Mortgage Bonds due 2043 in trust for the benefit of the Holders from time to time of the 4.60% Senior Notes due 2043 as security for any and all obligations of the Company with respect to the 4.60% Senior Notes due 2043, including but not limited to, (1) the full and prompt payment of the principal of and premium, if any, on the 4.60% Senior Notes due 2043 when and as the same shall become due and payable in accordance with the terms and provisions of the Indenture or the 4.60% Senior Notes due 2043, either at the stated maturity thereof, upon acceleration of the maturity thereof or upon redemption, and (2) the full and prompt payment of any interest on the 4.60% Senior Notes due 2043, when and as the same shall become due and payable in accordance with the terms and provisions of the Indenture or the 4.60% Senior Notes due 2043.

30

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 131 of 1367

(c)   The Company acknowledges and agrees that, solely for administrative purposes, the Trustee will establish an account in the name of the Company for the custody and safekeeping of 4.60% Collateral Mortgage Bonds due 2043 delivered to the Trustee."

Section 512   The Nineteenth Supplemental Indenture (Amended 310). The Nineteenth Supplemental Indenture is hereby amended by the addition of Section 310 thereto, to read as follows:

"Section 310   Actions with Respect to 4.60% Collateral Mortgage Bonds due 2043.

(a)   Except for the safe custody of any 4.60% Collateral Mortgage Bonds due 2043 in its possession and the accounting for moneys actually received by it with respect to the 4.60% Collateral Mortgage Bonds due 2043, the Trustee shall have no duty to act, consent or request any action of any Person in connection with the 4.60% Collateral Mortgage Bonds due 2043 unless the Trustee shall have received (i) written direction from the holders of at least a majority in aggregate principal amount of the Bonds then outstanding voting as a single class and (ii) indemnity or security satisfactory to it against any liabilities that may be incurred by it in connection therewith; *provided, however,* that in no event shall the Trustee have any duty to attend meetings of bondholders under the Mortgage Indenture, or to ascertain or take action with respect to voting, consents, waivers, amendments or any other matters relative to the 4.60% Collateral Mortgage Bonds due 2043 and/or the Mortgage Indenture. The Trustee shall have no duty to ascertain or inquire into or verify the performance or observance of any covenants, conditions or agreements on the part of the Company or the Mortgage Bond Trustee with respect to the 4.60% Collateral Mortgage Bonds due 2043. The Trustee will not be required to take any action that is contrary to applicable law or any provision of the Indenture, the 4.60% Collateral Mortgage Bonds due 2043 or the Mortgage Indenture or that, in the opinion of the Trustee, otherwise subjects it to liability; *provided, however,* that, subject to the foregoing limitations and any other protections that the Trustee may have under the Indenture, including without limitation its right to indemnification for actions taken at the direction of the holders, the Trustee shall vote or give any such consent or instruction as it may be directed to do so by the holders of a majority in principal amount of the 4.60% Senior Notes due 2043, unless the vote or consent is with respect to matters which under the Mortgage Indenture require the vote or consent of the holders of a greater percentage in principal amount of the 4.60% Senior Notes due 2043, in which case such direction must be from holders of such greater percentage in principal amount of the 4.60% Senior Notes due 2043.

(b)   To the extent that any consent or instruction from the Trustee and/or the holders of the 4.60% Senior Notes due 2043 is required with respect to the 4.60% Collateral Mortgage Bonds due 2043 and/or the Mortgage Indenture, the Trustee shall not have any duty or obligation to determine whether such consent or instruction is required nor any duty or obligation to give or otherwise solicit such consent or instructions; *provided, however,* that if the Trustee receives any written notices with respect to the 4.60% Collateral Mortgage Bonds due 2043, it shall promptly transmit such notices to the holders of the 4.60% Senior Notes due 2043 in accordance with the Indenture.

31

(c)    It is expressly understood and agreed by the Company (and, with respect to any holder of 4.60% Senior Notes due 2043, by holding such 4.60% Senior Notes due 2043 such holder shall be deemed to have agreed) that the Trustee shall not be responsible for any recital, statement, representation, or warranty (whether written or oral) made by any Person in or in connection with the Indenture or the Mortgage Indenture or any certificate or other document referred to or provided for in, or received by it under, the Indenture or the Mortgage Indenture (other than those statements, representations or warranties that are expressly made by the Trustee, if any), or for the value, validity, effectiveness, genuineness, enforceability, or sufficiency of the 4.60% Collateral Mortgage Bonds due 2043, the Mortgage Indenture, or any other document referred to or provided for therein or for any failure by the Company, the Mortgage Bond Trustee or any other Person to perform any of its obligations hereunder or thereunder.

(d)    Whether or not expressly provided herein, the rights, privileges, protections, immunities, indemnities and benefits given to the Trustee pursuant to the Indenture shall apply to any action taken by the Trustee in accordance with the terms of the 4.60% Collateral Mortgage Bonds due 2043 and/or the Mortgage Indenture.

(e)    If an Event of Default under the Indenture occurs and is continuing with respect to the 4.60% Senior Notes due 2043 and the 4.60% Senior Notes due 2043 have been accelerated as a consequence of such Event of Default, the Trustee may and, subject to Section 9.02 of the Indenture, upon receipt of written instructions of holders of not less than a majority in principal amount of the 4.60% Senior Notes due 2043, and receipt of indemnity or security to its satisfaction, shall exercise such other rights as it shall possess under the Mortgage Indenture as a holder of the 4.60% Collateral Mortgage Bonds due 2043.

(f)    With the written consent of the holders of a majority in aggregate principal amount of the outstanding 4.60% Senior Notes due 2043, the Trustee may consent to modifications, amendments, or supplements to (or provide waivers in respect of) the 4.60% Collateral Mortgage Bonds due 2043 and/or the Mortgage Indenture; provided, however, that without the written consent of each holder of a 4.60% Senior Note due 2043, the Trustee shall not consent to any modification, amendment or supplement to (or provide waivers in respect of) the 4.60% Collateral Mortgage Bonds due 2043 and/or the Mortgage Indenture that have the effect of (A) (i) extending the fixed maturity of the 4.60% Collateral Mortgage Bonds due 2043, (ii) changing any terms of any sinking fund or analogous fund or conversion rights with respect to the 4.60% Collateral Mortgage Bonds due 2043, (iii) reducing the rate or extending the time of payment of interest on the 4.60% Collateral Mortgage Bonds due 2043, or reducing the principal amount of the 4.60% Collateral Mortgage Bonds due 2043, or (iv) limiting the right of the Trustee (as the holder of the 4.60% Collateral Mortgage Bonds due 2043) to institute suit for the enforcement of payment of principal of or premium, if any, or interest on the 4.60% Collateral Mortgage Bonds due 2043 in accordance with the terms thereof, or (B) reducing the percentage of Bonds (as defined in the Mortgage Indenture), the holders of which are required to consent to any such supplement, amendment and/or waiver, or (C) permitting the creation by the Company of any Senior Lien (as such term is defined in the Mortgage Indenture) in accordance with the Mortgage Indenture."

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 133 of 1367

Section 513   <u>The Nineteenth Supplemental Indenture (Amended 311)</u>. The Nineteenth Supplemental Indenture is hereby amended by the addition of Section 311 thereto, to read as follows:

"Section 311   <u>Release of Liens in Respect of 4.60% Collateral Mortgage Bonds due 2043; Change of Amounts</u>.

(a) Upon Company Request and the Trustee's receipt of an Officer's Certificate and an Opinion of Counsel from the Company certifying that all conditions to the satisfaction and discharge of the Indenture with respect to the 4.60% Senior Notes due 2043 (but, for avoidance of doubt, not any other series of Bonds then outstanding under the Indenture) in accordance with Section 8.02 of the Base Indenture have been satisfied, the Trustee shall be deemed not to hold a lien on the 4.60% Collateral Mortgage Bonds due 2043 on behalf of the holders of the 4.60% Senior Notes due 2043 and the Trustee shall, upon written request of the Company, deliver to the Company the 4.60% Collateral Mortgage Bonds due 2043, together with such appropriate instruments of transfer or release (in form and substance reasonably satisfactory to the Trustee) as may be reasonably requested by the Company (and at the expense of the Company) to release such lien. All the 4.60% Collateral Mortgage Bonds due 2043 delivered to the Company in accordance with this Section 311 shall be delivered by the Company to the Mortgage Bond Trustee for cancellation.

(b) Following any partial payment, redemption or retirement of the 4.60% Senior Notes due 2043, the Company shall promptly furnish to the Trustee an Officer's Certificate certifying as to such payment, redemption or retirement and the principal amount of the 4.60% Senior Notes due 2043 outstanding following such change in aggregate principal amount and directing the Trustee to deliver the 4.60% Collateral Mortgage Bonds due 2043 then held by the Trustee to the Mortgage Bond Trustee in exchange for 4.60% Collateral Mortgage Bonds due 2043 in a principal amount equal to the current outstanding aggregate principal amount so certified in the Officer's Certificate."

Section 514   <u>The Nineteenth Supplemental Indenture (Amended 312)</u>. The Nineteenth Supplemental Indenture is hereby amended by the addition of Section 312 thereto, to read as follows:

"Section 312   <u>Delivery of Non-Payment Notice to Mortgage Bond Trustee</u>. If payment of the principal of, premium, if any, or interest on the 4.60% Senior Notes due 2043 has not been fully paid, deemed to have been paid or otherwise satisfied and discharged when due, the Trustee, acting at the written direction of Holders of a majority in aggregate principal amount of the outstanding 4.60% Senior Notes due 2043, shall deliver a written notice to the Mortgage Bond Trustee stating the amount of such non-payment and that such payment remains unpaid on the date of such notice (which notice shall be given by the Trustee within five Business Days of such direction; *provided, however*, that failure by the Trustee to give such notice shall not affect in any way the Company's obligation to pay such amount)."

Section 515    <u>The Nineteenth Supplemental Indenture (Amended 313)</u>. The Nineteenth Supplemental Indenture is hereby amended by the addition of Section 313 thereto, to read as follows:

"Section 313    <u>No Transfer of 4.60% Collateral Mortgage Bonds due 2043</u>. The Company shall cause all of the 4.60% Collateral Mortgage Bonds due 2043 to be issued and registered in the name of the Trustee. Except (i) as otherwise permitted by the Indenture or (ii) in connection with an assignment to a successor trustee in accordance with the Indenture, the Trustee shall not sell, assign or transfer the 4.60% Collateral Mortgage Bonds due 2043."

Section 516    <u>Bond Exchange</u>. The Company desires to exchange the original Global Bond representing the 4.60% Senior Notes due 2043, dated June 14, 2013 (the "Original 2043 Global Bond") for the amended and restated Global Bond set forth in Exhibit A-5 hereto (which is hereby incorporated herein and made a part hereof) (the "Amended and Restated Global 4.60% Senior Notes due 2043") incorporating the amendments effected by this Thirtieth Supplemental Indenture in accordance with Section 13.06 of the Base Indenture. In connection therewith, the Company has delivered to the Trustee (i) a Company Request for the authentication and delivery of the Amended and Restated Global 4.60% Senior Notes due 2043 and the cancellation of the Original 2043 Global Bond, along with an Officer's Certificate and Opinion of Counsel required by the Indenture, and (ii) the Amended and Restated Global 4.60% Senior Notes due 2043 representing the 4.60% Senior Notes due 2043 in the aggregate principal amount of $375,000,000. Upon receipt of the deliverables required by the Indenture, the Trustee shall authenticate the Amended and Restated Global 4.60% Senior Notes due 2043 to be exchanged for the Original 2043 Global Bond, cancel the Original 2043 Global Bond and deliver the cancelled Original 2043 Global Bond to the Company in accordance with the instructions set forth in the Company Request.

<div align="center">ARTICLE SIX</div>

<div align="center">AMENDMENT OF THE TWENTIETH SUPPLEMENTAL INDENTURE AND THE 3.85% SENIOR NOTES DUE 2023</div>

Section 601    <u>Exhibit A of the Twentieth Supplemental Indenture (Replaced A-6)</u>. Exhibit A of the Twentieth Supplemental Indenture is hereby replaced with Exhibit A-6 to this Thirtieth Supplemental Indenture.

Section 602    <u>The Twentieth Supplemental Indenture (Amended)</u>. The Twentieth Supplemental Indenture is hereby amended by amending and restating the defined terms "Indenture," "Twentieth Supplemental Indenture" and "3.85% Senior Notes" as follows:

"Indenture" means the Base Indenture, as amended and/or supplemented from time to time.

<div align="center">34</div>

"3.85% Senior Notes" is replaced with "3.85% Senior Notes due 2023".

"Twentieth Supplemental Indenture" means this Twentieth Supplemental Indenture between the Company and The Bank of New York Mellon Trust Company, N.A. (as predecessor trustee), dated as of November 12, 2013, as amended by the Thirtieth Supplemental Indenture by and between the Company and the Trustee, dated as of July 1, 2020, as may be further amended and or supplemented from time to time.

Section 603    Section 207 of the Twentieth Supplemental Indenture (Amended). Section 207 of the Twentieth Supplemental Indenture is hereby amended and restated as follows:

"Section 207 Global Securities; Appointment of Depositary for Global Securities.

The 3.85% Senior Notes due 2023 shall be issued in the form of one or more permanent Global Bonds as provided in Section 3.13 of the Indenture and deposited with, or on behalf of, the Depositary, or with the Trustee, as custodian for the Depositary, duly executed by the Company and authenticated by the Trustee.

Each Global Bond shall represent such of the 3.85% Senior Notes due 2023 as shall be specified therein and shall each provide that it shall represent the aggregate principal amount of 3.85% Senior Notes due 2023 from time to time endorsed thereon and that the aggregate principal amount of 3.85% Senior Notes due 2023 represented thereby may from time to time be reduced or increased, as appropriate, to reflect exchanges or redemptions. Any endorsement of a Global Bond to reflect the amount, or any increase or decrease in the aggregate principal amount, of 3.85% Senior Notes due 2023 represented thereby shall be reflected by the Trustee on Schedule B attached to the 3.85% Senior Notes due 2023 and made by the Trustee in accordance with written instructions or such other written form of instructions as is customary for the Depositary, from the Depositary or its nominee on behalf of any Person having a beneficial interest in the Global Bond.

The Company hereby initially appoints The Depository Trust Company ("DTC") to act as the Depositary with respect to all 3.85% Senior Notes due 2023, and the 3.85% Senior Notes due 2023 shall initially be registered in the name of Cede & Co., as the nominee of DTC.

The Company and DTC have executed a Blanket Letter of Representations, and the Trustee is hereby authorized, in connection with any successor nominee for DTC or any successor Depositary, to enter into appropriate or comparable arrangements, if necessary, and shall have the same rights with respect to its actions thereunder as it has with respect to its actions under the Indenture."

Section 604    The Twentieth Supplemental Indenture (Amended 209). The Twentieth Supplemental Indenture is hereby amended by the addition of Section 209 thereto, to read as follows:

"Section 209    Collateral Security for the 3.85% Senior Notes due 2023.

35

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 136 of 1367

(a)   For the purpose of providing collateral security for the obligations of the Company with respect to the 3.85% Senior Notes due 2023, the Company shall issue and deliver the 3.85% First Mortgage Bond, Collateral Series due 2023 (the "3.85% Collateral Mortgage Bonds due 2023") to the Trustee pursuant to the Second Supplemental Indenture, dated as of July 1, 2020 (the "Second Supplemental Mortgage Indenture") to the Indenture of Mortgage, dated as of June 19, 2020, between the Company and The Bank of New York Mellon Trust Company, N.A., as trustee (the "Mortgage Bond Trustee") (such Indenture of Mortgage, as previously and hereinafter supplemented, (including by the Second Supplemental Mortgage Indenture) is hereinafter referred to as the "Mortgage Indenture"). For the avoidance of doubt, any amounts received by the Trustee with respect to the 3.85% Collateral Mortgage Bonds due 2023 will be applied to satisfy any obligations under the 3.85% Senior Notes due 2023 in accordance with the Indenture and not any other Bonds outstanding under the Indenture. In connection with the delivery of the 3.85% Collateral Mortgage Bonds due 2023 to the Trustee, the Company shall (i) deliver to the Trustee an Officer's Certificate stating that (A) the Company has duly executed and the Mortgage Bond Trustee has duly authenticated the 3.85% Collateral Mortgage Bonds due 2023 in the aggregate principal amount of $300,000,000 and (B) the Company has delivered the 3.85% Collateral Mortgage Bonds due 2023 to the Trustee in the aggregate principal amount of $300,000,000, (ii) provide to the Trustee (or permit the Trustee to rely upon) an Opinion of Counsel, satisfactory in form and substance to the Trustee, regarding the due execution, delivery, issuance, validity and enforceability of the 3.85% Collateral Mortgage Bonds due 2023, and that the Mortgage Indenture creates a valid and enforceable lien on the Property Additions (as defined in the Mortgage Indenture) made the subject of the 3.85% Collateral Mortgage Bonds due 2023, subject to no prior Lien (as defined in the Mortgage Indenture) to the knowledge of such counsel, except for Permitted Liens (as defined in the Mortgage Indenture), and (iii) deliver to the Trustee a copy of the Mortgage Indenture, including the Second Supplemental Mortgage Indenture, certified by the Secretary or an Assistant Secretary of the Company.

(b)   The 3.85% Collateral Mortgage Bonds due 2023 shall be fully registered in the name of the Trustee. Until the 3.85% Collateral Mortgage Bonds due 2023 are released in accordance with Section 211 of this Twentieth Supplemental Indenture, the Trustee shall hold the 3.85% Collateral Mortgage Bonds due 2023 in trust for the benefit of the Holders from time to time of the 3.85% Senior Notes due 2023 as security for any and all obligations of the Company with respect to the 3.85% Senior Notes due 2023, including but not limited to, (1) the full and prompt payment of the principal of and premium, if any, on the 3.85% Senior Notes due 2023 when and as the same shall become due and payable in accordance with the terms and provisions of the Indenture or the 3.85% Senior Notes due 2023, either at the stated maturity thereof, upon acceleration of the maturity thereof or upon redemption, and (2) the full and prompt payment of any interest on the 3.85% Senior Notes due 2023, when and as the same shall become due and payable in accordance with the terms and provisions of the Indenture or the 3.85% Senior Notes due 2023.

(c)   The Company acknowledges and agrees that, solely for administrative purposes, the Trustee will establish an account in the name of the Company for the custody and safekeeping of 3.85% Collateral Mortgage Bonds due 2023 delivered to the Trustee."

Section 605   <u>The Twentieth Supplemental Indenture (Amended 210)</u>. The Twentieth Supplemental Indenture is hereby amended by the addition of Section 210 thereto, to read as follows:

"Section 210   <u>Actions with Respect to 3.85% Collateral Mortgage Bonds due 2023</u>.

(a)   Except for the safe custody of any 3.85% Collateral Mortgage Bonds due 2023 in its possession and the accounting for moneys actually received by it with respect to the 3.85% Collateral Mortgage Bonds due 2023, the Trustee shall have no duty to act, consent or request any action of any Person in connection with the 3.85% Collateral Mortgage Bonds due 2023 unless the Trustee shall have received (i) written direction from the holders of at least a majority in aggregate principal amount of the Bonds then outstanding voting as a single class and (ii) indemnity or security satisfactory to it against any liabilities that may be incurred by it in connection therewith; *provided, however,* that in no event shall the Trustee have any duty to attend meetings of bondholders under the Mortgage Indenture, or to ascertain or take action with respect to voting, consents, waivers, amendments or any other matters relative to the 3.85% Collateral Mortgage Bonds due 2023 and/or the Mortgage Indenture. The Trustee shall have no duty to ascertain or inquire into or verify the performance or observance of any covenants, conditions or agreements on the part of the Company or the Mortgage Bond Trustee with respect to the 3.85% Collateral Mortgage Bonds due 2023. The Trustee will not be required to take any action that is contrary to applicable law or any provision of the Indenture, the 3.85% Collateral Mortgage Bonds due 2023 or the Mortgage Indenture or that, in the opinion of the Trustee, otherwise subjects it to liability*; provided, however*, that, subject to the foregoing limitations and any other protections that the Trustee may have under the Indenture, including without limitation its right to indemnification for actions taken at the direction of the holders, the Trustee shall vote or give any such consent or instruction as it may be directed to do so by the holders of a majority in principal amount of the 3.85% Senior Notes due 2023, unless the vote or consent is with respect to matters which under the Mortgage Indenture require the vote or consent of the holders of a greater percentage in principal amount of the 3.85% Collateral Mortgage Bonds due 2023, in which case such direction must be from holders of such greater percentage in principal amount of the 3.85% Senior Notes due 2023.

(b)   To the extent that any consent or instruction from the Trustee and/or the holders of the 3.85% Senior Notes due 2023 is required with respect to the 3.85% Collateral Mortgage Bonds due 2023 and/or the Mortgage Indenture, the Trustee shall not have any duty or obligation to determine whether such consent or instruction is required nor any duty or obligation to give or otherwise solicit such consent or instructions; *provided, however,* that if the Trustee receives any written notices with respect to the 3.85% Collateral Mortgage Bonds due 2023, it shall promptly transmit such notices to the holders of the 3.85% Senior Notes due 2023 in accordance with the Indenture.

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 138 of 1367

(c)    It is expressly understood and agreed by the Company (and, with respect to any holder of 3.85% Senior Notes due 2023, by holding such 3.85% Senior Note due 2023 such holder shall be deemed to have agreed) that the Trustee shall not be responsible for any recital, statement, representation, or warranty (whether written or oral) made by any Person in or in connection with the Indenture or the Mortgage Indenture or any certificate or other document referred to or provided for in, or received by it under, the Indenture or the Mortgage Indenture (other than those statements, representations or warranties that are expressly made by the Trustee, if any), or for the value, validity, effectiveness, genuineness, enforceability, or sufficiency of the 3.85% Collateral Mortgage Bonds due 2023, the Mortgage Indenture, or any other document referred to or provided for therein or for any failure by the Company, the Mortgage Bond Trustee or any other Person to perform any of its obligations hereunder or thereunder.

(d)    Whether or not expressly provided herein, the rights, privileges, protections, immunities, indemnities and benefits given to the Trustee pursuant to the Indenture shall apply to any action taken by the Trustee in accordance with the terms of the 3.85% Collateral Mortgage Bonds due 2023 and/or the Mortgage Indenture.

(e)    If an Event of Default under the Indenture occurs and is continuing with respect to the 3.85% Senior Notes due 2023 and the 3.85% Senior Notes due 2023 have been accelerated as a consequence of such Event of Default, the Trustee may and, subject to Section 9.02 of the Indenture, upon receipt of written instructions of holders of not less than a majority in principal amount of the 3.85% Senior Notes due 2023, and receipt of indemnity or security to its satisfaction, shall exercise such other rights as it shall possess under the Mortgage Indenture as a holder of the 3.85% Collateral Mortgage Bonds due 2023.

(f)    With the written consent of the holders of a majority in aggregate principal amount of the outstanding 3.85% Senior Notes due 2023, the Trustee may consent to modifications, amendments, or supplements to (or provide waivers in respect of) the 3.85% Collateral Mortgage Bonds due 2023 and/or the Mortgage Indenture; provided, however, that without the written consent of each holder of a 3.85% Senior Note due 2023, the Trustee shall not consent to any modification, amendment or supplement to (or provide waivers in respect of) the 3.85% Collateral Mortgage Bonds due 2023 and/or the Mortgage Indenture that have the effect of (A) (i) extending the fixed maturity of the 3.85% Collateral Mortgage Bonds due 2023, (ii) changing any terms of any sinking fund or analogous fund or conversion rights with respect to the 3.85% Collateral Mortgage Bonds due 2023, (iii) reducing the rate or extending the time of payment of interest on the 3.85% Collateral Mortgage Bonds due 2023, or reducing the principal amount of the 3.85% Collateral Mortgage Bonds due 2023, or (iv) limiting the right of the Trustee (as the holder of the 3.85% Collateral Mortgage Bonds due 2023) to institute suit for the enforcement of payment of principal of or premium, if any, or interest on the 3.85% Collateral Mortgage Bonds due 2023 in accordance with the terms thereof, or (B) reducing the percentage of Bonds (as defined in the Mortgage Indenture), the holders of which are required to consent to any such supplement, amendment and/or waiver, or (C) permitting the creation by the Company of any Senior Lien (as such term is defined in the Mortgage Indenture) in accordance with the Mortgage Indenture."

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 139 of 1367

Section 606   <u>The Twentieth Supplemental Indenture (Amended 211)</u>. The Twentieth Supplemental Indenture is hereby amended by the addition of Section 211 thereto, to read as follows:

"Section 211   <u>Release of Liens in Respect of 3.85% Collateral Mortgage Bonds due 2023; Change of Amounts</u>.

(a) Upon Company Request and the Trustee's receipt of an Officer's Certificate and an Opinion of Counsel from the Company certifying that all conditions to the satisfaction and discharge of the Indenture with respect to the 3.85% Senior Notes due 2023 (but, for avoidance of doubt, not any other series of Bonds then outstanding under the Indenture) in accordance with Section 8.02 of the Base Indenture have been satisfied, the Trustee shall be deemed not to hold a lien on the 3.85% Collateral Mortgage Bonds due 2023 on behalf of the holders of the 3.85% Senior Notes due 2023 and the Trustee shall, upon written request of the Company, deliver to the Company the 3.85% Collateral Mortgage Bonds due 2023, together with such appropriate instruments of transfer or release (in form and substance reasonably satisfactory to the Trustee) as may be reasonably requested by the Company (and at the expense of the Company) to release such lien. All the 3.85% Collateral Mortgage Bonds due 2023 delivered to the Company in accordance with this Section 211 shall be delivered by the Company to the Mortgage Bond Trustee for cancellation.

(b) Following any partial payment, redemption or retirement of the 3.85% Senior Notes due 2023, the Company shall promptly furnish to the Trustee an Officer's Certificate certifying as to such payment, redemption or retirement and the principal amount of the 3.85% Senior Notes due 2023 outstanding following such change in aggregate principal amount and directing the Trustee to deliver the 3.85% Collateral Mortgage Bonds due 2023 then held by the Trustee to the Mortgage Bond Trustee in exchange for 3.85% Collateral Mortgage Bonds due 2023 in a principal amount equal to the current outstanding aggregate principal amount so certified in the Officer's Certificate."

Section 607   <u>The Twentieth Supplemental Indenture (Amended 212)</u>. The Twentieth Supplemental Indenture is hereby amended by the addition of Section 212 thereto, to read as follows:

"Section 212   <u>Delivery of Non-Payment Notice to Mortgage Bond Trustee</u>. If payment of the principal of, premium, if any, or interest on the 3.85% Senior Notes due 2023 has not been fully paid, deemed to have been paid or otherwise satisfied and discharged when due, the Trustee, acting at the written direction of Holders of a majority in aggregate principal amount of the outstanding 3.85% Senior Notes due 2023, shall deliver a written notice to the Mortgage Bond Trustee stating the amount of such non-payment and that such payment remains unpaid on the date of such notice (which notice shall be given by the Trustee within five Business Days of such direction; *provided, however*, that failure by the Trustee to give such notice shall not affect in any way the Company's obligation to pay such amount)."

39

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 140 of 1367

Section 608    <u>The Twentieth Supplemental Indenture (Amended 213)</u>. The Twentieth Supplemental Indenture is hereby amended by the addition of Section 213 thereto, to read as follows:

"Section 213    <u>No Transfer of 3.85% Collateral Mortgage Bonds due 2023</u>. The Company shall cause all of the 3.85% Collateral Mortgage Bonds due 2023 to be issued and registered in the name of the Trustee. Except (i) as otherwise permitted by the Indenture or (ii) in connection with an assignment to a successor trustee in accordance with the Indenture, the Trustee shall not sell, assign or transfer the 3.85% Collateral Mortgage Bonds due 2023."

Section 609    <u>Bond Exchange</u>. The Company desires to exchange the original Global Bond representing the 3.85% Senior Notes due 2023, dated November 12, 2013 (the "Original Global Bond") for the amended and restated Global Bond set forth in Exhibit A-6 hereto (which is hereby incorporated herein and made a part hereof) (the "Amended and Restated Global 3.85% Senior Notes due 2023") incorporating the amendments effected by this Thirtieth Supplemental Indenture in accordance with Section 13.06 of the Base Indenture. In connection therewith, the Company has delivered to the Trustee (i) a Company Request for the authentication and delivery of the Amended and Restated Global 3.85% Senior Notes due 2023 and the cancellation of the Original Global Bond, along with an Officer's Certificate and Opinion of Counsel required by the Indenture, and (ii) the Amended and Restated Global 3.85% Senior Notes due 2023 representing the 3.85% Senior Notes due 2023 in the aggregate principal amount of $300,000,000. Upon receipt of the deliverables required by the Indenture, the Trustee shall authenticate the Amended and Restated Global 3.85% Senior Notes due 2023 to be exchanged for the Original Global Bond, cancel the Original Global Bond and deliver the cancelled Original Global Bond to the Company in accordance with the instructions set forth in the Company Request.

<div align="center">

ARTICLE SEVEN

AMENDMENT OF THE TWENTY-FIRST SUPPLEMENTAL INDENTURE, THE 3.75% SENIOR NOTES DUE 2024 AND THE 4.75% SENIOR NOTES DUE 2044

</div>

Section 701    <u>Exhibit A and Exhibit B of the Twenty-First Supplemental Indenture (Amended)</u>. Exhibit A and Exhibit B of the Twenty-First Supplemental Indenture are hereby replaced with Exhibit A-7 and A-8 to this Thirtieth Supplemental Indenture.

Section 702    <u>The Twenty-First Supplemental Indenture (Amended)</u>. The Twenty-First Supplemental Indenture is hereby amended by amending and restating the defined terms "Indenture," "Twenty-First Supplemental Indenture", "3.75% Senior Notes" and "4.75% Senior Notes" as follows:

"Indenture" means the Base Indenture, as amended and/or supplemented from time to time.

<div align="center">40</div>

"3.75% Senior Notes" is replaced with "3.75% Senior Notes due 2024".

"4.75% Senior Notes" is replaced with "4.75% Senior Notes due 2044".

"Twenty-First Supplemental Indenture" means this Twenty-First Supplemental Indenture between the Company and The Bank of New York Mellon Trust Company, N.A. (as predecessor trustee), dated as of February 21, 2014, as amended by the Thirtieth Supplemental Indenture by and between the Company and the Trustee, dated as of July 1, 2020, as may be further amended and or supplemented from time to time.

Section 703     Section 207 of the Twenty-First Supplemental Indenture (Amended). Section 207 of the Twenty-First Supplemental Indenture is hereby amended and restated as follows:

"Section 207 Global Securities; Appointment of Depositary for Global Securities.

The 3.75% Senior Notes due 2024 shall be issued in the form of one or more permanent Global Bonds as provided in Section 3.13 of the Indenture and deposited with, or on behalf of, the Depositary, or with the Trustee, as custodian for the Depositary, duly executed by the Company and authenticated by the Trustee.

Each Global Bond shall represent such of the 3.75% Senior Notes due 2024 as shall be specified therein and shall each provide that it shall represent the aggregate principal amount of 3.75% Senior Notes due 2024 from time to time endorsed thereon and that the aggregate principal amount of 3.75% Senior Notes due 2024 represented thereby may from time to time be reduced or increased, as appropriate, to reflect exchanges or redemptions. Any endorsement of a Global Bond to reflect the amount, or any increase or decrease in the aggregate principal amount, of 3.75% Senior Notes due 2024 represented thereby shall be reflected by the Trustee on Schedule B attached to the 3.75% Senior Notes due 2024 and made by the Trustee in accordance with written instructions or such other written form of instructions as is customary for the Depositary, from the Depositary or its nominee on behalf of any Person having a beneficial interest in the Global Bond.

The Company hereby initially appoints The Depository Trust Company ("DTC") to act as the Depositary with respect to all 3.75% Senior Notes due 2024, and the 3.75% Senior Notes due 2024 shall initially be registered in the name of Cede & Co., as the nominee of DTC.

The Company and DTC have executed a Blanket Letter of Representations, and the Trustee is hereby authorized, in connection with any successor nominee for DTC or any successor Depositary, to enter into appropriate or comparable arrangements, if necessary, and shall have the same rights with respect to its actions thereunder as it has with respect to its actions under the Indenture.

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 142 of 1367

Section 704   The Twenty-First Supplemental Indenture (Amended 209). The Twenty-First Supplemental Indenture is hereby amended by the addition of Section 209 thereto, to read as follows:

"Section 209   Collateral Security for the 3.75% Senior Notes due 2024.

(a)   For the purpose of providing collateral security for the obligations of the Company with respect to the 3.75% Senior Notes due 2024, the Company shall issue and deliver the 3.75% First Mortgage Bond, Collateral Series due 2024 (the "3.75% Collateral Mortgage Bonds due 2024") to the Trustee pursuant to the Second Supplemental Indenture, dated as of July 1, 2020 (the "Second Supplemental Mortgage Indenture") to the Indenture of Mortgage, dated as of June 19, 2020, between the Company and The Bank of New York Mellon Trust Company, N.A., as trustee (the "Mortgage Bond Trustee") (such Indenture of Mortgage, as previously and hereinafter supplemented, (including by the Second Supplemental Mortgage Indenture) is hereinafter referred to as the "Mortgage Indenture"). For the avoidance of doubt, any amounts received by the Trustee with respect to the 3.75% Collateral Mortgage Bonds due 2024 will be applied to satisfy any obligations under the 3.75% Senior Notes due 2024 in accordance with the Indenture and not any other Bonds outstanding under the Indenture. In connection with the delivery of the 3.75% Collateral Mortgage Bonds due 2024 to the Trustee, the Company shall (i) deliver to the Trustee an Officer's Certificate stating that (A) the Company has duly executed and the Mortgage Bond Trustee has duly authenticated the 3.75% Collateral Mortgage Bonds due 2024 in the aggregate principal amount of $450,000,000 and (B) the Company has delivered the 3.75% Collateral Mortgage Bonds due 2024 to the Trustee in the aggregate principal amount of $450,000,000, (ii) provide to the Trustee (or permit the Trustee to rely upon) an Opinion of Counsel, satisfactory in form and substance to the Trustee, regarding the due execution, delivery, issuance, validity and enforceability of the 3.75% Collateral Mortgage Bonds due 2024, and that the Mortgage Indenture creates a valid and enforceable lien on the Property Additions (as defined in the Mortgage Indenture) made the subject of the 3.75% Collateral Mortgage Bonds due 2024, subject to no prior Lien (as defined in the Mortgage Indenture) to the knowledge of such counsel, except for Permitted Liens (as defined in the Mortgage Indenture), and (iii) deliver to the Trustee a copy of the Mortgage Indenture, including the Second Supplemental Mortgage Indenture, certified by the Secretary or an Assistant Secretary of the Company.

(b)   The 3.75% Collateral Mortgage Bonds due 2024 shall be fully registered in the name of the Trustee. Until the 3.75% Collateral Mortgage Bonds due 2024 are released in accordance with Section 211 of this Twenty-First Supplemental Indenture, the Trustee shall hold the 3.75% Collateral Mortgage Bonds due 2024 in trust for the benefit of the Holders from time to time of the 3.75% Senior Notes due 2024 as security for any and all obligations of the Company with respect to the 3.75% Senior Notes due 2024, including but not limited to, (1) the full and prompt payment of the principal of and premium, if any, on the 3.75% Senior Notes due 2024 when and as the same shall become due and payable in accordance with the terms and provisions of the Indenture or the 3.75% Senior Notes due 2024, either at the stated maturity thereof, upon acceleration of the maturity thereof or

42

upon redemption, and (2) the full and prompt payment of any interest on the 3.75% Senior Notes due 2024, when and as the same shall become due and payable in accordance with the terms and provisions of the Indenture or the 3.75% Senior Notes due 2024.

(c)  The Company acknowledges and agrees that, solely for administrative purposes, the Trustee will establish an account in the name of the Company for the custody and safekeeping of 3.75% Collateral Mortgage Bonds due 2024 delivered to the Trustee."

Section 705  The Twenty-First Supplemental Indenture (Amended 210). The Twenty-First Supplemental Indenture is hereby amended by the addition of Section 210 thereto, to read as follows:

"Section 210  Actions with Respect to 3.75% Collateral Mortgage Bonds due 2024.

(a)  Except for the safe custody of any 3.75% Collateral Mortgage Bonds due 2024 in its possession and the accounting for moneys actually received by it with respect to the 3.75% Collateral Mortgage Bonds due 2024, the Trustee shall have no duty to act, consent or request any action of any Person in connection with the 3.75% Collateral Mortgage Bonds due 2024 unless the Trustee shall have received (i) written direction from the holders of at least a majority in aggregate principal amount of the Bonds then outstanding voting as a single class and (ii) indemnity or security satisfactory to it against any liabilities that may be incurred by it in connection therewith; *provided, however,* that in no event shall the Trustee have any duty to attend meetings of bondholders under the Mortgage Indenture, or to ascertain or take action with respect to voting, consents, waivers, amendments or any other matters relative to the 3.75% Collateral Mortgage Bonds due 2024 and/or the Mortgage Indenture. The Trustee shall have no duty to ascertain or inquire into or verify the performance or observance of any covenants, conditions or agreements on the part of the Company or the Mortgage Bond Trustee with respect to the 3.75% Collateral Mortgage Bonds due 2024. The Trustee will not be required to take any action that is contrary to applicable law or any provision of the Indenture, the 3.75% Collateral Mortgage Bonds due 2024 or the Mortgage Indenture or that, in the opinion of the Trustee, otherwise subjects it to liability*; provided, however,* that, subject to the foregoing limitations and any other protections that the Trustee may have under the Indenture, including without limitation its right to indemnification for actions taken at the direction of the holders, the Trustee shall vote or give any such consent or instruction as it may be directed to do so by the holders of a majority in principal amount of the 3.75% Senior Notes due 2024, unless the vote or consent is with respect to matters which under the Mortgage Indenture require the vote or consent of the holders of a greater percentage in principal amount of the 3.75% Collateral Mortgage Bonds due 2024, in which case such direction must be from holders of such greater percentage in principal amount of the 3.75% Senior Notes due 2024.

(b)  To the extent that any consent or instruction from the Trustee and/or the holders of the 3.75% Senior Notes due 2024 is required with respect to the 3.75% Collateral Mortgage Bonds due 2024 and/or the Mortgage Indenture, the Trustee shall not have any duty or obligation to determine whether such consent or instruction is required nor any

43

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 144 of 1367

duty or obligation to give or otherwise solicit such consent or instructions; *provided, however*, that if the Trustee receives any written notices with respect to the 3.75% Collateral Mortgage Bonds due 2024, it shall promptly transmit such notices to the holders of the 3.75% Senior Notes due 2024 in accordance with the Indenture.

(c)   It is expressly understood and agreed by the Company (and, with respect to any holder of 3.75% Senior Notes due 2024, by holding such 3.75% Senior Notes due 2024 such holder shall be deemed to have agreed) that the Trustee shall not be responsible for any recital, statement, representation, or warranty (whether written or oral) made by any Person in or in connection with the Indenture or the Mortgage Indenture or any certificate or other document referred to or provided for in, or received by it under, the Indenture or the Mortgage Indenture (other than those statements, representations or warranties that are expressly made by the Trustee, if any), or for the value, validity, effectiveness, genuineness, enforceability, or sufficiency of the 3.75% Collateral Mortgage Bonds due 2024, the Mortgage Indenture, or any other document referred to or provided for therein or for any failure by the Company, the Mortgage Bond Trustee or any other Person to perform any of its obligations hereunder or thereunder.

(d)   Whether or not expressly provided herein, the rights, privileges, protections, immunities, indemnities and benefits given to the Trustee pursuant to the Indenture shall apply to any action taken by the Trustee in accordance with the terms of the 3.75% Collateral Mortgage Bonds due 2024 and/or the Mortgage Indenture.

(e)   If an Event of Default under the Indenture occurs and is continuing with respect to the 3.75% Senior Notes due 2024 and the 3.75% Senior Notes due 2024 have been accelerated as a consequence of such Event of Default, the Trustee may and, subject to Section 9.02 of the Indenture, upon receipt of written instructions of holders of not less than a majority in principal amount of the 3.75% Senior Notes due 2024, and receipt of indemnity or security to its satisfaction, shall exercise such other rights as it shall possess under the Mortgage Indenture as a holder of the 3.75% Collateral Mortgage Bonds due 2024.

(f)   With the written consent of the holders of a majority in aggregate principal amount of the outstanding 3.75% Senior Notes due 2024, the Trustee may consent to modifications, amendments, or supplements to (or provide waivers in respect of) the 3.75% Collateral Mortgage Bonds due 2024 and/or the Mortgage Indenture; provided, however, that without the written consent of each holder of a 3.75% Senior Note due 2024, the Trustee shall not consent to any modification, amendment or supplement to (or provide waivers in respect of) the 3.75% Collateral Mortgage Bonds due 2024 and/or the Mortgage Indenture that have the effect of (A) (i) extending the fixed maturity of the 3.75% Collateral Mortgage Bonds due 2024, (ii) changing any terms of any sinking fund or analogous fund or conversion rights with respect to the 3.75% Collateral Mortgage Bonds due 2024, (iii) reducing the rate or extending the time of payment of interest on the 3.75% Collateral Mortgage Bonds due 2024, or reducing the principal amount of the 3.75% Collateral Mortgage Bonds due 2024, or (iv) limiting the right of the Trustee (as the holder of the 3.75% Collateral Mortgage Bonds due 2024) to institute suit for the enforcement of

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 145 of 1367

payment of principal of or premium, if any, or interest on the 3.75% Collateral Mortgage Bonds due 2024 in accordance with the terms thereof, or (B) reducing the percentage of Bonds (as defined in the Mortgage Indenture), the holders of which are required to consent to any such supplement, amendment and/or waiver, or (C) permitting the creation by the Company of any Senior Lien (as such term is defined in the Mortgage Indenture) in accordance with the Mortgage Indenture."

Section 706   <u>The Twenty-First Supplemental Indenture (Amended 211)</u>. The Twenty-First Supplemental Indenture is hereby amended by the addition of Section 211 thereto, to read as follows:

"Section 211   <u>Release of Liens in Respect of 3.75% Collateral Mortgage Bonds due 2024; Change of Amounts</u>.

(a) Upon Company Request and the Trustee's receipt of an Officer's Certificate and an Opinion of Counsel from the Company certifying that all conditions to the satisfaction and discharge of the Indenture with respect to the 3.75% Senior Notes due 2024 (but, for avoidance of doubt, not any other series of Bonds then outstanding under the Indenture) in accordance with Section 8.02 of the Base Indenture have been satisfied, the Trustee shall be deemed not to hold a lien on the 3.75% Collateral Mortgage Bonds due 2024 on behalf of the holders of the 3.75% Senior Notes due 2024 and the Trustee shall, upon written request of the Company, deliver to the Company the 3.75% Collateral Mortgage Bonds due 2024, together with such appropriate instruments of transfer or release (in form and substance reasonably satisfactory to the Trustee) as may be reasonably requested by the Company (and at the expense of the Company) to release such lien. All the 3.75% Collateral Mortgage Bonds due 2024 delivered to the Company in accordance with this Section 211 shall be delivered by the Company to the Mortgage Bond Trustee for cancellation.

(b) Following any partial payment, redemption or retirement of the 3.75% Senior Notes due 2024, the Company shall promptly furnish to the Trustee an Officer's Certificate certifying as to such payment, redemption or retirement and the principal amount of the 3.75% Senior Notes due 2024 outstanding following such change in aggregate principal amount and directing the Trustee to deliver the 3.75% Collateral Mortgage Bonds due 2024 then held by the Trustee to the Mortgage Bond Trustee in exchange for 3.75% Collateral Mortgage Bonds due 2024 in a principal amount equal to the current outstanding aggregate principal amount so certified in the Officer's Certificate."

Section 707   <u>The Twenty-First Supplemental Indenture (Amended 212)</u>. The Twenty-First Supplemental Indenture is hereby amended by the addition of Section 212 thereto, to read as follows:

"Section 212   <u>Delivery of Non-Payment Notice to Mortgage Bond Trustee</u>. If payment of the principal of, premium, if any, or interest on the 3.75% Senior Notes due 2024 has not been fully paid, deemed to have been paid or otherwise satisfied and discharged when due, the Trustee, acting at the written direction of Holders of a majority

45

in aggregate principal amount of the outstanding 3.75% Senior Notes due 2024, shall deliver a written notice to the Mortgage Bond Trustee stating the amount of such non-payment and that such payment remains unpaid on the date of such notice (which notice shall be given by the Trustee within five Business Days of such direction; *provided, however,* that failure by the Trustee to give such notice shall not affect in any way the Company's obligation to pay such amount)."

Section 708   <u>The Twenty-First Supplemental Indenture (Amended 213)</u>. The Twenty-First Supplemental Indenture is hereby amended by the addition of Section 213 thereto, to read as follows:

"Section 213   <u>No Transfer of 3.75% Collateral Mortgage Bonds due 2024</u>. The Company shall cause all of the 3.75% Collateral Mortgage Bonds due 2024 to be issued and registered in the name of the Trustee. Except (i) as otherwise permitted by the Indenture or (ii) in connection with an assignment to a successor trustee in accordance with the Indenture, the Trustee shall not sell, assign or transfer the 3.75% Collateral Mortgage Bonds due 2024."

Section 709   <u>Bond Exchange</u>. The Company desires to exchange the original Global Bond representing the 3.75% Senior Notes due 2024, dated February 21, 2014 (the "Original Global Bond") for the amended and restated Global Bond set forth in Exhibit A-7 hereto (which is hereby incorporated herein and made a part hereof) (the "Amended and Restated Global 3.75% Senior Notes due 2024") incorporating the amendments effected by this Thirtieth Supplemental Indenture in accordance with Section 13.06 of the Base Indenture. In connection therewith, the Company has delivered to the Trustee (i) a Company Request for the authentication and delivery of the Amended and Restated Global 3.75% Senior Notes due 2024 and the cancellation of the Original Global Bond, along with an Officer's Certificate and Opinion of Counsel required by the Indenture, and (ii) the Amended and Restated Global 3.75% Senior Notes due 2024 representing the 3.75% Senior Notes due 2024 in the aggregate principal amount of $450,000,000. Upon receipt of the deliverables required by the Indenture, the Trustee shall authenticate the Amended and Restated Global 3.75% Senior Notes due 2024 to be exchanged for the Original Global Bond, cancel the Original Global Bond and deliver the cancelled Original Global Bond to the Company in accordance with the instructions set forth in the Company Request.

Section 710   <u>Section 307 of the Twenty-First Supplemental Indenture (Amended 307)</u>. Section 307 of the Twenty-First Supplemental Indenture is hereby amended and restated as follows:

"Section 307 <u>Global Securities; Appointment of Depositary for Global Securities</u>.

The 4.75% Senior Notes due 2044 shall be issued in the form of one or more permanent Global Bonds as provided in Section 3.13 of the Indenture and deposited with, or on behalf of, the Depositary, or with the Trustee, as custodian for the Depositary, duly executed by the Company and authenticated by the Trustee.

46

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 147 of 1367

Each Global Bond shall represent such of the 4.75% Senior Notes due 2044 as shall be specified therein and shall each provide that it shall represent the aggregate principal amount of 4.75% Senior Notes due 2044 from time to time endorsed thereon and that the aggregate principal amount of 4.75% Senior Notes due 2044 represented thereby may from time to time be reduced or increased, as appropriate, to reflect exchanges or redemptions. Any endorsement of a Global Bond to reflect the amount, or any increase or decrease in the aggregate principal amount, of 4.75% Senior Notes due 2044 represented thereby shall be reflected by the Trustee on Schedule B attached to the 4.75% Senior Notes due 2044 and made by the Trustee in accordance with written instructions or such other written form of instructions as is customary for the Depositary, from the Depositary or its nominee on behalf of any Person having a beneficial interest in the Global Bond.

The Company hereby initially appoints The Depository Trust Company ("DTC") to act as the Depositary with respect to all 4.75% Senior Notes due 2044, and the 4.75% Senior Notes due 2044 shall initially be registered in the name of Cede & Co., as the nominee of DTC.

The Company and DTC have executed a Blanket Letter of Representations, and the Trustee is hereby authorized, in connection with any successor nominee for DTC or any successor Depositary, to enter into appropriate or comparable arrangements, if necessary, and shall have the same rights with respect to its actions thereunder as it has with respect to its actions under the Indenture."

Section 711    The Twenty-First Supplemental Indenture (Amended 309). The Twenty-First Supplemental Indenture is hereby amended by the addition of Section 309 thereto, to read as follows:

"Section 309    Collateral Security for the 4.75% Senior Notes due 2044.

(a)    For the purpose of providing collateral security for the obligations of the Company with respect to the 4.75% Senior Notes due 2044, the Company shall issue and deliver the 4.75% First Mortgage Bond, Collateral Series due 2044] (the "4.75% Collateral Mortgage Bonds due 2044") to the Trustee pursuant to the Second Supplemental Mortgage Indenture. For the avoidance of doubt, any amounts received by the Trustee with respect to the 4.75% Collateral Mortgage Bonds due 2044 will be applied to satisfy any obligations under the 4.75% Senior Notes due 2044 in accordance with the Indenture and not any other Bonds outstanding under the Indenture. In connection with the delivery of the 4.75% Collateral Mortgage Bonds due 2044 to the Trustee, the Company shall (i) deliver to the Trustee an Officer's Certificate stating that (A) the Company has duly executed and the Mortgage Bond Trustee has duly authenticated the 4.75% Collateral Mortgage Bonds due 2044 in the aggregate principal amount of $675,000,000 and (B) the Company has delivered the 4.75% Collateral Mortgage Bonds due 2044 to the Trustee in the aggregate principal amount of $675,000,000, (ii) provide to the Trustee (or permit the Trustee to rely upon) an Opinion of Counsel, satisfactory in form and substance to the Trustee, regarding the due execution, delivery, issuance, validity and enforceability of the 4.75% Collateral Mortgage Bonds due 2044, and that the Mortgage Indenture creates a valid and enforceable

47

lien on the Property Additions (as defined in the Mortgage Indenture) made the subject of the 4.75% Collateral Mortgage Bonds due 2044, subject to no prior Lien (as defined in the Mortgage Indenture) to the knowledge of such counsel, except for Permitted Liens (as defined in the Mortgage Indenture), and (iii) deliver to the Trustee a copy of the Mortgage Indenture, including the Second Supplemental Mortgage Indenture, certified by the Secretary or an Assistant Secretary of the Company.

(b)     The 4.75% Collateral Mortgage Bonds due 2044 shall be fully registered in the name of the Trustee. Until the 4.75% Collateral Mortgage Bonds due 2044 are released in accordance with Section 311 of this Twenty-First Supplemental Indenture, the Trustee shall hold the 4.75% Collateral Mortgage Bonds due 2044 in trust for the benefit of the Holders from time to time of the 4.75% Senior Notes due 2044 as security for any and all obligations of the Company with respect to the 4.75% Senior Notes due 2044, including but not limited to, (1) the full and prompt payment of the principal of and premium, if any, on the 4.75% Senior Notes due 2044 when and as the same shall become due and payable in accordance with the terms and provisions of the Indenture or the 4.75% Senior Notes due 2044, either at the stated maturity thereof, upon acceleration of the maturity thereof or upon redemption, and (2) the full and prompt payment of any interest on the 4.75% Senior Notes due 2044, when and as the same shall become due and payable in accordance with the terms and provisions of the Indenture or the 4.75% Senior Notes due 2044.

(c)     The Company acknowledges and agrees that, solely for administrative purposes, the Trustee will establish an account in the name of the Company for the custody and safekeeping of 4.75% Collateral Mortgage Bonds due 2044 delivered to the Trustee."

Section 712     The Twenty-First Supplemental Indenture (Amended 310). The Twenty-First Supplemental Indenture is hereby amended by the addition of Section 310 thereto, to read as follows:

"Section 310     Actions with Respect to 4.75% Collateral Mortgage Bonds due 2044.

(a)     Except for the safe custody of any 4.75% Collateral Mortgage Bonds due 2044 in its possession and the accounting for moneys actually received by it with respect to the 4.75% Collateral Mortgage Bonds due 2044, the Trustee shall have no duty to act, consent or request any action of any Person in connection with the 4.75% Collateral Mortgage Bonds due 2044 unless the Trustee shall have received (i) written direction from the holders of at least a majority in aggregate principal amount of the Bonds then outstanding voting as a single class and (ii) indemnity or security satisfactory to it against any liabilities that may be incurred by it in connection therewith; *provided, however,* that in no event shall the Trustee have any duty to attend meetings of bondholders under the Mortgage Indenture, or to ascertain or take action with respect to voting, consents, waivers, amendments or any other matters relative to the 4.75% Collateral Mortgage Bonds due 2044 and/or the Mortgage Indenture. The Trustee shall have no duty to ascertain or inquire into or verify the performance or observance of any covenants, conditions or agreements on the part of the Company or the Mortgage Bond Trustee with respect to the 4.75% Collateral Mortgage Bonds due 2044. The Trustee will not be required to take any action

48

Case: 19-30088     Doc# 9156-3     Filed: 09/28/20     Entered: 09/28/20 16:25:53     Page 149 of 1367

that is contrary to applicable law or any provision of the Indenture, the 4.75% Collateral Mortgage Bonds due 2044 or the Mortgage Indenture or that, in the opinion of the Trustee, otherwise subjects it to liability; *provided, however*, that, subject to the foregoing limitations and any other protections that the Trustee may have under the Indenture, including without limitation its right to indemnification for actions taken at the direction of the holders, the Trustee shall vote or give any such consent or instruction as it may be directed to do so by the holders of a majority in principal amount of the 4.75% Senior Notes due 2044, unless the vote or consent is with respect to matters which under the Mortgage Indenture require the vote or consent of the holders of a greater percentage in principal amount of the 4.75% Collateral Mortgage Bonds due 2044, in which case such direction must be from holders of such greater percentage in principal amount of the 4.75% Senior Notes due 2044.

(b)     To the extent that any consent or instruction from the Trustee and/or the holders of the 4.75% Senior Notes due 2044 is required with respect to the 4.75% Collateral Mortgage Bonds due 2044 and/or the Mortgage Indenture, the Trustee shall not have any duty or obligation to determine whether such consent or instruction is required nor any duty or obligation to give or otherwise solicit such consent or instructions; *provided, however*, that if the Trustee receives any written notices with respect to the 4.75% Collateral Mortgage Bonds due 2044, it shall promptly transmit such notices to the holders of the 4.75% Senior Notes due 2044 in accordance with the Indenture.

(c)     It is expressly understood and agreed by the Company (and, with respect to any holder of 4.75% Senior Notes due 2044, by holding such 4.75% Senior Notes due 2044 such holder shall be deemed to have agreed) that the Trustee shall not be responsible for any recital, statement, representation, or warranty (whether written or oral) made by any Person in or in connection with the Indenture or the Mortgage Indenture or any certificate or other document referred to or provided for in, or received by it under, the Indenture or the Mortgage Indenture (other than those statements, representations or warranties that are expressly made by the Trustee, if any), or for the value, validity, effectiveness, genuineness, enforceability, or sufficiency of the 4.75% Collateral Mortgage Bonds due 2044, the Mortgage Indenture, or any other document referred to or provided for therein or for any failure by the Company, the Mortgage Bond Trustee or any other Person to perform any of its obligations hereunder or thereunder.

(d)     Whether or not expressly provided herein, the rights, privileges, protections, immunities, indemnities and benefits given to the Trustee pursuant to the Indenture shall apply to any action taken by the Trustee in accordance with the terms of the 4.75% Collateral Mortgage Bonds due 2044 and/or the Mortgage Indenture.

(e)     If an Event of Default under the Indenture occurs and is continuing with respect to the 4.75% Senior Notes due 2044 and the 4.75% Senior Notes due 2044 have been accelerated as a consequence of such Event of Default, the Trustee may and, subject to Section 9.02 of the Indenture, upon receipt of written instructions of holders of not less than a majority in principal amount of the 4.75% Senior Notes due 2044, and receipt of indemnity or security to its satisfaction, shall exercise such other rights as it shall possess under the Mortgage Indenture as a holder of the 4.75% Collateral Mortgage Bonds due 2044.

49

Case: 19-30088     Doc# 9156-3     Filed: 09/28/20     Entered: 09/28/20 16:25:53     Page 150 of 1367

(f)   With the written consent of the holders of a majority in aggregate principal amount of the outstanding 4.75% Senior Notes due 2044, the Trustee may consent to modifications, amendments, or supplements to (or provide waivers in respect of) the 4.75% Collateral Mortgage Bonds due 2044 and/or the Mortgage Indenture; provided, however, that without the written consent of each holder of a 4.75% Senior Note due 2044, the Trustee shall not consent to any modification, amendment or supplement to (or provide waivers in respect of) the 4.75% Collateral Mortgage Bonds due 2044 and/or the Mortgage Indenture that have the effect of (A) (i) extending the fixed maturity of the 4.75% Collateral Mortgage Bonds due 2044, (ii) changing any terms of any sinking fund or analogous fund or conversion rights with respect to the 4.75% Collateral Mortgage Bonds due 2044, (iii) reducing the rate or extending the time of payment of interest on the 4.75% Collateral Mortgage Bonds due 2044, or reducing the principal amount of the 4.75% Collateral Mortgage Bonds due 2044, or (iv) limiting the right of the Trustee (as the holder of the 4.75% Collateral Mortgage Bonds due 2044) to institute suit for the enforcement of payment of principal of or premium, if any, or interest on the 4.75% Collateral Mortgage Bonds due 2044 in accordance with the terms thereof, or (B) reducing the percentage of Bonds (as defined in the Mortgage Indenture), the holders of which are required to consent to any such supplement, amendment and/or waiver, or (C) permitting the creation by the Company of any Senior Lien (as such term is defined in the Mortgage Indenture) in accordance with the Mortgage Indenture."

Section 713   The Twenty-First Supplemental Indenture (Amended 311). The Twenty-First Supplemental Indenture is hereby amended by the addition of Section 311 thereto, to read as follows:

"Section 311   Release of Liens in Respect of 4.75% Collateral Mortgage Bonds due 2044; Change of Amounts.

(a) Upon Company Request and the Trustee's receipt of an Officer's Certificate and an Opinion of Counsel from the Company certifying that all conditions to the satisfaction and discharge of the Indenture with respect to the 4.75% Senior Notes due 2044 (but, for avoidance of doubt, not any other series of Bonds then outstanding under the Indenture) in accordance with Section 8.02 of the Base Indenture have been satisfied, the Trustee shall be deemed not to hold a lien on the 4.75% Collateral Mortgage Bonds due 2044 on behalf of the holders of the 4.75% Senior Notes due 2044 and the Trustee shall, upon written request of the Company, deliver to the Company the 4.75% Collateral Mortgage Bonds due 2044, together with such appropriate instruments of transfer or release (in form and substance reasonably satisfactory to the Trustee) as may be reasonably requested by the Company (and at the expense of the Company) to release such lien. All the 4.75% Collateral Mortgage Bonds due 2044 delivered to the Company in accordance with this Section 311 shall be delivered by the Company to the Mortgage Bond Trustee for cancellation.

50

(b) Following any partial payment, redemption or retirement of the 4.75% Senior Notes due 2044, the Company shall promptly furnish to the Trustee an Officer's Certificate certifying as to such payment, redemption or retirement and the principal amount of the 4.75% Senior Notes due 2044 outstanding following such change in aggregate principal amount and directing the Trustee to deliver the 4.75% Collateral Mortgage Bonds due 2044 then held by the Trustee to the Mortgage Bond Trustee in exchange for 4.75% Collateral Mortgage Bonds due 2044 in a principal amount equal to the current outstanding aggregate principal amount so certified in the Officer's Certificate."

Section 714   The Twenty-First Supplemental Indenture (Amended 312). The Twenty-First Supplemental Indenture is hereby amended by the addition of Section 312 thereto, to read as follows:

"Section 312   Delivery of Non-Payment Notice to Mortgage Bond Trustee. If payment of the principal of, premium, if any, or interest on the 4.75% Senior Notes due 2044 has not been fully paid, deemed to have been paid or otherwise satisfied and discharged when due, the Trustee, acting at the written direction of Holders of a majority in aggregate principal amount of the outstanding 3.25% Senior Notes due 2023, shall deliver a written notice to the Mortgage Bond Trustee stating the amount of such non-payment and that such payment remains unpaid on the date of such notice (which notice shall be given by the Trustee within five Business Days of such direction; *provided, however*, that failure by the Trustee to give such notice shall not affect in any way the Company's obligation to pay such amount)."

Section 715   The Twenty-First Supplemental Indenture (Amended 313). The Twenty-First Supplemental Indenture is hereby amended by the addition of Section 313 thereto, to read as follows:

"Section 313   No Transfer of 4.75% Collateral Mortgage Bonds due 2044. The Company shall cause all of the 4.75% Collateral Mortgage Bonds due 2044 to be issued and registered in the name of the Trustee. Except (i) as otherwise permitted by the Indenture or (ii) in connection with an assignment to a successor trustee in accordance with the Indenture, the Trustee shall not sell, assign or transfer the 4.75% Collateral Mortgage Bonds due 2044."

Section 716   Bond Exchange. The Company desires to exchange the original Global Bonds representing the 4.75% Senior Notes due 2044, originally dated February 21, 2014 and subsequently dated August 18, 2014 (the "Original 2044 Global Bonds") for the amended and restated Global Bonds set forth in Exhibit A-8 hereto (which are hereby incorporated herein and made a part hereof) (the "Amended and Restated Global 4.75% Senior Notes due 2044") incorporating the amendments effected by this Thirtieth Supplemental Indenture in accordance with Section 13.06 of the Base Indenture. In connection therewith, the Company has delivered to the Trustee (i) a Company Request for the authentication and delivery of the Amended and Restated Global 4.75% Senior Notes due 2044 and the cancellation of the Original 2044 Global Bonds, along with an Officer's Certificate and Opinion of Counsel required by the Indenture, and (ii) the Amended and Restated Global 4.75% Senior Notes due 2044 representing the 4.75% Senior

51

Notes due 2044 in the aggregate principal amount of $675,000,000. Upon receipt of the deliverables required by the Indenture, the Trustee shall authenticate the Amended and Restated Global 4.75% Senior Notes due 2044 to be exchanged for the Original 2044 Global Bonds, cancel the Original 2044 Global Bonds and deliver the cancelled Original 2044 Global Bonds to the Company in accordance with the instructions set forth in the Company Request.

## ARTICLE EIGHT

### AMENDMENT OF THE TWENTY-THIRD SUPPLEMENTAL INDENTURE AND THE 3.40% SENIOR NOTES DUE 2024

Section 801    Exhibit A of the Twenty-Third Supplemental Indenture. Exhibit A of the Twenty-Third Supplemental Indenture is hereby replaced with Exhibit A-9 to this Thirtieth Supplemental Indenture.

Section 802    The Twenty-Third Supplemental Indenture. The Twenty-Third Supplemental Indenture is hereby amended by amending and restating the defined terms "Indenture," "Twenty-Third Supplemental Indenture" and "3.40% Senior Notes" as follows:

"Indenture" means the Base Indenture, as amended and/or supplemented from time to time.

"3.40% Senior Notes" is replaced with "3.40% Senior Notes due 2024".

"Twenty-Third Supplemental Indenture" means this Twenty-Third Supplemental Indenture between the Company and The Bank of New York Mellon Trust Company, N.A. (as predecessor trustee), dated as of August 18, 2014, as amended by the Thirtieth Supplemental Indenture by and between the Company and the Trustee, dated as of July 1, 2020, as may be further amended and or supplemented from time to time.

Section 803    Section 207 of the Twenty-Third Supplemental Indenture (Amended). Section 207 of the Twenty-Third Supplemental Indenture is hereby amended and restated as follows:

"Section 207 Global Securities; Appointment of Depositary for Global Securities.

The 3.40% Senior Notes due 2024 shall be issued in the form of one or more permanent Global Bonds as provided in Section 3.13 of the Indenture and deposited with, or on behalf of, the Depositary, or with the Trustee, as custodian for the Depositary, duly executed by the Company and authenticated by the Trustee.

Each Global Bond shall represent such of the 3.40% Senior Notes due 2024 as shall be specified therein and shall each provide that it shall represent the aggregate principal amount of 3.40% Senior Notes due 2024 from time to time endorsed thereon and that the aggregate principal amount of 3.40% Senior Notes due 2024 represented thereby may from time to time be reduced or increased, as appropriate, to reflect exchanges or redemptions.

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 153 of 1367

Any endorsement of a Global Bond to reflect the amount, or any increase or decrease in the aggregate principal amount, of 3.40% Senior Notes due 2024 represented thereby shall be reflected by the Trustee on Schedule B attached to the 3.40% Senior Notes due 2024 and made by the Trustee in accordance with written instructions or such other written form of instructions as is customary for the Depositary, from the Depositary or its nominee on behalf of any Person having a beneficial interest in the Global Bond.

The Company hereby initially appoints The Depository Trust Company ("DTC") to act as the Depositary with respect to all 3.40% Senior Notes due 2024, and the 3.40% Senior Notes due 2024 shall initially be registered in the name of Cede & Co., as the nominee of DTC.

The Company and DTC have executed a Blanket Letter of Representations, and the Trustee is hereby authorized, in connection with any successor nominee for DTC or any successor Depositary, to enter into appropriate or comparable arrangements, if necessary, and shall have the same rights with respect to its actions thereunder as it has with respect to its actions under the Indenture."

Section 804  The Twenty-Third Supplemental Indenture (Amended 209). The Twenty-Third Supplemental Indenture is hereby amended by the addition of Section 209 thereto, to read as follows:

"Section 209  Collateral Security for the 3.40% Senior Notes due 2024.

(a)  For the purpose of providing collateral security for the obligations of the Company with respect to the 3.40% Senior Notes due 2024, the Company shall issue and deliver the 3.40% First Mortgage Bond, Collateral Series due 2024] (the "3.40% Collateral Mortgage Bonds due 2024") to the Trustee pursuant to the Second Supplemental Indenture, dated as of July 1, 2020 (the "Second Supplemental Mortgage Indenture") to the Indenture of Mortgage, dated as of June 19, 2020, between the Company and The Bank of New York Mellon Trust Company, N.A., as trustee (the "Mortgage Bond Trustee") (such Indenture of Mortgage, as previously and hereinafter supplemented, (including by the Second Supplemental Mortgage Indenture) is hereinafter referred to as the "Mortgage Indenture"). For the avoidance of doubt, any amounts received by the Trustee with respect to the 3.40% Collateral Mortgage Bonds due 2024 will be applied to satisfy any obligations under the 3.40% Senior Notes due 2024 in accordance with the Indenture and not any other Bonds outstanding under the Indenture. In connection with the delivery of the 3.40% Collateral Mortgage Bonds due 2024 to the Trustee, the Company shall (i) deliver to the Trustee an Officer's Certificate stating that (A) the Company has duly executed and the Mortgage Bond Trustee has duly authenticated the 3.40% Collateral Mortgage Bonds due 2024 in the aggregate principal amount of $350,000,000 and (B) the Company has delivered the 3.40% Collateral Mortgage Bonds due 2024 to the Trustee in the aggregate principal amount of $350,000,000, (ii) provide to the Trustee (or permit the Trustee to rely upon) an Opinion of Counsel, satisfactory in form and substance to the Trustee, regarding the due execution, delivery, issuance, validity and enforceability of the 3.40% Collateral Mortgage Bonds due 2024, and that the Mortgage Indenture creates a valid and enforceable lien on the Property

53

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 154 of 1367

Additions (as defined in the Mortgage Indenture) made the subject of the 3.40% Collateral Mortgage Bonds due 2024, subject to no prior Lien (as defined in the Mortgage Indenture) to the knowledge of such counsel, except for Permitted Liens (as defined in the Mortgage Indenture), and (iii) deliver to the Trustee a copy of the Mortgage Indenture, including the Second Supplemental Mortgage Indenture, certified by the Secretary or an Assistant Secretary of the Company.

(b)    The 3.40% Collateral Mortgage Bonds due 2024 shall be fully registered in the name of the Trustee. Until the 3.40% Collateral Mortgage Bonds due 2024 are released in accordance with Section 211 of this Twenty-Third Supplemental Indenture, the Trustee shall hold the 3.40% Collateral Mortgage Bonds due 2024 in trust for the benefit of the Holders from time to time of the 3.40% Senior Notes due 2024 as security for any and all obligations of the Company with respect to the 3.40% Senior Notes due 2024, including but not limited to, (1) the full and prompt payment of the principal of and premium, if any, on the 3.40% Senior Notes due 2024 when and as the same shall become due and payable in accordance with the terms and provisions of the Indenture or the 3.40% Senior Notes due 2024, either at the stated maturity thereof, upon acceleration of the maturity thereof or upon redemption, and (2) the full and prompt payment of any interest on the 3.40% Senior Notes due 2024, when and as the same shall become due and payable in accordance with the terms and provisions of the Indenture or the 3.40% Senior Notes due 2024.

(c)    The Company acknowledges and agrees that, solely for administrative purposes, the Trustee will establish an account in the name of the Company for the custody and safekeeping of 3.40% Collateral Mortgage Bonds due 2024 delivered to the Trustee."

Section 805    The Twenty-Third Supplemental Indenture (Amended 210). The Twenty-Third Supplemental Indenture is hereby amended by the addition of Section 210 thereto, to read as follows:

"Section 210    Actions with Respect to 3.40% Collateral Mortgage Bonds due 2024.

(a)    Except for the safe custody of any 3.40% Collateral Mortgage Bonds due 2024 in its possession and the accounting for moneys actually received by it with respect to the 3.40% Collateral Mortgage Bonds due 2024, the Trustee shall have no duty to act, consent or request any action of any Person in connection with the 3.40% Collateral Mortgage Bonds due 2024 unless the Trustee shall have received (i) written direction from the holders of at least a majority in aggregate principal amount of the Bonds then outstanding voting as a single class and (ii) indemnity or security satisfactory to it against any liabilities that may be incurred by it in connection therewith; *provided, however,* that in no event shall the Trustee have any duty to attend meetings of bondholders under the Mortgage Indenture, or to ascertain or take action with respect to voting, consents, waivers, amendments or any other matters relative to the 3.40% Collateral Mortgage Bonds due 2024 and/or the Mortgage Indenture. The Trustee shall have no duty to ascertain or inquire into or verify the performance or observance of any covenants, conditions or agreements on the part of the Company or the Mortgage Bond Trustee with respect to the 3.40% Collateral Mortgage Bonds due 2024. The Trustee will not be required to take any action

54

that is contrary to applicable law or any provision of the Indenture, the 3.40% Collateral Mortgage Bonds due 2024 or the Mortgage Indenture or that, in the opinion of the Trustee, otherwise subjects it to liability; *provided, however*, that, subject to the foregoing limitations and any other protections that the Trustee may have under the Indenture, including without limitation its right to indemnification for actions taken at the direction of the holders, the Trustee shall vote or give any such consent or instruction as it may be directed to do so by the holders of a majority in principal amount of the 3.40% Senior Notes due 2024, unless the vote or consent is with respect to matters which under the Mortgage Indenture require the vote or consent of the holders of a greater percentage in principal amount of the 3.40% Collateral Mortgage Bonds due 2024, in which case such direction must be from holders of such greater percentage in principal amount of the 3.40% Senior Notes due 2024.

(b)   To the extent that any consent or instruction from the Trustee and/or the holders of the 3.40% Senior Notes due 2024 is required with respect to the 3.40% Collateral Mortgage Bonds due 2024 and/or the Mortgage Indenture, the Trustee shall not have any duty or obligation to determine whether such consent or instruction is required nor any duty or obligation to give or otherwise solicit such consent or instructions; *provided, however*, that if the Trustee receives any written notices with respect to the 3.40% Collateral Mortgage Bonds due 2024, it shall promptly transmit such notices to the holders of the 3.40% Senior Notes due 2024 in accordance with the Indenture.

(c)   It is expressly understood and agreed by the Company (and, with respect to any holder of 3.40% Senior Notes due 2024, by holding such 3.40% Senior Notes due 2024 such holder shall be deemed to have agreed) that the Trustee shall not be responsible for any recital, statement, representation, or warranty (whether written or oral) made by any Person in or in connection with the Indenture or the Mortgage Indenture or any certificate or other document referred to or provided for in, or received by it under, the Indenture or Mortgage Indenture (other than those statements, representations or warranties that are expressly made by the Trustee, if any), or for the value, validity, effectiveness, genuineness, enforceability, or sufficiency of the 3.40% Collateral Mortgage Bonds due 2024, the Mortgage Indenture, or any other document referred to or provided for therein or for any failure by the Company, the Mortgage Bond Trustee or any other Person to perform any of its obligations hereunder or thereunder.

(d)   Whether or not expressly provided herein, the rights, privileges, protections, immunities, indemnities and benefits given to the Trustee pursuant to the Indenture shall apply to any action taken by the Trustee in accordance with the terms of the 3.40% Collateral Mortgage Bonds 2024 and/or the Mortgage Indenture.

(e)   If an Event of Default under the Indenture occurs and is continuing with respect to the 3.40% Senior Notes due 2024 and the 3.40% Senior Notes due 2024 have been accelerated as a consequence of such Event of Default, the Trustee may and, subject to Section 9.02 of the Indenture, upon receipt of written instructions of holders of not less than a majority in principal amount of the 3.40% Senior Notes due 2024, and receipt of indemnity or security to its satisfaction, shall exercise such other rights as it shall possess under the Mortgage Indenture as a holder of the 3.40% Collateral Mortgage Bonds due 2024.

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 156 of 1367

(f)   With the written consent of the holders of a majority in aggregate principal amount of the outstanding 3.40% Senior Notes due 2024, the Trustee may consent to modifications, amendments, or supplements to (or provide waivers in respect of) the 3.40% Collateral Mortgage Bonds due 2024 and/or the Mortgage Indenture; provided, however, that without the written consent of each holder of a 3.40% Senior Note due 2024, the Trustee shall not consent to any modification, amendment or supplement to (or provide waivers in respect of) the 3.40% Collateral Mortgage Bonds due 2024 and/or the Mortgage Indenture that have the effect of (A) (i) extending the fixed maturity of the 3.40% Collateral Mortgage Bonds due 2024, (ii) changing any terms of any sinking fund or analogous fund or conversion rights with respect to the 3.40% Collateral Mortgage Bonds due 2024, (iii) reducing the rate or extending the time of payment of interest on the 3.40% Collateral Mortgage Bonds due 2024, or reducing the principal amount of the 3.40% Collateral Mortgage Bonds due 2024, or (iv) limiting the right of the Trustee (as the holder of the 3.40% Collateral Mortgage Bonds due 2024) to institute suit for the enforcement of payment of principal of or premium, if any, or interest on the 3.40% Collateral Mortgage Bonds due 2024 in accordance with the terms thereof, or (B) reducing the percentage of Bonds (as defined in the Mortgage Indenture), the holders of which are required to consent to any such supplement, amendment and/or waiver, or (C) permitting the creation by the Company of any Senior Lien (as such term is defined in the Mortgage Indenture) in accordance with the Mortgage Indenture."

Section 806   <u>The Twenty-Third Supplemental Indenture (Amended 211)</u>. The Twenty-Third Supplemental Indenture is hereby amended by the addition of Section 211 thereto, to read as follows:

"Section 211   <u>Release of Liens in Respect of 3.40% Collateral Mortgage Bonds due 2024; Change of Amounts</u>.

(a) Upon Company Request and the Trustee's receipt of an Officer's Certificate and an Opinion of Counsel from the Company certifying that all conditions to the satisfaction and discharge of the Indenture with respect to the 3.40% Senior Notes due 2024 (but, for avoidance of doubt, not any other series of Bonds then outstanding under the Indenture) in accordance with Section 8.02 of the Base Indenture have been satisfied, the Trustee shall be deemed not to hold a lien on the 3.40% Collateral Mortgage Bonds due 2024 on behalf of the holders of the 3.40% Senior Notes due 2024 and the Trustee shall, upon written request of the Company, deliver to the Company the 3.40% Collateral Mortgage Bonds due 2024, together with such appropriate instruments of transfer or release (in form and substance reasonably satisfactory to the Trustee) as may be reasonably requested by the Company (and at the expense of the Company) to release such lien. All the 3.40% Collateral Mortgage Bonds due 2024 delivered to the Company in accordance with this Section 211 shall be delivered by the Company to the Mortgage Bond Trustee for cancellation.

56

(b) Following any partial payment, redemption or retirement of the 3.40% Senior Notes due 2024, the Company shall promptly furnish to the Trustee an Officer's Certificate certifying as to such payment, redemption or retirement and the principal amount of the 3.40% Senior Notes due 2024 outstanding following such change in aggregate principal amount and directing the Trustee to deliver the 3.40% Collateral Mortgage Bonds due 2024 then held by the Trustee to the Mortgage Bond Trustee in exchange for 3.40% Collateral Mortgage Bonds due 2024 in a principal amount equal to the current outstanding aggregate principal amount so certified in the Officer's Certificate."

Section 807   The Twenty-Third Supplemental Indenture (Amended 212). The Twenty-Third Supplemental Indenture is hereby amended by the addition of Section 212 thereto, to read as follows:

"Section 212   Delivery of Non-Payment Notice to Mortgage Bond Trustee. If payment of the principal of, premium, if any, or interest on the 3.40% Senior Notes due 2024 has not been fully paid, deemed to have been paid or otherwise satisfied and discharged when due, the Trustee, acting at the written direction of Holders of a majority in aggregate principal amount of the outstanding 3.40% Senior Notes due 2024, shall deliver a written notice to the Mortgage Bond Trustee stating the amount of such non-payment and that such payment remains unpaid on the date of such notice (which notice shall be given by the Trustee within five Business Days of such direction; *provided, however*, that failure by the Trustee to give such notice shall not affect in any way the Company's obligation to pay such amount)."

Section 808   The Twenty-Third Supplemental Indenture (Amended 213). The Twenty-Third Supplemental Indenture is hereby amended by the addition of Section 213 thereto, to read as follows:

"Section 213   No Transfer of 3.40% Collateral Mortgage Bonds due 2024. The Company shall cause all of the 3.40% Collateral Mortgage Bonds due 2024 to be issued and registered in the name of the Trustee. Except (i) as otherwise permitted by the Indenture or (ii) in connection with an assignment to a successor trustee in accordance with the Indenture, the Trustee shall not sell, assign or transfer the 3.40% Collateral Mortgage Bonds due 2024."

Section 809   Bond Exchange. The Company desires to exchange the original Global Bond representing the 3.40% Senior Notes due 2024, dated August 18, 2014 (the "Original Global Bond") for the amended and restated Global Bond set forth in Exhibit A-9 hereto (which is hereby incorporated herein and made a part hereof) (the "Amended and Restated Global 3.40% Senior Notes due 2024") incorporating the amendments effected by this Thirtieth Supplemental Indenture in accordance with Section 13.06 of the Base Indenture. In connection therewith, the Company has delivered to the Trustee (i) a Company Request for the authentication and delivery of the Amended and Restated Global 3.40% Senior Notes due 2024 and the cancellation of the Original Global Bond, along with an Officer's Certificate and Opinion of Counsel required by the Indenture, and (ii) the Amended and Restated Global 3.40% Senior Notes due 2024 representing the 3.40% Senior Notes due 2024 in the aggregate principal amount of $350,000,000. Upon receipt

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 158 of 1367

of the deliverables required by the Indenture, the Trustee shall authenticate the Amended and Restated Global 3.40% Senior Notes due 2024 to be exchanged for the Original Global Bond, cancel the Original Global Bond and deliver the cancelled Original Global Bond to the Company in accordance with the instructions set forth in the Company Request.

<div align="center">ARTICLE NINE</div>

<div align="center">AMENDMENT OF THE TWENTY-FOURTH SUPPLEMENTAL INDENTURE AND THE 4.30% SENIOR NOTES DUE 2045</div>

Section 901    Exhibit A of the Twenty-Fourth Supplemental Indenture. Exhibit A of the Twenty-Fourth Supplemental Indenture is hereby replaced with Exhibit A-10 to this Thirtieth Supplemental Indenture.

Section 902    The Twenty-Fourth Supplemental Indenture. The Twenty-Fourth Supplemental Indenture is hereby amended by amending and restating the defined terms "Indenture," "Twenty-Fourth Supplemental Indenture" and "4.30% Senior Notes" as follows:

"Indenture" means the Base Indenture, as amended and/or supplemented from time to time.

"4.30% Senior Notes" is replaced with "4.30% Senior Notes due 2045".

"Twenty-Fourth Supplemental Indenture" means this Twenty-Fourth Supplemental Indenture between the Company and The Bank of New York Mellon Trust Company, N.A. (as predecessor trustee), dated as of November 6, 2014, as amended by the Thirtieth Supplemental Indenture by and between the Company and the Trustee, dated as of July 1, 2020, as may be further amended and or supplemented from time to time.

Section 903    Section 207 of the Twenty-Fourth Supplemental Indenture (Amended). Section 207 of the Twenty-Fourth Supplemental Indenture is hereby amended and restated as follows:

"Section 207 Global Securities; Appointment of Depositary for Global Securities.

The 4.30% Senior Notes due 2045 shall be issued in the form of one or more permanent Global Bonds as provided in Section 3.13 of the Indenture and deposited with, or on behalf of, the Depositary, or with the Trustee, as custodian for the Depositary, duly executed by the Company and authenticated by the Trustee.

Each Global Bond shall represent such of the 4.30% Senior Notes due 2045 as shall be specified therein and shall each provide that it shall represent the aggregate principal amount of 4.30% Senior Notes due 2045 from time to time endorsed thereon and that the aggregate principal amount of 4.30% Senior Notes due 2045 represented thereby may from time to time be reduced or increased, as appropriate, to reflect exchanges or redemptions. Any endorsement of a Global Bond to reflect the amount, or any increase or decrease in

<div align="center">58</div>

the aggregate principal amount, of 4.30% Senior Notes due 2045 represented thereby shall be reflected by the Trustee on Schedule B attached to the 4.30% Senior Notes due 2045 and made by the Trustee in accordance with written instructions or such other written form of instructions as is customary for the Depositary, from the Depositary or its nominee on behalf of any Person having a beneficial interest in the Global Bond.

The Company hereby initially appoints The Depository Trust Company ("DTC") to act as the Depositary with respect to all 4.30% Senior Notes due 2045, and the 4.30% Senior Notes due 2045 shall initially be registered in the name of Cede & Co., as the nominee of DTC.

The Company and DTC have executed a Blanket Letter of Representations, and the Trustee is hereby authorized, in connection with any successor nominee for DTC or any successor Depositary, to enter into appropriate or comparable arrangements, if necessary, and shall have the same rights with respect to its actions thereunder as it has with respect to its actions under the Indenture.

Section 904    The Twenty-Fourth Supplemental Indenture (Amended 209). The Twenty-Fourth Supplemental Indenture is hereby amended by the addition of Section 209 thereto, to read as follows:

"Section 209    Collateral Security for the 4.30% Senior Notes due 2045.

(a)    For the purpose of providing collateral security for the obligations of the Company with respect to the 4.30% Senior Notes due 2045, the Company shall issue and deliver the 4.30% First Mortgage Bond, Collateral Series due 2045 (the "4.30% Collateral Mortgage Bonds due 2045") to the Trustee pursuant to the Second Supplemental Indenture, dated as of July 1, 2020 (the "Second Supplemental Mortgage Indenture") to the Indenture of Mortgage, dated as of June 19, 2020, between the Company and The Bank of New York Mellon Trust Company, N.A., as trustee (the "Mortgage Bond Trustee") (such Indenture of Mortgage, as previously and hereinafter supplemented, (including by the Second Supplemental Mortgage Indenture) is hereinafter referred to as the "Mortgage Indenture"). For the avoidance of doubt, any amounts received by the Trustee with respect to the 4.30% Collateral Mortgage Bonds due 2045 will be applied to satisfy any obligations under the 4.30% Senior Notes due 2045 in accordance with the Indenture and not any other Bonds outstanding under the Indenture. In connection with the delivery of the 4.30% Collateral Mortgage Bonds due 2045 to the Trustee, the Company shall (i) deliver to the Trustee an Officer's Certificate stating that (A) the Company has duly executed and the Mortgage Bond Trustee has duly authenticated the 4.30% Collateral Mortgage Bonds due 2045 in the aggregate principal amount of $600,000,000 and (B) the Company has delivered the 4.30% Collateral Mortgage Bonds due 2045 to the Trustee in the aggregate principal amount of $600,000,000, (ii) provide to the Trustee (or permit the Trustee to rely upon) an Opinion of Counsel, satisfactory in form and substance to the Trustee, regarding the due execution, delivery, issuance, validity and enforceability of the 4.30% Collateral Mortgage Bonds due 2045, and that the Mortgage Indenture creates a valid and enforceable lien on the Property Additions (as defined in the Mortgage Indenture) made the subject of the 4.30% Collateral

59

Mortgage Bonds due 2045, subject to no prior Lien (as defined in the Mortgage Indenture) to the knowledge of such counsel, except for Permitted Liens (as defined in the Mortgage Indenture), and (iii) deliver to the Trustee a copy of the Mortgage Indenture, including the Second Supplemental Mortgage Indenture, certified by the Secretary or an Assistant Secretary of the Company.

(b)     The 4.30% Collateral Mortgage Bonds due 2045 shall be fully registered in the name of the Trustee. Until the 4.30% Collateral Mortgage Bonds due 2045 are released in accordance with Section 211 of this Twenty-Fourth Supplemental Indenture, the Trustee shall hold the 4.30% Collateral Mortgage Bonds due 2045 in trust for the benefit of the Holders from time to time of the 4.30% Senior Notes due 2045 as security for any and all obligations of the Company with respect to the 4.30% Senior Notes due 2045, including but not limited to, (1) the full and prompt payment of the principal of and premium, if any, on the 4.30% Senior Notes due 2045 when and as the same shall become due and payable in accordance with the terms and provisions of the Indenture or the 4.30% Senior Notes due 2045, either at the stated maturity thereof, upon acceleration of the maturity thereof or upon redemption, and (2) the full and prompt payment of any interest on the 4.30% Senior Notes due 2045, when and as the same shall become due and payable in accordance with the terms and provisions of the Indenture or the 4.30% Senior Notes due 2045.

(c)     The Company acknowledges and agrees that, solely for administrative purposes, the Trustee will establish an account in the name of the Company for the custody and safekeeping of 4.30% Collateral Mortgage Bonds due 2045 delivered to the Trustee."

Section 905     The Twenty-Fourth Supplemental Indenture (Amended 210). The Twenty-Fourth Supplemental Indenture is hereby amended by the addition of Section 210 thereto, to read as follows:

"Section 210     Actions with Respect to 4.30% Collateral Mortgage Bonds due 2045.

(a)     Except for the safe custody of any 4.30% Collateral Mortgage Bonds due 2045 in its possession and the accounting for moneys actually received by it with respect to the 4.30% Collateral Mortgage Bonds due 2045, the Trustee shall have no duty to act, consent or request any action of any Person in connection with the 4.30% Collateral Mortgage Bonds due 2045 unless the Trustee shall have received (i) written direction from the holders of at least a majority in aggregate principal amount of the Bonds then outstanding voting as a single class and (ii) indemnity or security satisfactory to it against any liabilities that may be incurred by it in connection therewith; *provided, however,* that in no event shall the Trustee have any duty to attend meetings of bondholders under the Mortgage Indenture, or to ascertain or take action with respect to voting, consents, waivers, amendments or any other matters relative to the 4.30% Collateral Mortgage Bonds due 2045 and/or the Mortgage Indenture. The Trustee shall have no duty to ascertain or inquire into or verify the performance or observance of any covenants, conditions or agreements on the part of the Company or the Mortgage Bond Trustee with respect to the 4.30% Collateral Mortgage Bonds due 2045. The Trustee will not be required to take any action that is contrary to applicable law or any provision of the Indenture, the 4.30% Collateral

60

Case: 19-30088     Doc# 9156-3     Filed: 09/28/20     Entered: 09/28/20 16:25:53     Page 161 of 1367

Mortgage Bonds due 2045 or the Mortgage Indenture or that, in the opinion of the Trustee, otherwise subjects it to liability; *provided, however*, that, subject to the foregoing limitations and any other protections that the Trustee may have under the Indenture, including without limitation its right to indemnification for actions taken at the direction of the holders, the Trustee shall vote or give any such consent or instruction as it may be directed to do so by the holders of a majority in principal amount of the 4.30% Senior Notes due 2045, unless the vote or consent is with respect to matters which under the Mortgage Indenture require the vote or consent of the holders of a greater percentage in principal amount of the 4.30% Collateral Mortgage Bonds due 2045, in which case such direction must be from holders of such greater percentage in principal amount of the 4.30% Senior Notes due 2045.

(b)    To the extent that any consent or instruction from the Trustee and/or the holders of the 4.30% Senior Notes due 2045 is required with respect to the 4.30% Collateral Mortgage Bonds due 2045 and/or the Mortgage Indenture, the Trustee shall not have any duty or obligation to determine whether such consent or instruction is required nor any duty or obligation to give or otherwise solicit such consent or instructions; *provided, however*, that if the Trustee receives any written notices with respect to the 4.30% Collateral Mortgage Bonds due 2045, it shall promptly transmit such notices to the holders of the 4.30% Senior Notes due 2045 in accordance with the Indenture.

(c)    It is expressly understood and agreed by the Company (and, with respect to any holder of 4.30% Senior Notes due 2045, by holding such 4.30% Senior Notes due 2045 such holder shall be deemed to have agreed) that the Trustee shall not be responsible for any recital, statement, representation, or warranty (whether written or oral) made by any Person in or in connection with the Indenture or the Mortgage Indenture or any certificate or other document referred to or provided for in, or received by it under, the Indenture or the Mortgage Indenture (other than those statements, representations or warranties that are expressly made by the Trustee, if any), or for the value, validity, effectiveness, genuineness, enforceability, or sufficiency of the 4.30% Collateral Mortgage Bonds due 2045, the Mortgage Indenture, or any other document referred to or provided for therein or for any failure by the Company, the Mortgage Bond Trustee or any other Person to perform any of its obligations hereunder or thereunder.

(d)    Whether or not expressly provided herein, the rights, privileges, protections, immunities, indemnities and benefits given to the Trustee pursuant to the Indenture shall apply to any action taken by the Trustee in accordance with the terms of the 4.30% Collateral Mortgage Bonds due 2045 and/or the Mortgage Indenture.

(e)    If an Event of Default under the Indenture occurs and is continuing with respect to the 4.30% Senior Notes due 2045 and the 4.30% Senior Notes due 2045 have been accelerated as a consequence of such Event of Default, the Trustee may and, subject to Section 9.02 of the Indenture, upon receipt of written instructions of holders of not less than a majority in principal amount of the 4.30% Senior Notes due 2045, and receipt of indemnity or security to its satisfaction, shall exercise such other rights as it shall possess under the Mortgage Indenture as a holder of the 4.30% Collateral Mortgage Bonds due 2045.

(f)   With the written consent of the holders of a majority in aggregate principal amount of the outstanding 4.30% Senior Notes due 2045, the Trustee may consent to modifications, amendments, or supplements to (or provide waivers in respect of) the 4.30% Collateral Mortgage Bonds due 2045 and/or the Mortgage Indenture; provided, however, that without the written consent of each holder of a 4.30% Senior Note due 2045, the Trustee shall not consent to any modification, amendment or supplement to (or provide waivers in respect of) the 4.30% Collateral Mortgage Bonds due 2045 and/or the Mortgage Indenture that have the effect of (A) (i) extending the fixed maturity of the 4.30% Collateral Mortgage Bonds due 2045, (ii) changing any terms of any sinking fund or analogous fund or conversion rights with respect to the 4.30% Collateral Mortgage Bonds due 2045, (iii) reducing the rate or extending the time of payment of interest on the 4.30% Collateral Mortgage Bonds due 2045, or reducing the principal amount of the 4.30% Collateral Mortgage Bonds due 2045, or (iv) limiting the right of the Trustee (as the holder of the 4.30% Collateral Mortgage Bonds due 2045) to institute suit for the enforcement of payment of principal of or premium, if any, or interest on the 4.30% Collateral Mortgage Bonds due 2045 in accordance with the terms thereof, or (B) reducing the percentage of Bonds (as defined in the Mortgage Indenture), the holders of which are required to consent to any such supplement, amendment and/or waiver, or (C) permitting the creation by the Company of any Senior Lien (as such term is defined in the Mortgage Indenture) in accordance with the Mortgage Indenture."

Section 906   The Twenty-Fourth Supplemental Indenture (Amended 211). The Twenty-Fourth Supplemental Indenture is hereby amended by the addition of Section 211 thereto, to read as follows:

"Section 211   Release of Liens in Respect of 4.30% Collateral Mortgage Bonds due 2045; Change of Amounts.

(a) Upon Company Request and the Trustee's receipt of an Officer's Certificate and an Opinion of Counsel from the Company certifying that all conditions to the satisfaction and discharge of the Indenture with respect to the 4.30% Senior Notes due 2045 (but, for avoidance of doubt, not any other series of Bonds then outstanding under the Indenture) in accordance with Section 8.02 of the Base Indenture have been satisfied, the Trustee shall be deemed not to hold a lien on the 4.30% Collateral Mortgage Bonds due 2045 on behalf of the holders of the 4.30% Senior Notes due 2045 and the Trustee shall, upon written request of the Company, deliver to the Company the 4.30% Collateral Mortgage Bonds due 2045, together with such appropriate instruments of transfer or release (in form and substance reasonably satisfactory to the Trustee) as may be reasonably requested by the Company (and at the expense of the Company) to release such lien. All the 4.30% Collateral Mortgage Bonds due 2045 delivered to the Company in accordance with this Section 211 shall be delivered by the Company to the Mortgage Bond Trustee for cancellation.

(b) Following any partial payment, redemption or retirement of the 4.30% Senior Notes due 2045, the Company shall promptly furnish to the Trustee an Officer's Certificate certifying as to such payment, redemption or retirement and the principal amount of the 4.30% Senior Notes due 2045 outstanding following such change in aggregate principal amount and directing the Trustee to deliver the 4.30% Collateral Mortgage Bonds due 2045 then held by the Trustee to the Mortgage Bond Trustee in exchange for 4.30% Collateral Mortgage Bonds due 2045 in a principal amount equal to the current outstanding aggregate principal amount so certified in the Officer's Certificate."

Section 907     The Twenty-Fourth Supplemental Indenture (Amended 212). The Twenty-Fourth Supplemental Indenture is hereby amended by the addition of Section 212 thereto, to read as follows:

"Section 212     Delivery of Non-Payment Notice to Mortgage Bond Trustee. If payment of the principal of, premium, if any, or interest on the 4.30% Senior Notes due 2045 has not been fully paid, deemed to have been paid or otherwise satisfied and discharged when due, the Trustee, acting at the written direction of Holders of a majority in aggregate principal amount of the outstanding 4.30% Senior Notes due 2045, shall deliver a written notice to the Mortgage Bond Trustee stating the amount of such non-payment and that such payment remains unpaid on the date of such notice (which notice shall be given by the Trustee within five Business Days of such direction; *provided, however*, that failure by the Trustee to give such notice shall not affect in any way the Company's obligation to pay such amount)."

Section 908     The Twenty-Fourth Supplemental Indenture (Amended 213). The Twenty-Fourth Supplemental Indenture is hereby amended by the addition of Section 213 thereto, to read as follows:

"Section 213     No Transfer of 4.30% Collateral Mortgage Bonds due 2045. The Company shall cause all of the 4.30% Collateral Mortgage Bonds due 2045 to be issued and registered in the name of the Trustee. Except (i) as otherwise permitted by the Indenture or (ii) in connection with an assignment to a successor trustee in accordance with the Indenture, the Trustee shall not sell, assign or transfer the 4.30% Collateral Mortgage Bonds due 2045."

Section 909     Bond Exchange. The Company desires to exchange the original Global Bonds representing the 4.30% Senior Notes due 2045, originally dated November 6, 2014 and subsequently dated June 12, 2015 (the "Original Global Bonds") for the amended and restated Global Bonds set forth in Exhibit A-10 hereto (which are hereby incorporated herein and made a part hereof) (the "Amended and Restated Global 4.30% Senior Notes due 2045") incorporating the amendments effected by this Thirtieth Supplemental Indenture in accordance with Section 13.06 of the Base Indenture. In connection therewith, the Company has delivered to the Trustee (i) a Company Request for the authentication and delivery of the Amended and Restated Global 4.30% Senior Notes due 2045 and the cancellation of the Original Global Bonds, along with an Officer's Certificate and Opinion of Counsel required by the Indenture, and (ii) the Amended and Restated Global 4.30% Senior Notes due 2045 representing the 4.30% Senior Notes due 2045 in

Case: 19-30088     Doc# 9156-3     Filed: 09/28/20     Entered: 09/28/20 16:25:53     Page 164 of 1367

the aggregate principal amount of $600,000,000. Upon receipt of the deliverables required by the Indenture, the Trustee shall authenticate the Amended and Restated Global 4.30% Senior Notes due 2045 to be exchanged for the Original Global Bonds, cancel the Original Global Bonds and deliver the cancelled Original Global Bonds to the Company in accordance with the instructions set forth in the Company Request.

# ARTICLE TEN

AMENDMENT OF THE TWENTY-FIFTH SUPPLEMENTAL INDENTURE AND THE 3.50% SENIOR NOTES DUE 2025

Section 1001   Exhibit A of the Twenty-Fifth Supplemental Indenture. Exhibit A of the Twenty-Fifth Supplemental Indenture is hereby replaced with Exhibit A-11 to this Thirtieth Supplemental Indenture.

Section 1002   The Twenty-Fifth Supplemental Indenture. The Twenty-Fifth Supplemental Indenture is hereby amended by amending and restating the defined terms "Indenture," "Twenty-Fifth Supplemental Indenture" and "3.50% Senior Notes" as follows:

"Indenture" means the Base Indenture, as amended and/or supplemented from time to time.

"3.50% Senior Notes" is replaced with "3.50% Senior Notes due 2025".

"Twenty-Fifth Supplemental Indenture" means this Twenty-Fifth Supplemental Indenture between the Company and The Bank of New York Mellon Trust Company, N.A. (as predecessor trustee), dated as of June 12, 2015, as amended by the Thirtieth Supplemental Indenture by and between the Company and the Trustee, dated as of July 1, 2020, as may be further amended and or supplemented from time to time.

Section 1003   Section 207 of the Twenty-Fifth Supplemental Indenture. Section 207 of the Twenty-Fifth Supplemental Indenture is hereby amended and restated as follows:

"Section 207   Global Securities; Appointment of Depositary for Global Securities.

The 3.50% Senior Notes due 2025 shall be issued in the form of one or more permanent Global Bonds as provided in Section 3.13 of the Indenture and deposited with, or on behalf of, the Depositary, or with the Trustee, as custodian for the Depositary, duly executed by the Company and authenticated by the Trustee.

Each Global Bond shall represent such of the 3.50% Senior Notes due 2025 as shall be specified therein and shall each provide that it shall represent the aggregate principal amount of 3.50% Senior Notes due 2025 from time to time endorsed thereon and that the aggregate principal amount of 3.50% Senior Notes due 2025 represented thereby may from time to time be reduced or increased, as appropriate, to reflect exchanges or redemptions. Any endorsement of a Global Bond to reflect the amount, or any increase or decrease in

64

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 165 of 1367

the aggregate principal amount, of 3.50% Senior Notes due 2025 represented thereby shall be reflected by the Trustee on Schedule B attached to the 3.50% Senior Notes due 2025 and made by the Trustee in accordance with written instructions or such other written form of instructions as is customary for the Depositary, from the Depositary or its nominee on behalf of any Person having a beneficial interest in the Global Bond.

The Company hereby initially appoints The Depository Trust Company ("DTC") to act as the Depositary with respect to all 3.50% Senior Notes due 2025, and the 3.50% Senior Notes due 2025 shall initially be registered in the name of Cede & Co., as the nominee of DTC.

The Company and DTC have executed a Blanket Letter of Representations, and the Trustee is hereby authorized, in connection with any successor nominee for DTC or any successor Depositary, to enter into appropriate or comparable arrangements, if necessary, and shall have the same rights with respect to its actions thereunder as it has with respect to its actions under the Indenture."

Section 1004   The Twenty-Fifth Supplemental Indenture (Amended 209). The Twenty-Fifth Supplemental Indenture is hereby amended by the addition of Section 209 thereto, to read as follows:

"Section 209   Collateral Security for the 3.50% Senior Notes due 2025.

(a)   For the purpose of providing collateral security for the obligations of the Company with respect to the 3.50% Senior Notes due 2025, the Company shall issue and deliver the 3.50% First Mortgage Bond, Collateral Series due 2025] (the "3.50% Collateral Mortgage Bonds due 2025") to the Trustee pursuant to the Second Supplemental Indenture, dated as of July 1, 2020 (the "Second Supplemental Mortgage Indenture") to the Indenture of Mortgage, dated as of June 19, 2020, between the Company and The Bank of New York Mellon Trust Company, N.A., as trustee (the "Mortgage Bond Trustee") (such Indenture of Mortgage, as previously and hereinafter supplemented, (including by the Second Supplemental Mortgage Indenture) is hereinafter referred to as the "Mortgage Indenture"). For the avoidance of doubt, any amounts received by the Trustee with respect to the 3.50% Collateral Mortgage Bonds due 2025 will be applied to satisfy any obligations under the 3.50% Senior Notes due 2025 in accordance with the Indenture and not any other Bonds outstanding under the Indenture. In connection with the delivery of the 3.50% Collateral Mortgage Bonds due 2025 to the Trustee, the Company shall (i) deliver to the Trustee an Officer's Certificate stating that (A) the Company has duly executed and the Mortgage Bond Trustee has duly authenticated the 3.50% Collateral Mortgage Bonds due 2025 in the aggregate principal amount of $600,000,000 and (B) the Company has delivered the 3.50% Collateral Mortgage Bonds due 2025 to the Trustee in the aggregate principal amount of $600,000,000, (ii) provide to the Trustee (or permit the Trustee to rely upon) an Opinion of Counsel, satisfactory in form and substance to the Trustee, regarding the due execution, delivery, issuance, validity and enforceability of the 3.50% Collateral Mortgage Bonds due 2025, and that the Mortgage Indenture creates a valid and enforceable lien on the Property Additions (as defined in the Mortgage Indenture) made the subject of the 3.50% Collateral

65

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 166 of 1367

Mortgage Bonds due 2025, subject to no prior Lien (as defined in the Mortgage Indenture) to the knowledge of such counsel, except for Permitted Liens (as defined in the Mortgage Indenture), and (iii) deliver to the Trustee a copy of the Mortgage Indenture, including the Second Supplemental Mortgage Indenture, certified by the Secretary or an Assistant Secretary of the Company.

(b)    The 3.50% Collateral Mortgage Bonds due 2025 shall be fully registered in the name of the Trustee. Until the 3.50% Collateral Mortgage Bonds due 2025 are released in accordance with Section 211 of this Twenty-Fifth Supplemental Indenture, the Trustee shall hold the 3.50% Collateral Mortgage Bonds due 2025 in trust for the benefit of the Holders from time to time of the 3.50% Senior Notes due 2025 as security for any and all obligations of the Company with respect to the 3.50% Senior Notes due 2025, including but not limited to, (1) the full and prompt payment of the principal of and premium, if any, on the 3.50% Senior Notes due 2025 when and as the same shall become due and payable in accordance with the terms and provisions of the Indenture or the 3.50% Senior Notes due 2025, either at the stated maturity thereof, upon acceleration of the maturity thereof or upon redemption, and (2) the full and prompt payment of any interest on the 3.50% Senior Notes due 2025, when and as the same shall become due and payable in accordance with the terms and provisions of the Indenture or the 3.50% Senior Notes due 2025.

(c)    The Company acknowledges and agrees that, solely for administrative purposes, the Trustee will establish an account in the name of the Company for the custody and safekeeping of 3.50% Collateral Mortgage Bonds due 2025 delivered to the Trustee."

Section 1005    The Twenty-Fifth Supplemental Indenture (Amended 210). The Twenty-Fifth Supplemental Indenture is hereby amended by the addition of Section 210 thereto, to read as follows:

"Section 210    Actions with Respect to 3.50% Collateral Mortgage Bonds due 2025.

(a)    Except for the safe custody of any 3.50% Collateral Mortgage Bonds due 2025 in its possession and the accounting for moneys actually received by it with respect to the 3.50% Collateral Mortgage Bonds due 2025, the Trustee shall have no duty to act, consent or request any action of any Person in connection with the 3.50% Collateral Mortgage Bonds due 2025 unless the Trustee shall have received (i) written direction from the holders of at least a majority in aggregate principal amount of the Bonds then outstanding voting as a single class and (ii) indemnity or security satisfactory to it against any liabilities that may be incurred by it in connection therewith; *provided, however,* that in no event shall the Trustee have any duty to attend meetings of bondholders under the Mortgage Indenture, or to ascertain or take action with respect to voting, consents, waivers, amendments or any other matters relative to the 3.50% Collateral Mortgage Bonds due 2025 and/or the Mortgage Indenture. The Trustee shall have no duty to ascertain or inquire into or verify the performance or observance of any covenants, conditions or agreements on the part of the Company or the Mortgage Bond Trustee with respect to the 3.50% Collateral Mortgage Bonds due 2025. The Trustee will not be required to take any action that is contrary to applicable law or any provision of the Indenture, the 3.50% Collateral

66

Mortgage Bonds due 2025 or the Mortgage Indenture or that, in the opinion of the Trustee, otherwise subjects it to liability; *provided, however*, that, subject to the foregoing limitations and any other protections that the Trustee may have under the Indenture, including without limitation its right to indemnification for actions taken at the direction of the holders, the Trustee shall vote or give any such consent or instruction as it may be directed to do so by the holders of a majority in principal amount of the 3.50% Senior Notes due 2025, unless the vote or consent is with respect to matters which under the Mortgage Indenture require the vote or consent of the holders of a greater percentage in principal amount of the 3.50% Collateral Mortgage Bonds due 2025, in which case such direction must be from holders of such greater percentage in principal amount of the 3.50% Senior Notes due 2025.

(b)    To the extent that any consent or instruction from the Trustee and/or the holders of the 3.50% Senior Notes due 2025 is required with respect to the 3.50% Collateral Mortgage Bonds due 2025 and/or the Mortgage Indenture, the Trustee shall not have any duty or obligation to determine whether such consent or instruction is required nor any duty or obligation to give or otherwise solicit such consent or instructions; *provided, however*, that if the Trustee receives any written notices with respect to the 3.50% Collateral Mortgage Bonds due 2025, it shall promptly transmit such notices to the holders of the 3.50% Senior Notes due 2025 in accordance with the Indenture.

(c)    It is expressly understood and agreed by the Company (and, with respect to any holder of 3.50% Senior Notes due 2025, by holding such 3.50% Senior Notes due 2025 such holder shall be deemed to have agreed) that the Trustee shall not be responsible for any recital, statement, representation, or warranty (whether written or oral) made by any Person in or in connection with the Indenture or the Mortgage Indenture or any certificate or other document referred to or provided for in, or received by it under, the Indenture or the Mortgage Indenture (other than those statements, representations or warranties that are expressly made by the Trustee, if any), or for the value, validity, effectiveness, genuineness, enforceability, or sufficiency of the 3.50% Collateral Mortgage Bonds due 2025, the Mortgage Indenture, or any other document referred to or provided for therein or for any failure by the Company, the Mortgage Bond Trustee or any other Person to perform any of its obligations hereunder or thereunder.

(d)    Whether or not expressly provided herein, the rights, privileges, protections, immunities, indemnities and benefits given to the Trustee pursuant to the Indenture shall apply to any action taken by the Trustee in accordance with the terms of the 3.50% Collateral Mortgage Bonds due 2025 and/or the Mortgage Indenture.

(e)    If an Event of Default under the Indenture occurs and is continuing with respect to the 3.50% Senior Notes due 2025 and the 3.50% Senior Notes due 2025 have been accelerated as a consequence of such Event of Default, the Trustee may and, subject to Section 9.02 of the Indenture, upon receipt of written instructions of holders of not less than a majority in principal amount of the 3.50% Senior Notes due 2025, and receipt of indemnity or security to its satisfaction, shall exercise such other rights as it shall possess under the Mortgage Indenture as a holder of the 3.50% Collateral Mortgage Bonds due 2025.

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 168 of 1367

(f)    With the written consent of the holders of a majority in aggregate principal amount of the outstanding 3.50% Senior Notes due 2025, the Trustee may consent to modifications, amendments, or supplements to (or provide waivers in respect of) the 3.50% Collateral Mortgage Bonds due 2025 and/or the Mortgage Indenture; provided, however, that without the written consent of each holder of a 3.50% Senior Note due 2025, the Trustee shall not consent to any modification, amendment or supplement to (or provide waivers in respect of) the 3.50% Collateral Mortgage Bonds due 2025 and/or the Mortgage Indenture that have the effect of (A) (i) extending the fixed maturity of the 3.50% Collateral Mortgage Bonds due 2025, (ii) changing any terms of any sinking fund or analogous fund or conversion rights with respect to the 3.50% Collateral Mortgage Bonds due 2025, (iii) reducing the rate or extending the time of payment of interest on the 3.50% Collateral Mortgage Bonds due 2025, or reducing the principal amount of the 3.50% Collateral Mortgage Bonds due 2025, or (iv) limiting the right of the Trustee (as the holder of the 3.50% Collateral Mortgage Bonds due 2025) to institute suit for the enforcement of payment of principal of or premium, if any, or interest on the 3.50% Collateral Mortgage Bonds due 2025 in accordance with the terms thereof, or (B) reducing the percentage of Bonds (as defined in the Mortgage Indenture), the holders of which are required to consent to any such supplement, amendment and/or waiver, or (C) permitting the creation by the Company of any Senior Lien (as such term is defined in the Mortgage Indenture) in accordance with the Mortgage Indenture."

Section 1006    The Twenty-Fifth Supplemental Indenture (Amended 211). The Twenty-Fifth Supplemental Indenture is hereby amended by the addition of Section 211 thereto, to read as follows:

"Section 211    Release of Liens in Respect of 3.50% Collateral Mortgage Bonds due 2025; Change of Amounts.

(a) Upon Company Request and the Trustee's receipt of an Officer's Certificate and an Opinion of Counsel from the Company certifying that all conditions to the satisfaction and discharge of the Indenture with respect to the 3.50% Senior Notes due 2025 (but, for avoidance of doubt, not any other series of Bonds then outstanding under the Indenture) in accordance with Section 8.02 of the Base Indenture have been satisfied, the Trustee shall be deemed not to hold a lien on the 3.50% Collateral Mortgage Bonds due 2025 on behalf of the holders of the 3.50% Senior Notes due 2025 and the Trustee shall, upon written request of the Company, deliver to the Company the 3.50% Collateral Mortgage Bonds due 2025, together with such appropriate instruments of transfer or release (in form and substance reasonably satisfactory to the Trustee) as may be reasonably requested by the Company (and at the expense of the Company) to release such lien. All the 3.50% Collateral Mortgage Bonds due 2025 delivered to the Company in accordance with this Section 211 shall be delivered by the Company to the Mortgage Bond Trustee for cancellation.

68

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 169 of 1367

(b)  Following any partial payment, redemption or retirement of the 3.50% Senior Notes due 2025, the Company shall promptly furnish to the Trustee an Officer's Certificate certifying as to such payment, redemption or retirement and the principal amount of the 3.50% Senior Notes due 2025 outstanding following such change in aggregate principal amount and directing the Trustee to deliver the 3.50% Collateral Mortgage Bonds due 2025 then held by the Trustee to the Mortgage Bond Trustee in exchange for 3.50% Collateral Mortgage Bonds due 2025 in a principal amount equal to the current outstanding aggregate principal amount so certified in the Officer's Certificate."

Section 1007  The Twenty-Fifth Supplemental Indenture (Amended 212). The Twenty-Fifth Supplemental Indenture is hereby amended by the addition of Section 212 thereto, to read as follows:

"Section 212  Delivery of Non-Payment Notice to Mortgage Bond Trustee. If payment of the principal of, premium, if any, or interest on the 3.50% Senior Notes due 2025 has not been fully paid, deemed to have been paid or otherwise satisfied and discharged when due, the Trustee, acting at the written direction of Holders of a majority in aggregate principal amount of the outstanding 3.50% Senior Notes due 2025, shall deliver a written notice to the Mortgage Bond Trustee stating the amount of such non-payment and that such payment remains unpaid on the date of such notice (which notice shall be given by the Trustee within five Business Days of such direction; *provided, however*, that failure by the Trustee to give such notice shall not affect in any way the Company's obligation to pay such amount)."

Section 1008  The Twenty-Fifth Supplemental Indenture (Amended 213). The Twenty-Fifth Supplemental Indenture is hereby amended by the addition of Section 213 thereto, to read as follows:

"Section 213  No Transfer of 3.50% Collateral Mortgage Bonds due 2025. The Company shall cause all of the 3.50% Collateral Mortgage Bonds due 2025 to be issued and registered in the name of the Trustee. Except (i) as otherwise permitted by the Indenture or (ii) in connection with an assignment to a successor trustee in accordance with the Indenture, the Trustee shall not sell, assign or transfer the 3.50% Collateral Mortgage Bonds due 2025."

Section 1009  Bond Exchange. The Company desires to exchange the original Global Bonds representing the 3.50% Senior Notes due 2025, originally dated June 12, 2015 and subsequently dated November 5, 2015 (the "Original Global Bonds") for the amended and restated Global Bonds set forth in Exhibit A-11 hereto (which are hereby incorporated herein and made a part hereof) (the "Amended and Restated Global 3.50% Senior Notes due 2025") incorporating the amendments effected by this Thirtieth Supplemental Indenture in accordance with Section 13.06 of the Base Indenture. In connection therewith, the Company has delivered to the Trustee (i) a Company Request for the authentication and delivery of the Amended and Restated Global 3.50% Senior Notes due 2025 and the cancellation of the Original Global Bonds, along with an Officer's Certificate and Opinion of Counsel required by the Indenture, and (ii) the Amended and Restated Global 3.50% Senior Notes due 2025 representing the 3.50% Senior Notes due 2025 in

69

the aggregate principal amount of $600,000,000. Upon receipt of the deliverables required by the Indenture, the Trustee shall authenticate the Amended and Restated Global 3.50% Senior Notes due 2025 to be exchanged for the Original Global Bonds, cancel the Original Global Bonds and deliver the cancelled Original Global Bonds to the Company in accordance with the instructions set forth in the Company Request.

# ARTICLE ELEVEN

## AMENDMENT OF THE TWENTY-SIXTH SUPPLEMENTAL INDENTURE AND THE 4.25% SENIOR NOTES DUE 2046

Section 1101    Exhibit B of the Twenty-Sixth Supplemental Indenture. Exhibit B of the Twenty-Sixth Supplemental Indenture is hereby replaced with Exhibit A-12 to this Thirtieth Supplemental Indenture.

Section 1102    The Twenty-Sixth Supplemental Indenture. The Twenty-Sixth Supplemental Indenture is hereby amended by amending and restating the defined terms "Indenture," "Twenty-Sixth Supplemental Indenture" and "4.25% Senior Notes" as follows:

"Indenture" means the Base Indenture, as amended and/or supplemented from time to time.

"4.25% Senior Notes" is replaced with "4.25% Senior Notes due 2046".

"Twenty-Sixth Supplemental Indenture" means this Twenty-Sixth Supplemental Indenture between the Company and The Bank of New York Mellon Trust Company, N.A. (as predecessor trustee), dated as of November 5, 2015, as amended by the Thirtieth Supplemental Indenture by and between the Company and the Trustee, dated as of July 1, 2020, as may be further amended and or supplemented from time to time.

Section 1103    Section 307 of the Twenty-Sixth Supplemental Indenture. Section 307 of the Twenty-Sixth Supplemental Indenture is hereby amended and restated as follows:

"Section 307 Global Securities; Appointment of Depositary for Global Securities.

The 4.25% Senior Notes due 2046 shall be issued in the form of one or more permanent Global Bonds as provided in Section 3.13 of the Indenture and deposited with, or on behalf of, the Depositary, or with the Trustee, as custodian for the Depositary, duly executed by the Company and authenticated by the Trustee.

Each Global Bond shall represent such of the 4.25% Senior Notes due 2046 as shall be specified therein and shall each provide that it shall represent the aggregate principal amount of 4.25% Senior Notes due 2046 from time to time endorsed thereon and that the aggregate principal amount of 4.25% Senior Notes due 2046 represented thereby may from time to time be reduced or increased, as appropriate, to reflect exchanges or redemptions. Any endorsement of a Global Bond to reflect the amount, or any increase or decrease in

70

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 171 of 1367

the aggregate principal amount, of 4.25% Senior Notes due 2046 represented thereby shall be reflected by the Trustee on Schedule B attached to the 4.25% Senior Notes due 2046 and made by the Trustee in accordance with written instructions or such other written form of instructions as is customary for the Depositary, from the Depositary or its nominee on behalf of any Person having a beneficial interest in the Global Bond.

The Company hereby initially appoints The Depository Trust Company ("DTC") to act as the Depositary with respect to all 4.25% Senior Notes due 2046, and the 4.25% Senior Notes due 2046 shall initially be registered in the name of Cede & Co., as the nominee of DTC.

The Company and DTC have executed a Blanket Letter of Representations, and the Trustee is hereby authorized, in connection with any successor nominee for DTC or any successor Depositary, to enter into appropriate or comparable arrangements, if necessary, and shall have the same rights with respect to its actions thereunder as it has with respect to its actions under the Indenture."

Section 1104    The Twenty-Sixth Supplemental Indenture (Amended 309). The Twenty-Sixth Supplemental Indenture is hereby amended by the addition of Section 309 thereto, to read as follows:

"Section 309    Collateral Security for the 4.25% Senior Notes due 2046.

(a)    For the purpose of providing collateral security for the obligations of the Company with respect to the 4.25% Senior Notes due 2046, the Company shall issue and deliver the 4.25% First Mortgage Bond, Collateral Series due 2046 (the "4.25% Collateral Mortgage Bonds due 2046") to the Trustee pursuant to the Second Supplemental Indenture, dated as of July 1, 2020 (the "Second Supplemental Mortgage Indenture") to the Indenture of Mortgage, dated as of June 19, 2020, between the Company and The Bank of New York Mellon Trust Company, N.A., as trustee (the "Mortgage Bond Trustee") (such Indenture of Mortgage, as previously and hereinafter supplemented, (including by the Second Supplemental Mortgage Indenture) is hereinafter referred to as the "Mortgage Indenture"). For the avoidance of doubt, any amounts received by the Trustee with respect to the 4.25% Collateral Mortgage Bonds due 2046 will be applied to satisfy any obligations under the 4.25% Senior Notes due 2046 in accordance with the Indenture and not any other Bonds outstanding under the Indenture. In connection with the delivery of the 4.25% Collateral Mortgage Bonds due 2046 to the Trustee, the Company shall (i) deliver to the Trustee an Officer's Certificate stating that (A) the Company has duly executed and the Mortgage Bond Trustee has duly authenticated the 4.25% Collateral Mortgage Bonds due 2046 in the aggregate principal amount of $450,000,000 and (B) the Company has delivered the 4.25% Collateral Mortgage Bonds due 2046 to the Trustee in the aggregate principal amount of $450,000,000, (ii) provide to the Trustee (or permit the Trustee to rely upon) an Opinion of Counsel, satisfactory in form and substance to the Trustee, regarding the due execution, delivery, issuance, validity and enforceability of the 4.25% Collateral Mortgage Bonds due 2046, and that the Mortgage Indenture creates a valid and enforceable lien on the Property Additions (as defined in the Mortgage Indenture) made the subject of the 4.25% Collateral

71

Mortgage Bonds due 2046, subject to no prior Lien (as defined in the Mortgage Indenture) to the knowledge of such counsel, except for Permitted Liens (as defined in the Mortgage Indenture), and (iii) deliver to the Trustee a copy of the Mortgage Indenture, including the Second Supplemental Mortgage Indenture, certified by the Secretary or an Assistant Secretary of the Company.

(b)    The 4.25% Collateral Mortgage Bonds due 2046 shall be fully registered in the name of the Trustee. Until the 4.25% Collateral Mortgage Bonds due 2046 are released in accordance with Section 311 of this Twenty-Sixth Supplemental Indenture, the Trustee shall hold the 4.25% Collateral Mortgage Bonds due 2046 in trust for the benefit of the Holders from time to time of the 4.25% Senior Notes due 2046 as security for any and all obligations of the Company with respect to the 4.25% Senior Notes due 2046, including but not limited to, (1) the full and prompt payment of the principal of and premium, if any, on the 4.25% Senior Notes due 2046 when and as the same shall become due and payable in accordance with the terms and provisions of the Indenture or the 4.25% Senior Notes due 2046, either at the stated maturity thereof, upon acceleration of the maturity thereof or upon redemption, and (2) the full and prompt payment of any interest on the 4.25% Senior Notes due 2046, when and as the same shall become due and payable in accordance with the terms and provisions of the Indenture or the 4.25% Senior Notes due 2046.

(c)    The Company acknowledges and agrees that, solely for administrative purposes, the Trustee will establish an account in the name of the Company for the custody and safekeeping of 4.25% Collateral Mortgage Bonds due 2046 delivered to the Trustee."

Section 1105    The Twenty-Sixth Supplemental Indenture (Amended 310). The Twenty-Sixth Supplemental Indenture is hereby amended by the addition of Section 310 thereto, to read as follows:

"Section 310    Actions with Respect to 4.25% Collateral Mortgage Bonds due 2046.

(a)    Except for the safe custody of any 4.25% Collateral Mortgage Bonds due 2046 in its possession and the accounting for moneys actually received by it with respect to the 4.25% Collateral Mortgage Bonds due 2046, the Trustee shall have no duty to act, consent or request any action of any Person in connection with the 4.25% Collateral Mortgage Bonds due 2046 unless the Trustee shall have received (i) written direction from the holders of at least a majority in aggregate principal amount of the Bonds then outstanding voting as a single class and (ii) indemnity or security satisfactory to it against any liabilities that may be incurred by it in connection therewith; *provided, however,* that in no event shall the Trustee have any duty to attend meetings of bondholders under the Mortgage Indenture, or to ascertain or take action with respect to voting, consents, waivers, amendments or any other matters relative to the 4.25% Collateral Mortgage Bonds due 2046 and/or the Mortgage Indenture. The Trustee shall have no duty to ascertain or inquire into or verify the performance or observance of any covenants, conditions or agreements on the part of the Company or the Mortgage Bond Trustee with respect to the 4.25% Collateral Mortgage Bonds due 2046. The Trustee will not be required to take any action that is contrary to applicable law or any provision of the Indenture, the 4.25% Collateral

72

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 173 of 1367

Mortgage Bonds due 2046 or the Mortgage Indenture or that, in the opinion of the Trustee, otherwise subjects it to liability; *provided, however*, that, subject to the foregoing limitations and any other protections that the Trustee may have under the Indenture, including without limitation its right to indemnification for actions taken at the direction of the holders, the Trustee shall vote or give any such consent or instruction as it may be directed to do so by the holders of a majority in principal amount of the 4.25% Senior Notes due 2046, unless the vote or consent is with respect to matters which under the Mortgage Indenture require the vote or consent of the holders of a greater percentage in principal amount of the 4.25% Collateral Mortgage Bonds due 2046, in which case such direction must be from holders of such greater percentage in principal amount of the 4.25% Senior Notes due 2046.

(b)  To the extent that any consent or instruction from the Trustee and/or the holders of the 4.25% Senior Notes due 2046 is required with respect to the 4.25% Collateral Mortgage Bonds due 2046 and/or the Mortgage Indenture, the Trustee shall not have any duty or obligation to determine whether such consent or instruction is required nor any duty or obligation to give or otherwise solicit such consent or instructions; *provided, however*, that if the Trustee receives any written notices with respect to the 4.25% Collateral Mortgage Bonds due 2046, it shall promptly transmit such notices to the holders of the 4.25% Senior Notes due 2046 in accordance with the Indenture.

(c)  It is expressly understood and agreed by the Company (and, with respect to any holder of 4.25% Senior Notes due 2046, by holding such 4.25% Senior Notes due 2046 such holder shall be deemed to have agreed) that the Trustee shall not be responsible for any recital, statement, representation, or warranty (whether written or oral) made by any Person in or in connection with the Indenture or the Mortgage Indenture or any certificate or other document referred to or provided for in, or received by it under, the Indenture or the Mortgage Indenture (other than those statements, representations or warranties that are expressly made by the Trustee, if any), or for the value, validity, effectiveness, genuineness, enforceability, or sufficiency of the 4.25% Collateral Mortgage Bonds due 2046, the Mortgage Indenture, or any other document referred to or provided for therein or for any failure by the Company, the Mortgage Bond Trustee or any other Person to perform any of its obligations hereunder or thereunder.

(d)  Whether or not expressly provided herein, the rights, privileges, protections, immunities, indemnities and benefits given to the Trustee pursuant to the Indenture shall apply to any action taken by the Trustee in accordance with the terms of the 4.25% Collateral Mortgage Bonds due 2046 and/or the Mortgage Indenture.

(e)  If an Event of Default under the Indenture occurs and is continuing with respect to the 4.25% Senior Notes due 2046 and the 4.25% Senior Notes due 2046 have been accelerated as a consequence of such Event of Default, the Trustee may and, subject to Section 9.02 of the Indenture, upon receipt of written instructions of holders of not less than a majority in principal amount of the 4.25% Senior Notes due 2046, and receipt of indemnity or security to its satisfaction, shall exercise such other rights as it shall possess under the Mortgage Indenture as a holder of the 4.25% Collateral Mortgage Bonds due 2046.

73

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 174 of 1367

(f)   With the written consent of the holders of a majority in aggregate principal amount of the outstanding 4.25% Senior Notes due 2046, the Trustee may consent to modifications, amendments, or supplements to (or provide waivers in respect of) the 4.25% Collateral Mortgage Bonds due 2046 and/or the Mortgage Indenture; provided, however, that without the written consent of each holder of a 4.25% Senior Note due 2046, the Trustee shall not consent to any modification, amendment or supplement to (or provide waivers in respect of) the 4.25% Collateral Mortgage Bonds due 2046 and/or the Mortgage Indenture that have the effect of (A) (i) extending the fixed maturity of the 4.25% Collateral Mortgage Bonds due 2046, (ii) changing any terms of any sinking fund or analogous fund or conversion rights with respect to the 4.25% Collateral Mortgage Bonds due 2046, (iii) reducing the rate or extending the time of payment of interest on the 4.25% Collateral Mortgage Bonds due 2046, or reducing the principal amount of the 4.25% Collateral Mortgage Bonds due 2046, or (iv) limiting the right of the Trustee (as the holder of the 4.25% Collateral Mortgage Bonds due 2046) to institute suit for the enforcement of payment of principal of or premium, if any, or interest on the 4.25% Collateral Mortgage Bonds due 2046 in accordance with the terms thereof, or (B) reducing the percentage of Bonds (as defined in the Mortgage Indenture), the holders of which are required to consent to any such supplement, amendment and/or waiver, or (C) permitting the creation by the Company of any Senior Lien (as such term is defined in the Mortgage Indenture) in accordance with the Mortgage Indenture."

Section 1106   The Twenty-Sixth Supplemental Indenture (Amended 311). The Twenty-Sixth Supplemental Indenture is hereby amended by the addition of Section 311 thereto, to read as follows:

"Section 311   Release of Liens in Respect of 4.25% Collateral Mortgage Bonds due 2046; Change of Amounts.

(a) Upon Company Request and the Trustee's receipt of an Officer's Certificate and an Opinion of Counsel from the Company certifying that all conditions to the satisfaction and discharge of the Indenture with respect to the 4.25% Senior Notes due 2046 (but, for avoidance of doubt, not any other series of Bonds then outstanding under the Indenture) in accordance with Section 8.02 of the Base Indenture have been satisfied, the Trustee shall be deemed not to hold a lien on the 4.25% Collateral Mortgage Bonds due 2046 on behalf of the holders of the 4.25% Senior Notes due 2046 and the Trustee shall, upon written request of the Company, deliver to the Company the 4.25% Collateral Mortgage Bonds due 2046, together with such appropriate instruments of transfer or release (in form and substance reasonably satisfactory to the Trustee) as may be reasonably requested by the Company (and at the expense of the Company) to release such lien. All the 4.25% Collateral Mortgage Bonds due 2046 delivered to the Company in accordance with this Section 311 shall be delivered by the Company to the Mortgage Bond Trustee for cancellation.

74

(b) Following any partial payment, redemption or retirement of the 4.25% Senior Notes due 2046, the Company shall promptly furnish to the Trustee an Officer's Certificate certifying as to such payment, redemption or retirement and the principal amount of the 4.25% Senior Notes due 2046 outstanding following such change in aggregate principal amount and directing the Trustee to deliver the 4.25% Collateral Mortgage Bonds due 2046 then held by the Trustee to the Mortgage Bond Trustee in exchange for 4.25% Collateral Mortgage Bonds due 2046 in a principal amount equal to the current outstanding aggregate principal amount so certified in the Officer's Certificate."

Section 1107    The Twenty-Sixth Supplemental Indenture (Amended 312). The Twenty-Sixth Supplemental Indenture is hereby amended by the addition of Section 312 thereto, to read as follows:

"Section 312    Delivery of Non-Payment Notice to Mortgage Bond Trustee. If payment of the principal of, premium, if any, or interest on the 4.25% Senior Notes due 2046 has not been fully paid, deemed to have been paid or otherwise satisfied and discharged when due, the Trustee, acting at the written direction of Holders of a majority in aggregate principal amount of the outstanding 4.25% Senior Notes due 2046, shall deliver a written notice to the Mortgage Bond Trustee stating the amount of such non-payment and that such payment remains unpaid on the date of such notice (which notice shall be given by the Trustee within five Business Days of such direction; *provided, however*, that failure by the Trustee to give such notice shall not affect in any way the Company's obligation to pay such amount)."

Section 1108    The Twenty-Sixth Supplemental Indenture (Amended 313). The Twenty-Sixth Supplemental Indenture is hereby amended by the addition of Section 313 thereto, to read as follows:

"Section 313    No Transfer of 4.25% Collateral Mortgage Bonds due 2046. The Company shall cause all of the 4.25% Collateral Mortgage Bonds due 2046 to be issued and registered in the name of the Trustee. Except (i) as otherwise permitted by the Indenture or (ii) in connection with an assignment to a successor trustee in accordance with the Indenture, the Trustee shall not sell, assign or transfer the 4.25% Collateral Mortgage Bonds due 2046."

Section 1109    Bond Exchange. The Company desires to exchange the original Global Bond representing the 4.25% Senior Notes due 2046, dated November 5, 2015 (the "Original Global Bond") for the amended and restated Global Bond set forth in Exhibit A-12 hereto (which is hereby incorporated herein and made a part hereof) (the "Amended and Restated Global 4.25% Senior Notes due 2046") incorporating the amendments effected by this Thirtieth Supplemental Indenture in accordance with Section 13.06 of the Base Indenture. In connection therewith, the Company has delivered to the Trustee (i) a Company Request for the authentication and delivery of the Amended and Restated Global 4.25% Senior Notes due 2046 and the cancellation of the Original Global Bond, along with an Officer's Certificate and Opinion of Counsel required by the Indenture, and (ii) the Amended and Restated Global 4.25% Senior Notes due 2046 representing the 4.25% Senior Notes due 2046 in the aggregate principal amount of $450,000,000. Upon receipt

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 176 of 1367

of the deliverables required by the Indenture, the Trustee shall authenticate the Amended and Restated Global 4.25% Senior Notes due 2046 to be exchanged for the Original Global Bond, cancel the Original Global Bond and deliver the cancelled Original Global Bond to the Company in accordance with the instructions set forth in the Company Request.

# ARTICLE TWELVE

AMENDMENT OF THE TWENTY-SEVENTH SUPPLEMENTAL INDENTURE AND THE 2.95% SENIOR NOTES DUE 2026

Section 1201 <u>Exhibit A of the Twenty-Seventh Supplemental Indenture</u>. Exhibit A of the Twenty-Seventh Supplemental Indenture is hereby replaced with Exhibit A-13 to this Thirtieth Supplemental Indenture.

Section 1202 <u>The Twenty-Seventh Supplemental Indenture (Amended)</u>. The Twenty-Seventh Supplemental Indenture is hereby amended by amending and restating the defined terms "Indenture," "Twenty-Seventh Supplemental Indenture" and "2.95% Senior Notes" as follows:

"Indenture" means the Base Indenture, as amended and/or supplemented from time to time.

"2.95% Senior Notes" is replaced with "2.95% Senior Notes due 2026".

"Twenty-Seventh Supplemental Indenture" means this Twenty-Seventh Supplemental Indenture between the Company and The Bank of New York Mellon Trust Company, N.A. (as predecessor trustee), dated as of March 1, 2016, as amended by the Thirtieth Supplemental Indenture by and between the Company and the Trustee, dated as of July 1, 2020, as may be further amended and or supplemented from time to time.

Section 1203 <u>Section 207 of the Twenty-Seventh Supplemental Indenture</u>. Section 207 of the Twenty-Seventh Supplemental Indenture is hereby amended and restated as follows:

"Section 207 <u>Global Securities; Appointment of Depositary for Global Securities</u>.

The 2.95% Senior Notes due 2026 shall be issued in the form of one or more permanent Global Bonds as provided in Section 3.13 of the Indenture and deposited with, or on behalf of, the Depositary, or with the Trustee, as custodian for the Depositary, duly executed by the Company and authenticated by the Trustee.

Each Global Bond shall represent such of the 2.95% Senior Notes due 2026 as shall be specified therein and shall each provide that it shall represent the aggregate principal amount of 2.95% Senior Notes due 2026 from time to time endorsed thereon and that the aggregate principal amount of 2.95% Senior Notes due 2026 represented thereby may from time to time be reduced or increased, as appropriate, to reflect exchanges or redemptions. Any endorsement of a Global Bond to reflect the amount, or any increase or decrease in the aggregate principal amount, of 2.95% Senior Notes due 2026 represented thereby shall

76

be reflected by the Trustee on Schedule B attached to the 2.95% Senior Notes due 2026 and made by the Trustee in accordance with written instructions or such other written form of instructions as is customary for the Depositary, from the Depositary or its nominee on behalf of any Person having a beneficial interest in the Global Bond.

The Company hereby initially appoints The Depository Trust Company ("DTC") to act as the Depositary with respect to all 2.95% Senior Notes due 2026, and the 2.95% Senior Notes due 2026 shall initially be registered in the name of Cede & Co., as the nominee of DTC.

The Company and DTC have executed a Blanket Letter of Representations, and the Trustee is hereby authorized, in connection with any successor nominee for DTC or any successor Depositary, to enter into appropriate or comparable arrangements, if necessary, and shall have the same rights with respect to its actions thereunder as it has with respect to its actions under the Indenture."

Section 1204    The Twenty-Seventh Supplemental Indenture (Amended 209). The Twenty-Seventh Supplemental Indenture is hereby amended by the addition of Section 209 thereto, to read as follows:

"Section 209    Collateral Security for the 2.95% Senior Notes due 2026.

(a)    For the purpose of providing collateral security for the obligations of the Company with respect to the 2.95% Senior Notes due 2026, the Company shall issue and deliver the 2.95% First Mortgage Bond, Collateral Series due 2026 (the "2.95% Collateral Mortgage Bonds due 2026") to the Trustee pursuant to the Second Supplemental Indenture, dated as of July 1, 2020 (the "Second Supplemental Mortgage Indenture") to the Indenture of Mortgage, dated as of June 19, 2020, between the Company and The Bank of New York Mellon Trust Company, N.A., as trustee (the "Mortgage Bond Trustee") (such Indenture of Mortgage, as previously and hereinafter supplemented, (including by the Second Supplemental Mortgage Indenture) is hereinafter referred to as the "Mortgage Indenture"). For the avoidance of doubt, any amounts received by the Trustee with respect to the 2.95% Collateral Mortgage Bonds due 2026 will be applied to satisfy any obligations under the 2.95% Senior Notes due 2026 in accordance with the Indenture and not any other Bonds outstanding under the Indenture. In connection with the delivery of the 2.95% Collateral Mortgage Bonds due 2026 to the Trustee, the Company shall (i) deliver to the Trustee an Officer's Certificate stating that (A) the Company has duly executed and the Mortgage Bond Trustee has duly authenticated the 2.95% Collateral Mortgage Bonds due 2026 in the aggregate principal amount of $600,000,000 and (B) the Company has delivered the 2.95% Collateral Mortgage Bonds due 2026 to the Trustee in the aggregate principal amount of $600,000,000, (ii) provide to the Trustee (or permit the Trustee to rely upon) an Opinion of Counsel, satisfactory in form and substance to the Trustee, regarding the due execution, delivery, issuance, validity and enforceability of the 2.95% Collateral Mortgage Bonds due 2026, and that the Mortgage Indenture creates a valid and enforceable lien on the Property Additions (as defined in the Mortgage Indenture) made the subject of the 2.95% Collateral Mortgage Bonds due 2026, subject to no prior Lien (as defined in the Mortgage Indenture)

77

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 178 of 1367

to the knowledge of such counsel, except for Permitted Liens (as defined in the Mortgage Indenture), and (iii) deliver to the Trustee a copy of the Mortgage Indenture, including the Second Supplemental Mortgage Indenture, certified by the Secretary or an Assistant Secretary of the Company.

(b)   The 2.95% Collateral Mortgage Bonds due 2026 shall be fully registered in the name of the Trustee. Until the 2.95% Collateral Mortgage Bonds due 2026 are released in accordance with Section 211 of this Twenty-Seventh Supplemental Indenture, the Trustee shall hold the 2.95% Collateral Mortgage Bonds due 2026 in trust for the benefit of the Holders from time to time of the 2.95% Senior Notes due 2026 as security for any and all obligations of the Company with respect to the 2.95% Senior Notes due 2026, including but not limited to, (1) the full and prompt payment of the principal of and premium, if any, on the 2.95% Senior Notes due 2026 when and as the same shall become due and payable in accordance with the terms and provisions of the Indenture or the 2.95% Senior Notes due 2026, either at the stated maturity thereof, upon acceleration of the maturity thereof or upon redemption, and (2) the full and prompt payment of any interest on the 2.95% Senior Notes due 2026, when and as the same shall become due and payable in accordance with the terms and provisions of the Indenture or the 2.95% Senior Notes due 2026.

(c)   The Company acknowledges and agrees that, solely for administrative purposes, the Trustee will establish an account in the name of the Company for the custody and safekeeping of 2.95% Collateral Mortgage Bonds due 2026 delivered to the Trustee."

Section 1205   The Twenty-Seventh Supplemental Indenture (Amended 210). The Twenty-Seventh Supplemental Indenture is hereby amended by the addition of Section 210 thereto, to read as follows:

"Section 210   Actions with Respect to 2.95% Collateral Mortgage Bonds due 2026.

(a)   Except for the safe custody of any 2.95% Collateral Mortgage Bonds due 2026 in its possession and the accounting for moneys actually received by it with respect to the 2.95% Collateral Mortgage Bonds due 2026, the Trustee shall have no duty to act, consent or request any action of any Person in connection with the 2.95% Collateral Mortgage Bonds due 2026 unless the Trustee shall have received (i) written direction from the holders of at least a majority in aggregate principal amount of the Bonds then outstanding voting as a single class and (ii) indemnity or security satisfactory to it against any liabilities that may be incurred by it in connection therewith; *provided, however,* that in no event shall the Trustee have any duty to attend meetings of bondholders under the Mortgage Indenture, or to ascertain or take action with respect to voting, consents, waivers, amendments or any other matters relative to the 2.95% Collateral Mortgage Bonds due 2026 and/or the Mortgage Indenture. The Trustee shall have no duty to ascertain or inquire into or verify the performance or observance of any covenants, conditions or agreements on the part of the Company or the Mortgage Bond Trustee with respect to the 2.95% Collateral Mortgage Bonds due 2026. The Trustee will not be required to take any action that is contrary to applicable law or any provision of the Indenture, the 2.95% Collateral

78

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 179 of 1367

Mortgage Bonds due 2026 or the Mortgage Indenture or that, in the opinion of the Trustee, otherwise subjects it to liability; *provided, however*, that, subject to the foregoing limitations and any other protections that the Trustee may have under the Indenture, including without limitation its right to indemnification for actions taken at the direction of the holders, the Trustee shall vote or give any such consent or instruction as it may be directed to do so by the holders of a majority in principal amount of the 2.95% Senior Notes due 2026, unless the vote or consent is with respect to matters which under the Mortgage Indenture require the vote or consent of the holders of a greater percentage in principal amount of the 2.95% Collateral Mortgage Bonds due 2026, in which case such direction must be from holders of such greater percentage in principal amount of the 2.95% Senior Notes due 2026.

(b)     To the extent that any consent or instruction from the Trustee and/or the holders of the 2.95% Senior Notes due 2026 is required with respect to the 2.95% Collateral Mortgage Bonds due 2026 and/or the Mortgage Indenture, the Trustee shall not have any duty or obligation to determine whether such consent or instruction is required nor any duty or obligation to give or otherwise solicit such consent or instructions; *provided, however*, that if the Trustee receives any written notices with respect to the 2.95% Collateral Mortgage Bonds due 2026, it shall promptly transmit such notices to the holders of the 2.95% Senior Notes due 2026 in accordance with the Indenture.

(c)     It is expressly understood and agreed by the Company (and, with respect to any holder of 2.95% Senior Notes due 2026, by holding such 2.95% Senior Notes due 2026 such holder shall be deemed to have agreed) that the Trustee shall not be responsible for any recital, statement, representation, or warranty (whether written or oral) made by any Person in or in connection with the Indenture or the Mortgage Indenture or any certificate or other document referred to or provided for in, or received by it under, the Indenture or the Mortgage Indenture (other than those statements, representations or warranties that are expressly made by the Trustee, if any), or for the value, validity, effectiveness, genuineness, enforceability, or sufficiency of the 2.95% Collateral Mortgage Bonds due 2026, the Mortgage Indenture, or any other document referred to or provided for therein or for any failure by the Company, the Mortgage Bond Trustee or any other Person to perform any of its obligations hereunder or thereunder.

(d)     Whether or not expressly provided herein, the rights, privileges, protections, immunities, indemnities and benefits given to the Trustee pursuant to the Indenture shall apply to any action taken by the Trustee in accordance with the terms of the 2.95% Collateral Mortgage Bonds due 2026 and/or the Mortgage Indenture.

(e)     If an Event of Default under the Indenture occurs and is continuing with respect to the 2.95% Senior Notes due 2026 and the 2.95% Senior Notes due 2026 have been accelerated as a consequence of such Event of Default, the Trustee may and, subject to Section 9.02 of the Indenture, upon receipt of written instructions of holders of not less than a majority in principal amount of the 2.95% Senior Notes due 2026, and receipt of indemnity or security to its satisfaction, shall exercise such other rights as it shall possess under the Mortgage Indenture as a holder of the 2.95% Collateral Mortgage Bonds due 2026.

Case: 19-30088     Doc# 9156-3     Filed: 09/28/20     Entered: 09/28/20 16:25:53     Page 180 of 1367

(f)   With the written consent of the holders of a majority in aggregate principal amount of the outstanding 2.95% Senior Notes due 2026, the Trustee may consent to modifications, amendments, or supplements to (or provide waivers in respect of) the 2.95% Collateral Mortgage Bonds due 2026 and/or the Mortgage Indenture; provided, however, that without the written consent of each holder of a 2.95% Senior Note due 2026, the Trustee shall not consent to any modification, amendment or supplement to (or provide waivers in respect of) the 2.95% Collateral Mortgage Bonds due 2026 and/or the Mortgage Indenture that have the effect of (A) (i) extending the fixed maturity of the 2.95% Collateral Mortgage Bonds due 2026, (ii) changing any terms of any sinking fund or analogous fund or conversion rights with respect to the 2.95% Collateral Mortgage Bonds due 2026, (iii) reducing the rate or extending the time of payment of interest on the 2.95% Collateral Mortgage Bonds due 2026, or reducing the principal amount of the 2.95% Collateral Mortgage Bonds due 2026, or (iv) limiting the right of the Trustee (as the holder of the 2.95% Collateral Mortgage Bonds due 2026) to institute suit for the enforcement of payment of principal of or premium, if any, or interest on the 2.95% Collateral Mortgage Bonds due 2026 in accordance with the terms thereof, or (B) reducing the percentage of Bonds (as defined in the Mortgage Indenture), the holders of which are required to consent to any such supplement, amendment and/or waiver, or (C) permitting the creation by the Company of any Senior Lien (as such term is defined in the Mortgage Indenture) in accordance with the Mortgage Indenture."

Section 1206   The Twenty-Seventh Supplemental Indenture (Amended 211). The Twenty-Seventh Supplemental Indenture is hereby amended by the addition of Section 211 thereto, to read as follows:

"Section 211   Release of Liens in Respect of 2.95% Collateral Mortgage Bonds due 2026; Change of Amounts.

(a) Upon Company Request and the Trustee's receipt of an Officer's Certificate and an Opinion of Counsel from the Company certifying that all conditions to the satisfaction and discharge of the Indenture with respect to the 2.95% Senior Notes due 2026 (but, for avoidance of doubt, not any other series of Bonds then outstanding under the Indenture) in accordance with Section 8.02 of the Base Indenture have been satisfied, the Trustee shall be deemed not to hold a lien on the 2.95% Collateral Mortgage Bonds due 2026 on behalf of the holders of the 2.95% Senior Notes due 2026 and the Trustee shall, upon written request of the Company, deliver to the Company the 2.95% Collateral Mortgage Bonds due 2026, together with such appropriate instruments of transfer or release (in form and substance reasonably satisfactory to the Trustee) as may be reasonably requested by the Company (and at the expense of the Company) to release such lien. All the 2.95% Collateral Mortgage Bonds due 2026 delivered to the Company in accordance with this Section 211 shall be delivered by the Company to the Mortgage Bond Trustee for cancellation.

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 181 of 1367

(b) Following any partial payment, redemption or retirement of the 2.95% Senior Notes due 2026, the Company shall promptly furnish to the Trustee an Officer's Certificate certifying as to such payment, redemption or retirement and the principal amount of the 2.95% Senior Notes due 2026 outstanding following such change in aggregate principal amount and directing the Trustee to deliver the 2.95% Collateral Mortgage Bonds due 2026 then held by the Trustee to the Mortgage Bond Trustee in exchange for 2.95% Collateral Mortgage Bonds due 2026 in a principal amount equal to the current outstanding aggregate principal amount so certified in the Officer's Certificate."

Section 1207    The Twenty-Seventh Supplemental Indenture (Amended 212). The Twenty-Seventh Supplemental Indenture is hereby amended by the addition of Section 212 thereto, to read as follows:

"Section 212    Delivery of Non-Payment Notice to Mortgage Bond Trustee. If payment of the principal of, premium, if any, or interest on the 2.95% Senior Notes due 2026 has not been fully paid, deemed to have been paid or otherwise satisfied and discharged when due, the Trustee, acting at the written direction of Holders of a majority in aggregate principal amount of the outstanding 2.95% Senior Notes due 2026, shall deliver a written notice to the Mortgage Bond Trustee stating the amount of such non-payment and that such payment remains unpaid on the date of such notice (which notice shall be given by the Trustee within five Business Days of such direction; *provided, however*, that failure by the Trustee to give such notice shall not affect in any way the Company's obligation to pay such amount)."

Section 1208    The Twenty-Seventh Supplemental Indenture (Amended 213). The Twenty-Seventh Supplemental Indenture is hereby amended by the addition of Section 213 thereto, to read as follows:

"Section 213    No Transfer of 2.95% Collateral Mortgage Bonds due 2026. The Company shall cause all of the 2.95% Collateral Mortgage Bonds due 2026 to be issued and registered in the name of the Trustee. Except (i) as otherwise permitted by the Indenture or (ii) in connection with an assignment to a successor trustee in accordance with the Indenture, the Trustee shall not sell, assign or transfer the 2.95% Collateral Mortgage Bonds due 2026."

Section 1209    Bond Exchange. The Company desires to exchange the original Global Bond representing the 2.95% Senior Notes due 2026, dated March 1, 2016 (the "Original Global Bond") for the amended and restated Global Bond set forth in Exhibit A-13 hereto (which is hereby incorporated herein and made a part hereof) (the "Amended and Restated Global 2.95% Senior Notes due 2026") incorporating the amendments effected by this Thirtieth Supplemental Indenture in accordance with Section 13.06 of the Base Indenture. In connection therewith, the Company has delivered to the Trustee (i) a Company Request for the authentication and delivery of the Amended and Restated Global 2.95% Senior Notes due 2026 and the cancellation of the Original Global Bond, along with an Officer's Certificate and Opinion of Counsel required by the Indenture, and (ii) the Amended and Restated Global 2.95% Senior Notes due 2026 representing the 2.95% Senior Notes due 2026 in the aggregate principal amount of $600,000,000. Upon receipt

81

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 182 of 1367

of the deliverables required by the Indenture, the Trustee shall authenticate the Amended and Restated Global 2.95% Senior Notes due 2026 to be exchanged for the Original Global Bond, cancel the Original Global Bond and deliver the cancelled Original Global Bond to the Company in accordance with the instructions set forth in the Company Request.

# ARTICLE THIRTEEN

### AMENDMENT OF THE TWENTY-EIGHTH SUPPLEMENTAL INDENTURE AND THE 4.00% SENIOR NOTES DUE 2046

Section 1301    <u>Exhibit B of the Twenty-Eighth Supplemental Indenture</u>. Exhibit B of the Twenty-Eighth Supplemental Indenture is hereby replaced with Exhibit A-14 to this Thirtieth Supplemental Indenture.

Section 1302    <u>The Twenty-Eighth Supplemental Indenture</u>. The Twenty-Eighth Supplemental Indenture is hereby amended by amending and restating the defined terms "Indenture," "Twenty-Eighth Supplemental Indenture" and "4.00% Senior Notes" as follows:

"Indenture" means the Base Indenture, as amended and/or supplemented from time to time.

"4.00% Senior Notes" is replaced with "4.00% Senior Notes due 2046".

"Twenty-Eighth Supplemental Indenture" means this Twenty-Eighth Supplemental Indenture between the Company and The Bank of New York Mellon Trust Company, N.A. (as predecessor trustee), dated as of December 1, 2016, as amended by the Thirtieth Supplemental Indenture by and between the Company and the Trustee, dated as of July 1, 2020, as may be further amended and or supplemented from time to time.

Section 1303    <u>Section 307 of the Twenty-Eighth Supplemental Indenture</u>. Section 307 of the Twenty-Eighth Supplemental Indenture is hereby amended and restated as follows:

"Section 307    <u>Global Securities; Appointment of Depositary for Global Securities</u>.

The 4.00% Senior Notes due 2046 shall be issued in the form of one or more permanent Global Bonds as provided in Section 3.13 of the Indenture and deposited with, or on behalf of, the Depositary, or with the Trustee, as custodian for the Depositary, duly executed by the Company and authenticated by the Trustee.

Each Global Bond shall represent such of the 4.00% Senior Notes due 2046 as shall be specified therein and shall each provide that it shall represent the aggregate principal amount of 4.00% Senior Notes due 2046 from time to time endorsed thereon and that the aggregate principal amount of 4.00% Senior Notes due 2046 represented thereby may from time to time be reduced or increased, as appropriate, to reflect exchanges or redemptions. Any endorsement of a Global Bond to reflect the amount, or any increase or decrease in the aggregate principal amount, of 4.00% Senior Notes due 2046 represented thereby shall

82

be reflected by the Trustee on Schedule B attached to the 4.00% Senior Notes due 2046 and made by the Trustee in accordance with written instructions or such other written form of instructions as is customary for the Depositary, from the Depositary or its nominee on behalf of any Person having a beneficial interest in the Global Bond.

The Company hereby initially appoints The Depository Trust Company ("DTC") to act as the Depositary with respect to all 4.00% Senior Notes due 2046, and the 4.00% Senior Notes due 2046 shall initially be registered in the name of Cede & Co., as the nominee of DTC.

The Company and DTC have executed a Blanket Letter of Representations, and the Trustee is hereby authorized, in connection with any successor nominee for DTC or any successor Depositary, to enter into appropriate or comparable arrangements, if necessary, and shall have the same rights with respect to its actions thereunder as it has with respect to its actions under the Indenture."

Section 1304   The Twenty-Eighth Supplemental Indenture (Amended 309). The Twenty-Eighth Supplemental Indenture is hereby amended by the addition of Section 309 thereto, to read as follows:

"Section 309   Collateral Security for the 4.00% Senior Notes due 2046.

(a)   For the purpose of providing collateral security for the obligations of the Company with respect to the 4.00% Senior Notes due 2046, the Company shall issue and deliver the 4.00% First Mortgage Bond, Collateral Series due 2046 (the "4.00% Collateral Mortgage Bonds due 2046") to the Trustee pursuant to the Second Supplemental Indenture, dated as of July 1, 2020 (the "Second Supplemental Mortgage Indenture") to the Indenture of Mortgage, dated as of June 19, 2020, between the Company and The Bank of New York Mellon Trust Company, N.A., as trustee (the "Mortgage Bond Trustee") (such Indenture of Mortgage, as previously and hereinafter supplemented, (including by the Second Supplemental Mortgage Indenture) is hereinafter referred to as the "Mortgage Indenture"). For the avoidance of doubt, any amounts received by the Trustee with respect to the 4.00% Collateral Mortgage Bonds due 2046 will be applied to satisfy any obligations under the 4.00% Senior Notes due 2046 in accordance with the Indenture and not any other Bonds outstanding under the Indenture. In connection with the delivery of the 4.00% Collateral Mortgage Bonds due 2046 to the Trustee, the Company shall (i) deliver to the Trustee an Officer's Certificate stating that (A) the Company has duly executed and the Mortgage Bond Trustee has duly authenticated the 4.00% Collateral Mortgage Bonds due 2046 in the aggregate principal amount of $600,000,000 and (B) the Company has delivered the 4.00% Collateral Mortgage Bonds due 2046 to the Trustee in the aggregate principal amount of $600,000,000, (ii) provide to the Trustee (or permit the Trustee to rely upon) an Opinion of Counsel, satisfactory in form and substance to the Trustee, regarding the due execution, delivery, issuance, validity and enforceability of the 4.00% Collateral Mortgage Bonds due 2046, and that the Mortgage Indenture creates a valid and enforceable lien on the Property Additions (as defined in the Mortgage Indenture) made the subject of the 4.00% Collateral Mortgage Bonds due 2046, subject to no prior Lien (as defined in the Mortgage Indenture)

83

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 184 of 1367

to the knowledge of such counsel, except for Permitted Liens (as defined in the Mortgage Indenture), and (iii) deliver to the Trustee a copy of the Mortgage Indenture, including the Second Supplemental Mortgage Indenture, certified by the Secretary or an Assistant Secretary of the Company.

(b)    The 4.00% Collateral Mortgage Bonds due 2046 shall be fully registered in the name of the Trustee. Until the 4.00% Collateral Mortgage Bonds due 2046 are released in accordance with Section 311 of this Twenty-Eighth Supplemental Indenture, the Trustee shall hold the 4.00% Collateral Mortgage Bonds due 2046 in trust for the benefit of the Holders from time to time of the 4.00% Senior Notes due 2046 as security for any and all obligations of the Company with respect to the 4.00% Senior Notes due 2046, including but not limited to, (1) the full and prompt payment of the principal of and premium, if any, on the 4.00% Senior Notes due 2046 when and as the same shall become due and payable in accordance with the terms and provisions of the Indenture or the 4.00% Senior Notes due 2046, either at the stated maturity thereof, upon acceleration of the maturity thereof or upon redemption, and (2) the full and prompt payment of any interest on the 4.00% Senior Notes due 2046, when and as the same shall become due and payable in accordance with the terms and provisions of the Indenture or the 4.00% Senior Notes due 2046.

(c)    The Company acknowledges and agrees that, solely for administrative purposes, the Trustee will establish an account in the name of the Company for the custody and safekeeping of 4.00% Collateral Mortgage Bonds due 2046 delivered to the Trustee."

Section 1305    The Twenty-Eighth Supplemental Indenture (Amended 310). The Twenty-Eighth Supplemental Indenture is hereby amended by the addition of Section 310 thereto, to read as follows:

"Section 310    Actions with Respect to 4.00% Collateral Mortgage Bonds due 2046.

(a)    Except for the safe custody of any 4.00% Collateral Mortgage Bonds due 2046 in its possession and the accounting for moneys actually received by it with respect to the 4.00% Collateral Mortgage Bonds due 2046, the Trustee shall have no duty to act, consent or request any action of any Person in connection with the 4.00% Collateral Mortgage Bonds due 2046 unless the Trustee shall have received (i) written direction from the holders of at least a majority in aggregate principal amount of the Bonds then outstanding voting as a single class and (ii) indemnity or security satisfactory to it against any liabilities that may be incurred by it in connection therewith; *provided, however,* that in no event shall the Trustee have any duty to attend meetings of bondholders under the Mortgage Indenture, or to ascertain or take action with respect to voting, consents, waivers, amendments or any other matters relative to the 4.00% Collateral Mortgage Bonds due 2046 and/or the Mortgage Indenture. The Trustee shall have no duty to ascertain or inquire into or verify the performance or observance of any covenants, conditions or agreements on the part of the Company or the Mortgage Bond Trustee with respect to the 4.00% Collateral Mortgage Bonds due 2046. The Trustee will not be required to take any action that is contrary to applicable law or any provision of the Indenture, the 4.00% Collateral Mortgage Bonds due 2046 or the Mortgage Indenture or that, in the opinion of the Trustee,

84

otherwise subjects it to liability; *provided, however*, that, subject to the foregoing limitations and any other protections that the Trustee may have under the Indenture, including without limitation its right to indemnification for actions taken at the direction of the holders, the Trustee shall vote or give any such consent or instruction as it may be directed to do so by the holders of a majority in principal amount of the 4.00% Senior Notes due 2046, unless the vote or consent is with respect to matters which under the Mortgage Indenture require the vote or consent of the holders of a greater percentage in principal amount of the 4.00% Collateral Mortgage Bonds due 2046, in which case such direction must be from holders of such greater percentage in principal amount of the 4.00% Senior Notes due 2046.

(b)     To the extent that any consent or instruction from the Trustee and/or the holders of the 4.00% Senior Notes due 2046 is required with respect to the 4.00% Collateral Mortgage Bonds due 2046 and/or the Mortgage Indenture, the Trustee shall not have any duty or obligation to determine whether such consent or instruction is required nor any duty or obligation to give or otherwise solicit such consent or instructions; *provided, however*, that if the Trustee receives any written notices with respect to the 4.00% Collateral Mortgage Bonds due 2046, it shall promptly transmit such notices to the holders of the 4.00% Senior Notes due 2046 in accordance with the Indenture.

(c)     It is expressly understood and agreed by the Company (and, with respect to any holder of 4.00% Senior Notes due 2046, by holding such 4.00% Senior Notes due 2046 such holder shall be deemed to have agreed) that the Trustee shall not be responsible for any recital, statement, representation, or warranty (whether written or oral) made by any Person in or in connection with the Indenture or the Mortgage Indenture or any certificate or other document referred to or provided for in, or received by it under, the Indenture or the Mortgage Indenture (other than those statements, representations or warranties that are expressly made by the Trustee, if any), or for the value, validity, effectiveness, genuineness, enforceability, or sufficiency of the 4.00% Collateral Mortgage Bonds due 2046, the Mortgage Indenture, or any other document referred to or provided for therein or for any failure by the Company, the Mortgage Bond Trustee or any other Person to perform any of its obligations hereunder or thereunder.

(d)     Whether or not expressly provided herein, the rights, privileges, protections, immunities, indemnities and benefits given to the Trustee pursuant to the Indenture shall apply to any action taken by the Trustee in accordance with the terms of the 4.00% Collateral Mortgage Bonds due 2046 and/or the Mortgage Indenture.

(e)     If an Event of Default under the Indenture occurs and is continuing with respect to the 4.00% Senior Notes due 2046 and the 4.00% Senior Notes due 2046 have been accelerated as a consequence of such Event of Default, the Trustee may and, subject to Section 9.02 of the Indenture, upon receipt of written instructions of holders of not less than a majority in principal amount of the 4.00% Senior Notes due 2046, and receipt of indemnity or security to its satisfaction, shall exercise such other rights as it shall possess under the Mortgage Indenture as a holder of the 4.00% Collateral Mortgage Bonds due 2046.

85

Case: 19-30088     Doc# 9156-3     Filed: 09/28/20     Entered: 09/28/20 16:25:53     Page 186 of 1367

(f)   With the written consent of the holders of a majority in aggregate principal amount of the outstanding 4.00% Senior Notes due 2046, the Trustee may consent to modifications, amendments, or supplements to (or provide waivers in respect of) the 4.00% Collateral Mortgage Bonds due 2046 and/or the Mortgage Indenture; provided, however, that without the written consent of each holder of a 4.00% Senior Note due 2046, the Trustee shall not consent to any modification, amendment or supplement to (or provide waivers in respect of) the 4.00% Collateral Mortgage Bonds due 2046 and/or the Mortgage Indenture that have the effect of (A) (i) extending the fixed maturity of the 4.00% Collateral Mortgage Bonds due 2046, (ii) changing any terms of any sinking fund or analogous fund or conversion rights with respect to the 4.00% Collateral Mortgage Bonds due 2046, (iii) reducing the rate or extending the time of payment of interest on the 4.00% Collateral Mortgage Bonds due 2046, or reducing the principal amount of the 4.00% Collateral Mortgage Bonds due 2046, or (iv) limiting the right of the Trustee (as the holder of the 4.00% Collateral Mortgage Bonds due 2046) to institute suit for the enforcement of payment of principal of or premium, if any, or interest on the 4.00% Collateral Mortgage Bonds due 2046 in accordance with the terms thereof, or (B) reducing the percentage of Bonds (as defined in the Mortgage Indenture), the holders of which are required to consent to any such supplement, amendment and/or waiver, or (C) permitting the creation by the Company of any Senior Lien (as such term is defined in the Mortgage Indenture) in accordance with the Mortgage Indenture."

Section 1306   The Twenty-Eighth Supplemental Indenture (Amended 311). The Twenty-Eighth Supplemental Indenture is hereby amended by the addition of Section 311 thereto, to read as follows:

"Section 311   Release of Liens in Respect of 4.00% Collateral Mortgage Bonds due 2046; Change of Amounts.

(a) Upon Company Request and the Trustee's receipt of an Officer's Certificate and an Opinion of Counsel from the Company certifying that all conditions to the satisfaction and discharge of the Indenture with respect to the 4.00% Senior Notes due 2046 (but, for avoidance of doubt, not any other series of Bonds then outstanding under the Indenture) in accordance with Section 8.02 of the Base Indenture have been satisfied, the Trustee shall be deemed not to hold a lien on the 4.00% Collateral Mortgage Bonds due 2046 on behalf of the holders of the 4.00% Senior Notes due 2046 and the Trustee shall, upon written request of the Company, deliver to the Company the 4.00% Collateral Mortgage Bonds due 2046, together with such appropriate instruments of transfer or release (in form and substance reasonably satisfactory to the Trustee) as may be reasonably requested by the Company (and at the expense of the Company) to release such lien. All the 4.00% Collateral Mortgage Bonds due 2046 delivered to the Company in accordance with this Section 311 shall be delivered by the Company to the Mortgage Bond Trustee for cancellation.

(b) Following any partial payment, redemption or retirement of the 4.00% Senior Notes due 2046, the Company shall promptly furnish to the Trustee an Officer's Certificate certifying as to such payment, redemption or retirement and the principal amount of the

86

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 187 of 1367

4.00% Senior Notes due 2046 outstanding following such change in aggregate principal amount and directing the Trustee to deliver the 4.00% Collateral Mortgage Bonds due 2046 then held by the Trustee to the Mortgage Bond Trustee in exchange for 4.00% Collateral Mortgage Bonds due 2046 in a principal amount equal to the current outstanding aggregate principal amount so certified in the Officer's Certificate."

Section 1307   The Twenty-Eighth Supplemental Indenture (Amended 312). The Twenty-Eighth Supplemental Indenture is hereby amended by the addition of Section 312 thereto, to read as follows:

"Section 312   Delivery of Non-Payment Notice to Mortgage Bond Trustee. If payment of the principal of, premium, if any, or interest on the 4.00% Senior Notes due 2046 has not been fully paid, deemed to have been paid or otherwise satisfied and discharged when due, the Trustee, acting at the written direction of Holders of a majority in aggregate principal amount of the outstanding 4.00% Senior Notes due 2046, shall deliver a written notice to the Mortgage Bond Trustee stating the amount of such non-payment and that such payment remains unpaid on the date of such notice (which notice shall be given by the Trustee within five Business Days of such direction; *provided, however*, that failure by the Trustee to give such notice shall not affect in any way the Company's obligation to pay such amount)."

Section 1308   The Twenty-Eighth Supplemental Indenture (Amended 313). The Twenty-Eighth Supplemental Indenture is hereby amended by the addition of Section 313 thereto, to read as follows:

"Section 313   No Transfer of 4.00% Collateral Mortgage Bonds due 2046. The Company shall cause all of the 4.00% Collateral Mortgage Bonds due 2046 to be issued and registered in the name of the Trustee. Except (i) as otherwise permitted by the Indenture or (ii) in connection with an assignment to a successor trustee in accordance with the Indenture, the Trustee shall not sell, assign or transfer the 4.00% Collateral Mortgage Bonds due 2046."

Section 1309   Bond Exchange. The Company desires to exchange the original Global Bonds representing the 4.00% Senior Notes due 2046, originally dated December 1, 2016 and subsequently dated March 10, 2017 (the "Original Global Bonds") for the amended and restated Global Bonds set forth in Exhibit A-14 hereto (which are hereby incorporated herein and made a part hereof) (the "Amended and Restated Global 4.00% Senior Notes due 2046") incorporating the amendments effected by this Thirtieth Supplemental Indenture in accordance with Section 13.06 of the Base Indenture. In connection therewith, the Company has delivered to the Trustee (i) a Company Request for the authentication and delivery of the Amended and Restated Global 4.00% Senior Notes due 2046 and the cancellation of the Original Global Bonds, along with an Officer's Certificate and Opinion of Counsel required by the Indenture, and (ii) the Amended and Restated Global 4.00% Senior Notes due 2046 representing the 4.00% Senior Notes due 2046 in the aggregate principal amount of $600,000,000. Upon receipt of the deliverables required by the Indenture, the Trustee shall authenticate the Amended and Restated Global 4.00% Senior Notes due 2046 to be exchanged for the Original Global Bonds, cancel the Original Global Bonds and deliver the cancelled Original Global Bonds to the Company in accordance with the instructions set forth in the Company Request.

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 188 of 1367

# ARTICLE FOURTEEN

AMENDMENT OF THE TWENTY-NINTH SUPPLEMENTAL INDENTURE AND THE 3.30% SENIOR NOTES DUE 2027

Section 1401    Exhibit A of the Twenty-Ninth Supplemental Indenture. Exhibit A of the Twenty-Ninth Supplemental Indenture is hereby replaced with Exhibit A-15 to this Thirtieth Supplemental Indenture.

Section 1402    The Twenty-Ninth Supplemental Indenture. The Twenty-Ninth Supplemental Indenture is hereby amended by amending and restating the defined terms "Indenture," "Twenty-Ninth Supplemental Indenture" and "3.30% Senior Notes" as follows:

"Indenture" means the Base Indenture, as amended and/or supplemented from time to time.

"3.30% Senior Notes" is replaced with "3.30% Senior Notes due 2027".

"Twenty-Ninth Supplemental Indenture" means this Twenty-Ninth Supplemental Indenture between the Company and The Bank of New York Mellon Trust Company, N.A. (as predecessor trustee), dated as of March 10, 2017, as amended by the Thirtieth Supplemental Indenture by and between the Company and the Trustee, dated as of July 1, 2020, as may be further amended and or supplemented from time to time.

Section 1403    Section 207 of the Twenty-Ninth Supplemental Indenture. Section 207 of the Twenty-Ninth Supplemental Indenture is hereby amended and restated as follows:

"Section 207    Global Securities; Appointment of Depositary for Global Securities.

The 3.30% Senior Notes due 2027 shall be issued in the form of one or more permanent Global Bonds as provided in Section 3.13 of the Indenture and deposited with, or on behalf of, the Depositary, or with the Trustee, as custodian for the Depositary, duly executed by the Company and authenticated by the Trustee.

Each Global Bond shall represent such of the 3.30% Senior Notes due 2027 as shall be specified therein and shall each provide that it shall represent the aggregate principal amount of 3.30% Senior Notes due 2027 from time to time endorsed thereon and that the aggregate principal amount of 3.30% Senior Notes due 2027 represented thereby may from time to time be reduced or increased, as appropriate, to reflect exchanges or redemptions. Any endorsement of a Global Bond to reflect the amount, or any increase or decrease in the aggregate principal amount, of 3.30% Senior Notes due 2027 represented thereby shall be reflected by the Trustee on Schedule B attached to the 3.30% Senior Notes due 2027 and made by the Trustee in accordance with written instructions or such other written form of instructions as is customary for the Depositary, from the Depositary or its nominee on behalf of any Person having a beneficial interest in the Global Bond.

88

The Company hereby initially appoints The Depository Trust Company ("DTC") to act as the Depositary with respect to all 3.30% Senior Notes due 2027, and the 3.30% Senior Notes due 2027 shall initially be registered in the name of Cede & Co., as the nominee of DTC.

The Company and DTC have executed a Blanket Letter of Representations, and the Trustee is hereby authorized, in connection with any successor nominee for DTC or any successor Depositary, to enter into appropriate or comparable arrangements, if necessary, and shall have the same rights with respect to its actions thereunder as it has with respect to its actions under the Indenture.

Section 1404    The Twenty-Ninth Supplemental Indenture (Amended 209). The Twenty-Ninth Supplemental Indenture is hereby amended by the addition of Section 209 thereto, to read as follows:

"Section 209    Collateral Security for the 3.30% Senior Notes due 2027.

(a)    For the purpose of providing collateral security for the obligations of the Company with respect to the 3.30% Senior Notes due 2027, the Company shall issue and deliver the 3.30% First Mortgage Bond, Collateral Series due 2027 (the "3.30% Collateral Mortgage Bonds due 2027") to the Trustee pursuant to the Second Supplemental Indenture, dated as of July 1, 2020 (the "Second Supplemental Mortgage Indenture") to the Indenture of Mortgage, dated as of June 19, 2020, between the Company and The Bank of New York Mellon Trust Company, N.A., as trustee (the "Mortgage Bond Trustee") (such Indenture of Mortgage, as previously and hereinafter supplemented, (including by the Second Supplemental Mortgage Indenture) is hereinafter referred to as the "Mortgage Indenture"). For the avoidance of doubt, any amounts received by the Trustee with respect to the 3.30% Collateral Mortgage Bonds due 2027 will be applied to satisfy any obligations under the 3.30% Senior Notes due 2027 in accordance with the Indenture and not any other Bonds outstanding under the Indenture. In connection with the delivery of the 3.30% Collateral Mortgage Bonds due 2027 to the Trustee, the Company shall (i) deliver to the Trustee an Officer's Certificate stating that (A) the Company has duly executed and the Mortgage Bond Trustee has duly authenticated the 3.30% Collateral Mortgage Bonds due 2027 in the aggregate principal amount of $400,000,000 and (B) the Company has delivered the 3.30% Collateral Mortgage Bonds due 2027 to the Trustee in the aggregate principal amount of $400,000,000, (ii) provide to the Trustee (or permit the Trustee to rely upon) an Opinion of Counsel, satisfactory in form and substance to the Trustee, regarding the due execution, delivery, issuance, validity and enforceability of the 3.30% Collateral Mortgage Bonds due 2027, and that the Mortgage Indenture creates a valid and enforceable lien on the Property Additions (as defined in the Mortgage Indenture) made the subject of the 3.30% Collateral Mortgage Bonds due 2027, subject to no prior Lien (as defined in the Mortgage Indenture) to the knowledge of such counsel, except for Permitted Liens (as defined in the Mortgage Indenture), and (iii) deliver to the Trustee a copy of the Mortgage Indenture, including the Second Supplemental Mortgage Indenture, certified by the Secretary or an Assistant Secretary of the Company.

89

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 190 of 1367

(b)    The 3.30% Collateral Mortgage Bonds due 2027 shall be fully registered in the name of the Trustee. Until the 3.30% Collateral Mortgage Bonds due 2027 are released in accordance with Section 211 of this Twenty-Ninth Supplemental Indenture, the Trustee shall hold the 3.30% Collateral Mortgage Bonds due 2027 in trust for the benefit of the Holders from time to time of the 3.30% Senior Notes due 2027 as security for any and all obligations of the Company with respect to the 3.30% Senior Notes due 2027, including but not limited to, (1) the full and prompt payment of the principal of and premium, if any, on the 3.30% Senior Notes due 2027 when and as the same shall become due and payable in accordance with the terms and provisions of the Indenture or the 3.30% Senior Notes due 2027, either at the stated maturity thereof, upon acceleration of the maturity thereof or upon redemption, and (2) the full and prompt payment of any interest on the 3.30% Senior Notes due 2027, when and as the same shall become due and payable in accordance with the terms and provisions of the Indenture or the 3.30% Senior Notes due 2027.

(c)    The Company acknowledges and agrees that, solely for administrative purposes, the Trustee will establish an account in the name of the Company for the custody and safekeeping of 3.30% Collateral Mortgage Bonds due 2027 delivered to the Trustee."

Section 1405    <u>The Twenty-Ninth Supplemental Indenture (Amended 210)</u>. The Twenty-Ninth Supplemental Indenture is hereby amended by the addition of Section 210 thereto, to read as follows:

"Section 210    <u>Actions with Respect to 3.30% Collateral Mortgage Bonds due 2027</u>.

(a)    Except for the safe custody of any 3.30% Collateral Mortgage Bonds due 2027 in its possession and the accounting for moneys actually received by it with respect to the 3.30% Collateral Mortgage Bonds due 2027, the Trustee shall have no duty to act, consent or request any action of any Person in connection with the 3.30% Collateral Mortgage Bonds due 2027 unless the Trustee shall have received (i) written direction from the holders of at least a majority in aggregate principal amount of the Bonds then outstanding voting as a single class and (ii) indemnity or security satisfactory to it against any liabilities that may be incurred by it in connection therewith; *provided, however,* that in no event shall the Trustee have any duty to attend meetings of bondholders under the Mortgage Indenture, or to ascertain or take action with respect to voting, consents, waivers, amendments or any other matters relative to the 3.30% Collateral Mortgage Bonds due 2027 and/or the Mortgage Indenture. The Trustee shall have no duty to ascertain or inquire into or verify the performance or observance of any covenants, conditions or agreements on the part of the Company or the Mortgage Bond Trustee with respect to the 3.30% Collateral Mortgage Bonds due 2027. The Trustee will not be required to take any action that is contrary to applicable law or any provision of the Indenture, the 3.30% Collateral Mortgage Bonds due 2027 or the Mortgage Indenture or that, in the opinion of the Trustee, otherwise subjects it to liability; *provided, however,* that, subject to the foregoing limitations and any other protections that the Trustee may have under the Indenture,

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 191 of 1367

including without limitation its right to indemnification for actions taken at the direction of the holders, the Trustee shall vote or give any such consent or instruction as it may be directed to do so by the holders of a majority in principal amount of the 3.30% Senior Notes due 2027, unless the vote or consent is with respect to matters which under the Mortgage Indenture require the vote or consent of the holders of a greater percentage in principal amount of the 3.30% Collateral Mortgage Bonds due 2027, in which case such direction must be from holders of such greater percentage in principal amount of the 3.30% Senior Notes due 2027.

(b)    To the extent that any consent or instruction from the Trustee and/or the holders of the 3.30% Senior Notes due 2027 is required with respect to the 3.30% Collateral Mortgage Bonds due 2027 and/or the Mortgage Indenture, the Trustee shall not have any duty or obligation to determine whether such consent or instruction is required nor any duty or obligation to give or otherwise solicit such consent or instructions; *provided, however*, that if the Trustee receives any written notices with respect to the 3.30% Collateral Mortgage Bonds due 2027, it shall promptly transmit such notices to the holders of the 3.30% Senior Notes due 2027 in accordance with the Indenture.

(c)    It is expressly understood and agreed by the Company (and, with respect to any holder of 3.30% Senior Notes due 2027, by holding such 3.30% Senior Notes due 2027 such holder shall be deemed to have agreed) that the Trustee shall not be responsible for any recital, statement, representation, or warranty (whether written or oral) made by any Person in or in connection with the Indenture or the Mortgage Indenture or any certificate or other document referred to or provided for in, or received by it under, the Indenture or the Mortgage Indenture (other than those statements, representations or warranties that are expressly made by the Trustee, if any), or for the value, validity, effectiveness, genuineness, enforceability, or sufficiency of the 3.30% Collateral Mortgage Bonds due 2027, the Mortgage Indenture, or any other document referred to or provided for therein or for any failure by the Company, the Mortgage Bond Trustee or any other Person to perform any of its obligations hereunder or thereunder.

(d)    Whether or not expressly provided herein, the rights, privileges, protections, immunities, indemnities and benefits given to the Trustee pursuant to the Indenture shall apply to any action taken by the Trustee in accordance with the terms of the 3.30% Collateral Mortgage Bonds due 2027 and/or the Mortgage Indenture.

(e)    If an Event of Default under the Indenture occurs and is continuing with respect to the 3.30% Senior Notes due 2027 and the 3.30% Senior Notes due 2027 have been accelerated as a consequence of such Event of Default, the Trustee may and, subject to Section 9.02 of the Indenture, upon receipt of written instructions of holders of not less than a majority in principal amount of the 3.30% Senior Notes due 2027, and receipt of indemnity or security to its satisfaction, shall exercise such other rights as it shall possess under the Mortgage Indenture as a holder of the 3.30% Collateral Mortgage Bonds due 2027.

91

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 192 of 1367

(f)   With the written consent of the holders of a majority in aggregate principal amount of the outstanding 3.30% Senior Notes due 2027, the Trustee may consent to modifications, amendments, or supplements to (or provide waivers in respect of) the 3.30% Collateral Mortgage Bonds due 2027 and/or the Mortgage Indenture; provided, however, that without the written consent of each holder of a 3.30% Senior Note due 2027, the Trustee shall not consent to any modification, amendment or supplement to (or provide waivers in respect of) the 3.30% Collateral Mortgage Bonds due 2027 and/or the Mortgage Indenture that have the effect of (A) (i) extending the fixed maturity of the 3.30% Collateral Mortgage Bonds due 2027, (ii) changing any terms of any sinking fund or analogous fund or conversion rights with respect to the 3.30% Collateral Mortgage Bonds due 2027, (iii) reducing the rate or extending the time of payment of interest on the 3.30% Collateral Mortgage Bonds due 2027, or reducing the principal amount of the 3.30% Collateral Mortgage Bonds due 2027, or (iv) limiting the right of the Trustee (as the holder of the 3.30% Collateral Mortgage Bonds due 2027) to institute suit for the enforcement of payment of principal of or premium, if any, or interest on the 3.30% Collateral Mortgage Bonds due 2027 in accordance with the terms thereof, or (B) reducing the percentage of Bonds (as defined in the Mortgage Indenture), the holders of which are required to consent to any such supplement, amendment and/or waiver, or (C) permitting the creation by the Company of any Senior Lien (as such term is defined in the Mortgage Indenture) in accordance with the Mortgage Indenture."

Section 1406   The Twenty-Ninth Supplemental Indenture (Amended 211). The Twenty-Ninth Supplemental Indenture is hereby amended by the addition of Section 211 thereto, to read as follows:

"Section 211   Release of Liens in Respect of 3.30% Collateral Mortgage Bonds due 2027; Change of Amounts.

(a) Upon Company Request and the Trustee's receipt of an Officer's Certificate and an Opinion of Counsel from the Company certifying that all conditions to the satisfaction and discharge of the Indenture with respect to the 3.30% Senior Notes due 2027 (but, for avoidance of doubt, not any other series of Bonds then outstanding under the Indenture) in accordance with Section 8.02 of the Base Indenture have been satisfied, the Trustee shall be deemed not to hold a lien on the 3.30% Collateral Mortgage Bonds due 2027 on behalf of the holders of the 3.30% Senior Notes due 2027 and the Trustee shall, upon written request of the Company, deliver to the Company the 3.30% Collateral Mortgage Bonds due 2027, together with such appropriate instruments of transfer or release (in form and substance reasonably satisfactory to the Trustee) as may be reasonably requested by the Company (and at the expense of the Company) to release such lien. All the 3.30% Collateral Mortgage Bonds due 2027 delivered to the Company in accordance with this Section 211 shall be delivered by the Company to the Mortgage Bond Trustee for cancellation.

(b) Following any partial payment, redemption or retirement of the 3.30% Senior Notes due 2027, the Company shall promptly furnish to the Trustee an Officer's Certificate certifying as to such payment, redemption or retirement and the principal amount of the

92

3.30% Senior Notes due 2027 outstanding following such change in aggregate principal amount and directing the Trustee to deliver the 3.30% Collateral Mortgage Bonds due 2027 then held by the Trustee to the Mortgage Bond Trustee in exchange for 3.30% Collateral Mortgage Bonds due 2027 in a principal amount equal to the current outstanding aggregate principal amount so certified in the Officer's Certificate."

Section 1407    The Twenty-Ninth Supplemental Indenture (Amended 212). The Twenty-Ninth Supplemental Indenture is hereby amended by the addition of Section 212 thereto, to read as follows:

"Section 212    Delivery of Non-Payment Notice to Mortgage Bond Trustee. If payment of the principal of, premium, if any, or interest on the 3.30% Senior Notes due 2027 has not been fully paid, deemed to have been paid or otherwise satisfied and discharged when due, the Trustee, acting at the written direction of Holders of a majority in aggregate principal amount of the outstanding 3.30% Senior Notes due 2027, shall deliver a written notice to the Mortgage Bond Trustee stating the amount of such non-payment and that such payment remains unpaid on the date of such notice (which notice shall be given by the Trustee within five Business Days of such direction; *provided, however*, that failure by the Trustee to give such notice shall not affect in any way the Company's obligation to pay such amount)."

Section 1408    The Twenty-Ninth Supplemental Indenture (Amended 213). The Twenty-Ninth Supplemental Indenture is hereby amended by the addition of Section 213 thereto, to read as follows:

"Section 213    No Transfer of 3.30% Collateral Mortgage Bonds due 2027. The Company shall cause all of the 3.30% Collateral Mortgage Bonds due 2027 to be issued and registered in the name of the Trustee. Except (i) as otherwise permitted by the Indenture or (ii) in connection with an assignment to a successor trustee in accordance with the Indenture, the Trustee shall not sell, assign or transfer the 3.30% Collateral Mortgage Bonds due 2027."

Section 1409    Bond Exchange. The Company desires to exchange the original Global Bond representing the 3.30% Senior Notes due 2027, dated March 10, 2017 (the "Original Global Bond") for the amended and restated Global Bond set forth in Exhibit A-15 hereto (which is hereby incorporated herein and made a part hereof) (the "Amended and Restated Global 3.30% Senior Notes due 2027") incorporating the amendments effected by this Thirtieth Supplemental Indenture in accordance with Section 13.06 of the Base Indenture. In connection therewith, the Company has delivered to the Trustee (i) a Company Request for the authentication and delivery of the Amended and Restated Global 3.30% Senior Notes due 2027 and the cancellation of the Original Global Bond, along with an Officer's Certificate and Opinion of Counsel required by the Indenture, and (ii) the Amended and Restated Global 3.30% Senior Notes due 2027 representing the 3.30% Senior Notes due 2027 in the aggregate principal amount of $400,000,000. Upon receipt of the deliverables required by the Indenture, the Trustee shall authenticate the Amended and Restated Global 3.30% Senior Notes due 2027 to be exchanged for the Original Global Bond, cancel the Original Global Bond and deliver the cancelled Original Global Bond to the Company in accordance with the instructions set forth in the Company Request.

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 194 of 1367

# ARTICLE FIFTEEN

## PAYING AGENT, TRANSFER AGENT AND BOND REGISTRAR

Section 1501   Paying Agent, Transfer Agent and Bond Registrar.

The Trustee is hereby appointed as successor Paying Agent, transfer agent and Bond Registrar for the Secured Bonds. Place of Payment of the Secured Bonds shall be the Corporate Trust Office of the Trustee.

# ARTICLE SIXTEEN

## MISCELLANEOUS PROVISIONS

Section 1601   Concerning the Trustee.

In acting under and by virtue of this Thirtieth Supplemental Indenture, the Trustee shall have all of the rights, protections, privileges, indemnities and immunities given to it in the Base Indenture. The Trustee shall have no responsibility for the validity or sufficiency of this Thirtieth Supplemental Indenture. The recitals contained herein shall be taken as the statements of the Company, and the Trustee assumes no responsibility for their correctness.

Section 1602   Application of Thirtieth Supplemental Indenture.

Except as provided herein, each and every term and condition contained in this Thirtieth Supplemental Indenture that modifies, amends or supplements the terms and conditions of the Indenture shall apply only to the Secured Bonds and not to any other series of Bonds established under the Indenture. Except as specifically amended and supplemented by, or to the extent inconsistent with, this Thirtieth Supplemental Indenture, the Indenture shall remain in full force and effect and is hereby ratified and confirmed.

Section 1603   Effective Date of Thirtieth Supplemental Indenture.

This Thirtieth Supplemental Indenture shall be effective upon the execution and delivery hereof by each of the parties hereto.

Section 1604   Governing Law.

The laws of the State of California shall govern this Thirtieth Supplemental Indenture and the Secured Bonds, without giving effect to applicable principles of conflicts of law to the extent that the application of the laws of another jurisdiction would be required thereby.

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 195 of 1367

Section 1605    Counterparts.

This Thirtieth Supplemental Indenture may be executed in any number of counterparts, and each of such counterparts shall together constitute but one and the same instrument. Delivery of an executed Thirtieth Supplemental Indenture by one party to the other may be made by facsimile, electronic mail (including any electronic signature complying with the New York Electronic Signatures and Records Act (N.Y. State Tech. §§ 301-309), as amended from time to time, or other applicable law) or other transmission method, and the parties hereto agree that any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

95

IN WITNESS WHEREOF, the parties hereto have caused this Thirtieth Supplemental Indenture to be duly executed by their respective officers hereunto duly authorized, all as of the day and year first above written.

**PACIFIC GAS AND ELECTRIC COMPANY,**
as Issuer

By: /s/ Margaret K. Becker
Name:  Margaret K. Becker
Title:    Senior Director and Treasurer

**BOKF, N.A.,**
as Trustee

By: /s/ George F. Kubin
Name:  George F. Kubin
Title:    Senior Vice President

**Signature Page to Thirtieth Supplemental Indenture**

96

<div align="center">

**EXHIBIT A-1**

**FORM OF AMENDED AND RESTATED 4.50% SENIOR NOTE DUE 2041**

</div>

[IF THIS SECURITY IS TO BE A GLOBAL BOND -] THIS SENIOR NOTE IS A BOND AND A GLOBAL BOND WITHIN THE MEANING OF THE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF A DEPOSITARY OR A NOMINEE THEREOF. UNLESS AND UNTIL IT IS EXCHANGED IN WHOLE OR IN PART FOR SENIOR NOTES IN DEFINITIVE FORM, THIS SENIOR NOTE MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY OR BY THE DEPOSITARY OR ANY SUCH NOMINEE TO A SUCCESSOR DEPOSITARY OR A NOMINEE OF SUCH SUCCESSOR DEPOSITARY.

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE COMPANY OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

THE FOLLOWING SUMMARY OF TERMS IS SUBJECT TO THE INFORMATION SET FORTH ON THE REVERSE HEREOF:

| PRINCIPAL AMOUNT : | ORIGINAL ISSUE DATE: | INTEREST RATE: 4.50% per annum |
|---|---|---|
| $250,000,000 | December 1, 2011 | |

| MATURITY DATE: | INTEREST PAYMENT DATES: | THIS SENIOR NOTE IS A: |
|---|---|---|
| December 15, 2041 | June 15 and December 15, commencing June 15, 2012 | X  Global Book-Entry Bond<br>☐  Certificated Bond |

REGISTERED OWNER:

<div align="center">

PACIFIC GAS AND ELECTRIC COMPANY

AMENDED AND RESTATED 4.50% SENIOR NOTES DUE DECEMBER 15, 2041

(Fixed Rate)

</div>

No. R-1                                                         Principal Amount: $250,000,000

CUSIP No: 694308 GY7

PACIFIC GAS AND ELECTRIC COMPANY, a corporation duly organized and existing under the laws of the State of California (herein called the "Company," which term includes any successor Person pursuant to the applicable provisions of the Indenture hereinafter referred to), for value received, hereby promises to pay to Cede & Co., as nominee for The Depository Trust Company, or registered assigns, the Principal Amount stated above on the Maturity Date stated above, and to pay interest thereon from and including the Original Issue Date stated above or, in the case of a 4.50% Senior Note due December 15, 2041 issued upon the registration of transfer or exchange, from and including the most recent Interest Payment Date to which interest has been paid or duly provided for, semi-annually in arrears on the Interest Payment Dates set forth above and on the Maturity Date stated above, commencing June 15, 2012 at the rate of 4.50% per annum until the principal hereof is paid or made available for payment. The interest so payable, and punctually paid or duly provided for, on any Interest Payment Date will, as provided in such Indenture, be paid to the Person in whose name this 4.50% Senior Note due December 15, 2041 (this "Senior Note," and together with all other 4.50% Senior Notes due December 15, 2041, the "Senior Notes") (or one or more Predecessor Bonds) is registered at the close of business on the Regular Record Date for such interest, which shall be the 15th day preceding such Interest Payment Date; provided, however, that interest payable at the Maturity Date or on a Redemption Date will be paid to the Person to whom principal is payable. Any such interest not so punctually paid or duly provided for will forthwith cease to be payable to the Holder on such Regular Record Date and may either be paid to the Person in whose name this Senior Note (or one or more Predecessor Bonds) is registered at the close of business on a Special Record Date for the payment of such Defaulted Interest to be fixed by the Trustee, notice whereof shall be given to Holders of Senior Notes not less than 10 days prior to such Special Record Date, or be paid at any time in any other lawful manner not inconsistent with the requirements of the Indenture and any securities exchange, if any, on which the Senior Notes may be listed, and upon such notice as may be required by any such exchange, all as more fully provided in said Indenture.

Payments of interest on this Senior Note will include interest accrued to but excluding the respective Interest Payment Dates. Interest payments for this Senior Note shall be computed and paid on the basis of the 360-day year of twelve 30-day months and will accrue from December 1, 2011 or from the most recent Interest Payment Date to which interest has been paid or duly provided for. In the event that any date on which interest is payable on this Senior Note (other than the Maturity Date) is not a Business Day then payment of the interest payable on such date will be made on the next succeeding day that is a Business Day (and without any interest or payment in respect of any such delay) with the same force and effect as if made on the date the payment was originally payable. If the Maturity Date falls on a day that is not a Business Day, the payment of principal, premium, if any, and interest may be made on the next succeeding Business Day, and no interest on such payment shall accrue for the period from and after maturity.

Payment of principal of, premium, if any, and interest on Senior Notes shall be made in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts. Payments of principal of, premium, if any, and interest on the Senior Notes represented by a Global Bond shall be made by wire transfer of immediately available funds to the Holder of such Global Bond, provided that, in the case of payments of principal and premium, if any, such Global Bond is first surrendered to the Paying Agent. If any of the Senior Notes are no longer represented by a Global Bond, (i) payments of principal, premium, if any, and interest due on the Maturity Date or earlier redemption of such Senior Notes shall be made at the office of the Paying Agent upon surrender of such Senior Notes to the Paying Agent, and (ii) payments of interest shall be made, at the option of the Company, subject to such surrender where applicable, (A) by check mailed to the address of the Person entitled thereto as such address shall appear in the Bond Register or (B) by wire transfer to registered Holders of at least $10,000,000 in principal amount of Senior Notes at such place and to such account at a banking institution in the United States as such Holders may designate in writing to the Trustee at least sixteen (16) days prior to the date for payment.

REFERENCE IS HEREBY MADE TO THE FURTHER PROVISIONS OF THIS SENIOR NOTE SET FORTH ON THE REVERSE HEREOF, WHICH FURTHER PROVISIONS SHALL FOR ALL PURPOSES HAVE THE SAME EFFECT AS IF SET FORTH AT THIS PLACE.

Unless the certificate of authentication hereon has been executed by the Trustee referred to on the reverse hereof by manual signature, this Senior Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose.

IN WITNESS WHEREOF, the Company has caused this instrument to be duly executed.

Dated:

PACIFIC GAS AND ELECTRIC COMPANY

By: _____

    Name:

    Title:

By: _____

    Name:

    Title:

This Senior Note is one of the Bonds of the series designated as Bonds of the Thirty-Fifth Series referred to in the within-mentioned Indenture.

Dated:

BOKF, N.A., *As Trustee*

By: _____
*Authorized Signatory*

**Reverse of Amended and Restated 4.50% Senior Note due December 15, 2041**

This Senior Note is one of a duly authorized issue of Bonds of the Company, issued and issuable in one or more series under an Amended and Restated Indenture, dated as of April 22, 2005 (the "Base Indenture"), as previously supplemented and as further supplemented by a Sixteenth Supplemental Indenture, dated as of December 1, 2011, and as amended by the Thirtieth Supplemental Indenture, dated as of July 1, 2020 (as so amended and supplemented, and together with all additional indentures supplemental thereto, and any constituent instruments establishing the terms of particular Bonds, being herein called the "Indenture"), between the Company and BOKF, N.A., as Trustee (herein called the "Trustee," which term includes any successor trustee under the Indenture), and reference is hereby made to the Indenture for a description of the respective rights, limitations of rights, duties and immunities of the Company, the Trustee and the Holders of Bonds thereunder and of the terms and conditions upon which Bonds are, and are to be, authenticated and delivered. This Senior Note is a Bond within the meaning of the Indenture and is one of the Bonds of the thirty-fifth series designated as the 4.50% Senior Notes due December 15, 2041 established by the Company under the Indenture. The acceptance of this Senior Note shall be deemed to constitute the consent and agreement by the Holder hereof to all of the terms and provisions of the Indenture.

The Senior Notes will be secured by a series of first mortgage bonds (the "4.50% Collateral Mortgage Bonds due 2041") delivered by the Company to the Trustee for the benefit of the Holders of the Senior Notes, issued pursuant to the Second Supplemental Indenture, dated as of July 1, 2020 to the Indenture of Mortgage, dated as of June 19, 2020, between the Company and The Bank of New York Mellon Trust Company, N.A., as trustee (as so supplemented, the "Mortgage Indenture"). Reference is made to the Indenture and the Mortgage Indenture for a description of the rights of the Trustee as holder of the 4.50% Collateral Mortgage Bonds due 2041, the property mortgaged and pledged, the nature and extent of the security and rights of the holders of the first mortgage bonds under the Mortgage Indenture and the rights of the Company under the Mortgage Indenture and the terms and conditions upon which the Senior Notes are secured.

Subject to the terms and conditions of the Indenture, the Senior Notes are redeemable at the option of the Company ("Optional Redemption"), in whole or in part, (a) at any time prior to June 15, 2041 at a Redemption Price equal to the greater of:

(i) 100% of the principal amount of the Senior Notes to be redeemed; or

(ii) as determined by the Quotation Agent, the sum of the present values of the Remaining Scheduled Payments of principal and interest on the Senior Notes to be redeemed (not including any portion of payments of interest accrued as of the Redemption Date) discounted to the Redemption Date on a semi-annual basis at the Adjusted Treasury Rate, plus 25 basis points,

plus, in either of the above cases, accrued and unpaid interest thereon to but not including the Redemption Date; and (b) at any time on or after June 15, 2041, at 100% of the principal amount of the Senior Notes to be redeemed, plus accrued and unpaid interest thereon to but not including the Redemption Date.

Interest installments whose Stated Maturity is on or prior to such Redemption Date will be payable to Holders of such Senior Notes, or one or more Predecessor Bonds, of record at the close of business on the relevant Record Dates referred to on the face hereof, all as provided in the Indenture.

In the case of an Optional Redemption, notice of redemption will be in writing and mailed first-class postage-prepaid not less than 30 days nor more than 60 days prior to the Redemption Date to each Holder of Senior Notes to be redeemed at the Holder's registered address; provided, however, that such notice need not state the dollar amount of the Redemption Price if such dollar amount has not been determined as of the date such notice is being given to the Holders of the Senior Notes being redeemed. If money sufficient to pay the Redemption Price of all Senior Notes (or portions thereof) to be redeemed on the Redemption Date is deposited with the Paying Agent or the Trustee on or prior to the Redemption Date, from and after such Redemption Date such Senior Notes or portions thereof shall cease to bear interest. Senior Notes in denominations larger than $1,000 in principal amount may be redeemed in part but only in integral multiples of $1,000.

In the event of redemption of this Senior Note in part only, a new Senior Note or Senior Notes of like tenor for the unredeemed portion hereof will be issued in the name of the Holder hereof upon the surrender hereof.

As provided in the Indenture and subject to certain limitations therein set forth, this Senior Note or any portion of the principal amount hereof will be deemed to have been paid for all purposes of the Indenture and to be no longer Outstanding thereunder, and the Company's entire indebtedness in respect thereof will be satisfied and discharged, if there has been irrevocably deposited with the Trustee or any Paying Agent (other than the Company), in trust, money in an amount which will be sufficient and/or Eligible Obligations, the principal of and interest on which when due, without regard to any reinvestment thereof, will provide moneys which, together with money, if any, deposited with or held by the Trustee or such Paying Agent, will be sufficient to pay when due the principal of and premium, if any, and interest on this Senior Note when due.

If an Event of Default shall occur and be continuing, the Trustee or the Holders of not less than 33% in aggregate principal amount of the Outstanding Bonds, considered as one class, may declare the principal amount of all Bonds then Outstanding to be due and payable immediately by notice in writing to the Company (and to the Trustee if given by Holders); provided, however, that with respect to certain Events of Default relating to bankruptcy, insolvency and similar events, the principal amount of all Bonds then Outstanding shall be due and payable immediately without further action by the Trustee or the Holders.

The Indenture permits, with certain exceptions as therein provided, the Company and the Trustee to enter into one or more supplemental indentures for the purpose of adding any provisions to, or changing in any manner or eliminating any of the provisions of, the Indenture with the consent of the Holders of not less than a majority in aggregate principal amount of the Bonds at the time Outstanding, considered as one class; provided, however, that if there shall be Bonds of more than one series Outstanding under the Indenture and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such series, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all series so directly affected, considered as one class, shall be required; and

provided, further, that if the Bonds of any series shall have been issued in more than one Tranche and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such Tranches, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all Tranches so directly affected, considered as one class, shall be required; and provided, further, that the Indenture permits the Company and the Trustee to enter into one or more supplemental indentures for certain purposes without the consent of any Holders of Bonds. The Indenture also contains provisions permitting the Holders of a majority in aggregate principal amount of Bonds, on behalf of the Holders of all such Bonds, to waive certain past defaults under the Indenture and their consequences. Any such consent or waiver by the Holder of this Senior Note shall be conclusive and binding upon such Holder and upon all future Holders of this Senior Note and of any Senior Note issued upon the registration of transfer hereof or in exchange herefor or in lieu hereof, whether or not notation of such consent or waiver is made upon this Senior Note.

As provided in and subject to the provisions of the Indenture, the Holder of this Senior Note shall not have the right to institute any proceeding with respect to the Indenture or for the appointment of a receiver or trustee or for any other remedy thereunder, unless such Holder shall have previously given the Trustee written notice of a continuing Event of Default, the Holders of at least 33% in aggregate principal amount of the Bonds at the time Outstanding shall have made written request to the Trustee to institute proceedings in respect of such Event of Default as Trustee and offered the Trustee reasonable indemnity, and the Trustee shall not have received from the Holders of at least a majority in aggregate principal amount of Bonds at the time Outstanding a direction inconsistent with such written request, and shall have failed to institute any such proceeding for 60 days after receipt of such notice, request and offer of indemnity. The foregoing shall not apply to any suit instituted by the Holder of this Senior Note for the enforcement of any payment of principal hereof or any premium or interest hereon on or after the respective due dates expressed herein.

No reference herein to the Indenture and no provision of this Senior Note or of the Indenture shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal of and any premium and interest on this Senior Note at the times, place and rate, and in the coin or currency, herein prescribed.

As provided in the Indenture and subject to certain limitations therein set forth, the transfer of this Senior Note is registrable in the Bond Register, upon surrender of this Senior Note for registration of transfer at the office or agency of the Company in any place where the principal of and any premium and interest on this Senior Note are payable, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Company, the Trustee or the Bond Registrar, as the case may be, duly executed by the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new Senior Notes of like tenor, of authorized denominations and for the same aggregate principal amount, will be issued to the designated transferee or transferees.

The Senior Notes are issuable only in registered form without coupons in denominations of $1,000 and any integral multiple thereof. As provided in the Indenture and subject to certain limitations therein set forth, Senior Notes are exchangeable for a like aggregate principal amount of Senior Notes and of like tenor of a different authorized denomination, as requested by the Holder surrendering the same.

No service charge shall be made for any such registration of transfer or exchange, but the Company may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

The Company shall not be required to execute or to provide for the registration of the transfer of or the exchange of (A) any Senior Note of this series during a period of 15 days immediately preceding the date notice is to be given identifying the serial numbers of the Senior Notes called for redemption, or (B) any Senior Note selected for redemption in whole or in part, except the undeemed portion of any Senior Note being redeemed in part.

Prior to due presentment of this Senior Note for registration of transfer, the Company, the Trustee and any agent of the Company or the Trustee may treat the Person in whose name this Senior Note is registered as the owner hereof for all purposes, whether or not this Senior Note is overdue, and neither the Company, the Trustee nor any such agent shall be affected by notice to the contrary.

This Senior Note shall be governed by, and construed and enforced in accordance with, the laws of the State of California without regard to the principles of conflicts of laws thereunder, except to the extent that the Trust Indenture Act shall be applicable.

As provided in the Indenture, no recourse shall be had for the payment of the principal of, premium, if any, or interest with respect to this Senior Note, or any part thereof, or for any claim based hereon or otherwise in respect hereof, or of the indebtedness represented hereby, or upon any obligation, covenant or agreement under the Indenture, against any incorporator, shareholder, officer or director, as such, past, present or future, of the Company or of any predecessor or successor corporation (either directly or through the Company or a predecessor or successor corporation), whether by virtue of any constitutional provision, statute or rule of law or by the enforcement of any assessment or penalty or otherwise; it being expressly agreed and understood that the Indenture and all the Bonds are solely corporate obligations and that any such personal liability is hereby expressly waived and released as a condition of, and as part of the consideration for, the execution of the Indenture and the issuance of this Senior Note.

All terms used in this Senior Note which are not defined herein shall have the meanings assigned to them in the Indenture.

**ASSIGNMENT FORM**

To assign this Senior Note, fill in the form below: (I) or (we) assign and transfer this Senior Note to

_____
(Insert assignee's soc. sec. or tax I.D. no.)

_____

_____

_____
(Print or type assignee's name, address and zip code)

and irrevocably appoint
to transfer this Senior Note on the books of the Company. The agent may substitute another to act for him.

_____

Date:

Your signature:
(Sign exactly as your name appears on the face of this Senior Note)

Tax Identification No.:

SIGNATURE GUARANTEE:

_____
Signatures must be guaranteed by an "eligible guarantor institution"
meeting the requirements of the Bond Registrar, which requirements include
membership or participation in the Securities Transfer Agent Medallion
Program ("*STAMP*") or such other "signature guarantee program" as may be
determined by the Bond Registrar in addition to, or in substitution for,
STAMP, all in accordance with the Securities Exchange Act of 1934, as
amended.

**FORM OF AMENDED AND RESTATED 4.45% SENIOR NOTES DUE 2042**

[IF THIS SECURITY IS TO BE A GLOBAL BOND -] THIS SENIOR NOTE IS A BOND AND A GLOBAL BOND WITHIN THE MEANING OF THE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF A DEPOSITARY OR A NOMINEE THEREOF. UNLESS AND UNTIL IT IS EXCHANGED IN WHOLE OR IN PART FOR SENIOR NOTES IN DEFINITIVE FORM, THIS SENIOR NOTE MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY OR BY THE DEPOSITARY OR ANY SUCH NOMINEE TO A SUCCESSOR DEPOSITARY OR A NOMINEE OF SUCH SUCCESSOR DEPOSITARY.

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE COMPANY OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

THE FOLLOWING SUMMARY OF TERMS IS SUBJECT TO THE INFORMATION SET FORTH ON THE REVERSE HEREOF:

| PRINCIPAL AMOUNT: | ORIGINAL ISSUE DATE: | INTEREST RATE: 4.45% per annum |
|---|---|---|
| $400,000,000 | April 16, 2012 | |

| MATURITY DATE: | INTEREST PAYMENT DATES: | THIS SENIOR NOTE IS A: |
|---|---|---|
| April 15, 2042 | April 15 and October 15, commencing October 15, 2012 | X  Global Book-Entry Bond |
| | | ☐  Certificated Bond |

REGISTERED OWNER:

<center>PACIFIC GAS AND ELECTRIC COMPANY</center>

<center>AMENDED AND RESTATED 4.45% SENIOR NOTES DUE APRIL 15, 2042</center>

<center>(Fixed Rate)</center>

No. R-                                                                                                   Principal Amount: $400,000,000
CUSIP No: 694308 GZ4

PACIFIC GAS AND ELECTRIC COMPANY, a corporation duly organized and existing under the laws of the State of California (herein called the "Company," which term includes any successor Person pursuant to the applicable provisions of the Indenture hereinafter referred to), for value received, hereby promises to pay to Cede & Co., as nominee for The Depository Trust Company, or registered assigns, the Principal Amount stated above on the Maturity Date stated above, and to pay interest thereon from and including the Original Issue Date stated above or, in the case of a 4.45% Senior Note due April 15, 2042 issued upon the registration of transfer or exchange, from and including the most recent Interest Payment Date to which interest has been paid or duly provided for, semi-annually in arrears on the Interest Payment Dates set forth above and on the Maturity Date stated above, commencing October 15, 2012 at the rate of 4.45% per annum until the principal hereof is paid or made available for payment. The interest so payable, and punctually paid or duly provided for, on any Interest Payment Date will, as provided in such Indenture, be paid to the Person in whose name this 4.45% Senior Note due April 15, 2042 (this "Senior Note," and together with all other 4.45% Senior Notes due April 15, 2042, the "Senior Notes") (or one or more Predecessor Bonds) is registered at the close of business on the Regular Record Date for such interest, which shall be the 15th day preceding such Interest Payment Date; provided, however, that interest payable at the Maturity Date or on a Redemption Date will be paid to the Person to whom principal is payable. Any such interest not so punctually paid or duly provided for will forthwith cease to be payable to the Holder on such Regular Record Date and may either be paid to the Person in whose name this Senior Note (or one or more Predecessor Bonds) is registered at the close of business on a Special Record Date for the payment of such Defaulted Interest to be fixed by the Trustee, notice whereof shall be given to Holders of Senior Notes not less than 10 days prior to such Special Record Date, or be paid at any time in any other lawful manner not inconsistent with the requirements of the Indenture and any securities exchange, if any, on which the Senior Notes may be listed, and upon such notice as may be required by any such exchange, all as more fully provided in said Indenture.

Payments of interest on this Senior Note will include interest accrued to but excluding the respective Interest Payment Dates. Interest payments for this Senior Note shall be computed and paid on the basis of the 360-day year of twelve 30-day months and will accrue from April 16, 2012 or from the most recent Interest Payment Date to which interest has been paid or duly provided for. In the event that any date on which interest is payable on this Senior Note (other than the Maturity Date) is not a Business Day then payment of the interest payable on such date will be made on the next succeeding day that is a Business Day (and without any interest or payment in respect of any such delay) with the same force and effect as if made on the date the payment was originally payable. If the Maturity Date falls on a day that is not a Business Day, the payment of principal, premium, if any, and interest may be made on the next succeeding Business Day, and no interest on such payment shall accrue for the period from and after maturity.

Payment of principal of, premium, if any, and interest on Senior Notes shall be made in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts. Payments of principal of, premium, if any, and interest on the Senior Notes represented by a Global Bond shall be made by wire transfer of immediately available funds to the Holder of such Global Bond, provided that, in the case of payments of principal and premium, if any, such Global Bond is first surrendered to the Paying Agent. If any of the Senior Notes are no longer represented by a Global Bond, (i) payments of principal, premium, if any, and interest due on the Maturity Date or earlier redemption of such Senior Notes shall be made at the office of the Paying Agent upon surrender of such Senior Notes to the Paying Agent, and (ii) payments of interest shall be made, at the option of the Company, subject to such surrender where applicable, (A) by check mailed to the address of the Person entitled thereto as such address shall appear in the Bond Register or (B) by wire transfer to registered Holders of at least $10,000,000 in principal amount of Senior Notes at such place and to such account at a banking institution in the United States as such Holders may designate in writing to the Trustee at least sixteen (16) days prior to the date for payment.

REFERENCE IS HEREBY MADE TO THE FURTHER PROVISIONS OF THIS SENIOR NOTE SET FORTH ON THE REVERSE HEREOF, WHICH FURTHER PROVISIONS SHALL FOR ALL PURPOSES HAVE THE SAME EFFECT AS IF SET FORTH AT THIS PLACE.

Unless the certificate of authentication hereon has been executed by the Trustee referred to on the reverse hereof by manual signature, this Senior Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose.

IN WITNESS WHEREOF, the Company has caused this instrument to be duly executed.

Dated:

PACIFIC GAS AND ELECTRIC COMPANY

By: _____
     Name:
     Title:

By: _____
     Name:
     Title:

## TRUSTEE'S CERTIFICATE OF AUTHENTICATION

This Senior Note is one of the Bonds of the series designated as Bonds of the Thirty-Sixth Series referred to in the within-mentioned Indenture.

Dated:

BOKF, N.A., As Trustee

By: _____
Authorized Signatory

This Senior Note is one of a duly authorized issue of Bonds of the Company, issued and issuable in one or more series under an Amended and Restated Indenture, dated as of April 22, 2005 (the "Base Indenture"), as previously supplemented and as further supplemented by a Seventeenth Supplemental Indenture, dated as of April 16, 2012, and as amended by the Thirtieth Supplemental Indenture, dated as of July 1, 2020 (as so amended and supplemented, and together with all additional indentures supplemental thereto, and any constituent instruments establishing the terms of particular Bonds, being herein called the "Indenture"), between the Company and BOKF, N.A., as Trustee (herein called the "Trustee," which term includes any successor trustee under the Indenture), and reference is hereby made to the Indenture for a description of the respective rights, limitations of rights, duties and immunities of the Company, the Trustee and the Holders of Bonds thereunder and of the terms and conditions upon which Bonds are, and are to be, authenticated and delivered. This Senior Note is a Bond within the meaning of the Indenture and is one of the Bonds of the thirty-sixth series designated as the 4.45% Senior Notes due April 15, 2042 established by the Company under the Indenture. The acceptance of this Senior Note shall be deemed to constitute the consent and agreement by the Holder hereof to all of the terms and provisions of the Indenture.

The Senior Notes will be secured by a series of first mortgage bonds (the "4.45% Collateral Mortgage Bonds due 2042") delivered by the Company to the Trustee for the benefit of the Holders of the Senior Notes, issued pursuant to the Second Supplemental Indenture, dated as of July 1, 2020 to the Indenture of Mortgage, dated as of June 19, 2020, between the Company and The Bank of New York Mellon Trust Company, N.A., as trustee (as so supplemented, the "Mortgage Indenture"). Reference is made to the Indenture and the Mortgage Indenture for a description of the rights of the Trustee as holder of the 4.45% Collateral Mortgage Bonds due 2042, the property mortgaged and pledged, the nature and extent of the security and rights of the holders of the first mortgage bonds under the Mortgage Indenture and the rights of the Company under the Mortgage Indenture and the terms and conditions upon which the Senior Notes are secured.

Subject to the terms and conditions of the Indenture, the Senior Notes are redeemable at the option of the Company ("Optional Redemption"), in whole or in part, (a) at any time prior to October 15, 2041 at a Redemption Price equal to the greater of:

(i) 100% of the principal amount of the Senior Notes to be redeemed; or

(ii) as determined by the Quotation Agent, the sum of the present values of the Remaining Scheduled Payments of principal and interest on the Senior Notes to be redeemed (not including any portion of payments of interest accrued as of the Redemption Date) discounted to the Redemption Date on a semi-annual basis at the Adjusted Treasury Rate, plus 20 basis points,

plus, in either of the above cases, accrued and unpaid interest thereon to but not including the Redemption Date; and (b) at any time on or after October 15, 2041 at 100% of the principal amount of the Senior Notes to be redeemed, plus accrued and unpaid interest thereon to but not including the Redemption Date.

Interest installments whose Stated Maturity is on or prior to such Redemption Date will be payable to Holders of such Senior Notes, or one or more Predecessor Bonds, of record at the close of business on the relevant Record Dates referred to on the face hereof, all as provided in the Indenture.

In the case of an Optional Redemption, notice of redemption will be in writing and mailed first-class postage-prepaid not less than 30 days nor more than 60 days prior to the Redemption Date to each Holder of Senior Notes to be redeemed at the Holder's registered address; provided, however, that such notice need not state the dollar amount of the Redemption Price if such dollar amount has not been determined as of the date such notice is being given to the Holders of the Senior Notes being redeemed. If money sufficient to pay the Redemption Price of all Senior Notes (or portions thereof) to be redeemed on the Redemption Date is deposited with the Paying Agent or the Trustee on or prior to the Redemption Date, from and after such Redemption Date such Senior Notes or portions thereof shall cease to bear interest. Senior Notes in denominations larger than $1,000 in principal amount may be redeemed in part but only in integral multiples of $1,000.

In the event of redemption of this Senior Note in part only, a new Senior Note or Senior Notes of like tenor for the unredeemed portion hereof will be issued in the name of the Holder hereof upon the surrender hereof.

As provided in the Indenture and subject to certain limitations therein set forth, this Senior Note or any portion of the principal amount hereof will be deemed to have been paid for all purposes of the Indenture and to be no longer Outstanding thereunder, and the Company's entire indebtedness in respect thereof will be satisfied and discharged, if there has been irrevocably deposited with the Trustee or any Paying Agent (other than the Company), in trust, money in an amount which will be sufficient and/or Eligible Obligations, the principal of and interest on which when due, without regard to any reinvestment thereof, will provide moneys which, together with money, if any, deposited with or held by the Trustee or such Paying Agent, will be sufficient to pay when due the principal of and premium, if any, and interest on this Senior Note when due.

If an Event of Default shall occur and be continuing, the Trustee or the Holders of not less than 33% in aggregate principal amount of the Outstanding Bonds, considered as one class, may declare the principal amount of all Bonds then Outstanding to be due and payable immediately by notice in writing to the Company (and to the Trustee if given by Holders); provided, however, that with respect to certain Events of Default relating to bankruptcy, insolvency and similar events, the principal amount of all Bonds then Outstanding shall be due and payable immediately without further action by the Trustee or the Holders.

The Indenture permits, with certain exceptions as therein provided, the Company and the Trustee to enter into one or more supplemental indentures for the purpose of adding any provisions to, or changing in any manner or eliminating any of the provisions of, the Indenture with the consent of the Holders of not less than a majority in aggregate principal amount of the Bonds at the time Outstanding, considered as one class; provided, however, that if there shall be Bonds of more than one series Outstanding under the Indenture and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all,

of such series, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all series so directly affected, considered as one class, shall be required; and provided, further, that if the Bonds of any series shall have been issued in more than one Tranche and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such Tranches, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all Tranches so directly affected, considered as one class, shall be required; and provided, further, that the Indenture permits the Company and the Trustee to enter into one or more supplemental indentures for certain purposes without the consent of any Holders of Bonds. The Indenture also contains provisions permitting the Holders of a majority in aggregate principal amount of Bonds, on behalf of the Holders of all such Bonds, to waive certain past defaults under the Indenture and their consequences. Any such consent or waiver by the Holder of this Senior Note shall be conclusive and binding upon such Holder and upon all future Holders of this Senior Note and of any Senior Note issued upon the registration of transfer hereof or in exchange herefor or in lieu hereof, whether or not notation of such consent or waiver is made upon this Senior Note.

As provided in and subject to the provisions of the Indenture, the Holder of this Senior Note shall not have the right to institute any proceeding with respect to the Indenture or for the appointment of a receiver or trustee or for any other remedy thereunder, unless such Holder shall have previously given the Trustee written notice of a continuing Event of Default, the Holders of at least 33% in aggregate principal amount of the Bonds at the time Outstanding shall have made written request to the Trustee to institute proceedings in respect of such Event of Default as Trustee and offered the Trustee reasonable indemnity, and the Trustee shall not have received from the Holders of at least a majority in aggregate principal amount of Bonds at the time Outstanding a direction inconsistent with such written request, and shall have failed to institute any such proceeding for 60 days after receipt of such notice, request and offer of indemnity. The foregoing shall not apply to any suit instituted by the Holder of this Senior Note for the enforcement of any payment of principal hereof or any premium or interest hereon on or after the respective due dates expressed herein.

No reference herein to the Indenture and no provision of this Senior Note or of the Indenture shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal of and any premium and interest on this Senior Note at the times, place and rate, and in the coin or currency, herein prescribed.

As provided in the Indenture and subject to certain limitations therein set forth, the transfer of this Senior Note is registrable in the Bond Register, upon surrender of this Senior Note for registration of transfer at the office or agency of the Company in any place where the principal of and any premium and interest on this Senior Note are payable, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Company, the Trustee or the Bond Registrar, as the case may be, duly executed by the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new Senior Notes of like tenor, of authorized denominations and for the same aggregate principal amount, will be issued to the designated transferee or transferees.

The Senior Notes are issuable only in registered form without coupons in denominations of $1,000 and any integral multiple thereof. As provided in the Indenture and subject to certain

limitations therein set forth, Senior Notes are exchangeable for a like aggregate principal amount of Senior Notes and of like tenor of a different authorized denomination, as requested by the Holder surrendering the same.

No service charge shall be made for any such registration of transfer or exchange, but the Company may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

The Company shall not be required to execute or to provide for the registration of the transfer of or the exchange of (A) any Senior Note of this series during a period of 15 days immediately preceding the date notice is to be given identifying the serial numbers of the Senior Notes called for redemption, or (B) any Senior Note selected for redemption in whole or in part, except the unredeemed portion of any Senior Note being redeemed in part.

Prior to due presentment of this Senior Note for registration of transfer, the Company, the Trustee and any agent of the Company or the Trustee may treat the Person in whose name this Senior Note is registered as the owner hereof for all purposes, whether or not this Senior Note is overdue, and neither the Company, the Trustee nor any such agent shall be affected by notice to the contrary.

This Senior Note shall be governed by, and construed and enforced in accordance with, the laws of the State of California without regard to the principles of conflicts of laws thereunder, except to the extent that the Trust Indenture Act shall be applicable.

As provided in the Indenture, no recourse shall be had for the payment of the principal of, premium, if any, or interest with respect to this Senior Note, or any part thereof, or for any claim based hereon or otherwise in respect hereof, or of the indebtedness represented hereby, or upon any obligation, covenant or agreement under the Indenture, against any incorporator, shareholder, officer or director, as such, past, present or future, of the Company or of any predecessor or successor corporation (either directly or through the Company or a predecessor or successor corporation), whether by virtue of any constitutional provision, statute or rule of law or by the enforcement of any assessment or penalty or otherwise; it being expressly agreed and understood that the Indenture and all the Bonds are solely corporate obligations and that any such personal liability is hereby expressly waived and released as a condition of, and as part of the consideration for, the execution of the Indenture and the issuance of this Senior Note.

All terms used in this Senior Note which are not defined herein shall have the meanings assigned to them in the Indenture.

**ASSIGNMENT FORM**

To assign this Senior Note, fill in the form below: (I) or (we) assign and transfer this Senior Note to

_____
(Insert assignee's soc. sec. or tax I.D. no.)

_____

_____

_____

_____
(Print or type assignee's name, address and zip code)

and irrevocably appoint _____ to transfer this Senior Note on the books of the
Company. The agent may substitute another to act for him.

_____

Date:

Your signature: _____
(Sign exactly as your name appears on the face of this Senior Note)

Tax Identification No.:

SIGNATURE GUARANTEE:

_____

Signatures must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Bond Registrar, which requirements include membership or participation in the Securities Transfer Agent Medallion Program ("*STAMP*") or such other "signature guarantee program" as may be determined by the Bond Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

**FORM OF AMENDED AND RESTATED 3.75% SENIOR NOTES**
**DUE AUGUST 15, 2042**

THIS SENIOR NOTE IS A BOND AND A GLOBAL BOND WITHIN THE MEANING OF THE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF A DEPOSITARY OR A NOMINEE THEREOF. UNLESS AND UNTIL IT IS EXCHANGED IN WHOLE OR IN PART FOR SENIOR NOTES IN DEFINITIVE FORM, THIS SENIOR NOTE MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY OR BY THE DEPOSITARY OR ANY SUCH NOMINEE TO A SUCCESSOR DEPOSITARY OR A NOMINEE OF SUCH SUCCESSOR DEPOSITARY.

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE COMPANY OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

THE FOLLOWING SUMMARY OF TERMS IS SUBJECT TO THE INFORMATION SET FORTH ON THE REVERSE HEREOF:

| | | |
|---|---|---|
| PRINCIPAL AMOUNT :<br>$350,000,000 | ORIGINAL ISSUE DATE:<br>August 16, 2012 | INTEREST RATE: 3.75%<br>per annum |
| MATURITY DATE:<br>August 15, 2042 | INTEREST PAYMENT DATES:<br>February 15 and August 15, commencing<br>February 15, 2013 | THIS SENIOR NOTE IS A:<br>☐ Global Book-Entry Bond<br><br>☐ Certificated Bond |

REGISTERED OWNER: Cede & Co., as nominee of The Depository Trust Company

AMENDED AND RESTATED 3.75% SENIOR NOTES DUE AUGUST 15, 2042
(Fixed Rate)

No. R-1                                                                                                    Principal Amount: $350,000,000
CUSIP No: 694308 HA8

PACIFIC GAS AND ELECTRIC COMPANY, a corporation duly organized and existing under the laws of the State of California (herein called the "Company," which term includes any successor Person pursuant to the applicable provisions of the Indenture hereinafter referred to), for value received, hereby promises to pay to Cede & Co., as nominee for The Depository Trust Company, or registered assigns, the Principal Amount stated above on the Maturity Date stated above, and to pay interest thereon from and including the Original Issue Date stated above or, in the case of a 3.75% Senior Note due August 15, 2042 issued upon the registration of transfer or exchange, from and including the most recent Interest Payment Date to which interest has been paid or duly provided for, semi-annually in arrears on the Interest Payment Dates set forth above and on the Maturity Date stated above, commencing February 15, 2013 at the rate of 3.75% per annum until the principal hereof is paid or made available for payment. The interest so payable, and punctually paid or duly provided for, on any Interest Payment Date will, as provided in such Indenture, be paid to the Person in whose name this 3.75% Senior Note due August 15, 2042 (this "Senior Note," and together with all other 3.75% Senior Notes due August 15, 2042, the "Senior Notes") (or one or more Predecessor Bonds) is registered at the close of business on the Regular Record Date for such interest, which shall be the 15th day preceding such Interest Payment Date; *provided, however,* that interest payable at the Maturity Date or on a Redemption Date will be paid to the Person to whom principal is payable. Any such interest not so punctually paid or duly provided for will forthwith cease to be payable to the Holder on such Regular Record Date and may either be paid to the Person in whose name this Senior Note (or one or more Predecessor Bonds) is registered at the close of business on a Special Record Date for the payment of such Defaulted Interest to be fixed by the Trustee, notice whereof shall be given to Holders of Senior Notes not less than 10 days prior to such Special Record Date, or be paid at any time in any other lawful manner not inconsistent with the requirements of the Indenture and any securities exchange, if any, on which the Senior Notes may be listed, and upon such notice as may be required by any such exchange, all as more fully provided in said Indenture.

Payments of interest on this Senior Note will include interest accrued to but excluding the respective Interest Payment Dates. Interest payments for this Senior Note shall be computed and paid on the basis of the 360-day year of twelve 30-day months and will accrue from August 16, 2012 or from the most recent Interest Payment Date to which interest has been paid or duly provided for. In the event that any date on which interest is payable on this Senior Note (other than the Maturity Date) is not a Business Day then payment of the interest payable on such date will be made on the next succeeding day that is a Business Day (and without any interest or payment in respect of any such delay) with the same force and effect as if made on the date the payment was originally payable. If the Maturity Date falls on a day that is not a Business Day, the payment of principal, premium, if any, and interest may be made on the next succeeding Business Day, and no interest on such payment shall accrue for the period from and after maturity.

Payment of principal of, premium, if any, and interest on Senior Notes shall be made in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts. Payments of principal of, premium, if any, and interest on the Senior Notes represented by a Global Bond shall be made by wire transfer of immediately available funds to the Holder of such Global Bond, provided that, in the case of payments of principal and premium, if any, such Global Bond is first surrendered to the Paying Agent. If any of the Senior Notes are no longer represented by a Global Bond, (i) payments of principal, premium, if any, and interest due on the Maturity Date or earlier redemption of such Senior Notes shall be made at the office of the Paying Agent upon surrender of such Senior Notes to the Paying Agent, and (ii) payments of interest shall be made, at the option of the Company, subject to such surrender where applicable, (A) by check mailed to the address of the Person entitled thereto as such address shall appear in the Bond Register or (B) by wire transfer to registered Holders of at least $10,000,000 in principal amount of Senior Notes at such place and to such account at a banking institution in the United States as such Holders may designate in writing to the Trustee at least sixteen (16) days prior to the date for payment.

REFERENCE IS HEREBY MADE TO THE FURTHER PROVISIONS OF THIS SENIOR NOTE SET FORTH ON THE REVERSE HEREOF, WHICH FURTHER PROVISIONS SHALL FOR ALL PURPOSES HAVE THE SAME EFFECT AS IF SET FORTH AT THIS PLACE.

Unless the certificate of authentication hereon has been executed by the Trustee referred to on the reverse hereof by manual signature, this Senior Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose.

IN WITNESS WHEREOF, the Company has caused this instrument to be duly executed.

Dated:

PACIFIC GAS AND ELECTRIC COMPANY

By: _____
      Name:
      Title:

By: _____
      Name:
      Title:

## TRUSTEE'S CERTIFICATE OF AUTHENTICATION

This Senior Note is one of the Bonds of the series designated as Bonds of the Thirty-Eighth Series referred to in the within-mentioned Indenture.

Dated:

BOKF, N.A., *As Trustee*

By: _____

*Authorized Signatory*

**Reverse of Amended and Restated 3.75% Senior Note due August 15, 2042**

This Senior Note is one of a duly authorized issue of Bonds of the Company, issued and issuable in one or more series under an Amended and Restated Indenture, dated as of April 22, 2005 (the "Base Indenture"), as previously supplemented and as further supplemented by a Eighteenth Supplemental Indenture, dated as of August 16, 2012, and as amended by the Thirtieth Supplemental Indenture, dated as of July 1, 2020 (as so amended and supplemented, and together with all additional indentures supplemental thereto, and any constituent instruments establishing the terms of particular Bonds, being herein called the "Indenture"), between the Company and BOKF, N.A., as Trustee (herein called the "Trustee," which term includes any successor trustee under the Indenture), and reference is hereby made to the Indenture for a description of the respective rights, limitations of rights, duties and immunities of the Company, the Trustee and the Holders of Bonds thereunder and of the terms and conditions upon which Bonds are, and are to be, authenticated and delivered. This Senior Note is a Bond within the meaning of the Indenture and is one of the Bonds of the thirty-eighth series designated as the 3.75% Senior Notes due August 15, 2042 established by the Company under the Indenture. The acceptance of this Senior Note shall be deemed to constitute the consent and agreement by the Holder hereof to all of the terms and provisions of the Indenture.

The Senior Notes will be secured by a series of first mortgage bonds (the "3.75% Collateral Mortgage Bonds due 2042") delivered by the Company to the Trustee for the benefit of the Holders of the Senior Notes, issued pursuant to the Second Supplemental Indenture, dated as of July 1, 2020 to the Indenture of Mortgage, dated as of June 19, 2020, between the Company and The Bank of New York Mellon Trust Company, N.A., as trustee (as so supplemented, the "Mortgage Indenture"). Reference is made to the Indenture and the Mortgage Indenture for a description of the rights of the Trustee as holder of the 3.75% Collateral Mortgage Bonds due 2042, the property mortgaged and pledged, the nature and extent of the security and rights of the holders of the first mortgage bonds under the Mortgage Indenture and the rights of the Company under the Mortgage Indenture and the terms and conditions upon which the Senior Notes are secured.

Subject to the terms and conditions of the Indenture, the Senior Notes are redeemable at the option of the Company ("Optional Redemption"), in whole or in part, (a) at any time prior to February 15, 2042 at a Redemption Price equal to the greater of:

(i) 100% of the principal amount of the Senior Notes to be redeemed; or

(ii) as determined by the Quotation Agent, the sum of the present values of the Remaining Scheduled Payments of principal and interest on the Senior Notes to be redeemed (not including any portion of payments of interest accrued as of the Redemption Date) discounted to the Redemption Date on a semi-annual basis at the Adjusted Treasury Rate, plus 20 basis points,

plus, in either of the above cases, accrued and unpaid interest thereon to but not including the Redemption Date; and (b) at any time on or after February 15, 2042 at 100% of the principal amount of the Senior Notes to be redeemed, plus accrued and unpaid interest thereon to but not including the Redemption Date.

Interest installments whose Stated Maturity is on or prior to such Redemption Date will be payable to Holders of such Senior Notes, or one or more Predecessor Bonds, of record at the close of business on the relevant Record Dates referred to on the face hereof, all as provided in the Indenture.

In the case of an Optional Redemption, notice of redemption will be in writing and mailed first-class postage-prepaid not less than 30 days nor more than 60 days prior to the Redemption Date to each Holder of Senior Notes to be redeemed at the Holder's registered address; provided, however, that such notice need not state the dollar amount of the Redemption Price if such dollar amount has not been determined as of the date such notice is being given to the Holders of the Senior Notes being redeemed. If money sufficient to pay the Redemption Price of all Senior Notes (or portions thereof) to be redeemed on the Redemption Date is deposited with the Paying Agent or the Trustee on or prior to the Redemption Date, from and after such Redemption Date such Senior Notes or portions thereof shall cease to bear interest. Senior Notes in denominations larger than $1,000 in principal amount may be redeemed in part but only in integral multiples of $1,000.

In the event of redemption of this Senior Note in part only, a new Senior Note or Senior Notes of like tenor for the unredeemed portion hereof will be issued in the name of the Holder hereof upon the surrender hereof.

As provided in the Indenture and subject to certain limitations therein set forth, this Senior Note or any portion of the principal amount hereof will be deemed to have been paid for all purposes of the Indenture and to be no longer Outstanding thereunder, and the Company's entire indebtedness in respect thereof will be satisfied and discharged, if there has been irrevocably deposited with the Trustee or any Paying Agent (other than the Company), in trust, money in an amount which will be sufficient and/or Eligible Obligations, the principal of and interest on which when due, without regard to any reinvestment thereof, will provide moneys which, together with money, if any, deposited with or held by the Trustee or such Paying Agent, will be sufficient to pay when due the principal of and premium, if any, and interest on this Senior Note when due.

If an Event of Default shall occur and be continuing, the Trustee or the Holders of not less than 33% in aggregate principal amount of the Outstanding Bonds, considered as one class, may declare the principal amount of all Bonds then Outstanding to be due and payable immediately by notice in writing to the Company (and to the Trustee if given by Holders); provided, however, that with respect to certain Events of Default relating to bankruptcy, insolvency and similar events, the principal amount of all Bonds then Outstanding shall be due and payable immediately without further action by the Trustee or the Holders.

The Indenture permits, with certain exceptions as therein provided, the Company and the Trustee to enter into one or more supplemental indentures for the purpose of adding any provisions to, or changing in any manner or eliminating any of the provisions of, the Indenture with the consent of the Holders of not less than a majority in aggregate principal amount of the Bonds at the time Outstanding, considered as one class; provided, however, that if there shall be Bonds of more than one series Outstanding under the Indenture and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such series, then the consent only of the Holders of a majority in aggregate principal amount

of the Outstanding Bonds of all series so directly affected, considered as one class, shall be required; and provided, further, that if the Bonds of any series shall have been issued in more than one Tranche and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such Tranches, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all Tranches so directly affected, considered as one class, shall be required; and provided, further, that the Indenture permits the Company and the Trustee to enter into one or more supplemental indentures for certain purposes without the consent of any Holders of Bonds. The Indenture also contains provisions permitting the Holders of a majority in aggregate principal amount of Bonds, on behalf of the Holders of all such Bonds, to waive certain past defaults under the Indenture and their consequences. Any such consent or waiver by the Holder of this Senior Note shall be conclusive and binding upon such Holder and upon all future Holders of this Senior Note and of any Senior Note issued upon the registration of transfer hereof or in exchange herefor or in lieu hereof, whether or not notation of such consent or waiver is made upon this Senior Note.

As provided in and subject to the provisions of the Indenture, the Holder of this Senior Note shall not have the right to institute any proceeding with respect to the Indenture or for the appointment of a receiver or trustee or for any other remedy thereunder, unless such Holder shall have previously given the Trustee written notice of a continuing Event of Default, the Holders of at least 33% in aggregate principal amount of the Bonds at the time Outstanding shall have made written request to the Trustee to institute proceedings in respect of such Event of Default as Trustee and offered the Trustee reasonable indemnity, and the Trustee shall not have received from the Holders of at least a majority in aggregate principal amount of Bonds at the time Outstanding a direction inconsistent with such written request, and shall have failed to institute any such proceeding for 60 days after receipt of such notice, request and offer of indemnity. The foregoing shall not apply to any suit instituted by the Holder of this Senior Note for the enforcement of any payment of principal hereof or any premium or interest hereon on or after the respective due dates expressed herein.

No reference herein to the Indenture and no provision of this Senior Note or of the Indenture shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal of and any premium and interest on this Senior Note at the times, place and rate, and in the coin or currency, herein prescribed.

As provided in the Indenture and subject to certain limitations therein set forth, the transfer of this Senior Note is registrable in the Bond Register, upon surrender of this Senior Note for registration of transfer at the office or agency of the Company in any place where the principal of and any premium and interest on this Senior Note are payable, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Company, the Trustee or the Bond Registrar, as the case may be, duly executed by the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new Senior Notes of like tenor, of authorized denominations and for the same aggregate principal amount, will be issued to the designated transferee or transferees.

The Senior Notes are issuable only in registered form without coupons in denominations of $1,000 and any integral multiple thereof. As provided in the Indenture and subject to certain limitations therein set forth, Senior Notes are exchangeable for a like aggregate principal amount of Senior Notes and of like tenor of a different authorized denomination, as requested by the Holder surrendering the same.

No service charge shall be made for any such registration of transfer or exchange, but the Company may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

The Company shall not be required to execute or to provide for the registration of the transfer of or the exchange of (A) any Senior Note of this series during a period of 15 days immediately preceding the date notice is to be given identifying the serial numbers of the Senior Notes called for redemption, or (B) any Senior Note selected for redemption in whole or in part, except the undeemed portion of any Senior Note being redeemed in part.

Prior to due presentment of this Senior Note for registration of transfer, the Company, the Trustee and any agent of the Company or the Trustee may treat the Person in whose name this Senior Note is registered as the owner hereof for all purposes, whether or not this Senior Note is overdue, and neither the Company, the Trustee nor any such agent shall be affected by notice to the contrary.

This Senior Note shall be governed by, and construed and enforced in accordance with, the laws of the State of California without regard to the principles of conflicts of laws thereunder, except to the extent that the Trust Indenture Act shall be applicable.

As provided in the Indenture, no recourse shall be had for the payment of the principal of, premium, if any, or interest with respect to this Senior Note, or any part thereof, or for any claim based hereon or otherwise in respect hereof, or of the indebtedness represented hereby, or upon any obligation, covenant or agreement under the Indenture, against any incorporator, shareholder, officer or director, as such, past, present or future, of the Company or of any predecessor or successor corporation (either directly or through the Company or a predecessor or successor corporation), whether by virtue of any constitutional provision, statute or rule of law or by the enforcement of any assessment or penalty or otherwise; it being expressly agreed and understood that the Indenture and all the Bonds are solely corporate obligations and that any such personal liability is hereby expressly waived and released as a condition of, and as part of the consideration for, the execution of the Indenture and the issuance of this Senior Note.

All terms used in this Senior Note which are not defined herein shall have the meanings assigned to them in the Indenture.

**ASSIGNMENT FORM**

To assign this Senior Note, fill in the form below: (I) or (we) assign and transfer this Senior Note to

_____

(Insert assignee's soc. sec. or tax I.D. no.)

_____

_____

_____

_____

(Print or type assignee's name, address and zip code)

and irrevocably appoint                                                    to transfer this Senior Note on the books of the
Company. The agent may substitute another to act for him.

_____

Date:

Your signature: _____
(Sign exactly as your name appears on the face of this Senior Note)

Tax Identification No.: _____

SIGNATURE GUARANTEE:

Signatures must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Bond Registrar, which requirements include membership or participation in the Securities Transfer Agent Medallion Program ("*STAMP*") or such other "signature guarantee program" as may be determined by the Bond Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

**FORM OF AMENDED AND RESTATED 3.25% SENIOR NOTES DUE JUNE 15, 2023**

THIS SENIOR NOTE IS A BOND AND A GLOBAL BOND WITHIN THE MEANING OF THE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF A DEPOSITARY OR A NOMINEE THEREOF. UNLESS AND UNTIL IT IS EXCHANGED IN WHOLE OR IN PART FOR SENIOR NOTES IN DEFINITIVE FORM, THIS SENIOR NOTE MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY OR BY THE DEPOSITARY OR ANY SUCH NOMINEE TO A SUCCESSOR DEPOSITARY OR A NOMINEE OF SUCH SUCCESSOR DEPOSITARY.

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE COMPANY OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

THE FOLLOWING SUMMARY OF TERMS IS SUBJECT TO THE INFORMATION SET FORTH ON THE REVERSE HEREOF:

| | | |
|---|---|---|
| PRINCIPAL AMOUNT : | ORIGINAL ISSUE DATE: | INTEREST RATE: 3.25% |
| $375,000,000 | June 14, 2013 | per annum |
| MATURITY DATE: | INTEREST PAYMENT DATES: | THIS SENIOR NOTE IS A: |
| June 15, 2023 | June 15 and December 15, commencing | X Global Book-Entry Bond |
| | December 15, 2013 | ☐ Certificated Bond |
| REGISTERED OWNER: Cede & Co., as nominee of | | |
| The Depository Trust Company | | |

<div align="center">PACIFIC GAS AND ELECTRIC COMPANY</div>

<div align="center">AMENDED AND RESTATED 3.25% SENIOR NOTES DUE JUNE 15, 2023</div>

<div align="center">(Fixed Rate)</div>

No. R-1                                                                                      Principal Amount: $375,000,000
CUSIP No: 694308 HC4

PACIFIC GAS AND ELECTRIC COMPANY, a corporation duly organized and existing under the laws of the State of California (herein called the "Company," which term includes any successor Person pursuant to the applicable provisions of the Indenture hereinafter referred to), for value received, hereby promises to pay to Cede & Co., as nominee for The Depository Trust Company, or registered assigns, the Principal Amount stated above on the Maturity Date stated above, and to pay interest thereon from and including the Original Issue Date stated above or, in the case of a 3.25% Senior Note due June 15, 2023 issued upon the registration of transfer or exchange, from and including the most recent Interest Payment Date to which interest has been paid or duly provided for, semi-annually in arrears on the Interest Payment Dates set forth above and on the Maturity Date stated above, commencing December 15, 2013 at the rate of 3.25% per annum until the principal hereof is paid or made available for payment. The interest so payable, and punctually paid or duly provided for, on any Interest Payment Date will, as provided in such Indenture, be paid to the Person in whose name this 3.25% Senior Note due June 15, 2023 (this "Senior Note," and together with all other 3.25% Senior Notes due June 15, 2023, the "Senior Notes") (or one or more Predecessor Bonds) is registered at the close of business on the Regular Record Date for such interest, which shall be the 15th day preceding such Interest Payment Date; provided, however, that interest payable at the Maturity Date or on a Redemption Date will be paid to the Person to whom principal is payable. Any such interest not so punctually paid or duly provided for will forthwith cease to be payable to the Holder on such Regular Record Date and may either be paid to the Person in whose name this Senior Note (or one or more Predecessor Bonds) is registered at the close of business on a Special Record Date for the payment of such Defaulted Interest to be fixed by the Trustee, notice whereof shall be given to Holders of Senior Notes not less than 10 days prior to such Special Record Date, or be paid at any time in any other lawful manner not inconsistent with the requirements of the Indenture and any securities exchange, if any, on which the Senior Notes may be listed, and upon such notice as may be required by any such exchange, all as more fully provided in said Indenture.

Payments of interest on this Senior Note will include interest accrued to but excluding the respective Interest Payment Dates. Interest payments for this Senior Note shall be computed and paid on the basis of the 360-day year of twelve 30-day months and will accrue from June 14, 2013 or from the most recent Interest Payment Date to which interest has been paid or duly provided for. In the event that any date on which interest is payable on this Senior Note (other than the Maturity Date) is not a Business Day then payment of the interest payable on such date will be made on the next succeeding day that is a Business Day (and without any interest or payment in respect of any such delay) with the same force and effect as if made on the date the payment was originally payable. If the Maturity Date falls on a day that is not a Business Day, the payment of principal, premium, if any, and interest may be made on the next succeeding Business Day, and no interest on such payment shall accrue for the period from and after maturity.

Payment of principal of, premium, if any, and interest on Senior Notes shall be made in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts. Payments of principal of, premium, if any, and interest on the Senior Notes represented by a Global Bond shall be made by wire transfer of immediately available funds to the Holder of such Global Bond, provided that, in the case of payments of principal and premium, if any, such Global Bond is first surrendered to the Paying Agent. If any of the Senior Notes are no longer represented by a Global Bond, (i) payments of principal, premium, if any, and interest due on the Maturity Date or earlier redemption of such Senior Notes shall be made at the office of the Paying Agent upon surrender of such Senior Notes to the Paying Agent, and (ii) payments of interest shall be made, at the option of the Company, subject to such surrender where applicable, (A) by check mailed to the address of the Person entitled thereto as such address shall appear in the Bond Register or (B) by wire transfer to registered Holders of at least $10,000,000 in principal amount of Senior Notes at such place and to such account at a banking institution in the United States as such Holders may designate in writing to the Trustee at least sixteen (16) days prior to the date for payment.

REFERENCE IS HEREBY MADE TO THE FURTHER PROVISIONS OF THIS SENIOR NOTE SET FORTH ON THE REVERSE HEREOF, WHICH FURTHER PROVISIONS SHALL FOR ALL PURPOSES HAVE THE SAME EFFECT AS IF SET FORTH AT THIS PLACE.

Unless the certificate of authentication hereon has been executed by the Trustee referred to on the reverse hereof by manual signature, this Senior Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose.

IN WITNESS WHEREOF, the Company has caused this instrument to be duly executed.

Dated:

PACIFIC GAS AND ELECTRIC COMPANY

By: _____

    Name:

    Title:

By: _____

    Name:

    Title:

This Senior Note is one of the Bonds of the series designated as Bonds of the Thirty-Ninth Series referred to in the within-mentioned Indenture.

Dated:

BOKF, N.A., *As Trustee*

By: _____

*Authorized Signatory*

## Reverse of Amended and Restated 3.25% Senior Note due June 15, 2023

This Senior Note is one of a duly authorized issue of Bonds of the Company, issued and issuable in one or more series under an Amended and Restated Indenture, dated as of April 22, 2005 (the "Base Indenture"), as previously supplemented and as further supplemented by a Nineteenth Supplemental Indenture, dated as of June 14, 2013, and as amended by the Thirtieth Supplemental Indenture, dated as of July 1, 2020 (as so amended and supplemented, and together with all additional indentures supplemental thereto, and any constituent instruments establishing the terms of particular Bonds, being herein called the "Indenture"), between the Company and BOKF, N.A., as Trustee (herein called the "Trustee," which term includes any successor trustee under the Indenture), and reference is hereby made to the Indenture for a description of the respective rights, limitations of rights, duties and immunities of the Company, the Trustee and the Holders of Bonds thereunder and of the terms and conditions upon which Bonds are, and are to be, authenticated and delivered. This Senior Note is a Bond within the meaning of the Indenture and is one of the Bonds of the thirty-ninth series designated as the 3.25% Senior Notes due June 15, 2023 established by the Company under the Indenture. The acceptance of this Senior Note shall be deemed to constitute the consent and agreement by the Holder hereof to all of the terms and provisions of the Indenture.

The Senior Notes will be secured by a series of first mortgage bonds (the "3.25% Collateral Mortgage Bonds due 2023") delivered by the Company to the Trustee for the benefit of the Holders of the Senior Notes, issued pursuant to the Second Supplemental Indenture, dated as of July 1, 2020 to the Indenture of Mortgage, dated as of June 19, 2020, between the Company and The Bank of New York Mellon Trust Company, N.A., as trustee (as so supplemented, the "Mortgage Indenture"). Reference is made to the Indenture and the Mortgage Indenture for a description of the rights of the Trustee as holder of the 3.25% Collateral Mortgage Bonds due 2023, the property mortgaged and pledged, the nature and extent of the security and rights of the holders of the first mortgage bonds under the Mortgage Indenture and the rights of the Company under the Mortgage Indenture and the terms and conditions upon which the Senior Notes are secured.

Subject to the terms and conditions of the Indenture, the Senior Notes are redeemable at the option of the Company ("Optional Redemption"), in whole or in part, (a) at any time prior to March 15, 2023 at a Redemption Price equal to the greater of:

(i) 100% of the principal amount of the Senior Notes to be redeemed; or

(ii) as determined by the Quotation Agent, the sum of the present values of the Remaining Scheduled Payments of principal and interest on the Senior Notes to be redeemed (not including any portion of payments of interest accrued as of the Redemption Date) discounted to the Redemption Date on a semi-annual basis at the Adjusted Treasury Rate, plus 20 basis points,

plus, in either of the above cases, accrued and unpaid interest thereon to but not including the Redemption Date; and (b) at any time on or after March 15, 2023 at 100% of the principal amount of the Senior Notes to be redeemed, plus accrued and unpaid interest thereon to but not including the Redemption Date.

Interest installments whose Stated Maturity is on or prior to such Redemption Date will be payable to Holders of such Senior Notes, or one or more Predecessor Bonds, of record at the close of business on the relevant Record Dates referred to on the face hereof, all as provided in the Indenture.

In the case of an Optional Redemption, notice of redemption will be in writing and mailed first-class postage-prepaid not less than 30 days nor more than 60 days prior to the Redemption Date to each Holder of Senior Notes to be redeemed at the Holder's registered address; provided, however, that such notice need not state the dollar amount of the Redemption Price if such dollar amount has not been determined as of the date such notice is being given to the Holders of the Senior Notes being redeemed. If money sufficient to pay the Redemption Price of all Senior Notes (or portions thereof) to be redeemed on the Redemption Date is deposited with the Paying Agent or the Trustee on or prior to the Redemption Date, from and after such Redemption Date such Senior Notes or portions thereof shall cease to bear interest. Senior Notes in denominations larger than $1,000 in principal amount may be redeemed in part but only in integral multiples of $1,000.

In the event of redemption of this Senior Note in part only, a new Senior Note or Senior Notes of like tenor for the unredeemed portion hereof will be issued in the name of the Holder hereof upon the surrender hereof.

As provided in the Indenture and subject to certain limitations therein set forth, this Senior Note or any portion of the principal amount hereof will be deemed to have been paid for all purposes of the Indenture and to be no longer Outstanding thereunder, and the Company's entire indebtedness in respect thereof will be satisfied and discharged, if there has been irrevocably deposited with the Trustee or any Paying Agent (other than the Company), in trust, money in an amount which will be sufficient and/or Eligible Obligations, the principal of and interest on which when due, without regard to any reinvestment thereof, will provide moneys which, together with money, if any, deposited with or held by the Trustee or such Paying Agent, will be sufficient to pay when due the principal of and premium, if any, and interest on this Senior Note when due.

If an Event of Default shall occur and be continuing, the Trustee or the Holders of not less than 33% in aggregate principal amount of the Outstanding Bonds, considered as one class, may declare the principal amount of all Bonds then Outstanding to be due and payable immediately by notice in writing to the Company (and to the Trustee if given by Holders); provided, however, that with respect to certain Events of Default relating to bankruptcy, insolvency and similar events, the principal amount of all Bonds then Outstanding shall be due and payable immediately without further action by the Trustee or the Holders.

The Indenture permits, with certain exceptions as therein provided, the Company and the Trustee to enter into one or more supplemental indentures for the purpose of adding any provisions to, or changing in any manner or eliminating any of the provisions of, the Indenture with the consent of the Holders of not less than a majority in aggregate principal amount of the Bonds at the time Outstanding, considered as one class; provided, however, that if there shall be Bonds of more than one series Outstanding under the Indenture and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all,

of such series, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all series so directly affected, considered as one class, shall be required; and provided, further, that if the Bonds of any series shall have been issued in more than one Tranche and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such Tranches, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all Tranches so directly affected, considered as one class, shall be required; and provided, further, that the Indenture permits the Company and the Trustee to enter into one or more supplemental indentures for certain purposes without the consent of any Holders of Bonds. The Indenture also contains provisions permitting the Holders of a majority in aggregate principal amount of Bonds, on behalf of the Holders of all such Bonds, to waive certain past defaults under the Indenture and their consequences. Any such consent or waiver by the Holder of this Senior Note shall be conclusive and binding upon such Holder and upon all future Holders of this Senior Note and of any Senior Note issued upon the registration of transfer hereof or in exchange herefor or in lieu hereof, whether or not notation of such consent or waiver is made upon this Senior Note.

As provided in and subject to the provisions of the Indenture, the Holder of this Senior Note shall not have the right to institute any proceeding with respect to the Indenture or for the appointment of a receiver or trustee or for any other remedy thereunder, unless such Holder shall have previously given the Trustee written notice of a continuing Event of Default, the Holders of at least 33% in aggregate principal amount of the Bonds at the time Outstanding shall have made written request to the Trustee to institute proceedings in respect of such Event of Default as Trustee and offered the Trustee reasonable indemnity, and the Trustee shall not have received from the Holders of at least a majority in aggregate principal amount of Bonds at the time Outstanding a direction inconsistent with such written request, and shall have failed to institute any such proceeding for 60 days after receipt of such notice, request and offer of indemnity. The foregoing shall not apply to any suit instituted by the Holder of this Senior Note for the enforcement of any payment of principal hereof or any premium or interest hereon on or after the respective due dates expressed herein.

No reference herein to the Indenture and no provision of this Senior Note or of the Indenture shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal of and any premium and interest on this Senior Note at the times, place and rate, and in the coin or currency, herein prescribed.

As provided in the Indenture and subject to certain limitations therein set forth, the transfer of this Senior Note is registrable in the Bond Register, upon surrender of this Senior Note for registration of transfer at the office or agency of the Company in any place where the principal of and any premium and interest on this Senior Note are payable, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Company, the Trustee or the Bond Registrar, as the case may be, duly executed by the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new Senior Notes of like tenor, of authorized denominations and for the same aggregate principal amount, will be issued to the designated transferee or transferees.

The Senior Notes are issuable only in registered form without coupons in denominations of $1,000 and any integral multiple thereof. As provided in the Indenture and subject to certain

limitations therein set forth, Senior Notes are exchangeable for a like aggregate principal amount of Senior Notes and of like tenor of a different authorized denomination, as requested by the Holder surrendering the same.

No service charge shall be made for any such registration of transfer or exchange, but the Company may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

The Company shall not be required to execute or to provide for the registration of the transfer of or the exchange of (A) any Senior Note of this series during a period of 15 days immediately preceding the date notice is to be given identifying the serial numbers of the Senior Notes called for redemption, or (B) any Senior Note selected for redemption in whole or in part, except the unredeemed portion of any Senior Note being redeemed in part.

Prior to due presentment of this Senior Note for registration of transfer, the Company, the Trustee and any agent of the Company or the Trustee may treat the Person in whose name this Senior Note is registered as the owner hereof for all purposes, whether or not this Senior Note is overdue, and neither the Company, the Trustee nor any such agent shall be affected by notice to the contrary.

This Senior Note shall be governed by, and construed and enforced in accordance with, the laws of the State of California without regard to the principles of conflicts of laws thereunder, except to the extent that the Trust Indenture Act shall be applicable.

As provided in the Indenture, no recourse shall be had for the payment of the principal of, premium, if any, or interest with respect to this Senior Note, or any part thereof, or for any claim based hereon or otherwise in respect hereof, or of the indebtedness represented hereby, or upon any obligation, covenant or agreement under the Indenture, against any incorporator, shareholder, officer or director, as such, past, present or future, of the Company or of any predecessor or successor corporation (either directly or through the Company or a predecessor or successor corporation), whether by virtue of any constitutional provision, statute or rule of law or by the enforcement of any assessment or penalty or otherwise; it being expressly agreed and understood that the Indenture and all the Bonds are solely corporate obligations and that any such personal liability is hereby expressly waived and released as a condition of, and as part of the consideration for, the execution of the Indenture and the issuance of this Senior Note.

All terms used in this Senior Note which are not defined herein shall have the meanings assigned to them in the Indenture.

**ASSIGNMENT FORM**

To assign this Senior Note, fill in the form below: (I) or (we) assign and transfer this Senior Note to

_____

(Insert assignee's soc. sec. or tax I.D. no.)

_____

_____

(Print or type assignee's name, address and zip code)

and irrevocably appoint
to transfer this Senior Note on the books of the Company. The agent may substitute another to act for him.

_____

Date:

Your signature:_____
(Sign exactly as your name appears on the face of this Senior Note)

Tax Identification No.:  _____

SIGNATURE GUARANTEE:

_____

Signatures must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Bond Registrar, which requirements include membership or participation in the Securities Transfer Agent Medallion Program ("*STAMP*") or such other "signature guarantee program" as may be determined by the Bond Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

<div align="center">

**EXHIBIT A-5**

**FORM OF AMENDED AND RESTATED 4.60% SENIOR NOTES DUE JUNE 15, 2043**

</div>

THIS SENIOR NOTE IS A BOND AND A GLOBAL BOND WITHIN THE MEANING OF THE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF A DEPOSITARY OR A NOMINEE THEREOF. UNLESS AND UNTIL IT IS EXCHANGED IN WHOLE OR IN PART FOR SENIOR NOTES IN DEFINITIVE FORM, THIS SENIOR NOTE MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY OR BY THE DEPOSITARY OR ANY SUCH NOMINEE TO A SUCCESSOR DEPOSITARY OR A NOMINEE OF SUCH SUCCESSOR DEPOSITARY.

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE COMPANY OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

THE FOLLOWING SUMMARY OF TERMS IS SUBJECT TO THE INFORMATION SET FORTH ON THE REVERSE HEREOF:

| | | |
|---|---|---|
| PRINCIPAL AMOUNT : | ORIGINAL ISSUE DATE: | INTEREST RATE: 4.60% |
| $375,000,000 | June 14, 2013 | per annum |
| MATURITY DATE: | INTEREST PAYMENT DATES: | THIS SENIOR NOTE IS A: |
| June 15, 2043 | June 15 and December 15, commencing | X Global Book-Entry Bond |
| | December 15, 2013 | ☐ Certificated Bond |

REGISTERED OWNER: Cede & Co., as nominee of The Depository Trust Company

PACIFIC GAS AND ELECTRIC COMPANY

AMENDED AND RESTATED 4.60% SENIOR NOTES DUE JUNE 15, 2043
(Fixed Rate)

No. R-1                                                                                    Principal Amount: $375,000,000
CUSIP No: 694308 HD2

PACIFIC GAS AND ELECTRIC COMPANY, a corporation duly organized and existing under the laws of the State of California (herein called the "Company," which term includes any successor Person pursuant to the applicable provisions of the Indenture hereinafter referred to), for value received, hereby promises to pay to Cede & Co., as nominee for The Depository Trust Company, or registered assigns, the Principal Amount stated above on the Maturity Date stated above, and to pay interest thereon from and including the Original Issue Date stated above or, in the case of a 4.60% Senior Note due June 15, 2043 issued upon the registration of transfer or exchange, from and including the most recent Interest Payment Date to which interest has been paid or duly provided for, semi-annually in arrears on the Interest Payment Dates set forth above and on the Maturity Date stated above, commencing December 15, 2013 at the rate of 4.60% per annum until the principal hereof is paid or made available for payment. The interest so payable, and punctually paid or duly provided for, on any Interest Payment Date will, as provided in such Indenture, be paid to the Person in whose name this 4.60% Senior Note due June 15, 2043 (this "Senior Note," and together with all other 4.60% Senior Notes due June 15, 2043, the "Senior Notes") (or one or more Predecessor Bonds) is registered at the close of business on the Regular Record Date for such interest, which shall be the 15th day preceding such Interest Payment Date; provided, however, that interest payable at the Maturity Date or on a Redemption Date will be paid to the Person to whom principal is payable. Any such interest not so punctually paid or duly provided for will forthwith cease to be payable to the Holder on such Regular Record Date and may either be paid to the Person in whose name this Senior Note (or one or more Predecessor Bonds) is registered at the close of business on a Special Record Date for the payment of such Defaulted Interest to be fixed by the Trustee, notice whereof shall be given to Holders of Senior Notes not less than 10 days prior to such Special Record Date, or be paid at any time in any other lawful manner not inconsistent with the requirements of the Indenture and any securities exchange, if any, on which the Senior Notes may be listed, and upon such notice as may be required by any such exchange, all as more fully provided in said Indenture.

Payments of interest on this Senior Note will include interest accrued to but excluding the respective Interest Payment Dates. Interest payments for this Senior Note shall be computed and paid on the basis of the 360-day year of twelve 30-day months and will accrue from June 14, 2013 or from the most recent Interest Payment Date to which interest has been paid or duly provided for. In the event that any date on which interest is payable on this Senior Note (other than the Maturity Date) is not a Business Day then payment of the interest payable on such date will be made on the next succeeding day that is a Business Day (and without any interest or payment in respect of any such delay) with the same force and effect as if made on the date the payment was originally payable. If the Maturity Date falls on a day that is not a Business Day, the payment of principal, premium, if any, and interest may be made on the next succeeding Business Day, and no interest on such payment shall accrue for the period from and after maturity.

Payment of principal of, premium, if any, and interest on Senior Notes shall be made in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts. Payments of principal of, premium, if any, and interest on the Senior Notes represented by a Global Bond shall be made by wire transfer of immediately available funds to the Holder of such Global Bond, provided that, in the case of payments of principal and premium, if any, such Global Bond is first surrendered to the Paying Agent. If any of the Senior Notes are no longer represented by a Global Bond, (i) payments of principal, premium, if any, and interest due on the Maturity Date or earlier redemption of such Senior Notes shall be made at the office of the Paying Agent upon surrender of such Senior Notes to the Paying Agent, and (ii) payments of interest shall be made, at the option of the Company, subject to such surrender where applicable, (A) by check mailed to the address of the Person entitled thereto as such address shall appear in the Bond Register or (B) by wire transfer to registered Holders of at least $10,000,000 in principal amount of Senior Notes at such place and to such account at a banking institution in the United States as such Holders may designate in writing to the Trustee at least sixteen (16) days prior to the date for payment.

REFERENCE IS HEREBY MADE TO THE FURTHER PROVISIONS OF THIS SENIOR NOTE SET FORTH ON THE REVERSE HEREOF, WHICH FURTHER PROVISIONS SHALL FOR ALL PURPOSES HAVE THE SAME EFFECT AS IF SET FORTH AT THIS PLACE.

Unless the certificate of authentication hereon has been executed by the Trustee referred to on the reverse hereof by manual signature, this Senior Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose.

IN WITNESS WHEREOF, the Company has caused this instrument to be duly executed.

Dated:

PACIFIC GAS AND ELECTRIC COMPANY

By: _____
Name:
Title:

By: _____
Name:
Title:

This Senior Note is one of the Bonds of the series designated as Bonds of the Fortieth Series referred to in the within-mentioned Indenture.

Dated:

BOKF, N.A., *As Trustee*

By: _____
  *Authorized Signatory*

**Reverse of Amended and Restated 4.60% Senior Note due June 15, 2043**

This Senior Note is one of a duly authorized issue of Bonds of the Company, issued and issuable in one or more series under an Amended and Restated Indenture, dated as of April 22, 2005 (the "Base Indenture"), as previously supplemented and as further supplemented by a Nineteenth Supplemental Indenture, dated as of June 14, 2013, and as amended by the Thirtieth Supplemental Indenture, dated as of July 1, 2020 (as so amended and supplemented, and together with all additional indentures supplemental thereto, and any constituent instruments establishing the terms of particular Bonds, being herein called the "Indenture"), between the Company and BOKF, N.A., as Trustee (herein called the "Trustee," which term includes any successor trustee under the Indenture), and reference is hereby made to the Indenture for a description of the respective rights, limitations of rights, duties and immunities of the Company, the Trustee and the Holders of Bonds thereunder and of the terms and conditions upon which Bonds are, and are to be, authenticated and delivered. This Senior Note is a Bond within the meaning of the Indenture and is one of the Bonds of the fortieth series designated as the 4.60% Senior Notes due June 15, 2043 established by the Company under the Indenture. The acceptance of this Senior Note shall be deemed to constitute the consent and agreement by the Holder hereof to all of the terms and provisions of the Indenture.

The Senior Notes will be secured by a series of first mortgage bonds (the "4.60% Collateral Mortgage Bonds due 2043") delivered by the Company to the Trustee for the benefit of the Holders of the Senior Notes, issued pursuant to the Second Supplemental Indenture, dated as of July 1, 2020 to the Indenture of Mortgage, dated as of June 19, 2020, between the Company and The Bank of New York Mellon Trust Company, N.A., as trustee (as so supplemented, the "Mortgage Indenture"). Reference is made to the Indenture and the Mortgage Indenture for a description of the rights of the Trustee as holder of the 4.60% Collateral Mortgage Bonds due 2043, the property mortgaged and pledged, the nature and extent of the security and rights of the holders of the first mortgage bonds under the Mortgage Indenture and the rights of the Company under the Mortgage Indenture and the terms and conditions upon which the Senior Notes are secured.

Subject to the terms and conditions of the Indenture, the Senior Notes are redeemable at the option of the Company ("Optional Redemption"), in whole or in part, (a) at any time prior to December 15, 2042 at a Redemption Price equal to the greater of:

(i) 100% of the principal amount of the Senior Notes to be redeemed; or

(ii) as determined by the Quotation Agent, the sum of the present values of the Remaining Scheduled Payments of principal and interest on the Senior Notes to be redeemed (not including any portion of payments of interest accrued as of the Redemption Date) discounted to the Redemption Date on a semi-annual basis at the Adjusted Treasury Rate, plus 20 basis points,

plus, in either of the above cases, accrued and unpaid interest thereon to but not including the Redemption Date; and (b) at any time on or after December 15, 2042 at 100% of the principal amount of the Senior Notes to be redeemed, plus accrued and unpaid interest thereon to but not including the Redemption Date.

Interest installments whose Stated Maturity is on or prior to such Redemption Date will be payable to Holders of such Senior Notes, or one or more Predecessor Bonds, of record at the close of business on the relevant Record Dates referred to on the face hereof, all as provided in the Indenture.

In the case of an Optional Redemption, notice of redemption will be in writing and mailed first-class postage-prepaid not less than 30 days nor more than 60 days prior to the Redemption Date to each Holder of Senior Notes to be redeemed at the Holder's registered address; provided, however, that such notice need not state the dollar amount of the Redemption Price if such dollar amount has not been determined as of the date such notice is being given to the Holders of the Senior Notes being redeemed. If money sufficient to pay the Redemption Price of all Senior Notes (or portions thereof) to be redeemed on the Redemption Date is deposited with the Paying Agent or the Trustee on or prior to the Redemption Date, from and after such Redemption Date such Senior Notes or portions thereof shall cease to bear interest. Senior Notes in denominations larger than $1,000 in principal amount may be redeemed in part but only in integral multiples of $1,000.

In the event of redemption of this Senior Note in part only, a new Senior Note or Senior Notes of like tenor for the unredeemed portion hereof will be issued in the name of the Holder hereof upon the surrender hereof.

As provided in the Indenture and subject to certain limitations therein set forth, this Senior Note or any portion of the principal amount hereof will be deemed to have been paid for all purposes of the Indenture and to be no longer Outstanding thereunder, and the Company's entire indebtedness in respect thereof will be satisfied and discharged, if there has been irrevocably deposited with the Trustee or any Paying Agent (other than the Company), in trust, money in an amount which will be sufficient and/or Eligible Obligations, the principal of and interest on which when due, without regard to any reinvestment thereof, will provide moneys which, together with money, if any, deposited with or held by the Trustee or such Paying Agent, will be sufficient to pay when due the principal of and premium, if any, and interest on this Senior Note when due.

If an Event of Default shall occur and be continuing, the Trustee or the Holders of not less than 33% in aggregate principal amount of the Outstanding Bonds, considered as one class, may declare the principal amount of all Bonds then Outstanding to be due and payable immediately by notice in writing to the Company (and to the Trustee if given by Holders); provided, however, that with respect to certain Events of Default relating to bankruptcy, insolvency and similar events, the principal amount of all Bonds then Outstanding shall be due and payable immediately without further action by the Trustee or the Holders.

The Indenture permits, with certain exceptions as therein provided, the Company and the Trustee to enter into one or more supplemental indentures for the purpose of adding any provisions to, or changing in any manner or eliminating any of the provisions of, the Indenture with the consent of the Holders of not less than a majority in aggregate principal amount of the Bonds at the time Outstanding, considered as one class; provided, however, that if there shall be Bonds of more than one series Outstanding under the Indenture and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all,

of such series, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all series so directly affected, considered as one class, shall be required; and provided, further, that if the Bonds of any series shall have been issued in more than one Tranche and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such Tranches, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all Tranches so directly affected, considered as one class, shall be required; and provided, further, that the Indenture permits the Company and the Trustee to enter into one or more supplemental indentures for certain purposes without the consent of any Holders of Bonds. The Indenture also contains provisions permitting the Holders of a majority in aggregate principal amount of Bonds, on behalf of the Holders of all such Bonds, to waive certain past defaults under the Indenture and their consequences. Any such consent or waiver by the Holder of this Senior Note shall be conclusive and binding upon such Holder and upon all future Holders of this Senior Note and of any Senior Note issued upon the registration of transfer hereof or in exchange herefor or in lieu hereof, whether or not notation of such consent or waiver is made upon this Senior Note.

As provided in and subject to the provisions of the Indenture, the Holder of this Senior Note shall not have the right to institute any proceeding with respect to the Indenture or for the appointment of a receiver or trustee or for any other remedy thereunder, unless such Holder shall have previously given the Trustee written notice of a continuing Event of Default, the Holders of at least 33% in aggregate principal amount of the Bonds at the time Outstanding shall have made written request to the Trustee to institute proceedings in respect of such Event of Default as Trustee and offered the Trustee reasonable indemnity, and the Trustee shall not have received from the Holders of at least a majority in aggregate principal amount of Bonds at the time Outstanding a direction inconsistent with such written request, and shall have failed to institute any such proceeding for 60 days after receipt of such notice, request and offer of indemnity. The foregoing shall not apply to any suit instituted by the Holder of this Senior Note for the enforcement of any payment of principal hereof or any premium or interest hereon on or after the respective due dates expressed herein.

No reference herein to the Indenture and no provision of this Senior Note or of the Indenture shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal of and any premium and interest on this Senior Note at the times, place and rate, and in the coin or currency, herein prescribed.

As provided in the Indenture and subject to certain limitations therein set forth, the transfer of this Senior Note is registrable in the Bond Register, upon surrender of this Senior Note for registration of transfer at the office or agency of the Company in any place where the principal of and any premium and interest on this Senior Note are payable, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Company, the Trustee or the Bond Registrar, as the case may be, duly executed by the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new Senior Notes of like tenor, of authorized denominations and for the same aggregate principal amount, will be issued to the designated transferee or transferees.

The Senior Notes are issuable only in registered form without coupons in denominations of $1,000 and any integral multiple thereof. As provided in the Indenture and subject to certain

limitations therein set forth, Senior Notes are exchangeable for a like aggregate principal amount of Senior Notes and of like tenor of a different authorized denomination, as requested by the Holder surrendering the same.

No service charge shall be made for any such registration of transfer or exchange, but the Company may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

The Company shall not be required to execute or to provide for the registration of the transfer of or the exchange of (A) any Senior Note of this series during a period of 15 days immediately preceding the date notice is to be given identifying the serial numbers of the Senior Notes called for redemption, or (B) any Senior Note selected for redemption in whole or in part, except the unredeemed portion of any Senior Note being redeemed in part.

Prior to due presentment of this Senior Note for registration of transfer, the Company, the Trustee and any agent of the Company or the Trustee may treat the Person in whose name this Senior Note is registered as the owner hereof for all purposes, whether or not this Senior Note is overdue, and neither the Company, the Trustee nor any such agent shall be affected by notice to the contrary.

This Senior Note shall be governed by, and construed and enforced in accordance with, the laws of the State of California without regard to the principles of conflicts of laws thereunder, except to the extent that the Trust Indenture Act shall be applicable.

As provided in the Indenture, no recourse shall be had for the payment of the principal of, premium, if any, or interest with respect to this Senior Note, or any part thereof, or for any claim based hereon or otherwise in respect hereof, or of the indebtedness represented hereby, or upon any obligation, covenant or agreement under the Indenture, against any incorporator, shareholder, officer or director, as such, past, present or future, of the Company or of any predecessor or successor corporation (either directly or through the Company or a predecessor or successor corporation), whether by virtue of any constitutional provision, statute or rule of law or by the enforcement of any assessment or penalty or otherwise; it being expressly agreed and understood that the Indenture and all the Bonds are solely corporate obligations and that any such personal liability is hereby expressly waived and released as a condition of, and as part of the consideration for, the execution of the Indenture and the issuance of this Senior Note.

All terms used in this Senior Note which are not defined herein shall have the meanings assigned to them in the Indenture.

**ASSIGNMENT FORM**

To assign this Senior Note, fill in the form below: (I) or (we) assign and transfer this Senior Note to

_____

(Insert assignee's soc. sec. or tax I.D. no.)

_____

_____

(Print or type assignee's name, address and zip code)

and irrevocably appoint _____ to transfer this Senior Note on the books of the Company. The agent may substitute another to act for him.

_____

Date:

Your signature:
(Sign exactly as your name appears on the face of this Senior Note)

Tax Identification No.:

SIGNATURE GUARANTEE:

_____

Signatures must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Bond Registrar, which requirements include membership or participation in the Securities Transfer Agent Medallion Program ("*STAMP*") or such other "signature guarantee program" as may be determined by the Bond Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

<div align="center">**EXHIBIT A-6**</div>

<div align="center">**FORM OF AMENDED AND RESTATED 3.85% SENIOR NOTES**
**DUE NOVEMBER 15, 2023**</div>

THIS SENIOR NOTE IS A BOND AND A GLOBAL BOND WITHIN THE MEANING OF THE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF A DEPOSITARY OR A NOMINEE THEREOF. UNLESS AND UNTIL IT IS EXCHANGED IN WHOLE OR IN PART FOR SENIOR NOTES IN DEFINITIVE FORM, THIS SENIOR NOTE MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY OR BY THE DEPOSITARY OR ANY SUCH NOMINEE TO A SUCCESSOR DEPOSITARY OR A NOMINEE OF SUCH SUCCESSOR DEPOSITARY.

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE COMPANY OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

THE FOLLOWING SUMMARY OF TERMS IS SUBJECT TO THE INFORMATION SET FORTH ON THE REVERSE HEREOF:

| | | |
|---|---|---|
| PRINCIPAL AMOUNT : $300,000,000 | ORIGINAL ISSUE DATE: November 12, 2013 | INTEREST RATE: 3.85% per annum |
| MATURITY DATE: November 15, 2023 | INTEREST PAYMENT DATES: May 15 and November 15, commencing May 15, 2014 | THIS SENIOR NOTE IS A: X Global Book-Entry Bond ☐ Certificated Bond |
| REGISTERED OWNER: Cede & Co., as nominee of The Depository Trust Company | | |

AMENDED AND RESTATED 3.85% SENIOR NOTES DUE NOVEMBER 15, 2023
(Fixed Rate)

No. R-1     Principal Amount: $300,000,000

CUSIP No: 694308 HE0

PACIFIC GAS AND ELECTRIC COMPANY, a corporation duly organized and existing under the laws of the State of California (herein called the "Company," which term includes any successor Person pursuant to the applicable provisions of the Indenture hereinafter referred to), for value received, hereby promises to pay to Cede & Co., as nominee for The Depository Trust Company, or registered assigns, the Principal Amount stated above on the Maturity Date stated above, and to pay interest thereon from and including the Original Issue Date stated above or, in the case of a 3.85% Senior Note due November 15, 2023 issued upon the registration of transfer or exchange, from and including the most recent Interest Payment Date to which interest has been paid or duly provided for, semi-annually in arrears on the Interest Payment Dates set forth above and on the Maturity Date stated above, commencing May 15, 2014 at the rate of 3.85% per annum until the principal hereof is paid or made available for payment. The interest so payable, and punctually paid or duly provided for, on any Interest Payment Date will, as provided in such Indenture, be paid to the Person in whose name this 3.85% Senior Note due November 15, 2023 (this "Senior Note," and together with all other 3.85% Senior Notes due November 15, 2023, the "Senior Notes") (or one or more Predecessor Bonds) is registered at the close of business on the Regular Record Date for such interest, which shall be the 15th day preceding such Interest Payment Date; provided, however, that interest payable at the Maturity Date or on a Redemption Date will be paid to the Person to whom principal is payable. Any such interest not so punctually paid or duly provided for will forthwith cease to be payable to the Holder on such Regular Record Date and may either be paid to the Person in whose name this Senior Note (or one or more Predecessor Bonds) is registered at the close of business on a Special Record Date for the payment of such Defaulted Interest to be fixed by the Trustee, notice whereof shall be given to Holders of Senior Notes not less than 10 days prior to such Special Record Date, or be paid at any time in any other lawful manner not inconsistent with the requirements of the Indenture and any securities exchange, if any, on which the Senior Notes may be listed, and upon such notice as may be required by any such exchange, all as more fully provided in said Indenture.

Payments of interest on this Senior Note will include interest accrued to but excluding the respective Interest Payment Dates. Interest payments for this Senior Note shall be computed and paid on the basis of the 360-day year of twelve 30-day months and will accrue from November 12, 2013 or from the most recent Interest Payment Date to which interest has been paid or duly provided for. In the event that any date on which interest is payable on this Senior Note (other than the Maturity Date) is not a Business Day then payment of the interest payable on such date will be made on the next succeeding day that is a Business Day (and without any interest or payment in respect of any such delay) with the same force and effect as if made on the date the payment was originally payable. If the Maturity Date falls on a day that is not a Business Day, the payment of principal, premium, if any, and interest may be made on the next succeeding Business Day, and no interest on such payment shall accrue for the period from and after maturity.

Payment of principal of, premium, if any, and interest on Senior Notes shall be made in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts. Payments of principal of, premium, if any, and interest on the Senior Notes represented by a Global Bond shall be made by wire transfer of immediately available funds to the Holder of such Global Bond, provided that, in the case of payments of principal and premium, if any, such Global Bond is first surrendered to the Paying Agent. If any of the Senior Notes are no longer represented by a Global Bond, (i) payments of principal, premium, if any, and interest due on the Maturity Date or earlier redemption of such Senior Notes shall be made at the office of the Paying Agent upon surrender of such Senior Notes to the Paying Agent, and (ii) payments of interest shall be made, at the option of the Company, subject to such surrender where applicable, (A) by check mailed to the address of the Person entitled thereto as such address shall appear in the Bond Register or (B) by wire transfer to registered Holders of at least $10,000,000 in principal amount of Senior Notes at such place and to such account at a banking institution in the United States as such Holders may designate in writing to the Trustee at least sixteen (16) days prior to the date for payment.

REFERENCE IS HEREBY MADE TO THE FURTHER PROVISIONS OF THIS SENIOR NOTE SET FORTH ON THE REVERSE HEREOF, WHICH FURTHER PROVISIONS SHALL FOR ALL PURPOSES HAVE THE SAME EFFECT AS IF SET FORTH AT THIS PLACE.

Unless the certificate of authentication hereon has been executed by the Trustee referred to on the reverse hereof by manual signature, this Senior Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose.

IN WITNESS WHEREOF, the Company has caused this instrument to be duly executed.

Dated:

PACIFIC GAS AND ELECTRIC COMPANY

By: _____
     Name:
     Title:

By: _____
     Name:
     Title:

TRUSTEE'S CERTIFICATE OF AUTHENTICATION

This Senior Note is one of the Bonds of the series designated as Bonds of the Forty-First Series referred to in the within-mentioned Indenture.

Dated:

BOKF, N.A., *As Trustee*

By: _____

*Authorized Signatory*

This Senior Note is one of a duly authorized issue of Bonds of the Company, issued and issuable in one or more series under an Amended and Restated Indenture, dated as of April 22, 2005 (the "Base Indenture"), as previously supplemented and as further supplemented by a Twentieth Supplemental Indenture, dated as of November 12, 2013, and as amended by the Thirtieth Supplemental Indenture, dated as of July 1, 2020 (as so amended and supplemented, and together with all additional indentures supplemental thereto, and any constituent instruments establishing the terms of particular Bonds, being herein called the "Indenture"), between the Company and BOKF, N.A., as Trustee (herein called the "Trustee," which term includes any successor trustee under the Indenture), and reference is hereby made to the Indenture for a description of the respective rights, limitations of rights, duties and immunities of the Company, the Trustee and the Holders of Bonds thereunder and of the terms and conditions upon which Bonds are, and are to be, authenticated and delivered. This Senior Note is a Bond within the meaning of the Indenture and is one of the Bonds of the forty-first series designated as the 3.85% Senior Notes due November 15, 2023 established by the Company under the Indenture. The acceptance of this Senior Note shall be deemed to constitute the consent and agreement by the Holder hereof to all of the terms and provisions of the Indenture.

The Senior Notes will be secured by a series of first mortgage bonds (the "3.85% Collateral Mortgage Bonds due 2023") delivered by the Company to the Trustee for the benefit of the Holders of the Senior Notes, issued pursuant to the Second Supplemental Indenture, dated as of July 1, 2020 to the Indenture of Mortgage, dated as of June 19, 2020, between the Company and The Bank of New York Mellon Trust Company, N.A., as trustee (as so supplemented, the "Mortgage Indenture"). Reference is made to the Indenture and the Mortgage Indenture for a description of the rights of the Trustee as holder of the 3.85% Collateral Mortgage Bonds due 2023, the property mortgaged and pledged, the nature and extent of the security and rights of the holders of the first mortgage bonds under the Mortgage Indenture and the rights of the Company under the Mortgage Indenture and the terms and conditions upon which the Senior Notes are secured.

Subject to the terms and conditions of the Indenture, the Senior Notes are redeemable at the option of the Company ("Optional Redemption"), in whole or in part, (a) at any time prior to August 15, 2023 at a Redemption Price equal to the greater of:

    (i) 100% of the principal amount of the Senior Notes to be redeemed; or

    (ii) as determined by the Quotation Agent, the sum of the present values of the Remaining Scheduled Payments of principal and interest on the Senior Notes to be redeemed (not including any portion of payments of interest accrued as of the Redemption Date) discounted to the Redemption Date on a semi-annual basis at the Adjusted Treasury Rate, plus 20 basis points,

plus, in either of the above cases, accrued and unpaid interest thereon to but not including the Redemption Date; and (b) at any time on or after August 15, 2023 at 100% of the principal amount of the Senior Notes to be redeemed, plus accrued and unpaid interest thereon to but not including the Redemption Date.

Interest installments whose Stated Maturity is on or prior to such Redemption Date will be payable to Holders of such Senior Notes, or one or more Predecessor Bonds, of record at the close of business on the relevant Record Dates referred to on the face hereof, all as provided in the Indenture.

In the case of an Optional Redemption, notice of redemption will be in writing and mailed first-class postage-prepaid not less than 10 days nor more than 60 days prior to the Redemption Date to each Holder of Senior Notes to be redeemed at the Holder's registered address; provided, however, that such notice need not state the dollar amount of the Redemption Price if such dollar amount has not been determined as of the date such notice is being given to the Holders of the Senior Notes being redeemed. If money sufficient to pay the Redemption Price of all Senior Notes (or portions thereof) to be redeemed on the Redemption Date is deposited with the Paying Agent or the Trustee on or prior to the Redemption Date, from and after such Redemption Date such Senior Notes or portions thereof shall cease to bear interest. Senior Notes in denominations larger than $1,000 in principal amount may be redeemed in part but only in integral multiples of $1,000.

In the event of redemption of this Senior Note in part only, a new Senior Note or Senior Notes of like tenor for the unredeemed portion hereof will be issued in the name of the Holder hereof upon the surrender hereof.

As provided in the Indenture and subject to certain limitations therein set forth, this Senior Note or any portion of the principal amount hereof will be deemed to have been paid for all purposes of the Indenture and to be no longer Outstanding thereunder, and the Company's entire indebtedness in respect thereof will be satisfied and discharged, if there has been irrevocably deposited with the Trustee or any Paying Agent (other than the Company), in trust, money in an amount which will be sufficient and/or Eligible Obligations, the principal of and interest on which when due, without regard to any reinvestment thereof, will provide moneys which, together with money, if any, deposited with or held by the Trustee or such Paying Agent, will be sufficient to pay when due the principal of and premium, if any, and interest on this Senior Note when due.

If an Event of Default shall occur and be continuing, the Trustee or the Holders of not less than 33% in aggregate principal amount of the Outstanding Bonds, considered as one class, may declare the principal amount of all Bonds then Outstanding to be due and payable immediately by notice in writing to the Company (and to the Trustee if given by Holders); provided, however, that with respect to certain Events of Default relating to bankruptcy, insolvency and similar events, the principal amount of all Bonds then Outstanding shall be due and payable immediately without further action by the Trustee or the Holders.

The Indenture permits, with certain exceptions as therein provided, the Company and the Trustee to enter into one or more supplemental indentures for the purpose of adding any provisions to, or changing in any manner or eliminating any of the provisions of, the Indenture with the consent of the Holders of not less than a majority in aggregate principal amount of the Bonds at the time Outstanding, considered as one class; provided, however, that if there shall be Bonds of more than one series Outstanding under the Indenture and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all,

of such series, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all series so directly affected, considered as one class, shall be required; and provided, further, that if the Bonds of any series shall have been issued in more than one Tranche and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such Tranches, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all Tranches so directly affected, considered as one class, shall be required; and provided, further, that the Indenture permits the Company and the Trustee to enter into one or more supplemental indentures for certain purposes without the consent of any Holders of Bonds. The Indenture also contains provisions permitting the Holders of a majority in aggregate principal amount of Bonds, on behalf of the Holders of all such Bonds, to waive certain past defaults under the Indenture and their consequences. Any such consent or waiver by the Holder of this Senior Note shall be conclusive and binding upon such Holder and upon all future Holders of this Senior Note and of any Senior Note issued upon the registration of transfer hereof or in exchange herefor or in lieu hereof, whether or not notation of such consent or waiver is made upon this Senior Note.

As provided in and subject to the provisions of the Indenture, the Holder of this Senior Note shall not have the right to institute any proceeding with respect to the Indenture or for the appointment of a receiver or trustee or for any other remedy thereunder, unless such Holder shall have previously given the Trustee written notice of a continuing Event of Default, the Holders of at least 33% in aggregate principal amount of the Bonds at the time Outstanding shall have made written request to the Trustee to institute proceedings in respect of such Event of Default as Trustee and offered the Trustee reasonable indemnity, and the Trustee shall not have received from the Holders of at least a majority in aggregate principal amount of Bonds at the time Outstanding a direction inconsistent with such written request, and shall have failed to institute any such proceeding for 60 days after receipt of such notice, request and offer of indemnity. The foregoing shall not apply to any suit instituted by the Holder of this Senior Note for the enforcement of any payment of principal hereof or any premium or interest hereon on or after the respective due dates expressed herein.

No reference herein to the Indenture and no provision of this Senior Note or of the Indenture shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal of and any premium and interest on this Senior Note at the times, place and rate, and in the coin or currency, herein prescribed.

As provided in the Indenture and subject to certain limitations therein set forth, the transfer of this Senior Note is registrable in the Bond Register, upon surrender of this Senior Note for registration of transfer at the office or agency of the Company in any place where the principal of and any premium and interest on this Senior Note are payable, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Company, the Trustee or the Bond Registrar, as the case may be, duly executed by the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new Senior Notes of like tenor, of authorized denominations and for the same aggregate principal amount, will be issued to the designated transferee or transferees.

The Senior Notes are issuable only in registered form without coupons in denominations of $1,000 and any integral multiple thereof. As provided in the Indenture and subject to certain

limitations therein set forth, Senior Notes are exchangeable for a like aggregate principal amount of Senior Notes and of like tenor of a different authorized denomination, as requested by the Holder surrendering the same.

No service charge shall be made for any such registration of transfer or exchange, but the Company may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

The Company shall not be required to execute or to provide for the registration of the transfer of or the exchange of (A) any Senior Note of this series during a period of 15 days immediately preceding the date notice is to be given identifying the serial numbers of the Senior Notes called for redemption, or (B) any Senior Note selected for redemption in whole or in part, except the unredeemed portion of any Senior Note being redeemed in part.

Prior to due presentment of this Senior Note for registration of transfer, the Company, the Trustee and any agent of the Company or the Trustee may treat the Person in whose name this Senior Note is registered as the owner hereof for all purposes, whether or not this Senior Note is overdue, and neither the Company, the Trustee nor any such agent shall be affected by notice to the contrary.

This Senior Note shall be governed by, and construed and enforced in accordance with, the laws of the State of California without regard to the principles of conflicts of laws thereunder, except to the extent that the Trust Indenture Act shall be applicable.

As provided in the Indenture, no recourse shall be had for the payment of the principal of, premium, if any, or interest with respect to this Senior Note, or any part thereof, or for any claim based hereon or otherwise in respect hereof, or of the indebtedness represented hereby, or upon any obligation, covenant or agreement under the Indenture, against any incorporator, shareholder, officer or director, as such, past, present or future, of the Company or of any predecessor or successor corporation (either directly or through the Company or a predecessor or successor corporation), whether by virtue of any constitutional provision, statute or rule of law or by the enforcement of any assessment or penalty or otherwise; it being expressly agreed and understood that the Indenture and all the Bonds are solely corporate obligations and that any such personal liability is hereby expressly waived and released as a condition of, and as part of the consideration for, the execution of the Indenture and the issuance of this Senior Note.

All terms used in this Senior Note which are not defined herein shall have the meanings assigned to them in the Indenture.

**ASSIGNMENT FORM**

To assign this Senior Note, fill in the form below: (I) or (we) assign and transfer this Senior Note to

_____

(Insert assignee's soc. sec. or tax I.D. no.)

_____

_____

_____

(Print or type assignee's name, address and zip code)

and irrevocably appoint _____

to transfer this Senior Note on the books of the Company. The agent may substitute another to act for him.

_____

Date:

Your
signature: _____
(Sign exactly as your name appears on the face of this Senior Note)

Tax Identification
No.: _____

SIGNATURE GUARANTEE:

_____

Signatures must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Bond Registrar, which requirements include membership or participation in the Securities Transfer Agent Medallion Program ("*STAMP*") or such other "signature guarantee program" as may be determined by the Bond Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

**FORM OF AMENDED AND RESTATED 3.75% SENIOR NOTES**

**DUE FEBRUARY 15, 2024**

THIS SENIOR NOTE IS A BOND AND A GLOBAL BOND WITHIN THE MEANING OF THE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF A DEPOSITARY OR A NOMINEE THEREOF. UNLESS AND UNTIL IT IS EXCHANGED IN WHOLE OR IN PART FOR SENIOR NOTES IN DEFINITIVE FORM, THIS SENIOR NOTE MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY OR BY THE DEPOSITARY OR ANY SUCH NOMINEE TO A SUCCESSOR DEPOSITARY OR A NOMINEE OF SUCH SUCCESSOR DEPOSITARY.

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE COMPANY OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

THE FOLLOWING SUMMARY OF TERMS IS SUBJECT TO THE INFORMATION SET FORTH ON THE REVERSE HEREOF:

| PRINCIPAL AMOUNT: | ORIGINAL ISSUE DATE: | INTEREST RATE: |
|---|---|---|
| $450,000,000 | February 21, 2014 | 3.75% per annum |

| MATURITY DATE: | INTEREST PAYMENT DATES: | THIS SENIOR NOTE IS A: |
|---|---|---|
| February 15, 2024 | February 15 and August 15, commencing August 15, 2014 | ☒ Global Book-Entry Bond<br>☐ Certificated Bond |

REGISTERED OWNER:

Cede & Co., as nominee of The Depository Trust Company

AMENDED AND RESTATED 3.75% SENIOR NOTES DUE FEBRUARY 15, 2024
(Fixed Rate)

No. R-2                                                                                                    Principal Amount: $450,000,000
CUSIP No: 694308 HG5

PACIFIC GAS AND ELECTRIC COMPANY, a corporation duly organized and existing under the laws of the State of California (herein called the "Company," which term includes any successor Person pursuant to the applicable provisions of the Indenture hereinafter referred to), for value received, hereby promises to pay to Cede & Co., as nominee for The Depository Trust Company, or registered assigns, the Principal Amount stated above on the Maturity Date stated above, and to pay interest thereon from and including the Original Issue Date stated above or, in the case of a 3.75% Senior Note due February 15, 2024 issued upon the registration of transfer or exchange, from and including the most recent Interest Payment Date to which interest has been paid or duly provided for, semi-annually in arrears on the Interest Payment Dates set forth above and on the Maturity Date stated above, commencing August 15, 2014 at the rate of 3.75% per annum until the principal hereof is paid or made available for payment. The interest so payable, and punctually paid or duly provided for, on any Interest Payment Date will, as provided in such Indenture, be paid to the Person in whose name this 3.75% Senior Note due February 15, 2024 (this "Senior Note," and together with all other 3.75% Senior Notes due February 15, 2024, the "Senior Notes") (or one or more Predecessor Bonds) is registered at the close of business on the Regular Record Date for such interest, which shall be the 15th day preceding such Interest Payment Date; provided, however, that interest payable at the Maturity Date or on a Redemption Date will be paid to the Person to whom principal is payable. Any such interest not so punctually paid or duly provided for will forthwith cease to be payable to the Holder on such Regular Record Date and may either be paid to the Person in whose name this Senior Note (or one or more Predecessor Bonds) is registered at the close of business on a Special Record Date for the payment of such Defaulted Interest to be fixed by the Trustee, notice whereof shall be given to Holders of Senior Notes not less than 10 days prior to such Special Record Date, or be paid at any time in any other lawful manner not inconsistent with the requirements of the Indenture and any securities exchange, if any, on which the Senior Notes may be listed, and upon such notice as may be required by any such exchange, all as more fully provided in said Indenture.

Payments of interest on this Senior Note will include interest accrued to but excluding the respective Interest Payment Dates. Interest payments for this Senior Note shall be computed and paid on the basis of the 360-day year of twelve 30-day months and will accrue from February 21, 2014 or from the most recent Interest Payment Date to which interest has been paid or duly provided for. In the event that any date on which interest is payable on this Senior Note (other than the Maturity Date) is not a Business Day then payment of the interest payable on such date will be made on the next succeeding day that is a Business Day (and without any interest or payment in respect of any such delay) with the same force and effect as if made on the date the payment was originally payable. If the Maturity Date falls on a day that is not a Business Day, the payment of principal, premium, if any, and interest may be made on the next succeeding Business Day, and no interest on such payment shall accrue for the period from and after maturity.

Payment of principal of, premium, if any, and interest on Senior Notes shall be made in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts. Payments of principal of, premium, if any, and interest on the Senior Notes represented by a Global Bond shall be made by wire transfer of immediately available funds to the Holder of such Global Bond, provided that, in the case of payments of principal and premium, if any, such Global Bond is first surrendered to the Paying Agent. If any of the Senior Notes are no longer represented by a Global Bond, (i) payments of principal, premium, if any, and interest due on the Maturity Date or earlier redemption of such Senior Notes shall be made at the office of the Paying Agent upon surrender of such Senior Notes to the Paying Agent, and (ii) payments of interest shall be made, at the option of the Company, subject to such surrender where applicable, (A) by check mailed to the address of the Person entitled thereto as such address shall appear in the Bond Register or (B) by wire transfer to registered Holders of at least $10,000,000 in principal amount of Senior Notes at such place and to such account at a banking institution in the United States as such Holders may designate in writing to the Trustee at least sixteen (16) days prior to the date for payment.

REFERENCE IS HEREBY MADE TO THE FURTHER PROVISIONS OF THIS SENIOR NOTE SET FORTH ON THE REVERSE HEREOF, WHICH FURTHER PROVISIONS SHALL FOR ALL PURPOSES HAVE THE SAME EFFECT AS IF SET FORTH AT THIS PLACE.

Unless the certificate of authentication hereon has been executed by the Trustee referred to on the reverse hereof by manual signature, this Senior Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose.

IN WITNESS WHEREOF, the Company has caused this instrument to be duly executed.

Dated:

PACIFIC GAS AND ELECTRIC COMPANY

By: _____
     Name:
     Title:

By: _____
     Name:
     Title:

TRUSTEE'S CERTIFICATE OF AUTHENTICATION

This Senior Note is one of the Bonds of the series designated as Bonds of the Forty-Third Series referred to in the within-mentioned Indenture.

Dated:

BOKF, N.A., *As Trustee*

By: _____
*Authorized Signatory*

## Reverse of Amended and Restated 3.75% Senior Note due February 15, 2024

This Senior Note is one of a duly authorized issue of Bonds of the Company, issued and issuable in one or more series under an Amended and Restated Indenture, dated as of April 22, 2005 (the "Base Indenture"), as previously supplemented and as further supplemented by a Twenty-First Supplemental Indenture, dated as of February 21, 2014, and as amended by the Thirtieth Supplemental Indenture, dated as of July 1, 2020 (as so amended and supplemented, and together with all additional indentures supplemental thereto, and any constituent instruments establishing the terms of particular Bonds, being herein called the "Indenture"), between the Company and BOKF, N.A., as Trustee (herein called the "Trustee," which term includes any successor trustee under the Indenture), and reference is hereby made to the Indenture for a description of the respective rights, limitations of rights, duties and immunities of the Company, the Trustee and the Holders of Bonds thereunder and of the terms and conditions upon which Bonds are, and are to be, authenticated and delivered. This Senior Note is a Bond within the meaning of the Indenture and is one of the Bonds of the forty-third series designated as the 3.75% Senior Notes due February 15, 2024 established by the Company under the Indenture. The acceptance of this Senior Note shall be deemed to constitute the consent and agreement by the Holder hereof to all of the terms and provisions of the Indenture.

The Senior Notes will be secured by a series of first mortgage bonds (the "3.75% Collateral Mortgage Bonds due 2024") delivered by the Company to the Trustee for the benefit of the Holders of the Senior Notes, issued pursuant to the Second Supplemental Indenture, dated as of July 1, 2020 to the Indenture of Mortgage, dated as of June 19, 2020, between the Company and The Bank of New York Mellon Trust Company, N.A., as trustee (as so supplemented, the "Mortgage Indenture"). Reference is made to the Indenture and the Mortgage Indenture for a description of the rights of the Trustee as holder of the 3.75% Collateral Mortgage Bonds due 2024, the property mortgaged and pledged, the nature and extent of the security and rights of the holders of the first mortgage bonds under the Mortgage Indenture and the rights of the Company under the Mortgage Indenture and the terms and conditions upon which the Senior Notes are secured.

Subject to the terms and conditions of the Indenture, the Senior Notes are redeemable at the option of the Company ("Optional Redemption"), in whole or in part, (a) at any time prior to November 15, 2023 at a Redemption Price equal to the greater of:

(i) 100% of the principal amount of the Senior Notes to be redeemed; or

(ii) as determined by the Quotation Agent, the sum of the present values of the Remaining Scheduled Payments of principal and interest on the Senior Notes to be redeemed (not including any portion of payments of interest accrued as of the Redemption Date) discounted to the Redemption Date on a semi-annual basis at the Adjusted Treasury Rate, plus 20 basis points,

plus, in either of the above cases, accrued and unpaid interest thereon to but not including the Redemption Date; and (b) at any time on or after November 15, 2023 at 100% of the principal amount of the Senior Notes to be redeemed, plus accrued and unpaid interest thereon to but not including the Redemption Date.

Interest installments whose Stated Maturity is on or prior to such Redemption Date will be payable to Holders of such Senior Notes, or one or more Predecessor Bonds, of record at the close of business on the relevant Record Dates referred to on the face hereof, all as provided in the Indenture.

In the case of an Optional Redemption, notice of redemption will be in writing and mailed first-class postage-prepaid not less than 10 days nor more than 60 days prior to the Redemption Date to each Holder of Senior Notes to be redeemed at the Holder's registered address; provided, however, that such notice need not state the dollar amount of the Redemption Price if such dollar amount has not been determined as of the date such notice is being given to the Holders of the Senior Notes being redeemed. If money sufficient to pay the Redemption Price of all Senior Notes (or portions thereof) to be redeemed on the Redemption Date is deposited with the Paying Agent or the Trustee on or prior to the Redemption Date, from and after such Redemption Date such Senior Notes or portions thereof shall cease to bear interest. Senior Notes in denominations larger than $1,000 in principal amount may be redeemed in part but only in integral multiples of $1,000.

In the event of redemption of this Senior Note in part only, a new Senior Note or Senior Notes of like tenor for the unredeemed portion hereof will be issued in the name of the Holder hereof upon the surrender hereof.

As provided in the Indenture and subject to certain limitations therein set forth, this Senior Note or any portion of the principal amount hereof will be deemed to have been paid for all purposes of the Indenture and to be no longer Outstanding thereunder, and the Company's entire indebtedness in respect thereof will be satisfied and discharged, if there has been irrevocably deposited with the Trustee or any Paying Agent (other than the Company), in trust, money in an amount which will be sufficient and/or Eligible Obligations, the principal of and interest on which when due, without regard to any reinvestment thereof, will provide moneys which, together with money, if any, deposited with or held by the Trustee or such Paying Agent, will be sufficient to pay when due the principal of and premium, if any, and interest on this Senior Note when due.

If an Event of Default shall occur and be continuing, the Trustee or the Holders of not less than 33% in aggregate principal amount of the Outstanding Bonds, considered as one class, may declare the principal amount of all Bonds then Outstanding to be due and payable immediately by notice in writing to the Company (and to the Trustee if given by Holders); provided, however, that with respect to certain Events of Default relating to bankruptcy, insolvency and similar events, the principal amount of all Bonds then Outstanding shall be due and payable immediately without further action by the Trustee or the Holders.

The Indenture permits, with certain exceptions as therein provided, the Company and the Trustee to enter into one or more supplemental indentures for the purpose of adding any provisions to, or changing in any manner or eliminating any of the provisions of, the Indenture with the consent of the Holders of not less than a majority in aggregate principal amount of the Bonds at the time Outstanding, considered as one class; provided, however, that if there shall be Bonds of more than one series Outstanding under the Indenture and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all,

of such series, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all series so directly affected, considered as one class, shall be required; and provided, further, that if the Bonds of any series shall have been issued in more than one Tranche and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such Tranches, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all Tranches so directly affected, considered as one class, shall be required; and provided, further, that the Indenture permits the Company and the Trustee to enter into one or more supplemental indentures for certain purposes without the consent of any Holders of Bonds. The Indenture also contains provisions permitting the Holders of a majority in aggregate principal amount of Bonds, on behalf of the Holders of all such Bonds, to waive certain past defaults under the Indenture and their consequences. Any such consent or waiver by the Holder of this Senior Note shall be conclusive and binding upon such Holder and upon all future Holders of this Senior Note and of any Senior Note issued upon the registration of transfer hereof or in exchange herefor or in lieu hereof, whether or not notation of such consent or waiver is made upon this Senior Note.

As provided in and subject to the provisions of the Indenture, the Holder of this Senior Note shall not have the right to institute any proceeding with respect to the Indenture or for the appointment of a receiver or trustee or for any other remedy thereunder, unless such Holder shall have previously given the Trustee written notice of a continuing Event of Default, the Holders of at least 33% in aggregate principal amount of the Bonds at the time Outstanding shall have made written request to the Trustee to institute proceedings in respect of such Event of Default as Trustee and offered the Trustee reasonable indemnity, and the Trustee shall not have received from the Holders of at least a majority in aggregate principal amount of Bonds at the time Outstanding a direction inconsistent with such written request, and shall have failed to institute any such proceeding for 60 days after receipt of such notice, request and offer of indemnity. The foregoing shall not apply to any suit instituted by the Holder of this Senior Note for the enforcement of any payment of principal hereof or any premium or interest hereon on or after the respective due dates expressed herein.

No reference herein to the Indenture and no provision of this Senior Note or of the Indenture shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal of and any premium and interest on this Senior Note at the times, place and rate, and in the coin or currency, herein prescribed.

As provided in the Indenture and subject to certain limitations therein set forth, the transfer of this Senior Note is registrable in the Bond Register, upon surrender of this Senior Note for registration of transfer at the office or agency of the Company in any place where the principal of and any premium and interest on this Senior Note are payable, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Company, the Trustee or the Bond Registrar, as the case may be, duly executed by the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new Senior Notes of like tenor, of authorized denominations and for the same aggregate principal amount, will be issued to the designated transferee or transferees.

The Senior Notes are issuable only in registered form without coupons in denominations of $1,000 and any integral multiple thereof. As provided in the Indenture and subject to certain

limitations therein set forth, Senior Notes are exchangeable for a like aggregate principal amount of Senior Notes and of like tenor of a different authorized denomination, as requested by the Holder surrendering the same.

No service charge shall be made for any such registration of transfer or exchange, but the Company may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

The Company shall not be required to execute or to provide for the registration of the transfer of or the exchange of (A) any Senior Note of this series during a period of 15 days immediately preceding the date notice is to be given identifying the serial numbers of the Senior Notes called for redemption, or (B) any Senior Note selected for redemption in whole or in part, except the unredeemed portion of any Senior Note being redeemed in part.

Prior to due presentment of this Senior Note for registration of transfer, the Company, the Trustee and any agent of the Company or the Trustee may treat the Person in whose name this Senior Note is registered as the owner hereof for all purposes, whether or not this Senior Note is overdue, and neither the Company, the Trustee nor any such agent shall be affected by notice to the contrary.

This Senior Note shall be governed by, and construed and enforced in accordance with, the laws of the State of California without regard to the principles of conflicts of laws thereunder, except to the extent that the Trust Indenture Act shall be applicable.

As provided in the Indenture, no recourse shall be had for the payment of the principal of, premium, if any, or interest with respect to this Senior Note, or any part thereof, or for any claim based hereon or otherwise in respect hereof, or of the indebtedness represented hereby, or upon any obligation, covenant or agreement under the Indenture, against any incorporator, shareholder, officer or director, as such, past, present or future, of the Company or of any predecessor or successor corporation (either directly or through the Company or a predecessor or successor corporation), whether by virtue of any constitutional provision, statute or rule of law or by the enforcement of any assessment or penalty or otherwise; it being expressly agreed and understood that the Indenture and all the Bonds are solely corporate obligations and that any such personal liability is hereby expressly waived and released as a condition of, and as part of the consideration for, the execution of the Indenture and the issuance of this Senior Note.

All terms used in this Senior Note which are not defined herein shall have the meanings assigned to them in the Indenture.

**ASSIGNMENT FORM**

To assign this Senior Note, fill in the form below: (I) or (we) assign and transfer this Senior Note to

_____

(Insert assignee's soc. sec. or tax I.D. no.)

_____

_____

_____

(Print or type assignee's name, address and zip code)

and irrevocably appoint_____

to transfer this Senior Note on the books of the Company. The agent may substitute another to act for him.

_____

Date:

Your signature: _____
(Sign exactly as your name appears on the face of this Senior Note)

Tax Identification No.: _____

SIGNATURE GUARANTEE:

_____

Signatures must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Bond Registrar, which requirements include membership or participation in the Securities Transfer Agent Medallion Program ("*STAMP*") or such other "signature guarantee program" as may be determined by the Bond Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

<center>**EXHIBIT A-8**</center>

<center>**FORM OF AMENDED AND RESTATED 4.75% SENIOR NOTES**</center>

<center>**DUE FEBRUARY 15, 2044**</center>

THIS SENIOR NOTE IS A BOND AND A GLOBAL BOND WITHIN THE MEANING OF THE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF A DEPOSITARY OR A NOMINEE THEREOF. UNLESS AND UNTIL IT IS EXCHANGED IN WHOLE OR IN PART FOR SENIOR NOTES IN DEFINITIVE FORM, THIS SENIOR NOTE MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY OR BY THE DEPOSITARY OR ANY SUCH NOMINEE TO A SUCCESSOR DEPOSITARY OR A NOMINEE OF SUCH SUCCESSOR DEPOSITARY.

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE COMPANY OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

THE FOLLOWING SUMMARY OF TERMS IS SUBJECT TO THE INFORMATION SET FORTH ON THE REVERSE HEREOF:

| PRINCIPAL AMOUNT: | ORIGINAL ISSUE DATE: | INTEREST RATE: |
|---|---|---|
| $450,000,000 | February 21, 2014 | 4.75% per annum |

| MATURITY DATE: | INTEREST PAYMENT DATES: | THIS SENIOR NOTE IS A: |
|---|---|---|
| February 15, 2044 | February 15 and August 15, commencing August 15, 2014 | ☐ Global Book-Entry Bond<br>☐ Certificated Bond |

REGISTERED OWNER:

Cede & Co., as nominee of
The Depository Trust
Company

AMENDED AND RESTATED 4.75% SENIOR NOTES DUE FEBRUARY 15, 2044
(Fixed Rate)

No. R-2                                                                                                    Principal Amount: $450,000,000
CUSIP No: 694308 HH3

PACIFIC GAS AND ELECTRIC COMPANY, a corporation duly organized and existing under the laws of the State of California (herein called the "Company," which term includes any successor Person pursuant to the applicable provisions of the Indenture hereinafter referred to), for value received, hereby promises to pay to Cede & Co., as nominee for The Depository Trust Company, or registered assigns, the Principal Amount stated above on the Maturity Date stated above, and to pay interest thereon from and including the Original Issue Date stated above or, in the case of a 4.75% Senior Note due February 15, 2044 issued upon the registration of transfer or exchange, from and including the most recent Interest Payment Date to which interest has been paid or duly provided for, semi-annually in arrears on the Interest Payment Dates set forth above and on the Maturity Date stated above, commencing August 15, 2014 at the rate of 4.75% per annum until the principal hereof is paid or made available for payment. The interest so payable, and punctually paid or duly provided for, on any Interest Payment Date will, as provided in such Indenture, be paid to the Person in whose name this 4.75% Senior Note due February 15, 2044 (this "Senior Note," and together with all other 4.75% Senior Notes due February 15, 2044, the "Senior Notes") (or one or more Predecessor Bonds) is registered at the close of business on the Regular Record Date for such interest, which shall be the 15th day preceding such Interest Payment Date; provided, however, that interest payable at the Maturity Date or on a Redemption Date will be paid to the Person to whom principal is payable. Any such interest not so punctually paid or duly provided for will forthwith cease to be payable to the Holder on such Regular Record Date and may either be paid to the Person in whose name this Senior Note (or one or more Predecessor Bonds) is registered at the close of business on a Special Record Date for the payment of such Defaulted Interest to be fixed by the Trustee, notice whereof shall be given to Holders of Senior Notes not less than 10 days prior to such Special Record Date, or be paid at any time in any other lawful manner not inconsistent with the requirements of the Indenture and any securities exchange, if any, on which the Senior Notes may be listed, and upon such notice as may be required by any such exchange, all as more fully provided in said Indenture.

Payments of interest on this Senior Note will include interest accrued to but excluding the respective Interest Payment Dates. Interest payments for this Senior Note shall be computed and paid on the basis of the 360-day year of twelve 30-day months and will accrue from February 21, 2014 or from the most recent Interest Payment Date to which interest has been paid or duly provided for. In the event that any date on which interest is payable on this Senior Note (other than the Maturity Date) is not a Business Day then payment of the interest payable on such date will be made on the next succeeding day that is a Business Day (and without any interest or payment in respect of any such delay) with the same force and effect as if made on the date the payment was originally payable. If the Maturity Date falls on a day that is not a Business Day, the payment of principal, premium, if any, and interest may be made on the next succeeding Business Day, and no interest on such payment shall accrue for the period from and after maturity.

Payment of principal of, premium, if any, and interest on Senior Notes shall be made in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts. Payments of principal of, premium, if any, and interest on the Senior Notes represented by a Global Bond shall be made by wire transfer of immediately available funds to the Holder of such Global Bond, provided that, in the case of payments of principal and premium, if any, such Global Bond is first surrendered to the Paying Agent. If any of the Senior Notes are no longer represented by a Global Bond, (i) payments of principal, premium, if any, and interest due on the Maturity Date or earlier redemption of such Senior Notes shall be made at the office of the Paying Agent upon surrender of such Senior Notes to the Paying Agent, and (ii) payments of interest shall be made, at the option of the Company, subject to such surrender where applicable, (A) by check mailed to the address of the Person entitled thereto as such address shall appear in the Bond Register or (B) by wire transfer to registered Holders of at least $10,000,000 in principal amount of Senior Notes at such place and to such account at a banking institution in the United States as such Holders may designate in writing to the Trustee at least sixteen (16) days prior to the date for payment.

REFERENCE IS HEREBY MADE TO THE FURTHER PROVISIONS OF THIS SENIOR NOTE SET FORTH ON THE REVERSE HEREOF, WHICH FURTHER PROVISIONS SHALL FOR ALL PURPOSES HAVE THE SAME EFFECT AS IF SET FORTH AT THIS PLACE.

Unless the certificate of authentication hereon has been executed by the Trustee referred to on the reverse hereof by manual signature, this Senior Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose.

IN WITNESS WHEREOF, the Company has caused this instrument to be duly executed.

Dated:

PACIFIC GAS AND ELECTRIC COMPANY

By: _____
       Name:
       Title:

By: _____
       Name:
       Title:

TRUSTEE'S CERTIFICATE OF AUTHENTICATION

This Senior Note is one of the Bonds of the series designated as Bonds of the Forty-Fourth Series referred to in the within-mentioned Indenture.

Dated:

BOKF, N.A., *As Trustee*

By: _____

*Authorized Signatory*

## Reverse of Amended and Restated 4.75% Senior Note due February 15, 2044

This Senior Note is one of a duly authorized issue of Bonds of the Company, issued and issuable in one or more series under an Amended and Restated Indenture, dated as of April 22, 2005 (the "Base Indenture"), as previously supplemented and as further supplemented a Twenty-First Supplemental Indenture, dated as of February 21, 2014, and as amended by the Thirtieth Supplemental Indenture, dated as of July 1, 2020 (as so amended and supplemented, and together with all additional indentures supplemental thereto, and any constituent instruments establishing the terms of particular Bonds, being herein called the "Indenture"), between the Company and BOKF, N.A., as Trustee (herein called the "Trustee," which term includes any successor trustee under the Indenture), and reference is hereby made to the Indenture for a description of the respective rights, limitations of rights, duties and immunities of the Company, the Trustee and the Holders of Bonds thereunder and of the terms and conditions upon which Bonds are, and are to be, authenticated and delivered. This Senior Note is a Bond within the meaning of the Indenture and is one of the Bonds of the forty-fourth series designated as the 4.75% Senior Notes due February 15, 2044 established by the Company under the Indenture. The acceptance of this Senior Note shall be deemed to constitute the consent and agreement by the Holder hereof to all of the terms and provisions of the Indenture.

The Senior Notes will be secured by a series of first mortgage bonds (the "4.75% Collateral Mortgage Bonds due 2044") delivered by the Company to the Trustee for the benefit of the Holders of the Senior Notes, issued pursuant to the Second Supplemental Indenture, dated as of July 1, 2020 to the Indenture of Mortgage, dated as of June 19, 2020, between the Company and The Bank of New York Mellon Trust Company, N.A., as trustee (as so supplemented, the "Mortgage Indenture"). Reference is made to the Indenture and the Mortgage Indenture for a description of the rights of the Trustee as holder of the 4.75% Collateral Mortgage Bonds due 2044, the property mortgaged and pledged, the nature and extent of the security and rights of the holders of the first mortgage bonds under the Mortgage Indenture and the rights of the Company under the Mortgage Indenture and the terms and conditions upon which the Senior Notes are secured.

Subject to the terms and conditions of the Indenture, the Senior Notes are redeemable at the option of the Company ("Optional Redemption"), in whole or in part, (a) at any time prior to August 15, 2043 at a Redemption Price equal to the greater of:

(i) 100% of the principal amount of the Senior Notes to be redeemed; or

(ii) as determined by the Quotation Agent, the sum of the present values of the Remaining Scheduled Payments of principal and interest on the Senior Notes to be redeemed (not including any portion of payments of interest accrued as of the Redemption Date) discounted to the Redemption Date on a semi-annual basis at the Adjusted Treasury Rate, plus 20 basis points,

plus, in either of the above cases, accrued and unpaid interest thereon to but not including the Redemption Date; and (b) at any time on or after August 15, 2043 at 100% of the principal amount of the Senior Notes to be redeemed, plus accrued and unpaid interest thereon to but not including the Redemption Date.

Interest installments whose Stated Maturity is on or prior to such Redemption Date will be payable to Holders of such Senior Notes, or one or more Predecessor Bonds, of record at the close of business on the relevant Record Dates referred to on the face hereof, all as provided in the Indenture.

In the case of an Optional Redemption, notice of redemption will be in writing and mailed first-class postage-prepaid not less than 10 days nor more than 60 days prior to the Redemption Date to each Holder of Senior Notes to be redeemed at the Holder's registered address; provided, however, that such notice need not state the dollar amount of the Redemption Price if such dollar amount has not been determined as of the date such notice is being given to the Holders of the Senior Notes being redeemed. If money sufficient to pay the Redemption Price of all Senior Notes (or portions thereof) to be redeemed on the Redemption Date is deposited with the Paying Agent or the Trustee on or prior to the Redemption Date, from and after such Redemption Date such Senior Notes or portions thereof shall cease to bear interest. Senior Notes in denominations larger than $1,000 in principal amount may be redeemed in part but only in integral multiples of $1,000.

In the event of redemption of this Senior Note in part only, a new Senior Note or Senior Notes of like tenor for the unredeemed portion hereof will be issued in the name of the Holder hereof upon the surrender hereof.

As provided in the Indenture and subject to certain limitations therein set forth, this Senior Note or any portion of the principal amount hereof will be deemed to have been paid for all purposes of the Indenture and to be no longer Outstanding thereunder, and the Company's entire indebtedness in respect thereof will be satisfied and discharged, if there has been irrevocably deposited with the Trustee or any Paying Agent (other than the Company), in trust, money in an amount which will be sufficient and/or Eligible Obligations, the principal of and interest on which when due, without regard to any reinvestment thereof, will provide moneys which, together with money, if any, deposited with or held by the Trustee or such Paying Agent, will be sufficient to pay when due the principal of and premium, if any, and interest on this Senior Note when due.

If an Event of Default shall occur and be continuing, the Trustee or the Holders of not less than 33% in aggregate principal amount of the Outstanding Bonds, considered as one class, may declare the principal amount of all Bonds then Outstanding to be due and payable immediately by notice in writing to the Company (and to the Trustee if given by Holders); provided, however, that with respect to certain Events of Default relating to bankruptcy, insolvency and similar events, the principal amount of all Bonds then Outstanding shall be due and payable immediately without further action by the Trustee or the Holders.

The Indenture permits, with certain exceptions as therein provided, the Company and the Trustee to enter into one or more supplemental indentures for the purpose of adding any provisions to, or changing in any manner or eliminating any of the provisions of, the Indenture with the consent of the Holders of not less than a majority in aggregate principal amount of the Bonds at the time Outstanding, considered as one class; provided, however, that if there shall be Bonds of more than one series Outstanding under the Indenture and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all,

of such series, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all series so directly affected, considered as one class, shall be required; and provided, further, that if the Bonds of any series shall have been issued in more than one Tranche and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such Tranches, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all Tranches so directly affected, considered as one class, shall be required; and provided, further, that the Indenture permits the Company and the Trustee to enter into one or more supplemental indentures for certain purposes without the consent of any Holders of Bonds. The Indenture also contains provisions permitting the Holders of a majority in aggregate principal amount of Bonds, on behalf of the Holders of all such Bonds, to waive certain past defaults under the Indenture and their consequences. Any such consent or waiver by the Holder of this Senior Note shall be conclusive and binding upon such Holder and upon all future Holders of this Senior Note and of any Senior Note issued upon the registration of transfer hereof or in exchange herefor or in lieu hereof, whether or not notation of such consent or waiver is made upon this Senior Note.

As provided in and subject to the provisions of the Indenture, the Holder of this Senior Note shall not have the right to institute any proceeding with respect to the Indenture or for the appointment of a receiver or trustee or for any other remedy thereunder, unless such Holder shall have previously given the Trustee written notice of a continuing Event of Default, the Holders of at least 33% in aggregate principal amount of the Bonds at the time Outstanding shall have made written request to the Trustee to institute proceedings in respect of such Event of Default as Trustee and offered the Trustee reasonable indemnity, and the Trustee shall not have received from the Holders of at least a majority in aggregate principal amount of Bonds at the time Outstanding a direction inconsistent with such written request, and shall have failed to institute any such proceeding for 60 days after receipt of such notice, request and offer of indemnity. The foregoing shall not apply to any suit instituted by the Holder of this Senior Note for the enforcement of any payment of principal hereof or any premium or interest hereon on or after the respective due dates expressed herein.

No reference herein to the Indenture and no provision of this Senior Note or of the Indenture shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal of and any premium and interest on this Senior Note at the times, place and rate, and in the coin or currency, herein prescribed.

As provided in the Indenture and subject to certain limitations therein set forth, the transfer of this Senior Note is registrable in the Bond Register, upon surrender of this Senior Note for registration of transfer at the office or agency of the Company in any place where the principal of and any premium and interest on this Senior Note are payable, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Company, the Trustee or the Bond Registrar, as the case may be, duly executed by the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new Senior Notes of like tenor, of authorized denominations and for the same aggregate principal amount, will be issued to the designated transferee or transferees.

The Senior Notes are issuable only in registered form without coupons in denominations of $1,000 and any integral multiple thereof. As provided in the Indenture and subject to certain

limitations therein set forth, Senior Notes are exchangeable for a like aggregate principal amount of Senior Notes and of like tenor of a different authorized denomination, as requested by the Holder surrendering the same.

No service charge shall be made for any such registration of transfer or exchange, but the Company may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

The Company shall not be required to execute or to provide for the registration of the transfer of or the exchange of (A) any Senior Note of this series during a period of 15 days immediately preceding the date notice is to be given identifying the serial numbers of the Senior Notes called for redemption, or (B) any Senior Note selected for redemption in whole or in part, except the unredeemed portion of any Senior Note being redeemed in part.

Prior to due presentment of this Senior Note for registration of transfer, the Company, the Trustee and any agent of the Company or the Trustee may treat the Person in whose name this Senior Note is registered as the owner hereof for all purposes, whether or not this Senior Note is overdue, and neither the Company, the Trustee nor any such agent shall be affected by notice to the contrary.

This Senior Note shall be governed by, and construed and enforced in accordance with, the laws of the State of California without regard to the principles of conflicts of laws thereunder, except to the extent that the Trust Indenture Act shall be applicable.

As provided in the Indenture, no recourse shall be had for the payment of the principal of, premium, if any, or interest with respect to this Senior Note, or any part thereof, or for any claim based hereon or otherwise in respect hereof, or of the indebtedness represented hereby, or upon any obligation, covenant or agreement under the Indenture, against any incorporator, shareholder, officer or director, as such, past, present or future, of the Company or of any predecessor or successor corporation (either directly or through the Company or a predecessor or successor corporation), whether by virtue of any constitutional provision, statute or rule of law or by the enforcement of any assessment or penalty or otherwise; it being expressly agreed and understood that the Indenture and all the Bonds are solely corporate obligations and that any such personal liability is hereby expressly waived and released as a condition of, and as part of the consideration for, the execution of the Indenture and the issuance of this Senior Note.

All terms used in this Senior Note which are not defined herein shall have the meanings assigned to them in the Indenture.

**ASSIGNMENT FORM**

To assign this Senior Note, fill in the form below: (I) or (we) assign and transfer this Senior Note to

_____

(Insert assignee's soc. sec. or tax I.D. no.)

_____

_____

_____

_____

(Print or type assignee's name, address and zip code)

and irrevocably appoint _____

to transfer this Senior Note on the books of the Company. The agent may substitute another to act for him.

_____

Date:

Your signature: _____
_____

(Sign exactly as your name appears on the face of this Senior Note)

Tax Identification No.: _____
_____

SIGNATURE GUARANTEE:

_____

Signatures must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Bond Registrar, which requirements include membership or participation in the Securities Transfer Agent Medallion Program ( *"STAMP"*) or such other "signature guarantee program" as may be determined by the Bond Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

## FORM OF AMENDED AND RESTATED 4.75% SENIOR NOTES
## DUE FEBRUARY 15, 2044

THIS SENIOR NOTE IS A BOND AND A GLOBAL BOND WITHIN THE MEANING OF THE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF A DEPOSITARY OR A NOMINEE THEREOF. UNLESS AND UNTIL IT IS EXCHANGED IN WHOLE OR IN PART FOR SENIOR NOTES IN DEFINITIVE FORM, THIS SENIOR NOTE MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY OR BY THE DEPOSITARY OR ANY SUCH NOMINEE TO A SUCCESSOR DEPOSITARY OR A NOMINEE OF SUCH SUCCESSOR DEPOSITARY.

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE COMPANY OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

THE FOLLOWING SUMMARY OF TERMS IS SUBJECT TO THE INFORMATION SET FORTH ON THE REVERSE HEREOF:

PRINCIPAL AMOUNT :

$225,000,000

MATURITY DATE:

February 15, 2044

REGISTERED OWNER: Cede & Co., as nominee of The Depository Trust Company

ORIGINAL ISSUE DATE:
August 18, 2014

INTEREST PAYMENT DATES:

February 15 and August 15, commencing
February 15, 2015

INTEREST RATE: 4.75% per annum

THIS SENIOR NOTE IS A:

☐ Global Book-Entry Bond
☐ Certificated Bond

PACIFIC GAS AND ELECTRIC COMPANY

AMENDED AND RESTATED 4.75% SENIOR NOTES DUE FEBRUARY 15, 2044
(Fixed Rate)

No. R-2                                                                                             Principal Amount: $225,000,000
CUSIP No: 694308 HH3

PACIFIC GAS AND ELECTRIC COMPANY, a corporation duly organized and existing under the laws of the State of California (herein called the "Company," which term includes any successor Person pursuant to the applicable provisions of the Indenture hereinafter referred to), for value received, hereby promises to pay to Cede & Co., as nominee for The Depository Trust Company, or registered assigns, the Principal Amount stated above on the Maturity Date stated above, and to pay interest thereon from and including the Original Issue Date stated above or, in the case of a 4.75% Senior Note due February 15, 2044 issued upon the registration of transfer or exchange, from and including the most recent Interest Payment Date to which interest has been paid or duly provided for, semi-annually in arrears on the Interest Payment Dates set forth above and on the Maturity Date stated above, commencing February 15, 2015 at the rate of 4.75% per annum until the principal hereof is paid or made available for payment. The interest so payable, and punctually paid or duly provided for, on any Interest Payment Date will, as provided in such Indenture, be paid to the Person in whose name this 4.75% Senior Note due February 15, 2044 (this "Senior Note," and together with all other 4.75% Senior Notes due February 15, 2044, the "Senior Notes") (or one or more Predecessor Bonds) is registered at the close of business on the Regular Record Date for such interest, which shall be the 15th day preceding such Interest Payment Date; provided, however, that interest payable at the Maturity Date or on a Redemption Date will be paid to the Person to whom principal is payable. Any such interest not so punctually paid or duly provided for will forthwith cease to be payable to the Holder on such Regular Record Date and may either be paid to the Person in whose name this Senior Note (or one or more Predecessor Bonds) is registered at the close of business on a Special Record Date for the payment of such Defaulted Interest to be fixed by the Trustee, notice whereof shall be given to Holders of Senior Notes not less than 10 days prior to such Special Record Date, or be paid at any time in any other lawful manner not inconsistent with the requirements of the Indenture and any securities exchange, if any, on which the Senior Notes may be listed, and upon such notice as may be required by any such exchange, all as more fully provided in said Indenture.

Payments of interest on this Senior Note will include interest accrued to but excluding the respective Interest Payment Dates. Interest payments for this Senior Note shall be computed and paid on the basis of the 360-day year of twelve 30-day months and will accrue from August 15, 2014 or from the most recent Interest Payment Date to which interest has been paid or duly provided for. In the event that any date on which interest is payable on this Senior Note (other than the Maturity Date) is not a Business Day then payment of the interest payable on such date will be made on the next succeeding day that is a Business Day (and without any interest or payment in respect of any such delay) with the same force and effect as if made on the date the payment was originally payable. If the Maturity Date falls on a day that is not a Business Day, the payment of principal, premium, if any, and interest may be made on the next succeeding Business Day, and no interest on such payment shall accrue for the period from and after maturity.

Payment of principal of, premium, if any, and interest on Senior Notes shall be made in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts. Payments of principal of, premium, if any, and interest on the Senior Notes represented by a Global Bond shall be made by wire transfer of immediately available funds to the Holder of such Global Bond, provided that, in the case of payments of principal and premium, if any, such Global Bond is first surrendered to the Paying Agent. If any of the Senior Notes are no longer represented by a Global Bond, (i) payments of principal, premium, if any, and interest due on the Maturity Date or earlier redemption of such Senior Notes shall be made at the office of the Paying Agent upon surrender of such Senior Notes to the Paying Agent, and (ii) payments of interest shall be made, at the option of the Company, subject to such surrender where applicable, (A) by check mailed to the address of the Person entitled thereto as such address shall appear in the Bond Register or (B) by wire transfer to registered Holders of at least $10,000,000 in principal amount of Senior Notes at such place and to such account at a banking institution in the United States as such Holders may designate in writing to the Trustee at least sixteen (16) days prior to the date for payment.

REFERENCE IS HEREBY MADE TO THE FURTHER PROVISIONS OF THIS SENIOR NOTE SET FORTH ON THE REVERSE HEREOF, WHICH FURTHER PROVISIONS SHALL FOR ALL PURPOSES HAVE THE SAME EFFECT AS IF SET FORTH AT THIS PLACE.

Unless the certificate of authentication hereon has been executed by the Trustee referred to on the reverse hereof by manual signature, this Senior Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose.

IN WITNESS WHEREOF, the Company has caused this instrument to be duly executed.

Dated:

PACIFIC GAS AND ELECTRIC COMPANY

By: _____

Name:
Title:

By: _____

Name:
Title:

## TRUSTEE'S CERTIFICATE OF AUTHENTICATION

This Senior Note is one of the Bonds of the series designated as Bonds of the Forty-Fourth Series referred to in the within-mentioned Indenture.

Dated:

BOKF, N.A., *As Trustee*

By: _____

*Authorized Signatory*

**Reverse of Amended and Restated 4.75% Senior Note due February 15, 2044**

This Senior Note is one of a duly authorized issue of Bonds of the Company, issued and issuable in one or more series under an Amended and Restated Indenture, dated as of April 22, 2005 (the "Base Indenture"), as previously supplemented and as further supplemented by a Twenty-First Supplemental Indenture dated as of February 21, 2014, and as amended by the Thirtieth Supplemental Indenture, dated as of July 1, 2020 (as so amended and supplemented, and together with all additional indentures supplemental thereto, and any constituent instruments establishing the terms of particular Bonds, being herein called the "Indenture"), between the Company and BOKF, N.A., as Trustee (herein called the "Trustee," which term includes any successor trustee under the Indenture), and reference is hereby made to the Indenture for a description of the respective rights, limitations of rights, duties and immunities of the Company, the Trustee and the Holders of Bonds thereunder and of the terms and conditions upon which Bonds are, and are to be, authenticated and delivered. This Senior Note is a Bond within the meaning of the Indenture and is one of the Bonds of the forty-fourth series designated as the 4.75% Senior Notes due February 15, 2044 established by the Company under the Indenture and initially issued in an aggregate principal amount of $450,000,000 on February 21, 2014. As a result of the further issuance of $225,000,000 aggregate principal amount of Bonds of the forty-fourth series on August 18, 2014, the issued amount of Bonds of such series now totals $675,000,000. The acceptance of this Senior Note shall be deemed to constitute the consent and agreement by the Holder hereof to all of the terms and provisions of the Indenture.

The Senior Notes will be secured by a series of first mortgage bonds (the "4.75% Collateral Mortgage Bonds due 2044") delivered by the Company to the Trustee for the benefit of the Holders of the Senior Notes, issued pursuant to the Second Supplemental Indenture, dated as of July 1, 2020 to the Indenture of Mortgage, dated as of June 19, 2020, between the Company and The Bank of New York Mellon Trust Company, N.A., as trustee (as so supplemented, the "Mortgage Indenture"). Reference is made to the Indenture and the Mortgage Indenture for a description of the rights of the Trustee as holder of the 4.75% Collateral Mortgage Bonds due 2044, the property mortgaged and pledged, the nature and extent of the security and rights of the holders of the first mortgage bonds under the Mortgage Indenture and the rights of the Company under the Mortgage Indenture and the terms and conditions upon which the Senior Notes are secured.

Subject to the terms and conditions of the Indenture, the Senior Notes are redeemable at the option of the Company ("Optional Redemption"), in whole or in part, (a) at any time prior to August 15, 2043 at a Redemption Price equal to the greater of:

(i) 100% of the principal amount of the Senior Notes to be redeemed; or

(ii) as determined by the Quotation Agent, the sum of the present values of the Remaining Scheduled Payments of principal and interest on the Senior Notes to be redeemed (not including any portion of payments of interest accrued as of the Redemption Date) discounted to the Redemption Date on a semi-annual basis at the Adjusted Treasury Rate, plus 20 basis points,

plus, in either of the above cases, accrued and unpaid interest thereon to but not including the Redemption Date; and (b) at any time on or after August 15, 2043 at 100% of the principal amount of the Senior Notes to be redeemed, plus accrued and unpaid interest thereon to but not including the Redemption Date.

Interest installments whose Stated Maturity is on or prior to such Redemption Date will be payable to Holders of such Senior Notes, or one or more Predecessor Bonds, of record at the close of business on the relevant Record Dates referred to on the face hereof, all as provided in the Indenture.

In the case of an Optional Redemption, notice of redemption will be in writing and mailed first-class postage-prepaid not less than 10 days nor more than 60 days prior to the Redemption Date to each Holder of Senior Notes to be redeemed at the Holder's registered address; provided, however, that such notice need not state the dollar amount of the Redemption Price if such dollar amount has not been determined as of the date such notice is being given to the Holders of the Senior Notes being redeemed. If money sufficient to pay the Redemption Price of all Senior Notes (or portions thereof) to be redeemed on the Redemption Date is deposited with the Paying Agent or the Trustee on or prior to the Redemption Date, from and after such Redemption Date such Senior Notes or portions thereof shall cease to bear interest. Senior Notes in denominations larger than $1,000 in principal amount may be redeemed in part but only in integral multiples of $1,000.

In the event of redemption of this Senior Note in part only, a new Senior Note or Senior Notes of like tenor for the unredeemed portion hereof will be issued in the name of the Holder hereof upon the surrender hereof.

As provided in the Indenture and subject to certain limitations therein set forth, this Senior Note or any portion of the principal amount hereof will be deemed to have been paid for all purposes of the Indenture and to be no longer Outstanding thereunder, and the Company's entire indebtedness in respect thereof will be satisfied and discharged, if there has been irrevocably deposited with the Trustee or any Paying Agent (other than the Company), in trust, money in an amount which will be sufficient and/or Eligible Obligations, the principal of and interest on which when due, without regard to any reinvestment thereof, will provide moneys which, together with money, if any, deposited with or held by the Trustee or such Paying Agent, will be sufficient to pay when due the principal of and premium, if any, and interest on this Senior Note when due.

If an Event of Default shall occur and be continuing, the Trustee or the Holders of not less than 33% in aggregate principal amount of the Outstanding Bonds, considered as one class, may declare the principal amount of all Bonds then Outstanding to be due and payable immediately by notice in writing to the Company (and to the Trustee if given by Holders); provided, however, that with respect to certain Events of Default relating to bankruptcy, insolvency and similar events, the principal amount of all Bonds then Outstanding shall be due and payable immediately without further action by the Trustee or the Holders.

The Indenture permits, with certain exceptions as therein provided, the Company and the Trustee to enter into one or more supplemental indentures for the purpose of adding any provisions to, or changing in any manner or eliminating any of the provisions of, the Indenture with the consent of the Holders of not less than a majority in aggregate principal amount of the Bonds at the time Outstanding, considered as one class; provided, however, that if there shall be Bonds of more than one series Outstanding under the Indenture and if a proposed supplemental indenture

shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such series, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all series so directly affected, considered as one class, shall be required; and provided, further, that if the Bonds of any series shall have been issued in more than one Tranche and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such Tranches, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all Tranches so directly affected, considered as one class, shall be required; and provided, further, that the Indenture permits the Company and the Trustee to enter into one or more supplemental indentures for certain purposes without the consent of any Holders of Bonds. The Indenture also contains provisions permitting the Holders of a majority in aggregate principal amount of Bonds, on behalf of the Holders of all such Bonds, to waive certain past defaults under the Indenture and their consequences. Any such consent or waiver by the Holder of this Senior Note shall be conclusive and binding upon such Holder and upon all future Holders of this Senior Note and of any Senior Note issued upon the registration of transfer hereof or in exchange herefor or in lieu hereof, whether or not notation of such consent or waiver is made upon this Senior Note.

As provided in and subject to the provisions of the Indenture, the Holder of this Senior Note shall not have the right to institute any proceeding with respect to the Indenture or for the appointment of a receiver or trustee or for any other remedy thereunder, unless such Holder shall have previously given the Trustee written notice of a continuing Event of Default, the Holders of at least 33% in aggregate principal amount of the Bonds at the time Outstanding shall have made written request to the Trustee to institute proceedings in respect of such Event of Default as Trustee and offered the Trustee reasonable indemnity, and the Trustee shall not have received from the Holders of at least a majority in aggregate principal amount of Bonds at the time Outstanding a direction inconsistent with such written request, and shall have failed to institute any such proceeding for 60 days after receipt of such notice, request and offer of indemnity. The foregoing shall not apply to any suit instituted by the Holder of this Senior Note for the enforcement of any payment of principal hereof or any premium or interest hereon on or after the respective due dates expressed herein.

No reference herein to the Indenture and no provision of this Senior Note or of the Indenture shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal of and any premium and interest on this Senior Note at the times, place and rate, and in the coin or currency, herein prescribed.

As provided in the Indenture and subject to certain limitations therein set forth, the transfer of this Senior Note is registrable in the Bond Register, upon surrender of this Senior Note for registration of transfer at the office or agency of the Company in any place where the principal of and any premium and interest on this Senior Note are payable, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Company, the Trustee or the Bond Registrar, as the case may be, duly executed by the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new Senior Notes of like tenor, of authorized denominations and for the same aggregate principal amount, will be issued to the designated transferee or transferees.

The Senior Notes are issuable only in registered form without coupons in denominations of $1,000 and any integral multiple thereof. As provided in the Indenture and subject to certain limitations therein set forth, Senior Notes are exchangeable for a like aggregate principal amount of Senior Notes and of like tenor of a different authorized denomination, as requested by the Holder surrendering the same.

No service charge shall be made for any such registration of transfer or exchange, but the Company may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

The Company shall not be required to execute or to provide for the registration of the transfer of or the exchange of (A) any Senior Note of this series during a period of 15 days immediately preceding the date notice is to be given identifying the serial numbers of the Senior Notes called for redemption, or (B) any Senior Note selected for redemption in whole or in part, except the unredeemed portion of any Senior Note being redeemed in part.

Prior to due presentment of this Senior Note for registration of transfer, the Company, the Trustee and any agent of the Company or the Trustee may treat the Person in whose name this Senior Note is registered as the owner hereof for all purposes, whether or not this Senior Note is overdue, and neither the Company, the Trustee nor any such agent shall be affected by notice to the contrary.

This Senior Note shall be governed by, and construed and enforced in accordance with, the laws of the State of California without regard to the principles of conflicts of laws thereunder, except to the extent that the Trust Indenture Act shall be applicable.

As provided in the Indenture, no recourse shall be had for the payment of the principal of, premium, if any, or interest with respect to this Senior Note, or any part thereof, or for any claim based hereon or otherwise in respect hereof, or of the indebtedness represented hereby, or upon any obligation, covenant or agreement under the Indenture, against any incorporator, shareholder, officer or director, as such, past, present or future, of the Company or of any predecessor or successor corporation (either directly or through the Company or a predecessor or successor corporation), whether by virtue of any constitutional provision, statute or rule of law or by the enforcement of any assessment or penalty or otherwise; it being expressly agreed and understood that the Indenture and all the Bonds are solely corporate obligations and that any such personal liability is hereby expressly waived and released as a condition of, and as part of the consideration for, the execution of the Indenture and the issuance of this Senior Note.

All terms used in this Senior Note which are not defined herein shall have the meanings assigned to them in the Indenture.

**ASSIGNMENT FORM**

To assign this Senior Note, fill in the form below: (I) or (we) assign and transfer this Senior Note to

_____

(Insert assignee's soc. sec. or tax I.D. no.)

_____

_____

_____

_____

(Print or type assignee's name, address and zip code)

and irrevocably appoint _____

to transfer this Senior Note on the books of the Company. The agent may substitute another to act for him.

_____

Date:

Your
signature: _____

_____

(Sign exactly as your name appears on the face of this Senior Note)

Tax Identification
No.: _____

_____

SIGNATURE GUARANTEE:

Signatures must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Bond Registrar, which requirements include membership or participation in the Securities Transfer Agent Medallion Program ("*STAMP*") or such other "signature guarantee program" as may be determined by the Bond Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

<center>**EXHIBIT A-9**</center>

<center>**FORM OF AMENDED AND RESTATED 3.40% SENIOR NOTES**
**DUE AUGUST 15, 2024**</center>

THIS SENIOR NOTE IS A BOND AND A GLOBAL BOND WITHIN THE MEANING OF THE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF A DEPOSITARY OR A NOMINEE THEREOF. UNLESS AND UNTIL IT IS EXCHANGED IN WHOLE OR IN PART FOR SENIOR NOTES IN DEFINITIVE FORM, THIS SENIOR NOTE MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY OR BY THE DEPOSITARY OR ANY SUCH NOMINEE TO A SUCCESSOR DEPOSITARY OR A NOMINEE OF SUCH SUCCESSOR DEPOSITARY.

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE COMPANY OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

THE FOLLOWING SUMMARY OF TERMS IS SUBJECT TO THE INFORMATION SET FORTH ON THE REVERSE HEREOF:

| PRINCIPAL AMOUNT: | ORIGINAL ISSUE DATE: | INTEREST RATE: 3.40% per annum |
|---|---|---|
| $350,000,000 | August 18, 2014 | |
| MATURITY DATE: | INTEREST PAYMENT DATES: | THIS SENIOR NOTE IS A: |
| August 15, 2024 | February 15 and August 15, commencing February 15, 2015 | ☒ Global Book-Entry Bond |
| | | ☐ Certificated Bond |
| REGISTERED OWNER: Cede & Co., as nominee of The Depository Trust Company | | |

No. R-1                                                               Principal Amount: $350,000,000
CUSIP No: 694308 HK6

PACIFIC GAS AND ELECTRIC COMPANY, a corporation duly organized and existing under the laws of the State of California (herein called the "Company," which term includes any successor Person pursuant to the applicable provisions of the Indenture hereinafter referred to), for value received, hereby promises to pay to Cede & Co., as nominee for The Depository Trust Company, or registered assigns, the Principal Amount stated above on the Maturity Date stated above, and to pay interest thereon from and including the Original Issue Date stated above or, in the case of a 3.40% Senior Note due August 15, 2024 issued upon the registration of transfer or exchange, from and including the most recent Interest Payment Date to which interest has been paid or duly provided for, semi-annually in arrears on the Interest Payment Dates set forth above and on the Maturity Date stated above, commencing February 15, 2015 at the rate of 3.40% per annum until the principal hereof is paid or made available for payment. The interest so payable, and punctually paid or duly provided for, on any Interest Payment Date will, as provided in such Indenture, be paid to the Person in whose name this 3.40% Senior Note due August 15, 2024 (this "Senior Note," and together with all other 3.40% Senior Notes due August 15, 2024, the "Senior Notes") (or one or more Predecessor Bonds) is registered at the close of business on the Regular Record Date for such interest, which shall be the 15th day preceding such Interest Payment Date; provided, however, that interest payable at the Maturity Date or on a Redemption Date will be paid to the Person to whom principal is payable. Any such interest not so punctually paid or duly provided for will forthwith cease to be payable to the Holder on such Regular Record Date and may either be paid to the Person in whose name this Senior Note (or one or more Predecessor Bonds) is registered at the close of business on a Special Record Date for the payment of such Defaulted Interest to be fixed by the Trustee, notice whereof shall be given to Holders of Senior Notes not less than 10 days prior to such Special Record Date, or be paid at any time in any other lawful manner not inconsistent with the requirements of the Indenture and any securities exchange, if any, on which the Senior Notes may be listed, and upon such notice as may be required by any such exchange, all as more fully provided in said Indenture.

Payments of interest on this Senior Note will include interest accrued to but excluding the respective Interest Payment Dates. Interest payments for this Senior Note shall be computed and paid on the basis of the 360-day year of twelve 30-day months and will accrue from August 18, 2014 or from the most recent Interest Payment Date to which interest has been paid or duly provided for. In the event that any date on which interest is payable on this Senior Note (other than the Maturity Date) is not a Business Day then payment of the interest payable on such date will be made on the next succeeding day that is a Business Day (and without any interest or payment in respect of any such delay) with the same force and effect as if made on the date the payment was originally payable. If the Maturity Date falls on a day that is not a Business Day, the payment of principal, premium, if any, and interest may be made on the next succeeding Business Day, and no interest on such payment shall accrue for the period from and after maturity.

Payment of principal of, premium, if any, and interest on Senior Notes shall be made in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts. Payments of principal of, premium, if any, and interest on the Senior Notes represented by a Global Bond shall be made by wire transfer of immediately available funds to the Holder of such Global Bond, provided that, in the case of payments of principal and premium, if any, such Global Bond is first surrendered to the Paying Agent. If any of the Senior Notes are no longer represented by a Global Bond, (i) payments of principal, premium, if any, and interest due on the Maturity Date or earlier redemption of such Senior Notes shall be made at the office of the Paying Agent upon surrender of such Senior Notes to the Paying Agent, and (ii) payments of interest shall be made, at the option of the Company, subject to such surrender where applicable, (A) by check mailed to the address of the Person entitled thereto as such address shall appear in the Bond Register or (B) by wire transfer to registered Holders of at least $10,000,000 in principal amount of Senior Notes at such place and to such account at a banking institution in the United States as such Holders may designate in writing to the Trustee at least sixteen (16) days prior to the date for payment.

REFERENCE IS HEREBY MADE TO THE FURTHER PROVISIONS OF THIS SENIOR NOTE SET FORTH ON THE REVERSE HEREOF, WHICH FURTHER PROVISIONS SHALL FOR ALL PURPOSES HAVE THE SAME EFFECT AS IF SET FORTH AT THIS PLACE.

Unless the certificate of authentication hereon has been executed by the Trustee referred to on the reverse hereof by manual signature, this Senior Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose.

IN WITNESS WHEREOF, the Company has caused this instrument to be duly executed.

Dated:

PACIFIC GAS AND ELECTRIC COMPANY

By: _____
       Name:
       Title:

By: _____
       Name:
       Title:

## TRUSTEE'S CERTIFICATE OF AUTHENTICATION

This Senior Note is one of the Bonds of the series designated as Bonds of the Forty-Sixth Series referred to in the within-mentioned Indenture.

Dated:

BOKF, N.A., *As Trustee*

By: _____
*Authorized Signatory*

**Reverse of Amended and Restated 3.40% Senior Note due August 15, 2024**

This Senior Note is one of a duly authorized issue of Bonds of the Company, issued and issuable in one or more series under an Amended and Restated Indenture, dated as of April 22, 2005 (the "Base Indenture"), as previously supplemented and as further supplemented by a Twenty-Third Supplemental Indenture, dated as of August 18, 2014, and as amended by the Thirtieth Supplemental Indenture, dated as of July 1, 2020 (as so amended and supplemented, and together with all additional indentures supplemental thereto, and any constituent instruments establishing the terms of particular Bonds, being herein called the "Indenture"), between the Company and BOKF, N.A., as Trustee (herein called the "Trustee," which term includes any successor trustee under the Indenture), and reference is hereby made to the Indenture for a description of the respective rights, limitations of rights, duties and immunities of the Company, the Trustee and the Holders of Bonds thereunder and of the terms and conditions upon which Bonds are, and are to be, authenticated and delivered. This Senior Note is a Bond within the meaning of the Indenture and is one of the Bonds of the forty-sixth series designated as the 3.40% Senior Notes due August 15, 2024 established by the Company under the Indenture. The acceptance of this Senior Note shall be deemed to constitute the consent and agreement by the Holder hereof to all of the terms and provisions of the Indenture.

The Senior Notes will be secured by a series of first mortgage bonds (the "3.40% Collateral Mortgage Bonds due 2024") delivered by the Company to the Trustee for the benefit of the Holders of the Senior Notes, issued pursuant to the Second Supplemental Indenture, dated as of July 1, 2020 to the Indenture of Mortgage, dated as of June 19, 2020, between the Company and The Bank of New York Mellon Trust Company, N.A., as trustee (as so supplemented, the "Mortgage Indenture"). Reference is made to the Indenture and the Mortgage Indenture for a description of the rights of the Trustee as holder of the 3.40% Collateral Mortgage Bonds due 2024, the property mortgaged and pledged, the nature and extent of the security and rights of the holders of the first mortgage bonds under the Mortgage Indenture and the rights of the Company under the Mortgage Indenture and the terms and conditions upon which the Senior Notes are secured.

Subject to the terms and conditions of the Indenture, the Senior Notes are redeemable at the option of the Company ("Optional Redemption"), in whole or in part, (a) at any time prior to May 15, 2024 (the date that is three months prior to the Maturity Date) at a Redemption Price equal to the greater of:

(i) 100% of the principal amount of the Senior Notes to be redeemed; or

(ii) as determined by the Quotation Agent, the sum of the present values of the Remaining Scheduled Payments of principal and interest on the 3.40% Senior Notes to be redeemed (not including any portion of payments of interest accrued as of the Redemption Date), calculated as if the Maturity Date of such 3.40% Senior Notes was May 15, 2024 (the date that is three months prior to the Maturity Date), discounted to the Redemption Date on a semiannual basis at the Adjusted Treasury Rate, plus 15 basis points;

plus, in either of the above cases, accrued and unpaid interest thereon to but not including the Redemption Date; and (b) at any time on or after May 15, 2024 (the date that is three months prior to the Maturity Date) at 100% of the principal amount of the Senior Notes to be redeemed, plus accrued and unpaid interest thereon to but not including the Redemption Date.

Interest installments whose Stated Maturity is on or prior to such Redemption Date will be payable to Holders of such Senior Notes, or one or more Predecessor Bonds, of record at the close of business on the relevant Record Dates referred to on the face hereof, all as provided in the Indenture.

In the case of an Optional Redemption, notice of redemption will be in writing and mailed first-class postage-prepaid not less than 10 days nor more than 60 days prior to the Redemption Date to each Holder of Senior Notes to be redeemed at the Holder's registered address; provided, however, that such notice need not state the dollar amount of the Redemption Price if such dollar amount has not been determined as of the date such notice is being given to the Holders of the Senior Notes being redeemed. If money sufficient to pay the Redemption Price of all Senior Notes (or portions thereof) to be redeemed on the Redemption Date is deposited with the Paying Agent or the Trustee on or prior to the Redemption Date, from and after such Redemption Date such Senior Notes or portions thereof shall cease to bear interest. Senior Notes in denominations larger than $2,000 in principal amount may be redeemed in part but only in integral multiples of $1,000.

In the event of redemption of this Senior Note in part only, a new Senior Note or Senior Notes of like tenor for the unredeemed portion hereof will be issued in the name of the Holder hereof upon the surrender hereof.

As provided in the Indenture and subject to certain limitations therein set forth, this Senior Note or any portion of the principal amount hereof will be deemed to have been paid for all purposes of the Indenture and to be no longer Outstanding thereunder, and the Company's entire indebtedness in respect thereof will be satisfied and discharged, if there has been irrevocably deposited with the Trustee or any Paying Agent (other than the Company), in trust, money in an amount which will be sufficient and/or Eligible Obligations, the principal of and interest on which when due, without regard to any reinvestment thereof, will provide moneys which, together with money, if any, deposited with or held by the Trustee or such Paying Agent, will be sufficient to pay when due the principal of and premium, if any, and interest on this Senior Note when due.

If an Event of Default shall occur and be continuing, the Trustee or the Holders of not less than 33% in aggregate principal amount of the Outstanding Bonds, considered as one class, may declare the principal amount of all Bonds then Outstanding to be due and payable immediately by notice in writing to the Company (and to the Trustee if given by Holders); provided, however, that with respect to certain Events of Default relating to bankruptcy, insolvency and similar events, the principal amount of all Bonds then Outstanding shall be due and payable immediately without further action by the Trustee or the Holders.

The Indenture permits, with certain exceptions as therein provided, the Company and the Trustee to enter into one or more supplemental indentures for the purpose of adding any provisions to, or changing in any manner or eliminating any of the provisions of, the Indenture with the consent of the Holders of not less than a majority in aggregate principal amount of the

Bonds at the time Outstanding, considered as one class; provided, however, that if there shall be Bonds of more than one series Outstanding under the Indenture and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such series, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all series so directly affected, considered as one class, shall be required; and provided, further, that if the Bonds of any series shall have been issued in more than one Tranche and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such Tranches, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all Tranches so directly affected, considered as one class, shall be required; and provided, further, that the Indenture permits the Company and the Trustee to enter into one or more supplemental indentures for certain purposes without the consent of any Holders of Bonds. The Indenture also contains provisions permitting the Holders of a majority in aggregate principal amount of Bonds, on behalf of the Holders of all such Bonds, to waive certain past defaults under the Indenture and their consequences. Any such consent or waiver by the Holder of this Senior Note shall be conclusive and binding upon such Holder and upon all future Holders of this Senior Note and of any Senior Note issued upon the registration of transfer hereof or in exchange herefor or in lieu hereof, whether or not notation of such consent or waiver is made upon this Senior Note.

As provided in and subject to the provisions of the Indenture, the Holder of this Senior Note shall not have the right to institute any proceeding with respect to the Indenture or for the appointment of a receiver or trustee or for any other remedy thereunder, unless such Holder shall have previously given the Trustee written notice of a continuing Event of Default, the Holders of at least 33% in aggregate principal amount of the Bonds at the time Outstanding shall have made written request to the Trustee to institute proceedings in respect of such Event of Default as Trustee and offered the Trustee reasonable indemnity, and the Trustee shall not have received from the Holders of at least a majority in aggregate principal amount of Bonds at the time Outstanding a direction inconsistent with such written request, and shall have failed to institute any such proceeding for 60 days after receipt of such notice, request and offer of indemnity. The foregoing shall not apply to any suit instituted by the Holder of this Senior Note for the enforcement of any payment of principal hereof or any premium or interest hereon on or after the respective due dates expressed herein.

No reference herein to the Indenture and no provision of this Senior Note or of the Indenture shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal of and any premium and interest on this Senior Note at the times, place and rate, and in the coin or currency, herein prescribed.

As provided in the Indenture and subject to certain limitations therein set forth, the transfer of this Senior Note is registrable in the Bond Register, upon surrender of this Senior Note for registration of transfer at the office or agency of the Company in any place where the principal of and any premium and interest on this Senior Note are payable, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Company, the Trustee or the Bond Registrar, as the case may be, duly executed by the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new Senior Notes of like tenor, of authorized denominations and for the same aggregate principal amount, will be issued to the designated transferee or transferees.

The Senior Notes are issuable only in registered form without coupons in denominations of $2,000 and any integral multiple of $1,000 in excess thereof. As provided in the Indenture and subject to certain limitations therein set forth, Senior Notes are exchangeable for a like aggregate principal amount of Senior Notes and of like tenor of a different authorized denomination, as requested by the Holder surrendering the same.

No service charge shall be made for any such registration of transfer or exchange, but the Company may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

The Company shall not be required to execute or to provide for the registration of the transfer of or the exchange of (A) any Senior Note of this series during a period of 15 days immediately preceding the date notice is to be given identifying the serial numbers of the Senior Notes called for redemption, or (B) any Senior Note selected for redemption in whole or in part, except the unredeemed portion of any Senior Note being redeemed in part.

Prior to due presentment of this Senior Note for registration of transfer, the Company, the Trustee and any agent of the Company or the Trustee may treat the Person in whose name this Senior Note is registered as the owner hereof for all purposes, whether or not this Senior Note is overdue, and neither the Company, the Trustee nor any such agent shall be affected by notice to the contrary.

This Senior Note shall be governed by, and construed and enforced in accordance with, the laws of the State of California without regard to the principles of conflicts of laws thereunder, except to the extent that the Trust Indenture Act shall be applicable.

As provided in the Indenture, no recourse shall be had for the payment of the principal of, premium, if any, or interest with respect to this Senior Note, or any part thereof, or for any claim based hereon or otherwise in respect hereof, or of the indebtedness represented hereby, or upon any obligation, covenant or agreement under the Indenture, against any incorporator, shareholder, officer or director, as such, past, present or future, of the Company or of any predecessor or successor corporation (either directly or through the Company or a predecessor or successor corporation), whether by virtue of any constitutional provision, statute or rule of law or by the enforcement of any assessment or penalty or otherwise; it being expressly agreed and understood that the Indenture and all the Bonds are solely corporate obligations and that any such personal liability is hereby expressly waived and released as a condition of, and as part of the consideration for, the execution of the Indenture and the issuance of this Senior Note.

All terms used in this Senior Note which are not defined herein shall have the meanings assigned to them in the Indenture.

**ASSIGNMENT FORM**

To assign this Senior Note, fill in the form below: (I) or (we) assign and transfer this Senior Note to

_____

(Insert assignee's soc. sec. or tax I.D. no.)

_____

_____

_____

_____

(Print or type assignee's name, address and zip code)

and irrevocably appoint _____

to transfer this Senior Note on the books of the Company. The agent may substitute another to act for him.

_____

Date:

Your
signature: _____
_____
(Sign exactly as your name appears on the face of this Senior Note)

Tax Identification
No.: _____
_____

SIGNATURE GUARANTEE:

Signatures must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Bond Registrar, which requirements include membership or participation in the Securities Transfer Agent Medallion Program ("*STAMP*") or such other "signature guarantee program" as may be determined by the Bond Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

**FORM OF AMENDED AND RESTATED 4.30% SENIOR NOTES**
**DUE MARCH 15, 2045**

THIS SENIOR NOTE IS A BOND AND A GLOBAL BOND WITHIN THE MEANING OF THE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF A DEPOSITARY OR A NOMINEE THEREOF. UNLESS AND UNTIL IT IS EXCHANGED IN WHOLE OR IN PART FOR SENIOR NOTES IN DEFINITIVE FORM, THIS SENIOR NOTE MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY OR BY THE DEPOSITARY OR ANY SUCH NOMINEE TO A SUCCESSOR DEPOSITARY OR A NOMINEE OF SUCH SUCCESSOR DEPOSITARY.

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE COMPANY OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

THE FOLLOWING SUMMARY OF TERMS IS SUBJECT TO THE INFORMATION SET FORTH ON THE REVERSE HEREOF:

| | | |
|---|---|---|
| PRINCIPAL AMOUNT : $500,000,000 | ORIGINAL ISSUE DATE: November 6, 2014 | INTEREST RATE: 4.30% per annum |
| MATURITY DATE: March 15, 2045 | INTEREST PAYMENT DATES: March 15 and September 15, commencing March 15, 2015 | THIS SENIOR NOTE IS A: ☒ Global Book-Entry Bond ☐ Certificated Bond |
| REGISTERED OWNER: Cede & Co., as nominee of The Depository Trust Company | | |

<div align="center">

PACIFIC GAS AND ELECTRIC COMPANY

AMENDED AND RESTATED 4.30% SENIOR NOTES DUE MARCH 15, 2045
(Fixed Rate)

</div>

No. R-1                                                            Principal Amount: $500,000,000
CUSIP No: 694308 HL4

PACIFIC GAS AND ELECTRIC COMPANY, a corporation duly organized and existing under the laws of the State of California (herein called the "Company," which term includes any successor Person pursuant to the applicable provisions of the Indenture hereinafter referred to), for value received, hereby promises to pay to Cede & Co., as nominee for The Depository Trust Company, or registered assigns, the Principal Amount stated above on the Maturity Date stated above, and to pay interest thereon from and including the Original Issue Date stated above or, in the case of a 4.30% Senior Note due March 15, 2045 issued upon the registration of transfer or exchange, from and including the most recent Interest Payment Date to which interest has been paid or duly provided for, semiannually in arrears on the Interest Payment Dates set forth above and on the Maturity Date stated above, commencing March 15, 2015 at the rate of 4.30% per annum until the principal hereof is paid or made available for payment. The interest so payable, and punctually paid or duly provided for, on any Interest Payment Date will, as provided in such Indenture, be paid to the Person in whose name this 4.30% Senior Note due March 15, 2045 (this "Senior Note," and together with all other 4.30% Senior Notes due March 15, 2045, the "Senior Notes") (or one or more Predecessor Bonds) is registered at the close of business on the Regular Record Date for such interest, which shall be the 15th day preceding such Interest Payment Date; provided, however, that interest payable at the Maturity Date or on a Redemption Date will be paid to the Person to whom principal is payable. Any such interest not so punctually paid or duly provided for will forthwith cease to be payable to the Holder on such Regular Record Date and may either be paid to the Person in whose name this Senior Note (or one or more Predecessor Bonds) is registered at the close of business on a Special Record Date for the payment of such Defaulted Interest to be fixed by the Trustee, notice whereof shall be given to Holders of Senior Notes not less than 10 days prior to such Special Record Date, or be paid at any time in any other lawful manner not inconsistent with the requirements of the Indenture and any securities exchange, if any, on which the Senior Notes may be listed, and upon such notice as may be required by any such exchange, all as more fully provided in said Indenture.

Payments of interest on this Senior Note will include interest accrued to but excluding the respective Interest Payment Dates. Interest payments for this Senior Note shall be computed and paid on the basis of the 360-day year of twelve 30-day months and will accrue from November 6, 2014 or from the most recent Interest Payment Date to which interest has been paid or duly provided for. In the event that any date on which interest is payable on this Senior Note (other than the Maturity Date) is not a Business Day then payment of the interest payable on such date will be made on the next succeeding day that is a Business Day (and without any interest or payment in respect of any such delay) with the same force and effect as if made on the date the payment was originally payable. If the Maturity Date falls on a day that is not a Business Day, the payment of principal, premium, if any, and interest may be made on the next succeeding Business Day, and no interest on such payment shall accrue for the period from and after maturity.

Payment of principal of, premium, if any, and interest on Senior Notes shall be made in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts. Payments of principal of, premium, if any, and interest on the Senior Notes represented by a Global Bond shall be made by wire transfer of immediately available funds to the Holder of such Global Bond, provided that, in the case of payments of principal and premium, if any, such Global Bond is first surrendered to the Paying Agent. If any of the Senior Notes are no longer represented by a Global Bond, (i) payments of principal, premium, if any, and interest due on the Maturity Date or earlier redemption of such Senior Notes shall be made at the office of the Paying Agent upon surrender of such Senior Notes to the Paying Agent, and (ii) payments of interest shall be made, at the option of the Company, subject to such surrender where applicable, (A) by check mailed to the address of the Person entitled thereto as such address shall appear in the Bond Register or (B) by wire transfer to registered Holders of at least $10,000,000 in principal amount of Senior Notes at such place and to such account at a banking institution in the United States as such Holders may designate in writing to the Trustee at least sixteen (16) days prior to the date for payment.

REFERENCE IS HEREBY MADE TO THE FURTHER PROVISIONS OF THIS SENIOR NOTE SET FORTH ON THE REVERSE HEREOF, WHICH FURTHER PROVISIONS SHALL FOR ALL PURPOSES HAVE THE SAME EFFECT AS IF SET FORTH AT THIS PLACE.

Unless the certificate of authentication hereon has been executed by the Trustee referred to on the reverse hereof by manual signature, this Senior Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose.

IN WITNESS WHEREOF, the Company has caused this instrument to be duly executed.

Dated:

PACIFIC GAS AND ELECTRIC COMPANY

By: _____
     Name:
     Title:

By: _____
     Name:
     Title:

TRUSTEE'S CERTIFICATE OF AUTHENTICATION

This Senior Note is one of the Bonds of the series designated as Bonds of the Forty-Seventh Series referred to in the within-mentioned Indenture.

Dated:

BOKF, N.A., *As Trustee*

By: _____
*Authorized Signatory*

**Reverse of Amended and Restated 4.30% Senior Note due March 15, 2045**

This Senior Note is one of a duly authorized issue of Bonds of the Company, issued and issuable in one or more series under an Amended and Restated Indenture, dated as of April 22, 2005 (the "Base Indenture"), as previously supplemented and as further supplemented by a Twenty-Fourth Supplemental Indenture, dated as of November 6, 2014 and as amended by the Thirtieth Supplemental Indenture, dated as of July 1, 2020 (as so amended and supplemented, and together with all additional indentures supplemental thereto, and any constituent instruments establishing the terms of particular Bonds, being herein called the "Indenture"), between the Company and BOKF, N.A., as Trustee (herein called the "Trustee," which term includes any successor trustee under the Indenture), and reference is hereby made to the Indenture for a description of the respective rights, limitations of rights, duties and immunities of the Company, the Trustee and the Holders of Bonds thereunder and of the terms and conditions upon which Bonds are, and are to be, authenticated and delivered. This Senior Note is a Bond within the meaning of the Indenture and is one of the Bonds of the forty-seventh series designated as the 4.30% Senior Notes due March 15, 2045 established by the Company under the Indenture. The acceptance of this Senior Note shall be deemed to constitute the consent and agreement by the Holder hereof to all of the terms and provisions of the Indenture.

The Senior Notes will be secured by a series of first mortgage bonds (the "4.30% Collateral Mortgage Bonds due 2045") delivered by the Company to the Trustee for the benefit of the Holders of the Senior Notes, issued pursuant to the Second Supplemental Indenture, dated as of July 1, 2020 to the Indenture of Mortgage, dated as of June 19, 2020, between the Company and The Bank of New York Mellon Trust Company, N.A., as trustee (as so supplemented, the "Mortgage Indenture"). Reference is made to the Indenture and the Mortgage Indenture for a description of the rights of the Trustee as holder of the 4.30% Collateral Mortgage Bonds due 2045, the property mortgaged and pledged, the nature and extent of the security and rights of the holders of the first mortgage bonds under the Mortgage Indenture and the rights of the Company under the Mortgage Indenture and the terms and conditions upon which the Senior Notes are secured.

Subject to the terms and conditions of the Indenture, the Senior Notes are redeemable at the option of the Company ("Optional Redemption"), in whole or in part, (a) at any time prior to September 15, 2044 (the date that is six months prior to the Maturity Date) at a Redemption Price equal to the greater of:

(i) 100% of the principal amount of the Senior Notes to be redeemed; or

(ii) as determined by the Quotation Agent, the sum of the present values of the Remaining Scheduled Payments of principal and interest on the Senior Notes to be redeemed (not including any portion of payments of interest accrued as of the Redemption Date), calculated as if the Maturity Date of such Senior Notes was September 15, 2044 (the date that is six months prior to the Maturity Date), discounted to the Redemption Date on a semi-annual basis at the Adjusted Treasury Rate, plus 20 basis points,

plus, in either of the above cases, accrued and unpaid interest thereon to but not including the Redemption Date; and (b) at any time on or after September 15, 2044 (the date that is six months prior to the Maturity Date) at 100% of the principal amount of the Senior Notes to be redeemed, plus accrued and unpaid interest thereon to but not including the Redemption Date.

Interest installments whose Stated Maturity is on or prior to such Redemption Date will be payable to Holders of such Senior Notes, or one or more Predecessor Bonds, of record at the close of business on the relevant Record Dates referred to on the face hereof, all as provided in the Indenture.

In the case of an Optional Redemption, notice of redemption will be in writing and mailed first-class postage-prepaid not less than 10 days nor more than 60 days prior to the Redemption Date to each Holder of Senior Notes to be redeemed at the Holder's registered address; provided, however, that such notice need not state the dollar amount of the Redemption Price if such dollar amount has not been determined as of the date such notice is being given to the Holders of the Senior Notes being redeemed. If money sufficient to pay the Redemption Price of all Senior Notes (or portions thereof) to be redeemed on the Redemption Date is deposited with the Paying Agent or the Trustee on or prior to the Redemption Date, from and after such Redemption Date such Senior Notes or portions thereof shall cease to bear interest. Senior Notes in denominations larger than $1,000 in principal amount may be redeemed in part but only in integral multiples of $1,000.

In the event of redemption of this Senior Note in part only, a new Senior Note or Senior Notes of like tenor for the unredeemed portion hereof will be issued in the name of the Holder hereof upon the surrender hereof.

As provided in the Indenture and subject to certain limitations therein set forth, this Senior Note or any portion of the principal amount hereof will be deemed to have been paid for all purposes of the Indenture and to be no longer Outstanding thereunder, and the Company's entire indebtedness in respect thereof will be satisfied and discharged, if there has been irrevocably deposited with the Trustee or any Paying Agent (other than the Company), in trust, money in an amount which will be sufficient and/or Eligible Obligations, the principal of and interest on which when due, without regard to any reinvestment thereof, will provide moneys which, together with money, if any, deposited with or held by the Trustee or such Paying Agent, will be sufficient to pay when due the principal of and premium, if any, and interest on this Senior Note when due.

If an Event of Default shall occur and be continuing, the Trustee or the Holders of not less than 33% in aggregate principal amount of the Outstanding Bonds, considered as one class, may declare the principal amount of all Bonds then Outstanding to be due and payable immediately by notice in writing to the Company (and to the Trustee if given by Holders); provided, however, that with respect to certain Events of Default relating to bankruptcy, insolvency and similar events, the principal amount of all Bonds then Outstanding shall be due and payable immediately without further action by the Trustee or the Holders.

The Indenture permits, with certain exceptions as therein provided, the Company and the Trustee to enter into one or more supplemental indentures for the purpose of adding any provisions to, or changing in any manner or eliminating any of the provisions of, the Indenture with the consent of the Holders of not less than a majority in aggregate principal amount of the Bonds at the time Outstanding, considered as one class; provided, however, that if there shall be Bonds of more than one series Outstanding under the Indenture and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such series, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all series so directly affected, considered as one class, shall be required; and provided, further, that if the Bonds of any series shall have been issued in more than one Tranche and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such Tranches, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all Tranches so directly affected, considered as one class, shall be required; and provided, further, that the Indenture permits the Company and the Trustee to enter into one or more supplemental indentures for certain purposes without the consent of any Holders of Bonds. The Indenture also contains provisions permitting the Holders of a majority in aggregate principal amount of Bonds, on behalf of the Holders of all such Bonds, to waive certain past defaults under the Indenture and their consequences. Any such consent or waiver by the Holder of this Senior Note shall be

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 303 of 1367

conclusive and binding upon such Holder and upon all future Holders of this Senior Note and of any Senior Note issued upon the registration of transfer hereof or in exchange herefor or in lieu hereof, whether or not notation of such consent or waiver is made upon this Senior Note.

As provided in and subject to the provisions of the Indenture, the Holder of this Senior Note shall not have the right to institute any proceeding with respect to the Indenture or for the appointment of a receiver or trustee or for any other remedy thereunder, unless such Holder shall have previously given the Trustee written notice of a continuing Event of Default, the Holders of at least 33% in aggregate principal amount of the Bonds at the time Outstanding shall have made written request to the Trustee to institute proceedings in respect of such Event of Default as Trustee and offered the Trustee reasonable indemnity, and the Trustee shall not have received from the Holders of at least a majority in aggregate principal amount of Bonds at the time Outstanding a direction inconsistent with such written request, and shall have failed to institute any such proceeding for 60 days after receipt of such notice, request and offer of indemnity. The foregoing shall not apply to any suit instituted by the Holder of this Senior Note for the enforcement of any payment of principal hereof or any premium or interest hereon on or after the respective due dates expressed herein.

No reference herein to the Indenture and no provision of this Senior Note or of the Indenture shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal of and any premium and interest on this Senior Note at the times, place and rate, and in the coin or currency, herein prescribed.

As provided in the Indenture and subject to certain limitations therein set forth, the transfer of this Senior Note is registrable in the Bond Register, upon surrender of this Senior Note for registration of transfer at the office or agency of the Company in any place where the principal of and any premium and interest on this Senior Note are payable, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Company, the Trustee or the Bond Registrar, as the case may be, duly executed by the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new Senior Notes of like tenor, of authorized denominations and for the same aggregate principal amount, will be issued to the designated transferee or transferees.

The Senior Notes are issuable only in registered form without coupons in denominations of $1,000 and any integral multiple thereof. As provided in the Indenture and subject to certain limitations therein set forth, Senior Notes are exchangeable for a like aggregate principal amount of Senior Notes and of like tenor of a different authorized denomination, as requested by the Holder surrendering the same.

No service charge shall be made for any such registration of transfer or exchange, but the Company may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

The Company shall not be required to execute or to provide for the registration of the transfer of or the exchange of (A) any Senior Note of this series during a period of 15 days immediately preceding the date notice is to be given identifying the serial numbers of the Senior Notes called for redemption, or (B) any Senior Note selected for redemption in whole or in part, except the unredeemed portion of any Senior Note being redeemed in part.

Prior to due presentment of this Senior Note for registration of transfer, the Company, the Trustee and any agent of the Company or the Trustee may treat the Person in whose name this Senior Note is registered as the owner hereof for all purposes, whether or not this Senior Note is overdue, and neither the Company, the Trustee nor any such agent shall be affected by notice to the contrary.

This Senior Note shall be governed by, and construed and enforced in accordance with, the laws of the State of California without regard to the principles of conflicts of laws thereunder, except to the extent that the Trust Indenture Act shall be applicable.

As provided in the Indenture, no recourse shall be had for the payment of the principal of, premium, if any, or interest with respect to this Senior Note, or any part thereof, or for any claim based hereon or otherwise in respect hereof, or of the indebtedness represented hereby, or upon any obligation, covenant or agreement under the Indenture, against any incorporator, shareholder, officer or director, as such, past, present or future, of the Company or of any predecessor or successor corporation (either directly or through the Company or a predecessor or successor corporation), whether by virtue of any constitutional provision, statute or rule of law or by the enforcement of any assessment or penalty or otherwise; it being expressly agreed and understood that the Indenture and all the Bonds are solely corporate obligations and that any such personal liability is hereby expressly waived and released as a condition of, and as part of the consideration for, the execution of the Indenture and the issuance of this Senior Note.

All terms used in this Senior Note which are not defined herein shall have the meanings assigned to them in the Indenture.

**ASSIGNMENT FORM**

To assign this Senior Note, fill in the form below: (I) or (we) assign and transfer this Senior Note to

_____

(Insert assignee's soc. sec. or tax I.D. no.)

_____

(Print or type assignee's name, address and zip code)

and irrevocably appoint _____

to transfer this Senior Note on the books of the Company. The agent may substitute another to act for him.

_____

Date:

Your signature: _____

(Sign exactly as your name appears on the face of this Senior Note)

Tax Identification No.:

SIGNATURE GUARANTEE:

Signatures must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Bond Registrar, which requirements include membership or participation in the Securities Transfer Agent Medallion Program ("STAMP") or such other "signature guarantee program" as may be determined by the Bond Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

FORM OF AMENDED AND RESTATED 4.30% SENIOR NOTES
**DUE MARCH 15, 2045**

THIS SENIOR NOTE IS A BOND AND A GLOBAL BOND WITHIN THE MEANING OF THE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF A DEPOSITARY OR A NOMINEE THEREOF. UNLESS AND UNTIL IT IS EXCHANGED IN WHOLE OR IN PART FOR SENIOR NOTES IN DEFINITIVE FORM, THIS SENIOR NOTE MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY OR BY THE DEPOSITARY OR ANY SUCH NOMINEE TO A SUCCESSOR DEPOSITARY OR A NOMINEE OF SUCH SUCCESSOR DEPOSITARY.

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE COMPANY OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

THE FOLLOWING SUMMARY OF TERMS IS SUBJECT TO THE INFORMATION SET FORTH ON THE REVERSE HEREOF:

PRINCIPAL AMOUNT :          ORIGINAL ISSUE DATE:          INTEREST
RATE: 4.30% per annum

$100,000,000                November 6, 2014

MATURITY DATE:              INTEREST PAYMENT DATES:       THIS SENIOR
NOTE IS A:

March 15, 2045              March 15 and September 15, commencing 0 Global
Book-Entry Bond

                            September 15, 2015            ☐ Certificated
                            Bond

REGISTERED OWNER: Cede & Co., as
nominee of The Depository Trust Company

## AMENDED AND RESTATED 4.30% SENIOR NOTES DUE MARCH 15, 2045
(Fixed Rate)

No. R-2                                                                                          Principal Amount: $100,000,000
CUSIP No: 694308 HL4

PACIFIC GAS AND ELECTRIC COMPANY, a corporation duly organized and existing under the laws of the State of California (herein called the "Company," which term includes any successor Person pursuant to the applicable provisions of the Indenture hereinafter referred to), for value received, hereby promises to pay to Cede & Co., as nominee for The Depository Trust Company, or registered assigns, the Principal Amount stated above on the Maturity Date stated above, and to pay interest thereon from and including the Original Issue Date stated above or, in the case of a 4.30% Senior Note due March 15, 2045 issued upon the registration of transfer or exchange, from and including the most recent Interest Payment Date to which interest has been paid or duly provided for, semiannually in arrears on the Interest Payment Dates set forth above and on the Maturity Date stated above, commencing September 15, 2015 at the rate of 4.30% per annum until the principal hereof is paid or made available for payment. The interest so payable, and punctually paid or duly provided for, on any Interest Payment Date will, as provided in such Indenture, be paid to the Person in whose name this 4.30% Senior Note due March 15, 2045 (or one or more Predecessor Bonds) is registered at the close of business on the Regular Record Date for such interest, which shall be the 15th day preceding such Interest Payment Date; provided, however, that interest payable at the Maturity Date or on a Redemption Date will be paid to the Person to whom principal is payable. Any such interest not so punctually paid or duly provided for will forthwith cease to be payable to the Holder on such Regular Record Date and may either be paid to the Person in whose name this Senior Note (or one or more Predecessor Bonds) is registered at the close of business on a Special Record Date for the payment of such Defaulted Interest to be fixed by the Trustee, notice whereof shall be given to Holders of Senior Notes not less than 10 days prior to such Special Record Date, or be paid at any time in any other lawful manner not inconsistent with the requirements of the Indenture and any securities exchange, if any, on which the Senior Notes may be listed, and upon such notice as may be required by any such exchange, all as more fully provided in said Indenture.

Payments of interest on this Senior Note will include interest accrued to but excluding the respective Interest Payment Dates. Interest payments for this Senior Note shall be computed and paid on the basis of the 360-day year of twelve 30-day months and will accrue from March 15, 2015 or from the most recent Interest Payment Date to which interest has been paid or duly provided for. In the event that any date on which interest is payable on this Senior Note (other than the Maturity Date) is not a Business Day then payment of the interest payable on such date will be made on the next succeeding day that is a Business Day (and without any interest or payment in respect of any such delay) with the same force and effect as if made on the date the payment was originally payable. If the Maturity Date falls on a day that is not a Business Day, the payment of principal, premium, if any, and interest may be made on the next succeeding Business Day, and no interest on such payment shall accrue for the period from and after maturity.

Payment of principal of, premium, if any, and interest on Senior Notes shall be made in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts. Payments of principal of, premium, if any, and interest on the Senior Notes represented by a Global Bond shall be made by wire transfer of immediately available funds to the Holder of such Global Bond, provided that, in the case of payments of principal and premium, if any, such Global Bond is first surrendered to the Paying Agent. If any of the Senior Notes are no longer represented by a Global Bond, (i) payments of principal, premium, if any, and interest due on the Maturity Date or earlier redemption of such Senior Notes shall be made at the office of the Paying Agent upon surrender of such Senior Notes to the Paying Agent, and (ii) payments of interest shall be made, at the option of the Company, subject to such surrender where applicable, (A) by check mailed to the address of the Person entitled thereto as such address shall appear in the Bond Register or (B) by wire transfer to registered Holders of at least $10,000,000 in principal amount of Senior Notes at such place and to such account at a banking institution in the United States as such Holders may designate in writing to the Trustee at least sixteen (16) days prior to the date for payment.

REFERENCE IS HEREBY MADE TO THE FURTHER PROVISIONS OF THIS SENIOR NOTE SET FORTH ON THE REVERSE HEREOF, WHICH FURTHER PROVISIONS SHALL FOR ALL PURPOSES HAVE THE SAME EFFECT AS IF SET FORTH AT THIS PLACE.

Unless the certificate of authentication hereon has been executed by the Trustee referred to on the reverse hereof by manual signature, this Senior Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose.

IN WITNESS WHEREOF, the Company has caused this instrument to be duly executed.

Dated:

PACIFIC GAS AND ELECTRIC COMPANY

By: _____
      Name:
      Title:

By: _____
      Name:
      Title:

TRUSTEE'S CERTIFICATE OF AUTHENTICATION

This Senior Note is one of the Bonds of the series designated as Bonds of the Forty-Seventh Series referred to in the within-mentioned Indenture.

Dated:

BOKF, N.A., *As Trustee*

By: _____

*Authorized Signatory*

**Reverse of Amended and Restated 4.30% Senior Note due March 15, 2045**

This Senior Note is one of a duly authorized issue of Bonds of the Company, issued and issuable in one or more series under an Amended and Restated Indenture, dated as of April 22, 2005 (the "Base Indenture"), as previously supplemented and as further supplemented by a Twenty-Fourth Supplemental Indenture, dated as of November 6, 2014, and a Twenty-Fifth Supplemental Indenture, dated June 12, 2015 and as amended by the Thirtieth Supplemental Indenture, dated as of July 1, 2020 (as so supplemented, and together with all additional indentures supplemental thereto, and any constituent instruments establishing the terms of particular Bonds, being herein called the "Indenture"), between the Company and BOKF, N.A., as Trustee (herein called the "Trustee," which term includes any successor trustee under the Indenture), and reference is hereby made to the Indenture for a description of the respective rights, limitations of rights, duties and immunities of the Company, the Trustee and the Holders of Bonds thereunder and of the terms and conditions upon which Bonds are, and are to be, authenticated and delivered. This Senior Note is a Bond within the meaning of the Indenture and is one of the Bonds of the forty-seventh series designated as the 4.30% Senior Notes due March 15, 2045 established by the Company under the Indenture and initially issued in an aggregate principal amount of $500,000,000 on November 6, 2014. As a result of the further issuance of $100,000,000 aggregate principal amount of Bonds of the forty-seventh series on June 12, 2015, the issued amount of Bonds of such series now totals $600,000,000. The acceptance of this Senior Note shall be deemed to constitute the consent and agreement by the Holder hereof to all of the terms and provisions of the Indenture.

The Senior Notes will be secured by a series of first mortgage bonds (the "4.30% Collateral Mortgage Bonds due 2045") delivered by the Company to the Trustee for the benefit of the Holders of the Senior Notes, issued pursuant to the Second Supplemental Indenture, dated as of July 1, 2020 to the Indenture of Mortgage, dated as of June 19, 2020, between the Company and The Bank of New York Mellon Trust Company, N.A., as trustee (as so supplemented, the "Mortgage Indenture"). Reference is made to the Indenture and the Mortgage Indenture for a description of the rights of the Trustee as holder of the 4.30% Collateral Mortgage Bonds due 2045, the property mortgaged and pledged, the nature and extent of the security and rights of the holders of the first mortgage bonds under the Mortgage Indenture and the rights of the Company under the Mortgage Indenture and the terms and conditions upon which the Senior Notes are secured.

Subject to the terms and conditions of the Indenture, the Senior Notes are redeemable at the option of the Company ("Optional Redemption"), in whole or in part, (a) at any time prior to September 15, 2044 (the date that is six months prior to the Maturity Date) at a Redemption Price equal to the greater of:

      (i)   100% of the principal amount of the Senior Notes to be redeemed; or

      (ii)   as determined by the Quotation Agent, the sum of the present values of the Remaining Scheduled Payments of principal and interest on the Senior Notes to be redeemed (not including any portion of payments of interest accrued as of the Redemption Date), calculated as if the Maturity Date of such Senior Notes was September 15, 2044 (the date that is six months prior to the Maturity Date), discounted to the Redemption Date on a semi-annual basis at the Adjusted Treasury Rate, plus 20 basis points,

plus, in either of the above cases, accrued and unpaid interest thereon to but not including the Redemption Date; and (b) at any time on or after September 15, 2044 (the date that is six months prior to the Maturity Date) at 100% of the principal amount of the Senior Notes to be redeemed, plus accrued and unpaid interest thereon to but not including the Redemption Date.

Interest installments whose Stated Maturity is on or prior to such Redemption Date will be payable to Holders of such Senior Notes, or one or more Predecessor Bonds, of record at the close of business on the relevant Record Dates referred to on the face hereof, all as provided in the Indenture.

In the case of an Optional Redemption, notice of redemption will be in writing and mailed first-class postage-prepaid not less than 10 days nor more than 60 days prior to the Redemption Date to each Holder of Senior Notes to be redeemed at the Holder's registered address; provided, however, that such notice need not state the dollar amount of the Redemption Price if such dollar amount has not been determined as of the date such notice is being given to the Holders of the Senior Notes being redeemed. If money sufficient to pay the Redemption Price of all Senior Notes (or portions thereof) to be redeemed on the Redemption Date is deposited with the Paying Agent or the Trustee on or prior to the Redemption Date, from and after such Redemption Date such Senior Notes or portions thereof shall cease to bear interest. Senior Notes in denominations larger than $1,000 in principal amount may be redeemed in part but only in integral multiples of $1,000.

In the event of redemption of this Senior Note in part only, a new Senior Note or Senior Notes of like tenor for the unredeemed portion hereof will be issued in the name of the Holder hereof upon the surrender hereof.

As provided in the Indenture and subject to certain limitations therein set forth, this Senior Note or any portion of the principal amount hereof will be deemed to have been paid for all purposes of the Indenture and to be no longer Outstanding thereunder, and the Company's entire indebtedness in respect thereof will be satisfied and discharged, if there has been irrevocably deposited with the Trustee or any Paying Agent (other than the Company), in trust, money in an amount which will be sufficient and/or Eligible Obligations, the principal of and interest on which when due, without regard to any reinvestment thereof, will provide moneys which, together with money, if any, deposited with or held by the Trustee or such Paying Agent, will be sufficient to pay when due the principal of and premium, if any, and interest on this Senior Note when due.

If an Event of Default shall occur and be continuing, the Trustee or the Holders of not less than 33% in aggregate principal amount of the Outstanding Bonds, considered as one class, may declare the principal amount of all Bonds then Outstanding to be due and payable immediately by notice in writing to the Company (and to the Trustee if given by Holders); provided, however, that with respect to certain Events of Default relating to bankruptcy, insolvency and similar events, the principal amount of all Bonds then Outstanding shall be due and payable immediately without further action by the Trustee or the Holders.

The Indenture permits, with certain exceptions as therein provided, the Company and the Trustee to enter into one or more supplemental indentures for the purpose of adding any provisions to, or changing in any manner or eliminating any of the provisions of, the Indenture with the consent of the Holders of not less than a majority in aggregate principal amount of the Bonds at the time Outstanding, considered as one class; provided, however, that if there shall be Bonds of more than one series Outstanding under the Indenture and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such series, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all series so directly affected, considered as one class, shall be required; and provided, further, that if the Bonds of any series shall have been issued in more than one Tranche and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such Tranches, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all Tranches so directly affected, considered as one class, shall be required; and provided, further, that the Indenture permits the Company and the Trustee to enter into one or more supplemental indentures for certain purposes without the consent of any Holders of Bonds. The Indenture also contains provisions permitting the Holders of a majority in aggregate principal amount of Bonds, on behalf of the Holders of all such Bonds, to waive certain past defaults under the Indenture and their consequences. Any such consent or waiver by the Holder of this Senior Note shall be conclusive and binding upon such Holder and upon all future Holders of this Senior Note and of any Senior Note issued upon the registration of transfer hereof or in exchange herefor or in lieu hereof, whether or not notation of such consent or waiver is made upon this Senior Note.

As provided in and subject to the provisions of the Indenture, the Holder of this Senior Note shall not have the right to institute any proceeding with respect to the Indenture or for the appointment of a receiver or trustee or for any other remedy thereunder, unless such Holder shall have previously given the Trustee written notice of a continuing Event of Default, the Holders of at least 33% in aggregate principal amount of the Bonds at the time Outstanding shall have made written request to the Trustee to institute proceedings in respect of such Event of Default as Trustee and offered the Trustee reasonable indemnity, and the Trustee shall not have received from the Holders of at least a majority in aggregate principal amount of Bonds at the time Outstanding a direction inconsistent with such written request, and shall have failed to institute any such proceeding for 60 days after receipt of such notice, request and offer of indemnity. The foregoing shall not apply to any suit instituted by the Holder of this Senior Note for the enforcement of any payment of principal hereof or any premium or interest hereon on or after the respective due dates expressed herein.

No reference herein to the Indenture and no provision of this Senior Note or of the Indenture shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal of and any premium and interest on this Senior Note at the times, place and rate, and in the coin or currency, herein prescribed.

As provided in the Indenture and subject to certain limitations therein set forth, the transfer of this Senior Note is registrable in the Bond Register, upon surrender of this Senior Note for registration of transfer at the office or agency of the Company in any place where the principal of and any premium and interest on this Senior Note are payable, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Company, the Trustee or the Bond

Registrar, as the case may be, duly executed by the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new Senior Notes of like tenor, of authorized denominations and for the same aggregate principal amount, will be issued to the designated transferee or transferees.

The Senior Notes are issuable only in registered form without coupons in denominations of $1,000 and any integral multiple thereof. As provided in the Indenture and subject to certain limitations therein set forth, Senior Notes are exchangeable for a like aggregate principal amount of Senior Notes and of like tenor of a different authorized denomination, as requested by the Holder surrendering the same.

No service charge shall be made for any such registration of transfer or exchange, but the Company may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

The Company shall not be required to execute or to provide for the registration of the transfer of or the exchange of (A) any Senior Note of this series during a period of 15 days immediately preceding the date notice is to be given identifying the serial numbers of the Senior Notes called for redemption, or (B) any Senior Note selected for redemption in whole or in part, except the unredeemed portion of any Senior Note being redeemed in part.

Prior to due presentment of this Senior Note for registration of transfer, the Company, the Trustee and any agent of the Company or the Trustee may treat the Person in whose name this Senior Note is registered as the owner hereof for all purposes, whether or not this Senior Note is overdue, and neither the Company, the Trustee nor any such agent shall be affected by notice to the contrary.

This Senior Note shall be governed by, and construed and enforced in accordance with, the laws of the State of California without regard to the principles of conflicts of laws thereunder, except to the extent that the Trust Indenture Act shall be applicable.

As provided in the Indenture, no recourse shall be had for the payment of the principal of, premium, if any, or interest with respect to this Senior Note, or any part thereof, or for any claim based hereon or otherwise in respect hereof, or of the indebtedness represented hereby, or upon any obligation, covenant or agreement under the Indenture, against any incorporator, shareholder, officer or director, as such, past, present or future, of the Company or of any predecessor or successor corporation (either directly or through the Company or a predecessor or successor corporation), whether by virtue of any constitutional provision, statute or rule of law or by the enforcement of any assessment or penalty or otherwise; it being expressly agreed and understood that the Indenture and all the Bonds are solely corporate obligations and that any such personal liability is hereby expressly waived and released as a condition of, and as part of the consideration for, the execution of the Indenture and the issuance of this Senior Note.

All terms used in this Senior Note which are not defined herein shall have the meanings assigned to them in the Indenture.

**ASSIGNMENT FORM**

To assign this Senior Note, fill in the form below: (I) or (we) assign and transfer this Senior Note to

_____
(Insert assignee's soc. sec. or tax I.D. no.)

_____
_____
_____
(Print or type assignee's name, address and zip code)

and irrevocably appoint _____
to transfer this Senior Note on the books of the Company. The agent may substitute another to act for him.

Date:

Your signature: _____
(Sign exactly as your name appears on the face of this Senior Note)

Tax Identification No.:

SIGNATURE GUARANTEE:

_____

Signatures must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Bond Registrar, which requirements include membership or participation in the Securities Transfer Agent Medallion Program ("*STAMP*") or such other "signature guarantee program" as may be determined by the Bond Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

**FORM OF AMENDED AND RESTATED 3.50% SENIOR NOTES**
**DUE JUNE 15, 2025**

THIS SENIOR NOTE IS A BOND AND A GLOBAL BOND WITHIN THE MEANING OF THE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF A DEPOSITARY OR A NOMINEE THEREOF. UNLESS AND UNTIL IT IS EXCHANGED IN WHOLE OR IN PART FOR SENIOR NOTES IN DEFINITIVE FORM, THIS SENIOR NOTE MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY OR BY THE DEPOSITARY OR ANY SUCH NOMINEE TO A SUCCESSOR DEPOSITARY OR A NOMINEE OF SUCH SUCCESSOR DEPOSITARY.

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE COMPANY OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

THE FOLLOWING SUMMARY OF TERMS IS SUBJECT TO THE INFORMATION SET FORTH ON THE REVERSE HEREOF:

| | | |
|---|---|---|
| PRINCIPAL AMOUNT :<br>$400,000,000 | ORIGINAL ISSUE DATE:<br>June 12, 20215 | INTEREST RATE: 3.50%<br>per annum |
| MATURITY DATE:<br><br>June 15, 20215 | INTEREST PAYMENT DATES:<br><br>June 15 and December 15,<br>commencing December 15, 2015 | THIS SENIOR NOTE IS A:<br><br>☒ Global Book-Entry Bond<br>☐ Certificated Bond |
| REGISTERED OWNER: Cede & Co., as<br>nominee of The Depository Trust Company | | |

<div align="center">PACIFIC GAS AND ELECTRIC COMPANY</div>

<div align="center">AMENDED AND RESTATED 3.50% SENIOR NOTES DUE JUNE 15, 2025
(Fixed Rate)</div>

No. R-1            Principal Amount: $400,000,000

CUSIP No: 694308 HM2

      PACIFIC GAS AND ELECTRIC COMPANY, a corporation duly organized and existing under the laws of the State of California (herein called the "Company," which term includes any successor Person pursuant to the applicable provisions of the Indenture hereinafter referred to), for value received, hereby promises to pay to Cede & Co., as nominee for The Depository Trust Company, or registered assigns, the Principal Amount stated above on the Maturity Date stated above, and to pay interest thereon from and including the Original Issue Date stated above or, in the case of a 3.50% Senior Note due June 15, 2025 issued upon the registration of transfer or exchange, from and including the most recent Interest Payment Date to which interest has been paid or duly provided for, semiannually in arrears on the Interest Payment Dates set forth above and on the Maturity Date stated above, commencing December 15, 2015 at the rate of 3.50% per annum until the principal hereof is paid or made available for payment. The interest so payable, and punctually paid or duly provided for, on any Interest Payment Date will, as provided in such Indenture, be paid to the Person in whose name this 3.50% Senior Note due June 15, 2025 (this "Senior Note," and together with all other 3.50% Senior Notes due June 15, 2025, the "Senior Notes") (or one or more Predecessor Bonds) is registered at the close of business on the Regular Record Date for such interest, which shall be the 15th day preceding such Interest Payment Date; provided, however, that interest payable at the Maturity Date or on a Redemption Date will be paid to the Person to whom principal is payable. Any such interest not so punctually paid or duly provided for will forthwith cease to be payable to the Holder on such Regular Record Date and may either be paid to the Person in whose name this Senior Note (or one or more Predecessor Bonds) is registered at the close of business on a Special Record Date for the payment of such Defaulted Interest to be fixed by the Trustee, notice whereof shall be given to Holders of Senior Notes not less than 10 days prior to such Special Record Date, or be paid at any time in any other lawful manner not inconsistent with the requirements of the Indenture and any securities exchange, if any, on which the Senior Notes may be listed, and upon such notice as may be required by any such exchange, all as more fully provided in said Indenture.

      Payments of interest on this Senior Note will include interest accrued to but excluding the respective Interest Payment Dates. Interest payments for this Senior Note shall be computed and paid on the basis of the 360-day year of twelve 30-day months and will accrue from June 12, 2015 or from the most recent Interest Payment Date to which interest has been paid or duly provided for. In the event that any date on which interest is payable on this Senior Note (other than the Maturity Date) is not a Business Day then payment of the interest payable on such date will be made on the next succeeding day that is a Business Day (and without any interest or payment (or in respect of any such delay) with the same force and effect as if made on the date the payment was originally payable. If the Maturity Date falls on a day that is not a Business Day, the payment of principal, premium, if any, and interest may be made on the next succeeding Business Day, and no interest on such payment shall accrue for the period from and after maturity.

Payment of principal of, premium, if any, and interest on Senior Notes shall be made in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts. Payments of principal of, premium, if any, and interest on the Senior Notes represented by a Global Bond shall be made by wire transfer of immediately available funds to the Holder of such Global Bond, provided that, in the case of payments of principal and premium, if any, such Global Bond is first surrendered to the Paying Agent. If any of the Senior Notes are no longer represented by a Global Bond, (i) payments of principal, premium, if any, and interest due on the Maturity Date or earlier redemption of such Senior Notes shall be made at the office of the Paying Agent upon surrender of such Senior Notes to the Paying Agent, and (ii) payments of interest shall be made, at the option of the Company, subject to such surrender where applicable, (A) by check mailed to the address of the Person entitled thereto as such address shall appear in the Bond Register or (B) by wire transfer to registered Holders of at least $10,000,000 in principal amount of Senior Notes at such place and to such account at a banking institution in the United States as such Holders may designate in writing to the Trustee at least sixteen (16) days prior to the date for payment.

REFERENCE IS HEREBY MADE TO THE FURTHER PROVISIONS OF THIS SENIOR NOTE SET FORTH ON THE REVERSE HEREOF, WHICH FURTHER PROVISIONS SHALL FOR ALL PURPOSES HAVE THE SAME EFFECT AS IF SET FORTH AT THIS PLACE.

Unless the certificate of authentication hereon has been executed by the Trustee referred to on the reverse hereof by manual signature, this Senior Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose.

IN WITNESS WHEREOF, the Company has caused this instrument to be duly executed.

Dated:

PACIFIC GAS AND ELECTRIC COMPANY

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

TRUSTEE'S CERTIFICATE OF AUTHENTICATION

This Senior Note is one of the Bonds of the series designated as Bonds of the Forty-Eighth Series referred to in the within-mentioned Indenture.

Dated:

BOKF, N.A., *As Trustee*

By: _____

*Authorized Signatory*

<center>**Reverse of Amended and Restated 3.50% Senior Note due June 15, 2025**</center>

This Senior Note is one of a duly authorized issue of Bonds of the Company, issued and issuable in one or more series under an Amended and Restated Indenture, dated as of April 22, 2005 (the "Base Indenture"), as previously supplemented and as further supplemented by a Twenty-Fifth Supplemental Indenture, dated as of June 12, 2015, and as amended by the Thirtieth Supplemental Indenture, dated as of July 1, 2020 (as so supplemented, and together with all additional indentures supplemental thereto, and any constituent instruments establishing the terms of particular Bonds, being herein called the "Indenture"), between the Company and BOKF, N.A., as Trustee (herein called the "Trustee," which term includes any successor trustee under the Indenture), and reference is hereby made to the Indenture for a description of the respective rights, limitations of rights, duties and immunities of the Company, the Trustee and the Holders of Bonds thereunder and of the terms and conditions upon which Bonds are, and are to be, authenticated and delivered. This Senior Note is a Bond within the meaning of the Indenture and is one of the Bonds of the forty-eighth series designated as the 3.50% Senior Notes due June 15, 2025 established by the Company under the Indenture. The acceptance of this Senior Note shall be deemed to constitute the consent and agreement by the Holder hereof to all of the terms and provisions of the Indenture.

The Senior Notes will be secured by a series of first mortgage bonds (the "3.50% Collateral Mortgage Bonds due 2025") delivered by the Company to the Trustee for the benefit of the Holders of the Senior Notes, issued pursuant to the Second Supplemental Indenture, dated as of July 1, 2020 to the Indenture of Mortgage, dated as of June 19, 2020, between the Company and The Bank of New York Mellon Trust Company, N.A., as trustee (as so supplemented, the "Mortgage Indenture"). Reference is made to the Indenture and the Mortgage Indenture for a description of the rights of the Trustee as holder of the 3.50% Collateral Mortgage Bonds due 2025, the property mortgaged and pledged, the nature and extent of the security and rights of the holders of the first mortgage bonds under the Mortgage Indenture and the rights of the Company under the Mortgage Indenture and the terms and conditions upon which the Senior Notes are secured.

Subject to the terms and conditions of the Indenture, the Senior Notes are redeemable at the option of the Company ("Optional Redemption"), in whole or in part, (a) at any time prior to March 15, 2025 (the date that is three months prior to the Maturity Date) at a Redemption Price equal to the greater of:

(i)  100% of the principal amount of the Senior Notes to be redeemed; or

(ii)  as determined by the Quotation Agent, the sum of the present values of the Remaining Scheduled Payments of principal and interest on the Senior Notes to be redeemed (not including any portion of payments of interest accrued as of the Redemption Date), calculated as if the Maturity Date of such Senior Notes was March 15, 2025 (the date that is three months prior to the Maturity Date), discounted to the Redemption Date on a semi-annual basis at the Adjusted Treasury Rate, plus 20 basis points,

plus, in either of the above cases, accrued and unpaid interest thereon to but not including the Redemption Date; and (b) at any time on or after March 15, 2025 (the date that is three months prior to the Maturity Date) at 100% of the principal amount of the Senior Notes to be redeemed, plus accrued and unpaid interest thereon to but not including the Redemption Date.

Interest installments whose Stated Maturity is on or prior to such Redemption Date will be payable to Holders of such Senior Notes, or one or more Predecessor Bonds, of record at the close of business on the relevant Record Dates referred to on the face hereof, all as provided in the Indenture.

In the case of an Optional Redemption, notice of redemption will be in writing and mailed first-class postage-prepaid not less than 10 days nor more than 60 days prior to the Redemption Date to each Holder of Senior Notes to be redeemed at the Holder's registered address; provided, however, that such notice need not state the dollar amount of the Redemption Price if such dollar amount has not been determined as of the date such notice is being given to the Holders of the Senior Notes being redeemed. If money sufficient to pay the Redemption Price of all Senior Notes (or portions thereof) to be redeemed on the Redemption Date is deposited with the Paying Agent or the Trustee on or prior to the Redemption Date, from and after such Redemption Date such Senior Notes or portions thereof shall cease to bear interest. Senior Notes in denominations larger than $1,000 in principal amount may be redeemed in part but only in integral multiples of $1,000.

In the event of redemption of this Senior Note in part only, a new Senior Note or Senior Notes of like tenor for the unredeemed portion hereof will be issued in the name of the Holder hereof upon the surrender hereof.

As provided in the Indenture and subject to certain limitations therein set forth, this Senior Note or any portion of the principal amount hereof will be deemed to have been paid for all purposes of the Indenture and to be no longer Outstanding thereunder, and the Company's entire indebtedness in respect thereof will be satisfied and discharged, if there has been irrevocably deposited with the Trustee or any Paying Agent (other than the Company), in trust, money in an amount which will be sufficient and/or Eligible Obligations, the principal of and interest on which when due, without regard to any reinvestment thereof, will provide moneys which, together with money, if any, deposited with or held by the Trustee or such Paying Agent, will be sufficient to pay when due the principal of and premium, if any, and interest on this Senior Note when due.

If an Event of Default shall occur and be continuing, the Trustee or the Holders of not less than 33% in aggregate principal amount of the Outstanding Bonds, considered as one class, may declare the principal amount of all Bonds then Outstanding to be due and payable immediately by notice in writing to the Company (and to the Trustee if given by Holders); provided, however, that with respect to certain Events of Default relating to bankruptcy, insolvency and similar events, the principal amount of all Bonds then Outstanding shall be due and payable immediately without further action by the Trustee or the Holders.

The Indenture permits, with certain exceptions as therein provided, the Company and the Trustee to enter into one or more supplemental indentures for the purpose of adding any provisions to, or changing in any manner or eliminating any of the provisions of, the Indenture with the consent of the Holders of not less than a majority in aggregate principal amount of the

Bonds at the time Outstanding, considered as one class; provided, however, that if there shall be Bonds of more than one series Outstanding under the Indenture and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such series, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all series so directly affected, considered as one class, shall be required; and provided, further, that if the Bonds of any series shall have been issued in more than one Tranche and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such Tranches, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all Tranches so directly affected, considered as one class, shall be required; and provided, further, that the Indenture permits the Company and the Trustee to enter into one or more supplemental indentures for certain purposes without the consent of any Holders of Bonds. The Indenture also contains provisions permitting the Holders of a majority in aggregate principal amount of Bonds, on behalf of the Holders of all such Bonds, to waive certain past defaults under the Indenture and their consequences. Any such consent or waiver by the Holder of this Senior Note shall be conclusive and binding upon such Holder and upon all future Holders of this Senior Note and of any Senior Note issued upon the registration of transfer hereof or in exchange herefor or in lieu hereof, whether or not notation of such consent or waiver is made upon this Senior Note.

As provided in and subject to the provisions of the Indenture, the Holder of this Senior Note shall not have the right to institute any proceeding with respect to the Indenture or for the appointment of a receiver or trustee or for any other remedy thereunder, unless such Holder shall have previously given the Trustee written notice of a continuing Event of Default, the Holders of at least 33% in aggregate principal amount of the Bonds at the time Outstanding shall have made written request to the Trustee to institute proceedings in respect of such Event of Default as Trustee and offered the Trustee reasonable indemnity, and the Trustee shall not have received from the Holders of at least a majority in aggregate principal amount of Bonds at the time Outstanding a direction inconsistent with such written request, and shall have failed to institute any such proceeding for 60 days after receipt of such notice, request and offer of indemnity. The foregoing shall not apply to any suit instituted by the Holder of this Senior Note for the enforcement of any payment of principal hereof or any premium or interest hereon on or after the respective due dates expressed herein.

No reference herein to the Indenture and no provision of this Senior Note or of the Indenture shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal of and any premium and interest on this Senior Note at the times, place and rate, and in the coin or currency, herein prescribed.

As provided in the Indenture and subject to certain limitations therein set forth, the transfer of this Senior Note is registrable in the Bond Register, upon surrender of this Senior Note for registration of transfer at the office or agency of the Company in any place where the principal of and any premium and interest on this Senior Note are payable, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Company, the Trustee or the Bond Registrar, as the case may be, duly executed by the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new Senior Notes of like tenor, of authorized denominations and for the same aggregate principal amount, will be issued to the designated transferee or transferees.

The Senior Notes are issuable only in registered form without coupons in denominations of $1,000 and any integral multiple thereof. As provided in the Indenture and subject to certain limitations therein set forth, Senior Notes are exchangeable for a like aggregate principal amount of Senior Notes and of like tenor of a different authorized denomination, as requested by the Holder surrendering the same.

No service charge shall be made for any such registration of transfer or exchange, but the Company may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

The Company shall not be required to execute or to provide for the registration of the transfer of or the exchange of (A) any Senior Note of this series during a period of 15 days immediately preceding the date notice is to be given identifying the serial numbers of the Senior Notes called for redemption, or (B) any Senior Note selected for redemption in whole or in part, except the unredeemed portion of any Senior Note being redeemed in part.

Prior to due presentment of this Senior Note for registration of transfer, the Company, the Trustee and any agent of the Company or the Trustee may treat the Person in whose name this Senior Note is registered as the owner hereof for all purposes, whether or not this Senior Note is overdue, and neither the Company, the Trustee nor any such agent shall be affected by notice to the contrary.

This Senior Note shall be governed by, and construed and enforced in accordance with, the laws of the State of California without regard to the principles of conflicts of laws thereunder, except to the extent that the Trust Indenture Act shall be applicable.

As provided in the Indenture, no recourse shall be had for the payment of the principal of, premium, if any, or interest with respect to this Senior Note, or any part thereof, or for any claim based hereon or otherwise in respect hereof, or of the indebtedness represented hereby, or upon any obligation, covenant or agreement under the Indenture, against any incorporator, shareholder, officer or director, as such, past, present or future, of the Company or of any predecessor or successor corporation (either directly or through the Company or a predecessor or successor corporation), whether by virtue of any constitutional provision, statute or rule of law or by the enforcement of any assessment or penalty or otherwise; it being expressly agreed and understood that the Indenture and all the Bonds are solely corporate obligations and that any such personal liability is hereby expressly waived and released as a condition of, and as part of the consideration for, the execution of the Indenture and the issuance of this Senior Note.

All terms used in this Senior Note which are not defined herein shall have the meanings assigned to them in the Indenture.

**ASSIGNMENT FORM**

To assign this Senior Note, fill in the form below: (I) or (we) assign and transfer this Senior Note to

_____

(Insert assignee's soc. sec. or tax I.D. no.)

_____

_____

_____

_____

(Print or type assignee's name, address and zip code)

and irrevocably appoint _____

to transfer this Senior Note on the books of the Company. The agent may substitute another to act for him.

Date:

Your signature: _____

(Sign exactly as your name appears on the face of this Senior Note)

Tax Identification No.:

SIGNATURE GUARANTEE:

_____

Signatures must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Bond Registrar, which requirements include membership or participation in the Securities Transfer Agent Medallion Program ("*STAMP*") or such other "signature guarantee program" as may be determined by the Bond Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

<div align="center">**FORM OF AMENDED AND RESTATED 3.50% SENIOR NOTES**
**DUE JUNE 15, 2025**</div>

THIS SENIOR NOTE IS A BOND AND A GLOBAL BOND WITHIN THE MEANING OF THE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF A DEPOSITARY OR A NOMINEE THEREOF. UNLESS AND UNTIL IT IS EXCHANGED IN WHOLE OR IN PART FOR SENIOR NOTES IN DEFINITIVE FORM, THIS SENIOR NOTE MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY OR BY THE DEPOSITARY OR ANY SUCH NOMINEE TO A SUCCESSOR DEPOSITARY OR A NOMINEE OF SUCH SUCCESSOR DEPOSITARY.

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE COMPANY OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

THE FOLLOWING SUMMARY OF TERMS IS SUBJECT TO THE INFORMATION SET FORTH ON THE REVERSE HEREOF:

| | | |
|---|---|---|
| PRINCIPAL AMOUNT : | ORIGINAL ISSUE DATE: | INTEREST RATE: 3.50% |
| $200,000,000 | November 5, 2015 | per annum |
| | | |
| MATURITY DATE: | INTEREST PAYMENT DATES: | THIS SENIOR NOTE IS A: |
| | | |
| June 15, 2025 | June 15 and December 15, commencing | ☒ Global Book-Entry Bond |
| | | |
| | December 15, 2015 | ☐ Certificated Bond |
| | | |
| REGISTERED OWNER: Cede & Co., as | | |
| nominee of The Depository Trust Company | | |

<div align="center">
PACIFIC GAS AND ELECTRIC COMPANY

AMENDED AND RESTATED 3.50% SENIOR NOTES DUE JUNE 15, 2025
(Fixed Rate)
</div>

No. R-2                      Principal Amount: $200,000,000

CUSIP No: 694308 HM2

PACIFIC GAS AND ELECTRIC COMPANY, a corporation duly organized and existing under the laws of the State of California (herein called the "Company," which term includes any successor Person pursuant to the applicable provisions of the Indenture hereinafter referred to), for value received, hereby promises to pay to Cede & Co., as nominee for The Depository Trust Company, or registered assigns, the Principal Amount stated above on the Maturity Date stated above, and to pay interest thereon from and including the Original Issue Date stated above or, in the case of a 3.50% Senior Note due June 15, 2025 issued upon the registration of transfer or exchange, from and including the most recent Interest Payment Date to which interest has been paid or duly provided for, semi-annually in arrears on the Interest Payment Dates set forth above and on the Maturity Date stated above, commencing December 15, 2015 at the rate of 3.50% per annum until the principal hereof is paid or made available for payment. The interest so payable, and punctually paid or duly provided for, on any Interest Payment Date will, as provided in such Indenture, be paid to the Person in whose name this 3.50% Senior Note due June 15, 2025 (this "Senior Note," and together with all other 3.50% Senior Notes due June 15, 2025, the "Senior Notes") (or one or more Predecessor Bonds) is registered at the close of business on the Regular Record Date for such interest, which shall be the 15th day preceding such Interest Payment Date; provided, however, that interest payable at the Maturity Date or on a Redemption Date will be paid to the Person to whom principal is payable. Any such interest not so punctually paid or duly provided for will forthwith cease to be payable to the Holder on such Regular Record Date and may either be paid to the Person in whose name this Senior Note (or one or more Predecessor Bonds) is registered at the close of business on a Special Record Date for the payment of such Defaulted Interest to be fixed by the Trustee, notice whereof shall be given to Holders of Senior Notes not less than 10 days prior to such Special Record Date, or be paid at any time in any other lawful manner not inconsistent with the requirements of the Indenture and any securities exchange, if any, on which the Senior Notes may be listed, and upon such notice as may be required by any such exchange, all as more fully provided in said Indenture.

Payments of interest on this Senior Note will include interest accrued to but excluding the respective Interest Payment Dates. Interest payments for this Senior Note shall be computed and paid on the basis of the 360-day year of twelve 30-day months and will accrue from June 12, 2015 or from the most recent Interest Payment Date to which interest has been paid or duly provided for. In the event that any date on which interest is payable on this Senior Note (other than the Maturity Date) is not a Business Day then payment of the interest payable on such date will be made on the next succeeding day that is a Business Day (and without any interest or payment in respect of any such delay) with the same force and effect as if made on the date the payment was originally payable. If the Maturity Date falls on a day that is not a Business Day, the payment of principal, premium, if any, and interest may be made on the next succeeding Business Day, and no interest on such payment shall accrue for the period from and after maturity.

Payment of principal of, premium, if any, and interest on Senior Notes shall be made in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts. Payments of principal of, premium, if any, and interest on the Senior Notes represented by a Global Bond shall be made by wire transfer of immediately available funds to the Holder of such Global Bond, provided that, in the case of payments of principal and premium, if any, such Global Bond is first surrendered to the Paying Agent. If any of the Senior Notes are no longer represented by a Global Bond, (i) payments of principal, premium, if any, and interest due on the Maturity Date or earlier redemption of such Senior Notes shall be made at the office of the Paying Agent upon surrender of such Senior Notes to the Paying Agent, and (ii) payments of interest shall be made, at the option of the Company, subject to such surrender where applicable, (A) by check mailed to the address of the Person entitled thereto as such address shall appear in the Bond Register or (B) by wire transfer to registered Holders of at least $10,000,000 in principal amount of Senior Notes at such place and to such account at a banking institution in the United States as such Holders may designate in writing to the Trustee at least sixteen (16) days prior to the date for payment.

REFERENCE IS HEREBY MADE TO THE FURTHER PROVISIONS OF THIS SENIOR NOTE SET FORTH ON THE REVERSE HEREOF, WHICH FURTHER PROVISIONS SHALL FOR ALL PURPOSES HAVE THE SAME EFFECT AS IF SET FORTH AT THIS PLACE.

Unless the certificate of authentication hereon has been executed by the Trustee referred to on the reverse hereof by manual signature, this Senior Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose.

IN WITNESS WHEREOF, the Company has caused this instrument to be duly executed.

Dated:

PACIFIC GAS AND ELECTRIC COMPANY

By: _____
Name:
Title:

By: _____
Name:
Title:

TRUSTEE'S CERTIFICATE OF AUTHENTICATION

This Senior Note is one of the Bonds of the series designated as Bonds of the Forty-Eighth Series referred to in the within-mentioned Indenture.

Dated:

BOKF, N.A., *As Trustee*

By: _____

*Authorized Signatory*

## Reverse of Amended and Restated 3.50% Senior Note due June 15, 2025

This Senior Note is one of a duly authorized issue of Bonds of the Company, issued and issuable in one or more series under an Amended and Restated Indenture, dated as of April 22, 2005 (the "Base Indenture"), as previously supplemented and as further supplemented by a Twenty-Fifth Supplemental Indenture, dated as of June 12, 2015, and as amended by the Thirtieth Supplemental Indenture, dated as of July 1, 2020 (as so amended and supplemented, and together with all additional indentures supplemental thereto, and any constituent instruments establishing the terms of particular Bonds, being herein called the "Indenture"), between the Company and BOKF, N.A., as Trustee (herein called the "Trustee," which term includes any successor trustee under the Indenture), and reference is hereby made to the Indenture for a description of the respective rights, limitations of rights, duties and immunities of the Company, the Trustee and the Holders of Bonds thereunder and of the terms and conditions upon which Bonds are, and are to be, authenticated and delivered. This Senior Note is a Bond within the meaning of the Indenture and is one of the Bonds of the forty-eighth series designated as the 3.50% Senior Notes due June 15, 2025 established by the Company under the Indenture and initially issued in an aggregate principal amount of $400,000,000 on June 12, 2015. As a result of the further issuance of $200,000,000 aggregate principal amount of Bonds of the forty-eighth series on November 5, 2015, the issued amount of Bonds of such series now totals $600,000,000. The acceptance of this Senior Note shall be deemed to constitute the consent and agreement by the Holder hereof to all of the terms and provisions of the Indenture.

The Senior Notes will be secured by a series of first mortgage bonds (the "3.50% Collateral Mortgage Bonds due 2025") delivered by the Company to the Trustee for the benefit of the Holders of the Senior Notes, issued pursuant to the Second Supplemental Indenture, dated as of July 1, 2020 to the Indenture of Mortgage, dated as of June 19, 2020, between the Company and The Bank of New York Mellon Trust Company, N.A., as trustee (as so supplemented, the "Mortgage Indenture"). Reference is made to the Indenture and the Mortgage Indenture for a description of the rights of the Trustee as holder of the 3.50% Collateral Mortgage Bonds due 2023, the property mortgaged and pledged, the nature and extent of the security and rights of the holders of the first mortgage bonds under the Mortgage Indenture and the rights of the Company under the Mortgage Indenture and the terms and conditions upon which the Senior Notes are secured.

Subject to the terms and conditions of the Indenture, the Senior Notes are redeemable at the option of the Company ("Optional Redemption"), in whole or in part, (a) at any time prior to March 15, 2025 (the date that is three months prior to the Maturity Date) at a Redemption Price equal to the greater of:

      (i) 100% of the principal amount of the Senior Notes to be redeemed; or

      (ii) as determined by the Quotation Agent, the sum of the present values of the Remaining Scheduled Payments of principal and interest on the Senior Notes to be redeemed (not including any portion of payments of interest accrued as of the Redemption Date), calculated as if the Maturity Date of such Senior Notes was March 15, 2025 (the date that is three months prior to the Maturity Date), discounted to the Redemption Date on a semi-annual basis at the Adjusted Treasury Rate, plus 20 basis points,

plus, in either of the above cases, accrued and unpaid interest thereon to but not including the Redemption Date; and (b) at any time on or after March 15, 2025 (the date that is three months prior to the Maturity Date) at 100% of the principal amount of the Senior Notes to be redeemed, plus accrued and unpaid interest thereon to but not including the Redemption Date.

Interest installments whose Stated Maturity is on or prior to such Redemption Date will be payable to Holders of such Senior Notes, or one or more Predecessor Bonds, of record at the close of business on the relevant Record Dates referred to on the face hereof, all as provided in the Indenture.

In the case of an Optional Redemption, notice of redemption will be in writing and mailed first-class postage-prepaid not less than 10 days nor more than 60 days prior to the Redemption Date to each Holder of Senior Notes to be redeemed at the Holder's registered address; provided, however, that such notice need not state the dollar amount of the Redemption Price if such dollar amount has not been determined as of the date such notice is being given to the Holders of the Senior Notes being redeemed. If money sufficient to pay the Redemption Price of all Senior Notes (or portions thereof) to be redeemed on the Redemption Date is deposited with the Paying Agent or the Trustee on or prior to the Redemption Date, from and after such Redemption Date such Senior Notes or portions thereof shall cease to bear interest. Senior Notes in denominations larger than $1,000 in principal amount may be redeemed in part but only in integral multiples of $1,000.

In the event of redemption of this Senior Note in part only, a new Senior Note or Senior Notes of like tenor for the unredeemed portion hereof will be issued in the name of the Holder hereof upon the surrender hereof.

As provided in the Indenture and subject to certain limitations therein set forth, this Senior Note or any portion of the principal amount hereof will be deemed to have been paid for all purposes of the Indenture and to be no longer Outstanding thereunder, and the Company's entire indebtedness in respect thereof will be satisfied and discharged, if there has been irrevocably deposited with the Trustee or any Paying Agent (other than the Company), in trust, money in an amount which will be sufficient and/or Eligible Obligations, the principal of and interest on which when due, without regard to any reinvestment thereof, will provide moneys which, together with money, if any, deposited with or held by the Trustee or such Paying Agent, will be sufficient to pay when due the principal of and premium, if any, and interest on this Senior Note when due.

If an Event of Default shall occur and be continuing, the Trustee or the Holders of not less than 33% in aggregate principal amount of the Outstanding Bonds, considered as one class, may declare the principal amount of all Bonds then Outstanding to be due and payable immediately by notice in writing to the Company (and to the Trustee if given by Holders); provided, however, that with respect to certain Events of Default relating to bankruptcy, insolvency and similar events, the principal amount of all Bonds then Outstanding shall be due and payable immediately without further action by the Trustee or the Holders.

The Indenture permits, with certain exceptions as therein provided, the Company and the Trustee to enter into one or more supplemental indentures for the purpose of adding any

provisions to, or changing in any manner or eliminating any of the provisions of, the Indenture with the consent of the Holders of not less than a majority in aggregate principal amount of the Bonds at the time Outstanding, considered as one class; provided, however, that if there shall be Bonds of more than one series Outstanding under the Indenture and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such series, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all series so directly affected, considered as one class, shall be required; and provided, further, that if the Bonds of any series shall have been issued in more than one Tranche and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such Tranches, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all Tranches so directly affected, considered as one class, shall be required; and provided, further, that the Indenture permits the Company and the Trustee to enter into one or more supplemental indentures for certain purposes without the consent of any Holders of Bonds. The Indenture also contains provisions permitting the Holders of a majority in aggregate principal amount of Bonds, on behalf of the Holders of all such Bonds, to waive certain past defaults under the Indenture and their consequences. Any such consent or waiver by the Holder of this Senior Note shall be conclusive and binding upon such Holder and upon all future Holders of this Senior Note and of any Senior Note issued upon the registration of transfer hereof or in exchange herefor or in lieu hereof, whether or not notation of such consent or waiver is made upon this Senior Note.

As provided in and subject to the provisions of the Indenture, the Holder of this Senior Note shall not have the right to institute any proceeding with respect to the Indenture or for the appointment of a receiver or trustee or for any other remedy thereunder, unless such Holder shall have previously given the Trustee written notice of a continuing Event of Default, the Holders of at least 33% in aggregate principal amount of the Bonds at the time Outstanding shall have made written request to the Trustee to institute proceedings in respect of such Event of Default as Trustee and offered the Trustee reasonable indemnity, and the Trustee shall not have received from the Holders of at least a majority in aggregate principal amount of Bonds at the time Outstanding a direction inconsistent with such written request, and shall have failed to institute any such proceeding for 60 days after receipt of such notice, request and offer of indemnity. The foregoing shall not apply to any suit instituted by the Holder of this Senior Note for the enforcement of any payment of principal hereof or any premium or interest hereon on or after the respective due dates expressed herein.

No reference herein to the Indenture and no provision of this Senior Note or of the Indenture shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal of and any premium and interest on this Senior Note at the times, place and rate, and in the coin or currency, herein prescribed.

As provided in the Indenture and subject to certain limitations therein set forth, the transfer of this Senior Note is registrable in the Bond Register, upon surrender of this Senior Note for registration of transfer at the office or agency of the Company in any place where the principal of and any premium and interest on this Senior Note are payable, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Company, the Trustee or the Bond Registrar, as the case may be, duly executed by the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new Senior Notes of like tenor, of authorized denominations and for the same aggregate principal amount, will be issued to the designated transferee or transferees.

The Senior Notes are issuable only in registered form without coupons in denominations of $1,000 and any integral multiple thereof. As provided in the Indenture and subject to certain limitations therein set forth, Senior Notes are exchangeable for a like aggregate principal amount of Senior Notes and of like tenor of a different authorized denomination, as requested by the Holder surrendering the same.

No service charge shall be made for any such registration of transfer or exchange, but the Company may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

The Company shall not be required to execute or to provide for the registration of the transfer of or the exchange of (A) any Senior Note of this series during a period of 15 days immediately preceding the date notice is to be given identifying the serial numbers of the Senior Notes called for redemption, or (B) any Senior Note selected for redemption in whole or in part, except the unredeemed portion of any Senior Note being redeemed in part.

Prior to due presentment of this Senior Note for registration of transfer, the Company, the Trustee and any agent of the Company or the Trustee may treat the Person in whose name this Senior Note is registered as the owner hereof for all purposes, whether or not this Senior Note is overdue, and neither the Company, the Trustee nor any such agent shall be affected by notice to the contrary.

This Senior Note shall be governed by, and construed and enforced in accordance with, the laws of the State of California without regard to the principles of conflicts of laws thereunder, except to the extent that the Trust Indenture Act shall be applicable.

As provided in the Indenture, no recourse shall be had for the payment of the principal of, premium, if any, or interest with respect to this Senior Note, or any part thereof, or for any claim based hereon or otherwise in respect hereof, or of the indebtedness represented hereby, or upon any obligation, covenant or agreement under the Indenture, against any incorporator, shareholder, officer or director, as such, past, present or future, of the Company or of any predecessor or successor corporation (either directly or through the Company or a predecessor or successor corporation), whether by virtue of any constitutional provision, statute or rule of law or by the enforcement of any assessment or penalty or otherwise; it being expressly agreed and understood that the Indenture and all the Bonds are solely corporate obligations and that any such personal liability is hereby expressly waived and released as a condition of, and as part of the consideration for, the execution of the Indenture and the issuance of this Senior Note.

All terms used in this Senior Note which are not defined herein shall have the meanings assigned to them in the Indenture.

**ASSIGNMENT FORM**

To assign this Senior Note, fill in the form below: (I) or (we) assign and transfer this Senior Note to

_____
(Insert assignee's soc. sec. or tax I.D. no.)

_____

_____

_____

_____
(Print or type assignee's name, address and zip code)

and irrevocably appoint _____ to transfer this Senior Note on the books of the
Company. The agent may substitute another to act for him.

_____

Date:

Your signature:
(Sign exactly as your name appears on the face of this Senior Note)

Tax Identification No.:

SIGNATURE GUARANTEE:

Signatures must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Bond Registrar, which requirements include membership or participation in the Securities Transfer Agent Medallion Program ("*STAMP*") or such other "signature guarantee program" as may be determined by the Bond Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

**FORM OF AMENDED AND RESTATED 4.25% SENIOR NOTES**
**DUE MARCH 15, 2046**

THIS SENIOR NOTE IS A BOND AND A GLOBAL BOND WITHIN THE MEANING OF THE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF A DEPOSITARY OR A NOMINEE THEREOF. UNLESS AND UNTIL IT IS EXCHANGED IN WHOLE OR IN PART FOR SENIOR NOTES IN DEFINITIVE FORM, THIS SENIOR NOTE MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY OR BY THE DEPOSITARY OR ANY SUCH NOMINEE TO A SUCCESSOR DEPOSITARY OR A NOMINEE OF SUCH SUCCESSOR DEPOSITARY.

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE COMPANY OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

THE FOLLOWING SUMMARY OF TERMS IS SUBJECT TO THE INFORMATION SET FORTH ON THE REVERSE HEREOF:

| | | |
|---|---|---|
| PRINCIPAL AMOUNT :<br>$450,000,000 | ORIGINAL ISSUE DATE:<br>November 5, 2015 | INTEREST RATE: 4.25%<br>per annum |
| MATURITY DATE:<br><br>March 15, 2046 | INTEREST PAYMENT DATES:<br><br>March 15 and September 15, commencing<br><br>March 15, 2016 | THIS SENIOR NOTE IS A:<br><br>☐ Global Book-Entry Bond<br><br>☐ Certificated Bond |

REGISTERED OWNER: Cede & Co., as
nominee of The Depository Trust Company

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 337 of 1367

<div align="center">

PACIFIC GAS AND ELECTRIC COMPANY

AMENDED AND RESTATED 4.25% SENIOR NOTES DUE MARCH 15, 2046
(Fixed Rate)

</div>

No. R-1                                                               Principal Amount: $450,000,000
CUSIP No: 694308HN0

PACIFIC GAS AND ELECTRIC COMPANY, a corporation duly organized and existing under the laws of the State of California (herein called the "Company," which term includes any successor Person pursuant to the applicable provisions of the Indenture hereinafter referred to), for value received, hereby promises to pay to Cede & Co., as nominee for The Depository Trust Company, or registered assigns, the Principal Amount stated above on the Maturity Date stated above, and to pay interest thereon from and including the Original Issue Date stated above or, in the case of a 4.25% Senior Note due March 15, 2046 issued upon the registration of transfer or exchange, from and including the most recent Interest Payment Date to which interest has been paid or duly provided for, semi-annually in arrears on the Interest Payment Dates set forth above and on the Maturity Date stated above, commencing March 15, 2016 at the rate of 4.25% per annum until the principal hereof is paid or made available for payment. The interest so payable, and punctually paid or duly provided for, on any Interest Payment Date will, as provided in such Indenture, be paid to the Person in whose name this 4.25% Senior Note due March 15, 2046 (this "Senior Note," and together with all other 4.25% Senior Notes due March 15, 2046, the "Senior Notes") (or one or more Predecessor Bonds) is registered at the close of business on the Regular Record Date for such interest, which shall be the 15th day preceding such Interest Payment Date; provided, however, that interest payable at the Maturity Date or on a Redemption Date will be paid to the Person to whom principal is payable. Any such interest not so punctually paid or duly provided for will forthwith cease to be payable to the Holder on such Regular Record Date and may either be paid to the Person in whose name this Senior Note (or one or more Predecessor Bonds) is registered at the close of business on a Special Record Date for the payment of such Defaulted Interest to be fixed by the Trustee, notice whereof shall be given to Holders of Senior Notes not less than 10 days prior to such Special Record Date, or be paid at any time in any other lawful manner not inconsistent with the requirements of the Indenture and any securities exchange, if any, on which the Senior Notes may be listed, and upon such notice as may be required by any such exchange, all as more fully provided in said Indenture.

Payments of interest on this Senior Note will include interest accrued to but excluding the respective Interest Payment Dates. Interest payments for this Senior Note shall be computed and paid on the basis of the 360-day year of twelve 30-day months and will accrue from November 5, 2015 or from the most recent Interest Payment Date to which interest has been paid or duly provided for. In the event that any date on which interest is payable on this Senior Note (other than the Maturity Date) is not a Business Day then payment of the interest payable on such date will be made on the next succeeding day that is a Business Day (and without any interest or payment in respect of any such delay) with the same force and effect as if made on the date the payment was originally payable. If the Maturity Date falls on a day that is not a Business Day, the payment of principal, premium, if any, and interest may be made on the next succeeding Business Day, and no interest on such payment shall accrue for the period from and after maturity.

Payment of principal of, premium, if any, and interest on Senior Notes shall be made in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts. Payments of principal of, premium, if any, and interest on the Senior Notes represented by a Global Bond shall be made by wire transfer of immediately available funds to the Holder of such Global Bond, provided that, in the case of payments of principal and premium, if any, such Global Bond is first surrendered to the Paying Agent. If any of the Senior Notes are no longer represented by a Global Bond, (i) payments of principal, premium, if any, and interest due on the Maturity Date or earlier redemption of such Senior Notes shall be made at the office of the Paying Agent upon surrender of such Senior Notes to the Paying Agent, and (ii) payments of interest shall be made, at the option of the Company, subject to such surrender where applicable, (A) by check mailed to the address of the Person entitled thereto as such address shall appear in the Bond Register or (B) by wire transfer to registered Holders of at least $10,000,000 in principal amount of Senior Notes at such place and to such account at a banking institution in the United States as such Holders may designate in writing to the Trustee at least sixteen (16) days prior to the date for payment.

REFERENCE IS HEREBY MADE TO THE FURTHER PROVISIONS OF THIS SENIOR NOTE SET FORTH ON THE REVERSE HEREOF, WHICH FURTHER PROVISIONS SHALL FOR ALL PURPOSES HAVE THE SAME EFFECT AS IF SET FORTH AT THIS PLACE.

Unless the certificate of authentication hereon has been executed by the Trustee referred to on the reverse hereof by manual signature, this Senior Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose.

IN WITNESS WHEREOF, the Company has caused this instrument to be duly executed.

Dated:

PACIFIC GAS AND ELECTRIC COMPANY

By: _____
     Name:
     Title:

By: _____
     Name:
     Title:

TRUSTEE'S CERTIFICATE OF AUTHENTICATION

This Senior Note is one of the Bonds of the series designated as Bonds of the Forty-Ninth Series referred to in the within-mentioned Indenture.

Dated:

BOKF, N.A., *As Trustee*

By: _____

*Authorized Signatory*

## Reverse of Amended and Restated 4.25% Senior Note due March 15, 2046

This Senior Note is one of a duly authorized issue of Bonds of the Company, issued and issuable in one or more series under an Amended and Restated Indenture, dated as of April 22, 2005 (the "Base Indenture"), as previously supplemented and as further supplemented by a Twenty-Sixth Supplemental Indenture, dated as of November 5, 2015, and as amended by the Thirtieth Supplemental Indenture, dated as of July 1, 2020 (as so amended and supplemented, and together with all additional indentures supplemental thereto, and any constituent instruments establishing the terms of particular Bonds, being herein called the "Indenture"), between the Company and BOKF, N.A., as Trustee (herein called the "Trustee," which term includes any successor trustee under the Indenture), and reference is hereby made to the Indenture for a description of the respective rights, limitations of rights, duties and immunities of the Company, the Trustee and the Holders of Bonds thereunder and of the terms and conditions upon which Bonds are, and are to be, authenticated and delivered. This Senior Note is a Bond within the meaning of the Indenture and is one of the Bonds of the forty-ninth series designated as the 4.25% Senior Notes due March 15, 2046 established by the Company under the Indenture. The acceptance of this Senior Note shall be deemed to constitute the consent and agreement by the Holder hereof to all of the terms and provisions of the Indenture.

The Senior Notes will be secured by a series of first mortgage bonds (the "4.25% Collateral Mortgage Bonds due 2046") delivered by the Company to the Trustee for the benefit of the Holders of the Senior Notes, issued pursuant to the Second Supplemental Indenture, dated as of July 1, 2020 to the Indenture of Mortgage, dated as of June 19, 2020, between the Company and The Bank of New York Mellon Trust Company, N.A., as trustee (as so supplemented, the "Mortgage Indenture"). Reference is made to the Indenture and the Mortgage Indenture for a description of the rights of the Trustee as holder of the 4.25% Collateral Mortgage Bonds due 2046, the property mortgaged and pledged, the nature and extent of the security and rights of the holders of the first mortgage bonds under the Mortgage Indenture and the rights of the Company under the Mortgage Indenture and the terms and conditions upon which the Senior Notes are secured.

Subject to the terms and conditions of the Indenture, the Senior Notes are redeemable at the option of the Company ("Optional Redemption"), in whole or in part, (a) at any time prior to September 15, 2045 (the date that is six months prior to the Maturity Date) at a Redemption Price equal to the greater of:

(i) 100% of the principal amount of the Senior Notes to be redeemed; or

(ii) as determined by the Quotation Agent, the sum of the present values of the Remaining Scheduled Payments of principal and interest on the Senior Notes to be redeemed (not including any portion of payments of interest accrued as of the Redemption Date), calculated as if the Maturity Date of such Senior Notes was September 15, 2045 (the date that is six months prior to the Maturity Date), discounted to the Redemption Date on a semi-annual basis at the Adjusted Treasury Rate, plus 25 basis points,

plus, in either of the above cases, accrued and unpaid interest thereon to but not including the Redemption Date; and (b) at any time on or after September 15, 2045 (the date that is six months prior to the Maturity Date) at 100% of the principal amount of the Senior Notes to be redeemed, plus accrued and unpaid interest thereon to but not including the Redemption Date.

Interest installments whose Stated Maturity is on or prior to such Redemption Date will be payable to Holders of such Senior Notes, or one or more Predecessor Bonds, of record at the close of business on the relevant Record Dates referred to on the face hereof, all as provided in the Indenture.

In the case of an Optional Redemption, notice of redemption will be in writing and mailed first-class postage-prepaid not less than 10 days nor more than 60 days prior to the Redemption Date to each Holder of Senior Notes to be redeemed at the Holder's registered address; provided, however, that such notice need not state the dollar amount of the Redemption Price if such dollar amount has not been determined as of the date such notice is being given to the Holders of the Senior Notes being redeemed. If money sufficient to pay the Redemption Price of all Senior Notes (or portions thereof) to be redeemed on the Redemption Date is deposited with the Paying Agent or the Trustee on or prior to the Redemption Date, from and after such Redemption Date such Senior Notes or portions thereof shall cease to bear interest. Senior Notes in denominations larger than $2,000 in principal amount may be redeemed in part but only in integral multiples of $1,000.

In the event of redemption of this Senior Note in part only, a new Senior Note or Senior Notes of like tenor for the unredeemed portion hereof will be issued in the name of the Holder hereof upon the surrender hereof.

As provided in the Indenture and subject to certain limitations therein set forth, this Senior Note or any portion of the principal amount hereof will be deemed to have been paid for all purposes of the Indenture and to be no longer Outstanding thereunder, and the Company's entire indebtedness in respect thereof will be satisfied and discharged, if there has been irrevocably deposited with the Trustee or any Paying Agent (other than the Company), in trust, money in an amount which will be sufficient and/or Eligible Obligations, the principal of and interest on which when due, without regard to any reinvestment thereof, will provide moneys which, together with money, if any, deposited with or held by the Trustee or such Paying Agent, will be sufficient to pay when due the principal of and premium, if any, and interest on this Senior Note when due.

If an Event of Default shall occur and be continuing, the Trustee or the Holders of not less than 33% in aggregate principal amount of the Outstanding Bonds, considered as one class, may declare the principal amount of all Bonds then Outstanding to be due and payable immediately by notice in writing to the Company (and to the Trustee if given by Holders); provided, however, that with respect to certain Events of Default relating to bankruptcy, insolvency and similar events, the principal amount of all Bonds then Outstanding shall be due and payable immediately without further action by the Trustee or the Holders.

The Indenture permits, with certain exceptions as therein provided, the Company and the Trustee to enter into one or more supplemental indentures for the purpose of adding any provisions to, or changing in any manner or eliminating any of the provisions of, the Indenture with the consent of the Holders of not less than a majority in aggregate principal amount of the

Bonds at the time Outstanding, considered as one class; provided, however, that if there shall be Bonds of more than one series Outstanding under the Indenture and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such series, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all series so directly affected, considered as one class, shall be required; and provided, further, that if the Bonds of any series shall have been issued in more than one Tranche and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such Tranches, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all Tranches so directly affected, considered as one class, shall be required; and provided, further, that the Indenture permits the Company and the Trustee to enter into one or more supplemental indentures for certain purposes without the consent of any Holders of Bonds. The Indenture also contains provisions permitting the Holders of a majority in aggregate principal amount of Bonds, on behalf of the Holders of all such Bonds, to waive certain past defaults under the Indenture and their consequences. Any such consent or waiver by the Holder of this Senior Note shall be conclusive and binding upon such Holder and upon all future Holders of this Senior Note and of any Senior Note issued upon the registration of transfer hereof or in exchange herefor or in lieu hereof, whether or not notation of such consent or waiver is made upon this Senior Note.

As provided in and subject to the provisions of the Indenture, the Holder of this Senior Note shall not have the right to institute any proceeding with respect to the Indenture or for the appointment of a receiver or trustee or for any other remedy thereunder, unless such Holder shall have previously given the Trustee written notice of a continuing Event of Default, the Holders of at least 33% in aggregate principal amount of the Bonds at the time Outstanding shall have made written request to the Trustee to institute proceedings in respect of such Event of Default as Trustee and offered the Trustee reasonable indemnity, and the Trustee shall not have received from the Holders of at least a majority in aggregate principal amount of Bonds at the time Outstanding a direction inconsistent with such written request, and shall have failed to institute any such proceeding for 60 days after receipt of such notice, request and offer of indemnity. The foregoing shall not apply to any suit instituted by the Holder of this Senior Note for the enforcement of any payment of principal hereof or any premium or interest hereon on or after the respective due dates expressed herein.

No reference herein to the Indenture and no provision of this Senior Note or of the Indenture shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal of and any premium and interest on this Senior Note at the times, place and rate, and in the coin or currency, herein prescribed.

As provided in the Indenture and subject to certain limitations therein set forth, the transfer of this Senior Note is registrable in the Bond Register, upon surrender of this Senior Note for registration of transfer at the office or agency of the Company in any place where the principal of and any premium and interest on this Senior Note are payable, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Company, the Trustee or the Bond Registrar, as the case may be, duly executed by the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new Senior Notes of like tenor, of authorized denominations and for the same aggregate principal amount, will be issued to the designated transferee or transferees.

The Senior Notes are issuable only in registered form without coupons in denominations of $2,000 and any integral multiple of $1,000 in excess thereof. As provided in the Indenture and subject to certain limitations therein set forth, Senior Notes are exchangeable for a like aggregate principal amount of Senior Notes and of like tenor of a different authorized denomination, as requested by the Holder surrendering the same.

No service charge shall be made for any such registration of transfer or exchange, but the Company may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

The Company shall not be required to execute or to provide for the registration of the transfer of or the exchange of (A) any Senior Note of this series during a period of 15 days immediately preceding the date notice is to be given identifying the serial numbers of the Senior Notes called for redemption, or (B) any Senior Note selected for redemption in whole or in part, except the unredeemed portion of any Senior Note being redeemed in part.

Prior to due presentment of this Senior Note for registration of transfer, the Company, the Trustee and any agent of the Company or the Trustee may treat the Person in whose name this Senior Note is registered as the owner hereof for all purposes, whether or not this Senior Note is overdue, and neither the Company, the Trustee nor any such agent shall be affected by notice to the contrary.

This Senior Note shall be governed by, and construed and enforced in accordance with, the laws of the State of California without regard to the principles of conflicts of laws thereunder, except to the extent that the Trust Indenture Act shall be applicable.

As provided in the Indenture, no recourse shall be had for the payment of the principal of, premium, if any, or interest with respect to this Senior Note, or any part thereof, or for any claim based hereon or otherwise in respect hereof, or of the indebtedness represented hereby, or upon any obligation, covenant or agreement under the Indenture, against any incorporator, shareholder, officer or director, as such, past, present or future, of the Company or of any predecessor or successor corporation (either directly or through the Company or a predecessor or successor corporation), whether by virtue of any constitutional provision, statute or rule of law or by the enforcement of any assessment or penalty or otherwise; it being expressly agreed and understood that the Indenture and all the Bonds are solely corporate obligations and that any such personal liability is hereby expressly waived and released as a condition of, and as part of the consideration for, the execution of the Indenture and the issuance of this Senior Note.

All terms used in this Senior Note which are not defined herein shall have the meanings assigned to them in the Indenture.

**ASSIGNMENT FORM**

To assign this Senior Note, fill in the form below: (I) or (we) assign and transfer this Senior Note to

_____
(Insert assignee's soc. sec. or tax I.D. no.)

_____

_____

_____

_____
(Print or type assignee's name, address and zip code)

and irrevocably appoint _____
to transfer this Senior Note on the books of the Company. The agent may substitute another to act for him.

_____

Date:

Your signature:
(Sign exactly as your name appears on the face of this Senior Note)

Tax Identification No.:

SIGNATURE GUARANTEE:

Signatures must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Bond Registrar, which requirements include membership or participation in the Securities Transfer Agent Medallion Program ("STAMP") or such other "signature guarantee program" as may be determined by the Bond Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

**FORM OF AMENDED AND RESTATED 2.95% SENIOR NOTES DUE MARCH 1, 2026**

THIS SENIOR NOTE IS A BOND AND A GLOBAL BOND WITHIN THE MEANING OF THE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF A DEPOSITARY OR A NOMINEE THEREOF. UNLESS AND UNTIL IT IS EXCHANGED IN WHOLE OR IN PART FOR SENIOR NOTES IN DEFINITIVE FORM, THIS SENIOR NOTE MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY OR BY THE DEPOSITARY OR ANY SUCH NOMINEE TO A SUCCESSOR DEPOSITARY OR A NOMINEE OF SUCH SUCCESSOR DEPOSITARY.

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE COMPANY OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

THE FOLLOWING SUMMARY OF TERMS IS SUBJECT TO THE INFORMATION SET FORTH ON THE REVERSE HEREOF:

| | | |
|---|---|---|
| PRINCIPAL AMOUNT : $600,000,000 | ORIGINAL ISSUE DATE: March 1, 2016 | INTEREST RATE: 2.95% per annum |
| MATURITY DATE: | INTEREST PAYMENT DATES: | THIS SENIOR NOTE IS A: |
| March 1, 2026 | March 1 and September 1, commencing September 1, 2016 | ☐ Global Book-Entry Bond |
| | | ☐ Certificated Bond |
| REGISTERED OWNER: Cede & Co., as nominee of The Depository Trust Company | | |

No. R-                                                                                                    Principal Amount: $
CUSIP No: 694308 HP5

     PACIFIC GAS AND ELECTRIC COMPANY, a corporation duly organized and existing under the laws of the State of California (herein called the "Company," which term includes any successor Person pursuant to the applicable provisions of the Indenture hereinafter referred to), for value received, hereby promises to pay to Cede & Co., as nominee for The Depository Trust Company, or registered assigns, the Principal Amount stated above on the Maturity Date stated above, and to pay interest thereon from and including the Original Issue Date stated above or, in the case of a 2.95% Senior Note due March 1, 2026 issued upon the registration of transfer or exchange, from and including the most recent Interest Payment Date to which interest has been paid or duly provided for, semi-annually in arrears on the Interest Payment Dates set forth above and on the Maturity Date stated above, commencing September 1, 2016 at the rate of 2.95% per annum until the principal hereof is paid or made available for payment. The interest so payable, and punctually paid or duly provided for, on any Interest Payment Date will, as provided in such Indenture, be paid to the Person in whose name this 2.95% Senior Note due March 1, 2026 (this "Senior Note," and together with all other 2.95% Senior Notes due March 1, 2026, the "Senior Notes") (or one or more Predecessor Bonds) is registered at the close of business on the Regular Record Date for such interest, which shall be the February 15th and August 15th preceding such Interest Payment Date; provided, however, that interest payable at the Maturity Date or on a Redemption Date will be paid to the Person to whom principal is payable. Any such interest not so punctually paid or duly provided for will forthwith cease to be payable to the Holder on such Regular Record Date and may either be paid to the Person in whose name this Senior Note (or one or more Predecessor Bonds) is registered at the close of business on a Special Record Date for the payment of such Defaulted Interest to be fixed by the Trustee, notice whereof shall be given to Holders of Senior Notes not less than 10 days prior to such Special Record Date, or be paid at any time in any other lawful manner not inconsistent with the requirements of the Indenture and any securities exchange, if any, on which the Senior Notes may be listed, and upon such notice as may be required by any such exchange, all as more fully provided in said Indenture.

     Payments of interest on this Senior Note will include interest accrued to but excluding the respective Interest Payment Dates. Interest payments for this Senior Note shall be computed and paid on the basis of the 360-day year of twelve 30-day months and will accrue from March 1, 2016 or from the most recent Interest Payment Date to which interest has been paid or duly provided for. In the event that any date on which interest is payable on this Senior Note (other than the Maturity Date) is not a Business Day then payment of the interest payable on such date will be made on the next succeeding day that is a Business Day (and without any interest or payment in respect of any such delay) with the same force and effect as if made on the date the payment was originally payable. If the Maturity Date falls on a day that is not a Business Day, the payment of principal, premium, if any, and interest may be made on the next succeeding Business Day, and no interest on such payment shall accrue for the period from and after maturity.

Payment of principal of, premium, if any, and interest on Senior Notes shall be made in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts. Payments of principal of, premium, if any, and interest on the Senior Notes represented by a Global Bond shall be made by wire transfer of immediately available funds to the Holder of such Global Bond, provided that, in the case of payments of principal and premium, if any, such Global Bond is first surrendered to the Paying Agent. If any of the Senior Notes are no longer represented by a Global Bond, (i) payments of principal, premium, if any, and interest due on the Maturity Date or earlier redemption of such Senior Notes shall be made at the office of the Paying Agent upon surrender of such Senior Notes to the Paying Agent, and (ii) payments of interest shall be made, at the option of the Company, subject to such surrender where applicable, (A) by check mailed to the address of the Person entitled thereto as such address shall appear in the Bond Register or (B) by wire transfer to registered Holders of at least $10,000,000 in principal amount of Senior Notes at such place and to such account at a banking institution in the United States as such Holders may designate in writing to the Trustee at least sixteen (16) days prior to the date for payment.

REFERENCE IS HEREBY MADE TO THE FURTHER PROVISIONS OF THIS SENIOR NOTE SET FORTH ON THE REVERSE HEREOF, WHICH FURTHER PROVISIONS SHALL FOR ALL PURPOSES HAVE THE SAME EFFECT AS IF SET FORTH AT THIS PLACE.

Unless the certificate of authentication hereon has been executed by the Trustee referred to on the reverse hereof by manual signature, this Senior Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose.

IN WITNESS WHEREOF, the Company has caused this instrument to be duly executed.

Dated:

PACIFIC GAS AND ELECTRIC COMPANY

By: _____
Name:
Title:

By: _____
Name:
Title:

## TRUSTEE'S CERTIFICATE OF AUTHENTICATION

This Senior Note is one of the Bonds of the series designated as Bonds of the Fiftieth Series referred to in the within-mentioned Indenture.

Dated:

BOKF, N.A.., *As Trustee*

By: _____

*Authorized Signatory*

This Senior Note is one of a duly authorized issue of Bonds of the Company, issued and issuable in one or more series under an Amended and Restated Indenture, dated as of April 22, 2005 (the "Base Indenture"), as previously supplemented and as further supplemented by a Twenty-Seventh Supplemental Indenture, dated as of March 1, 2016, and as amended by the Thirtieth Supplemental Indenture, dated as of July 1, 2020 (as so supplemented, and together with all additional indentures supplemental thereto, and any constituent instruments establishing the terms of particular Bonds, being herein called the "Indenture"), between the Company and BOKF, N.A., as Trustee (herein called the "Trustee," which term includes any successor trustee under the Indenture), and reference is hereby made to the Indenture for a description of the respective rights, limitations of rights, duties and immunities of the Company, the Trustee and the Holders of Bonds thereunder and of the terms and conditions upon which Bonds are, and are to be, authenticated and delivered. This Senior Note is a Bond within the meaning of the Indenture and is one of the Bonds of the fiftieth series designated as the 2.95% Senior Notes due March 1, 2026 established by the Company under the Indenture. The acceptance of this Senior Note shall be deemed to constitute the consent and agreement by the Holder hereof to all of the terms and provisions of the Indenture.

The Senior Notes will be secured by a series of first mortgage bonds (the "2.95% Collateral Mortgage Bonds due 2026") delivered by the Company to the Trustee for the benefit of the Holders of the Senior Notes, issued pursuant to the Second Supplemental Indenture, dated as of July 1, 2020 to the Indenture of Mortgage, dated as of June 19, 2020, between the Company and The Bank of New York Mellon Trust Company, N.A., as trustee (as so supplemented, the "Mortgage Indenture"). Reference is made to the Indenture and the Mortgage Indenture for a description of the rights of the Trustee as holder of the 2.95% Collateral Mortgage Bonds due 2026, the property mortgaged and pledged, the nature and extent of the security and rights of the holders of the first mortgage bonds under the Mortgage Indenture and the rights of the Company under the Mortgage Indenture and the terms and conditions upon which the Senior Notes are secured.

Subject to the terms and conditions of the Indenture, the Senior Notes are redeemable at the option of the Company ("Optional Redemption"), in whole or in part, (a) at any time prior to December 1, 2025 (the date that is three months prior to the Maturity Date) at a Redemption Price equal to the greater of:

(i) 100% of the principal amount of the Senior Notes to be redeemed; or

(ii) as determined by the Quotation Agent, the sum of the present values of the Remaining Scheduled Payments of principal and interest on the Senior Notes to be redeemed (not including any portion of payments of interest accrued as of the Redemption Date), calculated as if the Maturity Date of such Senior Notes was December 1, 2025 (the date that is three months prior to the Maturity Date), discounted to the Redemption Date on a semi-annual basis at the Adjusted Treasury Rate, plus 20 basis points,

plus, in either of the above cases, accrued and unpaid interest thereon to but not including the Redemption Date; and (b) at any time on or after December 1, 2025 (the date that is three months prior to the Maturity Date) at 100% of the principal amount of the Senior Notes to be redeemed, plus accrued and unpaid interest thereon to but not including the Redemption Date.

Interest installments whose Stated Maturity is on or prior to such Redemption Date will be payable to Holders of such Senior Notes, or one or more Predecessor Bonds, of record at the close of business on the relevant Record Dates referred to on the face hereof, all as provided in the Indenture.

In the case of an Optional Redemption, notice of redemption will be in writing and mailed first-class postage-prepaid not less than 10 days nor more than 60 days prior to the Redemption Date to each Holder of Senior Notes to be redeemed at the Holder's registered address; provided, however, that such notice need not state the dollar amount of the Redemption Price if such dollar amount has not been determined as of the date such notice is being given to the Holders of the Senior Notes being redeemed. If money sufficient to pay the Redemption Price of all Senior Notes (or portions thereof) to be redeemed on the Redemption Date is deposited with the Paying Agent or the Trustee on or prior to the Redemption Date, from and after such Redemption Date such Senior Notes or portions thereof shall cease to bear interest. Senior Notes in denominations larger than $2,000 in principal amount may be redeemed in part but only in integral multiples of $1,000.

In the event of redemption of this Senior Note in part only, a new Senior Note or Senior Notes of like tenor for the unredeemed portion hereof will be issued in the name of the Holder hereof upon the surrender hereof.

As provided in the Indenture and subject to certain limitations therein set forth, this Senior Note or any portion of the principal amount hereof will be deemed to have been paid for all purposes of the Indenture and to be no longer Outstanding thereunder, and the Company's entire indebtedness in respect thereof will be satisfied and discharged, if there has been irrevocably deposited with the Trustee or any Paying Agent (other than the Company), in trust, money in an amount which will be sufficient and/or Eligible Obligations, the principal of and interest on which when due, without regard to any reinvestment thereof, will provide moneys which, together with money, if any, deposited with or held by the Trustee or such Paying Agent, will be sufficient to pay when due the principal of and premium, if any, and interest on this Senior Note when due.

If an Event of Default shall occur and be continuing, the Trustee or the Holders of not less than 33% in aggregate principal amount of the Outstanding Bonds, considered as one class, may declare the principal amount of all Bonds then Outstanding to be due and payable immediately by notice in writing to the Company (and to the Trustee if given by Holders); provided, however, that with respect to certain Events of Default relating to bankruptcy, insolvency and similar events, the principal amount of all Bonds then Outstanding shall be due and payable immediately without further action by the Trustee or the Holders.

The Indenture permits, with certain exceptions as therein provided, the Company and the Trustee to enter into one or more supplemental indentures for the purpose of adding any

provisions to, or changing in any manner or eliminating any of the provisions of, the Indenture with the consent of the Holders of not less than a majority in aggregate principal amount of the Bonds at the time Outstanding, considered as one class; provided, however, that if there shall be Bonds of more than one series Outstanding under the Indenture and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such series, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all series so directly affected, considered as one class, shall be required; and provided, further, that if the Bonds of any series shall have been issued in more than one Tranche and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such Tranches, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all Tranches so directly affected, considered as one class, shall be required; and provided, further, that the Indenture permits the Company and the Trustee to enter into one or more supplemental indentures for certain purposes without the consent of any Holders of Bonds. The Indenture also contains provisions permitting the Holders of a majority in aggregate principal amount of Bonds, on behalf of the Holders of all such Bonds, to waive certain past defaults under the Indenture and their consequences. Any such consent or waiver by the Holder of this Senior Note shall be conclusive and binding upon such Holder and upon all future Holders of this Senior Note and of any Senior Note issued upon the registration of transfer hereof or in exchange herefor or in lieu hereof, whether or not notation of such consent or waiver is made upon this Senior Note.

As provided in and subject to the provisions of the Indenture, the Holder of this Senior Note shall not have the right to institute any proceeding with respect to the Indenture or for the appointment of a receiver or trustee or for any other remedy thereunder, unless such Holder shall have previously given the Trustee written notice of a continuing Event of Default, the Holders of at least 33% in aggregate principal amount of the Bonds at the time Outstanding shall have made written request to the Trustee to institute proceedings in respect of such Event of Default as Trustee and offered the Trustee reasonable indemnity, and the Trustee shall not have received from the Holders of at least a majority in aggregate principal amount of Bonds at the time Outstanding a direction inconsistent with such written request, and shall have failed to institute any such proceeding for 60 days after receipt of such notice, request and offer of indemnity. The foregoing shall not apply to any suit instituted by the Holder of this Senior Note for the enforcement of any payment of principal hereof or any premium or interest hereon on or after the respective due dates expressed herein.

No reference herein to the Indenture and no provision of this Senior Note or of the Indenture shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal of and any premium and interest on this Senior Note at the times, place and rate, and in the coin or currency, herein prescribed.

As provided in the Indenture and subject to certain limitations therein set forth, the transfer of this Senior Note is registrable in the Bond Register, upon surrender of this Senior Note for registration of transfer at the office or agency of the Company in any place where the principal of and any premium and interest on this Senior Note are payable, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Company, the Trustee or the Bond Registrar, as the case may be, duly executed by the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new Senior Notes of like tenor, of authorized denominations and for the same aggregate principal amount, will be issued to the designated transferee or transferees.

The Senior Notes are issuable only in registered form without coupons in denominations of $2,000 and any integral multiple of $1,000 in excess thereof. As provided in the Indenture and subject to certain limitations therein set forth, Senior Notes are exchangeable for a like aggregate principal amount of Senior Notes and of like tenor of a different authorized denomination, as requested by the Holder surrendering the same.

No service charge shall be made for any such registration of transfer or exchange, but the Company may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

The Company shall not be required to execute or to provide for the registration of the transfer of or the exchange of (A) any Senior Note of this series during a period of 15 days immediately preceding the date notice is to be given identifying the serial numbers of the Senior Notes called for redemption, or (B) any Senior Note selected for redemption in whole or in part, except the unredeemed portion of any Senior Note being redeemed in part.

Prior to due presentment of this Senior Note for registration of transfer, the Company, the Trustee and any agent of the Company or the Trustee may treat the Person in whose name this Senior Note is registered as the owner hereof for all purposes, whether or not this Senior Note is overdue, and neither the Company, the Trustee nor any such agent shall be affected by notice to the contrary.

This Senior Note shall be governed by, and construed and enforced in accordance with, the laws of the State of California without regard to the principles of conflicts of laws thereunder, except to the extent that the Trust Indenture Act shall be applicable.

As provided in the Indenture, no recourse shall be had for the payment of the principal of, premium, if any, or interest with respect to this Senior Note, or any part thereof, or for any claim based hereon or otherwise in respect hereof, or of the indebtedness represented hereby, or upon any obligation, covenant or agreement under the Indenture, against any incorporator, shareholder, officer or director, as such, past, present or future, of the Company or of any predecessor or successor corporation (either directly or through the Company or a predecessor or successor corporation), whether by virtue of any constitutional provision, statute or rule of law or by the enforcement of any assessment or penalty or otherwise; it being expressly agreed and understood that the Indenture and all the Bonds are solely corporate obligations and that any such personal liability is hereby expressly waived and released as a condition of, and as part of the consideration for, the execution of the Indenture and the issuance of this Senior Note.

All terms used in this Senior Note which are not defined herein shall have the meanings assigned to them in the Indenture.

**ASSIGNMENT FORM**

To assign this Senior Note, fill in the form below: (I) or (we) assign and transfer this Senior Note to

_____

(Insert assignee's soc. sec. or tax I.D. no.)

_____

_____

_____

_____

(Print or type assignee's name, address and zip code)

and irrevocably appoint _____

to transfer this Senior Note on the books of the Company. The agent may substitute another to act for him.

_____

Date:

Your signature:_____

(Sign exactly as your name appears on the face of this Senior Note)

Tax Identification No.: _____

SIGNATURE GUARANTEE:

_____

Signatures must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Bond Registrar, which requirements include membership or participation in the Securities Transfer Agent Medallion Program ("*STAMP*") or such other "signature guarantee program" as may be determined by the Bond Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

<div align="center">

**EXHIBIT A-14**
**FORM OF AMENDED AND RESTATED 4.00% SENIOR NOTES**
**DUE DECEMBER 1, 2046**

</div>

THIS SENIOR NOTE IS A BOND AND A GLOBAL BOND WITHIN THE MEANING OF THE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF A DEPOSITARY OR A NOMINEE THEREOF. UNLESS AND UNTIL IT IS EXCHANGED IN WHOLE OR IN PART FOR SENIOR NOTES IN DEFINITIVE FORM, THIS SENIOR NOTE MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY OR BY THE DEPOSITARY OR ANY SUCH NOMINEE TO A SUCCESSOR DEPOSITARY OR A NOMINEE OF SUCH SUCCESSOR DEPOSITARY.

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE COMPANY OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

THE FOLLOWING SUMMARY OF TERMS IS SUBJECT TO THE INFORMATION SET FORTH ON THE REVERSE HEREOF:

| PRINCIPAL AMOUNT: | ORIGINAL ISSUE DATE: | INTEREST RATE: |
|---|---|---|
| $400,000,000 | December 1, 2016 | 4.00% per annum |
| MATURITY DATE: | INTEREST PAYMENT DATES: | THIS SENIOR NOTE IS A: |
| December 1, 2046 | June 1 and December 1, commencing June 1, 2017 | ☒ Global Book-Entry Bond<br>☐ Certificated Bond |
| REGISTERED OWNER: | | |
| Cede & Co., as nominee of<br>The Depository Trust Company | | |

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 357 of 1367

<div align="center">

PACIFIC GAS AND ELECTRIC COMPANY

AMENDED AND RESTATED 4.00% SENIOR NOTES DUE DECEMBER 1, 2046
(Fixed Rate)

</div>

No. R-1                                                                                  Principal Amount: $400,000,000
CUSIP No: 694308HR1

PACIFIC GAS AND ELECTRIC COMPANY, a corporation duly organized and existing under the laws of the State of California (herein called the "Company," which term includes any successor Person pursuant to the applicable provisions of the Indenture hereinafter referred to), for value received, hereby promises to pay to Cede & Co., as nominee for The Depository Trust Company, or registered assigns, the Principal Amount stated above on the Maturity Date stated above, and to pay interest thereon from and including the Original Issue Date stated above or, in the case of a 4.00% Senior Note due December 1, 2046 issued upon the registration of transfer or exchange, from and including the most recent Interest Payment Date to which interest has been paid or duly provided for, semi-annually in arrears on the Interest Payment Dates set forth above and on the Maturity Date stated above, commencing June 1, 2017 at the rate of 4.00% per annum until the principal hereof is paid or made available for payment. The interest so payable, and punctually paid or duly provided for, on any Interest Payment Date will, as provided in such Indenture, be paid to the Person in whose name this 4.00% Senior Note due December 1, 2046 (this "Senior Note," and together with all other 4.00% Senior Notes due December 1, 2046, the "Senior Notes") (or one or more Predecessor Bonds) is registered at the close of business on the Regular Record Date for such interest, which shall be the May 15th and November 15th preceding such Interest Payment Date; provided, however, that interest payable at the Maturity Date or on a Redemption Date will be paid to the Person to whom principal is payable. Any such interest not so punctually paid or duly provided for will forthwith cease to be payable to the Holder on such Regular Record Date and may either be paid to the Person in whose name this Senior Note (or one or more Predecessor Bonds) is registered at the close of business on a Special Record Date for the payment of such Defaulted Interest to be fixed by the Trustee, notice whereof shall be given to Holders of Senior Notes not less than 10 days prior to such Special Record Date, or be paid at any time in any other lawful manner not inconsistent with the requirements of the Indenture and any securities exchange, if any, on which the Senior Notes may be listed, and upon such notice as may be required by any such exchange, all as more fully provided in said Indenture.

Payments of interest on this Senior Note will include interest accrued to but excluding the respective Interest Payment Dates. Interest payments for this Senior Note shall be computed and paid on the basis of the 360-day year of twelve 30-day months and will accrue from December 1, 2016 or from the most recent Interest Payment Date to which interest has been paid or duly provided for. In the event that any date on which interest is payable on this Senior Note (other than the Maturity Date) is not a Business Day then payment of the interest payable on such date will be made on the next succeeding day that is a Business Day (and without any interest or payment in respect of any such delay) with the same force and effect as if made on the date the payment was originally payable. If the Maturity Date falls on a day that is not a Business Day, the payment of principal, premium, if any, and interest may be made on the next succeeding Business Day, and no interest on such payment shall accrue for the period from and after maturity.

Payment of principal of, premium, if any, and interest on Senior Notes shall be made in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts. Payments of principal of, premium, if any, and interest on the Senior Notes represented by a Global Bond shall be made by wire transfer of immediately available funds to the Holder of such Global Bond, provided that, in the case of payments of principal and premium, if any, such Global Bond is first surrendered to the Paying Agent. If any of the Senior Notes are no longer represented by a Global Bond, (i) payments of principal, premium, if any, and interest due on the Maturity Date or earlier redemption of such Senior Notes shall be made at the office of the Paying Agent upon surrender of such Senior Notes to the Paying Agent, and (ii) payments of interest shall be made, at the option of the Company, subject to such surrender where applicable, (A) by check mailed to the address of the Person entitled thereto as such address shall appear in the Bond Register or (B) by wire transfer to registered Holders of at least $10,000,000 in principal amount of Senior Notes at such place and to such account at a banking institution in the United States as such Holders may designate in writing to the Trustee at least sixteen (16) days prior to the date for payment.

REFERENCE IS HEREBY MADE TO THE FURTHER PROVISIONS OF THIS SENIOR NOTE SET FORTH ON THE REVERSE HEREOF, WHICH FURTHER PROVISIONS SHALL FOR ALL PURPOSES HAVE THE SAME EFFECT AS IF SET FORTH AT THIS PLACE.

Unless the certificate of authentication hereon has been executed by the Trustee referred to on the reverse hereof by manual signature, this Senior Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose.

IN WITNESS WHEREOF, the Company has caused this instrument to be duly executed.

Dated:

PACIFIC GAS AND ELECTRIC COMPANY

By: _____
      Name:
      Title:

By: _____
      Name:
      Title:

TRUSTEE'S CERTIFICATE OF AUTHENTICATION

This Senior Note is one of the Bonds of the series designated as Bonds of the Fifty-Second Series referred to in the within-mentioned Indenture.

Dated:

BOKF, N.A., *As Trustee*

By: _____

*Authorized Signatory*

**Reverse of Amended and Restated 4.00% Senior Note due December 1, 2046**

This Senior Note is one of a duly authorized issue of Bonds of the Company, issued and issuable in one or more series under an Amended and Restated Indenture, dated as of April 22, 2005 (the "Base Indenture"), as previously supplemented and as further supplemented by a Twenty-Eighth Supplemental Indenture, dated as of December 1, 2016, and as amended by the Thirtieth Supplemental Indenture, dated as of July 1, 2020 (as so amended and supplemented, and together with all additional indentures supplemental thereto, and any constituent instruments establishing the terms of particular Bonds, being herein called the "Indenture"), between the Company and BOKF, N.A., as Trustee (herein called the "Trustee," which term includes any successor trustee under the Indenture), and reference is hereby made to the Indenture for a description of the respective rights, limitations of rights, duties and immunities of the Company, the Trustee and the Holders of Bonds thereunder and of the terms and conditions upon which Bonds are, and are to be, authenticated and delivered. This Senior Note is a Bond within the meaning of the Indenture and is one of the Bonds of the fifty-second series designated as the 4.00% Senior Notes due December 1, 2046 established by the Company under the Indenture. The acceptance of this Senior Note shall be deemed to constitute the consent and agreement by the Holder hereof to all of the terms and provisions of the Indenture.

The Senior Notes will be secured by a series of first mortgage bonds (the "4.00% Collateral Mortgage Bonds due 2046") delivered by the Company to the Trustee for the benefit of the Holders of the Senior Notes, issued pursuant to the Second Supplemental Indenture, dated as of July 1, 2020 to the Indenture of Mortgage, together with all additional indentures supplemental thereto, and any constituent instruments establishing the terms of particular Bonds, being herein called the "Indenture"), between the Company and The Bank of New York Mellon Trust Company, N.A., as trustee (as so supplemented, the "Mortgage Indenture"). Reference is made to the Indenture and the Mortgage Indenture for a description of the rights of the Trustee as holder of the 4.00% Collateral Mortgage Bonds due 2046, the property mortgaged and pledged, the nature and extent of the security and rights of the holders of the first mortgage bonds under the Mortgage Indenture and the rights of the Company under the Mortgage Indenture and the terms and conditions upon which the Senior Notes are secured.

Subject to the terms and conditions of the Indenture, the Senior Notes are redeemable at the option of the Company ("Optional Redemption"), in whole or in part, (a) at any time prior to June 1, 2046 (the date that is six months prior to the Maturity Date) at a Redemption Price equal to the greater of:

(i) 100% of the principal amount of the Senior Notes to be redeemed; or

(ii) as determined by the Quotation Agent, the sum of the present values of the Remaining Scheduled Payments of principal and interest on the Senior Notes to be redeemed (not including any portion of payments of interest accrued as of the Redemption Date), calculated as if the Maturity Date of such Senior Notes was June 1, 2046 (the date that is six months prior to the Maturity Date), discounted to the Redemption Date on a semi-annual basis at the Adjusted Treasury Rate, plus 20 basis points,

plus, in either of the above cases, accrued and unpaid interest thereon to but not including the Redemption Date; and (b) at any time on or after June 1, 2046 (the date that is six months prior to the Maturity Date) at 100% of the principal amount of the Senior Notes to be redeemed, plus accrued and unpaid interest thereon to but not including the Redemption Date.

Interest installments whose Stated Maturity is on or prior to such Redemption Date will be payable to Holders of such Senior Notes, or one or more Predecessor Bonds, of record at the close of business on the relevant Record Dates referred to on the face hereof, all as provided in the Indenture.

In the case of an Optional Redemption, notice of redemption will be in writing and mailed first-class postage-prepaid not less than 10 days nor more than 60 days prior to the Redemption Date to each Holder of Senior Notes to be redeemed at the Holder's registered address; provided, however, that such notice need not state the dollar amount of the Redemption Price if such dollar amount has not been determined as of the date such notice is being given to the Holders of the Senior Notes being redeemed. If money sufficient to pay the Redemption Price of all Senior Notes (or portions thereof) to be redeemed on the Redemption Date is deposited with the Paying Agent or the Trustee on or prior to the Redemption Date, from and after such Redemption Date such Senior Notes or portions thereof shall cease to bear interest. Senior Notes in denominations larger than $2,000 in principal amount may be redeemed in part but only in integral multiples of $1,000.

In the event of redemption of this Senior Note in part only, a new Senior Note or Senior Notes of like tenor for the unredeemed portion hereof will be issued in the name of the Holder hereof upon the surrender hereof.

As provided in the Indenture and subject to certain limitations therein set forth, this Senior Note or any portion of the principal amount hereof will be deemed to have been paid for all purposes of the Indenture and to be no longer Outstanding thereunder, and the Company's entire indebtedness in respect thereof will be satisfied and discharged, if there has been irrevocably deposited with the Trustee or any Paying Agent (other than the Company), in trust, money in an amount which will be sufficient and/or Eligible Obligations, the principal of and interest on which when due, without regard to any reinvestment thereof, will provide moneys which, together with money, if any, deposited with or held by the Trustee or such Paying Agent, will be sufficient to pay when due the principal of and premium, if any, and interest on this Senior Note when due.

If an Event of Default shall occur and be continuing, the Trustee or the Holders of not less than 33% in aggregate principal amount of the Outstanding Bonds, considered as one class, may declare the principal amount of all Bonds then Outstanding to be due and payable immediately by notice in writing to the Company (and to the Trustee if given by Holders); provided, however, that with respect to certain Events of Default relating to bankruptcy, insolvency and similar events, the principal amount of all Bonds then Outstanding shall be due and payable immediately without further action by the Trustee or the Holders.

The Indenture permits, with certain exceptions as therein provided, the Company and the Trustee to enter into one or more supplemental indentures for the purpose of adding any

provisions to, or changing in any manner or eliminating any of the provisions of, the Indenture with the consent of the Holders of not less than a majority in aggregate principal amount of the Bonds at the time Outstanding, considered as one class; provided, however, that if there shall be Bonds of more than one series Outstanding under the Indenture and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such series, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all series so directly affected, considered as one class, shall be required; and provided, further, that if the Bonds of any series shall have been issued in more than one Tranche and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such Tranches, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all Tranches so directly affected, considered as one class, shall be required; and provided, further, that the Indenture permits the Company and the Trustee to enter into one or more supplemental indentures for certain purposes without the consent of any Holders of Bonds. The Indenture also contains provisions permitting the Holders of a majority in aggregate principal amount of Bonds, on behalf of the Holders of all such Bonds, to waive certain past defaults under the Indenture and their consequences. Any such consent or waiver by the Holder of this Senior Note shall be conclusive and binding upon such Holder and upon all future Holders of this Senior Note and of any Senior Note issued upon the registration of transfer hereof or in exchange herefor or in lieu hereof, whether or not notation of such consent or waiver is made upon this Senior Note.

As provided in and subject to the provisions of the Indenture, the Holder of this Senior Note shall not have the right to institute any proceeding with respect to the Indenture or for the appointment of a receiver or trustee or for any other remedy thereunder, unless such Holder shall have previously given the Trustee written notice of a continuing Event of Default, the Holders of at least 33% in aggregate principal amount of the Bonds at the time Outstanding shall have made written request to the Trustee to institute proceedings in respect of such Event of Default as Trustee and offered the Trustee reasonable indemnity, and the Trustee shall not have received from the Holders of at least a majority in aggregate principal amount of Bonds at the time Outstanding a direction inconsistent with such written request, and shall have failed to institute any such proceeding for 60 days after receipt of such notice, request and offer of indemnity. The foregoing shall not apply to any suit instituted by the Holder of this Senior Note for the enforcement of any payment of principal hereof or any premium or interest hereon on or after the respective due dates expressed herein.

No reference herein to the Indenture and no provision of this Senior Note or of the Indenture shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal of and any premium and interest on this Senior Note at the times, place and rate, and in the coin or currency, herein prescribed.

As provided in the Indenture and subject to certain limitations therein set forth, the transfer of this Senior Note is registrable in the Bond Register, upon surrender of this Senior Note for registration of transfer at the office or agency of the Company in any place where the principal of and any premium and interest on this Senior Note are payable, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Company, the Trustee or the Bond Registrar, as the case may be, duly executed by the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new Senior Notes of like tenor, of authorized denominations and for the same aggregate principal amount, will be issued to the designated transferee or transferees.

The Senior Notes are issuable only in registered form without coupons in denominations of $2,000 and any integral multiple of $1,000 in excess thereof. As provided in the Indenture and subject to certain limitations therein set forth, Senior Notes are exchangeable for a like aggregate principal amount of Senior Notes and of like tenor of a different authorized denomination, as requested by the Holder surrendering the same.

No service charge shall be made for any such registration of transfer or exchange, but the Company may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

The Company shall not be required to execute or to provide for the registration of the transfer of or the exchange of (A) any Senior Note of this series during a period of 15 days immediately preceding the date notice is to be given identifying the serial numbers of the Senior Notes called for redemption, or (B) any Senior Note selected for redemption in whole or in part, except the unredeemed portion of any Senior Note being redeemed in part.

Prior to due presentment of this Senior Note for registration of transfer, the Company, the Trustee and any agent of the Company or the Trustee may treat the Person in whose name this Senior Note is registered as the owner hereof for all purposes, whether or not this Senior Note is overdue, and neither the Company, the Trustee nor any such agent shall be affected by notice to the contrary.

This Senior Note shall be governed by, and construed and enforced in accordance with, the laws of the State of California without regard to the principles of conflicts of laws thereunder, except to the extent that the Trust Indenture Act shall be applicable.

As provided in the Indenture, no recourse shall be had for the payment of the principal of, premium, if any, or interest with respect to this Senior Note, or any part thereof, or for any claim based hereon or otherwise in respect hereof, or of the indebtedness represented hereby, or upon any obligation, covenant or agreement under the Indenture, against any incorporator, shareholder, officer or director, as such, past, present or future, of the Company or of any predecessor or successor corporation (either directly or through the Company or a predecessor or successor corporation), whether by virtue of any constitutional provision, statute or rule of law or by the enforcement of any assessment or penalty or otherwise; it being expressly agreed and understood that the Indenture and all the Bonds are solely corporate obligations and that any such personal liability is hereby expressly waived and released as a condition of, and as part of the consideration for, the execution of the Indenture and the issuance of this Senior Note.

All terms used in this Senior Note which are not defined herein shall have the meanings assigned to them in the Indenture.

**ASSIGNMENT FORM**

To assign this Senior Note, fill in the form below: (I) or (we) assign and transfer this Senior Note to

_____
(Insert assignee's soc. sec. or tax I.D. no.)

_____

_____

_____
(Print or type assignee's name, address and zip code)

and irrevocably appoint _____

to transfer this Senior Note on the books of the Company. The agent may substitute another to act for him.

_____

Date:

Your signature: _____
(Sign exactly as your name appears on the face of this Senior Note)

Tax Identification No.: _____

SIGNATURE GUARANTEE:

_____

Signatures must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Bond Registrar, which requirements include membership or participation in the Securities Transfer Agent Medallion Program ("*STAMP*") or such other "signature guarantee program" as may be determined by the Bond Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

<div align="center">

**FORM OF AMENDED AND RESTATED 4.00% SENIOR NOTES**
**DUE DECEMBER 1, 2046**

</div>

THIS SENIOR NOTE IS A BOND AND A GLOBAL BOND WITHIN THE MEANING OF THE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF A DEPOSITARY OR A NOMINEE THEREOF. UNLESS AND UNTIL IT IS EXCHANGED IN WHOLE OR IN PART FOR SENIOR NOTES IN DEFINITIVE FORM, THIS SENIOR NOTE MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY OR BY THE DEPOSITARY OR ANY SUCH NOMINEE TO A SUCCESSOR DEPOSITARY OR A NOMINEE OF SUCH SUCCESSOR DEPOSITARY.

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE COMPANY OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

THE FOLLOWING SUMMARY OF TERMS IS SUBJECT TO THE INFORMATION SET FORTH ON THE REVERSE HEREOF:

| PRINCIPAL AMOUNT: | ORIGINAL ISSUE DATE: | INTEREST RATE: 4.00% |
|---|---|---|
| $200,000,000 | March 10, 2017 | per annum |
| MATURITY DATE: | INTEREST PAYMENT DATES: | THIS SENIOR NOTE IS A: |
| December 1, 2046 | June 1 and December 1, commencing June 1, 2017 | ☒ Global Book-Entry Bond<br>☐ Certificated Bond |

REGISTERED OWNER: Cede & Co., as nominee of The Depository Trust Company

PACIFIC GAS AND ELECTRIC COMPANY

AMENDED AND RESTATED 4.00% SENIOR NOTES DUE DECEMBER 1, 2046
(Fixed Rate)

No. R-2                                                                                    Principal Amount: $200,000,000
CUSIP No: 694308HR1

   PACIFIC GAS AND ELECTRIC COMPANY, a corporation duly organized and existing under the laws of the State of California (herein called the "Company," which term includes any successor Person pursuant to the applicable provisions of the Indenture hereinafter referred to), for value received, hereby promises to pay to Cede & Co., as nominee for The Depository Trust Company, or registered assigns, the Principal Amount stated above on the Maturity Date stated above, and to pay interest thereon from and including the Original Issue Date stated above or, in the case of a 4.00% Senior Note due December 1, 2046 issued upon the registration of transfer or exchange, from and including the most recent Interest Payment Date to which interest has been paid or duly provided for, semi-annually in arrears on the Interest Payment Dates set forth above and on the Maturity Date stated above, commencing June 1, 2017 at the rate of 4.00% per annum until the principal hereof is paid or made available for payment. The interest so payable, and punctually paid or duly provided for, on any Interest Payment Date will, as provided in such Indenture, be paid to the Person in whose name this 4.00% Senior Note due December 1, 2046 (this "Senior Note," and together with all other 4.00% Senior Notes due December 1, 2046, the "Senior Notes") (or one or more Predecessor Bonds) is registered at the close of business on the Regular Record Date for such interest, which shall be the May 15th and November 15th preceding such Interest Payment Date; provided, however, that interest payable at the Maturity Date or on a Redemption Date will be paid to the Person to whom principal is payable. Any such interest not so punctually paid or duly provided for will forthwith cease to be payable to the Holder on such Regular Record Date and may either be paid to the Person in whose name this Senior Note (or one or more Predecessor Bonds) is registered at the close of business on a Special Record Date for the payment of such Defaulted Interest to be fixed by the Trustee, notice whereof shall be given to Holders of Senior Notes not less than 10 days prior to such Special Record Date, or be paid at any time in any other lawful manner not inconsistent with the requirements of the Indenture and any securities exchange, if any, on which the Senior Notes may be listed, and upon such notice as may be required by any such exchange, all as more fully provided in said Indenture.

   Payments of interest on this Senior Note will include interest accrued to but excluding the respective Interest Payment Dates. Interest payments for this Senior Note shall be computed and paid on the basis of the 360-day year of twelve 30-day months and will accrue from December 1, 2016 or from the most recent Interest Payment Date to which interest has been paid or duly provided for. In the event that any date on which interest is payable on this Senior Note (other than the Maturity Date) is not a Business Day then payment of the interest payable on such date will be made on the next succeeding day that is a Business Day (and without any interest or payment in respect of any such delay) with the same force and effect as if made on the date the payment was originally payable. If the Maturity Date falls on a day that is not a Business Day, the payment of principal, premium, if any, and interest may be made on the next succeeding Business Day, and no interest on such payment shall accrue for the period from and after maturity.

Payment of principal of, premium, if any, and interest on Senior Notes shall be made in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts. Payments of principal of, premium, if any, and interest on the Senior Notes represented by a Global Bond shall be made by wire transfer of immediately available funds to the Holder of such Global Bond, provided that, in the case of payments of principal and premium, if any, such Global Bond is first surrendered to the Paying Agent. If any of the Senior Notes are no longer represented by a Global Bond, (i) payments of principal, premium, if any, and interest due on the Maturity Date or earlier redemption of such Senior Notes shall be made at the office of the Paying Agent upon surrender of such Senior Notes to the Paying Agent, and (ii) payments of interest shall be made, at the option of the Company, subject to such surrender where applicable, (A) by check mailed to the address of the Person entitled thereto as such address shall appear in the Bond Register or (B) by wire transfer to registered Holders of at least $10,000,000 in principal amount of Senior Notes at such place and to such account at a banking institution in the United States as such Holders may designate in writing to the Trustee at least sixteen (16) days prior to the date for payment.

REFERENCE IS HEREBY MADE TO THE FURTHER PROVISIONS OF THIS SENIOR NOTE SET FORTH ON THE REVERSE HEREOF, WHICH FURTHER PROVISIONS SHALL FOR ALL PURPOSES HAVE THE SAME EFFECT AS IF SET FORTH AT THIS PLACE.

Unless the certificate of authentication hereon has been executed by the Trustee referred to on the reverse hereof by manual signature, this Senior Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose.

IN WITNESS WHEREOF, the Company has caused this instrument to be duly executed.

Dated:

PACIFIC GAS AND ELECTRIC COMPANY

By: _____
Name:
Title:

By: _____
Name:
Title:

TRUSTEE'S CERTIFICATE OF AUTHENTICATION

This Senior Note is one of the Bonds of the series designated as Bonds of the Fifty-Second Series referred to in the within-mentioned Indenture.

Dated:

BOKF, N.A., *As Trustee*

By: _____
                 *Authorized Signatory*

**Reverse of Amended and Restated 4.00% Senior Note due December 1, 2046**

This Senior Note is one of a duly authorized issue of Bonds of the Company, issued and issuable in one or more series under an Amended and Restated Indenture, dated as of April 22, 2005 (the "Base Indenture"), as previously supplemented and as further supplemented by a Twenty-Eighth Supplemental Indenture, dated as of December 1, 2016, and as amended by the Thirtieth Supplemental Indenture, dated as of July 1, 2020 (as so amended and supplemented, and together with all additional indentures supplemental thereto, and any constituent instruments establishing the terms of particular Bonds, being herein called the "Indenture"), between the Company and BOKF, N.A., as Trustee (herein called the "Trustee," which term includes any successor trustee under the Indenture), and reference is hereby made to the Indenture for a description of the respective rights, limitations of rights, duties and immunities of the Company, the Trustee and the Holders of Bonds thereunder and of the terms and conditions upon which Bonds are, and are to be, authenticated and delivered. This Senior Note is a Bond within the meaning of the Indenture and is one of the Bonds of the fifty-second series designated as the 4.00% Senior Notes due December 1, 2046 established by the Company under the Indenture and initially issued in an aggregate principal amount of $400,000,000 on December 1, 2016. As a result of the further issuance of $200,000,000 aggregate principal amount of Bonds of the fifty-second series on March 10, 2017, the issued amount of Bonds of such series now totals $600,000,000. The acceptance of this Senior Note shall be deemed to constitute the consent and agreement by the Holder hereof to all of the terms and provisions of the Indenture.

The Senior Notes will be secured by a series of first mortgage bonds (the "4.00% Collateral Mortgage Bonds due 2046") delivered by the Company to the Trustee for the benefit of the Holders of the Senior Notes, issued pursuant to the Second Supplemental Indenture, dated as of July 1, 2020 to the Indenture of Mortgage, dated as of June 19, 2020, between the Company and The Bank of New York Mellon Trust Company, N.A., as trustee (as so supplemented, the "Mortgage Indenture"). Reference is made to the Indenture and the Mortgage Indenture for a description of the rights of the Trustee as holder of the 4.00% Collateral Mortgage Bonds due 2046, the property mortgaged and pledged, the nature and extent of the security and rights of the holders of the first mortgage bonds under the Mortgage Indenture and the rights of the Company under the Mortgage Indenture and the terms and conditions upon which the Senior Notes are secured.

Subject to the terms and conditions of the Indenture, the Senior Notes are redeemable at the option of the Company ("Optional Redemption"), in whole or in part, (a) at any time prior to June 1, 2046 (the date that is six months prior to the Maturity Date) at a Redemption Price equal to the greater of:

(i) 100% of the principal amount of the Senior Notes to be redeemed; or

(ii) as determined by the Quotation Agent, the sum of the present values of the Remaining Scheduled Payments of principal and interest on the Senior Notes to be redeemed (not including any portion of payments of interest accrued as of the Redemption Date), calculated as if the Maturity Date of such Senior Notes was June 1, 2046 (the date that is six months prior to the Maturity Date), discounted to the Redemption Date on a semi-annual basis at the Adjusted Treasury Rate, plus 20 basis points,

plus, in either of the above cases, accrued and unpaid interest thereon to but not including the Redemption Date; and (b) at any time on or after June 1, 2046 (the date that is six months prior to the Maturity Date) at 100% of the principal amount of the Senior Notes to be redeemed, plus accrued and unpaid interest thereon to but not including the Redemption Date.

Interest installments whose Stated Maturity is on or prior to such Redemption Date will be payable to Holders of such Senior Notes, or one or more Predecessor Bonds, of record at the close of business on the relevant Record Dates referred to on the face hereof, all as provided in the Indenture.

In the case of an Optional Redemption, notice of redemption will be in writing and mailed first-class postage-prepaid not less than 10 days nor more than 60 days prior to the Redemption Date to each Holder of Senior Notes to be redeemed at the Holder's registered address; provided, however, that such notice need not state the dollar amount of the Redemption Price if such dollar amount has not been determined as of the date such notice is being given to the Holders of the Senior Notes being redeemed. If money sufficient to pay the Redemption Price of all Senior Notes (or portions thereof) to be redeemed on the Redemption Date is deposited with the Paying Agent or the Trustee on or prior to the Redemption Date, from and after such Redemption Date such Senior Notes or portions thereof shall cease to bear interest. Senior Notes in denominations larger than $2,000 in principal amount may be redeemed in part but only in integral multiples of $1,000.

In the event of redemption of this Senior Note in part only, a new Senior Note or Senior Notes of like tenor for the unredeemed portion hereof will be issued in the name of the Holder hereof upon the surrender hereof.

As provided in the Indenture and subject to certain limitations therein set forth, this Senior Note or any portion of the principal amount hereof will be deemed to have been paid for all purposes of the Indenture and to be no longer Outstanding thereunder, and the Company's entire indebtedness in respect thereof will be satisfied and discharged, if there has been irrevocably deposited with the Trustee or any Paying Agent (other than the Company), in trust, money in an amount which will be sufficient and/or Eligible Obligations, the principal of and interest on which when due, without regard to any reinvestment thereof, will provide moneys which, together with money, if any, deposited with or held by the Trustee or such Paying Agent, will be sufficient to pay when due the principal of and premium, if any, and interest on this Senior Note when due.

If an Event of Default shall occur and be continuing, the Trustee or the Holders of not less than 33% in aggregate principal amount of the Outstanding Bonds, considered as one class, may declare the principal amount of all Bonds then Outstanding to be due and payable immediately by notice in writing to the Company (and to the Trustee if given by Holders); provided, however, that with respect to certain Events of Default relating to bankruptcy, insolvency and similar events, the principal amount of all Bonds then Outstanding shall be due and payable immediately without further action by the Trustee or the Holders.

The Indenture permits, with certain exceptions as therein provided, the Company and the Trustee to enter into one or more supplemental indentures for the purpose of adding any

provisions to, or changing in any manner or eliminating any of the provisions of, the Indenture with the consent of the Holders of not less than a majority in aggregate principal amount of the Bonds at the time Outstanding, considered as one class; provided, however, that if there shall be Bonds of more than one series Outstanding under the Indenture and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such series, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all series so directly affected, considered as one class, shall be required; and provided, further, that if the Bonds of any series shall have been issued in more than one Tranche and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such Tranches, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all Tranches so directly affected, considered as one class, shall be required; and provided, further, that the Indenture permits the Company and the Trustee to enter into one or more supplemental indentures for certain purposes without the consent of any Holders of Bonds. The Indenture also contains provisions permitting the Holders of a majority in aggregate principal amount of Bonds, on behalf of the Holders of all such Bonds, to waive certain past defaults under the Indenture and their consequences. Any such consent or waiver by the Holder of this Senior Note shall be conclusive and binding upon such Holder and upon all future Holders of this Senior Note and of any Senior Note issued upon the registration of transfer hereof or in exchange herefor or in lieu hereof, whether or not notation of such consent or waiver is made upon this Senior Note.

As provided in and subject to the provisions of the Indenture, the Holder of this Senior Note shall not have the right to institute any proceeding with respect to the Indenture or for the appointment of a receiver or trustee or for any other remedy thereunder, unless such Holder shall have previously given the Trustee written notice of a continuing Event of Default, the Holders of at least 33% in aggregate principal amount of the Bonds at the time Outstanding shall have made written request to the Trustee to institute proceedings in respect of such Event of Default as Trustee and offered the Trustee reasonable indemnity, and the Trustee shall not have received from the Holders of at least a majority in aggregate principal amount of Bonds at the time Outstanding a direction inconsistent with such written request, and shall have failed to institute any such proceeding for 60 days after receipt of such notice, request and offer of indemnity. The foregoing shall not apply to any suit instituted by the Holder of this Senior Note for the enforcement of any payment of principal hereof or any premium or interest hereon on or after the respective due dates expressed herein.

No reference herein to the Indenture and no provision of this Senior Note or of the Indenture shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal of and any premium and interest on this Senior Note at the times, place and rate, and in the coin or currency, herein prescribed.

As provided in the Indenture and subject to certain limitations therein set forth, the transfer of this Senior Note is registrable in the Bond Register, upon surrender of this Senior Note for registration of transfer at the office or agency of the Company in any place where the principal of and any premium and interest on this Senior Note are payable, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Company, the Trustee or the Bond Registrar, as the case may be, duly executed by the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new Senior Notes of like tenor, of authorized denominations and for the same aggregate principal amount, will be issued to the designated transferee or transferees.

The Senior Notes are issuable only in registered form without coupons in denominations of $2,000 and any integral multiple of $1,000 in excess thereof. As provided in the Indenture and subject to certain limitations therein set forth, Senior Notes are exchangeable for a like aggregate principal amount of Senior Notes and of like tenor of a different authorized denomination, as requested by the Holder surrendering the same.

No service charge shall be made for any such registration of transfer or exchange, but the Company may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

The Company shall not be required to execute or to provide for the registration of the transfer of or the exchange of (A) any Senior Note of this series during a period of 15 days immediately preceding the date notice is to be given identifying the serial numbers of the Senior Notes called for redemption, or (B) any Senior Note selected for redemption in whole or in part, except the unredeemed portion of any Senior Note being redeemed in part.

Prior to due presentment of this Senior Note for registration of transfer, the Company, the Trustee and any agent of the Company or the Trustee may treat the Person in whose name this Senior Note is registered as the owner hereof for all purposes, whether or not this Senior Note is overdue, and neither the Company, the Trustee nor any such agent shall be affected by notice to the contrary.

This Senior Note shall be governed by, and construed and enforced in accordance with, the laws of the State of California without regard to the principles of conflicts of laws thereunder, except to the extent that the Trust Indenture Act shall be applicable.

As provided in the Indenture, no recourse shall be had for the payment of the principal of, premium, if any, or interest with respect to this Senior Note, or any part thereof, or for any claim based hereon or otherwise in respect hereof, or of the indebtedness represented hereby, or upon any obligation, covenant or agreement under the Indenture, against any incorporator, shareholder, officer or director, as such, past, present or future, of the Company or of any predecessor or successor corporation (either directly or through the Company or a predecessor or successor corporation), whether by virtue of any constitutional provision, statute or rule of law or by the enforcement of any assessment or penalty or otherwise; it being expressly agreed and understood that the Indenture and all the Bonds are solely corporate obligations and that any such personal liability is hereby expressly waived and released as a condition of, and as part of the consideration for, the execution of the Indenture and the issuance of this Senior Note.

All terms used in this Senior Note which are not defined herein shall have the meanings assigned to them in the Indenture.

**ASSIGNMENT FORM**

To assign this Senior Note, fill in the form below: (I) or (we) assign and transfer this Senior Note to

_____
(Insert assignee's soc. sec. or tax I.D. no.)

_____

_____

_____

_____

_____
(Print or type assignee's name, address and zip code)

and irrevocably appoint _____
to transfer this Senior Note on the books of the Company. The agent may substitute another to act for him.

_____

Date:

                Your signature: _____

                (Sign exactly as your name appears on the face of this Senior Note)

                Tax Identification No.:_____

                SIGNATURE GUARANTEE:

                _____

                Signatures must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Bond Registrar, which requirements include membership or participation in the Securities Transfer Agent Medallion Program ("*STAMP*") or such other "signature guarantee program" as may be determined by the Bond Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

**FORM OF AMENDED AND RESTATED 3.30% SENIOR NOTES**
**DUE MARCH 15, 2027**

THIS SENIOR NOTE IS A BOND AND A GLOBAL BOND WITHIN THE MEANING OF THE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF A DEPOSITARY OR A NOMINEE THEREOF. UNLESS AND UNTIL IT IS EXCHANGED IN WHOLE OR IN PART FOR SENIOR NOTES IN DEFINITIVE FORM, THIS SENIOR NOTE MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY OR BY THE DEPOSITARY OR ANY SUCH NOMINEE TO A SUCCESSOR DEPOSITARY OR A NOMINEE OF SUCH SUCCESSOR DEPOSITARY.

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE COMPANY OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

THE FOLLOWING SUMMARY OF TERMS IS SUBJECT TO THE INFORMATION SET FORTH ON THE REVERSE HEREOF:

| | | |
|---|---|---|
| PRINCIPAL AMOUNT: | ORIGINAL ISSUE DATE: | INTEREST RATE: 3.30% per annum |
| $400,000,000 | March 10, 2017 | |
| MATURITY DATE: | INTEREST PAYMENT DATES: | THIS SENIOR NOTE IS A: |
| March 15, 2027 | March 15 and September 15, commencing September 15, 2017 | ☒ Global Book-Entry Bond ☐ Certificated Bond |

REGISTERED OWNER: Cede & Co., as nominee of The Depository Trust Company

<div align="center">

PACIFIC GAS AND ELECTRIC COMPANY

AMENDED AND RESTATED 3.30% SENIOR NOTES
DUE MARCH 15, 2027
(Fixed Rate)

</div>

No. R-1                             Principal Amount: $400,000,000
CUSIP No: 694308HS9

   PACIFIC GAS AND ELECTRIC COMPANY, a corporation duly organized and existing under the laws of the State of California (herein called the "Company," which term includes any successor Person pursuant to the applicable provisions of the Indenture hereinafter referred to), for value received, hereby promises to pay to Cede & Co., as nominee for The Depository Trust Company, or registered assigns, the Principal Amount stated above on the Maturity Date stated above, and to pay interest thereon from and including the Original Issue Date stated above or, in the case of a 3.30% Senior Note due March 15, 2027 issued upon the registration of transfer or exchange, from and including the most recent Interest Payment Date to which interest has been paid or duly provided for, semi-annually in arrears on the Interest Payment Dates set forth above and on the Maturity Date stated above, commencing September 15, 2017 at the rate of 3.30% per annum until the principal hereof is paid or made available for payment. The interest so payable, and punctually paid or duly provided for, on any Interest Payment Date will, as provided in such Indenture, be paid to the Person in whose name this 3.30% Senior Note due March 15, 2027 (this "Senior Note," and together with all other 3.30% Senior Notes due March 15, 2027, the "Senior Notes") (or one or more Predecessor Bonds) is registered at the close of business on the Regular Record Date for such interest, which shall be the March 1st and September 1st preceding such Interest Payment Date; provided, however, that interest payable at the Maturity Date or on a Redemption Date will be paid to the Person to whom principal is payable. Any such interest not so punctually paid or duly provided for will forthwith cease to be payable to the Holder on such Regular Record Date and may either be paid to the Person in whose name this Senior Note (or one or more Predecessor Bonds) is registered at the close of business on a Special Record Date for the payment of such Defaulted Interest to be fixed by the Trustee, notice whereof shall be given to Holders of Senior Notes not less than 10 days prior to such Special Record Date, or be paid at any time in any other lawful manner not inconsistent with the requirements of the Indenture and any securities exchange, if any, on which the Senior Notes may be listed, and upon such notice as may be required by any such exchange, all as more fully provided in said Indenture.

   Payments of interest on this Senior Note will include interest accrued to but excluding the respective Interest Payment Dates. Interest payments for this Senior Note shall be computed and paid on the basis of the 360-day year of twelve 30-day months and will accrue from March 10, 2017 or from the most recent Interest Payment Date to which interest has been paid or duly provided for. In the event that any date on which interest is payable on this Senior Note (other than the Maturity Date) is not a Business Day then payment of the interest payable on such date will be made on the next succeeding day that is a Business Day (and without any interest or payment in respect of any such delay) with the same force and effect as if made on the date the payment was originally payable. If the Maturity Date falls on a day that is not a Business Day,

the payment of principal, premium, if any, and interest may be made on the next succeeding Business Day, and no interest on such payment shall accrue for the period from and after maturity.

Payment of principal of, premium, if any, and interest on Senior Notes shall be made in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts. Payments of principal of, premium, if any, and interest on the Senior Notes represented by a Global Bond shall be made by wire transfer of immediately available funds to the Holder of such Global Bond, provided that, in the case of payments of principal and premium, if any, such Global Bond is first surrendered to the Paying Agent. If any of the Senior Notes are no longer represented by a Global Bond, (i) payments of principal, premium, if any, and interest due on the Maturity Date or earlier redemption of such Senior Notes shall be made at the office of the Paying Agent upon surrender of such Senior Notes to the Paying Agent, and (ii) payments of interest shall be made, at the option of the Company, subject to such surrender where applicable, (A) by check mailed to the address of the Person entitled thereto as such address shall appear in the Bond Register or (B) by wire transfer to registered Holders of at least $10,000,000 in principal amount of Senior Notes at such place and to such account at a banking institution in the United States as such Holders may designate in writing to the Trustee at least sixteen (16) days prior to the date for payment.

REFERENCE IS HEREBY MADE TO THE FURTHER PROVISIONS OF THIS SENIOR NOTE SET FORTH ON THE REVERSE HEREOF, WHICH FURTHER PROVISIONS SHALL FOR ALL PURPOSES HAVE THE SAME EFFECT AS IF SET FORTH AT THIS PLACE.

Unless the certificate of authentication hereon has been executed by the Trustee referred to on the reverse hereof by manual signature, this Senior Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose.

IN WITNESS WHEREOF, the Company has caused this instrument to be duly executed.

Dated:

PACIFIC GAS AND ELECTRIC COMPANY

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

TRUSTEE'S CERTIFICATE OF AUTHENTICATION

This Senior Note is one of the Bonds of the series designated as Bonds of the Fifty-Third Series referred to in the within-mentioned Indenture.

Dated:

BOKF, N.A., *As Trustee*

By: _____
*Authorized Signatory*

This Senior Note is one of a duly authorized issue of Bonds of the Company, issued and issuable in one or more series under an Amended and Restated Indenture, dated as of April 22, 2005 (the "Base Indenture"), as previously supplemented and as further supplemented by a Twenty-Ninth Supplemental Indenture, dated as of March 10, 2017, and as amended by the Thirtieth Supplemental Indenture (as so amended and supplemented, and together with all additional indentures supplemental thereto, and any constituent instruments establishing the terms of particular Bonds, being herein called the "Indenture"), between the Company and BOKF, N.A., as Trustee (herein called the "Trustee," which term includes any successor trustee under the Indenture), and reference is hereby made to the Indenture for a description of the respective rights, limitations of rights, duties and immunities of the Company, the Trustee and the Holders of Bonds thereunder and of the terms and conditions upon which Bonds are, and are to be, authenticated and delivered. This Senior Note is a Bond within the meaning of the Indenture and is one of the Bonds of the fifty-third series designated as the 3.30% Senior Notes due March 15, 2027 established by the Company under the Indenture. The acceptance of this Senior Note shall be deemed to constitute the consent and agreement by the Holder hereof to all of the terms and provisions of the Indenture.

The Senior Notes will be secured by a series of first mortgage bonds (the "3.30% Collateral Mortgage Bonds due 2027") delivered by the Company to the Trustee for the benefit of the Holders of the Senior Notes, issued pursuant to the Second Supplemental Indenture, dated as of July 1, 2020 to the Indenture of Mortgage, dated as of June 19, 2020, between the Company and The Bank of New York Mellon Trust Company, N.A., as trustee (as so supplemented, the "Mortgage Indenture"). Reference is made to the Indenture and the Mortgage Indenture for a description of the rights of the Trustee as holder of the 3.30% Collateral Mortgage Bonds due 2027, the property mortgaged and pledged, the nature and extent of the security and rights of the holders of the first mortgage bonds under the Mortgage Indenture and the rights of the Company under the Mortgage Indenture and the terms and conditions upon which the Senior Notes are secured.

Subject to the terms and conditions of the Indenture, the Senior Notes are redeemable at the option of the Company ("Optional Redemption"), in whole or in part, (a) at any time prior to December 15, 2026 (the date that is three months prior to the Maturity Date) at a Redemption Price equal to the greater of:

(i) 100% of the principal amount of the Senior Notes to be redeemed; or

(ii) as determined by the Quotation Agent, the sum of the present values of the Remaining Scheduled Payments of principal and interest on the Senior Notes to be redeemed (not including any portion of payments of interest accrued as of the Redemption Date), calculated as if the Maturity Date of such Senior Notes was December 15, 2026 (the date that is three months prior to the Maturity Date), discounted to the Redemption Date on a semi-annual basis at the Adjusted Treasury Rate, plus 15 basis points,

plus, in either of the above cases, accrued and unpaid interest thereon to but not including the Redemption Date; and (b) at any time on or after December 15, 2026 (the date that is three months prior to the Maturity Date) at 100% of the principal amount of the Senior Notes to be redeemed, plus accrued and unpaid interest thereon to but not including the Redemption Date.

Interest installments whose Stated Maturity is on or prior to such Redemption Date will be payable to Holders of such Senior Notes, or one or more Predecessor Bonds, of record at the close of business on the relevant Record Dates referred to on the face hereof, all as provided in the Indenture.

In the case of an Optional Redemption, notice of redemption will be in writing and mailed first-class postage-prepaid not less than 10 days nor more than 60 days prior to the Redemption Date to each Holder of Senior Notes to be redeemed at the Holder's registered address; provided, however, that such notice need not state the dollar amount of the Redemption Price if such dollar amount has not been determined as of the date such notice is being given to the Holders of the Senior Notes being redeemed. If money sufficient to pay the Redemption Price of all Senior Notes (or portions thereof) to be redeemed on the Redemption Date is deposited with the Paying Agent or the Trustee on or prior to the Redemption Date, from and after such Redemption Date such Senior Notes or portions thereof shall cease to bear interest. Senior Notes in denominations larger than $2,000 in principal amount may be redeemed in part but only in integral multiples of $1,000.

In the event of redemption of this Senior Note in part only, a new Senior Note or Senior Notes of like tenor for the unredeemed portion hereof will be issued in the name of the Holder hereof upon the surrender hereof.

As provided in the Indenture and subject to certain limitations therein set forth, this Senior Note or any portion of the principal amount hereof will be deemed to have been paid for all purposes of the Indenture and to be no longer Outstanding thereunder, and the Company's entire indebtedness in respect thereof will be satisfied and discharged, if there has been irrevocably deposited with the Trustee or any Paying Agent (other than the Company), in trust, money in an amount which will be sufficient and/or Eligible Obligations, the principal of and interest on which when due, without regard to any reinvestment thereof, will provide moneys which, together with money, if any, deposited with or held by the Trustee or such Paying Agent, will be sufficient to pay when due the principal of and premium, if any, and interest on this Senior Note when due.

If an Event of Default shall occur and be continuing, the Trustee or the Holders of not less than 33% in aggregate principal amount of the Outstanding Bonds, considered as one class, may declare the principal amount of all Bonds then Outstanding to be due and payable immediately by notice in writing to the Company (and to the Trustee if given by Holders); provided, however, that with respect to certain Events of Default relating to bankruptcy, insolvency and similar events, the principal amount of all Bonds then Outstanding shall be due and payable immediately without further action by the Trustee or the Holders.

The Indenture permits, with certain exceptions as therein provided, the Company and the Trustee to enter into one or more supplemental indentures for the purpose of adding any

provisions to, or changing in any manner or eliminating any of the provisions of, the Indenture with the consent of the Holders of not less than a majority in aggregate principal amount of the Bonds at the time Outstanding, considered as one class; provided, however, that if there shall be Bonds of more than one series Outstanding under the Indenture and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such series, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all series so directly affected, considered as one class, shall be required; and provided, further, that if the Bonds of any series shall have been issued in more than one Tranche and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such Tranches, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all Tranches so directly affected, considered as one class, shall be required; and provided, further, that the Indenture permits the Company and the Trustee to enter into one or more supplemental indentures for certain purposes without the consent of any Holders of Bonds. The Indenture also contains provisions permitting the Holders of a majority in aggregate principal amount of Bonds, on behalf of the Holders of all such Bonds, to waive certain past defaults under the Indenture and their consequences. Any such consent or waiver by the Holder of this Senior Note shall be conclusive and binding upon such Holder and upon all future Holders of this Senior Note and of any Senior Note issued upon the registration of transfer hereof or in exchange herefor or in lieu hereof, whether or not notation of such consent or waiver is made upon this Senior Note.

As provided in and subject to the provisions of the Indenture, the Holder of this Senior Note shall not have the right to institute any proceeding with respect to the Indenture or for the appointment of a receiver or trustee or for any other remedy thereunder, unless such Holder shall have previously given the Trustee written notice of a continuing Event of Default, the Holders of at least 33% in aggregate principal amount of the Bonds at the time Outstanding shall have made written request to the Trustee to institute proceedings in respect of such Event of Default as Trustee and offered the Trustee reasonable indemnity, and the Trustee shall not have received from the Holders of at least a majority in aggregate principal amount of Bonds at the time Outstanding a direction inconsistent with such written request, and shall have failed to institute any such proceeding for 60 days after receipt of such notice, request and offer of indemnity. The foregoing shall not apply to any suit instituted by the Holder of this Senior Note for the enforcement of any payment of principal hereof or any premium or interest hereon on or after the respective due dates expressed herein.

No reference herein to the Indenture and no provision of this Senior Note or of the Indenture shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal of and any premium and interest on this Senior Note at the times, place and rate, and in the coin or currency, herein prescribed.

As provided in the Indenture and subject to certain limitations therein set forth, the transfer of this Senior Note is registrable in the Bond Register, upon surrender of this Senior Note for registration of transfer at the office or agency of the Company in any place where the principal of and any premium and interest on this Senior Note are payable, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Company, the Trustee or the Bond Registrar, as the case may be, duly executed by the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new Senior Notes of like tenor, of authorized denominations and for the same aggregate principal amount, will be issued to the designated transferee or transferees.

The Senior Notes are issuable only in registered form without coupons in denominations of $2,000 and any integral multiple of $1,000 in excess thereof. As provided in the Indenture and subject to certain limitations therein set forth, Senior Notes are exchangeable for a like aggregate principal amount of Senior Notes and of like tenor of a different authorized denomination, as requested by the Holder surrendering the same.

No service charge shall be made for any such registration of transfer or exchange, but the Company may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

The Company shall not be required to execute or to provide for the registration of the transfer of or the exchange of (A) any Senior Note of this series during a period of 15 days immediately preceding the date notice is to be given identifying the serial numbers of the Senior Notes called for redemption, or (B) any Senior Note selected for redemption in whole or in part, except the unredeemed portion of any Senior Note being redeemed in part.

Prior to due presentment of this Senior Note for registration of transfer, the Company, the Trustee and any agent of the Company or the Trustee may treat the Person in whose name this Senior Note is registered as the owner hereof for all purposes, whether or not this Senior Note is overdue, and neither the Company, the Trustee nor any such agent shall be affected by notice to the contrary.

This Senior Note shall be governed by, and construed and enforced in accordance with, the laws of the State of California without regard to the principles of conflicts of laws thereunder, except to the extent that the Trust Indenture Act shall be applicable.

As provided in the Indenture, no recourse shall be had for the payment of the principal of, premium, if any, or interest with respect to this Senior Note, or any part thereof, or for any claim based hereon or otherwise in respect hereof, or of the indebtedness represented hereby, or upon any obligation, covenant or agreement under the Indenture, against any incorporator, shareholder, officer or director, as such, past, present or future, of the Company or of any predecessor or successor corporation (either directly or through the Company or a predecessor or successor corporation), whether by virtue of any constitutional provision, statute or rule of law or by the enforcement of any assessment or penalty or otherwise; it being expressly agreed and understood that the Indenture and all the Bonds are solely corporate obligations and that any such personal liability is hereby expressly waived and released as a condition of, and as part of the consideration for, the execution of the Indenture and the issuance of this Senior Note.

All terms used in this Senior Note which are not defined herein shall have the meanings assigned to them in the Indenture.

**ASSIGNMENT FORM**

To assign this Senior Note, fill in the form below: (I) or (we) assign and transfer this Senior Note to

_____
(Insert assignee's soc. sec. or tax I.D. no.)

_____

_____

_____

_____
(Print or type assignee's name, address and zip code)

and irrevocably appoint _____
to transfer this Senior Note on the books of the Company. The agent may substitute another to act for him.

_____

Date:

Your signature: _____
(Sign exactly as your name appears on the face of this Senior Note)

Tax Identification No.: _____

SIGNATURE GUARANTEE:

_____

Signatures must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Bond Registrar, which requirements include membership or participation in the Securities Transfer Agent Medallion Program ("*STAMP*") or such other "signature guarantee program" as may be determined by the Bond Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

**Exhibit 4.4**

**First Supplemental Indenture**
**Dated as of July 1, 2020**

**to the Indenture**
**Dated as of November 29, 2017**

———————————

**PACIFIC GAS AND ELECTRIC COMPANY**
**Issuer**

**and**

**BOKF, N.A.**
**Trustee**

———————————

# TABLE OF CONTENTS

RECITALS OF THE COMPANY 1

ARTICLE ONE     RELATION TO INDENTURE; ADDITIONAL DEFINITIONS 2

     Section 101    Relation to Indenture 2
     Section 102    Additional Definitions 2

ARTICLE TWO     AMENDMENT OF BASE INDENTURE, THE 3.30% SENIOR NOTES DUE 2027 AND THE 3.95% SENIOR NOTES DUE 2047 2

     Section 201    Appendix A 2
     Section 202    The Base Indenture (Notes Amended) 2
     Section 203    The Base Indenture (3.15 Amended) 3
     Section 204    The Base Indenture (3.16 Amended) 3
     Section 205    The Base Indenture (3.17 Amended) 5
     Section 206    The Base Indenture (3.18 Amended) 7
     Section 207    The Base Indenture (3.19 Amended) 7
     Section 208    The Base Indenture (3.20 Amended) 8
     Section 209    Bond Exchange 8
     Section 210    The Base Indenture (3.21 Amended) 8
     Section 211    The Base Indenture (3.22 Amended) 9
     Section 212    The Base Indenture (3.23 Amended) 10
     Section 213    The Base Indenture (3.24 Amended) 12
     Section 214    The Base Indenture (3.25 Amended) 13
     Section 215    The Base Indenture (3.26 Amended) 13
     Section 216    Bond Exchange 13

ARTICLE THREE     PAYING AGENT, TRANSFER AGENT AND BOND REGISTRAR 14

     Section 301    Paying Agent, Transfer Agent and Bond Registrar 14

ARTICLE FOUR     MISCELLANEOUS PROVISIONS 14

     Section 401    Concerning the Trustee 14
     Section 402    Application of First Supplemental Indenture 14
     Section 403    Effective Date of First Supplemental Indenture 14
     Section 404    Governing Law 14
     Section 405    Counterparts 15

i

FIRST SUPPLEMENTAL INDENTURE, dated as of July 1, 2020 (this "First Supplemental Indenture"), by and between **PACIFIC GAS AND ELECTRIC COMPANY**, a corporation duly organized and existing under the laws of the State of California (the "Company" or the "Issuer"), and **BOKF, N.A.**, a national banking association organized and existing under the laws of the United States of America, as successor Trustee under the Base Indenture (as hereinafter defined) (the "Trustee").

## RECITALS OF THE COMPANY

A. The Company and the Trustee are parties to that certain Indenture, dated as of November 29, 2017 (the "Base Indenture"), as supplemented by this First Supplemental Indenture, dated as of July 1, 2020 (this "First Supplemental Indenture", and together with the Base Indenture, the "Indenture"), providing for the issuance by the Company of an unlimited principal amount of Bonds (as defined in the Base Indenture) and Additional Bonds (as defined in the Base Indenture) in accordance with the Base Indenture.

B. The Base Indenture providing for the issuance of (i) $1,150,000,000 in aggregate principal amount of the Company's 3.30% Senior Notes due 2027 (the "3.30% Senior Notes due 2027") and (ii) $850,000,000 in aggregate principal amount of the Company's 3.95% Senior Notes due 2047 (the "3.95% Senior Notes due 2047"), has been previously executed and delivered to the Trustee.

C. Under Section 7.07(a) of the Base Indenture, the Company covenanted that it will not issue, incur, assume or permit to exist any Debt if such Debt is secured by a Lien on any Principal Property (whether such Principal Property was owned at the Issue Date (as defined in the Base Indenture) or thereafter acquired), unless the Company provides that Outstanding Bonds will be equally and ratably secured by such Liens for as long as any such Debt shall be so secured, subject to certain exceptions set forth in the Base Indenture.

D. Under Section 13.01(b) of the Base Indenture, the Company and the Trustee, at any time and from time to time, may enter into one or more indentures supplemental thereto to add one or more covenants of the Company or other provisions for the benefit of all Holders or for the benefit of the Holders of, or to remain in effect only so long as there shall be Outstanding, Bonds of one or more specified series; or to surrender any right or power therein conferred upon the Company.

E. The Company intends to execute and deliver that certain Second Supplemental Indenture, dated as of July 1, 2020 (the "Second Supplemental Mortgage Indenture") to the Indenture of Mortgage, dated as of June 19, 2020, between the Company and The Bank of New York Mellon Trust Company, N.A., as trustee (the "Mortgage Bond Trustee") (such Indenture of Mortgage, as previously and hereinafter supplemented, the "Mortgage Indenture"), pursuant to which the Company intends to issue first mortgage bonds thereunder secured by a lien on and security interest in certain property of the Company as provided in the Mortgage Indenture (the "Mortgaged Property").

1

F. The Company desires to amend the Base Indenture and each of the 3.30% Senior Notes due 2027 and the 3.95% Senior Notes due 2047 to set forth the terms upon which the Company shall issue such first mortgage bonds to the Trustee for the benefit of the Holders of each of the 3.30% Senior Notes due 2027 and the 3.95% Senior Notes due 2047 (collectively, the "Secured Bonds") as collateral security for the payment of the Secured Bonds.

G. The execution and delivery of this First Supplemental Indenture has been authorized by a Board Resolution (as defined in the Base Indenture).

H. Concurrent with the execution hereof, the Company has caused its counsel to deliver to the Trustee an Opinion of Counsel (as defined in the Base Indenture) pursuant to Section 13.03 of the Base Indenture.

I. The Company has done all things necessary to make this First Supplemental Indenture a valid agreement of the Company, in accordance with its terms.

J. NOW, THEREFORE, the Company and the Trustee agree, for the benefit of each other and for the equal and proportionate benefit of Holders of the Secured Bonds with respect to all provisions herein applicable to each such series of Secured Bonds, as follows:

## ARTICLE ONE

### RELATION TO INDENTURE; ADDITIONAL DEFINITIONS

Section 101 <u>Relation to Indenture</u>. This First Supplemental Indenture constitutes an integral part of the Indenture.

Section 102 <u>Additional Definitions</u>. Unless the context otherwise requires, capitalized terms used but not defined herein have the meaning set forth in the Base Indenture; provided, however, that, where a term is defined both in this First Supplemental Indenture and in the Base Indenture, the meaning given to such term in this First Supplemental Indenture shall control for purposes of this First Supplemental Indenture and the Indenture.

The words "herein," "hereof" and "hereunder" and other words of similar import refer to this First Supplemental Indenture as a whole and not to any particular Article, Section or other subdivision.

## ARTICLE TWO

### AMENDMENT OF BASE INDENTURE, THE 3.30% SENIOR NOTES DUE 2027 AND THE 3.95% SENIOR NOTES DUE 2047

Section 201 <u>Appendix A</u>. Appendix A of the Base Indenture is hereby replaced in entirety with Exhibit A to this First Supplemental Indenture.

Section 202 <u>The Base Indenture (Notes Amended)</u>. The Base Indenture is hereby amended by amending and restating the defined terms "2027 Notes" and "2047 Notes" as follows:

2

"2027 Notes" is replaced with "3.30% Senior Notes due 2027" issued on May 15, 2018.

"2047 Notes" is replaced with "3.95% Senior Notes due 2047" issued on April 2, 2018.

Section 203 <u>The Base Indenture (3.15 Amended)</u>. The Base Indenture is hereby amended by the addition of Section 3.15 thereto, to read as follows:

"<u>Section 3.15 Global Bonds; Appointment of Depositary for Global Bonds</u>.

The 3.30% Senior Notes due 2027 shall be issued in the form of one or more permanent Global Bonds as provided in Section 3.13 of the Base Indenture and deposited with, or on behalf of, the Depositary, or with the Trustee, as custodian for the Depositary, duly executed by the Company and authenticated by the Trustee. The Company hereby initially appoints DTC to act as the Depositary with respect to all 3.30% Senior Notes due 2027, and the 3.30% Senior Notes due 2027 shall initially be registered in the name of Cede & Co., as the nominee of DTC.

Each Global Bond shall represent such of the 3.30% Senior Notes due 2027 as shall be specified therein and shall each provide that it shall represent the aggregate principal amount of 3.30% Senior Notes due 2027 from time to time endorsed thereon and that the aggregate principal amount of 3.30% Senior Notes due 2027 represented thereby may from time to time be reduced or increased, as appropriate, to reflect exchanges or redemptions. Any endorsement of a Global Bond to reflect the amount, or any increase or decrease in the aggregate principal amount, of 3.30% Senior Notes due 2027 represented thereby shall be reflected by the Trustee on Schedule A attached to the 3.30% Senior Notes due 2027 and made by the Trustee in accordance with written instructions or such other written form of instructions as is customary for the Depositary, from the Depositary or its nominee on behalf of any Person having a beneficial interest in the Global Bond.

The Company and DTC have executed a Blanket Letter of Representations, and the Trustee is hereby authorized, in connection with any successor nominee for DTC or any successor Depositary, to enter into appropriate or comparable arrangements, if necessary, and shall have the same rights with respect to its actions thereunder as it has with respect to its actions under the Indenture.

Section 204 <u>The Base Indenture (3.16 Amended)</u>. The Base Indenture is hereby amended by the addition of Section 3.16 thereto, to read as follows:

"Section 3.16 <u>Collateral Security for the 3.30% Senior Notes due 2027</u>.

3

(a) For the purpose of providing collateral security for the obligations of the Company with respect to the 3.30% Senior Notes due 2027, the Company shall issue and deliver the 3.30% First Mortgage Bond, Collateral Series due 2027 (the "3.30% Collateral Mortgage Bonds due 2027") to the Trustee pursuant to the Second Supplemental Indenture, dated as of July 1, 2020 (the "Second Supplemental Mortgage Indenture") to the Indenture of Mortgage, dated as of June 19, 2020, between the Company and The Bank of New York Mellon Trust Company, N.A., as trustee (the "Mortgage Bond Trustee") (such Indenture of Mortgage, as previously and hereinafter supplemented, (including by the Second Supplemental Mortgage Indenture) is hereinafter referred to as the "Mortgage Indenture"). For the avoidance of doubt, any amounts received by the Trustee with respect to the 3.30% Collateral Mortgage Bonds due 2027 will be applied to satisfy any obligations under the 3.30% Senior Notes due 2027 in accordance with the Indenture and not any other Bonds outstanding under the Indenture. In connection with the delivery of the 3.30% Collateral Mortgage Bonds due 2027 to the Trustee, the Company shall (i) deliver to the Trustee an Officer's Certificate stating that (A) the Company has duly executed and the Mortgage Bond Trustee has duly authenticated the 3.30% Collateral Mortgage Bonds due 2027 in the aggregate principal amount of $1,150,000,000 and (B) the Company has delivered the 3.30% Collateral Mortgage Bonds due 2027 to the Trustee in the aggregate principal amount of $1,150,000,000, (ii) provide to the Trustee (or permit the Trustee to rely upon) an Opinion of Counsel, satisfactory in form and substance to the Trustee, regarding the due execution, delivery, issuance, validity and enforceability of the 3.30% Collateral Mortgage Bonds due 2027, and that the Mortgage Indenture creates a valid and enforceable lien on the Property Additions (as defined in the Mortgage Indenture) made the subject of the 3.30% Collateral Mortgage Bonds due 2027, subject to no prior Lien (as defined in the Mortgage Indenture) to the knowledge of such counsel, except for Permitted Liens (as defined in the Mortgage Indenture), and (iii) deliver to the Trustee a copy of the Mortgage Indenture, including the Second Supplemental Mortgage Indenture, certified by the Secretary or an Assistant Secretary of the Company.

(b) The 3.30% Collateral Mortgage Bonds due 2027 shall be fully registered in the name of the Trustee. Until the 3.30% Collateral Mortgage Bonds due 2027 are released in accordance with Section 3.18 of the Indenture, the Trustee shall hold the 3.30% Collateral Mortgage Bonds due 2027 in trust for the benefit of the Holders from time to time of the 3.30% Senior Notes due 2027 as security for any and all obligations of the Company with respect to the 3.30% Senior Notes due 2027, including but not limited to, (1) the full and prompt payment of the principal of and premium, if any, on the 3.30% Senior Notes due 2027 when and as the same shall become due and payable in accordance with the terms and provisions of the Indenture or the 3.30% Senior Notes due 2027, either at the stated maturity thereof, upon acceleration of the maturity thereof or upon redemption, and (2) the full and prompt payment of any interest on the 3.30% Senior Notes due 2027, when and as the same shall become due and payable in accordance with the terms and provisions hereof or the 3.30% Senior Notes due 2027.

(c) The Company acknowledges and agrees that, solely for administrative purposes, the Trustee will establish an account in the name of the Company for the custody and safekeeping of 3.30% Collateral Mortgage Bonds due 2027 delivered to the Trustee."

4

Section 205 <u>The Base Indenture (3.17 Amended)</u>. The Base Indenture is hereby amended by the addition of Section 3.17 thereto, to read as follows:

"Section 3.17 <u>Actions with Respect to 3.30% Collateral Mortgage Bonds due 2027</u>.

(a) Except for the safe custody of any 3.30% Collateral Mortgage Bonds due 2027 in its possession and the accounting for moneys actually received by it with respect to the 3.30% Collateral Mortgage Bonds due 2027, the Trustee shall have no duty to act, consent or request any action of any Person in connection with the 3.30% Collateral Mortgage Bonds due 2027 unless the Trustee shall have received (i) written direction from the holders of at least a majority in aggregate principal amount of the Secured Bonds then outstanding voting as a single class and (ii) indemnity or security satisfactory to it against any liabilities that may be incurred by it in connection therewith; *provided, however,* that in no event shall the Trustee have any duty to attend meetings of bondholders under the Mortgage Indenture, or to ascertain or take action with respect to voting, consents, waivers, amendments or any other matters relative to the 3.30% Collateral Mortgage Bonds due 2027 and/or the Mortgage Indenture. The Trustee shall have no duty to ascertain or inquire into or verify the performance or observance of any covenants, conditions or agreements on the part of the Company or the Mortgage Bond Trustee with respect to the 3.30% Collateral Mortgage Bonds due 2027. The Trustee will not be required to take any action that is contrary to applicable law or any provision of the Indenture, the 3.30% Collateral Mortgage Bonds due 2027 or the Mortgage Indenture or that, in the opinion of the Trustee, otherwise subjects it to liability; *provided, however*, that, subject to the foregoing limitations and any other protections that the Trustee may have under the Indenture, including without limitation its right to indemnification for actions taken at the direction of the holders, the Trustee shall vote or give any such consent or instruction as it may be directed to do so by the holders of a majority in principal amount of the 3.30% Senior Notes due 2027, unless the vote or consent is with respect to matters which under the Mortgage Indenture require the vote or consent of the holders of a greater percentage in principal amount of the 3.30% Collateral Mortgage Bonds due 2027, in which case such direction must be from holders of such greater percentage in principal amount of the 3.30% Senior Notes due 2027.

(b) To the extent that any consent or instruction from the Trustee and/or the holders of the 3.30% Senior Notes due 2027 is required with respect to the 3.30% Collateral Mortgage Bonds due 2027 and/or the Mortgage Indenture, the Trustee shall not have any duty or obligation to determine whether such consent or instruction is required nor any duty or obligation to give or otherwise solicit such consent or instructions; *provided, however*, that if the Trustee receives any written notices with respect to the 3.30% Collateral Mortgage Bonds due 2027, it shall promptly transmit such notices to the holders of the 3.30% Senior Notes due 2027 in accordance with the Indenture.

5

(c) It is expressly understood and agreed by the Company (and, with respect to any holder of 3.30% Senior Notes due 2027, by holding such 3.30% Senior Notes due 2027 such holder shall be deemed to have agreed) that the Trustee shall not be responsible for any recital, statement, representation, or warranty (whether written or oral) made by any Person in or in connection with the Indenture or the Mortgage Indenture or any certificate or other document referred to or provided for in, or received by it under, the Indenture or the Mortgage Indenture (other than those statements, representations or warranties expressly made by the Trustee, if any), or for the value, validity, effectiveness, genuineness, enforceability, or sufficiency of the 3.30% Collateral Mortgage Bonds due 2027, the Mortgage Indenture, or any other document referred to or provided for therein or for any failure by the Company, the Mortgage Bond Trustee or any other Person to perform any of its obligations hereunder or thereunder.

(d) Whether or not expressly provided herein, the rights, privileges, protections, immunities, indemnities and benefits given to the Trustee pursuant to the Indenture shall apply to any action taken by the Trustee in accordance with the terms of the 3.30% Collateral Mortgage Bonds due 2027 and/or the Mortgage Indenture.

(e) If an Event of Default under the Indenture occurs and is continuing with respect to the 3.30% Senior Notes due 2027 and the 3.30% Senior Notes due 2027 have been accelerated as a consequence of such Event of Default, the Trustee may and, subject to Section 9.02 of the Base Indenture, upon receipt of written instructions of holders of not less than a majority in principal amount of the 3.30% Senior Notes due 2027, and receipt of indemnity or security to its satisfaction, shall exercise such other rights as it shall possess under the Mortgage Indenture as a holder of the 3.30% Collateral Mortgage Bonds due 2027.

(f) With the written consent of the holders of a majority in aggregate principal amount of the outstanding 3.30% Senior Notes due 2027, the Trustee may consent to modifications, amendments, or supplements to (or provide waivers in respect of) the 3.30% Collateral Mortgage Bonds due 2027 and/or the Mortgage Indenture; provided, however, that without the written consent of each holder of 3.30% Senior Notes due 2027, the Trustee shall not consent to any modification, amendment or supplement to (or provide waivers in respect of) the 3.30% Collateral Mortgage Bonds due 2027 and/or the Mortgage Indenture that have the effect of (A) (i) extending the fixed maturity of the 3.30% Collateral Mortgage Bonds due 2027, (ii) changing any terms of any sinking fund or analogous fund or conversion rights with respect to the 3.30% Collateral Mortgage Bonds due 2027, (iii) reducing the rate or extending the time of payment of interest on the 3.30% Collateral Mortgage Bonds due 2027, or reducing the principal amount of the 3.30% Collateral Mortgage Bonds due 2027, or (iv) limiting the right of the Trustee (as the holder of the 3.30% Collateral Mortgage Bonds due 2027) to institute suit for the enforcement of payment of principal of or premium, if any, or interest on the 3.30% Collateral Mortgage Bonds due 2027 in accordance with the terms thereof, or (B) reducing the percentage of Bonds (as defined in the Mortgage Indenture), the holders of which are required to consent to any such supplement, amendment and/or waiver, or (C) permitting the creation by the Company of any Senior Lien (as such term is defined in the Mortgage Indenture) in accordance with the Mortgage Indenture."

6

Section 206 <u>The Base Indenture (3.18 Amended)</u>. The Base Indenture is hereby amended by the addition of Section 3.18 thereto, to read as follows:

"Section 3.18 <u>Release of Liens in Respect of 3.30% Collateral Mortgage Bonds due 2027; Change of Amounts</u>.

(a) Upon Company Request and the Trustee's receipt of an Officer's Certificate and an Opinion of Counsel from the Company certifying that all conditions to the satisfaction and discharge of the Indenture with respect to the 3.30% Senior Notes due 2027 (but, for avoidance of doubt, not any other series of Bonds then outstanding under this Indenture) in accordance with Section 8.02 of the Base Indenture have been satisfied, the Trustee shall be deemed not to hold a lien on the 3.30% Collateral Mortgage Bonds due 2027 on behalf of the holders of the 3.30% Senior Notes due 2027 and the Trustee shall, upon written request of the Company, deliver to the Company the 3.30% Collateral Mortgage Bonds due 2027, together with such appropriate instruments of transfer or release (in form and substance reasonably satisfactory to the Trustee) as may be reasonably requested by the Company (and at the expense of the Company) to release such lien. All the 3.30% Collateral Mortgage Bonds due 2027 delivered to the Company in accordance with this Section 3.18 shall be delivered by the Company to the Mortgage Bond Trustee for cancellation.

(b) Following any partial payment, redemption or retirement of the 3.30% Senior Notes due 2027, the Company shall promptly furnish to the Trustee an Officer's Certificate certifying as to such payment, redemption or retirement and the principal amount of the 3.30% Senior Notes due 2027 outstanding following such change in aggregate principal amount and directing the Trustee to deliver the 3.30% Collateral Mortgage Bonds due 2027 then held by the Trustee to the Mortgage Bond Trustee in exchange for 3.30% Collateral Mortgage Bonds due 2027 in a principal amount equal to the current outstanding aggregate principal amount so certified in the Officer's Certificate."

Section 207 <u>The Base Indenture (3.19 Amended)</u>. The Base Indenture is hereby amended by the addition of Section 3.19 thereto, to read as follows:

"Section 3.19 <u>Delivery of Non-Payment Notice to Mortgage Bond Trustee</u>. If payment of the principal of, premium, if any, or interest on the 3.30% Senior Notes due 2027 has not been fully paid, deemed to have been paid or otherwise satisfied and discharged when due, the Trustee, acting at the written direction of Holders of a majority in aggregate principal amount of the outstanding 3.30% Senior Notes due 2027, shall deliver a written notice to the Mortgage Bond Trustee stating the amount of such non-payment and that such payment remains unpaid on the date of such notice (which notice shall be given by the Trustee within five Business Days of such direction; *provided, however*, that failure by the Trustee to give such notice shall not affect in any way the Company's obligation to pay such amount)."

7

Section 208 <u>The Base Indenture (3.20 Amended)</u>. The Base Indenture is hereby amended by the addition of Section 3.20 thereto, to read as follows:

"Section 3.20 <u>No Transfer of 3.30% Collateral Mortgage Bonds due 2027</u>. The Company shall cause all of the 3.30% Collateral Mortgage Bonds due 2027 to be issued and registered in the name of the Trustee. Except (i) as otherwise permitted by this Indenture or (ii) in connection with an assignment to a successor trustee in accordance with the Indenture, the Trustee shall not sell, assign or transfer the 3.30% Collateral Mortgage Bonds due 2027."

Section 209 <u>Bond Exchange</u>. The Company desires to exchange the original Global Bonds representing the 3.30% Senior Notes due 2027, dated May 15, 2018 (the "Original Global Bonds") for the amended and restated Global Bond set forth in Exhibit A hereto (which is hereby incorporated herein and made a part hereof) (the "Amended and Restated Global 3.30% Senior Notes due 2027") incorporating the amendments effected by this First Supplemental Indenture in accordance with Section 13.06 of the Base Indenture. In connection therewith, the Company has delivered to the Trustee (i) a Company Request for the authentication and delivery of the Amended and Restated Global 3.30% Senior Notes due 2027 and the cancellation of the Original Global Bonds, along with an Officer's Certificate and Opinion of Counsel required by the Indenture, and (ii) the Amended and Restated Global 3.30% Senior Notes due 2027 representing the 3.30% Senior Notes due 2027 in the aggregate principal amount of $1,150,000,000. Upon receipt of the deliverables required by the Indenture, the Trustee shall authenticate the Amended and Restated Global 3.30% Senior Notes due 2027 to be exchanged for the Original Global Bonds, cancel the Original Global Bonds and deliver the cancelled Original Global Bonds to the Company in accordance with the instructions set forth in the Company Request.

Section 210 <u>The Base Indenture (3.21 Amended)</u>. The Base Indenture is hereby amended by the addition of Section 3.21 thereto, to read as follows:

"Section 3.21 <u>Global Bonds; Appointment of Depositary for Global Bonds</u>.

The 3.95% Senior Notes due 2047 shall be issued in the form of one or more permanent Global Bonds as provided in Section 3.13 of the Base Indenture and deposited with, or on behalf of, the Depositary, or with the Trustee, as custodian for the Depositary, duly executed by the Company and authenticated by the Trustee, and shall bear the legend prescribed in Exhibit A, as applicable. The Company hereby initially appoints DTC to act as the Depositary with respect to all 3.95% Senior Notes due 2047, and the 3.95% Senior Notes due 2047 shall initially be registered in the name of Cede & Co., as the nominee of DTC.

Each Global Bond shall represent such of the 3.95% Senior Notes due 2047 as shall be specified therein and shall each provide that it shall represent the aggregate principal amount of 3.95% Senior Notes due 2047 from time to time endorsed thereon and that the aggregate principal amount of 3.95% Senior Notes due 2047 represented thereby may from time to time be reduced or increased, as appropriate, to reflect exchanges or redemptions. Any endorsement of a Global Bond to reflect the amount, or

8

any increase or decrease in the aggregate principal amount, of 3.95% Senior Notes due 2047 represented thereby shall be reflected by the Trustee on Schedule B attached to the 3.95% Senior Notes due 2047 and made by the Trustee in accordance with written instructions or such other written form of instructions as is customary for the Depositary, from the Depositary or its nominee on behalf of any Person having a beneficial interest in the Global Bond.

The Company and DTC have executed a Blanket Letter of Representations, and the Trustee is hereby authorized, in connection with any successor nominee for DTC or any successor Depositary, to enter into appropriate or comparable arrangements, if necessary, and shall have the same rights with respect to its actions thereunder as it has with respect to its actions under the Indenture.

Section 211 <u>The Base Indenture (3.22 Amended)</u>. The Base Indenture is hereby amended by the addition of Section 3.22 thereto, to read as follows:

"Section 3.22 <u>Collateral Security for the 3.95% Senior Notes due 2047</u>.

(a) For the purpose of providing collateral security for the obligations of the Company with respect to the 3.95% Senior Notes due 2047, the Company shall issue and deliver the 3.95% First Mortgage Bond, Collateral Series due 2047 (the "3.95% Collateral Mortgage Bonds due 2047") to the Trustee pursuant to the Second Supplemental Mortgage Indenture. For the avoidance of doubt, any amounts received by the Trustee with respect to the 3.95% Collateral Mortgage Bonds due 2047 will be applied to satisfy any obligations under the 3.95% Senior Notes due 2047 in accordance with the Indenture and not any other Bonds outstanding under the Indenture. In connection with the delivery of the 3.95% Collateral Mortgage Bonds due 2047 to the Trustee, the Company shall (i) deliver to the Trustee an Officer's Certificate stating that (A) the Company has duly executed and the Mortgage Bond Trustee has duly authenticated the 3.95% Collateral Mortgage Bonds due 2047 in the aggregate principal amount of $850,000,000 and (B) the Company has delivered the 3.95% Collateral Mortgage Bonds due 2047 to the Trustee in the aggregate principal amount of $850,000,000, (ii) provide to the Trustee (or permit the Trustee to rely upon) an Opinion of Counsel, satisfactory in form and substance to the Trustee, regarding the due execution, delivery, issuance, validity and enforceability of the 3.95% Collateral Mortgage Bonds due 2047, and that the Mortgage Indenture creates a valid and enforceable lien on the Property Additions (as defined in the Mortgage Indenture) made the subject of the 3.95% Collateral Mortgage Bonds due 2047, subject to no prior Lien (as defined in the Mortgage Indenture) to the knowledge of such counsel, except for Permitted Liens (as defined in the Mortgage Indenture), and (iii) deliver to the Trustee a copy of the Mortgage Indenture, including the Second Supplemental Mortgage Indenture, certified by the Secretary or an Assistant Secretary of the Company.

9

(b) The 3.95% Collateral Mortgage Bonds due 2047 shall be fully registered in the name of the Trustee. Until the 3.95% Collateral Mortgage Bonds due 2047 are released in accordance with Section 3.24, the Trustee shall hold the 3.95% Collateral Mortgage Bonds due 2047 in trust for the benefit of the Holders from time to time of the 3.95% Senior Notes due 2047 as security for any and all obligations of the Company with respect to the 3.95% Senior Notes due 2047, including but not limited to, (1) the full and prompt payment of the principal of and premium, if any, on the 3.95% Senior Notes due 2047 when and as the same shall become due and payable in accordance with the terms and provisions of the Indenture or the 3.95% Senior Notes due 2047, either at the stated maturity thereof, upon acceleration of the maturity thereof or upon redemption, and (2) the full and prompt payment of any interest on the 3.95% Senior Notes due 2047, when and as the same shall become due and payable in accordance with the terms and provisions hereof or the 3.95% Senior Notes due 2047.

(c) The Company acknowledges and agrees that, solely for administrative purposes, the Trustee will establish an account in the name of the Company for the custody and safekeeping of 3.95% Collateral Mortgage Bonds due 2047 delivered to the Trustee."

Section 212 <u>The Base Indenture (3.23 Amended)</u>. The Base Indenture is hereby amended by the addition of Section 3.23 thereto, to read as follows:

"Section 3.23 <u>Actions with Respect to 3.95% Collateral Mortgage Bonds due 2047</u>.

(a) Except for the safe custody of any 3.95% Collateral Mortgage Bonds due 2047 in its possession and the accounting for moneys actually received by it with respect to the 3.95% Collateral Mortgage Bonds due 2047, the Trustee shall have no duty to act, consent or request any action of any Person in connection with the 3.95% Collateral Mortgage Bonds due 2047 unless the Trustee shall have received (i) written direction from the holders of at least a majority in aggregate principal amount of the Secured Bonds then outstanding voting as a single class and (ii) indemnity or security satisfactory to it against any liabilities that may be incurred by it in connection therewith; *provided, however,* that in no event shall the Trustee have any duty to attend meetings of bondholders under the Mortgage Indenture, or to ascertain or take action with respect to voting, consents, waivers, amendments or any other matters relative to the 3.95% Collateral Mortgage Bonds due 2047 and/or the Mortgage Indenture. The Trustee shall have no duty to ascertain or inquire into or verify the performance or observance of any covenants, conditions or agreements on the part of the Company or the Mortgage Bond Trustee with respect to the 3.95% Collateral Mortgage Bonds due 2047. The Trustee will not be required to take any action that is contrary to applicable law or any provision of the Indenture, the 3.95% Collateral Mortgage Bonds due 2047 or the Mortgage Indenture or that, in the opinion of the Trustee, otherwise subjects it to liability; *provided, however*, that, subject to the foregoing limitations and any other protections that the Trustee may have under the Indenture, including without limitation its right to indemnification for actions taken at the direction of the holders, the Trustee shall vote or give any such consent or instruction as it may be directed to do so by the holders of a majority in principal amount of the 3.95% Senior Notes due 2047, unless the vote or consent is with respect to matters which under the Mortgage Indenture require the vote or consent of the holders of a greater percentage in principal amount of the 3.95% Collateral Mortgage Bonds due 2047, in which case such direction must be from holders of such greater percentage in principal amount of the 3.95% Senior Notes due 2047.

10

(b) To the extent that any consent or instruction from the Trustee and/or the holders of the 3.95% Senior Notes due 2047 is required with respect to the 3.95% Collateral Mortgage Bonds due 2047 and/or the Mortgage Indenture, the Trustee shall not have any duty or obligation to determine whether such consent or instruction is required nor any duty or obligation to give or otherwise solicit such consent or instructions; *provided, however,* that if the Trustee receives any written notices with respect to the 3.95% Collateral Mortgage Bonds due 2047, it shall promptly transmit such notices to the holders of the 3.95% Senior Notes due 2047 in accordance with the Indenture.

(c) It is expressly understood and agreed by the Company (and, with respect to any holder of 3.95% Senior Notes due 2047, by holding such 3.95% Senior Notes due 2047 such holder shall be deemed to have agreed) that the Trustee shall not be responsible for any recital, statement, representation, or warranty (whether written or oral) made by any Person in or in connection with the Indenture or the Mortgage Indenture or any certificate or other document referred to or provided for in, or received by it under, this Indenture or the Mortgage Indenture (other than those statements, representations or warranties expressly made by the Trustee, if any), or for the value, validity, effectiveness, genuineness, enforceability, or sufficiency of the 3.95% Collateral Mortgage Bonds due 2047, the Mortgage Indenture, or any other document referred to or provided for therein or for any failure by the Company, the Mortgage Bond Trustee or any other Person to perform any of its obligations hereunder or thereunder.

(d) Whether or not expressly provided herein, the rights, privileges, protections, immunities, indemnities and benefits given to the Trustee pursuant to the Indenture shall apply to any action taken by the Trustee in accordance with the terms of the 3.95% Collateral Mortgage Bonds due 2047 and/or the Mortgage Indenture.

(e) If an Event of Default under the Indenture occurs and is continuing with respect to the 3.95% Senior Notes due 2047 and the 3.95% Senior Notes due 2047 have been accelerated as a consequence of such Event of Default, the Trustee may and, subject to Section 9.02 of the Base Indenture, upon receipt of written instructions of holders of not less than a majority in principal amount of the 3.95% Senior Notes due 2047, and receipt of indemnity or security to its satisfaction, shall exercise such other rights as it shall possess under the Mortgage Indenture as a holder of the 3.95% Collateral Mortgage Bonds due 2047.

(f) With the written consent of the holders of a majority in aggregate principal amount of the outstanding 3.95% Senior Notes due 2047, the Trustee may consent to modifications, amendments, or supplements to (or provide waivers in respect of) the 3.95% Collateral Mortgage Bonds due 2047 and/or the Mortgage Indenture; provided, however, that without the written consent of each holder of 3.95% Senior Notes due 2047, the Trustee shall not consent to any modification, amendment or supplement to (or

11

provide waivers in respect of) the 3.95% Collateral Mortgage Bonds due 2047 and/or the Mortgage Indenture that have the effect of (A) (i) extending the fixed maturity of the 3.95% Collateral Mortgage Bonds due 2047, (ii) changing any terms of any sinking fund or analogous fund or conversion rights with respect to the 3.95% Collateral Mortgage Bonds due 2047, (iii) reducing the rate or extending the time of payment of interest on the 3.95% Collateral Mortgage Bonds due 2047, or reducing the principal amount of the 3.95% Collateral Mortgage Bonds due 2047, or (iv) limiting the right of the Trustee (as the holder of the 3.95% Collateral Mortgage Bonds due 2047) to institute suit for the enforcement of payment of principal of or premium, if any, or interest on the 3.95% Collateral Mortgage Bonds due 2047 in accordance with the terms thereof, or (B) reducing the percentage of Bonds (as defined in the Mortgage Indenture), the holders of which are required to consent to any such supplement, amendment and/or waiver, or (C) permitting the creation by the Company of any Senior Lien (as such term is defined in the Mortgage Indenture) in accordance with the Mortgage Indenture."

Section 213 The Base Indenture (3.24 Amended). The Base Indenture is hereby amended by the addition of Section 3.24 thereto, to read as follows:

"Section 3.24 Release of Liens in Respect of 3.95% Collateral Mortgage Bonds due 2047; Change of Amounts.

(a) Upon Company Request and the Trustee's receipt of an Officer's Certificate and an Opinion of Counsel from the Company certifying that all conditions to the satisfaction and discharge of the Indenture with respect to the 3.95% Senior Notes due 2047 (but, for avoidance of doubt, not any other series of Bonds then outstanding under this Indenture) in accordance with Section 8.02 of the Base Indenture have been satisfied, the Trustee shall be deemed not to hold a lien on the 3.95% Collateral Mortgage Bonds due 2047 on behalf of the holders of the 3.95% Senior Notes due 2047 and the Trustee shall, upon written request of the Company, deliver to the Company the 3.95% Collateral Mortgage Bonds due 2047, together with such appropriate instruments of transfer or release (in form and substance reasonably satisfactory to the Trustee) as may be reasonably requested by the Company (and at the expense of the Company) to release such lien. All the 3.95% Collateral Mortgage Bonds due 2047 delivered to the Company in accordance with this Section 3.24 shall be delivered by the Company to the Mortgage Bond Trustee for cancellation.

(b) Following any partial payment, redemption or retirement of the 3.95% Senior Notes due 2047, the Company shall promptly furnish to the Trustee an Officer's Certificate certifying as to such payment, redemption or retirement and the principal amount of the 3.95% Senior Notes due 2047 outstanding following such change in aggregate principal amount and directing the Trustee to deliver the 3.95% Collateral Mortgage Bonds due 2047 then held by the Trustee to the Mortgage Bond Trustee in exchange for 3.95% Collateral Mortgage Bonds due 2047 in a principal amount equal to the current outstanding aggregate principal amount so certified in the Officer's Certificate."

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 400 of 1367

Section 214 <u>The Base Indenture (3.25 Amended)</u>. The Base Indenture is hereby amended by the addition of Section 3.25 thereto, to read as follows:

"Section 3.25 <u>Delivery of Non-Payment Notice to Mortgage Bond Trustee</u>. If payment of the principal of, premium, if any, or interest on the 3.95% Senior Notes due 2047 has not been fully paid, deemed to have been paid or otherwise satisfied and discharged when due, the Trustee, acting at the written direction of Holders of a majority in aggregate principal amount of the outstanding 3.95% Senior Notes due 2047, shall deliver a written notice to the Mortgage Bond Trustee stating the amount of such non-payment and that such payment remains unpaid on the date of such notice (which notice shall be given by the Trustee within five Business Days of such direction; *provided, however*, that failure by the Trustee to give such notice shall not affect in any way the Company's obligation to pay such amount)."

Section 215 <u>The Base Indenture (3.26 Amended)</u>. The Base Indenture is hereby amended by the addition of Section 3.26 thereto, to read as follows:

"Section 3.26 <u>No Transfer of 3.95% Collateral Mortgage Bonds due 2047</u>. The Company shall cause all of the 3.95% Collateral Mortgage Bonds due 2047 to be issued and registered in the name of the Trustee. Except (i) as otherwise permitted by this Indenture or (ii) in connection with an assignment to a successor trustee in accordance with the Indenture, the Trustee shall not sell, assign or transfer the 3.95% Collateral Mortgage Bonds due 2047."

Section 216 <u>Bond Exchange</u>. The Company desires to exchange the original Global Bonds representing the 3.95% Senior Notes due 2047, dated April 2, 2018 (the "Original 2047 Global Bonds") for the amended and restated Global Bond set forth in Exhibit A hereto (which is hereby incorporated herein and made a part hereof) (the "Amended and Restated Global 3.95% Senior Notes due 2047") incorporating the amendments effected by this First Supplemental Indenture in accordance with Section 13.06 of the Base Indenture. In connection therewith, the Company has delivered to the Trustee (i) a Company Request for the authentication and delivery of the Amended and Restated Global 3.95% Senior Notes due 2047 and the cancellation of the Original 2047 Global Bonds, along with an Officer's Certificate and Opinion of Counsel required by the Indenture, and (ii) the Amended and Restated Global 3.95% Senior Notes due 2047 representing the 3.95% Senior Notes due 2047 in the aggregate principal amount of $850,000,000. Upon receipt of the deliverables required by the Indenture, the Trustee shall authenticate the Amended and Restated Global 3.95% Senior Notes due 2047 to be exchanged for the Original 2047 Global Bonds, cancel the Original 2047 Global Bonds and deliver the cancelled Original 2047 Global Bonds to the Company in accordance with the instructions set forth in the Company Request.

13

## ARTICLE THREE

### PAYING AGENT, TRANSFER AGENT AND BOND REGISTRAR

Section 301 Paying Agent, Transfer Agent and Bond Registrar.

The Trustee is hereby appointed as successor Paying Agent, transfer agent and Bond Registrar for the Secured Bonds. Place of Payment of the Secured Bonds shall be the Corporate Trust Office of the Trustee.

### ARTICLE FOUR

### MISCELLANEOUS PROVISIONS

Section 401 Concerning the Trustee.

In acting under and by virtue of this First Supplemental Indenture, the Trustee shall have all of the rights, protections, privileges, indemnities and immunities given to it in the Base Indenture. The Trustee shall have no responsibility for the validity or sufficiency of this First Supplemental Indenture. The recitals contained herein shall be taken as the statements of the Company, and the Trustee assumes no responsibility for their correctness.

Section 402 Application of First Supplemental Indenture.

Except as provided herein, each and every term and condition contained in this First Supplemental Indenture that modifies, amends or supplements the terms and conditions of the Indenture shall apply only to the Secured Bonds and not to any other series of Bonds established under the Indenture. Except as specifically amended and supplemented by, or to the extent inconsistent with, this First Supplemental Indenture, the Indenture shall remain in full force and effect and is hereby ratified and confirmed.

Section 403 Effective Date of First Supplemental Indenture.

This First Supplemental Indenture shall be effective upon the execution and delivery hereof by each of the parties hereto.

Section 404 Governing Law.

The laws of the State of New York shall govern this First Supplemental Indenture and the Secured Bonds, without giving effect to applicable principles of conflicts of law to the extent that the application of the laws of another jurisdiction would be required thereby.

14

Section 405 <u>Counterparts</u>.

This First Supplemental Indenture may be executed in any number of counterparts, and each of such counterparts shall together constitute but one and the same instrument. Delivery of an executed First Supplemental Indenture by one party to the other may be made by facsimile, electronic mail (including any electronic signature complying with the New York Electronic Signatures and Records Act (N.Y. State Tech. §§ 301-309), as amended from time to time, or other applicable law) or other transmission method, and the parties hereto agree that any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

IN WITNESS WHEREOF, the parties hereto have caused this First Supplemental Indenture to be duly executed by their respective officers hereunto duly authorized, all as of the day and year first above written.

**PACIFIC GAS AND ELECTRIC COMPANY**,
as Issuer

By:  /s/ Margaret K. Becker
Name:  Margaret K. Becker
Title:  Senior Director and Treasurer

**BOKF, N.A.**,
as Trustee

By:  /s/ George F. Kabin
Name:  George F. Kabin
Title:  Senior Vice President

**Signature Page to First Supplemental Indenture**

16

**FORM OF AMENDED AND RESTATED 3.30% SENIOR NOTES**
**DUE DECEMBER 1, 2027**

THIS BOND IS A GLOBAL BOND WITHIN THE MEANING OF THE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF A DEPOSITARY (AS DEFINED IN THE INDENTURE) OR A NOMINEE THEREOF. THIS GLOBAL BOND IS EXCHANGEABLE FOR BONDS REGISTERED IN THE NAME OF ANY PERSON OTHER THAN SUCH DEPOSITARY OR ITS NOMINEE ONLY IN LIMITED CIRCUMSTANCES DESCRIBED IN THE INDENTURE AND, UNLESS AND UNTIL IT IS EXCHANGED IN WHOLE OR IN PART FOR BONDS IN CERTIFICATED FORM, THIS GLOBAL BOND MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY, OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY, OR BY THE DEPOSITARY OR ANY SUCH NOMINEE TO A SUCCESSOR DEPOSITARY OR A NOMINEE OF SUCH SUCCESSOR DEPOSITARY.

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE COMPANY (AS DEFINED BELOW) OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY BOND ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

THE FOLLOWING SUMMARY OF TERMS IS SUBJECT TO THE INFORMATION SET FORTH ON THE REVERSE HEREOF:

| | | |
|---|---|---|
| PRINCIPAL AMOUNT:<br>$1,150,000,000 | ISSUE DATE:<br>May 15, 2018 | INTEREST RATE:<br>3.30% per annum |
| MATURITY DATE:<br>December 1, 2027 | INTEREST PAYMENT DATES:<br>June 1 and December 1, commencing June 1, 2018 | THIS SENIOR NOTE IS A:<br>☒ Global Book-Entry Bond<br>☐ Certificated Bond |

REGISTERED OWNER: Cede & Co., as nominee of
The Depository Trust Company

PACIFIC GAS AND ELECTRIC COMPANY

17

(Fixed Rate)

No. [•]

CUSIP No: 694308 HW0

Principal Amount: $[•]

   PACIFIC GAS AND ELECTRIC COMPANY, a corporation duly organized and existing under the laws of the State of California (herein called the "Company," which term includes any successor Person pursuant to the applicable provisions of the Indenture hereinafter referred to), for value received, hereby promises to pay to Cede & Co., as nominee for The Depository Trust Company, or registered assigns, the Principal Amount stated above on the Maturity Date stated above, and to pay interest thereon from and including November 29, 2017 or from and including the most recent Interest Payment Date to which interest has been paid or duly provided for, semi-annually in arrears on the Interest Payment Dates set forth above and on the Maturity Date stated above, commencing June 1, 2018 at the rate of 3.30% per annum until the principal hereof is paid or made available for payment. The interest so payable, and punctually paid or duly provided for, on any Interest Payment Date will, as provided in such Indenture, be paid to the Person in whose name this 3.30% Senior Note due December 1, 2027 (this "Senior Note," and together with all other 3.30% Senior Notes due December 1, 2027, the "Senior Notes") (or one or more Predecessor Bonds) is registered at the close of business on the Regular Record Date for such interest, which shall be the May 15 and November 15 preceding such Interest Payment Date; provided, however, that interest payable at the Maturity Date or on a Redemption Date will be paid to the Person to whom principal is payable. Any such interest not so punctually paid or duly provided for will forthwith cease to be payable to the Holder on such Regular Record Date and may either be paid to the Person in whose name this Senior Note (or one or more Predecessor Bonds) is registered at the close of business on a Special Record Date for the payment of such Defaulted Interest to be fixed by the Trustee, notice whereof shall be given to Holders of Senior Notes not less than 10 days prior to such Special Record Date, or be paid at any time in any other lawful manner not inconsistent with the requirements of the Indenture and any securities exchange, if any, on which the Senior Notes may be listed, and upon such notice as may be required by any such exchange, all as more fully provided in said Indenture.

   Payments of interest on this Senior Note will include interest accrued to but excluding the respective Interest Payment Dates. Interest payments for this Senior Note shall be computed and paid on the basis of the 360-day year of twelve 30-day months and will accrue from November 29, 2017 or from the most recent Interest Payment Date to which interest has been paid or duly provided for. In the event that any date on which interest is payable on this Senior Note (other than the Maturity Date) is not a Business Day then payment of the interest payable on such date will be made on the next succeeding day that is a Business Day (and without any interest or payment in respect of any such delay) with the same force and effect as if made on the date the payment was originally payable. If the Maturity Date falls on a day that is not a Business Day, the payment of principal, premium, if any, and interest may be made on the next succeeding Business Day, and no interest on such payment shall accrue for the period from and after maturity.

18

Payment of principal of, premium, if any, and interest on Senior Notes shall be made in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts. Payments of principal of, premium, if any, and interest on the Senior Notes represented by a Global Bond shall be made by wire transfer of immediately available funds to the Holder of such Global Bond, provided that, in the case of payments of principal and premium, if any, such Global Bond is first surrendered to the Paying Agent. If any of the Senior Notes are no longer represented by a Global Bond, (i) payments of principal, premium, if any, and interest due on the Maturity Date or earlier redemption of such Senior Notes shall be made at the office of the Paying Agent upon surrender of such Senior Notes to the Paying Agent, and (ii) payments of interest shall be made, at the option of the Company, subject to such surrender where applicable, (A) by check mailed to the address of the Person entitled thereto as such address shall appear in the Bond Register or (B) by wire transfer to registered Holders of at least $10,000,000 in principal amount of Senior Notes at such place and to such account at a banking institution in the United States as such Holders may designate in writing to the Trustee at least sixteen (16) days prior to the date for payment.

REFERENCE IS HEREBY MADE TO THE FURTHER PROVISIONS OF THIS SENIOR NOTE SET FORTH ON THE REVERSE HEREOF, WHICH FURTHER PROVISIONS SHALL FOR ALL PURPOSES HAVE THE SAME EFFECT AS IF SET FORTH AT THIS PLACE.

Unless the certificate of authentication hereon has been executed by the Trustee referred to on the reverse hereof by manual signature, this Senior Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose.

IN WITNESS WHEREOF, the Company has caused this instrument to be duly executed.

Dated: _____

PACIFIC GAS AND ELECTRIC COMPANY

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

19

TRUSTEE'S CERTIFICATE OF AUTHENTICATION

This Senior Note is one of the Bonds of the series designated as 3.30% Senior Notes due 2027 referred to in the within-mentioned Indenture.

Dated: _____

BOKF, N.A., *As Trustee*

By: _____
*Authorized Signatory*

20

**Reverse of Amended and Restated 3.30% Senior Notes Due December 1, 2027**

This 3.30% Senior Note due December 1, 2027 is one of a duly authorized issue of Bonds of the Company, issued and issuable in one or more series under the Indenture, dated as of November 29, 2017 and as amended by the First Supplemental Indenture, dated as of July 1, 2020 (as so amended, the "Indenture"), between the Company and BOKF, N.A., as Trustee (herein called the "Trustee," which term includes any successor trustee under the Indenture), and reference is hereby made to the Indenture for a description of the respective rights, limitations of rights, duties and immunities of the Company, the Trustee and the Holders of Bonds thereunder and of the terms and conditions upon which Bonds are, and are to be, authenticated and delivered. This Senior Note is a Bond within the meaning of the Indenture and is designated as the 3.30% Senior Notes due December 1, 2027 established by the Company under the Indenture and initially issued in an aggregate principal amount of $1,150,000,000 on May 15, 2018. The acceptance of this Senior Note shall be deemed to constitute the consent and agreement by the Holder hereof to all of the terms and provisions of the Indenture.

The Senior Notes will be secured by a series of first mortgage bonds (the "3.30% Collateral Mortgage Bonds due 2027") delivered by the Company to the Trustee for the benefit of the Holders of the Senior Notes, issued pursuant to the Second Supplemental Indenture, dated as of July 1, 2020 to the Indenture of Mortgage, dated as of June 19, 2020, between the Company and The Bank of New York Mellon Trust Company, N.A., as trustee (as so supplemented, the "Mortgage Indenture"). Reference is made to the Indenture and the Mortgage Indenture for a description of the rights of the Trustee as holder of the 3.30% Collateral Mortgage Bonds due 2027, the property mortgaged and pledged, the nature and extent of the security and rights of the holders of the first mortgage bonds under the Mortgage Indenture and the rights of the Company under the Mortgage Indenture and the terms and conditions upon which the Senior Notes are secured.

Subject to the terms and conditions of the Indenture, the Senior Notes are redeemable at the option of the Company ("Optional Redemption"), in whole or in part, (a) at any time prior to September 1, 2027 (the date that is three months prior to the Maturity Date) at a Redemption Price equal to the greater of:

(i) 100% of the principal amount of the Senior Notes to be redeemed; or

(ii) as determined by the Quotation Agent, the sum of the present values of the Remaining Scheduled Payments of principal and interest on the Senior Notes to be redeemed (not including any portion of payments of interest accrued as of the Redemption Date), calculated as if the Maturity Date of such Senior Notes was September 1, 2027 (the date that is three months prior to the Maturity Date), discounted to the Redemption Date on a semi-annual basis at the Adjusted Treasury Rate, plus 15 basis points,

plus, in either of the above cases, accrued and unpaid interest thereon to but not including the Redemption Date; and (b) at any time on or after September 1, 2027 (the date that is three months prior to the Maturity Date) at 100% of the principal amount of the Senior Notes to be redeemed, plus accrued and unpaid interest thereon to but not including the Redemption Date. For purposes of this Senior Note, "Comparable Treasury Issue" means the United States

21

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 409 of 1367

Treasury security selected by the applicable Quotation Agent as having a maturity comparable to the remaining term of this Senior Note, assuming, for such purpose, that this Senior Note matured on September 1, 2027 (the date that is three months prior to the Maturity Date)), that would be used, at the time of the selection and in accordance with customary financial practice, in pricing new issues of corporate debt securities of comparable maturity to the remaining term of this Senior Note.

Interest installments whose Stated Maturity is on or prior to such Redemption Date will be payable to Holders of such Senior Notes, or one or more Predecessor Bonds, of record at the close of business on the relevant Record Dates referred to on the face hereof, all as provided in the Indenture.

In the case of an Optional Redemption, notice of redemption will be in writing and mailed first-class postage-prepaid not less than 10 days nor more than 60 days prior to the Redemption Date to each Holder of Senior Notes to be redeemed at the Holder's registered address; provided, however, that such notice need not state the dollar amount of the Redemption Price if such dollar amount has not been determined as of the date such notice is being given to the Holders of the Senior Notes being redeemed. If money sufficient to pay the Redemption Price of all Senior Notes (or portions thereof) to be redeemed on the Redemption Date is deposited with the Paying Agent or the Trustee on or prior to the Redemption Date, from and after such Redemption Date such Senior Notes or portions thereof shall cease to bear interest. Senior Notes in denominations larger than $100,000 in principal amount may be redeemed in part but only in integral multiples of $1,000.

In the event of redemption of this Senior Note in part only, a new Senior Note or Senior Notes of like tenor for the unredeemed portion hereof will be issued in the name of the Holder hereof upon the surrender hereof.

As provided in the Indenture and subject to certain limitations therein set forth, this Senior Note or any portion of the principal amount hereof will be deemed to have been paid for all purposes of the Indenture and to be no longer Outstanding thereunder, and the Company's entire indebtedness in respect thereof will be satisfied and discharged, if there has been irrevocably deposited with the Trustee or any Paying Agent (other than the Company), in trust, money in an amount which will be sufficient and/or Eligible Obligations, the principal of and interest on which when due, without regard to any reinvestment thereof, will provide moneys which, together with money, if any, deposited with or held by the Trustee or such Paying Agent, will be sufficient to pay when due the principal of and premium, if any, and interest on this Senior Note when due.

If an Event of Default shall occur and be continuing, the Trustee or the Holders of not less than 33% in aggregate principal amount of the Outstanding Bonds, considered as one class, may declare the principal amount of all Bonds then Outstanding to be due and payable immediately by notice in writing to the Company (and to the Trustee if given by Holders); provided, however, that with respect to certain Events of Default relating to bankruptcy, insolvency and similar events, the principal amount of all Bonds then Outstanding shall be due and payable immediately without further action by the Trustee or the Holders.

22

The Indenture permits, with certain exceptions as therein provided, the Company and the Trustee to enter into one or more supplemental indentures for the purpose of adding any provisions to, or changing in any manner or eliminating any of the provisions of, the Indenture with the consent of the Holders of not less than a majority in aggregate principal amount of the Bonds at the time Outstanding, considered as one class; provided, however, that if there shall be Bonds of more than one series Outstanding under the Indenture and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such series, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all series so directly affected, considered as one class, shall be required; and provided, further, that the Indenture permits the Company and the Trustee to enter into one or more supplemental indentures for certain purposes without the consent of any Holders of Bonds. The Indenture also contains provisions permitting the Holders of a majority in aggregate principal amount of Bonds, on behalf of the Holders of all such Bonds, to waive certain past defaults under the Indenture and their consequences. Any such consent or waiver by the Holder of this Senior Note shall be conclusive and binding upon such Holder and upon all future Holders of this Senior Note and of any Senior Note issued upon the registration of transfer hereof or in exchange herefor or in lieu hereof, whether or not notation of such consent or waiver is made upon this Senior Note.

As provided in and subject to the provisions of the Indenture, the Holder of this Senior Note shall not have the right to institute any proceeding with respect to the Indenture or for the appointment of a receiver or trustee or for any other remedy thereunder, unless such Holder shall have previously given the Trustee written notice of a continuing Event of Default, the Holders of at least 33% in aggregate principal amount of the Bonds at the time Outstanding shall have made written request to the Trustee to institute proceedings in respect of such Event of Default as Trustee and offered the Trustee reasonable indemnity, and the Trustee shall not have received from the Holders of at least a majority in aggregate principal amount of Bonds at the time Outstanding a direction inconsistent with such written request, and shall have failed to institute any such proceeding for 60 days after receipt of such notice, request and offer of indemnity. The foregoing shall not apply to any suit instituted by the Holder of this Senior Note for the enforcement of any payment of principal hereof or any premium or interest hereon on or after the respective due dates expressed herein.

No reference herein to the Indenture and no provision of this Senior Note or of the Indenture shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal of and any premium and interest on this Senior Note at the times, place and rate, and in the coin or currency, herein prescribed.

As provided in the Indenture and subject to certain limitations therein set forth, the transfer of this Senior Note is registrable in the Bond Register, upon surrender of this Senior Note for registration of transfer at the office or agency of the Company in any place where the principal of and any premium and interest on this Senior Note are payable, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Company, the Trustee or the Bond Registrar, as the case may be, duly executed by the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new Senior Notes of like tenor, of authorized denominations and for the same aggregate principal amount, will be issued to the designated transferee or transferees.

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page
411 of 1367

The Senior Notes are issuable only in registered form without coupons in denominations of $100,000 and any integral multiple of $1,000 in excess thereof. As provided in the Indenture and subject to certain limitations therein set forth, Senior Notes are exchangeable for a like aggregate principal amount of Senior Notes and of like tenor of a different authorized denomination, as requested by the Holder surrendering the same.

No service charge shall be made for any such registration of transfer or exchange, but the Company may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

The Company shall not be required to execute or to provide for the registration of the transfer of or the exchange of (A) any Senior Note of this series during a period of 15 days immediately preceding the date notice is to be given identifying the serial numbers of the Senior Notes called for redemption, or (B) any Senior Note selected for redemption in whole or in part, except the unredeemed portion of any Senior Note being redeemed in part.

Prior to due presentment of this Senior Note for registration of transfer, the Company, the Trustee and any agent of the Company or the Trustee may treat the Person in whose name this Senior Note is registered as the owner hereof for all purposes, whether or not this Senior Note is overdue, and neither the Company, the Trustee nor any such agent shall be affected by notice to the contrary.

This Senior Note shall be governed by, and construed and enforced in accordance with, the laws of the State of New York without regard to the principles of conflicts of laws thereunder, except to the extent that the Trust Indenture Act shall be applicable.

As provided in the Indenture, no recourse shall be had for the payment of the principal of, premium, if any, or interest with respect to this Senior Note, or any part thereof, or for any claim based hereon or otherwise in respect hereof, or of the indebtedness represented hereby, or upon any obligation, covenant or agreement under the Indenture, against any incorporator, shareholder, officer or director, as such, past, present or future, of the Company or of any predecessor or successor corporation (either directly or through the Company or a predecessor or successor corporation), whether by virtue of any constitutional provision, statute or rule of law or by the enforcement of any assessment or penalty or otherwise; it being expressly agreed and understood that the Indenture and all the Bonds are solely corporate obligations and that any such personal liability is hereby expressly waived and released as a condition of, and as part of the consideration for, the execution of the Indenture and the issuance of this Senior Note.

All terms used in this Senior Note which are not defined herein shall have the meanings assigned to them in the Indenture.

24

ASSIGNMENT FORM

To assign this Security, fill in the form below:

I or we assign and transfer this Security to

_____

(Print or type assignee's name, address and zip code)

_____

(Insert assignee's soc. sec. or tax I.D. No.)

and irrevocably appoint agent to transfer this Security on the books of the Company. The agent may substitute another to act for him.

Date: _____          Your signature: _____

Sign exactly as your name appears on the other side of this
Security.

Signature Guarantee: _____

(Signature must be guaranteed)

Signatures must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Registrar, which requirements include membership or participation in the Security Transfer Agent Medallion Program ("STAMP") or such other "signature guarantee program" as may be determined by the Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

25

## SCHEDULE OF EXCHANGES OF INTERESTS IN THE GLOBAL BOND

The initial principal amount of this Global Bond is $[•]. The following increases or decreases in this Global Bond have been made:

| Date of Exchange | Amount of decrease in Principal Amount of this Global Bond | Amount of increase in Principal Amount of this Global Bond | Principal Amount of this Global Bond following such decrease (or increase) | Signature of authorized officer of Trustee or Depositary |
|---|---|---|---|---|
| | | | | |

26

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 414 of 1367

## FORM OF AMENDED AND RESTATED 3.95% SENIOR NOTES

## DUE DECEMBER 1, 2047

THIS BOND IS A GLOBAL BOND WITHIN THE MEANING OF THE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF A DEPOSITARY (AS DEFINED IN THE INDENTURE) OR A NOMINEE THEREOF. THIS GLOBAL BOND IS EXCHANGEABLE FOR BONDS REGISTERED IN THE NAME OF ANY PERSON OTHER THAN SUCH DEPOSITARY OR ITS NOMINEE ONLY IN LIMITED CIRCUMSTANCES DESCRIBED IN THE INDENTURE AND, UNLESS AND UNTIL IT IS EXCHANGED IN WHOLE OR IN PART FOR BONDS IN CERTIFICATED FORM, THIS GLOBAL BOND MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY, OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY, OR BY THE DEPOSITARY OR ANY SUCH NOMINEE TO A SUCCESSOR DEPOSITARY OR A NOMINEE OF SUCH SUCCESSOR DEPOSITARY.

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE COMPANY (AS DEFINED BELOW) OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY BOND ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

THE FOLLOWING SUMMARY OF TERMS IS SUBJECT TO THE INFORMATION SET FORTH ON THE REVERSE HEREOF:

PRINCIPAL AMOUNT:
$850,000,000

ISSUE DATE:
May 15, 2018

INTEREST RATE:
3.95% per annum

MATURITY DATE:
December 1, 2047

INTEREST PAYMENT DATES:
June 1 and December 1, commencing June 1, 2018

THIS SENIOR NOTE IS A:
☒ Global Book-Entry Bond
☐ Certificated Bond

REGISTERED OWNER: Cede & Co., as nominee of The Depository Trust Company

1-27

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 415 of 1367

AMENDED AND RESTATED 3.95% SENIOR NOTES DUE DECEMBER 1, 2047

(Fixed Rate)

No. [•]                                                                                               Principal Amount: $[•]
CUSIP No: 694308 HY6

PACIFIC GAS AND ELECTRIC COMPANY, a corporation duly organized and existing under the laws of the State of California (herein called the "Company," which term includes any successor Person pursuant to the applicable provisions of the Indenture hereinafter referred to), for value received, hereby promises to pay to Cede & Co., as nominee for The Depository Trust Company, or registered assigns, the Principal Amount stated above on the Maturity Date stated above, and to pay interest thereon from and including November 29, 2017 or from and including the most recent Interest Payment Date to which interest has been paid or duly provided for, semi-annually in arrears on the Interest Payment Dates set forth above and on the Maturity Date stated above, commencing June 1, 2018 at the rate of 3.95% per annum until the principal hereof is paid or made available for payment. The interest so payable, and punctually paid or duly provided for, on any Interest Payment Date will, as provided in such Indenture, be paid to the Person in whose name this 3.95% Senior Note due December 1, 2047 (this "Senior Note," and together with all other 3.95% Senior Notes due December 1, 2047, the "Senior Notes") (or one or more Predecessor Bonds) is registered at the close of business on the Regular Record Date for such interest, which shall be the May 15 and November 15 preceding such Interest Payment Date; provided, however, that interest payable at the Maturity Date or on a Redemption Date will be paid to the Person to whom principal is payable. Any such interest not so punctually paid or duly provided for will forthwith cease to be payable to the Holder on such Regular Record Date and may either be paid to the Person in whose name this Senior Note (or one or more Predecessor Bonds) is registered at the close of business on a Special Record Date for the payment of such Defaulted Interest to be fixed by the Trustee, notice whereof shall be given to Holders of Senior Notes not less than 10 days prior to such Special Record Date, or be paid at any time in any other lawful manner not inconsistent with the requirements of the Indenture and any securities exchange, if any, on which the Senior Notes may be listed, and upon such notice as may be required by any such exchange, all as more fully provided in said Indenture.

Payments of interest on this Senior Note will include interest accrued to but excluding the respective Interest Payment Dates. Interest payments for this Senior Note shall be computed and paid on the basis of the 360-day year of twelve 30-day months and will accrue from November 29, 2017 or from the most recent Interest Payment Date to which interest has been paid or duly provided for. In the event that any date on which interest is payable on this Senior Note (other than the Maturity Date) is not a Business Day then payment of the interest payable on such date will be made on the next succeeding day that is a Business Day (and without any interest or payment in respect of any such delay) with the same force and effect as if made on the date the payment was originally payable. If the Maturity Date falls on a day that is not a Business Day, the payment of principal, premium, if any, and interest may be made on the next succeeding Business Day, and no interest on such payment shall accrue for the period from and after maturity.

1-28

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 416 of 1367

Payment of principal of, premium, if any, and interest on Senior Notes shall be made in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts. Payments of principal of, premium, if any, and interest on the Senior Notes represented by a Global Bond shall be made by wire transfer of immediately available funds to the Holder of such Global Bond, provided that, in the case of payments of principal and premium, if any, such Global Bond is first surrendered to the Paying Agent. If any of the Senior Notes are no longer represented by a Global Bond, (i) payments of principal, premium, if any, and interest due on the Maturity Date or earlier redemption of such Senior Notes shall be made at the office of the Paying Agent upon surrender of such Senior Notes to the Paying Agent, and (ii) payments of interest shall be made, at the option of the Company, subject to such surrender where applicable, (A) by check mailed to the address of the Person entitled thereto as such address shall appear in the Bond Register or (B) by wire transfer to registered Holders of at least $10,000,000 in principal amount of Senior Notes at such place and to such account at a banking institution in the United States as such Holders may designate in writing to the Trustee at least sixteen (16) days prior to the date for payment.

REFERENCE IS HEREBY MADE TO THE FURTHER PROVISIONS OF THIS SENIOR NOTE SET FORTH ON THE REVERSE HEREOF, WHICH FURTHER PROVISIONS SHALL FOR ALL PURPOSES HAVE THE SAME EFFECT AS IF SET FORTH AT THIS PLACE.

Unless the certificate of authentication hereon has been executed by the Trustee referred to on the reverse hereof by manual signature, this Senior Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose.

IN WITNESS WHEREOF, the Company has caused this instrument to be duly executed.

Dated: _____

PACIFIC GAS AND ELECTRIC COMPANY

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

1-29

TRUSTEE'S CERTIFICATE OF AUTHENTICATION

This Senior Note is one of the Bonds of the series designated 3.95% Senior Notes due 2047 referred to in the within-mentioned Indenture.

Dated: _____

BOKF, N.A., *As Trustee*

By: _____

*Authorized Signatory*

1-30

This 3.95% Senior Note due December 1, 2047 is one of a duly authorized issue of Bonds of the Company, issued and issuable in one or more series under the Indenture, dated as of November 29, 2017 and as amended by the First Supplemental Indenture, dated as of July 1, 2020 (as so amended, the "Indenture"), between the Company and BOKF, N.A., as Trustee (herein called the "Trustee," which term includes any successor trustee under the Indenture), and reference is hereby made to the Indenture for a description of the respective rights, limitations of rights, duties and immunities of the Company, the Trustee and the Holders of Bonds thereunder and of the terms and conditions upon which Bonds are, and are to be, authenticated and delivered. This Senior Note is a Bond within the meaning of the Indenture and is designated as the 3.95% Senior Notes due December 1, 2047 established by the Company under the Indenture and initially issued in an aggregate principal amount of $850,000,000 on May 15, 2018. The acceptance of this Senior Note shall be deemed to constitute the consent and agreement by the Holder hereof to all of the terms and provisions of the Indenture.

The Senior Notes will be secured by a series of first mortgage bonds (the "3.95% Collateral Mortgage Bonds due 2047") delivered by the Company to the Trustee for the benefit of the Holders of the Senior Notes, issued pursuant to the Second Supplemental Indenture, dated as of July 1, 2020 to the Indenture of Mortgage, dated as of June 19, 2020, between the Company and The Bank of New York Mellon Trust Company, N.A., as trustee (as so supplemented, the "Mortgage Indenture"). Reference is made to the Indenture and the Mortgage Indenture for a description of the rights of the Trustee as holder of the 3.95% Collateral Mortgage Bonds due 2047, the property mortgaged and pledged, the nature and extent of the security and rights of the holders of the first mortgage bonds under the Mortgage Indenture and the rights of the Company under the Mortgage Indenture and the terms and conditions upon which the Senior Notes are secured.

Subject to the terms and conditions of the Indenture, the Senior Notes are redeemable at the option of the Company ("Optional Redemption"), in whole or in part, (a) at any time prior to June 1, 2047 (the date that is six months prior to the Maturity Date) at a Redemption Price equal to the greater of:

(i) 100% of the principal amount of the Senior Notes to be redeemed; or

(ii) as determined by the Quotation Agent, the sum of the present values of the Remaining Scheduled Payments of principal and interest on the Senior Notes to be redeemed (not including any portion of payments of interest accrued as of the Redemption Date), calculated as if the Maturity Date of such Senior Notes was June 1, 2047 (the date that is six months prior to the Maturity Date), discounted to the Redemption Date on a semi-annual basis at the Adjusted Treasury Rate, plus 20 basis points,

plus, in either of the above cases, accrued and unpaid interest thereon to but not including the Redemption Date; and (b) at any time on or after June 1, 2047 (the date that is six months prior to the Maturity Date) at 100% of the principal amount of the Senior Notes to be redeemed, plus accrued and unpaid interest thereon to but not including the Redemption Date. For purposes of this Senior Note, "Comparable Treasury Issue" means the United States Treasury security

1-31

selected by the applicable Quotation Agent as having a maturity comparable to the remaining term of this Senior Note, assuming, for such purpose, that this Senior Note matured on June 1, 2047 (the date that is six months prior to the Maturity Date)), that would be used, at the time of the selection and in accordance with customary financial practice, in pricing new issues of corporate debt securities of comparable maturity to the remaining term of this Senior Note.

Interest installments whose Stated Maturity is on or prior to such Redemption Date will be payable to Holders of such Senior Notes, or one or more Predecessor Bonds, of record at the close of business on the relevant Record Dates referred to on the face hereof, all as provided in the Indenture.

In the case of an Optional Redemption, notice of redemption will be in writing and mailed first-class postage-prepaid not less than 10 days nor more than 60 days prior to the Redemption Date to each Holder of Senior Notes to be redeemed at the Holder's registered address; provided, however, that such notice need not state the dollar amount of the Redemption Price if such dollar amount has not been determined as of the date such notice is being given to the Holders of the Senior Notes being redeemed. If money sufficient to pay the Redemption Price of all Senior Notes (or portions thereof) to be redeemed on the Redemption Date is deposited with the Paying Agent or the Trustee on or prior to the Redemption Date, from and after such Redemption Date such Senior Notes or portions thereof shall cease to bear interest. Senior Notes in denominations larger than $100,000 in principal amount may be redeemed in part but only in integral multiples of $1,000.

In the event of redemption of this Senior Note in part only, a new Senior Note or Senior Notes of like tenor for the unredeemed portion hereof will be issued in the name of the Holder hereof upon the surrender hereof.

As provided in the Indenture and subject to certain limitations therein set forth, this Senior Note or any portion of the principal amount hereof will be deemed to have been paid for all purposes of the Indenture and to be no longer Outstanding thereunder, and the Company's entire indebtedness in respect thereof will be satisfied and discharged, if there has been irrevocably deposited with the Trustee or any Paying Agent (other than the Company), in trust, money in an amount which will be sufficient and/or Eligible Obligations, the principal of and interest on which when due, without regard to any reinvestment thereof, will provide moneys which, together with money, if any, deposited with or held by the Trustee or such Paying Agent, will be sufficient to pay when due the principal of and premium, if any, and interest on this Senior Note when due.

If an Event of Default shall occur and be continuing, the Trustee or the Holders of not less than 33% in aggregate principal amount of the Outstanding Bonds, considered as one class, may declare the principal amount of all Bonds then Outstanding to be due and payable immediately by notice in writing to the Company (and to the Trustee if given by Holders); provided, however, that with respect to certain Events of Default relating to bankruptcy, insolvency and similar events, the principal amount of all Bonds then Outstanding shall be due and payable immediately without further action by the Trustee or the Holders.

<div align="center">1-32</div>

The Indenture permits, with certain exceptions as therein provided, the Company and the Trustee to enter into one or more supplemental indentures for the purpose of adding any provisions to, or changing in any manner or eliminating any of the provisions of, the Indenture with the consent of the Holders of not less than a majority in aggregate principal amount of the Bonds at the time Outstanding, considered as one class; provided, however, that if there shall be Bonds of more than one series Outstanding under the Indenture and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such series, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all series so directly affected, considered as one class, shall be required; and provided, further, that the Indenture permits the Company and the Trustee to enter into one or more supplemental indentures for certain purposes without the consent of any Holders of Bonds. The Indenture also contains provisions permitting the Holders of a majority in aggregate principal amount of Bonds, on behalf of the Holders of all such Bonds, to waive certain past defaults under the Indenture and their consequences. Any such consent or waiver by the Holder of this Senior Note shall be conclusive and binding upon such Holder and upon all future Holders of this Senior Note and of any Senior Note issued upon the registration of transfer hereof or in exchange herefor or in lieu hereof, whether or not notation of such consent or waiver is made upon this Senior Note.

As provided in and subject to the provisions of the Indenture, the Holder of this Senior Note shall not have the right to institute any proceeding with respect to the Indenture or for the appointment of a receiver or trustee or for any other remedy thereunder, unless such Holder shall have previously given the Trustee written notice of a continuing Event of Default, the Holders of at least 33% in aggregate principal amount of the Bonds at the time Outstanding shall have made written request to the Trustee to institute proceedings in respect of such Event of Default as Trustee and offered the Trustee reasonable indemnity, and the Trustee shall not have received from the Holders of at least a majority in aggregate principal amount of Bonds at the time Outstanding a direction inconsistent with such written request, and shall have failed to institute any such proceeding for 60 days after receipt of such notice, request and offer of indemnity. The foregoing shall not apply to any suit instituted by the Holder of this Senior Note for the enforcement of any payment of principal hereof or any premium or interest hereon on or after the respective due dates expressed herein.

No reference herein to the Indenture and no provision of this Senior Note or of the Indenture shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal of and any premium and interest on this Senior Note at the times, place and rate, and in the coin or currency, herein prescribed.

As provided in the Indenture and subject to certain limitations therein set forth, the transfer of this Senior Note is registrable in the Bond Register, upon surrender of this Senior Note for registration of transfer at the office or agency of the Company in any place where the principal of and any premium and interest on this Senior Note are payable, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Company, the Trustee or the Bond Registrar, as the case may be, duly executed by the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new Senior Notes of like tenor, of authorized denominations and for the same aggregate principal amount, will be issued to the designated transferee or transferees.

1-33

The Senior Notes are issuable only in registered form without coupons in denominations of $100,000 and any integral multiple of $1,000 in excess thereof. As provided in the Indenture and subject to certain limitations therein set forth, Senior Notes are exchangeable for a like aggregate principal amount of Senior Notes and of like tenor of a different authorized denomination, as requested by the Holder surrendering the same.

No service charge shall be made for any such registration of transfer or exchange, but the Company may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

The Company shall not be required to execute or to provide for the registration of the transfer of or the exchange of (A) any Senior Note of this series during a period of 15 days immediately preceding the date notice is to be given identifying the serial numbers of the Senior Notes called for redemption, or (B) any Senior Note selected for redemption in whole or in part, except the unredeemed portion of any Senior Note being redeemed in part.

Prior to due presentment of this Senior Note for registration of transfer, the Company, the Trustee and any agent of the Company or the Trustee may treat the Person in whose name this Senior Note is registered as the owner hereof for all purposes, whether or not this Senior Note is overdue, and neither the Company, the Trustee nor any such agent shall be affected by notice to the contrary.

This Senior Note shall be governed by, and construed and enforced in accordance with, the laws of the State of New York without regard to the principles of conflicts of laws thereunder, except to the extent that the Trust Indenture Act shall be applicable.

As provided in the Indenture, no recourse shall be had for the payment of the principal of, premium, if any, or interest with respect to this Senior Note, or any part thereof, or for any claim based hereon or otherwise in respect hereof, or of the indebtedness represented hereby, or upon any obligation, covenant or agreement under the Indenture, against any incorporator, shareholder, officer or director, as such, past, present or future, of the Company or of any predecessor or successor corporation (either directly or through the Company or a predecessor or successor corporation), whether by virtue of any constitutional provision, statute or rule of law or by the enforcement of any assessment or penalty or otherwise; it being expressly agreed and understood that the Indenture and all the Bonds are solely corporate obligations and that any such personal liability is hereby expressly waived and released as a condition of, and as part of the consideration for, the execution of the Indenture and the issuance of this Senior Note.

All terms used in this Senior Note which are not defined herein shall have the meanings assigned to them in the Indenture.

1-34

To assign this Security, fill in the form below:

I or we assign and transfer this Security to

_____
(Print or type assignee's name, address and zip code)
_____
(Insert assignee's soc. sec. or tax I.D. No.)

and irrevocably appoint agent to transfer this Security on the books of the Company. The agent may substitute another to act for him.

Date: _____          Your signature: _____
                                                    Sign exactly as your name appears on the other side of this
                                                    Security.

Signature Guarantee:

_____
(Signature must be guaranteed)

Signatures must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Registrar, which requirements include membership or participation in the Security Transfer Agent Medallion Program ("STAMP") or such other "signature guarantee program" as may be determined by the Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

1-35

SCHEDULE OF EXCHANGES OF INTERESTS IN THE GLOBAL BOND

The initial principal amount of this Global Bond is $[•]. The following increases or decreases in this Global Bond have been made:

| Date of Exchange | Amount of decrease in Principal Amount of this Global Bond | Amount of increase in Principal Amount of this Global Bond | Principal Amount of this Global Bond following such decrease (or increase) | Signature of authorized officer of Trustee or Depositary |
|---|---|---|---|---|

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 424 of 1367

Exhibit 4.5

**Second Supplemental Indenture**
**Dated as of July 1, 2020**

**to the Indenture**
**Dated as of August 6, 2018**

———————————————

**PACIFIC GAS AND ELECTRIC COMPANY**
**Issuer**

**and**

**BOKF, N.A.**
**Trustee**

———————————————

TABLE OF CONTENTS

RECITALS OF THE COMPANY                                                                                  1

ARTICLE ONE RELATION TO INDENTURE; ADDITIONAL DEFINITIONS                                                2

    Section 101    Relation to Indenture                                           2
    Section 102    Additional Definitions                                          2

ARTICLE TWO AMENDMENT OF FIRST SUPPLEMENTAL INDENTURE, THE 4.25% SENIOR NOTES DUE 2023 AND THE 4.65% SENIOR NOTES DUE 2028                                                                                                        2

    Section 201    Appendix A of the First Supplemental Indenture                  2
    Section 202    The First Supplemental Indenture (Amended)                     3
    Section 203    Section 207 of the First Supplemental Indenture (Amended)       3
    Section 204    The First Supplemental Indenture (Amended 211)                 4
    Section 205    The First Supplemental Indenture (Amended 212)                 5
    Section 206    The First Supplemental Indenture (Amended 213)                 7
    Section 207    The First Supplemental Indenture (Amended 214)                 8
    Section 208    The First Supplemental Indenture (Amended 215)                 8
    Section 209    Bond Exchange                                                  8
    Section 210    The First Supplemental Indenture (Amended 307)                 8
    Section 211    The First Supplemental Indenture (Amended 311)                 9
    Section 212    The First Supplemental Indenture (Amended 312)                 10
    Section 213    The First Supplemental Indenture (Amended 313)                 12
    Section 214    The First Supplemental Indenture (Amended 314)                 13
    Section 215    The First Supplemental Indenture (Amended 315)                 13
    Section 216    Bond Exchange                                                  14

ARTICLE THREE PAYING AGENT, TRANSFER AGENT AND BOND REGISTRAR                                            14

    Section 301    Paying Agent, Transfer Agent and Bond Registrar                14

ARTICLE FOUR MISCELLANEOUS PROVISIONS                                                                    14

    Section 401    Concerning the Trustee                                         14
    Section 402    Application of Second Supplemental Indenture                    14
    Section 403    Effective Date of Second Supplemental Indenture                15
    Section 404    Governing Law                                                  15
    Section 405    Counterparts                                                   15

i

SECOND SUPPLEMENTAL INDENTURE, dated as of July 1, 2020 (this "Second Supplemental Indenture"), by and between **PACIFIC GAS AND ELECTRIC COMPANY**, a corporation duly organized and existing under the laws of the State of California (the "Company" or the "Issuer"), and **BOKF, N.A.**, a national banking association organized and existing under the laws of the United States of America, as Successor Trustee under the Base Indenture (as hereinafter defined) (the "Trustee").

## RECITALS OF THE COMPANY

A. The Company and the Trustee are parties to that certain Indenture, dated as of August 6, 2018 (the "Base Indenture"), as supplemented by the First Supplemental Indenture, dated as of August 6, 2018 (the "First Supplemental Indenture") and this Second Supplemental Indenture (collectively, the "Indenture"), providing for the issuance by the Company of an unlimited number of series of Bonds (as defined in the Base Indenture) from time to time.

B. The First Supplemental Indenture providing for the issuance of (i) $500,000,000 in aggregate principal amount of the Company's 4.25% Senior Notes due 2023 (the "4.25% Senior Notes due 2023") and (ii) $300,000,000 in aggregate principal amount of the Company's 4.65% Senior Notes due 2028 (the "4.65% Senior Notes due 2028"), has been previously executed and delivered to the Trustee.

C. Under Section 7.07(a) of the Base Indenture, the Company covenanted that it will not issue, incur, assume or permit to exist any Debt if such Debt is secured by a Lien on any Principal Property (whether such Principal Property was owned at August 6, 2018 or thereafter acquired), unless the Company provides that Outstanding Bonds will be equally and ratably secured by such Liens for as long as any such Debt shall be so secured, subject to certain exceptions set forth in the Base Indenture.

D. Under Section 13.01(b) of the Base Indenture, without the consent of any Holder, the Company and the Trustee, at any time and from time to time, may enter into one or more indentures supplemental thereto to add one or more covenants of the Company or other provisions for the benefit of all Holders or for the benefit of the Holders of, or to remain in effect only so long as there shall be Outstanding, Bonds of one or more specified series, or one or more specified Tranches thereof; or to surrender any right or power therein conferred upon the Company.

E. The Company intends to execute and deliver that certain Second Supplemental Mortgage Indenture, dated as of July 1, 2020 (the "Second Supplemental Mortgage Indenture") to the Indenture of Mortgage, dated as of June 19, 2020, between the Company and The Bank of New York Mellon Trust Company, N.A., as trustee (the "Mortgage Bond Trustee") (such Indenture of Mortgage, as previously and hereinafter supplemented, the "Mortgage Indenture"), pursuant to which the Company intends to issue first mortgage bonds thereunder secured by a lien on and security interest in certain property of the Company as provided in the Mortgage Indenture (the "Mortgaged Property").

1

F. The Company desires to amend the First Supplemental Indenture and each of the 4.25% Senior Notes due 2023 and the 4.65% Senior Notes due 2028 to set forth the terms upon which the Company shall issue such first mortgage bonds to the Trustee for the benefit of the Holders of each of the 4.25% Senior Notes due 2023 and the 4.65% Senior Notes due 2028 (collectively, the "Secured Bonds") as collateral security for the payment of the Secured Bonds.

G. The execution and delivery of this Second Supplemental Indenture has been authorized by a Board Resolution (as defined in the Base Indenture).

H. Concurrent with the execution hereof, the Company has caused its counsel to deliver to the Trustee an Opinion of Counsel (as defined in the Base Indenture) and Officer's Certificate (as defined in the Base Indenture) pursuant to Section 13.03 of the Base Indenture, together with the documents required under Section 1.02 of the Base Indenture.

I. The Company has done all things necessary to make this Second Supplemental Indenture a valid agreement of the Company, in accordance with its terms.

J. NOW, THEREFORE, the Company and the Trustee agree, for the benefit of each other and for the equal and proportionate benefit of Holders of the Secured Bonds with respect to all provisions herein applicable to each such series of Secured Bonds, as follows:

<div align="center">ARTICLE ONE</div>

<div align="center">RELATION TO INDENTURE; ADDITIONAL DEFINITIONS</div>

Section 101 <u>Relation to Indenture</u>. This Second Supplemental Indenture constitutes an integral part of the Indenture.

Section 102 <u>Additional Definitions</u>. Unless the context otherwise requires, capitalized terms used but not defined herein have the meaning set forth in the Base Indenture; provided, however, that, where a term is defined both in this Second Supplemental Indenture and in the Base Indenture, the meaning given to such term in this Second Supplemental Indenture shall control for purposes of this Second Supplemental Indenture and the Indenture.

The words "herein," "hereof" and "hereunder" and other words of similar import refer to this Second Supplemental Indenture as a whole and not to any particular Article, Section or other subdivision.

<div align="center">ARTICLE TWO</div>

<div align="center">AMENDMENT OF FIRST SUPPLEMENTAL INDENTURE, THE 4.25% SENIOR NOTES DUE 2023 AND THE 4.65% SENIOR NOTES DUE 2028</div>

Section 201 <u>Appendix A of the First Supplemental Indenture</u>. Appendix A of the First Supplemental Indenture is hereby replaced with Exhibit A to this Second Supplemental Indenture.

<div align="center">2</div>

Section 202 <u>The First Supplemental Indenture (Amended)</u>. The First Supplemental Indenture is hereby amended by amending and restating the defined terms "Indenture," "Supplemental Indenture," "2023 Notes," and "2028 Notes" as follows:

"Indenture" means the Base Indenture, as amended and/or supplemented from time to time.

"2023 Notes" is replaced with "4.25% Senior Notes due 2023".

"2028 Notes" is replaced with "4.65% Senior Notes due 2028".

"Supplemental Indenture" means the First Supplemental Indenture between the Company and The Bank of New York Mellon Trust Company, N.A. (as predecessor trustee), dated as of August 6, 2018, as amended by this Second Supplemental Indenture, as may be further amended and or supplemented from time to time.

Section 203 <u>Section 207 of the First Supplemental Indenture (Amended)</u>. Section 207 of the First Supplemental Indenture is hereby amended and restated as follows:

"Section 207 <u>Global Securities; Appointment of Depositary for Global Securities.</u>

The 4.25% Senior Notes due 2023 shall be issued in the form of one or more permanent Global Bonds as provided in Section 3.13 of the Base Indenture and deposited with, or on behalf of, the Depositary, or with the Trustee, as custodian for the Depositary, duly executed by the Company and authenticated by the Trustee, and shall bear the legend prescribed in Exhibit A, as applicable. The Company hereby initially appoints The Depository Trust Company ("DTC") to act as the Depositary with respect to all 4.25% Senior Notes due 2023, and the 4.25% Senior Notes due 2023 shall initially be registered in the name of Cede & Co., as the nominee of DTC.

Each Global Bond shall represent such of the 4.25% Senior Notes due 2023 as shall be specified therein and shall each provide that it shall represent the aggregate principal amount of 4.25% Senior Notes due 2023 from time to time endorsed thereon and that the aggregate principal amount of 4.25% Senior Notes due 2023 represented thereby may from time to time be reduced or increased, as appropriate, to reflect exchanges or redemptions. Any endorsement of a Global Bond to reflect the amount, or any increase or decrease in the aggregate principal amount, of 4.25% Senior Notes due 2023 represented thereby shall be reflected by the Trustee on Schedule B attached to the 4.25% Senior Notes due 2023 and made by the Trustee in accordance with written instructions or such other written form of instructions as is customary for the Depositary, from the Depositary or its nominee on behalf of any Person having a beneficial interest in the Global Bond.

The Company and DTC have executed a Blanket Letter of Representations, and the Trustee is hereby authorized, in connection with any successor nominee for DTC or any successor Depositary, to enter into appropriate or comparable arrangements, if necessary, and shall have the same rights with respect to its actions thereunder as it has with respect to its actions under the Indenture."

3

Section 204 <u>The First Supplemental Indenture (Amended 211)</u>. The First Supplemental Indenture is hereby amended by the addition of Section 211 thereto, to read as follows:

"Section 211 <u>Collateral Security for the 4.25% Senior Notes due 2023</u>.

(a) For the purpose of providing collateral security for the obligations of the Company with respect to the 4.25% Senior Notes due 2023, the Company shall issue and deliver the 4.25% First Mortgage Bond, Collateral Series due 2023 (the "4.25% Collateral Mortgage Bonds due 2023") to the Trustee pursuant to the Second Supplemental Indenture, dated as of July 1, 2020 (the "Second Supplemental Mortgage Indenture") to the Indenture of Mortgage, dated as of June 19, 2020, between the Company and The Bank of New York Mellon Trust Company, N.A., as trustee (the "Mortgage Bond Trustee") (such Indenture of Mortgage, as previously and hereinafter supplemented, (including by the Second Supplemental Mortgage Indenture) is hereinafter referred to as the "Mortgage Indenture"). For the avoidance of doubt, any amounts received by the Trustee with respect to the 4.25% Collateral Mortgage Bonds due 2023 will be applied to satisfy any obligations under the 4.25% Senior Notes due 2023 in accordance with the Indenture and not any other Bonds outstanding under the Indenture. In connection with the delivery of the 4.25% Collateral Mortgage Bonds due 2023 to the Trustee, the Company shall (i) deliver to the Trustee an Officer's Certificate stating that (A) the Company has duly executed and the Mortgage Bond Trustee has duly authenticated the 4.25% Collateral Mortgage Bonds due 2023 in the aggregate principal amount of $500,000,000 and (B) the Company has delivered the 4.25% Collateral Mortgage Bonds due 2023 to the Trustee in the aggregate principal amount of $500,000,000, (ii) provide to the Trustee (or permit the Trustee to rely upon) an Opinion of Counsel, satisfactory in form and substance to the Trustee, regarding the due execution, delivery, issuance, validity and enforceability of the 4.25% Collateral Mortgage Bonds due 2023, and that the Mortgage Indenture creates a valid and enforceable lien on the Property Additions (as defined in the Mortgage Indenture) made the subject of the 4.25% Collateral Mortgage Bonds due 2023, subject to no prior Lien (as defined in the Mortgage Indenture) to the knowledge of such counsel, except for Permitted Liens (as defined in the Mortgage Indenture), and (iii) deliver to the Trustee a copy of the Mortgage Indenture, including the Second Supplemental Mortgage Indenture, certified by the Secretary or an Assistant Secretary of the Company.

(b) The 4.25% Collateral Mortgage Bonds due 2023 shall be fully registered in the name of the Trustee. Until the 4.25% Collateral Mortgage Bonds due 2023 are released in accordance with Section 213 of this Second Supplemental Indenture, the Trustee shall hold the 4.25% Collateral Mortgage Bonds due 2023 in trust for the benefit of the Holders from time to time of the 4.25% Senior Notes due 2023 as security for any and all obligations of the Company with respect to the 4.25% Senior Notes due 2023, including but not limited to, (1) the full and prompt payment of the principal of and

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 430 of 1367

premium, if any, on the 4.25% Senior Notes due 2023 when and as the same shall become due and payable in accordance with the terms and provisions of the Indenture or the 4.25% Senior Notes due 2023, either at the stated maturity thereof, upon acceleration of the maturity thereof or upon redemption, and (2) the full and prompt payment of any interest on the 4.25% Senior Notes due 2023, when and as the same shall become due and payable in accordance with the terms and provisions of the Indenture or the 4.25% Senior Notes due 2023.

(c) The Company acknowledges and agrees that, solely for administrative purposes, the Trustee will establish an account in the name of the Company for the custody and safekeeping of 4.25% Collateral Mortgage Bonds due 2023 delivered to the Trustee."

Section 205 <u>The First Supplemental Indenture (Amended 212)</u>. The First Supplemental Indenture is hereby amended by the addition of Section 212 thereto, to read as follows:

"Section 212 <u>Actions with Respect to 4.25% Collateral Mortgage Bonds due 2023</u>.

(a) Except for the safe custody of any 4.25% Collateral Mortgage Bonds due 2023 in its possession and the accounting for moneys actually received by it with respect to the 4.25% Collateral Mortgage Bonds due 2023, the Trustee shall have no duty to act, consent or request any action of any Person in connection with the 4.25% Collateral Mortgage Bonds due 2023 unless the Trustee shall have received (i) written direction from the holders of at least a majority in aggregate principal amount of the Bonds then outstanding voting as a single class and (ii) indemnity or security satisfactory to it against any liabilities that may be incurred by it in connection therewith; *provided, however,* that in no event shall the Trustee have any duty to attend meetings of bondholders under the Mortgage Indenture, or to ascertain or take action with respect to voting, consents, waivers, amendments or any other matters relative to the 4.25% Collateral Mortgage Bonds due 2023 and/or the Mortgage Indenture. The Trustee shall have no duty to ascertain or inquire into or verify the performance or observance of any covenants, conditions or agreements on the part of the Company or the Mortgage Bond Trustee with respect to the 4.25% Collateral Mortgage Bonds due 2023. The Trustee will not be required to take any action that is contrary to applicable law or any provision of the Indenture, the 4.25% Collateral Mortgage Bonds due 2023 or the Mortgage Indenture or that, in the opinion of the Trustee, otherwise subjects it to liability; *provided, however*, that, subject to the foregoing limitations and any other protections that the Trustee may have under the Indenture, including without limitation its right to indemnification for actions taken at the direction of the holders, the Trustee shall vote or give any such consent or instruction as it may be directed to do so by the holders of a majority in principal amount of the 4.25% Senior Notes due 2023, unless the vote or consent is with respect to matters which under the Mortgage Indenture require the vote or consent of the holders of a greater percentage in principal amount of the 4.25% Collateral Mortgage Bonds due 2023, in which case such direction must be from holders of such greater percentage in principal amount of the 4.25% Senior Notes due 2023.

(b) To the extent that any consent or instruction from the Trustee and/or the holders of the 4.25% Senior Notes due 2023 is required with respect to the 4.25% Collateral Mortgage Bonds due 2023 and/or the Mortgage Indenture, the Trustee shall not have any duty or obligation to determine whether such consent or instruction is required nor any duty or obligation to give or otherwise solicit such consent or instructions; *provided, however*, that if the Trustee receives any written notices with respect to the 4.25% Collateral Mortgage Bonds due 2023, it shall promptly transmit such notices to the holders of the 4.25% Senior Notes due 2023 in accordance with the Indenture.

(c) It is expressly understood and agreed by the Company (and, with respect to any holder of 4.25% Senior Notes due 2023, by holding such 4.25% Senior Notes due 2023 such holder shall be deemed to have agreed) that the Trustee shall not be responsible for any recital, statement, representation, or warranty (whether written or oral) made by any Person in or in connection with the Indenture or the Mortgage Indenture or any certificate or other document referred to or provided for in, or received by it under, the Indenture or the Mortgage Indenture (other than those statements, representations and warranties expressly made by the Trustee, if any), or for the value, validity, effectiveness, genuineness, enforceability, or sufficiency of the 4.25% Collateral Mortgage Bonds due 2023, the Mortgage Indenture, or any other document referred to or provided for therein or for any failure by the Company, the Mortgage Bond Trustee or any other Person to perform any of its obligations hereunder or thereunder.

(d) Whether or not expressly provided herein, the rights, privileges, protections, immunities, indemnities and benefits given to the Trustee pursuant to the Indenture shall apply to any action taken by the Trustee in accordance with the terms of the 4.25% Collateral Mortgage Bonds due 2023 and/or the Mortgage Indenture.

(e) If an Event of Default under the Indenture occurs and is continuing with respect to the 4.25% Senior Notes due 2023 and the 4.25% Senior Notes due 2023 have been accelerated as a consequence of such Event of Default, the Trustee may and, subject to Section 9.02 of the Indenture, upon receipt of written instructions of holders of not less than a majority in principal amount of the 4.25% Senior Notes due 2023, and receipt of indemnity or security to its satisfaction, shall exercise such other rights as it shall possess under the Mortgage Indenture as a holder of the 4.25% Collateral Mortgage Bonds due 2023.

(f) With the written consent of the holders of a majority in aggregate principal amount of the outstanding 4.25% Senior Notes due 2023, the Trustee may consent to modifications, amendments, or supplements to (or provide waivers in respect of) the 4.25% Collateral Mortgage Bonds due 2023 and/or the Mortgage Indenture; provided, however, that without the written consent of each holder of 4.25% Senior Notes due 2023, the Trustee shall not consent to any modification, amendment or supplement to (or provide waivers in respect of) the 4.25% Collateral Mortgage Bonds due 2023 and/or the

6

Mortgage Indenture that have the effect of (A) (i) extending the fixed maturity of the 4.25% Collateral Mortgage Bonds due 2023, (ii) changing any terms of any sinking fund or analogous fund or conversion rights with respect to the 4.25% Collateral Mortgage Bonds due 2023, (iii) reducing the rate or extending the time of payment of interest on the 4.25% Collateral Mortgage Bonds due 2023, or reducing the principal amount of the 4.25% Collateral Mortgage Bonds due 2023, or (iv) limiting the right of the Trustee (as the holder of the 4.25% Collateral Mortgage Bonds due 2023) to institute suit for the enforcement of payment of principal of or premium, if any, or interest on the 4.25% Collateral Mortgage Bonds due 2023 in accordance with the terms thereof, or (B) reducing the percentage of Bonds (as defined in the Mortgage Indenture), the holders of which are required to consent to any such supplement, amendment and/or waiver, or (C) permitting the creation by the Company of any Senior Lien (as such term is defined in the Mortgage Indenture) in accordance with the Mortgage Indenture."

Section 206 <u>The First Supplemental Indenture (Amended 213)</u>. The First Supplemental Indenture is hereby amended by the addition of Section 213 thereto, to read as follows:

"Section 213 <u>Release of Liens in Respect of 4.25% Collateral Mortgage Bonds due 2023; Change of Amounts</u>.

(a) Upon Company Request and the Trustee's receipt of an Officer's Certificate and an Opinion of Counsel from the Company certifying that all conditions to the satisfaction and discharge of the Indenture with respect to the 4.25% Senior Notes due 2023 (but, for avoidance of doubt, not any other series of Bonds then outstanding under the Indenture) in accordance with Section 8.02 of the Base Indenture have been satisfied, the Trustee shall be deemed not to hold a lien on the 4.25% Collateral Mortgage Bonds due 2023 on behalf of the holders of the 4.25% Senior Notes due 2023 and the Trustee shall, upon written request of the Company, deliver to the Company the 4.25% Collateral Mortgage Bonds due 2023, together with such appropriate instruments of transfer or release (in form and substance reasonably satisfactory to the Trustee) as may be reasonably requested by the Company (and at the expense of the Company) to release such lien. All the 4.25% Collateral Mortgage Bonds due 2023 delivered to the Company in accordance with this Section 213 shall be delivered by the Company to the Mortgage Bond Trustee for cancellation.

(b) Following any partial payment, redemption or retirement of the 4.25% Senior Notes due 2023, the Company shall promptly furnish to the Trustee an Officer's Certificate certifying as to such payment, redemption or retirement and the principal amount of the 4.25% Senior Notes due 2023 outstanding following such change in aggregate principal amount and directing the Trustee to deliver the 4.25% Collateral Mortgage Bonds due 2023 then held by the Trustee to the Mortgage Bond Trustee in exchange for 4.25% Collateral Mortgage Bonds due 2023 in a principal amount equal to the current outstanding aggregate principal amount so certified in the Officer's Certificate."

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 433 of 1367

Section 207 <u>The First Supplemental Indenture (Amended 214)</u>. The First Supplemental Indenture is hereby amended by the addition of Section 214 thereto, to read as follows:

"Section 214 <u>Delivery of Non-Payment Notice to Mortgage Bond Trustee</u>. If payment of the principal of, premium, if any, or interest on the 4.25% Senior Notes due 2023 has not been fully paid, deemed to have been paid or otherwise satisfied and discharged when due, the Trustee, acting at the written direction of Holders of a majority in aggregate principal amount of the outstanding 4.25% Senior Notes due 2023, shall deliver a written notice to the Mortgage Bond Trustee stating the amount of such non-payment and that such payment remains unpaid on the date of such notice (which notice shall be given by the Trustee within five Business Days of such direction; *provided, however*, that failure by the Trustee to give such notice shall not affect in any way the Company's obligation to pay such amount)."

Section 208 <u>The First Supplemental Indenture (Amended 215)</u>. The First Supplemental Indenture is hereby amended by the addition of Section 215 thereto, to read as follows:

"Section 215 <u>No Transfer of 4.25% Collateral Mortgage Bonds due 2023</u>. The Company shall cause all of the 4.25% Collateral Mortgage Bonds due 2023 to be issued and registered in the name of the Trustee. Except (i) as otherwise permitted by the Indenture or (ii) in connection with an assignment to a successor trustee in accordance with the Indenture, the Trustee shall not sell, assign or transfer the 4.25% Collateral Mortgage Bonds due 2023."

Section 209 <u>Bond Exchange</u>. The Company desires to exchange the original Global Bond representing the 4.25% Senior Notes due 2023, dated August 1, 2018 (the "Original Global Bond"), for the amended and restated Global Bond set forth in Exhibit A hereto (which is hereby incorporated herein and made a part hereof) (the "Amended and Restated Global 4.25% Senior Notes due 2023") incorporating the amendments effected by this Second Supplemental Indenture in accordance with Section 13.06 of the Base Indenture. In connection therewith, the Company has delivered to the Trustee (i) a Company Request for the authentication and delivery of the Amended and Restated Global 4.25% Senior Notes due 2023 and the cancellation of the Original Global Bond, along with an Officer's Certificate and Opinion of Counsel required by the Indenture, and (ii) the Amended and Restated Global 4.25% Senior Notes due 2023 representing the 4.25% Senior Notes due 2023 in the aggregate principal amount of $500,000,000. Upon receipt of the deliverables required by the Indenture, the Trustee shall authenticate the Amended and Restated Global 4.25% Senior Notes due 2023 to be exchanged for the Original Global Bond, cancel the Original Global Bond and deliver the cancelled Original Global Bond to the Company in accordance with the instructions set forth in the Company Request.

Section 210 <u>The First Supplemental Indenture (Amended 307)</u>. Section 307 of the First Supplemental Indenture is hereby amended and restated as follows:

"Section 307 <u>Global Securities; Appointment of Depositary for Global Securities</u>.

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 434 of 1367

The 4.65% Senior Notes due 2028 shall be issued in the form of one or more permanent Global Bonds as provided in Section 3.13 of the Base Indenture and deposited with, or on behalf of, the Depositary, or with the Trustee, as custodian for the Depositary, duly executed by the Company and authenticated by the Trustee, and shall bear the legend prescribed in Exhibit A, as applicable. The Company hereby initially appoints The Depository Trust Company ("DTC") to act as the Depositary with respect to all 4.65% Senior Notes due 2028, and the 4.65% Senior Notes due 2028 shall initially be registered in the name of Cede & Co., as the nominee of DTC.

Each Global Bond shall represent such of the 4.65% Senior Notes due 2028 as shall be specified therein and shall each provide that it shall represent the aggregate principal amount of 4.65% Senior Notes due 2028 from time to time endorsed thereon and that the aggregate principal amount of 4.65% Senior Notes due 2028 represented thereby may from time to time be reduced or increased, as appropriate, to reflect exchanges or redemptions. Any endorsement of a Global Bond to reflect the amount, or any increase or decrease in the aggregate principal amount, of 4.65% Senior Notes due 2028 represented thereby shall be reflected by the Trustee on Schedule B attached to the 4.65% Senior Notes due 2028 and made by the Trustee in accordance with written instructions or such other written form of instructions as is customary for the Depositary, from the Depositary or its nominee on behalf of any Person having a beneficial interest in the Global Bond.

The Company and DTC have executed a Blanket Letter of Representations, and the Trustee is hereby authorized, in connection with any successor nominee for DTC or any successor Depositary, to enter into appropriate or comparable arrangements, if necessary, and shall have the same rights with respect to its actions thereunder as it has with respect to its actions under the Indenture."

Section 211 <u>The First Supplemental Indenture (Amended 311)</u>. The First Supplemental Indenture is hereby amended by the addition of Section 311 thereto, to read as follows:

"Section 311 <u>Collateral Security for the 4.65% Senior Notes due 2028</u>.

(a) For the purpose of providing collateral security for the obligations of the Company with respect to the 4.65% Senior Notes due 2028, the Company shall issue and deliver the 4.65% First Mortgage Bond, Collateral Series due 2028 (the "4.65% Collateral Mortgage Bonds due 2028") to the Trustee pursuant to the Second Supplemental Indenture. For the avoidance of doubt, any amounts received by the Trustee with respect to the 4.65% Collateral Mortgage Bonds due 2028 will be applied to satisfy any obligations under the 4.65% Senior Notes due 2028 in accordance with the Indenture and not any other Bonds outstanding under the Indenture. In connection with the delivery of the 4.65% Collateral Mortgage Bonds due 2028 to the Trustee, the Company shall (i) deliver to the Trustee an Officer's Certificate stating that (A) the Company has duly executed and the Mortgage Bond Trustee has duly authenticated the 4.65% Collateral Mortgage Bonds due 2028 in the aggregate principal amount of

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 435 of 1367

$300,000,000 and (B) the Company has delivered the 4.65% Collateral Mortgage Bonds due 2028 to the Trustee in the aggregate principal amount of $300,000,000, (ii) provide to the Trustee (or permit the Trustee to rely upon) an Opinion of Counsel, satisfactory in form and substance to the Trustee, regarding the due execution, delivery, issuance, validity and enforceability of the 4.65% Collateral Mortgage Bonds due 2028, and that the Mortgage Indenture creates a valid and enforceable lien on the Property Additions (as defined in the Mortgage Indenture) made the subject of the 4.65% Collateral Mortgage Bonds due 2028, subject to no prior Lien (as defined in the Mortgage Indenture) to the knowledge of such counsel, except for Permitted Liens (as defined in the Mortgage Indenture), and (iii) deliver to the Trustee a copy of the Mortgage Indenture, including the Second Supplemental Mortgage Indenture, certified by the Secretary or an Assistant Secretary of the Company.

(b) The 4.65% Collateral Mortgage Bonds due 2028 shall be fully registered in the name of the Trustee. Until the 4.65% Collateral Mortgage Bonds due 2028 are released in accordance with Section 313 of this Second Supplemental Indenture, the Trustee shall hold the 4.65% Collateral Mortgage Bonds due 2028 in trust for the benefit of the Holders from time to time of the 4.65% Senior Notes due 2028 as security for any and all obligations of the Company with respect to the 4.65% Senior Notes due 2028, including but not limited to, (1) the full and prompt payment of the principal of and premium, if any, on the 4.65% Senior Notes due 2028 when and as the same shall become due and payable in accordance with the terms and provisions of the Indenture or the 4.65% Senior Notes due 2028, either at the stated maturity thereof, upon acceleration of the maturity thereof or upon redemption, and (2) the full and prompt payment of any interest on the 4.65% Senior Notes due 2028, when and as the same shall become due and payable in accordance with the terms and provisions of the Indenture or the 4.65% Senior Notes due 2028.

(c) The Company acknowledges and agrees that, solely for administrative purposes, the Trustee will establish an account in the name of the Company for the custody and safekeeping of 4.65% Collateral Mortgage Bonds due 2028 delivered to the Trustee."

Section 212 <u>The First Supplemental Indenture (Amended 312)</u>. The First Supplemental Indenture is hereby amended by the addition of Section 312 thereto, to read as follows:

"<u>Section 312 Actions with Respect to 4.65% Collateral Mortgage Bonds due 2028</u>.

(a) Except for the safe custody of any 4.65% Collateral Mortgage Bonds due 2028 in its possession and the accounting for moneys actually received by it with respect to the 4.65% Collateral Mortgage Bonds due 2028, the Trustee shall have no duty to act, consent or request any action of any Person in connection with the 4.65% Collateral Mortgage Bonds due 2028 unless the Trustee shall have received (i) written direction from the holders of at least a majority in aggregate principal amount of the Bonds then

10

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 436 of 1367

outstanding voting as a single class and (ii) indemnity or security satisfactory to it against any liabilities that may be incurred by it in connection therewith; *provided, however,* that in no event shall the Trustee have any duty to attend meetings of bondholders under the Mortgage Indenture, or to ascertain or take action with respect to voting, consents, waivers, amendments or any other matters relative to the 4.65% Collateral Mortgage Bonds due 2028 and/or the Mortgage Indenture. The Trustee shall have no duty to ascertain or inquire into or verify the performance or observance of any covenants, conditions or agreements on the part of the Company or the Mortgage Bond Trustee with respect to the 4.65% Collateral Mortgage Bonds due 2028. The Trustee will not be required to take any action that is contrary to applicable law or any provision of the Indenture, the 4.65% Collateral Mortgage Bonds due 2028 or the Mortgage Indenture or that, in the opinion of the Trustee, otherwise subjects it to liability; *provided, however,* that, subject to the foregoing limitations and any other protections that the Trustee may have under the Indenture, including without limitation its right to indemnification for actions taken at the direction of the holders, the Trustee shall vote or give any such consent or instruction as it may be directed to do so by the holders of a majority in principal amount of the 4.65% Senior Notes due 2028, unless the vote or consent is with respect to matters which under the Mortgage Indenture require the vote or consent of the holders of a greater percentage in principal amount of the 4.65% Collateral Mortgage Bonds due 2028, in which case such direction must be from holders of such greater percentage in principal amount of the 4.65% Senior Note due 2028.

(b) To the extent that any consent or instruction from the Trustee and/or the holders of the 4.65% Senior Notes due 2028 is required with respect to the 4.65% Collateral Mortgage Bonds due 2028 and/or the Mortgage Indenture, the Trustee shall not have any duty or obligation to determine whether such consent or instruction is required nor any duty or obligation to give or otherwise solicit such consent or instructions; *provided, however,* that if the Trustee receives any written notices with respect to the 4.65% Collateral Mortgage Bonds due 2028, it shall promptly transmit such notices to the holders of the 4.65% Senior Notes due 2028 in accordance with the Indenture.

(c) It is expressly understood and agreed by the Company (and, with respect to any holder of 4.65% Senior Notes due 2028, by holding such 4.65% Senior Notes due 2028 such holder shall be deemed to have agreed) that the Trustee shall not be responsible for any recital, statement, representation, or warranty (whether written or oral) made by any Person in or in connection with the Indenture or the Mortgage Indenture or any certificate or other document referred to or provided for in, or received by it under, the Indenture or the Mortgage Indenture, or for the value, validity, effectiveness, genuineness, enforceability, or sufficiency of the 4.65% Collateral Mortgage Bonds due 2028, the Mortgage Indenture (other than those statements, representations or warranties expressly made by the Trustee, if any), or any other document referred to or provided for therein or for any failure by the Company, the Mortgage Bond Trustee or any other Person to perform any of its obligations hereunder or thereunder.

11

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 437 of 1367

(d) Whether or not expressly provided herein, the rights, privileges, protections, immunities, indemnities and benefits given to the Trustee pursuant to the Indenture shall apply to any action taken by the Trustee in accordance with the terms of the 4.65% Collateral Mortgage Bonds due 2028 and/or the Mortgage Indenture.

(e) If an Event of Default under the Indenture occurs and is continuing with respect to the 4.65% Senior Notes due 2028 and the 4.65% Senior Notes due 2028 have been accelerated as a consequence of such Event of Default, the Trustee may and, subject to Section 9.02 of the Base Indenture, upon receipt of written instructions of holders of not less than a majority in principal amount of the 4.65% Senior Notes due 2028, and receipt of indemnity or security to its satisfaction, shall exercise such other rights as it shall possess under the Mortgage Indenture as a holder of the 4.65% Collateral Mortgage Bonds due 2028.

(f) With the written consent of the holders of a majority in aggregate principal amount of the outstanding 4.65% Senior Notes due 2028, the Trustee may consent to modifications, amendments, or supplements to (or provide waivers in respect of) the 4.65% Collateral Mortgage Bonds due 2028 and/or the Mortgage Indenture; provided, however, that without the written consent of each holder of 4.65% Senior Notes due 2028, the Trustee shall not consent to any modification, amendment or supplement to (or provide waivers in respect of) the 4.65% Collateral Mortgage Bonds due 2028 and/or the Mortgage Indenture that have the effect of (A) (i) extending the fixed maturity of the 4.65% Collateral Mortgage Bonds due 2028, (ii) changing any terms of any sinking fund or analogous fund or conversion rights with respect to the 4.65% Collateral Mortgage Bonds due 2028, (iii) reducing the rate or extending the time of payment of interest on the 4.65% Collateral Mortgage Bonds due 2028, or reducing the principal amount of the 4.65% Collateral Mortgage Bonds due 2028, or (iv) limiting the right of the Trustee (as the holder of the 4.65% Collateral Mortgage Bonds due 2028) to institute suit for the enforcement of payment of principal of or premium, if any, or interest on the 4.65% Collateral Mortgage Bonds due 2028 in accordance with the terms thereof, or (B) reducing the percentage of Bonds (as defined in the Mortgage Indenture), the holders of which are required to consent to any such supplement, amendment and/or waiver, or (C) permitting the creation by the Company of any Senior Lien (as such term is defined in the Mortgage Indenture) in accordance with the Mortgage Indenture."

Section 213 <u>The First Supplemental Indenture (Amended 313)</u>. The First Supplemental Indenture is hereby amended by the addition of Section 313 thereto, to read as follows:

"Section 313 <u>Release of Liens in Respect of 4.65% Collateral Mortgage Bonds due 2028; Change of Amounts</u>.

(a) Upon Company Request and the Trustee's receipt of an Officer's Certificate and an Opinion of Counsel from the Company certifying that all conditions to the satisfaction and discharge of the Indenture with respect to the 4.65% Senior Notes due 2028 (but, for avoidance of doubt, not any other series of Bonds then outstanding under

12

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 438 of 1367

the Indenture) in accordance with Section 8.02 of the Base Indenture have been satisfied, the Trustee shall be deemed not to hold a lien on the 4.65% Collateral Mortgage Bonds due 2028 on behalf of the holders of the 4.65% Senior Notes due 2028 and the Trustee shall, upon written request of the Company, deliver to the Company the 4.65% Collateral Mortgage Bonds due 2028, together with such appropriate instruments of transfer or release (in form and substance reasonably satisfactory to the Trustee) as may be reasonably requested by the Company (and at the expense of the Company) to release such lien. All the 4.65% Collateral Mortgage Bonds due 2028 delivered to the Company in accordance with this Section 313 shall be delivered by the Company to the Mortgage Bond Trustee for cancellation.

(b) Following any partial payment, redemption or retirement of the 4.65% Senior Notes due 2028, the Company shall promptly furnish to the Trustee an Officer's Certificate certifying as to such payment, redemption or retirement and the principal amount of the 4.65% Senior Notes due 2028 outstanding following such change in aggregate principal amount and directing the Trustee to deliver the 4.65% Collateral Mortgage Bonds due 2028 then held by the Trustee to the Mortgage Bond Trustee in exchange for 4.65% Collateral Mortgage Bonds due 2028 in a principal amount equal to the current outstanding aggregate principal amount so certified in the Officer's Certificate."

Section 214 <u>The First Supplemental Indenture (Amended 314)</u>. The First Supplemental Indenture is hereby amended by the addition of Section 314 thereto, to read as follows:

"Section 314 <u>Delivery of Non-Payment Notice to Mortgage Bond Trustee</u>. If payment of the principal of, premium, if any, or interest on the 4.65% Senior Notes due 2028 has not been fully paid, deemed to have been paid or otherwise satisfied and discharged when due, the Trustee, acting at the written direction of Holders of a majority in aggregate principal amount of the outstanding 4.65% Senior Notes due 2028, shall deliver a written notice to the Mortgage Bond Trustee stating the amount of such non-payment and that such payment remains unpaid on the date of such notice (which notice shall be given by the Trustee within five Business Days of such direction; *provided, however*, that failure by the Trustee to give such notice shall not affect in any way the Company's obligation to pay such amount)."

Section 215 <u>The First Supplemental Indenture (Amended 315)</u>. The First Supplemental Indenture is hereby amended by the addition of Section 315 thereto, to read as follows:

"Section 315 <u>No Transfer of 4.65% Collateral Mortgage Bonds due 2028</u>. The Company shall cause all of the 4.65% Collateral Mortgage Bonds due 2028 shall be issued and registered in the name of the Trustee. Except (i) as otherwise permitted by the Indenture or (ii) in connection with an assignment to a successor trustee in accordance with the Indenture, the Trustee shall not sell, assign or transfer the 4.65% Collateral Mortgage Bonds due 2028."

Section 216 <u>Bond Exchange</u>. The Company desires to exchange the original Global Bond representing the 4.65% Senior Notes due 2028, dated August 1, 2018 (the "Original 2028 Global Bond"), for the amended and restated Global Bond set forth in Exhibit A hereto (which is hereby incorporated herein and made a part hereof) (the "Amended and Restated Global 4.65% Senior Notes due 2028") incorporating the amendments effected by this Second Supplemental Indenture in accordance with Section 13.06 of the Base Indenture. In connection therewith, the Company has delivered to the Trustee (i) a Company Request for the authentication and delivery of the Amended and Restated Global 4.65% Senior Notes due 2028 and the cancellation of the Original 2028 Global Bond, along with an Officer's Certificate and Opinion of Counsel required by the Indenture, and (ii) the Amended and Restated Global 4.65% Senior Notes due 2028 representing the 4.65% Senior Notes due 2028 in the aggregate principal amount of $300,000,000. Upon receipt of the deliverables required by the Indenture, the Trustee shall authenticate the Amended and Restated Global 4.65% Senior Notes due 2028 to be exchanged for the Original 2028 Global Bond, cancel the Original 2028 Global Bond and deliver the cancelled Original 2028 Global Bond to the Company in accordance with the instructions set forth in the Company Request.

<div align="center">

ARTICLE THREE
PAYING AGENT, TRANSFER AGENT AND BOND REGISTRAR

</div>

Section 301 <u>Paying Agent, Transfer Agent and Bond Registrar</u>.

The Trustee is hereby appointed as successor Paying Agent, transfer agent and Bond Registrar for the Secured Bonds. Place of Payment of the Secured Bonds shall be the Corporate Trust Office of the Trustee.

<div align="center">

ARTICLE FOUR
MISCELLANEOUS PROVISIONS

</div>

Section 401 <u>Concerning the Trustee</u>.

In acting under and by virtue of this Second Supplemental Indenture, the Trustee shall have all of the rights, protections, privileges, indemnities and immunities given to it in the Base Indenture. The Trustee shall have no responsibility for the validity or sufficiency of this Second Supplemental Indenture. The recitals contained herein shall be taken as the statements of the Company, and the Trustee assumes no responsibility for their correctness.

Section 402 <u>Application of Second Supplemental Indenture</u>.

Except as provided herein, each and every term and condition contained in this Second Supplemental Indenture that modifies, amends or supplements the terms and conditions of the Indenture shall apply only to the Secured Bonds and not to any other series of Bonds established under the Indenture. Except as specifically amended and supplemented by, or to the extent inconsistent with, this Second Supplemental Indenture, the Indenture shall remain in full force and effect and is hereby ratified and confirmed.

<div align="center">14</div>

Section 403 <u>Effective Date of Second Supplemental Indenture</u>.

This Second Supplemental Indenture shall be effective upon the execution and delivery hereof by each of the parties hereto.

Section 404 <u>Governing Law</u>.

The laws of the State of New York shall govern this Second Supplemental Indenture and the Secured Bonds, without giving effect to applicable principles of conflicts of law to the extent that the application of the laws of another jurisdiction would be required thereby.

Section 405 <u>Counterparts</u>.

This Second Supplemental Indenture may be executed in any number of counterparts, and each of such counterparts shall together constitute but one and the same instrument. Delivery of an executed Second Supplemental Indenture by one party to the other may be made by facsimile, electronic mail (including any electronic signature complying with the New York Electronic Signatures and Records Act (N.Y. State Tech. §§ 301-309), as amended from time to time, or other applicable law) or other transmission method, and the parties hereto agree that any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

IN WITNESS WHEREOF, the parties hereto have caused this Second Supplemental Indenture to be duly executed by their respective officers hereunto duly authorized, all as of the day and year first above written.

**PACIFIC GAS AND ELECTRIC COMPANY,**
as Issuer

By: /s/ Margaret K. Becker
Name: Margaret K. Becker
Title: Senior Director and Treasurer

**BOKF, N.A.**
as Trustee

By: /s/ George F. Kubin
Name: George F. Kubin
Title: Senior Vice President

**Signature Page to Second Supplemental Indenture**

16

**EXHIBIT A**

[Face of Bond]

**FORM OF AMENDED AND RESTATED BOND**

     THIS BOND IS A GLOBAL BOND WITHIN THE MEANING OF THE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF A DEPOSITARY (AS DEFINED IN THE INDENTURE) OR A NOMINEE THEREOF. THIS GLOBAL BOND IS EXCHANGEABLE FOR BONDS REGISTERED IN THE NAME OF ANY PERSON OTHER THAN SUCH DEPOSITARY OR ITS NOMINEE ONLY IN LIMITED CIRCUMSTANCES DESCRIBED IN THE INDENTURE AND, UNLESS AND UNTIL IT IS EXCHANGED IN WHOLE OR IN PART FOR BONDS IN CERTIFICATED FORM, THIS GLOBAL BOND MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY OR BY THE DEPOSITARY OR ANY SUCH NOMINEE TO A SUCCESSOR DEPOSITARY OR A NOMINEE OF SUCH SUCCESSOR DEPOSITARY.

     UNLESS THIS GLOBAL BOND CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE COMPANY (AS DEFINED BELOW) OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY BOND CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

Exhibit A-1

**FORM OF AMENDED AND RESTATED 4.25% SENIOR NOTES DUE AUGUST 1, 2023**

THIS BOND IS A GLOBAL BOND WITHIN THE MEANING OF THE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF A DEPOSITARY (AS DEFINED IN THE INDENTURE) OR A NOMINEE THEREOF. THIS GLOBAL BOND IS EXCHANGEABLE FOR BONDS REGISTERED IN THE NAME OF ANY PERSON OTHER THAN SUCH DEPOSITARY OR ITS NOMINEE ONLY IN LIMITED CIRCUMSTANCES DESCRIBED IN THE INDENTURE AND, UNLESS AND UNTIL IT IS EXCHANGED IN WHOLE OR IN PART FOR BONDS IN CERTIFICATED FORM, THIS GLOBAL BOND MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY OR BY THE DEPOSITARY OR ANY SUCH NOMINEE TO A SUCCESSOR DEPOSITARY OR A NOMINEE OF SUCH SUCCESSOR DEPOSITARY.

UNLESS THIS GLOBAL BOND CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE COMPANY (AS DEFINED BELOW) OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY BOND CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

THE FOLLOWING SUMMARY OF TERMS IS SUBJECT TO THE INFORMATION SET FORTH ON THE REVERSE HEREOF:

PRINCIPAL AMOUNT:
$500,000,000

ISSUE DATE:
August 1, 2018

INTEREST RATE:
4.25% per annum

MATURITY DATE:
August 1, 2023

INTEREST PAYMENT DATES:
February 1 and August 1, commencing
February 1, 2019

THIS SENIOR NOTE IS A:
☒ Global Book-Entry Bond
☐ Certificated Bond

REGISTERED OWNER: Cede & Co., as nominee of
The Depository Trust Company

Exhibit A-2

PACIFIC GAS AND ELECTRIC COMPANY

AMENDED AND RESTATED 4.25% SENIOR NOTES DUE AUGUST 1, 2023

(Fixed Rate)

No. [•]                                                                              Principal Amount: $500,000,000
CUSIP No: 694308 JB4

    PACIFIC GAS AND ELECTRIC COMPANY, a corporation duly organized and existing under the laws of the State of California (herein called the "Company," which term includes any successor Person pursuant to the applicable provisions of the Indenture hereinafter referred to), for value received, hereby promises to pay to Cede & Co., as nominee for The Depository Trust Company, or registered assigns, the Principal Amount stated above on the Maturity Date stated above, and to pay interest thereon from and including the Issue Date stated above or, in the case of 4.25% Senior Notes due August 1, 2023 issued upon the registration of transfer or exchange, from and including the most recent Interest Payment Date to which interest has been paid or duly provided for, semi-annually in arrears on the Interest Payment Dates set forth above and on the Maturity Date stated above, commencing February 1, 2019 at the rate of 4.25% per annum until the principal hereof is paid or made available for payment. The interest so payable, and punctually paid or duly provided for, on any Interest Payment Date will, as provided in such Indenture, be paid to the Person in whose name this 4.25% Senior Note due August 1, 2023 (this "Senior Note," and together with all other 4.25% Senior Notes due August 1, 2023, the "Senior Notes") (or one or more Predecessor Bonds) is registered at the close of business on the Regular Record Date for such interest, which shall be the January 15 and July 15 preceding such Interest Payment Date; provided, however, that interest payable at the Maturity Date or on a Redemption Date will be paid to the Person to whom principal is payable. Any such interest not so punctually paid or duly provided for will forthwith cease to be payable to the Holder on such Regular Record Date and may either be paid to the Person in whose name this Senior Note (or one or more Predecessor Bonds) is registered at the close of business on a Special Record Date for the payment of such Defaulted Interest to be fixed by the Trustee, notice whereof shall be given to Holders of Senior Notes not less than 10 days prior to such Special Record Date, or be paid at any time in any other lawful manner not inconsistent with the requirements of the Indenture and any securities exchange, if any, on which the Senior Notes may be listed, and upon such notice as may be required by any such exchange, all as more fully provided in said Indenture.

    Payments of interest on this Senior Note will include interest accrued to but excluding the respective Interest Payment Dates. Interest payments for this Senior Note shall be computed and paid on the basis of the 360-day year of twelve 30-day months and will accrue from August 1, 2018 or from the most recent Interest Payment Date to which interest has been paid or duly provided for. In the event that any date on which interest is payable on this Senior Note (other than the Maturity Date) is not a Business Day then payment of the interest payable on such date will be made on the next succeeding day that is a Business Day (and without any interest or payment in respect of any such delay) with the same force and effect as if made on the date the payment was originally payable. If the Maturity Date falls on a day that is not a Business Day, the payment of principal, premium, if any, and interest may be made on the next succeeding Business Day, and no interest on such payment shall accrue for the period from and after maturity.

Exhibit A-3

Payment of principal of, premium, if any, and interest on Senior Notes shall be made in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts. Payments of principal of, premium, if any, and interest on the Senior Notes represented by a Global Bond shall be made by wire transfer of immediately available funds to the Holder of such Global Bond, provided that, in the case of payments of principal and premium, if any, such Global Bond is first surrendered to the Paying Agent. If any of the Senior Notes are no longer represented by a Global Bond, (i) payments of principal, premium, if any, and interest due on the Maturity Date or earlier redemption of such Senior Notes shall be made at the office of the Paying Agent upon surrender of such Senior Notes to the Paying Agent, and (ii) payments of interest shall be made, at the option of the Company, subject to such surrender where applicable, (A) by check mailed to the address of the Person entitled thereto as such address shall appear in the Bond Register or (B) by wire transfer to registered Holders of at least $10,000,000 in principal amount of Senior Notes at such place and to such account at a banking institution in the United States as such Holders may designate in writing to the Trustee at least sixteen (16) days prior to the date for payment.

REFERENCE IS HEREBY MADE TO THE FURTHER PROVISIONS OF THIS SENIOR NOTE SET FORTH ON THE REVERSE HEREOF, WHICH FURTHER PROVISIONS SHALL FOR ALL PURPOSES HAVE THE SAME EFFECT AS IF SET FORTH AT THIS PLACE.

Unless the certificate of authentication hereon has been executed by the Trustee referred to on the reverse hereof by manual signature, this Senior Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose.

Exhibit A-4

IN WITNESS WHEREOF, the Company has caused this instrument to be duly executed.

Dated: _____

PACIFIC GAS AND ELECTRIC COMPANY

By: _____
     Name:
     Title:

By: _____
     Name:
     Title:

Exhibit A-5

TRUSTEE'S CERTIFICATE OF AUTHENTICATION

This Senior Note is one of the Bonds of the series designated as 4.25% Senior Notes due 2023 referred to in the within-mentioned Indenture.

Dated: _____

BOKF, N.A., *As Trustee*

By: _____

*Authorized Signatory*

Exhibit A-6

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 448 of 1367

**Reverse of Amended and Restated 4.25% Senior Notes due August 1, 2023**

  This Senior Note is one of a duly authorized issue of Bonds of the Company, issued and issuable in one or more series under the Indenture, dated as of August 6, 2018, as previously amended and supplemented by a First Supplemental Indenture, dated as of August 6, 2018 and as amended by the Second Supplemental Indenture, dated as of July 1, 2020 (as so amended and supplemented, the "Indenture"), between the Company and BOKF, N.A., as Trustee (herein called the "Trustee," which term includes any successor trustee under the Indenture), and reference is hereby made to the Indenture for a description of the respective rights, limitations of rights, duties and immunities of the Company, the Trustee and the Holders of Bonds thereunder and of the terms and conditions upon which Bonds are, and are to be, authenticated and delivered. This Senior Note is a Bond within the meaning of the Indenture and is designated as the 4.25% Senior Notes due August 1, 2023 established by the Company under the Indenture and initially issued in an aggregate principal amount of $500,000,000 on August 6, 2018. The acceptance of this Senior Note shall be deemed to constitute the consent and agreement by the Holder hereof to all of the terms and provisions of the Indenture.

  The Senior Notes will be secured by a series of first mortgage bonds (the "4.25% Collateral Mortgage Bonds due 2023") delivered by the Company to the Trustee for the benefit of the Holders of the Senior Notes, issued pursuant to the Second Supplemental Indenture, dated as of July 1, 2020 to the Indenture of Mortgage, dated as of June 19, 2020, between the Company and The Bank of New York Mellon Trust Company, N.A., as trustee (as so supplemented, the "Mortgage Indenture"). Reference is made to the Indenture and the Mortgage Indenture for a description of the rights of the Trustee as holder of the 4.25% Collateral Mortgage Bonds due 2023, the property mortgaged and pledged, the nature and extent of the security and rights of the holders of the first mortgage bonds under the Mortgage Indenture and the rights of the Company under the Mortgage Indenture and the terms and conditions upon which the Senior Notes are secured.

  Subject to the terms and conditions of the Indenture, this Senior Note is redeemable at the option of the Company ("Optional Redemption"), in whole or in part, (a) at any time prior to July 1, 2023 (the date that is one month prior to the Maturity Date (the "Par Call Date")) at a Redemption Price equal to the greater of:

  (i) 100% of the principal amount of this Senior Note to be redeemed; or

  (ii) as determined by the Quotation Agent, the sum of the present values of the remaining scheduled payments of principal and interest on this Senior Note to be redeemed that would be due if this Senior Note matured on the Par Call Date (not including any portion of payments of interest accrued as of the Redemption Date), discounted to the redemption date on a semi-annual basis (assuming a 360-day year consisting of twelve 30-day months) at the Adjusted Treasury Rate, plus 25 basis points,

plus, in either of the above cases, accrued and unpaid interest thereon to, but not including, the Redemption Date; and (b) at any time on or after the Par Call Date, at a Redemption Price equal to 100% of the principal amount of this Senior Note to be redeemed, plus accrued and unpaid interest thereon to, but not including, the Redemption Date.

<div align="center">Exhibit A-7</div>

For purposes of determining the Redemption Price, the following terms have the following meanings:

"Adjusted Treasury Rate" means, with respect to any Redemption Date, the rate per annum equal to the semi-annual equivalent yield to maturity of the Comparable Treasury Issue, assuming a price for the Comparable Treasury Issue (expressed as a percentage of its principal amount) equal to the Comparable Treasury Price for such Redemption Date.

"Comparable Treasury Issue" means the United States Treasury security selected by the Quotation Agent as having a maturity comparable to the remaining term of this Senior Note to be redeemed (assuming, for such purpose, that this Senior Note matured on the Par Call Date (the "remaining term")), that would be used, at the time of selection and in accordance with customary financial practice, in pricing new issues of corporate debt securities of comparable maturity to the remaining term of this Senior Note to be redeemed.

"Comparable Treasury Price" means, with respect to any Redemption Date: (i) the average of the Reference Treasury Dealer Quotations for such Redemption Date, after excluding the highest and lowest of such Reference Treasury Dealer Quotations; or (ii) if the Quotation Agent obtains fewer than four of such Reference Treasury Dealer Quotations, the average of all such Reference Treasury Dealer Quotations so received.

"Quotation Agent" means the Reference Treasury Dealer appointed by the Company for this Senior Note.

"Reference Treasury Dealer" means (i) each of Goldman Sachs & Co. LLC, Mizuho Securities USA LLC and RBC Capital Markets, LLC, (ii) a Primary Treasury Dealer (as defined below) selected by SMBC Nikko Securities America, Inc., or their respective affiliates or successors, unless any of them ceases to be a primary dealer in certain U.S. government securities ("Primary Treasury Dealer"), in which case the Company shall substitute another Primary Treasury Dealer; and (ii) one other Primary Treasury Dealer selected by the Company.

"Reference Treasury Dealer Quotations" means, with respect to each Reference Treasury Dealer and any redemption date, the average, as determined by us, of the bid and asked prices for the Comparable Treasury Issue (expressed in each case as a percentage of its principal amount) quoted in writing to the Company by that Reference Treasury Dealer at 5:00 p.m., New York City time, on the third Business Day preceding that redemption date.

Interest installments whose Stated Maturity is on or prior to such Redemption Date will be payable to Holders of such Senior Notes, or one or more Predecessor Bonds, of record at the close of business on the relevant Record Dates referred to on the face hereof, all as provided in the Indenture.

In the case of an Optional Redemption, notice of redemption will be in writing and mailed first-class postage-prepaid not less than 10 days nor more than 60 days prior to the Redemption Date to each Holder of Senior Notes to be redeemed at the Holder's registered address; provided, however, that such notice need not state the dollar amount of the Redemption Price if such dollar amount has not been determined as of the date such notice is being given to

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 450 of 1367

the Holders of the Senior Notes being redeemed. If money sufficient to pay the Redemption Price of all Senior Notes (or portions thereof) to be redeemed on the Redemption Date is deposited with the Paying Agent or the Trustee on or prior to the Redemption Date, from and after such Redemption Date such Senior Notes or portions thereof shall cease to bear interest. Senior Notes in denominations larger than $100,000 in principal amount may be redeemed in part but only in integral multiples of $1,000.

In the event of redemption of this Senior Note in part only, a new Senior Note or Senior Notes of like tenor for the unredeemed portion hereof will be issued in the name of the Holder hereof upon the surrender hereof.

As provided in the Indenture and subject to certain limitations therein set forth, this Senior Note or any portion of the principal amount hereof will be deemed to have been paid for all purposes of the Indenture and to be no longer Outstanding thereunder, and the Company's entire indebtedness in respect thereof will be satisfied and discharged, if there has been irrevocably deposited with the Trustee or any Paying Agent (other than the Company), in trust, money in an amount which will be sufficient and/or Eligible Obligations, the principal of and interest on which when due, without regard to any reinvestment thereof, will provide moneys which, together with money, if any, deposited with or held by the Trustee or such Paying Agent, will be sufficient to pay when due the principal of and premium, if any, and interest on this Senior Note when due.

If an Event of Default shall occur and be continuing, the Trustee or the Holders of not less than 33% in aggregate principal amount of the Outstanding Bonds, considered as one class, may declare the principal amount of all Bonds then Outstanding to be due and payable immediately by notice in writing to the Company (and to the Trustee if given by Holders); provided, however, that with respect to certain Events of Default relating to bankruptcy, insolvency and similar events, the principal amount of all Bonds then Outstanding shall be due and payable immediately without further action by the Trustee or the Holders.

The Indenture permits, with certain exceptions as therein provided, the Company and the Trustee to enter into one or more supplemental indentures for the purpose of adding any provisions to, or changing in any manner or eliminating any of the provisions of, the Indenture with the consent of the Holders of not less than a majority in aggregate principal amount of the Bonds at the time Outstanding, considered as one class; provided, however, that if there shall be Bonds of more than one series Outstanding under the Indenture and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such series, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all series so directly affected, considered as one class, shall be required; and provided, further, that the Indenture permits the Company and the Trustee to enter into one or more supplemental indentures for certain purposes without the consent of any Holders of Bonds. The Indenture also contains provisions permitting the Holders of a majority in aggregate principal amount of Bonds, on behalf of the Holders of all such Bonds, to waive certain past defaults under the Indenture and their consequences. Any such consent or waiver by the Holder of this Senior Note shall be conclusive and binding upon such Holder and upon all future Holders of this Senior Note and of any Senior Note issued upon the registration of transfer hereof or in exchange herefor or in lieu hereof, whether or not notation of such consent or waiver is made upon this Senior Note.

Exhibit A-9

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 451 of 1367

As provided in and subject to the provisions of the Indenture, the Holder of this Senior Note shall not have the right to institute any proceeding with respect to the Indenture or for the appointment of a receiver or trustee or for any other remedy thereunder, unless such Holder shall have previously given the Trustee written notice of a continuing Event of Default, the Holders of at least 33% in aggregate principal amount of the Bonds at the time Outstanding shall have made written request to the Trustee to institute proceedings in respect of such Event of Default as Trustee and offered the Trustee reasonable indemnity, and the Trustee shall not have received from the Holders of at least a majority in aggregate principal amount of Bonds at the time Outstanding a direction inconsistent with such written request, and shall have failed to institute any such proceeding for 60 days after receipt of such notice, request and offer of indemnity. The foregoing shall not apply to any suit instituted by the Holder of this Senior Note for the enforcement of any payment of principal hereof or any premium or interest hereon on or after the respective due dates expressed herein.

No reference herein to the Indenture and no provision of this Senior Note or of the Indenture shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal of and any premium and interest on this Senior Note at the times, place and rate, and in the coin or currency, herein prescribed.

As provided in the Indenture and subject to certain limitations therein set forth, the transfer of this Senior Note is registrable in the Bond Register, upon surrender of this Senior Note for registration of transfer at the office or agency of the Company in any place where the principal of and any premium and interest on this Senior Note are payable, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Company, the Trustee or the Bond Registrar, as the case may be, duly executed by the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new Senior Notes of like tenor, of authorized denominations and for the same aggregate principal amount, will be issued to the designated transferee or transferees.

The Senior Notes are issuable only in registered form without coupons in denominations of $100,000 and any integral multiple of $1,000 in excess thereof. As provided in the Indenture and subject to certain limitations therein set forth, Senior Notes are exchangeable for a like aggregate principal amount of Senior Notes and of like tenor of a different authorized denomination, as requested by the Holder surrendering the same.

No service charge shall be made for any such registration of transfer or exchange, but the Company may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

The Company shall not be required to execute or to provide for the registration of the transfer of or the exchange of (A) any Senior Note of this series during a period of 15 days immediately preceding the date notice is to be given identifying the serial numbers of the Senior Notes called for redemption, or (B) any Senior Note selected for redemption in whole or in part, except the unredeemed portion of any Senior Note being redeemed in part.

<div align="center">Exhibit A-10</div>

Prior to due presentment of this Senior Note for registration of transfer, the Company, the Trustee and any agent of the Company or the Trustee may treat the Person in whose name this Senior Note is registered as the owner hereof for all purposes, whether or not this Senior Note is overdue, and neither the Company, the Trustee nor any such agent shall be affected by notice to the contrary.

This Senior Note shall be governed by, and construed and enforced in accordance with, the laws of the State of New York without regard to the principles of conflicts of laws thereunder, except to the extent that the Trust Indenture Act shall be applicable.

As provided in the Indenture, no recourse shall be had for the payment of the principal of, premium, if any, or interest with respect to this Senior Note, or any part thereof, or for any claim based hereon or otherwise in respect hereof, or of the indebtedness represented hereby, or upon any obligation, covenant or agreement under the Indenture or the Registration Rights Agreement, against any incorporator, shareholder, officer or director, as such, past, present or future, of the Company or of any predecessor or successor corporation (either directly or through the Company or a predecessor or successor corporation), whether by virtue of any constitutional provision, statute or rule of law or by the enforcement of any assessment or penalty or otherwise; it being expressly agreed and understood that the Indenture and all the Bonds are solely corporate obligations and that any such personal liability is hereby expressly waived and released as a condition of, and as part of the consideration for, the execution of the Indenture and the issuance of this Senior Note.

All terms used in this Senior Note which are not defined herein shall have the meanings assigned to them in the Indenture.

Exhibit A-11

ASSIGNMENT FORM

To assign this Security, fill in the form below:

I or we assign and transfer this Security to

_____

(Print or type assignee's name, address and zip code)

_____

(Insert assignee's soc. sec. or tax I.D. No.)

and irrevocably appoint _____ agent to transfer this Security on the books of the Company. The agent may substitute another to act for him.

Date: _____          Your signature: _____

Sign exactly as your name appears on the other side of this Security.

Signature Guarantee:

_____

(Signature must be guaranteed)

Signatures must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Registrar, which requirements include membership or participation in the Security Transfer Agent Medallion Program ("STAMP") or such other "signature guarantee program" as may be determined by the Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

Exhibit A-12

## SCHEDULE OF EXCHANGES OF INTERESTS IN THE GLOBAL BOND

The initial principal amount of this Global Bond is $500,000,000. The following increases or decreases in this Global Bond have been made:

| Date of Exchange | Amount of decrease in Principal Amount of this Global Bond | Amount of increase in Principal Amount of this Global Bond | Principal Amount of this Global Bond following such decrease (or increase) | Signature of authorized officer of Trustee or Depositary |
|---|---|---|---|---|

Exhibit A-13

**AMENDED AND RESTATED FORM OF 4.65% SENIOR NOTES DUE AUGUST 1, 2028**

THIS BOND IS A GLOBAL BOND WITHIN THE MEANING OF THE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF A DEPOSITARY (AS DEFINED IN THE INDENTURE) OR A NOMINEE THEREOF. THIS GLOBAL BOND IS EXCHANGEABLE FOR BONDS REGISTERED IN THE NAME OF ANY PERSON OTHER THAN SUCH DEPOSITARY OR ITS NOMINEE ONLY IN LIMITED CIRCUMSTANCES DESCRIBED IN THE INDENTURE AND, UNLESS AND UNTIL IT IS EXCHANGED IN WHOLE OR IN PART FOR BONDS IN CERTIFICATED FORM, THIS GLOBAL BOND MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY OR BY THE DEPOSITARY OR ANY SUCH NOMINEE TO A SUCCESSOR DEPOSITARY OR A NOMINEE OF SUCH SUCCESSOR DEPOSITARY.

UNLESS THIS GLOBAL BOND CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE COMPANY (AS DEFINED BELOW) OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY BOND CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

THE FOLLOWING SUMMARY OF TERMS IS SUBJECT TO THE INFORMATION SET FORTH ON THE REVERSE HEREOF:

| | | |
|---|---|---|
| PRINCIPAL AMOUNT: | ISSUE DATE: | INTEREST RATE: |
| $300,000,000 | August 1, 2018 | 4.65% per annum |
| MATURITY DATE: | INTEREST PAYMENT DATES: | THIS SENIOR NOTE IS A: |
| August 1, 2028 | February 1 and August 1, commencing February 1, 2019 | ☒ Global Book-Entry Bond ☐ Certificated Bond |

REGISTERED OWNER: Cede & Co., as nominee of The Depository Trust Company

Exhibit A-14

PACIFIC GAS AND ELECTRIC COMPANY

AMENDED AND RESTATED 4.65% SENIOR NOTES DUE AUGUST 1, 2028

(Fixed Rate)

No. [•]                                                                                    Principal Amount: $300,000,000
CUSIP No: 694308 JC2

    PACIFIC GAS AND ELECTRIC COMPANY, a corporation duly organized and existing under the laws of the State of California (herein called the "Company," which term includes any successor Person pursuant to the applicable provisions of the Indenture hereinafter referred to), for value received, hereby promises to pay to Cede & Co., as nominee for The Depository Trust Company, or registered assigns, the Principal Amount stated above on the Maturity Date stated above, and to pay interest thereon from and including the Issue Date stated above or, in the case of 4.65% Senior Notes due August 1, 2028 issued upon the registration of transfer or exchange, from and including the most recent Interest Payment Date to which interest has been paid or duly provided for, semi-annually in arrears on the Interest Payment Dates set forth above and on the Maturity Date stated above, commencing February 1, 2019 at the rate of 4.65% per annum until the principal hereof is paid or made available for payment. The interest so payable, and punctually paid or duly provided for, on any Interest Payment Date will, as provided in such Indenture, be paid to the Person in whose name this 4.65% Senior Note due August 1, 2028 (this "Senior Note," and together with all other 4.65% Senior Notes due August 1, 2028, the "Senior Notes") (or one or more Predecessor Bonds) is registered at the close of business on the Regular Record Date for such interest, which shall be the January 15 and July 15 preceding such Interest Payment Date; provided, however, that interest payable at the Maturity Date or on a Redemption Date will be paid to the Person to whom principal is payable. Any such interest not so punctually paid or duly provided for will forthwith cease to be payable to the Holder on such Regular Record Date and may either be paid to the Person in whose name this Senior Note (or one or more Predecessor Bonds) is registered at the close of business on a Special Record Date for the payment of such Defaulted Interest to be fixed by the Trustee, notice whereof shall be given to Holders of Senior Notes not less than 10 days prior to such Special Record Date, or be paid at any time in any other lawful manner not inconsistent with the requirements of the Indenture and any securities exchange, if any, on which the Senior Notes may be listed, and upon such notice as may be required by any such exchange, all as more fully provided in said Indenture.

    Payments of interest on this Senior Note will include interest accrued to but excluding the respective Interest Payment Dates. Interest payments for this Senior Note shall be computed and paid on the basis of the 360-day year of twelve 30-day months and will accrue from August 1, 2018 or from the most recent Interest Payment Date to which interest has been paid or duly provided for. In the event that any date on which interest is payable on this Senior Note (other than the Maturity Date) is not a Business Day then payment of the interest payable on such date will be made on the next succeeding day that is a Business Day (and without any interest or payment in respect of any such delay) with the same force and effect as if made on the date the payment was originally payable. If the Maturity Date falls on a day that is not a Business Day, the payment of principal, premium, if any, and interest may be made on the next succeeding Business Day, and no interest on such payment shall accrue for the period from and after maturity.

Exhibit A-15

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 457 of 1367

Payment of principal of, premium, if any, and interest on Senior Notes shall be made in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts. Payments of principal of, premium, if any, and interest on the Senior Notes represented by a Global Bond shall be made by wire transfer of immediately available funds to the Holder of such Global Bond, provided that, in the case of payments of principal and premium, if any, such Global Bond is first surrendered to the Paying Agent. If any of the Senior Notes are no longer represented by a Global Bond, (i) payments of principal, premium, if any, and interest due on the Maturity Date or earlier redemption of such Senior Notes shall be made at the office of the Paying Agent upon surrender of such Senior Notes to the Paying Agent, and (ii) payments of interest shall be made, at the option of the Company, subject to such surrender where applicable, (A) by check mailed to the address of the Person entitled thereto as such address shall appear in the Bond Register or (B) by wire transfer to registered Holders of at least $10,000,000 in principal amount of Senior Notes at such place and to such account at a banking institution in the United States as such Holders may designate in writing to the Trustee at least sixteen (16) days prior to the date for payment.

REFERENCE IS HEREBY MADE TO THE FURTHER PROVISIONS OF THIS SENIOR NOTE SET FORTH ON THE REVERSE HEREOF, WHICH FURTHER PROVISIONS SHALL FOR ALL PURPOSES HAVE THE SAME EFFECT AS IF SET FORTH AT THIS PLACE.

Unless the certificate of authentication hereon has been executed by the Trustee referred to on the reverse hereof by manual signature, this Senior Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose.

Exhibit A-16

IN WITNESS WHEREOF, the Company has caused this instrument to be duly executed.

Dated: _____

PACIFIC GAS AND ELECTRIC COMPANY

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

Exhibit A-17

TRUSTEE'S CERTIFICATE OF AUTHENTICATION

This Senior Note is one of the Bonds of the series designated as 4.65% Senior Notes due 2028 referred to in the within-mentioned Indenture.

Dated: _____

BOKF, N.A., *As Trustee*

By: _____

*Authorized Signatory*

Exhibit A-18

**Reverse of Amended and Restated 4.65% Senior Notes due August 1, 2028**

This Senior Note is one of a duly authorized issue of Bonds of the Company, issued and issuable in one or more series under the Indenture, dated as of August 6, 2018, as previously amended and supplemented by a First Supplemental Indenture, dated as of August 6, 2018 and as amended by the Second Supplemental Indenture, dated as of July 1, 2020 (as so amended and supplemented, the "Indenture"), between the Company and BOKF, N.A., as Trustee (herein called the "Trustee," which term includes any successor trustee under the Indenture), and reference is hereby made to the Indenture for a description of the respective rights, limitations of rights, duties and immunities of the Company, the Trustee and the Holders of Bonds thereunder and of the terms and conditions upon which Bonds are, and are to be, authenticated and delivered. This Senior Note is a Bond within the meaning of the Indenture and is designated as the 4.65% Senior Notes due August 1, 2028 established by the Company under the Indenture and initially issued in an aggregate principal amount of $300,000,000 on August 6, 2018. The acceptance of this Senior Note shall be deemed to constitute the consent and agreement by the Holder hereof to all of the terms and provisions of the Indenture.

The Senior Notes will be secured by a series of first mortgage bonds (the "4.65% Collateral Mortgage Bonds due 2028") delivered by the Company to the Trustee for the benefit of the Holders of the Senior Notes, issued pursuant to the Second Supplemental Indenture, dated as of July 1, 2020 to the Indenture of Mortgage, dated as of June 19, 2020, between the Company and The Bank of New York Mellon Trust Company, N.A., as trustee (as so supplemented, the "Mortgage Indenture"). Reference is made to the Indenture and the Mortgage Indenture for a description of the rights of the Trustee as holder of the 4.65% Collateral Mortgage Bonds due 2028, the property mortgaged and pledged, the nature and extent of the security and rights of the holders of the first mortgage bonds under the Mortgage Indenture and the rights of the Company under the Mortgage Indenture and the terms and conditions upon which the Senior Notes are secured.

Subject to the terms and conditions of the Indenture, this Senior Note is redeemable at the option of the Company ("Optional Redemption"), in whole or in part, (a) at any time prior to May 1, 2028 (the date that is three months prior to the Maturity Date (the "Par Call Date")) at a Redemption Price equal to the greater of:

(i) 100% of the principal amount of this Senior Note to be redeemed; or

(ii) as determined by the Quotation Agent, the sum of the present values of the remaining scheduled payments of principal and interest on this Senior Note to be redeemed that would be due if this Senior Note matured on the Par Call Date (not including any portion of payments of interest accrued as of the Redemption Date), discounted to the redemption date on a semi-annual basis (assuming a 360-day year consisting of twelve 30-day months) at the Adjusted Treasury Rate, plus 30 basis points,

plus, in either of the above cases, accrued and unpaid interest thereon to, but not including, the Redemption Date; and (b) at any time on or after the Par Call Date, at a Redemption Price equal to 100% of the principal amount of this Senior Note to be redeemed, plus accrued and unpaid interest thereon to, but not including, the Redemption Date.

Exhibit A-19

For purposes of determining the Redemption Price, the following terms have the following meanings:

"Adjusted Treasury Rate" means, with respect to any Redemption Date, the rate per annum equal to the semi-annual equivalent yield to maturity of the Comparable Treasury Issue, assuming a price for the Comparable Treasury Issue (expressed as a percentage of its principal amount) equal to the Comparable Treasury Price for such Redemption Date.

"Comparable Treasury Issue" means the United States Treasury security selected by the Quotation Agent as having a maturity comparable to the remaining term of this Senior Note to be redeemed (assuming, for such purpose, that this Senior Note matured on the Par Call Date (the "remaining term")), that would be used, at the time of selection and in accordance with customary financial practice, in pricing new issues of corporate debt securities of comparable maturity to the remaining term of this Senior Note to be redeemed.

"Comparable Treasury Price" means, with respect to any Redemption Date: (i) the average of the Reference Treasury Dealer Quotations for such Redemption Date, after excluding the highest and lowest of such Reference Treasury Dealer Quotations; or (ii) if the Quotation Agent obtains fewer than four of such Reference Treasury Dealer Quotations, the average of all such Reference Treasury Dealer Quotations so received.

"Quotation Agent" means the Reference Treasury Dealer appointed by the Company for this Senior Note.

"Reference Treasury Dealer" means (i) each of Goldman Sachs & Co. LLC, Mizuho Securities USA LLC and RBC Capital Markets, LLC, (ii) a Primary Treasury Dealer (as defined below) selected by SMBC Nikko Securities America, Inc., or their respective affiliates or successors, unless any of them ceases to be a primary dealer in certain U.S. government securities ("Primary Treasury Dealer"), in which case the Company shall substitute another Primary Treasury Dealer; and (ii) one other Primary Treasury Dealer selected by the Company.

"Reference Treasury Dealer Quotations" means, with respect to each Reference Treasury Dealer and any redemption date, the average, as determined by us, of the bid and asked prices for the Comparable Treasury Issue (expressed in each case as a percentage of its principal amount) quoted in writing to the Company by that Reference Treasury Dealer at 5:00 p.m., New York City time, on the third Business Day preceding that redemption date.

Interest installments whose Stated Maturity is on or prior to such Redemption Date will be payable to Holders of such Senior Notes, or one or more Predecessor Bonds, of record at the close of business on the relevant Record Dates referred to on the face hereof, all as provided in the Indenture.

In the case of an Optional Redemption, notice of redemption will be in writing and mailed first-class postage-prepaid not less than 10 days nor more than 60 days prior to the Redemption Date to each Holder of Senior Notes to be redeemed at the Holder's registered address; provided, however, that such notice need not state the dollar amount of the Redemption Price if such dollar amount has not been determined as of the date such notice is being given to

Exhibit A-20

the Holders of the Senior Notes being redeemed. If money sufficient to pay the Redemption Price of all Senior Notes (or portions thereof) to be redeemed on the Redemption Date is deposited with the Paying Agent or the Trustee on or prior to the Redemption Date, from and after such Redemption Date such Senior Notes or portions thereof shall cease to bear interest. Senior Notes in denominations larger than $100,000 in principal amount may be redeemed in part but only in integral multiples of $1,000.

In the event of redemption of this Senior Note in part only, a new Senior Note or Senior Notes of like tenor for the unredeemed portion hereof will be issued in the name of the Holder hereof upon the surrender hereof.

As provided in the Indenture and subject to certain limitations therein set forth, this Senior Note or any portion of the principal amount hereof will be deemed to have been paid for all purposes of the Indenture and to be no longer Outstanding thereunder, and the Company's entire indebtedness in respect thereof will be satisfied and discharged, if there has been irrevocably deposited with the Trustee or any Paying Agent (other than the Company), in trust, money in an amount which will be sufficient and/or Eligible Obligations, the principal of and interest on which when due, without regard to any reinvestment thereof, will provide moneys which, together with money, if any, deposited with or held by the Trustee or such Paying Agent, will be sufficient to pay when due the principal of and premium, if any, and interest on this Senior Note when due.

If an Event of Default shall occur and be continuing, the Trustee or the Holders of not less than 33% in aggregate principal amount of the Outstanding Bonds, considered as one class, may declare the principal amount of all Bonds then Outstanding to be due and payable immediately by notice in writing to the Company (and to the Trustee if given by Holders); provided, however, that with respect to certain Events of Default relating to bankruptcy, insolvency and similar events, the principal amount of all Bonds then Outstanding shall be due and payable immediately without further action by the Trustee or the Holders.

The Indenture permits, with certain exceptions as therein provided, the Company and the Trustee to enter into one or more supplemental indentures for the purpose of adding any provisions to, or changing in any manner or eliminating any of the provisions of, the Indenture with the consent of the Holders of not less than a majority in aggregate principal amount of the Bonds at the time Outstanding, considered as one class; provided, however, that if there shall be Bonds of more than one series Outstanding under the Indenture and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such series, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all series so directly affected, considered as one class, shall be required; and provided, further, that the Indenture permits the Company and the Trustee to enter into one or more supplemental indentures for certain purposes without the consent of any Holders of Bonds. The Indenture also contains provisions permitting the Holders of a majority in aggregate principal amount of Bonds, on behalf of the Holders of all such Bonds, to waive certain past defaults under the Indenture and their consequences. Any such consent or waiver by the Holder of this Senior Note shall be conclusive and binding upon such Holder and upon all future Holders of this Senior Note and of any Senior Note issued upon the registration of transfer hereof or in exchange herefor or in lieu hereof, whether or not notation of such consent or waiver is made upon this Senior Note.

<div align="center">Exhibit A-21</div>

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 463 of 1367

As provided in and subject to the provisions of the Indenture, the Holder of this Senior Note shall not have the right to institute any proceeding with respect to the Indenture or for the appointment of a receiver or trustee or for any other remedy thereunder, unless such Holder shall have previously given the Trustee written notice of a continuing Event of Default, the Holders of at least 33% in aggregate principal amount of the Bonds at the time Outstanding shall have made written request to the Trustee to institute proceedings in respect of such Event of Default as Trustee and offered the Trustee reasonable indemnity, and the Trustee shall not have received from the Holders of at least a majority in aggregate principal amount of Bonds at the time Outstanding a direction inconsistent with such written request, and shall have failed to institute any such proceeding for 60 days after receipt of such notice, request and offer of indemnity. The foregoing shall not apply to any suit instituted by the Holder of this Senior Note for the enforcement of any payment of principal hereof or any premium or interest hereon on or after the respective due dates expressed herein.

No reference herein to the Indenture and no provision of this Senior Note or of the Indenture shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal of and any premium and interest on this Senior Note at the times, place and rate, and in the coin or currency, herein prescribed.

As provided in the Indenture and subject to certain limitations therein set forth, the transfer of this Senior Note is registrable in the Bond Register, upon surrender of this Senior Note for registration of transfer at the office or agency of the Company in any place where the principal of and any premium and interest on this Senior Note are payable, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Company, the Trustee or the Bond Registrar, as the case may be, duly executed by the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new Senior Notes of like tenor, of authorized denominations and for the same aggregate principal amount, will be issued to the designated transferee or transferees.

The Senior Notes are issuable only in registered form without coupons in denominations of $100,000 and any integral multiple of $1,000 in excess thereof. As provided in the Indenture and subject to certain limitations therein set forth, Senior Notes are exchangeable for a like aggregate principal amount of Senior Notes and of like tenor of a different authorized denomination, as requested by the Holder surrendering the same.

No service charge shall be made for any such registration of transfer or exchange, but the Company may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

The Company shall not be required to execute or to provide for the registration of the transfer of or the exchange of (A) any Senior Note of this series during a period of 15 days immediately preceding the date notice is to be given identifying the serial numbers of the Senior Notes called for redemption, or (B) any Senior Note selected for redemption in whole or in part, except the unredeemed portion of any Senior Note being redeemed in part.

<div align="center">Exhibit A-22</div>

Prior to due presentment of this Senior Note for registration of transfer, the Company, the Trustee and any agent of the Company or the Trustee may treat the Person in whose name this Senior Note is registered as the owner hereof for all purposes, whether or not this Senior Note is overdue, and neither the Company, the Trustee nor any such agent shall be affected by notice to the contrary.

This Senior Note shall be governed by, and construed and enforced in accordance with, the laws of the State of New York without regard to the principles of conflicts of laws thereunder, except to the extent that the Trust Indenture Act shall be applicable.

As provided in the Indenture, no recourse shall be had for the payment of the principal of, premium, if any, or interest with respect to this Senior Note, or any part thereof, or for any claim based hereon or otherwise in respect hereof, or of the indebtedness represented hereby, or upon any obligation, covenant or agreement under the Indenture or the Registration Rights Agreement, against any incorporator, shareholder, officer or director, as such, past, present or future, of the Company or of any predecessor or successor corporation (either directly or through the Company or a predecessor or successor corporation), whether by virtue of any constitutional provision, statute or rule of law or by the enforcement of any assessment or penalty or otherwise; it being expressly agreed and understood that the Indenture and all the Bonds are solely corporate obligations and that any such personal liability is hereby expressly waived and released as a condition of, and as part of the consideration for, the execution of the Indenture and the issuance of this Senior Note.

All terms used in this Senior Note which are not defined herein shall have the meanings assigned to them in the Indenture.

<div align="center">Exhibit A-23</div>

ASSIGNMENT FORM

To assign this Security, fill in the form below:

I or we assign and transfer this Security to

---

(Print or type assignee's name, address and zip code)

---

(Insert assignee's soc. sec. or tax I.D. No.)

and irrevocably appoint _____ agent to transfer this Security on the books of the Company. The agent may substitute another to act for him.

Date: _____

Your signature: _____

Sign exactly as your name appears on the other side of this Security.

Signature Guarantee:

_____

(Signature must be guaranteed)

Signatures must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Registrar, which requirements include membership or participation in the Security Transfer Agent Medallion Program ("STAMP") or such other "signature guarantee program" as may be determined by the Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

Exhibit A-24

SCHEDULE OF EXCHANGES OF INTERESTS IN THE GLOBAL BOND

The initial principal amount of this Global Bond is $300,000,000. The following increases or decreases in this Global Bond have been made:

| Date of Exchange | Amount of decrease in Principal Amount of this Global Bond | Amount of increase in Principal Amount of this Global Bond | Principal Amount of this Global Bond following such decrease (or increase) | Signature of authorized officer of Trustee or Depositary |
|---|---|---|---|---|

Exhibit A-25

**Exhibit 4.6**

TO BE RECORDED AND WHEN
RECORDED RETURN TO:

Hunton Andrews Kurth LLP
550 South Hope Street, Suite 2000
Los Angeles, CA 90071
Attention: Robert M. Johnson, Esq.

<br>

**SECOND SUPPLEMENTAL INDENTURE**

**DATED AS OF JULY 1, 2020**

**SUPPLEMENT TO INDENTURE OF MORTGAGE**
**DATED AS OF JUNE 19, 2020**

––––––––––––––––––––

**PACIFIC GAS AND ELECTRIC COMPANY**
**ISSUER (MORTGAGOR)**

**AND**

**THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A.,**
**TRUSTEE (MORTGAGEE)**

––––––––––––––––––––

**TABLE OF CONTENTS**

| | PAGE |
|---|---|
| ARTICLE I DEFINITIONS | 2 |
| ARTICLE II ESTABLISHMENT OF 4.50% First Mortgage Bond, Collateral Series due 2041 | 3 |
| ARTICLE III ESTABLISHMENT OF 4.45% First Mortgage Bond, Collateral Series due 2042 | 4 |
| ARTICLE IV ESTABLISHMENT OF 3.75% First Mortgage Bond, Collateral Series due 2042 | 5 |
| ARTICLE V ESTABLISHMENT OF 3.25% First Mortgage Bond, Collateral Series due 2023 | 6 |
| ARTICLE VI ESTABLISHMENT OF 4.60% FIRST MORTGAGE BOND, COLLATERAL SERIES DUE 2043 | 7 |
| ARTICLE VII ESTABLISHMENT OF 3.85% FIRST MORTGAGE BOND, COLLATERAL SERIES DUE 2023 | 8 |
| ARTICLE VIII ESTABLISHMENT OF 3.75% FIRST MORTGAGE BOND, COLLATERAL SERIES DUE 2024 | 10 |
| ARTICLE IX ESTABLISHMENT OF 4.75% FIRST MORTGAGE BOND, COLLATERAL SERIES DUE 2044 | 11 |
| ARTICLE X ESTABLISHMENT OF 3.40% FIRST MORTGAGE BOND, COLLATERAL SERIES DUE 2024 | 12 |
| ARTICLE XI ESTABLISHMENT OF 4.30% FIRST MORTGAGE BOND, COLLATERAL SERIES DUE 2045 | 13 |
| ARTICLE XII ESTABLISHMENT OF 3.50% FIRST MORTGAGE BOND, COLLATERAL SERIES DUE 2025 | 14 |
| ARTICLE XIII ESTABLISHMENT OF 4.25% FIRST MORTGAGE BOND, COLLATERAL SERIES DUE 2046 | 15 |
| ARTICLE XIV ESTABLISHMENT OF 2.95% FIRST MORTGAGE BOND, COLLATERAL SERIES DUE 2026 | 17 |
| ARTICLE XV ESTABLISHMENT OF 4.00% FIRST MORTGAGE BOND, COLLATERAL SERIES DUE 2046 | 18 |
| ARTICLE XVI ESTABLISHMENT OF 3.30% FIRST MORTGAGE BOND, COLLATERAL SERIES DUE 2027A | 19 |
| ARTICLE XVII ESTABLISHMENT OF 3.30% FIRST MORTGAGE BOND, COLLATERAL SERIES DUE 2027B | 20 |
| ARTICLE XVIII ESTABLISHMENT OF 3.95% FIRST MORTGAGE BOND, COLLATERAL SERIES DUE 2047 | 21 |
| ARTICLE XIX ESTABLISHMENT OF 4.25% FIRST MORTGAGE BOND, COLLATERAL SERIES DUE 2023 | 22 |
| ARTICLE XX ESTABLISHMENT OF 4.65% FIRST MORTGAGE BOND, COLLATERAL SERIES DUE 2028 | 24 |
| ARTICLE XXI issue of collateralizing mortgage bond | 25 |
| ARTICLE XXII Trustee | 25 |
| ARTICLE XXIII MISCELLANEOUS | 25 |

| EXHIBIT A | FORM OF 4.50% FIRST MORTGAGE BOND, COLLATERAL SERIES DUE 2041 |
| EXHIBIT B | FORM OF 4.45% FIRST MORTGAGE BOND, COLLATERAL SERIES DUE 2042 |
| EXHIBIT C | FORM OF 3.75% FIRST MORTGAGE BOND, COLLATERAL SERIES DUE 2042 |
| EXHIBIT D | FORM OF 3.25% FIRST MORTGAGE BOND, COLLATERAL SERIES DUE 2023 |
| EXHIBIT E | FORM OF 4.60% FIRST MORTGAGE BOND, COLLATERAL SERIES DUE 2043 |

i

EXHIBIT F      FORM OF 3.85% FIRST MORTGAGE BOND, COLLATERAL SERIES DUE 2023
EXHIBIT G      FORM OF 3.75% FIRST MORTGAGE BOND, COLLATERAL SERIES DUE 2024
EXHIBIT H      FORM OF 4.75% FIRST MORTGAGE BOND, COLLATERAL SERIES DUE 2044
EXHIBIT I      FORM OF 3.40% FIRST MORTGAGE BOND, COLLATERAL SERIES DUE 2024
EXHIBIT J      FORM OF 4.30% FIRST MORTGAGE BOND, COLLATERAL SERIES DUE 2045
EXHIBIT K      FORM OF 3.50% FIRST MORTGAGE BOND, COLLATERAL SERIES DUE 2025
EXHIBIT L      FORM OF 4.25% FIRST MORTGAGE BOND, COLLATERAL SERIES DUE 2046
EXHIBIT M      FORM OF 2.95% FIRST MORTGAGE BOND, COLLATERAL SERIES DUE 2026
EXHIBIT N      FORM OF 4.00% FIRST MORTGAGE BOND, COLLATERAL SERIES DUE 2046
EXHIBIT O      FORM OF 3.30% FIRST MORTGAGE BOND, COLLATERAL SERIES DUE 2027A
EXHIBIT P      FORM OF 3.30% FIRST MORTGAGE BOND, COLLATERAL SERIES DUE 2027B
EXHIBIT Q      FORM OF 3.95% FIRST MORTGAGE BOND, COLLATERAL SERIES DUE 2047
EXHIBIT R      FORM OF 4.25% FIRST MORTGAGE BOND, COLLATERAL SERIES DUE 2023
EXHIBIT S      FORM OF 4.65% FIRST MORTGAGE BOND, COLLATERAL SERIES DUE 2028

**SECOND SUPPLEMENTAL INDENTURE**, dated as of July 1, 2020 (this "SUPPLEMENTAL INDENTURE"), by and between **PACIFIC GAS AND ELECTRIC COMPANY**, a California corporation (the "COMPANY"), and **THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A.**, a national banking association organized under the laws of the United States of America, as Trustee under the Mortgage Indenture (as hereinafter defined) (the "TRUSTEE").

## RECITALS OF THE COMPANY

A. The Company and the Trustee are parties to that certain Indenture of Mortgage, dated as of June 19, 2020 (together with all indentures supplemental thereto, the "MORTGAGE INDENTURE"), providing for the issuance by the Company of Bonds (as defined in the Mortgage Indenture) from time to time.

B. Under the Mortgage Indenture, the Company is authorized to issue unlimited series of Bonds and establish one or more series of Bonds at any time in accordance with the provisions of the Mortgage Indenture, and the terms of such series of Bonds may be described by a supplemental indenture executed by the Company and the Trustee.

C. The Company has heretofore executed and delivered to the 2005 Unsecured Note Trustee (as defined below) an Indenture, dated as of April 22, 2005 (the "Original 2005 Unsecured Indenture" and, as previously amended and supplemented, the "2005 Unsecured Indenture") between the Company and BOKF, N.A., as trustee (the "2005 Unsecured Note Trustee") pursuant to which the following series of unsecured notes have been issued:

(i) 4.50% Senior Notes due 2041 (the "4.50% Senior Notes due 2041");

(ii) 4.45% Senior Notes due 2042 (the "4.45% Senior Notes due 2042");

(iii) 3.75% Senior Notes due 2042 (the "3.75% Senior Notes due 2042");

(iv) 3.25% Senior Notes due 2023 (the "3.25% Senior Notes due 2023");

(v) 4.60% Senior Notes due 2043 (the "4.60% Senior Notes due 2043");

(vi) 3.85% Senior Notes due 2023 (the "3.85% Senior Notes due 2023");

(vii) 3.75% Senior Notes due 2024 (the "3.75% Senior Notes due 2024");

(viii) 4.75% Senior Notes due 2044 (the "4.75% Senior Notes due 2044");

(ix) 3.40% Senior Notes due 2024 (the "3.40% Senior Notes due 2024");

(x) 4.30% Senior Notes due 2045 (the "4.30% Senior Notes due 2045");

(xi) 3.50% Senior Notes due 2025 (the "3.50% Senior Notes due 2025");

(xii) 4.25% Senior Notes due 2046 (the "4.25% Senior Notes due 2046");

(xiii) 2.95% Senior Notes due 2026 (the "2.95% Senior Notes due 2026");

(xiv) 4.00% Senior Notes due 2046 (the "4.00% Senior Notes due 2046"); and

(xv) 3.30% Senior Notes due 2027 (the "3.30% Senior Notes due 2027A").

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 471 of 1367

D. the Company has heretofore executed and delivered to the 2017 Unsecured Note Trustee (as defined below) an Indenture, dated as of November 29, 2017 (the "2017 Unsecured Indenture") between the Company and BOKF, N.A., as trustee (the "2017 Unsecured Note Trustee") pursuant to which the following series of unsecured notes have been issued:

(i) 3.30% Senior Notes due 2027 (the "3.30% Senior Notes due 2027B"); and

(ii) 3.95% Senior Notes due 2047 (the "3.95% Senior Notes due 2047").

E. the Company has heretofore executed and delivered to the 2018 Unsecured Note Trustee (as defined below) an Indenture, dated as of August 6, 2018 (the "Original 2018 Unsecured Indenture" and as previously amended and supplemented, the "2018 Unsecured Indenture" and, collectively with the 2005 Unsecured Indenture and the 2017 Unsecured Indenture, the "Unsecured Indentures") between the Company and BOKF, N.A., as trustee (the "2018 Unsecured Note Trustee" and, collectively with the 2005 Unsecured Note Trustee and the 2017 Unsecured Note Trustee, the "Unsecured Note Trustees") pursuant to which the following series of unsecured notes have been issued:

(i) 4.25% Senior Notes due 2023 (the "4.25% Senior Notes due 2023"); and

(ii) 4.65% Senior Notes due 2028 (the "4.65% Senior Notes due 2028" and, collectively with the 4.50% Senior Notes due 2041, the 4.45% Senior Notes due 2042, the 3.75% Senior Notes due 2042, the 3.25% Senior Notes due 2023, the 4.60% Senior Notes due 2043, the 3.85% Senior Notes due 2023, the 3.75% Senior Notes due 2024, the 4.75% Senior Notes due 2044, the 3.40% Senior Notes due 2024, the 4.30% Senior Notes due 2045, the 3.50% Senior Notes due 2025, the 4.25% Senior Notes due 2046, the 2.95% Senior Notes due 2026, the 4.00% Senior Notes due 2046, the 3.30% Senior Notes due 2027A, 3.30% Senior Notes due 2027B, 3.95% Senior Notes due 2047 and the 4.25% Senior Notes due 2023, the "Unsecured Notes").

F. Section 14.01(f) of the Mortgage Indenture provides that the Company and the Trustee may enter into an indenture supplemental to the Mortgage Indenture to establish the form or terms of Bonds of any series as contemplated by Sections 2.01 and 3.01 of the Mortgage Indenture.

G. The Company desires in and by this Supplemental Indenture (i) to create seventeen (17) series of Bonds (collectively, the "Collateralizing Mortgage Bonds") to be issued under the Mortgage Indenture with each such series of said Collateralizing Mortgage Bonds to correspond to each series of Unsecured Notes, (ii) to designate such series of Collateralizing Mortgage Bonds and set forth the maturity date or dates, interest rate or rates and establish the form or terms of such Collateralizing Mortgage Bonds which shall be identical to each corresponding series of Unsecured Notes and (iii) to deliver such series of Collateralizing Mortgage Bonds to the applicable Unsecured Note Trustees to serve as collateral to each corresponding series of Unsecured Notes.

H. The execution and delivery of this Supplemental Indenture has been authorized by a Board Resolution (as defined in the Mortgage Indenture).

I. Concurrent with the execution hereof, the Company has caused its counsel to deliver to the Trustee an Officer's Certificate and Opinion of Counsel (as defined in the Mortgage Indenture) pursuant to Section 14.03 of the Mortgage Indenture.

J. The Company has done all things necessary to make this Supplemental Indenture a valid agreement of the Company in accordance with its terms.

**NOW**, **THEREFORE**, the Company and the Trustee agree, for the benefit of each other and the equal and proportionate benefit of all Holders of Unsecured Notes, as follows:

## ARTICLE I

## DEFINITIONS

Unless the context otherwise requires, capitalized terms used but not defined herein have the meaning set forth in the Mortgage Indenture.

The words "herein," "hereof" and "hereunder" and other words of similar import refer to this Supplemental Indenture as a whole and not to any particular Article, Section or other subdivision.

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 472 of 1367

# ARTICLE II

## ESTABLISHMENT OF 4.50% FIRST MORTGAGE BOND, COLLATERAL SERIES DUE 2041

SECTION 1. There is hereby created a seventh series of Bonds to consist of one Bond issued under and secured by the Mortgage Indenture, to be designated as "4.50% Mortgage Bond, Collateral Series Due 2041" of the Company ("Bond of the Seventh Series"). The Bond of the Seventh Series shall be fully registered in the name of and delivered to the 2005 Unsecured Note Trustee, held in trust for the benefit of the holders from time to time of the 4.50% Senior Notes due 2041 as security for any and all obligations of the Company under the 4.50% Senior Notes due 2041, including but not limited to, (i) the full and prompt payment of the principal of and premium, if any, on the 4.50% Senior Notes due 2041 when and as the same shall become due and payable in accordance with the terms and provisions of the 2005 Unsecured Indenture or the 4.50% Senior Notes due 2041, either at the stated maturity thereof, upon acceleration of the maturity thereof or upon redemption, and (ii) the full and prompt payment of any interest on the 4.50% Senior Notes due 2041, when and as the same shall become due and payable in accordance with the terms and provisions of the 2005 Unsecured Indenture or the 4.50% Senior Notes due 2041.

(a) The Bond of the Seventh Series shall be initially issued in the principal amount of $250,000,000, provided that the principal amount of the Bond of the Seventh Series actually outstanding as of any particular time shall be equal to the principal amount of the 4.50% Senior Notes due 2041 that at such particular time are outstanding under the 2005 Unsecured Indenture.

(b) The Bond of the Seventh Series shall be dated July 1, 2020. The Bond of the Seventh Series shall mature on the same date or dates as the 4.50% Senior Notes due 2041, subject to prior redemption.

(c) Interest will accrue on the unpaid portion of the principal of the Bond of the Seventh Series from its issue date until the entire principal amount of the Bond of the Seventh Series is paid. The Bond of the Seventh Series shall bear interest at the rate or rates per annum borne by the 4.50% Senior Notes due 2041 and interest shall be paid on the date or dates on which, and at the same place or places as, interest is payable on the 4.50% Senior Notes due 2041.

(d) The payment or payments of the principal of and premium, if any, on the Bond of the Seventh Series shall be equal to the principal of and premium, if any, on the 4.50% Senior Notes due 2041 which is due and payable under the 2005 Unsecured Indenture and shall be payable on the date or dates on which, and at the same place or places as, the principal of and premium, if any, on such 4.50% Senior Notes due 2041.

(e) The Bond of the Seventh Series shall be subject to redemption at the same times and in the same amounts as the 4.50% Senior Notes due 2041.

SECTION 2. At such time or times that all or a portion of the principal amount of the 4.50% Senior Notes due 2041 shall be redeemed or otherwise deemed to have been paid, the Company shall deliver a notice to the Trustee in writing specifying the principal amount of the 4.50% Senior Notes due 2041 so redeemed or paid, and the principal amount of the Bond of the Seventh Series shall be deemed reduced by such specified principal amount of 4.50% Senior Notes due 2041 so redeemed or paid for all purposes of the Mortgage Indenture.

SECTION 3. The Bond of the Seventh Series is not transferable except as may be required to effect a transfer to any successor to the 2005 Unsecured Note Trustee.

SECTION 4. (a) The obligation of the Company to make any payment of the principal of and premium, if any, or interest on the Bond of the Seventh Series shall be fully or partially, as the case may be, paid, deemed to have been paid or otherwise satisfied and discharged to the extent that at the time any such payment shall be due, the corresponding principal of and premium, if any, or interest on the 4.50% Senior Notes due 2041 then due shall have been fully or partially paid, deemed to have been paid or otherwise satisfied and discharged.

3

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 473 of 1367

(b) The Trustee shall conclusively presume that the obligation of the Company to make payments of the principal of and premium, if any, or interest on the Bond of the Seventh Series shall have been fully paid, deemed to have been paid or otherwise satisfied and discharged when due unless and until the Trustee shall have received written notice from the 2005 Unsecured Note Trustee stating that the payments of the principal of and premium, if any, or interest on the 4.50% Senior Notes due 2041 specified in such notice were not fully paid, deemed to have been paid or otherwise satisfied and discharged when due and remain unpaid at the date of such notice.

SECTION 5. The form of the Bond of the Seventh Series is set forth in Exhibit A hereto and is hereby incorporated herein and made a part hereof.

# ARTICLE III

## ESTABLISHMENT OF 4.45% FIRST MORTGAGE BOND, COLLATERAL SERIES DUE 2042

SECTION 1. There is hereby created a Eighth Series of Bonds to consist of one Bond issued under and secured by the Mortgage Indenture, to be designated as "4.45% Mortgage Bond, Collateral Series Due 2042" of the Company ("Bond of the Eighth Series"). The Bond of the Eighth Series shall be fully registered in the name of and delivered to the 2005 Unsecured Note Trustee, held in trust for the benefit of the holders from time to time of the 4.45% Senior Notes due 2042 as security for any and all obligations of the Company under the 4.45% Senior Notes due 2042, including but not limited to, (i) the full and prompt payment of the principal of and premium, if any, on the 4.45% Senior Notes due 2042 when and as the same shall become due and payable in accordance with the terms and provisions of the 2005 Unsecured Indenture or the 4.45% Senior Notes due 2042, either at the stated maturity thereof, upon acceleration of the maturity thereof or upon redemption, and (ii) the full and prompt payment of any interest on the 4.45% Senior Notes due 2042, when and as the same shall become due and payable in accordance with the terms and provisions of the 2005 Unsecured Indenture or the 4.45% Senior Notes due 2042.

(a) The Bond of the Eighth Series shall be initially issued in the principal amount of $400,000,000, provided that the principal amount of the Bond of the Eighth Series actually outstanding as of any particular time shall be equal to the principal amount of the 4.45% Senior Notes due 2042 that at such particular time are outstanding under the 2005 Unsecured Indenture.

(b) The Bond of the Eighth Series shall be dated July 1, 2020. The Bond of the Eighth Series shall mature on the same date or dates as the 4.45% Senior Notes due 2042, subject to prior redemption.

(c) Interest will accrue on the unpaid portion of the principal of the Bond of the Eighth Series from its issue date until the entire principal amount of the Bond of the Eighth Series is paid. The Bond of the Eighth Series shall bear interest at the rate or rates per annum borne by the 4.45% Senior Notes due 2042 and interest shall be paid on the date or dates on which, and at the same place or places as, interest is payable on the 4.45% Senior Notes due 2042.

(d) The payment or payments of the principal of and premium, if any, on the Bond of the Eighth Series shall be equal to the principal of and premium, if any, on the 4.45% Senior Notes due 2042 which is due and payable under the 2005 Unsecured Indenture and shall be payable on the date or dates on which, and at the same place or places as, the principal of and premium, if any, on such 4.45% Senior Notes due 2042.

(e) The Bond of the Eighth Series shall be subject to redemption at the same times and in the same amounts as the 4.45% Senior Notes due 2042.

SECTION 2. At such time or times that all or a portion of the principal amount of the 4.45% Senior Notes due 2042 shall be redeemed or otherwise deemed to have been paid, the Company shall deliver a notice to the Trustee in writing specifying the principal amount of the 4.45% Senior Notes due 2042 so redeemed or paid, and the principal amount of the Bond of the Eighth Series shall be deemed reduced by such specified principal amount of 4.45% Senior Notes due 2042 so redeemed or paid for all purposes of the Mortgage Indenture.

4

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 474 of 1367

SECTION 3. The Bond of the Eighth Series is not transferable except as may be required to effect a transfer to any successor to the 2005 Unsecured Note Trustee.

SECTION 4. (a) The obligation of the Company to make any payment of the principal of and premium, if any, or interest on the Bond of the Eighth Series shall be fully or partially, as the case may be, paid, deemed to have been paid or otherwise satisfied and discharged to the extent that at the time any such payment shall be due, the corresponding principal of and premium, if any, or interest on the 4.45% Senior Notes due 2042 then due shall have been fully or partially paid, deemed to have been paid or otherwise satisfied and discharged.

(b) The Trustee shall conclusively presume that the obligation of the Company to make payments of the principal of and premium, if any, or interest on the Bond of the Eighth Series shall have been fully paid, deemed to have been paid or otherwise satisfied and discharged when due unless and until the Trustee shall have received written notice from the 2005 Unsecured Note Trustee stating that the payments of the principal of and premium, if any, or interest on the 4.45% Senior Notes due 2042 specified in such notice were not fully paid, deemed to have been paid or otherwise satisfied and discharged when due and remain unpaid at the date of such notice.

SECTION 5. The form of the Bond of the Eighth Series is set forth in Exhibit B hereto and is hereby incorporated herein and made a part hereof.

## ARTICLE IV

## ESTABLISHMENT OF 3.75% FIRST MORTGAGE BOND, COLLATERAL SERIES DUE 2042

SECTION 1. There is hereby created a Ninth Series of Bonds to consist of one Bond issued under and secured by the Mortgage Indenture, to be designated as "3.75% Mortgage Bond, Collateral Series Due 2042" of the Company ("Bond of the Ninth Series"). The Bond of the Ninth Series shall be fully registered in the name of and delivered to the 2005 Unsecured Note Trustee, held in trust for the benefit of the holders from time to time of the 3.75% Senior Notes due 2042 as security for any and all obligations of the Company under the 3.75% Senior Notes due 2042, including but not limited to, (i) the full and prompt payment of the principal of and premium, if any, on the 3.75% Senior Notes due 2042 when and as the same shall become due and payable in accordance with the terms and provisions of the 2005 Unsecured Indenture or the 3.75% Senior Notes due 2042, either at the stated maturity thereof, upon acceleration of the maturity thereof or upon redemption, and (ii) the full and prompt payment of any interest on the 3.75% Senior Notes due 2042, when and as the same shall become due and payable in accordance with the terms and provisions of the 2005 Unsecured Indenture or the 3.75% Senior Notes due 2042.

(a) The Bond of the Ninth Series shall be initially issued in the principal amount of $350,000,000, provided that the principal amount of the Bond of the Ninth Series actually outstanding as of any particular time shall be equal to the principal amount of the 3.75% Senior Notes due 2042 that at such particular time are outstanding under the 2005 Unsecured Indenture.

(b) The Bond of the Ninth Series shall be dated July 1, 2020. The Bond of the Ninth Series shall mature on the same date or dates as the 3.75% Senior Notes due 2042, subject to prior redemption.

(c) Interest will accrue on the unpaid portion of the principal of the Bond of the Ninth Series from its issue date until the entire principal amount of the Bond of the Ninth Series is paid. The Bond of the Ninth Series shall bear interest at the rate or rates per annum borne by the 3.75% Senior Notes due 2042 and interest shall be paid on the date or dates on which, and at the same place or places as, interest is payable on the 3.75% Senior Notes due 2042.

(d) The payment or payments of the principal of and premium, if any, on the Bond of the Ninth Series shall be equal to the principal of and premium, if any, on the 3.75% Senior Notes due 2042 which is due and payable under the 2005 Unsecured Indenture and shall be payable on the date or dates on which, and at the same place or places as, the principal of and premium, if any, on such 3.75% Senior Notes due 2042.

5

(e) The Bond of the Ninth Series shall be subject to redemption at the same times and in the same amounts as the 3.75% Senior Notes due 2042.

SECTION 2. At such time or times that all or a portion of the principal amount of the 3.75% Senior Notes due 2042 shall be redeemed or otherwise deemed to have been paid, the Company shall deliver a notice to the Trustee in writing specifying the principal amount of the 3.75% Senior Notes due 2042 so redeemed or paid, and the principal amount of the Bond of the Ninth Series shall be deemed reduced by such specified principal amount of 3.75% Senior Notes due 2042 so redeemed or paid for all purposes of the Mortgage Indenture.

SECTION 3. The Bond of the Ninth Series is not transferable except as may be required to effect a transfer to any successor to the 2005 Unsecured Note Trustee.

SECTION 4. (a) The obligation of the Company to make any payment of the principal of and premium, if any, or interest on the Bond of the Ninth Series shall be fully or partially, as the case may be, paid, deemed to have been paid or otherwise satisfied and discharged to the extent that at the time any such payment shall be due, the corresponding principal of and premium, if any, or interest on the 3.75% Senior Notes due 2042 then due shall have been fully or partially paid, deemed to have been paid or otherwise satisfied and discharged.

(b) The Trustee shall conclusively presume that the obligation of the Company to make payments of the principal of and premium, if any, or interest on the Bond of the Ninth Series shall have been fully paid, deemed to have been paid or otherwise satisfied and discharged when due unless and until the Trustee shall have received written notice from the 2005 Unsecured Note Trustee stating that the payments of the principal of and premium, if any, or interest on the 3.75% Senior Notes due 2042 specified in such notice were not fully paid, deemed to have been paid or otherwise satisfied and discharged when due and remain unpaid at the date of such notice.

SECTION 5. The form of the Bond of the Ninth Series is set forth in Exhibit C hereto and is hereby incorporated herein and made a part hereof.

## ARTICLE V

### ESTABLISHMENT OF 3.25% FIRST MORTGAGE BOND, COLLATERAL SERIES DUE 2023

SECTION 1. There is hereby created a Tenth Series of Bonds to consist of one Bond issued under and secured by the Mortgage Indenture, to be designated as "3.25% Mortgage Bond, Collateral Series Due 2023" of the Company ("Bond of the Tenth Series"). The Bond of the Tenth Series shall be fully registered in the name of and delivered to the 2005 Unsecured Note Trustee, held in trust for the benefit of the holders from time to time of the 3.25% Senior Notes due 2023 as security for any and all obligations of the Company under the 3.25% Senior Notes due 2023, including but not limited to, (i) the full and prompt payment of the principal of and premium, if any, on the 3.25% Senior Notes due 2023 when and as the same shall become due and payable in accordance with the terms and provisions of the 2005 Unsecured Indenture or the 3.25% Senior Notes due 2023, either at the stated maturity thereof, upon acceleration of the maturity thereof or upon redemption, and (ii) the full and prompt payment of any interest on the 3.25% Senior Notes due 2023, when and as the same shall become due and payable in accordance with the terms and provisions of the 2005 Unsecured Indenture or the 3.25% Senior Notes due 2023.

(a) The Bond of the Tenth Series shall be initially issued in the principal amount of $375,000,000, provided that the principal amount of the Bond of the Tenth Series actually outstanding as of any particular time shall be equal to the principal amount of the 3.25% Senior Notes due 2023 that at such particular time are outstanding under the 2005 Unsecured Indenture.

(b) The Bond of the Tenth Series shall be dated July 1, 2020. The Bond of the Tenth Series shall mature on the same date or dates as the 3.25% Senior Notes due 2023, subject to prior redemption.

(c) Interest will accrue on the unpaid portion of the principal of the Bond of the Tenth Series from its issue date until the entire principal amount of the Bond of the Tenth Series is paid. The Bond of the Tenth Series shall bear interest at the rate or rates per annum borne by the 3.25% Senior Notes due 2023 and interest shall be paid on the date or dates on which, and at the same place or places as, interest is payable on the 3.25% Senior Notes due 2023.

6

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 476 of 1367

(d) The payment or payments of the principal of and premium, if any, on the Bond of the Tenth Series shall be equal to the principal of and premium, if any, on the 3.25% Senior Notes due 2023 which is due and payable under the 2005 Unsecured Indenture and shall be payable on the date or dates on which, and at the same place or places as, the principal of and premium, if any, on such 3.25% Senior Notes due 2023.

(e) The Bond of the Tenth Series shall be subject to redemption at the same times and in the same amounts as the 3.25% Senior Notes due 2023.

SECTION 2. At such time or times that all or a portion of the principal amount of the 3.25% Senior Notes due 2023 shall be redeemed or otherwise deemed to have been paid, the Company shall deliver a notice to the Trustee in writing specifying the principal amount of the 3.25% Senior Notes due 2023 so redeemed or paid, and the principal amount of the Bond of the Tenth Series shall be deemed reduced by such specified principal amount of 3.25% Senior Notes due 2023 so redeemed or paid for all purposes of the Mortgage Indenture.

SECTION 3. The Bond of the Tenth Series is not transferable except as may be required to effect a transfer to any successor to the 2005 Unsecured Note Trustee.

SECTION 4. (a) The obligation of the Company to make any payment of the principal of and premium, if any, or interest on the Bond of the Tenth Series shall be fully or partially, as the case may be, paid, deemed to have been paid or otherwise satisfied and discharged to the extent that at the time any such payment shall be due, the corresponding principal of and premium, if any, or interest on the 3.25% Senior Notes due 2023 then due shall have been fully or partially paid, deemed to have been paid or otherwise satisfied and discharged.

(b) The Trustee shall conclusively presume that the obligation of the Company to make payments of the principal of and premium, if any, or interest on the Bond of the Tenth Series shall have been fully paid, deemed to have been paid or otherwise satisfied and discharged when due unless and until the Trustee shall have received written notice from the 2005 Unsecured Note Trustee stating that the payments of the principal of and premium, if any, or interest on the 3.25% Senior Notes due 2023 specified in such notice were not fully paid, deemed to have been paid or otherwise satisfied and discharged when due and remain unpaid at the date of such notice.

SECTION 5. The form of the Bond of the Tenth Series is set forth in Exhibit D hereto and is hereby incorporated herein and made a part hereof.

# ARTICLE VI

## ESTABLISHMENT OF 4.60% FIRST MORTGAGE BOND, COLLATERAL SERIES DUE 2043

SECTION 1. There is hereby created an Eleventh Series of Bonds to consist of one Bond issued under and secured by the Mortgage Indenture, to be designated as "4.60% Mortgage Bond, Collateral Series Due 2043" of the Company ("Bond of the Eleventh Series"). The Bond of the Eleventh Series shall be fully registered in the name of and delivered to the 2005 Unsecured Note Trustee, held in trust for the benefit of the holders from time to time of the 4.60% Senior Notes due 2043 as security for any and all obligations of the Company under the 4.60% Senior Notes due 2043, including but not limited to, (i) the full and prompt payment of the principal of and premium, if any, on the 4.60% Senior Notes due 2043 when and as the same shall become due and payable in accordance with the terms and provisions of the 2005 Unsecured Indenture or the 4.60% Senior Notes due 2043, either at the stated maturity thereof, upon acceleration of the maturity thereof or upon redemption, and (ii) the full and prompt payment of any interest on the 4.60% Senior Notes due 2043, when and as the same shall become due and payable in accordance with the terms and provisions of the 2005 Unsecured Indenture or the 4.60% Senior Notes due 2043.

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 477 of 1367

(a) The Bond of the Eleventh Series shall be initially issued in the principal amount of $375,000,000, provided that the principal amount of the Bond of the Eleventh Series actually outstanding as of any particular time shall be equal to the principal amount of the 4.60% Senior Notes due 2043 that at such particular time are outstanding under the 2005 Unsecured Indenture.

(b) The Bond of the Eleventh Series shall be dated July 1, 2020. The Bond of the Eleventh Series shall mature on the same date or dates as the 4.60% Senior Notes due 2043, subject to prior redemption.

(c) Interest will accrue on the unpaid portion of the principal of the Bond of the Eleventh Series from its issue date until the entire principal amount of the Bond of the Eleventh Series is paid. The Bond of the Eleventh Series shall bear interest at the rate or rates per annum borne by the 4.60% Senior Notes due 2043 and interest shall be paid on the date or dates on which, and at the same place or places as, interest is payable on the 4.60% Senior Notes due 2043.

(d) The payment or payments of the principal of and premium, if any, on the Bond of the Eleventh Series shall be equal to the principal of and premium, if any, on the 4.60% Senior Notes due 2043 which is due and payable under the 2005 Unsecured Indenture and shall be payable on the date or dates on which, and at the same place or places as, the principal of and premium, if any, on such 4.60% Senior Notes due 2043.

(e) The Bond of the Eleventh Series shall be subject to redemption at the same times and in the same amounts as the 4.60% Senior Notes due 2043.

SECTION 2. At such time or times that all or a portion of the principal amount of the 4.60% Senior Notes due 2043 shall be redeemed or otherwise deemed to have been paid, the Company shall deliver a notice to the Trustee in writing specifying the principal amount of the 4.60% Senior Notes due 2043 so redeemed or paid, and the principal amount of the Bond of the Eleventh Series shall be deemed reduced by such specified principal amount of 4.60% Senior Notes due 2043 so redeemed or paid for all purposes of the Mortgage Indenture.

SECTION 3. The Bond of the Eleventh Series is not transferable except as may be required to effect a transfer to any successor to the 2005 Unsecured Note Trustee.

SECTION 4. (a) The obligation of the Company to make any payment of the principal of and premium, if any, or interest on the Bond of the Eleventh Series shall be fully or partially, as the case may be, paid, deemed to have been paid or otherwise satisfied and discharged to the extent that at the time any such payment shall be due, the corresponding principal of and premium, if any, or interest on the 4.60% Senior Notes due 2043 then due shall have been fully or partially paid, deemed to have been paid or otherwise satisfied and discharged.

(b) The Trustee shall conclusively presume that the obligation of the Company to make payments of the principal of and premium, if any, or interest on the Bond of the Eleventh Series shall have been fully paid, deemed to have been paid or otherwise satisfied and discharged when due unless and until the Trustee shall have received written notice from the 2005 Unsecured Note Trustee stating that the payments of the principal of and premium, if any, or interest on the 4.60% Senior Notes due 2043 specified in such notice were not fully paid, deemed to have been paid or otherwise satisfied and discharged when due and remain unpaid at the date of such notice.

SECTION 5. The form of the Bond of the Eleventh Series is set forth in Exhibit E hereto and is hereby incorporated herein and made a part hereof.

## ARTICLE VII

## ESTABLISHMENT OF 3.85% FIRST MORTGAGE BOND, COLLATERAL SERIES DUE 2023

SECTION 1. There is hereby created a Twelfth Series of Bonds to consist of one Bond issued under and secured by the Mortgage Indenture, to be designated as "3.85% Mortgage Bond, Collateral Series Due 2023" of the Company ("Bond of the Twelfth Series"). The Bond of the Twelfth Series shall be fully registered in the name of and delivered to the 2005 Unsecured Note Trustee, held in trust for the benefit of the holders from time to time of the 3.85% Senior Notes due 2023 as security for any and all obligations of the Company under the 3.85% Senior Notes due 2023, including but not limited to, (i) the full and prompt payment of the principal of and premium,

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 478 of 1367

if any, on the 3.85% Senior Notes due 2023 when and as the same shall become due and payable in accordance with the terms and provisions of the 2005 Unsecured Indenture or the 3.85% Senior Notes due 2023, either at the stated maturity thereof, upon acceleration of the maturity thereof or upon redemption, and (ii) the full and prompt payment of any interest on the 3.85% Senior Notes due 2023, when and as the same shall become due and payable in accordance with the terms and provisions of the 2005 Unsecured Indenture or the 3.85% Senior Notes due 2023.

(a) The Bond of the Twelfth Series shall be initially issued in the principal amount of $300,000,000, provided that the principal amount of the Bond of the Twelfth Series actually outstanding as of any particular time shall be equal to the principal amount of the 3.85% Senior Notes due 2023 that at such particular time are outstanding under the 2005 Unsecured Indenture.

(b) The Bond of the Twelfth Series shall be dated July 1, 2020. The Bond of the Twelfth Series shall mature on the same date or dates as the 3.85% Senior Notes due 2023, subject to prior redemption.

(c) Interest will accrue on the unpaid portion of the principal of the Bond of the Twelfth Series from its issue date until the entire principal amount of the Bond of the Twelfth Series is paid. The Bond of the Twelfth Series shall bear interest at the rate or rates per annum borne by the 3.85% Senior Notes due 2023 and interest shall be paid on the date or dates on which, and at the same place or places as, interest is payable on the 3.85% Senior Notes due 2023.

(d) The payment or payments of the principal of and premium, if any, on the Bond of the Twelfth Series shall be equal to the principal of and premium, if any, on the 3.85% Senior Notes due 2023 which is due and payable under the 2005 Unsecured Indenture and shall be payable on the date or dates on which, and at the same place or places as, the principal of and premium, if any, on such 3.85% Senior Notes due 2023.

(e) The Bond of the Twelfth Series shall be subject to redemption at the same times and in the same amounts as the 3.85% Senior Notes due 2023.

SECTION 2. At such time or times that all or a portion of the principal amount of the 3.85% Senior Notes due 2023 shall be redeemed or otherwise deemed to have been paid, the Company shall deliver a notice to the Trustee in writing specifying the principal amount of the 3.85% Senior Notes due 2023 so redeemed or paid, and the principal amount of the Bond of the Twelfth Series shall be deemed reduced by such specified principal amount of 3.85% Senior Notes due 2023 so redeemed or paid for all purposes of the Mortgage Indenture.

SECTION 3. The Bond of the Twelfth Series is not transferable except as may be required to effect a transfer to any successor to the 2005 Unsecured Note Trustee.

SECTION 4. (a) The obligation of the Company to make any payment of the principal of and premium, if any, or interest on the Bond of the Twelfth Series shall be fully or partially, as the case may be, paid, deemed to have been paid or otherwise satisfied and discharged to the extent that at the time any such payment shall be due, the corresponding principal of and premium, if any, or interest on the 3.85% Senior Notes due 2023 then due shall have been fully or partially paid, deemed to have been paid or otherwise satisfied and discharged.

(b) The Trustee shall conclusively presume that the obligation of the Company to make payments of the principal of and premium, if any, or interest on the Bond of the Twelfth Series shall have been fully paid, deemed to have been paid or otherwise satisfied and discharged when due unless and until the Trustee shall have received written notice from the 2005 Unsecured Note Trustee stating that the payments of the principal of and premium, if any, or interest on the 3.85% Senior Notes due 2023 specified in such notice were not fully paid, deemed to have been paid or otherwise satisfied and discharged when due and remain unpaid at the date of such notice.

SECTION 5. The form of the Bond of the Twelfth Series is set forth in Exhibit F hereto and is hereby incorporated herein and made a part hereof.

9

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 479 of 1367

# ARTICLE VIII

## ESTABLISHMENT OF 3.75% FIRST MORTGAGE BOND, COLLATERAL SERIES DUE 2024

SECTION 1. There is hereby created a Thirteenth Series of Bonds to consist of one Bond issued under and secured by the Mortgage Indenture, to be designated as "3.75% Mortgage Bond, Collateral Series Due 2024" of the Company ("Bond of the Thirteenth Series"). The Bond of the Thirteenth Series shall be fully registered in the name of and delivered to the 2005 Unsecured Note Trustee, held in trust for the benefit of the holders from time to time of the 3.75% Senior Notes due 2024 as security for any and all obligations of the Company under the 3.75% Senior Notes due 2024, including but not limited to, (i) the full and prompt payment of the principal of and premium, if any, on the 3.75% Senior Notes due 2024 when and as the same shall become due and payable in accordance with the terms and provisions of the 2005 Unsecured Indenture or the 3.75% Senior Notes due 2024, either at the stated maturity thereof, upon acceleration of the maturity thereof or upon redemption, and (ii) the full and prompt payment of any interest on the 3.75% Senior Notes due 2024, when and as the same shall become due and payable in accordance with the terms and provisions of the 2005 Unsecured Indenture or the 3.75% Senior Notes due 2024.

(a) The Bond of the Thirteenth Series shall be initially issued in the principal amount of $450,000,000, provided that the principal amount of the Bond of the Thirteenth Series actually outstanding as of any particular time shall be equal to the principal amount of the 3.75% Senior Notes due 2024 that at such particular time are outstanding under the 2005 Unsecured Indenture.

(b) The Bond of the Thirteenth Series shall be dated July 1, 2020. The Bond of the Thirteenth Series shall mature on the same date or dates as the 3.75% Senior Notes due 2024, subject to prior redemption.

(c) Interest will accrue on the unpaid portion of the principal of the Bond of the Thirteenth Series from its issue date until the entire principal amount of the Bond of the Thirteenth Series is paid. The Bond of the Thirteenth Series shall bear interest at the rate or rates per annum borne by the 3.75% Senior Notes due 2024 and interest shall be paid on the date or dates on which, and at the same place or places as, interest is payable on the 3.75% Senior Notes due 2024.

(d) The payment or payments of the principal of and premium, if any, on the Bond of the Thirteenth Series shall be equal to the principal of and premium, if any, on the 3.75% Senior Notes due 2024 which is due and payable under the 2005 Unsecured Indenture and shall be payable on the date or dates on which, and at the same place or places as, the principal of and premium, if any, on such 3.75% Senior Notes due 2024.

(e) The Bond of the Thirteenth Series shall be subject to redemption at the same times and in the same amounts as the 3.75% Senior Notes due 2024.

SECTION 2. At such time or times that all or a portion of the principal amount of the 3.75% Senior Notes due 2024 shall be redeemed or otherwise deemed to have been paid, the Company shall deliver a notice to the Trustee in writing specifying the principal amount of the 3.75% Senior Notes due 2024 so redeemed or paid, and the principal amount of the Bond of the Thirteenth Series shall be deemed reduced by such specified principal amount of 3.75% Senior Notes due 2024 so redeemed or paid for all purposes of the Mortgage Indenture.

SECTION 3. The Bond of the Thirteenth Series is not transferable except as may be required to effect a transfer to any successor to the 2005 Unsecured Note Trustee.

SECTION 4. (a) The obligation of the Company to make any payment of the principal of and premium, if any, or interest on the Bond of the Thirteenth Series shall be fully or partially, as the case may be, paid, deemed to have been paid or otherwise satisfied and discharged to the extent that at the time any such payment shall be due, the corresponding principal of and premium, if any, or interest on the 3.75% Senior Notes due 2024 then due shall have been fully or partially paid, deemed to have been paid or otherwise satisfied and discharged.

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 480 of 1367

(b) The Trustee shall conclusively presume that the obligation of the Company to make payments of the principal of and premium, if any, or interest on the Bond of the Thirteenth Series shall have been fully paid, deemed to have been paid or otherwise satisfied and discharged when due unless and until the Trustee shall have received written notice from the 2005 Unsecured Note Trustee stating that the payments of the principal of and premium, if any, or interest on the 3.75% Senior Notes due 2024 specified in such notice were not fully paid, deemed to have been paid or otherwise satisfied and discharged when due and remain unpaid at the date of such notice.

SECTION 5. The form of the Bond of the Thirteenth Series is set forth in Exhibit G hereto and is hereby incorporated herein and made a part hereof.

# ARTICLE IX

## ESTABLISHMENT OF 4.75% FIRST MORTGAGE BOND, COLLATERAL SERIES DUE 2044

SECTION 1. There is hereby created a Fourteenth Series of Bonds to consist of one Bond issued under and secured by the Mortgage Indenture, to be designated as "4.75% Mortgage Bond, Collateral Series Due 2044" of the Company ("Bond of the Fourteenth Series"). The Bond of the Fourteenth Series shall be fully registered in the name of and delivered to the 2005 Unsecured Note Trustee, held in trust for the benefit of the holders from time to time of the 4.75% Senior Notes due 2044 as security for any and all obligations of the Company under the 4.75% Senior Notes due 2044, including but not limited to, (i) the full and prompt payment of the principal of and premium, if any, on the 4.75% Senior Notes due 2044 when and as the same shall become due and payable in accordance with the terms and provisions of the 2005 Unsecured Indenture or the 4.75% Senior Notes due 2044, either at the stated maturity thereof, upon acceleration of the maturity thereof or upon redemption, and (ii) the full and prompt payment of any interest on the 4.75% Senior Notes due 2044, when and as the same shall become due and payable in accordance with the terms and provisions of the 2005 Unsecured Indenture or the 4.75% Senior Notes due 2044.

(a) The Bond of the Fourteenth Series shall be initially issued in the principal amount of $675,000,000, provided that the principal amount of the Bond of the Fourteenth Series at any particular time shall be equal to the principal amount of the 4.75% Senior Notes due 2044 that at such particular time are outstanding under the 2005 Unsecured Indenture.

(b) The Bond of the Fourteenth Series shall be dated July 1, 2020. The Bond of the Fourteenth Series shall mature on the same date or dates as the 4.75% Senior Notes due 2044, subject to prior redemption.

(c) Interest will accrue on the unpaid portion of the principal of the Bond of the Fourteenth Series from its issue date until the entire principal amount of the Bond of the Fourteenth Series is paid. The Bond of the Fourteenth Series shall bear interest at the rate or rates per annum borne by the 4.75% Senior Notes due 2044 and interest shall be paid on the date or dates on which, and at the same place or places as, interest is payable on the 4.75% Senior Notes due 2044.

(d) The payment or payments of the principal of and premium, if any, on the Bond of the Fourteenth Series shall be equal to the principal of and premium, if any, on the 4.75% Senior Notes due 2044 which is due and payable under the 2005 Unsecured Indenture and shall be payable on the date or dates on which, and at the same place or places as, the principal of and premium, if any, on such 4.75% Senior Notes due 2044.

(e) The Bond of the Fourteenth Series shall be subject to redemption at the same times and in the same amounts as the 4.75% Senior Notes due 2044.

SECTION 2. At such time or times that all or a portion of the principal amount of the 4.75% Senior Notes due 2044 shall be redeemed or otherwise deemed to have been paid, the Company shall deliver a notice to the Trustee in writing specifying the principal amount of the 4.75% Senior Notes due 2044 so redeemed or paid, and the principal amount of the Bond of the Fourteenth Series shall be deemed reduced by such specified principal amount of 4.75% Senior Notes due 2044 so redeemed or paid for all purposes of the Mortgage Indenture.

SECTION 3. The Bond of the Fourteenth Series is not transferable except as may be required to effect a transfer to any successor to the 2005 Unsecured Note Trustee.

11

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 481 of 1367

SECTION 4. (a) The obligation of the Company to make any payment of the principal of and premium, if any, or interest on the Bond of the Fourteenth Series shall be fully or partially, as the case may be, paid, deemed to have been paid or otherwise satisfied and discharged to the extent that at the time any such payment shall be due, the corresponding principal and premium, if any, or interest on the 4.75% Senior Notes due 2044 then due shall have been fully or partially paid, deemed to have been paid or otherwise satisfied and discharged.

(b) The Trustee shall conclusively presume that the obligation of the Company to make payments of the principal of and premium, if any, or interest on the Bond of the Fourteenth Series shall have been fully paid, deemed to have been paid or otherwise satisfied and discharged when due unless and until the Trustee shall have received written notice from the 2005 Unsecured Note Trustee stating that the payments of the principal of and premium, if any, or interest on the 4.75% Senior Notes due 2044 specified in such notice were not fully paid, deemed to have been paid or otherwise satisfied and discharged when due and remain unpaid at the date of such notice.

SECTION 5. The form of the Bond of the Fourteenth Series is set forth in Exhibit H hereto and is hereby incorporated herein and made a part hereof.

## ARTICLE X

### ESTABLISHMENT OF 3.40% FIRST MORTGAGE BOND, COLLATERAL SERIES DUE 2024

SECTION 1. There is hereby created a Fifteenth Series of Bonds to consist of one Bond issued under and secured by the Mortgage Indenture, to be designated as "3.40% Mortgage Bond, Collateral Series Due 2024" of the Company ("Bond of the Fifteenth Series"). The Bond of the Fifteenth Series shall be fully registered in the name of and delivered to the 2005 Unsecured Note Trustee, held in trust for the benefit of the holders from time to time of the 3.40% Senior Notes due 2024 as security for any and all obligations of the Company under the 3.40% Senior Notes due 2024, including but not limited to, (i) the full and prompt payment of the principal of and premium, if any, on the 3.40% Senior Notes due 2024 when and as the same shall become due and payable in accordance with the terms and provisions of the 2005 Unsecured Indenture or the 3.40% Senior Notes due 2024, either at the stated maturity thereof, upon acceleration of the maturity thereof or upon redemption, and (ii) the full and prompt payment of any interest on the 3.40% Senior Notes due 2024, when and as the same shall become due and payable in accordance with the terms and provisions of the 2005 Unsecured Indenture or the 3.40% Senior Notes due 2024.

(a) The Bond of the Fifteenth Series shall be initially issued in the principal amount of $350,000,000, provided that the principal amount of the Bond of the Fifteenth Series actually outstanding as of any particular time shall be equal to the principal amount of the 3.40% Senior Notes due 2024 that at such particular time are outstanding under the 2005 Unsecured Indenture.

(b) The Bond of the Fifteenth Series shall be dated July 1, 2020. The Bond of the Fifteenth Series shall mature on the same date or dates as the 3.40% Senior Notes due 2024, subject to prior redemption.

(c) Interest will accrue on the unpaid portion of the principal of the Bond of the Fifteenth Series from its issue date until the entire principal amount of the Bond of the Fifteenth Series is paid. The Bond of the Fifteenth Series shall bear interest at the rate or rates per annum borne by the 3.40% Senior Notes due 2024 and interest shall be paid on the date or dates on which, and at the same place or places as, interest is payable on the 3.40% Senior Notes due 2024.

(d) The payment or payments of the principal of and premium, if any, on the Bond of the Fifteenth Series shall be equal to the principal of and premium, if any, on the 3.40% Senior Notes due 2024 which is due and payable under the 2005 Unsecured Indenture and shall be payable on the date or dates on which, and at the same place or places as, the principal of and premium, if any, on such 3.40% Senior Notes due 2024.

(e) The Bond of the Fifteenth Series shall be subject to redemption at the same times and in the same amounts as the 3.40% Senior Notes due 2024.

12

SECTION 2. At such time or times that all or a portion of the principal amount of the 3.40% Senior Notes due 2024 shall be redeemed or otherwise deemed to have been paid, the Company shall deliver a notice to the Trustee in writing specifying the principal amount of the 3.40% Senior Notes due 2024 so redeemed or paid, and the principal amount of the Bond of the Fifteenth Series shall be deemed reduced by such specified principal amount of 3.40% Senior Notes due 2024 so redeemed or paid for all purposes of the Mortgage Indenture.

SECTION 3. The Bond of the Fifteenth Series is not transferable except as may be required to effect a transfer to any successor to the 2005 Unsecured Note Trustee.

SECTION 4. (a) The obligation of the Company to make any payment of the principal of and premium, if any, or interest on the Bond of the Fifteenth Series shall be fully or partially, as the case may be, paid, deemed to have been paid or otherwise satisfied and discharged to the extent that at the time any such payment shall be due, the corresponding principal of and premium, if any, or interest on the 3.40% Senior Notes due 2024 then due shall have been fully or partially paid, deemed to have been paid or otherwise satisfied and discharged.

(b) The Trustee shall conclusively presume that the obligation of the Company to make payments of the principal of and premium, if any, or interest on the Bond of the Fifteenth Series shall have been fully paid, deemed to have been paid or otherwise satisfied and discharged when due unless and until the Trustee shall have received written notice from the 2005 Unsecured Note Trustee stating that the payments of the principal of and premium, if any, or interest on the 3.40% Senior Notes due 2024 specified in such notice were not fully paid, deemed to have been paid or otherwise satisfied and discharged when due and remain unpaid at the date of such notice.

SECTION 5. The form of the Bond of the Fifteenth Series is set forth in Exhibit I hereto and is hereby incorporated herein and made a part hereof.

## ARTICLE XI

## ESTABLISHMENT OF 4.30% FIRST MORTGAGE BOND, COLLATERAL SERIES DUE 2045

SECTION 1. There is hereby created a Sixteenth Series of Bonds to consist of one Bond issued under and secured by the Mortgage Indenture, to be designated as "4.30% Mortgage Bond, Collateral Series Due 2045" of the Company ("Bond of the Sixteenth Series"). The Bond of the Sixteenth Series shall be fully registered in the name of and delivered to the 2005 Unsecured Note Trustee, held in trust for the benefit of the holders from time to time of the 4.30% Senior Notes due 2045 as security for any and all obligations of the Company under the 4.30% Senior Notes due 2045, including but not limited to, (i) the full and prompt payment of the principal of and premium, if any, on the 4.30% Senior Notes due 2045 when and as the same shall become due and payable in accordance with the terms and provisions of the 2005 Unsecured Indenture or the 4.30% Senior Notes due 2045, either at the stated maturity thereof, upon acceleration of the maturity thereof or upon redemption, and (ii) the full and prompt payment of any interest on the 4.30% Senior Notes due 2045, when and as the same shall become due and payable in accordance with the terms and provisions of the 2005 Unsecured Indenture or the 4.30% Senior Notes due 2045.

(a) The Bond of the Sixteenth Series shall be initially issued in the principal amount of $600,000,000, provided that the principal amount of the Bond of the Sixteenth Series actually outstanding as of any particular time shall be equal to the principal amount of the 4.30% Senior Notes due 2045 that at such particular time are outstanding under the 2005 Unsecured Indenture.

(b) The Bond of the Sixteenth Series shall be dated July 1, 2020. The Bond of the Sixteenth Series shall mature on the same date or dates as the 4.30% Senior Notes due 2045, subject to prior redemption.

(c) Interest will accrue on the unpaid portion of the principal of the Bond of the Sixteenth Series from its issue date until the entire principal amount of the Bond of the Sixteenth Series is paid. The Bond of the Sixteenth Series shall bear interest at the rate or rates per annum borne by the 4.30% Senior Notes due 2045 and interest shall be paid on the date or dates on which, and at the same place or places as, interest is payable on the 4.30% Senior Notes due 2045.

13

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 483 of 1367

(d) The payment or payments of the principal of and premium, if any, on the Bond of the Sixteenth Series shall be equal to the principal of and premium, if any, on the 4.30% Senior Notes due 2045 which is due and payable under the 2005 Unsecured Indenture and shall be payable on the date or dates on which, and at the same place or places as, the principal of and premium, if any, on such 4.30% Senior Notes due 2045.

(e) The Bond of the Sixteenth Series shall be subject to redemption at the same times and in the same amounts as the 4.30% Senior Notes due 2045.

SECTION 2. At such time or times that all or a portion of the principal amount of the 4.30% Senior Notes due 2045 shall be redeemed or otherwise deemed to have been paid, the Company shall deliver a notice to the Trustee in writing specifying the principal amount of the 4.30% Senior Notes due 2045 so redeemed or paid, and the principal amount of the Bond of the Sixteenth Series shall be deemed reduced by such specified principal amount of 4.30% Senior Notes due 2045 so redeemed or paid for all purposes of the Mortgage Indenture.

SECTION 3. The Bond of the Sixteenth Series is not transferable except as may be required to effect a transfer to any successor to the 2005 Unsecured Note Trustee.

SECTION 4. (a) The obligation of the Company to make any payment of the principal of and premium, if any, or interest on the Bond of the Sixteenth Series shall be fully or partially, as the case may be, paid, deemed to have been paid or otherwise satisfied and discharged to the extent that at the time any such payment shall be due, the corresponding principal of and premium, if any, or interest on the 4.30% Senior Notes due 2045 then due shall have been fully or partially paid, deemed to have been paid or otherwise satisfied and discharged.

(b) The Trustee shall conclusively presume that the obligation of the Company to make payments of the principal of and premium, if any, or interest on the Bond of the Sixteenth Series shall have been fully paid, deemed to have been paid or otherwise satisfied and discharged when due unless and until the Trustee shall have received written notice from the 2005 Unsecured Note Trustee stating that the payments of the principal of and premium, if any, or interest on the 4.30% Senior Notes due 2045 specified in such notice were not fully paid, deemed to have been paid or otherwise satisfied and discharged when due and remain unpaid at the date of such notice.

SECTION 5. The form of the Bond of the Sixteenth Series is set forth in Exhibit J hereto and is hereby incorporated herein and made a part hereof.

## ARTICLE XII

## ESTABLISHMENT OF 3.50% FIRST MORTGAGE BOND, COLLATERAL SERIES DUE 2025

SECTION 1. There is hereby created a Seventeenth Series of Bonds to consist of one Bond issued under and secured by the Mortgage Indenture, to be designated as "3.50% Mortgage Bond, Collateral Series Due 2025" of the Company ("Bond of the Seventeenth Series"). The Bond of the Seventeenth Series shall be fully registered in the name of and delivered to the 2005 Unsecured Note Trustee, held in trust for the benefit of the holders from time to time of the 3.50% Senior Notes due 2025 as security for any and all obligations of the Company under the 3.50% Senior Notes due 2025, including but not limited to, (i) the full and prompt payment of the principal of and premium, if any, on the 3.50% Senior Notes due 2025 when and as the same shall become due and payable in accordance with the terms and provisions of the 2005 Unsecured Indenture or the 3.50% Senior Notes due 2025, either at the stated maturity thereof, upon acceleration of the maturity thereof or upon redemption, and (ii) the full and prompt payment of any interest on the 3.50% Senior Notes due 2025, when and as the same shall become due and payable in accordance with the terms and provisions of the 2005 Unsecured Indenture or the 3.50% Senior Notes due 2025.

(a) The Bond of the Seventeenth Series shall be initially issued in the principal amount of $600,000,000, provided that the principal amount of the Bond of the Seventeenth Series actually outstanding as of any particular time shall be equal to the principal amount of the 3.50% Senior Notes due 2025 that at such particular time are outstanding under the 2005 Unsecured Indenture.

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 484 of 1367

(b) The Bond of the Seventeenth Series shall be dated July 1, 2020. The Bond of the Seventeenth Series shall mature on the same date or dates as the 3.50% Senior Notes due 2025, subject to prior redemption.

(c) Interest will accrue on the unpaid portion of the principal of the Bond of the Seventeenth Series from its issue date until the entire principal amount of the Bond of the Seventeenth Series is paid. The Bond of the Seventeenth Series shall bear interest at the rate or rates per annum borne by the 3.50% Senior Notes due 2025 and interest shall be paid on the date or dates on which, and at the same place or places as, interest is payable on the 3.50% Senior Notes due 2025.

(d) The payment or payments of the principal of and premium, if any, on the Bond of the Seventeenth Series shall be equal to the principal of and premium, if any, on the 3.50% Senior Notes due 2025 which is due and payable under the 2005 Unsecured Indenture and shall be payable on the date or dates on which, and at the same place or places as, the principal of and premium, if any, on such 3.50% Senior Notes due 2025.

(e) The Bond of the Seventeenth Series shall be subject to redemption at the same times and in the same amounts as the 3.50% Senior Notes due 2025.

SECTION 2. At such time or times that all or a portion of the principal amount of the 3.50% Senior Notes due 2025 shall be redeemed or otherwise deemed to have been paid, the Company shall deliver a notice to the Trustee in writing specifying the principal amount of the 3.50% Senior Notes due 2025 so redeemed or paid, and the principal amount of the Bond of the Seventeenth Series shall be deemed reduced by such specified principal amount of 3.50% Senior Notes due 2025 so redeemed or paid for all purposes of the Mortgage Indenture.

SECTION 3. The Bond of the Seventeenth Series is not transferable except as may be required to effect a transfer to any successor to the 2005 Unsecured Note Trustee.

SECTION 4. (a) The obligation of the Company to make any payment of the principal of and premium, if any, or interest on the Bond of the Seventeenth Series shall be fully or partially, as the case may be, paid, deemed to have been paid or otherwise satisfied and discharged to the extent that at the time any such payment shall be due, the corresponding principal of and premium, if any, or interest on the 3.50% Senior Notes due 2025 then due shall have been fully or partially paid, deemed to have been paid or otherwise satisfied and discharged.

(b) The Trustee shall conclusively presume that the obligation of the Company to make payments of the principal of and premium, if any, or interest on the Bond of the Seventeenth Series shall have been fully paid, deemed to have been paid or otherwise satisfied and discharged when due unless and until the Trustee shall have received written notice from the 2005 Unsecured Note Trustee stating that the payments of the principal of and premium, if any, or interest on the 3.50% Senior Notes due 2025 specified in such notice were not fully paid, deemed to have been paid or otherwise satisfied and discharged when due and remain unpaid at the date of such notice.

SECTION 5. The form of the Bond of the Seventeenth Series is set forth in Exhibit K hereto and is hereby incorporated herein and made a part hereof.

# ARTICLE XIII

## ESTABLISHMENT OF 4.25% FIRST MORTGAGE BOND, COLLATERAL SERIES DUE 2046

SECTION 1. There is hereby created a Eighteenth Series of Bonds to consist of one Bond issued under and secured by the Mortgage Indenture, to be designated as "4.25% Mortgage Bond, Collateral Series Due 2046" of the Company ("Bond of the Eighteenth Series"). The Bond of the Eighteenth Series shall be fully registered in the name of and delivered to the 2005 Unsecured Note Trustee, held in trust for the benefit of the holders from time to time of the 4.25% Senior Notes due 2046 as security for any and all obligations of the Company under the 4.25% Senior Notes due 2046, including but not limited to, (i) the full and prompt payment of the principal of and premium, if any, on the 4.25% Senior Notes due 2046 when and as the same shall become due and payable in accordance with the terms and provisions of the 2005 Unsecured Indenture or 4.25% Senior Notes due 2046, either at the stated maturity thereof, upon acceleration of the maturity thereof or upon redemption, and (ii) the full and prompt payment of any interest on the 4.25% Senior Notes due 2046, when and as the same shall become due and payable in accordance with the terms and provisions of the 2005 Unsecured Indenture or the 4.25% Senior Notes due 2046.

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 485 of 1367

(a) The Bond of the Eighteenth Series shall be initially issued in the principal amount of $450,000,000, provided that the principal amount of the Bond of the Eighteenth Series actually outstanding as of any particular time shall be equal to the principal amount of the 4.25% Senior Notes due 2046 that at such particular time are outstanding under the 2005 Unsecured Indenture.

(b) The Bond of the Eighteenth Series shall be dated July 1, 2020. The Bond of the Eighteenth Series shall mature on the same date or dates as the 4.25% Senior Notes due 2046, subject to prior redemption.

(c) Interest will accrue on the unpaid portion of the principal of the Bond of the Eighteenth Series from its issue date until the entire principal amount of the Bond of the Eighteenth Series is paid. The Bond of the Eighteenth Series shall bear interest at the rate or rates per annum borne by the 4.25% Senior Notes due 2046 and interest shall be paid on the date or dates on which, and at the same place or places as, interest is payable on the 4.25% Senior Notes due 2046.

(d) The payment or payments of the principal of and premium, if any, on the Bond of the Eighteenth Series shall be equal to the principal of and premium, if any, on the 4.25% Senior Notes due 2046 which is due and payable under the 2005 Unsecured Indenture and shall be payable on the date or dates on which, and at the same place or places as, the principal of and premium, if any, on such 4.25% Senior Notes due 2046.

(e) The Bond of the Eighteenth Series shall be subject to redemption at the same times and in the same amounts as the 4.25% Senior Notes due 2046.

SECTION 2. At such time or times that all or a portion of the principal amount of the 4.25% Senior Notes due 2046 shall be redeemed or otherwise deemed to have been paid, the Company shall deliver a notice to the Trustee in writing specifying the principal amount of the 4.25% Senior Notes due 2046 so redeemed or paid, and the principal amount of the Bond of the Eighteenth Series shall be deemed reduced by such specified principal amount of 4.25% Senior Notes due 2046 so redeemed or paid for all purposes of the Mortgage Indenture.

SECTION 3. The Bond of the Eighteenth Series is not transferable except as may be required to effect a transfer to any successor to the 2005 Unsecured Note Trustee.

SECTION 4. (a) The obligation of the Company to make any payment of the principal of and premium, if any, or interest on the Bond of the Eighteenth Series shall be fully or partially, as the case may be, paid, deemed to have been paid or otherwise satisfied and discharged to the extent that at the time any such payment shall be due, the corresponding principal of and premium, if any, or interest on the 4.25% Senior Notes due 2046 then due shall have been fully or partially paid, deemed to have been paid or otherwise satisfied and discharged.

(b) The Trustee shall conclusively presume that the obligation of the Company to make payments of the principal of and premium, if any, or interest on the Bond of the Eighteenth Series shall have been fully paid, deemed to have been paid or otherwise satisfied and discharged when due unless and until the Trustee shall have received written notice from the 2005 Unsecured Note Trustee stating that the payments of the principal of and premium, if any, or interest on the 4.25% Senior Notes due 2046 specified in such notice were not fully paid, deemed to have been paid or otherwise satisfied and discharged when due and remain unpaid at the date of such notice.

SECTION 5. The form of the Bond of the Eighteenth Series is set forth in Exhibit L hereto and is hereby incorporated herein and made a part hereof.

16

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 486 of 1367

**ESTABLISHMENT OF 2.95% FIRST MORTGAGE BOND, COLLATERAL SERIES DUE 2026**

SECTION 1. There is hereby created a Nineteenth Series of Bonds to consist of one Bond issued under and secured by the Mortgage Indenture, to be designated as "2.95% Mortgage Bond, Collateral Series Due 2026" of the Company ("Bond of the Nineteenth Series"). The Bond of the Nineteenth Series shall be fully registered in the name of and delivered to the 2005 Unsecured Note Trustee, held in trust for the benefit of the holders from time to time of the 2.95% Senior Notes due 2026 as security for any and all obligations of the Company under the 2.95% Senior Notes due 2026, including but not limited to, (i) the full and prompt payment of the principal of and premium, if any, on the 2.95% Senior Notes due 2026 when and as the same shall become due and payable in accordance with the terms and provisions of the 2005 Unsecured Indenture or the 2.95% Senior Notes due 2026, either at the stated maturity thereof, upon acceleration of the maturity thereof or upon redemption, and (ii) the full and prompt payment of any interest on the 2.95% Senior Notes due 2026, when and as the same shall become due and payable in accordance with the terms and provisions of the 2005 Unsecured Indenture or the 2.95% Senior Notes due 2026.

(a) The Bond of the Nineteenth Series shall be initially issued in the principal amount of $600,000,000, provided that the principal amount of the Bond of the Nineteenth Series actually outstanding as of any particular time shall be equal to the principal amount of the 2.95% Senior Notes due 2026 that at such particular time are outstanding under the 2005 Unsecured Indenture.

(b) The Bond of the Nineteenth Series shall be dated July 1, 2020. The Bond of the Nineteenth Series shall mature on the same date or dates as the 2.95% Senior Notes due 2026, subject to prior redemption.

(c) Interest will accrue on the unpaid portion of the principal of the Bond of the Nineteenth Series from its issue date until the entire principal amount of the Bond of the Nineteenth Series is paid. The Bond of the Nineteenth Series shall bear interest at the rate or rates per annum borne by the 2.95% Senior Notes due 2026 and interest shall be paid on the date or dates on which, and at the same place or places as, interest is payable on the 2.95% Senior Notes due 2026.

(d) The payment or payments of the principal of and premium, if any, on the Bond of the Nineteenth Series shall be equal to the principal of and premium, if any, on the 2.95% Senior Notes due 2026 which is due and payable under the 2005 Unsecured Indenture and shall be payable on the date or dates on which, and at the same place or places as, the principal of and premium, if any, on such 2.95% Senior Notes due 2026.

(e) The Bond of the Nineteenth Series shall be subject to redemption at the same times and in the same amounts as the 2.95% Senior Notes due 2026.

SECTION 2. At such time or times that all or a portion of the principal amount of the 2.95% Senior Notes due 2026 shall be redeemed or otherwise deemed to have been paid, the Company shall deliver a notice to the Trustee in writing specifying the principal amount of the 2.95% Senior Notes due 2026 so redeemed or paid, and the principal amount of the Bond of the Nineteenth Series shall be deemed reduced by such specified principal amount of 2.95% Senior Notes due 2026 so redeemed or paid for all purposes of the Mortgage Indenture.

SECTION 3. The Bond of the Nineteenth Series is not transferable except as may be required to effect a transfer to any successor to the 2005 Unsecured Note Trustee.

SECTION 4. (a) The obligation of the Company to make any payment of the principal of and premium, if any, or interest on the Bond of the Nineteenth Series shall be fully or partially, as the case may be, paid, deemed to have been paid or otherwise satisfied and discharged to the extent that at the time any such payment shall be due, the corresponding principal of and premium, if any, or interest on the 2.95% Senior Notes due 2026 then due shall have been fully or partially paid, deemed to have been paid or otherwise satisfied and discharged.

17

(b) The Trustee shall conclusively presume that the obligation of the Company to make payments of the principal of and premium, if any, or interest on the Bond of the Nineteenth Series shall have been fully paid, deemed to have been paid or otherwise satisfied and discharged when due unless and until the Trustee shall have received written notice from the 2005 Unsecured Note Trustee stating that the payments of the principal of and premium, if any, or interest on the 2.95% Senior Notes due 2026 specified in such notice were not fully paid, deemed to have been paid or otherwise satisfied and discharged when due and remain unpaid at the date of such notice.

SECTION 5. The form of the Bond of the Nineteenth Series is set forth in Exhibit M hereto and is hereby incorporated herein and made a part hereof.

# ARTICLE XV

## ESTABLISHMENT OF 4.00% FIRST MORTGAGE BOND, COLLATERAL SERIES DUE 2046

SECTION 1. There is hereby created a Twentieth Series of Bonds to consist of one Bond issued under and secured by the Mortgage Indenture, to be designated as "4.00% Mortgage Bond, Collateral Series Due 2046" of the Company ("Bond of the Twentieth Series"). The Bond of the Twentieth Series shall be fully registered in the name of and delivered to the 2005 Unsecured Note Trustee, held in trust for the benefit of the holders from time to time of the 4.00% Senior Notes due 2046 as security for any and all obligations of the Company under the 4.00% Senior Notes due 2046, including but not limited to, (i) the full and prompt payment of the principal of and premium, if any, on the 4.00% Senior Notes due 2046 when and as the same shall become due and payable in accordance with the terms and provisions of the 2005 Unsecured Indenture or the 4.00% Senior Notes due 2046, either at the stated maturity thereof, upon acceleration of the maturity thereof or upon redemption, and (ii) the full and prompt payment of any interest on the 4.00% Senior Notes due 2046, when and as the same shall become due and payable in accordance with the terms and provisions of the 2005 Unsecured Indenture or the 4.00% Senior Notes due 2046.

(a) The Bond of the Twentieth Series shall be initially issued in the principal amount of $600,000,000, provided that the principal amount of the Bond of the Twentieth Series outstanding as of any particular time shall be equal to the principal amount of the 4.00% Senior Notes due 2046 that at such particular time are outstanding under the 2005 Unsecured Indenture.

(b) The Bond of the Twentieth Series shall be dated July 1, 2020. The Bond of the Twentieth Series shall mature on the same date or dates as the 4.00% Senior Notes due 2046, subject to prior redemption.

(c) Interest will accrue on the unpaid portion of the principal of the Bond of the Twentieth Series from its issue date until the entire principal amount of the Bond of the Twentieth Series is paid. The Bond of the Twentieth Series shall bear interest at the rate or rates per annum borne by the 4.00% Senior Notes due 2046 and interest shall be paid on the date or dates on which, and at the same place or places as, interest is payable on the 4.00% Senior Notes due 2046.

(d) The payment or payments of the principal of and premium, if any, on the Bond of the Twentieth Series shall be equal to the principal of and premium, if any, on the 4.00% Senior Notes due 2046 which is due and payable under the 2005 Unsecured Indenture and shall be payable on the date or dates on which, and at the same place or places as, the principal of and premium, if any, on such 4.00% Senior Notes due 2046.

(e) The Bond of the Twentieth Series shall be subject to redemption at the same times and in the same amounts as the 4.00% Senior Notes due 2046.

SECTION 2. At such time or times that all or a portion of the principal amount of the 4.00% Senior Notes due 2046 shall be redeemed or otherwise deemed to have been paid, the Company shall deliver a notice to the Trustee in writing specifying the principal amount of the 4.00% Senior Notes due 2046 so redeemed or paid, and the principal amount of the Bond of the Twentieth Series shall be deemed reduced by such specified principal amount of 4.00% Senior Notes due 2046 so redeemed or paid for all purposes of the Mortgage Indenture.

SECTION 3. The Bond of the Twentieth Series is not transferable except as may be required to effect a transfer to any successor to the 2005 Unsecured Note Trustee.

18

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 488 of 1367

SECTION 4. (a) The obligation of the Company to make any payment of the principal of and premium, if any, or interest on the Bond of the Twentieth Series shall be fully or partially, as the case may be, paid, deemed to have been paid or otherwise satisfied and discharged to the extent that at the time any such payment shall be due, the corresponding principal of and premium, if any, or interest on the 4.00% Senior Notes due 2046 then due shall have been fully or partially paid, deemed to have been paid or otherwise satisfied and discharged.

(b) The Trustee shall conclusively presume that the obligation of the Company to make payments of the principal of and premium, if any, or interest on the Bond of the Twentieth Series shall have been fully paid, deemed to have been paid or otherwise satisfied and discharged when due unless and until the Trustee shall have received written notice from the 2005 Unsecured Note Trustee stating that the payments of the principal of and premium, if any, or interest on the 4.00% Senior Notes due 2046 specified in such notice were not fully paid, deemed to have been paid or otherwise satisfied and discharged when due and remain unpaid at the date of such notice.

SECTION 5. The form of the Bond of the Twentieth Series is set forth in Exhibit N hereto and is hereby incorporated herein and made a part hereof.

# ARTICLE XVI

## ESTABLISHMENT OF 3.30% FIRST MORTGAGE BOND, COLLATERAL SERIES DUE 2027A

SECTION 1. There is hereby created a Twenty-First Series of Bonds to consist of one Bond issued under and secured by the Mortgage Indenture, to be designated as "3.30% Mortgage Bond, Collateral Series Due 2027A" of the Company ("Bond of the Twenty-First Series"). The Bond of the Twenty-First Series shall be fully registered in the name of and delivered to the 2005 Unsecured Note Trustee, held in trust for the benefit of the holders from time to time of the 3.30% Senior Notes due 2027A as security for any and all obligations of the Company under the 3.30% Senior Notes due 2027A, including but not limited to, (i) the full and prompt payment of the principal of and premium, if any, on the 3.30% Senior Notes due 2027A when and as the same shall become due and payable in accordance with the terms and provisions of the 2005 Unsecured Indenture or the 3.30% Senior Notes due 2027A, either at the stated maturity thereof, upon acceleration of the maturity thereof or upon redemption, and (ii) the full and prompt payment of any interest on the 3.30% Senior Notes due 2027A, when and as the same shall become due and payable in accordance with the terms and provisions of the 2005 Unsecured Indenture or the 3.30% Senior Notes due 2027A.

(a) The Bond of the Twenty-First Series shall be initially issued in the principal amount of $400,000,000, provided that the principal amount of the Bond of the Twenty-First Series actually outstanding as of any particular time shall be equal to the principal amount of the 3.30% Senior Notes due 2027A that at such particular time are outstanding under the 2005 Unsecured Indenture.

(b) The Bond of the Twenty-First Series shall be dated July 1, 2020. The Bond of the Twenty-First Series shall mature on the same date or dates as the 3.30% Senior Notes due 2027A, subject to prior redemption.

(c) Interest will accrue on the unpaid portion of the principal of the Bond of the Twenty-First Series from its issue date until the entire principal amount of the Bond of the Twenty-First Series is paid. The Bond of the Twenty-First Series shall bear interest at the rate or rates per annum borne by the 3.30% Senior Notes due 2027A and interest shall be paid on the date or dates on which, and at the same place or places as, interest is payable on the 3.30% Senior Notes due 2027A.

(d) The payment or payments of the principal of and premium, if any, on the Bond of the Twenty-First Series shall be equal to the principal of and premium, if any, on the 3.30% Senior Notes due 2027A which is due and payable under the 2005 Unsecured Indenture and shall be payable on the date or dates on which, and at the same place or places as, the principal of and premium, if any, on such 3.30% Senior Notes due 2027A.

(e) The Bond of the Twenty-First Series shall be subject to redemption at the same times and in the same amounts as the 3.30% Senior Notes due 2027A.

19

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 489 of 1367

SECTION 2. At such time or times that all or a portion of the principal amount of the 3.30% Senior Notes due 2027A shall be redeemed or otherwise deemed to have been paid, the Company shall deliver a notice to the Trustee in writing specifying the principal amount of the 3.30% Senior Notes due 2027A so redeemed or paid, and the principal amount of the Bond of the Twenty-First Series shall be deemed reduced by such specified principal amount of 3.30% Senior Notes due 2027A so redeemed or paid for all purposes of the Mortgage Indenture.

SECTION 3. The Bond of the Twenty-First Series is not transferable except as may be required to effect a transfer to any successor to the 2005 Unsecured Note Trustee.

SECTION 4. (a) The obligation of the Company to make any payment of the principal of and premium, if any, or interest on the Bond of the Twenty-First Series shall be fully or partially, as the case may be, paid, deemed to have been paid or otherwise satisfied and discharged to the extent that at the time any such payment shall be due, the corresponding principal of and premium, if any, or interest on the 3.30% Senior Notes due 2027A then due shall have been fully or partially paid, deemed to have been paid or otherwise satisfied and discharged.

(b) The Trustee shall conclusively presume that the obligation of the Company to make payments of the principal of and premium, if any, or interest on the Bond of the Twenty-First Series shall have been fully paid, deemed to have been paid or otherwise satisfied and discharged when due unless and until the Trustee shall have received written notice from the 2005 Unsecured Note Trustee stating that the payments of the principal of and premium, if any, or interest on the 3.30% Senior Notes due 2027A specified in such notice were not fully paid, deemed to have been paid or otherwise satisfied and discharged when due and remain unpaid at the date of such notice.

SECTION 5. The form of the Bond of the Twenty-First Series is set forth in Exhibit O hereto and is hereby incorporated herein and made a part hereof.

## ARTICLE XVII

## ESTABLISHMENT OF 3.30% FIRST MORTGAGE BOND, COLLATERAL SERIES DUE 2027B

SECTION 1. There is hereby created a Twenty- Second Series of Bonds to consist of one Bond issued under and secured by the Mortgage Indenture, to be designated as "3.30% Mortgage Bond, Collateral Series Due 2027B" of the Company ("Bond of the Twenty-Second Series"). The Bond of the Twenty-Second Series shall be fully registered in the name of and delivered to the 2017 Unsecured Note Trustee, held in trust for the benefit of the holders from time to time of the 3.30% Senior Notes due 2027B as security for any and all obligations of the Company under the 3.30% Senior Notes due 2027B, including but not limited to, (i) the full and prompt payment of the principal of and premium, if any, on the 3.30% Senior Notes due 2027B when and as the same shall become due and payable in accordance with the terms and provisions of the 2017 Unsecured Indenture or the 3.30% Senior Notes due 2027B, either at the stated maturity thereof, upon acceleration of the maturity thereof or upon redemption, and (ii) the full and prompt payment of any interest on the 3.30% Senior Notes due 2027B, when and as the same shall become due and payable in accordance with the terms and provisions of the 2017 Unsecured Indenture or the 3.30% Senior Notes due 2027B.

(a) The Bond of the Twenty-Second Series shall be initially issued in the principal amount of $1,150,000,000, provided that the principal amount of the Bond of the Twenty-Second Series actually outstanding as of any particular time shall be equal to the principal amount of the 3.30% Senior Notes due 2027B that at such particular time are outstanding under the 2017 Unsecured Indenture.

(b) The Bond of the Twenty-Second Series shall be dated July 1, 2020. The Bond of the Twenty-Second Series shall mature on the same date or dates as the 3.30% Senior Notes due 2027B, subject to prior redemption.

(c) Interest will accrue on the unpaid portion of the principal of the Bond of the Twenty-Second Series from its issue date until the entire principal amount of the Bond of the Twenty-Second Series is paid. The Bond of the Twenty-Second Series shall bear interest at the rate or rates per annum borne by the 3.30% Senior Notes due 2027B and interest shall be paid on the date or dates on which, and at the same place or places as, interest is payable on the 3.30% Senior Notes due 2027B.

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 490 of 1367

(d) The payment or payments of the principal of and premium, if any, on the Bond of the Twenty-Second Series shall be equal to the principal of and premium, if any, on the 3.30% Senior Notes due 2027B which is due and payable under the 2017 Unsecured Indenture and shall be payable on the date or dates on which, and at the same place or places as, the principal of and premium, if any, on such 3.30% Senior Notes due 2027B.

(e) The Bond of the Twenty-Second Series shall be subject to redemption at the same times and in the same amounts as the 3.30% Senior Notes due 2027B.

SECTION 2. At such time or times that all or a portion of the principal amount of the 3.30% Senior Notes due 2027B shall be redeemed or otherwise deemed to have been paid, the Company shall deliver a notice to the Trustee in writing specifying the principal amount of the 3.30% Senior Notes due 2027B so redeemed or paid, and the principal amount of the Bond of the Twenty-Second Series shall be deemed reduced by such specified principal amount of 3.30% Senior Notes due 2027B so redeemed or paid for all purposes of the Mortgage Indenture.

SECTION 3. The Bond of the Twenty-Second Series is not transferable except as may be required to effect a transfer to any successor to the 2017 Unsecured Note Trustee.

SECTION 4. (a) The obligation of the Company to make any payment of the principal of and premium, if any, or interest on the Bond of the Twenty-Second Series shall be fully or partially, as the case may be, paid, deemed to have been paid or otherwise satisfied and discharged to the extent that at the time any such payment shall be due, the corresponding principal of and premium, if any, or interest on the 3.30% Senior Notes due 2027B then due shall have been fully or partially paid, deemed to have been paid or otherwise satisfied and discharged.

(b) The Trustee shall conclusively presume that the obligation of the Company to make payments of the principal of and premium, if any, or interest on the Bond of the Twenty-Second Series shall have been fully paid, deemed to have been paid or otherwise satisfied and discharged when due unless and until the Trustee shall have received written notice from the 2017 Unsecured Note Trustee stating that the payments of the principal of and premium, if any, or interest on the 3.30% Senior Notes due 2027B specified in such notice were not fully paid, deemed to have been paid or otherwise satisfied and discharged when due and remain unpaid at the date of such notice.

SECTION 5. The form of the Bond of the Twenty-Second Series is set forth in Exhibit P hereto and is hereby incorporated herein and made a part hereof.

**ARTICLE XVIII**

**ESTABLISHMENT OF 3.95% FIRST MORTGAGE BOND, COLLATERAL SERIES DUE 2047**

SECTION 1. There is hereby created a Twenty-Third Series of Bonds to consist of one Bond issued under and secured by the Mortgage Indenture, to be designated as "3.95% Mortgage Bond, Collateral Series Due 2047" of the Company ("Bond of the Twenty-Third Series"). The Bond of the Twenty-Third Series shall be fully registered in the name of and delivered to the 2017 Unsecured Note Trustee, held in trust for the benefit of the holders from time to time of the 3.95% Senior Notes due 2047 as security for any and all obligations of the Company under the 3.95% Senior Notes due 2047, including but not limited to, (i) the full and prompt payment of the principal of and premium, if any, on the 3.95% Senior Notes due 2047 when and as the same shall become due and payable in accordance with the terms and provisions of the 2017 Unsecured Indenture or the 3.95% Senior Notes due 2047, either at the stated maturity thereof, upon acceleration of the maturity thereof or upon redemption, and (ii) the full and prompt payment of any interest on the 3.95% Senior Notes due 2047, when and as the same shall become due and payable in accordance with the terms and provisions of the 2017 Unsecured Indenture or the 3.95% Senior Notes due 2047.

(a) The Bond of the Twenty-Third Series shall be initially issued in the principal amount of $850,000,000, provided that the principal amount of the Bond of the Twenty-Third Series actually outstanding as of any particular time shall be equal to the principal amount of the 3.95% Senior Notes due 2047 that at such particular time are outstanding under the 2017 Unsecured Indenture.

(b) The Bond of the Twenty-Third Series shall be dated July 1, 2020. The Bond of the Twenty-Third Series shall mature on the same date or dates as the 3.95% Senior Notes due 2047, subject to prior redemption.

(c) Interest will accrue on the unpaid portion of the principal of the Bond of the Twenty-Third Series from its issue date until the entire principal amount of the Bond of the Twenty-Third Series is paid. The Bond of the Twenty-Third Series shall bear interest at the rate or rates per annum borne by the 3.95% Senior Notes due 2047 and interest shall be paid on the date or dates on which, and at the same place or places as, interest is payable on the 3.95% Senior Notes due 2047.

(d) The payment or payments of the principal of and premium, if any, on the Bond of the Twenty-Third Series shall be equal to the principal of and premium, if any, on the 3.95% Senior Notes due 2047 which is due and payable under the 2017 Unsecured Indenture and shall be payable on the date or dates on which, and at the same place or places as, the principal of and premium, if any, on such 3.95% Senior Notes due 2047.

(e) The Bond of the Twenty-Third Series shall be subject to redemption at the same times and in the same amounts as the 3.95% Senior Notes due 2047.

SECTION 2. At such time or times that all or a portion of the principal amount of the 3.95% Senior Notes due 2047 shall be redeemed or otherwise deemed to have been paid, the Company shall deliver a notice to the Trustee in writing specifying the principal amount of the 3.95% Senior Notes due 2047 so redeemed or paid, and the principal amount of the Bond of the Twenty-Third Series shall be deemed reduced by such specified principal amount of 3.95% Senior Notes due 2047 so redeemed or paid for all purposes of the Mortgage Indenture.

SECTION 3. The Bond of the Twenty-Third Series is not transferable except as may be required to effect a transfer to any successor to the 2017 Unsecured Note Trustee.

SECTION 4. (a) The obligation of the Company to make any payment of the principal of and premium, if any, or interest on the Bond of the Twenty-Third Series shall be fully or partially, as the case may be, paid, deemed to have been paid or otherwise satisfied and discharged to the extent that at the time any such payment shall be due, the corresponding principal of and premium, if any, or interest on the 3.95% Senior Notes due 2047 then due shall have been fully or partially paid, deemed to have been paid or otherwise satisfied and discharged.

(b) The Trustee shall conclusively presume that the obligation of the Company to make payments of the principal of and premium, if any, or interest on the Bond of the Twenty-Third Series shall have been fully paid, deemed to have been paid or otherwise satisfied and discharged when due unless and until the Trustee shall have received written notice from the 2017 Unsecured Note Trustee stating that the payments of the principal of and premium, if any, or interest on the 3.95% Senior Notes due 2047 specified in such notice were not fully paid, deemed to have been paid or otherwise satisfied and discharged when due and remain unpaid at the date of such notice.

SECTION 5. The form of the Bond of the Twenty-Third Series is set forth in Exhibit Q hereto and is hereby incorporated herein and made a part hereof.

## ARTICLE XIX

## ESTABLISHMENT OF 4.25% FIRST MORTGAGE BOND, COLLATERAL SERIES DUE 2023

SECTION 1. There is hereby created a Twenty-Fourth Series of Bonds to consist of one Bond issued under and secured by the Mortgage Indenture, to be designated as "4.25% Mortgage Bond, Collateral Series Due 2023" of the Company ("Bond of the Twenty-Fourth Series"). The Bond of the Twenty-Fourth Series shall be fully registered in the name of and delivered to the 2018 Unsecured Note Trustee, held in trust for the benefit of the holders from time to time of the 4.25% Senior Notes due 2023 as security for any and all obligations of the Company under the 4.25% Senior Notes due 2023, including but not limited to, (i) the full and prompt payment of the principal

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 492 of 1367

of and premium, if any, on the 4.25% Senior Notes due 2023 when and as the same shall become due and payable in accordance with the terms and provisions of the 2018 Unsecured Indenture or the 4.25% Senior Notes due 2023, either at the stated maturity thereof, upon acceleration of the maturity thereof or upon redemption, and (ii) the full and prompt payment of any interest on the 4.25% Senior Notes due 2023, when and as the same shall become due and payable in accordance with the terms and provisions of the 2018 Unsecured Indenture or the 4.25% Senior Notes due 2023.

(a) The Bond of the Twenty-Fourth Series shall be initially issued in the principal amount of $500,000,000, provided that the principal amount of the Bond of the Twenty-Fourth Series actually outstanding as of any particular time shall be equal to the principal amount of the 4.25% Senior Notes due 2023 that at such particular time are outstanding under the 2018 Unsecured Indenture.

(b) The Bond of the Twenty-Fourth Series shall be dated July 1, 2020. The Bond of the Twenty-Fourth Series shall mature on the same date or dates as the 4.25% Senior Notes due 2023, subject to prior redemption.

(c) Interest will accrue on the unpaid portion of the principal of the Bond of the Twenty-Fourth Series from its issue date until the entire principal amount of the Bond of the Twenty-Fourth Series is paid. The Bond of the Twenty-Fourth Series shall bear interest at the rate or rates per annum borne by the 4.25% Senior Notes due 2023 and interest shall be paid on the date or dates on which, and at the same place or places as, interest is payable on the 4.25% Senior Notes due 2023.

(d) The payment or payments of the principal of and premium, if any, on the Bond of the Twenty-Fourth Series shall be equal to the principal of and premium, if any, on the 4.25% Senior Notes due 2023 which is due and payable under the 2018 Unsecured Indenture and shall be payable on the date or dates on which, and at the same place or places as, the principal of and premium, if any, on such 4.25% Senior Notes due 2023.

(e) The Bond of the Twenty-Fourth Series shall be subject to redemption at the same times and in the same amounts as the 4.25% Senior Notes due 2023.

SECTION 2. At such time or times that all or a portion of the principal amount of the 4.25% Senior Notes due 2023 shall be redeemed or otherwise deemed to have been paid, the Company shall deliver a notice to the Trustee in writing specifying the principal amount of the 4.25% Senior Notes due 2023 so redeemed or paid, and the principal amount of the Bond of the Twenty-Fourth Series shall be deemed reduced by such specified principal amount of 4.25% Senior Notes due 2023 so redeemed or paid for all purposes of the Mortgage Indenture.

SECTION 3. The Bond of the Twenty-Fourth Series is not transferable except as may be required to effect a transfer to any successor to the 2018 Unsecured Note Trustee.

SECTION 4. (a) The obligation of the Company to make any payment of the principal of and premium, if any, or interest on the Bond of the Twenty-Fourth Series shall be fully or partially, as the case may be, paid, deemed to have been paid or otherwise satisfied and discharged to the extent that at the time any such payment shall be due, the corresponding principal of and premium, if any, or interest on the 4.25% Senior Notes due 2023 then due shall have been fully or partially paid, deemed to have been paid or otherwise satisfied and discharged.

(b) The Trustee shall conclusively presume that the obligation of the Company to make payments of the principal of and premium, if any, or interest on the Bond of the Twenty-Fourth Series shall have been fully paid, deemed to have been paid or otherwise satisfied and discharged when due unless and until the Trustee shall have received written notice from the 2018 Unsecured Note Trustee stating that the payments of the principal of and premium, if any, or interest on the 4.25% Senior Notes due 2023 specified in such notice were not fully paid, deemed to have been paid or otherwise satisfied and discharged when due and remain unpaid at the date of such notice.

SECTION 5. The form of the Bond of the Twenty-Fourth Series is set forth in Exhibit R hereto and is hereby incorporated herein and made a part hereof.

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 493 of 1367

# ARTICLE XX

## ESTABLISHMENT OF 4.65% FIRST MORTGAGE BOND, COLLATERAL SERIES DUE 2028

SECTION 1. There is hereby created a Twenty-Fifth Series of Bonds to consist of one Bond issued under and secured by the Mortgage Indenture, to be designated as "4.65% Mortgage Bond, Collateral Series Due 2028" of the Company ("Bond of the Twenty-Fifth Series"). The Bond of the Twenty-Fifth Series shall be fully registered in the name of and delivered to the 2018 Unsecured Note Trustee, held in trust for the benefit of the holders from time to time of the 4.65% Senior Notes due 2028 as security for any and all obligations of the Company under the 4.65% Senior Notes due 2028, including but not limited to, (i) the full and prompt payment of the principal of and premium, if any, on the 4.65% Senior Notes due 2028 when and as the same shall become due and payable in accordance with the terms and provisions of the 2018 Unsecured Indenture or the 4.65% Senior Notes due 2028, either at the stated maturity thereof, upon acceleration of the maturity thereof or upon redemption, and (ii) the full and prompt payment of any interest on the 4.65% Senior Notes due 2028, when and as the same shall become due and payable in accordance with the terms and provisions of the 2018 Unsecured Indenture or the 4.65% Senior Notes due 2028.

(a) The Bond of the Twenty-Fifth Series shall be initially issued in the principal amount of $300,000,000, provided that the principal amount of the Bond of the Twenty-Fifth Series actually outstanding as of any particular time shall be equal to the principal amount of the 4.65% Senior Notes due 2028 that at such particular time are outstanding under the 2018 Unsecured Indenture.

(b) The Bond of the Twenty-Fifth Series shall be dated July 1, 2020. The Bond of the Twenty-Fifth Series shall mature on the same date or dates as the 4.65% Senior Notes due 2028, subject to prior redemption.

(c) Interest will accrue on the unpaid portion of the principal of the Bond of the Twenty-Fifth Series from its issue date until the entire principal amount of the Bond of the Twenty-Fifth Series is paid. The Bond of the Twenty-Fifth Series shall bear interest at the rate or rates per annum borne by the 4.65% Senior Notes due 2028 and interest shall be paid on the date or dates on which, and at the same place or places as, interest is payable on the 4.65% Senior Notes due 2028.

(d) The payment or payments of the principal of and premium, if any, on the Bond of the Twenty-Fifth Series shall be equal to the principal of and premium, if any, on the 4.65% Senior Notes due 2028 which is due and payable under the 2018 Unsecured Indenture and shall be payable on the date or dates on which, and at the same place or places as, the principal of and premium, if any, on such 4.65% Senior Notes due 2028.

(e) The Bond of the Twenty-Fifth Series shall be subject to redemption at the same times and in the same amounts as the 4.65% Senior Notes due 2028.

SECTION 2. At such time or times that all or a portion of the principal amount of the 4.65% Senior Notes due 2028 shall be redeemed or otherwise deemed to have been paid, the Company shall deliver a notice to the Trustee in writing specifying the principal amount of the 4.65% Senior Notes due 2028 so redeemed or paid, and the principal amount of the Bond of the Twenty-Fifth Series shall be deemed reduced by such specified principal amount of 4.65% Senior Notes due 2028 so redeemed or paid for all purposes of the Mortgage Indenture.

SECTION 3. The Bond of the Twenty-Fifth Series is not transferable except as may be required to effect a transfer to any successor to the 2018 Unsecured Note Trustee.

SECTION 4. (a) The obligation of the Company to make any payment of the principal of and premium, if any, or interest on the Bond of the Twenty-Fifth Series shall be fully or partially, as the case may be, paid, deemed to have been paid or otherwise satisfied and discharged to the extent that at the time any such payment shall be due, the corresponding principal of and premium, if any, or interest on the 4.65% Senior Notes due 2028 then due shall have been fully or partially paid, deemed to have been paid or otherwise satisfied and discharged.

24

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 494 of 1367

(b) The Trustee shall conclusively presume that the obligation of the Company to make payments of the principal of and premium, if any, or interest on the Bond of the Twenty-Fifth Series shall have been fully paid, deemed to have been paid or otherwise satisfied and discharged when due unless and until the Trustee shall have received written notice from the 2018 Unsecured Note Trustee stating that the payments of the principal of and premium, if any, or interest on the 4.65% Senior Notes due 2028 specified in such notice were not fully paid, deemed to have been paid or otherwise satisfied and discharged when due and remain unpaid at the date of such notice.

SECTION 5. The form of the Bond of the Twenty-Fifth Series is set forth in Exhibit S hereto and is hereby incorporated herein and made a part hereof.

## ARTICLE XXI

### ISSUE OF COLLATERALIZING MORTGAGE BOND

SECTION 1. Each series of the Collateralizing Mortgage Bonds may be executed, authenticated and delivered as permitted by the provisions of Section 5.02, 5.03 or 5.04 of the Mortgage Indenture.

## ARTICLE XXII

### TRUSTEE

SECTION 1. The Trustee shall not be responsible in any manner whatsoever for or in respect of the validity or sufficiency of this Supplemental Indenture or the due execution hereof by the Company, or for or in respect of the recitals and statements contained herein, all of which recitals and statements are made solely by the Company.

Except as herein otherwise provided, no duties, responsibilities or liabilities are assumed, or shall be construed to be assumed, by the Trustee by reason of this Supplemental Indenture other than as set forth in the Mortgage Indenture; and this Supplemental Indenture is executed and accepted on behalf of the Trustee, subject to all the terms and conditions set forth in the Mortgage Indenture, as fully to all intents as if the same were herein set forth at length.

## ARTICLE XXIII

### MISCELLANEOUS

SECTION 1. Except insofar as herein otherwise expressly provided, all the provisions, definitions, terms and conditions of the Mortgage Indenture, as amended, shall be deemed to be incorporated in, and made a part of, this Supplemental Indenture; and the Mortgage Indenture as supplemented and amended by this Supplemental Indenture is in all respects ratified and confirmed; and the Mortgage Indenture and this Supplemental Indenture shall be read, taken and construed as one and the same instrument.

SECTION 2. Nothing in this Supplemental Indenture is intended, or shall be construed to give to any person or corporation, other than the parties hereto and the holders of the Collateralizing Mortgage Bonds issued and to be issued under and in respect of this Supplemental Indenture, or under any covenant, condition or provision herein contained, all the covenants, conditions and provisions of this Supplemental Indenture being intended to be, and being, for the sole and exclusive benefit of the parties hereto and of the holders of the Collateralizing Mortgage Bond issued and to be issued under the Mortgage Indenture and secured thereby.

SECTION 3. All covenants, stipulations and agreements in this Supplemental Indenture contained by or on behalf of the Company shall bind and (subject to the provisions of the Mortgage Indenture) inure to the benefit of its successors and assigns, whether so expressed or not.

SECTION 4. The headings of the several Articles of this Supplemental Indenture are inserted for convenience of reference, and shall not be deemed to be any part hereof.

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 495 of 1367

SECTION 5. This Supplemental Indenture shall be effective upon the execution and delivery hereof by each of the parties hereto.

SECTION 6. This Supplemental Indenture may be executed in any number of counterparts, and each of such counterparts shall together constitute but one and the same instrument. Delivery of an executed Supplemental Indenture by one party to the other may be made by facsimile, electronic mail (including any electronic signature complying with the New York Electronic Signatures and Records Act (N.Y. State Tech. §§ 301-309), as amended from time to time, or other applicable law) or other transmission method, and the parties hereto agree that any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

SECTION 7. The laws of the State of New York shall govern this Supplemental Indenture and the Collateralizing Mortgage Bonds, without giving effect to applicable principles of conflicts of law to the extent that the application of the laws of another jurisdiction would be required thereby.

SECTION 8. In case any provision in this Supplemental Indenture or the Collateralizing Mortgage Bond shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

**IN WITNESS WHEREOF**, the parties hereto have caused this Supplemental Indenture to be duly executed by their respective officers hereunto duly authorized, all as of the day and year first above written.

**PACIFIC GAS AND ELECTRIC COMPANY,**
as Issuer (Mortgagor)

By: /s/ Margaret K. Becker
    Name:  Margaret K. Becker
    Title:   Senior Director and Treasurer

**THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A.,**
as Trustee (Mortgagee)

By: /s/ Charles G. Nelson
    Name:  Charles G. Nelson
    Title:   Vice President

[Signature Page to Supplemental Indenture]

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA          }
                                          }
COUNTY OF SAN FRANCISCO    }

On June 4, before me, Jolie F. Ocampo, personally appeared Margaret K. Becker, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

/s/ Jolie F. Ocampo
_____
Signature

Jolie Franchesca Ocampo
Notary Public – California
San Francisco County
Commission #2221172
My Comm. Expires Dec. 6, 2021

(Seal)

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF FLORIDA                    }
                                   }
COUNTY OF DUVAL                     }

On June 30, 2020, before me, Joshua P. Kakareka, personally appeared Charles G. Nelson, a Vice President of the Bank of New York Mellon Trust Company, N.A. and who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

/s/ Joshua P. Kakareka
_____
Joshua P. Kakareka
Notary Public
State of Florida
Comm# GG931852
Expires 11/13/2023

(Seal)

**EXHIBIT A**

**[FORM OF BOND OF THE SEVENTH SERIES]**

**[FORM OF FACE OF BOND]**

THIS BOND OF THE SEVENTH SERIES IS NOT TRANSFERABLE EXCEPT TO EFFECT A TRANSFER TO ANY SUCCESSOR TRUSTEE PURSUANT TO THE UNSECURED INDENTURE (AS DEFINED HEREIN), SUBJECT TO UNITED STATES SECURITIES LAWS.

THE FOLLOWING SUMMARY OF TERMS IS SUBJECT TO THE INFORMATION SET FORTH ON THE REVERSE HEREOF:

| | | |
|---|---|---|
| PRINCIPAL AMOUNT:<br>$250,000,000 | ORIGINAL ISSUE DATE:<br>July 1, 2020 | INTEREST RATE:<br>4.50% |
| MATURITY DATE:<br>December 15, 2041 | INTEREST PAYMENT DATES:<br>June 15 and December 15 of each year, commencing December 15, 2020 | THIS BOND IS A:<br>[  ] Global Book-Entry Bond<br>[X] Certificated Bond |

REGISTERED OWNER: BOKF, N.A., as Trustee under the Unsecured Note Indenture (as defined herein)

A-1

**PACIFIC GAS AND ELECTRIC COMPANY**
4.50% FIRST MORTGAGE BOND, COLLATERAL SERIES DUE 2041

No. _____                                    Principal Amount: $_____
CUSIP No: _____

PACIFIC GAS AND ELECTRIC COMPANY, a corporation duly organized and existing under the laws of the State of California (herein called the "Company," which term includes any successor Person pursuant to the applicable provisions of the Mortgage Indenture hereinafter referred to), for value received, hereby promises to pay to BOKF, N.A., as trustee (the "Unsecured Note Trustee") under the Amended and Restated Indenture, dated as of April 22, 2005 (the "Original 2005 Unsecured Indenture" and, as heretofore amended and supplemented, the "Unsecured Indenture"), between the Company and the Unsecured Note Trustee, or registered assigns, the Principal Amount stated above on the Maturity Date stated above, and to pay interest thereon from and including the Original Issue Date stated above or, in the case of a 4.50% First Mortgage Bond, Collateral Series Due 2041 issued upon the registration of transfer or exchange, from and including the most recent Interest Payment Date to which interest has been paid or duly provided for, semi-annually in arrears on the Interest Payment Dates set forth above and on the Maturity Date stated above, commencing December 15, 2020, at the rate of 4.50% per annum until the principal hereof is paid or made available for payment; provided that the obligation of the Company to make any payment of the principal of and premium, if any, or interest on this Bond of the Seventh Series shall be fully or partially, as the case may be, paid, deemed to have been paid or otherwise satisfied and discharged to the extent that at the time any such payment shall be due, the then due principal of and premium, if any, or interest on the Company's 4.50% Senior Notes due 2041 issued pursuant to the Unsecured Indenture (the "2041 Notes") shall have been fully or partially paid, deemed to have been paid or otherwise satisfied and discharged.

This Bond of the Seventh Series shall be delivered to the Unsecured Note Trustee to be held in trust for the benefit of the holders from time to time of the 2041 Notes as security for any and all obligations of the Company under the 2041 Notes, including but not limited to, (i) the full and prompt payment of the principal of and premium, if any, on the 2041 Notes when and as the same shall become due and payable in accordance with the terms and provisions of the Unsecured Indenture or the 2041 Notes, either at the stated maturity thereof, upon acceleration of the maturity thereof or upon redemption and (ii) the full and prompt payment of any interest on the 2041 Notes, when and as the same shall become due and payable in accordance with the terms and provisions of the Unsecured Indenture or the 2041 Notes.

REFERENCE IS HEREBY MADE TO THE FURTHER PROVISIONS OF THIS BOND SET FORTH ON THE REVERSE HEREOF, WHICH FURTHER PROVISIONS SHALL FOR ALL PURPOSES HAVE THE SAME EFFECT AS IF SET FORTH AT THIS PLACE.

A-2

Unless the certificate of authentication hereon has been executed by the Trustee referred to on the reverse hereof by manual or electronic signature, this Bond shall not be entitled to any benefit under the Mortgage Indenture or be valid or obligatory for any purpose.

**IN WITNESS WHEREOF**, the Company has caused this instrument to be duly executed.

Dated: _____

<div align="right">

**PACIFIC GAS AND ELECTRIC COMPANY**

By _____

By _____

</div>

A-3

**TRUSTEE'S CERTIFICATE OF AUTHENTICATION**

This is one of the Bonds of the series designated as Bonds of the Seventh Series referred to in the within-mentioned Mortgage Indenture.

_____,
As Trustee

By  _____
Authorized Signatory

A-4

This 4.50% First Mortgage Bond, Collateral Series due 2041 is one of a duly authorized issue of Bonds of the Company (the "Bonds"), issued and issuable in one or more series under and equally secured by an Indenture of Mortgage, dated as of June 19, 2020 (such Indenture of Mortgage as originally executed and delivered and as supplemented or amended from time to time thereafter, together with any constituent instruments establishing the terms of particular Bonds, being herein called the "Mortgage Indenture"), between the Company and The Bank of New York Mellon Trust Company, N.A., as Trustee (herein called the "Trustee," which term includes any successor trustee under the Mortgage Indenture), and reference is hereby made to the Mortgage Indenture for a description of the property mortgaged, pledged and held in trust, the nature and extent of the security and the respective rights, limitations of rights, duties and immunities of the Company, the Trustee and the Holders of Bonds thereunder and of the terms and conditions upon which Bonds are, and are to be, authenticated and delivered. The acceptance of this Bond shall be deemed to constitute the consent and agreement by the Holder hereof to all of the terms and provisions of the Mortgage Indenture.

In the event that all 2041 Notes are no longer outstanding under the Unsecured Indenture, then this Bond or any portion of the principal amount hereof will be deemed to have been paid for all purposes of the Mortgage Indenture and to be no longer Outstanding thereunder, and the Company's entire indebtedness in respect thereof will be satisfied and discharged.

If an Event of Default shall occur and be continuing, the Trustee or the Holders of not less than 25% in aggregate principal amount of the Bonds then Outstanding, considered as one class, may declare the principal amount of all Bonds then Outstanding to be due and payable immediately by notice in writing to the Company (and to the Trustee if given by Holders); *provided*, *however*, that with respect to certain Events of Default relating to bankruptcy, insolvency and similar events, the principal amount of all Bonds then Outstanding shall be due and payable immediately without further action by the Trustee or the Holders.

The Mortgage Indenture permits, with certain exceptions as therein provided, the Company and the Trustee to enter into one or more supplemental indentures for the purpose of adding any provisions to, or changing in any manner or eliminating any of the provisions of, the Mortgage Indenture with the consent of the Holders of not less than a majority in aggregate principal amount of the Bonds at the time Outstanding, considered as one class; *provided*, *however*, that if there shall be Bonds of more than one series Outstanding under the Mortgage Indenture and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such series, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all series so directly affected, considered as one class, shall be required; and *provided*, *further*, that if the Bonds of any series shall have been issued in more than one Tranche and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such Tranches, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all Tranches so directly affected, considered as one class, shall be required; and *provided*, *further*, that the Mortgage Indenture permits the Company and the Trustee to enter into one or more supplemental indentures for certain purposes without the consent of any Holders of Bonds. The Mortgage Indenture also contains provisions permitting the Holders of a majority in aggregate principal amount of Bonds, on behalf of the Holders of all such Bonds, to waive certain past defaults under the Mortgage Indenture and their consequences. Any such consent or waiver by the Holder of this Bond shall be conclusive and binding upon such Holder and upon all future Holders of this Bond and of any Bond issued upon the registration of transfer hereof or in exchange herefor or in lieu hereof, whether or not notation of such consent or waiver is made upon this Bond.

As provided in and subject to the provisions of the Mortgage Indenture, the Holder of this Bond shall not have the right to institute any proceeding with respect to the Mortgage Indenture or for the appointment of a receiver or trustee or for any other remedy thereunder, unless such Holder shall have previously given the Trustee written notice of a continuing Event of Default, the Holders of at least 25% in aggregate principal amount of the Bonds at the time Outstanding shall have made written request to the Trustee to institute proceedings in respect of such Event of Default as Trustee and offered the Trustee reasonable indemnity, and the Trustee shall not have received from the Holders of at least a majority in aggregate principal amount of Bonds at the time Outstanding a direction inconsistent with such written request, and shall have failed to institute any such proceeding for 60 days after receipt of such notice, request and offer of indemnity. The foregoing shall not apply to any suit instituted by the Holder of this Bond for the enforcement of any payment of principal hereof or any premium or interest hereon on or after the respective due dates expressed herein.

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 504 of 1367

No reference herein to the Mortgage Indenture and no provision of this Bond or of the Mortgage Indenture shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal of and any premium and interest on this Bond at the times, place and rate, and in the coin or currency, herein prescribed.

As provided in the Mortgage Indenture and subject to certain limitations therein set forth, the transfer of this Bond (but only as may be required to effect a transfer to any successor to the Unsecured Note Trustee) is registrable in the Bond Register, upon surrender of this Bond for registration of transfer at the office or agency of the Company in any place where the principal of and any premium and interest on this Bond are payable, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Company, the Trustee or the Bond Registrar, as the case may be, duly executed by the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new Bonds of this series and of like tenor, of authorized denominations and for the same aggregate principal amount, will be issued to the designated transferee or transferees.

The Bonds of the Seventh Series are issuable only in registered form without coupons in denominations of $1,000 and any integral multiple thereof.

No service charge shall be made for any such registration of transfer or exchange, but the Company may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

Prior to due presentment of this Bond for registration of transfer, the Company, the Trustee and any agent of the Company or the Trustee may treat the Person in whose name this Bond is registered as the owner hereof for all purposes, whether or not this Bond is overdue, and neither the Company, the Trustee nor any such agent shall be affected by notice to the contrary.

This Bond shall be governed by, and construed and enforced in accordance with, the laws of the State of California without regard to the principles of conflicts of laws thereunder, except to the extent that the Trust Indenture Act shall be applicable.

As provided in the Mortgage Indenture, no recourse shall be had for the payment of the principal of, premium, if any, or interest with respect to this Bond, or any part thereof, or for any claim based hereon or otherwise in respect hereof, or of the indebtedness represented hereby, or upon any obligation, covenant or agreement under the Mortgage Indenture, against any incorporator, shareholder, officer or director, as such, past, present or future, of the Company or of any predecessor or successor corporation (either directly or through the Company or a predecessor or successor corporation), whether by virtue of any constitutional provision, statute or rule of law or by the enforcement of any assessment or penalty or otherwise; it being expressly agreed and understood that the Mortgage Indenture and all the Bonds are solely corporate obligations and that any such personal liability is hereby expressly waived and released as a condition of, and as part of the consideration for, the execution of the Mortgage Indenture and the issuance of this Bond.

All terms used in this Bond which are not defined herein shall have the meanings assigned to them in the Mortgage Indenture.

A-6

**ASSIGNMENT FORM**

To assign this Bond, fill in the form below: (I) or (we) assign and transfer this Bond to_____

_____

(Insert assignee's soc. sec. or tax I.D. no.)

_____

_____

_____

_____

(Print or type assignee's name, address and zip code)

and irrevocably appoint _____
to transfer this Bond on the books of the Company. The agent may substitute another to act for him.

Date: _____

Your signature: _____
(Sign exactly as your name appears on the face of this Bond)

Tax Identification No.:

SIGNATURE GUARANTEE:

_____

Signatures must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Bond Registrar, which requirements include membership or participation in the Security Transfer Agent Medallion Program ("STAMP") or such other "signature guarantee program" as may be determined by the Bond Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

A-7

**[FORM OF BOND OF THE EIGHTH SERIES]**

**[FORM OF FACE OF BOND]**

THIS BOND OF THE EIGHTH SERIES IS NOT TRANSFERABLE EXCEPT TO EFFECT A TRANSFER TO ANY SUCCESSOR TRUSTEE PURSUANT TO THE UNSECURED INDENTURE (AS DEFINED HEREIN), SUBJECT TO UNITED STATES SECURITIES LAWS.

THE FOLLOWING SUMMARY OF TERMS IS SUBJECT TO THE INFORMATION SET FORTH ON THE REVERSE HEREOF:

| PRINCIPAL AMOUNT: | ORIGINAL ISSUE DATE: | INTEREST RATE: |
|---|---|---|
| $400,000,000 | July 1, 2020 | 4.45% |

| MATURITY DATE: | INTEREST PAYMENT DATES: | THIS BOND IS A: |
|---|---|---|
| April 15, 2042 | April 15 and October 15 of each year, commencing October 15, 2020 | ☐ Global Book-Entry Bond<br>☒ Certificated Bond |

REGISTERED OWNER: BOKF, N.A., as Trustee under the Unsecured Note Indenture (as defined herein)

A-1

**PACIFIC GAS AND ELECTRIC COMPANY**
**4.45% FIRST MORTGAGE BOND, COLLATERAL SERIES DUE 2042**

No. _____                                                     Principal Amount: $_____

CUSIP No: _____

     PACIFIC GAS AND ELECTRIC COMPANY, a corporation duly organized and existing under the laws of the State of California (herein called the "Company," which term includes any successor Person pursuant to the applicable provisions of the Mortgage Indenture hereinafter referred to), for value received, hereby promises to pay to BOKF, N.A., as trustee (the "Unsecured Note Trustee") under the Amended and Restated Indenture, dated as of April 22, 2005 (the "Original 2005 Unsecured Indenture" and, as heretofore amended and supplemented, the "Unsecured Indenture"), between the Company and the Unsecured Note Trustee, or registered assigns, the Principal Amount stated above on the Maturity Date stated above, and to pay interest thereon from and including the Original Issue Date stated above or, in the case of a 4.45% First Mortgage Bond, Collateral Series Due 2042 issued upon the registration of transfer or exchange, from and including the most recent Interest Payment Date to which interest has been paid or duly provided for, semi-annually in arrears on the Interest Payment Dates set forth above and on the Maturity Date stated above, commencing October 15, 2020, at the rate of 4.45% per annum until the principal hereof is paid or made available for payment; provided that the obligation of the Company to make any payment of the principal of and premium, if any, or interest on this Bond of the Eighth Series shall be fully or partially, as the case may be, paid, deemed to have been paid or otherwise satisfied and discharged to the extent that at the time any such payment shall be due, the then due principal of and premium, if any, or interest on the Company's 4.45% Senior Notes due 2042 issued pursuant to the Unsecured Indenture (the "2042 Notes") shall have been fully or partially paid, deemed to have been paid or otherwise satisfied and discharged.

     This Bond of the Eighth Series shall be delivered to the Unsecured Note Trustee to be held in trust for the benefit of the holders from time to time of the 2042 Notes as security for any and all obligations of the Company under the 2042 Notes, including but not limited to, (i) the full and prompt payment of the principal of and premium, if any, on the 2042 Notes when and as the same shall become due and payable in accordance with the terms and provisions of the Unsecured Indenture or the 2042 Notes, either at the stated maturity thereof, upon acceleration of the maturity thereof or upon redemption and (ii) the full and prompt payment of any interest on the 2042 Notes, when and as the same shall become due and payable in accordance with the terms and provisions of the Unsecured Indenture or the 2042 Notes.

     REFERENCE IS HEREBY MADE TO THE FURTHER PROVISIONS OF THIS BOND SET FORTH ON THE REVERSE HEREOF, WHICH FURTHER PROVISIONS SHALL FOR ALL PURPOSES HAVE THE SAME EFFECT AS IF SET FORTH AT THIS PLACE.

A-2

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 508 of 1367

Unless the certificate of authentication hereon has been executed by the Trustee referred to on the reverse hereof by manual or electronic signature, this Bond shall not be entitled to any benefit under the Mortgage Indenture or be valid or obligatory for any purpose.

**IN WITNESS WHEREOF**, the Company has caused this instrument to be duly executed.

Dated: _____

**PACIFIC GAS AND ELECTRIC COMPANY**

By _____

By _____

A-3

## TRUSTEE'S CERTIFICATE OF AUTHENTICATION

This is one of the Bonds of the series designated as Bonds of the Eighth Series referred to in the within-mentioned Mortgage Indenture.

_____,
As Trustee

By _____
Authorized Signatory

A-4

**[FORM OF REVERSE OF BOND OF THE EIGHTH SERIES]**

This 4.45% First Mortgage Bond, Collateral Series due 2042 is one of a duly authorized issue of Bonds of the Company (the "Bonds"), issued and issuable in one or more series under [and equally secured by] an Indenture of Mortgage, dated as of June 19, 2020 (such Indenture of Mortgage as originally executed and delivered and as supplemented or amended from time to time thereafter, together with any constituent instruments establishing the terms of particular Bonds, being herein called the "Mortgage Indenture"), between the Company and The Bank of New York Mellon Trust Company, N.A., as Trustee (herein called the "Trustee," which term includes any successor trustee under the Mortgage Indenture), and reference is hereby made to the Mortgage Indenture for a description of the property mortgaged, pledged and held in trust, the nature and extent of the security and the respective rights, limitations of rights, duties and immunities of the Company, the Trustee and the Holders of Bonds thereunder and of the terms and conditions upon which Bonds are, and are to be, authenticated and delivered. The acceptance of this Bond shall be deemed to constitute the consent and agreement by the Holder hereof to all of the terms and provisions of the Mortgage Indenture.

In the event that all 2042 Notes are no longer outstanding under the Unsecured Indenture, then this Bond or any portion of the principal amount hereof will be deemed to have been paid for all purposes of the Mortgage Indenture and to be no longer Outstanding thereunder, and the Company's entire indebtedness in respect thereof will be satisfied and discharged.

If an Event of Default shall occur and be continuing, the Trustee or the Holders of not less than 25% in aggregate principal amount of the Bonds then Outstanding, considered as one class, may declare the principal amount of all Bonds then Outstanding to be due and payable immediately by notice in writing to the Company (and to the Trustee if given by Holders); *provided, however,* that with respect to certain Events of Default relating to bankruptcy, insolvency and similar events, the principal amount of all Bonds then Outstanding shall be due and payable immediately without further action by the Trustee or the Holders.

The Mortgage Indenture permits, with certain exceptions as therein provided, the Company and the Trustee to enter into one or more supplemental indentures for the purpose of adding any provisions to, or changing in any manner or eliminating any of the provisions of, the Mortgage Indenture with the consent of the Holders of not less than a majority in aggregate principal amount of the Bonds at the time Outstanding, considered as one class; *provided, however,* that if there shall be Bonds of more than one series Outstanding under the Mortgage Indenture and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such series, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all series so directly affected, considered as one class, shall be required; and *provided, further,* that if the Bonds of any series shall have been issued in more than one Tranche and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such Tranches, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all Tranches so directly affected, considered as one class, shall be required; and *provided, further,* that the Mortgage Indenture permits the Company and the Trustee to enter into one or more supplemental indentures for certain purposes without the consent of any Holders of Bonds. The Mortgage Indenture also contains provisions permitting the Holders of a majority in aggregate principal amount of Bonds, on behalf of the Holders of all such Bonds, to waive certain past defaults under the Mortgage Indenture and their consequences. Any such consent or waiver by the Holder of this Bond shall be conclusive and binding upon such Holder and upon all future Holders of this Bond and of any Bond issued upon the registration of transfer hereof or in exchange herefor or in lieu hereof, whether or not notation of such consent or waiver is made upon this Bond.

As provided in and subject to the provisions of the Mortgage Indenture, the Holder of this Bond shall not have the right to institute any proceeding with respect to the Mortgage Indenture or for the appointment of a receiver or trustee or for any other remedy thereunder, unless such Holder shall have previously given the Trustee written notice of a continuing Event of Default, the Holders of at least 25% in aggregate principal amount of the Bonds at the time Outstanding shall have made written request to the Trustee to institute proceedings in respect of such Event of Default as Trustee and offered the Trustee reasonable indemnity, and the Trustee shall not have received from the Holders of at least a majority in aggregate principal amount of Bonds at the time Outstanding a direction inconsistent with such written request, and shall have failed to institute any such proceeding for 60 days after receipt of such notice, request and offer of indemnity. The foregoing shall not apply to any suit instituted by the Holder of this Bond for the enforcement of any payment of principal hereof or any premium or interest hereon on or after the respective due dates expressed herein.

A-5

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 511 of 1367

No reference herein to the Mortgage Indenture and no provision of this Bond or of the Mortgage Indenture shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal of and any premium and interest on this Bond at the times, place and rate, and in the coin or currency, herein prescribed.

As provided in the Mortgage Indenture and subject to certain limitations therein set forth, the transfer of this Bond (but only as may be required to effect a transfer to any successor to the Unsecured Note Trustee) is registrable in the Bond Register, upon surrender of this Bond for registration of transfer at the office or agency of the Company in any place where the principal of and any premium and interest on this Bond are payable, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Company, the Trustee or the Bond Registrar, as the case may be, duly executed by the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new Bonds of this series and of like tenor, of authorized denominations and for the same aggregate principal amount, will be issued to the designated transferee or transferees.

The Bonds of the Eighth Series are issuable only in registered form without coupons in denominations of $1,000 and any integral multiple thereof.

No service charge shall be made for any such registration of transfer or exchange, but the Company may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

Prior to due presentment of this Bond for registration of transfer, the Company, the Trustee and any agent of the Company or the Trustee may treat the Person in whose name this Bond is registered as the owner hereof for all purposes, whether or not this Bond is overdue, and neither the Company, the Trustee nor any such agent shall be affected by notice to the contrary.

This Bond shall be governed by, and construed and enforced in accordance with, the laws of the State of California without regard to the principles of conflicts of laws thereunder, except to the extent that the Trust Indenture Act shall be applicable.

As provided in the Mortgage Indenture, no recourse shall be had for the payment of the principal of, premium, if any, or interest with respect to this Bond, or any part thereof, or for any claim based hereon or otherwise in respect hereof, or of the indebtedness represented hereby, or upon any obligation, covenant or agreement under the Mortgage Indenture, against any incorporator, shareholder, officer or director, as such, past, present or future, of the Company or of any predecessor or successor corporation (either directly or through the Company or a predecessor or successor corporation), whether by virtue of any constitutional provision, statute or rule of law or by the enforcement of any assessment or penalty or otherwise; it being expressly agreed and understood that the Mortgage Indenture and all the Bonds are solely corporate obligations and that any such personal liability is hereby expressly waived and released as a condition of, and as part of the consideration for, the execution of the Mortgage Indenture and the issuance of this Bond.

All terms used in this Bond which are not defined herein shall have the meanings assigned to them in the Mortgage Indenture.

A-6

**ASSIGNMENT FORM**

To assign this Bond, fill in the form below: (I) or (we) assign and transfer this Bond to _____

_____

(Insert assignee's soc. sec. or tax I.D. no.)

_____

_____

_____

_____

(Print or type assignee's name, address and zip code)

and irrevocably appoint _____

to transfer this Bond on the books of the Company. The agent may substitute another to act for him.

Date: _____

Your signature: _____
(Sign exactly as your name appears on the face of this Bond)

Tax Identification No.:

SIGNATURE GUARANTEE:

_____

Signatures must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Bond Registrar, which requirements include membership or participation in the Security Transfer Agent Medallion Program ("STAMP") or such other "signature guarantee program" as may be determined by the Bond Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

A-7

**EXHIBIT C**

**[FORM OF BOND OF THE NINTH SERIES]**

**[FORM OF FACE OF BOND]**

THIS BOND OF THE NINTH SERIES IS NOT TRANSFERABLE EXCEPT TO EFFECT A TRANSFER TO ANY SUCCESSOR TRUSTEE PURSUANT TO THE UNSECURED INDENTURE (AS DEFINED HEREIN), SUBJECT TO UNITED STATES SECURITIES LAWS.

THE FOLLOWING SUMMARY OF TERMS IS SUBJECT TO THE INFORMATION SET FORTH ON THE REVERSE HEREOF:

| | | |
|---|---|---|
| PRINCIPAL AMOUNT:<br>$350,000,000 | ORIGINAL ISSUE DATE:<br>July 1, 2020 | INTEREST RATE:<br>3.75% |
| MATURITY DATE:<br>August 15, 2042 | INTEREST PAYMENT DATES:<br>February 15 and August 15 of each year,<br>commencing August 15, 2020 | THIS BOND IS A:<br>☐ Global Book-Entry Bond<br>☒ Certificated Bond |

REGISTERED OWNER: BOKF, N.A., as Trustee under the Unsecured Note Indenture (as defined herein)

# PACIFIC GAS AND ELECTRIC COMPANY

## 3.75% FIRST MORTGAGE BOND, COLLATERAL SERIES DUE 2042

No. _____           Principal Amount: $_____

CUSIP No: _____

PACIFIC GAS AND ELECTRIC COMPANY, a corporation duly organized and existing under the laws of the State of California (herein called the "Company," which term includes any successor Person pursuant to the applicable provisions of the Mortgage Indenture hereinafter referred to), for value received, hereby promises to pay to BOKF, N.A., as trustee (the "Unsecured Note Trustee") under the Amended and Restated Indenture, dated as of April 22, 2005 (the "Original 2005 Unsecured Indenture" and, as heretofore amended and supplemented, the "Unsecured Indenture"), between the Company and the Unsecured Note Trustee, or registered assigns, the Principal Amount stated above on the Maturity Date stated above, and to pay interest thereon from and including the Original Issue Date stated above or, in the case of a 3.75% First Mortgage Bond, Collateral Series Due 2042 issued upon the registration of transfer or exchange, from and including the most recent Interest Payment Date to which interest has been paid or duly provided for, semi-annually in arrears on the Interest Payment Dates set forth above and on the Maturity Date stated above, commencing August 15, 2020, at the rate of 3.75% per annum until the principal hereof is paid or made available for payment; provided that the obligation of the Company to make any payment of the principal of and premium, if any, or interest on this Bond of the Ninth Series shall be fully or partially, as the case may be, paid, deemed to have been paid or otherwise satisfied and discharged to the extent that at the time any such payment shall be due, the then due principal of and premium, if any, or interest on the Company's 3.75% Senior Notes due 2042 issued pursuant to the Unsecured Indenture (the "2042 Notes") shall have been fully or partially paid, deemed to have been paid or otherwise satisfied and discharged.

This Bond of the Ninth Series shall be delivered to the Unsecured Note Trustee to be held in trust for the benefit of the holders from time to time of the 2042 Notes as security for any and all obligations of the Company under the 2042 Notes, including but not limited to, (i) the full and prompt payment of the principal of and premium, if any, on the 2042 Notes when and as the same shall become due and payable in accordance with the terms and provisions of the Unsecured Indenture or the 2042 Notes, either at the stated maturity thereof, upon acceleration of the maturity thereof or upon redemption and (ii) the full and prompt payment of any interest on the 2042 Notes, when and as the same shall become due and payable in accordance with the terms and provisions of the Unsecured Indenture or the 2042 Notes.

REFERENCE IS HEREBY MADE TO THE FURTHER PROVISIONS OF THIS BOND SET FORTH ON THE REVERSE HEREOF, WHICH FURTHER PROVISIONS SHALL FOR ALL PURPOSES HAVE THE SAME EFFECT AS IF SET FORTH AT THIS PLACE.

Unless the certificate of authentication hereon has been executed by the Trustee referred to on the reverse hereof by manual or electronic signature, this Bond shall not be entitled to any benefit under the Mortgage Indenture or be valid or obligatory for any purpose.

**IN WITNESS WHEREOF**, the Company has caused this instrument to be duly executed.

Dated: _____

**PACIFIC GAS AND ELECTRIC COMPANY**

By _____

By _____

**TRUSTEE'S CERTIFICATE OF AUTHENTICATION**

This is one of the Bonds of the series designated as Bonds of the Ninth Series referred to in the within-mentioned Mortgage Indenture.

_____,
As Trustee

By _____
Authorized Signatory

**[FORM OF REVERSE OF BOND OF THE NINTH SERIES]**

This 3.75% First Mortgage Bond, Collateral Series due 2042 is one of a duly authorized issue of Bonds of the Company (the "Bonds"), issued and issuable in one or more series under and equally secured by an Indenture of Mortgage, dated as of June 19, 2020 (such Indenture of Mortgage as originally executed and delivered and as supplemented or amended from time to time thereafter, together with any constituent instruments establishing the terms of particular Bonds, being herein called the "Mortgage Indenture"), between the Company and The Bank of New York Mellon Trust Company, N.A., as Trustee (herein called the "Trustee," which term includes any successor trustee under the Mortgage Indenture), and reference is hereby made to the Mortgage Indenture for a description of the property mortgaged, pledged and held in trust, the nature and extent of the security and the respective rights, limitations of rights, duties and immunities of the Company, the Trustee and the Holders of Bonds thereunder and of the terms and conditions upon which Bonds are, and are to be, authenticated and delivered. The acceptance of this Bond shall be deemed to constitute the consent and agreement by the Holder hereof to all of the terms and provisions of the Mortgage Indenture.

In the event that all 2042 Notes are no longer outstanding under the Unsecured Indenture, then this Bond or any portion of the principal amount hereof will be deemed to have been paid for all purposes of the Mortgage Indenture and to be no longer Outstanding thereunder, and the Company's entire indebtedness in respect thereof will be satisfied and discharged.

If an Event of Default shall occur and be continuing, the Trustee or the Holders of not less than 25% in aggregate principal amount of the Bonds then Outstanding, considered as one class, may declare the principal amount of all Bonds then Outstanding to be due and payable immediately by notice in writing to the Company (and to the Trustee if given by Holders); *provided, however*, that with respect to certain Events of Default relating to bankruptcy, insolvency and similar events, the principal amount of all Bonds then Outstanding shall be due and payable immediately without further action by the Trustee or the Holders.

The Mortgage Indenture permits, with certain exceptions as therein provided, the Company and the Trustee to enter into one or more supplemental indentures for the purpose of adding any provisions to, or changing in any manner or eliminating any of the provisions of, the Mortgage Indenture with the consent of the Holders of not less than a majority in aggregate principal amount of the Bonds at the time Outstanding, considered as one class; *provided, however*, that if there shall be Bonds of more than one series Outstanding under the Mortgage Indenture and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such series, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all series so directly affected, considered as one class, shall be required; and *provided, further*, that if the Bonds of any series shall have been issued in more than one Tranche and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such Tranches, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all Tranches so directly affected, considered as one class, shall be required; and *provided, further*, that the Mortgage Indenture permits the Company and the Trustee to enter into one or more supplemental indentures for certain purposes without the consent of any Holders of Bonds. The Mortgage Indenture also contains provisions permitting the Holders of a majority in aggregate principal amount of Bonds, on behalf of the Holders of all such Bonds, to waive certain past defaults under the Mortgage Indenture and their consequences. Any such consent or waiver by the Holder of this Bond shall be conclusive and binding upon such Holder and upon all future Holders of this Bond and of any Bond issued upon the registration of transfer hereof or in exchange herefor or in lieu hereof, whether or not notation of such consent or waiver is made upon this Bond.

As provided in and subject to the provisions of the Mortgage Indenture, the Holder of this Bond shall not have the right to institute any proceeding with respect to the Mortgage Indenture or for the appointment of a receiver or trustee or for any other remedy thereunder, unless such Holder shall have previously given the Trustee written notice of a continuing Event of Default, the Holders of at least 25% in aggregate principal amount of the Bonds at the time Outstanding shall have made written request to the Trustee to institute proceedings in respect of such Event of Default as Trustee and offered the Trustee reasonable indemnity, and the Trustee shall not have received from the Holders of at least a majority in aggregate principal amount of Bonds at the time Outstanding a direction inconsistent with such written request, and shall have failed to institute any such proceeding for 60 days after receipt of such notice, request and offer of indemnity. The foregoing shall not apply to any suit instituted by the Holder of this Bond for the enforcement of any payment of principal hereof or any premium or interest hereon on or after the respective due dates expressed herein.

No reference herein to the Mortgage Indenture and no provision of this Bond or of the Mortgage Indenture shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal of and any premium and interest on this Bond at the times, place and rate, and in the coin or currency, herein prescribed.

As provided in the Mortgage Indenture and subject to certain limitations therein set forth, the transfer of this Bond (but only as may be required to effect a transfer to any successor to the Unsecured Note Trustee) is registrable in the Bond Register, upon surrender of this Bond for registration of transfer at the office or agency of the Company in any place where the principal of and any premium and interest on this Bond are payable, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Company, the Trustee or the Bond Registrar, as the case may be, duly executed by the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new Bonds of this series and of like tenor, of authorized denominations and for the same aggregate principal amount, will be issued to the designated transferee or transferees.

The Bonds of the Ninth Series are issuable only in registered form without coupons in denominations of $1,000 and any integral multiple thereof.

No service charge shall be made for any such registration of transfer or exchange, but the Company may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

Prior to due presentment of this Bond for registration of transfer, the Company, the Trustee and any agent of the Company or the Trustee may treat the Person in whose name this Bond is registered as the owner hereof for all purposes, whether or not this Bond is overdue, and neither the Company, the Trustee nor any such agent shall be affected by notice to the contrary.

This Bond shall be governed by, and construed and enforced in accordance with, the laws of the State of California without regard to the principles of conflicts of laws thereunder, except to the extent that the Trust Indenture Act shall be applicable.

As provided in the Mortgage Indenture, no recourse shall be had for the payment of the principal of, premium, if any, or interest with respect to this Bond, or any part thereof, or for any claim based hereon or otherwise in respect hereof, or of the indebtedness represented hereby, or upon any obligation, covenant or agreement under the Mortgage Indenture, against any incorporator, shareholder, officer or director, as such, past, present or future, of the Company or of any predecessor or successor corporation (either directly or through the Company or a predecessor or successor corporation), whether by virtue of any constitutional provision, statute or rule of law or by the enforcement of any assessment or penalty or otherwise; it being expressly agreed and understood that the Mortgage Indenture and all the Bonds are solely corporate obligations and that any such personal liability is hereby expressly waived and released as a condition of, and as part of the consideration for, the execution of the Mortgage Indenture and the issuance of this Bond.

All terms used in this Bond which are not defined herein shall have the meanings assigned to them in the Mortgage Indenture.

**ASSIGNMENT FORM**

To assign this Bond, fill in the form below: (I) or (we) assign and transfer this Bond to_____

_____

(Insert assignee's soc. sec. or tax I.D. no.)

_____

_____

_____

_____

(Print or type assignee's name, address and zip code)

and irrevocably appoint _____
to transfer this Bond on the books of the Company. The agent may substitute another to act for him.

Date: _____

Your signature: _____
(Sign exactly as your name appears on the face of this Bond)

Tax Identification No.:

SIGNATURE GUARANTEE:

_____

Signatures must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Bond Registrar, which requirements include membership or participation in the Security Transfer Agent Medallion Program ("STAMP") or such other "signature guarantee program" as may be determined by the Bond Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

**EXHIBIT D**

**[FORM OF BOND OF THE TENTH SERIES]**

**[FORM OF FACE OF BOND]**

THIS BOND OF THE TENTH SERIES IS NOT TRANSFERABLE EXCEPT TO EFFECT A TRANSFER TO ANY SUCCESSOR TRUSTEE PURSUANT TO THE UNSECURED INDENTURE (AS DEFINED HEREIN), SUBJECT TO UNITED STATES SECURITIES LAWS.

THE FOLLOWING SUMMARY OF TERMS IS SUBJECT TO THE INFORMATION SET FORTH ON THE REVERSE HEREOF:

PRINCIPAL AMOUNT:
$375,000,000

ORIGINAL ISSUE DATE:
July 1, 2020

INTEREST RATE:
3.25%

MATURITY DATE:
June 15, 2023

INTEREST PAYMENT DATES:
June 15 and December 15 of each year, commencing December 15, 2020

THIS BOND IS A:
☐ Global Book-Entry Bond
☒ Certificated Bond

REGISTERED OWNER: BOKF, N.A., as Trustee under the Unsecured Note Indenture (as defined herein)

<div align="center">**PACIFIC GAS AND ELECTRIC COMPANY**</div>

<div align="center">3.25% FIRST MORTGAGE BOND, COLLATERAL SERIES DUE 2023</div>

No. _____                                                    Principal Amount: $_____

CUSIP No: _____

PACIFIC GAS AND ELECTRIC COMPANY, a corporation duly organized and existing under the laws of the State of California (herein called the "Company," which term includes any successor Person pursuant to the applicable provisions of the Mortgage Indenture hereinafter referred to), for value received, hereby promises to pay to BOKF, N.A., as trustee (the "Unsecured Note Trustee") under the Amended and Restated Indenture, dated as of April 22, 2005 (the "Original 2005 Unsecured Indenture" and, as heretofore amended and supplemented, the "Unsecured Indenture"), between the Company and the Unsecured Note Trustee, or registered assigns, the Principal Amount stated above on the Maturity Date stated above, and to pay interest thereon from and including the Original Issue Date stated above or, in the case of a 3.25% First Mortgage Bond, Collateral Series Due 2023 issued upon the registration of transfer or exchange, from and including the most recent Interest Payment Date to which interest has been paid or duly provided for, semi-annually in arrears on the Interest Payment Dates set forth above and on the Maturity Date stated above, commencing June 19, 2020, at the rate of 3.25% per annum until the principal hereof is paid or made available for payment; provided that the obligation of the Company to make any payment of the principal of and premium, if any, or interest on this Bond of the Tenth Series shall be fully or partially, as the case may be, paid, deemed to have been paid or otherwise satisfied and discharged to the extent that at the time any such payment shall be due, the then due principal of and premium, if any, or interest on the Company's 3.25% Senior Notes due 2023 issued pursuant to the Unsecured Indenture (the "2023 Notes") shall have been fully or partially paid, deemed to have been paid or otherwise satisfied and discharged.

This Bond of the Tenth Series shall be delivered to the Unsecured Note Trustee to be held in trust for the benefit of the holders from time to time of the 2023 Notes as security for any and all obligations of the Company under the 2023 Notes, including but not limited to, (i) the full and prompt payment of the principal of and premium, if any, on the 2023 Notes when and as the same shall become due and payable in accordance with the terms and provisions of the Unsecured Indenture or the 2023 Notes, either at the stated maturity thereof, upon acceleration of the maturity thereof or upon redemption and (ii) the full and prompt payment of any interest on the 2023 Notes, when and as the same shall become due and payable in accordance with the terms and provisions of the Unsecured Indenture or the 2023 Notes.

REFERENCE IS HEREBY MADE TO THE FURTHER PROVISIONS OF THIS BOND SET FORTH ON THE REVERSE HEREOF, WHICH FURTHER PROVISIONS SHALL FOR ALL PURPOSES HAVE THE SAME EFFECT AS IF SET FORTH AT THIS PLACE.

Unless the certificate of authentication hereon has been executed by the Trustee referred to on the reverse hereof by manual or electronic signature, this Bond shall not be entitled to any benefit under the Mortgage Indenture or be valid or obligatory for any purpose.

**IN WITNESS WHEREOF**, the Company has caused this instrument to be duly executed.

Dated: _____

<div align="right">

**PACIFIC GAS AND ELECTRIC COMPANY**

By _____

By _____

</div>

**TRUSTEE'S CERTIFICATE OF AUTHENTICATION**

This is one of the Bonds of the series designated as Bonds of the Tenth Series referred to in the within-mentioned Mortgage Indenture.

_____ ,
As Trustee

By _____
Authorized Signatory

## [FORM OF REVERSE OF BOND OF THE TENTH SERIES]

This 3.25% First Mortgage Bond, Collateral Series due 2023 is one of a duly authorized issue of Bonds of the Company (the "Bonds"), issued and issuable in one or more series under and equally secured by an Indenture of Mortgage, dated as of June 19, 2020 (such Indenture of Mortgage as originally executed and delivered and as supplemented or amended from time to time thereafter, together with any constituent instruments establishing the terms of particular Bonds, being herein called the "Mortgage Indenture"), between the Company and The Bank of New York Mellon Trust Company, N.A., as Trustee (herein called the "Trustee," which term includes any successor trustee under the Mortgage Indenture), and reference is hereby made to the Mortgage Indenture for a description of the property mortgaged, pledged and held in trust, the nature and extent of the security and the respective rights, limitations of rights, duties and immunities of the Company, the Trustee and the Holders of Bonds thereunder and of the terms and conditions upon which Bonds are, and are to be, authenticated and delivered. The acceptance of this Bond shall be deemed to constitute the consent and agreement by the Holder hereof to all of the terms and provisions of the Mortgage Indenture.

In the event that all 2023 Notes are no longer outstanding under the Unsecured Indenture, then this Bond or any portion of the principal amount hereof will be deemed to have been paid for all purposes of the Mortgage Indenture and to be no longer Outstanding thereunder, and the Company's entire indebtedness in respect thereof will be satisfied and discharged.

If an Event of Default shall occur and be continuing, the Trustee or the Holders of not less than 25% in aggregate principal amount of the Bonds then Outstanding, considered as one class, may declare the principal amount of all Bonds then Outstanding to be due and payable immediately by notice in writing to the Company (and to the Trustee if given by Holders); *provided*, *however*, that with respect to certain Events of Default relating to bankruptcy, insolvency and similar events, the principal amount of all Bonds then Outstanding shall be due and payable immediately without further action by the Trustee or the Holders.

The Mortgage Indenture permits, with certain exceptions as therein provided, the Company and the Trustee to enter into one or more supplemental indentures for the purpose of adding any provisions to, or changing in any manner or eliminating any of the provisions of, the Mortgage Indenture with the consent of the Holders of not less than a majority in aggregate principal amount of the Bonds at the time Outstanding, considered as one class; *provided*, *however*, that if there shall be Bonds of more than one series Outstanding under the Mortgage Indenture and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such series, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all series so directly affected, considered as one class, shall be required; and *provided, further*, that if the Bonds of any series shall have been issued in more than one Tranche and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such Tranches, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all Tranches so directly affected, considered as one class, shall be required; and *provided, further*, that the Mortgage Indenture permits the Company and the Trustee to enter into one or more supplemental indentures for certain purposes without the consent of any Holders of Bonds. The Mortgage Indenture also contains provisions permitting the Holders of a majority in aggregate principal amount of Bonds, on behalf of the Holders of all such Bonds, to waive certain past defaults under the Mortgage Indenture and their consequences. Any such consent or waiver by the Holder of this Bond shall be conclusive and binding upon such Holder and upon all future Holders of this Bond and of any Bond issued upon the registration of transfer hereof or in exchange herefor or in lieu hereof, whether or not notation of such consent or waiver is made upon this Bond.

As provided in and subject to the provisions of the Mortgage Indenture, the Holder of this Bond shall not have the right to institute any proceeding with respect to the Mortgage Indenture or for the appointment of a receiver or trustee or for any other remedy thereunder, unless such Holder shall have previously given the Trustee written notice of a continuing Event of Default, the Holders of at least 25% in aggregate principal amount of the Bonds at the time Outstanding shall have made written request to the Trustee to institute proceedings in respect of such Event of Default as Trustee and offered the Trustee reasonable indemnity, and the Trustee shall not have received from the Holders of at least a majority in aggregate principal amount of Bonds at the time Outstanding a direction inconsistent with such written request, and shall have failed to institute any such proceeding for 60 days after receipt of such notice, request and offer of indemnity. The foregoing shall not apply to any suit instituted by the Holder of this Bond for the enforcement of any payment of principal hereof or any premium or interest hereon on or after the respective due dates expressed herein.

No reference herein to the Mortgage Indenture and no provision of this Bond or of the Mortgage Indenture shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal of and any premium and interest on this Bond at the times, place and rate, and in the coin or currency, herein prescribed.

As provided in the Mortgage Indenture and subject to certain limitations therein set forth, the transfer of this Bond (but only as may be required to effect a transfer to any successor to the Unsecured Note Trustee) is registrable in the Bond Register, upon surrender of this Bond for registration of transfer at the office or agency of the Company in any place where the principal of and any premium and interest on this Bond are payable, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Company, the Trustee or the Bond Registrar, as the case may be, duly executed by the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new Bonds of this series and of like tenor, of authorized denominations and for the same aggregate principal amount, will be issued to the designated transferee or transferees.

The Bonds of the Tenth Series are issuable only in registered form without coupons in denominations of $1,000 and any integral multiple thereof.

No service charge shall be made for any such registration of transfer or exchange, but the Company may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

Prior to due presentment of this Bond for registration of transfer, the Company, the Trustee and any agent of the Company or the Trustee may treat the Person in whose name this Bond is registered as the owner hereof for all purposes, whether or not this Bond is overdue, and neither the Company, the Trustee nor any such agent shall be affected by notice to the contrary.

This Bond shall be governed by, and construed and enforced in accordance with, the laws of the State of California without regard to the principles of conflicts of laws thereunder, except to the extent that the Trust Indenture Act shall be applicable.

As provided in the Mortgage Indenture, no recourse shall be had for the payment of the principal of, premium, if any, or interest with respect to this Bond, or any part thereof, or for any claim based hereon or otherwise in respect hereof, or of the indebtedness represented hereby, or upon any obligation, covenant or agreement under the Mortgage Indenture, against any incorporator, shareholder, officer or director, as such, past, present or future, of the Company or of any predecessor or successor corporation (either directly or through the Company or a predecessor or successor corporation), whether by virtue of any constitutional provision, statute or rule of law or by the enforcement of any assessment or penalty or otherwise; it being expressly agreed and understood that the Mortgage Indenture and all the Bonds are solely corporate obligations and that any such personal liability is hereby expressly waived and released as a condition of, and as part of the consideration for, the execution of the Mortgage Indenture and the issuance of this Bond.

All terms used in this Bond which are not defined herein shall have the meanings assigned to them in the Mortgage Indenture.

**ASSIGNMENT FORM**

To assign this Bond, fill in the form below: (I) or (we) assign and transfer this Bond to _____

_____

(Insert assignee's soc. sec. or tax I.D. no.)

_____

_____

_____

_____

(Print or type assignee's name, address and zip code)

and irrevocably appoint _____
to transfer this Bond on the books of the Company. The agent may substitute another to act for him.

Date: _____

Your signature: _____
(Sign exactly as your name appears on the face of this Bond)

Tax Identification No.:

SIGNATURE GUARANTEE:

_____

Signatures must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Bond Registrar, which requirements include membership or participation in the Security Transfer Agent Medallion Program ("STAMP") or such other "signature guarantee program" as may be determined by the Bond Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

**EXHIBIT E**

**[FORM OF BOND OF THE ELEVENTH SERIES]**

**[FORM OF FACE OF BOND]**

THIS BOND OF THE ELEVENTH SERIES IS NOT TRANSFERABLE EXCEPT TO EFFECT A TRANSFER TO ANY SUCCESSOR TRUSTEE PURSUANT TO THE UNSECURED INDENTURE (AS DEFINED HEREIN), SUBJECT TO UNITED STATES SECURITIES LAWS.

THE FOLLOWING SUMMARY OF TERMS IS SUBJECT TO THE INFORMATION SET FORTH ON THE REVERSE HEREOF:

PRINCIPAL AMOUNT:
$375,000,000

ORIGINAL ISSUE DATE:
July 1, 2020

INTEREST RATE:
4.60%

MATURITY DATE:
June 15, 2043

INTEREST PAYMENT DATES:
June 15 and December 15 of each year, commencing December 15, 2020

THIS BOND IS A:
☐ Global Book-Entry Bond
☒ Certificated Bond

REGISTERED OWNER: BOKF, N.A., as Trustee under the Unsecured Note Indenture (as defined herein)

# PACIFIC GAS AND ELECTRIC COMPANY
## 4.60% FIRST MORTGAGE BOND, COLLATERAL SERIES DUE 2043

No. _____                                                                                      Principal Amount: $_____

CUSIP No: _____

PACIFIC GAS AND ELECTRIC COMPANY, a corporation duly organized and existing under the laws of the State of California (herein called the "Company," which term includes any successor Person pursuant to the applicable provisions of the Mortgage Indenture hereinafter referred to), for value received, hereby promises to pay to BOKF, N.A., as trustee (the "Unsecured Note Trustee") under the Amended and Restated Indenture, dated as of April 22, 2005 (the "Original 2005 Unsecured Indenture" and, as heretofore amended and supplemented, the "Unsecured Indenture"), between the Company and the Unsecured Note Trustee, or registered assigns, the Principal Amount stated above on the Maturity Date stated above, and to pay interest thereon from and including the Original Issue Date stated above or, in the case of a 4.60% First Mortgage Bond, Collateral Series Due 2043 issued upon the registration of transfer or exchange, from and including the most recent Interest Payment Date to which interest has been paid or duly provided for, semi-annually in arrears on the Interest Payment Dates set forth above and on the Maturity Date stated above, commencing December 15, 2020, at the rate of 4.60% per annum until the principal hereof is paid or made available for payment; provided that the obligation of the Company to make any payment of the principal of and premium, if any, or interest on this Bond of the Eleventh Series shall be fully or partially, as the case may be, paid, deemed to have been paid or otherwise satisfied and discharged to the extent that at the time any such payment shall be due, the then due principal of and premium, if any, or interest on the Company's 4.60% Senior Notes due 2043 issued pursuant to the Unsecured Indenture (the "2043 Notes") shall have been fully or partially paid, deemed to have been paid or otherwise satisfied and discharged.

This Bond of the Eleventh Series shall be delivered to the Unsecured Note Trustee to be held in trust for the benefit of the holders from time to time of the 2043 Notes as security for any and all obligations of the Company under the 2043 Notes, including but not limited to, (i) the full and prompt payment of the principal of and premium, if any, on the 2043 Notes when and as the same shall become due and payable in accordance with the terms and provisions of the Unsecured Indenture or the 2043 Notes, either at the stated maturity thereof, upon acceleration of the maturity thereof or upon redemption and (ii) the full and prompt payment of any interest on the 2043 Notes, when and as the same shall become due and payable in accordance with the terms and provisions of the Unsecured Indenture or the 2043 Notes.

REFERENCE IS HEREBY MADE TO THE FURTHER PROVISIONS OF THIS BOND SET FORTH ON THE REVERSE HEREOF, WHICH FURTHER PROVISIONS SHALL FOR ALL PURPOSES HAVE THE SAME EFFECT AS IF SET FORTH AT THIS PLACE.

Unless the certificate of authentication hereon has been executed by the Trustee referred to on the reverse hereof by manual or electronic signature, this Bond shall not be entitled to any benefit under the Mortgage Indenture or be valid or obligatory for any purpose.

**IN WITNESS WHEREOF**, the Company has caused this instrument to be duly executed.

Dated: _____

<div align="right">

**PACIFIC GAS AND ELECTRIC COMPANY**

By _____

By _____

</div>

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 530 of 1367

**TRUSTEE'S CERTIFICATE OF AUTHENTICATION**

This is one of the Bonds of the series designated as Bonds of the Eleventh Series referred to in the within-mentioned Mortgage Indenture.

_____,
As Trustee

By _____
Authorized Signatory

**[FORM OF REVERSE OF BOND OF THE ELEVENTH SERIES]**

This 4.60% First Mortgage Bond, Collateral Series due 2043 is one of a duly authorized issue of Bonds of the Company (the "Bonds"), issued and issuable in one or more series under and equally secured by an Indenture of Mortgage, dated as of June 19, 2020 (such Indenture of Mortgage as originally executed and delivered and as supplemented or amended from time to time thereafter, together with any constituent instruments establishing the terms of particular Bonds, being herein called the "Mortgage Indenture"), between the Company and The Bank of New York Mellon Trust Company, N.A., as Trustee (herein called the "Trustee," which term includes any successor trustee under the Mortgage Indenture), and reference is hereby made to the Mortgage Indenture for a description of the property mortgaged, pledged and held in trust, the nature and extent of the security and the respective rights, limitations of rights, duties and immunities of the Company, the Trustee and the Holders of Bonds thereunder and of the terms and conditions upon which Bonds are, and are to be, authenticated and delivered. The acceptance of this Bond shall be deemed to constitute the consent and agreement by the Holder hereof to all of the terms and provisions of the Mortgage Indenture.

In the event that all 2043 Notes are no longer outstanding under the Unsecured Indenture, then this Bond or any portion of the principal amount hereof will be deemed to have been paid for all purposes of the Mortgage Indenture and to be no longer Outstanding thereunder, and the Company's entire indebtedness in respect thereof will be satisfied and discharged.

If an Event of Default shall occur and be continuing, the Trustee or the Holders of not less than 25% in aggregate principal amount of the Bonds then Outstanding, considered as one class, may declare the principal amount of all Bonds then Outstanding to be due and payable immediately by notice in writing to the Company (and to the Trustee if given by Holders); *provided, however,* that with respect to certain Events of Default relating to bankruptcy, insolvency and similar events, the principal amount of all Bonds then Outstanding shall be due and payable immediately without further action by the Trustee or the Holders.

The Mortgage Indenture permits, with certain exceptions as therein provided, the Company and the Trustee to enter into one or more supplemental indentures for the purpose of adding any provisions to, or changing in any manner or eliminating any of the provisions of, the Mortgage Indenture with the consent of the Holders of not less than a majority in aggregate principal amount of the Bonds at the time Outstanding, considered as one class; *provided, however,* that if there shall be Bonds of more than one series Outstanding under the Mortgage Indenture and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such series, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all series so directly affected, considered as one class, shall be required; and *provided, further,* that if the Bonds of any series shall have been issued in more than one Tranche and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such Tranches, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all Tranches so directly affected, considered as one class, shall be required; and *provided, further,* that the Mortgage Indenture permits the Company and the Trustee to enter into one or more supplemental indentures for certain purposes without the consent of any Holders of Bonds. The Mortgage Indenture also contains provisions permitting the Holders of a majority in aggregate principal amount of Bonds, on behalf of the Holders of all such Bonds, to waive certain past defaults under the Mortgage Indenture and their consequences. Any such consent or waiver by the Holder of this Bond shall be conclusive and binding upon such Holder and upon all future Holders of this Bond and of any Bond issued upon the registration of transfer hereof or in exchange herefor or in lieu hereof, whether or not notation of such consent or waiver is made upon this Bond.

As provided in and subject to the provisions of the Mortgage Indenture, the Holder of this Bond shall not have the right to institute any proceeding with respect to the Mortgage Indenture or for the appointment of a receiver or trustee or for any other remedy thereunder, unless such Holder shall have previously given the Trustee written notice of a continuing Event of Default, the Holders of at least 25% in aggregate principal amount of the Bonds at the time Outstanding shall have made written request to the Trustee to institute proceedings in respect of such Event of Default as Trustee and offered the Trustee reasonable indemnity, and the Trustee shall not have received from the Holders of at least a majority in aggregate principal amount of Bonds at the time Outstanding a direction inconsistent with such written request, and shall have failed to institute any such proceeding for 60 days after receipt of such notice, request and offer of indemnity. The foregoing shall not apply to any suit instituted by the Holder of this Bond for the enforcement of any payment of principal hereof or any premium or interest hereon on or after the respective due dates expressed herein.

No reference herein to the Mortgage Indenture and no provision of this Bond or of the Mortgage Indenture shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal of and any premium and interest on this Bond at the times, place and rate, and in the coin or currency, herein prescribed.

As provided in the Mortgage Indenture and subject to certain limitations therein set forth, the transfer of this Bond (but only as may be required to effect a transfer to any successor to the Unsecured Note Trustee) is registrable in the Bond Register, upon surrender of this Bond for registration of transfer at the office or agency of the Company in any place where the principal of and any premium and interest on this Bond are payable, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Company, the Trustee or the Bond Registrar, as the case may be, duly executed by the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new Bonds of this series and of like tenor, of authorized denominations and for the same aggregate principal amount, will be issued to the designated transferee or transferees.

The Bonds of the Eleventh Series are issuable only in registered form without coupons in denominations of $1,000 and any integral multiple thereof.

No service charge shall be made for any such registration of transfer or exchange, but the Company may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

Prior to due presentment of this Bond for registration of transfer, the Company, the Trustee and any agent of the Company or the Trustee may treat the Person in whose name this Bond is registered as the owner hereof for all purposes, whether or not this Bond is overdue, and neither the Company, the Trustee nor any such agent shall be affected by notice to the contrary.

This Bond shall be governed by, and construed and enforced in accordance with, the laws of the State of California without regard to the principles of conflicts of laws thereunder, except to the extent that the Trust Indenture Act shall be applicable.

As provided in the Mortgage Indenture, no recourse shall be had for the payment of the principal of, premium, if any, or interest with respect to this Bond, or any part thereof, or for any claim based hereon or otherwise in respect hereof, or of the indebtedness represented hereby, or upon any obligation, covenant or agreement under the Mortgage Indenture, against any incorporator, shareholder, officer or director, as such, past, present or future, of the Company or of any predecessor or successor corporation (either directly or through the Company or a predecessor or successor corporation), whether by virtue of any constitutional provision, statute or rule of law or by the enforcement of any assessment or penalty or otherwise; it being expressly agreed and understood that the Mortgage Indenture and all the Bonds are solely corporate obligations and that any such personal liability is hereby expressly waived and released as a condition of, and as part of the consideration for, the execution of the Mortgage Indenture and the issuance of this Bond.

All terms used in this Bond which are not defined herein shall have the meanings assigned to them in the Mortgage Indenture.

**ASSIGNMENT FORM**

To assign this Bond, fill in the form below: (I) or (we) assign and transfer this Bond to _____

_____

(Insert assignee's soc. sec. or tax I.D. no.)

_____

_____

_____

_____

(Print or type assignee's name, address and zip code)

and irrevocably appoint _____

to transfer this Bond on the books of the Company. The agent may substitute another to act for him.

Date: _____

Your signature: _____
(Sign exactly as your name appears on the face of this Bond)

Tax Identification No.:

SIGNATURE GUARANTEE:

_____

Signatures must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Bond Registrar, which requirements include membership or participation in the Security Transfer Agent Medallion Program ("STAMP") or such other "signature guarantee program" as may be determined by the Bond Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

**EXHIBIT F**

**[FORM OF BOND OF THE TWELFTH SERIES]**

**[FORM OF FACE OF BOND]**

THIS BOND OF THE TWELFTH SERIES IS NOT TRANSFERABLE EXCEPT TO EFFECT A TRANSFER TO ANY SUCCESSOR TRUSTEE PURSUANT TO THE UNSECURED INDENTURE (AS DEFINED HEREIN), SUBJECT TO UNITED STATES SECURITIES LAWS.

THE FOLLOWING SUMMARY OF TERMS IS SUBJECT TO THE INFORMATION SET FORTH ON THE REVERSE HEREOF:

PRINCIPAL AMOUNT:
$300,000,000

ORIGINAL ISSUE DATE:
July 1, 2020

INTEREST RATE:
3.85%

MATURITY DATE:
November 15, 2023

INTEREST PAYMENT DATES:
May 15 and November 15 of each year, commencing November 15, 2020

THIS BOND IS A:
[  ] Global Book-Entry Bond
[X] Certificated Bond

REGISTERED OWNER: BOKF, N.A., as Trustee under the Unsecured Note Indenture (as defined herein)

**PACIFIC GAS AND ELECTRIC COMPANY**

**3.85% FIRST MORTGAGE BOND, COLLATERAL SERIES DUE 2023**

No. _____                                                                    Principal Amount: $_____

CUSIP No: _____

PACIFIC GAS AND ELECTRIC COMPANY, a corporation duly organized and existing under the laws of the State of California (herein called the "Company," which term includes any successor Person pursuant to the applicable provisions of the Mortgage Indenture hereinafter referred to), for value received, hereby promises to pay to BOKF, N.A., as trustee (the "Unsecured Note Trustee") under the Amended and Restated Indenture, dated as of April 22, 2005 (the "Original 2005 Unsecured Indenture" and, as heretofore amended and supplemented, the "Unsecured Indenture"), between the Company and the Unsecured Note Trustee, or registered assigns, the Principal Amount stated above on the Maturity Date stated above, and to pay interest thereon from and including the Original Issue Date stated above or, in the case of a 3.85% First Mortgage Bond, Collateral Series Due 2023 issued upon the registration of transfer or exchange, from and including the most recent Interest Payment Date to which interest has been paid or duly provided for, semi-annually in arrears on the Interest Payment Dates set forth above and on the Maturity Date stated above, commencing November 15, 2020, at the rate of 3.85% per annum until the principal hereof is paid or made available for payment; provided that the obligation of the Company to make any payment of the principal of and premium, if any, or interest on this Bond of the Twelfth Series shall be fully or partially, as the case may be, paid, deemed to have been paid or otherwise satisfied and discharged to the extent that at the time any such payment shall be due, the then due principal of and premium, if any, or interest on the Company's 3.85% Senior Notes due 2023 issued pursuant to the Unsecured Indenture (the "2023 Notes") shall have been fully or partially paid, deemed to have been paid or otherwise satisfied and discharged.

This Bond of the Twelfth Series shall be delivered to the Unsecured Note Trustee to be held in trust for the benefit of the holders from time to time of the 2023 Notes as security for any and all obligations of the Company under the 2023 Notes, including but not limited to, (i) the full and prompt payment of the principal of and premium, if any, on the 2023 Notes when and as the same shall become due and payable in accordance with the terms and provisions of the Unsecured Indenture or the 2023 Notes, either at the stated maturity thereof, upon acceleration of the maturity thereof or upon redemption and (ii) the full and prompt payment of any interest on the 2023 Notes, when and as the same shall become due and payable in accordance with the terms and provisions of the Unsecured Indenture or the 2023 Notes.

REFERENCE IS HEREBY MADE TO THE FURTHER PROVISIONS OF THIS BOND SET FORTH ON THE REVERSE HEREOF, WHICH FURTHER PROVISIONS SHALL FOR ALL PURPOSES HAVE THE SAME EFFECT AS IF SET FORTH AT THIS PLACE.

Unless the certificate of authentication hereon has been executed by the Trustee referred to on the reverse hereof by manual or electronic signature, this Bond shall not be entitled to any benefit under the Mortgage Indenture or be valid or obligatory for any purpose.

**IN WITNESS WHEREOF**, the Company has caused this instrument to be duly executed.

Dated: _____

**PACIFIC GAS AND ELECTRIC COMPANY**

By _____

By _____

**TRUSTEE'S CERTIFICATE OF AUTHENTICATION**

This is one of the Bonds of the series designated as Bonds of the Twelfth Series referred to in the within-mentioned Mortgage Indenture.

_____

_____,

As Trustee

By     _____

Authorized Signatory

<p style="text-align:center">**[FORM OF REVERSE OF BOND OF THE TWELFTH SERIES]**</p>

This 3.85% First Mortgage Bond, Collateral Series due 2023 is one of a duly authorized issue of Bonds of the Company (the "<u>Bonds</u>"), issued and issuable in one or more series under and equally secured by an Indenture of Mortgage, dated as of June 19, 2020 (such Indenture of Mortgage as originally executed and delivered and as supplemented or amended from time to time thereafter, together with any constituent instruments establishing the terms of particular Bonds, being herein called the "<u>Mortgage Indenture</u>"), between the Company and The Bank of New York Mellon Trust Company, N.A., as Trustee (herein called the "<u>Trustee</u>," which term includes any successor trustee under the Mortgage Indenture), and reference is hereby made to the Mortgage Indenture for a description of the property mortgaged, pledged and held in trust, the nature and extent of the security and the respective rights, limitations of rights, duties and immunities of the Company, the Trustee and the Holders of Bonds thereunder and of the terms and conditions upon which Bonds are, and are to be, authenticated and delivered. The acceptance of this Bond shall be deemed to constitute the consent and agreement by the Holder hereof to all of the terms and provisions of the Mortgage Indenture.

In the event that all 2023 Notes are no longer outstanding under the Unsecured Indenture, then this Bond or any portion of the principal amount hereof will be deemed to have been paid for all purposes of the Mortgage Indenture and to be no longer Outstanding thereunder, and the Company's entire indebtedness in respect thereof will be satisfied and discharged.

If an Event of Default shall occur and be continuing, the Trustee or the Holders of not less than 25% in aggregate principal amount of the Bonds then Outstanding, considered as one class, may declare the principal amount of all Bonds then Outstanding to be due and payable immediately by notice in writing to the Company (and to the Trustee if given by Holders); *provided, however,* that with respect to certain Events of Default relating to bankruptcy, insolvency and similar events, the principal amount of all Bonds then Outstanding shall be due and payable immediately without further action by the Trustee or the Holders.

The Mortgage Indenture permits, with certain exceptions as therein provided, the Company and the Trustee to enter into one or more supplemental indentures for the purpose of adding any provisions to, or changing in any manner or eliminating any of the provisions of, the Mortgage Indenture with the consent of the Holders of not less than a majority in aggregate principal amount of the Bonds at the time Outstanding, considered as one class; *provided, however,* that if there shall be Bonds of more than one series Outstanding under the Mortgage Indenture and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such series, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all series so directly affected, considered as one class, shall be required; and *provided, further,* that if the Bonds of any series shall have been issued in more than one Tranche and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such Tranches, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all Tranches so directly affected, considered as one class, shall be required; and *provided, further,* that the Mortgage Indenture permits the Company and the Trustee to enter into one or more supplemental indentures for certain purposes without the consent of any Holders of Bonds. The Mortgage Indenture also contains provisions permitting the Holders of a majority in aggregate principal amount of Bonds, on behalf of the Holders of all such Bonds, to waive certain past defaults under the Mortgage Indenture and their consequences. Any such consent or waiver by the Holder of this Bond shall be conclusive and binding upon such Holder and upon all future Holders of this Bond and of any Bond issued upon the registration of transfer hereof or in exchange herefor or in lieu hereof, whether or not notation of such consent or waiver is made upon this Bond.

As provided in and subject to the provisions of the Mortgage Indenture, the Holder of this Bond shall not have the right to institute any proceeding with respect to the Mortgage Indenture or for the appointment of a receiver or trustee or for any other remedy thereunder, unless such Holder shall have previously given the Trustee written notice of a continuing Event of Default, the Holders of at least 25% in aggregate principal amount of the Bonds at the time Outstanding shall have made written request to the Trustee to institute proceedings in respect of such Event of Default as Trustee and offered the Trustee reasonable indemnity, and the Trustee shall not have received from the Holders of at least a majority in aggregate principal amount of Bonds at the time Outstanding a direction inconsistent with such written request, and shall have failed to institute any such proceeding for 60 days after receipt of such notice, request and offer of indemnity. The foregoing shall not apply to any suit instituted by the Holder of this Bond for the enforcement of any payment of principal hereof or any premium or interest hereon on or after the respective due dates expressed herein.

No reference herein to the Mortgage Indenture and no provision of this Bond or of the Mortgage Indenture shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal of and any premium and interest on this Bond at the times, place and rate, and in the coin or currency, herein prescribed.

As provided in the Mortgage Indenture and subject to certain limitations therein set forth, the transfer of this Bond (but only as may be required to effect a transfer to any successor to the Unsecured Note Trustee) is registrable in the Bond Register, upon surrender of this Bond for registration of transfer at the office or agency of the Company in any place where the principal of and any premium and interest on this Bond are payable, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Company, the Trustee or the Bond Registrar, as the case may be, duly executed by the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new Bonds of this series and of like tenor, of authorized denominations and for the same aggregate principal amount, will be issued to the designated transferee or transferees.

The Bonds of the Twelfth Series are issuable only in registered form without coupons in denominations of $1,000 and any integral multiple thereof.

No service charge shall be made for any such registration of transfer or exchange, but the Company may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

Prior to due presentment of this Bond for registration of transfer, the Company, the Trustee and any agent of the Company or the Trustee may treat the Person in whose name this Bond is registered as the owner hereof for all purposes, whether or not this Bond is overdue, and neither the Company, the Trustee nor any such agent shall be affected by notice to the contrary.

This Bond shall be governed by, and construed and enforced in accordance with, the laws of the State of California without regard to the principles of conflicts of laws thereunder, except to the extent that the Trust Indenture Act shall be applicable.

As provided in the Mortgage Indenture, no recourse shall be had for the payment of the principal of, premium, if any, or interest with respect to this Bond, or any part thereof, or for any claim based hereon or otherwise in respect hereof, or of the indebtedness represented hereby, or upon any obligation, covenant or agreement under the Mortgage Indenture, against any incorporator, shareholder, officer or director, as such, past, present or future, of the Company or of any predecessor or successor corporation (either directly or through the Company or a predecessor or successor corporation), whether by virtue of any constitutional provision, statute or rule of law or by the enforcement of any assessment or penalty or otherwise; it being expressly agreed and understood that the Mortgage Indenture and all the Bonds are solely corporate obligations and that any such personal liability is hereby expressly waived and released as a condition of, and as part of the consideration for, the execution of the Mortgage Indenture and the issuance of this Bond.

All terms used in this Bond which are not defined herein shall have the meanings assigned to them in the Mortgage Indenture.

**ASSIGNMENT FORM**

To assign this Bond, fill in the form below: (I) or (we) assign and transfer this Bond to

_____

_____

(Insert assignee's soc. sec. or tax I.D. no.)

_____

_____

_____

_____

(Print or type assignee's name, address and zip code)

and irrevocably appoint _____

to transfer this Bond on the books of the Company. The agent may substitute another to act for him.

Date: _____

Your signature: _____

(Sign exactly as your name appears on the face of this Bond)

Tax Identification No.:

SIGNATURE GUARANTEE:

_____

Signatures must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Bond Registrar, which requirements include membership or participation in the Security Transfer Agent Medallion Program ("STAMP") or such other "signature guarantee program" as may be determined by the Bond Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

**EXHIBIT G**

**[FORM OF BOND OF THE THIRTEENTH SERIES]**

**[FORM OF FACE OF BOND]**

THIS BOND OF THE THIRTEENTH SERIES IS NOT TRANSFERABLE EXCEPT TO EFFECT A TRANSFER TO ANY SUCCESSOR TRUSTEE PURSUANT TO THE UNSECURED INDENTURE (AS DEFINED HEREIN), SUBJECT TO UNITED STATES SECURITIES LAWS.

THE FOLLOWING SUMMARY OF TERMS IS SUBJECT TO THE INFORMATION SET FORTH ON THE REVERSE HEREOF:

PRINCIPAL AMOUNT:
$450,000,000

MATURITY DATE:
February 15, 2024

ORIGINAL ISSUE DATE:
July 1, 2020

INTEREST PAYMENT DATES:
February 15 and August 15 of each year,
commencing August 15, 2020

INTEREST RATE:
3.75%

THIS BOND IS A:
[   ] Global Book-Entry Bond
[X] Certificated Bond

REGISTERED OWNER: BOKF, N.A., as Trustee under the Unsecured Note Indenture (as defined herein)

**PACIFIC GAS AND ELECTRIC COMPANY**

**3.75% FIRST MORTGAGE BOND, COLLATERAL SERIES DUE 2024**

No. _____                                                                                        Principal Amount: $_____

CUSIP No: _____

PACIFIC GAS AND ELECTRIC COMPANY, a corporation duly organized and existing under the laws of the State of California (herein called the "Company," which term includes any successor Person pursuant to the applicable provisions of the Mortgage Indenture hereinafter referred to), for value received, hereby promises to pay to BOKF, N.A., as trustee (the "Unsecured Note Trustee") under the Amended and Restated Indenture, dated as of April 22, 2005 (the "Original 2005 Unsecured Indenture" and, as heretofore amended and supplemented, the "Unsecured Indenture"), between the Company and the Unsecured Note Trustee, or registered assigns, the Principal Amount stated above on the Maturity Date stated above, and to pay interest thereon from and including the Original Issue Date stated above or, in the case of a 3.75% First Mortgage Bond, Collateral Series Due 2024 issued upon the registration of transfer or exchange, from and including the most recent Interest Payment Date to which interest has been paid or duly provided for, semi-annually in arrears on the Interest Payment Dates set forth above and on the Maturity Date stated above, commencing August 15, 2020, at the rate of 3.75% per annum until the principal hereof is paid or made available for payment; provided that the obligation of the Company to make any payment of the principal of and premium, if any, or interest on this Bond of the Thirteenth Series shall be fully or partially, as the case may be, paid, deemed to have been paid or otherwise satisfied and discharged to the extent that at the time any such payment shall be due, the then due principal of and premium, if any, or interest on the Company's 3.75% Senior Notes due 2024 issued pursuant to the Unsecured Indenture (the "2024 Notes") shall have been fully or partially paid, deemed to have been paid or otherwise satisfied and discharged.

This Bond of the Thirteenth Series shall be delivered to the Unsecured Note Trustee to be held in trust for the benefit of the holders from time to time of the 2024 Notes as security for any and all obligations of the Company under the 2024 Notes, including but not limited to, (i) the full and prompt payment of the principal of and premium, if any, on the 2024 Notes when and as the same shall become due and payable in accordance with the terms and provisions of the Unsecured Indenture or the 2024 Notes, either at the stated maturity thereof, upon acceleration of the maturity thereof or upon redemption and (ii) the full and prompt payment of any interest on the 2024 Notes, when and as the same shall become due and payable in accordance with the terms and provisions of the Unsecured Indenture or the 2024 Notes.

REFERENCE IS HEREBY MADE TO THE FURTHER PROVISIONS OF THIS BOND SET FORTH ON THE REVERSE HEREOF, WHICH FURTHER PROVISIONS SHALL FOR ALL PURPOSES HAVE THE SAME EFFECT AS IF SET FORTH AT THIS PLACE.

Unless the certificate of authentication hereon has been executed by the Trustee referred to on the reverse hereof by manual or electronic signature, this Bond shall not be entitled to any benefit under the Mortgage Indenture or be valid or obligatory for any purpose.

**IN WITNESS WHEREOF**, the Company has caused this instrument to be duly executed.

Dated: _____

**PACIFIC GAS AND ELECTRIC COMPANY**

By _____

By _____

**TRUSTEE'S CERTIFICATE OF AUTHENTICATION**

This is one of the Bonds of the series designated as Bonds of the Thirteenth Series referred to in the within-mentioned Mortgage Indenture.

_____

_____,

As Trustee

By _____

Authorized Signatory

**[FORM OF REVERSE OF BOND OF THE THIRTEENTH SERIES]**

This 3.75% First Mortgage Bond, Collateral Series due 2024 is one of a duly authorized issue of Bonds of the Company (the "Bonds"), issued and issuable in one or more series under and equally secured by an Indenture of Mortgage, dated as of June 19, 2020 (such Indenture of Mortgage as originally executed and delivered and as supplemented or amended from time to time thereafter, together with any constituent instruments establishing the terms of particular Bonds, being herein called the "Mortgage Indenture"), between the Company and The Bank of New York Mellon Trust Company, N.A., as Trustee (herein called the "Trustee," which term includes any successor trustee under the Mortgage Indenture), and reference is hereby made to the Mortgage Indenture for a description of the property mortgaged, pledged and held in trust, the nature and extent of the security and the respective rights, limitations of rights, duties and immunities of the Company, the Trustee and the Holders of Bonds thereunder and of the terms and conditions upon which Bonds are, and are to be, authenticated and delivered. The acceptance of this Bond shall be deemed to constitute the consent and agreement by the Holder hereof to all of the terms and provisions of the Mortgage Indenture.

In the event that all 2024 Notes are no longer outstanding under the Unsecured Indenture, then this Bond or any portion of the principal amount hereof will be deemed to have been paid for all purposes of the Mortgage Indenture and to be no longer Outstanding thereunder, and the Company's entire indebtedness in respect thereof will be satisfied and discharged.

If an Event of Default shall occur and be continuing, the Trustee or the Holders of not less than 25% in aggregate principal amount of the Bonds then Outstanding, considered as one class, may declare the principal amount of all Bonds then Outstanding to be due and payable immediately by notice in writing to the Company (and to the Trustee if given by Holders); *provided*, *however*, that with respect to certain Events of Default relating to bankruptcy, insolvency and similar events, the principal amount of all Bonds then Outstanding shall be due and payable immediately without further action by the Trustee or the Holders.

The Mortgage Indenture permits, with certain exceptions as therein provided, the Company and the Trustee to enter into one or more supplemental indentures for the purpose of adding any provisions to, or changing in any manner or eliminating any of the provisions of, the Mortgage Indenture with the consent of the Holders of not less than a majority in aggregate principal amount of the Bonds at the time Outstanding, considered as one class; *provided*, *however*, that if there shall be Bonds of more than one series Outstanding under the Mortgage Indenture and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such series, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all series so directly affected, considered as one class, shall be required; and *provided*, *further*, that if the Bonds of any series shall have been issued in more than one Tranche and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such Tranches, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all Tranches so directly affected, considered as one class, shall be required; and *provided*, *further*, that the Mortgage Indenture permits the Company and the Trustee to enter into one or more supplemental indentures for certain purposes without the consent of any Holders of Bonds. The Mortgage Indenture also contains provisions permitting the Holders of a majority in aggregate principal amount of Bonds, on behalf of the Holders of all such Bonds, to waive certain past defaults under the Mortgage Indenture and their consequences. Any such consent or waiver by the Holder of this Bond shall be conclusive and binding upon such Holder and upon all future Holders of this Bond and of any Bond issued upon the registration of transfer hereof or in exchange herefor or in lieu hereof, whether or not notation of such consent or waiver is made upon this Bond.

As provided in and subject to the provisions of the Mortgage Indenture, the Holder of this Bond shall not have the right to institute any proceeding with respect to the Mortgage Indenture or for the appointment of a receiver or trustee or for any other remedy thereunder, unless such Holder shall have previously given the Trustee written notice of a continuing Event of Default, the Holders of at least 25% in aggregate principal amount of the Bonds at the time Outstanding shall have made written request to the Trustee to institute proceedings in respect of such Event of Default as Trustee and offered the Trustee reasonable indemnity, and the Trustee shall not have received from the Holders of at least a majority in aggregate principal amount of Bonds at the time Outstanding a direction inconsistent with such written request, and shall have failed to institute any such proceeding for 60 days after receipt of such notice, request and offer of indemnity. The foregoing shall not apply to any suit instituted by the Holder of this Bond for the enforcement of any payment of principal hereof or any premium or interest hereon on or after the respective due dates expressed herein.

No reference herein to the Mortgage Indenture and no provision of this Bond or of the Mortgage Indenture shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal of and any premium and interest on this Bond at the times, place and rate, and in the coin or currency, herein prescribed.

As provided in the Mortgage Indenture and subject to certain limitations therein set forth, the transfer of this Bond (but only as may be required to effect a transfer to any successor to the Unsecured Note Trustee) is registrable in the Bond Register, upon surrender of this Bond for registration of transfer at the office or agency of the Company in any place where the principal of and any premium and interest on this Bond are payable, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Company, the Trustee or the Bond Registrar, as the case may be, duly executed by the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new Bonds of this series and of like tenor, of authorized denominations and for the same aggregate principal amount, will be issued to the designated transferee or transferees.

The Bonds of the Thirteenth Series are issuable only in registered form without coupons in denominations of $1,000 and any integral multiple thereof.

No service charge shall be made for any such registration of transfer or exchange, but the Company may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

Prior to due presentment of this Bond for registration of transfer, the Company, the Trustee and any agent of the Company or the Trustee may treat the Person in whose name this Bond is registered as the owner hereof for all purposes, whether or not this Bond is overdue, and neither the Company, the Trustee nor any such agent shall be affected by notice to the contrary.

This Bond shall be governed by, and construed and enforced in accordance with, the laws of the State of California without regard to the principles of conflicts of laws thereunder, except to the extent that the Trust Indenture Act shall be applicable.

As provided in the Mortgage Indenture, no recourse shall be had for the payment of the principal of, premium, if any, or interest with respect to this Bond, or any part thereof, or for any claim based hereon or otherwise in respect hereof, or of the indebtedness represented hereby, or upon any obligation, covenant or agreement under the Mortgage Indenture, against any incorporator, shareholder, officer or director, as such, past, present or future, of the Company or of any predecessor or successor corporation (either directly or through the Company or a predecessor or successor corporation), whether by virtue of any constitutional provision, statute or rule of law or by the enforcement of any assessment or penalty or otherwise; it being expressly agreed and understood that the Mortgage Indenture and all the Bonds are solely corporate obligations and that any such personal liability is hereby expressly waived and released as a condition of, and as part of the consideration for, the execution of the Mortgage Indenture and the issuance of this Bond.

All terms used in this Bond which are not defined herein shall have the meanings assigned to them in the Mortgage Indenture.

**ASSIGNMENT FORM**

To assign this Bond, fill in the form below: (I) or (we) assign and transfer this Bond to

_____

_____

_____

_____

_____

(Insert assignee's soc. sec. or tax I.D. no.)

(Print or type assignee's name, address and zip code)

and irrevocably appoint  _____

to transfer this Bond on the books of the Company. The agent may substitute another to act for him.

Date: _____

Your signature: _____
(Sign exactly as your name appears on the face of this Bond)

Tax Identification No.:

SIGNATURE GUARANTEE:

_____

Signatures must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Bond Registrar, which requirements include membership or participation in the Security Transfer Agent Medallion Program ("STAMP") or such other "signature guarantee program" as may be determined by the Bond Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

**[FORM OF BOND OF THE FOURTEENTH SERIES]**

**[FORM OF FACE OF BOND]**

THIS BOND OF THE FOURTEENTH SERIES IS NOT TRANSFERABLE EXCEPT TO EFFECT A TRANSFER TO ANY SUCCESSOR TRUSTEE PURSUANT TO THE UNSECURED INDENTURE (AS DEFINED HEREIN), SUBJECT TO UNITED STATES SECURITIES LAWS.

THE FOLLOWING SUMMARY OF TERMS IS SUBJECT TO THE INFORMATION SET FORTH ON THE REVERSE HEREOF:

PRINCIPAL AMOUNT:
$675,000,000

ORIGINAL ISSUE DATE:
July 1, 2020

INTEREST RATE:
4.75%

MATURITY DATE:
February 15, 2044

INTEREST PAYMENT DATES:
February 15 and August 15 of each year, commencing August 15, 2020

THIS BOND IS A:
[   ] Global Book-Entry Bond
[X] Certificated Bond

REGISTERED OWNER: BOKF, N.A., as Trustee under the Unsecured Note Indenture (as defined herein)

<center>**PACIFIC GAS AND ELECTRIC COMPANY**</center>

<center>**4.75% FIRST MORTGAGE BOND, COLLATERAL SERIES DUE 2044**</center>

No. _____                                                                          Principal Amount: $_____
CUSIP No: _____

      PACIFIC GAS AND ELECTRIC COMPANY, a corporation duly organized and existing under the laws of the State of California (herein called the "Company," which term includes any successor Person pursuant to the applicable provisions of the Mortgage Indenture hereinafter referred to), for value received, hereby promises to pay to BOKF, N.A., as trustee (the "Unsecured Note Trustee") under the Amended and Restated Indenture, dated as of April 22, 2005 (the "Original 2005 Unsecured Indenture" and, as heretofore amended and supplemented, the "Unsecured Indenture"), between the Company and the Unsecured Note Trustee, or registered assigns, the Principal Amount stated above on the Maturity Date stated above, and to pay interest thereon from and including the Original Issue Date stated above or, in the case of a 4.75% First Mortgage Bond, Collateral Series Due 2044 issued upon the registration of transfer or exchange, from and including the most recent Interest Payment Date to which interest has been paid or duly provided for, semi-annually in arrears on the Interest Payment Dates set forth above and on the Maturity Date stated above, commencing August 15, 2020, at the rate of 4.75% per annum until the principal hereof is paid or made available for payment; provided that the obligation of the Company to make any payment of the principal of and premium, if any, or interest on this Bond of the Fourteenth Series shall be fully or partially, as the case may be, paid, deemed to have been paid or otherwise satisfied and discharged to the extent that at the time any such payment shall be due, the then due principal of and premium, if any, or interest on the Company's 4.75% Senior Notes due 2044 issued pursuant to the Unsecured Indenture (the "2044 Notes") shall have been fully or partially paid, deemed to have been paid or otherwise satisfied and discharged.

      This Bond of the Fourteenth Series shall be delivered to the Unsecured Note Trustee to be held in trust for the benefit of the holders from time to time of the 2044 Notes as security for any and all obligations of the Company under the 2044 Notes, including but not limited to, (i) the full and prompt payment of the principal of and premium, if any, on the 2044 Notes when and as the same shall become due and payable in accordance with the terms and provisions of the Unsecured Indenture or the 2044 Notes, either at the stated maturity thereof, upon acceleration of the maturity thereof or upon redemption and (ii) the full and prompt payment of any interest on the 2044 Notes, when and as the same shall become due and payable in accordance with the terms and provisions of the Unsecured Indenture or the 2044 Notes.

      REFERENCE IS HEREBY MADE TO THE FURTHER PROVISIONS OF THIS BOND SET FORTH ON THE REVERSE HEREOF, WHICH FURTHER PROVISIONS SHALL FOR ALL PURPOSES HAVE THE SAME EFFECT AS IF SET FORTH AT THIS PLACE.

Unless the certificate of authentication hereon has been executed by the Trustee referred to on the reverse hereof by manual or electronic signature, this Bond shall not be entitled to any benefit under the Mortgage Indenture or be valid or obligatory for any purpose.

**IN WITNESS WHEREOF**, the Company has caused this instrument to be duly executed.

Dated: _____

<div style="text-align: right;">

**PACIFIC GAS AND ELECTRIC COMPANY**

By _____

By _____

</div>

**TRUSTEE'S CERTIFICATE OF AUTHENTICATION**

This is one of the Bonds of the series designated as Bonds of the Fourteenth Series referred to in the within-mentioned Mortgage Indenture.

<div align="right">

_____,
As Trustee

By _____
Authorized Signatory

</div>

**[FORM OF REVERSE OF BOND OF THE EIGHTH SERIES]**

This 4.75% First Mortgage Bond, Collateral Series due 2044 is one of a duly authorized issue of Bonds of the Company (the "Bonds"), issued and issuable in one or more series under and equally secured by an Indenture of Mortgage, dated as of June 19, 2020 (such Indenture of Mortgage as originally executed and delivered and as supplemented or amended from time to time thereafter, together with any constituent instruments establishing the terms of particular Bonds, being herein called the "Mortgage Indenture"), between the Company and The Bank of New York Mellon Trust Company, N.A., as Trustee (herein called the "Trustee," which term includes any successor trustee under the Mortgage Indenture), and reference is hereby made to the Mortgage Indenture for a description of the property mortgaged, pledged and held in trust, the nature and extent of the security and the respective rights, limitations of rights, duties and immunities of the Company, the Trustee and the Holders of Bonds thereunder and of the terms and conditions upon which Bonds are, and are to be, authenticated and delivered. The acceptance of this Bond shall be deemed to constitute the consent and agreement by the Holder hereof to all of the terms and provisions of the Mortgage Indenture.

In the event that all 2044 Notes are no longer outstanding under the Unsecured Indenture, then this Bond or any portion of the principal amount hereof will be deemed to have been paid for all purposes of the Mortgage Indenture and to be no longer Outstanding thereunder, and the Company's entire indebtedness in respect thereof will be satisfied and discharged.

If an Event of Default shall occur and be continuing, the Trustee or the Holders of not less than 25% in aggregate principal amount of the Bonds then Outstanding, considered as one class, may declare the principal amount of all Bonds then Outstanding to be due and payable immediately by notice in writing to the Company (and to the Trustee if given by Holders); *provided, however,* that with respect to certain Events of Default relating to bankruptcy, insolvency and similar events, the principal amount of all Bonds then Outstanding shall be due and payable immediately without further action by the Trustee or the Holders.

The Mortgage Indenture permits, with certain exceptions as therein provided, the Company and the Trustee to enter into one or more supplemental indentures for the purpose of adding any provisions to, or changing in any manner or eliminating any of the provisions of, the Mortgage Indenture with the consent of the Holders of not less than a majority in aggregate principal amount of the Bonds at the time Outstanding, considered as one class; *provided, however,* that if there shall be Bonds of more than one series Outstanding under the Mortgage Indenture and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such series, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all series so directly affected, considered as one class, shall be required; and *provided, further,* that if the Bonds of any series shall have been issued in more than one Tranche and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such Tranches, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all Tranches so directly affected, considered as one class, shall be required; and *provided, further,* that the Mortgage Indenture permits the Company and the Trustee to enter into one or more supplemental indentures for certain purposes without the consent of any Holders of Bonds. The Mortgage Indenture also contains provisions permitting the Holders of a majority in aggregate principal amount of Bonds, on behalf of the Holders of all such Bonds, to waive certain past defaults under the Mortgage Indenture and their consequences. Any such consent or waiver by the Holder of this Bond shall be conclusive and binding upon such Holder and upon all future Holders of this Bond and of any Bond issued upon the registration of transfer hereof or in exchange herefor or in lieu hereof, whether or not notation of such consent or waiver is made upon this Bond.

As provided in and subject to the provisions of the Mortgage Indenture, the Holder of this Bond shall not have the right to institute any proceeding with respect to the Mortgage Indenture or for the appointment of a receiver or trustee or for any other remedy thereunder, unless such Holder shall have previously given the Trustee written notice of a continuing Event of Default, the Holders of at least 25% in aggregate principal amount of the Bonds at the time Outstanding shall have made written request to the Trustee to institute proceedings in respect of such Event of Default as Trustee and offered the Trustee reasonable indemnity, and the Trustee shall not have received from the Holders of at least a majority in aggregate principal amount of Bonds at the time Outstanding a direction inconsistent with such written request, and shall have failed to institute any such proceeding for 60 days after receipt of such notice, request and offer of indemnity. The foregoing shall not apply to any suit instituted by the Holder of this Bond for the enforcement of any payment of principal hereof or any premium or interest hereon on or after the respective due dates expressed herein.

No reference herein to the Mortgage Indenture and no provision of this Bond or of the Mortgage Indenture shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal of and any premium and interest on this Bond at the times, place and rate, and in the coin or currency, herein prescribed.

As provided in the Mortgage Indenture and subject to certain limitations therein set forth, the transfer of this Bond (but only as may be required to effect a transfer to any successor to the Unsecured Note Trustee) is registrable in the Bond Register, upon surrender of this Bond for registration of transfer at the office or agency of the Company in any place where the principal of and any premium and interest on this Bond are payable, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Company, the Trustee or the Bond Registrar, as the case may be, duly executed by the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new Bonds of this series and of like tenor, of authorized denominations and for the same aggregate principal amount, will be issued to the designated transferee or transferees.

The Bonds of the Fourteenth Series are issuable only in registered form without coupons in denominations of $1,000 and any integral multiple thereof.

No service charge shall be made for any such registration of transfer or exchange, but the Company may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

Prior to due presentment of this Bond for registration of transfer, the Company, the Trustee and any agent of the Company or the Trustee may treat the Person in whose name this Bond is registered as the owner hereof for all purposes, whether or not this Bond is overdue, and neither the Company, the Trustee nor any such agent shall be affected by notice to the contrary.

This Bond shall be governed by, and construed and enforced in accordance with, the laws of the State of California without regard to the principles of conflicts of laws thereunder, except to the extent that the Trust Indenture Act shall be applicable.

As provided in the Mortgage Indenture, no recourse shall be had for the payment of the principal of, premium, if any, or interest with respect to this Bond, or any part thereof, or for any claim based hereon or otherwise in respect hereof, or of the indebtedness represented hereby, or upon any obligation, covenant or agreement under the Mortgage Indenture, against any incorporator, shareholder, officer or director, as such, past, present or future, of the Company or of any predecessor or successor corporation (either directly or through the Company or a predecessor or successor corporation), whether by virtue of any constitutional provision, statute or rule of law or by the enforcement of any assessment or penalty or otherwise; it being expressly agreed and understood that the Mortgage Indenture and all the Bonds are solely corporate obligations and that any such personal liability is hereby expressly waived and released as a condition of, and as part of the consideration for, the execution of the Mortgage Indenture and the issuance of this Bond.

All terms used in this Bond which are not defined herein shall have the meanings assigned to them in the Mortgage Indenture.

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 554 of 1367

**ASSIGNMENT FORM**

To assign this Bond, fill in the form below: (I) or (we) assign and transfer this Bond to

_____

_____

(Insert assignee's soc. sec. or tax I.D. no.)

_____

_____

_____

_____

(Print or type assignee's name, address and zip code)

and irrevocably appoint _____

to transfer this Bond on the books of the Company. The agent may substitute another to act for him.

Date: _____

Your signature: _____
(Sign exactly as your name appears on the face of this Bond)

Tax Identification No.:

SIGNATURE GUARANTEE:

_____

Signatures must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Bond Registrar, which requirements include membership or participation in the Security Transfer Agent Medallion Program ("STAMP") or such other "signature guarantee program" as may be determined by the Bond Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

**EXHIBIT I**

**[FORM OF BOND OF THE FIFTEENTH SERIES]**

**[FORM OF FACE OF BOND]**

THIS BOND OF THE FIFTEENTH SERIES IS NOT TRANSFERABLE EXCEPT TO EFFECT A TRANSFER TO ANY SUCCESSOR TRUSTEE PURSUANT TO THE UNSECURED INDENTURE (AS DEFINED HEREIN), SUBJECT TO UNITED STATES SECURITIES LAWS.

THE FOLLOWING SUMMARY OF TERMS IS SUBJECT TO THE INFORMATION SET FORTH ON THE REVERSE HEREOF:

PRINCIPAL AMOUNT:
$350,000,000

ORIGINAL ISSUE DATE:
July 1, 2020

INTEREST RATE:
3.40%

MATURITY DATE:
August 15, 2024

INTEREST PAYMENT DATES:
February 15 and August 15 of each year,
commencing August 15, 2020

THIS BOND IS A:
[  ] Global Book-Entry Bond
[X] Certificated Bond

REGISTERED OWNER: BOKF, N.A., as Trustee under the Unsecured Note Indenture (as defined herein)

## PACIFIC GAS AND ELECTRIC COMPANY

### 3.40% FIRST MORTGAGE BOND, COLLATERAL SERIES DUE 2024

No. _____                                                Principal Amount: $_____

CUSIP No: _____

PACIFIC GAS AND ELECTRIC COMPANY, a corporation duly organized and existing under the laws of the State of California (herein called the "Company," which term includes any successor Person pursuant to the applicable provisions of the Mortgage Indenture hereinafter referred to), for value received, hereby promises to pay to BOKF, N.A., as trustee (the "Unsecured Note Trustee") under the Amended and Restated Indenture, dated as of April 22, 2005 (the "Original 2005 Unsecured Indenture" and, as heretofore amended and supplemented, the "Unsecured Indenture"), between the Company and the Unsecured Note Trustee, or registered assigns, the Principal Amount stated above on the Maturity Date stated above, and to pay interest thereon from and including the Original Issue Date stated above or, in the case of a 3.40% First Mortgage Bond, Collateral Series Due 2024 issued upon the registration of transfer or exchange, from and including the most recent Interest Payment Date to which interest has been paid or duly provided for, semi-annually in arrears on the Interest Payment Dates set forth above and on the Maturity Date stated above, commencing August 15, 2020, at the rate of 3.40% per annum until the principal hereof is paid or made available for payment; provided that the obligation of the Company to make any payment of the principal of and premium, if any, or interest on this Bond of the Fifteenth Series shall be fully or partially, as the case may be, paid, deemed to have been paid or otherwise satisfied and discharged to the extent that at the time any such payment shall be due, the then due principal of and premium, if any, or interest on the Company's 3.40% Senior Notes due 2024 issued pursuant to the Unsecured Indenture (the "2024 Notes") shall have been fully or partially paid, deemed to have been paid or otherwise satisfied and discharged.

This Bond of the Fifteenth Series shall be delivered to the Unsecured Note Trustee to be held in trust for the benefit of the holders from time to time of the 2024 Notes as security for any and all obligations of the Company under the 2024 Notes, including but not limited to, (i) the full and prompt payment of the principal of and premium, if any, on the 2024 Notes when and as the same shall become due and payable in accordance with the terms and provisions of the Unsecured Indenture or the 2024 Notes, either at the stated maturity thereof, upon acceleration of the maturity thereof or upon redemption and (ii) the full and prompt payment of any interest on the 2024 Notes, when and as the same shall become due and payable in accordance with the terms and provisions of the Unsecured Indenture or the 2024 Notes.

REFERENCE IS HEREBY MADE TO THE FURTHER PROVISIONS OF THIS BOND SET FORTH ON THE REVERSE HEREOF, WHICH FURTHER PROVISIONS SHALL FOR ALL PURPOSES HAVE THE SAME EFFECT AS IF SET FORTH AT THIS PLACE.

Unless the certificate of authentication hereon has been executed by the Trustee referred to on the reverse hereof by manual or electronic signature, this Bond shall not be entitled to any benefit under the Mortgage Indenture or be valid or obligatory for any purpose.

**IN WITNESS WHEREOF**, the Company has caused this instrument to be duly executed.

Dated: _____

<div align="right">

**PACIFIC GAS AND ELECTRIC COMPANY**

By _____

By _____

</div>

**TRUSTEE'S CERTIFICATE OF AUTHENTICATION**

This is one of the Bonds of the series designated as Bonds of the Fifteenth Series referred to in the within-mentioned Mortgage Indenture.

_____,
As Trustee

By _____

Authorized Signatory

**[FORM OF REVERSE OF BOND OF THE FIFTEENTH SERIES]**

This 3.40% First Mortgage Bond, Collateral Series due 2024 is one of a duly authorized issue of Bonds of the Company (the "Bonds"), issued and issuable in one or more series under and equally secured by an Indenture of Mortgage, dated as of June 19, 2020 (such Indenture of Mortgage as originally executed and delivered and as supplemented or amended from time to time thereafter, together with any constituent instruments establishing the terms of particular Bonds, being herein called the "Mortgage Indenture"), between the Company and The Bank of New York Mellon Trust Company, N.A., as Trustee (herein called the "Trustee," which term includes any successor trustee under the Mortgage Indenture), and reference is hereby made to the Mortgage Indenture for a description of the property mortgaged, pledged and held in trust, the nature and extent of the security and the respective rights, limitations of rights, duties and immunities of the Company, the Trustee and the Holders of Bonds thereunder and of the terms and conditions upon which Bonds are, and are to be, authenticated and delivered. The acceptance of this Bond shall be deemed to constitute the consent and agreement by the Holder hereof to all of the terms and provisions of the Mortgage Indenture.

In the event that all 2024 Notes are no longer outstanding under the Unsecured Indenture, then this Bond or any portion of the principal amount hereof will be deemed to have been paid for all purposes of the Mortgage Indenture and to be no longer Outstanding thereunder, and the Company's entire indebtedness in respect thereof will be satisfied and discharged.

If an Event of Default shall occur and be continuing, the Trustee or the Holders of not less than 25% in aggregate principal amount of the Bonds then Outstanding, considered as one class, may declare the principal amount of all Bonds then Outstanding to be due and payable immediately by notice in writing to the Company (and to the Trustee if given by Holders); *provided, however,* that with respect to certain Events of Default relating to bankruptcy, insolvency and similar events, the principal amount of all Bonds then Outstanding shall be due and payable immediately without further action by the Trustee or the Holders.

The Mortgage Indenture permits, with certain exceptions as therein provided, the Company and the Trustee to enter into one or more supplemental indentures for the purpose of adding any provisions to, or changing in any manner or eliminating any of the provisions of, the Mortgage Indenture with the consent of the Holders of not less than a majority in aggregate principal amount of the Bonds at the time Outstanding, considered as one class; *provided, however,* that if there shall be Bonds of more than one series Outstanding under the Mortgage Indenture and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such series, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all series so directly affected, considered as one class, shall be required; and *provided, further,* that if the Bonds of any series shall have been issued in more than one Tranche and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such Tranches, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all Tranches so directly affected, considered as one class, shall be required; and *provided, further,* that the Mortgage Indenture permits the Company and the Trustee to enter into one or more supplemental indentures for certain purposes without the consent of any Holders of Bonds. The Mortgage Indenture also contains provisions permitting the Holders of a majority in aggregate principal amount of Bonds, on behalf of the Holders of all such Bonds, to waive certain past defaults under the Mortgage Indenture and their consequences. Any such consent or waiver by the Holder of this Bond shall be conclusive and binding upon such Holder and upon all future Holders of this Bond and of any Bond issued upon the registration of transfer hereof or in exchange herefor or in lieu hereof, whether or not notation of such consent or waiver is made upon this Bond.

As provided in and subject to the provisions of the Mortgage Indenture, the Holder of this Bond shall not have the right to institute any proceeding with respect to the Mortgage Indenture or for the appointment of a receiver or trustee or for any other remedy thereunder, unless such Holder shall have previously given the Trustee written notice of a continuing Event of Default, the Holders of at least 25% in aggregate principal amount of the Bonds at the time Outstanding shall have made written request to the Trustee to institute proceedings in respect of such Event of Default as Trustee and offered the Trustee reasonable indemnity, and the Trustee shall not have received from the Holders of at least a majority in aggregate principal amount of Bonds at the time Outstanding a direction inconsistent with such written request, and shall have failed to institute any such proceeding for 60 days after receipt of such notice, request and offer of indemnity. The foregoing shall not apply to any suit instituted by the Holder of this Bond for the

enforcement of any payment of principal hereof or any premium or interest hereon on or after the respective due dates expressed herein.

No reference herein to the Mortgage Indenture and no provision of this Bond or of the Mortgage Indenture shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal of and any premium and interest on this Bond at the times, place and rate, and in the coin or currency, herein prescribed.

As provided in the Mortgage Indenture and subject to certain limitations therein set forth, the transfer of this Bond (but only as may be required to effect a transfer to any successor to the Unsecured Note Trustee) is registrable in the Bond Register, upon surrender of this Bond for registration of transfer at the office or agency of the Company in any place where the principal of and any premium and interest on this Bond are payable, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Company, the Trustee or the Bond Registrar, as the case may be, duly executed by the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new Bonds of this series and of like tenor, of authorized denominations and for the same aggregate principal amount, will be issued to the designated transferee or transferees.

The Bonds of the Fifteenth Series are issuable only in registered form without coupons in denominations of $1,000 and any integral multiple thereof.

No service charge shall be made for any such registration of transfer or exchange, but the Company may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

Prior to due presentment of this Bond for registration of transfer, the Company, the Trustee and any agent of the Company or the Trustee may treat the Person in whose name this Bond is registered as the owner hereof for all purposes, whether or not this Bond is overdue, and neither the Company, the Trustee nor any such agent shall be affected by notice to the contrary.

This Bond shall be governed by, and construed and enforced in accordance with, the laws of the State of California without regard to the principles of conflicts of laws thereunder, except to the extent that the Trust Indenture Act shall be applicable.

As provided in the Mortgage Indenture, no recourse shall be had for the payment of the principal of, premium, if any, or interest with respect to this Bond, or any part thereof, or for any claim based hereon or otherwise in respect hereof, or of the indebtedness represented hereby, or upon any obligation, covenant or agreement under the Mortgage Indenture, against any incorporator, shareholder, officer or director, as such, past, present or future, of the Company or of any predecessor or successor corporation (either directly or through the Company or a predecessor or successor corporation), whether by virtue of any constitutional provision, statute or rule of law or by the enforcement of any assessment or penalty or otherwise; it being expressly agreed and understood that the Mortgage Indenture and all the Bonds are solely corporate obligations and that any such personal liability is hereby expressly waived and released as a condition of, and as part of the consideration for, the execution of the Mortgage Indenture and the issuance of this Bond.

All terms used in this Bond which are not defined herein shall have the meanings assigned to them in the Mortgage Indenture.

**ASSIGNMENT FORM**

To assign this Bond, fill in the form below: (I) or (we) assign and transfer this Bond to _____

_____

(Insert assignee's soc. sec. or tax I.D. no.)

_____

_____

_____

_____

_____

(Print or type assignee's name, address and zip code)

and irrevocably appoint _____

to transfer this Bond on the books of the Company. The agent may substitute another to act for him.

Date: _____

Your signature: _____

_____

(Sign exactly as your name appears on the face of this Bond)

Tax Identification No.:

SIGNATURE GUARANTEE:

_____

Signatures must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Bond Registrar, which requirements include membership or participation in the Security Transfer Agent Medallion Program ("STAMP") or such other "signature guarantee program" as may be determined by the Bond Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

**EXHIBIT J**

**[FORM OF BOND OF THE SIXTEENTH SERIES]**

**[FORM OF FACE OF BOND]**

THIS BOND OF THE SIXTEENTH SERIES IS NOT TRANSFERABLE EXCEPT TO EFFECT A TRANSFER TO ANY SUCCESSOR TRUSTEE PURSUANT TO THE UNSECURED INDENTURE (AS DEFINED HEREIN), SUBJECT TO UNITED STATES SECURITIES LAWS.

THE FOLLOWING SUMMARY OF TERMS IS SUBJECT TO THE INFORMATION SET FORTH ON THE REVERSE HEREOF:

PRINCIPAL AMOUNT:
$600,000,000

ORIGINAL ISSUE DATE:
July 1, 2020

INTEREST RATE:
4.30%

MATURITY DATE:
March 15, 2045

INTEREST PAYMENT DATES:
March 15 and September 15 of each year, commencing September 15, 2020

THIS BOND IS A:
[   ] Global Book-Entry Bond
[X] Certificated Bond

REGISTERED OWNER: BOKF, N.A., as Trustee under the Unsecured Note Indenture (as defined herein)

# PACIFIC GAS AND ELECTRIC COMPANY

## 4.30% FIRST MORTGAGE BOND, COLLATERAL SERIES DUE 2045

No. _____                                                        Principal Amount: $_____

CUSIP No: _____

   PACIFIC GAS AND ELECTRIC COMPANY, a corporation duly organized and existing under the laws of the State of California (herein called the "Company," which term includes any successor Person pursuant to the applicable provisions of the Mortgage Indenture hereinafter referred to), for value received, hereby promises to pay to BOKF, N.A., as trustee (the "Unsecured Note Trustee") under the Amended and Restated Indenture, dated as of April 22, 2005 (the "Original 2005 Unsecured Indenture" and, as heretofore amended and supplemented, the "Unsecured Indenture"), between the Company and the Unsecured Note Trustee, or registered assigns, the Principal Amount stated above on the Maturity Date stated above, and to pay interest thereon from and including the Original Issue Date stated above or, in the case of a 4.30% First Mortgage Bond, Collateral Series Due 2045 issued upon the registration of transfer or exchange, from and including the most recent Interest Payment Date to which interest has been paid or duly provided for, semi-annually in arrears on the Interest Payment Dates set forth above and on the Maturity Date stated above, commencing September 15, 2020, at the rate of 4.30% per annum until the principal hereof is paid or made available for payment; provided that the obligation of the Company to make any payment of the principal of and premium, if any, or interest on this Bond of the Sixteenth Series shall be fully or partially, as the case may be, paid, deemed to have been paid or otherwise satisfied and discharged to the extent that at the time any such payment shall be due, the then due principal of and premium, if any, or interest on the Company's 4.30% Senior Notes due 2045 issued pursuant to the Unsecured Indenture (the "2045 Notes") shall have been fully or partially paid, deemed to have been paid or otherwise satisfied and discharged.

   This Bond of the Sixteenth Series shall be delivered to the Unsecured Note Trustee to be held in trust for the benefit of the holders from time to time of the 2045 Notes as security for any and all obligations of the Company under the 2045 Notes, including but not limited to, (i) the full and prompt payment of the principal of and premium, if any, on the 2045 Notes when and as the same shall become due and payable in accordance with the terms and provisions of the Unsecured Indenture or the 2045 Notes, either at the stated maturity thereof, upon acceleration of the maturity thereof or upon redemption and (ii) the full and prompt payment of any interest on the 2045 Notes, when and as the same shall become due and payable in accordance with the terms and provisions of the Unsecured Indenture or the 2045 Notes.

   REFERENCE IS HEREBY MADE TO THE FURTHER PROVISIONS OF THIS BOND SET FORTH ON THE REVERSE HEREOF, WHICH FURTHER PROVISIONS SHALL FOR ALL PURPOSES HAVE THE SAME EFFECT AS IF SET FORTH AT THIS PLACE.

Unless the certificate of authentication hereon has been executed by the Trustee referred to on the reverse hereof by manual or electronic signature, this Bond shall not be entitled to any benefit under the Mortgage Indenture or be valid or obligatory for any purpose.

**IN WITNESS WHEREOF**, the Company has caused this instrument to be duly executed.

Dated: _____

<div align="right">

**PACIFIC GAS AND ELECTRIC COMPANY**

By _____

By _____

</div>

**TRUSTEE'S CERTIFICATE OF AUTHENTICATION**

This is one of the Bonds of the series designated as Bonds of the Sixteenth Series referred to in the within-mentioned Mortgage Indenture.

_____

_____,

As Trustee

By _____

Authorized Signatory

**[FORM OF REVERSE OF BOND OF THE SIXTEENTH SERIES]**

This 4.30% First Mortgage Bond, Collateral Series due 2045 is one of a duly authorized issue of Bonds of the Company (the "Bonds"), issued and issuable in one or more series under and equally secured by an Indenture of Mortgage, dated as of June 19, 2020 (such Indenture of Mortgage as originally executed and delivered and as supplemented or amended from time to time thereafter, together with any constituent instruments establishing the terms of particular Bonds, being herein called the "Mortgage Indenture"), between the Company and The Bank of New York Mellon Trust Company, N.A., as Trustee (herein called the "Trustee," which term includes any successor trustee under the Mortgage Indenture), and reference is hereby made to the Mortgage Indenture for a description of the property mortgaged, pledged and held in trust, the nature and extent of the security and the respective rights, limitations of rights, duties and immunities of the Company, the Trustee and the Holders of Bonds thereunder and of the terms and conditions upon which Bonds are, and are to be, authenticated and delivered. The acceptance of this Bond shall be deemed to constitute the consent and agreement by the Holder hereof to all of the terms and provisions of the Mortgage Indenture.

In the event that all 2045 Notes are no longer outstanding under the Unsecured Indenture, then this Bond or any portion of the principal amount hereof will be deemed to have been paid for all purposes of the Mortgage Indenture and to be no longer Outstanding thereunder, and the Company's entire indebtedness in respect thereof will be satisfied and discharged.

If an Event of Default shall occur and be continuing, the Trustee or the Holders of not less than 25% in aggregate principal amount of the Bonds then Outstanding, considered as one class, may declare the principal amount of all Bonds then Outstanding to be due and payable immediately by notice in writing to the Company (and to the Trustee if given by Holders); *provided*, *however*, that with respect to certain Events of Default relating to bankruptcy, insolvency and similar events, the principal amount of all Bonds then Outstanding shall be due and payable immediately without further action by the Trustee or the Holders.

The Mortgage Indenture permits, with certain exceptions as therein provided, the Company and the Trustee to enter into one or more supplemental indentures for the purpose of adding any provisions to, or changing in any manner or eliminating any of the provisions of, the Mortgage Indenture with the consent of the Holders of not less than a majority in aggregate principal amount of the Bonds at the time Outstanding, considered as one class; *provided*, *however*, that if there shall be Bonds of more than one series Outstanding under the Mortgage Indenture and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such series, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all series so directly affected, considered as one class, shall be required; and *provided, further*, that if the Bonds of any series shall have been issued in more than one Tranche and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such Tranches, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all Tranches so directly affected, considered as one class, shall be required; and *provided, further*, that the Mortgage Indenture permits the Company and the Trustee to enter into one or more supplemental indentures for certain purposes without the consent of any Holders of Bonds. The Mortgage Indenture also contains provisions permitting the Holders of a majority in aggregate principal amount of Bonds, on behalf of the Holders of all such Bonds, to waive certain past defaults under the Mortgage Indenture and their consequences. Any such consent or waiver by the Holder of this Bond shall be conclusive and binding upon such Holder and upon all future Holders of this Bond and of any Bond issued upon the registration of transfer hereof or in exchange herefor or in lieu hereof, whether or not notation of such consent or waiver is made upon this Bond.

As provided in and subject to the provisions of the Mortgage Indenture, the Holder of this Bond shall not have the right to institute any proceeding with respect to the Mortgage Indenture or for the appointment of a receiver or trustee or for any other remedy thereunder, unless such Holder shall have previously given the Trustee written notice of a continuing Event of Default, the Holders of at least 25% in aggregate principal amount of the Bonds at the time Outstanding shall have made written request to the Trustee to institute proceedings in respect of such Event of Default as Trustee and offered the Trustee reasonable indemnity, and the Trustee shall not have received from the Holders of at least a majority in aggregate principal amount of Bonds at the time Outstanding a direction inconsistent with such written request, and shall have failed to institute any such proceeding for 60 days after receipt of such notice, request and offer of indemnity. The foregoing shall not apply to any suit instituted by the Holder of this Bond for the enforcement of any payment of principal hereof or any premium or interest hereon on or after the respective due dates expressed herein.

No reference herein to the Mortgage Indenture and no provision of this Bond or of the Mortgage Indenture shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal of and any premium and interest on this Bond at the times, place and rate, and in the coin or currency, herein prescribed.

As provided in the Mortgage Indenture and subject to certain limitations therein set forth, the transfer of this Bond (but only as may be required to effect a transfer to any successor to the Unsecured Note Trustee) is registrable in the Bond Register, upon surrender of this Bond for registration of transfer at the office or agency of the Company in any place where the principal of and any premium and interest on this Bond are payable, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Company, the Trustee or the Bond Registrar, as the case may be, duly executed by the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new Bonds of this series and of like tenor, of authorized denominations and for the same aggregate principal amount, will be issued to the designated transferee or transferees.

The Bonds of the Sixteenth Series are issuable only in registered form without coupons in denominations of $1,000 and any integral multiple thereof.

No service charge shall be made for any such registration of transfer or exchange, but the Company may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

Prior to due presentment of this Bond for registration of transfer, the Company, the Trustee and any agent of the Company or the Trustee may treat the Person in whose name this Bond is registered as the owner hereof for all purposes, whether or not this Bond is overdue, and neither the Company, the Trustee nor any such agent shall be affected by notice to the contrary.

This Bond shall be governed by, and construed and enforced in accordance with, the laws of the State of California without regard to the principles of conflicts of laws thereunder, except to the extent that the Trust Indenture Act shall be applicable.

As provided in the Mortgage Indenture, no recourse shall be had for the payment of the principal of, premium, if any, or interest with respect to this Bond, or any part thereof, or for any claim based hereon or otherwise in respect hereof, or of the indebtedness represented hereby, or upon any obligation, covenant or agreement under the Mortgage Indenture, against any incorporator, shareholder, officer or director, as such, past, present or future, of the Company or of any predecessor or successor corporation (either directly or through the Company or a predecessor or successor corporation), whether by virtue of any constitutional provision, statute or rule of law or by the enforcement of any assessment or penalty or otherwise; it being expressly agreed and understood that the Mortgage Indenture and all the Bonds are solely corporate obligations and that any such personal liability is hereby expressly waived and released as a condition of, and as part of the consideration for, the execution of the Mortgage Indenture and the issuance of this Bond.

All terms used in this Bond which are not defined herein shall have the meanings assigned to them in the Mortgage Indenture.

**ASSIGNMENT FORM**

To assign this Bond, fill in the form below: (I) or (we) assign and transfer this Bond to _____

_____
(Insert assignee's soc. sec. or tax I.D. no.)

_____
_____
_____
_____
(Print or type assignee's name, address and zip code)

and irrevocably appoint _____
to transfer this Bond on the books of the Company. The agent may substitute another to act for him.

Date: _____

Your signature: _____

_____
(Sign exactly as your name appears on the face of this Bond)

Tax Identification No.:

SIGNATURE GUARANTEE:

_____

Signatures must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Bond Registrar, which requirements include membership or participation in the Security Transfer Agent Medallion Program ("STAMP") or such other "signature guarantee program" as may be determined by the Bond Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

<div align="center">

**EXHIBIT K**

**[FORM OF BOND OF THE SEVENTEENTH SERIES ]**

**[FORM OF FACE OF BOND]**

</div>

THIS BOND OF THE SEVENTEENTH SERIES IS NOT TRANSFERABLE EXCEPT TO EFFECT A TRANSFER TO ANY SUCCESSOR TRUSTEE PURSUANT TO THE UNSECURED INDENTURE (AS DEFINED HEREIN), SUBJECT TO UNITED STATES SECURITIES LAWS.

THE FOLLOWING SUMMARY OF TERMS IS SUBJECT TO THE INFORMATION SET FORTH ON THE REVERSE HEREOF:

| PRINCIPAL AMOUNT: | ORIGINAL ISSUE DATE: | INTEREST RATE: |
|---|---|---|
| $600,000,000 | July 1, 2020 | 3.50% |

| MATURITY DATE: | INTEREST PAYMENT DATES: | THIS BOND IS A: |
|---|---|---|
| June 15, 2025 | June 15 and December 15 of each year, commencing December 15, 2020 | [   ] Global Book-Entry Bond<br>[X] Certificated Bond |

REGISTERED OWNER: BOKF, N.A., as Trustee under the Unsecured Note Indenture (as defined herein)

<div align="center">

**PACIFIC GAS AND ELECTRIC COMPANY**

**3.50% FIRST MORTGAGE BOND, COLLATERAL SERIES DUE 2025**

</div>

No. _____          Principal Amount: $_____

CUSIP No: _____

      PACIFIC GAS AND ELECTRIC COMPANY, a corporation duly organized and existing under the laws of the State of California (herein called the "Company," which term includes any successor Person pursuant to the applicable provisions of the Mortgage Indenture hereinafter referred to), for value received, hereby promises to pay to BOKF, N.A., as trustee (the "Unsecured Note Trustee") under the Amended and Restated Indenture, dated as of April 22, 2005 (the "Original 2005 Unsecured Indenture" and, as heretofore amended and supplemented, the "Unsecured Indenture"), between the Company and the Unsecured Note Trustee, or registered assigns, the Principal Amount stated above on the Maturity Date stated above, and to pay interest thereon from and including the Original Issue Date stated above or, in the case of a 3.50% First Mortgage Bond, Collateral Series Due 2025 issued upon the registration of transfer or exchange, from and including the most recent Interest Payment Date to which interest has been paid or duly provided for, semi-annually in arrears on the Interest Payment Dates set forth above and on the Maturity Date stated above, commencing December 15, 2020, at the rate of 3.50% per annum until the principal hereof is paid or made available for payment; provided that the obligation of the Company to make any payment of the principal of and premium, if any, or interest on this Bond of the Seventeenth Series shall be fully or partially, as the case may be, paid, deemed to have been paid or otherwise satisfied and discharged to the extent that at the time any such payment shall be due, the then due principal of and premium, if any, or interest on the Company's 3.50% Senior Notes due 2025 issued pursuant to the Unsecured Indenture (the "2025 Notes") shall have been fully or partially paid, deemed to have been paid or otherwise satisfied and discharged.

      This Bond of the Seventeenth Series shall be delivered to the Unsecured Note Trustee to be held in trust for the benefit of the holders from time to time of the 2025 Notes as security for any and all obligations of the Company under the 2025 Notes, including but not limited to, (i) the full and prompt payment of the principal of and premium, if any, on the 2025 Notes when and as the same shall become due and payable in accordance with the terms and provisions of the Unsecured Indenture or the 2025 Notes, either at the stated maturity thereof, upon acceleration of the maturity thereof or upon redemption and (ii) the full and prompt payment of any interest on the 2025 Notes, when and as the same shall become due and payable in accordance with the terms and provisions of the Unsecured Indenture or the 2025 Notes.

      REFERENCE IS HEREBY MADE TO THE FURTHER PROVISIONS OF THIS BOND SET FORTH ON THE REVERSE HEREOF, WHICH FURTHER PROVISIONS SHALL FOR ALL PURPOSES HAVE THE SAME EFFECT AS IF SET FORTH AT THIS PLACE.

Unless the certificate of authentication hereon has been executed by the Trustee referred to on the reverse hereof by manual or electronic signature, this Bond shall not be entitled to any benefit under the Mortgage Indenture or be valid or obligatory for any purpose.

**IN WITNESS WHEREOF**, the Company has caused this instrument to be duly executed.

Dated: _____

<div style="text-align: right;">

**PACIFIC GAS AND ELECTRIC COMPANY**

By _____

By _____

</div>

**TRUSTEE'S CERTIFICATE OF AUTHENTICATION**

This is one of the Bonds of the series designated as Bonds of the Seventeenth Series referred to in the within-mentioned Mortgage Indenture.

_____ ,
As Trustee

By _____
Authorized Signatory

**[FORM OF REVERSE OF BOND OF THE SEVENTEENTH SERIES]**

This 3.50% First Mortgage Bond, Collateral Series due 2025 is one of a duly authorized issue of Bonds of the Company (the "<u>Bonds</u>"), issued and issuable in one or more series under and equally secured by an Indenture of Mortgage, dated as of June 19, 2020 (such Indenture of Mortgage as originally executed and delivered and as supplemented or amended from time to time thereafter, together with any constituent instruments establishing the terms of particular Bonds, being herein called the "<u>Mortgage Indenture</u>"), between the Company and The Bank of New York Mellon Trust Company, N.A., as Trustee (herein called the "<u>Trustee</u>," which term includes any successor trustee under the Mortgage Indenture), and reference is hereby made to the Mortgage Indenture for a description of [the property mortgaged, pledged and held in trust, the nature and extent of the security and] the respective rights, limitations of rights, duties and immunities of the Company, the Trustee and the Holders of Bonds thereunder and of the terms and conditions upon which Bonds are, and are to be, authenticated and delivered. The acceptance of this Bond shall be deemed to constitute the consent and agreement by the Holder hereof to all of the terms and provisions of the Mortgage Indenture.

In the event that all 2025 Notes are no longer outstanding under the Unsecured Indenture, then this Bond or any portion of the principal amount hereof will be deemed to have been paid for all purposes of the Mortgage Indenture and to be no longer Outstanding thereunder, and the Company's entire indebtedness in respect thereof will be satisfied and discharged.

If an Event of Default shall occur and be continuing, the Trustee or the Holders of not less than 25% in aggregate principal amount of the Bonds then Outstanding, considered as one class, may declare the principal amount of all Bonds then Outstanding to be due and payable immediately by notice in writing to the Company (and to the Trustee if given by Holders); *provided*, *however*, that with respect to certain Events of Default relating to bankruptcy, insolvency and similar events, the principal amount of all Bonds then Outstanding shall be due and payable immediately without further action by the Trustee or the Holders.

The Mortgage Indenture permits, with certain exceptions as therein provided, the Company and the Trustee to enter into one or more supplemental indentures for the purpose of adding any provisions to, or changing in any manner or eliminating any of the provisions of, the Mortgage Indenture with the consent of the Holders of not less than a majority in aggregate principal amount of the Bonds at the time Outstanding, considered as one class; *provided*, *however*, that if there shall be Bonds of more than one series Outstanding under the Mortgage Indenture and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such series, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all series so directly affected, considered as one class, shall be required; and *provided*, *further*, that if the Bonds of any series shall have been issued in more than one Tranche and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such Tranches, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all Tranches so directly affected, considered as one class, shall be required; and *provided*, *further*, that the Mortgage Indenture permits the Company and the Trustee to enter into one or more supplemental indentures for certain purposes without the consent of any Holders of Bonds. The Mortgage Indenture also contains provisions permitting the Holders of a majority in aggregate principal amount of Bonds, on behalf of the Holders of all such Bonds, to waive certain past defaults under the Mortgage Indenture and their consequences. Any such consent or waiver by the Holder of this Bond shall be conclusive and binding upon such Holder and upon all future Holders of this Bond and of any Bond issued upon the registration of transfer hereof or in exchange herefor or in lieu hereof, whether or not notation of such consent or waiver is made upon this Bond.

As provided in and subject to the provisions of the Mortgage Indenture, the Holder of this Bond shall not have the right to institute any proceeding with respect to the Mortgage Indenture or for the appointment of a receiver or trustee or for any other remedy thereunder, unless such Holder shall have previously given the Trustee written notice of a continuing Event of Default, the Holders of at least 25% in aggregate principal amount of the Bonds at the time Outstanding shall have made written request to the Trustee to institute proceedings in respect of such Event of Default as Trustee and offered the Trustee reasonable indemnity, and the Trustee shall not have received from the Holders of at least a majority in aggregate principal amount of Bonds at the time Outstanding a direction inconsistent with such written request, and shall have failed to institute any such proceeding for 60 days after receipt of such notice, request and offer of indemnity. The foregoing shall not apply to any suit instituted by the Holder of this Bond for the enforcement of any payment of principal hereof or any premium or interest hereon on or after the respective due dates expressed herein.

No reference herein to the Mortgage Indenture and no provision of this Bond or of the Mortgage Indenture shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal of and any premium and interest on this Bond at the times, place and rate, and in the coin or currency, herein prescribed.

As provided in the Mortgage Indenture and subject to certain limitations therein set forth, the transfer of this Bond (but only as may be required to effect a transfer to any successor to the Unsecured Note Trustee) is registrable in the Bond Register, upon surrender of this Bond for registration of transfer at the office or agency of the Company in any place where the principal of and any premium and interest on this Bond are payable, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Company, the Trustee or the Bond Registrar, as the case may be, duly executed by the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new Bonds of this series and of like tenor, of authorized denominations and for the same aggregate principal amount, will be issued to the designated transferee or transferees.

The Bonds of the Seventeenth Series are issuable only in registered form without coupons in denominations of $1,000 and any integral multiple thereof.

No service charge shall be made for any such registration of transfer or exchange, but the Company may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

Prior to due presentment of this Bond for registration of transfer, the Company, the Trustee and any agent of the Company or the Trustee may treat the Person in whose name this Bond is registered as the owner hereof for all purposes, whether or not this Bond is overdue, and neither the Company, the Trustee nor any such agent shall be affected by notice to the contrary.

This Bond shall be governed by, and construed and enforced in accordance with, the laws of the State of California without regard to the principles of conflicts of laws thereunder, except to the extent that the Trust Indenture Act shall be applicable.

As provided in the Mortgage Indenture, no recourse shall be had for the payment of the principal of, premium, if any, or interest with respect to this Bond, or any part thereof, or for any claim based hereon or otherwise in respect hereof, or of the indebtedness represented hereby, or upon any obligation, covenant or agreement under the Mortgage Indenture, against any incorporator, shareholder, officer or director, as such, past, present or future, of the Company or of any predecessor or successor corporation (either directly or through the Company or a predecessor or successor corporation), whether by virtue of any constitutional provision, statute or rule of law or by the enforcement of any assessment or penalty or otherwise; it being expressly agreed and understood that the Mortgage Indenture and all the Bonds are solely corporate obligations and that any such personal liability is hereby expressly waived and released as a condition of, and as part of the consideration for, the execution of the Mortgage Indenture and the issuance of this Bond.

All terms used in this Bond which are not defined herein shall have the meanings assigned to them in the Mortgage Indenture.

**ASSIGNMENT FORM**

To assign this Bond, fill in the form below: (I) or (we) assign and transfer this Bond to _____

_____
(Insert assignee's soc. sec. or tax I.D. no.)

_____
_____
_____
_____

(Print or type assignee's name, address and zip code)

and irrevocably appoint _____
to transfer this Bond on the books of the Company. The agent may substitute another to act for him.

Date: _____

Your signature: _____
(Sign exactly as your name appears on the face of this Bond)

Tax Identification No.:

SIGNATURE GUARANTEE:

_____
Signatures must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Bond Registrar, which requirements include membership or participation in the Security Transfer Agent Medallion Program ("STAMP") or such other "signature guarantee program" as may be determined by the Bond Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

EXHIBIT L

**[FORM OF BOND OF THE EIGHTEENTH SERIES ]**

**[FORM OF FACE OF BOND]**

THIS BOND OF THE EIGHTEENTH SERIES IS NOT TRANSFERABLE EXCEPT TO EFFECT A TRANSFER TO ANY SUCCESSOR TRUSTEE PURSUANT TO THE UNSECURED INDENTURE (AS DEFINED HEREIN), SUBJECT TO UNITED STATES SECURITIES LAWS.

THE FOLLOWING SUMMARY OF TERMS IS SUBJECT TO THE INFORMATION SET FORTH ON THE REVERSE HEREOF:

PRINCIPAL AMOUNT:
$450,000,000

ORIGINAL ISSUE DATE:
July 1, 2020

INTEREST RATE:
4.25%

MATURITY DATE:
March 15, 2046

INTEREST PAYMENT DATES:
March 15 and September 15 of each year,
commencing September 15, 2020

THIS BOND IS A:
[   ] Global Book-Entry Bond
[X] Certificated Bond

REGISTERED OWNER: BOKF, N.A., as Trustee under the Unsecured Note Indenture (as defined herein)

<center>**PACIFIC GAS AND ELECTRIC COMPANY**</center>

<center>4.25% FIRST MORTGAGE BOND, COLLATERAL SERIES DUE 2046</center>

No. _____                                                Principal Amount: $_____
CUSIP No: _____

       PACIFIC GAS AND ELECTRIC COMPANY, a corporation duly organized and existing under the laws of the State of California (herein called the "Company," which term includes any successor Person pursuant to the applicable provisions of the Mortgage Indenture hereinafter referred to), for value received, hereby promises to pay to BOKF, N.A., as trustee (the "Unsecured Note Trustee") under the Amended and Restated Indenture, dated as of April 22, 2005 (the "Original 2005 Unsecured Indenture" and, as heretofore amended and supplemented, the "Unsecured Indenture"), between the Company and the Unsecured Note Trustee, or registered assigns, the Principal Amount stated above on the Maturity Date stated above, and to pay interest thereon from and including the Original Issue Date stated above or, in the case of a 4.25% First Mortgage Bond, Collateral Series Due 2046 issued upon the registration of transfer or exchange, from and including the most recent Interest Payment Date to which interest has been paid or duly provided for, semi-annually in arrears on the Interest Payment Dates set forth above and on the Maturity Date stated above, commencing September 15, 2020, at the rate of 4.25% per annum until the principal hereof is paid or made available for payment; provided that the obligation of the Company to make any payment of the principal of and premium, if any, or interest on this Bond of the Eighteenth Series shall be fully or partially, as the case may be, paid, deemed to have been paid or otherwise satisfied and discharged to the extent that at the time any such payment shall be due, the then due principal of and premium, if any, or interest on the Company's 4.25% Senior Notes due 2046 issued pursuant to the Unsecured Indenture (the "2046 Notes") shall have been fully or partially paid, deemed to have been paid or otherwise satisfied and discharged.

       This Bond of the Eighteenth Series shall be delivered to the Unsecured Note Trustee to be held in trust for the benefit of the holders from time to time of the 2046 Notes as security for any and all obligations of the Company under the 2046 Notes, including but not limited to, (i) the full and prompt payment of the principal of and premium, if any, on the 2046 Notes when and as the same shall become due and payable in accordance with the terms and provisions of the Unsecured Indenture or the 2046 Notes, either at the stated maturity thereof, upon acceleration of the maturity thereof or upon redemption and (ii) the full and prompt payment of any interest on the 2046 Notes, when and as the same shall become due and payable in accordance with the terms and provisions of the Unsecured Indenture or the 2046 Notes.

       REFERENCE IS HEREBY MADE TO THE FURTHER PROVISIONS OF THIS BOND SET FORTH ON THE REVERSE HEREOF, WHICH FURTHER PROVISIONS SHALL FOR ALL PURPOSES HAVE THE SAME EFFECT AS IF SET FORTH AT THIS PLACE.

Unless the certificate of authentication hereon has been executed by the Trustee referred to on the reverse hereof by manual or electronic signature, this Bond shall not be entitled to any benefit under the Mortgage Indenture or be valid or obligatory for any purpose.

**IN WITNESS WHEREOF**, the Company has caused this instrument to be duly executed.

Dated: _____

<div align="right">

**PACIFIC GAS AND ELECTRIC COMPANY**

By _____

By _____

</div>

**TRUSTEE'S CERTIFICATE OF AUTHENTICATION**

This is one of the Bonds of the series designated as Bonds of the Eighteenth Series referred to in the within-mentioned Mortgage Indenture.

_____

_____,

As Trustee

By _____

Authorized Signatory

## [FORM OF REVERSE OF BOND OF THE EIGHTEENTH SERIES]

This 4.25% First Mortgage Bond, Collateral Series due 2046 is one of a duly authorized issue of Bonds of the Company (the "Bonds"), issued and issuable in one or more series under and equally secured by an Indenture of Mortgage, dated as of June 19, 2020 (such Indenture of Mortgage as originally executed and delivered and as supplemented or amended from time to time thereafter, together with any constituent instruments establishing the terms of particular Bonds, being herein called the "Mortgage Indenture"), between the Company and The Bank of New York Mellon Trust Company, N.A., as Trustee (herein called the "Trustee," which term includes any successor trustee under the Mortgage Indenture), and reference is hereby made to the Mortgage Indenture for a description of the property mortgaged, pledged and held in trust, the nature and extent of the security and the respective rights, limitations of rights, duties and immunities of the Company, the Trustee and the Holders of Bonds thereunder and of the terms and conditions upon which Bonds are, and are to be, authenticated and delivered. The acceptance of this Bond shall be deemed to constitute the consent and agreement by the Holder hereof to all of the terms and provisions of the Mortgage Indenture.

In the event that all 2046 Notes are no longer outstanding under the Unsecured Indenture, then this Bond or any portion of the principal amount hereof will be deemed to have been paid for all purposes of the Mortgage Indenture and to be no longer Outstanding thereunder, and the Company's entire indebtedness in respect thereof will be satisfied and discharged.

If an Event of Default shall occur and be continuing, the Trustee or the Holders of not less than 25% in aggregate principal amount of the Bonds then Outstanding, considered as one class, may declare the principal amount of all Bonds then Outstanding to be due and payable immediately by notice in writing to the Company (and to the Trustee if given by Holders); *provided, however,* that with respect to certain Events of Default relating to bankruptcy, insolvency and similar events, the principal amount of all Bonds then Outstanding shall be due and payable immediately without further action by the Trustee or the Holders.

The Mortgage Indenture permits, with certain exceptions as therein provided, the Company and the Trustee to enter into one or more supplemental indentures for the purpose of adding any provisions to, or changing in any manner or eliminating any of the provisions of, the Mortgage Indenture with the consent of the Holders of not less than a majority in aggregate principal amount of the Bonds at the time Outstanding, considered as one class; *provided, however,* that if there shall be Bonds of more than one series Outstanding under the Mortgage Indenture and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such series, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all series so directly affected, considered as one class, shall be required; and *provided, further,* that if the Bonds of any series shall have been issued in more than one Tranche and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such Tranches, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all Tranches so directly affected, considered as one class, shall be required; and *provided, further,* that the Mortgage Indenture permits the Company and the Trustee to enter into one or more supplemental indentures for certain purposes without the consent of any Holders of Bonds. The Mortgage Indenture also contains provisions permitting the Holders of a majority in aggregate principal amount of Bonds, on behalf of the Holders of all such Bonds, to waive certain past defaults under the Mortgage Indenture and their consequences. Any such consent or waiver by the Holder of this Bond shall be conclusive and binding upon such Holder and upon all future Holders of this Bond and of any Bond issued upon the registration of transfer hereof or in exchange herefor or in lieu hereof, whether or not notation of such consent or waiver is made upon this Bond.

As provided in and subject to the provisions of the Mortgage Indenture, the Holder of this Bond shall not have the right to institute any proceeding with respect to the Mortgage Indenture or for the appointment of a receiver or trustee or for any other remedy thereunder, unless such Holder shall have previously given the Trustee written notice of a continuing Event of Default, the Holders of at least 25% in aggregate principal amount of the Bonds at the time Outstanding shall have made written request to the Trustee to institute proceedings in respect of such Event of Default as Trustee and offered the Trustee reasonable indemnity, and the Trustee shall not have received from the Holders of at least a majority in aggregate principal amount of Bonds at the time Outstanding a direction inconsistent with such written request, and shall have failed to institute any such proceeding for 60 days after receipt of such notice, request and offer of indemnity. The foregoing shall not apply to any suit instituted by the Holder of this Bond for the enforcement of any payment of principal hereof or any premium or interest hereon on or after the respective due dates expressed herein.

No reference herein to the Mortgage Indenture and no provision of this Bond or of the Mortgage Indenture shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal of and any premium and interest on this Bond at the times, place and rate, and in the coin or currency, herein prescribed.

As provided in the Mortgage Indenture and subject to certain limitations therein set forth, the transfer of this Bond (but only as may be required to effect a transfer to any successor to the Unsecured Note Trustee) is registrable in the Bond Register, upon surrender of this Bond for registration of transfer at the office or agency of the Company in any place where the principal of and any premium and interest on this Bond are payable, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Company, the Trustee or the Bond Registrar, as the case may be, duly executed by the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new Bonds of this series and of like tenor, of authorized denominations and for the same aggregate principal amount, will be issued to the designated transferee or transferees.

The Bonds of the Eighteenth Series are issuable only in registered form without coupons in denominations of $1,000 and any integral multiple thereof.

No service charge shall be made for any such registration of transfer or exchange, but the Company may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

Prior to due presentment of this Bond for registration of transfer, the Company, the Trustee and any agent of the Company or the Trustee may treat the Person in whose name this Bond is registered as the owner hereof for all purposes, whether or not this Bond is overdue, and neither the Company, the Trustee nor any such agent shall be affected by notice to the contrary.

This Bond shall be governed by, and construed and enforced in accordance with, the laws of the State of California without regard to the principles of conflicts of laws thereunder, except to the extent that the Trust Indenture Act shall be applicable.

As provided in the Mortgage Indenture, no recourse shall be had for the payment of the principal of, premium, if any, or interest with respect to this Bond, or any part thereof, or for any claim based hereon or otherwise in respect hereof, or of the indebtedness represented hereby, or upon any obligation, covenant or agreement under the Mortgage Indenture, against any incorporator, shareholder, officer or director, as such, past, present or future, of the Company or of any predecessor or successor corporation (either directly or through the Company or a predecessor or successor corporation), whether by virtue of any constitutional provision, statute or rule of law or by the enforcement of any assessment or penalty or otherwise; it being expressly agreed and understood that the Mortgage Indenture and all the Bonds are solely corporate obligations and that any such personal liability is hereby expressly waived and released as a condition of, and as part of the consideration for, the execution of the Mortgage Indenture and the issuance of this Bond.

All terms used in this Bond which are not defined herein shall have the meanings assigned to them in the Mortgage Indenture.

**ASSIGNMENT FORM**

To assign this Bond, fill in the form below: (I) or (we) assign and transfer this Bond to _____

_____
(Insert assignee's soc. sec. or tax I.D. no.)

_____
_____
_____
_____
(Print or type assignee's name, address and zip code)

and irrevocably appoint _____
to transfer this Bond on the books of the Company. The agent may substitute another to act for him.

Date: _____

Your signature: _____
(Sign exactly as your name appears on the face of this Bond)

Tax Identification No.:

SIGNATURE GUARANTEE:

_____
Signatures must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Bond Registrar, which requirements include membership or participation in the Security Transfer Agent Medallion Program ("STAMP") or such other "signature guarantee program" as may be determined by the Bond Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

**[FORM OF BOND OF THE NINETEENTH SERIES ]**

**[FORM OF FACE OF BOND]**

THIS BOND OF THE NINETEENTH SERIES IS NOT TRANSFERABLE EXCEPT TO EFFECT A TRANSFER TO ANY SUCCESSOR TRUSTEE PURSUANT TO THE UNSECURED INDENTURE (AS DEFINED HEREIN), SUBJECT TO UNITED STATES SECURITIES LAWS.

THE FOLLOWING SUMMARY OF TERMS IS SUBJECT TO THE INFORMATION SET FORTH ON THE REVERSE HEREOF:

| | | |
|---|---|---|
| PRINCIPAL AMOUNT:<br>$600,000,000 | ORIGINAL ISSUE DATE:<br>July 1, 2020 | INTEREST RATE:<br>2.95% |
| MATURITY DATE:<br>March 1, 2026 | INTEREST PAYMENT DATES:<br>March 1 and September 1 of each year,<br>commencing September 1, 2020 | THIS BOND IS A:<br>[   ] Global Book-Entry Bond<br>[X] Certificated Bond |

REGISTERED OWNER: BOKF, N.A., as Trustee under the Unsecured Note Indenture (as defined herein)

# PACIFIC GAS AND ELECTRIC COMPANY

## 2.95% FIRST MORTGAGE BOND, COLLATERAL SERIES DUE 2026

No. _____                                                    Principal Amount: $_____

CUSIP No: _____

PACIFIC GAS AND ELECTRIC COMPANY, a corporation duly organized and existing under the laws of the State of California (herein called the "Company," which term includes any successor Person pursuant to the applicable provisions of the Mortgage Indenture hereinafter referred to), for value received, hereby promises to pay to BOKF, N.A., as trustee (the "Unsecured Note Trustee") under the Amended and Restated Indenture, dated as of April 22, 2005 (the "Original 2005 Unsecured Indenture" and, as heretofore amended and supplemented, the "Unsecured Indenture"), between the Company and the Unsecured Note Trustee, or registered assigns, the Principal Amount stated above on the Maturity Date stated above, and to pay interest thereon from and including the Original Issue Date stated above or, in the case of a 2.95% First Mortgage Bond, Collateral Series Due 2026 issued upon the registration of transfer or exchange, from and including the most recent Interest Payment Date to which interest has been paid or duly provided for, semi-annually in arrears on the Interest Payment Dates set forth above and on the Maturity Date stated above, commencing September 1, 2020, at the rate of 2.95% per annum until the principal hereof is paid or made available for payment; provided that the obligation of the Company to make any payment of the principal of and premium, if any, or interest on this Bond of the Nineteenth Series shall be fully or partially, as the case may be, paid, deemed to have been paid or otherwise satisfied and discharged to the extent that at the time any such payment shall be due, the then due principal of and premium, if any, or interest on the Company's 2.95% Senior Notes due 2026 issued pursuant to the Unsecured Indenture (the "2026 Notes") shall have been fully or partially paid, deemed to have been paid or otherwise satisfied and discharged.

This Bond of the Nineteenth Series shall be delivered to the Unsecured Note Trustee to be held in trust for the benefit of the holders from time to time of the 2026 Notes as security for any and all obligations of the Company under the 2026 Notes, including but not limited to, (i) the full and prompt payment of the principal of and premium, if any, on the 2026 Notes when and as the same shall become due and payable in accordance with the terms and provisions of the Unsecured Indenture or the 2026 Notes, either at the stated maturity thereof, upon acceleration of the maturity thereof or upon redemption and (ii) the full and prompt payment of any interest on the 2026 Notes, when and as the same shall become due and payable in accordance with the terms and provisions of the Unsecured Indenture or the 2026 Notes.

REFERENCE IS HEREBY MADE TO THE FURTHER PROVISIONS OF THIS BOND SET FORTH ON THE REVERSE HEREOF, WHICH FURTHER PROVISIONS SHALL FOR ALL PURPOSES HAVE THE SAME EFFECT AS IF SET FORTH AT THIS PLACE.

Unless the certificate of authentication hereon has been executed by the Trustee referred to on the reverse hereof by manual or electronic signature, this Bond shall not be entitled to any benefit under the Mortgage Indenture or be valid or obligatory for any purpose.

**IN WITNESS WHEREOF**, the Company has caused this instrument to be duly executed.

Dated: _____

<div style="text-align:right">

**PACIFIC GAS AND ELECTRIC COMPANY**

By _____

By _____

</div>

**TRUSTEE'S CERTIFICATE OF AUTHENTICATION**

This is one of the Bonds of the series designated as Bonds of the Nineteenth Series referred to in the within-mentioned Mortgage Indenture.

_____

_____,

As Trustee

By _____

Authorized Signatory

<div style="text-align:center">

**[FORM OF REVERSE OF BOND OF THE NINETEENTH SERIES]**

</div>

This 2.95% First Mortgage Bond, Collateral Series due 2026 is one of a duly authorized issue of Bonds of the Company (the "Bonds"), issued and issuable in one or more series under and equally secured by an Indenture of Mortgage, dated as of June 19, 2020 (such Indenture of Mortgage as originally executed and delivered and as supplemented or amended from time to time thereafter, together with any constituent instruments establishing the terms of particular Bonds, being herein called the "Mortgage Indenture"), between the Company and The Bank of New York Mellon Trust Company, N.A., as Trustee (herein called the "Trustee," which term includes any successor trustee under the Mortgage Indenture), and reference is hereby made to the Mortgage Indenture for a description of the property mortgaged, pledged and held in trust, the nature and extent of the security and the respective rights, limitations of rights, duties and immunities of the Company, the Trustee and the Holders of Bonds thereunder and of the terms and conditions upon which Bonds are, and are to be, authenticated and delivered. The acceptance of this Bond shall be deemed to constitute the consent and agreement by the Holder hereof to all of the terms and provisions of the Mortgage Indenture.

In the event that all 2026 Notes are no longer outstanding under the Unsecured Indenture, then this Bond or any portion of the principal amount hereof will be deemed to have been paid for all purposes of the Mortgage Indenture and to be no longer Outstanding thereunder, and the Company's entire indebtedness in respect thereof will be satisfied and discharged.

If an Event of Default shall occur and be continuing, the Trustee or the Holders of not less than 25% in aggregate principal amount of the Bonds then Outstanding, considered as one class, may declare the principal amount of all Bonds then Outstanding to be due and payable immediately by notice in writing to the Company (and to the Trustee if given by Holders); *provided*, *however*, that with respect to certain Events of Default relating to bankruptcy, insolvency and similar events, the principal amount of all Bonds then Outstanding shall be due and payable immediately without further action by the Trustee or the Holders.

The Mortgage Indenture permits, with certain exceptions as therein provided, the Company and the Trustee to enter into one or more supplemental indentures for the purpose of adding any provisions to, or changing in any manner or eliminating any of the provisions of, the Mortgage Indenture with the consent of the Holders of not less than a majority in aggregate principal amount of the Bonds at the time Outstanding, considered as one class; *provided*, *however*, that if there shall be Bonds of more than one series Outstanding under the Mortgage Indenture and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such series, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all series so directly affected, considered as one class, shall be required; and *provided*, *further*, that if the Bonds of any series shall have been issued in more than one Tranche and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such Tranches, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all Tranches so directly affected, considered as one class, shall be required; and *provided*, *further*, that the Mortgage Indenture permits the Company and the Trustee to enter into one or more supplemental indentures for certain purposes without the consent of any Holders of Bonds. The Mortgage Indenture also contains provisions permitting the Holders of a majority in aggregate principal amount of Bonds, on behalf of the Holders of all such Bonds, to waive certain past defaults under the Mortgage Indenture and their consequences. Any such consent or waiver by the Holder of this Bond shall be conclusive and binding upon such Holder and upon all future Holders of this Bond and of any Bond issued upon the registration of transfer hereof or in exchange herefor or in lieu hereof, whether or not notation of such consent or waiver is made upon this Bond.

As provided in and subject to the provisions of the Mortgage Indenture, the Holder of this Bond shall not have the right to institute any proceeding with respect to the Mortgage Indenture or for the appointment of a receiver or trustee or for any other remedy thereunder, unless such Holder shall have previously given the Trustee written notice of a continuing Event of Default, the Holders of at least 25% in aggregate principal amount of the Bonds at the time Outstanding shall have made written request to the Trustee to institute proceedings in respect of such Event of Default as Trustee and offered the Trustee reasonable indemnity, and the Trustee shall not have received from the Holders of at least a majority in aggregate principal amount of Bonds at the time Outstanding a direction inconsistent with such written request, and shall have failed to institute any such proceeding for 60 days after receipt of such notice, request and offer of indemnity. The foregoing shall not apply to any suit instituted by the Holder of this Bond for the enforcement of any payment of principal hereof or any premium or interest hereon on or after the respective due dates expressed herein.

No reference herein to the Mortgage Indenture and no provision of this Bond or of the Mortgage Indenture shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal of and any premium and interest on this Bond at the times, place and rate, and in the coin or currency, herein prescribed.

As provided in the Mortgage Indenture and subject to certain limitations therein set forth, the transfer of this Bond (but only as may be required to effect a transfer to any successor to the Unsecured Note Trustee) is registrable in the Bond Register, upon surrender of this Bond for registration of transfer at the office or agency of the Company in any place where the principal of and any premium and interest on this Bond are payable, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Company, the Trustee or the Bond Registrar, as the case may be, duly executed by the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new Bonds of this series and of like tenor, of authorized denominations and for the same aggregate principal amount, will be issued to the designated transferee or transferees.

The Bonds of the Nineteenth Series are issuable only in registered form without coupons in denominations of $1,000 and any integral multiple thereof.

No service charge shall be made for any such registration of transfer or exchange, but the Company may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

Prior to due presentment of this Bond for registration of transfer, the Company, the Trustee and any agent of the Company or the Trustee may treat the Person in whose name this Bond is registered as the owner hereof for all purposes, whether or not this Bond is overdue, and neither the Company, the Trustee nor any such agent shall be affected by notice to the contrary.

This Bond shall be governed by, and construed and enforced in accordance with, the laws of the State of California without regard to the principles of conflicts of laws thereunder, except to the extent that the Trust Indenture Act shall be applicable.

As provided in the Mortgage Indenture, no recourse shall be had for the payment of the principal of, premium, if any, or interest with respect to this Bond, or any part thereof, or for any claim based hereon or otherwise in respect hereof, or of the indebtedness represented hereby, or upon any obligation, covenant or agreement under the Mortgage Indenture, against any incorporator, shareholder, officer or director, as such, past, present or future, of the Company or of any predecessor or successor corporation (either directly or through the Company or a predecessor or successor corporation), whether by virtue of any constitutional provision, statute or rule of law or by the enforcement of any assessment or penalty or otherwise; it being expressly agreed and understood that the Mortgage Indenture and all the Bonds are solely corporate obligations and that any such personal liability is hereby expressly waived and released as a condition of, and as part of the consideration for, the execution of the Mortgage Indenture and the issuance of this Bond.

All terms used in this Bond which are not defined herein shall have the meanings assigned to them in the Mortgage Indenture.

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 589 of 1367

**ASSIGNMENT FORM**

To assign this Bond, fill in the form below: (I) or (we) assign and transfer this Bond to _____
(Insert assignee's soc. sec. or tax I.D. no.)

_____

(Print or type assignee's name, address and zip code)

_____
_____
_____
_____
_____

and irrevocably appoint _____
to transfer this Bond on the books of the Company. The agent may substitute another to act for him.

Date: _____

Your signature: _____
_____
(Sign exactly as your name appears on the face of this Bond)

Tax Identification No.:

SIGNATURE GUARANTEE:

_____

Signatures must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Bond Registrar, which requirements include membership or participation in the Security Transfer Agent Medallion Program ("STAMP") or such other "signature guarantee program" as may be determined by the Bond Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

**[FORM OF BOND OF THE TWENTIETH SERIES ]**

**[FORM OF FACE OF BOND]**

THIS BOND OF THE TWENTIETH SERIES IS NOT TRANSFERABLE EXCEPT TO EFFECT A TRANSFER TO ANY SUCCESSOR TRUSTEE PURSUANT TO THE UNSECURED INDENTURE (AS DEFINED HEREIN), SUBJECT TO UNITED STATES SECURITIES LAWS.

THE FOLLOWING SUMMARY OF TERMS IS SUBJECT TO THE INFORMATION SET FORTH ON THE REVERSE HEREOF:

| PRINCIPAL AMOUNT: | ORIGINAL ISSUE DATE: | INTEREST RATE: |
|---|---|---|
| $600,000,000 | July 1, 2020 | 4.00% |

| MATURITY DATE: | INTEREST PAYMENT DATES: | THIS BOND IS A: |
|---|---|---|
| December 1, 2046 | June 1 and December 1 of each year, commencing December 1, 2020 | ☐ Global Book-Entry Bond<br>☒ Certificated Bond |

REGISTERED OWNER: BOKF, N.A., as Trustee under the Unsecured Note Indenture (as defined herein)

<div align="center">

**PACIFIC GAS AND ELECTRIC COMPANY**

**4.00% FIRST MORTGAGE BOND, COLLATERAL SERIES DUE 2046**

</div>

No. _____          Principal Amount: $_____

CUSIP No: _____

     PACIFIC GAS AND ELECTRIC COMPANY, a corporation duly organized and existing under the laws of the State of California (herein called the "Company," which term includes any successor Person pursuant to the applicable provisions of the Mortgage Indenture hereinafter referred to), for value received, hereby promises to pay to BOKF, N.A., as trustee (the "Unsecured Note Trustee") under the Amended and Restated Indenture, dated as of April 22, 2005 (the "Original 2005 Unsecured Indenture" and, as heretofore amended and supplemented, the "Unsecured Indenture"), between the Company and the Unsecured Note Trustee, or registered assigns, the Principal Amount stated above on the Maturity Date stated above, and to pay interest thereon from and including the Original Issue Date stated above or, in the case of a 4.00% First Mortgage Bond, Collateral Series Due 2046 issued upon the registration of transfer or exchange, from and including the most recent Interest Payment Date to which interest has been paid or duly provided for, semi-annually in arrears on the Interest Payment Dates set forth above and on the Maturity Date stated above, commencing December 1, 2020, at the rate of 4.00% per annum until the principal hereof is paid or made available for payment; provided that the obligation of the Company to make any payment of the principal of and premium, if any, or interest on this Bond of the Twentieth Series shall be fully or partially, as the case may be, paid, deemed to have been paid or otherwise satisfied and discharged to the extent that at the time any such payment shall be due, the then due principal of and premium, if any, or interest on the Company's 4.00% Senior Notes due 2046 issued pursuant to the Unsecured Indenture (the "2046 Notes") shall have been fully or partially paid, deemed to have been paid or otherwise satisfied and discharged.

     This Bond of the Twentieth Series shall be delivered to the Unsecured Note Trustee to be held in trust for the benefit of the holders from time to time of the 2046 Notes as security for any and all obligations of the Company under the 2046 Notes, including but not limited to, (i) the full and prompt payment of the principal of and premium, if any, on the 2046 Notes when and as the same shall become due and payable in accordance with the terms and provisions of the Unsecured Indenture or the 2046 Notes, either at the stated maturity thereof, upon acceleration of the maturity thereof or upon redemption and (ii) the full and prompt payment of any interest on the 2046 Notes, when and as the same shall become due and payable in accordance with the terms and provisions of the Unsecured Indenture or the 2046 Notes.

     REFERENCE IS HEREBY MADE TO THE FURTHER PROVISIONS OF THIS BOND SET FORTH ON THE REVERSE HEREOF, WHICH FURTHER PROVISIONS SHALL FOR ALL PURPOSES HAVE THE SAME EFFECT AS IF SET FORTH AT THIS PLACE.

Unless the certificate of authentication hereon has been executed by the Trustee referred to on the reverse hereof by manual or electronic signature, this Bond shall not be entitled to any benefit under the Mortgage Indenture or be valid or obligatory for any purpose.

**IN WITNESS WHEREOF**, the Company has caused this instrument to be duly executed.

Dated: _____

<div align="right">

**PACIFIC GAS AND ELECTRIC COMPANY**

By _____

By _____

</div>

## TRUSTEE'S CERTIFICATE OF AUTHENTICATION

This is one of the Bonds of the series designated as Bonds of the Twentieth Series referred to in the within-mentioned Mortgage Indenture.

$$\text{_____,}$$

As Trustee

By _____

Authorized Signatory

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 594 of 1367

This 4.00% First Mortgage Bond, Collateral Series due 2046 is one of a duly authorized issue of Bonds of the Company (the "Bonds"), issued and issuable in one or more series under and equally secured by an Indenture of Mortgage, dated as of June 19, 2020 (such Indenture of Mortgage as originally executed and delivered and as supplemented or amended from time to time thereafter, together with any constituent instruments establishing the terms of particular Bonds, being herein called the "Mortgage Indenture"), between the Company and The Bank of New York Mellon Trust Company, N.A., as Trustee (herein called the "Trustee," which term includes any successor trustee under the Mortgage Indenture), and reference is hereby made to the Mortgage Indenture for a description of the property mortgaged, pledged and held in trust, the nature and extent of the security and the respective rights, limitations of rights, duties and immunities of the Company, the Trustee and the Holders of Bonds thereunder and of the terms and conditions upon which Bonds are, and are to be, authenticated and delivered. The acceptance of this Bond shall be deemed to constitute the consent and agreement by the Holder hereof to all of the terms and provisions of the Mortgage Indenture.

In the event that all 2046 Notes are no longer outstanding under the Unsecured Indenture, then this Bond or any portion of the principal amount hereof will be deemed to have been paid for all purposes of the Mortgage Indenture and to be no longer Outstanding thereunder, and the Company's entire indebtedness in respect thereof will be satisfied and discharged.

If an Event of Default shall occur and be continuing, the Trustee or the Holders of not less than 25% in aggregate principal amount of the Bonds then Outstanding, considered as one class, may declare the principal amount of all Bonds then Outstanding to be due and payable immediately by notice in writing to the Company (and to the Trustee if given by Holders); *provided, however,* that with respect to certain Events of Default relating to bankruptcy, insolvency and similar events, the principal amount of all Bonds then Outstanding shall be due and payable immediately without further action by the Trustee or the Holders.

The Mortgage Indenture permits, with certain exceptions as therein provided, the Company and the Trustee to enter into one or more supplemental indentures for the purpose of adding any provisions to, or changing in any manner or eliminating any of the provisions of, the Mortgage Indenture with the consent of the Holders of not less than a majority in aggregate principal amount of the Bonds at the time Outstanding, considered as one class; *provided, however,* that if there shall be Bonds of more than one series Outstanding under the Mortgage Indenture and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such series, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all series so directly affected, considered as one class, shall be required; and *provided, further,* that if the Bonds of any series shall have been issued in more than one Tranche and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such Tranches, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all Tranches so directly affected, considered as one class, shall be required; and *provided, further,* that the Mortgage Indenture permits the Company and the Trustee to enter into one or more supplemental indentures for certain purposes without the consent of any Holders of Bonds. The Mortgage Indenture also contains provisions permitting the Holders of a majority in aggregate principal amount of Bonds, on behalf of the Holders of all such Bonds, to waive certain past defaults under the Mortgage Indenture and their consequences. Any such consent or waiver by the Holder of this Bond shall be conclusive and binding upon such Holder and upon all future Holders of this Bond and of any Bond issued upon the registration of transfer hereof or in exchange herefor or in lieu hereof, whether or not notation of such consent or waiver is made upon this Bond.

As provided in and subject to the provisions of the Mortgage Indenture, the Holder of this Bond shall not have the right to institute any proceeding with respect to the Mortgage Indenture or for the appointment of a receiver or trustee or for any other remedy thereunder, unless such Holder shall have previously given the Trustee written notice of a continuing Event of Default, the Holders of at least 25% in aggregate principal amount of the Bonds at the time Outstanding shall have made written request to the Trustee to institute proceedings in respect of such Event of Default as Trustee and offered the Trustee reasonable indemnity, and the Trustee shall not have received from the Holders of at least a majority in aggregate principal amount of Bonds at the time Outstanding a direction inconsistent with such written request, and shall have failed to institute any such proceeding for 60 days after receipt of such notice, request and offer of indemnity. The foregoing shall not apply to any suit instituted by the Holder of this Bond for the enforcement of any payment of principal hereof or any premium or interest hereon on or after the respective due dates expressed herein.

No reference herein to the Mortgage Indenture and no provision of this Bond or of the Mortgage Indenture shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal of and any premium and interest on this Bond at the times, place and rate, and in the coin or currency, herein prescribed.

As provided in the Mortgage Indenture and subject to certain limitations therein set forth, the transfer of this Bond (but only as may be required to effect a transfer to any successor to the Unsecured Note Trustee) is registrable in the Bond Register, upon surrender of this Bond for registration of transfer at the office or agency of the Company in any place where the principal of and any premium and interest on this Bond are payable, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Company, the Trustee or the Bond Registrar, as the case may be, duly executed by the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new Bonds of this series and of like tenor, of authorized denominations and for the same aggregate principal amount, will be issued to the designated transferee or transferees.

The Bonds of the Twentieth Series are issuable only in registered form without coupons in denominations of $1,000 and any integral multiple thereof.

No service charge shall be made for any such registration of transfer or exchange, but the Company may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

Prior to due presentment of this Bond for registration of transfer, the Company, the Trustee and any agent of the Company or the Trustee may treat the Person in whose name this Bond is registered as the owner hereof for all purposes, whether or not this Bond is overdue, and neither the Company, the Trustee nor any such agent shall be affected by notice to the contrary.

This Bond shall be governed by, and construed and enforced in accordance with, the laws of the State of California without regard to the principles of conflicts of laws thereunder, except to the extent that the Trust Indenture Act shall be applicable.

As provided in the Mortgage Indenture, no recourse shall be had for the payment of the principal of, premium, if any, or interest with respect to this Bond, or any part thereof, or for any claim based hereon or otherwise in respect hereof, or of the indebtedness represented hereby, or upon any obligation, covenant or agreement under the Mortgage Indenture, against any incorporator, shareholder, officer or director, as such, past, present or future, of the Company or of any predecessor or successor corporation (either directly or through the Company or a predecessor or successor corporation), whether by virtue of any constitutional provision, statute or rule of law or by the enforcement of any assessment or penalty or otherwise; it being expressly agreed and understood that the Mortgage Indenture and all the Bonds are solely corporate obligations and that any such personal liability is hereby expressly waived and released as a condition of, and as part of the consideration for, the execution of the Mortgage Indenture and the issuance of this Bond.

All terms used in this Bond which are not defined herein shall have the meanings assigned to them in the Mortgage Indenture.

**ASSIGNMENT FORM**

To assign this Bond, fill in the form below: (I) or (we) assign and transfer this Bond to

_____

(Insert assignee's soc. sec. or tax I.D. no.)

_____

_____

_____

_____

(Print or type assignee's name, address and zip code)

and irrevocably appoint _____
to transfer this Bond on the books of the Company. The agent may substitute another to act for him.

Date: _____

Your signature: _____
(Sign exactly as your name appears on the face of this Bond)

Tax Identification No.:

SIGNATURE GUARANTEE:

_____

Signatures must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Bond Registrar, which requirements include membership or participation in the Security Transfer Agent Medallion Program ("STAMP") or such other "signature guarantee program" as may be determined by the Bond Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

**[FORM OF BOND OF THE TWENTY-FIRST SERIES ]**

**[FORM OF FACE OF BOND]**

THIS BOND OF THE TWENTY-FIRST SERIES IS NOT TRANSFERABLE EXCEPT TO EFFECT A TRANSFER TO ANY SUCCESSOR TRUSTEE PURSUANT TO THE UNSECURED INDENTURE (AS DEFINED HEREIN), SUBJECT TO UNITED STATES SECURITIES LAWS.

THE FOLLOWING SUMMARY OF TERMS IS SUBJECT TO THE INFORMATION SET FORTH ON THE REVERSE HEREOF:

| PRINCIPAL AMOUNT: | ORIGINAL ISSUE DATE: | INTEREST RATE: |
|---|---|---|
| $600,000,000 | July 1, 2020 | 3.30% |

| MATURITY DATE: | INTEREST PAYMENT DATES: | THIS BOND IS A: |
|---|---|---|
| March 15, 2027 | March 15 and September 15 of each year, commencing September 15, 2020 | [  ] Global Book-Entry Bond<br>[X] Certificated Bond |

REGISTERED OWNER: BOKF, N.A., as Trustee under the Unsecured Note Indenture (as defined herein)

<div align="center">

**PACIFIC GAS AND ELECTRIC COMPANY**
**3.30% FIRST MORTGAGE BOND, COLLATERAL SERIES DUE 2027A**

</div>

No. _____                                                                    Principal Amount: $_____

CUSIP No: _____

     PACIFIC GAS AND ELECTRIC COMPANY, a corporation duly organized and existing under the laws of the State of California (herein called the "Company," which term includes any successor Person pursuant to the applicable provisions of the Mortgage Indenture hereinafter referred to), for value received, hereby promises to pay to BOKF, N.A., as trustee (the "Unsecured Note Trustee") under the Amended and Restated Indenture, dated as of April 22, 2005 (the "Original 2005 Unsecured Indenture" and, as heretofore amended and supplemented, the "Unsecured Indenture"), between the Company and the Unsecured Note Trustee, or registered assigns, the Principal Amount stated above on the Maturity Date stated above, and to pay interest thereon from and including the Original Issue Date stated above or, in the case of a 3.30% First Mortgage Bond, Collateral Series Due 2027A issued upon the registration of transfer or exchange, from and including the most recent Interest Payment Date to which interest has been paid or duly provided for, semi-annually in arrears on the Interest Payment Dates set forth above and on the Maturity Date stated above, commencing September 15, 2020, at the rate of 3.30% per annum until the principal hereof is paid or made available for payment; provided that the obligation of the Company to make any payment of the principal of and premium, if any, or interest on this Bond of the Twenty-First Series shall be fully or partially, as the case may be, paid, deemed to have been paid or otherwise satisfied and discharged to the extent that at the time any such payment shall be due, the then due principal of and premium, if any, or interest on the Company's 3.30% Senior Notes due 2027A issued pursuant to the Unsecured Indenture (the "2027A Notes") shall have been fully or partially paid, deemed to have been paid or otherwise satisfied and discharged.

     This Bond of the Twenty-First Series shall be delivered to the Unsecured Note Trustee to be held in trust for the benefit of the holders from time to time of the 2027A Notes as security for any and all obligations of the Company under the 2027A Notes, including but not limited to, (i) the full and prompt payment of the principal of and premium, if any, on the 2027A Notes when and as the same shall become due and payable in accordance with the terms and provisions of the Unsecured Indenture or the 2027A Notes, either at the stated maturity thereof, upon acceleration of the maturity thereof or upon redemption and (ii) the full and prompt payment of any interest on the 2027A Notes, when and as the same shall become due and payable in accordance with the terms and provisions of the Unsecured Indenture or the 2027A Notes.

     REFERENCE IS HEREBY MADE TO THE FURTHER PROVISIONS OF THIS BOND SET FORTH ON THE REVERSE HEREOF, WHICH FURTHER PROVISIONS SHALL FOR ALL PURPOSES HAVE THE SAME EFFECT AS IF SET FORTH AT THIS PLACE.

Unless the certificate of authentication hereon has been executed by the Trustee referred to on the reverse hereof by manual or electronic signature, this Bond shall not be entitled to any benefit under the Mortgage Indenture or be valid or obligatory for any purpose.

**IN WITNESS WHEREOF**, the Company has caused this instrument to be duly executed.

Dated: _____

<div align="right">

**PACIFIC GAS AND ELECTRIC COMPANY**

By _____

By _____

</div>

**TRUSTEE'S CERTIFICATE OF AUTHENTICATION**

This is one of the Bonds of the series designated as Bonds of the Twenty-First Series referred to in the within-mentioned Mortgage Indenture.

_____

_____,

As Trustee

By _____

Authorized Signatory

**[FORM OF REVERSE OF BOND OF THE TWENTY-FIRST SERIES]**

This 3.30% First Mortgage Bond, Collateral Series due 2027A is one of a duly authorized issue of Bonds of the Company (the "Bonds"), issued and issuable in one or more series under and equally secured by an Indenture of Mortgage, dated as of June 19, 2020 (such Indenture of Mortgage as originally executed and delivered and as supplemented or amended from time to time thereafter, together with any constituent instruments establishing the terms of particular Bonds, being herein called the "Mortgage Indenture"), between the Company and The Bank of New York Mellon Trust Company, N.A., as Trustee (herein called the "Trustee," which term includes any successor trustee under the Mortgage Indenture), and reference is hereby made to the Mortgage Indenture for a description of the property mortgaged, pledged and held in trust, the nature and extent of the security and the respective rights, limitations of rights, duties and immunities of the Company, the Trustee and the Holders of Bonds thereunder and of the terms and conditions upon which Bonds are, and are to be, authenticated and delivered. The acceptance of this Bond shall be deemed to constitute the consent and agreement by the Holder hereof to all of the terms and provisions of the Mortgage Indenture.

In the event that all 2027A Notes are no longer outstanding under the Unsecured Indenture, then this Bond or any portion of the principal amount hereof will be deemed to have been paid for all purposes of the Mortgage Indenture and to be no longer Outstanding thereunder, and the Company's entire indebtedness in respect thereof will be satisfied and discharged.

If an Event of Default shall occur and be continuing, the Trustee or the Holders of not less than 25% in aggregate principal amount of the Bonds then Outstanding, considered as one class, may declare the principal amount of all Bonds then Outstanding to be due and payable immediately by notice in writing to the Company (and to the Trustee if given by Holders); *provided*, *however*, that with respect to certain Events of Default relating to bankruptcy, insolvency and similar events, the principal amount of all Bonds then Outstanding shall be due and payable immediately without further action by the Trustee or the Holders.

The Mortgage Indenture permits, with certain exceptions as therein provided, the Company and the Trustee to enter into one or more supplemental indentures for the purpose of adding any provisions to, or changing in any manner or eliminating any of the provisions of, the Mortgage Indenture with the consent of the Holders of not less than a majority in aggregate principal amount of the Bonds at the time Outstanding, considered as one class; *provided*, *however*, that if there shall be Bonds of more than one series Outstanding under the Mortgage Indenture and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such series, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all series so directly affected, considered as one class, shall be required; and *provided*, *further*, that if the Bonds of any series shall have been issued in more than one Tranche and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such Tranches, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all Tranches so directly affected, considered as one class, shall be required; and *provided*, *further*, that the Mortgage Indenture permits the Company and the Trustee to enter into one or more supplemental indentures for certain purposes without the consent of any Holders of Bonds. The Mortgage Indenture also contains provisions permitting the Holders of a majority in aggregate principal amount of Bonds, on behalf of the Holders of all such Bonds, to waive certain past defaults under the Mortgage Indenture and their consequences. Any such consent or waiver by the Holder of this Bond shall be conclusive and binding upon such Holder and upon all future Holders of this Bond and of any Bond issued upon the registration of transfer hereof or in exchange herefor or in lieu hereof, whether or not notation of such consent or waiver is made upon this Bond.

As provided in and subject to the provisions of the Mortgage Indenture, the Holder of this Bond shall not have the right to institute any proceeding with respect to the Mortgage Indenture or for the appointment of a receiver or trustee or for any other remedy thereunder, unless such Holder shall have previously given the Trustee written notice of a continuing Event of Default, the Holders of at least 25% in aggregate principal amount of the Bonds at the time Outstanding shall have made written request to the Trustee to institute proceedings in respect of such Event of Default as Trustee and offered the Trustee reasonable indemnity, and the Trustee shall not have received from the Holders of at least a majority in aggregate principal amount of Bonds at the time Outstanding a direction inconsistent with such written request, and shall have failed to institute any such proceeding for 60 days after receipt of such notice, request and offer of indemnity. The foregoing shall not apply to any suit instituted by the Holder of this Bond for the enforcement of any payment of principal hereof or any premium or interest hereon on or after the respective due dates expressed herein.

No reference herein to the Mortgage Indenture and no provision of this Bond or of the Mortgage Indenture shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal of and any premium and interest on this Bond at the times, place and rate, and in the coin or currency, herein prescribed.

As provided in the Mortgage Indenture and subject to certain limitations therein set forth, the transfer of this Bond (but only as may be required to effect a transfer to any successor to the Unsecured Note Trustee) is registrable in the Bond Register, upon surrender of this Bond for registration of transfer at the office or agency of the Company in any place where the principal of and any premium and interest on this Bond are payable, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Company, the Trustee or the Bond Registrar, as the case may be, duly executed by the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new Bonds of this series and of like tenor, of authorized denominations and for the same aggregate principal amount, will be issued to the designated transferee or transferees.

The Bonds of the Twenty-First Series are issuable only in registered form without coupons in denominations of $1,000 and any integral multiple thereof.

No service charge shall be made for any such registration of transfer or exchange, but the Company may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

Prior to due presentment of this Bond for registration of transfer, the Company, the Trustee and any agent of the Company or the Trustee may treat the Person in whose name this Bond is registered as the owner hereof for all purposes, whether or not this Bond is overdue, and neither the Company, the Trustee nor any such agent shall be affected by notice to the contrary.

This Bond shall be governed by, and construed and enforced in accordance with, the laws of the State of California without regard to the principles of conflicts of laws thereunder, except to the extent that the Trust Indenture Act shall be applicable.

As provided in the Mortgage Indenture, no recourse shall be had for the payment of the principal of, premium, if any, or interest with respect to this Bond, or any part thereof, or for any claim based hereon or otherwise in respect hereof, or of the indebtedness represented hereby, or upon any obligation, covenant or agreement under the Mortgage Indenture, against any incorporator, shareholder, officer or director, as such, past, present or future, of the Company or of any predecessor or successor corporation (either directly or through the Company or a predecessor or successor corporation), whether by virtue of any constitutional provision, statute or rule of law or by the enforcement of any assessment or penalty or otherwise; it being expressly agreed and understood that the Mortgage Indenture and all the Bonds are solely corporate obligations and that any such personal liability is hereby expressly waived and released as a condition of, and as part of the consideration for, the execution of the Mortgage Indenture and the issuance of this Bond.

All terms used in this Bond which are not defined herein shall have the meanings assigned to them in the Mortgage Indenture.

**ASSIGNMENT FORM**

To assign this Bond, fill in the form below: (I) or (we) assign and transfer this Bond to

_____

(Insert assignee's soc. sec. or tax I.D. no.)

_____

_____

_____

_____

(Print or type assignee's name, address and zip code)

and irrevocably appoint _____

to transfer this Bond on the books of the Company. The agent may substitute another to act for him.

Date: _____

Your signature:_____
(Sign exactly as your name appears on the face of this Bond)

Tax Identification No.:

SIGNATURE GUARANTEE:

Signatures must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Bond Registrar, which requirements include membership or participation in the Security Transfer Agent Medallion Program ("STAMP") or such other "signature guarantee program" as may be determined by the Bond Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

**EXHIBIT P**

**[FORM OF BOND OF THE TWENTY-SECOND SERIES]**

**[FORM OF FACE OF BOND]**

THIS BOND OF THE TWENTY-SECOND SERIES IS NOT TRANSFERABLE EXCEPT TO EFFECT A TRANSFER TO ANY SUCCESSOR TRUSTEE PURSUANT TO THE UNSECURED INDENTURE (AS DEFINED HEREIN), SUBJECT TO UNITED STATES SECURITIES LAWS.

THE FOLLOWING SUMMARY OF TERMS IS SUBJECT TO THE INFORMATION SET FORTH ON THE REVERSE HEREOF:

PRINCIPAL AMOUNT:  ORIGINAL ISSUE DATE:  INTEREST RATE:
$1,150,000,000  July 1, 2020  3.30%

MATURITY DATE:  INTEREST PAYMENT DATES:  THIS BOND IS A:
December 1, 2027  June 1 and December 1 of each year, commencing December 1, 2020  ☐ Global Book-Entry Bond
  ☒ Certificated Bond

REGISTERED OWNER: BOKF, N.A, as Trustee under the Unsecured Note Indenture (as defined herein)

<div align="center">

**PACIFIC GAS AND ELECTRIC COMPANY**
**3.30% FIRST MORTGAGE BOND, COLLATERAL SERIES DUE 2027B**

</div>

No. _____                                    Principal Amount: $_____
CUSIP No: _____

    PACIFIC GAS AND ELECTRIC COMPANY, a corporation duly organized and existing under the laws of the State of California (herein called the "Company," which term includes any successor Person pursuant to the applicable provisions of the Mortgage Indenture hereinafter referred to), for value received, hereby promises to pay to BOKF, N.A., as trustee (the "Unsecured Note Trustee") under the Indenture, dated as of November 29, 2017 (the "Original 2017 Unsecured Indenture" and, as heretofore amended and supplemented, the "Unsecured Indenture"), between the Company and the Unsecured Note Trustee, or registered assigns, the Principal Amount stated above on the Maturity Date stated above, and to pay interest thereon from and including the Original Issue Date stated above or, in the case of a 3.30% First Mortgage Bond, Collateral Series Due 2027B issued upon the registration of transfer or exchange, from and including the most recent Interest Payment Date to which interest has been paid or duly provided for, semi-annually in arrears on the Interest Payment Dates set forth above and on the Maturity Date stated above, commencing December 1, 2020, at the rate of 3.30% per annum until the principal hereof is paid or made available for payment; provided that the obligation of the Company to make any payment of the principal of and premium, if any, or interest on this Bond of the Twenty-Second Series shall be fully or partially, as the case may be, paid, deemed to have been paid or otherwise satisfied and discharged to the extent that at the time any such payment shall be due, the then due principal of and premium, if any, or interest on the Company's 3.30% Senior Notes due 2027B issued pursuant to the Unsecured Indenture (the "2027B Notes") shall have been fully or partially paid, deemed to have been paid or otherwise satisfied and discharged.

    This Bond of the Twenty-Second Series shall be delivered to the Unsecured Note Trustee to be held in trust for the benefit of the holders from time to time of the 2027B Notes as security for any and all obligations of the Company under the 2027B Notes, including but not limited to, (i) the full and prompt payment of the principal of and premium, if any, on the 2027B Notes when and as the same shall become due and payable in accordance with the terms and provisions of the Unsecured Indenture or the 2027B Notes, either at the stated maturity thereof, upon acceleration of the maturity thereof or upon redemption and (ii) the full and prompt payment of any interest on the 2027B Notes, when and as the same shall become due and payable in accordance with the terms and provisions of the Unsecured Indenture or the 2027B Notes.

    REFERENCE IS HEREBY MADE TO THE FURTHER PROVISIONS OF THIS BOND SET FORTH ON THE REVERSE HEREOF, WHICH FURTHER PROVISIONS SHALL FOR ALL PURPOSES HAVE THE SAME EFFECT AS IF SET FORTH AT THIS PLACE.

Unless the certificate of authentication hereon has been executed by the Trustee referred to on the reverse hereof by manual or electronic signature, this Bond shall not be entitled to any benefit under the Mortgage Indenture or be valid or obligatory for any purpose.

**IN WITNESS WHEREOF**, the Company has caused this instrument to be duly executed.

Dated: _____

**PACIFIC GAS AND ELECTRIC COMPANY**

By _____

By _____

**TRUSTEE'S CERTIFICATE OF AUTHENTICATION**

This is one of the Bonds of the series designated as Bonds of the Twenty-Second Series referred to in the within-mentioned Mortgage Indenture.

<div style="text-align: right;">

_____ ,
As Trustee

By _____
Authorized Signatory

</div>

**[FORM OF REVERSE OF BOND OF THE TWENTY-SECOND SERIES]**

This 3.30% First Mortgage Bond, Collateral Series due 2027B is one of a duly authorized issue of Bonds of the Company (the "Bonds"), issued and issuable in one or more series under and equally secured by an Indenture of Mortgage, dated as of June 19, 2020 (such Indenture of Mortgage as originally executed and delivered and as supplemented or amended from time to time thereafter, together with any constituent instruments establishing the terms of particular Bonds, being herein called the "Mortgage Indenture"), between the Company and The Bank of New York Mellon Trust Company, N.A., as Trustee (herein called the "Trustee," which term includes any successor trustee under the Mortgage Indenture), and reference is hereby made to the Mortgage Indenture for a description of the property mortgaged, pledged and held in trust, the nature and extent of the security and the respective rights, limitations of rights, duties and immunities of the Company, the Trustee and the Holders of Bonds thereunder and of the terms and conditions upon which Bonds are, and are to be, authenticated and delivered. The acceptance of this Bond shall be deemed to constitute the consent and agreement by the Holder hereof to all of the terms and provisions of the Mortgage Indenture.

In the event that all 2027B Notes are no longer outstanding under the Unsecured Indenture, then this Bond or any portion of the principal amount hereof will be deemed to have been paid for all purposes of the Mortgage Indenture and to be no longer Outstanding thereunder, and the Company's entire indebtedness in respect thereof will be satisfied and discharged.

If an Event of Default shall occur and be continuing, the Trustee or the Holders of not less than 25% in aggregate principal amount of the Bonds then Outstanding, considered as one class, may declare the principal amount of all Bonds then Outstanding to be due and payable immediately by notice in writing to the Company (and to the Trustee if given by Holders); *provided, however,* that with respect to certain Events of Default relating to bankruptcy, insolvency and similar events, the principal amount of all Bonds then Outstanding shall be due and payable immediately without further action by the Trustee or the Holders.

The Mortgage Indenture permits, with certain exceptions as therein provided, the Company and the Trustee to enter into one or more supplemental indentures for the purpose of adding any provisions to, or changing in any manner or eliminating any of the provisions of, the Mortgage Indenture with the consent of the Holders of not less than a majority in aggregate principal amount of the Bonds at the time Outstanding, considered as one class; *provided, however,* that if there shall be Bonds of more than one series Outstanding under the Mortgage Indenture and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such series, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all series so directly affected, considered as one class, shall be required; and *provided, further,* that if the Bonds of any series shall have been issued in more than one Tranche and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such Tranches, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all Tranches so directly affected, considered as one class, shall be required; and *provided, further,* that the Mortgage Indenture permits the Company and the Trustee to enter into one or more supplemental indentures for certain purposes without the consent of any Holders of Bonds. The Mortgage Indenture also contains provisions permitting the Holders of a majority in aggregate principal amount of Bonds, on behalf of the Holders of all such Bonds, to waive certain past defaults under the Mortgage Indenture and their consequences. Any such consent or waiver by the Holder of this Bond shall be conclusive and binding upon such Holder and upon all future Holders of this Bond and of any Bond issued upon the registration of transfer hereof or in exchange herefor or in lieu hereof, whether or not notation of such consent or waiver is made upon this Bond.

As provided in and subject to the provisions of the Mortgage Indenture, the Holder of this Bond shall not have the right to institute any proceeding with respect to the Mortgage Indenture or for the appointment of a receiver or trustee or for any other remedy thereunder, unless such Holder shall have previously given the Trustee written notice of a continuing Event of Default, the Holders of at least 25% in aggregate principal amount of the Bonds at the time Outstanding shall have made written request to the Trustee to institute proceedings in respect of such Event of Default as Trustee and offered the Trustee reasonable indemnity, and the Trustee shall not have received from the Holders of at least a majority in aggregate principal amount of Bonds at the time Outstanding a direction inconsistent with such written request, and shall have failed to institute any such proceeding for 60 days after receipt of such notice, request and offer of indemnity. The foregoing shall not apply to any suit instituted by the Holder of this Bond for the enforcement of any payment of principal hereof or any premium or interest hereon on or after the respective due dates expressed herein.

No reference herein to the Mortgage Indenture and no provision of this Bond or of the Mortgage Indenture shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal of and any premium and interest on this Bond at the times, place and rate, and in the coin or currency, herein prescribed.

As provided in the Mortgage Indenture and subject to certain limitations therein set forth, the transfer of this Bond (but only as may be required to effect a transfer to any successor to the Unsecured Note Trustee) is registrable in the Bond Register, upon surrender of this Bond for registration of transfer at the office or agency of the Company in any place where the principal of and any premium and interest on this Bond are payable, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Company, the Trustee or the Bond Registrar, as the case may be, duly executed by the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new Bonds of this series and of like tenor, of authorized denominations and for the same aggregate principal amount, will be issued to the designated transferee or transferees.

The Bonds of the Twenty-Second Series are issuable only in registered form without coupons in denominations of $1,000 and any integral multiple thereof.

No service charge shall be made for any such registration of transfer or exchange, but the Company may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

Prior to due presentment of this Bond for registration of transfer, the Company, the Trustee and any agent of the Company or the Trustee may treat the Person in whose name this Bond is registered as the owner hereof for all purposes, whether or not this Bond is overdue, and neither the Company, the Trustee nor any such agent shall be affected by notice to the contrary.

This Bond shall be governed by, and construed and enforced in accordance with, the laws of the State of California without regard to the principles of conflicts of laws thereunder, except to the extent that the Trust Indenture Act shall be applicable.

As provided in the Mortgage Indenture, no recourse shall be had for the payment of the principal of, premium, if any, or interest with respect to this Bond, or any part thereof, or for any claim based hereon or otherwise in respect hereof, or of the indebtedness represented hereby, or upon any obligation, covenant or agreement under the Mortgage Indenture, against any incorporator, shareholder, officer or director, as such, past, present or future, of the Company or of any predecessor or successor corporation (either directly or through the Company or a predecessor or successor corporation), whether by virtue of any constitutional provision, statute or rule of law or by the enforcement of any assessment or penalty or otherwise; it being expressly agreed and understood that the Mortgage Indenture and all the Bonds are solely corporate obligations and that any such personal liability is hereby expressly waived and released as a condition of, and as part of the consideration for, the execution of the Mortgage Indenture and the issuance of this Bond.

All terms used in this Bond which are not defined herein shall have the meanings assigned to them in the Mortgage Indenture.

**ASSIGNMENT FORM**

To assign this Bond, fill in the form below: (I) or (we) assign and transfer this Bond to

_____

(Insert assignee's soc. sec. or tax I.D. no.)

_____

_____

_____

_____

(Print or type assignee's name, address and zip code)

and irrevocably appoint

to transfer this Bond on the books of the Company. The agent may substitute another to act for him.

Date: _____

Your signature: _____
(Sign exactly as your name appears on the face of this Bond)

Tax Identification No.:

SIGNATURE GUARANTEE:

_____

Signatures must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Bond Registrar, which requirements include membership or participation in the Security Transfer Agent Medallion Program ("STAMP") or such other "signature guarantee program" as may be determined by the Bond Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

<center>**EXHIBIT Q**</center>

<center>**[FORM OF BOND OF THE TWENTY-THIRD SERIES ]**</center>

<center>**[FORM OF FACE OF BOND]**</center>

THIS BOND OF THE TWENTY-THIRD SERIES IS NOT TRANSFERABLE EXCEPT TO EFFECT A TRANSFER TO ANY SUCCESSOR TRUSTEE PURSUANT TO THE UNSECURED INDENTURE (AS DEFINED HEREIN), SUBJECT TO UNITED STATES SECURITIES LAWS.

<center>THE FOLLOWING SUMMARY OF TERMS IS SUBJECT TO THE INFORMATION SET FORTH ON THE REVERSE HEREOF:</center>

| | | |
|---|---|---|
| PRINCIPAL AMOUNT:<br>$850,000,000 | ORIGINAL ISSUE DATE:<br>July 1, 2020 | INTEREST RATE:<br>3.95% |
| MATURITY DATE:<br>December 1, 2047 | INTEREST PAYMENT DATES:<br>June 1 and December 1 of each year, commencing December 1, 2020 | THIS BOND IS A:<br>☐ Global Book-Entry Bond<br>☒ Certificated Bond |

REGISTERED OWNER: BOKF, N.A., as Trustee under the Unsecured Note Indenture (as defined herein)

No. _____                                      Principal Amount: $_____

CUSIP No: _____

PACIFIC GAS AND ELECTRIC COMPANY, a corporation duly organized and existing under the laws of the State of California (herein called the "Company," which term includes any successor Person pursuant to the applicable provisions of the Mortgage Indenture hereinafter referred to), for value received, hereby promises to pay to BOKF, N.A., as trustee (the "Unsecured Note Trustee") under the Indenture, dated as of November 29, 2017 (the "Original 2017 Unsecured Indenture" and, as heretofore amended and supplemented, the "Unsecured Indenture"), between the Company and the Unsecured Note Trustee, or registered assigns, the Principal Amount stated above on the Maturity Date stated above, and to pay interest thereon from and including the Original Issue Date stated above or, in the case of a 3.95% First Mortgage Bond, Collateral Series Due 2047 issued upon the registration of transfer or exchange, from and including the most recent Interest Payment Date to which interest has been paid or duly provided for, semi-annually in arrears on the Interest Payment Dates set forth above and on the Maturity Date stated above, commencing December 1, 2020, at the rate of 3.95% per annum until the principal hereof is paid or made available for payment; provided that the obligation of the Company to make any payment of the principal of and premium, if any, or interest on this Bond of the Twenty-Third Series shall be fully or partially, as the case may be, paid, deemed to have been paid or otherwise satisfied and discharged to the extent that at the time any such payment shall be due, the then due principal of and premium, if any, or interest on the Company's 3.95% Senior Notes due 2047 issued pursuant to the Unsecured Indenture (the "2047 Notes") shall have been fully or partially paid, deemed to have been paid or otherwise satisfied and discharged.

This Bond of the Twenty-Third Series shall be delivered to the Unsecured Note Trustee to be held in trust for the benefit of the holders from time to time of the 2047 Notes as security for any and all obligations of the Company under the 2047 Notes, including but not limited to, (i) the full and prompt payment of the principal of and premium, if any, on the 2047 Notes when and as the same shall become due and payable in accordance with the terms and provisions of the Unsecured Indenture or the 2047 Notes, either at the stated maturity thereof, upon acceleration of the maturity thereof or upon redemption and (ii) the full and prompt payment of any interest on the 2047 Notes, when and as the same shall become due and payable in accordance with the terms and provisions of the Unsecured Indenture or the 2047 Notes.

REFERENCE IS HEREBY MADE TO THE FURTHER PROVISIONS OF THIS BOND SET FORTH ON THE REVERSE HEREOF, WHICH FURTHER PROVISIONS SHALL FOR ALL PURPOSES HAVE THE SAME EFFECT AS IF SET FORTH AT THIS PLACE.

Unless the certificate of authentication hereon has been executed by the Trustee referred to on the reverse hereof by manual or electronic signature, this Bond shall not be entitled to any benefit under the Mortgage Indenture or be valid or obligatory for any purpose.

**IN WITNESS WHEREOF**, the Company has caused this instrument to be duly executed.

Dated: _____

**PACIFIC GAS AND ELECTRIC COMPANY**

By _____

By _____

**TRUSTEE'S CERTIFICATE OF AUTHENTICATION**

This is one of the Bonds of the series designated as Bonds of the Twenty-Third Series referred to in the within-mentioned Mortgage Indenture.

_____,
As Trustee

By _____
Authorized Signatory

This 3.95% First Mortgage Bond, Collateral Series due 2047 is one of a duly authorized issue of Bonds of the Company (the "Bonds"), issued and issuable in one or more series under and equally secured by an Indenture of Mortgage, dated as of June 19, 2020 (such Indenture of Mortgage as originally executed and delivered and as supplemented or amended from time to time thereafter, together with any constituent instruments establishing the terms of particular Bonds, being herein called the "Mortgage Indenture"), between the Company and The Bank of New York Mellon Trust Company, N.A., as Trustee (herein called the "Trustee," which term includes any successor trustee under the Mortgage Indenture), and reference is hereby made to the Mortgage Indenture for a description of the property mortgaged, pledged and held in trust, the nature and extent of the security and the respective rights, limitations of rights, duties and immunities of the Company, the Trustee and the Holders of Bonds thereunder and of the terms and conditions upon which Bonds are, and are to be, authenticated and delivered. The acceptance of this Bond shall be deemed to constitute the consent and agreement by the Holder hereof to all of the terms and provisions of the Mortgage Indenture.

In the event that all 2047 Notes are no longer outstanding under the Unsecured Indenture, then this Bond or any portion of the principal amount hereof will be deemed to have been paid for all purposes of the Mortgage Indenture and to be no longer Outstanding thereunder, and the Company's entire indebtedness in respect thereof will be satisfied and discharged.

If an Event of Default shall occur and be continuing, the Trustee or the Holders of not less than 25% in aggregate principal amount of the Bonds then Outstanding, considered as one class, may declare the principal amount of all Bonds then Outstanding to be due and payable immediately by notice in writing to the Company (and to the Trustee if given by Holders); *provided*, *however*, that with respect to certain Events of Default relating to bankruptcy, insolvency and similar events, the principal amount of all Bonds then Outstanding shall be due and payable immediately without further action by the Trustee or the Holders.

The Mortgage Indenture permits, with certain exceptions as therein provided, the Company and the Trustee to enter into one or more supplemental indentures for the purpose of adding any provisions to, or changing in any manner or eliminating any of the provisions of, the Mortgage Indenture with the consent of the Holders of not less than a majority in aggregate principal amount of the Bonds at the time Outstanding, considered as one class; *provided*, *however*, that if there shall be Bonds of more than one series Outstanding under the Mortgage Indenture and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such series, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all series so directly affected, considered as one class, shall be required; and *provided*, *further*, that if the Bonds of any series shall have been issued in more than one Tranche and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such Tranches, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all Tranches so directly affected, considered as one class, shall be required; and *provided*, *further*, that the Mortgage Indenture permits the Company and the Trustee to enter into one or more supplemental indentures for certain purposes without the consent of any Holders of Bonds. The Mortgage Indenture also contains provisions permitting the Holders of a majority in aggregate principal amount of Bonds, on behalf of the Holders of all such Bonds, to waive certain past defaults under the Mortgage Indenture and their consequences. Any such consent or waiver by the Holder of this Bond shall be conclusive and binding upon such Holder and upon all future Holders of this Bond and of any Bond issued upon the registration of transfer hereof or in exchange herefor or in lieu hereof, whether or not notation of such consent or waiver is made upon this Bond.

As provided in and subject to the provisions of the Mortgage Indenture, the Holder of this Bond shall not have the right to institute any proceeding with respect to the Mortgage Indenture or for the appointment of a receiver or trustee or for any other remedy thereunder, unless such Holder shall have previously given the Trustee written notice of a continuing Event of Default, the Holders of at least 25% in aggregate principal amount of the Bonds at the time Outstanding shall have made written request to the Trustee to institute proceedings in respect of such Event of Default as Trustee and offered the Trustee reasonable indemnity, and the Trustee shall not have received from the Holders of at least a majority in aggregate principal amount of Bonds at the time Outstanding a direction inconsistent with such written request, and shall have failed to institute any such proceeding for 60 days after receipt of such notice, request and offer of indemnity. The foregoing shall not apply to any suit instituted by the Holder of this Bond for the enforcement of any payment of principal hereof or any premium or interest hereon on or after the respective due dates expressed herein.

No reference herein to the Mortgage Indenture and no provision of this Bond or of the Mortgage Indenture shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal of and any premium and interest on this Bond at the times, place and rate, and in the coin or currency, herein prescribed.

As provided in the Mortgage Indenture and subject to certain limitations therein set forth, the transfer of this Bond (but only as may be required to effect a transfer to any successor to the Unsecured Note Trustee) is registrable in the Bond Register, upon surrender of this Bond for registration of transfer at the office or agency of the Company in any place where the principal of and any premium and interest on this Bond are payable, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Company, the Trustee or the Bond Registrar, as the case may be, duly executed by the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new Bonds of this series and of like tenor, of authorized denominations and for the same aggregate principal amount, will be issued to the designated transferee or transferees.

The Bonds of the Twenty-Third Series are issuable only in registered form without coupons in denominations of $1,000 and any integral multiple thereof.

No service charge shall be made for any such registration of transfer or exchange, but the Company may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

Prior to due presentment of this Bond for registration of transfer, the Company, the Trustee and any agent of the Company or the Trustee may treat the Person in whose name this Bond is registered as the owner hereof for all purposes, whether or not this Bond is overdue, and neither the Company, the Trustee nor any such agent shall be affected by notice to the contrary.

This Bond shall be governed by, and construed and enforced in accordance with, the laws of the State of California without regard to the principles of conflicts of laws thereunder, except to the extent that the Trust Indenture Act shall be applicable.

As provided in the Mortgage Indenture, no recourse shall be had for the payment of the principal of, premium, if any, or interest with respect to this Bond, or any part thereof, or for any claim based hereon or otherwise in respect hereof, or of the indebtedness represented hereby, or upon any obligation, covenant or agreement under the Mortgage Indenture, against any incorporator, shareholder, officer or director, as such, past, present or future, of the Company or of any predecessor or successor corporation (either directly or through the Company or a predecessor or successor corporation), whether by virtue of any constitutional provision, statute or rule of law or by the enforcement of any assessment or penalty or otherwise; it being expressly agreed and understood that the Mortgage Indenture and all the Bonds are solely corporate obligations and that any such personal liability is hereby expressly waived and released as a condition of, and as part of the consideration for, the execution of the Mortgage Indenture and the issuance of this Bond.

All terms used in this Bond which are not defined herein shall have the meanings assigned to them in the Mortgage Indenture.

**ASSIGNMENT FORM**

To assign this Bond, fill in the form below: (I) or (we) assign and transfer this Bond to ___

_____

(Insert assignee's soc. sec. or tax I.D. no.)

_____

_____

_____

_____

(Print or type assignee's name, address and zip code)

and irrevocably appoint
to transfer this Bond on the books of the Company. The agent may substitute another to act for him.

Date: _____

Your signature: _____
(Sign exactly as your name appears on the face of this Bond)

Tax Identification No.:

SIGNATURE GUARANTEE:

_____
Signatures must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Bond Registrar, which requirements include membership or participation in the Security Transfer Agent Medallion Program ("STAMP") or such other "signature guarantee program" as may be determined by the Bond Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

# EXHIBIT R

## [FORM OF BOND OF THE TWENTY-FOURTH SERIES]

## [FORM OF FACE OF BOND]

THIS BOND OF THE TWENTY-FOURTH SERIES IS NOT TRANSFERABLE EXCEPT TO EFFECT A TRANSFER TO ANY SUCCESSOR TRUSTEE PURSUANT TO THE UNSECURED INDENTURE (AS DEFINED HEREIN), SUBJECT TO UNITED STATES SECURITIES LAWS.

THE FOLLOWING SUMMARY OF TERMS IS SUBJECT TO THE INFORMATION SET FORTH ON THE REVERSE HEREOF:

| | | |
|---|---|---|
| PRINCIPAL AMOUNT:<br>$500,000,000 | ORIGINAL ISSUE DATE:<br>July 1, 2020 | INTEREST RATE:<br>4.25% |
| MATURITY DATE:<br>August 1, 2023 | INTEREST PAYMENT DATES:<br>February 1 and August 1 of each year, commencing August 1, 2020 | THIS BOND IS A:<br>☐ Global Book-Entry Bond<br>☒ Certificated Bond |

REGISTERED OWNER: BOKF, N.A., as Trustee under the Unsecured Note Indenture (as defined herein)

**PACIFIC GAS AND ELECTRIC COMPANY**
4.25% FIRST MORTGAGE BOND, COLLATERAL SERIES DUE 2023

No. _____                                                   Principal Amount: $_____

CUSIP No: _____

PACIFIC GAS AND ELECTRIC COMPANY, a corporation duly organized and existing under the laws of the State of California (herein called the "Company," which term includes any successor Person pursuant to the applicable provisions of the Mortgage Indenture hereinafter referred to), for value received, hereby promises to pay to BOKF, N.A., as trustee (the "Unsecured Note Trustee") under the Indenture, dated as of August 6, 2018 (the "Original 2018 Unsecured Indenture" and and, as heretofore amended and supplemented, the "Unsecured Indenture"), between the Company and the Unsecured Note Trustee, or registered assigns, the Principal Amount stated above on the Maturity Date stated above, and to pay interest thereon from and including the Original Issue Date stated above or, in the case of a 4.25% First Mortgage Bond, Collateral Series Due 2023 issued upon the registration of transfer or exchange, from and including the most recent Interest Payment Date to which interest has been paid or duly provided for, semi-annually in arrears on the Interest Payment Dates set forth above and on the Maturity Date stated above, commencing August 1, 2020, at the rate of 4.25% per annum until the principal hereof is paid or made available for payment; provided that the obligation of the Company to make any payment of the principal of and premium, if any, or interest on this Bond of the Twenty-Fourth Series shall be fully or partially, as the case may be, paid, deemed to have been paid or otherwise satisfied and discharged to the extent that at the time any such payment shall be due, the then due principal of and premium, if any, or interest on the Company's 4.25% Senior Notes due 2023 issued pursuant to the Unsecured Indenture (the "2023 Notes") shall have been fully or partially paid, deemed to have been paid or otherwise satisfied and discharged.

This Bond of the Twenty-Fourth Series shall be delivered to the Unsecured Note Trustee to be held in trust for the benefit of the holders from time to time of the 2023 Notes as security for any and all obligations of the Company under the 2023 Notes, including but not limited to, (i) the full and prompt payment of the principal of and premium, if any, on the 2023 Notes when and as the same shall become due and payable in accordance with the terms and provisions of the Unsecured Indenture or the 2023 Notes, either at the stated maturity thereof, upon acceleration of the maturity thereof or upon redemption and (ii) the full and prompt payment of any interest on the 2023 Notes, when and as the same shall become due and payable in accordance with the terms and provisions of the Unsecured Indenture or the 2023 Notes.

REFERENCE IS HEREBY MADE TO THE FURTHER PROVISIONS OF THIS BOND SET FORTH ON THE REVERSE HEREOF, WHICH FURTHER PROVISIONS SHALL FOR ALL PURPOSES HAVE THE SAME EFFECT AS IF SET FORTH AT THIS PLACE.

Unless the certificate of authentication hereon has been executed by the Trustee referred to on the reverse hereof by manual or electronic signature, this Bond shall not be entitled to any benefit under the Mortgage Indenture or be valid or obligatory for any purpose.

**IN WITNESS WHEREOF**, the Company has caused this instrument to be duly executed.

Dated: _____

**PACIFIC GAS AND ELECTRIC COMPANY**

By _____

By _____

**TRUSTEE'S CERTIFICATE OF AUTHENTICATION**

This is one of the Bonds of the series designated as Bonds of the Twenty-Fourth Series referred to in the within-mentioned Mortgage Indenture.

_____,
As Trustee

By _____
Authorized Signatory

## [FORM OF REVERSE OF BOND OF THE TWENTY-FOURTH SERIES]

This 4.25% First Mortgage Bond, Collateral Series due 2023 is one of a duly authorized issue of Bonds of the Company (the "Bonds"), issued and issuable in one or more series under and equally secured by an Indenture of Mortgage, dated as of June 19, 2020 (such Indenture of Mortgage as originally executed and delivered and as supplemented or amended from time to time thereafter, together with any constituent instruments establishing the terms of particular Bonds, being herein called the "Mortgage Indenture"), between the Company and The Bank of New York Mellon Trust Company, N.A., as Trustee (herein called the "Trustee," which term includes any successor trustee under the Mortgage Indenture), and reference is hereby made to the Mortgage Indenture for a description of the property mortgaged, pledged and held in trust, the nature and extent of the security and the respective rights, limitations of rights, duties and immunities of the Company, the Trustee and the Holders of Bonds thereunder and of the terms and conditions upon which Bonds are, and are to be, authenticated and delivered. The acceptance of this Bond shall be deemed to constitute the consent and agreement by the Holder hereof to all of the terms and provisions of the Mortgage Indenture.

In the event that all 2023 Notes are no longer outstanding under the Unsecured Indenture, then this Bond or any portion of the principal amount hereof will be deemed to have been paid for all purposes of the Mortgage Indenture and to be no longer Outstanding thereunder, and the Company's entire indebtedness in respect thereof will be satisfied and discharged.

If an Event of Default shall occur and be continuing, the Trustee or the Holders of not less than 25% in aggregate principal amount of the Bonds then Outstanding, considered as one class, may declare the principal amount of all Bonds then Outstanding to be due and payable immediately by notice in writing to the Company (and to the Trustee if given by Holders); *provided, however,* that with respect to certain Events of Default relating to bankruptcy, insolvency and similar events, the principal amount of all Bonds then Outstanding shall be due and payable immediately without further action by the Trustee or the Holders.

The Mortgage Indenture permits, with certain exceptions as therein provided, the Company and the Trustee to enter into one or more supplemental indentures for the purpose of adding any provisions to, or changing in any manner or eliminating any of the provisions of, the Mortgage Indenture with the consent of the Holders of not less than a majority in aggregate principal amount of the Bonds at the time Outstanding, considered as one class; *provided, however,* that if there shall be Bonds of more than one series Outstanding under the Mortgage Indenture and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such series, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all series so directly affected, considered as one class, shall be required; and *provided, further,* that if the Bonds of any series shall have been issued in more than one Tranche and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such Tranches, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all Tranches so directly affected, considered as one class, shall be required; and *provided, further,* that the Mortgage Indenture permits the Company and the Trustee to enter into one or more supplemental indentures for certain purposes without the consent of any Holders of Bonds. The Mortgage Indenture also contains provisions permitting the Holders of a majority in aggregate principal amount of Bonds, on behalf of the Holders of all such Bonds, to waive certain past defaults under the Mortgage Indenture and their consequences. Any such consent or waiver by the Holder of this Bond shall be conclusive and binding upon such Holder and upon all future Holders of this Bond and of any Bond issued upon the registration of transfer hereof or in exchange herefor or in lieu hereof, whether or not notation of such consent or waiver is made upon this Bond.

As provided in and subject to the provisions of the Mortgage Indenture, the Holder of this Bond shall not have the right to institute any proceeding with respect to the Mortgage Indenture or for the appointment of a receiver or trustee or for any other remedy thereunder, unless such Holder shall have previously given the Trustee written notice of a continuing Event of Default, the Holders of at least 25% in aggregate principal amount of the Bonds at the time Outstanding shall have made written request to the Trustee to institute proceedings in respect of such Event of Default as Trustee and offered the Trustee reasonable indemnity, and the Trustee shall not have received from the Holders of at least a majority in aggregate principal amount of Bonds at the time Outstanding a direction inconsistent with such written request, and shall have failed to institute any such proceeding for 60 days after receipt of such notice, request and offer of indemnity. The foregoing shall not apply to any suit instituted by the Holder of this Bond for the enforcement of any payment of principal hereof or any premium or interest hereon on or after the respective due dates expressed herein.

No reference herein to the Mortgage Indenture and no provision of this Bond or of the Mortgage Indenture shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal of and any premium and interest on this Bond at the times, place and rate, and in the coin or currency, herein prescribed.

As provided in the Mortgage Indenture and subject to certain limitations therein set forth, the transfer of this Bond (but only as may be required to effect a transfer to any successor to the Unsecured Note Trustee) is registrable in the Bond Register, upon surrender of this Bond for registration of transfer at the office or agency of the Company in any place where the principal of and any premium and interest on this Bond are payable, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Company, the Trustee or the Bond Registrar, as the case may be, duly executed by the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new Bonds of this series and of like tenor, of authorized denominations and for the same aggregate principal amount, will be issued to the designated transferee or transferees.

The Bonds of the Twenty-Fourth Series are issuable only in registered form without coupons in denominations of $1,000 and any integral multiple thereof.

No service charge shall be made for any such registration of transfer or exchange, but the Company may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

Prior to due presentment of this Bond for registration of transfer, the Company, the Trustee and any agent of the Company or the Trustee may treat the Person in whose name this Bond is registered as the owner hereof for all purposes, whether or not this Bond is overdue, and neither the Company, the Trustee nor any such agent shall be affected by notice to the contrary.

This Bond shall be governed by, and construed and enforced in accordance with, the laws of the State of California without regard to the principles of conflicts of laws thereunder, except to the extent that the Trust Indenture Act shall be applicable.

As provided in the Mortgage Indenture, no recourse shall be had for the payment of the principal of, premium, if any, or interest with respect to this Bond, or any part thereof, or for any claim based hereon or otherwise in respect hereof, or of the indebtedness represented hereby, or upon any obligation, covenant or agreement under the Mortgage Indenture, against any incorporator, shareholder, officer or director, as such, past, present or future, of the Company or of any predecessor or successor corporation (either directly or through the Company or a predecessor or successor corporation), whether by virtue of any constitutional provision, statute or rule of law or by the enforcement of any assessment or penalty or otherwise; it being expressly agreed and understood that the Mortgage Indenture and all the Bonds are solely corporate obligations and that any such personal liability is hereby expressly waived and released as a condition of, and as part of the consideration for, the execution of the Mortgage Indenture and the issuance of this Bond.

All terms used in this Bond which are not defined herein shall have the meanings assigned to them in the Mortgage Indenture.

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 624 of 1367

# ASSIGNMENT FORM

To assign this Bond, fill in the form below: (I) or (we) assign and transfer this Bond to

_____

(Insert assignee's soc. sec. or tax I.D. no.)

_____

_____

_____

_____

(Print or type assignee's name, address and zip code)

and irrevocably appoint

to transfer this Bond on the books of the Company. The agent may substitute another to act for him.

Date: _____

Your signature: _____
(Sign exactly as your name appears on the face of this Bond)

Tax Identification No.:

SIGNATURE GUARANTEE:

_____

Signatures must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Bond Registrar, which requirements include membership or participation in the Security Transfer Agent Medallion Program ("STAMP") or such other "signature guarantee program" as may be determined by the Bond Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

**EXHIBIT S**

**[FORM OF BOND OF THE TWENTY-FIFTH SERIES]**

**[FORM OF FACE OF BOND]**

THIS BOND OF THE TWENTY-FIFTH SERIES IS NOT TRANSFERABLE EXCEPT TO EFFECT A TRANSFER TO ANY SUCCESSOR TRUSTEE PURSUANT TO THE UNSECURED INDENTURE (AS DEFINED HEREIN), SUBJECT TO UNITED STATES SECURITIES LAWS.

THE FOLLOWING SUMMARY OF TERMS IS SUBJECT TO THE INFORMATION SET FORTH ON THE REVERSE HEREOF:

| PRINCIPAL AMOUNT: | ORIGINAL ISSUE DATE: | INTEREST RATE: |
|---|---|---|
| $300,000,000 | July 1, 2020 | 4.65% |

| MATURITY DATE: | INTEREST PAYMENT DATES: | THIS BOND IS A: |
|---|---|---|
| August 1, 2028 | February 1 and August 1 of each year, commencing August 1, 2020 | ☐ Global Book-Entry Bond |
| | | ☒ Certificated Bond |

REGISTERED OWNER: BOKF, N.A., as Trustee under the Unsecured Note Indenture (as defined herein)

<div align="center">

**PACIFIC GAS AND ELECTRIC COMPANY**
**4.65% FIRST MORTGAGE BOND, COLLATERAL SERIES DUE 2028**

</div>

No. _____                                                  Principal Amount: $_____
CUSIP No: _____

    PACIFIC GAS AND ELECTRIC COMPANY, a corporation duly organized and existing under the laws of the State of California (herein called the "Company," which term includes any successor Person pursuant to the applicable provisions of the Mortgage Indenture hereinafter referred to), for value received, hereby promises to pay to BOKF, N.A., as trustee (the "Unsecured Note Trustee") under the Indenture, dated as of August 6, 2018 (the "Original 2018 Unsecured Indenture" and, as heretofore amended and supplemented, the "Unsecured Indenture"), between the Company and the Unsecured Note Trustee, or registered assigns, the Principal Amount stated above on the Maturity Date stated above, and to pay interest thereon from and including the Original Issue Date stated above or, in the case of a 4.65% First Mortgage Bond, Collateral Series Due 2028 issued upon the registration of transfer or exchange, from and including the most recent Interest Payment Date to which interest has been paid or duly provided for, semi-annually in arrears on the Interest Payment Dates set forth above and on the Maturity Date stated above, commencing August 1, 2020, at the rate of 4.65% per annum until the principal hereof is paid or made available for payment; provided that the obligation of the Company to make any payment of the principal of and premium, if any, or interest on this Bond of the Twenty-Fifth Series shall be fully or partially, as the case may be, paid, deemed to have been paid or otherwise satisfied and discharged to the extent that at the time any such payment shall be due, the then due principal of and premium, if any, or interest on the Company's 4.65% Senior Notes due 2028 issued pursuant to the Unsecured Indenture (the "2028 Notes") shall have been fully or partially paid, deemed to have been paid or otherwise satisfied and discharged.

    This Bond of the Twenty-Fifth Series shall be delivered to the Unsecured Note Trustee to be held in trust for the benefit of the holders from time to time of the 2028 Notes as security for any and all obligations of the Company under the 2028 Notes, including but not limited to, (i) the full and prompt payment of the principal of and premium, if any, on the 2028 Notes when and as the same shall become due and payable in accordance with the terms and provisions of the Unsecured Indenture or the 2028 Notes, either at the stated maturity thereof, upon acceleration of the maturity thereof or upon redemption and (ii) the full and prompt payment of any interest on the 2028 Notes, when and as the same shall become due and payable in accordance with the terms and provisions of the Unsecured Indenture or the 2028 Notes.

    REFERENCE IS HEREBY MADE TO THE FURTHER PROVISIONS OF THIS BOND SET FORTH ON THE REVERSE HEREOF, WHICH FURTHER PROVISIONS SHALL FOR ALL PURPOSES HAVE THE SAME EFFECT AS IF SET FORTH AT THIS PLACE.

Unless the certificate of authentication hereon has been executed by the Trustee referred to on the reverse hereof by manual or electronic signature, this Bond shall not be entitled to any benefit under the Mortgage Indenture or be valid or obligatory for any purpose.

**IN WITNESS WHEREOF**, the Company has caused this instrument to be duly executed.

Dated: _____

PACIFIC GAS AND ELECTRIC COMPANY

By _____

By _____

**TRUSTEE'S CERTIFICATE OF AUTHENTICATION**

This is one of the Bonds of the series designated as Bonds of the Twenty-Fifth Series referred to in the within-mentioned Mortgage Indenture.

_____,
As Trustee

By _____
Authorized Signatory

## [FORM OF REVERSE OF BOND OF THE TWENTY-FIFTH SERIES]

This 4.65% First Mortgage Bond, Collateral Series due 2028 is one of a duly authorized issue of Bonds of the Company (the "Bonds"), issued and issuable in one or more series under and equally secured by an Indenture of Mortgage, dated as of June 19, 2020 (such Indenture of Mortgage as originally executed and delivered and as supplemented or amended from time to time thereafter, together with any constituent instruments establishing the terms of particular Bonds, being herein called the "Mortgage Indenture"), between the Company and The Bank of New York Mellon Trust Company, N.A., as Trustee (herein called the "Trustee," which term includes any successor trustee under the Mortgage Indenture), and reference is hereby made to the Mortgage Indenture for a description of the property mortgaged, pledged and held in trust, the nature and extent of the security and the respective rights, limitations of rights, duties and immunities of the Company, the Trustee and the Holders of Bonds thereunder and of the terms and conditions upon which Bonds are, and are to be, authenticated and delivered. The acceptance of this Bond shall be deemed to constitute the consent and agreement by the Holder hereof to all of the terms and provisions of the Mortgage Indenture.

In the event that all 2028 Notes are no longer outstanding under the Unsecured Indenture, then this Bond or any portion of the principal amount hereof will be deemed to have been paid for all purposes of the Mortgage Indenture and to be no longer Outstanding thereunder, and the Company's entire indebtedness in respect thereof will be satisfied and discharged.

If an Event of Default shall occur and be continuing, the Trustee or the Holders of not less than 25% in aggregate principal amount of the Bonds then Outstanding, considered as one class, may declare the principal amount of all Bonds then Outstanding to be due and payable immediately by notice in writing to the Company (and to the Trustee if given by Holders); *provided, however,* that with respect to certain Events of Default relating to bankruptcy, insolvency and similar events, the principal amount of all Bonds then Outstanding shall be due and payable immediately without further action by the Trustee or the Holders.

The Mortgage Indenture permits, with certain exceptions as therein provided, the Company and the Trustee to enter into one or more supplemental indentures for the purpose of adding any provisions to, or changing in any manner or eliminating any of the provisions of, the Mortgage Indenture with the consent of the Holders of not less than a majority in aggregate principal amount of the Bonds at the time Outstanding, considered as one class; *provided, however,* that if there shall be Bonds of more than one series Outstanding under the Mortgage Indenture and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such series, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all series so directly affected, considered as one class, shall be required; and *provided, further,* that if the Bonds of any series shall have been issued in more than one Tranche and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such Tranches, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all Tranches so directly affected, considered as one class, shall be required; and *provided, further,* that the Mortgage Indenture permits the Company and the Trustee to enter into one or more supplemental indentures for certain purposes without the consent of any Holders of Bonds. The Mortgage Indenture also contains provisions permitting the Holders of a majority in aggregate principal amount of Bonds, on behalf of the Holders of all such Bonds, to waive certain past defaults under the Mortgage Indenture and their consequences. Any such consent or waiver by the Holder of this Bond shall be conclusive and binding upon such Holder and upon all future Holders of this Bond and of any Bond issued upon the registration of transfer hereof or in exchange herefor or in lieu hereof, whether or not notation of such consent or waiver is made upon this Bond.

As provided in and subject to the provisions of the Mortgage Indenture, the Holder of this Bond shall not have the right to institute any proceeding with respect to the Mortgage Indenture or for the appointment of a receiver or trustee or for any other remedy thereunder, unless such Holder shall have previously given the Trustee written notice of a continuing Event of Default, the Holders of at least 25% in aggregate principal amount of the Bonds at the time Outstanding shall have made written request to the Trustee to institute proceedings in respect of such Event of Default as Trustee and offered the Trustee reasonable indemnity, and the Trustee shall not have received from the Holders of at least a majority in aggregate principal amount of Bonds at the time Outstanding a direction inconsistent with such written request, and shall have failed to institute any such proceeding for 60 days after receipt of such notice, request and offer of indemnity. The foregoing shall not apply to any suit instituted by the Holder of this Bond for the enforcement of any payment of principal hereof or any premium or interest hereon on or after the respective due dates expressed herein.

No reference herein to the Mortgage Indenture and no provision of this Bond or of the Mortgage Indenture shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal of and any premium and interest on this Bond at the times, place and rate, and in the coin or currency, herein prescribed.

As provided in the Mortgage Indenture and subject to certain limitations therein set forth, the transfer of this Bond (but only as may be required to effect a transfer to any successor to the Unsecured Note Trustee) is registrable in the Bond Register, upon surrender of this Bond for registration of transfer at the office or agency of the Company in any place where the principal of and any premium and interest on this Bond are payable, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Company, the Trustee or the Bond Registrar, as the case may be, duly executed by the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new Bonds of this series and of like tenor, of authorized denominations and for the same aggregate principal amount, will be issued to the designated transferee or transferees.

The Bonds of the Twenty-Fifth Series are issuable only in registered form without coupons in denominations of $1,000 and any integral multiple thereof.

No service charge shall be made for any such registration of transfer or exchange, but the Company may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

Prior to due presentment of this Bond for registration of transfer, the Company, the Trustee and any agent of the Company or the Trustee may treat the Person in whose name this Bond is registered as the owner hereof for all purposes, whether or not this Bond is overdue, and neither the Company, the Trustee nor any such agent shall be affected by notice to the contrary.

This Bond shall be governed by, and construed and enforced in accordance with, the laws of the State of California without regard to the principles of conflicts of laws thereunder, except to the extent that the Trust Indenture Act shall be applicable.

As provided in the Mortgage Indenture, no recourse shall be had for the payment of the principal of, premium, if any, or interest with respect to this Bond, or any part thereof, or for any claim based hereon or otherwise in respect hereof, or of the indebtedness represented hereby, or upon any obligation, covenant or agreement under the Mortgage Indenture, against any incorporator, shareholder, officer or director, as such, past, present or future, of the Company or of any predecessor or successor corporation (either directly or through the Company or a predecessor or successor corporation), whether by virtue of any constitutional provision, statute or rule of law or by the enforcement of any assessment or penalty or otherwise; it being expressly agreed and understood that the Mortgage Indenture and all the Bonds are solely corporate obligations and that any such personal liability is hereby expressly waived and released as a condition of, and as part of the consideration for, the execution of the Mortgage Indenture and the issuance of this Bond.

All terms used in this Bond which are not defined herein shall have the meanings assigned to them in the Mortgage Indenture.

**ASSIGNMENT FORM**

To assign this Bond, fill in the form below: (I) or (we) assign and transfer this Bond to

(Insert assignee's soc. sec. or tax I.D. no.)

_____

_____

_____

_____

(Print or type assignee's name, address and zip code)

and irrevocably appoint _____

to transfer this Bond on the books of the Company. The agent may substitute another to act for him.

Date: _____

Your signature: _____
(Sign exactly as your name appears on the face of this Bond)

Tax Identification No.:

SIGNATURE GUARANTEE:

_____

Signatures must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Bond Registrar, which requirements include membership or participation in the Security Transfer Agent Medallion Program ("STAMP") or such other "signature guarantee program" as may be determined by the Bond Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

**Exhibit 4.7**

TO BE RECORDED AND WHEN
RECORDED RETURN TO:

Hunton Andrews Kurth LLP
550 South Hope Street, Suite 2000
Los Angeles, CA 90071
Attention: Robert M. Johnson, Esq.

---

**FIFTH SUPPLEMENTAL INDENTURE**

**DATED AS OF JULY 1, 2020**

**SUPPLEMENT TO INDENTURE OF MORTGAGE**
**DATED AS OF JUNE 19, 2020**

**PACIFIC GAS AND ELECTRIC COMPANY**
**Issuer (Mortgagor)**

**and**

**THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A.,**
**Trustee (Mortgagee)**

---

**TABLE OF CONTENTS**

ARTICLE I DEFINITIONS                                                                                          1
ARTICLE II ESTABLISHMENT OF THE BOND OF THE THIRTY-SECOND SERIES                                              2
ARTICLE III ESTABLISHMENT OF THE BOND OF THE THIRTY-THIRD SERIES                                              3
ARTICLE IV ESTABLISHMENT OF THE BOND OF THE THIRTY-FOURTH SERIES                                              4
ARTICLE V ESTABLISHMENT OF THE BOND OF THE THIRTY-FIFTH SERIES                                                6
ARTICLE VI TRUSTEE                                                                                            7
ARTICLE VII MISCELLANEOUS                                                                                     7

EXHIBIT A – FORM OF THE BOND OF THE THIRTY-SECOND SERIES
EXHIBIT B – FORM OF THE BOND OF THE THIRTY-THIRD SERIES
EXHIBIT C – FORM OF THE BOND OF THE THIRTY-FOURTH SERIES
EXHIBIT D – FORM OF THE BOND OF THE THIRTY-FIFTH SERIES

**FIFTH SUPPLEMENTAL INDENTURE**, dated as of July 1, 2020 (this "Fifth Supplemental Indenture"), by and between **PACIFIC GAS AND ELECTRIC COMPANY**, a California corporation (the "Company"), and **THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A.**, a national banking association organized under the laws of the United States of America, as Trustee and Mortgagee under the Mortgage Indenture (as hereinafter defined) (the "Trustee").

## RECITALS OF THE COMPANY

A. The Company and the Trustee are parties to that certain Indenture of Mortgage, dated as of June 19, 2020 (together with all indentures supplemental thereto, the "Mortgage Indenture"), providing for the issuance by the Company of Bonds (as defined in the Mortgage Indenture) from time to time.

B. Under the Mortgage Indenture, the Company is authorized to issue unlimited series of Bonds and establish one or more series of Bonds at any time in accordance with the provisions of the Mortgage Indenture, and the terms of such series of Bonds may be described by a supplemental indenture executed by the Company and the Trustee.

C. Pursuant to the Revolving Credit Agreement (as hereinafter defined) and Section 3.01 of the Mortgage Indenture, the Company deems it advisable to enter into this Fifth Supplemental Indenture for the purposes of establishing the terms of the Bond of the Thirty-Second Series (as hereinafter defined).

D. Pursuant to the Term Credit Agreement (as hereinafter defined) and Section 3.01 of the Mortgage Indenture, the Company deems it advisable to enter into this Fifth Supplemental Indenture for the purposes of establishing the terms of the Bond of the Thirty-Third Series in connection with the 364-Day Facility (as hereinafter defined) and the Bond of the Thirty-Fourth Series in connection with the 18-Month Facility (as hereinafter defined).

E. Pursuant to the Collateral Management Agreement (as hereinafter defined) and Section 3.01 of the Mortgage Indenture, the Company deems it advisable to enter into this Fifth Supplemental Indenture for the purposes of establishing the terms of the Bond of the Thirty-Fifth Series (as hereinafter defined).

F. The execution and delivery of this Fifth Supplemental Indenture has been authorized by a Board Resolution (as defined in the Mortgage Indenture).

G. Concurrent with the execution hereof, the Company has caused its counsel to deliver to the Trustee an Officer's Certificate and Opinion of Counsel (as defined in the Mortgage Indenture) pursuant to Section 14.03 of the Mortgage Indenture.

H. The Company has done all things necessary to make this Fifth Supplemental Indenture a valid agreement of the Company, in accordance with its terms.

**NOW, THEREFORE**, the Company and the Trustee agree, for the benefit of each other and the equal and proportionate benefit of the Holders of the Collateral Bonds (as hereinafter defined), as follows:

## ARTICLE I

## DEFINITIONS

The following definitions are hereby established for purposes of this Fifth Supplemental Indenture (capitalized terms used but not defined herein have the meaning set forth in the Mortgage Indenture) and shall have the meanings set forth in this Fifth Supplemental Indenture only for purposes of this Fifth Supplemental Indenture:

"18-Month Facility" means the $1,500,000,000 18-month term loan facility made available to the Company by certain lenders under the Term Credit Agreement.

1

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 635 of 1367

"364-Day Facility" means the $1,500,000,000 364-day term loan facility made available to the Company by certain lenders under the Term Credit Agreement.

"Collateral Bonds" means, collectively, the Bonds of the Thirty-Second Series, the Bonds of the Thirty-Third Series, the Bonds of the Thirty-Fourth Series and the Bonds of the Thirty-Fifth Series.

"Collateral Management Agreement" means the Collateral Management Agreement, dated as of July 1, 2020, by and among the Company, the several banks and other financial institutions or entities party thereto from time to time, and Citibank, N.A., as Agent, as amended, supplemented, restated or otherwise modified from time to time.

"Revolving Credit Agreement" means the Credit Agreement, dated as of July 1, 2020, by and among the Company, the several banks and other financial institutions or entities party thereto from time to time, JPMorgan Chase Bank, N.A. and Citibank, N.A., as co-administrative agents, and Citibank, N.A., as Designated Agent, as amended, supplemented, restated or otherwise modified from time to time.

"Term Credit Agreement" means the Term Loan Credit Agreement, dated as of July 1, 2020, by and among the Company, the several banks and other financial institutions or entities party thereto from time to time, and JPMorgan Chase Bank, N.A., as Administrative Agent, as amended, supplemented, restated or otherwise modified from time to time.

The words "herein," "hereof" and "hereunder" and other words of similar import refer to this Fifth Supplemental Indenture as a whole and not to any particular Article, Section or other subdivision.

## ARTICLE II

## ESTABLISHMENT OF THE BOND OF THE THIRTY-SECOND SERIES

SECTION 1. Establishment of the Bond of the Thirty-Second Series.

Pursuant to the terms hereof and Section 3.01 of the Mortgage Indenture, the Company hereby establishes a thirty-second series of Bonds designated as the "Bond of the Thirty-Second Series" (the "Bond of the Thirty-Second Series"). The Bond of the Thirty-Second Series shall be fully registered in the name of and delivered to Citibank, N.A., as Designated Agent under the Revolving Credit Agreement.

SECTION 2. Form of the Bond of the Thirty-Second Series.

The Bond of the Thirty-Second Series shall be issued in certificated form and the form of the Bond of the Thirty-Second Series is set forth in Exhibit A hereto and is hereby incorporated herein and made a part hereof.

SECTION 3. Principal Amount of the Bond of the Thirty-Second Series.

The Bond of the Thirty-Second Series shall be dated July 1, 2020 and be issued in an initial face amount of $3,500,000,000, which face amount shall represent the maximum principal amount of the Bond of the Thirty-Second Series. The amount of principal payable on the Bond of the Thirty-Second Series, and the date or dates on which such principal is payable, shall be as set forth in said Bond. For all purposes of the Mortgage Indenture, the principal amount of the Bond of the Thirty-Second Series Outstanding as of any date of calculation shall be equal to the Obligations (as defined in the Bond of the Thirty-Second Series) outstanding under the Loan Documents (as defined in the Bond of the Thirty-Second Series) as of such date, but in no event shall the principal amount of such Bond as of any date of calculation be greater than the then current face amount of such Bond. The initial face amount of the Bond of the Thirty-Second Series may be reduced from time to time as set forth in said Bond. Principal of the Bond of the Thirty-Second Series shall be payable without the presentment or surrender thereof.

2

SECTION 4. <u>Interest Rates; Interest Payment Dates; Stated Maturity of the Bond of the Thirty-Second Series.</u>

The Bond of the Thirty-Second Series shall bear interest at the rate or rates, and interest with respect thereto will be payable on the Interest Payment Dates, set forth in said Bond. The Bond of the Thirty-Second Series shall have a Stated Maturity of July 1, 2023; <u>provided</u>, that the Stated Maturity may be extended from time to time as set forth in said Bond. Interest on the Bond of the Thirty-Second Series shall accrue from the same dates that interest, if any, accrues on outstanding Obligations pursuant to the Loan Documents (as defined in the Bond of the Thirty-Second Series) until such interest is paid.

SECTION 5. <u>No Redemption; No Sinking Fund.</u>

The Bond of the Thirty-Second Series shall not be subject to redemption prior to its Stated Maturity. No sinking fund is provided for the Bond of the Thirty-Second Series.

SECTION 6. <u>Paying Agent and Bond Registrar.</u>

The Trustee is hereby appointed as initial Paying Agent and initial Bond Registrar for the Bond of the Thirty-Second Series. The Place of Payment of the Bond of the Thirty-Second Series shall be the Corporate Trust Office of the Trustee; <u>provided</u>, however, that the Company reserves the right to change, by one or more Officer's Certificates any such place or the Bond Registrar; <u>provided</u>, further, that the Company reserves the right to designate, by one or more Officer's Certificates, one or more of its offices as any such place or itself as the Bond Registrar.

SECTION 7. <u>No Exchanges; Limitations on Transfers.</u>

The Bond of the Thirty-Second Series may not be exchanged for any other Bond, except as provided in Section 3.06 of the Mortgage Indenture, and may not be transferred except to effect an assignment thereof to a successor or an assign of the Designated Agent (as defined in the Revolving Credit Agreement). The Company may take such actions as it shall deem necessary, desirable or appropriate to effect compliance with such restrictions on transfer, including the issuance of stop-transfer instructions to the Trustee or any other transfer agent.

SECTION 8. <u>Other Terms of the Bond of the Thirty-Second Series.</u>

The other terms of the Bond of the Thirty-Second Series shall be as expressly set forth in Exhibit A hereto.

## ARTICLE III

## ESTABLISHMENT OF THE BOND OF THE THIRTY-THIRD SERIES

SECTION 1. <u>Establishment of the Bond of the Thirty-Third Series.</u>

Pursuant to the terms hereof and Section 3.01 of the Mortgage Indenture, the Company hereby establishes a thirty-third series of Bonds designated as the "Bond of the Thirty-Third Series" (the "<u>Bond of the Thirty-Third Series</u>"). The Bond of the Thirty-Third Series shall be fully registered in the name of and delivered to JPMorgan Chase Bank, N.A., as Administrative Agent under the Term Credit Agreement.

SECTION 2. <u>Form of the Bond of the Thirty-Third Series.</u>

The Bond of the Thirty-Third Series shall be issued in certificated form and the form of the Bond of the Thirty-Third Series is set forth in Exhibit B hereto and is hereby incorporated herein and made a part hereof.

3

SECTION 3. <u>Principal Amount of the Bond of the Thirty-Third Series.</u>

The Bond of the Thirty-Third Series shall be dated July 1, 2020 and be issued in an initial face amount of $1,500,000,000, which face amount shall represent the maximum principal amount of the Bond of the Thirty-Third Series. The amount of principal payable on the Bond of the Thirty-Third Series, and the date or dates on which such principal is payable, shall be as set forth in said Bond. For all purposes of the Mortgage Indenture, the principal amount of the Bond of the Thirty-Third Series Outstanding as of any date of calculation shall be equal to the Obligations (as defined in the Bond of the Thirty-Third Series) outstanding under the Loan Documents (as defined in the Bond of the Thirty-Third Series) as of such date, but in no event shall the principal amount of such Bond as of any date of calculation be greater than the then current face amount of such Bond. The initial face amount of the Bond of the Thirty-Third Series may be reduced from time to time as set forth in said Bond. Principal of the Bond of the Thirty-Third Series shall be payable without the presentment or surrender thereof.

SECTION 4. <u>Interest Rates; Interest Payment Dates; Stated Maturity of the Bond of the Thirty-Third Series.</u>

The Bond of the Thirty-Third Series shall bear interest at the rate or rates, and interest with respect thereto will be payable on the Interest Payment Dates, set forth in said Bond. The Bond of the Thirty-Third Series shall have a Stated Maturity of June 30, 2021. Interest on the Bond of the Thirty-Third Series shall accrue from the same dates that interest, if any, accrues on outstanding Obligations pursuant to the Loan Documents (as defined in the Bond of the Thirty-Third Series) until such interest is paid.

SECTION 5. <u>No Redemption; No Sinking Fund.</u>

The Bond of the Thirty-Third Series shall not be subject to redemption prior to its Stated Maturity. No sinking fund is provided for the Bond of the Thirty-Third Series.

SECTION 6. <u>Paying Agent and Bond Registrar.</u>

The Trustee is hereby appointed as initial Paying Agent and initial Bond Registrar for the Bond of the Thirty-Third Series. The Place of Payment of the Bond of the Thirty-Third Series shall be the Corporate Trust Office of the Trustee; <u>provided</u>, however, that the Company reserves the right to change, by one or more Officer's Certificates any such place or the Bond Registrar; <u>provided</u>, further, that the Company reserves the right to designate, by one or more Officer's Certificates, one or more of its offices as any such place or itself as the Bond Registrar.

SECTION 7. <u>No Exchanges; Limitations on Transfers.</u>

The Bond of the Thirty-Third Series may not be exchanged for any other Bond, except as provided in Section 3.06 of the Mortgage Indenture, and may not be transferred except to effect an assignment thereof to a successor or an assign of the Administrative Agent (as defined in the Term Credit Agreement). The Company may take such actions as it shall deem necessary, desirable or appropriate to effect compliance with such restrictions on transfer, including the issuance of stop-transfer instructions to the Trustee or any other transfer agent.

SECTION 8. <u>Other Terms of the Bond of the Thirty-Third Series.</u>

The other terms of the Bond of the Thirty-Third Series shall be as expressly set forth in Exhibit B hereto.

# ARTICLE IV

## ESTABLISHMENT OF THE BOND OF THE THIRTY-FOURTH SERIES

SECTION 1. <u>Establishment of the Bond of the Thirty-Fourth Series.</u>

Pursuant to the terms hereof and Section 3.01 of the Mortgage Indenture, the Company hereby establishes a thirty-fourth series of Bonds designated as the "Bond of the Thirty-Fourth Series" (the "<u>Bond of the Thirty-Fourth Series</u>"). The Bond of the Thirty-Fourth Series shall be fully registered in the name of and delivered to JPMorgan Chase Bank, N.A., as Administrative Agent under the Term Credit Agreement.

4

SECTION 2. <u>Form of the Bond of the Thirty-Fourth Series.</u>

The Bond of the Thirty-Fourth Series shall be issued in certificated form and the form of the Bond of the Thirty-Fourth Series is set forth in Exhibit C hereto and is hereby incorporated herein and made a part hereof.

SECTION 3. <u>Principal Amount of the Bond of the Thirty-Fourth Series.</u>

The Bond of the Thirty-Fourth Series shall be dated July 1, 2020 and be issued in an initial face amount of $1,500,000,000, which face amount shall represent the maximum principal amount of the Bond of the Thirty-Fourth Series. The amount of principal payable on the Bond of the Thirty-Fourth Series, and the date or dates on which such principal is payable, shall be as set forth in said Bond. For all purposes of the Mortgage Indenture, the principal amount of the Bond of the Thirty-Fourth Series Outstanding as of any date of calculation shall be equal to the Obligations (as defined in the Bond of the Thirty-Fourth Series) outstanding under the Loan Documents (as defined in the Bond of the Thirty-Fourth Series) as of such date, but in no event shall the principal amount of such Bond as of any date of calculation be greater than the then current face amount of such Bond. The initial face amount of the Bond of the Thirty-Fourth Series may be reduced from time to time as set forth in said Bond. Principal of the Bond of the Thirty-Fourth Series shall be payable without the presentment or surrender thereof.

SECTION 4. <u>Interest Rates; Interest Payment Dates; Stated Maturity of the Bond of the Thirty-Fourth Series.</u>

The Bond of the Thirty-Fourth Series shall bear interest at the rate or rates, and interest with respect thereto will be payable on the Interest Payment Dates, set forth in said Bond. The Bond of the Thirty-Fourth Series shall have a Stated Maturity of January 1, 2022. Interest on the Bond of the Thirty-Fourth Series shall accrue from the same dates that interest, if any, accrues on outstanding Obligations pursuant to the Loan Documents (as defined in the Bond of the Thirty-Fourth Series) until such interest is paid.

SECTION 5. <u>No Redemption; No Sinking Fund.</u>

The Bond of the Thirty-Fourth Series shall not be subject to redemption prior to its Stated Maturity. No sinking fund is provided for the Bond of the Thirty-Fourth Series.

SECTION 6. <u>Paying Agent and Bond Registrar.</u>

The Trustee is hereby appointed as initial Paying Agent and initial Bond Registrar for the Bond of the Thirty-Fourth Series. The Place of Payment of the Bond of the Thirty-Fourth Series shall be the Corporate Trust Office of the Trustee; <u>provided</u>, however, that the Company reserves the right to change, by one or more Officer's Certificates any such place or the Bond Registrar; <u>provided</u>, further, that the Company reserves the right to designate, by one or more Officer's Certificates, one or more of its offices as any such place or itself as the Bond Registrar.

SECTION 7. <u>No Exchanges; Limitations on Transfers.</u>

The Bond of the Thirty-Fourth Series may not be exchanged for any other Bond, except as provided in Section 3.06 of the Mortgage Indenture, and may not be transferred except to effect an assignment thereof to a successor or an assign of the Administrative Agent (as defined in the Term Credit Agreement). The Company may take such actions as it shall deem necessary, desirable or appropriate to effect compliance with such restrictions on transfer, including the issuance of stop-transfer instructions to the Trustee or any other transfer agent.

SECTION 8. <u>Other Terms of the Bond of the Thirty-Fourth Series.</u>

The other terms of the Bond of the Thirty-Fourth Series shall be as expressly set forth in Exhibit C hereto.

5

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 639 of 1367

# ARTICLE V

## ESTABLISHMENT OF THE BOND OF THE THIRTY-FIFTH SERIES

SECTION 1. <u>Establishment of the Bond of the Thirty-Fifth Series.</u>

Pursuant to the terms hereof and Section 3.01 of the Mortgage Indenture, the Company hereby establishes a thirty-fifth series of Bonds designated as the "Bond of the Thirty-Fifth Series" (the "<u>Bond of the Thirty-Fifth Series</u>"). The Bond of the Thirty-Fifth Series shall be fully registered in the name of and delivered to Citibank, N.A., as Agent under the Collateral Management Agreement.

SECTION 2. <u>Form of the Bond of the Thirty-Fifth Series.</u>

The Bond of the Thirty-Fifth Series shall be issued in certificated form and the form of the Bond of the Thirty-Fifth Series is set forth in Exhibit D hereto and is hereby incorporated herein and made a part hereof.

SECTION 3. <u>Principal Amount of the Bond of the Thirty-Fifth Series.</u>

The Bond of the Thirty-Fifth Series shall be dated July 1, 2020 and be issued in an initial face amount of $110,000,000, which face amount shall represent the maximum principal amount of the Bond of the Thirty-Fifth Series. The amount of principal payable on the Bond of the Thirty-Fifth Series, and the date or dates on which such principal is payable, shall be as set forth in said Bond. For all purposes of the Mortgage Indenture, the principal amount of the Bond of the Thirty-Fifth Series Outstanding as of any date of calculation shall be equal to the Obligations (as defined in the Bond of the Thirty-Fifth Series) as of such date, but in no event shall the principal amount of such Bond as of any date of calculation be greater than the then current face amount of such Bond. The initial face amount of the Bond of the Thirty-Fifth Series may be reduced from time to time as set forth in said Bond. Principal of the Bond of the Thirty-Fifth Series shall be payable without the presentment or surrender thereof.

SECTION 4. <u>Interest Rates; Interest Payment Dates; Stated Maturity of the Bond of the Thirty-Fifth Series.</u>

The Bond of the Thirty-Fifth Series shall bear interest at the rate or rates, and interest with respect thereto will be payable on the Interest Payment Dates, set forth in said Bond. The Bond of the Thirty-Fifth Series shall have a Stated Maturity of July 1, 2023; <u>provided</u>, that the Stated Maturity may be extended from time to time as set forth in said Bond. Interest on the Bond of the Thirty-Fifth Series shall accrue from the same dates that interest, if any, accrues on outstanding Obligations (as defined in the Bond of the Thirty-Fifth Series) until such interest is paid.

SECTION 5. <u>No Redemption; No Sinking Fund.</u>

The Bond of the Thirty-Fifth Series shall not be subject to redemption prior to its Stated Maturity. No sinking fund is provided for the Bond of the Thirty-Fifth Series.

SECTION 6. <u>Paying Agent and Bond Registrar.</u>

The Trustee is hereby appointed as initial Paying Agent and initial Bond Registrar for the Bond of the Thirty-Fifth Series. The Place of Payment of the Bond of the Thirty-Fifth Series shall be the Corporate Trust Office of the Trustee; provided, however, that the Company reserves the right to change, by one or more Officer's Certificates any such place or the Bond Registrar; provided, further, that the Company reserves the right to designate, by one or more Officer's Certificates, one or more of its offices as any such place or itself as the Bond Registrar.

SECTION 7. <u>No Exchanges; Limitations on Transfers.</u>

The Bond of the Thirty-Fifth Series may not be exchanged for any other Bond, except as provided in Section 3.06 of the Mortgage Indenture, and may not be transferred except to effect an assignment thereof to a successor or an assign of the Agent (as defined in the Collateral Management Agreement). The Company may take such actions as it shall deem necessary, desirable or appropriate to effect compliance with such restrictions on transfer, including the issuance of stop-transfer instructions to the Trustee or any other transfer agent.

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 640 of 1367

SECTION 8. <u>Other Terms of the Bond of the Thirty-Fifth Series.</u>

The other terms of the Bond of the Thirty-Fifth Series shall be as expressly set forth in Exhibit D hereto.

## ARTICLE VI

### TRUSTEE

SECTION 1. The Trustee shall not be responsible in any manner whatsoever for or in respect of the validity or sufficiency of this Fifth Supplemental Indenture or the due execution hereof by the Company, or for or in respect of the recitals and statements contained herein, all of which recitals and statements are made solely by the Company.

SECTION 2. Except as herein otherwise provided, no duties, responsibilities or liabilities are assumed, or shall be construed to be assumed, by the Trustee by reason of this Fifth Supplemental Indenture other than as set forth in the Mortgage Indenture; and this Fifth Supplemental Indenture is executed and accepted on behalf of the Trustee, subject to all the terms and conditions set forth in the Mortgage Indenture, as fully to all intents as if the same were herein set forth at length.

## ARTICLE VII

### MISCELLANEOUS

SECTION 1. Except insofar as herein otherwise expressly provided, all the provisions, definitions, terms and conditions of the Mortgage Indenture, as amended, shall be deemed to be incorporated in, and made a part of, this Fifth Supplemental Indenture; and the Mortgage Indenture as supplemented and amended by this Fifth Supplemental Indenture is in all respects ratified and confirmed; and the Mortgage Indenture and this Fifth Supplemental Indenture shall be read, taken and construed as one and the same instrument.

SECTION 2. Nothing in this Fifth Supplemental Indenture is intended, or shall be construed to give to any person or corporation, other than the parties hereto and the holders of the Collateral Bonds issued and to be issued under and in respect of this Fifth Supplemental Indenture, or under any covenant, condition or provision herein contained, all the covenants, conditions and provisions of this Fifth Supplemental Indenture being intended to be, and being, for the sole and exclusive benefit of the parties hereto and of the holders of the Collateral Bonds issued and to be issued under the Mortgage Indenture and secured thereby.

SECTION 3. All covenants, stipulations and agreements in this Fifth Supplemental Indenture contained by or on behalf of the Company shall bind and (subject to the provisions of the Mortgage Indenture) inure to the benefit of its successors and assigns, whether so expressed or not.

SECTION 4. The headings of the several Articles of this Fifth Supplemental Indenture are inserted for convenience of reference, and shall not be deemed to be any part hereof.

SECTION 5. This Fifth Supplemental Indenture shall be effective upon the execution and delivery hereof by each of the parties hereto.

SECTION 6. This Fifth Supplemental Indenture may be executed in any number of counterparts, and each of such counterparts shall together constitute but one and the same instrument. Delivery of an executed copy of this Fifth Supplemental Indenture by one party to the other may be made by facsimile, electronic mail (including any electronic signature complying with the New York Electronic Signatures and Records Act (N.Y. State Tech. §§ 301-309), as amended from time to time, or other applicable law) or other transmission method, and the parties hereto agree that any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 641 of 1367

SECTION 7. The laws of the State of New York shall govern this Fifth Supplemental Indenture and the Collateral Bonds, without giving effect to applicable principles of conflicts of law to the extent that the application of the laws of another jurisdiction would be required thereby.

SECTION 8. In case any provision in this Fifth Supplemental Indenture or the Collateral Bonds shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

IN WITNESS WHEREOF, the parties hereto have caused this Fifth Supplemental Indenture to be duly executed as of the day and year first above written.

PACIFIC GAS AND ELECTRIC COMPANY, as Issuer (Mortgagor)

By: /s/ Margaret K. Becker
Name: Margaret K. Becker
Title: Senior Director and Treasurer

THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A., as Trustee (Mortgagee)

By: /s/ Charles G. Nelson
Name: Charles G. Nelson
Title: Vice President

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA }

}

COUNTY OF SAN FRANCISCO }

On June 4, 2020, before me, Jolie F. Ocampo, personally appeared Margaret K. Becker, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

/s/ Jolie F. Ocampo
_____
Signature

Jolie Franchesca Ocampo
Notary Public – California
San Francisco County
Commission #2221172
My. Comm. Expires Dec. 6, 2021

(Seal)

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF FLORIDA                    }
                                                    }
COUNTY OF DUVAL                    }

On June 30, 2020, before me, Joshua P. Kakareka, personally appeared Charles G. Nelson, a Vice President of the Bank of New York Mellon Trust Company, N.A. and who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

/s/ Joshua P. Kakareka
Joshua P. Kakareka
Notary Public
State of Florida
Comm# GG931852
Expires 11/13/2023

(Seal)

## EXHIBITS A

### [FORM OF BOND OF THE THIRTY-SECOND SERIES]

### [FORM OF FACE OF BOND]

**NOTE: THE HOLDER OF THIS BOND BY ACCEPTANCE HEREOF AGREES TO RESTRICTIONS ON TRANSFER, TO WAIVERS OF CERTAIN RIGHTS OF EXCHANGE, AND TO INDEMNIFICATION PROVISIONS AS SET FORTH BELOW. IN ADDITION, THE BOND REPRESENTED BY THIS CERTIFICATE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 AND SUCH BOND OR ANY INTEREST THEREIN MAY NOT BE TRANSFERRED WITHOUT COMPLIANCE WITH APPLICABLE SECURITIES LAWS.**

THIS BOND IS NOT TRANSFERABLE EXCEPT TO A SUCCESSOR OR ASSIGN OF THE DESIGNATED AGENT UNDER THE REVOLVING CREDIT AGREEMENT REFERRED TO HEREIN AMONG THE COMPANY (AS DEFINED HEREIN) AND THE SEVERAL PARTIES THERETO. THE COMPANY MAY TAKE SUCH ACTIONS AS IT SHALL DEEM NECESSARY, DESIRABLE, OR APPROPRIATE TO EFFECT COMPLIANCE WITH THESE RESTRICTIONS ON TRANSFER, INCLUDING THE ISSUANCE OF STOP-TRANSFER INSTRUCTIONS TO THE TRUSTEE (AS DEFINED HEREIN) UNDER THE MORTGAGE INDENTURE REFERRED TO HEREIN OR ANY OTHER TRANSFER AGENT THEREUNDER.

AS SET FORTH HEREIN, THE OUTSTANDING PRINCIPAL AMOUNT OF THIS BOND AT ANY TIME MAY BE LESS THAN THE AMOUNT SHOWN ON THE FACE HEREOF.

THE FOLLOWING SUMMARY OF TERMS IS SUBJECT TO THE INFORMATION SET FORTH IN THIS BOND:

| | | |
|---|---|---|
| ORIGINAL ISSUE DATE: July 1, 2020 | FACE AMOUNT: $3,500,000,000 | INTEREST RATE: See below |
| MATURITY DATE: July 1, 2023 or as such date may be extended. | INTEREST PAYMENT DATES: See below | THIS BOND IS A: ☐ Global Book-Entry Bond ☒ Certificated Bond |

REGISTERED OWNER: Citibank, N.A., as Designated Agent under the Revolving Credit Agreement (as defined below), or any successor Designated Agent under the Revolving Credit Agreement

This Bond is not a Discount Bond
within the meaning of the within mentioned Mortgage Indenture

A-1

<div align="center">

**PACIFIC GAS AND ELECTRIC COMPANY**

**BOND OF THE THIRTY-SECOND SERIES**

</div>

Face Amount (Maximum Principal Amount):
$3,500,000,000

<div align="right">

No. _____

</div>

PACIFIC GAS AND ELECTRIC COMPANY, a corporation duly organized and existing under the laws of the State of California (herein called the "Company," which term includes any successor Person pursuant to the applicable provisions of the Mortgage Indenture hereinafter referred to), for value received, hereby promises to pay to CITIBANK, N.A., as Designated Agent (the "Designated Agent"), or its registered assigns, on behalf of the Secured Parties (as defined herein), the principal sum of up to THREE BILLION FIVE HUNDRED MILLION DOLLARS ($3,500,000,000) or such lesser principal amount as shall be equal to the Obligations (as defined herein) due and payable under the Loan Documents (as defined herein), but not in excess of the then current face amount (maximum principal amount) of this Bond, and to pay interest with respect to this Bond at the Interest Rate (as defined herein) until the principal hereof is paid or duly made available for payment, but in each case not later than the Maturity Date specified above (as such date may be extended) or, in the event of default of the payment of the principal hereof, until the Company's obligations with respect to the payment of such principal shall be discharged as provided in the Mortgage Indenture.

The principal amount outstanding under this Bond will increase or decrease from time to time to be equal at all times to the Obligations outstanding from time to time under the Loan Documents, but in no event shall the principal amount exceed the then current face amount. The principal due and payable hereunder by the Company as of any date shall be equal to the Obligations due and payable under the Loan Documents on such date, but not in excess of the then current face amount (maximum principal amount) of this Bond, and such principal shall be payable on the same dates (whether on the stated due dates or by acceleration pursuant to the terms of the Revolving Credit Agreement) as Obligations are payable from time to time pursuant to the Loan Documents. The obligation of the Company to make any payment of principal on this Bond shall be fully or partially, as the case may be, deemed to have been paid or otherwise satisfied and discharged to the extent that the Company has paid the Obligations due and payable under the Loan Documents, but any such payment shall not reduce the face amount (maximum principal amount) of this Bond unless the Total Commitments (as defined in the Revolving Credit Agreement) are irrevocably reduced in accordance with the Revolving Credit Agreement. If the Total Commitments are irrevocably reduced, the face amount (maximum principal amount) of this Bond shall be reduced by the same amount as the amount by which the Total Commitments are so reduced; provided, that for the avoidance of doubt, the face amount (maximum principal amount) of this Bond shall not be less than the aggregate principal amount of the Obligations under the Revolving Credit Agreement at the time of, and after giving effect to, such reduction and any concurrent repayment of Obligations.

Interest on this Bond shall be payable on each Interest Payment Date (as defined herein). The obligation of the Company to make any payment of interest with respect to this Bond shall be fully or partially, as the case may be, deemed to have been paid or otherwise satisfied and discharged to the extent that the Company has paid Interest Amounts (as defined herein) due and payable pursuant to the Loan Documents.

For purposes of this Bond:

"Ascertainable Fees" means any fees due and payable under the Loan Documents and any other written fee agreements from time to time entered into in connection with the Revolving Credit Agreement by the Company and any other party to the Revolving Credit Agreement (the "Related Fee Letters"), including facility fees, administrative agent fees, fronting fees, arranger fees and up-front fees, that are determinable with reasonable certainty by the Company solely by reference to the Loan Documents or the Related Fee Letters.

"Interest Amount" means, without duplication, interest on all Obligations, and all Ascertainable Fees and interest thereon (including, for the avoidance of doubt, any default interest), due and payable under the Loan Documents and Related Fee Letters.

<div align="center">

A-2

</div>

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 647 of 1367

"Interest Payment Date" means each date on which Interest Amounts are due and payable pursuant to the Loan Documents.

"Interest Rate" means a rate of interest per annum to result in an interest payment hereunder equal to the Interest Amount due and payable under the Loan Documents on the applicable Interest Payment Date.

"Loan Documents" means the Revolving Credit Agreement, the Bond Delivery Agreement (as defined in the Revolving Credit Agreement), the Notes (as defined in the Revolving Credit Agreement), the Applications (as defined in the Revolving Credit Agreement), and any amendment, waiver, supplement or modification to any of the foregoing.

"Obligations" means all Obligations (as defined in the Revolving Credit Agreement), including Principal Obligations and Ascertainable Fees, but excluding the Interest Amount.

"Principal Obligations" means, as of any date of calculation, the sum of (a) the outstanding principal amount of Loans (as defined in the Revolving Credit Agreement) and (b) the outstanding amount of L/C Obligations (as defined in the Revolving Credit Agreement), excluding the aggregate amount of drawings under issued Letters of Credit (as defined in the Revolving Credit Agreement) that have been converted into a Loan under the Revolving Credit Agreement and excluding the aggregate undrawn and unexpired amount of any then outstanding Letters of Credit that have been fully cash collateralized pursuant to Section 8 of the Revolving Credit Agreement.

"Revolving Credit Agreement" means the Credit Agreement, dated as of July 1, 2020, among the Company, the Designated Agent, and the several banks and other financial institutions or entities party thereto from time to time (the "Lenders"), as amended, supplemented, restated or otherwise modified from time to time.

"Secured Parties" means, collectively, the Designated Agent, the Lenders, the Issuing Lenders (as defined in the Revolving Credit Agreement), each co-agent or sub-agent appointed by the Designated Agent from time to time pursuant to Section 9.2 of the Revolving Credit Agreement and any other Persons the obligations owing to whom are or are purported to be secured by the Bond of the Thirty-Second Series.

Other capitalized terms used herein and not otherwise defined herein shall have the meanings specified in the Mortgage Indenture, unless otherwise noted or the context otherwise requires.

**The Trustee (as defined herein) may conclusively presume that the obligation of the Company to pay the principal of and interest with respect to this Bond shall have been fully satisfied and discharged unless and until it shall have received a written notice from the Registered Owner (specified above), signed by an authorized officer of the Registered Owner, stating that the payment of principal of or interest with respect to this Bond has not been fully paid when due and specifying the amount of funds required to make such payment. The Trustee may also conclusively rely on any written notice from an authorized officer of the Registered Owner with respect to the principal amount Outstanding at any time on this Bond and the interest payable with respect to this Bond at any time and the date or dates on which such principal and interest are payable.**

Payments of the principal of and interest with respect to this Bond shall be made at the Corporate Trust Office of the Trustee located initially in Los Angeles, California or at such other office or agency as may be designated for such purpose by the Company from time to time. Payment of the principal of and interest with respect to this Bond, as aforesaid, shall be made in such coin or currency of the United States of America as at the time of payment is legal tender for the payment of public and private debts.

The Maturity Date of this Bond specified above shall be coincident with the Termination Date of the Revolving Credit Agreement and will be extended from time to time to the same date to which the Termination Date of the Revolving Credit Agreement may be extended from time to time, as provided in Section 2.7(b) of the Revolving Credit Agreement.

REFERENCE IS HEREBY MADE TO THE FURTHER PROVISIONS OF THIS BOND SET FORTH ON THE REVERSE HEREOF, WHICH FURTHER PROVISIONS SHALL FOR ALL PURPOSES HAVE THE SAME EFFECT AS IF SET FORTH AT THIS PLACE.

A-3

Unless the certificate of authentication hereon has been executed by the Trustee referred to on the reverse hereof by manual or electronic signature, this Bond shall not be entitled to any benefit under the Mortgage Indenture or be valid or obligatory for any purpose.

IN WITNESS WHEREOF, the Company has caused this instrument to be duly executed.

Dated: _____

<div style="text-align: right;">

PACIFIC GAS AND ELECTRIC COMPANY

By _____

By _____

</div>

A-4

**TRUSTEE'S CERTIFICATE OF AUTHENTICATION**

This is the Bond of the series designated as the Bonds of the Thirty-Second Series referred to in the within-mentioned Mortgage Indenture.

THE BANK OF NEW YORK MELLON TRUST
COMPANY, N.A., as Trustee

By _____

Authorized Signatory

Dated:

A-5

This Bond of the Thirty-Second Series (this "<u>Bond</u>") is one of a duly authorized issue of Bonds of the Company (the "<u>Bonds</u>") issued and issuable in one or more series under and equally secured by an Indenture of Mortgage, dated as of June 19, 2020 (such Indenture as originally executed and delivered and as supplemented or amended from time to time thereafter, together with any constituent instruments establishing the terms of particular Bonds, being herein called the "<u>Mortgage Indenture</u>"), between the Company and The Bank of New York Mellon Trust Company, N.A., as Trustee (herein called the "<u>Trustee</u>," which term includes any successor trustee under the Mortgage Indenture), and reference is hereby made to the Mortgage Indenture for a description of the property mortgaged, pledged and held in trust, the nature and extent of the security and the respective rights, limitations of rights, duties and immunities of the Company, the Trustee and the Holders of the Bonds thereunder and of the terms and conditions upon which the Bonds are, and are to be, authenticated and delivered and secured. The acceptance of this Bond shall be deemed to constitute the consent and agreement by the Holder hereof to all of the terms and provisions of the Mortgage Indenture. This Bond is limited in face amount (maximum principal amount) to $3,500,000,000.

This Bond is issued to the Designated Agent by the Company pursuant to the Company's obligations under the Loan Documents.

This Bond is not subject to redemption prior to the Maturity Date specified above.

As provided in the Mortgage Indenture and subject to certain limitations therein set forth, this Bond or any portion of the principal amount hereof will be deemed to have been paid for all purposes of the Mortgage Indenture and to be no longer Outstanding thereunder, and the Company's entire indebtedness in respect thereof will be satisfied and discharged, if there has been irrevocably deposited with the Trustee or any Paying Agent (other than the Company), in trust, money in an amount which will be sufficient and/or Eligible Obligations, the principal of and interest on which when due, without regard to any reinvestment thereof, will provide moneys which, together with money, if any, deposited with or held by the Trustee or such Paying Agent, will be sufficient to pay when due the principal of and interest with respect to this Bond when due, assuming all commitments under the Revolving Credit Agreement outstanding at the time of such deposit were fully drawn.

If an Event of Default (as defined in the Revolving Credit Agreement) shall have occurred under Section 8 of the Revolving Credit Agreement by reason of a failure by the Company to make a payment with respect to any Principal Obligation when the same shall be due and payable (including by acceleration) pursuant to the Loan Documents, it shall be deemed to be an Event of Default, for purposes of Section 10.01 of the Mortgage Indenture, in payment of an amount of principal of this Bond equal to the amount of such unpaid Obligation (but, in no event, in excess of the face amount (maximum principal amount) of this Bond). If an Event of Default (as defined in the Revolving Credit Agreement) shall have occurred under Section 8 of the Revolving Credit Agreement by reason of a failure by the Company to make a payment of any Interest Amount or any other Obligation (other than a Principal Obligation) when the same shall be due and payable (including by acceleration) pursuant to the Loan Documents, it shall be deemed to be an Event of Default, for purposes of Section 10.01 of the Mortgage Indenture, in the payment of an amount of interest with respect to this Bond equal to the amount of such unpaid Interest Amount or amount of such other Obligation. The Company's obligation with respect to this Bond shall be fully satisfied when (and the holder hereof shall surrender this Bond to, or upon the order of, the Company for cancellation) the Revolving Credit Agreement shall have been terminated, all commitments thereunder shall have been terminated, all of the Obligations and Interest Amounts then due and payable shall have been duly paid by the Company and all Letters of Credit shall have expired or terminated or have been fully cash collateralized pursuant to Section 8 of the Revolving Credit Agreement. At the time of surrender of this Bond, the holder hereof shall deliver such appropriate instruments of transfer or release as may reasonably be requested by the Company.

If an Event of Default shall occur and be continuing as provided in the Mortgage Indenture, the Trustee or the Holders of not less than 25% in aggregate principal amount of Bonds then Outstanding, considered as one class, may declare the principal amount of all Bonds then Outstanding to be due and payable immediately by notice in writing to the Company (and to the Trustee if given by Holders); provided, however, that with respect to certain Events of Default relating to bankruptcy, insolvency and similar events, the principal amount of all Bonds then Outstanding shall be due and payable immediately without further action by the Trustee or the Holders.

A-6

The Mortgage Indenture permits, with certain exceptions as therein provided, the Company and the Trustee to enter into one or more supplemental indentures for the purpose of adding any provisions to, or changing in any manner or eliminating any of the provisions of, the Mortgage Indenture with the consent of the Holders of not less than a majority in aggregate principal amount of the Bonds at the time Outstanding, considered as one class; provided, however, that if there shall be Bonds of more than one series Outstanding under the Mortgage Indenture and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such series, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all series so directly affected, considered as one class, shall be required; and provided, further, that if the Bonds of any series shall have been issued in more than one Tranche and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such Tranches, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all Tranches so directly affected, considered as one class, shall be required; and provided, further, that the Mortgage Indenture permits the Company and the Trustee to enter into one or more supplemental indentures for certain purposes without the consent of any Holders of Bonds; and provided, further, that for the avoidance of doubt, the foregoing shall not change the voting requirements under Section 14.02 of the Mortgage Indenture, which for the avoidance of doubt, requires the consent of each Outstanding Bond of each series or Tranche in certain circumstances. The Mortgage Indenture also contains provisions permitting the Holders of a majority in aggregate principal amount of Bonds, on behalf of the Holders of all such Bonds, to waive certain past defaults under the Mortgage Indenture and their consequences. Any such consent or waiver by the Holder of this Bond shall be conclusive and binding upon such Holder and upon all future Holders of this Bond and of any Bond issued upon the registration of transfer hereof or in exchange herefor or in lieu hereof, whether or not notation of such consent or waiver is made upon this Bond. Notwithstanding the foregoing, no supplemental indenture shall amend, modify or waive any provision of Section 10.07 of the Mortgage Indenture without the consent of the Holders.

As provided in and subject to the provisions of the Mortgage Indenture, the Holder of this Bond shall not have the right to institute any proceeding with respect to the Mortgage Indenture or for the appointment of a receiver or trustee or for any other remedy thereunder, unless such Holder shall have previously given the Trustee written notice of a continuing Event of Default, the Holders of at least 25% in aggregate principal amount of the Bonds at the time Outstanding shall have made written request to the Trustee to institute proceedings in respect of such Event of Default as Trustee and offered the Trustee reasonable indemnity, and the Trustee shall not have received from the Holders of at least a majority in aggregate principal amount of Bonds at the time Outstanding a direction inconsistent with such written request, and shall have failed to institute any such proceeding for 60 days after receipt of such notice, request and offer of indemnity. The foregoing shall not apply to any suit instituted by the Holder of this Bond for the enforcement of any payment of principal hereof or interest with respect hereto on or after the respective due dates expressed herein.

No reference herein to the Mortgage Indenture and no provision of this Bond or of the Mortgage Indenture shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal of and interest with respect to this Bond at the times, place and rate, and in the coin or currency, herein prescribed.

For all purposes of the Mortgage Indenture, the principal amount of this Bond Outstanding as of any date of calculation shall be equal to the Obligations outstanding under the Loan Documents as of such date.

This Bond is issuable in the denomination of $3,500,000,000 or such lesser amount equal to the face amount of this Bond as provided herein.

As provided in the Mortgage Indenture and subject to certain limitations set forth therein and herein, the transfer of this Bond is registrable in the Bond Register, upon surrender of this Bond for registration of transfer at the office or agency of the Company in any place where the principal of and interest with respect to this Bond are payable, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Company, the Trustee or the Bond Registrar, as the case may be, duly executed by the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new Bonds of this series and of like tenor, of authorized denominations and for the same aggregate principal amount, will be issued to the designated transferee or transferees.

A-7

Before any transfer of this Bond by the Holder or such Holder's legal representative will be recognized or given effect by the Company or the Trustee, the Holder shall note the then current principal amount payable on this Bond, the interest accrued to the date of such transfer and the then current face amount of this Bond, and shall notify the Company and the Trustee of the name and address of the transferee and shall afford the Company and the Trustee the opportunity of verifying the notation as to such then current principal amount payable on this Bond, the interest accrued to the date of such transfer and the then current face amount of this Bond. By acceptance hereof the Holder of this Bond and each transferee shall be deemed to have agreed to indemnify and hold harmless the Company and the Trustee against all losses, claims, damages or liability arising out of any failure on part of the Holder or of any such transferee to comply with the requirements of the preceding sentence.

No service charge shall be made for any such registration of transfer or exchange, but the Company may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

Prior to due presentment of this Bond for registration of transfer, the Company, the Trustee and any agent of the Company or the Trustee may treat the Person in whose name this Bond is registered as the owner hereof for all purposes, whether or not this Bond be overdue, and neither the Company, the Trustee nor any such agent shall be affected by notice to the contrary.

This Bond shall be governed by, and construed and enforced in accordance with, the laws of the State of New York without regard to the principles of conflicts of laws thereunder, except to the extent that the Trust Indenture Act shall be applicable.

As provided in the Mortgage Indenture, no recourse shall be had for the payment of the principal of or interest with respect to this Bond, or any part thereof, or for any claim based hereon or otherwise in respect hereof, or of the indebtedness represented hereby, or upon any obligation, covenant or agreement under the Mortgage Indenture, against any incorporator, shareholder, officer or director, as such, past, present or future, of the Company or of any predecessor or successor corporation (either directly or through the Company or a predecessor or successor corporation), whether by virtue of any constitutional provision, statute or rule of law or by the enforcement of any assessment or penalty or otherwise; it being expressly agreed and understood that the Mortgage Indenture and all the Bonds are solely corporate obligations and that any such personal liability is hereby expressly waived and released as a condition of, and as part of the consideration for, the execution of the Mortgage Indenture and the issuance of this Bond.

Anything in this Bond, the Mortgage Indenture, or the Loan Documents to the contrary notwithstanding, any payment by the Company of principal of or interest on this Bond shall be applied by the holder hereof to the payment of any amounts owing by the Company on the Obligations and Interest Amounts that are then due or are to become due, and shall, to the extent of such application, for all purposes, satisfy and discharge the obligation of the Company to make such payment on such Obligations and Interest Amounts, respectively.

Anything in this Bond, the Mortgage Indenture, or the Loan Documents to the contrary notwithstanding, any payment by the Company of the Obligations and Interest Amounts pursuant to the Loan Documents shall, to the extent thereof, for all purposes, satisfy and discharge the obligation of the Company to make a payment of principal or interest, as the case may be, in respect of this Bond that is then due or is to become due; provided, that any such payment of the Obligations and Interest Amounts pursuant to the Loan Documents shall not reduce the face amount (maximum principal amount) of this Bond, which shall be reduced only to the extent that the Total Commitments shall have been irrevocably reduced in accordance with the Revolving Credit Agreement.

A-8

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 653 of 1367

**ASSIGNMENT FORM**

To assign this Bond, fill in the form below: (1) or (we) assign and transfer this Bond to

_____

(Insert assignee's soc. sec. or tax I.D. no.)

_____

_____

_____

_____

(Print or type assignee's name, address and zip code)

and irrevocably appoint _____ to transfer this
Bond on the books of the Company. The agent may substitute another to act for him.

_____

Date:

Your signature: _____
(Sign exactly as your name appears on the face of this Bond)

Tax Identification No.: _____

SIGNATURE GUARANTEE:

_____

Signatures must be guaranteed by an "eligible guarantor institution"
meeting the requirements of the Bond Registrar, which requirements include
membership or participation in the Security Transfer Agent Medallion
Program ("*STAMP*") or such other "signature guarantee program" as may be
determined by the Bond Registrar in addition to, or in substitution for,
STAMP, all in accordance with the Securities Exchange Act of 1934, as
amended.

A-9

**EXHIBITS B**

**[FORM OF BOND OF THE THIRTY-THIRD SERIES]**

**[FORM OF FACE OF BOND]**

**NOTE: THE HOLDER OF THIS BOND BY ACCEPTANCE HEREOF AGREES TO RESTRICTIONS ON TRANSFER, TO WAIVERS OF CERTAIN RIGHTS OF EXCHANGE, AND TO INDEMNIFICATION PROVISIONS AS SET FORTH BELOW. IN ADDITION, THE BOND REPRESENTED BY THIS CERTIFICATE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 AND SUCH BOND OR ANY INTEREST THEREIN MAY NOT BE TRANSFERRED WITHOUT COMPLIANCE WITH APPLICABLE SECURITIES LAWS.**

THIS BOND IS NOT TRANSFERABLE EXCEPT TO A SUCCESSOR OR ASSIGN OF THE ADMINISTRATIVE AGENT UNDER THE TERM CREDIT AGREEMENT REFERRED TO HEREIN AMONG THE COMPANY (AS DEFINED HEREIN) AND THE SEVERAL PARTIES THERETO. THE COMPANY MAY TAKE SUCH ACTIONS AS IT SHALL DEEM NECESSARY, DESIRABLE, OR APPROPRIATE TO EFFECT COMPLIANCE WITH THESE RESTRICTIONS ON TRANSFER, INCLUDING THE ISSUANCE OF STOP-TRANSFER INSTRUCTIONS TO THE TRUSTEE (AS DEFINED HEREIN) UNDER THE MORTGAGE INDENTURE REFERRED TO HEREIN OR ANY OTHER TRANSFER AGENT THEREUNDER.

AS SET FORTH HEREIN, THE OUTSTANDING PRINCIPAL AMOUNT OF THIS BOND AT ANY TIME MAY BE LESS THAN THE AMOUNT SHOWN ON THE FACE HEREOF.

THE FOLLOWING SUMMARY OF TERMS IS SUBJECT TO THE INFORMATION SET FORTH IN THIS BOND:

ORIGINAL ISSUE DATE: July 1, 2020       FACE AMOUNT: $1,500,000,000       INTEREST RATE: See below

MATURITY DATE: June 30, 2021       INTEREST PAYMENT DATES: See below       THIS BOND IS A:
                           ☐ Global Book-Entry Bond
                           ☒ Certificated Bond

REGISTERED OWNER: JPMorgan Chase Bank, N.A., as Administrative Agent under the Term Credit Agreement (as defined below), or any successor Administrative Agent under the Term Credit Agreement

<div align="center">

This Bond is not a Discount Bond
within the meaning of the within mentioned Mortgage Indenture

B-1

</div>

# PACIFIC GAS AND ELECTRIC COMPANY

## BOND OF THE THIRTY-THIRD SERIES

Face Amount (Maximum Principal Amount):
$1,500,000,000

No. _____

PACIFIC GAS AND ELECTRIC COMPANY, a corporation duly organized and existing under the laws of the State of California (herein called the "Company," which term includes any successor Person pursuant to the applicable provisions of the Mortgage Indenture hereinafter referred to), for value received, hereby promises to pay to JPMORGAN CHASE BANK, N.A., as Administrative Agent (the "Administrative Agent"), or its registered assigns, on behalf of the Secured Parties (as defined herein), the principal sum of up to ONE BILLION FIVE HUNDRED MILLION DOLLARS ($1,500,000,000) or such lesser principal amount as shall be equal to the Obligations (as defined herein) due and payable under the Loan Documents (as defined herein), but not in excess of the then current face amount (maximum principal amount) of this Bond, and to pay interest with respect to this Bond at the Interest Rate (as defined herein) until the principal hereof is paid or duly made available for payment, but in each case not later than the Maturity Date specified above (as such date may be extended) or, in the event of default of the payment of the principal hereof, until the Company's obligations with respect to the payment of such principal shall be discharged as provided in the Mortgage Indenture.

The principal amount outstanding under this Bond will increase or decrease from time to time to be equal at all times to the Obligations outstanding from time to time under the Loan Documents, but in no event shall the principal amount exceed the then current face amount. The principal due and payable hereunder by the Company as of any date shall be equal to the Obligations due and payable under the Loan Documents on such date, but not in excess of the then current face amount (maximum principal amount) of this Bond, and such principal shall be payable on the same dates (whether on the stated due dates or by acceleration pursuant to the terms of the Term Credit Agreement) as Obligations are payable from time to time pursuant to the Loan Documents. The obligation of the Company to make any payment of principal on this Bond shall be fully or partially, as the case may be, deemed to have been paid or otherwise satisfied and discharged to the extent that the Company has paid the Obligations due and payable under the Loan Documents, but any such payment shall not reduce the face amount (maximum principal amount) of this Bond.

Interest on this Bond shall be payable on each Interest Payment Date (as defined herein). The obligation of the Company to make any payment of interest with respect to this Bond shall be fully or partially, as the case may be, deemed to have been paid or otherwise satisfied and discharged to the extent that the Company has paid Interest Amounts (as defined herein) due and payable pursuant to the Loan Documents.

For purposes of this Bond:

"Ascertainable Fees" means any fees due and payable under the Loan Documents and any other written fee agreements from time to time entered into in connection with the Term Credit Agreement by the Company and any other party to the Term Credit Agreement (the "Related Fee Letters"), including facility fees, administrative agent fees, fronting fees, arranger fees and up-front fees, that are determinable with reasonable certainty by the Company solely by reference to the Loan Documents or the Related Fee Letters.

"Interest Amount" means, without duplication, interest on all Obligations, and all Ascertainable Fees and interest thereon (including, for the avoidance of doubt, any default interest), due and payable under the Loan Documents and Related Fee Letters.

"Interest Payment Date" means each date on which Interest Amounts are due and payable pursuant to the Loan Documents.

"Interest Rate" means a rate of interest per annum to result in an interest payment hereunder equal to the Interest Amount due and payable under the Loan Documents on the applicable Interest Payment Date.

B-2

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 656 of 1367

"Loan Documents" means the Term Credit Agreement, the Bond Delivery Agreement (as defined in the Term Credit Agreement), the Notes (as defined in the Term Credit Agreement) held by the Lenders holding 364-Day Tranche Loans (as defined in the Term Credit Agreement), and any amendment, waiver, supplement or modification to any of the foregoing.

"Obligations" means all Obligations (as defined in the Term Credit Agreement), including Ascertainable Fees, but excluding the Interest Amount, in each case solely on account of the 364-Day Tranche Loans (as defined in the Term Credit Agreement).

"Secured Parties" means, collectively, the Administrative Agent, the Lenders holding 364-Day Tranche Loans (as defined in the Term Credit Agreement), each sub-agent appointed by the Administrative Agent from time to time pursuant to Section 9.2 of the Term Credit Agreement and any other Persons the Obligations owing to whom are or are purported to be secured by the Bond of the Thirty-Third Series.

"Term Credit Agreement" means the Term Loan Credit Agreement, dated as of July 1, 2020, among the Company, the Administrative Agent, and the several banks and other financial institutions or entities party thereto from time to time (the "Lenders"), as amended, supplemented, restated or otherwise modified from time to time.

Other capitalized terms used herein and not otherwise defined herein shall have the meanings specified in the Mortgage Indenture, unless otherwise noted or the context otherwise requires.

**The Trustee (as defined herein) may conclusively presume that the obligation of the Company to pay the principal of and interest with respect to this Bond shall have been fully satisfied and discharged unless and until it shall have received a written notice from the Registered Owner (specified above), signed by an authorized officer of the Registered Owner, stating that the payment of principal of or interest with respect to this Bond has not been fully paid when due and specifying the amount of funds required to make such payment. The Trustee may also conclusively rely on any written notice from an authorized officer of the Registered Owner with respect to the principal amount Outstanding at any time on this Bond and the interest payable with respect to this Bond at any time and the date or dates on which such principal and interest are payable.**

Payments of the principal of and interest with respect to this Bond shall be made at the Corporate Trust Office of the Trustee located initially in Los Angeles, California or at such other office or agency as may be designated for such purpose by the Company from time to time. Payment of the principal of and interest with respect to this Bond, as aforesaid, shall be made in such coin or currency of the United States of America as at the time of payment is legal tender for the payment of public and private debts.

The Maturity Date of this Bond specified above shall be coincident with the 364-Day Tranche Maturity Date (as defined in the Term Credit Agreement) of the Term Credit Agreement.

REFERENCE IS HEREBY MADE TO THE FURTHER PROVISIONS OF THIS BOND SET FORTH ON THE REVERSE HEREOF, WHICH FURTHER PROVISIONS SHALL FOR ALL PURPOSES HAVE THE SAME EFFECT AS IF SET FORTH AT THIS PLACE.

B-3

Unless the certificate of authentication hereon has been executed by the Trustee referred to on the reverse hereof by manual or electronic signature, this Bond shall not be entitled to any benefit under the Mortgage Indenture or be valid or obligatory for any purpose.

IN WITNESS WHEREOF, the Company has caused this instrument to be duly executed.

Dated: _____

PACIFIC GAS AND ELECTRIC COMPANY

By _____

By _____

B-4

**TRUSTEE'S CERTIFICATE OF AUTHENTICATION**

This is the Bond of the series designated as Bonds of the Thirty-Third Series referred to in the within-mentioned Mortgage Indenture.

THE BANK OF NEW YORK MELLON TRUST
COMPANY, N.A., as Trustee

By _____

Authorized Signatory

Dated:

B-5

**[FORM OF REVERSE OF BOND OF THE THIRTY-THIRD SERIES]**

This Bond of the Thirty-Third Series (this "Bond") is one of a duly authorized issue of Bonds of the Company (the "Bonds") issued and issuable in one or more series under and equally secured by an Indenture of Mortgage, dated as of June 19, 2020 (such Indenture as originally executed and delivered and as supplemented or amended from time to time thereafter, together with any constituent instruments establishing the terms of particular Bonds, being herein called the "Mortgage Indenture"), between the Company and The Bank of New York Mellon Trust Company, N.A., as Trustee (herein called the "Trustee," which term includes any successor trustee under the Mortgage Indenture), and reference is hereby made to the Mortgage Indenture for a description of the property mortgaged, pledged and held in trust, the nature and extent of the security and the respective rights, limitations of rights, duties and immunities of the Company, the Trustee and the Holders of the Bonds thereunder and of the terms and conditions upon which the Bonds are, and are to be, authenticated and delivered and secured. The acceptance of this Bond shall be deemed to constitute the consent and agreement by the Holder hereof to all of the terms and provisions of the Mortgage Indenture. This Bond is limited in face amount (maximum principal amount) to $1,500,000,000.

This Bond is issued to the Administrative Agent by the Company pursuant to the Company's obligations under the Loan Documents.

This Bond is not subject to redemption prior to the Maturity Date specified above.

As provided in the Mortgage Indenture and subject to certain limitations therein set forth, this Bond or any portion of the principal amount hereof will be deemed to have been paid for all purposes of the Mortgage Indenture and to be no longer Outstanding thereunder, and the Company's entire indebtedness in respect thereof will be satisfied and discharged, if there has been irrevocably deposited with the Trustee or any Paying Agent (other than the Company), in trust, money in an amount which will be sufficient and/or Eligible Obligations, the principal of and interest on which when due, without regard to any reinvestment thereof, will provide moneys which, together with money, if any, deposited with or held by the Trustee or such Paying Agent, will be sufficient to pay when due the principal of and interest with respect to this Bond when due.

If an Event of Default (as defined in the Term Credit Agreement) shall have occurred under Section 8 of the Term Credit Agreement by reason of a failure by the Company to make a payment with respect to any Obligation when the same shall be due and payable (including by acceleration) pursuant to the Loan Documents, it shall be deemed to be an Event of Default, for purposes of Section 10.01 of the Mortgage Indenture, in payment of an amount of principal of this Bond equal to the amount of such unpaid Obligation (but, in no event, in excess of the face amount (maximum principal amount) of this Bond). If an Event of Default (as defined in the Term Credit Agreement) shall have occurred under Section 8 of the Term Credit Agreement by reason of a failure by the Company to make a payment of any Interest Amount or any other Obligation when the same shall be due and payable (including by acceleration) pursuant to the Loan Documents, it shall be deemed to be an Event of Default, for purposes of Section 10.01 of the Mortgage Indenture, in the payment of an amount of interest with respect to this Bond equal to the amount of such unpaid Interest Amount or amount of such other Obligation. The Company's obligation with respect to this Bond shall be fully satisfied when (and the holder hereof shall surrender this Bond to, or upon the order of, the Company for cancellation) the Term Credit Agreement shall have been terminated and all of the Obligations and Interest Amounts then due and payable shall have been duly paid by the Company. At the time of surrender of this Bond, the holder hereof shall deliver such appropriate instruments of transfer or release as may reasonably be requested by the Company.

If an Event of Default shall occur and be continuing as provided in the Mortgage Indenture, the Trustee or the Holders of not less than 25% in aggregate principal amount of Bonds then Outstanding, considered as one class, may declare the principal amount of all Bonds then Outstanding to be due and payable immediately by notice in writing to the Company (and to the Trustee if given by Holders); provided, however, that with respect to certain Events of Default relating to bankruptcy, insolvency and similar events, the principal amount of all Bonds then Outstanding shall be due and payable immediately without further action by the Trustee or the Holders.

The Mortgage Indenture permits, with certain exceptions as therein provided, the Company and the Trustee to enter into one or more supplemental indentures for the purpose of adding any provisions to, or changing in any manner or eliminating any of the provisions of, the Mortgage Indenture with the consent of the Holders of not less

B-6

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 660 of 1367

than a majority in aggregate principal amount of the Bonds at the time Outstanding, considered as one class; provided, however, that if there shall be Bonds of more than one series Outstanding under the Mortgage Indenture and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such series, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all series so directly affected, considered as one class, shall be required; and provided, further, that if the Bonds of any series shall have been issued in more than one Tranche and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such Tranches, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all Tranches so directly affected, considered as one class, shall be required; and provided, further, that the Mortgage Indenture permits the Company and the Trustee to enter into one or more supplemental indentures for certain purposes without the consent of any Holders of Bonds; and provided, further, that for the avoidance of doubt, the foregoing shall not change the voting requirements under Section 14.02 of the Mortgage Indenture, which for the avoidance of doubt, require the consent of the Holders of each Outstanding Bond of each series or Tranche in certain circumstances. The Mortgage Indenture also contains provisions permitting the Holders of a majority in aggregate principal amount of Bonds, on behalf of the Holders of all such Bonds, to waive certain past defaults under the Mortgage Indenture and their consequences. Any such consent or waiver by the Holder of this Bond shall be conclusive and binding upon such Holder and upon all future Holders of this Bond and of any Bond issued upon the registration of transfer hereof or in exchange herefor or in lieu hereof, whether or not notation of such consent or waiver is made upon this Bond. Notwithstanding the foregoing, no supplemental indenture shall amend, modify or waive any provision of Section 10.07 of the Mortgage Indenture without the consent of the Holders.

As provided in and subject to the provisions of the Mortgage Indenture, the Holder of this Bond shall not have the right to institute any proceeding with respect to the Mortgage Indenture or for the appointment of a receiver or trustee or for any other remedy thereunder, unless such Holder shall have previously given the Trustee written notice of a continuing Event of Default, the Holders of at least 25% in aggregate principal amount of the Bonds at the time Outstanding shall have made written request to the Trustee to institute proceedings in respect of such Event of Default as Trustee and offered the Trustee reasonable indemnity, and the Trustee shall not have received from the Holders of at least a majority in aggregate principal amount of Bonds at the time Outstanding a direction inconsistent with such written request, and shall have failed to institute any such proceeding for 60 days after receipt of such notice, request and offer of indemnity. The foregoing shall not apply to any suit instituted by the Holder of this Bond for the enforcement of any payment of principal hereof or interest with respect hereto on or after the respective due dates expressed herein.

No reference herein to the Mortgage Indenture and no provision of this Bond or of the Mortgage Indenture shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal of and interest with respect to this Bond at the times, place and rate, and in the coin or currency, herein prescribed.

For all purposes of the Mortgage Indenture, the principal amount of this Bond Outstanding as of any date of calculation shall be equal to the Obligations outstanding under the Loan Documents as of such date.

This Bond is issuable in the denomination of $1,500,000,000 or such lesser amount equal to the face amount of this Bond as provided herein.

As provided in the Mortgage Indenture and subject to certain limitations set forth therein and herein, the transfer of this Bond is registrable in the Bond Register, upon surrender of this Bond for registration of transfer at the office or agency of the Company in any place where the principal of and interest with respect to this Bond are payable, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Company, the Trustee or the Bond Registrar, as the case may be, duly executed by the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new Bonds of this series and of like tenor, of authorized denominations and for the same aggregate principal amount, will be issued to the designated transferee or transferees.

Before any transfer of this Bond by the Holder or such Holder's legal representative will be recognized or given effect by the Company or the Trustee, the Holder shall note the then current principal amount payable on this Bond, the interest accrued to the date of such transfer and the then current face amount of this Bond, and shall notify the Company and the Trustee of the name and address of the transferee and shall afford the Company and the Trustee the opportunity of verifying the notation as to such then current principal amount payable on this Bond, the interest

B-7

accrued to the date of such transfer and the then current face amount of this Bond. By acceptance hereof the Holder of this Bond and each transferee shall be deemed to have agreed to indemnify and hold harmless the Company and the Trustee against all losses, claims, damages or liability arising out of any failure on part of the Holder or of any such transferee to comply with the requirements of the preceding sentence.

No service charge shall be made for any such registration of transfer or exchange, but the Company may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

Prior to due presentment of this Bond for registration of transfer, the Company, the Trustee and any agent of the Company or the Trustee may treat the Person in whose name this Bond is registered as the owner hereof for all purposes, whether or not this Bond be overdue, and neither the Company, the Trustee nor any such agent shall be affected by notice to the contrary.

This Bond shall be governed by, and construed and enforced in accordance with, the laws of the State of New York without regard to the principles of conflicts of laws thereunder, except to the extent that the Trust Indenture Act shall be applicable.

As provided in the Mortgage Indenture, no recourse shall be had for the payment of the principal of or interest with respect to this Bond, or any part thereof, or for any claim based hereon or otherwise in respect hereof, or of the indebtedness represented hereby, or upon any obligation, covenant or agreement under the Mortgage Indenture, against any incorporator, shareholder, officer or director, as such, past, present or future, of the Company or of any predecessor or successor corporation (either directly or through the Company or a predecessor or successor corporation), whether by virtue of any constitutional provision, statute or rule of law or by the enforcement of any assessment or penalty or otherwise; it being expressly agreed and understood that the Mortgage Indenture and all the Bonds are solely corporate obligations and that any such personal liability is hereby expressly waived and released as a condition of, and as part of the consideration for, the execution of the Mortgage Indenture and the issuance of this Bond.

Anything in this Bond, the Mortgage Indenture, or the Loan Documents to the contrary notwithstanding, any payment by the Company of principal of or interest on this Bond shall be applied by the holder hereof to the payment of any amounts owing by the Company on the Obligations and Interest Amounts that are then due or are to become due, and shall, to the extent of such application, for all purposes, satisfy and discharge the obligation of the Company to make such payment on such Obligations and Interest Amounts, respectively.

Anything in this Bond, the Mortgage Indenture, or the Loan Documents to the contrary notwithstanding, any payment by the Company of the Obligations and Interest Amounts pursuant to the Loan Documents shall, to the extent thereof, for all purposes, satisfy and discharge the obligation of the Company to make a payment of principal or interest, as the case may be, in respect of this Bond that is then due or is to become due; provided, that any such payment of the Obligations and Interest Amounts pursuant to the Loan Documents shall not reduce the face amount (maximum principal amount) of this Bond.

B-8

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 662 of 1367

**ASSIGNMENT FORM**

To assign this Bond, fill in the form below: (1) or (we) assign and transfer this Bond to

_____
(Insert assignee's soc. sec. or tax I.D. no.)

_____

_____

_____

_____

(Print or type assignee's name, address and zip code)

and irrevocably appoint _____
to transfer this Bond on the books of the Company. The agent may substitute another to act for him.

_____

Date: _____

Your signature: _____
(Sign exactly as your name appears on the face of this Bond)

Tax Identification No.: _____

SIGNATURE GUARANTEE:

_____

Signatures must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Bond Registrar, which requirements include membership or participation in the Security Transfer Agent Medallion Program ("*STAMP*") or such other "signature guarantee program" as may be determined by the Bond Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

B-9

[FORM OF BOND OF THE THIRTY-FOURTH SERIES]

[FORM OF FACE OF BOND]

**NOTE: THE HOLDER OF THIS BOND BY ACCEPTANCE HEREOF AGREES TO RESTRICTIONS ON TRANSFER, TO WAIVERS OF CERTAIN RIGHTS OF EXCHANGE, AND TO INDEMNIFICATION PROVISIONS AS SET FORTH BELOW. IN ADDITION, THE BOND REPRESENTED BY THIS CERTIFICATE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 AND SUCH BOND OR ANY INTEREST THEREIN MAY NOT BE TRANSFERRED WITHOUT COMPLIANCE WITH APPLICABLE SECURITIES LAWS.**

THIS BOND IS NOT TRANSFERABLE EXCEPT TO A SUCCESSOR OR ASSIGN OF THE ADMINISTRATIVE AGENT UNDER THE TERM CREDIT AGREEMENT REFERRED TO HEREIN AMONG THE COMPANY (AS DEFINED HEREIN) AND THE SEVERAL PARTIES THERETO. THE COMPANY MAY TAKE SUCH ACTIONS AS IT SHALL DEEM NECESSARY, DESIRABLE, OR APPROPRIATE TO EFFECT COMPLIANCE WITH THESE RESTRICTIONS ON TRANSFER, INCLUDING THE ISSUANCE OF STOP-TRANSFER INSTRUCTIONS TO THE TRUSTEE (AS DEFINED HEREIN) UNDER THE MORTGAGE INDENTURE REFERRED TO HEREIN OR ANY OTHER TRANSFER AGENT THEREUNDER.

AS SET FORTH HEREIN, THE OUTSTANDING PRINCIPAL AMOUNT OF THIS BOND AT ANY TIME MAY BE LESS THAN THE AMOUNT SHOWN ON THE FACE HEREOF.

THE FOLLOWING SUMMARY OF TERMS IS SUBJECT TO THE INFORMATION SET FORTH IN THIS BOND:

| | | |
|---|---|---|
| ORIGINAL ISSUE DATE: July 1, 2020 | FACE AMOUNT: $1,500,000,000 | INTEREST RATE: See below |
| MATURITY DATE: January 1, 2022 | INTEREST PAYMENT DATES: See below | THIS BOND IS A:<br>☐ Global Book-Entry Bond<br>☒ Certificated Bond |
| REGISTERED OWNER: JPMorgan Chase Bank, N.A., as Administrative Agent under the Term Credit Agreement (as defined below), or any successor Administrative Agent under the Term Credit Agreement | | |

This Bond is not a Discount Bond
within the meaning of the within mentioned Mortgage Indenture

C-1

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 664 of 1367

<div align="center">

**PACIFIC GAS AND ELECTRIC COMPANY**

BOND OF THE THIRTY-FOURTH SERIES

</div>

Face Amount (Maximum Principal Amount):
$1,500,000,000

<div align="right">

No. _____

</div>

     PACIFIC GAS AND ELECTRIC COMPANY, a corporation duly organized and existing under the laws of the State of California (herein called the "Company," which term includes any successor Person pursuant to the applicable provisions of the Mortgage Indenture hereinafter referred to), for value received, hereby promises to pay to JPMORGAN CHASE BANK, N.A., as Administrative Agent (the "Administrative Agent"), or its registered assigns, on behalf of the Secured Parties (as defined herein), the principal sum of up to ONE BILLION FIVE HUNDRED MILLION DOLLARS ($1,500,000,000) or such lesser principal amount as shall be equal to the Obligations (as defined herein) due and payable under the Loan Documents (as defined herein), but not in excess of the then current face amount (maximum principal amount) of this Bond, and to pay interest with respect to this Bond at the Interest Rate (as defined herein) until the principal hereof is paid or duly made available for payment, but in each case not later than the Maturity Date specified above (as such date may be extended) or, in the event of default of the payment of the principal hereof, until the Company's obligations with respect to the payment of such principal shall be discharged as provided in the Mortgage Indenture.

     The principal amount outstanding under this Bond will increase or decrease from time to time to be equal at all times to the Obligations outstanding from time to time under the Loan Documents, but in no event shall the principal amount exceed the then current face amount. The principal due and payable hereunder by the Company as of any date shall be equal to the Obligations due and payable under the Loan Documents on such date, but not in excess of the then current face amount (maximum principal amount) of this Bond, and such principal shall be payable on the same dates (whether on the stated due dates or by acceleration pursuant to the terms of the Term Credit Agreement) as Obligations are payable from time to time pursuant to the Loan Documents. The obligation of the Company to make any payment of principal on this Bond shall be fully or partially, as the case may be, deemed to have been paid or otherwise satisfied and discharged to the extent that the Company has paid the Obligations due and payable under the Loan Documents, but any such payment shall not reduce the face amount (maximum principal amount) of this Bond.

     Interest on this Bond shall be payable on each Interest Payment Date (as defined herein). The obligation of the Company to make any payment of interest with respect to this Bond shall be fully or partially, as the case may be, deemed to have been paid or otherwise satisfied and discharged to the extent that the Company has paid Interest Amounts (as defined herein) due and payable pursuant to the Loan Documents.

     For purposes of this Bond:

     "Ascertainable Fees" means any fees due and payable under the Loan Documents and any other written fee agreements from time to time entered into in connection with the Term Credit Agreement by the Company and any other party to the Term Credit Agreement (the "Related Fee Letters"), including facility fees, administrative agent fees, fronting fees, arranger fees and up-front fees, that are determinable with reasonable certainty by the Company solely by reference to the Loan Documents or the Related Fee Letters.

     "Interest Amount" means, without duplication, interest on all Obligations, and all Ascertainable Fees and interest thereon (including, for the avoidance of doubt, any default interest), due and payable under the Loan Documents and Related Fee Letters.

     "Interest Payment Date" means each date on which Interest Amounts are due and payable pursuant to the Loan Documents.

     "Interest Rate" means a rate of interest per annum to result in an interest payment hereunder equal to the Interest Amount due and payable under the Loan Documents on the applicable Interest Payment Date.

<div align="center">

C-2

</div>

"Loan Documents" means the Term Credit Agreement, the Bond Delivery Agreement (as defined in the Term Credit Agreement), the Notes (as defined in the Term Credit Agreement) held by the Lenders holding 18-Month Tranche Loans (as defined in the Term Credit Agreement), and any amendment, waiver, supplement or modification to any of the foregoing.

"Obligations" means all Obligations (as defined in the Term Credit Agreement), including Ascertainable Fees, but excluding the Interest Amount, in each case solely on account of the 18-Month Tranche Loans (as defined in the Term Credit Agreement).

"Secured Parties" means, collectively, the Administrative Agent, the Lenders holding 18-Month Tranche Loans (as defined in the Term Credit Agreement), each sub-agent appointed by the Administrative Agent from time to time pursuant to Section 9.2 of the Term Credit Agreement and any other Persons the Obligations owing to whom are or are purported to be secured by the Bond of the Thirty-Fourth Series.

"Term Credit Agreement" means the Term Loan Credit Agreement, dated as of July 1, 2020, among the Company, the Administrative Agent, and the several banks and other financial institutions or entities party thereto from time to time (the "Lenders"), as amended, supplemented, restated or otherwise modified from time to time.

Other capitalized terms used herein and not otherwise defined herein shall have the meanings specified in the Mortgage Indenture, unless otherwise noted or the context otherwise requires.

**The Trustee (as defined herein) may conclusively presume that the obligation of the Company to pay the principal of and interest with respect to this Bond shall have been fully satisfied and discharged unless and until it shall have received a written notice from the Registered Owner (specified above), signed by an authorized officer of the Registered Owner, stating that the payment of principal of or interest with respect to this Bond has not been fully paid when due and specifying the amount of funds required to make such payment. The Trustee may also conclusively rely on any written notice from an authorized officer of the Registered Owner with respect to the principal amount Outstanding at any time on this Bond and the interest payable with respect to this Bond at any time and the date or dates on which such principal and interest are payable.**

Payments of the principal of and interest with respect to this Bond shall be made at the Corporate Trust Office of the Trustee located initially in Los Angeles, California or at such other office or agency as may be designated for such purpose by the Company from time to time. Payment of the principal of and interest with respect to this Bond, as aforesaid, shall be made in such coin or currency of the United States of America as at the time of payment is legal tender for the payment of public and private debts.

The Maturity Date of this Bond specified above shall be coincident with the 18-Month Tranche Maturity Date (as defined in the Term Credit Agreement) of the Term Credit Agreement.

REFERENCE IS HEREBY MADE TO THE FURTHER PROVISIONS OF THIS BOND SET FORTH ON THE REVERSE HEREOF, WHICH FURTHER PROVISIONS SHALL FOR ALL PURPOSES HAVE THE SAME EFFECT AS IF SET FORTH AT THIS PLACE.

C-3

Unless the certificate of authentication hereon has been executed by the Trustee referred to on the reverse hereof by manual or electronic signature, this Bond shall not be entitled to any benefit under the Mortgage Indenture or be valid or obligatory for any purpose.

IN WITNESS WHEREOF, the Company has caused this instrument to be duly executed.

Dated: _____

PACIFIC GAS AND ELECTRIC COMPANY

By _____

By _____

C-4

## TRUSTEE'S CERTIFICATE OF AUTHENTICATION

This is the Bond of the series designated as Bonds of the Thirty-Fourth Series referred to in the within-mentioned Mortgage Indenture.

THE BANK OF NEW YORK MELLON TRUST
COMPANY, N.A., as Trustee

By _____
Authorized Signatory

Dated:

C-5

This Bond of the Thirty-Fourth Series (this "Bond") is one of a duly authorized issue of Bonds of the Company (the "Bonds") issued and issuable in one or more series under and equally secured by an Indenture of Mortgage, dated as of June 19, 2020 (such Indenture as originally executed and delivered and as supplemented or amended from time to time thereafter, together with any constituent instruments establishing the terms of particular Bonds, being herein called the "Mortgage Indenture"), between the Company and The Bank of New York Mellon Trust Company, N.A., as Trustee (herein called the "Trustee," which term includes any successor trustee under the Mortgage Indenture), and reference is hereby made to the Mortgage Indenture for a description of the property mortgaged, pledged and held in trust, the nature and extent of the security and the respective rights, limitations of rights, duties and immunities of the Company, the Trustee and the Holders of the Bonds thereunder and of the terms and conditions upon which the Bonds are, and are to be, authenticated and delivered and secured. The acceptance of this Bond shall be deemed to constitute the consent and agreement by the Holder hereof to all of the terms and provisions of the Mortgage Indenture. This Bond is limited in face amount (maximum principal amount) to $1,500,000,000.

This Bond is issued to the Administrative Agent by the Company pursuant to the Company's obligations under the Loan Documents.

This Bond is not subject to redemption prior to the Maturity Date specified above.

As provided in the Mortgage Indenture and subject to certain limitations therein set forth, this Bond or any portion of the principal amount hereof will be deemed to have been paid for all purposes of the Mortgage Indenture and to be no longer Outstanding thereunder, and the Company's entire indebtedness in respect thereof will be satisfied and discharged, if there has been irrevocably deposited with the Trustee or any Paying Agent (other than the Company), in trust, money in an amount which will be sufficient and/or Eligible Obligations, the principal of and interest on which when due, without regard to any reinvestment thereof, will provide moneys which, together with money, if any, deposited with or held by the Trustee or such Paying Agent, will be sufficient to pay when due the principal of and interest with respect to this Bond when due.

If an Event of Default (as defined in the Term Credit Agreement) shall have occurred under Section 8 of the Term Credit Agreement by reason of a failure by the Company to make a payment with respect to any Obligation when the same shall be due and payable (including by acceleration) pursuant to the Loan Documents, it shall be deemed to be an Event of Default, for purposes of Section 10.01 of the Mortgage Indenture, in payment of an amount of principal of this Bond equal to the amount of such unpaid Obligation (but, in no event, in excess of the face amount (maximum principal amount) of this Bond). If an Event of Default (as defined in the Term Credit Agreement) shall have occurred under Section 8 of the Term Credit Agreement by reason of a failure by the Company to make a payment of any Interest Amount or any other Obligation when the same shall be due and payable (including by acceleration) pursuant to the Loan Documents, it shall be deemed to be an Event of Default, for purposes of Section 10.01 of the Mortgage Indenture, in the payment of an amount of interest with respect to this Bond equal to the amount of such unpaid Interest Amount or amount of such other Obligation. The Company's obligation with respect to this Bond shall be fully satisfied when (and the holder hereof shall surrender this Bond to, or upon the order of, the Company for cancellation) the Term Credit Agreement shall have been terminated and all of the Obligations and Interest Amounts then due and payable shall have been duly paid by the Company. At the time of surrender of this Bond, the holder hereof shall deliver such appropriate instruments of transfer or release as may reasonably be requested by the Company.

If an Event of Default shall occur and be continuing as provided in the Mortgage Indenture, the Trustee or the Holders of not less than 25% in aggregate principal amount of Bonds then Outstanding, considered as one class, may declare the principal amount of all Bonds then Outstanding to be due and payable immediately by notice in writing to the Company (and to the Trustee if given by Holders); provided, however, that with respect to certain Events of Default relating to bankruptcy, insolvency and similar events, the principal amount of all Bonds then Outstanding shall be due and payable immediately without further action by the Trustee or the Holders.

The Mortgage Indenture permits, with certain exceptions as therein provided, the Company and the Trustee to enter into one or more supplemental indentures for the purpose of adding any provisions to, or changing in any manner or eliminating any of the provisions of, the Mortgage Indenture with the consent of the Holders of not less than a majority in aggregate principal amount of the Bonds at the time Outstanding, considered as one class; provided, however, that if there shall be Bonds of more than one series Outstanding under the Mortgage Indenture and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such series, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all series so directly affected, considered as one class, shall be required; and provided, further, that if the Bonds of any series shall have been issued in more than one Tranche and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such Tranches, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all Tranches so directly affected, considered as one class, shall be required; and provided, further, that the Mortgage Indenture permits the Company and the Trustee to enter into one or more supplemental indentures for certain purposes without the consent of any Holders of Bonds; and provided, further, that for the avoidance of doubt, the foregoing shall not change the voting requirements under Section 14.02 of the Mortgage Indenture, which for the avoidance of doubt, requires the consent of each Outstanding Bond of each series or Tranche in certain circumstances. The Mortgage Indenture also contains provisions permitting the Holders of a majority in aggregate principal amount of Bonds, on behalf of the Holders of all such Bonds, to waive certain past defaults under the Mortgage Indenture and their consequences. Any such consent or waiver by the Holder of this Bond shall be conclusive and binding upon such Holder and upon all future Holders of this Bond and of any Bond issued upon the registration of transfer hereof or in exchange herefor or in lieu hereof, whether or not notation of such consent or waiver is made upon this Bond. Notwithstanding the foregoing, no supplemental indenture shall amend, modify or waive any provision of Section 10.07 of the Mortgage Indenture without the consent of the Holders.

As provided in and subject to the provisions of the Mortgage Indenture, the Holder of this Bond shall not have the right to institute any proceeding with respect to the Mortgage Indenture or for the appointment of a receiver or trustee or for any other remedy thereunder, unless such Holder shall have previously given the Trustee written notice of a continuing Event of Default, the Holders of at least 25% in aggregate principal amount of the Bonds at the time Outstanding shall have made written request to the Trustee to institute proceedings in respect of such Event of Default as Trustee and offered the Trustee reasonable indemnity, and the Trustee shall not have received from the Holders of at least a majority in aggregate principal amount of Bonds at the time Outstanding a direction inconsistent with such written request, and shall have failed to institute any such proceeding for 60 days after receipt of such notice, request and offer of indemnity. The foregoing shall not apply to any suit instituted by the Holder of this Bond for the enforcement of any payment of principal hereof or interest with respect hereto on or after the respective due dates expressed herein.

No reference herein to the Mortgage Indenture and no provision of this Bond or of the Mortgage Indenture shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal of and interest with respect to this Bond at the times, place and rate, and in the coin or currency, herein prescribed.

For all purposes of the Mortgage Indenture, the principal amount of this Bond Outstanding as of any date of calculation shall be equal to the Obligations outstanding under the Loan Documents as of such date.

This Bond is issuable in the denomination of $1,500,000,000 or such lesser amount equal to the face amount of this Bond as provided herein.

As provided in the Mortgage Indenture and subject to certain limitations set forth therein and herein, the transfer of this Bond is registrable in the Bond Register, upon surrender of this Bond for registration of transfer at the office or agency of the Company in any place where the principal of and interest with respect to this Bond are payable, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Company, the Trustee or the Bond Registrar, as the case may be, duly executed by the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new Bonds of this series and of like tenor, of authorized denominations and for the same aggregate principal amount, will be issued to the designated transferee or transferees.

Before any transfer of this Bond by the Holder or such Holder's legal representative will be recognized or given effect by the Company or the Trustee, the Holder shall note the then current principal amount payable on this Bond, the interest accrued to the date of such transfer and the then current face amount of this Bond, and shall notify the Company and the Trustee of the name and address of the transferee and shall afford the Company and the Trustee

the opportunity of verifying the notation as to such then current principal amount payable on this Bond, the interest accrued to the date of such transfer and the then current face amount of this Bond. By acceptance hereof the Holder of this Bond and each transferee shall be deemed to have agreed to indemnify and hold harmless the Company and the Trustee against all losses, claims, damages or liability arising out of any failure on part of the Holder or of any such transferee to comply with the requirements of the preceding sentence.

No service charge shall be made for any such registration of transfer or exchange, but the Company may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

Prior to due presentment of this Bond for registration of transfer, the Company, the Trustee and any agent of the Company or the Trustee may treat the Person in whose name this Bond is registered as the owner hereof for all purposes, whether or not this Bond be overdue, and neither the Company, the Trustee nor any such agent shall be affected by notice to the contrary.

This Bond shall be governed by, and construed and enforced in accordance with, the laws of the State of New York without regard to the principles of conflicts of laws thereunder, except to the extent that the Trust Indenture Act shall be applicable.

As provided in the Mortgage Indenture, no recourse shall be had for the payment of the principal of or interest with respect to this Bond, or any part thereof, or for any claim based hereon or otherwise in respect hereof, or of the indebtedness represented hereby, or upon any obligation, covenant or agreement under the Mortgage Indenture, against any incorporator, shareholder, officer or director, as such, past, present or future, of the Company or of any predecessor or successor corporation (either directly or through the Company or a predecessor or successor corporation), whether by virtue of any constitutional provision, statute or rule of law or by the enforcement of any assessment or penalty or otherwise; it being expressly agreed and understood that the Mortgage Indenture and all the Bonds are solely corporate obligations and that any such personal liability is hereby expressly waived and released as a condition of, and as part of the consideration for, the execution of the Mortgage Indenture and the issuance of this Bond.

Anything in this Bond, the Mortgage Indenture, or the Loan Documents to the contrary notwithstanding, any payment by the Company of principal of or interest on this Bond shall be applied by the holder hereof to the payment of any amounts owing by the Company on the Obligations and Interest Amounts that are then due or are to become due, and shall, to the extent of such application, for all purposes, satisfy and discharge the obligation of the Company to make such payment on such Obligations and Interest Amounts, respectively.

Anything in this Bond, the Mortgage Indenture, or the Loan Documents to the contrary notwithstanding, any payment by the Company of the Obligations and Interest Amounts pursuant to the Loan Documents shall, to the extent thereof, for all purposes, satisfy and discharge the obligation of the Company to make a payment of principal or interest, as the case may be, in respect of this Bond that is then due or is to become due; provided, that any such payment of the Obligations and Interest Amounts pursuant to the Loan Documents shall not reduce the face amount (maximum principal amount) of this Bond.

<div align="center">C-8</div>

**ASSIGNMENT FORM**

To assign this Bond, fill in the form below: (1) or (we) assign and transfer this Bond to

_____

(Insert assignee's soc. sec. or tax I.D. no.)

_____
_____
_____
_____

(Print or type assignee's name, address and zip code)

and irrevocably appoint  _____

to transfer this Bond on the books of the Company. The agent may substitute another to act for him.

_____

Date: _____

Your signature:  _____
(Sign exactly as your name appears on the face of this Bond)

Tax Identification No.:  _____

SIGNATURE GUARANTEE:

_____

Signatures must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Bond Registrar, which requirements include membership or participation in the Security Transfer Agent Medallion Program ("*STAMP*") or such other "signature guarantee program" as may be determined by the Bond Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

C-9

<center>**EXHIBITS D**</center>

<center>**[FORM OF BOND OF THE THIRTY-FIFTH SERIES]**</center>

<center>**[FORM OF FACE OF BOND]**</center>

**NOTE: THE HOLDER OF THIS BOND BY ACCEPTANCE HEREOF AGREES TO RESTRICTIONS ON TRANSFER, TO WAIVERS OF CERTAIN RIGHTS OF EXCHANGE, AND TO INDEMNIFICATION PROVISIONS AS SET FORTH BELOW. IN ADDITION, THE BOND REPRESENTED BY THIS CERTIFICATE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 AND SUCH BOND OR ANY INTEREST THEREIN MAY NOT BE TRANSFERRED WITHOUT COMPLIANCE WITH APPLICABLE SECURITIES LAWS.**

THIS BOND IS NOT TRANSFERABLE EXCEPT TO A SUCCESSOR OR ASSIGN OF THE AGENT UNDER THE COLLATERAL MANAGEMENT AGREEMENT REFERRED TO HEREIN AMONG THE COMPANY (AS DEFINED HEREIN) AND THE SEVERAL PARTIES THERETO. THE COMPANY MAY TAKE SUCH ACTIONS AS IT SHALL DEEM NECESSARY, DESIRABLE, OR APPROPRIATE TO EFFECT COMPLIANCE WITH THESE RESTRICTIONS ON TRANSFER, INCLUDING THE ISSUANCE OF STOP-TRANSFER INSTRUCTIONS TO THE TRUSTEE (AS DEFINED HEREIN) UNDER THE MORTGAGE INDENTURE REFERRED TO HEREIN OR ANY OTHER TRANSFER AGENT THEREUNDER.

AS SET FORTH HEREIN, THE OUTSTANDING PRINCIPAL AMOUNT OF THIS BOND AT ANY TIME MAY BE LESS THAN THE AMOUNT SHOWN ON THE FACE HEREOF.

THE FOLLOWING SUMMARY OF TERMS IS SUBJECT TO THE INFORMATION SET FORTH IN THIS BOND:

ORIGINAL ISSUE DATE: July 1, 2020
MATURITY DATE: July 1, 2023 or as such date may be extended.

FACE AMOUNT: $110,000,000
INTEREST PAYMENT DATES: See below

INTEREST RATE: See below
THIS BOND IS A:
☐ Global Book-Entry Bond
☒ Certificated Bond

REGISTERED OWNER: Citibank, N.A., as Agent for the benefit of the Secured Counterparties under the Collateral Management Agreement (as defined below), or any successor Agent under the Collateral Management Agreement

<center>This Bond is not a Discount Bond
within the meaning of the within mentioned Mortgage Indenture</center>

<center>D-1</center>

# PACIFIC GAS AND ELECTRIC COMPANY

## BOND OF THE THIRTY-FIFTH SERIES

Face Amount (Maximum Principal Amount):
$110,000,000

No. _____

     PACIFIC GAS AND ELECTRIC COMPANY, a corporation duly organized and existing under the laws of the State of California (herein called the "Company," which term includes any successor Person pursuant to the applicable provisions of the Mortgage Indenture hereinafter referred to), for value received, hereby promises to pay to CITIBANK, N.A., as agent (the "Agent"), or its registered assigns, on behalf of the Secured Counterparties (as defined in the Collateral Management Agreement), the principal sum of up to ONE HUNDRED TEN MILLION DOLLARS ($110,000,000) or such lesser principal amount as shall be equal to the Obligations (as defined herein) due and payable under the Secured Cash Management Agreements (as defined herein), but not in excess of the then current face amount (maximum principal amount) of this Bond, and to pay interest with respect to this Bond at the Interest Rate (as defined herein) until the principal hereof is paid or duly made available for payment, but in each case not later than the Maturity Date specified above (as such date may be extended) or, in the event of default of the payment of the principal hereof, until the Company's obligations with respect to the payment of such principal shall be discharged as provided in the Mortgage Indenture.

     The principal amount outstanding under this Bond will increase or decrease from time to time to be equal at all times to the Obligations outstanding from time to time under the Secured Cash Management Agreements, but in no event shall the principal amount exceed the then current face amount. The principal due and payable hereunder by the Company as of any date shall be equal to the Obligations due and payable under the Secured Cash Management Agreements on such date, but not in excess of the then current face amount (maximum principal amount) of this Bond, and such principal shall be payable on the same dates (whether on the stated due dates or by acceleration pursuant to the terms of the applicable Secured Cash Management Agreement) as Obligations are payable from time to time pursuant to the Secured Cash Management Agreements. The obligation of the Company to make any payment of principal on this Bond shall be fully or partially, as the case may be, deemed to have been paid or otherwise satisfied and discharged to the extent that the Company has paid the Obligations due and payable under the Secured Cash Management Agreements, but any such payment shall not reduce the face amount (maximum principal amount) of this Bond unless the Maximum Secured Amount (as defined in the Collateral Management Agreement) is irrevocably reduced in accordance with the Collateral Management Agreement. If the Maximum Secured Amount is irrevocably reduced, the face amount (maximum principal amount) of this Bond shall be reduced by the same amount as the amount by which the Maximum Secured Amount is so reduced; provided, that for the avoidance of doubt, the face amount (maximum principal amount) of this Bond shall not be less than the Aggregate Exposure (as defined in the Collateral Management Agreement) of all Secured Counterparties (as defined in the Collateral Management Agreement) at the time of, and after giving effect to, such reduction and any concurrent repayment of the Obligations.

     Interest on this Bond shall be payable on each Interest Payment Date (as defined herein). The obligation of the Company to make any payment of interest with respect to this Bond shall be fully or partially, as the case may be, deemed to have been paid or otherwise satisfied and discharged to the extent that the Company has paid Interest Amounts (as defined herein) due and payable pursuant to the Secured Cash Management Agreements.

     For purposes of this Bond:

     "Ascertainable Fees" means any fees due and payable under the Secured Cash Management Agreements and any other written fee agreements from time to time entered into in connection with the Collateral Management Agreement by the Company and any Secured Counterparty.

     "Collateral Management Agreement" means the Collateral Management Agreement, dated as of July 1, 2020, among the Company, the Agent, and the banks and other financial institutions or entities party thereto from time to time as secured counterparties, as amended, supplemented, restated or otherwise modified from time to time.

<div align="center">D-2</div>

"Interest Amount" means, without duplication, interest on all Obligations, and all Ascertainable Fees and interest thereon due and payable under the Secured Cash Management Agreements.

"Interest Payment Date" means each date on which Interest Amounts are due and payable pursuant to the Secured Cash Management Agreements.

"Interest Rate" means a rate of interest per annum to result in an interest payment hereunder equal to the Interest Amount due and payable under the Secured Cash Management Agreements on the applicable Interest Payment Date.

"Obligations" means all Secured Cash Management Obligations (as defined in the Collateral Management Agreement).

Other capitalized terms used herein and not otherwise defined herein shall have the meanings specified in the Mortgage Indenture, unless otherwise noted or the context otherwise requires.

**The Trustee (as defined herein) may conclusively presume that the obligation of the Company to pay the principal of and interest with respect to this Bond shall have been fully satisfied and discharged unless and until it shall have received a written notice from the Registered Owner (specified above), signed by an authorized officer of the Registered Owner, stating that the payment of principal of or interest with respect to this Bond has not been fully paid when due and specifying the amount of funds required to make such payment. The Trustee may also conclusively rely on any written notice from an authorized officer of the Registered Owner with respect to the principal amount Outstanding at any time on this Bond and the interest payable with respect to this Bond at any time and the date or dates on which such principal and interest are payable.**

Payments of the principal of and interest with respect to this Bond shall be made at the Corporate Trust Office of the Trustee located initially in Los Angeles, California or at such other office or agency as may be designated for such purpose by the Company from time to time. Payment of the principal of and interest with respect to this Bond, as aforesaid, shall be made in such coin or currency of the United States of America as at the time of payment is legal tender for the payment of public and private debts.

The Maturity Date of this Bond specified above shall be coincident with the Termination Date of the Collateral Management Agreement and will be extended from time to time to the same date to which the Termination Date of the Collateral Management Agreement may be extended from time to time.

REFERENCE IS HEREBY MADE TO THE FURTHER PROVISIONS OF THIS BOND SET FORTH ON THE REVERSE HEREOF, WHICH FURTHER PROVISIONS SHALL FOR ALL PURPOSES HAVE THE SAME EFFECT AS IF SET FORTH AT THIS PLACE.

D-3

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 675 of 1367

Unless the certificate of authentication hereon has been executed by the Trustee referred to on the reverse hereof by manual or electronic signature, this Bond shall not be entitled to any benefit under the Mortgage Indenture or be valid or obligatory for any purpose.

IN WITNESS WHEREOF, the Company has caused this instrument to be duly executed.

Dated:

**PACIFIC GAS AND ELECTRIC COMPANY**

By: _____

By: _____

D-4

**TRUSTEE'S CERTIFICATE OF AUTHENTICATION**

This is the Bond of the series designated as the Bonds of the Thirty-Fifth Series referred to in the within-mentioned Mortgage Indenture.

THE BANK OF NEW YORK MELLON TRUST
COMPANY, N.A., as Trustee

By _____
Authorized Signatory

Dated:

D-5

This Bond of the Thirty-Fifth Series (this "Bond") is one of a duly authorized issue of Bonds of the Company (the "Bonds") issued and issuable in one or more series under and equally secured by an Indenture of Mortgage, dated as of June 19, 2020 (such Indenture as originally executed and delivered and as supplemented or amended from time to time thereafter, together with any constituent instruments establishing the terms of particular Bonds, being herein called the "Mortgage Indenture"), between the Company and The Bank of New York Mellon Trust Company, N.A., as Trustee (herein called the "Trustee," which term includes any successor trustee under the Mortgage Indenture), and reference is hereby made to the Mortgage Indenture for a description of the property mortgaged, pledged and held in trust, the nature and extent of the security and the respective rights, limitations of rights, duties and immunities of the Company, the Trustee and the Holders of the Bonds thereunder and of the terms and conditions upon which the Bonds are, and are to be, authenticated and delivered and secured. The acceptance of this Bond shall be deemed to constitute the consent and agreement by the Holder hereof (on behalf of the Secured Counterparties) to all of the terms and provisions of the Mortgage Indenture. This Bond is limited in face amount (maximum principal amount) to $110,000,000.

This Bond is issued to the Agent for the benefit of the Secured Counterparties by the Company pursuant to the Company's obligations under the Collateral Management Agreement.

This Bond is not subject to redemption prior to the Maturity Date specified above.

As provided in the Mortgage Indenture and subject to certain limitations therein set forth, this Bond or any portion of the principal amount hereof will be deemed to have been paid for all purposes of the Mortgage Indenture and to be no longer Outstanding thereunder, and the Company's entire indebtedness in respect thereof will be satisfied and discharged, if there has been irrevocably deposited with the Trustee or any Paying Agent (other than the Company), in trust, money in an amount which will be sufficient and/or Eligible Obligations, the principal of and interest on which when due, without regard to any reinvestment thereof, will provide moneys which, together with money, if any, deposited with or held by the Trustee or such Paying Agent, will be sufficient to pay when due the principal of and interest with respect to this Bond when due, assuming all extensions of credit under the Secured Cash Management Agreements outstanding at the time of such deposit were fully drawn.

If an Event of Default (as defined in the Collateral Management Agreement) shall have occurred by reason of a failure by the Company to make a payment with respect to any Obligation when the same shall be due and payable (including by acceleration) pursuant to the applicable Secured Cash Management Agreement, it shall be deemed to be an Event of Default, for purposes of Section 10.01 of the Mortgage Indenture, in payment of an amount of principal of this Bond equal to the amount of such unpaid Obligation (but, in no event, in excess of the face amount (maximum principal amount) of this Bond). If an Event of Default (as defined in the Collateral Management Agreement) shall have occurred by reason of a failure by the Company to make a payment of any Interest Amount or any other Obligation when the same shall be due and payable (including by acceleration) pursuant to the applicable Secured Cash Management Obligations, it shall be deemed to be an Event of Default, for purposes of Section 10.01 of the Mortgage Indenture, in the payment of an amount of interest with respect to this Bond equal to the amount of such unpaid Interest Amount or amount of such other Obligation. The Company's obligation with respect to this Bond shall be fully satisfied when (and the holder hereof shall surrender this Bond to, or upon the order of, the Company for cancellation) the Collateral Management Agreement shall have been terminated and all of the Obligations and Interest Amounts then due and payable shall have been duly paid by the Company. At the time of surrender of this Bond, the holder hereof shall deliver such appropriate instruments of transfer or release as may reasonably be requested by the Company.

If an Event of Default under the Mortgage Indenture shall occur and be continuing, the Trustee or the Holders of at least 25% of the aggregate principal amount of the Outstanding Bonds, considered as one class, may declare the principal amount of all Bonds then Outstanding to be due and payable immediately by notice in writing to the Company (and to the Trustee if given by Holders); provided, however, that with respect to certain Events of Default relating to bankruptcy, insolvency and similar events, the principal amount of all Bonds then Outstanding shall be due and payable immediately without further action by the Trustee or the Holders.

D-6

The Mortgage Indenture permits, with certain exceptions as therein provided, the Company and the Trustee to enter into one or more supplemental indentures for the purpose of adding any provisions to, or changing in any manner or eliminating any of the provisions of, the Mortgage Indenture with the consent of the Holders of not less than a majority in aggregate principal amount of the Bonds at the time Outstanding, considered as one class; provided, however, that if there shall be Bonds of more than one series Outstanding under the Mortgage Indenture and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such series, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all series so directly affected, considered as one class, shall be required; and provided, further, that if the Bonds of any series shall have been issued in more than one Tranche and if a proposed supplemental indenture shall directly affect the rights of the Holders of Bonds of one or more, but less than all, of such Tranches, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Bonds of all Tranches so directly affected, considered as one class, shall be required; and provided, further, that the Mortgage Indenture permits the Company and the Trustee to enter into one or more supplemental indentures for certain purposes without the consent of any Holders of Bonds; and provided, further, that for the avoidance of doubt, the foregoing shall not change the voting requirements under Section 14.02 of the Mortgage Indenture, which for the avoidance of doubt, require the consent of the Holders of each Outstanding Bond of each series or Tranche in certain circumstances. The Mortgage Indenture also contains provisions permitting the Holders of a majority in aggregate principal amount of Bonds, on behalf of the Holders of all such Bonds, to waive certain past defaults under the Mortgage Indenture and their consequences. Any such consent or waiver by the Holder of this Bond shall be conclusive and binding upon such Holder and upon all future Holders of this Bond and of any Bond issued upon the registration of transfer hereof or in exchange herefor or in lieu hereof, whether or not notation of such consent or waiver is made upon this Bond. Notwithstanding the foregoing, no supplemental indenture shall amend, modify or waive any provision of Section 10.07 of the Mortgage Indenture without the consent of the Holders.

As provided in and subject to the provisions of the Mortgage Indenture, the Holder of this Bond shall not have the right to institute any proceeding with respect to the Mortgage Indenture or for the appointment of a receiver or trustee or for any other remedy thereunder, unless such Holder shall have previously given the Trustee written notice of a continuing Event of Default, the Holders of at least 25% in aggregate principal amount of the Bonds at the time Outstanding shall have made written request to the Trustee to institute proceedings in respect of such Event of Default as Trustee and offered the Trustee reasonable indemnity, and the Trustee shall not have received from the Holders of at least a majority in aggregate principal amount of Bonds at the time Outstanding a direction inconsistent with such written request, and shall have failed to institute any such proceeding for 60 days after receipt of such notice, request and offer of indemnity. The foregoing shall not apply to any suit instituted by the Holder of this Bond for the enforcement of any payment of principal hereof or interest with respect hereto on or after the respective due dates expressed herein.

No reference herein to the Mortgage Indenture and no provision of this Bond or of the Mortgage Indenture shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal of and interest with respect to this Bond at the times, place and rate, and in the coin or currency, herein prescribed.

For all purposes of the Mortgage Indenture, the principal amount of this Bond Outstanding as of any date of calculation shall be equal to the Obligations outstanding under the Secured Cash Management Agreements as of such date.

This Bond is issuable in the denomination of $110,000,000 or such lesser amount equal to the face amount of this Bond as provided herein.

As provided in the Mortgage Indenture and subject to certain limitations set forth therein and herein, the transfer of this Bond is registrable in the Bond Register, upon surrender of this Bond for registration of transfer at the office or agency of the Company in any place where the principal of and interest with respect to this Bond are payable, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Company, the Trustee or the Bond Registrar, as the case may be, duly executed by the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new Bonds of this series and of like tenor, of authorized denominations and for the same aggregate principal amount, will be issued to the designated transferee or transferees.

D-7

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 679 of 1367

Before any transfer of this Bond by the Holder or such Holder's legal representative will be recognized or given effect by the Company or the Trustee, the Holder shall note the then current principal amount payable on this Bond, the interest accrued to the date of such transfer and the then current face amount of this Bond, and shall notify the Company and the Trustee of the name and address of the transferee and shall afford the Company and the Trustee the opportunity of verifying the notation as to such then current principal amount payable on this Bond, the interest accrued to the date of such transfer and the then current face amount of this Bond.

No service charge shall be made for any such registration of transfer or exchange, but the Company may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

Prior to due presentment of this Bond for registration of transfer, the Company, the Trustee and any agent of the Company or the Trustee may treat the Person in whose name this Bond is registered as the owner hereof for all purposes, whether or not this Bond be overdue, and neither the Company, the Trustee nor any such agent shall be affected by notice to the contrary.

This Bond shall be governed by, and construed and enforced in accordance with, the laws of the State of New York without regard to the principles of conflicts of laws thereunder, except to the extent that the Trust Indenture Act shall be applicable.

As provided in the Mortgage Indenture, no recourse shall be had for the payment of the principal of or interest with respect to this Bond, or any part thereof, or for any claim based hereon or otherwise in respect hereof, or of the indebtedness represented hereby, or upon any obligation, covenant or agreement under the Mortgage Indenture, against any incorporator, shareholder, officer or director, as such, past, present or future, of the Company or of any predecessor or successor corporation (either directly or through the Company or a predecessor or successor corporation), whether by virtue of any constitutional provision, statute or rule of law or by the enforcement of any assessment or penalty or otherwise; it being expressly agreed and understood that the Mortgage Indenture and all the Bonds are solely corporate obligations and that any such personal liability is hereby expressly waived and released as a condition of, and as part of the consideration for, the execution of the Mortgage Indenture and the issuance of this Bond.

Anything in this Bond, the Mortgage Indenture, the Collateral Management Agreement or the Secured Cash Management Agreements to the contrary notwithstanding, any payment by the Company of principal of or interest on this Bond shall be applied by the holder hereof to the payment of any amounts owing by the Company on the Obligations and Interest Amounts that are then due or are to become due, and shall, to the extent of such application, for all purposes, satisfy and discharge the obligation of the Company to make such payment on such Obligations and Interest Amounts, respectively.

Anything in this Bond, the Mortgage Indenture, the Collateral Management Agreement or the Secured Cash Management Agreements to the contrary notwithstanding, any payment by the Company of the Obligations and Interest Amounts pursuant to the Secured Cash Management Agreements shall, to the extent thereof, for all purposes, satisfy and discharge the obligation of the Company to make a payment of principal or interest, as the case may be, in respect of this Bond that is then due or is to become due; provided, that any such payment of the Obligations and Interest Amounts pursuant to the Secured Cash Management Agreements shall not reduce the face amount (maximum principal amount) of this Bond, which shall be reduced only to the extent that the Maximum Secured Amount shall have been irrevocably reduced in accordance with the Collateral Management Agreement.

D-8

**ASSIGNMENT FORM**

To assign this Bond, fill in the form below: (1) or (we) assign and transfer this Bond to

_____
(Insert assignee's soc. sec. or tax I.D. no.)

_____

_____

_____

_____

(Print or type assignee's name, address and zip code)

and irrevocably appoint _____ to transfer this Bond on the books of the Company. The agent may substitute another to act for him.

_____

Date: _____

Your signature: _____
(Sign exactly as your name appears on the face of this Bond)

Tax Identification No.: _____

SIGNATURE GUARANTEE:

_____

Signatures must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Bond Registrar, which requirements include membership or participation in the Security Transfer Agent Medallion Program ("*STAMP*") or such other "signature guarantee program" as may be determined by the Bond Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

D-9

**Exhibit 4.8**

**Execution Version**

PLEDGE AGREEMENT

dated as of

July 1, 2020

among

PG&E CORPORATION,
as Pledgor,

JPMORGAN CHASE BANK, N.A.,
as Collateral Agent,

JPMORGAN CHASE BANK, N.A.,
as Revolving Administrative Agent,

JPMORGAN CHASE BANK, N.A.,
as Term Administrative Agent,

THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A.,
as Initial Notes Trustee,

and

THE SECURED REPRESENTATIVES PARTY HERETO FROM TIME TO TIME

# **TABLE OF CONTENTS**

| | | PAGE |
|---|---|---|
| ARTICLE I DEFINITIONS | | 2 |
| SECTION 1.01. | Credit Agreement | 2 |
| SECTION 1.02. | Other Defined Terms | 2 |
| ARTICLE II PLEDGE OF SECURITIES | | 8 |
| SECTION 2.01. | Pledge | 8 |
| SECTION 2.02. | Delivery of the Pledged Equity | 8 |
| SECTION 2.03. | Representations, Warranties and Covenants | 8 |
| SECTION 2.04. | Registration in Nominee Name; Denominations | 10 |
| SECTION 2.05. | Voting Rights; Dividends and Interest | 10 |
| SECTION 2.06. | Filings | 12 |
| SECTION 2.07. | Supplements; Further Assurances | 12 |
| ARTICLE III REMEDIES | | 13 |
| SECTION 3.01. | Remedies upon Default | 13 |
| SECTION 3.02. | Application of Proceeds | 15 |
| ARTICLE IV MISCELLANEOUS | | 18 |
| SECTION 4.01. | Notices | 18 |
| SECTION 4.02. | Waivers, Amendment | 19 |
| SECTION 4.03. | Collateral Agent's Fees and Expenses; Indemnification | 21 |
| SECTION 4.04. | Successors and Assigns | 22 |
| SECTION 4.05. | Additional Pledgors | 22 |
| SECTION 4.06. | Survival of Agreement | 22 |
| SECTION 4.07. | Counterparts; Effectiveness, Several Agreement | 23 |
| SECTION 4.08. | Severability | 24 |
| SECTION 4.09. | Right of Set-Off | 24 |
| SECTION 4.10. | Governing Law; Jurisdiction; Venue; Waiver of Jury Trial; Consent to Service of Process | 24 |
| SECTION 4.11. | Headings | 25 |
| SECTION 4.12. | Security Interest Absolute | 26 |
| SECTION 4.13. | Termination or Release | 26 |
| SECTION 4.14. | Collateral Agent Appointed Attorney-in-Fact | 26 |

i

| | | |
|---|---|---|
| SECTION 4.15. | Appointment and General Authority of the Collateral Agent, Etc. | 26 |
| SECTION 4.16. | Additional Pari Passu Indebtedness | 27 |
| SECTION 4.17. | Collateral Agent's Duty | 28 |
| SECTION 4.18. | Reasonable Care | 29 |
| SECTION 4.19. | Delegation; Limitation | 29 |
| SECTION 4.20. | Miscellaneous | 29 |
| SECTION 4.21. | Treatment of Certain Information; Confidentiality | 29 |
| SECTION 4.22. | Certain Agreements with Respect to Bankruptcy or Insolvency Proceedings | 30 |
| SECTION 4.23. | Reinstatement | 31 |
| Schedule I | Equity Interests | |
| Schedule II | Pledgor Information | |
| Annex I | Form of Additional Pari Passu Joinder Agreement | |

ii

PLEDGE AGREEMENT dated as of July 1, 2020, by and among PG&E Corporation, a California corporation (the "**Pledgor**"), JPMorgan Chase Bank, N.A., as collateral agent (in such capacity, together with its successors and assigns in such capacity, the "**Collateral Agent**") for the Secured Parties (as defined below), JPMorgan Chase Bank, N.A., as the Revolving Administrative Agent (as defined below), JPMorgan Chase Bank, N.A., as the Term Administrative Agent (as defined below), The Bank of New York Mellon Trust Company, N.A., as Initial Notes Trustee (as defined below), and the other Secured Representatives (as defined below) from time to time party hereto. Capitalized terms used in this Agreement and not otherwise defined in Section 1.02 below shall have the meanings specified in the Revolving Credit Agreement (as defined below).

WHEREAS, the Pledgor, JPMorgan Chase Bank, N.A., as administrative agent (in such capacity, together with its successors and assigns in such capacity, the "**Revolving Administrative Agent**"), the lenders party thereto, and the Collateral Agent have entered into that certain Credit Agreement, dated as of the date hereof (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "**Revolving Credit Agreement**"), pursuant to which the lenders party thereto have agreed to provide a revolving credit facility to the Pledgor;

WHEREAS, the Pledgor, JPMorgan Chase Bank, N.A., as administrative agent (in such capacity, together with its successors and assigns in such capacity, the "**Term Administrative Agent**"), the lenders party thereto, and the Collateral Agent have entered into that certain Credit Agreement, dated as of June 23, 2020 (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "**Term Credit Agreement**"), pursuant to which the lenders party thereto advanced term loans to the Pledgor in an aggregate face amount equal to $2,750,000,000;

WHEREAS, the Pledgor and The Bank of New York Mellon Trust Company, N.A., as trustee (in such capacity, together with its successors and assigns in such capacity, the "**Initial Notes Trustee**"), have entered into that certain Indenture, dated as of June 23, 2020 (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "**Initial Notes Indenture**"), pursuant to which the Pledgor may, from time to time, issue debt securities in one or more series;

WHEREAS, pursuant to the Revolving Credit Agreement, the Term Credit Agreement and the Initial Notes Indenture, the Pledgor is required to enter into this Agreement; and

WHEREAS, the Pledgor will receive substantial benefits from the execution and delivery of the Revolving Credit Agreement, the Term Credit Agreement and the Initial Notes Indenture.

NOW, THEREFORE, the parties hereto agree as follows:

## ARTICLE I

### Definitions

SECTION 1.01. <u>Revolving Credit Agreement</u>. (a) Unless otherwise defined herein or in the Revolving Credit Agreement, capitalized terms used herein that are defined in the UCC shall have the meanings assigned to them in the UCC.

(b) The rules of construction specified in Section 1.2 of the Revolving Credit Agreement also apply to this Agreement, *mutatis mutandis*.

SECTION 1.02. <u>Other Defined Terms</u>. As used in this Agreement, the following terms have the meanings specified below:

"**Additional Pari Passu Agent**" means the Person appointed to act as trustee, agent or representative for the holders of Additional Pari Passu Indebtedness pursuant to any Additional Pari Passu Agreement, together with such Person's successors and assigns in such capacity.

"**Additional Pari Passu Agreement**" means the indenture, credit agreement or other agreement under which any Additional Pari Passu Indebtedness is incurred and any notes or other instruments or agreements representing such Additional Pari Passu Indebtedness.

"**Additional Pari Passu Indebtedness**" means any Indebtedness of the Pledgor that is not prohibited from being incurred pursuant to the Covered Documents and that is secured (or, at the time designated, proposed to be secured) by a lien on the Pledged Collateral permitted pursuant to the Covered Documents on an equal and ratable basis with the First Lien Obligations; *provided* that (i) the Additional Pari Passu Agent for the holders of such Indebtedness shall execute an Additional Pari Passu Joinder Agreement and (ii) the Pledgor shall designate such Indebtedness as Additional Pari Passu Indebtedness pursuant to <u>Section 4.16</u>.

"**Additional Pari Passu Joinder Agreement**" means a joinder to this Agreement in substantially the form of <u>Annex I</u> hereto or such other form as is reasonably acceptable to the Collateral Agent.

"**Agreement**" means this Pledge Agreement.

"**Applicable Secured Representative**" means (i) until the earlier of (x) the Discharge of Revolving Credit Agreement Obligations and (y) the Non-Applicable Secured Representative Enforcement Date, the Revolving Administrative Agent and (ii) thereafter, the Major Non-Applicable Secured Representative.

"**Bankruptcy Code**" means Title 11 of the United States Code.

2

"**Collateral Agent**" has the meaning assigned to such term in the introductory paragraph of this Agreement.

"**Controlling Secured Parties**" means the Secured Parties whose Secured Representative is the Applicable Secured Representative.

"**Covered Documents**" means the Revolving Loan Documents, the Term Loan Documents, the Initial Notes Documents and each Additional Pari Passu Agreement.

"**Debtor Relief Laws**" means the Bankruptcy Code and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect.

"**DIP Financing**" has the meaning assigned to such term in Section 4.22(b).

"**DIP Financing Liens**" has the meaning assigned to such term in Section 4.22(b).

"**DIP Lenders**" has the meaning assigned to such term in Section 4.22(b).

"**Discharge**" means, with respect to any Series of First Lien Obligations, the date on which such Series of First Lien Obligations is no longer secured by the Pledged Collateral. The term "**Discharged**" shall have a corresponding meaning.

"**Discharge of Revolving Credit Agreement Obligations**" means the Discharge of the Revolving Credit Agreement Obligations; *provided* that a Discharge of Revolving Credit Agreement Obligations shall not be deemed to have occurred in connection with a Refinancing of the Revolving Credit Agreement Obligations with additional First Lien Obligations secured by the Pledged Collateral under an Additional Pari Passu Agreement which has been designated in writing by the Pledgor to the Collateral Agent and each Secured Representative as "Revolving Credit Agreement Obligations" for purposes of this Agreement.

"**Electronic Signature**" means an electronic sound, symbol, or process attached to, or associated with, a contract or other record and adopted by a Person with the intent to sign, authenticate or accept such contract or record.

"**Event of Default**" means an "Event of Default" as defined in any of the Covered Documents.

"**First Lien Obligations**" means, collectively, (i) the Revolving Credit Agreement Obligations, (ii) the Term Credit Agreement Obligations, (iii) the Initial Notes Obligations and (iv) each Series of Additional Pari Passu Indebtedness.

3

"**Future Interests**" has the meaning assigned to such term in <u>Section 2.01</u>.

"**Impairment**" has the meaning assigned to such term in <u>Section 3.02(f)</u>.

"**Indemnified Liabilities**" has the meaning assigned to such term in <u>Section 4.03(c)</u>.

"**Indemnitees**" has the meaning assigned to such term in <u>Section 4.03(c)</u>.

"**Initial Notes Documents**" has the meaning assigned to the term "Notes Documents" (or any successor term thereof) in the Initial Notes Indenture.

"**Initial Notes Indenture**" has the meaning assigned to such term in the recitals of this Agreement.

"**Initial Notes Obligations**" means the "Notes Obligations" as defined in Section 101 of the Initial Notes Indenture.

"**Initial Notes Trustee**" has the meaning assigned to such term in the recitals of this Agreement.

"**Insolvency or Liquidation Proceeding**" means:

(1) any case or proceeding commenced by or against the Pledgor under any Debtor Relief Law, any other proceeding for the reorganization, recapitalization or adjustment or marshalling of the assets or liabilities of the Pledgor, any receivership or assignment for the benefit of creditors relating to the Pledgor or any similar case or proceeding relative to the Pledgor or its creditors, as such, in each case whether or not voluntary;

(2) any liquidation, dissolution, marshalling of assets or liabilities or other winding up of or relating to the Pledgor, whether or not voluntary and whether or not involving bankruptcy or insolvency (except for any voluntary liquidation, dissolution or other winding up to the extent permitted by the applicable Covered Documents); or

(3) any other case or proceeding of any type or nature in which substantially all claims of creditors of the Pledgor are determined and any payment or distribution is or may be made on account of such claims.

"**Intervening Creditor**" has the meaning assigned to such term in <u>Section 3.02(f)</u>.

"**Issuer**" means Pacific Gas and Electric Company, a California corporation.

4

"**Major Non-Applicable Secured Representative**" means the Secured Representative (other than the Revolving Administrative Agent) of the Series of First Lien Obligations that constitutes the largest outstanding principal amount of any then outstanding Series of First Lien Obligations (excluding the Series of Revolving Credit Agreement Obligations) as such Secured Representative is notified in writing by the Pledgor, but solely to the extent that such Series of First Lien Obligations has a larger aggregate outstanding principal amount than the Series of Revolving Credit Agreement Obligations then outstanding.

"**Non-Applicable Secured Representative**" means, at any time, any Secured Representative that is not the Applicable Secured Representative at such time with respect to such Pledged Collateral.

"**Non-Applicable Secured Representative Enforcement Date**" means, with respect to any Non-Applicable Secured Representative, the date which is 180 days (throughout which 180-day period such Non-Applicable Secured Representative was the Major Non-Applicable Secured Representative) after the occurrence of both (i) an Event of Default under and as defined in the Covered Documents under which such Non-Applicable Secured Representative is the Major Non-Applicable Secured Representative and (ii) the Applicable Secured Representative and the Collateral Agent's receipt of written notice from such Major Non-Applicable Secured Representative certifying that (x) such Non-Applicable Secured Representative is the Major Non-Applicable Secured Representative and that an Event of Default under and as defined in the Covered Documents under which such Non-Applicable Secured Representative is the Secured Representative has occurred and is continuing and (y) the First Lien Obligations of the Series with respect to which such Major Non-Applicable Secured Representative is the Secured Representative are currently due and payable in full (whether as a result of acceleration thereof or otherwise) in accordance with the terms of the applicable Covered Documents; *provided* that the Non-Applicable Secured Representative Enforcement Date shall be stayed and shall not occur and shall be deemed not to have occurred (1) at any time that the Collateral Agent, on the instructions of the Applicable Secured Representative, has commenced and is diligently pursuing any enforcement action with respect to the Pledged Collateral or (2) at any time that the Pledgor is then a debtor under or with respect to (or otherwise subject to) any Insolvency or Liquidation Proceeding. Such Applicable Secured Representative and the Collateral Agent shall give prompt notice of such enforcement action to each Non-Applicable Secured Representative; *provided* that the failure to give such notice shall not affect its rights hereunder.

"**Non-Controlling Secured Parties**" means the Secured Parties which are not Controlling Secured Parties.

"**Person**" means "Person" as such term is defined in the Revolving Credit Agreement.

"**Pledged Collateral**" has the meaning assigned to such term in <u>Section 2.01</u>.

"**Pledged Equity**" has the meaning assigned to such term in <u>Section 2.01</u>.

"**Pledgor**" has the meaning assigned to such term in the introductory paragraph of this Agreement.

"**Proceeds**" means all proceeds (including proceeds of proceeds) of the Pledged Equity and Future Interests including all "proceeds," as such term is defined in Section 9-102(a)(64) of the UCC.

"**Reaffirmation Agreement**" means a reaffirmation of this Agreement executed by the Pledgor in form and substance reasonably acceptable to the Collateral Agent.

"**Refinance**" means, in respect of any Indebtedness, to refinance, extend, renew, defease, amend, increase, modify, supplement, restructure, refund, replace or repay, or to issue other Indebtedness or enter alternative financing arrangements, in exchange or replacement for such Indebtedness (in whole or in part), including by adding or replacing lenders, creditors, agents, borrowers and/or guarantors, and including in each case, but not limited to, after the original instrument giving rise to such Indebtedness has been terminated and including, in each case, through any credit agreement, indenture or other agreement. "**Refinanced**" and "**Refinancing**" have correlative meanings.

"**Related Parties**" means with respect to any Person, each such Person's affiliates and the partners, directors, officers, employees, agents and advisors of each such Person and of each such Person's affiliates.

"**Revolving Administrative Agent**" has the meaning assigned to such term in the recitals of this Agreement.

"**Revolving Credit Agreement**" has the meaning assigned to such term in the recitals of this Agreement.

"**Revolving Credit Agreement Obligations**" means the "Obligations" as defined in the Revolving Credit Agreement.

"**Revolving Loan Documents**" has the meaning assigned to the term "Loan Documents" (or any successor term thereof) in the Revolving Credit Agreement.

"**Secured Obligations**" means all advances to, and debts, liabilities, obligations, covenants and duties of, the Pledgor, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against the Pledgor or any Affiliate thereof of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding, arising under or otherwise with respect to any of (i) the Revolving Loan Documents, (ii) the Term Loan Documents, (iii) the Initial Notes Documents, (iv) any Additional Pari Passu Agreement and (v) this Agreement.

"**Secured Parties**" means, collectively, the Collateral Agent, the Revolving Administrative Agent, the Term Administrative Agent, the Initial Notes Trustee, each Additional Pari Passu Agent and any other holders of Secured Obligations (including, without limitation, the "Secured Parties" (as defined in the Revolving Credit Agreement), the "Secured Parties" (as defined in the Term Credit Agreement) and the "Notes Secured Parties" (as defined in the Initial Notes Indenture)).

"**Secured Representative**" means, (i) with respect to the Revolving Credit Agreement Obligations, the Revolving Administrative Agent, (ii) with respect to the Term Credit Agreement Obligations, the Term Administrative Agent, (iii) with respect to the Initial Notes Obligations, the Initial Notes Trustee and (iv) with respect to any Series of Additional Pari Passu Indebtedness, the Person designated as the Additional Pari Passu Agent for such Series in the applicable Additional Pari Passu Joinder Agreement.

"**Series**" means with respect to any First Lien Obligations, each of (i) the Revolving Credit Agreement Obligations, (ii) the Term Credit Agreement Obligations, (iii) the Initial Notes Obligations and (iv) the Additional Pari Passu Indebtedness incurred pursuant to any Additional Pari Passu Agreement, which pursuant to any Additional Pari Passu Joinder Agreement, are to be represented hereunder by an Additional Pari Passu Agent.

"**Term Administrative Agent**" has the meaning assigned to such term in the recitals of this Agreement.

"**Term Credit Agreement**" has the meaning assigned to such term in the recitals of this Agreement.

"**Term Credit Agreement Obligations**" means the "Obligations" as defined in the Term Credit Agreement.

"**Term Loan Documents**" has the meaning assigned to the term "Loan Documents" (or any successor term thereof) in the Term Credit Agreement.

"**UCC**" means the Uniform Commercial Code as from time to time in effect in the State of New York; *provided* that, if perfection or the effect of perfection or non-perfection or the priority of the security interest in Pledged Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, "**UCC**" means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority.

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 691 of 1367

# ARTICLE II

## Pledge of Securities

SECTION 2.01. <u>Pledge</u>. As security for the payment and performance in full of the Secured Obligations when due, whether at stated maturity, by acceleration or otherwise, the Pledgor hereby pledges to the Collateral Agent, for the benefit of the Secured Parties, a security interest in all of the Pledgor's right, title and interest in, to and under (i) all shares of common stock of the Issuer owned by the Pledgor, including those that are listed on <u>Schedule I</u>, and any other shares of common stock of the Issuer obtained in the future by the Pledgor and the certificates or instruments representing such common stock (the "**Pledged Equity**"); (ii) all payments of dividends, cash, options, warrants, instruments and other property or proceeds from time to time received, receivable or otherwise distributed in respect of, in exchange for or upon the conversion of, the Pledged Equity, and all certificates or instruments representing, and rights and privileges of the Pledgor with respect to, the securities and other property referred to in this clause (ii) and clause (i) above (collectively, the "**Future Interests**"); and (iii) all Proceeds of any of the foregoing (the items referred to in clauses (i) through (iii) above being collectively referred to as the "**Pledged Collateral**").

SECTION 2.02. <u>Delivery of the Pledged Equity</u>. (a) The Pledgor agrees promptly (but in any event within thirty (30) days, or such longer period as the Collateral Agent may agree in its reasonable discretion, after receipt by the Pledgor) to deliver or cause to be delivered to the Collateral Agent, for the benefit of the Secured Parties, any and all certificates or instruments representing Pledged Collateral constituting certificated securities.

(b) Upon delivery to the Collateral Agent, any certificates or instruments representing the Pledged Collateral required to be delivered hereunder shall be accompanied by an undated and duly executed stock or security powers, indorsement certificate or other instrument of transfer or assignment in blank, in form and substance reasonably satisfactory to the Collateral Agent. Each delivery of certificates or instruments representing the Pledged Collateral required to be delivered hereunder shall be accompanied by a schedule describing the securities, which schedule shall be deemed to supplement <u>Schedule I</u> and made a part hereof; *provided* that failure to supplement <u>Schedule I</u> shall not affect the validity of such pledge of such Pledged Collateral. Each schedule so delivered shall supplement any prior schedules so delivered.

SECTION 2.03. <u>Representations, Warranties and Covenants</u>. The Pledgor represents, warrants and covenants to and with the Collateral Agent, for the benefit of the Secured Parties, that:

(a) as of the date hereof, <u>Schedule I</u> includes all of the issued and outstanding Capital Stock required to be pledged by the Pledgor hereunder and under the Revolving Credit Agreement, the Term Credit Agreement and the Initial Notes Indenture and all certificates or instruments representing such Capital Stock have been delivered to the Collateral Agent, for the benefit of the Secured Parties, accompanied by an undated and duly executed instrument of transfer or assignment in blank, in form and substance reasonably satisfactory to the Collateral Agent (or arrangements reasonably satisfactory to the Collateral Agent shall have been made for such delivery);

(b) the Pledged Equity has been duly and validly authorized and issued by the Issuer and is fully paid and non-assessable;

8

(c) as of the date hereof, the exact legal name (within the meaning of Section 9-503(a) of the UCC), jurisdiction of incorporation and location of chief executive office of the Pledgor is set forth on Schedule II hereto;

(d) the Pledgor (i) is, subject to any transfers made in compliance with this Agreement and the Covered Documents, the direct owner, beneficially and of record, of the Pledged Equity listed on Schedule I as being pledged by the Pledgor, (ii) holds the same free and clear of all Liens (other than Liens not prohibited by the Covered Documents), and (iii) if requested by the Collateral Agent, will use commercially reasonable efforts to defend its title or interest thereto or therein against any and all Liens (other than the Liens not prohibited by the Covered Documents), however arising, of all Persons whomsoever;

(e) except for restrictions and limitations imposed or not prohibited by the Covered Documents or securities laws generally or resulting from Liens prohibited by the Covered Documents, subject to receipt of any applicable regulatory approvals, including ,without limitation, any approval or consent of the CPUC, the Pledged Collateral is freely transferable and assignable, and none of the Pledged Collateral is subject to any option, right of first refusal, shareholders agreement, charter or by-law provisions or contractual restriction of any nature that might prohibit, impair, delay or otherwise affect in any manner material and adverse to the Secured Parties the pledge of the Pledged Collateral hereunder, the sale or disposition thereof pursuant hereto or the exercise by the Collateral Agent of rights and remedies hereunder;

(f) the execution and performance by the Pledgor of this Agreement are within the Pledgor's organizational powers and have been duly authorized by all necessary organizational action;

(g) no consent or approval of, or filing with, any Governmental Authority, any securities exchange or any other Person was or is necessary to the validity of the pledge effected hereby, except for the approvals, consents, exemptions, authorizations, actions, notices and filings which have been duly obtained, taken, given or made and are in full force and effect (except such approvals, consents, exemptions, authorizations, actions, notices and filings, the failure to obtain or make which could not be reasonably expected to affect in any manner material and adverse to the Secured Parties the pledge of the Pledged Collateral hereunder, the sale or disposition thereof pursuant hereto or the exercise by the Collateral Agent of rights and remedies hereunder); and

(h) by virtue of the execution and delivery by the Pledgor of this Agreement, the delivery of the certificates representing the Pledged Collateral to, and continued possession by, the Collateral Agent in the State of New York, or the filing of a UCC-1 financing statement with the Secretary of State of the State of California, naming the Pledgor, as debtor, and the Collateral Agent, as secured party, the Collateral Agent, for the benefit of the Secured Parties, will have a valid and perfected Lien upon the Pledged Collateral as security for the payment and performance of the Secured Obligations to the extent such perfection is governed by the UCC.

9

The Pledgor hereby agrees that if any Pledged Collateral constituting investment property (as defined under Section 9-102(a)(49) of the UCC) is at any time not evidenced by certificates of ownership, then the Pledgor shall, to the extent permitted by applicable law, promptly after the reasonable request of the Collateral Agent (i) cause the Issuer to promptly execute and deliver to the Collateral Agent an acknowledgment of the pledge of such Pledged Collateral in a form that is reasonably satisfactory to the Collateral Agent, (ii) if necessary or desirable (as reasonably determined by the Collateral Agent) to perfect a security interest in such Pledged Collateral, cause such pledge to be recorded on the books of the Issuer, (iii) execute any customary pledge forms or other documents necessary or appropriate (as reasonably determined by the Collateral Agent) to complete the pledge contemplated hereby and give the Collateral Agent the right to transfer such Pledged Collateral at the direction of the Controlling Secured Parties after the occurrence and during the continuance of any Event of Default under any Covered Document in accordance with the terms hereof and (iv) after the occurrence and during the continuance of any Event of Default under any Covered Document, promptly upon request by the Collateral Agent, (A) cause the organizational documents of the Issuer to be amended to provide that such Pledged Equity shall be treated as "securities" for purposes of the UCC and (B) cause such Pledged Equity to become certificated and delivered to the Collateral Agent in accordance with the provisions of <u>Section 2.02</u>.

SECTION 2.04. <u>Registration in Nominee Name; Denominations</u>. If an Event of Default under any Covered Document shall have occurred and be continuing and the Collateral Agent (at the direction of the Controlling Secured Parties) shall have given the Pledgor prior written notice of its intent to exercise such rights, (a) the Collateral Agent, on behalf of the Secured Parties, shall have the right (to be exercised at the direction of the Controlling Secured Parties and subject to receipt of any applicable regulatory approvals) to hold the Pledged Equity in its own name as pledgee, the name of its nominee (as pledgee or as sub-agent) or the name of the Pledgor, endorsed or assigned in blank or in favor of the Collateral Agent and the Pledgor will promptly give to the Collateral Agent copies of any written notices or other written communications received by it with respect to Pledged Equity registered in the name of the Pledgor and (b) the Collateral Agent shall have the right to exchange the certificates representing Pledged Equity for certificates of smaller or larger denominations for any purpose consistent with this Agreement, to the extent not prohibited by the documentation governing such Pledged Equity or applicable law and subject to receipt of any applicable regulatory approvals.

SECTION 2.05. <u>Voting Rights; Dividends and Interest</u>. (a) Unless and until an Event of Default under any Covered Document shall have occurred and be continuing and the Collateral Agent (at the direction of the Controlling Secured Parties) shall have provided prior written notice to the Pledgor that the rights of the Pledgor under this <u>Section 2.05</u> are being suspended:

(i) the Pledgor shall be entitled to exercise any and all voting and/or other consensual rights and powers inuring to an owner of Pledged Equity or any part thereof, and the Pledgor agrees that it shall exercise such rights for purposes consistent with the terms of this Agreement and the other Covered Documents;

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 694 of 1367

(ii) the Collateral Agent shall promptly (after reasonable advance notice) execute and deliver to the Pledgor, or cause to be executed and delivered to the Pledgor, all such proxies, powers of attorney and other instruments as the Pledgor may reasonably request for the purpose of enabling the Pledgor to exercise the voting and/or consensual rights and powers it is entitled to exercise pursuant to Section 2.05(a)(i); and

(iii) the Pledgor shall be entitled to receive, retain and use (free and clear of any Lien hereunder, except as provided in the proviso to this Section 2.05(a)(iii)) any and all dividends, interest, principal and other distributions paid on or distributed in respect of the Pledged Collateral to the extent and only to the extent that such dividends, interest, principal and other distributions are not prohibited by, and otherwise paid or distributed in accordance with, the terms and conditions of the Covered Documents and applicable laws; *provided* that any noncash dividends, interest, principal or other distributions that would constitute Pledged Equity, whether resulting from a subdivision, combination or reclassification of the outstanding Capital Stock of the Issuer or received in exchange for Pledged Equity or any part thereof, or in redemption thereof, or as a result of any merger, consolidation, acquisition or other exchange of assets to which the Issuer may be a party or otherwise, shall be and become part of the Pledged Collateral, and, if received by the Pledgor, shall not be commingled by the Pledgor with any of its other funds or property but shall be held separate and apart therefrom, shall be held in trust for the benefit of the Collateral Agent and the Secured Parties and shall be forthwith delivered to the Collateral Agent in the same form as so received (with any necessary endorsement reasonably requested by the Collateral Agent), to the extent delivery thereof is required pursuant to Section 2.02. So long as no Event of Default under any Covered Document has occurred and is continuing, the Collateral Agent shall promptly deliver to the Pledgor any Pledged Equity in its possession if requested to be delivered to the Issuer in connection with any exchange or redemption of such Pledged Equity not prohibited by the Covered Documents in accordance with this Section 2.05(a)(iii).

(b) Upon the occurrence and during the continuance of an Event of Default under any Covered Document, after the Collateral Agent (at the direction of the Controlling Secured Parties) shall have provided the Pledgor with prior written notice of the suspension of the Pledgor's rights under Section 2.05(a)(iii), then all rights of the Pledgor to dividends, interest, principal or other distributions that the Pledgor is authorized to receive pursuant to Section 2.05(a)(iii) shall cease, and all such rights shall thereupon become vested in the Collateral Agent, which shall have the sole and exclusive right and authority to receive and retain such dividends, interest, principal or other distributions; *provided* that, unless otherwise directed in accordance with Section 3.02(e), the Collateral Agent shall have the right from time to time during the continuance of an Event of Default under any Covered Document to permit the Pledgor to exercise such rights. All dividends, interest, principal or other distributions received by the Pledgor contrary to the provisions of this Section 2.05 shall be held in trust for the benefit of the Collateral Agent, shall be segregated from other property or funds of the Pledgor and

11

shall be forthwith delivered to the Collateral Agent upon demand in the same form as so received (with any necessary endorsement reasonably requested by the Collateral Agent). Any and all money and other property paid over to or received by the Collateral Agent pursuant to the provisions of this Section 2.05(b) shall be retained by the Collateral Agent in an account to be established by the Collateral Agent upon receipt of such money or other property and shall be applied in accordance with the provisions of Section 3.02. After all Events of Default have been cured or waived, the Collateral Agent shall promptly repay to the Pledgor (without interest) all dividends, interest, principal or other distributions that the Pledgor would otherwise be permitted to retain pursuant to the terms of Section 2.05(a)(iii) and that remain in such account.

(c) Upon the occurrence and during the continuance of an Event of Default under any Covered Document, after the Collateral Agent (at the direction of the Controlling Secured Parties) shall have provided the Pledgor with prior written notice of the suspension of the Pledgor's rights under Section 2.05(a)(i), subject to receipt of any applicable regulatory approvals, all rights of the Pledgor to exercise the voting and consensual rights and powers it is entitled to exercise pursuant to Section 2.05(a)(i) shall cease, and all such rights shall thereupon become vested in the Collateral Agent, which shall have the sole and exclusive right and authority to exercise such voting and consensual rights and powers (at the direction of the Controlling Secured Parties); *provided* that, unless otherwise directed in accordance with Section 3.02(e), the Collateral Agent shall have the right from time to time during the continuance of an Event of Default under any Covered Document to permit the Pledgor to exercise such rights. After all Events of Default have been cured or waived, the Pledgor shall have the exclusive right to exercise the voting and/or consensual rights and powers that the Pledgor would otherwise be entitled to exercise pursuant to the terms of Section 2.05(a)(i).

SECTION 2.06. Filings. The Pledgor hereby irrevocably authorizes the Collateral Agent at any time and from time to time to file in any relevant jurisdiction any financing statements and amendments thereto that contain the information required by Article 9 of the UCC of each applicable jurisdiction for the filing of any financing statement or amendment relating to the Pledged Collateral. The Pledgor agrees to provide all information described in the immediately preceding sentence to the Collateral Agent promptly upon request by the Collateral Agent.

SECTION 2.07. Supplements; Further Assurances. Promptly after any reasonable request by the Collateral Agent, the Pledgor shall take such further actions, and execute and/or deliver to the Collateral Agent such additional financing statements, amendments, assignments, agreements, supplements, powers and instruments, as the Collateral Agent may in its reasonable judgment deem necessary in order to create, perfect, preserve and protect the security interest in the Pledged Collateral as provided herein and the rights and interests granted to the Collateral Agent hereunder, to carry into effect the purposes hereof or to confirm the validity, enforceability and priority of the Collateral Agent's security interest in the Pledged Collateral or permit the Collateral Agent to exercise and enforce its rights, powers and remedies hereunder with respect to any Pledged Collateral, including the filing of financing statements, continuation statements and other documents (including this Agreement) under the UCC (or other

12

similar laws) in effect in any jurisdiction with respect to the security interest created hereby, all in form reasonably satisfactory to the Collateral Agent and in such offices wherever required by law to perfect, continue and maintain the validity, enforceability and priority of the security interest in the Pledged Collateral as provided herein and to preserve the other rights and interests granted to the Collateral Agent hereunder, as against third parties, with respect to the Pledged Collateral. If an Event of Default under any Covered Document has occurred and is continuing, the Collateral Agent (at the direction of the Controlling Secured Parties) may institute and maintain, in its own name or in the name of a Pledgor, such suits and proceedings as the Collateral Agent may be advised by counsel shall be necessary or expedient to prevent any impairment of the security interest in or the perfection thereof in the Pledged Collateral contemplated hereby. All of the foregoing shall be at the sole cost and expense of the Pledgor.

<div align="center">

**ARTICLE III**

**Remedies**

</div>

SECTION 3.01. <u>Remedies upon an Event of Default</u>. Upon the occurrence and during the continuance of an Event of Default under any Covered Document, subject to receipt of any applicable regulatory approvals, the Collateral Agent shall have the right to exercise (at the direction of the Controlling Secured Parties) any and all rights afforded to a secured party with respect to the Secured Obligations under the UCC or other applicable law and also may (i) exercise (at the direction of the Controlling Secured Parties) any and all rights and remedies of the Pledgor under or in connection with the Pledged Collateral, or otherwise in respect of the Pledged Collateral; *provided* that the Collateral Agent shall provide the Pledgor with notice thereof prior to such exercise and (ii) subject to the requirements of applicable law and the notice requirements described below, at the direction of the Controlling Secured Parties, sell or otherwise dispose of all or any part of the Pledged Collateral securing the Secured Obligations at a public or private sale or at any broker's board or on any securities exchange, for cash, upon credit or for future delivery as the Collateral Agent shall deem appropriate. The Collateral Agent shall be authorized at any such sale of securities (if it deems it advisable to do so) to restrict the prospective bidders or purchasers to Persons who will represent and agree that they are purchasing the Pledged Collateral for their own account for investment and not with a view to the distribution or sale thereof, and upon consummation of any such sale the Collateral Agent shall have the right to assign, transfer and deliver to the purchaser or purchasers thereof the Pledged Collateral so sold. Each such purchaser at any such sale of Pledged Collateral shall hold the property sold absolutely, free from any claim or right on the part of the Pledgor, and the Pledgor hereby waives (to the extent permitted by applicable law) all rights of redemption, stay and appraisal which the Pledgor now has or may at any time in the future have under any law now existing or hereafter enacted.

<div align="center">13</div>

The Collateral Agent shall give the Pledgor ten (10) days' written notice (which the Pledgor agrees is reasonable notice within the meaning of Section 9-611 of the UCC or its equivalent in other jurisdictions) of the Collateral Agent's intention to make any sale of Pledged Collateral. Such notice, in the case of a public sale, shall state the time and place for such sale and, in the case of a sale at a broker's board or on a securities exchange, shall state the board or exchange at which such sale is to be made and the day on which the Pledged Collateral, or portion thereof, will first be offered for sale at such board or exchange. Any such public sale shall be held at such time or times within ordinary business hours and at such place or places as the Collateral Agent may fix and state in the notice (if any) of such sale. At any such sale, the Pledged Collateral, or portion thereof, to be sold may be sold in one lot as an entirety or in separate parcels, as the Collateral Agent may (in its sole and absolute discretion) determine. The Collateral Agent shall not be obligated to make any sale of any Pledged Collateral if it shall determine not to do so, regardless of the fact that notice of sale of such Pledged Collateral shall have been given. The Collateral Agent may, without notice or publication, adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for sale, and such sale may, without further notice, be made at the time and place to which the same was so adjourned. In case any sale of all or any part of the Pledged Collateral is made on credit or for future delivery, the Pledged Collateral so sold may be retained by the Collateral Agent until the sale price is paid by the purchaser or purchasers thereof, but the Collateral Agent shall not incur any liability in case any such purchaser or purchasers shall fail to take up and pay for the Pledged Collateral so sold and, in case of any such failure, such Pledged Collateral may be sold again upon like notice. At any public (or, to the extent permitted by law, private) sale made pursuant to this Agreement, any Secured Party may bid for or purchase, free (to the extent permitted by law) from any right of redemption, stay, valuation or appraisal on the part of the Pledgor (all said rights being also hereby waived and released to the extent permitted by law), the Pledged Collateral or any part thereof offered for sale and may make payment on account thereof by using any claim then due and payable to such Secured Party from the Pledgor as a credit against the purchase price, and such Secured Party may, upon compliance with the terms of sale, hold, retain and dispose of such property without further accountability to the Pledgor therefor. For purposes hereof, a written agreement to purchase the Pledged Collateral or any portion thereof shall be treated as a sale thereof; the Collateral Agent shall be free to carry out such sale pursuant to any such agreement entered into at the direction of the Controlling Secured Parties in accordance with the terms of this Section 3.01 and the Pledgor shall not be entitled to the return of the Pledged Collateral or any portion thereof subject thereto, notwithstanding the fact that after the Collateral Agent shall have entered into such an agreement all Events of Default shall have been remedied and the Secured Obligations paid in full. As an alternative to exercising the power of sale herein conferred upon it, the Collateral Agent (at the direction of the Controlling Secured Parties) may proceed by a suit or suits at law or in equity to foreclose this Agreement and to sell the Pledged Collateral or any portion thereof pursuant to a judgment or decree of a court or courts having competent jurisdiction or pursuant to a proceeding by a court-appointed receiver. Any sale pursuant to the provisions of this Section 3.01 shall be deemed to conform to the commercially reasonable standards as provided in Section 9-610(b) of the UCC or its equivalent in other jurisdictions.

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 698 of 1367

SECTION 3.02. <u>Application of Proceeds</u>.

(a) The Collateral Agent shall apply the proceeds of any collection, sale or realization of Pledged Collateral, including any Pledged Collateral consisting of cash, in each case to the extent received after the occurrence and during the continuance of an Event of Default under any Covered Document as a result of an enforcement of remedies or in connection with a bankruptcy or insolvency proceeding, in the following order of priority:

(i) *first,* to fees, expenses and indemnities owing to the Collateral Agent, the Revolving Administrative Agent, the Term Administrative Agent, the Initial Notes Trustee and any Additional Pari Passu Agent, in each case, in its capacity as such in accordance with the terms of this Agreement;

(ii) *second,* to the payment in full of the Revolving Credit Agreement Obligations to the extent the aggregate principal amount in respect thereof does not exceed $650,000,000;

(iii) *third*, to the extent not described in clause (i) or clause (ii) above, to the payment in full of all remaining Secured Obligations (the amounts so applied to be distributed among the Secured Parties pro rata in accordance with the amount of Secured Obligations owed to them on the date of any such distribution); and

(iv) *fourth,* to the Pledgor and/or other Persons entitled thereto.

(b) If, despite the provisions of this Agreement, any Secured Party shall receive any payment or recovery from the proceeds of any collection, sale or realization of Pledged Collateral in excess of its portion of payments on account of the Secured Obligations to which it is then entitled in accordance with this Agreement, such Secured Party shall hold such payment or other recovery in trust for the benefit of all Secured Parties hereunder for distribution in accordance with this <u>Section 3.02</u> and shall deliver such payment or recovery to the Collateral Agent for distribution in accordance with this <u>Section 3.02</u>.

(c) The Collateral Agent shall have absolute discretion as to the time of application of any such proceeds, moneys or balances in accordance with this Agreement. Upon any sale of Pledged Collateral by the Collateral Agent (including pursuant to a power of sale granted by statute or under a judicial proceeding), the receipt of the Collateral Agent or of the officer making the sale shall be a sufficient discharge to the purchaser or purchasers of the Pledged Collateral so sold and such purchaser or purchasers shall not be obligated to see to the application of any part of the purchase money paid over to the Collateral Agent or such officer or be answerable in any way for the misapplication thereof.

15

(d) In making the determinations and allocations required by this Section 3.02, the Collateral Agent may rely upon information supplied by any Secured Representative as to the amounts of unpaid principal and interest and other amounts outstanding with respect to the Secured Obligations arising under or with respect to any Covered Document for which such Person acts as Secured Representative and the Collateral Agent shall have no duty to inquire as to the application by such Secured Representative of any amounts distributed by such Secured Representative. The Collateral Agent shall have no liability to any of the Secured Parties for actions taken in reliance on information supplied to it as to the amounts of unpaid principal and interest and other amounts outstanding with respect to the Secured Obligations; *provided* that nothing in this Section 3.02 shall prevent the Pledgor from contesting any amounts claimed by any Secured Party in any information so supplied. All distributions made by the Collateral Agent pursuant to this Section 3.02 shall be (subject to any decree of any court of competent jurisdiction) final (absent manifest error), and the Collateral Agent shall have no duty to inquire as to the application by any Secured Representative of any amounts distributed to such Secured Representative.

(e) Notwithstanding anything in this Agreement to the contrary, with respect to any Pledged Collateral, (i) only the Collateral Agent shall act or refrain from acting with respect to the Pledged Collateral (including with respect to any intercreditor agreement with respect to any Pledged Collateral) and then only on the instructions of the Applicable Secured Representative and (ii) no Non-Applicable Secured Representative or other Non-Controlling Secured Party shall, or shall instruct or direct the Collateral Agent to, commence any judicial or nonjudicial foreclosure proceedings with respect to, seek to have a trustee, receiver, liquidator, examiner or similar official appointed for or over, attempt any action to take possession of, exercise any right, remedy or power with respect to, or otherwise take any action to enforce its security interest in or realize upon, or take any other action available to it in respect of, any Pledged Collateral (including with respect to any intercreditor agreement with respect to any Pledged Collateral), whether under this Agreement, applicable law or otherwise or have a right to consent to any such action, it being agreed that only the Collateral Agent acting on the instructions of the Applicable Secured Representative shall be entitled to take any such actions or exercise any such remedies with respect to Pledged Collateral; *provided* that, notwithstanding the foregoing, (i) in any Insolvency or Liquidation Proceeding, any Secured Representative or any other Secured Party may file a claim or proof of claim or statement of interest with respect to the First Lien Obligations owed to the Secured Parties; (ii) any Secured Representative or any other Secured Party may take any action to preserve or protect the validity and enforceability of the Liens granted in favor of the Secured Parties, *provided* that no such action is, or could reasonably be expected to be, (A) adverse to the Liens granted in favor of the Controlling Secured Parties or the rights of the Applicable Secured Representative, or shall instruct, the Collateral Agent or any other Controlling Secured Parties to exercise remedies in respect thereof or (B) otherwise inconsistent with the terms of this Agreement; and (iii) any Secured Representative or any other Secured Party may file any responsive or defensive pleadings in opposition to any motion, claim, adversary proceeding or other pleading made by any Person objecting to or otherwise seeking the disallowance of the claims of such Secured Party, including any claims secured by the Pledged Collateral, in each case, to the extent not inconsistent with the terms of this Agreement. Notwithstanding the equal priority of the Liens, the Applicable Secured Representative and Collateral Agent may deal with the Pledged Collateral as if such Applicable Secured Representative and the Collateral Agent had a senior Lien on such

16

Collateral. No Non-Applicable Secured Representative or Non-Controlling Secured Party will contest, protest or object to any foreclosure proceeding or action brought by the Applicable Secured Representative, the Collateral Agent or the Controlling Secured Party or any other exercise by the Applicable Secured Representative, the Collateral Agent or the Controlling Secured Party of any rights and remedies relating to the Pledged Collateral. The foregoing shall not be construed to limit the rights and priorities of any Secured Party or the Collateral Agent with respect to any Collateral not constituting Pledged Collateral. Each of the Secured Representatives agrees that it will not (and hereby waives any right to) contest or support any other Person in contesting, in any proceeding (including any Insolvency or Liquidation Proceeding), the perfection, priority, validity, attachment or enforceability of a Lien held by or on behalf of any of the Secured Parties in all or any part of the Pledged Collateral, or the provisions of this Agreement; *provided* that nothing in this Agreement shall be construed to prevent or impair the rights of any Secured Representative or any other Secured Party to enforce this Agreement.

(f) Notwithstanding the foregoing and the pari passu nature of all the First Lien Obligations, in the event that (i) any Series of First Lien Obligations is unenforceable under applicable law or is subordinated to any obligations, (ii) any Additional Pari Passu Indebtedness is not secured by an enforceable security interest in any of the Pledged Collateral and/or (iii) any intervening security interest exists securing any other obligations (other than other Secured Obligations) on a basis ranking prior to the security interest securing any Additional Pari Passu Indebtedness but junior to the security interest securing the other First Lien Obligations (any such condition referred to in the foregoing clauses (i), (ii) or (iii) with respect to any Series of First Lien Obligations, an "**Impairment**" of such Series of First Lien Obligations), the results of such Impairment shall be borne solely by the holders of such Series of First Lien Obligations, and the rights of the holders of such Series of First Lien Obligations (including, without limitation, the right to receive distributions in respect of such Series of First Lien Obligations) set forth herein shall be modified to the extent necessary so that the effects of such Impairment are borne solely by the holders of such Series of First Lien Obligations subject to such Impairment. Notwithstanding the foregoing, with respect to any Pledged Collateral for which a third party (other than a Secured Party) has a Lien that is junior in priority to the Lien of the holders of the Revolving Credit Agreement Obligations, the Term Credit Agreement Obligations and the Initial Notes Obligations but senior (as determined by appropriate legal proceedings in the case of any dispute) to the Lien of any other Secured Obligations (such third party, an "**Intervening Creditor**"), the value of any Pledged Collateral or proceeds that are allocated to such Intervening Creditor shall be deducted on a ratable basis solely from the Pledged Collateral or proceeds to be distributed in respect of the Secured Obligations with respect to which such Impairment exists.

17

# ARTICLE IV

## Miscellaneous

SECTION 4.01. <u>Notices</u>.

(a) All notices, requests, demands and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier, as follows:

(i) if to the Pledgor or the Issuer, c/o PG&E Corporation, P.O. Box 770000, San Francisco, CA 94177, Attention of Treasurer (Telecopier No. 415-973-8968; Telephone No. 415-973-8956), with a copy to PG&E Corporation, P.O. Box 770000, San Francisco, CA 94177, Attention of General Counsel (Telecopier No. 415-973-5520);

(ii) if to Collateral Agent, to JPMorgan Chase Bank, N.A., CIB DMO WLO, Mail code NY1-C413, 4 CMC, Brooklyn, NY, 11245-0001, United States, Email: <u>ib.collateral.services@jpmchase.com</u>;

(iii) if to a Secured Representative, to it at its address (or telecopier number) set forth in its signature page hereto or in its Additional Pari Passu Joinder Agreement; and

(iv) if to any other Secured Party, to it at its address (or telecopier number) specified by the relevant Secured Representative.

Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next business day for the recipient). Notices delivered through electronic communications to the extent provided in <u>Section 4.01(b)</u>, shall be effective as provided in <u>Section 4.01(b)</u>. Notices to any Secured Party shall also be effective if given as provided in the applicable notice provision set forth in the relevant Covered Document by which such Secured Party is bound.

(b) The Collateral Agent, any Secured Representative, the Pledgor or any Issuer may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; *provided* that approval of such procedures may be limited to particular notices or communications.

Unless the Collateral Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement); *provided* that, if such notice or other communication is not sent during the normal

18

business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(c) Any party hereto may change its address or telecopier number for notices and other communications hereunder by notice to the other parties hereto.

SECTION 4.02. <u>Waivers, Amendment</u>. (a) No failure or delay by any Secured Party in exercising any right, remedy, power or privilege hereunder or under any Covered Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges of the Secured Parties herein provided, and provided under each Covered Document, are cumulative and are not exclusive of any rights, remedies, powers and privileges provided by law. No waiver of any provision of this Agreement or consent to any departure by the Pledgor therefrom shall in any event be effective unless the same shall be permitted under <u>Section 4.02(b)</u>, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Without limiting the generality of the foregoing, the making of a loan or the issuance of any Additional Pari Passu Indebtedness shall not be construed as a waiver of any Event of Default, regardless of whether any Secured Party may have had notice or knowledge of such Event of Default at the time.

Notwithstanding anything to the contrary contained herein or in any Covered Document, the authority to enforce rights and remedies hereunder against the Pledgor, the Issuer or any of their respective Affiliates or Subsidiaries shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, the Collateral Agent for the benefit of the Secured Parties; *provided, however,* that the foregoing shall not prohibit (i) the Collateral Agent or any Secured Representative from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as the Collateral Agent or a Secured Representative, as applicable) hereunder or under the applicable Covered Documents (subject to any applicable limitations set forth in <u>Section 4.17</u>), (ii) any Secured Party from exercising set-off rights in accordance with <u>Section 4.09</u> or the applicable Covered Documents, or (iii) any Secured Party from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to the Pledgor, the Issuer or any of their respective Affiliates or Subsidiaries under any Debtor Relief Law.

(b) Neither this Agreement nor any provision hereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the Collateral Agent and the Pledgor, subject to any consent required in accordance with each Covered Document; *provided* that no such agreement shall:

19

(i) change any of the provisions of this Section 4.02(b) or the definition of the term "Controlling Secured Parties" or any other provision hereof specifying the number or percentage of Secured Parties required to waive, amend or modify any rights hereunder or make any determination or grant any consent hereunder, without the written consent of each Secured Representative;

(ii) change any of the provisions of Section 3.02(a), without the written consent of each Secured Representative;

(iii) release any Lien on any Pledged Collateral securing any Series of First Lien Obligations (other than in accordance with Section 3.01 or Section 4.13) without the written consent of the Secured Representative for such Series;

(iv) by its terms directly and adversely affect the rights of, or expand or impose additional duties on, any Secured Representative hereunder without the prior written consent of such Secured Representative; or

(v) by its terms directly and adversely affect the rights of the holders of any Series of First Lien Obligations in a manner different than such amendment affects other Series, without the written consent of the Secured Representative of any such adversely affected Series; *provided, further,* that this Agreement may be supplemented by an Additional Pari Passu Joinder Agreement and/or Reaffirmation Agreement in accordance with Section 4.16, without the consent of any other Secured Party.

Notwithstanding anything to the contrary herein or in any Covered Document, without the consent of any other Secured Party, the Pledgor and the Collateral Agent may (i) enter into any amendment, supplement or modification of this Agreement, or enter into any new agreement or instrument, (x) to effect the granting, perfection, protection, expansion or enhancement of any security interest in any Pledged Collateral or additional property to become collateral for the benefit of the Secured Parties (including entering into and/or modifying any intercreditor agreement in connection with Indebtedness not prohibited under any Covered Document that is or is contemplated to be subject to a Lien permitted by the Covered Documents (subject to any restrictions set forth in the Covered Documents as to the priority of any such Lien relative to any Lien securing, or required to be granted to secure, the Secured Obligations)), (y) as required by local law or to comply with advice from local counsel to give effect to, or protect any security interest for the benefit of the Secured Parties, in any property or so that the security interests therein comply with applicable law or any Covered Document, or (z) to otherwise enhance the rights or benefits of the Secured Parties hereunder, and (ii) enter into any amendment, supplement or modification of this Agreement (w) to cure any ambiguity, omission, mistake, defect or inconsistency, (x) to correct any typographical error or other manifest error in this Agreement, (y) to effect administrative changes of a technical or immaterial nature or (z) to make, complete or confirm any release of any Pledged Collateral in accordance with Section 4.13.

20

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 704 of 1367

SECTION 4.03. <u>Collateral Agent's Fees and Expenses; Indemnification</u>. (a) The Pledgor hereby reaffirms its indemnification obligations under the Covered Documents with respect to the Collateral Agent and each other Secured Party and their respective officers, directors, employees, agents and affiliates in connection with their execution and delivery of this Agreement, the transactions contemplated hereunder and the performance of their respective obligations hereunder.

(b) Without duplication of its obligations under the other Covered Documents, the Pledgor hereby agrees (i) to pay or reimburse the Collateral Agent for its reasonable out of pocket costs and expenses incurred in connection with the development, preparation and execution of, and any amendment, supplement or modification to, this Agreement and the other Loan Documents and any other documents prepared in connection herewith or therewith, and the consummation of the transactions contemplated hereby and thereby, including the reasonable fees and disbursements of only one joint counsel and one joint special California counsel and, if necessary, one joint local counsel in each other relevant jurisdiction to the Collateral Agent and the Secured Parties (and in the case of an actual or perceived conflict of interest, one additional counsel for each applicable jurisdiction to each group of similarly situated affected persons) and filing and recording fees and expenses, with statements with respect to the foregoing to be submitted to the Pledgor prior to the Effective Date (in the case of amounts to be paid on the Effective Date) and from time to time thereafter on a quarterly basis or such other periodic basis as the Collateral Agent shall deem appropriate and (ii) to pay or reimburse the Collateral Agent for all its costs and expenses incurred in connection with the enforcement or preservation of its rights under this Agreement, the other Loan Documents and any such other documents, including the reasonable fees and disbursements of only one joint counsel, one joint special California counsel and, if necessary, one local counsel in each other relevant jurisdiction to the Collateral Agent and the Secured Parties (and in the case of an actual or perceived conflict of interest, one additional counsel for each applicable jurisdiction to each group of similarly situated affected persons).

(c) Without duplication of its indemnification obligations under the other Covered Documents, the Pledgor agrees to indemnify the Collateral Agent and its Affiliates and their respective officers, directors, employees and agents (each, an "**Indemnitee**") against, and hold each Indemnitee harmless from, any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever whether brought by the Pledgor or any other Person, with respect to the execution, delivery, enforcement and performance of, or arising out of or in connection with, this Agreement, the Covered Documents and any such other documents, including the reasonable, documented and invoiced fees and expenses of one joint counsel and one joint special California counsel and, if necessary, one joint local counsel in each other relevant jurisdiction to the applicable Indemnitee (and in the case of a conflict of interest, one additional counsel to each group of similarly situated affected Persons (it being understood and agreed, for the avoidance of doubt, that the limitation on number of counsel shall not be applicable to the Initial Notes Trustee)), in connection with claims, actions or proceedings by any Indemnitee against the Pledgor under any Covered Document (collectively, the "**Indemnified Liabilities**"), *provided,*

21

that the Pledgor shall have no obligation hereunder to any Indemnitee with respect to Indemnified Liabilities relating to any Series of First Lien Obligations to the extent such Indemnified Liabilities resulted from, as determined in a final non-appealable judgment by a court of competent jurisdiction, (x) the gross negligence, bad faith or willful misconduct of such Indemnitee or its Affiliates, (y) the material breach of such Indemnitee's funding obligations under the Covered Documents in respect of such Series of First Lien Obligations or (z) a dispute amongst one or more Secured Parties of such Series of First Lien Obligations not arising from the Pledgor's breach of its obligations under the Covered Documents in respect of such Series of First Lien Obligations (other than a dispute involving a claim against an Indemnitee for its acts or omissions in its capacity as an arranger, bookrunner, agent or similar role in respect of such Series of First Lien Obligations, except, to the extent such acts or omissions are determined by a court of competent jurisdiction by a final and non-appealable judgment to have constituted the gross negligence, bad faith or willful misconduct of such Indemnitee in such capacity). This <u>Section 4.03(c)</u> shall not apply with respect to Taxes, other than Taxes that represent claims, damages, losses, liabilities, costs or expenses arising from non-Tax claims.

(d) Any such amounts payable under this <u>Section 4.03</u> shall be additional Secured Obligations secured hereby. The provisions of this <u>Section 4.03</u> shall remain operative and in full force and effect regardless of the termination of this Agreement or any Covered Document, the consummation of the transactions contemplated hereby, the repayment of any of the Secured Obligations, the invalidity or unenforceability of any term or provision of this Agreement or any Covered Document, or any investigation made by or on behalf of the Collateral Agent or any other Secured Party, and shall survive for two years (provided that such two year limitation shall not apply with respect to the Initial Notes Trustee), after repayment of all Secured Obligations and all other amounts payable hereunder and under the Covered Documents. All amounts due under this <u>Section 4.03</u> shall be payable not later than 30 days after written demand therefor.

SECTION 4.04. <u>Successors and Assigns</u>. The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective permitted successors and assigns.

SECTION 4.05. <u>Reserved</u>.

SECTION 4.06. <u>Survival of Agreement</u>. All covenants, agreements, representations and warranties made by the Pledgor hereunder and in the Covered Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement shall be considered to have been relied upon by the Secured Parties and shall survive the execution and delivery of the Covered Documents, the making of any loans and the issuance of any Additional Pari Passu Indebtedness, regardless of any investigation made by any Secured Party or on its behalf and notwithstanding that any Secured Party may have had notice or knowledge of any Event of Default at the time any credit is extended under the Revolving Credit Agreement, the Term Credit Agreement, the Initial Notes Indenture, or any Additional Pari Passu Agreement, and shall continue in full force and effect as long as any Secured Obligations are outstanding and unpaid (other than contingent obligations in respect of which no claim has been made).

22

SECTION 4.07. <u>Counterparts; Effectiveness, Several Agreement</u>. This Agreement may be executed in one or more counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which together shall constitute a single contract. Delivery of an executed counterpart of a signature page of this Agreement or any Additional Pari Passu Joinder Agreement by telecopy, emailed pdf. or any other electronic means that reproduces an image of the actual executed signature page shall be effective as delivery of a manually executed counterpart of this Agreement or such any Additional Pari Passu Joinder Agreement. The words "execution," "signed," "signature," "delivery," and words of like import in or relating to any document to be signed in connection with this Agreement and the transactions contemplated hereby shall be deemed to include Electronic Signatures, deliveries or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act. Without limiting the generality of the foregoing, the Pledgor hereby (i) agrees that, for all purposes, including without limitation, in connection with any workout, restructuring, enforcement of remedies, bankruptcy proceedings or litigation among the Pledgor and any Secured Parties, electronic images of this Agreement or any or any Additional Pari Passu Joinder Agreement (in each case, including with respect to any signature pages thereto) shall have the same legal effect, validity and enforceability as any paper original, and (ii) waives any argument, defense or right to contest the validity or enforceability of any Covered Documents based solely on the lack of paper original copies of any Covered Documents, including with respect to any signature pages thereto. This Agreement shall become effective as to each party hereto when a counterpart hereof executed on behalf of each of the parties hereto shall have been delivered to the Collateral Agent, and thereafter shall be binding upon each party hereto and their respective permitted successors and assigns, and shall inure to the benefit of the Pledgor, the Collateral Agent and the other Secured Parties and their respective permitted successors and assigns, except that the Pledgor shall not have the right to assign or transfer its rights or obligations hereunder (and any such assignment or transfer shall be void) except as expressly contemplated by this Agreement or the Covered Documents (it being understood and agreed that any assignee or transferee of the Pledgor pursuant to a transaction permitted by Section 7.6 of the Revolving Credit Agreement, Section 7.3 of the Term Credit Agreement and Section 901 of the Initial Notes Indenture and not otherwise prohibited by the Covered Documents shall be permitted so long as such Person assumes all of the obligations of the Pledgor hereunder and reaffirms the pledge granted hereby on terms reasonably satisfactory to the Collateral Agent).

SECTION 4.08. <u>Severability</u>. Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

SECTION 4.09. <u>Right of Set-Off</u>. In addition to any rights and remedies of the Secured Parties provided by law, upon the occurrence and during the continuance of any Event of Default under any Covered Document (with respect to which the Collateral Agent, each Secured Representative and the Pledgor have been notified pursuant to this Agreement), each Secured Party and its Affiliates is authorized at any time and from time to time, without prior notice to the Pledgor, any such notice being waived by Pledgor to the fullest extent permitted by applicable law, to set-off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held by, and other obligations at any time owing by, such Secured Party and its Affiliates to or for the credit or the account of the Pledgor against any and all Secured Obligations owing to such Secured Party and its Affiliates hereunder or under any Covered Document, now or hereafter existing, irrespective of whether or not such Secured Party or Affiliate shall have made demand under this Agreement or under any Covered Document and although such Secured Obligations may be contingent or unmatured or denominated in a currency different from that of the applicable deposit or obligations. Each Secured Party agrees promptly to notify the Pledgor and the Collateral Agent after any such set-off and application made by such Secured Party; provided that, the failure to give such notice shall not affect the validity of such set-off and application. The rights of each Secured Party under this <u>Section 4.09</u> are in addition to other rights and remedies (including other rights of set-off) that such Secured Party may have at law. Notwithstanding anything to the contrary in this <u>Section 4.09</u>, (x) the rights of each Secured Party under this <u>Section 4.09</u> are subject to any additional limitations and/or notice requirements set forth in any provisions relating to rights of set-off against the Pledgor and/or any of its Subsidiaries that are contained in any Covered Document by which such Secured Party is bound (including, without limitation, limitations on the rights of "defaulting lenders") and (y) the foregoing right of setoff shall apply only to the extent not restricted or prohibited by applicable law.

SECTION 4.10. <u>Governing Law; Jurisdiction; Venue; Waiver of Jury Trial; Consent to Service of Process</u>.

(a) <u>Governing Law</u>. This Agreement shall be governed by, and construed in accordance with, the law of the State of New York.

(b) <u>Submission to Jurisdiction</u>. The parties hereto irrevocably and unconditionally submit, for themselves and their property, to the non-exclusive jurisdiction of the United States District Court of the Southern District of New York sitting in the Borough of Manhattan (or if such court lacks subject matter jurisdiction, the Supreme Court of the State of New York sitting in the Borough of Manhattan) and of any appellate court from any thereof, in any action or proceeding arising out of or relating to

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 708 of 1367

this Agreement, or for recognition or enforcement of any judgment, and each of the parties hereto irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State court or, to the fullest extent permitted by applicable law, in such Federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement shall affect any right that the Collateral Agent or any other Secured Party may otherwise have to bring any action or proceeding relating to this Agreement against the Pledgor or its properties in the courts of any jurisdiction.

(c) <u>Waiver of Venue</u>. The parties hereto irrevocably and unconditionally waive, to the fullest extent permitted by applicable law, any objection that it may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Agreement in any court referred to in <u>Section 4.10(b)</u>. Each of the parties hereto irrevocably waives, to the fullest extent permitted by applicable law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d) <u>**WAIVER OF JURY TRIAL**</u>. **EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 4.10(d)</u>.**

(e) <u>Service of Process</u>. Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in <u>Section 4.01</u>. Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by applicable law.

SECTION 4.11. <u>Headings</u>. Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this Agreement.

25

SECTION 4.12. <u>Security Interest Absolute</u>. To the extent permitted by law, all rights of the Collateral Agent hereunder, the grant of a security interest in the Pledged Collateral and all obligations of the Pledgor hereunder shall be absolute and unconditional irrespective of (a) any lack of validity or enforceability of any Covered Document, any agreement with respect to any of the Secured Obligations or any other agreement or instrument relating to any of the foregoing, (b) any change in the time, manner or place of payment of, or in any other term of, all or any of the Secured Obligations, or any other amendment or waiver of or any consent to any departure from any Covered Document or any other agreement or instrument, (c) any exchange, release or non-perfection of any Lien on other collateral, or any release or amendment or waiver of or consent under or departure from any guarantee, securing or guaranteeing all or any of the Secured Obligations or (d) any other circumstance that might otherwise constitute a defense available to, or a discharge of, the Pledgor in respect of the Secured Obligations or this Agreement (other than payment in full of the Secured Obligations or termination or release of the Pledgor's obligations in accordance with the terms of <u>Section 4.13</u>).

SECTION 4.13. <u>Termination or Release</u>. (a) The release of Liens on the Pledged Collateral securing any Series of First Lien Obligations, whether in connection with a sale, transfer or other disposition of such Pledged Collateral or otherwise, shall be governed by and subject to the Covered Documents of such Series, and that nothing in this Agreement shall be deemed to amend or affect the terms of the Covered Documents of such Series with respect thereto; *provided* that if, at any time any Pledged Collateral is transferred to a third party or otherwise disposed of, in each case, in connection with any enforcement by the Applicable Secured Representative in accordance with the provisions of this Agreement, then (whether or not any Insolvency or Liquidation Proceeding is pending at the time) the Liens in favor of the other Secured Parties on such Pledged Collateral will automatically be released and discharged upon final conclusion of foreclosure proceeding as and when, but only to the extent, such Liens on such Pledged Collateral of the Applicable Secured Representative are released and discharged; *provided* that any proceeds of any Pledged Collateral realized therefrom shall be applied pursuant to <u>Section 3.02(a)</u>.

(b) In connection with any termination or release pursuant to <u>Section 4.13(a)</u>, the Collateral Agent shall execute and deliver to the Pledgor, at the Pledgor's expense, all documents that the Pledgor shall reasonably request to evidence such termination or release and shall perform such other actions reasonably requested by the Pledgor to effect such release, including delivery of certificates, securities and instruments. Any execution and delivery of documents pursuant to this <u>Section 4.13</u> shall be without recourse or warranty to the Collateral Agent.

SECTION 4.14. <u>Collateral Agent Appointed Attorney-in-Fact</u>. The Pledgor hereby appoints the Collateral Agent (and all officers, employees or agents designated by the Collateral Agent) as its true and lawful attorney-in-fact during the continuance of an Event of Default under any Covered Document, for the purpose of carrying out the provisions of this Agreement and taking any action and executing any instrument that the Collateral Agent may deem necessary or advisable to accomplish the purposes hereof at any time during the continuance of an Event of Default under any Covered Document, which appointment is irrevocable (until such time as the Secured Obligations shall have been paid in full (other than contingent obligations in respect of which no claim has been made)) and coupled with an interest *(provided that the*

Collateral Agent shall provide the Pledgor with notice thereof prior to exercising such rights). Without limiting the generality of the foregoing, the Collateral Agent shall have the right (to be exercised at the direction of the Controlling Secured Parties), upon the occurrence and during the continuance of an Event of Default under any Covered Document and upon notice by the Collateral Agent to the Pledgor of the Collateral Agent's intent to exercise such rights, with full power of substitution either in the Collateral Agent's name or in the name of the Pledgor (a) to receive, endorse, assign and/or deliver any and all notes, acceptances, checks, drafts, money orders or other evidences of payment relating to the Pledged Collateral or any part thereof; (b) to demand, collect, receive payment of, give receipt for and give discharges and releases of all or any of the Pledged Collateral; (c) to commence and prosecute any and all suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect or otherwise realize on all or any of the Pledged Collateral or to enforce any rights in respect of any Pledged Collateral; (d) to settle, compromise, compound, adjust or defend any actions, suits or proceedings relating to all or any of the Pledged Collateral; (e) to endorse the name of the Pledgor on any check, draft, instrument or other item of payment representing or included in the Pledged Collateral; and (f) to use, sell, assign, transfer, pledge, make any agreement with respect to or otherwise deal with all or any of the Pledged Collateral, and to do all other acts and things necessary to carry out the purposes of this Agreement, as fully and completely as though the Collateral Agent were the absolute owner of the Pledged Collateral for all purposes; *provided* that nothing herein contained shall be construed as requiring or obligating the Collateral Agent to make any commitment or to make any inquiry as to the nature or sufficiency of any payment received by the Collateral Agent, or to present or file any claim or notice, or to take any action with respect to the Pledged Collateral or any part thereof or the moneys due or to become due in respect thereof or any property covered thereby. The Collateral Agent and the other Secured Parties shall be accountable only for amounts actually received as a result of the exercise of the powers granted to them herein, and neither they nor their officers, directors, employees or agents shall be responsible to the Pledgor for any act or failure to act hereunder, except for their own gross negligence, bad faith, or willful misconduct or that of any of their Affiliates, directors, officers, employees, counsel, agents or attorneys-in-fact, in each case, as determined by a final non-appealable judgment of a court of competent jurisdiction. All sums disbursed by the Collateral Agent in connection with this <u>Section 4.14</u>, including reasonable attorneys' fees, court costs, expenses and other charges relating thereto (in any such case, to the extent reimbursable by the Pledgor pursuant to <u>Section 4.03</u>), shall be payable by the Pledgor to the Collateral Agent not later than thirty (30) days after demand and shall be additional Secured Obligations secured hereby.

SECTION 4.15. <u>Appointment and General Authority of the Collateral Agent, Etc.</u>

(a) Each Secured Representative from time to time party hereto, on behalf of itself and the other Secured Parties that it represents, irrevocably appoints JPMorgan Chase Bank, N.A. to act as Collateral Agent under this Agreement and authorizes the Collateral Agent to take such action as agent on behalf of such Secured Representative and such other Secured Parties and to exercise such powers under this Agreement as are delegated to the Collateral Agent by the terms hereof, together with all such powers as are reasonably incidental thereto.

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 711 of 1367

(b) By acceptance of the benefits of this Agreement, each Secured Party (whether or not a signatory hereto) shall be deemed irrevocably (i) to consent to the appointment of the Collateral Agent as its agent hereunder, (ii) to confirm that the Collateral Agent shall have the authority to act as the exclusive agent of such Secured Party for the enforcement of any provisions of this Agreement against the Pledgor, the exercise of remedies hereunder and the giving or withholding of any consent or approval hereunder relating to any Pledged Collateral or the Pledgor's obligations with respect thereto, (iii) to agree that it shall not take any action to enforce any provisions of this Agreement against the Pledgor, to exercise any remedy hereunder (including without limitation the right to enforce the security interest in the Pledged Collateral, institute proceedings, give any notice to account debtors, make collections, or sell or otherwise foreclose on any portion of the Pledged Collateral) or to give any consents or approvals hereunder except as expressly provided in this Agreement and (iv) to agree to be bound by the terms of this Agreement.

(c) The Collateral Agent may at any time give notice of its resignation to the Secured Representatives and the Pledgor. Upon receipt of any such notice of resignation, the Controlling Secured Parties shall have the right to appoint a successor, which shall be one of the Secured Representatives or a bank with an office in New York, New York, or an Affiliate of any such bank with an office in New York, New York and which shall be reasonably acceptable to the Pledgor. If no such successor shall have been so appointed by the Controlling Secured Parties and shall have accepted such appointment within thirty (30) days after the retiring Collateral Agent gives notice of its resignation, then the retiring Collateral Agent may, on behalf of the Secured Parties, appoint a successor Collateral Agent meeting the qualifications set forth above; *provided* that, if the Collateral Agent shall notify the Pledgor and the Secured Representatives that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (1) the retiring Collateral Agent shall be discharged from its duties and obligations hereunder and under the Covered Documents (except that in the case of any collateral security held by the Collateral Agent on behalf of any of the Secured Parties under any of the Covered Documents, the retiring Collateral Agent shall continue to hold such collateral security until such time as a successor Collateral Agent is appointed) and (2) all payments, communications and determinations provided to be made by, to or through the Collateral Agent shall instead be made by or to each Secured Representative directly, until such time as the Controlling Secured Parties appoint a successor Collateral Agent as provided for above in this Section 4.15(c). Upon the acceptance of a successor's appointment as Collateral Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Collateral Agent, and the retiring Collateral Agent shall be discharged from all of its duties and obligations hereunder and under the Covered Documents (if not already discharged therefrom as provided above in this Section 4.15(c)). The fees payable by the Pledgor to a successor Collateral Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Pledgor and such successor. After the retiring Collateral Agent's

28

resignation hereunder, the provisions of Section 4.03 shall continue in effect for the benefit of such retiring Collateral Agent, its sub-agents, as applicable, and its Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Collateral Agent was acting as Collateral Agent.

SECTION 4.16. Additional Pari Passu Indebtedness. The Pledgor may from time to time designate any of its additional obligations as Additional Pari Passu Indebtedness by delivering, or causing to be delivered, to the Collateral Agent and each Secured Representative party hereto at such time (a) a certificate signed by a Responsible Officer (as such term is defined in the Revolving Credit Agreement) of the Pledgor (i) identifying in reasonable detail the obligations so designated and the aggregate principal amount or face amount thereof as of the date of such certificate, stating that such obligations are designated as "Additional Pari Passu Indebtedness" for purposes hereof, (ii) representing that such designation does not violate the terms of the then extant Covered Documents and (iii) specifying the name and address of the Additional Pari Passu Agent for such obligations; (b) an Additional Pari Passu Joinder Agreement executed by the Additional Pari Passu Agent for such obligations and (c) to the extent reasonably requested by the Additional Pari Passu Agent for such obligations, a Reaffirmation Agreement executed by the Pledgor. Notwithstanding anything to the contrary contained herein, with respect to any Additional Pari Passu Agreement, the Collateral Agent shall have no responsibility for, or any duty to inquire as to, any matter pertaining to such Additional Pari Passu Agreement (or the contents thereof) or the compliance of the Pledgor or Additional Pari Passu Agent with the terms thereof. Without limiting the foregoing, in the event the Collateral Agent is required to take action hereunder and such action is conditioned upon compliance with the terms of any Additional Pari Passu Agreement, the Collateral Agent shall be entitled to request, and be fully protected in relying upon, a certificate of a Responsible Officer (as such term is defined in the Revolving Credit Agreement) of the Pledgor or an authorized officer of the applicable Additional Pari Passu Agent that such action is permitted or authorized under the terms of such Additional Pari Passu Agreement. To the extent such Additional Pari Passu Agreement grants any rights, protections, immunities or indemnities thereunder to the Collateral Agent, the Pledgor agrees that the Collateral Agent is an express third-party beneficiary thereunder.

SECTION 4.17. Collateral Agent's Duty. The obligations of the Collateral Agent to the Secured Parties hereunder shall be limited solely to (i) holding the Pledged Collateral for the benefit of the Secured Obligations and (ii) distributing any proceeds received by the Collateral Agent from the sale, collection or realization of the Pledged Collateral to the holders of Secured Obligations in accordance with the terms of this Agreement. This Agreement shall not create any liability of the Collateral Agent to any Secured Party and the Secured Parties agree to hold the Collateral Agent harmless from any and all liability incurred by or asserted against the Collateral Agent, in each case, arising out of, in connection with, or as a result of, the creation, perfection or continuation of the security interest on the Pledged Collateral, actions with respect to the occurrence of an Event of Default under any Covered Document, actions with respect to the foreclosure upon, sale, release, or depreciation of, or failure to realize upon, any of the Pledged Collateral or action with respect to the collection of any claim for all or any

29

part of the Secured Obligations from any account debtor, guarantor or any other party or the valuation, use or protection of the Pledged Collateral except to the extent that such liability resulted from (x) the gross negligence or willful misconduct of the Collateral Agent (as determined by a court of competent jurisdiction in a final and non-appealable decision) or (y) a claim brought by a Secured Party against the Collateral Agent for material breach of the Collateral Agent's obligations under this Agreement or under any Covered Document, if such Secured Party has obtained a final and non-appealable judgment in its favor on such claim as determined by a court of competent jurisdiction. By acceptance of the benefits under this Agreement, the Secured Parties will be deemed to have acknowledged and agreed that the provisions of the preceding sentence are intended to induce the Collateral Agent to serve in such capacity and are being relied upon by the Collateral Agent as consideration therefor.

SECTION 4.18. Reasonable Care. The Collateral Agent is required to use reasonable care in the custody and preservation of any of the Pledged Collateral in its possession and to account for all proceeds thereof; *provided,* that the Collateral Agent shall be deemed to have used reasonable care in the custody and preservation of any of the Pledged Collateral, if such Pledged Collateral is accorded treatment substantially similar to that which the Collateral Agent accords its own property, which shall be no less than the treatment employed by a reasonable and prudent agent in the industry.

SECTION 4.19. Delegation; Limitation. Subject to receipt of any applicable regulatory approvals, the Collateral Agent may execute any of the powers granted under this Agreement and perform any duty hereunder either directly or by or through agents or attorneys-in-fact, and shall not be responsible for the actions of any agents or attorneys-in-fact selected by it with reasonable care and without gross negligence or willful misconduct. Notwithstanding anything to the contrary contained in this Agreement, the rights of the Collateral Agent with respect to the Pledged Collateral shall be subject to the receipt of any necessary regulatory approvals.

SECTION 4.20. Miscellaneous. The Collateral Agent shall not be deemed to have actual, constructive, direct or indirect notice or knowledge of the occurrence of any Event of Default under any Covered Document unless and until the Collateral Agent shall have received a notice from (a) the Pledgor, (b) the Controlling Secured Parties or (c) with respect to any Series of First Lien Obligations, the Secured Representative for such Series or the requisite Secured Parties under such Series, in any such case, to the Collateral Agent in its capacity as Collateral Agent indicating that an Event of Default under any Covered Document in respect of such Series has occurred.

SECTION 4.21. Treatment of Certain Information; Confidentiality. The Collateral Agent agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Affiliates and to its and its Affiliates' respective partners, directors, officers, employees, agents, advisors and other representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority purporting to have jurisdiction over it (including any self-regulatory authority, such as the

30

National Association of Insurance Commissioners) (and, in the case of any non-ordinary course disclosure under this clause (b), the disclosing party shall use its reasonable efforts to inform the Pledgor thereof prior to any such disclosure and, in any event, shall promptly inform the Pledgor thereof, in each case to the extent legally permitted to do so), (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process (in which case the disclosing party shall use its reasonable efforts to inform the Pledgor thereof prior to any such disclosure and, in any event, shall promptly inform the Pledgor thereof, in each case to the extent legally permitted to do so), (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or any action or proceeding relating to this Agreement or the enforcement of rights hereunder, (f) to any Secured Representative or Affiliate thereof or the respective partners, directors, officers, employees, agents, advisors and other representatives of the foregoing (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (g) with the consent of the Pledgor or (h) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section 4.21 or (y) becomes available to the Collateral Agent or any of its Affiliates on a non-confidential basis from a source other than the Pledgor.

For purposes of this Section 4.21, "**Information**" means all information received from the Pledgor or any of its Subsidiaries relating to the Pledgor or any of its Subsidiaries or any of their respective businesses, other than any such information that is available to the Collateral Agent on a non-confidential basis prior to disclosure by the Pledgor or any of its Subsidiaries and other than information pertaining to this Agreement of the type routinely provided by arrangers to data service providers, including league table providers, that serve the lending industry; *provided* that, in the case of information received from the Pledgor or any of its Subsidiaries after the date hereof, such information is clearly identified at the time of delivery as confidential. Any Person required to maintain the confidentiality of Information as provided in this Section 4.21 shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

SECTION 4.22. Certain Agreements with Respect to Bankruptcy or Insolvency Proceedings.

(a) The parties acknowledge that the terms of this Agreement constitute a "subordination agreement" under section 510(a) of any Bankruptcy Code and this Agreement shall continue in full force and effect notwithstanding the commencement of any proceeding under any Debtor Relief Law by or against the Pledgor or any of its Subsidiaries.

(b) If the Pledgor shall become subject to any Insolvency or Liquidation Proceeding and shall, as debtor-in-possession, move for approval of debtor-in-possession financing ("**DIP Financing**") to be provided by one or more lenders (the "**DIP Lenders**") under Section 364 of the Bankruptcy Code or any equivalent provision of any other Debtor Relief Law and/or the use of cash collateral under Section 363 of the

31

Bankruptcy Code or any equivalent provision of any other Debtor Relief Law, each Secured Party agrees that it will not oppose and will raise no objection to any such financing or to any Liens on the Pledged Collateral securing the same ("**DIP Financing Liens**") and/or to any use of cash collateral that constitutes Pledged Collateral unless, in each case, the Applicable Secured Representative, shall then object to such DIP Financing or such DIP Financing Liens or use of cash collateral (and (i) to the extent that such DIP Financing Liens are senior to the Liens on any such Pledged Collateral for the benefit of the Controlling Secured Parties, each Non-Controlling Secured Party will subordinate its Liens with respect to such Pledged Collateral on the same terms as the Liens of the Controlling Secured Parties (other than any Liens of any Secured Parties constituting DIP Financing Liens) are subordinated thereto, and (ii) to the extent that such DIP Financing Liens rank pari passu with the Liens on any such Pledged Collateral granted to secure the First Lien Obligations of the Controlling Secured Parties, each Non-Controlling Secured Party will confirm the priorities of its Liens with respect to such Pledged Collateral as set forth herein), in each case so long as (A) the Secured Parties of each Series retain the benefit of their Liens on all such Pledged Collateral pledged to the DIP Lenders, including proceeds thereof arising after the commencement of such Insolvency or Liquidation Proceeding, with the same priority vis-a-vis all the other Secured Parties (other than any Liens of the Secured Parties constituting DIP Financing Liens) as existed prior to the commencement of the Insolvency or Liquidation Proceedings, (B) the Secured Parties of each Series are granted Liens on any additional or replacement collateral pledged to any Secured Parties as adequate protection or otherwise in connection with such DIP Financing and/or use of cash collateral, with the same priority vis-a-vis the Secured Parties as set forth in this Agreement, (C) if any amount of such DIP Financing and/or cash collateral is applied to repay any of the First Lien Obligations, such amount is applied pursuant to Section 3.02, and (D) if any Secured Parties are granted adequate protection with respect to First Lien Obligations subject hereto, including in the form of periodic payments, in connection with such DIP Financing or use of cash collateral, the proceeds of such adequate protection are applied pursuant to Section 3.02; *provided* that the Secured Parties of each Series shall have a right to object to the grant of a Lien to secure the DIP Financing over any assets subject to Liens in favor of the Secured Parties of such Series or its Collateral Agent that shall not constitute Pledged Collateral; and provided, further, that any Secured Parties receiving adequate protection shall not object to any other Secured Party receiving adequate protection comparable to any adequate protection granted to such Secured Parties in connection with a DIP Financing or use of cash collateral.

SECTION 4.23. Reinstatement. In the event that any of the First Lien Obligations shall be paid in full and such payment or any part thereof shall subsequently, for whatever reason (including an order or judgment for avoidance or disgorgement of a preference or fraudulent conveyance or transfer under any Debtor Relief Law), be required to be returned or repaid, the terms and conditions of this Agreement shall be fully applicable thereto until all such First Lien Obligations shall again have been paid in full in cash.

*[Signature Pages Follow]*

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the date first written above.

PG&E CORPORATION, as Pledgor

By: /s/ Margaret K. Becker
Name: Margaret K. Becker
Title: Senior Director and Treasurer

[*Signature Page to Pledge Agreement*]

JPMORGAN CHASE BANK, N.A.,
as Collateral Agent

By: /s/ Jeffrey Miller
   Name: Jeffrey Miller
   Title: Executive Director

Address for notices:
CIB DMO WLO
Mail code NY1-C413
4 CMC, Brooklyn, NY, 11245-0001
United States
Email: ib.collateral.services@jpmchase.com


JPMORGAN CHASE BANK, N.A.,
as Revolving Administrative Agent

By: /s/ Jeffrey Miller
   Name: Jeffrey Miller
   Title: Executive Director

Address for notices:
500 Stanton Christiana Road
NCC 5, 1st Floor
Newark, DE 19713-2107
Attention: Mary Crews
Telecopy/phone: (302) 634-5758/(302) 634-1417
Email: mary.crews@jpmorgan.com


JPMORGAN CHASE BANK, N.A.,
as Term Administrative Agent

By: /s/ Jeffrey Miller
   Name: Jeffrey Miller
   Title: Executive Director

Address for notices:
500 Stanton Christiana Road
NCC 5, 1st Floor
Newark, DE 19713-2107
Attention: Mary Crews
Telecopy: (302) 634-5758
Telephone: (302) 634-1417
Email: mary.crews@jpmorgan.com


[*Signature Page to Pledge Agreement*]

THE BANK OF NEW YORK MELLON
TRUST COMPANY, N.A.,
as the Initial Notes Trustee

By: /s/ Lawrence M. Kusch
    Name: Lawrence M. Kusch
    Title: Vice President

Address for notices:
The Bank of New York Mellon Trust
Company, N.A.
400 South Hope Street, Suite 500
Los Angeles, CA 90071
Atten: Corporate Unit

[*Signature Page to Pledge Agreement*]

EQUITY INTERESTS

| Issuer | Class of Equity Interests | Stock Certificate No. | Percentage of Outstanding Shares held by the Pledgor that are Pledged | Number of Shares Pledged by the Pledgor | Owner of Record |
|---|---|---|---|---|---|
| Pacific Gas and Electric Company | Common Stock | ZQU 16 | 100% | 264,374,809 | PG&E Corporation |

*Schedule 1*

PLEDGOR INFORMATION

| Legal Name | Jurisdiction of Incorporation | Chief Executive Office/ Principal Place of Business |
|---|---|---|
| PG&E Corporation | California | San Francisco, California 94177 |

*Schedule II*

FORM OF ADDITIONAL PARI PASSU JOINDER AGREEMENT

The undersigned is an Additional Pari Passu Agent (the "**New Additional Pari Passu Agent**") for Persons wishing to become "Secured Parties" (the "**New Secured Parties**") under the Pledge Agreement, dated as of July 1, 2020 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Pledge Agreement**" (terms used without definition herein have the meanings assigned to such terms by the Pledge Agreement)), among the Pledgor, JPMorgan Chase Bank, N.A., as collateral agent (in such capacity, together with its successors and assigns in such capacity, the "**Collateral Agent**") for the Secured Parties, JPMorgan Chase Bank, N.A., as the Revolving Administrative Agent, JPMorgan Chase Bank, N.A., as the Term Administrative Agent, and The Bank of New York Mellon Trust Company, N.A., as Initial Notes Trustee.

In consideration of the foregoing, the undersigned hereby:

(a) represents that the New Additional Pari Passu Agent has been authorized by the New Secured Parties to become a party to the Pledge Agreement on behalf of the New Secured Parties under that certain [DESCRIBE OPERATIVE AGREEMENT] (the "**New Pari Passu Agreement**") and to act as the Additional Pari Passu Agent for the New Secured Parties hereunder and under the Pledge Agreement;

(b) acknowledges that the New Secured Parties have received a copy of the Pledge Agreement;

(c) on behalf of itself and the other New Secured Parties, irrevocably appoints JPMorgan Chase Bank, N.A. to act as Collateral Agent under the Pledge Agreement and authorizes the Collateral Agent to take such action as agent on behalf of the undersigned and the other New Secured Parties and to exercise such powers under the Pledge Agreement as are delegated to the Collateral Agent by the terms thereof, together with all such powers as are reasonably incidental thereto; and

(d) accepts and acknowledges the terms of the Pledge Agreement applicable to it and the New Secured Parties and agrees to serve as Additional Pari Passu Agent for the New Secured Parties with respect to the New Pari Passu Agreement and the Secured Obligations thereunder and agrees on its own behalf and on behalf of the New Secured Parties to be bound by the terms of the Pledge Agreement applicable to holders of Secured Obligations, with all the rights and obligations of a Secured Party thereunder, and to be bound by all the provisions thereof as fully as if it had been a Secured Party on the effective date of the Pledge Agreement.

The name and address of the New Additional Pari Passu Agent for purposes of Section 4.01 of the Pledge Agreement are as follows:

[name and address of New Additional Pari Passu Agent]

*Annex I*

IN WITNESS WHEREOF, the undersigned has caused this Additional Pari Passu Joinder Agreement to be duly executed by its authorized officer as of the _____ day of _____ , 20___.

**[Name],**
as the New Additional Pari Passu Agent

By: _____
     Name:
     Title:

*Annex I*

AGREED TO AND ACCEPTED
The Collateral Agent hereby acknowledges
its acceptance of this Additional Pari Passu
Joinder Agreement for purpose of the Pledge
Agreement

JPMorgan Chase Bank, N.A.,
as Collateral Agent

By: _____
    Name:
    Title:

<div align="center">40</div>

**Exhibit 4.9**

PG&E CORPORATION

THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A.,
AS PURCHASE CONTRACT AGENT

AND

HOLDERS
FROM TIME TO TIME

------------------------

PURCHASE CONTRACT AND UNIT AGREEMENT

------------------------

DATED AS OF JULY 1, 2020

**TABLE OF CONTENTS**

Page

ARTICLE 1

DEFINITIONS AND OTHER PROVISIONS OF GENERAL APPLICATION

Section 1.01. *Definitions* 2
Section 1.02. *Compliance Certificates and Opinions* 13
Section 1.03. *Notices* 14
Section 1.04. *Effect of Headings and Table of Contents* 15
Section 1.05. *Successors and Assigns* 15
Section 1.06. *Separability Clause* 15
Section 1.07. *Benefits of Agreement* 15
Section 1.08. *Governing Law* 16
Section 1.09. *Legal Holidays* 16
Section 1.10. *Counterparts* 16
Section 1.11. *Inspection of Agreement* 16
Section 1.12. *Calculations* 16
Section 1.13. *UCC* 17
Section 1.14. *Waiver of Jury Trial* 17
Section 1.15. *Foreign Account Tax Compliance Act (FATCA)* 17

ARTICLE 2

UNIT AND PURCHASE CONTRACT FORMS

Section 2.01. *Forms of Units and Purchase Contracts Generally* 17
Section 2.02. *Form of Certificate of Authentication* 18
Section 2.03. *Global Securities; Separation of Units* 18
Section 2.04. *Recreation of Units* 19

ARTICLE 3

THE UNITS AND PURCHASE CONTRACTS

Section 3.01. *Amount and Denominations* 20
Section 3.02. *Rights and Obligations Evidenced by the Equity-Linked Securities* 21
Section 3.03. *Execution, Authentication, Delivery and Dating* 21
Section 3.04. *Temporary Equity-Linked Securities* 22
Section 3.05. *Registration; Registration of Transfer and Exchange* 22
Section 3.06. *Book-Entry Interests* 24
Section 3.07. *Notices to Holders* 24
Section 3.08. *Appointment of Successor Depositary* 24
Section 3.09. *Definitive Securities* 24
Section 3.10. *Mutilated, Destroyed, Lost and Stolen Securities* 25
Section 3.11. *Persons Deemed Owners* 26
Section 3.12. *Cancellation* 28

i

ARTICLE 4

SETTLEMENT OF THE PURCHASE CONTRACTS

Section 4.01. *Settlement Rate*                                                          28
Section 4.02. *Representations and Agreements of Holders*                                29
Section 4.03. *Purchase Contract Settlement Fund*                                        29
Section 4.04. *Settlement Conditions*                                                    30
Section 4.05. *Settlement on the Purchase Contract Settlement Date*                      30
Section 4.06. *Early Settlement*                                                         30
Section 4.07. *Early Settlement Upon a Fundamental Change*                               32
Section 4.08. *Acceleration of Purchase Contract Settlement Date*                        35
Section 4.09. *Registration of Underlying Shares and Transfer Taxes*                     35
Section 4.10. *Return of Purchase Contract Settlement Fund*                              35
Section 4.11. *No Fractional Shares*                                                     36


ARTICLE 5

ANTI-DILUTION ADJUSTMENTS TO THE FIXED SETTLEMENT RATES

Section 5.01. *Adjustments*                                                              36


ARTICLE 6

RECAPITALIZATIONS, RECLASSIFICATIONS AND CHANGES OF COMMON STOCK

Section 6.01. *Reorganization Events and Exchange Property*                              47


ARTICLE 7

CONCERNING THE HOLDERS OF PURCHASE CONTRACTS

Section 7.01. *Evidence of Action Taken by Holders*                                      49
Section 7.02. *Proof of Execution of Instruments and of Holding of Securities*           49
Section 7.03. *Purchase Contracts Deemed Not Outstanding*                                49
Section 7.04. *Record Date for Consents and Waivers*                                     50


ARTICLE 8

REMEDIES

Section 8.01. *Unconditional Right of Holders to Receive Shares of Common Stock*         50
Section 8.02. *Notice To Purchase Contract Agent; Limitation On Proceedings*             50
Section 8.03. *Restoration of Rights and Remedies*                                       51
Section 8.04. *Rights and Remedies Cumulative*                                           51
Section 8.05. *Delay or Omission Not Waiver*                                             51
Section 8.06. *Undertaking for Costs*                                                    51
Section 8.07. *Waiver of Stay or Execution Laws*                                         52
Section 8.08. *Control by Majority*                                                      52

ii

## ARTICLE 9
### THE PURCHASE CONTRACT AGENT

| | |
|---|---|
| Section 9.01. *Certain Duties and Responsibilities* | 52 |
| Section 9.02. *Notice of Default* | 53 |
| Section 9.03. *Certain Rights of Purchase Contract Agent* | 53 |
| Section 9.04. *Not Responsible for Recitals* | 55 |
| Section 9.05. *May Hold Units and Purchase Contracts* | 56 |
| Section 9.06. *Money Held in Custody* | 56 |
| Section 9.07. *Compensation, Reimbursement and Indemnification* | 56 |
| Section 9.08. *Corporate Purchase Contract Agent Required; Eligibility* | 57 |
| Section 9.09. *Resignation and Removal; Appointment of Successor* | 57 |
| Section 9.10. *Acceptance of Appointment by Successor* | 58 |
| Section 9.11. *Merger; Conversion; Consolidation or Succession to Business* | 59 |
| Section 9.12. *Preservation of Information; Communications to Holders* | 59 |
| Section 9.13. *No Other Obligations of Purchase Contract Agent* | 59 |
| Section 9.14. *Tax Compliance* | 60 |

## ARTICLE 10
### SUPPLEMENTAL AGREEMENTS

| | |
|---|---|
| Section 10.01. *Supplemental Agreements Without Consent of Holders* | 60 |
| Section 10.02. *Supplemental Agreements with Consent of Holders* | 61 |
| Section 10.03. *Execution of Supplemental Agreements* | 62 |
| Section 10.04. *Effect of Supplemental Agreements* | 62 |
| Section 10.05. *Reference to Supplemental Agreements* | 62 |
| Section 10.06. *Notice of Supplemental Agreements* | 62 |

## ARTICLE 11
### CONSOLIDATION, MERGER, CONVEYANCE, TRANSFER OR LEASE

| | |
|---|---|
| Section 11.01. *Covenant Not to Consolidate, Merge, Convey, Transfer or Lease Property Except Under Certain Conditions* | 63 |
| Section 11.02. *Rights and Duties of Successor Entity* | 63 |
| Section 11.03. *Officer's Certificate and Opinion of Counsel Given to Purchase Contract Agent* | 64 |

## ARTICLE 12
### THE TREASURY STRIPS

| | |
|---|---|
| Section 12.01. *Custodial Arrangement* | 64 |
| Section 12.02. *Instruction Regarding Payment of Amounts Received in Respect of Treasury Strips* | 64 |
| Section 12.03. *Delivery of Treasury Strips Upon Occurrence of a Bankruptcy Event* | 65 |
| Section 12.04. *Delivery of Treasury Strips Upon an Early Settlement or Early Settlement in Connection with a Fundamental Change* | 65 |

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 728 of 1367

ARTICLE 13
COVENANTS OF THE COMPANY

Section 13.01. *Performance Under Purchase Contracts*                                      65
Section 13.02. *Maintenance of Office or Agency*                                           66
Section 13.03. *Statements of Officers of the Company as to Default; Notice of Default*    66
Section 13.04. *Existence*                                                                 66
Section 13.05. *Company to Reserve Common Stock*                                           66
Section 13.06. *Covenants as to Common Stock*                                              66
Section 13.07. *Tax Treatment*                                                             67

EXHIBIT A FORM OF UNIT                                                                     A-1
EXHIBIT B FORM OF PURCHASE CONTRACT                                                        B-1

iv

PARTIES

PURCHASE CONTRACT AND UNIT AGREEMENT, dated as of July 1, 2020, between PG&E CORPORATION, a California corporation (the "**Company**"), THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A., acting as purchase contract agent (the "**Purchase Contract Agent**") for Holders from time to time, except when acting as Security Registrar for the Company, and Holders from time to time. Capitalized terms used herein have those meanings ascribed to them in Section 1.01.

RECITALS

WHEREAS, on and from the date hereof the Holders from time to time and the Company have entered into this Agreement, under which the Company has agreed to issue and deliver shares of Common Stock to such Holders pursuant to the Purchase Contracts on the Purchase Contract Settlement Date or, at the option of any Holder, on the second Business Day following any Early Settlement Date or the second Business Day following any Fundamental Change Early Settlement Date, or upon a Bankruptcy Event, in each case, in consideration for the approximate purchase price of $82.8574 per Purchase Contract paid by the initial Holders to the Company on the original issue date of the Purchase Contracts; and

WHEREAS, simultaneously with entering into the Purchase Contracts with the Company, the initial Holders will have acquired Treasury Strips, as contemplated in the prospectus supplement relating to the Units dated June 25, 2020, which Treasury Strips will have been delivered to the Custodian in accordance with the Custodial Agreement; and

WHEREAS, for the convenience of the Holders, the Holders wish to appoint the Purchase Contract Agent to inform the Custodian as to the identity of the Holders on the Security Register and to instruct the Custodian as to the manner by which all payments with respect to the Treasury Strips that are received by the Custodian are to be made to Holders and to administer all deliveries made on settlement of the Purchase Contracts; and

WHEREAS, the Company acknowledges such appointment and agrees to make all deliveries under the Purchase Contracts to the Purchase Contract Agent, to deliver all notices to Holders to the Purchase Contract Agent and to otherwise deal with the Purchase Contract Agent as agent for the Holders, all as set forth herein; and

WHEREAS, the Company has appointed the Purchase Contract Agent to act as Security Registrar for the Company; and

WHEREAS, the Company acknowledges, and the Purchase Contract Agent and the Holders agree, that the Purchase Contract Agent's duties to the Holders in respect of the Treasury Strips Components evidenced by Units as set forth in this Agreement are only for convenience of the Holders, and that the Company shall not have any obligations or responsibilities with respect to the administration, custody or any payments of the Treasury Strips and further that substantially all of the duties and responsibilities of the Purchase Contract Agent contemplated in this Agreement are in respect of the Purchase Contracts and the Units insofar as they evidence the Purchase Contracts and the administration thereof; and

NOW THEREFORE, in consideration of the premises and the purchase of the Units by the Holders thereof, it is mutually agreed as follows:

ARTICLE 1
DEFINITIONS AND OTHER PROVISIONS OF GENERAL APPLICATION

Section 1.01. *Definitions*. For all purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires:

(a) the terms defined in this Article have the meanings assigned to them in this Article and include the plural as well as the singular, and nouns and pronouns of the masculine gender include the feminine and neuter genders;

(b) all accounting terms not otherwise defined herein have the meanings assigned to them in accordance with generally accepted accounting principles in the United States as in effect from time to time;

(c) the words "herein," "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section, Exhibit or other subdivision; and

(d) the following terms have the meanings given to them in this Section 1.01(d):

"**Acceleration Date**" has the meaning set forth in Section 4.08.

"**ADRs**" shall have the meaning set forth in Section 6.01.

"**Affiliate**" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For the purposes of this definition, "control," when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing. Notwithstanding anything to the contrary herein, the determination of whether one Person is an "**Affiliate**" of another Person for purposes of this Agreement shall be made based on the facts at the time such determination is made or required to be made, as the case may be, hereunder.

"**Agreement**" means this instrument as originally executed or as it may from time to time be supplemented or amended by one or more agreements supplemental hereto entered into pursuant to the applicable provisions hereof.

2

"**Amended Articles**" means the Company's Amended and Restated Articles of Incorporation of PG&E Corporation, which initially became effective on June 22, 2020.

"**Applicable Law**" has the meaning set forth in Section 1.15.

"**Applicable Market Value**" means the arithmetic average of the Daily VWAPs of the Common Stock on each Trading Day during the Valuation Period.

"**Applicants**" has the meaning set forth in Section 8.12(b).

"**Authorized Officer**", means, with respect to the Company, the Chairman of the board of directors, the Chief Executive Officer, the Chief Financial Officer, the Chief Accounting Officer, the Chief Operating Officer, the President, the Treasurer, the Secretary or any Vice President.

"**Average VWAP**" per share over a certain period means the arithmetic average of the Daily VWAP per share for each Trading Day in such period.

"**Averaging Period**" shall have the meaning set forth in Section 5.01(v).

"**Bankruptcy Event**" means the occurrence of one or more of the following events:

(a) a decree or order by a court having jurisdiction in the premises shall have been entered adjudging the Company a bankrupt or insolvent entity, or approving as properly filed a petition seeking reorganization of the Company under any Bankruptcy Law and such decree or order shall have continued undischarged and unstayed for a period of 90 days;

(b) a decree or order by a court having jurisdiction in the premises for the appointment of a receiver or liquidator or trustee or assignee (or other similar official) in bankruptcy or insolvency of the Company or of all or substantially all of its property, or for the winding up or liquidation of its affairs, shall have been entered and such decree or order shall have continued undischarged and unstayed for a period of 90 days; or

(c) the Company shall commence a voluntary case under any Bankruptcy Law, or shall consent to the filing of a bankruptcy proceeding against it, or shall file a petition or answer or consent seeking reorganization under any Bankruptcy Law, or shall consent to the filing of any such petition, or shall consent to the appointment of a receiver or liquidator or trustee or assignee (or other similar official) in bankruptcy or insolvency of it or of its property, or shall make an assignment for the benefit of creditors, or shall admit in writing its inability to pay its debts generally as they become due.

"**Bankruptcy Law**" means title 11 of the United States Code, as amended, or any similar federal or state law for the relief of debtors.

3

"**Beneficial Holder**" means, with respect to a Book-Entry Interest, a Person who is the beneficial owner of such Book-Entry Interest as reflected on the books of the Depositary or on the books of a Person maintaining an account with the Depositary (directly as a Depositary Participant or as an indirect participant, in each case in accordance with the rules of the Depositary).

"**Board of Directors**" means the board of directors of the Company or a duly authorized committee of that board.

"**Board Resolution**" means one or more resolutions of the Board of Directors, a copy of which has been certified by the secretary or an assistant secretary of the Company to have been duly adopted by the Board of Directors and to be in full force and effect on the date of such certification and delivered to the Purchase Contract Agent.

"**Book-Entry Interest**" means a beneficial interest in a Global Security, registered in the name of a Depositary or a nominee thereof, ownership and transfers of which shall be maintained and made through book entries by such Depositary as described in Section 3.06.

"**Business Day**" means any day other than a Saturday, Sunday or any day on which banking institutions in New York, New York are authorized or obligated by applicable law or executive order to close or be closed.

"**Capital Stock**" means, with respect to any Person, any and all shares, interests, participations or other equivalents (however designated) of or in such Person's capital stock or other equity interests, and options, rights or warrants to purchase such capital stock or other equity interests, whether now outstanding or issued after the Issue Date.

"**Clause A Distribution**" shall have the meaning set forth in Section 5.01(c).

"**Clause B Distribution**" shall have the meaning set forth in Section 5.01(c).

"**Clause C Distribution**" shall have the meaning set forth in Section 5.01(c).

"**Clearing Agency**" means an organization registered as a "Clearing Agency" pursuant to Section 17A of the Exchange Act.

"**close of business**" means 5:00 p.m. (New York City time).

"**Code**" means the Internal Revenue Code of 1986 (title 26 of the United States Code), as amended from time to time.

"**Commission**" has the meaning set forth in Section 1.11.

"**Common Stock**" means the common stock, no par value, of the Company as it existed on the date of this Agreement, subject to Section 6.01.

"**Company**" means the Person named as the "**Company**" in the first paragraph of this Agreement until a successor shall have become such pursuant to Article 11, and thereafter "**Company**" shall mean such successor or the issuer of any Exchange Property, as the context may require.

4

"**Component Purchase Contract**" means a Purchase Contract, in global form and attached to a Global Unit, that (a) shall evidence the number of Purchase Contracts specified therein that are components of the Units evidenced by such Global Unit, (b) shall be registered on the Security Register in the name of the Purchase Contract Agent, as attorney-in-fact of holder(s) of the Units of which such Purchase Contract forms a part, and (c) shall be held by the Purchase Contract Agent as attorney-in-fact of such holder(s), together with such Global Unit, as custodian of such Global Unit for the Depositary.

"**control**" when used with respect to any Person, means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "**controlling**" and "**controlled**" have meanings correlative to the foregoing.

"**Corporate Trust Office**" means the designated corporate trust office of the Purchase Contract Agent at which, at any particular time, its corporate trust business shall be administered, which office at the date hereof is located at 400 South Hope Street, Suite 500, Los Angeles, CA 90071, Attention: Corporate Trust Administration, or such other address as the Purchase Contract Agent may designate from time to time by notice to the Holders and the Company, or the principal corporate trust office of any successor Purchase Contract Agent (or such other address as such successor Purchase Contract Agent may designate from time to time by notice to the Holders and the Company).

"**Custodial Agreement**" means the custodial agreement, dated as of July 1, 2020, between the Purchase Contract Agent and the Custodian.

"**Custodian**" means the Person named as the "**Custodian**" under the Custodial Agreement.

"**Daily VWAP**" of the Common Stock on any Trading Day means the per share volume-weighted average price as displayed under the heading "Bloomberg VWAP" on Bloomberg page "PCG <equity> AQR" (or its equivalent successor if such page is not available) in respect of the period from the scheduled open of trading until the scheduled close of trading of the primary trading session on such Trading Day (or if such volume-weighted average price is unavailable, the market value of one share of Common Stock on such Trading Day determined, using a volume-weighted average method, by a nationally recognized independent investment banking firm retained by the Company for this purpose). The "Daily VWAP" shall be determined without regard to after-hours trading or any other trading outside of the regular trading session trading hours.

"**default**" means any failure to comply with terms of this Agreement or any covenant contained herein.

"**Definitive Equity-Linked Security**" means an Equity-Linked Security in definitive form.

5

"**Definitive Security**" means any Security in definitive form.

"**Definitive Unit**" means any Unit in definitive form.

"**Depositary**" means a Clearing Agency that is acting as a depositary for the Equity-Linked Securities and in whose name, or in the name of a nominee of that organization, shall be registered one or more Global Securities and which shall undertake to effect book-entry transfers of the Equity-Linked Securities as contemplated by Section 3.06, Section 3.07, Section 3.08 and Section 3.09.

"**Depositary Participant**" means a broker, dealer, bank, other financial institution or other Person for whom from time to time the Depositary effects book-entry transfers of securities deposited with the Depositary.

"**Determination Date**" means each of (a) in the case of a settlement of Purchase Contracts on the Purchase Contract Settlement Date, the last Trading Day of the Valuation Period, (b) any Early Settlement Date, (c) any Fundamental Change Early Settlement Date, and (d) the day immediately preceding any Acceleration Date.

"**Distribution Valuation Period**" has the meaning set forth in Section 5.01(a)(iii).

"**DTC**" means The Depository Trust Company.

"**Early Settlement**" means, in respect of any Purchase Contract, that the Holder of such Purchase Contract has elected to settle such Purchase Contract early pursuant to Section 4.06 or Section 4.07, as the case may be.

"**Early Settlement Date**" has the meaning set forth in Section 4.06(c).

"**Early Settlement Notice**" has the meaning set forth in Section 4.06(b)(i).

"**Early Settlement Rate**" means, for any Purchase Contract in respect of which Early Settlement is applicable, the Minimum Settlement Rate on the Early Settlement Date, unless the Holder of such Purchase Contract has elected to settle such Purchase Contract early in connection with a Fundamental Change pursuant to Section 4.07, in which case the "**Early Settlement Rate**" for such Purchase Contract means the Fundamental Change Early Settlement Rate.

"**Early Settlement Right**" has the meaning set forth in Section 4.06(a).

"**Effective Date**" shall mean the first date on which the shares of Common Stock trade on the Relevant Stock Exchange, regular way, reflecting the relevant share split or share combination, as applicable.

"**Equity-Linked Security**" means a Unit or a Purchase Contract, as applicable.

6

"**Ex-Date**" means the first date on which the shares of Common Stock trade on the applicable exchange or in the applicable market, regular way, without the right to receive the issuance, dividend or distribution in question, from the Company or, if applicable, from the seller of the Common Stock on such exchange or market (in the form of due bills or otherwise) as determined by such exchange or market.

"**Exchange Act**" means the United States Securities Exchange Act of 1934, as amended, and any statute successor thereto, in each case as amended from time to time.

"**Exchange Property**" shall have the meaning set forth in Section 6.01.

"**Expiration Date**" shall have the meaning set forth in Section 5.01(v).

"**Fixed Settlement Rate**" has the meaning set forth in Section 4.01(c).

A "**Fundamental Change**" shall be deemed to have occurred upon the occurrence of any of the following:

(a) any "person" or "group" within the meaning of Section 13(d) of the Exchange Act, other than the Company, any of its Wholly Owned Subsidiaries and any of the Company's and its Wholly Owned Subsidiaries' employee benefit plans, files a Schedule TO or any other schedule, form or report under the Exchange Act disclosing that such person or group has become the direct or indirect "beneficial owner" (as defined in Rule 13d-3 under the Exchange Act) of more than 50% of the outstanding shares of the Common Stock.

(b) the consummation of (A) any recapitalization, reclassification or change of the Common Stock (other than changes resulting from a subdivision or combination) as a result of which the Common Stock would be converted into, or exchanged for, stock, other securities, other property or assets; (B) any share exchange, consolidation or merger of the Company pursuant to which the Common Stock will be converted into cash, securities or other property or assets; or (C) any sale, lease or other transfer in one transaction or a series of transactions of all or substantially all of the consolidated assets of the Company and its Subsidiaries, taken as a whole, to any person other than one of the Company's Wholly Owned Subsidiaries; or

(c) the Common Stock (or other common stock receivable upon settlement of the Purchase Contracts, if applicable) ceases to be listed or quoted on any of the NYSE, the NASDAQ Global Select Market or the NASDAQ Global Market (or any of their respective successors).

A transaction or transactions described in either of clause (a) or clause (b) above shall not constitute a Fundamental Change, however, if (i) at least 90% of the consideration received or to be received by the common stockholders of the Company (excluding cash payments for fractional shares) in connection with such transaction or transactions consists of shares of common stock that are listed on any of the NYSE, the NASDAQ Global Select Market or the NASDAQ Global Market (or any of their respective successors), or will be so listed when issued or exchanged in connection with such transaction or transactions and (ii) as a result of such transaction or transactions such consideration becomes the consideration receivable upon settlement of the Purchase Contracts, if applicable, excluding cash payments for fractional shares.

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 736 of 1367

If any transaction in which the Common Stock is replaced by the securities of another Person occurs, following completion of any related Fundamental Change Early Settlement Period (or, in the case of a transaction that would have been a Fundamental Change but for the immediately preceding paragraph, following the Fundamental Change Effective Date of such transaction), references to the Company in the definition of "**Fundamental Change**" above shall instead be references to such other Person.

"**Fundamental Change Early Settlement Date**" has the meaning set forth in Section 4.07(b).

"**Fundamental Change Early Settlement Period**" has the meaning set forth in Section 4.07(a).

"**Fundamental Change Early Settlement Rate**" has the meaning set forth in Section 4.07(d).

"**Fundamental Change Early Settlement Right**" has the meaning set forth in Section 4.07(a).

"**Fundamental Change Effective Date**" has the meaning set forth in Section 4.07(d).

"**Global Purchase Contract**" means a Purchase Contract in global form that (a) shall evidence the number of Separate Purchase Contracts specified therein, (b) shall be registered on the Security Register in the name of the Depositary or its nominee, and (c) shall be held by the Purchase Contract Agent as custodian for the Depositary.

"**Global Security**" means a Global Unit or a Global Purchase Contract, as applicable.

"**Global Unit**" means a Unit in global form that (a) shall evidence the number of Units specified therein, (b) shall be registered on the Security Register in the name of the Depositary or its nominee, (c) shall include, as an attachment thereto, a Component Purchase Contract, evidencing a number of Purchase Contracts equal to the number of Units evidenced by such Unit in global form, (d) shall evidence a number of Treasury Strip Components equal to the number of Units evidenced by such Unit in global form evidence, which shall be held by the Custodian on behalf of Holders and (e) shall be held by the Purchase Contract Agent as custodian for the Depositary.

"**Holder**" means, with respect to a Unit or Purchase Contract, the Person in whose name the Unit or Purchase Contract, as the case may be, is registered in the Security Register.

"**Issue Date**" means July 1, 2020.

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 737 of 1367

"**Issuer Order**" means a written statement, request or order of the Company, which is signed in its name by the chairman of the Board of Directors, the chief financial officer, the president or chief executive officer, any senior vice president, any vice president or the treasurer of the Company, and delivered to the Purchase Contract Agent.

"**Market Disruption Event**" means (i) a failure by the primary U.S. national or regional securities exchange or market on which the Common Stock is listed or admitted for trading to open for trading during its regular trading session or (ii) the occurrence or existence prior to 1:00 p.m., New York City time, on any Scheduled Trading Day for the Common Stock for more than one half-hour period in the aggregate during regular trading hours of any suspension or limitation imposed on trading (by reason of movements in price exceeding limits permitted by the relevant stock exchange, relevant market or otherwise) in the Common Stock or in any options contracts or futures contracts relating to the Common Stock.

"**Maximum Settlement Rate**" has the meaning set forth under Section 4.01(b)(iii), subject to adjustment pursuant to the terms of Article 5.

"**Minimum Settlement Rate**" has the meaning set forth under Section 4.01(b)(i), subject to adjustment pursuant to the terms of Article 5.

"**Minimum Stock Price**" has the meaning set forth under Section 4.07(f).

"**NYSE**" means the New York Stock Exchange.

"**Officer's Certificate**" means a certificate signed on behalf of the Company by any Authorized Officer.

"**open of business**" means 9:00 a.m. (New York City time).

"**Opinion of Counsel**" means an opinion in writing signed by the chief counsel of the Company or by such other legal counsel who may be an employee of or counsel to the Company and who shall be reasonably satisfactory to the Purchase Contract Agent. Each such opinion shall include the statements provided for in Section 1.02 if and to the extent required by the provisions of such Section 1.02.

"**Outstanding Purchase Contracts**" means, subject to the provisions of Section 7.03, as of the date of determination, all Purchase Contracts theretofor executed, authenticated on behalf of the Holder and delivered under this Agreement (including, for the avoidance of doubt, Purchase Contracts held as a component of Units and Separate Purchase Contracts), except:

(a) Purchase Contracts theretofor cancelled by the Purchase Contract Agent or delivered to the Purchase Contract Agent for cancellation or deemed cancelled pursuant to the provisions of this Agreement; and

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 738 of 1367

(b) Purchase Contracts in exchange for or in lieu of which other Purchase Contracts have been executed, authenticated on behalf of the Holder and delivered pursuant to this Agreement, other than any such Purchase Contract in respect of which there shall have been presented to the Purchase Contract Agent proof satisfactory to it that such Purchase Contract is held by a protected purchaser in whose hands the Purchase Contracts are valid obligations of the Company.

"**Payment Date**" means the Business Day immediately following the date the relevant Treasury Strip matures on February 15, May 15, August 15 and November 15 of each year, with such Payment Dates commencing on, and including, August 17, 2020 and ending on, and including, August 16, 2023.

"**Payment Record Date**" means the fifteenth day (whether or not a Business Day), prior to the relevant Payment Date; *provided, however,* to the extent such amounts are payable on a Payment Date with respect to a Global Unit, the "Payment Record Date" shall mean the Business Day immediately prior to such Payment Date.

"**Person**" means any individual, corporation, limited liability company, partnership, joint venture, association, joint stock company, trust, estate, unincorporated organization or government or any agency or political subdivision thereof.

"**Plan Effective Date**" means the effective date of the Plan of Reorganization.

"**Plan of Reorganization**" means the *Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization* dated December 12, 2019 (as amended on January 31, 2020, March 9, 2020, March 16, 2020, May 22, 2020 and June 19, 2020 and as may be further amended, supplemented or otherwise modified from time to time).

"**Prospectus Supplement**" means the preliminary prospectus supplement dated June 19, 2020, as supplemented by the pricing term sheet dated June 25, 2020, relating to the offering and sale of the Units.

"**Purchase Contract**" means a prepaid stock purchase contract obligating the Company to deliver shares of Common Stock on the terms and subject to the conditions set forth herein.

"**Purchase Contract Agent**" means the Person named as the "Purchase Contract Agent" in the first paragraph of this Agreement until a successor Purchase Contract Agent shall have become such pursuant to Article 8, and thereafter "Purchase Contract Agent" shall mean such Person.

"**Purchase Contract Settlement Date**" means the second Business Day immediately following the last Trading Day of the Valuation Period, subject to acceleration pursuant to Section 4.08.

"**Purchase Contract Settlement Fund**" has the meaning set forth in Section 4.03.

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 739 of 1367

"**Record Date**" means, when used with respect to any dividend, distribution or other transaction or event in which the holders of the Common Stock (or other applicable security) have the right to receive any cash, securities or other property or in which the Common Stock (or other applicable security) is exchanged for or converted into any combination of cash, securities or other property, the date fixed for determination of holders of the Common Stock (or such other applicable security) entitled to receive such cash, securities or other property (whether such date is fixed by the Board of Directors, statute, contract or otherwise).

"**Recreation Notice**" has the meaning set forth in Section 2.04(a).

"**Reference Price**" means the Stated Amount, *divided by* the Maximum Settlement Rate, which as of the Issue Date is approximately equal to $9.5000.

"**Relevant Stock Exchange**" means the NYSE or, if the Common Stock is not then listed on the NYSE, on the principal other U.S. national or regional securities exchange on which the Common Stock is then listed or, if the Common Stock is not then listed on a U.S. national or regional securities exchange, on the principal other market on which the Common Stock is then listed or admitted for trading.

"**Reorganization Event**" has the meaning set forth in Section 6.01.

"**Responsible Officer**" means any officer within the corporate trust department of the Purchase Contract Agent, including any vice president, assistant vice president, assistant secretary, senior associate, associate, trust officer or any other officer of the Purchase Contract Agent who customarily performs functions similar to those performed by the persons who at the time shall be such officers, respectively, or to whom any corporate trust matter is referred because of such person's knowledge of and familiarity with the particular subject and who shall have direct responsibility for the administration of this Agreement.

"**Scheduled Trading Day**" means a day that is scheduled to be a Trading Day on the NYSE or, if the Common Stock is not then listed on the NYSE, on the principal other U.S. national or regional securities exchange on which the Common Stock is then listed or, if the Common Stock is not then listed on a U.S. national or regional securities exchange, on the principal other market on which the Common Stock is then traded. If the Common Stock is not so listed or admitted for trading, "Scheduled Trading Day" means a Business Day.

"**Securities Act**" means the Securities Act of 1933, as amended, and any statute successor thereto, in each case as amended from time to time, and the rules and regulations promulgated thereunder.

"**Security**" means a Unit, a Purchase Contract or a Treasury Strips Component, as applicable.

"**Security Register**" has the meaning set forth in Section 3.05.

"**Security Registrar**" has the meaning set forth in Section 3.05.

"**Separate Purchase Contract**" has the meaning set forth in Section 2.03(a).

11

"**Separate Treasury Strips**" has the meaning set forth in Section 2.03(a).

"**Separation Notice**" has the meaning set forth in Section 2.03(a).

"**Settlement Date**" means (i) the second Business Day following any Fundamental Change Early Settlement Date, (ii) the second Business Day following any Early Settlement Date, or (iii) the Purchase Contract Settlement Date.

"**Settlement Rate**" has the meaning set forth in Section 4.01(b).

"**Spin-Off**" means a payment of a dividend or other distribution on the Common Stock of shares of Capital Stock of any class or series, or similar equity interest, of or relating to a Subsidiary or other business unit of the Company that are, or, when issued, will be, listed or admitted for trading on a U.S. national securities exchange.

"**Stated Amount**" means $100.00.

"**Stock Price**" has the meaning set forth in Section 4.07(d).

"**Subsidiary**" of any Person means any corporation or other entity of which a majority of the Capital Stock having ordinary voting power to elect a majority of the board of directors or other Persons performing similar functions of such corporation or other entity is at the time directly or indirectly owned or controlled by such Person.

"**Threshold Appreciation Price**" means an amount equal to the Stated Amount, *divided by* the Minimum Settlement Rate, which as of the Issue Date is approximately equal to $11.6375.

"**Trading Day**" means a day on which (i) there is no Market Disruption Event and (ii) trading in the Common Stock (or other security for which a Daily VWAP must be determined) generally occurs on the NYSE or, if the Common Stock (or such other security) is not then listed on the NYSE, on the principal other U.S. national or regional securities exchange on which the Common Stock (or such other security) is then listed or, if the Common Stock (or such other security) is not then listed on a U.S. national or regional securities exchange, on the principal other market on which the Common Stock (or such other security) is then traded. If the Common Stock (or such other security) is not so listed or traded, "Trading Day" means a Business Day.

"**Treasury Strips**" has the meaning set forth in the Custodial Agreement.

"**Treasury Strips Component**" has the meaning set forth in the Custodial Agreement.

"**Trigger Event**" shall have the meaning set forth in Section 5.01(a)(iii).

"**Underwriting Agreement**" means the underwriting agreement relating to the Units dated June 25, 2020 between the Company and the several underwriters named therein.

"**Underwriters**" means Goldman Sachs & Co. LLC and J.P. Morgan Securities LLC.

"**Unit**" means and evidences the collective rights of a Holder of an equity unit consisting of (i) one Purchase Contract and (ii) one Treasury Strips Component prior to separation pursuant Section 2.03 or subsequent to recreation pursuant to Section 2.04.

"**Unit of Exchange Property**" shall have the meaning set forth in Section 6.01.

"**Utility**" means Pacific Gas and Electric Company, a California corporation.

"**Valuation Period**" means each of the 20 consecutive Trading Days beginning on, and including the 21st Scheduled Trading Day immediately preceding August 16, 2023.

"**Wholly Owned Subsidiary**" means, with respect to any Person, any Subsidiary of such Person, except that, solely for the purposes of this definition, the reference to "a majority of the Capital Stock" in the definition of "Subsidiary" shall be deemed replaced by a reference to "all of the Capital Stock".

Section 1.02. *Compliance Certificates and Opinions*. Except as otherwise expressly provided by this Agreement, upon any application or request by the Company to the Purchase Contract Agent to take any action in accordance with any provision of this Agreement, the Company shall furnish to the Purchase Contract Agent an Officer's Certificate stating that all conditions precedent, if any, provided for in this Agreement relating to the proposed action have been complied with and an Opinion of Counsel stating that, in the opinion of such counsel, all such conditions precedent, if any, have been complied with.

Every Officer's Certificate or Opinion of Counsel with respect to compliance with a condition or covenant provided for in this Agreement shall include:

(i) a statement that each individual signing such Officer's Certificate or Opinion of Counsel has read such covenant or condition and the definitions herein relating thereto;

(ii) a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such Officer's Certificate or Opinion of Counsel are based;

(iii) a statement that, in the opinion of each such individual, he or she has made such examination or investigation as is necessary to enable such individual to express an informed opinion as to whether or not such covenant or condition has been complied with; and

13

(iv) a statement as to whether, in the opinion of each such individual, such condition or covenant has been complied with.

Any certificate, statement or opinion of an officer of the Company may be based, insofar as it relates to legal matters, upon a certificate or opinion of or representations by counsel, unless such officer knows that the certificate or opinion or representations with respect to the matters upon which his certificate, statement or opinion may be based as aforesaid are erroneous, or in the exercise of reasonable care should know that the same are erroneous. Any certificate, statement or Opinion of Counsel may be based, insofar as it relates to factual matters, on information with respect to which is in the possession of the Company as applicable, upon the certificate, statement or opinion of or representations by an officer or officers of the Company unless such counsel knows that the certificate, statement or opinion or representations with respect to the matters upon which his certificate, statement or opinion may be based as aforesaid are erroneous, or in the exercise of reasonable care should know that the same are erroneous.

Any certificate, statement or opinion of an officer of the Company, as applicable, or of counsel may be based, insofar as it relates to accounting matters, upon a certificate or opinion of or representations by an accountant or firm of accountants in the employ of the Company, as applicable, unless such officer or counsel, as the case may be, knows that the certificate or opinion or representations with respect to the accounting matters upon which his certificate, statement or opinion may be based as aforesaid are erroneous, or in the exercise of reasonable care should know that the same are erroneous.

Section 1.03. *Notices*. Any notice or demand which by any provision of this Agreement is required or permitted to be given or served by the Purchase Contract Agent or by the Holders to or on the Company may be given or served by being deposited postage prepaid, first class mail (except as otherwise specifically provided herein) addressed (until another address of the Company is filed by the Company with the Purchase Contract Agent) to the Company's General Counsel, PG&E Corporation, at 77 Beale Street, San Francisco, California 94105, Attention: General Counsel with copy (which shall not constitute a notice) to Nicholas A. Dorsey and C. Daniel Haaren, Cravath, Swaine & Moore LLP, at 825 Eighth Avenue, New York, New York 10019. Any notice, direction, request or demand by the Company or any Holder to or upon the Purchase Contract Agent shall be deemed to have been sufficiently given or served by being deposited postage prepaid, first class mail (except as otherwise specifically provided herein) addressed (until another address of the Purchase Contract Agent is filed by the Purchase Contract Agent with the Company) to The Bank of New York Mellon Trust Company, N.A., 400 South Hope Street, Suite 500, Los Angeles, CA 90073, Attention: Corporate Trust Administration.

The Purchase Contract Agent agrees to accept and act upon instructions or directions pursuant to this Agreement sent by unsecured e-mail, pdf, facsimile transmission or other similar unsecured electronic methods, provided, however, that the Purchase Contract Agent shall have received an incumbency certificate listing persons designated to give such instructions or directions and containing specimen signatures of such designated persons, which such incumbency certificate shall be amended and

14

replaced whenever a person is to be added or deleted from the listing. If the Company elects to give the Purchase Contract Agent e-mail or facsimile instructions (or instructions by a similar electronic method) and the Purchase Contract Agent in its discretion elects to act upon such instructions, the Purchase Contract Agent's understanding of such instructions shall be deemed controlling. The Purchase Contract Agent shall not be liable for any losses, costs or expenses arising directly or indirectly from the Purchase Contract Agent's reliance upon and compliance with such instructions notwithstanding such instructions conflict or are inconsistent with a subsequent written instruction. The Company agrees to assume all risks arising out of the use of such electronic methods to submit instructions and directions to the Purchase Contract Agent, including without limitation the risk of the Purchase Contract Agent acting on unauthorized instructions, and the risk of interception and misuse by third parties.

Where this Agreement provides for notice to Holders, such notice shall be sufficiently given (unless otherwise herein expressly provided) if in writing and mailed, first class postage prepaid, to each Holder entitled thereto, at his last address as it appears in the Security Register; *provided, however,* that, in the case of a Global Unit or Global Purchase Contract, electronic notice may be given to the Depositary, as the Holder thereof, in accordance with the applicable procedures of the Depositary. Where this Agreement provides for notice in any manner, such notice may be waived in writing by the Person entitled to receive such notice, either before or after the event, and such waiver shall be the equivalent of such notice. Waivers of notice by Holders shall be filed with the Purchase Contract Agent, but such filing shall not be a condition precedent to the validity of any action taken in reliance upon such waiver.

In case, by reason of the suspension of or irregularities in regular mail service, it shall be impracticable to mail notice to the Company when such notice is required to be given pursuant to any provision of this Agreement, then any manner of giving such notice as shall be reasonably satisfactory to the Purchase Contract Agent shall be deemed to be sufficient notice.

Section 1.04. *Effect of Headings and Table of Contents*. The Article and Section headings herein and in the Table of Contents are for convenience only and shall not affect the construction hereof.

Section 1.05. *Successors and Assigns*. All covenants and agreements in this Agreement by the Company and the Purchase Contract Agent shall bind their respective successors and assigns, whether so expressed or not.

Section 1.06. *Separability Clause*. In case any provision in this Agreement or in the Purchase Contracts shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions hereof and thereof shall not in any way be affected or impaired thereby.

<div align="center">15</div>

Section 1.07. *Benefits of Agreement*. Nothing contained in this Agreement or in the Purchase Contracts, express or implied, shall give to any Person, other than the parties hereto and their successors hereunder and, to the extent provided hereby, the Holders, any benefits or any legal or equitable right, remedy or claim under this Agreement. The Holders from time to time shall be beneficiaries of this Agreement and shall be bound by all of the terms and conditions hereof and of the Purchase Contracts by their acceptance of delivery of such Purchase Contracts.

Section 1.08. *Governing Law*. THIS AGREEMENT, THE UNITS AND THE PURCHASE CONTRACTS AND ANY CLAIM, CONTROVERSY OR DISPUTE ARISING UNDER OR RELATED THERETO SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

Section 1.09. *Legal Holidays*. In any case where any Settlement Date shall not be a Business Day, notwithstanding any other provision of this Agreement or the Purchase Contracts, the settlement of the Purchase Contracts shall not be effected on such date, but instead shall be effected on the next succeeding Business Day with the same force and effect as if made on such Settlement Date, and no interest or other amounts shall accrue or be payable by the Company or to any Holder in respect of such delay.

Section 1.10. *Counterparts*. This Agreement may be executed by facsimile (including electronic) signature in any number of counterparts by the parties hereto on separate counterparts, each of which, when so executed and delivered, shall be deemed an original, but all such counterparts shall together constitute one and the same instrument.

Section 1.11. *Inspection of Agreement*. Unless a conformed copy of this Agreement has been filed on the EDGAR system of the U.S. Securities and Exchange Commission (the "**Commission**"), a copy of this Agreement shall be available at all reasonable times during normal business hours at PG&E Corporation, 77 Beale Street, San Francisco, California 94105, for inspection by any Holder or Beneficial Holder.

Section 1.12. *Calculations*. The solicitation of any necessary bids and the performance of any calculations to be made hereunder and under the Units and Purchase Contracts shall be the sole obligation of the Company, and the Purchase Contract Agent shall have no obligation to make, review or verify such calculations. These calculations include, but are not limited to, determination of the applicable Settlement Rate, the Fixed Settlement Rates, the Early Settlement Rate, the Fundamental Change Early Settlement Rate, the Applicable Market Value, and the Daily VWAP, as the case may be. All such calculations made by the Company or its agent hereunder shall be made in good faith and, absent manifest error, be final and binding on the Purchase Contract Agent, Custodian and the Holders. For any calculations to be made by the Company or its agent hereunder, the Company shall provide a schedule of such calculations to the Purchase Contract Agent, and the Purchase Contract Agent shall be entitled to conclusively rely upon the accuracy of the calculations by the Company or its agent without independent verification, shall have no liability with respect thereto and shall have no liability to the Holders for any loss any of them may incur in connection with no independent verification having been done. Furthermore, the Purchase Contract Agent shall not be under any duty or responsibility to determine whether any facts exist which may require any adjustment hereunder, or with respect to the nature or extent of any such adjustment when made, or with respect to the method employed.

16

Section 1.13. *UCC*. Each Purchase Contract (whether or not included in a Unit) is a security governed by Article 8 of the Uniform Commercial Code as in effect in the State of New York on the date hereof.

Section 1.14. *Waiver of Jury Trial*. Each of the Company and the Purchase Contract Agent waives its respective rights to trial by jury in any action or proceeding arising out of or related to the Purchase Contracts, this Agreement or the transactions contemplated hereby, to the maximum extent permitted by law.

Section 1.15. *Foreign Account Tax Compliance Act (FATCA)*. The Company agrees (i) to provide the Purchase Contract Agent with such reasonable information as it has in its possession to enable the Purchase Contract Agent to determine whether any payments pursuant to this Agreement are subject to the withholding requirements described in Section 1471(b) of the Code or otherwise imposed pursuant to Sections 1471 through 1474 of the Code and any regulations, or agreements thereunder or official interpretations thereof ("Applicable Law"), and (ii) that the Purchase Contract Agent shall be entitled to make any withholding or deduction from payments under this Agreement to the extent necessary to comply with Applicable Law, for which the Purchase Contract Agent shall not have any liability.

ARTICLE 2

UNIT AND PURCHASE CONTRACT FORMS

Section 2.01. *Forms of Units and Purchase Contracts Generally.* (a) The Units and Purchase Contracts shall be in substantially the forms set forth in Exhibit A and Exhibit B hereto, respectively, which shall be incorporated in and made a part of this Purchase Contract Agreement, with such letters, numbers or other marks of identification or designation and such legends or endorsements printed, lithographed or engraved thereon as may be required by the rules of any securities exchange on which the Units or Purchase Contracts, as the case may be, are (or may in the future be) listed or any depositary therefor, or as may, consistently herewith, be determined by the officers of the Company executing such Units and Purchase Contracts, as the case may be, as evidenced by their execution thereof.

(b) The Units and Purchase Contracts shall be issuable only in registered form and only in denominations of a single Unit or Purchase Contract, as the case may be, and any integral multiple thereof.

(c) The Units will initially be issued in the form of one or more fully registered Global Units as set forth in Section 3.06. The Purchase Contracts will initially be issued as Component Purchase Contracts substantially in the form of Attachment 3 to the form of Global Unit attached as Exhibit A hereto, and will be attached to the related Global Unit and registered in the name of The Bank of New York Mellon Trust Company, N.A., as attorney-in-fact of the holder(s) of such Global Unit.

17

(d) Definitive Securities shall be printed, lithographed or engraved with steel engraved borders or may be produced in any other manner, all as determined by the officers of the Company executing the Units or Purchase Contracts, as the case may be, evidenced by such Definitive Securities, consistent with the provisions of this Agreement, as evidenced by their execution thereof.

(e) Cash payments in respect of the Treasury Strips Components of Global Units will be made by the Custodian, at the direction of the Purchase Contract Agent, to the Depositary (or its nominee) as the holder of such Units.

(f) Every Global Unit and Global Purchase Contract executed, authenticated on behalf of the Holders and delivered hereunder shall bear a legend in substantially the following form:

"THIS SECURITY IS A GLOBAL [UNIT / PURCHASE CONTRACT] WITHIN THE MEANING OF THE PURCHASE CONTRACT AGREEMENT HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF A DEPOSITARY OR A NOMINEE OF A DEPOSITARY OR A SUCCESSOR DEPOSITARY. UNLESS AND UNTIL IT IS EXCHANGED IN WHOLE OR IN PART FOR SECURITIES IN CERTIFICATED FORM, THIS SECURITY MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION (THE "**DEPOSITARY**") TO THE NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY OR BY THE DEPOSITARY OR ANY SUCH NOMINEE TO A SUCCESSOR DEPOSITARY OR A NOMINEE OF SUCH SUCCESSOR DEPOSITARY.

UNLESS THIS SECURITY IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITARY TO THE COMPANY OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY SECURITY ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITARY (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITARY), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN."

Section 2.02. *Form of Certificate of Authentication.* The form of certificate of authentication of the Units and Purchase Contracts shall be in substantially the form set forth in the form of Unit or form of Purchase Contract, respectively, attached hereto.

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 747 of 1367

Section 2.03. *Global Securities; Separation of Units.*

(a) On any Business Day during the period beginning on, and including, the Business Day immediately following the Issue Date to, but excluding, the second Scheduled Trading Day immediately preceding August 16, 2023, a Holder of a Unit may separate 48,000 Units (or any integral multiples thereof) into their constituent Purchase Contracts and withdraw the Treasury Strips underlying those Units (each such separated Purchase Contract and separated Treasury Strips, a "**Separate Purchase Contract**" and "**Separate Treasury Strips**," respectively), which will thereafter trade under their respective CUSIP numbers, and that Unit will cease to exist. Any separation of Units may be made only in integral multiples of 48,000 Units. To withdraw the Treasury Strips evidenced by the Units, a Holder must: (i) deliver the relevant Units to the Purchase Contract Agent; and (ii) a separation notice ("**Separation Notice**") to the Purchase Contract Agent, in the form set forth in Attachment 1 to the form of Unit attached hereto as Exhibit A, requesting that the Purchase Contract Agent instruct the Custodian to release to such Holder the Treasury Strips underlying those Units. In order to cause the separation of a Global Unit into its component parts, a Beneficial Holder must comply with the applicable procedures of the Depositary. Following a valid exercise of separation rights by a Holder of Global Units, the Purchase Contract Agent shall register (x) a decrease in the number of Units represented by the Global Unit and the number of Purchase Contracts represented by the Component Purchase Contract attached to the Global Unit as Attachment 3, as set forth in Schedule A to each such attachment, and (y) a corresponding increase in the number of Purchase Contracts represented by the Global Purchase Contract. The Purchase Contract Agent shall also instruct the Custodian to deliver the Holder's withdrawn Treasury Strips in accordance with the delivery instructions set forth in the Separation Notice. If, however, such Units are in the form of a Definitive Security in accordance with Section 3.09, the Holder thereof must deliver to the Purchase Contract Agent such Units, together with the relevant Separation Notice. Upon the receipt of such Separation Notice, the Company shall, in accordance with the delivery instructions set forth in such Separation Notice, promptly cause delivery to such Holder of a number of Separate Purchase Contracts underlying the Units identified in the Separation Notice and instruct the Custodian deliver to such Holder a number of Separate Treasury Strips underlying such Units. Separate Purchase Contracts and Separate Treasury Strips will be transferable independently from each other.

(b) Holders which elect to separate the Purchase Contracts and withdraw the related Treasury Strips in accordance with this Section 2.03 shall be responsible for any fees or expenses payable in connection with such separation and withdraw, and neither the Company, the Purchase Contract Agent nor the Custodian shall be liable for any such fees or expenses.

Section 2.04. *Recreation of Units.*

(a) On any Business Day during the period beginning on, and including, the Business Day immediately following the Issue Date to, but excluding, the second Scheduled Trading Day immediately preceding August 16, 2023, a Holder of 48,000 Separate Purchase Contracts and 48,000 Separate Treasury Strips may recreate Units (which will thereafter trade under the CUSIP number 69331C 140 for the Units) by delivering, for every 48,000 Units being recreated, (i) to the Purchase Contract Agent, 48,000 Separate Purchase Contracts and (ii) to the Custodian, $66,000 face amount (or $33,000 face amount in the case of the Treasury Strips maturing on August 15, 2020) of

19

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 748 of 1367

each of the Treasury Strips that would be then remaining as a portion of the Treasury Strips Component of a Unit. Any recreation of Units may be made only in integral multiples of 48,000 Units. The newly deposited Treasury Strips used to recreate the Units must have the same CUSIP numbers as the ones originally comprising the Treasury Strips Component. Each such Separate Purchase Contract and Separate Treasury Strip will then cease to exist. In order to cause the recreation of global Separate Purchase Contracts and a Separate Treasury Strips into Units, a Beneficial Holder must comply with the applicable procedures of the Depositary. Following a valid exercise of recreation rights by a Holder of Separate Treasury Strips and Global Purchase Contracts, the Purchase Contract Agent shall register (x) an increase in the number of Units represented by the Global Unit and the number of Purchase Contracts represented by the Component Purchase Contract attached to the Global Unit as Attachment 3, as set forth in Schedule A to such attachment, and (y) a corresponding decrease in the number of Purchase Contracts represented by the Global Purchase Contract. If, however, such Separate Purchase Contract and Separate Treasury Strips are in the form of Definitive Securities, the Holder thereof must deliver to the Purchase Contract Agent such Definitive Securities, together with a recreation notice ("**Recreation Notice**"), in the form set forth in Attachment 2 to the form of Unit attached hereto as Exhibit A. Upon the receipt of such Recreation Notice, the Company shall promptly cause delivery, in accordance with the delivery instructions set forth in such Recreation Notice, of one Unit in definitive form for such Definitive Securities.

(b) Holders that recreate Units in accordance with this Section 2.04 shall be responsible for any fees or expenses payable in connection with such recreation, and neither the Company nor the Purchase Contract Agent shall be liable for any such fees or expenses.

ARTICLE 3
THE UNITS AND PURCHASE CONTRACTS

Section 3.01. *Amount and Denominations.* The aggregate number of Units and Separate Purchase Contracts evidenced by Equity-Linked Securities executed, authenticated on behalf of the Holders and delivered hereunder is limited to 14,545,455 (as increased by a number of Units equal to the number of any additional Units purchased by the Underwriters pursuant to the exercise of their option to purchase additional Units as set forth in the Underwriting Agreement), except for Units and Separate Purchase Contracts executed, authenticated and delivered upon registration of transfer of, in exchange for, or in lieu of, other Units and Separate Purchase Contracts pursuant to Section 3.04, Section 3.05, Section 3.10 or Section 9.05. Each Unit was initially issued for a purchase price of $100.00 (before underwriting discounts and commissions).

20

Section 3.02. *Rights and Obligations Evidenced by the Equity-Linked Securities.* Each Equity-Linked Security shall evidence the number of Units or Separate Purchase Contracts, as the case may be, specified therein, with (a) each such Unit representing the rights and obligations of the Holder thereof and of the Company under one Purchase Contract, and the rights and obligations of the Holder thereof, and (b) each such Separate Purchase Contract representing the rights and obligations of the Holder thereof and of the Company under one Separate Purchase Contract. In the case of a Unit, the Holder of such Unit shall, for all purposes hereunder and for the purposes of the Custodial Agreement, be deemed to be the Holder of the Treasury Strip Component and Purchase Contract that are components of such Unit.

Prior to the close of business on the Determination Date with respect to any Purchase Contract (whether such Purchase Contract is held as a component of a Unit or as a Separate Purchase Contract), the shares of Common Stock underlying such Purchase Contract shall not be outstanding, and such Purchase Contract shall not entitle the Holder thereof to any of the rights of a holder of Common Stock, including, without limitation, the right to vote or receive any dividends or other payments or to consent or to receive notice as a shareholder in respect of the meetings of shareholders or for the election of directors for any other matter, or any other rights whatsoever as a shareholder of the Company.

Section 3.03. *Execution, Authentication, Delivery and Dating.* Upon the execution and delivery of this Agreement, and at any time and from time to time thereafter, the Company may deliver Equity-Linked Securities executed by the Company and the Purchase Contract Agent as attorney-in-fact for the Holders of Purchase Contracts from time to time (in the case of Purchase Contracts), to the Purchase Contract Agent for authentication on behalf of the Holders and delivery, together with an Issuer Order for authentication of such Equity-Linked Securities, and the Purchase Contract Agent in accordance with such Issuer Order shall authenticate on behalf of the Holders and deliver such Equity-Linked Securities.

The Equity-Linked Securities shall be executed on behalf of the Company by any Authorized Officer and, in the case of the Purchase Contracts, shall be executed on behalf of the Holders by any authorized officer of the Purchase Contract Agent as attorney-in-fact for the Holders of Purchase Contracts from time to time. The signature of any such officer of the Company and the Purchase Contract Agent on the Equity-Linked Securities may be manual or facsimile (including, for the avoidance of doubt, electronic signature).

Equity-Linked Securities bearing the manual or facsimile signature of an individual who was at any time the proper officer of the Company or, in the case of the Purchase Contracts, the Purchase Contract Agent, shall bind the Company and the Holders of Purchase Contracts, as the case may be, notwithstanding that such individual has ceased to hold such offices prior to the authentication and delivery of such Equity-Linked Securities or did not hold such offices at the date of such Equity-Linked Securities.

Each Equity-Linked Security shall be dated the date of its authentication.

21

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 750 of 1367

No Equity-Linked Security shall be entitled to any benefit under this Agreement or be valid or obligatory for any purpose unless there appears on such Equity-Linked Security a certificate of authentication substantially in the form provided for herein executed by an authorized officer of the Purchase Contract Agent by manual or facsimile (including, for the avoidance of doubt, electronic) signature, and such certificate upon any Equity-Linked Security shall be conclusive evidence, and the only evidence, that such Equity-Linked Security has been duly authenticated and delivered hereunder.

Section 3.04. *Temporary Equity-Linked Securities*. Pending the preparation of any Definitive Equity-Linked Securities, the Company shall execute and deliver to the Purchase Contract Agent, in lieu of such Definitive Equity-Linked Securities, temporary Equity-Linked Securities that are in substantially the form set forth in Exhibit A or Exhibit B hereto, as the case may be, with such letters, numbers or other marks of identification or designation and such legends or endorsements printed, lithographed or engraved thereon as may be required by the rules of any securities exchange on which the Units or Separate Purchase Contracts, as the case may be, are listed, or as may, consistently herewith, be determined by the officers of the Company executing such Equity-Linked Securities, as evidenced by their execution of the Equity-Linked Securities.

If temporary Equity-Linked Securities are issued, the Company will cause Definitive Equity-Linked Securities to be prepared without unreasonable delay. After the preparation of Definitive Equity-Linked Securities, the temporary Equity-Linked Securities shall be exchangeable for Definitive Equity-Linked Securities upon surrender of the temporary Equity-Linked Securities at the Corporate Trust Office, at the expense of the Company and without charge to the Holder or the Purchase Contract Agent. Upon surrender for cancellation of any one or more temporary Equity-Linked Securities, the Company shall execute and deliver to the Purchase Contract Agent, and the Purchase Contract Agent shall execute as attorney-in-fact for the Holder, authenticate and deliver in exchange therefor, one or more Definitive Equity-Linked Securities of like tenor and denominations and evidencing a like number of Units or Separate Purchase Contracts, as the case may be, as the temporary Equity-Linked Securities so surrendered. Until so exchanged, the temporary Equity-Linked Securities shall in all respects evidence the same benefits and the same obligations with respect to the Units or Separate Purchase Contracts, as the case may be, evidenced thereby as Definitive Equity-Linked Securities.

Section 3.05. *Registration; Registration of Transfer and Exchange*. The Company shall cause to be kept at the Corporate Trust Office a register (the "**Security Register**") in which, subject to such reasonable regulations as it may prescribe, the Company shall provide for the registration of Equity-Linked Securities and of transfers of Equity-Linked Securities. The Purchase Contract Agent is hereby initially appointed security registrar (the "**Security Registrar**") for the purpose of registration of Equity-Linked Securities and transfers of Equity-Linked Securities as provided herein. The Security Registrar shall record separately the registration and transfer of the Equity-Linked Securities evidencing Units and Separate Purchase Contracts.

22

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 751 of 1367

Upon surrender for registration of transfer of any Equity-Linked Security at the Corporate Trust Office, the Company shall execute and deliver to the Purchase Contract Agent, and the Purchase Contract Agent shall execute as attorney-in-fact for and on behalf of the designated transferee or transferees, authenticate and deliver, in the name of the designated transferee or transferees, one or more new Equity-Linked Securities of any authorized denominations, of like tenor, and evidencing a like number of Units or Separate Purchase Contracts, as the case may be.

At the option of the Holder, Equity-Linked Securities may be exchanged for other Equity-Linked Securities, of any authorized numbers and evidencing a like number of Units or Separate Purchase Contracts, as the case may be, upon surrender of the Equity-Linked Securities to be exchanged at the Corporate Trust Office. Whenever any Equity-Linked Securities are so surrendered for exchange, the Company shall execute and deliver to the Purchase Contract Agent, and the Purchase Contract Agent shall execute as attorney-in-fact for and on behalf of the Holder, authenticate and deliver the Equity-Linked Securities which the Holder making the exchange is entitled to receive.

All Equity-Linked Securities issued upon any registration of transfer or exchange of an Equity-Linked Security shall evidence the ownership of the same number of Units or Separate Purchase Contracts, as the case may be, and be entitled to the same benefits and subject to the same obligations, under this Agreement as the Units or Separate Purchase Contracts, as the case may be, evidenced by the Equity-Linked Security surrendered upon such registration of transfer or exchange.

Every Equity-Linked Security presented or surrendered for registration of transfer or exchange shall (if so required by the Purchase Contract Agent) be duly endorsed, or be accompanied by a written instrument of transfer in form satisfactory to the Company and the Purchase Contract Agent duly executed by the Holder thereof, or its attorney duly authorized in writing.

No service charge shall be made for any registration of transfer or exchange of an Equity-Linked Security, but the Company or the Purchase Contract Agent on behalf of the Company may require payment from the Holder of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with any registration of transfer or exchange of Equity-Linked Securities, other than any exchanges pursuant to Section 3.06 and Section 10.05 not involving any transfer.

Notwithstanding the foregoing, the Company shall not be obligated to execute and deliver to the Purchase Contract Agent, and the Purchase Contract Agent shall not be obligated to deliver any Equity-Linked Security in exchange for any other Equity-Linked Security presented or surrendered for registration of transfer or for exchange on or after the Business Day immediately preceding the Purchase Contract Settlement Date or any earlier Settlement Date with respect to such Equity-Linked Security. In lieu of delivery of a new Equity-Linked Security, upon satisfaction of the applicable conditions specified above in this Section and receipt of appropriate registration or transfer instructions from such Holder, the Company shall, if a Settlement Date with respect to such Equity-Linked Security has occurred, deliver or cause to be delivered the shares of Common Stock deliverable and cash in lieu of any fractional share of Common Stock in respect of the Purchase Contracts evidenced by such Equity-Linked Security (and shall direct the Custodian to deliver the corresponding Separate Treasury Strips, if such Equity-Linked Security is a Unit).

23

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 752 of 1367

Section 3.06. *Book-Entry Interests.* The Units, on original issuance, will be issued in the form of one or more fully registered Global Units, to be delivered to the Depositary or its custodian by, or on behalf of, the Company. The Company hereby designates DTC as the initial Depositary. Such Global Units shall initially be registered on the books and records of the Company in the name of Cede & Co., the nominee of DTC, and no Beneficial Holder will receive a Definitive Unit representing such Beneficial Holder's interest in such Global Unit, except as provided in Section 3.09. Unless and until definitive, fully registered Securities have been issued to Beneficial Holders pursuant to Section 3.09:

(i) the provisions of this Section 3.06 shall be in full force and effect;

(ii) the Company shall treat the Depositary for all purposes of this Agreement (including settling the Purchase Contracts and receiving approvals, votes or consents hereunder) as the Holder of the Global Units and Global Purchase Contracts and shall have no obligation to the Beneficial Holders;

(iii) to the extent that the provisions of this Section 3.06 conflict with any other provisions of this Agreement, the provisions of this Section 3.06 shall control; and

(iv) the rights of the Beneficial Holders shall be exercised only through the Depositary and shall be limited to those established by law and agreements between such Beneficial Holders and the Depositary or the Depositary Participants.

Section 3.07. *Notices to Holders.* Whenever a notice or other communication to the Holders is required to be given under this Agreement, the Company or the Company's agent shall give such notices and communications to the Holders and, with respect to any Units or Purchase Contracts registered in the name of the Depositary or the nominee of the Depositary, the Company or the Company's agent shall, except as set forth herein, have no obligations to the Beneficial Holders.

Section 3.08. *Appointment of Successor Depositary.* If the Depositary elects to discontinue its services as securities depositary with respect to the Units or Purchase Contracts, the Company may, in its sole discretion, appoint a successor Depositary with respect to such Units or such Purchase Contracts, as the case may be.

Section 3.09. *Definitive Securities.* If:

(i) the Depositary is at any time unwilling or unable to continue as depositary for the Global Securities or ceases to be a Clearing Agency registered under the Exchange Act, and a successor Depositary registered as a Clearing Agency under the Exchange Act is not appointed by the Company within 90 days; or

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 753 of 1367

(ii) any failure on the part of the Company to observe or perform any covenant or agreement in the Purchase Contracts or the Purchase Contract Agreement, has occurred and is continuing and a Beneficial Holder of 48,000 Units (or any integral multiple thereof) or a Holder of Separate Purchase Contracts requests that its Securities be issued in physical, certificated form,

then, in each case the Company shall execute, and the Purchase Contract Agent upon receipt of an Issuer Order for the authentication and delivery of Definitive Securities, shall authenticate and deliver Definitive Securities representing an aggregate number of Securities with respect to the Global Security or Securities representing such Securities (or representing an aggregate number of Securities equal to the aggregate number of Securities in respect of which such Beneficial Holder has requested the issuance of Definitive Securities pursuant to clause (ii) above) in exchange for such Global Security or Securities (or portion thereof). Each Definitive Security so delivered shall evidence Units, Purchase Contracts or Treasury Strip Components, as the case may be, of the same kind and tenor as the Global Security so surrendered in respect thereof.

Section 3.10. *Mutilated, Destroyed, Lost and Stolen Securities*. If any mutilated Equity-Linked Security is surrendered to the Purchase Contract Agent, together with such security or indemnity as may be reasonably required by the Company and the Purchase Contract Agent to hold them or any of their agents harmless, then the Company shall execute and deliver to the Purchase Contract Agent, and the Purchase Contract Agent shall authenticate on behalf of the Holder, and deliver in exchange therefor, a new Equity-Linked Security, evidencing the same number of Units or Separate Purchase Contracts, as the case may be, and bearing a security number not contemporaneously outstanding.

If there shall be delivered to the Company and the Purchase Contract Agent (i) evidence to their satisfaction of the destruction, loss or theft of any Equity-Linked Security, and (ii) such security or indemnity as may be reasonably required by them to hold each of them and any agent of any of them harmless, then, in the absence of notice to the Company, the Purchase Contract Agent that such Equity-Linked Security has been acquired by a protected purchaser, the Company shall execute and deliver to the Purchase Contract Agent and the Purchase Contract Agent shall authenticate on behalf of the Holder, and deliver to the Holder, in lieu of any such destroyed, lost or stolen Equity-Linked Security, a new Equity-Linked Security, evidencing the same number of Units or Separate Purchase Contracts, as the case may be, and bearing a security number not contemporaneously outstanding.

Notwithstanding the foregoing, the Company shall not be obligated to execute and deliver to the Purchase Contract Agent, and the Purchase Contract Agent shall not be obligated to execute as attorney-in-fact on behalf of the Holder, authenticate and deliver to the Holder, an Equity-Linked Security on or after the Business Day immediately preceding the Purchase Contract Settlement Date or any earlier Settlement Date with

25

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 754 of 1367

respect to such Equity-Linked Security. In lieu of delivery of a new Equity-Linked Security, upon satisfaction of the applicable conditions specified above in this Section and receipt of appropriate registration or transfer instructions from such Holder, the Company shall, if a Settlement Date with respect to such Equity-Linked Security has occurred, deliver or arrange for delivery of the shares of Common Stock deliverable and cash in lieu of any fractional share of Common Stock in respect of the Purchase Contracts evidenced by such Equity-Linked Security (together with (i) a number of Separate Treasury Strips equal to the number of, and with the same CUSIP numbers, as the Treasury Strips originally comprising the Treasury Strips Components of such Equity-Linked Security if such Equity-Linked Security is a Unit (in the case of any settlement occurring on the second Business Day following any Early Settlement Date, the second Business Day following any Fundamental Change Early Settlement Date or upon a Bankruptcy Event) or (ii) cash (in the case of any settlement occurring on the Purchase Contract Settlement Date), as applicable).

Upon the issuance of any new Equity-Linked Security under this Section 3.10, the Company and the Purchase Contract Agent may require the payment by the Holder of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other expenses (including the fees and expenses of the Purchase Contract Agent) connected therewith.

Every new Equity-Linked Security issued pursuant to this Section 3.10 in lieu of any destroyed, lost or stolen Equity-Linked Security shall constitute an original additional contractual obligation of the Company and of the Holder in respect of the Unit or Separate Purchase Contract, as the case may be, evidenced thereby, whether or not the destroyed, lost or stolen Equity-Linked Security shall be found at any time. Such new Equity-Linked Security (and the Units or Separate Purchase Contracts, as applicable, evidenced thereby) shall be at any time enforceable by anyone, and shall be entitled to all the benefits and be subject to all the obligations of this Agreement equally and proportionately with any and all other Equity-Linked Securities delivered hereunder.

The provisions of this Section 3.10 are exclusive and shall preclude, to the extent lawful, all other rights and remedies with respect to the replacement or payment of mutilated, destroyed, lost or stolen Equity-Linked Securities.

Section 3.11. *Persons Deemed Owners*. Prior to due presentment of an Equity-Linked Security for registration of transfer, the Company, the Purchase Contract Agent and any agent of the Company or the Purchase Contract Agent, may treat the Person in whose name such Equity-Linked Security is registered as the owner of the Unit or Purchase Contract, as the case may be, evidenced thereby, for the purpose of performance of the Units or Purchase Contracts, as applicable, evidenced by such Equity-Linked Securities and for all other purposes whatsoever, and none of the Company, the Purchase Contract Agent, nor any agent of the Company or the Purchase Contract Agent, shall be affected by notice to the contrary.

26

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 755 of 1367

Notwithstanding the foregoing, with respect to any Global Unit or Global Purchase Contract, nothing contained herein shall prevent the Company or the Purchase Contract Agent or any agent of the Company or the Purchase Contract Agent from giving effect to any written certification, proxy or other authorization furnished by the Depositary (or its nominee), as a Holder, with respect to such Global Unit or Global Purchase Contract or impair, as between such Depositary and the related Beneficial Holder, the operation of customary practices governing the exercise of rights of the Depositary (or its nominee) as Holder of such Global Unit or Global Purchase Contract.

None of the Purchase Contract Agent, the Custodian and the Security Registrar shall have any responsibility or obligation to any Beneficial Holder in a Global Security, an agent member or other Person with respect to the accuracy of the records of the Depositary or its nominee or of any agent member, with respect to any ownership interest in the Securities or with respect to the delivery to any agent member, Beneficial Holder or other Person (other than the Depositary) of any notice or the payment of any amount, under or with respect to such Securities. All notices and communications to be given to the Holders and all payments to be made to Holders under the Securities and this Agreement shall be given or made only to or upon the order of the registered Holders (which shall be the Depositary or its nominee in the case of a Global Security). The rights of Beneficial Holders in Global Securities shall be exercised only through the Depositary subject to the applicable procedures. The Purchase Contract Agent, the Custodian and the Security Registrar shall be entitled to rely and shall be fully protected in relying upon information furnished by the Depositary with respect to its members, DTC participants and any Beneficial Holders. The Purchase Contract Agent, the Custodian and the Security Registrar shall be entitled to deal with the Depositary, and any nominee thereof, that is the registered Holder of any Global Security for all purposes of this Agreement relating to such Global Security (including the payment or delivery of amounts due hereunder and the giving of instructions or directions by or to any Beneficial Holder) as the sole Holder of such Global Security and shall have no obligations to the Beneficial Holders thereof. None of the Purchase Contract Agent, the Custodian and the Security Registrar shall have any responsibility or liability for any acts or omissions of the Depositary with respect to such Global Security, for the records of any such Depositary, including records in respect of the Beneficial Holders of any such Global Security, for any transactions between the Depositary and any agent member or between or among the Depositary, any such agent member and/or any Holder or Beneficial Holder of such Global Security, or for any transfers of beneficial interests in any such Global Security.

Notwithstanding the foregoing, with respect to any Global Security, nothing herein shall prevent the Company or the Purchase Contract Agent, or any agent of the Company or the Purchase Contract Agent from giving effect to any written certification, proxy or other authorization furnished by any depositary (or its nominee), as a Holder, with respect to such Global Security or shall impair, as between such Depositary and Beneficial Holders of such Global Security, the operation of customary practices governing the exercise of the rights of such depositary (or its nominee) as Holder of such Global Security.

<div align="center">27</div>

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 756 of 1367

None of the Purchase Contract Agent, the Custodian or the Security Registrar shall have any obligation or duty to monitor, determine or inquire as to compliance with any restrictions on transfer imposed under this Agreement or under applicable law with respect to any transfer of any interest in any Security (including any transfers between or among DTC participants, members or Beneficial Holders in any Global Security) other than to require delivery of such certificates and other documentation or evidence as are expressly required by, and to do so if and when expressly required by, the terms of this Agreement, and to examine the same to determine substantial compliance as to form with the express requirements hereof.

Section 3.12. *Cancellation.* All Securities surrendered for separation or recreation and all Equity-Linked Securities surrendered for settlement or upon the registration of transfer or exchange of an Equity-Linked Security shall, if surrendered to any Person other than the Purchase Contract Agent, be delivered to the Purchase Contract Agent and, if not already cancelled, be promptly cancelled by it. The Company may at any time deliver to the Purchase Contract Agent for cancellation any Equity-Linked Securities previously executed, authenticated and delivered hereunder that the Company may have acquired in any manner whatsoever, and all Equity-Linked Securities so delivered shall, upon an Issuer Order, be promptly cancelled by the Purchase Contract Agent. No Equity-Linked Securities shall be executed, authenticated on behalf of the Holder and delivered in lieu of or in exchange for any Equity-Linked Securities cancelled as provided in this Section, except as expressly permitted by this Agreement. All cancelled Equity-Linked Securities held by the Purchase Contract Agent shall be disposed of in accordance with its customary practices.

If the Company or any Affiliate of the Company shall acquire any Equity-Linked Security, such acquisition shall not operate as a cancellation of such Equity-Linked Security unless and until such Equity-Linked Security is delivered to the Purchase Contract Agent for cancellation, in which case such Equity-Linked Security shall be accompanied by an Issuer Order and cancelled in accordance with the immediately preceding paragraph.

ARTICLE 4
SETTLEMENT OF THE PURCHASE CONTRACTS

Section 4.01. *Settlement Rate.* (a) Each Purchase Contract obligates the Company to deliver, on the Purchase Contract Settlement Date, a number of shares of Common Stock (subject to Article 5) equal to the Settlement Rate as determined by the Company, unless such Purchase Contract has settled prior to the Purchase Contract Settlement Date.

(b) The "**Settlement Rate**" is equal to:

(i) if the Applicable Market Value is greater than the Threshold Appreciation Price, 8.5929 shares of Common Stock for each Purchase Contract (the "**Minimum Settlement Rate**");

(ii) if the Applicable Market Value is greater than or equal to the Reference Price but less than or equal to the Threshold Appreciation Price, a number of shares of Common Stock for each Purchase Contract equal to the Stated Amount, *divided by* the Applicable Market Value; and

28

(iii) if the Applicable Market Value is less than the Reference Price, 10.5263 shares of Common Stock for each Purchase Contract (the "**Maximum Settlement Rate**").

(c) The Maximum Settlement Rate and the Minimum Settlement Rate (each, a "**Fixed Settlement Rate**") shall be subject to adjustment as provided in Article 5.

(d) The Company shall give notice of the Settlement Rate to the Purchase Contract Agent and Holders no later than the Scheduled Trading Day prior to the Purchase Contract Settlement Date.

Section 4.02. *Representations and Agreements of Holders.* Each Holder of an Equity-Linked Security, by its acceptance thereof:

(a) irrevocably authorizes and directs the Purchase Contract Agent to execute and deliver on its behalf and perform this Agreement on its behalf and appoints the Purchase Contract Agent as its attorney-in-fact for any and all such purposes;

(b) in the case of a Purchase Contract that is a component of a Unit, or that is evidenced by a Global Purchase Contract, irrevocably authorizes and directs the Purchase Contract Agent to execute, deliver and hold on its behalf the Global Purchase Contract or the Component Purchase Contract evidencing such Purchase Contract and appoints the Purchase Contract Agent its attorney-in-fact for any and all such purposes;

(c) consents to, and agrees to be bound by the terms and provisions thereof;

(d) agrees to the tax treatment provided for in Section 13.07; and

(e) represents and warrants that neither the Beneficial Holder nor, to the Beneficial Holder's knowledge, any other Person, would become a "Substantial Shareholder" (as defined in the Amended Articles) as a result of the Beneficial Holder's acquisition of Purchase Contracts (treating the Beneficial Holder and any such other Person as actually holding, solely for purposes of this representation, the number of shares of Common Stock that would be received upon settlement at the Maximum Settlement Rate of all Purchase Contracts acquired or beneficially owned by the Beneficial Holder or any such other Person, as applicable, but treating all other Purchase Contracts as still unsettled), and, for the avoidance of doubt, taking into account the Beneficial Holder's and any such other Person's (i) current ownership of the Common Stock and any of the Utility's preferred stock and (ii) other acquisitions of the Common Stock and any of the Utility's preferred stock (if any) concurrent with or in connection with such Beneficial Holder's acquisition of the Purchase Contracts.

Section 4.03. *Purchase Contract Settlement Fund*. On the applicable Settlement Date, the Company shall issue and deliver to the Holders of the Outstanding Purchase Contracts (or, in the case of an Early Settlement, to the Holders of Purchase Contracts that have elected such Early Settlement) the aggregate number of shares of Common Stock to which such Holders of the Purchase Contracts to be settled on such Settlement Date are entitled hereunder. When any shares of Common Stock are required to be delivered to Holders pursuant to this Article 4, the Company shall deliver such shares of Common Stock, together with any dividends or distributions for which a Record Date and payment date for such dividend or distribution have occurred as of or after the close of business on the applicable Determination Date (collectively, the "**Purchase Contract Settlement Fund**") to such Holders, and the Company shall cause any such shares to be registered in the name of such Holder or such Holder's designee pursuant to Section 4.09.

Section 4.04. *Settlement Conditions*. A Holder's right to receive the shares of Common Stock, and any dividends or distributions with respect to such shares constituting part of the Purchase Contract Settlement Fund, upon settlement of any of its Purchase Contracts is subject to the following conditions:

(a) if such Purchase Contract or the Unit that includes such Purchase Contract is in the form of a Definitive Security, surrendering the relevant Definitive Security to the Purchase Contract Agent at the Corporate Trust Office duly endorsed for transfer to the Company or in blank and with duly completed settlement instructions in the form attached thereto, or if such Purchase Contract is represented by a Global Security, surrendering the relevant Security in compliance with the Depositary's applicable procedures; and

(b) the payment of any transfer or similar taxes payable pursuant to Section 4.09.

Section 4.05. *Settlement on the Purchase Contract Settlement Date*. On the Purchase Contract Settlement Date, subject to satisfaction of the conditions set forth in Section 4.04 by a Holder with respect to any of its Purchase Contracts, the Company shall cause a number of shares of Common Stock per Purchase Contract equal to the Settlement Rate to be issued and delivered, together with payment of (i) any cash payable in lieu of fractional shares pursuant to Section 4.11 and (ii) any dividends or distributions with respect to such shares constituting part of the Purchase Contract Settlement Fund (but without any interest thereon), to such Holder by book-entry transfer or other appropriate procedures pursuant to Section 4.09. The Person in whose name any shares of Common Stock shall be issuable upon settlement of any Purchase Contract on the Purchase Contract Settlement Date shall be treated as the holder of record of such shares as of the close of business on the last Trading Day of the Valuation Period.

Section 4.06. *Early Settlement*. (a) Subject to and upon compliance with the provisions of this Section 4.06, prior to the close of business on the second Scheduled Trading Day immediately preceding August 16, 2023, a Holder of 48,000 Units (or any integral multiple thereof) or a Holder of Separate Purchase Contracts, may elect to settle its Purchase Contracts early at the Early Settlement Rate ("**Early Settlement Right**").

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 759 of 1367

(b) A Holder's right to receive Common Stock upon Early Settlement of any of its Purchase Contracts is subject to the following conditions (in the case of Global Securities, subject to the applicable procedures of the Depositary):

(i) delivery of a written and signed notice of election (an "**Early Settlement Notice**") in the form attached to the Purchase Contract to the Purchase Contract Agent electing Early Settlement of such Purchase Contract;

(ii) satisfaction of the conditions set forth in Section 4.04; and

(iii) in the case of Purchase Contracts underlying Units, election of an Early Settlement may be made only in integral multiples of 48,000 Units.

(c) If a Holder complies with the requirements set forth in Section 4.06(b) before the close of business on any Business Day, then that Business Day shall be considered the "**Early Settlement Date**." If a Holder complies with the requirements set forth in Section 4.06(b) at or after the close of business on any Business Day or at any time on a day that is not a Business Day, then the next succeeding Business Day shall be considered the "**Early Settlement Date**."

(d) Subject to satisfaction of the conditions set forth in Section 4.06(b) by a Holder with respect to any of its Purchase Contracts, the Company shall cause a number of shares of Common Stock per Purchase Contract equal to the Early Settlement Rate to be issued and delivered, together with payment of (i) any cash payable in lieu of fractional shares pursuant to Section 4.11 and (ii) any dividends or distributions with respect to such shares constituting part of the Purchase Contract Settlement Fund (but without any interest thereon), to such Holder by book-entry transfer or other appropriate procedures pursuant to Section 4.09 on the second Business Day following the Early Settlement Date. The Person in whose name any shares of the Common Stock shall be issuable upon such Early Settlement of a Purchase Contract shall be treated as the holder of record of such shares as of the close of business on the relevant Early Settlement Date.

(e) In the event that Early Settlement is effected with respect to Purchase Contracts that are a component of Units, upon such Early Settlement, the Purchase Contract Agent shall direct the Custodian to deliver the Treasury Strips evidenced by those Units to such Holder free and clear of any liens or other encumbrances on the second Business Day following the Early Settlement Date.

(f) In the event that Early Settlement is effected with respect to Purchase Contracts represented by less than all the Purchase Contracts evidenced by a Security, upon such Early Settlement, the Company shall execute and the Purchase Contract Agent shall execute as attorney-in-fact on behalf of the Holder, authenticate and deliver to the Holder thereof, at the expense of the Company, a Security evidencing the Purchase Contracts as to which Early Settlement was not effected.

31

(g) Upon receipt of any Early Settlement Notice pursuant to Section 4.06(b), the Purchase Contract Agent shall promptly deliver a copy of such Early Settlement Notice to the Company.

Section 4.07. *Early Settlement Upon a Fundamental Change*. (a) If a Fundamental Change occurs and a Holder exercises the option to effect Early Settlement in respect of its Purchase Contracts in connection with such Fundamental Change in accordance with the procedures set forth in Section 4.06, such Holder shall receive a number of shares of Common Stock (or cash, securities or other property, as applicable) for each such Purchase Contract equal to the Fundamental Change Early Settlement Rate on the date such Settlement Change Early Settlement Right is exercised (the "**Fundamental Change Early Settlement Right**"). An Early Settlement shall be deemed for these purposes to be "in connection with" such Fundamental Change if the Holder delivers an Early Settlement Notice to the Purchase Contract Agent, and otherwise satisfies the requirements for effecting Early Settlement of its Purchase Contracts set forth in Section 4.06 hereof, during the period beginning on, and including, the Fundamental Change Effective Date and ending at the close of business on the 35th Business Day thereafter (or, if earlier, the second Scheduled Trading Day immediately preceding August 16, 2023) (the "**Fundamental Change Early Settlement Period**").

(b) If a Holder complies with the requirements set forth in Section 4.07(a) and 4.06(b) to exercise the Fundamental Change Early Settlement Right before the close of business on any Business Day during the Fundamental Change Early Settlement Period, then that Business Day shall be considered the "**Fundamental Change Early Settlement Date**." If a Holder complies with the requirements set forth in set forth in Section 4.07(a) and 4.06(b) to exercise the Fundamental Change Early Settlement Right at or after the close of business on any Business Day during the Fundamental Change Early Settlement Period or at any time on a day during the Fundamental Change Early Settlement Period that is not a Business Day, then the next succeeding Business Day shall be considered the "**Fundamental Change Early Settlement Date**."

(c) The Company shall provide the Purchase Contract Agent, the Custodian and the Holders of Units and Separate Purchase Contracts with a notice of a Fundamental Change within five Business Days after its Fundamental Change Effective Date and issue a press release announcing such Fundamental Change Effective Date. The notice shall set forth (i) the applicable Fundamental Change Early Settlement Rate, (ii) if not Common Stock, the kind and amount of cash, securities and other property receivable by the Holder upon settlement, (iii) the deadline by which each Holder's Fundamental Change Early Settlement Right must be exercised and (iv) any other information the Company determines to be appropriate.

(d) The "**Fundamental Change Early Settlement Rate**" shall be determined by the Company by reference to the table below, based on the date on which the Fundamental Change occurs or becomes effective (the "**Fundamental Change Effective Date**") and the stock price (the "**Stock Price**") in the Fundamental Change, which shall be:

32

(i) in the case of a Fundamental Change described in clause (b) of the definition thereof in which all holders of shares of Common Stock receive only cash in the Fundamental Change, the Stock Price shall be the cash amount paid per share of Common Stock; and

(ii) in all other cases, the Stock Price shall be the arithmetic average of the Daily VWAPs of the Common Stock over the five consecutive Trading Day period ending on the Trading Day immediately preceding such Fundamental Change Effective Date.

(e) The Stock Prices set forth in the column headings of the table below shall be adjusted as of any date on which the Fixed Settlement Rates are adjusted. The adjusted Stock Prices shall equal the Stock Prices applicable immediately prior to such adjustment, *multiplied by* a fraction, the numerator of which is the Maximum Settlement Rate immediately prior to the adjustment giving rise to the Stock Price adjustment and the denominator of which is the Maximum Settlement Rate as so adjusted. The Fundamental Change Early Settlement Rates per Purchase Contract in the table below shall be adjusted in the same manner and at the same time as the Fixed Settlement Rates as set forth in Section 5.01.

(f) The following table sets forth the Fundamental Change Early Settlement Rate per Purchase Contract for each Stock Price and Fundamental Change Effective Date set forth below:

| Fundamental Change Effective Date | Stock Price | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | $2.00 | $4.00 | $6.00 | $8.00 | $9.50 | $10.50 | $11.64 | $13.00 | $15.00 | $18.00 | $21.00 | $25.00 | $30.00$ | $35.00 |
| July 1, 2020 | 10.3248 | 9.9939 | 9.5052 | 9.0924 | 8.8699 | 8.7592 | 8.6630 | 8.5811 | 8.5065 | 8.4547 | 8.4379 | 8.4357 | 8.4415 | 8.4475 |
| August 16, 2020 | 10.3372 | 10.0252 | 9.5399 | 9.1200 | 8.8914 | 8.7774 | 8.6781 | 8.5936 | 8.5167 | 8.4633 | 8.4459 | 8.4433 | 8.4487 | 8.4542 |
| February 16, 2021 | 10.3813 | 10.1499 | 9.6883 | 9.2397 | 8.9836 | 8.8538 | 8.7404 | 8.6438 | 8.5564 | 8.4966 | 8.4769 | 8.4729 | 8.4765 | 8.4803 |
| August 16, 2021 | 10.4170 | 10.2681 | 9.8520 | 9.3763 | 9.0862 | 8.9361 | 8.8043 | 8.6924 | 8.5927 | 8.5265 | 8.5055 | 8.5005 | 8.5025 | 8.5047 |
| February 16, 2022 | 10.4472 | 10.3753 | 10.0399 | 9.5445 | 9.2088 | 9.0297 | 8.8715 | 8.7386 | 8.6236 | 8.5521 | 8.5314 | 8.5265 | 8.5273 | 8.5282 |
| August 16, 2022 | 10.4738 | 10.4551 | 10.2454 | 9.7595 | 9.3615 | 9.1370 | 8.9374 | 8.7734 | 8.6408 | 8.5695 | 8.5530 | 8.5498 | 8.5498 | 8.5500 |
| February 16, 2023 | 10.5002 | 10.4998 | 10.4479 | 10.0823 | 9.5949 | 9.2760 | 8.9882 | 8.7694 | 8.6265 | 8.5775 | 8.5721 | 8.5716 | 8.5716 | 8.5716 |
| August 16, 2023 | 10.5263 | 10.5263 | 10.5263 | 10.5263 | 10.5263 | 9.5238 | 8.5929 | 8.5929 | 8.5929 | 8.5929 | 8.5929 | 8.5929 | 8.5929 | 8.5929 |

The exact Stock Prices and Fundamental Change Effective Dates may not be set forth in the table above, in which case:

(i) if the applicable Stock Price is between two Stock Prices in the table or the applicable Fundamental Change Effective Date is between two Fundamental Change Effective Dates in the table, the Fundamental Change Early Settlement Rate shall be determined by a straight-line interpolation between the Fundamental Change Early Settlement Rates set forth for the higher and lower Stock Prices and the earlier and later Fundamental Change Effective Dates, as applicable, based on a 365- or 366-day year, as applicable;

33

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 762 of 1367

(ii) if the applicable Stock Price is greater than $35.00 per share (subject to adjustment in the same manner and at the same time as the Stock Prices set forth in the column headings of the table above), the Fundamental Change Early Settlement Rate shall be the Minimum Settlement Rate; or

(iii) if the applicable Stock Price is less than $2.00 per share (subject to adjustment in the same manner and at the same time as the Stock Price set forth in the column headings of the table above), the "**Minimum Stock Price**") the Fundamental Change Early Settlement Rate shall be determined as if the Stock Price equaled the Minimum Stock Price, and using straight-line interpolation, as described in clause (i) of this Section 4.07(f), if the Fundamental Change Effective Date is between two Fundamental Change Effective Dates in the table.

The maximum number of shares of Common Stock deliverable under a Purchase Contract is 10.5263, subject to adjustment in the same manner and at the same time as the Fixed Settlement Rates as set forth under Section 5.01.

(g) [*Reserved.*]

(h) Subject to satisfaction of the conditions set forth in Section 4.06(b) by a Holder with respect to any of its Purchase Contracts, the Company shall cause to be delivered a number of shares of Common Stock, or securities, cash or other property, as applicable, payable as a result of such Holder's exercise of the Fundamental Change Early Settlement Right in accordance with the provisions set forth in Section 4.06(d), except that (i) such delivery shall be made on the second Business Day following the Fundamental Change Early Settlement Date, and (ii) the Person in whose name any shares of Common Stock or other securities, if applicable, shall be issuable following exercise of a Holder's Fundamental Change Early Settlement Right shall be treated as the holder of record of such shares or other securities, if applicable, as of the close of business on the Fundamental Change Early Settlement Date.

(i) If a Holder exercises its Fundamental Change Early Settlement Right with respect to Purchase Contracts that are a component of Units, upon such Early Settlement in connection with a Fundamental Change, the Purchase Contract Agent shall direct the Custodian to deliver the Treasury Strips evidenced by those Units to such Holder free and clear of any liens or other encumbrances on the second Business Day following the Fundamental Change Early Settlement Date.

(j) If a Holder exercises its Fundamental Change Early Settlement Right with respect to Purchase Contracts represented by less than all the Purchase Contracts evidenced by a Security, upon such Early Settlement in connection with a Fundamental Change, the Company shall execute and the Purchase Contract Agent shall execute as attorney-in-fact on behalf of the Holder, authenticate and deliver to the Holder thereof, at the expense of the Company, a Security evidencing the Purchase Contracts as to which Early Settlement in connection with a Fundamental Change was not effected.

34

(k) If a Holder does not elect to exercise the Fundamental Change Early Settlement Right, such Holder's Purchase Contracts shall remain outstanding and shall be subject to normal settlement on any subsequent Settlement Date, including, if applicable, the provisions set forth in Section 5.01.

Section 4.08. *Acceleration of Purchase Contract Settlement Date.* If a Bankruptcy Event occurs at any time on or before the last Trading Day of the Valuation Period (the day on which such Bankruptcy Event occurs, the "**Acceleration Date**"), the Purchase Contract Settlement Date shall automatically be accelerated to the Business Day immediately following the Acceleration Date and Holders of Purchase Contracts shall be entitled to receive, upon settlement of the Purchase Contracts on such accelerated Purchase Contract Settlement Date, a number of shares of Common Stock per Purchase Contract equal to the Maximum Settlement Rate in effect immediately prior to the Acceleration Date (regardless of the Applicable Market Value of the Common Stock at that time). The Company shall cause to be delivered the shares of Common Stock, securities, cash or other property deliverable as a result of any such acceleration of the Purchase Contract Settlement Date in accordance with the provisions set forth in Section 4.05, except that (i) such delivery shall be made on the accelerated Purchase Contract Settlement Date, and (ii) the Person in whose name any shares of Common Stock shall be issuable following such acceleration shall be treated as the holder of record of such shares as of the close of business on the Acceleration Date. Any claim for damages that Holders of the Purchase Contracts (whether as Separate Purchase Contracts or Purchase Contracts underlying Units) have for the Company's failure to deliver shares of Common Stock following a Bankruptcy Event as described in this Section 4.08 will rank *pari passu* with the claims of holders of the shares of Common Stock in the relevant bankruptcy proceeding.

Section 4.09. *Registration of Underlying Shares and Transfer Taxes.* The shares of Common Stock underlying the Purchase Contracts shall be registered in the name of the Holder or the Holder's designee as specified in the settlement instructions provided by the Holder to the Purchase Contract Agent, and the Company will pay all documentary, stamp or similar issue or transfer taxes attributable to the delivery thereof, unless any such tax is payable in respect of any registration of such shares in a name of a Person other than the Person in whose name the Security evidencing such Purchase Contract is registered, in which case the Company shall not be required to pay any such tax and no such registration shall be made unless the Person requesting such registration has paid any such taxes required by reason of such registration in a name of a Person other than the Person in whose name the Security evidencing such Purchase Contract is registered or has established to the satisfaction of the Company that such tax either has been paid or is not payable.

Section 4.10. *Return of Purchase Contract Settlement Fund.* In the event a Holder fails to effect surrender or delivery of its Units or Purchase Contracts on or following the applicable Settlement Date in accordance with the provisions hereof, the *shares of Common Stock underlying such Purchase Contracts, and any dividends or distributions with respect to such shares constituting part of the Purchase Contract Settlement Fund, shall be held in the name of the Purchase Contract Agent or its nominee in trust for the benefit of such Holder, until the earlier to occur of:*

35

(i) the surrender of the relevant Units or Separate Purchase Contracts for settlement in accordance with the provisions hereof or receipt by the Company and the Purchase Contract Agent from such Holder of satisfactory evidence that such Units or Separate Purchase Contracts have been destroyed, lost or stolen, together with any indemnity that may be required by the Purchase Contract Agent and the Company; and

(ii) the passage of two years from the applicable Settlement Date, as the case may be, following which the Purchase Contract Agent shall pay to the Company such Holder's share of such Common Stock and any dividends or distributions with respect to such shares constituting part of the Purchase Contract Settlement Fund; *provided*, *however*, that prior to receiving any such payment, the Company shall notify each such Holder that such property remains unclaimed and that, after a date specified therein, which shall not be less than 30 days from the date of such notice, any unclaimed balance of such property then remaining will be repaid to the Company. After payment to the Company, (A) Holders entitled to such property must look to the Company for payment as general creditors, unless applicable abandoned property law designates another Person, and (B) all liability of the Purchase Contract Agent with respect to such property shall cease.

Section 4.11. *No Fractional Shares*. No fractional shares or scrip certificates representing fractional shares of Common Stock shall be issued or delivered to Holders upon settlement of the Purchase Contracts. In lieu of any fractional shares of Common Stock that would otherwise be issuable upon settlement of any Purchase Contracts, a Holder of a Purchase Contract shall be entitled to receive an amount in cash equal to the fraction of a share of Common Stock, calculated on an aggregate basis in respect of the Purchase Contracts being settled (provided that, so long as the Units are held as Global Units, the Company may elect to aggregate Units for purposes of these calculations on any basis permitted by the applicable procedures of the Depositary), multiplied by the Daily VWAP of the Common Stock on the Trading Day immediately preceding the Purchase Contract Settlement Date, Early Settlement Date or Fundamental Change Early Settlement Date, as the case may be. To the extent the Purchase Contract Agent is obligated to make any payments on behalf of the Company pursuant to this Agreement, the Company shall provide the Purchase Contract Agent with sufficient funds to permit the Purchase Contract Agent to make all such cash payments in a timely manner, and the Purchase Contract Agent shall incur no liability as a result of the failure of the Company to provide such funds.

36

Section 5.01. *Adjustments*. (a) Each Fixed Settlement Rate shall be adjusted as set forth in this 5.01, except that the Company shall not make any adjustments to the Fixed Settlement Rates if Holders participate (other than in the case of a share split or share combination or a tender or exchange offer described in Section 5.01(a)(v)), at the same time and upon the same terms as holders of Common Stock and solely as a result of holding the Purchase Contracts, in any of the transactions set forth in Sections 5.01(a)(i)-(v) without having to settle their Purchase Contracts as if they held a number of shares of Common Stock equal to (i) the Maximum Settlement Rate as of the Record Date for such transaction, *multiplied by* (ii) the number of Purchase Contracts held by such Holder.

(i) If the Company exclusively issues shares of Common Stock as a dividend or distribution on shares of Common Stock, or if the Company effects a share split or share combination, each Fixed Settlement Rate shall be adjusted based on the following formula:

$$CR_1 = CR_0 \times \frac{OS_1}{OS_0}$$

where,

$CR_0$ = such Fixed Settlement Rate in effect immediately prior to the close of business on the Record Date of such dividend or distribution, or immediately prior to the open of business on the Effective Date of such share split or share combination, as applicable;

$CR_1$ = such Fixed Settlement Rate in effect immediately after the close of business on such Record Date or immediately after the open of business on such Effective Date, as applicable;

$OS_0$ = the number of shares of Common Stock outstanding immediately prior to the close of business on such Record Date or immediately prior to the open of business on such Effective Date, as applicable, before giving effect to such dividend, distribution, share split or share combination; and

$OS_1$ = the number of shares of Common Stock outstanding immediately after giving effect to such dividend, distribution, share split or share combination.

Any adjustment made under this Section 5.01(a)(i) shall become effective immediately after the close of business on the Record Date for such dividend or distribution, or immediately after the open of business on the Effective Date for such share split or share combination, as applicable. If any dividend or distribution of the type set forth in this Section 5.01(a)(i) is declared but not so paid or made, each Fixed Settlement Rate shall be immediately readjusted, effective as of the date the Board of Directors determines not to pay such dividend or distribution, to such Fixed Settlement Rate that would then be in effect if such dividend or distribution had not been declared. For the purposes of this clause (i), the number of shares of Common Stock outstanding immediately prior to the close of business on the relevant Record Date or immediately prior to the open of business on the relevant Effective Date, as the case may be, and the number of shares of Common Stock outstanding immediately after giving effect to such dividend, distribution, share split or share combination shall, in each case, not include shares that the Company holds in treasury. The Company shall not pay any dividend or make any distribution on shares of Common Stock that it holds in treasury.

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 766 of 1367

(ii) If the Company issues to all or substantially all holders of Common Stock any rights, options or warrants entitling them, for a period of not more than 45 calendar days after the announcement date of such issuance, to subscribe for or purchase Common Stock at a price per share that is less than the Average VWAP per share of Common Stock for the ten consecutive Trading Day period ending on, and including, the Trading Day immediately preceding the date of announcement of such issuance, each Fixed Settlement Rate shall be increased based on the following formula:

$$CR_1 = CR_0 \times \frac{OS_0 + X}{OS_0 + Y}$$

where,

$CR_0 =$    such Fixed Settlement Rate in effect immediately prior to the close of business on the Record Date for such issuance;

$CR_1 =$    such Fixed Settlement Rate in effect immediately after the close of business on such Record Date;

$OS_0 =$    the number of shares of Common Stock outstanding immediately prior to the close of business on such Record Date;

$X =$    the total number of shares of Common Stock issuable pursuant to such rights, options or warrants; and

$Y =$    the number of shares of Common Stock equal to (i) the aggregate price payable to exercise such rights, options or warrants, divided by (ii) the Average VWAP per share of Common Stock over the ten consecutive Trading Day period ending on, and including, the Trading Day immediately preceding the date of announcement of the issuance of such rights, options or warrants.

Any increase made under this Section 5.01(a)(ii) shall be made successively whenever any such rights, options or warrants are issued and shall become effective immediately after the close of business on the Record Date for such issuance. To the extent that such rights, options or warrants are not exercised prior to their expiration or shares of Common Stock are not delivered after the exercise of such rights, options or warrants, each Fixed Settlement Rate shall be decreased to such Fixed Settlement Rate that would then be in effect had the increase with respect to the issuance of such rights, options or warrants been made on the basis of delivery of only the number of shares of Common Stock actually delivered, if any. If such rights, options or warrants are not so issued, each Fixed Settlement Rate shall be immediately readjusted, effective as of the date the Board of Directors determines not to issue such rights, options or warrants to such Fixed Settlement Rate that would then be in effect if such Record Date for such issuance had not occurred.

For the purpose of this Section 5.01(a)(ii), in determining whether any rights, options or warrants entitle the holders of Common Stock to subscribe for or purchase shares of Common Stock at less than such Average VWAP per share for the ten consecutive Trading Day period ending on, and including, the Trading Day immediately preceding the date of announcement of such issuance, and in determining the aggregate offering price of such shares of Common Stock, there shall be taken into account any consideration received by the Company for such rights, options or warrants and any amount payable on exercise or conversion thereof, the value of such consideration, if other than cash, to be determined by the Board of Directors in good faith.

(iii) (A) If the Company distributes shares of its Capital Stock, evidences of the Company's indebtedness, other assets or property of the Company or rights, options or warrants to acquire its Capital Stock or other securities, to all or substantially all holders of Common Stock, excluding:

(1) dividends, distributions or issuances as to which the provisions set forth in Section 5.01(a)(i) or Section 5.01(a)(ii) shall apply;

(2) dividends or distributions paid exclusively in cash as to which the provisions set forth in Section 5.01(a)(iv) shall apply;

(3) any distributions upon conversion of, or in exchange for, shares of Common Stock in connection with a recapitalization, reclassification, change, consolidation, merger or other combination, share exchange, or sale, lease or other transfer or disposition resulting in the change in the consideration due upon settlement of the Purchase Contracts as set forth under Section 6.01;

(4) except as otherwise set forth in Section 5.01(a)(vii), rights issued pursuant to a shareholder rights plan adopted by the Company; and

(5) Spin-Offs as to which the provisions set forth below in Section 5.01(a)(iii)(B) shall apply;

then each Fixed Settlement Rate shall be increased based on the following formula:

$$CR_1 = CR_0 \times \frac{SP_0}{SP_0 - FMV}$$

where,

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 768 of 1367

$CR_0$ = such Fixed Settlement Rate in effect immediately prior to the close of business on the Record Date for such distribution;

$CR1$ = such Fixed Settlement Rate in effect immediately after the close of business on such Record Date;

$SP0$ = the Average VWAP per share of Common Stock over the ten consecutive Trading Day period ending on, and including, the Trading Day immediately preceding the Ex-Date for such distribution; and

$FMV$ = the fair market value (as determined by the Board of Directors in good faith) of the shares of Capital Stock, evidences of indebtedness, assets, property, rights, options or warrants so distributed, expressed as an amount per share of Common Stock on the Ex-Date for such distribution.

Any increase made under this Section 5.01(a)(iii)(A) will become effective immediately after the close of business on the Record Date for such distribution. If such distribution is not so paid or made, each Fixed Settlement Rate shall be immediately readjusted, effective as of the date the Board of Directors determines not to pay such dividend or distribution, to be such Fixed Settlement Rate that would then be in effect if such distribution had not been declared.

Notwithstanding the foregoing, if "FMV" (as defined above) is equal to or greater than "$SP_0$" (as defined above), in lieu of the foregoing increase, each Holder shall receive, in respect of each Purchase Contract, at the same time and upon the same terms as holders of Common Stock, without having to settle such Purchase Contract, the amount and kind of the Company's Capital Stock, evidences of the Company's indebtedness, other assets or property of the Company or rights, options or warrants to acquire its Capital Stock or other securities that such Holder would have received if such Holder owned a number of shares of Common Stock equal to the Maximum Settlement Rate in effect on the Record Date for the distribution.

(B) With respect to an adjustment made under this Section 5.01(a)(iii) where there has been a Spin-Off, each Fixed Settlement Rate shall be increased based on the following formula:

$$CR_1 = CR_0 \times \frac{FMV_0 + MP_0}{MP_0}$$

where,

$CR_0$ = such Fixed Settlement Rate in effect immediately prior to the open of business on the Ex-Date for the Spin-Off;

$CR_1$ = such Fixed Settlement Rate in effect immediately after the open of business on the Ex-Date for the Spin-Off;

$FMV_0$ = the Average VWAP per share of the Capital Stock or similar equity interest distributed to holders of Common Stock applicable to one share of Common Stock over the ten consecutive Trading Day period commencing on, and including, the Ex-Date for the Spin-Off (the "Distribution Valuation Period"); and

$MP_0$ = the Average VWAP per share of Common Stock over the Distribution Valuation Period.

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 769 of 1367

The increase to each Fixed Settlement Rate made under this Section 5.01(a)(iii)(B) will be calculated as of the close of business on the last Trading Day of the Distribution Valuation Period but will be given retroactive effect as of immediately after the open of business on the Ex-Date of the Spin-Off. Because the Company shall make the adjustment to each Fixed Settlement Rate with retroactive effect, the Company shall delay the settlement of any Purchase Contract where any date for determining the number of shares of Common Stock issuable to a Holder occurs during the Distribution Valuation Period until the second Business Day after the last Trading Day of such Distribution Valuation Period. If such dividend or distribution is not so paid, each Fixed Settlement Rate shall be decreased, effective as of the date the Board of Directors determines not to make or pay such dividend or distribution, to be such Fixed Settlement Rate that would then be in effect if such dividend or distribution had not been declared.

For purposes of this Section 5.01(a)(iii) (and subject in all respects to Section 5.01(a)(i) and Section 5.01(a)(ii)):

(A) rights, options or warrants distributed by the Company to all or substantially all holders of the Common Stock entitling them to subscribe for or purchase shares of the Company's Capital Stock, including Common Stock (either initially or under certain conditions), which rights, options or warrants, until the occurrence of a specified event or events ("**Trigger Event**"):

(1) are deemed to be transferred with such shares of Common Stock;

(2) are not exercisable; and

(3) are also issued in respect of future issuances of the Common Stock,

shall be deemed not to have been distributed for purposes of this Section 5.01(a)(iii) (and no adjustment to the Fixed Settlement Rates under this Section 5.01(a)(iii) shall be required) until the occurrence of the earliest Trigger Event, whereupon such rights, options or warrants shall be deemed to have been distributed and an appropriate adjustment (if any is required) to the Fixed Settlement Rates shall be made under this Section 5.01(a)(iii).

(B) If any such right, option or warrant, including any such existing rights, options or warrants distributed prior to the initial Issue Date, are subject to events, upon the occurrence of which such rights, options or warrants become exercisable to purchase different securities, evidences of indebtedness or other assets, then the date of the occurrence of any and each such event shall be deemed to be the date of distribution and Record Date with respect to new rights, options or warrants with such rights (in which case the existing rights, options or warrants shall be deemed to terminate and expire on such date without exercise by any of the holders thereof).

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 770 of 1367

(C) In addition, in the event of any distribution (or deemed distribution) of rights, options or warrants, or any Trigger Event or other event (of the type described in the immediately preceding clause (B)) with respect thereto that was counted for purposes of calculating a distribution amount for which an adjustment to the Fixed Settlement Rates under this clause (iii) was made:

(1) in the case of any such rights, options or warrants that shall all have been redeemed or repurchased without exercise by any holders thereof, upon such final redemption or repurchase (x) the Fixed Settlement Rates shall be readjusted as if such rights, options or warrants had not been issued and (y) the Fixed Settlement Rates shall then again be readjusted to give effect to such distribution, deemed distribution or Trigger Event, as the case may be, as though it were a cash distribution pursuant to Section 5.01(a)(iv), equal to the per share redemption or repurchase price received by a holder or holders of Common Stock with respect to such rights, options or warrants (assuming such holder had retained such rights, options or warrants), made to all holders of Common Stock as of the date of such redemption or repurchase; and

(2) in the case of such rights, options or warrants that shall have expired or been terminated without exercise by any holders thereof, the Fixed Settlement Rates shall be readjusted as if such rights, options and warrants had not been issued;

*provided* that, in each case, such rights, options or warrants are deemed to be transferred with such shares of Common Stock and are also issued in respect of future issuances of the Common Stock.

For purposes of Section 5.01(a)(i), Section 5.01(a)(ii) and this Section 5.01(a)(iii), if any dividend or distribution to which this 5.01(a)(iii) is applicable includes one or both of:

(A) a dividend or distribution of shares of Common Stock to which Section 5.01(a)(i) is applicable (the "**Clause A Distribution**"); or

(B) an issuance of rights, options or warrants to which Section 5.01(a)(ii) is applicable (the "**Clause B Distribution**"),

then:

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 771 of 1367

(1) such dividend or distribution, other than the Clause A Distribution and the Clause B Distribution, shall be deemed to be a dividend or distribution to which this Section 5.01(a)(iii) is applicable (the "**Clause C Distribution**") and any Fixed Settlement Rate adjustment required by this Section 5.01(a)(iii) with respect to such Clause C Distribution shall then be made; and

(2) the Clause A Distribution and Clause B Distribution shall be deemed to immediately follow the Clause C Distribution and any Fixed Settlement Rate adjustment required by Section 5.01(a)(i) and Section 5.01(a)(ii) with respect thereto shall then be made, except that, if determined by the Company (I) the "Record Date" of the Clause A Distribution and the Clause B Distribution shall be deemed to be the Record Date of the Clause C Distribution and (II) any shares of Common Stock included in the Clause A Distribution or Clause B Distribution shall be deemed not to be "outstanding immediately prior to the close of business on such Record Date or immediately prior to the open of business on such Effective Date" within the meaning of Section 5.01(a)(i) or "outstanding immediately prior to close of business on such Record Date" within the meaning of Section 5.01(a)(ii).

(iv) If any cash dividend or distribution is made to all or substantially all holders of Common Stock, each Fixed Settlement Rate shall be adjusted based on the following formula:

$$CR_1 = CR_0 \times \frac{SP_0}{SP_0 - C}$$

where,

$CR_0 =$ such Fixed Settlement Rate in effect immediately prior to the close of business on the Record Date for such dividend or distribution;

$CR_1 =$ such Fixed Settlement Rate in effect immediately after the close of business on the Record Date for such dividend or distribution;

$SP_0 =$ the Average VWAP per share of Common Stock over the ten consecutive Trading Day period ending on, and including, the Trading Day immediately preceding the Ex-Date for such distribution;

$C =$ the amount in cash per share the Company distributes to all or substantially all holders of Common Stock.

Any increase made under this Section 5.01(a)(iv) shall become effective immediately after the close of business on the Record Date for such dividend or distribution. If such dividend or distribution is not so paid, each Fixed Settlement Rate shall be decreased, effective as of the date the Board of Directors determines not to make or pay such dividend or distribution, to be such Fixed Settlement Rate that would then be in effect if such dividend or distribution had not been declared.

43

Notwithstanding the foregoing, if "C" (as defined above) is equal to or greater than "$SP_0$" (as defined above) in lieu of the foregoing increase, each Holder shall receive, in respect of each Purchase Contract, at the same time and upon the same terms as holders of shares of Common Stock, without having to settle such Purchase Contract, the amount of cash that such Holder would have received if such Holder owned a number of shares of Common Stock equal to the Maximum Settlement Rate on the Record Date for such cash dividend or distribution.

(v) If the Company or any of its Subsidiaries make a payment in respect of a tender or exchange offer for Common Stock, to the extent that the cash and value of any other consideration included in the payment per share of Common Stock exceeds the Average VWAP per share of Common Stock over the ten consecutive Trading Day period commencing on, and including, the Trading Day next succeeding the last date on which tenders or exchanges may be made pursuant to such tender or exchange offer (the "**Expiration Date**"), each Fixed Settlement Rate shall be increased based on the following formula:

$$CR_1 = CR_0 \text{ x } \frac{AC + (SP_1 \text{ x } OS_1)}{OS_0 \text{ x } SP_1}$$

where,

$CR_0 =$     such Fixed Settlement Rate in effect immediately prior to the close of business on the Expiration Date;

$CR_1 =$     such Fixed Settlement Rate in effect immediately after the close of business on the Expiration Date;

$AC =$     the aggregate value of all cash and any other consideration (as determined by the Board of Directors in good faith) paid or payable for shares purchased in such tender or exchange offer;

$OS_0 =$     the number of shares of Common Stock outstanding immediately prior to the Expiration Date (prior to giving effect to the purchase of all shares accepted for purchase or exchange in such tender or exchange offer);

$OS_1 =$     the number of shares of Common Stock outstanding immediately after the Expiration Date (after giving effect to the purchase of all shares accepted for purchase or exchange in such tender or exchange offer); and

$SP_1 =$     the Average VWAP of Common Stock over the ten consecutive Trading Day period commencing on, and including, the Trading Day next succeeding the Expiration Date (the "Averaging Period").

44

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 773 of 1367

The increase to each Fixed Settlement Rate made under this Section 5.01(a)(v) will be calculated at the close of business on the last Trading Day of the Averaging Period but will be given retroactive effect as of immediately after the close of business on the Expiration Date. Because the Company will make the adjustment to each Fixed Settlement Rate with retroactive effect, the Company shall delay the settlement of any Purchase Contracts where any date for determining the number of shares of Common Stock issuable to a Holder occurs within the Averaging Period until the second Business Day after the last Trading Day of such Averaging Period. For the avoidance of doubt, no adjustment under this Section 5.01(a)(v) will be made if such adjustment would result in a decrease in any Fixed Settlement Rate, except as set forth in the immediately succeeding sentence.

In the event that the Company or one of its Subsidiaries is obligated to purchase shares of Common Stock pursuant to any such tender offer or exchange offer, but the Company or such Subsidiary is permanently prevented by applicable law from effecting any such purchases, or all such purchases are rescinded, then each Fixed Settlement Rate shall again be adjusted to be such Fixed Settlement Rate that would then be in effect if such tender offer or exchange offer had not been made (or had been made only in respect of the purchases that have been made and not rescinded).

(vi) If:

(A) the Record Date for a dividend or distribution on shares of Common Stock occurs after the end of the Valuation Period and before the Purchase Contract Settlement Date; and

(B) such dividend or distribution would have resulted in an adjustment of the number of shares of Common Stock issuable to the Holders had such Record Date occurred on or before the last Trading Day of such 20-Trading Day period,

then the Company shall deem the Holders to be holders of record, for each Purchase Contract, of a number of shares of Common Stock equal to the Settlement Rate for purposes of that dividend or distribution, and in such a case, the Holders would receive the dividend or distribution on Common Stock together with the number of share of Common Stock issuable upon settlement of such Purchase Contract.

(vii) If the Company has a rights plan in effect upon settlement of the Purchase Contracts into shares of Common Stock, the Holders shall receive, in addition to any shares of Common Stock received in connection with such settlement, the rights under the rights plan. However, if, prior to any settlement of the Purchase Contracts, the rights have separated from the shares of Common Stock in accordance with the provisions of the applicable rights plan, each Fixed Settlement Rate will be adjusted at the time of separation as if the Company distributed to all or substantially all holders of Common Stock, shares of its Capital Stock, evidences of indebtedness, assets, property, rights, options or warrants as set forth in Section 5.01(a)(iii), subject to readjustment in the event of the expiration, termination or redemption of such rights.

45

(viii) The Company may (but is not required to), to the extent permitted by law and the rules of NYSE or any other securities exchange on which the shares of Common Stock or the Purchase Contracts are then listed, increase each Fixed Settlement Rate by any amount for a period of at least 20 Business Days if such increase is irrevocable during such 20 Business Days and the Board of Directors determines that such increase would be in the best interest of the Company. The Company may also (but is not required to) increase each Fixed Settlement Rate as it deems advisable in order to avoid or diminish any income tax to holders of shares of Common Stock resulting from any dividend or distribution of shares of Common Stock (or issuance of rights or warrants to acquire shares of Common Stock) or from any event treated as such for income tax purposes or for any other reason. However, in either case, the Company may only make such discretionary adjustments if it makes the same proportionate adjustment to each Fixed Settlement Rate.

(ix) The Company shall not adjust the Fixed Settlement Rates:

(A) upon the issuance of shares of Common Stock pursuant to any present or future plan providing for the reinvestment of dividends or interest payable on securities of the Company and the investment of additional optional amounts in Common Stock under any plan;

(B) upon the issuance of any shares of Common Stock or options, rights or warrants to purchase such shares of Common Stock pursuant to any present or future benefit or other incentive plan or program of or assumed by the Company or any of its Subsidiaries;

(C) subject to Section 5.01(a)(vii), upon the issuance of any shares of Common Stock pursuant to any option, warrant, right or exercisable, exchangeable or convertible security not described in (B) of this Section 5.01(a)(ix) and outstanding as of the initial Issue Date;

(D) for a change in the par value of the Common Stock; or

(E) for stock repurchases that are not tender or exchange offers referred to in Section 5.01(a)(v), including structured or derivative transactions or pursuant to a stock repurchase program approved by the Board of Directors that are not tender or exchange offers referred to in Section 5.01(a)(v).

(x) Adjustments to each Fixed Settlement Rate will be calculated to the nearest 1/10,000th of a share, and corresponding adjustments to the Reference Price and Threshold Appreciation Price will be calculated to the nearest $0.0001. Except as otherwise provided above, the Company shall be responsible for making all calculations called for under the Purchase Contracts. These calculations include, but are not limited to, determinations of the Fundamental Change Early Settlement Rate, the Stock Price, the Daily VWAPs, the Average VWAPs and the Fixed Settlement Rates.

46

(xi) For the avoidance of doubt, if an adjustment is made to the Fixed Settlement Rates, no separate inversely proportionate adjustment will be made to the Reference Price or the Threshold Appreciation Price because the Reference Price is equal to $100.00 *divided by* the Maximum Settlement Rate (as adjusted in the manner described herein) and the Threshold Appreciation Price is equal to $100.00 *divided by* the Minimum Settlement Rate (as adjusted in the manner described herein).

(xii) Whenever any provision of this Agreement requires the Company to calculate the VWAP per share of Common Stock over a span of multiple days, the Board of Directors shall make appropriate adjustments in good faith (including, without limitation, to the Applicable Market Value, the Early Settlement Rate or the Fundamental Change Early Settlement Rate, as the case may be) to account for any adjustments to the Fixed Settlement Rates (as the case may be) that become effective, or any event that would require such an adjustment if the Record Date, Ex-Date, Effective Date or Expiration Date, as the case may be, of such event occurs during the relevant period used to calculate such prices or values, as the case may be.

(b) Whenever the Fixed Settlement Rates and the Fundamental Change Conversion Rates set forth in the table in the definition of "Fundamental Change Conversion Rate" are to be adjusted, the Company shall:

(i) compute such adjusted Fixed Settlement Rates and Fundamental Change Conversion Rates;

(ii) within ten Business Days after the Fixed Settlement Rates are to be adjusted, provide or cause to be provided, a written notice to the Holders of the occurrence of such event; and

(iii) within ten Business Days after the Fixed Settlement Rates are to be adjusted, provide or cause to be provided, to the Holders and the Purchase Contract Agent, a statement setting forth in reasonable detail the method by which the adjustments to the Fixed Settlement Rates and Fundamental Change Conversion Rates were determined and setting forth such adjusted Fixed Settlement Rates and Fundamental Change Conversion Rates.

ARTICLE 6
RECAPITALIZATIONS, RECLASSIFICATIONS AND CHANGES OF COMMON STOCK

Section 6.01. *Reorganization Events and Exchange Property*. In the event of:

(i) any consolidation or merger of the Company with or into another Person;

47

(ii) any sale, transfer, lease or conveyance to another Person of all or substantially all of the property and assets of the Company;

(iii) any reclassification of Common Stock into securities (other than a share split or share combination) including securities other than Common Stock; or

(iv) any statutory exchange of securities of the Company with another Person (other than in connection with a consolidation or merger),

in each case, as a result of which the Common Stock would be converted into, or exchanged for, stock, other securities or other property or assets (including cash or any combination thereof) (each, a "**Reorganization Event**"), each Purchase Contract outstanding immediately prior to such Reorganization Event shall, without the consent of the Holders, be settled by delivering the kind of stock, other securities or other property or assets (including cash or any combination thereof) that a Holder of shares of Common Stock would have been entitled to receive in connection with such Reorganization Event (such stock, other securities or other property or assets (including cash or any combination thereof), the "**Exchange Property**," with each "**Unit of Exchange Property**" meaning the kind and amount of such Exchange Property that a holder of one share of Common Stock would have received in such Reorganization Event), and, prior to or at the effective time of such Reorganization Event, the Company or the successor or purchasing Person, as the case may be, shall execute with the Purchase Contract Agent a supplemental agreement pursuant to this Agreement and the Purchase Contracts to provide for such change in the right to settle the Purchase Contracts. If the Reorganization Event causes the Common Stock to be converted into, or exchanged for, the right to receive more than a single type of consideration (determined based in part upon any form of shareholder election), the Exchange Property underlying the Purchase Contracts shall be deemed to be the weighted average of the types and amounts of consideration actually received by the holders of the Common Stock in such Reorganization Event.

The number of Units of Exchange Property the Company shall deliver upon the settlement of each Purchase Contract following the effective date of such Reorganization Event shall be determined as if references to shares of Common Stock deliverable upon settlement of the Purchase Contracts on the Purchase Contract Settlement Date, the second Business Day following any Early Settlement Date or the second Business Day following any Fundamental Change Early Settlement Date, as the case may be, were to Units of Exchange Property (without interest thereon and without any right to dividends or distributions thereon which have a Record Date that is prior to the date on which the Holders become holders of record of the underlying shares of Common Stock). For the purpose of determining which of clauses (i), (ii) and (iii) of Section 4.01(b) shall apply upon settlement of each Purchase Contract, and for the purpose of calculating the Settlement Rate if clause (ii) of Section 4.01(b) is applicable, the value of a Unit of Exchange Property shall be determined in good faith by the Board of Directors (which determination will be final), except that if a Unit of Exchange Property includes common stock or American Depositary Receipts ("**ADRs**") that are traded on a U.S. national

48

securities exchange, the value of such common stock or ADRs shall be the average over the Valuation Period of the volume-weighted Average Prices for such common stock or ADRs, as displayed on the applicable Bloomberg screen (as determined in good faith by the Board of Directors (which determination will be final)); or, if such price is not available, the average market value per share of such common stock or ADRs over such period as determined, using a volume-weighted average method, by a nationally recognized independent investment banking firm retained by the Company for this purpose.

The above provisions of this Section 6.01 shall similarly apply to successive Reorganization Events, and the provisions of Section 5.01 shall apply to any shares of common equity or ADRs of the Company (or any successor thereto) received by the holders of shares of Common Stock in any such Reorganization Event.

The Company (or any successor thereto) shall, as soon as reasonably practicable (but in any event within five calendar days) after the occurrence of any Reorganization Event, provide written notice to the Holders of such occurrence and of the kind and amount of the cash, securities or other property that constitute the Exchange Property. Failure to deliver such notice shall not affect the operation of this Section 6.01.

ARTICLE 7
CONCERNING THE HOLDERS OF PURCHASE CONTRACTS

Section 7.01. *Evidence of Action Taken by Holders.* Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Agreement to be given or taken by a specified percentage of number of Purchase Contracts may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such specified percentage of Holders in Person or by agent duly appointed in writing; and, except as herein otherwise expressly provided, such action shall become effective when such instrument or instruments are delivered to the Purchase Contract Agent. Proof of execution of any instrument or of a writing appointing any such agent shall be sufficient for any purpose of this Agreement and (subject to Section 9.01 and Section 9.03) conclusive in favor of the Purchase Contract Agent and the Company, if made in the manner provided in this Article 7.

Section 7.02. *Proof of Execution of Instruments and of Holding of Securities.* Subject to Section 9.01 and Section 9.03, the execution of any instrument by a Holder or his agent or proxy may be proved in the following manner:

(a) The fact and date of the execution by any Holder of any instrument may be proved by the certificate of any notary public or other officer of any jurisdiction authorized to take acknowledgments of deeds or administer oaths that the Person executing such instruments acknowledged to him the execution thereof, or by an affidavit of a witness to such execution sworn to before any such notary or other such officer. Where such execution is by or on behalf of any legal entity other than an individual, such certificate or affidavit shall also constitute sufficient proof of the authority of the Person executing the same.

(b) The ownership of the Units and the Purchase Contracts shall be proved by the Security Register or by a certificate of the Security Registrar.

Section 7.03. *Purchase Contracts Deemed Not Outstanding.* In determining whether the Holders of the requisite number of Outstanding Purchase Contracts have concurred in any direction, consent or waiver under this Agreement, Purchase Contracts which are owned by the Company or by any Affiliate of the Company with respect to which such determination is being made shall be disregarded and deemed not to be Outstanding Purchase Contracts for the purpose of any such determination, except that for the purpose of determining whether the Purchase Contract Agent shall be protected in relying on any such direction, consent or waiver only Purchase Contracts which a Responsible Officer of the Purchase Contract Agent actually knows are so owned shall be so disregarded. Purchase Contracts so owned which have been pledged in good faith may be regarded as Outstanding Purchase Contracts if the pledgee establishes to the satisfaction of the Purchase Contract Agent the pledgee's right so to act with respect to such Purchase Contracts and that the pledgee is not the Company or any Affiliate of the Company. In case of a dispute as to such right, the advice of counsel shall be full protection in respect of any decision made by the Purchase Contract Agent in accordance with such advice. Upon request of the Purchase Contract Agent, the Company shall furnish to the Purchase Contract Agent promptly an Officer's Certificate listing and identifying all Purchase Contracts, if any, known by the Company to be owned or held by or for the account of any of the above described Persons; and, subject to Section 8.01 and Section 8.03, the Purchase Contract Agent shall be entitled to accept such Officer's Certificate as conclusive evidence of the facts therein set forth and of the fact that all Purchase Contracts not listed therein are Outstanding Purchase Contracts for the purpose of any such determination.

Section 7.04. *Record Date for Consents and Waivers.* The Company may, but shall not be obligated to, establish a record date for the purpose of determining the Persons entitled to give, make or take any request, demand, authorization, direction, notice, consent, waiver or other action provided or permitted by this Agreement to be given made or taken by Holders of Purchase Contracts. If a record date is fixed, the Holders on such record date, or their duly designated proxies, and any such Persons, shall be entitled to give, make or take any such request, demand, authorization, direction, notice, consent, waiver or other action, whether or not such Holder remains a Holder after such record date.

ARTICLE 8
REMEDIES

Section 8.01. *Unconditional Right of Holders to Receive Shares of Common Stock.* Each Holder of a Purchase Contract (whether or not included in a Unit) shall have the right, which is absolute and unconditional, to receive the shares of Common Stock pursuant to such Purchase Contract and to institute suit for the enforcement of any such right to receive the shares of Common Stock, and such right shall not be impaired without the consent of such Holder.

Section 8.02. *Notice To Purchase Contract Agent; Limitation On Proceedings.* Holders of not less than 25% of Outstanding Purchase Contracts, by notice given to the Purchase Contract Agent, may request that Purchase Contract Agent to institute proceedings with respect to a default relating to any covenant hereunder; *provided,* subject to Section 8.08 and Article 9 hereof, the Purchase Contract Agent shall have no obligation to institute any such proceeding. No Holder of Purchase Contracts may institute any proceedings, judicial or otherwise, with respect to this Agreement or for any remedy hereunder, except in the case of failure of the Purchase Contract Agent, for 60 days, to act after the Purchase Contract Agent has received a written request to institute proceedings in respect of a default with respect to any covenant hereunder from the Holders of not less than 25% of the Outstanding Purchase Contracts, as well as an offer of indemnity reasonably satisfactory to the Purchase Contract Agent. This provision will not prevent any Holder of Purchase Contracts from instituting suit for the delivery of shares of Common Stock deliverable upon settlement of the Purchase Contracts on any Settlement Date.

Section 8.03. *Restoration of Rights and Remedies.* If any Holder has instituted any proceeding to enforce any right or remedy under this Agreement and such proceeding has been discontinued or abandoned for any reason, or has been determined adversely to such Holder, then and in every such case, subject to any determination in such proceeding, the Company and such Holder shall be restored severally and respectively to their former positions hereunder and thereafter all rights and remedies of such Holder shall continue as though no such proceeding had been instituted.

Section 8.04. *Rights and Remedies Cumulative.* Except as otherwise provided with respect to the replacement or payment of mutilated, destroyed, lost or stolen Securities in the last paragraph of Section 3.10, no right or remedy herein conferred upon or reserved to the Holders is intended to be exclusive of any other right or remedy, and every right and remedy shall, to the extent permitted by law, be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at law or in equity or otherwise. The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right or remedy.

Section 8.05. *Delay or Omission Not Waiver.* No delay or omission of any Holder to exercise any right or remedy upon a default hereunder shall impair any such right or remedy or constitute a waiver of any such right. Every right and remedy given by this Article or by law to the Holders may be exercised from time to time, and as often as may be deemed expedient, by such Holders.

Section 8.06. *Undertaking for Costs.* All parties to this Agreement agree, and each Holder of a Purchase Contract, by its acceptance of such Purchase Contract shall be deemed to have agreed, that any court may in its discretion require, in any suit for the enforcement of any right or remedy under this Agreement, or in any suit against the Purchase Contract Agent for any action taken, suffered or omitted by it as Purchase Contract Agent, the filing by any party litigant in such suit of an undertaking to pay the costs of such suit, and that such court may in its discretion assess reasonable costs,

51

including reasonable attorneys' fees and costs against any party litigant in such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant; *provided* that the provisions of this Section shall not apply to any suit instituted by (a) the Purchase Contract Agent, (b) any Holder, or group of Holders, holding in the aggregate more than 10% of the Outstanding Purchase Contracts, or (c) any Holder for the enforcement of the right to receive shares of Common Stock or other Exchange Property issuable upon settlement of the Purchase Contracts held by such Holder.

Section 8.07. *Waiver of Stay or Execution Laws.* The Company covenants (to the extent that it may lawfully do so) that it will not at any time insist upon, or plead, or in any manner whatsoever claim or assume or take the benefit or advantage of, any stay or extension law wherever enacted, now or at any time hereafter in force, that may affect the covenants or the performance of this Agreement; and the Company (to the extent that it may lawfully do so) hereby expressly waives all benefit or advantage of any such law and covenants that it will not hinder, delay or impede the execution of any power herein granted to the Purchase Contract Agent or the Holders, but will suffer and permit the execution of every such power as though no such law had been enacted.

Section 8.08. *Control by Majority.* The Holders of not less than a majority in number of the Outstanding Purchase Contracts shall have the right to direct the time, method and place of conducting any proceeding for any remedy available to the Purchase Contract Agent, or of exercising any trust or power conferred upon the Purchase Contract Agent; *provided* that the Purchase Contract Agent has received indemnity reasonably satisfactory to it. Notwithstanding the foregoing, the Purchase Contract Agent may refuse to follow any direction that is in conflict with any law or the Purchase Contract Agreement, or that may involve it in personal liability.

ARTICLE 9
THE PURCHASE CONTRACT AGENT

Section 9.01. *Certain Duties and Responsibilities.* (a) The Purchase Contract Agent undertakes to perform, with respect to the Units and Purchase Contracts, such duties and only such duties as are specifically delegated to it and set forth in this Agreement.

(b) No provision of this Agreement shall be construed to relieve the Purchase Contract Agent from liability for its own grossly negligent action, its own grossly negligent failure to act or its own willful misconduct, except that:

(i) the duties and obligations of the Purchase Contract Agent with respect to the Purchase Contracts shall be determined solely by the express provisions of this Agreement, and the Purchase Contract Agent shall not be liable except for the performance of such duties and obligations as are specifically set forth in this Agreement, and no implied covenants or obligations shall be read into this Agreement against the Purchase Contract Agent;

52

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 781 of 1367

(ii) in the absence of bad faith on the part of the Purchase Contract Agent, the Purchase Contract Agent may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon any statements, certificates or opinions furnished to the Purchase Contract Agent and conforming to the requirements of this Agreement; but in the case of any such statements, certificates or opinions which by any provision hereof are specifically required to be furnished to the Purchase Contract Agent, the Purchase Contract Agent shall be under a duty to examine the same to determine whether or not they conform to the requirements of this Agreement (but need not confirm or investigate the accuracy of mathematical calculations or other facts stated therein); and

(iii) the Purchase Contract Agent shall not be liable for any error of judgment made in good faith by a Responsible Officer or Responsible Officers of the Purchase Contract Agent unless it shall be proved that the Purchase Contract Agent was negligent in ascertaining the pertinent facts.

(c) This Agreement shall not be deemed to create a fiduciary relationship under state or federal law between The Bank of New York Mellon Trust Company, N.A., in its capacity as the Purchase Contract Agent and any Holder of any Purchase Contract (whether separated or as part of a Unit). The Purchase Contract Agent's rights, benefits, protections, indemnities, privileges and immunities hereunder shall be extended to and shall be enforceable by the Purchase Contract Agent under the Custodial Agreement.

None of the provisions contained in this Agreement shall require the Purchase Contract Agent to expend or risk its own funds or otherwise incur personal financial liability in the performance of any of its duties or in the exercise of any of its rights or powers, if it shall have reasonable ground for believing that the repayment of such funds or adequate indemnity against such liability is not reasonably assured to it.

Whether or not therein expressly so provided, every provision of this Agreement and the Custodial Agreement relating to the conduct or affecting the liability of or affording protection to the Purchase Contract Agent shall be subject to the provisions of this Section.

Section 9.02. *Notice of Default*. Within 90 days after the occurrence of any default by the Company hereunder of which a Responsible Officer of the Purchase Contract Agent has received written notice at the Corporate Trust Office of the Purchase Contract Agent (subject to Section 9.03(h) hereof), the Purchase Contract Agent shall notify the Company and the Holders of Purchase Contracts of such default hereunder, unless such default shall have been cured or waived.

Section 9.03. *Certain Rights of Purchase Contract Agent.* Subject to the provisions of Section 9.01:

(a) the Purchase Contract Agent may conclusively rely and shall be protected in acting or refraining from acting upon any resolution, Officer's Certificate or any other certificate, statement, instrument, opinion, report, notice, request, consent, order, bond, debenture, note, coupon, security or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties;

(b) any request, direction, order or demand of the Company mentioned herein shall be sufficiently evidenced by an Officer's Certificate or Issuer Order (unless other evidence in respect thereof be herein specifically prescribed); and any resolution of the Board of Directors may be evidenced to the Purchase Contract Agent by a Board Resolution;

(c) the Purchase Contract Agent may consult with counsel of its selection and any advice or opinion of such counsel shall be full and complete authorization and protection in respect of any action taken, suffered or omitted to be taken by it hereunder in good faith and in reliance thereon in accordance with such advice or opinion;

(d) the Purchase Contract Agent shall be under no obligation to exercise any of the rights or powers vested in it by this Agreement at the request, order or direction of any of the Holders pursuant to the provisions of this Agreement, unless such Holders shall have offered to the Purchase Contract Agent security or indemnity reasonably satisfactory to the Purchase Contract Agent against the costs, expenses and liabilities which might be incurred therein or thereby;

(e) the Purchase Contract Agent shall not be liable for any action taken or omitted by it in good faith and believed by it to be authorized or within the discretion, rights or powers conferred upon it by this Agreement and in no case shall the Purchase Contract Agent be liable for any act or omission hereunder in the absence of its own gross negligence, willful misconduct or bad faith;

(f) the Purchase Contract Agent shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, approval, appraisal, bond, debenture, note, coupon, security, or other paper or document unless requested in writing so to do by the Holders of not less than a majority in aggregate principal amount of the Outstanding Purchase Contracts; *provided* that, if the payment within a reasonable time to the Purchase Contract Agent of the costs, expenses or liabilities likely to be incurred by it in the making of such investigation is, in the opinion of the Purchase Contract Agent, not reasonably assured to the Purchase Contract Agent by the security afforded to it by the terms of this Agreement, the Purchase Contract Agent may require indemnity against such expenses or liabilities as a condition to proceeding; the reasonable expenses of every such investigation shall be paid by the Company or, if paid by the Purchase Contract Agent (which it shall have no obligation to do) or any predecessor Purchase Contract Agent, shall be promptly repaid by the Company upon demand;

(g) the Purchase Contract Agent may execute any of the rights or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys not regularly in its employ and the Purchase Contract Agent shall not be responsible for any misconduct or negligence on the part of any such agent or attorney appointed with due care by it hereunder;

54

(h) the Purchase Contract Agent shall not be charged with knowledge of any default of Securities unless a Responsible Officer of the Purchase Contract Agent shall have received written notice of such default from the Company or any Holder at the Corporate Trust Office;

(i) the Purchase Contract Agent shall not be liable for any action taken, suffered or omitted by it in good faith and believed by it to be authorized or within the discretion or rights or powers conferred upon it by this Agreement and in no case shall the Purchase Contract Agent be liable for any losses, costs or liabilities of any kind except for those arising directly out of its own gross negligence or willful misconduct;

(j) the permissive rights of the Purchase Contract Agent hereunder shall not be construed as duties;

(k) in no event shall the Purchase Contract Agent be liable for any consequential, special, punitive or indirect loss or damages, including lost profits, even if advised of the likelihood thereof in advance and regardless of the form of action;

(l) the rights, privileges, protections, immunities and benefits given to the Purchase Contract Agent, including, without limitation, its right to be indemnified, are extended to, and shall be enforceable by, the Purchase Contract Agent in each of its capacities hereunder, and to each agent, custodian and other Person employed to act hereunder;

(m) the Purchase Contract Agent may request that the Company deliver an Officer's Certificate setting forth the name of the individuals and/or titles of Officers authorized at such time to take specific actions pursuant to this Agreement, which Officer's Certificate may be signed by any Person authorized to sign an Officer's Certificate, including any Person specified as so authorized in any such Officer's Certificate previously delivered and not superseded;

(n) the Purchase Contract Agent shall not be responsible for delays or failures in performance of its obligations hereunder resulting from acts beyond its reasonable control. Such acts shall include but not be limited to acts of God, strikes, lockouts, riots, acts of war, epidemics or pandemics, governmental regulations superimposed after the fact, fire, communication line failures, loss or malfunctions of utilities, communications or computer (software and hardware) services, computer viruses, power failures, earthquakes, terrorist attacks or other disasters, it being understood that the Purchase Contract Agent shall use reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances;

55

(o) the Purchase Contract Agent shall not be required to exercise discretion in exercising its rights, powers or authorizations hereunder and the Purchase Contract Agent shall be entitled to refrain from any such act unless and until the Purchase Contract Agent has received written direction from a majority in number of the Outstanding Purchase Contracts and indemnification satisfactory to it and shall not be liable for any delay in acting caused while awaiting such direction.

(p) the Purchase Contract Agent shall not be required to initiate or conduct any litigation or collection proceedings hereunder and shall have no responsibilities with respect to any default hereunder, in each case, except as expressly set forth herein.

Section 9.04. *Not Responsible for Recitals*. The recitals contained herein and in the Units or Purchase Contracts shall be taken as the statements of the Company and the Purchase Contract Agent assumes no responsibility for their accuracy. The Purchase Contract Agent does not make any representations as to the validity or sufficiency of either this Agreement or of the Units or Purchase Contracts. The Purchase Contract Agent shall not be accountable for the use or application by the Company of the proceeds in respect of the Units or Purchase Contracts.

Section 9.05. *May Hold Units and Purchase Contracts*. Any Security Registrar or any other agent of the Company, or the Purchase Contract Agent and any of their Affiliates, in their individual or any other capacity, may become the owner of Units, Separate Purchase Contracts and Separate Treasury Strips and may otherwise deal with the Company or any other Person with the same rights it would have if it were not Security Registrar or such other agent, or the Purchase Contract Agent. The Company may become the owner of Units, Separate Purchase Contracts and Separate Treasury Strips.

Section 9.06. *Money Held in Custody*. Money held by the Purchase Contract Agent in custody hereunder need not be segregated from other funds except to the extent required by law or provided herein. The Purchase Contract Agent shall be under no obligation to invest or pay interest on any money received by it hereunder except as specifically instructed by the Company in an Issuer Order.

Section 9.07. *Compensation, Reimbursement and Indemnification*. The Company covenants and agrees to pay to the Purchase Contract Agent and the Custodian from time to time, and the Purchase Contract Agent and the Custodian shall be entitled to, such compensation as shall be agreed to in writing between the Company, the Purchase Contract Agent and the Custodian, and the Company covenants and agrees to pay or reimburse the Purchase Contract Agent, each predecessor Purchase Contract Agent, the Custodian and each predecessor Custodian upon its request for all reasonable expenses, disbursements and advances incurred or made by or on behalf of it in accordance with any of the provisions of this Agreement or the Custodial Agreement (including the reasonable compensation and the expenses and disbursements of its counsel and of all agents and other Persons not regularly in its employ) except any such expense, disbursement or advance as may arise from its gross negligence or bad faith. The Company also covenants to indemnify the Purchase Contract Agent, each predecessor Purchase Contract Agent, the Custodian and each predecessor Custodian for, and to hold each of them harmless against, any and all loss, liability, damage, claim (whether asserted

56

by the Company, any Holder or any other Person) or expense, including taxes (other than taxes based on the income of the Purchase Contract Agent or the Custodian), incurred without gross negligence or bad faith on its part, arising out of or in connection with the acceptance or administration of this Agreement or the Custodial Agreement, as the case may be, and their duties hereunder or thereunder, including the costs and expenses of defending itself against or investigating any claim or liability (regardless of whether such claim is brought by the Company or any third party). The provisions of this Section 9.07 shall survive the resignation or removal of the Purchase Contract Agent or the Custodian and the termination of this Agreement or the Custodial Agreement. If the Purchase Contract Agent or the Custodian incurs any expenses, or if the Purchase Contract Agent or the Custodian is entitled to any compensation for services rendered (including fees and expenses of its agent and counsel), in each case, in connection with the performance of its obligations under this Agreement or the Custodial Agreement, as the case may be, after the occurrence of a Bankruptcy Event, then any such expenses or compensation are intended to constitute expenses of administration under applicable Bankruptcy Laws. As security for the performance of the obligations of the Company under this Section the Purchase Contract Agent and the Custodian shall have a lien prior to the Holders upon all property and funds held or collected by the Purchase Contract Agent or the Custodian as such, except funds or property held in trust for payment to the Holders of particular Securities. The Company acknowledges and agrees that the Custodian is intended to be a third party beneficiary of this Agreement with respect to this Section 9.07 and shall be entitled to enforce the provisions of this Section 9.07 in all respects as if it had been named as an original party to this Agreement.

Section 9.08. *Corporate Purchase Contract Agent Required; Eligibility.* There shall at all times be a Purchase Contract Agent hereunder. The Purchase Contract Agent shall at all times be a corporation organized and doing business under the laws of the United States of America or of any state thereof or the District of Columbia having a combined capital and surplus of at least $25,000,000, and which is authorized under such laws to exercise corporate trust powers and is subject to supervision or examination by federal, state or District of Columbia authority, or a corporation or other Person permitted to act as trustee by the Commission. If such corporation publishes reports of condition at least annually, pursuant to law or to the requirements of the aforesaid supervising or examining authority, then for the purposes of this Section, the combined capital and surplus of such corporation shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published. In case at any time the Purchase Contract Agent shall cease to be eligible in accordance with the provisions of this Section, it shall resign immediately in the manner and with the effect specified in this Article.

Section 9.09. *Resignation and Removal; Appointment of Successor.* (a) No resignation or removal of the Purchase Contract Agent and no appointment of a successor Purchase Contract Agent pursuant to this Article shall become effective until the acceptance of appointment by the successor Purchase Contract Agent in accordance with the applicable requirements of Section 9.10.

57

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 786 of 1367

(b) The Purchase Contract Agent may resign at any time by giving written notice thereof to the Company 60 days prior to the effective date of such resignation. If the instrument of acceptance by a successor Purchase Contract Agent required by Section 9.10 shall not have been delivered to the Purchase Contract Agent within 30 days after the giving of such notice of resignation, the resigning Purchase Contract Agent may petition, at the expense of the Company, any court of competent jurisdiction for the appointment of a successor Purchase Contract Agent.

(c) The Purchase Contract Agent may be removed at any time the Holders of a majority in number of the Outstanding Purchase Contracts. If the instrument of acceptance by a successor Purchase Contract Agent required by Section 9.10 shall not have been delivered to the Purchase Contract Agent within 30 days after evidence of such removal is delivered to the Company and Purchase Contract Agent, the removed Purchase Contract Agent may petition, at the expense of the Company, any court of competent jurisdiction for the appointment of a successor Purchase Contract Agent.

(d) If at any time (i) the Purchase Contract Agent shall cease to be eligible under Section 9.08 and shall fail to resign after written request therefor by the Company or by any such Holder or (ii) the Purchase Contract Agent shall be adjudged bankrupt or insolvent or a receiver of the Purchase Contract Agent or of its property shall be appointed or any public officer shall take charge or control of the Purchase Contract Agent or of its property or affairs for the purpose of rehabilitation, conservation or liquidation, then, in any such case, (x) the Company by a Board Resolution may remove the Purchase Contract Agent, or (y) any Holder who has been a bona fide Holder of a Purchase Contract for at least six months may, on behalf of himself and all others similarly situated, petition any court of competent jurisdiction for the removal of the Purchase Contract Agent and the appointment of a successor Purchase Contract Agent.

(e) If the Purchase Contract Agent shall resign, be removed or become incapable of acting, or if a vacancy shall occur in the office of Purchase Contract Agent for any cause, the Company shall promptly appoint a successor Purchase Contract Agent and shall comply with the applicable requirements of Section 9.10. If no successor Purchase Contract Agent shall have been so appointed by the Company and accepted appointment in the manner required by Section 9.10, any Holder who has been a bona fide Holder of a Purchase Contract for at least six months, on behalf of itself and all others similarly situated, or the Purchase Contract Agent may petition at the expense of the Company, any court of competent jurisdiction for the appointment of a successor Purchase Contract Agent.

(f) The Company shall give, or shall cause such successor Purchase Contract Agent to give, notice of each resignation and each removal of the Purchase Contract Agent and each appointment of a successor Purchase Contract Agent to Holders. Each notice shall include the name of the successor Purchase Contract Agent and the address of its Corporate Trust Office.

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 787 of 1367

Section 9.10. *Acceptance of Appointment by Successor.* (a) In case of the appointment hereunder of a successor Purchase Contract Agent, every such successor Purchase Contract Agent so appointed shall execute, acknowledge and deliver to the Company and to the retiring Purchase Contract Agent an instrument accepting such appointment, and thereupon the resignation or removal of the retiring Purchase Contract Agent shall become effective and such successor Purchase Contract Agent, without any further act, deed or conveyance, shall become vested with all the rights, powers, agencies and duties of the retiring Purchase Contract Agent. At the request of the Company or the successor Purchase Contract Agent, such retiring Purchase Contract Agent shall, upon its receipt of payment or reimbursement of any amounts due to it hereunder, execute and deliver an instrument transferring to such successor Purchase Contract Agent all the rights, powers and trusts of the retiring Purchase Contract Agent and shall duly assign, transfer and deliver to such successor Purchase Contract Agent all property and money held by such retiring Purchase Contract Agent hereunder.

(b) Upon request of any such successor Purchase Contract Agent, the Company shall execute any and all instruments for more fully and certainly vesting in and confirming to such successor Purchase Contract Agent all such rights, powers and agencies referred to in paragraph (a) of this Section.

(c) No successor Purchase Contract Agent shall accept its appointment unless at the time of such acceptance such successor Purchase Contract Agent shall be qualified and eligible under this Article.

Section 9.11. *Merger; Conversion; Consolidation or Succession to Business.* Any corporation into which the Purchase Contract Agent may be merged or converted or with which it may be consolidated, or any corporation resulting from any merger, conversion or consolidation to which the Purchase Contract Agent shall be a party, or any corporation succeeding to all or substantially all the corporate trust business of the Purchase Contract Agent, shall be the successor of the Purchase Contract Agent hereunder; *provided* that such corporation shall be otherwise qualified and eligible under this Article, without the execution or filing of any paper or any further act on the part of any of the parties hereto. If any Equity-Linked Securities shall have been authenticated on behalf of the Holders by the Purchase Contract Agent then in office, but not delivered, any successor by merger, conversion or consolidation to such Purchase Contract Agent may adopt such Purchase Contract Agent's authentication and deliver the Equity-Linked Securities so authenticated with the same effect as if such successor Purchase Contract Agent had itself authenticated such Equity-Linked Securities.

Section 9.12. *Preservation of Information; Communications to Holders.* (a) The Purchase Contract Agent shall preserve, in as current a form as is reasonably practicable, the names and addresses of Holders as received by the Purchase Contract Agent in its capacity as Security Registrar.

(b) If three or more Holders (such three or more Holders, the "**Applicants**") apply in writing to the Purchase Contract Agent, and furnish to the Purchase Contract Agent reasonable proof that each such Applicant has owned a Unit or Separate Purchase Contract for a period of at least six months preceding the date of such application, and such application states that the Applicants desire to communicate with other Holders with respect to their rights under this Agreement or under the Units or Separate Purchase Contracts and is accompanied by a copy of the form of proxy or other communication

59

that such Applicants propose to transmit, then the Purchase Contract Agent shall transmit to all the Holders copies of the form of proxy or other communication that is specified in such request, with reasonable promptness after a tender to the Purchase Contract Agent of the materials to be transmitted and of payment, or provision for the payment, of the reasonable expenses of such transmission.

Section 9.13. *No Other Obligations of Purchase Contract Agent.* Except to the extent otherwise expressly provided in this Agreement, the Purchase Contract Agent does not assume any obligations, and the Purchase Contract Agent shall not be subject to any liability, under this Agreement or any Security evidencing a Unit or Purchase Contract in respect of the obligations of the Holder of any Unit or Purchase Contract thereunder. The Company agrees, and each Holder of a Security, by his or her acceptance thereof, shall be deemed to have agreed, that the Purchase Contract Agent's execution of the Securities on behalf of the Holders shall be solely as agent and attorney-in-fact for the Holders, and that the Purchase Contract Agent shall not have any obligation to perform such Purchase Contracts (whether held as components of Units or Separate Purchase Contracts) on behalf of the Holders, except to the extent expressly provided in Article 3 hereof.

Section 9.14. *Tax Compliance.* (a) The Purchase Contract Agent shall comply with all applicable certification, information reporting and withholding (including "backup" withholding) requirements imposed by applicable tax laws, regulations or administrative practice with respect to (i) any shares of Common Stock delivered upon settlement of the Purchase Contracts, any amounts paid in lieu of fractional shares of Common Stock upon settlement of the Purchase Contracts, and any other amounts included in the Purchase Contract Settlement Fund paid to Holders upon settlement of any Purchase Contracts or (ii) the issuance, delivery, holding, transfer or exercise of rights under the Purchase Contracts. Such compliance shall include, without limitation, the preparation and timely filing of required returns and the timely payment of all amounts required to be withheld to the appropriate taxing authority or its designated agent. Notwithstanding anything to the contrary, but without limiting the requirements imposed by applicable tax laws, the Purchase Contract Agent's obligations under this Section 9.14 shall extend only to form 1099 reporting and any applicable withholding unless and until the Purchase Contract Agent is otherwise notified by the Company pursuant to paragraph (b) below.

(b) The Purchase Contract Agent shall, in accordance with the terms hereof, comply with any written direction received from the Company with respect to the execution or certification of any required documentation and the application of such requirements to particular payments or Holders or in other particular circumstances, and may for purposes of this Agreement conclusively rely on any such direction in accordance with the provisions of Section 9.01(b)(ii).

(c) The Purchase Contract Agent shall maintain all appropriate records documenting compliance with such requirements, and shall make such records available, on written request, to the Company or its authorized representative within a reasonable period of time after receipt of such request. For the avoidance of doubt, any costs or expenses incurred by the Purchase Contract Agent in connection with complying with its obligations under this Section 9.14 shall be covered by Section 9.07.

60

Section 10.01. *Supplemental Agreements Without Consent of Holders.* Without the consent of any Holders, the Company and the Purchase Contract Agent at any time and from time to time, may enter into one or more agreements supplemental hereto, in form satisfactory to the Company and the Purchase Contract Agent, for the purpose of modifying in any manner the terms of the Purchase Contracts, or the provisions of this Agreement or the rights of the Holders in respect of the Purchase Contracts:

(i) to evidence the succession of another Person to the Company and the assumption by any such successor of the covenants and obligations of the Company under this Agreement and the Units and Separate Purchase Contracts, if any;

(ii) to add to the covenants for the benefit of Holders or to surrender any of the Company's rights or powers under this Agreement;

(iii) to evidence and provide for the acceptance of appointment of a successor Purchase Contract Agent;

(iv) upon the occurrence of a Reorganization Event, solely (i) to provide that each Purchase Contract will become a contract to purchase Exchange Property and (ii) to effect the related changes to the terms of the Purchase Contracts and the provisions of this Agreement, in each case, pursuant to Section 5.02;

(v) to conform the terms of the Purchase Contracts or the provisions of this Agreement to the "Description of the Purchase Contracts," "Description of the U.S. Treasury Strips Components" and "Description of the Equity Units" sections in the Prospectus Supplement;

(vi) to cure any ambiguity or manifest error, or to correct or supplement any provisions that may be inconsistent or defective; or

(vii) to make any other provisions with respect to such matters or questions, so long as such action does not adversely affect the interest of the Holders in any material respect.

Section 10.02. *Supplemental Agreements with Consent of Holders.* With the consent of the Holders of not less than a majority in number of the Outstanding Purchase Contracts, the Company, when authorized by a Board Resolution, and the Purchase Contract Agent may enter into an one or more agreements supplemental hereto for the purpose of modifying in any manner the terms of the Purchase Contracts, or the provisions of this Agreement or the rights of the Holders in respect of the Purchase Contracts; *provided*, *however*, that, except as contemplated herein, no such supplemental agreement shall, without the consent of each Holder of an Outstanding Purchase Contract affected thereby:

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 790 of 1367

(i) reduce the number of shares of Common Stock deliverable upon settlement of the Purchase Contracts (except to the extent expressly required pursuant to Section 5.01);

(ii) change the Purchase Contract Settlement Date, or adversely modify the Early Settlement Right or the Fundamental Change Early Settlement Right;

(iii) reduce the above-stated percentage of Outstanding Purchase Contracts the consent of the Holders of which is required for the modification or amendment of the provisions of the Purchase Contracts or the Purchase Contract Agreement.

It shall not be necessary for any consent of Holders under this Section to approve the particular form of any proposed supplemental agreement, but it shall be sufficient if such consent shall approve the substance thereof.

Section 10.03. *Execution of Supplemental Agreements*. In executing, or accepting the additional agencies created by, any supplemental agreement permitted by this Article or the modifications thereby of the agencies created by this Agreement, the Purchase Contract Agent shall be provided, and (subject to Section 9.01) shall be fully protected in relying upon, an Officer's Certificate and an Opinion of Counsel stating that the execution of such supplemental agreement is authorized or permitted by this Agreement, and that any and all conditions precedent to the execution and delivery of such supplemental agreement have been satisfied. The Purchase Contract Agent may, but shall not be obligated to, enter into any such supplemental agreement that affects the Purchase Contract Agent's own rights, duties or immunities under this Agreement or otherwise.

Section 10.04. *Effect of Supplemental Agreements*. Upon the execution of any supplemental agreement under this Article, this Agreement and the Equity-Linked Securities shall be modified in accordance therewith, and such supplemental agreement shall form a part of this Agreement and the Equity-Linked Securities for all purposes; and every Holder of Securities theretofore or thereafter authenticated on behalf of the Holders and delivered hereunder, shall be bound thereby.

Section 10.05. *Reference to Supplemental Agreements*. Securities authenticated on behalf of the Holders and delivered after the execution of any supplemental agreement pursuant to this Article may, and shall if required by the Purchase Contract Agent, bear a notation in form approved by the Purchase Contract Agent as to any matter provided for in such supplemental agreement. If the Company shall so determine, new Securities so modified as to conform, in the opinion of the Purchase Contract Agent and the Company, to any such supplemental agreement may be prepared and executed by the Company and authenticated on behalf of the Holders and delivered by the Purchase Contract Agent in exchange for outstanding Securities.

62

Section 10.06. *Notice of Supplemental Agreements.* After any supplemental agreement under this Article becomes effective, the Company shall give to the Holders a notice briefly describing such supplemental agreement; *provided*, *however*, that the failure to give such notice to all Holders, or any defect therein, shall not impair or affect the validity of such supplemental agreement.

## ARTICLE 11
CONSOLIDATION, MERGER, CONVEYANCE, TRANSFER OR LEASE

Section 11.01. *Covenant Not to Consolidate, Merge, Convey, Transfer or Lease Property Except Under Certain Conditions.* The Company covenants that it will not merge with and into, consolidate with any other Person or sell, assign, transfer, lease or convey all or substantially all of its assets to any Person, unless:

(i) the successor entity to such consolidation or merger, or the entity which acquires all or substantially all of the Company's assets, shall expressly assume all of the Company's obligations under the Purchase Contracts and this Agreement via a supplement to this Agreement;

(ii) the successor entity to such consolidation or merger, or the entity which acquires all or substantially all of the Company's assets, shall be a corporation organized and existing under the laws of the United States or any state thereof or the District of Columbia; and

(iii) immediately after the merger, consolidation, sale, assignment, transfer, lease or conveyance, no default has occurred and is continuing under the Purchase Contracts or this Agreement.

Section 11.02. *Rights and Duties of Successor Entity.* In case of any such merger, consolidation, sale, assignment, transfer or conveyance (but not any such lease) and upon any such assumption by a successor entity in accordance with Section 11.01, such successor entity shall succeed to and be substituted for the Company with the same effect as if it had been named herein as the Company. Such successor entity thereupon may cause to be signed, and may issue either in its own name or in the name of the Company, any or all of the Securities evidencing Units or Purchase Contracts issuable hereunder which theretofor shall not have been signed by the Company and delivered to the Purchase Contract Agent; and, upon the order of such successor entity, instead of the Company, and subject to all the terms, conditions and limitations in this Agreement prescribed, the Purchase Contract Agent shall authenticate on behalf of the Holders and deliver any Securities that previously shall have been signed and delivered by the officers of the Company to the Purchase Contract Agent for authentication, and any Security evidencing Units or Purchase Contracts that such successor corporation thereafter shall cause to be signed and delivered to the Purchase Contract Agent for that purpose. All the Securities issued shall in all respects have the same legal rank and benefit under this Agreement as the Securities theretofor or thereafter issued in accordance with the terms of this Agreement as though all of such Securities had been issued at the date of the execution hereof.

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 792 of 1367

In the event of any such merger, consolidation, sale, assignment, transfer, lease or conveyance, such change in phraseology and form (but not in substance) may be made in the Securities evidencing Units or Purchase Contracts thereafter to be issued as may be appropriate.

Section 11.03. *Officer's Certificate and Opinion of Counsel Given to Purchase Contract Agent*. The Purchase Contract Agent, subject to Section 9.01 and Section 9.03, shall receive an Officer's Certificate and an Opinion of Counsel as conclusive evidence that any such merger, consolidation, sale, assignment, transfer, lease or conveyance, and any such assumption, complies with the provisions of this Article and that all conditions precedent to the consummation of any such merger, consolidation, sale, assignment, transfer, lease or conveyance have been met.

<div align="center">

ARTICLE 12

THE TREASURY STRIPS

</div>

Section 12.01. *Custodial Arrangement*. Concurrently with the initial closing of the offering of the Units under the Underwriting Agreement, the Purchase Contract Agent shall have entered into the Custodial Agreement with the Custodian to which the Treasury Strips acquired by the Holders, which are described in Schedule 1 of the Custodial Agreement, are to be delivered. On the date of execution and delivery of this Agreement, Goldman Sachs & Co. LLC (on behalf of itself and the other underwriters named in the Underwriting Agreement) shall have acquired the Treasury Strips, shall have sold the Treasury Strips to the Holders, and shall have delivered the Treasury Strips to the Custodian in accordance with the Custodial Agreement. In connection with any exercise by the Underwriters of their option to purchase additional Purchase Contracts pursuant to Section 2(b) of the Underwriting Agreement, Goldman Sachs & Co. LLC (on behalf of itself and the other underwriters named in the Underwriting Agreement) will acquire additional zero-coupon United States Treasury securities with the maturity dates specified on Schedule 1 of the Custodial Agreement and in the face amounts necessary to create a number of additional Units corresponding to the number of Purchase Contracts with respect to which such option has been exercised, and will sell such zero-coupon United States Treasury securities to the Holders, and will deliver such zero-coupon United States Treasury securities to the Custodian in accordance with the Custodial Agreement. For greater certainty, by agreeing to subscribe for a Unit, each Holder shall be considered to have agreed to purchase Treasury Strips from the underwriters named in the Underwriting Agreement. The Custodian or its nominee shall be the holder of security entitlements with regard to such Treasury Strips on the records of the Federal Reserve Bank of New York for and on behalf of the Holders of Units. Each Unit shall evidence in part the applicable Holder's ownership of that Holder's Treasury Strips Component.

<div align="center">64</div>

Section 12.02. *Instruction Regarding Payment of Amounts Received in Respect of Treasury Strips.* (a) On or prior to each Payment Date, the Purchase Contract Agent shall inform the Custodian as to the identity of the registered Holders of Units on the Security Register at the close of business on the Payment Record Date with respect to such Payment Date and the Purchase Contract Agent shall instruct the Custodian to deliver all amounts its receives on the Treasury Strips maturing on such Payment Date to such Holders.

(b) In any case where any Payment Date shall not be a Business Day, then (notwithstanding any other provision of this Agreement) the Purchase Contract Agent shall instruct the Custodian to make payments of amounts received by the Custodian with respect to the Treasury Strips on the next succeeding Business Day; *provided,* that no interest shall accrue or be payable for the period from and after any such Payment Date.

Section 12.03. *Delivery of Treasury Strips Upon Occurrence of a Bankruptcy Event.* If the Purchase Contract Settlement Date is accelerated pursuant to Section 4.08 of this Agreement, the Purchase Contract Agent shall direct the Custodian to deliver the Treasury Strips to the Purchase Contract Agent and, in the case of any Definitive Security, upon presentation and surrender of such Definitive Security evidencing the related Units at the Corporate Trust Office of the Purchase Contract Agent. Following such acceleration and if applicable, such delivery, the Purchase Contract Agent shall direct the Custodian to sell (or, at the expense of the Holders, retain the services of a broker dealer that will sell) the Treasury Strips, and the Purchase Contract Agent shall direct the Custodian to distribute the net cash proceeds of such sale (less any expenses incurred by the Custodian in connection with such sale) on a pro rata basis to Holders of Units (or in accordance with the procedures of the Depositary in the case of Global Units). If applicable, until any Definitive Security is presented and surrendered or the Holder provides satisfactory evidence that such Definitive Security has been destroyed, lost or stolen, together with any indemnity that may be required by the Purchase Contract Agent, the Treasury Strips will be held by the Custodian for the account of the Holder. The Purchase Contract Agent shall request from each registered Holder of Units by written request mailed to such Holder's address as it appears in the Security Register, delivery instructions in respect of all Treasury Strips Components owned by such Holder and evidenced by Units held by such Holder. The Purchase Contract Agent shall provide such instructions to the Custodian. The Custodian will have no obligation to invest or to pay interest on any amounts held by the Custodian pending delivery.

Section 12.04. *Delivery of Treasury Strips Upon an Early Settlement or Early Settlement in Connection with a Fundamental Change.* Upon the election of an Early Settlement Right or Fundamental Change Early Settlement Right by any Holder of any Purchase Contracts evidenced by Units in accordance with Section 4.06 or Section 4.07, as the case may be, the Purchase Contract Agent shall instruct the Custodian to deliver the Treasury Strips evidenced by such Units to such Holder in accordance with the instructions provided by such Holder on the applicable form of Election for Early Settlement or Early Settlement Upon a Fundamental Change, as the case may be.

65

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 794 of 1367

# ARTICLE 13
## COVENANTS OF THE COMPANY

Section 13.01. *Performance Under Purchase Contracts*. The Company covenants and agrees for the benefit of the Holders from time to time of the Units and Purchase Contracts, as the case may be, that it will duly and punctually perform its obligations under the Units and Purchase Contracts, as the case may be, in accordance with the terms of the Units and Purchase Contracts and this Agreement.

Section 13.02. *Maintenance of Office or Agency*. The Company will maintain in the continental United States an office or agency where Securities may be presented or surrendered for acquisition of shares of Common Stock upon settlement of the Purchase Contracts on any Settlement Date, and where notices and demands to or upon the Company in respect of the Purchase Contracts and this Agreement may be served. The Company will give prompt written notice to the Purchase Contract Agent of the location, and any change in the location, of such office or agency. If at any time the Company shall fail to maintain any such required office or agency or shall fail to furnish the Purchase Contract Agent with the address thereof, such presentations, surrenders, notices and demands may be made or served at the Corporate Trust Office, and the Company hereby appoints the Purchase Contract Agent as its agent to receive all such presentations, surrenders, notices and demands.

The Company may also from time to time designate one or more other offices or agencies where Securities may be presented or surrendered for any or all such purposes and may from time to time rescind such designations; *provided, however*, that no such designation or rescission shall in any manner relieve the Company of its obligation to maintain an office or agency in the continental United States for such purposes. The Company will give prompt written notice to the Purchase Contract Agent of any such designation or rescission and of any change in the location of any such other office or agency. The Company hereby designates as the place of payment for the Purchase Contracts the Corporate Trust Office and appoints the Purchase Contract Agent at its Corporate Trust Office as paying agent.

Section 13.03. *Statements of Officers of the Company as to Default; Notice of Default*. The Company will deliver to the Purchase Contract Agent, within 120 days after the end of each fiscal year of the Company (which fiscal year ends, as of the Issue Date, on December 31, 2020) ending after the date hereof, an Officer's Certificate, stating whether or not to the knowledge of the signers thereof the Company is in default in the performance and observance of any of the terms, provisions and conditions hereof, and if the Company shall be in default, specifying all such defaults and the nature and status thereof of which they may have knowledge and what action the Company is taking or proposes to take with respect thereto.

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 795 of 1367

Section 13.04. *Existence.* The Company shall do or cause to be done all things necessary to preserve and keep in full force and effect its existence; *provided* that this Section 13.04 shall not prohibit any transaction otherwise permitted by Article 11.

Section 13.05. *Company to Reserve Common Stock.* The Company shall at all times reserve and keep available out of its authorized but unissued Common Stock, solely for issuance upon settlement of the Purchase Contracts, the number of shares of Common Stock that would be issuable upon the settlement of all Outstanding Purchase Contracts (whether or not included in a Unit), assuming settlement at the Maximum Settlement Rate.

Section 13.06. *Covenants as to Common Stock.* The Company covenants that all shares of Common Stock issuable upon settlement of any Outstanding Purchase Contract will, upon issuance, be duly authorized, validly issued, fully paid and nonassessable, free from all taxes, liens and charges and not subject to any preemptive rights.

The Company further covenants that, if at any time the Common Stock shall be listed on the NYSE or any other national securities exchange, the Company will, if permitted by the rules of such exchange, list and keep listed, so long as the Common Stock shall be so listed on such exchange, all shares of Common Stock issuable upon settlement of the Purchase Contracts at the Maximum Settlement Rate; *provided*, *however*, that, if the rules of such exchange system permit the Company to defer the listing of such Common Stock until the first delivery of shares of Common Stock upon settlement of Purchase Contracts in accordance with the provisions of this Agreement, the Company covenants to list such Common Stock issuable upon settlement of the Purchase Contracts in accordance with the requirements of such exchange at such time.

Section 13.07. *Tax Treatment.* The Company agrees, and by purchasing a Unit each Beneficial Holder agrees, for United States federal income tax purposes, to (a) treat a Unit as an investment unit composed of two separate instruments, in accordance with its form and (b) in the case of each Beneficial Holder acquiring the Units at original issuance, allocate the Stated Amount of each Unit between the Purchase Contract and Treasury Strip Component so that such Beneficial Holder's initial tax basis in each Purchase Contract will be $82.8574 and each such Beneficial Holder's initial tax basis in each Treasury Strip Component will be $ 17.1402 (as reflected in the cross-receipt for the Units' initial issuance).

67

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

PG&E CORPORATION

By: /s/ MARI BECKER
     Name: Mari Becker
     Title: Senior Director and Treasurer

THE BANK OF NEW YORK MELLON TRUST
   COMPANY, N.A., as Purchase Contract Agent

By: /s/ LAWRENCE M. KUSCH
     Name: Lawrence M. Kusch
     Title: Vice President

THE BANK OF NEW YORK MELLON TRUST
   COMPANY, N.A., as Attorney-in- Fact of the Holders
   from time to time as provided under the Purchase Contract
   Agreement

By: /s/ LAWRENCE M. KUSCH
     Name: Lawrence M. Kusch
     Title: Vice President

[FORM OF FACE OF UNIT]

[THIS SECURITY IS A GLOBAL UNIT WITHIN THE MEANING OF THE PURCHASE CONTRACT AGREEMENT HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF A DEPOSITARY OR A NOMINEE OF A DEPOSITARY OR A SUCCESSOR DEPOSITARY. UNLESS AND UNTIL IT IS EXCHANGED IN WHOLE OR IN PART FOR SECURITIES IN CERTIFICATED FORM, THIS SECURITY MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION (THE "**DEPOSITARY**") TO THE NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY OR BY THE DEPOSITARY OR ANY SUCH NOMINEE TO A SUCCESSOR DEPOSITARY OR A NOMINEE OF SUCH SUCCESSOR DEPOSITARY.

UNLESS THIS SECURITY IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITARY TO THE COMPANY OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY SECURITY ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITARY (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITARY), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.]*

---

\*    Include if a Global Unit.

CUSIP No. 69331C 140
ISIN No. US69331C1403
No. ___                                 [Initial]* Number of Units _____

This Unit certifies that [CEDE & CO., as nominee of The Depository Trust Company]*[         ]** (the "**Holder**"), or registered assigns, is the registered owner of the number of Units set forth above[, which number may from time to time be reduced or increased, as set forth on Schedule A, as appropriate, in accordance with the terms of the Purchase Contract Agreement (as defined below), but which number, taken together with the number of all other outstanding Units, shall not exceed [16,000,000]][14,545,455] (as increased by a number of Units equal to the number of any additional Units purchased by the Underwriters pursuant to the exercise of their option to purchase additional Units as set forth in the Underwriting Agreement)]4 Units at any time]*.

Each Unit consists of (i) a Purchase Contract issued by the Company, and (ii) a Treasury Strip Component. Each Unit evidenced hereby is governed by a Purchase Contract Agreement, dated as of July 1, 2020 (as may be supplemented from time to time, the "**Purchase Contract Agreement**"), between the Company and The Bank of New York Mellon Trust Company, N.A., as Purchase Contract Agent (including its successors hereunder, the "**Purchase Contract Agent**") and as attorney-in-fact for the Holders of Purchase Contracts from time to time.

Reference is hereby made to the Purchase Contract Agreement and the Custodial Agreement and, in each case supplemental agreements thereto, for a description of the respective rights, limitations of rights, obligations, duties and immunities thereunder of the Purchase Contract Agent, the Company and the Holders and of the terms upon which the Units are, and are to be, executed and delivered. Capitalized terms that are used but not defined herein have those meanings ascribed to them in the Purchase Contract Agreement.

Any amounts received by the Custodian from the U.S. government on the Treasury Strips on each February 15, May 15, August 15 and November 15, commencing August 15, 2020 (or in each case if payments on the Treasury Strips are not received on such date, on the date when such amounts are received by the Custodian), shall be forwarded by the Custodian by wire transfer in same day funds no later than 5:00 p.m, New York City time, on the Business Day immediately following such February 15, May 15, August 15 and November 15 of each year, with such payments commencing August 17, 2020 and ending on August 16, 2023 (each a "**Payment Date**") to the Person in whose name this Unit is registered at the close of business on the Payment Record Date with respect to such Payment Date.

---

\*      Include only if a Global Unit.
\*\*    Include only if not a Global Unit.
4      Delete if greenshoe is exercised in full before initial closing and will be settled on closing date for initial issuance.

Upon the conditions and under the circumstances set forth in the Purchase Contract Agreement, Holders of Units shall have the right to separate 48,000 Units (or any integral multiples thereof) into their component parts, and Holders of 48,000 Separate Purchase Contracts (or any integral multiples thereof) and 48,000 Separate Treasury Strips (or any integral multiples thereof) shall have the right to re-create Units.

The Company agrees, and by purchasing a Unit each Beneficial Holder agrees, for United States federal income tax purposes, to (a) treat a Unit as an investment unit composed of two separate instruments, in accordance with its form and (b) in the case of each Beneficial Holder acquiring the Units at original issuance, allocate the Stated Amount of each Unit between the Purchase Contract and Treasury Strip Component so that such Beneficial Holder's initial tax basis in each Purchase Contract will be $82.8574 and each such Beneficial Holder's initial tax basis in each Treasury Strip Component will be $17.1402.

Each Beneficial Holder of a Unit, by its acceptance thereof, represents and warrants that neither it nor, to such Beneficial Holder's knowledge, any other Person, would become a "Substantial Shareholder" (as defined in the Amended Articles) as a result of such Beneficial Holder's acquisition of Purchase Contracts (treating such Beneficial Holder and any such other Person as actually holding, solely for purposes of this representation, the number of shares of Common Stock that would be received upon settlement at the Maximum Settlement Rate of all Purchase Contracts acquired or beneficially owned by such Beneficial Holder or any such other Person, as applicable, but treating all other Purchase Contracts as still unsettled), and, for the avoidance of doubt, taking into account such Beneficial Holder's and any such other Person's (i) current ownership of the Common Stock and any of the Utility's preferred stock and (ii) other acquisitions of the Common Stock and any of the Utility's preferred stock (if any) concurrent with or in connection with such Beneficial Holder's acquisition of Purchase Contracts.

**The Units shall be governed by, and construed in accordance with, the laws of the State of New York.**

Capitalized terms used herein and not defined have the meanings given to such terms in the Purchase Contract Agreement.

In the event of any inconsistency between the provisions of this Unit and the provisions of the Purchase Contract Agreement, the Purchase Contract Agreement shall prevail.

[SIGNATURES ON THE FOLLOWING PAGE]

A-3

IN WITNESS WHEREOF, the Company has caused this instrument to be duly executed.

PG&E CORPORATION

By: _____
     Name:
     Title:

Dated:_____

A-4

HOLDER SPECIFIED ABOVE (as to obligations of such Holder under the Purchase Contracts)

By: THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A., not individually but solely as Attorney-in-Fact of such Holder

By: _____
    Authorized Signatory

A-5

UNIT CERTIFICATE OF AUTHENTICATION
OF PURCHASE CONTRACT AGENT

This is one of the Units referred to in the within mentioned Purchase Contract Agreement.

Dated: _____

THE BANK OF NEW YORK MELLON,
TRUST COMPANY, N.A as Purchase
Contract Agent

By: _____
      Authorized Signatory

A-6

[FORM OF REVERSE OF UNIT]

[Intentionally Blank]

A-7

**SCHEDULE A\***

[SCHEDULE OF INCREASES OR DECREASES IN GLOBAL UNIT]

The initial number of Units evidenced by this Global Unit is [_____]. The following increases or decreases in this Global Unit have been made:

| Date | Amount of increase in number of Units evidenced by the Global Unit | Amount of decrease in number of Units evidenced by the Global Unit | Number of Units evidenced by the Global Unit following such decrease or increase | Signature of authorized signatory of Purchase Contract Agent |
|------|------|------|------|------|

---

\*     Include only if a Global Unit.

A-8

[FORM OF SEPARATION NOTICE]

THE BANK OF NEW YORK MELLON TRUST
COMPANY, N.A.
400 South Hope Street, Suite 500
Los Angeles, CA 90073
Attention: Corporate Trust Administration

Re: Separation of [Global]* Units

      The undersigned [Beneficial Holder]* hereby notifies you that it wishes to separate _____ Units [as to which it holds a Book-Entry Interest]* (the "**Relevant Units**"), which is equal to the minimum number of Units (or an integral multiple thereof) required for separation of Units in accordance with the Purchase Contract Agreement (the "**Purchase Contract Agreement**") dated July 1, 2020 between the Company and The Bank of New York Mellon Trust Company, N.A., as Purchase Contract Agent and as attorney-in-fact for the Holders of Purchase Contracts from time to time, into (i) a number of Purchase Contracts equal to the number of Relevant Units in accordance with the Purchase Contract Agreement and (ii) _____ Treasury Strips underlying the Relevant Units in accordance with the Purchase Contract Agreement. Holders of Units shall have the right to separate 48,000 Units (or any integral multiples thereof) into their component parts, and Holders of 48,000 Separate Purchase Contracts (or any integral multiples thereof) and 48,000 Separate Treasury Strips (or any integral multiples thereof) shall have the right to re-create Units.

      Terms used and not defined herein have the meaning assigned to such terms in the Purchase Contract Agreement.

      The undersigned [includes herewith]** [Beneficial Holder has instructed the undersigned Depository Participant to transfer to you its Book-Entry Interests in]* the number of Units specified in the immediately succeeding paragraph. The undersigned [includes herewith]** [Beneficial Holder has furnished the undersigned Depository Participant with]* the appropriate endorsements and documents and paid all applicable transfer or similar taxes, if any, to the extent required by the Purchase Contract Agreement.

      Please [deliver to the undersigned's address specified below]** [transfer to the account of the undersigned Beneficial Holder with the undersigned Depositary Participant the beneficial interests in]* the number of Separate Purchase Contracts represented by the number of Units specified above. Further, the undersigned [Beneficial Holder]* directs the Purchase Contract Agent to instruct the Custodian to deliver the Holder's withdrawn Treasury Strips in accordance with the delivery instructions set forth below.

---

\*     Include only if a Global Unit.
\*     Include only if not a Global Unit.

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 806 of 1367

Number of Units evidenced hereby as to which withdrawal of the related Treasury Strips is being elected: _____

REGISTERED HOLDER

Please print name and address of Registered Holder:
Name:_____
Address:_____
Social Security or other Taxpayer Identification Number, if any:_____

If Treasury Strips are to be delivered to a Person other than the Holder, please print such Person's name and address

Name:_____
Address:_____
Social Security or other Taxpayer Identification Number, if any:_____

[Delivery Instructions for Units for which withdrawal of the Treasury Strips is not effected.

_____
_____
_____

Delivery Instructions for number of Separate Purchase Contracts represented by the number of Units specified above.

_____
_____
_____

Delivery Instructions for Treasury Strips represented by the number of Units specified above.

_____
_____
_____]**

[SIGNATURES ON THE FOLLOWING PAGE]

*       Include only if a Global Unit.
**      Include only if not a Global Unit.

A-10

IN WITNESS WHEREOF, the [undersigned has caused this instrument to be duly executed]* [Depository Participant has caused this instrument to be duly executed on behalf of itself and the undersigned Beneficial Holder]**.

Dated: _____

[NAME OF BENEFICIAL HOLDER]

By: _____
    Name:
    Title:
    Address:

[NAME OF DEPOSITORY PARTICIPANT]*

By: _____
    Name:
    Address:

Attest By:
_____

\*     Include only if not a Global Unit
\*\*    Include only if a Global Unit

A-11

[FORM OF RECREATION NOTICE]

THE BANK OF NEW YORK MELLON
TRUST COMPANY, N.A.
400 South Hope Street, Suite 500
Los Angeles, CA 90073
Attention: Corporate Trust Administration

Re: Recreation of [Global]* Units

The undersigned [Beneficial Holder]* hereby notifies you that it wishes to recreate _____ Units [as to which it holds a Book-Entry Interest]* (the "**New Units**"), which is equal to the minimum number of Units (or an integral multiple thereof) required for recreation of Units in accordance with the Purchase Contract Agreement (the "**Purchase Contract Agreement**") dated as of July 1, 2020 between the Company and The Bank of New York Mellon Trust Company, N.A., as Purchase Contract Agent and as attorney-in-fact for the Holders of Purchase Contracts from time to time, from _____ Separate Treasury Strips and _____ Separate Purchase Contracts in accordance with the Purchase Contract Agreement. Terms used and not defined herein have the meaning assigned to such terms in the Purchase Contract Agreement.

The undersigned [Beneficial Holder]* hereby notifies you that is delivering _____ Separate Treasury Strips to The Bank of New York Mellon Trust Company, N.A., as Custodian and _____ Separate Purchase Contracts to The Bank of New York Mellon Trust Company, N.A., as Purchase Contract Agent on [insert date], and hereby requests that the Purchase Contract Agent instruct the Custodian to receive such Treasury Strip Components on such date.

The undersigned [includes herewith]** [Beneficial Holder has instructed the undersigned Depository Participant to transfer to you its Book-Entry Interests in]* the applicable number of Separate Purchase Contracts and the applicable number of Separate Treasury Strips (to be delivered to Custodian) sufficient for the recreation of the number of Units specified above. The undersigned [includes herewith]** [Beneficial Holder has furnished the undersigned Depository Participant with]* the appropriate endorsements and documents and paid all applicable transfer or similar taxes, if any, to the extent required by the Purchase Contract Agreement.

Please [deliver to the undersigned's address specified below]** [transfer to the account of the undersigned Beneficial Holder with the undersigned Depositary Participant the beneficial interests in]* the number of Units specified above.

_____

\*        Include only if a Global Unit.
\*\*      Include only if not a Global Unit.

A-12

Please print name and address of Holder:

Name:_____

Social Security or other Taxpayer Identification Number, if any:

Address:_____

[SIGNATURES ON THE FOLLOWING PAGE]

A-13

IN WITNESS WHEREOF, the [undersigned has caused this instrument to be duly executed]* [Depository Participant has caused this instrument to be duly executed on behalf of itself and the undersigned Beneficial Holder]**.

Dated: _____

[NAME OF BENEFICIAL HOLDER]

By: _____
    Name:
    Title:
    Address:

[NAME OF DEPOSITORY PARTICIPANT]*

By: _____
    Name:
    Address:

Attest By: _____

\*     Include only if not a Global Unit.
\*\*    Include only if a Global Unit.

A-14

PG&E CORPORATION

PURCHASE CONTRACTS

No. ___                                                    Initial Number of Purchase Contracts: _____

This Purchase Contract certifies that, _____, or its registered assigns (the "**Holder**") is the registered owner of the number of Purchase Contracts set forth above, which number may from time to time be reduced or increased as set forth on Schedule A hereto, as appropriate, in accordance with the terms of the Purchase Contract Agreement (as defined below), but which number of Purchase Contracts, taken together with the number of all other Outstanding Purchase Contracts, shall not exceed 14,545,455 (as increased by a number of Purchase Contracts equal to the number of any additional Units purchased by the Underwriters pursuant to the exercise of their option to purchase additional Units as set forth in the Underwriting Agreement) Purchase Contracts at any time.

Each Purchase Contract consists of the rights of the Holder under such Purchase Contract with the Company. All capitalized terms used herein which are defined in the Purchase Contract Agreement (as defined on the reverse hereof) have the meaning set forth therein.

Each Purchase Contract evidenced hereby obligates the Company to deliver to the Holder of this Purchase Contract on the Purchase Contract Settlement Date a number of shares of Common Stock, no par value ("**Common Stock**"), of the Company equal to the Settlement Rate, unless such Purchase Contract has settled prior to the Purchase Contract Settlement Date, all as provided in the Purchase Contract Agreement and more fully described on the reverse hereof.

Reference is hereby made to the further provisions set forth on the reverse hereof, which further provisions shall for all purposes have the same effect as if set forth at this place.

[SIGNATURES ON THE FOLLOWING PAGE]

A-15

IN WITNESS WHEREOF, the Company has caused this instrument to be duly executed.

PG&E CORPORATION

By: _____

    Name:

    Title:

Dated: _____

A-16

REGISTERED HOLDER(S) (as to obligations of such holder(s) under the Purchase Contracts evidenced hereby)

By: THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A., not individually but solely as Attorney-in-Fact of such holder(s)

By: _____

    Name:

    Title:

A-17

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 814 of 1367

PURCHASE CONTRACT CERTIFICATE OF AUTHENTICATION OF
PURCHASE CONTRACT AGENT

This is one of the Purchase Contracts referred to in the within-mentioned Purchase Contract Agreement.

THE BANK OF NEW YORK MELLON
TRUST COMPANY, N.A., as Purchase
Contract Agent

By: _____
Authorized Signatory

Dated:

A-1

Each Purchase Contract evidenced hereby is governed by a Purchase Contract Agreement, dated as of July 1, 2020 (as may be supplemented from time to time, the "**Purchase Contract Agreement**"), between PG&E Corporation, a California corporation (the "**Company**") and The Bank of New York Mellon Trust Company, N.A., as Purchase Contract Agent (including its successors hereunder, the "**Purchase Contract Agent**") and as attorney-in-fact for the Holders of Purchase Contracts from time to time. Reference is hereby made to the Purchase Contract Agreement and supplemental agreements thereto for a description of the respective rights, limitations of rights, obligations, duties and immunities thereunder of the Purchase Contract Agent, the Company and the Holders and of the terms upon which the Purchase Contracts are, and are to be, executed and delivered.

Each Purchase Contract evidenced hereby obligates the Company to deliver to the Holder of this Purchase Contract, on the Purchase Contract Settlement Date, a number of shares of Common Stock equal to the Settlement Rate, unless such Purchase Contract has settled prior to the Purchase Contract Settlement Date, in either case, pursuant to the terms of the Purchase Contract Agreement.

No fractional shares of Common Stock will be issued upon settlement of Purchase Contracts, as provided in Section 4.11 of the Purchase Contract Agreement.

The Purchase Contracts are issuable only in registered form and only in denominations of a single Purchase Contract and any integral multiple thereof. The transfer of any Purchase Contract will be registered and Purchase Contracts may be exchanged as provided in the Purchase Contract Agreement.

The Purchase Contracts are initially being issued as part of the Equity Units (the "**Units**") issued by the Company pursuant to the Purchase Contract Agreement. Holders of the Units have the right to separate such Units into their constituent parts, consisting of Separate Treasury Strips and Separate Purchase Contracts, during the times, and under the circumstances, described in the Purchase Contract Agreement. Following separation of any Unit into its constituent parts, the Separate Purchase Contracts are transferable independently from the Separate Treasury Strips. In addition, Separate Purchase Contracts can be recombined with Separate Treasury Strips to recreate Units, as provided for in the Purchase Contract Agreement.

The Holder of this Purchase Contract, by its acceptance hereof, authorizes the Purchase Contract Agent to enter into and perform the Purchase Contract Agreement on its behalf as its attorney-in-fact and agrees to be bound by the terms and provisions thereof.

A-2

The Beneficial Holder of this Purchase Contract, by its acceptance thereof, represents and warrants that neither it nor, to such Beneficial Holder's knowledge, any other Person, would become a "Substantial Shareholder" (as defined in the Amended Articles) as a result of such Beneficial Holder's acquisition of Purchase Contracts (treating such Beneficial Holder and any such other Person as actually holding, solely for purposes of this representation, the number of shares of Common Stock that would be received upon settlement at the Maximum Settlement Rate of all Purchase Contracts acquired or beneficially owned by such Beneficial Holder or any such other Person, as applicable, but treating all other Purchase Contracts as still unsettled), and, for the avoidance of doubt, taking into account such Beneficial Holder's and any such other Person's (i) current ownership of the Common Stock and any of the Utility's preferred stock and (ii) other acquisitions of the Common Stock and any of the Utility's preferred stock (if any) concurrent with or in connection with such Beneficial Holder's acquisition of Purchase Contracts.

Subject to certain exceptions set forth in the Purchase Contract Agreement, the provisions of the Purchase Contract Agreement may be amended with the consent of the Holders of a majority of the Purchase Contracts.

**The Purchase Contracts shall be governed by, and construed in accordance with, the laws of the State of New York.**

The Company, the Purchase Contract Agent, and any agent of the Company or the Purchase Contract Agent, may treat the Person in whose name this Purchase Contract is registered as the owner of the Purchase Contracts, evidenced hereby, for the purpose of performance of the Purchase Contracts evidenced by such Purchase Contracts and for all other purposes whatsoever, and neither the Company nor the Purchase Contract Agent, nor any agent of the Company or the Purchase Contract Agent, shall be affected by notice to the contrary.

The Purchase Contracts shall not entitle the Holder to any of the rights of a holder of the shares of Common Stock or other Exchange Property, except as provided by the Purchase Contract Agreement.

Each Purchase Contract (whether or not included in a Unit) is a security governed by Article 8 of the Uniform Commercial Code as in effect in the State of New York on the date hereof.

Unless a conformed copy of the Purchase Contract Agreement has been filed on the EDGAR system of the U.S. Securities and Exchange Commission, a copy of the Purchase Contract Agreement will be available for inspection at the offices of the Company.

In the event of any inconsistency between the provisions of this Purchase Contract and the provisions of the Purchase Contract Agreement, the Purchase Contract Agreement shall prevail.

A-3

## ABBREVIATIONS

The following abbreviations, when used in the inscription on the face of this instrument, shall be construed as though they were written out in full according to applicable laws or regulations:

TEN COM:                          as tenants in common

UNIF GIFT MIN ACT:     _____    Custodian _____

                                      (cust)                                          (minor)

                                      Under Uniform Gifts to Minors

                                      Act of _____

                                      _____

TENANT:                          as tenants by the entireties

JT TEN:                            as joint tenants with rights of survivorship and not as tenants in common

Additional abbreviations may also be used though not in the above list.

FOR VALUE RECEIVED, the undersigned hereby sell(s), assign(s) and transfer(s) unto (Please insert Social Security or Taxpayer I.D. or other Identifying Number of Assignee) (Please Print or Type Name and Address Including Postal Zip Code of Assignee) the within Purchase Contracts and all rights thereunder, hereby irrevocably constituting and appointing attorney _____, to transfer said Purchase Contracts on the books of the Company with full power of substitution in the premises.

DATED: _____                                          Signature _____

                                                                Notice : The signature to this assignment must correspond with
                                                                the name as it appears upon the face of the within Purchase
                                                                Contracts in every particular, without alteration or enlargement
                                                                or any change whatsoever.

Signature Guarantee: _____

A-4

The undersigned Holder directs that a certificate (including in book entry if requested by the Holder) for shares of Common Stock or other securities, as applicable, deliverable upon settlement of the number of Purchase Contracts evidenced by this Purchase Contract be registered in the name of, and delivered, together with a check in payment for any fractional share, to the undersigned at the address indicated below (or to the securities account designated in writing by the Holder) unless a different name and address have been indicated below. [Treasury Strips deliverable (or, if applicable, cash payable from the sale of such Treasury Strips upon a Bankruptcy Event) in connection with such settlement of Purchase Contracts constituting Units, will be delivered in accordance with the delivery instructions set forth below.] If shares of Common Stock or other securities, as applicable, are to be registered in the name of a Person other than the undersigned, the undersigned will pay any transfer tax payable incidental thereto, as provided in the Purchase Contract Agreement.

Dated: _____

Signature
Signature Guarantee:_____
(if assigned to another Person)

If shares are to be registered in the name of and delivered to (or cash is to be paid to) a Person other than the Holder, please (i) print such Person's name and address and (ii) provide a guarantee of your signature:

Name
Address

Name
Address

Social Security or other Taxpayer Identification Number, if any

[Delivery instructions for Treasury Strips deliverable (or, if applicable, cash payable from the sale of such Treasury Strips upon a Bankruptcy Event):]

Name
Address

A-5

Social Security or other Taxpayer
Identification Number, if any

A-6

## ELECTION TO SETTLE EARLY

The undersigned Holder of this Purchase Contract hereby irrevocably exercises the option to effect Early Settlement (which Early Settlement may, as applicable, be deemed to be in connection with a Fundamental Change pursuant to Section 4.07 of the Purchase Contract Agreement) in accordance with the terms of the Purchase Contract Agreement with respect to the Purchase Contracts evidenced by this Purchase Contract as specified below. The undersigned Holder directs that a certificate (including in book entry if requested by the Holder) for shares of Common Stock or other securities, as applicable, deliverable upon such Early Settlement be registered in the name of, and delivered, together with a check in payment for any fractional share and any Purchase Contract representing any Purchase Contracts evidenced hereby as to which Early Settlement is not effected, to the undersigned at the address indicated below (or to the securities account designated in writing by the Holder) unless a different name and address have been indicated below. [Treasury Strips deliverable upon such Early Settlement will be delivered in accordance with the delivery instructions set forth below.] If shares of Common Stock or other securities, as applicable, are to be registered in the name of a Person other than the undersigned, the undersigned will pay any transfer tax payable incident thereto, as provided in the Purchase Contract Agreement.

Dated: _____

_____
Signature

Signature Guarantee: _____

[Delivery Instructions for Treasury Strips upon Early Settlement:]

_____
Name

Address

_____
_____
Social Security or other Taxpayer
Identification Number, if any

A-7

Number of Purchase Contracts evidenced hereby as to which Early Settlement is being elected:

If shares of Common Stock or Purchase Contracts are to be registered in the name of and delivered to a Person other than the Holder, please print such Person's name and address:

REGISTERED HOLDER

Please print name and address of Registered Holder:

_____

Name

Address

_____

_____

Social Security or other Taxpayer
Identification Number, if any

Name

Address

_____

_____

_____

[Delivery Instructions for Treasury Strips upon Early Settlement:]

_____

Name
Address

_____

_____

Social Security or other Taxpayer
Identification Number, if any

A-8

**SCHEDULE A***

SCHEDULE OF INCREASES OR DECREASES

IN THE PURCHASE CONTRACT

The initial number of Purchase Contracts evidenced by this certificate is _____. The following increases or decreases in this certificate have been made:

| Date | Amount of increase in number of Purchase Contracts evidenced hereby | Amount of decrease in number of Purchase Contracts evidenced hereby | Number of Purchase Contracts evidenced hereby following such decrease or increase | Signature of authorized signatory of Purchase Contract Agent |
|---|---|---|---|---|
| | | | | |

\*      Include only if a Global Purchase Contract.

A-9

[FORM OF FACE OF PURCHASE CONTRACT]

[THIS SECURITY IS A GLOBAL PURCHASE CONTRACT WITHIN THE MEANING OF THE PURCHASE CONTRACT AGREEMENT HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF A DEPOSITARY OR A NOMINEE OF A DEPOSITARY OR A SUCCESSOR DEPOSITARY. UNLESS AND UNTIL IT IS EXCHANGED IN WHOLE OR IN PART FOR SECURITIES IN CERTIFICATED FORM, THIS SECURITY MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION (THE "**DEPOSITARY**") TO THE NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY OR BY THE DEPOSITARY OR ANY SUCH NOMINEE TO A SUCCESSOR DEPOSITARY OR A NOMINEE OF SUCH SUCCESSOR DEPOSITARY.

UNLESS THIS SECURITY IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITARY TO THE COMPANY OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY SECURITY ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITARY (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITARY), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.]*

_____

\*     Include only if a Global Purchase Contract.

CUSIP No. 69331C 132
ISIN No. US69331C1320

No. _____                                              [Initial]* Number of Purchase Contracts: _____

This Purchase Contract certifies that [CEDE & CO., as nominee of The Depository Trust Company]* [_____]**, or its registered assigns (the "**Holder**") is the registered owner of the number of Purchase Contracts set forth above[, which number may from time to time be reduced or increased as set forth on Schedule A hereto, as appropriate, in accordance with the terms of the Purchase Contract Agreement (as defined below), but which number of Purchase Contracts, taken together with the number of all other Outstanding Purchase Contracts, shall not exceed 14,545,455 (as increased by a number of Purchase Contracts equal to the number of any additional Units purchased by the Underwriters pursuant to the exercise of their option to purchase additional Units as set forth in the Underwriting Agreement) Purchase Contracts at any time]*.

Each Purchase Contract consists of the rights of the Holder under such Purchase Contract with the Company. All capitalized terms used herein which are defined in the Purchase Contract Agreement (as defined on the reverse hereof) have the meaning set forth therein.

Each Purchase Contract evidenced hereby obligates the Company to deliver to the Holder of this Purchase Contract on the Purchase Contract Settlement Date a number of shares of Common Stock, no par value ("**Common Stock**"), of the Company equal to the Settlement Rate, unless such Purchase Contract has settled prior to the Purchase Contract Settlement Date, all as provided in the Purchase Contract Agreement and more fully described on the reverse hereof.

Reference is hereby made to the further provisions set forth on the reverse hereof, which further provisions shall for all purposes have the same effect as if set forth at this place.

[SIGNATURES ON THE FOLLOWING PAGE]

---

*        Include only if a Global Purchase Contract.
**       Include only not if a Global Purchase Contract.

B-2

IN WITNESS WHEREOF, the Company has caused this instrument to be duly executed.

PG&E CORPORATION

By: _____
Name:
Title:

Dated: _____

B-3

REGISTERED HOLDER(S) (as to obligations of such holder(s) under the Purchase Contracts evidenced hereby)

By: THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A., not individually but solely as Attorney-in-Fact of such holder(s)

By: _____
    Name:
    Title:

<div align="center">B-4</div>

PURCHASE CONTRACT CERTIFICATE OF AUTHENTICATION OF

PURCHASE CONTRACT AGENT

This is one of the Purchase Contracts referred to in the within-mentioned Purchase Contract Agreement.

THE BANK OF NEW YORK MELLON TRUST
COMPANY, N.A., as Purchase Contract Agent

By: _____
Authorized Signatory

Dated: _____

B-5

Each Purchase Contract evidenced hereby is governed by a Purchase Contract Agreement, dated as of July 1, 2020 (as may be supplemented from time to time, the "**Purchase Contract Agreement**"), between PG&E Corporation, a California corporation (the "**Company**") and The Bank of New York Mellon Trust Company, N.A., as Purchase Contract Agent (including its successors hereunder, the "**Purchase Contract Agent**") and as attorney-in-fact for the Holders of Purchase Contracts from time to time. Reference is hereby made to the Purchase Contract Agreement and supplemental agreements thereto for a description of the respective rights, limitations of rights, obligations, duties and immunities thereunder of the Purchase Contract Agent, the Company and the Holders and of the terms upon which the Purchase Contracts are, and are to be, executed and delivered.

Each Purchase Contract evidenced hereby obligates the Company to deliver to the Holder of this Purchase Contract, on the Purchase Contract Settlement Date, a number of shares of Common Stock equal to the Settlement Rate, unless such Purchase Contract has settled prior to the Purchase Contract Settlement Date, in either case, pursuant to the terms of the Purchase Contract Agreement.

No fractional shares of Common Stock will be issued upon settlement of Purchase Contracts, as provided in Section 4.11 of the Purchase Contract Agreement.

The Purchase Contracts are issuable only in registered form and only in denominations of a single Purchase Contract and any integral multiple thereof. The transfer of any Purchase Contract will be registered and Purchase Contracts may be exchanged as provided in the Purchase Contract Agreement.

The Purchase Contracts are initially being issued as part of the Equity Units (the "**Units**") issued by the Company pursuant to the Purchase Contract Agreement. Holders of the Units have the right to separate such Units into their constituent parts, consisting of Separate Treasury Strips and Separate Purchase Contracts, during the times, and under the circumstances, described in the Purchase Contract Agreement. Following separation of any Unit into its constituent parts, the Separate Purchase Contracts are transferable independently from the Separate Treasury Strips. In addition, Separate Purchase Contracts can be recombined with Separate Treasury Strips to recreate Units, as provided for in the Purchase Contract Agreement.

The Holder of this Purchase Contract, by its acceptance hereof, authorizes the Purchase Contract Agent to enter into and perform the Purchase Contract Agreement on its behalf as its attorney-in-fact and agrees to be bound by the terms and provisions thereof.

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 829 of 1367

The Beneficial Holder of this Purchase Contract, by its acceptance thereof, represents and warrants that neither it nor, to such Beneficial Holder's knowledge, any other Person, would become a "Substantial Shareholder" (as defined in the Amended Articles) as a result of such Beneficial Holder's acquisition of Purchase Contracts (treating such Beneficial Holder and any such other Person as actually holding, solely for purposes of this representation, the number of shares of Common Stock that would be received upon settlement at the Maximum Settlement Rate of all Purchase Contracts acquired or beneficially owned by such Beneficial Holder or any such other Person, as applicable, but treating all other Purchase Contracts as still unsettled), and, for the avoidance of doubt, taking into account such Beneficial Holder's and any such other Person's (i) current ownership of the Common Stock and any of the Utility's preferred stock and (ii) other acquisitions of the Common Stock and any of the Utility's preferred stock (if any) concurrent with or in connection with such Beneficial Holder's acquisition of Purchase Contracts.

Subject to certain exceptions set forth in the Purchase Contract Agreement, the provisions of the Purchase Contract Agreement may be amended with the consent of the Holders of a majority of the Purchase Contracts.

**The Purchase Contracts shall be governed by, and construed in accordance with, the laws of the State of New York.**

The Company, the Purchase Contract Agent, and any agent of the Company or the Purchase Contract Agent, may treat the Person in whose name this Purchase Contract is registered as the owner of the Purchase Contracts, evidenced hereby, for the purpose of performance of the Purchase Contracts evidenced by such Purchase Contracts and for all other purposes whatsoever, and neither the Company nor the Purchase Contract Agent, nor any agent of the Company or the Purchase Contract Agent, shall be affected by notice to the contrary.

The Purchase Contracts shall not entitle the Holder to any of the rights of a holder of the shares of Common Stock or other Exchange Property, except as provided by the Purchase Contract Agreement.

Each Purchase Contract (whether or not included in a Unit) is a security governed by Article 8 of the Uniform Commercial Code as in effect in the State of New York on the date hereof.

Unless a conformed copy of the Purchase Contract Agreement has been filed on the EDGAR system of the U.S. Securities and Exchange Commission, a copy of the Purchase Contract Agreement will be available for inspection at the offices of the Company.

In the event of any inconsistency between the provisions of this Purchase Contract and the provisions of the Purchase Contract Agreement, the Purchase Contract Agreement shall prevail.

B-7

## ABBREVIATIONS

The following abbreviations, when used in the inscription on the face of this instrument, shall be construed as though they were written out in full according to applicable laws or regulations:

TEN COM:                     as tenants in common

UNIF GIFT MIN ACT:      _____ Custodian _____

                                     (cust)                                     (minor)

                                     Under Uniform Gifts to Minors

                                     Act of _____

TENANT:                     as tenants by the entireties

JT TEN:                      as joint tenants with rights of survivorship and not as tenants in common

Additional abbreviations may also be used though not in the above list.

FOR VALUE RECEIVED, the undersigned hereby sell(s), assign(s) and transfer(s) unto (Please insert Social Security or Taxpayer I.D. or other Identifying Number of Assignee) (Please Print or Type Name and Address Including Postal Zip Code of Assignee) the within Purchase Contracts and all rights thereunder, hereby irrevocably constituting and appointing attorney _____, to transfer said Purchase Contracts on the books of the Company with full power of substitution in the premises.

DATED: _____

Signature _____

Notice : The signature to this assignment must correspond with the name as it appears upon the face of the within Purchase Contracts in every particular, without alteration or enlargement or any change whatsoever.

Signature Guarantee: _____

B-8

SETTLEMENT INSTRUCTIONS

The undersigned Holder directs that a certificate (including in book entry if requested by the Holder) for shares of Common Stock or other securities, as applicable, deliverable upon settlement of the number of Purchase Contracts evidenced by this Purchase Contract be registered in the name of, and delivered, together with a check in payment for any fractional share, to the undersigned at the address indicated below (or to the securities account designated in writing by the Holder) unless a different name and address have been indicated below. [Treasury Strips deliverable (or, if applicable, cash payable from the sale of such Treasury Strips upon a Bankruptcy Event) in connection with such settlement of Purchase Contracts constituting Units, will be delivered in accordance with the delivery instructions set forth below.] If shares of Common Stock or other securities, as applicable, are to be registered in the name of a Person other than the undersigned, the undersigned will pay any transfer tax payable incidental thereto, as provided in the Purchase Contract Agreement.

Dated: _____

Signature
Signature Guarantee:_____
(if assigned to another Person)

If shares are to be registered in the name of and delivered to (or cash is to be paid to) a Person other than the Holder, please (i) print such Person's name and address and (ii) provide a guarantee of your signature:

_____
Name
Address

_____

Social Security or other Taxpayer Identification Number, if any

_____
Name
Address

_____

_____

[Delivery instructions for Treasury Strips deliverable (or, if applicable, cash payable from the sale of such Treasury Strips upon a Bankruptcy Event):]

_____
Name
Address

_____

_____

B-9

_____

Social Security or other Taxpayer
Identification Number, if any

B-10

## ELECTION TO SETTLE EARLY

The undersigned Holder of this Purchase Contract hereby irrevocably exercises the option to effect Early Settlement (which Early Settlement may, as applicable, be deemed to be in connection with a Fundamental Change pursuant to Section 4.07 of the Purchase Contract Agreement) in accordance with the terms of the Purchase Contract Agreement with respect to the Purchase Contracts evidenced by this Purchase Contract as specified below. The undersigned Holder directs that a certificate (including in book entry if requested by the Holder) for shares of Common Stock or other securities, as applicable, deliverable upon such Early Settlement be registered in the name of, and delivered, together with a check in payment for any fractional share and any Purchase Contract representing any Purchase Contracts evidenced hereby as to which Early Settlement is not effected, to the undersigned at the address indicated below (or to a securities account designated in writing by the Holder) unless a different name and address have been indicated below. [Treasury Strips deliverable upon such Early Settlement will be delivered in accordance with the delivery instructions set forth below.] If shares of Common Stock or other securities, as applicable, are to be registered in the name of a Person other than the undersigned, the undersigned will pay any transfer tax payable incident thereto, as provided in the Purchase Contract Agreement.

Dated: _____

_____
Signature

Signature Guarantee: _____

[Delivery Instructions for Treasury Strips upon Early Settlement:]

_____
Name
Address

_____

_____
Social Security or other Taxpayer
Identification Number, if any

B-11

Number of Purchase Contracts evidenced hereby as to which Early Settlement is being elected:

If shares of Common Stock or Purchase Contracts are to be registered in the name of and delivered to a Person other than the Holder, please print such Person's name and address:

REGISTERED HOLDER

Please print name and address of Registered Holder:

Name
Address

Name
Address

Social Security or other Taxpayer
Identification Number, if any

B-12

**SCHEDULE A\***

[SCHEDULE OF INCREASES OR DECREASES
IN THE PURCHASE CONTRACT]

The initial number of Purchase Contracts evidenced by this certificate is _____. The following increases or decreases in this certificate have been made:

| Date | Amount of increase in number of Purchase Contracts evidenced hereby | Amount of decrease in number of Purchase Contracts evidenced hereby | Number of Purchase Contracts evidenced hereby following such decrease or increase | Signature of authorized signatory of Purchase Contract Agent |
|---|---|---|---|---|
| | | | | |

\*      Include only if a Global Purchase Contract.

B-13

Exhibit 4.12

THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A.,
AS PURCHASE CONTRACT AGENT,

THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A., AS CUSTODIAN,

AND

HOLDERS (AS DEFINED HEREIN)
FROM TIME TO TIME

———————————

CUSTODIAL AGREEMENT

———————————

DATED AS OF JULY 1, 2020

**TABLE OF CONTENTS**

---

PAGE

ARTICLE ONE
DEFINITIONS AND OTHER PROVISIONS OF GENERAL APPLICATION

Section 1.01. *Interpretation* ....................................................................... 1
Section 1.02. *Definitions* ............................................................................ 2
Section 1.03. *Effect of Headings and Table of Contents* ......................... 5
Section 1.04. *Successors and Assigns* ....................................................... 5
Section 1.05. *Severability Clause* ............................................................. 5
Section 1.06. *Benefits of Agreement* ......................................................... 5
Section 1.07. *Governing Law; Jurisdiction* ............................................. 5
Section 1.08. *Legal Holidays* .................................................................... 6
Section 1.09. *Counterparts* ........................................................................ 6
Section 1.10. *Inspection of Agreement* ..................................................... 6
Section 1.11. *Notices* ................................................................................. 6

ARTICLE TWO
THE TREASURY STRIPS

Section 2.01. *Delivery of Treasury Strips to the Custodian* .................... 7
Section 2.02. *Acceptance by Custodian* .................................................... 7
Section 2.03. *Payment of Amounts Received Upon Maturity of Treasury Strips* ...... 8
Section 2.04. *Establishment of Custody Account* ..................................... 8
Section 2.05. *Collection of Payments on Treasury Strips* ........................ 8
Section 2.06. *Delivery of Treasury Strips to Holders* .............................. 8

ARTICLE THREE
THE CUSTODIAN

Section 3.01. *Certain Duties and Responsibilities* ................................... 9
Section 3.02. *Certain Rights of Custodian* ............................................... 10
Section 3.03. *Use of Third Parties and Limitations on Custodian's Liability* ...... 12
Section 3.04. *Money Held by Custodian* ................................................... 13
Section 3.05. *Compensation and Expense* ................................................. 13
Section 3.06. *Corporate Agent Required; Eligibility* ............................... 13
Section 3.07. *Resignation and Removal; Appointment of Successor* ...... 14
Section 3.08. *Acceptance of Appointment by Successor* .......................... 15
Section 3.09. *Merger, Conversion, Consolidation or Succession to Business* ...... 15
Section 3.10. *No Obligations of Custodian* ............................................... 15
Section 3.11. *Tax Compliance* ................................................................... 16

i

# ARTICLE FOUR
## The Purchase Contract Agent Section

Section 4.01. *Purchase Contract Agent's Direct Liability*     16
Section 4.02. *Force Majeure*     16

# ARTICLE FIVE
## Supplemental Agreements

Section 5.01. *Supplemental Agreements without Consent of Holders*     16
Section 5.02. *Supplemental Agreements with Consent of Holders*     16
Section 5.03. *Effect of Supplemental Agreements*     17

# ARTICLE SIX
## Covenants

Section 6.01. *Performance Under this Agreement*     17

# ARTICLE SEVEN
## General Conditions

Section 7.01. *Entire Agreement*     17

ii

<div align="center">PARTIES</div>

CUSTODIAL AGREEMENT, dated as of July 1, 2020, among THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A., acting as purchase contract agent (the "**Purchase Contract Agent**"), THE BANK OF NEW YORK MELLON TRUST COMPANY N.A., acting as custodian (the "**Custodian**"), and HOLDERS (as defined herein) from time to time.

<div align="center">RECITALS</div>

WHEREAS, on and from the date hereof, the Purchase Contract Agent, as purchase contract agent for the Holders, and PG&E Corporation, a California corporation (the "**Company**"), have entered into the Purchase Contracts pursuant to the Purchase Contract and Unit Agreement, dated as of July 1, 2020 (the "**Purchase Contract Agreement**"), under which the Company has agreed to issue and deliver shares of Common Stock to the Holders on (i) the Purchase Contract Settlement Date, (ii) at a Holder's option, on an Early Settlement Date or Fundamental Change Early Settlement Date or (iii) upon an Acceleration Event, in each case, in consideration of the purchase price of the Purchase Contracts paid by the initial Holders to the Company on the Closing Date (as defined in the Underwriting Agreement); and

WHEREAS, simultaneously with entering into the Purchase Contracts with the Company, the initial Holders have acquired from Goldman Sachs & Co. LLC, a representative of the underwriters named in the Underwriting Agreement, Treasury Strips; and

WHEREAS, for the convenience of the Holders, the Holders wish to appoint the Custodian as their custodian to hold the Treasury Strips for them and on their behalf and to forward to the Holders all payments of the Treasury Strips as and when they mature and to deliver the Treasury Strips to the Holders under certain circumstances as set forth herein;

NOW THEREFORE, in consideration of the premises and the purchase of the Units by the Holders thereof, it is mutually agreed as follows:

<div align="center">ARTICLE ONE<br>DEFINITIONS AND OTHER PROVISIONS OF GENERAL APPLICATION</div>

Section 1.01. *Interpretation*. For all purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires:

(i) capitalized terms used but not defined herein have those meanings ascribed to them in the Purchase Contract Agreement;

(ii) the terms defined in this Article have the meanings assigned to them in this Article and include the plural as well as the singular;

(iii) the words "herein," "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision; and

(iv) all references to "$" herein means United States dollars.

Section 1.02. Definitions.

"**Affiliate**" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For the purposes of this definition, "control," when used with respect to any specified Person means the power to direct or cause the direction of the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing. Notwithstanding anything to the contrary herein, the determination of whether one Person is an "**Affiliate**" of another Person for purposes of this Agreement shall be made based on the facts at the time such determination is made or required to be made, as the case may be, hereunder.

"**Agreement**" means this instrument as originally executed or as it may from time to time be supplemented or amended by one or more agreements supplemental hereto entered into pursuant to the applicable provisions hereof.

"**Authorized Person**" means a Responsible Officer (as defined in the Purchase Contract Agreement) of the Purchase Contract Agent.

"**Clearing Agency**" means an organization registered as a "Clearing Agency" pursuant to Section 17A of the Exchange Act that is acting as a depositary for the Units and in whose name, or in the name of a nominee of that organization, a Global Unit Certificate is registered in the Unit Register. The initial Clearing Agency shall be The Depository Trust Company ("**DTC**").

"**Corporate Trust Office**" means, for identification only, the designated office of the Custodian, at which at any particular time the Custodian's corporate trust business is administered, which office at the date hereof is located at 400 South Hope Street, Suite 500, Los Angeles, CA 90071, Attention: Corporate Trust Administration, or such other address as the Custodian may designate from time to time by notice to the Holders, the Purchase Contract Agent and the Company, or the principal corporate trust office of any successor Custodian (or such other address as such successor Custodian may designate from time to time by notice to the Holders, the Purchase Contract Agent and the Company).

2

"**Custodian**" means the Person named as the "Custodian" in the first paragraph of this Agreement until a successor Custodian has become such pursuant to the applicable provisions of this Agreement, and thereafter "Custodian" means the Person who is then the Custodian hereunder.

"**Custody Account**" has the meaning set forth in Section 2.04.

"**Force Majeure Event**" means any event arising out of or due to any cause, directly or indirectly, beyond the control of any party to this Agreement, such as restrictions on convertibility or transferability, requisitions, involuntary transfers, interruptions, loss or malfunctions of utilities, communications or computer (software or hardware) services, sabotage, fire, flood, explosion, acts of God, epidemics, pandemics, civil or military commotion, strikes, work stoppages or industrial action of any kind, accidents, acts of terrorism, riots, insurrection, war or acts of government.

"**Holder**" means a Person in whose name the Unit evidenced by such Unit Certificate (or the Unit Certificate evidencing such Unit) is registered in the Unit Register. For purposes of this Agreement, Holder shall mean the Clearing Agency as long as the Units are held in book-entry form and registered in the name of the Clearing Agency or its nominee.

"**Instructions**" means any and all instructions (including approvals, consents and notices) received by the Custodian from, or reasonably believed by the Custodian to be from, any Authorized Person, including any instructions communicated through any manual or electronic medium or system agreed between the Purchase Contract Agent and the Custodian.

"**Outstanding Units**" means, as of the date of determination, all Units evidenced by then Outstanding Unit Certificates, except on and after any applicable Early Settlement Date or Fundamental Change Early Settlement Date, Units as to which the Holder has elected to effect Early Settlement or Early Settlement in connection with a Fundamental Change, as the case may be, of the related Purchase Contracts; *provided*, however, that in determining whether the Holders of the requisite number of Units have given any request, demand, authorization, direction, notice, consent or waiver hereunder, Units owned by the Company or any Affiliate of the Company shall be disregarded and deemed not to be outstanding, except that, in determining whether the Purchase Contract Agent shall be protected in relying upon any such request, demand, authorization, direction, notice, consent or waiver, only Units which a Responsible Officer of the Purchase Contract Agent knows to be so owned shall be so disregarded. Units so owned which have been pledged in good faith may be regarded as outstanding if the pledgee establishes to the satisfaction of the Purchase Contract Agent the pledgee's right so to act with respect to such Units and that the pledge is not the Company or any Affiliate of the Company.

3

"**Outstanding Unit Certificates**" means, as of the date of determination, all Unit Certificates theretofore executed and delivered under the Purchase Contract Agreement, except:

(i)     Unit Certificates theretofore cancelled by the Purchase Contract Agent or delivered to the Purchase Contract Agent for cancellation; and

(ii)    Unit Certificates in exchange for or in lieu of which other Unit Certificates have been authenticated, executed on behalf of the Holder and delivered pursuant to this Agreement, other than any such Unit Certificate in respect of which there shall have been presented to the Purchase Contract Agent proof satisfactory to it that such Unit Certificate is held by a bona fide purchaser.

"**Person**" means any individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

"**Predecessor Unit Certificate**" of any particular Unit Certificate means every previous Unit Certificate evidencing all or a portion of the rights and obligations of the Holder under the Units evidenced thereby; and, for the purposes of this definition, any Unit Certificate authenticated and delivered under Section 3.10 of the Purchase Contract Agreement in exchange for or in lieu of a mutilated, destroyed, lost or stolen Unit Certificate shall be deemed to evidence the same rights and obligations of the Holder as the mutilated, destroyed, lost or stolen Unit Certificate.

"**Purchase Contract Agent**" means the Person named as the "Purchase Contract Agent" in the first paragraph of this Agreement until a successor Purchase Contract Agent has become such pursuant to the applicable provisions of the Purchase Contract Agreement, and thereafter "Purchase Contract Agent" means the Person who is then the Purchase Contract Agent hereunder.

"**Purchase Contract Agreement**" has the meaning specified in the recitals to this Agreement.

"**Responsible Officer**", when used with respect to the Custodian or Purchase Contract Agent, means any officer or officers of the Custodian or Purchase Contract Agent within the corporate trust department of the Custodian or Purchase Contract Agent, as the case may be, including any vice president, assistant vice president, assistant secretary, senior associate, associate, trust officer or any other officer of the Custodian or Purchase Contract Agent who customarily performs functions similar to those performed by the Persons who at the time shall be such officers, respectively, or to whom any corporate trust matter is referred because of such person's knowledge of and familiarity with the particular subject and who shall have with direct responsibility for the administration of this Agreement.

"**Settlement System**" means any clearing agency, settlement system or depository (including any entity that acts as a system for the central handling of securities in the country where it is incorporated or organized or that acts as a transactional system for the central handling of securities) used in connection with transactions relating to securities and any nominee of the foregoing.

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 843 of 1367

"**TIA**" means the United States Trust Indenture Act of 1939, as amended, or any successor statute.

"**Treasury Strips**" means, initially, the zero-coupon United States Treasury securities in the face amounts, and with the maturity dates, specified on Schedule 1 hereto.

"**Treasury Strips Component**" means, initially, the 1/48,000th undivided beneficial ownership interest in $66,000 principal amount at maturity (or $33,000 principal amount at maturity in the case of the Treasury Strips maturing on August 15, 2020) of each of the thirteen Treasury Strips specified on Schedule 1 hereto.

"**Underwriting Agreement**" means the underwriting agreement relating to the Units dated June 25, 2020 between the Company and the several underwriters named therein.

"**Unit**" means and evidences the ownership by a Holder of (i) one Purchase Contract and (ii) one Treasury Strips Component.

Section 1.03. *Effect of Headings and Table of Contents*. The Article and Section headings herein and the Table of Contents are for convenience only and shall not affect the construction hereof. The parties hereto do not assume any responsibility for the correctness of the recitals contained herein and make no representation as to the validity or sufficiency of this Agreement.

Section 1.04. *Successors and Assigns*. All covenants and agreements in this Agreement by the Custodian shall bind its successors and assigns, whether so expressed or not.

Section 1.05. *Severability Clause*. In case any provision in this Agreement or in the Units shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions hereof and thereof shall not in any way be affected or impaired thereby.

Section 1.06. *Benefits of Agreement*. Nothing in this Agreement or in the Units, express or implied, shall give to any Person, other than the parties hereto and their successors hereunder and the Holders, any benefits or any legal or equitable right, remedy or claim under this Agreement. The Holders from time to time shall be beneficiaries of this Agreement and shall be bound by all of the terms and conditions hereof and of the Units as evidenced by their Unit Certificates, by their acceptance of delivery thereof.

Section 1.07. *Governing Law; Jurisdiction*. THIS AGREEMENT, AND ANY CLAIM, CONTROVERSY OR DISPUTE ARISING UNDER OR RELATED TO THIS AGREEMENT, SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK (WITHOUT REGARD TO THE CONFLICTS OF LAWS PROVISIONS THEREOF).

5

The Custodian irrevocably consents and agrees, for the benefit of the Holders from time to time, that any legal action, suit or proceeding against it with respect to obligations, liabilities or any other matter arising out of or in connection with this Agreement may be brought in the courts of the State of New York or the courts of the United States located in the Borough of Manhattan, New York City, New York and, until amounts due and to become due in respect of the Units have been paid, hereby irrevocably consents and submits to the non-exclusive jurisdiction of each such court *in personam*, generally and unconditionally with respect to any action, suit or proceeding for itself in respect of its properties, assets and revenues.

The Custodian irrevocably and unconditionally waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of venue of any of the aforesaid actions, suits or proceedings arising out of or in connection with this Agreement brought in the courts of the State of New York or the courts of the United States located in the Borough of Manhattan, New York City, New York and hereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.

Section 1.08. *Legal Holidays*. If any Payment Date, any Early Settlement Date, any Fundamental Change Early Settlement Date or the Purchase Contract Settlement Date falls on a day that is not a Business Day, then (notwithstanding any other provision of this Agreement, Purchase Contract Agreement or of the Unit Certificates) payments in respect of amounts received by the Custodian on the Treasury Strips Components or deliveries of Treasury Strips, as the case may be, shall not be made on such date, but such payments or such deliveries shall be made on the next succeeding Business Day with the same force and effect as if made on such Payment Date, Early Settlement Date, Fundamental Change Early Settlement Date or Purchase Contract Settlement Date, as the case may be; *provided*, that no interest shall accrue or be payable for the period from and after any such Payment Date, Early Settlement Date, Fundamental Change Early Settlement Date or Purchase Contract Settlement Date, as the case may be.

Section 1.09. *Counterparts*. This Agreement may be executed in any number of counterparts, each of which, when so executed, shall be deemed an original, but all such counterparts shall together constitute one and the same instrument.

Section 1.10. *Inspection of Agreement*. Unless a conformed copy of this Agreement has been filed on the EDGAR system of the U.S. Securities and Exchange Commission, a copy of this Agreement shall be available at all reasonable times during normal business hours at the Corporate Trust Office for inspection by any Holder.

Section 1.11. *Notices*. Any notice or demand which by any provision of this Agreement is required or permitted to be given or served to or on the Custodian may be given or served by being deposited postage prepaid, first class mail (except as otherwise specifically provided herein) addressed (until another address of the Custodian is filed by the Custodian with the Company and the Purchase Contract Agent) to The Bank of New York Mellon Trust Company, N.A., 400 South Hope Street, Suite 500, Los Angeles, CA 90071, Attention: Corporate Trust Administration. Any notice or demand which by any provision of this Agreement is required or permitted to be given or served to or on the Purchase Contract Agent, the Company or the Holders may be given or served in accordance with Section 1.03 of the Purchase Contract Agreement.

## ARTICLE TWO
### THE TREASURY STRIPS

Section 2.01. *Delivery of Treasury Strips to the Custodian*. On the Closing Date (as defined in the Underwriting Agreement), the initial Holders have acquired from Goldman Sachs & Co. LLC (as a Representative on behalf of itself and the other underwriters named in the Underwriting Agreement) the Treasury Strips described on Schedule 1 hereto and directed them to be delivered to the Custodian by causing the Custodian or its nominee to be the holder of security entitlements for such Treasury Strips on the records of the Federal Reserve Bank of New York for and on behalf of the Holders, and the Custodian has accepted delivery of the Treasury Strips. Each Unit evidences ownership of the related Treasury Strips Component held by the Custodian hereunder as agent for and on behalf of the Holders as identified by a security entitlement credited to an account on the records of the Custodian. For greater certainty, each Holder shall have a separate property interest in each of its Treasury Strips Component and shall have no interest whatsoever in any other Holder's Treasury Strips Component and Holders shall not be considered to own Treasury Strips Components as joint tenants or tenants in common. The Custodian shall act as agent for the Holders and no provision hereof is intended to create or shall be construed as having created a trust of any kind or any fiduciary duty owed by the Custodian to any Holder.

Section 2.02. *Acceptance by Custodian*. The Custodian hereby acknowledges that, on the Closing Date (as defined in the Underwriting Agreement), the Custodian has received the Treasury Strips listed in Schedule 1 in accordance with the Purchase Contract Agreement, and in the manner described in, Section 2.01. The Custodian agrees to accept additional free deliveries of Treasury Strips in accordance with the terms of the Purchase Contract Agreement, including, without limitation, pursuant to Section 2.04 of the Purchase Contract Agreement and/or in connection with any exercise by the Underwriters (as defined in the Underwriting Agreement) of their option to purchase additional Purchase Contracts pursuant to Section 2(b) of the Underwriting Agreement. The Custodian shall accept all Treasury Strips delivered (or caused to be delivered) free hereunder as custodian for the Holders and the Custodian shall hold the Treasury Strips in a separate Custody Account as defined in and as provided in Section 2.04 for and on behalf of the Holders. The Custodian shall hold the Treasury Strips delivered to it pursuant to this Agreement solely as custodian and not as a fiduciary, identified separate and apart from the general assets of the Custodian for and on behalf of the Holders. The Custodian shall not have the authority or obligation to assign, transfer, pledge, set off or otherwise dispose of any of the Treasury Strips, or of any interests therein, except as provided hereunder or as required by law.

7

Section 2.03. *Payment of Amounts Received Upon Maturity of Treasury Strips*. On any Payment Date on which amounts are received by the Custodian on payments of the Treasury Strips (or, if such amounts are received between Payment Dates, on the next Payment Date after the Custodian receives such amounts), the Custodian shall forward all such amounts the Custodian receives to the Holders as instructed by the Purchase Contract Agent.

Section 2.04. *Establishment of Custody Account*. The Custodian, as agent for the Holders, shall establish and maintain a separate account bearing a designation clearly indicating that the funds and assets deposited therein are held in custody for the Holders (the "**Custody Account**"). The Custody Account shall at all times be maintained as a segregated custodial account identified separate and apart from the general assets of the Custodian and all other accounts, funds and property of or in the possession of the Custodian, including any other custody account. The Treasury Strips and any moneys held in the Custody Account shall not at any time be commingled with any other assets or property held by the Custodian.

Notwithstanding anything else in this Agreement, the Custodian shall not hold cash as a fiduciary. The Custodian shall at all times maintain accurate records reflecting each transaction in the Custody Account in connection with the Units and the related Treasury Strips Components evidenced thereby. The Custodian shall have no power or authority to assign, transfer, pledge, set off or otherwise dispose of any of the Treasury Strips, or any interest therein, except as provided hereunder or as required by law. The Custody Account shall be non-interest bearing and the amounts therein shall not be invested.

Section 2.05. *Collection of Payments on Treasury Strips*. Not later than the close of business on each Business Day on which the Custodian receives any payments of the Treasury Strips in the form of immediately available funds, the Custodian shall credit to or deposit in the Custody Account the amount of such payment. All moneys so received shall be held by the Custodian in the Custody Account until the Custodian receives the Purchase Contract Agent's instruction to transfer funds.

Section 2.06. *Delivery of Treasury Strips to Holders*. (a) Treasury Strips shall be delivered to Holders only and in such denominations as instructed by the Purchase Contract Agent pursuant to Section 4.06 of the Purchase Contract Agreement, pursuant to Section 4.07 of the Purchase Contract Agreement, pursuant to Section 4.08 of the Purchase Contract Agreement or pursuant to Section 2.03 of the Purchase Contract Agreement.

(b) The Custodian is entitled to rely and act upon Instructions of any Authorized Person until the Custodian has received notice of any change from the Purchase Contract Agent and has had a reasonable time to note and implement such change. The Custodian is authorized to rely upon any Instructions received by any means, provided that the Custodian and the Purchase Contract Agent have agreed upon the means of transmission and the method of identification for the Instructions.

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 847 of 1367

(c) Absent a contrary Instruction, the Custodian shall carry out the following without further Instructions:

(i) in the Purchase Contract Agent's name or on its behalf, sign any affidavits, certificates of ownership and other certificates and documents relating to Treasury Strips which may be required by any tax or regulatory authority;

(ii) notify the Purchase Contract Agent of notices, circulars, reports and announcements which the Custodian has received, in the course of acting in the capacity of custodian, concerning Treasury Strips held on the Purchase Contract Agent's behalf that require discretionary action;

(iii) make any payment by debiting the Custody Account or any other designated account of the Purchase Contract Agent with the Custodian as required to effect any Instruction; and

(iv) attend to all non-discretionary matters in connection with anything provided in this Section or any Instruction.

ARTICLE THREE
THE CUSTODIAN

Section 3.01. *Certain Duties and Responsibilities*. (a) The Custodian undertakes to perform, with respect to the Treasury Strips, such duties and only such duties as are specifically set forth in this Agreement, and no implied covenants or obligations shall be read into this Agreement against the Custodian.

(b) Subject to paragraph (d) below, the Custodian shall exercise the due care of a professional custodian for hire.

(c) The Custodian will not be responsible for any loss or damage suffered by any Holder unless the loss or damage results from the Custodian's gross negligence or willful misconduct. Under no circumstances will the Custodian be liable for consequential, special, punitive or indirect loss or damages, including lost profits, even if advised of the possibility thereof in advance and regardless of the form of action.

(d) No provision of this Agreement shall be construed to relieve the Custodian from liability for its own gross negligence, its own grossly negligent failure to act, or its own willful misconduct, except that:

(i) this paragraph (d) shall not be construed to limit the effect of paragraph (a) of this Section;

9

(ii) the Custodian shall not be liable for any error of judgment made in good faith by a Responsible Officer, unless it is proved that the Custodian was negligent in ascertaining the pertinent facts; and

(iii) no provision of this Agreement shall require the Custodian to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers.

(e) Whether or not therein expressly so provided, every provision of this Agreement relating to the conduct or affecting the liability of or affording protection to the Custodian shall be subject to the provisions of this Section.

(f) The Holders agree to indemnify the Custodian and to hold it harmless against, any and all loss, liability, damage, claim incurred without gross negligence or bad faith on its part, arising out of or in connection with the acceptance by the Custodian of its appointment as their custodian to hold the Treasury Strips for them and on their behalf and to forward to the Holders all payments of the Treasury Strips as and when they mature and to deliver the Treasury Strips to the Holders under the circumstances as set forth herein, including the costs and expenses of defending itself against any claim or liability (regardless of whether such claim is brought by the Company or any third party). The provisions of this Section 3.01(f) shall survive the resignation or removal of the Custodian and the termination of this Agreement.

Section 3.02. *Certain Rights of Custodian.* Subject to the provisions of Section 3.01:

(a) The Custodian may conclusively rely and shall be protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture, note, other evidence of indebtedness or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties.

(b) Any request or direction of the Purchase Contract Agent mentioned herein shall be sufficient if evidenced by an Instruction.

(c) Whenever in the administration of this Agreement the Custodian shall deem it desirable that a matter be proved or established prior to taking, suffering or omitting any action hereunder, the Custodian (unless other evidence is specifically prescribed herein) may, in the absence of bad faith on its part, rely upon an Officer's Certificate.

(d) The Custodian may consult with counsel of its selection and the advice or opinion of such counsel shall be full and complete authorization and protection in respect of any action taken, suffered or omitted by it hereunder in good faith and in reliance thereon.

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 849 of 1367

(e) This Agreement shall not be deemed to create a fiduciary relationship under state or federal law between The Bank of New York Mellon Trust Company, N.A., in its capacity as the Custodian and any Holder of any Purchase Contract (whether separated or as part of a Unit). The Custodian's rights, benefits, protections, indemnities, privileges and immunities hereunder shall be extended to and shall be enforceable by the Custodian under this Agreement.

(f) None of the provisions contained in this Agreement shall require the Custodian to expend or risk its own funds or otherwise incur personal financial liability in the performance of any of its duties or in the exercise of any of its rights or powers, if it shall have reasonable ground for believing that the repayment of such funds or adequate indemnity against such liability is not reasonably assured to it.

(g) The Custodian shall be under no obligation to exercise any of the rights or powers vested in it by this Agreement at the request, order or direction of any of the Holders pursuant to the provisions of this Agreement, unless such Holders shall have offered to the Custodian security or indemnity reasonably satisfactory to the Custodian against the costs, expenses and liabilities which might be incurred therein or thereby.

(h) The Custodian shall not be liable for any action taken or omitted by it in good faith and believed by it to be authorized or within the discretion, rights or powers conferred upon it by this Agreement and in no case shall the Custodian be liable for any act or omission hereunder in the absence of its own gross negligence, willful misconduct or bad faith.

(i) The Custodian may execute any of the rights or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys not regularly in its employ and the Custodian shall not be responsible for any misconduct or negligence on the part of any such agent or attorney appointed with due care by it hereunder.

(j) The Custodian shall not be liable for any action taken, suffered or omitted by it in good faith and believed by it to be authorized or within the discretion or rights or powers conferred upon it by this Agreement and in no case shall the Custodian be liable for any losses, costs or liabilities of any kind except for those arising directly out of its own gross negligence or willful misconduct.

(k) The permissive rights of the Custodian hereunder shall not be construed as duties.

(l) In no event shall the Custodian be liable for any consequential, special, punitive or indirect loss or damages, including lost profits, even if advised of the likelihood thereof in advance and regardless of the form of action.

(m) The rights, privileges, protections, immunities and benefits given to the Custodian, including, without limitation, its right to be indemnified, are extended to, and shall be enforceable by, each agent, custodian and other Person employed by the Custodian to act hereunder.

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 850 of 1367

(n) The Custodian shall not be required to exercise discretion in exercising its rights, powers or authorizations hereunder and the Custodian shall be entitled to refrain from any such act unless and until the Custodian has received written direction from a majority in number of the Outstanding Units and indemnification satisfactory to it and shall not be liable for any delay in acting caused while awaiting such direction.

(o) The Custodian shall not be required to initiate or conduct any litigation or collection proceedings hereunder and shall have no responsibilities with respect to any default hereunder or under the Purchase Contract Agreement.

Section 3.03. *Use of Third Parties and Limitations on Custodian's Liability*. Subject to the provisions of Section 3.01:

(a) (i) The Custodian is hereby authorized to act through administrative support providers and to use or participate in Settlement Systems to perform any of the duties of the Custodian under this Agreement.

(ii) Administrative support providers are those persons utilized by the Custodian to perform ancillary services of a purely administrative nature such as couriers, messengers or other commercial transport systems.

(iii) Market infrastructures are public utilities, external telecommunications facilities and other common carriers of electronic and other messages, and external postal services. Market infrastructures are not delegates of the Custodian.

(iv) Treasury Strips deposited with any Settlement System hereunder will be subject to the laws, rules, statements of principle and practices of such Settlement System. Settlement Systems are not delegates of the Custodian.

(b) (i) The Custodian shall act in good faith and use due care in the selection of administrative support providers, but shall otherwise have no responsibility for any negligence or misconduct of such persons under this Agreement.

(ii) The Custodian may deposit or procure the deposit of securities with any Settlement System as may be required hereby. The Custodian has no responsibility for the selection or appointment of, or for performance by, any Settlement System or market infrastructure.

(iii) The Custodian is not responsible for the acts, omissions, defaults or insolvency of any unaffiliated third party including, but not limited to, any broker counterparty or issuer of securities.

(iv) The Custodian will not be responsible for any failure to perform any of its obligations (nor will it be responsible for any unavailability of funds credited to the Custody Account) if such performance is prevented, hindered or delayed by a Force Majeure Event, in such case its obligations will be suspended for so long as the Force Majeure Event continues.

12

(v) The Custodian is not acting under this Agreement as an investment manager, nor as an investment, legal or tax adviser to the Purchase Contract Agent, the Company, any Holder or any other Person, and the Custodian's duty is solely to act as a custodian in accordance with the terms of this Agreement.

(vi) The Custodian is not responsible for the form, accuracy or content of any notice, circular, report, announcement or other material provided under or in connection with this Agreement, the Purchase Contract Agreement, the Units, the Purchase Contracts or the transactions contemplated hereunder or under the Purchase Contract Agreement.

Section 3.04. *Money Held by Custodian*. Money held by the Custodian hereunder shall not be held for the Holders as a fiduciary. The Custodian shall be under no obligation to invest or pay interest on any money received or held by it hereunder.

Section 3.05. *Compensation and Expense*. (a) The Custodian acknowledges receipt on the date hereof of:

(i) full compensation in advance for all services to be rendered by it hereunder during the term of this Agreement; and

(ii) payment in advance for all expected expenses to be incurred by the Custodian in accordance with any provision of this Agreement (including the reasonable compensation and the expenses and disbursements of its agents and counsel during the term of this Agreement).

(b) The Custodian acknowledges that the source of all payments referred to in subsection (a) above is a portion of the proceeds from the purchase by Holders of the Treasury Strips evidenced by Units and that all such amounts have been paid to the Custodian by the Representative.

Section 3.06. *Corporate Agent Required; Eligibility*. There shall at all times be a Custodian hereunder which shall be a corporation organized and doing business under the laws of the United States of America, any State thereof or the District of Columbia, authorized under such laws to exercise corporate trust powers, having a combined capital and surplus of at least $50,000,000, subject to supervision or examination by Federal or State authority and having its Corporate Trust Office in the continental United States, if there be such a corporation in the continental United States qualified and eligible under this Article and willing to act on reasonable terms.

Section 3.07. If such corporation publishes reports of condition at least annually, pursuant to law or to the requirements of said supervising or examining authority, then for the purposes of this Section, the combined capital and surplus of such corporation shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published. If at any time the Custodian shall cease to be eligible in accordance with the provisions of this Section, it shall resign immediately in the manner and with the effect hereinafter specified in this Article.

13

Section 3.08. *Resignation and Removal; Appointment of Successor.* (a) No resignation or removal of the Custodian and no appointment of a successor Custodian pursuant to this Article shall become effective until the acceptance of appointment by the successor Custodian in accordance with the applicable requirements of Section 3.08.

(b) The Custodian may resign at any time by giving written notice thereof to the Purchase Contract Agent and the Holders 60 days prior to the effective date of such resignation. If the instrument of acceptance by a successor Custodian required by Section 3.08 shall not have been delivered to the Custodian within 30 days after the giving of such notice of resignation, the resigning Custodian may petition any court of competent jurisdiction for the appointment of a successor Custodian.

(c) The Custodian may be removed at any time by written notice of the Holders of a majority of the Outstanding Units delivered to the Purchase Contract Agent and the Custodian.

(d) If at any time,

(i) the Custodian shall cease to be eligible under Section 3.06 and shall fail to resign after written request therefor by any Holder who has been a bona fide Holder of a Unit for at least six months (or, if a shorter period of time, since the date of this Agreement), or

(ii) the Custodian shall become incapable of acting or shall be adjudged a bankrupt or insolvent or a receiver of the Custodian or of its property shall be appointed or any public officer shall take charge or control of the Custodian or of its property or affairs for the purpose of rehabilitation, conservation or liquidation, then, in any such case, (i) the Purchase Contract Agent or (ii) any Holder who has been a bona fide Holder for at least six months (of, if a shorter period of time, since the date of this Agreement) may, on behalf of himself and all others similarly situated, petition any court of competent jurisdiction for the removal of the Custodian and the appointment of a successor Custodian.

(e) If the Custodian resigns, is removed or becomes incapable of acting, or if a vacancy occurs in the office of Custodian for any cause, the Holders of a majority of the Outstanding Units shall promptly appoint a successor Custodian and shall comply with the applicable requirements of Section 3.08. If no successor Custodian shall have been so appointed by such Holders and accepted appointment in the manner required by Section 3.08, any Holder who has been a bona fide Holder for at least six months (of, if a shorter period of time, since the date of this Agreement) may, on behalf of himself and all others similarly situated, petition any court of competent jurisdiction for the appointment of a successor Custodian.

(f) The Purchase Contract Agent shall give, or shall cause such successor Custodian to give, notice of each resignation and each removal of the Custodian and each appointment of a successor Custodian by mailing written notice of such event by first class mail, postage prepaid, to all Holders as their names and addresses appear in the Unit Register. Each notice shall include the name of the successor Custodian and the address of its Corporate Trust Office.

14

(g) Upon the appointment of a successor Custodian pursuant to this Article, the predecessor Custodian shall immediately deliver to the successor Custodian any remaining portion of the compensation and expenses received in advance by the predecessor Custodian pursuant to either Section 3.05 or this Section 3.07(g). The amount of compensation and expenses the predecessor Custodian shall deliver will be determined by multiplying the total amount received by the predecessor Custodian, pursuant to either Section 3.05 or this Section 3.07(g), by a fraction, which numerator is the number of days remaining until the Purchase Contract Settlement Date and which denominator is the number of days remaining until the Purchase Contract Settlement Date plus the number of days such predecessor Custodian has performed the duties hereunder.

Section 3.09. *Acceptance of Appointment by Successor*. (a) In case of the appointment hereunder of a successor Custodian, every such successor Custodian so appointed shall execute, acknowledge and deliver to the Purchase Contract Agent and to the retiring Custodian (with a copy to each Holder) an instrument accepting such appointment, and thereupon the resignation or removal of the retiring Custodian shall become effective and such successor Custodian, without any further act, deed or conveyance, shall become vested with all the rights, powers, agencies and duties of the retiring Custodian; and such retiring Custodian shall duly assign, transfer and deliver to such successor Custodian all property and money held by such retiring Custodian hereunder.

(b) No successor Custodian shall accept its appointment unless at the time of such acceptance such successor Custodian shall be qualified and eligible under this Article.

Section 3.10. *Merger, Conversion, Consolidation or Succession to Business*. Any corporation into which the Custodian may be merged or converted or with which it may be consolidated, or any corporation resulting from any merger, conversion or consolidation to which the Custodian shall be a party, or any corporation succeeding to all or substantially all the corporate trust business of the Custodian, shall be the successor of the Custodian hereunder, provided such corporation shall be otherwise qualified and eligible under this Article, without the execution or filing of any paper or any further act on the part of any of the parties hereto.

Section 3.11. *No Obligations of Custodian*. Except to the extent otherwise provided for in this Agreement, the Custodian assumes no obligations and shall not be subject to any liability under this Agreement or any Unit in respect of the obligations of the Company or the Purchase Contract Agent.

15

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 854 of 1367

Section 3.12. *Tax Compliance*. The Custodian will comply with all applicable certification, information reporting and withholding (including "backup" withholding) requirements imposed by applicable tax laws, regulations or administrative practice with respect to (i) any payments made with respect to the Treasury Strips or (ii) the delivery, holding, transfer or withdrawal of the Treasury Strips. Such compliance shall include, without limitation, the timely payment of all amounts required to be withheld to the appropriate taxing authority or its designated agent.

ARTICLE FOUR
THE PURCHASE CONTRACT AGENT SECTION

Section 4.01. *Purchase Contract Agent's Direct Liability*. The rights, privileges, protections, immunities and indemnities afforded the Purchase Contract Agent under the Purchase Contract Agreement, including, without limitation, its rights under Section 9.07 thereof, are hereby incorporated herein as if set forth herein in full.

Section 4.02. *Force Majeure*. Without limiting Section 4.01 hereof, the Purchase Contract Agent will not be responsible for any failure to perform any of its obligations if such performance is prevented, hindered or delayed by a Force Majeure Event, in such case its obligations will be suspended for so long as the Force Majeure Event continues.

ARTICLE FIVE
SUPPLEMENTAL AGREEMENTS

Section 5.01. *Supplemental Agreements without Consent of Holders*. Without the consent of any Holders, the Purchase Contract Agent and the Custodian, at any time and from time to time, may enter into one or more agreements supplemental hereto, in form satisfactory to the Purchase Contract Agent and the Custodian, for any of the following purposes:

(i) to evidence the succession of another Person to the Purchase Contract Agent; or

(ii) to evidence and provide for the acceptance of appointment hereunder by a successor Custodian, and the assumption by any such successor of the covenants of the Custodian hereunder; or

(iii) to cure any ambiguity, to correct or supplement any provisions herein which may be inconsistent with any other provisions herein, or to make any other provisions with respect to such matters or questions arising under this Agreement, but only to the extent such action does not adversely affect in any material respect rights or obligations of the Holders or of the Purchase Contract Agent in relation to the Holders, as the case may be.

Section 5.02. *Supplemental Agreements with Consent of Holders*. Except as set forth in Section 5.01, without the consent of each Holder affected thereby, the Purchase Contract Agent and the Custodian shall not enter into an agreement or agreements supplemental hereto for the purpose of modifying in any manner any of the terms of this Agreement.

Section 5.03. *Effect of Supplemental Agreements*. In executing a supplemental agreement under this Article, the Custodian and the Purchase Contract Agent shall be entitled to receive an Officer's Certificate and Opinion of Counsel from the Company to the effect that such supplemental agreement is authorized or permitted under this Agreement. Upon the execution of any supplemental agreement under this Article, this Agreement shall be modified in accordance therewith, and such supplemental agreement shall form a part of this Agreement for all purposes; and every Holder of Unit Certificates theretofore or thereafter authenticated, executed on behalf of the Holders and delivered hereunder shall be bound thereby.

## ARTICLE SIX
### COVENANTS

Section 6.01. *Performance Under this Agreement*. Subject to Sections 3.01 and 3.02, the Custodian covenants and agrees for the benefit of the Holders of Units from time to time that it will duly and punctually perform its obligations under the terms of this Agreement.

## ARTICLE SEVEN
### GENERAL CONDITIONS

Section 7.01. *Entire Agreement*. This Agreement constitutes the entire agreement and understanding of the parties hereto with respect to the matters set forth herein, and all prior negotiations, drafts and writings, and understandings relating to the subject matter of this Agreement, are merged herein and are superseded, nullified and canceled by this Agreement.

IN WITNESS WHEREOF, the Purchase Contract Agent and the Custodian have caused this Agreement to be duly executed as of the day and year first above written and all Holders shall become parties hereto upon acceptance by them of Unit Certificates issued in accordance with the terms of the Purchase Contract Agreement.

THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A., as Custodian

By:   /s/ LAWRENCE M. KUSCH
      Name: Lawrence M. Kusch
      Title:  Vice President

THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A., as Purchase Contract Agent

By:   /s/ LAWRENCE M. KUSCH
      Name: Lawrence M. Kusch
      Title:  Vice President

**TREASURY STRIPS**

| Maturity | Face Amount | CUSIP |
|---|---|---|
| August 15, 2020 | $ 10,000,000 | 912803AU7 |
| November 15, 2020 | $ 20,000,000 | 912820WZ6 |
| February 15, 2021 | $ 20,000,000 | 912803AV5 |
| May 15, 2021 | $ 20,000,000 | 912803AW3 |
| August 15, 2021 | $ 20,000,000 | 912821AG0 |
| November 15, 2021 | $ 20,000,000 | 912820ZH3 |
| February 15, 2022 | $ 20,000,000 | 912833LG3 |
| May 15, 2022 | $ 20,000,000 | 912821BZ7 |
| August 15, 2022 | $ 20,000,000 | 912820RU3 |
| November 15, 2022 | $ 20,000,000 | 912820SH1 |
| February 15, 2023 | $ 20,000,000 | 912820B30 |
| May 15, 2023 | $ 20,000,000 | 912820F36 |
| August 15, 2023 | $ 20,000,000 | 912820G84 |

Sch. 1-1

Exhibit 5.1



HUNTON ANDREWS KURTH LLP
200 PARK AVENUE
NEW YORK, NY 10166-0005

TEL  212 • 309 • 1000
FAX 212 • 309 • 1100

July 1, 2020

PG&E Corporation
77 Beale Street
San Francisco, California 94105

Re:   PG&E Corporation
      Registration Statement on Form S-3

Ladies and Gentlemen:

    We have served as special California counsel to PG&E Corporation, a California corporation (the "Company"), in connection with the Registration Statement on Form S-3 (Registration Statement No. 333-236629-01), as amended (the "Registration Statement") relating to 423,372,629 shares of common stock of the Company, no par value (the "Securities").

    In rendering the opinions expressed below, we have examined and relied upon a copy of the Registration Statement and the exhibits to be filed therewith. We have also examined originals, or copies of originals certified to our satisfaction, of such agreements, documents, certificates and statements of government officials and other instruments, and have examined such questions of law and have satisfied ourselves as to such matters of fact, as we have considered relevant and necessary as a basis for this opinion letter. We have assumed: (i) the genuineness of all signatures; (ii) the legal capacity of natural persons; (iii) the authenticity of all documents submitted to us as originals and (iv) the conformity to original documents of all documents submitted to us as certified or photostatic copies and the authenticity of the originals of such latter documents.

    Based upon the foregoing and such other documents and matters as we have deemed necessary and appropriate to render the opinions set forth herein, and subject to the limitations, assumptions and qualifications noted herein, we are of the opinion that the Securities have been duly authorized by the Company and are validly issued, fully paid and non-assessable.

    We do not express any opinion herein concerning any law other than the General Corporation Law of the State of California.

ATLANTA   AUSTIN   BANGKOK   BEIJING   BOSTON   BRUSSELS   CHARLOTTE   DALLAS   DUBAI   HOUSTON   LONDON   LOS ANGELES
MIAMI   NEW YORK   NORFOLK   RALEIGH/DURHAM   RICHMOND   SAN FRANCISCO   THE WOODLANDS   TYSONS   WASHINGTON, DC
www.HuntonAK.com

We are aware that we are referred to under the heading "Legal Matters" in the prospectus forming a part of the Registration Statement. We hereby consent to such use of our name therein and the filing of this opinion letter as Exhibit 5.1 to the Registration Statement. In giving the foregoing consent, we do not hereby admit that we come within the category of persons whose consent is required under Section 7 of the Securities Act or the rules and regulations of the Commission thereunder. This opinion letter is limited to the matters stated in this opinion letter, and no opinion may be implied or inferred beyond the matters expressly stated in this opinion letter. This opinion letter is given as of the date hereof. We assume no obligation to advise you after the date hereof of facts or circumstances that come to our attention or changes in the law, including judicial or administrative interpretations thereof, that occur which could affect the opinions contained herein.

Very truly yours,

/s/ Hunton Andrews Kurth LLP

13936/13951/14929/09310

Exhibit 5.2



HUNTON ANDREWS KURTH LLP
200 PARK AVENUE
NEW YORK, NY 10166-0005

TEL 212 • 309 • 1000
FAX 212 • 309 • 1100

July 1, 2020

PG&E Corporation
77 Beale Street
San Francisco, California 94105

Re:   PG&E Corporation
       Registration Statement on Form S-3

Ladies and Gentlemen:

We have served as special California counsel to PG&E Corporation, a California corporation (the "Company"), in connection with the Registration Statement on Form S-3 (Registration Statement No. 333-236629-01), as amended (the "Registration Statement") relating to 14,545,455 Equity Units (the "Units") of the Company, each consisting of (A) a prepaid forward stock purchase contract (each, a "Purchase Contract", and collectively, the "Purchase Contracts") being issued by the Company under the Purchase Contract and Unit Agreement dated as of July 1, 2020 (the "Purchase Contract Agreement"), between the Company and The Bank of New York Mellon Trust Company, N.A., as purchase contract agent and as attorney-in-fact for the holders of the Purchase Contracts from time to time, pursuant to which the holder thereof will agree to purchase from the Company and the Company will agree to sell to the holder thereof an amount of shares of common stock of the Company, no par value (the "Shares") as set forth in the Purchase Contract Agreement and (B) a 1/48,000th undivided beneficial ownership interest in specified zero-coupon U.S. treasury strips.

In rendering the opinions in this opinion letter, we have examined the following documents:

(a)   The Registration Statement;

(b)   The Amended and Restated Articles of Incorporation of the Company dated June 20, 2020, as certified by the Secretary of State of the State of California (the "California SOS") on June 22, 2020 and the Bylaws of the Company amended as of June 22, 2020 (collectively, the "Organizational Documents");

(c)   That certain entity status letter dated as of June 30, 2020 with respect to the Company issued by the Franchise Tax Board of the State of California and that certain certificate of status dated as of June 24, 2020 with respect to the Company issued by the California SOS (collectively, the "Company Status Certificates");

(d)   The Underwriting Agreement dated June 25, 2020, among the Company and the Underwriters named therein, as executed;

(e)   The Purchase Contract and Unit Agreement dated as of July 1, 2020 (the "Purchase Contract Agreement"), among the Company and The Bank of New York Mellon Trust Company, N.A., as purchase contract agent and as attorney-in-fact for the holders of the Purchase Contracts from time to time;

(f)   The form of Unit and the form of Purchase Contract included in the Purchase Contract Agreement;

(g)   The Custodial Agreement dated as of July 1, 2020 between The Bank of New York Mellon Trust Company, N.A., as purchase contract agent and custodian, and the holders of the Units; and

(h)   Resolutions of the Board of Directors of the Company adopted on April 29, 2020 and resolutions of the Pricing Committee of the Board of Directors of the Company adopted on June 25, 2020.

In rendering the opinions expressed below, we have examined and relied upon a copy of the Registration Statement and the exhibits to be filed therewith. We have also examined originals, or copies of originals certified to our satisfaction, of such agreements, documents, certificates and statements of government officials and other instruments, and have examined such questions of law and have satisfied ourselves as to such matters of fact, as we have considered relevant and necessary as a basis for this opinion letter. We have assumed: (i) the genuineness of all signatures; (ii) the legal capacity of natural persons; (iii) the authenticity of all documents submitted to us as originals and (iv) the conformity to original documents of all documents submitted to us as certified or photostatic copies and the authenticity of the originals of such latter documents and (v) the due authorization, execution and delivery of all documents by all parties, except as to the Company, as set forth in numbered

paragraph 3 below, and the validity, binding effect and enforceability of all documents by all parties.

Based upon the foregoing and such other documents and matters as we have deemed necessary and appropriate to render the opinions set forth herein, and subject to the limitations, assumptions and qualifications noted herein, we are of the opinion that:

1. Based solely on our review of the Company Status Certificates, the Company is a corporation in good standing under the laws of the State of California as of the date of the Company Status Certificates.

2. The Company has the requisite corporate power and authority to execute and deliver the Purchase Contract Agreement, the Purchase Contracts and the Units and to consummate the transactions contemplated thereby.

3. The Purchase Contract Agreement, the Purchase Contracts and the Units have each been duly authorized by all necessary corporate action of the Company and have each been duly executed and delivered by the Company.

4. The Shares initially issuable by the Company upon settlement of the Purchase Contracts at the maximum settlement rate provided for therein have been duly authorized and reserved for issuance upon settlement and, when issued and delivered in accordance with the terms of the Purchase Contract Agreement, will be validly issued, fully paid and non-assessable, and the issuance of the Shares will not be subject to any preemptive or similar rights.

We do not express any opinion herein concerning any law other than the General Corporation Law of the State of California. With respect to the opinion expressed herein relating to matters of the General Corporation Law of the State of California, we hereby consent to the reliance of Cravath, Swaine & Moore LLP in rendering its Exhibit 5 opinion, of even date herewith, in connection with the Registration Statement.

We are aware that we are referred to under the heading "Legal Matters" in the prospectus forming a part of the Registration Statement. We hereby consent to such use of our name therein and the filing of this opinion letter as Exhibit 5.1 to the Registration Statement. In giving the foregoing consent, we do not hereby admit that we come within the category of persons whose consent is required under Section 7 of the Securities Act or the rules and regulations of the Commission thereunder. This opinion letter is limited to the matters stated in this opinion letter, and no opinion may be implied or inferred beyond the matters expressly stated in this opinion letter. This opinion letter is given as of the date hereof. We assume no obligation to advise you after the date hereof of facts or circumstances that come to our attention or changes in the law, including judicial or administrative interpretations thereof, that occur which could affect the opinions contained herein.

Very truly yours,

/s/ Hunton Andrews Kurth LLP

13936/13951/14929/09310

Exhibit 5.3

CRAVATH, SWAINE & MOORE LLP

JOHN W. WHITE
EVAN R. CHESLER
RICHARD W. CLARY
STEPHEN L. GORDON
ROBERT H. BARON
DAVID MERCADO
CHRISTINE A. VARNEY
PETER T. BARBUR
THOMAS G. RAFFERTY
MICHAEL S. GOLDMAN
RICHARD HALL
JULIE A. NORTH
ANDREW W. NEEDHAM
STEPHEN L. BURNS
KATHERINE B. FORREST
KEITH R. HUMMEL
DAVID J. KAPPOS
DANIEL SLIFKIN
ROBERT I. TOWNSEND, III
PHILIP J. BOECKMAN
WILLIAM V. FOGG
FAIZA J. SAEED
RICHARD J. STARK
THOMAS E. DUNN
MARK I. GREENE

DAVID R. MARRIOTT
MICHAEL A. PASKIN
ANDREW J. PITTS
MICHAEL T. REYNOLDS
ANTONY L. RYAN
GEORGE L. ZOBITZ
GEORGE A. STEPHANAKIS
DARIN P. McATEE
GARY A. BORNSTEIN
TIMOTHY G. CAMERON
KARIN A. DeMASI
DAVID S. FINKELSTEIN
DAVID GREENWALD
RACHEL G. SKAISTIS
PAUL H. ZUMBRO
ERIC W. HILFERS
GEORGE F. SCHOEN
ERIK R. TAVZEL
CRAIG F. ARCELLA
DAMIEN R. ZOUBEK
LAUREN ANGELILLI
TATIANA LAPUSHCHIK
ALYSSA K. CAPLES
JENNIFER S. CONWAY
MINH VAN NGO

KEVIN J. ORSINI
MATTHEW MORREALE
JOHN D. BURETTA
J. WESLEY EARNHARDT
YONATAN EVEN
BENJAMIN GRUENSTEIN
JOSEPH D. ZAVAGLIA
STEPHEN M. KESSING
LAUREN A. MOSKOWITZ
DAVID J. PERKINS
JOHNNY G. SKUMPIJA
J. LEONARD TETI, II
D. SCOTT BENNETT
TING S. CHEN
CHRISTOPHER K. FARGO
KENNETH C. HALCOM
DAVID M. STUART
AARON M. GRUBER
O. KEITH HALLAM, III
OMID H. NASAB
DAMARIS HERNÁNDEZ
JONATHAN J. KATZ
MARGARET SEGALL D'AMICO
RORY A. LERARIS
KARA L. MUNGOVAN

NICHOLAS A. DORSEY
ANDREW C. ELKEN
JENNY HOCHENBERG
VANESSA A. LAVELY
G.J. LIGELIS JR.
MICHAEL L. MARIANI
LAUREN R. KENNEDY
SASHA ROSENTHAL-LARREA
ALLISON H. WEIN
MICHAEL P. ADDIS
JUSTIN C. CLARKE
SHARONMOYEE GOSWAMI
C. DANIEL HAAREN
EVAN MEHRAN NORRIS
LAUREN M. ROSENBERG

SPECIAL COUNSEL
SAMUEL C. BUTLER

OF COUNSEL
MICHAEL L. SCHLER
CHRISTOPHER J. KELLY

WORLDWIDE PLAZA
825 EIGHTH AVENUE
NEW YORK, NY 10019-7475

TELEPHONE: +1-212-474-1000
FACSIMILE: +1-212-474-3700

CITYPOINT
ONE ROPEMAKER STREET
LONDON EC2Y 9HR
TELEPHONE: +44-20-7453-1000
FACSIMILE: +44-20-7860-1150

WRITER'S DIRECT DIAL NUMBER

WRITER'S EMAIL ADDRESS

July 1, 2020

PG&E Corporation
14,545,455 Equity Units

Ladies and Gentlemen:

We have acted as counsel for PG&E Corporation, a California corporation (the "Company"), in connection with the public offering and sale by the Company of an aggregate of 14,545,455 prepaid forward stock purchase contracts of the Company (the "Purchase Contracts"), which form one component of the 14,545,455 Equity Units (the "Units") to be issued under the Purchase Contract and Units Agreement dated as of July 1, 2020 (the "Purchase Contract Agreement"), among the Company and The Bank of New York Mellon Trust Company, N.A., as purchase contract agent and as attorney-in-fact for the holders of the Purchase Contracts from time to time (the "Purchase Contract Agent"), in accordance with the Underwriting Agreement dated as of June 25, 2020 (the "Underwriting Agreement"), among Goldman Sachs & Co. LLC and J.P. Morgan Securities LLC, as Representatives of the several Underwriters listed on Schedule I thereto (the "Underwriters"). Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Underwriting Agreement.

In connection with this opinion, we have examined originals, or copies certified or otherwise identified to our satisfaction, of such corporate records, certificates of corporate officers and government officials and such other documents as we have deemed necessary or appropriate for the purposes of this opinion, including: (a) the Purchase Contract Agreement and the form of Unit and the form of Purchase Contract included therein and (b) the Registration Statement on Form S-3 (Registration No. 333-236629-01) filed with the Securities and Exchange Commission (the "Commission") on February 25, 2020 (the "Registration Statement"), with respect to the registration under the Securities Act of 1933, as amended (the "Securities Act"), of $25,675,000,000 aggregate amount of various securities of the Company, including the Units and the Purchase Contracts, to be issued from time to time by the Company, as amended by Amendment No. 1 thereto filed with the Commission on April 13, 2020, Amendment No. 2 thereto filed with the Commission on May 22, 2020 and Amendment No. 3 thereto filed with the Commission on May 29, 2020 (such Registration Statement, as amended by such amendments, being hereinafter referred to as the "Registration Statement").

In rendering this opinion, we have assumed, with your consent and without independent investigation or verification, the genuineness of all signatures, the legal capacity and competency of all natural persons, the authenticity of all documents submitted to us as originals and the conformity to authentic original documents of all documents submitted to us as duplicates or copies. We also have assumed, with your consent, that the Purchase Contract Agreement has been duly authorized, executed and delivered by, and represents a legal, valid and binding obligation of, the Purchase Contract Agent and that the form of Unit and the form of Purchase Contract will conform to that included in the Purchase Contract Agreement.

Based on the foregoing and subject to the qualifications set forth herein, we are of opinion as follows:

1. Assuming that the Purchase Contract Agreement has been duly authorized, executed and delivered by the Company, the Purchase Contract Agreement constitutes a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms (subject to applicable bankruptcy, insolvency, reorganization, fraudulent conveyance, moratorium or other similar laws affecting creditors' rights generally from time to time in effect and subject to general principles of equity, including, without limitation, concepts of materiality, reasonableness, good faith and fair dealing, regardless of whether such enforceability is considered in a proceeding in equity or at law);

2. Assuming that the Purchase Contracts have been duly authorized by the Company, the Purchase Contracts will, when executed, authenticated (including the due authentication of the Purchase Contracts by the Purchase Contract Agent), issued and delivered in accordance with the provisions of the Purchase Contract Agreement and the Underwriting Agreement, and upon payment of the consideration therefor as provided for therein, such Purchase Contracts will constitute legal, valid and binding obligations of the Company, entitled to the benefits of the Purchase Contract Agreement and enforceable against the Company in accordance with their terms (subject to applicable bankruptcy, insolvency, reorganization, fraudulent conveyance, moratorium or other similar laws affecting creditors' rights generally from time to time in effect and subject to general principles of equity, including, without limitation, concepts of materiality, reasonableness, good faith and fair dealing, regardless of whether such enforceability is considered in a proceeding in equity or at law); and

3. Assuming that the Units have been duly authorized by the Company, the Units will, when executed, authenticated (including the due authentication of the Units by the Purchase Contract Agent), issued and delivered in accordance with the provisions of the Purchase Contract Agreement and the Underwriting Agreement, and upon payment of the consideration therefor as provided for therein, such Units will constitute legal, valid and binding obligations of the Company, entitled to the benefits of the Purchase Contract Agreement and enforceable against the Company in accordance with their terms (subject to applicable bankruptcy, insolvency, reorganization, fraudulent conveyance, moratorium or other similar laws affecting creditors' rights generally from time to time in effect and subject to general principles of equity, including, without limitation, concepts of materiality, reasonableness, good faith and fair dealing, regardless of whether such enforceability is considered in a proceeding in equity or at law).

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 864 of 1367

We express no opinion herein as to any provision of the Purchase Contract Agreement, the Units or the Purchase Contracts that (a) relates to the subject matter jurisdiction of any Federal court of the United States of America, or any Federal appellate court, to adjudicate any controversy related to the Purchase Contract Agreement, the Units or the Purchase Contracts, (b) contains a waiver of an inconvenient forum or (c) relates to the waiver of rights to jury trial. We also express no opinion as to whether a state court outside the State of New York or a Federal court of the United States would give effect to the choice of New York law provided for in the Purchase Contract Agreement, the Units or the Purchase Contracts.

We are admitted to practice only in the State of New York and express no opinion as to matters governed by any laws other than the laws of the State of New York and the Federal laws of the United States of America. In particular, we do not purport to pass on any matter governed by the laws of the State of California. In rendering this opinion, we have assumed, without independent investigation, the correctness of, and take no responsibility for, the opinion dated July 1, 2020, of Hunton Andrews Kurth LLP, California counsel to the Company, copies of which shall be filed with the Commission as Exhibit 5.2 to the Current Report on Form 8-K dated the date hereof and incorporated by reference into the Registration Statement, as to all matters of law covered therein relating to the laws of California.

We hereby consent to the filing of this opinion with the Commission as Exhibit 5.3 to the Current Report on Form 8-K dated the date hereof and incorporated by reference into the Registration Statement. We also consent to the reference to our firm under the caption "Legal Matters" in the Prospectus Supplement constituting part of the Registration Statement. In giving this consent, we do not thereby admit that we are included in the category of persons whose consent is required under Section 7 of the Securities Act or the rules and regulations of the Commission promulgated thereunder.

Very truly yours,

/s/ Cravath, Swaine & Moore LLP

PG&E Corporation
  77 Beale Street
    San Francisco, CA 94177

O

3

Exhibit 10.1

<u>**TAX BENEFIT PAYMENT AGREEMENT**</u>

This **TAX BENEFIT PAYMENT AGREEMENT** (this "**Agreement**") is entered into as of **[•]**, by and among PG&E Corporation, a California corporation ("**PG&E**"), Pacific Gas and Electric Company, a California corporation (the "**Utility**"; together with the Utility, the "**Debtors**"), and the Fire Victim Trust, a **[•]** (the "**Trust**"). PG&E, the Utility and the Trust are sometimes referred to in this Agreement individually as a "**Party**" and collectively as the "**Parties**".

<div align="center">

**RECITALS**

</div>

**WHEREAS**, on January 29, 2019, the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the U.S. Code in the U.S. Bankruptcy Court of the Northern District of California (the "**Bankruptcy Court**").

**WHEREAS**, on **[•]**, the Bankruptcy Court entered an order confirming the **[•]** (the "**Plan**"). Capitalized terms used, but not defined in this Agreement, shall have the meanings given to them in the Plan.

**WHEREAS**, the Trust is the "Fire Victim Trust" as defined in the Plan and is organized to administer, process, settle, resolve, liquidate, satisfy, and pay all Fire Victim Claims.

**WHEREAS**, pursuant to the Plan, the Debtors have agreed to issue, transfer, or pay to, as applicable, the Trust for the benefit of holders of Fire Victim Claims the Aggregate Fire Victim Consideration consisting of, among other things, (i) on the Effective Date, pursuant to and as more particularly provided in <u>Section 1.6</u> of the Plan, $6.750 billion in New HoldCo Common Stock (issued at Fire Victim Equity Value), which shall not be less than 20.9% of the New HoldCo Common Stock assuming the Utility's allowed return on equity as of the date of the Tort Claimants RSA and $5.40 billion in cash, and other elements constituting part of the Aggregate Fire Victim Consideration, and (ii) on the terms set forth in this Agreement and the Plan, an additional $1.350 billion in cash (the amount described in <u>clause (ii)</u> of this recital, the "**Aggregate Tax Benefit Payment Amount**").

**NOW**, **THEREFORE**, in consideration of the foregoing and the respective covenants and agreements set forth herein, and intending to be legally bound hereby, the Parties agree as follows:

<div align="center">

<u>**ARTICLE I**</u>
**DEFINITIONS; INTERPRETATION**

</div>

Section 1.1 <u>**Definitions**</u>. As used in this Agreement, the terms set forth in this <u>Section 1.1</u> shall have the following meanings:

(a) "**2021 Payment**" means an amount in cash payable on or before the First Payment Date equal to the lesser of (i) $650.0 million and (ii) the Wildfire Claim Tax Benefits for the Utility's taxable year ended December 31, 2020.

(b) "**2022 Payment**" means an amount in cash equal to the 2022 Payment Cap.

(c) "**2022 Payment Cap**" means an amount in cash payable on or before the Final Payment Date equal to the (i) the Aggregate Tax Benefit Payment Amount minus (ii) the 2021 Payment plus any 2022 Prepayment Amount.

(d) "**2022 Prepayment Amount**" means an amount, if greater than zero, equal to (i) the Wildfire Claim Tax Benefits for the Utility's taxable year ended December 31, 2020 minus (ii) $650.0 million, up to the Aggregate Tax Benefit Payment Amount.

(e) "**Agreement**" has the meaning set forth in the preamble of this Agreement.

(f) "**Aggregate Tax Benefit Payment Amount**" has the meaning set forth in the recitals of this Agreement.

(g) "**Bankruptcy Court**" has the meaning set forth in the recitals of this Agreement.

(h) "**Business Day**" means a day other than Saturday, Sunday or any day on which commercial banks in New York, New York are authorized or required by law to close.

(i) "**Change of Control**" means the occurrence of any of the following events at any time after the Effective Date: (i) if any Person or "group" (within the meaning of Section 13(d) of the Securities Exchange Act of 1934, or any successor provisions thereto), other than PG&E or the Trust (whether directly or indirectly, including as a holder of PG&E), shall at any time have acquired direct or indirect beneficial ownership (as defined in Rules 13d-3 and 13d-5 under the Securities Exchange Act of 1934) of securities of the Utility representing more than 50% of the combined voting power of the Utility's then outstanding voting securities, (ii) if any Person or "group" (within the meaning of Section 13(d) of the Securities Exchange Act of 1934, or any successor provisions thereto) (other than the Trust) shall at any time have acquired direct or indirect beneficial ownership (as defined in Rules 13d-3 and 13d-5 under the Securities Exchange Act of 1934) of securities of PG&E representing more than 50% of the combined voting power of PG&E's then outstanding voting securities, (iii) upon the consummation of any merger, consolidation, recapitalization, reclassification or other similar transaction involving the Utility (or PG&E) where, immediately after giving effect to such transaction, the direct or indirect beneficial owners of the voting securities of the Utility (or PG&E) immediately prior to such transaction beneficially (directly or indirectly) own, by reason of such holders owning stock in the Utility (or PG&E) immediately before the transaction, less than a majority of the voting power of the outstanding voting securities of the Utility (or PG&E, as applicable), the Person that is the survivor (or the equivalent) of the transaction, (iv) the shareholder(s) of the Utility (or the PG&E) approve a plan of liquidation or dissolution of the Utility or there is consummated an agreement or series of related agreements for the sale, lease or other disposition, directly or indirectly, by the Utility of all or substantially all of the Utility' assets, or (v) an "Ownership Change" (within the meaning of Section 382(g) of the Tax Code or any successor provision) of the Utility or the PG&E occurring after and other than as a result of the occurrence of the Effective Date. For purposes of this definition, a Person shall not be deemed to have beneficial ownership of securities subject to a stock purchase agreement, merger agreement or similar agreement until the consummation of the transactions contemplated by such agreement.

2

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 867 of 1367

(j) "**Debtors**" has the meaning set forth in the recitals of this Agreement.

(k) "**Eligible Bank**" means any commercial bank having a senior unsecured debt rating by Moody's of A3 or better and by S&P of A- or better, which is domiciled in the United States or has a branch office in the United States and is domiciled in a country which is a member of the OECD.

(l) "**Financing Event**" means any transaction or series of transactions pursuant to which the Utility monetizes, securitizes, sells, assigns, transfers, or grants a lien, security interest or other encumbrance on any of the Wildfire Claim Tax Deductions or any of its interests therein and which in all events shall be deemed to include, without limitation, any securitization referred to in the Utility Securitization Application.

(m) "**First Payment Date**" means January 15, 2021, or, if such date is not a Business Day, the next succeeding Business Day.

(n) "**First Payment Shortfall**" means, as applicable, either (i) the 2021 Payment received by the Trust on or prior to the First Payment Date is less than $650.0 million or (ii) no 2021 Payment was received by the Trust on the First Payment Date.

(o) "**First Payment Shortfall Amount**" means (x) in the case of clause (i) of the definition of First Payment Shortfall, $650.0 million minus the amount of the 2021 Payment received by the Trust on or prior to the First Payment Date, and (y) in the case of clause (ii) of the definition of First Payment Shortfall, $650.0 million.

(p) "**Final Payment Date**" means January 15, 2022, or, if such date is not a Business Day, the next succeeding Business Day.

(q) "**Final Payment Shortfall**" means the amount by which, if any, at the end of the Final Payment Date the total of payments received in cash by the Trust hereunder is less than the Aggregate Tax Benefit Payment Amount.

(r) "**LC**" has the meaning set forth in <u>Section 2.2(a)</u> hereof.

(s) "**LC Issuance Date**" means the date that is fifteen (15) Business Days after the First Payment Date.

(t) "**LC Issuer**" has the meaning set forth in <u>Section 2.2(a)</u> hereof.

(u) "**Mandatory Prepayment Amount**" means an amount equal to, as of the date of a Mandatory Prepayment Event, the difference between (i) the Aggregate Tax Benefit Payment Amount and (ii) the aggregate Tax Benefit Payments paid in cash hereunder to the Trust prior to such date.

(v) "**Mandatory Prepayment Event**" means the occurrence of a (i) Change of Control or (ii) a Financing Event.

(w) "**Moody's**" means Moody's Investors Service, Inc., or its successors and assigns.

3

(x) "**OECD**" means the countries constituting the "Contracting Parties" to the Convention on the Organisation For Economic Co-operation and Development, as such term is defined in Article 4 of such Convention.

(y) "**Party**" and "**Parties**" have the meaning set forth in the preamble to this Agreement.

(z) "**Person**" means any individual, corporation, firm, partnership, joint venture, limited liability company, estate, trust, business association, organization, governmental entity or other entity.

(aa) "**PG&E**" has the meaning set forth in the recitals of this Agreement.

(bb) "**Plan**" has the meaning set forth in the recitals of this Agreement.

(cc) "**S&P**" means Standard & Poor's Ratings Services, or its successors and assigns.

(dd) "**Tax Benefit Payment**" has the meaning set forth in Section 2.1.

(ee) "**Tax Code**" means the Internal Revenue Code of 1986, as amended.

(ff) "**Tax Rate**" means, with respect to the applicable taxable year of the Utility, the Utility's expected combined U.S. federal, state, and local income tax rate, as determined by a nationally recognized public accounting firm retained by the Utility in good faith. For calendar year 2020, the Tax Rate is 27.9836%.

(gg) "**Trust**" has the meaning set forth in the preamble of this Agreement.

(hh) "**Utility**" has the meaning set forth in the preamble of this Agreement.

(ii) "**Utility Accounting Firm**" has the meaning set forth in Section 2.1.

(jj) "**Utility Income Amount**" means, with respect to the applicable taxable year of the Utility, the greater of (i) the amount determined by application of the formula set forth on Schedule 1.1(jj) and (ii) zero dollars ($0).

(kk) "**Utility Securitization Application**" means the Application of Pacific Gas And Electric Company (U 39 E) for (1) Administration of Stress Test Methodology Developed Pursuant to Section 451.2(B) and (2) Determination That $7.5 Billion of 2017 Catastrophic Wildfire Costs and Expenses are Stress Test Costs that May Be Financed Through Issuance of Recovery Bonds, dated as of and filed with the California Public Utilities Commission on April 30, 2020.

(ll) "**Wildfire Claim Tax Benefits**" means, with respect to the applicable taxable year of the Utility, an amount equal to the product of (i) the Tax Rate and (ii) the Wildfire Claim Tax Deductions; provided that the amount of Wildfire Claim Tax Deductions (1) shall not exceed the Utility Income Amount for such year (which amount shall be assumed to be the taxable income of the Utility for U.S. federal (and applicable state and local) income tax purposes for the applicable taxable year), and (2) shall take into account all applicable limitations on the utilization of such deductions (including pursuant to Sections 172 and 382 of the Tax Code).

4

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 869 of 1367

(mm) "**Wildfire Claim Tax Deductions**" means the U.S. federal (and state and local) tax deductions resulting from the payment of cash or delivery of other consideration to satisfy Fire Claims pursuant to the Plan, including the portion of any net operating loss carryovers attributable to such deductions.

Section 1.2 **Rules of Construction**. The words "hereof", "herein" and "hereunder" and words of like import used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. The captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof. References to Sections and Schedules are to Sections and Schedules of this Agreement unless otherwise specified. All Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any singular term in this Agreement shall be deemed to include the plural, and any plural term the singular. Whenever the words "include", "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation", whether or not they are in fact followed by those words or words of like import. "Writing", "written" and comparable terms refer to printing, typing and other means of reproducing words (including electronic media) in a visible form. References to any statute, law or regulation shall be deemed to refer to such statute, law or regulation as amended from time to time and to any rules or regulations promulgated thereunder. References from or through any date mean, unless otherwise specified, from and including or through and including, respectively. The word "extent" in the phrase "to the extent" shall mean the degree to which a subject or other theory extends and such phrase shall not mean "if". The Parties have participated jointly in the negotiation and drafting of this Agreement, and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement. The terms "or", "any" and "either" are not exclusive, except to the extent expressly provided otherwise.

## ARTICLE II
## TAX BENEFIT PAYMENTS

Section 2.1 **Tax Benefit Payments**. The Utility shall make the following payments to the Trust in cash (each, a "**Tax Benefit Payment**"):

(a) on or before the First Payment Date, the Utility shall (i) pay to the Trust an amount equal to the 2021 Payment plus the 2022 Prepayment Amount (if any) and (ii) provide the Trust with a statement, prepared by the Utility in good faith and in consultation with PriceWaterhouseCoopers LLP, a nationally recognized accounting firm retained by the Utility ("**Utility Accounting Firm**"), setting forth, in reasonable detail, the calculation of such payment in accordance with this Agreement along with supporting schedules as well as the identification of any material assumptions that were utilized in preparing such calculation;

5

(b) on or before the Final Payment Date, the Utility shall (i) pay to the Trust an amount equal to the 2022 Payment Cap, and (ii) provide the Trust with a statement, prepared by the Utility in good faith and in consultation with the Utility Accounting Firm, setting forth, in reasonable detail, the calculation of such payment in accordance with this Agreement along with supporting schedules as well as the identification of any material assumptions that were utilized in preparing such calculation; and

(c) notwithstanding the foregoing, the Utility shall, if applicable, (i) make any payment when and as required pursuant to Section 2.3 hereof and (ii) provide the Trust with a statement prepared by the Utility in good faith and in consultation with the Utility Accounting Firm setting forth, in reasonable detail, the calculation of such payment in accordance with this Agreement along with supporting schedules as well as the identification of any material assumptions that were utilized in preparing such calculation.

Section 2.2 **Letter of Credit**.

(a) In the event that on the First Payment Date, a First Payment Shortfall exists for any reason, then the Utility shall, no later than the LC Issuance Date, cause to be issued one or more unconditional stand-by letters of credit (individually and collectively, the "**LC**") from one or more LC issuers each of which must be an Eligible Bank (each such issuer, individually and collectively, an "**LC Issuer**") and otherwise reasonably acceptable to the Trust. There shall be no more than five LC Issuers and no more than five LCs. Each such LC shall be substantially in the form of Exhibit A hereof and otherwise in form and substance satisfactory to the Trust, and shall: (i) name the Trust as beneficiary, (ii) be, in the aggregate with each other LC, in a stated amount equal to the First Payment Shortfall Amount, (iii) provide that it is payable at sight, in whole or in part (with no approval or confirmation from the Utility or other drawing conditions), on or after the Final Payment Date, or, in the case of a Mandatory Prepayment Event, as set forth pursuant to Section 2.3 hereof, and (iv) expire no earlier than February 8, 2022. The Trust may draw on the LCs in an aggregate amount equal to the difference between (i) the Aggregate Tax Benefit Payment Amount and (ii) the aggregate Tax Benefit Payments previously paid in cash hereunder to the Trust.

(b) If the LC or LCs have not been issued in accordance with Section 2.2(a) hereof within ten (10) days of the LC Issuance Date, then the Trust shall have the right to file the stipulated judgment attached hereto as Exhibit B-1 against the Utility in any federal or state court of competent jurisdiction in the State of California the amount of the First Payment Shortfall solely based on a declaration by the trustee of the Trust that the Utility has failed to comply with Section 2.2(a) of this Agreement. Such judgment shall unconditionally require the Utility to pay the First Payment Shortfall. The Debtors hereby waive the right to contest and appeal such stipulated judgment.

Section 2.3 **Mandatory Prepayments**.

(a) If a Change of Control occurs, then within fifteen (15) days of such Change of Control, (i) the Mandatory Prepayment Amount shall become automatically due and payable without any notice or other action from the Trust; (ii) the Utility shall pay the Trust the Mandatory Prepayment Amount, (iii) to the extent the Mandatory Prepayment Amount is not paid in full on such date, and the LC has been issued and is outstanding pursuant to Section 2.2(a) hereof, the Trust may draw on the LC up to the lesser of the stated amount thereof and the unpaid portion of the Mandatory Prepayment Amount, and (iv) the Utility shall provide the Trust with a statement prepared by the Utility in good faith and in consultation with the Utility Accounting Firm setting forth, in reasonable detail, the calculation of such payment in accordance with this Agreement along with supporting schedules as well as the identification of any material assumptions that were utilized in preparing such calculation.

(b) If a Financing Event occurs, then (i) the Mandatory Prepayment Amount shall become automatically due and payable without any notice or other action from the Trust upon the later of (x) the First Payment Date and (y) fifteen (15) days after the consummation of such Financing Event; (ii) the Utility shall pay the Trust on the applicable payment date (as determined pursuant to clause (i) immediately above) an amount equal to the Mandatory Prepayment Amount, (iii) to the extent the Mandatory Prepayment Amount is not paid in full on such date, and the LC has been issued and is outstanding pursuant to Section 2.2(a) hereof, the Trust may draw on the LC up to the lesser of the stated amount thereof and the unpaid portion of the Mandatory Prepayment Amount, and (iv) the Utility shall provide the Trust with a statement prepared by the Utility in good faith and in consultation with the Utility Accounting Firm setting forth, in reasonable detail, the calculation of such payment in accordance with this Agreement along with supporting schedules as well as the identification of any material assumptions that were utilized in preparing such calculation.

Section 2.4 **Final Payment Shortfall**. In the event that there is a Final Payment Shortfall on the Final Payment Date, then on February 8, 2022, the Trust shall have the right to file the stipulated judgment attached hereto as Exhibit B-2 against the Utility in any federal or state court of competent jurisdiction in the State of California in the amount of the Final Payment Shortfall solely based on a declaration by the trustee of the Trust that a Final Payment Shortfall has occurred in consequence of which the Utility has failed to comply with this Agreement. Such judgment shall unconditionally require the Utility to pay the Final Payment Shortfall. The Debtors hereby waive the right to contest and appeal such stipulated judgement.

Section 2.5 **Payment Instructions**. All payments by the Utility to the Trust pursuant to this Agreement shall be paid by wire transfer of immediately available funds to the bank account or accounts set forth on Schedule 2.5, as such Schedule may be amended from time to time by the Trust upon written notice to the Utility.

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 872 of 1367

# ARTICLE III
## REPRESENTATIONS OF DEBTORS

As a material inducement for the Trust to enter into this Agreement and consummate the transactions contemplated by this Agreement, the Debtors hereby represent and warrant to the Trust, as of the date hereof, the following:

Section 3.1 **Capacity; Noncontravention.**

(a) Each Debtor has all necessary power and authority and all requisite governmental licenses, authorizations, consents and approvals to execute and deliver this Agreement and to perform all of its obligations hereunder. This Agreement has been duly executed and delivered by each Debtor and constitutes a legal, valid and binding obligation of each Debtor, enforceable against each Debtor in accordance with its terms except as such enforceability may be limited by bankruptcy, insolvency, reorganization, receivership, moratorium or other laws affecting creditors' rights generally and by general principles of equity.

(b) The execution and delivery of this Agreement, and the consummation by each Debtor of the transactions described herein, does not (a) contravene the terms of its corporate charter, by-laws, operating agreement or equivalent, (b) conflict with or result in any breach or contravention of, or the creation of any lien under, or require any payment to be made under (i) any material contract to which the Debtor is a party or affecting such Debtor or the properties of the Debtors or (ii) any material order, injunction, writ or decree of any governmental authority or any arbitral award to which any Debtor or its property is subject or (c) violate any law, regulation, rule, or court order in any material respect.

Section 3.2 **Approvals**. All approvals, filings, declarations or registration with any governmental authority or otherwise which are necessary for each of (i) the execution and delivery of this Agreement by the Debtors to the Trust, and (ii) to create a fully binding commitment of the Debtors as of the date of this Agreement with respect to each of the terms of this Agreement without modification have, in each case, been made and obtained by the Debtors prior to the date hereof.

# ARTICLE IV
## MISCELLANEOUS

Section 4.1 **Negative Pledge**. During the term of this Agreement, no Debtor shall enter into any agreement, amendment or other modification governing or guaranteeing any indebtedness that would prohibit, condition, or restrict the Utility from timely performing its obligations under this Agreement. Other than in connection with a transaction that will result in a Mandatory Prepayment Event under this Agreement, the Utility shall not grant a Lien on or otherwise encumber the Wildfire Claim Tax Benefits or Wildfire Claim Tax Deductions.

Section 4.2 **Termination**. This Agreement shall terminate on the date on which the Aggregate Tax Benefit Payment Amount has been paid in full in cash to the Trust.

Section 4.3 **Notices**. All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be deemed duly given and received (a) on the date of delivery if delivered personally, or by facsimile upon confirmation of transmission by the sender's fax machine if sent on a Business Day (or otherwise on the next Business Day), (b) on the first Business Day following the date of dispatch if delivered by a recognized next-day courier service or (c) when sent by electronic mail (with hard copy to follow) during a Business Day (or on the next Business Day if sent after the close of normal business hours or on any non-Business Day). All notices hereunder shall be delivered as set forth below, or pursuant to such other instructions as may be designated in writing by the Party to receive such notice:

If to the Debtors, to:

PG&E Corporation
77 Beale Street
San Francisco, CA 94105
Attention: Janet Loduca

8

With a copy (which shall not constitute notice) to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Attention: Stephen Karotkin, Jessica Liou, and Matthew Goren
(stephen.karotkin@weil.com, jessica.liou@weil.com, matthew.goren@weil.com)

- and -

Cravath, Swaine & Moore LLP
825 8th Avenue
New York, NY 10019
Attention: Richard Hall and C. Daniel Haaren (rhall@cravath.com,
dhaaren@cravath.com)

If to the Trust, to:

Hon. John K. Trotter, Trustee
Trustee
PG&E Fire Victim Trust
Two Embarcadero Center
Suite 1500
San Francisco, CA 94111
Email: trustee@firevictimtrust.com

with copies to:

Cathy Yanni Claims Administrator
PG&E Fire Victim Trust
Two Embarcadero Center
Suite 1500
San Francisco, CA 94111
Email: claimsadministrator@firevictimtrust.com
With a copy (which shall not constitute notice) to:

Brown Rudnick LLP
One Financial Center
Boston, MA 02111
Attn: David Molton, Philip Flink and Steven Pohl
Email: DMolton@brownrudnick.com; PFlink@brownrudnick.com;
SPohl@brownrudnick.com

Any Party may change its address or fax number by giving the other Party written notice of its new address or fax number in the manner set forth above.

9

Section 4.4 **Counterparts**. This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the Parties and delivered to the other Parties, it being understood that all Parties need not sign the same counterpart. Delivery of an executed signature page to this Agreement by facsimile or electronic transmission (including by pdf) shall be as effective as delivery of a manually signed counterpart of this Agreement.

Section 4.5 **Entire Agreement; Third Party Beneficiaries**. This Agreement constitutes the entire agreement and supersedes all prior agreements and understandings, both written and oral, among the Parties with respect to the subject matter hereof. This Agreement shall be binding upon and inure solely to the benefit of each Party and its successors and permitted assigns. Except as otherwise provided in the preceding sentence, nothing in this Agreement, express or implied, is intended to or shall confer upon any other Person any right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

Section 4.6 **Governing Law; Jurisdiction; Jury Trial**.

(a) Except to the extent the Bankruptcy Code or other U.S. federal law is applicable, the rights, duties, and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of California, without giving effect to the principles of conflicts of law thereof to the extent they would result in the application of the laws of any other jurisdiction.

(b) Each Party hereto: (i) submits for itself and its property in any legal action or proceeding relating to this Agreement, or for recognition and enforcement of any judgment in respect thereof, to the jurisdiction of the Bankruptcy Court, and to the extent the Bankruptcy Court does not have (or abstains from exercising) jurisdiction, the jurisdiction of state and federal courts with competent jurisdiction located in the State of California; (ii) consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same; (iii) agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such Party at its address set forth in Section 4.3 or at such other address which has been notified to the Parties hereto; and (iv) agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law or shall limit the right to sue in any other jurisdiction.

(c) TO THE FULLEST EXTENT PERMITTED BY LAW, EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT.

Section 4.7 **Severability**. If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any law or public policy, all other terms and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 875 of 1367

adverse to any Party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

Section 4.8 **Amendments; Waiver**. No provision of this Agreement may be amended unless such amendment is approved in writing by the Utility and the Trust. No provision of this Agreement may be waived unless such waiver is in writing and signed by the Party or Parties against whom the waiver is to be effective.

*[Signature Page(s) Follow]*

11

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed as of the day and year first above written.

PG&E CORPORATION

By:   /s/ DAVID THOMASON
Name:  David Thomason
Title:   Vice President and Controller

PACIFIC GAS AND ELECTRIC COMPANY

By:   /s/ DAVID THOMASON
Name:  David Thomason
Title:   Vice President, Chief Financial Officer and Controller

FIRE VICTIM TRUST

By:   /s/ JOHN K. TROTTER
Name:  Hon. John K. Trotter
Title:   Trustee

12

**EXHIBIT A**

Form of Letter of Credit

(to be attached)

13

**EXHIBIT B-1**

Stipulated Judgment – First Payment Shortfall

(to be attached)

14

**Schedule 1.1(j)(j)**

Formula for Calculation of Utility Income Amount

[(Rate Base x equity ratio x return on equity)[1] / (1 – Tax Rate)] <u>minus</u> PG&E debt interest <u>minus</u> unrecoverable Utility debt interest <u>minus</u> the Utility's required annual contribution to the wildfire fund created by AB 1054

For the purposes of this <u>Schedule 1.1(j)(j)</u>, the **"Rate Base"** shall mean the total company rate base as approved by the California Public Utilities Commission in the Utility's 2020 General Rate Case proceeding but shall not include any fire risk mitigation capital expenditures that must be excluded from the Utility's equity rate base under AB 1054.

---

[1]    For the avoidance of doubt, should "(rate base x equity ratio x return on equity)" include any Effective Date or pre-Effective Date net operating losses of the Debtors, all such net operating losses of the Debtors shall be excluded when calculating any amount pursuant to the "(rate base x equity ratio x return on equity)" formula.

16

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 881 of 1367

**Exhibit 10.2**

EXECUTION VERSION

REGISTRATION RIGHTS AGREEMENT

dated as of

July 1, 2020

between

PG&E Corporation

and

the PG&E Fire Victim Trust

# TABLE OF CONTENTS

**Page**

ARTICLE I

Definitions

| | | |
|---|---|---|
| SECTION 1.01. | Certain Defined Terms | 2 |
| SECTION 1.02. | Terms Generally | 6 |

ARTICLE II

Registration Rights

| | | |
|---|---|---|
| SECTION 2.01. | Shelf Registration | 7 |
| SECTION 2.02. | Piggyback Offerings | 11 |
| SECTION 2.03. | Holdback | 13 |
| SECTION 2.04. | Registration Procedures | 14 |
| SECTION 2.05. | Free Writing Prospectuses | 18 |
| SECTION 2.06. | Suspension of Dispositions | 19 |
| SECTION 2.07. | Registration Expenses | 19 |
| SECTION 2.08. | Indemnification | 19 |
| SECTION 2.09. | Transfer of Registration Rights | 22 |

ARTICLE III

Periodic Reporting and Rule 144

| | | |
|---|---|---|
| SECTION 3.01. | Periodic Reporting | 23 |
| SECTION 3.02. | Rule 144 Block Trades | 23 |

ARTICLE IV

Mirror Voting

| | | |
|---|---|---|
| SECTION 4.01. | Mirror Voting | 23 |

ARTICLE V

Termination

| | | |
|---|---|---|
| SECTION 5.01. | Termination | 24 |

i

# ARTICLE VI

## Miscellaneous

| | | |
|---|---|---|
| SECTION 6.01. | Notices | 24 |
| SECTION 6.02. | Authority | 26 |
| SECTION 6.03. | No Third Party Beneficiaries | 26 |
| SECTION 6.04. | Governing Law; Forum Selection | 26 |
| SECTION 6.05. | WAIVER OF JURY TRIAL | 26 |
| SECTION 6.06. | Successors and Assigns | 26 |
| SECTION 6.07. | Entire Agreement | 26 |
| SECTION 6.08. | Severability | 27 |
| SECTION 6.09. | Amendment | 27 |
| SECTION 6.10. | Headings | 27 |
| SECTION 6.11. | Counterparts; Facsimiles | 27 |
| SECTION 6.12. | Time Periods | 27 |

ANNEX A: Plan of Distribution

## REGISTRATION RIGHTS AGREEMENT

This Registration Rights Agreement (as amended, supplemented or otherwise modified from time to time, this "<u>Agreement</u>") is entered into as of July 1, 2020, between PG&E Corporation, a California corporation (the "<u>Corporation</u>"), and the Trustee (as defined herein), solely in its capacity as trustee of the PG&E Fire Victim Trust, a statutory trust created under the Delaware Statutory Trust Act (including any of its Subsidiaries who may become a party hereto, the "<u>Trust</u>") established in connection with the Plan of Reorganization (as defined herein). Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Plan of Reorganization.

WHEREAS, on January 29, 2019, the Corporation and its subsidiary, Pacific Gas and Electric Company, a California corporation (collectively, the "<u>Debtors</u>"), commenced voluntary cases under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Northern District of California (the "<u>Bankruptcy Court</u>");

WHEREAS, on December 6, 2019, the Debtors entered into a Restructuring Support Agreement, as amended on December 16, 2019 (as amended, supplemented or otherwise modified from time to time, the "<u>RSA</u>"), with the Tort Claimants Committee, the Consenting Fire Claimant Professionals and the Shareholder Proponents, pursuant to which each party thereto agreed, upon the terms and subject to the conditions set forth therein, to support the Debtors' amended plan of reorganization identified therein;

WHEREAS, on December 12, 2019, the Debtors and the Shareholder Proponents filed the *Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization* (as amended on January 31, 2020, March 9, 2020, March 16, 2020, May 22, 2020 and June 19, 2020, and as may be further amended, supplemented or otherwise modified from time to time, the "<u>Plan of Reorganization</u>");

WHEREAS, upon the effective date of the Plan of Reorganization (the "<u>Effective Date</u>") and pursuant to the Plan of Reorganization, the Corporation will issue to the Trust, upon the terms and subject to the conditions set forth in the RSA and the Plan of Reorganization, 476,995,175 shares of the Corporation's common stock, no par value (the "<u>Common Stock</u>" and such shares, together with any other shares of Common Stock issued to the Fire Victim Trust pursuant to the Plan of Reorganization, the "<u>Trust Shares</u>"); and

WHEREAS, the Corporation has agreed to provide the Trust with registration rights with respect to the Registrable Securities (as defined herein), upon the terms and subject to the conditions set forth herein.

NOW, THEREFORE, in consideration of the foregoing and the mutual agreements contained in this Agreement, the parties hereby agree as follows:

## ARTICLE I

<u>Definitions</u>

SECTION 1.01. <u>Certain Defined Terms.</u> As used in this Agreement, the following terms have the following meanings set forth below or in the sections set forth below:

"<u>Adverse Disclosure</u>" means public disclosure of material non-public information that, as determined in good faith by the Board or an Executive Officer, (a) would not be required to be made at such time but for filing or maintaining in effect a registration statement as contemplated by this Agreement and (b) would not be in the Corporation's best interests.

"<u>Adverse Effect</u>" shall have the meaning set forth in **Section 2.01(e)**.

"<u>Advice</u>" shall have the meaning set forth in **Section 2.06**.

"<u>Agreement</u>" shall have the meaning set forth in the preamble.

"<u>Backstop Approval Order</u>" means the *Order (I) Approving Terms of, and Debtors' Entry Into and Performance Under, Equity Backstop Commitment Letters and (II) Authorizing Incurrence, Payment and Allowance of Related Premiums and Expenses As Administrative Expense Claims,* signed and filed on March 16, 2020.

"<u>Backstop Commitment Letters</u>" means those certain Amended and Restated Chapter 11 Plan Backstop Commitment Letters (as amended, supplemented or otherwise modified from time to time prior to the date of this Agreement in accordance with the terms thereof and the Backstop Approval Order and as may be otherwise permitted under the Plan of Reorganization and the RSA) entered into with the investors party thereto, pursuant to which the Backstop Parties have separately committed to purchase, and will receive as consideration thereunder, shares of Common Stock, on the terms and subject to the conditions of the Backstop Commitment Letters and the Backstop Approval Order.

"<u>Backstop Commitments</u>" means "Aggregate Backstop Commitments" as defined in the Backstop Commitment Letters.

"<u>Backstop Parties</u>" means, collectively, each "Backstop Party" as defined in each Backstop Commitment Letter.

"<u>Backstop RRAs</u>" shall have the meaning set forth in **Section 2.01(h)(ii)**.

"<u>Bankruptcy Court</u>" shall have the meaning set forth in the recitals.

"<u>Board</u>" means the Board of Directors of the Corporation, or any authorized committee thereof.

"<u>Business Day</u>" means any day other than a Saturday, Sunday or other day on which banks in the State of New York are authorized by law to remain closed.

2

"Common Stock" shall have the meaning set forth in the recitals.

"Control" means the direct or indirect power to direct or cause the direction of management or policies of a Person, whether through the ownership of voting securities, general partnership interests or management member interests, by contract or trust agreement, pursuant to a voting trust or otherwise. "Controlling" and "Controlled" have the correlative meanings.

"Corporation" shall have the meaning set forth in the preamble.

"Debtors" shall have the meaning set forth in the recitals.

"Effective Date" shall have the meaning set forth in the recitals.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder.

"Excluded Registration" means a registration under the Securities Act of (a) Common Stock pursuant to the Shelf Registration in accordance with **Article II**, (b) Common Stock registered on Form S-4 or S-8 or any similar successor forms, (c) securities convertible into or exercisable or exchangeable for Common Stock and (d) Common Stock registered on Form S-3 or any successor form covering securities issued under a dividend reinvestment program and/or an "at the market" program.

"Executive Officer" means the Chief Executive Officer, the Chief Financial Officer, the General Counsel or the Executive Vice President, Law, Strategy and Policy, in each case of the Corporation.

"FINRA" shall have the meaning set forth in **Section 2.04(a)(xii)**.

"Governmental Authority" means any United States or non-United States federal, provincial, state or local government or other political subdivision thereof, any entity, authority, agency or body exercising executive, legislative, judicial, regulatory or administrative functions of any such government or political subdivision and any supranational organization of sovereign states exercising such functions for such sovereign states.

"Indemnitee" shall have the meaning set forth in **Section 2.08(a)**.

"Indemnitor" shall have the meaning set forth in **Section 2.08(c)(i)**.

"Initial Sale Time" shall have the meaning set forth in **Section 2.08(a)**.

"Inspectors" shall have the meaning set forth in **Section 2.04(a)(viii)**.

"Issuer Free Writing Prospectus" shall have the meaning set forth in **Section 2.05**.

"Lockup Period" shall have the meaning set forth in **Section 2.01(c)(i)**.

"Losses" shall have the meaning set forth in **Section 2.08(a)**.

3

"Market Value" means (a) for so long as the Common Stock is listed for trading on a nationally recognized exchange or market, the average per share closing price of the Common Stock as reported on the principal exchange or market on which the Common Stock is then traded over the ten consecutive Trading Days immediately preceding the date of the Transfer Notice or (b) if not so listed, the estimated market value determined in good faith by the Board based upon the advice of a nationally recognized investment banking firm retained by the Corporation (at the sole expense of the Corporation) for this purpose (which investment banking firm shall be reasonably acceptable to the Trust).

"Marketed Offering" means a "Permitted Equity Offering" (as defined in the Backstop Commitment Letters) that is a rights offering or an underwritten primary offering of equity securities, equity forward purchase contracts and/or other equity-linked instruments involving a customary "road show" or other substantial marketing effort by or on behalf of the Corporation; provided that, in the event the Corporation, solely as a result of drawing on the Backstop Commitments, issues to the Backstop Parties pursuant to the Backstop Commitment Letters an aggregate number of shares of Common Stock equal to or greater than 20% of the aggregate number of shares of Common Stock issued on the Effective Date (or deemed to be issued as of the Effective Date based on the minimum conversion rate, in the case of any equity forward purchase contracts or other equity-linked instruments) in furtherance of the Plan of Reorganization (not including the shares of Common Stock to be issued to the Trust), the Corporation shall be deemed not to have executed a Marketed Offering for purposes of this Agreement.

"mirror voting" shall have the meaning set forth in **Section 4.01**.

"Non-Transferable Rights" shall have the meaning set forth in **Section 2.09**.

"Non-Underwritten Sale" shall have the meaning set forth in **Section 2.01(c)(i)**.

"Other Stockholders" means any Person (other than the Trust) who has a right to participate as a seller in any underwritten offering of Common Stock by the Corporation (whether for the account of the Corporation, the Trust or otherwise) pursuant to a registration rights agreement or other similar arrangements (other than this Agreement) with the Corporation.

"Permitted Transferee" shall have the meaning set forth in **Section 2.09**.

"Person" means any individual, partnership, firm, corporation, association, trust, unincorporated organization, joint venture, limited liability company, Governmental Authority or other entity.

"Piggyback Notice" shall have the meaning set forth in **Section 2.02(a)**.

"Piggyback Offering" shall have the meaning set forth in **Section 2.02(a)**.

"Plan of Reorganization" shall have the meaning set forth in the recitals.

"Re-Activation Notice" shall have the meaning set forth in **Section 2.01(f)**.

4

"Records" shall have the meaning set forth in **Section 2.04(a)(viii)**.

"register", "registered" and "registration" refer to a registration effected by preparing and filing a registration statement in compliance with the Securities Act, and the declaration or ordering of the effectiveness (or automatic effectiveness) of such registration statement.

"Registrable Securities" means (a) the Trust Shares and (b) any equity security issued in exchange for or with respect to any Trust Shares by way of a stock dividend or stock split or in connection with a combination of shares, recapitalization, merger, consolidation or other reorganization or similar transaction, or otherwise. As to any particular Registrable Securities, such securities shall cease to be Registrable Securities on the earliest of the date on which such securities: (i) have been registered under the Securities Act and disposed of in accordance with an effective registration statement; (ii) have been sold pursuant to Rule 144; (iii) together with all other Registrable Securities held by the Trust, represent less than 4% of the outstanding shares of Common Stock and all such Registrable Securities may be sold in a single day without notice or manner of sale restrictions pursuant to, and in accordance with, Rule 144; (iv) cease to be outstanding (whether as a result of exercise, redemption, repurchase, conversion or otherwise); or (v) are transferred to any third Person; provided, however, that in the case of this clause (v) any such securities shall remain Registrable Securities if sold or transferred to a Permitted Transferee until the date that all Registrable Securities held by such Permitted Transferee may be sold in a single day without notice or manner of sale restrictions and, if the Corporation has not complied with its periodic reporting requirements under the Exchange Act, without current information, pursuant to, and in accordance with, Rule 144 (giving effect, if applicable, to "tacking" the holding period of the Trust), and upon such date such securities shall cease to be Registrable Securities.

"Representatives" means, with respect to any Person, any of such Person's Controlling persons, trustees, officers, directors, managers, employees, agents, attorneys, accountants, actuaries, consultants or advisors or any other Person acting on behalf of such Person.

"RSA" shall have the meaning set forth in the recitals.

"Rule 144" means Rule 144 under the Securities Act (or any successor provision).

"Rule 144 Block Trade" means an offering and/or sale of Registrable Securities made pursuant to Rule 144 on a block trade basis, including a same day trade, overnight trade or similar transaction.

"SEC" means the United States Securities and Exchange Commission.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations thereunder.

"Shelf Registration" shall have the meaning set forth in **Section 2.01(a)(i)**.

"Subsidiary" means, with respect to any Person, any direct or indirect wholly owned subsidiary.

"Suspension Notice" shall have the meaning set forth in **Section 2.06**.

"Trading Day" means a day during which (a) trading in securities generally occurs on the principal United States national securities exchange on which the Common Stock is then listed or admitted for trading or, if the Common Stock is not then listed or admitted for trading on a United States national securities exchange, on the principal other market on which the Common Stock is then traded, and (b) a closing sale price for the Common Stock is available on such securities exchange or market. If the Common Stock is not so listed or traded, "Trading Day" means a Business Day.

"Transfer Notice" shall have the meaning set forth in **Section 2.01(b)**.

"Trust" shall have the meaning set forth in the preamble.

"Trust Shares" shall have the meaning set forth in the recitals.

"Trustee" means the Hon. John K. Trotter (Ret.) and any successor thereto appointed pursuant to the Fire Victim Trust Agreement.

"Underwritten Offering" means an offering and/or sale of Common Stock of the Corporation made pursuant to the Shelf Registration on an underwritten or block trade basis (whether firm commitment or otherwise).

"WKSI" means a "well known seasoned issuer" as defined in Rule 405 under the Securities Act.

SECTION 1.02. Terms Generally. The definitions in **Section 1.01** shall apply equally to both the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation," unless the context expressly provides otherwise. All references herein to Articles, Sections, paragraphs, subparagraphs or clauses shall be deemed references to Articles, Sections, paragraphs, subparagraphs or clauses of this Agreement, unless the context requires otherwise. Unless otherwise specified, the words "this Agreement," "herein," "hereof," "hereto" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular provision of this Agreement. The word "extent" in the phrase "to the extent" shall mean the degree to which a subject or other thing extends, and such phrase shall not mean simply "if." Unless expressly stated otherwise, any law defined or referred to herein means such law as from time to time amended, modified or supplemented, including by succession of comparable successor laws and references to all attachments thereto and instruments incorporated therein.

SECTION 2.01. Shelf Registration. (a) (i) Subject to **Section 2.01(f)** and to the extent not previously filed or effective, as soon following the Effective Date as is permissible under applicable rules and regulations of the SEC, the Corporation shall file with the SEC a registration statement (as may be amended, supplemented or replaced from time to time, the "Shelf Registration") (on Form S-3 to the extent permissible) pursuant to applicable rules under the Securities Act covering the resale of all Registrable Securities, and any other securities desired by the Corporation for an offering to be made on a delayed or continuous basis, and shall (x) use reasonable best efforts to cause such registration statement to become effective on the earliest date practicable and (y) cause such registration statement to become effective in all events not later than 20 days after the Effective Date. After the Corporation becomes a WKSI and upon the written request of the Trust, the Corporation shall use commercially reasonable best efforts to file promptly with the SEC a registration statement on Form S-3 covering the resale of all Registrable Securities (and not any other securities), which registration statement shall also be considered the "Shelf Registration" for purposes of this Agreement; provided that the foregoing shall not limit the right of the Corporation under **Section 2.01(e)** to include securities other than Registrable Securities in an Underwritten Offering (other than a block trade) of Registrable Securities pursuant to a Transfer Notice; provided, further, that the Corporation shall not be required to keep more than one registration statement covering the sale of Registrable Securities effective at any given time during the term of this Agreement.

(ii) Subject to **Section 2.01(f)**, the Corporation shall use commercially reasonable best efforts to keep the Shelf Registration continuously effective under the Securities Act in order to permit the prospectus forming a part thereof to be usable by the Trust and its Permitted Transferees until the date as of which there are no longer Registrable Securities.

(iii) Subject to **Section 2.01(a)(ii)**, the Corporation shall promptly file any supplements or post-effective amendments, or replace by filing a new registration statement, the Shelf Registration if required in each case by the Securities Act, including the rules, regulations or instructions applicable to the registration form used by the Corporation for the Shelf Registration so that (x) the Shelf Registration does not include any untrue statement of material fact or omit to state any material fact necessary in order to make the statements therein not misleading and (y) the Corporation complies with its obligations under Item 512(a)(1) of Regulation S-K.

(b) Underwritten Take-Downs. Subject to **Section 2.01(c)** and **Section 2.01(f)**, in the event the Trust intends to effect an Underwritten Offering with respect to Registrable Securities included in the Shelf Registration, the Trust shall deliver a notice (a "Transfer Notice") to the Corporation at least 20 days, in the case of the initial Underwritten Offering that is not a block trade, 10 days, in the case of any other Underwritten Offering that is not a block trade, and 5 Business Days, in the case of an Underwritten Offering that is a block trade, prior to the commencement of such Underwritten Offering, stating (A) that the Trust intends to effect an Underwritten Offering of such Registrable Securities, (B) the number of Registrable Securities to be included in such Underwritten Offering and the total number of Registrable Securities held by the Trust as of the date of the Transfer Notice, (C) whether the Registrable Securities to be included by the Trust are all of the Registrable Securities then held by the Trust, (D) the proposed timetable for such Underwritten Offering and (E) other customary information reasonably requested by the Corporation.

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 891 of 1367

(c) <u>Limitations.</u> Notwithstanding anything to the contrary herein:

(i) In the event the Corporation consummates a Marketed Offering, the Trust shall not be permitted to submit a Transfer Notice for an Underwritten Offering, or otherwise effect any such Underwritten Offering, or effect any non-underwritten sale or transfer of Registrable Securities (including any Rule 144 Block Trade) (each, a "<u>Non-Underwritten Sale</u>"), prior to 90 days after the Effective Date (such period, the "<u>Lockup Period</u>"); <u>provided</u> that, following notice to the Corporation (and providing any information reasonably requested by the Corporation), the Trust shall be permitted (A) to pledge Registrable Securities for a *bona fide* loan or other extension of credit, including any subsequent transfer of such Registrable Securities to such lender or collateral agent or other transferee in connection with the exercise of remedies under such loan or extension of credit, subject to such lender or collateral agent or other transferee agreeing not to sell or transfer such Registrable Securities for the remainder of the Lockup Period and (B) to transfer Registrable Securities to any Subsidiary so long as such Subsidiary complies with the requirements set forth in **Section 2.09**.

(ii) The Trust shall not be permitted to submit a Transfer Notice for an Underwritten Offering, or otherwise effect any such Underwritten Offering, unless such Transfer Notice is for at least the lesser of (A) a number of Registrable Securities having a Market Value equal to or exceeding $250,000,000 in the aggregate, (B) a number of Registrable Securities equal to or exceeding 1.25% of the outstanding shares of Common Stock or (C) all of the Registrable Securities then held by the Trust.

(iii) The Corporation shall not be required to effect:

(A) in the event the Corporation executes a Marketed Offering, (1) more than one Underwritten Offering pursuant to a Transfer Notice during the 90-day period following the Lockup Period and (2) any such Underwritten Offering sooner than 90 days following the closing of any Underwritten Offering of Registrable Securities;

(B) in the event the Corporation does not execute a Marketed Offering, (1) more than one Underwritten Offering pursuant to a Transfer Notice during the 90-day period following the Effective Date and (2) any such Underwritten Offering sooner than 90 days following the closing of any Underwritten Offering of Registrable Securities; and

(C) during the term of this Agreement, more than eight Underwritten Offerings pursuant to a Transfer Notice in total.

(iv) The Trust shall not be permitted to offer, sell, contract to sell or otherwise dispose of any Registrable Securities pursuant to any Underwritten Offering in an amount that would cause an Adverse Effect (as defined herein), as determined jointly by the investment banking firms selected pursuant to **Section 2.01(d)(i)** to jointly lead or manage such Underwritten Offering.

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 892 of 1367

(d) <u>Underwriting.</u> (i) With respect to any Underwritten Offering of Registrable Securities pursuant to a Transfer Notice, (A) the Trust shall select one (and no more than one) nationally recognized investment banking firm acceptable to the Corporation (such acceptance not to be unreasonably withheld, conditioned or delayed), it being agreed that Royal Bank of Canada is acceptable to the Corporation for such purposes, and (B) the Corporation shall select one (and no more than one) nationally recognized investment banking firm acceptable to the Trust (such acceptance not to be unreasonably withheld, conditioned or delayed), which firms together shall jointly lead or manage the Underwritten Offering, and, unless otherwise agreed, each of the Corporation and the Trust shall select an equal number of other nationally recognized investment banking firms, if any, to co-manage such Underwritten Offering.

(ii) With respect to any Underwritten Offering of Registrable Securities pursuant to a Transfer Notice, the Trustee agrees (A) to sell the Trust's Registrable Securities on the basis provided in any customary underwriting arrangements approved by the Corporation and the Trustee (such approval not to be unreasonably withheld, conditioned or delayed) and (B) to complete and execute all customary questionnaires, powers of attorney, indemnities, underwriting agreements (containing indemnity and contribution provisions of the type made in customary underwriting agreements for an underwritten public offering), lock-ups and other documents reasonably required under the terms of such underwriting arrangements.

(e) <u>Priority on Underwritten Offerings Pursuant to a Transfer Notice.</u> The Corporation may include securities other than Registrable Securities in an Underwritten Offering (other than a block trade) of Registrable Securities pursuant to a Transfer Notice, for any accounts (including for the account of the Corporation) on the terms provided below. With respect to any such Underwritten Offering, if the lead or managing underwriters advise that in their good faith determination the inclusion of the securities proposed to be included in such Underwritten Offering would adversely affect or jeopardize the price or distribution of the offering or otherwise adversely affect or jeopardize its success (an "<u>Adverse Effect</u>"), the Corporation shall include in such Underwritten Offering (in each case, to the extent inclusion would not have an Adverse Effect):

(i) first, the Registrable Securities and any Common Stock requested to be included therein by the Trust and Other Stockholders, respectively, allocated *pro rata* among the Trust and such Other Stockholders on the basis of the amount of Registrable Securities or Common Stock held by the Trust and such Other Stockholders (and eligible for inclusion in such offering under this Agreement or an agreement between such Other Stockholders and the Corporation) as of the date of the Transfer Notice; and

(ii) second, any securities requested to be included therein by the Corporation.

(f) <u>Deferral of Filing; Suspension of Use.</u> The Corporation may defer the filing (but not the preparation) or the effectiveness, or suspend the use, of the Shelf Registration at any time if (i) the Board or an Executive Officer determines, in its good faith judgment, that such action or use (or proposed action or use) (A) would require the Corporation to make an Adverse Disclosure or (B) would materially impede, delay or interfere with any significant financing, significant acquisition, corporate reorganization or other significant transaction then pending or proposed to be taken by the Corporation or any of its subsidiaries (or any negotiations, discussions or pending proposals with respect thereto) or (ii) prior to receiving the applicable

9

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 893 of 1367

Transfer Notice, the Corporation had determined to effect an underwritten offering of Common Stock or Corporation securities convertible into or exchangeable for Common Stock for the Corporation's account only and the Corporation had taken substantial steps (such as selecting a lead or managing underwriter for such offering) and is proceeding with reasonable diligence to effect such offering; provided, however, that the Corporation shall not be permitted to exercise a deferral or suspension right pursuant to this **Section 2.01(f)**, for (i) more than a total of 120 days (which need not be consecutive) in any 12-month period; or (ii) more than 45 consecutive days at any time; or (iii) in a manner imposing greater deferral or suspension limitations on the Trust than those imposed on or with respect to any other stockholders (including for the avoidance of doubt, the Backstop Parties); provided further, however, that while the Shelf Registration is deferred or suspended pursuant to **Section 2.01(f)(A)**, the Corporation shall not be permitted to register under the Securities Act any Common Stock, warrants or securities convertible into or exchangeable for Common Stock, other than shares of Common Stock or other equity securities to be issued in connection with equity compensation pursuant to Form S-8. The Corporation shall promptly notify the Trust of any deferral or suspension pursuant to this **Section 2.01(f)** (provided that the Corporation shall not disclose any material non-public information that is the basis for such notice to the Trust without the express consent of the Trust) and the Corporation agrees that it will terminate any such deferral or suspension as promptly as reasonably practicable (but in any event not more than seven days after the abandonment or consummation of any of the foregoing proposals or transactions) and will promptly notify the Trust in writing of the termination of any such deferral or suspension. Notwithstanding anything to the contrary in this Agreement, the Trust may elect from time to time, by delivering written notice to the Corporation, not to use the Shelf Registration and not to receive notice of any deferral or suspension pursuant to this **Section 2.01(f)**, in which case the Trust shall not offer, sell, contract to sell or otherwise dispose of any Registrable Securities pursuant to the Shelf Registration unless it provides at least two Business Days advance written notice thereof (a "Re-Activation Notice"). The Trust's election not to use the Shelf Registration will not relieve the Corporation of its obligation to maintain the Shelf Registration as otherwise provided herein, and, following the Corporation's receipt of a Re-Activation Notice, the Trust may continue to use the Shelf Registration and the Corporation may continue to exercise its deferral and suspension rights pursuant to this **Section 2.01(f)**.

(g) Withdrawal from Underwritten Offering Pursuant to a Transfer Notice. The Trust may withdraw Registrable Securities from an Underwritten Offering pursuant to a Transfer Notice by providing written notice to the Corporation; provided that, if the remaining Registrable Securities in such Underwritten Offering would not meet the requirements of **Section 2.01(c)(ii)**, then the Trust shall be deemed to have requested all Registrable Securities in such Underwritten Offering be withdrawn. In the event all Registrable Securities in an Underwritten Offering Registration to a Transfer Notice are so withdrawn, (i) if such withdrawal occurs prior to the commencement of such Underwritten Offering, (A) the Trust will reimburse the Corporation for all reasonable documented out-of-pocket fees and expenses incurred in connection with such Underwritten Offering or (B) the Underwritten Offering pursuant to a Transfer Notice that has been withdrawn will be deemed to have been effected for purposes of **Section 2.01(c)(iii)** and (ii) if such withdrawal occurs after the commencement of such Underwritten Offering, (x) the Trust will reimburse the Corporation for all reasonable documented out-of-pocket fees and expenses incurred in connection with such Underwritten Offering and (y) the Underwritten Offering

pursuant to a Transfer Notice that has been withdrawn will be deemed to have been effected for purposes of **Section 2.01(c)(iii)**; provided, however, that in each case if such withdrawal was based on the Corporation's failure to comply in any material respect with its obligations hereunder or in response to the Corporation's exercise of a deferral or suspension right pursuant to **Section 2.01(f)**, such reimbursement from the Trust will not be required, the Corporation will pay (or reimburse, as applicable) the expenses specified in **Section 2.07**, and the proposed Underwritten Offering pursuant to a Transfer Notice will not be deemed to have been effected for purposes of **Section 2.01(c)(iii)**. A withdrawal will be irrevocable and, after making such withdrawal, the Trust will no longer have any right to include the Registrable Securities so withdrawn in that Underwritten Offering.

(h) Backstop Parties' Registration Rights.

(i) The Corporation hereby represents and warrants that, as of the Effective Date, no Backstop Party is an Other Stockholder. The Corporation covenants that it will not have or enter into any agreement or understanding to permit a Backstop Party to become an Other Stockholder or otherwise obtain "demand" or "piggyback" rights with respect to the shares of Common Stock received by such Backstop Party in connection with the Plan of Reorganization.

(ii) In the event that the Debtors enter into any registration rights agreements with the Backstop Parties pursuant to the Backstop Commitment Letters (the "Backstop RRAs"), which contain terms that correlate to terms in this Agreement, such correlative terms in the Backstop RRAs shall not be more favorable to a Backstop Party in any material respect, unless (A) the Debtors incorporate such more favorable terms into this Agreement (or offer to incorporate such more favorable terms and the Trustee declines such offer) or (B) the Trustee consents to such inclusion in the applicable Backstop RRA. Notwithstanding the foregoing, it is understood that (1) no Backstop RRA shall have any "demand" or "piggyback" rights for the applicable Backstop Party to participate as a seller in an underwritten offering, and (2) the fact that a Backstop RRA does not include or require a lockup provision shall not be considered to be a term that is more favorable to a Backstop Party, and neither the Torts Claimants Committee nor the Trustee shall be permitted to object or, under this **Section 2.01(h)(ii)**, withhold consent to the absence of a lockup provision in a Backstop RRA.

(i) No Other Restrictions. The Corporation will not take any action to restrict the Trust's ability to offer, sell, contract to sell or otherwise dispose of any Registrable Securities to any person except as provided in this Agreement or in the Corporation's Amended and Restated Articles of Incorporation, as amended from time to time, unless such action is generally applicable to all of the Corporation's stockholders.

SECTION 2.02. Piggyback Offerings. (a) Right to Piggyback. Each time the Corporation proposes to offer Common Stock in an underwritten offering (other than pursuant to an Excluded Registration) registered under the Securities Act (whether for the account of the Corporation or the account of any equity holder of the Corporation other than the Trust) (a "Piggyback Offering"), the Corporation shall give prompt written notice to the Trust (which notice shall be given not less than 10 Business Days prior to such Piggyback Offering (the

11

"Piggyback Notice")), which notice shall offer to the Trust the opportunity to include any or all of its Registrable Securities in such Piggyback Offering, subject to the limitations contained in **Section 2.01(c)(iv)** and **Section 2.02(b)**. To participate in any Piggyback Offering, the Trust shall provide written notice to the Corporation (stating the number of Registrable Securities desired to be registered or included and the total number of Registrable Securities held by the Trust as of the date of the Piggyback Notice) within five Business Days after the date of such notice from the Corporation. The Trust shall have the right to withdraw its request for inclusion of its Registrable Securities in any Piggyback Offering prior to the commencement of such Piggyback Offering by giving written notice to the Corporation of such withdrawal. Subject to the limitations contained in **Section 2.01(c)(iv)** and **Section 2.02(b)**, the Corporation shall include in such underwritten offering all such Registrable Securities so requested to be included therein. No registration pursuant to this **Section 2.02(a)** shall relieve the Corporation of its obligation to effect a registration statement, as contemplated by **Section 2.01** hereof. The Trust's rights to a Piggyback Offering may be exercised on an unlimited number of occasions. Notwithstanding the foregoing, the Corporation may at any time withdraw, abandon or cease proceeding with any such offering for any reason at any time.

(b) <u>Priority on Piggyback Offerings.</u> (i) If a Piggyback Offering was initiated by the Corporation and if the lead or managing underwriter(s) advise that in their good faith determination the inclusion of the Registrable Securities proposed to be included in such Piggyback Offering would cause an Adverse Effect, the Corporation shall include in such Piggyback Offering (in each case, to the extent inclusion would not have an Adverse Effect):

(A) if such Piggyback Offering is commenced during the Lockup Period:

(1) first, any Registrable Securities requested to be included therein by the Trust; and

(2) second, and only if all of the securities referenced in clause (1) above have been included, the Common Stock the Corporation proposes to sell and/or any Common Stock requested to be included therein by Other Stockholders, as determined by the Corporation;

(B) if such Piggyback Offering is commenced at any other time:

(1) first, the Common Stock the Corporation proposes to sell; and

(2) second, any Registrable Securities and Common Stock requested to be included therein by the Trust and Other Stockholders, respectively, allocated *pro rata* among the Trust and such Other Stockholders on the basis of the amount of Registrable Securities or Common Stock held by the Trust and such Other Stockholders (and eligible for inclusion in such offering under this Agreement or an agreement between such Other Stockholders and the Corporation) as of the date of the Piggyback Notice.

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 896 of 1367

If as a result of the provisions of this **Section 2.02(b)(i)**, the Trust shall not be entitled to include all Registrable Securities in such Piggyback Offering that the Trust has requested to be so included, the Trust may withdraw its request to include its Registrable Securities in such Piggyback Offering prior to the commencement thereof.

(ii) If a Piggyback Offering was initiated by any Other Stockholders and if the lead or managing underwriter(s) advise that in their good faith determination the inclusion of the Registrable Securities proposed to be included in such Piggyback Offering would cause an Adverse Effect, the Corporation shall include in such Piggyback Offering (in each case, to the extent inclusion would not have an Adverse Effect):

(A) first, any Registrable Securities and the Common Stock requested to be included therein by the Trust and Other Stockholders, respectively, allocated *pro rata* among the Trust and such Other Stockholders on the basis of the amount of Registrable Securities or Common Stock then held by the Trust and such Other Stockholders (and eligible for inclusion in such offering under this Agreement or an agreement between such Other Stockholders and the Corporation); and

(B) second, and only if all of the securities referenced in clause (A) above have been included, any securities requested to be included therein by the Corporation.

If as a result of the provisions of this **Section 2.02(b)(ii)**, the Trust shall not be entitled to include all Registrable Securities in such Piggyback Offering that the Trust has requested to be so included, the Trust may withdraw its request to include its Registrable Securities in such Piggyback Offering prior to the commencement thereof.

(c) Underwriting. (i) The Corporation (or Other Stockholders, if contractually required) shall select the investment banking firm or firms to lead or manage any Piggyback Offering, and the other investment banking firms, if any, to co-manage such Piggyback Offering.

(ii) The Trust may not participate in a Piggyback Offering unless the Trust (A) agrees to sell its Registrable Securities on the basis provided in any customary underwriting arrangements approved by the Corporation and (B) completes and executes all customary questionnaires, powers of attorney, indemnities, underwriting agreements (containing indemnity and contribution provisions of the type included in customary underwriting agreements for an underwritten public offering), lock-ups and other documents reasonably required under the terms of such underwriting arrangements.

(d) No Effect on Registration Rights. No registration or offering of Registrable Securities effected pursuant to this **Section 2.02** shall be deemed to have been effected pursuant to **Section 2.01(b)**.

SECTION 2.03. Holdback. In the event of an underwritten offering (other than a block trade) of equity securities of the Corporation (whether for the account of the Corporation, the Trust or otherwise), at the request of the lead or managing underwriter(s), (a) each of the Trust and the Corporation agrees to enter into a customary "lockup" agreement for such offering in a

13

form reasonably satisfactory to the Corporation and the Trust prohibiting any offer, sale, contract to sell or other disposition of Common Stock, including any sale pursuant to Rule 144, during the period (or such lesser period as the lead or managing underwriter(s) may determine) commencing seven days prior to the effective date of the registration statement for such underwritten offering (or, in the case of an offering pursuant to an effective shelf registration statement pursuant to Rule 415, seven days prior to the commencement date for such underwritten offering) and ending no later than the 90th day after such effective date (or commencement date) and (b) the Corporation agrees to cause the executive officers and directors of the Corporation so requested by the lead or managing underwriter(s), and any Other Stockholders (other than those who "beneficially own" (as such term is defined under and determined pursuant to Rule 13d-3 under the Exchange Act) (x) less than 4.75% of the outstanding shares of Common Stock and (y) together with all other Other Stockholders so excluded, less than 7.5% of the outstanding shares of Common Stock), to enter into customary "lockup" agreements for such offering in a form satisfactory to the Corporation; provided that, with respect to the Corporation, such restrictions shall not apply to any offer, sale, contract to sell or other disposition of Common Stock by the Corporation pursuant to any "at the market offering" (as such term is defined under Rule 415 of the Securities Act) and shall be subject to other customary exclusions as permitted by the lead or managing underwriter(s); provided, further, (i) that the "lockup" period shall be substantially similar for the Trust and all Other Stockholders who are participating in such offering; (ii) the foregoing restrictions shall be applicable to the Trust only to the extent they are applicable on substantially similar or more restrictive terms to all directors and executive officers of the Corporation requested by the lead or managing underwriter(s) to be subject to the "lockup" and (iii) if the lockup restrictions applicable to any director or executive officer of the Corporation, or the restrictions applicable to any Other Stockholder participating in such offering, are less restrictive (due to a waiver, release of obligation or otherwise) than the foregoing restrictions applicable to the Trust, then such less restrictive provisions shall apply to the Trust in connection with such underwritten offering.

Notwithstanding the foregoing, under any "lockup" agreement under this **Section 2.03**, the Trust shall be permitted (A) to pledge Registrable Securities for a *bona fide* loan or other extension of credit, including any subsequent transfer of such Registrable Securities to such lender or collateral agent or other transferee in connection with the exercise of remedies under such loan or extension of credit, subject to such lender or collateral agent or other transferee agreeing not to sell or transfer such Registrable Securities for the remainder of the lockup period thereunder and (B) to transfer Registrable Securities to Subsidiary so long as such Subsidiary complies with the requirements set forth in **Section 2.09**.

SECTION 2.04. <u>Registration Procedures.</u>

(a) In connection with the registration statement required by or filed pursuant to **Section 2.01(a)**, subject to the terms and conditions of this Agreement, the Corporation shall use commercially reasonable best efforts to effect the Shelf Registration and the sale, as applicable, of the Registrable Securities in accordance with the intended method of disposition thereof, and pursuant thereto the Corporation shall as promptly as practicable:

14

(i) furnish to the Trust copies of reasonably complete drafts of the registration statement or any amendments thereto, and the Corporation shall consider in good faith any corrections reasonably requested by the Trust with respect to information related to the Trust prior to filing any such registration statement or amendment and, if requested by the Trust, provide the Trust, any participating underwriter and any attorney, accountant or other agent retained by the Trust, reasonable opportunity to participate in the preparation of such registration statement;

(ii) comply with the provisions of Section 2.01(a)(ii) and Section 2.01(a)(iii);

(iii) furnish to the Trust and the underwriters of the offering and sale of Registrable Securities being registered, without charge, electronic copies of such registration statement and any post-effective amendment thereto (but excluding all schedules, all exhibits and all materials incorporated or deemed incorporated therein by reference) and the prospectus included in such registration statement (including each preliminary prospectus) as the Trust or lead or managing underwriter(s) may reasonably request in order to facilitate the disposition of the Registrable Securities owned by the Trust or the sale of such securities by such underwriters (it being understood that, subject to **Section 2.01(f)**, **Section 2.03**, **Section 2.05** and **Section 2.06** and the requirements of the Securities Act and applicable state securities laws, the Corporation consents to the use of the prospectus and any amendment or supplement thereto by the Trust and the underwriters in connection with the offering and sale of the Registrable Securities covered by the registration statement of which such prospectus, amendment or supplement is a part);

(iv) use commercially reasonable best efforts to register or qualify such Registrable Securities under such other securities or "blue sky" laws of such jurisdictions as the lead or managing underwriter(s) reasonably request; and use commercially reasonable best efforts to keep each such registration or qualification (or exemption therefrom) effective during the period in which such registration statement is required to be kept effective; provided, however, that the Corporation shall not be required to (A) qualify generally to do business in any jurisdiction where it would not otherwise be required to qualify but for this subparagraph, (B) consent to general service of process in any such jurisdiction, (C) take any action that would subject it to taxation in respect of doing business in any jurisdiction in which it is not otherwise so subject or (D) prepare or file any prospectus, prospectus supplement or post-effective amendment for purposes of effecting a Non-Underwritten Sale;

(v) promptly following its actual knowledge thereof, notify the Trust (A) when the prospectus or any prospectus supplement or post-effective amendment has been filed and, with respect to the registration statement or any post-effective amendment, when the same has become effective, (B) when the SEC notifies the Corporation whether there will be a "review" of the registration statement or provides any comments (written or oral), (C) of the issuance by any state securities or other regulatory authority of any order suspending the qualification or exemption from qualification of any of the Registrable Securities under state securities or "blue sky" laws or the initiation of any proceedings for that purpose, or the receipt of any comments (oral or written) by state securities or other regulatory authority with respect thereto, and (D) upon the discovery that, or upon the happening of any event as a result of which, any prospectus or registration statement

15

contains any untrue statement of a material fact or omits to state any material fact required to be stated therein or necessary to make the statements therein not misleading, and, as promptly as practicable thereafter, prepare and file with the SEC and furnish a supplement or amendment to such prospectus so that, as thereafter deliverable to the purchasers of such Registrable Securities, such prospectus shall not contain any untrue statement of a material fact or omit a material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading;

(vi) otherwise use commercially reasonable best efforts to comply with all applicable rules and regulations of the SEC, including the Securities Act and the Exchange Act and the rules and regulations promulgated thereunder, and make generally available to the Corporation's security holders an earnings statement satisfying the provisions of Section 11(a) of the Securities Act, which requirement shall be deemed to be satisfied if the Corporation files complete and accurate information on Forms 10-K, 10-Q and 8-K under the Exchange Act and otherwise complies with Rule 158 under the Securities Act;

(vii) if requested by the lead or managing underwriter(s) or the Trust, promptly incorporate in a prospectus supplement or post-effective amendment information with respect to the Registrable Securities being sold by the Trust, the purchase price being paid therefor by the underwriters and with respect to any other terms of the Underwritten Offering of the Registrable Securities to be sold in such offering, and promptly make all required filings of such prospectus supplement or post-effective amendment;

(viii) promptly make available for inspection by the Trust, any underwriter participating in any disposition pursuant to the registration statement and any attorney, accountant or other agent or Representative retained by the Trust or underwriter (collectively, the "Inspectors"), all financial and other records and pertinent corporate documents (collectively, the "Records") and properties of the Corporation, as shall be reasonably necessary to enable them to exercise any legal due diligence responsibility, and cause the Corporation's officers, directors and employees to supply all information reasonably requested by any such Inspector in connection with such registration statement; provided, however, that, unless the release of such Records is ordered pursuant to a subpoena or other order from a court of competent jurisdiction, the Corporation shall not be required to provide any information under this subparagraph (viii) if (A) the Corporation reasonably and in good faith believes, after consultation with counsel for the Corporation, that to do so would cause the Corporation to forfeit an attorney-client privilege that was applicable to such information or (B) either (1) the Corporation has requested and been granted from the SEC confidential treatment of such information contained in any filing with the SEC or documents provided supplementally or otherwise or (2) the Corporation reasonably determines in good faith that such Records are confidential and so notifies the Inspectors in writing, unless prior to furnishing any such information with respect to clause (B) the Trust agrees to enter into a confidentiality agreement in a form acceptable to the Corporation; and provided, further, that the Trust agrees that it shall, upon learning that disclosure of such Records is sought in a court of competent jurisdiction, give notice to the Corporation and allow the Corporation, at its expense, to undertake appropriate action and to prevent disclosure of the Records deemed confidential;

16

(ix) use commercially reasonable best efforts to obtain (A) an opinion of outside counsel to the Corporation including a customary 10b-5 statement (which may be addressed to the underwriters), provided that such counsel is reasonably acceptable to the Trust and the lead or managing underwriter(s), and (B) a comfort letter or comfort letters from the Corporation's independent public accountants, dated as of the date of the closing, addressed to the underwriters, each in customary form and covering such matters of the type customarily covered by opinions or comfort letters, as the case may be, as reasonably requested by the Trust or the lead or managing underwriter(s);

(x) use commercially reasonable best efforts to cause the Registrable Securities included in the Shelf Registration to be promptly listed on each securities exchange, if any, on which similar securities issued by the Corporation are then listed;

(xi) maintain a transfer agent and registrar for all Registrable Securities registered hereunder;

(xii) if such registration is in connection with an Underwritten Offering, provide officers' certificates and other customary closing documents as the lead or managing underwriter of such offering may reasonably request;

(xiii) cooperate with the Trust and each underwriter participating in the disposition of such Registrable Securities and their respective counsel in connection with any filings required to be made with the Financial Industry Regulatory Authority ("FINRA");

(xiv) notify the Trust promptly of any request by the SEC for the amending or supplementing of such registration statement or prospectus or for additional information;

(xv) advise the Trust, promptly after it receives (A) notice or actual knowledge, of the issuance or threatened issuance of any stop order by the SEC suspending the effectiveness of such registration statement or the initiation of any proceeding for such purpose and promptly use commercially reasonable efforts to prevent the issuance of any stop order or to obtain its withdrawal if such stop order should be issued, or (B) any notification with respect to the suspension of the qualification or exemption from qualification of any of the Registrable Securities for sale in any jurisdiction or the initiation or threatening of any proceeding for such purpose, and the Corporation agrees to use commercially reasonable best efforts to (x) prevent the issuance of any such stop order, and in the event of such issuance, to obtain the withdrawal of any such stop order and (y) obtain the withdrawal of any order suspending or preventing the use of any related prospectus or suspending the qualification of any Registrable Securities included in such registration statement for sale in any jurisdiction at the earliest practicable date;

17

(xvi) enter into and perform its obligations under customary agreements (including an underwriting agreement in customary form with the relevant underwriter) and take such other actions as are prudent and reasonably required to expedite or facilitate the disposition of Registrable Securities, including causing the appropriate officers and members of the management of the Corporation as the lead or managing underwriter of such offering may reasonably request to participate in the selling efforts relating to an Underwritten Offering of Registrable Securities to the extent customary for such offering (including, to the extent customary, telephonic, video or recorded participation in road shows); and

(xvii) take all other actions reasonably necessary to effect the registration of the Registrable Securities contemplated hereby.

(b) The Trust shall reasonably cooperate with the Corporation in the preparation and filing of the registration statement under the Securities Act and any related prospectus, in each case pursuant to this Agreement, and any amendment or supplement thereto, and provide the Corporation with all information reasonably necessary to complete such preparation as the Corporation may, from time to time, reasonably request in writing, and the Corporation may exclude from such registration the Registrable Securities of the Trust (or not proceed with such registration) and be relieved of any related obligations hereunder if the Trust fails to furnish such information within a reasonable time after receiving such request.

(c) In furtherance of the foregoing, the Trust shall reasonably cooperate with the Corporation with respect to providing information relevant to the preservation of the Corporation's tax attributes, including the ownership of Registrable Securities; provided that the Trust shall have no obligation pursuant to this **Section 2.04(c)** to provide any such information that the Trust determines, in its reasonable judgment, it is legally or contractually prohibited from disclosing.

(d) Each of the parties shall treat all notices of proposed transfers and registrations, all notices of, and information relating to, any blackout periods under **Section 2.01(f)** and all Suspension Notices received from another party with the strictest confidence (and in accordance with the terms of any applicable confidentiality agreement among the Corporation and the Trust) and shall not disseminate such information or disclose the existence thereof.

(e) Plan of Distribution. The Corporation agrees to include the Shelf Registration, and any related prospectus (to the extent such inclusion is permitted under applicable SEC regulations and is consistent with comments received from the SEC during any SEC review of such registration statement), a "Plan of Distribution" section substantially in the form of Annex A hereto and that shall be no more restrictive on the ability of the Trust to sell or transfer Registrable Securities than that included in any registration statement filed by the Corporation on behalf of any Other Stockholder.

SECTION 2.05. Free Writing Prospectuses. The Trust agrees that, unless it obtains the prior written consent of the Corporation, it shall not make any offer relating to the Registrable Securities that would constitute a "free writing prospectus," as defined in Rule 405 under the Securities Act, required to be filed with the SEC. The Corporation represents that any "issuer free writing prospectus," as defined in Rule 433 under the Securities Act, prepared by or on behalf of the Corporation (an "Issuer Free Writing Prospectus") shall not include any information

18

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 902 of 1367

that conflicts with the information contained in a registration statement or prospectus and that any Issuer Free Writing Prospectus, when taken together with the information in the registration statement and the prospectus, shall not include any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading.

SECTION 2.06. <u>Suspension of Dispositions.</u> The Trust agrees that upon receipt of any notice (a "<u>Suspension Notice</u>") from the Corporation of the happening of any event of the kind described in **Section 2.04(a)(v)(B)** or **(C)** or **Section 2.04(a)(xv)**, the Trust shall forthwith discontinue disposition of Registrable Securities pursuant to the Shelf Registration until the Trust's receipt of the copies of the supplemented or amended prospectus, or until it is advised in writing (the "<u>Advice</u>") by the Corporation that the use of the prospectus may be resumed, and has received copies of any additional or supplemental filings that are incorporated by reference in the prospectus, and, if so directed by the Corporation, the Trust shall deliver to the Corporation all copies, other than permanent file copies then in the Trust's possession, of the prospectus covering such Registrable Securities current at the time of receipt of such notice. The Corporation shall use commercially reasonable best efforts and take such actions as are reasonably necessary to render the Advice as promptly as practicable. Any Suspension Notice shall not contain information other than as required by this **Section 2.06**.

SECTION 2.07. <u>Registration Expenses.</u> The Corporation shall pay all of its fees and expenses incident to the performance of or compliance with its obligations under this **Article II**, whether or not any Registrable Securities are sold pursuant to a registration statement, including fees and expenses of compliance with securities or blue sky laws, SEC or trading market filing fees, FINRA fees, listing application fees, printing expenses, transfer agent's and registrar's fees, cost of distributing prospectuses in preliminary and final form as well as any supplements thereto, fees and disbursements of counsel for the Corporation and all independent certified public accountants for the Corporation and other Persons retained by the Corporation and fees and disbursements of one counsel for the Trust in connection with the Shelf Registration (not to exceed $100,000) and for each Underwritten Offering of Registrable Securities (not to exceed $100,000 per offering) pursuant to a Transfer Notice (but not including any underwriting discounts or commissions attributable to the sale of Registrable Securities or fees and expenses of any other Representative representing any underwriters or the Trust). Subject to the immediately preceding sentence, the Trust shall pay all its own expenses, including fees and expenses of any additional counsel retained by it.

SECTION 2.08. <u>Indemnification.</u> (a) <u>Indemnification by the Corporation.</u> The Corporation agrees to indemnify and hold harmless, to the fullest extent permitted by law, the Trust, the Trustee, the officers, directors, employees and investment manager or managers acting on behalf of the Trust with respect to the Registrable Securities, Persons, if any, who Control any of them, and each of their respective Representatives (each, an "<u>Indemnitee</u>"), from and against any and all losses, penalties, judgments, suits, costs, claims, damages, liabilities (including amounts paid in settlement) and expenses, joint or several (including reasonable costs of investigation and legal expenses) ("<u>Losses</u>"), arising out of or caused by any untrue statement or alleged untrue statement of a material fact contained in the registration statement or any related prospectus or Issuer Free Writing Prospectus in each case relating to an offering or sale of the Registrable Securities (as amended or supplemented if the Corporation shall have furnished any

19

amendments or supplements thereto), or arising out of or caused by any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein in the case of the prospectus, in light of the circumstances in which they were made, not misleading, except insofar as such Losses arise out of or are caused by any such untrue statement or omission included or omitted in conformity with information furnished to the Corporation in writing by an Indemnitee or any Person acting on behalf of an Indemnitee expressly for use therein; provided, however, that the foregoing indemnity agreement with respect to any preliminary prospectuses or Issuer Free Writing Prospectuses shall not inure to the benefit of such Indemnitee if the Person asserting any Losses against such Indemnitee purchased Registrable Securities and (i) prior to the time of sale of the Registrable Securities to such Person (the "Initial Sale Time") the Corporation shall have notified the Trust that the preliminary prospectus or Issuer Free Writing Prospectus (as it existed prior to the Initial Sale Time) contains an untrue statement of material fact or omits to state therein a material fact required to be stated therein in order to make the statements therein not misleading, (ii) such untrue statement or omission of a material fact was corrected in a preliminary prospectus or, where permitted by law, Issuer Free Writing Prospectus and such corrected preliminary prospectus or Issuer Free Writing Prospectus was provided to the Trust a reasonable amount of time in advance of the Initial Sale Time such that the corrected preliminary prospectus or Issuer Free Writing Prospectus could have been provided to such Person prior to the Initial Sale Time, (iii) such corrected preliminary prospectus or Issuer Free Writing Prospectus (excluding any document then incorporated or deemed incorporated therein by reference) was not conveyed to such Person at or prior to the Initial Sale Time and (iv) such Losses would not have occurred had the corrected preliminary prospectus or Issuer Free Writing Prospectus (excluding any document then incorporated or deemed incorporated therein by reference) been conveyed to such Person as provided for in clause (iii) above.

(b) Indemnification by the Trust. The Trust agrees, to the fullest extent permitted under applicable law, to indemnify and hold harmless each of the Corporation, each Person, if any, who Controls the Corporation, and each of their respective Representatives to the same extent as the foregoing indemnity from the Corporation, but only with respect to Losses arising out of or caused by an untrue statement or omission included or omitted in conformity with information furnished in writing by or on behalf of the Trust expressly for use in any registration statement described herein or any related prospectus relating to the Registrable Securities (as amended or supplemented if the Corporation shall have furnished any amendments or supplements thereto). The liability of the Trust hereunder shall in no event exceed the dollar amount of the net proceeds received by the Trust in the sale of Registrable Securities giving rise to such indemnification obligation.

(c) Indemnification Procedures. (i) In case any claim is asserted or any proceeding (including any governmental investigation) shall be instituted in which indemnity may be sought by an Indemnitee pursuant to any of the preceding paragraphs of this **Section 2.08**, such Indemnitee shall promptly notify in writing the Person against whom such indemnity may be sought (the "Indemnitor"); provided, however, that the omission so to notify the Indemnitor shall not relieve the Indemnitor of any liability that it may have to such Indemnitee except to the extent that the Indemnitor was prejudiced by such failure to notify. The Indemnitor, upon request of the Indemnitee, shall retain counsel reasonably satisfactory to the Indemnitee to represent (subject to the following sentences of this **Section 2.08(c)(i)**) the Indemnitee and any

20

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 904 of 1367

others the Indemnitor may designate in such proceeding and shall pay the fees and disbursements of such counsel related to such proceeding. In any such proceeding, any Indemnitee shall have the right to retain its own counsel, but the fees and expenses of such counsel shall be at the expense of such Indemnitee unless (A) the Indemnitor and the Indemnitee shall have mutually agreed to the retention of such counsel, (B) the Indemnitor fails to take reasonable steps necessary to defend diligently any claim within ten days after receiving written notice from the Indemnitee that the Indemnitee believes the Indemnitor has failed to take such steps, or (C) the named parties to any such proceeding (including any impleaded parties) include both the Indemnitor and the Indemnitee and representation of both parties by the same counsel would be inappropriate due to actual or potential differing interests or legal defenses between them and, in all such cases, the Indemnitor shall be responsible for the reasonable fees and expenses of only such counsel. It is understood that the Indemnitor shall not, in connection with any proceeding or related proceedings in the same jurisdiction, be liable for the reasonable fees and expenses of more than one separate law firm (in addition to any appropriate local counsel) for all such Indemnitees. The Indemnitor shall not be liable for any settlement of any proceeding effected without its written consent.

(ii) If the indemnification provided for in this **Section 2.08** is held by a court of competent jurisdiction to be unavailable to an Indemnitee in respect of any Losses referred to herein, then the Indemnitor, in lieu of indemnifying such Indemnitee hereunder, shall contribute to the amount paid or payable by such Indemnitee as a result of such Losses in such proportion as is appropriate to reflect the relative fault of the Indemnitor and the Indemnitee and Persons acting on behalf of or Controlling the Indemnitor or the Indemnitee in connection with the statements or omissions that resulted in such Losses, as well as any other relevant equitable considerations. The relative fault of the Corporation, the Trust and Persons acting on behalf of or Controlling the Corporation or the Trust shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by the Corporation, the Trust or by Persons acting on behalf of the Corporation or the Trust and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission. The Indemnitor shall not be required to contribute pursuant to this **Section 2.08(c)(ii)** if there has been a settlement of any proceeding effected without its written consent.

(iii) The parties hereto agree that it would not be just and equitable if contribution pursuant to this **Section 2.08(c)** were determined by *pro rata* allocation or by any other method of allocation that does not take into account the equitable considerations referred to in the immediately preceding paragraph. Notwithstanding the provisions of this **Section 2.08(c)**, the Trust shall not be required to contribute, in the aggregate, any amount in excess of the amount by which the net proceeds actually received by the Trust from the sale of the Registrable Securities subject to any proceeding (including any governmental investigation) exceeds the amount of any damages that the Trust has otherwise been required to pay by reason of such untrue or alleged untrue statement or omission or alleged omission. No person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation.

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 905 of 1367

(d) <u>Survival.</u> The indemnification contained in this **Section 2.08** shall remain operative and in full force and effect regardless of any termination of this Agreement.

SECTION 2.09. <u>Transfer of Registration Rights.</u>

(a) Other than, in the case of clause (b) of this sentence, the rights and obligations of the Trust relating to "demand" and "piggyback" rights (including, without limitation, those set forth in **Section 2.01(b)**, **(d)** and **(g)** and **Section 2.02**) (the "<u>Non-Transferable Rights</u>"), the rights and obligations of the Trust under this Agreement (including the rights and obligations under **Section 2.08**, and which, in the case of obligations of the Trust and any Permitted Transferees, shall be several and not joint) may be transferred or assigned (a) to any Subsidiary of the Trust or (b) to any Person that directly acquires from the Trust, in a single transaction, Registrable Securities in an amount equal to or greater than 1% of the outstanding shares of Common Stock (or, if less, all Registrable Securities then held by the Trust) (each such Person, a "<u>Permitted Transferee</u>"), but only if (x) such transfer or assignment is agreed to in writing, and a copy of such agreement is furnished to the Corporation prior to or concurrently with such transfer or assignment, (y) prior to or concurrently with such transfer or assignment, such Subsidiary or Permitted Transferee furnishes the Corporation with written notice of the name and address of such Subsidiary or Permitted Transferee and the number of Registrable Securities with respect to which such registration rights (other than Non-Transferable Rights) are being transferred or assigned and (z) the Subsidiary or Permitted Transferee agrees in writing with the Corporation to be bound by all the provisions and obligations contained herein applicable to the Trust (other than Non-Transferable Rights), such agreement being in a form reasonably satisfactory to the Corporation. The rights and obligations under this Agreement of any Permitted Transferee shall terminate automatically upon the date that all Registrable Securities held by such Permitted Transferee may be sold in a single day without notice or manner of sale restrictions and, if the Corporation has not complied with its periodic reporting requirements under the Exchange Act, without current information, pursuant to, and in accordance with, Rule 144 (giving effect, if applicable, to "tacking" the holding period of the Trust).

(b) In the event the Corporation engages in a merger or consolidation in which the Registrable Securities are converted into securities of another company, appropriate arrangements will be made so that the registration rights provided under this Agreement continue to be provided to the Trust, its applicable Subsidiaries and any Permitted Transferee by the issuer of such securities.

22

# ARTICLE III

## Periodic Reporting and Rule 144

SECTION 3.01. <u>Periodic Reporting.</u> If the Corporation is subject to the requirements of Section 13, 14 or 15(d) of the Exchange Act, the Corporation covenants that it will file any reports required to be filed by it under the Securities Act and the Exchange Act, so as to enable the Trust to sell Registrable Securities without registration under the Securities Act within the limitation of the exemptions provided by Rule 144. Upon the request of the Trust, the Corporation will deliver to the Trust a written statement as to whether it has complied with such requirement.

SECTION 3.02. <u>Rule 144 Block Trades.</u> Upon request and at least three Business Days advance notice by the Trust, the Corporation shall use its commercially reasonable best efforts to cooperate in a timely manner with reasonable requests by the Trust with respect any Rule 144 Block Trade by the Trust, including delivery of customary certificates to the Corporation's transfer agent or the Trust's broker, but excluding the delivery of legal opinions, disclosure letters or comfort letters.

# ARTICLE IV

## Mirror Voting

SECTION 4.01. <u>Mirror Voting.</u> The Corporation and the Trust hereby agree that all votes with respect to Common Stock held by the Trust from time to time in excess of 9.9% of the Corporation's outstanding shares of Common Stock as of any applicable record date for voting shall, with respect to all matters subject to a vote of the shareholders other than matters directly related to the natural environment or safety, be cast in the same proportion as the votes of all other shareholders of the Corporation (herein referred to as "<u>mirror voting</u>"), unless on or before the Effective Date, the Corporation determines in good faith (taking into account relevant factors including, among other things, the outcome of any offering or issuance of Common Stock or equity-linked securities in furtherance of the Plan of Reorganization, to the extent then known), and after providing all reasonably requested information to, and consultation with, tax counsel to the Trust and to the Tort Claimants Committee, that the absence of mirror voting is reasonably necessary or advisable to preserve the ability of the Debtors to utilize their net operating loss carryforwards and other tax attributes without limitation under section 382 of the Internal Revenue Code of 1986, as amended, and any applicable state law. If the Corporation makes such a determination, the Corporation will deliver written notice to such effect to the Trust on or within two Business Days after the Effective Date. If mirror voting is so implemented, and upon the Trust's request, the Corporation shall provide acknowledgement of and reasonable cooperation with the Trust's position that it will not be an "affiliate" of the Corporation under Rule 144 as a result of its holding Registrable Securities; <u>provided</u> that the Corporation and its counsel shall not be required to deliver any legal opinion with respect to such matter. In the event mirror voting is implemented and (a) the Trust is determined to be an "affiliate" of the Corporation under Rule 144 or (b) the Corporation fails to comply in any material respect with its obligations under this **Section 4.01**, mirror voting shall be suspended automatically, effective as of the day on which the Trust delivers notice to the Corporation stating that the events described in clause (a) or (b) have occurred and describing in reasonable detail the circumstances giving rise thereto.

23

## ARTICLE V

### Termination

SECTION 5.01. <u>Termination.</u> Other than **Sections 2.07** and **2.08** and **Article VI**, this Agreement and the respective rights and obligations of the Corporation and the Trust hereunder (a) shall terminate automatically on the date as of which the Trust beneficially owns less than 4% of the outstanding shares of Common Stock and all Registrable Securities may be sold in a single day without notice or manner of sale restrictions pursuant to, and in accordance with, Rule 144 (and the Trust shall promptly notify the Corporation when its beneficial ownership is less than 4% and all Registrable Securities may be sold in a single day without notice or manner of sale restrictions pursuant to, and in accordance with, Rule 144) and (b) may be terminated by the Trust upon written notice by the Trust to the Corporation once the Trust beneficially owns less than 10% of the outstanding shares of Common Stock; <u>provided</u> that, in the event the Trust exercises its right pursuant to clause (b), the respective rights and obligations of the Corporation and the Trust under **Section 2.03** shall remain in effect until the Trust beneficially owns less than 7.5% of the outstanding shares of Common Stock (and the Trust shall promptly notify the Corporation when its beneficial ownership is less than 7.5%). All liabilities, rights or obligations under **Sections 2.07** and **2.08** and **Article VI** shall remain in effect in accordance with the terms of such provisions.

## ARTICLE VI

### Miscellaneous

SECTION 6.01. <u>Notices.</u> Any notice, request, instruction, consent, document or other communication required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been sufficiently given or served for all purposes (a) upon delivery when personally delivered; (b) on the delivery date after having been sent by a nationally or internationally recognized overnight courier service (charges prepaid); (c) at the time received when sent by registered or certified mail, return receipt requested, postage prepaid; or (d) at the time when a "read receipt" is received (or the first Business Day following such receipt if the date of such receipt is not a Business Day) if sent by email, in each case, to the recipient at the address or email, as applicable, indicated below:

      If to the Corporation:

          PG&E Corporation
          77 Beale Street
          San Francisco, CA 94105
          Attention: Janet Loduca, Senior Vice President and General Counsel

with a copy to:

    Cravath, Swaine & Moore LLP
    825 8th Avenue
    New York, NY 10019
    Attention: Richard Hall, Nicholas A. Dorsey and C. Daniel Haaren
    Email: RHall@cravath.com; NDorsey@cravath.com;
    DHaaren@cravath.com

If to the Trust:

    Hon. John K. Trotter (Ret.), Trustee
    PG&E Fire Victim Trust
    Two Embarcadero Center
    Suite 1500
    San Francisco, CA 94111
    Email: trustee@firevictimtrust.com

with a copy to:

    Cathy Yanni, Claims Administrator
    PG&E Fire Victim Trust
    Two Embarcadero Center
    Suite 1500
    San Francisco, CA 94111
    Email: claimsadministrator@firevictimtrust.com

    Brown Rudnick LLP
    7 Times Square
    New York, NY 11036
    Attn: David J. Molton, Esq.,
    Gerard T. Cicero, Esq.
    Email: dmolton@brownrudnick.com,
    gcicero@brownrudnick.com

provided, however, if any party shall have designated a different addressee and/or contact information by notice in accordance with this **Section 6.01**, then to the last addressee as so designated.

SECTION 6.02. <u>Authority.</u> Each of the parties hereto represents to the other that (a) it has the corporate or other organizational power and authority to execute, deliver and perform this Agreement, (b) the execution, delivery and performance of this Agreement by it has been duly authorized by all necessary corporate or organizational action and no such further action is required, (c) it has duly and validly executed and delivered this Agreement and (d) this Agreement is a legal, valid and binding obligation, enforceable against it in accordance with its terms subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and general equity principles.

SECTION 6.03. <u>No Third Party Beneficiaries.</u> Except for Indemnitees as set forth in **Section 2.08**, this Agreement shall be binding upon and inure solely to the benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or will confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

SECTION 6.04. <u>Governing Law; Forum Selection.</u> This Agreement shall be governed by and construed and interpreted in accordance with the laws of the State of New York irrespective of choice of laws principles thereof. Any action or proceeding against the parties relating in any way to this Agreement may be brought and enforced exclusively in the courts of the State of New York located in the Borough of Manhattan or (to the extent subject matter jurisdiction exists therefor) the U.S. District Court for the Southern District of New York, and the parties irrevocably submit to the jurisdiction of both courts in respect of any such action or proceeding.

SECTION 6.05. <u>WAIVER OF JURY TRIAL.</u> EACH PARTY WAIVES THE RIGHT TO A TRIAL BY JURY IN ANY DISPUTE IN CONNECTION WITH OR RELATING TO THIS AGREEMENT OR ANY MATTERS DESCRIBED OR CONTEMPLATED HEREIN, AND AGREES TO TAKE ANY AND ALL ACTION NECESSARY OR APPROPRIATE TO EFFECT SUCH WAIVER.

SECTION 6.06. <u>Successors and Assigns.</u> Except as expressly provided in **Section 2.09**, neither this Agreement nor any of the rights, interests or obligations provided by this Agreement may be assigned by any party (whether by operation of law or otherwise) without the prior written consent of the other party, and any such assignment without such prior written consent shall be null and void. Subject to the immediately preceding sentence, this Agreement shall be binding upon and benefit the Corporation, the Trust and their respective successors and permitted assigns, and Indemnitees pursuant to **Section 2.08**.

SECTION 6.07. <u>Entire Agreement.</u> This Agreement contains the final, exclusive and entire agreement and understanding of the parties with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements and understandings, whether written or oral, among the parties with respect to the subject matter hereof. This Agreement shall not be deemed to contain or imply any restriction, covenant, representation, warranty, agreement or undertaking of any party with respect to the transactions contemplated hereby other than those expressly set forth herein, and none shall be deemed to exist or be inferred with respect to the subject matter hereof.

26

SECTION 6.08. <u>Severability.</u> Whenever possible, each term and provision of this Agreement will be interpreted in such manner as to be effective and valid under law. If any term or provision of this Agreement, or the application thereof to any Person or any circumstance, is held to be illegal, invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be legal, valid and enforceable, the intent and purpose of such illegal, invalid or unenforceable provision and (b) the remainder of this Agreement or such term or provision and the application of such term or provision to other Persons or circumstances shall remain in full force and effect and shall not be affected by such illegality, invalidity or unenforceability, nor shall such invalidity or unenforceability affect the legality, validity or enforceability of such term or provision, or the application thereof, in any jurisdiction.

SECTION 6.09. <u>Amendment.</u> This Agreement may not be amended, modified or supplemented except upon the execution and delivery of a written agreement executed by a duly authorized representative or officer of each of the parties.

SECTION 6.10. <u>Headings.</u> The descriptive headings of the Articles, Sections and paragraphs of this Agreement are included for convenience only, do not constitute a part of this Agreement and shall not be deemed to limit, modify or affect any of the provisions hereof.

SECTION 6.11. <u>Counterparts; Facsimiles.</u> This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which taken together shall constitute one and the same Agreement. All signatures of the parties may be transmitted by facsimile or electronic delivery, and each such facsimile signature or electronic delivery signature (including a PDF signature) will, for all purposes, be deemed to be the original signature of the party whose signature it reproduces and be binding upon such party.

SECTION 6.12. <u>Time Periods.</u> Unless otherwise specified in this Agreement, an action required under this Agreement to be taken within a certain number of days shall be taken within that number of calendar days (and not Business Days).

[*Remainder of Page Intentionally Left Blank*]

27

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 911 of 1367

**IN WITNESS WHEREOF**, the parties hereto, being duly authorized, have executed and delivered this Agreement on the date first above written.

PG&E CORPORATION,

by  /s/ MARI BECKER
_____
Name: Mari Becker
Title: Senior Director & Treasurer

[*Signature Page to Registration Rights Agreement*]

JUSTICE JOHN K. TROTTER (RET.), ACTING ON
BEHALF OF THE PG&E FIRE VICTIM TRUST,

by  /s/ JOHN K. TROTTER
    Name: Hon. John K. Trotter
    Title: Trustee

[*Signature Page to Registration Rights Agreement*]

## PLAN OF DISTRIBUTION

As of the date of this prospectus, we have not been advised by the selling shareholders as to any plan of distribution. The selling shareholders, or their pledgees, donees (including charitable organizations), transferees or other successors-in-interest, may from time to time, sell any or all of the shares of common stock offered by this prospectus either directly by such individual, or through underwriters, dealers or agents or on any exchange on which the shares of common stock may from time to time be traded, in the over-the-counter market, or in independently negotiated transactions or otherwise. The selling stockholder may use any one or more of the following methods when selling shares of our common stock:

- ordinary brokerage transactions and transactions in which the broker-dealer solicits purchasers;

- block trades in which the broker-dealer will attempt to sell the shares of common stock as agent but may position and resell a portion of the block as principal to facilitate the transaction;

- purchases by a broker-dealer as principal and resale by the broker-dealer for its account;

- any exchange distribution in accordance with the rules of the applicable exchange;

- privately negotiated transactions;

- settlement of short sales entered into after the effective date of the registration statement of which the prospectus will form a part;

- broker-dealers may agree with the selling shareholders to sell a specified number of such shares of common stock at a stipulated price per share;

- through the writing or settlement of options or other hedging transactions, whether through an options exchange or otherwise;

- a combination of any such methods of sale; or

- any other method permitted pursuant to applicable law.

The selling shareholders may also sell shares of common stock under Rule 144 under the Securities Act, if available, or otherwise as permitted pursuant to applicable law, rather than under this prospectus.

Broker-dealers engaged by the selling shareholders may arrange for other broker-dealers to participate in sales. Broker-dealers may receive commissions or discounts from the selling shareholders (or, if any broker-dealer acts as agent for the purchaser of the shares of common stock under this prospectus, from the purchaser) in amounts to be negotiated, but, except as set forth in a supplement to the prospectus, in the case of any agency transaction not in excess of a customary brokerage commission in compliance with Financial Industry Regulatory Authority Rule 2121 ("Rule 2121"), and, in the case of a principal transaction a markup or markdown in compliance with Rule 2121.

In connection with sales of the shares of common stock under this prospectus or interests therein, the selling shareholders may enter into hedging transactions with broker-dealers or other financial institutions, which may in turn engage in short sales of the shares of common stock in the course of hedging the positions they assume. The selling shareholders may also sell the shares of common stock short and deliver them to close their short positions, or loan or pledge the shares of common stock to broker-dealers that in turn may sell them. The selling shareholders may also enter into option or other transactions with broker-dealers or other financial institutions or the creation of one or more derivative securities that require the delivery to such broker-dealer or other financial institution of shares of common stock offered by this prospectus, which shares such broker-dealer or other financial institution may resell pursuant to this prospectus (as supplemented or amended to reflect such transaction). Notwithstanding the foregoing, the selling shareholders have been advised that they may not use the shares of common stock registered on the registration statement of which this prospectus forms a part to cover short sales of the shares of common stock made prior to the date the registration statement has been declared effective by the SEC.

The selling shareholders may from time to time pledge or grant a security interest in some or all of the shares of common stock owned by them, and the pledgees or secured parties will, upon foreclosure in the event of default, be deemed to be selling shareholders. As and when the selling stockholder takes such actions, the number of securities under this prospectus on behalf of such selling stockholder will decrease. The selling shareholders may also transfer and donate the shares of common stock in other circumstances in which case the transferees, donees, pledgees or other successors in interest will be the selling beneficial owners for purposes of this prospectus.

The selling shareholders and any underwriters, dealers or agents that participate in distribution of the securities may be deemed to be underwriters, and any profit on sale of the securities by them and any discounts, commissions or concessions received by any underwriter, dealer or agent may be deemed to be underwriting discounts and commissions under the Securities Act.

There can be no assurances that the selling shareholders will sell any or all of the securities offered under this prospectus.

**Exhibit 10.3**

**Execution Version**

$500,000,000

CREDIT AGREEMENT

among

PG&E CORPORATION,
as Borrower,

the Several Lenders from Time to Time Parties Hereto,

JPMORGAN CHASE BANK, N.A.,
as Administrative Agent

JPMORGAN CHASE BANK, N.A.,

as Collateral Agent,

BOFA SECURITIES, INC.
BARCLAYS BANK PLC,
CITIBANK, N.A.
and GOLDMAN SACHS BANK USA,
as Co-Syndication Agents,

and

BNP PARIBAS,
CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH,
MIZUHO BANK, LTD.,
MUFG UNION BANK, N.A.,
and WELLS FARGO BANK, NATIONAL ASSOCIATION,
as Co-Documentation Agents

Dated as of July 1, 2020

JPMORGAN CHASE BANK, N.A.,
BOFA SECURITIES, INC.,
BARCLAYS BANK PLC,
CITIBANK, N.A.
and GOLDMAN SACHS BANK USA
as Joint Lead Arrangers and
Joint Bookrunners

# TABLE OF CONTENTS

**Page**

SECTION 1.    DEFINITIONS   1

    1.1    Defined Terms   1
    1.2    Other Definitional Provisions and Interpretative Provisions   30
    1.3    Divisions   31
    1.4    Interest Rates; LIBOR Notification   31

SECTION 2.    AMOUNT AND TERMS OF COMMITMENTS   31

    2.1    Commitments   31
    2.2    Procedure for Revolving Loan Borrowing   32
    2.3    Commitment Increases   32
    2.4    [Reserved]   34
    2.5    [Reserved]   34
    2.6    Commitment Fees, Etc.   34
    2.7    Termination or Reduction of Commitments; Extension of Termination Date   34
    2.8    Optional Prepayments   36
    2.9    Conversion and Continuation Options   36
    2.10    Limitations on Eurodollar Tranches   37
    2.11    Interest Rates and Payment Dates   37
    2.12    Computation of Interest and Fees   38
    2.13    Inability to Determine Interest Rate   38
    2.14    Pro Rata Treatment and Payments; Notes   39
    2.15    Change of Law   41
    2.16    Taxes   42
    2.17    Indemnity   46
    2.18    Change of Lending Office   46
    2.19    Replacement of Lenders   46
    2.20    Defaulting Lenders   47
    2.21    Illegality   48

SECTION 3.    [RESERVED]   49

SECTION 4.    REPRESENTATIONS AND WARRANTIES   49

    4.1    Financial Condition   49
    4.2    No Change   49
    4.3    Existence; Compliance with Law   49
    4.4    Power; Authorization; Enforceable Obligations   49
    4.5    No Legal Bar   50
    4.6    Litigation   50
    4.7    No Default   50
    4.8    Taxes   50
    4.9    Federal Regulations   51

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 917 of 1367

| 4.10 | ERISA | 51 |
|---|---|---|
| 4.11 | Investment Company Act; Other Regulations | 51 |
| 4.12 | Use of Proceeds | 52 |
| 4.13 | Environmental Matters | 52 |
| 4.14 | Regulatory Matters | 52 |
| 4.15 | Sanctions; Anti-Corruption | 52 |
| 4.16 | Affected Financial Institutions | 52 |
| 4.17 | Solvency | 53 |
| 4.18 | Disclosure | 53 |
| 4.19 | Validity of Security Interests | 53 |
| 4.20 | Ownership of Property | 53 |
| 4.21 | Covered Entity | 53 |

| SECTION 5. | CONDITIONS PRECEDENT | 54 |
|---|---|---|
| 5.1 | Conditions to the Effective Date | 54 |
| 5.2 | Conditions to Each Credit Event | 55 |

| SECTION 6. | AFFIRMATIVE COVENANTS | 56 |
|---|---|---|
| 6.1 | Financial Statements | 56 |
| 6.2 | Certificates; Other Information | 57 |
| 6.3 | Payment of Taxes | 57 |
| 6.4 | Maintenance of Existence; Compliance | 58 |
| 6.5 | Maintenance of Property; Insurance | 58 |
| 6.6 | Inspection of Property; Books and Records; Discussions | 58 |
| 6.7 | Notices | 58 |
| 6.8 | Maintenance of Licenses, etc. | 59 |
| 6.9 | Further Assurances | 59 |

| SECTION 7. | NEGATIVE COVENANTS | 59 |
|---|---|---|
| 7.1 | Indebtedness | 59 |
| 7.2 | Financial Covenants | 61 |
| 7.3 | Liens | 62 |
| 7.4 | Sale and Lease Back Transactions | 64 |
| 7.5 | Investments | 64 |
| 7.6 | Fundamental Changes | 65 |
| 7.7 | Dispositions | 66 |
| 7.8 | Change in Nature of Business | 67 |
| 7.9 | Transactions with Affiliates | 67 |
| 7.10 | Burdensome Agreements | 67 |
| 7.11 | Use of Proceeds | 68 |
| 7.12 | Restricted Payments | 68 |
| 7.13 | Swap Agreements | 68 |
| 7.14 | Ownership of PG&E Utility Common Stock | 69 |

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 918 of 1367

| SECTION 8. | EVENTS OF DEFAULT | 69 |
|---|---|---|
| SECTION 9. | THE AGENTS | 71 |
| 9.1 | Appointment and Authority | 71 |
| 9.2 | Delegation of Duties | 72 |
| 9.3 | Exculpatory Provisions | 72 |
| 9.4 | Reliance by Agents | 73 |
| 9.5 | Notice of Default | 73 |
| 9.6 | Non-Reliance on Agents and Other Lenders | 73 |
| 9.7 | Indemnification | 74 |
| 9.8 | Agent in Its Individual Capacity | 74 |
| 9.9 | Successor Agents | 74 |
| 9.10 | Documentation Agents and Syndication Agents | 76 |
| 9.11 | Administrative Agent May File Proofs of Claim | 76 |
| 9.12 | Collateral Matters | 76 |
| 9.13 | Credit Bidding | 77 |
| 9.14 | Intercreditor Agreement; Pledge Agreement | 77 |
| 9.15 | Certain ERISA Matters | 78 |
| SECTION 10. | MISCELLANEOUS | 79 |
| 10.1 | Amendments and Waivers | 79 |
| 10.2 | Notices | 81 |
| 10.3 | No Waiver; Cumulative Remedies | 82 |
| 10.4 | Survival of Representations and Warranties | 83 |
| 10.5 | Payment of Expenses and Taxes | 83 |
| 10.6 | Successors and Assigns; Participations and Assignments | 84 |
| 10.7 | Adjustments; Set off | 88 |
| 10.8 | Counterparts; Electronic Execution; Binding Effect | 89 |
| 10.9 | Severability | 90 |
| 10.10 | Integration | 90 |
| 10.11 | GOVERNING LAW | 90 |
| 10.12 | Submission To Jurisdiction; Waivers | 90 |
| 10.13 | Acknowledgments | 91 |
| 10.14 | Confidentiality | 91 |
| 10.15 | WAIVERS OF JURY TRIAL | 92 |
| 10.16 | USA Patriot Act; Beneficial Ownership Regulation | 92 |
| 10.17 | Judicial Reference | 92 |
| 10.18 | No Advisory or Fiduciary Responsibility | 92 |
| 10.19 | Acknowledgement Regarding Any Supported QFCs | 93 |
| 10.20 | Acknowledgement and Consent to Bail-In of Affected Financial Institutions | 93 |
| 10.21 | Release of Liens | 94 |

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page
919 of 1367

SCHEDULES:

1.1        Commitments
7.4        Sale and Lease Back Transactions
7.9        Transactions with Affiliates
7.12     Restricted Payments


EXHIBITS:

A        Form of New Lender Supplement
B        Form of Commitment Increase Supplement
C        Form of Compliance Certificate
D        Form of Closing Certificate
E        Form of Assignment and Assumption
F        [Reserved]
G        Forms of U.S. Tax Compliance Certificates
H        Form of Note
I        Form of Solvency Certificate

This CREDIT AGREEMENT (this "Agreement"), dated as of July 1, 2020, among PG&E CORPORATION, a California corporation (the "Borrower"), the several banks and other financial institutions or entities from time to time parties to this Agreement (the "Lenders") and JPMORGAN CHASE BANK, N.A., as administrative agent (in such capacity, together with any permitted successor thereto, the "Administrative Agent") and JPMORGAN CHASE BANK, N.A., as collateral agent (in such capacity, together with any permitted successor thereto, the "Collateral Agent").

W I T N E S S E T H:

WHEREAS, on January 29, 2019, Pacific Gas and Electric Company, a California corporation ("PG&E Utility"), and the Borrower, holder of all of the issued and outstanding common stock of PG&E Utility (together with PG&E Utility, each, a "Debtor" and collectively, the "Debtors") filed voluntary petitions for relief in the United States Bankruptcy Court for the Northern District of California (the "Bankruptcy Court"), and commenced their respective cases under chapter 11 of title 11 of the United States Code;

WHEREAS, on June 19, 2020, the Debtors filed the Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization Dated June 19, 2020 [Docket No. 8048] (together with all exhibits, schedules, annexes, supplements, and other attachments thereto, and as may be further amended, modified or otherwise changed in accordance with this Agreement, the "Plan of Reorganization");

WHEREAS, on June 20, 2020, the Plan of Reorganization was confirmed by the Bankruptcy Court and is to be consummated on the Effective Date; and

WHEREAS, in connection with the foregoing, the Borrower has requested that the Lenders provide the commitments and loans set forth herein and the Lenders are willing to make available to the Borrower such commitments and loans upon the terms and subject to the conditions set forth herein.

NOW, THEREFORE, IT IS AGREED AS FOLLOWS:

SECTION 1.   DEFINITIONS

1.1   Defined Terms. As used in this Agreement, the terms listed in this Section 1.1 shall have the respective meanings set forth in this Section 1.1.

"ABR": for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the NYFRB Rate in effect on such day plus ½ of 1% and (c) the Eurodollar Rate for a one month Interest Period commencing on such day (or if such day is not a Business Day, the immediately preceding Business Day) plus 1%; provided that for the purpose of this definition, the Eurodollar Rate for any day shall be based on the Eurodollar Screen Rate (or if the Eurodollar Screen Rate is not available for such one month Interest Period, the Interpolated Rate) at approximately 11:00 a.m. London time on such day. Any change in the ABR due to a change in the Prime Rate, the NYFRB Rate or the Eurodollar Rate shall be effective from and including the effective date of such change in the Prime Rate, the NYFRB Rate or the Eurodollar Rate, respectively. If ABR is being used as an alternate rate of interest pursuant to Section 2.13 (for the

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 921 of 1367

avoidance of doubt, only until any amendment has become effective pursuant to Section 2.13(b)), then ABR shall be the greater of clauses (a) and (b) above and shall be determined without reference to clause (c) above. If the ABR as determined pursuant to the foregoing would be less than 1.00%, such rate shall be deemed to be 1.00% for purposes of this Agreement.

"ABR Loans": Loans the rate of interest applicable to which is based upon the ABR.

"Adjusted Borrower Cash": for any period:

(i)    the amount of unrestricted cash and cash equivalents on the balance sheet of the Borrower determined in accordance with GAAP on the last day of such period (other than cash and cash equivalents that are proceeds of Revolving Loans), *minus*

(ii)    the difference, if positive, of (A) the aggregate amount of net cash proceeds received by the Borrower from the issuance or incurrence of any Indebtedness (other than the incurrence of Indebtedness under this Agreement) during such period *less* (B) the aggregate amount of repayments or prepayments of any Indebtedness (other than repayments or prepayments of Indebtedness under this Agreement) during such period.

"Administrative Agent": as defined in the preamble hereto.

"Affected Financial Institution": (a) any EEA Financial Institution or (b) any UK Financial Institution.

"Affiliate": with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"Agent Parties": as defined in Section 10.2(d)(ii).

"Agents": the collective reference to the Collateral Agent, the Syndication Agents, the Documentation Agents and the Administrative Agent.

"Agreement": as defined in the preamble hereto.

"Anti-Corruption Laws": as defined in Section 4.15.

"Applicable Margin": for any day, the applicable rate per annum set forth under the relevant column heading below, based upon the Ratings then in effect:

| Level | Rating S&P/Moody's/Fitch | Applicable Margin for ABR Loans | Applicable Margin for Eurodollar Loans |
|---|---|---|---|
| 1 | Higher than BB/Ba2/BB | 2.00% | 3.00% |
| 2 | BB/Ba2/BB | 2.25% | 3.25% |
| 3 | BB-/Ba3/BB- | 2.50% | 3.50% |
| 4 | B+/B1/B+ | 2.75% | 3.75% |
| 5 | B/B2/B | 3.00% | 4.00% |
| 6 | Lower than B/B2/B | 3.25% | 4.25% |

2

Subject to the provisions of this paragraph regarding split ratings, changes in the Applicable Margin shall become effective on the date on which S&P, Moody's and/or Fitch changes its relevant Rating. (a) If Ratings are issued by all three rating agencies and the respective Ratings issued by two or more of the rating agencies are in the same pricing level, that pricing level shall apply; (b) if Ratings are issued by all three rating agencies and none of the respective Ratings are in the same pricing level, the pricing level shall be determined based on the middle Rating; (c) if only two Ratings are issued and they differ by one level, then the pricing level for the higher of such Ratings shall apply; (d) if only two Ratings are issued and they differ by more than one level, then the pricing level that is one level lower than the pricing level of the higher Rating shall apply; (e) if only one Rating is issued, the pricing level shall be determined based on that Rating; and (f) if no such Ratings in clauses (a) through (e) of this sentence are issued for the Borrower, but are generally available for other companies, then the Applicable Margin shall be those set forth above opposite pricing level 6.

"Approved Fund": with respect to any Lender, any Person (other than a natural person) that is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business that is administered or managed by (a) such Lender, (b) an Affiliate of such Lender or (c) an entity or an Affiliate of any entity that administers or manages such Lender.

"Arrangers": the Joint Lead Arrangers and Joint Bookrunners identified on the cover hereto.

"A/R Securitization Assets": (i) any accounts receivable, notes receivable, rights to future accounts receivable, notes receivable or residuals or other similar rights to payments due or any other rights to payment or related assets in respect of the provision of gas and electric service to consumers or otherwise (whether then existing or arising in the future) of the Borrower or any of its Subsidiaries and the proceeds thereof and (ii) all collateral securing such receivable or asset, all contracts and contract rights, guarantees or other obligations in respect of such receivable or asset, lockbox accounts and records with respect to such receivables or asset and any other assets customarily transferred (or in respect of which security interests are customarily granted) together with receivables or assets in connection with a securitization transaction involving such assets.

"A/R Securitization Subsidiary": PG&E AR Facility, LLC and any other Subsidiary formed and operating solely for the purpose of entering into A/R Securitization Transactions and engaging in activities ancillary thereto.

"A/R Securitization Transaction": any financing transaction or series of financing transactions entered into by any Subsidiary of the Borrower pursuant to which such Subsidiary may sell, convey or otherwise transfer to any Person (including, without limitation, an A/R Securitization Subsidiary), or may grant a security interest in any A/R Securitization Assets and that are (other than to the extent of the Standard A/R Securitization Obligations) non-recourse to the Borrower or any of its Subsidiaries (other than an A/R Securitization Subsidiary).

3

"Assignee": as defined in Section 10.6(b).

"Assignment and Assumption": an Assignment and Assumption, substantially in the form of Exhibit E.

"Available Commitment": as to any Lender at any time, an amount equal to the excess, if any, of (a) such Lender's Commitment then in effect over (b) the principal amount of such Lender's then outstanding Revolving Loans.

"Bail-In Action": the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"Bail-In Legislation": (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation, rule or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"Bankruptcy Court": as defined in the first recital paragraph.

"Benchmark Replacement": the sum of: (a) the alternate benchmark rate (which may be a SOFR-Based Rate) that has been selected by the Administrative Agent and the Borrower giving due consideration to (i) any selection or recommendation of a replacement rate or the mechanism for determining such a rate by the Relevant Governmental Body and/or (ii) any evolving or then-prevailing market convention for determining a rate of interest as a replacement to the Eurodollar Base Rate for U.S. dollar-denominated syndicated credit facilities and (b) the Benchmark Replacement Adjustment; provided that, if the Benchmark Replacement as so determined would be less than zero, the Benchmark Replacement will be deemed to be zero for the purposes of this Agreement; provided further that any such Benchmark Replacement shall be administratively feasible as determined by the Administrative Agent in its sole discretion.

"Benchmark Replacement Adjustment": the spread adjustment, or method for calculating or determining such spread adjustment (which may be a positive or negative value or zero), that has been selected by the Administrative Agent and the Borrower giving due consideration to (i) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of the Eurodollar Base Rate with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body and/or (ii) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of the Eurodollar Base Rate with the applicable Unadjusted Benchmark Replacement for U.S. dollar-denominated syndicated credit facilities at such time (for the avoidance of doubt, such Benchmark Replacement Adjustment shall not be in the form of a reduction to the Applicable Margin).

"Benchmark Replacement Conforming Changes": with respect to any Benchmark Replacement, any technical, administrative or operational changes (including changes to the

4

definition of "ABR," the definition of "Interest Period," timing and frequency of determining rates and making payments of interest and other administrative matters) that the Administrative Agent decides in its reasonable discretion may be appropriate to reflect the adoption and implementation of such Benchmark Replacement and to permit the administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Administrative Agent determines that no market practice for the administration of the Benchmark Replacement exists, in such other manner of administration as the Administrative Agent decides is reasonably necessary in connection with the administration of this Agreement).

"Benchmark Replacement Date": the earlier to occur of the following events with respect to the Eurodollar Base Rate:

(1)     in the case of clause (1) or (2) of the definition of "Benchmark Transition Event," the later of (a) the date of the public statement or publication of information referenced therein and (b) the date on which the administrator of the Eurodollar Screen Rate permanently or indefinitely ceases to provide the Eurodollar Screen Rate; and

(2)     in the case of clause (3) of the definition of "Benchmark Transition Event," the date of the public statement or publication of information referenced therein.

"Benchmark Transition Event": the occurrence of one or more of the following events with respect to the Eurodollar Base Rate:

(1)     a public statement or publication of information by or on behalf of the administrator of the Eurodollar Screen Rate announcing that such administrator has ceased or will cease to provide the Eurodollar Screen Rate, permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide the Eurodollar Screen Rate;

(2)     a public statement or publication of information by the regulatory supervisor for the administrator of the Eurodollar Screen Rate, the U.S. Federal Reserve System, an insolvency official with jurisdiction over the administrator for the Eurodollar Screen Rate, a resolution authority with jurisdiction over the administrator for the Eurodollar Screen Rate or a court or an entity with similar insolvency or resolution authority over the administrator for the Eurodollar Screen Rate, in each case which states that the administrator of the Eurodollar Screen Rate has ceased or will cease to provide the Eurodollar Screen Rate permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide the Eurodollar Screen Rate; and/or

(3)     a public statement or publication of information by the regulatory supervisor for the administrator of the Eurodollar Screen Rate announcing that the Eurodollar Screen Rate is no longer representative.

"Benchmark Transition Start Date": (a) in the case of a Benchmark Transition Event, the earlier of (i) the applicable Benchmark Replacement Date and (ii) if such Benchmark Transition Event is a public statement or publication of information of a prospective event, the 90th day prior

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 925 of 1367

to the expected date of such event as of such public statement or publication of information (or if the expected date of such prospective event is fewer than 90 days after such statement or publication, the date of such statement or publication) and (b) in the case of an Early Opt-in Election, the date specified by the Administrative Agent or the Required Lenders, as applicable, by notice to the Borrower, the Administrative Agent (in the case of such notice by the Required Lenders) and the Lenders.

"Benchmark Unavailability Period": if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred with respect to the Eurodollar Base Rate and solely to the extent that the Eurodollar Base Rate has not been replaced with a Benchmark Replacement, the period (a) beginning at the time that such Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the Eurodollar Base Rate for all purposes hereunder in accordance with Section 2.13 and (b) ending at the time that a Benchmark Replacement has replaced the Eurodollar Base Rate for all purposes hereunder pursuant to Section 2.13.

"Beneficial Owner": as defined in Rule 13d-3 and Rule 13d-5 under the Exchange Act, except that in calculating the beneficial ownership of any particular "person" (as that term is used in Sections 13(d) and 14(d) of the Exchange Act), such "person" will be deemed to have beneficial ownership of all securities that such "person" has the right to acquire by conversion or exercise of other securities, whether such right is currently exercisable or is exercisable only upon the occurrence of a subsequent condition. The terms "Beneficially Owns" and "Beneficially Owned" have correlative meanings.

"Beneficial Ownership Certification": a certification regarding beneficial ownership or control as required by the Beneficial Ownership Regulation.

"Beneficial Ownership Regulation": 31 C.F.R. § 1010.230.

"Benefit Plan": any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in and subject to Section 4975 of the Code or (c) any Person whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

"Benefitted Lender": as defined in Section 10.7(a).

"BHC Act Affiliate": an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)).

"Board": the Board of Governors of the Federal Reserve System of the United States (or any successor).

"Borrower": as defined in the preamble hereto.

"Borrowing Date": any Business Day specified by the Borrower as a date on which the Borrower requests the Lenders to make Loans hereunder.

"Business Day": a day other than a Saturday, Sunday or other day on which commercial banks in New York City or San Francisco, California are authorized or required by law to close, provided, that with respect to notices and determinations in connection with, and payments of principal and interest on, Eurodollar Loans, such day is also a day for trading by and between banks in Dollar deposits in the London interbank eurodollar market.

"Capital Lease Obligations": as to any Person, the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on the balance sheet of such Person under GAAP and, for the purposes of this Agreement, the amount of such obligations at any time shall be the capitalized amount thereof at such time determined in accordance with GAAP, subject to Section 1.2(f).

"Capital Stock": any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation) and any and all warrants, rights or options to purchase any of the foregoing.

"Cash Coverage Ratio": for any period, the ratio of (a) Adjusted Borrower Cash as of the last day of such period plus Interest Charges for such period to (b) Fixed Charges for such period, in each case determined on a Trailing Four Quarter Basis.

"Cash Management Agreement": any agreement to establish or maintain accounts or provide cash management services, including treasury, depository, overdraft, netting services, cash pooling arrangements, credit or debit card, purchasing card, electronic funds transfer, automated clearing house, foreign exchange facilities and other cash management arrangements.

"Change of Control": the occurrence of one of the following:

(i)     any person or group (within the meaning of the Exchange Act and the rules of the SEC thereunder as of the Effective Date) shall become the Beneficial Owner of shares representing more than 35% of the voting power of the Capital Stock of the Borrower; or

(ii)    at any point during any period of 24 consecutive months, commencing after the Effective Date, individuals who at the beginning of such 24-month period were directors of the Borrower, together with any directors whose election or nomination for election to the board of directors of the Borrower (whether by the board of directors of the Borrower or any shareholder of the Borrower) was approved by a majority of the directors who either were directors of the Borrower at the beginning of such 24-month period or whose election or nomination for election was so approved, cease to constitute a majority of the board of directors of the Borrower (it being understood and agreed that, for the avoidance of doubt, the change of directors of the Borrower contemplated by the Plan of Reorganization shall not constitute a Change of Control); or

(iii)   there shall have been (A) a receiver appointed pursuant to an order from the State of California or a revocation of Certificate of Public Convenience and Necessity of PG&E Utility, in each case, in accordance with Order Instituting Investigation on the

7

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 927 of 1367

Commission's Own Motion to Consider the Ratemaking and Other Implications of a Proposed Plan for Resolution of Voluntary Cases filed by Pacific Gas and Electric Company Pursuant to Chapter 11 of the Bankruptcy Code, in the United States Bankruptcy Court, Northern District of California, San Francisco Division, In re Pacific Gas and Electric Corporation and Pacific Gas and Electric Company, Case No. 19-30088 or otherwise or (B) a transfer of the license and/or operating assets constituting more than 10% of the Net Tangible Assets of PG&E Utility to the State of California, to any other Governmental Authority or to a third party at the direction of State of California, the CPUC or any similar Governmental Authority.

"Change of Law": the occurrence, after the Effective Date, of any of the following: (a) the adoption or taking effect of any law, rule, regulation, statute, treaty, policy, guideline or directive by any Governmental Authority, (b) any change in any law, rule, regulation, statute, treaty, policy, guideline or directive or in the application, interpretation, promulgation, implementation, administration or enforcement thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority, provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change of Law", regardless of the date enacted, adopted or issued.

"Code": the Internal Revenue Code of 1986, as amended from time to time.

"Collateral": as defined in the Pledge Agreement.

"Collateral Agent": as defined in the preamble hereto.

"Commitment": as to any Lender, the obligation of such Lender, if any, to make Revolving Loans in an aggregate principal and/or face amount not to exceed the amount set forth under the heading "Commitment" opposite such Lender's name on Schedule 1.1 or in the Assignment and Assumption or New Lender Supplement pursuant to which such Lender became a party hereto, as the same may be changed from time to time pursuant to the terms hereof. The original amount of the Total Commitments is $500,000,000.

"Commitment Fee Rate": for any day, the rate per annum determined pursuant to the grid set forth below, based upon the Ratings then in effect:

| Level | Rating S&P/Moody's/Fitch | Commitment Fee Rate |
|---|---|---|
| 1 | Higher than BB/Ba2/BB | 0.50% |
| 2 | BB/Ba2/BB | 0.55% |
| 3 | BB-/Ba3/BB- | 0.60% |
| 4 | B+/B1/B+ | 0.65% |
| 5 | B/B2/B | 0.70% |
| 6 | Lower than B/B2/B | 0.75% |

8

Subject to the provisions of this paragraph regarding split ratings, changes in the Commitment Fee Rate shall become effective on the date on which S&P, Moody's and/or Fitch changes its relevant Rating. (a) If Ratings are issued by all three rating agencies and the respective Ratings issued by two or more of the rating agencies are in the same pricing level, that pricing level shall apply; (b) if Ratings are issued by all three rating agencies and none of the respective Ratings are in the same pricing level, the Commitment Fee Rate shall be determined based on the middle Rating; (c) if only two Ratings are issued and they differ by one level, then the Commitment Fee Rate for the higher of such Ratings shall apply; (d) if only two Ratings are issued and they differ by more than one level, then the Commitment Fee Rate that is one level lower than the Commitment Fee Rate of the higher Rating shall apply; (e) if only one Rating is issued, the Commitment Fee Rate shall be determined based on that Rating; and (f) if no such Ratings in clauses (a) through (e) of this sentence are issued for the Borrower, but are generally available for other companies, then the Commitment Fee Rate shall be that set forth above opposite pricing level 6.

"Commitment Increase Notice": as defined in Section 2.3(a).

"Commitment Letter": that certain RCF Commitment Letter dated as of May 26, 2020 among PG&E Corporation, as the borrower, Pacific Gas and Electric Company and the commitment parties from time to time party thereto, as amended, modified or supplemented from time to time prior to the date hereof.

"Commitment Period": the period from and including the Effective Date to the Termination Date.

"Commonly Controlled Entity": an entity, whether or not incorporated, that is under common control with the Borrower within the meaning of Section 4001 of ERISA or is part of a group that includes the Borrower and that is treated as a single employer under Section 414 of the Code.

"Communications": as defined in Section 10.2(d)(ii).

"Compliance Certificate": a certificate duly executed by a Responsible Officer substantially in the form of Exhibit C.

"Compounded SOFR": the compounded average of SOFRs for the applicable Corresponding Tenor, with the rate, or methodology for this rate, and conventions for this rate (which may include compounding in arrears with a lookback and/or suspension period as a mechanism to determine the interest amount payable prior to the end of each Interest Period) being established by the Administrative Agent in accordance with:

(1) the rate, or methodology for this rate, and conventions for this rate selected or recommended by the Relevant Governmental Body for determining compounded SOFR; provided that:

(2) if, and to the extent that, the Administrative Agent determines that Compounded SOFR cannot be determined in accordance with clause (1) above, then the

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 929 of 1367

rate, or methodology for this rate, and conventions for this rate that the Administrative Agent determines in its reasonable discretion are substantially consistent with any evolving or then-prevailing market convention for determining compounded SOFR for U.S. dollar-denominated syndicated credit facilities at such time;

provided, further, that if the Administrative Agent decides that any such rate, methodology or convention determined in accordance with clause (1) or clause (2) is not administratively feasible for the Administrative Agent, then Compounded SOFR will be deemed unable to be determined for purposes of the definition of "Benchmark Replacement."

"Conduit Lender": any special purpose corporation organized and administered by any Lender for the purpose of making Loans otherwise required to be made by such Lender and designated by such Lender in a written instrument; provided, that the designation by any Lender of a Conduit Lender shall not relieve the designating Lender of any of its obligations to fund a Loan under this Agreement if, for any reason, its Conduit Lender fails to fund any such Loan, and the designating Lender (and not the Conduit Lender) shall have the sole right and responsibility to deliver all consents and waivers required or requested under this Agreement with respect to its Conduit Lender, and provided, further, that no Conduit Lender shall (a) be entitled to receive any greater amount pursuant to Sections 2.15, 2.16, 2.17 or 10.5 than the designating Lender would have been entitled to receive in respect of the extensions of credit made by such Conduit Lender or (b) be deemed to have any Commitment.

"Connection Income Taxes": Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Consolidated Capitalization": on any date of determination, the sum of (a) Consolidated Total Debt on such date, plus without duplication, (b) (i) the amounts set forth opposite the captions "common shareholders' equity" (or any similar caption) and "preferred stock" (or any similar caption) on the consolidated balance sheet, prepared in accordance with GAAP, of the Borrower and its Subsidiaries as of such date, and (ii) the outstanding principal amount of any junior subordinated deferrable interest debentures or other similar securities issued by the Borrower or any of its Subsidiaries after the Effective Date.

"Consolidated Capitalization Ratio": on any date of determination, the ratio of (a) Consolidated Total Debt to (b) Consolidated Capitalization.

"Consolidated Total Debt": at any date, the aggregate principal amount of all obligations of the Borrower and its Significant Subsidiaries at such date that in accordance with GAAP would be classified as debt on a consolidated balance sheet of the Borrower, and without duplication all Guarantee Obligations of the Borrower and its Significant Subsidiaries at such date in respect of obligations of any other Person that in accordance with GAAP would be classified as debt on a consolidated balance sheet of such Person; provided that, the determination of "Consolidated Total Debt" shall exclude, without duplication, (a) the Securitized Bonds and any Indebtedness under any A/R Securitization Transaction, (b) Indebtedness of the Borrower and its Significant Subsidiaries in an amount equal to the amount of cash held as cash collateral for any fully cash

10

collateralized letter of credit issued for the account of the Borrower or any Significant Subsidiary, (c) imputed Indebtedness of the Borrower or any Significant Subsidiary incurred in connection with power purchase and fuel agreements, (d) any junior subordinated deferrable interest debenture or other similar securities issued by the Borrower and (e) as of any date of determination, the amount of any securities included within the caption "preferred stock" (or any similar caption) on a consolidated balance sheet, prepared in accordance with GAAP, of the Borrower as of such date.

"Continuing Lender": as defined in Section 2.7.

"Contractual Obligation": as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Control": the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Corresponding Tenor": with respect to a Benchmark Replacement, a tenor (including overnight) having approximately the same length (disregarding business day adjustment) as the applicable tenor for the applicable Interest Period with respect to the Eurodollar Base Rate.

"Covered Entity": any of the following:

(i)     a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b);

(ii)    a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or

(iii)   a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"Covered Party": as defined in Section 10.19.

"CPUC": the California Public Utilities Commission or its successor.

"Credit Event": as defined in Section 5.2.

"Debtor Relief Laws": the Bankruptcy Code of the United States, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect.

"Debtors": as defined in the first recital paragraph.

"Default": any of the events specified in Section 8, whether or not any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 931 of 1367

"<u>Default Right</u>": the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"<u>Defaulting Lender</u>": subject to the penultimate paragraph of Section 2.20, any Lender, as reasonably determined by the Administrative Agent, that has (a) failed to fund any portion of its Revolving Loans within two (2) Business Days of the date required to be funded by it under this Agreement, unless such Lender notifies the Administrative Agent in writing that such failure is the result of such Lender's good faith determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable Default, shall be specifically identified in such writing) has not been satisfied, (b) notified the Borrower, the Administrative Agent or any other Lender in writing that it does not intend to comply with any of its funding obligations under this Agreement or has made a public statement to the effect that it does not intend to comply with its funding obligations under this Agreement (other than a notice of a good faith dispute or related communications) or generally under other agreements in which it commits to extend credit, unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's good faith determination that a condition precedent to funding (which condition precedent, together with any applicable Default, shall be specifically identified in such writing or public statement) cannot be satisfied, (c) failed, within two (2) Business Days after written request by the Administrative Agent or the Borrower, to confirm that it will comply with the terms of this Agreement relating to its obligations to fund prospective Revolving Loans, unless the subject of a good faith dispute (provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent or the Borrower), (d) otherwise failed to pay over to the Administrative Agent or any other Lender any other amount required to be paid by it under this Agreement within two (2) Business Days of the date when due, unless the subject of a good faith dispute, or (e) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, (ii) had a custodian appointed for it, or has consented to, approved of or acquiesced in any such proceeding or appointment or has a parent company that has become the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee or custodian appointed for it, or has consented to, approved of or acquiesced in any such proceeding or appointment, or (iii) become the subject of a Bail-In Action; provided that (x) if a Lender would be a "Defaulting Lender" solely by reason of events relating to a parent company of such Lender or solely because a Governmental Authority has been appointed as receiver, conservator, trustee or custodian for such Lender, in each case as described in clause (e) above, the Administrative Agent may, in their discretion, determine that such Lender is not a "Defaulting Lender" if and for so long as the Administrative Agent is satisfied that such Lender will continue to perform its funding obligations hereunder and (y) a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of voting stock or any other Capital Stock in such Lender or a parent company thereof by a Governmental Authority or an instrumentality thereof, or the exercise of control over such Lender or parent company thereof, by a Governmental Authority or instrumentality thereof so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender. Any determination by the Administrative Agent that a Lender is a Defaulting Lender under any one or more of clauses (a) through (e) above shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to the penultimate paragraph of Section 2.20) upon delivery of written notice of such determination to the Borrower and each Lender.

12

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 932 of 1367

"<u>Disposition</u>": with respect to any property, any sale, lease, sale and leaseback, assignment, conveyance, transfer or other disposition thereof. The term "<u>Dispose of</u>" shall have a correlative meaning.

"<u>Documentation Agents</u>": as defined on the cover hereto.

"<u>Dollars</u>" and "<u>$</u>": dollars in lawful currency of the United States.

"<u>Early Opt-in Election</u>": the occurrence of:

(1)    (i) a determination by the Administrative Agent or (ii) a notification by the Required Lenders to the Administrative Agent (with a copy to the Borrower) that the Required Lenders have determined that U.S. dollar-denominated syndicated credit facilities being executed at such time, or that include language similar to that contained in Section 2.13 are being executed or amended, as applicable, to incorporate or adopt a new benchmark interest rate to replace the Eurodollar Base Rate; and

(2)    (i) the election by the Administrative Agent or (ii) the election by the Required Lenders to declare that an Early Opt-in Election has occurred and the provision, as applicable, by the Administrative Agent of written notice of such election to the Borrower and the Lenders or by the Required Lenders of written notice of such election to the Administrative Agent.

"<u>EEA Financial Institution</u>": (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"<u>EEA Member Country</u>": any of the member states of the European Union, Iceland, Liechtenstein and Norway.

"<u>EEA Resolution Authority</u>": any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"<u>Effective Date</u>": the date on which the conditions precedent set forth in Section 5.1 shall have been satisfied or waived.

"<u>Eligible Assignee</u>": (a) any commercial bank or other financial institution having a senior unsecured debt rating by Moody's of A3 or better and by S&P of A- or better, which is domiciled in a country which is a member of the OECD or (b) with respect to any Person referred to in the preceding clause (a), any other Person that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course of business all of the Capital

13

Stock of which is owned, directly or indirectly, by such Person; provided that in the case of clause (b), the Administrative Agent shall have consented to the designation of such Person as an Eligible Assignee (such consent not to be unreasonably withheld or delayed).

"Environmental Laws": any and all foreign, Federal, state, local or municipal laws, rules, orders, regulations, statutes, ordinances, codes, decrees, requirements of any Governmental Authority or other Requirements of Law (including common law) regulating, relating to or imposing liability or standards of conduct concerning protection of human health or the environment, as now or may at any time hereafter be in effect.

"ERISA": the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Event": (a) any Reportable Event; (b) the failure of the Borrower or any Commonly Controlled Entity to timely make a required contribution with respect to any Plan or any Multiemployer Plan; (c) the imposition of a Lien under Section 430 of the Code or Section 303 of ERISA with respect to any Single Employer Plan; (d) the failure of the Borrower or any Commonly Controlled Entity to meet the minimum funding standard under Section 412 or 430 of the Code with respect to any Plan or the filing of an application for a funding waiver with respect to any Single Employer Plan; (e) the incurrence by the Borrower or any Commonly Controlled Entity of any liability under Title IV of ERISA, including with respect to the termination of any Plan (other than the payment of PBGC premiums in the ordinary course); (f) (i) the termination of, or the filing or receipt of a notice of intent to terminate, a Single Employer Plan under Section 4041 of ERISA, or the treatment of a plan amendment as a termination under Section 4041 of ERISA, or (ii) (A) the appointment of a trustee to administer a Single Employer Plan under Section 4042, or (B) the institution by the PBGC of proceedings to terminate a Single Employer Plan or to have a trustee appointed to administer a Single Employer Plan, or receipt by the Borrower of notice from the PBGC thereof, where such proceedings continue unstayed or in effect for more than 60 days, or such notice is not withdrawn by the PBGC within 60 days following delivery by PBGC; (g) the incurrence by the Borrower or any Commonly Controlled Entity of any liability with respect to the complete withdrawal or partial withdrawal under Title IV of ERISA from any Multiemployer Plan; (h) the receipt by the Borrower or any Commonly Controlled Entity of any notice from a Multiemployer Plan concerning the imposition of Withdrawal Liability; (i) receipt of notification by Borrower or any Commonly Controlled Entity from a Multiemployer Plan that such Multiemployer Plan is in endangered or critical status (within the meaning of Section 305 of ERISA) or in Insolvency; (j) the incurrence by the Borrower or any Commonly Controlled Entity of any liability pursuant to Section 4063 or 4064 of ERISA or a substantial cessation of operations with respect to a Plan within the meaning of Section 4062(e) of ERISA; (k) the posting of a bond or security under Section 436(f) of the Code with respect to any Plan; or (l) the Borrower incurs material tax liability with respect to any Plan (including Sections 4975, 4980B, 4980D, 4980H and 4980I of the Code, as applicable).

"EU Bail-In Legislation Schedule": the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Eurocurrency Liabilities": as defined in Regulation D of the Board.

14

"Eurocurrency Reserve Requirements": of any Lender for any Interest Period as applied to a Eurodollar Loan, the reserve percentage applicable during such Interest Period (or if more than one such percentage shall be so applicable, the daily average of such percentages for those days in such Interest Period during any such percentage shall be so applicable) under any regulations of the Board or other Governmental Authority having jurisdiction with respect to determining the maximum reserve requirement (including basic, supplemental and emergency reserves) for such Lender with respect to liabilities or assets consisting of or including Eurocurrency Liabilities having a term equal to such Interest Period.

"Eurodollar Base Rate": with respect to each day during each Interest Period pertaining to a Eurodollar Loan, the Eurodollar Screen Rate at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period; provided that if the Eurodollar Screen Rate shall not be available at such time for such Interest Period (an "Impacted Interest Period") then the Eurodollar Base Rate shall be the Interpolated Rate.

"Eurodollar Loans": Loans the rate of interest applicable to which is based upon the Eurodollar Rate.

"Eurodollar Rate": with respect to each day during each Interest Period pertaining to a Eurodollar Loan, a rate per annum determined for such day in accordance with the following formula (rounded upwards, if necessary, to the next 1/16 of 1%):

$$\frac{\text{Eurodollar Base Rate}}{1.00 - \text{Eurocurrency Reserve Requirements}}$$

"Eurodollar Screen Rate": for any day and time, with respect to any Eurodollar Loan for any Interest Period, the London interbank offered rate as administered by ICE Benchmark Administration (or any other Person that takes over the administration of such rate) for a period equal in length to such Interest Period as displayed on such day and time on pages LIBOR01 or LIBOR02 of the Reuters screen that displays such rate (or, in the event such rate does not appear on a Reuters page or screen, on any successor or substitute page on such screen that displays such rate, or on the appropriate page of such other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion); provided that if the Eurodollar Screen Rate as so determined would be less than zero, such rate shall be deemed to zero for the purposes of this Agreement.

"Eurodollar Tranche": the collective reference to Eurodollar Loans the then current Interest Periods with respect to all of which begin on the same date and end on the same later date (whether or not such Loans shall originally have been made on the same day).

"Event of Default": any of the events specified in Section 8, provided that any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

"Exchange Act": Securities Exchange Act of 1934, as amended.

"Excluded Taxes": any of the following Taxes imposed on or with respect to any Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in

15

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 935 of 1367

each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by the Borrower under Section 2.19) or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.16(a) or (c), amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure to comply with Section 2.16(e) and (d) any U.S. federal withholding Taxes imposed pursuant to FATCA.

"Extension Notice": as defined in Section 2.7(b).

"FATCA": Sections 1471 through 1474 of the Code, as of the Effective Date (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code.

"FCPA": as defined in Section 4.15.

"Federal Funds Effective Rate": for any day, the rate calculated by the NYFRB based on such day's federal funds transactions by depositary institutions, as determined in such manner as shall be set forth on the Federal Reserve Bank of New York's Website from time to time, and published on the next succeeding Business Day by the NYFRB as the effective federal funds rate; provided that if the Federal Funds Effective Rate as so determined would be less than zero, such rate shall be deemed to be zero for the purposes of this Agreement.

"Federal Reserve Bank of New York's Website": the website of the NYFRB at http://www.newyorkfed.org, or any successor source.

"Fee Payment Date": (a) the fifth Business Day following the last day of each March, June, September and December during the Commitment Period and (b) the last day of the Commitment Period.

"Fitch": Fitch Ratings, Inc. and any successor thereto.

"Fixed Charges": for any period, the sum of (a) Interest Charges for such period, and (b) any cash dividends or other distributions paid in cash on any series of Capital Stock of the Borrower during such period (including, for the avoidance of doubt, any such cash dividends or distributions to be paid in cash in reliance upon the calculation of the Cash Coverage Ratio).

"Foreign Lender": a Lender that is not a U.S. Person.

"FPA": the Federal Power Act, as amended, and the rules and regulations promulgated thereunder.

16

"Funding Office": the office of the Administrative Agent specified in Section 10.2(a) or such other office as may be specified from time to time by the Administrative Agent as its funding office by written notice to the Borrower and the Lenders.

"GAAP": generally accepted accounting principles in the United States as in effect from time to time, except as noted below. In the event that any "Change in Accounting Principles" (as defined below) shall occur and such change results in a change in the method of calculation of financial covenants, standards or terms in this Agreement, then, upon the request of the Borrower or the Required Lenders, the Borrower and the Administrative Agent agree to enter into negotiations in order to amend such provisions of this Agreement so as to reflect equitably such Change in Accounting Principles with the desired result that the criteria for evaluating the Borrower's financial condition shall be the same after such Change in Accounting Principles as if such Change in Accounting Principles had not been made. Until such time as such an amendment shall have been executed and delivered by the Borrower, the Administrative Agent and the Required Lenders, all financial covenants, standards and terms in this Agreement shall continue to be calculated or construed as if such Change in Accounting Principles had not occurred. "Change in Accounting Principles" refers to (i) changes in accounting principles required by the promulgation of any rule, regulation, pronouncement or opinion by the Financial Accounting Standards Board of the American Institute of Certified Public Accountants or any successor thereto, the SEC or, if applicable, the Public Company Accounting Oversight Board and (ii) any change in the application of GAAP concurred by the Borrower's independent public accountants and disclosed in writing to the Administrative Agent.

"Governmental Authority": any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government, any securities exchange and any self-regulatory organization (including the National Association of Insurance Commissioners and supra-national bodies such as the European Union or the European Central Bank).

"Guarantee Obligation": as to any Person (the "guaranteeing person"), any obligation, including a reimbursement, counterindemnity or similar obligation, of the guaranteeing person that guarantees any Indebtedness, leases, dividends or other obligations (the "primary obligations") of any other third Person (the "primary obligor") in any manner, whether directly or indirectly, including any obligation of the guaranteeing person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (1) for the purchase or payment of any such primary obligation or (2) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation, (iv) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof or (v) to reimburse or indemnify an issuer of a letter of credit, surety bond or guarantee issued by such issuer in respect of primary obligations of a primary obligor other than the Borrower or any Significant Subsidiary; provided, however, that the term Guarantee Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business. The amount of any Guarantee Obligation of any guaranteeing person shall be deemed to be the lower of (a) an amount

17

equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee Obligation is made and (b) the maximum amount for which such guaranteeing person may be liable pursuant to the terms of the instrument embodying such Guarantee Obligation, unless such primary obligation and the maximum amount for which such guaranteeing person may be liable are not stated or determinable, in which case the amount of such Guarantee Obligation shall be such guaranteeing person's reasonably anticipated liability in respect thereof as determined by the Borrower in good faith.

"IBA": as defined in Section 1.4.

"Indebtedness": of any Person at any date, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person for the deferred purchase price of property or services (other than trade payables, including under energy procurement and transportation contracts, incurred in the ordinary course of such Person's business), (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) all Capital Lease Obligations of such Person, (f) all obligations of such Person, contingent or otherwise, as an account party or applicant under or in respect of acceptances, letters of credit, surety bonds or similar arrangements (other than reimbursement obligations, which are not due and payable on such date, in respect of documentary letters of credit issued to provide for the payment of goods and services in the ordinary course of business), (g) the liquidation value of all mandatorily redeemable preferred Capital Stock of such Person, (h) all Guarantee Obligations of such Person in respect of obligations of the kind referred to in clauses (a) through (g) above, (i) all obligations of the kind referred to in clauses (a) through (h) above secured by (or for which the holder of such obligation has an existing right, contingent or otherwise, to be secured by) any Lien on property (including accounts and contract rights) owned by such Person, whether or not such Person has assumed or become liable for the payment of such obligation (provided, that if such Person is not liable for such obligation, the amount of such Person's Indebtedness with respect thereto shall be deemed to be the lesser of the stated amount of such obligation and the value of the property subject to such Lien), and (j) for the purposes of Sections 7.1 and 8(e) only, all obligations of such Person in respect of Swap Agreements, provided that Indebtedness as used in this Agreement shall exclude any Non-Recourse Debt and any obligations under any A/R Securitization Transaction. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness expressly provide that such Person is not liable therefor.

"Indemnified Liabilities": as defined in Section 10.5.

"Indemnified Taxes": (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Borrower under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Indemnitee": as defined in Section 10.5.

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 938 of 1367

"Insolvency": with respect to any Multiemployer Plan, the condition that such plan is insolvent within the meaning of Section 4245 of ERISA.

"Interest Charges": for any period, (a) all interest, premium payments, debt discount, fees, charges and related expenses of the Borrower in connection with borrowed money (including capitalized interest) or in connection with the deferred purchase price of assets, in each case to the extent treated as interest in accordance with GAAP, and (b) the portion of rent expense of the Borrower with respect to such period under capital leases that is treated as interest in accordance with GAAP.

"Interest Payment Date": (a) as to any ABR Loan, the last day of each March, June, September and December to occur while such Loan is outstanding and the final maturity date of such Loan, (b) as to any Eurodollar Loan having an Interest Period of three months or less, the last day of such Interest Period, (c) as to any Eurodollar Loan having an Interest Period longer than three months, each day that is three months, or a whole multiple thereof, after the first day of such Interest Period and the last day of such Interest Period and (d) as to any Loan, the date of any repayment or prepayment made in respect thereof.

"Interest Period": as to any Eurodollar Loan, (a) initially, the period commencing on the borrowing or conversion date, as the case may be, with respect to such Eurodollar Loan and ending one week thereafter or one, two, three or six or (if agreed to by all Lenders) twelve months thereafter, as selected by the Borrower in its notice of borrowing or notice of conversion, as the case may be, given with respect thereto; and (b) thereafter, each period commencing on the last day of the next preceding Interest Period applicable to such Eurodollar Loan and ending one week thereafter or one, two, three or six or (if agreed to by all Lenders) twelve months thereafter, as selected by the Borrower by irrevocable notice to the Administrative Agent not later than 12:00 Noon, New York City time, on the date that is three Business Days prior to the last day of the then current Interest Period with respect thereto; provided that, all of the foregoing provisions relating to Interest Periods are subject to the following:

(i)     if any Interest Period would otherwise end on a day that is not a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless the result of such extension would be to carry such Interest Period into another calendar month in which event such Interest Period shall end on the immediately preceding Business Day;

(ii)    the Borrower may not select an Interest Period that would extend beyond the Termination Date;

(iii)   any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of a calendar month;

(iv)    the Borrower shall select Interest Periods so as not to require a payment or prepayment of any Eurodollar Loan during an Interest Period for such Loan; and

19

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 939 of 1367

(v)    at the election of the Borrower, the initial Interest Period for any Eurodollar Loans made on the Effective Date, shall commence on the Effective Date and end on the last day of the calendar month during which the Effective Date occurs.

"Interpolated Rate": at any time, for any Interest Period, the rate per annum (rounded to the same number of decimal places as the Eurodollar Screen Rate) determined by the Administrative Agent (which determination shall be conclusive and binding absent manifest error) to be equal to the rate that results from interpolating on a linear basis between: (a) the Eurodollar Screen Rate for the longest period (for which the Eurodollar Screen Rate is available) that is shorter than the Impacted Interest Period; and (b) the Eurodollar Screen Rate for the shortest period (for which that Eurodollar Screen Rate is available) that exceeds the Impacted Interest Period, in each case, at such time.

"Investment": as defined in Section 7.5.

"IRS": the United States Internal Revenue Service.

"knowledge of the Borrower": actual knowledge of any Responsible Officer of the Borrower.

"Laws": collectively, all international, foreign, federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case whether or not having the force of law.

"Lenders": as defined in the preamble hereto; provided, that unless the context otherwise requires, each reference herein to the Lenders shall be deemed to include any Conduit Lender.

"Lien": any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge or other security interest or any preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement and any Capital Lease Obligation having substantially the same economic effect as any of the foregoing).

"Loan": any loan made by any Lender pursuant to this Agreement.

"Loan Documents": this Agreement, the Security Documents, any intercreditor agreement entered into in connection herewith, the Notes and, in each case, any amendment, waiver, supplement or other modification to any of the foregoing.

"Material Adverse Effect": (a) a change in the business, property, operations or financial condition of the Borrower and its Subsidiaries taken as a whole that could reasonably be expected to materially and adversely affect the Borrower's ability to perform its obligations under the Loan Documents or (b) a material adverse effect on (i) the validity or enforceability of this Agreement or any of the other Loan Documents or (ii) the rights and remedies of the Administrative Agent, the Collateral Agent and the Lenders, taken as a whole, under this Agreement or any other Loan Document.

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 940 of 1367

"Materials of Environmental Concern": any gasoline or petroleum (including crude oil or any fraction thereof) or petroleum products or any hazardous or toxic substances, materials or wastes, defined or regulated as such in or under any Environmental Law, including asbestos, polychlorinated biphenyls and urea-formaldehyde insulation.

"Moody's": Moody's Investors Service, Inc.

"Multiemployer Plan": a plan that is a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"Net Tangible Assets": the total amount of PG&E Utility's assets determined on a consolidated basis in accordance with GAAP as of the last day of the most recently ended fiscal quarter for which financial statements have been delivered under Section 6.1, less (a) the sum of PG&E Utility's consolidated current liabilities determined in accordance with GAAP, and (b) the amount of PG&E Utility's consolidated assets classified as intangible assets, determined in accordance with GAAP.

"New Lender Supplement": as defined in Section 2.3(b).

"New Revolving Credit Lender": as defined in Section 2.3(b).

"Non-Extending Lender": as defined in Section 2.7.

"Non-Recourse Debt": Indebtedness of the Borrower or any of its Significant Subsidiaries that is incurred in connection with the acquisition, construction, sale, transfer or other Disposition of specific assets, to the extent recourse, whether contractual or as a matter of law, for non-payment of such Indebtedness is limited (a) to such assets, or (b) if such assets are (or are to be) held by a Subsidiary formed solely for such purpose, to such Subsidiary or the Capital Stock of such Subsidiary.

"Notes": as defined in Section 2.14(f).

"NYFRB": the Federal Reserve Bank of New York.

"NYFRB Rate": for any day, the greater of (a) the Federal Funds Effective Rate in effect on such day and (b) the Overnight Bank Funding Rate in effect on such day (or for any day that is not a Business Day, for the immediately preceding Business Day); provided that if none of such rates are published for any day that is a Business Day, the term "NYFRB Rate" means the rate for a federal funds transaction quoted at 11:00 a.m. (New York City time) on such day received by the Administrative Agent from a federal funds broker of recognized standing selected by it; provided, further, that if any of the aforesaid rates as so determined would be less than zero, such rate shall be deemed to be zero for purposes of this Agreement.

"Obligations": the unpaid principal of and interest on (including, without limitation, interest accruing after the maturity of the Loans and interest accruing after the filing of any petition

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 941 of 1367

in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding, relating to the Borrower, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding) the Loans and all other obligations and liabilities of the Borrower to the Administrative Agent or to any Lender, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, which may arise under, out of, or in connection with, this Agreement, any other Loan Document or any other document made, delivered or given in connection herewith or therewith, whether on account of principal, interest, reimbursement obligations, fees, indemnities, costs, expenses (including, without limitation, all fees, charges and disbursements of counsel to the Administrative Agent or to any Lender that are required to be paid by the Borrower pursuant hereto) or otherwise.

"OECD": the countries constituting the "Contracting Parties" to the Convention on the Organisation For Economic Co-operation and Development, as such term is defined in Article 4 of such Convention.

"Other Connection Taxes": with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Taxes": all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 2.19).

"Overnight Bank Funding Rate": for any day, the rate comprised of both overnight federal funds and overnight Eurodollar borrowings by U.S.-managed banking offices of depository institutions, as such composite rate shall be determined by the NYFRB as set forth on the Federal Reserve Bank of New York's Website from time to time, and published on the next succeeding Business Day by the NYFRB as an overnight bank funding rate.

"Participant": as defined in Section 10.6(c).

"Participant Register": as defined in Section 10.6(c)(iii).

"Patriot Act": as defined in Section 10.16.

"PBGC": the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA (or any successor).

"Percentage": as to any Lender at any time, the percentage which such Lender's Commitment then constitutes of the Total Commitments or, at any time after the Commitments shall have expired or terminated, the percentage which the aggregate principal amount of such Lender's Revolving Loans then outstanding constitutes of the aggregate principal amount of the Revolving Loans then outstanding.

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 942 of 1367

"Permitted Cash Equivalents":

(a)   securities issued by the United States government or any agency or instrumentality of the United States government having maturities of not more than two (2) years from the date of acquisition;

(b)   certificates of deposit, time deposits, money market deposits and Eurodollar time deposits with maturities of two (2) years or less from the date of acquisition, bankers' acceptances with maturities of two (2) years or less and overnight bank deposits, in each case with any domestic commercial bank having capital and surplus in excess of $500 million;

(c)   repurchase obligations with a term of not more than 180 days for underlying securities of the types described in clauses (a), (b) and (e) entered into with any financial institution meeting the qualifications specified in clause (b) above;

(d)   commercial paper rated at least P-1 by Moody's or at least A-1 by S&P and, in each case, maturing within twelve months after the date of acquisition;

(e)   securities issued or fully guaranteed by any state or commonwealth of the United States or by any political subdivision or taxing authority thereof, and rated at least Baa3 by Moody's or BBB- by S&P and, in each case, maturing within two (2) years after the date of acquisition;

(f)   mutual funds whose investment guidelines restrict 90% of such funds' investments to those satisfying the provisions of clauses (a) through (e) above;

(g)   money market funds that (i) comply with the criteria set forth in Rule 2a-7 under the Investment Company Act of 1940, as amended, (ii) are rated AAA by S&P and Aaa by Moody's and (iii) have portfolio assets of least $5,000,000,000; and

(h)   time deposit accounts, certificates of deposit and money market deposits in an aggregate face amount not in excess of 1/2 of 1% of the total assets of the Borrower and its Subsidiaries, on a consolidated basis, as of the end of the Borrower's most recently completed fiscal year.

"Permitted Refinancing": with respect to any Indebtedness (the "Refinanced Indebtedness"), any extension, refinancing, refunding or replacement thereof with Indebtedness provided that (i) the amount of such Indebtedness does not exceed the aggregate principal amount of the Refinanced Indebtedness, plus any premium, interest, fee or expenses payable in connection therewith, (ii) the final maturity date of such Indebtedness is no earlier than the maturity date of the Refinanced Indebtedness, (iii) the weighted average life to maturity of such Indebtedness is not shorter than the weighted average life to maturity of the Refinanced Indebtedness, (iv) if the Refinanced Indebtedness was unsecured, then such Indebtedness must be unsecured and (v) if the Refinanced Indebtedness was secured, then such Indebtedness shall not be secured by assets that did not secure the Refinanced Indebtedness and, if the Refinanced Indebtedness was secured by Collateral, such Indebtedness shall not have a ranking higher in the Priority Waterfall than the Refinanced Indebtedness had.

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 943 of 1367

"Person": an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, Governmental Authority or other entity of whatever nature.

"PG&E Utility": as defined in the first recital paragraph.

"PG&E Utility Revolving Credit Agreement": that certain Credit Agreement dated as of the Effective Date, among PG&E Utility, the lenders from time to time party thereto and JPMorgan Chase Bank, N.A., as administrative agent.

"Plan": at a particular time, any employee benefit plan that is covered by ERISA and in respect of which the Borrower or a Commonly Controlled Entity is (or, if such plan were terminated at such time, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"Plan of Reorganization": as defined in the second recital paragraph.

"Platform": as defined in Section 10.2(d).

"Pledge Agreement": as defined in Section 5.1(d).

"Prime Rate": the rate of interest last quoted by The Wall Street Journal as the "Prime Rate" in the U.S. or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by the Administrative Agent) or in any similar release by the Federal Reserve Board (as determined by the Administrative Agent). Each change in the Prime Rate shall be effective from and including the date such change is publicly announced or quoted as being effective.

"Priority Waterfall": the provisions of Section 3.02(a) of the Pledge Agreement.

"PTE": a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"QFC": the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

"QFC Credit Support" in Section 10.19.

"Qualified Securitization Bond Issuer": a Subsidiary of PG&E Utility formed and operating solely for the purpose of (a) purchasing and owning property created under a "financing order" (as such term is defined in the California Public Utilities Code) or similar order issued by the CPUC, (b) issuing such securities pursuant to such order, (c) pledging its interests in such property to secure such securities and (d) engaging in activities ancillary to those described in (a), (b) and (c).

24

"Rating": each rating announced by S&P, Moody's and Fitch in respect of the Borrower's senior secured debt.

"Recipient": the Administrative Agent or any Lender.

"Register": as defined in Section 10.6(b).

"Regulation U": Regulation U of the Board as in effect from time to time.

"Related Parties": with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees, administrators, managers, advisors and representatives of such Person and of such Person's Affiliates.

"Relevant Governmental Body": the Federal Reserve Board and/or the NYFRB, or a committee officially endorsed or convened by the Federal Reserve Board and/or the NYFRB or, in each case, any successor thereto.

"Removal Effective Date": as defined in Section 9.9(b).

"Reportable Event": any of the events set forth in Section 4043(c) of ERISA, other than those events as to which the thirty-day notice period is waived under subsections .27, .28, .29, .30, .31, .32, .34 or .35 of PBGC Reg. § 4043.

"Required Lenders": at any time, the holders of more than 50% of the Total Commitments then in effect or, if the Commitments have been terminated, the aggregate amount of Revolving Loans then outstanding. The Total Commitments of any Defaulting Lender shall be disregarded in determining Required Lenders at any time.

"Requirement of Law": as to any Person, the Articles of Incorporation and By-Laws or other organizational or governing documents of such Person, and any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Resignation Effective Date": as defined in Section 9.9(a).

"Resolution Authority": with respect to any EEA Financial Institution, an EEA Resolution Authority and, with respect to any UK Financial Institution, a UK Resolution Authority.

"Responsible Officer": the chief executive officer, president, chief financial officer, treasurer or assistant treasurer of the Borrower, but in any event, with respect to financial matters, the chief financial officer, treasurer or assistant treasurer of the Borrower.

"Revolving Credit Offered Increase Amount": as defined in Section 2.3(a).

25

"Revolving Credit Re-Allocation Date": as defined in Section 2.3(d).

"Revolving Loans": as defined in Section 2.1(a).

"S&P": Standard & Poor's Global Ratings, a division of S&P Global Inc., and any successor thereto.

"Sanctions": as defined in Section 4.15.

"SEC": the Securities and Exchange Commission, any successor thereto and any analogous Governmental Authority.

"Secured Parties": the Administrative Agent, the Collateral Agent, the Lenders and each sub-agent appointed pursuant to Section 9.2.

"Securitized Bonds": without duplication, securities, however denominated, that are (i) issued by a Qualified Securitization Bond Issuer, (ii) secured by or otherwise payable from charges authorized by the financing order referred to in clause (a) of the definition of "Qualified Securitization Bond Issuer," and (iii) non-recourse to the Borrower or any of its Subsidiaries (other than the issuer of such securities).

"Security Documents": the Pledge Agreement and any other agreement or document executed and delivered by the Borrower that grants or purports to grant a Lien on any assets of the Borrower in favor of the Collateral Agent to secure the Obligations.

"Significant Subsidiary": as defined in Article 1, Rule 1-02(w) of Regulation S-X of the Exchange Act as of the Effective Date, provided that notwithstanding the foregoing, (x) PG&E Utility shall at all times constitute a Significant Subsidiary and (y) no special purpose finance subsidiary, no A/R Securitization Subsidiary and no Qualified Securitization Bond Issuer (nor any Subsidiaries of any Qualified Securitization Bond Issuer or of any A/R Securitization Subsidiary) shall constitute a Significant Subsidiary. Unless otherwise qualified, all references to a "Significant Subsidiary" or to "Significant Subsidiaries" in this Agreement shall refer to a "Significant Subsidiary" or "Significant Subsidiaries" of the Borrower.

"Single Employer Plan": any Plan that is covered by Title IV of ERISA, but that is not a Multiemployer Plan.

"SOFR": with respect to any day, the secured overnight financing rate published for such day by the NYFRB, as the administrator of the benchmark (or a successor administrator), on the Federal Reserve Bank of New York's Website.

"SOFR-Based Rate": SOFR, Compounded SOFR or Term SOFR.

"Solvent": with respect to the Borrower and its Subsidiaries, on a consolidated basis, that as of the date of determination, (i) the fair value of the assets of the Borrower and its Subsidiaries, on a consolidated basis, at a fair valuation on a going concern basis, exceeds, on a consolidated basis, their debts and liabilities, subordinated, contingent or otherwise, (ii) the present fair saleable value of the property of the Borrower and its Subsidiaries, on a consolidated and going concern

26

basis, is greater than the amount that will be required to pay the probable liability, on a consolidated basis, of their debts and other liabilities, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured in the ordinary course of business, (iii) the Borrower and its Subsidiaries, on a consolidated basis, are able to pay their debts and liabilities, subordinated, contingent or otherwise, as such liabilities become absolute and matured in the ordinary course of business, (iv) the Borrower and its Subsidiaries are not engaged in businesses, and are not about to engage in businesses for which they have unreasonably small capital. For purposes of this definition, the amount of any contingent liability at any time shall be computed as the amount that, in light of all the facts and circumstances existing as of the Effective Date, would reasonably be expected to become an actual and matured liability.

"Specified Exchange Act Filings": the Borrower's Form 10-K annual report for the year ended December 31, 2019 and each and all of the Form 10-Qs and Form 8-Ks (and to the extent applicable proxy statements) filed by the Borrower or PG&E Utility with the SEC after December 31, 2019 and prior to the date that is one Business Day before the date of this Agreement.

"Specified Material Adverse Effect": any occurrence, fact, change, event, effect, violation, penalty, inaccuracy or circumstance (whether or not constituting a breach of a representation, warranty or covenant set forth in the Plan of Reorganization) that, individually or in the aggregate with any such other results, occurrences, facts, changes, events, effects, violations, penalties, inaccuracies, or circumstances, (i) would have or would reasonably be expected to have a material adverse effect on the business, operations, assets, liabilities, capitalization, financial performance, financial condition or results of operations, in each case, of PG&E Utility and the Borrower, taken as a whole, or (ii) would reasonably be expected to prevent or materially delay the ability of PG&E Utility and the Borrower to consummate the transactions contemplated by this Agreement or the Plan of Reorganization or perform their obligations hereunder or thereunder; provided, however, that none of the following results, occurrences, facts, changes, events, effects, violations, penalties, inaccuracies or circumstances shall constitute or be taken into account in determining whether a Specified Material Adverse Effect has occurred, is continuing or would reasonably be expected to occur: (A) the filing of the Chapter 11 cases with respect to the Debtors, (B) results, occurrences, facts, changes, events, violations, inaccuracies or circumstances affecting (1) the electric or gas utility businesses in the United States generally or (2) the economy, credit, financial, capital or commodity markets, in the United States or elsewhere in the world, including changes in interest rates, monetary policy or inflation, (C) changes or prospective changes in law (other than any law or regulation of California or the United States that is applicable to any electrical utility) or in GAAP or accounting standards, or any changes or prospective changes in the interpretation or enforcement of any of the foregoing, (D) any decline in the market price, or change in trading volume, of any securities of the Debtors, (E) any failure to meet any internal or public projections, forecasts, guidance, estimates, milestones, credit ratings, budgets or internal or published financial or operating predictions of revenue, earnings, cash flow or cash position, (F) any wildfire occurring after the Petition Date (as defined in the Plan of Reorganization) and prior to January 1, 2020, and (G) one or more wildfires, occurring on or after January 1, 2020, that destroys or damages fewer than 500 dwellings or commercial structures in the aggregate (it being understood that the exceptions in clauses (D) and (E) shall not prevent or otherwise affect a determination that the underlying cause of any such change, decline or failure referred to therein is a Specified Material Adverse Effect, and (II) a Specified Material Adverse Effect shall include the occurrence of one or more wildfires on or after January 1, 2020 destroying or damaging at least 500 dwellings or commercial structures within the Borrower's service area at a time when the portion of the Borrower's system at the location of such wildfire was not successfully de-energized.

27

"Standard A/R Securitization Obligations": representations, warranties, covenants, indemnities, repurchase obligations, servicing obligations, guarantees, intercompany notes and obligations relating to contributions of A/R Securitization Assets to an A/R Securitization Subsidiary and other obligations entered into by any Subsidiary of the Borrower which are reasonably customary in A/R Securitization Transactions.

"Subsidiary": as to any Person, a corporation, partnership, limited liability company or other entity of which shares of stock or other ownership interests having ordinary voting power (other than stock or such other ownership interests having such power only by reason of the happening of a contingency) to elect a majority of the board of directors or other managers of such corporation, partnership or other entity are at the time owned, or the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, or both, by such Person. Unless otherwise qualified, all references to a "Subsidiary" or to "Subsidiaries" in this Agreement shall refer to a Subsidiary or Subsidiaries of the Borrower.

"Supported QFC": as defined in Section 10.19.

"Swap Agreement": any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; provided that (x) no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of the Borrower or any of its Subsidiaries shall be a "Swap Agreement" and (y) no stock purchase contract issued by the Borrower shall be a "Swap Agreement".

"Syndication Agents": as defined on the cover hereto.

"Taxes": all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Term SOFR": the forward-looking term rate based on SOFR that has been selected or recommended by the Relevant Governmental Body.

"Termination Date": the date that is the third anniversary of the Effective Date or such later date as may be determined pursuant to Section 2.7(b) or such earlier date as otherwise determined pursuant to Section 2.7.

"Testing Condition": satisfied if any Revolving Loans are outstanding.

"Total Commitments": at any time, the aggregate amount of the Commitments of all Lenders at such time.

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 948 of 1367

"Trailing Four Quarter Basis": determined for the trailing four fiscal quarters ending on the last day of any fiscal quarter; provided that, if fewer than four full consecutive fiscal quarters of the Borrower have been completed since the Effective Date, "Trailing Four Quarter Basis" shall mean, determined for the full fiscal quarters of the Borrower that have been completed since the Effective Date with Interest Charges and Fixed Charges annualized on a simple straight line basis.

"Transferee": any Assignee or Participant.

"Type": as to any Loan, its nature as an ABR Loan or a Eurodollar Loan.

"UK Financial Institution": any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended form time to time) promulgated by the United Kingdom Prudential Regulation Authority)) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"UK Resolution Authority": the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"Unadjusted Benchmark Replacement": the Benchmark Replacement excluding the Benchmark Replacement Adjustment; provided that, if the Unadjusted Benchmark Replacement as so determined would be less than zero, the Unadjusted Benchmark Replacement will be deemed to be zero for the purposes of this Agreement.

"United States" or "U.S.": the United States of America.

"U.S. Person": any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"U.S. Special Resolution Regime": as defined in Section 10.19.

"U.S. Tax Compliance Certificate": as defined in Section 2.16(e)(ii)(B)(III).

"Withdrawal Liability": any liability to a Multiemployer Plan as a result of a complete or partial withdrawal by the Borrower or any Commonly Controlled Entity from such Multiemployer Plan, as such terms are defined in Title IV of ERISA.

"Write-Down and Conversion Powers": (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the applicable Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to any UK Resolution Authority, any powers of such UK Resolution Authority under the applicable Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

29

1.2    Other Definitional Provisions and Interpretative Provisions.

(a)    Unless otherwise specified therein, all terms defined in this Agreement shall have the defined meanings when used in the other Loan Documents or any certificate or other document made or delivered pursuant hereto or thereto.

(b)    As used herein and, except as otherwise provided therein, in the other Loan Documents, and any certificate or other document made or delivered pursuant hereto or thereto, (i) accounting terms relating to the Borrower and its Significant Subsidiaries defined in Section 1.1 and accounting terms partly defined in Section 1.1, to the extent not defined, shall have the respective meanings given to them under GAAP, (ii) the words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation", (iii) the word "incur" shall be construed to mean incur, create, issue, assume or become liable in respect of (and the words "incurred" and "incurrence" shall have correlative meanings), (iv) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, Capital Stock, securities, revenues, accounts, leasehold interests and contract rights, and (v) references to agreements or other Contractual Obligations shall, unless otherwise specified, be deemed to refer to such agreements or Contractual Obligations as amended, supplemented, restated or otherwise modified from time to time.

(c)    The words "hereof", "herein" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, Schedule and Exhibit references are to this Agreement unless otherwise specified.

(d)    The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

(e)    The Borrower shall not be required to perform, nor shall it be required to guarantee the performance of, any of the affirmative covenants set forth in Section 6 that apply to any of its Significant Subsidiaries nor shall any of the Borrower's Significant Subsidiaries be required to perform, nor shall any of such Significant Subsidiaries be required to guarantee the performance of, any of the Borrower's affirmative covenants set forth in Section 6 or any of the affirmative covenants set forth in Section 6 that apply to any other Significant Subsidiary; provided, that nothing in this Section 1.2(e) shall prevent the occurrence of a Default or an Event of Default arising out of the Borrower's failure to cause any Significant Subsidiary to comply with the provisions of this Agreement applicable to such Significant Subsidiary.

(f)    Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made, without giving effect to any change in accounting for leases pursuant to GAAP resulting from the implementation of Financial Accounting Standards Board ASU No. 2016-02, Leases (Topic 842), to the extent such adoption would require treating any lease (or similar arrangement conveying the right to use) as a capital lease where such lease (or similar arrangement) would not have been required to be so treated under GAAP as in effect on December 31, 2015.

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 950 of 1367

1.3    <u>Divisions</u>. For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized and acquired on the first date of its existence by the holders of its Capital Stock at such time.

1.4    <u>Interest Rates; LIBOR Notification</u>. The London interbank offered rate is intended to represent the rate at which contributing banks may obtain short-term borrowings from each other in the London interbank market. In July 2017, the U.K. Financial Conduct Authority announced that, after the end of 2021, it would no longer persuade or compel contributing banks to make rate submissions to the ICE Benchmark Administration (together with any successor to the ICE Benchmark Administrator, the "<u>IBA</u>") for purposes of the IBA setting the London interbank offered rate. As a result, it is possible that commencing in 2022, the London interbank offered rate may no longer be available or may no longer be deemed an appropriate reference rate upon which to determine the interest rate on Eurodollar Loans. In light of this eventuality, public and private sector industry initiatives are currently underway to identify new or alternative reference rates to be used in place of the London interbank offered rate. Upon the occurrence of a Benchmark Transition Event or an Early Opt-In Election, Section 2.13(b) provides a mechanism for determining an alternative rate of interest. The Administrative Agent will promptly notify the Borrower, pursuant to Section 2.13(d), of any change to the reference rate upon which the interest rate on Eurodollar Loans is based. However, the Administrative Agent does not warrant or accept any responsibility for, and shall not have any liability with respect to, the administration, submission or any other matter related to the London interbank offered rate or other rates in the definition of "Eurodollar Base Rate" or with respect to any alternative or successor rate thereto, or replacement rate thereof (including, without limitation, (i) any such alternative, successor or replacement rate implemented pursuant to Section 2.13(b), whether upon the occurrence of a Benchmark Transition Event or an Early Opt-In Election, and (ii) the implementation of any Benchmark Replacement Conforming Changes pursuant to Section 2.13(c)), including without limitation, whether the composition or characteristics of any such alternative, successor or replacement reference rate will be similar to, or produce the same value or economic equivalence of, the Eurodollar Base Rate or have the same volume or liquidity as did the London interbank offered rate prior to its discontinuance or unavailability.

SECTION 2.   AMOUNT AND TERMS OF COMMITMENTS

2.1    <u>Commitments</u>.

(a)    Subject to the terms and conditions hereof, each Lender severally agrees to make revolving credit loans in Dollars ("<u>Revolving Loans</u>") to the Borrower from time to time on or after the Effective Date and during the Commitment Period in an aggregate principal amount at any one time outstanding which does not exceed the amount of such Lender's Commitment;

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 951 of 1367

provided that, after giving effect to the Revolving Loans requested to be made, the aggregate amount of the Available Commitments shall not be less than zero. During the Commitment Period, the Borrower may use the Commitments by borrowing, prepaying the Revolving Loans in whole or in part, and reborrowing, all in accordance with the terms and conditions hereof. The Revolving Loans may from time to time be Eurodollar Loans or ABR Loans, as determined by the Borrower and notified to the Administrative Agent in accordance with Sections 2.2 and 2.9.

(b)    The Borrower shall repay all outstanding Revolving Loans on the Termination Date.

2.2    <u>Procedure for Revolving Loan Borrowing</u>. The Borrower may borrow under the Commitments during the Commitment Period on any Business Day, <u>provided</u> that the Borrower shall give the Administrative Agent irrevocable notice (which notice must be received by the Administrative Agent (a) prior to 12:00 Noon, New York City time, three Business Days prior to the requested Borrowing Date, in the case of Eurodollar Loans, or (b) prior to 1:00 P.M., New York City time, on the requested Borrowing Date, in the case of ABR Loans) specifying (i) the amount and Type of Revolving Loans to be borrowed, (ii) the requested Borrowing Date and (iii) in the case of Eurodollar Loans, the respective amounts of each such Type of Loan and the respective lengths of the initial Interest Period therefor. Each borrowing under the Commitments shall be in an amount equal to $1,000,000 or a whole multiple of $500,000 in excess thereof (or, if the then aggregate Available Commitments are less than $1,000,000, such lesser amount). Upon receipt of any such notice from the Borrower, the Administrative Agent shall promptly notify each Lender thereof. Each Lender will make the amount of its *pro rata* share of each borrowing available to the Administrative Agent for the account of the Borrower at the Funding Office prior to 3:00 P.M., New York City time, on the Borrowing Date requested by the Borrower in funds immediately available to the Administrative Agent. Such borrowing will then be made available to the Borrower by the Administrative Agent crediting the account of the Borrower on the books of such office with the aggregate of the amounts made available to the Administrative Agent by the Lenders and in like funds as received by the Administrative Agent.

2.3    <u>Commitment Increases</u>.

(a)    In the event that the Borrower wishes to increase the Total Commitments at any time when no Default or Event of Default has occurred and is continuing (or shall result of such increase), it shall notify the Administrative Agent in writing, given not more frequently than once per calendar year, of the amount (the "<u>Revolving Credit Offered Increase Amount</u>") of such proposed increase (such notice, a "<u>Commitment Increase Notice</u>") which shall be in a minimum amount equal to $10,000,000 and shall not exceed, in the aggregate for all increases, $150,000,000. The Borrower shall offer each of the Lenders the opportunity to provide such Lender's Percentage of the Revolving Credit Offered Increase Amount, and if any Lender declines such offer, in whole or in part, the Borrower may offer such declined amount to (i) other Lenders and/or (ii) other banks, financial institutions or other entities with the consent of the Administrative Agent (which consent of the Administrative Agent shall not be unreasonably withheld, conditioned or delayed). The Commitment Increase Notice shall specify the Lenders and/or banks, financial institutions or other entities that will be requested to provide such Revolving Credit Offered Increase Amount. The Borrower or, if requested by the Borrower, the Administrative Agent will notify such Lenders, and/or banks, financial institutions or other entities of such offer.

32

(b)    Any additional bank, financial institution or other entity which the Borrower selects to offer a portion of the increased Total Commitments and which elects to become a party to this Agreement and obtain a Commitment in an amount so offered and accepted by it pursuant to Section 2.3(a) shall execute a new lender supplement (the "New Lender Supplement") with the Borrower and the Administrative Agent, substantially in the form of Exhibit A, whereupon such bank, financial institution or other entity (herein called a "New Revolving Credit Lender") shall become a Lender for all purposes and to the same extent as if originally a party hereto and shall be bound by and entitled to the benefits of this Agreement, provided that the Commitment of any such New Revolving Credit Lender shall be in an amount not less than $5,000,000.

(c)    Any Lender which accepts an offer to it by the Borrower to increase its Commitment pursuant to Section 2.3(a) shall, in each case, execute a commitment increase supplement with the Borrower and the Administrative Agent, substantially in the form of Exhibit B, whereupon such Lender shall be bound by and entitled to the benefits of this Agreement with respect to the full amount of its Commitment as so increased.

(d)    If any bank, financial institution or other entity becomes a New Revolving Credit Lender pursuant to Section 2.3(b) or any Lender's Commitment is increased pursuant to Section 2.3(c), additional Revolving Loans made on or after the effectiveness thereof (the "Revolving Credit Re-Allocation Date") shall be made pro rata based on the Percentages in effect on and after such Revolving Credit Re-Allocation Date (except to the extent that any such pro rata borrowings would result in any Lender making an aggregate principal amount of Revolving Loans in excess of its Commitment, in which case such excess amount will be allocated to, and made by, such New Revolving Credit Lenders and/or Lenders with such increased Commitments to the extent of, and pro rata based on, their respective Commitments otherwise available for Revolving Loans), and continuations of Eurodollar Loans outstanding on such Revolving Credit Re-Allocation Date shall be effected by repayment of such Eurodollar Loans on the last day of the Interest Period applicable thereto and the making of new Eurodollar Loans pro rata based on such new Percentages. In the event that on any such Revolving Credit Re-Allocation Date there is an unpaid principal amount of ABR Loans, the Borrower shall make prepayments thereof and borrowings of ABR Loans so that, after giving effect thereto, the ABR Loans outstanding are held pro rata based on such new Percentages. In the event that on any such Revolving Credit Re-Allocation Date there is an unpaid principal amount of Eurodollar Loans, such Eurodollar Loans shall remain outstanding with the respective holders thereof until the expiration of their respective Interest Periods (unless the Borrower elects to prepay any thereof in accordance with the applicable provisions of this Agreement), and interest on repayments of such Eurodollar Loans will be paid thereon to the respective Lenders holding such Eurodollar Loans pro rata based on the respective principal amounts thereof outstanding.

(e)    Notwithstanding anything to the contrary in this Section 2.3, (i) no Lender shall have any obligation to increase its Commitment unless it agrees to do so in its sole discretion and unless the Administrative Agent consents to such increase (which consent of the Administrative Agent shall not be unreasonably withheld, conditioned or delayed); provided, that any Lender not responding to the Commitment Increase Notice within the time period prescribed therein shall be deemed to have declined to increase its Commitment and (ii) in no event shall any transaction effected pursuant to this Section 2.3 (A) cause the Total Commitments to exceed $650,000,000 or (B) occur at a time at which a Default or an Event of Default has occurred and is continuing.

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 953 of 1367

(f)   The Administrative Agent shall have received on or prior to the Revolving Credit Re-Allocation Date, for the benefit of the Lenders, (i) a legal opinion of counsel to the Borrower covering such matters as are customary for transactions of this type as may be reasonably requested by the Administrative Agent, which opinions shall be substantially the same, to the extent appropriate, as the opinions rendered by counsel to the Borrower on the Effective Date and (ii) certified copies of resolutions of the board of directors of the Borrower authorizing the Borrower to borrow the Revolving Credit Offered Increase Amount.

2.4    [Reserved].

2.5    [Reserved].

2.6    Commitment Fees, Etc.

(a)   The Borrower agrees to pay to the Administrative Agent for the account of each Lender (other than a Defaulting Lender to the extent provided in Section 2.20) a commitment fee for the period from and including the Effective Date to the last day of the Commitment Period, in an amount equal to the Commitment Fee Rate multiplied by the daily average Available Commitment of such Lender during the period for which payment is made, payable quarterly in arrears on each Fee Payment Date, commencing on the first such date to occur after the Effective Date.

(b)   The Borrower agrees to pay to the Administrative Agent the fees in the amounts and on the dates as set forth in any written, duly executed fee agreements with the Administrative Agent and to perform any other obligations contained therein.

2.7    Termination or Reduction of Commitments; Extension of Termination Date.

(a)   The Borrower shall have the right, upon not less than three Business Days' notice to the Administrative Agent, to terminate the Commitments or, from time to time, to reduce the amount of the Commitments; provided that no such termination or reduction of Commitments shall be permitted if, after giving effect thereto and to any prepayments of the Revolving Loans made on the effective date thereof, aggregate amount of Revolving Loans outstanding would exceed the Total Commitments. Any such reduction shall be in an amount equal to $1,000,000, or a whole multiple thereof, and shall reduce permanently the Commitments then in effect.

(b)   The Borrower may, by written notice to the Administrative Agent (such notice being an "Extension Notice") given no more frequently than once in each calendar year, on not more than two occasions, request the Lenders to consider an extension of the then applicable Termination Date to a later date (which shall be a Business Day), which extension shall not exceed one year from the then applicable Termination Date in each instance. The Administrative Agent shall promptly transmit any Extension Notice to each Lender. Each Lender shall notify the Administrative Agent whether it wishes to extend the then applicable Termination Date not later than 30 days after the date of such Extension Notice, and any such notice given by a Lender to the Administrative Agent, once given, shall be irrevocable as to such Lender. Any Lender which does not expressly notify the Administrative Agent prior to the expiration of such thirty-day period that it wishes to so extend the then applicable Termination Date shall be deemed to have rejected the Borrower's request for extension of such Termination Date. Lenders consenting to extend the then

34

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 954 of 1367

applicable Termination Date are hereinafter referred to as "<u>Continuing Lenders</u>", and Lenders declining to consent to extend such Termination Date (or Lenders deemed to have so declined) are hereinafter referred to as "<u>Non-Extending Lenders</u>". If the Required Lenders have elected (in their sole and absolute discretion) to so extend the Termination Date, the Administrative Agent shall promptly notify the Borrower of such election by the Required Lenders, and effective on the date which is 30 days after the date of such notice by the Administrative Agent to the Borrower, the Termination Date shall be automatically and immediately so extended with regard to the Continuing Lenders. No extension will be permitted hereunder without the consent of the Required Lenders. Upon the delivery of an Extension Notice and upon the extension of the Termination Date pursuant to this Section, the Borrower shall be deemed to have represented and warranted on and as of the date of such Extension Notice and the effective date of such extension, as the case may be, that no Default or Event of Default has occurred and is continuing. Notwithstanding anything contained in this Agreement to the contrary, no Lender shall have any obligation to extend the Termination Date, and each Lender may at its option, unconditionally and without cause, decline to extend the Termination Date.

(c)    If the Termination Date shall have been extended in accordance with this Section 2.7, all references herein to the "Termination Date" (except with respect to any Non-Extending Lender) shall refer to the Termination Date as so extended.

(d)    If any Lender shall determine (or be deemed to have determined) not to extend the Termination Date as requested by any Extension Notice given by the Borrower pursuant to this Section, the Commitment of such Non-Extending Lender shall terminate on the Termination Date without giving any effect to such proposed extension, and the Borrower shall on such date pay to the Administrative Agent, for the account of such Non-Extending Lender, the principal amount of, and accrued interest on, such Non-Extending Lender's Loans, together with any amounts payable to such Lender pursuant to Section 2.17 and any and all fees or other amounts owing to such Non-Extending Lender under this Agreement; <u>provided</u> that if the Borrower has replaced such Non-Extending Lender pursuant to Section 2.7(e) then the provisions of such paragraph shall apply. The Total Commitments shall be reduced by the amount of the Commitment of such Non-Extending Lender to the extent the Commitment of such Non-Extending Lender has <u>not</u> been transferred to one or more Continuing Lenders pursuant to Section 2.7(e).

(e)    A Non-Extending Lender shall be obligated, at the request of the Borrower and subject to (i) payment by the successor Lender described below to the Administrative Agent for the account of such Non-Extending Lender of the principal amount of, and accrued interest on, such Non-Extending Lender's Loans, and (ii) payment by the Borrower to such Non-Extending Lender of any amounts payable to such Non-Extending Lender pursuant to Section 2.17 (as if the purchase of such Non-Extending Lender's Loans constituted a prepayment thereof) and any and all fees or other amounts owing to such Non-Extending Lender under this Agreement, to transfer without recourse, representation, warranty (other than a representation that such Lender has not created an adverse claim on its Loans) or expense to such Non-Extending Lender, at any time prior to the Termination Date applicable to such Non-Extending Lender, all of such Non-Extending Lender's rights and obligations hereunder to another financial institution or group of financial institutions nominated by the Borrower and willing to participate as a successor Lender in the place of such Non-Extending Lender; <u>provided</u> that, if such transferee is not already a Lender, (1) such transferee satisfies all the requirements of this Agreement, and (2) the Administrative Agent shall

35

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 955 of 1367

have consented to such transfer, which consent shall not be unreasonably withheld, conditioned or delayed. Each such transferee successor Lender shall be deemed to be a Continuing Lender hereunder in replacement of the transferor Non-Extending Lender and shall enjoy all rights and assume all obligations on the part of such Non-Extending Lender set forth in this Agreement. Each such transfer shall be effected pursuant to an Assignment and Assumption.

(f)     If the Termination Date shall have been extended in respect of Continuing Lenders in accordance with this Section, any notice of borrowing pursuant to Section 2.2 specifying a Borrowing Date occurring after the Termination Date applicable to a Non-Extending Lender or requesting an Interest Period extending beyond such date shall (i) have no effect in respect of such Non-Extending Lender and (ii) not specify a requested aggregate principal amount exceeding the aggregate Available Commitments (calculated on the basis of the Commitments of the Continuing Lenders).

2.8     Optional Prepayments.

(a)     The Borrower may at any time and from time to time prepay the Loans, in whole or in part, without premium or penalty, upon irrevocable notice delivered to the Administrative Agent no later than 12:00 Noon, New York City time, three Business Days prior thereto, in the case of Eurodollar Loans, and no later than 2:00 p.m., New York City time, one Business Day prior thereto, in the case of ABR Loans, which notice shall specify the date and amount of prepayment and whether the prepayment is of Eurodollar Loans or ABR Loans; provided, that if a Eurodollar Loan is prepaid on any day other than the last day of the Interest Period applicable thereto, the Borrower shall also pay any amounts owing pursuant to Section 2.17. Upon receipt of any such notice the Administrative Agent shall promptly notify each relevant Lender thereof. If any such notice is given, the amount specified in such notice shall be due and payable on the date specified therein, together with accrued interest to such date on the amount prepaid. Partial prepayments of Revolving Loans which shall be in an aggregate principal amount of $1,000,000 or a whole multiple of $500,000 in excess thereof. Notwithstanding the foregoing, any notice of prepayment delivered in connection with any refinancing of all of the Loans and Commitments with the proceeds of such refinancing or of any other incurrence of Indebtedness or the occurrence of some other identifiable event or condition, may be, if expressly so stated to be, contingent upon the consummation of such refinancing or incurrence or occurrence of such other identifiable event or condition and may be revoked by the Borrower, subject to compliance with the obligations under Section 2.17 in connection with any such revocation, in the event such contingency is not met.

2.9     Conversion and Continuation Options.

(a)     The Borrower may elect from time to time to convert Eurodollar Loans to ABR Loans by giving the Administrative Agent prior irrevocable notice of such election no later than 12:00 Noon, New York City time, on the Business Day preceding the proposed conversion date, provided that any such conversion of Eurodollar Loans may only be made on the last day of an Interest Period with respect thereto. The Borrower may elect from time to time to convert ABR Loans to Eurodollar Loans by giving the Administrative Agent prior irrevocable notice of such election no later than 12:00 Noon, New York City time, on the third Business Day preceding the proposed conversion date (which notice shall specify the length of the initial Interest Period

36

Case: 19-30088     Doc# 9156-3     Filed: 09/28/20     Entered: 09/28/20 16:25:53     Page 956 of 1367

therefor), <u>provided</u> that no ABR Loan may be converted into a Eurodollar Loan when any Event of Default has occurred and is continuing and the Required Lenders have determined in their sole discretion not to permit such conversions. Upon receipt of any such notice the Administrative Agent shall promptly notify each relevant Lender thereof.

(b)    Any Eurodollar Loan may be continued as such upon the expiration of the then current Interest Period with respect thereto by the Borrower giving irrevocable notice to the Administrative Agent, in accordance with the applicable provisions of the defined term "Interest Period", of the length of the next Interest Period to be applicable to such Loans, <u>provided</u> that no Eurodollar Loan may be continued as such when any Event of Default has occurred and is continuing and the Required Lenders have determined in their sole discretion not to permit such continuations; <u>provided</u>, <u>further</u>, that if the Borrower shall fail to give any required notice as described above in this paragraph, subject to the preceding proviso, such Loans shall be automatically continued as Eurodollar Loans with an Interest Period of one month on the last day of such then expiring Interest Period. Upon receipt of any such notice the Administrative Agent shall promptly notify each relevant Lender thereof.

2.10    <u>Limitations on Eurodollar Tranches</u>. Notwithstanding anything to the contrary in this Agreement, all borrowings, conversions and continuations of Eurodollar Loans and all selections of Interest Periods shall be in such amounts and be made pursuant to such elections so that (a) after giving effect thereto, the aggregate principal amount of the Eurodollar Loans comprising each Eurodollar Tranche shall be equal to $1,000,000 or a whole multiple of $500,000 in excess thereof and (b) no more than 15 Eurodollar Tranches shall be outstanding at any one time.

2.11    <u>Interest Rates and Payment Dates</u>.

(a)    Each Eurodollar Loan shall bear interest for each day during each Interest Period with respect thereto at a rate per annum equal to the Eurodollar Rate determined for such day <u>plus</u> the Applicable Margin.

(b)    Each ABR Loan shall bear interest at a rate per annum equal to the ABR plus the Applicable Margin.

(c)    (i) If all or a portion of the principal amount of any Loan shall not be paid when due (whether at the stated maturity, by acceleration or otherwise), such overdue amount shall bear interest at a default rate per annum equal to, in the case of the Loans, the rate that would otherwise be applicable thereto pursuant to the foregoing provisions of this Section <u>plus</u> 2%, and (ii) if all or a portion of any interest payable on any Loan or any commitment fee, letter of credit fee, or any other fee payable (excluding any expenses or other indemnity) hereunder shall not be paid when due (whether at the stated maturity, by acceleration or otherwise), such overdue amount shall bear interest at a default rate per annum equal to the rate then applicable to ABR Loans <u>plus</u> 2%, in each case, with respect to clauses (i) and (ii) above, from the date of such non-payment until such amount is paid in full (as well after as before judgment).

(d)    Interest shall be payable in arrears on each Interest Payment Date, <u>provided</u> that interest accruing pursuant to Section 2.11(c) shall be payable from time to time on demand.

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 957 of 1367

2.12   Computation of Interest and Fees.

(a)   Interest and fees payable pursuant hereto shall be calculated on the basis of a 360-day year for the actual days elapsed, except that, with respect to ABR Loans, the rate of interest on which is calculated on the basis of ABR, the interest thereon shall be calculated on the basis of a 365- (or 366-, as the case may be) day year for the actual days elapsed. The Administrative Agent shall as soon as practicable notify the Borrower and the relevant Lenders of each determination of a Eurodollar Rate. Any change in the interest rate on a Loan resulting from a change in the ABR or the Eurocurrency Reserve Requirements shall become effective as of the opening of business on the day on which such change becomes effective. The Administrative Agent shall as soon as practicable notify the Borrower and the relevant Lenders of the effective date and the amount of each such change in interest rate.

(b)   Each determination of an interest rate by the Administrative Agent pursuant to any provision of this Agreement shall constitute prima facie evidence of such amounts. The Administrative Agent shall, at the request of the Borrower or any Lender, deliver to the Borrower or such Lender a statement showing the quotations used by the Administrative Agent in determining any interest rate pursuant to Section 2.11(a).

2.13   Inability to Determine Interest Rate.

(a)   If prior to the first day of any Interest Period:

(i)   the Administrative Agent shall have determined (which determination shall be conclusive and binding upon the Borrower absent manifest error) that, by reason of circumstances affecting the relevant market, adequate and reasonable means do not exist for ascertaining the Eurodollar Rate for such Interest Period, provided that no Benchmark Transition Event shall have occurred at such time; or

(ii)   the Administrative Agent shall have received notice from the Required Lenders that the Eurodollar Rate determined or to be determined for such Interest Period will not adequately and fairly reflect the cost to such Lenders (as conclusively certified by such Lenders) of making or maintaining their affected Loans during such Interest Period,

the Administrative Agent shall give telecopy or telephonic notice thereof to the Borrower and the relevant Lenders as soon as practicable thereafter. If such notice is given (x) any Eurodollar Loans requested to be made on the first day of such Interest Period shall be made as ABR Loans, (y) any Loans that were to have been converted on the first day of such Interest Period to Eurodollar Loans shall be continued as ABR Loans and (z) any outstanding Eurodollar Loans shall be converted, on the last day of the then-current Interest Period, to ABR Loans. Until such notice has been withdrawn by the Administrative Agent, no further Eurodollar Loans shall be made or continued as such, nor shall the Borrower have the right to convert Loans to Eurodollar Loans.

(b)   Notwithstanding anything to the contrary herein or in any other Loan Document, upon the occurrence of a Benchmark Transition Event or an Early Opt-in Election, as applicable, the Administrative Agent and the Borrower may amend this Agreement to replace the Eurodollar Base Rate with a Benchmark Replacement. Any such amendment with respect to a Benchmark Transition Event will become effective at 5:00 p.m. on the fifth Business Day after the

38

Administrative Agent has posted such proposed amendment to all Lenders and the Borrower, so long as the Administrative Agent has not received, by such time, written notice of objection to such proposed amendment from Lenders comprising the Required Lenders; provided that, with respect to any proposed amendment containing any SOFR-Based Rate, the Lenders shall be entitled to object only to the Benchmark Replacement Adjustment contained therein. Any such amendment with respect to an Early Opt-in Election will become effective on the date that Lenders comprising the Required Lenders have delivered to the Administrative Agent written notice that such Required Lenders accept such amendment. No replacement of the Eurodollar Base Rate with a Benchmark Replacement will occur prior to the applicable Benchmark Transition Start Date.

(c)    In connection with the implementation of a Benchmark Replacement, the Administrative Agent will have the right to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Benchmark Replacement Conforming Changes will become effective without any further action or consent of any other party to this Agreement.

(d)    The Administrative Agent will promptly notify the Borrower and the Lenders of (i) any occurrence of a Benchmark Transition Event or an Early Opt-in Election, as applicable, and its related Benchmark Replacement Date and Benchmark Transition Start Date, (ii) the implementation of any Benchmark Replacement, (iii) the effectiveness of any Benchmark Replacement Conforming Changes and (iv) the commencement or conclusion of any Benchmark Unavailability Period. Any determination, decision or election that may be made by the Administrative Agent or Lenders pursuant to this Section 2.13, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party hereto, except, in each case, as expressly required pursuant to this Section 2.13.

(e)    Upon the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, the Borrower may revoke any request for a borrowing of Eurodollar Loans, or conversion or continuation of Eurodollar Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, (x) any Eurodollar Loans requested to be made shall be made as ABR Loans, (y) any Loans that were to have been converted to Eurodollar Loans shall be continued as ABR Loans and (z) any outstanding Eurodollar Loans shall be converted, on the last day of the then-current Interest Period, to ABR Loans.

2.14    Pro Rata Treatment and Payments; Notes.

(a)    Each borrowing by the Borrower from the Lenders hereunder, each payment by the Borrower on account of any commitment fee and any reduction of the Commitments of the Lenders shall be made pro rata according to the respective Percentages of the Lenders.

(b)    Each payment (including each prepayment) by the Borrower on account of principal of and interest on the Revolving Loans shall be made pro rata according to the respective outstanding principal amounts of the Revolving Loans then held by the Lenders.

39

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 959 of 1367

(c)   Notwithstanding anything to the contrary herein, all payments (including prepayments) to be made by the Borrower hereunder, whether on account of principal, interest, fees or otherwise, shall be made without setoff or counterclaim and shall be made prior to 4:00 P.M., New York City time, on the due date thereof to the Administrative Agent, for the account of the Lenders, at the Funding Office, in Dollars and in immediately available funds. The Administrative Agent shall distribute such payments to the Lenders promptly upon receipt in like funds as received. If any payment hereunder (other than payments on the Eurodollar Loans) becomes due and payable on a day other than a Business Day, such payment shall be extended to the next succeeding Business Day. If any payment on a Eurodollar Loan becomes due and payable on a day other than a Business Day, the maturity thereof shall be extended to the next succeeding Business Day unless the result of such extension would be to extend such payment into another calendar month, in which event such payment shall be made on the immediately preceding Business Day. In the case of any extension of any payment of principal pursuant to the preceding two sentences, interest thereon shall be payable at the then applicable rate during such extension.

(d)   Unless the Administrative Agent shall have been notified in writing by any Lender prior to a borrowing that such Lender will not make the amount that would constitute its share of such borrowing available to the Administrative Agent, the Administrative Agent may assume that such Lender is making such amount available to the Administrative Agent, and the Administrative Agent may, in reliance upon such assumption, make available to the Borrower a corresponding amount. If such amount is not made available to the Administrative Agent by the required time on the Borrowing Date therefor, such Lender shall pay to the Administrative Agent, on demand, such amount with interest thereon, at a rate equal to the greater of (i) the Federal Funds Effective Rate and (ii) a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation, for the period until such Lender makes such amount immediately available to the Administrative Agent. A certificate of the Administrative Agent submitted to any Lender with respect to any amounts owing under this paragraph shall be conclusive in the absence of manifest error. If such Lender's share of such borrowing is not made available to the Administrative Agent by such Lender within three Business Days after such Borrowing Date, the Administrative Agent shall also be entitled to recover such amount with interest thereon at the rate per annum applicable to ABR Loans from the Borrower within 30 days after written demand therefor.

(e)   Unless the Administrative Agent shall have been notified in writing by the Borrower prior to the date of any payment due to be made by the Borrower hereunder that the Borrower will not make such payment to the Administrative Agent, the Administrative Agent may assume that the Borrower is making such payment, and the Administrative Agent may, but shall not be required to, in reliance upon such assumption, make available to the Lenders their respective *pro rata* shares of a corresponding amount. If such payment is not made to the Administrative Agent by the Borrower within three Business Days after such due date, the Administrative Agent shall be entitled to recover, on demand, from each Lender to which any amount which was made available pursuant to the preceding sentence, such amount with interest thereon at the rate per annum equal to the daily average Federal Funds Effective Rate. Nothing herein shall be deemed to limit the rights of the Administrative Agent or any Lender against the Borrower.

(f)   The Borrower agrees that, upon the request to the Administrative Agent by any Lender, the Borrower will promptly execute and deliver to such Lender a promissory note (a

40

"Note") of the Borrower evidencing any Revolving Loans of such Lender, substantially in the form of Exhibit H, with appropriate insertions as to date and principal amount; provided, that delivery of Notes shall not be a condition precedent to the occurrence of the Effective Date or the making of Loans on the Effective Date.

(g)    If any Lender shall fail to make any payment required to be made by it pursuant to Section 2.14(d), then the Administrative Agent may, in its discretion and notwithstanding any contrary provision hereof, (i) apply any amounts thereafter received by the Administrative Agent hereunder for the account of such Lender for the benefit of the Administrative Agent to satisfy such Lender's obligations to the Administrative Agent, as the case may be, under such Section until all such unsatisfied obligations are fully paid, and/or (ii) so long as such Lender is a Defaulting Lender, hold any such amounts in a segregated account as cash collateral for, and application to, any future funding obligations of such Lender under any such Section, in the case of each of clauses (i) and (ii) above, in any order as determined by the Administrative Agent in its discretion.

2.15    Change of Law.

(a)    If a Change of Law shall:

(i)    subject any Recipient to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its Loans or Commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto;

(ii)    impose, modify or hold applicable any reserve, special deposit, compulsory loan, Federal Deposit Insurance Corporation insurance charge or other similar insurance charge or similar requirement against assets held by, deposits or other liabilities in or for the account of, advances, loans or other extensions of credit by, or any other acquisition of funds by, any Lender that is not otherwise included in the determination of the Eurodollar Rate, which requirements are generally applicable to advances, loans and other extensions of credit made by such Lender; or

(iii)    impose on any Lender any other condition that is generally applicable to loans made by such Lender or participations therein by a Lender;

and the result of any of the foregoing is to increase the cost to such Lender or such other Recipient, by an amount that such Lender or such other Recipient deems to be material, of making, converting into, continuing or maintaining Loans, or to reduce any amount receivable hereunder in respect thereof, then, in such case, the Borrower shall promptly pay such Lender or such other Recipient, within ten Business Days after its demand, any additional amounts necessary to compensate such Lender or such other Recipient for such increased cost or reduced amount receivable. If any Lender or other Recipient becomes entitled to claim any additional amounts pursuant to this paragraph, it shall promptly notify the Borrower (with a copy to the Administrative Agent) of the event by reason of which it has become so entitled; provided, however, that no Lender or other Recipient shall be entitled to demand such compensation more than 90 days following (x) the last day of the Interest Period in respect of which such demand is made or (y) the

41

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 961 of 1367

repayment of the Loan in respect of which such demand is made. Notwithstanding any other provision herein, no Lender shall demand compensation pursuant to this Section 2.15 if it shall not at the time be the general policy or practice of such Lender to demand such compensation from similarly situated borrowers (to the extent that such Lender has the right to do so under its credit facilities with similarly situated borrowers).

(b)    If any Lender shall have determined that a Change of Law regarding capital or liquidity requirements shall have the effect of reducing the rate of return on such Lender's capital or the capital of any corporation controlling such Lender as a consequence of its obligations hereunder to a level below that which such Lender or such corporation could have achieved but for such Change of Law (taking into consideration such Lender's or such corporation's policies with respect to capital adequacy or liquidity) by an amount deemed by such Lender to be material, then from time to time, after submission by such Lender to the Borrower (with a copy to the Administrative Agent) of a written request therefor, the Borrower shall pay to such Lender such additional amount or amounts as will compensate such Lender or such corporation for such reduction.

(c)    A certificate as to any additional amounts payable pursuant to this Section 2.15 submitted by any Lender or any other Recipient to the Borrower (with a copy to the Administrative Agent) shall constitute prima facie evidence of such costs or amounts. Notwithstanding anything to the contrary in this Section 2.15, the Borrower shall not be required to compensate a Lender or any other Recipient pursuant to this Section 2.15 for any amounts incurred more than six months prior to the date that such Lender or such other Recipient notifies the Borrower of such Lender's or such other Recipient's intention to claim compensation therefor; provided that, if the circumstances giving rise to such claim have a retroactive effect, then such six-month period shall be extended to include the period of such retroactive effect not to exceed twelve months. The obligations of the Borrower pursuant to this Section 2.15 shall survive for 90 days after the termination of this Agreement and the payment of the Loans and all other amounts then due and payable hereunder.

2.16    Taxes.

(a)    Any and all payments by or on account of any obligation of the Borrower under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable laws. If any applicable laws (as determined in the good faith discretion of the Borrower or Administrative Agent making the payment) require the deduction or withholding of any Tax from any such payment, then (A) the Borrower or Administrative Agent, as applicable, shall withhold or make such deductions as are determined by the Borrower or the Administrative Agent to be required, (B) the Borrower or Administrative Agent, as applicable, shall timely pay the full amount withheld or deducted to the relevant Governmental Authority in accordance with such laws, and (C) to the extent that the withholding or deduction is made on account of Indemnified Taxes, the sum payable by the Borrower shall be increased as necessary so that after any required withholding or the making of all required deductions (including deductions applicable to additional sums payable under this Section 2.16) the applicable Recipient receives an amount equal to the sum it would have received had no such withholding or deduction been made.

42

(b)   Without limiting the provisions of subsection (a) above, the Borrower shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(c)   (i) The Borrower shall, and does hereby, indemnify each Recipient, and shall make payment in respect thereof within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 2.16) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender or another Recipient (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender or another Recipient, shall be conclusive absent manifest error.

(ii)   Each Lender shall, and does hereby, severally indemnify, and shall make payment in respect thereof within 10 days after demand therefor, (x) the Administrative Agent against any Indemnified Taxes attributable to such Lender (but only to the extent that the Borrower has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Borrower to do so), (y) the Administrative Agent against any Taxes attributable to such Lender's failure to comply with the provisions of Section 10.6(c) (iii) relating to the maintenance of a Participant Register and (z) the Administrative Agent against any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender, as the case may be, under this Agreement or any other Loan Document against any amount due to the Administrative Agent under this clause (ii).

(d)   Upon request by the Borrower or the Administrative Agent, as the case may be, after any payment of Taxes by the Borrower or by the Administrative Agent to a Governmental Authority as provided in this Section 2.16, the Borrower shall deliver to the Administrative Agent or the Administrative Agent shall deliver to the Borrower, as the case may be, the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of any return required by laws to report such payment or other evidence of such payment reasonably satisfactory to the Borrower or the Administrative Agent, as the case may be.

(e)   (i) Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender, if reasonably requested

43

by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Sections 2.16(e)(ii)(A), (ii)(B) and (ii)(D) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)     Without limiting the generality of the foregoing,

(A)     any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(I)     in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W- 8BEN or W-8BEN-E, as applicable, establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or W-8BEN-E, as applicable, establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(II)     executed copies of IRS Form W-8ECI;

(III)     in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit G-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) executed copies of IRS Form W- 8BEN or W-8BEN-E, as applicable; or

(IV)     to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W- 8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN

44

or W-8BEN-E, as applicable, a U.S. Tax Compliance Certificate substantially in the form of Exhibit G-2 or Exhibit G-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit G-4 on behalf of each such direct and indirect partner.

(C)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(D)     if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3) (C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the Effective Date.

(iii)    Each Lender agrees that if any form or certification it previously delivered pursuant to this Section 2.16 expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(f)    At no time shall the Administrative Agent have any obligation to file for or otherwise pursue on behalf of a Lender any refund of Taxes withheld or deducted from funds paid for the account of such Lender. If any Recipient determines, in its sole discretion exercised in good faith, that it has received a refund of, or credit with respect to, any Taxes as to which it has been indemnified pursuant to this Section 2.16 (including by the payment of additional amounts pursuant to this Section 2.16), it shall pay to the Borrower an amount equal to such refund or credit (but only to the extent of indemnity payments made under this Section 2.16 with respect to the Taxes giving rise to such refund or credit), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund or credit). The Borrower, upon

45

the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (f) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event such indemnified party is required to repay such refund or credit to such Governmental Authority. Notwithstanding anything to the contrary in this paragraph (f), in no event will the indemnified party be required to pay any amount to the Borrower pursuant to this paragraph (f) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund or credit had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This paragraph (f) shall not be construed to require any Recipient to make available its tax returns (or any other information relating to its Taxes that it deems confidential) to the Borrower or any other Person.

(g)     Each party's obligations under this Section 2.16 shall survive for one year after the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

2.17     <u>Indemnity</u>. The Borrower agrees to indemnify each Lender for, and to hold each Lender harmless from, any loss (other than the loss of Applicable Margin) or expense that such Lender may sustain or incur as a consequence of (a) default by the Borrower in making a borrowing of, conversion into or continuation of Eurodollar Loans after the Borrower has given a notice requesting the same in accordance with the provisions of this Agreement, (b) default by the Borrower in making any prepayment of or conversion from Eurodollar Loans after the Borrower has given a notice thereof in accordance with the provisions of this Agreement or (c) the making of a prepayment of Eurodollar Loans on a day that is not the last day of an Interest Period with respect thereto. A certificate as to any amounts payable pursuant to this Section submitted to the Borrower by any Lender shall be conclusive in the absence of manifest error. This covenant shall survive for 90 days after the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

2.18     <u>Change of Lending Office</u>. Each Lender agrees that, upon the occurrence of any event giving rise to the operation of Section 2.15 or 2.16 with respect to such Lender, it will, if requested by the Borrower, use reasonable efforts (subject to overall policy considerations of such Lender) to designate another lending office for any Loans affected by such event with the object of avoiding the consequences of such event; <u>provided</u>, that such designation is made on terms that, in the sole but reasonable judgment of such Lender, cause such Lender and its lending office(s) to suffer no unreimbursed economic disadvantage or any legal or regulatory disadvantage, and <u>provided</u>, <u>further</u>, that nothing in this Section shall affect or postpone any of the obligations of the Borrower or the rights of any Lender pursuant to Section 2.15 or 2.16.

2.19     <u>Replacement of Lenders</u>. The Borrower shall be permitted to replace any Lender that (a) requests (on its behalf or any of its Participants) reimbursement for amounts owing pursuant to Section 2.15 or 2.16, (b) provides notice under Section 2.21 or (c) becomes a Defaulting Lender, with a replacement financial institution; <u>provided</u> that (i) such replacement does not conflict with any Requirement of Law, (ii) no Event of Default shall have occurred and be continuing at the time of such replacement, (iii) prior to any such replacement, such Lender shall have taken no action under Section 2.18 which eliminates the continued need for payment of

46

amounts owing pursuant to Section 2.15 or 2.16, (iv) the replacement financial institution shall purchase, at par, all Loans and other amounts owing to such replaced Lender on or prior to the date of replacement, (v) the Borrower shall be liable to such replaced Lender under Section 2.17 if any Eurodollar Loan owing to such replaced Lender shall be purchased other than on the last day of the Interest Period relating thereto, (vi) the replacement financial institution, if not already a Lender, shall be reasonably satisfactory to the Administrative Agent, (vii) the replaced Lender shall be obligated to make such replacement in accordance with the provisions of Section 10.6 (provided that the Borrower shall be obligated to pay the registration and processing fee referred to therein), (viii) until such time as such replacement shall be consummated, the Borrower shall pay all additional amounts (if any) required pursuant to Section 2.15 or 2.16, as the case may be, and (ix) any such replacement shall not be deemed to be a waiver of any rights that the Borrower, the Administrative Agent or any other Lender shall have against the replaced Lender.

2.20    Defaulting Lenders. Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by applicable law:

(a)    any payment of principal, interest, fees or other amounts (other than those described in Section 2.20(b)) received by the Administrative Agent for the account of that Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Section 7 or otherwise, and including any amounts made available to the Administrative Agent by that Defaulting Lender pursuant to Section 9.7), shall be applied at such time or times as may be determined by the Administrative Agent as follows: *first*, to the payment of any amounts owing by that Defaulting Lender to the Administrative Agent hereunder; *second*, as the Borrower may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which that Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; *third*, if so determined by the Borrower with the consent of the Administrative Agent, not to be unreasonably withheld, to be held in a non-interest bearing deposit account and released in order to satisfy obligations of that Defaulting Lender to fund Loans under this Agreement; *fourth*, to the payment of any amounts owing to the Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Lender against that Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Agreement; *fifth*, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against that Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Agreement; and *sixth*, to that Defaulting Lender or as otherwise directed by a court of competent jurisdiction; provided that if such payment is a payment of the principal amount of any Loans in respect of which that Defaulting Lender has not fully funded its appropriate share such payment shall be applied solely to pay the Loans of all non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of that Defaulting Lender. Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender pursuant to this Section 2.20(a) shall be deemed paid to and redirected by that Defaulting Lender, and each Lender irrevocably consents hereto;

(b)    [reserved];

(c)    [reserved];

47

(d)   [reserved]; and

(e)   that Defaulting Lender's right to approve or disapprove any amendment, supplement, modification, waiver or consent with respect to this Agreement shall be restricted as set forth in the definition of "Required Lenders" and Section 10.1.

If the Borrower and the Administrative Agent reasonably determine in writing that a Defaulting Lender should no longer be deemed to be a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein (which may include arrangements with respect to any cash collateral), that Lender will, to the extent applicable, purchase that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Loans to be held on a pro rata basis by the Lenders in accordance with their Percentages, whereupon that Lender will cease to be a Defaulting Lender; provided that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while that Lender was a Defaulting Lender; and provided, further, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

2.21   Illegality. If any Lender determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender or its applicable lending office to make, maintain, or fund Loans whose interest is determined by reference to the Eurodollar Rate, or to determine or charge interest rates based upon the Eurodollar Rate, or any Governmental Authority has imposed material restrictions on the authority of such Lender to purchase or sell, or to take deposits of, Dollars in the London interbank market, then, upon notice thereof by such Lender to the Borrower (through the Administrative Agent), (a) any obligation of such Lender to make or continue Eurodollar Loans or to convert ABR Loans to Eurodollar Loans shall be suspended, and (b) if such notice asserts the illegality of such Lender making or maintaining ABR Loans the interest rate on which is determined by reference to the Eurodollar Rate component of the ABR, the interest rate on which ABR Loans of such Lender shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to the Eurodollar Rate component of the ABR, in each case until such Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such determination no longer exist. Upon receipt of such notice, (i) the Borrower shall, upon demand from such Lender (with a copy to the Administrative Agent), prepay or, if applicable, convert all Eurodollar Loans of such Lender to ABR Loans (the interest rate on which ABR Loans of such Lender shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to the Eurodollar Rate component of the ABR), either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such Eurodollar Loans to such day, or immediately, if such Lender may not lawfully continue to maintain such Eurodollar Loans and (ii) if such notice asserts the illegality of such Lender determining or charging interest rates based upon the Eurodollar Rate, the Administrative Agent shall during the period of such suspension compute the ABR applicable to such Lender without reference to the Eurodollar Rate component thereof until the Administrative Agent is advised in writing by such Lender that it is no longer illegal for such Lender to determine or charge interest rates based upon the Eurodollar Rate. Upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so prepaid or converted, together with any additional amounts required pursuant to Section 2.17.

48

SECTION 3.    [RESERVED].

SECTION 4.    REPRESENTATIONS AND WARRANTIES

To induce the Administrative Agent and the Lenders to enter into this Agreement and to make the Loans, the Borrower hereby represents and warrants to the Administrative Agent and each Lender, on the Effective Date and on the date of each Credit Event hereunder after the Effective Date, that:

4.1    <u>Financial Condition</u>. (a) The audited consolidated balance sheet of the Borrower and its consolidated Subsidiaries as of December 31, 2019, and the related consolidated statements of income and cash flows for the fiscal year ended on such date, reported on by Deloitte & Touche LLP, and (b) the unaudited consolidated balance sheet of the Borrower and its consolidated Subsidiaries as of March 31, 2020, and the related consolidated statements of income and cash flows for the portion of the fiscal year ended on such date, each delivered to the Administrative Agent prior to the Effective Date, in each case, (i) were prepared in accordance with GAAP consistently applied throughout the periods covered thereby, except as otherwise expressly noted therein, and (ii) present fairly in all material respects the consolidated financial condition of the Borrower and its consolidated Subsidiaries as of such date, and its consolidated income and its consolidated cash flows for the respective fiscal year or portion of the fiscal year then ended, subject, in the case of the financial statements referred to in clause (b), to the absence of footnotes and to normal year-end audit adjustments.

4.2    <u>No Change</u>. Since December 31, 2019, no Specified Material Adverse Effect has occurred.

4.3    <u>Existence; Compliance with Law</u>. Each of the Borrower and its Significant Subsidiaries (a) is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization, (b) has the organizational power and organizational authority to own and operate its property, to lease the property it operates as lessee and to conduct the business in which it is currently engaged, (c) is duly qualified as a foreign corporation or other organization and in good standing under the laws of each jurisdiction where its ownership, lease or operation of property or the conduct of its business requires such qualification except to the extent that the failure to so qualify could not reasonably be expected to have a Material Adverse Effect and (d) is in compliance with all Requirements of Law except for any Requirements of Law being contested in good faith by appropriate proceedings and except to the extent that the failure to comply therewith could not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

4.4    <u>Power; Authorization; Enforceable Obligations</u>. The Borrower has the corporate power and corporate authority to execute and deliver and to perform its obligations under the Loan Documents and to obtain extensions of credit hereunder. The Borrower has taken all necessary corporate action to authorize the execution and delivery of, and performance of its obligations under, the Loan Documents to which it is a party and to authorize the extensions of credit on the terms and conditions of this Agreement. No consent or authorization of, filing with, notice to or

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 969 of 1367

other act by or in respect of, any Governmental Authority or any other Person is required in connection with the extensions of credit hereunder or with the execution, delivery, performance, validity or enforceability of this Agreement or any of the Loan Documents, except (i) consents, authorizations, filings and notices which have been obtained or made and are in full force and effect, (ii) any consent, authorization or filing that may be required in the future the failure of which to make or obtain could not reasonably be expected to have a Material Adverse Effect and (iii) applicable Requirements of Law (including the approval of the CPUC) prior to foreclosure or other exercise of remedies under the Loan Documents. This Agreement has been, and each other Loan Document upon execution and delivery will be, duly executed and delivered. This Agreement constitutes, and each other Loan Document upon execution will constitute, a legal, valid and binding obligation of the Borrower, enforceable against the Borrower in accordance with its terms, except as enforceability may be limited by (x) applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally, laws of general application related to the enforceability of securities secured by real estate and by general equitable principles (whether enforcement is sought by proceedings in equity or at law) and (y) applicable Requirements of Law (including the approval of the CPUC) prior to foreclosure or other exercise of remedies hereunder or under the other Loan Documents.

4.5   No Legal Bar. The execution and delivery of, and the performance of the obligations under, this Agreement and the other Loan Documents, the borrowings hereunder and the use of the proceeds thereof will not violate in any material respect any Requirement of Law or any Contractual Obligation of the Borrower or any of its Significant Subsidiaries and will not result in, or require, the creation or imposition of any Lien on any of their respective properties or revenues pursuant to any Requirement of Law or any such Contractual Obligation (other than the Liens created by the Loan Documents).

4.6   Litigation. (a) No litigation, investigation or proceeding of or before any arbitrator or Governmental Authority is pending or, to the knowledge of the Borrower, threatened in writing by or against the Borrower or any of its Significant Subsidiaries or against any of their respective material properties or revenues with respect to any of the Loan Documents.

(b) No litigation, investigation or proceeding of or before any arbitrator or Governmental Authority is pending or, to the knowledge of the Borrower, threatened in writing by or against the Borrower or any of its Significant Subsidiaries or against any of their respective material properties or revenues, except as disclosed in the Specified Exchange Act Filings, that could reasonably be expected to have a Material Adverse Effect.

4.7   No Default. No Default or Event of Default has occurred and is continuing.

4.8   Taxes. The Borrower and each of its Significant Subsidiaries has filed or caused to be filed all Federal and state returns of income and franchise taxes imposed in lieu of net income taxes and all other material tax returns that are required to be filed and has paid all taxes shown to be due and payable on said returns or with respect to any claims or assessments for taxes made against it or any of its property by any Governmental Authority (other than (i) any amounts the validity of which are currently being contested in good faith by appropriate proceedings and with respect to which reserves in conformity with GAAP have been provided on the books of the Borrower or any of its Significant Subsidiaries, as applicable, and (ii) claims which could not

50

reasonably be expected to have a Material Adverse Effect). No material tax Liens have been filed against the Borrower or any of its Significant Subsidiaries other than (A) Liens for taxes which are not delinquent or (B) Liens for taxes which are being contested in good faith by appropriate proceedings and with respect to which reserves in conformity with GAAP have been provided on the books of the Borrower or any of its Significant Subsidiaries, as applicable.

4.9    Federal Regulations. No part of the proceeds of any Loans, and no other extensions of credit hereunder, will be used for "buying" or "carrying" any "margin stock" within the respective meanings of each of the quoted terms under Regulation U as now and from time to time hereafter in effect or for any purpose that violates the provisions of the Regulations of the Board.

4.10    ERISA. No Reportable Event has occurred during the five year period prior to the date on which this representation is made or deemed made with respect to any Plan, and each Plan has complied with the applicable provisions of ERISA and the Code, except, in each case, to the extent that any such Reportable Event or failure to comply with the applicable provisions of ERISA or the Code could not reasonably be expected to result in a Material Adverse Effect. During the five year period prior to the date on which this representation is made or deemed made, there has been no (i) failure to make a required contribution to any Plan that would result in the imposition of a Lien or other encumbrance or the provision of security under Section 430 of the Code or Section 303 or 4068 of ERISA, or the arising of such a Lien or encumbrance; or (ii) "unpaid minimum required contribution" or "accumulated funding deficiency" (as defined or otherwise set forth in Section 4971 of the Code or Part 3 of Subtitle B of Title I of ERISA), whether or not waived, except, in each case, to the extent that such event could not reasonably be expected to result in a Material Adverse Effect. No termination of a Single Employer Plan has occurred, and no Lien in favor of the PBGC or a Plan has arisen, during such five-year period. The present value of all accrued benefits under each Single Employer Plan (based on those assumptions used to fund such Plan) did not, as of the last annual valuation date for which a certified actuarial valuation report is available prior to the date on which this representation is made or deemed made, exceed the value of the assets of such Plan allocable to such accrued benefits, except as could not reasonably be expected to result in a Material Adverse Effect. Neither the Borrower nor any Commonly Controlled Entity has had a complete or partial withdrawal from any Multiemployer Plan during the five year period prior to the date on which this representation is made or deemed made that has resulted or could reasonably be expected to result in a material liability under ERISA, and neither the Borrower nor any Commonly Controlled Entity would become subject to any liability under ERISA if the Borrower or any such Commonly Controlled Entity were to withdraw completely from all Multiemployer Plans as of the valuation date most closely preceding the date on which this representation is made or deemed made, except as could not reasonably be expected to result in a Material Adverse Effect. No such Multiemployer Plan is in endangered or critical status (within the meaning of Section 305 of ERISA) or in Insolvency.

4.11    Investment Company Act; Other Regulations. The Borrower is not an "investment company", or a company "controlled" by an "investment company", within the meaning of the Investment Company Act of 1940, as amended. On the Effective Date, the Borrower is not subject to regulation under any Requirement of Law (other than (a) Regulation X of the Board and (b) Sections 817-830, and Sections 701 and 851 of the California Public Utilities Code) that limits its ability to incur Indebtedness under this Agreement.

51

4.12    Use of Proceeds. The proceeds of the Revolving Loans shall be used to finance working capital needs, capital expenditures and other general corporate purposes (other than to redeem, purchase, retire, obtain the surrender of or otherwise acquire for value Capital Stock of the Borrower) of the Borrower and its Subsidiaries. No part of the proceeds of any Loans, and no other extensions of credit hereunder, will be used for "buying" or "carrying" any "margin stock" within the respective meanings of each of the quoted terms under Regulation U as now and from time to time hereafter in effect or for any purpose that violates the provisions of the Regulations of the Board.

4.13    Environmental Matters. Except as disclosed in the Specified Exchange Act Filings, the Borrower and its Significant Subsidiaries are not subject to any pending violations or liabilities under Environmental Laws or relating to the disposal, spill or other release of Materials of Environmental Concern that would reasonably be expected to have a Material Adverse Effect, and, to the knowledge of the Borrower, there are no facts, circumstances or conditions that could reasonably be expected to give rise to such violations or liabilities.

4.14    Regulatory Matters. Solely by virtue of the execution, delivery and performance of, or the consummation of the transactions contemplated by this Agreement, no Lender shall be or become subject to regulation (a) under the FPA or (b) as a "public utility" or "public service corporation" or the equivalent under any Requirement of Law.

4.15    Sanctions; Anti-Corruption. None of the Borrower, any of its Subsidiaries, nor, to the knowledge of the Borrower, any director, officer, agent, Affiliate or employee of the Borrower or any of its Subsidiaries is currently (i) the subject of any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department or the U.S. State Department ("Sanctions") or (ii) located, organized or resident in a country or territory that is, or whose government is, the subject of any Sanctions. None of the Borrower, any of its Subsidiaries nor, to the knowledge of the Borrower, any director, officer, agent, Affiliate or employee of the Borrower or any of its Subsidiaries, has taken any action, directly or indirectly, that would result in a violation in any material respect by any such Person of the United States Foreign Corrupt Practices Act of 1977, as amended ("FCPA") or of any other anti-bribery or anti-corruption laws, rules, regulations legally applicable to such Persons (collectively, "Anti-Corruption Laws"). The Borrower will not use the proceeds of Revolving Loans, or lend, contribute or otherwise make available such proceeds (a) to any Subsidiary, Affiliate, joint venture partner or other Person or entity, to fund the activities of any Person, or in any country or territory, that, at the time of such funding, is, or whose government is, the subject of any Sanctions, or (b) directly, or, to the knowledge of the Borrower, indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the FCPA or of any Anti-Corruption Laws.

4.16    Affected Financial Institutions. The Borrower is not an Affected Financial Institution.

4.17    Solvency. The Borrower and its Subsidiaries, on a consolidated basis, are Solvent as of the Effective Date (after giving effect to the Plan of Reorganization and the transactions described therein).

52

4.18  <u>Disclosure</u>.

(a)  All written information relating to the Borrower, its Subsidiaries and their respective businesses, other than any projections, estimates and other forward-looking materials and information of a general economic or industry specific nature, that has been provided by or on behalf of the Borrower to the Administrative Agent or the Lenders in connection with the transactions contemplated hereby does not, when taken as a whole, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements were made (giving effect to all supplements and updates thereto). Any projected information, estimates, other forward-looking materials and pro forma financial information that have been made available to any Lenders or the Administrative Agent prior to the Effective Date in connection with the transactions contemplated hereby have been prepared in good faith based upon assumptions believed by the Borrower to be reasonable as of the date such information was furnished to the Lenders and as of the Effective Date (it being understood that actual results may vary materially from such projections and pro forma information and such projections and pro forma information are not a guarantee of performance).

(b)  As of the Effective Date, to the knowledge of the Borrower, the information included in any Beneficial Ownership Certification provided on or prior to the Effective Date to any Lender in connection with this Agreement is true and correct in all respects..

4.19  <u>Validity of Security Interests</u>. The Security Documents will (to the extent required thereby) create in favor of the Collateral Agent, for the benefit of the Lenders, a valid and enforceable Lien on and security interest in the Collateral (subject to any limitations specified therein) and (i) when financing statements and other filings in appropriate form are filed in the offices specified in the Pledge Agreement and (ii) upon the taking of possession or control by the Collateral Agent of such Collateral with respect to which a security interest may be perfected only by possession or control (which possession or control shall be given to the Collateral Agent to the extent possession or control by the Collateral Agent is required by the Pledge Agreement), the Liens created by the Security Documents shall constitute perfected Liens on, and security interests in, all right, title and interest of the Borrower in such Collateral to the extent perfection can be obtained by filing financing statements or by possession or control, in each case subject to no Liens other than Liens permitted hereunder.

4.20  <u>Ownership of Property</u>. As of the Effective Date, each of the Borrower and its Significant Subsidiaries has good title to, or valid leasehold interests in, all its real and personal property material to its business, subject to no Liens other than Liens permitted under Section 7.3, except for where the failure would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

4.21  <u>Covered Entity</u>. The Borrower is not a Covered Entity.

## SECTION 5.  CONDITIONS PRECEDENT

5.1   Conditions to the Effective Date. The occurrence of the Effective Date and the effectiveness of the Lenders' Commitments hereunder is subject to the satisfaction of the following conditions precedent:

(a)   Credit Agreement. The Administrative Agent shall have received this Agreement (including copies of all schedules attached hereto in a form reasonably satisfactory to the Lenders), executed and delivered by the Administrative Agent, the Borrower and each Person listed on Schedule 1.1.

(b)   Consents and Approvals. All governmental and third party consents and approvals necessary in connection with the execution and delivery of this Agreement and the other Loan Documents and the consummation of the transactions contemplated hereby shall have been obtained and be in full force and effect; and the Administrative Agent shall have received a certificate of a Responsible Officer to the foregoing effect.

(c)   KYC Information. At least three (3) Business Days prior to the Effective Date, the Administrative Agent and each Lender shall have received all documentation and information relating to the Borrower as is reasonably requested in writing by the Administrative Agent and/or any such Lender at least ten (10) Business Days prior to the Effective Date that is required by Governmental Authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the Patriot Act and the Beneficial Ownership Regulation. If the Borrower qualifies as a "legal entity customer" under the Beneficial Ownership Regulation and the Administrative Agent or any Lender so request at least five (5) Business Days prior to the Effective Date, then at least three (3) Business Days prior to the Effective Date, the Borrower shall have delivered to the Administrative Agent and/or any such Lender a Beneficial Ownership Certification in relation to the Borrower.

(d)   The Administrative Agent shall have received the executed a pledge agreement (the "Pledge Agreement"), in a form satisfactory to the Administrative Agent, duly executed by the Borrower, the Administrative Agent, the Collateral Agent and the other secured representatives named therein, together with:

(i)   a UCC-1 financing statement in form appropriate for filing under the Uniform Commercial Code of the State of California in order to perfect the first priority Liens, subject to Liens permitted under Section 7.3, covering the Collateral as defined and described in the Pledge Agreement;

(ii)   certified copies of UCC, tax and judgment lien searches, or equivalent reports or searches, each of a recent date listing all effective financing statements, lien notices or comparable documents (together with copies of such financing statements and documents) that name the Borrower as debtor and that are filed in those state and county jurisdictions in which the Borrower is organized or maintains its principal place of business and such other searches that the Administrative Agent deems necessary or appropriate, none of which encumber the Collateral covered or intended to be covered by the Security Documents (other than Liens permitted under Section 7.3 and those Liens to be discharged as of the Effective Date); and

54

(iii)   the certificate representing the Capital Stock of PG&E Utility pledged pursuant to the Pledge Agreement, together with an undated stock or similar power for such certificate executed in blank by a duly authorized officer of the Borrower.

(e)   Fees. The Lenders, the Arrangers and the Administrative Agent shall have received all fees required to be paid, and all expenses for which invoices have been presented (including the reasonable fees and expenses of legal counsel) on or before the date that is two (2) Business Days prior to the Effective Date.

(f)   Closing Certificate; Certified Articles of Incorporation; Good Standing Certificates. The Administrative Agent shall have received (i) a certificate of the Borrower, dated the Effective Date, substantially in the form of Exhibit D, with appropriate insertions and attachments, including the articles of incorporation of the Borrower certified as of a recent date by the Secretary of State of the State of California, (ii) a good standing certificate for the Borrower dated as of a recent date from the Secretary of State of the State of California, and (iii) a certificate of a Responsible Officer, dated the Effective Date, confirming the satisfaction of the conditions precedent set forth in Sections 5.1(h) and (i).

(g)   Legal Opinion. The Administrative Agent shall have received the legal opinion of (i) Hunton Andrews Kurth LLP, counsel to the Borrower, and (ii) Munger, Tolles & Olson LLP, special California regulatory counsel to the Borrower, each in a form reasonably satisfactory to the Administrative Agent.

(h)   Representations and Warranties. Each of the representations and warranties made by the Borrower in this Agreement that does not contain a materiality qualification shall be true and correct in all material respects on and as of the Effective Date, and each of the representations and warranties made by the Borrower in this Agreement that contains a materiality qualification shall be true and correct on and as of the Effective Date (or, in each case, to the extent such representations and warranties specifically relate to an earlier date, that such representations and warranties were true and correct in all material respects, or true and correct, as the case may be, as of such earlier date).

(i)   No Default. No Default or Event of Default shall have occurred and be continuing on the Effective Date or after giving effect to any Credit Event requested to be made on the Effective Date.

(j)   Solvency. The Administrative Agent shall have received a solvency certificate from the chief financial officer of the Borrower in substantially the form of Exhibit I hereto.

5.2   Conditions to Each Credit Event. The agreement of each Lender to make any Loan (a "Credit Event"), on any date (other than (except for clause (d)) the Effective Date) is subject to the satisfaction of the following conditions precedent:

(a)   Effective Date. The Effective Date shall have occurred.

(b)   Representations and Warranties. Each of the representations and warranties made by the Borrower in this Agreement (other than the representations and warranties set forth in Sections 4.2, 4.6(b) and 4.13) that does not contain a materiality qualification shall be true and

55

correct in all material respects on and as of the date of such Credit Event as if made on and as of such date, and each of the representations and warranties made by the Borrower in this Agreement (other than the representations and warranties set forth in Sections 4.2, 4.6(b) and 4.13) that contains a materiality qualification shall be true and correct on and as of such date (or, to the extent such representations and warranties specifically relate to an earlier date, that such representations and warranties were true and correct in all material respects, or true and correct, as the case may be, as of such earlier date).

(c)    No Default. No Default or Event of Default shall have occurred and be continuing on the date of such Credit Event or after giving effect to the Credit Event requested to be made on such date.

(d)    Request for Credit Event. The Administrative Agent shall have received a notice of borrowing in accordance with the requirements of Section 2.2.

Each Credit Event (other than a Credit Event occurring on the Effective Date) shall constitute a representation and warranty by the Borrower as of the date of such Credit Event that the conditions contained in this Section 5.2 have been satisfied.


SECTION 6.   AFFIRMATIVE COVENANTS

The Borrower hereby agrees that, so long as the Commitments remain in effect, or any Loan, any interest on any Loan or any fee payable to any Lender or the Administrative Agent hereunder remains outstanding, or any other amount then due and payable is owing to any Lender or the Administrative Agent hereunder, the Borrower shall and, with respect to Sections 6.3 and 6.6(b), shall cause its Significant Subsidiaries to:

6.1    Financial Statements. Furnish to the Administrative Agent with a copy for each Lender, and the Administrative Agent shall deliver to each Lender:

(a)    as soon as available, but in any event within 120 days after the end of each fiscal year of the Borrower, a copy of the audited consolidated balance sheet of the Borrower and its consolidated Subsidiaries as at the end of such year and the related audited consolidated statements of income and cash flows for such year, setting forth in each case in comparative form the figures for the previous year, reported on without a "going concern" or like qualification or exception, or qualification arising out of the scope of the audit, by Deloitte & Touche LLP or other independent certified public accountants of nationally recognized standing; and

(b)    as soon as available, but in any event not later than 60 days after the end of each of the first three quarterly periods of each fiscal year of the Borrower, the unaudited consolidated balance sheet of the Borrower and its consolidated Subsidiaries as at the end of such quarter and the related unaudited consolidated statements of income and cash flows for such quarter and the portion of the fiscal year through the end of such quarter, setting forth in each case in comparative form the figures for the previous year, certified by a Responsible Officer as being fairly stated in all material respects (subject to the absence of footnotes and normal year-end audit adjustments).

All such financial statements shall (x) be complete and correct in all material respects and (y) shall be prepared in reasonable detail and in accordance with GAAP applied (except as

56

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 976 of 1367

approved by such accountants or officer, as the case may be, and disclosed in reasonable detail therein) consistently throughout the periods reflected therein and with prior periods, subject, in each case to the absence of footnotes and to normal year-end audit adjustments. The Borrower shall be deemed to have delivered the financial statements required to be delivered pursuant to this Section 6.1 upon the filing of such financial statements by the Borrower through the SEC's EDGAR system (or any successor electronic gathering system that is publicly available free of charge) or the publication by the Borrower of such financial statements on its website.

6.2    Certificates; Other Information. Furnish to the Administrative Agent, for delivery to the Lenders:

(a)    within two Business Days after the delivery of any financial statements pursuant to Section 6.1, (i) a certificate of a Responsible Officer stating that such Responsible Officer has obtained no actual knowledge of any Default or Event of Default except as specified in such certificate and (ii) a Compliance Certificate, substantially in the form of Exhibit C, containing all information and calculations reasonably necessary for determining compliance by the Borrower with the provisions of this Agreement referred to therein as of the last day of the fiscal quarter or fiscal year of the Borrower, as the case may be;

(b)    within five days after the same are sent, copies of all financial statements and reports that the Borrower sends to the holders of any class of its debt securities or public equity securities, provided that, such financial statements and reports shall be deemed to have been delivered upon the filing of such financial statements and reports by the Borrower through the SEC's EDGAR system (or any successor electronic gathering system that is publicly available free of charge) or publication by the Borrower of such financial statements and reports on its website;

(c)    promptly, such additional financial and other information (other than any such information the disclosure of which is prohibited by applicable law or binding agreement or subject to attorney-client privilege or constitutes attorney-work product or constitutes non-financial trade secrets or non-financial proprietary information so long as (x) such confidentiality obligation was not entered into in contemplation hereof and (y) the Borrower provides such Lender with notice that information is being withheld due to the existence of such confidentiality obligation) as any Lender, through the Administrative Agent, may from time to time reasonably request; and

(d)    promptly, such documentation and other information that the Administrative Agent or such Lender reasonably requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the Patriot Act and the Beneficial Ownership Regulation.

6.3    Payment of Taxes. Pay all taxes due and payable or any other tax assessments made against the Borrower or any of its Significant Subsidiaries or any of their respective property by any Governmental Authority (other than (i) any amounts the validity of which are currently being contested in good faith by appropriate proceedings and with respect to which reserves in conformity with GAAP have been provided on the books of the Borrower or any of its Significant Subsidiaries, as applicable or (ii) where the failure to effect such payment could not reasonably be expected to have a Material Adverse Effect).

6.4     Maintenance of Existence; Compliance. (a) (i) Preserve, renew and keep in full force and effect its organizational existence and (ii) take all reasonable action to maintain all rights, privileges and franchises necessary or desirable in the normal conduct of its business, except, in each case, as otherwise permitted by Section 7.6 and except, in the case of clause (ii) above, to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect; (b) comply with all Contractual Obligations except to the extent that failure to comply therewith could not, in the aggregate, reasonably be expected to have a Material Adverse Effect and (c) comply with all Requirements of Law except for any Requirements of Law being contested in good faith by appropriate proceedings or except to the extent that failure to comply therewith could not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

6.5     Maintenance of Property; Insurance. (a) Keep all property useful and necessary in its business in good working order and condition, ordinary wear and tear and casualty excepted, except to the extent that failure to do so could not, in the aggregate, reasonably be expected to have a Material Adverse Effect, and (b) maintain with financially sound and reputable insurance companies insurance on all its material property in at least such amounts and against at least such risks as are usually insured against in the same general area by companies engaged in the same or a similar business of comparable size and financial strength and owning similar properties in the same general areas in which the Borrower operates, which may include self-insurance, if determined by the Borrower to be reasonably prudent.

6.6     Inspection of Property; Books and Records; Discussions. (a) Keep proper books of records and account in which full, true and correct entries in conformity with GAAP and all Requirements of Law shall be made of all dealings and transactions in relation to its business and activities and (b) unless a Default or Event of Default has occurred and is continuing, not more than once a year and after at least five Business Days' notice, (i) permit representatives of any Lender to visit and inspect any of its properties and examine and make abstracts from any of its books and records at any reasonable time to discuss the business, operations, properties and financial and other condition of the Borrower and its Significant Subsidiaries with officers and employees of the Borrower and its Significant Subsidiaries and (ii) use commercially reasonable efforts to provide for the Lenders (in the presence of representatives of the Borrower) to meet with the independent certified public accountants of the Borrower and its Significant Subsidiaries; provided, that any such visits or inspections shall be subject to such conditions as the Borrower and each of its Significant Subsidiaries shall deem necessary based on reasonable considerations of safety, security and confidentiality; and provided, further, that neither the Borrower nor any Significant Subsidiary shall be required to disclose to any Person any information the disclosure of which is prohibited by applicable law or binding agreement or subject to attorney-client privilege or constitutes attorney-work product or constitutes non-financial trade secrets or non-financial proprietary information so long as (x) such confidentiality obligation was not entered into in contemplation hereof and (y) the Borrower provides such Lender with notice that information is being withheld due to the existence of such confidentiality obligation.

6.7     Notices. Give notice to the Administrative Agent, and the Administrative Agent shall deliver such notice to each Lender, promptly upon any Responsible Officer obtaining knowledge of:

(a)     the occurrence of any Default or Event of Default;

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 978 of 1367

(b)  any change in the Rating issued by either S&P or Moody's; and

(c)  the occurrence of an ERISA Event which, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect (provided, that, any judicial proceeding instituted by PBGC that, within 60 days after the institution of such proceeding, has been withdrawn or stayed by PBGC or otherwise, shall be disregarded for the purpose of this Section 6.7(c)).

6.8  Maintenance of Licenses, etc. Maintain in full force and effect any authorization, consent, license or approval of any Governmental Authority necessary for the conduct of the Borrower's business as now conducted by it or necessary in connection with this Agreement, except to the extent the failure to do so could not reasonably be expected to have a Material Adverse Effect.

6.9  Further Assurances. Promptly upon the reasonable request by the Administrative Agent, or by the Required Lenders through the Administrative Agent, (a) correct any material defect or error that may be discovered in any Loan Document or the execution, acknowledgment, filing or recordation thereof, and (b) do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, certificates, documents, agreements and other instruments as reasonably required from time to time to (i) carry out more effectively the purposes of the Loan Documents, (ii) to the fullest extent permitted by applicable law, subject the Borrower's properties, assets, rights or interests to the Liens now or hereafter intended to be covered by the Pledge Agreement, (iii) perfect and maintain the validity, effectiveness and priority of the Pledge Agreement and any of the Liens intended to be created thereby and (iv) assure, convey, grant, assign, transfer, preserve, protect and confirm more effectively unto the Lenders and the Agents the rights granted or now or hereafter intended to be granted to the Lenders and the Agents under the Pledge Agreement or under any other instrument executed in connection with the Pledge Agreement.

SECTION 7.   NEGATIVE COVENANTS

The Borrower hereby agrees that, so long as the Commitments remain in effect, or any Loan, or any interest on any Loan or any fee payable to any Lender or the Administrative Agent hereunder remains outstanding, or any other amount then due and payable is owing to any Lender or the Administrative Agent hereunder, the Borrower shall not and shall not permit any of its Significant Subsidiaries (solely with respect to Sections 7.1, 7.3, 7.4, 7.9 and 7.13) to:

7.1  Indebtedness. Create, incur, assume or permit to exist any Indebtedness, except for:

(a)  Indebtedness and other Obligations created hereunder (including any Indebtedness incurred pursuant to Section 2.3);

(b)  Indebtedness of PG&E Utility and any of its Significant Subsidiaries, in each case, to the extent not prohibited by the PG&E Utility Revolving Credit Agreement; provided that, no Guarantee Obligations by PG&E Utility or any of its Significant Subsidiaries, in each case, with respect to Indebtedness of the Borrower constituting debt for borrowed money or evidenced by notes, bonds, debentures or other similar instruments shall be permitted except to the extent provided by a Person that is, or concurrently with providing such Guarantee Obligations becomes, a guarantor of the Obligations hereunder on terms and pursuant to documentation reasonably satisfactory to the Administrative Agent;

59

(c)  Indebtedness of the Borrower outstanding on the Effective Date in an aggregate outstanding principal amount not to exceed $4,750,000,000 that is (i) unsecured, (ii) secured only by Liens on the Collateral that are junior to the Liens securing the Obligations pursuant to an intercreditor agreement reasonably satisfactory to the Collateral Agent or (iii) secured by Liens that rank equally and ratably with the Liens securing the Obligations and that are subject to the Pledge Agreement, and any Permitted Refinancing thereof;

(d)  Indebtedness (i) pursuant to tenders, statutory obligations, bids, leases, governmental contracts, trade contracts, surety, stay, customs, appeal, performance and/or return of money bonds or other similar obligations incurred in the ordinary course of business and (ii) in respect of letters of credit, bank guaranties, surety bonds, performance bonds or similar instruments and reimbursement obligations to support any of the foregoing items;

(e)  (i) Guarantee Obligations with respect to the obligations of suppliers, customers and licensees and other third parties in the ordinary course of business, (ii) Indebtedness incurred in the ordinary course of business to pay the deferred purchase price of goods or services or progress payments in connection with such goods and services and (iii) Indebtedness in respect of letters of credit, bankers' acceptances, bank guaranties or similar instruments supporting trade payables, warehouse receipts or similar facilities entered into in the ordinary course of business, workers compensation claims or other employee benefits;

(f)  Guarantee Obligations of PG&E Utility and its Significant Subsidiaries with respect to Indebtedness otherwise permitted to be incurred pursuant to this Section 7.1; provided that, no such Guarantee Obligations with respect to Indebtedness of the Borrower constituting debt for borrowed money or evidenced by notes, bonds, debentures or other similar instruments shall be permitted except to the extent provided by a Person that is, or concurrently with providing such Guarantee Obligations becomes, a guarantor of the Obligations hereunder on terms and pursuant to documentation reasonably satisfactory to the Administrative Agent;

(g)  Indebtedness consisting of (i) the financing of insurance premiums and/or (ii) take-or-pay obligations contained in supply arrangements;

(h)  Indebtedness with respect to Capital Lease Obligations and purchase money Indebtedness; provided that the aggregate outstanding principal amount of Indebtedness with respect to Capital Lease Obligations shall not exceed $10,000,000 at any one time;

(i)  (x) obligations under any Cash Management Agreement and (y) Indebtedness under any Swap Agreement permitted under Section 7.13;

(j)  Indebtedness arising from any agreement providing for indemnification, adjustment or purchase price or similar obligations (including contingent earn-out obligations) incurred in connection with any Disposition or any purchase of assets or Capital Stock, and Indebtedness arising from guaranties, letters of credit, bank guaranties, surety bonds, performance bonds or similar instruments securing the performance of the Borrower or its Significant Subsidiaries pursuant to any such agreement;

60

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 980 of 1367

(k)   Indebtedness in respect of banking services and incentive, supplier finance or similar programs incurred in the ordinary course of business;

(l)   customer deposits and advance payments received in the ordinary course of business from customers for goods and services purchased in the ordinary course of business;

(m)   Indebtedness representing deferred compensation to employees, consultants or independent contractors incurred in the ordinary course of business;

(n)   Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or other similar instrument drawn against insufficient funds in the ordinary course of business;

(o)   endorsements for collection or deposit in the ordinary course of business;

(p)   unsecured Indebtedness owing to PG&E Utility or to any other Significant Subsidiary;

(q)   Indebtedness of the Borrower in an aggregate amount not to exceed $10,000,000 outstanding at any one time; and

(r)   Indebtedness of the Borrower if at the time of and immediately after giving effect to the incurrence of such Indebtedness, (i) no Default shall have occurred and be continuing and (ii) the Borrower shall be in pro forma compliance with the financial covenants set forth in Section 7.2 (whether or not in effect, and, prior to the first test date thereunder, assuming the level applicable on such first date applies as of the date of such pro forma test) as of the last day of the most recently ended fiscal quarter for which financial statements have been delivered pursuant to Section 6.1 (such compliance to be determined as though such Indebtedness had been incurred as of the first day of such fiscal quarter); provided that (x) the final maturity date of such Indebtedness is no earlier than the latest maturity date of the Loans and Commitments hereunder, (y) the weighted average life to maturity of such Indebtedness is not shorter than the remaining weighted average life to maturity of the Loans and Commitments hereunder and (iii) such Indebtedness is (A) unsecured, (B) secured only by Liens on the Collateral that are junior to the Liens securing the Obligations pursuant to an intercreditor agreement reasonably satisfactory to the Collateral Agent or (C) secured by Liens that rank equally and ratably with the Lien securing the Obligations pursuant to the Pledge Agreement.

For the avoidance of doubt, no Indebtedness of the Borrower which is secured by the Collateral shall have priority equal to or higher than the Obligations under the Priority Waterfall.

7.2   <u>Financial Covenants</u>.

(a)   Permit the Consolidated Capitalization Ratio on the last day of any fiscal quarter, from and after the last day of the first fiscal quarter ending after the Effective Date, to exceed 0.70 to 1.00.

(b)   If the Testing Condition is satisfied as of the last day of any fiscal quarter commencing with the first full fiscal quarter ended after the Effective Date, permit the Cash

61

Coverage Ratio on the last day of such fiscal quarter to be less than (i) prior to the first date on which the Borrower declares any cash dividend on its common Capital Stock, 1.50 to 1.00 and (ii) thereafter, 1.00 to 1.00.

7.3    Liens. Create, incur, assume or suffer to exist any Lien upon any assets of the Borrower or any Significant Subsidiary, whether now owned or hereafter acquired, except:

(a)    Liens securing the Obligations, which pursuant to the Pledge Agreement shall have priority under the Priority Waterfall;

(b)    Liens for Taxes not yet due or payable or that are being contested in good faith by appropriate proceedings; provided that adequate reserves with respect thereto are maintained on the books of the Borrower or the relevant Significant Subsidiary, as the case may be, in conformity with GAAP;

(c)    carriers', warehousemen's, mechanics', materialmen's, repairmen's or other like Liens arising in the ordinary course of business that are not overdue for a period of more than 60 days or that are being contested in good faith by appropriate proceedings;

(d)    pledges or deposits in connection with workers' compensation, employee benefits, including Plans, unemployment insurance and other social security legislation or in connection with compliance with Environmental Law;

(e)    deposits to secure (i) the performance of bids, trade contracts (other than for borrowed money), leases, statutory and regulatory obligations, governmental contracts, agreements with utilities, surety and appeal bonds, performance bonds, and other obligations of a like nature incurred in the ordinary course of business or (ii) letters of credit, bank guaranties or similar instruments to support any of the foregoing items;

(f)    easements, rights-of-way, conservation easements, restrictions, minor defects or irregularities in title and other similar encumbrances imposed by law or incurred in the ordinary course of business that, in the aggregate, do not materially interfere with the ordinary conduct of the business of the Borrower and its Significant Subsidiaries, taken as a whole;

(g)    precautionary or purported Liens evidenced by the filing of UCC financing statements or similar financing statements under applicable Requirements of Law;

(h)    leases, licenses, subleases or sublicenses granted to others not interfering in any material respect with the business of the Borrower and its Significant Subsidiaries, in each case, in the ordinary course of business which do not secure any Indebtedness;

(i)    Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto;

(j)    any interest or title of a lessor under any lease entered into by the Borrower or any Significant Subsidiary thereof in the ordinary course of business and covering only the assets so leased;

62

(k)   (i) Liens on assets securing judgments, awards, attachments and/or decrees and notices of lis pendens and associated rights relating to litigation being contested in good faith not constituting an Event of Default hereunder and (ii) any pledge and/or deposit securing any settlement of litigation;

(l)   Liens in favor of collecting or payor banks having a right of setoff, revocation, refund or chargeback with respect to money or instruments of the Borrower on deposit with such bank;

(m)   Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale of any asset in the ordinary course of business and permitted by this Agreement;

(n)   Liens solely on any cash earnest money deposits in connection with any letter of intent or purchase agreement;

(o)   Liens securing Indebtedness in connection with Capital Lease Obligations and purchase money Indebtedness permitted under Section 7.1(h); provided that (i) such Liens shall be created substantially simultaneously with the incurrence of such Indebtedness or within 180 days after completion of the acquisition, construction, repair, restoration, replacement, expansion, installation or improvement (as applicable) of the property subject to such Liens and (ii) such Liens attach at all times only to the property so financed except (A) for accessions to the property and the proceeds thereof and (B) that individual financings of property provided by one lender may be cross collateralized to other financings of property provided by such lender;

(p)   rights reserved to or vested in others to take or receive any part of, or royalties related to, the power, gas, oil, coal, lignite or other minerals or timber generated, developed, manufactured or produced by, or grown on, or acquired with, any property of the Borrower and its Significant Subsidiaries in the ordinary course of business;

(q)   Liens upon the production from property of power, gas, oil, coal, lignite or other minerals or timber, and the by-products and proceeds thereof, to secure the obligations or pay all or part of the expenses of development of such property only out of such production or proceeds incurred in the ordinary course of business;

(r)   Liens arising out of all presently existing and future division and transfer orders, advance payment agreements, processing contracts, gas processing plant agreements, operating agreements, gas balancing or deferred production agreements, pooling, unitization or communitization agreements, pipeline, gathering or transportation agreements, platform agreements, cycling agreements, construction agreements, shared facilities agreements, salt water or other disposal agreements, leases or rental agreements, farm-out and farm-in agreements, development agreements, and any and all other contracts or agreements covering, arising out of, used or useful in connection with or pertaining to the development, operation, production, sale, use, purchase, exchange, storage, separation, dehydration, treatment, compression, gathering, transportation, processing, improvement, marketing, disposal or handling of any property of the Borrower and its Significant Subsidiaries, provided that such agreements are entered into in the ordinary course of business;

63

(s)    Liens on assets of PG&E Utility and any of its Significant Subsidiaries to the extent not prohibited by the PG&E Utility Revolving Credit Agreement;

(t)    Liens securing Indebtedness permitted pursuant to Sections 7.1(c) and Section 7.1(i); provided that either (i) such Lien ranks junior to the Lien securing the Obligations pursuant to an intercreditor agreement reasonably satisfactory to the Collateral Agent, (ii) such Lien ranks equally and ratably with the Lien securing the Obligations pursuant to the Pledge Agreement (but in no event shall any such Lien have priority equal to or higher than the Obligations under the Priority Waterfall) or (iii) solely with respect to Liens securing Indebtedness permitted pursuant to Section 7.1(i), such Lien is secured only by assets that are not Collateral; and

(u)    other Liens securing Indebtedness and other obligations in an aggregate outstanding amount not to exceed $10,000,000 at any one time.

7.4    <u>Sale and Lease Back Transactions</u>. Enter into any arrangement, directly or indirectly, with any Person whereby it shall sell or transfer any property having fair market value in excess of $10,000,000, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property being sold or transferred, except for (a) those transactions by PG&E Utility and any of its Significant Subsidiaries to the extent not prohibited by the PG&E Utility Revolving Credit Agreement, (b) those transactions described on Schedule 7.4 and (c) any other sale of any fixed or capital assets that is made for cash consideration; provided that, in each case, if such sale and leaseback results in a Capital Lease Obligation, such Capital Lease Obligation is permitted by Section 7.1 and any Lien made the subject of such Capital Lease Obligation is permitted by Section 7.3.

7.5    <u>Investments</u>. Purchase, hold or acquire (including pursuant to any merger, consolidation or amalgamation with a Person immediately prior to such merger, consolidation or amalgamation) any Capital Stock, evidences of Indebtedness or other securities of, make or permit to exist any loans or advances to or guarantees of the obligations of, or make or permit to exist any investment or any other interest in any other Person or purchase or acquire (in one transaction or a series of transactions) all or substantially all of the property and assets or business of another Person or assets constituting a business unit, line of business or division of such Person (each, an "<u>Investment</u>"), except:

(a)    Investments in any Subsidiary of the Borrower;

(b)    Swap Agreements permitted under Section 7.13;

(c)    Permitted Cash Equivalents;

(d)    Investments (i) constituting deposits, prepayments and/or other credits to suppliers, (ii) made in connection with obtaining, maintaining or renewing client and customer contracts and/or (iii) in the form of advances made to distributors, suppliers, licensors and licensees, in each case, in the ordinary course of business or, in the case of clause (iii) to the extent necessary to maintain the ordinary course of supplies;

64

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 984 of 1367

(e)  Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business;

(f)  Investments (including Indebtedness and Capital Stock) received (i) in connection with the bankruptcy or reorganization of any Person, (ii) in settlement of delinquent obligations of, or other disputes with, customers, suppliers and other account debtors arising in the ordinary course of business, (iii) upon foreclosure with respect to any secured Investment or other transfer of title with respect to any secured Investment and/or (iv) as a result of the settlement, compromise or resolution of litigation, arbitration or other disputes;

(g)  Investments consisting of the licensing of intellectual property rights pursuant to joint marketing arrangements with other Persons entered into in the ordinary course of business;

(h)  loans and advances not to exceed $25,000,000 in the aggregate outstanding at any one time to officers, directors, employees and consultants for reasonable and customary business-related travel, entertainment, relocation and analogous ordinary business purposes (including employee payroll advances);

(i)  Investments constituting non-cash proceeds of Dispositions of assets to the extent received in a Disposition permitted by Section 7.7;

(j)  Investments relating to decommission trusts and insurance and self-insurance organizations or arrangements in the ordinary course of business;

(k)  Investments required to comply with any requirement of a Governmental Authority or a Requirement of Law; and

(l)  other Investments in an aggregate amount at any time outstanding not to exceed $100,000,000 if at the time of and immediately after giving effect to such Investment, (i) no Default shall have occurred and be continuing and (ii) the Borrower shall be in pro forma compliance with the financial covenants set forth in Section 7.2 (whether or not in effect, and, prior to the first test date thereunder, assuming the level applicable on such first date applies as of the date of such pro forma test) as of the last day of the most recently ended fiscal quarter for which financial statements have been delivered pursuant to Section 6.1 (such compliance to be determined as though such Investment had been consummated as of the first day of such fiscal quarter).

7.6  <u>Fundamental Changes</u>. Enter into any merger, consolidation or amalgamation, or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), or Dispose of all or substantially all of its property or business, except that the Borrower may be merged, consolidated or amalgamated with another Person or Dispose of all or substantially all of its property or business so long as, after giving effect to such transaction, (a) no Default or Event of Default shall have occurred and be continuing, (b) either (i) the Borrower is the continuing or surviving corporation of such merger, consolidation or amalgamation or (ii) the continuing or surviving corporation of such merger, consolidation or amalgamation, if not the Borrower or the purchaser, (x) shall be an entity organized or existing under the laws of the United States, any state thereof or the District of Columbia, (y) shall have assumed all obligations of the Borrower under the Loan Documents pursuant to arrangements reasonably satisfactory to the Administrative Agent and (z) to the extent

65

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 985 of 1367

requested by the Administrative Agent or any Lender, shall have promptly provided to the Administrative Agent or such Lender all documentation and other information that may be required by the Administrative Agent or such Lender in order to enable compliance with applicable "know-your-customer" and anti-money laundering rules and regulations, including information required by the Patriot Act and the Beneficial Ownership Regulation and (c) the ratings by Moody's and S&P of the continuing or surviving corporation's or purchaser's senior secured debt shall be at least the higher of (1) Baa3 from Moody's and BBB- from S&P and (2) the ratings by such rating agencies of the Borrower's senior secured debt in effect before the earlier of the occurrence or the public announcement of such event.

7.7    <u>Dispositions</u>. Dispose of (in one transaction or a series of transactions) any property or Dispose of any Capital Stock of any Subsidiary, except:

(a)    Dispositions of property to a wholly-owned Subsidiary;

(b)    Dispositions of surplus, obsolete or worn out property, or property that is no longer useful, useable or economically viable in the conduct of the business;

(c)    Dispositions of inventory in the ordinary course of business;

(d)    Dispositions of property (other than Collateral) having a fair market value not to exceed $25,000,000 (or the equivalent in any other currency) in the aggregate during the term of this Agreement;

(e)    Dispositions to the extent that (i) the relevant property subject to such Disposition is exchanged for, or for credit against the purchase price of, similar replacement property or (ii) the proceeds of the relevant Disposition are promptly applied to the purchase price of such replacement property;

(f)    Dispositions of property subject to foreclosure, casualty, eminent domain or condemnation proceedings (including in lieu thereof or any similar proceeding);

(g)    [Reserved];

(h)    Dispositions required to comply with any requirement of a Governmental Authority or a Requirement of Law;

(i)    Dispositions of cash and/or cash equivalents (including Permitted Cash Equivalents) in the ordinary course of business;

(j)    Dispositions of assets for the purpose of charitable contributions or similar gifts to the extent such assets are not material to the ability of the Borrower and its Subsidiaries, taken as a whole, to conduct its business;

(k)    Dispositions permitted pursuant to Section 7.4 or Section 7.6;

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 986 of 1367

(l)   Dispositions of accounts receivable in connection with the collection or compromise thereof in the ordinary course of business, in an aggregate amount not to exceed $50,000,000 in any fiscal year;

(m)   any other Disposition of any property in the ordinary course of business; provided that (i) the consideration for such Disposition shall be at least equal to the fair market value of such property at the time of such Disposition, (ii) at least 75% of such consideration shall be in cash and/or cash equivalents and (iii) the aggregate amount (based upon the fair market value of such property) of all property sold or otherwise disposed pursuant to all such Dispositions on and after the Effective Date at the time of and after giving effect to any such Disposition does not exceed $10,000,000.

7.8   <u>Change in Nature of Business</u>. Notwithstanding any other provisions hereof, engage at any time in any business or business activity other than any business or business activity conducted by any of them on the date hereof and any business or business activity incidental or related thereto, or any business or business activity that is reasonably similar thereto or a reasonable extension, development or expansion thereof or ancillary thereto.

7.9   <u>Transactions with Affiliates</u>. Sell or transfer any property or assets to, or purchase or acquire any property or assets from, or otherwise engage in any other transaction with any of its Affiliates; provided that this Section 7.9 shall not prohibit:

(a)   any transaction among the Borrower and its Subsidiaries;

(b)   transactions in existence on the Effective Date and set forth on Schedule 7.9;

(c)   transactions otherwise permitted under Section 7.1 (other than Section 7.1(r)), Section 7.5, Section 7.6, Section 7.7 (other than Section 7.7(m)) and Section 7.12;

(d)   employment and severance arrangements (including equity incentive plans and employee benefit plans and arrangements) with their respective officers and employees in the ordinary course of business;

(e)   payment of customary fees and reasonable out of pocket costs to, and indemnities for the benefit of, directors, officers and employees in the ordinary course of business;

(f)   any transaction or series of related transactions with an aggregate value or payment of $10,000,000 or less; and

(g)   any transaction on terms that are no less favorable to the Borrower or such Significant Subsidiary than could be obtained at the time in a comparable arm's length transaction from a Person who is not an Affiliate.

7.10   <u>Burdensome Agreements</u>. Directly or indirectly, create or otherwise cause or suffer to exist or become effective any encumbrance or restriction on the ability of any Subsidiary to (a) pay dividends or make other distributions on its Capital Stock owned by the Borrower or any Subsidiary, or pay any Indebtedness owed to the Borrower or any Subsidiary (other than customary limits imposed by corporate law and fraudulent conveyance statutes), (b) make loans or advances

67

to the Borrower or (c) transfer any of its assets or properties to the Borrower, except for such encumbrances or restrictions existing by reason of or under (i) any requirement of a Governmental Authority or a Requirement of Law, (ii) this Agreement and the other Loan Documents, (iii) customary restrictions with respect to a Subsidiary pursuant to an agreement that has been entered into for the sale or disposition of all or substantially all of the Capital Stock of such Subsidiary and (iv) restrictions binding on any Subsidiary on the date it becomes a Subsidiary, provided such restrictions were not created in contemplation of such Person becoming a Subsidiary.

7.11    Use of Proceeds. Use the proceeds of the Loans in any manner other than as described in Section 4.12.

7.12    Restricted Payments. (a) Declare or pay any dividend or make any other distribution (by reduction of capital or otherwise), whether in cash, property, securities or a combination thereof, with respect to any Capital Stock of the Borrower, or (b) directly or indirectly redeem, purchase, retire, obtain the surrender of or otherwise acquire for value (or permit any Subsidiary to purchase or acquire) any Capital Stock of the Borrower or set aside any amount for any such purpose (all of the foregoing, "Restricted Payments"), except:

(i)    the Borrower may make any Restricted Payment required under the Plan of Reorganization as set forth on Schedule 7.12;

(ii)    the Borrower may pay any dividend or consummate any redemption within 60 days after the date of the declaration thereof or the provision of a redemption notice with respect thereto, as the case may be, if at the date of such declaration or notice, the dividend or redemption notice would have complied with this Section 7.12;

(iii)    the Borrower may declare and make dividend payments or other distributions payable solely in the common Capital Stock of the Borrower;

(iv)    the Borrower may purchase, redeem or otherwise acquire Capital Stock issued by it (A) with the proceeds received from the substantially concurrent issue of new shares of its common Capital Stock or (B) upon the exercise of stock options or warrants if such Capital Stock represents a portion of the exercise price of such options or warrants; and

(v)    the Borrower may make any other Restricted Payment or incur any other obligation (contingent or otherwise) to do so provided that, at the time and after giving effect thereto, (A) no Default shall have occurred and be continuing and (B) the Borrower shall be in pro forma compliance with the financial covenants set forth in Section 7.2 (whether or not in effect, and, prior to the first test date thereunder, assuming the level applicable on such first date applies as of the date of such pro forma test) as of the last day of the most recently ended fiscal quarter for which financial statements have been delivered pursuant to Section 6.1.

7.13    Swap Agreements. Enter into any Swap Agreement, other than Swap Agreements entered into not for speculative purposes (a) to hedge or mitigate risks to which the Borrower and its Subsidiaries are exposed in the conduct of its business or the management of its liabilities (including, without limitation, raw material, commodities, fuel, electricity or other supply costs and currency risks), (b) to effectively cap, collar or exchange interest rates (from fixed to floating rates, from one floating rate to another floating rate or fixed rate or otherwise) with respect to any

68

interest bearing Indebtedness of the Borrower and its Subsidiaries permitted by this Agreement, (c) to swap currency in connection with funding the business of the Borrower and its Subsidiaries in the ordinary course of business or (d) entered into in connection with any A/R Securitization Transaction.

7.14   Ownership of PG&E Utility Common Stock. Permit ownership by the Borrower, at any time, either directly, or indirectly through one or more Subsidiaries, of less than 100% of the outstanding common stock of PG&E Utility.

SECTION 8.   EVENTS OF DEFAULT

If any of the following events shall occur and be continuing on or after the Effective Date:

(a)   the Borrower shall fail to pay any principal of any Loan when due in accordance with the terms hereof; or the Borrower shall fail to pay any interest on any Loan or any other amount payable hereunder or under any other Loan Document, within five Business Days after any such interest or other amount becomes due in accordance with the terms hereof; or

(b)   any representation or warranty made or deemed made by the Borrower herein or in any other Loan Document or that is contained in any certificate, document or financial or other statement furnished by it at any time under or in connection with this Agreement or any such other Loan Document shall prove to have been inaccurate in any material respect on or as of the date made or deemed made, unless, as of any date of determination, the facts or circumstances to which such representation or warranty relates have changed with the result that such representation or warranty is true and correct in all material respects on such date; or

(c)   the Borrower shall default in the observance or performance of any agreement contained in Section 6.4(a)(i), Section 6.7(a), Section 7 (other than Section 7.4 and 7.13) of this Agreement; or

(d)   the Borrower shall default in the observance or performance of any other agreement contained in this Agreement or any other Loan Document (other than as provided in paragraphs (a) through (c) of this Section), and such default shall continue unremedied for a period of 30 days after notice to the Borrower from the Administrative Agent at the request of the Required Lenders; or

(e)   the Borrower or any of its Significant Subsidiaries shall (i) default in making any payment of any principal of any Indebtedness (including any Guarantee Obligation, but excluding the Loans) on the due date with respect thereto (after giving effect to any period of grace, if any, provided in the instrument or agreement under which such Indebtedness was created); or (ii) default in making any payment of any interest on any such Indebtedness beyond the period of grace, if any, provided in the instrument or agreement under which such Indebtedness was created; or (iii) default in the observance or performance of any other agreement or condition relating to any such Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist, the effect of which default or other event or condition is to cause, or (in the case of all Indebtedness other than Indebtedness under any Swap Agreement) to permit the holder or beneficiary of such Indebtedness (or a trustee

69

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 989 of 1367

or agent on behalf of such holder or beneficiary) to cause, with the giving of notice if required, such Indebtedness to become due prior to its stated maturity or (in the case of any such Indebtedness constituting a Guarantee Obligation) to become payable; provided, that a default, event or condition described in clause (i), (ii) or (iii) of this paragraph (e) shall not at any time constitute an Event of Default unless, at such time, one or more defaults, events or conditions of the type described in clauses (i), (ii) and (iii) of this paragraph (e) shall have occurred and be continuing with respect to Indebtedness the outstanding principal amount of which exceeds in the aggregate $200,000,000; provided further, that unless payment of the Loans hereunder has already been accelerated, if such default shall be cured by the Borrower or such Significant Subsidiary or waived by the holders of such Indebtedness and any acceleration of maturity having resulted from such default shall be rescinded or annulled, in each case, in accordance with the terms of such agreement or instrument, without any modification of the terms of such Indebtedness requiring the Borrower or such Significant Subsidiary to furnish security or additional security therefor, reducing the average life to maturity thereof or increasing the principal amount thereof, or any agreement by the Borrower or such Significant Subsidiary to furnish security or additional security therefor or to issue in lieu thereof Indebtedness secured by additional or other collateral or with a shorter average life to maturity or in a greater principal amount, then any Default hereunder by reason thereof shall be deemed likewise to have been thereupon cured or waived; or

(f)   (i) the Borrower or any of its Significant Subsidiaries shall commence any case, proceeding or other action (A) under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it as a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding up, liquidation, dissolution, composition or other relief with respect to it or its debts, or (B) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for it or for all or any substantial part of its assets, or the Borrower or any of its Significant Subsidiaries shall make a general assignment for the benefit of its creditors; or (ii) there shall be commenced against the Borrower or any of its Significant Subsidiaries any case, proceeding or other action of a nature referred to in clause (i) above that (A) results in the entry of an order for relief or any such adjudication or appointment or (B) remains undismissed, undischarged or unbonded for a period of 60 days; or (iii) there shall be commenced against the Borrower or any of its Significant Subsidiaries any case, proceeding or other action seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of its assets that results in the entry of an order for any such relief that shall not have been vacated, discharged, or stayed or bonded pending appeal within 60 days from the entry thereof; or (iv) the Borrower or any of its Significant Subsidiaries shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due; or

(g)   there occurs any ERISA Event that, individually or in the aggregate, would reasonably be expected to result in a Material Adverse Effect; or

(h)   one or more judgments or decrees shall be entered against the Borrower or any of its Significant Subsidiaries by a court of competent jurisdiction involving in the aggregate a liability (not paid or, subject to customary deductibles, fully covered by insurance as to which the relevant insurance company has not denied coverage) of $200,000,000 or more, and all such judgments or decrees shall not have been vacated, discharged, stayed or bonded pending appeal

within 45 days from the entry thereof unless, in the case of a discharge, such judgment or decree is due at a later date in one or more payments and the Borrower or such Significant Subsidiary satisfies the obligation to make such payment or payments on or prior to the date such payment or payments become due in accordance with such judgment or decree;

(i)   there shall have occurred a Change of Control; or

(j)   (i) any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder or satisfaction in full of all the Obligations, ceases to be in full force and effect, (ii) the Borrower contests in any manner in writing the validity or enforceability of any such Loan Document or the validity or perfection of any Lien on any Collateral purported to be covered by the Pledge Agreement, (iii) the Borrower denies in writing that it has any or further liability or obligation under any such Loan Document, or purports in writing to revoke, terminate or rescind any such Loan Document, (iv) with respect to the Pledge Agreement, the Collateral Agent shall not have or shall cease to have a valid and perfected Lien in the Collateral purported to be covered by the Pledge Agreement with the priority required by the Pledge Agreement.

then, and in any such event, (A) if such event is an Event of Default specified in clause (i) or (ii) of paragraph (f) above with respect to the Borrower, automatically the Commitments shall immediately terminate and the Loans (with accrued interest thereon) and all other amounts owing under this Agreement and the other Loan Documents shall immediately become due and payable, and (B) if such event is any other Event of Default, either or both of the following actions may be taken: (i) with the consent of the Required Lenders, the Administrative Agent may, or upon the request of the Required Lenders, the Administrative Agent shall, by notice to the Borrower declare the Commitments to be terminated forthwith, whereupon the Commitments shall immediately terminate; and (ii) with the consent of the Required Lenders, the Administrative Agent may, or upon the request of the Required Lenders, the Administrative Agent shall, by notice to the Borrower, declare the Loans (with accrued interest thereon) and all other amounts owing under this Agreement and the other Loan Documents to be due and payable forthwith, whereupon the same shall immediately become due and payable. Except as expressly provided above in this Section, presentment, demand, protest and all other notices of any kind are hereby expressly waived by the Borrower.

### SECTION 9.   THE AGENTS

9.1   <u>Appointment and Authority</u>. Each of the Lenders hereby irrevocably appoints JPMorgan Chase Bank, N.A. to act on its behalf as the Administrative Agent and as the Collateral Agent hereunder and under the other Loan Documents and authorizes each Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto. The provisions of this Section 9 are solely for the benefit of the Agents, the Lenders, and the Borrower shall not have rights as a third-party beneficiary of any of such provisions (other than with respect to the Borrower's rights under Sections 9.9(a) and (b)). It is understood and agreed that the use of the term "agent" herein or in any other Loan Documents (or any other similar term) with reference to any Agent is not intended to connote any fiduciary or other implied (or

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 991 of 1367

express) obligations arising under agency doctrine of any applicable law. Instead such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties.

9.2    Delegation of Duties. The Administrative Agent and Collateral Agent may each perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by it. The Administrative Agent, the Collateral Agent and any such sub-agent may each perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties. The exculpatory provisions of this Section shall apply to any such sub-agent and to the Related Parties of the Administrative Agent, the Collateral Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent and the Collateral Agent. Neither the Administrative Agent nor the Collateral Agent shall be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and nonappealable judgment that such Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

9.3    Exculpatory Provisions.

(a)    No Agent shall have any duties or obligations except those expressly set forth herein and in the other Loan Documents, and its duties hereunder shall be administrative in nature. Without limiting the generality of the foregoing, no Agent:

(i)    shall be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(ii)    shall have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that an Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents); provided that no Agent shall be required to take any action that, in its opinion or the opinion of its counsel, may expose such Agent to liability or that is contrary to any Loan Document or applicable law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Debtor Relief Law or that may effect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Debtor Relief Law; and

(iii)    shall, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Affiliates that is communicated to or obtained by the Person serving as an Agent or any of its Affiliates in any capacity.

(b)    No Agent shall be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as such Agent shall believe in good faith shall be necessary, under the circumstances as provided in Sections 10.1 and 8), or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction by final and nonappealable judgment.

72

(c)    No Agent shall be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default or Event of Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in Section 5 or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to such Agent.

9.4    <u>Reliance by Agents</u>. The Administrative Agent and the Collateral Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. The Administrative Agent and the Collateral Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Loan, that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Loan. The Administrative Agent and the Collateral Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

9.5    <u>Notice of Defaul</u>t. Neither the Administrative Agent nor the Collateral Agent shall be deemed to have knowledge or notice of the occurrence of any Default or Event of Default unless the Administrative Agent or the Collateral Agent, as applicable, has received notice from a Lender or the Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default". In the event that the Administrative Agent receives such a notice, the Administrative Agent shall give notice thereof to the Lenders and the Collateral Agent. The Administrative Agent and the Collateral Agent shall each take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders (or, if so specified by this Agreement, all Lenders); <u>provided</u> that unless and until such Agent shall have received such directions, such Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of the Lenders.

9.6    <u>Non-Reliance on Agents and Other Lenders</u>. Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent, the Collateral Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 993 of 1367

Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent, the Collateral Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder. Except for notices, reports and other documents expressly required to be furnished to the Lenders by the Administrative Agent or the Collateral Agent hereunder, neither the Administrative Agent nor the Collateral Agent shall have any duty or responsibility to provide any Lender with any credit or other information concerning the business, operations, property, condition (financial or otherwise), prospects or creditworthiness of the Borrower or any of its Affiliates that may come into the possession of such Agent or any of its officers, directors, employees, agents, attorneys in fact or Affiliates.

9.7    Indemnification. The Lenders agree to indemnify each Agent in its capacity as such (to the extent not reimbursed by the Borrower and without limiting the obligation of the Borrower to do so), ratably according to their respective Percentages in effect on the date on which indemnification is sought under this Section (or, if indemnification is sought after the date upon which the Commitments shall have terminated and the Loans shall have been paid in full, ratably in accordance with such Percentages immediately prior to such date), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time (whether before or after the payment of the Loans) be imposed on, incurred by or asserted against such Agent in any way relating to or arising out of, the Commitments, this Agreement, any of the other Loan Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by such Agent under or in connection with any of the foregoing; provided that no Lender shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements that are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from such Agent's gross negligence or willful misconduct.

9.8    Agent in Its Individual Capacity. Each Person serving as an Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not an Agent, and the terms "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include such Person serving as an Agent hereunder in its individual capacity. Such Person and its Affiliates may accept deposits from, lend money to, own securities of, act as the financial advisor or in any other advisory capacity for, and generally engage in any kind of business with, the Borrower or any Subsidiary or other Affiliate thereof as if such Person were not an Agent hereunder and without any duty to account therefor to the Lenders.

9.9    Successor Agents.

(a)    Each of the Administrative Agent and the Collateral Agent may resign upon 10 days' notice to the Lenders and the Borrower. If either such Agent shall so resign under this Agreement and the other Loan Documents, then the Required Lenders shall appoint from among the Lenders a successor agent for the Lenders, which successor agent shall (unless an Event of Default under Section 8(f) with respect to the Borrower shall have occurred and be continuing) be

74

subject to approval by the Borrower (which approval shall not be unreasonably withheld, conditioned or delayed), whereupon such successor agent shall succeed to the rights, powers and duties of the Administrative Agent or the Collateral Agent, as applicable,, and the term "Administrative Agent" or "Collateral Agent", as applicable, shall mean such successor agent effective upon such appointment and approval, and the former Agent's rights, powers and duties as Administrative Agent or Collateral Agent, as applicable, shall be terminated, without any other or further act or deed on the part of such former Agent or any of the parties to this Agreement or any holders of the Loans. If no successor agent has accepted appointment as Administrative Agent or Collateral Agent, as applicable, by the date that is 10 days following a retiring Agent's notice of resignation (the "Resignation Effective Date"), the retiring Agent's resignation shall nevertheless thereupon become effective, and the Lenders shall assume and perform all of the duties of the Administrative Agent or Collateral Agent, as applicable, hereunder until such time, if any, as the Required Lenders appoint a successor agent as provided for above. After any retiring Agent's resignation as Administrative Agent or Collateral Agent, as applicable, the provisions of Section 9.7 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was an Agent under this Agreement and the other Loan Documents.

(b)    If the Person serving as Administrative Agent or Collateral Agent is a Defaulting Lender pursuant to clause (e) of the definition thereof, the Required Lenders may, to the extent permitted by applicable law, by notice in writing to the Borrower and such Person remove such Person as Administrative Agent or Collateral Agent and, shall appoint a successor, subject to the approval of the Borrower (unless an Event of Default under Section 8(f) with respect to the Borrower shall have occurred and be continuing), which approval shall not be unreasonably withheld, conditioned or delayed. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days (or such earlier day as shall be agreed by the Required Lenders) (the "Removal Effective Date"), then such removal shall nonetheless become effective in accordance with such notice on the Removal Effective Date.

(c)    With effect from the Resignation Effective Date or the Removal Effective Date (as applicable) (i) the retiring or removed Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any Collateral held by the Collateral Agent on behalf of the Lenders under any of the Loan Documents, the retiring or removed Collateral Agent shall continue to hold such Collateral until such time as a successor Collateral Agent is appointed) and (ii) except for any indemnity payments or other amounts then owed to the retiring or removed Administrative Agent or Collateral Agent, all payments, communications and determinations provided to be made by, to or through the Administrative Agent or Collateral Agent shall instead be made by or to each Lender directly, until such time, if any, as the Required Lenders appoint a successor Administrative Agent or Collateral Agent as provided for above. Upon the acceptance of a successor's appointment as Administrative Agent or Collateral Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring or removed Agent (other than any rights to indemnity payments or other amounts owed to the retiring or removed Agent as of the Resignation Effective Date or the Removal Effective Date (as applicable)), and the retiring or removed Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents. The fees payable by the Borrower to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After the retiring or removed Agent's resignation or removal hereunder and under the other Loan

75

Documents, the provisions of this Section and Sections 2.17 and 10.5 shall continue in effect for the benefit of such retiring or removed Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring or removed Agent was acting as Agent.

9.10    Documentation Agents and Syndication Agents. None of the Documentation Agents or the Syndication Agents shall have any duties or responsibilities hereunder in its capacity as such.

9.11    Administrative Agent May File Proofs of Claim. In case of the pendency of any proceeding under any Debtor Relief Law, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:

(a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other document as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent under Sections 2.6, 2.17 and 10.5) allowed in such judicial proceeding; and

(b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under Sections 2.6, 2.17 and 10.5.

9.12    Collateral Matters.

(a)    Each of the Lenders irrevocably authorize the Collateral Agent, at its option and in its discretion, to release any Lien on any property granted to or held by the Collateral Agent under any Loan Document in accordance with the terms of Section 10.21. Upon request by the Collateral Agent at any time, the Required Lenders will confirm in writing the Collateral Agent's authority to release its Liens in accordance with this Section 9.12.

(b)    Each of the Lenders irrevocably authorize the Collateral Agent and/or the Administrative Agent, at its option and in its discretion, to enter into any amendment, amendment and restatement, modification, supplement or waiver of any Loan Document, or enter into any new agreement or instrument, to effect the granting, perfection, protection, expansion or enhancement of any security interest in any Collateral or additional property to become Collateral for the benefit

76

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 996 of 1367

of the Secured Parties, and to give effect to any intercreditor agreement reasonably satisfactory to the Collateral Agent or Administrative Agent associated therewith, or as required by local law to give effect to, or protect, any security interest for the benefit of the Secured Parties in any property or so that the security interests therein comply with applicable law or this Agreement or in each case to otherwise enhance the rights or benefits of any Lender under any Loan Document.

(c) The Administrative Agent and/or the Collateral Agent shall not be responsible for or have a duty to ascertain or inquire into any representation or warranty regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of the Collateral Agent's Lien thereon, or any certificate prepared by the Borrower in connection therewith, nor shall the Administrative Agent or the Collateral Agent be responsible or liable to the Lenders for any failure to monitor or maintain any portion of the Collateral.

9.13    Credit Bidding. The Secured Parties hereby irrevocably authorize each of the Administrative Agent and the Collateral Agent, at the direction of the Required Lenders, to credit bid all or any portion of the Obligations (including by accepting some or all of the Collateral in satisfaction of some or all of the Obligations pursuant to a deed in lieu of foreclosure or otherwise) and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral (a) at any sale thereof conducted under the provisions of the Bankruptcy Code, including under sections 363, 1123 or 1129 of the Bankruptcy Code, or any similar laws in any other jurisdictions to which the Borrower is subject, or (b) at any other sale or foreclosure or acceptance of collateral in lieu of debt conducted by (or with the consent or at the direction of) the Administrative Agent or Collateral Agent (whether by judicial action or otherwise) in accordance with any applicable law. In connection with any such credit bid and purchase, the Obligations owed to the Secured Parties shall be entitled to be, and shall be, credit bid by the Administrative Agent at the direction of the Required Lenders on a ratable basis (with Obligations with respect to contingent or unliquidated claims receiving contingent interests in the acquired assets on a ratable basis that would vest upon the liquidation of such claims in an amount proportional to the liquidated portion of the contingent claim amount used in allocating the contingent interests) in the asset or assets so purchased (or in the equity interests or debt instruments of the acquisition vehicle or vehicles that are used to consummate such purchase).

9.14    Intercreditor Agreement; Pledge Agreement. Each of the Lenders hereby authorize the Administrative Agent to enter into the Pledge Agreement and any other intercreditor agreement or arrangement permitted under this Agreement and the Lenders acknowledge that the Pledge Agreement and any other such intercreditor agreement shall be binding upon the Lenders. Notwithstanding anything herein to the contrary, (i) the Liens granted to the Administrative Agent pursuant to the Security Documents are expressly subject to the Pledge Agreement and any intercreditor agreement entered into pursuant hereto and (ii) the exercise of any right or remedy by the Administrative Agent hereunder or under the Pledge Agreement and any other intercreditor agreement entered into pursuant hereto is subject to the limitations and provisions of any intercreditor agreement entered into pursuant hereto. In the event of any conflict between the terms of the Pledge Agreement or any such intercreditor agreement and the terms of this Agreement, the terms of the Pledge Agreement or such intercreditor agreement shall govern.

77

9.15   Certain ERISA Matters.

(a)   Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent, and not, for the avoidance of doubt, to or for the benefit of the Borrower, that at least one of the following is and will be true:

(i)   such Lender is not using "plan assets" (within the meaning of Section 3(42) of ERISA or otherwise) of one or more Benefit Plans with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments or this Agreement,

(ii)   the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement,

(iii)   (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans, the Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement, or

(iv)   such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender.

(b)   In addition, unless either (1) sub-clause (i) in the immediately preceding clause (a) is true with respect to a Lender or (2) a Lender has provided another representation, warranty and covenant in accordance with sub-clause (iv) in the immediately preceding clause (a), such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent, and not, for the avoidance of doubt, to or for the benefit of the Borrower, that the Administrative Agent is not a fiduciary with respect to the assets of such Lender involved in such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, any Loan Document or any documents related hereto or thereto).

78

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 998 of 1367

# SECTION 10.   MISCELLANEOUS

10.1   <u>Amendments and Waivers</u>. Subject to Section 2.13(b) and (c), neither this Agreement, any other Loan Document, nor any terms hereof or thereof may be amended, supplemented or modified except in accordance with the provisions of this Section 10.1. The Required Lenders and the Borrower may, or, with the written consent of the Required Lenders, the Administrative Agent and the Borrower may, from time to time, (a) enter into written amendments, supplements or modifications hereto and to the other Loan Documents for the purpose of adding any provisions to this Agreement or the other Loan Documents or changing in any manner the rights of the Lenders or of the Borrower hereunder or thereunder or (b) waive, on such terms and conditions as the Required Lenders or the Administrative Agent, as the case may be, may specify in such instrument, any of the requirements of this Agreement or the other Loan Documents or any Default or Event of Default and its consequences; <u>provided</u>, <u>however</u>, that no such waiver and no such amendment, supplement or modification shall:

(i)   forgive the principal amount or extend the final scheduled date of maturity of any Loan, reduce the stated rate of any interest or fee payable hereunder (except in connection with the waiver of applicability of any post-default increase in interest rates (which waiver shall be effective with the consent of the Required Lenders)) or extend the scheduled date of any payment thereof, or increase the amount or extend the expiration date of any Lender's Commitment, in each case without the written consent of each Lender directly affected thereby (except that only the Lenders who are increasing their Commitments are required to consent to a request by the Borrower under Section 2.3 to increase the Total Commitments);

(ii)   eliminate or reduce the voting rights of any Lender under this Section 10.1 or Section 10.6(a)(i) without the written consent of such Lender;

(iii)   reduce any percentage specified in the definition of Required Lenders without the written consent of all Lenders;

(iv)   amend, modify or waive any provision of Section 2.14 or any similar provision in the Loan Documents related to <u>pro rata</u> treatment without the consent of each Lender directly affected thereby;

(v)   amend, modify or waive any provision of Section 9 without the written consent of the Administrative Agent and the Collateral Agent;

(vi)   amend, modify or waive the order of payments required by, or the scope of the Obligations receiving the benefit of or the scope of the proceeds or other amounts subject to the Priority Waterfall in a manner that by its terms adversely affects Loans and Obligations that have priority under the Priority Waterfall without the consent of each Lender holding such adversely affected Loans and Obligations;

(vii)   amend, modify or waive any provision of Section 5.1 without the written consent of all the Lenders; or

79

(viii)   release all or substantially all of the Collateral (except as expressly permitted hereunder or under the Security Documents) without the written consent of all the Lenders.

Any such waiver and any such amendment, supplement or modification shall apply equally to each of the Lenders and shall be binding upon the Borrower, the Lenders, the Administrative Agent and all future holders of the Loans. In the case of any waiver, the Borrower, the Lenders and the Administrative Agent shall be restored to their former position and rights hereunder and under the other Loan Documents, and any Default or Event of Default waived shall be deemed to be cured and not continuing; but no such waiver shall extend to any subsequent or other Default or Event of Default, or impair any right consequent thereon.

Notwithstanding anything to the contrary contained in this Section 10.1, if the Administrative Agent and the Borrower acting together identify any ambiguity, omission, mistake, typographical error or other defect in any provision of this Agreement or any other Loan Document, then the Administrative Agent and the Borrower shall be permitted to amend, modify or supplement such provision to cure such ambiguity, omission, mistake, typographical error or other defect, and any such amendment, modification or supplement shall become effective without any further action or consent of any other party to this Agreement.

If the Required Lenders shall have approved any amendment which requires the consent of all of the Lenders, the Borrower shall be permitted to replace any non-consenting Lender with another financial institution, provided that, (i) the replacement financial institution shall purchase at par, all Loans and other amounts owing to such replaced Lender on or prior to the date of replacement, (ii) the Borrower shall be liable to such replaced Lender under Section 2.17 if any Eurodollar Loan owing to such replaced Lender shall be purchased other than on the last day of the Interest Period relating thereto (as if such purchase constituted a prepayment of such Loans), (iii) such replacement financial institution, if not already a Lender, shall be reasonably satisfactory to the Administrative Agent, (iv) the replaced Lender shall be obligated to make such replacement in accordance with the provisions of Section 10.6 (provided that the Borrower shall be obligated to pay the registration and processing fee referred to therein) and (v) any such replacement shall not be deemed to be a waiver of any rights the Borrower, the Administrative Agent, the Collateral Agent or any other Lender shall have against the replaced Lender.

Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, supplement, modification, waiver or consent hereunder (and any amendment, supplement, modification, waiver or consent which by its terms requires the consent of all Lenders or each affected Lender may be effected with the consent of the applicable Lenders other than Defaulting Lenders), except that (i) (x) an increase or extension of the Commitment of such Defaulting Lender, or (y) any reduction of the amount of principal or interest owed to such Defaulting Lender shall, in each case, require the consent of such Defaulting Lender, and (ii) a Defaulting Lender's Percentage shall be taken into consideration along with the Percentage of non-Defaulting Lenders when voting to approve or disapprove any waiver, amendment or modification that by its terms affects any Defaulting Lender more adversely than other affected Lenders.

80

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 1000 of 1367

10.2    Notices.

(a)    All notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing (including by telecopy), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when delivered during the recipient's normal business hours, or three Business Days after being deposited in the mail, postage prepaid, or, in the case of telecopy notice, when received during the recipient's normal business hours, addressed as follows in the case of the Borrower, the Administrative Agent and the Collateral Agent, and as set forth in an administrative questionnaire delivered to the Administrative Agent in the case of the Lenders, or to such other address as may be hereafter notified by the respective parties hereto:

| | |
|---|---|
| Borrower: | PG&E Corporation |
| | P.O. Box 770000 |
| | San Francisco, California 94177 |
| | Attention: Treasurer |
| | Telecopy: (415) 973-8968 |
| | Telephone: (415) 973-8956 |
| | |
| with a copy to: | PG&E Corporation |
| | P.O. Box 770000 |
| | San Francisco, California 94177 |
| | Attention: General Counsel |
| | Telecopy: (415) 973-5520 |
| | |
| Administrative Agent: | JPMorgan Chase Bank, N.A. |
| | 500 Stanton Christiana Road |
| | NCC 5, 1st Floor |
| | Newark, DE 19713-2107 |
| | Attention: Mary Crews |
| | Telecopy: (302) 634-5758 |
| | Telephone: (302) 634-1417 |
| | Email: mary.crews@jpmorgan.com |
| | |
| Collateral Agent: | JPMorgan Chase Bank, N.A. |
| | CIB DMO WLO |
| | Mail code NY1-C413 |
| | 4 CMC, Brooklyn, NY, 11245-0001 |
| | United States |
| | Email: ib.collateral.services@jpmchase.com |

provided that any notice, request or demand to or upon the Administrative Agent or any Lender shall not be effective until received.

(b)    Notices and other communications to the Administrative Agent or the Lenders hereunder may be delivered or furnished by electronic communications pursuant to procedures approved by the Administrative Agent; provided that the foregoing shall not apply to notices pursuant to Section 2 unless otherwise agreed by the Administrative Agent and each Lender. The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications.

81

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 1001 of 1367

(c) Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient, at its e-mail address as described in the foregoing clause (i), of notification that such notice or communication is available and identifying the website address therefor; provided that, for both clauses (i) and (ii) above, if such notice, email or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient.

(d) (i) The Borrower agrees that the Administrative Agent may, but shall not be obligated to, make the Communications (as defined below) available to the other Lenders by posting the Communications on Debt Domain, Intralinks, Syndtrak or a substantially similar electronic transmission system (the "Platform").

(ii) The Platform is provided "as is" and "as available." The Agent Parties (as defined below) do not warrant the adequacy of the Platform and expressly disclaim liability for errors or omissions in the Communications. No warranty of any kind, express, implied or statutory, including, without limitation, any warranty of merchantability, fitness for a particular purpose, non-infringement of third-party rights or freedom from viruses or other code defects, is made by any Agent Party in connection with the Communications or the Platform. In no event shall the Administrative Agent or any of its Related Parties (collectively, the "Agent Parties") have any liability to the Borrower, any Lender or any other Person or entity for damages of any kind, including, without limitation, direct or indirect, special, incidental or consequential damages, losses or expenses (whether in tort, contract or otherwise) arising out of the Borrower's or the Administrative Agent's transmission of Communications through the Platform, except to the extent such liability resulted from the gross negligence or willful misconduct of the Administrative Agent or any of its Related Parties as determined by a court of competent jurisdiction in a final non-appealable judgment. "Communications" means, collectively, any notice, demand, communication, information, document or other material provided by or on behalf of the Borrower pursuant to any Loan Document or the transactions contemplated therein which is distributed to the Administrative Agent or any Lender by means of electronic communications pursuant to this Section, including through the Platform.

10.3 No Waiver; Cumulative Remedies. No failure to exercise and no delay in exercising, on the part of the Administrative Agent, the Collateral Agent or any Lender, any right, remedy, power or privilege hereunder or under the other Loan Documents shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

82

10.4  <u>Survival of Representations and Warranties</u>. All representations and warranties made hereunder, in the other Loan Documents and in any document, certificate or statement delivered pursuant hereto or in connection herewith shall survive the execution and delivery of this Agreement and the making of the Loans and other extensions of credit hereunder.

10.5  <u>Payment of Expenses and Taxes</u>. The Borrower agrees (a) to pay or reimburse the Administrative Agent, the Collateral Agent the Lenders for all their respective reasonable out of pocket costs and expenses incurred in connection with the development, preparation and execution of, and any amendment, supplement or modification to, this Agreement and the other Loan Documents and any other documents prepared in connection herewith or therewith, and the consummation of the transactions contemplated hereby and thereby, including the reasonable fees and disbursements of only one joint counsel and one joint special California counsel and, if necessary, one joint local counsel in each other relevant jurisdiction to the Administrative Agent and the Lenders (and in the case of an actual or perceived conflict of interest, one additional counsel for each applicable jurisdiction to each group of similarly situated affected persons) and filing and recording fees and expenses, with statements with respect to the foregoing to be submitted to the Borrower prior to the Effective Date (in the case of amounts to be paid on the Effective Date) and from time to time thereafter on a quarterly basis or such other periodic basis as the Administrative Agent shall deem appropriate, (b) to pay or reimburse each Lender, the Collateral Agent and the Administrative Agent for all its costs and expenses incurred in connection with the enforcement or preservation of its rights under this Agreement, the other Loan Documents and any such other documents, including the reasonable fees and disbursements of only one joint counsel, one joint special California counsel and, if necessary, one local counsel in each other relevant jurisdiction to the Administrative Agent and the Lenders (and in the case of an actual or perceived conflict of interest, one additional counsel for each applicable jurisdiction to each group of similarly situated affected persons), and (c) to pay, indemnify, and hold each Lender, the Collateral Agent, the Administrative Agent and their respective Affiliates and their respective officers, directors, employees and agents (each, an "<u>Indemnitee</u>") harmless from and against any and all other liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever whether brought by the Borrower or any other Person, with respect to the execution, delivery, enforcement and performance of, or arising out of or in connection with, this Agreement, the other Loan Documents and any such other documents, including any of the foregoing relating to the use of proceeds of the Loans or the violation of, noncompliance with or liability under, any Environmental Law directly or indirectly relating to the Borrower, its Significant Subsidiaries or any of the facilities and properties owned, leased or operated by the Borrower or its Significant Subsidiaries and the reasonable, documented and invoiced fees and expenses of one joint counsel and one joint special California counsel and, if necessary, one joint local counsel in each other relevant jurisdiction to the applicable Indemnitee (and in the case of an actual or perceived conflict of interest, one additional counsel for each applicable jurisdiction to each group of similarly situated affected persons), in connection with claims, actions or proceedings by any Indemnitee against the Borrower under any Loan Document (all the foregoing in this clause (c), collectively, the "<u>Indemnified Liabilities</u>"), provided, that the Borrower shall have no obligation hereunder to any Indemnitee with respect to Indemnified Liabilities to the extent such Indemnified Liabilities resulted from, as determined in a final non-appealable

83

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 1003 of 1367

judgment by a court of competent jurisdiction, (x) the gross negligence, bad faith or willful misconduct of such Indemnitee or its Affiliates, (y) the material breach of such Indemnitee's funding obligations hereunder or (z) a dispute amongst one or more Lenders not arising from the Borrower's breach of its obligations under the Loan Documents (other than a dispute involving a claim against an Indemnitee for its acts or omissions in its capacity as an arranger, bookrunner, agent or similar role in respect of the Loan Agreement, except, to the extent such acts or omissions are determined by a court of competent jurisdiction by a final and non-appealable judgment to have constituted the gross negligence, bad faith or willful misconduct of such Indemnitee in such capacity). Without limiting the foregoing, and to the extent permitted by applicable law, the Borrower agrees not to assert and to cause its Significant Subsidiaries not to assert, and hereby waives and agrees to cause its Significant Subsidiaries to waive, all rights for contribution or any other rights of recovery with respect to all claims, demands, penalties, fines, liabilities, settlements, damages, costs and expenses of whatever kind or nature, under or related to Environmental Laws, that any of them might have by statute or otherwise against any Indemnitee. All amounts due under this Section 10.5 shall be payable not later than 30 days after written demand therefor, subject to the Borrower's receipt of reasonably detailed invoices. Statements payable by the Borrower pursuant to this Section 10.5 shall be submitted to Treasurer (Telephone No. (415) 817-8199/(415) 267-7000) (Telecopy No. (415) 267-7265/7268), at the address of the Borrower set forth in Section 10.2(a) with a copy to Chief Counsel, Corporate (Telephone No. (415) 817-8200) (Telecopy No. (415) 817-8225), at the address of the Borrower set forth in Section 10.2(a), or to such other Person or address as may be hereafter designated by the Borrower in a written notice to the Administrative Agent. The agreements in this Section 10.5 shall survive for two years after repayment of the Loans and all other amounts payable hereunder. This Section 10.5 shall not apply with respect to Taxes, other than Taxes that represent claims, damages, losses, liabilities, costs or expenses arising from non-Tax claims.

10.6 <u>Successors and Assigns; Participations and Assignments</u>.

(a) The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section 10.6.

(b) (i) Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may assign to one or more assignees (each, an "<u>Assignee</u>") other than a Defaulting Lender, any Subsidiary of a Defaulting Lender, any natural person (or holding company, investment vehicle or trust for, or owned or operated by or for the primary benefit of, one or more natural persons), the Borrower or any of the Borrower's Affiliates or Subsidiaries, all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitments and the Loans at

84

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 1004 of 1367

the time owing to it) with the prior written consent (such consent not to be unreasonably withheld or delayed) of:

        (A)    the Borrower, provided that no consent of the Borrower shall be required for an assignment to a Lender (or an Affiliate of any Lender) or an Approved Fund or, if an Event of Default under Section 8(a), (e) or (f) has occurred and is continuing, any other Person, and provided further, that the Borrower shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Administrative Agent within ten (10) Business Days after having received notice thereof from the assigning Lender (with a copy to the Administrative Agent); and

        (B)    the Administrative Agent, provided that no consent of the Administrative Agent shall be required for an assignment of any Commitment or Loan to an Assignee that is a Lender (or an Affiliate of a Lender) with a Commitment or Loan immediately prior to giving effect to such assignment.

    (ii)    Assignments shall be subject to the following additional conditions:

        (A)    except in the case of an assignment to a Lender, an Eligible Assignee that is an Affiliate of any Lender or an assignment of the entire remaining amount of the assigning Lender's Commitments or Loans, the amount of the Commitments or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $10,000,000 (or, if such Assignee is an Eligible Assignee that is an Affiliate of a Lender, $5,000,000) unless each of the Borrower and the Administrative Agent otherwise consent, provided that (1) no such consent of the Borrower shall be required if an Event of Default has occurred and is continuing and (2) with respect to any Lender party to this Agreement on the Effective Date, such amounts shall be aggregated in respect of such Lender and any Affiliate of such Lender that is an Eligible Assignee;

        (B)    the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500; and

        (C)    the Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an administrative questionnaire.

In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the Assignee of participations or sub-participations, or other compensating actions, including funding, with the consent of the Borrower and the Administrative Agent, the applicable pro rata share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable Assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Administrative Agent or any Lender hereunder (and interest accrued thereon) and (y) acquire (and fund as appropriate) its full pro rata share of all Loans in accordance with its Percentage. Notwithstanding the foregoing, in the event that any assignment of rights and

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 1005 of 1367

obligations of any Defaulting Lender hereunder shall become effective under applicable law without compliance with the provisions of this paragraph, then the Assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

(iii)    Subject to acceptance and recording thereof pursuant to paragraph (b)(iv) below, from and after the effective date specified in each Assignment and Assumption the Assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, shall have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.15, 2.16, 2.17 and 10.5 but shall be subject to the limitations set forth therein); provided, that except to the extent otherwise expressly agreed by the affected parties, no assignment by a Defaulting Lender will constitute a waiver or release of any claim of any party hereunder arising from the Lender's having been a Defaulting Lender. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 10.6 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (c) of this Section.

(iv)    The Administrative Agent, acting for this purpose as a non-fiduciary agent of the Borrower (and such agency being solely to establish that the relevant obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations), shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amount of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive, in the absence of manifest error, and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(v)    Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an Assignee, the Assignee's completed administrative questionnaire (unless the Assignee shall already be a Lender hereunder), the processing and recordation fee referred to in paragraph (b) of this Section and any written consent to such assignment required by paragraph (b) of this Section, the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register. No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(c)    (i) Any Lender may, without the consent of the Borrower or the Administrative Agent, sell participations to one or more banks or other entities (other than a Defaulting Lender or

86

the Borrower or any of the Borrower's Affiliates or Subsidiaries) (a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitments and the Loans owing to it); provided that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) the Borrower, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver that (1) requires the consent of each Lender directly affected thereby pursuant to the proviso to the second sentence of Section 10.1 and (2) directly affects such Participant. Subject to paragraph (c)(ii) of this Section, the Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.15, 2.16 and 2.17 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section.

(ii)    Notwithstanding anything to the contrary herein, a Participant shall not be entitled to receive any greater payment under Section 2.15 or 2.16 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent to such greater payments. Any Participant that is a Foreign Lender shall not be entitled to the benefits of Section 2.16 unless such Participant complies with Section 2.16(e).

(iii)    Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(d)    Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or other central bank having jurisdiction over such Lender, and this Section shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or Assignee for such Lender as a party hereto.

87

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 1007 of 1367

(e)    The Borrower, upon receipt of written notice from the relevant Lender, agrees to issue Notes to any Lender requiring Notes to facilitate transactions of the type described in paragraph (d) above.

(f)    Notwithstanding the foregoing, any Conduit Lender may assign any or all of the Loans it may have funded hereunder to its designating Lender without the consent of the Borrower or the Administrative Agent and without regard to the limitations set forth in Section 10.6(b). Each of the Borrower, each Lender and the Administrative Agent hereby confirms that it will not institute against a Conduit Lender or join any other Person in instituting against a Conduit Lender any bankruptcy, reorganization, arrangement, insolvency or liquidation proceeding under any state bankruptcy or similar law, for one year and one day after the payment in full of the latest maturing commercial paper note issued by such Conduit Lender; provided, however, that each Lender designating any Conduit Lender hereby agrees to indemnify, save and hold harmless each other party hereto for any loss, cost, damage, expense, obligations, penalties, actions, judgments, suits or any kind whatsoever arising out of its inability to institute such a proceeding against such Conduit Lender during such period of forbearance.

(g)    Notwithstanding anything to the contrary in this Section, none of the Agents, in their capacity as Lenders, will assign without the consent of the Borrower, prior to the Effective Date, any of the Commitments held by them on the date of this Agreement.

(h)    Notwithstanding anything to the contrary in this Section 10.6, for the avoidance of doubt, Goldman Sachs Bank USA may assign any amount of its Commitments or Loans hereunder to Goldman Sachs Lending Partners LLC (or vice versa) without the prior written consent of any other Person.

10.7    Adjustments; Set off.

(a)    Except to the extent that this Agreement expressly provides for payments to be allocated to a particular Lender, if any Lender (a "Benefitted Lender") shall receive any payment of all or part of the Obligations owing to it hereunder, or receive any collateral in respect thereof (whether voluntarily or involuntarily, by set off, pursuant to events or proceedings of the nature referred to in Section 8(f), or otherwise), in a greater proportion than any such payment to or collateral received by any other Lender, if any, in respect of the Obligations owing to such other Lender hereunder, such Benefitted Lender shall purchase for cash from the other Lenders a participating interest in such portion of the Obligations owing to each such other Lender hereunder, or shall provide such other Lenders with the benefits of any such collateral, as shall be necessary to cause such Benefitted Lender to share the excess payment or benefits of such collateral ratably with each of the Lenders; provided, however, that if all or any portion of such excess payment or benefits is thereafter recovered from such Benefitted Lender, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery, but without interest. 8(f)

88

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 1008 of 1367

(b)   In addition to any rights and remedies of the Lenders provided by law, including other rights of set-off, each Lender shall have the right, without prior notice to the Borrower, any such notice being expressly waived by the Borrower to the extent permitted by applicable law, upon any amount becoming due and payable by the Borrower hereunder (whether at the stated maturity, by acceleration or otherwise), after any applicable grace period, to set off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by such Lender or any branch, Affiliate or agency thereof to or for the credit or the account of the Borrower; <u>provided</u>, that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 2.20 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent and the Lenders, and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff. Each Lender agrees promptly to notify the Borrower and the Administrative Agent after any such setoff and application made by such Lender, <u>provided</u> that the failure to give such notice shall not affect the validity of such setoff and application.

10.8   <u>Counterparts; Electronic Execution; Binding Effect</u>. This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument. Delivery of an executed signature page of this Agreement by facsimile transmission, emailed pdf. or any other electronic means that reproduces an image of the actual executed signature page shall be effective as delivery of an original executed counterpart hereof. The words "execution," "signed," "signature," "delivery," and words of like import in or relating to any document to be signed in connection with this Agreement and the transactions contemplated hereby shall be deemed to include an electronic sound, symbol, or process attached to, or associated with, a contract or other record and adopted by a Person with the intent to sign, authenticate or accept such contract or record, deliveries or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act; provided that nothing herein shall require the Administrative Agent to accept electronic signatures in any form or format without its prior written consent. Without limiting the generality of the foregoing, the Borrower hereby (i) agrees that, for all purposes, including without limitation, in connection with any workout, restructuring, enforcement of remedies, bankruptcy proceedings or litigation among the Administrative Agent and the Lenders, electronic images of this Agreement or any other Loan Documents (in each case, including with respect to any signature pages thereto) shall have the same legal effect, validity and enforceability as any paper original, and (ii) waives any argument, defense or right to contest the validity or enforceability of the Loan Documents based solely on the lack of paper original copies of any Loan Documents, including with respect to any signature pages thereto. This Agreement shall become binding on the parties hereto when it shall have been executed by the Administrative Agent and the Administrative Agent

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 1009 of 1367

shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

10.9    Severability. Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. Without limiting the foregoing provisions of this Section 10.9, if and to the extent that the enforceability of any provisions in this Agreement relating to Defaulting Lenders shall be limited by Debtor Relief Laws, as determined in good faith by the Administrative Agent, as applicable, then such provisions shall be deemed to be in effect only to the extent not so limited.

10.10    Integration. This Agreement and the other Loan Documents represent the entire agreement of the Borrower, the Administrative Agent, the Collateral Agent and the Lenders with respect to the subject matter hereof and thereof, and there are no promises, undertakings, representations or warranties by the Administrative Agent, the Collateral Agent or any Lender relative to the subject matter hereof not expressly set forth or referred to herein or in the other Loan Documents.

10.11    GOVERNING LAW. THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

10.12    Submission To Jurisdiction; Waivers. The Borrower hereby irrevocably and unconditionally:

(a)    submits for itself and its property in any legal action or proceeding relating to this Agreement and the other Loan Documents to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the non-exclusive jurisdiction of the United States District Court for the Southern District of New York sitting in the Borough of Manhattan (or if such court lacks subject matter jurisdiction, the Supreme Court of the State of New York sitting in the Borough of Manhattan), and any appellate court from any thereof;

(b)    consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(c)    agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to the Borrower at its address set forth in Section 10.2(a) or at such other address of which the Administrative Agent shall have been notified pursuant thereto;

(d)    agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law or shall limit the right to sue in any other jurisdiction; and

90

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 1010 of 1367

(e)  waives, to the maximum extent not prohibited by law, and agrees not to assert any right it may have to claim or recover in any legal action or proceeding relating to this Agreement or any other Loan Document any special, exemplary, punitive or consequential damages.

NOTHING IN THIS AGREEMENT OR IN ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT THE ADMINISTRATIVE AGENT, THE COLLATERAL AGENT OR ANY LENDER MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST THE BORROWER OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

10.13  <u>Acknowledgments</u>. The Borrower hereby acknowledges that:

(a)  it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Loan Documents;

(b)  none of the Administrative Agent, the Collateral Agent or any Lender has any fiduciary relationship with or duty to the Borrower arising out of or in connection with this Agreement or any of the other Loan Documents, and the relationship between Administrative Agent, the Collateral Agent and Lenders, on one hand, and the Borrower, on the other hand, in connection herewith or therewith is solely that of debtor and creditor; and

(c)  no joint venture is created hereby or by the other Loan Documents or otherwise exists by virtue of the transactions contemplated hereby among the Lenders or among the Borrower and the Lenders.

10.14  <u>Confidentiality</u>. Each of the Administrative Agent, the Collateral Agent and each Lender agrees to keep confidential in accordance with such party's customary practices (and in any event in compliance with applicable law regarding material non-public information) all non-public information provided to it by the Borrower, the Administrative Agent, the Collateral Agent or any Lender pursuant to or in connection with this Agreement that is designated by the provider thereof as confidential; provided that nothing herein shall prevent the Administrative Agent or any Lender from disclosing any such information (a) to the Administrative Agent, the Collateral Agent, any other Lender or any Affiliate thereof, (b) subject to an agreement to comply with the provisions of this Section or substantially equivalent provisions, to any actual or prospective Transferee, any direct or indirect counterparty to any Swap Agreement (or any professional advisor to such counterparty) or any credit insurance providers, (c) to its employees, directors, agents, attorneys, service providers, accountants and other professional advisors or those of any of its Affiliates (as long as such attorneys, service providers, accountants and other professional advisors are directed to comply with confidentiality requirements substantially equivalent to this Section), (d) upon the request or demand of any Governmental Authority, (e) in response to any order of any court or other Governmental Authority or as may otherwise be required pursuant to any Requirement of Law, (f) if requested or required to do so in connection with any litigation or similar proceeding, (g) that has been publicly disclosed, (h) to the National Association of Insurance Commissioners or any similar organization or any nationally recognized rating agency that requires access to information about a Lender's investment portfolio in connection with ratings issued with respect to such Lender, (i) in connection with the exercise of any remedy hereunder or

91

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 1011 of 1367

under any other Loan Document, (j) any rating agency in connection with rating of the Borrower or its Subsidiaries or the credit facilities provided hereunder or (k) to the extent such information (i) becomes available to the Administrative Agent, the Collateral Agent, any Lender or any of their respective Affiliates on a nonconfidential basis from a source other than the Borrower or its Subsidiaries or (ii) is independently discovered or developed by a party hereto without utilizing any information received from the Borrower or its Subsidiaries or violating the terms of this Section 10.14, provided that, in the case of clauses (d), (e) and (f) of this Section 10.14, with the exception of disclosure to bank regulatory authorities, the Borrower (to the extent legally permissible) shall be given prompt prior notice so that it may seek a protective order or other appropriate remedy.

10.15    WAIVERS OF JURY TRIAL. TO THE FULLEST EXTENT PERMITTED BY LAW, THE BORROWER, THE ADMINISTRATIVE AGENT AND THE LENDERS HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN.

10.16    USA Patriot Act; Beneficial Ownership Regulation. Each Lender hereby notifies the Borrower that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Patriot Act"), it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow such Lender to identify the Borrower in accordance with the Patriot Act.

10.17    Judicial Reference. If any action or proceeding is filed in a court of the State of California by or against any party hereto in connection with any of the transactions contemplated by this Agreement or any other Loan Document, (i) the court shall, and is hereby directed to, make a general reference pursuant to California Code of Civil Procedure Section 638 to a referee (who shall be a single active or retired judge) to hear and determine all of the issues in such action or proceeding (whether of fact or of law) and to report a statement of decision, provided that at the option of any party to such proceeding, any such issues pertaining to a "provisional remedy" as defined in California Code of Civil Procedure Section 1281.8 shall be heard and determined by the court, and (ii) without limiting the generality of Section 10.5, the Borrower shall be solely responsible to pay all fees and expenses of any referee appointed in such action or proceeding.

10.18    No Advisory or Fiduciary Responsibility. In connection with all aspects of each transactions contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), the Borrower acknowledges and agrees that: (i) (A) the arranging and other services regarding this Agreement provided by the Agents, the Arrangers and the Lenders are arm's-length commercial transactions between the Borrower, on the one hand, and the Agents, the Arrangers and the Lenders, on the other hand, (B) the Borrower has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (C) the Borrower is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (ii) (A) each Agent, Arranger and Lender is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for the Borrower or any other Person and (B) none of the Agents,

92

Arrangers or Lenders has any obligation to the Borrower or any of its Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (iii) the Agents, the Arrangers and the Lenders and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Borrower and its Affiliates, and none of the Agents, Arrangers or Lenders has any obligation to disclose any of such interests to the Borrower or its Affiliates. To the fullest extent permitted by law, the Borrower hereby waives and releases any claims that it may have against the Agents, the Arrangers and the Lenders with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby other than a breach of the confidentiality provisions set forth in Section 10.14.

10.19   Acknowledgement Regarding Any Supported QFCs.

(a)   To the extent that the Loan Documents provide support, through a guarantee or otherwise, for Swap Agreements or any other agreement or instrument that is a QFC (such support "QFC Credit Support" and each such QFC a "Supported QFC"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "U.S. Special Resolution Regimes") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or the United States or any other state of the United States):

(b)   In the event a Covered Entity that is party to a Supported QFC (each, a "Covered Party") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States. In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Loan Documents were governed by the laws of the United States or a state of the United States. Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support..

10.20   Acknowledgement and Consent to Bail-In of Affected Financial Institutions. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Affected Financial Institution arising under any Loan Document, to the extent such

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 1013 of 1367

liability is unsecured, may be subject to the Write-Down and Conversion Powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)   the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

(b)   the effects of any Bail-In Action on any such liability, including, if applicable:

(i)   a reduction in full or in part or cancellation of any such liability;

(ii)   a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)   the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of the applicable Resolution Authority.

10.21   Release of Liens.

(a)   Upon the termination of the Commitments and the payment in full in cash of the Obligations (other than contingent Obligations not yet due and payable), the Collateral shall be automatically released from any Liens created by the Security Documents.

(b)   The following Collateral shall be automatically released from the Liens created by the Security Documents without delivery of any instrument or performance of any act by any Person:

(i)   upon a Disposition of Collateral permitted hereunder or any other Loan Document to a Person other than the Borrower or its Subsidiaries, such Collateral; or

(ii)   upon the approval in writing by the Required Lenders of the release of the Liens on any Collateral not constituting all or substantially all of the Collateral, such Collateral.

(c)   In connection with the termination or release of Collateral from the Liens created by the Security Documents, the Collateral Agent shall (i) execute and deliver to the Borrower at the Borrower's expense, all documents that the Borrower shall reasonably request to evidence such termination or release and (ii) return to the Borrower, any possessory Collateral that is in the possession of the Collateral Agent and is the subject of such release (provided that, upon request by the Collateral Agent, the Borrower shall deliver to the Collateral Agent a certificate of a Responsible Officer certifying that such transaction has been or was consummated in compliance with the Loan Documents).

*[Remainder of page intentionally left blank. Signature pages follow.]*

94

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

PG&E CORPORATION

By: /s/ Margaret K. Becker
    Name: Margaret K. Becker
    Title: Senior Director and Treasurer

Signature Page to Credit Agreement
PG&E Corporation

JPMORGAN CHASE BANK, N.A.
as Administrative Agent and as a Lender

By: /s/ Jeffrey Miller
Name: Jeffrey Miller
Title: Executive Director

Signature Page to Credit Agreement
PG&E Corporation

JPMORGAN CHASE BANK, N.A.
as Collateral Agent

By:    /s/ Jeffrey Miller
Name:  Jeffrey Miller
Title:   Executive Director

Signature Page to Credit Agreement
PG&E Corporation

BANK OF AMERICA, N.A.
as a Lender

By:  /s/ Dee Dee Farkas
     Name: Dee Dee Farkas
     Title: Director

Signature Page to Credit Agreement
PG&E Corporation

BARCLAYS BANK PLC
as a Lender

By: /s/ Sydney G. Dennis
    Name: Sydney G. Dennis
    Title: Director

Signature Page to Credit Agreement
PG&E Corporation

CITIBANK, N.A.
as a Lender

By: /s/ Richard Rivera

Name: Richard Rivera
Title: Vice President

Signature Page to Credit Agreement
PG&E Corporation

CITICORP NORTH AMERICA, INC.
as a Lender

By: /s/ Richard Rivera
    Name: Richard Rivera
    Title: Authorized Signatory

Signature Page to Credit Agreement
PG&E Corporation

GOLDMAN SACHS BANK USA
as a Lender

By: /s/ Jacob Elder
Name: Jacob Elder
Title: Authorized Signatory

Signature Page to Credit Agreement
PG&E Corporation

BNP PARIBAS
as a Lender

By: /s/ Denis O'Meara
    Name: Denis O'Meara
    Title: Managing Director

By: /s/ Francis Delaney
    Name: Francis Delaney
    Title: Managing Director

Signature Page to Credit Agreement
PG&E Corporation

CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH
as a Lender

By: /s/ Vipul Dhadda
    Name: Vipul Dhadda
    Title: Authorized Signatory

By: /s/ Brady Bingham
    Name: Brady Bingham
    Title: Authorized Signatory

Signature Page to Credit Agreement
PG&E Corporation

MIZUHO BANK, LTD.
as a Lender

By: /s/ Edward Sacks
Name: Edward Sacks
Title: Authorized Signatory

Signature Page to Credit Agreement
PG&E Corporation

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 1025 of 1367

MUFG UNION BANK, N.A.
as a Lender

By: /s/ Nietzsche Rodricks
    Name: Nietzsche Rodricks
    Title: Managing Director

Signature Page to Credit Agreement
PG&E Corporation

WELLS FARGO BANK, NATIONAL ASSOCIATION
as a Lender

By: /s/ Gregory R. Gredvig
    Name: Gregory R. Gredvig
    Title: Director

Signature Page to Credit Agreement
PG&E Corporation

BANK OF MONTREAL, CHICAGO BRANCH
as a Lender

By: /s/ Darren Thomas
    Name: Darren Thomas
    Title: Vice President

Signature Page to Credit Agreement
PG&E Corporation

THE BANK OF NEW YORK MELLON
as a Lender

By: /s/ Molly H. Ross
    Name: Molly H. Ross
    Title: Vice President

Signature Page to Credit Agreement
PG&E Corporation

**Schedule 1.1**
**Commitments**

| Lender | Commitment |
|---|---|
| JPMorgan Chase Bank, N.A. | $ 60,615,384.63 |
| Bank of America, N.A. | $ 55,564,102.56 |
| Barclays Bank PLC | $ 55,564,102.56 |
| Citibank, N.A. | $ 52,500,000.00 |
| Citicorp North America, Inc. | $ 3,064,102.56 |
| Goldman Sachs Bank USA | $ 55,564,102.56 |
| BNP Paribas | $ 38,389,743.59 |
| Credit Suisse AG, Cayman Islands Branch | $ 38,389,743.59 |
| Mizuho Bank, Ltd. | $ 38,389,743.59 |
| MUFG Union Bank, N.A. | $ 38,389,743.59 |
| Wells Fargo Bank, National Association | $ 38,389,743.59 |
| Bank of Montreal, Chicago Branch | $ 17,679,487.18 |
| The Bank of New York Mellon | $ 7,500,000.00 |
| | $500,000,000.00 |

[Schedules to Corp Revolver Credit Agreement]

**Schedule 7.4**
**Sale and Lease Back Transactions**

The sale and leaseback of the property described to the Administrative Agent prior to the Effective Date as the "SF Properties".

[Schedules to Corp Revolver Credit Agreement]

**Schedule 7.9**
**Transactions with Affiliates**

1. Continuing Services Agreement, dated as of October 15, 1999, by and between PG&E Corporation Support Services, Inc. and PG&E Utility

2. Continuing Services Agreement, dated as of July 27, 2010, by and between Pacific Energy Capital IV, LLC and PG&E Utility

3. Continuing Services Agreement, dated as of March 1, 2011, by and between PCG Capital, Inc. and PG&E Utility

4. Continuing Services Agreement, dated as of April 18, 2007, by and between PG&E Corporation Support Services II, Inc. and PG&E Utility

5. Continuing Services Agreement, dated as of February 23, 2009, by and between PG&E Utility and Eureka Energy Company

6. Continuing Services Agreement, dated as of March 28, 2008, by and among PG&E Utility and those affiliated companies named on Appendix A thereto

7. Organization and Management Agreement, dated as of January 9, 1961, by and among Standard Pacific Gas Line Incorporated, Standard Oil Company of California, and PG&E Utility

8. Promissory Note, dated January 1, 1996, by and between Eureka Energy Company and PG&E Utility

9. Promissory Note, dated December 9, 1998, by and between Pacific Energy Fuels Company and PG&E Utility

10. Promissory Note, dated November 15, 2005, by and between Eureka Energy Company and PG&E Utility

11. Promissory Note, dated February 26, 1992, by and between Standard Pacific Gas Line Incorporated and PG&E Utility

12. Lease, dated as of September 17, 1966, by and between Luigi Marre Land and Cattle Company and San Luis Obispo Bay Properties, Inc., as assigned pursuant to the Sublease, dated as of September 17, 1966, by and between San Luis Obispo Bay Properties, Inc. and PG&E Utility

[Schedules to Corp Revolver Credit Agreement]

**Schedule 7.12**
**Restricted Payments**

To the extent that any fees, discounts or premiums constituting Restricted Payments under the Agreement are required to be paid by the Borrower in connection with any purchase, redemption or other acquisition of Capital Stock or other Qualifying Equity (as defined in the Commitment Letter) issued to consummate the transactions required under the Plan of Reorganization, all such fees, discounts or premiums are permitted.

[Schedules to Corp Revolver Credit Agreement]

FORM OF
NEW LENDER SUPPLEMENT

Reference is made to the $500,000,000 Credit Agreement, dated as of July 1, 2020 (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), among PG&E Corporation, a California corporation (the "Borrower"), the Lenders party thereto, JPMorgan Chase Bank, N.A., as administrative agent (in such capacity, together with any permitted successor thereto, the "Administrative Agent") and JPMorgan Chase Bank, N.A., as collateral agent (in such capacity, together with any permitted successor thereto, the "Collateral Agent"). Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

The New Revolving Credit Lender identified on Schedule l hereto (the "New Lender"), the Administrative Agent and the Borrower agree as follows:

1.    The New Lender hereby irrevocably makes a Commitment to the Borrower in the amount set forth on Schedule 1 hereto (the "New Commitment") pursuant to Section 2.3(b) of the Credit Agreement. From and after the Effective Date (as defined below), the New Lender will be a Lender under the Credit Agreement with respect to the New Commitment.

2.    The Administrative Agent (a) makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with the Credit Agreement or with respect to the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Credit Agreement; and (b) makes no representation or warranty and assumes no responsibility with respect to the financial condition of the Borrower, any of its Subsidiaries or any other obligor or the performance or observance by the Borrower, any of its Subsidiaries or any other obligor of any of their respective obligations under the Credit Agreement or any other instrument or document furnished pursuant hereto or thereto.

3.    The New Lender (a) represents and warrants that it is legally authorized to enter into this New Lender Supplement; (b) confirms that it has received a copy of the Credit Agreement, together with copies of the most recent financial statements delivered or deemed delivered pursuant to Section 6.1 of the Credit Agreement and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this New Lender Supplement; (c) agrees that it will, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Credit Agreement or any other instrument or document furnished pursuant hereto or thereto; (d) appoints and authorizes the Administrative Agent to take such action as agent on its behalf and to exercise such powers and discretion under the Credit Agreement or any other instrument or document furnished pursuant hereto or thereto as are delegated to the Administrative Agent by the terms thereof, together with such powers as are incidental thereto; and (e) agrees that it will be bound by the provisions of the Credit Agreement and will perform in accordance with its terms all the obligations which by the terms of the Credit Agreement are required to be performed by it as a Lender.

Exhibits
Credit Agreement
PG&E Corporation

4.    The effective date of this New Lender Supplement shall be the Effective Date of the New Commitment described in Schedule 1 hereto (the "Effective Date"). Following the execution of this New Lender Supplement by each of the New Lender and the Borrower, it will be delivered to the Administrative Agent for acceptance and recording by it pursuant to the Credit Agreement, effective as of the Effective Date (which shall not, unless otherwise agreed to by the Administrative Agent, be earlier than five Business Days after the date of such acceptance and recording by the Administrative Agent).

5.    Upon such acceptance and recording, from and after the Effective Date, the Administrative Agent shall make all payments in respect of the New Commitment (including payments of principal, interest, fees and other amounts) to the New Lender for amounts which have accrued on and subsequent to the Effective Date.

6.    From and after the Effective Date, the New Lender shall be a party to the Credit Agreement and, to the extent provided in this New Lender Supplement, shall have the rights and obligations of a Lender thereunder and shall be bound by the provisions thereof.

7.    This New Lender Supplement shall be governed by, and construed and interpreted in accordance with, the law of the State of New York.

IN WITNESS WHEREOF, the parties hereto have caused this New Lender Supplement to be executed as of        ,    20    by their respective duly authorized officers on Schedule 1 hereto.

*[Remainder of page intentionally left blank. Schedule 1 to follow.]*

Exhibits
Credit Agreement
PG&E Corporation

Name of New Lender: _____

Effective Date of New Commitment: _____

Principal Amount of New Commitment: $_____

[NAME OF NEW LENDER]                                    PG&E CORPORATION

By: _____                          By: _____
    Authorized Officer                                      Title:

JPMORGAN CHASE BANK, N.A., as Administrative Agent

By: _____
    Authorized Officer

Exhibits
Credit Agreement
PG&E Corporation

FORM OF

COMMITMENT INCREASE SUPPLEMENT

Reference is made to the $500,000,000 Credit Agreement, dated as of July 1, 2020 (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), among PG&E Corporation, a California corporation (the "Borrower"), the Lenders party thereto, JPMorgan Chase Bank, N.A., as administrative agent (in such capacity, together with any permitted successor thereto, the "Administrative Agent") and JPMorgan Chase Bank, N.A., as collateral agent (in such capacity, together with any permitted successor thereto, the "Collateral Agent"). Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

The Lender identified on Schedule l hereto (the "Increasing Lender"), the Administrative Agent and the Borrower agree as follows:

1.    The Increasing Lender hereby irrevocably increases its Commitment to the Borrower by the amount set forth on Schedule 1 hereto under the heading "Principal Amount of Increased Commitment" (the "Increased Commitment") pursuant to Section 2.3(c) of the Credit Agreement. From and after the Effective Date (as defined below), the Increasing Lender will be a Lender under the Credit Agreement with respect to the Increased Commitment as well as its existing Commitment under the Credit Agreement.

2.    The Administrative Agent (a) makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with the Credit Agreement or with respect to the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Credit Agreement; and (b) makes no representation or warranty and assumes no responsibility with respect to the financial condition of the Borrower, any of its Subsidiaries or any other obligor or the performance or observance by the Borrower, any of its Subsidiaries or any other obligor of any of their respective obligations under the Credit Agreement or any other instrument or document furnished pursuant hereto or thereto.

3.    The Increasing Lender (a) represents and warrants that it is legally authorized to enter into this Commitment Increase Supplement; (b) confirms that it has received a copy of the Credit Agreement, together with copies of the most recent financial statements delivered or deemed delivered pursuant to Section 6.1 of the Credit Agreement and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Commitment Increase Supplement; (c) agrees that it will, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Credit Agreement or any other instrument or document furnished pursuant hereto or thereto; (d) appoints and authorizes the Administrative Agent to take such action as agent on its behalf and to exercise such powers and discretion under the Credit Agreement or any other instrument or document furnished pursuant hereto or thereto as are delegated to the Administrative

Exhibits
Credit Agreement
PG&E Corporation

Agent by the terms thereof, together with such powers as are incidental thereto; and (e) agrees that it will be bound by the provisions of the Credit Agreement and will perform in accordance with its terms all the obligations which by the terms of the Credit Agreement are required to be performed by it as a Lender.

4. The effective date of this Commitment Increase Supplement shall be the Effective Date of the Increased Commitment described in Schedule 1 hereto (the "Effective Date"). Following the execution of this Commitment Increase Supplement by the Increasing Lender and the Borrower, it will be delivered to the Administrative Agent for acceptance and recording by it pursuant to the Credit Agreement, effective as of the Effective Date (which shall not, unless otherwise agreed to by the Administrative Agent, be earlier than five Business Days after the date of such acceptance and recording by the Administrative Agent).

5. Upon such acceptance and recording, from and after the Effective Date, the Administrative Agent shall make all payments in respect of the Increased Commitment (including payments of principal, interest, fees and other amounts) to the Increasing Lender for amounts which have accrued on and subsequent to the Effective Date.

6. This Commitment Increase Supplement shall be governed by, and construed and interpreted in accordance with, the law of the State of New York.

IN WITNESS WHEREOF, the parties hereto have caused this Commitment Increase Supplement to be executed as of        ,     , 20     by their respective duly authorized officers on Schedule 1 hereto.

*[Remainder of page intentionally left blank. Schedule 1 to follow.]*

Exhibits
Credit Agreement
PG&E Corporation

Name of Increasing Lender: _____

Effective Date of Increased Commitment: _____

|  Principal<br>Amount of<br>Increased Commitment: | Total Amount of Commitment<br>of Increasing Lender<br>(including Increased Commitment): |
|---|---|
| $_____ | $_____ |

[NAME OF NEW LENDER]                    PG&E CORPORATION

By: _____       By: _____
    Authorized Officer                          Title:

JPMORGAN CHASE BANK, N.A., as Administrative Agent

By: _____       By: _____
    Authorized Officer

Exhibits
Credit Agreement
PG&E Corporation

EXHIBIT C

FORM OF COMPLIANCE CERTIFICATE

This Compliance Certificate is delivered pursuant to Section 6.2 of the $500,000,000 Credit Agreement, dated as of July 1, 2020 (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), among PG&E Corporation, a California corporation (the "Borrower"), the Lenders party thereto, JPMorgan Chase Bank, N.A., as administrative agent (in such capacity, together with any permitted successor thereto, the "Administrative Agent") and JPMorgan Chase Bank, N.A., as collateral agent (in such capacity, together with any permitted successor thereto, the "Collateral Agent"). Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

The undersigned hereby certifies to the Administrative Agent and the Lenders as follows:

1. I am the duly elected, qualified and acting [Chief Financial Officer] [Treasurer] [Assistant Treasurer] of the Borrower.

2. I have reviewed and am familiar with the contents of this Certificate.

3. To the actual knowledge of the undersigned, during the fiscal period covered by the financial statements attached hereto as Attachment 1, no Default or Event of Default has occurred and is continuing [, except as set forth below].

4. Attached hereto as Attachment 2 are the computations showing compliance with the covenants set forth in Section 7.2 of the Credit Agreement.

*[Remainder of page intentionally left blank. Schedule 1 to follow.]*

IN WITNESS WHEREOF, the undersigned has executed this Compliance Certificate as of the date set forth below.

PG&E CORPORATION

By: _____

Name:

Title:

Date: _____, 20__

[Financial Statements
Period Ended            , 20    ][1]

---

[1]    Include only if financial statements are being physically delivered.

The information described herein is as of          , 20    .

[Set forth Covenant Calculation]

FORM OF CLOSING CERTIFICATE

This Closing Certificate is delivered pursuant to Section 5.1(f) of the $500,000,000 Credit Agreement, dated as of July 1, 2020 (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), among PG&E Corporation, a California corporation (the "Borrower"), the Lenders party thereto, JPMorgan Chase Bank, N.A., as administrative agent (in such capacity, together with any permitted successor thereto, the "Administrative Agent") and JPMorgan Chase Bank, N.A., as collateral agent (in such capacity, together with any permitted successor thereto, the "Collateral Agent"). Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement. The undersigned consents to Hunton Andrews Kurth LLP relying upon this Closing Certificate in connection with the opinions to be rendered by it on or about the date hereof relating to the transactions contemplated by the Credit Agreement.

The undersigned [          ] of the Borrower hereby certifies as follows:

1.    [          ] is a duly elected and qualified [          ] of the Borrower and the signature set forth for such officer below is such officer's true and genuine signature.

2.    That the conditions precedent set forth in Sections 5.1 (b), (h) and (i) of the Credit Agreement have been satisfied as of the Effective Date.

The undersigned [          ] of the Borrower hereby certifies as follows:

1.    Attached hereto as Annex 1 is a true and complete copy of resolutions duly adopted by the Board of Directors of the Borrower on [          ]; such resolutions have not in any way been amended, modified, revoked or rescinded, have been in full force and effect since their adoption to and including the date hereof and are now in full force and effect and are the only corporate proceedings of the Borrower now in force relating to or affecting the Credit Agreement.

2.    Attached hereto as Annex 2 is a true and complete copy of the Bylaws of the Borrower as in effect on the date hereof.

3.    Attached hereto as Annex 3 is a true and complete copy of the Articles of Incorporation of the Borrower as in effect on the date hereof, and such Articles of Incorporation have not been amended, repealed, modified or restated.

4.    The following person is now a duly elected and qualified officer of the Borrower holding the office indicated next to his/her name below, and that the facsimile signature affixed next to his/her name below is the facsimile signature of such officer, and such officer is duly authorized to execute and deliver on behalf of the Borrower each of the Loan Documents to which

it is a party and any certificate or other document to be delivered by the Borrower pursuant to the Loan Documents to which it is a party:

<u>Name</u>               <u>Office</u>               <u>Signature</u>

[_____]          [_____]

[Signature Page Follows]

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 1045 of 1367

IN WITNESS WHEREOF, the undersigned have executed this Closing Certificate as of the date set forth below.

Name: [          ]                     Name: [          ]
Title: [          ]                      Title: [          ]

Date: [          ]

[Board Resolutions]

[Bylaws of the Company]

[Articles of Incorporation]

FORM OF
ASSIGNMENT AND ASSUMPTION

This Assignment and Assumption (this "<u>Assignment and Assumption</u>") is dated as of the Effective Date set forth below and is entered into by and between [the][each][1] Assignor identified in item 1 below ([the][each, an] "<u>Assignor</u>") and [the][each][2] Assignee identified in item 2 below ([the][each, an] "<u>Assignee</u>"). [It is understood and agreed that the rights and obligations of [the Assignors][the Assignees][3] hereunder are several and not joint.][4] Capitalized terms used but not defined herein shall have the meanings given to them in the Credit Agreement identified below (as amended, the "<u>Credit Agreement</u>"), receipt of a copy of which is hereby acknowledged by [the][each] Assignee. The Standard Terms and Conditions for Assignment and Assumption set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Assumption as if set forth herein in full.

For an agreed consideration, [the][each] Assignor hereby irrevocably sells and assigns to [the Assignee][the respective Assignees], and [the][each] Assignee hereby irrevocably purchases and assumes from [the Assignor][the respective Assignors], subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the Administrative Agent as contemplated below (i) all of [the Assignor's][the respective Assignors'] rights and obligations in [its capacity as a Lender][their respective capacities as Lenders] under the Credit Agreement and any other documents or instruments delivered pursuant thereto in the amount**[s]** and equal to the percentage interest**[s]** identified below of all the outstanding rights and obligations under the respective facilities identified below and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of [the Assignor (in its capacity as a Lender)][the respective Assignors (in their respective capacities as Lenders)] against any Person, whether known or unknown, arising under or in connection with the Credit Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including, but not limited to, contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned by [the][any] Assignor to [the] [any] Assignee pursuant to clauses (i) and (ii) above being referred to herein collectively as [the][an]

---

1    For bracketed language here and elsewhere in this form relating to the Assignor(s), if the assignment is from a single Assignor, choose the first bracketed language. If the assignment is from multiple Assignors, choose the second bracketed language.

2    For bracketed language here and elsewhere in this form relating to the Assignee(s), if the assignment is to a single Assignee, choose the first bracketed language. If the assignment is to multiple Assignees, choose the second bracketed language.

3    Select as appropriate.

4    Include bracketed language if there are either multiple Assignors or multiple Assignees.

Exhibits
Credit Agreement
PG&E Corporation

"<u>Assigned Interest</u>"). Each such sale and assignment is without recourse to [the][any] Assignor and, except as expressly provided in this Assignment and Assumption, without representation or warranty by [the][any] Assignor.

1.  <u>Assignor[s]</u>: _____

_____

[Assignor [is] [is not] a Defaulting Lender]

2.  <u>Assignee[s]</u>: _____

_____

[for each Assignee, indicate [Eligible Assignee] of [*identify Lender*]]

3.  <u>Borrower(s)</u>: PG&E Corporation, a California corporation

4.  <u>Administrative Agent</u>: JPMorgan Chase Bank, N.A., as the Administrative Agent under the Credit Agreement

5.  <u>Credit Agreement</u>: $500,000,000 Credit Agreement, dated as of July 1, 2020 (as amended, supplemented or otherwise modified from time to time, the "<u>Credit Agreement</u>"), among PG&E Corporation, a California corporation (the "Borrower"), the Lenders party thereto, JPMorgan Chase Bank, N.A., as administrative agent (in such capacity, together with any permitted successor thereto, the "<u>Administrative Agent</u>") and JPMorgan Chase Bank, N.A., as collateral agent (in such capacity, together with any permitted successor thereto, the "<u>Collateral Agent</u>").

<div align="center">
Exhibits<br>
Credit Agreement<br>
PG&E Corporation
</div>

6.  Assigned Interest[s]:

| Assignor[s][5] | Assignee[s][6] | Facility Assigned[7] | Aggregate Amount of Commitments for all Lenders | Amount of Commitment Assigned | Percentage Assigned of Commitment[8] | Amount of Loans Assigned | CUSIP Number |
|---|---|---|---|---|---|---|---|
| | | | $ | $ | % | $ | |
| | | | $ | $ | % | $ | |
| | | | $ | $ | % | $ | |

Effective Date:         , 20    [TO BE INSERTED BY ADMINISTRATIVE AGENT AND WHICH SHALL BE THE EFFECTIVE DATE OF RECORDATION OF TRANSFER IN THE REGISTER THEREFOR.]

The terms set forth in this Assignment and Assumption are hereby agreed to:

[ASSIGNOR(S)]                                      [ASSIGNEE(S)]

By: _____                       By: _____
Name:                                             Name:
Title:                                            Title:

_____
5    List each Assignor, as appropriate.
6    List each Assignee and, if available, its market entity identifier, as appropriate.
7    Fill in the appropriate terminology for the types of facilities under the Credit Agreement that are being assigned under this Assignment.
8    Set forth, to at least 9 decimals, as a percentage of the Commitment/Loans of all Lenders thereunder.

<div align="center">
Exhibits
Credit Agreement
PG&E Corporation
</div>

[Consented to and] Accepted

PG&E CORPORATION[9]

JPMORGAN CHASE BANK, N.A.,
as Administrative Agent[10]

By: _____
   Title: _____

By: _____
   Authorized Officer

---

[9] As applicable pursuant to Section 10.6(b).
[10] As applicable pursuant to Section 10.6(b).

Exhibits
Credit Agreement
PG&E Corporation

STANDARD TERMS AND CONDITIONS FOR
ASSIGNMENT AND ASSUMPTION

1.    Representations and Warranties.

1.1.    Assignor. [The][Each] Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of [the][[the relevant] Assigned Interest, (ii) [the][such] Assigned Interest is free and clear of any lien, encumbrance or other adverse claim, (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and (iv) it is **[not]** a Defaulting Lender and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Credit Agreement or any other Loan Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any collateral thereunder, (iii) the financial condition of the Borrower, any of its Subsidiaries or Affiliates or any other Person obligated in respect of any Loan Document or (iv) the performance or observance by the Borrower, any of its Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Loan Document.

1.2    Assignee. [The][Each] Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) it meets all the requirements to be an assignee under Section 10.6(b)(i) and (ii) of the Credit Agreement (subject to such consents, if any, as may be required under Section 10.6(b)(i) of the Credit Agreement), (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement as a Lender thereunder and, to the extent of [the][the relevant] Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it is sophisticated with respect to decisions to acquire assets of the type represented by [the][such] Assigned Interest and either it, or the Person exercising discretion in making its decision to acquire [the][such] Assigned Interest, is experienced in acquiring assets of such type, (v) it has received a copy of the Credit Agreement, and has received or has been accorded the opportunity to receive copies of the most recent financial statements delivered pursuant to Section 6.1 thereof, as applicable, and such other documents and information as it deems appropriate to make its own credit analysis and decision to enter into this Assignment and Assumption and to purchase [the][such] Assigned Interest, (vi) it has, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Assignment and Assumption and to purchase [the] [such] Assigned Interest, and (vii) if it is a Foreign Lender, attached hereto is any documentation required to be delivered by it pursuant to the terms of the Credit Agreement, duly completed and executed by [the][such] Assignee and (b) agrees that (i) it will, independently and without reliance upon the Administrative Agent, [the][any] Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender.

Exhibits
Credit Agreement
PG&E Corporation

2. <u>Payments</u>. From and after the Effective Date, the Administrative Agent shall make all payments in respect of [the] [each] Assigned Interest (including payments of principal, interest, fees and other amounts) to [the][the relevant] Assignor for amounts which have accrued to but excluding the Effective Date and to [the][the relevant] Assignee for amounts which have accrued from and after the Effective Date. Notwithstanding the foregoing, the Administrative Agent shall make all payments of interest, fees or other amounts paid or payable in kind from and after the Effective Date to [the][the relevant] Assignee.

3. <u>General Provisions</u>. This Assignment and Assumption shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns. This Assignment and Assumption may be executed by one or more of the parties to this Assignment and Assumption on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument. Delivery of an executed signature page of this Assignment and Assumption by facsimile transmission, emailed pdf. or any other electronic means that reproduces an image of the actual executed signature page shall be effective as delivery of an original executed counterpart hereof. The words "execution," "signed," "signature," "delivery," and words of like import in or relating to any document to be signed in connection with this Assignment and Assumption and the transactions contemplated hereby shall be deemed to include an electronic sound, symbol, or process attached to, or associated with, a contract or other record and adopted by a Person with the intent to sign, authenticate or accept such contract or record, deliveries or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act; provided that nothing herein shall require the Administrative Agent to accept electronic signatures in any form or format without its prior written consent. This Assignment and Assumption shall be governed by, and construed in accordance with, the law of the State of New York.

Exhibits
Credit Agreement
PG&E Corporation

[RESERVED].

Exhibits
Credit Agreement
PG&E Corporation

**FORM OF**
**U.S. TAX COMPLIANCE CERTIFICATE**
(For Foreign Lenders That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the $500,000,000 Credit Agreement, dated as of July 1, 2020 (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), among PG&E Corporation, a California corporation (the "Borrower"), the Lenders party thereto, JPMorgan Chase Bank, N.A., as administrative agent (in such capacity, together with any permitted successor thereto, the "Administrative Agent") and JPMorgan Chase Bank, N.A., as collateral agent (in such capacity, together with any permitted successor thereto, the "Collateral Agent"). Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

Pursuant to the provisions of Section 2.16(e) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a ten percent shareholder of the Borrower within the meaning of Section 881(c)(3)(B) of the Code and (iv) it is not a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Borrower with a certificate of its non-U.S. Person status on IRS Form W-8BEN or W-8BEN-E, as applicable. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower and the Administrative Agent, and (2) the undersigned shall have at all times furnished the Borrower and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments. Notwithstanding the foregoing, where the undersigned is not an individual, the undersigned shall furnish the Borrower and the Administrative Agent with an IRS Form W-8BEN-E together with this certificate even if the undersigned has previously furnished the Borrower and the Administrative Agent with an IRS Form W-8BEN.

[NAME OF LENDER]

By: _____

    Name: _____

    Title: _____

Date: _____ __, 20[   ]

Exhibits
Credit Agreement
PG&E Corporation

**FORM OF**
**U.S. TAX COMPLIANCE CERTIFICATE**
(For Foreign Participants That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the $500,000,000 Credit Agreement, dated as of July 1, 2020 (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), among PG&E Corporation, a California corporation (the "Borrower"), the Lenders party thereto, JPMorgan Chase Bank, N.A., as administrative agent (in such capacity, together with any permitted successor thereto, the "Administrative Agent") and JPMorgan Chase Bank, N.A., as collateral agent (in such capacity, together with any permitted successor thereto, the "Collateral Agent"). Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

Pursuant to the provisions of Section 2.16(e) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the participation in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a ten percent shareholder of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, and (iv) it is not a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with a certificate of its non-U.S. Person status on IRS Form W-8BEN or W-8BEN-E, as applicable. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender in writing, and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments. Notwithstanding the foregoing, where the undersigned is not an individual, the undersigned shall furnish its participating Lender with an IRS Form W-8BEN-E together with this certificate even if the undersigned has previously furnished such Lender with an IRS Form W-8BEN.

[NAME OF PARTICIPANT]

By: _____
    Name: _____
    Title: _____

Date: ____ __, 20[   ]

Exhibits
Credit Agreement
PG&E Corporation

**FORM OF**
**U.S. TAX COMPLIANCE CERTIFICATE**
(For Foreign Participants That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the $500,000,000 Credit Agreement, dated as of July 1, 2020 (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), among PG&E Corporation, a California corporation (the "Borrower"), the Lenders party thereto, JPMorgan Chase Bank, N.A., as administrative agent (in such capacity, together with any permitted successor thereto, the "Administrative Agent") and JPMorgan Chase Bank, N.A., as collateral agent (in such capacity, together with any permitted successor thereto, the "Collateral Agent"). Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

Pursuant to the provisions of Section 2.16(e) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the participation in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such participation, (iii) with respect such participation, neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a ten percent shareholder of the Borrower within the meaning of Section 881(c)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or W-BEN-E, as applicable, or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or W-8BEN-E, as applicable, from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments. Notwithstanding the foregoing, where any of the undersigned and/or its direct or indirect partners/members is not an individual, the undersigned or the applicable partner(s) or member(s), as the case may be, shall furnish its participating Lender with an IRS Form W-8BEN-E together with this certificate even if the undersigned or the applicable partner(s) or member(s), as the case may be, has previously furnished such Lender with an IRS Form W-8BEN.

[Signature Page Follows]

Exhibits
Credit Agreement
PG&E Corporation

[NAME OF PARTICIPANT]

By: _____

    Name: _____

    Title: _____

Date: _____ __, 20[  ]

Exhibits
Credit Agreement
PG&E Corporation

**FORM OF**
**U.S. TAX COMPLIANCE CERTIFICATE**
(For Foreign Lenders That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the $500,000,000 Credit Agreement, dated as of July 1, 2020 (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), among PG&E Corporation, a California corporation (the "Borrower"), the Lenders party thereto, JPMorgan Chase Bank, N.A., as administrative agent (in such capacity, together with any permitted successor thereto, the "Administrative Agent") and JPMorgan Chase Bank, N.A., as collateral agent (in such capacity, together with any permitted successor thereto, the "Collateral Agent"). Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

Pursuant to the provisions of Section 2.16(e) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such Loan(s) (as well as any Note(s) evidencing such Loan(s)), (iii) with respect to the extension of credit pursuant to this Credit Agreement or any other Loan Document, neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a ten percent shareholder of the Borrower within the meaning of Section 881(c)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Borrower with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or W-8BEN-E, as applicable, or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or W-8BEN-E, as applicable, from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower and the Administrative Agent, and (2) the undersigned shall have at all times furnished the Borrower and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments. Notwithstanding the foregoing, where any of the undersigned and/or its direct or indirect partners/members is not an individual, the undersigned or the applicable partner(s) or member(s), as the case may be, shall furnish the Borrower and the Administrative Agent with an IRS Form W-8BEN-E together with this certificate even if the undersigned or the applicable partner(s) or member(s), as the case may be, has previously furnished the Borrower and the Administrative Agent with an IRS Form W-8BEN.

Exhibits
Credit Agreement
PG&E Corporation

[NAME OF LENDER]

By: _____

    Name: _____

    Title: _____

Date: ____ __, 20[  ]

<div align="center">

Exhibits
Credit Agreement
PG&E Corporation

</div>

<u>FORM OF NOTE</u>

THIS NOTE AND THE OBLIGATIONS REPRESENTED HEREBY MAY NOT BE TRANSFERRED EXCEPT IN COMPLIANCE WITH THE TERMS AND PROVISIONS OF THE CREDIT AGREEMENT REFERRED TO BELOW. TRANSFERS OF THIS NOTE AND THE OBLIGATIONS REPRESENTED HEREBY MUST BE RECORDED IN THE REGISTER MAINTAINED BY THE ADMINISTRATIVE AGENT PURSUANT TO THE TERMS OF SUCH CREDIT AGREEMENT.

$                                                                                                 New York, New York
                                                                                                 as of [          ], 20[    ]

FOR VALUE RECEIVED, PG&E CORPORATION, a California corporation (the "<u>Borrower</u>"), DOES HEREBY PROMISE TO PAY to [insert name of Lender] (the "<u>Lender</u>") or its registered assigns at the office of JPMORGAN CHASE BANK, N.A., at [                 ], in lawful money of the United States of America in immediately available funds, the principal amount of                      DOLLARS ($         ), or, if less, the aggregate unpaid principal amount of all Revolving Loans (as defined in the Credit Agreement referred to below) made by the Lender to the Borrower pursuant to the Credit Agreement referred to below, whichever is less, on such date or dates as is required by said Credit Agreement, and to pay interest on the unpaid principal amount from time to time outstanding hereunder, in like money, at such office, and at such times and in such amounts as set forth in Section 2.11 of said Credit Agreement.

The holder of this Note is authorized to indorse on the schedules annexed hereto and made a part hereof or on a continuation thereof which shall be attached hereto and made a part hereof the date, the Type and amount of each Revolving Loan made pursuant to the Credit Agreement and the date and amount of each payment or prepayment of principal thereof, each continuation thereof, each conversion of all or a portion thereof to another Type and, in the case of Eurodollar Loans, the length of each Interest Period with respect thereto. Each such indorsement shall constitute <u>prima</u> <u>facie</u> evidence of the accuracy of the information indorsed. The failure to make any such indorsement or any error in any such indorsement shall not affect the obligations of the Borrower in respect of any Revolving Loan.

The Borrower hereby waives demand, presentment for payment, protest, notice of any kind (including, but not limited to, notice of dishonor, notice of protest, notice of intention to accelerate or notice of acceleration), other than notice required pursuant to the Credit Agreement and diligence in collecting and bringing suit against any party hereto. The nonexercise by the holder of this Note of any of its rights hereunder in any particular instance shall not constitute a waiver thereof in that or any subsequent instance.

<div align="center">
Exhibits<br>
Credit Agreement<br>
PG&E Corporation
</div>

This Note (a) is one of the promissory notes referred to in the $500,000,000 Credit Agreement, dated as of July 1, 2020 (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), among the Borrower, the Lenders party thereto, JPMorgan Chase Bank, N.A., as administrative agent (in such capacity, together with any permitted successor thereto, the "Administrative Agent") and JPMorgan Chase Bank, N.A., as collateral agent (in such capacity, together with any permitted successor thereto, the "Collateral Agent"), (b) is subject to the provisions of the Credit Agreement and (c) is subject to optional prepayment in whole or in part and acceleration of the maturity hereof upon the occurrence of certain events, all as provided in the Credit Agreement. Terms defined in the Credit Agreement are used herein as therein defined.

**NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN OR IN THE CREDIT AGREEMENT, THIS NOTE MAY NOT BE TRANSFERRED EXCEPT PURSUANT TO AND IN ACCORDANCE WITH THE REGISTRATION AND OTHER PROVISIONS OF SECTION 10.6 OF THE CREDIT AGREEMENT.**

**THIS NOTE SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.**

PG&E CORPORATION

By: _____
    Name:
    Title:

Exhibits
Credit Agreement
PG&E Corporation

LOANS, CONVERSIONS AND REPAYMENTS OF ABR LOANS

| Date | Amount of ABR Loans | Amount Converted to ABR Loans | Amount of Principal of ABR Loans Repaid | Amount of ABR Loans Converted to Eurodollar Loans | Unpaid Principal Balance of ABR Loans | Notation Made By |
|------|---------------------|-------------------------------|-----------------------------------------|---------------------------------------------------|---------------------------------------|------------------|
|      |                     |                               |                                         |                                                   |                                       |                  |
|      |                     |                               |                                         |                                                   |                                       |                  |
|      |                     |                               |                                         |                                                   |                                       |                  |
|      |                     |                               |                                         |                                                   |                                       |                  |
|      |                     |                               |                                         |                                                   |                                       |                  |

Exhibits
Credit Agreement
PG&E Corporation

LOANS, CONTINUATIONS, CONVERSIONS AND REPAYMENTS OF EURODOLLAR LOANS

| Date | Amount of Eurodollar Loans | Amount Converted to Eurodollar Loans | Interest Period and Eurodollar Rate with Respect Thereto | Amount of Principal of Eurodollar Loans Repaid | Amount of Eurodollar Loans Converted to ABR Loans | Unpaid Principal Balance of Eurodollar Loans | Notation Made By |
|------|------|------|------|------|------|------|------|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

Exhibits
Credit Agreement
PG&E Corporation

EXHIBIT I

**Form of Solvency Certificate**

[DATE]

This Solvency Certificate ("Certificate") of PG&E Corporation, a California corporation (the "Borrower"), and its Subsidiaries is delivered pursuant to Section 5.1(j) of the $500,000,000 Credit Agreement, dated as of July 1, 2020 (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), among the Borrower, the Lenders party thereto, JPMorgan Chase Bank, N.A., as administrative agent (in such capacity, together with any permitted successor thereto, the "Administrative Agent") and JPMorgan Chase Bank, N.A., as collateral agent (in such capacity, together with any permitted successor thereto, the "Collateral Agent").

. Unless otherwise defined herein, capitalized terms used in this Certificate shall have the meanings set forth in the Credit Agreement.

I, [          ], the duly elected, qualified and acting [Chief Financial Officer] of the Borrower and its Subsidiaries, DO HEREBY CERTIFY that I have reviewed the Credit Agreement and the other Loan Documents referred to therein and have made such investigation as I have deemed necessary to enable me to express a reasonably informed opinion as to the matters referred to herein.

I HEREBY FURTHER CERTIFY, in my capacity as [Chief Financial Officer] and not in my individual capacity, that as of the date hereof, immediately after giving effect to the Credit Agreement and the transactions contemplated thereby:

1.    The fair value of the assets of the Borrower and its Subsidiaries, on a consolidated basis, at a fair valuation on a going concern basis, exceeds, on a consolidated basis, their debts and liabilities, subordinated, contingent or otherwise.

2.    The present fair saleable value of the property of the Borrower and its Subsidiaries, on a consolidated and going concern basis, is greater than the amount that will be required to pay the probable liability, on a consolidated basis, of their debts and other liabilities, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured in the ordinary course of business.

3.    The Borrower and its Subsidiaries, on a consolidated basis, are able to pay their debts and liabilities, subordinated, contingent or otherwise, as such liabilities become absolute and matured in the ordinary course of business.

4.    The Borrower and its Subsidiaries are not engaged in businesses, and are not about to engage in businesses for which they have unreasonably small capital.

Exhibits
Credit Agreement
PG&E Corporation

For purposes of this Certificate, the amount of any contingent liability at any time shall be computed as the amount that, in light of all the facts and circumstances existing as of the date hereof, would reasonably be expected to become an actual and matured liability.

For the purpose of the foregoing, I have assumed there is no default under the Credit Agreement on the date hereof and will be no default under the Credit Agreement after giving effect to the funding under the Credit Agreement.

[Remainder of page intentionally left blank]

Exhibits
Credit Agreement
PG&E Corporation

IN WITNESS WHEREOF, I have executed this Certificate as of the date first written above.

PG&E CORPORATION

By: _____

Name:
Title:   Chief Financial Officer

Exhibits
Credit Agreement
PG&E Corporation

**Exhibit 10.4**

**Execution Version**

$3,500,000,000

CREDIT AGREEMENT

among

PACIFIC GAS AND ELECTRIC COMPANY,
as Borrower,

the Several Lenders from Time to Time Parties Hereto,

JPMORGAN CHASE BANK, N.A. and CITIBANK, N.A.,
as Co-Administrative Agents

CITIBANK, N.A.,
as Designated Agent,

BOFA SECURITIES, INC.,
BARCLAYS BANK PLC,
and GOLDMAN SACHS BANK USA,
as Co-Syndication Agents,

and

BNP PARIBAS,
CREDIT SUISSE AG, NEW YORK BRANCH,
MIZUHO BANK, LTD.,
MUFG UNION BANK, N.A.,
and WELLS FARGO BANK, NATIONAL ASSOCIATION,
as Co-Documentation Agents

Dated as of July 1, 2020

———————————

JPMORGAN CHASE BANK, N.A.,
BOFA SECURITIES, INC.,
BARCLAYS BANK PLC,
CITIBANK, N.A.
and GOLDMAN SACHS BANK USA
as Joint Lead Arrangers and
Joint Bookrunners

**TABLE OF CONTENTS**

|  |  | Page |
|---|---|---|
| SECTION 1. | DEFINITIONS | 1 |
| | | |
| 1.1 | Defined Terms | 1 |
| 1.2 | Other Definitional Provisions and Interpretative Provisions | 30 |
| 1.3 | Divisions | 31 |
| 1.4 | Interest Rates; LIBOR Notification | 31 |
| | | |
| SECTION 2. | AMOUNT AND TERMS OF COMMITMENTS | 32 |
| | | |
| 2.1 | Commitments | 32 |
| 2.2 | Procedure for Revolving Loan Borrowing | 32 |
| 2.3 | Commitment Increases | 33 |
| 2.4 | [Reserved] | 34 |
| 2.5 | [Reserved] | 34 |
| 2.6 | Commitment Fees, Etc. | 34 |
| 2.7 | Termination or Reduction of Commitments; Extension of Termination Date | 35 |
| 2.8 | Optional Prepayments | 37 |
| 2.9 | Conversion and Continuation Options | 37 |
| 2.10 | Limitations on Eurodollar Tranches | 38 |
| 2.11 | Interest Rates and Payment Dates | 38 |
| 2.12 | Computation of Interest and Fees | 39 |
| 2.13 | Inability to Determine Interest Rate | 39 |
| 2.14 | Pro Rata Treatment and Payments; Notes | 41 |
| 2.15 | Change of Law | 42 |
| 2.16 | Taxes | 44 |
| 2.17 | Indemnity | 48 |
| 2.18 | Change of Lending Office | 48 |
| 2.19 | Replacement of Lenders | 48 |
| 2.20 | Defaulting Lenders | 49 |
| 2.21 | Illegality | 51 |
| | | |
| SECTION 3. | LETTERS OF CREDIT | 51 |
| | | |
| 3.1 | L/C Commitment | 51 |
| 3.2 | Procedure for Issuance of Letters of Credit | 52 |
| 3.3 | Fees and Other Charges | 53 |
| 3.4 | L/C Participations | 54 |
| 3.5 | Reimbursement Obligation of the Borrower | 55 |
| 3.6 | Obligations Absolute | 56 |
| 3.7 | Letter of Credit Payments | 56 |
| 3.8 | Applications | 57 |
| 3.9 | Actions of Issuing Lenders | 57 |
| 3.10 | Borrower's Indemnification | 57 |
| 3.11 | Lenders' Indemnification | 58 |
| 3.12 | Replacement and Resignation of an Issuing Lender | 58 |

i

| | | |
|---|---|---|
| 3.13 | Existing Letters of Credit | 59 |
| SECTION 4. | REPRESENTATIONS AND WARRANTIES | 59 |
| | | |
| 4.1 | Financial Condition | 59 |
| 4.2 | No Change | 59 |
| 4.3 | Existence; Compliance with Law | 59 |
| 4.4 | Power; Authorization; Enforceable Obligations | 59 |
| 4.5 | No Legal Bar | 60 |
| 4.6 | Litigation | 60 |
| 4.7 | No Default | 60 |
| 4.8 | Taxes | 60 |
| 4.9 | Federal Regulations | 61 |
| 4.10 | ERISA | 61 |
| 4.11 | Investment Company Act; Other Regulations | 61 |
| 4.12 | Use of Proceeds | 62 |
| 4.13 | Environmental Matters | 62 |
| 4.14 | Regulatory Matters | 62 |
| 4.15 | Sanctions; Anti-Corruption | 62 |
| 4.16 | Affected Financial Institutions | 62 |
| 4.17 | Solvency | 62 |
| 4.18 | Disclosure | 63 |
| 4.19 | Status of Obligations | 63 |
| 4.20 | Ownership of Property | 63 |
| 4.21 | Covered Entity | 63 |
| | | |
| SECTION 5. | CONDITIONS PRECEDENT | 63 |
| | | |
| 5.1 | Conditions to the Effective Date | 63 |
| 5.2 | Conditions to Each Credit Event | 65 |
| | | |
| SECTION 6. | AFFIRMATIVE COVENANTS | 66 |
| | | |
| 6.1 | Financial Statements | 66 |
| 6.2 | Certificates; Other Information | 67 |
| 6.3 | Payment of Taxes | 67 |
| 6.4 | Maintenance of Existence; Compliance | 68 |
| 6.5 | Maintenance of Property; Insurance | 68 |
| 6.6 | Inspection of Property; Books and Records; Discussions | 68 |
| 6.7 | Notices | 68 |
| 6.8 | Maintenance of Licenses, etc. | 69 |
| 6.9 | Further Assurances | 69 |
| 6.10 | Use of Proceeds | 69 |
| | | |
| SECTION 7. | NEGATIVE COVENANTS | 69 |
| | | |
| 7.1 | Indebtedness | 70 |
| 7.2 | Consolidated Capitalization Ratio | 71 |
| 7.3 | Liens | 71 |

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 1072 of 1367

| 7.4 | Fundamental Changes | 71 |
| 7.5 | Sale and Lease Back Transactions | 72 |
| 7.6 | Swap Agreements | 72 |
| 7.7 | Amendments to FMB Indenture | 72 |

SECTION 8.   EVENTS OF DEFAULT                                              73

SECTION 9.   THE AGENTS                                                     76

| 9.1 | Appointment and Authority | 76 |
| 9.2 | Delegation of Duties | 76 |
| 9.3 | Exculpatory Provisions | 76 |
| 9.4 | Reliance by Designated Agent | 77 |
| 9.5 | Notice of Default | 78 |
| 9.6 | Non-Reliance on Agents and Other Lenders | 78 |
| 9.7 | Indemnification | 78 |
| 9.8 | Agent in Its Individual Capacity | 79 |
| 9.9 | Successor Agents | 79 |
| 9.10 | Documentation Agents and Syndication Agents | 80 |
| 9.11 | Designated Agent May File Proofs of Claim | 80 |
| 9.12 | Certain ERISA Matters | 81 |

SECTION 10.   MISCELLANEOUS                                                 82

| 10.1 | Amendments and Waivers | 82 |
| 10.2 | Notices | 84 |
| 10.3 | No Waiver; Cumulative Remedies | 86 |
| 10.4 | Survival of Representations and Warranties | 86 |
| 10.5 | Payment of Expenses and Taxes | 86 |
| 10.6 | Successors and Assigns; Participations and Assignments | 87 |
| 10.7 | Adjustments; Set off | 91 |
| 10.8 | Counterparts; Electronic Execution; Binding Effect | 92 |
| 10.9 | Severability | 93 |
| 10.10 | Integration | 93 |
| 10.11 | GOVERNING LAW | 93 |
| 10.12 | Submission To Jurisdiction; Waivers | 93 |
| 10.13 | Acknowledgments | 94 |
| 10.14 | Confidentiality | 94 |
| 10.15 | WAIVERS OF JURY TRIAL | 95 |
| 10.16 | USA Patriot Act; Beneficial Ownership Regulation | 95 |
| 10.17 | Judicial Reference | 95 |
| 10.18 | No Advisory or Fiduciary Responsibility | 96 |
| 10.19 | Acknowledgement Regarding Any Supported QFCs | 96 |
| 10.20 | Acknowledgement and Consent to Bail-In of Affected Financial Institutions | 97 |

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page
1073 of 1367

SCHEDULES:

1.1     Commitments
3.1     Existing Letters of Credit
7.5     Sale and Lease Back Transactions

EXHIBITS:

A       Form of New Lender Supplement
B       Form of Commitment Increase Supplement
C       Form of Compliance Certificate
D       Form of Closing Certificate
E       Form of Assignment and Assumption
F       [Reserved]
G       Forms of U.S. Tax Compliance Certificates
H       Form of Note
I       Form of Solvency Certificate

This CREDIT AGREEMENT (this "Agreement"), dated as of July 1, 2020, among PACIFIC GAS AND ELECTRIC COMPANY, a California corporation (the "Borrower"), the several banks and other financial institutions or entities from time to time parties to this Agreement (the "Lenders") and JPMORGAN CHASE BANK, N.A. and CITIBANK, N.A., as co-administrative agents (in such capacity, the "Co-Administrative Agents") and CITIBANK, N.A., as designated agent (in such capacity, together with any permitted successor thereto, the "Designated Agent").

W I T N E S S E T H:

WHEREAS, on January 29, 2019, the Borrower and PG&E Corporation, a California corporation and the holder of all of the issued and outstanding common stock of the Borrower ("PCG", and together with Borrower, each, a "Debtor" and collectively, the "Debtors") filed voluntary petitions for relief in the United States Bankruptcy Court for the Northern District of California (the "Bankruptcy Court"), and commenced their respective cases under chapter 11 of title 11 of the United States Code;

WHEREAS, on June 19, 2020, the Debtors filed the Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization Dated June 19, 2020 [Docket No. 8048] (together with all exhibits, schedules, annexes, supplements, and other attachments thereto, and as may be further amended, modified or otherwise changed in accordance with this Agreement, the "Plan of Reorganization");

WHEREAS, on June 20, 2020, the Plan of Reorganization was confirmed by the Bankruptcy Court and is to be consummated on the Effective Date; and

WHEREAS, in connection with the foregoing, the Borrower has requested that the Lenders provide the commitments, loans and letters of credit set forth herein and the Lenders are willing to make available to the Borrower such commitments, loans and letters of credit upon the terms and subject to the conditions set forth herein.

NOW, THEREFORE, IT IS AGREED AS FOLLOWS:

SECTION 1.  DEFINITIONS

1.1  Defined Terms. As used in this Agreement, the terms listed in this Section 1.1 shall have the respective meanings set forth in this Section 1.1.

"ABR": for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the NYFRB Rate in effect on such day plus ½ of 1% and (c) the Eurodollar Rate for a one month Interest Period commencing on such day (or if such day is not a Business Day, the immediately preceding Business Day) plus 1%; provided that for the purpose of this definition, the Eurodollar Rate for any day shall be based on the Eurodollar Screen Rate (or if the Eurodollar Screen Rate is not available for such one month Interest Period, the Interpolated Rate) at approximately 11:00 a.m. London time on such day. Any change in the ABR due to a change in the Prime Rate, the NYFRB Rate or the Eurodollar Rate shall be effective from and including the effective date of such change in the Prime Rate, the NYFRB Rate or the Eurodollar Rate, respectively. If ABR is being used as an alternate rate of interest pursuant to Section 2.13 (for the

avoidance of doubt, only until any amendment has become effective pursuant to Section 2.13(b)), then ABR shall be the greater of clauses (a) and (b) above and shall be determined without reference to clause (c) above. If the ABR as determined pursuant to the foregoing would be less than 1.00%, such rate shall be deemed to be 1.00% for purposes of this Agreement.

"ABR Loans": Loans the rate of interest applicable to which is based upon the ABR.

"Affected Financial Institution": (a) any EEA Financial Institution or (b) any UK Financial Institution.

"Affiliate": with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"Agent Parties": as defined in Section 10.2(d)(ii).

"Agents": the collective reference to the Syndication Agents, the Documentation Agents, Co-Administrative Agents and the Designated Agent.

"Agreement": as defined in the preamble hereto.

"Anti-Corruption Laws": as defined in Section 4.15.

"Applicable Margin": for any day, the applicable rate per annum set forth under the relevant column heading below, based upon the Ratings then in effect:

| Level | Rating S&P/Moody's/Fitch | Applicable Margin for ABR Loans | Applicable Margin for Eurodollar Loans |
|---|---|---|---|
| 1 | Higher than BBB+/Baa1/BBB+ | 0.375% | 1.375% |
| 2 | BBB+/Baa1/BBB+ | 0.50% | 1.50% |
| 3 | BBB/Baa2/BBB | 0.75% | 1.75% |
| 4 | BBB-/Baa3/BBB- | 1.00% | 2.00% |
| 5 | BB+/Ba1/BB+ | 1.25% | 2.25% |
| 6 | Lower than BB+/Ba1/BB+ | 1.50% | 2.50% |

Subject to the provisions of this paragraph regarding split ratings, changes in the Applicable Margin shall become effective on the date on which S&P, Moody's and/or Fitch changes its relevant Rating. (a) If Ratings are issued by all three rating agencies and the respective Ratings issued by two or more of the rating agencies are in the same pricing level, that pricing level shall apply; (b) if Ratings are issued by all three rating agencies and none of the respective Ratings are in the same pricing level, the pricing level shall be determined based on the middle Rating; (c) if only two Ratings are issued and they differ by one level, then the pricing level for the higher of such Ratings shall apply; (d) if only two Ratings are issued and they differ by more than one level, then the pricing level that is one level lower than the pricing level of the higher Rating shall apply;

2

(e) if only one Rating is issued, the pricing level shall be determined based on that Rating; and (f) if no such Ratings in clauses (a) through (e) of this sentence are issued for the Borrower, but are generally available for other companies, then the Applicable Margin shall be those set forth above opposite pricing level 6.

"Application": an application, in such form as the relevant Issuing Lender may reasonably specify from time to time, requesting such Issuing Lender to issue a Letter of Credit.

"Approved Fund": with respect to any Lender, any Person (other than a natural person) that is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business that is administered or managed by (a) such Lender, (b) an Affiliate of such Lender or (c) an entity or an Affiliate of any entity that administers or manages such Lender.

"Arrangers": the Joint Lead Arrangers and Joint Bookrunners identified on the cover hereto.

"A/R Securitization Assets": (i) any accounts receivable, notes receivable, rights to future accounts receivable, notes receivable or residuals or other similar rights to payments due or any other rights to payment or related assets in respect of the provision of gas and electric service to consumers or otherwise (whether then existing or arising in the future) of the Borrower or any of its Subsidiaries and the proceeds thereof and (ii) all collateral securing such receivable or asset, all contracts and contract rights, guarantees or other obligations in respect of such receivable or asset, lockbox accounts and records with respect to such receivables or asset and any other assets customarily transferred (or in respect of which security interests are customarily granted) together with receivables or assets in connection with a securitization transaction involving such assets.

"A/R Securitization Subsidiary": PG&E AR Facility, LLC and any other Subsidiary formed and operating solely for the purpose of entering into A/R Securitization Transactions and engaging in activities ancillary thereto.

"A/R Securitization Transaction": any financing transaction or series of financing transactions entered into by the Borrower or any Subsidiary of the Borrower pursuant to which the Borrower may sell, convey or otherwise transfer to any Person (including, without limitation, an A/R Securitization Subsidiary), or may grant a security interest in any A/R Securitization Assets and that are (other than to the extent of the Standard A/R Securitization Obligations) non-recourse to the Borrower or any of its Subsidiaries (other than an A/R Securitization Subsidiary).

"Assignee": as defined in Section 10.6(b).

"Assignment and Assumption": an Assignment and Assumption, substantially in the form of Exhibit E.

"Auto-Extension Letter of Credit": as defined in Section 3.2.

"Available Commitment": as to any Lender at any time, an amount equal to the excess, if any, of (a) such Lender's Commitment then in effect over (b) such Lender's Extensions of Credit then outstanding.

3

"Bail-In Action": the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"Bail-In Legislation": (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation, rule or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"Bankruptcy Court": as defined in the first recital paragraph.

"Benchmark Replacement": the sum of: (a) the alternate benchmark rate (which may be a SOFR-Based Rate) that has been selected by the Designated Agent and the Borrower giving due consideration to (i) any selection or recommendation of a replacement rate or the mechanism for determining such a rate by the Relevant Governmental Body and/or (ii) any evolving or then-prevailing market convention for determining a rate of interest as a replacement to the Eurodollar Base Rate for U.S. dollar-denominated syndicated credit facilities and (b) the Benchmark Replacement Adjustment; provided that, if the Benchmark Replacement as so determined would be less than zero, the Benchmark Replacement will be deemed to be zero for the purposes of this Agreement; provided further that any such Benchmark Replacement shall be administratively feasible as determined by the Designated Agent in its sole discretion.

"Benchmark Replacement Adjustment": the spread adjustment, or method for calculating or determining such spread adjustment (which may be a positive or negative value or zero), that has been selected by the Designated Agent and the Borrower giving due consideration to (i) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of the Eurodollar Base Rate with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body and/or (ii) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of the Eurodollar Base Rate with the applicable Unadjusted Benchmark Replacement for U.S. dollar-denominated syndicated credit facilities at such time (for the avoidance of doubt, such Benchmark Replacement Adjustment shall not be in the form of a reduction to the Applicable Margin).

"Benchmark Replacement Conforming Changes": with respect to any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "ABR," the definition of "Interest Period," timing and frequency of determining rates and making payments of interest and other administrative matters) that the Designated Agent decides in its reasonable discretion may be appropriate to reflect the adoption and implementation of such Benchmark Replacement and to permit the administration thereof by the Designated Agent in a manner substantially consistent with market practice (or, if the Designated Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Designated Agent determines that no market practice for the administration of the Benchmark Replacement exists, in such other manner of administration as the Designated Agent decides is reasonably necessary in connection with the administration of this Agreement).

4

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 1078 of 1367

"Benchmark Replacement Date": the earlier to occur of the following events with respect to the Eurodollar Base Rate:

(1)    in the case of clause (1) or (2) of the definition of "Benchmark Transition Event," the later of (a) the date of the public statement or publication of information referenced therein and (b) the date on which the administrator of the Eurodollar Screen Rate permanently or indefinitely ceases to provide the Eurodollar Screen Rate; and

(2)    in the case of clause (3) of the definition of "Benchmark Transition Event," the date of the public statement or publication of information referenced therein.

"Benchmark Transition Event": the occurrence of one or more of the following events with respect to the Eurodollar Base Rate:

(1)    a public statement or publication of information by or on behalf of the administrator of the Eurodollar Screen Rate announcing that such administrator has ceased or will cease to provide the Eurodollar Screen Rate, permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide the Eurodollar Screen Rate;

(2)    a public statement or publication of information by the regulatory supervisor for the administrator of the Eurodollar Screen Rate, the U.S. Federal Reserve System, an insolvency official with jurisdiction over the administrator for the Eurodollar Screen Rate, a resolution authority with jurisdiction over the administrator for the Eurodollar Screen Rate or a court or an entity with similar insolvency or resolution authority over the administrator for the Eurodollar Screen Rate, in each case which states that the administrator of the Eurodollar Screen Rate has ceased or will cease to provide the Eurodollar Screen Rate permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide the Eurodollar Screen Rate; and/or

(3)    a public statement or publication of information by the regulatory supervisor for the administrator of the Eurodollar Screen Rate announcing that the Eurodollar Screen Rate is no longer representative.

"Benchmark Transition Start Date": (a) in the case of a Benchmark Transition Event, the earlier of (i) the applicable Benchmark Replacement Date and (ii) if such Benchmark Transition Event is a public statement or publication of information of a prospective event, the 90th day prior to the expected date of such event as of such public statement or publication of information (or if the expected date of such prospective event is fewer than 90 days after such statement or publication, the date of such statement or publication) and (b) in the case of an Early Opt-in Election, the date specified by the Designated Agent or the Required Lenders, as applicable, by notice to the Borrower, the Designated Agent (in the case of such notice by the Required Lenders) and the Lenders.

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 1079 of 1367

"<u>Benchmark Unavailability Period</u>": if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred with respect to the Eurodollar Base Rate and solely to the extent that the Eurodollar Base Rate has not been replaced with a Benchmark Replacement, the period (a) beginning at the time that such Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the Eurodollar Base Rate for all purposes hereunder in accordance with Section 2.13 and (b) ending at the time that a Benchmark Replacement has replaced the Eurodollar Base Rate for all purposes hereunder pursuant to Section 2.13.

"<u>Beneficial Owner</u>": as defined in Rule 13d-3 and Rule 13d-5 under the Exchange Act, except that in calculating the beneficial ownership of any particular "person" (as that term is used in Sections 13(d) and 14(d) of the Exchange Act), such "person" will be deemed to have beneficial ownership of all securities that such "person" has the right to acquire by conversion or exercise of other securities, whether such right is currently exercisable or is exercisable only upon the occurrence of a subsequent condition. The terms "Beneficially Owns" and "Beneficially Owned" have correlative meanings.

"<u>Beneficial Ownership Certification</u>": a certification regarding beneficial ownership or control as required by the Beneficial Ownership Regulation.

"<u>Beneficial Ownership Regulation</u>": 31 C.F.R. § 1010.230.

"<u>Benefit Plan</u>": any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in and subject to Section 4975 of the Code or (c) any Person whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

"<u>Benefitted Lender</u>": as defined in Section 10.7(a).

"<u>BHC Act Affiliate</u>": an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)).

"<u>Board</u>": the Board of Governors of the Federal Reserve System of the United States (or any successor).

"<u>Bond Delivery Agreement</u>": (i) that certain Bond Delivery Agreement, dated as of the Effective Date, between the Borrower and the Designated Agent and (ii) any bond delivery agreement entered into in connection with the issuance of any new First Mortgage Bonds to the Designated Agent pursuant to Sections 2.3(g) or 2.7(a).

"<u>Bond Documents</u>": collectively, the FMB Indenture, the Supplemental Indenture, the Senior Bond and the Bond Delivery Agreement.

"<u>Borrower</u>": as defined in the preamble hereto.

"<u>Borrowing Date</u>": any Business Day specified by the Borrower as a date on which the Borrower requests the Lenders to make Loans hereunder.

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 1080 of 1367

"Business Day": a day other than a Saturday, Sunday or other day on which commercial banks in New York City or San Francisco, California are authorized or required by law to close, provided, that with respect to notices and determinations in connection with, and payments of principal and interest on, Eurodollar Loans, such day is also a day for trading by and between banks in Dollar deposits in the London interbank eurodollar market.

"Capital Lease Obligations": as to any Person, the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on the balance sheet of such Person under GAAP and, for the purposes of this Agreement, the amount of such obligations at any time shall be the capitalized amount thereof at such time determined in accordance with GAAP, subject to Section 1.2(f).

"Capital Stock": any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation) and any and all warrants, rights or options to purchase any of the foregoing.

"Cash Management Agreement": any agreement to establish or maintain accounts or provide cash management services, including treasury, depository, overdraft, netting services, cash pooling arrangements, credit or debit card, purchasing card, electronic funds transfer, automated clearing house, foreign exchange facilities and other cash management arrangements.

"Change of Control": the occurrence of one of the following:

(i)     (A) PCG shall at any time not be the Beneficial Owner of 100% of the common stock of the Borrower or (B) PCG shall at any time not be the Beneficial Owner of at least 70% of the voting Capital Stock of the Borrower; or

(ii)     any person or group (within the meaning of the Exchange Act and the rules of the SEC thereunder as of the Effective Date) shall become the Beneficial Owner of shares representing more than 35% of the voting power of the Capital Stock of PCG; or

(iii)     at any point during any period of 24 consecutive months, commencing after the Effective Date, individuals who at the beginning of such 24-month period were directors of PCG, together with any directors whose election or nomination for election to the board of directors of PCG (whether by the board of directors of PCG or any shareholder of PCG) was approved by a majority of the directors who either were directors of PCG at the beginning of such 24-month period or whose election or nomination for election was so approved, cease to constitute a majority of the board of directors of PCG (it being understood and agreed that, for the avoidance of doubt, the change of directors of PCG contemplated by the Plan of Reorganization shall not constitute a Change of Control); or

(iv)     there shall have been (A) a receiver appointed pursuant to an order from the State of California or a revocation of Certificate of Public Convenience and Necessity of the Borrower, in each case, in accordance with Order Instituting Investigation on the Commission's Own Motion to Consider the Ratemaking and Other Implications of a Proposed Plan for Resolution of Voluntary Cases filed by Pacific Gas and Electric

7

Company Pursuant to Chapter 11 of the Bankruptcy Code, in the United States Bankruptcy Court, Northern District of California, San Francisco Division, In re Pacific Gas and Electric Corporation and Pacific Gas and Electric Company, Case No. 19-30088 or otherwise or (B) a transfer of the license and/or operating assets constituting more than 10% of the Net Tangible Assets of the Borrower to the State of California, to any other Governmental Authority or to a third party at the direction of State of California, the CPUC or any similar Governmental Authority.

"Change of Law": the occurrence, after the Effective Date, of any of the following: (a) the adoption or taking effect of any law, rule, regulation, statute, treaty, policy, guideline or directive by any Governmental Authority, (b) any change in any law, rule, regulation, statute, treaty, policy, guideline or directive or in the application, interpretation, promulgation, implementation, administration or enforcement thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change of Law", regardless of the date enacted, adopted or issued.

"Code": the Internal Revenue Code of 1986, as amended from time to time.

"Commitment": as to any Lender, the obligation of such Lender, if any, to make Revolving Loans and participate in Letters of Credit in an aggregate principal and/or face amount not to exceed the amount set forth under the heading "Commitment" opposite such Lender's name on Schedule 1.1 or in the Assignment and Assumption or New Lender Supplement pursuant to which such Lender became a party hereto, as the same may be changed from time to time pursuant to the terms hereof. The original amount of the Total Commitments is $3,500,000,000.

"Commitment Fee Rate": for any day, the rate per annum determined pursuant to the grid set forth below, based upon the Ratings then in effect:

| Level | Rating S&P/Moody's/Fitch | Commitment Fee Rate |
|---|---|---|
| 1 | Higher than BBB+/Baa1/BBB+ | 0.25% |
| 2 | BBB+/Baa1/BBB+ | 0.275% |
| 3 | BBB/Baa2/BBB | 0.325% |
| 4 | BBB-/Baa3/BBB- | 0.375% |
| 5 | BB+/Ba1/BB+ | 0.425% |
| 6 | Lower than BB+/Ba1/BB+ | 0.50% |

Subject to the provisions of this paragraph regarding split ratings, changes in the Commitment Fee Rate shall become effective on the date on which S&P, Moody's and/or Fitch changes its relevant Rating. (a) If Ratings are issued by all three rating agencies and the respective Ratings issued by two or more of the rating agencies are in the same pricing level, that pricing level shall apply; (b)

8

if Ratings are issued by all three rating agencies and none of the respective Ratings are in the same pricing level, the Commitment Fee Rate shall be determined based on the middle Rating; (c) if only two Ratings are issued and they differ by one level, then the Commitment Fee Rate for the higher of such Ratings shall apply; (d) if only two Ratings are issued and they differ by more than one level, then the Commitment Fee Rate that is one level lower than the Commitment Fee Rate of the higher Rating shall apply; (e) if only one Rating is issued, the Commitment Fee Rate shall be determined based on that Rating; and (f) if no such Ratings in clauses (a) through (e) of this sentence are issued for the Borrower, but are generally available for other companies, then the Commitment Fee Rate shall be that set forth above opposite pricing level 6.

"Commitment Increase Notice": as defined in Section 2.3(a).

"Commitment Letter": that certain RCF Commitment Letter dated as of May 26, 2020 among Pacific Gas and Electric Company, as the borrower, PG&E Corporation and the commitment parties from time to time party thereto, as amended, modified or supplemented from time to time prior to the date hereof.

"Commitment Period": the period from and including the Effective Date to the Termination Date.

"Commonly Controlled Entity": an entity, whether or not incorporated, that is under common control with the Borrower within the meaning of Section 4001 of ERISA or is part of a group that includes the Borrower and that is treated as a single employer under Section 414 of the Code.

"Communications": as defined in Section 10.2(d)(ii).

"Compliance Certificate": a certificate duly executed by a Responsible Officer substantially in the form of Exhibit C.

"Compounded SOFR": the compounded average of SOFRs for the applicable Corresponding Tenor, with the rate, or methodology for this rate, and conventions for this rate (which may include compounding in arrears with a lookback and/or suspension period as a mechanism to determine the interest amount payable prior to the end of each Interest Period) being established by the Designated Agent in accordance with:

(1) the rate, or methodology for this rate, and conventions for this rate selected or recommended by the Relevant Governmental Body for determining compounded SOFR; provided that:

(2) if, and to the extent that, the Designated Agent determines that Compounded SOFR cannot be determined in accordance with clause (1) above, then the rate, or methodology for this rate, and conventions for this rate that the Designated Agent determines in its reasonable discretion are substantially consistent with any evolving or then-prevailing market convention for determining compounded SOFR for U.S. dollar-denominated syndicated credit facilities at such time;

9

*provided*, *further*, that if the Designated Agent decides that any such rate, methodology or convention determined in accordance with clause (1) or clause (2) is not administratively feasible for the Designated Agent, then Compounded SOFR will be deemed unable to be determined for purposes of the definition of "Benchmark Replacement."

"Conduit Lender": any special purpose corporation organized and administered by any Lender for the purpose of making Loans otherwise required to be made by such Lender and designated by such Lender in a written instrument; *provided*, that the designation by any Lender of a Conduit Lender shall not relieve the designating Lender of any of its obligations to fund a Loan under this Agreement if, for any reason, its Conduit Lender fails to fund any such Loan, and the designating Lender (and not the Conduit Lender) shall have the sole right and responsibility to deliver all consents and waivers required or requested under this Agreement with respect to its Conduit Lender, and *provided*, *further*, that no Conduit Lender shall (a) be entitled to receive any greater amount pursuant to Sections 2.15, 2.16, 2.17 or 10.5 than the designating Lender would have been entitled to receive in respect of the extensions of credit made by such Conduit Lender or (b) be deemed to have any Commitment.

"Connection Income Taxes": Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Consolidated Capitalization": on any date of determination, the sum of (a) Consolidated Total Debt on such date, *plus* without duplication, (b) (i) the amounts set forth opposite the captions "common shareholders' equity" (or any similar caption) and "preferred stock" (or any similar caption) on the consolidated balance sheet, prepared in accordance with GAAP, of the Borrower and its Subsidiaries as of such date, and (ii) the outstanding principal amount of any junior subordinated deferrable interest debentures or other similar securities issued by the Borrower or any of its Subsidiaries after the Effective Date.

"Consolidated Capitalization Ratio": on any date of determination, the ratio of (a) Consolidated Total Debt to (b) Consolidated Capitalization.

"Consolidated Total Debt": at any date, the aggregate principal amount of all obligations of the Borrower and its Significant Subsidiaries at such date that in accordance with GAAP would be classified as debt on a consolidated balance sheet of the Borrower, and without duplication all Guarantee Obligations of the Borrower and its Significant Subsidiaries at such in respect of obligations of any other Person that in accordance with GAAP would be classified as debt on a consolidated balance sheet of such Person; *provided that*, the determination of "Consolidated Total Debt" shall exclude, without duplication, (a) the Securitized Bonds and any Indebtedness under any A/R Securitization Transaction, (b) Indebtedness of the Borrower and its Significant Subsidiaries in an amount equal to the amount of cash held as cash collateral for any fully cash collateralized letter of credit issued for the account of the Borrower or any Significant Subsidiary, (c) imputed Indebtedness of the Borrower or any Significant Subsidiary incurred in connection with power purchase and fuel agreements, (d) any junior subordinated deferrable interest debenture or other similar securities issued by the Borrower and (e) as of any date of determination, the amount of any securities included within the caption "preferred stock" (or any similar caption) on a consolidated balance sheet, prepared in accordance with GAAP, of the Borrower as of such date.

10

"Continuing Lender": as defined in Section 2.7.

"Contractual Obligation": as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Control": the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Corresponding Tenor": with respect to a Benchmark Replacement, a tenor (including overnight) having approximately the same length (disregarding business day adjustment) as the applicable tenor for the applicable Interest Period with respect to the Eurodollar Base Rate.

"Covered Entity": any of the following:

(i)      a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b);

(ii)     a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or

(iii)    a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"Covered Party": as defined in Section 10.19.

"Co-Administrative Agents": as defined in the preamble hereto.

"CPUC": the California Public Utilities Commission or its successor.

"Credit Event": as defined in Section 5.2.

"Debtor Relief Laws": the Bankruptcy Code of the United States, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect.

"Debtors": as defined in the first recital paragraph.

"Default": any of the events specified in Section 8, whether or not any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

"Default Right": the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

11

"Defaulting Lender": subject to the penultimate paragraph of Section 2.20, any Lender, as reasonably determined by the Designated Agent, that has (a) failed to fund any portion of its Revolving Loans or Participation Amounts within two (2) Business Days of the date required to be funded by it under this Agreement, unless such Lender notifies the Designated Agent in writing that such failure is the result of such Lender's good faith determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable Default, shall be specifically identified in such writing) has not been satisfied, (b) notified the Borrower, the Designated Agent, any Issuing Lender or any other Lender in writing that it does not intend to comply with any of its funding obligations under this Agreement or has made a public statement to the effect that it does not intend to comply with its funding obligations under this Agreement (other than a notice of a good faith dispute or related communications) or generally under other agreements in which it commits to extend credit, unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's good faith determination that a condition precedent to funding (which condition precedent, together with any applicable Default, shall be specifically identified in such writing or public statement) cannot be satisfied, (c) failed, within two (2) Business Days after written request by the Designated Agent or the Borrower, to confirm that it will comply with the terms of this Agreement relating to its obligations to fund prospective Revolving Loans and Participation Amounts, unless the subject of a good faith dispute (provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Designated Agent or the Borrower), (d) otherwise failed to pay over to the Designated Agent or any other Lender any other amount required to be paid by it under this Agreement within two (2) Business Days of the date when due, unless the subject of a good faith dispute, or (e) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, (ii) had a custodian appointed for it, or has consented to, approved of or acquiesced in any such proceeding or appointment or has a parent company that has become the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee or custodian appointed for it, or has consented to, approved of or acquiesced in any such proceeding or appointment, or (iii) become the subject of a Bail-In Action; provided that (x) if a Lender would be a "Defaulting Lender" solely by reason of events relating to a parent company of such Lender or solely because a Governmental Authority has been appointed as receiver, conservator, trustee or custodian for such Lender, in each case as described in clause (e) above, the Designated Agent and each Issuing Lender may, in their discretion, determine that such Lender is not a "Defaulting Lender" if and for so long as the Designated Agent and each Issuing Lender is satisfied that such Lender will continue to perform its funding obligations hereunder and (y) a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of voting stock or any other Capital Stock in such Lender or a parent company thereof by a Governmental Authority or an instrumentality thereof, or the exercise of control over such Lender or parent company thereof, by a Governmental Authority or instrumentality thereof so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender. Any determination by the Designated Agent that a Lender is a Defaulting Lender under any one or more of clauses (a) through (e) above shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to the penultimate paragraph of Section 2.20) upon delivery of written notice of such determination to the Borrower, each Issuing Lender and each Lender.

"Designated Agent": as defined in the preamble hereto.

12

"Disposition": with respect to any property, any sale, lease, sale and leaseback, assignment, conveyance, transfer or other disposition thereof. The term "Dispose of" shall have a correlative meaning.

"Documentation Agents": as defined on the cover hereto.

"Dollars" and "$": dollars in lawful currency of the United States.

"Drawing Documents": as defined in Section 3.6.

"Early Opt-in Election": the occurrence of:

(1)    (i) a determination by the Designated Agent or (ii) a notification by the Required Lenders to the Designated Agent (with a copy to the Borrower) that the Required Lenders have determined that U.S. dollar-denominated syndicated credit facilities being executed at such time, or that include language similar to that contained in Section 2.13 are being executed or amended, as applicable, to incorporate or adopt a new benchmark interest rate to replace the Eurodollar Base Rate; and

(2)    (i) the election by the Designated Agent or (ii) the election by the Required Lenders to declare that an Early Opt-in Election has occurred and the provision, as applicable, by the Designated Agent of written notice of such election to the Borrower and the Lenders or by the Required Lenders of written notice of such election to the Designated Agent.

"EEA Financial Institution": (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country": any of the member states of the European Union, Iceland, Liechtenstein and Norway.

"EEA Resolution Authority": any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Effective Date": the date on which the conditions precedent set forth in Section 5.1 shall have been satisfied or waived.

"Eligible Assignee": (a) any commercial bank or other financial institution having a senior unsecured debt rating by Moody's of A3 or better and by S&P of A- or better, which is domiciled in a country which is a member of the OECD or (b) with respect to any Person referred to in the preceding clause (a), any other Person that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course of business all of the Capital Stock of which is owned, directly or indirectly, by such Person; provided that in the case of clause (b), the Designated Agent and each Issuing Lender shall have consented to the designation of such Person as an Eligible Assignee (such consent not to be unreasonably withheld or delayed).

13

"<u>Environmental Laws</u>": any and all foreign, Federal, state, local or municipal laws, rules, orders, regulations, statutes, ordinances, codes, decrees, requirements of any Governmental Authority or other Requirements of Law (including common law) regulating, relating to or imposing liability or standards of conduct concerning protection of human health or the environment, as now or may at any time hereafter be in effect.

"<u>ERISA</u>": the Employee Retirement Income Security Act of 1974, as amended from time to time.

"<u>ERISA Event</u>": (a) any Reportable Event; (b) the failure of the Borrower or any Commonly Controlled Entity to timely make a required contribution with respect to any Plan or any Multiemployer Plan; (c) the imposition of a Lien under Section 430 of the Code or Section 303 of ERISA with respect to any Single Employer Plan; (d) the failure of the Borrower or any Commonly Controlled Entity to meet the minimum funding standard under Section 412 or 430 of the Code with respect to any Plan or the filing of an application for a funding waiver with respect to any Single Employer Plan; (e) the incurrence by the Borrower or any Commonly Controlled Entity of any liability under Title IV of ERISA, including with respect to the termination of any Plan (other than the payment of PBGC premiums in the ordinary course); (f) (i) the termination of, or the filing or receipt of a notice of intent to terminate, a Single Employer Plan under Section 4041 of ERISA, or the treatment of a plan amendment as a termination under Section 4041 of ERISA, or (ii) (A) the appointment of a trustee to administer a Single Employer Plan under Section 4042, or (B) the institution by the PBGC of proceedings to terminate a Single Employer Plan or to have a trustee appointed to administer a Single Employer Plan, or receipt by the Borrower of notice from the PBGC thereof, where such proceedings continue unstayed or in effect for more than 60 days, or such notice is not withdrawn by the PBGC within 60 days following delivery by PBGC; (g) the incurrence by the Borrower or any Commonly Controlled Entity of any liability with respect to the complete withdrawal or partial withdrawal under Title IV of ERISA from any Multiemployer Plan; (h) the receipt by the Borrower or any Commonly Controlled Entity of any notice from a Multiemployer Plan concerning the imposition of Withdrawal Liability; (i) receipt of notification by Borrower or any Commonly Controlled Entity from a Multiemployer Plan that such Multiemployer Plan is in endangered or critical status (within the meaning of Section 305 of ERISA) or in Insolvency; (j) the incurrence by the Borrower or any Commonly Controlled Entity of any liability pursuant to Section 4063 or 4064 of ERISA or a substantial cessation of operations with respect to a Plan within the meaning of Section 4062(e) of ERISA; (k) the posting of a bond or security under Section 436(f) of the Code with respect to any Plan; or (l) the Borrower incurs material tax liability with respect to any Plan (including Sections 4975, 4980B, 4980D, 4980H and 4980I of the Code, as applicable).

"<u>Escrow Deposit and Disbursement Agreement</u>": that certain Escrow Deposit Agreement and Disbursement Agreement, dated as of the Effective Date, by and among the Borrower and the Indenture Trustee.

"<u>EU Bail-In Legislation Schedule</u>": the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

14

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 1088 of 1367

"Eurocurrency Liabilities": as defined in Regulation D of the Board.

"Eurocurrency Reserve Requirements": of any Lender for any Interest Period as applied to a Eurodollar Loan, the reserve percentage applicable during such Interest Period (or if more than one such percentage shall be so applicable, the daily average of such percentages for those days in such Interest Period during any such percentage shall be so applicable) under any regulations of the Board or other Governmental Authority having jurisdiction with respect to determining the maximum reserve requirement (including basic, supplemental and emergency reserves) for such Lender with respect to liabilities or assets consisting of or including Eurocurrency Liabilities having a term equal to such Interest Period.

"Eurodollar Base Rate": with respect to each day during each Interest Period pertaining to a Eurodollar Loan, the Eurodollar Screen Rate at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period; provided that if the Eurodollar Screen Rate shall not be available at such time for such Interest Period (an "Impacted Interest Period") then the Eurodollar Base Rate shall be the Interpolated Rate.

"Eurodollar Loans": Loans the rate of interest applicable to which is based upon the Eurodollar Rate.

"Eurodollar Rate": with respect to each day during each Interest Period pertaining to a Eurodollar Loan, a rate per annum determined for such day in accordance with the following formula (rounded upwards, if necessary, to the next 1/16 of 1%):

$$\frac{\text{Eurodollar Base Rate}}{1.00 - \text{Eurocurrency Reserve Requirements}}$$

"Eurodollar Screen Rate": for any day and time, with respect to any Eurodollar Loan for any Interest Period, the London interbank offered rate as administered by ICE Benchmark Administration (or any other Person that takes over the administration of such rate) for a period equal in length to such Interest Period as displayed on such day and time on pages LIBOR01 or LIBOR02 of the Reuters screen that displays such rate (or, in the event such rate does not appear on a Reuters page or screen, on any successor or substitute page on such screen that displays such rate, or on the appropriate page of such other information service that publishes such rate from time to time as selected by the Designated Agent in its reasonable discretion); provided that if the Eurodollar Screen Rate as so determined would be less than zero, such rate shall be deemed to zero for the purposes of this Agreement.

"Eurodollar Tranche": the collective reference to Eurodollar Loans the then current Interest Periods with respect to all of which begin on the same date and end on the same later date (whether or not such Loans shall originally have been made on the same day).

"Event of Default": any of the events specified in Section 8, provided that any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

"Exchange Act": Securities Exchange Act of 1934, as amended.

15

"Excluded Taxes": any of the following Taxes imposed on or with respect to any Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by the Borrower under Section 2.19) or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.16(a) or (c), amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure to comply with Section 2.16(e) and (d) any U.S. federal withholding Taxes imposed pursuant to FATCA.

"Existing Letter of Credit": each letter of credit issued prior to the Effective Date by a Person that shall be an Issuing Lender listed on Schedule 3.1.

"Extension Notice": as defined in Section 2.7(b).

"Extensions of Credit": as to any Lender at any time, an amount equal to the sum of (a) the aggregate principal amount of all Revolving Loans held by such Lender then outstanding and (b) such Lender's Percentage of the L/C Obligations then outstanding.

"FATCA": Sections 1471 through 1474 of the Code, as of the Effective Date (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code.

"FCPA": as defined in Section 4.15.

"Federal Funds Effective Rate": for any day, the rate calculated by the NYFRB based on such day's federal funds transactions by depositary institutions, as determined in such manner as shall be set forth on the Federal Reserve Bank of New York's Website from time to time, and published on the next succeeding Business Day by the NYFRB as the effective federal funds rate; provided that if the Federal Funds Effective Rate as so determined would be less than zero, such rate shall be deemed to be zero for the purposes of this Agreement.

"Federal Reserve Bank of New York's Website": the website of the NYFRB at http://www.newyorkfed.org, or any successor source.

"Fee Payment Date": (a) the fifth Business Day following the last day of each March, June, September and December during the Commitment Period and (b) the last day of the Commitment Period.

"First Mortgage Bonds": bonds issued by the Borrower pursuant to the FMB Indenture.

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 1090 of 1367

"Fitch": Fitch Ratings, Inc. and any successor thereto.

"FMB Indenture": the Indenture of Mortgage (Mortgage), dated as of June 19, 2020, between the Borrower and the Indenture Trustee (as supplemented by the Supplemental Indenture) and as further supplemented or amended from time to time.

"Foreign Lender": a Lender or an Issuing Lender that is not a U.S. Person.

"FPA": the Federal Power Act, as amended, and the rules and regulations promulgated thereunder.

"Fronting Exposure": at any time there is a Defaulting Lender, such Defaulting Lender's Percentage of L/C Obligations other than L/C Obligations as to which such Defaulting Lender's participation obligation has been reallocated to other Lenders or cash collateralized in accordance with the terms hereof.

"Funding Office": the office of the Designated Agent specified in Section 10.2(a) or such other office as may be specified from time to time by the Designated Agent as its funding office by written notice to the Borrower and the Lenders.

"GAAP": generally accepted accounting principles in the United States as in effect from time to time, except as noted below. In the event that any "Change in Accounting Principles" (as defined below) shall occur and such change results in a change in the method of calculation of financial covenants, standards or terms in this Agreement, then, upon the request of the Borrower or the Required Lenders, the Borrower and the Designated Agent agree to enter into negotiations in order to amend such provisions of this Agreement so as to reflect equitably such Change in Accounting Principles with the desired result that the criteria for evaluating the Borrower's financial condition shall be the same after such Change in Accounting Principles as if such Change in Accounting Principles had not been made. Until such time as such an amendment shall have been executed and delivered by the Borrower, the Designated Agent and the Required Lenders, all financial covenants, standards and terms in this Agreement shall continue to be calculated or construed as if such Change in Accounting Principles had not occurred. "Change in Accounting Principles" refers to (i) changes in accounting principles required by the promulgation of any rule, regulation, pronouncement or opinion by the Financial Accounting Standards Board of the American Institute of Certified Public Accountants or any successor thereto, the SEC or, if applicable, the Public Company Accounting Oversight Board and (ii) any change in the application of GAAP concurred by the Borrower's independent public accountants and disclosed in writing to the Designated Agent.

"Governmental Authority": any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government, any securities exchange and any self-regulatory organization (including the National Association of Insurance Commissioners and supra-national bodies such as the European Union or the European Central Bank).

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 1091 of 1367

"Guarantee Obligation": as to any Person (the "guaranteeing person"), any obligation, including a reimbursement, counterindemnity or similar obligation, of the guaranteeing person that guarantees any Indebtedness, leases, dividends or other obligations (the "primary obligations") of any other third Person (the "primary obligor") in any manner, whether directly or indirectly, including any obligation of the guaranteeing person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (1) for the purchase or payment of any such primary obligation or (2) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation, (iv) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof or (v) to reimburse or indemnify an issuer of a letter of credit, surety bond or guarantee issued by such issuer in respect of primary obligations of a primary obligor other than the Borrower or any Significant Subsidiary; provided, however, that the term Guarantee Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business. The amount of any Guarantee Obligation of any guaranteeing person shall be deemed to be the lower of (a) an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee Obligation is made and (b) the maximum amount for which such guaranteeing person may be liable pursuant to the terms of the instrument embodying such Guarantee Obligation, unless such primary obligation and the maximum amount for which such guaranteeing person may be liable are not stated or determinable, in which case the amount of such Guarantee Obligation shall be such guaranteeing person's reasonably anticipated liability in respect thereof as determined by the Borrower in good faith.

"IBA": as defined in Section 1.4.

"Indebtedness": of any Person at any date, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person for the deferred purchase price of property or services (other than trade payables, including under energy procurement and transportation contracts, incurred in the ordinary course of such Person's business), (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) all Capital Lease Obligations of such Person, (f) all obligations of such Person, contingent or otherwise, as an account party or applicant under or in respect of acceptances, letters of credit, surety bonds or similar arrangements (other than reimbursement obligations, which are not due and payable on such date, in respect of documentary letters of credit issued to provide for the payment of goods and services in the ordinary course of business), (g) the liquidation value of all mandatorily redeemable preferred Capital Stock of such Person, (h) all Guarantee Obligations of such Person in respect of obligations of the kind referred to in clauses (a) through (g) above, (i) all obligations of the kind referred to in clauses (a) through (h) above secured by (or for which the holder of such obligation has an existing right, contingent or otherwise, to be secured by) any Lien on property (including accounts and contract rights) owned by such Person, whether or not such Person has assumed or become liable for the payment of such obligation (provided, that if such Person is not liable for such obligation, the amount of such Person's Indebtedness with respect thereto shall be deemed to be the lesser of the stated amount of such obligation and the value of the property subject to such Lien), and (j) for the purposes of Sections 7.1 and 8(e) only, all

18

obligations of such Person in respect of Swap Agreements, <u>provided</u> that Indebtedness as used in this Agreement shall exclude any Non-Recourse Debt and any obligations under any A/R Securitization Transaction. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness expressly provide that such Person is not liable therefor.

"<u>Indebtedness Covenant Release Date</u>": the earlier to occur of (a) the retirement, repayment or refinancing of all of the Borrower's obligations under the Temporary Utility Debt with proceeds of either equity contributions from PCG, excess cash from operations or Securitized Bonds and (b) the expiration of the temporary waiver from its authorized capital structure granted by the CPUC on May 28, 2020.

"<u>Indemnified Liabilities</u>": as defined in Section 10.5.

"<u>Indemnified Taxes</u>": (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Borrower under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"<u>Indemnitee</u>": as defined in Section 10.5.

"<u>Indenture Trustee</u>": The Bank of New York Mellon Trust Company, N.A. and any successor thereto as trustee under the FMB Indenture.

"<u>Insolvency</u>": with respect to any Multiemployer Plan, the condition that such plan is insolvent within the meaning of Section 4245 of ERISA.

"<u>Interest Payment Date</u>": (a) as to any ABR Loan, the last day of each March, June, September and December to occur while such Loan is outstanding and the final maturity date of such Loan, (b) as to any Eurodollar Loan having an Interest Period of three months or less, the last day of such Interest Period, (c) as to any Eurodollar Loan having an Interest Period longer than three months, each day that is three months, or a whole multiple thereof, after the first day of such Interest Period and the last day of such Interest Period and (d) as to any Loan, the date of any repayment or prepayment made in respect thereof.

"<u>Interest Period</u>": as to any Eurodollar Loan, (a) initially, the period commencing on the borrowing or conversion date, as the case may be, with respect to such Eurodollar Loan and ending one week thereafter or one, two, three or six or (if agreed to by all Lenders) twelve months thereafter, as selected by the Borrower in its notice of borrowing or notice of conversion, as the case may be, given with respect thereto; and (b) thereafter, each period commencing on the last day of the next preceding Interest Period applicable to such Eurodollar Loan and ending one week thereafter or one, two, three or six or (if agreed to by all Lenders) twelve months thereafter, as selected by the Borrower by irrevocable notice to the Designated Agent not later than 12:00 Noon, New York City time, on the date that is three Business Days prior to the last day of the then current Interest Period with respect thereto; <u>provided</u> that, all of the foregoing provisions relating to Interest Periods are subject to the following:

19

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 1093 of 1367

(i)    if any Interest Period would otherwise end on a day that is not a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless the result of such extension would be to carry such Interest Period into another calendar month in which event such Interest Period shall end on the immediately preceding Business Day;

(ii)   the Borrower may not select an Interest Period that would extend beyond the Termination Date;

(iii)   any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of a calendar month;

(iv)   the Borrower shall select Interest Periods so as not to require a payment or prepayment of any Eurodollar Loan during an Interest Period for such Loan; and

(v)   at the election of the Borrower, the initial Interest Period for any Eurodollar Loans made on the Effective Date, shall commence on the Effective Date and end on the last day of the calendar month during which the Effective Date occurs.

"Interpolated Rate": at any time, for any Interest Period, the rate per annum (rounded to the same number of decimal places as the Eurodollar Screen Rate) determined by the Designated Agent (which determination shall be conclusive and binding absent manifest error) to be equal to the rate that results from interpolating on a linear basis between: (a) the Eurodollar Screen Rate for the longest period (for which the Eurodollar Screen Rate is available) that is shorter than the Impacted Interest Period; and (b) the Eurodollar Screen Rate for the shortest period (for which that Eurodollar Screen Rate is available) that exceeds the Impacted Interest Period, in each case, at such time.

"IRS": the United States Internal Revenue Service.

"ISP": the "International Standby Practices 1998" published by the Institute of International Banking Law & Practice, Inc. (or such later version thereof as may be in effect at the time of issuance).

"Issuing Lender": (a) JPMorgan Chase Bank, N.A., Bank of America, N.A., Barclays Bank PLC, Citibank, N.A., Goldman Sachs Bank USA, BNP Paribas, Credit Suisse AG, New York Branch, Mizuho Bank, Ltd., MUFG Union Bank, N.A. and Wells Fargo Bank, National Association and (b) any other Lender selected by the Borrower as an Issuing Lender with the consent of such Lender and the Designated Agent. The Borrower may, at any time upon giving at least 10 days' prior written notice thereof to the Lenders and the Designated Agent, remove any Issuing Lender, provided that no Letters of Credit issued by such Issuing Lender are outstanding or the Borrower terminates or cash collateralizes any Letters of Credit issued by such Issuing Lender on or prior to such removal. Any Issuing Lender may, in its discretion, arrange for one or more Letters of Credit to be issued by Affiliates of such Issuing Lender, in which case the term "Issuing Lender" shall include any such Affiliate with respect to Letters of Credit issued by such Affiliate.

20

"knowledge of the Borrower": actual knowledge of any Responsible Officer of the Borrower.

"L/C Commitment": $1,500,000,000.

"L/C Obligations": at any time, an amount equal to the sum of (a) the aggregate then undrawn and unexpired amount of the then outstanding Letters of Credit and (b) the aggregate amount of drawings under issued Letters of Credit that have not then been reimbursed pursuant to Section 3.5.

"L/C Participants": in respect of any Letter of Credit, the collective reference to all the Lenders other than the Issuing Lender that issued such Letter of Credit.

"L/C Pro Rata Commitment": with respect to each Issuing Lender, the commitment of such Issuing Lender hereunder to make Letters of Credit available to the Borrower in the amount set forth under the heading "L/C Pro Rata Commitment" opposite its name on Schedule 1.1 hereto or as otherwise agreed to in writing between the Borrower and the applicable Issuing Lender from time to time.

"Laws": collectively, all international, foreign, federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case whether or not having the force of law.

"Lenders": as defined in the preamble hereto; provided, that unless the context otherwise requires, each reference herein to the Lenders shall be deemed to include any Conduit Lender.

"Letter of Credit Expiration Date": as defined in Section 3.1(a).

"Letters of Credit": as defined in Section 3.1.

"Lien": any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge or other security interest or any preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement and any Capital Lease Obligation having substantially the same economic effect as any of the foregoing).

"Loan": any loan made by any Lender pursuant to this Agreement.

"Loan Documents": this Agreement, the Notes, the Applications, the Supplemental Indenture, the Senior Bond, the Bond Delivery Agreement, the FMB Indenture and, in each case, any amendment, waiver, supplement or other modification to any of the foregoing; provided, that the term "Loan Documents" shall not include the FMB Indenture for any purposes under Section 2.16, Section 8 or Section 10 (other than for the purposes of Sections 10.1(iv) and (ix)).

21

"Material Adverse Effect": (a) a change in the business, property, operations or financial condition of the Borrower and its Subsidiaries taken as a whole that could reasonably be expected to materially and adversely affect the Borrower's ability to perform its obligations under the Loan Documents or (b) a material adverse effect on (i) the validity or enforceability of this Agreement or any of the other Loan Documents or (ii) the rights and remedies of the Agents and the Lenders, taken as a whole, under this Agreement or any other Loan Document.

"Materials of Environmental Concern": any gasoline or petroleum (including crude oil or any fraction thereof) or petroleum products or any hazardous or toxic substances, materials or wastes, defined or regulated as such in or under any Environmental Law, including asbestos, polychlorinated biphenyls and urea-formaldehyde insulation.

"Moody's": Moody's Investors Service, Inc.

"Mortgaged Property": as defined in the FMB Indenture.

"Multiemployer Plan": a plan that is a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"Net Tangible Assets": the total amount of the Borrower's assets determined on a consolidated basis in accordance with GAAP as of the last day of the most recently ended fiscal quarter for which financial statements have been delivered under Section 6.1, less (a) the sum of the Borrower's consolidated current liabilities determined in accordance with GAAP, and (b) the amount of the Borrower's consolidated assets classified as intangible assets, determined in accordance with GAAP.

"New Lender Supplement": as defined in Section 2.3(b).

"New Revolving Credit Lender": as defined in Section 2.3(b).

"Non-Extending Lender": as defined in Section 2.7.

"Non-Extension Notice Date": as defined in Section 3.2.

"Non-Recourse Debt": Indebtedness of the Borrower or any of its Significant Subsidiaries that is incurred in connection with the acquisition, construction, sale, transfer or other Disposition of specific assets, to the extent recourse, whether contractual or as a matter of law, for non-payment of such Indebtedness is limited (a) to such assets, or (b) if such assets are (or are to be) held by a Subsidiary formed solely for such purpose, to such Subsidiary or the Capital Stock of such Subsidiary.

"Notes": as defined in Section 2.14(f).

"NYFRB": the Federal Reserve Bank of New York.

"NYFRB Rate": for any day, the greater of (a) the Federal Funds Effective Rate in effect on such day and (b) the Overnight Bank Funding Rate in effect on such day (or for any day that is not a Business Day, for the immediately preceding Business Day); provided that if none of such

22

rates are published for any day that is a Business Day, the term "NYFRB Rate" means the rate for a federal funds transaction quoted at 11:00 a.m. (New York City time) on such day received by the Designated Agent from a federal funds broker of recognized standing selected by it; provided, further, that if any of the aforesaid rates as so determined would be less than zero, such rate shall be deemed to be zero for purposes of this Agreement.

"Obligations": the unpaid principal of and interest on (including, without limitation, interest accruing after the maturity of the Loans and Reimbursement Obligations and interest accruing after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding, relating to the Borrower, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding) the Loans, the Reimbursement Obligations and all other obligations and liabilities of the Borrower to the Agents or to any Issuing Lender or to any Lender, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, which may arise under, out of, or in connection with, this Agreement, any other Loan Document or any other document made, delivered or given in connection herewith or therewith, whether on account of principal, interest, reimbursement obligations, fees, indemnities, costs, expenses (including, without limitation, all fees, charges and disbursements of counsel to the Agents or to any Lender that are required to be paid by the Borrower pursuant hereto) or otherwise.

"OECD": the countries constituting the "Contracting Parties" to the Convention on the Organisation For Economic Co-operation and Development, as such term is defined in Article 4 of such Convention.

"Other Connection Taxes": with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Taxes": all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 2.19).

"Overnight Bank Funding Rate": for any day, the rate comprised of both overnight federal funds and overnight Eurodollar borrowings by U.S.-managed banking offices of depository institutions, as such composite rate shall be determined by the NYFRB as set forth on the Federal Reserve Bank of New York's Website from time to time, and published on the next succeeding Business Day by the NYFRB as an overnight bank funding rate.

"Participant": as defined in Section 10.6(c).

"Participant Register": as defined in Section 10.6(c)(iii).

23

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 1097 of 1367

"Participation Amount": as defined in Section 3.4(b).

"Patriot Act": as defined in Section 10.16.

"Payment Amount": as defined in Section 3.5.

"PBGC": the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA (or any successor).

"PCG": as defined in the first recital paragraph.

"Percentage": as to any Lender at any time, the percentage which such Lender's Commitment then constitutes of the Total Commitments or, at any time after the Commitments shall have expired or terminated, the percentage which the aggregate principal amount of such Lender's Revolving Loans then outstanding constitutes of the aggregate principal amount of the Revolving Loans then outstanding, provided, that, in the event that the Revolving Loans are paid in full prior to the reduction to zero of the Total Extensions of Credit, the Percentages shall be determined in a manner designed to ensure that the other outstanding Extensions of Credit shall be held by the Lenders on a comparable basis.

"Permitted Refinancing": with respect to any Indebtedness (the "Refinanced Indebtedness"), any extension, refinancing, refunding or replacement thereof with Indebtedness provided that (i) the amount of such Indebtedness does not exceed the aggregate principal amount of the Refinanced Indebtedness, plus any premium, interest, fee or expenses payable in connection therewith, (ii) the final maturity date of such Indebtedness is no earlier than the maturity date of the Refinanced Indebtedness, and (iii) the weighted average life to maturity of such Indebtedness is not shorter than the weighted average life to maturity of the Refinanced Indebtedness.

"Person": an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, Governmental Authority or other entity of whatever nature.

"Plan": at a particular time, any employee benefit plan that is covered by ERISA and in respect of which the Borrower or a Commonly Controlled Entity is (or, if such plan were terminated at such time, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"Plan of Reorganization": as defined in the second recital paragraph.

"Platform": as defined in Section 10.2(d).

"Prime Rate": the rate of interest last quoted by The Wall Street Journal as the "Prime Rate" in the U.S. or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by the Designated Agent) or in any similar release by the Federal Reserve Board (as determined by the Designated Agent). Each change in the Prime Rate shall be effective from and including the date such change is publicly announced or quoted as being effective.

24

"PTE": a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"QFC": the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

"QFC Credit Support" in Section 10.19.

"Qualified Securitization Bond Issuer": a Subsidiary of the Borrower formed and operating solely for the purpose of (a) purchasing and owning property created under a "financing order" (as such term is defined in the California Public Utilities Code) or similar order issued by the CPUC, (b) issuing such securities pursuant to such order, (c) pledging its interests in such property to secure such securities and (d) engaging in activities ancillary to those described in (a), (b) and (c).

"Rating": each rating announced by S&P, Moody's and Fitch in respect of the Borrower's senior secured debt.

"Recipient": the Designated Agent, any Lender or any Issuing Lender.

"Register": as defined in Section 10.6(b).

"Regulation U": Regulation U of the Board as in effect from time to time.

"Reimbursement Obligation": the obligation of the Borrower to reimburse each Issuing Lender pursuant to Section 3.5 for amounts drawn under Letters of Credit issued by such Issuing Lender.

"Related Parties": with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees, administrators, managers, advisors and representatives of such Person and of such Person's Affiliates.

"Relevant Governmental Body": the Federal Reserve Board and/or the NYFRB, or a committee officially endorsed or convened by the Federal Reserve Board and/or the NYFRB or, in each case, any successor thereto.

"Removal Effective Date": as defined in Section 9.9(b).

"Reportable Event": any of the events set forth in Section 4043(c) of ERISA, other than those events as to which the thirty-day notice period is waived under subsections .27, .28, .29, .30, .31, .32, .34 or .35 of PBGC Reg. § 4043.

"Required Lenders": at any time, the holders of more than 50% of the Total Commitments then in effect or, if the Commitments have been terminated, the Total Extensions of Credit then outstanding. The Total Commitments of any Defaulting Lender shall be disregarded in determining Required Lenders at any time; provided that, any Participation Amount that such

25

Defaulting Lender has failed to fund and that have not been reallocated to and funded by another Lender shall be deemed to be held by the Lender that is an Issuing Lender, as the case may be, in making such determination.

"Requirement of Law": as to any Person, the Articles of Incorporation and By-Laws or other organizational or governing documents of such Person, and any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Resignation Effective Date": as defined in Section 9.9(a).

"Resolution Authority": with respect to any EEA Financial Institution, an EEA Resolution Authority and, with respect to any UK Financial Institution, a UK Resolution Authority.

"Responsible Officer": the chief executive officer, president, chief financial officer, treasurer or assistant treasurer of the Borrower, but in any event, with respect to financial matters, the chief financial officer, treasurer or assistant treasurer of the Borrower.

"Revolving Credit Offered Increase Amount": as defined in Section 2.3(a).

"Revolving Credit Re-Allocation Date": as defined in Section 2.3(d).

"Revolving Loans": as defined in Section 2.1(a).

"S&P": Standard & Poor's Global Ratings, a division of S&P Global Inc., and any successor thereto.

"Sanctions": as defined in Section 4.15.

"SEC": the Securities and Exchange Commission, any successor thereto and any analogous Governmental Authority.

"Securitized Bonds": without duplication, securities, however denominated, that are (i) issued by a Qualified Securitization Bond Issuer, (ii) secured by or otherwise payable from charges authorized by the financing order referred to in clause (a) of the definition of "Qualified Securitization Bond Issuer," and (iii) non-recourse to the Borrower or any of its Subsidiaries (other than the issuer of such securities).

"Senior Bond": (i) that certain First Mortgage Bond in the aggregate principal amount of $3,500,000,000 issued to the Designated Agent pursuant to the Supplemental Indenture and (ii) any new First Mortgage Bonds issued to the Designated Agent pursuant to any Supplemental Indenture acceptable to the Designated Agent in accordance with the issuance of such new First Mortgage Bonds pursuant to Sections 2.3(g) or 2.7(a).

"Significant Subsidiary": as defined in Article 1, Rule 1-02(w) of Regulation S-X of the Exchange Act as of the Effective Date, provided that notwithstanding the foregoing, no special purpose finance subsidiary, no A/R Securitization Subsidiary (or Subsidiaries of any A/R

26

Securitization Subsidiary) nor any Qualified Securitization Bond Issuer (or Subsidiaries of any Qualified Securitization Bond Issuer) shall constitute a Significant Subsidiary. Unless otherwise qualified, all references to a "Significant Subsidiary" or to "Significant Subsidiaries" in this Agreement shall refer to a "Significant Subsidiary" or "Significant Subsidiaries" of the Borrower.

"Single Employer Plan": any Plan that is covered by Title IV of ERISA, but that is not a Multiemployer Plan.

"SOFR": with respect to any day, the secured overnight financing rate published for such day by the NYFRB, as the administrator of the benchmark (or a successor administrator), on the Federal Reserve Bank of New York's Website.

"SOFR-Based Rate": SOFR, Compounded SOFR or Term SOFR.

"Solvent": with respect to the Borrower and its Subsidiaries, on a consolidated basis, that as of the date of determination, (i) the fair value of the assets of the Borrower and its Subsidiaries, on a consolidated basis, at a fair valuation on a going concern basis, exceeds, on a consolidated basis, their debts and liabilities, subordinated, contingent or otherwise, (ii) the present fair saleable value of the property of the Borrower and its Subsidiaries, on a consolidated and going concern basis, is greater than the amount that will be required to pay the probable liability, on a consolidated basis, of their debts and other liabilities, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured in the ordinary course of business, (iii) the Borrower and its Subsidiaries, on a consolidated basis, are able to pay their debts and liabilities, subordinated, contingent or otherwise, as such liabilities become absolute and matured in the ordinary course of business, (iv) the Borrower and its Subsidiaries are not engaged in businesses, and are not about to engage in businesses for which they have unreasonably small capital. For purposes of this definition, the amount of any contingent liability at any time shall be computed as the amount that, in light of all the facts and circumstances existing as of the Effective Date, would reasonably be expected to become an actual and matured liability.

"Specified Exchange Act Filings": the Borrower's Form 10-K annual report for the year ended December 31, 2019 and each and all of the Form 10-Qs and Form 8-Ks (and to the extent applicable proxy statements) filed by the Borrower or PCG with the SEC after December 31, 2019 and prior to the date that is one Business Day before the date of this Agreement.

"Specified Material Adverse Effect": any occurrence, fact, change, event, effect, violation, penalty, inaccuracy or circumstance (whether or not constituting a breach of a representation, warranty or covenant set forth in the Plan of Reorganization) that, individually or in the aggregate with any such other results, occurrences, facts, changes, events, effects, violations, penalties, inaccuracies, or circumstances, (i) would have or would reasonably be expected to have a material adverse effect on the business, operations, assets, liabilities, capitalization, financial performance, financial condition or results of operations, in each case, of PCG and the Borrower, taken as a whole, or (ii) would reasonably be expected to prevent or materially delay the ability of PCG and the Borrower to consummate the transactions contemplated by this Agreement or the Plan of Reorganization or perform their obligations hereunder or thereunder; provided, however, that none of the following results, occurrences, facts, changes, events, effects, violations, penalties, inaccuracies or circumstances shall constitute or be taken into account in determining whether a

27

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 1101 of 1367

Specified Material Adverse Effect has occurred, is continuing or would reasonably be expected to occur: (A) the filing of the Chapter 11 cases with respect to the Debtors, (B) results, occurrences, facts, changes, events, violations, inaccuracies or circumstances affecting (1) the electric or gas utility businesses in the United States generally or (2) the economy, credit, financial, capital or commodity markets, in the United States or elsewhere in the world, including changes in interest rates, monetary policy or inflation, (C) changes or prospective changes in law (other than any law or regulation of California or the United States that is applicable to any electrical utility) or in GAAP or accounting standards, or any changes or prospective changes in the interpretation or enforcement of any of the foregoing, (D) any decline in the market price, or change in trading volume, of any securities of the Debtors, (E) any failure to meet any internal or public projections, forecasts, guidance, estimates, milestones, credit ratings, budgets or internal or published financial or operating predictions of revenue, earnings, cash flow or cash position, (F) any wildfire occurring after the Petition Date (as defined in the Plan of Reorganization) and prior to January 1, 2020, and (G) one or more wildfires, occurring on or after January 1, 2020, that destroys or damages fewer than 500 dwellings or commercial structures in the aggregate (it being understood that (I) the exceptions in clauses (D) and (E) shall not prevent or otherwise affect a determination that the underlying cause of any such change, decline or failure referred to therein is a Specified Material Adverse Effect, and (II) a Specified Material Adverse Effect shall include the occurrence of one or more wildfires on or after January 1, 2020 destroying or damaging at least 500 dwellings or commercial structures within PCG's service area at a time when the portion of PCG's system at the location of such wildfire was not successfully de-energized.

"Standard A/R Securitization Obligations": representations, warranties, covenants, indemnities, repurchase obligations, servicing obligations, guarantees, intercompany notes and obligations relating to contributions of A/R Securitization Assets to an A/R Securitization Subsidiary and other obligations entered into by the Borrower or any of its Subsidiaries which are reasonably customary in A/R Securitization Transactions.

"Subsidiary": as to any Person, a corporation, partnership, limited liability company or other entity of which shares of stock or other ownership interests having ordinary voting power (other than stock or such other ownership interests having such power only by reason of the happening of a contingency) to elect a majority of the board of directors or other managers of such corporation, partnership or other entity are at the time owned, or the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, or both, by such Person. Unless otherwise qualified, all references to a "Subsidiary" or to "Subsidiaries" in this Agreement shall refer to a Subsidiary or Subsidiaries of the Borrower.

"Supplemental Indenture": (i) with respect to that certain First Mortgage Bond in the aggregate principal amount of $3,500,000,000 issued to the Designated Agent, the Supplemental Indenture, dated as of the Effective Date, by and between the Borrower and the Indenture Trustee, and (ii) with respect to any new First Mortgage Bonds issued to the Designated Agent in connection with the Obligations hereunder, including, without limitation, pursuant to Sections 2.3(g) or 2.7(a).

"Supported QFC": as defined in Section 10.19.

"Swap Agreement": any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; provided that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of the Borrower or any of its Subsidiaries shall be a "Swap Agreement".

"Syndication Agents": as defined on the cover hereto.

"Taxes": all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Temporary Utility Debt": the $6,000,000,000 of Indebtedness of the Borrower in the form of term loans existing as of the Effective Date under that certain Term Loan Credit Agreement dated as of the Effective Date among the Borrower, the lenders party thereto and JPMorgan Chase Bank, N.A. as administrative agent, or under any Indebtedness (other than Securitized Bonds) of the Borrower issued or incurred in lieu of or to replace any portion of such term loans.

"Term SOFR": the forward-looking term rate based on SOFR that has been selected or recommended by the Relevant Governmental Body.

"Termination Date": the date that is the third anniversary of the Effective Date or such later date as may be determined pursuant to Section 2.7(b) or such earlier date as otherwise determined pursuant to Section 2.7.

"Total Commitments": at any time, the aggregate amount of the Commitments of all Lenders at such time.

"Total Extensions of Credit": at any time, the aggregate amount of the Extensions of Credit of all Lenders at such time.

"Transferee": any Assignee or Participant.

"Type": as to any Loan, its nature as an ABR Loan or a Eurodollar Loan.

"UK Financial Institution": any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended form time to time) promulgated by the United Kingdom Prudential Regulation Authority)) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"UK Resolution Authority": the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"Unadjusted Benchmark Replacement": the Benchmark Replacement excluding the Benchmark Replacement Adjustment; provided that, if the Unadjusted Benchmark Replacement as so determined would be less than zero, the Unadjusted Benchmark Replacement will be deemed to be zero for the purposes of this Agreement.

"United States" or "U.S.": the United States of America.

"U.S. Person": any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"U.S. Special Resolution Regime": as defined in Section 10.19.

"U.S. Tax Compliance Certificate": as defined in Section 2.16(e)(ii)(B)(III).

"Withdrawal Liability": any liability to a Multiemployer Plan as a result of a complete or partial withdrawal by the Borrower or any Commonly Controlled Entity from such Multiemployer Plan, as such terms are defined in Title IV of ERISA.

"Write-Down and Conversion Powers": (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the applicable Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to any UK Resolution Authority, any powers of such UK Resolution Authority under the applicable Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

1.2   Other Definitional Provisions and Interpretative Provisions.

(a)   Unless otherwise specified therein, all terms defined in this Agreement shall have the defined meanings when used in the other Loan Documents or any certificate or other document made or delivered pursuant hereto or thereto.

(b)   As used herein and, except as otherwise provided therein, in the other Loan Documents, and any certificate or other document made or delivered pursuant hereto or thereto, (i) accounting terms relating to the Borrower and its Significant Subsidiaries defined in Section 1.1 and accounting terms partly defined in Section 1.1, to the extent not defined, shall have the respective meanings given to them under GAAP, (ii) the words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation", (iii) the word "incur" shall be construed to mean incur, create, issue, assume or become liable in respect of (and the words "incurred" and "incurrence" shall have correlative meanings), (iv) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, Capital Stock, securities, revenues, accounts, leasehold interests and contract rights, and (v) references to agreements or other Contractual Obligations shall, unless otherwise specified, be deemed to refer to such agreements or Contractual Obligations as amended, supplemented, restated or otherwise modified from time to time.

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 1104 of 1367

(c)    The words "hereof", "herein" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, Schedule and Exhibit references are to this Agreement unless otherwise specified.

(d)    The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

(e)    The Borrower shall not be required to perform, nor shall it be required to guarantee the performance of, any of the affirmative covenants set forth in Section 6 that apply to any of its Significant Subsidiaries nor shall any of the Borrower's Significant Subsidiaries be required to perform, nor shall any of such Significant Subsidiaries be required to guarantee the performance of, any of the Borrower's affirmative covenants set forth in Section 6 or any of the affirmative covenants set forth in Section 6 that apply to any other Significant Subsidiary; provided, that nothing in this Section 1.2(e) shall prevent the occurrence of a Default or an Event of Default arising out of the Borrower's failure to cause any Significant Subsidiary to comply with the provisions of this Agreement applicable to such Significant Subsidiary.

(f)    Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made, without giving effect to any change in accounting for leases pursuant to GAAP resulting from the implementation of Financial Accounting Standards Board ASU No. 2016-02, Leases (Topic 842), to the extent such adoption would require treating any lease (or similar arrangement conveying the right to use) as a capital lease where such lease (or similar arrangement) would not have been required to be so treated under GAAP as in effect on December 31, 2015.

1.3    Divisions. For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized and acquired on the first date of its existence by the holders of its Capital Stock at such time.

1.4    Interest Rates; LIBOR Notification. The London interbank offered rate is intended to represent the rate at which contributing banks may obtain short-term borrowings from each other in the London interbank market. In July 2017, the U.K. Financial Conduct Authority announced that, after the end of 2021, it would no longer persuade or compel contributing banks to make rate submissions to the ICE Benchmark Administration (together with any successor to the ICE Benchmark Administrator, the "IBA") for purposes of the IBA setting the London interbank offered rate. As a result, it is possible that commencing in 2022, the London interbank offered rate may no longer be available or may no longer be deemed an appropriate reference rate upon which to determine the interest rate on Eurodollar Loans. In light of this eventuality, public

31

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 1105 of 1367

and private sector industry initiatives are currently underway to identify new or alternative reference rates to be used in place of the London interbank offered rate. Upon the occurrence of a Benchmark Transition Event or an Early Opt-In Election, Section 2.13(b) provides a mechanism for determining an alternative rate of interest. The Designated Agent will promptly notify the Borrower, pursuant to Section 2.13(d), of any change to the reference rate upon which the interest rate on Eurodollar Loans is based. However, the Designated Agent does not warrant or accept any responsibility for, and shall not have any liability with respect to, the administration, submission or any other matter related to the London interbank offered rate or other rates in the definition of "Eurodollar Base Rate" or with respect to any alternative or successor rate thereto, or replacement rate thereof (including, without limitation, (i) any such alternative, successor or replacement rate implemented pursuant to Section 2.13(b), whether upon the occurrence of a Benchmark Transition Event or an Early Opt-In Election, and (ii) the implementation of any Benchmark Replacement Conforming Changes pursuant to Section 2.13(c)), including without limitation, whether the composition or characteristics of any such alternative, successor or replacement reference rate will be similar to, or produce the same value or economic equivalence of, the Eurodollar Base Rate or have the same volume or liquidity as did the London interbank offered rate prior to its discontinuance or unavailability.

SECTION 2.    AMOUNT AND TERMS OF COMMITMENTS

2.1    Commitments.

(a)    Subject to the terms and conditions hereof, each Lender severally agrees to make revolving credit loans in Dollars ("Revolving Loans") to the Borrower from time to time on or after the Effective Date and during the Commitment Period in an aggregate principal amount at any one time outstanding which, when added to such Lender's Percentage of the L/C Obligations then outstanding, does not exceed the amount of such Lender's Commitment; provided that, after giving effect to the Revolving Loans requested to be made, the aggregate amount of the Available Commitments shall not be less than zero and the Total Extensions of Credit may not at any time exceed the outstanding principal amount of the Senior Bond. During the Commitment Period, the Borrower may use the Commitments by borrowing, prepaying the Revolving Loans in whole or in part, and reborrowing, all in accordance with the terms and conditions hereof. The Revolving Loans may from time to time be Eurodollar Loans or ABR Loans, as determined by the Borrower and notified to the Designated Agent in accordance with Sections 2.2 and 2.9.

(b)    The Borrower shall repay all outstanding Revolving Loans on the Termination Date; provided, that any principal payment under the Senior Bond shall automatically be deemed to be an equal principal payment in respect of the Revolving Loans (but any such principal payment under the Senior Bond shall not reduce the face amount thereof unless such payment is accompanied by an equal permanent reduction in the Total Commitments).

2.2    Procedure for Revolving Loan Borrowing. The Borrower may borrow under the Commitments during the Commitment Period on any Business Day, provided that the Borrower shall give the Designated Agent irrevocable notice (which notice must be received by the Designated Agent (a) prior to 12:00 Noon, New York City time, three Business Days prior to the requested Borrowing Date, in the case of Eurodollar Loans, or (b) prior to 1:00 P.M., New York City time, on the requested Borrowing Date, in the case of ABR Loans; provided that any notice

32

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 1106 of 1367

of ABR Loans to be incurred on the Effective Date must be received prior to 1:00 P.M., New York City time, one Business Day prior to the Effective Date) specifying (i) the amount and Type of Revolving Loans to be borrowed, (ii) the requested Borrowing Date and (iii) in the case of Eurodollar Loans, the respective amounts of each such Type of Loan and the respective lengths of the initial Interest Period therefor. Each borrowing under the Commitments shall be in an amount equal to $1,000,000 or a whole multiple of $500,000 in excess thereof (or, if the then aggregate Available Commitments are less than $1,000,000, such lesser amount). Upon receipt of any such notice from the Borrower, the Designated Agent shall promptly notify each Lender thereof. Each Lender will make the amount of its *pro rata* share of each borrowing available to the Designated Agent for the account of the Borrower at the Funding Office prior to 3:00 P.M., New York City time (or, for any borrowing to occur on the Effective Date, prior to 10:00 A.M., New York City time), on the Borrowing Date requested by the Borrower in funds immediately available to the Designated Agent. Such borrowing will then be made available to the Borrower by the Designated Agent crediting the account of the Borrower on the books of such office with the aggregate of the amounts made available to the Designated Agent by the Lenders and in like funds as received by the Designated Agent.

2.3    Commitment Increases.

(a)    In the event that the Borrower wishes to increase the Total Commitments at any time when no Default or Event of Default has occurred and is continuing (or shall result of such increase) and subject to obtaining all necessary regulatory approvals, it shall notify the Designated Agent in writing, given not more frequently than once per calendar year, of the amount (the "Revolving Credit Offered Increase Amount") of such proposed increase (such notice, a "Commitment Increase Notice") which shall be in a minimum amount equal to $10,000,000 and shall not exceed, in the aggregate for all increases, $500,000,000. The Borrower shall offer each of the Lenders the opportunity to provide such Lender's Percentage of the Revolving Credit Offered Increase Amount, and if any Lender declines such offer, in whole or in part, the Borrower may offer such declined amount to (i) other Lenders with the consent of the Issuing Lenders (which consents of the Issuing Lenders shall not be unreasonably withheld, conditioned or delayed) and/or (ii) other banks, financial institutions or other entities with the consent of the Designated Agent and the Issuing Lenders (which consents of the Designated Agent and the Issuing Lenders shall not be unreasonably withheld, conditioned or delayed). The Commitment Increase Notice shall specify the Lenders and/or banks, financial institutions or other entities that will be requested to provide such Revolving Credit Offered Increase Amount. The Borrower or, if requested by the Borrower, the Designated Agent will notify such Lenders, and/or banks, financial institutions or other entities of such offer.

(b)    Any additional bank, financial institution or other entity which the Borrower selects to offer a portion of the increased Total Commitments and which elects to become a party to this Agreement and obtain a Commitment in an amount so offered and accepted by it pursuant to Section 2.3(a) shall execute a new lender supplement (the "New Lender Supplement") with the Borrower, the Issuing Lenders and the Designated Agent, substantially in the form of Exhibit A, whereupon such bank, financial institution or other entity (herein called a "New Revolving Credit Lender") shall become a Lender for all purposes and to the same extent as if originally a party hereto and shall be bound by and entitled to the benefits of this Agreement, provided that the Commitment of any such New Revolving Credit Lender shall be in an amount not less than $5,000,000.

33

(c)    Any Lender which accepts an offer to it by the Borrower to increase its Commitment pursuant to Section 2.3(a) shall, in each case, execute a commitment increase supplement with the Borrower, the Issuing Lenders and the Designated Agent, substantially in the form of Exhibit B, whereupon such Lender shall be bound by and entitled to the benefits of this Agreement with respect to the full amount of its Commitment as so increased.

(d)    If any bank, financial institution or other entity becomes a New Revolving Credit Lender pursuant to Section 2.3(b) or any Lender's Commitment is increased pursuant to Section 2.3(c), additional Revolving Loans made on or after the effectiveness thereof (the "Revolving Credit Re-Allocation Date") shall be made *pro rata* based on the Percentages in effect on and after such Revolving Credit Re-Allocation Date (except to the extent that any such *pro rata* borrowings would result in any Lender making an aggregate principal amount of Revolving Loans in excess of its Commitment, in which case such excess amount will be allocated to, and made by, such New Revolving Credit Lenders and/or Lenders with such increased Commitments to the extent of, and *pro rata* based on, their respective Commitments otherwise available for Revolving Loans), and continuations of Eurodollar Loans outstanding on such Revolving Credit Re-Allocation Date shall be effected by repayment of such Eurodollar Loans on the last day of the Interest Period applicable thereto and the making of new Eurodollar Loans *pro rata* based on such new Percentages. In the event that on any such Revolving Credit Re-Allocation Date there is an unpaid principal amount of ABR Loans, the Borrower shall make prepayments thereof and borrowings of ABR Loans so that, after giving effect thereto, the ABR Loans outstanding are held *pro rata* based on such new Percentages. In the event that on any such Revolving Credit Re-Allocation Date there is an unpaid principal amount of Eurodollar Loans, such Eurodollar Loans shall remain outstanding with the respective holders thereof until the expiration of their respective Interest Periods (unless the Borrower elects to prepay any thereof in accordance with the applicable provisions of this Agreement), and interest on and repayments of such Eurodollar Loans will be paid thereon to the respective Lenders holding such Eurodollar Loans *pro rata* based on the respective principal amounts thereof outstanding.

(e)    Notwithstanding anything to the contrary in this Section 2.3, (i) no Lender shall have any obligation to increase its Commitment unless it agrees to do so in its sole discretion and unless the Designated Agent and the Issuing Lenders consent to such increase (which consents of the Designated Agent and the Issuing Lenders shall not be unreasonably withheld, conditioned or delayed); provided, that any Lender not responding to the Commitment Increase Notice within the time period prescribed therein shall be deemed to have declined to increase its Commitment and (ii) in no event shall any transaction effected pursuant to this Section 2.3 (A) cause the Total Commitments to exceed $4,000,000,000 or (B) occur at a time at which a Default or an Event of Default has occurred and is continuing.

(f)    The Designated Agent shall have received on or prior to the Revolving Credit Re-Allocation Date, for the benefit of the Lenders, (i) a legal opinion of counsel to the Borrower covering such matters as are customary for transactions of this type as may be reasonably requested by the Designated Agent, which opinions shall be substantially the same, to the extent appropriate, as the opinions rendered by counsel to the Borrower on the Effective Date and (ii) certified copies of resolutions of the board of directors of the Borrower authorizing the Borrower to borrow the Revolving Credit Offered Increase Amount.

34

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 1108 of 1367

(g)   In connection with any increase in the Total Commitments pursuant to this Section 2.3, the Borrower shall cause to be issued to the Designated Agent a new First Mortgage Bond (i) in the amount of the Total Commitment (giving effect to such increase) (in which case such new First Mortgage Bond shall replace any then-outstanding Senior Bonds) or (ii) in the amount of such increase, such that the aggregate principal amount of the Senior Bonds will, when taken together, equal the Total Commitment (giving effect to such increase).

2.4    [Reserved].

2.5    [Reserved].

2.6    Commitment Fees, Etc.

(a)   The Borrower agrees to pay to the Designated Agent for the account of each Lender (other than a Defaulting Lender to the extent provided in Section 2.20) a commitment fee for the period from and including the Effective Date to the last day of the Commitment Period, in an amount equal to the Commitment Fee Rate multiplied by the daily average Available Commitment of such Lender during the period for which payment is made, payable quarterly in arrears on each Fee Payment Date, commencing on the first such date to occur after the Effective Date.

(b)   The Borrower agrees to pay to the Designated Agent the fees in the amounts and on the dates as set forth in any written, duly executed fee agreements with the Designated Agent and to perform any other obligations contained therein.

2.7    Termination or Reduction of Commitments; Extension of Termination Date.

(a)   The Borrower shall have the right, upon not less than three Business Days' notice to the Designated Agent, to terminate the Commitments or, from time to time, to reduce the amount of the Commitments; provided that no such termination or reduction of Commitments shall be permitted if, after giving effect thereto and to any prepayments of the Revolving Loans made on the effective date thereof, the Total Extensions of Credit would exceed the Total Commitments. Any such reduction shall be in an amount equal to $1,000,000, or a whole multiple thereof, and shall reduce permanently the Commitments then in effect. In connection with any such termination or reduction, the Borrower may request that a new First Mortgage Bond be issued to the Designated Agent in the amount of the Total Commitment (giving effect to such termination or reduction) and such new First Mortgage Bond shall replace any then-outstanding Senior Bonds.

(b)   The Borrower may, by written notice to the Designated Agent (such notice being an "Extension Notice") given no more frequently than once in each calendar year, on not more than two occasions, request the Lenders to consider an extension of the then applicable Termination Date to a later date (which shall be a Business Day), which extension shall not exceed one year from the then applicable Termination Date in each instance. The Designated Agent shall promptly transmit any Extension Notice to each Lender. Each Lender shall notify the Designated Agent whether it wishes to extend the then applicable Termination Date not later than 30 days after the date of such Extension Notice, and any such notice given by a Lender to the Designated Agent,

35

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 1109 of 1367

once given, shall be irrevocable as to such Lender. Any Lender which does not expressly notify the Designated Agent prior to the expiration of such thirty-day period that it wishes to so extend the then applicable Termination Date shall be deemed to have rejected the Borrower's request for extension of such Termination Date. Lenders consenting to extend the then applicable Termination Date are hereinafter referred to as "Continuing Lenders", and Lenders declining to consent to extend such Termination Date (or Lenders deemed to have so declined) are hereinafter referred to as "Non-Extending Lenders". If the Required Lenders have elected (in their sole and absolute discretion) to so extend the Termination Date, the Designated Agent shall promptly notify the Borrower of such election by the Required Lenders, and effective on the date which is 30 days after the date of such notice by the Designated Agent to the Borrower, the Termination Date shall be automatically and immediately so extended with regard to the Continuing Lenders. No extension will be permitted hereunder without the consent of the Required Lenders. Upon the delivery of an Extension Notice and upon the extension of the Termination Date pursuant to this Section, the Borrower shall be deemed to have represented and warranted on and as of the date of such Extension Notice and the effective date of such extension, as the case may be, that no Default or Event of Default has occurred and is continuing. Notwithstanding anything contained in this Agreement to the contrary, no Lender shall have any obligation to extend the Termination Date, and each Lender may at its option, unconditionally and without cause, decline to extend the Termination Date.

(c)     If the Termination Date shall have been extended in accordance with this Section 2.7, all references herein to the "Termination Date" (except with respect to any Non-Extending Lender) shall refer to the Termination Date as so extended.

(d)     If any Lender shall determine (or be deemed to have determined) not to extend the Termination Date as requested by any Extension Notice given by the Borrower pursuant to this Section, the Commitment of such Non-Extending Lender (including the obligations of such Lender under Section 3.4 and, if such Non-Extending Lender is also an Issuing Lender, the obligation of such Issuing Lender to issue Letters of Credit pursuant to Section 3) shall terminate on the Termination Date without giving any effect to such proposed extension, and the Borrower shall on such date pay to the Designated Agent, for the account of such Non-Extending Lender, the principal amount of, and accrued interest on, such Non-Extending Lender's Loans and outstanding Reimbursement Obligations, together with any amounts payable to such Lender pursuant to Section 2.17 and any and all fees or other amounts owing to such Non-Extending Lender under this Agreement (including, if such Non-Extending Lender is an Issuing Lender, such accrued fronting fees as may have been agreed between the Borrower and such Issuing Lender); provided that if the Borrower has replaced such Non-Extending Lender pursuant to Section 2.7(e) then the provisions of such paragraph shall apply. The Total Commitments (but not, for the avoidance of doubt, except as hereinafter provided, the L/C Commitment) shall be reduced by the amount of the Commitment of such Non-Extending Lender to the extent the Commitment of such Non-Extending Lender has not been transferred to one or more Continuing Lenders pursuant to Section 2.7(e), provided that, if the Total Commitments, after giving effect to the reduction in the Total Commitments due to Non-Extending Lenders which are not replaced pursuant to Section 2.7(e), is less than the L/C Commitment, the L/C Commitment shall be reduced by an amount equal to such excess.

36

(e)    A Non-Extending Lender shall be obligated, at the request of the Borrower and subject to (i) payment by the successor Lender described below to the Designated Agent for the account of such Non-Extending Lender of the principal amount of, and accrued interest on, such Non-Extending Lender's Loans, and (ii) payment by the Borrower to such Non-Extending Lender of any amounts payable to such Non-Extending Lender pursuant to Section 2.17 (as if the purchase of such Non-Extending Lender's Loans constituted a prepayment thereof) and any and all fees or other amounts owing to such Non-Extending Lender under this Agreement (including, if such Non-Extending Lender is an Issuing Lender, such accrued fronting fees as may have been agreed between the Borrower and such Issuing Lender), to transfer without recourse, representation, warranty (other than a representation that such Lender has not created an adverse claim on its Loans) or expense to such Non-Extending Lender, at any time prior to the Termination Date applicable to such Non-Extending Lender, all of such Non-Extending Lender's rights and obligations hereunder to another financial institution or group of financial institutions nominated by the Borrower and willing to participate as a successor Lender in the place of such Non-Extending Lender; provided that, if such transferee is not already a Lender, (1) such transferee satisfies all the requirements of this Agreement, and (2) the Designated Agent and each Issuing Lender that is a Continuing Lender shall have consented to such transfer, which consent shall not be unreasonably withheld, conditioned or delayed. Each such transferee successor Lender shall be deemed to be a Continuing Lender hereunder in replacement of the transferor Non-Extending Lender and shall enjoy all rights and assume all obligations on the part of such Non-Extending Lender set forth in this Agreement. Each such transfer shall be effected pursuant to an Assignment and Assumption.

(f)    If the Termination Date shall have been extended in respect of Continuing Lenders in accordance with this Section, any notice of borrowing pursuant to Section 2.2 specifying a Borrowing Date occurring after the Termination Date applicable to a Non-Extending Lender or requesting an Interest Period extending beyond such date shall (i) have no effect in respect of such Non-Extending Lender and (ii) not specify a requested aggregate principal amount exceeding the aggregate Available Commitments (calculated on the basis of the Commitments of the Continuing Lenders).

2.8    Optional Prepayments.

(a)    The Borrower may at any time and from time to time prepay the Loans, in whole or in part, without premium or penalty, upon irrevocable notice delivered to the Designated Agent no later than 12:00 Noon, New York City time, three Business Days prior thereto, in the case of Eurodollar Loans, and no later than 2:00 p.m., New York City time, one Business Day prior thereto, in the case of ABR Loans, which notice shall specify the date and amount of prepayment and whether the prepayment is of Eurodollar Loans or ABR Loans; provided, that if a Eurodollar Loan is prepaid on any day other than the last day of the Interest Period applicable thereto, the Borrower shall also pay any amounts owing pursuant to Section 2.17. Upon receipt of any such notice the Designated Agent shall promptly notify each relevant Lender thereof. If any such notice is given, the amount specified in such notice shall be due and payable on the date specified therein, together with accrued interest to such date on the amount prepaid. Partial prepayments of Revolving Loans which shall be in an aggregate principal amount of $1,000,000 or a whole multiple of $500,000 in excess thereof. Notwithstanding the foregoing, any notice of prepayment delivered in connection with any refinancing of all of the Loans and Commitments with the proceeds of such refinancing

37

or of any other incurrence of Indebtedness or the occurrence of some other identifiable event or condition, may be, if expressly so stated to be, contingent upon the consummation of such refinancing or incurrence or occurrence of such other identifiable event or condition and may be revoked by the Borrower, subject to compliance with the obligations under Section 2.17 in connection with any such revocation, in the event such contingency is not met.

2.9    Conversion and Continuation Options.

(a)    The Borrower may elect from time to time to convert Eurodollar Loans to ABR Loans by giving the Designated Agent prior irrevocable notice of such election no later than 12:00 Noon, New York City time, on the Business Day preceding the proposed conversion date, provided that any such conversion of Eurodollar Loans may only be made on the last day of an Interest Period with respect thereto. The Borrower may elect from time to time to convert ABR Loans to Eurodollar Loans by giving the Designated Agent prior irrevocable notice of such election no later than 12:00 Noon, New York City time, on the third Business Day preceding the proposed conversion date (which notice shall specify the length of the initial Interest Period therefor), provided that no ABR Loan may be converted into a Eurodollar Loan when any Event of Default has occurred and is continuing and the Required Lenders have determined in their sole discretion not to permit such conversions. Upon receipt of any such notice the Designated Agent shall promptly notify each relevant Lender thereof.

(b)    Any Eurodollar Loan may be continued as such upon the expiration of the then current Interest Period with respect thereto by the Borrower giving irrevocable notice to the Designated Agent, in accordance with the applicable provisions of the defined term "Interest Period", of the length of the next Interest Period to be applicable to such Loans, provided that no Eurodollar Loan may be continued as such when any Event of Default has occurred and is continuing and the Required Lenders have determined in their sole discretion not to permit such continuations; provided, further, that if the Borrower shall fail to give any required notice as described above in this paragraph, subject to the preceding proviso, such Loans shall be automatically continued as Eurodollar Loans with an Interest Period of one month on the last day of such then expiring Interest Period. Upon receipt of any such notice the Designated Agent shall promptly notify each relevant Lender thereof.

2.10    Limitations on Eurodollar Tranches. Notwithstanding anything to the contrary in this Agreement, all borrowings, conversions and continuations of Eurodollar Loans and all selections of Interest Periods shall be in such amounts and be made pursuant to such elections so that (a) after giving effect thereto, the aggregate principal amount of the Eurodollar Loans comprising each Eurodollar Tranche shall be equal to $1,000,000 or a whole multiple of $500,000 in excess thereof and (b) no more than 15 Eurodollar Tranches shall be outstanding at any one time.

2.11    Interest Rates and Payment Dates.

(a)    Each Eurodollar Loan shall bear interest for each day during each Interest Period with respect thereto at a rate per annum equal to the Eurodollar Rate determined for such day plus the Applicable Margin.

38

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 1112 of 1367

(b)   Each ABR Loan shall bear interest at a rate per annum equal to the ABR plus the Applicable Margin.

(c)   (i) If all or a portion of the principal amount of any Loan or Reimbursement Obligation shall not be paid when due (whether at the stated maturity, by acceleration or otherwise), such overdue amount shall bear interest at a default rate per annum equal to (x) in the case of the Loans, the rate that would otherwise be applicable thereto pursuant to the foregoing provisions of this Section plus 2% or (y) in the case of Reimbursement Obligations, the rate applicable to ABR Loans plus 2%, and (ii) if all or a portion of any interest payable on any Loan or Reimbursement Obligation or any commitment fee, letter of credit fee, or any other fee payable (excluding any expenses or other indemnity) hereunder shall not be paid when due (whether at the stated maturity, by acceleration or otherwise), such overdue amount shall bear interest at a default rate per annum equal to the rate then applicable to ABR Loans plus 2%, in each case, with respect to clauses (i) and (ii) above, from the date of such non-payment until such amount is paid in full (as well after as before judgment).

(d)   Interest shall be payable in arrears on each Interest Payment Date, provided that interest accruing pursuant to Section 2.11(c) shall be payable from time to time on demand.

(e)   The amount of each interest payment received by the Designated Agent under the Senior Bond shall be deemed to be a payment of interest payable by the Borrower hereunder and shall reduce, dollar-for-dollar, the amount of interest then owing by the Borrower hereunder.

2.12   Computation of Interest and Fees.

(a)   Interest and fees payable pursuant hereto shall be calculated on the basis of a 360-day year for the actual days elapsed, except that, with respect to ABR Loans the rate of interest on which is calculated on the basis of ABR, the interest thereon shall be calculated on the basis of a 365- (or 366-, as the case may be) day year for the actual days elapsed. The Designated Agent shall as soon as practicable notify the Borrower and the relevant Lenders of each determination of a Eurodollar Rate. Any change in the interest rate on a Loan resulting from a change in the ABR or the Eurocurrency Reserve Requirements shall become effective as of the opening of business on the day on which such change becomes effective. The Designated Agent shall as soon as practicable notify the Borrower and the relevant Lenders of the effective date and the amount of each such change in interest rate.

(b)   Each determination of an interest rate by the Designated Agent pursuant to any provision of this Agreement shall constitute prima facie evidence of such amounts. The Designated Agent shall, at the request of the Borrower or any Lender, deliver to the Borrower or such Lender a statement showing the quotations used by the Designated Agent in determining any interest rate pursuant to Section 2.11(a).

2.13   Inability to Determine Interest Rate.

(a)   If prior to the first day of any Interest Period:

(i)   the Designated Agent shall have determined (which determination shall be conclusive and binding upon the Borrower absent manifest error) that, by reason of circumstances affecting the relevant market, adequate and reasonable means do not exist for ascertaining the Eurodollar Rate for such Interest Period, provided that no Benchmark Transition Event shall have occurred at such time; or

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 1113 of 1367

(ii) the Designated Agent shall have received notice from the Required Lenders that the Eurodollar Rate determined or to be determined for such Interest Period will not adequately and fairly reflect the cost to such Lenders (as conclusively certified by such Lenders) of making or maintaining their affected Loans during such Interest Period,

the Designated Agent shall give telecopy or telephonic notice thereof to the Borrower and the relevant Lenders as soon as practicable thereafter. If such notice is given (x) any Eurodollar Loans requested to be made on the first day of such Interest Period shall be made as ABR Loans, (y) any Loans that were to have been converted on the first day of such Interest Period to Eurodollar Loans shall be continued as ABR Loans and (z) any outstanding Eurodollar Loans shall be converted, on the last day of the then-current Interest Period, to ABR Loans. Until such notice has been withdrawn by the Designated Agent, no further Eurodollar Loans shall be made or continued as such, nor shall the Borrower have the right to convert Loans to Eurodollar Loans.

(b) Notwithstanding anything to the contrary herein or in any other Loan Document, upon the occurrence of a Benchmark Transition Event or an Early Opt-in Election, as applicable, the Designated Agent and the Borrower may amend this Agreement to replace the Eurodollar Base Rate with a Benchmark Replacement. Any such amendment with respect to a Benchmark Transition Event will become effective at 5:00 p.m. on the fifth Business Day after the Designated Agent has posted such proposed amendment to all Lenders and the Borrower, so long as the Designated Agent has not received, by such time, written notice of objection to such proposed amendment from Lenders comprising the Required Lenders; provided that, with respect to any proposed amendment containing any SOFR-Based Rate, the Lenders shall be entitled to object only to the Benchmark Replacement Adjustment contained therein. Any such amendment with respect to an Early Opt-in Election will become effective on the date that Lenders comprising the Required Lenders have delivered to the Designated Agent written notice that such Required Lenders accept such amendment. No replacement of the Eurodollar Base Rate with a Benchmark Replacement will occur prior to the applicable Benchmark Transition Start Date.

(c) In connection with the implementation of a Benchmark Replacement, the Designated Agent will have the right to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Benchmark Replacement Conforming Changes will become effective without any further action or consent of any other party to this Agreement.

(d) The Designated Agent will promptly notify the Borrower and the Lenders of (i) any occurrence of a Benchmark Transition Event or an Early Opt-in Election, as applicable, and its related Benchmark Replacement Date and Benchmark Transition Start Date, (ii) the implementation of any Benchmark Replacement, (iii) the effectiveness of any Benchmark Replacement Conforming Changes and (iv) the commencement or conclusion of any Benchmark Unavailability Period. Any determination, decision or election that may be made by the Designated Agent or Lenders pursuant to this Section 2.13, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event,

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 1114 of 1367

circumstance or date and any decision to take or refrain from taking any action, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party hereto, except, in each case, as expressly required pursuant to this Section 2.13.

(e)    Upon the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, the Borrower may revoke any request for a borrowing of Eurodollar Loans, or conversion or continuation of Eurodollar Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, (x) any Eurodollar Loans requested to be made shall be made as ABR Loans, (y) any Loans that were to have been converted to Eurodollar Loans shall be continued as ABR Loans and (z) any outstanding Eurodollar Loans shall be converted, on the last day of the then-current Interest Period, to ABR Loans.

2.14    Pro Rata Treatment and Payments; Notes.

(a)    Each borrowing by the Borrower from the Lenders hereunder, each payment by the Borrower on account of any commitment fee and any reduction of the Commitments of the Lenders shall be made pro rata according to the respective Percentages of the Lenders.

(b)    Each payment (including each prepayment) by the Borrower on account of principal of and interest on the Revolving Loans shall be made pro rata according to the respective outstanding principal amounts of the Revolving Loans then held by the Lenders. Each payment in respect of Reimbursement Obligations in respect of any Letter of Credit shall be made to the Issuing Lender that issued such Letters of Credit.

(c)    Notwithstanding anything to the contrary herein, all payments (including prepayments) to be made by the Borrower hereunder, whether on account of principal, Reimbursement Obligations, interest, fees or otherwise, shall be made without setoff or counterclaim and shall be made prior to 4:00 P.M., New York City time, on the due date thereof to the Designated Agent, for the account of the Lenders or the Issuing Lenders, as applicable, at the Funding Office, in Dollars and in immediately available funds. The Designated Agent shall distribute such payments to the Lenders promptly upon receipt in like funds as received. If any payment hereunder (other than payments on the Eurodollar Loans) becomes due and payable on a day other than a Business Day, such payment shall be extended to the next succeeding Business Day. If any payment on a Eurodollar Loan becomes due and payable on a day other than a Business Day, the maturity thereof shall be extended to the next succeeding Business Day unless the result of such extension would be to extend such payment into another calendar month, in which event such payment shall be made on the immediately preceding Business Day. In the case of any extension of any payment of principal pursuant to the preceding two sentences, interest thereon shall be payable at the then applicable rate during such extension.

(d)    Unless the Designated Agent shall have been notified in writing by any Lender prior to a borrowing that such Lender will not make the amount that would constitute its share of such borrowing available to the Designated Agent, the Designated Agent may assume that such Lender is making such amount available to the Designated Agent, and the Designated Agent may, in reliance upon such assumption, make available to the Borrower a corresponding amount. If such amount is not made available to the Designated Agent by the required time on the Borrowing

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 1115 of 1367

Date therefor, such Lender shall pay to the Designated Agent, on demand, such amount with interest thereon, at a rate equal to the greater of (i) the Federal Funds Effective Rate and (ii) a rate determined by the Designated Agent in accordance with banking industry rules on interbank compensation, for the period until such Lender makes such amount immediately available to the Designated Agent. A certificate of the Designated Agent submitted to any Lender with respect to any amounts owing under this paragraph shall be conclusive in the absence of manifest error. If such Lender's share of such borrowing is not made available to the Designated Agent by such Lender within three Business Days after such Borrowing Date, the Designated Agent shall also be entitled to recover such amount with interest thereon at the rate per annum applicable to ABR Loans from the Borrower within 30 days after written demand therefor.

(e)    Unless the Designated Agent shall have been notified in writing by the Borrower prior to the date of any payment due to be made by the Borrower hereunder that the Borrower will not make such payment to the Designated Agent, the Designated Agent may assume that the Borrower is making such payment, and the Designated Agent may, but shall not be required to, in reliance upon such assumption, make available to the Lenders their respective *pro rata* shares of a corresponding amount. If such payment is not made to the Designated Agent by the Borrower within three Business Days after such due date, the Designated Agent shall be entitled to recover, on demand, from each Lender to which any amount which was made available pursuant to the preceding sentence, such amount with interest thereon at the rate per annum equal to the daily average Federal Funds Effective Rate. Nothing herein shall be deemed to limit the rights of the Designated Agent or any Lender against the Borrower.

(f)    The Borrower agrees that, upon the request to the Designated Agent by any Lender, the Borrower will promptly execute and deliver to such Lender a promissory note (a "Note") of the Borrower evidencing any Revolving Loans of such Lender, substantially in the form of Exhibit H, with appropriate insertions as to date and principal amount; provided, that delivery of Notes shall not be a condition precedent to the occurrence of the Effective Date or the making of Loans on the Effective Date.

(g)    If any Lender shall fail to make any payment required to be made by it pursuant to Section 3.4 or 2.14(d), then the Designated Agent may, in its discretion and notwithstanding any contrary provision hereof, (i) apply any amounts thereafter received by the Designated Agent hereunder for the account of such Lender for the benefit of the Designated Agent or any Issuing Lender to satisfy such Lender's obligations to the Designated Agent or such Issuing Lender, as the case may be, under such Section until all such unsatisfied obligations are fully paid, and/or (ii) so long as such Lender is a Defaulting Lender, hold any such amounts in a segregated account as cash collateral for, and application to, any future funding obligations of such Lender under any such Section, in the case of each of clauses (i) and (ii) above, in any order as determined by the Designated Agent in its discretion.

2.15    Change of Law.

(a)    If a Change of Law shall:

(i)    subject any Recipient to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its Loans, Letters of Credit or Commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto;

42

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 1116 of 1367

(ii)    impose, modify or hold applicable any reserve, special deposit, compulsory loan, Federal Deposit Insurance Corporation insurance charge or other similar insurance charge or similar requirement against assets held by, deposits or other liabilities in or for the account of, advances, loans or other extensions of credit by, or any other acquisition of funds by, any Lender or any Issuing Lender that is not otherwise included in the determination of the Eurodollar Rate, which requirements are generally applicable to advances, loans and other extensions of credit made by such Lender or such Issuing Lender; or

(iii)    impose on any Lender or any Issuing Lender any other condition that is generally applicable to loans made by such Lender or Letters of Credit issued by such Issuing Lender or participations therein by a Lender;

and the result of any of the foregoing is to increase the cost to such Lender or such other Recipient, by an amount that such Lender or such other Recipient deems to be material, of making, converting into, continuing or maintaining Loans or issuing or participating in Letters of Credit, or to reduce any amount receivable hereunder in respect thereof, then, in any such case, the Borrower shall promptly pay such Lender or such other Recipient, within ten Business Days after its demand, any additional amounts necessary to compensate such Lender or such other Recipient for such increased cost or reduced amount receivable. If any Lender or other Recipient becomes entitled to claim any additional amounts pursuant to this paragraph, it shall promptly notify the Borrower (with a copy to the Designated Agent) of the event by reason of which it has become so entitled; provided, however, that no Lender or other Recipient shall be entitled to demand such compensation more than 90 days following (x) the last day of the Interest Period in respect of which such demand is made or (y) the repayment of the Loan in respect of which such demand is made, and no Issuing Lender shall be entitled to demand such compensation more than 90 days following the expiration or termination (by drawing or otherwise) of the Letter of Credit issued by it in respect of which such demand is made. Notwithstanding any other provision herein, no Lender shall demand compensation pursuant to this Section 2.15 if it shall not at the time be the general policy or practice of such Lender to demand such compensation from similarly situated borrowers (to the extent that such Lender has the right to do so under its credit facilities with similarly situated borrowers).

(b)    If any Lender or any Issuing Lender shall have determined that a Change of Law regarding capital or liquidity requirements shall have the effect of reducing the rate of return on such Lender's or such Issuing Lender's capital or the capital of any corporation controlling such Lender or such Issuing Lender as a consequence of its obligations hereunder or under or in respect of any Letter of Credit to a level below that which such Lender, such Issuing Lender or such corporation could have achieved but for such Change of Law (taking into consideration such Lender's, such Issuing Lender's or such corporation's policies with respect to capital adequacy or liquidity) by an amount deemed by such Lender or such Issuing Lender to be material, then from time to time, after submission by such Lender or such Issuing Lender to the Borrower (with a copy to the Designated Agent) of a written request therefor, the Borrower shall pay to such Lender or such Issuing Lender such additional amount or amounts as will compensate such Lender, such Issuing Lender or such corporation for such reduction.

43

(c)    A certificate as to any additional amounts payable pursuant to this Section 2.15 submitted by any Lender, any Issuing Lender or any other Recipient to the Borrower (with a copy to the Designated Agent) shall constitute prima facie evidence of such costs or amounts. Notwithstanding anything to the contrary in this Section 2.15, the Borrower shall not be required to compensate a Lender, any Issuing Lender or any other Recipient pursuant to this Section 2.15 for any amounts incurred more than six months prior to the date that such Lender, such Issuing Lender or such other Recipient notifies the Borrower of such Lender's, such Issuing Lender's or such other Recipient's intention to claim compensation therefor; provided that, if the circumstances giving rise to such claim have a retroactive effect, then such six-month period shall be extended to include the period of such retroactive effect not to exceed twelve months. The obligations of the Borrower pursuant to this Section 2.15 shall survive for 90 days after the termination of this Agreement and the payment of the Loans and all other amounts then due and payable hereunder.

2.16    Taxes.

(a)    Any and all payments by or on account of any obligation of the Borrower under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable laws. If any applicable laws (as determined in the good faith discretion of the Borrower or Designated Agent making the payment) require the deduction or withholding of any Tax from any such payment, then (A) the Borrower or Designated Agent, as applicable shall withhold or make such deductions as are determined by the Borrower or the Designated Agent to be required, (B) the Borrower or Designated Agent, as applicable shall timely pay the full amount withheld or deducted to the relevant Governmental Authority in accordance with such laws, and (C) to the extent that the withholding or deduction is made on account of Indemnified Taxes, the sum payable by the Borrower shall be increased as necessary so that after any required withholding or the making of all required deductions (including deductions applicable to additional sums payable under this Section 2.16) the applicable Recipient receives an amount equal to the sum it would have received had no such withholding or deduction been made.

(b)    Without limiting the provisions of subsection (a) above, the Borrower shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Designated Agent timely reimburse it for the payment of, any Other Taxes.

(c)    (i) The Borrower shall, and does hereby, indemnify each Recipient, and shall make payment in respect thereof within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 2.16) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender or another Recipient (with a copy to the Designated Agent), or by the Designated Agent on its own behalf or on behalf of a Lender or another Recipient, shall be conclusive absent manifest error.

44

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 1118 of 1367

(ii)   Each Lender and each Issuing Lender shall, and does hereby, severally indemnify, and shall make payment in respect thereof within 10 days after demand therefor, (*x*) the Designated Agent against any Indemnified Taxes attributable to such Lender or such Issuing Lender (but only to the extent that the Borrower has not already indemnified the Designated Agent for such Indemnified Taxes and without limiting the obligation of the Borrower to do so), (*y*) the Designated Agent against any Taxes attributable to such Lender's or such Issuing Lender's failure to comply with the provisions of Section 10.6(c)(iii) relating to the maintenance of a Participant Register and (*z*) the Designated Agent against any Excluded Taxes attributable to such Lender or such Issuing Lender, in each case, that are payable or paid by the Designated Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender or any Issuing Lender by the Designated Agent shall be conclusive absent manifest error. Each Lender and each Issuing Lender hereby authorizes the Designated Agent to set off and apply any and all amounts at any time owing to such Lender or such Issuing Lender, as the case may be, under this Agreement or any other Loan Document against any amount due to the Designated Agent under this clause (ii).

(d)   Upon request by the Borrower or the Designated Agent, as the case may be, after any payment of Taxes by the Borrower or by the Designated Agent to a Governmental Authority as provided in this Section 2.16, the Borrower shall deliver to the Designated Agent or the Designated Agent shall deliver to the Borrower, as the case may be, the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of any return required by laws to report such payment or other evidence of such payment reasonably satisfactory to the Borrower or the Designated Agent, as the case may be.

(e)   (i) Any Lender or any Issuing Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Designated Agent, at the time or times reasonably requested by the Borrower or the Designated Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Designated Agent as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender or any Issuing Lender, if reasonably requested by the Borrower or the Designated Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Designated Agent as will enable the Borrower or the Designated Agent to determine whether or not such Lender or such Issuing Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Sections 2.16(e)(ii)(A), (ii)(B) and (ii)(D) below) shall not be required if in the Lender's or any Issuing Lender's reasonable judgment such completion, execution or submission would subject such Lender or such Issuing Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender or such Issuing Lender.

(ii)   Without limiting the generality of the foregoing,

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 1119 of 1367

(A)    any Lender or any Issuing Lender that is a U.S. Person shall deliver to the Borrower and the Designated Agent on or prior to the date on which such Lender or such Issuing Lender becomes a Lender or an Issuing Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Designated Agent), executed copies of IRS Form W-9 certifying that such Lender or such Issuing Lender is exempt from U.S. federal backup withholding tax;

(B)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Designated Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender or an Issuing Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Designated Agent), whichever of the following is applicable:

(I)    in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BEN or W-8BEN-E, as applicable, establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or W-8BEN-E, as applicable, establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(II)    executed copies of IRS Form W-8ECI;

(III)    in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit G-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) executed copies of IRS Form W-8BEN or W-8BEN-E, as applicable; or

(IV)    to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN or W-8BEN-E, as applicable, a U.S. Tax Compliance Certificate substantially in the form of Exhibit G-2 or Exhibit G-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit G-4 on behalf of each such direct and indirect partner.

46

(C)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Designated Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender or an Issuing Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Designated Agent), executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Designated Agent to determine the withholding or deduction required to be made; and

(D)    if a payment made to a Lender or any Issuing Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender or such Issuing Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender or such Issuing Lender shall deliver to the Borrower and the Designated Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Designated Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3) (C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Designated Agent as may be necessary for the Borrower and the Designated Agent to comply with their obligations under FATCA and to determine that such Lender or such Issuing Lender has complied with such Lender's or such Issuing Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the Effective Date.

(iii)    Each Lender and each Issuing Lender agrees that if any form or certification it previously delivered pursuant to this Section 2.16 expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Designated Agent in writing of its legal inability to do so.

(f)    At no time shall the Designated Agent have any obligation to file for or otherwise pursue on behalf of a Lender or an Issuing Lender any refund of Taxes withheld or deducted from funds paid for the account of such Lender or such Issuing Lender, as the case may be. If any Recipient determines, in its sole discretion exercised in good faith, that it has received a refund of, or credit with respect to, any Taxes as to which it has been indemnified pursuant to this Section 2.16 (including by the payment of additional amounts pursuant to this Section 2.16), it shall pay to the Borrower an amount equal to such refund or credit (but only to the extent of indemnity payments made under this Section 2.16 with respect to the Taxes giving rise to such refund or credit), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund or credit). The Borrower, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (f) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event such indemnified party is required to repay such refund or credit to such Governmental Authority. Notwithstanding

47

anything to the contrary in this paragraph (f), in no event will the indemnified party be required to pay any amount to the Borrower pursuant to this paragraph (f) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund or credit had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This paragraph (f) shall not be construed to require any Recipient to make available its tax returns (or any other information relating to its Taxes that it deems confidential) to the Borrower or any other Person.

(g)     Each party's obligations under this Section 2.16 shall survive for one year after the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

2.17     <u>Indemnity</u>. The Borrower agrees to indemnify each Lender for, and to hold each Lender harmless from, any loss (other than the loss of Applicable Margin) or expense that such Lender may sustain or incur as a consequence of (a) default by the Borrower in making a borrowing of, conversion into or continuation of Eurodollar Loans after the Borrower has given a notice requesting the same in accordance with the provisions of this Agreement, (b) default by the Borrower in making any prepayment of or conversion from Eurodollar Loans after the Borrower has given a notice thereof in accordance with the provisions of this Agreement or (c) the making of a prepayment of Eurodollar Loans on a day that is not the last day of an Interest Period with respect thereto. A certificate as to any amounts payable pursuant to this Section submitted to the Borrower by any Lender shall be conclusive in the absence of manifest error. This covenant shall survive for 90 days after the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

2.18     <u>Change of Lending Office</u>. Each Lender agrees that, upon the occurrence of any event giving rise to the operation of Section 2.15 or 2.16 with respect to such Lender, it will, if requested by the Borrower, use reasonable efforts (subject to overall policy considerations of such Lender) to designate another lending office for any Loans affected by such event with the object of avoiding the consequences of such event; provided, that such designation is made on terms that, in the sole but reasonable judgment of such Lender, cause such Lender and its lending office(s) to suffer no unreimbursed economic disadvantage or any legal or regulatory disadvantage, and provided, further, that nothing in this Section shall affect or postpone any of the obligations of the Borrower or the rights of any Lender pursuant to Section 2.15 or 2.16.

2.19     <u>Replacement of Lenders</u>. The Borrower shall be permitted to replace any Lender that (a) requests (on its behalf or any of its Participants) reimbursement for amounts owing pursuant to Section 2.15 or 2.16, (b) provides notice under Section 2.21 or (c) becomes a Defaulting Lender, with a replacement financial institution; provided that (i) such replacement does not conflict with any Requirement of Law, (ii) no Event of Default shall have occurred and be continuing at the time of such replacement, (iii) prior to any such replacement, such Lender shall have taken no action under Section 2.18 which eliminates the continued need for payment of amounts owing pursuant to Section 2.15 or 2.16, (iv) the replacement financial institution shall purchase, at par, all Loans and other amounts owing to such replaced Lender on or prior to the date of replacement, (v) the Borrower shall be liable to such replaced Lender under Section 2.17 if any Eurodollar Loan owing to such replaced Lender shall be purchased other than on the last day of

48

the Interest Period relating thereto, (vi) the replacement financial institution, if not already a Lender, shall be reasonably satisfactory to the Designated Agent, (vii) the replaced Lender shall be obligated to make such replacement in accordance with the provisions of Section 10.6 (provided that the Borrower shall be obligated to pay the registration and processing fee referred to therein), (viii) until such time as such replacement shall be consummated, the Borrower shall pay all additional amounts (if any) required pursuant to Section 2.15 or 2.16, as the case may be, and (ix) any such replacement shall not be deemed to be a waiver of any rights that the Borrower, the Designated Agent or any other Lender shall have against the replaced Lender.

2.20   Defaulting Lenders. Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by applicable law:

(a)   any payment of principal, interest, fees or other amounts (other than those described in Section 2.20(b)) received by the Designated Agent for the account of that Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Section 7 or otherwise, and including any amounts made available to the Designated Agent by that Defaulting Lender pursuant to Section 9.7), shall be applied at such time or times as may be determined by the Designated Agent as follows: *first*, to the payment of any amounts owing by that Defaulting Lender to the Designated Agent hereunder; *second*, to the payment on a pro rata basis of any amounts owing by that Defaulting Lender to any Issuing Lender hereunder; *third*, if so requested by any Issuing Lender with a Letter of Credit outstanding or with unreimbursed drawings owing under a Letter of Credit, to be held as cash collateral in respect of such Defaulting Lender's Percentage of such L/C Obligations; *fourth*, if so determined by the Designated Agent or requested by any Issuing Lender, to be held as cash collateral for future funding obligations of that Defaulting Lender of any participation in any L/C Obligations; *fifth*, as the Borrower may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which that Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Designated Agent; *sixth*, if so determined by the Borrower with the consent of the Designated Agent, not to be unreasonably withheld, to be held in a non-interest bearing deposit account and released in order to satisfy obligations of that Defaulting Lender to fund Loans under this Agreement; *seventh*, to the payment of any amounts owing to the Lenders or any Issuing Lender as a result of any judgment of a court of competent jurisdiction obtained by any Lender or any Issuing Lender against that Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Agreement; *eighth*, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against that Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Agreement; and *ninth*, to that Defaulting Lender or as otherwise directed by a court of competent jurisdiction; provided that if such payment is a payment of the principal amount of any Loans or unreimbursed drawings under Letters of Credit in respect of which that Defaulting Lender has not fully funded its appropriate share such payment shall be applied solely to pay the Loans and unreimbursed drawings under Letters of Credit of all non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of that Defaulting Lender or participating interests of that Defaulting Lender in unreimbursed drawings under Letters of Credit. Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender or to post cash collateral pursuant to this Section 2.20(a) shall be deemed paid to and redirected by that Defaulting Lender, and each Lender irrevocably consents hereto;

49

(b)     [reserved];

(c)     during any period in which there is a Defaulting Lender, for purposes of computing the amount of the obligation of each non-Defaulting Lender to acquire, refinance or fund participations in Letters of Credit pursuant to Section 3.4, the Percentage of each non-Defaulting Lender shall be computed without giving effect to the Commitment of that Defaulting Lender; provided, that, (i) each such reallocation shall be given effect only if, at the date the applicable Lender becomes a Defaulting Lender, no Default or Event of Default exists; and (ii) the aggregate obligation of each non-Defaulting Lender to acquire, refinance or fund participations in L/C Obligations shall not exceed the positive difference, if any, of (1) the Commitment of that non-Defaulting Lender minus (2) the aggregate outstanding Loans of that Lender and that Lender's Percentage of L/C Obligations. Subject to Section 10.20, no reallocation hereunder shall constitute a waiver or release of any claim of any party hereunder against a Defaulting Lender arising from that Lender having become a Defaulting Lender, including any claim of a non-Defaulting Lender as a result of such non-Defaulting Lender's increased exposure following such reallocation.

(d)     if the reallocation described in paragraph (c) above cannot, or can only partially, be effected, the Borrower shall within one Business Day following notice by the Designated Agent (after giving effect to any partial reallocation pursuant to paragraph (c) above) deposit cash with the Designated Agent as collateral to secure such Defaulting Lender's Percentage of any outstanding L/C Obligations for so long as any such L/C Obligation are outstanding; and

(e)     that Defaulting Lender's right to approve or disapprove any amendment, supplement, modification, waiver or consent with respect to this Agreement shall be restricted as set forth in the definition of "Required Lenders" and Section 10.1.

If the Borrower, the Designated Agent and each Issuing Lender reasonably determine in writing that a Defaulting Lender should no longer be deemed to be a Defaulting Lender, the Designated Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein (which may include arrangements with respect to any cash collateral), that Lender will, to the extent applicable, purchase that portion of outstanding Loans and Participation Amounts of the other Lenders or take such other actions as the Designated Agent may determine to be necessary to cause the Loans and funded and unfunded participations in Letters of Credit to be held on a pro rata basis by the Lenders in accordance with their Percentages (without giving effect to Section 2.20(c)), whereupon that Lender will cease to be a Defaulting Lender; provided that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while that Lender was a Defaulting Lender; and provided, further, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

Cash collateral held by the Designated Agent to reduce Fronting Exposure shall be released to the applicable Lender promptly following (i) the elimination of the applicable Fronting Exposure or other obligations giving rise thereto (including by the termination of Defaulting Lender status of

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 1124 of 1367

the applicable Lender (or, as appropriate, its assignee following compliance with Section 10.6)); (ii) the Designated Agent's good faith determination that there exists excess cash collateral; and (iii) the termination of the Commitment Period and the repayment in full of all outstanding Loans and L/C Obligations.

2.21    Illegality. If any Lender determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender or its applicable lending office to make, maintain, or fund Loans whose interest is determined by reference to the Eurodollar Rate, or to determine or charge interest rates based upon the Eurodollar Rate, or any Governmental Authority has imposed material restrictions on the authority of such Lender to purchase or sell, or to take deposits of, Dollars in the London interbank market, then, upon notice thereof by such Lender to the Borrower (through the Designated Agent), (a) any obligation of such Lender to make or continue Eurodollar Loans or to convert ABR Loans to Eurodollar Loans shall be suspended, and (b) if such notice asserts the illegality of such Lender making or maintaining ABR Loans the interest rate on which is determined by reference to the Eurodollar Rate component of the ABR, the interest rate on which ABR Loans of such Lender shall, if necessary to avoid such illegality, be determined by the Designated Agent without reference to the Eurodollar Rate component of the ABR, in each case until such Lender notifies the Designated Agent and the Borrower that the circumstances giving rise to such determination no longer exist. Upon receipt of such notice, (i) the Borrower shall, upon demand from such Lender (with a copy to the Designated Agent), prepay or, if applicable, convert all Eurodollar Loans of such Lender to ABR Loans (the interest rate on which ABR Loans of such Lender shall, if necessary to avoid such illegality, be determined by the Designated Agent without reference to the Eurodollar Rate component of the ABR), either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such Eurodollar Loans to such day, or immediately, if such Lender may not lawfully continue to maintain such Eurodollar Loans and (ii) if such notice asserts the illegality of such Lender determining or charging interest rates based upon the Eurodollar Rate, the Designated Agent shall during the period of such suspension compute the ABR applicable to such Lender without reference to the Eurodollar Rate component thereof until the Designated Agent is advised in writing by such Lender that it is no longer illegal for such Lender to determine or charge interest rates based upon the Eurodollar Rate. Upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so prepaid or converted, together with any additional amounts required pursuant to Section 2.17.

SECTION 3.    LETTERS OF CREDIT

3.1    L/C Commitment.

(a)    Subject to the terms and conditions hereof, each Issuing Lender, in reliance on the agreements of the other Lenders set forth in Section 3.4(a), agrees to issue standby and commercial letters of credit (the letters of credit issued pursuant to this Section 3 and including each Existing Letter of Credit, collectively, the "Letters of Credit") for the account of the Borrower on any Business Day on or after the Effective Date and during the Commitment Period in such form as may be approved from time to time by such Issuing Lender; provided, that each Goldman Sachs Bank USA, Credit Suisse AG, New York Branch, Barclays Bank PLC and their respective Affiliates shall not be required to issue any commercial letters of credit; provided further that no Issuing Lender shall issue, amend or extend any Letter of Credit if, after giving effect to such

51

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 1125 of 1367

issuance, amendment or extension, (i) the aggregate amount of L/C Obligations owed by the Borrower to any Issuing Lender shall exceed the amount of such Issuing Lender's L/C Pro Rata Commitment (or such higher amount agreed upon in writing between the Borrower and such Issuing Lender), (ii) the L/C Obligations would exceed the L/C Commitment, (iii) the aggregate amount of the Available Commitments would be less than zero or (iv) the Total Extensions of Credit would exceed the outstanding principal amount of the Senior Bond at any time (as determined by the Designated Agent). Each Letter of Credit shall (i) be denominated in Dollars and, (ii) subject to the second paragraph of Section 3.2, expire no later than the earlier of (x) the first anniversary of its date of issuance and (y) the date which is five Business Days prior to the Termination Date (such fifth Business Day, the "Letter of Credit Expiration Date").

(b)  No Issuing Lender shall at any time be obligated to issue, amend or extend any Letter of Credit hereunder if such issuance, amendment or extension would (i) conflict with, or cause such Issuing Lender or any L/C Participant to exceed any limits imposed by, any applicable Requirement of Law, (ii) violate one or more policies of the Issuing Lender applicable to letters of credit generally or (iii) violate any order, judgment, or decree of any Governmental Authority that, by its terms, purports to enjoin or restrain such Issuing Lender from issuing such Letter of Credit, or any law applicable to such Issuing Lender. No Issuing Lender shall be under any obligation to issue, amend or extend any Letter of Credit that is not a standby Letter of Credit, unless otherwise agreed by such Issuing Lender. In the event there is a Defaulting Lender as of the date of any request for the issuance of a Letter of Credit, no Issuing Lender shall be required to issue or arrange for such Letter of Credit to the extent the Issuing Lender is not reasonably satisfied that the Defaulting Lender's L/C Obligations with respect to such Letter of Credit have been reallocated and/or cash collateralized pursuant to Section 2.20.

(c)  Unless otherwise specified herein, the amount of a Letter of Credit at any time shall be deemed to be the stated amount of such Letter of Credit in effect at such time; provided, however, that with respect to any Letter of Credit that provides for one or more automatic increases in the stated amount thereof, the amount of such Letter of Credit shall be deemed to be the maximum stated amount of such Letter of Credit after giving effect to all such increases, whether or not such maximum stated amount is in effect at such time.

(d)  For all purposes of this Agreement, if on any date of determination, a Letter of Credit has expired by its terms but any amount may still be drawn thereunder by reason of the operation of any rule of law or uniform practices to which any Letter of Credit is subject (including Rule 3.13 and Rule 3.14 of the ISP) or similar terms in the Letter of Credit itself that permit a drawing to be made under such Letter of Credit after the expiration thereof, such Letter of Credit shall be deemed to be "outstanding" in the amount so remaining available to be drawn.

3.2  Procedure for Issuance of Letters of Credit. The Borrower may from time to time request that an Issuing Lender issue a Letter of Credit by delivering to such Issuing Lender at its address for notices specified herein an Application therefor, completed to the satisfaction of such Issuing Lender, and such other certificates, documents and other papers and information as such Issuing Lender may request. Concurrently with the delivery of an Application to an Issuing Lender, the Borrower shall deliver a copy thereof to the Designated Agent and the Designated Agent shall provide notice of such request to the Lenders. Upon receipt of any Application, an Issuing Lender will process such Application and the certificates, documents and other papers and information

52

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 1126 of 1367

delivered to it in connection therewith in accordance with its customary procedures and shall promptly issue the Letter of Credit requested thereby by issuing the original of such Letter of Credit to the beneficiary thereof or as otherwise may be agreed to by such Issuing Lender and the Borrower (but in no event shall any Issuing Lender be required to issue any Letter of Credit earlier than three Business Days after its receipt of the Application therefor and all such other certificates, documents and other papers and information relating thereto). Promptly after issuance by an Issuing Lender of a Letter of Credit, such Issuing Lender shall furnish a copy of such Letter of Credit to the Borrower. The Borrower is responsible for the final text of the Letter of Credit as issued by an Issuing Lender, irrespective of any assistance such Issuing Lender may provide such as drafting or recommending text or by Issuing Lender's use or refusal to use text submitted by the Borrower. The Borrower is solely responsible for the suitability of the Letter of Credit for the Borrower's purposes. Each Issuing Lender shall promptly give notice to the Designated Agent of the issuance of each Letter of Credit issued by such Issuing Lender (including the amount thereof), and shall provide a copy of such Letter of Credit to the Designated Agent as soon as possible after the date of issuance. Unless otherwise expressly agreed by an Issuing Lender and the Borrower, when a Letter of Credit is issued (i) the rules of the ISP shall apply to each standby Letter of Credit, and (ii) the rules of the Uniform Customs and Practice for Documentary Credits, as most recently published by the International Chamber of Commerce at the time of issuance shall apply to each commercial Letter of Credit.

If the Borrower so requests in any applicable Application, the Issuing Lender may, in its sole discretion, agree to issue a Letter of Credit that has automatic extension provisions (each, an "Auto-Extension Letter of Credit"); provided that any such Auto-Extension Letter of Credit must permit the Issuing Lender to prevent any such extension at least once in each twelve-month period (commencing with the date of issuance of such Letter of Credit) by giving prior notice to the beneficiary thereof not later than a day (the "Non-Extension Notice Date") in each such twelve-month period to be agreed upon at the time such Letter of Credit is issued. Unless otherwise directed by the Issuing Lender, the Borrower shall not be required to make a specific request to the Issuing Lender for any such extension. Once an Auto-Extension Letter of Credit has been issued, the Lenders shall be deemed to have authorized (but may not require) the Issuing Lender to permit the extension of such Letter of Credit at any time to an expiry date not later than the Letter of Credit Expiration Date; provided, however, that the Issuing Lender shall not permit any such extension if it has received notice (which may be by telephone or in writing) on or before the day that is seven Business Days before the Non-Extension Notice Date (1) from the Designated Agent that the Required Lenders have elected not to permit such extension or (2) from the Designated Agent, any Lender or the Borrower that one or more of the applicable conditions specified in Section 5.2 is not then satisfied, and in each such case directing the Issuing Lender not to permit such extension.

3.3   Fees and Other Charges.

(a)   The Borrower will pay a fee on the aggregate drawable amount of all outstanding Letters of Credit at a per annum rate equal to the Applicable Margin then in effect with respect to Eurodollar Loans, shared ratably among the Lenders (other than Defaulting Lenders to the extent provided in Section 2.20) in accordance with their respective Percentages and payable quarterly in arrears on each Fee Payment Date after the issuance date. In addition, the Borrower shall pay to the relevant Issuing Lender for its own account a fronting fee on the aggregate drawable amount of all outstanding Letters of Credit issued in an amount to be agreed between the Borrower and such Issuing Lender, payable quarterly in arrears on each Fee Payment Date after the issuance date.

53

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 1127 of 1367

(b)   In addition to the foregoing fees, the Borrower shall pay or reimburse each Issuing Lender for such normal and customary costs and expenses as are incurred or charged by such Issuing Lender in issuing, negotiating, effecting payment under, amending, extending or otherwise administering any Letter of Credit.

### 3.4   L/C Participations.

(a)   Each Issuing Lender irrevocably agrees to grant and hereby grants to each L/C Participant, and, to induce each Issuing Lender to issue Letters of Credit hereunder, each L/C Participant irrevocably agrees to accept and purchase and hereby accepts and purchases from each Issuing Lender, on the terms and conditions hereinafter stated, for such L/C Participant's own account and risk, an undivided interest equal to such L/C Participant's Percentage in each Issuing Lender's obligations and rights under each Letter of Credit issued by such Issuing Lender hereunder and the amount of each drawing paid by such Issuing Lender thereunder. Each L/C Participant unconditionally and irrevocably agrees with each Issuing Lender that, if a drawing is paid under any Letter of Credit issued by such Issuing Lender for which such Issuing Lender is not reimbursed in full by the Borrower in accordance with the terms of this Agreement, such L/C Participant shall pay to the Designated Agent for the account of such Issuing Lender upon demand at such Issuing Lender's address for notices specified herein (and thereafter the Designated Agent shall promptly pay to such Issuing Lender) an amount equal to such L/C Participant's Percentage of the amount of such drawing, or any part thereof, that is not so reimbursed. Each L/C Participant's obligation to pay such amount shall be absolute and unconditional and shall not be affected by any circumstance, including (i) any setoff, counterclaim, recoupment, defense or other right that such L/C Participant may have against the Issuing Lender, the Borrower or any other Person for any reason whatsoever, (ii) the occurrence or continuance of a Default or an Event of Default or the failure to satisfy any of the other conditions specified in Section 5, (iii) any adverse change in the condition (financial or otherwise) of the Borrower, (iv) any breach of this Agreement or any other Loan Document by the Borrower or any other L/C Participant or (v) any other circumstance, happening or event whatsoever, whether or not similar to any of the foregoing.

(b)   If any amount (a "Participation Amount") required to be paid by any L/C Participant to an Issuing Lender pursuant to Section 3.4(a) in respect of any unreimbursed portion of any payment made by such Issuing Lender under any Letter of Credit is not paid to such Issuing Lender within three Business Days after the date such payment is due, such Issuing Lender shall so notify the Designated Agent, which shall promptly notify the L/C Participants, and each L/C Participant shall pay to the Designated Agent, for the account of such Issuing Lender, on demand (and thereafter the Designated Agent shall promptly pay to such Issuing Lender) an amount equal to the product of (i) such Participation Amount, times (ii) the daily average Federal Funds Effective Rate during the period from and including the date such payment is required to the date on which such payment is immediately available to such Issuing Lender, times (iii) a fraction the numerator of which is the number of days that elapse during such period and the denominator of which is 360. If any Participation Amount required to be paid by any L/C Participant pursuant to Section 3.4(a) is not made available to the Designated Agent for the account of the relevant Issuing Lender by such L/C Participant within three Business Days after the date such payment is due, the

54

Designated Agent on behalf of such Issuing Lender shall be entitled to recover from such L/C Participant, on demand, such Participation Amount with interest thereon calculated from such due date at the rate per annum applicable to ABR Loans. A certificate of the Designated Agent submitted on behalf of an Issuing Lender to any L/C Participant with respect to any amounts owing under this Section shall be conclusive in the absence of manifest error.

(c)   Whenever, at any time after an Issuing Lender has made payment under any Letter of Credit and has received from the Designated Agent any L/C Participant's *pro rata* share of such payment in accordance with Section 3.4(a), such Issuing Lender receives any payment related to such Letter of Credit (whether directly from the Borrower or otherwise, including proceeds of collateral applied thereto by such Issuing Lender), or any payment of interest on account thereof, such Issuing Lender will distribute to the Designated Agent for the account of such L/C Participant (and thereafter the Designated Agent will promptly distribute to such L/C Participant) its pro rata share thereof; provided, however, that in the event that any such payment received by such Issuing Lender shall be required to be returned by such Issuing Lender, such L/C Participant shall return to the Designated Agent for the account of such Issuing Lender (and thereafter the Designated Agent shall promptly return to such Issuing Lender) the portion thereof previously distributed by such Issuing Lender.

3.5   <u>Reimbursement Obligation of the Borrower</u>. The Borrower agrees to reimburse each Issuing Lender on (i) the Business Day on which the Borrower receives notice from an Issuing Lender of a drawing on a Letter of Credit issued by such Issuing Lender and paid by such Issuing Lender, if such notice is received on such Business Day prior to 11:00 A.M., New York City time, or (ii) if clause (i) above does not apply, the Business Day immediately following the day on which the Borrower receives such notice, for the amount of (a) such draft so paid and (b) any taxes, fees, charges or other costs or expenses incurred by such Issuing Lender in connection with such payment which are obligations of the Borrower hereunder (the amounts described in the foregoing clauses (a) and (b) in respect of any drawing, collectively, the "<u>Payment Amount</u>"). Each such payment shall be made to such Issuing Lender at its address for notices specified herein in lawful money of the United States and in immediately available funds. Interest shall be payable on each Payment Amount from the date of the applicable drawing until payment in full at the rate set forth in (i) until the second Business Day following the date of the applicable drawing, Section 2.11(b) and (ii) thereafter, Section 2.11(c). If the Borrower fails to make such payment in accordance with the foregoing, such failure shall be deemed to constitute a request by the Borrower to the Designated Agent for a borrowing pursuant to Section 2.1 of ABR Loans in an amount equal to the Payment Amount. The Borrowing Date with respect to such borrowing shall be the first date on which a borrowing of Revolving Loans could be made, pursuant to Section 2.1, if the Designated Agent had received a notice of such borrowing at the time the Designated Agent receives notice from the relevant Issuing Lender of such drawing under such Letter of Credit.

3.6   <u>Obligations Absolute</u>. The Borrower's obligations under this Section 3 shall be absolute and unconditional under any and all circumstances and irrespective of any setoff, counterclaim or defense to payment that the Borrower may have or have had against any Issuing Lender, any beneficiary of a Letter of Credit or any other Person. The Borrower also agrees with each Issuing Lender that such Issuing Lender shall not be responsible for, and the Borrower's Reimbursement Obligations under Section 3.5 shall not be affected by, among other things, the validity or genuineness of documents or of any endorsements thereon, even though such

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 1129 of 1367

documents shall in fact prove to be invalid, fraudulent or forged, or any dispute between or among the Borrower and any beneficiary of any Letter of Credit or any other party to which such Letter of Credit may be transferred or any claims whatsoever of the Borrower against any beneficiary of such Letter of Credit or any such transferee. No Issuing Lender shall be liable for any error, omission, interruption or delay in transmission, dispatch or delivery of any message or advice, however transmitted, in connection with any Letter of Credit, except for errors or omissions caused by such Issuing Lender's gross negligence or willful misconduct as determined by final non-appealable judgment by a court of competent jurisdiction. The Borrower agrees that any action taken or omitted by an Issuing Lender under or in connection with any Letter of Credit issued by it or the related drafts or documents, if done in the absence of gross negligence or willful misconduct as determined by final non-appealable judgment by a court of competent jurisdiction, shall be binding on the Borrower and shall not result in any liability of such Issuing Lender to the Borrower. The liability of an Issuing Lender under, in connection with or arising out of any Letter of Credit (or pre-advice), regardless of the form or legal grounds of the action or proceeding, shall be limited to direct damages suffered by the Borrower that is caused directly by such Issuing Lender's gross negligence or willful misconduct, in each case as determined in a final non-appealable judgment of a court of competent jurisdiction, in (i) honoring a presentation under a Letter of Credit that on its face does not at least substantially comply with the terms and conditions of such Letter of Credit, (ii) failing to honor a presentation under a Letter of Credit that strictly complies with the terms and conditions of such Letter of Credit, or (iii) retaining documents presented for purposes of drawing under any Letter of Credit, including by electronic transmission such as SWIFT, electronic mail, facsimile or computer generated communication presented under a Letter of Credit (collectively, "Drawing Documents"). The Borrower's aggregate remedies against any Issuing Lender for wrongfully honoring a presentation under any Letter of Credit or wrongfully retaining honored Drawing Documents shall in no event exceed the aggregate amount paid by the Borrower to the Issuing Lender in respect of the honored presentation in connection with such Letter of Credit under Section 3.5, plus interest at the rate then applicable to ABR Loans hereunder.

3.7    Letter of Credit Payments. If any documents shall be presented for payment under any Letter of Credit, the relevant Issuing Lender shall, within the period stipulated by the terms and conditions of such Letter of Credit, examine the drawing documents. After such examination and provided that the drawing documents are compliant, such Issuing Lender will promptly notify the Borrower and the Designated Agent of the date and amount thereof. The responsibility of the relevant Issuing Lender to the Borrower in connection with any documents presented for payment under any Letter of Credit, in addition to any payment obligation expressly provided for in such Letter of Credit issued by such Issuing Lender, shall be limited, in the absence of gross negligence or willful misconduct, in each case as determined in a final non-appealable judgment of a court of competent jurisdiction, to determining that the documents (including each draft) delivered under such Letter of Credit in connection with such presentment appear on their face to be in conformity with such Letter of Credit.

3.8    Applications. To the extent that any provision of any Application related to any Letter of Credit is inconsistent with the provisions of this Section 3, the provisions of this Section 3 shall apply.

56

3.9   <u>Actions of Issuing Lenders</u>. Each Issuing Lender shall be entitled to rely, and shall be fully protected in relying, upon any draft, writing, resolution, notice, consent, certificate, affidavit, letter, cablegram, telegram, telecopy, telex or teletype message, statement, order or other document believed by it in good faith to be genuine and correct and to have been signed, sent or made by the proper Person or Persons, and upon advice and statements of legal counsel, independent accountants and other experts selected by such Issuing Lender. Each Issuing Lender shall be fully justified in failing or refusing to take any action under this Agreement unless it shall first have received such advice or concurrence of the Required Lenders as it reasonably deems appropriate (provided that no Issuing Lender shall be under any obligation to obtain such advice or concurrence and no L/C Participant's obligations hereunder shall be affected by the seeking or the failure to seek any such advice or concurrence) or it shall first be indemnified to its reasonable satisfaction by the Lenders against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action. Notwithstanding any other provision of this Section, as between the Issuing Lenders and the Lenders, each Issuing Lender in all cases be fully protected in acting, or in refraining from acting, under this Agreement in accordance with a request of the Required Lenders, and such request and any action taken or failure to act pursuant thereto shall be binding upon the Lenders and any future holders of a participation in any Letter of Credit (provided that no Issuing Lender shall be under any obligation to obtain such request and no L/C Participant's obligations hereunder shall be affected by the seeking or the failure to seek any such request).

3.10   <u>Borrower's Indemnification</u>. The Borrower hereby agrees to indemnify and hold harmless each Lender, each Issuing Lender (and each of its branches and Affiliates) and the Designated Agent, and their respective directors, officers, agents and employees from and against any and all claims and damages, losses, liabilities, costs or expenses which such Lender, such Issuing Lender or the Designated Agent may incur (or which may be claimed against such Lender, such Issuing Lender or the Designated Agent by any Person whatsoever) by reason of or in connection with the issuance, execution and delivery or transfer of or payment or failure to pay under any Letter of Credit or any actual or proposed use of any Letter of Credit, including, without limitation, any claims, damages, losses, liabilities, costs or expenses which such Issuing Lender may incur by reason of or in connection with (i) the failure of any other Lender to fulfill or comply with its obligations to an Issuing Lender hereunder (but nothing herein contained shall affect any rights the Borrower may have against any Defaulting Lender) or (ii) by reason of or on account of an Issuing Lender issuing any Letter of Credit which specifies that the term "Beneficiary" included therein includes any successor by operation of law of the named Beneficiary, but which Letter of Credit does not require that any drawing by any such successor Beneficiary be accompanied by a copy of a legal document, satisfactory to such Issuing Lender, evidencing the appointment of such successor Beneficiary; provided that the Borrower shall not be required to indemnify any Lender, any Issuing Lender or the Designated Agent for any claims, damages, losses, liabilities, costs or expenses to the extent, but only to the extent, caused by (x) the willful misconduct or gross negligence of such Issuing Lender in determining whether a request presented under any Letter of Credit complied with the terms of such Letter of Credit as determined in a final non-appealable judgment of a court of competent jurisdiction or (y) such Issuing Lender's failure to pay under any Letter of Credit after the presentation to it of a request strictly complying with the terms and conditions of such Letter of Credit. Nothing in this Section is intended to limit the obligations of the Borrower under any other provision of this Agreement. This indemnification provision shall survive termination of this Agreement and all Letters of Credit.

57

3.11   Lenders' Indemnification. Each Lender shall, ratably in accordance with its Percentage, indemnify each Issuing Lender, its branches and Affiliates, and their respective directors, officers, agents and employees (to the extent not reimbursed by the Borrower) against any cost, expense (including reasonable counsel fees and disbursements), claim, demand, action, loss or liability (except such as result from such indemnitees' gross negligence or willful misconduct or such Issuing Lender's failure to pay under any Letter of Credit after the presentation to it of a request strictly complying with the terms and conditions of the Letter of Credit in each case as determined in a final non-appealable judgment of a court of competent jurisdiction) that such indemnitees may suffer or incur in connection with this Section or any action taken or omitted by such indemnitees hereunder. This indemnification provision shall survive termination of this Agreement and all Letters of Credit.

3.12   Replacement and Resignation of an Issuing Lender. (i) An Issuing Lender may be replaced at any time by written agreement among the Borrower, the Designated Agent, the replaced Issuing Lender and the successor Issuing Lender. The Designated Agent shall notify the Lenders of any such replacement of an Issuing Lender. At the time any such replacement shall become effective, the Borrower shall pay all unpaid fees accrued for the account of the replaced Issuing Lender pursuant to Section 2.6. From and after the effective date of any such replacement, (x) the successor Issuing Lender shall have all the rights and obligations of an Issuing Lender under this Agreement with respect to Letters of Credit to be issued by it thereafter and (y) references herein to the term "Issuing Lender" shall be deemed to refer to such successor or to any previous Issuing Lender, or to such successor and all previous Issuing Lenders, as the context shall require. After the replacement of an Issuing Lender hereunder, the replaced Issuing Lender shall remain a party hereto and shall continue to have all the rights and obligations of an Issuing Lender under this Agreement with respect to Letters of Credit issued by it prior to such replacement, but shall not be required to issue additional Letters of Credit or extend or otherwise amend any existing Letter of Credit.

(ii)   Subject to the appointment and acceptance of a successor Issuing Lender, any Issuing Lender may resign as an Issuing Lender at any time upon thirty days' prior written notice to the Designated Agent, the Borrower and the Lenders, in which case, such resigning Issuing Lender shall be replaced in accordance with Section 3.12(i) above.

3.13   Existing Letters of Credit. Each Existing Letter of Credit shall be deemed a Letter of Credit issued hereunder for all purposes under this Agreement without need for any further action by the Borrower or any other Person.

SECTION 4.   REPRESENTATIONS AND WARRANTIES

To induce the Agents and the Lenders to enter into this Agreement and to make the Loans and issue or participate in the Letters of Credit, the Borrower hereby represents and warrants to each Agent and each Lender, on the Effective Date and on the date of each Credit Event hereunder after the Effective Date, that:

4.1   Financial Condition. (a) The audited consolidated balance sheet of the Borrower and its consolidated Subsidiaries as of December 31, 2019, and the related consolidated statements of income and cash flows for the fiscal year ended on such date, reported on by Deloitte & Touche

58

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 1132 of 1367

LLP, and (b) the unaudited consolidated balance sheet of the Borrower and its consolidated Subsidiaries as of March 31, 2020, and the related consolidated statements of income and cash flows for the portion of the fiscal year ended on such date, each delivered to the Designated Agent prior to the Effective Date, in each case, (i) were prepared in accordance with GAAP consistently applied throughout the periods covered thereby, except as otherwise expressly noted therein, and (ii) present fairly in all material respects the consolidated financial condition of the Borrower and its consolidated Subsidiaries as of such date, and its consolidated income and its consolidated cash flows for the respective fiscal year or portion of the fiscal year then ended, subject, in the case of the financial statements referred to in clause (b), to the absence of footnotes and to normal year-end audit adjustments.

4.2   <u>No Change</u>. Since December 31, 2019, no Specified Material Adverse Effect has occurred.

4.3   <u>Existence; Compliance with Law</u>. Each of the Borrower and its Significant Subsidiaries (a) is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization, (b) has the organizational power and organizational authority to own and operate its property, to lease the property it operates as lessee and to conduct the business in which it is currently engaged, (c) is duly qualified as a foreign corporation or other organization and in good standing under the laws of each jurisdiction where its ownership, lease or operation of property or the conduct of its business requires such qualification except to the extent that the failure to so qualify could not reasonably be expected to have a Material Adverse Effect and (d) is in compliance with all Requirements of Law except for any Requirements of Law being contested in good faith by appropriate proceedings and except to the extent that the failure to comply therewith could not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

4.4   <u>Power; Authorization; Enforceable Obligations</u>. The Borrower has the corporate power and corporate authority to execute and deliver and to perform its obligations under the Loan Documents and to obtain extensions of credit hereunder. The Borrower has taken all necessary corporate action to authorize the execution and delivery of, and performance of its obligations under, the Loan Documents to which it is a party and to authorize the extensions of credit on the terms and conditions of this Agreement. No consent or authorization of, filing with, notice to or other act by or in respect of, any Governmental Authority or any other Person is required in connection with the extensions of credit hereunder or with the execution, delivery, performance, validity or enforceability of this Agreement or any of the Loan Documents, except (i) consents, authorizations, filings and notices which have been obtained or made and are in full force and effect, (ii) any consent, authorization or filing that may be required in the future the failure of which to make or obtain could not reasonably be expected to have a Material Adverse Effect and (iii) applicable Requirements of Law (including the approval of the CPUC) prior to foreclosure or other exercise of remedies under the Loan Documents. This Agreement has been, and each other Loan Document upon execution and delivery will be, duly executed and delivered. This Agreement constitutes, and each other Loan Document upon execution will constitute, a legal, valid and binding obligation of the Borrower, enforceable against the Borrower in accordance with its terms, except as enforceability may be limited by (x) applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally, laws of general application related to the enforceability of securities secured by real estate and by general equitable principles (whether enforcement is sought by proceedings in equity or at law) and (y) applicable Requirements of Law (including the approval of the CPUC) prior to foreclosure or other exercise of remedies hereunder or under the Loan Documents.

59

4.5     No Legal Bar. The execution and delivery of, and the performance of the obligations under, this Agreement and the other Loan Documents, the issuance of Letters of Credit, the borrowings hereunder and the use of the proceeds thereof will not violate in any material respect any Requirement of Law or any Contractual Obligation of the Borrower or any of its Significant Subsidiaries and will not result in, or require, the creation or imposition of any Lien on any of their respective properties or revenues pursuant to any Requirement of Law or any such Contractual Obligation (other than the Liens created by the Loan Documents and the FMB Indenture).

4.6     Litigation. (a) No litigation, investigation or proceeding of or before any arbitrator or Governmental Authority is pending or, to the knowledge of the Borrower, threatened in writing by or against the Borrower or any of its Significant Subsidiaries or against any of their respective material properties or revenues with respect to any of the Loan Documents.

(b)     No litigation, investigation or proceeding of or before any arbitrator or Governmental Authority is pending or, to the knowledge of the Borrower, threatened in writing by or against the Borrower or any of its Significant Subsidiaries or against any of their respective material properties or revenues, except as disclosed in the Specified Exchange Act Filings, that could reasonably be expected to have a Material Adverse Effect.

4.7     No Default. No Default or Event of Default has occurred and is continuing.

4.8     Taxes. The Borrower and each of its Significant Subsidiaries has filed or caused to be filed all Federal and state returns of income and franchise taxes imposed in lieu of net income taxes and all other material tax returns that are required to be filed and has paid all taxes shown to be due and payable on said returns or with respect to any claims or assessments for taxes made against it or any of its property by any Governmental Authority (other than (i) any amounts the validity of which are currently being contested in good faith by appropriate proceedings and with respect to which reserves in conformity with GAAP have been provided on the books of the Borrower or any of its Significant Subsidiaries, as applicable, and (ii) claims which could not reasonably be expected to have a Material Adverse Effect). No material tax Liens have been filed against the Borrower or any of its Significant Subsidiaries other than (A) Liens for taxes which are not delinquent or (B) Liens for taxes which are being contested in good faith by appropriate proceedings and with respect to which reserves in conformity with GAAP have been provided on the books of the Borrower or any of its Significant Subsidiaries, as applicable.

4.9     Federal Regulations. No part of the proceeds of any Loans, and no other extensions of credit hereunder, will be used for "buying" or "carrying" any "margin stock" within the respective meanings of each of the quoted terms under Regulation U as now and from time to time hereafter in effect or for any purpose that violates the provisions of the Regulations of the Board.

4.10     ERISA. No Reportable Event has occurred during the five year period prior to the date on which this representation is made or deemed made with respect to any Plan, and each Plan has complied with the applicable provisions of ERISA and the Code, except, in each case, to the

60

extent that any such Reportable Event or failure to comply with the applicable provisions of ERISA or the Code could not reasonably be expected to result in a Material Adverse Effect. During the five year period prior to the date on which this representation is made or deemed made, there has been no (i) failure to make a required contribution to any Plan that would result in the imposition of a Lien or other encumbrance or the provision of security under Section 430 of the Code or Section 303 or 4068 of ERISA, or the arising of such a Lien or encumbrance; or (ii) "unpaid minimum required contribution" or "accumulated funding deficiency" (as defined or otherwise set forth in Section 4971 of the Code or Part 3 of Subtitle B of Title I of ERISA), whether or not waived, except, in each case, to the extent that such event could not reasonably be expected to result in a Material Adverse Effect. No termination of a Single Employer Plan has occurred, and no Lien in favor of the PBGC or a Plan has arisen, during such five-year period.   The present value of all accrued benefits under each Single Employer Plan (based on those assumptions used to fund such Plan) did not, as of the last annual valuation date for which a certified actuarial valuation report is available prior to the date on which this representation is made or deemed made, exceed the value of the assets of such Plan allocable to such accrued benefits, except as could not reasonably be expected to result in a Material Adverse Effect. Neither the Borrower nor any Commonly Controlled Entity has had a complete or partial withdrawal from any Multiemployer Plan during the five year period prior to the date on which this representation is made or deemed made that has resulted or could reasonably be expected to result in a material liability under ERISA, and neither the Borrower nor any Commonly Controlled Entity would become subject to any liability under ERISA if the Borrower or any such Commonly Controlled Entity were to withdraw completely from all Multiemployer Plans as of the valuation date most closely preceding the date on which this representation is made or deemed made, except as could not reasonably be expected to result in a Material Adverse Effect. No such Multiemployer Plan is in endangered or critical status (within the meaning of Section 305 of ERISA) or in Insolvency.

4.11   Investment Company Act; Other Regulations. The Borrower is not an "investment company", or a company "controlled" by an "investment company", within the meaning of the Investment Company Act of 1940, as amended. On the Effective Date, the Borrower is not subject to regulation under any Requirement of Law (other than (a) Regulation X of the Board and (b) Sections 817-830, and Sections 701 and 851 of the California Public Utilities Code) that limits its ability to incur Indebtedness under this Agreement.

4.12   Use of Proceeds. The proceeds of the Revolving Loans and the Letters of Credit shall be used (a) on the Effective Date, to fund the transactions contemplated under the Plan of Reorganization and (b) to finance working capital needs, capital expenditures and other general corporate purposes of the Borrower and its Subsidiaries.

4.13   Environmental Matters. Except as disclosed in the Specified Exchange Act Filings, the Borrower and its Significant Subsidiaries are not subject to any pending violations or liabilities under Environmental Laws or relating to the disposal, spill or other release of Materials of Environmental Concern that would reasonably be expected to have a Material Adverse Effect, and, to the knowledge of the Borrower, there are no facts, circumstances or conditions that could reasonably be expected to give rise to such violations or liabilities.

4.14   Regulatory Matters. Solely by virtue of the execution, delivery and performance of, or the consummation of the transactions contemplated by this Agreement, no Lender shall be or become subject to regulation (a) under the FPA or (b) as a "public utility" or "public service corporation" or the equivalent under any Requirement of Law.

61

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 1135 of 1367

4.15    Sanctions; Anti-Corruption. None of the Borrower, any of its Subsidiaries, nor, to the knowledge of the Borrower, any director, officer, agent, Affiliate or employee of the Borrower or any of its Subsidiaries is currently (i) the subject of any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department or the U.S. State Department ("Sanctions") or (ii) located, organized or resident in a country or territory that is, or whose government is, the subject of any Sanctions. None of the Borrower, any of its Subsidiaries nor, to the knowledge of the Borrower, any director, officer, agent, Affiliate or employee of the Borrower or any of its Subsidiaries, has taken any action, directly or indirectly, that would result in a violation in any material respect by any such Person of the United States Foreign Corrupt Practices Act of 1977, as amended ("FCPA") or of any other anti-bribery or anti-corruption laws, rules, regulations legally applicable to such Persons (collectively, "Anti-Corruption Laws"). The Borrower will not use the proceeds of Revolving Loans or Letters of Credit, or lend, contribute or otherwise make available such proceeds (a) to any Subsidiary, Affiliate, joint venture partner or other Person or entity, to fund the activities of any Person, or in any country or territory, that, at the time of such funding, is, or whose government is, the subject of any Sanctions, or (b) directly, or, to the knowledge of the Borrower, indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the FCPA or of any Anti-Corruption Laws.

4.16    Affected Financial Institutions. The Borrower is not an Affected Financial Institution.

4.17    Solvency. The Borrower and its Subsidiaries, on a consolidated basis, are Solvent as of the Effective Date (after giving effect to the Plan of Reorganization and the transactions described therein).

4.18    Disclosure.

(a)    All written information relating to the Borrower, its Subsidiaries and their respective businesses, other than any projections, estimates and other forward-looking materials and information of a general economic or industry specific nature, that has been provided by or on behalf of the Borrower to the Agents or the Lenders in connection with the transactions contemplated hereby does not, when taken as a whole, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements were made (giving effect to all supplements and updates thereto). Any projected information, estimates, other forward-looking materials and pro forma financial information that have been made available to any Lenders or Agents prior to the Effective Date in connection with the transactions contemplated hereby have been prepared in good faith based upon assumptions believed by the Borrower to be reasonable as of the date such information was furnished to the Lenders and as of the Effective Date (it being understood that actual results may vary materially from such projections and pro forma information and such projections and pro forma information are not a guarantee of performance).

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 1136 of 1367

(b) As of the Effective Date, to the knowledge of the Borrower, the information included in any Beneficial Ownership Certification provided on or prior to the Effective Date to any Lender in connection with this Agreement is true and correct in all respects.

4.19    Status of Obligations. The issuance to the Designated Agent of the Senior Bond provides the Lenders, as beneficial holders of the Senior Bond through the Designated Agent, the benefit of the Lien of the FMB Indenture equally and ratably with the holders of other First Mortgage Bonds.

4.20    Ownership of Property. As of the Effective Date, each of the Borrower and its Significant Subsidiaries has good title to, or valid leasehold interests in, all its real and personal property material to its business, subject to no Liens other than Liens permitted under Section 7.3, except for where the failure would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

4.21    Covered Entity. The Borrower is not a Covered Entity.

SECTION 5.    CONDITIONS PRECEDENT

5.1    Conditions to the Effective Date. The occurrence of the Effective Date and the effectiveness of the Lenders' Commitments hereunder is subject to the satisfaction of the following conditions precedent:

(a)    Credit Agreement. The Designated Agent shall have received this Agreement (including copies of all schedules attached hereto in a form reasonably satisfactory to the Lenders), executed and delivered by the Designated Agent, the Co-Administrative Agents, the Borrower and each Person listed on Schedule 1.1.

(b)    Consents and Approvals. All governmental and third party consents and approvals necessary in connection with the execution and delivery of this Agreement and the other Loan Documents and the consummation of the transactions contemplated hereby shall have been obtained and be in full force and effect; and the Designated Agent shall have received a certificate of a Responsible Officer to the foregoing effect.

(c)    KYC Information. At least three (3) Business Days prior to the Effective Date, the Designated Agent and each Lender shall have received all documentation and information relating to the Borrower as is reasonably requested in writing by the Designated Agent and/or any such Lender at least ten (10) Business Days prior to the Effective Date that is required by Governmental Authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the Patriot Act and the Beneficial Ownership Regulation. If the Borrower qualifies as a "legal entity customer" under the Beneficial Ownership Regulation and the Designated Agent or any Lender so request at least five (5) Business Days prior to the Effective Date, then at least three (3) Business Days prior to the Effective Date, the Borrower shall have delivered to the Designated Agent and/or any such Lender a Beneficial Ownership Certification in relation to the Borrower.

(d)    Bond Documents. The Designated Agent shall have received:

63

(i)    the Bond Delivery Agreement, duly executed and delivered by the Borrower and Designated Agent;

(ii)    the Senior Bond in a face amount equal to the Total Commitments as of the Effective Date, duly issued and authenticated under the FMB Indenture and in a form reasonably satisfactory to the Designated Agent;

(iii)    the Supplemental Indenture, duly executed and delivered by the Borrower and the Indenture Trustee and in a form reasonably satisfactory to the Designated Agent;

(iv)    a certificate of a duly authorized officer of the Indenture Trustee certifying that the Senior Bond has been authenticated and is outstanding under the FMB Indenture;

(v)    copies of all legal opinions and other documents delivered to the Indenture Trustee by or on behalf of the Borrower on or prior to the Effective Date in connection with the issuance of the Senior Bond;

(vi)    copies of all title reports and commitments as of the Effective Date with respect to the Mortgaged Property consisting of real property as to which Liens in favor of the Indenture Trustee, for the benefit of the holders of the First Mortgage Bond, has been granted; and

(vii)    the Escrow Deposit and Disbursement Agreement, duly executed and delivered by the Borrower and the Indenture Trustee and in a form reasonably satisfactory to the Designated Agent.

(e)    Fees. The Lenders, the Arrangers and the Agents shall have received all fees required to be paid, and all expenses for which invoices have been presented (including the reasonable fees and expenses of legal counsel) on or before the date that is two (2) Business Days prior to the Effective Date.

(f)    Closing Certificate; Certified Articles of Incorporation; Good Standing Certificates. The Designated Agent shall have received (i) a certificate of the Borrower, dated the Effective Date, substantially in the form of Exhibit D, with appropriate insertions and attachments, including the articles of incorporation of the Borrower certified as of a recent date by the Secretary of State of the State of California, (ii) a good standing certificate for the Borrower dated as of a recent date from the Secretary of State of the State of California, and (iii) a certificate of a Responsible Officer, dated the Effective Date, confirming the satisfaction of the conditions precedent set forth in Sections 5.1(h) and (i).

(g)    Legal Opinion. The Designated Agent shall have received the legal opinion of (i) Hunton Andrews Kurth LLP, counsel to the Borrower, and (ii) Munger, Tolles & Olson LLP, special California regulatory counsel to the Borrower, each in a form reasonably satisfactory to the Designated Agent.

(h)    Representations and Warranties. Each of the representations and warranties made by the Borrower in this Agreement that does not contain a materiality qualification shall be true and correct in all material respects on and as of the Effective Date, and each of the representations

64

and warranties made by the Borrower in this Agreement that contains a materiality qualification shall be true and correct on and as of the Effective Date (or, in each case, to the extent such representations and warranties specifically relate to an earlier date, that such representations and warranties were true and correct in all material respects, or true and correct, as the case may be, as of such earlier date).

(i)    No Default. No Default or Event of Default shall have occurred and be continuing on the Effective Date or after giving effect to any Credit Event requested to be made on the Effective Date.

(j)    Solvency. The Designated Agent shall have received a solvency certificate from the chief financial officer of the Borrower in substantially the form of Exhibit I hereto.

5.2    Conditions to Each Credit Event. The agreement of each Lender to make any Loan or to issue or extend the expiry date under, or participate in, a Letter of Credit (other than the extension of a Letter of Credit pursuant to the evergreen provisions therein) (each, a "Credit Event"), including each Issuing Lender to issue a Letter of Credit, on any date (other than (except for clause (d)) the Effective Date) is subject to the satisfaction of the following conditions precedent:

(a)    Effective Date. The Effective Date shall have occurred.

(b)    Representations and Warranties. Each of the representations and warranties made by the Borrower in this Agreement (other than the representations and warranties set forth in Sections 4.2, 4.6(b) and 4.13) that does not contain a materiality qualification shall be true and correct in all material respects on and as of the date of such Credit Event as if made on and as of such date, and each of the representations and warranties made by the Borrower in this Agreement (other than the representations and warranties set forth in Sections 4.2, 4.6(b) and 4.13) that contains a materiality qualification shall be true and correct on and as of such date (or, to the extent such representations and warranties specifically relate to an earlier date, that such representations and warranties were true and correct in all material respects, or true and correct, as the case may be, as of such earlier date).

(c)    No Default. No Default or Event of Default shall have occurred and be continuing on the date of such Credit Event or after giving effect to the Credit Event requested to be made on such date.

(d)    Request for Credit Event. The Designated Agent and, if applicable, the relevant Issuing Lender, shall have received a notice of borrowing or an Application, as applicable, in accordance with the requirements of Section 2.2 or 3.2, as applicable.

Each Credit Event (other than a Credit Event occurring on the Effective Date) shall constitute a representation and warranty by the Borrower as of the date of such Credit Event that the conditions contained in this Section 5.2 have been satisfied.

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 1139 of 1367

SECTION 6.   AFFIRMATIVE COVENANTS

The Borrower hereby agrees that, so long as the Commitments remain in effect, or any Letter of Credit, any Loan, any interest on any Loan or any fee payable to any Lender or any Agent hereunder remains outstanding, or any other amount then due and payable is owing to any Lender or any Agent hereunder, the Borrower shall and, with respect to Sections 6.3 and 6.6(b), shall cause its Significant Subsidiaries to:

6.1   Financial Statements. Furnish to the Designated Agent with a copy for each Lender, and the Designated Agent shall deliver to each Lender:

(a)   as soon as available, but in any event within 120 days after the end of each fiscal year of the Borrower, a copy of the audited consolidated balance sheet of the Borrower and its consolidated Subsidiaries as at the end of such year and the related audited consolidated statements of income and cash flows for such year, setting forth in each case in comparative form the figures for the previous year, reported on without a "going concern" or like qualification or exception, or qualification arising out of the scope of the audit, by Deloitte & Touche LLP or other independent certified public accountants of nationally recognized standing; and

(b)   as soon as available, but in any event not later than 60 days after the end of each of the first three quarterly periods of each fiscal year of the Borrower, the unaudited consolidated balance sheet of the Borrower and its consolidated Subsidiaries as at the end of such quarter and the related unaudited consolidated statements of income and cash flows for such quarter and the portion of the fiscal year through the end of such quarter, setting forth in each case in comparative form the figures for the previous year, certified by a Responsible Officer as being fairly stated in all material respects (subject to the absence of footnotes and normal year-end audit adjustments).

All such financial statements shall (x) be complete and correct in all material respects and (y) shall be prepared in reasonable detail and in accordance with GAAP applied (except as approved by such accountants or officer, as the case may be, and disclosed in reasonable detail therein) consistently throughout the periods reflected therein and with prior periods, subject, in each case to the absence of footnotes and to normal year-end audit adjustments. The Borrower shall be deemed to have delivered the financial statements required to be delivered pursuant to this Section 6.1 upon the filing of such financial statements by the Borrower through the SEC's EDGAR system (or any successor electronic gathering system that is publicly available free of charge) or the publication by the Borrower of such financial statements on its website.

6.2   Certificates; Other Information. Furnish to the Designated Agent, for delivery to the Lenders:

(a)   within two Business Days after the delivery of any financial statements pursuant to Section 6.1, (i) a certificate of a Responsible Officer stating that such Responsible Officer has obtained no actual knowledge of any Default or Event of Default except as specified in such certificate and (ii) a Compliance Certificate, substantially in the form of Exhibit C, containing all information and calculations reasonably necessary for determining compliance by the Borrower with the provisions of this Agreement referred to therein as of the last day of the fiscal quarter or fiscal year of the Borrower, as the case may be;

66

(b)  within five days after the same are sent, copies of all financial statements and reports that the Borrower sends to the holders of any class of its debt securities or public equity securities, _provided_ that, such financial statements and reports shall be deemed to have been delivered upon the filing of such financial statements and reports by the Borrower through the SEC's EDGAR system (or any successor electronic gathering system that is publicly available free of charge) or publication by the Borrower of such financial statements and reports on its website;

(c)  promptly, such additional financial and other information (other than any such information the disclosure of which is prohibited by applicable law or binding agreement or subject to attorney-client privilege or constitutes attorney-work product or constitutes non-financial trade secrets or non-financial proprietary information so long as (x) such confidentiality obligation was not entered into in contemplation hereof and (y) the Borrower provides such Lender with notice that information is being withheld due to the existence of such confidentiality obligation) as any Lender, through the Designated Agent, may from time to time reasonably request; and

(d)  promptly, such documentation and other information that the Designated Agent or such Lender reasonably requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the Patriot Act and the Beneficial Ownership Regulation.

6.3  _Payment of Taxes_. Pay all taxes due and payable or any other tax assessments made against the Borrower or any of its Significant Subsidiaries or any of their respective property by any Governmental Authority (other than (i) any amounts the validity of which are currently being contested in good faith by appropriate proceedings and with respect to which reserves in conformity with GAAP have been provided on the books of the Borrower or any of its Significant Subsidiaries, as applicable or (ii) where the failure to effect such payment could not reasonably be expected to have a Material Adverse Effect).

6.4  _Maintenance of Existence; Compliance_. (a)(i) Preserve, renew and keep in full force and effect its organizational existence and (ii) take all reasonable action to maintain all rights, privileges and franchises necessary or desirable in the normal conduct of its business, except, in each case, as otherwise permitted by Section 7.4 and except, in the case of clause (ii) above, to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect; (b) comply with all Contractual Obligations except to the extent that failure to comply therewith could not, in the aggregate, reasonably be expected to have a Material Adverse Effect and (c) comply with all Requirements of Law except for any Requirements of Law being contested in good faith by appropriate proceedings or except to the extent that failure to comply therewith could not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

6.5  _Maintenance of Property; Insurance_. (a) Keep all property useful and necessary in its business in good working order and condition, ordinary wear and tear and casualty excepted, except to the extent that failure to do so could not, in the aggregate, reasonably be expected to have a Material Adverse Effect, and (b) maintain with financially sound and reputable insurance companies insurance on all its material property in at least such amounts and against at least such risks as are usually insured against in the same general area by companies engaged in the same or a similar business of comparable size and financial strength and owning similar properties in the same general areas in which the Borrower operates, which may include self-insurance, if determined by the Borrower to be reasonably prudent.

67

6.6 <u>Inspection of Property; Books and Records; Discussions</u>. (a) Keep proper books of records and account in which full, true and correct entries in conformity with GAAP and all Requirements of Law shall be made of all dealings and transactions in relation to its business and activities and (b) unless a Default or Event of Default has occurred and is continuing, not more than once a year and after at least five Business Days' notice, (i) permit representatives of any Lender to visit and inspect any of its properties and examine and make abstracts from any of its books and records at any reasonable time to discuss the business, operations, properties and financial and other condition of the Borrower and its Significant Subsidiaries with officers and employees of the Borrower and its Significant Subsidiaries and (ii) use commercially reasonable efforts to provide for the Lenders (in the presence of representatives of the Borrower) to meet with the independent certified public accountants of the Borrower and its Significant Subsidiaries; provided, that any such visits or inspections shall be subject to such conditions as the Borrower and each of its Significant Subsidiaries shall deem necessary based on reasonable considerations of safety, security and confidentiality; and provided, further, that neither the Borrower nor any Significant Subsidiary shall be required to disclose to any Person any information the disclosure of which is prohibited by applicable law or binding agreement or subject to attorney-client privilege or constitutes attorney-work product or constitutes non-financial trade secrets or non-financial proprietary information so long as (x) such confidentiality obligation was not entered into in contemplation hereof and (y) the Borrower provides such Lender with notice that information is being withheld due to the existence of such confidentiality obligation.

6.7 <u>Notices</u>. Give notice to the Designated Agent, and the Designated Agent shall deliver such notice to each Lender, promptly upon any Responsible Officer obtaining knowledge of:

(a) the occurrence of any Default or Event of Default;

(b) any change in the Rating issued by either S&P or Moody's; and

(c) the occurrence of an ERISA Event which, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect (provided, that, any judicial proceeding instituted by PBGC that, within 60 days after the institution of such proceeding, has been withdrawn or stayed by PBGC or otherwise, shall be disregarded for the purpose of this Section 6.7(c)).

6.8 <u>Maintenance of Licenses, etc</u>. Maintain in full force and effect any authorization, consent, license or approval of any Governmental Authority necessary for the conduct of the Borrower's business as now conducted by it or necessary in connection with this Agreement, except to the extent the failure to do so could not reasonably be expected to have a Material Adverse Effect.

6.9 <u>Further Assurances</u>.

(a) (i) Comply with Section 7.08(a) of the FMB Indenture, (ii) deliver to the Designated Agent (A) within 120 days after the Effective Date, a copy of the Opinion of Counsel (as defined

68

in the FMB Indenture) delivered to the Indenture Trustee under Section 7.08(a)(i) of the FMB Indenture relating the Supplemental Indenture described in clause (i) of the definition of "Supplemental Indenture", and (B) within 120 days after the execution and delivery of any Supplemental Indenture described in clause (ii) of the definition of "Supplemental Indenture", a copy of the Opinion of Counsel delivered to the Indenture Trustee under Section 7.08(a)(i) of the FMB Indenture relating to such Supplemental Indenture and (iii) deliver to the Designated Agent a copy of each Opinion of Counsel delivered to the Indenture Trustee under Section 7.08(a)(ii) of the FMB Indenture relating to the Supplemental Indenture.

(b)    Promptly upon the reasonable request by the Designated Agent, or by the Required Lenders through the Designated Agent, (i) correct any material defect or error that may be discovered in any Loan Document or the execution, acknowledgment, filing or recordation thereof and (ii) do, execute, acknowledge and deliver any and all such further certificates, documents, agreements and other instruments as reasonably required from time to time to carry out more effectively the purposes of the Loan Documents.

6.10    <u>Use of Proceeds</u>. The Borrower shall use the proceeds of the Loans or the Letters of Credit in accordance with Section 4.12.

SECTION 7.   NEGATIVE COVENANTS

The Borrower hereby agrees that, so long as the Commitments remain in effect, or any Letter of Credit, any Loan, or any interest on any Loan or any fee payable to any Lender or any Agent hereunder remains outstanding, or any other amount then due and payable is owing to any Lender or any Agent hereunder, the Borrower shall not and shall not permit its Significant Subsidiaries to:

7.1    <u>Indebtedness</u>. At all times prior to the Indebtedness Covenant Release Date, create, incur, assume or permit to exist any Indebtedness, except for:

(a)    Indebtedness and other Obligations created hereunder (including any Indebtedness incurred pursuant to Section 2.3);

(b)    Indebtedness of the Borrower outstanding on the Effective Date in an aggregate outstanding principal amount not to exceed $33,350,000,000 and any Permitted Refinancing thereof;

(c)    Indebtedness (i) pursuant to tenders, statutory obligations, bids, leases, governmental contracts, trade contracts, surety, stay, customs, appeal, performance and/or return of money bonds or other similar obligations incurred in the ordinary course of business and (ii) in respect of letters of credit, bank guaranties, surety bonds, performance bonds or similar instruments and reimbursement obligations to support any of the foregoing items;

(d)    (i) Guarantee Obligations with respect to the obligations of suppliers, customers and licensees and other third parties in the ordinary course of business, (ii) Indebtedness incurred in the ordinary course of business to pay the deferred purchase price of goods or services or progress payments in connection with such goods and services and (iii) Indebtedness in respect of letters of credit, bankers' acceptances, bank guaranties or similar instruments supporting trade payables, warehouse receipts or similar facilities entered into in the ordinary course of business, workers compensation claims or other employee benefits;

69

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 1143 of 1367

(e) Guarantee Obligations with respect to Indebtedness otherwise permitted to be incurred pursuant to this Section 7.1 and Guarantee Obligations with respect to the obligations of Subsidiaries and joint ventures of the Borrower; provided that no such Guarantee Obligations with respect to Indebtedness of the Borrower constituting debt for borrowed money or evidenced by notes, bonds, debentures or other similar instruments (including, for the avoidance of doubt, the First Mortgage Bonds) shall be permitted except to the extent provided by a Person that is, or concurrently with providing such Guarantee Obligations becomes, a guarantor of the Obligations hereunder on terms and pursuant to documentation reasonably satisfactory to the Designated Agent;

(f) Indebtedness consisting of (i) the financing of insurance premiums and/or (ii) take-or-pay obligations contained in supply arrangements;

(g) Indebtedness with respect to Capital Lease Obligations and purchase money Indebtedness; provided, that the aggregate outstanding principal amount of Indebtedness with respect to Capital Lease Obligations shall not exceed $500,000,000 at any one time;

(h) (i) obligations under any Cash Management Agreement and (ii) Indebtedness under any Swap Agreement permitted under Section 7.6;

(i) Indebtedness arising from any agreement providing for indemnification, adjustment or purchase price or similar obligations (including contingent earn-out obligations) incurred in connection with any Disposition or any purchase of assets or Capital Stock, and Indebtedness arising from guaranties, letters of credit, bank guaranties, surety bonds, performance bonds or similar instruments securing the performance of the Borrower or its Subsidiaries pursuant to any such agreement;

(j) Indebtedness in respect of banking services and incentive, supplier finance or similar programs incurred in the ordinary course of business;

(k) customer deposits and advance payments received in the ordinary course of business from customers for goods and services purchased in the ordinary course of business;

(l) Indebtedness representing deferred compensation to employees, consultants or independent contractors incurred in the ordinary course of business;

(m) Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or other similar instrument drawn against insufficient funds in the ordinary course of business;

(n) endorsements for collection or deposit in the ordinary course of business;

(o) Indebtedness issued or incurred to fund rate base growth in an aggregate outstanding principal amount not to exceed $9,000,000,000 at any time and any Permitted Refinancing thereof; and

(p)   other Indebtedness of the Borrower in an aggregate outstanding principal amount not to exceed the excess, if any, of 10% of Net Tangible Assets of the Borrower over the amount of Indebtedness incurred pursuant to clause (o) above.

Notwithstanding anything herein to the contrary, no Guarantee Obligations from any Significant Subsidiary of the Borrower with respect to Indebtedness of the Borrower constituting debt for borrowed money or evidenced by notes, bonds, debentures or other similar instruments (including, for the avoidance of doubt, the First Mortgage Bonds) shall be permitted hereunder except to the extent provided by a Person that is, or concurrently with providing such Guarantee Obligations becomes, a guarantor of the Obligations hereunder on terms and pursuant to documentation reasonably satisfactory to the Designated Agent.

7.2   <u>Consolidated Capitalization Ratio</u>. Permit the Consolidated Capitalization Ratio on the last day of any fiscal quarter, from and after the last day of the first fiscal quarter ending after the Effective Date, to exceed 0.65 to 1.00.

7.3   <u>Liens</u>. Create, incur, assume or suffer to exist any Lien upon any assets of the Borrower or any Significant Subsidiary, whether now owned or hereafter acquired, except for (a) Liens securing the Obligations under this Agreement and the other Loan Documents and (b) Liens permitted under Section 7.06(b) of the FMB Indenture.

7.4   <u>Fundamental Changes</u>. Enter into any merger, consolidation or amalgamation, or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), or Dispose of all or substantially all of its property or business (including, without limitation, rental equipment or leasehold interests and excluding the sale or transfer of any accounts receivable or of any amounts that are accrued and recorded in a regulatory account for collections by the Borrower, in each case, in connection with a securitization transaction, including, without limitation, any A/R Securitization Transaction), except that the Borrower may be merged, consolidated or amalgamated with another Person or Dispose of all or substantially all of its property or business so long as, after giving effect to such transaction, (a) no Default or Event of Default shall have occurred and be continuing, (b) either (i) the Borrower is the continuing or surviving corporation of such merger, consolidation or amalgamation or (ii) the continuing or surviving corporation of such merger, consolidation or amalgamation, if not the Borrower or the purchaser, (x) shall be an entity organized or existing under the laws of the United States, any state thereof or the District of Columbia, (y) shall have assumed all obligations of the Borrower under the Loan Documents pursuant to arrangements reasonably satisfactory to the Designated Agent and (z) to the extent requested by the Designated Agent or any Lender, shall have promptly provided to the Designated Agent or such Lender all documentation and other information that may be required by the Designated Agent or such Lender in order to enable compliance with applicable "know-your-customer" and anti-money laundering rules and regulations, including information required by the Patriot Act and the Beneficial Ownership Regulation and (c) the ratings by Moody's and S&P of the continuing or surviving corporation's or purchaser's senior, secured debt shall be at least the higher of (1) Baa3 from Moody's and BBB- from S&P and (2) the ratings by such rating agencies of the Borrower's senior, secured debt in effect before the earlier of the occurrence or the public announcement of such event.

71

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 1145 of 1367

7.5   Sale and Lease Back Transactions. Enter into any arrangement, directly or indirectly, with any Person whereby it shall sell or transfer any property having fair market value in excess of $10,000,000, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property being sold or transferred, except for (a) those transactions described on Schedule 7.5 and (b) any other sale of any fixed or capital assets that is made for cash consideration; provided that, in each case, if such sale and leaseback results in a Capital Lease Obligation, such Capital Lease Obligation is permitted by Section 7.1 and any Lien made the subject of such Capital Lease Obligation is permitted by Section 7.3.

7.6   Swap Agreements. Enter into any Swap Agreement, other than Swap Agreements entered into not for speculative purposes (a) to hedge or mitigate risks to which the Borrower and its Subsidiaries are exposed in the conduct of its business or the management of its liabilities (including, without limitation, raw material, commodities, fuel, electricity or other supply costs and currency risks), (b) to effectively cap, collar or exchange interest rates (from fixed to floating rates, from one floating rate to another floating rate or fixed rate or otherwise) with respect to any interest bearing Indebtedness of the Borrower and its Subsidiaries permitted by this Agreement, (c) to swap currency in connection with funding the business of the Borrower and its Subsidiaries in the ordinary course of business or (d) entered into in connection with any A/R Securitization Transaction.

7.7   Amendments to FMB Indenture. Amend, supplement, modify or waive the FMB Indenture in any manner that is materially adverse to the Lenders hereunder; provided that the foregoing shall not prohibit the Borrower from supplementing the FMB Indenture in order to provide for the issuance of additional First Mortgage Bonds in accordance with the FMB Indenture or to add property to the Lien of the FMB Indenture.

SECTION 8.   EVENTS OF DEFAULT

If any of the following events shall occur and be continuing on or after the Effective Date:

(a)   the Borrower shall fail to pay any principal of any Loan or Reimbursement Obligation when due in accordance with the terms hereof; or the Borrower shall fail to pay any interest on any Loan or Reimbursement Obligation, or any other amount payable hereunder or under any other Loan Document, within five Business Days after any such interest or other amount becomes due in accordance with the terms hereof; or

(b)   any representation or warranty made or deemed made by the Borrower herein or in any other Loan Document or that is contained in any certificate, document or financial or other statement furnished by it at any time under or in connection with this Agreement or any such other Loan Document shall prove to have been inaccurate in any material respect on or as of the date made or deemed made, unless, as of any date of determination, the facts or circumstances to which such representation or warranty relates have changed with the result that such representation or warranty is true and correct in all material respects on such date; or

72

(c)     the Borrower shall default in the observance or performance of any agreement contained in Section 6.4(a)(i), Section 6.7(a), Section 6.10, Section 7.1, Section 7.2, Section 7.3 or Section 7.4 of this Agreement; or

(d)     the Borrower shall default in the observance or performance of any other agreement contained in this Agreement or any other Loan Document (other than as provided in paragraphs (a) through (c) of this Section), and such default shall continue unremedied for a period of 30 days after notice to the Borrower from the Designated Agent at the request of the Required Lenders; or

(e)     the Borrower or any of its Significant Subsidiaries shall (i) default in making any payment of any principal of any Indebtedness (including any Guarantee Obligation, but excluding the Loans) on the due date with respect thereto (after giving effect to any period of grace, if any, provided in the instrument or agreement under which such Indebtedness was created); or (ii) default in making any payment of any interest on any such Indebtedness beyond the period of grace, if any, provided in the instrument or agreement under which such Indebtedness was created; or (iii) default in the observance or performance of any other agreement or condition relating to any such Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist, the effect of which default or other event or condition is to cause, or (in the case of all Indebtedness other than Indebtedness under any Swap Agreement) to permit the holder or beneficiary of such Indebtedness (or a trustee or agent on behalf of such holder or beneficiary) to cause, with the giving of notice if required, such Indebtedness to become due prior to its stated maturity or (in the case of any such Indebtedness constituting a Guarantee Obligation) to become payable; provided, that a default, event or condition described in clause (i), (ii) or (iii) of this paragraph (e) shall not at any time constitute an Event of Default unless, at such time, one or more defaults, events or conditions of the type described in clauses (i), (ii) and (iii) of this paragraph (e) shall have occurred and be continuing with respect to Indebtedness the outstanding principal amount of which exceeds in the aggregate $200,000,000; provided, further, that unless payment of the Loans hereunder has already been accelerated, if such default shall be cured by the Borrower or such Significant Subsidiary or waived by the holders of such Indebtedness and any acceleration of maturity having resulted from such default shall be rescinded or annulled, in each case, in accordance with the terms of such agreement or instrument, without any modification of the terms of such Indebtedness requiring the Borrower or such Significant Subsidiary to furnish security or additional security therefor, reducing the average life to maturity thereof or increasing the principal amount thereof, or any agreement by the Borrower or such Significant Subsidiary to furnish security or additional security therefor or to issue in lieu thereof Indebtedness secured by additional or other collateral or with a shorter average life to maturity or in a greater principal amount, then any Default hereunder by reason thereof shall be deemed likewise to have been thereupon cured or waived; or

(f)     (i) the Borrower or any of its Significant Subsidiaries shall commence any case, proceeding or other action (A) under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it as bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding up, liquidation, dissolution, composition or other relief with respect to it or its debts, or (B) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for it or for all or any substantial part of its assets, or the Borrower or any of its Significant Subsidiaries shall make a general assignment for

73

the benefit of its creditors; or (ii) there shall be commenced against the Borrower or any of its Significant Subsidiaries any case, proceeding or other action of a nature referred to in clause (i) above that (A) results in the entry of an order for relief or any such adjudication or appointment or (B) remains undismissed, undischarged or unbonded for a period of 60 days; or (iii) there shall be commenced against the Borrower or any of its Significant Subsidiaries any case, proceeding or other action seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of its assets that results in the entry of an order for any such relief that shall not have been vacated, discharged, or stayed or bonded pending appeal within 60 days from the entry thereof; or (iv) the Borrower or any of its Significant Subsidiaries shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due; or

(g) there occurs any ERISA Event that, individually or in the aggregate, would reasonably be expected to result in a Material Adverse Effect; or

(h) one or more judgments or decrees shall be entered against the Borrower or any of its Significant Subsidiaries by a court of competent jurisdiction involving in the aggregate a liability (not paid or, subject to customary deductibles, fully covered by insurance as to which the relevant insurance company has not denied coverage) of $200,000,000 or more, and all such judgments or decrees shall not have been vacated, discharged, stayed or bonded pending appeal within 45 days from the entry thereof unless, in the case of a discharge, such judgment or decree is due at a later date in one or more payments and the Borrower or such Significant Subsidiary satisfies the obligation to make such payment or payments on or prior to the date such payment or payments become due in accordance with such judgment or decree; or

(i) there shall have occurred a Change of Control; or

(j) any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder or satisfaction in full of all the Obligations, ceases to be in full force and effect; or the Borrower contests in any manner in writing the validity or enforceability of any Loan Document; or the Borrower denies in writing that it has any or further liability or obligation under any Loan Document, or purports in writing to revoke, terminate or rescind any Loan Document; or

(k) at any time (i) the Senior Bond shall cease to be outstanding for any reason other than (A) the termination of the Total Commitments, the payment in full of the Loans, Reimbursement Obligations and other obligations then due and owing under the Loan Documents and the termination or expiration of the Letters of Credit or (B) the payment in full of the Senior Bond, (ii) the Designated Agent, on behalf of the Lenders, shall cease at any time to be the holder of the Senior Bond for all purposes of the FMB Indenture (unless the Senior Bond is transferred by the Designated Agent) or (iii) the Lien of the FMB Indenture shall cease to constitute a valid and enforceable Lien on the Mortgaged Property;

then, and in any such event, (A) if such event is an Event of Default specified in clause (i) or (ii) of paragraph (f) above with respect to the Borrower, automatically the Commitments shall immediately terminate and the Loans (with accrued interest thereon) and all other amounts owing under this Agreement and the other Loan Documents (including all amounts of L/C Obligations,

74

whether or not the beneficiaries of the then outstanding Letters of Credit shall have presented the documents required thereunder) shall immediately become due and payable, and (B) if such event is any other Event of Default, either or both of the following actions may be taken: (i) with the consent of the Required Lenders, the Designated Agent may, or upon the request of the Required Lenders, the Designated Agent shall, by notice to the Borrower declare the Commitments to be terminated forthwith, whereupon the Commitments shall immediately terminate; and (ii) with the consent of the Required Lenders, the Designated Agent may, or upon the request of the Required Lenders, the Designated Agent shall, by notice to the Borrower, declare the Loans (with accrued interest thereon) and all other amounts owing under this Agreement and the other Loan Documents (including all amounts of L/C Obligations, whether or not the beneficiaries of the then outstanding Letters of Credit shall have presented the documents required thereunder) to be due and payable forthwith, whereupon the same shall immediately become due and payable. With respect to all Letters of Credit with respect to which presentment for honor shall not have occurred at the time of an acceleration pursuant to this paragraph, the Borrower shall at such time deposit in an interest-bearing cash collateral account opened by the Designated Agent pursuant to the Escrow Deposit and Disbursement Agreement an amount equal to the aggregate then undrawn and unexpired amount of such Letters of Credit. Amounts held in such interest-bearing cash collateral account shall be applied by the Designated Agent to the payment of drafts drawn under such Letters of Credit, and the unused portion thereof after all such Letters of Credit shall have expired or been fully drawn upon, if any, shall be applied to repay other obligations of the Borrower hereunder and under the other Loan Documents. After all such Letters of Credit shall have expired or been fully drawn upon, all Reimbursement Obligations shall have been satisfied and all other obligations of the Borrower hereunder and under the other Loan Documents shall have been paid in full, the balance, if any, in such interest-bearing cash collateral account shall be returned to the Borrower (or such other Person as may be lawfully entitled thereto). Except as expressly provided above in this Section, presentment, demand, protest and all other notices of any kind are hereby expressly waived by the Borrower.

SECTION 9.    THE AGENTS

9.1    <u>Appointment and Authority</u>. Each of the Lenders and the Issuing Lenders hereby irrevocably appoints Citibank, N.A. to act on its behalf as the Designated Agent hereunder and under the other Loan Documents and authorizes the Designated Agent to take such actions on its behalf and to exercise such powers as are delegated to the Designated Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto. The provisions of this Section 9 are solely for the benefit of the Agents, the Lenders and the Issuing Lenders, and the Borrower shall not have rights as a third-party beneficiary of any of such provisions (other than with respect to the Borrower's rights under Sections 9.9(a) and (b)). It is understood and agreed that the use of the term "agent" herein or in any other Loan Documents (or any other similar term) with reference to any Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law. Instead such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties.

9.2    <u>Delegation of Duties</u>. The Designated Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by it. The Designated Agent, and any such sub-agent may each

75

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 1149 of 1367

perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties. The exculpatory provisions of this Section shall apply to any such sub-agent and to the Related Parties of the Designated Agent, and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Designated Agent. The Designated Agent shall not be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and nonappealable judgment that the Designated Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

9.3    Exculpatory Provisions.

(a)    No Agent shall have any duties or obligations except those expressly set forth herein and in the other Loan Documents, and its duties hereunder shall be administrative in nature. Without limiting the generality of the foregoing, no Agent:

(i)    shall be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(ii)    shall have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that an Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents); provided that no Agent shall be required to take any action that, in its opinion or the opinion of its counsel, may expose such Agent to liability or that is contrary to any Loan Document or applicable law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Debtor Relief Law or that may effect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Debtor Relief Law; and

(iii)    shall, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Affiliates that is communicated to or obtained by the Person serving as an Agent or any of its Affiliates in any capacity.

(b)    No Agent shall be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as such Agent shall believe in good faith shall be necessary, under the circumstances as provided in Sections 10.1 and 8), or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction by final and nonappealable judgment.

(c)    No Agent shall be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or

76

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 1150 of 1367

therein or the occurrence of any Default or Event of Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in Section 5 or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to such Agent.

9.4 <u>Reliance by Designated Agent</u>. The Designated Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. The Designated Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Loan, or the issuance, extension, renewal or increase of a Letter of Credit, that by its terms must be fulfilled to the satisfaction of a Lender or an Issuing Lender, the Designated Agent may presume that such condition is satisfactory to such Lender or such Issuing Lender unless the Designated Agent shall have received notice to the contrary from such Lender or such Issuing Lender prior to the making of such Loan or the issuance, extension, renewal or increase of such Letter of Credit. The Designated Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

9.5 <u>Notice of Default</u>. The Designated Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default unless the Designated Agent has received notice from a Lender, an Issuing Lender or the Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default". In the event that the Designated Agent receives such a notice, the Designated Agent shall give notice thereof to the Lenders and the Issuing Lenders. The Designated Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders (or, if so specified by this Agreement, all Lenders); provided that unless and until such Agent shall have received such directions, such Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of the Lenders and the Issuing Lenders.

9.6 <u>Non-Reliance on Agents and Other Lenders</u>. Each Lender and Issuing Lender acknowledges that it has, independently and without reliance upon the Agents, or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender and Issuing Lender also acknowledges that it will, independently and without reliance upon the Agents, or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder. Except for notices, reports and other documents expressly required to be furnished to the Lenders by the Designated Agent hereunder, the Designated Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, operations, property, condition (financial or otherwise), prospects or creditworthiness of the Borrower or any of its Affiliates that may come into the possession of such Agent or any of its officers, directors, employees, agents, attorneys in fact or Affiliates.

77

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 1151 of 1367

9.7    Indemnification. The Lenders and the Issuing Lenders agree to indemnify each Agent in its capacity as such (to the extent not reimbursed by the Borrower and without limiting the obligation of the Borrower to do so), ratably according to their respective Percentages in effect on the date on which indemnification is sought under this Section (or, if indemnification is sought after the date upon which the Commitments shall have terminated and the Loans shall have been paid in full, ratably in accordance with such Percentages immediately prior to such date), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time (whether before or after the payment of the Loans) be imposed on, incurred by or asserted against such Agent in any way relating to or arising out of, the Commitments, this Agreement, any of the other Loan Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by such Agent under or in connection with any of the foregoing; provided that no Lender or Issuing Lender shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements that are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from such Agent's gross negligence or willful misconduct.

9.8    Agent in Its Individual Capacity. Each Person serving as an Agent hereunder shall have the same rights and powers in its capacity as a Lender or an Issuing Lender as any other Lender or Issuing Lender and may exercise the same as though it were not an Agent, and the terms "Lender", "Issuing Lender", "Lenders" or "Issuing Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include such Person serving as an Agent hereunder in its individual capacity. Such Person and its Affiliates may accept deposits from, lend money to, own securities of, act as the financial advisor or in any other advisory capacity for, and generally engage in any kind of business with, the Borrower or any Subsidiary or other Affiliate thereof as if such Person were not an Agent hereunder and without any duty to account therefor to the Lenders or the Issuing Lenders.

9.9    Successor Agents.

(a)    The Designated Agent may resign upon 10 days' notice to the Lenders and the Borrower. If the Designated Agent shall so resign under this Agreement and the other Loan Documents, then the Required Lenders shall appoint from among the Lenders a successor agent for the Lenders, which successor agent shall (unless an Event of Default under Section 8(f) with respect to the Borrower shall have occurred and be continuing) be subject to approval by the Borrower (which approval shall not be unreasonably withheld, conditioned or delayed), whereupon such successor agent shall succeed to the rights, powers and duties of the Designated Agent and the term "Designated Agent" shall mean such successor agent effective upon such appointment and approval, and the former Agent's rights, powers and duties as Designated Agent shall be terminated, without any other or further act or deed on the part of such former Agent or any of the parties to this Agreement or any holders of the Loans. If no successor agent has accepted appointment as Designated Agent by the date that is 10 days following a retiring Agent's notice of resignation (the "Resignation Effective Date"), the retiring Agent's resignation shall

78

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 1152 of 1367

nevertheless thereupon become effective, and the Lenders shall assume and perform all of the duties of the Designated Agent hereunder until such time, if any, as the Required Lenders appoint a successor agent as provided for above. After any retiring Agent's resignation as Designated Agent the provisions of Section 9.7 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was an Agent under this Agreement and the other Loan Documents.

(b)    If the Person serving as Designated Agent is a Defaulting Lender pursuant to clause (e) of the definition thereof, the Required Lenders may, to the extent permitted by applicable law, by notice in writing to the Borrower and such Person remove such Person as Designated Agent and, shall appoint a successor, subject to the approval of the Borrower (unless an Event of Default under Section 8(f) with respect to the Borrower shall have occurred and be continuing), which approval shall not be unreasonably withheld, conditioned or delayed. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days (or such earlier day as shall be agreed by the Required Lenders) (the "Removal Effective Date"), then such removal shall nonetheless become effective in accordance with such notice on the Removal Effective Date.

(c)    With effect from the Resignation Effective Date or the Removal Effective Date (as applicable) (i) the retiring or removed Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of the Senior Bond held by the Designated Agent on behalf of the Lenders or any Issuing Lender, the retiring or removed Designated Agent shall continue to hold such Senior Bond in its name until such time as a successor Designated Agent is appointed) and (ii) except for any indemnity payments or other amounts then owed to the retiring or removed Designated Agent, all payments, communications and determinations provided to be made by, to or through the Designated Agent shall instead be made by or to each Lender and each Issuing Lender directly, until such time, if any, as the Required Lenders appoint a successor Designated Agent as provided for above. Upon the acceptance of a successor's appointment as Designated Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring or removed Agent (other than any rights to indemnity payments or other amounts owed to the retiring or removed Agent as of the Resignation Effective Date or the Removal Effective Date (as applicable)), and the retiring or removed Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents. The fees payable by the Borrower to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After the retiring or removed Agent's resignation or removal hereunder and under the other Loan Documents, the provisions of this Section and Sections 2.17, 3.10 and 10.5 shall continue in effect for the benefit of such retiring or removed Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring or removed Agent was acting as Agent.

9.10    Documentation Agents and Syndication Agents. None of the Co-Administrative Agents, the Documentation Agents or the Syndication Agents shall have any duties or responsibilities hereunder in its capacity as such.

9.11    Designated Agent May File Proofs of Claim. In case of the pendency of any proceeding under any Debtor Relief Law, the Designated Agent (irrespective of whether the principal of any Loan or L/C Obligation shall then be due and payable as herein expressed or by

79

declaration or otherwise and irrespective of whether the Designated Agent shall have made any demand on the Borrower) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:

(a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans, L/C Obligations and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders, the Issuing Lenders and the Designated Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders, the Issuing Lenders and the Designated Agent and their respective agents and counsel and all other amounts due the Lenders, the Issuing Lenders and the Designated Agent under Sections 2.6, 2.17, 3.3, 3.10 and 10.5) allowed in such judicial proceeding; and

(b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender and Issuing Lender to make such payments to the Designated Agent and, in the event that the Designated Agent shall consent to the making of such payments directly to the Lenders and the Issuing Lenders, to pay to the Designated Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Designated Agent and its agents and counsel, and any other amounts due the Designated Agent under Sections 2.6, 2.17, 3.10 and 10.5.

9.12    Certain ERISA Matters.

(a)    Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Designated Agent, and not, for the avoidance of doubt, to or for the benefit of the Borrower, that at least one of the following is and will be true:

(i)    such Lender is not using "plan assets" (within the meaning of Section 3(42) of ERISA or otherwise) of one or more Benefit Plans with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments or this Agreement,

(ii)    the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement,

80

(iii)    (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans, the Letters of Credit, the Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement, or

(iv)    such other representation, warranty and covenant as may be agreed in writing between the Designated Agent, in its sole discretion, and such Lender.

(b)    In addition, unless either (1) sub-clause (i) in the immediately preceding clause (a) is true with respect to a Lender or (2) a Lender has provided another representation, warranty and covenant in accordance with sub-clause (iv) in the immediately preceding clause (a), such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Designated Agent, and not, for the avoidance of doubt, to or for the benefit of the Borrower, that the Designated Agent is not a fiduciary with respect to the assets of such Lender involved in such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement (including in connection with the reservation or exercise of any rights by the Designated Agent under this Agreement, any Loan Document or any documents related hereto or thereto).

SECTION 10.    MISCELLANEOUS

10.1    <u>Amendments and Waivers</u>. Subject to Section 2.13(b) and (c), neither this Agreement, any other Loan Document, nor any terms hereof or thereof may be amended, supplemented or modified except in accordance with the provisions of this Section 10.1. The Required Lenders and the Borrower may, or, with the written consent of the Required Lenders, the Designated Agent and the Borrower may, from time to time, (a) enter into written amendments, supplements or modifications hereto and to the other Loan Documents for the purpose of adding any provisions to this Agreement or the other Loan Documents or changing in any manner the rights of the Lenders or of the Borrower hereunder or thereunder or (b) waive, on such terms and conditions as the Required Lenders or the Designated Agent, as the case may be, may specify in such instrument, any of the requirements of this Agreement or the other Loan Documents or any Default or Event of Default and its consequences; provided, however, that no such waiver and no such amendment, supplement or modification shall:

(i)    forgive the principal amount or extend the final scheduled date of maturity of any Loan, reduce the stated rate of any interest or fee payable hereunder (except in connection with the waiver of applicability of any post-default increase in interest rates (which waiver shall be effective with the consent of the Required Lenders)) or extend the

81

scheduled date of any payment thereof, or increase the amount or extend the expiration date of any Lender's Commitment, in each case without the written consent of each Lender directly affected thereby (except that only the Lenders who are increasing their Commitments are required to consent to a request by the Borrower under Section 2.3 to increase the Total Commitments);

(ii)    eliminate or reduce the voting rights of any Lender under this Section 10.1 or Section 10.6(a)(i) without the written consent of such Lender;

(iii)    reduce any percentage specified in the definition of Required Lenders without the written consent of all Lenders;

(iv)    amend, modify or waive any provision of Section 2.14, Section 10.07 (*Application of Money Collected*) of the FMB Indenture or any similar provision in the Loan Documents related to pro rata treatment without the consent of each Lender directly affected thereby;

(v)    amend, modify or waive any provision of Section 9 without the written consent of the Designated Agent;

(vi)    [reserved];

(vii)    amend, modify or waive any provision of Section 5.1 without the written consent of all the Lenders;

(viii)    amend, modify or waive any provision of Section 3 or any other provision affecting the Issuing Lenders in their capacity as such without the written consent of each Issuing Lender affected thereby; or

(ix)    instruct the Designated Agent to vote the Senior Bond in favor of the release of all or substantially all of the Mortgaged Property without the written consent of all the Lenders.

Any such waiver and any such amendment, supplement or modification shall apply equally to each of the Lenders and shall be binding upon the Borrower, the Lenders, the Designated Agent and all future holders of the Loans. In the case of any waiver, the Borrower, the Lenders and the Designated Agent shall be restored to their former position and rights hereunder and under the other Loan Documents, and any Default or Event of Default waived shall be deemed to be cured and not continuing; but no such waiver shall extend to any subsequent or other Default or Event of Default, or impair any right consequent thereon.

Notwithstanding anything to the contrary contained in this Section 10.1, if the Designated Agent and the Borrower acting together identify any ambiguity, omission, mistake, typographical error or other defect in any provision of this Agreement or any other Loan Document, then the Designated Agent and the Borrower shall be permitted to amend, modify or supplement such provision to cure such ambiguity, omission, mistake, typographical error or other defect, and any such amendment, modification or supplement shall become effective without any further action or consent of any other party to this Agreement.

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 1156 of 1367

If the Required Lenders shall have approved any amendment which requires the consent of all of the Lenders, the Borrower shall be permitted to replace any non-consenting Lender with another financial institution, provided that, (i) the replacement financial institution shall purchase at par, all Loans and other amounts owing to such replaced Lender on or prior to the date of replacement, (ii) the Borrower shall be liable to such replaced Lender under Section 2.17 if any Eurodollar Loan owing to such replaced Lender shall be purchased other than on the last day of the Interest Period relating thereto (as if such purchase constituted a prepayment of such Loans), (iii) such replacement financial institution, if not already a Lender, shall be reasonably satisfactory to the Designated Agent and each Issuing Lender, (iv) the replaced Lender shall be obligated to make such replacement in accordance with the provisions of Section 10.6 (provided that the Borrower shall be obligated to pay the registration and processing fee referred to therein) and (v) any such replacement shall not be deemed to be a waiver of any rights the Borrower, the Designated Agent, or any other Lender shall have against the replaced Lender.

Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, supplement, modification, waiver or consent hereunder (and any amendment, supplement, modification, waiver or consent which by its terms requires the consent of all Lenders or each affected Lender may be effected with the consent of the applicable Lenders other than Defaulting Lenders), except that (i) (x) an increase or extension of the Commitment of such Defaulting Lender, or (y) any reduction of the amount of principal or interest owed to such Defaulting Lender shall, in each case, require the consent of such Defaulting Lender, and (ii) a Defaulting Lender's Percentage shall be taken into consideration along with the Percentage of non-Defaulting Lenders when voting to approve or disapprove any waiver, amendment or modification that by its terms affects any Defaulting Lender more adversely than other affected Lenders.

10.2  Notices.

(a)  All notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing (including by telecopy), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when delivered during the recipient's normal business hours, or three Business Days after being deposited in the mail, postage prepaid, or, in the case of telecopy notice, when received during the recipient's normal business hours, addressed as follows in the case of the Borrower and the Designated Agent, and as set forth in an administrative questionnaire delivered to the Designated Agent in the case of the Lenders, or to such other address as may be hereafter notified by the respective parties hereto:

Borrower:                      Pacific Gas and Electric Company
                               c/o PG&E Corporation
                               P.O. Box 770000
                               San Francisco, California 94177
                               Attention: Treasurer
                               Telecopy: (415) 973-8968
                               Telephone: (415) 973-8956

with a copy to:                Pacific Gas and Electric Company
                               c/o PG&E Corporation

83

|                    |                                                             |
|--------------------|-------------------------------------------------------------|
|                    | P.O. Box 770000                                             |
|                    | San Francisco, California 94177                             |
|                    | Attention: General Counsel                                  |
|                    | Telecopy: (415) 973-5520                                    |
| Designated Agent:  | Citibank, N.A.                                              |
|                    | Citibank Delaware                                           |
|                    | One Penns Way                                               |
|                    | OPS 2/2                                                     |
|                    | New Castle, DE 19720                                        |
|                    | Attention: Agency Operations                                |
|                    | Telecopy: (646) 274-5080                                    |
|                    | Telephone: (302) 894-6010                                   |
|                    | Borrower Notifications Email: AgencyABTFSupport@citi.com    |
|                    | Financial Reporting Email: Oploanswebadmin@citi.com         |
|                    | Lender Inquiries Email: global.loans.support@citi.com       |
| Issuing Lenders:   | As notified by each Issuing Lender to the Designated Agent and the Borrower. |

provided that any notice, request or demand to or upon the Designated Agent, the Issuing Lenders or any Lender shall not be effective until received.

(b)   Notices and other communications to the Designated Agent, the Issuing Lenders or the Lenders hereunder may be delivered or furnished by electronic communications pursuant to procedures approved by the Designated Agent; provided that the foregoing shall not apply to notices pursuant to Section 2 unless otherwise agreed by the Designated Agent, the applicable Issuing Lender and each Lender. The Designated Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications.

(c)   Unless the Designated Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient, at its e-mail address as described in the foregoing clause (i), of notification that such notice or communication is available and identifying the website address therefor; provided that, for both clauses (i) and (ii) above, if such notice, email or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient.

(d)   (i) The Borrower agrees that the Designated Agent may, but shall not be obligated to, make the Communications (as defined below) available to the Issuing Lenders and the other Lenders by posting the Communications on Debt Domain, Intralinks, Syndtrak or a substantially similar electronic transmission system (the "Platform").

84

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 1158 of 1367

(ii)    The Platform is provided "as is" and "as available." The Agent Parties (as defined below) do not warrant the adequacy of the Platform and expressly disclaim liability for errors or omissions in the Communications. No warranty of any kind, express, implied or statutory, including, without limitation, any warranty of merchantability, fitness for a particular purpose, non-infringement of third-party rights or freedom from viruses or other code defects, is made by any Agent Party in connection with the Communications or the Platform. In no event shall the Designated Agent or any of its Related Parties (collectively, the "Agent Parties") have any liability to the Borrower, any Lender, any Issuing Lender or any other Person or entity for damages of any kind, including, without limitation, direct or indirect, special, incidental or consequential damages, losses or expenses (whether in tort, contract or otherwise) arising out of the Borrower's or the Designated Agent's transmission of Communications through the Platform, except to the extent such liability resulted from the gross negligence or willful misconduct of the Designated Agent or any of its Related Parties as determined by a court of competent jurisdiction in a final non-appealable judgment. "Communications" means, collectively, any notice, demand, communication, information, document or other material provided by or on behalf of the Borrower pursuant to any Loan Document or the transactions contemplated therein which is distributed to the Designated Agent, any Lender or any Issuing Lender by means of electronic communications pursuant to this Section, including through the Platform.

10.3    No Waiver; Cumulative Remedies. No failure to exercise and no delay in exercising, on the part of the Designated Agent or any Lender, any right, remedy, power or privilege hereunder or under the other Loan Documents shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

10.4    Survival of Representations and Warranties. All representations and warranties made hereunder, in the other Loan Documents and in any document, certificate or statement delivered pursuant hereto or in connection herewith shall survive the execution and delivery of this Agreement and the making of the Loans and other extensions of credit hereunder.

10.5    Payment of Expenses and Taxes. The Borrower agrees (a) to pay or reimburse the Designated Agent, each Issuing Lender and the Lenders for all their respective reasonable out of pocket costs and expenses incurred in connection with the development, preparation and execution of, and any amendment, supplement or modification to, this Agreement and the other Loan Documents and any other documents prepared in connection herewith or therewith, and the consummation of the transactions contemplated hereby and thereby, including the reasonable fees and disbursements of only one joint counsel and one joint special California counsel and, if necessary, one joint local counsel in each other relevant jurisdiction to the Designated Agent, the Issuing Lenders and the Lenders (and in the case of an actual or perceived conflict of interest, one additional counsel for each applicable jurisdiction to each group of similarly situated affected persons) and filing and recording fees and expenses, with statements with respect to the foregoing

85

to be submitted to the Borrower prior to the Effective Date (in the case of amounts to be paid on the Effective Date) and from time to time thereafter on a quarterly basis or such other periodic basis as the Designated Agent shall deem appropriate, (b) to pay or reimburse each Lender, each Issuing Lender, and the Designated Agent for all its costs and expenses incurred in connection with the enforcement or preservation of its rights under this Agreement, the other Loan Documents and any such other documents, including the reasonable fees and disbursements of only one joint counsel, one joint special California counsel and, if necessary, one local counsel in each other relevant jurisdiction to the Designated Agent, the Issuing Lenders and the Lenders (and in the case of an actual or perceived conflict of interest, one additional counsel for each applicable jurisdiction to each group of similarly situated affected persons), and (c) to pay, indemnify, and hold each Lender, each Issuing Lender, the Designated Agent and their respective Affiliates and their respective officers, directors, employees and agents (each, an "Indemnitee") harmless from and against any and all other liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever whether brought by the Borrower or any other Person, with respect to the execution, delivery, enforcement and performance of, or arising out of or in connection with, this Agreement, the other Loan Documents and any such other documents, including any of the foregoing relating to the use of proceeds of the Loans or the violation of, noncompliance with or liability under, any Environmental Law directly or indirectly relating to the Borrower, its Significant Subsidiaries or any of the facilities and properties owned, leased or operated by the Borrower or its Significant Subsidiaries and the reasonable, documented and invoiced fees and expenses of one joint counsel and one joint special California counsel and, if necessary, one joint local counsel in each other relevant jurisdiction to the applicable Indemnitee (and in the case of an actual or perceived conflict of interest, one additional counsel for each applicable jurisdiction to each group of similarly situated affected persons), in connection with claims, actions or proceedings by any Indemnitee against the Borrower under any Loan Document (all the foregoing in this clause (c), collectively, the "Indemnified Liabilities"), provided, that the Borrower shall have no obligation hereunder to any Indemnitee with respect to Indemnified Liabilities to the extent such Indemnified Liabilities resulted from, as determined in a final non-appealable judgment by a court of competent jurisdiction, (x) the gross negligence, bad faith or willful misconduct of such Indemnitee or its Affiliates, (y) the material breach of such Indemnitee's funding obligations hereunder or (z) a dispute amongst one or more Lenders not arising from the Borrower's breach of its obligations under the Loan Documents (other than a dispute involving a claim against an Indemnitee for its acts or omissions in its capacity as an arranger, bookrunner, agent or similar role in respect of the Loan Agreement, except, to the extent such acts or omissions are determined by a court of competent jurisdiction by a final and non-appealable judgment to have constituted the gross negligence, bad faith or willful misconduct of such Indemnitee in such capacity). Without limiting the foregoing, and to the extent permitted by applicable law, the Borrower agrees not to assert and to cause its Significant Subsidiaries not to assert, and hereby waives and agrees to cause its Significant Subsidiaries to waive, all rights for contribution or any other rights of recovery with respect to all claims, demands, penalties, fines, liabilities, settlements, damages, costs and expenses of whatever kind or nature, under or related to Environmental Laws, that any of them might have by statute or otherwise against any Indemnitee. All amounts due under this Section 10.5 shall be payable not later than 30 days after written demand therefor, subject to the Borrower's receipt of reasonably detailed invoices. Statements payable by the Borrower pursuant to this Section 10.5 shall be submitted to Treasurer (Telephone No. (415) 817-8199/(415) 267-7000)

86

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 1160 of 1367

(Telecopy No. (415) 267-7265/7268), at the address of the Borrower set forth in Section 10.2(a) with a copy to Chief Counsel, Corporate (Telephone No. (415) 817-8200) (Telecopy No. (415) 817-8225), at the address of the Borrower set forth in Section 10.2(a), or to such other Person or address as may be hereafter designated by the Borrower in a written notice to the Designated Agent. The agreements in this Section 10.5 shall survive for two years after repayment of the Loans and all other amounts payable hereunder. This Section 10.5 shall not apply with respect to Taxes, other than Taxes that represent claims, damages, losses, liabilities, costs or expenses arising from non-Tax claims.

10.6    Successors and Assigns; Participations and Assignments.

(a)    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby (including any Affiliate of the Issuing Lender that issues any Letter of Credit), except that (i) the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section 10.6.

(b)    (i) Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may assign to one or more assignees (each, an "Assignee") other than a Defaulting Lender, any Subsidiary of a Defaulting Lender, any natural person (or holding company, investment vehicle or trust for, or owned or operated by or for the primary benefit of, one or more natural persons), the Borrower or any of the Borrower's Affiliates or Subsidiaries, all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitments and the Loans at the time owing to it) with the prior written consent (such consent not to be unreasonably withheld or delayed) of:

(A)    the Borrower, provided that no consent of the Borrower shall be required for an assignment to a Lender (or an Affiliate of any Lender) or an Approved Fund or, if an Event of Default under Section 8(a), (e) or (f) has occurred and is continuing, any other Person, and provided further, that the Borrower shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Designated Agent within ten (10) Business Days after having received notice thereof from the assigning Lender (with a copy to the Designated Agent);

(B)    the Designated Agent, provided that no consent of the Designated Agent shall be required for an assignment of any Commitment or Loan to an Assignee that is a Lender (or an Affiliate of a Lender) with a Commitment or Loan immediately prior to giving effect to such assignment; and

(C)    each Issuing Lender.

(ii)    Assignments shall be subject to the following additional conditions:

(A)    except in the case of an assignment to a Lender, an Eligible Assignee that is an Affiliate of any Lender or an assignment of the entire remaining amount

87

of the assigning Lender's Commitments or Loans, the amount of the Commitments or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Designated Agent) shall not be less than $10,000,000 (or, if such Assignee is an Eligible Assignee that is an Affiliate of a Lender, $5,000,000) unless each of the Borrower and the Designated Agent otherwise consent, provided that (1) no such consent of the Borrower shall be required if an Event of Default has occurred and is continuing and (2) with respect to any Lender party to this Agreement on the Effective Date, such amounts shall be aggregated in respect of such Lender and any Affiliate of such Lender that is an Eligible Assignee;

(B)    the parties to each assignment shall execute and deliver to the Designated Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500; and

(C)    the Assignee, if it shall not be a Lender, shall deliver to the Designated Agent an administrative questionnaire.

In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Designated Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the Assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of the Borrower and the Designated Agent, the applicable pro rata share of Loans and L/C Obligations previously requested but not funded by the Defaulting Lender, to each of which the applicable Assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Designated Agent, any Issuing Lender or any Lender hereunder (and interest accrued thereon) and (y) acquire (and fund as appropriate) its full pro rata share of all Loans and participations in Letters of Credit in accordance with its Percentage. Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable law without compliance with the provisions of this paragraph, then the Assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

(iii)    Subject to acceptance and recording thereof pursuant to paragraph (b)(iv) below, from and after the effective date specified in each Assignment and Assumption the Assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, shall have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.15, 2.16, 2.17 and 10.5 but shall be subject to the limitations set forth therein); provided, that except to the extent otherwise expressly agreed by the affected parties, no assignment by a Defaulting Lender will constitute a waiver or release of any claim of any party hereunder arising from the

88

Lender's having been a Defaulting Lender. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 10.6 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (c) of this Section.

(iv)    The Designated Agent, acting for this purpose as a non-fiduciary agent of the Borrower (and such agency being solely to establish that the relevant obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations), shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amount of the Loans and L/C Obligations owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive, in the absence of manifest error, and the Borrower, the Designated Agent, the Issuing Lenders and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower, each Issuing Lender and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(v)    Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an Assignee, the Assignee's completed administrative questionnaire (unless the Assignee shall already be a Lender hereunder), the processing and recordation fee referred to in paragraph (b) of this Section and any written consent to such assignment required by paragraph (b) of this Section, the Designated Agent shall accept such Assignment and Assumption and record the information contained therein in the Register. No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(c)    (i)  Any Lender may, without the consent of the Borrower, the Designated Agent or any Issuing Lender, sell participations to one or more banks or other entities (other than a Defaulting Lender or the Borrower or any of the Borrower's Affiliates or Subsidiaries) (a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitments and the Loans owing to it); provided that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) the Borrower, the Designated Agent, the Issuing Lender and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver that (1) requires the consent of each Lender directly affected thereby pursuant to the proviso to the second sentence of Section 10.1 and (2) directly affects such Participant. Subject to paragraph (c)(ii) of this Section, the Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.15, 2.16 and 2.17 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section.

89

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 1163 of 1367

(ii)   Notwithstanding anything to the contrary herein, a Participant shall not be entitled to receive any greater payment under Section 2.15 or 2.16 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent to such greater payments. Any Participant that is a Foreign Lender shall not be entitled to the benefits of Section 2.16 unless such Participant complies with Section 2.16(e).

(iii)   Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Designated Agent (in its capacity as Designated Agent) shall have no responsibility for maintaining a Participant Register.

(d)   Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or other central bank having jurisdiction over such Lender, and this Section shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or Assignee for such Lender as a party hereto.

(e)   The Borrower, upon receipt of written notice from the relevant Lender, agrees to issue Notes to any Lender requiring Notes to facilitate transactions of the type described in paragraph (d) above.

(f)   Notwithstanding the foregoing, any Conduit Lender may assign any or all of the Loans it may have funded hereunder to its designating Lender without the consent of the Borrower, the Designated Agent or any Issuing Lender and without regard to the limitations set forth in Section 10.6(b). Each of the Borrower, each Lender and the Designated Agent hereby confirms that it will not institute against a Conduit Lender or join any other Person in instituting against a Conduit Lender any bankruptcy, reorganization, arrangement, insolvency or liquidation proceeding under any state bankruptcy or similar law, for one year and one day after the payment in full of the latest maturing commercial paper note issued by such Conduit Lender; provided, however, that each Lender designating any Conduit Lender hereby agrees to indemnify, save and hold harmless each other party hereto for any loss, cost, damage, expense, obligations, penalties, actions, judgments, suits or any kind whatsoever arising out of its inability to institute such a proceeding against such Conduit Lender during such period of forbearance.

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 1164 of 1367

(g)   Notwithstanding anything to the contrary in this Section, none of the Agents, in their capacity as Lenders, will assign without the consent of the Borrower, prior to the Effective Date, any of the Commitments held by them on the date of this Agreement.

(h)   Notwithstanding anything to the contrary in this Section 10.6, for the avoidance of doubt, Goldman Sachs Bank USA may assign any amount of its Commitments or Loans hereunder to Goldman Sachs Lending Partners LLC (or vice versa) without the prior written consent of any other Person.

10.7   Adjustments; Set off.

(a)   Except to the extent that this Agreement expressly provides for payments to be allocated to a particular Lender, if any Lender (a "Benefitted Lender") shall receive any payment of all or part of the Obligations owing to it hereunder, or receive any collateral in respect thereof (whether voluntarily or involuntarily, by set off, pursuant to events or proceedings of the nature referred to in Section 8(f), or otherwise), in a greater proportion than any such payment to or collateral received by any other Lender, if any, in respect of the Obligations owing to such other Lender hereunder, such Benefitted Lender shall purchase for cash from the other Lenders a participating interest in such portion of the Obligations owing to each such other Lender hereunder, or shall provide such other Lenders with the benefits of any such collateral, as shall be necessary to cause such Benefitted Lender to share the excess payment or benefits of such collateral ratably with each of the Lenders; provided, however, that if all or any portion of such excess payment or benefits is thereafter recovered from such Benefitted Lender, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery, but without interest.

(b)   In addition to any rights and remedies of the Lenders provided by law, including other rights of set-off, each Lender shall have the right, without prior notice to the Borrower, any such notice being expressly waived by the Borrower to the extent permitted by applicable law, upon any amount becoming due and payable by the Borrower hereunder (whether at the stated maturity, by acceleration or otherwise), after any applicable grace period, to set off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by such Lender or any branch, Affiliate or agency thereof to or for the credit or the account of the Borrower; provided, that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Designated Agent for further application in accordance with the provisions of Section 2.20 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Designated Agent, the Issuing Lenders and the Lenders, and (y) the Defaulting Lender shall provide promptly to the Designated Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff. Each Lender agrees promptly to notify the Borrower and the Designated Agent after any such setoff and application made by such Lender, provided that the failure to give such notice shall not affect the validity of such setoff and application.

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 1165 of 1367

10.8    Counterparts; Electronic Execution; Binding Effect. This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument. Delivery of an executed signature page of this Agreement by facsimile transmission, emailed pdf. or any other electronic means that reproduces an image of the actual executed signature page shall be effective as delivery of an original executed counterpart hereof. The words "execution," "signed," "signature," "delivery," and words of like import in or relating to any document to be signed in connection with this Agreement and the transactions contemplated hereby shall be deemed to include an electronic sound, symbol, or process attached to, or associated with, a contract or other record and adopted by a Person with the intent to sign, authenticate or accept such contract or record, deliveries or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act; provided that nothing herein shall require the Designated Agent to accept electronic signatures in any form or format without its prior written consent. Without limiting the generality of the foregoing, the Borrower hereby (i) agrees that, for all purposes, including without limitation, in connection with any workout, restructuring, enforcement of remedies, bankruptcy proceedings or litigation among the Designated Agent, the Lenders and the Issuing Lenders, electronic images of this Agreement or any other Loan Documents (in each case, including with respect to any signature pages thereto) shall have the same legal effect, validity and enforceability as any paper original, and (ii) waives any argument, defense or right to contest the validity or enforceability of the Loan Documents based solely on the lack of paper original copies of any Loan Documents, including with respect to any signature pages thereto. This Agreement shall become binding on the parties hereto when it shall have been executed by the Designated Agent and the Designated Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

10.9    Severability. Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. Without limiting the foregoing provisions of this Section 10.9, if and to the extent that the enforceability of any provisions in this Agreement relating to Defaulting Lenders shall be limited by Debtor Relief Laws, as determined in good faith by the Designated Agent or any Issuing Lender, as applicable, then such provisions shall be deemed to be in effect only to the extent not so limited.

10.10    Integration. This Agreement and the other Loan Documents represent the entire agreement of the Borrower, the Designated Agent, and the Lenders with respect to the subject matter hereof and thereof, and there are no promises, undertakings, representations or warranties by the Designated Agent, or any Lender relative to the subject matter hereof not expressly set forth or referred to herein or in the other Loan Documents.

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 1166 of 1367

10.11   GOVERNING LAW. THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

10.12   Submission To Jurisdiction; Waivers. The Borrower hereby irrevocably and unconditionally:

(a)   submits for itself and its property in any legal action or proceeding relating to this Agreement and the other Loan Documents to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the non-exclusive jurisdiction of the United States District Court for the Southern District of New York sitting in the Borough of Manhattan (or if such court lacks subject matter jurisdiction, the Supreme Court of the State of New York sitting in the Borough of Manhattan), and any appellate court from any thereof;

(b)   consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(c)   agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to the Borrower at its address set forth in Section 10.2(a) or at such other address of which the Designated Agent shall have been notified pursuant thereto;

(d)   agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law or shall limit the right to sue in any other jurisdiction; and

(e)   waives, to the maximum extent not prohibited by law, and agrees not to assert any right it may have to claim or recover in any legal action or proceeding relating to this Agreement or any other Loan Document any special, exemplary, punitive or consequential damages.

NOTHING IN THIS AGREEMENT OR IN ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT THE DESIGNATED AGENT, ANY LENDER OR ANY ISSUING LENDER MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST THE BORROWER OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

10.13   Acknowledgments. The Borrower hereby acknowledges that:

(a)   it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Loan Documents;

(b)   none of the Designated Agent or any Lender has any fiduciary relationship with or duty to the Borrower arising out of or in connection with this Agreement or any of the other Loan Documents, and the relationship between Designated Agent and Lenders, on one hand, and the Borrower, on the other hand, in connection herewith or therewith is solely that of debtor and creditor; and

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 1167 of 1367

(c)    no joint venture is created hereby or by the other Loan Documents or otherwise exists by virtue of the transactions contemplated hereby among the Lenders or among the Borrower and the Lenders.

10.14    Confidentiality. Each of the Designated Agent and each Lender agrees to keep confidential in accordance with such party's customary practices (and in any event in compliance with applicable law regarding material non-public information) all non-public information provided to it by the Borrower, the Designated Agent or any Lender pursuant to or in connection with this Agreement that is designated by the provider thereof as confidential; provided that nothing herein shall prevent the Designated Agent or any Lender from disclosing any such information (a) to the Designated Agent, any other Lender or any Affiliate thereof, (b) subject to an agreement to comply with the provisions of this Section or substantially equivalent provisions, to any actual or prospective Transferee, any direct or indirect counterparty to any Swap Agreement (or any professional advisor to such counterparty) or any credit insurance providers, (c) to its employees, directors, agents, attorneys, service providers, accountants and other professional advisors or those of any of its Affiliates (as long as such attorneys, service providers, accountants and other professional advisors are directed to comply with confidentiality requirements substantially equivalent to this Section), (d) upon the request or demand of any Governmental Authority, (e) in response to any order of any court or other Governmental Authority or as may otherwise be required pursuant to any Requirement of Law, (f) if requested or required to do so in connection with any litigation or similar proceeding, (g) that has been publicly disclosed, (h) to the National Association of Insurance Commissioners or any similar organization or any nationally recognized rating agency that requires access to information about a Lender's investment portfolio in connection with ratings issued with respect to such Lender, (i) in connection with the exercise of any remedy hereunder or under any other Loan Document, (j) any rating agency in connection with rating of the Borrower or its Subsidiaries or the credit facilities provided hereunder or (k) to the extent such information (i) becomes available to the Designated Agent, any Lender, Issuing Lender or any of their respective Affiliates on a nonconfidential basis from a source other than the Borrower or its Subsidiaries or (ii) is independently discovered or developed by a party hereto without utilizing any information received from the Borrower or its Subsidiaries or violating the terms of this Section 10.14, provided that, in the case of clauses (d), (e) and (f) of this Section 10.14, with the exception of disclosure to bank regulatory authorities, the Borrower (to the extent legally permissible) shall be given prompt prior notice so that it may seek a protective order or other appropriate remedy.

10.15    WAIVERS OF JURY TRIAL. TO THE FULLEST EXTENT PERMITTED BY LAW, THE BORROWER, THE DESIGNATED AGENT AND THE LENDERS HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN.

10.16    USA Patriot Act; Beneficial Ownership Regulation. Each Lender hereby notifies the Borrower that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Patriot Act"), it is required to obtain, verify and record

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 1168 of 1367

information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow such Lender to identify the Borrower in accordance with the Patriot Act.

10.17    Judicial Reference. If any action or proceeding is filed in a court of the State of California by or against any party hereto in connection with any of the transactions contemplated by this Agreement or any other Loan Document, (i) the court shall, and is hereby directed to, make a general reference pursuant to California Code of Civil Procedure Section 638 to a referee (who shall be a single active or retired judge) to hear and determine all of the issues in such action or proceeding (whether of fact or of law) and to report a statement of decision, provided that at the option of any party to such proceeding, any such issues pertaining to a "provisional remedy" as defined in California Code of Civil Procedure Section 1281.8 shall be heard and determined by the court, and (ii) without limiting the generality of Section 10.5, the Borrower shall be solely responsible to pay all fees and expenses of any referee appointed in such action or proceeding.

10.18    No Advisory or Fiduciary Responsibility. In connection with all aspects of each transactions contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), the Borrower acknowledges and agrees that: (i) (A) the arranging and other services regarding this Agreement provided by the Agents, the Arrangers and the Lenders are arm's-length commercial transactions between the Borrower, on the one hand, and the Agents, the Arrangers and the Lenders, on the other hand, (B) the Borrower has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (C) the Borrower is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (ii) (A) each Agent, Arranger and Lender is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for the Borrower or any other Person and (B) none of the Agents, Arrangers or Lenders has any obligation to the Borrower or any of its Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (iii) the Agents, the Arrangers and the Lenders and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Borrower and its Affiliates, and none of the Agents, Arrangers or Lenders has any obligation to disclose any of such interests to the Borrower or its Affiliates. To the fullest extent permitted by law, the Borrower hereby waives and releases any claims that it may have against the Agents, the Arrangers and the Lenders with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby other than a breach of the confidentiality provisions set forth in Section 10.14.

10.19    Acknowledgement Regarding Any Supported QFCs.

(a)    To the extent that the Loan Documents provide support, through a guarantee or otherwise, for Swap Agreements or any other agreement or instrument that is a QFC (such support "QFC Credit Support" and each such QFC a "Supported QFC"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "U.S. Special Resolution Regimes") in respect of such Supported QFC and QFC Credit Support (with the

95

provisions below applicable notwithstanding that the Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States):

(b)     In the event a Covered Entity that is party to a Supported QFC (each, a "Covered Party") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States. In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Loan Documents were governed by the laws of the United States or a state of the United States. Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support..

10.20    <u>Acknowledgement and Consent to Bail-In of Affected Financial Institutions</u>. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Affected Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)     the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

(b)     the effects of any Bail-In Action on any such liability, including, if applicable:

(i)     a reduction in full or in part or cancellation of any such liability;

(ii)     a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)     the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of the applicable Resolution Authority.

*[Remainder of page intentionally left blank. Signature pages follow.]*

96

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

PACIFIC GAS AND ELECTRIC COMPANY

By:    /s/ Margaret K. Becker
Name:  Margaret K. Becker
Title:  Senior Director and Treasurer

Signature Page to Credit Agreement
Pacific Gas and Electric Company

JPMORGAN CHASE BANK, N.A.,
as Co-Administrative Agent, an Issuing Lender and as a
Lender

By: /s/ Jeffrey Miller
Name: Jeffrey Miller
Title: Executive Director

Signature Page to Credit Agreement
Pacific Gas and Electric Company

CITIBANK, N.A.,
as Co-Administrative Agent, Designated Agent, an Issuing
Lender and as a Lender

By: /s/ Richard Rivera
Name: Richard Rivera
Title: Vice President

Signature Page to Credit Agreement
Pacific Gas and Electric Company

BANK OF AMERICA, N.A., as an Issuing
Lender and as a Lender

By:    /s/ Dee Dee Farkas
Name:  Dee Dee Farkas
Title:  Director

Signature Page to Credit Agreement
Pacific Gas and Electric Company

BARCLAYS BANK PLC, as an Issuing Lender
and as a Lender

By: /s/ Sydney G. Dennis
Name: Sydney G. Dennis
Title: Director

Signature Page to Credit Agreement
Pacific Gas and Electric Company

CITICORP NORTH AMERICA, INC., as a
Lender

By:    /s/ Richard Rivera
Name:  Richard Rivera
Title:   Authorized Signatory

Signature Page to Credit Agreement
Pacific Gas and Electric Company

GOLDMAN SACHS BANK USA, as an Issuing Lender and as a Lender

By: /s/ Jacob Elder
Name: Jacob Elder
Title: Authorized Signatory

Signature Page to Credit Agreement
Pacific Gas and Electric Company

BNP PARIBAS, as an Issuing Lender and as a Lender

By: /s/ Denis O'Meara
Name: Denis O'Meara
Title: Managing Director

By: /s/ Francis Delaney
Name: Francis Delaney
Title: Managing Director

Signature Page to Credit Agreement
Pacific Gas and Electric Company

CREDIT SUISSE AG, NEW YORK BRANCH,
as an Issuing Lender and as a Lender

By: /s/ Vipul Dhadda
Name: Vipul Dhadda
Title: Authorized Signatory

By: /s/ Brady Bingham
Name: Brady Bingham
Title: Authorized Signatory

Signature Page to Credit Agreement
Pacific Gas and Electric Company

MIZUHO BANK, LTD., as an Issuing Lender
and as a Lender

By:   /s/ Edward Sacks

Name:  Edward Sacks
Title:   Authorized Signatory

Signature Page to Credit Agreement
Pacific Gas and Electric Company

MUFG UNION BANK, N.A., as an Issuing
Lender and as a Lender

By:   /s/ Nietzsche Rodricks
Name:  Nietzsche Rodricks
Title:   Managing Director

Signature Page to Credit Agreement
Pacific Gas and Electric Company

WELLS FARGO BANK, NATIONAL ASSOCIATION,
as an Issuing Lender and as a Lender

By: /s/ Gregory R. Gredvig
Name: Gregory R. Gredvig
Title: Director

Signature Page to Credit Agreement
Pacific Gas and Electric Company

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 1182 of 1367

BANK OF MONTREAL, CHICAGO BRANCH,
as a Lender

By:    /s/ Darren Thomas
Name:  Darren Thomas
Title:  Vice President

Signature Page to Credit Agreement
Pacific Gas and Electric Company

THE BANK OF NEW YORK MELLON, as a Lender

By:     /s/ Molly H. Ross
Name:  Molly H. Ross
Title:   Vice President

Signature Page to Credit Agreement
Pacific Gas and Electric Company

**Schedule 1.1**
**Commitments**

| Lender | | Commitment | | L/C Pro Rata Commitment |
|---|---|---|---|---|
| JPMorgan Chase Bank, N.A. | $ | 424,307,692.30 | $ | 150,000,000.00 |
| Bank of America, N.A. | $ | 388,948,717.95 | $ | 150,000,000.00 |
| Barclays Bank PLC | $ | 388,948,717.95 | $ | 150,000,000.00 |
| Citibank, N.A. | $ | 367,500,000.00 | $ | 150,000,000.00 |
| Citicorp North America, Inc. | $ | 21,448,717.95 | | N/A |
| Goldman Sachs Bank USA | $ | 388,948,717.95 | $ | 150,000,000.00 |
| BNP Paribas | $ | 268,728,205.13 | $ | 100,000,000.00 |
| Credit Suisse AG, New York Branch | $ | 268,728,205.13 | $ | 100,000,000.00 |
| Mizuho Bank, Ltd. | $ | 268,728,205.13 | $ | 100,000,000.00 |
| MUFG Union Bank, N.A. | $ | 268,728,205.13 | $ | 107,142,857.00 |
| Wells Fargo Bank, National Association | $ | 268,728,205.13 | $ | 100,000,000.00 |
| Bank of Montreal, Chicago Branch | $ | 123,756,410.25 | | N/A |
| The Bank of New York Mellon | $ | 52,500,000.00 | | N/A |
| | $ | 3,500,000,000.00 | $ | 1,257,142,857.00 |

[Schedules to Utility Revolver Credit Agreement]

**Schedule 3.1**
**Existing Letters of Credit**

| Number | Issuing Bank | Issuance Date | Counterparty | Value | SBLC Number |
|---|---|---|---|---|---|
| 1 | Bank of America | 4/30/2019 | Counterparty 1 | $ 135,000,000.00 | 68146407 |
| 2 | MUFG | 5/14/2019 | Counterparty 2 | $ 107,142,857.00 | S339035M |
| 3 | Citibank | 5/15/2019 | Counterparty 3 | $ 76,203,000.00 | 69616280 |
| 4 | JP Morgan | 5/4/2020 | Counterparty 4 | $ 75,000,000.00 | NUSCGS033255 |
| 5 | Barclays | 8/27/2019 | Counterparty 5 | $ 70,000,000.00 | SB-03682 |
| 6 | Bank of America | 5/13/2019 | Counterparty 6 | $ 43,814,463.00 | 68146684 |
| 7 | Citibank | 2/5/2019 | Counterparty 7 | $ 30,000,000.00 | 69615524 |
| 8 | Goldman Sachs | 5/21/2020 | Counterparty 8 | $ 30,000,000.00 | 40000460 |
| 9 | Citibank | 3/12/2019 | Counterparty 9 | $ 29,000,000.00 | 69615759 |
| 10 | Bank of America | 3/28/2019 | Counterparty 10 | $ 27,800,000.00 | 68145831 |
| 11 | Barclays | 10/25/2019 | Counterparty 11 | $ 20,000,000.00 | SB-03709 |
| 12 | Citibank | 3/15/2019 | Counterparty 12 | $ 20,000,000.00 | 69615831 |
| 13 | Bank of America | 4/2/2020 | Counterparty 13 | $ 18,000,000.00 | 68171460 |
| 14 | BNP Paribas | 5/27/2020 | Counterparty 14 | $ 16,733,333.00 | 04159549 |
| 15 | JP Morgan | 4/22/2020 | Counterparty 15 | $ 16,036,000.00 | NUSCGS033219 |
| 16 | Citibank | 3/19/2019 | Counterparty 16 | $ 16,000,000.00 | 69615859 |
| 17 | Barclays | 9/26/2019 | Counterparty 17 | $ 16,000,000.00 | SB-03698 |
| 18 | JP Morgan | 11/7/2019 | Counterparty 18 | $ 12,000,000.00 | NUSCGS030517 |
| 19 | JP Morgan | 3/25/2020 | Counterparty 19 | $ 12,000,000.00 | NUSCGS033059 |
| 20 | JP Morgan | 12/26/2019 | Counterparty 20 | $ 10,000,000.00 | NUSCGS032225 |
| 21 | JP Morgan | 5/5/2020 | Counterparty 21 | $ 10,000,000.00 | NUSCGS033254 |
| 22 | BNP Paribas | 5/27/2020 | Counterparty 22 | $ 8,366,667.00 | 04159551 |
| 23 | JP Morgan | 3/18/2020 | Counterparty 23 | $ 8,100,000.00 | NUSCGS033021 |
| 24 | Barclays | 10/25/2019 | Counterparty 24 | $ 8,000,000.00 | SB-03708 |
| 25 | Citibank | 5/17/2019 | Counterparty 25 | $ 8,000,000.00 | 69616318 |
| 26 | Barclays | 10/17/2019 | Counterparty 26 | $ 7,600,000.00 | SB-03706 |
| 27 | JP Morgan | 11/19/2019 | Counterparty 27 | $ 7,353,451.00 | NUSCGS030648 |
| 28 | Citibank | 12/27/2018 | Counterparty 28 | $ 7,270,011.19 | 69615228 |
| 29 | JP Morgan | 10/22/2019 | Counterparty 29 | $ 6,500,000.00 | NUSCGS030478 |
| 30 | Citibank | 6/30/2014 | Counterparty 30 | $ 6,384,698.86 | 69601244 |
| 31 | JP Morgan | 1/30/2020 | Counterparty 31 | $ 6,000,000.00 | NUSCGS032561 |
| 32 | Citibank | 3/20/2019 | Counterparty 32 | $ 5,900,000.00 | 69615865 |
| 33 | Barclays | 12/10/2019 | Counterparty 33 | $ 5,000,000.00 | SB-03736 |
| 34 | Barclays | 6/28/2019 | Counterparty 34 | $ 5,000,000.00 | SB-03654 |
| 35 | JP Morgan | 5/15/2020 | Counterparty 35 | $ 5,000,000.00 | NUSCGS033367 |
| 36 | Goldman Sachs | 5/21/2020 | Counterparty 36 | $ 5,000,000.00 | 40000459 |
| 37 | Citibank | 3/20/2019 | Counterparty 37 | $ 4,500,000.00 | 69615866 |
| 38 | Citibank | 12/27/2018 | Counterparty 38 | $ 4,059,231.65 | 69615229 |
| 39 | Citibank | 12/27/2018 | Counterparty 39 | $ 2,429,988.81 | 69615228 |

[Schedules to Utility Revolver Credit Agreement]

| 40 | JP Morgan | 8/8/2019 | Counterparty 40 | $ | 2,416,000.00 | NUSCGS029669 |
|---|---|---|---|---|---|---|
| 41 | JP Morgan | 7/23/2019 | Counterparty 41 | $ | 2,268,986.00 | NUSCGS029547 |
| 42 | JP Morgan | 4/24/2020 | Counterparty 42 | $ | 2,250,000.00 | NUSCGS033236 |
| 43 | Citibank | 5/30/2019 | Counterparty 43 | $ | 2,000,000.00 | 69616390 |
| 44 | JP Morgan | 3/9/2020 | Counterparty 44 | $ | 2,000,000.00 | NUSCGS032903 |
| 45 | JP Morgan | 4/23/2020 | Counterparty 45 | $ | 2,000,000.00 | NUSCGS033229 |
| 46 | Citibank | 3/25/2019 | Counterparty 46 | $ | 1,900,000.00 | 69615904 |
| 47 | Citibank | 3/8/2019 | Counterparty 47 | $ | 1,687,200.00 | 69615739 |
| 48 | Citibank | 3/18/2019 | Counterparty 48 | $ | 1,430,000.00 | 69615843 |
| 49 | Citibank | 12/27/2018 | Counterparty 49 | $ | 1,140,768.35 | 69615229 |
| 50 | JP Morgan | 10/22/2009 | Counterparty 50 | $ | 1,113,000.00 | CPCS-784305 |
| 51 | JP Morgan | 8/9/2019 | Counterparty 51 | $ | 1,100,000.00 | NUSCGS029747 |
| 52 | Citibank | 3/29/2019 | Counterparty 52 | $ | 1,000,000.00 | 69615947 |
| 53 | JP Morgan | 10/31/2019 | Counterparty 53 | $ | 1,000,000.00 | NUSCGS030623 |
| 54 | Citibank | 5/19/2020 | Counterparty 54 | $ | 608,157.00 | 69619410 |
| 55 | JP Morgan | 12/13/2019 | Counterparty 55 | $ | 505,000.00 | NUSCGS032038 |
| 56 | JP Morgan | 3/29/2019 | Counterparty 56 | $ | 373,685.46 | NUSCGS001564 |
| 57 | Citibank | 3/28/2019 | Counterparty 57 | $ | 209,852.94 | 69615937 |
| 58 | JP Morgan | 9/4/2019 | Counterparty 58 | $ | 141,700.00 | NUSCGS029967 |
| 59 | Citibank | 6/30/2014 | Counterparty 59 | $ | 129,679.00 | 69601216 |
| 60 | Citibank | 1/27/2012 | Counterparty 60 | $ | 104,005.50 | 63659819 |
| 61 | JP Morgan | 12/12/2019 | Counterparty 61 | $ | 100,000.00 | NUSCGS032039 |
| 62 | Citibank | 10/22/2013 | Counterparty 62 | $ | 90,336.00 | 63669436 |
| 63 | JP Morgan | 8/8/2019 | Counterparty 63 | $ | 60,828.00 | NUSCGS029670 |
| 64 | JP Morgan | 9/19/2019 | Counterparty 64 | $ | 35,985.60 | NUSCGS030103 |
| 65 | JP Morgan | 3/27/2019 | Counterparty 65 | $ | 35,000.00 | NUSCGS001565 |
| 66 | JP Morgan | 8/13/2019 | Counterparty 66 | $ | 26,600.00 | NUSCGS029787 |
| 67 | Citibank | 2/28/2014 | Counterparty 67 | $ | 26,038.00 | 69600179 |

[Schedules to Utility Revolver Credit Agreement]

**Schedule 7.5**
**Sale and Lease Back Transactions**

The sale and leaseback of the property described to the Designated Agent prior to the Effective Date as the "SF Properties".

[Schedules to Utility Revolver Credit Agreement]

FORM OF
NEW LENDER SUPPLEMENT

Reference is made to the $3,500,000,000 Credit Agreement, dated as of July 1, 2020 (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), among Pacific Gas and Electric Company, a California corporation (the "Borrower"), the Lenders party thereto, JPMorgan Chase Bank, N.A. and Citibank, N.A., as co-administrative agents, and Citibank, N.A., as designated agent (in such capacity, together with any permitted successor thereto, the "Designated Agent"). Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

The New Revolving Credit Lender identified on Schedule l hereto (the "New Lender"), the Designated Agent, the Issuing Lenders and the Borrower agree as follows:

1.    The New Lender hereby irrevocably makes a Commitment to the Borrower in the amount set forth on Schedule 1 hereto (the "New Commitment") pursuant to Section 2.3(b) of the Credit Agreement. From and after the Effective Date (as defined below), the New Lender will be a Lender under the Credit Agreement with respect to the New Commitment.

2.    The Designated Agent (a) makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with the Credit Agreement or with respect to the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Credit Agreement; and (b) makes no representation or warranty and assumes no responsibility with respect to the financial condition of the Borrower, any of its Subsidiaries or any other obligor or the performance or observance by the Borrower, any of its Subsidiaries or any other obligor of any of their respective obligations under the Credit Agreement or any other instrument or document furnished pursuant hereto or thereto.

3.    The New Lender (a) represents and warrants that it is legally authorized to enter into this New Lender Supplement; (b) confirms that it has received a copy of the Credit Agreement, together with copies of the most recent financial statements delivered or deemed delivered pursuant to Section 6.1 of the Credit Agreement and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this New Lender Supplement; (c) agrees that it will, independently and without reliance upon the Designated Agent, any Issuing Lender or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Credit Agreement or any other instrument or document furnished pursuant hereto or thereto; (d) appoints and authorizes the Designated Agent to take such action as agent on its behalf and to exercise such powers and discretion under the Credit Agreement or any other instrument or document furnished pursuant hereto or thereto as are delegated to the Designated Agent by the terms thereof, together with such powers as are incidental thereto; and (e) agrees that it will be bound by the provisions of the Credit Agreement and will perform in accordance with its terms all the obligations which by the terms of the Credit Agreement are required to be performed by it as a Lender.

Exhibits
Credit Agreement
Pacific Gas and Electric Company

4. The effective date of this New Lender Supplement shall be the Effective Date of the New Commitment described in Schedule 1 hereto (the "Effective Date"). Following the execution of this New Lender Supplement by each of the New Lender, the Borrower and each Issuing Lender, it will be delivered to the Designated Agent for acceptance and recording by it pursuant to the Credit Agreement, effective as of the Effective Date (which shall not, unless otherwise agreed to by the Designated Agent, be earlier than five Business Days after the date of such acceptance and recording by the Designated Agent).

5. Upon such acceptance and recording, from and after the Effective Date, the Designated Agent shall make all payments in respect of the New Commitment (including payments of principal, interest, fees and other amounts) to the New Lender for amounts which have accrued on and subsequent to the Effective Date.

6. From and after the Effective Date, the New Lender shall be a party to the Credit Agreement and, to the extent provided in this New Lender Supplement, shall have the rights and obligations of a Lender thereunder and shall be bound by the provisions thereof.

7. This New Lender Supplement shall be governed by, and construed and interpreted in accordance with, the law of the State of New York.

IN WITNESS WHEREOF, the parties hereto have caused this New Lender Supplement to be executed as of _____, _____20__ by their respective duly authorized officers on Schedule 1 hereto.

*[Remainder of page intentionally left blank. Schedule 1 to follow.]*

Exhibits
Credit Agreement
Pacific Gas and Electric Company

Name of New Lender: _____

Effective Date of New Commitment: _____

Principal Amount of New Commitment: $ _____

[NAME OF NEW LENDER]                           PACIFIC GAS AND ELECTRIC COMPANY

By: _____              By: _____
    Authorized Officer                              Title:

CITIBANK, N.A., as Designated Agent and as an Issuing Lender              JPMORGAN CHASE BANK, N.A.,
    as an Issuing Lender

By: _____              By: _____
    Authorized Officer                              Authorized Officer

BANK OF AMERICA, N.A.,                         BARCLAYS BANK PLC,
as an Issuing Lender                           as an Issuing Lender

By: _____              By: _____
    Authorized Officer                              Authorized Officer

GOLDMAN SACHS BANK USA,                     BNP PARIBAS,
as an Issuing Lender                           as an Issuing Lender

By: _____              By: _____
    Authorized Officer                              Authorized Officer

                                                     By: _____
                                                        Authorized Officer

CREDIT SUISSE AG, NEW YORK
BRANCH,
as an Issuing Lender

By: _____
     Authorized Officer

By: _____
     Authorized Officer

MUFG UNION BANK, N.A.,
as an Issuing Lender

By: _____
     Authorized Officer

MIZUHO BANK, LTD.,
as an Issuing Lender

By: _____
     Authorized Officer

WELLS FARGO BANK, NATIONAL
ASSOCIATION,
as an Issuing Lender

By: _____
     Authorized Officer

Exhibits
Credit Agreement
Pacific Gas and Electric Company

FORM OF

COMMITMENT INCREASE SUPPLEMENT

Reference is made to the $3,500,000,000 Credit Agreement, dated as of July 1, 2020 (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), among Pacific Gas and Electric Company, a California corporation (the "Borrower"), the Lenders party thereto, JPMorgan Chase Bank, N.A. and Citibank, N.A., as co-administrative agents, and Citibank, N.A., as designated agent (in such capacity, together with any permitted successor thereto, the "Designated Agent"). Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

The Lender identified on Schedule l hereto (the "Increasing Lender"), the Designated Agent, the Issuing Lenders and the Borrower agree as follows:

1.     The Increasing Lender hereby irrevocably increases its Commitment to the Borrower by the amount set forth on Schedule 1 hereto under the heading "Principal Amount of Increased Commitment" (the "Increased Commitment") pursuant to Section 2.3(c) of the Credit Agreement. From and after the Effective Date (as defined below), the Increasing Lender will be a Lender under the Credit Agreement with respect to the Increased Commitment as well as its existing Commitment under the Credit Agreement.

2.     The Designated Agent (a) makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with the Credit Agreement or with respect to the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Credit Agreement; and (b) makes no representation or warranty and assumes no responsibility with respect to the financial condition of the Borrower, any of its Subsidiaries or any other obligor or the performance or observance by the Borrower, any of its Subsidiaries or any other obligor of any of their respective obligations under the Credit Agreement or any other instrument or document furnished pursuant hereto or thereto.

3.     The Increasing Lender (a) represents and warrants that it is legally authorized to enter into this Commitment Increase Supplement; (b) confirms that it has received a copy of the Credit Agreement, together with copies of the most recent financial statements delivered or deemed delivered pursuant to Section 6.1 of the Credit Agreement and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Commitment Increase Supplement; (c) agrees that it will, independently and without reliance upon the Designated Agent, any Issuing Lender or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Credit Agreement or any other instrument or document furnished pursuant hereto or thereto; (d) appoints and authorizes the Designated Agent to take such action as agent on its behalf and to exercise such powers and discretion under the Credit Agreement or any other instrument or document furnished pursuant hereto or thereto as are delegated to the

Exhibits
Credit Agreement
Pacific Gas and Electric Company

Designated Agent by the terms thereof, together with such powers as are incidental thereto; and (e) agrees that it will be bound by the provisions of the Credit Agreement and will perform in accordance with its terms all the obligations which by the terms of the Credit Agreement are required to be performed by it as a Lender.

4.    The effective date of this Commitment Increase Supplement shall be the Effective Date of the Increased Commitment described in Schedule 1 hereto (the "Effective Date"). Following the execution of this Commitment Increase Supplement by the Increasing Lender, each Issuing Lender and the Borrower, it will be delivered to the Designated Agent for acceptance and recording by it pursuant to the Credit Agreement, effective as of the Effective Date (which shall not, unless otherwise agreed to by the Designated Agent, be earlier than five Business Days after the date of such acceptance and recording by the Designated Agent).

5.    Upon such acceptance and recording, from and after the Effective Date, the Designated Agent shall make all payments in respect of the Increased Commitment (including payments of principal, interest, fees and other amounts) to the Increasing Lender for amounts which have accrued on and subsequent to the Effective Date.

6.    This Commitment Increase Supplement shall be governed by, and construed and interpreted in accordance with, the law of the State of New York.

IN WITNESS WHEREOF, the parties hereto have caused this Commitment Increase Supplement to be executed as of _____, _____, 20_ by their respective duly authorized officers on Schedule 1 hereto.

*[Remainder of page intentionally left blank. Schedule 1 to follow.]*

Exhibits
Credit Agreement
Pacific Gas and Electric Company

Schedule 1
to Commitment Increase Supplement

Name of Increasing Lender: _____

Effective Date of Increased Commitment: _____

Principal
Amount of
Increased Commitment:

$_____

Total Amount of Commitment
of Increasing Lender
(including Increased Commitment):

$_____

[NAME OF NEW LENDER]

By: _____
      Authorized Officer

PACIFIC GAS AND ELECTRIC
COMPANY

By: _____
      Title:

CITIBANK, N.A., as Designated Agent and
as an Issuing Lender

By: _____
      Authorized Officer

JPMORGAN CHASE BANK, N.A.,
as an Issuing Lender

By: _____
      Authorized Officer

BANK OF AMERICA, N.A.,
as an Issuing Lender

By: _____
      Authorized Officer

BARCLAYS BANK PLC,
as an Issuing Lender

By: _____
      Authorized Officer

Exhibits
Credit Agreement
Pacific Gas and Electric Company

GOLDMAN SACHS BANK USA,
as an Issuing Lender

By: _____
       Authorized Officer

CREDIT SUISSE AG, NEW YORK BRANCH,
as an Issuing Lender

By: _____
       Authorized Officer

By: _____
       Authorized Officer

MUFG UNION BANK, N.A.,
as an Issuing Lender

By: _____
       Authorized Officer

BNP PARIBAS,
as an Issuing Lender

By: _____
       Authorized Officer

By: _____
       Authorized Officer

MIZUHO BANK, LTD.,
as an Issuing Lender

By: _____
       Authorized Officer

WELLS FARGO BANK, NATIONAL ASSOCIATION,
as an Issuing Lender

By: _____
       Authorized Officer

Exhibits
Credit Agreement
Pacific Gas and Electric Company

EXHIBIT C

FORM OF COMPLIANCE CERTIFICATE

This Compliance Certificate is delivered pursuant to Section 6.2 of the $3,500,000,000 Credit Agreement, dated as of July 1, 2020 (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), among Pacific Gas and Electric Company, a California corporation (the "Borrower"), the Lenders party thereto, JPMorgan Chase Bank, N.A. and Citibank, N.A., as co-administrative agents, and Citibank, N.A., as designated agent (in such capacity, together with any permitted successor thereto, the "Designated Agent"). Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

The undersigned hereby certifies to the Designated Agent and the Lenders as follows:

1. I am the duly elected, qualified and acting [Chief Financial Officer] [Treasurer] [Assistant Treasurer] of the Borrower.

2. I have reviewed and am familiar with the contents of this Certificate.

3. To the actual knowledge of the undersigned, during the fiscal period covered by the financial statements attached hereto as Attachment 1, no Default or Event of Default has occurred and is continuing [, except as set forth below].

4. Attached hereto as Attachment 2 are the computations showing compliance with the covenant set forth in Section 7.2 of the Credit Agreement.

*[Remainder of page intentionally left blank. Schedule 1 to follow.]*

Exhibits
Credit Agreement
Pacific Gas and Electric Company

IN WITNESS WHEREOF, the undersigned has executed this Compliance Certificate as of the date set forth below.

PACIFIC GAS AND ELECTRIC COMPANY

By: _____

Name:
Title:

Date: _____, 20__

Exhibits
Credit Agreement
Pacific Gas and Electric Company

[Financial Statements
Period Ended _____, 20___]¹

—————————

¹ Include only if financial statements are being physically delivered.

Exhibits
Credit Agreement
Pacific Gas and Electric Company

The information described herein is as of _____, 20__.

[Set forth Covenant Calculation]

Exhibits
Credit Agreement
Pacific Gas and Electric Company

FORM OF CLOSING CERTIFICATE

This Closing Certificate is delivered pursuant to Section 5.1(f) of the $3,500,000,000 Credit Agreement, dated as of July 1, 2020 (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), among Pacific Gas and Electric Company, a California corporation (the "Borrower"), the Lenders party thereto, JPMorgan Chase Bank, N.A. and Citibank, N.A., as co-administrative agents and Citibank, N.A., as designated agent (in such capacity, together with any permitted successor thereto, the "Designated Agent"). Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement. The undersigned consents to Hunton Andrews Kurth LLP relying upon this Closing Certificate in connection with the opinions to be rendered by it on or about the date hereof relating to the transactions contemplated by the Credit Agreement.

The undersigned [_____] of the Borrower hereby certifies as follows:

1.  [_____] is a duly elected and qualified [_____] of the Borrower and the signature set forth for such officer below is such officer's true and genuine signature.

2.  That the conditions precedent set forth in Sections 5.1 (b), (h) and (i) of the Credit Agreement have been satisfied as of the Effective Date.

The undersigned [_____] of the Borrower hereby certifies as follows:

1.  Attached hereto as Annex 1 is a true and complete copy of resolutions duly adopted by the Board of Directors of the Borrower on [_____]; such resolutions have not in any way been amended, modified, revoked or rescinded, have been in full force and effect since their adoption to and including the date hereof and are now in full force and effect and are the only corporate proceedings of the Borrower now in force relating to or affecting the Credit Agreement.

2.  Attached hereto as Annex 2 is a true and complete copy of the Bylaws of the Borrower as in effect on the date hereof.

3.  Attached hereto as Annex 3 is a true and complete copy of the Articles of Incorporation of the Borrower as in effect on the date hereof, and such Articles of Incorporation have not been amended, repealed, modified or restated.

4.  The following person is now a duly elected and qualified officer of the Borrower holding the office indicated next to his/her name below, and that the facsimile signature affixed next to his/her name below is the facsimile signature of such officer, and such officer is duly authorized to execute and deliver on behalf of the Borrower each of the Loan Documents to which it is a party and any certificate or other document to be delivered by the Borrower pursuant to the Loan Documents to which it is a party:

<div align="center">

Exhibits
Credit Agreement
Pacific Gas and Electric Company

</div>

| Name | Office | Signature |
|---|---|---|
| [_____] | [_____] | _____ |

[Signature Page Follows]

Exhibits
Credit Agreement
Pacific Gas and Electric Company

IN WITNESS WHEREOF, the undersigned have executed this Closing Certificate as of the date set forth below.

Name:   [_____]

Title:    [_____]

Date: [_____]

Name:   [_____]

Title:    [_____]

Exhibits
Credit Agreement
Pacific Gas and Electric Company

[Board Resolutions]

Exhibits
Credit Agreement
Pacific Gas and Electric Company

[Bylaws of the Company]

Exhibits
Credit Agreement
Pacific Gas and Electric Company

[Articles of Incorporation]

Exhibits
Credit Agreement
Pacific Gas and Electric Company

FORM OF
ASSIGNMENT AND ASSUMPTION

     This Assignment and Assumption (this "Assignment and Assumption") is dated as of the Effective Date set forth below and is entered into by and between [the][each][1] Assignor identified in item 1 below ([the][each, an] "Assignor") and [the][each][2] Assignee identified in item 2 below ([the][each, an] "Assignee"). [It is understood and agreed that the rights and obligations of [the Assignors][the Assignees][3] hereunder are several and not joint.][4] Capitalized terms used but not defined herein shall have the meanings given to them in the Credit Agreement identified below (as amended, the "Credit Agreement"), receipt of a copy of which is hereby acknowledged by [the][each] Assignee. The Standard Terms and Conditions for Assignment and Assumption set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Assumption as if set forth herein in full.

     For an agreed consideration, [the][each] Assignor hereby irrevocably sells and assigns to [the Assignee][the respective Assignees], and [the][each] Assignee hereby irrevocably purchases and assumes from [the Assignor][the respective Assignors], subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the Designated Agent as contemplated below (i) all of [the Assignor's][the respective Assignors'] rights and obligations in [its capacity as a Lender][their respective capacities as Lenders] under the Credit Agreement and any other documents or instruments delivered pursuant thereto in the amount[s] and equal to the percentage interest[s] identified below of all the outstanding rights and obligations under the respective facilities identified below (including, without limitation, the Letters of Credit included in such facilities[5]) and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of [the Assignor (in its capacity as a Lender)][the respective Assignors (in their respective capacities as Lenders)] against any Person, whether known or unknown, arising under or in connection with the Credit Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed

---

1    For bracketed language here and elsewhere in this form relating to the Assignor(s), if the assignment is from a single Assignor, choose the first bracketed language. If the assignment is from multiple Assignors, choose the second bracketed language.

2    For bracketed language here and elsewhere in this form relating to the Assignee(s), if the assignment is to a single Assignee, choose the first bracketed language. If the assignment is to multiple Assignees, choose the second bracketed language.

3    Select as appropriate.

4    Include bracketed language if there are either multiple Assignors or multiple Assignees.

5    Include all applicable subfacilities.

Exhibits
Credit Agreement
Pacific Gas and Electric Company

thereby or in any way based on or related to any of the foregoing, including, but not limited to, contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned by [the][any] Assignor to [the] [any] Assignee pursuant to clauses (i) and (ii) above being referred to herein collectively as [the][an] "Assigned Interest"). Each such sale and assignment is without recourse to [the][any] Assignor and, except as expressly provided in this Assignment and Assumption, without representation or warranty by [the][any] Assignor.

1.  Assignor[s]:  _____

       :  _____

    [Assignor [is] [is not] a Defaulting Lender]

2.  Assignee[s]:  _____

       :  _____

    [for each Assignee, indicate [Eligible Assignee] of [*identify Lender*]]

3.  Borrower(s): Pacific Gas and Electric Company, a California corporation

4.  Designated Agent: Citibank, N.A., as the designated agent under the Credit Agreement

5.  Credit Agreement: $3,500,000,000 Credit Agreement, dated as of July 1, 2020 (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), among Pacific Gas and Electric Company, a California corporation (the "Borrower"), the Lenders party thereto, JPMorgan Chase Bank, N.A. and Citibank, N.A., as co-administrative agents, and Citibank, N.A., as designated agent (in such capacity, together with any permitted successor thereto, the "Designated Agent")

<div align="center">

Exhibits
Credit Agreement
Pacific Gas and Electric Company

</div>

6.   <u>Assigned Interest[s]</u>:

| <u>Assignor[s]</u>[6] | <u>Assignee[s]</u>[7] | Facility <u>Assigned</u>[8] | Aggregate Amount of Commitments <u>for all Lenders</u> | Amount of Commitment <u>Assigned</u> | Percentage Assigned of <u>Commitment</u>[9] | Amount of Loans <u>Assigned</u> | CUSIP <u>Number</u> |
|---|---|---|---|---|---|---|---|
| | | _____ | $_____ | $_____ | _____% | $_____ | |
| | | _____ | $_____ | $_____ | _____% | $_____ | |
| | | _____ | $_____ | $_____ | _____% | $_____ | |

Effective Date: _____, 20___ [TO BE INSERTED BY DESIGNATED AGENT AND WHICH SHALL BE THE EFFECTIVE DATE OF RECORDATION OF TRANSFER IN THE REGISTER THEREFOR.]

The terms set forth in this Assignment and Assumption are hereby agreed to:

[ASSIGNOR(S)]                                    [ASSIGNEE(S)]

By: _____            By: _____
Name:                                           Name:
Title: _____                                 Title:

---
6       List each Assignor, as appropriate.
7       List each Assignee and, if available, its market entity identifier, as appropriate.
8       Fill in the appropriate terminology for the types of facilities under the Credit Agreement that are being assigned under this Assignment.
9       Set forth, to at least 9 decimals, as a percentage of the Commitment/Loans of all Lenders thereunder.

<div align="center">

Exhibits
Credit Agreement
Pacific Gas and Electric Company

</div>

[Consented to and] Accepted

PACIFIC GAS AND ELECTRIC COMPANY[10]

By: _____
    Title:

CITIBANK, N.A.,
as [Designated Agent][11] and as an Issuing Lender

By: _____
    Authorized Officer

JPMORGAN CHASE BANK, N.A.,
as an Issuing Lender

By: _____
    Authorized Officer

BANK OF AMERICA, N.A.,
as an Issuing Lender

By: _____
    Authorized Officer

BARCLAYS BANK PLC,
as an Issuing Lender

By: _____
    Authorized Officer

GOLDMAN SACHS BANK USA, as an Issuing Lender

By: _____
    Authorized Officer

BNP PARIBAS,
as an Issuing Lender

By: _____
    Authorized Officer

CREDIT SUISSE AG, NEW YORK BRANCH,
as an Issuing Lender

By: _____
    Authorized Officer

By: _____
    Authorized Officer

By: _____
    Authorized Officer

---

[10] As applicable pursuant to Section 10.6(b).
[11] As applicable pursuant to Section 10.6(b).

Exhibits
Credit Agreement
Pacific Gas and Electric Company

MIZUHO BANK, LTD.,
as an Issuing Lender

By: _____
          Authorized Officer

MUFG UNION BANK, N.A.,
as an Issuing Lender

By: _____
          Authorized Officer

WELLS FARGO BANK, NATIONAL
ASSOCIATION,
as an Issuing Lender

By: _____
          Authorized Officer

Exhibits
Credit Agreement
Pacific Gas and Electric Company

STANDARD TERMS AND CONDITIONS FOR
ASSIGNMENT AND ASSUMPTION

1.   Representations and Warranties.

1.1.   Assignor. [The][Each] Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of [the][[the relevant] Assigned Interest, (ii) [the][such] Assigned Interest is free and clear of any lien, encumbrance or other adverse claim, (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and (iv) it is **[not]** a Defaulting Lender and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Credit Agreement or any other Loan Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any collateral thereunder, (iii) the financial condition of the Borrower, any of its Subsidiaries or Affiliates or any other Person obligated in respect of any Loan Document or (iv) the performance or observance by the Borrower, any of its Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Loan Document.

1.2   Assignee. [The][Each] Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) it meets all the requirements to be an assignee under Section 10.6(b)(i) and (ii) of the Credit Agreement (subject to such consents, if any, as may be required under Section 10.6(b)(i) of the Credit Agreement), (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement as a Lender thereunder and, to the extent of [the][the relevant] Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it is sophisticated with respect to decisions to acquire assets of the type represented by [the][such] Assigned Interest and either it, or the Person exercising discretion in making its decision to acquire [the][such] Assigned Interest, is experienced in acquiring assets of such type, (v) it has received a copy of the Credit Agreement, and has received or has been accorded the opportunity to receive copies of the most recent financial statements delivered pursuant to Section 6.1 thereof, as applicable, and such other documents and information as it deems appropriate to make its own credit analysis and decision to enter into this Assignment and Assumption and to purchase [the][such] Assigned Interest, (vi) it has, independently and without reliance upon the Designated Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Assignment and Assumption and to purchase [the] [such] Assigned Interest, and (vii) if it is a Foreign Lender, attached hereto is any documentation required to be delivered by it pursuant to the terms of the Credit Agreement, duly completed and executed by [the][such] Assignee and (b) agrees that (i) it will, independently and without reliance upon the Designated Agent, [the][any] Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender.

Exhibits
Credit Agreement
Pacific Gas and Electric Company

2.   Payments. From and after the Effective Date, the Designated Agent shall make all payments in respect of [the] [each] Assigned Interest (including payments of principal, interest, fees and other amounts) to [the][the relevant] Assignor for amounts which have accrued to but excluding the Effective Date and to [the][the relevant] Assignee for amounts which have accrued from and after the Effective Date. Notwithstanding the foregoing, the Designated Agent shall make all payments of interest, fees or other amounts paid or payable in kind from and after the Effective Date to [the][the relevant] Assignee.

3.   General Provisions. This Assignment and Assumption shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns. This Assignment and Assumption may be executed by one or more of the parties to this Assignment and Assumption on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument. Delivery of an executed signature page of this Assignment and Assumption by facsimile transmission, emailed pdf. or any other electronic means that reproduces an image of the actual executed signature page shall be effective as delivery of an original executed counterpart hereof. The words "execution," "signed," "signature," "delivery," and words of like import in or relating to any document to be signed in connection with this Assignment and Assumption and the transactions contemplated hereby shall be deemed to include an electronic sound, symbol, or process attached to, or associated with, a contract or other record and adopted by a Person with the intent to sign, authenticate or accept such contract or record, deliveries or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act; provided that nothing herein shall require the Designated Agent to accept electronic signatures in any form or format without its prior written consent. This Assignment and Assumption shall be governed by, and construed in accordance with, the law of the State of New York.

Exhibits
Credit Agreement
Pacific Gas and Electric Company

[RESERVED].

Exhibits
Credit Agreement
Pacific Gas and Electric Company

**FORM OF**
**U.S. TAX COMPLIANCE CERTIFICATE**
(For Foreign Lenders That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the $3,500,000,000 Credit Agreement, dated as of July 1, 2020 (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), among Pacific Gas and Electric Company, a California corporation (the "Borrower"), the Lenders party thereto, JPMorgan Chase Bank, N.A. and Citibank, N.A., as co-administrative agents, and Citibank, N.A., as designated agent (in such capacity, together with any permitted successor thereto, the "Designated Agent"). Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

Pursuant to the provisions of Section 2.16(e) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a ten percent shareholder of the Borrower within the meaning of Section 881(c)(3)(B) of the Code and (iv) it is not a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Designated Agent and the Borrower with a certificate of its non-U.S. Person status on IRS Form W-8BEN or W-8BEN-E, as applicable. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower and the Designated Agent, and (2) the undersigned shall have at all times furnished the Borrower and the Designated Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments. Notwithstanding the foregoing, where the undersigned is not an individual, the undersigned shall furnish the Borrower and the Designated Agent with an IRS Form W-8BEN-E together with this certificate even if the undersigned has previously furnished the Borrower and the Designated Agent with an IRS Form W-8BEN.

[NAME OF LENDER]

By: _____

Name: _____

Title: _____

Date: _____ __, 20[    ]

Exhibits
Credit Agreement
Pacific Gas and Electric Company

**FORM OF**
**U.S. TAX COMPLIANCE CERTIFICATE**
(For Foreign Participants That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the $3,500,000,000 Credit Agreement, dated as of July 1, 2020 (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), among Pacific Gas and Electric Company, a California corporation (the "Borrower"), the Lenders party thereto, JPMorgan Chase Bank, N.A. and Citibank, N.A., as co-administrative agents, and Citibank, N.A., as designated agent (in such capacity, together with any permitted successor thereto, the "Designated Agent"). Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

Pursuant to the provisions of Section 2.16(e) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the participation in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a ten percent shareholder of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, and (iv) it is not a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with a certificate of its non-U.S. Person status on IRS Form W-8BEN or W-8BEN-E, as applicable. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender in writing, and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments. Notwithstanding the foregoing, where the undersigned is not an individual, the undersigned shall furnish its participating Lender with an IRS Form W-8BEN-E together with this certificate even if the undersigned has previously furnished such Lender with an IRS Form W-8BEN.

[NAME OF PARTICIPANT]

By: _____

    Name: _____

    Title: _____

Date: _____ __, 20[   ]

Exhibits
Credit Agreement
Pacific Gas and Electric Company

**FORM OF**
**U.S. TAX COMPLIANCE CERTIFICATE**
(For Foreign Participants That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the $3,500,000,000 Credit Agreement, dated as of July 1, 2020 (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), among Pacific Gas and Electric Company, a California corporation (the "Borrower"), the Lenders party thereto, JPMorgan Chase Bank, N.A. and Citibank, N.A., as co-administrative agents, and Citibank, N.A., as designated agent (in such capacity, together with any permitted successor thereto, the "Designated Agent"). Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

Pursuant to the provisions of Section 2.16(e) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the participation in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such participation, (iii) with respect such participation, neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a ten percent shareholder of the Borrower within the meaning of Section 881(c)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or W-BEN-E, as applicable, or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or W-8BEN-E, as applicable, from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments. Notwithstanding the foregoing, where any of the undersigned and/or its direct or indirect partners/members is not an individual, the undersigned or the applicable partner(s) or member(s), as the case may be, shall furnish its participating Lender with an IRS Form W-8BEN-E together with this certificate even if the undersigned or the applicable partner(s) or member(s), as the case may be, has previously furnished such Lender with an IRS Form W-8BEN.

[Signature Page Follows]

[NAME OF PARTICIPANT]

Exhibits
Credit Agreement
Pacific Gas and Electric Company

By: _____

    Name: _____

    Title: _____

Date: _____ __, 20[  ]

Exhibits
Credit Agreement
Pacific Gas and Electric Company

**FORM OF**
**U.S. TAX COMPLIANCE CERTIFICATE**
(For Foreign Lenders That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the $3,500,000,000 Credit Agreement, dated as of July 1, 2020 (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), among Pacific Gas and Electric Company, a California corporation (the "Borrower"), the Lenders party thereto, JPMorgan Chase Bank, N.A. and Citibank, N.A., as co-administrative agents, and Citibank, N.A., as designated agent (in such capacity, together with any permitted successor thereto, the "Designated Agent"). Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

Pursuant to the provisions of Section 2.16(e) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such Loan(s) (as well as any Note(s) evidencing such Loan(s)), (iii) with respect to the extension of credit pursuant to this Credit Agreement or any other Loan Document, neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a ten percent shareholder of the Borrower within the meaning of Section 881(c)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Designated Agent and the Borrower with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or W-8BEN-E, as applicable, or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or W-8BEN-E, as applicable, from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower and the Designated Agent, and (2) the undersigned shall have at all times furnished the Borrower and the Designated Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments. Notwithstanding the foregoing, where any of the undersigned and/or its direct or indirect partners/members is not an individual, the undersigned or the applicable partner(s) or member(s), as the case may be, shall furnish the Borrower and the Designated Agent with an IRS Form W-8BEN-E together with this certificate even if the undersigned or the applicable partner(s) or member(s), as the case may be, has previously furnished the Borrower and the Designated Agent with an IRS Form W-8BEN.

Exhibits
Credit Agreement
Pacific Gas and Electric Company

[NAME OF LENDER]

By: _____

    Name: _____

    Title: _____

Date: _____ __, 20[    ]

Exhibits
Credit Agreement
Pacific Gas and Electric Company

FORM OF NOTE

THIS NOTE AND THE OBLIGATIONS REPRESENTED HEREBY MAY NOT BE TRANSFERRED EXCEPT IN COMPLIANCE WITH THE TERMS AND PROVISIONS OF THE CREDIT AGREEMENT REFERRED TO BELOW. TRANSFERS OF THIS NOTE AND THE OBLIGATIONS REPRESENTED HEREBY MUST BE RECORDED IN THE REGISTER MAINTAINED BY THE DESIGNATED AGENT PURSUANT TO THE TERMS OF SUCH CREDIT AGREEMENT.

$_____                                                                                    New York, New York
                                                                                           as of [_____], 20[__]

      FOR VALUE RECEIVED, PACIFIC GAS AND ELECTRIC COMPANY, a California corporation (the "Borrower"), DOES HEREBY PROMISE TO PAY to [insert name of Lender] (the "Lender") or its registered assigns at the office of CITIBANK, N.A., at [_____], in lawful money of the United States of America in immediately available funds, the principal amount of _____ DOLLARS ($_____), or, if less, the aggregate unpaid principal amount of all Revolving Loans (as defined in the Credit Agreement referred to below) made by the Lender to the Borrower pursuant to the Credit Agreement referred to below, whichever is less, on such date or dates as is required by said Credit Agreement, and to pay interest on the unpaid principal amount from time to time outstanding hereunder, in like money, at such office, and at such times and in such amounts as set forth in Section 2.11 of said Credit Agreement.

      The holder of this Note is authorized to indorse on the schedules annexed hereto and made a part hereof or on a continuation thereof which shall be attached hereto and made a part hereof the date, the Type and amount of each Revolving Loan made pursuant to the Credit Agreement and the date and amount of each payment or prepayment of principal thereof, each continuation thereof, each conversion of all or a portion thereof to another Type and, in the case of Eurodollar Loans, the length of each Interest Period with respect thereto. Each such indorsement shall constitute prima facie evidence of the accuracy of the information indorsed. The failure to make any such indorsement or any error in any such indorsement shall not affect the obligations of the Borrower in respect of any Revolving Loan.

      The Borrower hereby waives demand, presentment for payment, protest, notice of any kind (including, but not limited to, notice of dishonor, notice of protest, notice of intention to accelerate or notice of acceleration), other than notice required pursuant to the Credit Agreement and diligence in collecting and bringing suit against any party hereto. The nonexercise by the holder of this Note of any of its rights hereunder in any particular instance shall not constitute a waiver thereof in that or any subsequent instance.

<div align="center">
Exhibits<br>
Credit Agreement<br>
Pacific Gas and Electric Company
</div>

This Note (a) is one of the promissory notes referred to in the $3,500,000,000 Credit Agreement, dated as of July 1, 2020 (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), among the Borrower, the Lenders party thereto, JPMorgan Chase Bank, N.A. and Citibank, N.A., as co-administrative agents and Citibank, N.A., as designated agent (in such capacity, together with any permitted successor thereto, the "Designated Agent"), (b) is subject to the provisions of the Credit Agreement and (c) is subject to optional prepayment in whole or in part and acceleration of the maturity hereof upon the occurrence of certain events, all as provided in the Credit Agreement. Terms defined in the Credit Agreement are used herein as therein defined.

**NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN OR IN THE CREDIT AGREEMENT, THIS NOTE MAY NOT BE TRANSFERRED EXCEPT PURSUANT TO AND IN ACCORDANCE WITH THE REGISTRATION AND OTHER PROVISIONS OF SECTION 10.6 OF THE CREDIT AGREEMENT.**

**THIS NOTE SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.**

PACIFIC GAS AND ELECTRIC COMPANY

By: _____

Name:
Title:

Exhibits
Credit Agreement
Pacific Gas and Electric Company

LOANS, CONVERSIONS AND REPAYMENTS OF ABR LOANS

| Date | Amount of ABR Loans | Amount Converted to ABR Loans | Amount of Principal of ABR Loans Repaid | Amount of ABR Loans Converted to Eurodollar Loans | Unpaid Principal Balance of ABR Loans | Notation Made By |
|------|------|------|------|------|------|------|
|      |      |      |      |      |      |      |

Exhibits
Pacific Gas and Electric Company

LOANS, CONTINUATIONS, CONVERSIONS AND REPAYMENTS OF EURODOLLAR LOANS

| Date | Amount of Eurodollar Loans | Amount Converted to Eurodollar Loans | Interest Period and Eurodollar Rate with Respect Thereto | Amount of Principal of Eurodollar Loans Repaid | Amount of Eurodollar Loans Converted to ABR Loans | Unpaid Principal Balance of Eurodollar Loans | Notation Made By |
|---|---|---|---|---|---|---|---|

Exhibits
Pacific Gas and Electric Company

EXHIBIT I

**Form of Solvency Certificate**

[DATE]

This Solvency Certificate ("Certificate") of Pacific Gas and Electric Company, a California corporation (the "Borrower"), and its Subsidiaries is delivered pursuant to Section 5.1(j) of the $3,500,000,000 Credit Agreement, dated as of July 1, 2020 (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), among the Borrower, the Lenders party thereto, JPMorgan Chase Bank, N.A. and Citibank, N.A., as co-administrative agents and Citibank, N.A., as designated agent (in such capacity, together with any permitted successor thereto, the "Designated Agent"). Unless otherwise defined herein, capitalized terms used in this Certificate shall have the meanings set forth in the Credit Agreement.

I, [_____], the duly elected, qualified and acting [Chief Financial Officer] of the Borrower and its Subsidiaries, DO HEREBY CERTIFY that I have reviewed the Credit Agreement and the other Loan Documents referred to therein and have made such investigation as I have deemed necessary to enable me to express a reasonably informed opinion as to the matters referred to herein.

I HEREBY FURTHER CERTIFY, in my capacity as [Chief Financial Officer] and not in my individual capacity, that as of the date hereof, immediately after giving effect to the Credit Agreement and the transactions contemplated thereby:

1.    The fair value of the assets of the Borrower and its Subsidiaries, on a consolidated basis, at a fair valuation on a going concern basis, exceeds, on a consolidated basis, their debts and liabilities, subordinated, contingent or otherwise.

2.    The present fair saleable value of the property of the Borrower and its Subsidiaries, on a consolidated and going concern basis, is greater than the amount that will be required to pay the probable liability, on a consolidated basis, of their debts and other liabilities, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured in the ordinary course of business.

3.    The Borrower and its Subsidiaries, on a consolidated basis, are able to pay their debts and liabilities, subordinated, contingent or otherwise, as such liabilities become absolute and matured in the ordinary course of business.

4.    The Borrower and its Subsidiaries are not engaged in businesses, and are not about to engage in businesses for which they have unreasonably small capital.

For purposes of this Certificate, the amount of any contingent liability at any time shall be computed as the amount that, in light of all the facts and circumstances existing as of the date hereof, would reasonably be expected to become an actual and matured liability.

Exhibits
Pacific Gas and Electric Company

For the purpose of the foregoing, I have assumed there is no default under the Credit Agreement on the date hereof and will be no default under the Credit Agreement after giving effect to the funding under the Credit Agreement.

[Remainder of page intentionally left blank]

Exhibits
Pacific Gas and Electric Company

IN WITNESS WHEREOF, I have executed this Certificate as of the date first written above.

PACIFIC GAS AND ELECTRIC COMPANY

By: _____
Name:
Title: Chief Financial Officer

Exhibits
Pacific Gas and Electric Company

**Exhibit 10.5**

**Execution Version**

$3,000,000,000

TERM LOAN CREDIT AGREEMENT

among

PACIFIC GAS AND ELECTRIC COMPANY,
as Borrower,

the Several Lenders from Time to Time Parties Hereto,

JPMORGAN CHASE BANK, N.A.,
as Administrative Agent,

BOFA SECURITIES, INC.,
BARCLAYS BANK PLC,
CITIBANK, N.A.,
and GOLDMAN SACHS BANK USA,
as Co-Syndication Agents,
and

BNP PARIBAS,

CREDIT SUISSE AG, NEW YORK BRANCH,
MIZUHO BANK, LTD.,
MUFG UNION BANK, N.A.,
and WELLS FARGO BANK, NATIONAL ASSOCIATION,
as Co-Documentation Agents
Dated as of July 1, 2020

---

JPMorgan Chase Bank, N.A.,
BofA Securities, Inc.,
Barclays Bank PLC,
Citibank, N.A.
and Goldman Sachs Bank USA
as Joint Lead Arrangers and
Joint Bookrunners

**TABLE OF CONTENTS**

|  | | PAGE |
|---|---|---|
| SECTION 1. | DEFINITIONS | 1 |
| 1.1 | *Defined Terms* | 1 |
| 1.2 | *Other Definitional Provisions and Interpretative Provisions* | 29 |
| 1.3 | *Divisions* | 30 |
| 1.4 | *Interest Rates; LIBOR Notification* | 31 |
| SECTION 2. | AMOUNT AND TERMS OF THE TERM LOANS | 31 |
| 2.1 | *Loans* | 31 |
| 2.2 | *Procedures for Borrowing* | 32 |
| 2.3 | *[Reserved]* | 32 |
| 2.4 | *[Reserved]* | 32 |
| 2.5 | *[Reserved]* | 32 |
| 2.6 | *Fees, Etc* | 32 |
| 2.7 | *Termination of Commitments* | 32 |
| 2.8 | *Prepayments* | 33 |
| 2.9 | *Conversion and Continuation Options* | 34 |
| 2.10 | *Limitations on Eurodollar Tranches* | 34 |
| 2.11 | *Interest Rates and Payment Dates* | 34 |
| 2.12 | *Computation of Interest and Fees* | 35 |
| 2.13 | *Inability to Determine Interest Rate* | 35 |
| 2.14 | *Pro Rata Treatment and Payments; Notes* | 37 |
| 2.15 | *Change of Law* | 39 |
| 2.16 | *Taxes* | 40 |
| 2.17 | *Indemnity* | 44 |
| 2.18 | *Change of Lending Office* | 45 |
| 2.19 | *Replacement of Lenders* | 45 |
| 2.20 | *Defaulting Lenders* | 45 |
| SECTION 3. | [RESERVED] | 47 |
| SECTION 4. | REPRESENTATIONS AND WARRANTIES | 47 |
| 4.1 | *Financial Condition* | 47 |
| 4.2 | *No Change* | 48 |
| 4.3 | *Existence; Compliance with Law* | 48 |
| 4.4 | *Power; Authorization; Enforceable Obligations* | 48 |
| 4.5 | *No Legal Bar* | 49 |
| 4.6 | *Litigation* | 49 |
| 4.7 | *No Default* | 49 |
| 4.8 | *Taxes* | 49 |
| 4.9 | *Federal Regulations* | 49 |

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 1229 of 1367

| 4.10 | *ERISA* | 49 |
| 4.11 | *Investment Company Act; Other Regulations* | 50 |
| 4.12 | *Use of Proceeds* | 50 |
| 4.13 | *Environmental Matters* | 50 |
| 4.14 | *Regulatory Matters* | 51 |
| 4.15 | *Sanctions; Anti-Corruption* | 51 |
| 4.16 | *Affected Financial Institutions* | 51 |
| 4.17 | *Solvency* | 51 |
| 4.18 | *Disclosure* | 51 |
| 4.19 | *Status of Obligations* | 52 |
| 4.20 | *Ownership of Property* | 52 |

| SECTION 5. | CONDITIONS PRECEDENT | 52 |

| 5.1 | *Conditions to the Effective Date* | 52 |

| SECTION 6. | AFFIRMATIVE COVENANTS | 54 |

| 6.1 | *Financial Statements* | 54 |
| 6.2 | *Certificates; Other Information* | 55 |
| 6.3 | *Payment of Taxes.* | 56 |
| 6.4 | *Maintenance of Existence; Compliance* | 56 |
| 6.5 | *Maintenance of Property; Insurance* | 56 |
| 6.6 | *Inspection of Property; Books and Records; Discussions* | 56 |
| 6.7 | *Notices* | 57 |
| 6.8 | *Maintenance of Licenses, etc.* | 57 |
| 6.9 | *Further Assurances* | 57 |

| SECTION 7. | NEGATIVE COVENANTS | 58 |

| 7.1 | *Indebtedness* | 58 |
| 7.2 | *Consolidated Capitalization Ratio* | 60 |
| 7.3 | *Liens* | 60 |
| 7.4 | *Fundamental Changes* | 60 |
| 7.5 | *Sale and Lease Back Transactions* | 60 |
| 7.6 | *Swap Agreements* | 61 |
| 7.7 | *Amendments to FMB Indenture* | 61 |

| SECTION 8. | EVENTS OF DEFAULT | 61 |

| SECTION 9 | THE AGENTS | 64 |

| 9.1 | *Appointment and Authority* | 64 |
| 9.2 | *Delegation of Duties* | 64 |
| 9.3 | *Exculpatory Provisions* | 65 |
| 9.4 | *Reliance by Administrative Agent* | 65 |
| 9.5 | *Notice of Default* | 66 |
| 9.6 | *Non-Reliance on Agents and Other Lenders* | 66 |
| 9.7 | *Indemnification* | 66 |

ii

| 9.8 | *Agent in Its Individual Capacity* | 67 |
| 9.9 | *Successor Agents* | 67 |
| 9.10 | *Documentation Agents and Syndication Agents* | 68 |
| 9.11 | *Administrative Agent May File Proofs of Claim* | 68 |
| 9.12 | *Certain ERISA Matters* | 69 |

SECTION 10.  MISCELLANEOUS | 70 |

| 10.1 | *Amendments and Waivers* | 70 |
| 10.2 | *Notices* | 72 |
| 10.3 | *No Waiver; Cumulative Remedies* | 74 |
| 10.4 | *Survival of Representations and Warranties* | 74 |
| 10.5 | *Payment of Expenses and Taxes* | 74 |
| 10.6 | *Successors and Assigns; Participations and Assignments* | 76 |
| 10.7 | *Adjustments; Set off* | 80 |
| 10.8 | *Counterparts; Binding Effect* | 81 |
| 10.9 | *Severability* | 82 |
| 10.10 | *Integration* | 82 |
| 10.11 | *GOVERNING LAW* | 82 |
| 10.12 | *Submission To Jurisdiction; Waivers* | 82 |
| 10.13 | *Acknowledgments* | 83 |
| 10.14 | *Confidentiality* | 83 |
| 10.15 | *WAIVERS OF JURY TRIAL* | 84 |
| 10.16 | *USA Patriot Act; Beneficial Ownership Regulation* | 84 |
| 10.17 | *Judicial Reference* | 84 |
| 10.18 | *No Advisory or Fiduciary Responsibility* | 84 |
| 10.19 | *Acknowledgement Regarding Any Supported QFCs* | 85 |
| 10.20 | *Acknowledgement and Consent to Bail-In of Affected Financial Institutions* | 86 |

**SCHEDULES:**

1.1    Commitments
7.5    Sale and Lease Back Transactions

**EXHIBITS:**

A    [Reserved]
B    [Reserved]
C    Form of Compliance Certificate
D    Form of Closing Certificate
E    Form of Assignment and Assumption
F    [Reserved]
G    Forms of U.S. Tax Compliance Certificates
H    Form of Note
I    Form of Solvency Certificate

This TERM LOAN CREDIT AGREEMENT (this "**Agreement**"), dated as of July 1, 2020, among PACIFIC GAS AND ELECTRIC COMPANY, a California corporation (the "**Borrower**"), the several banks and other financial institutions or entities from time to time parties to this Agreement (the "**Lenders**") and JPMORGAN CHASE BANK, N.A., as administrative agent (in such capacity, together with any permitted successor thereto, the "**Administrative Agent**").

<center>W I T N E S S E T H :</center>

WHEREAS, on January 29, 2019, the Borrower and PG&E Corporation, a California corporation and the holder of all of the issued and outstanding common stock of the Borrower ("**PCG**", and together with Borrower, each, a "**Debtor**" and collectively, the "**Debtors**") filed voluntary petitions for relief in the United States Bankruptcy Court for the Northern District of California (the "**Bankruptcy Court**"), and commenced their respective cases under chapter 11 of title 11 of the United States Code;

WHEREAS, on June 19, 2020, the Debtors filed the Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization Dated June 19, 2020 [Docket No. 8048] (together with all exhibits, schedules, annexes, supplements, and other attachments thereto, and as may be further amended, modified or otherwise changed in accordance with this Agreement, the "**Plan of Reorganization**");

WHEREAS, on June 20, 2020, the Plan of Reorganization was confirmed by the Bankruptcy Court and is to be consummated on the Effective Date; and

WHEREAS, in connection with the foregoing, the Borrower has requested that the Lenders provide the term loans set forth herein and the Lenders are willing to make available to the Borrower such term loans upon the terms and subject to the conditions set forth herein.

NOW, THEREFORE, IT IS AGREED AS FOLLOWS:

SECTION 1.   DEFINITIONS

1.1   *Defined Terms*. As used in this Agreement, the terms listed in this Section 1.1 shall have the respective meanings set forth in this Section 1.1.

"**18-Month Tranche Commitment**": as to each 18-Month Tranche Lender, its obligation to make Loans under the 18-Month Tranche to the Borrower on the Effective Date pursuant to Section 2.1(b), in an aggregate principal amount equal to the amount set forth opposite such 18-Month Tranche Lender's name on Schedule 1.1, as such amount may be adjusted from time to time in accordance with this Agreement. As of the Effective Date, the aggregate amount of the 18-Month Tranche Commitments for all 18-Month Tranche Lenders is $1,500,000,000.

"**18-Month Tranche Lender**": a Lender with an 18-Month Tranche Commitment or holding 18-Month Tranche Loans.

<center>1</center>

"**18-Month Tranche Loans**": as defined in Section 2.1(a).

"**18-Month Tranche Maturity Date**": the date that is 18 months after the Effective Date.

"**364-Day Tranche Commitment**": as to each 364-Day Tranche Lender, its obligation to make Loans under the 364-Day Tranche to the Borrower on the Effective Date pursuant to Section 2.1(a), in an aggregate principal amount equal to the amount set forth opposite such 364-Day Tranche Lender's name on Schedule 1.1, as such amount may be adjusted from time to time in accordance with this Agreement. As of the Effective Date, the aggregate amount of the 364-Day Tranche Commitments for all 364-Day Tranche Lenders is $1,500,000,000.

"**364-Day Tranche Lender**": a Lender with a 364-Day Tranche Commitment or holding 364-Day Tranche Loans.

"**364-Day Tranche Loans**": as defined in Section 2.1(a).

"**364-Day Tranche Maturity Date**": the date that is 364 days after the Effective Date.

"**ABR**": for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the NYFRB Rate in effect on such day plus $\frac{1}{2}$ of 1% and (c) the Eurodollar Rate for a one month Interest Period commencing on such day (or if such day is not a Business Day, the immediately preceding Business Day) plus 1%; provided that for the purpose of this definition, the Eurodollar Rate for any day shall be based on the Eurodollar Screen Rate (or if the Eurodollar Screen Rate is not available for such one month Interest Period, the Interpolated Rate) at approximately 11:00 a.m. London time on such day. Any change in the ABR due to a change in the Prime Rate, the NYFRB Rate or the Eurodollar Rate shall be effective from and including the effective date of such change in the Prime Rate, the NYFRB Rate or the Eurodollar Rate, respectively. If ABR is being used as an alternate rate of interest pursuant to Section 2.13 (for the avoidance of doubt, only until any amendment has become effective pursuant to Section 2.13(b)), then ABR shall be the greater of clauses (a) and (b) above and shall be determined without reference to clause (c) above. If the ABR as determined pursuant to the foregoing would be less than 1.00%, such rate shall be deemed to be 1.00% for purposes of this Agreement.

"**ABR Loans**": Loans the rate of interest applicable to which is based upon the ABR.

"**Administrative Agent**": as defined in the preamble hereto.

"**Affected Financial Institution**": (a) any EEA Financial Institution or (b) any UK Financial Institution.

"**Affiliate**": with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

2

"**Agent Parties**": as defined in Section 10.2(d)(ii).

"**Agents**": the collective reference to the Syndication Agents, the Documentation Agents, and the Administrative Agent.

"**Agreement**": as defined in the preamble hereto.

"**Anti-Corruption Laws**": as defined in Section 4.15.

"**Applicable Margin**": for any day, (a) (i) with respect to any ABR Loans under the 364-Day Tranche, 1.00% per annum and (ii) with respect to Eurodollar Loans under the 364-Day Tranche, 2.00% per annum and (b) (i) with respect to any ABR Loans under the 18-Month Tranche, 1.25% per annum and (ii) with respect to Eurodollar Loans under the 18-Month Tranche, 2.25% per annum.

"**Approved Fund**": with respect to any Lender, any Person (other than a natural person) that is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business that is administered or managed by (a) such Lender, (b) an Affiliate of such Lender or (c) an entity or an Affiliate of any entity that administers or manages such Lender.

"**Arrangers**": the Joint Lead Arrangers and Joint Bookrunners identified on the cover hereto.

"**A/R Securitization Assets**": (i) any accounts receivable, notes receivable, rights to future accounts receivable, notes receivable or residuals or other similar rights to payments due or any other rights to payment or related assets in respect of the provision of gas and electric service to consumers or otherwise (whether then existing or arising in the future) of the Borrower or any of its Subsidiaries and the proceeds thereof and (ii) all collateral securing such receivable or asset, all contracts and contract rights, guarantees or other obligations in respect of such receivable or asset, lockbox accounts and records with respect to such receivables or asset and any other assets customarily transferred (or in respect of which security interests are customarily granted) together with receivables or assets in connection with a securitization transaction involving such assets.

"**A/R Securitization Subsidiary**": PG&E AR Facility, LLC and any other Subsidiary formed and operating solely for the purpose of entering into A/R Securitization Transactions and engaging in activities ancillary thereto.

"**A/R Securitization Transaction**": any financing transaction or series of financing transactions entered into by the Borrower or any Subsidiary of the Borrower pursuant to which the Borrower may sell, convey or otherwise transfer to any Person (including, without limitation, an A/R Securitization Subsidiary), or may grant a security interest in any A/R Securitization Assets and that are (other than to the extent of the Standard A/R Securitization Obligations) non-recourse to the Borrower or any of its Subsidiaries (other than an A/R Securitization Subsidiary).

"**Assignee**": as defined in Section 10.6(b).

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 1235 of 1367

"**Assignment and Assumption**": an Assignment and Assumption, substantially in the form of Exhibit E.

"**Bail-In Action**": the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"**Bail-In Legislation**": (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation, rule or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"**Bankruptcy Court**": as defined in the first recital paragraph.

"**Benchmark Replacement**": the sum of: (a) the alternate benchmark rate (which may be a SOFR-Based Rate) that has been selected by the Administrative Agent and the Borrower giving due consideration to (i) any selection or recommendation of a replacement rate or the mechanism for determining such a rate by the Relevant Governmental Body and/or (ii) any evolving or then-prevailing market convention for determining a rate of interest as a replacement to the Eurodollar Base Rate for U.S. dollar-denominated syndicated credit facilities and (b) the Benchmark Replacement Adjustment; provided that, if the Benchmark Replacement as so determined would be less than zero, the Benchmark Replacement will be deemed to be zero for the purposes of this Agreement; provided further that any such Benchmark Replacement shall be administratively feasible as determined by the Administrative Agent in its sole discretion.

"**Benchmark Replacement Adjustment**": the spread adjustment, or method for calculating or determining such spread adjustment (which may be a positive or negative value or zero), that has been selected by the Administrative Agent and the Borrower giving due consideration to (i) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of the Eurodollar Base Rate with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body and/or (ii) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of the Eurodollar Base Rate with the applicable Unadjusted Benchmark Replacement for U.S. dollar-denominated syndicated credit facilities at such time (for the avoidance of doubt, such Benchmark Replacement Adjustment shall not be in the form of a reduction to the Applicable Margin).

"**Benchmark Replacement Conforming Changes**": with respect to any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "**ABR,**" the definition of "Interest Period," timing and

4

frequency of determining rates and making payments of interest and other administrative matters) that the Administrative Agent decides in its reasonable discretion may be appropriate to reflect the adoption and implementation of such Benchmark Replacement and to permit the administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Administrative Agent determines that no market practice for the administration of the Benchmark Replacement exists, in such other manner of administration as the Administrative Agent decides is reasonably necessary in connection with the administration of this Agreement).

"**Benchmark Replacement Date**": the earlier to occur of the following events with respect to the Eurodollar Base Rate:

(1)   in the case of clause (1) or (2) of the definition of "Benchmark Transition Event," the later of (a) the date of the public statement or publication of information referenced therein and (b) the date on which the administrator of the Eurodollar Screen Rate permanently or indefinitely ceases to provide the Eurodollar Screen Rate; and

(2)   in the case of clause (3) of the definition of "Benchmark Transition Event," the date of the public statement or publication of information referenced therein.

"**Benchmark Transition Event**": the occurrence of one or more of the following events with respect to the Eurodollar Base Rate:

(1)   a public statement or publication of information by or on behalf of the administrator of the Eurodollar Screen Rate announcing that such administrator has ceased or will cease to provide the Eurodollar Screen Rate, permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide the Eurodollar Screen Rate;

(2)   a public statement or publication of information by the regulatory supervisor for the administrator of the Eurodollar Screen Rate, the U.S. Federal Reserve System, an insolvency official with jurisdiction over the administrator for the Eurodollar Screen Rate, a resolution authority with jurisdiction over the administrator for the Eurodollar Screen Rate or a court or an entity with similar insolvency or resolution authority over the administrator for the Eurodollar Screen Rate, in each case which states that the administrator of the Eurodollar Screen Rate has ceased or will cease to provide the Eurodollar Screen Rate permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide the Eurodollar Screen Rate; and/or

(3)   a public statement or publication of information by the regulatory supervisor for the administrator of the Eurodollar Screen Rate announcing that the Eurodollar Screen Rate is no longer representative.

5

"**Benchmark Transition Start Date**": (a) in the case of a Benchmark Transition Event, the earlier of (i) the applicable Benchmark Replacement Date and (ii) if such Benchmark Transition Event is a public statement or publication of information of a prospective event, the 90th day prior to the expected date of such event as of such public statement or publication of information (or if the expected date of such prospective event is fewer than 90 days after such statement or publication, the date of such statement or publication) and (b) in the case of an Early Opt-in Election, the date specified by the Administrative Agent or the Required Lenders, as applicable, by notice to the Borrower, the Administrative Agent (in the case of such notice by the Required Lenders) and the Lenders.

"**Benchmark Unavailability Period**": if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred with respect to the Eurodollar Base Rate and solely to the extent that the Eurodollar Base Rate has not been replaced with a Benchmark Replacement, the period (a) beginning at the time that such Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the Eurodollar Base Rate for all purposes hereunder in accordance with Section 2.13 and (b) ending at the time that a Benchmark Replacement has replaced the Eurodollar Base Rate for all purposes hereunder pursuant to Section 2.13.

"**Beneficial Owner**": as defined in Rule 13d-3 and Rule 13d-5 under the Exchange Act, except that in calculating the beneficial ownership of any particular "person" (as that term is used in Sections 13(d) and 14(d) of the Exchange Act), such "person" will be deemed to have beneficial ownership of all securities that such "person" has the right to acquire by conversion or exercise of other securities, whether such right is currently exercisable or is exercisable only upon the occurrence of a subsequent condition. The terms "Beneficially Owns" and "Beneficially Owned" have correlative meanings.

"**Beneficial Ownership Certification**": a certification regarding beneficial ownership or control as required by the Beneficial Ownership Regulation.

"**Beneficial Ownership Regulation**": 31 C.F.R. § 1010.230.

"**Benefit Plan**": any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in and subject to Section 4975 of the Code or (c) any Person whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

"**Benefitted Lender**": as defined in Section 10.7(a).

"**BHC Act Affiliate**": an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)).

"**Board**": the Board of Governors of the Federal Reserve System of the United States (or any successor).

"**Bond Delivery Agreement**": that certain Bond Delivery Agreement, dated as of the Effective Date, between the Borrower and the Administrative Agent.

6

"**Bond Documents**": collectively, the FMB Indenture, the Supplemental Indenture, the Senior Bonds and the Bond Delivery Agreement.

"**Borrower**": as defined in the preamble hereto.

"**Bridge Facilities**": each of the bridge facilities outstanding, as of any date of determination, pursuant to the terms of the Utility Commitment Letter and the PCG Commitment Letter.

"**Business Day**": a day other than a Saturday, Sunday or other day on which commercial banks in New York City or San Francisco, California are authorized or required by law to close, *provided*, that with respect to notices and determinations in connection with, and payments of principal and interest on, Eurodollar Loans, such day is also a day for trading by and between banks in Dollar deposits in the London interbank eurodollar market.

"**Capital Lease Obligations**": as to any Person, the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on the balance sheet of such Person under GAAP and, for the purposes of this Agreement, the amount of such obligations at any time shall be the capitalized amount thereof at such time determined in accordance with GAAP, subject to Section 1.2(f).

"**Capital Stock**": any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation) and any and all warrants, rights or options to purchase any of the foregoing.

"**Cash Management Agreement**": any agreement to establish or maintain accounts or provide cash management services, including treasury, depository, overdraft, netting services, cash pooling arrangements, credit or debit card, purchasing card, electronic funds transfer, automated clearing house, foreign exchange facilities and other cash management arrangements.

"**Change of Control**": the occurrence of one of the following:

(i) (A) PCG shall at any time not be the Beneficial Owner of 100% of the common stock of the Borrower or (B) PCG shall at any time not be the Beneficial Owner of at least 70% of the voting Capital Stock of the Borrower; or

(ii) any person or group (within the meaning of the Exchange Act and the rules of the SEC thereunder as of the Effective Date) shall become the Beneficial Owner of shares representing more than 35% of the voting power of the Capital Stock of PCG; or

7

(iii)   at any point during any period of 24 consecutive months, commencing after the Effective Date, individuals who at the beginning of such 24-month period were directors of PCG, together with any directors whose election or nomination for election to the board of directors of PCG (whether by the board of directors of PCG or any shareholder of PCG) was approved by a majority of the directors who either were directors of PCG at the beginning of such 24-month period or whose election or nomination for election was so approved, cease to constitute a majority of the board of directors of PCG (it being understood and agreed that, for the avoidance of doubt, the change of directors of PCG contemplated by the Plan of Reorganization shall not constitute a Change of Control); or

(iv)   there shall have been (A) a receiver appointed pursuant to an order from the State of California or a revocation of Certificate of Public Convenience and Necessity of the Borrower, in each case, in accordance with Order Instituting Investigation on the Commission's Own Motion to Consider the Ratemaking and Other Implications of a Proposed Plan for Resolution of Voluntary Cases filed by Pacific Gas and Electric Company Pursuant to Chapter 11 of the Bankruptcy Code, in the United States Bankruptcy Court, Northern District of California, San Francisco Division, In re Pacific Gas and Electric Corporation and Pacific Gas and Electric Company, Case No. 19-30088 or otherwise or (B) a transfer of the license and/or operating assets constituting more than 10% of the Net Tangible Assets of the Borrower to the State of California, to any other Governmental Authority or to a third party at the direction of State of California, the CPUC or any similar Governmental Authority.

"**Change of Law**": the occurrence, after the Effective Date, of any of the following: (a) the adoption or taking effect of any law, rule, regulation, statute, treaty, policy, guideline or directive by any Governmental Authority, (b) any change in any law, rule, regulation, statute, treaty, policy, guideline or directive or in the application, interpretation, promulgation, implementation, administration or enforcement thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; *provided* that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change of Law", regardless of the date enacted, adopted or issued.

"**Code**": the Internal Revenue Code of 1986, as amended from time to time.

"**Commitment**": as to any Lender, its 364-Day Tranche Commitment or 18-Month Tranche Commitment.

"**Commitment Letter**": that certain Term Loan Commitment Letter dated as of May 26, 2020 among Pacific Gas and Electric Company, as the borrower, PG&E Corporation and the commitment parties from time to time party thereto, as amended, modified or supplemented from time to time prior to the date hereof.

"**Commonly Controlled Entity**": an entity, whether or not incorporated, that is under common control with the Borrower within the meaning of Section 4001 of ERISA or is part of a group that includes the Borrower and that is treated as a single employer under Section 414 of the Code.

"**Communications**": as defined in Section 10.2(d)(ii).

"**Compliance Certificate**": a certificate duly executed by a Responsible Officer substantially in the form of Exhibit C.

"**Compounded SOFR**": the compounded average of SOFRs for the applicable Corresponding Tenor, with the rate, or methodology for this rate, and conventions for this rate (which may include compounding in arrears with a lookback and/or suspension period as a mechanism to determine the interest amount payable prior to the end of each Interest Period) being established by the Administrative Agent in accordance with:

(1)    the rate, or methodology for this rate, and conventions for this rate selected or recommended by the Relevant Governmental Body for determining compounded SOFR; *provided* that:

(2)    if, and to the extent that, the Administrative Agent determines that Compounded SOFR cannot be determined in accordance with clause (1) above, then the rate, or methodology for this rate, and conventions for this rate that the Administrative Agent determines in its reasonable discretion are substantially consistent with any evolving or then-prevailing market convention for determining compounded SOFR for U.S. dollar-denominated syndicated credit facilities at such time;

*provided*, *further*, that if the Administrative Agent decides that any such rate, methodology or convention determined in accordance with clause (1) or clause (2) is not administratively feasible for the Administrative Agent, then Compounded SOFR will be deemed unable to be determined for purposes of the definition of "Benchmark Replacement."

"**Conduit Lender**": any special purpose corporation organized and administered by any Lender for the purpose of making Loans otherwise required to be made by such Lender and designated by such Lender in a written instrument; *provided*, that the designation by any Lender of a Conduit Lender shall not relieve the designating Lender of any of its obligations to fund a Loan under this Agreement if, for any reason, its Conduit Lender fails to fund any such Loan, and the designating Lender (and not the Conduit Lender) shall have the sole right and responsibility to deliver all consents and waivers required or requested under this Agreement with respect to its Conduit Lender, and *provided*, *further*, that no Conduit Lender shall (a) be entitled to receive any greater amount pursuant to Sections 2.15, 2.16, 2.17 or 10.5 than the designating Lender would have been entitled to receive in respect of the extensions of credit made by such Conduit Lender or (b) be deemed to have any Commitment.

9

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 1241 of 1367

"**Connection Income Taxes**": Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"**Consolidated Capitalization**": on any date of determination, the sum of (a) Consolidated Total Debt on such date, *plus* without duplication, (b) (i) the amounts set forth opposite the captions "common shareholders' equity" (or any similar caption) and "preferred stock" (or any similar caption) on the consolidated balance sheet, prepared in accordance with GAAP, of the Borrower and its Subsidiaries as of such date, and (ii) the outstanding principal amount of any junior subordinated deferrable interest debentures or other similar securities issued by the Borrower or any of its Subsidiaries after the Effective Date.

"**Consolidated Capitalization Ratio**": on any date of determination, the ratio of (a) Consolidated Total Debt to (b) Consolidated Capitalization.

"**Consolidated Total Debt**": at any date, the aggregate principal amount of all obligations of the Borrower and its Significant Subsidiaries at such date that in accordance with GAAP would be classified as debt on a consolidated balance sheet of the Borrower, and without duplication all Guarantee Obligations of the Borrower and its Significant Subsidiaries at such date in respect of obligations of any other Person that in accordance with GAAP would be classified as debt on a consolidated balance sheet of such Person; *provided* that, the determination of "**Consolidated Total Debt**" shall exclude, without duplication, (a) the Securitized Bonds and any Indebtedness under any A/R Securitization Transaction, (b) Indebtedness of the Borrower and its Significant Subsidiaries in an amount equal to the amount of cash held as cash collateral for any fully cash collateralized letter of credit issued for the account of the Borrower or any Significant Subsidiary, (c) imputed Indebtedness of the Borrower or any Significant Subsidiary incurred in connection with power purchase and fuel agreements, (d) any junior subordinated deferrable interest debenture or other similar securities issued by the Borrower and (e) as of any date of determination, the amount of any securities included within the caption "preferred stock" (or any similar caption) on a consolidated balance sheet, prepared in accordance with GAAP, of the Borrower as of such date.

"**Contractual Obligation**": as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"**Control**": the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"**Corresponding Tenor**": with respect to a Benchmark Replacement, a tenor (including overnight) having approximately the same length (disregarding business day adjustment) as the applicable tenor for the applicable Interest Period with respect to the Eurodollar Base Rate.

10

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 1242 of 1367

"**Covered Entity**": any of the following:

    (i)    a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b);

    (ii)    a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or

    (iii)    a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"**Covered Party**": as defined in Section 10.19.

"**CPUC**": the California Public Utilities Commission or its successor.

"**Debt Issuance**": the issuance of Securitized Bonds under or pursuant to the Application of Pacific Gas and Electric Company for (1) Administration of Stress Test Methodology Developed Pursuant to Public Utilities Code Section 451.2(b) and (2) Determination That $7.5 Billion of 2017 Catastrophic Wildfire Costs and Expenses Are Stress Test Costs That May Be Financed Through Issuance of Recovery Bonds Pursuant to Section 451.2(c) and Section 850 et seq. (U39E) - Application No. 20-04-023 dated as of April 30, 2020, or the contemplated subsequent and related application for the issuance of a financing order authorizing the securitization transaction described in A.20-04-023, to be filed later in 2020 and consolidated therewith, by the Borrower or any of its Subsidiaries.

"**Debtor Relief Laws**": the Bankruptcy Code of the United States, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect.

"**Debtors**": as defined in the first recital paragraph.

"**Default**": any of the events specified in Section 8, whether or not any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

"**Default Right**": the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"**Defaulting Lender**": subject to the penultimate paragraph of Section 2.20, any Lender, as reasonably determined by the Administrative Agent, that has (a) failed to fund any portion of its Loans within two (2) Business Days of the date required to be funded by it under this Agreement, unless such Lender notifies the Administrative Agent in writing that such failure is the result of such Lender's good faith determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable Default, shall be specifically identified in such writing) has not been satisfied, (b) notified the Borrower, the Administrative Agent or any other Lender in writing that it does not intend to comply with any of its funding obligations under this Agreement or has

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 1243 of 1367

made a public statement to the effect that it does not intend to comply with its funding obligations under this Agreement (other than a notice of a good faith dispute or related communications) or generally under other agreements in which it commits to extend credit, unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's good faith determination that a condition precedent to funding (which condition precedent, together with any applicable Default, shall be specifically identified in such writing or public statement) cannot be satisfied, (c) failed, within two (2) Business Days after written request by the Administrative Agent or the Borrower, to confirm that it will comply with the terms of this Agreement relating to its obligations to fund prospective Loans, unless the subject of a good faith dispute (provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent or the Borrower), (d) otherwise failed to pay over to the Administrative Agent or any other Lender any other amount required to be paid by it under this Agreement within two (2) Business Days of the date when due, unless the subject of a good faith dispute, or (e) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, (ii) had a custodian appointed for it, or has consented to, approved of or acquiesced in any such proceeding or appointment or has a parent company that has become the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee or custodian appointed for it, or has consented to, approved of or acquiesced in any such proceeding or appointment, or (iii) become the subject of a Bail-In Action; provided that (x) if a Lender would be a "Defaulting Lender" solely by reason of events relating to a parent company of such Lender or solely because a Governmental Authority has been appointed as receiver, conservator, trustee or custodian for such Lender, in each case as described in clause (e) above, the Administrative Agent may, in its discretion, determine that such Lender is not a "Defaulting Lender" if and for so long as the Administrative Agent is satisfied that such Lender will continue to perform its funding obligations hereunder and (y) a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of voting stock or any other Capital Stock in such Lender or a parent company thereof by a Governmental Authority or an instrumentality thereof, or the exercise of control over such Lender or parent company thereof, by a Governmental Authority or instrumentality thereof so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender. Any determination by the Administrative Agent that a Lender is a Defaulting Lender under any one or more of clauses (a) through (e) above shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to the penultimate paragraph of Section 2.20) upon delivery of written notice of such determination to the Borrower and each Lender.

"**Disposition**": with respect to any property, any sale, lease, sale and leaseback, assignment, conveyance, transfer or other disposition thereof. The term "**Dispose of**" shall have a correlative meaning.

"**Documentation Agents**": as defined on the cover hereto.

"**Dollars**" and "**$**": dollars in lawful currency of the United States.

"**Early Opt-in Election**": the occurrence of:

(1)   (i) a determination by the Administrative Agent or (ii) a notification by the Required Lenders to the Administrative Agent (with a copy to the Borrower) that the Required Lenders have determined that U.S. dollar-denominated syndicated credit facilities being executed at such time, or that include language similar to that contained in Section 2.13 are being executed or amended, as applicable, to incorporate or adopt a new benchmark interest rate to replace the Eurodollar Base Rate; and

(2)   (i) the election by the Administrative Agent or (ii) the election by the Required Lenders to declare that an Early Opt-in Election has occurred and the provision, as applicable, by the Administrative Agent of written notice of such election to the Borrower and the Lenders or by the Required Lenders of written notice of such election to the Administrative Agent.

"**EEA Financial Institution**": (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"**EEA Member Country**": any of the member states of the European Union, Iceland, Liechtenstein and Norway.

"**EEA Resolution Authority**": any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"**Effective Date**": the date on which the conditions precedent set forth in Section 5.1 shall have been satisfied or waived.

"**Eligible Assignee**": (a) any commercial bank or other financial institution having a senior unsecured debt rating by Moody's of A3 or better and by S&P of A- or better, which is domiciled in a country which is a member of the OECD or (b) with respect to any Person referred to in the preceding clause (a), any other Person that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course of business all of the Capital Stock of which is owned, directly or indirectly, by such Person; *provided* that in the case of clause (b), the Administrative Agent shall have consented to the designation of such Person as an Eligible Assignee (such consent not to be unreasonably withheld or delayed).

"**Environmental Laws**": any and all foreign, Federal, state, local or municipal laws, rules, orders, regulations, statutes, ordinances, codes, decrees, requirements of any Governmental Authority or other Requirements of Law (including common law) regulating, relating to or imposing liability or standards of conduct concerning protection of human health or the environment, as now or may at any time hereafter be in effect.

13

"**ERISA**": the Employee Retirement Income Security Act of 1974, as amended from time to time.

"**ERISA Event**": (a) any Reportable Event; (b) the failure of the Borrower or any Commonly Controlled Entity to timely make a required contribution with respect to any Plan or any Multiemployer Plan; (c) the imposition of a Lien under Section 430 of the Code or Section 303 of ERISA with respect to any Single Employer Plan; (d) the failure of the Borrower or any Commonly Controlled Entity to meet the minimum funding standard under Section 412 or 430 of the Code with respect to any Plan or the filing of an application for a funding waiver with respect to any Single Employer Plan; (e) the incurrence by the Borrower or any Commonly Controlled Entity of any liability under Title IV of ERISA, including with respect to the termination of any Plan (other than the payment of PBGC premiums in the ordinary course); (f) (i) the termination of, or the filing or receipt of a notice of intent to terminate, a Single Employer Plan under Section 4041 of ERISA, or the treatment of a plan amendment as a termination under Section 4041 of ERISA, or (ii) (A) the appointment of a trustee to administer a Single Employer Plan under Section 4042, or (B) the institution by the PBGC of proceedings to terminate a Single Employer Plan or to have a trustee appointed to administer a Single Employer Plan, or receipt by the Borrower of notice from the PBGC thereof, where such proceedings continue unstayed or in effect for more than 60 days, or such notice is not withdrawn by the PBGC within 60 days following delivery by PBGC; (g) the incurrence by the Borrower or any Commonly Controlled Entity of any liability with respect to the complete withdrawal or partial withdrawal under Title IV of ERISA from any Multiemployer Plan; (h) the receipt by the Borrower or any Commonly Controlled Entity of any notice from a Multiemployer Plan concerning the imposition of Withdrawal Liability; (i) receipt of notification by Borrower or any Commonly Controlled Entity from a Multiemployer Plan that such Multiemployer Plan is in endangered or critical status (within the meaning of Section 305 of ERISA) or in Insolvency; (j) the incurrence by the Borrower or any Commonly Controlled Entity of any liability pursuant to Section 4063 or 4064 of ERISA or a substantial cessation of operations with respect to a Plan within the meaning of Section 4062(e) of ERISA; (k) the posting of a bond or security under Section 436(f) of the Code with respect to any Plan; or (l) the Borrower incurs material tax liability with respect to any Plan (including Sections 4975, 4980B, 4980D, 4980H and 4980I of the Code, as applicable).

"**EU Bail-In Legislation Schedule**": the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"**Eurocurrency Liabilities**": as defined in Regulation D of the Board.

"**Eurocurrency Reserve Requirements**": of any Lender for any Interest Period as applied to a Eurodollar Loan, the reserve percentage applicable during such Interest Period (or if more than one such percentage shall be so applicable, the daily average of such percentages for those days in such Interest Period during any such percentage shall be so

14

applicable) under any regulations of the Board or other Governmental Authority having jurisdiction with respect to determining the maximum reserve requirement (including basic, supplemental and emergency reserves) for such Lender with respect to liabilities or assets consisting of or including Eurocurrency Liabilities having a term equal to such Interest Period.

"**Eurodollar Base Rate**": with respect to each day during each Interest Period pertaining to a Eurodollar Loan, the Eurodollar Screen Rate at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period; provided that if the Eurodollar Screen Rate shall not be available at such time for such Interest Period (an "**Impacted Interest Period**") then the Eurodollar Base Rate shall be the Interpolated Rate.

"**Eurodollar Loans**": Loans the rate of interest applicable to which is based upon the Eurodollar Rate.

"**Eurodollar Rate**": with respect to each day during each Interest Period pertaining to a Eurodollar Loan, a rate per annum determined for such day in accordance with the following formula (rounded upwards, if necessary, to the next 1/16 of 1%):

$$\frac{\text{Eurodollar Base Rate}}{1.00 - \text{Eurocurrency Reserve Requirements}}$$

"**Eurodollar Screen Rate**": for any day and time, with respect to any Eurodollar Loan for any Interest Period, the London interbank offered rate as administered by ICE Benchmark Administration (or any other Person that takes over the administration of such rate) for a period equal in length to such Interest Period as displayed on such day and time on pages LIBOR01 or LIBOR02 of the Reuters screen that displays such rate (or, in the event such rate does not appear on a Reuters page or screen, on any successor or substitute page on such screen that displays such rate, or on the appropriate page of such other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion); provided that if the Eurodollar Screen Rate as so determined would be less than zero, such rate shall be deemed to zero for the purposes of this Agreement.

"**Eurodollar Tranche**": the collective reference to Eurodollar Loans the then current Interest Periods with respect to all of which begin on the same date and end on the same later date (whether or not such Loans shall originally have been made on the same day).

"**Event of Default**": any of the events specified in Section 8, *provided* that any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

"**Exchange Act**": Securities Exchange Act of 1934, as amended.

15

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 1247 of 1367

"**Excluded Taxes**": any of the following Taxes imposed on or with respect to any Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan (other than pursuant to an assignment request by the Borrower under Section 2.19) or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.16(a) or (c), amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure to comply with Section 2.16(e) and (d) any U.S. federal withholding Taxes imposed pursuant to FATCA.

"**FATCA**": Sections 1471 through 1474 of the Code, as of the Effective Date (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code.

"**FCPA**": as defined in Section 4.15.

"**Federal Funds Effective Rate**": for any day, the rate calculated by the NYFRB based on such day's federal funds transactions by depositary institutions, as determined in such manner as shall be set forth on the Federal Reserve Bank of New York's Website from time to time, and published on the next succeeding Business Day by the NYFRB as the effective federal funds rate; provided that if the Federal Funds Effective Rate as so determined would be less than zero, such rate shall be deemed to be zero for the purposes of this Agreement.

"**Federal Reserve Bank of New York's Website**": the website of the NYFRB at http://www.newyorkfed.org, or any successor source.

"**First Mortgage Bonds**": bonds issued by the Borrower pursuant to the FMB Indenture.

"**FMB Indenture**": the Indenture of Mortgage (Mortgage), dated as of June 19, 2020, between the Borrower and the Indenture Trustee (as supplemented by the Supplemental Indenture) and as further supplemented or amended from time to time.

"**Foreign Lender**": a Lender that is not a U.S. Person.

"**FPA**": the Federal Power Act, as amended, and the rules and regulations promulgated thereunder.

16

"**Funding Office**": the office of the Administrative Agent specified in Section 10.2(a) or such other office as may be specified from time to time by the Administrative Agent as its funding office by written notice to the Borrower and the Lenders.

"**GAAP**": generally accepted accounting principles in the United States as in effect from time to time, except as noted below. In the event that any "Change in Accounting Principles" (as defined below) shall occur and such change results in a change in the method of calculation of financial covenants, standards or terms in this Agreement, then, upon the request of the Borrower or the Required Lenders, the Borrower and the Administrative Agent agree to enter into negotiations in order to amend such provisions of this Agreement so as to reflect equitably such Change in Accounting Principles with the desired result that the criteria for evaluating the Borrower's financial condition shall be the same after such Change in Accounting Principles as if such Change in Accounting Principles had not been made. Until such time as such an amendment shall have been executed and delivered by the Borrower, the Administrative Agent and the Required Lenders, all financial covenants, standards and terms in this Agreement shall continue to be calculated or construed as if such Change in Accounting Principles had not occurred. "**Change in Accounting Principles**" refers to (i) changes in accounting principles required by the promulgation of any rule, regulation, pronouncement or opinion by the Financial Accounting Standards Board of the American Institute of Certified Public Accountants or any successor thereto, the SEC or, if applicable, the Public Company Accounting Oversight Board and (ii) any change in the application of GAAP concurred by the Borrower's independent public accountants and disclosed in writing to the Administrative Agent.

"**Governmental Authority**": any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government, any securities exchange and any self-regulatory organization (including the National Association of Insurance Commissioners and supra-national bodies such as the European Union or the European Central Bank).

"**Guarantee Obligation**": as to any Person (the "**guaranteeing person**"), any obligation, including a reimbursement, counterindemnity or similar obligation, of the guaranteeing person that guarantees any Indebtedness, leases, dividends or other obligations (the "**primary obligations**") of any other third Person (the "**primary obligor**") in any manner, whether directly or indirectly, including any obligation of the guaranteeing person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (1) for the purchase or payment of any such primary obligation or (2) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation, (iv) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof or (v) to reimburse or indemnify an issuer of a letter of credit, surety bond or guarantee issued by such issuer in respect of primary obligations of a primary obligor other than the

Borrower or any Significant Subsidiary; provided, however, that the term Guarantee Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business. The amount of any Guarantee Obligation of any guaranteeing person shall be deemed to be the lower of (a) an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee Obligation is made and (b) the maximum amount for which such guaranteeing person may be liable pursuant to the terms of the instrument embodying such Guarantee Obligation, unless such primary obligation and the maximum amount for which such guaranteeing person may be liable are not stated or determinable, in which case the amount of such Guarantee Obligation shall be such guaranteeing person's reasonably anticipated liability in respect thereof as determined by the Borrower in good faith.

"**IBA**": as defined in Section 1.4.

"**Indebtedness**": of any Person at any date, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person for the deferred purchase price of property or services (other than trade payables, including under energy procurement and transportation contracts, incurred in the ordinary course of such Person's business), (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) all Capital Lease Obligations of such Person, (f) all obligations of such Person, contingent or otherwise, as an account party or applicant under or in respect of acceptances, letters of credit, surety bonds or similar arrangements (other than reimbursement obligations, which are not due and payable on such date, in respect of documentary letters of credit issued to provide for the payment of goods and services in the ordinary course of business), (g) the liquidation value of all mandatorily redeemable preferred Capital Stock of such Person, (h) all Guarantee Obligations of such Person in respect of obligations of the kind referred to in clauses (a) through (g) above, (i) all obligations of the kind referred to in clauses (a) through (h) above secured by (or for which the holder of such obligation has an existing right, contingent or otherwise, to be secured by) any Lien on property (including accounts and contract rights) owned by such Person, whether or not such Person has assumed or become liable for the payment of such obligation (*provided*, that if such Person is not liable for such obligation, the amount of such Person's Indebtedness with respect thereto shall be deemed to be the lesser of the stated amount of such obligation and the value of the property subject to such Lien), and (j) for the purposes of Sections 7.1 and 8(e) only, all obligations of such Person in respect of Swap Agreements, *provided* that Indebtedness as used in this Agreement shall exclude any Non-Recourse Debt and any obligations under any A/R Securitization Transaction. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness expressly provide that such Person is not liable therefor.

18

"**Indebtedness Covenant Release Date**": the date of the expiration of the temporary waiver from its authorized capital structure granted by the CPUC on May 28, 2020.

"**Indemnified Liabilities**": as defined in Section 10.5.

"**Indemnified Taxes**": (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Borrower under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"**Indemnitee**": as defined in Section 10.5.

"**Indenture Trustee**": The Bank of New York Mellon Trust Company, N.A. and any successor thereto as trustee under the FMB Indenture.

"**Insolvency**": with respect to any Multiemployer Plan, the condition that such plan is insolvent within the meaning of Section 4245 of ERISA.

"**Interest Payment Date**": (a) as to any ABR Loan, the last day of each March, June, September and December to occur while such Loan is outstanding and the final maturity date of such Loan, (b) as to any Eurodollar Loan having an Interest Period of three months or less, the last day of such Interest Period, (c) as to any Eurodollar Loan having an Interest Period longer than three months, each day that is three months, or a whole multiple thereof, after the first day of such Interest Period and the last day of such Interest Period and (d) as to any Loan, the date of any repayment or prepayment made in respect thereof.

"**Interest Period**": as to any Eurodollar Loan, (a) initially, the period commencing on the borrowing or conversion date, as the case may be, with respect to such Eurodollar Loan and ending one week thereafter or one, two, three or six or (if agreed to by all Lenders) twelve months thereafter, as selected by the Borrower in its notice of borrowing or notice of conversion, as the case may be, given with respect thereto; and (b) thereafter, each period commencing on the last day of the next preceding Interest Period applicable to such Eurodollar Loan and ending one, two, three or six or (if agreed to by all Lenders) twelve months thereafter, as selected by the Borrower by irrevocable notice to the Administrative Agent not later than 12:00 Noon, New York City time, on the date that is three Business Days prior to the last day of the then current Interest Period with respect thereto; *provided* that, all of the foregoing provisions relating to Interest Periods are subject to the following:

    (i)   if any Interest Period would otherwise end on a day that is not a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless the result of such extension would be to carry such Interest Period into another calendar month in which event such Interest Period shall end on the immediately preceding Business Day;

    (ii)   the Borrower may not select an Interest Period that would extend beyond the applicable Maturity Date;

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 1251 of 1367

(iii)    any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of a calendar month;

(iv)    the Borrower shall select Interest Periods so as not to require a payment or prepayment of any Eurodollar Loan during an Interest Period for such Loan; and

(v)    at the election of the Borrower, the initial Interest Period for any Eurodollar Loans made on the Effective Date, shall commence on the Effective Date and end on the last day of the calendar month during which the Effective Date occurs.

"**Interpolated Rate**": at any time, for any Interest Period, the rate per annum (rounded to the same number of decimal places as the Eurodollar Screen Rate) determined by the Administrative Agent (which determination shall be conclusive and binding absent manifest error) to be equal to the rate that results from interpolating on a linear basis between: (a) the Eurodollar Screen Rate for the longest period (for which the Eurodollar Screen Rate is available) that is shorter than the Impacted Interest Period; and (b) the Eurodollar Screen Rate for the shortest period (for which that Eurodollar Screen Rate is available) that exceeds the Impacted Interest Period, in each case, at such time.

"**IRS**": the United States Internal Revenue Service.

"**knowledge of the Borrower**": actual knowledge of any Responsible Officer of the Borrower.

"**Laws**": collectively, all international, foreign, federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case whether or not having the force of law.

"**Lenders**": as defined in the preamble hereto; *provided*, that unless the context otherwise requires, each reference herein to the Lenders shall be deemed to include any Conduit Lender.

"**Lien**": any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge or other security interest or any preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement and any Capital Lease Obligation having substantially the same economic effect as any of the foregoing).

"**Loans**": the 364-Day Tranche Loans and the 18-Month Tranche Loans.

20

"**Loan Documents**": this Agreement, the Notes, the Supplemental Indenture, the Senior Bonds, the Bond Delivery Agreement, the FMB Indenture and, in each case, any amendment, waiver, supplement or other modification to any of the foregoing; provided, that the term "Loan Documents" shall not include the FMB Indenture for any purposes under Section 2.16, Section 8 or Section 10 (other than for the purposes of Sections 10.1(iv) 10.1(x)).

"**Material Adverse Effect**": (a) a change in the business, property, operations or financial condition of the Borrower and its Subsidiaries taken as a whole that could reasonably be expected to materially and adversely affect the Borrower's ability to perform its obligations under the Loan Documents or (b) a material adverse effect on (i) the validity or enforceability of this Agreement or any of the other Loan Documents or (ii) the rights and remedies of the Administrative Agent and the Lenders, taken as a whole, under this Agreement or any other Loan Document.

"**Materials of Environmental Concern**": any gasoline or petroleum (including crude oil or any fraction thereof) or petroleum products or any hazardous or toxic substances, materials or wastes, defined or regulated as such in or under any Environmental Law, including asbestos, polychlorinated biphenyls and urea-formaldehyde insulation.

"**Maturity Date**": (a) with respect to the 364-Day Tranche Loans, the 364-Day Tranche Maturity Date, and (b) with respect to the 18-Month Tranche Loans, the 18-Month Tranche Maturity Date.

"**Moody's**": Moody's Investors Service, Inc.

"**Mortgaged Property**": as defined in the FMB Indenture.

"**Multiemployer Plan**": a plan that is a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"**Net Cash Proceeds**": with respect to any Debt Issuance, the excess, if any, of (i) cash actually received by the Borrower or its Subsidiaries in connection with such incurrence, issuance, offering or placement over (ii) the underwriting discounts and commissions and other fees and expenses incurred by the Borrower or its Subsidiaries in connection with such incurrence, issuance, offering or placement.

"**Net Tangible Assets**": the total amount of the Borrower's assets determined on a consolidated basis in accordance with GAAP as of the last day of the most recently ended fiscal quarter for which financial statements have been delivered under Section 6.1, less (a) the sum of the Borrower's consolidated current liabilities determined in accordance with GAAP, and (b) the amount of the Borrower's consolidated assets classified as intangible assets, determined in accordance with GAAP.

"**Non-Recourse Debt**": Indebtedness of the Borrower or any of its Significant Subsidiaries that is incurred in connection with the acquisition, construction, sale, transfer or other Disposition of specific assets, to the extent recourse, whether contractual or as a matter of law, for non-payment of such Indebtedness is limited (a) to such assets, or (b) if such assets are (or are to be) held by a Subsidiary formed solely for such purpose, to such Subsidiary or the Capital Stock of such Subsidiary.

21

"**Notes**": as defined in Section 2.14(f).

"**NYFRB**": the Federal Reserve Bank of New York.

"**NYFRB Rate**": for any day, the greater of (a) the Federal Funds Effective Rate in effect on such day and (b) the Overnight Bank Funding Rate in effect on such day (or for any day that is not a Business Day, for the immediately preceding Business Day); provided that if none of such rates are published for any day that is a Business Day, the term "NYFRB Rate" means the rate for a federal funds transaction quoted at 11:00 a.m. (New York City time) on such day received by the Administrative Agent from a federal funds broker of recognized standing selected by it; provided, further, that if any of the aforesaid rates as so determined would be less than zero, such rate shall be deemed to be zero for purposes of this Agreement.

"**Obligations**": the unpaid principal of and interest on (including, without limitation, interest accruing after the maturity of the Loans and interest accruing after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding, relating to the Borrower, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding) the Loans and all other obligations and liabilities of the Borrower to the Administrative Agent or to any Lender, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, which may arise under, out of, or in connection with, this Agreement, any other Loan Document or any other document made, delivered or given in connection herewith or therewith, whether on account of principal, interest, reimbursement obligations, fees, indemnities, costs, expenses (including, without limitation, all fees, charges and disbursements of counsel to the Administrative Agent or to any Lender that are required to be paid by the Borrower pursuant hereto) or otherwise.

"**OECD**": the countries constituting the "Contracting Parties" to the Convention on the Organisation For Economic Co-operation and Development, as such term is defined in Article 4 of such Convention.

"**Other Connection Taxes**": with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"**Other Taxes**": all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 2.19).

22

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 1254 of 1367

"**Overnight Bank Funding Rate**": for any day, the rate comprised of both overnight federal funds and overnight Eurodollar borrowings by U.S.-managed banking offices of depository institutions, as such composite rate shall be determined by the NYFRB as set forth on the Federal Reserve Bank of New York's Website from time to time, and published on the next succeeding Business Day by the NYFRB as an overnight bank funding rate.

"**Participant**": as defined in Section 10.6(c).

"**Participant Register**": as defined in Section 10.6(c)(iii).

"**Patriot Act**": as defined in Section 10.16.

"**PBGC**": the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA (or any successor).

"**PCG**": as defined in the first recital paragraph.

"**PCG Commitment Letter**": that certain Commitment Letter dated as of October 4, 2019 among PG&E Corporation, as the borrower, Pacific Gas and Electric Company and the commitment parties from time to time party thereto, as amended, modified or supplemented from time to time prior to the date hereof.

"**PCG Revolving Credit Agreement**": that certain Credit Agreement dated as of the Effective Date, among PCG, the lenders from time to time party thereto and JPMorgan Chase Bank, N.A., as administrative agent.

"**Percentage**": as to any Lender at any time with respect to a Tranche, the percentage which the aggregate principal amount of such Lender's Loans then outstanding constitutes of the aggregate principal amount of the Loans then outstanding with respect to such Tranche.

"**Permitted Refinancing**": with respect to any Indebtedness (the "**Refinanced Indebtedness**"), any extension, refinancing, refunding or replacement thereof with Indebtedness provided that (i) the amount of such Indebtedness does not exceed the aggregate principal amount of the Refinanced Indebtedness, plus any premium, interest, fee or expenses payable in connection therewith, (ii) the final maturity date of such Indebtedness is no earlier than the maturity date of the Refinanced Indebtedness, and (iii) the weighted average life to maturity of such Indebtedness is not shorter than the weighted average life to maturity of the Refinanced Indebtedness.

"**Person**": an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, Governmental Authority or other entity of whatever nature.

23

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 1255 of 1367

"**Plan**": at a particular time, any employee benefit plan that is covered by ERISA and in respect of which the Borrower or a Commonly Controlled Entity is (or, if such plan were terminated at such time, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"**Plan of Reorganization**": as defined in the second recital paragraph.

"**Platform**": as defined in Section 10.2(d).

"**Prime Rate**": the rate of interest last quoted by The Wall Street Journal as the "Prime Rate" in the U.S. or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by the Administrative Agent) or in any similar release by the Federal Reserve Board (as determined by the Administrative Agent). Each change in the Prime Rate shall be effective from and including the date such change is publicly announced or quoted as being effective.

"**PTE**": a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"**QFC**": the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

"**QFC Credit Support**" in Section 10.19.

"**Qualified Securitization Bond Issuer**": a Subsidiary of the Borrower formed and operating solely for the purpose of (a) purchasing and owning property created under a "financing order" (as such term is defined in the California Public Utilities Code) or similar order issued by the CPUC, (b) issuing such securities pursuant to such order, (c) pledging its interests in such property to secure such securities and (d) engaging in activities ancillary to those described in (a), (b) and (c).

"**Rating**": each rating announced by S&P and Moody's in respect of the Borrower's senior secured debt.

"**Recipient**": the Administrative Agent or any Lender.

"**Register**": as defined in Section 10.6(b).

"**Regulation U**": Regulation U of the Board as in effect from time to time.

"**Related Parties**": with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees, administrators, managers, advisors and representatives of such Person and of such Person's Affiliates.

24

"**Relevant Governmental Body**": the Federal Reserve Board and/or the NYFRB, or a committee officially endorsed or convened by the Federal Reserve Board and/or the NYFRB or, in each case, any successor thereto.

"**Removal Effective Date**": as defined in Section 9.9(b).

"**Reportable Event**": any of the events set forth in Section 4043(c) of ERISA, other than those events as to which the thirty-day notice period is waived under subsections .27, .28, .29, .30, .31, .32, .34 or .35 of PBGC Reg. § 4043.

"**Required Lenders**": at any time, the holders of more than 50% of the aggregate Loans then outstanding. The Loans of any Defaulting Lender shall be disregarded in determining Required Lenders at any time.

"**Requirement of Law**": as to any Person, the Articles of Incorporation and By-Laws or other organizational or governing documents of such Person, and any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"**Resignation Effective Date**": as defined in Section 9.9(a).

"**Resolution Authority**": with respect to any EEA Financial Institution, an EEA Resolution Authority and, with respect to any UK Financial Institution, a UK Resolution Authority.

"**Responsible Officer**": the chief executive officer, president, chief financial officer, treasurer or assistant treasurer of the Borrower, but in any event, with respect to financial matters, the chief financial officer, treasurer or assistant treasurer of the Borrower.

"**S&P**": Standard & Poor's Global Ratings, a division of S&P Global Inc., and any successor thereto.

"**Sanctions**": as defined in Section 4.15.

"**SEC**": the Securities and Exchange Commission, any successor thereto and any analogous Governmental Authority.

"**Securitized Bonds**": without duplication, securities, however denominated, that are (i) issued by a Qualified Securitization Bond Issuer, (ii) secured by or otherwise payable from charges authorized by the financing order referred to in clause (a) of the definition of "Qualified Securitization Bond Issuer," and (iii) non-recourse to the Borrower or any of its Subsidiaries (other than the issuer of such securities).

"**Senior Bonds**": (i) with respect to the 364-Day Tranche Loans, that certain First Mortgage Bond in the aggregate principal amount of $1,500,000,000 and (ii) with respect to the 18-Month Tranche Loans, that certain First Mortgage Bond in the aggregate principal amount of $1,500,000,000, in each case, issued to the Administrative Agent pursuant to the Supplemental Indenture.

"**Significant Subsidiary**": as defined in Article 1, Rule 1-02(w) of Regulation S-X of the Exchange Act as of the Effective Date, provided that notwithstanding the foregoing, no special purpose finance subsidiary, no A/R Securitization Subsidiary (or Subsidiaries of any A/R Securitization Subsidiary) nor any Qualified Securitization Bond Issuer (or Subsidiaries of any Qualified Securitization Bond Issuer) shall constitute a Significant Subsidiary. Unless otherwise qualified, all references to a "Significant Subsidiary" or to "Significant Subsidiaries" in this Agreement shall refer to a "Significant Subsidiary" or "Significant Subsidiaries" of the Borrower.

"**Single Employer Plan**": any Plan that is covered by Title IV of ERISA, but that is not a Multiemployer Plan.

"**SOFR**": with respect to any day, the secured overnight financing rate published for such day by the NYFRB, as the administrator of the benchmark (or a successor administrator), on the Federal Reserve Bank of New York's Website.

"**SOFR-Based Rate**": SOFR, Compounded SOFR or Term SOFR.

"**Solvent**": with respect to the Borrower and its Subsidiaries, on a consolidated basis, that as of the date of determination, (i) the fair value of the assets of the Borrower and its Subsidiaries, on a consolidated basis, at a fair valuation on a going concern basis, exceeds, on a consolidated basis, their debts and liabilities, subordinated, contingent or otherwise, (ii) the present fair saleable value of the property of the Borrower and its Subsidiaries, on a consolidated and going concern basis, is greater than the amount that will be required to pay the probable liability, on a consolidated basis, of their debts and other liabilities, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured in the ordinary course of business, (iii) the Borrower and its Subsidiaries, on a consolidated basis, are able to pay their debts and liabilities, subordinated, contingent or otherwise, as such liabilities become absolute and matured in the ordinary course of business, (iv) the Borrower and its Subsidiaries are not engaged in businesses, and are not about to engage in businesses for which they have unreasonably small capital. For purposes of this definition, the amount of any contingent liability at any time shall be computed as the amount that, in light of all the facts and circumstances existing as of the Effective Date, would reasonably be expected to become an actual and matured liability.

"**Specified Exchange Act Filings**": the Borrower's Form 10-K annual report for the year ended December 31, 2019 and each and all of the Form 10-Qs and Form 8-Ks (and to the extent applicable proxy statements) filed by the Borrower or PCG with the SEC after December 31, 2019 and prior to the date that is one Business Day before the date of this Agreement.

"**Specified Material Adverse Effect**": any occurrence, fact, change, event, effect, violation, penalty, inaccuracy or circumstance (whether or not constituting a breach of a representation, warranty or covenant set forth in the Plan of Reorganization) that,

26

individually or in the aggregate with any such other results, occurrences, facts, changes, events, effects, violations, penalties, inaccuracies, or circumstances, (i) would have or would reasonably be expected to have a material adverse effect on the business, operations, assets, liabilities, capitalization, financial performance, financial condition or results of operations, in each case, of PCG and the Borrower, taken as a whole, or (ii) would reasonably be expected to prevent or materially delay the ability of PCG and the Borrower to consummate the transactions contemplated by this Agreement or the Plan of Reorganization or perform their obligations hereunder or thereunder; *provided*, *however*, that none of the following results, occurrences, facts, changes, events, effects, violations, penalties, inaccuracies or circumstances shall constitute or be taken into account in determining whether a Specified Material Adverse Effect has occurred, is continuing or would reasonably be expected to occur: (A) the filing of the Chapter 11 cases with respect to the Debtors, (B) results, occurrences, facts, changes, events, violations, inaccuracies or circumstances affecting (1) the electric or gas utility businesses in the United States generally or (2) the economy, credit, financial, capital or commodity markets, in the United States or elsewhere in the world, including changes in interest rates, monetary policy or inflation, (C) changes or prospective changes in law (other than any law or regulation of California or the United States that is applicable to any electrical utility) or in GAAP or accounting standards, or any changes or prospective changes in the interpretation or enforcement of any of the foregoing, (D) any decline in the market price, or change in trading volume, of any securities of the Debtors, (E) any failure to meet any internal or public projections, forecasts, guidance, estimates, milestones, credit ratings, budgets or internal or published financial or operating predictions of revenue, earnings, cash flow or cash position, (F) any wildfire occurring after the Petition Date (as defined in the Plan of Reorganization) and prior to January 1, 2020, and (G) one or more wildfires, occurring on or after January 1, 2020, that destroys or damages fewer than 500 dwellings or commercial structures in the aggregate (it being understood that (I) the exceptions in clauses (D) and (E) shall not prevent or otherwise affect a determination that the underlying cause of any such change, decline or failure referred to therein is a Specified Material Adverse Effect, and (II) a Specified Material Adverse Effect shall include the occurrence of one or more wildfires on or after January 1, 2020 destroying or damaging at least 500 dwellings or commercial structures within PCG's service area at a time when the portion of PCG's system at the location of such wildfire was not successfully de-energized.

"**Standard A/R Securitization Obligations**": representations, warranties, covenants, indemnities, repurchase obligations, servicing obligations, guarantees, intercompany notes and obligations relating to contributions of A/R Securitization Assets to an A/R Securitization Subsidiary and other obligations entered into by the Borrower or any of its Subsidiaries which are reasonably customary in A/R Securitization Transactions.

"**Subsidiary**": as to any Person, a corporation, partnership, limited liability company or other entity of which shares of stock or other ownership interests having ordinary voting power (other than stock or such other ownership interests having such power only by reason of the happening of a contingency) to elect a majority of the board of directors or other managers of such corporation, partnership or other entity are at the time owned, or the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, or both, by such Person. Unless otherwise qualified, all references to a "Subsidiary" or to "Subsidiaries" in this Agreement shall refer to a Subsidiary or Subsidiaries of the Borrower.

27

"**Supplemental Indenture**": with respect to those certain First Mortgage Bonds in the aggregate principal amount of $3,000,000,000 issued to the Administrative Agent, the Supplemental Indenture, dated as of the Effective Date, by and between the Borrower and the Indenture Trustee.

"**Supported QFC**": as defined in Section 10.19.

"**Swap Agreement**": any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; provided that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of the Borrower or any of its Subsidiaries shall be a "Swap Agreement".

"**Syndication Agents**": as defined on the cover hereto.

"**Taxes**": all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**Term SOFR**": the forward-looking term rate based on SOFR that has been selected or recommended by the Relevant Governmental Body.

"**Tranche**": (i) the 364-Day Tranche Commitments or the 364-Day Tranche Loans or (ii) the 18-Month Tranche Commitments or the 18-Month Tranche Loans.

"**Transferee**": any Assignee or Participant.

"**Type**": as to any Loan, its nature as an ABR Loan or a Eurodollar Loan.

"**UK Financial Institution**": any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended form time to time) promulgated by the United Kingdom Prudential Regulation Authority)) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"**UK Resolution Authority**": the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

28

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 1260 of 1367

"**Unadjusted Benchmark Replacement**": the Benchmark Replacement excluding the Benchmark Replacement Adjustment; *provided* that, if the Unadjusted Benchmark Replacement as so determined would be less than zero, the Unadjusted Benchmark Replacement will be deemed to be zero for the purposes of this Agreement.

"**United States**" or "**U.S.**": the United States of America.

"**U.S. Person**": any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"**U.S. Special Resolution Regime**": as defined in Section 10.19.

"**U.S. Tax Compliance Certificate**": as defined in Section 2.16(e)(ii)(B)(III).

"**Utility Commitment Letter**": that certain Commitment Letter dated as of October 4, 2019 among Pacific Gas and Electric Company, as the borrower, PG&E Corporation and the commitment parties from time to time party thereto, as amended, modified or supplemented from time to time prior to the date hereof.

"**Utility Revolving Credit Agreement**": that certain Credit Agreement dated as of the Effective Date, among the Borrower, the lenders from time to time party thereto and JPMorgan Chase Bank, N.A., as administrative agent.

"**Withdrawal Liability**": any liability to a Multiemployer Plan as a result of a complete or partial withdrawal by the Borrower or any Commonly Controlled Entity from such Multiemployer Plan, as such terms are defined in Title IV of ERISA.

"**Write-Down and Conversion Powers**": (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the applicable Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to any UK Resolution Authority, any powers of such UK Resolution Authority under the applicable Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

1.2    *Other Definitional Provisions and Interpretative Provisions*.

(a)    Unless otherwise specified therein, all terms defined in this Agreement shall have the defined meanings when used in the other Loan Documents or any certificate or other document made or delivered pursuant hereto or thereto.

29

(b)    As used herein and, except as otherwise provided therein, in the other Loan Documents, and any certificate or other document made or delivered pursuant hereto or thereto, (i) accounting terms relating to the Borrower and its Significant Subsidiaries defined in Section 1.1 and accounting terms partly defined in Section 1.1, to the extent not defined, shall have the respective meanings given to them under GAAP, (ii) the words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation", (iii) the word "incur" shall be construed to mean incur, create, issue, assume or become liable in respect of (and the words "incurred" and "incurrence" shall have correlative meanings), (iv) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, Capital Stock, securities, revenues, accounts, leasehold interests and contract rights, and (v) references to agreements or other Contractual Obligations shall, unless otherwise specified, be deemed to refer to such agreements or Contractual Obligations as amended, supplemented, restated or otherwise modified from time to time.

(c)    The words "hereof", "herein" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, Schedule and Exhibit references are to this Agreement unless otherwise specified.

(d)    The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

(e)    The Borrower shall not be required to perform, nor shall it be required to guarantee the performance of, any of the affirmative covenants set forth in Section 6 that apply to any of its Significant Subsidiaries nor shall any of the Borrower's Significant Subsidiaries be required to perform, nor shall any of such Significant Subsidiaries be required to guarantee the performance of, any of the Borrower's affirmative covenants set forth in Section 6 or any of the affirmative covenants set forth in Section 6 that apply to any other Significant Subsidiary; *provided*, that nothing in this Section 1.2(e) shall prevent the occurrence of a Default or an Event of Default arising out of the Borrower's failure to cause any Significant Subsidiary to comply with the provisions of this Agreement applicable to such Significant Subsidiary.

(f)    Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made, without giving effect to any change in accounting for leases pursuant to GAAP resulting from the implementation of Financial Accounting Standards Board ASU No. 2016-02, Leases (Topic 842), to the extent such adoption would require treating any lease (or similar arrangement conveying the right to use) as a capital lease where such lease (or similar arrangement) would not have been required to be so treated under GAAP as in effect on December 31, 2015.

1.3    *Divisions*. For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed

30

to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized and acquired on the first date of its existence by the holders of its Capital Stock at such time.

1.4    *Interest Rates; LIBOR Notification*. The London interbank offered rate is intended to represent the rate at which contributing banks may obtain short-term borrowings from each other in the London interbank market. In July 2017, the U.K. Financial Conduct Authority announced that, after the end of 2021, it would no longer persuade or compel contributing banks to make rate submissions to the ICE Benchmark Administration (together with any successor to the ICE Benchmark Administrator, the "**IBA**") for purposes of the IBA setting the London interbank offered rate. As a result, it is possible that commencing in 2022, the London interbank offered rate may no longer be available or may no longer be deemed an appropriate reference rate upon which to determine the interest rate on Eurodollar Loans. In light of this eventuality, public and private sector industry initiatives are currently underway to identify new or alternative reference rates to be used in place of the London interbank offered rate. Upon the occurrence of a Benchmark Transition Event or an Early Opt-In Election, Section 2.13(b) provides a mechanism for determining an alternative rate of interest. The Administrative Agent will promptly notify the Borrower, pursuant to Section 2.13(d), of any change to the reference rate upon which the interest rate on Eurodollar Loans is based. However, the Administrative Agent does not warrant or accept any responsibility for, and shall not have any liability with respect to, the administration, submission or any other matter related to the London interbank offered rate or other rates in the definition of "Eurodollar Base Rate" or with respect to any alternative or successor rate thereto, or replacement rate thereof (including, without limitation, (i) any such alternative, successor or replacement rate implemented pursuant to Section 2.13(b), whether upon the occurrence of a Benchmark Transition Event or an Early Opt-In Election, and (ii) the implementation of any Benchmark Replacement Conforming Changes pursuant to Section 2.13(c)), including without limitation, whether the composition or characteristics of any such alternative, successor or replacement reference rate will be similar to, or produce the same value or economic equivalence of, the Eurodollar Base Rate or have the same volume or liquidity as did the London interbank offered rate prior to its discontinuance or unavailability.

SECTION 2.    AMOUNT AND TERMS OF THE TERM LOANS

2.1    *Loans*.

(a)    Subject to the terms and conditions set forth herein, each 364-Day Tranche Lender (severally and not jointly) agrees to make a term loan (the "**364-Day Tranche Loans**") to the Borrower in Dollars on the Effective Date in an amount equal to such 364-Day Tranche Lender's 364-Day Tranche Commitment. Loans under the 364-Day Tranche may be ABR Loans or Eurodollar Loans, as further provided herein. 364-Day Tranche Loans borrowed under this Section 2.1(a) and paid or prepaid may not be reborrowed.

31

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 1263 of 1367

(b)    Subject to the terms and conditions set forth herein, each 18-Month Tranche Lender (severally and not jointly) agrees to make a term loan (the "**18-Month Tranche Loans**") to the Borrower in Dollars on the Effective Date in an aggregate amount equal to the amount of such 18-Month Tranche Lender's 18-Month Tranche Commitment. Loans under the 18-Month Tranche may be ABR Loans or Eurodollar Rate Loans, as further provided herein. 18-Month Tranche Loans borrowed under this Section 2.1(b) and paid or prepaid may not be reborrowed.

2.2    *Procedures for Borrowing*. The Borrower may borrow the Loans on the Effective Date (so long as the Effective Date is a Business Day), provided that the Borrower shall give the Administrative Agent irrevocable notice (which notice must be received by the Administrative Agent (a) prior to 12:00 Noon, New York City time, three Business Days prior to the Effective Date, in the case of Eurodollar Loans, or (b) prior to 1:00 P.M., New York City time, one Business Day prior to the Effective Date, in the case of ABR Loans) specifying (i) the amount and Type of Loans to be borrowed on the Effective Date and (ii) in the case of Eurodollar Loans, the respective amounts of each such Type of Loan and the respective lengths of the initial Interest Period therefor. Upon receipt of any such notice from the Borrower, the Administrative Agent shall promptly notify each Lender thereof. Each Lender will make the amount of its *pro rata* share of each borrowing available to the Administrative Agent for the account of the Borrower at the Funding Office prior to 10:00 A.M., New York City time, on the Effective Date requested by the Borrower in funds immediately available to the Administrative Agent. Such borrowing will then be made available to the Borrower by the Administrative Agent crediting the account of the Borrower on the books of such office with the aggregate of the amounts made available to the Administrative Agent by the Lenders and in like funds as received by the Administrative Agent

2.3    *[Reserved]*.

2.4    *[Reserved]*.

2.5    *[Reserved]*.

2.6    *Fees, Etc.*

(a)    The Borrower agrees to pay to the Administrative Agent, for the account of each Lender (other than a Defaulting Lender to the extent provided in Section 2.20), any fees payable in the amounts and at the times separately agreed upon between the Borrower and the Lenders.

(b)    The Borrower agrees to pay to the Administrative Agent the fees in the amounts and on the dates as set forth in any written, duly executed fee agreements with the Administrative Agent and to perform any other obligations contained therein.

2.7    *Termination of Commitments*. The Commitments shall automatically terminate in full on the Effective Date after the proceeds of the Loans have been made available to the Borrower.

32

2.8  *Prepayments*.

(a)  *Optional*. The Borrower may at any time and from time to time prepay the Loans, in whole or in part, without premium or penalty, upon irrevocable notice delivered to the Administrative Agent no later than 12:00 Noon, New York City time, three Business Days prior thereto, in the case of Eurodollar Loans, and no later than 2:00 p.m., New York City time, one Business Day prior thereto, in the case of ABR Loans, which notice shall specify the date and amount of prepayment and whether the prepayment is of Eurodollar Loans or ABR Loans. Upon receipt of any such notice the Administrative Agent shall promptly notify each relevant Lender thereof. If any such notice is given, the amount specified in such notice shall be due and payable on the date specified therein, together with accrued interest to such date on the amount prepaid. Partial prepayments of Loans shall be in an aggregate principal amount of $1,000,000 or a whole multiple of $500,000 in excess thereof. Notwithstanding the foregoing, any notice of prepayment delivered in connection with any refinancing of all of the Loans with the proceeds of such refinancing or of any other incurrence of Indebtedness or the occurrence of some other identifiable event or condition, may be, if expressly so stated to be, contingent upon the consummation of such refinancing or incurrence or occurrence of such other identifiable event or condition and may be revoked by the Borrower, subject to compliance with the obligations under Section 2.17 in connection with any such revocation, in the event such contingency is not met. Each prepayment of Loans under this clause (a) shall be applied to the prepayment in full of the aggregate principal amount and any accrued but unpaid interest with respect to the 364-Day Tranche Loans before being applied to prepay the aggregate principal amount and any accrued but unpaid interest with respect to the 18-Month Tranche Loans and shall be accompanied by accrued interest and fees on the amount prepaid to the date fixed for prepayment, plus, in the case of any Eurodollar Loans that are prepaid on any day other than the last day of the Interest Period applicable to it, the Borrower shall pay any amounts due to the Lenders as a result thereof pursuant to Section 2.17.

(b)  *Mandatory*. So long as (i) the commitments in respect of each of the Bridge Facilities have been terminated without the funding of any loans thereunder or (ii) the loans and any accrued interest, fees and other obligations under the Bridge Facilities have been paid in full, in the event that the Borrower or any of its Subsidiaries receives any Net Cash Proceeds arising from any Debt Issuance, then the Borrower shall prepay the Loans hereunder in an amount equal to 100% of such Net Cash Proceeds not later than five (5) Business Days following the receipt by the Borrower or such Subsidiary of such Net Cash Proceeds. The Borrower shall promptly (and not later than five (5) Business Days following receipt thereof) notify the Administrative Agent of the receipt by the Borrower or any Subsidiary, as applicable, of such Net Cash Proceeds and such notice shall be accompanied by a reasonably detailed calculation of the Net Cash Proceeds. Each prepayment of Loans under this clause (b) shall be applied to the prepayment in full of the aggregate principal amount and any accrued but unpaid interest with respect to the 364-Day Tranche Loans before being applied to prepay the aggregate principal amount and any accrued but unpaid interest with respect to the 18-Month Tranche Loans and shall be accompanied by accrued interest and fees on the amount prepaid to the date fixed for prepayment, plus, in the case of any Eurodollar Loans that are prepaid on any day other than the last day of the Interest Period applicable to it, the Borrower shall pay any amounts due to the Lenders as a result thereof pursuant to Section 2.17.

33

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 1265 of 1367

2.9 Conversion and Continuation Options.

(a)    The Borrower may elect from time to time to convert Eurodollar Loans to ABR Loans by giving the Administrative Agent prior irrevocable notice of such election no later than 12:00 Noon, New York City time, on the Business Day preceding the proposed conversion date, *provided* that any such conversion of Eurodollar Loans may only be made on the last day of an Interest Period with respect thereto. The Borrower may elect from time to time to convert ABR Loans to Eurodollar Loans by giving the Administrative Agent prior irrevocable notice of such election no later than 12:00 Noon, New York City time, on the third Business Day preceding the proposed conversion date (which notice shall specify the length of the initial Interest Period therefor), *provided* that no ABR Loan may be converted into a Eurodollar Loan when any Event of Default has occurred and is continuing and the Required Lenders have determined in their sole discretion not to permit such conversions. Upon receipt of any such notice the Administrative Agent shall promptly notify each relevant Lender thereof.

(b)    Any Eurodollar Loan may be continued as such upon the expiration of the then current Interest Period with respect thereto by the Borrower giving irrevocable notice to the Administrative Agent, in accordance with the applicable provisions of the defined term "Interest Period", of the length of the next Interest Period to be applicable to such Loans, *provided* that no Eurodollar Loan may be continued as such when any Event of Default has occurred and is continuing and the Required Lenders have determined in their sole discretion not to permit such continuations; *provided, further*, that if the Borrower shall fail to give any required notice as described above in this paragraph, subject to the preceding proviso, such Loans shall be automatically continued as Eurodollar Loans with an Interest Period of one month on the last day of such then expiring Interest Period. Upon receipt of any such notice the Administrative Agent shall promptly notify each relevant Lender thereof.

2.10    *Limitations on Eurodollar Tranches*. Notwithstanding anything to the contrary in this Agreement, all borrowings, conversions and continuations of Eurodollar Loans and all selections of Interest Periods shall be in such amounts and be made pursuant to such elections so that (a) after giving effect thereto, the aggregate principal amount of the Eurodollar Loans comprising each Eurodollar Tranche shall be equal to $1,000,000 or a whole multiple of $500,000 in excess thereof and (b) no more than 5 Eurodollar Tranches shall be outstanding at any one time.

2.11    *Interest Rates and Payment Dates*.

(a)    Each Eurodollar Loan shall bear interest for each day during each Interest Period with respect thereto at a rate per annum equal to the Eurodollar Rate determined for such day *plus* the Applicable Margin.

(b)    Each ABR Loan shall bear interest at a rate per annum equal to the ABR plus the Applicable Margin.

34

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 1266 of 1367

(c)  (i) If all or a portion of the principal amount of the Loans shall not be paid when due (whether at the stated maturity, by acceleration or otherwise), such overdue amount shall bear interest per annum equal to the rate that would otherwise be applicable thereto pursuant to the foregoing provisions of this Section *plus* 2% and (ii) if all or a portion of any interest payable on the Loans or any other fee payable in connection herewith (excluding any expenses or other indemnity) shall not be paid when due (whether at the stated maturity, by acceleration or otherwise), such overdue amount shall bear interest at a default rate per annum equal to the rate then applicable to ABR Loans *plus* 2%, in each case, with respect to clauses (i) and (ii) above, from the date of such non-payment until such amount is paid in full (as well after as before judgment).

(d)  Interest shall be payable in arrears on each Interest Payment Date, *provided* that interest accruing pursuant to Section 2.11(c) shall be payable from time to time on demand.

(e)  The amount of each interest payment received by the Administrative Agent under the applicable Senior Bond shall be deemed to be a payment of interest payable by the Borrower hereunder and shall reduce, dollar-for-dollar, the amount of interest then owing by the Borrower hereunder.

2.12  *Computation of Interest and Fees*.

(a)  Interest and fees payable pursuant hereto shall be calculated on the basis of a 360-day year for the actual days elapsed, except that, with respect to ABR Loans the rate of interest on which is calculated on the basis of ABR, the interest thereon shall be calculated on the basis of a 365- (or 366-, as the case may be) day year for the actual days elapsed. The Administrative Agent shall as soon as practicable notify the Borrower and the relevant Lenders of each determination of a Eurodollar Rate. Any change in the interest rate on a Loan resulting from a change in the ABR or the Eurocurrency Reserve Requirements shall become effective as of the opening of business on the day on which such change becomes effective. The Administrative Agent shall as soon as practicable notify the Borrower and the relevant Lenders of the effective date and the amount of each such change in interest rate.

(b)  Each determination of an interest rate by the Administrative Agent pursuant to any provision of this Agreement shall constitute prima facie evidence of such amounts. The Administrative Agent shall, at the request of the Borrower or any Lender, deliver to the Borrower or such Lender a statement showing the quotations used by the Administrative Agent in determining any interest rate pursuant to Section 2.11(a).

2.13  *Inability to Determine Interest Rate*.

(a)  If prior to the first day of any Interest Period:

(i)  the Administrative Agent shall have determined (which determination shall be conclusive and binding upon the Borrower absent manifest error) that, by reason of circumstances affecting the relevant market, adequate and reasonable means do not exist for ascertaining the Eurodollar Rate for such Interest Period, *provided* that no Benchmark Transition Event shall have occurred at such time; or

35

(ii)   the Administrative Agent shall have received notice from the Required Lenders that the Eurodollar Rate determined or to be determined for such Interest Period will not adequately and fairly reflect the cost to such Lenders (as conclusively certified by such Lenders) of making or maintaining their affected Loans during such Interest Period,

the Administrative Agent shall give telecopy or telephonic notice thereof to the Borrower and the relevant Lenders as soon as practicable thereafter. If such notice is given (x) any Eurodollar Loans requested to be made on the first day of such Interest Period shall be made as ABR Loans, (y) any Loans that were to have been converted on the first day of such Interest Period to Eurodollar Loans shall be continued as ABR Loans and (z) any outstanding Eurodollar Loans shall be converted, on the last day of the then-current Interest Period, to ABR Loans. Until such notice has been withdrawn by the Administrative Agent, no further Eurodollar Loans shall be made or continued as such, nor shall the Borrower have the right to convert Loans to Eurodollar Loans.

(b)   Notwithstanding anything to the contrary herein or in any other Loan Document, upon the occurrence of a Benchmark Transition Event or an Early Opt-in Election, as applicable, the Administrative Agent and the Borrower may amend this Agreement to replace the Eurodollar Base Rate with a Benchmark Replacement. Any such amendment with respect to a Benchmark Transition Event will become effective at 5:00 p.m. on the fifth Business Day after the Administrative Agent has posted such proposed amendment to all Lenders and the Borrower, so long as the Administrative Agent has not received, by such time, written notice of objection to such proposed amendment from Lenders comprising the Required Lenders; *provided* that, with respect to any proposed amendment containing any SOFR-Based Rate, the Lenders shall be entitled to object only to the Benchmark Replacement Adjustment contained therein. Any such amendment with respect to an Early Opt-in Election will become effective on the date that Lenders comprising the Required Lenders have delivered to the Administrative Agent written notice that such Required Lenders accept such amendment. No replacement of the Eurodollar Base Rate with a Benchmark Replacement will occur prior to the applicable Benchmark Transition Start Date.

(c)   In connection with the implementation of a Benchmark Replacement, the Administrative Agent will have the right to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Benchmark Replacement Conforming Changes will become effective without any further action or consent of any other party to this Agreement.

(d)   The Administrative Agent will promptly notify the Borrower and the Lenders of (i) any occurrence of a Benchmark Transition Event or an Early Opt-in Election, as applicable, and its related Benchmark Replacement Date and Benchmark Transition Start Date, (ii) the implementation of any Benchmark Replacement, (iii) the effectiveness of any

36

Benchmark Replacement Conforming Changes and (iv) the commencement or conclusion of any Benchmark Unavailability Period. Any determination, decision or election that may be made by the Administrative Agent or Lenders pursuant to this Section 2.13, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party hereto, except, in each case, as expressly required pursuant to this Section 2.13.

(e)    Upon the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, the Borrower may revoke any request for a borrowing of Eurodollar Loans, or conversion or continuation of Eurodollar Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, (x) any Eurodollar Loans requested to be made shall be made as ABR Loans, (y) any Loans that were to have been converted to Eurodollar Loans shall be continued as ABR Loans and (z) any outstanding Eurodollar Loans shall be converted, on the last day of the then-current Interest Period, to ABR Loans.

2.14    *Pro Rata Treatment and Payments; Notes*.

(a)    [Reserved].

(b)    Each payment (including each prepayment) by the Borrower on account of principal of and interest on the Loans shall be made *pro rata* (i) in the case of the 364-Day Tranche Loans, according to the respective outstanding principal amounts of the 364-Day Tranche Loans then held by the 364-Day Tranche Lenders and (ii) in the case of the 18-Month Tranche Loans, according to the respective outstanding principal amounts of the 18-Month Tranche Loans then held by the 18-Month Tranche Lenders.

(c)    Notwithstanding anything to the contrary herein, all payments (including prepayments) to be made by the Borrower hereunder, whether on account of principal, interest, fees or otherwise, shall be made without setoff or counterclaim and shall be made prior to 4:00 P.M., New York City time, on the due date thereof to the Administrative Agent, for the account of the Lenders, as applicable, at the Funding Office, in Dollars and in immediately available funds. The Administrative Agent shall distribute such payments to the Lenders promptly upon receipt in like funds as received. If any payment hereunder (other than payments on the Eurodollar Loans) becomes due and payable on a day other than a Business Day, such payment shall be extended to the next succeeding Business Day. If any payment on a Eurodollar Loan becomes due and payable on a day other than a Business Day, the maturity thereof shall be extended to the next succeeding Business Day unless the result of such extension would be to extend such payment into another calendar month, in which event such payment shall be made on the immediately preceding Business Day. In the case of any extension of any payment of principal pursuant to the preceding two sentences, interest thereon shall be payable at the then applicable rate during such extension.

(d)   Unless the Administrative Agent shall have been notified in writing by any Lender prior to a borrowing that such Lender will not make the amount that would constitute its share of such borrowing available to the Administrative Agent, the Administrative Agent may assume that such Lender is making such amount available to the Administrative Agent, and the Administrative Agent may, in reliance upon such assumption, make available to the Borrower a corresponding amount. If such amount is not made available to the Administrative Agent by the required time on the Effective Date, such Lender shall pay to the Administrative Agent, on demand, such amount with interest thereon, at a rate equal to the greater of (i) the Federal Funds Effective Rate and (ii) a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation, for the period until such Lender makes such amount immediately available to the Administrative Agent. A certificate of the Administrative Agent submitted to any Lender with respect to any amounts owing under this paragraph shall be conclusive in the absence of manifest error. If such Lender's share of such borrowing is not made available to the Administrative Agent by such Lender within three Business Days after the Effective Date, the Administrative Agent shall also be entitled to recover such amount with interest thereon at the rate per annum applicable to ABR Loans from the Borrower within 30 days after written demand therefor.

(e)   Unless the Administrative Agent shall have been notified in writing by the Borrower prior to the date of any payment due to be made by the Borrower hereunder that the Borrower will not make such payment to the Administrative Agent, the Administrative Agent may assume that the Borrower is making such payment, and the Administrative Agent may, but shall not be required to, in reliance upon such assumption, make available to the Lenders their respective *pro rata* shares of a corresponding amount. If such payment is not made to the Administrative Agent by the Borrower within three Business Days after such due date, the Administrative Agent shall be entitled to recover, on demand, from each Lender to which any amount which was made available pursuant to the preceding sentence, such amount with interest thereon at the rate per annum equal to the daily average Federal Funds Effective Rate. Nothing herein shall be deemed to limit the rights of the Administrative Agent or any Lender against the Borrower.

(f)   The Borrower agrees that, upon the request to the Administrative Agent by any Lender, the Borrower will promptly execute and deliver to such Lender a promissory note (a "**Note**") of the Borrower evidencing any Loans (or any portion thereof) of such Lender, substantially in the form of Exhibit H, with appropriate insertions as to date and principal amount; *provided*, that delivery of Notes shall not be a condition precedent to the occurrence of the Effective Date or the making of the Loans on the Effective Date.

(g)   If any Lender shall fail to make any payment required to be made by it pursuant to Section 2.14(d), then the Administrative Agent may, in its discretion and notwithstanding any contrary provision hereof, (i) apply any amounts thereafter received by the Administrative Agent hereunder for the account of such Lender for the benefit of the Administrative Agent to satisfy such Lender's obligations to the Administrative Agent, as the case may be, under such Section until all such unsatisfied obligations are fully paid, and/or (ii) so long as such Lender is a Defaulting Lender, hold any such amounts in a segregated account as cash collateral for, and application to, any future funding obligations of such Lender under any such Section, in the case of each of clauses (i) and (ii) above, in any order as determined by the Administrative Agent in its discretion.

38

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 1270 of 1367

2.15    *Change of Law*.

(a)    If a Change of Law shall:

(i)    subject any Recipient to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its Loans, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto;

(ii)    impose, modify or hold applicable any reserve, special deposit, compulsory loan, Federal Deposit Insurance Corporation insurance charge or other similar insurance charge or similar requirement against assets held by, deposits or other liabilities in or for the account of, advances, loans or other extensions of credit by, or any other acquisition of funds by, any Lender that is not otherwise included in the determination of the Eurodollar Rate, which requirements are generally applicable to advances, loans and other extensions of credit made by such Lender; or

(iii)    impose on any Lender any other condition that is generally applicable to loans made by such Lender or participations therein;

and the result of any of the foregoing is to increase the cost to such Lender or such other Recipient, by an amount that such Lender or such other Recipient deems to be material, of making, converting into, continuing or maintaining the Loans, or to reduce any amount receivable hereunder in respect thereof, then, in any such case, the Borrower shall promptly pay such Lender or such other Recipient, within ten Business Days after its demand, any additional amounts necessary to compensate such Lender or such other Recipient for such increased cost or reduced amount receivable. If any Lender or other Recipient becomes entitled to claim any additional amounts pursuant to this paragraph, it shall promptly notify the Borrower (with a copy to the Administrative Agent) of the event by reason of which it has become so entitled; *provided*, *however*, that no Lender or other Recipient shall be entitled to demand such compensation more than 90 days following (x) the last day of the Interest Period in respect of which such demand is made or (y) the repayment of the Loan in respect of which such demand is made. Notwithstanding any other provision herein, no Lender shall demand compensation pursuant to this Section 2.15 if it shall not at the time be the general policy or practice of such Lender to demand such compensation from similarly situated borrowers (to the extent that such Lender has the right to do so under its credit facilities with similarly situated borrowers).

(b)    If any Lender shall have determined that a Change of Law regarding capital or liquidity requirements shall have the effect of reducing the rate of return on such Lender's capital or the capital of any corporation controlling such Lender as a consequence of its obligations hereunder to a level below that which such Lender or such corporation could have achieved but for such Change of Law (taking into consideration such Lender's

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 1271 of 1367

or such corporation's policies with respect to capital adequacy or liquidity) by an amount deemed by such Lender to be material, then from time to time, after submission by such Lender to the Borrower (with a copy to the Administrative Agent) of a written request therefor, the Borrower shall pay to such Lender such additional amount or amounts as will compensate such Lender or such corporation for such reduction.

(c) A certificate as to any additional amounts payable pursuant to this Section 2.15 submitted by any Lender or any other Recipient to the Borrower (with a copy to the Administrative Agent) shall constitute prima facie evidence of such costs or amounts. Notwithstanding anything to the contrary in this Section 2.15, the Borrower shall not be required to compensate a Lender or any other Recipient pursuant to this Section 2.15 for any amounts incurred more than six months prior to the date that such Lender or such other Recipient notifies the Borrower of such Lender's or such other Recipient's intention to claim compensation therefor; *provided* that, if the circumstances giving rise to such claim have a retroactive effect, then such six-month period shall be extended to include the period of such retroactive effect not to exceed twelve months. The obligations of the Borrower pursuant to this Section 2.15 shall survive for 90 days after the termination of this Agreement and the payment of the Loans and all other amounts then due and payable hereunder.

2.16  *Taxes*.

(a) Any and all payments by or on account of any obligation of the Borrower under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable laws. If any applicable laws (as determined in the good faith discretion of the Borrower or Administrative Agent making the payment) require the deduction or withholding of any Tax from any such payment, then (A) the Borrower or Administrative Agent, as applicable shall withhold or make such deductions as are determined by the Borrower or the Administrative Agent to be required, (B) the Borrower or Administrative Agent, as applicable shall timely pay the full amount withheld or deducted to the relevant Governmental Authority in accordance with such laws, and (C) to the extent that the withholding or deduction is made on account of Indemnified Taxes, the sum payable by the Borrower shall be increased as necessary so that after any required withholding or the making of all required deductions (including deductions applicable to additional sums payable under this Section 2.16) the applicable Recipient receives an amount equal to the sum it would have received had no such withholding or deduction been made.

(b) Without limiting the provisions of subsection (a) above, the Borrower shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(c) (i) The Borrower shall, and does hereby, indemnify each Recipient, and shall make payment in respect thereof within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 2.16) payable or paid by such Recipient

40

or required to be withheld or deducted from a payment to such Recipient, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender or another Recipient (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender or another Recipient, shall be conclusive absent manifest error.

(ii)    Each Lender shall, and does hereby, severally indemnify, and shall make payment in respect thereof within 10 days after demand therefor, (*x*) the Administrative Agent against any Indemnified Taxes attributable to such Lender (but only to the extent that the Borrower has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Borrower to do so), (*y*) the Administrative Agent against any Taxes attributable to such Lender's failure to comply with the provisions of Section 10.6(c)(iii) relating to the maintenance of a Participant Register and (*z*) the Administrative Agent against any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender, as the case may be, under this Agreement or any other Loan Document against any amount due to the Administrative Agent under this clause (ii).

(d)    Upon request by the Borrower or the Administrative Agent, as the case may be, after any payment of Taxes by the Borrower or by the Administrative Agent to a Governmental Authority as provided in this Section 2.16, the Borrower shall deliver to the Administrative Agent or the Administrative Agent shall deliver to the Borrower, as the case may be, the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of any return required by laws to report such payment or other evidence of such payment reasonably satisfactory to the Borrower or the Administrative Agent, as the case may be.

(e)    (i) Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 1273 of 1367

withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Sections 2.16(e)(ii)(A), (ii)(B) and (ii)(D) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)     Without limiting the generality of the foregoing,

(A)     any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(I)     in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BEN or W-8BEN-E, as applicable, establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or W-8BEN-E, as applicable, establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(II)     executed copies of IRS Form W-8ECI;

(III)     in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit G-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "**U.S. Tax Compliance Certificate**") and (y) executed copies of IRS Form W-8BEN or W-8BEN-E, as applicable; or

Case: 19-30088     Doc# 9156-3     Filed: 09/28/20     Entered: 09/28/20 16:25:53     Page 1274 of 1367

(IV)    to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN or W-8BEN-E, as applicable, a U.S. Tax Compliance Certificate substantially in the form of Exhibit G-2 or Exhibit G-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; *provided* that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit G-4 on behalf of each such direct and indirect partner.

(C)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(D)    if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3) (C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the Effective Date.

(iii)    Each Lender agrees that if any form or certification it previously delivered pursuant to this Section 2.16 expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(f)   At no time shall the Administrative Agent have any obligation to file for or otherwise pursue on behalf of a Lender, any refund of Taxes withheld or deducted from funds paid for the account of such Lender, as the case may be. If any Recipient determines, in its sole discretion exercised in good faith, that it has received a refund of, or credit with respect to, any Taxes as to which it has been indemnified pursuant to this Section 2.16 (including by the payment of additional amounts pursuant to this Section 2.16), it shall pay to the Borrower an amount equal to such refund or credit (but only to the extent of indemnity payments made under this Section 2.16 with respect to the Taxes giving rise to such refund or credit), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund or credit). The Borrower, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (f) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event such indemnified party is required to repay such refund or credit to such Governmental Authority. Notwithstanding anything to the contrary in this paragraph (f), in no event will the indemnified party be required to pay any amount to the Borrower pursuant to this paragraph (f) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund or credit had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This paragraph (f) shall not be construed to require any Recipient to make available its tax returns (or any other information relating to its Taxes that it deems confidential) to the Borrower or any other Person.

(g)   Each party's obligations under this Section 2.16 shall survive for one year after the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

2.17   *Indemnity*. The Borrower agrees to indemnify each Lender for, and to hold each Lender harmless from, any loss (other than the loss of Applicable Margin) or expense that such Lender may sustain or incur as a consequence of (a) default by the Borrower in making a borrowing of, conversion into or continuation of Eurodollar Loans after the Borrower has given a notice requesting the same in accordance with the provisions of this Agreement, (b) default by the Borrower in making any prepayment of or conversion from Eurodollar Loans after the Borrower has given a notice thereof in accordance with the provisions of this Agreement or (c) the making of a prepayment of Eurodollar Loans on a day that is not the last day of an Interest Period with respect thereto. A certificate as to any amounts payable pursuant to this Section submitted to the Borrower by any Lender shall be conclusive in the absence of manifest error. This covenant shall survive for 90 days after the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

44

2.18    *Change of Lending Office*. Each Lender agrees that, upon the occurrence of any event giving rise to the operation of Section 2.15 or 2.16 with respect to such Lender, it will, if requested by the Borrower, use reasonable efforts (subject to overall policy considerations of such Lender) to designate another lending office for any Loans affected by such event with the object of avoiding the consequences of such event; provided, that such designation is made on terms that, in the sole but reasonable judgment of such Lender, cause such Lender and its lending office(s) to suffer no unreimbursed economic disadvantage or any legal or regulatory disadvantage, and provided, further, that nothing in this Section shall affect or postpone any of the obligations of the Borrower or the rights of any Lender pursuant to Section 2.15 or 2.16.

2.19    *Replacement of Lenders*. The Borrower shall be permitted to replace any Lender that (a) requests (on its behalf or any of its Participants) reimbursement for amounts owing pursuant to Section 2.15 or 2.16, (b) provides notice under Section 2.21 or (c) becomes a Defaulting Lender, with a replacement financial institution; provided that (i) such replacement does not conflict with any Requirement of Law, (ii) no Event of Default shall have occurred and be continuing at the time of such replacement, (iii) prior to any such replacement, such Lender shall have taken no action under Section 2.18 which eliminates the continued need for payment of amounts owing pursuant to Section 2.15 or 2.16, (iv) the replacement financial institution shall purchase, at par, all Loans and other amounts owing to such replaced Lender on or prior to the date of replacement, (v) the Borrower shall be liable to such replaced Lender under Section 2.17 if any Eurodollar Loan owing to such replaced Lender shall be purchased other than on the last day of the Interest Period relating thereto, (vi) the replacement financial institution, if not already a Lender, shall be reasonably satisfactory to the Administrative Agent, (vii) the replaced Lender shall be obligated to make such replacement in accordance with the provisions of Section 10.6 (provided that the Borrower shall be obligated to pay the registration and processing fee referred to therein), (viii) until such time as such replacement shall be consummated, the Borrower shall pay all additional amounts (if any) required pursuant to Section 2.15 or 2.16, as the case may be, and (ix) any such replacement shall not be deemed to be a waiver of any rights that the Borrower, the Administrative Agent or any other Lender shall have against the replaced Lender.

2.20    *Defaulting Lenders*. Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by applicable law:

(a)    any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of that Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Section 7 or otherwise, and including any amounts made available to the Administrative Agent by that Defaulting Lender pursuant to Section 9.7), shall be applied at such time or times as may be determined by the Administrative Agent as follows: *first*, to the payment of any amounts owing by that Defaulting Lender to the Administrative Agent hereunder; *second*, as the Borrower may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which that Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; *third*, if so determined by

45

the Borrower with the consent of the Administrative Agent, not to be unreasonably withheld, to be held in a non-interest bearing deposit account and released in order to satisfy obligations of that Defaulting Lender to fund Loans under this Agreement; *fourth*, to the payment of any amounts owing to the Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Lender against that Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Agreement; *fifth*, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against that Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Agreement; and *sixth*, to that Defaulting Lender or as otherwise directed by a court of competent jurisdiction; provided that if such payment is a payment of the principal amount of the Loans in respect of which that Defaulting Lender has not fully funded its appropriate share such payment shall be applied solely to pay the Loans of all non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of that Defaulting Lender. Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender pursuant to this Section 2.20(a) shall be deemed paid to and redirected by that Defaulting Lender, and each Lender irrevocably consents hereto;

(b)  [Reserved];

(c)  [Reserved];

(d)  [Reserved]; and

(e)  that Defaulting Lender's right to approve or disapprove any amendment, supplement, modification, waiver or consent with respect to this Agreement shall be restricted as set forth in the definition of "Required Lenders" and Section 10.1.

If the Borrower and the Administrative Agent reasonably determine in writing that a Defaulting Lender should no longer be deemed to be a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein (which may include arrangements with respect to any cash collateral), that Lender will, to the extent applicable, purchase that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Loans to be held on a pro rata basis by the Lenders in accordance with their Percentages, whereupon that Lender will cease to be a Defaulting Lender; provided that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while that Lender was a Defaulting Lender; and provided, further, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

2.21  *Illegality*. If any Lender determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender or its applicable lending office to make, maintain, or fund Loans whose interest is determined by

46

reference to the Eurodollar Rate, or to determine or charge interest rates based upon the Eurodollar Rate, or any Governmental Authority has imposed material restrictions on the authority of such Lender to purchase or sell, or to take deposits of, Dollars in the London interbank market, then, upon notice thereof by such Lender to the Borrower (through the Administrative Agent), (a) any obligation of such Lender to make or continue Eurodollar Loans or to convert ABR Loans to Eurodollar Loans shall be suspended, and (b) if such notice asserts the illegality of such Lender making or maintaining ABR Loans the interest rate on which is determined by reference to the Eurodollar Rate component of the ABR, the interest rate on which ABR Loans of such Lender shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to the Eurodollar Rate component of the ABR, in each case until such Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such determination no longer exist. Upon receipt of such notice, (i) the Borrower shall, upon demand from such Lender (with a copy to the Administrative Agent), prepay or, if applicable, convert all Eurodollar Loans of such Lender to ABR Loans (the interest rate on which ABR Loans of such Lender shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to the Eurodollar Rate component of the ABR), either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such Eurodollar Loans to such day, or immediately, if such Lender may not lawfully continue to maintain such Eurodollar Loans and (ii) if such notice asserts the illegality of such Lender determining or charging interest rates based upon the Eurodollar Rate, the Administrative Agent shall during the period of such suspension compute the ABR applicable to such Lender without reference to the Eurodollar Rate component thereof until the Administrative Agent is advised in writing by such Lender that it is no longer illegal for such Lender to determine or charge interest rates based upon the Eurodollar Rate. Upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so prepaid or converted, together with any additional amounts required pursuant to Section 2.17.

SECTION 3.   [RESERVED].

SECTION 4.   REPRESENTATIONS AND WARRANTIES

To induce the Administrative Agent and the Lenders to enter into this Agreement and to make the Loans, the Borrower hereby represents and warrants to the Administrative Agent and each Lender, on the Effective Date, that:

4.1   *Financial Condition*. (a) The audited consolidated balance sheet of the Borrower and its consolidated Subsidiaries as of December 31, 2019, and the related consolidated statements of income and cash flows for the fiscal year ended on such date, reported on by Deloitte & Touche LLP, and (b) the unaudited consolidated balance sheet of the Borrower and its consolidated Subsidiaries as of March 31, 2020, and the related consolidated statements of income and cash flows for the portion of the fiscal year ended on such date, each delivered to the Administrative Agent prior to the Effective Date, in each case, (i) were prepared in accordance with GAAP consistently applied throughout the periods covered thereby, except as otherwise expressly noted therein, and (ii) present fairly in all material respects the consolidated financial condition of the Borrower and its

47

consolidated Subsidiaries as of such date, and its consolidated income and its consolidated cash flows for the respective fiscal year or portion of the fiscal year then ended, subject, in the case of the financial statements referred to in clause (b), to the absence of footnotes and to normal year-end audit adjustments.

4.2    *No Change*. Since December 31, 2019, no Specified Material Adverse Effect has occurred.

4.3    *Existence; Compliance with Law*. Each of the Borrower and its Significant Subsidiaries (a) is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization, (b) has the organizational power and organizational authority to own and operate its property, to lease the property it operates as lessee and to conduct the business in which it is currently engaged, (c) is duly qualified as a foreign corporation or other organization and in good standing under the laws of each jurisdiction where its ownership, lease or operation of property or the conduct of its business requires such qualification except to the extent that the failure to so qualify could not reasonably be expected to have a Material Adverse Effect and (d) is in compliance with all Requirements of Law except for any Requirements of Law being contested in good faith by appropriate proceedings and except to the extent that the failure to comply therewith could not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

4.4    *Power; Authorization; Enforceable Obligations*. The Borrower has the corporate power and corporate authority to execute and deliver and to perform its obligations under the Loan Documents and to obtain extensions of credit hereunder. The Borrower has taken all necessary corporate action to authorize the execution and delivery of, and performance of its obligations under, the Loan Documents to which it is a party and to authorize the extensions of credit on the terms and conditions of this Agreement. No consent or authorization of, filing with, notice to or other act by or in respect of, any Governmental Authority or any other Person is required in connection with the extensions of credit hereunder or with the execution, delivery, performance, validity or enforceability of this Agreement or any of the Loan Documents, except (i) consents, authorizations, filings and notices which have been obtained or made and are in full force and effect, (ii) any consent, authorization or filing that may be required in the future the failure of which to make or obtain could not reasonably be expected to have a Material Adverse Effect and (iii) applicable Requirements of Law (including the approval of the CPUC) prior to foreclosure or other exercise of remedies under the Loan Documents. This Agreement has been, and each other Loan Document upon execution and delivery will be, duly executed and delivered. This Agreement constitutes, and each other Loan Document upon execution will constitute, a legal, valid and binding obligation of the Borrower, enforceable against the Borrower in accordance with its terms, except as enforceability may be limited by (x) applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally, laws of general application related to the enforceability of securities secured by real estate and by general equitable principles (whether enforcement is sought by proceedings in equity or at law) and (y) applicable Requirements of Law (including the approval of the CPUC) prior to foreclosure or other exercise of remedies hereunder or under the Loan Documents.

48

4.5    *No Legal Bar*. The execution and delivery of, and the performance of the obligations under, this Agreement and the other Loan Documents, the borrowing of the Loans hereunder and the use of the proceeds thereof will not violate in any material respect any Requirement of Law or any Contractual Obligation of the Borrower or any of its Significant Subsidiaries and will not result in, or require, the creation or imposition of any Lien on any of their respective properties or revenues pursuant to any Requirement of Law or any such Contractual Obligation (other than the Liens created by the Loan Documents and the FMB Indenture).

4.6    *Litigation*. (a) No litigation, investigation or proceeding of or before any arbitrator or Governmental Authority is pending or, to the knowledge of the Borrower, threatened in writing by or against the Borrower or any of its Significant Subsidiaries or against any of their respective material properties or revenues with respect to any of the Loan Documents.

(b)    No litigation, investigation or proceeding of or before any arbitrator or Governmental Authority is pending or, to the knowledge of the Borrower, threatened in writing by or against the Borrower or any of its Significant Subsidiaries or against any of their respective material properties or revenues, except as disclosed in the Specified Exchange Act Filings, that could reasonably be expected to have a Material Adverse Effect.

4.7    *No Default*. No Default or Event of Default has occurred and is continuing.

4.8    *Taxes*. The Borrower and each of its Significant Subsidiaries has filed or caused to be filed all Federal and state returns of income and franchise taxes imposed in lieu of net income taxes and all other material tax returns that are required to be filed and has paid all taxes shown to be due and payable on said returns or with respect to any claims or assessments for taxes made against it or any of its property by any Governmental Authority (other than (i) any amounts the validity of which are currently being contested in good faith by appropriate proceedings and with respect to which reserves in conformity with GAAP have been provided on the books of the Borrower or any of its Significant Subsidiaries, as applicable, and (ii) claims which could not reasonably be expected to have a Material Adverse Effect). No material tax Liens have been filed against the Borrower or any of its Significant Subsidiaries other than (A) Liens for taxes which are not delinquent or (B) Liens for taxes which are being contested in good faith by appropriate proceedings and with respect to which reserves in conformity with GAAP have been provided on the books of the Borrower or any of its Significant Subsidiaries, as applicable.

4.9    *Federal Regulations*. No part of the proceeds of any Loans hereunder, will be used for "buying" or "carrying" any "margin stock" within the respective meanings of each of the quoted terms under Regulation U as now and from time to time hereafter in effect or for any purpose that violates the provisions of the Regulations of the Board.

4.10    *ERISA*. No Reportable Event has occurred during the five year period prior to the date on which this representation is made or deemed made with respect to any Plan, and each Plan has complied with the applicable provisions of ERISA and the Code, except, in each case, to the extent that any such Reportable Event or failure to comply with the

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 1281 of 1367

applicable provisions of ERISA or the Code could not reasonably be expected to result in a Material Adverse Effect. During the five year period prior to the date on which this representation is made or deemed made, there has been no (i) failure to make a required contribution to any Plan that would result in the imposition of a Lien or other encumbrance or the provision of security under Section 430 of the Code or Section 303 or 4068 of ERISA, or the arising of such a Lien or encumbrance; or (ii) "unpaid minimum required contribution" or "accumulated funding deficiency" (as defined or otherwise set forth in Section 4971 of the Code or Part 3 of Subtitle B of Title I of ERISA), whether or not waived, except, in each case, to the extent that such event could not reasonably be expected to result in a Material Adverse Effect. No termination of a Single Employer Plan has occurred, and no Lien in favor of the PBGC or a Plan has arisen, during such five-year period. The present value of all accrued benefits under each Single Employer Plan (based on those assumptions used to fund such Plan) did not, as of the last annual valuation date for which a certified actuarial valuation report is available prior to the date on which this representation is made or deemed made, exceed the value of the assets of such Plan allocable to such accrued benefits, except as could not reasonably be expected to result in a Material Adverse Effect. Neither the Borrower nor any Commonly Controlled Entity has had a complete or partial withdrawal from any Multiemployer Plan during the five year period prior to the date on which this representation is made or deemed made that has resulted or could reasonably be expected to result in a material liability under ERISA, and neither the Borrower nor any Commonly Controlled Entity would become subject to any liability under ERISA if the Borrower or any such Commonly Controlled Entity were to withdraw completely from all Multiemployer Plans as of the valuation date most closely preceding the date on which this representation is made or deemed made, except as could not reasonably be expected to result in a Material Adverse Effect. No such Multiemployer Plan is in endangered or critical status (within the meaning of Section 305 of ERISA) or in Insolvency.

4.11    *Investment Company Act; Other Regulations*. The Borrower is not an "investment company", or a company "controlled" by an "investment company", within the meaning of the Investment Company Act of 1940, as amended. On the Effective Date, the Borrower is not subject to regulation under any Requirement of Law (other than (a) Regulation X of the Board and (b) Sections 817-830, and Sections 701 and 851 of the California Public Utilities Code) that limits its ability to incur Indebtedness under this Agreement.

4.12    *Use of Proceeds*. The proceeds of the Loans shall be used to fund the transactions contemplated under the Plan of Reorganization.

4.13    *Environmental Matters*. Except as disclosed in the Specified Exchange Act Filings, the Borrower and its Significant Subsidiaries are not subject to any pending violations or liabilities under Environmental Laws or relating to the disposal, spill or other release of Materials of Environmental Concern that would reasonably be expected to have a Material Adverse Effect, and, to the knowledge of the Borrower, there are no facts, circumstances or conditions that could reasonably be expected to give rise to such violations or liabilities.

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 1282 of 1367

4.14   *Regulatory Matters*. Solely by virtue of the execution, delivery and performance of, or the consummation of the transactions contemplated by this Agreement, no Lender shall be or become subject to regulation (a) under the FPA or (b) as a "public utility" or "public service corporation" or the equivalent under any Requirement of Law.

4.15   *Sanctions; Anti-Corruption*. None of the Borrower, any of its Subsidiaries, nor, to the knowledge of the Borrower, any director, officer, agent, Affiliate or employee of the Borrower or any of its Subsidiaries is currently (i) the subject of any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department or the U.S. State Department ("**Sanctions**") or (ii) located, organized or resident in a country or territory that is, or whose government is, the subject of any Sanctions. None of the Borrower, any of its Subsidiaries nor, to the knowledge of the Borrower, any director, officer, agent, Affiliate or employee of the Borrower or any of its Subsidiaries, has taken any action, directly or indirectly, that would result in a violation in any material respect by any such Person of the United States Foreign Corrupt Practices Act of 1977, as amended ("**FCPA**") or of any other anti-bribery or anti-corruption laws, rules, regulations legally applicable to such Persons (collectively, "**Anti-Corruption Laws**"). The Borrower will not use the proceeds of the Loans, or lend, contribute or otherwise make available such proceeds (a) to any Subsidiary, Affiliate, joint venture partner or other Person or entity, to fund the activities of any Person, or in any country or territory, that, at the time of such funding, is, or whose government is, the subject of any Sanctions, or (b) directly, or, to the knowledge of the Borrower, indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the FCPA or of any Anti-Corruption Laws.

4.16   *Affected Financial Institutions*. The Borrower is not an Affected Financial Institution.

4.17   *Solvency*. The Borrower and its Subsidiaries, on a consolidated basis, are Solvent as of the Effective Date (after giving effect to the Plan of Reorganization and the transactions described therein).

4.18   *Disclosure*.

(a)   All written information relating to the Borrower, its Subsidiaries and their respective businesses, other than any projections, estimates and other forward-looking materials and information of a general economic or industry specific nature, that has been provided by or on behalf of the Borrower to the Administrative Agent or the Lenders in connection with the transactions contemplated hereby does not, when taken as a whole, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements were made (giving effect to all supplements and updates thereto). Any projected information, estimates, other forward-looking materials and pro forma financial information that have been made available to any Lenders or the Administrative Agent prior to the Effective Date in connection with the transactions contemplated hereby have been prepared in good faith based upon assumptions believed

51

by the Borrower to be reasonable as of the date such information was furnished to the Lenders and as of the Effective Date (it being understood that actual results may vary materially from such projections and pro forma information and such projections and pro forma information are not a guarantee of performance).

(b) As of the Effective Date, to the knowledge of the Borrower, the information included in any Beneficial Ownership Certification provided on or prior to the Effective Date to any Lender in connection with this Agreement is true and correct in all respects.

4.19 *Status of Obligations*. The issuance to the Administrative Agent of the Senior Bonds provides the Lenders, as beneficial holders of the Senior Bonds through the Administrative Agent, the benefit of the Lien of the FMB Indenture equally and ratably with the holders of other First Mortgage Bonds.

4.20 *Ownership of Property*. As of the Effective Date, each of the Borrower and its Significant Subsidiaries has good title to, or valid leasehold interests in, all its real and personal property material to its business, subject to no Liens other than Liens permitted under Section 7.3, except for where the failure would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

4.21 *Covered Entity*. The Borrower is not a Covered Entity.

SECTION 5. CONDITIONS PRECEDENT

5.1 *Conditions to the Effective Date*. The occurrence of the Effective Date and the obligation of each Lender to make its Loans hereunder on the Effective Date is subject to the satisfaction of the following conditions precedent:

(a) *Credit Agreement*. The Administrative Agent shall have received this Agreement (including copies of all schedules attached hereto in a form reasonably satisfactory to the Lenders), executed and delivered by the Administrative Agent, the Borrower and each Person listed on Schedule 1.1.

(b) *Consents and Approvals*. All governmental and third party consents and approvals necessary in connection with the execution and delivery of this Agreement and the other Loan Documents and the consummation of the transactions contemplated hereby shall have been obtained and be in full force and effect; and the Administrative Agent shall have received a certificate of a Responsible Officer to the foregoing effect.

(c) *KYC Information*. At least three (3) Business Days prior to the Effective Date, the Administrative Agent and each Lender shall have received all documentation and information relating to the Borrower as is reasonably requested in writing by the Administrative Agent and/or any such Lender at least ten (10) Business Days prior to the Effective Date that is required by Governmental Authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the Patriot Act and the Beneficial Ownership Regulation. If the Borrower qualifies as a "legal entity customer" under the Beneficial Ownership Regulation and the Administrative Agent or any Lender so request at least five (5) Business Days prior to the Effective Date, then at least three (3)

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 1284 of 1367

Business Days prior to the Effective Date, the Borrower shall have delivered to the Administrative Agent and/or any such Lender a Beneficial Ownership Certification in relation to the Borrower.

(d)     *Bond Documents*. The Administrative Agent shall have received:

(i)     the Bond Delivery Agreement, duly executed and delivered by the Borrower and Administrative Agent;

(ii)     the Senior Bonds in a face amount equal to the Loans as of the Effective Date, duly issued and authenticated under the FMB Indenture and in a form reasonably satisfactory to the Administrative Agent;

(iii)     the Supplemental Indenture, duly executed and delivered by the Borrower and the Indenture Trustee and in a form reasonably satisfactory to the Administrative Agent;

(iv)     a certificate of a duly authorized officer of the Indenture Trustee certifying that each Senior Bond has been authenticated and is outstanding under the FMB Indenture;

(v)     copies of all legal opinions and other documents delivered to the Indenture Trustee by or on behalf of the Borrower on or prior to the Effective Date in connection with the issuance of each Senior Bond; and

(vi)     copies of all title reports and commitments as of the Effective Date with respect to the Mortgaged Property consisting of real property as to which Liens in favor of the Indenture Trustee, for the benefit of the holders of the First Mortgage Bond, has been granted.

(e)     *Fees*. The Lenders, the Arrangers and the Administrative Agent shall have received all fees required to be paid, and all expenses for which invoices have been presented (including the reasonable fees and expenses of legal counsel) on or before the date that is two (2) Business Days prior to the Effective Date.

(f)     *Closing Certificate; Certified Articles of Incorporation; Good Standing Certificates*. The Administrative Agent shall have received (i) a certificate of the Borrower, dated the Effective Date, substantially in the form of Exhibit D, with appropriate insertions and attachments, including the articles of incorporation of the Borrower certified as of a recent date by the Secretary of State of the State of California, (ii) a good standing certificate for the Borrower dated as of a recent date from the Secretary of State of the State of California, and (iii) a certificate of a Responsible Officer, dated the Effective Date, confirming the satisfaction of the conditions precedent set forth in Sections 5.1(h) and (i).

(g)     *Legal Opinion*. The Administrative Agent shall have received the legal opinion of (i) Hunton Andrews Kurth LLP, counsel to the Borrower, and (ii) Munger, Tolles & Olson LLP, special California regulatory counsel to the Borrower, each in a form reasonably satisfactory to the Administrative Agent.

53

Case: 19-30088     Doc# 9156-3     Filed: 09/28/20     Entered: 09/28/20 16:25:53     Page 1285 of 1367

(h)   *Representations and Warranties*. Each of the representations and warranties made by the Borrower in this Agreement that does not contain a materiality qualification shall be true and correct in all material respects on and as of the Effective Date, and each of the representations and warranties made by the Borrower in this Agreement that contains a materiality qualification shall be true and correct on and as of the Effective Date (or, in each case, to the extent such representations and warranties specifically relate to an earlier date, that such representations and warranties were true and correct in all material respects, or true and correct, as the case may be, as of such earlier date).

(i)   *No Default*. No Default or Event of Default shall have occurred and be continuing on the Effective Date or would result from the funding of the Loans on the Effective Date.

(j)   *Notice of Borrowing*. The Administrative Agent shall have received a notice of borrowing in accordance with the requirements of Section 2.2.

(k)   *Solvency*. The Administrative Agent shall have received a solvency certificate from the chief financial officer of the Borrower in substantially the form of Exhibit I hereto.

SECTION 6.   AFFIRMATIVE COVENANTS

The Borrower hereby agrees that, so long as any Loan, any interest on any Loan or any fee payable to any Lender or the Administrative Agent hereunder remains outstanding, or any other amount then due and payable is owing to any Lender or the Administrative Agent hereunder, the Borrower shall and, with respect to Sections 6.3 and 6.6(b), shall cause its Significant Subsidiaries to:

6.1   *Financial Statements*. Furnish to the Administrative Agent with a copy for each Lender, and the Administrative Agent shall deliver to each Lender:

(a)   as soon as available, but in any event within 120 days after the end of each fiscal year of the Borrower, a copy of the audited consolidated balance sheet of the Borrower and its consolidated Subsidiaries as at the end of such year and the related audited consolidated statements of income and cash flows for such year, setting forth in each case in comparative form the figures for the previous year, reported on without a "going concern" or like qualification or exception, or qualification arising out of the scope of the audit, by Deloitte & Touche LLP or other independent certified public accountants of nationally recognized standing; and

(b)   as soon as available, but in any event not later than 60 days after the end of each of the first three quarterly periods of each fiscal year of the Borrower, the unaudited consolidated balance sheet of the Borrower and its consolidated Subsidiaries as at the end of such quarter and the related unaudited consolidated statements of income and cash flows for such quarter and the portion of the fiscal year through the end of such quarter, setting forth in each case in comparative form the figures for the previous year, certified by a Responsible Officer as being fairly stated in all material respects (subject to the absence of footnotes and normal year-end audit adjustments).

54

All such financial statements shall (x) be complete and correct in all material respects and (y) shall be prepared in reasonable detail and in accordance with GAAP applied (except as approved by such accountants or officer, as the case may be, and disclosed in reasonable detail therein) consistently throughout the periods reflected therein and with prior periods, subject, in each case to the absence of footnotes and to normal year-end audit adjustments. The Borrower shall be deemed to have delivered the financial statements required to be delivered pursuant to this Section 6.1 upon the filing of such financial statements by the Borrower through the SEC's EDGAR system (or any successor electronic gathering system that is publicly available free of charge) or the publication by the Borrower of such financial statements on its website.

6.2  *Certificates; Other Information*. Furnish to the Administrative Agent, for delivery to the Lenders:

(a)  within two Business Days after the delivery of any financial statements pursuant to Section 6.1, (i) a certificate of a Responsible Officer stating that such Responsible Officer has obtained no actual knowledge of any Default or Event of Default except as specified in such certificate and (ii) a Compliance Certificate, substantially in the form of Exhibit C, containing all information and calculations reasonably necessary for determining compliance by the Borrower with the provisions of this Agreement referred to therein as of the last day of the fiscal quarter or fiscal year of the Borrower, as the case may be;

(b)  within five days after the same are sent, copies of all financial statements and reports that the Borrower sends to the holders of any class of its debt securities or public equity securities, *provided* that, such financial statements and reports shall be deemed to have been delivered upon the filing of such financial statements and reports by the Borrower through the SEC's EDGAR system (or any successor electronic gathering system that is publicly available free of charge) or publication by the Borrower of such financial statements and reports on its website;

(c)  promptly, such additional financial and other information (other than any such information the disclosure of which is prohibited by applicable law or binding agreement or subject to attorney-client privilege or constitutes attorney-work product or constitutes non-financial trade secrets or non-financial proprietary information so long as (x) such confidentiality obligation was not entered into in contemplation hereof and (y) the Borrower provides such Lender with notice that information is being withheld due to the existence of such confidentiality obligation) as any Lender, through the Administrative Agent, may from time to time reasonably request; and

(d)  promptly, such documentation and other information that the Administrative Agent or such Lender reasonably requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the Patriot Act and the Beneficial Ownership Regulation.

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 1287 of 1367

6.3    *Payment of Taxes*. Pay all taxes due and payable or any other tax assessments made against the Borrower or any of its Significant Subsidiaries or any of their respective property by any Governmental Authority (other than (i) any amounts the validity of which are currently being contested in good faith by appropriate proceedings and with respect to which reserves in conformity with GAAP have been provided on the books of the Borrower or any of its Significant Subsidiaries, as applicable or (ii) where the failure to effect such payment could not reasonably be expected to have a Material Adverse Effect).

6.4    *Maintenance of Existence; Compliance*. (a)(i) Preserve, renew and keep in full force and effect its organizational existence and (ii) take all reasonable action to maintain all rights, privileges and franchises necessary or desirable in the normal conduct of its business, except, in each case, as otherwise permitted by Section 7.4 and except, in the case of clause (ii) above, to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect; (b) comply with all Contractual Obligations except to the extent that failure to comply therewith could not, in the aggregate, reasonably be expected to have a Material Adverse Effect and (c) comply with all Requirements of Law except for any Requirements of Law being contested in good faith by appropriate proceedings or except to the extent that failure to comply therewith could not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

6.5    *Maintenance of Property; Insurance*. (a) Keep all property useful and necessary in its business in good working order and condition, ordinary wear and tear and casualty excepted, except to the extent that failure to do so could not, in the aggregate, reasonably be expected to have a Material Adverse Effect, and (b) maintain with financially sound and reputable insurance companies insurance on all its material property in at least such amounts and against at least such risks as are usually insured against in the same general area by companies engaged in the same or a similar business of comparable size and financial strength and owning similar properties in the same general areas in which the Borrower operates, which may include self-insurance, if determined by the Borrower to be reasonably prudent.

6.6    *Inspection of Property; Books and Records; Discussions*. (a) Keep proper books of records and account in which full, true and correct entries in conformity with GAAP and all Requirements of Law shall be made of all dealings and transactions in relation to its business and activities and (b) unless a Default or Event of Default has occurred and is continuing, not more than once a year and after at least five Business Days' notice, (i) permit representatives of any Lender to visit and inspect any of its properties and examine and make abstracts from any of its books and records at any reasonable time to discuss the business, operations, properties and financial and other condition of the Borrower and its Significant Subsidiaries with officers and employees of the Borrower and its Significant Subsidiaries and (ii) use commercially reasonable efforts to provide for the Lenders (in the presence of representatives of the Borrower) to meet with the independent certified public accountants of the Borrower and its Significant Subsidiaries; provided, that any such visits or inspections shall be subject to such conditions as the Borrower and each of its Significant Subsidiaries shall deem necessary based on reasonable considerations of safety, security and confidentiality; and provided, further, that neither the Borrower nor any Significant Subsidiary shall be required to disclose to any Person any information the disclosure of which is prohibited by applicable law or binding agreement or subject to

56

attorney-client privilege or constitutes attorney-work product or constitutes non-financial trade secrets or non-financial proprietary information so long as (x) such confidentiality obligation was not entered into in contemplation hereof and (y) the Borrower provides such Lender with notice that information is being withheld due to the existence of such confidentiality obligation.

6.7    *Notices*. Give notice to the Administrative Agent, and the Administrative Agent shall deliver such notice to each Lender, promptly upon any Responsible Officer obtaining knowledge of:

(a)    the occurrence of any Default or Event of Default;

(b)    any change in the Rating issued by either S&P or Moody's; and

(c)    the occurrence of an ERISA Event which, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect (provided, that, any judicial proceeding instituted by PBGC that, within 60 days after the institution of such proceeding, has been withdrawn or stayed by PBGC or otherwise, shall be disregarded for the purpose of this Section 6.7(c)).

6.8    *Maintenance of Licenses, etc.* Maintain in full force and effect any authorization, consent, license or approval of any Governmental Authority necessary for the conduct of the Borrower's business as now conducted by it or necessary in connection with this Agreement, except to the extent the failure to do so could not reasonably be expected to have a Material Adverse Effect.

6.9    *Further Assurances*.

(a)    (i) Comply with Section 7.08(a) of the FMB Indenture, (ii) deliver to the Administrative Agent within 120 days after the Effective Date, a copy of the Opinion of Counsel (as defined in the FMB Indenture) delivered to the Indenture Trustee under Section 7.08(a)(i) of the FMB Indenture relating the Supplemental Indenture and (iii) deliver to the Administrative Agent a copy of each Opinion of Counsel delivered to the Indenture Trustee under Section 7.08(a)(ii) of the FMB Indenture relating to the Supplemental Indenture.

(b)    Promptly upon the reasonable request by the Administrative Agent, or by the Required Lenders through the Administrative Agent, (i) correct any material defect or error that may be discovered in any Loan Document or the execution, acknowledgment, filing or recordation thereof and (ii) do, execute, acknowledge and deliver any and all such further certificates, documents, agreements and other instruments as reasonably required from time to time to carry out more effectively the purposes of the Loan Documents.

6.10    *Use of Proceeds*. The Borrower shall use the proceeds of the Loans in accordance with Section 4.12.

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 1289 of 1367

## SECTION 7.   NEGATIVE COVENANTS

The Borrower hereby agrees that, so long as any Loan, or any interest on any Loan or any fee payable to any Lender or the Administrative Agent hereunder remains outstanding, or any other amount then due and payable is owing to any Lender or the Administrative Agent hereunder, the Borrower shall not and shall not permit its Significant Subsidiaries to:

7.1   *Indebtedness*. At all times prior to the Indebtedness Covenant Release Date, create, incur, assume or permit to exist any Indebtedness, except for:

(a)   Indebtedness and other Obligations created hereunder;

(b)   Indebtedness of the Borrower under the Utility Revolving Credit Agreement in an aggregate outstanding principal amount not to exceed $3,500,000,000 plus any additional amounts permitted to be incurred thereunder pursuant to Section 2.3 of the Utility Revolving Credit Agreement as in effect on the date hereof and any Permitted Refinancing thereof;

(c)   Indebtedness of the Borrower outstanding on the Effective Date in an aggregate outstanding principal amount not to exceed, together with any Loans outstanding hereunder on the Effective Date, $33,350,000,000 and any Permitted Refinancing thereof;

(d)   Indebtedness (i) pursuant to tenders, statutory obligations, bids, leases, governmental contracts, trade contracts, surety, stay, customs, appeal, performance and/or return of money bonds or other similar obligations incurred in the ordinary course of business and (ii) in respect of letters of credit, bank guaranties, surety bonds, performance bonds or similar instruments and reimbursement obligations to support any of the foregoing items;

(e)   (i) Guarantee Obligations with respect to the obligations of suppliers, customers and licensees and other third parties in the ordinary course of business, (ii) Indebtedness incurred in the ordinary course of business to pay the deferred purchase price of goods or services or progress payments in connection with such goods and services and (iii) Indebtedness in respect of letters of credit, bankers' acceptances, bank guaranties or similar instruments supporting trade payables, warehouse receipts or similar facilities entered into in the ordinary course of business, workers compensation claims or other employee benefits;

(f)   Guarantee Obligations with respect to Indebtedness otherwise permitted to be incurred pursuant to this Section 7.1 and Guarantee Obligations with respect to the obligations of Subsidiaries and joint ventures of the Borrower; provided that no such Guarantee Obligations with respect to Indebtedness of the Borrower constituting debt for borrowed money or evidenced by notes, bonds, debentures or other similar instruments (including, for the avoidance of doubt, the First Mortgage Bonds) shall be permitted except to the extent provided by a Person that is, or concurrently with providing such Guarantee Obligations becomes, a guarantor of the Obligations hereunder on terms and pursuant to documentation reasonably satisfactory to the Administrative Agent;

58

(g)  Indebtedness consisting of (i) the financing of insurance premiums and/or (ii) take-or-pay obligations contained in supply arrangements;

(h)  Indebtedness with respect to Capital Lease Obligations and purchase money Indebtedness; *provided*, that the aggregate outstanding principal amount of Indebtedness with respect to Capital Lease Obligations shall not exceed $500,000,000 at any one time;

(i)  (i) obligations under any Cash Management Agreement and (ii) Indebtedness under any Swap Agreement permitted under Section 7.6;

(j)  Indebtedness arising from any agreement providing for indemnification, adjustment or purchase price or similar obligations (including contingent earn-out obligations) incurred in connection with any Disposition or any purchase of assets or Capital Stock, and Indebtedness arising from guaranties, letters of credit, bank guaranties, surety bonds, performance bonds or similar instruments securing the performance of the Borrower or its Subsidiaries pursuant to any such agreement;

(k)  Indebtedness in respect of banking services and incentive, supplier finance or similar programs incurred in the ordinary course of business;

(l)  customer deposits and advance payments received in the ordinary course of business from customers for goods and services purchased in the ordinary course of business;

(m)  Indebtedness representing deferred compensation to employees, consultants or independent contractors incurred in the ordinary course of business;

(n)  Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or other similar instrument drawn against insufficient funds in the ordinary course of business;

(o)  endorsements for collection or deposit in the ordinary course of business;

(p)  Indebtedness issued or incurred to fund rate base growth in an aggregate outstanding principal amount not to exceed $9,000,000,000 at any time and any Permitted Refinancing thereof; and

(q)  other Indebtedness of the Borrower in an aggregate outstanding principal amount not to exceed the excess, if any, of 10% of Net Tangible Assets of the Borrower over the amount of Indebtedness incurred pursuant to clause (p) above.

Notwithstanding anything herein to the contrary, no Guarantee Obligations from any Significant Subsidiary of the Borrower with respect to Indebtedness of the Borrower constituting debt for borrowed money or evidenced by notes, bonds, debentures or other similar instruments (including, for the avoidance of doubt, the First Mortgage Bonds) shall be permitted hereunder except to the extent provided by a Person that is, or concurrently with providing such Guarantee Obligations becomes, a guarantor of the Obligations hereunder on terms and pursuant to documentation reasonably satisfactory to the Administrative Agent.

59

7.2    *Consolidated Capitalization Ratio*. Permit the Consolidated Capitalization Ratio on the last day of any fiscal quarter, from and after the last day of the first fiscal quarter ending after the Effective Date, to exceed 0.65 to 1.00.

7.3    *Liens*. Create, incur, assume or suffer to exist any Lien upon any assets of the Borrower or any Significant Subsidiary, whether now owned or hereafter acquired, except for (a) Liens securing the Obligations under this Agreement and the other Loan Documents and (b) Liens permitted under Section 7.06(b) of the FMB Indenture.

7.4    *Fundamental Changes*. Enter into any merger, consolidation or amalgamation, or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), or Dispose of all or substantially all of its property or business (including, without limitation, rental equipment or leasehold interests and excluding the sale or transfer of any accounts receivable or of any amounts that are accrued and recorded in a regulatory account for collections by the Borrower, in each case, in connection with a securitization transaction including, without limitation, any A/R Securitization Transaction), except that the Borrower may be merged, consolidated or amalgamated with another Person or Dispose of all or substantially all of its property or business so long as, after giving effect to such transaction, (a) no Default or Event of Default shall have occurred and be continuing, (b) either (i) the Borrower is the continuing or surviving corporation of such merger, consolidation or amalgamation or (ii) the continuing or surviving corporation of such merger, consolidation or amalgamation, if not the Borrower or the purchaser, (x) shall be an entity organized or existing under the laws of the United States, any state thereof or the District of Columbia, (y) shall have assumed all obligations of the Borrower under the Loan Documents pursuant to arrangements reasonably satisfactory to the Administrative Agent and (z) to the extent requested by the Administrative Agent or any Lender, shall have promptly provided to the Administrative Agent or such Lender all documentation and other information that may be required by the Administrative Agent or such Lender in order to enable compliance with applicable "know-your-customer" and anti-money laundering rules and regulations, including information required by the Patriot Act and the Beneficial Ownership Regulation and (c) the ratings by Moody's and S&P of the continuing or surviving corporation's or purchaser's senior, secured debt shall be at least the higher of (1) Baa3 from Moody's and BBB- from S&P and (2) the ratings by such rating agencies of the Borrower's senior, secured debt in effect before the earlier of the occurrence or the public announcement of such event.

7.5    *Sale and Lease Back Transactions*. Enter into any arrangement, directly or indirectly, with any Person whereby it shall sell or transfer any property having fair market value in excess of $10,000,000, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property being sold or transferred, except for (a) those transactions described on Schedule 7.5 and (b) any other sale of any fixed or capital assets that is made for cash consideration; provided that, in each case, if such sale and leaseback results in a Capital Lease Obligation, such Capital Lease Obligation is permitted by Section 7.1 and any Lien made the subject of such Capital Lease Obligation is permitted by Section 7.3.

60

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 1292 of 1367

7.6 *Swap Agreements*. Enter into any Swap Agreement, other than Swap Agreements entered into not for speculative purposes (a) to hedge or mitigate risks to which the Borrower and its Subsidiaries are exposed in the conduct of its business or the management of its liabilities (including, without limitation, raw material, commodities, fuel, electricity or other supply costs and currency risks), (b) to effectively cap, collar or exchange interest rates (from fixed to floating rates, from one floating rate to another floating rate or fixed rate or otherwise) with respect to any interest bearing Indebtedness of the Borrower and its Subsidiaries permitted by this Agreement, (c) to swap currency in connection with funding the business of the Borrower and its Subsidiaries in the ordinary course of business or (d) entered into in connection with any A/R Securitization Transaction.

7.7 *Amendments to FMB Indenture*. Amend, supplement, modify or waive the FMB Indenture in any manner that is materially adverse to the Lenders hereunder; provided that the foregoing shall not prohibit the Borrower from supplementing the FMB Indenture in order to provide for the issuance of additional First Mortgage Bonds in accordance with the FMB Indenture or to add property to the Lien of the FMB Indenture.

SECTION 8.   EVENTS OF DEFAULT

If any of the following events shall occur and be continuing on or after the Effective Date:

(a)   the Borrower shall fail to pay any principal of the Loans when due in accordance with the terms hereof; or the Borrower shall fail to pay any interest on the Loans, or any other amount payable hereunder or under any other Loan Document, within five Business Days after any such interest or any other amount becomes due in accordance with the terms hereof; or

(b)   any representation or warranty made or deemed made by the Borrower herein or in any other Loan Document or that is contained in any certificate, document or financial or other statement furnished by it at any time under or in connection with this Agreement or any such other Loan Document shall prove to have been inaccurate in any material respect on or as of the date made or deemed made, unless, as of any date of determination, the facts or circumstances to which such representation or warranty relates have changed with the result that such representation or warranty is true and correct in all material respects on such date; or

(c)   the Borrower shall default in the observance or performance of any agreement contained in Section 6.4(a)(i), Section 6.7(a), Section 6.10, Section 7.1, Section 7.2, Section 7.3 or Section 7.4 of this Agreement; or

(d)   the Borrower shall default in the observance or performance of any other agreement contained in this Agreement or any other Loan Document (other than as provided in paragraphs (a) through (c) of this Section), and such default shall continue unremedied for a period of 30 days after notice to the Borrower from the Administrative Agent at the request of the Required Lenders; or

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 1293 of 1367

(e)   the Borrower or any of its Significant Subsidiaries shall (i) default in making any payment of any principal of any Indebtedness (including any Guarantee Obligation, but excluding the Loans) on the due date with respect thereto (after giving effect to any period of grace, if any, provided in the instrument or agreement under which such Indebtedness was created); or (ii) default in making any payment of any interest on any such Indebtedness beyond the period of grace, if any, provided in the instrument or agreement under which such Indebtedness was created; or (iii) default in the observance or performance of any other agreement or condition relating to any such Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist, the effect of which default or other event or condition is to cause, or (in the case of all Indebtedness other than Indebtedness under any Swap Agreement) to permit the holder or beneficiary of such Indebtedness (or a trustee or agent on behalf of such holder or beneficiary) to cause, with the giving of notice if required, such Indebtedness to become due prior to its stated maturity or (in the case of any such Indebtedness constituting a Guarantee Obligation) to become payable; *provided*, that a default, event or condition described in clause (i), (ii) or (iii) of this paragraph (e) shall not at any time constitute an Event of Default unless, at such time, one or more defaults, events or conditions of the type described in clauses (i), (ii) and (iii) of this paragraph (e) shall have occurred and be continuing with respect to Indebtedness the outstanding principal amount of which exceeds in the aggregate $200,000,000; *provided, further*, that unless payment of the Loans hereunder has already been accelerated, if such default shall be cured by the Borrower or such Significant Subsidiary or waived by the holders of such Indebtedness and any acceleration of maturity having resulted from such default shall be rescinded or annulled, in each case, in accordance with the terms of such agreement or instrument, without any modification of the terms of such Indebtedness requiring the Borrower or such Significant Subsidiary to furnish security or additional security therefor, reducing the average life to maturity thereof or increasing the principal amount thereof, or any agreement by the Borrower or such Significant Subsidiary to furnish security or additional security therefor or to issue in lieu thereof Indebtedness secured by additional or other collateral or with a shorter average life to maturity or in a greater principal amount, then any Default hereunder by reason thereof shall be deemed likewise to have been thereupon cured or waived; or

(f)   (i) the Borrower or any of its Significant Subsidiaries shall commence any case, proceeding or other action (A) under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it as bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding up, liquidation, dissolution, composition or other relief with respect to it or its debts, or (B) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for it or for all or any substantial part of its assets, or the Borrower or any of its Significant Subsidiaries shall make a general assignment for the benefit of its creditors; or (ii) there shall be commenced against the Borrower or any of its Significant Subsidiaries any case, proceeding or other action of a nature referred to in clause (i) above that (A) results in the

62

entry of an order for relief or any such adjudication or appointment or (B) remains undismissed, undischarged or unbonded for a period of 60 days; or (iii) there shall be commenced against the Borrower or any of its Significant Subsidiaries any case, proceeding or other action seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of its assets that results in the entry of an order for any such relief that shall not have been vacated, discharged, or stayed or bonded pending appeal within 60 days from the entry thereof; or (iv) the Borrower or any of its Significant Subsidiaries shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due; or

(g)     there occurs any ERISA Event that, individually or in the aggregate, would reasonably be expected to result in a Material Adverse Effect; or

(h)     one or more judgments or decrees shall be entered against the Borrower or any of its Significant Subsidiaries by a court of competent jurisdiction involving in the aggregate a liability (not paid or, subject to customary deductibles, fully covered by insurance as to which the relevant insurance company has not denied coverage) of $200,000,000 or more, and all such judgments or decrees shall not have been vacated, discharged, stayed or bonded pending appeal within 45 days from the entry thereof unless, in the case of a discharge, such judgment or decree is due at a later date in one or more payments and the Borrower or such Significant Subsidiary satisfies the obligation to make such payment or payments on or prior to the date such payment or payments become due in accordance with such judgment or decree; or

(i)     there shall have occurred a Change of Control; or

(j)     any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder or satisfaction in full of all the Obligations, ceases to be in full force and effect; or the Borrower contests in any manner in writing the validity or enforceability of any Loan Document; or the Borrower denies in writing that it has any or further liability or obligation under any Loan Document, or purports in writing to revoke, terminate or rescind any Loan Document; or

(k)     at any time (i) any Senior Bond shall cease to be outstanding for any reason other than (A) the payment in full of the applicable Tranche relating to such Senior Bond and other obligations then due and owing under the Loan Documents with respect thereto or (B) the payment in full of such Senior Bond, (ii) the Administrative Agent, on behalf of the Lenders, shall cease at any time to be the holder of any Senior Bond for all purposes of the FMB Indenture (unless such Senior Bond is transferred by the Administrative Agent other than in connection with the payment in full of the obligations with respect to such Senior Bond) or (iii) the Lien of the FMB Indenture shall cease to constitute a valid and enforceable Lien on the Mortgaged Property;

then, and in any such event, (A) if such event is an Event of Default specified in clause (i) or (ii) of paragraph (f) above with respect to the Borrower, the Loans (with accrued interest thereon) and all other amounts owing under this Agreement and the other Loan Documents shall immediately become due and payable, and (B) if such event is any other Event of

63

Default, either or both of the following actions may be taken: with the consent of the Required Lenders, the Administrative Agent may, or upon the request of the Required Lenders, the Administrative Agent shall, by notice to the Borrower, declare the Loans (with accrued interest thereon) and all other amounts owing under this Agreement and the other Loan Documents to be due and payable forthwith, whereupon the same shall immediately become due and payable. Except as expressly provided above in this Section, presentment, demand, protest and all other notices of any kind are hereby expressly waived by the Borrower.

SECTION 9.    THE AGENTS

9.1    *Appointment and Authority*. Each of the Lenders hereby irrevocably appoints JPMorgan Chase Bank, N.A. to act on its behalf as the Administrative Agent hereunder and under the other Loan Documents and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto. The provisions of this Section 9 are solely for the benefit of the Agents, the Lenders and the Borrower shall not have rights as a third-party beneficiary of any of such provisions (other than with respect to the Borrower's rights under Sections 9.9(a) and (b)). It is understood and agreed that the use of the term "agent" herein or in any other Loan Documents (or any other similar term) with reference to any Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law. Instead such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties.

9.2    *Delegation of Duties*. The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by it. The Administrative Agent, and any such sub-agent may each perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties. The exculpatory provisions of this Section shall apply to any such sub-agent and to the Related Parties of the Administrative Agent, and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent. The Administrative Agent shall not be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and nonappealable judgment that the Administrative Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

64

9.3    *Exculpatory Provisions*.

(a)    No Agent shall have any duties or obligations except those expressly set forth herein and in the other Loan Documents, and its duties hereunder shall be administrative in nature. Without limiting the generality of the foregoing, no Agent:

(i)    shall be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(ii)    shall have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that an Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents); *provided* that no Agent shall be required to take any action that, in its opinion or the opinion of its counsel, may expose such Agent to liability or that is contrary to any Loan Document or applicable law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Debtor Relief Law or that may effect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Debtor Relief Law; and

(iii)    shall, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Affiliates that is communicated to or obtained by the Person serving as an Agent or any of its Affiliates in any capacity.

(b)    No Agent shall be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as such Agent shall believe in good faith shall be necessary, under the circumstances as provided in Sections 10.1 and 8), or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction by final and nonappealable judgment.

(c)    No Agent shall be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default or Event of Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in Section 5 or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to such Agent.

9.4    *Reliance by Administrative Agent*. The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur

65

any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Loan, that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Loan. The Administrative Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

9.5    *Notice of Default*. The Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default unless the Administrative Agent has received notice from a Lender or the Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default". In the event that the Administrative Agent receives such a notice, the Administrative Agent shall give notice thereof to the Lenders. The Administrative Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders (or, if so specified by this Agreement, all Lenders); provided that unless and until such Agent shall have received such directions, such Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of the Lenders.

9.6    *Non-Reliance on Agents and Other Lenders*. Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent, or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent, or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder. Except for notices, reports and other documents expressly required to be furnished to the Lenders by the Administrative Agent hereunder, the Administrative Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, operations, property, condition (financial or otherwise), prospects or creditworthiness of the Borrower or any of its Affiliates that may come into the possession of such Agent or any of its officers, directors, employees, agents, attorneys in fact or Affiliates.

9.7    *Indemnification*. The Lenders agree to indemnify each Agent in its capacity as such (to the extent not reimbursed by the Borrower and without limiting the obligation of the Borrower to do so), ratably according to their respective Percentages in effect on the date on which indemnification is sought under this Section (or, if indemnification is sought after the date upon which the Commitments shall have terminated and the Loans shall have been paid in full, ratably in accordance with such Percentages immediately prior to such date), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that

66

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 1298 of 1367

may at any time (whether before or after the payment of the Loans) be imposed on, incurred by or asserted against such Agent in any way relating to or arising out of, the Commitments, this Agreement, any of the other Loan Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by such Agent under or in connection with any of the foregoing; provided that no Lender shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements that are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from such Agent's gross negligence or willful misconduct.

9.8    *Agent in Its Individual Capacity*. Each Person serving as an Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not an Agent, and the terms "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include such Person serving as an Agent hereunder in its individual capacity. Such Person and its Affiliates may accept deposits from, lend money to, own securities of, act as the financial advisor or in any other advisory capacity for, and generally engage in any kind of business with, the Borrower or any Subsidiary or other Affiliate thereof as if such Person were not an Agent hereunder and without any duty to account therefor to the Lenders.

9.9    *Successor Agents*.

(a)    The Administrative Agent may resign upon 10 days' notice to the Lenders and the Borrower. If the Administrative Agent shall so resign under this Agreement and the other Loan Documents, then the Required Lenders shall appoint from among the Lenders a successor agent for the Lenders, which successor agent shall (unless an Event of Default under Section 8(f) with respect to the Borrower shall have occurred and be continuing) be subject to approval by the Borrower (which approval shall not be unreasonably withheld, conditioned or delayed), whereupon such successor agent shall succeed to the rights, powers and duties of the Administrative Agent and the term "**Administrative Agent**" shall mean such successor agent effective upon such appointment and approval, and the former Agent's rights, powers and duties as Administrative Agent shall be terminated, without any other or further act or deed on the part of such former Agent or any of the parties to this Agreement or any holders of the Loans. If no successor agent has accepted appointment as Administrative Agent by the date that is 10 days following a retiring Agent's notice of resignation (the "**Resignation Effective Date**"), the retiring Agent's resignation shall nevertheless thereupon become effective, and the Lenders shall assume and perform all of the duties of the Administrative Agent hereunder until such time, if any, as the Required Lenders appoint a successor agent as provided for above. After any retiring Agent's resignation as Administrative Agent the provisions of Section 9.7 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was an Agent under this Agreement and the other Loan Documents.

(b)    If the Person serving as Administrative Agent is a Defaulting Lender pursuant to clause (e) of the definition thereof, the Required Lenders may, to the extent permitted by applicable law, by notice in writing to the Borrower and such Person remove such

67

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 1299 of 1367

Person as Administrative Agent and, shall appoint a successor, subject to the approval of the Borrower (unless an Event of Default under Section 8(f) with respect to the Borrower shall have occurred and be continuing), which approval shall not be unreasonably withheld, conditioned or delayed. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days (or such earlier day as shall be agreed by the Required Lenders) (the "**Removal Effective Date**"), then such removal shall nonetheless become effective in accordance with such notice on the Removal Effective Date.

(c)     With effect from the Resignation Effective Date or the Removal Effective Date (as applicable) (i) the retiring or removed Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any Senior Bond held by the Administrative Agent on behalf of the Lenders, the retiring or removed Administrative Agent shall continue to hold such Senior Bond in its name until such time as a successor Administrative Agent is appointed) and (ii) except for any indemnity payments or other amounts then owed to the retiring or removed Administrative Agent, all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender directly, until such time, if any, as the Required Lenders appoint a successor Administrative Agent as provided for above. Upon the acceptance of a successor's appointment as Administrative Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring or removed Agent (other than any rights to indemnity payments or other amounts owed to the retiring or removed Agent as of the Resignation Effective Date or the Removal Effective Date (as applicable)), and the retiring or removed Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents. The fees payable by the Borrower to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After the retiring or removed Agent's resignation or removal hereunder and under the other Loan Documents, the provisions of this Section and Sections 2.17 and 10.5 shall continue in effect for the benefit of such retiring or removed Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring or removed Agent was acting as Agent.

9.10     *Documentation Agents and Syndication Agents*. None of the Documentation Agents or the Syndication Agents shall have any duties or responsibilities hereunder in its capacity as such.

9.11     *Administrative Agent May File Proofs of Claim*. In case of the pendency of any proceeding under any Debtor Relief Law, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:

(a)     to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have

68

the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent under Sections 2.6, 2.17 and 10.5) allowed in such judicial proceeding; and

(b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under Sections 2.6, 2.17 and 10.5.

9.12    *Certain ERISA Matters*.

(a)    Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent, and not, for the avoidance of doubt, to or for the benefit of the Borrower, that at least one of the following is and will be true:

(i)    such Lender is not using "plan assets" (within the meaning of Section 3(42) of ERISA or otherwise) of one or more Benefit Plans with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments or this Agreement,

(ii)    the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement,

(iii)    (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans, the Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loans, the Commitments and this

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 1301 of 1367

Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement, or

(iv)  such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender.

(b)  In addition, unless either (1) sub-clause (i) in the immediately preceding clause (a) is true with respect to a Lender or (2) a Lender has provided another representation, warranty and covenant in accordance with sub-clause (iv) in the immediately preceding clause (a), such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent, and not, for the avoidance of doubt, to or for the benefit of the Borrower, that the Administrative Agent is not a fiduciary with respect to the assets of such Lender involved in such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, any Loan Document or any documents related hereto or thereto).

SECTION 10.   MISCELLANEOUS

10.1   *Amendments and Waivers*. Subject to Section 2.13(b) and (c), neither this Agreement, any other Loan Document, nor any terms hereof or thereof may be amended, supplemented or modified except in accordance with the provisions of this Section 10.1. The Required Lenders and the Borrower may, or, with the written consent of the Required Lenders, the Administrative Agent and the Borrower may, from time to time, (a) enter into written amendments, supplements or modifications hereto and to the other Loan Documents for the purpose of adding any provisions to this Agreement or the other Loan Documents or changing in any manner the rights of the Lenders or of the Borrower hereunder or thereunder or (b) waive, on such terms and conditions as the Required Lenders or the Administrative Agent, as the case may be, may specify in such instrument, any of the requirements of this Agreement or the other Loan Documents or any Default or Event of Default and its consequences; provided, however, that no such waiver and no such amendment, supplement or modification shall:

(i)  forgive the principal amount or extend the final scheduled date of maturity of any Loan, reduce the stated rate of any interest or fee payable hereunder (except in connection with the waiver of applicability of any post-default increase in interest rates (which waiver shall be effective with the consent of the Required Lenders)) or extend the scheduled date of any payment thereof, in each case without the written consent of each Lender directly affected thereby;

70

(ii)    eliminate or reduce the voting rights of any Lender under this Section 10.1 or Section 10.6(a)(i) without the written consent of such Lender;

(iii)    reduce any percentage specified in the definition of Required Lenders without the written consent of all Lenders;

(iv)    amend, modify or waive any provision of Section 2.14, Section 10.07 (*Application of Money Collected*) of the FMB Indenture or any similar provision in the Loan Documents related to *pro rata* treatment without the consent of each Lender directly affected thereby;

(v)    amend, modify or waive any provision of Section 9 without the written consent of the Administrative Agent;

(vi)    [reserved];

(vii)    amend, modify or waive any provision of Section 5.1 without the written consent of all the Lenders;

(viii)    amend, modify or waive any provision of Section 2.8(b) without the written consent of each Lender affected thereby;

(ix)    amend or modify any provision in any Loan Document in a manner that by its terms affects the rights or duties under this Agreement of the Lenders of one Tranche (but not the other Tranche), without the prior written consent of the requisite number or percentage in interest of each affected Tranche of Lenders that would be required to consent thereto under this Section if such Tranche of Lenders were the only Tranche of Lenders hereunder at the time; or

(x)    instruct the Administrative Agent to vote the Senior Bonds in favor of the release of all or substantially all of the Mortgaged Property without the written consent of all the Lenders.

Any such waiver and any such amendment, supplement or modification shall apply equally to each of the Lenders and shall be binding upon the Borrower, the Lenders, the Administrative Agent and all future holders of the Loans. In the case of any waiver, the Borrower, the Lenders and the Administrative Agent shall be restored to their former position and rights hereunder and under the other Loan Documents, and any Default or Event of Default waived shall be deemed to be cured and not continuing; but no such waiver shall extend to any subsequent or other Default or Event of Default, or impair any right consequent thereon.

Notwithstanding anything to the contrary contained in this Section 10.1, if the Administrative Agent and the Borrower acting together identify any ambiguity, omission, mistake, typographical error or other defect in any provision of this Agreement or any other Loan Document, then the Administrative Agent and the Borrower shall be permitted to amend, modify or supplement such provision to cure such ambiguity, omission, mistake, typographical error or other defect, and any such amendment, modification or supplement shall become effective without any further action or consent of any other party to this Agreement.

If the Required Lenders shall have approved any amendment which requires the consent of all of the Lenders, the Borrower shall be permitted to replace any non-consenting Lender with another financial institution, *provided* that, (i) the replacement financial institution shall purchase at par, all Loans and other amounts owing to such replaced Lender on or prior to the date of replacement, (ii) the Borrower shall be liable to such replaced Lender under Section 2.17 if any Eurodollar Loan owing to such replaced Lender shall be purchased other than on the last day of the Interest Period relating thereto (as if such purchase constituted a prepayment of such Loans), (iii) such replacement financial institution, if not already a Lender, shall be reasonably satisfactory to the Administrative Agent, (iv) the replaced Lender shall be obligated to make such replacement in accordance with the provisions of Section 10.6 (provided that the Borrower shall be obligated to pay the registration and processing fee referred to therein) and (v) any such replacement shall not be deemed to be a waiver of any rights the Borrower, the Administrative Agent, or any other Lender shall have against the replaced Lender.

Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, supplement, modification, waiver or consent hereunder (and any amendment, supplement, modification, waiver or consent which by its terms requires the consent of all Lenders or each affected Lender may be effected with the consent of the applicable Lenders other than Defaulting Lenders), except that (i) any reduction of the amount of principal or interest owed to such Defaulting Lender shall, in each case, require the consent of such Defaulting Lender, and (ii) a Defaulting Lender's Percentage shall be taken into consideration along with the Percentage of non-Defaulting Lenders when voting to approve or disapprove any waiver, amendment or modification that by its terms affects any Defaulting Lender more adversely than other affected Lenders.

10.2    *Notices*.

(a)    All notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing (including by telecopy), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when delivered during the recipient's normal business hours, or three Business Days after being deposited in the mail, postage prepaid, or, in the case of telecopy notice, when received during the recipient's normal business hours, addressed as follows in the case of the Borrower and the Administrative Agent, and as set forth in an administrative questionnaire delivered to the Administrative Agent in the case of the Lenders, or to such other address as may be hereafter notified by the respective parties hereto:

Borrower:                    Pacific Gas and Electric Company
                             c/o PG&E Corporation
                             P.O. Box 770000
                             San Francisco, California 94177
                             Attention: Treasurer

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 1304 of 1367

Telecopy: (415) 973-8968
Telephone: (415) 973-8956

with a copy to:                Pacific Gas and Electric Company
                               c/o PG&E Corporation
                               P.O. Box 770000
                               San Francisco, California 94177
                               Attention: General Counsel
                               Telecopy: (415) 973-5520

Administrative Agent:          JPMorgan Chase Bank, N.A.
                               500 Stanton Christiana Road
                               NCC 5, 1st Floor
                               Newark, DE 19713-2107
                               Attention: Mary Crews
                               Telecopy: (302) 634-5758
                               Telephone: (302) 634-1417
                               Email: mary.crews@jpmorgan.com

*provided* that any notice, request or demand to or upon the Administrative Agent or any Lender shall not be effective until received.

(b)    Notices and other communications to the Administrative Agent or the Lenders hereunder may be delivered or furnished by electronic communications pursuant to procedures approved by the Administrative Agent; *provided* that the foregoing shall not apply to notices pursuant to Section 2 unless otherwise agreed by the Administrative Agent and each Lender. The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; *provided* that approval of such procedures may be limited to particular notices or communications.

(c)    Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient, at its e-mail address as described in the foregoing clause (i), of notification that such notice or communication is available and identifying the website address therefor; *provided* that, for both clauses (i) and (ii) above, if such notice, email or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient.

(d)    (i) The Borrower agrees that the Administrative Agent may, but shall not be obligated to, make the Communications (as defined below) available to the Lenders by posting the Communications on Debt Domain, Intralinks, Syndtrak or a substantially similar electronic transmission system (the "**Platform**").

73

(ii)   The Platform is provided "as is" and "as available." The Agent Parties (as defined below) do not warrant the adequacy of the Platform and expressly disclaim liability for errors or omissions in the Communications. No warranty of any kind, express, implied or statutory, including, without limitation, any warranty of merchantability, fitness for a particular purpose, non-infringement of third-party rights or freedom from viruses or other code defects, is made by any Agent Party in connection with the Communications or the Platform. In no event shall the Administrative Agent or any of its Related Parties (collectively, the "**Agent Parties**") have any liability to the Borrower, any Lender or any other Person or entity for damages of any kind, including, without limitation, direct or indirect, special, incidental or consequential damages, losses or expenses (whether in tort, contract or otherwise) arising out of the Borrower's or the Administrative Agent's transmission of Communications through the Platform, except to the extent such liability resulted from the gross negligence or willful misconduct of the Administrative Agent or any of its Related Parties as determined by a court of competent jurisdiction in a final non-appealable judgment. "**Communications**" means, collectively, any notice, demand, communication, information, document or other material provided by or on behalf of the Borrower pursuant to any Loan Document or the transactions contemplated therein which is distributed to the Administrative Agent or any Lender by means of electronic communications pursuant to this Section, including through the Platform.

10.3   *No Waiver; Cumulative Remedies.* No failure to exercise and no delay in exercising, on the part of the Administrative Agent or any Lender, any right, remedy, power or privilege hereunder or under the other Loan Documents shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

10.4   *Survival of Representations and Warranties.* All representations and warranties made hereunder, in the other Loan Documents and in any document, certificate or statement delivered pursuant hereto or in connection herewith shall survive the execution and delivery of this Agreement and the making of the Loans hereunder.

10.5   *Payment of Expenses and Taxes.* The Borrower agrees (a) to pay or reimburse the Administrative Agent and the Lenders for all their respective reasonable out of pocket costs and expenses incurred in connection with the development, preparation and execution of, and any amendment, supplement or modification to, this Agreement and the other Loan Documents and any other documents prepared in connection herewith or therewith, and the consummation of the transactions contemplated hereby and thereby, including the reasonable fees and disbursements of only one joint counsel and one joint special California counsel and, if necessary, one joint local counsel in each other relevant jurisdiction to the Administrative Agent and the Lenders (and in the case of an actual or perceived conflict of interest, one additional counsel for each applicable jurisdiction to each group of similarly situated affected persons) and filing and recording fees and

74

expenses, with statements with respect to the foregoing to be submitted to the Borrower prior to the Effective Date (in the case of amounts to be paid on the Effective Date) and from time to time thereafter on a quarterly basis or such other periodic basis as the Administrative Agent shall deem appropriate, (b) to pay or reimburse each Lender and the Administrative Agent for all its costs and expenses incurred in connection with the enforcement or preservation of its rights under this Agreement, the other Loan Documents and any such other documents, including the reasonable fees and disbursements of only one joint counsel, one joint special California counsel and, if necessary, one local counsel in each other relevant jurisdiction to the Administrative Agent and the Lenders (and in the case of an actual or perceived conflict of interest, one additional counsel for each applicable jurisdiction to each group of similarly situated affected persons), and (c) to pay, indemnify, and hold each Lender, the Administrative Agent and their respective Affiliates and their respective officers, directors, employees and agents (each, an "**Indemnitee**") harmless from and against any and all other liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever whether brought by the Borrower or any other Person, with respect to the execution, delivery, enforcement and performance of, or arising out of or in connection with, this Agreement, the other Loan Documents and any such other documents, including any of the foregoing relating to the use of proceeds of the Loans or the violation of, noncompliance with or liability under, any Environmental Law directly or indirectly relating to the Borrower, its Significant Subsidiaries or any of the facilities and properties owned, leased or operated by the Borrower or its Significant Subsidiaries and the reasonable, documented and invoiced fees and expenses of one joint counsel and one joint special California counsel and, if necessary, one joint local counsel in each other relevant jurisdiction to the applicable Indemnitee (and in the case of an actual or perceived conflict of interest, one additional counsel for each applicable jurisdiction to each group of similarly situated affected persons), in connection with claims, actions or proceedings by any Indemnitee against the Borrower under any Loan Document (all the foregoing in this clause (c), collectively, the "**Indemnified Liabilities**"), provided, that the Borrower shall have no obligation hereunder to any Indemnitee with respect to Indemnified Liabilities to the extent such Indemnified Liabilities resulted from, as determined in a final non-appealable judgment by a court of competent jurisdiction, (x) the gross negligence, bad faith or willful misconduct of such Indemnitee or its Affiliates, (y) the material breach of such Indemnitee's funding obligations hereunder or (z) a dispute amongst one or more Lenders not arising from the Borrower's breach of its obligations under the Loan Documents (other than a dispute involving a claim against an Indemnitee for its acts or omissions in its capacity as an arranger, bookrunner, agent or similar role in respect of the Loan Agreement, except, to the extent such acts or omissions are determined by a court of competent jurisdiction by a final and non-appealable judgment to have constituted the gross negligence, bad faith or willful misconduct of such Indemnitee in such capacity). Without limiting the foregoing, and to the extent permitted by applicable law, the Borrower agrees not to assert and to cause its Significant Subsidiaries not to assert, and hereby waives and agrees to cause its Significant Subsidiaries to waive, all rights for contribution or any other rights of recovery with respect to all claims, demands, penalties, fines, liabilities, settlements, damages, costs and expenses of whatever kind or nature, under or related to Environmental Laws, that any of them might have by statute or otherwise against any

75

Case: 19-30088    Doc# 9156-3    Filed: 09/28/20    Entered: 09/28/20 16:25:53    Page 1307 of 1367

Indemnitee. All amounts due under this Section 10.5 shall be payable not later than 30 days after written demand therefor, subject to the Borrower's receipt of reasonably detailed invoices. Statements payable by the Borrower pursuant to this Section 10.5 shall be submitted to Treasurer (Telephone No. (415) 817-8199/(415) 267-7000) (Telecopy No. (415) 267-7265/7268), at the address of the Borrower set forth in Section 10.2(a) with a copy to Chief Counsel, Corporate (Telephone No. (415) 817-8200) (Telecopy No. (415) 817-8225), at the address of the Borrower set forth in Section 10.2(a), or to such other Person or address as may be hereafter designated by the Borrower in a written notice to the Administrative Agent. The agreements in this Section 10.5 shall survive for two years after repayment of the Loans and all other amounts payable hereunder. This Section 10.5 shall not apply with respect to Taxes, other than Taxes that represent claims, damages, losses, liabilities, costs or expenses arising from non-Tax claims.

10.6   *Successors and Assigns; Participations and Assignments.*

(a)   The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section 10.6.

(b)   (i) Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may assign to one or more assignees (each, an "**Assignee**") other than a Defaulting Lender, any Subsidiary of a Defaulting Lender, any natural person (or holding company, investment vehicle or trust for, or owned or operated by or for the primary benefit of, one or more natural persons), the Borrower or any of the Borrower's Affiliates or Subsidiaries, all or a portion of its rights and obligations under this Agreement (including all or a portion of the Loans at the time owing to it) with the prior written consent (such consent not to be unreasonably withheld or delayed) of:

(A)   the Borrower, *provided* that no consent of the Borrower shall be required for an assignment to a Lender (or an Affiliate of any Lender) or an Approved Fund or, if an Event of Default under Section 8(a), (e) or (f) has occurred and is continuing, any other Person, and *provided further*, that the Borrower shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Administrative Agent within ten (10) Business Days after having received notice thereof from the assigning Lender (with a copy to the Administrative Agent); and

(B)   the Administrative Agent, *provided* that no consent of the Administrative Agent shall be required for an assignment of any Loans to an Assignee that is a Lender (or an Affiliate of a Lender) immediately prior to giving effect to such assignment.

76

Case: 19-30088   Doc# 9156-3   Filed: 09/28/20   Entered: 09/28/20 16:25:53   Page 1308 of 1367

(ii) Assignments shall be subject to the following additional conditions:

(A) except in the case of an assignment to a Lender, an Eligible Assignee that is an Affiliate of any Lender or an assignment of the entire remaining amount of the assigning Lender's Loans, the amount of the Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $10,000,000 (or, if such Assignee is an Eligible Assignee that is an Affiliate of a Lender, $5,000,000) unless each of the Borrower and the Administrative Agent otherwise consent, *provided* that (1) no such consent of the Borrower shall be required if an Event of Default has occurred and is continuing and (2) with respect to any Lender party to this Agreement on the Effective Date, such amounts shall be aggregated in respect of such Lender and any Affiliate of such Lender that is an Eligible Assignee;

(B) the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500; and

(C) the Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an administrative questionnaire.

In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the Assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of the Borrower and the Administrative Agent, the applicable pro rata share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable Assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Administrative Agent or any Lender hereunder (and interest accrued thereon) and (y) acquire (and fund as appropriate) its full pro rata share of all Loans in accordance with its Percentage. Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable law without compliance with the provisions of this paragraph, then the Assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

(iii) Subject to acceptance and recording thereof pursuant to paragraph (b)(iv) below, from and after the effective date specified in each Assignment and Assumption the Assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, shall have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be

released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.15, 2.16, 2.17 and 10.5 but shall be subject to the limitations set forth therein); *provided*, that except to the extent otherwise expressly agreed by the affected parties, no assignment by a Defaulting Lender will constitute a waiver or release of any claim of any party hereunder arising from the Lender's having been a Defaulting Lender. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 10.6 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (c) of this Section.

(iv)    The Administrative Agent, acting for this purpose as a non-fiduciary agent of the Borrower (and such agency being solely to establish that the relevant obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations), shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the principal amount of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "**Register**"). The entries in the Register shall be conclusive, in the absence of manifest error, and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(v)    Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an Assignee, the Assignee's completed administrative questionnaire (unless the Assignee shall already be a Lender hereunder), the processing and recordation fee referred to in paragraph (b) of this Section and any written consent to such assignment required by paragraph (b) of this Section, the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register. No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(c)    (i) Any Lender may, without the consent of the Borrower or the Administrative Agent, sell participations to one or more banks or other entities (other than a Defaulting Lender or the Borrower or any of the Borrower's Affiliates or Subsidiaries) (a "**Participant**") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of the Loans owing to it); *provided* that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) the Borrower, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement pursuant to which a Lender sells such a

78

participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; *provided* that such agreement may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver that (1) requires the consent of each Lender directly affected thereby pursuant to the proviso to the second sentence of Section 10.1 and (2) directly affects such Participant. Subject to paragraph (c)(ii) of this Section, the Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.15, 2.16 and 2.17 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section.

(ii)     Notwithstanding anything to the contrary herein, a Participant shall not be entitled to receive any greater payment under Section 2.15 or 2.16 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent to such greater payments. Any Participant that is a Foreign Lender shall not be entitled to the benefits of Section 2.16 unless such Participant complies with Section 2.16(e).

(iii)     Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "**Participant Register**"); *provided* that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any loans or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(d)     Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or other central bank having jurisdiction over such Lender, and this Section shall not apply to any such pledge or assignment of a security interest; *provided* that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or Assignee for such Lender as a party hereto.

(e)     The Borrower, upon receipt of written notice from the relevant Lender, agrees to issue Notes to any Lender requiring Notes to facilitate transactions of the type described in paragraph (d) above.

(f)    Notwithstanding the foregoing, any Conduit Lender may assign any or all of the Loans it may have funded hereunder to its designating Lender without the consent of the Borrower or the Administrative Agent and without regard to the limitations set forth in Section 10.6(b). Each of the Borrower, each Lender and the Administrative Agent hereby confirms that it will not institute against a Conduit Lender or join any other Person in instituting against a Conduit Lender any bankruptcy, reorganization, arrangement, insolvency or liquidation proceeding under any state bankruptcy or similar law, for one year and one day after the payment in full of the latest maturing commercial paper note issued by such Conduit Lender; *provided*, however, that each Lender designating any Conduit Lender hereby agrees to indemnify, save and hold harmless each other party hereto for any loss, cost, damage, expense, obligations, penalties, actions, judgments, suits or any kind whatsoever arising out of its inability to institute such a proceeding against such Conduit Lender during such period of forbearance.

(g)    Notwithstanding anything to the contrary in this Section, none of the Agents, in their capacity as Lenders, will assign without the consent of the Borrower, prior to the Effective Date, any of the Commitments held by them on the date of this Agreement.

(h)    Notwithstanding anything to the contrary in this Section 10.6, for the avoidance of doubt, Goldman Sachs Bank USA may assign any amount of its Loans hereunder to Goldman Sachs Lending Partners LLC (or vice versa) without the prior written consent of any other Person.

10.7    *Adjustments; Set off.*

(a)    Except to the extent that this Agreement expressly provides for payments to be allocated to a particular Lender, if any Lender (a "**Benefitted Lender**") shall receive any payment of all or part of the Obligations owing to it hereunder, or receive any collateral in respect thereof (whether voluntarily or involuntarily, by set off, pursuant to events or proceedings of the nature referred to in Section 8(f), or otherwise), in a greater proportion than any such payment to or collateral received by any other Lender, if any, in respect of the Obligations owing to such other Lender hereunder, such Benefitted Lender shall purchase for cash from the other Lenders a participating interest in such portion of the Obligations owing to each such other Lender hereunder, or shall provide such other Lenders with the benefits of any such collateral, as shall be necessary to cause such Benefitted Lender to share the excess payment or benefits of such collateral ratably with each of the Lenders; *provided*, *however*, that if all or any portion of such excess payment or benefits is thereafter recovered from such Benefitted Lender, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery, but without interest.

(b)    In addition to any rights and remedies of the Lenders provided by law, including other rights of set-off, each Lender shall have the right, without prior notice to the Borrower, any such notice being expressly waived by the Borrower to the extent permitted by applicable law, upon any amount becoming due and payable by the Borrower hereunder (whether at the stated maturity, by acceleration or otherwise), after any applicable grace period, to set off and appropriate and apply against such amount any and

80

all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by such Lender or any branch, Affiliate or agency thereof to or for the credit or the account of the Borrower; *provided*, that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 2.20 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent and the Lenders, and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff. Each Lender agrees promptly to notify the Borrower and the Administrative Agent after any such setoff and application made by such Lender, *provided* that the failure to give such notice shall not affect the validity of such setoff and application.

10.8 *Counterparts; Electronic Execution; Binding Effect*. This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument. Delivery of an executed signature page of this Agreement by facsimile transmission, emailed pdf. or any other electronic means that reproduces an image of the actual executed signature page shall be effective as delivery of an original executed counterpart hereof. The words "execution," "signed," "signature," "delivery," and words of like import in or relating to any document to be signed in connection with this Agreement and the transactions contemplated hereby shall be deemed to include an electronic sound, symbol, or process attached to, or associated with, a contract or other record and adopted by a Person with the intent to sign, authenticate or accept such contract or record, deliveries or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act; provided that nothing herein shall require the Administrative Agent to accept electronic signatures in any form or format without its prior written consent. Without limiting the generality of the foregoing, the Borrower hereby (i) agrees that, for all purposes, including without limitation, in connection with any workout, restructuring, enforcement of remedies, bankruptcy proceedings or litigation among the Administrative Agent and the Lenders, electronic images of this Agreement or any other Loan Documents (in each case, including with respect to any signature pages thereto) shall have the same legal effect, validity and enforceability as any paper original, and (ii) waives any argument, defense or right to contest the validity or enforceability of the Loan Documents based solely on the lack of paper original copies of any Loan Documents, including with respect to any signature pages thereto. This Agreement shall become binding on the parties hereto when it shall have been executed by the Administrative Agent and the Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

81

10.9    *Severability*. Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. Without limiting the foregoing provisions of this Section 10.9, if and to the extent that the enforceability of any provisions in this Agreement relating to Defaulting Lenders shall be limited by Debtor Relief Laws, as determined in good faith by the Administrative Agent, as applicable, then such provisions shall be deemed to be in effect only to the extent not so limited.

10.10    *Integration*. This Agreement and the other Loan Documents represent the entire agreement of the Borrower, the Administrative Agent, and the Lenders with respect to the subject matter hereof and thereof, and there are no promises, undertakings, representations or warranties by the Administrative Agent, or any Lender relative to the subject matter hereof not expressly set forth or referred to herein or in the other Loan Documents.

10.11    *GOVERNING LAW*. THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

10.12    *Submission To Jurisdiction; Waivers*. The Borrower hereby irrevocably and unconditionally:

(a)    submits for itself and its property in any legal action or proceeding relating to this Agreement and the other Loan Documents to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the non-exclusive jurisdiction of the United States District Court for the Southern District of New York sitting in the Borough of Manhattan (or if such court lacks subject matter jurisdiction, the Supreme Court of the State of New York sitting in the Borough of Manhattan), and any appellate court from any thereof;

(b)    consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(c)    agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to the Borrower at its address set forth in Section 10.2(a) or at such other address of which the Administrative Agent shall have been notified pursuant thereto;

82

(d)    agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law or shall limit the right to sue in any other jurisdiction; and

(e)    waives, to the maximum extent not prohibited by law, and agrees not to assert any right it may have to claim or recover in any legal action or proceeding relating to this Agreement or any other Loan Document any special, exemplary, punitive or consequential damages.

NOTHING IN THIS AGREEMENT OR IN ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT THE ADMINISTRATIVE AGENT OR ANY LENDER MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST THE BORROWER OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

10.13    *Acknowledgments*. The Borrower hereby acknowledges that:

(a)    it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Loan Documents;

(b)    none of the Administrative Agent or any Lender has any fiduciary relationship with or duty to the Borrower arising out of or in connection with this Agreement or any of the other Loan Documents, and the relationship between Administrative Agent and Lenders, on one hand, and the Borrower, on the other hand, in connection herewith or therewith is solely that of debtor and creditor; and

(c)    no joint venture is created hereby or by the other Loan Documents or otherwise exists by virtue of the transactions contemplated hereby among the Lenders or among the Borrower and the Lenders.

10.14    *Confidentiality*. Each of the Administrative Agent and each Lender agrees to keep confidential in accordance with such party's customary practices (and in any event in compliance with applicable law regarding material non-public information) all non-public information provided to it by the Borrower, the Administrative Agent or any Lender pursuant to or in connection with this Agreement that is designated by the provider thereof as confidential; provided that nothing herein shall prevent the Administrative Agent or any Lender from disclosing any such information (a) to the Administrative Agent, any other Lender or any Affiliate thereof, (b) subject to an agreement to comply with the provisions of this Section or substantially equivalent provisions, to any actual or prospective Transferee, any direct or indirect counterparty to any Swap Agreement (or any professional advisor to such counterparty) or any credit insurance providers, (c) to its employees, directors, agents, attorneys, service providers, accountants and other professional advisors or those of any of its Affiliates (as long as such attorneys, service providers, accountants and other professional advisors are directed to comply with confidentiality requirements substantially equivalent to this Section), (d) upon the request or demand of any Governmental Authority, (e) in response to any order of any court or other Governmental

Authority or as may otherwise be required pursuant to any Requirement of Law, (f) if requested or required to do so in connection with any litigation or similar proceeding, (g) that has been publicly disclosed, (h) to the National Association of Insurance Commissioners or any similar organization or any nationally recognized rating agency that requires access to information about a Lender's investment portfolio in connection with ratings issued with respect to such Lender, (i) in connection with the exercise of any remedy hereunder or under any other Loan Document, (j) any rating agency in connection with rating of the Borrower or its Subsidiaries or the credit facilities provided hereunder or (k) to the extent such information (i) becomes available to the Administrative Agent, any Lender or any of their respective Affiliates on a nonconfidential basis from a source other than the Borrower or its Subsidiaries or (ii) is independently discovered or developed by a party hereto without utilizing any information received from the Borrower or its Subsidiaries or violating the terms of this Section 10.14, provided that, in the case of clauses (d), (e) and (f) of this Section 10.14, with the exception of disclosure to bank regulatory authorities, the Borrower (to the extent legally permissible) shall be given prompt prior notice so that it may seek a protective order or other appropriate remedy.

10.15 *WAIVERS OF JURY TRIAL*. TO THE FULLEST EXTENT PERMITTED BY LAW, THE BORROWER, THE ADMINISTRATIVE AGENT AND THE LENDERS HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN.

10.16 *USA Patriot Act; Beneficial Ownership Regulation*. Each Lender hereby notifies the Borrower that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "**Patriot Act**"), it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow such Lender to identify the Borrower in accordance with the Patriot Act.

10.17 *Judicial Reference*. If any action or proceeding is filed in a court of the State of California by or against any party hereto in connection with any of the transactions contemplated by this Agreement or any other Loan Document, (i) the court shall, and is hereby directed to, make a general reference pursuant to California Code of Civil Procedure Section 638 to a referee (who shall be a single active or retired judge) to hear and determine all of the issues in such action or proceeding (whether of fact or of law) and to report a statement of decision, provided that at the option of any party to such proceeding, any such issues pertaining to a "provisional remedy" as defined in California Code of Civil Procedure Section 1281.8 shall be heard and determined by the court, and (ii) without limiting the generality of Section 10.5, the Borrower shall be solely responsible to pay all fees and expenses of any referee appointed in such action or proceeding.

10.18 *No Advisory or Fiduciary Responsibility*. In connection with all aspects of each transactions contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), the Borrower acknowledges and agrees that: (i) (A) the arranging and other services regarding this Agreement provided by the Agents, the Arrangers and the Lenders are arm's-length

84

commercial transactions between the Borrower, on the one hand, and the Agents, the Arrangers and the Lenders, on the other hand, (B) the Borrower has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (C) the Borrower is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (ii) (A) each Agent, Arranger and Lender is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for the Borrower or any other Person and (B) none of the Agents, Arrangers or Lenders has any obligation to the Borrower or any of its Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (iii) the Agents, the Arrangers and the Lenders and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Borrower and its Affiliates, and none of the Agents, Arrangers or Lenders has any obligation to disclose any of such interests to the Borrower or its Affiliates. To the fullest extent permitted by law, the Borrower hereby waives and releases any claims that it may have against the Agents, the Arrangers and the Lenders with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby other than a breach of the confidentiality provisions set forth in Section 10.14.

10.19 *Acknowledgement Regarding Any Supported QFCs.*

(a) To the extent that the Loan Documents provide support, through a guarantee or otherwise, for Swap Agreements or any other agreement or instrument that is a QFC (such support "**QFC Credit Support**" and each such QFC a "**Supported QFC**"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "**U.S. Special Resolution Regimes**") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States):

(b) In the event a Covered Entity that is party to a Supported QFC (each, a "**Covered Party**") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States. In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such

85

Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Loan Documents were governed by the laws of the United States or a state of the United States. Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support..

10.20    *Acknowledgement and Consent to Bail-In of Affected Financial Institutions*. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Affected Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

(b)    the effects of any Bail-In Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

(ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise is conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)    the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of the applicable Resolution Authority.

*[Remainder of page intentionally left blank. Signature pages follow.]*

86

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

PACIFIC GAS AND ELECTRIC COMPANY

By:   /s/ Margaret K. Becker
Name:  Margaret K. Becker
Title:  Senior Director and Treasurer

Signature Page to Term Loan Credit Agreement
Pacific Gas and Electric Company

JPMORGAN CHASE BANK, N.A.
as Administrative Agent and as a Lender

By:     /s/ Jeffrey Miller
Name:   Jeffrey Miller
Title:    Executive Director

Signature Page to Term Loan Credit Agreement
Pacific Gas and Electric Company

BANK OF AMERICA, N.A.
as a Lender

By: /s/ Dee Dee Farkas
Name: Dee Dee Farkas
Title: Director

Signature Page to Term Loan Credit Agreement
Pacific Gas and Electric Company

BARCLAYS BANK PLC
as a Lender

By:   /s/ Sydney G. Dennis
Name:   Sydney G. Dennis
Title:   Director

Signature Page to Term Loan Credit Agreement
Pacific Gas and Electric Company

CITIBANK, N.A.
as a Lender

By: /s/ Richard Rivera

Name:  Richard Rivera

Title:  Vice President

Signature Page to Term Loan Credit Agreement
Pacific Gas and Electric Company

GOLDMAN SACHS BANK USA
as a Lender

By: /s/ Jacob Elder
Name: Jacob Elder
Title: Authorized Signatory

Signature Page to Term Loan Credit Agreement
Pacific Gas and Electric Company

BNP PARIBAS
as a Lender

By: /s/ Denis O'Meara
Name: Denis O'Meara
Title: Managing Director

By: /s/ Francis Delaney
Name: Francis Delaney
Title: Managing Director

Signature Page to Term Loan Credit Agreement
Pacific Gas and Electric Company

CREDIT SUISSE AG, NEW YORK BRANCH
as a Lender

By: /s/ Vipul Dhadda
Name: Vipul Dhadda
Title: Authorized Signatory

By: /s/ Brady Bingham
Name: Brady Bingham
Title: Authorized Signatory

Signature Page to Term Loan Credit Agreement
Pacific Gas and Electric Company

MIZUHO BANK, LTD.
as a Lender

By: /s/ Edward Sacks
Name: Edward Sacks
Title: Authorized Signatory

Signature Page to Term Loan Credit Agreement
Pacific Gas and Electric Company

MUFG UNION BANK, N.A.
as a Lender

By: /s/ Nietzsche Rodricks
Name: Nietzsche Rodricks
Title: Managing Director

Signature Page to Term Loan Credit Agreement
Pacific Gas and Electric Company

WELLS FARGO BANK, NATIONAL ASSOCIATION
as a Lender

By:   /s/ Gregory R. Gredvig
Name:  Gregory R. Gredvig
Title:   Director

Signature Page to Term Loan Credit Agreement
Pacific Gas and Electric Company

BANK OF MONTREAL, CHICAGO BRANCH
as a Lender

By: /s/ Darren Thomas
Name: Darren Thomas
Title: Vice President

Signature Page to Term Loan Credit Agreement
Pacific Gas and Electric Company

THE BANK OF NEW YORK MELLON
as a Lender

By:    /s/ Molly H. Ross
Name:  Molly H. Ross
Title: Vice President

Signature Page to Term Loan Credit Agreement
Pacific Gas and Electric Company

BANK OF CHINA, LOS ANGELES BRANCH
as a Lender

By: /s/ Yong Ou
Name: Yong Ou
Title: SVP & Branch Director

Signature Page to Term Loan Credit Agreement
Pacific Gas and Electric Company

<div align="center">

**Schedule 1.1**
**Commitments**

</div>

| Lender | 364-Day Tranche Commitment | 18-Month Tranche Commitment |
|---|---|---|
| JPMorgan Chase Bank, N.A. | $ 181,641,025.65 | $ 170,153,846.15 |
| Bank of America, N.A. | $ 166,504,273.50 | $ 155,974,358.98 |
| Barclays Bank PLC | $ 166,504,273.50 | $ 155,974,358.98 |
| Citibank, N.A. | $ 166,504,273.50 | $ 155,974,358.98 |
| Goldman Sachs Bank USA | $ 166,504,273.50 | $ 155,974,358.98 |
| BNP Paribas | $ 115,039,316.24 | $ 107,764,102.56 |
| Credit Suisse AG, New York Branch | $ 115,039,316.24 | $ 107,764,102.56 |
| Mizuho Bank, Ltd. | $ 115,039,316.24 | $ 107,764,102.56 |
| MUFG Union Bank, N.A. | $ 115,039,316.24 | $ 107,764,102.56 |
| Wells Fargo Bank, National Association | $ 115,039,316.24 | $ 107,764,102.56 |
| Bank of Montreal, Chicago Branch | $ 52,978,632.48 | $ 49,628,205.13 |
| The Bank of New York Mellon | $ 22,500,000.00 | $ 22,500,000.00 |
| Bank of China, Los Angeles Branch | $ 1,666,666.67 | $ 95,000,000.00 |
| | $ 1,500,000,000.00 | $ 1,500,000,000.00 |

<div align="center">

[Schedules to Utility Term Loan Credit Agreement]

</div>

**Schedule 7.5**
**<u>Sale and Lease Back Transactions</u>**

The sale and leaseback of the property described to the Administrative Agent prior to the Effective Date as the "SF Properties".

[Schedules to Utility Term Loan Credit Agreement]

[RESERVED]

Exhibits
Term Loan Credit Agreement
Pacific Gas and Electric Company

[RESERVED]

Exhibits
Term Loan Credit Agreement
Pacific Gas and Electric Company

EXHIBIT C

FORM OF COMPLIANCE CERTIFICATE

This Compliance Certificate is delivered pursuant to Section 6.2 of the $3,000,000,000 Term Loan Credit Agreement, dated as of July 1, 2020 (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), among Pacific Gas and Electric Company, a California corporation (the "Borrower"), the Lenders party thereto and JPMorgan Chase Bank, N.A., as administrative agent (in such capacity, together with any permitted successor thereto, the "Administrative Agent"). Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

The undersigned hereby certifies to the Administrative Agent and the Lenders as follows:

1. I am the duly elected, qualified and acting [Chief Financial Officer] [Treasurer] [Assistant Treasurer] of the Borrower.

2. I have reviewed and am familiar with the contents of this Certificate.

3. To the actual knowledge of the undersigned, during the fiscal period covered by the financial statements attached hereto as Attachment 1, no Default or Event of Default has occurred and is continuing [, except as set forth below].

4. Attached hereto as Attachment 2 are the computations showing compliance with the covenant set forth in Section 7.2 of the Credit Agreement.

*[Remainder of page intentionally left blank. Schedule 1 to follow.]*

IN WITNESS WHEREOF, the undersigned has executed this Compliance Certificate as of the date set forth below.

PACIFIC GAS AND ELECTRIC COMPANY

By: _____

Name:

Title:

Date: _____, 20__

[Financial Statements
Period Ended _____, 20___][1]

---

[1]      Include only if financial statements are being physically delivered.

The information described herein is as of _____, 20__.

[Set forth Covenant Calculation]

FORM OF CLOSING CERTIFICATE

This Closing Certificate is delivered pursuant to Section 5.1(f) of the $3,000,000,000 Term Loan Credit Agreement, dated as of July 1, 2020 (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), among Pacific Gas and Electric Company, a California corporation (the "Borrower"), the Lenders party thereto and JPMorgan Chase Bank, N.A., as administrative agent (in such capacity, together with any permitted successor thereto, the "Administrative Agent"). Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement. The undersigned consents to Hunton Andrews Kurth LLP relying upon this Closing Certificate in connection with the opinions to be rendered by it on or about the date hereof relating to the transactions contemplated by the Credit Agreement.

The undersigned [_____] of the Borrower hereby certifies as follows:

1.  [_____] is a duly elected and qualified [_____] of the Borrower and the signature set forth for such officer below is such officer's true and genuine signature.

2.  That the conditions precedent set forth in Sections 5.1 (b), (h) and (i) of the Credit Agreement have been satisfied as of the Effective Date.

The undersigned [_____] of the Borrower hereby certifies as follows:

1.  Attached hereto as Annex 1 is a true and complete copy of resolutions duly adopted by the Board of Directors of the Borrower on [_____]; such resolutions have not in any way been amended, modified, revoked or rescinded, have been in full force and effect since their adoption to and including the date hereof and are now in full force and effect and are the only corporate proceedings of the Borrower now in force relating to or affecting the Credit Agreement.

2.  Attached hereto as Annex 2 is a true and complete copy of the Bylaws of the Borrower as in effect on the date hereof.

3.  Attached hereto as Annex 3 is a true and complete copy of the Articles of Incorporation of the Borrower as in effect on the date hereof, and such Articles of Incorporation have not been amended, repealed, modified or restated.

4.  The following person is now a duly elected and qualified officer of the Borrower holding the office indicated next to his/her name below, and that the facsimile signature affixed next to his/her name below is the facsimile signature of such officer, and such officer is duly authorized to execute and deliver on behalf of the Borrower each of the Loan Documents to which it is a party and any certificate or other document to be delivered by the Borrower pursuant to the Loan Documents to which it is a party:

| Name | Office | Signature |
|------|--------|-----------|
| [_____] | [_____] | |

[Signature Page Follows]

IN WITNESS WHEREOF, the undersigned have executed this Closing Certificate as of the date set forth below.

Name:[_____]          Name:[_____]
Title: [_____]          Title: [_____]

Date: [_____]

[Board Resolutions]

[Bylaws of the Company]

[Articles of Incorporation]

FORM OF
ASSIGNMENT AND ASSUMPTION

This Assignment and Assumption (this "<u>Assignment and Assumption</u>") is dated as of the Effective Date set forth below and is entered into by and between [the][each][1] Assignor identified in item 1 below ([the][each, an] "<u>Assignor</u>") and [the][each][2] Assignee identified in item 2 below ([the][each, an] "<u>Assignee</u>"). [It is understood and agreed that the rights and obligations of [the Assignors][the Assignees][3] hereunder are several and not joint.][4] Capitalized terms used but not defined herein shall have the meanings given to them in the Term Loan Credit Agreement identified below (as amended, the "<u>Credit Agreement</u>"), receipt of a copy of which is hereby acknowledged by [the][each] Assignee. The Standard Terms and Conditions for Assignment and Assumption set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Assumption as if set forth herein in full.

For an agreed consideration, [the][each] Assignor hereby irrevocably sells and assigns to [the Assignee][the respective Assignees], and [the][each] Assignee hereby irrevocably purchases and assumes from [the Assignor][the respective Assignors], subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the Administrative Agent as contemplated below (i) all of [the Assignor's][the respective Assignors'] rights and obligations in [its capacity as a Lender][their respective capacities as Lenders] under the Credit Agreement and any other documents or instruments delivered pursuant thereto in the amount**[s]** and equal to the percentage interest**[s]** identified below of all the outstanding rights and obligations under the respective facilities identified below and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of [the Assignor (in its capacity as a Lender)][the respective Assignors (in their respective capacities as Lenders)] against any Person, whether known or unknown, arising under or in connection with the Credit Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including, but not limited to, contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned by [the][any] Assignor to [the] [any] Assignee pursuant to clauses (i) and (ii) above being referred to herein collectively as [the][an]

---

1  For bracketed language here and elsewhere in this form relating to the Assignor(s), if the assignment is from a single Assignor, choose the first bracketed language. If the assignment is from multiple Assignors, choose the second bracketed language.

2  For bracketed language here and elsewhere in this form relating to the Assignee(s), if the assignment is to a single Assignee, choose the first bracketed language. If the assignment is to multiple Assignees, choose the second bracketed language.

3  Select as appropriate.

4  Include bracketed language if there are either multiple Assignors or multiple Assignees.

Exhibits
Term Loan Credit Agreement
Pacific Gas and Electric Company

"Assigned Interest"). Each such sale and assignment is without recourse to [the][any] Assignor and, except as expressly provided in this Assignment and Assumption, without representation or warranty by [the][any] Assignor.

1. Assignor[s]: _____

   _____

   [Assignor [is] [is not] a Defaulting Lender]

2. Assignee[s]: _____

   _____

   [for each Assignee, indicate [Eligible Assignee] of [*identify Lender*]]

3. Borrower(s): Pacific Gas and Electric Company, a California corporation

4. Administrative Agent: JPMorgan Chase Bank, N.A. as administrative agent under the Credit Agreement

5. Credit Agreement: $3,000,000,000 Term Loan Credit Agreement, dated as of July 1, 2020 (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), among Pacific Gas and Electric Company, a California corporation (the "Borrower"), the Lenders party thereto and JPMorgan Chase Bank, N.A., as administrative agent (in such capacity, together with any permitted successor thereto, the "Administrative Agent")

6. Assigned Interest[s]:

| Assignor[s][5] | Assignee[s][6] | Facility Assigned[7] | Aggregate Amount of Loans for all Lenders | Amount of Loans Assigned | Percentage Assigned[8] of Loans[8] | CUSIP Number |
|---|---|---|---|---|---|---|
| | | _____ | $_____ | $_____ | _____% | |
| | | _____ | $_____ | $_____ | _____% | |
| | | _____ | $_____ | $_____ | _____% | |

_____

5   List each Assignor, as appropriate.
6   List each Assignee and, if available, its market entity identifier, as appropriate.
7   Fill in the appropriate terminology for the types of facilities under the Credit Agreement that are being assigned under this Assignment.
8   Set forth, to at least 9 decimals, as a percentage of the Loans of all Lenders thereunder.

<div align="center">

Exhibits
Term Loan Credit Agreement
Pacific Gas and Electric Company

</div>

Effective Date: _____, 20__ [TO BE INSERTED BY ADMINISTRATIVE AGENT AND WHICH SHALL BE THE EFFECTIVE DATE OF RECORDATION OF TRANSFER IN THE REGISTER THEREFOR.]

The terms set forth in this Assignment and Assumption are hereby agreed to:

[ASSIGNOR(S)]                                          [ASSIGNEE(S)]

By: _____        By: _____
Name:                                                  Name:
Title:                                                   Title:

<div align="center">

Exhibits
Term Loan Credit Agreement
Pacific Gas and Electric Company

</div>

[Consented to and] Accepted

PACIFIC GAS AND ELECTRIC
COMPANY[9]

By: _____
Title: _____

JPMORGAN CHASE BANK, N.A.,
as Administrative Agent[10]

By: _____
Authorized Officer

---

[9] As applicable pursuant to Section 10.6(b).
[10] As applicable pursuant to Section 10.6(b).

Exhibits
Term Loan Credit Agreement
Pacific Gas and Electric Company

STANDARD TERMS AND CONDITIONS FOR
ASSIGNMENT AND ASSUMPTION

1.  Representations and Warranties.

1.1.  Assignor. [The][Each] Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of [the][[the relevant] Assigned Interest, (ii) [the][such] Assigned Interest is free and clear of any lien, encumbrance or other adverse claim, (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and (iv) it is **[not]** a Defaulting Lender and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Credit Agreement or any other Loan Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any collateral thereunder, (iii) the financial condition of the Borrower, any of its Subsidiaries or Affiliates or any other Person obligated in respect of any Loan Document or (iv) the performance or observance by the Borrower, any of its Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Loan Document.

1.2  Assignee. [The][Each] Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) it meets all the requirements to be an assignee under Section 10.6(b)(i) and (ii) of the Credit Agreement (subject to such consents, if any, as may be required under Section 10.6(b)(i) of the Credit Agreement), (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement as a Lender thereunder and, to the extent of [the][the relevant] Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it is sophisticated with respect to decisions to acquire assets of the type represented by [the][such] Assigned Interest and either it, or the Person exercising discretion in making its decision to acquire [the][such] Assigned Interest, is experienced in acquiring assets of such type, (v) it has received a copy of the Credit Agreement, and has received or has been accorded the opportunity to receive copies of the most recent financial statements delivered pursuant to Section 6.1 thereof, as applicable, and such other documents and information as it deems appropriate to make its own credit analysis and decision to enter into this Assignment and Assumption and to purchase [the][such] Assigned Interest, (vi) it has, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Assignment and Assumption and to purchase [the] [such] Assigned Interest, and (vii) if it is a Foreign Lender, attached hereto is any documentation required to be delivered by it pursuant to the terms of the Credit Agreement, duly completed and executed by [the][such] Assignee and (b) agrees that (i) it will, independently and without reliance upon the Administrative Agent, [the][any] Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender.

Exhibits
Term Loan Credit Agreement
Pacific Gas and Electric Company

2.    <u>Payments</u>. From and after the Effective Date, the Administrative Agent shall make all payments in respect of [the] [each] Assigned Interest (including payments of principal, interest, fees and other amounts) to [the][the relevant] Assignor for amounts which have accrued to but excluding the Effective Date and to [the][the relevant] Assignee for amounts which have accrued from and after the Effective Date. Notwithstanding the foregoing, the Administrative Agent shall make all payments of interest, fees or other amounts paid or payable in kind from and after the Effective Date to [the][the relevant] Assignee.

3.    <u>General Provisions</u>. This Assignment and Assumption shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns. This Assignment and Assumption may be executed by one or more of the parties to this Assignment and Assumption on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument. Delivery of an executed signature page of this Assignment and Assumption by facsimile transmission, emailed pdf. or any other electronic means that reproduces an image of the actual executed signature page shall be effective as delivery of an original executed counterpart hereof. The words "execution," "signed," "signature," "delivery," and words of like import in or relating to any document to be signed in connection with this Assignment and Assumption and the transactions contemplated hereby shall be deemed to include an electronic sound, symbol, or process attached to, or associated with, a contract or other record and adopted by a Person with the intent to sign, authenticate or accept such contract or record, deliveries or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act; provided that nothing herein shall require the Administrative Agent to accept electronic signatures in any form or format without its prior written consent. This Assignment and Assumption shall be governed by, and construed in accordance with, the law of the State of New York.

<div align="center">

Exhibits
Term Loan Credit Agreement
Pacific Gas and Electric Company

</div>

[RESERVED].

Exhibits
Term Loan Credit Agreement
Pacific Gas and Electric Company

**FORM OF**
**U.S. TAX COMPLIANCE CERTIFICATE**
(For Foreign Lenders That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the $3,000,000,000 Term Loan Credit Agreement, dated as of July 1, 2020 (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), among Pacific Gas and Electric Company, a California corporation (the "Borrower"), the Lenders party thereto and JPMorgan Chase Bank, N.A., as administrative agent (in such capacity, together with any permitted successor thereto, the "Administrative Agent"). Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

Pursuant to the provisions of Section 2.16(e) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a ten percent shareholder of the Borrower within the meaning of Section 881(c)(3)(B) of the Code and (iv) it is not a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Borrower with a certificate of its non-U.S. Person status on IRS Form W-8BEN or W-8BEN-E, as applicable. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower and the Administrative Agent, and (2) the undersigned shall have at all times furnished the Borrower and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments. Notwithstanding the foregoing, where the undersigned is not an individual, the undersigned shall furnish the Borrower and the Administrative Agent with an IRS Form W-8BEN-E together with this certificate even if the undersigned has previously furnished the Borrower and the Administrative Agent with an IRS Form W-8BEN.

[NAME OF LENDER]

By: _____

    Name: _____

    Title: _____

Date: _____, 20[     ]

Exhibits
Term Loan Credit Agreement
Pacific Gas and Electric Company

**FORM OF**
**U.S. TAX COMPLIANCE CERTIFICATE**
(For Foreign Participants That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the $3,000,000,000 Term Loan Credit Agreement, dated as of July 1, 2020 (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), among Pacific Gas and Electric Company, a California corporation (the "Borrower"), the Lenders party thereto and JPMorgan Chase Bank, N.A., as administrative agent (in such capacity, together with any permitted successor thereto, the "Administrative Agent"). Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

Pursuant to the provisions of Section 2.16(e) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the participation in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a ten percent shareholder of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, and (iv) it is not a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with a certificate of its non-U.S. Person status on IRS Form W-8BEN or W-8BEN-E, as applicable. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender in writing, and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments. Notwithstanding the foregoing, where the undersigned is not an individual, the undersigned shall furnish its participating Lender with an IRS Form W-8BEN-E together with this certificate even if the undersigned has previously furnished such Lender with an IRS Form W-8BEN.

[NAME OF PARTICIPANT]

By: _____

    Name: _____
    Title: _____
Date: _____, 20[  ]

Exhibits
Term Loan Credit Agreement
Pacific Gas and Electric Company

**FORM OF**
**U.S. TAX COMPLIANCE CERTIFICATE**
(For Foreign Participants That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the $3,000,000,000 Term Loan Credit Agreement, dated as of July 1, 2020 (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), among Pacific Gas and Electric Company, a California corporation (the "Borrower"), the Lenders party thereto and JPMorgan Chase Bank, N.A., as administrative agent (in such capacity, together with any permitted successor thereto, the "Administrative Agent"). Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

Pursuant to the provisions of Section 2.16(e) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the participation in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such participation, (iii) with respect such participation, neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a ten percent shareholder of the Borrower within the meaning of Section 881(c)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or W-BEN-E, as applicable, or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or W-8BEN-E, as applicable, from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments. Notwithstanding the foregoing, where any of the undersigned and/or its direct or indirect partners/members is not an individual, the undersigned or the applicable partner(s) or member(s), as the case may be, shall furnish its participating Lender with an IRS Form W-8BEN-E together with this certificate even if the undersigned or the applicable partner(s) or member(s), as the case may be, has previously furnished such Lender with an IRS Form W-8BEN.

[Signature Page Follows]

Exhibits
Term Loan Credit Agreement
Pacific Gas and Electric Company

[NAME OF PARTICIPANT]

By: _____

    Name: _____

    Title: _____

Date: _____, 20[   ]

<div align="center">

Exhibits
Term Loan Credit Agreement
Pacific Gas and Electric Company

</div>

**FORM OF**
**U.S. TAX COMPLIANCE CERTIFICATE**
(For Foreign Lenders That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the $3,000,000,000 Term Loan Credit Agreement, dated as of July 1, 2020 (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), among Pacific Gas and Electric Company, a California corporation (the "Borrower"), the Lenders party thereto and JPMorgan Chase Bank, N.A., as administrative agent (in such capacity, together with any permitted successor thereto, the "Administrative Agent"). Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

Pursuant to the provisions of Section 2.16(e) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such Loan(s) (as well as any Note(s) evidencing such Loan(s)), (iii) with respect to the extension of credit pursuant to this Credit Agreement or any other Loan Document, neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a ten percent shareholder of the Borrower within the meaning of Section 881(c)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Borrower with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or W-8BEN-E, as applicable, or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or W-8BEN-E, as applicable, from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower and the Administrative Agent, and (2) the undersigned shall have at all times furnished the Borrower and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments. Notwithstanding the foregoing, where any of the undersigned and/or its direct or indirect partners/members is not an individual, the undersigned or the applicable partner(s) or member(s), as the case may be, shall furnish the Borrower and the Administrative Agent with an IRS Form W-8BEN-E together with this certificate even if the undersigned or the applicable partner(s) or member(s), as the case may be, has previously furnished the Borrower and the Administrative Agent with an IRS Form W-8BEN.

Exhibits
Term Loan Credit Agreement
Pacific Gas and Electric Company

[NAME OF LENDER]

By: _____

      Name: _____

      Title: _____

Date: _____, 20[  ]

Exhibits
Term Loan Credit Agreement
Pacific Gas and Electric Company

<u>FORM OF NOTE</u>

THIS NOTE AND THE OBLIGATIONS REPRESENTED HEREBY MAY NOT BE TRANSFERRED EXCEPT IN COMPLIANCE WITH THE TERMS AND PROVISIONS OF THE CREDIT AGREEMENT REFERRED TO BELOW. TRANSFERS OF THIS NOTE AND THE OBLIGATIONS REPRESENTED HEREBY MUST BE RECORDED IN THE REGISTER MAINTAINED BY THE ADMINISTRATIVE AGENT PURSUANT TO THE TERMS OF SUCH CREDIT AGREEMENT.

$_____

New York, New York
as of [_____], 20[\_\_]

      FOR VALUE RECEIVED, PACIFIC GAS AND ELECTRIC COMPANY, a California corporation (the "<u>Borrower</u>"), DOES HEREBY PROMISE TO PAY to [insert name of Lender] (the "<u>Lender</u>") or its registered assigns at the office of JPMORGAN CHASE BANK, N.A., at [_____], in lawful money of the United States of America in immediately available funds, the principal amount of _____ DOLLARS ($_____), or, if less, the aggregate unpaid principal amount of all Loans (as defined in the Credit Agreement referred to below) made by the Lender to the Borrower pursuant to the Credit Agreement referred to below, whichever is less, on such date or dates as is required by said Credit Agreement, and to pay interest on the unpaid principal amount from time to time outstanding hereunder, in like money, at such office, and at such times and in such amounts as set forth in Section 2.11 of said Credit Agreement.

      The holder of this Note is authorized to indorse on the schedules annexed hereto and made a part hereof or on a continuation thereof which shall be attached hereto and made a part hereof the date, the Type and amount of each Loan made pursuant to the Credit Agreement and the date and amount of each payment or prepayment of principal thereof, each continuation thereof, each conversion of all or a portion thereof to another Type and, in the case of Eurodollar Loans, the length of each Interest Period with respect thereto. Each such indorsement shall constitute <u>prima facie</u> evidence of the accuracy of the information indorsed. The failure to make any such indorsement or any error in any such indorsement shall not affect the obligations of the Borrower in respect of any Loan.

      The Borrower hereby waives demand, presentment for payment, protest, notice of any kind (including, but not limited to, notice of dishonor, notice of protest, notice of intention to accelerate or notice of acceleration), other than notice required pursuant to the Credit Agreement and diligence in collecting and bringing suit against any party hereto. The nonexercise by the holder of this Note of any of its rights hereunder in any particular instance shall not constitute a waiver thereof in that or any subsequent instance.

<div align="center">

Exhibits
Term Loan Credit Agreement
Pacific Gas and Electric Company

</div>

This Note (a) is one of the promissory notes referred to in the $3,000,000,000 Term Loan Credit Agreement, dated as of July 1, 2020 (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), among the Borrower, the Lenders party thereto and JPMorgan Chase Bank, N.A., as administrative agent (in such capacity, together with any permitted successor thereto, the "Administrative Agent"), (b) is subject to the provisions of the Credit Agreement and (c) is subject to optional prepayment in whole or in part and acceleration of the maturity hereof upon the occurrence of certain events, all as provided in the Credit Agreement. Terms defined in the Credit Agreement are used herein as therein defined.

**NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN OR IN THE CREDIT AGREEMENT, THIS NOTE MAY NOT BE TRANSFERRED EXCEPT PURSUANT TO AND IN ACCORDANCE WITH THE REGISTRATION AND OTHER PROVISIONS OF SECTION 10.6 OF THE CREDIT AGREEMENT.**

**THIS NOTE SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.**

PACIFIC GAS AND ELECTRIC COMPANY

By: _____
     Name:
     Title:

Exhibits
Term Loan Credit Agreement
Pacific Gas and Electric Company

LOANS, CONVERSIONS AND REPAYMENTS OF ABR LOANS

| Date | Amount of ABR Loans | Amount Converted to ABR Loans | Amount of Principal of ABR Loans Repaid | Amount of ABR Loans Converted to Eurodollar Loans | Unpaid Principal Balance of ABR Loans | Notation Made By |
|------|---------------------|-------------------------------|------------------------------------------|---------------------------------------------------|----------------------------------------|------------------|
|      |                     |                               |                                          |                                                   |                                        |                  |
|      |                     |                               |                                          |                                                   |                                        |                  |
|      |                     |                               |                                          |                                                   |                                        |                  |
|      |                     |                               |                                          |                                                   |                                        |                  |
|      |                     |                               |                                          |                                                   |                                        |                  |

Exhibits
Term Loan Credit Agreement
Pacific Gas and Electric Company

LOANS, CONTINUATIONS, CONVERSIONS AND REPAYMENTS OF EURODOLLAR LOANS

| Date | Amount of Eurodollar Loans | Amount Converted to Eurodollar Loans | Interest Period and Eurodollar Rate with Respect Thereto | Amount of Principal of Eurodollar Loans Repaid | Amount of Eurodollar Loans Converted to ABR Loans | Unpaid Principal Balance of Eurodollar Loans | Notation Made By |
|------|------|------|------|------|------|------|------|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

Exhibits
Term Loan Credit Agreement
Pacific Gas and Electric Company

EXHIBIT I

**Form of Solvency Certificate**

[DATE]

This Solvency Certificate ("<u>Certificate</u>") of Pacific Gas and Electric Company, a California corporation (the "<u>Borrower</u>"), and its Subsidiaries is delivered pursuant to Section 5.1(j) of the $3,000,000,000 Term Loan Credit Agreement, dated as of July 1, 2020 (as amended, supplemented or otherwise modified from time to time, the "<u>Credit Agreement</u>"), among the Borrower, the Lenders party thereto and JPMorgan Chase Bank, N.A., as administrative agent (in such capacity, together with any permitted successor thereto, the "<u>Administrative Agent</u>"). Unless otherwise defined herein, capitalized terms used in this Certificate shall have the meanings set forth in the Credit Agreement.

I, [_____], the duly elected, qualified and acting [Chief Financial Officer] of the Borrower and its Subsidiaries, DO HEREBY CERTIFY that I have reviewed the Credit Agreement and the other Loan Documents referred to therein and have made such investigation as I have deemed necessary to enable me to express a reasonably informed opinion as to the matters referred to herein.

I HEREBY FURTHER CERTIFY, in my capacity as [Chief Financial Officer] and not in my individual capacity, that as of the date hereof, immediately after giving effect to the Credit Agreement and the transactions contemplated thereby:

1.    The fair value of the assets of the Borrower and its Subsidiaries, on a consolidated basis, at a fair valuation on a going concern basis, exceeds, on a consolidated basis, their debts and liabilities, subordinated, contingent or otherwise.

2.    The present fair saleable value of the property of the Borrower and its Subsidiaries, on a consolidated and going concern basis, is greater than the amount that will be required to pay the probable liability, on a consolidated basis, of their debts and other liabilities, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured in the ordinary course of business.

3.    The Borrower and its Subsidiaries, on a consolidated basis, are able to pay their debts and liabilities, subordinated, contingent or otherwise, as such liabilities become absolute and matured in the ordinary course of business.

4.    The Borrower and its Subsidiaries are not engaged in businesses, and are not about to engage in businesses for which they have unreasonably small capital.

For purposes of this Certificate, the amount of any contingent liability at any time shall be computed as the amount that, in light of all the facts and circumstances existing as of the date hereof, would reasonably be expected to become an actual and matured liability.

Exhibits
Term Loan Credit Agreement
Pacific Gas and Electric Company

For the purpose of the foregoing, I have assumed there is no default under the Credit Agreement on the date hereof and will be no default under the Credit Agreement after giving effect to the funding under the Credit Agreement.

[Remainder of page intentionally left blank]

Exhibits
Term Loan Credit Agreement
Pacific Gas and Electric Company

IN WITNESS WHEREOF, I have executed this Certificate as of the date first written above.

PACIFIC GAS AND ELECTRIC COMPANY

By: _____

Name:
Title: Chief Financial Officer

Exhibits
Term Loan Credit Agreement
Pacific Gas and Electric Company

**Exhibit 99.1**

Dear Nora and Bill,

I am resigning as a board member and audit chair of PG&E, effective immediately, in relation to the upcoming emergence from bankruptcy, confirmation of the Chapter 11 Plan, and in conformance with the agreement with the Governor's Office.

My resignation is further due to a disagreement with PG&E's intended policy to carry out the Governor's Office mandate for the Company to retain Filsinger Partners for a period of time post emergence.

It's been a pleasure to serve on the board and I remain at your disposal.

Warm regards,

Dominique