**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| In re:<br><br>PG&E CORPORATION<br><br>- and –<br><br>PACIFIC GAS AND ELECTRIC COMPANY,<br><br>Debtors.<br><br>☒ Affects Both Debtors<br>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company | Case No. 19-30088 (DM) (Lead Case)<br><br>Chapter 11<br><br>(Jointly Administered)<br><br><br>**DECLARATION OF CHAD COFFMAN, CFA IN SUPPORT OF SECURITIES LEAD PLAINTIFF'S MOTION TO APPLY BANKRUPTCY RULE 7023 AND CERTIFY A LIMITED CLASS** |

I, Chad Coffman, submit this declaration pursuant to 28 U.S.C §1746 and declare as follows:

## I. INTRODUCTION

1. I have been retained by counsel ("**Lead Counsel**") for the Public Employee Retirement Association of New Mexico ("Securities Lead Plaintiff" or "**PERA**") as a consulting expert on behalf of Securities Lead Plaintiff in the above-captioned Chapter 11 cases (the "**Chapter 11 Cases**") of the above-captioned debtors and debtors-in-possession (collectively, "**PG&E**" or the "**Debtors**"). My assignment is to analyze the Debtors' confirmed Plan[1] and the Securities Claims at issue, and determine whether the techniques typically used in settlement of federal securities class actions can be applied here. Specifically, Lead Counsel requested that I provide the Court with an explanation of how readily a typical plan of allocation – one that follows the standards commonly applied in securities class action settlements – can be developed

---

[1] Capitalized terms used but not defined herein shall have the meanings given thereto in *Securities Lead Plaintiff's Motion to Apply Bankruptcy Rule 7023 and Certify a Limited Class* filed simultaneously herewith.

and applied in the Chapter 11 Cases to ensure that each Securities Claimant receives its pro rata share of any recovery in the Action, and that takes into account (a) the nine events on which PG&E securities allegedly experienced fraud-related losses, (b) a Securities Claimant's trading information, and (c) the formula for converting allowed damages to shares that was approved in the Chapter 11 Cases (as set forth in Section 1.109 of the Plan).

2. The details of my opinions are provided in the sections of this declaration immediately following my qualifications.

## II. QUALIFICATIONS

3. I am the President of Global Economics Group, a Chicago-based firm that specializes in the application of economics, finance, statistics, and valuation principles to questions that arise in a variety of contexts, including, as here, in the context of litigation.

4. I hold a Bachelor's Degree in Economics with Honors from Knox College and a Master's of Public Policy from the University of Chicago. I am also a CFA charter-holder. The CFA, or Chartered Financial Analyst designation, is awarded to those who have sufficient practical experience and complete a rigorous series of three examinations over three years that cover a wide variety of financial topics including financial statement analysis and valuation.

5. I, along with several others, founded Global Economics Group in March 2008. (Prior to March 16, 2011, Global Economics Group was known as Winnemac Consulting, LLC.) Prior to starting Global Economics Group, I was employed by Chicago Partners, LLC for over twelve years where I was responsible for conducting and managing analysis in a wide variety of areas including securities valuation and damages, labor discrimination, and antitrust. I have been engaged numerous times as a valuation expert both within and outside the litigation context. My experience in class action securities cases includes work for plaintiffs, defendants, D&O insurers, and prominent mediators to provide economic analysis and opinions in dozens of securities class actions as well as other matters. As part of my work in securities class actions, I have assisted counsel in designing Plans of Allocation in dozens in cases.

### III. CALCULATING CLAIMANT DAMAGES IN RULE 10b-5 AND SECTION 11 CLASS ACTION MATTERS

6. Securities Lead Plaintiff claims that the Debtors made alleged false and misleading statements between April 29, 2015 and November 15, 2018 (the "**Class Period**") and that Class members suffered losses upon nine fraud-related disclosures that affected the market price of PG&E securities.[2] Once the fraud-related loss from each of the nine disclosures is quantified, the computation of damages is formulaic and subject to a well-accepted methodology that can be applied class-wide.

7. For losses to be compensable damages under Rule 10b-5 of the federal securities laws, the allegedly misrepresented information must cause the decline in the price of the relevant security. Thus, to suffer damages and participate in the distribution of a Rule 10b-5 settlement in this case, a Securities Claimant must have purchased or otherwise acquired PG&E common stock during the Class Period and must have suffered a loss resulting from the alleged misstatements on his/her/its investments in PG&E common stock.

8. Further, for losses to be compensable damages under Section 11 of the securities laws, information must be misrepresented in a registration statement such as a bond offering. Thus, to suffer damages and participate in the distribution of a settlement in this case, a claimant must have purchased or otherwise acquired registered PG&E bonds and suffered a loss.

9. The calculations needed to determine any individual claimant's recovery in a securities class action plan of allocation are based on well-established methodologies that apply equally across Class members.

10. For instance, damages in this matter can be calculated using a methodology common to the Class. Indeed, the standard and well-settled formula for assessing damages for each Class member under Rule 10b-5 is the "out-of-pocket" method, which measures damages as the artificial (*i.e.,* fraud-related) inflation per share at the time of purchase less the artificial inflation per share at the time of sale (or just the inflation per share at the time of purchase if the

---

[2] Third Amended Consolidated Class Action Complaint ("**Complaint**") ¶¶ 1-10, 328-381.

Case: 19-30088    Doc# 9157    Filed: 09/28/20    Entered: 09/28/20 16:32:37    Page 3 of 13

1    share is held through the final relevant disclosure).  This approach ensures that only investors that were damaged by the dissipation of artificial inflation are compensated.  For example, if an investor purchased PG&E stock when there was $10 per share of artificial inflation, but sold before any of the fraud-related disclosures, and thus sold their share when there was still $10 per share of artificial inflation, then that investor would have zero damages.  In other words, only investors that held their shares through at least one of the fraud-related disclosures, and therefore suffered a fraud-related investment loss, have a claim under application of the standard formula.

11.    Likewise, if an investor purchased when there was $10 of artificial inflation, but sold after one or more of the fraud-related disclosures when the artificial inflation had been dissipated from $10 per share to $3 per share, then that investor would have a claim for $7 per share in damages ($10 of inflation at time of purchase *minus* $3 per share of inflation at the time of sale).  In other words, the investor suffered a loss of $7 per share upon the disclosure of fraud-related information.

12.    As described in more detail below in Section IV, a common method can be used to establish the artificial inflation of PG&E during the Class Period by quantifying the fraud-related loss from each of the nine purported disclosures. Once the fraud-related loss is determined for each of the nine disclosures, a simple mathematical formula can be applied to determine an "out-of-pocket" loss.

13.    Typically, once the artificial inflation is determined, a claims administrator only needs to apply a straightforward set of calculations to each claim based on submitted trading data to determine each claimant's recovery. For instance, an accounting methodology such as "first-in, first-out," or "FIFO," is often used to match purchases and sales. Then damages can be calculated as the artificial inflation at purchase minus the artificial inflation at sale.

IV.    **DETERMINING ARTIFICIAL INFLATION PER SHARE**

14.    It is my understanding that if a class is certified in the Chapter 11 Cases, the parties may enter a period of mediation, during which time there may be a discussion of how to calculate damages over the nine events during which investors are alleged to have experienced losses related to the Debtors' misstatements and/or omissions. To calculate such damages, the

methodology and evidence for establishing the artificial inflation per share in the market price of the securities during the Class Period, as detailed above, is also common to the Class and can be measured class-wide.

15. In particular, as is standard procedure in Rule 10b-5 cases, the most common methodology to quantify artificial inflation relies on a technique called an "event study." An event study is a well-accepted statistical method utilized to isolate the impact of information on market prices, and has been relied upon by academics (both inside and outside of the context of litigation) to establish a causal connection between new company-specific news events and movements in the market price of company securities.[3] Moreover, event studies have now been used for over 40 years and appear in hundreds, if not thousands, of academic articles as scientific evidence in evaluating how new information affects securities prices.[4] Further, because a properly performed event study only attributes stock price movements to new information, and not previously disclosed information (*i.e.*, "truth on the market"), the methodology inherently addresses and forecloses any damages from the disclosure of previously released information.

16. In my work on this case, I developed a preliminary event study suitable for framing the issues expected to be addressed at mediation.[5] This analysis was used for a limited purpose in a confidential setting, to determine whether PG&E common stock reacted to the release of purported fraud-related information in a statistically significant manner after controlling for market and industry factors. I have used the results of the event study to preliminarily determine

---

[3] David I. Tabak and Frederick C. Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," Ch. 19, *Litigation Services Handbook, The Role of the Financial Expert*, Third Edition, 2001.

[4] John Binder, "The Event Study Methodology Since 1969," *Review of Quantitative Finance and Accounting* Vol. 11, 1998, pp. 111-137.

[5] Such preliminary event studies are typically used by parties during mediation to provide a framework and guide for determining damages metrics. I understand that I may not disclose the particulars of materials developed for the purposes of mediation as being subject to a mediation privilege and Federal Rule of Evidence 408. Because the existence of such preliminary studies are extraordinarily commonplace, I believe that the information herein does not trigger concerns related to the mediation privilege.

Case: 19-30088    Doc# 9157    Filed: 09/28/20    Entered: 09/28/20 16:32:37    Page 5 of 13

the amount of artificial inflation per share that was potentially dissipated during the Class Period based on the alleged fraud-related disclosures. My understanding from counsel is that the Debtors will have the opportunity to perform their own independent event study for the mediator's consideration. Regardless of the outcome, this analysis, and the evidence supporting it, are common to the Class.

17. I understand there are nine stock loss events alleged in this case whereon the price of PG&E stock declined, allegedly due to the fraud. The fact that there are nine alleged fraud-related events does not create any impediment to determining the artificial inflation during the Class Period and then applying a class wide formula to determine recovery. It is also my understanding that counsel for PERA would, on behalf of the Class, negotiate during mediation the amount of loss attributable to each stock decline, based on my preliminary event study, the strength of the claims, each false and misleading statement and omission, and the information revealed on the nine allegedly fraud-related loss events. In my professional experience, the establishment of such a number for each stock decline is conducted routinely in the development of court-approved plans of allocation for securities class actions, a process in which I have participated on dozens of occasions.

18. Once the parties agree on a numerical value for fraud-related artificial inflation attributable to each of the nine loss events, damages for any individual Class member could then be calculated formulaically based upon information collected in the claims process (*i.e.*, the investor's purchase and sale history for the security, which is routinely available from brokerage statements and/or other documents that provide evidence of securities transactions).[6] This standard methodology can determine the damages suffered by equity claimants on a share by share basis, for each of the nine loss events on each day of the Class Period.

---

[6] For simplicity I have assumed that the inflation dissipated by each disclosure was present in the common stock from the beginning of the Class Period. This is the most common approach and is referred to as the "constant dollar" methodology. Nevertheless, regardless of whether that assumption holds, and even if an alternative method for quantifying inflation prior to the disclosures were applied, the damages under the "out-of-pocket" method described herein can still be calculated formulaically on a class-wide basis.

19. Further, the proper measure of damages for bond claims arising under Section 11 is set by statute – 15 U.S.C. § 77k(e) – and can be determined on a class-wide basis through similar methods. As a result, there is a standard procedure for calculating such damages that involves the simple application of a formula established by Congress to the trading information of Class members. The statutory formula for bond claimants under Section 11 can likewise be applied formulaically for each of the bonds at issue.

20. Based on my expertise, experience in dozens of similar matters, and understanding of the nature of the claims in this case, I conclude that damages in the Chapter 11 Cases are readily determinable based on the well-settled, common methodology, described above, that can be applied to the Class as a whole.

## V. THE ABOVE METHODOLOGY DOVETAILS WITH THE PLAN

21. It is my understanding that in the Chapter 11 Cases, common stock Securities Claimants will be compensated in shares rather than dollars by converting the calculated "out-of-pocket" dollar damages to shares based on the purchase date of the damaged shares using the following algorithm:[7]

    a) Dollar claims relating to purchases of PG&E common stock from April 29, 2015 through and including October 13, 2017 get divided by 65.00;

    b) Dollar claims relating to purchases of PG&E common stock from October 14, 2017, through and including December 20, 2017, get divided by 46.50;

    c) Dollar claims relating to purchases of PG&E common stock from December 21, 2017, through and including May 25, 2018, get divided by 37.25; and

    d) Dollar claims relating to purchases of PG&E common stock from May 26, 2018, through and including November 15, 2018, get divided by 32.50.

22. This conversion from dollars to shares dovetails with the standard methodology for calculating recovery amounts. It simply requires the basic mathematical function above to be

---

[7] Plan, Dkt. No. 8053 at Section 1.109.

applied after the typical dollar-loss calculations, detailed above, are determined based on the purchase dates corresponding to the calculated dollar losses.

23. A further benefit to using the typical securities class action settlement methodology in this matter is that it utilizes a standard set of calculations and applies them to all claims in a manner that, in combination with the above algorithm, may simply be processed by a claims administrator. As a result, all Securities Claimants will receive compensation by the same uniform process and in the same time frame in accordance with the Plan. Thus, using standard methodologies still ensures that all Securities Claimants are treated fairly and equally under the same set of rules, regardless of their ability or inability to obtain assistance from outside professionals and independent of their differences in bargaining power.

24. I understand that there is no such algorithm in the Plan related to bond Securities Claimants, because the Plan provides for payment of all allowed damages for bond claims in cash and in full.

## VI. EXAMPLES OF RECOVERIES USING THE STANDARD METHODOLOGY DESCRIBED HEREIN, IN COMBINATION WITH THE PLAN

25. Below, I walk through sample calculations in greater detail, starting with the common stock.

### A. CALCULATING RECOVERIES FOR A COMMON STOCK CLAIM

26. As an example, Table 1 provides hypothetical trading data similar to what a PG&E stock Securities Claimant may submit to the claims administrator. In this hypothetical, the claimant owned no PG&E shares prior to the Class Period and made a number of purchases and sales over the Class Period.

| Table 1. Claimant Transaction Data ||||| 
|---|---|---|---|---|
| Trade No | Trade Date | Buy or Sell | Number of shares | Shares Held |
| 1 | October 10, 2017 | Buy | 100 | 100 |
| 2 | November 16, 2017 | Buy | 200 | 300 |
| 3 | December 21, 2017 | Sell | 100 | 200 |
| 4 | January 12, 2018 | Buy | 100 | 300 |
| 5 | November 9, 2018 | Buy | 300 | 600 |
| 6 | November 15, 2018 | Sell | 600 | 0 |

27. By matching the trades with the alleged artificial inflation embedded in the stock by date as shown in Table 2, the Securities Claimant's damages can be calculated easily.[8]

| Table 2. Artificial Inflation per Share by Transaction Date over the Class Period ||
|---|---|
| Transaction Date | Artificial Inflation Per Share |
| April 29, 2015 – October 11, 2017 | $56 |
| October 12, 2017 | $51 |
| October 13, 2017 – October 15, 2017 | $44 |
| October 16, 2017 – December 20, 2017 | $40 |
| December 21, 2017 – May 28, 2018 | $33 |
| May 29, 2018 – June 10, 2018 | $31 |
| June 11, 2018 – November 8, 2018 | $30 |
| November 9, 2018 – November 11, 2018 | $22 |
| November 12, 2018 – November 13, 2018 | $15 |
| November 14, 2018 | $8 |
| November 15, 2018 or later | $0 |

28. In Table 1, the first purchase was for 100 shares on October 10, 2017. Using FIFO accounting as described above, these 100 shares were sold on December 21, 2017 (Trade No. 3). Inflation on the date of purchase can be found in the first row, $56. Artificial inflation on the date of sale was $33. Subtracting inflation at sale from inflation at purchase is $23 per share ($56-$33). Multiplying that $23 per share by the 100 shares purchased results in damages of $2,300.

---

[8] The artificial inflation presented in Table 2 is for ease of exposition only, though the date ranges align with the fraud-related events in the Complaint. Also, the nine events in the Complaint led to price declines on ten distinct days, which aligns with the ten drops presented in Table 2.

The purchase date puts those 100 shares in the first settlement tranche (*i.e.*, subject to the calculation in ¶21(a) above), which means that we must apply a conversion factor of 65, meaning we divide $2,300 by $65, which is 35.38, so this purchase would add 35.38 shares of PG&E stock to the Securities Claimant's claim.

29. The second purchase was for 200 shares on November 16, 2017, which places it in the second tranche. This purchase and all the remaining purchases were sold at the end of the Class Period when all of the artificial inflation had been removed from the price of the stock. Inflation in the price at purchase was $40 according to Table 2. As done for the first purchase, inflation at the time of purchase ($40) minus inflation at the time of sale ($0) is multiplied by the shares purchased (200) resulting in damages of $8,000 (200 shares * ($40-$0)). Applying the conversion factor for Tranche 2 of 46.50 results in a claim of 172.04 shares.

30. The third and fourth purchases fall in the third and fourth tranches, respectively. Like the second purchase, there was no inflation in the stock at the time of sale for either purchase. Thus, it follows that dollar damages for the third purchase are found by multiplying the 100 purchased shares by the difference in inflation at the time of purchase and sale, $33 ($33-$0), which is $3,300, and dollar damages for the fourth purchase are found by multiplying the 300 purchased shares by $22, which is $6,600 (300 shares * ($22 at time of purchase minus $0 at time of sale). Dividing the $3,300 by the third tranche conversion factor of 37.25 results in a claim of 88.59 shares ($3,300/37.25) for the third purchase, and dividing the $6,600 by the fourth tranche conversion factor of 32.50 results in a claim of 203.08 shares ($6,600/32.50).

31. As shown in Table 3, this Securities Claimant's total claim would be 449.10 new PG&E shares (35.38 from the first purchase, 172.04 from the second purchase, 88.59 from the third purchase, and 203.08 from the fourth purchase).

**Table 3. Summary of Stock Claim Calculations**

| Purchase Date | Artificial Inflation per Share at Time of Purchase | Artificial Inflation per Share at Time of Sale | Difference in Artificial Inflation per Share at Purchase and Sale | Number of Shares Purchased | Dollar Damages | Tranche Conversion Factor | Shares to Claim |
|---|---|---|---|---|---|---|---|
| [A] | [B] | [C] | [D]=[B]-[C] | [E] | [F]=[D]*[E] | [G] | [H]=[F]/[G] |
| October 10, 2017 | $56.00 | $33.00 | $23.00 | 100 | $2,300 | 65.00 | 35.38 |
| November 16, 2017 | $40.00 | $0.00 | $40.00 | 200 | $8,000 | 46.50 | 172.04 |
| January 12, 2018 | $33.00 | $0.00 | $33.00 | 100 | $3,300 | 37.25 | 88.59 |
| November 9, 2018 | $22.00 | $0.00 | $22.00 | 300 | $6,600 | 32.50 | 203.08 |
| | | | | | | **TOTAL CLAIM** | **499.10** |

### B. CALCULATING RECOVERIES FOR A BOND CLAIM

32. PG&E issued five bonds during the Class Period for which there are Section 11 claims at issue. Calculating dollar damages associated with purchases of these bonds during the Class Period is a straightforward formulaic exercise given any Securities Claimant's trading records.

33. Damages for all bonds in this matter fall under the statutory damages formula under Section 11. This statute prescribes the methodology that will be used to calculate damages for all eligible bonds.[9] Below I expand upon this statutory framework and provide examples of damages calculations for hypothetical investors in one of those bonds "Bond A," which was issued on March 1, 2016 at an offering price of $997.34 per bond.

---

[9] The statute also states that a defendants may mitigate damages by proving "negative causation", *i.e.* that some of the diminution in value of the security was caused by information unrelated to the alleged misstatements. For ease of exposition, I have not assumed any negative causation, but any proof of negative causation would be common to the Class and would not interfere with the formulaic computation of damages described herein.

34.     According to the statute, for each eligible bond purchased during the Class Period and subsequently sold on or prior to February 22, 2019 (the "date of suit"), damages are measured as the difference between the amount paid for the security (not to exceed the price at which the security was offered to the public, in this case $997.34) and the price at which the security was sold. Examples of the damages calculations for Bond A Class Period purchases and sold prior to the date of suit are in Table 4, Panel A.

35.     The statute also says that for each eligible bond purchased on or before February 22, 2019 (the date of suit) and sold *after* February 22, 2019, but before the entry of judgment, the damages formula is the same as articulated above, the difference between the amount paid for the security (not to exceed the price at which the security was offered to the public) and the price at which the security was sold), except if the sale price is lower than the value of the security on the date of suit, in which case the calculation limits the damages to the purchase price (not to exceed the price at which the security was offered to the public) minus the value of the security on the date of suit.[10] In other words, further deterioration in the value of the security after the date of suit shall not be included in the damages. Examples of the damages calculations for Class Period purchases that were sold after the date of suit and before the date of judgment are in Table 4, Panel B.

36.     Finally, the statute says that for each eligible bond purchased on or before February 22, 2019 (the date of suit) and retained through judgment, damages are measured as the difference between the amount paid for the security (not to exceed the offering price) and the value of the security on the date of suit. As a result, per bond damages are equal to the purchase price (up to the $997.34 per bond offering price) minus $801.90, the closing price on February 22, 2019. Examples of the damages calculations for Class Period purchases held through the date of judgment are in Table 4, Panel C.

---

[10] The closing price on the date of suit (February 22, 2019) for Bond A was $801.90 per bond. Therefore, the maximum damages for a bond held through the date of suit is $195.44 per bond (the offering price of $997.34 less the closing price of $801.90 on the date of suit).

-12-

### Table 4. Summary of Bond Claim Calculations

#### Panel A. Bonds Sold on or Prior to the Date of Suit, February 22, 2019

| Purchase Date | Purchase Price | Sale Date | Sales Price | Price on Date of Suit | Dollar Damages per Bond |
|---|---|---|---|---|---|
| [A] | [B] | [C] | [D] | [E] | [F] = Min($997.34,[B]) - [D] |
| October 10, 2017 | $1,001.80 | June 1, 2018 | $916.84 | n/a | $80.50 |
| November 16, 2017 | $983.99 | July 10, 2018 | $914.55 | n/a | $69.44 |
| January 12, 2018 | $967.90 | January 2, 2019 | $829.30 | n/a | $138.60 |
| November 9, 2018 | $879.27 | February 1, 2019 | $800.00 | n/a | $79.27 |

#### Panel B. Bonds Sold After the Date of Suit, February 22, 2019, and Before the Date of Judgment

| Purchase Date | Purchase Price | Sale Date | Sales Price | Price on Date of Suit | Dollar Damages per Bond |
|---|---|---|---|---|---|
| [A] | [B] | [C] | [D] | [E] | [F] = Min($997.34,[B]) - Max([D],(E]) |
| October 10, 2017 | $1,001.80 | July 25, 2019 | $957.50 | $801.90 | $39.84 |
| November 16, 2017 | $983.99 | April 22, 2019 | $886.50 | $801.90 | $97.49 |
| January 12, 2018 | $967.90 | April 8, 2019 | $872.50 | $801.90 | $95.40 |
| November 9, 2018 | $879.27 | February 27, 2019 | $799.50 | $801.90 | $77.37 |

#### Panel C. Bonds Retained Through the Date of Judgment

| Purchase Date | Purchase Price | Sale Date | Sales Price | Price on Date of Suit | Dollar Damages per Bond |
|---|---|---|---|---|---|
| [A] | [B] | [C] | [D] | [E] | [F] = Min($997.34,[B]) - [E] |
| October 10, 2017 | $1,001.80 | n/a | n/a | $801.90 | $195.44 |
| November 16, 2017 | $983.99 | n/a | n/a | $801.90 | $182.09 |
| January 12, 2018 | $967.90 | n/a | n/a | $801.90 | $166.00 |
| November 9, 2018 | $879.27 | n/a | n/a | $801.90 | $77.37 |

I hereby certify under penalty of perjury that the foregoing statements made by me are true and correct.

Dated: September 28, 2020

*Chad Coffman* (signature)

Chad Coffman