ANDREW J. McCLURE (SBN 266825)
MINASIAN, MEITH, SOARES,
SEXTON & COOPER, LLP
1681 Bird Street, P.O. Box 1679
Oroville, California 95965
Telephone: (530) 533-2885
Fax: (530) 533-0197

Attorneys for Solano Irrigation District

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| **In re:** | **Bankruptcy Case No.:**19-30088 (DM) |
| **PG&E CORPORATION,** | Chapter 11 |
| -and- | (Lead Case) (Jointly Administered) |
| **PACIFIC GAS AND ELECTRIC COMPANY,** | **DECLARATION OF CAMMIE MORIN IN SUPPORT OF SOLANO IRRIGATION DISTRICT'S OPPOSITION TO THE REORGANIZED DEBTORS' FIFTEENTH OMNIBUS OBJECTION TO CLAIMS (SATISFIED CLAIMS) CONCERNING CLAIM NO. 1952** |
| **Debtors.** | |
| Affects PG&E Corporation Affects Pacific Gas and x Affects both Debtors | **Response Deadline:** **October 14, 2020, 4:00 p.m. (PT)** |
| *All papers shall be filed in the Lead Case, No. 19-30088 (DM) | **Hearing Information If Timely Response Made:** Date: October 28, 2020 Time 100:00 a.m. (Pacific Time) Place: (Telephonic Appearances Only) United States Bankruptcy Court Courtroom 17, 16th Floor San Francisco. CA 94102 |

I, Cammie Morin, declare as follows:

1.     I am the Finance Manager of Solano Irrigation District ("SID"). I have served in

that role since June of 2010. My role as Finance Manager includes the supervision of all

financial affairs of the District, including accounting concerning the Monticello Power Project.

-1-

**DECLARATION OF CAMMIE MORIN IN SUPPORT OF SOLANO IRRIGATION DISTRICT'S**
**OPPOSITION TO THE REORGANIZED DEBTORS' FIFTEENTH OMNIBUS OBJECTION TO CLAIMS**
**(SATISFIED CLAIMS) CONCERNING CLAIM NO. 1952**

Case: 19-30088    Doc# 9256    Filed: 10/08/20    Entered: 10/08/20 14:35:13    Page 1 of 64

MINASIAN, MEITH, SOARES, SEXTON & COOPER, LLP
1681 Bird Street
P.O. Box 1679
Oroville, CA 95965
(530) 533-2885

2.      SID and Pacific Gas & Electric Company are parties to the 1981 Monticello Power Purchase Contract. A true and correct copy is set forth in Attachment 1 hereto. Pursuant that Power Purchase Contract, PG&E pays SID to operate and maintain the Monticello Power Project. Since the early 1980s, SID has invoiced PG&E for recoverable Operation and Maintenance Costs on a monthly basis, and PG&E has paid those costs to SID.

3.      In January 2019, SID incurred $145,008.03 in recoverable Project Operation and Maintenance Costs. On February 12, 2019, SID invoiced PG&E for those costs. A true and correct copy of the invoice is attached hereto as Attachment 2.

4.      After PG&E filed its Chapter 11 Bankruptcy Petition, in March 2019, SID filed a Proof of Claim for the $145, 008.03 due from PG&E pursuant to the Monticello Power Purchase Contract. The Bankruptcy Court assigned Claim No. 1952 to this claim. A true and correct copy of Proof of Claim No. 1952 is attached as Attachment 3 hereto.

5.      SID has not been paid in whole or in part the amounts due pursuant to Claim No. 1952, and as of the date of this declaration, PG&E continues to owe SID the amount of $145,008.03 for costs incurred to operate and maintain the Monticello Power Project in January, 2019.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on October __8___, 2020.


By: _____
    Cammie Morin

-2-

**DECLARATION OF CAMMIE MORIN IN SUPPORT OF SOLANO IRRIGATION DISTRICT'S
OPPOSITION TO THE REORGANIZED DEBTORS' FIFTEENTH OMNIBUS OBJECTION TO CLAIMS
(SATISFIED CLAIMS) CONCERNING CLAIM NO. 1952**

Case: 19-30088    Doc# 9256    Filed: 10/08/20    Entered: 10/08/20 14:35:13    Page 2 of 64

# ATTACHMENT 1

SOLANO IRRIGATION DISTRICT AND
PACIFIC GAS AND ELECTRIC COMPANY

MONTICELLO POWER PURCHASE CONTRACT

THIS CONTRACT entered into as of this 1st day of September 1981, by and between PACIFIC GAS AND ELECTRIC COMPANY, hereinafter referred to as "Pacific," and SOLANO IRRIGATION DISTRICT, hereinafter referred to as "Solano."

W I T N E S S E T H :

WHEREAS, on April 25, 1980, the parties hereto entered into a Memorandum of Understanding, as amended, contemplating the construction by Solano of its Monticello Power Project and the purchase by Pacific of electric power generated by Solano at that project;

WHEREAS, Solano has completed preliminary steps necessary to provide for the said construction; and

WHEREAS, it is timely to enter into this Power Purchase Contract ("Contract") in order to provide for said construction and power purchases.

NOW THEREFORE, it is mutually agreed by and between the parties hereto as follows:

1. This Contract includes Appendix A, Definitions; Appendix B, Requirements and General Specifications for the Monticello Power Project; Appendix C, Operation and Maintenance Requirements; Appendix D, Memorandum of Understanding, as amended; and Appendix E, Power Purchase Payment Schedule. For clearness, words or phrases defined in Appendix A are underlined in the text.

2. Solano shall construct, at its own risk and expense, and shall be the sole owner (under Federal Energy Regulatory Commission License) of the Project. Solano shall design, construct, purchase, and install all structures, equipment, and facilities to meet the requirements and specifications of Appendix B. The Project shall be substantially equal in quality and design of materials, and in equipment and facilities provided, to those which Pacific has installed in its Battle Creek Hydroelectric System. Pacific shall make available to Solano for inspection, at Pacific's San Francisco office, plans, and specifications of said plants of Pacific, and Solano may inspect any of such plants.

1

Case: 19-30088   Doc# 9256   Filed: 10/08/20   Entered: 10/08/20 14:35:13   Page 4 of 64

Solano shall submit to Pacific from time to time, as soon as possible, all drawing designs, plans, and specifications of all portions of the Project and terms of contracts relating to the construction and operation of the Project. Pacific shall be provided this information so that it has a reasonable time period in which to perform an adequate review. Pacific shall have the right to inspect all work performed by or for Solano in constructing elements of the Project. Neither approval of, nor failure by Pacific to approve, any plans or specifications, or inspections of any work hereunder, shall relieve Solano of the responsibility of meeting the requirements and general specifications set forth in Appendix B, nor shall Pacific, because of its approval of, comment upon, or failure to review such plans, specifications, contracts, or work be responsible to Solano or anyone else for strength, details of design, adequacy, or capability of any structure, facility or work. Solano shall keep Pacific fully and promptly informed of all matters pertaining to the Project. Such information shall include, but not be limited to, the information specified above in this paragraph, and all agreements, license applications, correspondence, and data relating to the financing and licensing of the Project.

Solano shall include provisions substantially as follows in all cost reimbursable contracts entered into for the construction of the Project; (1) the contractor shall make its books and records relating to the items used for the determination of billings available for review by Solano or its representatives, and by Pacific, (2) after resolution of any billing dispute where Solano is due a refund, such refund shall be made to Solano including interest, and (3) interest shall be compounded monthly, and the rate used shall be the first of the month prime rate(s) of the Bank of America National Trust and Savings Association plus one-half of one percent, but not in excess of what is permitted by law, and shall accrue from the due date of the billing for the month under dispute until the payment date of the dispute.

Solano shall use all reasonable efforts to resolve billing disputes with such contractors promptly.

3.    Solano shall acquire and, to the extent that it can do so with money available from payments made by Pacific pursuant to Paragraph 9(b), 10 and Appendix C-5 and from money available in the operation and maintenance fund as provided in Paragraph 10 and Appendix C-IV, maintain ownership of all lands, easements, flowage rights, water rights, federal and state licenses and permits, and all other rights and privileges necessary for the foregoing

2

purposes and for the operation and maintenance of Project works and facilities in accordance with Appendix C. Solano shall not voluntarily convey, transfer or in any manner encumber any of such rights without the written consent of Pacific.

4. On and after the Full Operation Date, Solano, to the extent that it can do so with money available from payments by Pacific pursuant to Paragraph 9(b), 10 and Appendix C-5 and from moneys otherwise available in the operation and maintenance fund as provided in Paragraph 10 and Appendix C-IV, (a) shall operate, maintain, repair, and carry third-party bodily injury and property damage liability insurance and property insurance on the Project, substantially in accordance with the practice followed by Pacific with respect to its hydroelectric projects under Federal Energy Regulatory Commission License, and at Pacific's request shall carry mechanical breakdown and use and occupancy insurance on the Project to the extent reasonably available; (b) shall replace structures, facilities, and equipment of the Project whenever they no longer are capable of reliably or economically performing the service for which they were designed; and (c) shall operate such switching facilities as Pacific shall install from time to time at the power plant of the Project, including switching operations as requested by Pacific.

5. Pacific shall construct, own, operate, and maintain at its own risk and expense transmission lines required to transmit the power generated by the power plant of the Project into Pacific's transmission network. Pacific shall acquire, in a form acceptable to Pacific, all lands, easements, federal and state permits, and all other rights and privileges necessary to carry out its obligations under this paragraph and use its best efforts to complete said lines prior to completion of the Project by Solano. Failure by Pacific to complete said lines pursuant to Paragraph 6 shall not relieve Pacific of its obligations to make payments under Paragraphs 9(a), 9(b), 10 and Appendix C-5.

6. Solano shall schedule the date of synchronizing the generating units with the transmission system and notify Pacific thereof in writing at least six months in advance of the scheduled date. Pacific shall complete the transmission line to the power plant prior to the scheduled date of synchronization.

7. Solano shall sell and deliver to Pacific during the Term of Contract all the electric capacity and energy generated by the power plant of the Project, except the capacity and energy delivered by Solano for Project Power

3

Plant Use and except for the right to retain up to 20% of the power for pumping requirements within Solano's own boundaries, subject to the conditions in the portion of Appendix D entitled "Solano Use of Project Power." Delivery of capacity and energy to Pacific shall be at Solano's high voltage disconnect switch at the Project, except for such capacity and energy as Pacific shall request to be delivered to it for transmission at generator voltage, in which case such protective devices as Solano deems necessary shall be installed at Pacific's expense.

8. Pacific shall pay Solano 14 mills per kilowatt-hour for Net Project Generation delivered to Pacific hereunder prior to the Full Operation Date.

9. Following the Full Operation Date and during the Term of Contract, Pacific shall pay Solano for all benefits derived hereunder, including capacity and energy delivered, all of the following:

(a) (i) Semiannually amounts in accordance with the attached Power Purchase Payment Schedule, Appendix E. No reduction or increase in, or termination of said payments shall result from early retirement, retirement at a discount, refunding, or refinancing of Project Bonds.

(ii) In lieu of all or part of that part of the payment made pursuant to subparagraph (a) (i) attributable to principal on the term Project Bonds (as opposed to the serial Project Bonds), Pacific may (A) deliver to Solano term Project Bonds theretofore issued by Solano and acquired by Pacific, (B) deliver such documentation of the price at which such term Project Bonds were acquired by Pacific as Solano may reasonably require, and (C) pay to Solano one-half the difference between (1) the aggregate principal amount of such term Project Bonds and (2) the aggregate price, including brokerage and other expenses and including accrued interest, at which such term Project Bonds were acquired by Pacific. Any such delivery of term Project Bonds shall be credited against such payment to be made pursuant to subparagraph (a)(i) above in the amount of such aggregate principal amount of the term Project Bonds so delivered plus interest accrued thereon and to accrue thereon up to the date of the next interest payment thereon. Any such delivery of term Project Bonds by Pacific shall be made to the bond trustee as agent for Solano and for Solano's benefit; provided, that the bond trustee shall hold bonds so delivered as Pacific's escrow agent until the date the applicable Paragraph 9(a) payment is due, and on that date deliver them and the title thereto to Solano on the condition that Pacific receives full credit

4

against the applicable Paragraph 9(a) payment when the balance of the said payment is made by Pacific.

(b) Monthly, a sum estimated as being necessary to pay the costs of repair, operation, and maintenance of the Project pursuant to Paragraphs 3 and 4, and Appendices C and D. Such costs shall include, but not be limited to insurance, taxes, trustee fees, annual audit, and fees of regulatory agencies having jurisdiction. Costs shall be budgeted annually by the parties, and the said estimated amounts shall be made in monthly installments; provided, such monthly payments shall not be made when the balance in the operation and maintenance fund established pursuant to Appendix C is greater than the monthly payment to be made.

(c) Annually, on each anniversary of the end of the Quarter in which the Full Operation Date of the Project occurred, an amount equal to a payment factor of 14 mills per kilowatt hour, adjusted each Quarter, as described in the "Adjustment Provision" of Appendix D, multiplied by the Net Project Generation delivered to Pacific during each corresponding Quarter in the preceding 12-month period.

(d) Annually in accordance with the terms of Paragraph 9(c), an extra amount equal to a payment factor of 0.40 mills per kilowatt hour of Net Project Generation adjusted as provided in the "Adjustment Provision" of Appendix D; provided that such extra amount shall not be paid until after the North Bay Aqueduct is completed and operational and after Solano certifies in writing to Pacific that such payment is to be reimbursement for a Project related expense to be borne by Solano.

(e) Commencing January 1, 2020, Pacific shall become obligated for variable semiannual power purchase payments which shall continue until termination of this Contract. The variable payments shall be in an amount computed by multiplying the Net Project Generation by $0.0307 and shall be due for periods ending June 30 and December 31 each year.

In the event of a catastrophic failure in the Project after January 1, 2020, which failure precludes generation of energy upon which Pacific's variable semiannual power purchase payments are based, Solano, in its sole judgement, may terminate this Contract upon written notice to Pacific. The parties shall have no further obligation toward each other subsequent to the date of such termination.

5

Case: 19-30088    Doc# 9256    Filed: 10/08/20    Entered: 10/08/20 14:35:13    Page 8 of 64

10. Solano and Pacific agree that the Use of Dam Charge shall be paid by deposit into the operation and maintenance fund moneys by one or both parties as follows:

(a) If said charge is $37,400 or less, Solano shall pay the entire amount.

(b) If said charge exceeds $37,400, Solano shall pay that amount of said charge which is not paid by Pacific. Pacific shall pay a share of that amount of the Use of Dam Charge which is in excess of $37,400. Pacific's share of the excess shall be as follows:

| Calendar Year of Project Operation | | Pacific's Share of Excess Over $37,400 |
|---|---|---|
| 1 | 1983 | 10% |
| 2 | 1984 | 20% |
| 3 | 1985 | 30% |
| 4 | 1986 | 40% |
| 5 through 10 | 1987-1993 | 50% |
| | 1994 | 50/50 of entire amount |

*Full Operation Date - June 1, 1983* (handwritten)

*50/50 of entire amount* (handwritten)

(c) If said charge exceeds $37,400, starting in the eleventh calendar year of Project operation, Solano and Pacific shall share the entire amount equally until Solano retains Project power for its own pumping requirements pursuant to Paragraph 7.

(d) If Solano retains Project power for its own pumping requirements pursuant to Paragraph 7, Solano shall pay said charge pursuant to Paragraph 10(a) or 10(c); however, in the event of a payment under Paragraph 10(c), Solano shall also pay a percentage of Pacific's share of the Use of Dam Charge corresponding to the percentage of Project power so retained.

(e) The $37,400 amount in this paragraph will be increased or decreased by the corresponding percentage change that may be made to the initially established Use of Dam Charge according to the possible readjustment provisions of Section 10(e) of the Federal Power Act. However, if said percentage change exceeds the percentage change in the Paragraph 9(c) payment factor, then Solano and Pacific shall share equally in paying the excess percentage change increase in the Use of Dam Charge.

11. Payments under Paragraph 9(a) shall be due and payable each June 30 and December 31, or if either day falls on a weekend or banking holiday, on the last business day prior to that date for the semiannual periods ending on the

Case: 19-30088   Doc# 9256   Filed: 10/08/20   Entered: 10/08/20 14:35:13   Page 9 of 64

dates shown in the Power Purchase Payment Schedule, Appendix E. The first payment shall be prorated according to the ratio of the number of days for which payment is to be made to the number of days in the semiannual period for which payment otherwise would be due. Any delivery of term Project Bonds pursuant to Paragraph 9(a)(ii) shall be made not less than 60 days before the day the said payment would otherwise be due.

Payments under Paragraph 9(b) for each month or part thereof shall be due and payable on the first day of such month or other dates as agreed to by the parties.

Payments under Paragraph 9(c) and (d) shall be due and payable each year within 15 days after receipt of invoice by Pacific.

Payments under Paragraph 9(e) shall be due and payable within 15 days after receipt of invoice by Pacific.

Payments under Paragraph 8 shall be due and payable each month within 15 days after receipt of invoice by Pacific.

Payments under Paragraph 10 shall be due and payable as agreed by the parties to enable Solano to meet the payment schedule set forth by Federal Energy Regulatory Commission regulations.

12. (a) Subject to the provisions of Paragraph 17, Pacific's obligation under Paragraphs 9(a), 9(b) and 10 shall not be dependent upon all or any part of the Project continuing to be capable of operation, nor shall its obligation under Paragraphs 9(a), 9(b) and 10 be dependent upon the ability of Pacific to take energy produced by or made available from the Project. This provision, however, shall not be deemed to relieve Solano of any of its obligations hereunder.

(b) Pacific may offset against any amounts due from it to Solano hereunder any amounts due to Pacific from Solano by reason of this Contract or any breach thereof, except that no offset shall be applied by Pacific to reduce the payments due from it to Solano under the provisions of Paragraph 9(a).

13. Solano intends to finance construction of the Project by the sale and issuance of Project Bonds duly authorized by the electorate in accordance with the laws of California. Solano shall proceed diligently with all necessary action to have the Project Bonds authorized and to

7

complete such financing; provided, that Solano shall not be required to accept or agree to any conditions or obligations in connection with any such financing which it deems unreasonably burdensome. If Solano shall have proceeded diligently but shall not have completed such financing on terms satisfactory to it and awarded <u>Project</u> construction contracts within 90 days of the date of this Contract, this Contract shall thereupon terminate and neither party shall have any further obligation to the other under this Contract or be liable to the other by reason of any expenses incurred or obligations undertaken for the performance by it of this Contract or for any damages suffered as a result of the termination of this Contract. In the event of such termination, the parties shall confer and endeavor to reach a solution that will permit the <u>Project</u> to proceed, and Solano shall continue to be obligated to repay Pacific for advances of <u>Development Costs</u>, with interest, but only to the extent provided in Paragraph 8(c) of Appendix D.

As soon as possible, upon completion of <u>Project</u> financing acceptable to Solano and Pacific, each party shall sign a certificate to that effect. Such certificate shall be binding and conclusive upon Solano and Pacific; thereafter, there shall be no termination of any obligation under this Contract by reason of any provisions of this paragraph.

14. Solano shall defend its water rights necessary or useful to the operation of the <u>Project</u>.

15. Consistent with Solano's use for <u>Project</u> purposes, Solano shall permit all roads, lands, rights-of-way, and road structures owned or controlled by it for <u>Project</u> purposes to be used by Pacific in the performance of this Contract, without additional cost or expense, for construction, installation, operation, repair, and maintenance of any works or facilities of Pacific now in existence or hereafter constructed or installed. Consistent with Pacific's use for its own purposes, Pacific shall permit use by Solano of Pacific's roads and rights-of-way without cost or expense for the purpose of constructing, maintaining, repairing, and operating facilities of the <u>Project</u>. Solano hereby grants Pacific a license, irrevocable during the <u>Term of Contract</u>, to construct, install, operate, maintain, replace and repair, upon properties of the <u>Project</u>, facilities of Pacific, including, but not limited to, facilities for transmission, transformation, and distribution of electric power and for switching and control, as are necessary and desirable for the purpose of this Contract.

8

16. Solano shall indemnify Pacific, its officers, agents, and employees against all loss, damage, expense, and liability to third persons for injury to or death of persons or injury to property, proximately caused by Solano's construction, ownership, operation, repair, or maintenance of, or by failure of, any of Solano's works or facilities used in connection with the Project. Solano shall, on Pacific's request, defend any suit asserting a claim covered by this indemnity. Solano shall pay any costs that may be incurred by Pacific in enforcing this indemnity.

Pacific shall indemnify Solano, its officers, agents, and employees against all loss, damage, expense, and liability to third persons for injury to or death of persons or injury to property, proximately caused by Pacific's construction, ownership, operation, repair, or maintenance of, or by failure of, any of Pacific's works or facilities used in connection with the Project. Pacific shall, on Solano's request, defend any suit asserting a claim covered by this indemnity. Pacific shall pay any costs that may be incurred by Solano in enforcing this indemnity.

17. Except as provided in Paragraph 13, this Contract shall, except in case of condemnation of all or part of the Project which precludes Solano from being able to fully perform under this Contract, remain in effect so long as Solano holds a Federal Energy Regulatory Commission License and other necessary rights for the Project permitting full performance by it of this Contract. Termination of this Contract as a result of the loss by Solano of such rights necessary for the full performance by it of its obligation under this Contract with respect to the Project shall not affect obligations of either party accrued hereunder prior to such termination, but no further obligation shall accrue subsequent to the date of such termination and final payments as of the date of termination shall be prorated as may be appropriate.

18. No voluntary assignment of this Contract, except for security purposes in connection with Solano's financing of the Project, shall be effective without the written consent of Pacific.

19. Any dispute that may arise hereunder between Solano and Pacific shall, upon the written request of either party to the other, be submitted to and decided by arbitration. Each of the parties shall, within 30 days after giving or receiving such written notice, appoint one arbitrator. If either party fails to appoint an arbitrator within such time, such arbitrator shall be appointed by a Superior Court of the State of California in accordance with

9

the California Code of Civil Procedure. At any time that either arbitrator concludes they cannot agree, the two arbitrators shall appoint a third arbitrator or, if they cannot agree upon a third arbitrator, such arbitrator shall be appointed by said Superior Court in accordance with said Code. A decision by two of the arbitrators shall be binding on the parties. If a decision cannot be reached within 90 days after appointment of the third arbitrator, on written notice by either party to the other, the arbitrators' authority shall terminate and either party may submit the matter to an appropriate court for decision.

Each party shall bear the expenses and fees of the arbitrator appointed by it and its own expense involved in the arbitration. The expenses and fees of the third arbitrator and all other expenses of arbitration shall be borne equally by Pacific and Solano.

20. If any of Paragraphs 16 or 19 of this Contract shall be held by a court of competent jurisdiction to be void, voidable or unenforceable, then such paragraphs shall be null and void only to the extent held void, voidable or unenforceable, and shall to that extent be deemed separable from the remaining paragraphs, covenants, agreements, or portions of this Contract and shall in no way affect the validity of or enforceability of the remaining portions of this Contract.

IN WITNESS WHEREOF, the parties hereto have executed this Contract as of the day and year first above written.

PACIFIC GAS AND ELECTRIC COMPANY

By _____
Senior Vice President
Facilities Development

SOLANO IRRIGATION DISTRICT

By _____

By _____

10

# APPENDIX A

## Definitions

When used in the Contract, the following terms have the meaning hereinafter set forth:

### A-1  Project

A hydroelectric power plant located at the downstream face of Monticello Dam on Lake Berryessa, Solano, Napa, and Yolo Counties, California, including two Francis type turbines and generators, each rated at about 5,000 kilowatts, and a third Francis type turbine and 1,500 kilowatt induction generator, a penstock extending from the northern existing outlet from Monticello Dam, a 115 kV switchyard, Project Communication Facilities, road, operation and maintenance equipment, and all necessary appurtenances for each of the foregoing.

### A-2  Project Communication Facilities

Facilities for communication with Solano's dam operator's headquarters (Lake Solano Headquarters) and with Pacific's Vaca-Dixon Substation.

### A-3  Project Road

A road needed to make the Project readily accessible for proper operation and maintenance.

### A-4  Full Operation Date

The first date, after all elements of the Project have been completed and after the startup tests at Monticello Power Plant have been completed, on which the following simultaneously occur:

(a)  Monticello Power Plant has all features and equipment capable of operating simultaneously in such condition and adjustment that the plant is capable of continuous delivery into Pacific's transmission lines at its full capacity for the then-existing head of water.

(b)  Monticello Penstock and all other elements of the Project are completed in all features and are capable of maintaining simultaneously such continuity of performance as is necessary for the reliable operation of the Project.

A-1

The fact that Monticello Power Plant has met the standards of Paragraph (a) above must be confirmed by satisfactory completion of performance tests, which shall be conducted as soon as possible and shall commence not later than 30 days after the first delivery of power from the plant. For the purpose of this paragraph, one of the performance tests, which shall follow the startup tests, shall include the satisfactory operation of the Project under the conditions of Appendix C-1 for a period of at least 30 days.

Performance tests may be deferred to the extent that sufficient water cannot be made available from Lake Berryessa; however, each unit may be tested separately if there is insufficient water to test two or three units simultaneously in meeting the requirements for Full Operation Date.

A-5  Project Power Plant Use

Use of electric power supplied solely from the powerhouse station service transformer bank and solely for operating and maintaining the Project powerhouse, and not for any other purpose.

A-6  Project Bonds

Revenue bonds issued by Solano to meet its obligations under this Contract.

A-7  Project Construction Costs

All costs of Project construction, including Development Costs, cost of acquisition of sites and easements, election, clearing, engineering and legal services, financial advisers, interest on the Project Bonds during construction, application, permit and license fees and costs, inspection, insurance premiums, trustee's fees, bond paying agent fees, and all other costs incident to litigation, planning, and investigation, authorization, financing, and construction of the facilities, and contractors' incentive bonus, and operation, maintenance and administrative costs incurred prior to the Full Operation Date.

A-8  Memorandum of Understanding

The Memorandum of Understanding, dated as of April 25, 1980, between the parties, as amended .  A copy of such memorandum is attached as Appendix D.

A-9  Development Costs

Costs incurred pursuant to Paragraph 6 of Appendix D.

A-2

## A-10 Net Project Generation

The number of kilowatt hours generated by the Project less the number of kilowatt hours supplied for Project Power Plant Use and less the number of kilowatt hours taken by Solano pursuant to Article 1 of Appendix B in the Memorandum of Understanding.

## A-11 Term of Contract

The period from the date of execution of this Contract to January 1, 2031, unless terminated by the provisions of Paragraph 9(e).

## A-12 Quarter

One of the four three-month periods set forth in Table A of the "Adjustment Provision" in Appendix D. The quarters shall be numbered as follows:

| Quarter | Number of Quarter |
|---------|-------------------|
| Feb-April | First |
| May-July | Second |
| Aug-Oct | Third |
| Nov-Jan | Fourth |

## A-13 Prudent Electrical Practices

Those practices, methods and equipment, as changed from time to time, that are commonly used in prudent electrical engineering and operations to operate electric equipment lawfully and with safety, dependability, efficiency and economy, and to make the highest and best use of the resource.

## A-14 Use of Dam Charge

The annual payment made by Solano to the federal government for the use of Monticello Dam pursuant to Article 38(c) of Solano's Project license issued by the Federal Energy Regulatory Commission.

APPENDIX B

## Requirements and General Specifications
## For Monticello Power Project

The following requirements and specifications cover the general conditions for major structures, equipment, and facilities for the Project. In addition to those herein described, the Project shall contain all structures and facilities needed for the development of power and for the operation and maintenance of the Project. Requirements and specifications herein contained may be changed by mutual consent of the parties.

It is essential to the economic feasibility of the Project and of this Contract that there be a minimum of lost generation caused by breakdowns of equipment and unnecessary delays in accomplishing repairs and replacements. Both in equipment design and in the time necessary to have replacements delivered, all equipment must be such that it can be repaired, and have replacements made, within a period of time substantially similar to that required for repairs and replacements of similar equipment which Pacific has installed in its Battle Creek Hydroelectric System.

All manufacturers of equipment shall be experienced in the manufacture of the class, size, and rating of the various components specified herein.

All equipment and parts used and all measurements or dimensions shown on drawings shall conform to standards acceptable to Pacific.

## B-1   Penstock

(a)   The penstock shall conform to the "The American Society of Mechanical Engineering Rules for Construction of Unfired Pressure Vessels", latest Edition, except where it may differ from the following requirements and limitations. Pressures for the design of penstock shall include proper allowance for water hammer due to load rejection or to runaway speed, whichever is greater. In any event, the allowance for maximum water hammer shall not be less than 10 percent of the maximum static pressure. All welded penstock joints shall be 100 percent radiographed or tested by magnetic particle examination where radiographing is not possible. Welded contours shall be uniformly prepared for testing. Fully fabricated units containing welding shall be manufactured in accordance with ASME

B-1

Case: 19-30088    Doc# 9256    Filed: 10/08/20    Entered: 10/08/20 14:35:13    Page 17 of 64

procedures. Field welding on penstock, except for circumferential joints, shall not be permitted. Penstock stress shall not exceed one-third the ultimate tensile stress or two-thirds yield stress, whichever is less, including water hammer. Welds shall be assumed to be 100 percent efficient. The minimum pipe thickness without stiffeners shall not be less than the diameter in inches divided by 288. The interior of the penstock shall be coated with coal tar epoxy.

A penstock shutoff valve shall be installed at the upper end of the penstock. The valve shall be arranged to close without external power. It shall be designed to be operated from the powerhouse and to close automatically when the flow exceeds a fixed percent estimated to be between 110 and 125 percent of the normal operating flow. The valve shall be equipped with appurtenant features, such as a bypass valve, an air valve, and a drain.

## B-2  Power Plant Installation

Units 1 and 2 of the power plant shall be capable of starting and operating, for the purpose of testing the transmission line, without being connected to or dependent upon the transmission system constructed by Pacific pursuant to this Contract. The power plant shall have a total installed capacity that will generate and have an input to the transmission line of not less than 11,400 kilowatts at an effective head of 220 feet with water flows of 711 cubic feet per second.

## B-3  Turbine-Generator Units and Related Equipment

(a) The turbine-generator units and related equipment, including but not limited to excitation system, storage battery, turbine shutoff valves and hydraulic controllers, shall be equal in completeness of features and quality of design and materials in all respects to installations in Pacific's Battle Creek Hydroelectric System. The overspeed of the units on load rejection at maximum output at maximum head shall be limited to not more than 50 percent of the rated speed. Spare parts for the turbine-generator units and related equipment shall be provided to the same extent as in Pacific's said installations.

(b) The turbine-generator units for Units 1 and 2 shall be of the horizontal shaft type with synchronous generators and Francis type turbines. Each unit shall be rated not less than 5,000 kilowatts at 0.9 power

B-2

factor, 600 rpm, at an effective head of 220 feet when passing a flow of 307 cubic feet per second and be provided with an excitation system, hydraulic controller and turbine shutoff valve. The units shall be designed for peak efficiency at or above 90 percent of rated capacity.

(c) The turbine-generator for Unit 3 shall be of the horizontal shaft type with an induction generator and Francis type turbine. It shall be rated not less than 1,500 kilowatts at an effective head of 220 feet when passing a flow of 97 cubic feet per second and be equipped with a hydraulic controller and turbine shutoff valve. The rated speed shall be 900 rpm or less. The unit shall be designed for peak efficiency at or above 90 percent of rated capacity.

(d) The generators shall be designed to withstand, without damage or distortion, the forces resulting from the maximum turbine runaway speed. All generator ratings shall be on the basis of 80°C rise at rated output.

(e) The rating of the generators for Units 1 and 2 shall be 4,160 volts, 0.90 power factor lagging, 1.10 short circuit ratio, 60 hertz, three-phase, 600 rpm, Class F insulation.

(f) The rating of the generator for Unit 3, an induction type, shall be 4,160 volts, 0.85 power factor 1.05 short current ratio, 60 hertz, three phase synchronous speed of 900 rpm or less, Class F insulation.

## B-4  Main Power Transformer

The main power transformer shall be 60 hertz, oil-insulated, and equal in completeness of features and in quality of design and materials in all respects to installations in Pacific's Battle Creek Hydroelectric System. The transformer shall have a full basic impulse insulation level (BIL) corresponding to its voltage class and shall be provided with 80 percent lightning arresters adjacent to the high voltage terminals. The transformer rating shall be on the basis of 65°C rise.

The transformer shall be 115 kV insulation class with a three-phase OA/FA bank rating of not less than 11,500/14,375 kVa. The high voltage winding shall be grounded wye with the following full capacity taps: 122,500; 120,000; 117,500; 115,000; 112,500.

The low voltage winding shall be 4,160 volts, delta connected. The impedance at rated kVa and voltage, and within standard tolerances, shall be not more than 8 percent.

## B-5  Station Power Facilities and Other Equipment

Station power equipment and all other auxiliary equipment shall be equal in completeness of features and in quality of design and materials in all respects to installations in Pacific's Battle Creek Hydroelectric System.

The normal source of station power for the plant shall be from the 4.16 kV station switch gear bus. The plant shall be provided with an alternate power supply which shall be a transformer bank connecting to Pacific's existing distribution circuit.

A line circuit switcher shall be provided with an overhead structure, to which Pacific's transmission line will be connected.

Adequate facilities shall be installed for modern relay protection to the transmission line constructed by Pacific pursuant to this Contract.

## B-6  Project Communication Facilities

Adequate communication facilities shall be provided to insure reliable and efficient operation and maintenance of the Project. All Project Communication Facilities shall be equal in completeness of features and in quality of design and materials in all respects to installations in Pacific's Battle Creek Hydroelectric System.

Communication between Monticello Power Plant, Solano's Project operator's headquarters, and Vaca-Dixon Substation shall be by leased telephone lines.

## B-7  Automatic Power Plant Facilities

(a)  General for the Project Power Plant

The control, metering, protective, and alarm systems for the project plant shall be equal in completeness of features and in quality of design and materials in all respects to installations in Pacific's Battle Creek Hydroelectric System.

(b)  The plant shall be designed for both local automatic and manual operation with transfer means to select

Case: 19-30088   Doc# 9256   Filed: 10/08/20   Entered: 10/08/20 14:35:13   Page 20 of 64

either. Normal operation will be under automatic control. Control may automatically transfer from the turbines to the plant hollow jet valve to maintain flow at the plant if the required flow through the turbines is interrupted for any reason.

(c) Separate alarm indications shall be transmitted to Solano's Project operator's headquarters for, but not limited to, the following: unit shutdown, unit breaker status, circuit switcher status, hollow jet valve open and miscellaneous station alarms.

(d) Separate alarm indications shall be transmitted to Pacific's Vaca-Dixon Substation for, but not limited to: generator breaker status, unit shutdown, circuit switcher status, and miscellaneous alarms.

B-8 Gages and Meters

(a) Conduit Flow

A recorder shall be installed to provide a continuous record of flows in each unit and the hollow jet valve. Recorded flows may be measured at the powerhouse with a suitable recording device.

(b) Power Plant Meters

In addition to the normal installation of transmission and generator meters, the following installations shall be made at the powerhouse:

(1) For registration of delivery of power from the Project to Pacific, a

(i) Watt-hour meter for each unit with demand register, and a

(ii) Watt-hour meter and transformer loss compensator with provision for adjustment to equivalent values at the high voltage delivery point, for revenue metering, and recording wattmeter.

(2) For registration of delivery of power for Project Power Plant Use, a watt-hour meter with demand register.

(3) For registration of delivery of alternate station power, a watt-hour meter with demand register.

B-5

(4) For registration of <u>Project</u> power plant voltage, a recording voltmeter.

Meters specified above for items (1), (2) and (4) are to be connected to the low voltage side of the main transformer bank.

## B-9 Startup and Performance Tests and All Test Reports

(a) A complete testing and checking program shall be outlined and scheduled at least 30 days in advance of the first delivery of power. The program shall include checks on all equipment guarantees and general checking of all components of plant and facilities and the interrelated functions of the various facilities. The generating units shall be tested to full capabilities, and the settings of the protective devices shall be coordinated within the limits of each unit. All checks and tests shall be thoroughly documented and included in a comprehensive startup test report so that the proper functioning of all facilities and equipment under all normal and emergency operating conditions shall be known and so that the necessary information shall be available for the <u>Project</u>.

(b) Performance tests for the turbine and generator units shall be made by Solano in the presence of Pacific's representatives. The tests shall be thoroughly documented and included in a comprehensive test report.

(c) Solano shall provide Pacific with four copies of all test reports, including all records obtained in the tests and checks. Pacific should have the test reports as soon as possible, and all test reports shall be due within six months after first delivery of power. Startup and performance test data in field report form shall be given to Pacific within ten days after each test.

## B-10 Permanent Road

A permanent road shall be provided for satisfactory operation and maintenance of the powerhouse.

The road shall be drained, graded, and surfaced to maintain access to the plant at all times. It shall be suitable for a mobile crane of 50-ton loading and for moving the transformers.

Case: 19-30088   Doc# 9256   Filed: 10/08/20   Entered: 10/08/20 14:35:13   Page 22 of 64

## B-11  Miscellaneous

The powerhouse deck shall be designed to support a 50-ton mobile crane.

The tailrace shall be protected against erosion by rip-rap or other suitable means. The power plant, tailrace, road, buildings, fences, and other critical areas shall be properly signed for ownership, water releases, warning to trespassers, or as may be necessary.

## B-12  Operation and Maintenance Tools and Equipment

On the Full Operation Date, the Project shall be equipped with necessary tools, vehicles, and other equipment and supplies purchased by Solano and required for operation and maintenance of the Project.

## B-13  Drawings, Specifications, and Other Information

Within six months following the Full Operation Date, Solano shall provide Pacific: A complete list of all Project and manufacturer's drawings. Two 11-inch by 17-inch reduced size copies and one full size copy of all drawings, all of which shall have been brought up to date; not less than three copies of all manufacturers' drawings and instruction books; and copies, or originals, of all pertinent correspondence and data. All manufacturers' drawings and instruction books and all other drawings for the project shall be numbered and indexed by Solano.

Unless otherwise agreed, Solano shall store reproducible copies of all drawings and copies of all contracts, specifications, instruction books, and other pertinent data and correspondence for the Project in a vault. Solano's project manager shall conform such drawings and instruction books to reflect changes in facilities and equipment as such may occur from time to time, and when any such changes are conformed, shall furnish Pacific with copies thereof.

# APPENDIX C

## Operation and Maintenance Requirements

The following provisions shall govern the operation and maintenance of the Project, except as may otherwise be agreed upon from time to time by the parties.

## I. OPERATION

### C-1 General

Solano shall operate the Project, insofar as is consistent with agreements with the United States Department of the Interior, and with water releases through project turbines from Lake Berryessa, in accordance with irrigation, domestic, and industrial uses of water, and release of surplus water from Lake Berryessa. Solano shall also operate the Project in accordance with Prudent Electrical Practices, including operating its generators as necessary to contribute equitably to system area reactive requirements as requested by Pacific. Solano shall, consistent with the requirements of Paragraph 4 of the Contract, to the extent it can do so with money available from payments made by Pacific pursuant to Paragraph 9(b) thereof and from money available in the operation and maintenance fund as provided in Appendix C-IV, from time to time make such changes in Project facilities as may be mutually concluded are reasonably required to improve economy of operation and shall employ only such personnel as are jointly determined and agreed to be reasonably necessary to operate and maintain the Project in an economic manner. Pacific and Solano shall exchange information necessary for effective and economic operation and maintenance of the Project, and agree upon such operation and maintenance procedures.

Solano shall use its personnel, as appropriate, to staff the Project, with Pacific assisting in obtaining the proper personnel to staff the Project. The parties shall agree upon a suitable means of accounting for expenditures. Solano may, at its option, request Pacific to perform Project maintenance, or contract the work to others.

### C-2 Requirements for the Support of Fish Life

Solano shall limit water releases for the support of fish life to flows through Project turbines to the maximum extent possible, combined with domestic, irrigation, and industrial commitments.

Case: 19-30088   Doc# 9256   Filed: 10/08/20   Entered: 10/08/20 14:35:13   Page 24 of 64

## II. MAINTENANCE

### C-3  Scheduling

Solano shall notify Pacific of contemplated maintenance work which would affect operation of the <u>Project</u>, and shall cooperate with Pacific in scheduling the work by advancing or postponing the time of performance so as not unnecessarily to cause power loss or inconvenience to Pacific. Such maintenance work shall be completed in the shortest possible time and, if requested by Pacific, shall be performed on a 24-hour per day basis including Sundays and holidays.

### C-4  Inspection

Solano shall make such inspections, investigations and tests, both routine and extraordinary, as are called for by the best engineering and operating practice and shall afford Pacific full opportunity to inform itself as to the condition of the <u>Project</u> and the elements thereof by giving Pacific notice and opportunity to join with Solano in inspections, investigations and testing, and by submission to Pacific of copies of reports as to the results thereof and by giving Pacific access to Solano's properties for the purpose of any inspections, investigations, and tests which Pacific may desire to perform independently of Solano. Pacific shall be given full opportunity to inspect the performance of any maintenance work on the <u>Project</u> by Solano, its employees, agents, and contractors.

## III.  PERFORMANCE BY PACIFIC

### C-5  Operation and Maintenance

Solano shall have no obligation to perform under this Appendix, or to operate, repair, or maintain the <u>Project</u> pursuant to Paragraphs 3 and 4 of the Contract or to repay any sums paid by Pacific or interest thereon, except to the extent that Solano can do so with money received from payments made by Pacific pursuant to Paragraph 9(b), and by Pacific and Solano pursuant to Paragraph 10 of the Contract, and with money deposited in the operation and maintenance fund pursuant to Appendix C-8. At any time when the operation and maintenance fund is exhausted and moneys received by Solano under Paragraph 9(b) of this Contract are insufficient to pay the operation, repair, and maintenance costs of the <u>Project</u> and withdrawals by Pacific under Appendix C-11, Pacific shall pay Solano each month such additional sums as may reasonably and necessarily be required to pay such costs; provided, that in lieu of making

Case: 19-30088    Doc# 9256    Filed: 10/08/20    Entered: 10/08/20 14:35:13    Page 25 of 64

such additional payments, or in the event that Solano fails or is unable to operate, repair, or maintain the _Project_ in accordance with this Contract, Pacific may upon reasonable notice to Solano, which may be 24 hours or less in case of urgency, enter upon, operate, repair, and maintain the _Project_, as may be necessary, for and on behalf of Solano, but at Pacific's own cost and expense. In such event, Solano hereby employs Pacific to act as such operator and hereby consents and agrees that Pacific may enter upon the _Project_ and act as such operator, until Solano shall provide satisfactory assurance that it is able to and will perform satisfactory operation, repair, and maintenance of the _Project_. Pacific's determination as to the necessity for, and manner of, operation, repair or maintenance, and as to the amount of expenses incurred hereunder, in the event Pacific shall take over such operation, repair or maintenance shall be conclusive in the absence of bad faith.

IV. FUNDS, DEPOSITS AND WITHDRAWALS

C-6 Establishment of Funds

To assure construction of the _Project_ and its proper operation, repair and maintenance, and to enable performance of the obligations provided for in this Appendix and in Paragraphs 3 and 4 of the Contract, Solano shall establish a construction fund and an operation and maintenance fund under a trust agreement with a trustee chosen by mutual agreement of the parties hereto.

C-7 Trustee

The trustee shall be a bank or trust company authorized to do and doing business in the State of California and having capital and surplus of at least $100,000,000.

C-8 Deposits

A. Construction Fund

Solano shall deposit in the construction fund upon receipt (a) all moneys received from the proceeds of the _Project Bonds_, except the amount received as accrued interest upon the issuance of the _Project Bonds_ and the amount required to be set aside for the payment of interest on the _Project Bonds_ during construction; (b) all moneys received or recovered by Solano under surety bonds executed by any construction contractor to gurarantee performance of the _Project_ construction contract or under any policy or contract of insurance insuring against physical loss or damage to the Project

C-3

prior to the Full Operation Date; (c) all moneys received as liquidated damages from any construction contractor, which moneys are not required for payment of principal or interest on Project Bonds; (d) all moneys earned on investment of moneys in the construction fund or received from the sale of such investments; (e) all moneys received from contractors prior to Full Operation Date for any required inspection fees or for penalty payments; (f) all moneys earned from investment of the Project Bond proceeds set aside for the payment of interest on the Project Bonds during construction; (g) any balance remaining upon confirmation of Full Operation Date from Project Bond proceeds set aside for the payment of interest on the Project Bonds during construction, after provision for payment of interest accrued on the Project Bonds to Full Operation Date; and (h) all moneys received by Solano from the voluntary sale of Project property, other than power and water, prior to Full Operation Date.

Upon confirmation of Full Operation Date, after provision for payment of all Project Construction Costs, Solano shall deposit any balance remaining in the construction fund into the construction fund surplus account, established within the construction fund.

B. Operation and Maintenance Fund

Solano shall deposit in the operation and maintenance fund upon receipt unless otherwise specified herein: (a) all moneys received under Paragraph 9(b), 10 and Appendix C-5 of this Contract; (b) on each June 30 and December 31, one-half of the excess by which that power payment received on such date pursuant to Paragraph 9(a) of this Contract, and interest earnings thereon, exceed the amount needed by Solano to pay interest on and principal of bonds (including bonds which mature prior to the termination date of this Contract, issued to refund project bonds) issued to finance the Project, but only to the extent that such one-half of the excess is money which Pacific is entitled to receive from early retirement, retirement at a discount, refinancing or refunding of Project Bonds pursuant to the second paragraph of Paragraph 5, but subject to the third paragraph of Paragraph 5, in Appendix D; (c) all moneys received or recovered under any policy or contract of insurance insuring against physical loss or damage to the Project on and after Full Operation Date; and (d) all moneys received by

C-4

Solano from the voluntary sale of _Project_ property after _Full Operation Date_, other than power and water. Solano shall also deposit in the operation and maintenance fund moneys due from Solano under the provisions of Paragraph 10.

## C-9  Withdrawals

Withdrawals may be made from the construction fund and the operation and maintenance fund only as provided in the following paragraphs.

## C-10  Withdrawals by Solano

### A.  Construction Fund

Solano shall be entitled to withdraw money from the construction fund to pay _Project Construction Costs_. For each authorized withdrawal, Solano shall, by written certificate signed by the President of its Board of Directors or its authorized representative, certify to the trustee the amount actually expended or owing. Upon receipt of such certificate, said trustee shall thereupon be empowered to pay said amount.

Solano shall withdraw money from the construction fund surplus account to make the first payments due pursuant to Paragraph 9(a)(i) to the extent that moneys are available in such account, in accordance with the provisions of Appendix E. Both Solano and Pacific shall certify to the trustee the amount to be withdrawn from the construction fund surplus account.

### B.  Operation and Maintenance Fund

(a) Solano shall be entitled to withdraw money from the operation and maintenance fund to pay (i) debts incurred pursuant to Paragraphs 3, 4 and 10 of the Contract and C-I and C-II of this Appendix, including premiums for insurance required by Paragraph 4 of the Contract including such deductible or self-insured retention provisions as are agreed upon by Solano and Pacific, and (ii) any other charges included from time to time within the Federal Energy Regulatory Commission Uniform System of Accounts presecribed for Public Utilities and Licensees, including taxes, if any, imposed on any interest which Solano may be found to have in the Project. Solano shall not be entitled to withdraw money from the operation and maintenance fund to pay (i) compensation and expenses of Solano's directors or non-_Project_ personnel exceeding $1,000 in

C-5

any year; (ii) compensation of personnel in excess of that paid by California public agencies for similar services; (iii) any costs properly allocable to irrigation; industrial and domestic water purposes; and (iv) any costs of recreation facilities not required by Federal Energy Regulatory Commission License; and (v) any costs incurred pursuant to Paragraphs 16 and 19 of this Contract.

(b) For each authorized withdrawal, Solano shall, by written certificate signed by its President or other authorized representative, certify to the trustee of said fund the amount actually expended or owing, and Pacific shall, by written certificate signed by its duly authorized representative, certify to said trustee that such payment is a proper charge under the Contract. Upon receipt of such certificates, said trustee shall thereupon be empowered to pay said amounts.

## C-11 Withdrawals by Pacific

Pacific shall be entitled to withdraw money from the operation and maintenance fund to pay (a) its costs of operation and maintenance incurred at any time pursuant to Appendix C-5, calculated in accordance with Pacific's established billing procedures, as set forth in its Comptroller's Department Standard Practice 117.1-1 as hereafter amended or superseded; (b) taxes, if any, imposed on any interest in the Project which Pacific may be found to have under this Contract, or imposed on Pacific because of the purchase by or delivery to it of power, energy, or falling water under the Contract; and (c) interest, at a rate equal to the most recent rate of return found to be reasonable by the Public Utilities Commission of the State of California on Pacific's Electric Department rate base, on any amount owed to Pacific by the operation and maintenance fund to reimburse Pacific for said costs or taxes, such interest to accrue from the date the amount is due until the time when moneys are available in said fund to pay said debt. For each such withdrawal, Pacific shall, by written certificate signed by its authorized representative, certify to the trustee of said fund the amount for which it is entitled to payment, and Solano shall, by written certificate signed by its President or other authorized representative, certify to said trustee that such payment is a proper charge under the Contract. Upon receipt of such certificates, said trustee shall thereupon be empowered to pay said amount.

Case: 19-30088    Doc# 9256    Filed: 10/08/20    Entered: 10/08/20 14:35:13    Page 29 of 64

## C-12  Termination

Upon the termination of this Contract, all amounts remaining in the operation and maintenance fund shall be paid to Solano, except that any amount that Pacific may be entitled to by reason of the second paragraph in Paragraph 5 of Appendix D shall be paid to Pacific, and except that any amount that Pacific may be entitled to by reason of Appendix C-11 shall be withheld upon Pacific's certificate alone and retained until the respective rights of Solano and Pacific shall be finally ascertained.

## C-13  Reliance by Trustee

Trustee, in all matters relating to the operation of and withdrawal from the said funds shall be entitled to rely upon the certificates of Solano and Pacific and shall not be obligated to make an independent determination of the facts certified.

## C-14  Investment

Funds in excess of working capital needs in the construction fund, and in the operation and maintenance fund shall be invested in United States government securities or in such other securities as may be agreed upon by Solano and Pacific.  All interest and other income received from such investment shall be deposited in and become a part of said funds.

## C-15  Expenses of Trustee

The expenses and fees of the bond trustee or fiscal agent and bond paying agents and the expenses and fees of the trustee in connection with the handling of said funds shall be paid from the construction fund prior to the <u>Full Operation Date</u>, and from the operation and maintenance fund after said date.

## C-16  Financial Statements

The trustee monthly shall submit to Solano and Pacific an itemized account showing the current status of the said funds and all disbursements made therefrom during the preceding month.

Solano monthly shall submit to Pacific itemized statements showing the current status of said funds and all transactions relating to the <u>Project</u> during the preceding month and shall make its books and records relating to the <u>Project</u> available for monthly audit by Pacific.  Any

Case: 19-30088   Doc# 9256   Filed: 10/08/20   Entered: 10/08/20 14:35:13   Page 30 of 64

findings by Pacific where it determines that withdrawals from the said funds are not appropriate shall be reported to Solano and resolved promptly. After resolution, adjustments shall be made to the applicable fund including interest. The interest rate used shall be the first of the month prime rate of the Bank of America during the period adjusted, plus one-half of one percent, but not in excess of what is permitted by law, and shall accrue from the date of the withdrawal from the fund until the date the adjusted amount is deposited in the fund.

## C-17  Notice:  Re Possible Possessory Interest Taxation

In compliance with Revenue and Taxation Code Section 107.6, Solano hereby gives Pacific notice that under this Contract, a possessory interest subject to property taxation may be created and such property interest may be subject to property taxation if created, and Pacific may be subject to the payment of property taxes levied on such interest. Pacific hereby acknowledges such notice but does not agree that any such property interest would be created.

C-8

## Memorandum of Understanding

This memorandum of understanding entered into as of the 25th day of April 1980 and as amended as of September 1, 1981, by and between SOLANO IRRIGATION DISTRICT, hereinafter referred to as "Solano", and PACIFIC GAS AND ELECTRIC COMPANY, hereinafter referred to as "Pacific".

### W I T N E S S E T H :

In 1979 Solano made public a preliminary feasibility report on the Monticello Power Project ("Project"). That report was prepared by Tudor Engineering Company and concluded that the installation of a hydroelectric generating unit at the existing outlet works of Monticello Dam would be technically and economically feasible. Solano has since received its preliminary power permit (No. 2780) from the Federal Energy Regulatory Commission (FERC) and desires to proceed with such installation.

Pacific will require additional sources of power for its electrical system and desires to purchase the power to be produced by the Project for the term of the FERC license period.

In response to an offer by Solano and to effectuate these ends, Solano and Pacific propose to execute a power purchase contract (Contract) when all regulatory clearances are obtained and construction bids and revenue bond bids are received, and herewith set forth terms that are to be incorporated in the Contract for the sale and purchase of the power to be produced.

### 1. THE PROJECT

Solano and other local interests originated the concept of constructing a dam (Monticello Dam) which would form Lake Berryessa. The dam and distribution facilities were built between 1953 and 1957 as a part of the United States Bureau of Reclamation Solano Project. Since the construction of Monticello Dam, it has been conceived that the dam would have a power function. Water is discharged through the dam by means of two 90-inch diameter penstocks. It is proposed that a power plant consisting of hydraulic turbines and generators, hereinafter referred to as the "Project", be installed at the outlet works and power be generated from the falling water.

Case: 19-30088   Doc# 9256   Filed: 10/08/20   Entered: 10/08/20 14:35:13   Page 32 of 64

The Project features would consist of two Francis type turbine generators, each rated at about 5,000 kW in size with a .9 power factor, and a third Francis type turbine and 1,500 kW induction generator, 115-kV switchyard and required transmission facilities, access road, control and communication equipment and associated facilities. The final sizing of the unit (in approximately the above size) will be determined upon mutual agreement after further studies. One of the two 90-inch penstocks currently in place through the dam will be used for the power features of the Project. The other penstock will be modified as necessary. No additional Project features are contemplated.

Power would be generated from the Project whenever water is released through Project turbines from Lake Berryessa, in accordance with the irrigation, domestic and industrial use of water and release of surplus water from the Lake.

All equipment and designs used in the Project shall be substantially equal in quality and design to such similar equipment and structures which Pacific has installed in its Battle Creek Hydroelectric System.

## 2. PROJECT CONSTRUCTION COSTS

Project construction costs include all costs of construction, development costs defined in Paragraph 6, cost of acquisition of site and easement, interest during construction, inspection, insurance premiums, trustee fees, Bond paying agent's fees, and all other costs incident to planning, investigation, authorization, financing and construction of the Project.

## 3. OBLIGATIONS OF SOLANO

Solano, organized in 1948 under the California Irrigation District Act and Acts amendatory thereto, has the authority pursuant to Division 11 of the Water Code of California and subject to the approval of the government regulating commissions, agencies and department having jurisdiction, to obtain water, power and other necessary rights to carry out and finance the proposed Project. Solano will exercise those rights and work vigorously toward the completion of the Project.

Solano agrees to use its best efforts to construct, own, operate and maintain the Project, except as provided in Paragraph 4, at its own risk and expense, and shall acquire all lands, easements, Federal and State permits and all other rights and privileges necessary to carry out its

D-2

obligations under this Paragraph. All such permits and rights shall be in a form acceptable to Pacific.

Solano will use its best efforts to finance the Project, except as provided in Paragraph 4, by the sale of Revenue Bonds ("Bonds"). The following additional provisions shall apply to the issuance of said Bonds in the order listed below:

(a) To the extent that applicable law and regulations permit, tax-exempt Bonds will be issued.

(b) To the extent that Bond proceeds under Paragraph 3(a) hereof are insufficient, Solano will endeavor to sell taxable Bonds.

(c) To the extent possible, Bonds to be issued under Paragraphs 3(a) and 3(b) will be sold as close to par as practicable.

Solano agrees to enter into a Contract for the sale of all Project power to Pacific, except power for Project use and except for the right to retain up to 20% of the power for pumping requirements within Solano's own boundaries, subject to the conditions in Appendix B.

If Solano does not exercise its right to retain any Project power for its own use, then such power will continue to be delivered to Pacific under the terms and conditions set forth in Paragraph 4.

4. OBLIGATIONS OF PACIFIC

Pacific agrees to enter into a Contract for the purchase of the power to be generated by the Project for the period from the date of completion of construction of the Project to termination of the FERC license (hereinafter referred to as the Contract Term).

Pacific agrees to construct at its own expense the transmission line required to transmit the power generated by the Project into Pacific's transmission network. Pacific shall use its best efforts to complete said line prior to completion of the Project by Solano. Failure by Pacific to complete said line by the time the Project is capable of producing power shall not relieve Pacific of its obligations to make payments under Paragraphs 4(a) and 4(b).

In consideration of its rights hereunder to receive all of the Project's net power output during the Contract Term, Pacific agrees to enter into a Contract under which Pacific agrees to pay to Solano all of the following:

D-3

(a) Starting with the full operation date of the Project, the semi-annual amounts to be set forth in a Power Purchase Payment Schedule, which shall be Appendix E in the Contract. No reduction or increase in, or termination of said payments shall result from early retirement, retirement at a discount, refunding or refinancing of Bonds. Full operation date shall be when all features and equipment of the Project are capable of operating simultaneously in such conditions and adjustment that the plant is capable of continuous delivery into Pacific's transmission line at its full capacity.

(b) The expense of maintenance, operation and repair of the Project, including but not limited to insurance, bond paying agent fees, trustee fees, annual audit and fees of regulatory agencies having jurisdiction shall be budgeted annually by the parties, and payments to cover the actual operation, maintenance and repair expense shall be made in monthly installments over the Contract Term; provided, such monthly payments shall not be made when the balance in the operation and maintenance fund is greater than the monthly payment to be made. Payments to cover otherwise unprovided for items of repair and maintenance, which have had prior approval by Pacific, shall be made immediately by Pacific in addition to the above when required.

(c) For all power delivered to Pacific prior to the full operation date of the Project, an amount equal to the number of kilowatt hours generated less the number of kilowatt hours supplied from the Project generators for Project power plant use, multiplied by a factor of 14 mills per kilowatt hour.

(d) On each anniversary of the full operation date of the Project, an amount equal to a payment factor of 14 mills per kilowatt hours, as adjusted pursuant to Appendix A, multiplied by the net kilowatt hours delivered to Pacific during the preceding twelve month period. If at a future date, the adjustment provision described in Appendix A is no longer an appropriate measure of changes in Pacific's cost of electrical energy, Pacific may request that the provision be revised accordingly. In no event will the factor be less than 14 mills per kilowatt hour.

5. SAVINGS

All proceeds received from the sale of Bonds will be deposited with a trustee to enable construction of the Project. Any such money remaining upon confirmation of the full operation date after provision for payment of all

D-4

Project construction costs, shall be deposited in the construction fund surplus account.

If early retirement, retirement at a discount, refinancing or refunding of the Bonds results in a reduction in Bond debt service, such reduction shall be divided equally between Pacific and Solano.

In the event and to the extent that Solano uses funds, other than received from Pacific under Paragraph 4(a), any reduction in Bond debt service that may result from early retirement, retirement at a discount, refinancing or refunding of the Bonds will accrue solely to the benefit of Solano.

6. DEVELOPMENT COSTS

As a further expression of its interest in receipt of Project power, Pacific agrees to advance 50% of the development costs of the Project, up to a maximum of $660,000 prior to the sale of Bonds, it being understood that Solano has heretofore advanced and paid for the cost of obtaining the FERC License, the cost of complying with NEPA and CEQA, the cost of obtaining water rights and the cost of preliminary engineering. The funds advanced by Solano prior to execution of this Memorandum of Understanding shall be matched by Pacific as needed prior to any further advancement of Solano's 50% of the development costs. Pacific and Solano shall review and approve all proposed development cost expenditures, including the amount and scheduling of such expenditures. Funds so advanced by Solano and Pacific shall be repaid at the time of sale of the Project Bonds with an interest charge as set forth below, compounded monthly on such advances from the date the advance is made until repaid.

The interest rate for Pacific shall be its pretax weighted cost of capital, determined annually. The balances for long-term debt, preferred stock, and common equity shall be the actual book balances as of the end of the prior year. The cost rates for long-term debt and preferred stock shall be their respective embedded costs. The cost rate for common equity shall be the one most recently granted by the California Public Utilities Commission. The current effective tax rate will be used. The interest rate for Solano shall correspond to the rate of return available to Solano if the moneys advanced for the Project had been invested in alternative money market securities. In no event shall the interest rates of Pacific or Solano exceed the statutory interest rates for an irrigation district.

Case: 19-30088    Doc# 9256    Filed: 10/08/20    Entered: 10/08/20 14:35:13    Page 36 of 64

Development costs include, but are not limited to, the following:

(a) Cost of soils and geological investigations;

(b) Costs of surveying and mapping;

(c) Costs of obtaining water rights;

(d) Costs of obtaining Federal Energy Regulatory Commission License;

(e) Costs of preliminary engineering prior to commencement of final design;

(f) Costs of final design engineering specifications, and legal fees;

(g) Costs of complying with NEPA and CEQA;

(h) Costs of printing and distribution of documents relating to the sale of Bonds and rating service fees;

(i) Costs of election, certification, validation and proceedings related to the bond issue including costs of hearing on certification of Bonds and fees of the State Treasurer; and

(j) Costs of all additional work performed by Solano and Pacific in order to accomplish the work set forth.

It is the intent of both parties that expenditures for development of the Project be kept to a minimum. To minimize risk of loss of funds advanced, these expenditures will be deferred as long as possible without delaying the progress of the Project.

Solano shall establish a development fund with a trustee. Solano shall submit quarterly estimates of costs for Pacific's approval and upon such approval Pacific and Solano shall make appropriate deposits as needed up to the approved amount into the development fund, Solano shall submit a signed withdrawal statement to certify to the trustee the amount expended or owed, and Pacific shall sign the same statement to certify to the said trustee that such payment is a proper charge under this Memorandum of Understanding. Upon receipt of such statement, said trustee shall thereupon be empowered to pay said amount. All income derived from investment of the development funds by the trustee shall be credited to the development fund.

D-6

7. INFORMATION TO BE MADE AVAILABLE TO PACIFIC

It is agreed that Solano will keep Pacific fully and promptly informed of all matters pertaining to the Project and that such information, including, but not limited to, the following, shall be sent to Pacific.

(a) All drawing designs, plans, specifications and terms of contracts relating to the construction and operation of the Project will be sent to Pacific for its review. Pacific will be provided this information so that it has a reasonable time period to perform an adequate review. Neither approval of, comment upon, nor failure by Pacific to review any plans or specifications, or inspections of any works hereunder, shall relieve Solano of the responsibility for complying with this Memorandum of Understanding, nor shall Pacific, because of its approval of, comment upon or failure to review such plans, specifications or works, be responsible to Solano or anyone else for strength, detail of design, adequacy or capability of any structure, facility or work.

(b) All agreements, license applications, correspondence and data relating to the financing and licensing of the Project will be sent to Pacific.

(c) Solano shall submit monthly to Pacific itemized statements showing the current status of the development fund and all transactions relating to the Project during the preceding month and shall make its books and records relating to the Project available for monthly audit by Pacific. Any findings by Pacific where it determines that withdrawals from the said fund are not appropriate shall be reported to Solano and resolved promptly. After resolution, adjustment shall be made to said fund including interest. The appropriate interest rate used shall be as set forth in Paragraph 6 of this Memorandum of Understanding and shall accrue from the date of the withdrawal from the fund until the date the adjusted amount is deposited in the fund.

8. WITHDRAWAL OF PARTICIPATION

(a) Pacific shall have the right to withdraw from participation in the Project, and thereby terminate its obligations to Solano, at any time prior to the sale of Bonds which enable Solano to award a contract for the construction of the Project.

(b) If it appears that Solano cannot, despite its best efforts, construct the Project under the terms of this

D-7

Memorandum of Understanding, the parties shall confer and endeavor to reach a solution that will permit the Project to proceed. If the parties are unable to agree upon a solution within a period of six months after the parties first so confer, unless otherwise agreed upon in writing, Pacific shall be deemed to have withdrawn from participation in the Project and thereby its obligation to Solano shall be terminated.

(c) Upon termination under Paragraph 8(a) or 8(b), Solano's obligations to sell power from the Project to Pacific shall terminate and Solano shall be free to contract for the disposal of such power to others or itself use the power. If Solano thereafter is able to construct a power plant at Monticello Dam, substantially as contemplated in this Memorandum of Understanding, funds advanced by Pacific shall be refunded to Pacific with interest as specified for Pacific in Paragraph 6 of this Memorandum of Understanding. If Solano is not able to construct such power plant, it shall have no obligation to reimburse Pacific for funds advanced.

9. ADVISORY COMMITTEE

A Project Advisory Committee will be formed to ensure orderly development of the Project, and will continue in existence until the full operation date of the Project. The committee will consist of representatives of Solano and Pacific as appropriate. Any action by the committee that affects the use or the scheduling of the funds to be advanced by Pacific will require Pacific's approval.

10. EXECUTION OF AGREEMENT

This Agreement shall become binding upon its execution by both parties.

SOLANO IRRIGATION DISTRICT

By _____
President

By _____
Secretary

PACIFIC GAS AND ELECTRIC COMPANY

By _____
Senior Vice President
Facilities Development

D-8

# Appendix A

## Adjustment Provision

Begnning on the full operation date or January 1, 1984, whichever date is earlier, an adjustment will be applied to the Paragraph 4(d) payment. The adjustment will be applied quarterly, as follows in Table A.

### Table A

| | Quarters Used to Compute Energy Price Change | Quarter to Which Adjustment Applies |
|---|---|---|
| Between: (Feb - Apr) and | (May - Jul) | May - Jul |
| Between: (May - Jul) and | (Aug - Oct) | Aug - Oct |
| Between: (Aug - Oct) and | (Nov - Jan) | Nov - Jan |
| Between: (Nov - Jan) and | (Feb - Apr) | Feb - Apr |

The adjustment shall be the percentage change in the applicable energy price between the two quarters indicated in the "Quarters Used" column of Table A. The adjustment will be applied to the Paragraph 4(d) payment factor to be made for energy received by Pacific in the "Quarter to Which Adjustment Applies" column in Table A. Quarterly prices shall be published by Pacific as provided by California Public Utilities Commission OII-26, Decision No. 91109 dated December 19, 1979.

Sample Computation:

| | |
|---|---|
| Average Energy Price (Nov - Jan): | 35.67 mills per Kwh |
| Average Energy Price (Feb - Apr): | 36.53 mills per kWh |
| Difference: | 0.86 mills per kWh |
| Percentage Difference: | 2.41% |
| Adjustment Factor: | 1.0241 |

Thus, the adjustment would be made by multiplying the Paragraph 4(d) payment factor in effect on February (say 20.0 mills/kWh) by the adjustment factor, 1.0241. The unit payment for energy delivered to Pacific February - April would be 20.0 x 1.0241 = 20.4820 mills/kWh.

D-9

# Appendix B

## Solano Use Of Project Power

Pursuant to Paragraph 3, beginning on the fifteenth anniversary of the full operation date, Solano may use up to 20 percent of the power output of the Project for meeting its own pumping requirements within its boundaries, in accordance with the principles set forth in this Appendix.

1. Solano shall give Pacific a minimum of five years written notice of its intent to use Project power for its own use. Such notice and any subsequent notice shall declare what percentage of Project power Solano intends to use. The first notice shall not be given earlier than ten years following the full operation date of the Project.

2. Prior to Solano's first use of Project power, the parties shall enter into agreements necessary to allow Project power to be used by Solano, including an agreement which will provide for the transmission of such power from the Project to Solano's pumping loads. Such agreement shall be consistent with Pacific's then current policies and procedures (including appropriate charges) as may be authorized or amended from time to time by the FERC or other regulatory agency having jurisdiction.

3. Solano shall pay Pacific for use of Project power, beginning in the year the power is first used. Payment shall be computed by applying the percentage declared pursuant to Article 1 of this Appendix to the payments required under Paragraph 4(a) as may be modified by Paragraph 5, and to payments required under Paragraph 4(b). The dates of Solano's payments shall correspond to the payment due dates of Pacific.

4. Pacific will continue to make all other payments in accordance with Paragraph 4, except that the Paragraph 4(d) payment shall apply to the net Project power output less the percentage declared by Solano.

5. The parties recognize that Solano's right to use Project power pursuant to this Appendix shall be on an "as generated" basis. No banking, standby or other services are contemplated, except transmission service as provided under Article 2 of this Appendix.

D-10

6.   Pacific Agrees to repurchase all power annually declared, but not used by Solano. Pacific's payment for power repurchased shall be at a unit rate (mills/kWh) derived from the following formula: 90 percent of the total annual payments required under Paragraph 4(a) as may be modified by Paragraph 5, plus 90 percent of the total annual payments required under Paragraph 4(b), divided by 50,000,000 kWh; plus 90 percent of the Paragraph 4(d) payment factor.

D-11

## (July 1, 1983 to January 1, 2031)

Immediately following Full Operation Date, payments due under Paragraph 9(a)(i) shall be made first from moneys held in the construction fund surplus account until the balance in such account is depleted. Such payments from the construction fund shall be in lieu of payments otherwise due from Pacific pursuant to Paragraph 9(a)(i).

| DATE DUE | POWER PURCHASE PAYMENT | DATE DUE | POWER PURCHASE PAYMENT |
|---|---|---|---|
| | | 01-01-02 | $1,597,450.00 |
| | | 07-01-02 | 1,455,750.00 |
| | | 01-01-03 | 1,610,750.00 |
| 07-01-83 | $1,529,050.00 (1) (2) | 07-01-03 | 1,441,800.00 |
| 01-01-84 | 1,529,050.00 | 01-01-04 | 1,626,800.00 |
| 07-01-84 | 1,529,050.00 | 07-01-04 | 1,425,150.00 |
| 01-01-85 | 1,539,050.00 | 01-01-05 | 1,640,150.00 |
| 07-01-85 | 1,528,200.00 | 07-01-05 | 1,405,900.00 |
| 01-01-86 | 1,538,200.00 | 01-01-06 | 1,660,800.00 |
| 07-01-86 | 1,527,350.00 | 07-01-06 | 1,382,850.00 |
| 01-01-87 | 1,537,350.00 | 01-01-07 | 1,687,850.00 |
| 07-01-87 | 1,526,500.00 | 07-01-07 | 1,355,400.00 |
| 01-01-88 | 1,541,500.00 | 01-01-08 | 1,715,400.00 |
| 07-01-88 | 1,525,225.00 | 07-01-08 | 1,323,000.00 |
| 01-01-89 | 1,540,225.00 | 01-01-09 | 1,743,000.00 |
| 07-01-89 | 1,523,950.00 | 07-01-09 | 1,285,200.00 |
| 01-01-90 | 1,543,950.00 | 01-01-10 | 1,785,200.00 |
| 07-01-90 | 1,522,250.00 | 07-01-10 | 1,240,200.00 |
| 01-01-91 | 1,542,250.00 | 01-01-11 | 1,825,200.00 |
| 07-01-91 | 1,520,550.00 | 07-01-11 | 1,187,550.00 |
| 01-01-92 | 1,545,550.00 | 01-01-12 | 1,877,550.00 |
| 07-01-92 | 1,518,425.00 | 07-01-12 | 1,125,450.00 |
| 01-01-93 | 1,548,425.00 | 01-01-13 | 1,940,450.00 |
| 07-01-93 | 1,515,875.00 | 07-01-13 | 1,052,100.00 |
| 01-01-94 | 1,550,875.00 | 01-01-14 | 2,017,100.00 |
| 07-01-94 | 1,512,900.00 | 07-01-14 | 965,250.00 |
| 01-01-95 | 1,552,900.00 | 01-01-15 | 2,100,250.00 |
| 07-01-95 | 1,509,300.00 | 07-01-15 | 853,100.00 |
| 01-01-96 | 1,559,300.00 | 01-01-16 | 2,203,100.00 |
| 07-01-96 | 1,504,800.00 | 07-01-16 | 742,500.00 |
| 01-01-97 | 1,564,800.00 | 01-01-17 | 2,322,500.00 |
| 07-01-97 | 1,499,400.00 | 07-01-17 | 600,300.00 |
| 01-01-98 | 1,569,400.00 | 01-01-18 | 2,465,300.00 |
| 07-01-98 | 1,493,100.00 | 07-01-18 | 432,450.00 |
| 01-01-99 | 1,573,100.00 | 01-01-19 | 2,637,450.00 |
| 07-01-99 | 1,485,900.00 | 07-01-19 | 234,000.00 |
| 01-01-00 | 1,580,900.00 | 01-01-20 | 2,834,000.00 |
| 07-01-00 | 1,477,350.00 | | |
| 01-01-01 | 1,587,350.00 | | |
| 07-01-01 | 1,467,450.00 | TOTALS | $113,468,950.00 |

Commencing January 1, 2020, Pacific shall become obligated for variable semiannual power purchase payments which shall continue until termination of this Contract. The variable payments shall be in an amount computed by multiplying the Net Project Generation by $.0307 and shall be due for periods ending June 30 and December 31 each year.

(1) Assumes Full Operation Date will be achieved prior to July 1, 1983.
(2) Initial payments are to be made from any surplus moneys available in the Interest Fund or Construction Fund.

## SOLANO IRRIGATION DISTRICT
### RESOLUTION NO. 81-33

At an adjourned meeting of the Board of Directors of Solano Irrigation District held at the office of said District on the 9th day of September, 1981, the following Resolution was approved and adopted:

BE AND IT IS HEREBY RESOLVED that the Board of Directors approve the Power Purchase Agreement for the Monticello Power Project between the Solano Irrigation District and the Pacific Gas and Electric Company, dated September 1, 1981;

BE IT FURTHER RESOLVED that the President and Secretary are authorized and directed to execute such agreement.

PASSED AND ADOPTED at an adjourned meeting of the Board of Directors of Solano Irrigation District on the 9th day of September, 1981, by the following vote:

  AYES: Directors Dally, Glashoff, Rogers, Wetzel and Alonzo

  NOES: None

ABSENT: None

ATTEST: I hereby certify that the foregoing Resolution was duly made, seconded and adopted by the Board of Directors of Solano Irrigation District at an adjourned meeting of the Board of Directors held September 9, 1981.

    Brice Bledsoe, Secretary of the
Board of Directors of the
Solano Irrigation District

Case: 19-30088    Doc# 9256    Filed: 10/08/20    Entered: 10/08/20 14:35:13    Page 44 of 64

# ATTACHMENT 2

**DIRECTORS**

JOHN D. KLUGE
PRESIDENT – Div #1

LANCE PORTER
VICE PRESIDENT -
Div #2

MICHAEL J. BARRETT
DIV#3

GUIDO E. COLLA
DIV #4

MIKE GERMAN
DIV #5

**OFFICERS**

CARY KEATEN
GENERAL MANAGER

JAMES S. DANIELS, P.E.
DISTRICT ENGINEER

MINASIAN, SPRUANCE, MEITH,
SOARES & SEXTON
ATTORNEYS



February 12, 2019


Stephanie Maggard
Director Planning Portfolio Strategy
Pacific Gas and Electric
245 Market Street, Mail Code: 1136
San Francisco, California  94105


RE: January 2019, Request 01-19


Dear Ms. Maggard:

This is withdrawal request number 01-19 in the amount of $145,008.03.  Upon your approval, please forward  $145,008.03 to US Bank Trust National Association for payment.

The purpose of this withdrawal is to replenish the Solano Irrigation District, Monticello Power Project's revolving account for maintenance and operations for the month of Jan 2019.


Very truly yours,

Cammie Morin
Finance Director

**DIRECTORS**

JOHN D. KLUGE
PRESIDENT – Div #1

LANCE PORTER
VICE PRESIDENT -
Div #2

MICHAEL J. BARRETT
DIV#3

GUIDO E. COLLA
DIV #4

MIKE GERMAN
DIV #5



**OFFICERS**

CARY KEATEN
GENERAL MANAGER

JAMES S. DANIELS, P.E.
DISTRICT ENGINEER

MINASIAN, SPRUANCE,
MEITH, SOARES & SEXTON
ATTORNEYS

February 12, 2019

Myrna Choroski
US Bank National Association
One California Street, Suite 2100
San Francisco, California 94111

RE: January 2019

Dear Ms. Choroski:

Please transfer from the maintenance and operations account no. 70297-86, to Bank of America, Vacaville branch

no. 0051, Parker Street, Vacaville, CA 95688, Account number 00515-03395: the amount shown below.

The request is to replenish the Solano Irrigation District, Monticello Power Project revolving account as summarized:

| | |
|---|---:|
| Engineering | $0.00 |
| Information Technology | 0.00 |
| Administration | 36,304.88 |
| Operations | 22,976.99 |
| Maintenance & Repairs | 210.35 |
| Capital Improvements | 85,515.81 |
| TOTAL EXPENDITURES | $145,008.03 |
| Less prior period credit | 0.00 |
| **NET WITHDRAWAL REQUEST** | **$ 145,008.03** |

Solano Irrigation District                    Pacific Gas & Electric Company

Cammie Morin, Finance Director              Manager

**Solano Irrigation District**

810 Vaca Valley Parkway, Suite 201
Vacaville, CA 95688
Telephone: 707-448-6847



| DATE | INVOICE NO |
|------|------------|
| 2/12/2019 | 0007421 |

| BILL TO |
|---------|
| Pacific Gas and Electric<br>Stephanie Maggard, Director Planning Portfolio Strategy<br>245 Market Street, Mail Code #1136<br>San Francisco, CA 94105 |

| | DUE DATE |
|--|----------|
| | 2/12/2019 |

| DESCRIPTION | QUANTITY | EFFECTIVE RATE | AMOUNT | DISCOUNT | CREDIT | BALANCE |
|-------------|----------|----------------|--------|----------|--------|---------|
| PREVIOUS ACCOUNT BALANCE | | | | | | 0.00 |
| WO Billing - Jan 2019 Expenses: | | | | | | |
| 0000006 - Adjustments | 1.00 | 14.35 | 14.35 | 0.00 | 0.00 | 14.35 |
| 0000006 - Equipment | 1.00 | 5,060.00 | 5,060.00 | 0.00 | 0.00 | 5,060.00 |
| 0000006 - Labor | 1.00 | 53,537.98 | 53,537.98 | 0.00 | 0.00 | 53,537.98 |
| 0000006 - Services | 1.00 | 86,395.70 | 86,395.70 | 0.00 | 0.00 | 86,395.70 |
| | | **INVOICE TOTAL:** | **145,008.03** | **0.00** | **0.00** | **145,008.03** |

PLEASE DETACH BOTTOM PORTION & REMIT WITH YOUR PAYMENT

For questions please contact us at (707) 448-6847

| | DUE DATE | INVOICE NO |
|--|----------|------------|
| | 2/12/2019 | 0007421 |

Customer Name:     Pacific Gas and Electric
Customer No:     000004
Account No:     0000002   - Monthly Agency Billing for Monticello Power Plant (M

**Please remit payment by the due date to:**

Solano Irrigation District
810 Vaca Valley Pkwy, Ste 201
Vacaville, CA 95688

| | |
|--|--|
| Invoice Total: | 145,008.03 |
| Discounts: | 0.00 |
| Credit Applied: | 0.00 |
| Ending Balance: | 145,008.03 |
| **INVOICE BALANCE:** | **$145,008.03** |
| **AMOUNT PAID:** | |

**MONTICELLO POWER PLANT**
**BILLING SUMMARY**

**Current Billing Period:** <mark>January-19</mark>

| | MONTICELLO POWER PLANT | Month of<br>Jan-19 | Y-T-D | BUDGET | % USED |
|---|---|---|---|---|---|
| 2000 | General Manager | $ - | $ - | $ - | 0% |
| 2010 | Board of Directors | $ - | $ - | $ - | 0% |
| 2500 | Finance | $ - | $ - | $ - | 0% |
| 2550 | Purchasing/Warehouse | $ - | $ - | $ - | 0% |
| 2600 | Human Resources | $ - | $ - | $ - | 0% |
| 2700 | Risk Management/Safety | $ - | $ - | $ - | 0% |
| 3000 | Engineering | $ - | $ - | $ 1,000.00 | 0% |
| 3040 | Information Technology | $ - | $ - | $ - | 0% |
| 5000 | Administration | $ 36,304.88 | $ 36,304.88 | $ 648,500.00 | 6% |
| 6000 | Operations | $ 22,976.99 | $ 22,976.99 | $ 397,297.00 | 6% |
| 7000 | Maintenance & Repairs | $ 210.35 | $ 210.35 | $ 52,393.00 | 0% |
| 8000 | Capital Improvements | $ 85,515.81 | $ 85,515.81 | $ 650,810.00 | 13% |
| | TOTAL - MONTICELLO POWER PLANT | $ 145,008.03 | $ 145,008.03 | $ 1,750,000.00 | 8% |
| | **TOTAL NOW DUE TO SID** | **$ 145,008.03** | | | |

Case: 19-30088   Doc# 9256   Filed: 10/08/20   Entered: 10/08/20 14:35:13   Page 49
Page 12 of 6
of 64

| MONTICELLO POWER PLANT | Jan-19 | Y-T-D | BUDGET | % USED |
|---|---|---|---|---|

| | | | | | | |
|---|---|---|---|---|---|---|
| 2000 | General Manager | | | | | |
| | Subtotal - General Manager | $ - | $ - | $ - | 0% |
| 2010 | Board of Directors | | | | | |
| | Subtotal - Board of Directors | $ - | $ - | $ - | 0% |
| 2500 | Finance | | | | | |
| | Subtotal - Finance | $ - | $ - | $ - | 0% |
| 2550 | Purchasing/Warehouse | | | | | |
| | Subtotal - Purchasing/Warehouse | $ - | $ - | $ - | 0% |
| 2600 | Human Resources | | | | | |
| | Subtotal - Human Resources | $ - | $ - | $ - | 0% |
| 2700 | Risk Management/Safety | | | | | |
| 540-2700-6003 | Hourly | $ - | $ - | $ - | 0% |
| 540-2700-6407 | Training | $ - | $ - | $ - | 0% |
| 540-2700-7405 | Safety | $ - | $ - | $ - | 0% |
| 540-2700-7637 | Fleet Charges | $ - | $ - | $ - | 0% |
| 540-2700-7699 | Other Services | $ - | $ - | $ - | 0% |
| 540-2700-7813 | Administrative Overhead | $ - | $ - | $ - | 0% |
| | Subtotal - Risk Management/Safety | $ - | $ - | $ - | 0% |
| 3000 | Engineering | | | | | |
| 540-3000-6001 | Salary | $ - | $ - | $ 500.00 | 0% |
| 540-3000-6003 | Hourly | $ - | $ - | $ - | 0% |
| 540-3000-6201 | Medicare | $ - | $ - | $ - | 0% |
| 540-3000-6203 | FICA | $ - | $ - | $ - | 0% |
| 540-3000-6205 | Health Insurance | $ - | $ - | $ - | 0% |
| 540-3000-6207 | Dental Insurance | $ - | $ - | $ - | 0% |
| 540-3000-6209 | Life Insurance | $ - | $ - | $ - | 0% |
| 540-3000-6211 | Pension, Employer | $ - | $ - | $ - | 0% |
| 540-3000-6213 | Pension, Employee (ER Paid) | $ - | $ - | $ - | 0% |
| 540-3000-6217 | Long-Term Disability | $ - | $ - | $ - | 0% |
| 540-3000-6219 | Employee Share Medical (contra) | $ - | $ - | $ - | 0% |
| 540-3000-6221 | Employee Share Dental (contra) | $ - | $ - | $ - | 0% |
| 540-3000-6223 | Workers' Compensation | $ - | $ - | $ - | 0% |
| 540-3000-6225 | Unemployment Insurance | $ - | $ - | $ - | 0% |
| 540-3000-6601 | Legal | $ - | $ - | $ - | 0% |
| 540-3000-7201 | Telephone, Landlines | $ - | $ - | $ - | 0% |
| 540-3000-7423 | Gasoline, Diesel | $ - | $ - | $ 500.00 | 0% |

Case: 19-30088   Doc# 9256   Filed: 10/08/20   Entered: 10/08/20 14:35:13   Page 50 of 64

| | MONTICELLO POWER PLANT | Jan-19 | Y-T-D | BUDGET | % USED |
|---|---|---|---|---|---|
| 540-3000-7499 | Other Materials & Supplies | $ - | $ - | $ - | 0% |
| 540-3000-7699 | Other Services | $ - | $ - | $ - | 0% |
| 540-3000-7813 | Administrative Overhead | $ - | $ - | $ - | 0% |
| | Subtotal - Engineering | $ - | $ - | $ 1,000.00 | 0% |
| 3040 | Information Technology | | | | |
| | Subtotal - Information Technology | $ - | $ - | $ - | 0% |
| 5000 | Administration | | | | |
| 540-5000-6001 | Salary | $ - | $ - | $ - | 0% |
| 540-5000-6003 | Hourly | $ - | $ - | $ - | 0% |
| 540-5000-6011 | Holiday | $ - | $ - | $ - | 0% |
| 540-5000-6015 | Sick | $ - | $ - | $ - | 0% |
| 540-5000-6201 | Medicare | $ - | $ - | $ - | 0% |
| 540-5000-6203 | FICA | $ - | $ - | $ - | 0% |
| 540-5000-6205 | Health Insurance | $ - | $ - | $ - | 0% |
| 540-5000-6207 | Dental Insurance | $ - | $ - | $ - | 0% |
| 540-5000-6209 | Life Insurance | $ - | $ - | $ - | 0% |
| 540-5000-6211 | Pension, Employer | $ - | $ - | $ - | 0% |
| 540-5000-6213 | Pension, Employee (ER Paid) | $ - | $ - | $ - | 0% |
| 540-5000-6217 | Long-Term Disability | $ - | $ - | $ - | 0% |
| 540-5000-6219 | Employee Share Medical (contra) | $ - | $ - | $ - | 0% |
| 540-5000-6221 | Employee Share Dental (contra) | $ - | $ - | $ - | 0% |
| 540-5000-6223 | Workers' Compensation | $ - | $ - | $ - | 0% |
| 540-5000-6225 | Unemployment Insurance | $ - | $ - | $ - | 0% |
| 540-5000-6403 | Licenses and Certificates | $ - | $ - | $ - | 0% |
| 540-5000-6405 | Conferences and Seminars | $ - | $ - | $ 500.00 | 0% |
| 540-5000-6601 | Legal | $ - | $ - | $ - | 0% |
| 540-5000-7001 | Property Insurance | $ - | $ - | $ 38,500.00 | 0% |
| 540-5000-7401 | Office Supplies | $ - | $ - | $ - | 0% |
| 540-5000-7402 | Food Beverage Meetings | $ - | $ - | $ - | 0% |
| 540-5000-7499 | Other Materials & Supplies | $ - | $ - | $ - | 0% |
| 540-5000-7631 | Rent, Equipment | $ - | $ - | $ - | 0% |
| 540-5000-7637 | Fleet Charges | $ 5,060.00 | $ 5,060.00 | $ 45,000.00 | 11% |
| 540-5000-7699 | Other Services | $ - | $ - | $ - | 0% |
| 540-5000-7801 | Permits and Fees | $ - | $ - | $ 83,000.00 | 0% |
| 540-5000-7805 | Bank Service Fees | $ 14.35 | $ 14.35 | $ 6,500.00 | 0% |
| 540-5000-7809 | SID G&A Allocation | $ - | $ - | $ - | 0% |
| 540-5000-7813 | Administrative Overhead | $ 31,230.53 | $ 31,230.53 | $ 475,000.00 | 7% |
| 540-5000-7898 | Work Order Clearing | $ - | $ - | $ - | 0% |
| 540-5000-7899 | Other | $ - | $ - | $ - | 0% |
| | Subtotal - Administration | $ 36,304.88 | $ 36,304.88 | $ 648,500.00 | 6% |
| 6000 | Operations | | | | |
| 540-6000-6001 | Salary | $ 1,908.20 | $ 1,908.20 | $ 37,795.00 | 5% |
| 540-6000-6003 | Hourly | $ 8,776.69 | $ 8,776.69 | $ 238,454.00 | 4% |

| | MONTICELLO POWER PLANT | Jan-19 | Y-T-D | BUDGET | % USED |
|---|---|---|---|---|---|
| 540-6000-6005 | Overtime | $ 4,373.14 | $ 4,373.14 | $ 43,000.00 | 10% |
| 540-6000-6007 | Standby | $ 3,811.02 | $ 3,811.02 | $ 49,268.00 | 8% |
| 540-6000-6009 | Longevity | $ - | $ - | | 0% |
| 540-6000-6011 | Holiday | $ 3,438.40 | $ 3,438.40 | $ 4,800.00 | 72% |
| 540-6000-6013 | Vacation | $ - | $ - | $ - | 0% |
| 540-6000-6015 | Sick | $ - | $ - | $ - | 0% |
| 540-6000-6017 | Other Pay | $ - | $ - | $ - | 0% |
| 540-6000-6201 | Medicare | $ - | $ - | $ - | 0% |
| 540-6000-6203 | FICA | $ - | $ - | $ - | 0% |
| 540-6000-6205 | Health Insurance | $ - | $ - | $ - | 0% |
| 540-6000-6207 | Dental Insurance | $ - | $ - | $ - | 0% |
| 540-6000-6209 | Life Insurance | $ - | $ - | $ - | 0% |
| 540-6000-6211 | Pension, Employer | $ - | $ - | $ - | 0% |
| 540-6000-6213 | Pension, Employee (ER Paid) | $ - | $ - | $ - | 0% |
| 540-6000-6217 | Long-Term Disability | $ - | $ - | $ - | 0% |
| 540-6000-6219 | Employee Share Medical (contra) | $ - | $ - | $ - | 0% |
| 540-6000-6221 | Employee Share Dental (contra) | $ - | $ - | $ - | 0% |
| 540-6000-6223 | Workers' Compensation | $ - | $ - | $ - | 0% |
| 540-6000-6225 | Unemployment Insurance | $ - | $ - | $ - | 0% |
| 540-6000-6407 | Training | $ - | $ - | $ 1,500.00 | 0% |
| 540-6000-6417 | Travel, Other | $ - | $ - | $ - | 0% |
| 540-6000-6601 | Legal | $ - | $ - | $ - | 0% |
| 540-6000-7201 | Telephone, Landlines | $ 40.77 | $ 40.77 | $ 500.00 | 8% |
| 540-6000-7203 | Telephone, Cellular | $ - | $ - | $ - | 0% |
| 540-6000-7205 | Telephone, SCADA (Telemetry) | $ - | $ - | $ - | 0% |
| 540-6000-7207 | Electricity | $ 78.65 | $ 78.65 | $ 6,800.00 | 1% |
| 540-6000-7213 | Trash | $ - | $ - | $ - | 0% |
| 540-6000-7401 | Office Supplies | $ - | $ - | $ 1,200.00 | 0% |
| 540-6000-7405 | Safety | $ 184.22 | $ 184.22 | $ 1,200.00 | 15% |
| 540-6000-7419 | Nuts and Bolts | $ - | $ - | $ - | 0% |
| 540-6000-7421 | Tools, Equipment | $ - | $ - | $ 2,000.00 | 0% |
| 540-6000-7423 | Gasoline, Diesel | $ - | $ - | $ - | 0% |
| 540-6000-7425 | Oil, Grease | $ - | $ - | $ - | 0% |
| 540-6000-7427 | Automotive | $ - | $ - | $ - | 0% |
| 540-6000-7429 | Chemicals, Treatment | $ - | $ - | $ - | 0% |
| 540-6000-7431 | Chemicals, Pest Control | $ - | $ - | $ - | 0% |
| 540-6000-7433 | Materials Inventory | $ - | $ - | $ - | 0% |
| 540-6000-7441 | Vaults | $ - | $ - | $ - | 0% |
| 540-6000-7455 | Backflows | $ - | $ - | $ - | 0% |
| 540-6000-7499 | Other Materials & Supplies | $ - | $ - | $ 2,000.00 | 0% |
| 540-6000-7613 | Uniforms | $ - | $ - | $ 2,780.00 | 0% |
| 540-6000-7622 | Welder | $ - | $ - | $ - | 0% |
| 540-6000-7631 | Rent, Equipment | $ - | $ - | $ - | 0% |
| 540-6000-7633 | Rent, Vehicles | $ - | $ - | $ - | 0% |
| 540-6000-7637 | Fleet Charges | $ - | $ - | $ - | 0% |
| 540-6000-7699 | Other Services | $ 365.90 | $ 365.90 | $ 4,000.00 | 9% |
| 540-6000-7801 | Permits and Fees | $ - | $ - | $ - | 0% |
| 540-6000-7813 | Administrative Overhead | $ - | $ - | $ - | 0% |
| 540-6000-7899 | Other | $ - | $ - | $ 2,000.00 | 0% |
| | **Subtotal - Operations** | $ 22,976.99 | $ 22,976.99 | $ 397,297.00 | 6% |

| | MONTICELLO POWER PLANT | Jan-19 | Y-T-D | BUDGET | % USED |
|---|---|---|---|---|---|
| 7000 | Maintenance & Repairs | | | | |
| | | | | | |
| 540-7000-6001 | Salary | $ - | $ - | $ 2,000.00 | 0% |
| 540-7000-6003 | Hourly | $ - | $ - | $ 2,000.00 | 0% |
| 540-7000-6005 | Overtime | $ - | $ - | $ - | 0% |
| 540-7000-6007 | Standby | $ - | $ - | $ - | 0% |
| 540-7000-6009 | Longevity | $ - | $ - | $ - | 0% |
| 540-7000-6011 | Holiday | $ - | $ - | $ - | 0% |
| 540-7000-6013 | Vacation | $ - | $ - | $ - | 0% |
| 540-7000-6015 | Sick | $ - | $ - | $ - | 0% |
| 540-7000-6017 | Other Pay | $ - | $ - | $ - | 0% |
| 540-7000-6201 | Medicare | $ - | $ - | $ - | 0% |
| 540-7000-6203 | FICA | $ - | $ - | $ - | 0% |
| 540-7000-6205 | Health Insurance | $ - | $ - | $ - | 0% |
| 540-7000-6207 | Dental Insurance | $ - | $ - | $ - | 0% |
| 540-7000-6209 | Life Insurance | $ - | $ - | $ - | 0% |
| 540-7000-6211 | Pension, Employer | $ - | $ - | $ - | 0% |
| 540-7000-6213 | Pension, Employee (ER Paid) | $ - | $ - | $ - | 0% |
| 540-7000-6217 | Long-Term Disability | $ - | $ - | $ - | 0% |
| 540-7000-6219 | Employee Share Medical (contra) | $ - | $ - | $ - | 0% |
| 540-7000-6221 | Employee Share Dental (contra) | $ - | $ - | $ - | 0% |
| 540-7000-6223 | Workers' Compensation | $ - | $ - | $ - | 0% |
| 540-7000-6225 | Unemployment Insurance | $ - | $ - | $ - | 0% |
| 540-7000-6699 | Other Contract Services | $ - | $ - | $ 4,000.00 | 0% |
| 540-7000-7201 | Telephone, Landlines | $ - | $ - | $ - | 0% |
| 540-7000-7419 | Nuts and Bolts | $ - | $ - | $ 50.00 | 0% |
| 540-7000-7421 | Tools, Equipment | $ - | $ - | $ 2,500.00 | 0% |
| 540-7000-7423 | Gasoline, Diesel | $ - | $ - | $ - | 0% |
| 540-7000-7425 | Oil, Grease | $ - | $ - | $ 4,000.00 | 0% |
| 540-7000-7427 | Automotive | $ - | $ - | $ - | 0% |
| 540-7000-7433 | Materials Inventory | $ - | $ - | $ 1,200.00 | 0% |
| 540-7000-7441 | Vaults | $ - | $ - | $ - | 0% |
| 540-7000-7499 | Other Materials & Supplies | $ 210.35 | $ 210.35 | $ 6,500.00 | 3% |
| 540-7000-7613 | Uniforms | $ - | $ - | $ - | 0% |
| 540-7000-7615 | Electrican | $ - | $ - | $ 1,000.00 | 0% |
| 540-7000-7619 | Pest Control | $ - | $ - | $ - | 0% |
| 540-7000-7621 | Lab | $ - | $ - | $ - | 0% |
| 540-7000-7622 | Welder | $ - | $ - | $ - | 0% |
| 540-7000-7623 | Survey/Inspection | $ - | $ - | $ - | 0% |
| 540-7000-7627 | Vehicle Services | $ - | $ - | $ - | 0% |
| 540-7000-7631 | Rent, Equipment | $ - | $ - | $ 4,500.00 | 0% |
| 540-7000-7633 | Rent, Vehicles | $ - | $ - | $ - | 0% |
| 540-7000-7635 | Grading and Paving | $ - | $ - | $ - | 0% |
| 540-7000-7637 | Fleet Charges | $ - | $ - | $ - | 0% |
| 540-7000-7699 | Other Services | $ - | $ - | $ 20,143.00 | 0% |
| 540-7000-7813 | Administrative Overhead | $ - | $ - | $ - | 0% |
| 540-7000-7899 | Other | $ - | $ - | $ 4,500.00 | 0% |
| | | | | | |
| | Subtotal - Maintenance & Repairs | $ 210.35 | $ 210.35 | $ 52,393.00 | 0% |
| | | | | | |
| 8000 | Capital Improvements | | | | |

Case: 19-30088   Doc# 9256   Filed: 10/08/20   Entered: 10/08/20 14:35:13   Page 53 of 64

| | MONTICELLO POWER PLANT | Jan-19 | Y-T-D | BUDGET | % USED |
|---|---|---|---|---|---|
| 540-8000-6001 | Salary | $ - | $ - | $ - | 0% |
| 540-8000-6003 | Hourly | $ - | $ - | $ - | 0% |
| 540-8000-6201 | Medicare | $ - | $ - | $ - | 0% |
| 540-8000-6203 | FICA | $ - | $ - | $ - | 0% |
| 540-8000-6205 | Health Insurance | $ - | $ - | $ - | 0% |
| 540-8000-6207 | Dental Insurance | $ - | $ - | $ - | 0% |
| 540-8000-6209 | Life Insurance | $ - | $ - | $ - | 0% |
| 540-8000-6211 | Pension, Employer | $ - | $ - | $ - | 0% |
| 540-8000-6213 | Pension, Employee (ER Paid) | $ - | $ - | $ - | 0% |
| 540-8000-6215 | Short-Term Liability | $ - | $ - | $ - | 0% |
| 540-8000-6217 | Long-Term Disability | $ - | $ - | $ - | 0% |
| 540-8000-6219 | EE Share Medical (contra) | $ - | $ - | $ - | 0% |
| 540-8000-6221 | EE Share Dental (contra) | $ - | $ - | $ - | 0% |
| 540-8000-6223 | Workers' Compensation | $ - | $ - | $ - | 0% |
| 540-8000-6225 | Unemployment Insurance | $ - | $ - | $ - | 0% |
| 540-8000-6699 | Other | $ - | $ - | $ 76,560.00 | 0% |
| 540-8000-6807 | Other | $ - | $ - | $ - | 0% |
| 540-8000-7419 | Nuts and Bolts | $ - | $ - | $ - | 0% |
| 540-8000-7421 | Tools and Equipment | $ - | $ - | $ 5,000.00 | 0% |
| 540-8000-7423 | Gasoline, Diesel | $ - | $ - | $ - | 0% |
| 540-8000-7433 | Materials Inventory | $ - | $ - | $ - | 0% |
| 540-8000-7499 | Other | $ - | $ - | $ - | 0% |
| 540-8000-7622 | Welder | $ - | $ - | $ - | 0% |
| 540-8000-7623 | Survey/Inspection | $ - | $ - | $ 250.00 | 0% |
| 540-8000-7631 | Rent, Equipment | $ - | $ - | $ - | 0% |
| 540-8000-7637 | Fleet Charges | $ - | $ - | $ - | 0% |
| 540-8000-7699 | Other | $ 85,515.81 | $ 85,515.81 | $ 569,000.00 | 15% |
| 540-8000-7801 | Permits and Fees | $ - | $ - | $ - | 0% |
| 540-8000-7813 | Administrative Overhead | $ - | $ - | $ - | 0% |
| 540-8000-7898 | Work Order Clearing | $ - | $ - | $ - | 0% |
| 540-8000-7899 | Other | $ - | $ - | $ - | 0% |
| | **Subtotal - Capital Improvements** | $ 85,515.81 | $ 85,515.81 | $ 650,810.00 | 13% |
| | **TOTAL - MONTICELLO POWER PLANT** | **$ 145,008.03** | **$ 145,008.03** | **$ 1,750,000.00** | **8%** |

-

Case: 19-30088   Doc# 9256   Filed: 10/08/20   Entered: 10/08/20 14:35:13   Page 54 of 64

# 01 - Jan 2019 - Fund 540 - MPP Work Orders

## WO Audit Report

User: cjirasritumrong
Printed: 02/11/19 14:44:09

| WO Number | Work Order Description | Activity | Units | Amount / Unit | Overhead | Date | Description | Reference Code | |
|-----------|------------------------|----------|-------|---------------|----------|------|-------------|----------------|---|
| 0000006 | 540 | 14.35 | 1.00 | 14.35 | - | 01/31/201 | Jan 2019 Bank Fees less interest earned | | |
| 0000006 | 540 | 1,000.00 | 50.00 | 20.00 | - | 12/26/201 | | 0449 - Ford F150 | |
| 0000006 | 540 | 1,400.00 | 70.00 | 20.00 | - | 01/02/201 | | 0449 - Ford F150 | |
| 0000006 | 540 | 320.00 | 16.00 | 20.00 | - | 12/26/201 | | 0440 - Ford Ranger | |
| 0000006 | 540 | 480.00 | 24.00 | 20.00 | - | 01/09/201 | | 0440 - Ford Ranger | |
| 0000006 | 540 | 800.00 | 40.00 | 20.00 | - | 01/16/201 | | 0440 - Ford Ranger | |
| 0000006 | 540 | 160.00 | 8.00 | 20.00 | - | 01/09/201 | | 0440 - Ford Ranger | |
| 0000006 | 540 | 300.00 | 15.00 | 20.00 | - | 01/16/201 | | 0440 - Ford Ranger | |
| 0000006 | 540 | 400.00 | 20.00 | 20.00 | - | 01/09/201 | | 0449 - Ford F150 | |
| 0000006 | 540 | 200.00 | 10.00 | 20.00 | - | 01/13/201 | | 0449 - Ford F150 | |
| 0000006 | 540 | 1,085.38 | 8.00 | 56.53 | 633.14 | 12/20/201 | Faulkner, Mickey | 193 - Faulkner, Mickey | |
| 0000006 | 540 | 1,085.38 | 8.00 | 56.53 | 633.14 | 12/21/201 | Faulkner, Mickey | 193 - Faulkner, Mickey | |
| 0000006 | 540 | 294.62 | 2.00 | 61.38 | 171.86 | 12/20/201 | Gerard, Timothy | 346 - Gerard, Timothy | |
| 0000006 | 540 | 294.62 | 2.00 | 61.38 | 171.86 | 12/21/201 | Gerard, Timothy | 346 - Gerard, Timothy | |
| 0000006 | 540 | 264.31 | 3.00 | 36.71 | 154.18 | 12/20/201 | Johnson, Eric | 384 - Johnson, Eric | |
| 0000006 | 540 | 261.70 | 2.00 | 54.52 | 152.66 | 12/20/201 | Vignau, Melissa | 379 - Vignau, Melissa | |
| 0000006 | 540 | 261.70 | 2.00 | 54.52 | 152.66 | 12/27/201 | Vignau, Melissa | 379 - Vignau, Melissa | |
| 0000006 | 540 | 392.54 | 3.00 | 54.52 | 228.98 | 12/28/201 | Vignau, Melissa | 379 - Vignau, Melissa | |
| 0000006 | 540 | 261.70 | 2.00 | 54.52 | 152.66 | 12/26/201 | Vignau, Melissa | 379 - Vignau, Melissa | |
| 0000006 | 540 | 261.70 | 2.00 | 54.52 | 152.66 | 01/02/201 | Vignau, Melissa | 379 - Vignau, Melissa | |
| 0000006 | 540 | 1,547.28 | 10.00 | 64.47 | 902.58 | 12/22/201 | Pile, Rick | 226 - Pile, Rick | |
| 0000006 | 540 | 1,547.28 | 10.00 | 64.47 | 902.58 | 12/27/201 | Pile, Rick | 226 - Pile, Rick | |
| 0000006 | 540 | 1,547.28 | 10.00 | 64.47 | 902.58 | 12/29/201 | Pile, Rick | 226 - Pile, Rick | |
| 0000006 | 540 | 1,547.28 | 10.00 | 64.47 | 902.58 | 12/28/201 | Pile, Rick | 226 - Pile, Rick | |
| 0000006 | 540 | 1,031.52 | 10.00 | 42.98 | 601.72 | 12/26/201 | Pile, Rick | 226 - Pile, Rick | |
| 0000006 | 540 | 1,031.52 | 10.00 | 42.98 | 601.72 | 12/23/201 | Pile, Rick | 226 - Pile, Rick | |
| 0000006 | 540 | 1,031.52 | 10.00 | 42.98 | 601.72 | 12/30/201 | Pile, Rick | 226 - Pile, Rick | |
| 0000006 | 540 | 825.22 | 8.00 | 42.98 | 481.38 | 01/02/201 | Pile, Rick | 226 - Pile, Rick | |
| 0000006 | 540 | 412.61 | 2.00 | 85.96 | 240.69 | 01/02/201 | Pile, Rick | 226 - Pile, Rick | |
| 0000006 | 540 | 309.46 | 2.00 | 64.47 | 180.52 | 01/01/201 | Pile, Rick | 226 - Pile, Rick | |
| 0000006 | 540 | 309.46 | 2.00 | 64.47 | 180.52 | 12/24/201 | Pile, Rick | 226 - Pile, Rick | |
| 0000006 | 540 | 309.46 | 2.00 | 64.47 | 180.52 | 12/31/201 | Pile, Rick | 226 - Pile, Rick | |
| 0000006 | 540 | 309.46 | 2.00 | 64.47 | 180.52 | 12/25/201 | Pile, Rick | 226 - Pile, Rick | |
| 0000006 | 540 | 2,063.04 | 8.00 | 107.45 | 1,203.44 | 12/24/201 | Pile, Rick | 226 - Pile, Rick | |
| 0000006 | 540 | 2,063.04 | 8.00 | 107.45 | 1,203.44 | 12/25/201 | Pile, Rick | 226 - Pile, Rick | |

# 01 - Jan 2019 - Fund 540 - MPP Work Orders

## WO Audit Report

User: cjirasritumrong
Printed: 02/11/19 14:44:09

| WO Number | Work Order Description | Activity | Units | Amount / Unit | Overhead | Date | Description | Reference Code |
|---|---|---|---|---|---|---|---|---|
| 0000006 | 540 | 2,063.04 | 8.00 | 107.45 | 1,203.44 | 12/31/201 | Pile, Rick | 226 - Pile, Rick |
| 0000006 | 540 | 2,063.04 | 8.00 | 107.45 | 1,203.44 | 01/01/201 | Pile, Rick | 226 - Pile, Rick |
| 0000006 | 540 | 309.46 | 2.00 | 64.47 | 180.52 | 12/29/201 | Pile, Rick | 226 - Pile, Rick |
| 0000006 | 540 | 309.46 | 2.00 | 64.47 | 180.52 | 12/27/201 | Pile, Rick | 226 - Pile, Rick |
| 0000006 | 540 | 309.46 | 2.00 | 64.47 | 180.52 | 12/30/201 | Pile, Rick | 226 - Pile, Rick |
| 0000006 | 540 | 309.46 | 2.00 | 64.47 | 180.52 | 12/26/201 | Pile, Rick | 226 - Pile, Rick |
| 0000006 | 540 | 309.46 | 2.00 | 64.47 | 180.52 | 12/25/201 | Pile, Rick | 226 - Pile, Rick |
| 0000006 | 540 | 309.46 | 2.00 | 64.47 | 180.52 | 12/31/201 | Pile, Rick | 226 - Pile, Rick |
| 0000006 | 540 | 309.46 | 2.00 | 64.47 | 180.52 | 12/28/201 | Pile, Rick | 226 - Pile, Rick |
| 0000006 | 540 | 309.46 | 2.00 | 64.47 | 180.52 | 12/24/201 | Pile, Rick | 226 - Pile, Rick |
| 0000006 | 540 | 309.46 | 2.00 | 64.47 | 180.52 | 01/01/201 | Pile, Rick | 226 - Pile, Rick |
| 0000006 | 540 | 309.46 | 2.00 | 64.47 | 180.52 | 12/23/201 | Pile, Rick | 226 - Pile, Rick |
| 0000006 | 540 | 309.46 | 2.00 | 64.47 | 180.52 | 12/22/201 | Pile, Rick | 226 - Pile, Rick |
| 0000006 | 540 | 309.46 | 2.00 | 64.47 | 180.52 | 01/02/201 | Pile, Rick | 226 - Pile, Rick |
| 0000006 | 540 | 1,085.38 | 8.00 | 56.53 | 633.14 | 01/07/201 | Faulkner, Mickey | 193 - Faulkner, Mickey |
| 0000006 | 540 | 407.04 | 2.00 | 84.80 | 237.44 | 01/07/201 | Faulkner, Mickey | 193 - Faulkner, Mickey |
| 0000006 | 540 | 1,085.38 | 8.00 | 56.53 | 633.14 | 01/08/201 | Faulkner, Mickey | 193 - Faulkner, Mickey |
| 0000006 | 540 | 407.04 | 2.00 | 84.80 | 237.44 | 01/08/201 | Faulkner, Mickey | 193 - Faulkner, Mickey |
| 0000006 | 540 | 1,085.38 | 8.00 | 56.53 | 633.14 | 01/09/201 | Faulkner, Mickey | 193 - Faulkner, Mickey |
| 0000006 | 540 | 407.04 | 2.00 | 84.80 | 237.44 | 01/09/201 | Faulkner, Mickey | 193 - Faulkner, Mickey |
| 0000006 | 540 | 1,085.38 | 8.00 | 56.53 | 633.14 | 01/10/201 | Faulkner, Mickey | 193 - Faulkner, Mickey |
| 0000006 | 540 | 1,085.38 | 8.00 | 56.53 | 633.14 | 01/11/201 | Faulkner, Mickey | 193 - Faulkner, Mickey |
| 0000006 | 540 | 407.04 | 2.00 | 84.80 | 237.44 | 01/11/201 | Faulkner, Mickey | 193 - Faulkner, Mickey |
| 0000006 | 540 | 1,085.38 | 8.00 | 56.53 | 633.14 | 01/14/201 | Faulkner, Mickey | 193 - Faulkner, Mickey |
| 0000006 | 540 | 407.04 | 2.00 | 84.80 | 237.44 | 01/14/201 | Faulkner, Mickey | 193 - Faulkner, Mickey |
| 0000006 | 540 | 407.04 | 2.00 | 84.80 | 237.44 | 01/14/201 | Faulkner, Mickey | 193 - Faulkner, Mickey |
| 0000006 | 540 | 1,085.38 | 8.00 | 56.53 | 633.14 | 01/15/201 | Faulkner, Mickey | 193 - Faulkner, Mickey |
| 0000006 | 540 | 407.04 | 2.00 | 84.80 | 237.44 | 01/15/201 | Faulkner, Mickey | 193 - Faulkner, Mickey |
| 0000006 | 540 | 407.04 | 2.00 | 84.80 | 237.44 | 01/15/201 | Faulkner, Mickey | 193 - Faulkner, Mickey |
| 0000006 | 540 | 1,085.38 | 8.00 | 56.53 | 633.14 | 01/16/201 | Faulkner, Mickey | 193 - Faulkner, Mickey |
| 0000006 | 540 | 1,547.28 | 10.00 | 64.47 | 902.58 | 01/03/201 | Pile, Rick | 226 - Pile, Rick |
| 0000006 | 540 | 309.46 | 2.00 | 64.47 | 180.52 | 01/03/201 | Pile, Rick | 226 - Pile, Rick |
| 0000006 | 540 | 1,031.52 | 10.00 | 42.98 | 601.72 | 01/06/201 | Pile, Rick | 226 - Pile, Rick |
| 0000006 | 540 | 309.46 | 2.00 | 64.47 | 180.52 | 01/06/201 | Pile, Rick | 226 - Pile, Rick |
| 0000006 | 540 | 1,031.52 | 10.00 | 42.98 | 601.72 | 01/13/201 | Pile, Rick | 226 - Pile, Rick |

# 01 - Jan 2019 - Fund 540 - MPP Work Orders

## WO Audit Report

User: cjirasritumrong
Printed: 02/11/19 14:44:09

| WO Number | Work Order Description | Activity | Units | Amount / Unit | Overhead | Date | Description | Reference Code |
|---|---|---|---|---|---|---|---|---|
| 0000006 | 540 | 309.46 | 2.00 | 64.47 | 180.52 | 01/13/2019 | Pile, Rick | 226 - Pile, Rick |
| 0000006 | 540 | 982.08 | 10.00 | 40.92 | 572.88 | 01/04/2019 | Gerard, Timothy | 346 - Gerard, Timothy |
| 0000006 | 540 | 294.62 | 2.00 | 61.38 | 171.86 | 01/04/2019 | Gerard, Timothy | 346 - Gerard, Timothy |
| 0000006 | 540 | 982.08 | 10.00 | 40.92 | 572.88 | 01/05/2019 | Gerard, Timothy | 346 - Gerard, Timothy |
| 0000006 | 540 | 294.62 | 2.00 | 61.38 | 171.86 | 01/05/2019 | Gerard, Timothy | 346 - Gerard, Timothy |
| 0000006 | 540 | 294.62 | 2.00 | 61.38 | 171.86 | 01/10/2019 | Gerard, Timothy | 346 - Gerard, Timothy |
| 0000006 | 540 | 982.08 | 10.00 | 40.92 | 572.88 | 01/12/2019 | Gerard, Timothy | 346 - Gerard, Timothy |
| 0000006 | 540 | 294.62 | 2.00 | 61.38 | 171.86 | 01/12/2019 | Gerard, Timothy | 346 - Gerard, Timothy |
| 0000006 | 540 | 294.62 | 2.00 | 61.38 | 171.86 | 01/16/2019 | Gerard, Timothy | 346 - Gerard, Timothy |
| 0000006 | 540 | 294.62 | 2.00 | 61.38 | 171.86 | 01/16/2019 | Gerard, Timothy | 346 - Gerard, Timothy |
| 0000006 | 540 | 261.70 | 2.00 | 54.52 | 152.66 | 01/03/2019 | Vignau, Melissa | 379 - Vignau, Melissa |
| 0000006 | 540 | 261.70 | 2.00 | 54.52 | 152.66 | 01/04/2019 | Vignau, Melissa | 379 - Vignau, Melissa |
| 0000006 | 540 | 392.54 | 3.00 | 54.52 | 228.98 | 01/07/2019 | Vignau, Melissa | 379 - Vignau, Melissa |
| 0000006 | 540 | 392.54 | 3.00 | 54.52 | 228.98 | 01/08/2019 | Vignau, Melissa | 379 - Vignau, Melissa |
| 0000006 | 540 | 261.70 | 2.00 | 54.52 | 152.66 | 01/09/2019 | Vignau, Melissa | 379 - Vignau, Melissa |
| 0000006 | 540 | 261.70 | 2.00 | 54.52 | 152.66 | 01/10/2019 | Vignau, Melissa | 379 - Vignau, Melissa |
| 0000006 | 540 | 261.70 | 2.00 | 54.52 | 152.66 | 01/11/2019 | Vignau, Melissa | 379 - Vignau, Melissa |
| 0000006 | 540 | 392.54 | 3.00 | 54.52 | 228.98 | 01/14/2019 | Vignau, Melissa | 379 - Vignau, Melissa |
| 0000006 | 540 | 392.54 | 3.00 | 54.52 | 228.98 | 01/15/2019 | Vignau, Melissa | 379 - Vignau, Melissa |
| 0000006 | 540 | 261.70 | 2.00 | 54.52 | 152.66 | 01/16/2019 | Vignau, Melissa | 379 - Vignau, Melissa |
| 0000006 | 540 | 462.24 | 5.00 | 38.52 | 269.64 | 01/09/2019 | Johnson, Eric | 384 - Johnson, Eric |
| 0000006 | 540 | 277.34 | 3.00 | 38.52 | 161.78 | 01/10/2019 | Johnson, Eric | 384 - Johnson, Eric |
| 0000006 | 540 | 277.34 | 3.00 | 38.52 | 161.78 | 01/11/2019 | Johnson, Eric | 384 - Johnson, Eric |
| 0000006 | 540 | 11,888.70 | 1.00 | 11,888.70 | - | 01/07/2019 | 00007764256.9 - Pay credit taken on 6783000916-2 | 1544 - PG&E |
| 0000006 | 540 | 78.65 | 1.00 | 78.65 | - | 01/09/2019 | 6783000916-2 - December 2018 SID Electricity | 1544 - PG&E |
| 0000006 | 540 | 210.35 | 1.00 | 210.35 | - | 01/23/2019 | 9958920350 - rent cyl ind large nitrogen | 0062 - Airgas NCN |
| 0000006 | 540 | 184.22 | 1.00 | 184.22 | - | 01/17/2019 | 62170 - Mickey Faulkner 2019 boot purchase | 2249 - Work World America, Inc. |
| 0000006 | 540 | 365.90 | 1.00 | 365.90 | - | 01/24/2019 | P45798 - MPH rental of standard portable toilet service 2x mon | 2265 - Yolo Pumping Service, Inc. |
| 0000006 | 540 | 60,677.43 | 1.00 | 60,677.43 | - | 01/17/2019 | 0007808269-0 - Monticello PH Stick Drawing 12/1 - 12/31/18 | 3279 - PG&E |
| 0000006 | 540 | 12,949.68 | 1.00 | 12,949.68 | - | 01/17/2019 | 0007808271-6 - Monticello PH Unit 3 Rewind 12/1 - 12/31/1 | 3279 - PG&E |
| 0000006 | 540 | 40.77 | 1.00 | 40.77 | - | 02/14/2019 | 000012477627 - Bill Payer No. 9391035198 12/13 - 1/12/19 | 0166 - AT&T |
| **0000006 Totals** | **MPP Agency Billing** | **145,008.03** | | | **31,230.53** | | | |
| | | | | | | | | |
| **Report Totals** | | **145,008.03** | | | **31,230.53** | | | |

# ATTACHMENT 3

FIRE CLERK LLC

SU S 1

RECEIVED

**United States Bankruptcy Court, Northern District of California**

Fill in this information to identify the case (Select only one Debtor per claim form):

☐ PG&E Corporation (19-30088)

☒ Pacific Gas and Electric Company (19-30089)

**FILED**
MAR 25 2019
UNITED STATES BANKRUPTCY COURT
SAN FRANCISCO, CA

CDS 03.05.2019

# Proof of 503(b)(9) Claim

Read the instructions before filling out this form. This form is for asserting claims entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9) against one of the above Debtors arising on or after January 9, 2019 through and including January 28, 2019. Do not use this form to assert any other pre-petition claim(s). Assert such claims on Form 410.

11 U.S.C. § 503(b)(9) applies only to claims arising from the value of any goods received by the Debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of the Debtor's business. Attach documentation supporting such claim.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. Do not send original documents; they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed.

| Part 1: | Identify the Claim |
| --- | --- |

| | | |
| --- | --- | --- |
| 1. Who is the current creditor? | Solano Irrigation District | |
| | Name of the current creditor (the person or entity to be paid for this claim) | |
| | Other names the creditor used with the debtor _____ | |
| 2. Has this claim been acquired from someone else? | ☒ No | |
| | ☐ Yes. From whom? _____ | |
| 3. Where should notices and payments to the creditor be sent? | **Where should notices to the creditor be sent?** | **Where should payments to the creditor be sent?** (if different) |
| Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | Solano Irrigation District | Name |
| | Name | |
| **RECEIVED** | 810 Vaca Valley Prkwy #201 | Number Street |
| **MAR 26 2019** | Number Street | |
| | Vacaville CA 95688 | City State ZIP Code |
| **PRIME CLERK LLC** | City State ZIP Code | Stamped Copy Returned |
| | | Addressed Stamped Envelope |
| | Contact phone 707-455-4008 | ✓ No Copy Provided |
| | | Contact phone _____ |
| | Contact email Cmorin@sidwater.org | Contact email _____ |
| 4. Does this claim amend one already filed? | ☒ No | |
| | ☐ Yes. Claim number on court claims registry (if known)_____ | Filed on ____ / ____ / _____  MM / DD / YYYY |
| 5. Do you know if anyone else has filed a proof of claim for this claim? | ☒ No | |
| | ☐ Yes. Who made the earlier filing? _____ | |

Case: 19-30088   Doc# 9256   Filed: 10/08/20   Entered: 10/08/20 14:35:13   Page 60 of 64



193008880000472

6. On what date (or dates) were the goods delivered? (if known)

*between approximately 12/20/18 thru 1/20/19* (mm/dd/yyyy)

7. How much is the claim?

$ 145,008.03

Note: 11 U.S.C. § 503(b)(9) applies only to claims arising from the value of any goods received by the Debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of the Debtor's business. Do not include in the above amount the value of goods received by the Debtor outside of that period, or the value of any other services performed. Assert such claims on Form 410.

8. What is the description of the goods provided in the claim?

*Solano Irrigation District — under contract with PG&E — operates & maintains a power plan at Lake Berryessa. Solano Irrigation District initially pays the costs and then PG&E reimburses for amounts paid by Solano Irrigation District.*

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.
18 U.S.C. §§ 152, 157, and 3571.

Check the appropriate box:

☒ I am the creditor. *I work for Creditor — Employee of Solano Irrigation District.*
☐ I am the creditor's attorney or authorized agent.
☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.
☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date 03/20/2019 (mm/dd/yyyy)

_____
Signature

Print the name of the person who is completing and signing this claim:

Name: Cammie Lee Morin
First name / Middle name / Last name

Title: Finance Director

Company: Solano Irrigation District
Identify the corporate servicer as the company if the authorized agent is a servicer.

Address: 810 Vaca Valley Parkway, Suite 201
Number / Street
Vacaville CA 95688
City / State / ZIP Code

Contact phone: 707-453-4003    Email: cmorin@sidwater.org

RECEIVED
PRIME CLERK LLC

Modified Official Form 410 Proof of Claim
503(b)(9) Claim    page 2

**FedEx** Express

**Package US Airbill**

FedEx Tracking Number: 8139 3748 3089

Form ID No.: 0215

Recipient's Copy

**1 From**

Date

Sender's Name _____ Phone _____

Company _____

Address _____ Dept./Floor/Suite/Room

City _____ State _____ ZIP _____

**2 Your Internal Billing Reference**

**3 To**

Recipient's Name _____ Phone 257-4167

Company PRIME CLERK

Address 850 3RD AVE STE 412
We cannot deliver to P.O. boxes or P.O. ZIP codes.

Address
Use this line for the HOLD location address or for continuation of your shipping address.

City BROOKLYN State NY ZIP 11232

*Stamp:* RECEIVED MAR 28 2019 PRIME CLERK LLC

0132307086

8139 3748 3089

**4 Express Package Service** *To most locations.*

Packages up to 150 lbs.
*For packages over 150 lbs, use the FedEx Express Freight US Airbill.*

**Next Business Day**

☐ FedEx First Overnight
Earliest next business morning delivery to select locations. Friday shipments will be delivered on Monday unless Saturday Delivery is selected.

☐ FedEx Priority Overnight
Next business morning.* Friday shipments will be delivered on Monday unless Saturday Delivery is selected.

☐ FedEx Standard Overnight
Next business afternoon.*
Saturday Delivery NOT available.

**2 or 3 Business Days**

☐ FedEx 2Day A.M.
Second business morning.*
Saturday Delivery NOT available.

☐ FedEx 2Day
Second business afternoon.* Thursday shipments will be delivered on Monday unless Saturday Delivery is selected.

☐ FedEx Express Saver
Third business day.*
Saturday Delivery NOT available.

**5 Packaging** *Declared value limit $500.*

☐ FedEx Envelope* ☐ FedEx Pak* ☐ FedEx Box ☐ FedEx Tube ☐ Other

**6 Special Handling and Delivery Signature Options** Fees may apply. See the FedEx Service Guide.

☐ Saturday Delivery
NOT available for FedEx Standard Overnight, FedEx 2Day A.M., or FedEx Express Saver.

☐ No Signature Required
Package may be left without obtaining a signature for delivery.

☐ Direct Signature
Someone at recipient's address may sign for delivery.

☐ Indirect Signature
If no one is available at recipient's address, someone at a neighboring address may sign for delivery. For residential deliveries only.

Does this shipment contain dangerous goods?
One box must be checked.

☐ No ☐ Yes As per attached Shipper's Declaration. ☐ Yes Shipper's Declaration not required. ☐ Dry Ice Dry Ice, 9, UN 1845 ___ kg

☐ Cargo Aircraft Only

Restrictions apply for dangerous goods — see the current FedEx Service Guide.

**7 Payment** Bill to:

Enter FedEx Acct. No. or Credit Card No. below.

☐ Sender Acct. No. in Section 1 will be billed. ☐ Recipient ☐ Third Party ☐ Credit Card ☐ Cash/Check

Total Packages ___ Total Weight ___ lbs. Credit Card Auth. ___

*Our liability is limited to US$100 unless you declare a higher value. See the current FedEx Service Guide for details.

Rev. Date 5/15 • Part #153134 • ©1994–2015 FedEx • PRINTED IN U.S.A. SRM

611

fedex.com 1.800.GoFedEx 1.800.463.3339




**SOLANO IRRIGATION DISTRI**
810 Vaca Valley Parkway, Suite 20
Vacaville, California 95688

7014 2120 0003 6320 7633

U.S. Bankruptcy Court
450 Golden Gate Avenue
Mailbox 36009
San Francisco, CA
94102



1370 Valley Vista Drive
Suite 100
Diamond Bar, CA 91765

RECEIVED

MAR 26 2019

PRIME CLERK LLC