DOWNEY BRAND LLP
DAVID ALADJEM (Bar No. 152203)
JAMIE P. DREHER (Bar No. 209380)
PAUL GAUS (Bar No. 319979)
Email: daladjem@downeybrand.com
jdreher@downeybrand.com
pgaus@downeybrand.com
621 Capitol Mall, 18th Floor
Sacramento, California 95814
Telephone: 916.444.1000
Facsimile: 916.444.2100

Attorneys for Mendocino County Inland Water
& Power Commission

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| In re<br><br>PG&E Corporation,<br><br>and<br><br>PACIFIC GAS AND ELECTRIC COMPANY,<br><br>Debtors.<br><br>[X] Affects PG&E Corporation<br>[ ] Affects Pacific Gas and Electric Company<br>[X] Affects both Debtors<br><br>*All papers shall be filed in the Lead Case, No. 19-30088-DM, | Case No. 19-30088-DM<br><br>Chapter 11<br>Lead Case, Jointly Administered<br><br>**MENDOCINO COUNTY INLAND WATER & POWER COMMISSION'S RESPONSE AND OPPOSITION TO REORGANIZED DEBTORS' EIGHTH OMNIBUS OBJECTION (ECF NO. 8983)**<br><br>**Response Deadline:**<br>**October 15, 2020**<br>**4:00 P.M. (PST)**<br><br>**Hearing Information If Timely Response Made:**<br><br>Date: October 28, 2020<br>Time: 10:00 a.m. (Pacific Time)<br>Place: (Telephonic Appearances Only)<br>United States Bankruptcy Court<br>Courtroom 17, 16th Floor<br>San Francisco, CA 94102 |

Mendocino County Inland Water & Power Commission ("Commission") submits this response and opposition to the *Reorganized Debtors' Eighth Omnibus Objection to Claims (No Liability Claims)* (ECF No. 8983) (hereinafter "Objection" or "Obj.") regarding the Commission's Claim No. 86469 filed against Pacific Gas and Electric Company ("Utility") on October 21, 2019

("Claim") in excess of $100 million arising in part from PG&E's pre-petition repudiation of contractual obligations arising from the Potter Valley Project ("Project") as well as waste to the Project along with and in reliance on the concurrently-filed *Declaration of Janet Pauli in Support of Mendocino County Inland Water & Power Commission's Response and Opposition to Reorganized Debtors' Eighth Omnibus Objection (ECF No. 8983)* ("Pauli Decl.").

I.  **FACTUAL BACKGROUND**

Pursuant to this Court's *Order Approving (A) Procedures for Filing Omnibus Objections to Claims and (B) the Form and Manner of the Notice of Omnibus Objections* (ECF No. 8228) ("Omnibus Objection Procedures Order"), the Commission provides the following explanation for the amount of its Claim.

**A. Background on the Potter Valley Project and the Commission's Interests Therein**

The Potter Valley Project ("Project") consists of water diversion and hydroelectric facilities located in Mendocino and Lake County. (Pauli Decl. ¶ 5, Ex. B at 1). Scott Dam impounds headwaters to the Russian River, creating Lake Pillsbury, and also diverts water through the Potter Valley Powerhouse. (*Id.*) Downstream of Scott Dam, Cape Horn Dam impounds waters of the Eel River and forms the Van Arsdale Reservoir, which diverts water through a tunnel to the Potter Valley Powerhouse. (*Id.*) Water then flows into east branch of the Russian River where it is delivered to Potter Valley, other locations in Mendocino County, and much of Sonoma County. (*Id.*)

The Commission is a joint power authority consisting of the (1) County of Mendocino; (2) City of Ukiah; (3) Redwood Valley County Water District; (4) Potter Valley Irrigation District; and (5) the Mendocino County Russian River Flood Control and Water Conservation Improvement District. (*Id.* Ex. B at 2). Together the Commission and its member districts share interests in the water supply provided by the Project. (*Id.*)

As an example of the critical water infrastructure the Project provides, on August 21, 2018, in Resolution 18-131, the Board of Supervisors of Mendocino County found *inter alia* that the water used as part of the Project was intended for use in Potter Valley and downstream within the Russian River watershed in Mendocino, Sonoma and Marin Counties, that the direct and indirect economic value of the water supply is estimated at $775 million annually within Mendocino County alone,

that more than a half-million people benefit from this water supply, and that the Project "provides a critically important segment of our water supply infrastructure." (Pauli Decl. ¶ 12, Ex. H).

**B. The Reorganized Debtors' Relationship to the Project and the Commission**

The Utility acquired the Project in 1933 and maintains the diversion and hydroelectric facilities today. (*Id.* Ex. B at 1) The Project also includes a series of twelve check dams located along the Russian River between the Powerhouse and Lake Mendocino. (*Id.*)

The Utility claims the following water rights for operation of the Project:

> 1. The right to directly divert up to 340 cubic feet per second from the Eel River to the Potter Valley Tunnel for both power and irrigation under claim of pre-1914 water right, as specified in Statement of Water Diversion and Use No. 1010, with a priority of 1905.
>
> 2. The right to divert up to 4,500 acre feet to storage in Lake Pillsbury for irrigation in Potter Valley under Water Right license No. 1191 (Application 5661, priority date: 8/15/1927).
>
> 3. The right to divert up to 4,908 acre feet to storage in Lake Pillsbury and to directly divert up to 40 cubic feet per second from the Eel River to the Potter Valley Tunnel, provided the combined amount of such diversion to storage and direct diversion does not exceed 4,908 acre feet, for irrigation in Potter Valley under Water Right License No. 5545 (Application 6594, priority date: 3/11/1930).

(*Id.*)

Importantly, the Utility operates the hydroelectric facilities pursuant to a 50 year license from the Federal Energy Regulatory Commission ("FERC") that expires on April 14, 2022. (*Id.*)

Additionally, there are contractual relationships between the Utility and member districts of the Commission. For example, on March 30, 1936, the Utility and Potter Valley Irrigation District ("PVID") entered into a water delivery agreement for the tailrace of the Utility's Potter Valley Plant ("1936 Agreement"). (Pauli Decl. ¶ 10, Ex. F). The 1936 Contract states that the Utility "shall maintain the existing diversion works and water measuring facilities" and "at its own cost and expense replace, improve, or otherwise alter, said works and/or measuring facilities." (*Id.* Ex F at § 5).

On October 15, 2014, the Utility and PVID entered into a Second Amendment to the 1936 Agreement ("Second Amendment"). (Pauli Decl. ¶ 11, Ex. G). The Second Amendment called for

deliveries of water at a certain price up to April 30, 2025 after which an agreed upon formula would dictate the price PVID would pay to the Utility for water. (*Id*. Ex G at § 9). Section Two of the Second Amendment provides that the Agreement remains in full force and effect until the later of the expiration of the existing FERC license on April 14, 2022, the termination of any annual license issued after April 14, 2022 or the termination of the subsequent FERC license for the Potter Valley Project. (*Id*. Ex. G at § 2).

### B. In 2017, the Utility Begins the FERC Relicensing Process and Then Irrevocably Withdraws Its Application Four Days Before This Chapter 11 Bankruptcy

On April 6, 2017, the Utility filed a notice of intent (NOI) to relicense the Project and a pre-application document (PAD). (Pauli Decl. ¶ 6, Ex. B). On January 25, 2019, the Utility filed a notice of withdrawal of its NOI and PAD, indicating it was discontinuing its efforts to relicense the Project. (*Id*. ¶ 7, Ex. C). In its Notice of Withdrawal, the Utility acknowledged the potentially devastating impact its decision posed for "stakeholders" and represented to FERC that:

> PG&E recognizes the value of Potter Valley to local communities because it provides for protection of important environmental resources, consumptive water uses, public recreation, ***and other economic values***. Accordingly, PG&E is committed to working with stakeholders to ensure these values are appropriately considered if PG&E is required to file a surrender application.

(*Id*.)

The Reorganized Debtors commenced these chapter 11 proceedings four days later on January 29, 2019.

### C. The Commission Undertakes the FERC Licensing Process in Order to Save the Project Beyond 2022

As a consequence of the Utility's irrevocable decision to withdraw from the FERC licensing process, FERC issued a Notice of Soliciting Applications, establishing a deadline of 120 days from the date of the notice (i.e. July 1, 2019) for interested applicants, other than the Utility, to file NOIs, PADs, and requests to complete the pre-filing stages of the licensing process. (Pauli Decl. ¶ 6, Ex. B).

In response, the Commission, along with Sonoma County Water, California Trout, Inc. and the County of Humboldt ("NOI Parties") filed a NOI and PAD for the Project as required by the

FERC July 1st deadline. (Pauli Decl. ¶ 8, Ex. D). No other NOI/PAD documents were submitted to FERC by other entities interested in licensing the Project. (Pauli Decl. ¶ 6, Ex. B). The NOI Parties propose to continue the Integrated Licensing Process initiated by PG&E. (*Id.*) According to the proposed pre-filing process plan and schedule, the NOI Parties proposed to complete a feasibility study in 2020, consult on the need for additional studies and file a final license application by April 14, 2022. (*Id.*) The cost of relicensing the Potter Valley Project is estimated to exceed $100 million and these costs are included as part of the Claim. (*Id.*)

If the NOI Parties or a successor regional entity do not successfully relicense the Project, then the Utility would be compelled to surrender the license and incur costs associated with the shut-down of the power plant and removal of facilities necessary to protect public safety, environmental quality and other aspects of the public interest. (*Id.*) The cost of decommissioning could well exceed the $196.3 million estimated by the Utility. (*Id.*)

**D. The Present Condition of the Project**

The Commission believes there has been a substantial deposition of sediment behind Scott Dam (and also behind Cape Horn Dam). (Pauli Decl. ¶ 6, Ex. B). Such sediments are potentially contaminated with mercury and other toxic materials that may be in concentrations that constitute contaminated soils under state and federal law. (*Id.*) The Utility has failed- due to the potential costs of mitigation and liability- to determine if the sediments behind the dams have toxic sediments that may impact all existing downstream uses of the impounded water with continued operation of the Project. (*Id.*) In addition, the Commission believes the Utility has minimized necessary operations and maintenance practices for the Project with the goal of reducing costs at the expense of the long-term viability of the Project. (*Id.*) As an example, without limitation, the Utility has failed to provide any maintenance to the check dams downstream of the Powerhouse for at least ten years. (*Id.*)

On October 16, 2019, PVID and the Commission entered into an Assignment Agreement wherein PVID assigned all its rights, title, and interest in PVID's claims arising from the Utility's anticipatory breach, waste, and other claims to the Commission. (Pauli Decl. ¶ 13, Ex. I).

**II. ARGUMENT**

The Reorganized Debtors advance three arguments in their Eighth Omnibus Objection.

Primarily, the Reorganized Debtors improperly classify the Commission's Claim as a "protective claim" arising solely from an assumed executory contract under 11 U.S.C. § 365. The argument goes that because of the Reorganized Debtors' purported assumption, no current right to payment arises because assumption of an executory contract requires curing pre-petition defaults. (Obj. at 7:5-9). Additionally, Reorganized Debtors assure the Commission that it "retains its non-bankruptcy remedies" with respect to post-petition claims. *Id*. at 7:8-9. Finally, Reorganized Debtors insist the Commission presently bears the burden of proof on the validity of its Claim.

As discussed further below, each argument fails. *First*, addressing the burden of proof issue, at this point, the Ninth Circuit places a burden of going forward on the Reorganized Debtors to counter the *prima facie* validity of the Claim with probative facts "equal to that of the allegations of the proofs of claims themselves." *See Lundell v. Anchor Constr. Specialists, Inc.*, 223 F.3d 1035, 1039 (9th Cir. 2000). At best, the Eighth Omnibus Objection affords the Reorganized Debtors a status conference on the Commission's Claim pursuant to Local Rule. But given this, ultimate resolution of the Claim requires an evidentiary hearing.

*Second*, the Reorganized Debtors improperly classify the Commission's Claim as a "protective claim" arising solely from an executory contract that the Reorganized Debtors assumed. However, as discussed below, the Commission's claim arises both in tort and in contract, and while both components of the Claim arose pre-petition, there are ongoing damages and breaches.

*Third*, the Reorganized Debtors assurance that the Commission retains its non-bankruptcy remedies for potential post-petition defaults is insufficient to justify disallowance of the Commission's Claim, absent protection afforded to allow the Commission what would then be an administrative expense claim based on continuing or ongoing breaches of the various agreements and obligations arising as described above.

**A.    The Reorganized Debtors Presently Bear the Burden to Counter the *Prima Facie* Validity of the Commission's Claim**

Importantly, the Reorganized Debtors assert the Commission bears the burden of proof to bring "affirmative evidence demonstrating the validity of [its] claim." *See* Obj. at 7:5-6. Critically, this argument ignores the Reorganized Debtors' present burden going forward.

It is axiomatic that a proof of claim constitutes *prima facie* evidence of the validity and the amount of claim. *See Lundell*, 223 F.3d at 1039. The evidentiary presumption created by a proof of claim is strong enough to carry over a mere formal objection, without more. *See In re Holm*, 931 F.2d 620, 623 (9th Cir. 1991). Accordingly, in response to a proof of claim (presumed valid), the "burden of going forward shifts to the objector to produce evidence sufficient to negate the *prima facie* validity of the filed claim." *In re Consolidated Pioneer Mortg.*, 178 B.R. 222, 226 (B.A.P. 9th Cir. 1995) (quoting *In re Allegheny International, Inc.*, 954 F.2d 167, 173-74 (3d Cir. 1992)). It is only then that the burden reverts to the claimant to prove the validity of the claim by a preponderance of the evidence. *Id*. **If the objector fails to meet this burden, the claim should be allowed without any further evidentiary burden to the claimant**. *See Lundell*, 223 F.3d at 1041; *see also In re 3MB, LLC*, 609 B.R. 841, 847 (Bankr. E.D. Cal. 2019) ("But if the objecting party does not rebut the presumption, the claims litigation ends there; the claim should be allowed without the claimant bearing any further burden to demonstrate the validity of its claim.") (citing *Lundell*, 225 F.3d at 1041).

The Commission met its initial burden of proof by filing its Claim supported with substantial evidence including, but not limited to (1) the 1936 Contract and Second Amendment thereto under which a portion of the Commission's Claim is based; (2) the Utility's pre-petition revocation of its notice of intent to relicense the Potter Valley Project; and (3) statements regarding the Utility's failure to properly care for the Project and ameliorate potentially dangerous conditions on facilities supporting the Project. Presently, the Reorganized Debtors' mechanical Eighth Omnibus Objection and singular assertion that "their professionals have reviewed each of the No Liability Claims . . . and determined that they do not state a basis for a current right to payment . . ." does not rebut the *prima facie* validity of the Claim. *See* Obj. at 7:22-24. At best, this filing buys the Reorganized Debtors a status conference pursuant to Bankr. N.D. Cal. L.R. 3007-1(b).[1] In sum, the Reorganized

---

[1] Bankr. N.D. Cal. L.R. 3007-1(b) states:

**(b) Factual Dispute.**

Where a factual dispute is involved, the initial hearing on an objection shall be deemed a

1662894v2

RESPONSE AND OPPOSITION TO EIGHTH OMNIBUS OBJECTION    7

Debtors have not – and cannot – set forth facts with "probative force equal to that of the allegation of the proofs of claim themselves." *See Lundell*, 223 F.3d at 1039. On this first independent basis, the Reorganized Debtors' objection the Commission's Claim should be overruled. Additionally, and nothwithstanding, the evidentiary basis and support for allowance of the Claim is set forth in and authenticated by the attached Declaration of Janet Pauli.

### B. The Reorganized Debtors' Reliance on § 365 is Legally Untenable

The Reorganized Debtors argue their purported assumption of any contractual obligations arising from the Project moots the Commission's Claim because assumption necessarily involves curing pre-petition defaults. Yet the Reorganized Debtors' reliance on the executory contract provisions of § 365(b) is misplaced for several reasons.

*First*, the Claim arises, in part, from the Utility's pre-petition anticipatory breach of the 1936 Agreement and Second Amendment thereto. Anticipatory breach occurs before performance is due under the contract and results in a total breach. *County of Solano v. Vallejo Redevelopment Agency*, 75 Cal.App.4th 1262, 1275-76 (1999). The breach arises when a party to a contract expressly or impliedly repudiates the agreement prior to performance. *See Mammoth Lakes Land Acquisition, LLC v. Town of Mammoth Lakes*, 191 Cal.App.4th 435, 467 (2010). An implied repudiation "results from conduct where the promisor puts it out of his power to perform so to make substantial performance of [the] promise impossible." *Id.* at 463. Moreover, repudiation of the contract gives the non-breaching party an immediate right to pursue damages arising from the repudiation. *County of Solano*, 75 Cal.App.4th at 1276.

Four days before the Reorganized Debtors sought chapter 11 protection, the Utility made the irrevocable decision to withdraw from the FERC licensing process and filed its Notice of Withdrawal with FERC. In so doing, the Utility confirmed it would not perform under the terms of the 1936 Contract and Second Amendment thereto after April 14, 2022 because it could not legally do so. Before FERC, the Utility effectively acknowledged the potentially devastating impact its

---

status conference at which the Court will not receive evidence. Where the objection involves only a matter of law, the matter may be argued at the initial hearing. Any notice of hearing on a claim objection shall so state.

1662894v2

RESPONSE AND OPPOSITION TO EIGHTH OMNIBUS OBJECTION

DOWNEY BRAND LLP

decision posed for "stakeholders" and represented to FERC that:

> PG&E recognizes the value of Potter Valley to local communities because it provides for protection of important environmental resources, consumptive water uses, public recreation, *and other economic values*. Accordingly, PG&E is committed to working with stakeholders to ensure these values are appropriately considered if PG&E is required to file a surrender application.

(Pauli Decl. ¶ 7, Ex. C).

Moreover, the exigent circumstances the Utility's decision created cannot be discounted. Following the Utility's withdrawal, FERC established a 120-day deadline to file a Notice of Intent and pre-application documents for the Project. Essentially, the Utility's decision created a 120-day window for any third-party to decide to undertake the extraordinarily burdensome FERC licensing process – estimated to exceed $100 million in costs – in order to save the Project and the critical infrastructure it provides beyond 2022.

Thus, the Commission's Claim is not – as the Reorganized Debtors insist – a "protective" claim. Rather, the Claim arises from the Utility's sudden, irrevocable, and potentially devastating decision to withdraw from the FERC licensing process and consequential repudiation of the Utility's obligations under the 1936 Agreement and Second Amendment thereto. This occurred pre-petition and affords the Commission a present right to payment.

*Second*, the Reorganized Debtors cannot rely on the Plan Confirmation process and executory contract provision of § 365(b) to absolve them of the Utility's anticipatory breach. This argument presents a legal impossibility.

Section 365 cannot be used as a mechanism to "resuscitate" a contract terminated prior to the commencement of a bankruptcy proceeding. *See, e.g., Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1214 (7th Cir. 1984); *see also Matter of Benrus Watch Co., Inc.*, 13 B.R. 331, 334 (Banrk. S.D.N.Y. 1981) ("[C]ontracts that have effectively terminated prior to the filing of a Chapter 11 petition cannot be revived by the Bankruptcy Court."). Moreover, several bankruptcy courts have held that a contract terminated pre-petition through repudiation loses its executory nature and cannot thereafter be assumed under § 365. *See In re C.M. Turtur Investments, Inc.*, 93 B.R. 526, 535 (Bankr. S.D.Tex. 1988) ("Termination was effected by [a party] anticipatorily repudiating the contract and

. . . [t]he contract, having been terminated, cannot be executory."); *see also In re Oklahoma Trash Control, Inc.*, 258 B.R. 461, 466 (Bankr. N.D. Okla. 2001) ("The Court concludes that, as a result of the pre-petition repudiation of the Contract by [the chapter 11 debtor], there is no executory contract left for [the chapter 11 debtor] to assume.").

As discussed above, the Utility repudiated its contractual obligations related to the Project by virtue of the 1936 Agreement and Second Amendment thereto when it withdrew from the FERC licensing process.[2] The Reorganized Debtors' immediate commencement of these chapter 11 proceedings limited the Commission's remedies to those afforded to them under the Bankruptcy Code – and more specifically, the claims process. Accordingly, the Commission filed this Claim on October 21, 2019 and so the Reorganized Debtors' reliance on assumption and treatment of executory contracts under its Plan does not bear on the Commission's Claim. On this second basis, the Reorganized Debtors' Eighth Omnibus Objection should be overruled.

*Third*, the Eighth Omnibus Objection is equally inapplicable because the Commission's Claim is not entirely contractual in nature. The doctrine of waste additionally forms the basis for the Claim.

The doctrine of waste places a duty on the possessor of property to preserve and protect the property for the reasonable expectations of another's interest in the same. *Cornelison v. Kornbluth*, 15 Cal.3d 590, 597-98 (1975). Thus, "[w]aste occurs when the market value of property is substantially or permanently diminished or depreciated." *Dieterich Internat. Truck Sales, Inc. v. J.S. & J Services, Inc.*, 3 Cal.App.4th 1601, 1609 (1992). Loss of market value to the property is the "ultimate test" but other factors considered include, but are not limited to, "the nature and species of property, [and] the relation of it to the person charged to have committed the wrong." *Smith v. Cap Concrete, Inc.*, 133 Cal.App.3d 769, 777 (1982).

The Project is a complex web of water diversion and hydroelectric facilities that incorporates

---

[2] And even if a question arose regarding whether the Utility repudiated any contractual obligations arising from the Project, that would more properly be the subject of an adversary proceeding pursuant to Fed. R. Bankr. P. 7001(2) as the question of anticipatory repudiation presents a factual dispute.

PG&E's claimed water rights pursuant to pre-1914 appropriative water rights and two water licenses. At its crux, the functionality of the Project depends on proper maintenance of watercourses, dams, and other facilities located in between Mendocino and Lake County. As set forth in the Claim, the Reorganized Debtors have allowed the facilities powering the Project to enter a state of degradation. For example, the Commission believes there has been a substantial accumulation of sediment behind both the Scott Dam and the Cape Horn Dam which are potentially contaminated with mercury and other toxic materials.

In light of the above, the Reorganized Debtors' gratuitous assumption that § 365 absolves them of all liability related to the Project fails. Separate from any consideration of contract, the Reorganized Debtors owe a duty to maintain the facilities and processes constituting the Project for the Commission as a putative future licensee. The Commission alleges that the Reorganized Debtors have fallen short of this obligation as the Reorganized Debtors have increasingly viewed the Project as economically unworkable – ultimately leading to their decision to stop pursuing relicensing the Project. This, in turn, wrongfully thrusts the burden of ameliorating potentially hazardous conditions like the presence of mercury in soils onto the Commission. On this basis, the Commission is entitled to a right to payment and the Eighth Omnibus Objection fails to account for this.

### C. The Reorganized Debtors' Argument Regarding Post-Petition Claims is Irrelevant

Finally, the Reorganized Debtors argue that no liability stems from the Commission's Claim because the Commission "retains its non-bankruptcy remedies with respect to post-petition claims." Yet, as discussed above, the Claim focuses on pre-petition conduct by virtue of the Utility's anticipatory repudiation of the Project as well as its liability for waste to the dams, watercourses, and facilities constituting the Project.

To be clear, however, in an abundance of caution and pursuant to this explicit Reservation of Rights, this Objection cannot be read as a waiver of any rights of the Commission to pursue applicable remedies for either post-petition conduct, including but not limited to the continuing and un-curable breaches going forward, or post-assumption conduct and/or breaches to the extent the

DOWNEY BRAND LLP

court determines the Commission's claim is solely based on an assumed executory contract.[3]

## III. ADDITIONAL INFORMATION PURSUANT TO OMNIBUS OBJECTIONS PROCEDURES ORDER

Pursuant to the Omnibus Objections Procedures Order, any reply filed by the Reorganized Debtors should be served on:

> Janet Pauli
> Chair
> Mendocino County Inland Water & Power Commission
> c/o David Aladjem
> Downey Brand LLP
> 621 Capitol Mall, 18th Floor
> Sacramento, CA 95814

Additionally, Ms. Pauli is the person with authority to reconcile, settle, or otherwise resolve the Eighth Omnibus Objection on the Commission's behalf.

## IV. CONCLUSION

The Eighth Omnibus Objection fails to disprove the Commission's Claim. The Commission's Claim arises entirely from pre-petition conduct and the Reorganized Debtors' reliance on § 365 is inapplicable.[4] The same is equally true regarding the Reorganized Debtors' discussion of post-petition remedies. On this basis, the Reorganized Debtors' Eighth Omnibus Objection should be overruled with respect to the Commission's Claim.

---

[3] Post-assumption obligations and/or continuing breaches do afford the Commission an administrative claim. *See In re Frontier Properties, Inc.*, 979 F.2d 1358, 1367 (9th Cir. 1992) ("When a [chapter 11 trustee] assumes and then rejects an executory contract, however, all liabilities flowing from that rejection are entitled to administrative expenses priority."); *see also In re Airlift Intern., Inc.*, 761 F.2d 1503, 1509 fn. 5 (11th Cir. 1985) (observing that the post-petition breach of an assumed executory contract results in an administrative expense). But this does not absolve the Reorganized Debtors of liability on the pre-petition component of the Claim.

[4] And while the Commission may also have or retain administrative or post-petition claims, the existence of those claims cannot negate the existence of the pre-petition component of the Claim.

| | |
|---|---|
| DATED: October 15, 2020 | DOWNEY BRAND LLP |

By: _____/s/ Jamie P. Dreher_____
JAMIE P. DREHER
Attorney for Mendocino County Inland Water &
Power Commission