**LABATON SUCHAROW LLP**
Thomas A. Dubbs (*pro hac vice*)
Carol C. Villegas (*pro hac vice*)
Jeffrey A. Dubbin (SBN 287199)
140 Broadway
New York, New York 10005

*Lead Counsel to Lead Plaintiff and the Class*

**MICHELSON LAW GROUP**
Randy Michelson (SBN 114095)
220 Montgomery Street, Suite 2100
San Francisco, California 94104

*Bankruptcy Counsel to Lead Plaintiff and the Class*

**LOWENSTEIN SANDLER LLP**
Michael S. Etkin (*pro hac vice*)
Andrew Behlmann (*pro hac vice*)
Scott Cargill
Nicole Fulfree
Colleen Maker
One Lowenstein Drive
Roseland, New Jersey 07068

*Bankruptcy Counsel to Lead Plaintiff and the Class*

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

In re:

PG&E CORPORATION

      - and –

PACIFIC GAS AND ELECTRIC COMPANY,

            Debtors.

☒ Affects Both Debtors
☐ Affects PG&E Corporation
☐ Affects Pacific Gas and Electric Company

Case No. 19-30088 (DM) (Lead Case)

Chapter 11

(Jointly Administered)

**DECLARATION OF ANDREW D. BRADT CONCERNING SECURITIES PLAINTIFF'S REPLY IN FURTHER SUPPORT OF MOTION TO APPLY BANKRUPTCY RULE 7023 AND CERTIFY A LIMITED CLASS**

I, Andrew D. Bradt, submit this declaration pursuant to 28 U.S.C §1746 and declare as follows:

**INTRODUCTION**

1.      I have been retained by Lead Plaintiff's counsel Labaton Sucharow LLP ("Securities Lead Counsel") as an expert on behalf of the Public Employee Retirement Association of New Mexico ("PERA" or "Securities Lead Plaintiff"), in this action.  My assignment was to analyze *Securities Lead Plaintiff's Memorandum of Points and Authorities in Support of Motion to Apply Bankruptcy Rule 7023 and Certify a Limited Class* [Dkt. No. 9152] (the "Rules 7023 & 23 Certification Motion"), the Reorganized Debtors' opposition thereto, and related exhibits, from the perspective of an expert in class actions, so as to give the Court necessary background, context, and, where appropriate, my opinions.

2.      The details of my opinions are provided in the sections of this declaration immediately following my qualifications.

**QUALIFICATIONS**

3.      I am Professor of Law at the University of California, Berkeley School of Law.  I graduated from Harvard College, *summa cum laude*, in 2002, and from Harvard Law School, *magna cum laude*, in 2005.  Following law school, I clerked for the Hon. Patti B. Saris of the U.S. District Court for the District of Massachusetts and the Hon. Robert A. Katzmann of the U.S. Court of Appeals for the Second Circuit.  Before joining the Berkeley Law faculty in 2012, I served as a Climenko Fellow and Lecturer on Law at Harvard Law School and was a litigator in private practice at Ropes & Gray LLP and Jones Day.  I am admitted to practice in the Commonwealth of Massachusetts, the State of New York, and in several federal courts. In 2019, I was elected to the membership of the American Law Institute.

4.      My principal area of scholarship is complex civil litigation, with an emphasis on aggregate litigation in the federal courts, including class actions, mass actions, and multidistrict litigation (MDL).  I have published, or have slated for publication, over a dozen law-review articles on aggregate litigation (all of which are listed on my CV, attached as Exhibit A).  I am

also a co-author of a leading Civil Procedure casebook (Geoffrey C. Hazard, Jr., William A. Fletcher, Stephen McG. Bundy & Andrew D. Bradt, *Pleading and Procedure—Cases and Materials*, Foundation Press, 12th ed. 2020), in which I am responsible for all of the materials on class actions, among other topics. I am also a co-author on the next edition of a leading casebook on Complex Litigation (Richard L. Marcus, Edward F. Sherman, and Howard M. Erichson, *Complex Litigation—Cases and Materials on Advanced Civil Procedure*, West Academic, 7th ed. forthcoming 2021). My scholarship has been cited in casebooks and treatises, including *Federal Practice and Procedure and Newberg on Class Actions*, and I have presented at numerous conferences and symposia on class actions and aggregate litigation. My scholarship has also been cited by the federal Civil Rules Advisory Committee in its minutes in connection with the current debate over whether there should be Federal Rules of Civil Procedure for multidistrict litigation.

5.  At Berkeley, my teaching focuses on procedure and complex civil litigation. I teach the first-year course in Civil Procedure and regularly offer four other courses: Complex Litigation, Conflict of Laws, Remedies, and a seminar on mass-tort litigation. In 2019, I was the recipient of Berkeley Law's Rutter Award for Teaching Distinction, which honors one faculty member each year who has demonstrated an outstanding commitment to teaching.

6.  My academic work on aggregate litigation follows several years in practice working primarily on class actions and MDLs at Ropes & Gray in Boston and in the Issues & Appeals Group at Jones Day in New York City. During my time in private practice I represented plaintiffs and defendants in complex litigations, including numerous class actions, at both the state and federal level.

7.  I have been retained in this case to provide an opinion based on my research, teaching, and other experience. I am being compensated for my work. That compensation is in no way contingent upon the content of my opinion.

## CLASS CERTIFICATION IN SECURITIES CLASS ACTIONS

### Factual Background

8.      Lead Plaintiff has alleged that Reorganized Debtors, as well as certain of its current and former directors and officers, made false and misleading statements between April 29, 2015, and November 15, 2018 (the "Class Period"), and that a putative class of investors in PG&E securities suffered losses as a result.[1]  Such cases are typically referred to as securities class actions.

9.      I further understand that, on September 10, 2018, the U.S. District Court for the Northern District of California appointed PERA as Lead Plaintiff and Labaton Sucharow LLP as Lead Counsel pursuant to the Private Securities Litigation Reform Act ("PSLRA") of 1995.  15 U.S.C. § 78u-4.  By that statute, Congress has mandated that within a certain time limit, a district court presiding over a securities class action "shall appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members (hereafter in this paragraph referred to as the 'most adequate plaintiff')." 15 U.S.C. § 78u-4(a)(3)(B)(i).  Congress also provides a rebuttable presumption that the "most adequate plaintiff" will be the candidate that "has the largest financial interest in the relief sought by the class."  15 U.S.C. § 78u-4(a)(3)(B)(iii).  As a result, since the passage of this law in 1995, it has become common for large, public pension funds to be appointed class representatives in securities class action.

### Class Actions in Securities Cases Generally

10.      There are several types of class actions that are relevant here, particularly under Federal Rule of Civil Procedure Rule 23(b) ("23(b)"), and a party seeking certification must establish that at least one of the following scenarios is present, assuming the threshold requirements of 23(a) are met:

---

[1] *See In re PG&E Corporation Securities Litigation*, Case No. 18-03509 (the "Securities Litigation"), Dkt. No. 121, Third Amended Consolidated Class Action Complaint ("TAC") ¶¶ 1-10, 328-381.

1   (a)     Cases where proceeding individually would risk inappropriate or unfair

2   outcomes, e.g., inconsistent or varying results and incompatible standards of conduct for a

3   defendant, or substantial impairment to the interests of individual claimants (as in a limited

4   fund), *see* Rule 23(b)(1);

5   (b)     Cases where declaratory or injunctive relief as to an issue or issues is

6   appropriate given the applicability of defendant's uniform or similar conduct as to multiple

7   parties, *see* Rule 23(b)(2).

8   (c)     Cases where common questions predominate over individual questions,

9   and a class is superior to other modes of resolution, *see* Rule 23(b)(3).

10   11.     In addition, Rule 23(c)(4) ("Particular Issues") permits limited certification of

11   "particular issues," regardless of the category of 23(b) into which the class action falls, thus

12   allowing the court to tailor and narrow the focus of 23(b) to one or a limited number of issues as

13   opposed to the entirety of a case.  *See* Rule 23(c)(4).  Classes certified under Rule 23(c)(4) are

14   often referred to as "issue classes."  The ability to certify issue classes affords the courts

15   discretion to realize the advantages and efficiencies of classwide adjudication of common issues

16   when there also exists a number of individual issues that are best adjudicated separately.[2]

17   12.     It is my understanding that the Rules 7023 & 23 Certification Motion does not

18   seek certification under Rules 23(b)(2) or 23(b)(3).

19   **Class Actions in Securities Cases Under Rule 23(b)(3)**

20   13.     Most securities class actions are certified under Rule 23(b)(3).  This is because

21   substantive securities laws provide causes of actions whose elements may be shown (or

22   disproven) on a class-wide basis, and as a result, it can usually be shown that these issues

23   predominate over any others and that proceeding as a class is the superior case management tool.

24   For example, under the substantive securities law of Section 10(b) of the Exchange Act of 1934,

25   and Rule 10b-5 thereunder, one common question is showing a strong inference of defendants'

26   scienter (*i.e.*, a culpable mental state).  This element of the claim is not always easy to

27

28   [2] *See* 2 Newberg on Class Actions § 4:89 (5th ed.).

1  successfully allege or demonstrate, but once shown, it is straightforward to see how it would

2  apply on a class-wide basis.  Similarly, the element of reliance on an alleged misstatement can be

3  presented in a way that creates a common question, even though individual class members may

4  not have personally relied on any alleged misstatement but relied in a general way on a

5  prevailing market price that fully incorporated all public statements a company made.  However,

6  to present the element of reliance in this general way so that it can be treated as a common

7  question for class certification purposes – *i.e.*, whether all investors relied on the effects of a

8  false statement – the Supreme Court created (in 1988) a presumption of reliance if plaintiffs can

9  show the stock in question traded on an efficient market (meaning one that rapidly incorporates

10  all public information by a company or its officers into the prevailing market price of its

11  securities). *Basic Inc. v. Levinson*, 485 U.S. 224 (1988).  Even after plaintiffs show that the

12  market for defendants' securities was "efficient" in this sense, the presumption of reliance can be

13  rebutted by showing a lack of "price impact" as to any statement in question.  In other words, a

14  showing that the alleged misstatements did not artificially lift or maintain the prevailing market

15  price may rebut the presumption of reliance.

16       14.      The procedural machinery of first demonstrating an efficient market to invoke the

17  presumption of reliance, followed by proving or disproving whether price impact does or does

18  not rebut that presumption, is a complex exercise, the moves of which have been developed most

19  particularly—and reaffirmed repeatedly—by the Supreme Court in the last fifteen years.  *See*

20  *Erica P. John Fund, Inc. v. Halliburton Co.* ("*Halliburton I*"), 563 U.S. 804 (2011); *Amgen Inc.*

21  *v. Connecticut Retirement Plans and Trust Funds*, 568 U.S. 455 (2013); *Halliburton Co. v. Erica*

22  *P. John Fund, Inc.* ("*Halliburton II*"), 573 U.S. 258 (2014).

23       15.      As the Supreme Court has described in Halliburton II, 573 U.S. at 280-81,

24  statistical analysis via an "event study" is virtually mandatory to show or disprove market

25  efficiency and, in turn, invoke the presumption of reliance to show that common issues

26  predominate over individual ones, and thus, to certify a class under Rule 23(b)(3). This step

27  alone requires high-powered financial economists steeped in financial market statistical analysis.

28  In addition, rebutting the efficient-market presumption through price-impact arguments similarly

involves expert evidence developed by financial economists, typically relying on market data or evidence of company-specific market activity grounded on financial databases or security analysts' reports.

16.     In such attempts to certify classes under Rule 23(b)(3) or defend against certification, it is virtually inevitable that extensive discovery ensues, wherein the parties fight over the data and expert analytics underlying this evidence. Depositions, sometimes numerous, follow on each of those issues.

**APPLICATION OF A DIFFERENT RULE 23 CERTIFICATION OPTION TO THIS CASE**

17.     In contrast, here, Lead Plaintiff has tried to maximize judicial economy and the interests of the class members by avoiding the time, expense, and often extensive litigation that goes with Rule 23(b)(3) litigation as detailed above.  Instead, Lead Plaintiff relies on other parts of Rule 23—Rule 23(b)(1) and Rule 23(c)(4)—to present this Court with other more pertinent certification options.  As discussed in more detail below, and given that damages in this type of securities case are measured uniformly and mechanically based on which investors were impacted by identifiable and measurable stock drops when fraud-related information was disclosed, circumscribed classes coupled with targeted ADR with a securities-savvy mediator offers a structure that will maximize the chances of class-wide resolution within a relatively short period of time.

**Notice Under Rule 23(b)(1)**

18.     It is true that courts have referred to these alternatives under Rule 23(b)(1) as "mandatory" classes.[3]  However, there is a common misconception about what the "mandatory" nature of these classes means with regard to a party's ability to opt out.  Notice and opt out rights are not required in Rule 23(b)(1) class actions, but they are discretionary, may be permitted, and have been employed under Rule 23(c)(2)(A).[4]  With regard to opting out, the "mandatory"

---

[3] *E.g., Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2559 (2011).

[4] *See* 2 Newberg on Class Actions § 4:4 (5th ed.)

nature of Rule 23(b)(1) classes means only that there is no recognized constitutional right to opt out; courts may nevertheless impose a judicially crafted right to opt out of a Rule 23(b)(1) class if it determines such a measure should be employed in its discretion.

**Rule 23(b)(1)(A) and Targeted Issue Classes Under Rule 23(c)(4)**

19. It is true that classes alleging violations of the securities laws are relatively rare under Rule 23(b)(1)(A).[5] Given the widely shared conclusion that such "incompatible standards of conduct" class actions are generally limited to non-monetary situations—few of which arise in securities class actions—the reported securities cases certified under Rule 23(b)(1)(A) may not be recent but are in any opinion still good law.[6] Legal scholars believe that such certification in securities cases should be reserved for particular situations.[7] This is such a case.

20. Here, Lead Plaintiff presents the Court with a classic example where the individual ADR procedures as advocated by PG&E will undoubtedly lead to incompatible and differing standards of conduct dictated by factors unrelated to the merits of their claims, such as whether or not small claimants can afford representation, whether they have favorable status as current partners with PG&E, and other arbitrary factors.

21. It is my understanding that the Reorganized Debtors' ADR proposal is structured so that after all the claimants have started ADR, unless they accept the results of the ADR orchestrated by the PG&E-paid mediator, they must return to Bankruptcy Court to risk an adverse determination of certain defenses reserved until the end of the process by PG&E.[8]

22. I further understand that Reorganized Debtors refer to this process of lodging post-mediation defenses as "Omnibus Objection Procedures" that apply to any securities claimants based upon Reorganized Debtors' view that such claims are objectionable on some

---

[5] Rule 23(b)(1)(A) authorizes class certification if prosecution of the suit through separate actions could result in "inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class." In such situations, a class action aggregates the individual actions into one case and generates a single demand of the defendant, thereby rationalizing the legal obligations on that party. *See* Fed. R. Civ. P. 23(b)(1)(A).

[6] 7 Newberg on Class Actions § 22:76 (5th ed.) (citing cases).

[7] *See* 7 Newberg on Class Actions § 22:76 (5th ed.).

[8] *See* Reorganized Debtors' *Motion to Approve Securities ADR and Related Procedures* (the "ADR Motion") [Dkt. No. 8964] at 10–11.

"common basis."[9]  That is, the denominated "omnibus" issues are just that: overwhelmingly common issues that apply or potentially apply equally to all or a massive number of claimants.[10] The proffered omnibus grounds for objection include the impermissibility of a single agent filing more than one parties' claims on a single claim form (which I understand the parties term "bulk claims") as well as the timeliness of claims, among other defenses that the Reorganized Debtors describe as "common grounds" or "common basis" for a denial of claim.[11]

23.     Based on Reorganized Debtors' view that these are "omnibus" or "common" issues, I believe these issues both (a) satisfy the *commonality* requirement of Rule 23(a)(2) and (b) mean that they may properly be certified as "issue classes" under Rule 23(c)(4).

24.     Class-wide adjudication of these common issues is necessary to avoid subjecting Reorganized Debtor to incompatible standards of conduct.  Proceeding individually on these "omnibus" defenses creates an undeniable risk that two identically situated claimants who filed claims on the same day might reach different outcomes where the first has no legal representation and a small claim who concedes the matter, whereas the other has the resources to establish how their claim that day was timely.  This disparity would be exacerbated by the fact that, with thousands of claims, there may be hundreds of other claimants whose claims were filed that day.  These concerns of incompatible standards of conduct for Reorganized Debtors are particularly important here, where the law obligates debtors to treat similarly situated claimants alike.

25.     Accordingly, I believe that this case represents precisely the specialized situation for which a Rule 23(b)(1)(A) class may be maintained with regard to securities claims.[12]

---

[9] *See* ADR Motion at 11–13 (listing various "omnibus objections," *inter alia*, "Certain Subordinated Securities Claims are objectionable on some other common basis under applicable bankruptcy or non-bankruptcy law, including failure to file timely claims by the Extended Securities Bar Date and statute of limitations defects" (emphasis added); *id.* at 14 ("Addressing common issues on an omnibus basis will allow the Bankruptcy Court to efficiently administer its docket while reducing claims that need to be addressed by other procedures or on the merits." (Emphasis added.)).

[10] Based on my review of the claims register maintained by PrimeClerk, I understand that the timeliness and bulk claims issues affect potentially many thousands of claimants and billions of dollars in claims.  *See* https://restructuring.primeclerk.com/pge/Home-ClaimInfo?RescissionorDamage=MTY=

[11] *See* ADR Motion at 12–13.

[12] *See* 7 Newberg on Class Actions § 22:76 (5th ed.)

## Rule 23(b)(1)(B) and the "Limited Fund" – A Second Approach

26.     More common in cases alleging violations of the securities laws is the application of another variant of Rule 23(b)(1) that is present here, the "limited fund". In class actions where the available pool of recovery is limited a class action is necessary in order to treat the claimants equitably because to permit individual actions would risk individual class members' ability to recover, not on the basis of the merits, but their failure to achieve a judgment before the assets are depleted.[13] In *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999), the Supreme Court set forth the requirements for certification of limited fund class actions under this subsection, requiring the presence of three independent factors: (1) "the totals of the aggregated liquidated claims and the fund available for satisfying them, set definitely at their maximums, demonstrate the inadequacy of the fund to pay all the claims"; (2) "the whole of the inadequate fund [is] to be devoted to the overwhelming claims"; and (3) "the claimants identified by a common theory of recovery [are] treated equitably among themselves."  As the Court noted in *Ortiz*, in limited-fund class actions, "equity require[s] absent parties to be represented, joinder being impractical, where individual claims to be satisfied from the one asset would, as a practical matter, prejudice the rights of absent claimants against a fund inadequate to pay them all."  *Id*. at 836.

27.     Securities cases do not often satisfy the requirements of a limited fund because they do not satisfy the first of the three criteria: that is, if the defendants are solvent, the maximum amount of their assets will not exceed the class's claims.  In other words, the funds available to pay the claims are not limited, so concerns about equitable treatment of the class members described above do not exist.  There are exceptions, of course—such as securities litigation arising out of a Ponzi scheme or within a bankruptcy—though both are relatively rare.

---

[13] Rule 23(b)(1)(B) provides that a class action may be maintained when separate actions could result in a determination that "as a practical matter would be dispositive of the interests of the other [class] members … or substantially impede their ability to protect their interests." Fed. R. Civ. P. 23(b)(1)(A).  The Rules Advisory Committee Notes state that subdivision (b)(1)(B) applies to "situations where the judgment in a nonclass action by or against an individual member of the class, while not technically concluding the other members, might do so as a practical matter."  Rules Advisory Committee Notes, 39 F.R.D. 69, 100–01 (1966).

Nonetheless, Rule 23(b)(1)(B), as interpreted by *Ortiz*, remains viable and appropriate under the right circumstances.[14]

28.     I believe that a Rule 23(b)(1)(B) class is appropriate with regard to the stockholder claimants within this bankruptcy's Confirmed Plan Class 10A-II. It is my understanding that Confirmed Plan Class 10A-II encompasses all securities claimants whose claims against PG&E arise from common stock and who filed valid proofs of claim in this Bankruptcy Action. In particular, here PG&E is a solvent company with sufficient assets to flow down to equity claimants, but because the amount of stock PG&E can issue is limited, this case constitutes exactly the kind of specialized situation that would fit Rule 23(b)(1)(B).

29.     I have been asked by Securities Lead Counsel to consider the possibility that PG&E could amend its Articles of Incorporation with the State of California to raise its cap on the number of its shares it could issue. In my opinion, this possibility does not necessarily result in the fund available for satisfying Plan Class 10A-II claims ceasing to be "limited" in the sense of *Ortiz*, at least for purposes of class certification. It unavoidably depends on whether and how high PG&E actually raises that ceiling and the maximum extent of its liability to the class. In any event, unless and until PG&E proves both (a) that it has already raised its cap on the number of its shares it could issue, and further that (b) the issuance of these shares would be adequate to pay all "the totals of the aggregated liquidated claims . . . set definitely at their maximums," the Confirmed Plan of Reorganization constitutes a "limited fund" with regard to its treatment of Class 10A-II claims under *Ortiz*.

30.     Until those eventualities in fact occur, the "mandatory" nature of class certification under Ortiz controls. Whether the fund is no longer limited at some uncertain date in the future has no bearing on whether the class should be certified now. If at some point the fund is no longer limited, this Court may revisit class certification under Rule 23(c)(1)(C).

---

[14] 7 Newberg on Class Actions § 22:77 (5th ed.)

**OBSERVATIONS ON CERTIFICATION OPTIONS BEFORE THE COURT**

31.     In my view, this case seems well suited for certification under Rule 23(b)(1), perhaps in combination with certification of an issues class under Rule 23(c)(4). The predicate for judicial decision-making is perhaps easiest focusing on the limitations of stock available to the Reorganized Debtor. The "mandatory" certification is a blessing in disguise, [after the limited fact finding], as it shifts the burden to Reorganized Debtors to not drag out the ADR process hoping for a manageable agreed-to amount below the "limited fund," which compels certification.

32.     In any event, I note that this Court retains the ability to decertify the "mandatory" certification (under Rule 23(c)(i)(C)) in the event that Reorganized Debtors take action that results in their fund no longer being "limited" and Rule 23(b)(1)(b) no longer being applicable. At that point, the Court can decide it if wants to keep certification in place as an "issue class" or otherwise. My opinion is that an "issue class" grounded, at least in a part, on the Omnibus Issues is the next best fall back for efficient adjudication.

**DISCOVERY IN CLASS CERTIFICATION**

33.     I have been asked to assess whether additional discovery regarding PERA's adequacy as class representative is warranted in this case. It is my opinion that it is not. A motion for class certification requires a court to focus on a limited set of issues: namely, just the Rule 23(a) and (b) factors in dispute.[15] Although it is perhaps unavoidable for the Court to consider merits issues that bear on class certification, the requisite discovery is not nearly as wide-ranging as discovery more generally. As a general matter, the discovery available at the certification stage should be limited to that necessary to consider the motion to certify the class. To do more would run counter to Supreme Court authority and, as a practical matter, would delay proceedings unnecessarily.

---

[15] *See* 3 Newberg on Class Actions § 7:16 (5th ed.)

34.     As such, prior to certifying a class, courts typically endeavor to tailor any class-certification discovery to resolve only disputed facts that pertain to the Rule 23 factors.[16]  The question of whether the scope of class certification discovery should exceed strict relevance to these factors is often framed in terms of whether parties may also engage in discovery into the "merits" of claims and defenses.  In analyzing the 2003 amendments to Rule 23, the Advisory Committee wrote:

> Although an evaluation of the probable outcome on the merits is not properly part of the certification decision, discovery in aid of the certification decision often includes information required to identify the nature of the issues that actually will be presented at trial. In this sense it is appropriate to conduct controlled discovery into the "merits," limited to those aspects relevant to making the certification decision on an informed basis.[17]

35.     Similarly, the *Manual for Complex Litigation* instructs courts to "encourage counsel to confer and stipulate as to relevant facts that are not genuinely disputed, to reduce the extent of precertification discovery, and to refine the pertinent issues of deciding class certification."[18]

36.     In *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011), the Supreme Court explained that lower courts ought to consider the merits as necessary to ascertain whether the prerequisites of Rule 23 have been satisfied.  Shortly thereafter, the Supreme Court reminded courts, in the specific context of a defendant seeking to establishing facts supporting its defenses in securities class actions, that "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."  *Amgen Inc. v. Connecticut Retirement Plans and Trust Funds*, 133 S.

---

[16] The Rule 23(a) factors are: numerosity, commonality, typicality, adequacy of representation, and counsel's adequacy.  The Rule 23(b) factors are: the presence of incompatible standards (Rule 23(b)(1)(A)), the limitations of a fund (Rule 23(b)(1)(B)), the need for injunctive relief (Rule 23(b)(2)), or the predominance of common issues and the superiority of the class device (Rule 23(b)(3)).

[17] Fed. R. Civ. P. 23(c)(1) advisory committee's note (2003).

[18] Manual for Complex Litigation, Fourth, § 21.14.

Ct. 1184, 1194–95 (2013). As a result, courts generally tailor class-certification discovery as closely as possible to the Rule 23(a) and (b) factors that are actually shown to be in dispute.[19]

37.     Because the U.S. District Court here has already found Securities Lead Plaintiff PERA to be the "most adequate plaintiff," which it was required to find in order to appoint PERA lead plaintiff pursuant to 15 U.S.C. § 78u-4(a)(3)(B), the factual underpinnings of PERA's adequacy cannot be subject to collateral attack.[20]  In my opinion, additional discovery on the question is therefore unnecessary and unsupported by both Supreme Court precedent and customary practice in class actions.

**ADEQUACY AND CONFLICTS OF INTEREST IN SECURITIES CLASS ACTIONS**

38.     Adequacy should rarely barrier to certification in securities class actions due to the PSLRA process described above.[21]  A determination that a party is suited to be the lead plaintiff in a securities class action is in fact more rigorous and requires more scrutiny than the typical adequacy inquiry.[22]

39.     The central component of class representative adequacy is the absence of conflicts of interest between the proposed representatives and the class.  A class representative whose interests are materially adverse to some of the class's interests cannot be an adequate representative for the whole class because in promoting her own interests she may undercut the interests of other class members.  To preclude a finding of adequacy under Rule 23(a)(4), a conflict must be fundamental to issues at the heart of the litigation and more than speculative in nature.[23]  The inquiry does not focus on comparisons between a lead plaintiff's role in one case compared to the same entity's role in other, related cases.

---

[19] 3 Newberg on Class Actions § 7:17 (5th ed.)

[20] *See* 7 Newberg on Class Actions § 22:74 (5th ed.) ("In sum, adequacy is usually not a major barrier to class certification in any case, but it may be even less of a barrier in securities class actions for reasons particular to this type of case. Specifically, according to the processes of the Private Securities Litigation Reform Act (PSLRA) that Congress enacted 1995, a court is required to appoint a lead plaintiff at the outset of the case. In doing so, that lead plaintiff must make a *prima facie* showing that it can adequately represent the class, and other candidates then have an opportunity to rebut those allegations.")

[21] 7 Newberg on Class Actions § 22:74 (5th ed.).

[22] Wright and Miller § 1806.

[23] 7 Newberg on Class Actions § 22:74 (5th ed.)

40.     Lead Counsel asked me to opine about the likelihood of a conflict of interest if they and PERA are appointed to represent both the District Court class and the Bankruptcy Court class.

41.     I have reviewed materials filed in both the District Court and Bankruptcy Actions. I note that the operative complaint in the District Court defines the putative class as: "all persons and entities who, during the period from April 29, 2015 through November 15, 2018, inclusive (the "Class Period"), purchased or otherwise acquired publicly traded PG&E securities and were damaged thereby."[24]  Similarly, I note that here, in the Rules 7023 & 23 Certification Motion, the proposed class is defined as: "all those who purchased or otherwise acquired PG&E's publicly traded securities from April 29, 2015 through November 15, 2018 (inclusive), with valid Securities Class Claims."[25]  I understand that the term "Securities Class Claims" is a defined term within that proposal, referencing bankruptcy claimants under "Plan Classes 9A, 10A-II, and 10B."[26]

42.     Accordingly, the claims sought to be certified by the Rules 7023 & 23 Certification Motion are a definite subset contained within the class of claims sought to be certified in the District Court – the only difference being whether the putative class members in the District Court action also became members of "Plan Classes 9A, 10A-II, and 10B" by appropriately filing valid proofs of claim in Bankruptcy Court.

43.     Based on this information, I do not believe that there would be a conflict of interest implicating Rule 23(a)(4) if PERA were appointed class representative as part of a certified class in both the district court and bankruptcy court actions.

44.     As noted above, the central component of class representative adequacy is the absence of conflicts of interest between the proposed representatives and the class – not a theoretical comparison between the proposed representative's role in related cases.

---

[24] TAC ¶11.

[25] *See* Rules 7023 & 23 Certification Motion, Ex. A, Proposed Order.

[26] *Id*.

45. Here, as a member of Confirmed Plan Classes 9A and 10B, PERA is incentivized to prosecute Class claims to recover the greatest amount for debt purchaser victims. As a member of Confirmed Plan Class 10A-II, PERA is equally incentivized to prosecute Class claims to recover the greatest amount for stockholder victims. All claimants, including PERA, have the same interests in obtaining as much value from the bankrupt estates as possible. Finally, PERA retains the same incentives as any other claimant to prosecute the parallel claims against Reorganized Debtors' current and former officers, directors, and underwriters in the District Court action, where it has already been adjudicated the "most adequate plaintiff" by virtue of the District Court's appointment as Lead Plaintiff.

46. In sum, the argument against PERA's adequacy, based on PERA's simultaneous involvement in both the District Court and Bankruptcy Court actions, falls outside the typical conflict-of-interest arguments directed to the "adequacy of representation" requirement of Rule 23(a)(4). Serving as Lead Plaintiff in both cases does not bear PERA's adequacy as the analysis was intended by the drafters of Rule 23(a)(4).

47. I hereby certify under penalty of perjury that the foregoing statements made by me are true and correct.

I hereby certify under penalty of perjury that the foregoing statements made by me are true and correct.

Executed this 11th day of November, 2020.

Andrew D. Bradt

# EXHIBIT A

# ANDREW D. BRADT

University of California, Berkeley School of Law
885 Simon Hall, Berkeley, CA 94720
(510) 664-4984; abradt@law.berkeley.edu

## ACADEMIC APPOINTMENTS

**UNIVERSITY OF CALIFORNIA, BERKELEY SCHOOL OF LAW**
*Professor of Law (with tenure)*                                   2018-pres.
*Assistant Professor of Law*                                        2012-2018

Teaching: Civil Procedure, Conflict of Laws, Remedies, Complex Litigation, Mass Torts
         Rutter Award for Teaching Distinction (2019)

Service:  Admissions Committee (2017-present)
        Curriculum Committee (2017-present)
        Campus Committee on Memorial Resolutions (2016-present)
        Judicial Clerkships Committee, 2012-2017 (co-chair, 2013-2017)
        Faculty Workshop Committee, 2015-2016 (co-chair)
        Academic Placement Committee, 2013-2015
        Faculty Advisor, American Constitution Society (2013-present)

Professional Affiliations:
        Member, American Law Institute
        Member, Academic Advisory Board, Supreme Court Fellows Program
        Executive Committee Member, AALS Litigation Section (Chair, 2019-20)
        Executive Committee Member, AALS Conflict of Laws Section
        Affiliated Faculty, Civil Justice Research Initiative

**HARVARD LAW SCHOOL**                                              2010-2012
*Climenko Fellow and Lecturer on Law*
Course: Legal Research & Writing

## PUBLICATIONS

### BOOKS

PLEADING AND PROCEDURE: CASES AND MATERIALS (12th ed. 2020, Foundation Press) (with
    Geoffrey C. Hazard, Jr., Hon. William A. Fletcher, and Stephen McG. Bundy)).

### ARTICLES & ESSAYS

*It's Good to Have the "Haves" On Your Side: A Defense of Repeat Players in Multidistrict
    Litigation* 108 GEO. L.J. 73 (2019) (with D. Theodore Rave).

Case: 19-30088   Doc# 9492-2   Filed: 11/11/20   Entered: 11/11/20 11:44:20   Page 18
of 23

*Party Preferences in Multidistrict Litigation*, 108 CAL. L. REV. 1752 (2019) (with Zachary D. Clopton).

*MDL and Adversarial Legalism*, 53 GA. L. REV. 1382 (2019) (invited contribution to symposium, "MDL Turns 50: A Look Back and the Way Forward").

*Aggregation on Defendants' Terms:* Bristol-Myers Squibb *and the Federalization of Mass-Tort Litigation*, 59 B.C. L. REV. 1251 (2018) (with D. Theodore Rave) (winner of 2018 Call for Papers Award, Southeastern Association of Law Schools).

*The Looming Battle for Control of Multidistrict Litigation in Historical Perspective*, 87 FORDHAM L. REV. 87 (2018) (invited contribution to symposium, "Civil Justice Reform in the Trump Era").

*The Long Arm of Multidistrict Litigation*, 59 WM. & MARY L. REV. 1166 (2018).

*MDL v. Trump: The Puzzle of Public-Law MDLs*, 112 NW. U. L. REV. 905 (2018) (with Zachary D. Clopton).

*The Stickiness of the MDL Statute*, 37 REV LITIG. 203 (2018) (invited contribution to symposium, "MDL Problems").

*The Information-Forcing Role of the Judge in Multidistrict Litigation*, 105 CAL. L. REV. 1259 (2017) (with D. Theodore Rave).

*Something Less and Something More: MDL's Roots as a Class Action Alternative,* 165 U. PA. L. REV. 1711 (2017) (invited contribution to symposium on the fiftieth anniversary of the 1966 amendments to Rule 23).

*"A Radical Proposal": The Multidistrict Litigation Act of 1968*, 165 U. PA. L. REV. 831 (2017).

*Herma Hill Kay and the Conflict of Laws: A Tribute*, 104 CAL. L. REV. 579 (2016) (invited contribution to festschrift).

*Resolving Intrastate Conflicts of Laws: The Example of the Federal Arbitration Act*, 92 WASH. U. L. REV. 603 (2015).

Atlantic Marine *and Choice-of-Law Federalism*, 65 HASTINGS L.J. 617 (2015) (invited contribution to symposium on *Atlantic Marine v. U.S. District Court*).

*The Shortest Distance: Direct Filing and Choice of Law in Multidistrict Litigation*, 88 NOTRE DAME L. REV. 759 (2012).

Grable *on the Ground: Mitigating Unchecked Jurisdictional Discretion*, 44 U.C. DAVIS L. REV. 1153 (2011).

Case: 19-30088    Doc# 9492-2    Filed: 11/11/20    Entered: 11/11/20 11:44:20    Page 19 of 23

*Much to Gain and Nothing to Lose: Implications of the History of the Declaratory Judgment for the (b)(2) Class Action*, 58 ARK. L. REV. 767 (2006).

## EDUCATION

**HARVARD LAW SCHOOL**, J.D., *magna cum laude*                    June 2005

    Joseph H. Beale Prize for highest grade in Conflict of Laws, 2004-2005
    Research Assistant, Prof. Stephen B. Burbank, University of Pennsylvania Law School
    Research Assistant, Prof. Charles R. Nesson, Harvard Law School

**HARVARD UNIVERSITY**, A.B. in Social Studies, *summa cum laude*                    June 2002

    Awards:  Phi Beta Kappa, Detur Book Prize, John Harvard Scholarship

## JUDICIAL CLERKSHIPS

**HON. ROBERT A. KATZMANN**, New York, NY                    2007-2008
    U.S. Court of Appeals for the Second Circuit

**HON. PATTI B. SARIS**, Boston, MA                    2005-2006
    U.S. District Court for the District of Massachusetts

## PRACTICE EXPERIENCE

**JONES DAY**, New York, NY

    *Associate, Issues & Appeals Group*                    2008-2010

**ROPES & GRAY**, Boston, MA

    *Litigation Associate*                    2006-2007
    *Summer Associate*                    Summer 2004

## BAR ADMISSIONS

New York (admitted 2007); Massachusetts (admitted 2007); U.S. Court of Appeals for the Ninth Circuit; U.S District Courts for the District of Massachusetts and the Eastern and Southern Districts of New York.

## AMICUS BRIEFS

Brief by Civil Procedure Professors in Support of Respondents, *Ford Motor Co. v. Montana Eighth Judicial District Court*, U.S. Supreme Court, No. 19-368 (2020) (with Pamela K. Bookman, Zachary D. Clopton, Maggie Gardner, and D. Theodore Rave).

Brief by Civil Procedure Professors in Support of Respondents, *Bristol-Myers Squibb v. Superior Court of California*, U.S. Supreme Court, No. 16-466 (2017) (with Pamela K. Bookman, Zachary D. Clopton, Maggie Gardner, and D. Theodore Rave) (cited in dissent by Justice Sotomayor, 137 S. Ct. 1773, 1788 n. 3).

Case: 19-30088   Doc# 9492-2   Filed: 11/11/20   Entered: 11/11/20 11:44:20   Page 20 of 23

Letter in Support of Petition for Review, *Chen v. L.A. Truck Centers, LLC*, California Supreme Court, No. S240245 (2017) (review subsequently granted).

## SELECTED PRESENTATIONS

Adult Supervision: Opioids, Mandamus, and "Law Reform" in Multidistrict Litigation, University of Texas School of Law Colloquium on Current Issues in Complex Litigation, Austin, TX (virtually), November 2020.

The Civil Rules in the Age of Covid, Covid in the Courts Symposium, Civil Justice Research Initiative & RAND Corporation, Berkeley, CA (virtually), October 2020.

Super Litigation for Super Cases, 2020 Clifford Symposium on Tort Law and Policy—The Opioid Crisis: Where Do We Go From Here?, DePaul Law School (virtually), May 2020.

The Next Decade in Aggregate Litigation, Bolch Judicial Institute Civil Rules Planning Conference, Duke Law School, Durham, NC, November 2019.

Built to Last: The History of the MDL Statute and Implications for its Future, Judicial Panel on Multidistrict Litigation Transferee Judges Conference, Palm Beach, FL, October 2019.

What MDL Can Teach Us About Federal Judicial Reform, California Law Review Symposium, Berkeley, CA, April 2019.

MDL and Adversarial Legalism, Georgia Law Review Symposium, University of Georgia School of Law, Athens, GA, Feb. 2019.

Jurisdiction and Choice of Law in Multidistrict Litigation, Center for Civil Justice, New York University School of Law, New York, NY, Oct. 2018.

"The Looming Battle for the Soul of MDL," Fordham Law Review Symposium, "Civil Justice Reform in the Trump Era," New York, NY, Feb. 2018.

"Aggregation on Defendants' Terms: *Bristol-Myers Squibb* and the Federalization of Mass-Tort Litigation," AALS Annual Meeting, Conflict of Laws Section, San Diego, CA, Jan 2018; Bay Area Civil Procedure Forum, UC-Hastings College of the Law, San Francisco, CA, Oct. 2017; Berkeley Law Faculty Workshop, Sept. 2017.

"MDL v. Trump," Joint Workshop with Seoul National University Law School, Berkeley, CA, Aug. 2017.

Case: 19-30088   Doc# 9492-2   Filed: 11/11/20   Entered: 11/11/20 11:44:20   Page 21 of 23

Presentation on recent Supreme Court decisions on personal jurisdiction, Berkeley Law Summer Faculty Workshop, June 2017.

"The Long Arm of Multidistrict Litigation," UCLA Law School Faculty Workshop, April 2017.

"The Information-Forcing Role of the Judge in Multidistrict Litigation," presented at Junior Federal Courts Scholars Workshop, Emory Law School, Atlanta, GA, April 2017; University of Houston Public Law Colloquium, Feb. 2017; University of Arizona Law School Faculty Workshop, Tucson, AZ, Jan. 2017; Civil Procedure Workshop, Seattle, WA, July 2016; Law & Society Conference, New Orleans, LA, June 2016.

"The Stickiness of the MDL Statute," presented at American Association of Law Schools Litigation Section Annual Meeting, San Francisco, CA, Jan. 2017.

"MDL as a Class Action Alternative," presented at the University of Pennsylvania Law Review Symposium, Philadelphia, PA, November 2016.

"The Multidistrict Litigation Act of 1968," presented at American Society for Legal History Conference, Toronto, ON, Oct. 2016; Faculty Workshop, University of California-Irvine School of Law, Irvine, CA, Jan. 2016; Junior Federal Courts Scholars Workshop, Irvine, CA, Sept. 2015; First Annual Civil Procedure Conference, University of Washington, Seattle, WA, July 2015; Berkeley Law Faculty Workshop, Berkeley, CA, July 2015.

"Declaratory Relief and Full Faith and Credit," Bay Area Civil Procedure Forum, UC-Hastings College of the Law, San Francisco, CA, Oct. 2014.

"When States Don't Blink: Declaratory Judgments and Full Faith and Credit," Seventh Annual Junior Faculty Federal Courts Workshop, University of Georgia School of Law, Athens, GA, Oct. 2014.

"*Atlantic Marine* and Choice-of-Law Federalism," Symposium on Forum Selection after *Atlantic Marine*, UC-Hastings College of the Law, San Francisco, CA, Sept. 2014.

"Recent Developments in Civil Procedure," Berkeley Law Faculty Workshop, Berkeley, CA, June 2014.

"Intrastate Conflicts and the Federal Arbitration Act," Junior Faculty Federal Courts Workshop, Brooklyn Law School, New York, NY, Oct. 2013.

Case: 19-30088   Doc# 9492-2   Filed: 11/11/20   Entered: 11/11/20 11:44:20   Page 22 of 23

"Multidistrict Litigation and Choice of Law," University of Pennsylvania School of Law Complex Litigation Seminar, Philadelphia, PA, Nov. 2012; New England Junior Scholars' Conference, Boston College Law School, Boston, MA, Mar. 2011.

"The Shortest Distance: Direct Filing and Choice of Law in Multidistrict Litigation," presented at law-school-faculty workshops held by Harvard Law School, Drexel University, Syracuse University, Temple University, Tulane University, University of Alabama, University of California-Berkeley, University of California-Davis, University of Oklahoma, University of Washington, and the University of Wisconsin, Sept.-Dec. 2011.