Case 4:20-cv-04568-HSG   Document 37   Filed 11/12/20   Page 1 of 9

**Entered on Docket
November 16, 2020
EDWARD J. EMMONS, CLERK
U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

THERESA MCDONALD,

Plaintiff,

v.

PG&E CORPORATION,

Defendant.

Case No. 20-cv-04568-HSG

**ORDER GRANTING MOTION TO DISMISS APPEAL**

Re: Dkt. No. 5

Pending before the Court is PG&E Corporation ("PG&E Corp.") and Pacific Gas and Electric Company ("Utility"), as debtors (collectively, the "Debtors," and as reorganized pursuant to the Plan (as defined below), "Reorganized Debtors") motion to dismiss ("Motion") this appeal by Theresa Ann McDonald ("Appellant"). Dkt. No. 5. Appellant filed this appeal of the Bankruptcy Court's order ("Confirmation Order") confirming the Debtors' Plan of Reorganization dated June 19, 2020 ("Plan").[1] For the reasons set forth below, the Court **GRANTS** the Motion.[2]

**I.   BACKGROUND**

On January 29, 2019, the Debtors commenced voluntary cases for relief under chapter 11 of title 11 of the United States Code ("Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of California ("Bankruptcy Court"). Significantly, the Debtors needed to propose a plan of reorganization that satisfied the requirements of A.B. 1054, including its June 30, 2020 deadline for plan confirmation. In light of the "increased risk of catastrophic wildfires," A.B. 1054 created the Go-Forward Wildfire Fund as a multi-billion dollar safety net to

---

[1] Capitalized terms not otherwise defined in this order have the meanings ascribed to them in the Plan.
[2] The Court finds this matter appropriate for disposition without oral argument, and the matter is deemed submitted. *See* Civil L.R. 7-1(b).

compensate future victims of public utility fires and thereby "reduce the costs to ratepayers in addressing utility-caused catastrophic wildfires," support "the credit worthiness of electrical corporations," like the Debtors, and provide "a mechanism to attract capital for investment in safe, clean, and reliable power for California at a reasonable cost to ratepayers." A.B. 1054 § 1(a). For the Debtors to qualify for the Go-Forward Wildfire Fund, however, A.B. 1054 required the Debtors to obtain an order from the Bankruptcy Court confirming a plan of reorganization by June 30, 2020. *See* A.B. 1054 § 16, ch. 3, 3292(b).

After more than sixteen months of negotiations among a variety of stakeholders, including the Official Committee of Tort Claimants, as the fiduciary for all holders of Fire Victim Claims, and following confirmation hearings that spanned several weeks, the Plan was confirmed by the Bankruptcy Court on June 20, 2020 and became effective on July 1, 2020 ("Effective Date"). Among the most crucial and fundamental of the various settlements embodied in the Plan was the "Tort Claimants RSA," a comprehensive settlement of all Fire Victim Claims for approximately $13.5 billion in cash and stock, plus certain other assets to be transferred to a trust for the benefit of Fire Victim Claimants. BR Dkt. No. 5174.[3] In addition to the Tort Claimants RSA, the Debtors also consummated the following settlements (collectively, with the Tort Claimants RSA, the "Settlements"), either in advance or as part of Plan confirmation: (i) the Public Entities Support Agreements, which successfully resolved the wildfire claims of 18 local public entities for approximately $1 billion; (ii) the Subrogation Claims RSA, which settled and resolved more than $20 billion of potential subrogation liabilities for approximately $11 billion in cash; (iii) the Noteholder RSA, which resolved outstanding disputes with the Ad Hoc Noteholder Committee representing holders of billions of dollars in note claims with respect to, among other things, the payment of make-whole premiums and the appropriate rate of postpetition interest to be paid on unsecured claims under the Plan; (iv) the Tubbs Settlements, which liquidated and allowed the Fire Claims of certain elderly or infirm individual plaintiffs for whom the Bankruptcy Court granted relief from the automatic stay to pursue their claims relating to the Tubbs fire; (v) the

---

[3] "BR Dkt. No." references are to the Bankruptcy Court's docket, Case No. 19-30088 (DM) (Bankr. N.D. Cal.). "Dkt. No." references are to this Court's docket.

2

1  Butte County DA Settlement, pursuant to which the Debtors agreed to plead guilty to certain
2  charges, and pay a fine of approximately $4 million to fully resolve the criminal prosecution of the
3  Debtors arising out of the 2018 Camp Fire; (vi) the Federal Agency Claims Settlement and the
4  State Agency Claims Settlements, which resolved the treatment of approximately $7.5 billion in
5  Fire Claims that were asserted by various governmental agencies for an allowed $1 billion
6  subordinated claim, and certain additional allowed Claims to be satisfied from the Fire Victim
7  Trust; (vii) the Case Resolution Contingency Process, which approved an agreement with the
8  Governor's Office to address the circumstance in which the Plan was not confirmed or failed to go
9  into effect in accordance with certain required dates, including the A.B. 1054 deadline; (viii) the
10 Wildfire OII, which resolved the CPUC's pending investigation into the role the Utility's
11 electrical facilities played in igniting wildfires in its service territory in 2017 and 2018; and (ix)
12 the Plan OII, which culminated in the CPUC's final determination that the Plan fully complied
13 with A.B. 1054, enabling the timely entry of the Confirmation Order and the Reorganized
14 Debtors' ability to participate in the Go Forward Wildfire Fund.

15 The Bankruptcy Court held the Confirmation Hearing from May 27, 2020 through June 19,
16 2020. Appellant agrees that "[h]aving the hearings available to watch via Zoom made the case
17 more accessible to fire victims, because we did not have to travel to San Francisco for the
18 hearings." *See* Appellant's Designation of Record and Statement of Issues on Appeal from
19 Bankruptcy Court ¶ 13 (BR Dkt. No. 8438, "Appellant's Designation") at 6.

20 On the Effective Date, in accordance with the Plan, a number of complex transactions
21 occurred, including the Reorganized Debtors making distributions to thousands of creditors
22 according to the terms of the Plan. *See* Declaration of John Boken (Dkt. No. 5-3, "Boken Decl.")
23 ¶ 6. The Reorganized Debtors made more than $42 billion in disbursements to creditors and other
24 parties in interest, including funding the Fire Victim Trust established under the Plan with $5.4
25 billion in cash and 476,995,175 shares of common stock, funding the Subrogation Wildfire Trust
26 established under the Plan with approximately $11 billion, paying approximately $1 billion in
27 connection with the Public Entities Settlements, making payment of approximately $5 billion to
28 the Go-Forward Wildfire Fund established under A.B. 1054, and making payments to noteholders

and other holders of funded debt of over $15 billion and distributing new, replacement and reinstated notes aggregating to over $21 billion. *Id.*

As a result of the shares transferred to the Fire Victim Trust, that trust held approximately 22% of the Reorganized Debtors' equity on the Effective Date. *Id.* ¶ 7. The Reorganized Debtors also issued on the Effective Date 423,372,629 shares of common stock and 16,000,000 equity units to their underwriters in connection with the closing of the common stock and equity unit offerings to fund the Plan. *Id.* In addition, 211,337,189 shares were issued to nearly 200 entities representing Backstop Parties pursuant to the terms of the Backstop Commitment Letters and the Forward Stock Purchase Contracts, and 342,105,261 shares of common stock were issued to other private investors. *Id.* In total, the Reorganized Debtors issued approximately 1.5 billion new shares of common stock—three times the Reorganized Debtors' previously existing shares. *Id.*

To fund the Plan and their operations, the Debtors raised approximately $9 billion in new value through the sale of over 800 million new shares and 16 million equity units, approximately $5.35 billion of which was sold in the public markets. *Id.* ¶ 8. In addition to their equity raise, and again based on the Confirmation Order, the Reorganized Debtors also raised nearly $11 billion by issuing several new debt securities to hundreds of new debt purchasers. *Id.* Many of the Reorganized Debtors' new securities are currently trading on the public debt and equity markets. *Id.*

## II. LEGAL STANDARD

The Ninth Circuit has recognized that courts "will not entertain an appeal if the case is moot" on either Constitutional or equitable grounds. *In re Thorpe Insulation Co.*, 677 F.3d 869, 880 (9th Cir. 2012). The doctrine of equitable mootness reflects a public policy valuing the finality of chapter 11 plan confirmation orders, and serves to protect the debtor, creditors, and third parties in bankruptcy cases. *Id.* This is because "[f]inality is essential to the success of bankruptcy reorganization plans," and "[b]oth creditors and the debtor require certainty so that the debtor can return to economic health, and the creditors can maximize their recovery within the debtor's ability to pay." *In re City of Stockton, California*, 909 F.3d 1256, 1263 (9th Cir. 2018).

In the Ninth Circuit, an appeal is equitably moot "if the case presents transactions that are

so complex or difficult to unwind that debtors, creditors, and third parties are entitled to rely on the final bankruptcy court order." *In re Transwest Resort Properties, Inc.*, 801 F.3d 1161, 1167 (9th Cir. 2015); *In re Mortgages Ltd.,* 771 F.3d 1211, 1215 (9th Cir. 2014). The Ninth Circuit considers four factors in determining whether an appeal is equitably moot:

> [1] We will look first at whether a stay was sought, for absent that a party has not fully pursued its rights. [2] If a stay was sought and not gained, we then will look to whether substantial consummation of the plan has occurred. [3] Next, we will look to the effect a remedy may have on third parties not before the court. [4] Finally, we will look at whether the bankruptcy court can fashion effective and equitable relief without completely knocking the props out from under the plan and thereby creating an uncontrollable situation for the bankruptcy court.

*Transwest Resort*, 801 F.3d at 1167–68.

## III.   DISCUSSION

### A.   Appellant Did Not Seek a Stay

As a threshold matter, the Ninth Circuit requires that an appellant must "pursue with diligence all available remedies to obtain a stay of execution of the objectionable order." *Stockton*, 909 F.3d at 1264 (quoting *In re Roberts Farms, Inc.*, 652 F.2d 793, 798 (9th Cir. 1981)). Given that the debtor, creditors, and interested third parties need certainty to implement a confirmed plan, the Ninth Circuit has explained that "if a creditor wishes to challenge a reorganization plan on appeal, we require the creditor to seek a stay of proceedings before the bankruptcy court." *Stockton*, 909 F.3d at 1263.

Here, Appellant unquestionably failed to seek a stay of the Confirmation Order. Appellant does not dispute that she never even attempted to seek a stay of the Confirmation Order, and instead contends that she did not seek a stay because the Confirmation Order states that the "Debtors' insolvency proceeding is resolved pursuant to the Plan and is not subject to stay." Dkt. No. 11 ("Opp.") at 15. But Appellant misinterprets the Confirmation Order, which only indicates that the Plan and the proceedings were not subject to a stay at the time the Bankruptcy Court entered the Confirmation Order (to comply with the requirements of A.B. 1054).

It is clear that nothing in the Confirmation Order (or elsewhere) prevented Appellant from seeking a stay of the Confirmation Order, and that nothing in the Confirmation Order excuses

Appellant's failure to seek a stay. Appellant's failure to seek a stay alone is sufficient reason for the Court to dismiss the appeal. *Stockton*, 909 F.3d at 1264 ("Failure to [seek a stay] without adequate explanation should result in dismissal.").

### B.   The Debtors Have Substantially Consummated the Plan

However, in light of Appellant's *pro se* status, even if the Court were to consider the appeal, the Court must look to whether the Plan has been substantially consummated. The Bankruptcy Code defines "substantial consummation" to mean: "(A) transfer of all or substantially all of the property proposed by the plan to be transferred; (B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and (C) commencement of distribution under the plan." *See* 11 U.S.C. § 1101(2) (defining "substantial consummation"); *Mortgages*, 771 F.3d at 628 (applying section 1101(2) in finding that plan was substantially consummated); *Stockton*, 909 F.3d at 1264 (plan was substantially consummated where "[t]he City wired payment to institutional creditors, transferred property, and sent checks to former city employees to resolve pension claims, . . . conveyed title to numerous parcels of real property, assigned leasehold interests, and granted purchase options").

There is no question that the Debtors have substantially consummated the Plan. Appellant asserts that there has been no substantial consummation solely because individual Fire Victims have yet to receive payments on their claims. Opp.at 16. This, however, ignores that distributions from the Fire Victim Trust are to be administered and controlled by the Fire Victim Trustee, and the Reorganized Debtors have no role in how or when those funds are to be distributed. Dkt. No. 14 at 3. The Reorganized Debtors have, however, already distributed over $5 billion in cash and nearly half a billion shares of new common stock, representing approximately 22% of the Reorganized Debtors' equity on the Effective Date, to the Fire Victim Trust, which will, in turn, be used to satisfy Fire Victim Claims in accordance with the Plan and the Fire Victim Trust Agreement and Claim Procedures, and the Fire Victim Trustee has already begun the process of reviewing Fire Victim Claims to prepare to make distributions to Fire Victim Claimants. Boken Decl. ¶ 6.

1    The Debtors have also already (i) completed one of the largest capital raises in chapter 11
2    history, (ii) distributed billions of dollars to creditors and other parties in interest, (iii) funded the
3    various trusts established under the Plan, including the Fire Victim Trust and Subrogation Wildfire
4    Trust, (iv) distributed approximately 1.5 billion common shares to the Fire Victim Trust, the
5    public and others, and raised billions through new debt and equity offerings, and (v) paid nearly
6    $5 billion to the Go-Forward Wildfire Fund in compliance with A.B. 1054. *Id*. ¶¶ 6–8. The Fire
7    Victim Trustee and Subrogation Wildfire Trustee have been appointed and, pursuant to the
8    Channeling Injunction, each of their respective trusts have assumed all liability for the Fire Claims
9    of their respective constituencies. *Id*. ¶ 9. The Fire Victim Trustee and claims administrator have
10   commenced their review of the various Fire Victim Claims that were channeled to the Fire Victim
11   Trust on the Effective Date to enable them to commence making timely distributions to Fire
12   Victim Claimants. *Id*. The Reorganized Debtors have also executed the transfer of certain causes
13   of action to the Fire Victims Trust that the Fire Victim Trustee may pursue for the benefit of Fire
14   Victims. *Id*.

15   Therefore, under the plain language of the Bankruptcy Code and Ninth Circuit precedent,
16   the Court finds that the Plan has been substantially consummated. *Stockton*, 909 F.3d at 1264.

17   **C.    Harm and Prejudice to Third Parties**

18   In considering whether the relief sought in an appeal "would bear unduly on innocent third
19   parties," the Ninth Circuit considers whether it is possible to alter the plan "in a way that does not
20   affect third party interests to such an extent that the change is inequitable." *Transwest Resort*, 801
21   F.3d at 1169 (quoting *Thorpe*, 677 F.3d at 882). The Ninth Circuit held that this factor weighed in
22   favor of dismissal where "reversal of the Confirmation Order would undermine the settlements
23   negotiated with the unions, pension plan participants and retirees, bond creditors, and capital
24   market creditors, all of which were built into the reorganization plan." *Stockton*, 909 F.3d at 1264.

25   This appeal would unquestionably undermine the various interdependent Settlements that
26   were the foundation of the Plan and the numerous distributions to creditors and constituencies,
27   including to the holders of Fire Victim Claims who voted overwhelmingly in favor of the Plan.
28   The issues raised in the appeal could very easily require a wholesale restart of the chapter 11

1 process, to the detriment and prejudice of more than 80,000 Fire Victim Claimants and thousands
2 of creditors and public shareholders.

3      Further, the relief sought in the appeal would severely prejudice the parties who have
4 provided billions of dollars of new debt financing and equity investment to the Debtors in reliance
5 on the restructuring and claim settlements embodied in the Plan and the ongoing trading by the
6 public in the Reorganized Debtors' securities—all based on the implementation of the Plan and
7 the ongoing effectiveness of the Plan and the Confirmation Order, and in reliance on the capital
8 structure the Reorganized Debtors established.  The relief sought in the appeal would also likely
9 eliminate any ability of the Debtors to comply with A.B. 1054, and obtain the benefit and
10 protection of the Go-Forward Wildfire Fund, which is key to the success of the Debtors'
11 reorganization effort and essential to the customers they serve on an ongoing basis.  The prejudice
12 to third parties and to all interested parties is clear, and the Court will not unravel the Plan to the
13 detriment of these parties, including Fire Victims whose distributions would be substantially
14 delayed.[4]

15     **D.**    **The Court Cannot Fashion Effective and Equitable Relief**

16      Finally, the Ninth Circuit has directed a reviewing court to dismiss an appeal as equitably
17 moot where the relief requested "would create chaos and undo years of carefully negotiated
18 settlements." *See, e.g.*, *Stockton*, 909 F.3d at 1265.  That is exactly the effect that this appeal
19 would have.  In fact, Appellant acknowledges that her appeal "challenge[s] the Plan's foundation,"
20 and the Plan "may have to be undone."  Opp. at 8.  These highly complex transactions cannot be
21 undone in any reasonable way by the Court, and the Reorganized Debtors, creditors, and third
22 parties are "entitled to rely on [the Confirmation Order]."  *Mortgages*, 771 F.3d at 1215.  To claw
23 back distributions and other transfers would create an "uncontrollable situation for the bankruptcy

---

[4] Appellant's reliance on the Supreme Court's decision in *Merit Management Group, LP v. FTI Consulting, Inc.*, 138 S. Ct. 883 (2018), is misplaced.  Opp. at 16.  That decision considered the scope of the safe harbor provision under section 546(e) of the Bankruptcy Code, which limits the power of the trustee in bankruptcy to bring avoidance actions.  *See id.*  That issue has no bearing on the question of equitable mootness, and that decision did not address the expectations of third parties who justifiably rely on a Bankruptcy Court's confirmation order in choosing to invest in the future of a reorganized debtor.

United States District Court
Northern District of California

court." *Transwest Resort*, 801 F.3d at 1168.

After nearly seventeen months of negotiations and complex settlements, regulatory proceedings concerning the Plan, and a confirmation hearing that spanned several weeks, Appellant, who did not request a stay, wants a second chance to collaterally attack the Plan. But any relief that might be provided through this appeal would result in chaos that would harm the thousands of Fire Victims and other stakeholders who have relied on the Plan and Confirmation Order.

## IV. CONCLUSION

For the foregoing reasons, the Reorganized Debtors' Motion to Dismiss the appeal is **GRANTED**. The Clerk is directed to terminate this appeal and close the case.

**IT IS SO ORDERED.**

Dated: 11/12/2020

*Haywood S. Gilliam Jr.*
HAYWOOD S. GILLIAM, JR.
United States District Judge