# EXHIBIT A

# United States Bankruptcy Court, Northern District of California

Fill in this information to identify the case (Select only one Debtor per claim form):

☒ PG&E Corporation (19-30088)

☒ Pacific Gas and Electric Company (19-30089)

☒ Date Stamped Copy Ret'
☐ No Self-Addressed Stamped L......
☐ No Copy Provided

## Official Form 410

# Proof of Claim

04/16

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

Unless an exception in the Bar Date Order applies to you, you should not use this form to submit a claim that arises out of or relates to the fires that occurred in Northern California prior to January 29, 2019.

---

**Part 1:** Identify the Claim

**1. Who is the current creditor?**

GEORGE L ENGEL

Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☒ No
☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

☐ Date Stamped Copy Returned
☐ No Self-Addressed Stamped Envelope
☐ No Copy Provided

Where should notices to the creditor be sent?

GEORGE L ENGEL
12116 HORSESHOE LN
NEVADA CITY CA  95959-3570

Contact phone 415-370-5943
Contact email larry@engeladvice.com

Where should payments to the creditor be sent? (if different)

Name

Number          Street

City                    State           ZIP Code

Contact phone _____
Contact email _____

**4. Does this claim amend one already filed?**

☒ No
☐ Yes. Claim number on court claims registry (if known) _____

Filed on _____ / _____ / _____
MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☒ No
☐ Yes. Who made the earlier filing? _____

193008880010534
1930088CUST

**6. Do you have any number you use to identify the debtor?**

☒ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor:  ____ ____ ____ ____

**7. How much is the claim?**  $25,070.72 plus others. See Attached

Does this amount include interest or other charges?

☒ No but I reserve interest and charges. See Attached.

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

See Attachment. Claims and reservations for PSPS blackouts

**9. Is all or part of the claim secured?**

☒ No

☐ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**  $_____

**Amount of the claim that is secured:**  $_____

**Amount of the claim that is unsecured:**  $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**  $_____

**Annual Interest Rate** (when case was filed) _____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☒ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.**  $_____

**11. Is this claim subject to a right of setoff?**

☐ No

☒ Yes. Identify the property: See Attachment reserving setoff etc.

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☐ No

☒ Yes. *Check one:*

**Amount entitled to priority**

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

$_____

☐ Up to $2,850 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).

$_____

☐ Wages, salaries, or commissions (up to $12,850) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).

$_____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).

$_____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).

$_____

☒ Other. Specify subsection of 11 U.S.C. § 507(a)(**2**) that applies. *See Attached* $ 25,070.72 administrative claim *plus more, See Attachment.*

\* Amounts are subject to adjustment on 4/01/19 and every 3 years after that for cases begun on or after the date of adjustment.

---

## Part 3: Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

*Check the appropriate box:*

☒ I am the creditor.
☐ I am the creditor's attorney or authorized agent.
☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.
☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date  10/10/19  (mm/dd/yyyy)

*George Larry Engel* (signature)
Signature

**Print the name of the person who is completing and signing this claim:**

Name   George      Larry      Engel
          First name        Middle name        Last name

Title   _____

Company   _____
          Identify the corporate servicer as the company if the authorized agent is a servicer.

Address   12116 Horseshoe Lane
          Number      Street
          Nevada City,      CA      95959
          City      State      ZIP Code

Contact phone   415-370-5943      Email   larry@engeladvice.com

PG&E Corporation
c/o Prime Clerk LLC
Grand Central Station, PO Box 4850
New York, NY 10163-4850

**IMPORTANT LEGAL NOTICE**

FIRST-CLASS MAIL
PRESORTED
U.S. POSTAGE PAID
SEYMOUR, IN
PERMIT NO. 341

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*AUTO\*\*5-DIGIT 95959
B02901241 \*\*001\*\* 1\*12116\*203
 BDN PGE SRF 34081 PACKID:0001996543
GEORGE L ENGEL
12116 HORSESHOE LN
NEVADA CITY CA  95959-3570



# IMPORTANT LEGAL NOTICE

*This Notice was authorized by a federal court. Read it carefully. Your rights are at stake.*

# Instructions for Proof of Claim

These instructions and definitions generally explain the law. In certain circumstances, such as bankruptcy cases that debtors do not file voluntarily, exceptions to these general rules may apply. You should consider obtaining the advice of an attorney, especially if you are unfamiliar with the bankruptcy process and privacy regulations.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157 and 3571.

## How to fill out this form

- Fill in all of the information about the claim as of January 29, 2019.
- Fill in the caption at the top of the form.
- If the claim has been acquired from someone else, then state the identity of the last party who owned the claim or was the holder of the claim and who transferred it to you before the initial claim was filed.
- Attach any supporting documents to this form. Attach redacted copies of any documents that show that the debt exists, a lien secures the debt, or both. (See the definition of *redaction* on the next page.)

  Also attach redacted copies of any documents that show perfection of any security interest or any assignments or transfers of the debt. In addition to the documents, a summary may be added. Federal Rule of Bankruptcy Procedure (called "Bankruptcy Rule") 3001(c) and (d).

- Do not attach original documents because attachments may be destroyed after scanning.
- If the claim is based on delivering health care goods or services, do not disclose confidential health care information. Leave out or redact confidential information both in the claim and in the attached documents.
- A *Proof of Claim* form and any attached documents must show only the last 4 digits of any social security number, individual's tax identification number, or financial account number, and only the year of any person's date of birth. See Bankruptcy Rule 9037.
- For a minor child, fill in only the child's initials and the full name of the child's parent or guardian. For example, write *A.B., a minor child* (*John Doe, parent*). See Bankruptcy Rule 9037.

## Confirmation that the claim has been filed

To receive confirmation that the claim has been filed, either enclose a stamped self-addressed envelope and a copy of this form. You may view a list of filed claims in this case by visiting the Claims and Noticing Agent's website at https://restructuring.primeclerk.com/pge.

## Understand the terms used in this form

**Administrative expense:** Generally, an expense that arises after a bankruptcy case is filed in connection with operating, liquidating, or distributing the bankruptcy estate. 11 U.S.C. § 503.

**Claim:** A creditor's right to receive payment for a debt that the debtor owed on the date the debtor filed for bankruptcy. 11 U.S.C. §101 (5). A claim may be secured or unsecured.

**Creditor:** A person, corporation, or other entity to whom a debtor owes a debt that was incurred on or before the date the debtor filed for bankruptcy. 11 U.S.C. § 101 (10).

**Debtor:** A person, corporation, or other entity who is in bankruptcy. Use the debtor's name and case number as shown in the bankruptcy notice you received. 11 U.S.C. § 101 (13).

**Evidence of perfection:** Evidence of perfection of a security interest may include documents showing that a security interest has been filed or recorded, such as a mortgage, lien, certificate of title, or financing statement.

**Information that is entitled to privacy:** A *Proof of Claim* form and any attached documents must show only the last 4 digits of any social security number, an individual's tax identification number, or a financial account number, only the initials of a minor's name, and only the year of any person's date of birth. If a claim is based on delivering health care goods or services, limit the disclosure of the goods or services to avoid embarrassment or disclosure of confidential health care information. You may later be required to give more information if the trustee or someone else in interest objects to the claim.

**Priority claim:** A claim within a category of unsecured claims that is entitled to priority under 11 U.S.C. § 507(a). These claims are paid from the available money or property in a bankruptcy case before other unsecured claims are paid. Common priority unsecured claims include alimony, child support, taxes, and certain unpaid wages.

**Proof of claim:** A form that shows the amount of debt the debtor owed to a creditor on the date of the bankruptcy filing. The form must be filed in the district where the case is pending.

**Redaction of information:** Masking, editing out, or deleting certain information to protect privacy. Filers must redact or leave out information entitled to **privacy** on the *Proof of Claim* form and any attached documents.

**Secured claim under 11 U.S.C. § 506(a):** A claim backed by a lien on particular property of the debtor. A claim is secured to the extent that a creditor has the right to be paid from the property before other creditors are paid. The amount of a secured claim usually cannot be more than the value of the particular property on which the creditor has a lien. Any amount owed to a creditor that is more than the value of the property normally may be an unsecured claim. But exceptions exist; for example, see 11 U.S.C. § 1322(b) and the final sentence of § 1325(a).

Examples of liens on property include a mortgage on real estate or a security interest in a car. A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment may be a lien.

**Setoff:** Occurs when a creditor pays itself with money belonging to the debtor that it is holding, or by canceling a debt it owes to the debtor.

**Unsecured claim:** A claim that does not meet the requirements of a secured claim. A claim may be unsecured in part to the extent that the amount of the claim is more than the value of the property on which a creditor has a lien.

## Offers to purchase a claim

Certain entities purchase claims for an amount that is less than the face value of the claims. These entities may contact creditors offering to purchase their claims. Some written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court, the bankruptcy trustee, or the debtor. A creditor has no obligation to sell its claim. However, if a creditor decides to sell its claim, any transfer of that claim is subject to Bankruptcy Rule 3001(e), any provisions of the Bankruptcy Code (11 U.S.C. § 101 et seq.) that apply, and any orders of the bankruptcy court that apply.

## Please send completed Proof(s) of Claim to:

**If by first class mail:**
PG&E Corporation Claims Processing Center
c/o Prime Clerk LLC
Grand Central Station, PO Box 4850
New York, NY 10163-4850

**If by overnight courier or hand delivery:**
PG&E Corporation Claims Processing Center
c/o Prime Clerk LLC
850 Third Avenue, Suite 412
Brooklyn, NY 11232

**You may also hand deliver your completed Proof(s) of Claim to any of the following service center offices (beginning July 15, 2019 through the Bar Date (October 21, 2019) during the hours of 8:30 a.m. – 5:00 p.m. Prevailing Pacific Time):**

Chico Service Center
350 Salem Street
Chico, CA 95928

Marysville Service Center
231 "D" Street
Marysville, CA 95901

Napa Service Center
1850 Soscol Ave. Ste 105
Napa, CA 94559

Oroville Service Center
1567 Huntoon Street
Oroville, CA 95965

Redding Service Center
3600 Meadow View Road
Redding, CA 96002

Santa Rosa Service Center
111 Stony Circle
Santa Rosa, CA 95401

**Photocopy machines will not be available at the Claim Service Centers; you must bring a copy of your claim if you wish to receive a date-stamped conformed copy.**

## Do not file these instructions with your form

| If by first class mail: | If by hand delivery: | If electronically: |
|---|---|---|
| PG&E Corporation Claims Processing Center c/o Prime Clerk LLC Grand Central Station PO Box 4850 New York, NY 10163-4850 **If by overnight courier:** PG&E Corporation Claims Processing Center c/o Prime Clerk LLC 850 Third Avenue, Suite 412 Brooklyn, NY 11232 | PG&E Corporation Claims Processing Center c/o Prime Clerk LLC 850 Third Avenue, Suite 412 Brooklyn, NY 11232 -or- One of following PG&E locations (beginning July 15, 2019 through the Bar Date (October 21, 2019) during the hours of 8:30 a.m. – 5:00 p.m. Prevailing Pacific Time): (i) 350 Salem Street, Chico, CA 95928; (ii) 231 "D" Street, Marysville, CA 95901; (iii) 1567 Huntoon Street, Oroville, CA 95965; (iv) 3600 Meadow View Road, Redding, CA 96002; (v) 111 Stony Circle, Santa Rosa, CA 95401; or (vi) 1850 Soscol Ave. Ste 105, Napa, CA 94559. **Photocopy machines will not be available at the Claim Service Centers; you must bring a photocopy of your claim if you wish to receive a date-stamped copy.** | Access the case website established by Prime Clerk, www.pgecustomerbardateinfo.com, click the "Submit a Claim" link and follow the instructions as described. |

Any claimant that timely files a Proof of Claim and makes a good faith effort to complete a Proof of Claim Form as set forth in the Bar Date Order, shall be permitted to revise, amend, and/or supplement their applicable Proof of Claim Form to the extent permitted by applicable law until such time as their claim is allowed or disallowed by order of the Court. Proof of Claim Forms will be deemed filed only when actually received at the addresses listed above or electronically on or before the Bar Date. If you submit a Proof of Claim Form via the Electronic Filing System, you will receive an email confirmation generated by the Electronic Filing System with an image of your filed Proof of Claim Form. Proof of Claim forms may not be delivered by facsimile, telecopy, or electronic mail transmission (other than Proofs of Claim filed electronically through the Electronic Filing System on the Prime Clerk website).

**Future Notifications**

If you would like to receive further updates, you may register your email address for electronic notification of important case documents at the website maintained by Prime Clerk, at www.pgecustomerbardateinfo.com. If you require additional information regarding this notice, you may contact Prime Clerk at (844) 627-7787 (toll free) for U.S.-based parties; or +1 (347) 292-2703 for International parties or by e-mail at: pgecustomerbardateinfo@primeclerk.com. **Please note that Prime Clerk cannot provide legal advice, nor can it advise you as to whether you should file a Proof of Claim.**

---

### About the Chapter 11 Case

*On January 29, 2019, PG&E Corporation and Pacific Gas and Electric Company each filed a petition under Chapter 11 of the Bankruptcy Code in the U. S. Bankruptcy Court for the Northern District of California. The Chapter 11 Cases are being jointly administered under the lead case In re PG&E Corporation and Pacific Gas and Electric Company, Case No. 19-30088 (DM). To find more information on PG&E's Chapter 11 Cases, please visit http://www.pge.com/reorganization.*

*Copies of all of the documents filed in the Chapter 11 Cases, including the Bar Date Order and the Proof of Claim Form, can be viewed and/or obtained from the Debtors' notice and claims agent, Prime Clerk, at https://restructuring.primeclerk.com/pge.*



**Pacific Gas and Electric Company**®

### *IMPORTANT LEGAL NOTICE*

Dear PG&E Customer,

You have received this mailing because PG&E Corporation and Pacific Gas and Electric Company (collectively, "PG&E") have reached the next step in their Chapter 11 Cases: the setting of the "Bar Date." The Bar Date is the deadline by which any person or entity must file a Proof of Claim **if they believe money is owed to them by PG&E for the period <u>prior</u> to the January 29, 2019, Chapter 11 filing**. The U.S. Bankruptcy Court for the Northern District of California has set the Bar Date at **October 21, 2019 at 5:00 p.m. Prevailing Pacific Time**.

This deadline is important because, as part of the Chapter 11 process, PG&E must determine all amounts claimed to be owed to various creditors. The Bar Date and the procedures for filing Proofs of Claim apply to all claims against PG&E that arose before the filing date, January 29, 2019.

**What You Need to Know About the Bar Date**

1. **All PG&E customers are receiving this notice.** Receiving this notice does <u>not</u> mean that you have a claim or that PG&E or the Bankruptcy Court believes that you have a claim.

2. **Note that customers are <u>not</u> required to file Proofs of Claim for ordinary and customary refunds, overpayments, billing credits, deposits, or similar billing items**. Inquiries relating to these items should continue to be directed to PG&E's customer service center.

3. <u>**If you do not believe you have a claim against PG&E, you do not need to do anything in response to this Notice or return a Proof of Claim Form.**</u>

4. To the extent you believe that you have a claim that arose before January 29, 2019, or that you are otherwise owed money by PG&E from before the filing date that has not been paid (other than an amount referenced in paragraph 2 above), you **MUST** file a Proof of Claim by the **October 21, 2019** Bar Date. If you fail to do so your claim may be barred and you may not receive any distribution.

5. **IF YOU BELIEVE YOU HAVE A CLAIM ARISING OUT OF OR IN ANY WAY RELATING TO THE NORTHERN CALIFORNIA FIRES[1] YOU MUST FILE THE APPLICABLE FIRE PROOF OF CLAIM FORM BY THE BAR DATE, WHICH CAN BE FOUND AT** WWW.PGECUSTOMERBARDATEINFO.COM.

6. If you have already submitted a claim to PG&E's claims agent, Prime Clerk, prior to receiving this notice, you do **not** need to file another Proof of Claim.

**How to File a Proof of Claim**

Enclosed is a Proof of Claim Form to be used for any claims other than for claims related to the Northern California Fires. As noted above, if you believe you have a claim arising out of or in any way relating to the Northern California Fires, you must file the applicable Fire Proof of Claim Form by the Bar Date. All Proof of Claim Forms (including Fire Proof of Claim Forms) must be filed so as to be received on or before **October 21, 2019 at 5:00 p.m. (Prevailing Pacific Time)** as follows:

Attachment to Proof of Claim of "Creditor" George Larry Engel as to the Chapter 11 Cases Of PG&E Corporation (No. 19-30088) and Pacific Gas And Electric Company (No. 19-30089) Pending in the US Bankruptcy Court for the Northern District of California

Preservation And Reservation of Claims that Creditor Contends Are Administrative Claims Arising Post-petition (Or Later), While the Debtors May Attempt Incorrectly To Contend Instead that Such Are Pre-petition Claims That Debtors Can Dispute And Could Bar, If Not Timely Filed Now.

### 1. Some Reasons for This "Protected Claim" Filing Now.

Creditor makes this protective filing now in order to reserve, preserve and enforce any and all **"PSPS Claims," "PSPS Remedies,"** and other "claims" addressed in this proof of claim collectively as **"Protected Claims,"** all as defined below. This is done in as a defensive measure, among other things, based upon Debtors' refusal to reassure Creditor about his stated concerns inspiring this protective filing on account of various threat clues in various Debtor bankruptcy filings in this administratively consolidated case, including without limitation in Debtors' Bar Date Motion and Debtors' First Amended Joint Plan of Reorganization, as amended from time to time (the **"Plan"**), as to how Debtors' may adversely interpret and attempt to enforce the Bankruptcy Court's Bar Date Order (eg, clues such as excessive releases, exculpations, injunctions relating to Debtors' Plan's objectionably defined or used certain terms such as "**Causes of Action**" and "**claim**"). (When used with respect to Debtors' joint Plan references, the Plan definitions apply herein for clarity as to Debtors' disputed positions without any admission or other prejudice to Creditor, since relevant definitions and other adverse effects of the Plan on Creditor are disputed by Creditor and objectionable.) Creditor believes his such PSPS Claims and other Protected Claims addressed herein to be post-petition, administrative claims that Creditor intends to preserve, reserve and enforce, regardless of however else the Debtors may attempt to characterize such claims, such as "**unmatured**" or "**contingent**" prepetition "claims" or otherwise. Whatever the reality, Creditor is intending at all times and circumstances to reserve his PSPS Claims and other Protected Claims, even as to the future events, damages, and harms that may or may not occur in the future, but as to which Debtors may contend the filing of this protective proof of claim now is essential for the preservation and enforcement of such claims, even as to damages or other harms with respect to future events, such as allegedly based on or arising from prepetition conditions. Neither the mention of such claims in this proof of claim, nor anything else herein or hereby, shall waive, release, impair, or otherwise adversely affect any such administrative claim or other rights of Creditor.

### 2. "PSPS Claims" Entitling Creditor to "PSPS Remedies" as to "E System Flaws" Or Wrongful Conduct by Any Debtor as Additional "Protected Claims," as Supported by "Key PSPS POC Documents," Among Other Things

This proof of claim reserves, preserves and enforces any and all Protected Claims, including without limitation any and all PSPS Claims and PSPS Remedies, as defined below and explained or illustrated herein. However, to the extent that the CPUC or FERC may have

Case: 19-30088    Doc# 9653-3    Filed: 12/01/20    Entered: 12/01/20 14:21:55    Exhibit A
of 44
Page 8 of 31

paramount or other jurisdiction over such claims or remedies, Creditor is not waiving, releasing, impairing or otherwise adversely affecting the same, but instead is preserving his cumulative rights, remedies, and claims. This proof of claim is filed under the compulsion of the Bar Date Order in this case in order to protect Creditor from any asserted forfeiture of claim by reason of such bar date, and Creditor reserves the right to amend and supplement this proof of claim for any and all purposes and to the extent permitted by applicable law.

Except as specified in the official form and attached invoice liquidating that known and accrued specified claim, the amount of each other Claim at this time is contingent, unliquidated and unknown, and this proof of such claims is filed out of an abundance of caution in order to assure that Creditor is not barred from a recovery under any Debtor theory or from amending or supplementing this proof of claim. The following is only a required summary, and it does not fully describe or document the Claims and the amounts, obligations, duties and/or indebtedness due. Nothing in this proof of claim is intended to restrict, alter, impair, estop, waive, release, amend, and/or modify any instrument, document, agreement, lien, encumbrance, right, setoff, right of recoupment, defense, remedy, interest, cause of action, and/or other claim or matter of Creditor in any form whatsoever, all of which are reserved. This proof of claim is based on Creditor's present understanding of information currently available to Creditor and is subject, from time to time, (i) to supplements, changes, amendments and/or modifications, including with respect to the amounts, obligations, claims, causes of action, duties, liabilities, and/or indebtedness due Creditor, and (ii) to assertion of additional claims, whether legal or equitable or otherwise, to the maximum extent permitted by applicable law, as well as additional documentation, support, or evidence, including as the relevant realities are exposed or revealed by evidence presented in the relevant proceeding records, by any probation, legal or regulatory compliance filings by either Debtor, or by discovery, rulings, testimony, or developments in any relevant proceedings, including those referenced in the Key PSPS POC Documents definition.

To the extent any amount is owed by PG&E or PG&E Corp for any Protected Claims, that amount should be increased to include accrued and accruing interest and legal fees, to the extent provided by applicable contract or law. The Claims also include any other unliquidated and/or contingent amounts for direct, indirect, nominal or consequential damages and other amounts owed or owing to Creditor, whether or not fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured.

### A. "E System Flaws" Evidenced in "Key PSPS POC Documents."

Among other things, a basis for PSPS Claims, PSPS Remedies, and most other Protected Claims is that for decades either or both Debtors, either negligently, grossly negligently, recklessly, willfully, intentionally, or otherwise wrongfully or contrary to applicable laws and regulations, (i) have created, acquired, maintained and cared for their electric system in such a manner that it has become unsafe or dangerous to operate, especially on windy days when it is

hot and dry, which conditions are not unusual, and (ii) have also caused that system otherwise to suffers from, or be otherwise subject to, other "**E System Flaws,**" as defined below. Such a Debtor pattern and practice of wrongful or claim creating conduct is illustrated in the **"Key PSPS POC Documents."** Debtors have also failed, including as part of PG&E's monopoly obligation to serve Creditor and others, to maintain, upgrade and improve the system for foreseeable conditions of use that preserve operating capacity, especially without PSPS blackouts to the maximum extent feasible (eg, with much more undergrounding), as other utilities like SDG&E have earlier done in establishing better and even minimum acceptable systems and practices. Those continuing failures to prevent, reduce and correct E System Flaws, including by reducing the need for PSPS blackouts with undergrounding and other improvements, create continuing additional PSPS Claims. (Some of those E System Flaws and better alternatives have been admitted or implicitly conceded by PG&E in its Wildfire Mitigation Plan filed with the CPUC, in its filings with Judge Alsup in its probation proceeding, or in other Key PSPS POC Documents, including where PG&E now seeks to do some what it could and should have done long ago, such as by belatedly following the SDG&E lead, including by more undergrounding to reduce the need or excuse for excessive PSPS blackouts). Each of the Key PSPS POC Documents and other documents supporting claims is (i) in the possession of Debtors; and (ii) voluminous. Such supporting documentation are available from Creditor to the extent required to be (subject to applicable laws and rules and entry of appropriate confidentiality agreements, to the extent necessary and satisfaction of the requester's standing) upon written request to Creditor.

### B. Each Debtor's Role In Such Matters.

Creditor is informed and believes that this objectionable and actionable PG&E conduct and such E System Flaws and PSPS Claims resulted from the direction or actionable participation of its shareholder, PG&E Corporation, with the intent and effect of (i) increasing the equity value and returns to PG&E Corporation at the expense of safety and even minimum required performance without so many or so long PSPS blackouts, and (ii) evading or failing compliance with applicable laws and regulations, especially those assuring that PG&E could timely and safely perform its obligations to serve its public trust obligations to its customers and other obligee parties, including Creditor. (Such concerns about PG&E Corporation have been confirmed, for example, (a) by the requirements of AB 1054, where the Legislature and Governor have attempted to assure through the CPCU process that such objectionable Debtor governance and PG&E's criminal history does not repeat itself, and (b) by the "Securities Fraud Suit" and other "Key PSPS POC Documents" defined below.) Although Debtors must have been long aware of the climate and other foreseeable changes and other external operating conditions affecting their system, and were therefor required to adapt earlier to those conditions, as SDG&E and others did, Debtors' system would still have been dangerous and unsafe even without any such climate or other changes, because the insufficiently updated system was flawed and allowed to deteriorate and, worse, was wrongfully operated by Debtors in a "run to failure" approach criticized in Key PSPS POC Documents. For example, it is irrefutable that Debtors allowed at least hundreds of thousands of large trees to grow next to

PG&E wires and poles where applicable laws and regulations required them to have clear and safe spaces, including in Creditor's neighborhood. This is confirmed by the fact that the PG&E Wildfire Mitigation Plan now requires a decade of intense effort to attempt to correct such E System Flaw dangers in order to restore even the basic minimum tolerable position in which such system should have been operating all along and, if complied with, would have reduced the need for PSPS blackouts now and at least their duration and frequency. Moreover, applicable laws and regulations required more of the Debtors, which may be one of many reasons why the Debtors' records and reporting were so incorrect and deficient on such topics and others, for example, as demonstrated in complaint filed on behalf of shareholders as the "Securities Fraud Complaint," in the Monitor's report to Judge Alsup, and in other Key PSPS POC Documents, as defined below. Furthermore, even as PG&E has attempted to apply its new "hardening" plans in Creditor's neighborhood, many vegetation and other dangers continue to exist there and, because Debtors' negligently, grossly negligently, recklessly or willfully chose that inferior, inadequate approach to the undergrounding that would have reduced the need for PSPS blackouts, Debtors caused Creditor to purchase and install a natural gas generator to partly mitigate Creditor's damages, as described in this proof of claim.

Among circumstantial other evidence for such PSPS Claim allegations supported by the Key PSPS POC Documents is that such investor owned utilities historically (and as properly run) were considered and operated as conservative investments for pension funds, insurance companies and the like, since the utility was only entitled to a regulated cost recovery plus a reasonable and regulated rate of return. However, now as to Debtors, as is indisputable in the record of Debtors' Chapter 11 cases, hedge funds and private equity funds are buying massive claims, proposing huge investments, and otherwise competing in battles for control of the reorganized Debtors. Since such hedge and PE funds require high minimum returns of at least many times higher than any regulated utility's reasonable and normal rate of return (eg, a minimum of 25% and often much more versus maybe something like 6%), there must be some value opportunity for such controlling equity holders that they perceive as worth fighting for to achieve somehow far more than that lesser permitted reasonable regulatory rate of return. A properly run utility should not interest such aggressive high yield funds. By analogy, this is like a situation where a felon on parole owner of an ordinary cab runs it into a dilapidated condition where it is unsafe or dangerous to operate (much less to carry passengers) under various seasonally common conditions (and under occasional, worse conditions), but where now two different teams of race car drivers are competing in an extremely aggressive and high cost manner to buy that old cab for regulated use that still has to operate at regulated rates and terms. Why, unless some objectionable prior history of mysteriously high yield returns is to be repeated somehow?

### C. "PSPS Blackouts" And Related "PSPS Claims" As Defined Below.

In any event, in order to reduce Debtors' risk of liability and mitigate their damages for that dangerous and unsafe system causing more fires and harms, Debtors have embraced a problematic solution of Public Safety Public Shutoff (**"PSPS"**) blackouts to simply shut off the power on windy days when it is hot and dry, subject to various evolving regulatory tests and

4

standards responding to that public safety threat that should not exist, at least at that level of risk. Because the PSPS trigger conditions commonly occur in fire season and such dangers by such E System Flaws require not only long periods without electric service, but even longer periods for checking the wires before re-energizing the system for resumed service to customers, the Debtors have wrongfully created and are now perpetuating a bigger problem than should or could exist, if there had been timely and complete compliance with applicable laws and regulations and other practices and actions needed to prevent E System Flaws, including following the better SDG&E minimum practices with better and more improvements, such as more undergrounding. If before now Debtors had complied with applicable laws and regulations and otherwise conducted themselves properly to avoid or reform E System Flaws, the system could better operate safely under many conditions where it will now be shut off by PSPS blackouts that are unreasonable and excessive, especially since they are unnecessary and only needed because of the dangerous E System Flaws that Debtors wrongfully created in the first place. Furthermore, if and when a safer system would still be shut off properly for extraordinary conditions, the delay in resuming service would be much shorter, as is apparent from comparing the performance differences between PG&E and SDG&E.

In order for Creditor to protect himself from adverse consequences of excessive and unreasonable PSPS blackouts by Debtors and to mitigate my damages, Creditor has had to purchase and install the referenced Kohler natural gas generator to provide electricity to Creditor's home (and home office) when PG&E was not performing its obligations to serve Creditor with electricity. Those invoices are among the Key PSPS POC Documents. That amount is a liquidated part of Creditor's PSPS Claim, and that is an exercise of Creditor's PSPS Remedy to mitigate his damages with such acquisitions and, when permitted, to recoup or offset them against any amounts that Creditor may at any time owe to PG&E or its successor.

In effect, Debtors have used the concept of mitigation of their liabilities (for their many violations of laws and regulations, negligence, gross negligence, reckless or intentional misconduct, and other wrongs, such as reported in the Key PSPS POC Documents) in order to use PSPS blackouts attempt to preserve equity value and shift problems that the Debtors have created instead to Creditor and to their customers and entire communities. That is especially applicable here, where Debtors could have provided a better solution (eg, with undergrounding and SDG&E type smaller circuits to shut off the smallest possible areas) that would have eliminated or reduced PSPS blackouts in Creditor's community, but, instead, Debtors wrongfully chose to adopt a less effective so-called hardening solution that will cause unreasonable and excessive PSPS blackouts for at least a decade in order to amortize Debtors' costs, so as to preserve PG&E Corp's shareholder equity, wrongfully prioritizing shareholders over customers entitled to service without such excessive and unreasonable PSPS blackouts. While Debtors predictably will attempt to claim immunity or excuses, such as based on Debtors' disputed interpretations of CPUC rulings or those of its probation court, permission for such a wrongdoer (especially a felon on parole) to shut down for public safety needs caused by dangers that Debtors created (or made worse) is not the same as immunity for the E System Flaws that Debtors created, much less for PSPS Claims or any other Protected Claims; it's just a less

harmful, but still wrongful, mitigation of the damages from greater continuing wrongs, including as illustrated in the Key PSPS POC Documents.

### D. The Post-petition Character of the PSPS Claims For "Excessive" Or Unreasonable PSPS Blackouts

To the maximum extent permitted by law, all Protected Claims shall be asserted and enforced one way or another, but ideally as what they should be: as post-petition administrative claims (or, if occurring after the confirmation of a plan of reorganization, by a reorganized PG&E or its other successor as post-bankruptcy claims against that successor.) By analogy, consider a situation where a criminal mine owner next to a river creates a toxic mine water out-flooding problem that it plans to manage during a decade of planned, gradual future remediation with an interim dam at the mine entrance and an insufficient overflow pond to attempt to hold back the toxic water from further poisoning the river and destroying the economics of the town and the health of its residents. However, since that interim water retention solution may be inadequate under some foreseeable conditions whenever the water after heavy rains threatens to overwhelm the dam and holding pond, the mine owner gets interim permission from the EPA to release enough water from that flawed system in order to save the dam and holding pond from washing out entirely and flooding everything in an even more massive, toxic tidal wave. That emergency toxic water pressure release accommodation does not mean that the locals who now choose to mitigate their damages, such as by drilling safe wells and/or buying water filtration or storage devices, have no claim, because their river water is still now more poisoned from that interim continuing conduct. The same is true here by analogy with the coming decade of excessive and unreasonable PSPS blackouts, whose reasonableness or excessiveness must be judged by the fact that they are caused by Debtors' wrongfully created E System Flaws and the selfish Debtors' refusal properly to mitigate those dangerous conditions with better solutions, such as by what SDG&E has done, especially with more undergrounding and micro circuits to narrow the blackouts as much as possible.

This proof of claim preserves Creditor's right to all PSPS Claims and other claims relating to Debtors' failing properly to upgrade and maintain the system, so that it is in compliance with applicable laws and regulations and is safe to operate without excessive or unreasonable PSPS blackouts. (Where as used everywhere herein, "**excessive**" includes whatever is more than the law requires Creditor to tolerate or whatever is unreasonable by any applicable legal test.) Furthermore, each and every excessive or unreasonable PSPS blackouts entitles Creditor to every PSPS Claim and other relevant claim for any and all damages that he may suffer and other PSPS Remedies in accordance with applicable laws and regulations, including as well as for any mitigation expenses and costs that Creditor may incur, together with claims for equitable, implied and other indemnity for any claims against Creditor for what any Debtor has done or not done as required by applicable laws, regulations, contracts, tariffs, and other obligations.

### 3. Other Protected Claims.

While it is not yet clear what will be the fate of the Debtors' objectionable Plan or any competing plan of reorganization, such a plan could be attempted or confirmed that could result in or reveal other Protected Claims. Debtors could also engage post-petition in other wrongful conduct, whether tortious, inequitable, in violation of applicable fiduciary duties, laws, regulations, or otherwise creating a claim, while Debtors attempt to characterize the same (incorrectly as discussed above) as some kind of unmatured, contingent, or other prepetition claim. However so characterized following the dispute with Creditor by the final order of any applicable court in such cases, that is a Protected Claim that is reserved herein.

### 4. Additional Definitions.

The following additional defined terms shall also apply herein:

"**E System Flaws**" means the flawed, defective, or wrongful designs, equipment, improvements, conditions, and circumstances relating to the PG&E electrical system for which any Debtor is directly or indirectly responsible or liable on any basis in law or equity or otherwise, including without limitation on account of noncompliance with applicable laws, regulations, probation court orders, and other requirements to be satisfied in order to avoid liability or responsibility for any of the dangerous or claim-creating conditions of that system under the foreseeable or expected circumstances under which such electrical systems and components are expected to operate or perform safely and properly consistent with applicable laws and regulations. As illustrated herein, PG&E is liable for causing (and PG&E Corporation is liable as described above for indirectly causing or for supporting or participating in), whether willfully, intentionally, recklessly, grossly negligently, negligently, otherwise tortuously, and/or in violation of applicable law and regulations (each applicable to some or all of the actionable acts or omissions at issue), such system to be designed, constructed, equipped, improved, maintained, and neglected by PG&E so badly that its system is now too defective and dangerous to operate normally, especially on windy days when it is hot and dry within the PSPS standards for the PSPS blackouts that the Debtors have directly or indirectly made necessary or required, all as explained in this proof of claim or referenced in the Key PSPS POC Documents. This includes the commonly asserted claim by fire victims and other critics that PG&E long operated its neglected system on a "run to failure" approach, illustrated by the Caribou line near Paradise that PG&E abandoned after the fire. Now that the neglected and defective system and components are failing, PG&E (and, to the extent applicable, PG&E Corporation) is liable whenever it is shifting the related problems, burdens and risks to its customers and their communities and governmental units, including Creditor, by excessive or unreasonable PSPS blackouts etc for which Debtors must be accountable and as to which the quickest, best, least disruptive, and otherwise more effective mitigation solutions must be used instead, eg, by following the better practices of SDG&E, such as using more undergrounding and micro circuits in areas like where Creditor lives. The reasons and causes for that situation are all E System Flaws, in addition to other flaws identified or referenced in this proof of claim or in the "Key PSPS POC Documents." The same PG&E system causes for fires for which PG&E is liable are now also causes for excessive or unreasonable PSPS blackouts, eg, as Debtors' objectionable and unsatisfactory attempt (i) to mitigate the risks and harms that they have created with more

Case: 19-30088    Doc# 9653-3    Filed: 12/01/20    Entered: 12/01/20 14:21:55    Page 15
of 44

wrongful conduct in excessive and unreasonable PSPS blackouts, and (ii) to shift the problems created by PG&E that expose it to liability instead to such others, like Creditor, through such blackouts in an attempt impermissibly to evade accountability for those wrongs.

"**Key PSPS POC Documents**" means, regardless of the physical, electronic, or other nature, medium or material of the same, any and all of the (i) filings, documents, evidence or admissions, (ii) rulings, decisions, or acts of any court, regulator, or other governmental or legislative committee, commission, official, authority, monitor, or agent, and (iii) any other bases cited or referenced in this proof of claim or in any other referenced objection, complaint, statement, argument or other basis, for, evidencing, proving, or supporting any "PSPS Claim," any other "Protected Claims," any requested "PSPS Remedies," or any other claims noticed or reserved in this proof of claim, including with respect to any reporting or compliance imposed or required of PG&E by Judge Alsup or his Monitor, by the Legislature in newly enacted SB 70, 167,and/or 560, or by the implementing or related CPUC regulations or proceeding, or in anything else referenced in any such references, including, for example, what else is cited or referenced in any complaints, motions, declarations, reports, other filings in referenced proceedings, or other things referenced in any Key PSPS POC Documents. The same Debtor acts, omissions, and wrongs, including any E System Flaws, that cause the risk of fire are also causing excessive and unreasonable PSPS blackouts, and may also be relevant to other claims asserted or reserved in this proof of claim, as may also any related objectionable conduct by or for any Debtor, especially where there is a wrongful pattern and practice, such as, for example, the accusations by many fire victim representatives of Debtors evading discovery by a "hide the ball and run out the game" strategy, and such as "scorched earth" litigation resistance. Those Key PSPS POC Documents include anything Creditor considers relevant in the entire relevant record at any time in any relevant proceedings in which the E System Flaws or any Debtor's relevant acts, omissions or wrongs are addressed or alleged, such as in the cases, proceedings, actions, and communications listed herein: (a) by or for any Debtor (as admissions, confessions, or other evidence against its interest, rather than its alleged excuses or defenses, whether in such cases or proceedings or in any Debtor's SEC, regulatory, probation, or other governmental filings, whether state or Federal), (b) by or for any relevant court, regulator, or other governmental monitor, official, authority, agency, or unit or legislative committee or group, or governmental commission, or (c) by or for any applicable plaintiff, PG&E adversary, declarant, PG&E monitor, critic or investigator of any Debtor (including reporters, such as the Wall Street Journal reporters inspiring Judge Alsup's (or his Monitor's) follow up probation inquiry or such as the Sacramento Bee or San Francisco Chronicle reporters or editors covering these issues), witness, or any other commentator or critic in or with respect to any such Key PSPS POC Documents. Such Key PSPS POC Documents therefore include without limitation what is directly or indirectly relevant to anything in this proof of claim in or from or related to any of the following proceedings at any time: (1) in these Chapter 11 cases, and the related adversary proceedings, cases and appeals, including the estimation proceeding before Judge Donato, which relevant documents and other things include without limitation (i) the fire or PSPS related filings [or documents or things referenced in such filings] by or for the Official Committee of Tort Claimants ("TCC"), such as their relief from stay motion filings (DKTs 2842, especially exhibit 2842-2: the Master Complaint-Individual Plaintiffs in the North Bay Fires

Cases, among other things demonstrating the actionable patterns and practices of Debtors in connection with many prior fires and Debtors' "run to failure" approach to maintenance; Dkt. 2855, and especially declarations in Dkts 2844 and 2847; (ii) the related or similar filings by the Ad Hoc Subrogation Group before their settlement, including their relief from stay filings and exhibits, such as the Declaration of McCallen dated 7/3/19 referencing among other things the Master Complaint-Subrogation Plaintiffs in the In re California North Bay Fire Cases pending in the San Francisco Superior Court No. 17004955 CJC; (iii) the "Public Entities Operative Complaints" or other court or regulatory filings asserting any " Wildfire Claims," as both such terms are defined in PG&E's First Amended Plan of Reorganization; and (iv) by the filings, evidence and other data to come against either or both Debtors in connection with the competing plan of reorganization by TCC and the Ad Hoc Committee of Senior Unsecured Noteholders (the Ad Hoc Noteholders Committee"); (2) in the PG&E probation proceeding, US v. PG&E, Case No. 14-CR-00175-WHA, which includes many PG&E admissions and other useful evidence, such as in the PG&E responses to court questions (eg, Dkt. 1075) (i) in Dkt. 1077 as to the $5B in dividends and $5.3B in campaign contributions and lobbying that could have been better spent on safety compliance and correcting E System Flaws, and (ii) in Dkt. 1078/7/31/19 admitting and responding paragraph by paragraph to the Wall Street Journal's 7/10/19 expose [incorporated herein] entitled: "PG&E Knew For Years Its Lines Could Spark Wildfires and Didn't Fix Them," as well as (iii) many other determinations or stated concerns of Judge Alsup in that record, and (iv) any and all relevant admissions and evidence against any Debtor reflected in the record in that proceeding, including the 7/26/19 report to Judge Alsup of the Kirkland & Ellis Monitor as to some of the failures in the achievement of the Wildfire Mitigation Plan or in compliance with any of Judge Alsup's order or expectations; (3) in any other criminal proceedings that may occur against any Debtor, such as the one some people expect from the prosecutor in Butte County as to fires there; (4) in the complaints and actions of any and all fire victims, including those referenced above in other Key PSPS POC Documents, such as the aforementioned Public Entities Operative Complaints, the In re California North Bay Fire Cases, the Tubbs Fire jury trial set for January 2020, the settled (but not paid for) Butte Fire Cases, and others; (5) in (i) the central CPUC proceeding OII I-19-09-016 commenced 9/26/19 for the approval of a plan of reorganization for Debtors, satisfying the requirements of AB 1054, settling CPUC claims, and other issues, as well as resolving or addressing others by related proceedings listed or added therein, including without limitation anything related to Rule 35 (eg, vegetation management), the Wildfire Mitigation Plan and Decision 19-05-037, the Investigation of the 2017 fires in I19-06-015 and in CPUC Order dated 6/27/19, the Safety &Enforcement Division Report dated 6/13/19 on the October 2017 Fire Siege, CPUC decision 19-05-037, and (ii) any and all PSPS related proceedings, among other things, requiring PSPS as something that must be reasonable and a last resort, not an excuse for avoiding liability (eg, CPUC Resolution ESRB-8 dated 7/12/18, expanding on Decision 12-04-024, as well as the relevant record of any such proceedings and the patterns and practices reflected in the San Bruno fire findings and rulings (eg, OII 18-12-007); (6) in the class action securities fraud etc amended complaint and any other filings by any such plaintiffs or any admissions or evidence against interest by or for any Debtor either in the In re PG&E Corp. Securities Litigation Civil Action No. 3:18-CV-03509-EJD pending in the N.D. Cal. (sometimes called the "**Securities Fraud Suit**") or at issue in the Adversary Proceeding No. 19-03003 in this Case entitled PG&E Corp. et

9

al v. Public Employees Retirement Association of New Mexico et al, describing a long history of reasons for that parent company to be responsible and liable for the wrongs of or for its PG&E subsidiary; (7) the record of the hearings on any Debtor fire or any PSPS blackout or related matter in any of the Legislative Committees or the Fire Commission or otherwise in any governmental units proceedings or hearings, including those related to or complying with AB 1054 or newly enacted SB 70, 167, or 560; and (8) investigative reporting on any such matters that includes relevant evidence or admissions, including the series of stories in the Wall Street Journal, such as the story that attracted Judge Alsup's investigation above, and the series in the San Francisco Chronicle, such as the 7/16/19 article "PG&E says power line inspections revealed 10,000 problems—some in need of immediate repair," and the editorial on 7/12/19 entitled: "Power shut offs are serious, and California lawmakers need to watch PG&E carefully," or similar coverage in the Sacramento Bee.

"**PSPS blackouts**" means any de-energization or abandonment of any PG&E transmission or distribution service by or for PG&E for any cause or excuse, whether temporarily or permanently, whether permitted by law or regulation, including by CPUC Resolution ESRB-8 (July 12, 2018), enhancing and supplementing CPUC Decision 12-04-024 applied to SDG&E and extending it to PG&E, and whether or not involved in or a basis for any PSPS Claims or PSPS Remedies. Those PSPS blackouts include what must be reported and otherwise addressed by newly enacted SB 70, 167, and 560. A PSPS blackout is for all purposes "**excessive**" and "**unreasonable**" (and contrary to the PG&E Electric Rule 14 tariff as not an exercise of "**reasonable diligence**") whenever it creates any basis for PSPS Claims or PSPS Remedies in accordance with applicable law. While disagreements are expected with Debtors over which PSPS blackouts are excessive, unreasonable, or otherwise actionable or contrary to applicable law or regulations, one conceptual test is that such wrongful condition and Debtor liability exists whenever there is a PSPS blackout that would not be required, or that endures longer than would be the case, if there were no E System Flaws and none of the relevant, actionable Debtor conduct had occurred as stated in the Key PSPS POC Documents. For example, if Debtors timely had properly followed the SDG&E model, even as referenced in PG&E's Wildfire Mitigation Plan, such as with more undergrounding (which avoids the need for such PSPS blackouts) and micro circuits (which allows smaller and more precise blackout areas), including as contemplated in newly enacted SB 70, 167, and 560, there would be many fewer PSPS blackouts and service recovery would be much faster. Moreover, instead of PG&E's incorrect position that its PSPS decisions must be judged as if it were starting from a "clean slate," the correct view is that Debtors begin any PSPS decision or action with a long list of relevant negligent, grossly negligent, reckless, willful, intentional, criminal, and other wrongs that affect any judgment of the Debtors' relevant PSPS conduct.

"**PSPS Claims**" means any claim, cause of action or complaint of Creditor, whether legal equitable of otherwise, whether contingent, fixed or inchoate, whether liquidated, or unliquidated or otherwise characterized, and however and whenever arising, directly or indirectly entitling Creditor to any PSPS Remedies or relating in any way to any PSPS decision, act or omission by or for any Debtor cited or referenced in this proof or claim or any other bases for any PSPS Remedies, or as arising from or relating to any E System Flaws considered or

alleged to cause excessive or unreasonable PSPS blackouts or related liability. If and to the extent that any Debtor asserts (as discussed herein) broad interpretations of what is an unmatured, contingent or other claim beyond a normal nonbankruptcy cause of action, then the PSPS Claim matches that assertion, so as to leave no gap to lose any claim, while Creditor reserves its right to resist and dispute such excessive Debtor expansion of such jurisprudence in favor of such claims arising when the harm or damages occur after the petition (and, when applicable, after the bankruptcy). Since Debtors appear to contend, as explained in this proof of claim, that a proof of claim filing may be required by this existing Bar Date Order or others as to future or contingent or unmatured events, acts or harms, such as when there is a preexisting contract or relationship, this proof of claim has to assume the worst case Debtor conduct or consequences that may occur, since to do otherwise would (under the Debtors' disputed theory) result in the loss of the right to enforce the claim that would result when that worst case or harm occurs. Therefore, this proof of claim is filed in an abundance of caution, so as to preserve any and all Protected Claims that may arise against any Debtor, although Creditor has focused without limitation on PSPS Claims, because those exist post-petition and seem the most likely to arise again and continue.

This includes, among other things, any and all applicable causes of action for any unfair business practices (eg, Ca. Bus. & Prof. Code 17200 et seq), violation of PG&E's duties to serve under applicable laws, regulations, and tariffs (eg, Public Utilities Code section 451 et seq), inverse condemnation, nuisance, other torts of any kind, breaches of contract or quasi-contract, breach of fiduciary duty of each Debtor in accordance with applicable law (eg, In re Cochise College Park, Inc., 703 F.2d 1339 [9th Cir. 1983] and following precedents), restitution for unjust enrichment by any Debtor or for or on account of any profit or benefit of any kind directly or indirectly accruing at any time to PG&E, in any case on account of any excessive PSPS blackout or other loss or damage to or of Creditor, as well as any liability arising directly or indirectly from any violation of any applicable laws and regulations binding any Debtor for the protection or benefit of Creditor, including the newly enacted SB 70, 167, and/or 560.

To the extent that PG&E is acting for or other behalf of or for the benefit of PG&E Corporation with respect to any applicable Claim or that under any applicable law or equity or theory or cause of action PG&E Corporation is directly or indirectly liable on any Claim with or on account of PG&E, whether jointly, severally or jointly and severally liable for the wrongful and other actionable conduct of PG&E on any theories for vicarious and other liability, whether as joint tortfeasors, aiders and abettors, or otherwise, then such PSPS Claims (and applicable PSPS Remedies) and other Protected Claims shall apply to PG&E Corporation as well.

As for Creditor, the loss of electric service by a PSPS blackout is almost as bad as the loss of use or access to a functioning system caused by fire, expect that the fire damage may be a bigger surprise and last longer, although there will be many more relevant PSPS blackouts than relevant fires. The damages and losses suffered by Creditor are not merely as a customer/homeowner, but also a professional working from a home office. As a result, even though Creditor now has purchased and installed a generator to achieve some relief from the PSPS blackouts, that generator does not solve Creditor's need for continuing internet access to conduct his business.

Case: 19-30088    Doc# 9653-3    Filed: 12/01/20    Entered: 12/01/20 14:21:55    Exhibit 19
of 44

"**PSPS Remedies**" means any setoff, recoupment, mitigation, remedy, damages, or other relief available to Creditor with respect to either Debtor at law or equity or otherwise, including as to any regulatory, political or other protective response, whether pursuant to or in response to any PSPS Claims or otherwise, on account of E System Flaws, excessive or unreasonable PSPS blackouts, or other wrongful conduct at issue in any PSPS Claim or other Protected Claim.

## 5. Reserved Additional Rights And Protections Without Waivers Etc.

Nothing herein nor in any other appearance, pleading, claim, suit, motion, complaint, or any other writing or conduct shall constitute a waiver (or other basis for estoppel, impairment, or other adverse effect) by or for Creditor of any procedural and/or substantive claims, interests, rights, remedies and/or defenses including, without limitation: (a) the right to have any and all final or otherwise applicable orders in any and all matters entered only after de novo review by a United States District Court Judge, as well as any other rights derived from the jurisprudence of Stern v Marshall and related precedents at any time; (b) the right to have any matter or claim heard and tried before an Article III court or before any regulator, including the CPUC or the Federal Energy Regulatory Commission ("FERC"); (c) the right to trial by jury or before any regulator, including the CPUC or FERC, in any proceeding as to any and all claims or matters so triable therein, whether or not the same be designated legal or private rights, or in any cases, controversy or proceeding related hereto, whether or not such jury trial right is pursuant to statute or the United States Constitution or otherwise; (d) the right to have the reference of any claim or matter withdrawn by the United States District Court in any matter or proceeding subject to mandatory or discretionary withdrawal; (e) other rights, claims, actions, remedies, defenses, setoffs, recoupments or other matters to which Creditor is entitled at law or in equity or under the United States Constitution or otherwise; or (f) the right to be served directly with pleadings commencing an adversary proceeding, contested matter and/or lawsuit or proceeding. Nothing herein nor in any other pleading or papers filed by Creditor is or is to be construed as any waiver of the right to jury trial or to relief from CPUC, FERC, or any other regulatory or governmental authority which Creditor has or may have under the applicable law.

Creditor reserves the right to attach or rely upon additional documents or evidence in support of this proof of claim, including if, as, and when such additional documents or evidence become available or requested, such as described in the Key PSPS POC Documents.

Filing of this proof of claim or participating in or seeking relief from the bankruptcy case shall not be deemed to constitute a concession or admission of jurisdiction in the case or cases or before this Court, or any other court or regulator, or as to any regulatory or criminal or other jurisdiction. Nor does Creditor waive, and specifically reserves and preserves, any procedural and/or substantive and/or regulatory defenses, recoupments, or setoffs to any claim that may be asserted

Case: 19-30088    Doc# 9653-3    Filed: 12/01/20    Entered: 12/01/20 14:21:55    Page 20 of 44

against Creditor by or for either Debtor, by or for any trustee of any Debtor's estate, or by any trustee or other official appointed in any plan of reorganization or otherwise in this case, or by or for any other party, person, entity or group. The filing of this proof of claim shall not constitute an election of remedies or choice of law or a waiver (or other basis for estoppel, impairment, or other adverse effect) of any such rights, remedies, or claims relating thereto. To the extent permitted by applicable law, nothing contained in this proof of claim shall limit any right of Creditor to commence or continue any proceeding or take any action to the extent permitted by the Bankruptcy Code, application non-bankruptcy law or regulation, or order of a court or regulator of competent jurisdiction, or shall constitute an election of a bankruptcy remedy over a regulatory or other remedy, except as otherwise expressly chosen by Creditor in those terms (but not by mere implication or consequence of actions).

Claims reserved or preserved by this proof of claim include any and all claims on any basis, including costs, defenses, contracts, regulatory rights, demands, setoffs, recoupments, credits, causes of action, obligations, duties, bonds, accidents, injuries, attorneys' fees, expenses, interests, losses, penalties, damages, punitive damages, special damages, rights of contribution and indemnity, whether partial or full, equitable, legal or contractual, and liabilities of all types, whether known or unknown, whether contract or tort, whether in law or equity, or whether under federal and state law. The claims reserved or preserved also include the causes of action claims, remedies, interests, or powers of Creditor in any capacity, whether held as owner, principal, agent, representative, subrogee or beneficiary.

Without limiting any of the foregoing, Creditor reserves any and all post-petition administrative expense rights or post-petition claims (or subsequent post-bankruptcy claims) it has or may have beyond unreasonable or excessive PSPS blackouts, including without limitation with respect to any matters not in its the fair contemplation at the time of filing this proof of claim, whether arising out of, related to, or in connection with any pre-petition condition or otherwise thereafter.

Dated: October 10, 2019

George Larry Engel

13

**EMPIRE ENERGY CONSTRUCTION**
**LIC 1052127**
**mail@empireenergyinc.com**
**530-272-5462**
A notice of cancellation may be sent to **EMPIRE ENERGY CONSTRUCTION** at the
following address: **578 SUTTON WAY #510**

LARRY ENGEL for Home Improvement.

This contract ("Contract") is between LARRY ENGEL (the "Client") and EMPIRE ENERGY
CONSTRUCTION (the "Contractor").

Project Address: 12116 HORSESHOE LN, NEVADA CITY, CA 95959

The Contract is signed and dated _____(DATE/TIME)

You are entitled to a completely filled in copy of this agreement, signed by both you and
the Contractor, before any work may be started.

## AGREEMENT

A. **Licensing:** The Contractor warrants that the Business currently holds a valid license, 1052127, under
the laws of the State of California to perform the work. Work performed will be done so in compliance
with all applicable local, state, or federal statutes and regulations.

B. **Scope of Work/Payment:**

    a. Description of the Project and Description of the Significant Materials to be Used and Equipment
to be Installed: The Client is hiring the Contractor to do the following:

       SUPPLY AND INSTALL KOHLER 22 KW GENERATOR IN GARDEN AREA SOUTH OF
GARAGE. PROVIDE AUTOMATIC TRANSFER SWITCH FOR SAME COVERING MOST
LOADS EXCEPT THOSE UNABLE TO BE SUPPORTED. PROVIDE CONCRETE PAD FOR
SAME. EXCAVATE AND PROVIDE UNDERGROUND GAS SERVICE TO SAME.
RECONFIGURE ELECTRIC SERVICE AND BRANCH CIRCUITS TO MEET CODE AND
REQUIREMENTS OF THIS INSTALLATION.

    b. Approximate Start Date: _____

    c. Substantial Commencement of Work: INITIAL EXCAVATION

    d. Approximate Completion Date: _____

    e. Documents incorporated into this Agreement. **Exhibit A** attached hereto lists additional
documents that, when executed, shall be made pursuant to and subject to this Agreement.

    f. Extra Work and Change Orders.

       i. Extra Work and Change Orders become part of the contract once the order is
prepared in writing and signed by the parties prior to the commencement of work covered by the
new order in substantially the same form as attached as **Exhibit B** hereto. The order must
describe the scope of the extra work or change, the cost to be added or subtracted from the
contract, and the effect the order will have on the schedule of progress payments.

       ii. Client may not require a contractor to perform extra or change-order work without
providing written authorization prior to the commencement of work covered by the new change
order.

iii.     Any Extra work or Change Order shall not be enforceable against Client unless the it also identifies all of the following in writing prior to the commencement of work covered by the order:

1. The scope of work encompassed by the order.

2. The amount to be added or subtracted from the contract.

3. The effect the order will make in the progress payments or the completion date.

iv.     Contractor's failure to comply with the requirements of this paragraph does not preclude the recovery of compensation for work performed based upon legal or equitable remedies designed to prevent unjust enrichment.

v.     Corrections to existing violations required by building inspectors to be corrected before final will result in a change order and are not covered under the scope of this contract.

vi.     If conditions are encountered on the site which are subsurface or otherwise concealed physical conditions which differ materially from those contemplated, or physical conditions of an unusual nature are encountered and cause a furtherance to the Contractor in time or materials, the Contractor will be entitled to an equitable adjustment in the contract price, an extension of the completion date, or both, by change order. Furthermore, the Contractor will not be held responsible for any damage to the following:

Underground Sprinkler heads - Underground irrigation piping - Television Cable - Phone Cable – Low Voltage Cable, Cesspools/Septic Tanks or any buried utilities and/or devices not installed in accordance with local building codes or common practices.

The owner will clearly identify boundaries of the property, shall provide surveys of the property describing physical characteristics, legal limitations and utility locations and/or cause the property to be staked if reasonably requested by the Contractor. The owner is obligated to provide notice of all concealed conditions, and shall provide and pay for water and electricity to the property.

g.   Contract Price: $25071.16

h.   Downpayment:  $1000

THE DOWNPAYMENT MAY NOT EXCEED $1,000 OR 10 PERCENT OF THE CONTRACT PRICE, WHICHEVER IS LESS.

i.   Payment Schedule:

i.     Schedule of Progress Payments: Contractor will complete the deliverables and/or complete specified milestones, and Client will pay Contractor upon acceptance of Deliverables or timely completion of a milestone, according to the following schedule:

| Amount of work or services to be performed | Materials and equipment to be supplied | Amount Payable Upon Acceptance/Completion |
| --- | --- | --- |
| Trenching, Concrete | Slab, transfer switch | $4,500 |
| Delivery of materials | Generator, piping | $13,500 |
| Completion of installation | Conduit, wire, miscellaneous | $4,000 |
| Operational testing | Balance of materials | $1,817.16 |
| Final inspection | | $1,253.56 |

The schedule of progress payments must specifically describe each phase of work, including the type and amount of work or services scheduled to be supplied in each phase, along with the amount of each proposed progress payment. IT IS AGAINST THE LAW FOR A CONTRACTOR TO COLLECT PAYMENT FOR WORK NOT YET COMPLETED, OR FOR MATERIALS NOT YET DELIVERED. HOWEVER, A CONTRACTOR MAY REQUIRE A DOWNPAYMENT. **Client Initial Here** _____

    ii. <u>Payment Terms:</u> Payment shall be made to the Contractor via CASH, CHECK, CREDIT CARD, OR OTHER MEANS ACCEPTABLE TO BOTH PARTIES. If any invoice is not paid when due, this could result in suspension or termination of the project. If the Client fails to pay for the Services when due, the Contractor reserves the right to treat such failure as a breach of this Contract. Any legal fees associated with such will be the Client's responsibility.

    iii. Invoices: The Contractor will invoice the Client on the dates listed in the Payment Schedule section. The Client agrees to pay the invoice with the amount owed on the date invoiced.

    iv. Late Payments: If the Client fails to pay the Contractor on time per agreed upon payment schedule, the Business may suspend work until delinquent payments are brought current. If payments are delinquent for more than 30 days then the Client will be subjected to a late fee of 18% per annum.

    v. Expenses: Client shall pay to the Contractor any expenses incurred by the Contractor in the provision of services under this Agreement, including, but not limited to: travel expenses, 3rd party vendors, etc no later than 10 days here after receipt is provided.

    vi. Lien Release: Upon satisfactory payment being made for any portion of the work performed, the Contractor, prior to any further payment being made, shall furnish to the Client a full and unconditional release from any potential lien claimant claim or mechanics lien authorized pursuant to Sections 8400 and 8404 of the California Civil Code for that portion of the work for which payment has been made.

j.  <u>Refund Policy:</u> Refund Policy:

    1.6.2(a) No Refunds: Services completed as described in this contract are not subject to refunds. The Client will not be reimbursed for services cancelled once work has begun. All sales are final.

    **Client Initial Here** _____

    1.6.2(b) Warranty Policy: No refunds will be provided for work completed as described in this contract. Services for work completed are warranted to be free from defects in materials or workmanship for 12 months from the date of service completion. This warranty does not apply to: (i.) cosmetic damage (ii.) damage by service of another business (iii) customer abuse (iv) failure to follow maintenance recommendations **Client Initial Here** _____

**C.  MECHANICS LIEN WARNING.**

Anyone who helps improve your property, but who is not paid, may record what is called a mechanics lien on your property. A mechanics lien is a claim, like a mortgage or home equity loan, made against your property and recorded with the county recorder.

Even if you pay your contractor in full, unpaid subcontractors, suppliers, and laborers who helped to improve your property may record mechanics liens and sue you in court to foreclose the lien. If a court finds the lien is valid, you could be forced to pay twice or have a court officer sell your home to pay the lien. Liens can also affect your credit.

To preserve their right to record a lien, each subcontractor and material supplier must provide you with a

document called a 'Preliminary Notice.' This notice is not a lien. The purpose of the notice is to let you know that the person who sends you the notice has the right to record a lien on your property if he or she is not paid.

BE CAREFUL.  The Preliminary Notice can be sent up to 20 days after the subcontractor starts work or the supplier provides material. This can be a big problem if you pay your contractor before you have received the Preliminary Notices.

You will not get Preliminary Notices from your prime contractor or from laborers who work on your project. The law assumes that you already know they are improving your property.

PROTECT YOURSELF FROM LIENS.  You can protect yourself from liens by getting a list from your contractor of all the subcontractors and material suppliers that work on your project. Find out from your contractor when these subcontractors started work and when these suppliers delivered goods or materials. Then wait 20 days, paying attention to the Preliminary Notices you receive.

PAY WITH JOINT CHECKS.  One way to protect yourself is to pay with a joint check. When your contractor tells you it is time to pay for the work of a subcontractor or supplier who has provided you with a Preliminary Notice, write a joint check payable to both the contractor and the subcontractor or material supplier.

For other ways to prevent liens, visit CSLB's Internet Web site at www.cslb.ca.gov or call CSLB at 800-321-CSLB (2752).

REMEMBER, IF YOU DO NOTHING, YOU RISK HAVING A LIEN PLACED ON YOUR HOME. This can mean that you may have to pay twice, or face the forced sale of your home to pay what you owe.


### D. Information about the Contractors' State License Board (CSLB):

CSLB is the state consumer protection agency that licenses and regulates construction contractors.

Contact CSLB for information about the licensed contractor you are considering, including information about disclosable complaints, disciplinary actions, and civil judgments that are reported to CSLB.

Use only licensed contractors. If you file a complaint against a licensed contractor within the legal deadline (usually four years), CSLB has authority to investigate the complaint. If you use an unlicensed contractor, CSLB may not be able to help you resolve your complaint. Your only remedy may be in civil court, and you may be liable for damages arising out of any injuries to the unlicensed contractor or the unlicensed contractor's employees.

For more information:

Visit CSLB's Internet Web site at www.cslb.ca.gov

Call CSLB at 800-321-CSLB (2752)

Write CSLB at P.O. Box 26000, Sacramento, CA 95826.


### E. Representations:

a. Authority to Sign: Each party promises to the other party that it has the authority to enter into this Contract and to perform all of its obligations under this Contract.

b. Client will Review Work: The Client promises to review the work product, to be reasonably available to the Contractor if the Business has questions regarding this project, and to provide

timely feedback and decisions.

**F.** **General:**

a. Signatures: The Client and the Contractor must sign the document either electronically or in hardcopy. If this document is signed in hard copy, it must be returned to the Business for valid record. Electronic signatures count as originals for all purposes.

b. Compliance with Laws: Contractor must comply with all provisions of law applicable to this Contract.

**G.** **Term and Termination:** This Contract ends on _____, unless the Client or the Business ends the contract before that time. If one of the parties chooses to end the Contract prior to project completion, the Client is responsible for paying for all work and costs incurred up until that date.

**H.** **Bond**. Client has the right to require the Contractor to have a performance and payment bond.

**I.** **Three-Day Right to Cancel**

The Client has the right to cancel this contract within three business days. You may cancel by e-mailing, mailing, faxing, or delivering a written notice to the Contractor at the Contractor's place of business by midnight of the third business day after you received a signed and dated copy of the contract that includes this notice. Include your name, your address, and the date you received the signed copy of the contract and this notice.

If you cancel, the contractor must return to you anything you paid within 10 days of receiving the notice of cancellation. For your part, you must make available to the contractor at your residence, in substantially as good condition as you received them, goods delivered to you under this contract or sale. Or, you may, if you wish, comply with the contractor's instructions on how to return the goods at the contractor's expense and risk. If you do make the goods available to the contractor and the contractor does not pick them up within 20 days of the date of your notice of cancellation, you may keep them without any further obligation. If you fail to make the goods available to the contractor, or if you agree to return the goods to the contractor and fail to do so, then you remain liable for performance of all obligations under the contract.

**The Parties hereto agree to the foregoing as evidenced by their signatures below.**

Date_____  _____          Date_____  _____
 _____ PRESIDENT / SECRETARY                   ZACH CALVERT, Client
 EMPIRE ENERGY CONSTRUCTION

## <u>Exhibit A</u>
### List of Documents to be Incorporated into the contract

1. Extra Work or Change Order Form
2. Notice of Cancellation Form

Note: These documents are included for your use, as applicable.

**Exhibit B**
**Extra Work or Change Order Form**
**[Instruction: use this form if you want to add Extra Work or make Changes to the original work from the original agreement]**

**Extra Work or Change Order NO. [Add Number] for**
**_____(Contract Title)**
**For Home Improvement**

This Extra Work or Change Order ("**CO**") is entered into between EMPIRE ENERGY CONSTRUCTION, 578 SUTTON WAY #510, ("**Contractor**") and CLIENT NAME ("**Client**"), and is effective as of _____ ("**CO Effective Date**").

This CO is governed by and incorporated into the _____ (PROJECT/Contract TITLE) executed between the parties on _____(DATE) (the "**Contract**"). Capitalized terms not defined in this CO will have the meanings assigned to them in the Contract. The terms of this CO are limited to the scope of this CO and are not applicable to any other COs that may be executed under the Contract. This CO and the Contract represent the parties' entire agreement relating to the subject of this CO and supersede all prior or contemporaneous agreements, whether written or oral, on that subject.

You are entitled to a completely filled in copy of this agreement, signed by both you and the contractor, before any work may be started.

**1. Project Information.**

| |
|---|
| Contractor Project Manager: |
| Email: |
| Telephone: |
| License Number: Contractor warrants that Contractor currently holds a valid license, 1052127, under the laws of the State of California to perform the work. Work performed will be done so in compliance with all applicable local, state, or federal statutes and regulations. |
| |

**2. Term.** Unless terminated earlier in accordance with the termination provisions in the Contract, this CO will end when Contractor has completed the Services (as defined below), which in no event will be later than _____[date], and Client has accepted the Services.

**3. Description of the Project and Description of the Significant Materials to be Used and Equipment to be Installed.** The Client is hiring Contractor to do the following: _____
_____

Contractor will provide the Services at _____[location]

**4. Contract Price:** Cost to be added or subtracted from the Contract_____ from the original contract price.

**6.** <u>Downpayment:</u>  _____

THE DOWNPAYMENT MAY NOT EXCEED $1,000 OR 10 PERCENT OF THE CONTRACT PRICE, WHICHEVER IS LESS.

**7. Payment Schedule:**

    a.  Flat Price: The Client will pay the Contractor write Total Contract Price here for the completion of the project. **Client Initial Here** _____

    b.  Schedule of Progress Payments: Contractor will complete the deliverables and/or complete specified milestones, and Client will pay Contractor upon acceptance of Deliverables or timely completion of a milestone, according to the following schedule:

| Amount of work or services to be performed | Materials and equipment to be supplied | Amount Payable Upon Acceptance/Completion |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

The schedule of progress payments must specifically describe each phase of work, including the type and amount of work or services scheduled to be supplied in each phase, along with the amount of each proposed progress payment. IT IS AGAINST THE LAW FOR A CONTRACTOR TO COLLECT PAYMENT FOR WORK NOT YET COMPLETED, OR FOR MATERIALS NOT YET DELIVERED. HOWEVER, A CONTRACTOR MAY REQUIRE A DOWNPAYMENT. **Client Initial Here** _____

    c.  Hourly Rate:  Contractor will perform Services at the following hourly rate(s):  US $[rate].  Include if applicable: This hourly rate will be guaranteed and will not be increased for the duration of this Contract, unless the Parties have agreed upon a written change to the scope of Services signed by the parties. **Client Initial Here** _____

**8. Project Dates.**

    a.  Approximate Start Date: _____

    b.  Substantial Commencement of Work: _____

    c.  Approximate Completion Date: _____

**9.** <u>Three-Day Right to Cancel</u>

The Client has the right to cancel this contract within three business days. You may cancel by e-mailing, mailing, faxing, or delivering a written notice to the Contractor at the Contractor's place of business by midnight of the third business day after you received a signed and dated copy of the contract that includes this notice. Include your name, your address, and the date you received the signed copy of the contract and this notice.

If you cancel, the contractor must return to you anything you paid within 10 days of receiving the notice of cancellation. For your part, you must make available to the contractor at your residence, in substantially as good condition as you received them, goods delivered to you under this contract or sale. Or, you may, if you wish, comply with the contractor's instructions on how to return the goods at the contractor's expense and risk. If you do make the goods available to the contractor and the contractor does not pick them up within 20 days of the date of your notice of cancellation, you may keep them without any further obligation. If you fail to make the goods available to the contractor, or if you agree to return the goods to the contractor and fail to do so, then you remain liable for performance of all obligations under the contract.

**10. Effect on Original Project Schedule:** _____

**IN WITNESS WHEREOF**, the representatives of two parties hereby sign as follows:

**CLIENT NAME**

Signature:_____

Printed Name:_____

Title:_____

Date:_____

**EMPIRE ENERGY CONSTRUCTION**

Signature:_____

Printed Name:_____

Title:_____

Date:_____

**Exhibit C**
**Notice of Cancellation**
**[Instruction: use this form within three days of execution of a Home Improvement
contract or Extra Work or Change Order to cancel the agreement]**

_____ (Date of the original transaction)

You may cancel this transaction, without any penalty or obligation, within three
business days from the above date.

If you cancel, any property traded in, any payments made by you under the
contract or sale, and any negotiable instrument executed by you will be returned
within 10 days following receipt by the seller of your cancellation notice, and any
security interest arising out of the transaction will be canceled.

If you cancel, you must make available to the contractor at your residence, in
substantially as good condition as when received, any goods delivered to you under
this contract or sale, or you may, if you wish, comply with the instructions of the
seller regarding the return shipment of the goods at the seller's expense and risk.

If you do make the goods available to the seller and the seller does not pick them
up within 20 days of the date of your notice of cancellation, you may retain or
dispose of the goods without any further obligation. If you fail to make the goods
available to the seller, or if you agree to return the goods to the seller and fail to do
so, then you remain liable for performance of all obligations under the contract.

To cancel this transaction, mail or deliver a signed and dated copy of this cancellation
notice, or any other written notice, or send a telegram to, EMPIRE ENERGY
CONSTRUCTION, at 578 SUTTON WAY #510, not later than midnight of _____.

I hereby cancel this transaction. Date here _____

**CLIENT NAME**

Signature:_____

Printed Name:_____

Date:_____

G. Larry Engel
12116 Horseshoe Lane
Nevada City, CA 95959

RECEIVED
OCT 17 2019
PRIME CLERK LLC

PG+E Corporation Claims Processing Center
do Prime Clerk LLC
850 Third Ave, Suite 412
Brooklyn, NY
11232



UNITED STATES
POSTAL SERVICE.                          Retail

**F** | US POSTAGE PAID
**$5.66** | Origin: 95959
10/11/19
0553340959-92

FIRST-CLASS PKG SVC - RTL™

0 Lb 9.20 Oz
1022

C010

SHIP
TO:
850 3RD AVE
STE 412
BROOKLYN NY 11232-1523

USPS TRACKING NUMBER

9500 1148 7488 9284 2512 42

# EXHIBIT B







Case: 19-30088   Doc# 9653-3   Filed: 12/01/20   Entered: 12/01/20 14:21:55   Exhibit 36
of 44









Case: 19-30088    Doc# 9653-3    Filed: 12/01/20    Entered: 12/01/20 14:21:55    Exhibit B

# EXHIBIT C

**From:** PG&E Customer Service <PGECustomerService@notifications.pge.com>
**Date:** July 3, 2020 at 2:15:30 PM PDT
**To:** "G. Larry Engel" <larry@engeladvice.com>
**Subject: How to Minimize Public Safety Power Shutoff Impacts**
**Reply-To:** "PG&E Customer Service" <PGECustomerService@notifications.pge.com>



View as a web page »

**Learn About Backup Power Options to Keep Your Power On**

LEARN MORE

Dear Valued Customer:

We all rely on electricity for everyday life and we want to work with you on solutions that can prevent wildfires and keep our communities safe. If severe

weather threatens the electric system, PG&E may turn off power for safety. This is known as a Public Safety Power Shutoff (PSPS).

## Backup Power Solutions

There are many different backup power solutions that vary in size, cost, fuel and more. If you think a backup power solution may be appropriate for your home or business, PG&E has resources available that can help you with your choice.

To learn more about backup power, including financing and safety tips visit **pge.com/backuppower**.

## Self-Generation Incentive Program

The Self-Generation Incentive Program (SGIP) can help customers install battery storage in their home. Battery storage could extend your home's power from several hours to multiple days.* SGIP offers incentives that can cover up to 100 percent of battery purchase and installation costs, based on income, location, and medical needs.

For more information and to apply for SGIP incentives, visit **pge.com/pspsbattery**.

*How long your system will provide backup power depends on your battery size, critical energy needs and (if paired with rooftop solar) weather conditions. Talk to a battery installer to learn more about your specific needs and options.

## Disability Disaster Access and Resources Program

PG&E is collaborating with the California Foundation for Independent Living Centers (CFILC) to help customers who use medical devices to access backup portable batteries through a grant, lease-to-own or financial loan application.

Customers interested in learning more about this program can visit **disabilitydisasteraccess.org** or to contact their local Independent Living Center.

Learn more about all of our wildfire safety efforts at **pge.com/wildfiresafety**.

Sincerely,
PG&E Community Wildfire Safety Team

If you need further assistance to understand this important message, please call **1-866-743-6589**.

Si necesita ayuda en español para entender este importante mensaje de seguridad, sírvase llamar al **1-866-743-6589**.

如果您需要中文協助以瞭解此重要訊息，請致電 **1-866-743-6589**。

Nếu quý vị cần giúp đỡ bằng tiếng Việt để hiểu thông báo quan trọng về an toàn này, vui lòng gọi **1-866-743-6589**.

이 중요한 메시지에 대한 추가 지원이 필요하시면 **1-866-743-6589** 로 전화하십시오.

Para tulong sa Tagalog, mangyari lamang na tumawag sa **1-866-743-6589**.

Для получения помощи на русском языке, пожалуйста, позвоните по телефону: **1-866-743-6589**.

pge.com | Privacy | Disclosure

For inquiries, please do not reply to this email. Submit feedback via Contact Us.
"PG&E" refers to Pacific Gas and Electric Company, a subsidiary of PG&E Corporation 77 Beale St. San Francisco, CA 94105.

© 2020 Pacific Gas and Electric Company. All rights reserved.
These offerings are funded by California utility customers and administered by PG&E under the auspices of the California Public Utilities Commission.

This email has been scanned for spam and viruses by Proofpoint Essentials. Click here to report this email as spam.