LEONIDOU & ROSIN
Professional Corporation
A. Robert Rosin (SBN 115245)
arrosin@alr-law.com
Gregory S. Gerson (SBN 318795)
ggerson@alr-law.com
777 Cuesta Drive, Suite 200
Mountain View, CA  94040
Telephone: (650) 691-2888

Attorneys for Creditor
GORDON N. BALL, INC.

## UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| In re:<br><br>PG&E CORPORATION,<br><br>   -and-<br><br>PACIFIC GAS AND ELECTRIC COMPANY,<br><br>          Debtors. | ) Case No. 19-30088 (DM)<br>)<br>) Chapter 11<br>)<br>) (Lead Case) (Jointly Administered)<br>)<br>) Hearing:<br>)<br>) Date:  December 15, 2020<br>) Time: 10:00 a.m.<br>) |

**GORDON N. BALL, INC.'S**
**RESPONSE TO DEBTORS' FORTY-FIFTH OMNIBUS OBJECTION**
**(REDUCED AND ALLOWED CLAIMS)**

COMES NOW, Gordon N. Ball, Inc. ("GNB"), creditor, who submits this response to the Debtors' Forty-Fifth Omnibus Objection (Reduced and Allowed Claims) [Document No. 9466].

GNB requests that the Court take judicial notice of the pleadings and documents filed in this bankruptcy case pursuant to Federal Rule of Bankruptcy Procedure 9017 and Federal Rule of Evidence 201.    To the extent this Response contains factual assertions predicated upon statements made by the Debtors or their agents in documents filed by the Debtors in this bankruptcy case, GNB submits that such factual assertions are supported by admissible evidence in the form of admissions of a party opponent under Federal Rule of Bankruptcy Procedure 9017

1

and Federal Rule of Evidence 801(d)(2). The Declaration of Lane Grover, GNB project manager, in support of this Response is incorporated herein by reference.

## I. INTRODUCTION

GNB entered a contract with the City of San Francisco ("City") under which GNB was to perform construction work on the Transbay Transit Center Streetscape project ("Project"), identified as City contract number 2862J ("Contract").

During performance of its work, GNB discovered in December 2017 undisclosed underground utilities, including a live power line, belonging to Pacific Gas and Electric Company ("PG&E") which were directly in the way of the proposed Project work. These facilities were located at or near the northside of Mission Street and Shaw Alley, near Golden Gate University. Not until July 2018 did PG&E perform its obligation to relocate the utilities in conflict with the Project work.

Pursuant to an agreement between the City and PG&E concerning support, work around, and protection of underground utility facilities ("SWAPP Agreement"), PG&E as a franchisee of the City is financially responsible directly to contractors in contract with the City, such as GNB; GNB is a third-party beneficiary of the SWAPP Agreement. Specification 00 73 20, incorporated as part of the Contract, reflect the fact that GNB is a third-party beneficiary of the SWAPP Agreement and expressly provides for the contractor to obtain compensation directly from the utility whose utility facilities conflict with construction work for the City.

GNB duly submitted its Proof of Claim ("Claim")[1] in this matter to recover its losses. Debtors have proposed paying GNB 62% of GNB's damages and therefore have acknowledged liability and entitlement. As set forth in its Claim and herein, GNB is entitled to recover the full amount of its claims. Any attempt to reduce the amount of the Claim is baseless.

Debtors' Objection as it relates to GNB's Claim should also be overruled because Debtors' have offered no evidence in support of their Objection. Had Debtors offered evidence,

---

[1] GNB's Proof of Claim is claim number 4463. While box 7 states the claim as $93,108.48 due to a typographical error, the claim is actually $98,103.48. The enclosures with the Claim are in accord. On information and belief, Debtors do not dispute that the claim value is $98,103.48. To eliminate any doubt, GNB has submitted an amended proof of claim in the amount of $98,103.48.

2

there would be disputed issues of fact that preclude Debtors' Objection from being sustained at the initial hearing on the Objection pursuant to Loc. R. Bankr. P. 3007-1.

## II. ARGUMENT

### A. PG&E Is Liable For Costs Resulting From The Interference That Its Utilities Caused

Under California law, a project owner owes a duty to provide complete and accurate plans and specifications for use by the contractors performing construction work. *See Los Angeles Unified School Dist. v. Great American Ins. Co.*, 49 Cal. 4th 739, 752 (2010) (reaffirming owner's "obligation to provide prospective bidders with correct plans and specifications"); *G. Voskanian Construction, Inc. v. Alhambra Unified School Dist.*, 204 Cal. App. 4th 981 (2012); *Warner Construction Corporation v. City of Los Angeles*, 2 Cal. 3d 285 (1970); *E.H. Morrill Co. v. State*, 65 Cal. 2d 787, 792 (1967); *Souza & McCue Construction Co. v. Superior Court*, 57 Cal. 2d 508 (1962); *Welch v. State of California*, 139 Cal. App. 3d 546 (1983).

In Public Contract Code section 1104, the Legislature codified the common law duty to provide complete and accurate plans and specifications. Section 1104 provides that "[n]o local public entity, charter city, or charter county shall require a bidder to assume responsibility for the completeness and accuracy of architectural or engineering plans and specifications on public works projects."

The City, and hence PG&E, owed a duty to provide timely corrections to incomplete designs and to issue change orders in a timely manner. There is a covenant of good faith and fair dealing that requires a party to a contract not to interfere with the other party's performance. *Zurn Eng'rs v. State of California ex rel. Dept. Water Res.*, 69 Cal. App. 3d 798, 833 (1977) (covenant of good faith and fair dealing in every contract); Civ. Code § 1511. That covenant requires that the owner promptly provide necessary directions, furnish needed information, and issue change orders. *Gen. Ins. Co. v. Commerce Hyatt House*, 5 Cal. App. 3d 460, 466 (1979); *Aetna Cas. & Surety Co. v. Rincon Valley Sch. Dist.*, 223 Cal. App. 2d 337, 338-339 (1963); *McIsaac & Menke v. Cardox Corp.*, 193 Cal. App. 2d 661, 666-68, 672 (1961).

3

The SWAPP Agreement between the City and PG&E, states in pertinent part:

> If a Conflict is discovered during construction that was not identified previously either by the Company or by City due to inadequate utility information, the Company will cooperate with City and City Contractor to expeditiously resolve the Conflict so as not to unreasonably delay the City Contract. Should a City Contractor comply with its obligations under Government Code §4216 *et. seq* and discover a Conflict during construction that Company had failed to identify in a SWAPP provided under Section II.A. <u>Company shall be responsible for all incremental design and/or construction costs caused by the newly discovered Conflict.</u> <u>Company will have the option to pay the City Contractor directly for such work or to reimburse the City under a separate agreement</u>.

(Emphasis supplied).

A true and correct copy of the Contract between the City and GNB, without its many incorporated documents, is attached hereto as **Exhibit A.** The documents comprising the Contract are voluminous and include specifications and oversize drawings. To avoid prolixity, they are not attached and instead are incorporated by reference and judicial notice. A true and correct copy of the SWAPP Agreement between the City and PG&E is attached hereto as **Exhibit B.** [2]

The City, and hence PG&E, could not contractually disclaim the duty to provide a complete and accurate design for the Project. Contract provisions that purport to "save another from the consequences" of "defects in design" furnished by that party are "void and unenforceable." Civ. Code §§ 2772, 2782(a) & 2784. "Design defects" include any condition that renders a structure or other item "unfit, either wholly or in part, for its intended use, or which impairs the usefulness" of the structure or item. *Id.*, § 2784.

Similarly, contract provisions that "purport to impose on the contractor, or relieve the public agency from, liability for the active negligence of the public agency are void and unenforceable." Civ. Code § 2782(b).

---

[2] The Court is authorized to take judicial notice of contracts with the City because they are official public records. See Fed. Rules Evidence 201; Cal. Evid. Code §§ 452 & 453; *Clack v. California*, 275 Cal. App. 2d 743, 746 (1969) (public contract); *E. H. Morrill Co. v. State of California*, 65 Cal. 2d 787, 794-795 (1967) (same); *A. Teichert & Son, Inc. v. State of California*, 238 Cal. App. 2d 736, 742 (1965); *Chas. L. Harney, Inc. v. California,* 217 Cal. App. 2d 77, 85-87 (1965); *Mendez v. Pacific Gas & Elec. Co.*, 115 Cal. App. 2d 192 (1953) ("The trial court was bound to notice judicially the provisions of the contract and in considering the complaint to read the pleading as if the contract were set out in full therein.")

The City's designs failed to indicate underground utility facilities of PG&E – including a live power line – which were directly in the way of the proposed Project work at or near the northside of Mission Street and Shaw Alley. This design omission – presumably caused by PG&E's failure to provide information to the City, constitutes a deficiency in design for which GNB is entitled to compensation.[3] Under the provisions of the SWAPP and the Contract, PG&E agreed to pay for these costs.

**B.**    **PG&E Is Liable For Differing Conditions Arising from its Facilities**

In Public Contract Code Section 7104, the Legislature mandated that the City include in its contract documents a differing conditions clause that provides that the contractor shall notify the agency of

> …(2)    Subsurface or latent physical conditions at the site differing from those indicated by information about the site made available to bidders prior to the deadline for submitting bids.
>
> (3)    Unknown physical conditions at the site of any unusual nature, different materially from those ordinarily encountered and generally recognized as inherent in work of the character provided for in the contract.

Upon receipt of such notice, the statute requires that "the local public entity shall promptly investigate the conditions, and if it finds that the conditions do materially so differ, or do involve hazardous waste, and cause a decrease or increase in the contractor's cost of, or the time required for, performance of any part of the work shall issue a change order under the procedures described in the contract."

Significantly, Section 7104 imposes a mandatory duty to pay for costs incurred when differing conditions are encountered, because it states that the owner "shall issue a change order" for such conditions. *See Judith P. v. Superior Court*, 106 Cal. App. 4th 535, 550 (2002) ("shall"

---

[3] San Francisco Administrative Code Section 11.30, Maps and Plans, imposes the following obligations on franchise holders, such as PG&E, who have facilities installed in or under City rights of way: "Grantee shall make a good faith effort to maintain current, accurate and complete plans and record drawings showing, in detail, all physical features of the Facilities, including, without limitation, the approximate location, depth, and size of its Facilities constructed or installed in the Public Rights-of-Way in relation to the adjoining property lines, and the services provided over the Facilities. Upon demand, such plans and record drawings shall be delivered to City, in a format acceptable to the City, within ten (10) City business days of a written request, or immediately, upon oral request and in whatever format is available, in the event of an emergency."

GORDON N. BALL, INC.'S RESPONSE TO DEBTORS' FORTY-FIFTH OMNIBUS OBJECTION (REDUCE AND ALLOW CLAIMS)

S:\ALRDOCS\12039\1\00245892.DOCX

Case: 19-30088    Doc# 9660    Filed: 12/03/20    Entered: 12/03/20 16:08:21    Page 5 of 42

imposes a mandatory duty.)

The duty to issue a change order for differing site conditions cannot be contractually waived or limited. In *Condon-Johnson & Associates, Inc. v. Sacramento Municipal Utility Dist.*, 149 Cal. App. 4th 1384 (2007), the Court of Appeal ruled that language that purported to make the contractor responsible for differing conditions violated public policy and was unenforceable.

The Court reasoned:

… the Legislature has allocated the risks between public entity and contractor in enacting section 7104, subdivision (a)(2) as a matter of public policy. That is manifest not only in determining the measure of reliability as that "indicated" in the contract but also in placing the risk of unknown and unusual conditions upon the public entity in subdivision (a)(3).

… To disclaim what is "indicated" [by a soils report] runs counter to the requirements of section 7104 and its embodiment in the changed conditions provision of the contract, that if the subsurface physical conditions materially differ from that indicated in the contract, the public entity shall issue a change order effecting a change in the bid price.

The City's designs failed to indicate the presence of underground utility facilities of PG&E, including a live power line, directly in the way of the proposed Project work at or near the northside of Mission Street and Shaw Alley. That omission constitutes a differing site condition for which GNB is entitled to compensation. Under the provisions of the SWAPP Agreement and the Contract, PG&E agreed to pay for these costs.

**C.** **PG&E Is Liable For All Amounts Necessary To Compensate GNB For The Detriment Caused By The Undisclosed Utility Facilities**

"Where delays are caused by a defendant's breach, a contractor is not only excused from performance of a contract within the time specified, but is also entitled to damages." *Kenworthy v. State*, 236 Cal. App. 2d 378, 382 (1965).

Civil Code Section 3300 prescribes the measure of damages for a breach of contract. The City and hence Debtors are liable for:

the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom.

6

Case: 19-30088   Doc# 9660   Filed: 12/01/20   Entered: 12/01/20 16:08:21   Page 6 of 42

The "detriment" which Civil Code Section 3300 refers is the "loss or harm" that the plaintiff suffers. Civ. Code § 3282. Thus, "a contractor who, acting reasonably, is misled by incorrect plans and specifications issued by another contracting party as the basis for bids and who, as a result, submits a bid which is lower than he would otherwise have made may recover in a contract action for extra work necessitated by the incorrect plans and specifications." *Coleman Engineering Co. v. No. Am. Aviation, Inc.*, 65 Cal. 2d 396, 404 (1966). GNB is entitled to all the benefits which it would have obtained if the Contract had been fully and properly performed by all parties – including PG&E. Cal Civ. Code § 1512. GNB therefore is entitled to recover for all of the detriment it has incurred, including the costs associated with performing extra work and delay.

On a public works project, clauses that purport to limit a contractor's remedies to a time extension are void and ineffective. Pub. Contract Code § 7102; *Howard Contracting, Inc. v. G.A. MacDonald Construction Co., Inc.*, 71 Cal. App. 4th 38 (1999).

Moreover, here the delays resulted from errors and omissions in the City's plans and specifications as they related to PG&E's facilities. The decision in *G. Voskanian Construction, Inc. v. Alhambra Unified. Sch. Dist.*, 204 Cal. App. 4th 981 (2012) therefore confirms that GNB is entitled to compensation for the detriment that it suffered because of the City's defective designs and the delay in providing accurate information. In *Voskanian*, a contractor sued because a school district had provided defective plans and specifications:

> After Voskanian was awarded the fire alarm contract, it discovered that many of the portable buildings had more rooms than shown on the plans, thus requiring more alarm devices, conduit and wiring. For example, one of the buildings was shown on the plans as a single room with no interior walls; however, as built, that structure had six interior rooms. Due to the error in the plans, Voskanian requested an additional $39,777 for extra work on the fire alarm contract, over and above the original $55,000 contract price.

The Court of Appeal rejected arguments that the change order provisions of the contract barred recovery for the $39,777 spent to install the fire alarms, pointing out that the contractor was entitled to recover damages for breach of contract and was therefore not bound by the provisions of the change order clause:

7

Thus, Voskanian's entitlement to recover for extra work performed in connection with the fire alarm contract does not turn upon the issuance of written change orders. Because the extra work on the fire alarm contract was necessitated by incorrect plans and specifications furnished by the District, under settled law Voskanian was entitled to recover for said work.

Like the contractor in *Voskanian*, GNB is not seeking to recover for change orders for which the City has failed to pay. Instead, GNB is entitled to recover for damages it suffered because of the City and Debtor PG&E's material breach of contract – sums that PG&E agreed to pay as consideration for being allowed to install its facilities under City streets. GNB is entitled to recover for "all the detriment proximately caused" by the undisclosed PG&E facilities.

In addition to extra work, the damages for delay that GNB is entitled to recover include:

**1. Extended Costs For Equipment And Jobsite General Conditions**

A contractor that has been delayed may recover additional and extended equipment and jobsite costs. *See Howard Contracting, Inc. v. G.A. MacDonald Const. Co.*, 71 Cal. App. 4th 38 (1998); *Zurn Eng'rs v. California*, 69 Cal. App. 3d 798, 811 (1977); *John A. Artukovich Sons v. American Fidelity Fire Ins. Co.*, 72 Cal. App. 3d 940 (1977); *A.A. Baxter Corp. v. Colt Industries, Inc.*, 10 Cal. App. 3d 144, 158 (1970); *Western Concrete Structure Co. v. James I. Barnes Constr. Co.*, 206 Cal. App. 2d 1 (1962).

**2. Extended Jobsite Supervision and Labor**

A contractor also may recover the additional costs of supervision and labor when its performance has been delayed. *See A.A. Baxter Corp. v. Colt Industries, Inc.*, 10 Cal. App. 3d 144, 158 (1970); *D.A. Parrish & Sons v. County Sanitation Dist. No. 4*, 174 Cal. App. 2d 406, 415-16 (1959).

**3. Home Office Overhead**

A contractor is entitled to recover unabsorbed home office overhead for periods when a contractor's performance has been extended by events or circumstances for which the defendant is responsible. *See JMR Construction Corp. v. Environmental Assessment & Remediation Management, Inc.*, 243 Cal. App. 4th 571 (2015) authorizing recovery of damages under

Eichleay formula); *Howard Contracting, Inc. v. G.A. MacDonald Const. Co.*, 71 Cal. App. 4th 38 (1998) (upholding award of damages); *see Guntert v. City of Stockton*, 55 Cal. App. 3d 131, 150 (1976) (overhead damages available as element of damages);

Here, GNB was on standby for an indefinite period while waiting for Debtors to relocate their facilities. This period lasted approximately seven months. As it was uncertain when the work in question would be completed, GNB could not reassign its project management team, attempt to fill its schedule with new work, or take any other actions to replace the revenues that had been delayed or to reduce home office overhead. The fact that GNB may have been able work on non-critical path work during part of the delay does not preclude GNB from recovering unabsorbed home office overhead. "The Eichleay formula does not require that the contractor's work force be idle." *JMR Constr. Corp. v. United States*, 117 Fed. Cl. 436, 443 (Fed. Cl. 2014). For purposes of *Eichleay* damages, it is sufficient if the contractor was "significantly slowed," as GNB was in this case. *Id.* In addition, the 36 days of delay associated with the utility conflict in question already reflects the mitigation of delays obtained from working on non-critical work out of sequence.

**D.**     **Debtors' Objection Should Be Overruled For Lack Of Evidentiary Support**

GNB requests that the Court overrule the Debtors' Objection as to GNB's Claim because Debtors submitted no evidence in support of their allegations. The Claim remains presumptively valid.

A proof of claim is deemed allowed unless a party objects under 11 U.S.C. § 502(a). A proof of claim constitutes "*prima facie* evidence of the validity and amount of the claim" pursuant to Bankruptcy Rule 3001(f). As stated by the Ninth Circuit in *In re Lundell*: "Upon objection, the proof of claim provides 'some evidence as to its validity and amount' and is 'strong enough to carry over a mere formal objection without more.'" *Lundell v. Anchor Const. Specialists, Inc.*, 223 F.3d 1035, 1039 (9th Cir. 2000), *citing Wright v. Holm (In re Holm)*, 931 F.2d 620, 623 (9th Cir. 1991). Further, "to defeat the claim, the objector must come forward with sufficient evidence and 'show facts tending to defeat the claim by probative force equal to that of the allegations of the proofs of claim themselves.'" *Lundell*, 223 F.3d at 1039, *citing In re Holm*,

931 F.2d at 623.

In its Objection, the Debtors value GNB's claim at $57,791.00, but nowhere do the Debtors provide any evidence supporting a reduction of GNB's claim amount. Instead, the Debtors through counsel assert that their claims team applied "California law principles and practices" to derive a fair market value of "the damaged property," taking into account depreciation. (Objection at p. 4).

Debtors' boilerplate assertions are baseless. Debtors failed to submit any supporting evidence for their allegations, but equally important, Debtors' position does not make sense. GNB's Claim is not a property damage claim.[4] The Claim arises from delay in construction work that was caused by the undisclosed presence of Debtors' underground utilities; PG&E agreed to pay for these costs as consideration for being allowed to install its facilities under City rights of way. GNB's Claim included approximately eighty (80) pages of backup for the claimed amount, an itemized spreadsheet, and even the Eichleay formula explaining how GNB calculated the overhead portion of its claims.

Because Debtors did not carry their burden to come forward with any evidence, much less sufficient evidence to support their allegations, the Objection should be overruled.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

---

[4] Another factual discrepancy in the Objection is its assertion that GNB (under the generalization of all claimants treated in the Objection) either rejected the settlement offer by Debtors or failed to respond. In reality, GNB made several efforts to contact the maker of the Debtors' offer. However, that individual was unreachable by phone and her voicemail was full. Emails to that individual were not returned until fourteen (14) days after the filing of the Objection.

10

Case: 19-30088    Doc# 9660    Filed: 12/01/20    Entered: 12/01/20 16:08:21    Page 10 of 42

### III.  <u>CONCLUSION</u>

GNB respectfully requests that the Court overrule the Objection as it relates to GNB's Claim and grant such further relief as the Court deems just and proper.  Alternatively, material factual or legal disputes, and the absence of any evidence proffered by Debtors, render issues related to GNB's Claim unsuited for disposition by omnibus objection at the initially noticed hearing (*See* Advisory Committee Comment on 2007 amendments to Fed. R. Bankr. P. 3007). Instead, if for any reason the Objection were not overruled, the matter should be separately set for a hearing.

Dated: December 1, 2020

LEONIDOU & ROSIN
Professional Corporation


By_____*/s/ A. Robert Rosin*_____
A. Robert Rosin
Attorneys for Creditor Gordon N. Ball, Inc.

11

Case: 19-30088   Doc# 9660   Filed: 12/01/20   Entered: 12/01/20 16:08:21   Page 11 of 42

# Exhibit A

SECTION 00 52 00

AGREEMENT FORM

THIS AGREEMENT made for the convenience of the parties this ___31st___ day of _____August_____ 20 _17_ by and between _____Gordon N. Ball, Inc._____ located at _____333 Camille Avenue, Alamo, CA 94507_____ ("CONTRACTOR"), and the City and County of San Francisco, State of California (the "CITY"), acting through the Director (the "DIRECTOR") of the San Francisco Public Works, under and by virtue of the Charter and Administrative Code of the City and County of San Francisco.

WHEREAS, the DIRECTOR awarded this AGREEMENT to CONTRACTOR on the 31st day of August, 2017, under AWARD OF FORMAL CONTRACT ORDER NO. 186,307, as more fully appears in the formal record of the DIRECTOR:

**TRANSBAY TRANSIT CENTER STREETSCAPE PHASE I**
**(San Francisco Public Works Contract No. 2862J)**

NOW, THEREFORE, CONTRACTOR, in consideration of the mutual covenants set forth in this AGREEMENT, promises and agrees to provide all services to construct the Project in accordance with the requirements of the Contract Documents, to perform the Work in good and workmanlike manner to the satisfaction of the **DIRECTOR**, to prosecute the Work with diligence from day to day to Final Completion, to furnish all construction work, labor and materials to be used in the execution and completion of the Work in accordance with the Contract Documents, and to otherwise fulfill all of CONTRACTOR's obligations under the Contract Documents, as and when required under the Contract Documents to the satisfaction of the **DIRECTOR**.

CONTRACTOR's execution of this AGREEMENT signifies its acceptance of the Contract Time and Contract Sum as being sufficient for completion of the Work, as well as acceptance of the other terms and conditions of the Contract Documents.

**ARTICLE 1 - CONTRACT DOCUMENTS; CONTRACTOR'S GENERAL RESPONSIBILITIES**

1.01    Contract Documents.  CONTRACTOR shall Provide all Work according to the Contract Documents, which are incorporated into and made a part of this AGREEMENT by this reference, and all labor and materials used in providing the Work shall comply with the Contract Documents.  The Contract Documents, which comprise the entire agreement between CONTRACTOR and the CITY concerning the Provision of the Work, are defined in the General Conditions (Section 00 72 00). Any undefined term used in this AGREEMENT shall be given the definition set forth in the General Conditions (Section 00 72 00).

1.02    Contractor's General Responsibilities.  CONTRACTOR shall provide a fully functional, complete and operational Project constructed in accordance with the Contract Documents, including but not limited to, all investigations, analyses, surveys, engineering, procurement, materials, labor, workmanship, construction and erection, commissioning, equipment, shipping, subcontractors, material suppliers, permits, insurance, bonds, fees, taxes, duties, documentation, spare parts, materials for initial operation, security, disposal, startup, testing, training, warranties, guarantees, and all incidentals.

**ARTICLE 2 - CONTRACT TIME**

2.01    Completion Dates.  As set forth in Section 00 73 02, the Work shall be Substantially Complete within 110 consecutive calendar days, beginning with and including the official date of Notice to Proceed as established by the DIRECTOR, and Finally Complete in accordance with Article 9 of the General Conditions (Section 00 72 00) within 30 consecutive calendar days after the date the

Case: 19-30088    Doc# 9660    Filed: 12/01/20    Entered: 12/01/20 16:08:21    Page 13 of 42

CITY issues a Notice of Substantial Completion.

2.02    Critical Milestone Dates.  Contractor shall complete all critical milestone Work during the periods specified in Section 00 73 02.

2.03    Liquidated Damages.  It is understood and agreed by and between CONTRACTOR and the CITY that time is of the essence in all matters relating to the Contract Documents and that the CITY will suffer financial loss if the Work is not completed within the above-stated Contract Times, plus any extensions thereof allowed in accordance with Article 7 of the General Conditions (Section 00 72 00).  The CITY and CONTRACTOR further understand and agree that the actual cost to CITY which would result from CONTRACTOR's failure to complete the Work within the Contract Time is extremely difficult, if not impossible, to determine.  Accordingly, CONTRACTOR and the CITY agree that as liquidated damages for delay (but not as a penalty), CONTRACTOR shall pay the CITY the amounts set forth in Section 00 73 02 (Contract Time and Liquidated Damages) for each calendar day that expires after the above Contract Times and the Work remains incomplete.

## ARTICLE 3 – CONTRACT SUM

3.01    Contract Sum.

    A.    CONTRACTOR and the CITY agree that, upon performance and fulfillment of the mutual covenants set forth herein, the CITY will, in the manner provided by law and as set forth in the Contract Documents, pay or cause to be paid to CONTRACTOR the following price(s), as indicated in the Schedule of Bid Prices on the Bid Form (Section 00 41 00):

        1.    Lump sums for specified portions of the Work.

        2.    The total of all Unit Price Items bid.

        3.    The allowance specified.

        4.    Selected additive/deductive Alternate Bid Items.

    Total awarded contract amount:  $_____**2,289,850.00**_____.

    The price(s) and amount set forth above shall be adjusted during performance or upon final completion of the Work in accordance with the Contract Documents.

    B.    CONTRACTOR understands and agrees that the CONTRACTOR shall be solely responsible for providing all resources that may be necessary to provide the Work, and that the CITY shall have no obligation whatsoever to finance any part of such costs except with respect to those amounts which become due under the terms and conditions of the Contract Documents.

3.02    Certification by Controller.  This AGREEMENT is subject to the budget and fiscal provisions of the CITY's Charter.  Charges will accrue only after prior written authorization certified by the Controller, and the amount of the CITY's obligation hereunder shall not at any time exceed the amount certified for the purpose and period stated in such advance authorization.

## ARTICLE 4 – LABOR REQUIREMENTS

4.01    Applicable Laws and Agreements.  Compensation and working conditions for labor performed or services rendered under this AGREEMENT shall be in accordance with the Contract Documents, the San Francisco Charter, and applicable sections of the San Francisco Administrative Code, including section 6.22(e).    In Addition, this Project is subject to the requirements of the San Francisco Local Hiring Policy for Construction, pursuant to San Francisco Administrative Code section 6.22(g).  Refer to Section 00 73 30 for further information.

Case: 19-30088      Doc# 9660      Filed: 12/01/20      Entered: 12/01/20 16:08:21      Page 14
of 42

4.02    <u>Prevailing Wages</u>.  The latest Wage Rates for Private Employment on Public Contracts in the City and County of San Francisco, as determined by the San Francisco Board of Supervisors and the Director of the California Department of Industrial Relations, and, when federal funds are involved, the current General Wage Determination Decisions, as determined by the U.S. Secretary of Labor, as same may be changed during the term of this AGREEMENT, shall be included in this AGREEMENT and are hereby incorporated by this reference.  CONTRACTOR agrees that any person performing labor in the provision of the Work shall be paid not less than the highest general prevailing rate of wages as so determined.  If federal funds are involved, where the minimum rate of pay for any classification differs among State, City and Federal wage rate determinations, the highest of the three rates of pay shall prevail.  CONTRACTOR shall include, in any contract or subcontract relating to the Work, a requirement that all persons performing labor under such contract or subcontract shall be paid not less than the highest prevailing rate of wages for the labor so performed.  CONTRACTOR shall require any contractor to provide, and shall deliver to CITY every month during any construction period, certified payroll reports with respect to all persons performing labor in the Provision of the Work.

A.      Copies of the latest prevailing wage rates are on file at the San Francisco Public Works, City and County of San Francisco, Maurice Williams, Manager, PCS, 30 Van Ness Avenue, 3rd Floor, San Francisco, CA, 94102 and are also available on the Internet at http://www.dir.ca.gov/oprl/DPreWageDetermination.htm.

4.03    <u>Penalties</u>.  CONTRACTOR shall forfeit to the CITY back wages due plus not less than fifty dollars ($50.00) for:

A.      Each laborer, workman, or mechanic employed in the provision of the Work, for each calendar day or portion thereof during which such laborer, workman, or mechanic is not paid the highest general prevailing rate of wage for the work performed; or

B.      Each laborer, mechanic or artisan employed in the provision of the Work, for each calendar day or portion thereof during which such laborer, mechanic or artisan is compelled or permitted to work for a longer period than five days (Monday-Friday) per calendar week of eight hours each, and not compensated in accordance with the prevailing overtime standard and rate.

## ARTICLE 5 – NOTICES TO PARTIES

5.01    Unless otherwise indicated in the Contract Documents, all written communications sent by the Parties may be by U.S. mail, e-mail or by fax, and shall be addressed as follows:

To CITY:            Shannon Cairns, Project Manager
                    San Francisco Public Works
                    30 Van Ness Avenue, 5th Floor
                    San Francisco, CA 94102
                    Phone:  (415) 581-2576
                    Email: Shannon.Cairns@sfdpw.org

To CONTRACTOR:      Hal Stober, President
                    Gordon N. Ball, Inc.
                    333 Camille Avenue
                    Alamo, CA 94507
                    Phone: (925) 838-5675
                    Email: estimating@ballconco.com

5.02    From time to time, the parties may designate new address information by notice in writing, delivered to the other Party.

Case: 19-30088      Doc# 9660      Filed: 12/01/20      Entered: 12/01/20 16:08:21      Page 15
of 42

Copyright ©2017 City & County of San Francisco

5.03    The delivery to CONTRACTOR at the legal address listed above, as it may be amended upon written notice, or the depositing in any post office or post office box regularly maintained by the United States Postal Service in a postage paid wrapper directed to CONTRACTOR at such address, of any drawing, notice, letter or other communication shall be deemed legal and sufficient service thereof upon CONTRACTOR.

## ARTICLE 6 – TERMINATION AND SURVIVAL

6.01    This AGREEMENT and the other Contract Documents shall terminate when all obligations required to be performed by CONTRACTOR and the CITY have been fulfilled, unless sooner terminated as set forth in Article 14 of the General Conditions (Section 00 72 00).

6.02    The provisions of the Contract Documents which by their nature survive termination of the Contract, including without limitation all warranties, indemnities, payment obligations, and the City's right to audit Contractor's books and records, shall remain in full force and effect after termination of the Contract.

THIS SPACE WAS INTENTIONALLY LEFT BLANK

Case: 19-30088    Doc# 9660    Filed: 12/01/20    Entered: 12/01/20 16:08:21    Page 16
of 42

Copyright ©2017 City & County of San Francisco

IN WITNESS WHEREOF, the CONTRACTOR and the CITY have hereunto set their hands and seals, and have executed this AGREEMENT in duplicate, the day and year first above written.

CONTRACTOR:

By my signature hereunder, as CONTRACTOR, I certify that I have read and understand the section captioned MacBride Principles – Northern Ireland included in Section 00 73 73, the CITY's statement urging companies doing business in Northern Ireland to move towards resolving employment inequities, encouraging compliance with the MacBride Principles, and urging San Francisco companies to do business with corporations that abide by the MacBride Principles.

I further certify that I am aware of the provisions of section 3700 of the Labor Code which require every employer to be insured against liability for worker's compensation or to undertake self-insurance in accordance with the provisions of that code, and I will comply with such provisions before commencing the performance of the Work of this Contract.

*Gordon N. Ball, inc.*

Principal

BY: _____

*Vice President*

Title

CITY:

Recommended By:

Project Manager: _____

Division Manager: _____

Deputy Director: _____

Approved as to form:
DENNIS J. HERRERA
City Attorney

APPROVED:

_____
Director

By: _____
Deputy City Attorney

END OF SECTION

Rev. 3/15/2016   00 52 00 - 5   Agreement Form
Case: 19-30088  Doc# 9660  Filed: 12/01/20  Entered: 12/01/20 16:08:21  Page 17
of 42

# Exhibit B

## AGREEMENT TO SUPPORT, WORK AROUND, AND PROTECT UTILITY FACILITIES

8-6-2017 Final

# TABLE OF CONTENTS

AGREEMENT ......................................................................................................... 1

RECITALS ........................................................................................................... 1

DEFINITIONS ...................................................................................................... 1

TERMS ................................................................................................................ 2

   I.     SUPPORT, WORK AROUND AND PROTECTION PROCEDURES ........................................ 2
   II.    COORDINATION SCHEDULES ........................................................................... 2
       A.   Planned City Projects ............................................................................ 2
       B.   Emergency Work Contracts ................................................................... 3
       C.   Spot Sewer Work ................................................................................. 3
       D.   As Needed City Contracts or Job Order Contracts ................................... 4
       E.   Unforeseen Schedule Acceleration ....................................................... 4
       F.   Additional Work under Revised NOI and FPP .......................................... 4
       G.   Sixty-Five Percent Designs ................................................................... 4
   III.   POTHOLING ................................................................................................. 5
   IV.   COMPANY'S RESPONSIBILITY TO ENTER INTO PAYMENT AGREEMENTS ....................... 5
   V.    CITY ADMINISTRATIVE COSTS .......................................................................... 5
   VI.   COST BASIS ................................................................................................. 6
   VII.   UNIFORM CONTRACT ..................................................................................... 6
   VIII.  DESIGNATED REPRESENTATIVES FROM COMPANY AND THE CITY; REGULAR MEETINGS ... 6
   IX.   TERM OF AGREEMENT ................................................................................... 6
   X.    COMPANY'S OBLIGATION TO COMPENSATE, DEFEND, INDEMNIFY, AND HOLD CITY HARMLESS ... 6
   XI.   INSURANCE REQUIREMENTS OF CITY CONTRACTOR .............................................. 6
   XII.   LIMITATION OF CITY LIABILITY ....................................................................... 7
   XIII.  GENERAL PROVISIONS ................................................................................... 7
       A.   Severability ........................................................................................ 7
       B.   Headings ............................................................................................ 7
       C.   Amendment of Agreement .................................................................... 7
       D.   Counterpart ....................................................................................... 7
       E.   Governing Law .................................................................................... 7
   XIV.  DISPUTE RESOLUTION .................................................................................. 7
   XV.   EXCEPTIONS ................................................................................................ 8
   XVI.  EFFECTIVE DATE AND TERMINATION OF PRIOR AGREEMENTS ................................. 8
   XVII. SAFETY ...................................................................................................... 8
   XVIII. RELOCATION PROJECTS NOT COVERED BY THIS AGREEMENT ................................... 8

EXHIBIT A: ......................................................................................................... 1

   I.     INTRODUCTION, DEFINITIONS AND KEY PRINCIPLES ............................................... 1
       A.   Direct Company/City Contractor Payment .............................................. 1
       B.   Utility Crossing Defined ....................................................................... 1
       C.   Fixed Price Schedule ........................................................................... 1
       D.   Added Costs for Overlooked/Unexpected Utility Crossings ....................... 1
       E.   No Mark-Up for Certain Work ................................................................ 1
       F.   Negotiated Payment ............................................................................ 1
       G.   Abandoned Facilities or Inactive Facilities .............................................. 2
           1.  Inactive Facilities ............................................................................ 2
           2.  Abandoned Facilities ...................................................................... 2
           3.  Flushing ....................................................................................... 2
           4.  Removal of Abandoned Facilities or Inactive Facilities Designated to Be Abandoned ... 2
       H.   Payment Only for Work Performed by City Contractor ............................... 2

8-6-2017 Final

II.    METHOD OF ADMINISTRATION ...................................................................................................... 3
    A.    SWAPP Content ............................................................................................................... 3
        1.    Location and Size of Facilities ................................................................................. 3
        2.    Utility Crossing Cost: ............................................................................................. 3
        3.    Utility Conflicts ...................................................................................................... 3
    B.    SWAPP Format ................................................................................................................ 3
        1.    AUTOCAD ............................................................................................................... 3
        2.    Size ........................................................................................................................ 3
        3.    Title Block ............................................................................................................. 4
        4.    Contact Information .............................................................................................. 4
        5.    Disclaimer ............................................................................................................. 4
    C.    Specifications ................................................................................................................. 4
    D.    Contract Activities ......................................................................................................... 4
        1.    City Contractor Measurement .............................................................................. 4
        2.    Variations and Cost Adjustments .......................................................................... 4
        3.    Supporting Documentation for City Projects other than Spot Sewer Repair Contracts ................ 4
        4.    Supporting Documentation for Spot Sewer Repair Contracts ............................... 5
        5.    Photos ................................................................................................................... 6
        6.    Company's Right of Confirmation .......................................................................... 6
        7.    Unidentified Facilities ........................................................................................... 6
        8.    Verification and City Contractor Itemization ........................................................ 6
        9.    Progress Payments ................................................................................................ 6
III.    METHOD OF DETERMINING UTILITY CROSSING COSTS ................................................................ 6
    A.    Fixed Price Schedule ...................................................................................................... 6
    B.    Measurement of Maximum Outside Diameter ............................................................. 7
    C.    Duct Bank Structure ....................................................................................................... 8
    D.    Nested Utility Facilities .................................................................................................. 8

**EXHIBIT B: SF BOARD RESOLUTION NO. 176-70, DATED APRIL 6, 1970** .................................... 1

8-6-2017 Final

# AGREEMENT

**THIS AGREEMENT, MADE AND ENTERED INTO THIS** 31st day of August, 2017 by and between Pacific Gas and Electric Company, hereinafter called "Company", and the City and County of San Francisco, hereinafter called the "City", in accordance with San Francisco Public Works Code Section 909.

## RECITALS

**WHEREAS**, public utility companies own or control utility facilities located in City Streets that City Contractors encounter during City Projects;

**WHEREAS**, the 1939 Franchise Agreements (for Pacific Gas and Electric Company) and/or San Francisco Public Works Code Sections 906 – 908 (for other public utility companies), obligate public utility companies to remove or relocate their utility facilities as described therein;

**WHEREAS**, San Francisco Board of Supervisors Resolution No. 176-70, dated April 6, 1970 ("Resolution No. 176-70" attached hereto as Exhibit B), recognized that utility encounters can cause significant delays to City Projects while public utility companies make arrangements to relocate or adjust their facilities;

**WHEREAS**, Resolution No. 176-70 directed the Director of Public Works to adopt a procedure to mitigate construction delays and to negotiate and execute an agreement with public utility companies to pay the cost of such mitigation;

**WHEREAS**, in September 1970, the Director of Public Works developed a process for City contractors to support, work around and protect public utility facilities (Document 810) and concurrently entered into an agreement with public utility companies to pay for such work ("Support and Work Around Agreement");

**WHEREAS**, the City and Company now wish to update the Support and Work Around Agreement to bring it in line with current construction practices and to coordinate and share information as set forth herein;

**WHEREAS**, Company agrees to pay City Contractors directly for Company Reimbursed Work as and to the extent set forth herein;

**NOW THEREFORE** it is mutually understood and agreed as follows:

## DEFINITIONS

1. **Abandoned Facilities:** Facilities that the Company has stopped using with the intent of never using again.

2. **City Contract**: A City construction contract.

3. **City Contractor**: The City's construction contractor for a City Project.

4. **City Project**: A City construction project.

5. **City Streets:** The public streets, ways, alleys and places as the same may now exist or hereafter exist within the City and County of San Francisco.

6. **Company Reimbursed Work**: Work performed by a City Contractor to support, work around and/or protect Facilities, and/or to remove Abandoned Facilities or Inactive Facilities (when specifically agreed) within a City Project's limits.

8-6-2017 Final

Case: 19-30088   Doc# 9660   Filed: 12/01/20   Entered: 12/01/20 16:08:21   Page 22 of 42

7. **Conflict**: Any Facilities that must be removed, relocated, adjusted, or abandoned to enable the City Contractor to perform City Project work.

8. **Coordination Schedule**: The time for the City to notify the Company of a City Project; for the Company to provide as built drawings of Facilities and SWAPP to the City; and for the City to incorporate SWAPP in a City Contract.

9. **Effective Date**: October 1, 2017.

10. **Facilities**: Any Company-owned subsurface facility installed, used and maintained under the 1939 Gas or Electric Franchise Agreements, including Inactive Facilities, within the City Project limits. Facilities expressly do not include any Company-owned subsurface facility installed, used or maintained under a PG&E exclusive easement and not under the 1939 Gas or Electric Franchise Agreements.

11. **Inactive/Deactivated Facilities**: Facilities that the Company has stopped using temporarily with the intent of possibly using again.

12. **NTP**: The notice to proceed issued by the City to the City Contractor for a City Project.

13. **Payment Agreement**: An agreement between the Company and the City Contractor pursuant to which the Company will pay the City Contractor directly for Company Reimbursed Work in accordance with the Contract Procedure attached as Exhibit A.

14. **SWAPP**: The Company's support, work around, and protection plans for Facilities, including estimates and specifications.

15. **Time for City to Provide FPP and Form X-FPP**: As defined in Section II.A.

16. **Time for Company Transmittal of Completed Form X-FPP and SWAPP**: As defined in Section II.A.

## TERMS

## I. SUPPORT, WORK AROUND AND PROTECTION PROCEDURES

The document entitled "Contract Procedure for Support, Work Around and Protection of Utility Facilities" marked as Exhibit A and attached to this Agreement is hereby made a part hereof.

## II. COORDINATION SCHEDULES

### A. Planned City Projects

For City Projects not covered by Sections II.B, C, D, E, or F, the Parties agree to use the following Coordination Schedule:

| 1. No later than 150 (one hundred fifty) calendar days before advertisement | City will provide to Company the Preliminary Notice of Intention ("NOI") and Request for Information (Form X-NOI). |
|---|---|
| 2. Within 45 (forty-five) calendar days of the transmittal date of the Preliminary NOI and Form X-NOI | Company will: (1) return completed Form X-NOI; (2) provide as-built drawings reflecting size and locations of Facilities; and (3) provide plans and schedules, if any, for Company's proposed construction within the City Project limits in the next five years. |

8-6-2017 Final

| | |
|---|---|
| 3. No later than X** calendar days before advertisement - **NOTE, Please see ** Table below** | City will provide to Company (1) scanned copies of the Final Preliminary Plans ("FPP") and (2) Form X-FPP requesting SWAPP. If the Company has Facilities within the City Project limits, upon request, and subject to execution of a Confidentiality Agreement as appropriate, City may also provide information from the City's AUTOCAD files to be used as a base for Company to prepare its SWAPP. City will include the deadline for the Company to return the completed Form X-FPP in the Form X-FPP and in Envista. |
| 4. Within Y**calendar days of the transmittal date of the Final Preliminary Plans and Form X-FPP - **NOTE, Please see ** Table below** | Company will return the completed Form X-FPP to City. If Company has Facilities, Company will provide: (1) SWAPP in conformance with Exhibit A (Contract Procedure), Section II.A and B; and (2) plans and schedules, if any, for Company's proposed construction within the City Project limits. |
| 5. Prior to Advertisement | City shall incorporate into the City Contract all SWAPP that is received 15 (fifteen) calendar days before advertisement. |
| 6. Within 15 calendar days of the award of City Contract | City will notify Company of the award of the City Contract and make available the advertised set of contract documents and provide contact information of the City Contractor to which it was awarded. |

**\*\* Table**

| Total LF of Main Line Trench | "X" | "Y" |
|---|---|---|
| Less than 3,000 LF | 60 (sixty) | 45 (forty Five) |
| 3,001 LF to 10,000 LF | 75 (seventy-five) | 60 (sixty) |
| Greater than 10,000 LF | 105 (one hundred-five) | 90 (ninety) |

**B.     Emergency Work Contracts**

For emergency work covered by Section 6.60 of the S.F. Administrative Code, the Parties agree to use the following Coordination Schedule:

The City will provide Company with an NOI and Request for Information (X-NOI) as soon as practical, designating the City Project as involving emergency work. The Company will provide the City with (1) completed Form X-NOI; (2) as-built drawings reflecting size and locations of Facilities; and (3) plans and schedules, if any, for scheduled Company construction within the City Project limits as soon as that information can reasonably be gathered.

**C.     Spot Sewer Work**

For spot sewer work, the Parties agree to use the following Coordination Schedule:

The City will provide Company with NOIs as soon as practical for each work order issued to the City Contractor, designating the City Project involving Spot Sewer Repair Work and identifying the Work Order Number. The Company will utilize this information in

8-6-2017 Final

Case: 19-30088   Doc# 9660   Filed: 12/01/20   Entered: 12/01/20 16:08:21   Page 24 of 42

processing of the invoices received from the City Contractor. Both parties realize that since the nature of work to be done under these contracts are localized spot repairs, sometimes the actual quantity of work performed on the sewer facility is more than originally stated in the work order as the City Contractor needs to connect new section of pipe(s) to an existing pipe section that is in fair condition.

**D.    As Needed City Contracts or Job Order Contracts**

For As Needed City Contracts or Job Order Contracts covered by Chapter 6 of the S.F. Administrative Code, the Parties agree to use the following Coordination Schedule:

The City will provide Company with an NOI and Request for Information (X-NOI) as soon as practical, designating the work as being done as part of an As Needed City Contract. The Company will provide the City with (1) completed Form X-NOI; (2) as-built drawings reflecting size and locations of Facilities; and (3) plans and schedules, if any, for scheduled Company construction within the City Project limits as soon as that information can reasonably be gathered.

**E.    Unforeseen Schedule Acceleration**

For some unforeseen urgent City Projects, it may be impossible for the City to comply with the Coordination Schedule set forth in Section II.A above.  In such event, the Parties agree to use the following Coordination Schedule:

The City will immediately notify the Company of the unforeseen schedule acceleration by designating the City Project as an "Accelerated Project" in utility coordination communications, and Company and City agree to voluntarily reduce the time periods in Section II.A above.

**F.    Additional Work under Revised NOI and FPP**

In case of a revision to the scope listed in original NOI or FPP and/or revision that expands the boundaries of the original scope, the City shall issue revised NOI and FPP to the Company identifying changes to the scope. The City and Company agree to follow the Coordination Schedule listed in Section II-A for additional scope unless the added scope is an "Accelerated Project" as explained in Section II-E.

The City will provide Company with a revised NOI and Request for Information (X-NOI) as soon as it is practical designating the work being done as an added scope to the original NOI. The Company will provide the City with (1) completed X-NOI; (2) as built drawings reflecting size and locations of Facilities; and (3) plans and schedules, if any, for scheduled Company construction within the expanded City Project limits as soon as that information can reasonably be gathered.

If a City revision is not provided to Company or FPP is issued less than minimum number of days listed in table II-A prior to the advertisement, then the City, and not Company, shall be responsible for added costs, if any per Exhibit A part I.D, for Overlooked/Unexpected Utility Crossings related to additional scope.

**G.    Sixty-Five Percent Designs**

When a City Project involves trenching, trenchless installation, and/or City substructure alignment then in addition to the information discussed above, the City will provide Company an approximately sixty-five percent (65%) design, if available, or as soon as it becomes available.

8-6-2017 Final

Case: 19-30088    Doc# 9660    Filed: 12/01/20    Entered: 12/01/20 16:08:21    Page 25 of 42

## III. POTHOLING

During the design phase and prior to the award of the City Contract, the Company will pothole at locations identified by City or by Company where it is reasonably necessary to provide the City with more precise information about the horizontal and vertical locations of Facilities or where Facilities may be in close proximity to and potentially in conflict with City Project work. The parties shall cooperate in selecting the appropriate locations for the Company to pothole.

Nothing in this section or in this Agreement is intended to release or relieve Company, City Contractor or City from any of their obligations under Government Code § 4216 *et. seq.*

Nothing in this section or in this Agreement is intended to require Company to pothole, to locate, or provide information regarding Facilities that do not belong to Company or that are not Facilities as defined above.

Nothing in this section or in this Agreement is intended in any way to alter, amend or change the parties' responsibilities with respect to performing positive location of utility Facilities (i.e., potholing) within a state highway.

If a Conflict is discovered during construction that was not identified previously either by the Company or by City due to inadequate utility information, the Company will cooperate with City and City Contractor to expeditiously resolve the Conflict so as not to unreasonably delay the City Contract. Should a City Contractor comply with its obligations under Government Code § 4216 *et. seq* and discover a Conflict during construction that Company had failed to identify in a SWAPP provided under Section II.A. Company shall be responsible for all incremental design and/or construction costs caused by the newly discovered Conflict. Company will have the option to pay the City Contractor directly for such work or to reimburse the City under a separate agreement.

City agrees that any potholes performed under this Agreement shall be exempt from the requirements to install curb ramp upgrades or replacements.

## IV. COMPANY'S RESPONSIBILITY TO ENTER INTO PAYMENT AGREEMENTS

Company shall enter into a Payment Agreement with City Contractor within 45 calendar days after City notifies Company of the award of the Contract provided that Company has Facilities that will require the City Contractor to perform Company Reimbursed Work. The City Contractor shall submit invoices and related supporting documentations listed in Exhibit A to the Company. The Company is not required to accept or pay invoices submitted to Company by a subcontractor.

Notwithstanding the paragraph above, Company shall have the right to support, protect, remove or relocate its Facilities itself or by using Company contractors, provided that doing so shall not delay the City's Project.

## V. CITY ADMINISTRATIVE COSTS

Pursuant to Section 910 of the S.F. Public Works Code, the City may be entitled to compensation from Company for the City's administrative costs associated with incorporating SWAPP into the construction documents. Should Company comply with the Coordination Schedule, City will waive collection of such administrative costs.

8-6-2017 Final

Case: 19-30088   Doc# 9660   Filed: 12/01/20   Entered: 12/01/20 16:08:21   Page 26 of 42

## VI. COST BASIS

As of the Effective Date, SWAPP costs shall be in accordance with Exhibit A – Contract Procedure. The Fixed Price Schedule in Section III of Exhibit A (Contract Procedure) shall be adjusted annually on January 1 of each year in accordance with the Construction Cost Index for the San Francisco Bay Area or closest geographical area, published by the Engineering News Record for the third quarter of the previous year. Such adjusted costs shall be used for City Projects advertised for bids after each January 1 or as soon thereafter as is practicable.

## VII. UNIFORM CONTRACT

The City agrees that the provisions of this Agreement shall be substantially the same for each utility Company.

## VIII. DESIGNATED REPRESENTATIVES FROM COMPANY AND THE CITY; REGULAR MEETINGS

Within 30 calendar days of execution of this Agreement, the Company and the City each shall designate one primary representative and two alternate representatives. Such designees may be changed only by written notification to the other Party's primary designee.

The primary representatives or their alternate representatives will confer, either by phone, email or face to face, at least once every month unless otherwise agreed to review the status of ongoing activities and a forecast of future activity. The primary representatives or their alternate representatives will also meet periodically to discuss issues that arise with respect to the implementation of this Agreement. The primary representatives for each Party shall meet no less frequently than quarterly to exchange information and discuss implementation issues.

## IX. TERM OF AGREEMENT

This Agreement shall be in full force and effect for an initial term of three years from the Effective Date. Thereafter, this Agreement shall continue in full force and effect indefinitely, provided that after the initial three-year term either party may provide a written request to renegotiate any term or terms of this Agreement. Upon such written request, the parties agree to negotiate proposed contract modifications in good faith. If the parties do not agree on a proposed contract modification within six months after the date of the written request to renegotiate, then the party that sought renegotiation may terminate this Agreement by providing three months' written notice to the other party. If terminated, this Agreement shall continue to apply to all City Contracts for which an NOI was issued during the term of this Agreement.

## X. COMPANY'S OBLIGATION TO COMPENSATE, DEFEND, INDEMNIFY, AND HOLD CITY HARMLESS

Company shall compensate and/or defend, indemnify and save harmless City, its officers, employees, boards, and commissions, from all claims, loss, damage, or liabilities, for personal injury or property damage arising from defects in SWAPP incorporated in any City Contract, and/or the Company's failure to provide SWAPP in accordance with the terms of this Agreement.

## XI. INSURANCE REQUIREMENTS OF CITY CONTRACTOR

If the Company has Company Reimbursed Work within the scope of a City Project, the City agrees to require the City Contractor to include the Company as an additionally named insured on the City Contractor's commercial general liability and automobile liability insurance

8-6-2017 Final

Case: 19-30088    Doc# 9660    Filed: 12/01/20    Entered: 12/01/20 16:08:21    Page 27 of 42

policies. The City may require the City Contractor to name other companies having facilities within the City Project limits as appropriate.

## XII.  LIMITATION OF CITY LIABILITY

The City shall not be liable to Company for any loss of or damage to property of the Company or injury to employees of Company caused by any City Contractor while performing Company Reimbursed Work, provided, however, that nothing herein limits the liability of any City Contractor for such loss, damage or injury.

## XIII.  GENERAL PROVISIONS

### A.  Severability

In case any part, term, portion or provision of this Agreement is or shall be invalid, illegal or unenforceable, the remaining parts, terms, portions and provisions shall be deemed severable and the validity, legality and enforceability of the remaining parts, terms, portions and provisions shall not be affected or impaired.

### B.  Headings

The headings in this Agreement are for convenience only and do not limit or alter the meaning or interpretation of this Agreement in any manner.

### C.  Amendment of Agreement

This Agreement may only be amended by written agreement.

### D.  Counterpart

This Agreement may be executed in multiple counterparts and signatures may be exchanged by facsimile or electronically, each of which shall be deemed to be an original document, and all of which together shall constitute one and the same document.

### E.  Governing Law

This Agreement shall be construed in accordance with the laws of the State of California.

## XIV.  DISPUTE RESOLUTION

In the event of a dispute, the parties shall notify the primary representatives and the alternates in writing of the disputed issue. Within thirty business day of receipt of a dispute notice, the primary representatives or alternates shall meet in an effort to resolve the matter. If the primary representatives and/or alternates agree upon a resolution, that decision shall be final. The intent of the parties is for all disputes to be resolved by the primary representatives and/or alternates to the greatest extent possible.

If the primary representatives and/or alternates do not agree upon a resolution after good faith efforts to do so, either party may refer the dispute to mediation, with a mediator mutually acceptable to both Parties.

The City and Company each shall bear its own dispute resolution expenses and shall share equally the cost of any mediator. Unless otherwise agreed in writing, the Parties shall continue to perform their obligations under the provisions of this Agreement during the course of dispute resolution efforts. If the parties are unable to agree upon a mediator, or if the mediation is unsuccessful, then either party may file suit.

8-6-2017 Final

Case: 19-30088    Doc# 9660    Filed: 12/01/20    Entered: 12/01/20 16:08:21    Page 28 of 42

## XV. EXCEPTIONS

There may at times be conditions which, in the opinion of the City and Company, do not fit the average conditions intended by this Agreement and Contract Procedure. The primary representatives may mutually agree to deviations from this Agreement or the Contract Procedure for a particular City Project or City Projects.

## XVI. EFFECTIVE DATE AND TERMINATION OF PRIOR AGREEMENTS

This Agreement will apply to all City Contracts advertised after the Effective Date. City Contracts advertised prior to the effective date of this agreement shall be covered by the terms of the previous agreements or arrangements, unless the parties otherwise mutually agree.

Any prior Support and Work Around Agreements or Support, Work Around and Protect Agreements between Company and City are terminated as of the Effective Date.

## XVII. SAFETY

City Contractors are chosen by the City, not by Company, and will work under the supervision and control of the City. The City Contractors are merely to be reimbursed by Company for Company Reimbursed Work. Notwithstanding the above, Company shall have the right to order the City Contractor to stop work if Company is concerned about a safety issue involving its Facilities. In addition, the City Contractor shall arrange for a Company inspector to be present during execution of all support, work around and protection work involving Company electric or gas transmission Facilities. Nothing in this Section or in this Agreement is intended to release or relieve Company, City or City Contractor from following safe practices when working on or around Facilities or from complying with Government Code § 4216 *et. seq.*

## XVIII. RELOCATION PROJECTS NOT COVERED BY THIS AGREEMENT

If the City determines that an actual relocation of Facilities may be necessary to accommodate a City Project, the City will make best efforts to apply for the relocation through the Company application process. Only one application is required per City Project.

| CITY AND COUNTY OF SAN FRANCISCO, a California municipal corporation | PACIFIC GAS AND ELECTRIC COMPANY |
|---|---|
| By: _____ | By: _____ |
| Mohammed Nuru | Michael Ritter |
| Director of Public Works | Director of Gas Distribution Engineering and Design |
| Date: 8/11/17 , 2017 | Date: 8/31/17 , 2017 |

8-6-2017 Final

**APPROVED AS TO FORM:**
Dennis J. Herrera, City Attorney

By: _____
        Louise S. Simpson
        Deputy City Attorney
        Attorneys for the City and County
        of San Francisco

**APPROVED AS TO FORM:**
Pacific Gas and Electric Company

By: _____
        Stephen L. Garber
        Attorneys for Pacific Gas and Electric
        Company

## EXHIBITS:

Exhibit A -   Contract Procedure:  Support, Work Around and Protection of Utility Facilities
Exhibit B -   San Francisco Board of Supervisors Resolution No. 176-70, dated April 6, 1970

8-6-2017 Final

## XV. EXCEPTIONS

There may at times be conditions which, in the opinion of the City and Company, do not fit the average conditions intended by this Agreement and Contract Procedure. The primary representatives may mutually agree to deviations from this Agreement or the Contract Procedure for a particular City Project or City Projects.

## XVI. EFFECTIVE DATE AND TERMINATION OF PRIOR AGREEMENTS

This Agreement will apply to all City Contracts advertised after the Effective Date. City Contracts advertised prior to the effective date of this agreement shall be covered by the terms of the previous agreements or arrangements, unless the parties otherwise mutually agree.

Any prior Support and Work Around Agreements or Support, Work Around and Protect Agreements between Company and City are terminated as of the Effective Date.

## XVII. SAFETY

City Contractors are chosen by the City, not by Company, and will work under the supervision and control of the City. The City Contractors are merely to be reimbursed by Company for Company Reimbursed Work. Notwithstanding the above, Company shall have the right to order the City Contractor to stop work if Company is concerned about a safety issue involving its Facilities. In addition, the City Contractor shall arrange for a Company inspector to be present during execution of all support, work around and protection work involving Company electric or gas transmission Facilities. Nothing in this Section or in this Agreement is intended to release or relieve Company, City or City Contractor from following safe practices when working on or around Facilities or from complying with Government Code § 4216 *et. seq.*

## XVIII. RELOCATION PROJECTS NOT COVERED BY THIS AGREEMENT

If the City determines that an actual relocation of Facilities may be necessary to accommodate a City Project, the City will make best efforts to apply for the relocation through the Company application process. Only one application is required per City Project.

**CITY AND COUNTY OF SAN FRANCISCO,**
a California municipal corporation

By: _____
        Mohammed Nuru
        Director of Public Works

Date: _____8/11/17_____, 2017

**PACIFIC GAS AND ELECTRIC COMPANY**

By: _____

Date: _____, 2017

8-6-2017 Final

Case: 19-30088    Doc# 9660    Filed: 12/01/20    Entered: 12/01/20 16:08:21    Page 31 of 42

**APPROVED AS TO FORM:**
Dennis J. Herrera, City Attorney

By: _____
      Louise S. Simpson
      Deputy City Attorney
      Attorneys for the City and County
      of San Francisco

**APPROVED AS TO FORM:**
Pacific Gas and Electric Company

By: _____
      Stephen L. Garber
      Attorneys for Pacific Gas and Electric
      Company

## EXHIBITS:

**Exhibit A -**    Contract Procedure:  Support, Work Around and Protection of Utility Facilities
**Exhibit B -**    San Francisco Board of Supervisors Resolution No. 176-70, dated April 6, 1970

8-6-2017 Final

Case: 19-30088   Doc# 9660   Filed: 12/01/20   Entered: 12/01/20 16:08:21   Page 32 of 42

**EXHIBIT A:**

**CONTRACT PROCEDURE, SUPPORT, WORK AROUND AND PROTECTION OF UTILITY FACILITIES**

## I.     INTRODUCTION, DEFINITIONS AND KEY PRINCIPLES

### A.     Direct Company/City Contractor Payment

This Contract Procedure covers SWAPP content and format, supporting documentation required from City Contractors and payment by Company to a City Contractor directly for all costs incurred as the result of the performance of Company Reimbursed Work.

### B.     Utility Crossing Defined

A "Utility Crossing" is defined as any Facility located within the excavation area of a City Project, which Facility will remain in place and will not be relocated, abandoned in place, or removed. The length of a Utility Crossing is the centerline distance in feet of the portion of the Facility within the excavation area for the City Project.

### C.     Fixed Price Schedule

Utility Crossings where the length of the Facility is not more than 3 times the width of the excavation for excavation widths less than 18 feet, shall be priced pursuant to the Price Schedule established in Section III of this Exhibit A. The Company will make payments to City Contractor in accordance with the Fixed Price Schedule.

### D.     Added Costs for Overlooked/Unexpected Utility Crossings

The fixed price for Utility Crossings where the length of the Facility is not more than 3 times the width of the excavation for excavation widths less than 18 feet, and that have been overlooked, unexpected and/or not shown on the SWAPP, including those instances where Company failed to submit SWAPP following proper notice by City, will be paid for in accordance with the Fixed Price Schedule established in Section III of this Exhibit A, plus an additional 15% percent markup for City Contractor's profit and overhead.

### E.     No Mark-Up for Certain Work

The additional 15% markup in Section I.D above of this Exhibit A does not apply to work that falls within the Agreement's Sections II.B (Emergency Work Contracts), II.C (Spot Sewer Work), II.D (As Needed City Contracts Or Job Order Contracts), II.E (Unforeseen Schedule Acceleration), II.F (Additional Work under Revised NOI and FPP) if revised FPP is issued less than minimum number of days listed in Section II.A of the Agreement prior to the advertisement or where City failed to provide Company with the notice required in Section II.A, Row 1 or Section II.A, Row 3 of the Agreement.

### F.     Negotiated Payment

Notwithstanding the Fixed Price Schedule established in Section III of this Exhibit A , the Company and the City Contractor shall directly negotiate the SWAPP costs for Utility Crossings or encroachments for (1) "parallel" Utility Crossings; (2) Utility Crossings with lengths more than three times the width of the excavation, and/or (3) where the computed cost of any Utility Crossing exceeds $9,784.

8-6-2017 Final

If a utility facility is located longitudinally and directly on top of the city trench or multiple utility facilities crossing the City trench are located too close to each other leaving no space in between for the City Contractor to excavate and shore the trench, and there is a need to change the construction method to install City facilities, the increased cost shall be shared by various utility agencies and City departments based on the number and size of each agency or department facilities.

### G. Abandoned Facilities or Inactive Facilities

#### 1. Inactive Facilities

Company will specify on its SWAPP Inactive Facilities. The City Contractor will perform Company Reimbursed Work around Inactive Facilities unless otherwise instructed by the Company on the SWAPP documents.

#### 2. Abandoned Facilities

Company may, but is not required to, specify Abandoned Facilities on its SWAPP. If City Contractor encounters unidentified company facility during construction, Contractor shall notify the Company in accordance with Section II.D.7 of this Exhibit A. The Company Inspector shall visit the site within the time allotted in Section II.D.7 of this Exhibit A to confirm that the facility is abandoned. If the Company fails to confirm that line is abandoned, the contractor will receive full payment per Section III of this Exhibit A.

#### 3. Flushing

Within 48 hours of Company's receipt of notice pursuant to Section II.D.7 of this Exhibit A, Company will either flush or inform City Contractor that Company has already flushed all Abandoned gas Facilities or Inactive/deactivated gas Facilities prior to removal by City Contractor.

#### 4. Removal of Abandoned Facilities or Inactive Facilities Designated to Be Abandoned

If necessary to construct City Project, the removal of Abandoned Facilities or Inactive Facilities that the Company specifies on its SWAPP that it intends to abandon will be at the City Contractor's sole expense, except for removal of duct banks and conduits or pipes larger than 12" in diameter. Company and City Contractor will negotiate the cost for removal of such duct banks and conduits or pipes larger than 12" in diameter. At Company's option if decided during the design phase, Company may remove Facilities itself without unreasonably delaying the City Contractor.

### H. Payment Only for Work Performed by City Contractor

Company will not pay and is not expected to pay City Contractor unless City Contractor actually supports, works around or protects Company's Facilities. No payment shall be due to the City Contractor if Company crews respond and are the ones supporting, working around, and/or protecting the Company's Facilities, such as in an emergency, or if the City Contractor does not actually perform any work or undertake any action to support, work around or protect the Company's Facilities.

8-6-2017 Final

Case: 19-30088    Doc# 9660    Filed: 12/01/20    Entered: 12/01/20 16:08:21    Page 34 of 42

## II.    METHOD OF ADMINISTRATION

### A.    SWAPP Content

SWAPP must contain the following:

#### 1.    Location and Size of Facilities

**a.**    The horizontal location of Company's existing Facilities, including Inactive/deactivated Facilities, and those Facilities planned to be installed within five years, located within the City Project limits. Company is not obligated to update the SWAPP or its list of Facilities planned or scheduled to be installed within five years if the Company's plans or schedules change after the SWAPP has been provided.

**b.**    The size [outside dimensions] and approximate depth of cover of any Utility Crossing in the City trench or located in the close proximity to a City trench shall also be reflected if Company's records contain this information.

#### 2.    Utility Crossing Cost:

All Utility Crossings and associated authorized costs, including a tabulation of the identity, size, type, material, length and SWAPP cost of each Utility Crossing, and the following instruction:  PAYMENT FOR SUPPORT, WORK AROUND AND PROTECTION WORK WILL BE MADE BY COMPANY UNDER DIRECT CONTRACT WITH THE CITY CONTRACTOR.

**a.**    <u>Actual Number and Size of Utility Crossing</u>: The number of Utility Crossings reflected on the SWAPP will be based on the information known at that time. Company shall pay City Contractor based on the actual number, size, and length of Utility Crossings per schedule of prices effective for the year during which the City Contract is advertised.

**b.**    <u>Negotiated Costs</u>: Utility Crossings that the Company intends to negotiate directly with a City Contractor must be identified.

#### 3.    Utility Conflicts

All Utility Conflicts that Company intends to remove or relocate,  or that Company intends to abandon shall be identified.

### B.    SWAPP Format

Company must provide SWAPP in the following format:

#### 1.    AUTOCAD

Company must use City AUTOCAD drawings, or such other software or format that is mutually acceptable to City and Company, as a base for the SWAPP so that SWAPP will reflect the City Project limits and locations of each Utility Crossing to scale.

#### 2.    Size

Drawing size must be 22 inches by 34 inches, or such other size as is mutually acceptable to City and Company.

8-6-2017 Final

### 3. Title Block

Drawings must have the Company's title block with complete signatures.

### 4. Contact Information

Drawings must include phone numbers or email addresses that the City Contractor can use to contact Company for negotiations regarding negotiated costs or to notify Company of field conditions that deviate from the SWAPP information.

### 5. Disclaimer

Drawings must include the following disclaimer: THE UTILITY INFORMATION SHOWN ON THIS PLAN HAS BEEN PREPARED BY [NAME OF COMPANY]. THE CITY AND [NAME OF COMPANY] MAKE NO REPRESENTATION AS TO THE ACCURACY OR COMPLETENESS THEREOF.

Nothing herein shall be construed to prohibit Company from adding such other disclaimers to the drawings as Company deems appropriate.

## C. Specifications

City shall incorporate standard SWAPP specifications into all City Contracts. Company may revise said specifications for any particular Contract. Such changes must be submitted with the SWAPP or at least fourteen (14) days prior to advertisement. Company shall prepare its standard specifications in a form satisfactory to the City.

## D. Contract Activities

### 1. City Contractor Measurement

The City Contractor will measure the outside diameter or width of Utility Crossings to the nearest inch (outside diameter *excluding* any fittings, bells, or gate valves) and length of the Utility Crossings to the nearest foot to determine the cost of each Utility Crossing according to the Fixed Price Schedule in Section III of this Exhibit A.

### 2. Variations and Cost Adjustments

The City Contractor will notify Company immediately of any variation of Utility Crossings from the SWAPP and/or estimate that requires cost adjustment and such cost adjustments shall be settled within no more than two business days without delay to the City Project.

### 3. Supporting Documentation for City Projects other than Spot Sewer Repair Contracts

Unless otherwise agreed by the Primary Representatives, the City Contractor shall, at a minimum, submit the following documentation with each invoice submitted to the Company for payment:

    a. Utility Facility Crossing Support and Work Around Summary.

    b. "Drawing for Support and Work Around Invoice for Utility Facilities" identifying Company reimbursed work by block, type of facility, and shall include following:

        i. Identification of all Utility Crossings by alpha-numerical numbering system (e.g., E1, E2, G1, G2);

8-6-2017 Final

Case: 19-30088    Doc# 9660    Filed: 12/01/20    Entered: 12/01/20 16:08:21    Page 36 of 42

  ii. Location and size of all Utility Crossings

  iii. Length of all Utility Crossings

  iv. Invoice and as-built templates should be utilized and all information filled out its entirety (e.g. As-built stamp, Date, City Contractor's Full Name, Signature, etc.)

 c. Photos of following Utility Crossings:

  i. Utility Crossings where the size of the Facility varies from that shown on Company's SWAPP drawings; any change of measurement requires one photo per block per size variation.

  ii. Utility Crossings not shown on Company's SWAPP drawings.

  iii. Parallel Utility Crossings showing measurements and potential facilities support

  iv. Utility Crossings 6 feet or longer unless:

- Shown on SWAPP and no variance.
- Facility is a lateral that is crossing the City main facility trench having 6 feet or greater trench width and crossing length does not exceed the trench width.

**4. Supporting Documentation for Spot Sewer Repair Contracts**

Unless otherwise agreed by the Primary Representatives, the City Contractor shall, submit following documentation with each invoice submitted to the Company for payment for Spot Sewer Repair Contracts:

 a. Utility Facility Crossing Support and Work Around Summary.

 b. "Drawing for Support and Work Around Invoice for Utility Facilities" identifying company reimbursed work by block, type of facility and shall include following:

  i. Identification of all Utility Crossings by alpha-numerical numbering system (e.g., E1, E2, G1, G2);

  ii. Location and size of all Utility Crossings

  iii. Length of all Utility Crossings.

  iv. Invoice and as-built templates should be utilized and all information filled out in its entirety (e.g. City Representative's Name and Signature, Date, City Contractor's Full Name, Signature, etc.)

 c. Photos of following Utility Crossings:

  i. All Duct Bank Structures and measurements

  ii. All Utility Crossings 6 feet or greater in length

  iii. All unmarked active Utility Crossings

  iv. Each utility that varies in size and/or location from USA street marking(s).

 d. Underground Service Alert ticket number

8-6-2017 Final

Case: 19-30088 Doc# 9660 Filed: 12/01/20 Entered: 12/01/20 16:08:21 Page 37 of 42

5. **Photos**

All photos must include:

      i. Label w/Utility Crossing Reference Number

      ii. Name of Street or Intersection

      iii. Above-ground picture that includes a landmark street sign, or house that helps identify location of the crossing.

6. **Company's Right of Confirmation**

The Company shall have the right to confirm measurements with the City Contractor but all disagreements shall be resolved without delay to the City Project.

7. **Unidentified Facilities**

Unidentified Facilities not reflected on the SWAPP discovered by a City Contractor shall be called to the attention of the Company immediately by the City Contractor. Company shall have 48 hours from receipt of such notification to determine ownership and provide direction to the City Contractor for disposition of the facility which are not in direct conflict with City Project work and can be supported, worked around and protected in the trench. However, if the unidentified facility is in direct conflict with the City Project work and City Contractor cannot proceed further without resolution, the Company will visit the site as soon as possible within the 24 hours from receipt of such notification to determine ownership and provide direction to the City Contractor. The time allowance shall include at least 8 working hours. If the ownership of the unidentified facility is unknown, the City Contractor shall call Underground Service Alert (USA) requesting Utility Agencies to visit the site to identify the ownership. If no determination can be made after the aforementioned procedure is followed, the City Contractor will follow the direction of the City's primary representative or authorized designee.

8. **Verification and City Contractor Itemization**

During the course of a City Contract, the City Contractor shall keep an itemized record of support and work around costs for each Utility Crossing, noting any variation from Company's SWAPP and/or Estimates. The itemized record shall be maintained and copies submitted monthly to Company and the City as the City Contract work progresses, or as otherwise agreed by Company and City Contractor.

9. **Progress Payments**

Progress payment for SWAPP costs shall be made by Company within ninety (90) days of receipt of an invoice from the City Contractor submitted in accordance with the Company's then-current requirements and standards for submitting invoices.

### III. METHOD OF DETERMINING UTILITY CROSSING COSTS

A. **Fixed Price Schedule**

The cost of support, work around and protection of utility mains, duct structures and services shall be based on the outside diameter (*excluding* any fittings, bells, or gate valves) or width of said Facilities and the length of the Utility Crossing. Utility Crossings and length of Utility Crossing are defined in Section I.B of this Exhibit A.

8-6-2017 Final

Case: 19-30088   Doc# 9660   Filed: 12/01/20   Entered: 12/01/20 16:08:21   Page 38 of 42

**B. Measurement of Maximum Outside Diameter**

The following schedule of prices shall be used in computing the cost of each Utility Crossing. In the following schedules, the maximum outside diameter shall mean outside diameter of pipe, conduit, service, duct or main *excluding* any fittings, bells, or gate valves, and width shall mean the distance measured horizontally across the duct structure:

The schedule of prices as shown in this section reflects the Cost of Utility Crossing Schedules, effective January 2017.

### FIXED PRICE SCHEDULE

**Cost of Utility Crossing = Fixed Cost + Support Cost**

**Group I: Length of Crossing less than Six Feet**

| Maximum Outside Diameter Of Main And Service Or Width Of Duct Structure | Fixed Cost | Support Cost Per Foot of Length of Crossing |
|---|---|---|
| 4 inches or less | $550 | 0 |
| Over 4 inches to 20 inches | $550 + $92 per inch over 4 inches | 0 |
| Over 20 inches | $2,017 + $153 per inch over 20 inches | 0 |

**Group II: Length of Crossing Six Feet to Twelve Feet**

| Maximum Outside Diameter Of Main And Service Or Width Of Duct Structure | Fixed Cost | Support Cost Per Foot of Length of Crossing Over Six Feet |
|---|---|---|
| 4 inches or less | $703 | $92 |
| Over 4 inches to 20 inches | $703 + $98 per inch over 4 inches | $92 |
| Over 20 inches | $2,268 + $165 per inch over 20 inches | $92 |

**Group III: Length of Crossing greater than Twelve Feet**

| Maximum Outside Diameter Of Main And Service Or Width Of Duct Structure | Fixed Cost | Support Cost Per Foot of Length of Crossing Over Twelve Feet |
|---|---|---|
| 4 inches or less | $1,253 | $122 |
| Over 4 inches to 20 inches | $1,253 + $110 per inch over 4 inches | $122 |
| Over 20 inches | $3,013 + $183 per inch over 20 inches | $153 |

8-6-2017 Final

**C.     Duct Bank Structure**

Duct Structure is one or more ducts, conduits or pipes, of any size, or a combination of such ducts, conduits or pipes, which are grouped together but which may or may not be banded, encased in concrete, or otherwise incorporated into a solid unit.

**D.     Nested Utility Facilities**

Nested Facilities are Facilities 6 inches or less in outside diameter or width and are less than 3 feet clear distance of each other regardless of ownership.  In the case of nested Facilities, the calculated cost of each Utility Crossing shall be reduced by 33-1/3%.

8-6-2017 Final

**EXHIBIT B: SF Board Resolution No. 176-70, dated April 6, 1970**

DIRECTING THE DIRECTOR OF PUBLIC WORKS TO ADOPT PROCEDURES AND TO NEGOTIATE AGREEMENTS WITH PUBLIC UTILITY COMPANIES FOR INCORPORATION INTO CITY CONTRACTS OF COMPANY WORK NECESSARY UNDER PUBLIC WORKS CODE.

RESOLUTION NO. 176-70

WHEREAS, in the conduct of City construction work in streets and public areas or easements there are facilities owned or controlled by public utility companies and City departments performing proprietary functions, and

WHEREAS, under Sections 752, 753 and 754 of the Public Works Code (Part II, Chapter X of the Municipal Code) said companies or City departments are required to remove or adjust their facilities so as to permit the work of the City's Contractor to proceed without interference, and

WHEREAS, Section 104.03 of the Standard Specifications of the Bureau of Engineering allows said companies or City departments to arrange for the Contractor to modify his work if the cost to remove or adjust their facilities materially exceeds the cost of modifying the work of the Contractor, and

WHEREAS, said companies or departments at times will elect to remove, adjust or add improvements to their facilities, and

WHEREAS, significant delays are experienced in the progress of City contract work, which at times can come to a standstill while said arrangements are made by the companies or City department with the Contractor to modify his work or for the companies or City departments to contract for extra work, and

WHEREAS, such delays are costly and not in the best interest of the City,

NOW, THEREFORE, BE IT RESOLVED, that the Director of Public Works is requested to adopt a procedure or procedures which will provide a method of allowing said companies or City departments owning or controlling utility facilities used in the exercise of proprietary functions to include in City contracts plans and specifications for such work as may be necessary under the Public Works Code, Sections 752, 753 and 754 and the Standard Specifications Section 104.03, and other work which might directly or indirectly cause delay to the progress of the City's construction work, and

BE IT FURTHER RESOLVED that upon adoption of such procedure or procedures the Director of Public Works be authorized to negotiate and execute an agreement with said companies and City departments individually or collectively, for a method of payment, acceptable to the Controller and adequate to compensate the City for additional work performed by the City and the City Contractor associated with said procedure or procedures.

I hereby certify that the foregoing resolution was adopted by the Board of Supervisors of the City and County of San Francisco at its meeting of April 6, 1970.

ROBERT J. DOLAN, Clerk
Approved: April 8, 1970
JOHN A. ERTOLA, Acting Mayor
April 14, 1970—It

8-6-17 Final

**END OF DOCUMENT**

8-6-17 Final