Case 4:20-cv-05414-HSG   Document 47   Filed 02/08/21   Page 1 of 11

**Entered on Docket
February 09, 2021
EDWARD J. EMMONS, CLERK
U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PARADISE UNIFIED SCHOOL DISTRICT, ET AL, <br><br> Plaintiff, <br><br> v. <br><br> FIRE VICTIM TRUST, ET Al, <br><br> Defendant. | Case No. 20-cv-05414-HSG <br><br> **ORDER GRANTING MOTION TO DISMISS APPEAL** <br><br> Re: Dkt. No. 26 |

Pending before the Court is the motion to dismiss filed by the Fire Victim Trust and the Official Committee of Tort Claimants (collectively "Appellees"), appointed in the chapter 11 cases of PG&E Corporation and Pacific Gas and Electric Company as debtors (collectively, "Debtors," and as reorganized, "Reorganized Debtors"), in response to the appeal by Paradise Unified School District and certain other wildfire victims ("Appellants"). Dkt. No. 26 ("Motion"). Appellants filed this appeal of the Bankruptcy Court's order ("Confirmation Order") confirming the Debtors' Plan of Reorganization dated June 19, 2020 ("Plan").[1] For the reasons set forth below, the Court **GRANTS** the Motion.

**I. BACKGROUND**

On January 29, 2019, the Debtors commenced voluntary cases for relief under chapter 11 of title 11 of the United States Code ("Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of California ("Bankruptcy Court"). Significantly, the Debtors needed to propose a plan of reorganization that satisfied the requirements of A.B. 1054, including its June 30, 2020 deadline for plan confirmation. In light of the "increased risk of catastrophic wildfires,"

---

[1] Capitalized terms not otherwise defined in this order have the meanings ascribed to them in the Plan.

A.B. 1054 created the "Go-Forward Wildfire Fund" as a multi-billion dollar safety net to compensate future victims of public utility fires and thereby "reduce the costs to ratepayers in addressing utility-caused catastrophic wildfires," support "the credit worthiness of electrical corporations," like the Debtors, and provide "a mechanism to attract capital for investment in safe, clean, and reliable power for California at a reasonable cost to ratepayers."  A.B. 1054 § 1(a).  For the Debtors to qualify for the Go-Forward Wildfire Fund, however, A.B. 1054 required, among other things, the Debtors to obtain an order from the Bankruptcy Court confirming a plan of reorganization by June 30, 2020.  *See* A.B. 1054 § 16, ch. 3, 3292(b).

After more than sixteen months of negotiations among a variety of stakeholders, including the Official Committee of Tort Claimants as the fiduciary for all holders of Fire Victim Claims, and following confirmation hearings that spanned several weeks, the Plan was confirmed by the Bankruptcy Court on June 20, 2020 and became effective on July 1, 2020 ("Effective Date"). Among the most crucial and fundamental of the various settlements embodied in the Plan was the Tort Claimants RSA and the Subrogation Claims RSA.  BR Dkt. No. 5174.[2]  The Tort Claimants RSA was a comprehensive settlement of all Fire Victim Claims for approximately $13.5 billion in cash and stock, plus certain other assets to be transferred to a trust for the benefit of Fire Victim Claimants ("Fire Victim Trust").  *Id.*  The Subrogation Claims RSA allowed the Debtors to settle and resolve Subrogation Claims of over $20 billion in alleged liabilities for approximately $11 billion.  *See Int'l Church of the Foursquare Gospel v. PG&E Corp.*, No. 20-CV-04569-HSG, 2020 WL 6684578, at *1 (N.D. Cal. Nov. 12, 2020).  In connection with that settlement, and the allowance of the Subrogation Wildfire Claims in the reduced amount, the Debtors agreed to fund an $11 billion trust under the Plan ("Subrogation Wildfire Trust") that would administer, process, satisfy, and resolve all Subrogation Fire Claims following the Effective Date.  *See* Plan, §§ 4.6(a), 4.25(e), 6.4–6.6.  The settlements embodied in the Tort Claimant RSA and the Subrogation Claims RSA were critical to confirming a plan by the June 30, 2020 A.B. 1054 deadline.  *See Int'l Church¸* 2020 WL 6684578 at *1.

---

[2] "BR Dkt. No." references are to the Bankruptcy Court's docket, Case No. 19-30088 (DM) (Bankr. N.D. Cal.).  "Dkt. No." references are to this Court's docket.

1    Crucial to these settlements and the two-trust structure of the Plan were Section 6.7(a) of

2    the Plan ("Section 6.7(a)")[3] and the corresponding Section 2.6 of the Fire Victim Trust Agreement

3    ("Section 2.6"). Mot. at 1. These provisions permit the Trustee to reduce payments to fire victims

4    by the amount reasonably recoverable by the victim from its insurer and require fire victims to

5    exhaust their available insurance recoveries before seeking compensation from the Fire Victim

6    Trust. *Id*. Appellants challenge the application of Section 6.7(a) and Section 2.6 to their claims.

7    Dkt. No. 36 ("Opposition") at 8.

8    On July 1, 2020 ("Effective Date"), the Reorganized Debtors executed a number of

9    transactions under the Plan, including making distributions to more than 2,800 creditors. *Int'l*

10   *Church*, 2020 WL 6684578 at *2. By the end of July 2020, the Reorganized Debtors made more

11   than $42 billion in disbursements to creditors and other parties in interest. *Id.* These

12   disbursements included (1) funding the Fire Victim Trust with $5.4 billion in cash and

13   476,995,175 shares of Reorganized PG&E common stock; (2) funding the Subrogation Wildfire

14   Trust with approximately $11 billion; (3) paying approximately $1 billion in connection with the

15   Public Entities Settlements; (4) paying approximately $5 billion to the Go-Forward Wildfire Fund

---

[3] Section 6.7(a) of the Plan provides:

> On or before the Effective Date, the Fire Victim Trust shall be established. In accordance with the Plan, the Confirmation Order, the Fire Victim Trust Agreement and the Fire Victim Claims Resolution Procedures, the Fire Victim Trust shall, among other tasks described in this Plan or the Fire Victim Trust Agreement, administer, process, settle, resolve, liquidate, satisfy, and pay all Fire Victim Claims, and prosecute or settle all Assigned Rights and Causes of Action. All Fire Victim Claims shall be channeled to the Fire Victim Trust and shall be subject to the Channeling Injunction. The Fire Victim Trust shall be funded with the Aggregate Fire Victim Consideration. To the extent, if any, a holder of a Fire Victim Claim asserts damages against the Debtors or the Fire Victim Trust for amounts covered by a policy of insurance, the Fire Victim Trust may receive a credit against the Fire Victim Claim of any such holder, its predecessor, successor, or assignee, for insurance coverage amounts as provided in the Fire Victim Trust Agreement. In addition, coverage provisions of any insurance policy for losses resulting from a Fire and any funds received by any holder of a Fire Victim Claim, net of attorney's fees, shall satisfy, to the extent applicable, any amounts of restitution the Debtors or Reorganized Debtors might be subject to under Cal. Penal Code § 1202.4

United States District Court
Northern District of California

1  established under A.B. 1054; and (5) paying noteholders and other holders of funded debt over
2  $15 billion and distributing new replacement and reinstated notes aggregating over $21
3  billion.  *Id.*  Since the Effective Date, an additional 748,415 shares of common stock were issued
4  to the Fire Victim Trust.  *Id.*

5  As a result of the shares transferred to the Fire Victim Trust, that trust held approximately
6  22% of the Reorganized Debtors' equity on the Effective Date.  *Id.* at *3.  On the Effective Date,
7  the Reorganized Debtors also issued 423,372,629 shares of common stock and 16,000,000 equity
8  units to their underwriters in connection with the closing of the common stock and equity unit
9  offerings to fund the Plan.  *Id.*  In addition, 211,337,189 shares were issued to nearly 200 entities
10 representing Backstop Parties pursuant to the terms of the Backstop Commitment Letters and the
11 Forward Stock Purchase Contracts, and 342,105,261 shares of common stock were issued to other
12 private investors.  *Id.*  In total, the Reorganized Debtors issued approximately 1.5 billion new
13 shares of common stock—three times the Reorganized Debtors' previously existing shares.  *Id.*

14 To fund the Plan and their operations, the Debtors raised approximately $9 billion in new
15 value through the sale of over 800 million new shares and 16 million equity units, approximately
16 $5.35 billion of which was sold in the public markets.  *Id.*  In addition to their equity raise, and
17 again based on the Confirmation Order, the Reorganized Debtors also raised nearly $11 billion by
18 issuing several new debt securities to hundreds of new debt purchasers.  *Id.*  Many of the
19 Reorganized Debtors' new securities are currently trading on the public debt and equity
20 markets.  *Id.*

21 **II.     LEGAL STANDARD**

22 The Ninth Circuit has recognized that courts "will not entertain an appeal if the case is
23 moot" on either Constitutional or equitable grounds.  *In re Thorpe Insulation Co.*, 677 F.3d 869,
24 880 (9th Cir. 2012).  The doctrine of equitable mootness reflects a public policy valuing the
25 finality of chapter 11 plan confirmation orders, and serves to protect the debtor, creditors, and
26 third parties in bankruptcy cases.  *Id.*  This is because "[f]inality is essential to the success of
27 bankruptcy reorganization plans," and "[b]oth creditors and the debtor require certainty so that the
28 debtor can return to economic health, and the creditors can maximize their recovery within the

debtor's ability to pay." *In re City of Stockton, California*, 909 F.3d 1256, 1263 (9th Cir. 2018).

In the Ninth Circuit, an appeal is equitably moot "if the case presents transactions that are so complex or difficult to unwind that debtors, creditors, and third parties are entitled to rely on the final bankruptcy court order." *In re Transwest Resort Properties, Inc.*, 801 F.3d 1161, 1167 (9th Cir. 2015); *In re Mortgages Ltd.,* 771 F.3d 1211, 1215 (9th Cir. 2014) ("*Mortgages I*"). The Ninth Circuit considers four factors in determining whether an appeal is equitably moot:

> [1] We will look first at whether a stay was sought, for absent that a party has not fully pursued its rights. [2] If a stay was sought and not gained, we then will look to whether substantial consummation of the plan has occurred. [3] Next, we will look to the effect a remedy may have on third parties not before the court. [4] Finally, we will look at whether the bankruptcy court can fashion effective and equitable relief without completely knocking the props out from under the plan and thereby creating an uncontrollable situation for the bankruptcy court.

*Transwest Resort*, 801 F.3d at 1167–68.

## III.   DISCUSSION

### A.   Appellants Did Not Seek a Stay

As a threshold matter, the Ninth Circuit requires that an appellant must "pursue with diligence all available remedies to obtain a stay of execution of the objectionable order." *Stockton*, 909 F.3d at 1264 (quoting *In re Roberts Farms, Inc.*, 652 F.2d 793, 798 (9th Cir. 1981)). Given that the debtor, creditors, and interested third parties need certainty to implement a confirmed plan, the Ninth Circuit has explained that "if a creditor wishes to challenge a reorganization plan on appeal, we require the creditor to seek a stay of proceedings before the bankruptcy court." *Stockton*, 909 F.3d at 1263.

Appellants, which are corporations represented by counsel, do not dispute that they never attempted to seek a stay of the Confirmation Order. Rather, they argue that they are not seeking to unravel the Plan and that the failure to seek a stay thus does not render the appeal equitably moot. Opp. at 3. They claim that it would have made no sense for them to seek to block the Debtors from emerging from bankruptcy, which would have threatened the success of the entire reorganization. *Id.* Appellants do not otherwise attempt to justify their failure to seek a stay.

Appellants' argument is unavailing. The Ninth Circuit has made clear that the requirement

to seek a stay before appeal is "the general rule" and that exceptions to that rule should be "narrow." *Mortgages I*, 771 F.3d at 1216. This requirement "is grounded in important principles of equity" and the importance of "notif[ying] third parties that the transactions they might enter into with the estate may be undone on appeal." *Id.* As detailed below, the Plan has been substantially consummated, implicating the equity interests protected by the stay requirement. Appellants' failure to seek a stay means that other third parties were not put on adequate notice that Appellants would be challenging the Plan requirements to exhaust available insurance recoveries. And, contrary to Appellants' arguments, Opp. at 7, their damage claims of $765 million, if fully allowed, would have a material impact on the recovery available to other claimants.[4]

Under the Ninth Circuit's four-factor analysis, Appellants' failure to pursue a stay without adequate explanation militates in favor of dismissal. *See Stockton*, 909 F.3d at 1264 ("Failure to [seek a stay] without adequate explanation should result in dismissal.").

### B. The Debtors Have Substantially Consummated the Plan

Even if the Court were to consider the appeal in light of Appellants' failure to seek a stay, the Court must look to whether the Plan has been substantially consummated. The Bankruptcy Code defines "substantial consummation" to mean: "(A) transfer of all or substantially all of the property proposed by the plan to be transferred; (B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and (C) commencement of distribution under the plan." *See* 11 U.S.C. § 1101(2) (defining "substantial consummation"); *In re Mortgages Ltd.*, 771 F.3d 623, 628 (9th Cir. 2014) ("*Mortgages II*") (applying section 1101(2) in finding that plan was substantially consummated); *Stockton*, 909 F.3d at 1264 (plan was substantially consummated where "[t]he City wired payment to institutional creditors, transferred property, and sent checks to former city employees to resolve pension claims, . . . conveyed title to numerous parcels of real property, assigned leasehold interests, and granted purchase options").

---

[4] Appellants themselves present hypothetical calculations showing that allowing their claims in full would result in a 4% reduction in recovery available to other claimants.

As this Court has already found, there is no question that the Debtors have substantially consummated the Plan. *See Int'l Church¸* 2020 WL 6684578 at *4-5.  As discussed above, the Debtors have already (1) completed one of the largest capital raises in chapter 11 history; (2) distributed billions of dollars to creditors and other parties in interest; (3) funded the various trusts established under the Plan, including the Fire Victim Trust and Subrogation Wildfire Trust; (4) distributed approximately 1.5 billion common shares to the Fire Victim Trust, the public, and others and raised billions through new debt and equity offerings; and (5) paid nearly $5 billion to the Go-Forward Wildfire Fund in compliance with A.B. 1054. *Id.*

The Fire Victim Trustee and Subrogation Wildfire Trustee have been appointed and, pursuant to the Channeling Injunction, each of their respective trusts have assumed all liability for the Fire Claims of their respective constituencies. *Id*. The Fire Victim Trustee and claims administrator have commenced their review of the various Fire Victim Claims that were channeled to the Fire Victim Trust on the Effective Date to enable them to commence making timely distributions to Fire Victim Claimants. *Id*. The Reorganized Debtors have also executed the transfer of certain causes of action to the Fire Victims Trust that the Fire Victim Trustee may pursue for the benefit of Fire Victims. *Id*.

Therefore, under the plain language of the Bankruptcy Code and Ninth Circuit precedent, the Court finds that the Plan has been substantially consummated. *Stockton*, 909 F.3d at 1264.

### C.   Harm and Prejudice to Third Parties

In considering whether the relief sought in an appeal "would bear unduly on innocent third parties," the Ninth Circuit considers whether it is possible to alter the plan "in a way that does not affect third party interests to such an extent that the change is inequitable." *Transwest Resort*, 801 F.3d at 1169 (quoting *Thorpe*, 677 F.3d at 882).  The Ninth Circuit held that this factor weighed in favor of dismissal where "reversal of the Confirmation Order would undermine the settlements negotiated with the unions, pension plan participants and retirees, bond creditors, and capital market creditors, all of which were built into the reorganization plan." *Stockton*, 909 F.3d at 1264.

Appellants argue that the other wildfire claimants are not the sort of third parties protected by the equitable-mootness doctrine because those claimants participated in the bankruptcy

proceedings. Opp. at 4-5. Appellants rely on the Ninth Circuit's decisions in *In re Thorpe* and *In re Transwest Resort*. Opp. at 6-7. This reliance is misplaced. The third parties whose interests are implicated in this appeal include the other wildfire claimants, and those who have reliance interests based on their participation in the substantial consummation of the Plan. In *Transwest*, the party found not to be a protected "third party" was the owner of the reorganized debtor, and this owner had participated in both the bankruptcy proceedings and in the district court appeal. 801 F.3d at 1169-70. This is inadequate precedent to support Appellants' attempt to exclude the wildfire claimants, who are not analogous to the owner of a reorganized debtor, from equitable protection.

In *Thorpe*, the appellants exercised due diligence in seeking a stay but were refused. 677 F.3d at 881 ("[T]his is not a case where Appellants sat on their rights; they sought a stay and were refused," and "failure to obtain a stay does not require a conclusion of equitable mootness where parties use due diligence in seeking the stay."). Appellants in this case failed to seek a stay and thus are not similarly situated to the appellants in *Thorpe*. Even if they were, the Ninth Circuit made it clear that the operative question is whether it is possible to alter the Plan "in a way that does not affect third party interests to such an extent that the change is inequitable." *Id.* at 882.

Here, exempting Appellants from Section 6.7(a) and Section 2.6 would be inequitable to the other claimants not only because it would reduce the available recovery, but also because Section 2.6 includes provisions designed to protect claimants who pursue their available insurance recoveries in good faith. First, Section 2.6(a)(ii) makes clear that reduction based on "Available Insurance Recoveries shall not include any policy of insurance that cannot be reasonably construed to provide coverage for damages or losses arising from or attributable to a Wildfire." Second, Section 2.6(b)(iii) directs the Trustee to consider "whether the Fire Victim has exercised reasonable efforts to obtain all recoveries available under policies of insurance," and Section 2.6(c) allows the Trustee to accept an assignment of rights against an insurance company if the Fire Victim was unsuccessful in its reasonable efforts at recovery. Third, Section 2.6(d) provides for the Trustee "to assist Claimants to recover the full amount due to the Claimant under the applicable insurance policy." Fourth, Section 2.6(e) allows the Trustee to "grant exceptions to

United States District Court
Northern District of California

1  Section 2.6(a) for good cause." Thus, Appellants seem to be arguing that they should be exempted
2  from Section 6.7(a) and Section 2.6 whether or not they have made reasonable efforts to recover
3  under their insurance policies and whether or not they have shown good cause for an exception.
4  The Court finds that exempting Appellants in this manner and thereby reducing the recovery of
5  other wildfire victims would be inequitable.

6  Appellants' contention also ignores that the available insurance requirements were integral
7  to the financial foundations and incentives of the Plan. *See Int'l Church*, 2020 WL 6684578 at *5;
8  Mot. at 1. Without the available insurance provisions, the Fire Victim Trust would be required to
9  pay the victim's insured losses that should be paid by the insurer, and all other claimants' recovery
10 would be correspondingly reduced. Mot. at 1. The available insurance provisions require that
11 claimants actively pursue their insurance claims to ensure the greatest recovery possible for all
12 claimants. "The thousands of parties that voted to accept the Plan, received distributions in the
13 form of cash, stock, or reinstated or replacement debt under the Plan, or agreed to purchase new
14 debt or equity securities to allow the Debtors to fund the Plan and their operations all relied upon
15 the terms of the Plan and these settlements," including the available insurance provisions. *Int'l*
16 *Church*, 2020 WL 6684578 at *5.

17 Therefore, this appeal threatens to undermine a critical and fundamental settlement
18 provision built into the Plan and would be inequitable to other claimants, shareholders, and
19 investors who relied on the settlement and the enforceability of the Confirmation Order. *Id.*
20 Accordingly, the Court finds there would be harm to third parties if the Court were to grant
21 Appellants' requested remedy.

22 **D.   The Court Cannot Fashion Effective and Equitable Relief**

23 Finally, the Ninth Circuit has directed a reviewing court to dismiss an appeal as equitably
24 moot where the relief requested "would create chaos and undo years of carefully negotiated
25 settlements." *See, e.g.*, *Stockton*, 909 F.3d at 1265. Although Appellants contend that the Court
26 could fashion limited relief without undermining the Plan, Opp. 12-15, the clear practical effect is
27 that this appeal threatens to unravel integral provisions of the Plan.

28 As discussed, this appeal attacks a key provision of the Plan, the available insurance

1    provision, and any meaningful relief on this appeal would require the Court to rewrite the financial
2    foundations of the Plan, allowing the trust amount to be depleted by claims that should have been
3    paid by insurers.  The available insurance provisions protect fire victims from claimants who fail
4    to exhaust their available insurance remedies before seeking compensation from the Fire Victim
5    Trust.  The good cause exception to the provisions protects claimants who act in good faith.  *See*
6    Section 2.6(e).

7    While Section 12.6 of the Plan contemplates that the Plan may be modified or amended in
8    certain circumstances, the Plan provides that a modification or amendment shall not "materially
9    and adversely affect the treatment of holders of Claims or Interests [t]hereunder." Plan § 12.6; *see*
10   *Int'l Church*, 2020 WL 6684578 at *6.

11   Therefore, the Court could not modify the Plan to exempt Appellants from the available
12   insurance provisions without undermining the two-trust structure, which would, in turn, materially
13   and adversely affect the treatment of other claimants under the Plan and destroy the foundation of
14   the settlement.  *See Int'l Church*, 2020 WL 6684578 at *6.

15   As the Court has previously found, "[b]ased on the Settlements, Confirmation Order, and
16   Appellants' failure to seek a stay, billions of dollars were distributed to thousands of creditors,
17   billions of dollars of new debt and equity financing was incurred, hundreds of millions of shares
18   were issued and continue to trade, and a multitude of parties acted in reliance." *Id.*  "Under these
19   circumstances, relief for the Appellants is neither equitable nor available." *Id.*  These highly
20   complex and interconnected transactions cannot be undone, and the Reorganized Debtors,
21   creditors, and third parties are "entitled to rely on [the Confirmation Order]." *Mortgages I*, 771
22   F.3d at 1215.

23   //
24   //
25   //
26   //
27   //
28   //

**IV. CONCLUSION**

For the foregoing reasons, the Fire Victims Trust's motion to dismiss the appeal is **GRANTED**. The Clerk is directed to terminate this appeal and close the case.

**IT IS SO ORDERED.**

Dated: 2/8/2021

*[signature]*
HAYWOOD S. GILLIAM, JR.
United States District Judge