**Exhibit B**

**Declaration of Donald Barnes**

HOGAN LOVELLS US LLP
Erin N. Brady (CA 215038)
erin.brady@hoganlovells.com
1999 Avenue of the Stars, Suite 1400
Los Angeles, California 90067
Telephone: (310) 785-4600
Facsimile: (310) 785-4601

*Counsel for the Yurok Tribe*

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **In re:** | Bankruptcy Case No. 19-30088 (DM) |
| **PG&E CORPORATION,** | Chapter 11 |
| **- and -** | (Lead Case) (Jointly Administered) |
| **PACIFIC GAS AND ELECTRIC COMPANY,** | |
| **Debtors.** | **DECLARATION OF DONALD BARNES IN SUPPORT OF THE MOTION OF THE YUROK TRIBE FOR RECONSIDERATION OF THE ORDER DISALLOWING AND EXPUNGING PROOFS OF CLAIM PURSUANT TO REORGANIZED DEBTORS' FIFTY-THIRD OMNIBUS OBJECTION TO CLAIMS (NO LIABILITY SUBCONTRACTOR CLAIMS)** |
| ☐ Affects PG&E Corporation | |
| ☐ Affects Pacific Gas and Electric Company | |
| ☒ Affects both Debtors | |
| *\* All papers shall be filed in the Lead Case, No. 19-30088 (DM)* | **[Re: Docket No. 10104; Claim No. 55953]** |

I, Donald Barnes, declare as follows:

      1.     I am the Director of the Yurok Tribe's Office of Self-Governance. I have served in this position since 2019. I also served as the Director for Yurok Tribe's Tribal Employment Rights Ordinance (TERO) Program from 2013 to 2019. The Yurok Tribe is a federally-recognized Indian tribe located in a remote area of northwestern California in the region of the Trinity and Klamath river basins.

      2.     I submit this declaration (the "<u>Declaration</u>") on behalf of the Yurok Tribe in support

of the *Motion of the Yurok Tribe for Reconsideration of the Order Disallowing and Expunging Proofs of Claim Pursuant to Reorganized Debtors' Fifty-Third Omnibus Objection to Claims (No Liability Subcontractor Claims)* (the "Motion"). Capitalized terms used but not defined herein shall have the meanings assigned to such terms in the Motion.

3. I have personal knowledge of the facts stated in this Declaration. If called as a witness I could, and would, competently testify under oath as set forth below.

4. From 2013 to 2019, I was the Director for the Yurok Tribe's TERO Program. TERO requires all employers conducting business on reservations to give preference to qualified Indians in all aspects of employment, training, contracting and other business activities. The purpose of TERO programs are to provide job training opportunities to tribal members and to provide income for the tribal workforce in light of the challenging economic conditions that Indian tribes face on the reservations.

5. To address the lack of electrical services on the Yurok Reservation as well as to ensure the reliability of the existing, limited service, Pacific Gas and Electric Company ("PG&E") installed electrical infrastructure on the Yurok Reservation to address this critical need. In my capacity as Director of the Yurok Tribe's TERO Program, I directly engaged in discussions and negotiations with PG&E regarding the Yurok Tribe's provision of traffic control services to PG&E in connection with the Wautec electrical line extension (the "Project"). Before the Project started on the Yurok Reservation, I informed PG&E that in accordance with TERO, PG&E would need to give preference to hiring Yurok Tribal members and Indian people for any portion of the Project that took place on the Yurok Reservation, and PG&E agreed to do so. The Yurok Tribe had previously provided PG&E with traffic control services in connection with PG&E's electrical and energizing work on the Yurok Reservation, so the Yurok Tribe had an existing business relationship with PG&E and vice versa. *See, e.g.,* a true and correct copy of the 5/21/15 email from Michael Miller (PG&E) to Raymond McQuillen (Yurok Tribe) attached hereto as **Exhibit 1** ("Please let me know if the Tribe will be able to provide TC for PG&E.").

6. On March 31, 2017, the Yurok Tribe contacted PG&E in the process of compiling a list of certified TERO workers who could provide traffic control services to PG&E for the Project.

A true and correct copy of the 3/31/17 email from John Safford, TERO Compliance Officer for the Yurok Tribe, to Michael Miller (PG&E), copying me, is attached hereto as **Exhibit 2**. In the subsequent email correspondence between Mr. Miller and Mr. Safford, on May 18, 2017, PG&E and the Yurok Tribe discuss how the Yurok Tribe will issue invoices to PG&E for the traffic control services provided in connection with the Project.

7. On July 19, 2017, upon requesting and receiving a new Form W-9 with tax identification from the Yurok Tribe in order to reactivate the Yurok Tribe's vendor identification in PG&E's billing system, PG&E confirmed that it would "[h]ave this processed so we can generate a PO to pay." A true and correct copy of the 7/19/17 email from Michael Miller (PG&E) to John Safford (Yurok Tribe), copying me, is attached hereto as **Exhibit 3**.

8. On January 25, 2018, the Yurok Tribe issued Invoice No. 18-106 to PG&E in the amount of $56,751.26 for traffic control services provided in connection with the Project from June 5, 2017 through November 13, 2017. On April 6, 2018, the Yurok Tribe issued Invoice No. 18-107 (together with Invoice No. 18-106, the "First Invoices") to PG&E in the amount of $14,664.63 for the traffic control services provided in connection with the Project from February 26, 2018 through March 19, 2018. True and correct copies of the First Invoices are attached hereto as **Exhibit 4**.

9. Upon receipt of the First Invoices, PG&E issued Order No. 2700101967 (the "First Purchase Order") on May 1, 2018 for the aggregate total of the First Invoices in the amount of $71,415.89. True and correct copies of the First Purchase Order and the 5/1/18 email from Stacey Bronzini (PG&E) to me confirming approval of the First Purchase Order are attached hereto as **Exhibit 5**. The First Purchase Order, on PG&E letterhead, clearly lists the Yurok Tribe as the "supplier" and the "bill to" party as PG&E and includes a brief description of the Project. On May 11, 2018, the Yurok Tribe received a check from PG&E for the full amount of $71,415.89 reflected in the First Purchase Order. Not only did PG&E not dispute in any form that it was liable for these amounts, but in fact, PG&E paid the amounts to the Yurok Tribe. A true and correct copy of the check stub for PG&E's check no. 4393994, dated May 8, 2018, is attached hereto as **Exhibit 6.**

10. On May 29, 2018, PG&E confirmed that it would be back out to the Yurok

Reservation to continue working on the Project and asked the Yurok Tribe to arrange traffic control services for the period of June 4, 2018 through June 28, 2018. On May 30, 2018, the Yurok Tribe confirmed with PG&E that certain of its TERO workers would provide the traffic control services to PG&E starting on June 4, 2018. A true and correct copy of the 5/29/18 email from Ross Marshall (PG&E) to me and John Safford (Yurok Tribe) is attached hereto as **Exhibit 7**.

11.     On May 24, 2019, the Yurok Tribe issued Invoice No. 19-104 (the "Last Invoice") to PG&E in the amount of $88,365.26 for traffic control services provided in connection with the Project from March 26, 2018 through September 9, 2018. A true and correct copy of the Last Invoice is attached hereto as **Exhibit 8**. Unlike with the First Invoices, which were also invoiced directly to PG&E for the traffic control services provided in connection with the same Project, PG&E did not issue a purchase order or make any payment to the Yurok Tribe for the Last Invoice. At this point in time, PG&E had filed for bankruptcy, and so I presumed that was the reason PG&E had not proceeded to issue a purchase order and pay the Yurok Tribe pursuant to past practice.

12.     At no point in time during the duration of the Project did the Yurok Tribe enter into a separate agreement, contract or arrangement with any general contractor that was otherwise involved in the Project. It was PG&E, from the start and throughout the Project, that agreed to utilize and pay the Yurok Tribe for traffic control services provided in connection with the Project. There were no instances in which the Yurok Tribe provided services to PG&E on the Yurok Reservation pursuant to a separate agreement, contract, or arrangement with any general contractor.

13.     During the entire period that the Yurok Tribe provided traffic control services to PG&E for the Project, from June 5, 2017 through September 9, 2018, all communications that I had regarding staffing needs and the provision of such services to PG&E were with PG&E directly. The agreement for the Yurok Tribe to provide traffic control services to PG&E in connection with the Project was between PG&E and the Yurok Tribe. Pursuant to not only the agreement and understanding between PG&E and the Yurok Tribe, but also past course of dealing as evidenced by PG&E's payment of the First Invoices, PG&E is the liable party for the unpaid Final Invoice.

I declare under penalty of perjury under the law of the United States and the state of California that the foregoing is true and correct.

- 4 -

1    Executed this 19th day of February, 2021 at Klamath, California.

2

3                                      */s/ Donald Barnes*

4                                      Donald Barnes

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Exhibit 1**

**From:** Miller, Michael G <MGMi@pge.com>
**Sent:** Wednesday, May 27, 2015 5:13 PM
**To:** Donald Barnes
**Cc:** Raymond McQuillen; Amanda Mager; John Safford; Del Grande, Michael
**Subject:** RE: Wautec Line Extension

Don-
Just wanted to follow up to see if you had a chance to coordinate flagging with Mike Del Grande?

Thank You

*Mike Miller*
Industrial Power Engineer
3965 Occidental Rd.
Santa Rosa, Ca 95401
Office: 707-579-6478
Cell: 707-483-9978

---

**From:** Donald Barnes [mailto:dbarnes@yuroktribe.nsn.us]
**Sent:** Thursday, May 21, 2015 10:49 AM
**To:** Miller, Michael G
**Cc:** Raymond McQuillen; Amanda Mager; John Safford; Del Grande, Michael
**Subject:** RE: Wautec Line Extension

Michael,

Thank you for the contact and the opportunity to staff your TC needs. Yes, Yurok TERO will be able to provide TC for PG&E, but we will need to the size of crew needed (2 or 4 person?), and what, if any flagging/signage equipment, we will need.

We look forward to working with you on this project.

**Don Barnes**
**TERO Director**



THE YUROK TRIBE

190 Klamath Blvd
P.O. Box 1027
Klamath, CA 95548
707-482-1350 ext. 1388
707-954-0546 (C)

---

**From:** Raymond McQuillen
**Sent:** Thursday, May 21, 2015 10:09 AM

**To:** Donald Barnes
**Subject:** FW: Wautec Line Extension

---

**From:** Miller, Michael G [mailto:MGMi@pge.com]
**Sent:** Thursday, May 21, 2015 10:08 AM
**To:** Raymond McQuillen
**Cc:** Amanda Mager; John Safford
**Subject:** Wautec Line Extension

Raymond-
PG&E 3 man overhead crew is schedule for June 9th to energize the last section of overhead facilities to end of line. PG&E will be onsite @ location 537. I believe the pole is located 32 ' S/0 culvert @ MP 19.55. We will need traffic control for half a day. Please let me know if the Tribe will be able to provide TC for PG&E. Any questions please let me know.

Please coordinate time with:
Mike Del Grande
Work and Resource Coordinator
Pacific Gas and Electric
707-672-2613
mjdm@pge.com

Thank You

***Mike Miller***
Industrial Power Engineer
3965 Occidental Rd.
Santa Rosa, Ca 95401
Office: 707-579-6478
Cell: 707-483-9978
Mike Miller

---

PG&E is committed to protecting our customers' privacy.
To learn more, please visit http://www.pge.com/about/company/privacy/customer/

---

PG&E is committed to protecting our customers' privacy.
To learn more, please visit http://www.pge.com/about/company/privacy/customer/

**<u>Exhibit 2</u>**

| **From:** | John Safford <jsafford@yuroktribe.nsn.us> |
|---|---|
| **Sent:** | Thursday, May 18, 2017 6:57 PM |
| **To:** | Miller, Michael |
| **Cc:** | Donald Barnes; Thunder Nix-Rivera |
| **Subject:** | RE: Wautec ELE II |

Hi Michael
We'll do weekly verified payroll for the two flaggers from Ross or the site manager and invoice PG&E monthly with all the documentations. Who would we send the documents to?
John

**From:** Miller, Michael [mailto:MGMi@pge.com]
**Sent:** Thursday, May 18, 2017 3:16 PM
**To:** John Safford
**Cc:** Donald Barnes; Thunder Nix-Rivera
**Subject:** RE: Wautec ELE II

John-
Do you want to issue invoices weekly or monthly to PG&E?

**Mike Miller**
Pacific Gas and Electric Company
Industrial Power Engineer
3965 Occidental Road
Santa Rosa, CA 95401
707-579-6478 office
707-483-9978 cell

**From:** John Safford [mailto:jsafford@yuroktribe.nsn.us]
**Sent:** Friday, March 31, 2017 9:35 AM
**To:** Miller, Michael
**Cc:** Donald Barnes; Thunder Nix-Rivera
**Subject:** Wautec ELE II

This is an EXTERNAL EMAIL. Stop and think before clicking links or opening attachments.
*************************************

Hi Michael
We're compiling a list of certified flaggers for you to choose from, these workers are based out of the Weitchpec and Wautec area with a good solid background. Do you know how many you need and will they start on May 15th? In our previous conversations PG&E was going to hire our flaggers on a seasonal or temporary basis, right?

JOHN SAFFORD – YUROK TRIBE
TERO COMPLIANCE OFFICER
1(707) 482-1350 Ext.1424
Cell (707) 954-6574
jsafford@yuroktribe.nsn.us

**Exhibit 3**

| **From:** | Miller, Michael <MGMi@pge.com> |
|---|---|
| **Sent:** | Wednesday, July 19, 2017 1:08 PM |
| **To:** | John Safford |
| **Cc:** | Donald Barnes; Marshall, Ross |
| **Subject:** | RE: Flagger Billing |

Have this processed so we can generate a PO to pay.

-Mike

**From:** John Safford [mailto:jsafford@yuroktribe.nsn.us]
**Sent:** Wednesday, July 19, 2017 10:01 AM
**To:** Miller, Michael
**Cc:** Donald Barnes; Marshall, Ross
**Subject:** RE: Flagger Billing

*****CAUTION**: This email was sent from an EXTERNAL source. Think before clicking links or opening attachments.*****
Here u go Mike
What's next?

**From:** Miller, Michael [mailto:MGMi@pge.com]
**Sent:** Wednesday, July 19, 2017 7:04 AM
**To:** John Safford
**Cc:** Marshall, Ross
**Subject:** RE: Flagger Billing

Per my email on July 12th: It appears we have not issued a PO to the Tribe in a long time so your vendor ID is inactive. We will need a copy of the Tribes W-9 form with tax Id number.

-Mike

**From:** John Safford [mailto:jsafford@yuroktribe.nsn.us]
**Sent:** Tuesday, July 18, 2017 3:38 PM
**To:** Miller, Michael
**Cc:** Marshall, Ross
**Subject:** Flagger Billing

*****CAUTION**: This email was sent from an EXTERNAL source. Think before clicking links or opening attachments.*****
Mike or Ross
What do we need to do for the billing of the flagging services?

JOHN SAFFORD – YUROK TRIBE
TERO COMPLIANCE OFFICER
1(707) 482-1350 Ext.1424
Cell (707) 954-6574
jsafford@yuroktribe.nsn.us

**Exhibit 4**



# Yurok Tribe

P. O Box 1027
Klamath, CA 95548

| | |
|---|---|
| **INVOICE #** | 18-106 |
| **DATE** | 1/25/2018 |

<u>Customer</u>

Pacific Gas & Electric Company
3965 Occidental Road
Santa Rosa, CA 95401

| DESCRIPTION | AMOUNT |
|---|---|
| **PG&E - Wautec Electrical Line Extension II** | |
| **Traffic Control for the week of 6/5/17** | |
| Chaz Smith - 25.5 hrs @ $46.17 ($27.14 base + 19.03 fringe) | $1,177.34 |
| Melissa Myers - 24.0 hrs @ $46.17 ($27.14 base + 19.03 fringe) | $1,108.08 |
| | |
| **Traffic Control for the week of 6/12/17** | |
| Chaz Smith - 29.5 hrs @ $46.17 | $1,362.02 |
| Melissa Myers - 29.5 hrs @ $46.17 | $1,362.02 |
| | |
| **Traffic Control for the week of 6/19/17** | |
| Chaz Smith - 28.0 hrs @ $46.17 | $1,292.76 |
| Melissa Myers - 20.5 hrs @ $46.17 | $946.49 |
| | |
| **Traffic Control for the week of 6/26/17** | |
| Chaz Smith - 28.0 hrs @ $46.17 | $1,292.76 |
| Melissa Myers - 20.0 hrs @ $46.17 | $923.40 |
| Willie Simms - 8.0 hrs @ $46.17 | $369.36 |
| | |
| **Traffic Control for the week of 7/31/17** | |
| Chaz Smith - 19.0 hrs @ $46.17 | $877.23 |
| Melissa Myers - 19.0 hrs @ $46.17 | $877.23 |
| | |
| **Traffic Control for the week of 8/7/17** | |
| Chaz Smith - 29.5 hrs @ $46.17 | $1,362.02 |
| Melissa Myers - 29.5 hrs @ $46.17 | $1,362.02 |
| | |
| **Traffic Control for the week of 8/14/17** | |
| Chaz Smith - 27.5 hrs @ $46.17 | $1,269.68 |
| Melissa Myers - 24.5 hrs @ $46.17 | $1,131.17 |
| | |
| **Traffic Control for the week of 8/21/17** | |
| Chaz Smith - 30.0 hrs @ $46.17 | $1,385.10 |
| Melissa Myers - 30.0 hrs @ $46.17 | $1,385.10 |
| | |
| **Traffic Control for the week of 8/28/17** | |
| Chaz Smith - 22.0 hrs @ $46.17 | $1,015.74 |
| Melissa Myers - 22.0 hrs @ $46.17 | $1,015.74 |
| | |
| **Traffic Control for the week of 9/11/17** | |
| Chaz Smith - 33.5 hrs @ $46.17 | $1,546.70 |
| Melissa Myers - 25.5 hrs @ $46.17 | $1,177.34 |
| | |
| **Traffic Control for the week of 9/18/17** | |
| Chaz Smith - 24.0 hrs @ $46.17 | $1,108.08 |
| Melissa Myers - 24.0 hrs @ $46.17 | $1,108.08 |
| | |
| **Traffic Control for the week of 9/25/17** | |
| Chaz Smith - 31.5 hrs @ $46.17 | $1,454.36 |
| Melissa Myers - 31.5 hrs @ $46.17 | $1,454.36 |
| | |
| **Traffic Control for the week of 10/2/17** | |
| Chaz Smith - 24.0 hrs @ $46.17 | $1,108.08 |
| Melissa Myers - 24.0 hrs @ $46.17 | $1,108.08 |
| | |
| **Traffic Control for the week of 10/9/17** | |

|  |  |
|---|---|
| Chaz Smith - 16.0 hrs @ $46.17 | $738.72 |
| Melissa Myers - 7.5 hrs @ $46.17 | $346.28 |

**Traffic Control for the week of 10/16/17**

|  |  |
|---|---|
| Chaz Smith - 35.0 hrs @ $46.17 | $1,615.95 |
| Melissa Myers - 35.0 hrs @ $46.17 | $1,615.95 |

**Traffic Control for the week of 10/23/17**

|  |  |
|---|---|
| Chaz Smith - 35.0 hrs @ $46.17 | $1,615.95 |
| Melissa Myers - 35.0 hrs @ $46.17 | $1,615.95 |

**Traffic Control for the week of 10/30/17**

|  |  |
|---|---|
| Chaz Smith - 31.0 hrs @ $46.17 | $1,431.27 |
| Melissa Myers - 23.5 hrs @ $46.17 | $1,085.00 |

**Traffic Control for the week of 11/6/17**

|  |  |
|---|---|
| Chaz Smith - 35.5 hrs @ $46.17 | $1,639.04 |
| Melissa Myers - 35.5 hrs @ $46.17 | $1,639.04 |

**Traffic Control for the week of 11/13/17**

|  |  |
|---|---|
| Chaz Smith - 18.0 hrs @ $46.17 | $831.06 |
| Melissa Myers - 18.0 hrs @ $46.17 | $831.06 |

| | |
|---|---|
| Subtotal: | $45,408.27 |
| Yurok Tribe Indirect Cost (24.98%): | $11,342.99 |

| | |
|---|---|
| **Invoice Total:** | **$56,751.26** |

**Please send payment to:**
Yurok Tribe TERO
Attn: Don Barnes
P.O. Box 1027
Klamath, CA 95548

Don Barnes
Yurok Tribe TERO Director

1.25.1B
Date

If you have any questions regarding this invoice please contact:
Don Barnes, TERO Director 707-482-1350 x 1388



# Yurok Tribe

P. O Box 1027
Klamath, CA 95548

**INVOICE #** 18-107
**DATE** 4/6/2018

Customer

Pacific Gas & Electric Company
3965 Occidental Road
Santa Rosa, CA 95401

| DESCRIPTION | AMOUNT |
|---|---|
| **PG&E - Wautec Electrical Line Extension II** | |
| | |
| **Traffic Control for MGE - Week of 2/26/18** | |
| Lana Crutchfield - 32.5 hrs @ $46.17 ($27.14 base + 19.03 fringe) | $1,500.53 |
| Melissa Myers - 31.5 hrs @ $46.17 ($27.14 base + 19.03 fringe) | $1,454.36 |
| | |
| **Traffic Control for MGE - Week of 3/5/18** | |
| Lana Crutchfield - 40.0 hrs @ $46.17 | $1,846.80 |
| Lana Crutchfield - 21.5 hrs @ $59.74 ($40.71 base + 19.03 fringe) | $1,284.41 |
| Melissa Myers - 40.0 hrs @ $46.17 | $1,846.80 |
| Melissa Myers - 21.5 hrs @ $46.17 ($40.71 base + 19.03 fringe) | $1,284.41 |
| | |
| **Traffic Control for MGE - Week of 3/12/18** | |
| Lana Crutchfield - 11.0 hrs @ $46.17 | $507.87 |
| Melissa Myers - 10.5 hrs @ $46.17 | $484.79 |
| | |
| **Traffic Control for MGE - Week of 3/19/18** | |
| Lana Crutchfield - 17.0 hrs @ $46.17 | $784.89 |
| Melissa Myers - 16.0 hrs @ $46.17 | $738.72 |

Subtotal: $11,733.58

Yurok Tribe Indirect Cost (24.98%): $2,931.05

**Invoice Total:** **$14,664.63**

**Please send payment to:**
Yurok Tribe TERO
Attn: Don Barnes
P.O. Box 1027
Klamath, CA 95548

_M Mmmm_     4.6.18
Don Barnes        Date
Yurok Tribe TERO Director

If you have any questions regarding this invoice please contact:
Don Barnes, TERO Director 707-482-1350 x 1388

**Exhibit 5**

| **From:** | Bronzini, Stacey <S3Bx@pge.com> |
|---|---|
| **Sent:** | Tuesday, May 01, 2018 1:42 PM |
| **To:** | Donald Barnes |
| **Cc:** | Marshall, Ross; Rhodes, Karen |
| **Subject:** | PO 2700101967.pdf $71,415.89 |
| **Attachments:** | PO 2700101967.pdf |

Don,

Attached is approve PO 2700101967 for billing purposes. This covers invoices 18-106 and 18-107.

Stacey Bronzini
Sr. Sourcing Specialist
Electric Distribution Sourcing Operations
Pacific Gas and Electric Company
3136 Boeing Way, 1st Floor, 1317F
Stockton, CA 95206
Phone: 209-272-8589
Int. Phone: 8-848-8589
Fax: 209-272-8522
s3bx@pge.com


*Pacific Gas and Electric Company*

# ORDER NO. 2700101967

Issued on Tuesday, May 1, 2018 PDT
Created on Tuesday, May 1, 2018 PDT by Karen Rhodes

| | |
|---|---|
| **SUPPLIER:** | **TOTAL AMOUNT** |
| YUROK TRIBE | **$71,415.89 USD** |
| "190 KLAMATH BLVD" | |
| KLAMATH, CA 95548 | |
| United States | |
| Phone: +1 707-482-1822 | |
| Fax: +1 707-482-1722 | |

| **DELIVERY ADDRESS:** | **BILL TO:** |
|---|---|
| PGE | PGE |
| 3600 MEADOWVIEW DR | P.O. Box 7760 |
| REDDING, CA 96002 | San Francisco, CA 94120-7760 |
| United States | United States |
| Phone: +1 530 246 6589 | Phone: +1 1-800-756-7243 |

**DELIVER TO:**
GC LINE

GL Account:
    General Ledger Name: "Traffic Control Contracts"
    ID: 0005490027
Cost Center:
Internal Order:
    Description: "PRTC-WAUTEC LINE EXTENSION PHASE 2"
    ID: 000031065654

Payment Terms: Net due upon receipt

## LINE ITEM DETAILS (1 LINE ITEM )

| NO. | DESCRIPTION | PART NUMBER | QTY | NEED-BY DATE | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|---|
| 1 | flagging at construction site on the Yurok ... | | 71,415.89 USD (US Dollars) | Saturday, June 30, 2018 PDT | $1.00 USD | $71,415.89 USD |

Full Description: flagging at construction site on the Yurok Tribe reservation

ATTACHMENTS

- YUROK TRIBE _INVOICE#18-106_SIGNED.pdf (6742401 bytes)
- YUROK TRIBE _INVOICE#18-107_SIGNED.pdf (3454973 bytes)

Req. Line No.: 1
Requester: Karen Rhodes
PR No.: PR129857
Tax Code: I0

TOTAL AMOUNT
# $71,415.89 USD

# ATTACHMENTS

## TERMS AND CONDITIONS OF PURCHASE

### 1.0 DEFINITIONS
Contractor means the Party, identified on the face of the Purchase Order, performing Work for PG&E.
Deliverables means any written materials to be provided by Contractor under this Purchase Order, including but not limited to reports, manuals, data, technical drawings, and presentations.
Goods means all equipment, material, parts, and other personal property purchased by PG&E under this Purchase Order.
Party or Parties means, in the singular, Contractor or PG&E, and in the plural, both Contractor and PG&E.
Purchase Order or PO means the contract between the Parties, comprised of the Purchase Order form, these Terms and Conditions, and any other document incorporated into the Purchase Order. A reference to the face of the Purchase Order means the Purchase Order form.
Services means all supervision, labor, materials, equipment and requirements necessary to perform the Work described on the face of the Purchase Order and includes all Deliverables and Goods provided hereunder.
"Subcontract" means an agreement between Contractor and Subcontractor or between Subcontractors at any level for a portion of the Work.
"Subcontractor" means the party or parties entering into a Subcontract with Contractor or another Subcontractor to perform a portion of the Work.
Work means, collectively, any and all Goods, Services and Deliverables to be provided by Contractor under this Purchase Order, regardless of whether or not the Goods were manufactured by Contractor.

### 2.0 ORDER AND ACCEPTANCE

2.1 Acceptance: This Purchase Order is PG&E s offer to purchase from Contractor the Work described in this Purchase Order. ANY OF THE FOLLOWING SHALL CONSTITUTE CONTRACTOR S ACCEPTANCE OF THE TERMS AND CONDITIONS OF THIS PURCHASE ORDER: (i) WRITTEN ACCEPTANCE OF THIS PURCHASE ORDER: (ii) SHIPMENT OF ALL OR ANY PORTION OF THE GOODS COVERED BY THIS PURCHASE ORDER, OR (iii) COMMENCEMENT OF PERFORMANCE OF THE SERVICES. ANY ADDITIONAL OR DIFFERENT TERMS PROPOSED BY CONTRACTOR, WHETHER IN ANY PROPOSAL, QUOTATION, CONFIRMATION, ACKNOWLEDGMENT, INVOICE, NOTATION OR INTERLINEATION ON THE PURCHASE ORDER OR OTHERWISE, ARE EXPRESSLY REJECTED AND SHALL BE OF NO FORCE AND EFFECT, AND NO COURSE OF DEALING, USAGE OF TRADE, OR COURSE OF PERFORMANCE SHALL BE RELEVANT TO EXPLAIN OR SUPPLEMENT ANY OTHER TERM. If the Parties have entered into a separate contract for the Goods, then in case of conflict between this Purchase Order and the contract, the terms of the contract shall prevail.

2.2 Exhibits: THIS PURCHASE ORDER SPECIFICIALLY INCLUDES THE EXHIBITS IN EFFECT ON THE DATE OF THIS PURCHASE ORDER AND WHICH CAN BE FOUND AT http://www.pge.com/suppliers. THE EXHIBITS ARE HEREBY INCORPORATED INTO THIS PURCHASE ORDER BY REFERENCE.

2.3 Performance: Time is of the essence, and PG&E may terminate this Purchase Order if, as applicable, the Goods are not shipped or the Services are not commenced by the date specified on the face of the Purchase Order. No change in the scheduled performance date is permitted without PG&E s prior written consent.

2.4 Changes: PG&E may make adjustments and changes within the general scope of this order by written notice to Contractor, including but not limited to drawings and specifications for specially manufactured Goods, place of delivery, method of shipment, packing of the Goods, and description of the Services, and Contractor shall comply with such instructions. If the changes affect the cost of or the time required for performance, an equitable adjustment in the price or delivery or both shall be made, provided that no change by Contractor shall be allowed without written approval of PG&E. Unless waived in writing by PG&E, Contractor must provide written notice of any claim for adjustment within 30 days from the date Contractor receives notice of the requested changes.

2.5 Notice Concerning Electronic Purchase Orders: PG&E s Email Purchase Order Program provides the opportunity to receive PG&E Purchase Orders quickly via email. Participation in the program requires that Contractor provide PG&E with its Internet email address for delivery of Purchase Orders. To minimize possible delays in receipt of Purchase Orders, PG&E suggests that Contractor establish a general email box accessible to Contractor s staff, rather than a single individual s email address. Contractor should retrieve PG&E email Purchase Orders at least once daily during business hours to help ensure timely receipt and processing. Participation in the Email Purchase Order Program requires use of free Adobe Reader software which can be downloaded at http://get.adobe.com/reader/.

### 3.0 GENERAL

3.1 Independent Contractor. Contractor is an independent contractor, and all persons hired by Contractor in connection with this Purchase Order shall be employees or subcontractors of Contractor and shall not be construed as employees or agents of PG&E in any respect.

3.2 Non Exclusivity. THIS IS NOT AN EXCLUSIVE AGREEMENT. THIS PURCHASE ORDER DOES NOT GUARANTEE CONTRACTOR ANY VOLUME OR DURATION OF WORK.

3.3 Amendments; Non-Waiver. No modification or change to this Purchase Order, or waiver of any breach or default, shall be binding or effective unless expressly set forth in writing by Change Order signed by the authorized representative of each Party. Waiver by either Party of any breach or default shall not be deemed to be a waiver of any other breach or default of the same or any other requirement, nor shall any waiver of an incident of breach or default constitute a continuing waiver of the same.

3.4 Subcontracts. Contractor shall not enter into subcontracts ( Subcontracts ) without the prior written approval of PG&E. PG&E s approval of any Subcontract shall not relieve Contractor of its obligations to PG&E under this Purchase Order. The provisions and obligations of this Purchase Order shall apply to any Subcontract, and Contractor shall be responsible to PG&E for any damages to PG&E arising out of Subcontracts not in accordance with this Purchase Order. Nothing in this Purchase Order shall create any contractual relations between a Subcontractor and PG&E.

3.5 Limit of Liability. NEITHER PARTY SHALL BE LIABLE TO THE OTHER PARTY FOR ANY INDIRECT, INCIDENTAL, PUNITIVE, SPECIAL OR CONSEQUENTIAL DAMAGES, INCLUDING BUT NOT LIMITED TO LOSS OF REVENUES OR PROFITS, COMMITMENTS TO SUBVENDORS, RENTAL OR LEASE AGREEMENTS, AND PERSONAL SERVICE CONTRACTS, EVEN IF SUCH PARTY WAS AWARE OF THE POSSIBILITY OF SUCH DAMAGES: PROVIDED, HOWEVER, THAT NOTHING IN THIS CLAUSE SHALL AFFECT CONTRACTOR S OBLIGATIONS IN THE CLAUSES CONCERNING INFRINGEMENT PROTECTION AND INDEMNIFICATION. PG&E S TOTAL OBLIGATION UNDER THIS PURCHASE ORDER IS SET FORTH IN THE TOTAL AMOUNT FIELD ON THE FACE OF THE PURCHASE ORDER.

3.6 Tax Withholding: Contractor represents and warrants that it will withhold all taxes, if any, which are required to be withheld under applicable law with respect to payments to persons hired by Contractor who perform Services for PG&E. Contractor shall indemnify and hold PG&E harmless, on an after-tax basis, for any liability incurred by PG&E as a result of Contractor s failure to institute any such required withholding.

4.0 BILLING AND PAYMENT

4.1 Billing
(A) Time and Materials: Contractor shall submit invoices monthly for time and materials work according to the billing rates in the Purchase Order.
(B) Lump Sum and Unit Price Work: Contractor shall submit an invoice upon completion and final acceptance by PG&E of all lump sum and unit price Work.

4.2 Sales Tax: PG&E IS NOT TAX EXEMPT. Invoices shall include sales tax where applicable. However, no sales tax applies to prepaid freight charges.

4.3 Expenses. All reimbursable expenses shall be reasonable, ordinary, and necessary and shall be billed to PG&E at cost to Contractor. All air travel costs within or outside of the United States will be reimbursed only on a coach fare basis and all rental car costs will be reimbursed only on a subcompact rate basis. All other reimbursable mileage shall be at the current IRS rate.

4.4 Invoice Instructions: PG&E will reject any invoices that do not meet the following minimum requirements:
(A) Each invoice must specify the Purchase Order number, item number, shipping point and delivery address;
(B) A separate invoice must be submitted for each Purchase Order. Individual Purchase Orders may not be combined on one invoice;
(C) Invoices must include only items and charges specified on the Purchase Order. Invoices with additional items or charges (e.g., surcharges) will be rejected: and
(D) PG&E must receive invoices within 60 days after final acceptance of the Work. PG&E will not be liable for payment of late invoices received after the 60 day period.

4.5 Invoice Instructions: Contractor shall submit invoices in accordance with the instructions as designated on the service contract order and include the purchase order number. All timelines for payment of invoices run from the date a correct invoice is received by PG&E s Accounts Payable department. All invoices submitted to and accepted by PG&E s Accounts Payable department by 6:00 PM on a business day are considered received that same day. Electronic invoices submitted through PG&E s electronic invoicing system and accepted by PG&E s Accounts Payable department after 6:00 PM may not be considered received until the next business day. Paper invoices must be submitted to PG&E s Accounts Payable department at the following address only:
PG&E Accounts Payable
PO Box 7760
San Francisco, CA 94120-7760
Invoices submitted to any other office, location or address, including a local office or the department in charge of the work, are NOT considered received for payment purposes. The discount and net due date timelines for invoice payment DO NOT BEGIN until the receiving location has forwarded a correct invoice to PG&E s Accounts Payable department and the invoice has been received and accepted.

4.6 Payment. PG&E may withhold from the payment any agreed withholding until satisfactory completion of all the Work, or which in PG&E s reasonable opinion is necessary to provide security against all loss, damage, expense and liability covered by the indemnity provision. PG&E will notify Contractor of any invoice deficiencies or will return the invoice to Contractor with the deficiencies noted. Contractor shall provide to PG&E such documents or information correcting such deficiencies, or for invoices returned to Contractor, Contractor shall resubmit a corrected invoice.

4.7 Payment Terms. Unless otherwise specified herein, the payment terms for this Purchase Order are 2% 15 Dynamic Net 45. PG&E's payment terms are a dynamic sliding scale early payment discount. The 2% discount applies when PG&E pays the invoice within 15 days. The discount decreases proportionally each day thereafter until Day 45, the net due date, when zero discount applies. All timelines are calculated from the date a correct invoice is received and accepted by PG&E s Accounts Payable department in San Francisco.

4.8 Final Invoice. The final invoice shall be marked FINAL and must be received by PG&E within sixty (60) calendar days after completion of the Work. PG&E will not be liable for payment of any late invoices that are received by PG&E beyond such 60 day period.

4.9 Withholding. PG&E may withhold from the final payment due Contractor hereunder such amounts as, in PG&E opinion, are reasonably necessary to provide security against all loss, damage, expense and liability covered by the indemnity provision.

4.10 Delinquent Accounts. PG&E may retain from any payments due hereunder sufficient funds to discharge any delinquent accounts of Contractor for which liens on PG&E's property have been or can be filed, and PG&E may at any time pay therefrom, for Contractor's account, such amounts as are admittedly due thereon.

5.0 PROVISION OF GOODS.
The following provisions shall apply to provision of Goods under this Purchase Order:

5.1 PACKING, SHIPMENT AND INSPECTION
(A) Packing: The price of the Goods includes packing materials. PG&E will not pay additional charges for packing.
(B) Packing List Instructions: (i) The packing list must be a clear, legible document identifying Contractor s name, a contact name and phone number, along with the shipping point, delivery address, PG&E Purchase Order number and line item, and the PG&E Material Code. (ii) Separate packing lists shall be placed in a plastic envelope and securely attached to each package, skid or pallet, as applicable. (iii) Contractor shall not make partial shipments except with prior written authorization (including e-mail) from Contractor. Authorized partial shipments must be identified on the packing list and specify the PG &E Purchase Order number, line item and quantity. If kit components are shipped separately, the packing list must

Case: 19-30088    Doc# 10238-2    Filed: 02/19/21    Entered: 02/19/21 12:52:39    Page
22 of 35

clearly identify the partial shipment. (iv) The packing lists of any 3rd party vendor, Subcontractor or carrier must also comply with these requirements.
(C) Material Safety Data Sheets: Contractor shall submit a Material Safety data Sheet (MSDS) for all materials requested on this Purchase Order that could be hazardous to humans as required by Title 8, California Code of Regulations, Section 519. Contractor shall also submit an amended MSDS whenever there is a formulation change. Contractor shall provide the MSDS to the following address:
Pacific Gas and Electric Company
Safety, Health and Claims Department
B23A Industrial Hygienist Group
P.O. Box 770000
San Francisco, CA 94177
(D) Title and Risk of Loss: Contractor warrants that it has and shall convey to PG&E good and clear title, free from any security interest, lien, or other encumbrance, to all Goods delivered. Contractor assumes all risk of loss of or damage to all Goods ordered and all work in progress, materials and other items related to the Purchase Order until the same are accepted by PG&E.
(E) Freight Charges: (i) Standard: Unless otherwise stated, the freight vendor should invoice PG&E directly. (ii) If the Purchase Order provides that Contractor will pay the freight costs, Contractor shall submit the freight bill to PG&E along with the invoice. If Contractor's invoice does not include a freight bill, PG&E reserves the right either not to pay the freight costs or to offset the freight charges against the Contractor's invoice. Prepay and add shipments must be supported by a copy of the carrier's freight bill, except for UPS shipments, which are billed directly to PG&E. (iii) Failure To Comply With Routing Instructions: PG&E reserves the right to back-charge Contractor for freight overcharges caused by failure to comply with these routing instructions, including Goods tendered freight collect to other than PG&E-designated carriers in the shipping instructions (misrouted) or Goods shipped 'prepay and add.
(F) SHIP VIA - All FOB shipping point terms shipments are required to route through Agistix.com. If you have a user ID go to Agistix.com and route: Carriers: For weights up to 150 lbs, ship via UPS. For weights greater than 150 lbs and palletized, use CH Robinson, For Air Freight, contact Aeronet. If you do not have a user ID, or have any questions please email: pgefreighttransportation@pge.com
(G) Inspection: PG&E may require inspection and testing of material and workmanship at Contractor's plant, PG&E's location, or both. Notwithstanding any inspection during manufacture or witnessed test at Contractor's plant, final inspection and acceptance of the Goods shall occur at PG&E's delivery location.

5.2 Warranty of Goods:
(A) Warranty: Contractor warrants that the Goods and all parts thereof, whether or not manufactured by Contractor, shall be of the kind and quality described in this Purchase Order, free of defects in workmanship, material design, and title, shall perform in the manner set forth in the Purchase Order, shall be of good and merchantable quality, and shall be fit for their intended purpose.
(B) Remedies. Contractor shall repair or replace at its expense any part of the Goods that develop defects due to faulty material or workmanship within 12 months after the Goods are placed in operation by PG&E; provided that unless otherwise specified, the warranty period for Goods used by PG&E in transmission or distribution of natural gas or electricity or generation of electricity shall be 24 months after the Goods are placed in operation by PG&E. Contractor shall at its expense repair or replace other work or equipment damaged as a result of the defects, or as a result of the repair thereof, and hold PG&E harmless from repair expenses. Warranties will be provided at no charge to PG&E. Contractor will assume full responsibility to coordinate all warranty terms with approved manufacturers, including but not limited to: (i) Coordinating the issuance of Return Material Authorization (RMA) to PG&E on a timely basis and collection of non-compliant material within a reasonable time (normally not to exceed two weeks from notification of the need to collect that material); (ii) Timely notification to PG&E of product defects as announced by the manufacturer or manufacturer s suppliers: and Coordination of any compensation owed to PG&E from the manufacturer for the installation of defective materials within the warranty period. (iii) Coordinating the issuance of Return Material Authorization (RMA) to PG&E on a timely basis and collection of non-compliant material within a reasonable time (normally not to exceed two weeks from notification of the need to collect that material): (iv) Timely notification to PG&E of product defects as announced by the manufacturer or manufacturer s suppliers; and (v) Coordination of any compensation owed to PG&E from the manufacturer for the installation of defective materials within the warranty period.

5.3 SUPPLIER QUALITY ASSURANCE (SQA) MANAGEMENT SYSTEM:
(A) Introduction: To assure safety, reliability, and affordability of procured material, Contractor shall comply with PG&E's material quality requirements. These requirements are fully defined in PG&E's policies and procedures, with a summary provided below. Non-compliance with PG&E requirements and/or problematic quality may lead to consequences including but not limited to Contractor probation with additional Contractor cost related to oversight performed by PG&E Supplier Quality and/or contracted third parties, and/or business diverted to another supplier. The following section highlights certain material quality requirements for direct material suppliers to PG&E for products and custom tools used in power generation (excluding nuclear) and the transmission and distribution of natural gas and electricity. Contractor is responsible for complying with PG&E's Supplier Qualification Manual, SCM-2104M, as it may be revised from time to time. In case of conflict between this summary and the Manual, the Manual shall control. The Manual is available at PG&E's website, www.pge.com, at the following link, and is specifically incorporated herein by reference: http://www.pge.com/includes/docs/pdfs/b2b/purchasing/suppliers/SupplierQualificationManual.pdf.
(B) Record Retention: Records required by applicable industry product standards shall be retained for not less than the period of time specified by any applicable industry standards or five years, whichever is longer. Records required to provide evidence of conformity to requirements and of the effective operation of the quality management system shall be retained for a minimum of five years. Supplier's records shall support material traceability to include material code, description, manufacturer, ship date to PG&E and serial number. Supplier shall maintain this data in an on-line spread sheet for the duration of the contract and shall be available for verification and download by PG&E. Supplier shall notify PG&E prior to the disposal of any quality records.
(C) Right of Access: PG&E reserves the right to visit Suppliers and sub-Suppliers for audits or business meetings during the normal course of business or to perform source inspection and surveillance. PG&E will use reasonable efforts to provide at least five (5) days advance notice and work with Supplier to ensure adequate preparation for audit and business visits.Supplier shall provide advance notice to PG&E for planned surveillance or source inspection activities consistent with manufacturing schedules or as required for key hold points or witness points .
(D) Change Management Process: This process implements a formal PG&E policy requiring approval for all supplier changes. It requires a formal system for assessing, tracking & documenting changes: improves PG&E ability to be aware, prepare and support the change: and ensures pre-approval to avoid the adverse effect of random changes. The Supplier is required to implement a Configuration Management System to ensure the control of documentation and the definition of product manufactured and / or designed for PG&E by the Supplier or its sub-Suppliers.
(E) Material Traceability: Supplier may be required to maintain traceability data on oil filled or solid state or vacuum operated products. The traceability data to include material code, description, manufacturer, ship date to PG&E, type of oil (mineral, FR3, silicon), PCB Concentration at time of manufacture and serial number. This data shall be maintained in an on-line spread sheet for the duration of the contract and shall be available for verification and download by PG&E. Records shall be maintained by Supplier for the useful life of the equipment and/or transferred to PG&E at the end of the contracting period: plus any applicable record retention requirements in the contract.
(F) Control of Sub-tier Suppliers: If a Supplier chooses to outsource a process or product, the Supplier is responsible for qualification and surveillance of the sub-Supplier to PG&E requirements and notifying PG&E of this qualification. PG&E reserves the right to review the Supplier s process for selection, qualification and surveillance of its sub-Suppliers: to approve or disapprove the sub-Supplier s qualification; and audit and monitor the sub-Supplier s processes and facilities when deemed necessary. The Supplier shall perform routine quality audits and inspection of its

key sub-Suppliers to ensure oversight, knowledge and control of critical or special processes as well as changes enacted by the sub-Supplier. In addition, the Supplier shall have a documented system in place to inspect custom incoming components from sub-Suppliers for adherence to drawings or specifications. The Supplier shall conduct requalification to validate any major changes to processes or product provided by the sub-Suppliers, including First Article inspections. Key sub-Suppliers, sub-Supplier processes, or sub-Supplier manufacturing locations or critical components that affect form, fit, or function that are approved as part of the PG&E qualification are considered frozen and cannot be changed without resubmittal and approval of the required documents by PG&E.

(G) First Article: Supplier shall inform and monitor sub-tier Suppliers to ensure that any major changes to their products or facilities are communicated to PG&E Supplier Quality and Sourcing personnel with at least 30 days prior to the commencement of that change. PG&E shall be notified at minimum through the website firstarticle@pge.com and shall include the contact information for the individual at the distributor most knowledgeable about the change. PG&E personnel will respond with follow-up questions and/or directions on any further testing/measurements/certs that may be required to "re-qualify" the product or facility changes. This note does not apply to custom or "one-off" products. The changes covered by this note include:

Major revision to a product produced for PG&E

Change of location of manufacturing or major change of facility

Change of sub-tier Supplier to a Supplier for a major component of a product

Break of production (that will begin production of that product) for at least 2 years PG&E shall be notified at minimum through the email firstarticle@pge.com and shall include the contact information for the individual at the distributor most knowledgeable about the change. PG&E personnel will respond with follow-up questions and/or directions on any further testing/measurements/certs that may be required to "re-qualify" the product or facility changes. This note does not apply to custom or "one-off" products.

(H) Quality Representation: Supplier shall maintain at least one quality professional on staff to support duties and tasks as noted in the terms and conditions of this Purchase Order. Supplier shall maintain a staff of trained quality inspectors (as required) to ensure consistent and accurate quality inspection of products as required in this Purchase Order.

(I) Hold Points and Witness Points: Hold Points are mandatory verification points identified by the PG&E Supplier Quality Engineer (SQE) beyond which work may not proceed until a PG&E representative performs verification or surveillance and provides notice to proceed. Source inspection prior to product release and PG&E surveillance of a manufacturing step, special process test or inspection are examples of Hold Points. Hold points or witness points, when required, will normally be communicated through purchase order notes. Witness Points require the Supplier to notify the SQE in writing prior to completion of those steps. After notification, work may not proceed beyond a Witness Point without action by the SQE. The Supplier shall notify the SQE of Hold Points or Witness Points in the manufacturing or qualification process schedule a minimum of ten (10) days in advance (unless otherwise agreed upon with the SQE).

(J) Supplier Inspection of Parts: Supplier shall establish a formal inspection process to ensure all required items are appropriately inspected to meet PG&E s quality requirements. Note: Supplier shall be provided an inspection plan by PG&E for each item subject to inspection. Supplier shall notify PG&E Supplier Quality at least 15 business days prior to the need for the unique inspection plans. Inspection plans are subject to change by PG&E and shall be modified by Supplier to reflect those changes driven by PG&E immediately upon receipt. PG&E may on occasion specifically add or subtract material codes from inspection based on quality concerns or levels of successful inspection. Supplier shall maintain records of inspection and provide the data in a usable format with a minimum of the material code, part description, Supplier name, pass / fail status, quantity and reason for failure if applicable and related rejection report number.

(K) Supplier Re-inspection of Rejected Lots at PG&E: Supplier shall be available to re-inspect 100% of parts rejected by PG&E during the course of inspection at PG&E facilities. This effort shall normally affect large or critical lots and would be conducted when lots are rejected by PG&E based upon a sampling plan rejection. The support would normally be expected to be on site at PG&E at the required location. The re-inspection shall generally be accomplished in not more than 4 business days from notification of the need for 100% inspection. Supplier shall report the inspection results to PG&E Supplier Quality immediately upon completion.

(L) Reporting Failures: Upon being informed of any product quality or usability problem(s) (including but not limited to recurrent product failures, Supplier bulletins, and warranty return issues) that may affect products that have been and/or are being sold to PG&E, the Supplier of that product shall inform PG&E of the particular product quality or usability problem(s) within five (5) business days of the discovery by emailing the related SQA Manager or Director. The Supplier shall additionally exercise reasonable efforts, in a timely manner, to work with PG&E to ensure all suspect Goods are removed from PG&E s system and shall do so at no material or labor cost to PG&E.

(M) Customer Service and Technical Support: Supplier will provide key contacts representing quality at their plant(s) and if applicable their corporate headquarters. Technical support from the Supplier plants shall be available to PG&E if needed up to 7 days per week 24 hours a day. During problematic quality or product qualifications, the Supplier s quality organization will lead routine meetings, issue minutes, and maintain plans for qualification and corrective actions.

(N) Preventive Maintenance: The Supplier shall identify key process equipment and tooling, develop and document a Preventive Maintenance program. PG&E may verify that such programs are documented and effectively implemented during Supplier audits

(O) Metrics: Supplier will provide to PG&E a 4-Panel dashboard report format or an equivalent alternative upon request to demonstrate the Supplier s continuous improvement trend over time to reduce material defects. This report will contain trending of total inspection rejects over time, Pareto trending observed condition leading to the rejects, details of number of parts rejected as a function of time and part type, to include Corrective Action Plans and Status. In the case of problematic quality, updates are required bi-weekly and timely achievement of Scorecard requirements will prevent reductions in product allocations.

(P) Sub-Tier Supplier Metrics: Supplier shall maintain metrics results from their inspections of each unique supplier for each lot inspected and shall take corrective action as supplier's metrics vary from acceptable levels as agreed upon with PG&E Quality. Supplier shall routinely notify PG&E quality related to suppliers that are struggling with maintaining the agreed upon metrics targets and shall inform PG&E upon request the steps taken to work with that Supplier.

(Q) Supplier Response to SCARs (Supplier Corrective Action Response): Unless otherwise agreed, Supplier shall (i) achieve "containment" of any noted defects within three business days of finding those defects or of being notified of those defects by PG&E; and (ii) provide a corrective action plan to PG&E or plan of corrective action within 10 business days of finding or of being notified of those defects by PG&E.

6.0 SERVICES WORK

6.1 Services Warranties. In addition to the warranties implied in fact or in law, Contractor warrants that it will perform the Work with the degree of skill and care required by currently prevailing best industry practices. The equipment, material and parts furnished by Contractor, whether or not manufactured by Contractor, shall be of the kind and quality described in the Purchase Order, free of defects in workmanship, material, design, and title, shall be of good and merchantable quality, and shall be fit for its intended purpose. Contractor shall repair or replace at its expense any part of the Work that develops defects due to faulty material or workmanship within a period of one year after being placed in operation by PG&E. Contractor shall at its expense repair or replace other work or equipment damaged as the result of the defects, or as a result of the repairing thereof, and hold PG&E harmless from repair expenses. Neither acceptance of the Work by PG&E nor payment therefore shall relieve Contractor from liability under the indemnity or any of the guarantees contained in or implied by this Purchase Order.

## 7.0 PROVISIONS APPLICABLE TO ALL WORK

### 7.1 Additional Work or Changes in Work

(A) Procedure For Additional Work: Before proceeding with any work involving possible claims for extra compensation not specified in the Purchase Order, Contractor shall submit in writing to PG&E a detailed estimate of the cost for such proposed work, including extensions and Change Orders, as follows: (i) Description of work to be performed, including detailed breakdown by identifiable tasks, (ii) Estimated cost of each task, and (iii) Expected date of completion of each task.

(B) PG&E Approval Needed For Additional Work: Contractor shall not proceed with any work not authorized in the Purchase Order without first receiving specific written authorization or a Change Order signed by PG&E. CONTRACTOR AGREES THAT ALL COSTS FOR ANY SUCH MODIFICATION OR CHANGE PERFORMED BY CONTRACTOR WITHOUT THE PRIOR WRITTEN APPROVAL OF PG&E S REPRESENTATIVE AUTHORIZED TO APPROVE SUCH CHANGE SHALL BE AT CONTRACTOR S SOLE RISK AND EXPENSE.

(C) PG&E Changes To Work. PG&E reserves the right to make such changes in Work, specifications, or level of effort as may be necessary or desirable, and any difference in Purchase Order price resulting from such changes shall be approved in writing by PG&E before the Work is begun.

### 7.2 Intellectual Property and Data Security

(A) Royalties and License Fees: Royalties, license fees or other charges for patents, copyrights, licenses, or other intellectual property for designs, processes, machinery, equipment, technology, published or unpublished data, information or materials, including but not limited to, manuals, computer programs or other deliverables furnished by Contractor for the Work, or for processes or methods employed by Contractor in performing the Work, shall be included in the Purchase Order price. Contractor shall indemnify PG&E against all loss, damage, expense, and liability arising out of the infringement or alleged infringement of any patent, trademark, copyright or other intellectual property right by the equipment, material and parts furnished by Contractor.

(B) Use and Reproduction Rights: PG&E shall have the unrestricted right of use and reproduction of all documentation, including but not limited to, instructional manuals, and other materials related to the Work furnished hereunder. Such use and reproduction by PG&E or by contractors doing work for PG&E shall not require further permission by Contractor, nor shall it constitute infringement of Contractor s ownership rights, including copyright, to such materials. Any claims of Contractor to ownership in materials furnished hereunder must be expressly set forth in the Purchase Order or shall be disclosed to PG&E in writing.

(C) Ownership of Deliverables: PG&E shall own all data, drawings, designs, reports, information, manuals, computer programs or other written, recorded, photographic or visual materials, or other deliverables produced in the performance of this Purchase Order. Contractor shall retain no ownership, interest, or title in them except as may otherwise be provided specifically in this Purchase Order.

(D) Contractor s Use of PG&E Property: All records, reports, computer programs, written procedures and similar materials, documents or data, in whatever form, provided by PG&E for Contractor s use in the performance of Work under this Purchase Order shall remain the confidential property of PG&E and shall be returned to PG&E immediately upon completion of Contractor s use for the performance of Work or earlier upon the written request of PG&E.

(E) Third Party Licenses: Contractor represents and warrants that it shall comply (and ensure that its personnel and Subcontractors comply) with all third party licenses, terms of use, policies and procedures that apply to or otherwise govern access to and/or use of any third party materials made available by PG&E to Contractor under this Purchase Order.

### 7.3 Confidentiality and Data Security

(A) Confidentiality: In the course of performing the Work under this Purchase Order, Contractor may have access to confidential commercial or personal information concerning, but not limited to, technological, ratemaking, legislative, personnel, and customer-related information, matters and practices of PG&E, its parent company, subsidiaries, affiliates, or members of the public. Contractor agrees not to disclose any such confidential information or otherwise make it available to any other person or entity, including any affiliate of PG&E that produces energy or energy-related products or services, without the prior written approval of PG&E.

(B) No Customer Data: Contractor warrants that it is not receiving and will not accept any PG&E Customer Data under this Purchase Order. As used in the preceding sentence, Customer Data means, collectively, any and all data and information of or concerning any identified or identifiable PG&E retail or business customer or PG&E employee, including, but not limited to, name, home address and home telephone number; device IDs; e-mail addresses; billing information: electric and gas energy usage, electric service (including, without limitation, service account number, electricity demand (in kilowatts), monthly billed revenue, credit history, rate schedule(s), or number or type of meters at a location).

(C) Security: Contractor hereby represents, warrants and covenants to PG&E that the Work, including any hardware, software, firmware, equipment and other deliverables, does not and will not contain or make available any Malicious Code, defined as any malicious or unauthorized code, scripts, routines or techniques (including without limitation any virus, spyware, ransomware or other malware) that is designed to erase data or programming, or infect, impair, modify, record, take control of, disrupt, damage, destroy, disable, shut down or permit or cause unauthorized access to or misuse of a computer system or any component thereof. Without limiting any of PG&E s rights and remedies with respect thereto (all of which are expressly reserved), if Contractor detects or is made aware of Malicious Code in the Work, Contractor shall notify PG&E immediately, remove such Malicious Code, remediate the effects of such Malicious Code, and restore any lost or corrupt data if applicable.

(D) Cyber Protection for Programmable Devices: The following requirements apply to any deliverables under this Purchase Order containing software, firmware, microcode or other programmable features. These requirements apply on a continuing basis for the longer of five years and the expected service life of the deliverables as disclosed by Contractor in its product descriptions (the Service Life ): (i) Malicious Code. Contractor hereby represents, warrants, and covenants to PG&E that upon delivery to PG&E the deliverables will not contain or make available any Malicious Code. Without limiting any of PG&E s rights and remedies with respect thereto (all of which are expressly reserved), if Contractor detects or is made aware of Malicious Code in the deliverables during the Service Life, Contractor shall immediately notify PG&E. If the deliverables are not yet in use by PG&E, Contractor shall remove such Malicious Code, remediate its effects and certify to PG&E that the Malicious Code has been removed. If the deliverables are in use by PG&E, Contractor shall assist PG&E to remove the Malicious Code in accordance with the Section below titled Security Updates and Support. (ii) Cybersecurity Specifications. Contractor hereby represents, warrants, and covenants that the deliverables comply with the cybersecurity features and functions, if any, described in the associated specifications. (iii) Security Vulnerabilities and Tests. Contractor acknowledges that the deliverables may be subject to security testing by PG&E or its security testing consultants before the deliverables are accepted by PG&E as well as subsequently, at any time during their Service Life. If the deliverables are integrated with products supplied by third parties, the third party suppliers may also be involved in the testing process. Contractor shall fully cooperate in the conduct of such tests. If requested by PG&E, such cooperation shall include the following: (i) providing source code and other program documentation (which PG&E shall use solely for testing purposes), and (ii) providing a representative with suitable technical expertise to participate in the tests. The conduct and results of the tests, including any security vulnerabilities that are identified in the course of the tests, shall be PG&E Confidential Information. Any security vulnerabilities that are identified in such tests shall be resolved in accordance with the following Section, titled Security Updates and Support. (iv) Security Updates and Support. Contractor shall maintain a technical support line with access to PG&E so that any security-related issues can be addressed promptly. Contractor shall notify PG&E without delay if Contractor detects or is made aware of any Malicious Code or security vulnerability in the deliverables during their Service Life. If Malicious Code or security vulnerability is identified during the Service Life, Contractor shall provide an update or revision to the deliverables to remove the Malicious Code and/or cure the vulnerability (a Security Patch ) as soon as possible and at no charge to PG&E. Contractor shall assist PG&E to implement the Security Patch if requested by PG&E and shall reimburse PG&E for the cost of implementing the Security Patch.

Case: 19-30088     Doc# 10238-2     Filed: 02/19/21     Entered: 02/19/21 12:52:39     Page
25 of 35

7.4 Termination or Cancellation: PG&E may suspend, terminate or cancel the Purchase Order, in whole or in part, upon written notice to Contractor. If PG&E cancels or terminates for cause, PG&E shall be liable to Contractor only for compensation earned on the Work satisfactorily performed to the date of termination. If PG&E cancels or terminates for its own reasons (not for cause), PG&E will in addition compensate Contractor for costs, if any, reasonably incurred by Contractor in terminating its operation. However, in no event will Contractor be entitled to payment for lost or anticipated profits or overhead on uncompleted portions of the Work. Contractor shall not enter into any agreements, commitments or Subcontracts which would incur significant cancellation costs without prior written approval of PG&E, which written approval is a condition precedent to the payment of any cancellation charges. Prior to release of final payment, Contractor shall deliver to PG&E all reports, drawings or other documents prepared for PG&E prior to the effective date of such termination or cancellation.

7.5 Assignment. Contractor shall not assign its rights or delegate its duties under this Purchase Order without the prior written consent of PG&E, and any attempted assignment or delegation without such consent shall be void. At its discretion, PG&E may assign its rights or delegate its duties under this Purchase Order, provided PG&E will remain obligated for payments unless otherwise agreed in writing by Contractor.

8.0 ALL ON-SITE WORK
The following provisions apply if the Contractor is performing Work on PG&E s premises:

8.1 Importance of Safety. Contractor recognizes and agrees that safety is of paramount importance in the performance of the Work and that Contractor is responsible for performing the Work in a safe manner. Contractor shall plan and conduct the Work, and shall require all Subcontractors to perform their portion of the Work, in accordance with Contractor s safety program and with all applicable local, state and federal rules, regulations, codes, and ordinances to safeguard persons and property from injury. Contractor further agrees to provide necessary training to its employees and Subcontractors to inform them of the foregoing safety and health rules and standards. Should PG&E at any time observe Contractor, or any of its Subcontractors, performing the Work in an unsafe manner, or in a manner that may, if continued, become unsafe, then PG&E shall have the right (but not the obligation) to require Contractor to stop the Work affected by the unsafe practice until Contractor has taken corrective action so that the Work performance has been rendered safe.

8.2 Indemnification. Contractor shall indemnify PG&E, its directors, officers, agents, and employees, against all loss, damage, expense and liability resulting from injury to or death of person, including, but not limited to, employees of PG&E or Contractor, or injury to property, including, but not limited to, property of PG&E or Contractor, violation of local, state, or federal common law, statute or regulation, including but not limited to environmental laws or regulations; strict liability imposed by any law or regulation; breach of confidentiality; payments to any Subcontractor including but not limited to any demands for payment, invoices, or liens; or delay or failure to pay any Subcontractor or Contractor or Subcontractor personnel the compensation, monies, wages or other payment due or allegedly due; arising out of or in any way connected with the performance of this Purchase Order, however caused, regardless of any negligence of PG&E, whether active or passive, excepting only such loss damage, cost, expense, liability, payment, strict liability, or violation of law for which indemnity is not allowed under applicable law. Contractor shall, on PG&E's request, defend any suit asserting a claim covered by this indemnity. Contractor shall pay all costs that may be incurred by PG&E in enforcing this indemnity, including reasonable attorney's fees.

8.3 Insurance. Contractor shall maintain the following insurance coverage. Contractor is also responsible for its Subcontractors maintaining sufficient limits of the same coverage.
(A) Workers' Compensation and Employers' Liability: Workers' Compensation insurance complying with any applicable labor codes, acts, laws or statutes, state or federal, where Contractor performs work. Employers' Liability insurance shall not be less than $1,000,000 for injury or death each accident.
(B) Commercial General Liability: (i) Coverage shall be at least as broad as the Insurance Services Office (ISO) Commercial General Liability Coverage occurrence form, with no coverage deletions. The limit shall not be less than $1,000,000 each occurrence for bodily injury, property damage and personal injury. If coverage is subject to a general aggregate limit, this aggregate limit shall be twice the occurrence limit. (ii) Coverage shall:
By "Additional Insured" endorsement add as insureds PG&E, its directors, officers, agents and employees with respect to liability arising out of work performed by or for the Contractor; and
Be endorsed to specify that the Contractor's insurance is primary and that any insurance or self-insurance maintained by PG&E shall not contribute with it.
(C) Business Auto: Coverage shall be at least as broad as the Insurance Services Office (ISO) Business Auto Coverage form covering Automobile liability, code 1 "any auto." The limit shall not be less than $1,000,000 each accident for bodily injury and property damage.
(D) Professional Liability Insurance. Errors and Omissions Liability insurance if appropriate for the Service Provider s profession. Coverage shall be for a professional error, act or omission arising out of the scope of services shown in the Purchase Order. The limit shall not be less than $1,000,000 each claim/$2,000,000 aggregate.
(E) Cyber Security and Privacy Liability Insurance: (i) Contractor shall obtain and maintain cyber risks insurance providing coverage for at least the following perils and losses: unauthorized use of or access to a computer system containing or giving access to PG&E confidential information; defense of any regulatory action involving a breach of privacy in connection with PG&E confidential information; failure to protect PG&E confidential information from disclosure; and costs of notifying affected individuals and providing credit monitoring for up to one year, whether or not required by applicable law. (ii) The policy(s) shall have limits of liability of at least $5,000,000 per occurrence and $10,000,000 in the aggregate. If any deductible is applicable, such deductible shall not exceed $100,000, unless such increased deductible or retention is approved in advance by PG&E in writing. (iii) PG&E, its affiliates, subsidiaries and parent company, and PG&E s directors, officers, agents and employees shall be named as additional insureds under this policy. If the policy includes a blanket endorsement by contract, the following language added to the certificate of insurance will satisfy PG&E s additional insured requirement: PG&E, its affiliates, subsidiaries, and parent company, and PG&E s directors, officers, agents and employees with respect to liability arising out of the work performed by or for the Contractor are additional insureds under a blanket endorsement.
(F) Insurance Documentation Requirements: (i) Contractor shall have insurance in place before beginning any Work. Upon request, Contractor shall provide PG&E with certificates of insurance, declaration pages and endorsements of all required insurance. Such documentation shall be signed and submitted by a person authorized by that insurer to issue certificates of insurance and endorsements on its behalf. (ii) Should any of the above described policies be cancelled before the expiration date thereof, the insurer shall deliver notification to PG&E in accordance with the policy provisions: (iii) PG&E may inspect the original policies or require complete certified copies, at any time; and (iv) Upon request, Contractor shall furnish PG&E the same evidence of insurance for its Subcontractors as PG&E requires of Contractor.

9.0 REQUIREMENTS AND POLICIES

9.1 PG&E S Supply Chain Responsibility Policy: It is PG&E s policy that small and diverse businesses shall have the maximum practicable

opportunity to participate in providing the goods and services purchased by PG&E. Small and diverse businesses include Small Business Enterprises ( SBEs ): Women, Minority, and Disabled Veteran Business Enterprises ( WMDVBEs ); and Lesbian, Gay, Bisexual, and Transgender Business Enterprises ( LGBTBEs ).
(A) Contractor agrees to comply, and to require all Subcontractors and sub-Subcontractors to comply, with PG&E s Supply Chain Responsibility Policy, Exhibit 2, available at http://www.pge.com/suppliers and incorporated herein by this reference. Contractor shall provide a copy of Exhibit 2 to each prospective Subcontractor.
(B) Contractor shall act in accordance with its completed Prime Supplier Subcontracting Plan, Exhibit 1-A, available at http://www.pge.com/suppliers and incorporated herein, in the performance of the Work and in the award of all Subcontracts.
(C) In addition, if the Purchase Order exceeds $500,000 ($1 million for construction contracts), Contractor shall comply with Exhibit 2A, Policy Regarding Utilization of Small Business Concerns and Small Disadvantaged Business Concerns, available at http://www.pge.com/suppliers and incorporated herein by this reference, and the Prime Supplier Subcontracting Plan must include provisions for implementing the requirements of Exhibit 2A.
(D) Each Bidder s Proposal shall describe how Bidder will comply with the requirements of Exhibit 2 if awarded the Work. The requirements of Exhibit 2 and the successful Bidder s response, along with a completed, signed copy of Exhibit 1-A, will be incorporated into the Purchase Order.

9.2 Equal Employment Opportunity And Affirmative Action Regulations Policy: During the performance of this Purchase Order and to the extent they may be applicable, Contractor agrees to comply with all laws, orders, and regulations included by summary or reference as follows:
(A) Executive Order 11246, 41 CFR Part 60-1.4: Equal Opportunity Clause.
(B) Executive Order 11246, 41 CFR Part 60-1.8: Nonsegregated Facilities.
(C) Vietnam Era Veterans Readjustment Assistance Act of 1974, 41 CFR Part 60-300.5.a: Equal Opportunity Clause. Contractor and its Subcontractor(s) shall abide by the requirements of 41 CFR 60-300.5(a). This regulation prohibits discrimination against qualified protected veterans, and requires affirmative action by covered prime contractors and subcontractors to employ and advance in employment qualified protected veterans.
(D) Section 503 of the Rehabilitation Act of 1973, 41 CFR Part 60-741.5.a: Equal Opportunity Clause. Contractor and its Subcontractor(s) shall abide by the requirements of 41 CFR 60-741.5(a). This regulation prohibits discrimination against qualified individuals on the basis of disability, and requires affirmative action by covered prime contractors and subcontractors to employ and advance in employment qualified individuals with disabilities.

9.3 Executive Order 13496 Employee Rights Under The National Labor Relations Act. To the extent applicable, the employee notice requirements set forth in 29 C.F.R. Part 471, Appendix A to Subpart A are hereby incorporated by reference into this Purchase Order.

9.4 Contractor Safety Program: Contractor represents and warrants that it will perform all applicable Work, and cause all Subcontractors to perform all applicable Work, in compliance with PG&E s Contractor Safety Program Standard Contract Requirements, as may be modified from time to time. The Contractor Safety Program Standard Contract Requirements can be located and downloaded at: www.pge.com/contractorsafety and are hereby incorporated by reference into this Contract. Contractor s failure to comply with the Contractor Safety Program Standard Contract Requirements shall be immediate grounds for termination for cause under this Contract. Notwithstanding the above, Contractor is the "controlling employer" as defined under CalOSHA and will remain responsible for all fines and liability arising from violation of the Contractor Safety Program Standard Contract Requirements and applicable law.

9.5 Injury and Illness Prevention Program: In the performance of the Work under this Purchase Order, Contractor acknowledges that it has an effective Injury and Illness Prevention Program which meets the requirements of all applicable laws and regulations, including but not limited to Section 6401.7 of the California Labor Code. Contractor shall ensure that any Subcontractor hired by Contractor to perform any portion of the Work under this Purchase Order shall also have an effective Injury and Illness Prevention Program. The person with the authority and responsibility for implementing and administering Contractor s Injury and Illness and Prevention Program shall execute the Compliance Certificate, Exhibit 3, available at http://www.pge.com/suppliers and incorporated herein by this reference.

9.6 PG&E Drug and Alcohol Policy: PG&E is committed to maintain and promote job safety and health for all workers at its facilities. In addition, PG&E is determined to protect its employees, customers, and the general public while they are on PG&E property from any harm caused by illegal drug and alcohol use by non-PG&E personnel. To accomplish these objectives, PG&E has established a drug and alcohol policy for access to PG&E facilities by its Contractor and Subcontractor personnel. If any personnel of Contractor or its approved Subcontractors perform any Work or services at PG&E offices and/or other PG&E facilities, then Contractor shall comply with PG&E s Drug and Alcohol Abuse and Testing Policies, Exhibit 4, available at http://www.pge.com/suppliers and incorporated herein by this reference.

9.7 Document Retention and Production Requirements: PG&E is committed to maintain documents and records so as to satisfy applicable legal, contractual and regulatory requirements as well as PG&E son-going business needs; to enable appropriate records management, provide appropriate retrieval and achieve the proper level of security and privacy. In furtherance of this commitment, Contractor agrees to comply with the requirements of Exhibit 5, PG&E Contractor Document Retention and Production Requirements, and Exhibit 5A, Document and Data List, available at http://www.pge.com/suppliers and incorporated herein by this reference.

9.8 Code of Conduct: Contractor, its Subcontractors and their suppliers at all tiers shall comply with PG&E s Supplier Code of Conduct in the award of all contracts and subcontracts. The Supplier Code of Conduct requires that Contractor and each of its Subcontractors demonstrate a strong commitment to compliance, ethics, sustainability, and supplier diversity as a foundation to successful business. Contractor must complete its Work for PG&E in full compliance with the Supplier Code of Conduct, as it may be modified from time to time. Contractor shall access, read and comply with PG&E s Supplier Code of Conduct and shall make it available to its Subcontractors and suppliers. The Supplier Code of Conduct can be located and downloaded at the following link: http://www.pge.com/includes/docs/pdfs/b2b/purchasing/suppliers/SupplierCodeofConductPGE.pdf and is hereby incorporated by reference into this Purchase Order.

9.9 Conflict of Interest and Business Ethics
(A) Contractor shall not offer, or cause to be offered, gifts, entertainment, payments, loans, services, benefits, or any other consideration of more than a nominal value to PG&E's employees, their families, vendors, subcontractors, or third parties.
(B) Contractor shall exercise reasonable care and diligence to prevent any actions or conditions which could result in a conflict with PG&E's interest.

9.10 Availability of Information: Contractor shall keep accurate records and books of accounts, and shall preserve and make available such records and books of accounts, in accordance with the requirements of Exhibit 6, Audit Rights, available at http://www.pge.com/suppliers and incorporated herein by this reference.

9.11 California Health and Safety Code. The California Health and Safety Code requires businesses to provide warnings prior to exposing

individuals to materials listed by the Governor as chemicals "known to the State of California to cause cancer, birth defects or reproductive harm." PG&E uses chemicals on the Governor's list at many of its facilities. In addition, many of these chemicals are present at non-PG&E-owned facilities and locations. Accordingly, in performing the Work or services contemplated under this Purchase Order, Contractor, its employees, agents, and Subcontractors may be exposed to chemicals on the Governor's list. Contractor is responsible for notifying its employees, agents, and Subcontractors that Work performed hereunder may result in exposures to chemicals on the Governor's list.

9.12 Export Controls. Contractor shall provide PG&E with information and assistance as may reasonably be required in connection with compliance with applicable import and export laws, including but not limited to, Manufacturer's Affidavits, Harmonized Tariff Schedules, Export Control Classification Numbers, and qualification information (e.g. origin) relevant to United States and foreign regulatory approvals for deliverables, products, and other materials furnished hereunder. Contractor shall make such information available to PG&E within five (5) business days following receipt of PG&E s written request.

9.13 Work On PG&E or PG&E Customer Property: The following provisions shall apply to the extent that the Work under the Purchase Order requires any Contractor or Subcontractor personnel (collectively, Personnel ) to have access to PG&E assets, premises, customer property, or logical access to PG&E data or systems (collectively, Access ).
(A) Criminal Background Checks: (i) Contractor warrants and represents that it will not assign any Personnel to work requiring Access unless Contractor has performed a criminal background check on each such individual (either at the time of hiring or during the course of employment). Prior to assigning work requiring Access to any Personnel with one or more criminal convictions during the last seven years, Contractor must consider the gravity of the individual s offense, the time since the conviction, the successful completion of parole/probation, the individual s age at the time of conviction, the number of convictions, and the stability of the individual, including favorable work history. Contractor shall also consider the relation of the offense to the nature of the work the individual will perform. (ii) Notwithstanding the foregoing, in no event shall Contractor grant Access to an individual with one or more convictions for a Serious Offense(s), which is defined as violent and sex offenses, crimes against children, domestic violence, fraud, theft (including but not limited to identity theft), embezzlement, all felonies during the last seven years, and/or two or more DUI s in the past three years. (iii) Contractor shall maintain documentation related to its criminal background check investigation for all Personnel requiring Access and make it available to PG&E for audit if requested pursuant to the audit provisions of this Purchase Order. (iv) Contractor also agrees to notify PG&E if any of its Personnel requiring Access are charged with or convicted of a Serious Offense during the course of a PG&E assignment.
(B) Fitness for Duty: Contractor shall ensure that its Personnel granted Access report to work fit for duty. Personnel with Access may not consume alcohol while on duty and/or be under the influence of drugs that impair their ability to work safely. PG&E expects each supplier to have policies in place that requires their employees report to work in a condition that allows them to perform the work safely. For example, employees should not be operating equipment under medication that creates drowsiness. As a federal contractor, PG&E does not recognize nor allow work to be completed under the influence of marijuana, whether or not is it used for medical reasons.
(C) Eligibility For PG&E Work: When assigning any Personnel to perform Work requiring Access, Contractor shall submit each person s full name and the last four digits of their social security number to PG&E at the following e-mail address: RecruitingOperations@pge.com. PG&E reserves the right to decline to accept any proposed Personnel, in which case Contractor shall promptly propose a replacement.

9.14 NERC Requirements: Pursuant to a directive from the North American Reliability Corporation ( NERC ), PG&E has implemented policies and procedures for the protection of facilities, systems, assets and information that are critical to the operation or support of the Bulk Electric System ( BES ). PG&E identifies these facilities, systems, assets and information in accordance with its internal utility procedures. If this Purchase Order relates to BES Cyber Systems or Bulk Electric System Cyber System Information (as designated by PG&E), then Contractor shall comply with the requirements of Exhibit 7, NERC Requirements and Exhibit 7A, PG&E NERC CIP Program Non-Employee Attestation Form, available at http://www.pge.com/suppliers and incorporated herein. Contractor represents and warrants that it has consulted with PG&E to determine whether Exhibit 7 is applicable to the Work under this Purchase Order.

10.0 GENERAL

10.1 Compliance with Laws: In performing the Work, Contractor shall comply with all applicable Federal, State and local laws, rules and regulations, and shall obtain all applicable licenses and permits for the conduct of its business and the performance of the Work.

10.2 Reporting: In accordance with Section 7912 of the California Public Utilities Code, Contractor agrees to report annually to PG&E the number of California residents employed by Contractor, calculated on a full-time or full-time equivalent basis, who are personally providing services to PG&E.

10.3 Choice of Laws: This Purchase Order shall be construed and interpreted in accordance with the laws of the State of California, excluding any choice of law rules which may direct the application of the laws of another jurisdiction.

10.4 Severability: If any provision of this Purchase Order is determined to be illegal, unenforceable, or invalid in whole or in part, such provision or part thereof shall be stricken from this Purchase Order and shall not affect the legality, enforceability or validity of the remainder of this Purchase Order. If any provision or part thereof of this Purchase Order is stricken in accordance with the provisions of this Article, it shall be replaced, to the extent possible, with a legal, enforceable, and valid provision that is as similar in intent to the stricken provision as is legally possible.

10.5 Survival: The provisions of this Purchase Order which by their nature should survive expiration, cancellation or other termination of this Purchase Order, including but not limited to provisions regarding warranty, indemnity, document retention, business ethics, confidentiality and availability of information, shall survive such expiration, cancellation or other termination.

10.6 Entire Agreement. This Purchase Order constitutes the entire agreement and understanding between Contractor and PG&E as to the subject matter of the Purchase Order and supersedes all prior or contemporaneous agreements, commitments, representations, writings, and discussions, whether oral or written.

**Exhibit 6**

**RECEIPT** DATE *05.11.18*    No. **445467**

$ *71,415.89*

RECEIVED FROM *PG & E*

*SEVENTY ONE THOUSAND FOUR HUNRED FIFTEEN & 89/100* DOLLARS

○ FOR RENT    *CK # 4393994*

⦿ FOR    *TERO*

| ACCOUNT | | ○ CASH |
| PAYMENT | *71,415.89* | ○ CHECK |
| BAL. DUE | | ○ MONEY ORDER |
| | | ○ CREDIT CARD |

FROM _____ ENTERED MAY 1 5 2018

BY *Ynn Warson*                        3-11

*10*
*6135-y84045*
*215*
*15*

*964045*
*6135*
*FUND 10*
*PROJ 15*

*JV*
*6135 to 4045*

*Please*
*change to*
*4045*
*J.T.*

**Special Handle Code:**

**Pacific Gas and Electric Company**   77 Beale Street, San Francisco, CA 94105

Not Negotiable

1575

---

**— PLEASE FOLD FIRST THEN DETACH ALONG PERFORATION —**

**YUROK TRIBE**
**Check no.**            4393994
**Date**                 05/08/2018
**Your account number**  1076892
**Payment Document**     2000080050
**Our account with you** N/A

| Invoice | Date | Discount | Net Amount | Comments |
|---------|------|----------|------------|----------|
| 18-106 | 01/25/18 | 0.00 | 56,751.26 | |
| 18-107 | 04/06/18 | 0.00 | 14,664.63 | |
| Totals: | USD | 0.00 | 71,415.89 | For Payment Inquiries, Call 1-800-756-PAID |

**Exhibit 7**

| | |
|---|---|
| **From:** | Marshall, Ross <RZM4@pge.com> |
| **Sent:** | Wednesday, May 30, 2018 12:10 PM |
| **To:** | John Safford |
| **Cc:** | Donald Barnes |
| **Subject:** | Re: Wautec Line Ext Traffic Control 6/4 thru 6/28 |

Perfect. Thanks John.
Do you have the names and a contact number for the flaggers that we will be using so I can provide that to my field personnel? Thanks.

Get Outlook for iOS

**From:** John Safford <jsafford@yuroktribe.nsn.us>
**Sent:** Wednesday, May 30, 2018 8:58:01 AM
**To:** Marshall, Ross
**Cc:** Donald Barnes
**Subject:** RE: Wautec Line Ext Traffic Control 6/4 thru 6/28
*****CAUTION**: This email was sent from an EXTERNAL source. Think before clicking links or opening attachments.*****
Ross
I've contacted our flaggers that worked for MGE up there, they'll be there on Monday, June 4 @ 9:am.
We'll have the traffic control signs and cones for the gate to meet Caltrans specifications.
John Safford - Yurok Tribe TERO Compliance Officer

**From:** Marshall, Ross [mailto:RZM4@pge.com]
**Sent:** Tuesday, May 29, 2018 3:37 PM
**To:** Donald Barnes; John Safford
**Cc:** Eugene O'Rourke; Miller, Michael; Marshall, Ross
**Subject:** Wautec Line Ext Traffic Control 6/4 thru 6/28
John & Don,
Our crews will be back out starting work on the Wautec Line Extension starting this week.
They will just be getting reacquainted with the job and preparing most of this week but we would like to get traffic control set up to start on Monday, 6/4.
Our crews will be working a 4-10 schedule so we will likely need traffic control Monday thru Thursday starting 6/4 thru 6/28.
If we could have the traffic control crew meet at 0900 on 6/4 at Meyers to start that would be great.
Please let me know if this will work and if you have any questions/concerns. Thanks.
**Ross Marshall**
**530-215-5882**
**PG&E GC Line – NV North**
**3600 Meadowview Dr.**
**Redding, CA 96002**

**<u>Exhibit 8</u>**



# Yurok Tribe

P. O Box 1027
Klamath, CA 95548

| | |
|---|---|
| **INVOICE #** | 19-104 |
| **DATE** | 5/24/2019 |

**Customer**

Pacific Gas & Electric Company
3965 Occidental Road
Santa Rosa, CA 95401

| DESCRIPTION | AMOUNT |
|---|---|
| **PG&E - Wautec Electrical Line Extension II** | |
| | |
| **Traffic Control for MGE - Week of 3/26/18-4/8/18** | |
| Lana Crutchfield - 80 hrs @ $46.17 ($27.14 base + $19.03 fringe) | $3,693.60 |
| Lana Crutchfield - 33 hrs OT @ $59.74 ($40.71 base + 19.03 fringe) | $1,971.42 |
| Melissa Myers - 80 hrs @ $46.17 ($27.14 base + $19.03 fringe) | $3,693.60 |
| Melissa Myers- 33 @ $59.74 ($40.71 base + 19.03 fringe) | $1,971.42 |
| | |
| **Traffic Control for MGE - Week of 4/9/18-4/22/18** | |
| Lana Crutchfield - 40 hrs @ $46.17 ($27.14 base + $19.03 fringe) | $1,846.80 |
| Lana Crutchfield - 14.5 hrs OT @ $59.74 ($40.71 base + 19.03 fringe) | $866.23 |
| Melissa Myers - 40 hrs @ $46.17 ($27.14 base + $19.03 fringe) | $1,846.80 |
| Melissa Myers- 14.4 @ $59.74 ($40.71 base + 19.03 fringe) | $866.23 |
| | |
| **Traffic Control for MGE - Week of 4/23/18-5/6/18** | |
| Lana Crutchfield - 80 hrs @ $46.17 ($27.14 base + $19.03 fringe) | $3,693.60 |
| Lana Crutchfield - 27 hrs OT @ $59.74 ($40.71 base + 19.03 fringe) | $1,612.98 |
| Melissa Myers - 80 hrs @ $46.17 ($27.14 base + $19.03 fringe) | $3,693.60 |
| Melissa Myers- 27 @ $59.74 ($40.71 base + 19.03 fringe) | $1,612.98 |
| | |
| **Traffic Control for MGE - Week of 5/7/18/18-5/20/18** | |
| Lana Crutchfield - 80 hrs @ $46.17 ($27.14 base + $19.03 fringe) | $3,693.60 |
| Lana Crutchfield - 16.5 hrs OT @ $59.74 ($40.71 base + 19.03 fringe) | $985.71 |
| Melissa Myers - 72.5 hrs @ $46.17 ($27.14 base + $19.03 fringe) | $3,347.36 |
| Melissa Myers- 15.5 @ $59.74 ($40.71 base + 19.03 fringe) | $925.97 |
| | |
| **Traffic Control for MGE - Week of 5/21/18/18-6/3/18** | |
| Lana Crutchfield - 27.5 hrs @ $46.17 ($27.14 base + $19.03 fringe) | $1,269.68 |
| Melissa Myers - 27.5 hrs @ $46.17 ($27.14 base + $19.03 fringe) | $1,269.68 |
| | |
| **Traffic Control for MGE - Week of 6/4/18/18-6/17/18** | |
| Lana Crutchfield - 76.5 hrs @ $46.17 ($27.14 base + $19.03 fringe) | $3,532.01 |
| Melissa Myers - 76.5 hrs @ $46.17 ($27.14 base + $19.03 fringe) | $3,532.01 |
| | |
| **Traffic Control for MGE - Week of 6/18/18/-7/1/18** | |
| Lana Crutchfield - 64 hrs @ $46.17 ($27.14 base + $19.03 fringe) | $2,954.88 |
| Melissa Myers - 64 hrs @ $46.17 ($27.14 base + $19.03 fringe) | $2,954.88 |
| | |
| **Traffic Control for MGE - Week of 7/2/18/-7/15/18** | |
| Lana Crutchfield - 40 hrs @ $46.17 ($27.14 base + $19.03 fringe) | $1,846.80 |
| Lana Crutchfield - 5.5 hrs OT @ $59.74 ($40.71 base + 19.03 fringe) | $328.57 |
| Melissa Myers - 40 hrs @ $46.17 ($27.14 base + $19.03 fringe) | $1,846.80 |
| Melissa Myers- 4.5 OT @ $59.74 ($40.71 base + 19.03 fringe) | $268.83 |
| | |
| **Traffic Control for MGE - Week of 7/16/18/-7/29/18** | |
| Lana Crutchfield - 74 hrs @ $46.17 ($27.14 base + $19.03 fringe) | $3,416.58 |
| Melissa Myers - 64 hrs @ $46.17 ($27.14 base + $19.03 fringe) | $2,954.88 |
| | |
| **Traffic Control for MGE - Week of 7/30/18/-8/5/18** | |
| Lana Crutchfield - 31.5 hrs @ $46.17 ($27.14 base + $19.03 fringe) | $1,454.36 |
| Lana Crutchfield - 2.5 hrs OT @ $59.74 ($40.71 base + 19.03 fringe) | $149.35 |
| Melissa Myers - 28 hrs @ $46.17 ($27.14 base + $19.03 fringe) | $1,292.76 |
| | |
| **Traffic Control for MGE - Week of 8/20/18-9/2/18** | |
| Lana Crutchfield - 24 hrs @ $46.17 ($27.14 base + $19.03 fringe) | $1,108.08 |

| | |
|---|---|
| Melissa Myers -  24 hrs @ $46.17 ($27.14 base + $19.03 fringe) | $1,108.08 |

**Traffic Control for MGE - Week of 9/3/18-9/9/18**

| | |
|---|---|
| Lana Crutchfield - 33 hrs @ $46.17 ($27.14 base + $19.03 fringe) | $1,523.61 |
| Melissa Myers -  34 hrs @ $46.17 ($27.14 base + $19.03 fringe) | $1,569.78 |

$70,703.52

Yurok Tribe Indirect Cost (24.98%): $17,661.74

**Invoice Total:** **$88,365.26**

**Please send payment to:**
Yurok Tribe TERO
Attn: Don Barnes
P.O. Box 1027
Klamath,  CA  95548

_5.28.19_
Don Barnes                                           Date
Yurok Tribe TERO Director

If you have any questions regarding this invoice please contact:
Don Barnes, TERO Director 707-482-1350 x 1388