WEIL, GOTSHAL & MANGES LLP
Jessica Liou (pro hac vice)
(jessica.liou@weil.com)
Matthew Goren (pro hac vice)
(matthew.goren@weil.com)
767 Fifth Avenue
New York, NY 10153-0119
Tel: 212 310 8000
Fax: 212 310 8007

KELLER BENVENUTTI KIM LLP
Tobias S. Keller (#151445)
(tkeller@kbkllp.com)
Jane Kim (#298192)
(jkim@kbkllp.com)
650 California Street, Suite 1900
San Francisco, CA 94108
Tel: 415 496 6723
Fax: 650 636 9251

*Attorneys for Debtors and Reorganized Debtors*

BROWN RUDNICK LLP
Joel S. Miliband (#077438)
(jmiliband@brownrudnick.com)
2211 Michelson Drive
Seventh Floor
Irvine, CA 92612
Tel: 949 725 7100
Fax: 949 252 1514

David J. Molton (#262075)
(dmolton@brownrudnick.com)
Seven Times Square
New York, NY 10036
Tel: 212 209 4800
Fax: 212 209 4801

*Attorneys for the Hon. John K. Trotter (Ret.)
as Trustee of PG&E Fire Victim Trust*

**UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

| | |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION,**<br><br>-and-<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br><br>Debtors.<br><br>☐ **Affects PG&E Corporation**<br>☐ **Affects Pacific Gas and Electric Company**<br>☒ **Affects both Debtors**<br><br>*All papers shall be filed in the Lead Case, No. 19-30088 (DM).* | Bankruptcy Case No. 19-30088 (DM)<br>Chapter 11<br>(Lead Case) (Jointly Administered)<br><br>**JOINT MOTION OF FIRE VICTIM TRUSTEE AND REORGANIZED DEBTORS REGARDING EXCHANGE TRANSACTION IN SUPPORT OF A GRANTOR TRUST TAX ELECTION**<br><br>**Date:** **April 28, 2021**<br>**Time:** **10:00 a.m.**<br>**Place:** **(Telephonic or Video Only)**<br>**Courtroom 17, 16th Fl.**<br>**450 Golden Gate Ave.**<br>**San Francisco, CA 94102** |

The Honorable John K. Trotter (Ret.), in his capacity as the Trustee (the "**Trustee**") of the PG&E Fire Victim Trust (the "**Trust**," and its beneficiaries, the "**Fire Victims**"), and PG&E Corporation ("**PG&E Corp**") and Pacific Gas and Electric Company (the "**Utility**"), as reorganized debtors (the "**Reorganized Debtors**," and together with the Trustee, the "**Movants**" or the "**Parties**") in the above-captioned cases, hereby submit this motion (the "**Motion**") pursuant to section 105(a) of title 11 of the United States Code (the "**Bankruptcy Code**"), Section 11.1 of the Plan and Paragraph 78 of the Confirmation Order (each of the foregoing capitalized terms as defined below), for entry of an order (a) approving the Exchange Transaction Agreement (as defined below) and any ancillary agreements (the "**Ancillary Agreements**") appropriate to effect the Exchange Transaction Agreement, and (b) determining that the Exchange Transaction Agreement and the implementation thereof are consistent with (i) the authorizations provided under the Plan, Confirmation Order and the Trust Documents[1]; and (ii) the powers, duties and responsibilities granted to the Trustee under the Plan, Confirmation Order and the Trust Documents. A proposed form of order granting the relief requested in the Motion is annexed hereto as **Exhibit A** (the "**Proposed Order**").

Entry into and implementation of the Exchange Transaction Agreement are subject to the execution of definitive documentation mutually acceptable to the Parties. In addition, the relief requested in the Motion and the execution, implementation, and performance under the Exchange Transaction Agreement and any related agreements are not intended to in any way affect, modify or alter the Plan, Confirmation Order, or the validity or enforceability of the Channeling Injunction contained in the Plan and Confirmation Order.

In support of the Motion, the Movants respectfully submit the Declaration of the Honorable John K. Trotter (Ret.) in his capacity as Trustee of the Trust, filed contemporaneously herewith.

---

[1] "**Trust Documents**" means the PG&E Fire Victim Trust Agreement dated July 1, 2020 (the "**Trust Agreement**") together with the Claims Resolution Procedures attached as Exhibit 2 thereto, including all related exhibits.

2

# **TABLE OF CONTENTS**

MEMORANDUM OF POINTS AND AUTHORITIES ..................................................................3

I.      PRELIMINARY STATEMENT ....................................................................................3

II.     JURISDICTION AND VENUE ....................................................................................4

III.    BACKGROUND ...........................................................................................................4

       A.     The Chapter 11 Plan and the Trust Agreement. ...............................................4

       B.     The Grantor Trust Election and Private Letter Ruling. ....................................7

       C.     Certain Key Terms and Provisions of the Exchange Transaction Agreement. ...........9

       D.     Potential Risks Inherent to the Exchange Transaction Agreement. .........................13

IV.     BASIS FOR RELIEF REQUESTED .........................................................................15

CONCLUSION .........................................................................................................................17

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*In re Gonzales*,
    512 B.R. 255 (Bankr. C.D. Cal. 2014) ................................................................... 15

*In re Mako, Inc.*,
    120 B.R. 198 (Bankr. E.D. Okla. 1990) ........................................................... 15, 16

*U.S. for I.R.S. v. APT Indus., Inc.*,
    128 B.R. 145 (W.D.N.C. 1991) ........................................................................... 15

**Federal Statutes**

28 U.S.C.
    § 157 ................................................................................................................... 4
    § 1334 ................................................................................................................. 4
    § 1408 ..................................................................................................................
    § 1409 ................................................................................................................. 4

Bankruptcy Code
    § 105(a) ......................................................................................................... 16, 21
    § 1145 ................................................................................................................. 6

ii

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. PRELIMINARY STATEMENT

The Parties are finalizing an agreement (the "Exchange Transaction Agreement") based on substantially the same terms as are set forth in the Exchange Transaction Term Sheet (attached hereto as Exhibit B), regarding the Reorganized Debtors' right to treat the Trust as a grantor trust for U.S. federal income tax purposes (the "Grantor Trust Election") pursuant to the Plan, the Confirmation Order and the Trust Documents. The purpose of the Exchange Transaction Agreement is to allow the Trust and the Reorganized Debtors to maximize the potential tax benefits of grantor trust status. The potential tax benefits to the Trust and the Reorganized Debtors consist of potentially hundreds of millions of dollars of tax savings for the benefit of Fire Victims (and related tax deductions for the Reorganized Debtors), without giving rise to potentially significant gain recognition to the Utility in connection with the sale of common stock of PG&E Corp ("PG&E Stock") by the Trust. The realization of these benefits turns on whether the Trust is treated as a grantor trust for U.S. federal income tax purposes.

To clarify certain tax matters relating to grantor trust status, the Reorganized Debtors sought and obtained, after months of discussions with the Internal Revenue Service ("**IRS**"), a confidential private letter ruling ("**PLR**") from the IRS that approved a series of transactional steps, consistent with applicable Treasury Regulations, which the Reorganized Debtors and the Trust could follow to meet the requirements of the applicable Treasury Regulations and achieve the desired tax benefits of grantor trust status. The necessary steps to achieve these benefits for the Trust and the Reorganized Debtors, a series of securities transactions regarding the sale of PG&E Stock by the Trust, were not known at the time the Plan was confirmed and the Confirmation Order was entered.

For the Reorganized Debtors to make the Grantor Trust Election, and, therefore, for the Trust and the Reorganized Debtors to realize the above-described benefits, the Reorganized Debtors must be assured that the Trust will be able to comply with applicable Treasury Regulations requirements as described in the PLR. The Exchange Transaction Agreement addresses these matters and, as stated, is being pursued to achieve the significant economic benefits that will inure to both the Trust and the Reorganized Debtors.

The Movants therefore request that this Court approve the Exchange Transaction Agreement and confirm that the Trustee has the authority to enter into the Exchange Transaction Agreement, which is expected to provide favorable tax benefits to the Trust but would also come with certain risks and potential tax payment obligations.[2]  The Trustee believes that execution of and performance under the Exchange Transaction Agreement is in the best interest of Fire Victims, is within the discretion and authority provided to the Trustee under the documents governing the Trust, and is consistent with the Plan, Confirmation Order and Trust Documents.  Nonetheless, in the interest of transparency, the Trustee, with the support of the Reorganized Debtors, seeks this Court's approval of the execution and performance of the Exchange Transaction Agreement, and the transactions contemplated thereby, as consistent with the Plan and within the Trustee's authority under the documents governing the Trust.

## II.       JURISDICTION AND VENUE

The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, the *Order Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges*, General Order 24 (N.D. Cal.), Rule 5011-1(a) of the Bankruptcy Local Rules for the United States District Court for the Northern District of California, and the jurisdictional retention provisions of the Plan and Confirmation Order.[3]  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory basis for the Motion's requested relief is section 105 of the United States Bankruptcy Code.

## III.      BACKGROUND

### A.       The Chapter 11 Plan and the Trust Agreement.

On January 29, 2019 (the "**Petition Date**"), the Debtors commenced the chapter 11 cases (the "**Chapter 11 Cases**") in the United States Bankruptcy Court for the Northern District of California (the "**Bankruptcy Court**").  The Reorganized Debtors filed the Chapter 11 Cases to address the

---

[2] The Reorganized Debtors are proceeding in parallel in the California Department of Financial Protection and Innovation to hold a fairness hearing and obtain an exemption under Section 3(a)(10) of the Securities Act with respect to the issuance of the New Shares (as defined below).

[3] *See* Confirmation Order, ¶ 78; Plan, § 11.1.

billions of dollars of damage and loss (and therefore, liabilities) relating to the devastating 2017 and 2018 California fires and the 2015 Butte Fire and to provide compensation to wildfire victims fairly and expeditiously. On June 19, 2020, the Reorganized Debtors filed the *Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization Dated June 19, 2020* [Dkt. No. 8048] (together with all schedules and exhibits thereto, the "**Plan**").[4] The Plan, which, among other things, addresses the claims of approximately 80,000 Fire Victims, received the overwhelming support of the Fire Victims, with over 85% of Fire Victim ballots cast in favor of the Plan.[5]

The Trust was funded with a combination of cash, stock, rights to deferred cash and causes of action (all funding, collectively, the "**Aggregate Fire Victim Consideration**"). At the time a settlement agreement was reached with respect to the treatment of the Fire Victim Claims under the Plan, the Aggregate Fire Victim Consideration was purported to have the nominal aggregate value of approximately $13.5 billion.[6] A critical component of the Aggregate Fire Victim Consideration was the PG&E Stock issued to the Trust pursuant to the Plan, which now comprises approximately 24% of the fully diluted shares of PG&E Corp. The Disclosure Statement and Disclosure Statement Supplement identified the risks associated with the Trust being funded with PG&E Stock.[7]

On June 20, 2020, the Bankruptcy Court entered the *Order Confirming Debtors' and Shareholder Proponent's Joint Chapter 11 Plan of Reorganization Dated June 19, 2020* [Dkt. No.

---

[4] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Plan.

[5] *See Declaration of Christina Pullo of Prime Clerk LLC Regarding Solicitation of Votes and Tabulation of Ballots Cast with Respect to the Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization* [Dkt. No. 7507] (the "**Voting Certification**").

[6] *See* Debtors' Motion to Approve Tort Claimants' RSA [Dkt. No. 5038 at 12].

[7] *See, e.g., Disclosure Statement for Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization* [Dkt. No. 6353] at 4 ("The $6.75 billion value of the common stock of Reorganized PG&E Corp. is based on a formula set forth in the Tort Claimants RSA and incorporated in the Plan. The $ 6.75 billion value does not necessarily reflect the actual value of the stock to be held by the Fire Victim Trust on the Effective Date and thereafter. The actual value of the stock on the Effective Date and the thereafter could be greater or less than the $6.75 billion based on the future trading value of the common stock of Reorganized PG&E Corp.") (bold emphasis and capitalization omitted).

Case: 19-30088    Doc# 10497    Filed: 04/05/21    Entered: 04/05/21 18:09:59    Page 7 of 32

8053] (the "**Confirmation Order**") and the Effective Date of the Plan occurred on July 1, 2020. Pursuant to the Plan and Confirmation Order, the Trust was established on the Effective Date and funded with approximately $5.4 billion in cash and approximately 478 million shares of PG&E Stock. The Confirmation Order provided that the issuance of the PG&E Stock to the Trust was exempt from registration under the securities laws under section 1145 of the Bankruptcy Code and that such securities would be freely tradable by the recipients thereof subject to certain limited exceptions contained in the Confirmation Order.[8]

The Trust Agreement governs the Trustee's authority to marshal, manage, monetize and ultimately distribute the Aggregate Fire Victim Consideration to Fire Victims. The Trust Agreement provides the Trustee with broad authority and discretion over a number of matters, and to the extent that there is no inconsistency with the Plan or Confirmation Order, the Trustee "need not obtain the order or approval of any court in the exercise of any power or discretion conferred [under the Trust Agreement]."[9] One such express power conferred on the Trustee is the authority to effect the "[sale], transfer, or exchange [of] any or all of the Trust Assets at such prices and upon such terms as the Trustee may determine proper in consultation with the Investment Advisor and consistent with the other terms of the Trust Documents, the Plan and Confirmation Order[.]"[10] In monetizing the Trust Assets, including the PG&E Stock held by the Trust, the Trustee is required to consult with, and in some cases, obtain the consent of the Trust Oversight Committee (as defined in the Trust Agreement).[11] The Trustee is also required to obtain the advice of professional advisors when developing a monetization plan or entering into an agreement to transfer material Trust Assets.[12]

/ / /

---

[8] *See* Confirmation Order, ¶¶ 30(a), (b).

[9] *See* Trust Agreement, § 2.1(d).

[10] *See Notice of Filing of Ninth Supplement to Plan Supplement in connection with Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization* [Dkt. No. 8057], Exhibit A (the "**Trust Agreement**") at Section 2.1(e)(iv).

[11] *See, e.g.*, Trust Agreement §§ 2.2(f)(ix), (x).

[12] *Id.*

### B. The Grantor Trust Election and Private Letter Ruling.

Under the Confirmation Order, the Plan and Trust Agreement, the Trust is intended to qualify as a "qualified settlement fund" ("**QSF**") for U.S. federal income tax purposes, subject to the Reorganized Debtors' right to elect to treat the Trust as a grantor trust for U.S. federal income tax purposes.[13] The Trust Agreement requires the Reorganized Debtors to inform the Trustee by April 1, 2021 of their decision with respect to the Grantor Trust Election.[14] The Reorganized Debtors informed the Trustee on March 29, 2021 that, in the event that the Reorganized Debtors and the Trust enter into definitive documentation consistent with the Exchange Transaction Term Sheet attached hereto as Exhibit B (or as otherwise agreed between the Parties) on or prior to the date required to make a timely Grantor Trust Election, the Reorganized Debtors will make the Grantor Trust Election. The Parties must therefore be able to act with certainty before the tax election deadline that will occur later this year. The Trust is required to cooperate with the Reorganized Debtors to facilitate the filing of tax returns and the consistent tax treatment of the Trust for federal and state tax purposes.[15]

The provision allowing the Reorganized Debtors to elect grantor trust treatment was included in the Plan to allow for potentially significant favorable economic benefits to both the Trust and the Reorganized Debtors: (i) neither the Trust nor the Reorganized Debtors would pay tax on any gain in the PG&E Stock when sold by the Trust, and (ii) the Reorganized Debtors would take a tax deduction as of the date the Fire Victims were actually compensated by the Trust rather than the date on which the Trust was funded. In other words, the Grantor Trust Election would allow the Trust to retain more cash for distribution to Fire Victims and allow the Reorganized Debtors to get a larger

---

[13] *See, e.g.*, Confirmation Order, ¶ 18(b); Trust Agreement, Recital I; Plan, § 6.7(b).

[14] *See* Trust Agreement, § 1.4(c).

[15] *See* Plan, § 6.8(c) ("The Fire Victim Trustee shall cooperate fully with the Reorganized Debtors in connection with the preparation and filing by the Reorganized Debtors of any tax returns, claims for refunds, or other tax filings, and any tax proceedings, to the extent relating to any transfers to, distributions by, or the operations of the Fire Victim Trust."); Confirmation Order, ¶ 18(b) ("the Reorganized Debtors may elect to treat any trust comprising the Fire Victim Trust as a "grantor trust" for U.S. federal income tax purposes, in which case each such trust shall be treated consistently for state and local tax purposes, to the extent applicable. The Fire Victim Trustee and all holders of Fire Victim Claims shall report consistently with the foregoing.").

tax deduction to the extent the PG&E Stock is monetized by the Trust at an aggregate value higher than its value on the Effective Date, so long as sales of PG&E Stock by the Trust are structured consistently with the securities exchange transaction described in the PLR. This securities exchange transaction was not explicitly addressed in the Plan. Conversely, if the Reorganized Debtors ***do not*** make the Grantor Trust Election, then the Trust would be subject to a 37% federal income tax and an 8.84% California state income tax on its gain from the sale of PG&E Stock at an aggregate value higher than its value on the Effective Date.

To clarify certain tax matters relating to grantor trust status, including with respect to the securities exchange transaction, the Reorganized Debtors obtained the PLR from the IRS. Due to technical requirements under the Treasury Regulations, the securities exchange transaction (to be implemented through the Exchange Transaction Agreement) is vital to achieving the desired tax benefits. That is, in the event of a sale by the Trust of the newly received PG&E Stock immediately following a stock-for-stock exchange (conducted in accordance with the Exchange Transaction Agreement), neither the Trust nor the Reorganized Debtors would pay tax on the gain realized, and the Reorganized Debtors may potentially obtain a greater tax deduction as a result of the greater amount available for distribution to the Fire Victims.

An illustration of the difference in taxation using approximate numbers follows:

The Trust acquired the PG&E Stock with a fair market value (*i.e.*, tax basis) of roughly $9 per share. If the Trust were to sell the PG&E Stock at $11 per share without the Grantor Trust Election, it would be subject to tax on the $2 per share gain. Because the Trust currently has approximately 478 million shares of PG&E Stock, it is clear that the tax cost to the Fire Victims could be substantial (over $400 million in total based on these assumptions).[16] Conversely, if the Grantor Trust Election is made, the Exchange Transaction Agreement entered into, and the PG&E Stock is disposed of in accordance with the stock-for-stock exchange process required under the applicable Treasury Regulations, the Trust would pay no tax on the same assumed facts.

---

[16] At the close of trading on April 1, 2021, the price per share of PG&E Stock was $11.50.

The Trustee and the Reorganized Debtors have both independently concluded that proceeding with the Exchange Transaction Agreement in order to obtain the benefits of grantor trust status is in their respective interests. To that end, the Parties are pursuing the securities exchange agreement described in the PLR (to be implemented through the Exchange Transaction Agreement) in order to assure the favorable tax outcome to the Trust and to the Reorganized Debtors. Consistent with commercial practices, the Exchange Transaction Agreement allocates liability where the Parties fail to perform in accordance with the agreement. Thus, the tax savings benefits to be obtained by the Trust carry with them the potential downside of liability for failing to perform. In accordance with the Trust Agreement, the Trustee obtained the advice of the Trust's financial advisors and legal counsel with respect to the Exchange Transaction Agreement, as well as the consent of the Trust Oversight Committee.[17] The Trustee intends to take every precaution to limit the risk of liability under the Exchange Transaction Agreement. However, given the potential risk inherent in such commercial agreements, the Trustee seeks this Court's confirmation that the Exchange Transaction Agreement is consistent with the Plan, Confirmation Order, and Trust Documents.

### C. Certain Key Terms and Provisions of the Exchange Transaction Agreement.

In order to comply with technical requirements under IRS Treasury Regulations embodied in the PLR, the Trust cannot directly sell the PG&E Stock that it received under the Plan. Instead, when the Trust intends to sell shares, it must first exchange them for newly issued shares. The purpose of the Exchange Transaction Agreement is to create a procedure for effecting these exchanges, with such agreement appropriately apportioning any potential risk of liability among the Parties.

The Exchange Transaction Term Sheet is attached hereto as **Exhibit B**. The Exchange Transaction Agreement contemplates the following:

- The Trust exchanges with the Reorganized Debtors, on a one-for-one basis, a number of shares of PG&E Stock that it currently owns (the "**Old Shares**") for an equal number of newly issued shares of PG&E Stock (the "**New Shares**") that are exactly

---

[17] *See* Trust Agreement §§ 2.2(f)(ix), (x), 6.2, and 6.6.

the same as the Old Shares being exchanged.  It is critical under the PLR that <u>only</u> the New Shares be sold by the Trust.

- For example: if the Trust wants to sell 10 shares of PG&E Stock, the following occurs:
  - The Trust returns to the Utility 10 Old Shares.
  - Reorganized Debtors <u>transfer to</u> the Trust 10 New Shares.  This is a stock-for-stock exchange at the same then-current value.
  - The Trust then proceeds to sell the New Shares on a timely basis.
- These procedures are applicable until the Trust sells all of its shares of PG&E Stock.

Certain key terms and provision of the Exchange Transaction Term Sheet are summarized as follows:[18]

| | |
|---|---|
| **Parties** | PG&E Corp, the Utility, a newly formed direct subsidiary of PG&E Corp ("**ShareCo,**" and together with PG&E Corp and Utility, "**PG&E**"), and the Trust. |
| **Issuance of New Shares** | On the effective date of the Exchange Transaction Agreement, PG&E Corp will issue 477,743,590 New Shares to ShareCo, which, for so long as the Trust continues to hold Old Shares, will hold New Shares in a brokerage account at the brokerage firm where the Trust holds its Old Shares (the "**Brokerage Firm**"). |
| **Exchange of Old Shares for New Shares** | As and when the Trust desires to immediately sell or otherwise dispose of any Old Shares, the Trust shall provide notice to PG&E and the exchange of the Old Shares proposed to be sold for an equal number of New Shares will be effected.<br><br>At such time, the Brokerage Firm will immediately deposit into an account of the Trust the same number of New Shares in exchange for the corresponding Old Shares (an "**Exchange**") which will be deposited into the account of Utility. |

---

[18] This summary is qualified in its entirety by reference to the provisions of the Exchange Transaction Term Sheet and final Exchange Transaction Agreement (as may be supplemented).  To the extent that any discrepancies exist between the summary described in the Motion and the terms of the Exchange Transaction Term Sheet and final Exchange Transaction Agreement (as may be supplemented), the Exchange Transaction Term Sheet and when finalized, the Exchange Transaction Agreement (as may be supplemented) shall govern.

| | |
|---|---|
| **Disposition of New Shares by Trust** | The Trust shall not enter into an agreement to sell or otherwise dispose of any New Shares prior to its receipt of such New Shares.

The Trust shall immediately (but in no event later than two business days, absent circumstances beyond its control) (the "**Disposition Period**") dispose of such New Shares for cash. In the case of a sale on the market, it is sufficient that the trade date occur within the Disposition Period although such trade is to be settled within two business days thereafter in the ordinary course, and in the case of an underwritten offering, it is sufficient that such transaction becomes binding on the Trust within the Disposition Period. In the event that the Trust is unable to dispose of New Shares within the Disposition period, without the Trust's fault, then the Trust may use the Mitigation Mechanism (defined below) to set aside such New Shares.

The following events, not within the control of the Trust, shall relieve the Trust of any obligation to sell New Shares immediately after the Exchange, subject to the utilization and exhaustion of the Mitigation Mechanism:

- The delivery by PG&E Corp of a notice to suspend trading pursuant to the Registration Rights Agreement (defined below) to the Trust during any Disposition Period,
- In the event that the Trust enters into an agreement with one or more underwriters for the underwritten offering of any New Shares, and prior to closing, the underwriters validly exercise a termination right or assert a failure of a condition to closing,
- The Brokerage Firm is unable to timely effect an Exchange or sale due to any act or omission of PG&E in breach of the Exchange Transaction Agreement,
- Bankruptcy of PG&E Corp, ShareCo or Utility, unless the Exchanges are permitted to continue in accordance with the terms of the Exchange Transaction Agreement pursuant to "Day 1" relief granted by the applicable bankruptcy court, or
- An injunction by a court of competent jurisdiction, or a regulatory ruling, order or similar restriction applicable to PG&E Corp, ShareCo or Utility, prohibits or delays the timely execution of an Exchange or subsequent sale (an adverse effect on PG&E Corp's share price is not a cause for delay of a subsequent sale for purposes of this provision).

The Exchange Transaction Agreement will provide an additional exchange mechanism intended to preserve the tax benefits of the Exchange for both the Trust and PG&E (the "**Mitigation Mechanism**"); the Trust will not be required to utilize the Mitigation Mechanism to the extent that the events specified above involve more than 250,000,000 shares in the aggregate during the term of the Exchange Transaction Agreement. |

| | |
|---|---|
| **Nonconforming Disposition of Old Shares or New Shares by Trust** | If the Trust disposes (or is deemed to dispose for U.S. federal income tax purposes) of any Old Shares or New Shares in a manner other than (1) an Exchange or (2) a Trust disposition of New Shares in accordance with the terms set forth herein, the Trust must (unless the transaction has been or is waived by Utility) pay Utility, within 10 days following the end of the fiscal quarter in which such disposition (or deemed disposition) occurs, an amount equal to (i) the value of such shares at the time of the disposition (or deemed disposition) multiplied by (ii) the highest combined federal, state and local marginal income tax rate applicable to a corporation resident in the city in which PG&E is headquartered (initially, San Francisco, California) as in effect for the then current taxable year for the date of the disposition (or deemed disposition), on the assumption that Utility shall include in its taxable income an amount of income or gain attributable to the disposition (or deemed disposition) of such shares, for such taxable year, regardless of any available offsetting deductions or losses (such income or gain, the "**Specified Tax Items**"). Within 10 days following the filing of the federal income tax return for any taxable year in respect of which a tax payment has been made by the Trust, PG&E Corp must furnish to the Trust a statement from a third party accounting firm confirming that Utility has taken the Specified Tax Items into account in determining its annual taxable income, and to the extent (if any) Utility has not included all Specified Tax Items in its annual taxable income, PG&E Corp will return to the Trust the applicable portion of such tax payment within 10 days following the delivery of such statement. |
| **Other Transactions** | The Trust shall have limited rights to engage in transactions other than Exchanges and related sales of New Shares. |
| **Shares Free and Clear** | All New Shares shall be issued to the Trust fully paid and nonassessable and free and clear of any and all liens of any kind, nature or description, including any mortgage, deed of trust, pledge, hypothecation, security interest, encumbrance, claim, lien or charge of any kind. |
| | All Old Shares held by the Trust shall be delivered to Utility free and clear of any and all liens of any kind, nature or description, including any mortgage, deed of trust, pledge, hypothecation, security interest, encumbrance, claim, lien or charge of any kind. |
| **Securities Law Considerations** | To allow reliance on Section 3(a)(10) of the Securities Act for the Exchanges, PG&E will seek a fairness determination under Section 25142 of the California Corporations Code. |
| | The New Shares will not bear any restrictive legend. |

> Promptly following the Effective Date, PG&E Corp will amend or supplement its registration statement on Form S-3ASR (Registration No. 333-253630) to the extent required to register the resale of the New Shares by the Trust in a manner consistent with this term sheet and the Registration Rights Agreement dated July 1, 2020, between PG&E Corp and the Trust (the "**Registration Rights Agreement**"). The Registration Rights Agreement may be amended to address the new proposed structure, as needed.

### D.    Potential Risks Inherent to the Exchange Transaction Agreement.

The Trustee believes that the benefits of the Exchange Transaction Agreement outweigh the potential risks, which are summarized as follows:

1.    **(a) Potential Execution/Market Risk:**  The need to transfer Old Shares back to Utility and receive New Shares from PG&E Corp (on behalf of Utility) *prior to entering into any agreement to sell PG&E Corp stock* has the potential to impair the Trust's ability to opportunistically respond to rapid changes in market conditions.

**(b) Mitigation of Potential Risk:** Steps have been taken to ensure that the exchange of Old Shares for New Shares will happen nearly contemporaneously so as to minimize the amount of time between the Trust's decision to sell shares and the time it can execute a trade. For example, the Exchange Transaction Agreement will require that the share transferor and transferee accounts be held at all times at the same office (*i.e.*, where the Trust's Broker/Dealer account is maintained) and that each Exchange (as defined in the Exchange Transaction Term Sheet) will take place pursuant to standing instructions that cannot be revoked without the Trust's consent.

2.    **(a) Potential Execution and Tax Payment Risk:**  If the New Shares are not sold in a manner consistent with the securities exchange transactions described in the PLR, there may be taxable gain recognized to the Reorganized Debtors that would otherwise not exist.  The Exchange Transaction Agreement provides that the Trust will make a tax payment to the Reorganized Debtors in respect of certain violations of the Exchange Transaction Agreement that cause the Utility to recognize taxable gain.

/ / /

**(b) Mitigation of Potential Risk:** The Exchange Transaction Agreement provides that the following events, that are not within the control of the Trust, will relieve the Trust of any obligation to sell New Shares immediately after an Exchange:

(i) the delivery by PG&E Corp to the Trust of a notice to suspend trading by the Trust of PG&E Corp common stock during the period between an Exchange and a planned sale of New Shares by the Trust received pursuant to such Exchange,

(ii) in the event the Trust enters into an agreement with one or more underwriters for the underwritten offering of any New Shares, and prior to closing the underwriters validly exercise a termination right or assert a failure of a condition to closing,

(iii) the Brokerage Firm (as defined in the Exchange Transaction Term Sheet) is unable to timely effect an Exchange or sale due to any act or omission of the Reorganized Debtors in breach of the Exchange Transaction Agreement,

(iv) bankruptcy of PG&E Corp, ShareCo or the Utility, unless the Exchanges are permitted to continue in accordance with the terms of the Exchange Transaction Agreement pursuant to "Day 1" relief granted by the applicable bankruptcy court, or

(v) an injunction by a court of competent jurisdiction, or a regulatory ruling, order or similar restriction applicable to PG&E Corp or the Utility prohibits or delays the timely execution of an Exchange or subsequent sale.

In addition, the Reorganized Debtors and the Trust have negotiated a procedure (the Mitigation Mechanism) to avoid an adverse tax consequence in the event of certain nonconforming transactions. In situations where this procedure is available, the Trust would be required to utilize this procedure to mitigate potential tax liability, which would eliminate the need for any tax payment. The tax payment risk will be further mitigated by the Trust agreeing to limitations on hedging and similar activities that could result in the recognition of taxable gain by the Utility under the Internal Revenue Code and applicable Treasury Regulations. *See* Exhibit A to the attached Exchange Transaction Term Sheet.

The Trustee believes that these potential risks are addressed and apportioned appropriately in the Exchange Transaction Agreement and that, as stated, the economic benefits to be realized by the Fire Victims outweigh the potential risks, making execution of the agreement and performance thereunder in the best interests of the Fire Victims.

## IV. BASIS FOR RELIEF REQUESTED

The Movants understand the importance of transparency on matters of significant importance to the Fire Victims, including a transaction that impacts the PG&E Stock held by the Trust. The Movants acknowledge that the Plan, Confirmation Order and the Trust Documents contemplate a grantor trust election but do not expressly contemplate that the grantor trust election would be coupled with the stock-for-stock exchange mechanics in connection with the disposition of Trust Assets as provided for in the Exchange Transaction Agreement. Therefore, to provide assurance to the Fire Victims and other stakeholders in these Chapter 11 Cases, the Trustee requests, with the support of the Reorganized Debtors, that the Court enter an Order (a) approving the Exchange Transaction Agreement and any Ancillary Agreements appropriate to effect the Exchange Transaction Agreement, and (b) determining that the Exchange Transaction Agreement and the implementation thereof are consistent with (i) the authorization provided under the Plan, Confirmation Order, and the Trust Documents; and (ii) the power, duties and responsibilities granted to the Trustee under the Plan, Confirmation Order and the Trust Documents.

Bankruptcy Code Section 105(a) explicitly authorizes bankruptcy courts to "issue any order, process, or judgment that is necessary or appropriate" to adjudicate bankruptcy proceedings, and Courts have repeatedly held that not only do bankruptcy courts possess the authority and jurisdiction to clarify the scope of confirmation orders, but that it is appropriate to do so. *See, e.g.*, *In re Gonzales*, 512 B.R. 255, 259 (Bankr. C.D. Cal. 2014) (holding that § 105 authorizes (and grants ancillary jurisdiction to) bankruptcy courts to issue orders clarifying the scope of previously ordered confirmation orders); *U.S. for I.R.S. v. APT Indus., Inc.*, 128 B.R. 145, 147 (W.D.N.C. 1991) (affirming a bankruptcy court's order directing the application of reorganization plan payments

because, although the plan had been substantially consummated, the court's order "did not change any material terms of the plan," but rather permissibly "clarified the plan where previously it had been silent").  Indeed, in *In re Mako, Inc.*, 120 B.R. 198 (Bankr. E.D. Okla. 1990), a litigation trustee and proposed purchaser of the debtor's assets sought court approval of their agreement.  The Court explained that "[u]nder the Plan confirmed in this case, this Court is also authorized to provide instruction to the Litigation Trustee with regard to the discharge of his duties," and—as requested— "interpret[ed] the Plan to provide instruction to the Litigation Trustee." *Id.* at 202.

Here, the Fire Victims and other stakeholders in the Chapter 11 Cases will benefit from this Court's authorization of the Exchange Transaction Agreement under the Plan, Confirmation Order and the Trust Documents, and the Trustee's execution of and performance under the Exchange Transaction Agreement and any related agreements.

To recap, such an order is appropriate because:  (1) the Exchange Transaction Agreement is consistent with the Plan, Confirmation Order and the Trust Documents; (2) the Trustee has obtained the advice of professional advisors as to the legal and financial considerations of the Exchange Transaction Agreement; (3) the Trust Oversight Committee has consented to the transactions set forth in the Exchange Transaction Agreement, and (4) the Trustee has concluded, based upon careful consideration and appropriate advice, that entering into the Exchange Transaction Agreement is in the best interests of the Fire Victims

**NOTICE**

Notice of this Motion will be provided to (i) the Office of the U.S. Trustee for Region 17 (Attn: Timothy Laffredi, Esq., James L. Snyder, Esq. and Marta Villacorta, Esq.); (ii) the Securities and Exchange Commission; (iii) the Internal Revenue Service; (iv) the Office of the California Attorney General; (v) the California Public Utilities Commission; (vi) the Nuclear Regulatory Commission; (vii) the Federal Energy Regulatory Commission; (viii) the Office of the United States Attorney for the Northern District of California; (ix) those persons who have formally appeared in these Chapter 11 Cases and requested service pursuant to Bankruptcy Rule 2002; and (x) beneficiaries of the Trust, through postings on the Trust website and portals in accordance with

Section 8.6(d) of the Trust Agreement. The Movants respectfully submit that no further notice is required.

## CONCLUSION

WHEREFORE, for the good cause shown and reasons presented herein, the Movants respectfully request entry of an Order granting the relief requested herein and any further relief the Court may deem just and proper.

DATED: April 5, 2021          BROWN RUDNICK LLP

By: /s/ Joel S. Miliband
Joel S. Miliband (SBN 077438)
(JMiliband@brownrudnick.com)
David J. Molton (SBN 262075)
(DMolton@brownrudnick.com)

*Attorneys for the Hon. John K. Trotter (Ret.)*
*as Trustee of PG&E Fire Victim Trust*

KELLER BENVENUTTI KIM LLP
Tobias S. Keller (#151445)
(tkeller@kbkllp.com)
Jane Kim (#298192)
(jkim@kbkllp.com)
650 California Street, Suite 1900
San Francisco, CA 94108
Tel: 415 496 6723
Fax: 650 636 9251

WEIL, GOTSHAL & MANGES LLP
Jessica Liou (pro hac vice)
(jessica.liou@weil.com)
Matthew Goren (pro hac vice)
(matthew.goren@weil.com)
767 Fifth Avenue
New York, NY 10153-0119
Tel: 212 310 8000
Fax: 212 310 8007

*Attorneys for Debtors and Reorganized*
*Debtors*

1

**EXHIBIT A to Motion**

2

<u>Proposed Order</u>

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

18

1 WEIL, GOTSHAL & MANGES LLP
Jessica Liou (pro hac vice)
2 (jessica.liou@weil.com)
Matthew Goren (pro hac vice)
3 (matthew.goren@weil.com)
767 Fifth Avenue
4 New York, NY 10153-0119
Tel: 212 310 8000
5 Fax: 212 310 8007

6 KELLER BENVENUTTI KIM LLP                    BROWN RUDNICK LLP
Tobias S. Keller (#151445)                      Joel S. Miliband (#077438)
7 (tkeller@kbkllp.com)                          (jmiliband@brownrudnick.com)
Jane Kim (#298192)                              2211 Michelson Drive, Seventh Floor
8 (jkim@kbkllp.com)                             Irvine, CA 92612
650 California Street, Suite 1900               Tel: 949 725 7100
9 San Francisco, CA 94108                       Fax: 949 252 1514
Tel: 415 496 6723
10 Fax: 650 636 9251                            David J. Molton (#262075)
                                                (dmolton@brownrudnick.com)
11 *Attorneys for Debtors and Reorganized*      Seven Times Square
*Debtors*                                        New York, NY 10036
12                                              Tel: 212 209 4800
                                                Fax: 212 209 4801
13
                                                *Attorneys for the Hon. John K. Trotter (Ret.)*
14                                              *as Trustee of PG&E Fire Victim Trust*

15          **UNITED STATES BANKRUPTCY COURT**
         **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
16                 **SAN FRANCISCO DIVISION**

17 **In re:**                                   Bankruptcy Case No. (DM)

18
**PG&E CORPORATION,**                            Chapter 11
19                -and-                          (Lead Case)
                                                (Jointly Administered)
20
**PACIFIC GAS AND ELECTRIC COMPANY,**

21                                              **[PROPOSED] ORDER GRANTING**
                                                **JOINT MOTION**
           **Debtors.**                          **OF FIRE VICTIM TRUSTEE AND**
22                                              **REORGANIZED DEBTORS**
                                                **REGARDING EXCHANGE**
23 ☐ **Affects PG&E Corporation**                **TRANSACTION IN SUPPORT**
                                                **OF A GRANTOR TRUST TAX**
24 ☐ **Affects Pacific Gas and Electric Company** **ELECTION**
25 ☒ **Affects both Debtors**

26 *All papers shall be filed in the Lead Case, No. 19-*  **Re: Docket No. _____**
*30088 (DM).*
27

28                              19

Upon the Motion dated April 5, 2021 [Docket No. _____], (the "**Motion**")[1] of the Honorable John K. Trotter (Ret.), in his capacity as the Trustee of the PG&E Fire Victim Trust appointed pursuant to the Plan (the "**Trustee**"), and the Reorganized Debtors pursuant to section 105(a) of title 11 of the United States Code (the "**Bankruptcy Code**"), Section 11.1 of the Plan and Paragraph 78 of the Confirmation Order, seeking entry of an order (a) approving the Exchange Transaction Agreement and any Ancillary Agreements appropriate to effect the Exchange Transaction Agreement, and (b) determining that the Exchange Transaction Agreement and the implementation thereof are consistent with the Plan, Confirmation Order, the Trust Documents and the Trustee's power, duties and responsibilities thereunder; and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having found and determined that notice of the Motion as provided to the parties listed therein is reasonable and sufficient, and it appearing that no other or further notice need be provided; and this Court having reviewed the Motion and the Trotter Declaration submitted in support of the Motion; and this Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and upon all of the proceedings had before this Court and after due deliberation and sufficient cause appearing therefor,

IT IS HEREBY ORDERED as follows:

1. The Motion is hereby granted.

2. The Exchange Transaction Agreement is authorized and approved, and, subject to the Parties entering into mutually acceptable documentation, the Parties are authorized to execute, perform and implement the actions and transactions contemplated by the Exchange Transaction Agreement and any and all Ancillary Agreements appropriate to effect the Exchange Transaction Agreement.

---

[1] All capitalized terms used but not defined herein have the meanings ascribed to them in the Motion.

Case: 19-30088    Doc# 10497    Filed: 04/05/21    Entered: 04/05/21 18:09:59    Page 22 of 32

3.    The Trustee's execution of and performance under the Exchange Transaction Agreement and the implementation thereof (including any and all Ancillary Agreements) are consistent with (a) the authorization provided to the Trustee under the Plan, Confirmation Order and the Trust Documents, and (b) the power, duties and responsibilities granted to the Trustee under the Plan, Confirmation Order and Trust Documents.

4.    The relief and authorization granted in this Order, and the execution of and performance under the Exchange Transaction Agreement and any and all Ancillary Agreements, shall not in any way affect, modify or alter the Plan, Confirmation Order or the validity or enforceability of the Channeling Injunction (as such term is defined in the Plan and Confirmation Order) contained in the Plan and Confirmation Order.

**\*\*END OF ORDER\*\***

21

**EXHIBIT B to Motion**

Exchange Transaction Term Sheet

# PG&E

## Fire Victim Trust – Grantor Trust Election and Share Exchange Term Sheet

This term sheet is non-binding and shall not give rise to any duty to negotiate or create or imply any other legal obligation on the part of any party. No legal obligation of any kind shall arise with respect to the matters set forth in this term sheet, unless and until definitive agreements are executed and delivered by the parties. Except as required by applicable laws, no party shall disclose the terms of the arrangements set out herein to any other person other than their attorneys, accountants and financial advisors.

| | |
|---|---|
| **Parties** | PG&E Corporation ("HoldCo"), Pacific Gas and Electric Company ("Utility"), a newly formed direct subsidiary of HoldCo that is a limited liability company ("ShareCo", and together with HoldCo and Utility, "PG&E") and the PG&E Fire Victim Trust (the "Trust" and together with PG&E, the "Parties"). |
| **Background** | On June 20, 2020, the U.S. Bankruptcy Court for the Northern District of California approved HoldCo's and Utility's Joint Chapter 11 Plan of Reorganization (the "Plan"). Pursuant to the Plan, HoldCo contributed an aggregate of 477,743,590 shares of common stock of HoldCo to Utility (the "Plan Shares"), which Utility then transferred to the Trust. |
| **Grantor Trust Election** | Utility shall make a timely grantor trust election with respect to the Trust for U.S. federal (and any applicable state and local) income tax purposes. Subject to applicable confidentiality protections, the Trust shall provide Utility with such information as Utility may reasonably request in connection with the making of such election. Once the election is made, all Parties shall report consistent with such election as provided in Section 6.8(c) of the Plan. |
| **Issuance of New Shares** | Upon the effectiveness of the definitive documentation (the "Definitive Documentation") for the matters set forth in this term sheet (the "Effective Date"), HoldCo will issue 477,743,590 newly issued shares of HoldCo common stock ("New Shares") to ShareCo which, for so long as the Trust continues to hold its Plan Shares, will be held by ShareCo in a brokerage account at the brokerage firm where the Trust holds its Plan Shares (the "Designated Brokerage Firm"). Other than the approval of the Board of Directors of HoldCo, no authorization, approval or other consent will be required by HoldCo or any of its subsidiaries in order for HoldCo to issue and/or exchange the New Shares as set forth herein. |
| **Separate Accounts for the Trust** | The Trust shall maintain at least two separate brokerage accounts with the Designated Brokerage Firm, with an account solely for holding of Plan Shares (the "Plan Share Trust Account") and a separate account for the temporary holding and disposition of New Shares (the "New Share Trust Account"). |

Case: 19-30088    Doc# 10497    Filed: 04/05/21    Entered: 04/05/21 18:09:59    Page 25 of 32

| | |
|---|---|
| **Exchange of Plan Shares for New Shares** | As and when the Trust desires to immediately sell or otherwise dispose of any Plan Shares, the Trust shall exchange with ShareCo (on behalf of Utility)[1] the Plan Shares proposed to be sold for an equal number of New Shares. To effect such Exchange (as further defined below), the Trust shall provide written notice to HoldCo and the Designated Brokerage Firm of the number of Plan Shares that it desires to dispose of and deliver to an account of Utility at the Designated Brokerage Firm such number of Plan Shares. Such notice (the "Notice") shall be in the form set forth in the Definitive Documentation, or as otherwise agreed to by the Trust and HoldCo and shall provide for the Exchange to automatically occur on the books and records of the Designated Brokerage Firm without any further consent or approval of Holdco or Utility.[2]

Upon the Designated Brokerage Firm's receipt of the Notice and delivery of the Plan Shares by the Trust as provided above, the Designated Brokerage Firm shall (pursuant to an outstanding order of ShareCo which may not be revoked or modified without the prior written consent of the Trust) immediately deposit into the New Share Trust Account the same amount of New Shares in exchange for the corresponding Plan Shares (an "Exchange") deposited into the account of Utility. PG&E shall agree to fully cooperate in each such Exchange and shall take no action to delay, impede or otherwise hinder such Exchange.

(Note that, in the event of a transaction pursuant to which PG&E would repurchase shares from the Trust, the same procedure would be used but, instead of receiving New Shares in the Exchange, the Trust would receive the agreed price.) |
| **Disposition of New Shares by Trust** | The Trust agrees that it shall not enter into an agreement to sell or otherwise dispose of any New Shares prior to receipt of such New Shares.

The Trust further agrees that, upon receipt of the New Shares, it shall immediately (but in no event later than two business days, absent circumstances beyond its control) (the "Disposition Period") dispose of such shares for cash or other property. In the case of a sale on the market, it is sufficient that the trade date occur within the Disposition Period although such trade is to be settled within two business days thereafter in the ordinary course, and in the case of an underwritten offering, it is sufficient that such transaction becomes binding on the Trust within the Disposition Period. In the event that the Trust is unable to dispose of New Shares within the Disposition Period, without the Trust's fault, then the Trust may use the mitigation mechanism described below to set aside such New Shares if such mitigation mechanism has not been exhausted.

The following events, not within the control of the Trust, shall relieve the Trust of any obligation to sell New Shares immediately after the Exchange pursuant to which such |

---

[1] The delivery of the New Shares shall be treated by all parties as a capital contribution by HoldCo to Utility, followed by Utility's delivery of New Shares to the Trust in exchange for Plan Shares.

[2] Through an Agreement with the Designated Brokerage Firm, documentation should operate like a sight letter of credit, without any further action or consent required of HoldCo, ShareCo or Utility.

| | |
|---|---|
| | New Shares were received, subject to the utilization and exhaustion of the additional exchange mechanism described in the next paragraph:<br>• The delivery by HoldCo of a Suspension Notice (as defined in the Registration Rights Agreement (as defined below)) to the Trust during any Disposition Period,<br>• In the event that the Trust enters into an agreement with one or more underwriters for the underwritten offering of any New Shares, and prior to closing, the underwriters validly exercise a termination right or assert a failure of a condition to closing,<br>• The Designated Brokerage Firm is unable to timely effect an Exchange or sale due to any act or omission of PG&E in breach of the Definitive Documentation,<br>• Bankruptcy of HoldCo, ShareCo or Utility, unless the Exchanges are permitted to continue in accordance with the terms of the Definitive Documentation pursuant to "Day 1" relief granted by the applicable bankruptcy court, or<br>• an injunction by a court of competent jurisdiction, or a regulatory ruling, order or similar restriction applicable to HoldCo, ShareCo or Utility, prohibits or delays the timely execution of an Exchange or subsequent sale (it being understood that an adverse effect on HoldCo's share price is not a cause for delay of a subsequent sale for purposes of this provision).<br><br>The Definitive Documentation will provide an additional exchange mechanism[3] intended to preserve the tax benefits of the Exchange for both the Trust and PG&E, it being understood that the Trust will not be required to utilize the additional exchange mechanism to the extent that the events specified above involve more than 250,000,000 shares in the aggregate during the term of the Definitive Documentation.<br><br>The Trust shall, and shall instruct any broker or other third party effecting a disposition on its behalf to, take reasonable steps to properly designate and identify only New Shares as being disposed of. |
| **Nonconforming Disposition of Plan Shares or New Shares by Trust** | If the Trust disposes (or is deemed to dispose for U.S. federal income tax purposes) of any Plan Shares or New Shares in a manner other than (1) an Exchange or (2) a Trust disposition of New Shares in accordance with the terms set forth herein[4], the Trust shall (unless the transaction has been or is waived by Utility) pay Utility, within 10 days following the end of the fiscal quarter in which such disposition (or deemed disposition) occurs, an amount equal to (i) the value of such shares at the time of the disposition (or deemed disposition)[5] *multiplied* by (ii) the highest combined federal, state and local |

---

[3]   Under no circumstances will the additional exchange mechanism require a "forced sale" by the Trust.

[4]   For the avoidance of doubt, transactions such as a merger, consolidation or recapitalization of HoldCo shall not be considered a disposition of Plan Shares or New Shares by the Trust. However, the sale or other disposition of any New Shares in a transaction in which the acquirer would receive a substituted basis in the New Shares for U.S. federal income tax purposes (other than a sale or other disposition of New Shares to a subsidiary that is a disregarded entity for U.S. federal income tax purposes (to be defined to include multitier disregarded entities)) shall be considered a nonconforming transfer.  In the event of a merger, consolidation or recapitalization, the Parties will cooperate in good faith to preserve the tax benefits of the Exchange structure.

[5]   Note:  This is based on a presumptive "zero basis." With respect to the Plan Shares, such
(footnote continued)

| | |
|---|---|
| | marginal income tax rate applicable to a corporation resident in the city in which PG&E is headquartered (initially, San Francisco, California) as in effect for the then current taxable year for the date of the disposition (or deemed disposition), on the assumption that Utility shall include in its taxable income an amount of income or gain attributable to the disposition (or deemed disposition) of such shares, for such taxable year, regardless of any available offsetting deductions or losses (such income or gain, the "Specified Tax Items").  Within 10 days following the filing of the federal income tax return for any taxable year in respect of which a tax payment has been made by the Trust, HoldCo will furnish to the Trust a statement from a third party accounting firm confirming that Utility has taken the Specified Tax Items into account in determining its annual taxable income, and to the extent (if any) Utility has not included all Specified Tax Items in its annual taxable income, HoldCo will return the applicable portion of such tax payment within 10 days following the delivery of such statement. |
| **Other Transactions** | To facilitate the transactions contemplated by this Term Sheet, the Definitive Documentation shall further include the Trust Plan Share Restrictions attached as Exhibit A hereto. |
| **Shares Free and Clear** | All New Shares shall be issued to the Trust fully paid and nonassessable and free and clear of any and all liens of any kind, nature or description, including any mortgage, deed of trust, pledge, hypothecation, security interest, encumbrance, claim, lien or charge of any kind.

All Plan Shares held by the Trust shall be delivered to Utility free and clear of any and all liens of any kind, nature or description, including any mortgage, deed of trust, pledge, hypothecation, security interest, encumbrance, claim, lien or charge of any kind. |
| **Other Tax Payments** | No amount shall be payable by the Trust to PG&E with respect to the disposition of New Shares consistent with the foregoing. |
| **Trust Tax Filing Requirements** | The Trust shall timely prepare and file (i) all tax filings required to be filed by the Trust as a grantor trust of which Utility is considered the grantor and owner, including any applicable state and local tax filings and annual IRS Form 1041 with accompanying schedules and statements, and (ii) all required tax information statements relating to all payments and distributions made by the Trust, *e.g.,* all Form 1099s to creditors, etc. |
| **Cooperation and Information Sharing; Confidentiality** | The Parties shall cooperate fully with each other in exchanging such information as provided in the Plan and providing such assistance as the other Parties may reasonably request in connection with the foregoing, including in connection with its financial or tax reporting obligations with respect to the foregoing and the examination, defense or pursuit of any tax proceeding.[6] |

---

zero basis will only apply unless and until PG&E successfully obtains an advance closing agreement from the IRS providing for a fair market value tax basis in such shares as of the date of contribution to Utility (in which event the tax payment computation would be the same as that formerly included under "Tax Payments" for sales of Plan Shares predating this term sheet).

[6]    Simultaneously with the execution of the Definitive Documentation, the parties will
(footnote continued)

| | |
|---|---|
| | Subject to customary exceptions to be agreed (including the financial and tax reporting obligations referred to above), the Parties will keep confidential and not disclose any information exchanged pursuant to the definitive documents, including information about the Trust's Exchange and trading transactions. |
| **Securities Law Considerations** | To allow reliance on Section 3(a)(10) of the Securities Act for the Exchanges, PG&E will seek a fairness determination under California state law.<br><br>The New Shares will not bear any restrictive legend.<br><br>Promptly following the Effective Date, HoldCo will amend or supplement its registration statement on Form S-3ASR (Registration No. 333-253630) to the extent required to register the resale of the New Shares by the Trust in a manner consistent with this term sheet and the Registration Rights Agreement dated July 1, 2020, between HoldCo and the Trust (the "Registration Rights Agreement"). Registration Rights Agreement to be amended in form and substance mutually satisfactory to PG&E and Trust to address the new proposed structure.<br><br>Subject to applicable law, the Parties will cooperate in a commercially reasonable manner in the defense of any claim by a holder of PG&E common stock in connection with any purchase or sale of Plan Shares or New Shares made in accordance with the terms of the definitive documents for the Exchange. |
| **Miscellaneous** | The Parties will cooperate to obtain Bankruptcy Court approval of the Exchange Transaction Agreement. All Definitive Documentation and all filings with the Bankruptcy Court with respect to the matters set forth in this term sheet shall be mutually reasonably acceptable to the Parties. If necessary, the Trust will extend the April 1 deadline in the Trust Agreement for PG&E to make a grantor trust election.<br><br>Each party will bear its own legal expenses. |

---

execute a separate document setting forth the specific items of information that the parties agree the Trust is required to provide under the Plan.

## EXHIBIT A to Exchange Transaction Term Sheet

## Trust Plan Share Restrictions

On June 20, 2020, the U.S. Bankruptcy Court for the Northern District of California approved PG&E's ("HoldCo") and Pacific Gas and Electric Company's Joint Chapter 11 Plan of Reorganization (the "Plan"). The purpose of this document is to set forth guidelines and restrictions (the "Tax Guidelines") with respect to activities conducted (or to be conducted) by the PG&E Fire Victim Trust (the "Trust") relating to HoldCo common stock ("HoldCo Stock") in order to ensure that such activities will not (i) result in a transfer of ownership for U.S. federal income tax purposes of any of the HoldCo Stock received by the Trust pursuant to the Plan (in particular, the HoldCo Stock received in July and August of 2020) (the "Plan Shares") and any other HoldCo Stock that is treated as Plan Shares as described in the accompanying term sheet or (ii) cause gain recognition with respect to any Plan Shares including, without limitation, by virtue of a "constructive sale" of the Plan Shares for purposes of section 1259 of the Internal Revenue Code of 1986, as amended (the "Code") and thus to ensure deferral of gain with respect to all Plan Shares.

## I.    CERTAIN DEFINED TERMS:

   A.    References to "Similar Property" shall mean any securities, shares or other property (either individually or in the aggregate) to the extent changes to the fair market value of such property could reasonably be expected to positively and significantly correlate with changes in the fair market value of HoldCo Stock.

   B.    References to "Offsetting Transaction" shall mean any transaction or transactions (either individually or in the aggregate) to the extent changes to the fair market value of such transaction or transactions could reasonably be expected to negatively and significantly correlate with changes in the fair market value of HoldCo Stock or Similar Property.

## II.    Financing Transactions:

   A.    The Trust may post Plan Shares (directly or indirectly through its interest in one or more direct or indirect wholly-owned subsidiaries of the Trust that holds Plan Shares and is a disregarded entity for Federal income tax purposes) as collateral for a loan so long as the Trust (or disregarded entity, as applicable) (i) is permitted to substitute cash or other property for the Plan Shares or interests posted as collateral and (ii) remains the shareholder (or owner of such interests) of record, retains the right to vote the shares or interests, and receives any dividends or distributions paid on the Plan Shares or such interests during the course of the transaction.

   B.    While a financing described in part II.A of the Tax Guidelines is in effect, the Trust may not enter into any transaction or combination of transactions the result of which would be to reduce risk of loss or the opportunity for gain with respect to any of the Plan Shares used as collateral in respect of such financing, including, for example, any transaction described in part III.

### III. Hedging Transactions:

**A.** The Trust may enter into either a purchased put option or a written call option with respect to the Plan Shares or Similar Property if such option is not "in-the-money" when entered.

**B.** The Trust may not enter into a combination of a purchased put option and a written call option or equivalent transaction with respect to any of the Plan Shares or Similar Property.

**C.** The Trust may enter into a transaction that is intended to hedge general market risk (e.g., a regulated futures contract or option on a broad stock index to the extent that it satisfies the other requirements herein).

**D.** Except as specifically provided herein, the Trust may not enter into any Offsetting Transactions.

### IV. Securities Lending and Short-Sale or Similar Transactions:

**A.** The Trust may not loan any Plan Shares, as securities lender, to any other party, as securities borrower.

**B.** The Trust may not borrow HoldCo Stock or any Similar Property, as securities borrower, from any other party, as securities lender, and sell such HoldCo Stock or Similar Property to any other party or otherwise engage in a "short sale" transaction.

**C.** The Trust may not enter into a transaction or combination of transactions which provides that the Trust pays amounts by reference to the investment yield on any HoldCo Stock or Similar Property and receives amounts by reference to the decline in the value of such property (*e.g.*, a short total return swap transaction).

**D.** The Trust may not enter into a transaction or combination of transactions pursuant to which it is required deliver any HoldCo Stock or Similar Property (or an amount of cash by reference thereto) in the future in exchange for a cash payment (*i.e.*, a futures or forward transaction).

### V. Change in Law:

**A.** The parties shall cooperate in updating the Tax Guidelines from time to time to reflect any change or expected change in U.S. federal income tax law or the interpretation thereof after the date hereof that could be reasonably expected to, when considered in light of the potential activities of the Trust, (i) result in a transfer of ownership of any Plan Shares for U.S. federal income tax purposes, (ii) cause a constructive sale of any Plan Shares for purposes of section 1259 of the Code or (iii) otherwise result in the recognition of gain with respect to any Plan Shares for U.S. federal income tax purposes (a "Relevant Law Change").

**B.** If the parties become aware of a Relevant Law Change applicable to any past, current, or proposed transaction by the Trust, (x) such party shall notify the other party of such

Case: 19-30088   Doc# 10497   Filed: 04/05/21   Entered: 04/05/21 18:09:59   Page 31 of 32

Relevant Law Change and (y) and the Trust shall abstain from further engaging in any activities that because of such Relevant Law Change could reasonably be expected to (i) result in a transfer of ownership of any Plan Shares for U.S. federal income tax purposes, (ii) cause a constructive sale of any Plan Shares for purposes of section 1259 of the Code or (iii) otherwise result in the recognition of gain with respect to any Plan Shares for U.S. federal income tax purposes.