BROWN RUDNICK LLP
David J. Molton (SBN 262075)
(DMolton@brownrudnick.com)
Eric R. Goodman (admitted pro hac vice)
(EGoodman@brownrudnick.com)
Seven Times Square
New York, New York 10036
Telephone:    (212) 209-4800
Facsimile:     (212) 209-4801

BROWN RUDNICK LLP
Joel S. Miliband (SBN 077438)
(JMiliband@brownrudnick.com)
2211 Michelson Drive, Seventh Floor
Irvine, California 92612
Telephone:    (949) 752-7100
Facsimile:     (949) 252-1514

*Attorneys for Fire Victim Trustee*

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION**<br><br>-and-<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br><br>Debtors.<br><br>☐  Affects PG&E Corporation<br>☐  Affects Pacific Gas and Electric Company<br>■  Affects both Debtors<br><br>*All papers shall be filed in the Lead Case, No. 19-30088 (DM)* | Bankruptcy Case No. 19-30088 (DM)<br><br>Chapter 11<br>Lead Case, Jointly Administered<br><br>**NOTICE OF FILING OF LETTER TO FIRE VICTIMS ON BEHALF OF THE FIRE VICTIM TRUST** |

TO FIRE VICTIMS AND ALL OTHER INTERESTED PARTIES:

    PLEASE TAKE NOTICE that The Honorable John K. Trotter (Ret.) in his capacity as the Fire Victim Trustee, has filed a letter to Fire Victims (the "**Trustee Letter**"), which is attached hereto as Exhibit A. The Trustee Letter also will be posted on the Fire Victim Trust Website at www.firevictimtrust.com.

DATED: April 12, 2021        BROWN RUDNICK LLP

By: /s/ Joel S. Miliband
    Joel S. Miliband (SBN 077438)
    (JMiliband@brownrudnick.com)
    2211 Michelson Drive
    Seventh Floor
    Irvine, California 92612
    Telephone:  (949) 752-7100
    Facsimile:  (949) 252-1514

and

BROWN RUDNICK LLP
David J. Molton (SBN 262075)
(DMolton@brownrudnick.com)
Seven Times Square
New York, New York 10036
Telephone:  (212) 209-4800
Facsimile:  (212) 209-4801

*Counsel for Fire Victim Trustee*

EXHIBIT "A"



# A LETTER FROM THE TRUSTEE OF THE FIRE VICTIM TRUST

Dear Fire Victims,

On January 26, 2021, I sent a letter providing you with an update on the status of the Fire Victim Trust (the "Trust") and an understanding of what you might expect in the future. I take this opportunity to further inform you of our progress, including Claims Administration, monetization of the stock, as well as the Trust's involvement in the Third-Party Cases, designed to augment the total amount available for distribution to Fire Victims.

**Claims Processing**

The Trust was created and funded on July 1, 2020. Prior to accepting any claims, the Trust was tasked with creating machinery that would accept thousands of submissions electronically, organize and compile documentation to be reviewed, and provide the reviewers with a consistent way to make determinations. To handle this project, the Trust retained the services of BrownGreer, a law firm that specializes in claims administration and claims processing. Approximately 300 staff members are committed to this project, including attorneys, project managers, analysts, claim reviewers, and software developers. Out of this group, 130 of these employees are dedicated to claims reviews, with BrownGreer adding staff as recently as this past week. In addition, BrownGreer has increased the number of managers overseeing the claims reviews, which will increase output by increasing the rate of claims assignments, ensuring quality control, and helping to train reviewers on eligibility requirements.

On August 17, 2020, the claims process opened, and the Claims Questionnaire became available for attorneys and claimants to use to submit claims. However, submission of the Claims Questionnaire is only the beginning of the process. In order to fully value and verify a claim, as required by the Court-approved Trust Documents, the reviewer must also have supporting

1

Case: 19-30088    Doc# 10519    Filed: 04/12/21    Entered: 04/12/21 16:04:26    Page 4 of 10

documentation, which can include proof of residence, content inventories, construction estimates, tree or landscaping estimates, insurance information, photos, videos or medical records. A submitted claim must be identified as complete, including all necessary supporting documents, before it can be reviewed. The Trust has no ability to independently gather information related to a claim and must therefore rely upon the sufficiency and timely submission of material provided to the Claims Administrator by the claimant herself, or, if the claimant is represented by an attorney, by claimant's counsel.

To date, the Trust has received 40,000 Claims Questionnaires representing over 70,000 claimants and approximately *250,000* individual claims. Roughly 27 million pages of materials have been received by the Claims Administrator and must be reviewed so that the circumstances of each claim can be fully evaluated.

The damage categories eligible for payment are claims for real property, including forestry and landscaping, personal property, personal or business income loss, out-of-pocket expenses, wrongful death, bodily personal injury, emotional distress and other injuries. Claimants may make claims for each category of loss which they have suffered. For example, some claimants have made multiple claims within one damage category, multiple claims across several damage categories or multiple claims in every damage category. Because each of the claims involves unique circumstances, every claim must be individually assessed and valued by a reviewer, and the entire claim, including each of the damage categories claimed, must be reviewed, approved and finalized before any notice of determination can be sent.

The Trust regularly receives inquiries from claimants regarding when payments will be made. Understandably, you have suffered with the devastating effects of these disasters for many years and are anxious to receive a recovery after so much time has already passed. Although it may seem that this process is moving slowly, it is actually much more efficient when compared to the court system. Plagued by COVID-19 and heavy dockets, it can take years for a civil case such as those

that the Trust is administering to wind its way through San Francisco or Alameda county courts. Some of the cases now appearing on the court trial calendar have been on file for over five years. If a plaintiff were to file a Complaint in the court today, it is possible that it would take even longer to be heard, given the impacts of the pandemic. Even if a plaintiff did try a case to verdict today, it is likely that a post-verdict appeal would take two to four additional years to completion.

Alternatively, the Trust, which has only been funded since July 2020 and only started accepting Claims Questionnaires in August 2020, has already started to make payments to Fire Victims. As of November 23, 2020, the Trust responded to victims who were vulnerable and struggling because of the fires and impacted even more by the COVID-19 crisis by issuing Preliminary Payments of up to $25,000. As of today, the Trust has issued 7,364 Preliminary Payments for a total of $95,523,500 paid to victims. The Trust continues to review and respond to those requests on a rolling basis.

In addition, as of March 15, 2021, the Trust began distributing the first round of *pro rata* payments toward satisfying the claims of individuals and families who suffered losses in the 2015 Butte Fire, 2017 North Bay Fires and 2018 Camp Fire. The initial *pro rata* payment is 30% of the total approved and accepted claim amount. As of today, the Trust has issued 183 *pro rata* payments, totaling $45,816,527. In all, the Trust has issued payments totaling $141,340,027 to Fire Victims. Notices of payments, which began being issued to claimants on February 15, 2021, continue to be issued daily and payments are made on a twice monthly basis, on the 15th and last day of the month.

To put the magnitude of our undertaking in perspective, assume each claim took only one hour of a reviewer's time to process and approve, and further assume there are 2,000 working hours per reviewer per year (forty hours times fifty weeks). The 250,000 claims would require 125 reviewer work years to complete. By devoting resources effectively, we expect to review all claims within months, not years.

Case: 19-30088    Doc# 10519    Filed: 04/12/21    Entered: 04/12/21 16:04:26    Page 6 of 10

Although these numbers seem daunting, the Trust has and will continue making payments twice per month on all claims that are fully submitted, reviewed and eligible. While this effort may seem to be progressing slower than anticipated, the Trust anticipates that as more supporting documents are provided, a greater number of claims will become complete allowing them to be reviewed and more payments made.

**Monetization of PG&E Stock**

As you know, the Trust holds approximately 478 million shares of PG&E Stock and one of my duties as Trustee is to monetize these shares in the best interests of the Fire Victims. As such, I have been working closely with Trust advisors regarding the sale of PG&E Stock. This matter has involved some complexity: PG&E sought and obtained from the IRS a Private Letter Ruling so that it could make a significant tax election which benefits the Trust. This is the "Grantor Trust Election" and this election provides the necessary foundation for the Trust to sell PG&E Stock without federal or state taxes being imposed in connection with a stock sale. Without this "Grantor Trust Election," the Trust would be subject to a 37% federal income tax and an 8.84% California state income tax on its gain from the sale of PG&E Stock to the extent the stock is sold at a value higher than its value on the Effective Date.

The benefit of the Grantor Trust Election using illustrative numbers follows:

> The Trust acquired the PG&E Stock with a fair market value (i.e., tax basis) of roughly $9 per share. If the Trust were to sell the PG&E Stock at $11 per share without the Grantor Trust Election, it would be subject to tax on the $2 per share gain. Because the Trust currently has approximately 478 million shares of PG&E Stock, the tax cost to the Fire Victims would be over $400 million based on these assumptions. If the Grantor Trust Election is made, and the PG&E Stock is disposed of <u>in accordance with necessary steps</u>, the Trust would pay **no tax** on the same assumed facts.

4

The complexity that we have been working on recently involves the "necessary steps" to monetize the stock. Basically, before the Trust sells any of its existing PG&E Stock, it must exchange those shares with PG&E (in a one-for-one exchange) and then sell the exchanged shares. Economically, this is neutral to the Trust, but it allows for the income tax result we desire.

Because an exchange transaction of this type is not routine, I determined that it was prudent to seek the order of the Bankruptcy Court to proceed with these "necessary steps" which are detailed in an "Exchange Transaction Agreement" with PG&E. We intend to file with the Bankruptcy Court and post on the Fire Victim Trust website the Exchange Transaction Agreement, when finalized.

I have sought and obtained the consent of the Trust Oversight Committee on this matter. And, I have stated in a declaration to the Bankruptcy Court that the execution of the Exchange Transaction Agreement on behalf of the Trust is in the best interests of Fire Victims and is consistent with the Plan, Confirmation Order and Trust Documents. The hearing on this matter is set for April 28, 2021 before the Bankruptcy Court, and I will keep you updated on developments.

**Third-Party Litigation**

When the Trust was created, in addition to cash and stock, it was assigned the right to pursue legal claims held by PG&E before the bankruptcy. This includes a derivative claim against the former officers and directors of PG&E in connection with their failure to assess and take appropriate action to manage the wildfire risk.

The Trust has also begun to prosecute claims regarding third-party liabilities arising from the subject fires. These third-party claims involve individual and corporate contractors allegedly responsible for failing to maintain vegetation, trees, lines, poles and other PG&E equipment consistent with rules and regulations intended to prevent wildfires.

5

Case: 19-30088    Doc# 10519    Filed: 04/12/21    Entered: 04/12/21 16:04:26    Page 8 of 10

These cases are in their early stage and I will keep you informed as they develop and progress.

**Additional Trustee Obligations**

As Trustee, I am also obligated to monitor the activities of PG&E as it might relate to its stock price. One arena that is particularly sensitive is the California Public Utilities Commission ("CPUC"). The Trust has employed an experienced law firm to represent it before the CPUC. Significant hearings took place in December 2020 and January/February of this year regarding rate payer issues and PG&E's request to issue recovery bonds of $7.5 billion in order to retire outstanding short-term debt and accelerate a final cash payment to the Trust. While the prospects for all of the above appear favorable, a final decision is due May 6, 2021. Obviously, no one can predict the future or outguess the stock market. These developments, however, may seem favorable to PG&E's stock price.

Finally, as Trustee, I am fully aware of my obligation to minimize the cost of administration while increasing the speed and fairness of payments. This is a daunting challenge. In my career, I have served as Court-Appointed Special Master in numerous large-claim processes. In most, the average cost of administration ran between two and four percent. That cost was generally covered by the return on investment of the proceeds of the settlement pending distribution. The Trust Documents mandate the proceeds be invested in government securities, which now are averaging 1.7 basis points and thus, do not come close to covering the cost incurred in the administration of the Trust. My goal is to keep the cost of administration below or as close to one percent as possible. I continually balance the need for personnel to assist in the resolution process against the cost, which reduces the corpus of the Trust. A detailed accounting of all the Trust expenses through December 31, 2020 will be filed with the Court later this month, along with an update on claim payments.

Everyone employed by the Trust, including myself, knows there is little that can be done to ease the suffering that you have experienced. What we can do, and have been doing, is to direct our energies to the expeditious and fair administration of claims. Accordingly, we are focused on our responsibility to distribute funds to qualifying Fire Victims as quickly as we can. I hope that the foregoing provided you with some information and understanding of how we are accomplishing that task, balancing the need for alacrity against the need for accuracy, fairness, and economy.

Very truly yours,

Justice John K. Trotter (Ret.), Trustee