WEIL, GOTSHAL & MANGES LLP
Theodore E. Tsekerides (*pro hac vice*)
(theodore.tsekerides@weil.com)
Jessica Liou (*pro hac vice*)
(jessica.liou@weil.com)
Matthew Goren (*pro hac vice*)
(matthew.goren@weil.com)
767 Fifth Avenue
New York, NY 10153-0119
Tel: 212 310 8000
Fax: 212 310 8007

KELLER BENVENUTTI KIM LLP
Tobias S. Keller (#151445)
(tkeller@kbkllp.com)
Peter J. Benvenutti (#60566)
(pbenvenutti@kbkllp.com)
Jane Kim (#298192)
(jkim@kbkllp.com)
650 California Street, Suite 1900
San Francisco, CA 94108
Tel: 415 496 6723
Fax: 650 636 9251

*Attorneys for Debtors and Reorganized Debtors*

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION,**<br><br>- and -<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br><br>**Debtors.**<br><br>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>☒ Affects both Debtors<br><br>*\* All papers shall be filed in the Lead Case, No. 19-30088 (DM).* | Case No. 19-30088 (DM)<br>Chapter 11 (Lead Case) (Jointly Administered)<br><br>**REORGANIZED DEBTORS' OBJECTION TO CONSOLIDATED EDISON DEVELOPMENT, INC.'S AMENDED CURE PAYMENT CLAIM DEMAND**<br><br>Date:  June 15, 2021<br>Time: 10:00 a.m. (Prevailing Pacific Time)<br>Place:  U.S. Bankruptcy Court, Courtroom 17, 16th Floor<br>San Francisco, CA 94102<br><br>**Response Deadline**:  June 1, 2021<br>4:00 p.m. (Pacific Time) |

**Table of Contents**

Page

I.    Preliminary Statement ................................................................................................6

II.   Background ...............................................................................................................12

      A.    The PPAs and IAs ...........................................................................................12

      B.    Con Ed's Third-Party Financing Agreements and the Consents and
            Agreements .....................................................................................................14

      C.    The Chapter 11 Cases .....................................................................................15

      D.    The Plan and the Assumption of the PPAs and IAs........................................16

      E.    Con Ed's Demands ..........................................................................................16

III.  Argument ..................................................................................................................17

      A.    The Bankruptcy Code Bars Con Ed From Relying on an Ipso Facto Clause
            For Its Breach-of-Contract Claim ..................................................................18

      B.    Default Interest, Consent Fees, and Attorneys' Fees Arising Under Con Ed's
            Third-Party Financing Agreements Are Not Direct Damages Arising from the
            Debtors' Chapter 11 Filing Or Any Other Purported Breach of the CED
            Agreements. ....................................................................................................20

      C.    The Consents and Agreements Are Irrelevant to Con Ed's Demand ........................24

      D.    The Stayed Payments Do Not Give Rise to Direct Damages for Default
            Interest, Consent Fees, and Attorneys' Fees on the Third-Party Financing
            Agreements. ....................................................................................................25

      E.    Con Ed Is Not Entitled to Indemnification. ..................................................27

            1.    Con Ed Ignores the Plain Language of the PPA Indemnification
                  Provisions..............................................................................................27

            2.    Con Ed Is Not Entitled to Indemnification Under the IAs............................29

IV.   Conclusion ...............................................................................................................29

## Table of Authorities

**Cases**

*In re 53 Stanhope LLC*,
    625 B.R. 573 (Bankr. S.D.N.Y. 2021).................................................................20

*Automatic Poultry Feeder Co. v. Wedel*,
    213 Cal. App. 2d 509 (1963)........................................................................23

*In re B-Bar Tavern. Inc.*,
    506 B.R. 879 (Bankr. D. Mont. 2013)..........................................................18

*In re Chateaugay Corp.*,
    No. 92-cv-7054 (PKL), 1993 WL 159969 (S.D.N.Y. May 10, 1993)..........................19

*City & Cnty. of S.F. v. Tutor-Saliba Corp.*,
    No. C 02-5286 CW, 2005 U.S. Dist. LEXIS 46590 (N.D. Cal. Mar. 17, 2005) ..........................21

*In re Cochise Coll. Park, Inc.*,
    703 F.2d 1339 (9th Cir. 1983) ...................................................................18

*Conley v. Matthes*,
    66 Cal. Rptr. 2d 518 (Ct. App. 1997)...........................................................25

*Cont'l Holdings, Ltd. v. Leahy*,
    132 S.W.3d 471 (Tex. Ct. App. 2003) ..........................................................23

*Four Star Elec., Inc. v. F&H Constr.*,
    7 Cal. App. 4th 1375 (1992) ......................................................................27

*Henrici v. S. Feather Land & Water Co.*,
    177 Cal. 442 (1918) ..................................................................................21

*Hunt Bros. Co. v. San Lorenzo Water Co.*,
    150 Cal. 51 (1906) ...................................................................................25

*In re Johns-Manville Corp.*,
    36 B.R. 727 (Bankr. S.D.N.Y. 1984) ...........................................................26

*In re Lehman Bros. Holdings, Inc.*,
    422 B.R. 407 (Bankr. S.D.N.Y. 2010)..........................................................19

*Lewis Jorge Constr. Mgmt., Inc. v. Pomona Unified Sch. Dist.*,
    34 Cal. 4th 960, 968 (2004) ..............................................................*passim*

*Oasis W. Realty, LLC v. Goldman*,
    51 Cal. 4th 811 (2011) ..............................................................................17

*In re PPI Enters. (U.S.), Inc.*,
   228 B.R. 339 (Bankr. D. Del. 1998), *aff'd*, 324 F.3d 197 (3d Cir. 2003)........................26

*In re Penn Traffic Co.*,
   No. 05-cv-3755 (NRB), 2005 WL 2276879 (S.D.N.Y. Sept. 16, 2005) ......................18

*In re Residential Cap., LLC*,
   508 B.R. 851 (Bankr. S.D.N.Y. 2014)........................20

*Riggs Nat'l Bank of Washington, D.C. v. Perry (In re Perry)*,
   729 F.2d 982 (4th Cir. 1984) ........................19

*In re Rose*,
   21 B.R. 272 (Bankr. D.N.J. 1982) ........................19

*In re Ry. Reorganization Est., Inc.*,
   133 B.R. 578 (Bankr. D. Del. 1991) ........................20

*Scott S. Div. Emps. Credit Union v. Loftin*,
   281 So. 2d 283 (Ala. Civ. App. 1973) ........................23

*Senior Ests., Inc. v. Bauman Homes, Inc.*,
   539 P.2d 142 (Or. 1975) ........................23

*Shaffer v. Debbas*,
   17 Cal. App. 4th 33 (Ct. App. 1993)........................21

*In re W.R. Grace & Co.*,
   475 B.R. 34 (D. Del. 2012), *aff'd*, 532 F. App'x 264, 729 F.3d 311, 729 F.3d 332
   (3d Cir. 2013)........................18, 19, 26

**Statutes**

11 U.S.C. § 362........................7, 9, 15, 26

11 U.S.C. § 365(b)(2) ........................10, 19

11 U.S.C. § 365(e)(1)........................19

11 U.S.C. § 502(b)(2) ........................26

11 U.S.C. § 503(b)(9) ........................6, 8

11 U.S.C. § 1123(a)(5)(G)........................26

11 U.S.C. § 1124(2)(A)........................19

Cal. Civ. Code § 3358........................27

**Other Authorities**

James M. Berger, *How PG&E financial stress is affecting projects*, Norton Rose
Fulbright (December 18, 2018)
https://www.projectfinance.law/publications/2018/december/how-pge-financial-
stress-is-affecting-projects/ ...........................................................................................................22

PG&E Corporation and Pacific Gas and Electric Company (the "**Utility**"), as debtors and reorganized debtors (collectively, the "**Debtors**" or "**Reorganized Debtors**," as applicable) in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), hereby submit this objection (the "**Objection**") to $11,844,598.00 in asserted claims for breach of contract and indemnification submitted by Consolidated Edison Development, Inc., on behalf of itself and certain of its affiliates (collectively, "**Con Ed**"). The amounts are purportedly owed as Cure Amounts[1] in connection with the assumption of certain power purchase agreements ("**PPAs**") and interconnection agreements ("**IAs**") between Con Ed and the Debtors (collectively, the "**CED Agreements**"). A copy of Con Ed's *Amended Cure Payment Claim Demand*,[2] is attached hereto as **Exhibit A** (the "**Demand**"). The Reorganized Debtors and Con Ed engaged in mediation in an effort to resolve Con Ed's Demand, which, although unsuccessful, has narrowed the dispute before the Court to the issues described herein.[3]

## I. PRELIMINARY STATEMENT

The Debtors assumed all of Con Ed's power purchase and other energy procurement agreements under the Plan and paid Con Ed more than $9.1 million on the Effective Date in satisfaction of the outstanding claims under those agreements, including the payment of postpetition interest. Nevertheless, Con Ed wants more and contends it is entitled to recover approximately $12 million in additional damages in the form of default interest, consent fees, and related attorneys' fees that Con

---

[1] Capitalized terms used but not herein defined have the meanings ascribed to them in the *Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization dated June 19, 2020* [Docket No. 8048] (the "**Plan**"), as confirmed by Order of the Court, dated June 20, 2020 [Docket No. 8053] (the "**Confirmation Order**").

[2] Due to the commercially sensitive nature of the CED Agreements, certain references within, and exhibits to, this Objection and the Demand are being filed with appropriate redactions or under seal. A motion authorizing the Reorganized Debtors to file such documents in redacted form and/or under seal is being filed contemporaneously herewith. Unredacted copies of the Demand and the applicable PPA and IA provisions will be provided to the Court.

[3] In addition to the approximately $12 million in asserted indemnity and breach of contract claims, Con Ed also asserts in its Demand certain additional amounts as postpetition interest it claims to be owed on its Allowed 503(b)(9) Claims. Although the Reorganized Debtors disagree that such amounts are owed, they agreed to pay the claimed amounts to further narrow the issues with respect to the Demand.

Ed says it incurred to its lenders under separate financing agreements it entered into with those parties. The Debtors are not parties to those separate, third-party financing agreements, which were all entered into after the CED Agreements—in many cases years after the CED Agreements—and were not privy to their terms. According to Con Ed, as a result of the commencement of the Chapter 11 Cases and the stay of certain prepetition payments by operation of section 362 of the Bankruptcy Code (which amounts were paid in full, with interest, under the Plan), Con Ed is entitled to this additional $12 million as a Cure Amount in connection with the assumption of the CED Agreements. Con Ed never mentioned these purported claims in any of its approximately twenty-nine proofs of claim in these cases, and, despite being active participants in these Chapter 11 Cases since the Petition Date, never raised these potential claims with the Debtors or sought to have their PPAs and IAs assumed during the cases in light of these potential claims and alleged damages.

As demonstrated below, there is no basis for Con Ed to recover these amounts under the CED Agreements, the Bankruptcy Code, or other applicable law. Con Ed received everything it is entitled to receive, and its efforts to obtain more should be denied and the additional Cure Amounts sought should be disallowed.

Under the CED Agreements, the Debtors contracted for the purchase and delivery of energy and ancillary products from Con Ed (or in certain instances, completely unrelated parties who later assigned the CED Agreements to Con Ed). Directly relevant to Con Ed's baseless Demand, each of the CED Agreements expressly waives liability for consequential damages arising out of a breach of the  agreements. ███████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████ Additionally, the CED Agreements also provide for indemnification, but only in certain limited and defined circumstances. Under the PPAs, the Debtors agreed to indemnify Con Ed for ████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████

1 ████████████████████████████████████████████████████

2 ████████████

3       Separate and independent from its agreements with the Debtors, Con Ed, without any input

4 from the Debtors and often years later, entered into agreements with various third-party financiers to

5 finance construction of its power generation plants (the "**Third-Party Financing Agreements**"). The

6 Debtors were not in any way involved in those Third-Party Financing Agreements, nor were they privy

7 to the specific terms and conditions to which Con Ed agreed to bind itself with its lenders. In certain

8 instances, to assist Con Ed in procuring the financing it was seeking, the Debtors executed consents

9 and agreements to permit Con Ed to pledge the PPAs as collateral on its Third-Party Financing

10 Agreements (the "**Consents and Agreements**"). The terms of these Consents and Agreements make

11 clear that they do not constitute amendments to, nor are they part of, the CED Agreements that the

12 parties entered into years prior. Additionally, even when providing the Consents and Agreements, the

13 Debtors were not made aware of the specific terms in the Third-Party Financing Agreements.

14       On the Effective Date, the Reorganized Debtors assumed all of their PPAs and IAs pursuant

15 to Section 8.1(b) of the Plan and Paragraphs 32b and 43 of the Confirmation Order, and paid all

16 prepetition amounts due under those agreements, including the CED Agreements, in full, with

17 postpetition interest. The Debtors clearly broadcast this Plan treatment in September 2019, providing

18 in the first version of the Plan filed in the Chapter 11 Cases that the CED Agreements would be

19 assumed along with all other PPAs and IAs. Furthermore, during the course of the Chapter 11 Cases,

20 the Debtors timely made all postpetition payments due under their PPAs and, once authorized by the

21 Court, under their IAs, and made every effort to limit the impact of the commencement of the Chapter

22 11 Cases to their PPA and IA counterparties, including Con Ed.[4] Of course, certain limited prepetition

23 amounts owed to Con Ed and other PPA counterparties, including certain prepetition amounts for

24

25   [4] This included, among other things, (i) prepaying certain amounts due under the PPAs prior to the

26 commencement of the Chapter 11 Cases, (ii) obtaining Court approval early in the Chapter 11 Cases
to classify certain unsecured amounts due under the PPAs as administrative expense claims under

27 section 503(b)(9) of the Bankruptcy Code, and (iii) securing Court authority to make certain payments
on account of prepetition network upgrade reimbursement credits due under the IAs during the

28 pendency of the Chapter 11 Cases.

energy deliveries that did not come due until February 2019, were stayed at the onset of the Chapter 11 Cases as a result of the imposition of the automatic stay under section 362 of the Bankruptcy Code; however, all of these amounts were paid in full with interest on the Effective Date of the Plan.

Although all monetary defaults were cured with interest as of the Effective Date, Con Ed now seeks to saddle the Reorganized Debtors with the consequences of Con Ed's own commercial deals with *its* financiers on *its* financing agreements for *its* power generation plants. Con Ed contends it can recover its losses—which it concedes arise from its Third-Party Financing Agreements—as "direct damages" for purported breaches of the PPAs and IAs from the Debtors' chapter 11 filing (Con Ed, of course, must plead "direct damages" to recover because, as noted above, the PPAs and IAs unequivocally bar recovery of consequential damages). Additionally, Con Ed tacks on at least two other inchoate, ill-conceived asserted theories. The first appears to arise out of payments under the CED Agreements that were stayed by operation of law upon the commencement of the Chapter 11 Cases and later repaid in full, which Con Ed contends somehow give rise to its losses under the Third-Party Financing Agreements. Demand at 3-4, 6. Second, Con Ed suggests, presumably in the alternative but with little elaboration, that it is entitled to recover for these same losses based on the indemnification provisions in the PPAs and IAs. Demand at 8. As demonstrated below, each of these theories fails.

First, Con Ed's reliance on the commencement of the Debtors' Chapter 11 Cases as the basis for its attenuated "direct damages" claim fails as a matter of law, which this Court may adjudicate solely on the pleadings. The thrust of Con Ed's argument is that when the Debtors exercised their statutory right to seek protection under chapter 11 of the Bankruptcy Code, that constituted a "breach" of the various CED Agreements that gave rise to a default under Con Ed's Third-Party Financing Agreements, which purportedly led to Con Ed paying the asserted default interest and consent fees to its lenders and incurring related attorneys' fees. However, adopting Con Ed's reading of the PPAs' bankruptcy default provisions—the IAs lack any analogous provision—is a clear attempt to impose contractual liability on the Debtors based solely on the commencement of these Chapter 11 Cases,

which amounts to an unenforceable *ipso facto* clause that cannot be the basis for a purported cure payment. *See* 11 U.S.C. § 365(b)(2)(A).

Second, even if the Debtors' exercise of their right to seek chapter 11 protection was a "breach" of the PPAs (which it was not), any default interest, consent fees, and attorneys' fees incurred by Con Ed in connection with its Third-Party Financing Agreements are not "direct damages." Indeed, losses arising from third-party contracts, the terms of which were not known at the time of contracting and which were kept private from the purportedly breaching party, are textbook consequential damages, which are expressly barred under the terms of the CED Agreements. ███████████████ ███████████ And, it matters not at all that the Debtors may have been generally aware that Con Ed would need to seek financing, because general awareness of a potential action does not transform consequential damages from the unknown details of that action into direct damages. Con Ed's effort to frame its claims as "direct damages" is a transparent and futile ploy to avoid these plain terms of the CED Agreements precluding recovery of consequential damages.

Con Ed attempts to avoid the clear terms of the PPAs by asserting that the Consents and Agreements somehow change the calculus for what are direct versus consequential damages. But the Consents and Agreements do nothing of the sort, because they, by their own terms, do not modify the CED Agreements or change the parties' understanding of the CED Agreements at the time of contracting, the critical point in time for any analysis of damages. Foreseeability *at the time of contracting* is required for consequential damages to be recoverable under common law, and the same holds true to the extent foreseeability informs whether damages directly and necessarily flow from a breach of contract or are a natural result of breach as required for a direct damages claim. Con Ed simply offers no explanation either for how the Debtors could have foreseen the specific terms that Con Ed would have agreed to with its own lenders in separate agreements or how a breach by the Debtors of the CED Agreements would directly lead to damages under those separate agreements. Given the speciousness of Con Ed's contentions, it is not surprising that Con Ed is the only one of the Debtors' hundreds of PPA counterparties asserting claims for damages for default interest and consent fees arising from breaches of third-party financing agreements.

<u>Third</u>, the automatic stay that applied to prepetition payments owed to Con Ed under the CED Agreements cannot give rise to a claim for "direct damages" under the Third-Party Financing Agreements. In fact, the first cure demand Con Ed provided to the Debtors, attached hereto as **<u>Exhibit B</u>**, makes no reference to the stayed payments as a stated basis giving rise to Con Ed's newly asserted Cure Amounts. Rather, when the Debtors repaid the stayed payments in full on the Effective Date, with interest, those payments pursuant to the Plan *were* the full measure of any direct damages for any breach of the CED Agreements due for the stayed payments.

<u>Finally</u>, the indemnification language of the PPAs and the IAs does not entitle Con Ed to any recovery for losses under the Third-Party Financing Agreements. Indemnification under the PPAs is ███████████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████ As the losses sought by Con Ed are at most consequential damages, they are not indemnifiable losses even if they were somehow incurred in connection with the delivery of the Product after the Delivery Point.

Neither can any purported recovery for Con Ed's losses be supported under the IA's indemnification provisions. First, Con Ed cannot identify any purported breach of the IAs that could possibly support a claim for damages as a result of the Third-Party Financing Agreements because filing for chapter 11 is not an event of default under the IAs. Second, the Debtors timely sought and received Court approval to make all payments under the IAs, repaying any stayed payments in full, with interest. Third, the IAs' indemnification provision applies only to ██████████████████████ ███████████████████████████████████████. There is nothing to support that ██████████████████ ██████████████████ to trigger any indemnity obligations under the IAs, let alone that could be tied to default interest, consent fees, and attorneys' fees under the Third Party Financing Agreements.

Accordingly, Con Ed's Demand should be denied and no further amounts should be due and owing by the Reorganized Debtors in connection with the assumption of the CED Agreements.

## II. BACKGROUND

### A. The PPAs and IAs

As part of its normal business operations, the Utility enters into PPAs with numerous counterparties setting terms for the purchase of power and ancillary products from various energy generation facilities. In order to physically receive energy from a generator, the Utility also enters into IAs setting the terms for connecting the Utility's transmission system to the generating facility. Con Ed's PPAs generally contain substantially similar language, while the IAs follow one of two *pro forma* templates promulgated by the Federal Energy Regulatory Commission—a small generator IA (SGIA) or a large generator IA (LGIA), depending on the size of the generating facility.

The PPAs include an event of default in the event of a chapter 11 filing by the Debtors. The IAs have no such event of default.





█████████████████████████████████████████████████████████

██████

████████████████████████████████████
██████████████████████████████████
████████████████████████████

█████████████████████████████████

███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
██████████████████

████████████████████

    B.     *Con Ed's Third-Party Financing Agreements and the Consents and Agreements*

    Some time after entering into or acquiring the PPAs and IAs, Con Ed entered into the Third-Party Financing Agreements with its financing sources. Con Ed has closely guarded the terms of those financing agreements, and to this day, the Debtors and Reorganized Debtors have not seen copies of the Third-Party Financing Agreements.[7]

    To help Con Ed secure financing, the Debtors executed the Consents and Agreements, which permitted the third-party financiers to step into Con Ed's shoes in the event Con Ed defaulted on the Third-Party Financing Agreements or the CED Agreements. These Consents and Agreements were executed well after the PPAs and IAs and specifically provide that ██████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████

1

2

3

4

5

**C.** *The Chapter 11 Cases*

On January 29, 2019 (the "**Petition Date**"), the Debtors commenced the Chapter 11 Cases. The Debtors made every effort to lessen the impact of the commencement of the Chapter 11 Cases on their suppliers, vendors, and contract counterparties, including Con Ed. The Debtors also timely made all postpetition payments due under the PPAs and all relevant IAs through the entirety of the Chapter 11 Cases.

Of course, payment of certain prepetition amounts owed to Con Ed was stayed by operation of section 362 of the Bankruptcy Code upon the commencement of the Chapter 11 Cases (the "**Stayed Payments**"). These Stayed Payments, included, among others things, (i) certain amounts that came due in February 2019 for energy deliveries in the month preceding the Petition Date, and (ii) certain payments contemplated to be made under a prepetition settlement agreement entered into by Con Ed and the Debtors on July 12, 2018, which settlement was conditioned on approval of certain PPA amendments by the California Public Utilities Commission that was ultimately received on April 17, 2019. In addition, certain payments due for Network Upgrade Reimbursements ("**NURs**") under two of Con Ed's IAs were also stayed by operation of the automatic stay. Nevertheless, in November 2019, the Debtors received authority from this Court to pay amounts due on account of NURs in full, with interest, during the Chapter 11 Cases and to make all ongoing NUR payments going forward, which the Debtors did. *See* Docket Nos. 4779, 4790. Con Ed's contention in its Demand that the Debtors did not make any NUR payments with respect to several projects until after the Effective Date is, therefore, both incorrect and irrelevant, Demand at 3, because the Debtors made all payments due under the IAs

26

27

28

during the Chapter 11 Cases after receiving Court approval and those payments cannot serve as a basis for alleged damages under the Third Party Financing Agreements.

### D. The Plan and the Assumption of the PPAs and IAs

The Plan was confirmed by the Court pursuant to the Confirmation Order on June 20, 2020. Pursuant to Paragraphs 32b and 43 of the Confirmation Order and Section 8.1 of the Plan, all power purchase agreements and interconnection agreements were assumed on the Effective Date of the Plan. In fact, the provisions providing for the assumption of all of the Debtors' PPAs had been included in every version of the Plan filed with the Court dating back to the first version of the Plan filed on September 9, 2019. Pursuant to Paragraph 43 of the Confirmation Order, the parties agreed to attempt to resolve any disputes related to assumption of the PPAs and IAs in the ordinary course, provided that if no resolution could be reached within 45 days of the Confirmation Order, either party may submit the dispute to this Court.

The Effective Date of the Plan occurred on July 1, 2020, and the Stayed Payments were repaid in full, with interest, in connection with the assumption of the CED Agreements on the Effective Date of the Plan.

### E. Con Ed's Demands

On August 25, 2020, approximately two months following the Effective Date and approximately nineteen months after the commencement of the Chapter 11 Cases, the event which allegedly gave rise to the claims at issue here, Con Ed made its first demand on the Reorganized Debtors for additional amounts in connection with the assumption of the CED Agreements, including, among other claims, the default interest, consent fees, and attorneys' fees at issue in the Demand. The parties engaged in mediation but were unable to resolve the dispute. Con Ed later amended its Demand as set forth in **Exhibit A**. Although the mediation was not successful, the parties have narrowed their dispute to the issues currently before the Court.

In its Demand, Con Ed asserts $11,844,598 allegedly owed as additional Cure Amounts comprised of: (1) $4,805,060 in default interest on its Third-Party Financing Agreements, purportedly triggered by the Debtors' chapter 11 filing and the Stayed Payments; (2) $6,000,000 in consent fees paid to Con Ed's financiers in lieu of default interest; and (3) $1,039,538 in attorneys' fees incurred

in relation to Con Ed's project financing issues. Con Ed asserts these amounts are either direct damages of the Debtors' purported breaches or reimbursable indemnification obligations of the Debtors, payable as cure.

[REDACTED]

## III. ARGUMENT

Con Ed has no right to any Cure Amount beyond what it has already received, which included postpetition interest in accordance with the Plan. Any further amounts are expressly barred under the terms of the applicable CED Agreements, the Bankruptcy Code, and otherwise applicable law.

For Con Ed to recover damages, it carries the burden of establishing "(1) the existence of the contract; (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff." *Oasis W. Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821 (2011). Con Ed does not meet and cannot discharge this burden because it cannot show that the Debtors breached any enforceable obligation owed to Con Ed under the CED Agreements. Nor can Con Ed demonstrate that any alleged breach by the Debtors gave rise to what Con Ed ambitiously labels "direct damages" for default interest, consent fees, and attorneys' fees arising from the Third-Party Financing Agreements. Instead, the damages Con Ed asserts are textbook consequential damages that are barred by the express terms of the CED Agreements' limitation of liability provisions. Further, Con Ed's claim for indemnification is without merit, as [REDACTED]

███████████████████████████████████████████████████████

████████████

Because Con Ed's claims all fail as a matter of law, this Court can and should dispose of them on the pleadings.

A.     The Bankruptcy Code Bars Con Ed From Relying on an Ipso Facto Clause For Its Breach-of-Contract Claim

Con Ed's reliance on the PPAs' bankruptcy default provision as the basis for its cure demands for "direct damages" is misplaced. At bottom, Con Ed's breach-of-contract claim rests on the theory that the Debtors had an obligation not to file for chapter 11, they breached that obligation, and that a breach gave rise to "direct damages" because Con Ed subsequently defaulted under a separate agreement with another party and was ostensibly obligated to pay default interest and negotiated consent fees, and incurred attorneys' fees in the process. This is, to put it succinctly, the opposite of direct damages. Regardless, Con Ed's requested relief also is barred as a matter of law.

It is "well-settled law that the filing of a bankruptcy petition does not alter a debtor's contractual rights or obligations." *In re Penn Traffic Co.*, No. 05-cv-3755 (NRB), 2005 WL 2276879, at *6 (S.D.N.Y. Sept. 16, 2005); *see also In re Cochise Coll. Park, Inc.*, 703 F.2d 1339, 1352 (9th Cir. 1983) ("Until rejection, however, the executory contract continues in effect and the non-bankrupt party to the executory contract is not a creditor with a provable claim against the bankrupt estate."). Accordingly, notwithstanding that the PPAs contained a bankruptcy default provision, the Debtors' chapter 11 petition is not a "breach" of their obligations, because it did not affect the parties' rights or obligations.[9]

Moreover, "[b]ankruptcy policy generally prevents enforcement of *ipso facto* clauses. *In re B-Bar Tavern. Inc.*, 506 B.R. 879, 927 n. 39 (Bankr. D. Mont. 2013); *see also In re W.R. Grace & Co.*, 475 B.R. 34, 152 (D. Del. 2012) ("[I]t is well-established that *ipso facto* clauses are unenforceable as a matter of law under the Bankruptcy Code"), *aff'd*, 532 F. App'x 264, 729 F.3d 311, 729 F.3d 332

---

[9] Indeed, at no point did the Debtors covenant under the PPAs not to seek protection under the Bankruptcy Code—nor could they, as any such prohibition would be void as a matter of public policy. *See infra* at p. 18.

(3d Cir. 2013); *In re Lehman Bros. Holdings, Inc.*, 422 B.R. 407, 414–15 (Bankr. S.D.N.Y. 2010) ("It is now axiomatic that *ipso facto* clauses are, as a general matter, unenforceable."); *Riggs Nat'l Bank of Washington, D.C. v. Perry (In re Perry)*, 729 F.2d 982, 984-85 (4th Cir. 1984) (observing that "enforcement of a default-upon-filing clause would clearly intrude upon" the Bankruptcy Code's policy of creating a fresh start for debtors and are "unenforceable as a matter of law"). Because the CED Agreements are undisputedly executory contracts, the Bankruptcy Code's prohibition on *ipso facto* clauses within executory contracts fully applies to them.

Section 365(b)(2)(A) of the Code expressly excuses a debtor from curing "a default that is a breach of a provision relating to … the insolvency or financial condition of the debtor at any time before the closing of the case." 11 U.S.C. § 365(b)(2)(A); *see also id.* § 1124(2)(A). Section 365(e)(1) similarly provides that an executory contract "may not be terminated or modified" on the basis of "the insolvency or financial condition of the debtor at any time before the closing of the case." *Id.* § 365(e)(1); *see also In re Chateaugay Corp.*, No. 92-cv-7054 (PKL), 1993 WL 159969, at *5 (S.D.N.Y. May 10, 1993) ("Section 365 abrogates the power of *ipso facto* clauses. No default may occur pursuant to an *ipso facto* clause and no reliance may be placed upon an alleged default where the only cause for default is the debtor's commencement of a bankruptcy case."). Section 365(b)(2), thus, forecloses, by its express terms, any recovery for damages purportedly arising out of the PPAs' bankruptcy default provision, and section 365(e)(1) evinces a clear congressional intent to prevent creditors from taking property out of the estate based on bankruptcy default provisions.

Courts have widely recognized that the prohibition on *ipso facto* clauses should not be limited to the express terms of the Bankruptcy Code, a consequence of creditor efforts to plead around Congress's clear disapproval of this practice. For numerous policy reasons, *ipso facto* clauses, regardless of how a counterparty tries to enforce them, are not enforceable against a debtor. "[T]he whole purpose of filing for bankruptcy is to provide the debtor with a 'fresh start,' and enforcement of *ipso facto* clauses would punish debtors by negating this central purpose." *W.R. Grace*, 475 B.R. at 152 (citing *In re Rose*, 21 B.R. 272, 276-77 (Bankr. D.N.J. 1982)). Courts have accordingly "prohibited enforcement of *ipso facto* clauses on more general grounds," including by undermining

the effectiveness of the automatic stay or a debtor's ability to reorganize. *See, e.g.*, *Riggs Nat'l Bank of Washington, D.C.*, 729 F.2d at 984-85; *In re Ry. Reorganization Est., Inc.*, 133 B.R. 578, 582 (Bankr. D. Del. 1991) ("Not only are [*ipso facto*] clauses expressly unenforceable, but they contravene Code policy of providing debtors with a fresh start."); *cf. In re 53 Stanhope LLC*, 625 B.R. 573, 583 (Bankr. S.D.N.Y. 2021) ("When the only default was the bankruptcy filing itself, courts have properly held, that post-default interests should not be allowed"); *In re Residential Cap., LLC*, 508 B.R. 851, 862 (Bankr. S.D.N.Y. 2014) (declining to enforce bankruptcy default provision because "bankruptcy policy should not penalize a debtor for filing by awarding default interest when the only default was the filing itself").

The Demand represents an obvious attempt by Con Ed to side-step the Bankruptcy Code's unambiguous disapproval of *ipso facto* clauses as a means to extract payment from a debtor. Accordingly, Con Ed is barred from relying on the PPAs' bankruptcy default provision to seek a cure payment for any damages from the Debtors and the Demand should be disallowed.

      B.    *Default Interest, Consent Fees, and Attorneys' Fees Arising Under Con Ed's Third-Party Financing Agreements Are Not Direct Damages Arising from the Debtors' Chapter 11 Filing Or Any Other Purported Breach of the CED Agreements*

Even if Con Ed could rely on the Debtors' Chapter 11 filing to support a breach of contract—which it cannot for the reasons stated above—Con Ed's claimed losses here are not "direct" damages, to the extent they are even damages at all. In order for Con Ed's losses to be "direct damages," they must "flow directly and necessarily from a breach of contract," or be "a natural result of a breach." *Lewis Jorge Constr. Mgmt., Inc. v. Pomona Unified Sch. Dist.*, 34 Cal. 4th 960, 968 (2004). But that is obviously not the case here.

But even if Con Ed could delineate a viable basis for breach, tracing a line from Con Ed's losses to any contract with the Debtors requires passing through *at least* one other contract that the Debtors are not even a party to—the Third-Party Financing Agreements—as well as the independent decision-making of the counterparties to those agreements, both at the time of contracting (which was subsequent to Con Ed's agreements with the Debtors) and at the time of Con Ed's losses, when those parties entered into their own independent resolution. Additionally, even if the Debtors were generally

aware that Con Ed would seek financing, default interest, consent fees, and attorneys' fees under a separate contract are not a "natural result of breach" of the PPAs.[10] Under Con Ed's theory, it could have agreed to any relief imposed by its lenders under its Third-Party Financing Agreements, however outrageous, and then claim recovery for that relief from the Debtors if the Debtors breached the PPAs. On these facts, Con Ed's losses are thus every bit as "direct" as a flight from Shanghai to New York, with layovers in Osaka and Chicago—which is to say, not direct at all.

Instead, the damages asserted by Con Ed in its Demand are, at best, claims for consequential damages, *i.e.*, "secondary or derivative losses arising from circumstances that are particular to the contract or to the parties." *Lewis Jorge*, 34 Cal. 4th at 968; *see also City & Cnty. of S.F. v. Tutor-Saliba Corp.*, No. C 02-5286 CW, 2005 U.S. Dist. LEXIS 46590, at *50–51 (N.D. Cal. Mar. 17, 2005) (consequential damages are those losses that "have proximately resulted but do not always immediately result from the breach and will, therefore, not be implied by law.") (citation omitted). And as consequential damages, Con Ed is barred from recovery on its breach-of-contract theory because it expressly waived such damages under its agreements with the Debtors. ███████████

███████████████████

The California Supreme Court's reasoning in *Lewis Jorge*, the leading California case on consequential versus direct damages, leaves no ambiguity on this point. In distinguishing between direct and consequential damages, the Court asked as "a threshold inquiry" the question of "[w]hat performance did the parties bargain for?" because direct damages are based on the performance the parties bargained for and "the value of the performance itself, not on the value of some consequence that performance may produce." 34 Cal. 4th at 971. The Court then considered whether a party's breach of a construction contract that left a counterparty-contractor with impaired bonding capacity

---

[10] Con Ed would also have had a duty to mitigate damages. *See, e.g.*, *Henrici v. S. Feather Land & Water Co.*, 177 Cal. 442, 449 (1918); *Shaffer v. Debbas*, 17 Cal. App. 4th 33, 41 (Ct. App. 1993). The Reorganized Debtors reserve all rights to challenge Con Ed's abdication of this duty and its failure to apprise the Debtors of the damages Con Ed was purportedly incurring as a result of the commencement of the Chapter 11 Cases. It is also curious how Con Ed could incur approximately one million dollars in attorneys' fees without getting any benefit on two of its financing agreements and getting only a nominal benefit on the third in a full-pay chapter 11 case.

with its surety, thus impairing the contractor's ability to bid for other projects, could support a claim for damages. *Id.* at 965. The California Supreme Court found that such losses were not "general"—*i.e.*, direct—damages. *Id.* at 975. The Court then considered whether these losses, although not direct damages, were otherwise recoverable as consequential damages, but concluded that because they were not foreseeable, they could not be recovered at all.[11] *Id.* at 977. There, even though bonding requirements were an industry standard, the damages were not foreseeable because the breach "might or might not" have led to the surety reducing the contractor's bonding capacity. *Id.* at 970, 977. Because a party could not have "reasonably contemplated" that breach would result in a "series of misfortunes" leading to consequential damages, the damages were not foreseeable and therefore not recoverable. *Id.* at 977.

Applying the analysis of *Lewis Jorge* to Con Ed's Demand, the performance the parties bargained for in the PPAs was the purchase and delivery of energy, which informs the full scope of direct damages under a breach of contract action. Any losses arising out of that bargained-for agreement that are incidental to performance or non-performance, such as losses arising out of third-party contracts to which the Debtors are not parties, are, at most, consequential damages. As with the bonding capacity at issue in *Lewis Jorge*, even if bankruptcy events of default are an industry standard in PPAs and financing agreements, as Con Ed contends, because such a default "might or might not" cause a financier to impose default interest, Con Ed's damages cannot be direct.[12]

---

[11] As *Lewis Jorge* explains, although foreseeability may factor into an evaluation of whether damages are direct, foreseeability is primarily relevant to consequential damages, because consequential damages cannot be recovered at common law unless they were foreseeable. *See id.* at 970 ("Not recoverable as [consequential] damages are those 'beyond the expectations of the parties' … [Consequential] damages for breach of contract are limited to losses that were either actually foreseen or were 'reasonably foreseeable' when the contract was formed.") (citations omitted).

[12] This conclusion is supported by the same article Con Ed cites in its Demand in an attempt to repackage its consequential damages into direct damages. *See* James M. Berger, *How PG&E financial stress is affecting projects*, Norton Rose Fulbright (December 18, 2018) https://www.projectfinance.law/publications/2018/december/how-pge-financial-stress-is-affecting-projects/ ("After a default, the lenders usually can accelerate all obligations and initiate foreclosure proceedings. However, if PG&E continues to perform under the power purchase agreement, *the lenders may wait to take any action because they prefer not to foreclose so long as the debt is being paid*.") (emphasis added).

Were there any doubt left that Con Ed's demands are, at most, consequential damages, California courts have also found that financial losses arising from a second, separate contract with a distinct contract counterparty are at most consequential damages of a breach of the first contract, even when the counterparty to the first contract has general knowledge of the second contract.

For example, in *Automatic Poultry Feeder Co. v. Wedel*, 213 Cal. App. 2d 509, 514 (1963), the court found a turkey farmer's lost bonus on a turkey sale contract, which resulted from the death of the farmer's turkeys due to a defective feeding machine supplied under a separate contract, was an unforeseen consequential damage of the machinery-supplier's breach of that contract—even though the machinery provider had knowledge of the contract providing for the bonus, yet no knowledge of the bonus itself. *See also Lewis Jorge*, 34 Cal. 4th at 975 ("When the contractor's claim is extended to profits allegedly lost on *other* jobs because of the defendant's breach that claim is clearly a claim for [consequential] damages.") (quotation marks omitted). Courts across the country have similarly recognized that an alleged breach that results in losses arising from collateral business arrangements only gives rise to consequential damages. *See, e.g.*, *Cont'l Holdings, Ltd. v. Leahy*, 132 S.W.3d 471, 475 (Tex. Ct. App. 2003) ("Profits lost on the breached contract itself ... are classified as 'direct' damages. Profits lost on other contracts or relationships resulting from the breach are classified as 'indirect' damages."); *Senior Ests., Inc. v. Bauman Homes, Inc.*, 539 P.2d 142, 148 (Or. 1975) (noting that a plaintiff's "recovery of [consequential damages] is conditioned on the defendant having notice that a potential loss on [] collateral contracts would result on account of their breach"); *Scott S. Div. Emps. Credit Union v. Loftin*, 281 So. 2d 283, 285–86 (Ala. Civ. App. 1973) ("When the collateral contract was made subsequent to the original and the defaulting party had no notice thereof nor the nature of the original transaction was not such as to give notice thereof, lost profits from the collateral transaction are considered too remote and not recoverable on default of the original contract.").

Accordingly, Con Ed's alleged claims are not direct damages but rather are consequential damages barred under the express terms of the CED Agreements.

### C. *The Consents and Agreements Are Irrelevant to Con Ed's Demand*

Con Ed appears to suggest that because the Debtors consented to the pledge of the PPAs by Con Ed as security for certain future financings, the Debtors also consented to pay for any damages Con Ed might have incurred as a result of whatever future bargains it would strike in contracts to which the Debtors are not parties. The argument fails.

First, the Consents and Agreements do not change Con Ed's (non)entitlement to relief under the terms of a particular PPA, because the Consents and Agreements, by their clear and unambiguous terms, ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████ Because the Consents and Agreements do not amend the actual agreements between the Debtors and Con Ed, they are not relevant to the analysis of whether the asserted claims necessarily flow from a breach of the CED Agreements or were foreseeable.

Second, the Consents and Agreements, as contracts that were entered into *subsequent* to the CED Agreements, cannot alter the understanding of the parties at the time they entered into the CED Agreements—the critical point in time from when foreseeability must be analyzed. *See Lewis Jorge*, 34 Cal. 4th at 968-69. Because the Consents and Agreements came *after*, not before, the parties' execution of the PPAs, they are incapable of serving as evidence of the parties' intentions at the time of contracting.[13] It is a bedrock principle of the law of contracts that extrinsic evidence, even where admissible, is only relevant to construing an agreement to the extent such evidence is "prior or

---

[13] To the extent Con Ed attempts to rely on extrinsic evidence to bolster its arguments, Con Ed has already agreed that the plain terms of its agreements with the Debtors control here. ██████████████

█████████████████████████████ The Reorganized Debtors do not believe that discovery is necessary in the first instance. Threshold legal issues—for example, that Con Ed's Demand is based on an unenforceable *ipso facto* clause; that direct damages for the Stayed Payments are simply the amount of the Stayed Payments; that a general awareness that Con Ed might seek financing does not turn consequential damages into direct damages; and that the plain terms of the CED Agreements' indemnification provision prohibit the recovery sought by Con Ed—exist with respect to Con Ed's Demand that, if decided in accordance with the Bankruptcy Code and basic contract law, would obviate the need to burden the parties or this Court with discovery and additional briefing. If the Court has a different view, the Reorganized Debtors reserve all of their rights to take discovery from Con Ed.

contemporaneous" to that agreement. *See, e.g.*, *Conley v. Matthes*, 66 Cal. Rptr. 2d 518, 526 (Ct. App. 1997). Although the terms of the CED Agreements are themselves unambiguous and require no recourse to extrinsic evidence, any effort by Con Ed to plead around its own agreements by reference to the Consents and Agreements (or any other similar agreement) fails because they are, at best, *post hoc* evidence of the parties' intentions.

Finally, Con Ed cannot point to any contractual language, either in the Consents and Agreements or elsewhere that entitles Con Ed to the damages it seeks. The foreseeability of damages is guided by the "understanding and intention of the parties" at the time of contracting and "must, of course, be ascertained from the language of the contract, in the light of such facts." *Hunt Bros. Co. v. San Lorenzo Water Co.*, 150 Cal. 51, 56-57 (1906); *see also Lewis Jorge*, 34 Cal. 4th at 968-69 ("[Consequential] damages are recoverable if the special or particular circumstances from which they arise were actually communicated to or known by the breaching party (a subjective test) or were matters of which the breaching party should have been aware at the time of contracting (an objective test)"). In other words, the *intentions of the parties as manifested in the bargained-for terms of the contract* determines whether Con Ed has a right to damages. And, as "ascertained from the language of the contract," the parties did not contemplate that Con Ed would one day enter into an agreement *with a default condition imposing default interest based on the Debtors' chapter 11 filing*. The Consents and Agreements are as silent on this as the CED Agreements, with the result that even if they did bear some legal relevance, they could not sustain Con Ed's arguments.

In short, nothing in the language of the PPAs or Consents and Agreements supports any argument that the parties contemplated that the Debtors would have any liability for losses sustained by Con Ed on its Third Party-Financing Agreements, and there is nothing ambiguous about the contract's silence on this point. Indeed, the most applicable provisions are the ones *limiting liability for any consequential damages*, and those provisions plainly defeat Con Ed's claims.

> D.    *The Stayed Payments Do Not Give Rise to Direct Damages for Default Interest, Consent Fees, and Attorneys' Fees on the Third-Party Financing Agreements*

Con Ed's other stated bases for breach—the Stayed Payments—are even more attenuated and cannot support its expansive view of direct damages. First, Con Ed's claim that the Stayed Payments

gave rise to its asserted damages is just another way of saying that the automatic stay injured Con Ed. But that cannot be a basis to recover for breach of contract. "In enacting the Bankruptcy Code, Congress made a determination that an eligible debtor should have the opportunity to avail itself of a number of Code provisions which adversely alter creditors' contractual and nonbankruptcy law rights." *In re PPI Enters. (U.S.), Inc.*, 228 B.R. 339, 344-45 (Bankr. D. Del. 1998) (citing *In re Johns-Manville Corp.*, 36 B.R. 727, 735–37 (Bankr. S.D.N.Y. 1984)), *aff'd*, 324 F.3d 197 (3d Cir. 2003). The automatic stay is one such provision, resting as it does on several "important federal interests," including:

> (1) the overarching bankruptcy principle rooted in § 362(a) that a debtor's bankruptcy filing should afford it a fresh start and grant it some temporary breathing room from its liabilities, based on state law or otherwise, until it can effectively reorganize; (2) the Bankruptcy Code's central objective of facilitating a debtor's reorganization, as evidenced by § 1123(a)(5)(G); and (3) the limits placed upon unsecured creditors in bankruptcy due to their unsecured status, found in § 502(b)(2) of the Bankruptcy Code.

*W.R. Grace*, 475 B.R. at 157–59 (holding that "[t]here is no question that the impact" of the automatic stay "can factually and legally alter prior contractual agreements between parties"). Though Con Ed may have found the automatic stay inconvenient, the fact that the Bankruptcy Code "adversely alter[ed]" Con Ed's "contractual and nonbankruptcy law rights" does not mean Con Ed has an entitlement to damages here. *PPI Enterprises*, 228 B.R. at 344-45. Plus, had Con Ed wanted to, it always could have requested the Debtors assume the PPAs and IAs or moved the Court to compel the Debtors to assume or reject those agreements during the Chapter 11 Cases. But Con Ed never did either of these.

Even more, the Stayed Payments were paid in full, with interest, by the Reorganized Debtors. Those payments *were* the full measure of direct damages, *i.e.*, "the value of the performance" the parties bargained for if the Debtors were to fail to make a payment. *See Lewis Jorge*, 34 Cal. 4th at 971.[14] Here, because the Debtors paid those prepetition amounts owed in full under the Plan, *plus*

---

[14] Indeed, this is what *Lewis Jorge* means when it says contract damages, assuming they are recoverable, "seek to approximate the agreed-upon performance" and put the non-breaching party "in

*interest*, it is untenable for Con Ed to claim that an entirely separate universe of losses are now also "direct" damages arising from that same breach.

E.    *Con Ed Is Not Entitled to Indemnification*

In a single cursory sentence, Con Ed asserts it may also recover for these same losses under a theory of indemnification. *See* Demand at 8. To the extent Con Ed has even adequately put this issue before the Court, it should be denied as well because it has no basis under the terms of the CED Agreements.

1.    Con Ed Ignores the Plain Language of the PPA Indemnification Provisions

Con Ed's claims do not fall within the scope of the PPA indemnification provisions. Under the PPAs, ███████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████    The plain language of the PPAs is dispositive here. *See Four Star Elec., Inc. v. F&H Constr.*, 7 Cal. App. 4th 1375, 1379 (1992) ("An indemnitee seeking to recover on an agreement for indemnification must allege the parties' contractual relationship, the indemnitee's performance of that portion of the contract which gives rise to the indemnification claim, the facts showing a loss within the meaning of the parties' indemnification agreement, and the amount of damages sustained.").

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

as good a position as he or she would have occupied;" not, as Con Ed seems to contend, that a cure payment can somehow import a tort-damages standard that permits recovery in excess of the scope of recoverable contract damages. *See Lewis Jorge*, 34 Cal. 4th at 967 (quotation marks omitted); Demand at 8; *see also* Cal. Civ. Code § 3358 ("Except as expressly provided by statute, no person can recover a greater amount in damages for the breach of an obligation, than he could have gained by the full performance thereof on both sides").



2.   <u>Con Ed Is Not Entitled to Indemnification Under the IAs</u>

Similarly, Con Ed cannot identify any basis under the IAs for its indemnification demands. The IA indemnification provisions apply ███████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████ ███████  As an initial matter, the IAs do not contain bankruptcy default provisions. Although there is nothing in the Demand articulating its precise position, Con Ed appears to be claiming that the payments stayed under just two of the IAs constituted a default that somehow entitles Con Ed to indemnification for default interest, consent fees, and attorneys' fees from losses across all of Con Ed's Third-Party Financing Agreements. This half-hearted claim fails. The Stayed Payments were stayed by operation of law immediately upon the commencement of the Chapter 11 Cases and not by any decision by the Debtors to delay or decline to pay them. Moreover, Con Ed has not made any attempt to apportion these particular defaults against any particular losses, likely because the Stayed Payments did not trigger the cavalcade of losses Con Ed claims to have incurred. Furthermore, the IA indemnification provisions are limited to third-party claims against a party to the IAs and do not cover losses suffered in the first instance by a party to the IAs.

## IV.   CONCLUSION

Con Ed's stated theories for breach of contract each suffer fatal defects that foreclose any recovery for losses that ultimately arise out of an entirely separate set of transactions to which the Debtors are not even parties. In addition, Con Ed's reliance on the Debtors' chapter 11 filing and the Stayed Payments as putative "breaches" runs afoul of the Bankruptcy Code, long-settled common law, and the plain terms of the parties' agreements, which waived any right to consequential damages arising out of the CED Agreements. Accordingly, Con Ed's Demand must be disallowed and its claim for additional Cure Amounts denied.

Dated: May 3, 2021

**WEIL, GOTSHAL & MANGES LLP**
**KELLER BENVENUTTI KIM LLP**

By: */s/ Theodore E. Tsekerides*
　　Theodore E. Tsekerides

*Attorneys for Debtors and Reorganized Debtors*