**EXHIBIT A**

**Amended Cure Payment Claim Demand**

```
UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA
```

| | |
|---|---|
| In re ) | Case No. 19-30089 |
| PG&E Corporation ) | |
| ) | Chapter 11 (Lead Case) (Jointly |
| and ) | Administered) |
| ) | |
| Pacific Gas and Electric Company, ) | |
| Debtors. ) | |

## AMENDED CURE PAYMENT CLAIM DEMAND

Consolidated Edison Development, Inc. ("CED") on behalf of itself and its Affiliates (as defined below) formally demands as cure payments an amount equal to $12,017,928.50, which represents, in the aggregate, post-petition and default interest, consent fees and attorney's fees stemming from Pacific Gas and Electric Company's ("PG&E" or the "Utility" and, together with its parent company PG&E Corporation, the "Debtors") defaults under the CED Agreements (as defined below) as well as under the Financing Agreements (as defined below) (the "Demand").

I. PRELIMINARY STATEMENT

Certain affiliates of CED (the "Affiliates")[1] are parties to wholesale power purchase agreements (the "PPAs") and/or interconnection agreements (the "IAs"), as each may have been amended, supplemented, or otherwise modified from time to time (collectively, the "CED Agreements"), with the Utility.[2] In connection with the CED Agreements, certain of the Affiliates entered into Financing Agreements with third-party financiers. Debtors were well aware of the significance of the CED Agreements to the Financing Agreement, so much so that PG&E

---

[1] Attached hereto as Exhibit A is a schedule of the relevant Affiliates.
[2] Because the CED Agreements are voluminous and contain sensitive trade secret and proprietary information, they are not attached to this Demand. Upon information and belief, the Debtors are in possession of the CED Agreements, and copies will be made available upon a showing of need and entry into an appropriate confidentiality agreement and/or entry of a protective order by the Court.

consented to the pledge of the PPAs and IAs as collateral in the financings.[3] When the Debtors filed for bankruptcy in January 2019, they breached the CED Agreements by filing the bankruptcy petition and failing to make required payments both pre-and post-petition. As material agreements to the Financing Agreements, the breach of the CED Agreements caused defaults under the Financing Agreements. Consequently, the Affiliates suffered significant monetary loss for which, pursuant to the CED Agreements, the Utility is obligated to pay as damages for its breaches.

Pursuant to the *Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization Date June 19, 2020* (the "Plan"), which was confirmed on June 20, 2020, the Utility assumed the CED Agreements as of the Effective Date of the Plan. As a condition to assumption, the Utility must cure all defaults and outstanding amounts owed, including those resulting from the default of the Financing Agreements.

## II. BACKGROUND

CED is a wholly-owned subsidiary of Con Edison Clean Energy Businesses, Inc., which in turn is a subsidiary of Consolidated Edison, Inc., one of the nation's largest energy delivery and service companies. CED develops, owns, and operates solar and wind renewable energy generation, battery storage and energy infrastructure projects throughout the continental United States.

CED has more than 1,800 MWac of renewable energy projects in California, Nevada and Arizona (the "Projects"). Approximately 665 MWac of the Projects provide electricity and renewable energy credits to California and are the subject of wholesale power purchase agreements with PG&E ("PPA"), consisting of one wind project in California totaling 102 MW, and fifteen solar projects in Arizona, California and Nevada totaling 563 MW.

---

[3] [redacted]

Prior to the Utility's bankruptcy filing on January 29, 2019 (the "Petition Date"), CED'S Affiliates and the Utility entered into the PPAs. Under the terms of each PPA, a subsidiary (or predecessor) of CED constructs, owns and operates a generating facility and sells the energy and certain attributes (including, without limitation, "green attributes" such as Renewable Energy Certificates ("RECs")) generated thereby to PG&E. This enables PG&E to, among other things, meet its resource adequacy and renewable energy requirements prescribed by the California Public Utilities Commission ("CPUC").

In addition to the PPAs, each of CED's Affiliates executed IAs among the affiliate, California Independent System Operator ("CAISO"), and PG&E, pursuant to which PG&E designed, procured, constructed, installed and owned certain additions, modifications, and upgrades to PG&E's transmission system required to accommodate the interconnection of each Project with the CAISO grid (the "Network Upgrades").

Pursuant to each IA, the CED affiliate bore the initial financial cost of the Network Upgrades. After commercial operation of the Projects commenced, PG&E became obligated to reimburse the CED affiliate for the cost of Network Upgrades. Reimbursements are made in the form of either (i) direct payments made on a levelized basis over a five (5) year period, or (ii) an alternative mutually agreed upon payment schedule. After the Petition Date, PG&E failed to make any payments for Network Upgrades with respect to several Projects until after the Plan went into effect.

As part of the development of certain Projects, CED affiliates entered into Financing Agreements with third-party financiers to fund the construction of the Projects. As a condition for obtaining third-party financing, PG&E was required to and did execute acknowledgements and consents for the benefit of the financing party and the CED affiliate. As contemplated by the PPAs and the financings, PG&E also consented to the assignment of the applicable PPA and IA as collateral for each financing. Each Financing Agreement contains event-of-default clauses that are triggered by, among other things, the bankruptcy filing of a counterparty to a material project contract, which includes the PPAs and IAs, and any defaults or breaches of such contracts.

3

After the Petition Date, PG&E declined to pay for electricity that was delivered to it from January 1-29, 2019. CED continued to perform all of its obligations under the PPAs and even delivered all RECs to PG&E after the Petition Date. PG&E, however, failed to pay for such RECs that were based upon electricity delivered before the Petition Date. PG&E also failed to make required NUR payments post-petition and failed to perform under a settlement agreement related to four PPAs that was approved by the CPUC post-petition.

As a result of PG&E's breaches and bankruptcy filing, certain third-party financiers sent notices to CED noting the occurrence of a default and reserving rights to seek, among other things, the payment of interest at the applicable default rate. As discussed in more detail below, CED was required to pay default interest and consent fees in lieu of default interest and incurred attorney's fees to resolve project financing issues directly caused by PG&E breaches of the CED Agreements.

### III. CED's PROOF OF CLAIMS

#### 1. Section 503(b)(9) Claims

On March 1, 2019, the Bankruptcy Court entered the *Amended Order Pursuant to 11 U.S.C. §§ 503(b)(9) and 105(a) Establishing Procedures for the Assertion, Resolution, and Satisfaction of Claims Asserted Pursuant to 11 U.S.C. § 503(b)(9)* [Docket No. 725] (the "503(b)(9) Order"). As provided in the 503(b)(9) Order, the Court fixed April 20, 2019 as the deadline for vendors to assert proofs of claim pursuant to section 503(b)(9) of the Bankruptcy Code for the value of "goods" delivered to either Debtor twenty days before the Petition Date (the "503(b)(9) Period"). All but three Affiliates filed claims (collectively, the "503(b)(9) Claims") on April 18, 2019 to recover, as administrative expenses, the unpaid costs of electricity delivered to the Utility during the 503(b)(9) Period, while reserving all rights to seek further claims for

indemnity and attorneys' fees.[4] In support of the 503(b)(9) Claims, the filing Affiliates attached invoices reflecting the amounts owed, which aggregate $6,365,206.59.

### 2. General Unsecured Claims

On July 1, 2019, this court entered an order (the "Bar Date Order") [Docket No. 2806] that, *inter alia*, established October 21, 2019 as the general bar date. In accordance with the Bar Date Order, the Affiliates collectively filed sixteen proofs of claim (the "General Unsecured Claims") reflecting amounts due and owing from the Utility as of the Petition Date under the PPAs, IAs, and/or related agreements (as applicable), while reserving all rights to, among other things, (i) assert any and all claims at law or in equity against PG&E, (ii) file additional proofs of claim for additional claims which may be based on the same or additional documents and (iii) file additional proofs of claim with respect to any other liability or indebtedness of any debtor.[5] The General Unsecured claims total $37,727,283.10 exclusive of interest, costs, and other fees and expenses that are recoverable pursuant to the express terms of the CED Agreements.

IV. PG&E's CHAPTER 11 PLAN AND ASSUMPTION OF CED AGREEMENTS

The Debtors filed the Plan, which was confirmed by the Bankruptcy Court pursuant to an order entered on June 20, 2020 (the "Confirmation Order") and went into effect on July 1, 2020 (the "Effective Date"). The Plan provided for the assumption of all unexpired leases and executory contracts including the CED Agreements (with a carveout not applicable here), subject to the occurrence of the Plan's Effective Date and payment of amounts required to cure any defaults. *See* Plan, Section 8.1(b); Confirmation Order, ¶ 32a. Upon assumption of the CED Agreements, PG&E was required to cure all defaults under such agreements in accordance with the terms of such agreements. *See* Plan, Section 8.2; *see also Elliott v. Four Seasons Props. (In re Frontier*

---

[4] A schedule identifying each of the 503(b)(9) Claims as filed is attached as Exhibit C.
[5] A schedule identifying each of the General Unsecured Claims as filed is attached as Exhibit D.

*Props., Inc.)*, 979 F.2d 1358, 1367 (9th Cir. 1992) ("[T]he cost of assumption is nothing short of complete mutuality and requires performance in full just as if bankruptcy had not intervened.") (internal quotation omitted). The CED Affiliates are entitled to be returned to the financial position they were before PG&E filed for bankruptcy and breached the CED Agreements.

V. **BASIS FOR PAYMENT**

The Debtors' bankruptcy filing constituted a default by the Utility under the PPAs and the Utility's failure to perform under the IAs post-petition constituted further defaults and breaches of the agreements. Pursuant to the Financing Agreements[6], the Utility's bankruptcy filing and the defaults under the PPAs or IAs constituted defaults under the applicable Financing Agreements. Consequentially, CED incurred the following direct damages: (i) payment of default interest under such Financing Agreements, (ii) payment of consent fees paid to noteholders in lieu of default interest and (iii) related attorneys' fees and costs.

Following the commencement of the Debtors' bankruptcy cases, CED Affiliates were required to pay interest at a default rate on project financings in the total amount of $4,805,060.00. In addition, consent fees were incurred by two CED Affiliates pursuant to agreements reached with noteholders to waive the PG&E defaults and the requirement to pay default rate interest.[7] The agreements enabled CED to reduce PG&E's exposure by mitigating the damages resulting from the defaults caused by the Debtors' bankruptcy and breaches of the CED Agreements. The consent fees, which are less than the amount that CED would have been obligated to pay absent the Consent Agreements, aggregate $6,000,000.00. Finally, CED incurred $1,039,538.00 in

---

[6] PG&E was unequivocally aware of the existence of the Financing Agreements, consented to such financings and the pledge of the PPA as security for such financings and thus the impact its defaults and bankruptcy filing would have on such financings.

[7] [redacted]

attorneys' fees and costs to directly address the defaults under the financing agreements.

The fees and interest cost incurred to resolve project financing issues were clearly foreseeable and within the contemplation of both parties at the inception of the CED Agreements and, therefore, are recoverable as direct or general damages as a result of PG&E's breaches of such agreements. In addition to the express acknowledgements by PG&E of the Financing Agreements, PG&E admitted at the outset of the case that it was aware that renewable energy projects had been financed: "The Utility's entrance into these PPAs has ***financed*** the building of thousands of Megawatts of renewable energy generation resources, and in so doing contributed to significant price reductions for renewable energy resources currently available in the market." Declaration of Fong Wan in Support of Debtors' Motion for Preliminary Injunction, dated January 31, 2019 (Adv. Proc. Case No. 19-03003 -- Dkt No. 3) at ¶ 13 (emphasis added).

Indeed, PG&E has been aware of the importance of project financing and having financeable power purchase agreements well before it filed for bankruptcy. For example, in PG&E's filing with the CPUC entitled "Renewables Portfolio Standard – 2011 Solicitation Protocol dated May 4, 2011 (Compliance Filing)", PG&E provided that any proposals for new PPAs and projects needed to have milestones for, among other things, financing for the project. (p.26). In addition, any participant needed to provide their experience and history in financing power generation facilities. (p.28). The CPUC has also acknowledged that the execution of power purchase agreements was critical to obtaining third-financing to finance projects wholesale power purchase agreements. *See* Decision Adopting the Renewable Auction Mechanism, CPUC Decision 10-12-048, Issued 12/17/2010 at p.15 ("Next, we evaluate whether the fixed price approach and/or the market based RAM proposal result in contract prices that are reasonable – *i.e.* financeable to

7

4834-8924-2338.v7
Case: 19-30088   Doc# 10613-1   Filed: 05/03/21   Entered: 05/03/21 18:01:00   Page 8 of 14

the developer and competitive for the ratepayer.").[8]

It is well-settled that a debtor cannot assume an executory contract without curing all its defaults and compensating the non-debtor party for the "actual pecuniary loss" caused by those defaults. *See* 11 U.S.C. § 365(b). As part of the assumption of the CED Agreements and cure of defaults, CED must be put back into the same position it was pre-petition, as if the bankruptcy never happened. *See Frontier Props.*, 979 F.2d at 1367; *see also Lewis Jorge Construction Management, Inc. v. Pomona Unified School Dist.*, 34 Cal. 4th 960, 967 (2004) ("The goal is to put the [non-breaching party] "in as good a position as he or she would have occupied" if the defendant had not breached the contract.").

The third-party financing fees and costs incurred as a result of PG&E's defaults are also recoverable under the CED Agreements' indemnity provisions. Each CED Agreement contains language that obligates the Utility to indemnify the applicable Affiliate from any and all obligations to third parties that arise out of the Utility's actions and/or failure to meet its obligations under the CED Agreement.[9]

CED has suffered damages for which the Utility is obligated to reimburse CED as a cure payment as part of the assumption of the CED Agreements.

---

[8] It is widely known in the energy industry that a common term in project financings is a default provision based upon the bankruptcy or insolvency of a major project contract counterparty. "Many of the projects with PG&E PPAs were financed in the project finance market. These financings are privately negotiated and not generally available for review, but contain event-of-default clauses that are triggered if the power purchaser files for bankruptcy or admits insolvency. After a default, the lenders usually can accelerate all obligations and initiate foreclosure proceedings. However, if PG&E continues to perform under the power purchase agreement, the lenders may wait to take any action because they prefer not to foreclose so long as the debt is being paid. Being in default is never a comfortable position." James M. Berger, *How PG&E financial stress is affecting projects*, Norton Rose Fulbright, December 18, 2018, https://www.projectfinance.law/publications/how-pge-financial-stress-is-affecting-projects

[9] ▉▉▉▉▉▉▉▉▉ *See also* Order No. 2003, Standardization of Generator Interconnection Agreements and Procedure, Docket No. RM02-1-000; 104 FERC ¶ 61,103, at P 640, 2003 WL 21725988 (July 24, 2003); FERC, Final Rule, Order No. 2006, Standardization of Generator Interconnection Agreements and Procedure, Docket No. RM02-12-000, Rule 2006 (May 12, 2005) and Order No. 2003-A, Standardization of Generator Interconnection Agreements and Procedure, Docket No. RM02-1-000; 106 FERC ¶ 61,220, 2003 WL 21725988 (Mar. 5, 2004).

The aggregate amount for default interest, consent fees, and attorneys' fees owed under the CED Agreements is **$11,844,598.00**.

| Default Interest[10] | $4,805,060.00 |
|---|---|
| Consent Fees | $6,000,000.00 |
| Attorneys' Fees for Project Financing Issues[11] | $1,039,538.00 |
| **Total:** | **$11,844,598.00** |

IV. <u>POST-PETITION INTEREST</u>

CED has received cure payments for amounts owed by PG&E for pre-petition electricity. However, PG&E calculated post-petition interest owed on such amounts in two different ways: (1) for the amounts claimed in CED's 503(b)(9) claims, PG&E utilized the federal judgment rate, and (2) for the balance of the amounts owed, it applied the contract rate. PG&E's method of calculating is incorrect and inconsistent with the Bankruptcy Code, the Plan, the Confirmation Order, statements made on the record during the confirmation hearing, and Judge Montali's decision on the applicable interest rate for unsecured claims.[12] Upon assumption of the CED Agreements, PG&E was required to cure all defaults under such agreements in accordance with the terms of such agreements, including applicable interest and late payment provisions. *See Elliott v. Four Seasons Props. (In re Frontier Props., Inc.)*, 979 F.2d at 1367. Once the CED Agreements were assumed, the 503(b)(9) claims became cure claims that had to be paid pursuant to the terms of the agreements as provided in PG&E's Plan. Only if the CED Agreements had been rejected could PG&E assert that the Judge Montali interest rate decision was applicable.

---

10 [redacted]

11 [redacted]

12 CED filed a reservation of rights in connection with the litigation over the applicable interest rate to assert that any decision would not be applicable to cure claims. *See* Dkt. No. 4625. Indeed, Judge Montali's decision did not address the interest rate that would be applicable to cure claims. *See* Dkt. No. 5225.

9

PG&E is required to pay all amounts due under the assumed CED Agreements in accordance with the terms of such agreements. When calculated in accordance with the terms of such agreements, PG&E owes CED an additional sum of **$173,330.53** in post-petition interest.[13]

## V. CONCLUSION

For the foregoing reasons, CED respectfully requests that the Debtors timely comply with this demand for payment in the aggregate amount of **$12,017,928.50**.

## VI. RESERVATION OF RIGHTS

CED submits this Cure Payment Claim Demand without prejudice to, and with full reservation of, its rights and the rights of its Affiliates under the CED Agreements, the Bankruptcy Code, or any applicable non-bankruptcy law. CED reserves all of its rights to further amend, clarify, modify, supplement, or otherwise revise this Demand, including all schedules or exhibits hereto, in any respect, at any time and for any purpose. CED also reserves the right to submit any disputes relating to this Demand to the Bankruptcy Court for resolution.

Dated: New York, NY
March 30, 2021

**PILLSBURY WINTHROP SHAW PITTMAN LLP**

By: *Hugh M. McDonald*
Hugh M. McDonald
Melissa S. Pettit
Kwame O. Akuffo
31 West 52nd Street
New York, NY 10019-6131
Telephone: (212) 858-1000
Facsimile: (212) 858-1500
hugh.mcdonald@pillsburylaw.com
melissa.pettit@pillsburylaw.com
kwame.akuffo@pillsburylaw.com

*Counsel for Consolidated Edison Development, Inc.*

---

[13] Attached hereto as Exhibit G is a schedule of post-petition interest calculations.

# Exhibit A

List of CED Affiliates

1. Alpaugh 50, LLC

2. Alpaugh North, LLC

3. CED Avenal Solar, LLC

4. CED White River Solar, LLC

5. Copper Mountain Solar 2, LLC

6. Copper Mountain Solar 1, LLC (10)

7. Copper Mountain Solar 1, LLC (48)

8. Coram California Development, L.P.

9. CED Corcoran Solar 2, LLC

10. CED Corcoran Solar 3, LLC

11. CED Corcoran Solar, LLC

12. CED Lost Hills Solar, LLC

13. Mesquite Solar 1, LLC

14. CED Oro Loma Solar, LLC

15. Panoche Valley Solar, LLC

16. CED White River Solar 2, LLC

# Remaining Exhibits to
# Con Ed's Amended Demand
# Redacted