1   G. LARRY ENGEL (SBN 53484)
    **ENGEL LAW, PC**
2   12116 Horseshoe Lane
    Nevada City, California  95959
3   Telephone: (415) 370-5943
    larry@engeladvice.com
4
    Attorneys for
5   Creditor (who is also the Creditor himself
    and shares the same address and data for service
6   and otherwise, is the person with authority to reconcile,
    settle, or otherwise resolve the Objection as to Creditor)
7

8                   UNITED STATES BANKRUPTCY COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10                       SAN FRANCISCO DIVISION

11  In re:                          | CASE NO. 19-30088 (DM)

12  PG&E CORPORATION                | Chapter 11
                                    | (Lead Case – Jointly Administered)
13  -and-
                                    | HEARING INFORMATION:
14  PACIFIC GAS AND ELECTRIC
    COMPANY,                        | Date:     June 15, 2021
15                                  | Time:     10:00 AM (Pacific Time)
                    Debtors.        | Place:    (Telephonic Appearances Only)
16                                  |           United State Bankruptcy Court
    Affects both Debtors            |           Courtroom 17, 16th Floor
17                                  |           San Francisco, CA. 94102

18                                  | Reply Deadline: 5/14/21

19          **"REPLY" TO (1)"REORGANIZED DEBTORS' FURTHER OBJECTION TO
            CLAIMS 80033 AND 80500" [DKT. 10574] ("OBJECTION #2"), RELATING TO
20          (2) REORGANIZED DEBTORS' FORTY-SECOND OMNIBUS OBJECTION
            TO CLAIMS (NO LIABILITY/PASS THROUGH CLAIMS) [DKT 9460]
21          ("OBJECTION #1"); AND SUPPLEMENTING (3) ENGEL'S "RESPONSE
            AND REQUEST FOR SECTION 105(D) STATUS CONFERENCE AND REQUEST
22          FOR JUDICIAL NOTICE" [DKT 9653] ("RESPONSE #1"). RELATED
                            COURT ORDER [DKT 10471]**
23

24

25

26

27

28

# TABLE OF CONTENTS

I.      PRELIMINARY STATEMENT....................................................................................1

II.     DEBTORS' OBJECTIONS FAIL THEIR OWN SECTION 502 STANDARD (AS WELL AS MY ARGUMENTS), AND DEBTORS CANNOT REWRITE, DIMINISH BY OMISSION, OR OTHERWISE MISCHARACTERIZE MY POC AND ALLEGATIONS AS TO APPLICABLE FACTS AND LAW. ...............................4

III.    DEBTORS' OBJECTIONS GENERALLY IGNORE MY CLAIMS AND ALLEGATIONS AGAINST THE PARENT, BECAUSE DEBTORS ONLY FOCUS ON THE UTILITY DEFENSES AND THE DISTINGUISHABLE *GANTNER* NEGLIGENCE..................................................................................6

IV.     DEBTORS' FOUR ARGUMENTS EACH FAIL FOR REASONS STATED HERE AND IN MY PRIOR RESPONSE #1, DECLARATIONS #1 AND 2, MY RJN, AND MY POC.................................................................................7

        A.      My Claims Are Not Defeated by California Public Utilities Code ("PUC") §1759, But They're Either Allowed By PUC §2106 (e.g., *Smith v LA*; *Varjabedian*) Or Beyond Such Preemption as Matters of Constitutional Or General Law.........................................................................7

        B.      My POC And Other Filings Include Many Sufficiently Alleged Theories Of Recovery, Including "Cognizable Damages" Debtors Argue To Be Missing.........................................................................10

        C.      My Claims Are Beyond Debtors' Causation Arguments, Especially When They Are Not Incorrectly Rewritten by Debtors As Straw Men (See Section II Above)...............................................................13

        D.      Tariff Rule 14 Provides No Immunity For My Claims. If It Did, Why Is Not PG&E Daring To Assert That Argument At the CPUC Or In the Probation Case (See, e.g., Exhibits 1-3), And Why Did Debtors Not Confront Any of My Relevant Response #1 Arguments, Such As Those Under CPUC ESRB-8 (2018 Cal.PUC LEXIS 330 (2018), As Amended? .........14

V.      CONCLUSION.................................................................................15

# TABLE OF AUTHORITIES

## <u>CASES</u>

*Albers v. County of LA*
   62 Cal. 2d 250 (1965) ............................................4, 6, 11, 12

*Bruton v Gerber Prods. Co.*
   703 Fed. APP. 468 (9th Cir. 2017) ...................................13

*Coachella Valley Water Dist. v Western Allied Properties, Inc*, 190 Cal.App.3d
   969 (1987) ...........................................................................12

*County of San Diego v Bressi*
   184 Cal.Ap.3d 112 (1986)........................................10, 11, 12

*Cundiff v GTE California, Inc*
   101 Cal. App. 4th 1395 (2002) .........................................2, 8

*Elder v Pacific Bell Telephone Co.*
   205 Cal. App. 4th 841 (2012) ...............................4, 7, 12, 14

*Ghirardo v. Antonioli*
   14 Cal. 4th 39 (1996) ........................................................13

*Hartford Cas. Ins. Co.*
   61 Cal. 4th 988 (2015) ......................................................13

*Hartwell Corp. v. Super. Ct.*
   27 Cal.4th 256 (2002) ..............................................2, 3, 8, 9

*Koponen v PG&E Co.*
   165 Cal. App. 4th 345 (2008) ............................................2, 3

*Leghorn v Wells Fargo Bank, N.A.*
   950 F.Supp. 2d 1093 (N.D. Ca. 2013) ..............................13

*Mata v PG&E Co.*
   224 Cal. App. 4th 309 (2014) ............................................2, 9

*North Star Gas Co. v. PG&E Co.*
   2016 US Dist. LEXIS 131684 (N.D. Cal. 2016)..................2

*PegaStaff v PG&E Co.*
   239 Cal. App. 4th 1303 (2015) .........................................2, 9

*San Diego Gas & Elec. Co. v. Super. Ct.*
   13 Cal.4th 893 (1996) ...........................................7, 9, 14

*Sheffet v. County of LA*
   3 Cal.App. 3d 720 (1970)..................................................12

*Smith v County of LA*
   214 Cal. App.3d 266 (1989).................................4, 7, 9, 12

*Tesoro Refining & Marketing Co. v. PG&E Co.*
   146 F. Supp 3d 1170 (N.D. Cal. 2015) ...................................................14

*Umpqua Bank v. Burke (In re Burke)*
   2019 Bankr. Lexis 3653 (BAP 9th Cir. 2019) .......................................13

*Uniwill v. City of LA*
   124 Cal. App. 4th 537 (2004) .................................................................5

*Varjabedian v. Madera*
   20 Cal. 3d 285 (1977) .......................................................................7, 15

*Vataj v. Johnson et al.*
   Case No. 19-cv-06996-HSG, Dkt Nos. 88 and 98, (N. D. Ca. 4/20/21)........6

*Wilson v Southern Cal. Edison Co.*
   234 Cal. App. 4th 123 (2015) .........................................................2, 3, 9

**STATUTES**

Business and Professions Code §17200 ........................................4, 8, 12, 13

California Code of Civil Procedure §1263 ............................................11

California Constitution Article I, §19 ............................................11, 15

California Health & Safety Code §13001 ...............................................10

California Public Resources Code §4294 ................................................10

California Public Utilities Code §1105 .............................................3, 13

California Public Utilities Code §1759 ..........................................passim

California Public Utilities Code §2106 ..........................................passim

California Public Utilities Code §451 .............................................5, 10

California Public Utilities Code §702 ..................................................10

Public Resources Code §4293 ..........................................................3, 10

Public Utilities Code §8386, et seq. .................................................5, 10

**OTHER AUTHORITIES**

California Public Utilities Commission Decision 20-05-05 ...........................14

California Public Utilities Commission General Order 95 ...........................10

California Public Utilities Commission Resolution ESRB-8 (2018 Cal.PUC
   LEXIS 330 (2018)...............................................................................passim

California Public Utilities Commission Resolution M-4852 dated April 15, 2021
(Exhibit 3) ................................................................................................ 1, 9, 14

*Order Instituting Investigation on the Commission's Own Motion on the late 2019*
*Public Safety Power Shutoff Events*
2019 Cal. PUC LEXIS 752 (2019) ........................................................... 14

*Order Instituting Rulemaking to Examine Electric Utility De-Energization of*
*Power Lines in Dangerous Conditions*
2018 Cal. PUC LEXIS 614 (2018) ........................................................... 14

**TABLE OF EXHIBITS**

**Exhibit 1**

    Judge Alsup's 4/29/21 Order Resolving Proposed Conditions of Probation Re PSPS Criteria as to Pacific Gas & Electric Company, Dkt. 1386 in USA v PG&E, Case #3:14-cr-00175-WHA-1 pending in the Northern District of California.

**Exhibit 2**

    CPUC's 4/20/21 letter amicus brief attaching "PG&E Tree Overstrike Workshop" dated 4/20/21 PSPS and EVM admissions, Dkt. 1380 and 1380-1 in USA v PG&E, Case #3:14-cr-00175-WHA-1 pending in the Northern District of California.

**Exhibit 3**

    CPUC's 4/15/21 Resolution M-4852: Placing Pacific Gas and Electric Company Into Step 1 of the "Enhanced Oversight and Enforcement Process" Adopted in Decision 20-05-053

    \*\*\*

    I recently became aware of a PG&E response to this Resolution M-4852 with a new PG&E plan for 2021 dated 5/6/21, entitled "Enhanced Oversight And Enforcement Process Corrective Action Plan Pursuant to Resolution M-4852. There is no time now for me to study and respond to this new development, but a quick scan enables me to state that I see nothing that changes my filings or position. While this new plan is written by PG&E to avoid express admissions and with the usual PG&E public relations "spin," there appear to be many implied admissions and data that support my allegations and claims and defeat Debtors' Objection #2, which I may illustrate to some extent in my Declaration #2, if I have time to do so before filing. One obvious fact to note is that this new plan is irreconcilable with PG&E's incorrect attempt to separate and isolate PSPS from fire fuel and ignition risk wrongly created by PG&E in its continuous noncompliance with applicable laws and regulations, especially those vegetation management rules addressed in my Reply. I see many useful quotes to use against Debtors at trial.

To: (A) The Honorable Dennis Montali, United State Bankruptcy Judge; (B) The Office of the United States Trustee; (C) Debtors and Reorganized Debtors; and (D) Other Parties Entitled To Notice:

**I.      Preliminary Statement.**

This "Reply" further disputes Debtors' "Objection #2" [Dkt. 10574], although my "Response #1" [Dkt. 9653], my "Declaration #1" related thereto, and my related Proof of Claims No. 80033 ("POC") (each incorporated herein), also should defeat both of Debtors' "Objections #1 and #2." See § IV, rebutting Debtors' four legal theories. There is no declaration for Debtors' Objection #2, and I expose many incorrect Debtor statements, errors and omissions about my allegations and claims in section II. **Debtors also ignore prior (and new developments) support for my claims. Those include** (and are incorporated by this request for judicial notice): **Exhibit 1** (Judge Alsup's 4/29/21 "Order Resolving Proposed Conditions of Probation Re PSPS Criteria as to …[PG&E]" Dkt. 1386 in Probation Case No. 14-00175, including his 12/29/20 Order #1369 and 1369-1 referenced therein, **Exhibit 2** (following in that case as Dkt. #1380 and 1380-1 CPUC's 4/20/21 amicus brief attaching "PG&E Tree Overstrike Workshop" dated 4/20/21, and **Exhibit 3** on relevant vegetation management noncompliance in Resolution M-4852 dated 4/15/21 (which exhibit also identifies and discusses a new 5/6/21 corrective action response). Those illustrate other Related Proceeding documents addressed in my Declaration #2, such as the Proposed Decision on PSPS 2019 noncompliance by PG&E in I.19-11-013 in my RJN.

This Reply is also supported: (1) by a further Declaration of G. Larry Engel ("**Declaration #2**"), and (2) by my related Request for Judicial Notice ("**RJN**") as to selected documents from POC "Related Proceedings" (e.g., Judge Alsup's "Probation Case" and the "CPUC Proceedings"). My such responses relate to the continuing wrongs by Debtors **first placed at such issue by Debtors** in their Objection #2.

Besides such developments disregarded by Debtors, Objection #2 ignores entirely many of my claim theories/causes of action, allegations, and authorities. My **actual** broader, distinguishable, and different claims are for continuing wrongs (that I contend are post-petition

and) that **cannot be barred by _Gantner_, even if it were correctly applied to me. By its own terms and cited cases, _Gantner_ is not applicable to my context**, even as to my distinguished negligence and §2106 claims, and certainly not as to my other claim theories not even mentioned in _Gantner v. PG&E Corp., 2021_ US Dist. LEXIS 58461 (ND Cal. 3/26/21) ("_Gantner_"). Unlike the plaintiff in _Gantner_, my claims qualify under even Judge Gilliam's own reading in _Gantner_ (at *13) of both (a) **his own decision** in _North Star Gas Co. v. PG&E Co._, 2016 US Dist. LEXIS 131684 (N.D. Cal. 2016) (explaining many relevant precedents and principles at *42 and concluding: "Together _Hartwell_, _Vila_, _Cundiff_, _Cellular Plus_, and _Nwabueze_ make clear that California law permits courts to entertain actions for both damage and injunctive relief against regulated utilities where those actions seek to enforce, rather than challenge, obligations created by CPUC regulations.") ("_Northstar_"), and (b) _PegaStaff v PG&E Co._, 239 Cal. App. 4th 1303, 1317-18, 1322 (2015) (explaining _Hartwell_, _Koponen_, _Wilson_, _Mata_, and other precedents illustrating successful §2106 causes of action not just (1) as to private damages actions for such enforcement against wrongs in excess of tolerated minimum regulatory standards, but also (2) as to claims "not subject to regulatory authority [and which therefore] were not barred by section 1759," or [like my inverse condemnation and nuisance or Parent claims] where "the nature of the relief sought or the parties against whom the suit is brought fall outside the PUC's constitutional and statutory powers …" since "there can be no interference with authority the PUC does not have" and, in any event, "meeting a minimum standard established by the PUC does not by itself insulate a utility from liability … from its failure to do more." ) ("_PegaStaff_").

Consider the parallels to such referenced cases defeating even the exaggerated §1759 defenses relevant to my POC, such as _Mata v PG&E Co._, 224 Cal. App. 4th 309, 319-20 (2014) (PG&E electrocuted the victim, because it and its tree trimmer failed to maintain adequate clearance of its lines, where the court concluded: "Nowhere in its rules or orders does the commission suggest that in making any such [trimming] determinations, the utility is relieved of its obligation to exercise reasonable care to avoid causing harm to others or relieved of responsibility for failing to do so" and awarding damages in such a suit "complements and reinforces [the regulations].") ("_Mata_"); _Wilson v Southern Cal. Edison Co._, 234 Cal. App. 4th

123 (2015) (rejecting the §1759 defense where a substation failed to comply with requirements for "effective grounding" allowing current to enter plaintiff's home) ("*Wilson*"); *Koponen v PG&E Co.*, 165 Cal. App. 4th 345, 355-56 (2008) (where PG&E leased or licensed part of its easement to telecommunications companies, the court rejected §1759, because, even though the CPUC granted PG&E's application to lease or license plaintiff's property, in which PG&E did not have that right, "the commission had no authority to determine the property dispute between plaintiffs and PG&E"). Besides my claims that are so outside PUC authority (e.g., like my inverse condemnation, nuisance, and Parent claims), my claims also "seek to enforce, rather than challenge, obligations created by CPUC regulations" by focusing on **excess or unreasonable** PSPS, like the *Hartwell* claims for toxic water in excess of the permitted regulatory threshold. *Hartwell Corp. v. Super. Ct.*, 27 Cal.4th 256 (2002).

As Exhibits 1-3 confirm, PSPS is not just an isolated weather decision, but it occurs **in a context of fire risk in a specific place, such as my Tier 3 Extreme High Risk home area** (in my §1105 and other local "Brunswick circuits" area), where there is an inseparable interaction between Debtors' wrongs increasing fire risks and PSPS harms. **Fire risk classification and management (largely beyond CPUC §1759 jurisdiction) is about fuel (e.g., vegetation), ignition sources (e.g., PG&E gear and vegetation noncompliance at least as often as lightning), and weather, which *Gantner* itself notes by acknowledging that Debtors' noncompliance with the Wildfire Mitigation Plan would have made a difference for judging noncompliance with PSPS guidelines**. For example, while the Objection #2 and *Gantner* address a negligence-only all-in class action that did "not allege any violations by Debtors of those [PSPS] guidelines or the [Wildfire Safety] plan, I did and again so allege. However, in his Exhibit 1 order (at p.7, line 1-18) Judge Alsup notes that **only 12% (including my area) are exposed to his view of certain kinds of excessive PSPS**, because of PG&E's continuous noncompliance with Public Resources Code §4293 and other laws. See, e.g., *Varjabedian, infra*, (allowing nuisance and inverse condemnation claims on the portion of the district customers most impacted by the sewer plant stink). What Exhibits 1-3 confirm are my allegations that, because my area is among the most abused by Debtors' continuing wrongs (to quote Judge Alsup Ex.1 at

p.2, l.25-26: "the root cause is that over many years PG&E robbed its tree clearance budget"), my area will continue to be abused by excessive PSPS, and that PSPS could increase by somewhere between 55% (Judge Alsup Ex.1 at p.7, l.1-18) or twice (Exhibit 2 PG&E admissions). Judge Alsup recommended (p.1, l.17-21) that PG&E should consider "the extent to which trees and limbs bordering specific circuits [that] remain in violation of California law and/or its own wildfire mitigation plan" and the CPUC is still evaluating solutions. See Id. at pp.8-9.

Debtors' Objections ignore entirely various express parts of my POC, my Response #1, and my Declaration #1. Objection #2 improperly "reinterprets" my approach and prematurely demands more evidence, specifics, and allegations from me, without any discussion of my claim support in key CPUC and Judge Alsup developments, and little or no response to my correct authorities previously cited in my prior filings or of other related key cases cited here, such as *Smith v County of LA*, 214 Cal. App.3d 266 (1989) (**successful nuisance and inverse condemnation claims** relating to government road construction in slide area creating dangerous conditions causing landslides, **despite the taker's asserted defense of exercising police powers under emergency conditions**) ("*Smith v. LA*"); *Albers v. County of LA*, 62 Cal. 2d 250 (1965) (homeowners threatened by an inverse condemnation landslide were entitled to recover their mitigation costs, **such as inserting "shearpin caisson" braces to reduce or delay the coming landslide**) ("*Albers*"); and *Elder v Pacific Bell Telephone Co.*, 205 Cal. App. 4th 841 (2012) (where the public utility was accused of unlawful "cramming" of unauthorized charges on phone bills, the Court explained **why the claims must be allowed by PUC §2106, despite §1759 and other regulatory defenses, including as to claims for restitution of unjust enrichment under B&PC §17200**) ("*Elder.*").

**II.    Debtors' Objections Fail Their Own Section 502 Standard (As Well As My Arguments), And Debtors Cannot Rewrite, Diminish By Omission, Or Otherwise Mischaracterize My POC And Allegations As To Applicable Facts And Law.**

Both Debtor Objections fail to satisfy even their own disputed section 502/*In re Holm* standard (Objection #2 at p.4, lines 14-23), failing to raise "facts tending to defeat the claims by probative force equal to that of the allegations of the proofs of claims themselves." There is no Debtor Declaration for their flawed, incorrect, and insufficient Objection #2, and Debtors have

established no such material facts, just their disputed arguments mischaracterizing my positions as the same as those *Gantner* plaintiffs. E.g., *Uniwill v. City of LA*, 124 Cal. App. 4th 537, 543 (2004) ("*Uniwill*") (a relevant inverse condemnation case where the utility and the government had joint liability, demonstrating that: "It is the allegations of the complaint, not the defendants' interpretation of them, that must control").

There are more than a dozen instances in Objection #2 where Debtors incorrectly complained of the insufficiency of my allegations or proof (e.g., too general, too conclusory, too *Gantner*, or lacking) or incorrectly attempted to rewrite them by self-serving "translations" etc. Consider one example in their disputed opening paragraph at lines 8-13: "Nor do they [I] allege that PG&E violated the …CPUC … regulations that govern PSPS events and authorize de-energizations. Instead, Claimants …" As the court may recall, my prior filings are replete both with such allegations about noncompliance with applicable laws and regulations and with illustrations from Related Proceedings, as well as my specific rebuttal of Debtors' regulatory defenses in my Response #1 at I.B and my Declaration #1. For example, I discussed many allegations of "excess" or "unreasonable" PSPS as a violation of CPUC ESRB-8, now further explained in Exhibits 1 and 3, the recent CPUC support, such as my RJN excerpts from CPUC PSPS Investigation 19-11-013 (at 223), where the CPUC said, "**we find PG&E and SCE failed to reasonably comply with the utility obligation to promote safety in PUB. Util. Code §451.**" (emphasis added).  Unlike Debtors, who incorrectly try to segregate PSPS from related fire risks caused by faulty equipment, run until it breaks practices, and such vegetation management violations, those are all inextricably and legally connected together.[1] PUC §8386, et seq. connect together PSPS, EVM, and other alleged claim concerns in PG&E annual Wildfire Mitigation Plans and related actions.  See CPUC Wildfires webpage (www.cpuc.ca.gov/wildfires).

---

[1]   The facts (established in Exhibits 1-3, RJN, and elsewhere) are that Tier 3 Extreme Fire Risk areas (like mine on a "Brunswick" circuit in Nevada City) are not just about the weather, but also about the massive amounts of tall trees and other vegetation too close to uninsulated PG&E wires and aging gear that cause/ignite fires in violation of the Vegetation Legal Requirements and other safety standards. The fire threat is about both fuel and a trigger ignition, mostly human caused, like by PG&E. As my POC and other cited Related Proceedings chronicle and predict, PG&E's dangerous system is among the major and most persistent triggers. While PSPS temporarily reduces that illegal danger caused by Debtors (per the CPUC and Judge Alsup "as a last resort"), any excess violates PG&E's public trust obligation per PUC Section 451, etc.

Obviously, there must be some legal limit on PG&E declaring excessive PSPS or, in effect, abandoning service in my high-risk area, as Exhibit 2 shows Debtors may wish to do, given the cost-benefit economic disparity that they have wrongfully created over decades, as Judge Alsup has noted and my Exhibits illustrate. Coercing people like me with our suffering actual and threatened excessive PSPS into buying self-defense generators (as PG&E and others advocate that customers do) unjustly enriches PG&E as it mitigates the lesser PSPS evil harms that it creates as Debtors struggle to mitigate the greater fire risk evils created by PG&E.

Debtors incorrectly allege in their third opening Objection paragraph (at lines 21-22) that I "do not allege that they [I] suffered hardships and costs as a result of their [my] power being shut off." My Declarations, RJN, and POC also rebut that (e.g., my need for home office electricity and home fire safety access for fire communications), especially during the Covid problems. **Like the homeowner allowed to install braces to combat the coming landslide in *Albers*, my self-defense generator is recoverable mitigation of what correctly predicted PSPS harms, with worse coming pursuant to Exhibits 1-3**. Also, these are **continuing** wrongs by Debtors that Judge Alsup and others predict people like me to suffer for at least a decade (Exhibit 1, p.3, lines 2-3). Thus, I must forecast forward until the distant day when PG&E ceases to be in continuous violation of applicable laws, and when PSPS ceases to be excess or unreasonable in my area.

### III. Debtors' Objections Generally Ignore My Claims And Allegations Against the Parent, Because Debtors Only Focus On the Utility Defenses And the Distinguishable *Gantner* Negligence.

My POC addresses many claims against PG&E Corp, including by incorporating many allegations and evidence already cited by other plaintiffs, and Debtors have ignored them in their Objections. In addition, Judge Gilliam's recently approved a $10 Million settlement of a PSPS securities class action against the "Parent," as to which I request judicial notice of plaintiff's complaint and related allegations explaining such wrongs and justifying that result. See "Order Granting Motion For Preliminary Approval" in *Vataj v. Johnson et al.*, Case No. 19-cv-06996-HSG, Dkt Nos. 88 and 98, (N. D. Ca. 4/20/21). I understand that such settlements are not admissions, but I believe the alleged bases of such claims and allegations are correct (along with PG&E's many actual admissions and other compelling evidence and developments in Judge

Alsup's probation case and other Related Proceedings, as well as the Plan's Fire Victim Trustee Trotter's claims against relevant directors and officers). E.g., *Uniwill* at 544: "A private utility … may be liable in inverse condemnation when it jointly participates in depriving a person of property rights." While PG&E and others may try to argue that my such PSPS claims raise policy issues with respect to customers and rates, in fact, my position is that the beneficiary of these PG&E wrongs, as well as my self-defense generation mitigation, are the unjustly enriched Parent and its shareholders. Nothing in §1759 protects the Parent.

IV. **Debtors' Four Arguments Each Fail For Reasons Stated Here And In My Prior Response #1, Declarations #1 and 2, My RJN, And My POC.**

A. **My Claims Are Not Defeated by California Public Utilities Code ("PUC") §1759, But They're Either Allowed By PUC §2106 (e.g., *Smith v LA*; *Varjabedian*) Or Beyond Such Preemption as Matters of Constitutional Or General Law.**

Section I of my incorporated prior Response #1 is primarily devoted to rebutting such erroneous and exaggerated Debtor §1759 and *Gantner* arguments, including by my approach to CPUC ESRB-8 and other CPUC related cites. Debtors never even address those or my Exhibits 1 or 2, relying instead on their disputed interpretations of *Gantner* and general "*Covalt*" principle discussions. However, as explained in the many cites that I offered at the outset of this Reply, I am asserting broader, distinguishable, and different negligence and §2106 claims, as well as various other causes of action entirely ignored by Debtors and not addressed in *Gantner* and in some cases not even in *Covalt*, i.e, *San Diego Gas & Elec. Co. v. Super. Ct.*, 13 Cal.4th 893 (1996). See, e.g., *Varjabedian* (the California Supreme Court allowance of inverse condemnation and nuisance claims for sewer plant stink) discussed at the end of this Reply. Consider, for example, applying *Elder* and similar validating cases cited therein or following that case, both as to my excessive or unreasonable PSPS theories and as to related continuing violations of Vegetation Legal Requirements that interact with PSPS. E.g., *Elder v Pacific Bell Telephone Co.*, 205 Cal. App.4th 841 (2012) (where the public utility was accused of unlawful "cramming" of unauthorized charges on phone bills, the Court allowed such PUC §2106 and some other claims, despite §1759 and other regulatory defenses, including as to claims like mine for restitution for unjust enrichment under B&PC §17200 [Citing *Cundiff v GTE California, Inc*, 101 Cal. App. 4th

1    1395, 1405 (2002)], explaining:

2        Section 2106 and section 1759 address different things. Section 1759 defines and
         limits the power of [the] courts to pass judgment on, or interfere with, what the
3        commission does. Section 2106, on the other hand, confirms the power of the
         courts to pass judgment on what utilities do. Section 2106 'explicitly authorizes
4        California courts to hear claims against public utilities for damages.' [citation] …
         at 848.
5
         * * *
6        [T]he PUC has not effectively occupied the field such that all such superior court
         actions are subject to PUC's exclusive jurisdiction … [T]he PUC has not
7        approved 'a general policy of limiting the liability' of …[phone utilities] for
         cramming. … Nor has the PUC stated that compliance with its rules provides 'a
8        safe harbor' against liability for …[those] cramming. [citing *Hartwell*] … [B]ut
         these [CPUC] remedies are essentially prospective in nature. They are designed to
9        stop **utilities** from engaging in current and ongoing violations and do not redress
         injuries for past wrongs. [citation] … Because the PUC cannot provide for such
10       relief for past violations [superior court] damage actions would not interfere with
         the PUC in implementing its supervisory and regulatory policies to prevent future
11       harm. [citing *Hartwell*]

12       …[T]his lawsuit would be in aid of, rather than in derogation of, the PUC's
         jurisdiction. [citing *Hartwell*] at 853-54.
13

14       That same result for my prevailing §2106 and other claims is even more appropriate.

15   CPUC (and everyone else) benefits from minimizing the negative consequences of excessive or

16   unreasonable PSPS, which is made worse, more extreme, and more pervasive (and thereby

17   coercive) on account of PG&E's continuing noncompliance with ESRB-8, Vegetation Legal

18   Requirements, and other laws. See Exhibits 1-3, my RJN, and Declaration #2. Indeed, both

19   PG&E and CPUC policy encourage my type of self-defense generation in mitigation that

20   enhances PG&E's dangerous system a)nd PG&E's own flawed PSPS mitigation of Debtors'

21   chronic and continuing wrongs. Id. PG&E itself is engaged in its own token local generation pilot

22   projects in some fire risk areas for public relations to reduce PSPS blowback (Id.), but meanwhile

23   our coerced self-defense generation continues to unjustly enrich PG&E's shareholders by making

24   some of us pay for and do what PG&E itself should pay for and do in order to mitigate such

25   Debtor wrongs.

26       While these principles should save my negligence and §2106 POC claims from Debtors'

27   attack, my ignored other claims, such as my inverse condemnation, nuisance and §17200 claims

28   (discussed below), are never at risk from §1759, especially when they arise from the California

-8-

and US Constitutions and trump any such attempted §1759 excuse. See, e.g., *Hartwell*, *PegaStaff*, *Wilson*, and *Mata*. To put that in *Covalt* test wording, even its first two or three tests (i.e., CPUC authority and exercise of that authority) are not satisfied for such other latter claims. CPUC has no authority as to inverse condemnation or nuisance **without compensation**, and CPUC has not tried to assert such authority (which would require condemnation and damage payments). No one says that CPUC cannot authorize PSPS, but the issue is: who pays for that mitigation of Debtors' such continuing wrongs that require **excess** or unreasonable PSPS for safety from the dangerous system that Debtors wrongfully created and continue to mismanage: me or the shareholders of the wrongdoers? See, e.g., *Smith v County of LA*, 214 Cal. App.3d 266 (1989) (successful nuisance and inverse condemnation claims relating to government road construction in slide area creating dangerous conditions causing landslides, **despite the taker's asserted defense of exercising police powers under emergency conditions**). See also **Exhibit 3: CPUC Resolution M-4852 dated 4/15/21 placing PG&E into Step 1 punishment of the Enhanced Oversight and Enforcement Process of Decision 20-05-053, because PG&E has wrongfully failed to prioritize Enhanced Vegetation Management (EVM) based on risk; i.e., "less than 5%" of PG&E's 2020 EVM work was on the 20 highest risk power lines, including the Brunswick circuits near me**; and (2) Judge Alsup's Exhibit 1 consideration of more probation conditions on account of disappointing related PSPS and vegetation conduct, to which the CPUC's Exhibit 2 and its amicus brief letter dated 4/20/21 [Dkt. 1380] address standards for "de-energizing power lines" on account of trees and vegetation that were not cleared by PG&E in accordance with Vegetation Legal Requirements and [in 1380-1] include PG&E's 4/20/21 controversial solution proposing hugely to increase PSPS in certain areas like mine, because of the vast number of tall trees that could fall on the lines because of Debtors' wrongs. Knowingly contrary to applicable law and for shareholder profit or illusory value (see above Judge Alsup's Exhibit 1 conclusion as to "robbing" safety budgets as the "root cause" of Debtors' harms), PG&E has willfully allowed large illegal trees and other fuel to cumulate under and adjacent to its uninsulated and neglected wires and gear. **By analogy, if fire risk were assessed for a welding facility, the fire risk of using the torch flame around metal is less than if, in violation of applicable law, the torch**

**bearer has filled the workspace with scores of open containers of flammable liquids**. For example, when the Debtors adopted a wrongful operational strategy and practice of "run it until it breaks" (or aka "run to failure"), the aggregate mass of violations now requires more than a decade to come into compliance with, among other regulations and laws addressed in my POC, Public Utilities Code ("PUC") §§ 2106, 451, 702, 8386, et seq., Public Resources Code §§ 4293, 4294, Health & Safety Code §13001, and General Order 95, as well as Judge Alsup's condition of probation and CPUC updated requirements discussed herein and in my Exhibits, Declarations, and RJN (collectively called the "**Vegetation Legal Requirements**").

      **B.**      **My POC And Other Filings Include Many Sufficiently Alleged Theories Of Recovery, Including "Cognizable Damages" Debtors Argue To Be Missing.**

As a further incorrect effort to squeeze me into their *Gantner* model, further rebutted in my Declaration #2 and RJN, Debtors are flat wrong in their Objection #2 (at III.B and C.) arguments, such as that: (a) I "do not allege that they [I] suffered hardships and cost as a result of power being shut off," that I "do not even claim damages arising out of PG&E events, like loss of habitability," and that I do not have any "cognizable damages," (b) I "chose to buy generators … in case of interruptions from any cause" [i.e., not on account of PSPS] from which Debtors somehow incorrectly speculate that I did not suffer any hardships at all after such purchase, (c) I "do not articulate any damages they [I] incurred" from PSPS, (d) I do not so much as identify any PSPS events to which [I] was subject, or identify when [my] generator was installed" [my purchase documents were attached to my POC and my Declaration #1 and service began 9/20/19], and (e) "They [the generator purchase] were voluntary steps taken … to avoid [my] power being interrupted for any reason." No sufficient basis or authority is cited by Debtors for why these such disputed and unsubstantiated allegations justify dismissal of my POC, and my initial filings were sufficient and contradict the foregoing. See my Declaration #2 and RJN. Because these are chronic and continuing wrongs that must be forecast for more than another decade (see *Bressi* below), my POC and claims reasonably allege more possible threats ahead of me. For example, I acquired the generator specifically for self-defense mitigation against correctly predicted, excessive PG&E PSPS and related fire threats. See, e.g., Exhibits 1-3. While

-10-

normal PG&E outages had been tolerable, the excessive and unreasonable PSPS threatened by PG&E for more than another decade would be intolerable. That made my generator necessary both for functionality (e.g., my home office work) and for safety responses (e.g., communications) against local fire risks materially and wrongly increased by Debtors. The generator is also a practical kind of safety insurance against fire risks, especially because PSPS interruption of communications can be lethal, especially here where the only road off my Banner Mountain requires a lethal "Paradise fire decision": go left or right?

Damages for inverse condemnation and certain other claims, for example, do not require much elaboration as to how Debtors have diminished the value of my home and added extra costs (e.g., higher insurance, if any remains available, as many are forced into the State's hugely expensive, last resort program). Clearly, CPUC regulation cannot deprive me of my paramount constitutional rights for such an inverse taking or by allowing a nuisance which results in or threatens violations of the section 451 obligations in such a taking. Thus, I am so acting prudently to mitigate my excessive PSPS exposure in such a reasonable way. E.g., *Albers v County of LA*, 62 Cal.2d 250 (1965) (explaining with extensive cites and policy discussions the constitutional right of inverse condemnation victims to recover their reasonable expenses in mitigating their losses, in that case, for example, the expenses of evaluating the landslide and the best way to stop or moderate its impacts, and then constructing 25 shearpin caissons to hold back or delay a progressing landslide.) Moreover, as the court explained in *County of San Diego v Bressi*, 184 Cal.Ap.3d 112 (1986) (CA Constitution art. I, §19/CCP §1263.310 condemnation of aviation easement at end of runway, where the county was denied the right to understate the future burden to its expectation of limited use to small local planes, instead allowing maximum possible future harms, since its taking resolution allowed much worse burdens, even beyond jumbo jets to space vehicles), **in order to deal with future problems from such continuing wrongs, the courts must consider the most injurious use of the property reasonably possible in calculating the liability; i.e., the worst case**. That worst case is what PG&E proposes in Exhibit 2 [Dkt.1380-1] and other things that I have put into the record; i.e., "The jury must… 'once and for all fix the damages, present and prospective, that will accrue reasonably from the construction of the

improvement and in this connection [the jury] must consider the most injurious use of the property reasonably possible. [useful cite omitted] … [And in doing so] the jury must consider the entire range of uses permitted under the resolution of necessity." Id. at 123.

While each of my POC claims has a different theory of recovery, they all include various things that, in some sense of the word, may be considered "damages," such as restitution for unjust enrichment by my generator enhancing PG&E's dangerous system (in effect, doing what PG&E should do itself) and as a recovery for mitigation of my damages. See also above, *Elder*, 205 Cal. App.4th at 857 (rejecting a demurrer attack and allowing plaintiff to proceed with a claim for "unjust enrichment in the nature of restitution" in a §17200 case); *Albers.*, where homeowners were compensated for building mitigation buttresses to protect their property from a threatening landslide. See *Smith v LA*, 214 Cal. App.3d at 288 ("Damages recoverable in a successive nuisance action for injuries to real property [inverse condemnation in that case] include not only diminution in market value but also damages for annoyance, inconvenience, and discomfort…" citing cases and relevant discussion). That is especially true where calculating damages (or, as here, unjust enrichment/restitution) as illustrated in the condemnation value calculation lesson in *Coachella Valley Water Dist. v Western Allied Properties, Inc*, 190 Cal.App.3d 969, 975-76 (1987) (jury and experts allowed to consider alternative to actual flood control designed by condemning district).

The "*Sheffet*" decision (at 741-42) further explains my concept of mitigation of damages in this inverse condemnation context (and distinguishes nuisance claims at 739). *Sheffet v. County of LA*, 3 Cal.App.3d 720 (1970) (county liable for inverse condemnation and negligence as distinguished in wrongful drainage/diversion case). Just as PG&E suggests that its victims should buy their own generators to protect themselves from the consequences of Debtors' wrongs and PSPS mitigation (and, as I argue, thereby unjustly enrich the Debtors, entitling me to restitution and damages), the county in *Sheffet* argued unsuccessfully that the downhill victim whose property the county was flooding should have (at its own expense) constructed a gate and drain to funnel away the water to a ditch. But the courts ruled (Id.): "Certainly, whatever plaintiff [the victim] must erect on his property, he is entitled to both the cost of such erection and the damage

caused by the burden requiring such protective structures [citing authorities for such recovery in mitigation of such harms and policy and practical reasons for that result]. * * * [But] the obligation to prevent future damage from the county's maintenance of its negligently constructed street was that of the county [cites omitted but useful]."

While restitution/unjust enrichment is a remedy under B&PC §17200, it can also be alleged on its own in the alternative, each of which is applicable here. E.g., *Leghorn v Wells Fargo Bank, N.A.*, 950 F.Supp. 2d 1093 (N.D. Ca. 2013). As the 9th Circuit has recognized with reference to California Supreme Court (e.g., *Ghirardo* and *Hartford Casualty Insurance Co.*) and other authorities, unjust enrichment is a stand-alone cause of action independent of contract or quasi-contract. *Bruton v Gerber Prods. Co.*, 703 Fed. APP. 468, 470 (9th Cir. 2017). See, e.g., *Hartford Cas. Ins. Co.*, 61 Cal.4th 988, 989 (2015); *Ghirardo v. Antonioli*, 14 Cal.4th 39, 51 (1996) (addressing the Restatement for unjust enrichment, noting that the "benefit" "denotes any form of advantage," "not only when one adds to the property of another, but also when one saves the other from expense or loss," as with my generator). While unpublished, *Umpqua Bank v. Burke (In re Burke)*, 2019 Bankr. Lexis 3653 (BAP 9th Cir. 2019) (post-Chapter 7 discharge insufficient lien payoff mistake created a debtor windfall and a potential administrative claim for unjust enrichment) also supports my recovery of unjust enrichment and restitution arguments.

### C. My Claims Are Beyond Debtors' Causation Arguments, Especially When They Are Not Incorrectly Rewritten by Debtors As Straw Men (See Section II Above)

Debtors incorrectly "reinterpret" my POC claims for their disputed *Gantner* negligence model. I dispute that my "Claims rest in PG&E's alleged failure to maintain its equipment and not in PG&E's implementation of the PSPS events" and that "there are no specific [i.e., not "conclusor[y]"] allegations that could give rise to a cognizable claim." Objection #2 at 13 of 15 lines 9-12 and 20-21. (Since Debtors insist that I prematurely identify the "specific circuits encompassing Claimants' homes were selected because of the conditions of the equipment." [Id at lines 22-23]. I have done so, although they had my home address above, and know it is near §1105 and other "Brunswick circuits"). This is like the **Fukushima** nuclear power plant problem in Japan, where the wrongdoing operator chooses to release the radioactive wastewater into the

adjacent ocean, because the alternative of causing an even greater flood on the land again would cause greater harm. But that operator cannot claim that it should be immune on account of the lesser evil mitigating the greater wrongs that it caused. Likewise, neither can Debtors.

**D.    Tariff Rule 14 Provides No Immunity For My Claims. If It Did, Why Is Not PG&E Daring To Assert That Argument At the CPUC Or In the Probation Case (See, e.g., Exhibits 1-3), And Why Did Debtors Not Confront Any of My Relevant Response #1 Arguments, Such As Those Under CPUC ESRB-8 (2018 Cal.PUC LEXIS 330 (2018), As Amended?**

**My Response #1 already disposed of these weak arguments with substantial authority, as well as noting that the burden of proof on such a regulatory defense is on Debtors. E.g., *Tesoro Refining & Marketing Co. v. PG&E Co.*, 146 F. Supp 3d 1170 (N.D. Cal. 2015) (Rule 14 does not protect the utility from its own negligence); *Covalt* (the burden is on the party asserting preemption). As the *Elder* Court stated (at 850): "The PUC further concluded: '...we reaffirm the principle that tariffs, and any limitation of liability provisions included in tariffs, are not designed to immunize carriers from liability for willful or fraudulent misconduct and violations of law."** That allows my POC claims, as to which the Debtors' misconduct is repeatedly alleged to be willful and in knowing violation of law, including Vegetation Legal Requirements and noncompliance with ESRB-8 and other PSPS requirements, such as described in Exhibits 1-3 and RJN. E.g., *Order Instituting Rulemaking to Examine Electric Utility De-Energization of Power Lines in Dangerous Conditions*, 2018 Cal. PUC LEXIS 614 (2018); *Order Instituting Investigation on the Commission's Own Motion on the late 2019 Public Safety Power Shutoff Events*, 2019 Cal. PUC LEXIS 752 (2019).

Debtors do not either cite any persuasive authority for or attempt to explain the obvious inconsistency between how Debtors read general Tariff 14 and the more PSPS specific ESRB-8. PUC §2106 and MY other PSPS authorities are consistent with what's being debated in the relevant ongoing CPUC Proceedings, including the follow up on **Exhibit 3 (**CPUC Resolution M-4852 dated April 15, 2021, and authorities cited therein) placing PG&E into Step 1 of the "Enhanced Oversight And Enforcement Process" adopted in CPUC Decision 20-05-053 as part of its approval of Debtors' Chapter 11 Plan of Reorganization, because, despite PG&E ranking its power line circuits by wildfire risk in its 2020 Enhanced Vegetation Management ("EVM"), its

-14-

work in 2020 did not correspond to "making risk-driven investments;" i.e., less than 5% of that EVM work was on the highest risk power pole lines ranked by PG&E itself (one of which neglected circuits was a Brunswick circuit in Nevada City near me).

The title of Rule 14 (D. 02-12-045 effective 1/1/2003, long before ESRB-8 superseded it as to PSPS) is "Shortage of Supply And Interruption of Delivery." That is just a limited, standard terms force majeure protection for PG&E, and that is the limited context for Debtors' inapplicable and exaggerated **partial** quotes. As the second sentence states: "PG&E will not be liable [for such force majeure events] …**except that arising from its failure to exercise reasonable diligence**" [as I allege is the case here] (emphasis added). Moreover, CPUC cannot deprive me of my paramount constitutional rights for such a taking or by allowing a nuisance, which results or threatened violations of section 451. E.g., *Varjabedian v. Madera*, 20 Cal.3d 285, 296 (1977) and authorities cited therein ("*Varjabedian*") (both (i) applying CA Constitution art. I, §14 [now 19] in the context of noxious odors from the city sewer treatment plant, holding that physical damage to property is not necessary for compensation for such an inverse taking, and (ii) affirming nuisance damages for "loss of value to real property" and "damages for personal discomfort," stating: "…[W]e note that physical damage to property is not invariably a prerequisite to compensation [for inverse compensation liability] [citing two prior CA Supreme Court cases, *Breidert* and *Bourgerie*]").

V.     **Conclusion.**

For the foregoing reasons, I respectfully request that the court deny any relief to Debtors and allow my POC Claims, subject to proof as to the amounts.

Dated:  May 11, 2021

ENGEL LAW, PC


*/s/ G. Larry Engel*
G. LARRY ENGEL
Attorney for Creditor

# EXHIBIT 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

        Plaintiff,

    v.

PACIFIC GAS AND ELECTRIC
COMPANY,

        Defendant.

No. CR 14-0175 WHA

**ORDER RESOLVING PROPOSED
CONDITIONS OF PROBATION
RE PSPS CRITERIA**

---

In this criminal probation of California's largest utility, this filing recommends that in deciding which power circuits to leave on and which to turn off during windstorms in the wildfire season, the convicted utility should take into account, among other factors it already considers, the extent to which trees and limbs bordering specific circuits remain in violation of California law and/or its own wildfire mitigation plan. For the reasons stated below, however, the Court will not impose the proposed conditions of probation numbers 11 and 12 and will leave to the utility the decision on the extent to which it will adopt the recommendation.

           \*               \*               \*

In our most recent wildfire season, a windstorm blew a tall gray pine onto a PG&E distribution line in Shasta County, pushing the power conductors together, thereby unleashing a bolt of electricity, and thus igniting what became known as the Zogg Fire. A mother and her daughter burned to death in their car, trying to escape the wildfire. Another woman died alone,

also trying to escape, and a man succumbed to burns he suffered while defending his home from the blaze.

Two years earlier, PG&E, through its contractor, had marked the gray pine as a hazard and slated it for removal. Standing more than 100 feet tall, the gray pine leaned at more than twenty degrees from vertical, looming downhill over PG&E's Girvan Circuit, the distribution line in question. It remained obvious that if it fell in the direction of the lean, it would fall on the power line. Gray pines, it was further known, have shallow root systems and topple more easily than trees with tap roots. And, this particular tree, although it had a healthy canopy, had a severe, tall scar at its base. The contractor was correct to mark the tree for removal. PG&E, however, did not remove it. Two years went by. In a windstorm in September 2020, as stated, the gray pine blew onto the circuit, ignited the Zogg Fire, and four people died. Two hundred four structures were lost.

To prevent such wildfires, Section 4293 of the California Public Resources Code has long required utilities to remove such trees and to keep clearance around its lines. When power lines are pushed together by the trees or limbs, the resulting bolt of electricity sends molten metal to the dry grass below. Especially during a windstorm but at any time in our dry season, this will very likely result in a wildfire. We have seen this exact scenario dozens of times in PG&E's territory.

The Zogg Fire was the most recent in a long line of disastrous wildfires started by PG&E's violations of Section 4293, all as laid out in the Order to Show Cause Re Conditions of Probation dated December 29, 2020, the order initiating this chapter in our probation proceedings, all arising out of PG&E's felony convictions due to the San Bruno gas explosion. Some of the Wine Country Fires in 2017 and the Camp Fire in 2018 became tragic examples. In those, 107 victims were burned to death and 22,060 structures were destroyed.

Also, as laid out in the December 29 order, the root cause is that over many years PG&E robbed its tree clearance budget — why is not now pertinent but it's obvious it was to enhance the bottom line. As a result, we now find ourselves with a power grid overgrown with hazard trees ready to strike onto PG&E's lines during windstorms, spelling wildfire disaster in our dry

season.  During this federal criminal probation, PG&E has begun to set this right by investing larger sums in "vegetation management."  But it will take close to a decade for PG&E to clear the backlog and to reach compliance.  Meanwhile, as a last resort and interim stop-gap, the Court recommended in the wake of the Camp Fire, and PG&E has since adopted, a protocol to de-energize selected circuits during severe windstorms.  In this way, when trees and limbs crash onto the de-energized lines, there will be no power to spark a wildfire.  This protocol became PG&E's Public Safety Power Shutoff program or PSPS.

PG&E rolled out its PSPS program during the 2019 wildfire season during which PG&E conducted eight PSPS events.  *Significantly, that year saw no wildfires caused by PG&E distribution lines, a vast improvement over both 2017 and 2018*.  We know for sure that the PSPS events saved us from many wildfires because of the hundreds of trees that were blown down onto the (thankfully) de-energized lines.  But, due to criticism in 2019 over the inconvenience and hardship of PSPS events, PG&E revised its criteria in the 2020 wildfire season in order "to be more targeted."  This led to fewer PSPS events, six to be exact, but it also led to the Zogg Fire.

In the days leading up to the windstorm, PG&E went through its PSPS decision-making process to determine which distribution lines, *i.e.*, circuits, in Shasta County (and elsewhere) to de-energize.  Significantly, in making those circuit-by-circuit decisions, we now know PG&E did *not* consider in any way the extent to which any particular circuit remained threatened (or not) by hazard trees and limbs, the number one cause of fires ignited by PG&E distribution lines.  For example, it did not consider its own wildfire risk assessment priority ranking for any circuit.  And, it did not consider in any way the gray pine looming at a steep angle over the Girvan Circuit.  So, PG&E left it on — with fatal consequences.

These details emerged from inquiries made by the Court in the wake of the Zogg Fire, whereupon an order on December 29 ordered PG&E to show cause why its PSPS criteria should not be adjusted to take into account the extent to which hazard trees remained along various rights of way in the high-risk fire zones.  Specifically, that order proposed the following new condition of probation and asked all parties to respond (Dkt. No. 1277 at 16):

Proposed Condition 11:  In determining which distribution lines in Tier 2 or Tier 3 to de-energize during a PSPS, PG&E must take into account all information in its possession and in the possession of its contractors and subcontractors concerning the extent to which trees and/or limbs bordering those lines remain in violation of Public Resources Code Section 4293, GO 95, FERC FAC-003-4, and/or its own wildfire mitigation plan.

Proposed Condition 12:  To the extent that such information shows that such trees and limbs present a safety hazard in the event of a windstorm, PG&E must make a specific determination with respect to that distribution line and it must de-energize it unless PG&E finds in writing that there are specific reasons to believe that no safety issue exists.

Tiers 2 and 3 are the highest wildfire risk areas, typically in foothill counties covered with chaparral.  PG&E purportedly accepted these new conditions but on the condition that it would, in effect, get full credit for considering *all* information yet it would only have to consider a *sliver* of the information available to it, as indicated by the bolded additions (Dkt. No. 1279 at 4, 6):

Proposed Condition 11:  In determining which distribution lines in Tier 2 or Tier 3 to de-energize during a PSPS, PG&E must take into account all information in its possession and in the possession of its contractors and subcontractors concerning the extent to which trees and/or limbs bordering those lines remain in violation of Public Resources Code Section 4293, GO 95, FERC FAC-003-4, and/or its own wildfire mitigation plan.  **In determining which distribution lines to de-energize during a PSPS event, PG&E will implement this condition by July 1, 2021, by considering the existence of all outstanding vegetation management work tagged "Priority 1" or "Priority 2" within PG&E's service territory that is subject to potential de-energizations.**

Proposed Condition 12:  To the extent that such information shows that such trees and limbs present a safety hazard in the event of a windstorm, PG&E must make a specific determination with respect to that distribution line and it must de-energize it unless PG&E finds in writing that there are specific reasons to believe that no safety issue exists.  **PG&E will implement this condition by July 1, 2021, by developing a methodology to de-energize line segments in areas subject to potential de-energizations that have outstanding Priority 1 or Priority 2 vegetation management work when forecast conditions are above specified fire-risk thresholds, absent a documented determination that de-energization is not warranted.**

4

While these counter-proposals seemed to step in the right direction, they would *not*, as we eventually learned, have prevented the Zogg Fire. They would not have required de-energization of the Girvan Circuit because the gray pine in question was not a Priority 1 or Priority 2 work order under PG&E's system. Nor was any other tree along the Girvan Circuit. So, PG&E's counter-proposal would have made no difference. Those four victims would have been burned to death anyway.

Trying to find a compromise, the Court offered on February 4 to accept PG&E's counter-proposal, provided that PG&E would further consider the density of trees tall enough to fall on each circuit (Dkt. No. 1294) (additions in bold):

> Proposed Condition 11: In determining which distribution lines in Tier 2 or Tier 3 to de-energize during a PSPS, PG&E must take into account all information in its possession and in the possession of its contractors and subcontractors concerning the extent to which trees and/or limbs are at risk of falling on those lines in a windstorm. In determining which distribution lines to de-energize during a PSPS event, PG&E will implement this condition by July 1, 2021, by considering the existence of all outstanding vegetation management work tagged "Priority 1" or "Priority 2" within PG&E's service territory that is subject to potential de-energizations. **PG&E shall also consider the approximate number of trees tall enough to fall on the line irrespective of the health of the tree and irrespective of whether the tree stands outside or inside prescribed clearances. The latter may be done by simply rating the total approximate number of such tall trees along a line as "None," "Few," "Average" or "Many," and by treating the "Many" category as posing a greater risk than the "Average" category and the "Average" category as posing a greater risk than the "Few" category and so on.**

> Proposed Condition 12: To the extent that such information shows that such trees and limbs present a safety hazard in the event of a windstorm, PG&E must make a specific determination with respect to that distribution line and it must de-energize it unless PG&E finds in writing that there are specific reasons to believe that no safety issue exists. PG&E will implement this condition by July 1, 2021.

In response, PG&E stated that it had developed a model using LiDAR data measuring actual tree height along all PG&E lines based on helicopter flyovers during the last two years. These data and model allowed PG&E to see and measure the actual height of any and all trees

to calculate whether they could strike a power line if they fell. The number of such "strike trees" along a circuit could be counted and, in turn, all circuits could be rated by risk based on the number of such strike trees. Strike trees in this model counted both healthy and unhealthy trees, both hazard and non-hazard, on the theory that even healthy non-hazard trees, in PG&E's experience, could blow over in a windstorm and strike lines. By this method, the Girvan Circuit would have been ranked in the top 24 percent of risk, so PG&E proposed to use the top thirty percent as a cutoff. This approach would have prevented the Zogg Fire because it would have de-energized the Girvan Circuit.

At our recent hearing, PG&E stated that it wanted to adopt this modification to its PSPS decision-making approach. PG&E Attorney Kevin Orsini stated, "The company believes that this is the right approach . . . . We share the Court's goal and [*sic*] expanding the program . . . and not waiting until 2022 to do that" (Tr. 31:10–14).

By contrast, however, letters from commissioners of the California Public Utilities Commission (CPUC) and from the California Governor's Office of Emergency Management vigorously opposed PG&E's safety consideration of strike trees, saying it was an unvetted approach and likely to lead to many more PSPS events and thus more public inconvenience and hardship. They insisted that PSPS events should be a "last resort." They asked the Court not to impose it.

How did these agencies acquire this fear of marked increase in PSPS events? Earlier in March, we now know, PG&E handed these agencies an internal "study" that seemed to indicate a large number of additional PSPS events would flow from the strike-tree proposal. That provoked the CPUC commissioners to express alarm about "doubling" the number of PSPS events (Dkt. No. 1349). The Court then asked for the study.

In its filing dated March 23, PG&E produced its LiDAR "Sensitivity Study," the estimate given to the CPUC. In it, PG&E described the impact of the new PSPS criteria over a ten-year hypothetical retrospective (Dkt. No. 1358-1). PG&E used its LiDAR strike-tree data in combination with now-current PSPS criteria (examining extreme wind, heat, and fuel moisture factors) to estimate how many PSPS events *would have occurred* between 2010 and 2020

using PG&E now-current criteria plus the strike-tree criteria. The study also estimated how many PSPS events would have occurred in that ten-year period under PG&E's now-current PSPS criteria (without the strike-tree criteria). The comparison showed that hypothetical PSPS events would have increased by 55 percent with the strike-tree criteria (Dkt. No. 1358-1).

We held a hearing on March 23 and explored these concerns and heard the CPUC's specifics. In response, the Court requested that PG&E perform a real-life comparison: how would the *actual* PSPS events in 2019 and 2020 have changed had the proposed conditions of probation been in effect? PG&E produced a 2019 comparison on March 29 (Dkt. No. 1369-1). *The estimate showed that PSPS events in 2019 would have decreased, not increased, from eight to five.* The average customer impact (in both hours and numbers) would also have *decreased*.

With respect to 2020, PG&E stalled and said it would produce the 2020 numbers only if requested again. The Court then repeated its request for the 2020 figures. PG&E filed that estimate on April 16 (Dkt. No. 1377). *The analysis showed that the number of actual PSPS events in 2020 would not have changed at all had the proposed conditions been in effect.* Only twelve percent more customers would have been affected, meaning the PSPS events would have caused twelve percent more customers, including those served by the Girvan Circuit, to lose power.

It now seems obvious that PG&E used some sleight-of-hand to promote the incorrect impression that the additional criteria — Priority 1 and 2 tags plus strike tree rankings — would make a substantial difference in public safety whereas, in truth, they would have *reduced* the number of PSPS events in 2019 and would have left the 2020 number unchanged (though they would have de-energized the Girvan Circuit). Remembering that 2019 was the only year in which the PSPS program succeeded in stopping wildfires caused by PG&E distribution lines, it would be *a step backward* to bless PG&E's criteria.

Another reason the Court is reluctant to adopt these conditions is that the Priority 1 and Priority 2 criteria have turned out to be the sleeves out of PG&E's vest. PG&E has now admitted that the number of Priority 1 and Priority 2 tags would be very few because PG&E

7

expects to clear them all in the run-ups to future PSPS events.  Such tags, therefore, would rarely lead to any further circuits being de-energized.  (Priority 1 and Priority 2 tags constitute only a small fraction of all hazards.  The gray pine looming over the Girvan Line, for example, was *not* a Priority 1 or Priority 2 tag.)

To finalize the criteria proposed by PG&E in the form of a federal court order would give PG&E a "Get-Out-of-Jail-Free" card, a card it could and would play in every civil lawsuit and criminal prosecution arising out of future wildfires based on PG&E's failure to de-energize at-risk circuits.  It would smile and say, "We did what the judge and the CPUC said to do and they said that considering the sliver of information would count as considering all information."

A final reason is that the CPUC and the Governor's Office have opposed the proposed changes, curiously out of fear that they will lead to more PSPS events.  Out of deference to these authorities, the Court will simply state its recommendation but not impose any version of the conditions.  A related complication is that PG&E's most recent counter-proposal involving strike-tree count was expressly contingent on obtaining eventual CPUC approval, but in response, the CPUC stated that it does not and will not bless such specific criteria and, instead, as a matter of practice, leaves the selection of criteria to the utility.  So, PG&E's latest version would be impossible to implement.

Accordingly, the Court will *not* impose Proposed Conditions 11 and 12.  Instead, the Court will and hereby does recommend that PG&E do the following:

> In determining which distribution lines in Tier 2 or Tier 3 to de-energize during a PSPS, PG&E should take into account all information in its possession and in the possession of its contractors or subcontractors concerning the extent to which trees and/or limbs bordering those lines remain in violation of Public Resources Code Section 4293, GO95, FERC PAC-003-4 and/or its own wildfire mitigation plan.

> To the extent that such information shows that such trees and/or limbs present a safety hazard in the event of a windstorm, PG&E should make a specific determination with respect to that distribution line and it should de-energize it unless PG&E finds in writing that there are specific overriding public safety needs to leave the lines energized.

For example, that a circuit is in compliance with all vegetation clearance laws militates in favor of leaving the power on in that circuit. Conversely, that a circuit has not been cleared in years and is out of compliance militates in favor of turning the power off in that circuit. Of course, all the other factors should be considered as well but in some cases this difference would be and should be decisive. These are recommendations, not orders, but are recommendations informed by years of studying the problem while trying to rehabilitate the offender and to protect California from further crimes and wildfires by the offender.

To the extent that PG&E chooses to honor the Court's recommendation, it should not pretend that using its "Priority 1" and "Priority 2" plus its "Strike Tree" criterion, although steps in the right direction, would satisfy the recommendation or constitute taking into account "all" information available to it. PG&E has much more information available to it pertaining to wildfire risks specific to each circuit. PG&E, for example, has ranked each circuit in terms of priority for "vegetation management." And, it knows or should know the extent to which its circuits have been cleared. PG&E should know the true safety status of every one of its circuits.

The Court agrees that PSPS events should be a last resort. Due to PG&E's neglect over many years, however, our power grid remains overgrown with hazard trees poised to strike during windstorms and unleash catastrophic wildfires. So our backs remain against the wall and last resorts are necessary. In deciding which circuits to leave on and which to turn off during windstorms in the wildfire season, it would be reckless not to take into account, in addition to factors otherwise considered, the extent to which a circuit has been cleared of hazard trees versus not cleared, keeping in mind that hazard trees falling on the lines in windstorms has been the number one cause of wildfires started by PG&E distribution lines. And, when deciding whether to leave a borderline circuit on versus off, public safety should always take priority over inconvenience and hardship, it being preferable to lose power than to lose lives. Again, the above are recommendations, not orders.

By July 1, 2021, PG&E shall file herein a statement setting forth its 2021 PSPS criteria and stating the extent to which it has and has not adopted the above recommendations.

1    Within **TWENTY-EIGHT DAYS** after each PSPS event in the 2021 Wildfire Season, PG&E shall

2    also file a public report herein stating:

3        (i)     How many circuits were turned off in the PSPS;

4        (ii)    How many of such circuits had limbs and/or trees blown or fallen onto

5                the lines (as determined in the post-storm inspection);

6        (iii)   How many of such strikes would, in the judgment of PG&E, have

7                started a fire (regardless of size) had the circuit been energized at the

8                time of the strike;

9        (iv)    How many circuits left energized had limbs and/or trees blown or fallen

10               onto the lines by the storm without causing a fire; and

11       (v)     How many circuits left energized with strikes that in fact resulted in fires

12               (regardless of size).

13   The above five categories should each be further broken down by those circuits that were in

14   substantial compliance with Section 4293 as well as PG&E's Wildfire Mitigation Plan versus

15   those circuits that were not at the time of the PSPS event.  The purpose of this information is to

16   assist in post-mortem analysis of how to improve the PSPS process by better selecting which

17   circuits to leave on and which to leave off.  The order to show cause dated December 29, 2020,

18   is otherwise **DISCHARGED**.  This paragraph is the only court order in this document, everything

19   else being a recommendation or explanation.

20

21

22   Dated:  April 29, 2021.

23                                                    _____

24                                                    WILLIAM ALSUP
                                                     UNITED STATES DISTRICT JUDGE

25

26

27

28

**EXHIBIT 2**

1  AROCLES AGUILAR, SBN 94753
   CHRISTINE JUN HAMMOND, SBN 206768
2  CHRISTOFER C. NOLAN, SBN 229542
   California Public Utilities Commission
3  505 Van Ness Avenue
   San Francisco, CA 94102
4  Telephone: (415) 703-2682
   Facsimile: (415) 703-4592
5  Christine.Hammond@cpuc.ca.gov
6
7  Attorneys for the California Public Utilities Commission and
   Marybel Batjer, Martha Guzman Aceves, Clifford Rechtschaffen,
8  Genevieve Shiroma, and Darcie Houck in their official capacities as
   Commissioners of the California Public Utilities Commission
9

10              **UNITED STATES DISTRICT COURT**

11        **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

12                  **SAN FRANCISCO DIVISION**

13

| | |
|---|---|
| 14  UNITED STATES OF AMERICA, | Case No. 14-cr-00175-WHA |
| 15                        Plaintiff, | **CPUC MOTION FOR LEAVE TO FILE AMICUS LETTER** |
| 16      vs. | |
| 17  PACIFIC GAS AND ELECTRIC COMPANY, | Courtroom:  12, 19th Floor |
| 18 | Judge:        Hon. William H. Alsup |
| 19                        Defendant. | |

20

21

22

23

24

25

26

27

28

1         The California Public Utilities Commission ("CPUC") hereby seeks leave of the

2    Court to file an *Amicus* letter regarding the new proposed terms of probation for defendant

3    Pacific Gas and Electric Company ("PG&E"). Federal courts have inherent authority to

4    entertain Amicus briefs. *In re Bayshore Ford Truck Sales, Inc.*, 471 F.3d 1233, 1249, n.34

5    (11th Cir. 2006).

6         The CPUC's proposed letter is attached hereto as **Exhibit 1**.

7

8                            Respectfully submitted,

9

10                       By:    /s/     *Christine Jun Hammond*
     April 20, 2021

11                           AROCLES AGUILAR
                             CHRISTINE JUN HAMMOND
                             CHRISTOFER C. NOLAN

12

13                           Attorneys for the CALIFORNIA PUBLIC
                             UTILITIES COMMISSION

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 1

## PUBLIC UTILITIES COMMISSION

505 VAN NESS AVENUE
SAN FRANCISCO, CA 94102-3298



April 20, 2021

**VIA ELECTRONIC MAIL**

Honorable William H. Alsup
United States District Court
Northern District of California
Courtroom 12 - 19th Floor
450 Golden Gate Avenue
San Francisco, California 94102

   Re:  Proposed Probation Conditions 11 and 12 in Case No. 14-cr-00175-WHA

Dear Judge Alsup,

The California Public Utilities Commission ("CPUC") greatly appreciates the Court's consideration of the CPUC's concerns that probation conditions might conflict with the CPUC's ongoing exercise of jurisdiction to regulate the safe and reliable operation of regulated utilities' electric systems, based on broad considerations heard in public proceedings. The sphere of public utility regulation is complex, closely integrated, and has broad public and customer impacts. While intending to preserve and not waive its Eleventh Amendment immunity or broad authority, derived from the California Constitution and the state's police powers, to regulate public utilities (see, e.g., ECF No. 987 at 3-5 of 150; and ECF No. 1368 at 4-5 of 11), the CPUC here asks the Court to consider a path that provides for the two authorities to fully carry out their respective responsibilities and mandates.

The CPUC has approved guidelines for electric utilities to use in their PSPS decision-making process, that are designed to maximize the wildfire mitigation benefits of the PSPS option while minimizing the public safety consequences that can follow directly from exercising PSPS as a tool of last resort. Accordingly, the CPUC has not, to date, "approved" specific models, methodologies, criteria or assumptions to be used in PSPS decision-making. These matters are the responsibility of utility operators who must, by law, operate their electric systems safely and reliably, subject to the CPUC's regulatory oversight and enforcement.

PG&E's latest language offered for Proposed Condition of Probation 11 (ECF No. 1369), however, directs the CPUC to take a specific regulatory action -- to "approve" (or not) -- PG&E's proposed new, bright-line criterion to de-energize power lines during its PSPS decision-making. PG&E's tree over strike criterion is new and untested, arising out of this criminal proceeding, and at present the CPUC and stakeholders do not have an understanding of how it will affect PSPS scope, scale, and impacts. The

CPUC therefore submits Proposed Condition of Probation 11 would more appropriately be phrased as (CPUC suggestions appear in blue bolded language):

### Proposed Condition 11

In determining which distribution lines in Tier 2 or Tier 3 to de-energize during a PSPS, PG&E must take into account all information in its possession and in the possession of its contractors and subcontractors concerning the extent to which trees and/or limbs are at risk of falling on those lines in a windstorm. In determining which distribution lines to de-energize during a PSPS event, PG&E will implement this condition by July 1, 2021, by considering the existence of all outstanding vegetation management work tagged "Priority 1" or "Priority 2" within PG&E's service territory that is subject to potential de-energizations and which is forecast to satisfy PG&E's minimum fire potential conditions. [Subject to the ~~approval~~ **oversight, and direction if needed,** of the California Public Utilities Commission,] PG&E shall also consider the approximate number of trees tall enough to fall on the line ~~**by using LiDAR, or other remote sensing and data-capture methods, to approximate the relative amount of tree overstrike exposure in areas that are subject to potential de-energizations and forecast to satisfy PG&E's minimum fire potential conditions and, in particular, by considering whether the area is in the 70th percentile or greater of tree overstrike exposure as compared with other areas subject to potential de-energization irrespective of the health of the tree and irrespective of whether the tree stands outside or inside prescribed clearances. The latter may be done by simply rating the total approximate number of such tall trees along a line as 'None,' 'Few,' 'Average' or 'Many,' and by treating the 'Many' category as posing a greater risk than the 'Average' category and the 'Average' category as posing a greater risk than the 'Few' category and so on**~~.

This revised probation condition, if adopted, should provide the CPUC with a role and the flexibility necessary to review, oversee, and respond to PG&E's use of an untested criterion in PSPS decision-making this fire season as needed. Accordingly, the CPUC suggests deleting the immutable operationalizing particulars in the remainder of PG&E's proposed language. In addition to allowing the CPUC to direct changes in real-time, if needed to address unanticipated consequences from PG&E's proposed implementation, the condition should allow the process to consider, in due time, lessons learned, improvements that can be made, and how to mitigate unforeseen or unwarranted safety consequences. Such flexibility is necessary for PG&E and the CPUC to ensure that PG&E's criminal probation does not adversely affect PG&E's requirement to provide safe, reliable, and affordable electric service.

Further to its March 29, 2021 letter (ECF No. 1368) and commitment to conducting an expedited review of Proposed Conditions 11 and 12, the CPUC wishes to inform the Court that the CPUC's Safety and Enforcement Division and Energy Division today hosted a public workshop on Proposed Conditions 11 and 12.  This is the CPUC's first public forum to enlarge public understanding of, and to consider, PG&E's proposal to implement and operationalize Proposed Condition 11 as PG&E has currently framed it.  A copy of PG&E's presentation is attached hereto and was provided to parties in the CPUC's pending PSPS proceedings.

The CPUC continues to urge the Court to pursue the CPUC's proposed means for the two authorities to oversee PG&E in their respective capacities.

Sincerely,

/s/      *Christine Jun Hammond*
AROCLES AGUILAR
CHRISTINE JUN HAMMOND
CHRISTOFER NOLAN

Attorneys for the
CALIFORNIA PUBLIC UTILITIES COMMISSION

Attachment

# PG&E Tree Overstrike Workshop

Proposed Implementation of Probation Conditions 11 and 12

April 20, 2021



California Public
Utilities Commission

# Agenda

| | |
|---|---|
| **Background** | **9:00 am – 9:30 am** |
| **PG&E Proposal** | **9:30 am – 11:00 am** |
| PG&E's Proposed Implementation of Conditions 11 and 12 | 20 min |
| Identify and Define Impact Metrics | 20 min |
| Impacts of PG&E's Proposal | 20 min |
| Panelist Q&A | 30 min |
| **Communication and Mitigation of Incremental Impacts** | **11:00 am – 11:10 am** |
| **Panelist Q&A** | **11:10 am – 11:20 am** |
| **Oversight and Evaluation of Tree Overstrike Factor Implementation** | **11:20 am – 11:30 am** |
| **Panelist Q&A** | **11:30 am – 11:40 am** |
| **Public Comment** *(Call in and Press **\*1** to make a comment)* | **11:40 am  – 1:00 pm** |

# Background

- PG&E is under ongoing probation stemming from PG&E's felony conviction for its involvement in the deadly 2010 San Bruno gas pipeline explosion.

- As a condition of this ongoing probation, the court may order PG&E to implement new probation conditions 11 and 12, which would require PG&E to de-energize additional distribution lines during Public Safety Power Shutoff (PSPS) events based on the number of trees tall enough to fall on the line (i.e. the *tree overstrike exposure*).

- If ordered, PG&E would implement these conditions for the 2021 fire season, by July 1.

- The CPUC has notified the court about its concern that these conditions would increase the scope and frequency of PSPS.

# Workshop Purpose

- The workshop is a forum to present, develop, and comment on PG&E's proposal to fulfill probation conditions 11 and 12.

- These probation conditions are currently proposed; they are not yet ordered by the Federal court.

- PG&E will explain its proposed methodology to implement conditions 11 and 12.

- PG&E will also explain the impacts of this proposed implementation on the estimated size and number of PSPS events.

- Commission Staff will pose questions to PG&E for their response, after which Public Comment will be held at the end of today's agenda.

- Interested parties may serve written comments 5 business days after today's workshop to the 3 Service Lists noticed about this workshop.

# Tree Overstrike Workshop

**Pacific Gas and Electric Company**

**April 20, 2021**



# Background





# Evolution of the Public Safety Power Shutoff Program

**We are continuing to refine our Public Safety Power Shutoff (PSPS) Program,** evolving the scoping process and modifying operations, communications and coordination before, during and after PSPS events.

## 2018
### Launch Community Wildfire Safety and PSPS Programs

- PSPS scope included **Tier 3 distribution lines and low-voltage transmission lines** (potential to impact ~500K total customers)



**Key Learning:** program scope too limited

## 2019
### Expand PSPS Program Scope

- Expanded PSPS scope to **all distribution and transmission lines in Tier 2/Tier 3 areas**
- **Public awareness campaign** rolled out for more than 5M customers

**Key Learning:** customer support and event execution must improve

## 2020
### Target PSPS Events to Highest Risk Areas

- Top to bottom re-engineering of entire PSPS operation
- Developed more granular meteorological scoping capabilities
- Developed a structure-by-structure analysis of the transmission system to allow more targeted scoping
- Improved local partnerships and customer support



**Key Learning:** program must continue to evolve to capture catastrophic wildfire risk

## 2021
### Continuous Improvement & Further Risk Reduction

- Update distribution scoping analysis to further incorporate tree overstrike exposure potential
- Focus on opportunities to support repeatedly impacted customers (e.g., backup power rebates, other offerings)
- Continue to increase resiliency to offer other wildfire risk mitigations in lieu of PSPS

*Some of the measures included in this presentation are contemplated as additional precautionary measures intended to further reduce the risk of wildfires.*



## EXCERPT FROM PROPOSED CONDITION 11 (2/4/21)

*In determining which distribution lines in Tier 2 or Tier 3 to de-energize during a PSPS, PG&E must take into account all information in its possession and in the possession of its contractors and subcontractors concerning the extent to which trees and/or limbs are at risk of falling on those lines in a windstorm. In determining which distribution lines to de-energize during a PSPS event, PG&E will implement this condition by July 1, 2021, by considering the existence of all outstanding vegetation management work tagged "Priority 1" or "Priority 2" within PG&E's service territory that is subject to potential de-energizations. PG&E shall also consider the approximate number of trees tall enough to fall on the line irrespective of the health of the tree and irrespective of whether the tree stands outside or inside prescribed clearances. The latter may be done by simply rating the total approximate number of such tall trees along a line as "None," "Few," "Average" or "Many," and by treating the "Many" category as posing a greater risk than the "Average" category and the "Average" category as posing a greater risk than the "Few" category and so on.*

## EXCERPT FROM PROPOSED CONDITION 12 (2/4/21)

*To the extent that such information shows that such trees and limbs present a safety hazard in the event of a windstorm, PG&E must make a specific determination with respect to that distribution line and it must de-energize it unless PG&E finds in writing that there are specific reasons to believe that no safety issue exists. PG&E will implement this condition by July 1, 2021.*

---

*Some of the measures included in this presentation are contemplated as additional precautionary measures intended to further reduce the risk of wildfires.*







## Routine Vegetation Management

12 ft. 12 ft.
4 ft. 4 ft.

## Enhanced Vegetation Management

12 ft. 12 ft.
4 ft. 4 ft.

**Clearing 4 feet around distribution power lines** in high fire-threat areas with recommended **minimum clearances of 12 feet** to ensure year-round compliance and assessing trees for hazards.

**Increasing safety clearances between power lines and surrounding vegetation** and **assessing trees** with overstrike potential on distribution lines in high fire-threat areas to mitigate higher-risk trees.

*Some of the measures included in this presentation are contemplated as additional precautionary measures intended to further reduce the risk of wildfires.*



# Tree Overstrike Exposure and Potential PSPS Decision-Making

**The safety of our customers and communities is our most important responsibility. After last year's wildfire season and the drier than average weather we are experiencing, we have developed proposed additional criteria for our PSPS program, consistent with the proposed conditions of the federal court.**

**To reduce the risk of major wildfires, PG&E may turn off power on distribution lines\* where there are large amounts of trees tall enough to fall into electric lines during severe weather.**

✅ **Customers who live in areas of the highest wildfire risk may experience more frequent PSPS events** compared to last year's weather conditions.

✅ **We are sharing community-specific information** regarding these potential impacts with customers, cities, counties and tribes.

\*Does not include transmission lines (which are considered to be ≥ 60 kV)

**Fall Zone**

Approx. **5.3 million trees** are tall enough to strike distribution lines in high fire-threat districts. These may be outside our easements and rights of way

For illustrative purposes only

*Some of the measures included in this presentation are contemplated as additional precautionary measures intended to further reduce the risk of wildfires.*



**A fall-in tree is a tree that may fall over the nearest wire when measured in 3D distance from the tree ground level to the nearest phase of conductor wire.**

The **greater the tree overstrike exposure**, the **greater range of angles the tree could fall at and still hit the line.**

### Tree Overstrike = Tree Height - 3D Distance



There are **7.3 million trees detected** through LiDAR in PG&E's HFTD distribution corridors, **of which 5.3 million trees could strike** the line.

## 70TH PERCENTILE OVERSTRIKE EXPOSURE

Areas with a higher aggregate amount of tree overstrike exposure potential.

## PRIORITY 1 TREES

- In contact or showing signs of previous contact with a primary conductor;
- Actively failing or at immediate risk of failing and which could strike PG&E's facilities; or
- Presenting an immediate risk to PG&E's facilities

**Priority 1 trees must be addressed within 24 hours**

## PRIORITY 2 TREES

- Encroached within the PG&E minimum clearance requirements; or
- Having any other identifiable potential safety issues, including the ability to strike PG&E facilities, requiring expedited work

**Priority 2 trees must be addressed within 30 days**

*Some of the measures included in this presentation are contemplated as additional precautionary measures intended to further reduce the risk of wildfires.*



# How is Overstrike Exposure Being Assessed?

**LiDAR data was collected in 2019 and early 2020 for all ~25,000 line miles of distribution circuit corridors in high fire-threat districts (HFTDs).**







LiDAR generally **covers 150ft** for both sides of the utility corridor (typically ~500ft captured).

LiDAR point cloud rendering with **red dots marking fall-in treetop detects**, and orange dots marking detects of radial clearance vectors of nearest vegetation point to nearest line.

*Some of the measures included in this presentation are contemplated as additional precautionary measures intended to further reduce the risk of wildfires.*



# LiDAR Review of Dense Tree Canopies

Aerial LiDAR data is a sophisticated tool that we can use to measure the three-dimensional distance between trees and power lines. In certain instances of dense tree canopies, the analysis may overestimate or underestimate overstrike exposure potential.



Detection of tree trunks from aerial LiDAR under tree canopies can be challenging to identify accurately due to point cloud data, **so trees are detected through their treetops**.



Tree top could be **detected closer** to wire compared to the actual tree trunk which **over-estimates overstrike.**

Tree top could be detected **further from** wire compared to the actual tree trunk, which **under-estimates overstrike.**

*Some of the measures included in this presentation are contemplated as additional precautionary measures intended to further reduce the risk of wildfires.*

# PG&E Proposal





**The Fire Potential Index (FPI) is a key factor in the PSPS decision-making process.**

**Datasets included in current FPI:**

- PG&E 30-year weather and fuels climatology

- Fire occurrence dataset from USFS: 1992 – 2018

**Analysis / Results of current FPI:**

- Benchmarked FPI against agencies and utility best-practices

- Evaluated dozens of parameters to determine best predictors of large fires

- Constructed over 4,000 FPI models for accuracy evaluation

## PG&E's Utility FPI
Outputs the probability of observing a large fire based on weather, fuel moisture and land-type

 +  + 

**Weather**

- Wind Speed
- Temperature
- Relative Humidity

**Fuels**

- Dead Fuel Moisture
- Live Fuel Moisture

**Land Type**

- Forest
- Shrub/Brush
- Grass

*Some of the measures included in this presentation are contemplated as additional precautionary measures intended to further reduce the risk of wildfires.*

15



We use FPI in unison with an Outage Producing Winds (OPW) model to analyze weather, outage potential and fuel drivers to identify conditions that could lead to catastrophic wildfires.



PG&E's Distribution Large Fire Probability (LFP) Model:

**OPW 2.0**
*Probability of Outages (sustained and momentary)*

**FPI**
*Probability of Large Fire (weather + fuels + land type)*

**Scenario: Winter Storm**
High Outage Probability, Low Probability of an Ignition Becoming a Large Fire

**Scenario: Windy + Dry Fuels**
High Outage Probability, High Probability of an Ignition Becoming a Large Fire

**Scenario: Blue Sky Day**
Low Outage Probability, Low Probability of an Ignition Becoming a Large Fire

**Scenario: Hot/Dry Day**
Low Outage Probability, High Probability of an Ignition Becoming a Large Fire

OPW axis: High / Low
FPI axis: Low / High

**Note:** Similar model for transmission that combines FPI and Operability Assessment (OA)


**Distribution PSPS scope is proposed to follow the decision-making diagram below with the additional PSPS criteria under consideration shown in Box 4 in blue.**



**Not In Scope for PSPS**

**No**

**1. Area Meeting Minimum Fire Potential Conditions?\*\***

**Yes →**

**2. Distribution Large Fire Probability\*\***
$LFP_D > 6$
$LFP_D = FPI*OPW$
(Fire Potential Index * Outage Producing Winds)

**OR**

**3. Distribution Black Swan Conditions\*\***

**OR**

**Additional Proposed 2021 Criteria**

**4. Direct Vegetation Consideration**
(Priority 1 OR Priority 2 Trees OR
>70th percentile Sum Tree Over Strike\*)

**In Scope for Distribution PSPS**

**1. Minimum Fire Potential Conditions (FPI)\*\***

| Logic | Variable | Sign | Value |
|-------|----------|------|-------|
| & | Fire Potential Index (FPI) | > | 0.2 |
| & | Sustained Wind Speed mph | > | 20 |
| & | Dead Fuel Moisture (DFM) 10hr | < | 9% |
| & | Dead Fuel Moisture (DFM) 100hr | < | 11% |
| & | Dead Fuel Moisture (DFM) 1000hr | < | 11% |
| & | Relative Humidity (RH) | < | 30% |

**3. Distribution Black Swan Conditions\*\***

| Logic | Variable | Sign | Value |
|-------|----------|------|-------|
| & | Fire Potential Index (FPI) | > | 0.3 |
| & | Sustained Wind Speed mph | > | 30 |
| & | Dead Fuel Moisture (DFM) 10hr | < | 9% |
| & | Dead Fuel Moisture (DFM) 100hr | < | 11% |
| & | Dead Fuel Moisture (DFM) 1000hr | < | 11% |
| & | Relative Humidity (RH) | < | 20% |

\*    Note: Direct vegetation considerations were not part of 2020 Distribution PSPS decision criteria.
\*\*   Note: May be revised based on cont. 2021 studies (t.b.d.)

*Some of the measures included in this presentation are contemplated as additional precautionary measures intended to further reduce the risk of wildfires.*


**PG&E studied 11 years of weather data from 2010 to 2020 to analyze the potential impact of the proposed criteria. The study found:**

- ✓ **Reduced risk** of catastrophic wildfires

- ✓ **Additional PSPS events**, increased customers impacted and increased event duration

- ✓ **Customer impacts** are higher for smaller events and smaller for larger events

## Potential Customer Impacts

| | | BASELINE | WITH PROPOSED CRITERIA | INCREASE |
|---|---|---|---|---|
| | Event **Frequency** | ~3 events per year | ~5 events per year | **61%** |
| | Average Event **Duration** (excludes restoration time) | ~24 hours | ~29 hours | **18%** |
| | Average Event **Customer Count*** | ~98K customers | ~125K customers | **28%** |
| | Largest Event **Customer Count*** | ~345K customers | ~368K customers | **6%** |

***Customer counts** are distribution service points and are estimated at **circuit level,** and do not include customer impacts from Transmission PSPS.*

*Some of the measures included in this presentation are contemplated as additional precautionary measures intended to further reduce the risk of wildfires.*

18



**The chart below uses 11 years of weather data to show the number of potential PSPS events based on 2020 PSPS criteria compared to the additional proposed criteria.**



**Note:** This information is for planning purposes only and additional data analysis is underway. Future events will be dependent on weather conditions.

*Following the wildfires in 2017 and 2018, some of the changes included in this document are contemplated as additional precautionary measures intended to further reduce future wildfire risk.*



# PSPS Lookback Utilizing Proposed Criteria – Butte County

**As an example, the following chart shows what these proposed criteria could mean for Butte County.**



**Note:** This information is for planning purposes only and additional data analysis is underway. Future events will be dependent on weather conditions.

*Following the wildfires in 2017 and 2018, some of the changes included in this document are contemplated as additional precautionary measures intended to further reduce future wildfire risk.*

# Staff Q&A

*Commission Staff will direct questions to PG&E for response.*



# Communication and Mitigation of Incremental Impacts





# Communicating Potential Impacts to Customers and Communities



## Customers and Partners

- Public Safety Town Halls
- Customer Wildfire Safety Webinars
- Information sharing with community-based organizations
- Regional and statewide Access and Functional Needs (AFN) Council meetings & AFN webinars
- Social media (Twitter, Next Door, Instagram, Facebook)
- Large commercial customer/critical facility briefings
- Industry-specific informational webinars



## Agencies and Tribes

- Emergency Manager Coordination Meetings
- Regional Working Groups
- Emergency Manager Advisory Committee
- Ongoing Stakeholder Meetings
  - Cities
  - Counties
  - Tribes
  - Critical facilities
  - Telecoms

**Note:** Details on the proposed conditions are being added to the PSPS outreach efforts already underway

*Some of the measures included in this presentation are contemplated as additional precautionary measures intended to further reduce the risk of wildfires.*



# Customer Support Programs to Reduce PSPS Impacts

**We are planning to integrate proposed criteria into existing customer support strategies and programs while expanding coverage and resources.**

| PROGRAM | 2021 TARGET | ADDITIONAL INCREMENTAL IMPROVEMENTS |
|---|---|---|
| **Community-Based Organization Partnerships** | ▪ 35+ additional CBOs targeted | ▪ **Targeting additional CBOs in more heavily impacted areas**<br>▪ **Working with resource partners to prepare for additional customer support** |
| **Food Resource Partnerships** | ▪ Meal replacement options for customers in 46 counties<br>▪ 10 new partnerships | ▪ **Completing gap analysis to inform the need for additional partnerships** |
| **Portable Batteries** | ▪ ~11,500 batteries available | ▪ **Covering all interested low-income Medical Baseline customers in high fire-threat areas** |
| **Community Resource Centers** | ▪ Targeting 370 total ADA-accessible sites<br>▪ Locations in partnership with county and tribal agencies | ▪ **Preparing for additional deployment due to increased event frequency** |
| **Well Water Rebates** | ▪ Continue well water rebate pilot program | ▪ **Expand program promotion in areas likely to see higher event impacts** |

*Some of the measures included in this presentation are contemplated as additional precautionary measures intended to further reduce the risk of wildfires.*

# Staff Q&A

*Commission Staff will direct questions to PG&E for response.*



# Oversight and Evaluation of Tree Overstrike Factor Implementation





**To help determine the effectiveness of the proposed conditions, we will include additional information about any circuit section pulled into scope due to the proposed conditions as part of our post-season reporting to the CPUC.**

## This includes:



**Number of customers impacted**



**Customer impact frequency**



**Customer impact duration**



**Damages/hazards found**

**We would like to work with the Commission on the most appropriate metrics and reporting timing for the proposed conditions.**

*Some of the measures included in this presentation are contemplated as additional precautionary measures intended to further reduce the risk of wildfires.*

27

# Staff Q&A

*Commission Staff will direct questions to PG&E for response.*



# Appendix





**For each step down in the scenarios of a 10-year study (2010-2019) from the 2020 Base Line to the >50th Percentile shows:**

- ✓ **Diminishing rate** of additional HFTD vegetation caused outages captured

- ✓ **Additional PSPS events**, increased customers impacted and increased event duration

- ✓ **Percentage increase in event duration and customer impacts** is higher for smaller events, with less percentage increase for the largest events



**Vegetation Risk vs. Potential PSPS Events**

- % Increase of PSPS Customer-Hours from Baseline*
- Residiual Tree Overstrike Outage Exposure (%)**

\* Customer-Hours impacted is based on event duration multiplied by the customer count for each event and then summed across all events to calculated total customer-hours.
\*\* % Residual of HFTD Vegetation Caused Outages 2008-2020, based on outages not captured by >70th percentile OPW with input sustained wind speed of 20mph and net new cells greater than respective percentile tree overstrike.

*Some of the measures included in this presentation are contemplated as additional precautionary measures intended to further reduce the risk of wildfires.*



**Response to Court's Post-Hearing Additional Request for Condition 11**
**(3/29/21)**

. . . . *In determining which distribution lines to de-energize during a PSPS event, PG&E will implement this condition by July 1, 2021, by considering the existence of all outstanding vegetation management work tagged Priority 1 or Priority 2 within PG&E's service territory that is subject to potential de-energizations and which is forecast to satisfy PG&E's minimum fire potential conditions. [Subject to the approval of the California Public Utilities Commission,] PG&E shall also consider the approximate number of trees tall enough to fall on the line by using LiDAR, or other remote sensing and data-capture methods, to approximate the relative amount of tree-overstrike exposure in areas that are subject to potential de-energizations and forecast to satisfy PG&E's minimum fire potential conditions and, in particular, by considering whether the area is in the 70th percentile or greater of tree-overstrike exposure as compared with other areas subject to potential de-energization.* ~~irrespective of the health of the~~ ~~tree and irrespective of whether the tree stands outside or inside prescribed clearances. The latter may be done by simply rating the total approximate number of such tall trees along a line as 'None,' 'Few,' 'Average' or 'Many,' and by treating the 'Many' category as posing a greater risk than the 'Average' category and the 'Average' category as posing a greater risk than the 'Few' category and so on.~~

**NOTE:** *Text shown is PG&E's proposed clarifications to Condition 11 that are being considered by the federal court and are not final.*

*Some of the measures included in this presentation are contemplated as additional precautionary measures intended to further reduce the risk of wildfires.*


## County 10 Year Event Count

| County | Version baseli | 70th... |
|---|---|---|
| Butte | 23 | 46 |
| Yuba | 25 | 45 |
| Nevada | 22 | 45 |
| Placer | 19 | 43 |
| Sierra | 22 | 42 |
| El Dorado | 21 | 41 |
| Shasta | 16 | 40 |
| Tehama | 15 | 38 |
| Napa | 20 | 36 |
| Sonoma | 20 | 35 |
| Amador | 22 | 34 |
| Calaveras | 21 | 33 |
| Lake | 20 | 28 |
| Humboldt | 17 | 28 |
| Trinity | 8 | 27 |
| Santa Cruz | 16 | 23 |
| Madera | 10 | 22 |
| San Mateo | 16 | 20 |
| Santa Clara | 14 | 19 |
| Kern | 13 | 18 |
| Tuolumne | 10 | 17 |
| Mendocino | 9 | 16 |
| Plumas | 10 | 15 |
| Yolo | 12 | 12 |
| Solano | 10 | 11 |
| Monterey | 8 | 9 |
| Fresno | 7 | 9 |
| Glenn | 4 | 4 |
| San Luis Obispo | 3 | 3 |
| San Benito | 2 | 3 |
| Mariposa | 1 | 3 |
| Contra Costa | 3 | 3 |
| Santa Barbara | 1 | 2 |
| Marin | 1 | 2 |
| Colusa | 2 | 2 |
| Alameda | 2 | 2 |
| Tulare | 1 | 1 |
| Stanislaus | 1 | 1 |
| Kings | 1 | 1 |



PSPS 10 Year Total Event Count (2010-2019)

*Some of the measures included in this presentation are contemplated as additional precautionary measures intended to further reduce the risk of wildfires.*

# Public Comment

*Call in at 1-800-857-1917, and press **\*1** to make a comment*



# Written Comment

*Stakeholders may send written comment by serving the 3 Service Lists:*
- *R.18-12-005;*
- *R.18-10-007;*
- *I.19-11-013.*

*by 5:00pm April 27, 2021.*

*https://ia.cpuc.ca.gov/servicelists/sl_index.htm*



I recently became aware of a PG&E response to this Resolution M-4852 with a new PG&E plan for 2021 dated 5/6/21, entitled "Enhanced Oversight And Enforcement Process Corrective Action Plan Pursuant to Resolution M-4852. There is no time now for me to study and respond to this new development, but a quick scan enables me to state that I see nothing that changes my filings or position. While this new plan is written by PG&E to avoid express admissions and with the usual PG&E public relations "spin," there appear to be many implied admissions and data that support my allegations and claims and defeat Debtors' Objection #2, which I may illustrate to some extent in my Declaration #2, if I have time to do so before filing. One obvious fact to note is that this new plan is irreconcilable with PG&E's incorrect attempt to separate and isolate PSPS from fire fuel and ignition risk wrongly created by PG&E in its continuous noncompliance with applicable laws and regulations, especially those vegetation management rules addressed in my Reply. I see many useful quotes to use against Debtors at trial.

# EXHIBIT 3

PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA

Executive Division                    Date: April 15, 2021
                                      Resolution M-4852

# R E S O L U T I O N

**RESOLUTION M-4852: PLACING PACIFIC GAS AND ELECTRIC COMPANY INTO STEP 1 OF THE "ENHANCED OVERSIGHT AND ENFORCEMENT PROCESS" ADOPTED IN DECISION 20-05-053**

## SUMMARY

This Resolution is issued to Pacific Gas and Electric Company (PG&E) in accordance with Commission Decision (D.) 20-05-053, which gave Commission approval of PG&E's bankruptcy plan of reorganization with conditions and modifications. The decision established an Enhanced Oversight and Enforcement Process (EOE Process) allowing the Commission to take additional steps to ensure PG&E is improving its safety performance if specific Triggering Events occur. The steps range from Step 1, which contains enhanced reporting and oversight requirements, to Step 6, involving the potential revocation of PG&E's ability to operate as a California electric utility.

This Resolution invokes Step 1, with regard to PG&E's insufficient progress with risk-driven wildfire mitigation efforts and requires PG&E to submit a Corrective Action Plan within 20 days of the Resolution effective date.

It is appropriate to place PG&E into Step 1 of the EOE Process due to the following Triggering Event:

> PG&E Has Made Insufficient Progress Toward Approved Safety or Risk-Driven Investments Related to Its Electric Business (EOE Process Step 1, Triggering Event A(iii)).

The findings supporting this Triggering Event include the following:

> PG&E is not sufficiently prioritizing its Enhanced Vegetation Management (EVM) based on risk. PG&E ranks its power line circuits by wildfire risk, but the work performed in 2020 demonstrates that PG&E is not making risk-driven investments. PG&E is not doing the majority of EVM work – or even a significant portion of work – on the highest risk lines.

In 2020, PG&E conducted more work in 2020 on lower risk power lines than high risk lines if one examines the 161 power lines on which PG&E performed EVM. Less than five percent of the EVM work PG&E completed was on the 20 highest risk power lines according to PG&E's own risk rankings.

The foregoing facts meet the triggering requirements for placing PG&E into Step 1 of the EOE Process, which warrants imposition of a Corrective Action Plan containing enhanced reporting requirements. No later than 20 days following issuance of this Resolution, PG&E shall submit a Corrective Action Plan containing the material set forth below. The enhanced reporting requires PG&E to prioritize EVM on power lines that pose the greatest wildfire risk.

PG&E shall serve the Corrective Action Plan on the service lists for Investigation (I.) 19-09-016 (which created the EOE Process) and Rulemaking (R.) 18-10-007 (the Commission's wildfire mitigation proceeding), as well as on the Wildfire Safety Division (WSD) at wildfiresafetydivision@cpuc.ca.gov and the Safety and Enforcement Division at ESRB_ComplianceFilings@cpuc.ca.gov. PG&E shall also send the Corrective Action Plan to the Commission's Executive Director seeking her approval.

The EOE Process does not supplant existing Commission regulatory or enforcement jurisdiction, and nothing in this Resolution is intended to affect such jurisdiction or limit the Commission's or WSD's authority to pursue other enforcement related to the facts set forth herein. Further, nothing in this Resolution alters the requirements of D.20-05-019.[1]

## **BACKGROUND**

PG&E entered bankruptcy in 2019 following several catastrophic wildfires in its service territory. In D.20-05-053, the Commission approved a reorganization plan, giving its approval for PG&E to emerge from bankruptcy with specific financial and operational conditions. To hold PG&E accountable for improving its safety record, including the need to reduce the risk of catastrophic wildfire caused by its infrastructure, the decision instituted a new EOE Process to supplement the Commission's existing enforcement authority. Appendix A to this Resolution provides the EOE Process adopted in D.20-05-053.

---

[1] *Rehearing denied*, D.20-12-015. The underlying decision adopts, with modifications, a settlement with regard to the *Order Instituting Investigation on the Commission's Own Motion into the Maintenance, Operations and Practices of Pacific Gas and Electric Company (U39E) with Respect to its Electric Facilities; and Order to Show Cause Why the Commission Should not Impose Penalties and/or Other Remedies for the Role PG&E's Electrical Facilities had in Igniting Fires in its Service Territory in 2017.* The decision and settlement require reporting, root cause analyses of past fires, and other actions related to wildfires in PG&E's territory.

The Commission may invoke the EOE Process if PG&E self-reports, or the Commission becomes aware of, Triggering Events covered by the EOE Process.  In this case, PG&E did not self-report problems.  Instead, through persistent inquiry, the Commission and WSD have discovered that PG&E did not prioritize EVM in 2020 in a risk-driven manner that would entail performing work on its highest risk power lines first. PG&E has failed to provide the WSD with consistent information about how it assesses power line risk for prioritizing EVM work, but under any of PG&E's risk rankings, PG&E has not made sufficient progress toward risk-driven investments in the area of EVM.

## 1.  EOE Process

The EOE Process has six steps, which range from adoption of additional reporting requirements in Step 1 to formal review of PG&E's Certificate of Public Convenience and Necessity (CPCN) in Step 6.  D.20-05-053 states that the Commission need not necessarily move PG&E through the steps sequentially.  This Resolution relies on findings made, and requirements imposed, by the WSD through its review of PG&E's Wildfire Mitigation Plan (WMP) performance, and places PG&E into Step 1 of the EOE Process.

The EOE Process:

> contains six steps which are triggered by specific events, some of which would rely on Safety and Operational Metrics.  The Process includes enhanced reporting requirements and additional monitoring and oversight.  The Process also contains provisions for PG&E to cure and permanently exit the Process if it can satisfy specific criteria.  If triggered, the Process would occur in coordination with the Commission's existing formal and informal reporting requirements and procedures and would not replace or limit the Commission's regulatory authority including the authority to impose fines and penalties.

> If triggered, the Commission would place PG&E in the appropriate step upon the occurrence of a specified Triggering Event, with appropriate notification by the Commission's Executive Director, or as otherwise provided below.  The Commission's Executive Director may move PG&E through the steps of the Process sequentially, or the Commission or its Executive Director may place PG&E in the appropriate step upon the occurrence of a specified Triggering Event.  D.20-05-053 at 58.

**2. Step 1**

This Resolution places PG&E into Step 1 of the EOE Process, which provides that if PG&E's conduct meets any of the Triggering Events listed below, a Corrective Action Plan is required.  Specifically, this Resolution invokes Step 1 Section A(iii).

**STEP 1: Enhanced Reporting**

A.  Triggering Events

   i.  PG&E fails to obtain an approved wildfire mitigation plan or fails in any material respect to comply with its regulatory reporting requirements;

   ii.  PG&E fails to comply with, or has shown insufficient progress toward, any of the metrics (i) set forth in its approved wildfire mitigation plan including Public Safety Power Shutoffs (PSPS) protocols, (ii) resulting from its on-going safety culture assessment, (iii) contained within the approved Safety and Operational Metrics, or (iv) related to other specified safety performance goals;

   iii.  PG&E demonstrates insufficient progress toward approved safety or risk-driven investments related to the electric and gas business; or

   iv.  PG&E (or PG&E Corporation) fails in any material respect to comply with the Commission's requirements and conditions for approval of its emergence from bankruptcy.

B.  Actions During Step 1

PG&E will submit a Corrective Action Plan to the Executive Director within twenty days of a Commission Order placing PG&E into Step 1.

   i.  The Corrective Action Plan shall be designed to correct or prevent a recurrence of the Step 1 Triggering Event, or otherwise mitigate an ongoing safety risk or impact, as soon as practicable and include an attestation stating that it has been approved by the Chief Risk Officer (CRO).

ii. The Corrective Action Plan, including any timeframes set forth therein for the correction of the Triggering Events or mitigation of any ongoing safety risk or impact, shall be approved by the Commission or the Executive Director.

iii. Commission staff will monitor PG&E's compliance with its Corrective Action Plan based on, among other things, existing or enhanced reporting.

iv. The CRO, the Safety and Nuclear Oversight (SNO) Subcommittee, and the boards of directors shall provide reporting to the Commission as directed.

C. Performance that Results in Exit from Step 1

i. PG&E shall exit from Step 1 of the Process upon issuance of a Commission Resolution finding that PG&E has met the conditions of its Corrective Action Plan within the required timeframe.

ii. The Commission, by Resolution, will move PG&E to Step 2 if it fails to adequately meet the conditions of its Corrective Action Plan within the required timeframe. PG&E may remain in Step 1 if it demonstrates sufficient progress toward meeting the conditions of its Corrective Action Plan and additional time appears needed to successfully address the Triggering Event(s).

## **DISCUSSION**

PG&E should be placed in Step 1 of the EOE Process based on Triggering Event A(iii) above. PG&E failed to prioritize its limited vegetation management resources in 2020 on working the highest risk power lines for EVM, thereby "demonstrat[ing] insufficient progress toward approved safety or risk-driven investments related to the electric … business."

To remedy this failure, PG&E's Corrective Action Plan must explain in detail how it will both perform risk modeling and use the results of risk modeling to ensure the highest risk power lines are prioritized for vegetation management under its EVM program in 2021 before working lower risk lines. It must report changes to its risk modeling and output proactively. It must report accurately to the Commission the location where it intends to engage in EVM and demonstrate that it is prioritizing high risk power lines for EVM work.

The facts supporting invocation of Triggering Event in Step 1 Section A(iii) appear below.

### 1.    Failure to Target Highest Risk Power Lines for EVM

The WSD's Action Statement and Commission's Resolution approving PG&E's 2020 WMP required PG&E to demonstrate that it was using a system of risk prioritization in all of its wildfire mitigation work.[2]  This direction included a requirement that PG&E use risk assessment to determine where to target its EVM work.

Over the course of 2020 and early 2021, PG&E provided the WSD with three different lists ranking its power lines by risk (with item 1 being the highest-risk circuit or feeder). Each risk ranking differed from the others in material respects. Notwithstanding these differences in approach to identifying high risk power lines, under each risk ranking list, less than five percent of the EVM work PG&E completed in 2020 was done to the 20 highest-risk power lines.  This failure to appropriately prioritize and execute EVM on its highest-risk power lines is a Triggering Event under Step 1, Section A(iii), because PG&E has demonstrated insufficient progress toward approved safety or risk-driven investments related to its electric business.

As detailed in WSD's recently published Audit Report on PG&E's Implementation of Enhanced Vegetation Management Program in 2020 (EVM Audit),[3] PG&E furnished WSD with three risk rankings dated September 2020, December 2020, and January 2021. If one tallies the total percentages worked under either the September 2020 or January 2021 risk rankings, the work completed as a percentage of the total was at most 4.9 percent, as shown in Table 1 below:

---

[2] *See, e.g.,* Resolution WSD-003 at 24-25 & Appendix A, Conditions PGE-5 and PGE-18; Resolution WSD-002 at 21 & Appendix A, Conditions Guidance-1 and Guidance-3; and WSD June 11, 2020 Action Statement on PG&E's WMP at 3-5.

[3] The EVM Audit is available at the following link: https://www.cpuc.ca.gov/uploadedFiles/CPUCWebsite/Content/About_Us/Organization/Divisions/WSD/2021.02.08.EVMAudit.pdf.  Its contents are incorporated as if set forth herein.  In response to the EVM Audit, PG&E has stated the January 2021 risk ranking is not a "model" but that characterization does not alter the basic conclusion of this Resolution.

**Table 1 - Work Completed on Top 20 Circuits as Proportion of Total EVM Work Completed (September 2020 and January 2021 Rankings)**

|  | Miles of Work Completed, as of January 3 2021 | Work completed as % of total |
|---|---|---|
| Top 20 circuits, September risk rankings | 59.19 | 3.2% |
| Top 20 circuits, January risk rankings | 91.72 | 4.9% |
| All circuits | 1877.94 |  |

Table 2 shows the risk rankings of PG&E's power line circuits:

**Table 2 - Risk Rankings from PG&E**
**(September 2020, December 2020, January 2021) Sorted by January 2021 Rankings; Highest Risk is #1**

| Circuit | Risk score rank | | |
|---|---|---|---|
|  | September | December | January |
| PUEBLO 2103 | 107 | 1 | 1 |
| APPLE HILL 2102 | 276 | 2 | 2 |
| PINE GROVE 1102 | 90 | 3 | 3 |
| MOLINO 1102 | 10 | 4 | 4 |
| EL DORADO PH 2101 | 8 | 5 | 5 |
| SILVERADO 2104 | 86 | 6 | 6 |
| HICKS 2101 | 540 | 7 | 7 |
| RINCON 1101 | 57 | 8 | 8 |
| PLACERVILLE 2106 | 103 | 9 | 9 |
| CASTRO VALLEY 1104 | 575 | 10 | 10 |
| SANTA ROSA A 1111 | 235 | 11 | 11 |
| WYANDOTTE 1103 | 112 | 12 | 12 |
| DUNBAR 1101 | 174 | 13 | 13 |
| STELLING 1110 | 295 | 14 | 14 |
| PUEBLO 2102 | 34 | 15 | 15 |
| STANISLAUS 1702 | 4 | 16 | 16 |
| SAN RAFAEL 1108 | 266 | 17 | 17 |
| BRUNSWICK 1106 | 13 | 18 | 18 |
| WOODSIDE 1104 | 332 | 19 | 19 |
| CASTRO VALLEY 1106 | 190 | 20 | 20 |
| ... | | | |
| HIGGINS 1110 | 302 | 500 | 430 |
| PERRY 1101 | 121 | 805 | 591 |
| RESERVATION ROAD 1101 | 81 | 952 | 635 |

While PG&E's changing approach to its risk ranking made it more challenging for WSD to evaluate PG&E's EVM work, under all three risk rankings, PG&E has made insufficient progress toward risk-driven investments in its EVM program.  Simply put, PG&E failed to risk-prioritize its EVM work on the ground, as is apparent from an

analysis of the EVM work performed under any of the results.[4]  This failure is demonstrated in the following tables and figures and summary, which are based on WSD's EVM Audit.

PG&E states it completed 1,800 miles of EVM work in 2020 on 161 circuits.  As shown in Table 3, using the September risk ranking, fewer than 60 miles of EVM work was completed on the top 20 highest risk lines.  As shown in Table 4, using the January risk ranking, fewer than 92 miles of the 1,800 miles of EVM work was completed on the top 20 highest risk circuits.

**Table 3 - Miles of Completed Work, Top 20 Highest Risk Circuits (September 2020)**

| Circuit | Risk score rank | | Miles of Completed Work, as of January 3, 2021 |
|---|---|---|---|
| | September | January | |
| MIWUK 1701 | 1 | 63 | 0.66 |
| WOODACRE 1101 | 2 | 180 | 7.85 |
| MONTE RIO 1113 | 3 | 44 | 0.65 |
| STANISLAUS 1702 | 4 | 16 | 3.60 |
| ORO FINO 1102 | 5 | 42 | 0.57 |
| MIWUK 1702 | 6 | 57 | 1.56 |
| WOODSIDE 1101 | 7 | 171 | 6.98 |
| EL DORADO PH 2101 | 8 | 5 | 4.51 |
| MIDDLETOWN 1101 | 9 | 66 | 19.68 |
| MOLINO 1102 | 10 | 4 | 0.14 |
| ORO FINO 1101 | 11 | 25 | 1.32 |
| BRUNSWICK 1105 | 12 | 23 | 1.43 |
| BRUNSWICK 1106 | 13 | 18 | 7.30 |
| FITCH MOUNTAIN 1113 | 14 | 39 | 1.90 |
| MONTE RIO 1112 | 15 | 164 | 0.18 |
| SALT SPRINGS 2102 | 16 | 62 | 0.00 |
| BRUNSWICK 1103 | 17 | 33 | 0.87 |
| WEST POINT 1101 | 18 | 72 | 0.00 |
| CHALLENGE 1102 | 19 | 148 | 0.00 |
| FORESTHILL 1101 | 20 | 51 | 0.00 |
| | | *Total:* | 59.19 |

---

[4] The December 2020 and January 2021 Risk Rankings are similar for the highest risk circuits; accordingly, like the EVM Audit this Resolution uses the September 2020 and January 2021 lists.

**Table 4 - Miles of Completed Work, Top 20 Highest Risk Circuits
(January 2021)**

| Circuit | Risk score rank | | Miles of Completed Work, as of January 3, 2021 |
|---|---|---|---|
| | September | January | |
| PUEBLO 2103 | 107 | 1 | 0.87 |
| APPLE HILL 2102 | 276 | 2 | 28.93 |
| PINE GROVE 1102 | 90 | 3 | 0.45 |
| MOLINO 1102 | 10 | 4 | 0.14 |
| EL DORADO PH 2101 | 8 | 5 | 4.51 |
| SILVERADO 2104 | 86 | 6 | 38.89 |
| HICKS 2101 | 540 | 7 | 0.00 |
| RINCON 1101 | 57 | 8 | 0.00 |
| PLACERVILLE 2106 | 103 | 9 | 0.00 |
| CASTRO VALLEY 1104 | 575 | 10 | 0.00 |
| SANTA ROSA A 1111 | 235 | 11 | 0.60 |
| WYANDOTTE 1103 | 112 | 12 | 0.00 |
| DUNBAR 1101 | 174 | 13 | 2.04 |
| STELLING 1110 | 295 | 14 | 0.00 |
| PUEBLO 2102 | 34 | 15 | 4.41 |
| STANISLAUS 1702 | 4 | 16 | 3.60 |
| SAN RAFAEL 1108 | 266 | 17 | 0.00 |
| BRUNSWICK 1106 | 13 | 18 | 7.30 |
| WOODSIDE 1104 | 332 | 19 | 0.00 |
| CASTRO VALLEY 1106 | 190 | 20 | 0.00 |
| | | *Total:* | 91.72 |

Seen another way, based on either PG&E's September 2020 or January 2021 risk
rankings, as of January 3, 2021, PG&E's own reports show that a significant portion of
the total miles for the 20 highest risk circuits remains unworked. This fact is
demonstrated in Figures 1 and 2:

**Figure 1 - Miles Completed and Unworked Miles, Top 20 Circuits
(September 2020)**



**Figure 2 - Miles Completed and Unworked Miles, Top 20 Circuits (January 2021)**



Further, looking at the full set of 161 circuits on which PG&E performed any EVM work in 2020, the highest percentage of this work was completed on the lowest-risk circuits. Figures 3 and 4 below illustrate the percentage of miles worked (in the green bars) on all 161 circuits, showing the September risk rankings in Figure 3 and the January risk rankings in Figure 4:

**Figure 3 - Miles Completed and Unworked Miles**
**161 Circuits with Work Performed in 2020, September Risk Rankings**



**Figure 4 - Miles Completed and Unworked Miles
161 Circuits with Work Performed in 2020, January Risk Rankings**



The examination in Figures 3 and 4 of the full set of 161 circuits on which PG&E performed EVM work in 2020 shows that the low-risk circuits received the greatest focus. This result is the opposite of the desired result and contrary to the expectations in the EOE Process that PG&E would demonstrate progress toward approved safety or risk-driven investments or else be placed into Step 1 of the EOE process.

By failing to prioritize EVM on the circuits PG&E itself identified as highest risk and allocating resources instead to conducting EVM on lower-risk circuits, in 2020 PG&E made insufficient progress toward approved safety or risk-driven investments.

## 2.    Consequences of Step 1 – Corrective Action Plan

Step 1 triggers a requirement for PG&E to submit a Corrective Action Plan for approval by the Commission's Executive Director. The Commission may move PG&E to another Step if it fails to adequately meet the conditions of its Corrective Action Plan within a required timeframe. If PG&E complies with the Corrective Action Plan requirements, it may exit Step 1. The Commission will inform PG&E whether PG&E has complied with the Step 1 conditions and may exit Step 1 via a Resolution. The Commission will issue a new Resolution in the event PG&E is required to move to another step of Enhanced Oversight and Enforcement.

PG&E's Corrective Action Plan must explain how it will model the highest risk power lines and demonstrate that PG&E is prioritizing the highest risk lines in its EVM program. PG&E must also report accurately to the Commission where it is performing work and keep the Commission apprised of changes in its plans or the risk model(s) used to inform those plans. PG&E's Corrective Action Plan is due no later than 20 days following issuance of this Resolution.

### 3.    Corrective Action Plan for Triggering Event A(iii)

PG&E shall submit its Corrective Action Plan for approval by the Commission's Executive Director.  The Corrective Action Plan for Step 1 Section A(iii) shall consist of reporting starting on day 20 and every 90 days thereafter (until the Commission issues a Resolution or other communication ceasing the required reporting) as follows:

1.  A detailed description of the circumstances that contributed to PG&E's failure to adequately prioritize the highest risk lines, as described in this Resolution and the WSD's EVM Audit, in its EVM in 2020;

2.  A detailed description of its risk model(s) for determining where to target EVM in the next 90 days, including the specific data sets and vegetation management records PG&E is using as inputs to the risk model, and the data modeling program(s) that make up PG&E's risk model;

3.  A detailed list of the EVM projects for the calendar year of the reporting date and the EVM plan for the subsequent calendar year, when available;

4.  A description of how the list in item 3 above ensures PG&E is prioritizing the power lines with highest risk first;

5.  A description of PG&E's decision-making that leads to the list in item 3: how the list is developed, evaluated, revised in terms of projects that are added to or dropped from the list, finalized, and communicated to EVM work crews, and PG&E's internal documentation of the decision-making process;

6.  An explanation of the rationale for any planned EVM work that does not target the power lines with highest risk first;

7.  Any changes to the 2021 Wildfire Distribution Risk Model, the Wildfire Consequence Model, or the Vegetation Risk Model occurring over the prior 90 days or planned for the subsequent 90 days;

8.  A detailed description of the circumstances that contributed to PG&E management's inconsistent reporting on the details of its risk modeling and risk ranking lists;

9.  Verification by a senior officer of PG&E that the risk model, including underlying data sets and vegetation management records, it is using to prioritize EVM is as set forth in its report;

10. Verification by a senior officer of PG&E that it will target a substantial majority of EVM to the highest risk circuit protection zones first, as shown by its risk model or other ranking, in the next 90 days for EVM;

11. Verification by a senior officer of PG&E that it targeted a substantial majority of EVM to the highest risk circuit protection zones first, as shown by its risk model or other ranking, in the prior 90 days;

12. Verification by a senior officer of PG&E that the company has communicated information and internal decisions in items 3, 4 and 9 above to personnel of PG&E's EVM programs and that such personnel is aware of where to target EVM in the subsequent 90 days.

13. A proposed timeline for ending the required reporting, with a detailed explanation of why the proposal ensures PG&E is in compliance with the requirement that it prioritize high risk circuits in its EVM work. The timeline shall include milestone goals for June 1, 2021, September 1. 2021, and December 31, 2021. These goals shall include a targeted percentage of high risk power line circuits to be completed by those dates.

14. A description of how the Corrective Action Plan proposed in response to this Resolution will complement and not undermine PG&E's compliance activities ordered in D.20-05-019.[5]

PG&E shall coordinate with Commission Staff on the formatting of its reporting for its Corrective Action plan to ensure the information provided is clearly discernable and demonstrates whether PG&E has made progress over the prior 90 days. At all times, the Commission retains the authority to exercise all powers within its jurisdiction regardless of PG&E's position in Step 1 of the EOE Process.

---

[5] D.20-05-019 adopted a settlement agreement among PG&E, the Safety and Enforcement Division and other parties which required several actions by PG&E with regard to its vegetation management, including 1) a Tree Crew Training and Certificate Program; 2) a Pre-Inspector Training and Certificate Program; 3) a Vegetation Management Oversight Pilot; 4) Semi-Annual Wildfire Mitigation Meetings among PG&E and local government planning, public works, emergency services, and fire leadership to exchange feedback and information regarding ongoing wildfire safety activities; 5) Independent Wildfire Safety Audits; 6) Quarterly Reports on Electric Maintenance Work; 7) Fuel Reduction Funding; 8) Local Government Vegetation Management Data Sharing: and 9) a PG&E shareholder-funded Independent Study of PG&E's Distribution and Transmission System.

**CONCLUSION**

PG&E's conduct set forth herein justifies its placement into Step 1 of the EOE Process established in D.20-05-053. Consequently, PG&E is required to serve a Corrective Action Plan, as described herein, no later than 20 days following issuance of this Resolution for approval by the Commission's Executive Director, and a progress report on the Corrective Action Plan every 90 days thereafter. If PG&E demonstrates that it is prioritizing high risk lines for EVM to the Commission's satisfaction, it may be removed from the EOE process by Resolution. If it fails to satisfy the Step 1 requirements, it may be placed in Step 2 or such other Step as the Commission may direct. The Commission will issue a new Resolution specifying the consequences of such a failure by PG&E.

Nothing in this Resolution precludes the Commission from placing PG&E into another Step of the EOE Process if warranted.

**COMMENTS**

Public Utilities Code Section 311(g)(1) provides that this Resolution must be served on all parties and subject to at least 30 days public review and comment prior to a vote of the Commission. This Resolution is being served on the service lists for I.19-09-016 (which created the EOE Process) and R.18-10-007 (a formal Commission wildfire-related proceeding).

Timely comments were received from The Utility Reform Network (TURN), the Public Advocates Office (PAO), the Rural County Representatives of California (RCRC), and PG&E.

TURN supports the finding that PG&E failed to prioritize its 2020 EVM work based on risk even though it had been directed to do so by WSD. However, TURN argues that the Draft Resolution is unduly lenient, and should be modified by placing PG&E in Step 2 of the EOE Process. Specifically, TURN argues that PG&E's failure to report this transgression constitutes "fail[ure] to report to the Commission a systematic electric . . . safety issue," justifying immediate escalation to Step 2 of the EOE Process. TURN also argues that PG&E's failure to perform climbing inspections of transmission structures in high fire threat districts, as noted in a letter from a Federal Monitor dated October 16, 2020, is another example of "systemic safety problems covered by the Step 2 triggering event." TURN also asserts the Draft Resolution should be modified to make clear that PG&E could face further consequences, including potential disallowance of cost of mis-prioritized 2020 wildfire mitigation work.

TURN also asserts that the corrective action plan needs to be supplemented with "requirements to address the problems captured by Step 2 triggering event A(iv) – PG&E's failure to self-report its improper execution of the 2020 WMP as well as the

systemic nature of the breakdown," and that PG&E should be required to explain: (1) why PG&E's managerial systems allowed low-priority work to take precedence over work to address the highest risk parts of its system), (2) what PG&E is doing to prevent systemic breakdowns and failures to self-report in the future, and (3) the monitoring and associated reports that need to be implemented to ensure that these failures will not recur. In particular, TURN states that "PG&E should not be allowed to continue to evade a specific discussion of what it has done wrong," and that "PG&E must be directed to provide a plan to ensure that its managers understand that it is not appropriate to elevate paper compliance with WMP targets above the achievement of maximum risk reduction."

PAO supports Draft Resolution M-4852, but recommends that it be revised to include additional reasons for triggering Step 1 of the EOE Process including PG&E's failure to prioritize climbing inspections of transmission structures in high fire threat districts and the nominal increase in injuries to PG&E employees and contractors while performing wildfire mitigation work in 2020 compared to 2019. PAO recommends additional corrective actions corresponding to the additional triggering events, but does not propose specific actions.

RCRC expresses strong support for Draft Resolution M-4852.

PG&E notes that the issues raised in this the Draft Resolution are consistent with concerns raised by the Wildfire Safety Division and the Federal Monitor about PG&E's EVM program. PG&E states that it has implemented significant improvements to its EVM program and will continue to do so as outlined in its 2021 Wildfire Mitigation Plan. PG&E suggests minor modifications to clarify the scope and/or timing of Corrective Action Plan Elements 3, 7, 10, and 11, and Finding 1.

At this time, we believe PG&E's failure to prioritize EVM is the appropriate basis for triggering Step 1 of the EOE Process. We acknowledge the other issues raised by TURN, but do not find them to rise to the level of a triggering event at this time. Nevertheless, as Commission President Marybel Batjer explained in her letter to PG&E dated November 24, 2020, the Commission is "intensely focused on progress by PG&E in its wildfire mitigation activities." The Commission will continue to closely monitor PG&E's performance on safety, including, but not limited to, its compliance with all aspects of its WMP. Should additional instances of non-compliance occur or patterns of deficiencies emerge that indicate a systemic safety issue, the Commission will require additional corrective actions or advance PG&E pursuant to the EOE process. Additionally, depending on the prevalence and/or severity of non-compliance or deficiencies, the Commission's Safety and Enforcement Division may issue citations where appropriate the Commission may invoke its authority to issue Orders to Show Cause and Orders Instituting Investigation and to impose fines and penalties. In short, we will continue to hold PG&E accountable, in real time to fulfill its safety responsibilities, independent and parallel to any other regulatory or judicial process.

We agree with TURN that further specifics and detail are needed from PG&E to explain its failures in risk-prioritizing its EVM work in 2020, in order to understand what went wrong and to correct the course for 2021. We have modified the Corrective Action Plan to add detail to PG&E's reporting obligations, including an additional element focused on PG&E's decision-making process in undertaking EVM activities. These modifications partially implement TURN's recommendations and are intended to help the Commission identify systematic failures in PG&E's process.

With respect to the clarifications to the corrective actions proposed by PG&E, the proposed modifications to Elements 3, 7, and Finding 1 are consistent with the intent of the Draft Resolution, and have accepted these proposed changes. However, we decline to fully modify Elements 10 and 11, as requested, because the proposed changes do not meet the intent of the Draft Resolution.

## FINDINGS

1. PG&E did not sufficiently prioritize its Enhanced Vegetation Management (EVM) based on risk in 2020.

2. PG&E's progress on the highest risk power lines in 2020 is set forth herein in Tables 1-4 and Figures 1-4, as well as the EVM Audit.

3. PG&E's failure to prioritize EVM on the highest risk power lines is a Triggering Event under Step 1 Section A(iii) of the EOE Process in D.20-05-053, which applies Step 1 if PG&E fails to make progress toward approved safety or risk-driven investments related to the electric business.

4. As a consequence of PG&E being in Step 1, PG&E is required by D.20-05-053 and this Resolution to submit a Corrective Action Plan. The Corrective Action Plan shall address the issues contained in this Resolution and be served as directed herein no later than 20 days following issuance of this Resolution, with follow-up reporting every 90 days thereafter.

5. The Commission will notify PG&E whether it meets or fails to meet the requirements of the Corrective Action Plan ordered in this Resolution. If it meets the requirements, the Commission will determine by Resolution that PG&E may exit Step 1.

6. If the Commission determines that PG&E has failed to satisfy the Corrective Action Plan, it may place PG&E in Step 2 or other relevant Step set forth in D.20-05-053. The Commission will issue a new Resolution specifying the consequences of such a failure by PG&E.

**THEREFORE, IT IS ORDERED that:**

1. Pacific Gas and Electric Company is in Step 1 of the Commission's Enhanced Oversight and Enforcement Process adopted in Decision 20-05-053.

2. Pacific Gas and Electric Company shall serve in Investigation 19-09-016 (the proceeding resulting in Decision 20-05-053), Rulemaking 18-10-007 (a formal wildfire-related proceeding), and serve on the Wildfire Safety Division at wildfiresafetydivision@cpuc.ca.gov, and on the Safety and Enforcement Division at ESRB_ComplianceFilings@cpuc.ca.gov, on the Commission's Executive Director, and/or any other proceeding service lists or persons requested by the Commission or its staff, a Corrective Action Plan as described herein.  The Corrective Action Plan shall be served no later than 20 days following issuance of this Resolution.  The Corrective Action Plan shall request approval by the Commission's Executive Director.

3. Every 90 days following service of the Corrective Action Plan described above, Pacific Gas and Electric Company shall serve in the same proceedings, and on the same email addresses as in ordering paragraph 2, a report updating the information required in the Corrective Action Plan until such time as the Commission issues a Resolution or other communication ceasing such required reporting.

4. In its Corrective Action Plan, Pacific Gas and Electric Company shall propose a timeline for the cessation of reporting required in this Resolution, with justification of the proposal.

5. Upon Pacific Gas and Electric Company's demonstration that it is prioritizing high risk lines for Enhanced Vegetation Management to the Commission's satisfaction and meeting all of the Step 1 conditions imposed by this Resolution, the Commission will issue a Resolution allowing Pacific Gas and Electric Company to exit Step 1.

6. If Pacific Gas and Electric Company fails to demonstrate that it is prioritizing high risk lines for Enhanced Vegetation Management to the Commission's satisfaction and meeting all of the Step 1 conditions, the Commission may place Pacific Gas and Electric Company in Step 2 or other relevant Step set forth in Decision 20-05-053.  If the Commission determines such action is appropriate, it will issue a new Resolution.

7. Nothing in this Resolution limits the Commission's authority to place Pacific Gas and Electric Company into any Step set forth in Decision 20-05-053's Enhanced Oversight and Enforcement process at any time.

8. Nothing in this Resolution limits the Commission's authority to take actions to ensure safe and reliable gas and electric service, enforce its own orders or California law and regulation, or take any other steps to ensure Pacific Gas and Electric Company's system is designed, operated and maintained to mitigate catastrophic wildfire.

This Resolution is effective today.

I certify that the foregoing Resolution was duly introduced, passed and adopted at a conference of the Public Utilities Commission of the State of California held on April 15, 2021, the following Commissioners voting favorably thereon:

 

 

 

_____
Rachel Peterson
Executive Director