G. LARRY ENGEL (SBN 53484)
**ENGEL LAW, PC**
12116 Horseshoe Lane
Nevada City, California 95959
Telephone: (415) 370-5943
larry@engeladvice.com

Attorneys for
Creditor (who is also the Creditor himself
and shares the same address and data for service
and otherwise, is the person with authority to reconcile,
settle, or otherwise resolve the Objection as to Creditor)

## UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| In re:<br><br>PG&E CORPORATION<br><br>-and-<br><br>PACIFIC GAS AND ELECTRIC COMPANY,<br><br>               Debtors.<br><br>Affects both Debtors | CASE NO. 19-30088 (DM)<br><br>Chapter 11<br>(Lead Case – Jointly Administered)<br><br>HEARING INFORMATION:<br><br>Date:     June 15, 2021<br>Time:    10:00 AM (Pacific Time)<br>Place:   (Telephonic Appearances Only)<br>         United State Bankruptcy Court<br>         Courtroom 17, 16th Floor<br>         San Francisco, CA. 94102<br><br>Reply Deadline: 5/14/21 |

**DECLARATION #2 OF G. LARRY ENGEL IN SUPPORT OF HIS "REPLY" TO (1)"REORGANIZED DEBTORS' FURTHER OBJECTION TO CLAIMS 80033 AND 80500" [DKT. 10574] ("OBJECTION #2"), RELATING TO (2) REORGANIZED DEBTORS' FORTY-SECOND OMNIBUS OBJECTION TO CLAIMS (NO LIABILITY/PASS THROUGH CLAIMS) [DKT 9460] ("OBJECTION #1"); AND SUPPLEMENTING (3) ENGEL'S "RESPONSE AND REQUEST FOR SECTION 105(D) STATUS CONFERENCE AND REQUEST FOR JUDICIAL NOTICE" [DKT 9653] ("RESPONSE #1"). RELATED COURT ORDER [DKT 10471]**

To: (A) The Honorable Dennis Montali, United State Bankruptcy Judge; (B) The Office of the United States Trustee; (C) Debtors and Reorganized Debtors; and (D) Other Parties Entitled To Notice:

///

///

Case: 19-30088   Doc# 10642-1   Filed: 05/11/21   Entered: 05/11/21 16:54:33   Page 1 of 42

**TABLE OF CONTENTS**

I.      Introductory Data Relating To Creditor And His Allegations And Claims........................1

II.     Rebuttals Of Specific Objection #2 Errors And Omissions By Debtors Arguing (Incorrectly And Without Any Substantiation Or Declaration) That My Poc Claim Essential Allegations Are Presently Insufficient, Deficient Or Missing............................8

III.    Some Key Examples That Rebut Some Of Debtors' Objection #2 Allegations And Contentions From CPUC I:19-11-013 Dated 4/20/21, Which Specifically Finds Many Types Of PG&E Noncompliance In 2019 With PSPS Guidelines And Law, So As To Cause Violations Of PUC §451. ........................................................20

IV.     Comments To Explain Some Of My POC Allegations For Claim And Damages, Etc. Theories, And An Illustrative POC Core Theory. .......................................26

        A.      Generally Framing The Disputes My Way, As Opposed To The Debtors' Incorrect Way................................................................26

        B.      Damages, Mitigation, Restitution And Remedy Allegations................................37

V.      Comments About Court Concerns As To The Broad Scope Of My POC, And Status Conference Suggestions For Using Related Proceedings For Cost-Effective Resolutions With Less Burden On The Court, Including By Using PG&E Admissions In Related Proceedings And Useful Rule 30b-6 Admissions By The "Right" Witnesses. ........................................................38

Case: 19-30088    Doc# 10642-1    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page 2 of 42

I, George Larry Engel, pursuant to section 1746 of title 28 of the United States Code, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

**I.      Introductory Data Relating To Creditor And His Allegations And Claims.**

1.      I submit this Declaration for and on behalf of myself in support of the attached Reply filed herewith (the "Reply") to the "Reorganized Debtors' Further Objection To Claims 80033 and 80500" [Dkt. 10574] ("Objection #2") to my Proof of Claim #80033 ("POC") and my related "Response #1" and "Declaration #1" [Dkt 9653] that I filed earlier in opposition to Debtors' initial "Objection #1," which Response #1 and Declaration #1 I reaffirm and incorporate where referenced herein. This Declaration is also supported by a Request for Judicial Notice (herein, together with the Reply Exhibits 1-3 for judicial notice, called the "RJN"). My reference to "Debtors" includes Reorganized Debtors as well, since their post-petition wrongs continue post-reorganization.

2.      This Declaration is unusual, since the Debtors and I are disputing what my allegations are or are not in my POC and other filings, and what is included or not therein. Thus, when I clarify or explain what I have alleged or supplement my allegations with more allegations, I am making allegations as if this were a complaint. Since the Debtors' disputed process (addressed at the end of this Declaration) has not yet permitted me to file a normal complaint, but the Debtors are "reinterpreting" my allegations and treating my POC as if it were to be judged by normal rules applicable to complaints, I find myself having no choice but to clarify and supplement prior allegations with more allegations in this Declaration. Nevertheless, except as otherwise indicated herein, all facts set forth in this Declaration are based upon my personal knowledge, my review of, and information obtained from, and, where appropriate, in addressing relevant allegations at issue, my information and belief: (a) the documents  and record of "**Related Proceedings**" defined or referenced in my POC, Response #1, RNJ, and Reply, (b) the "**Key PSPS POC Documents**" defined in my POC, including as updated and amended in those Related Proceedings, (c) updating supplements thereto noted herein, in the RJN, or in my Reply, (d) comments of relevant parties in interest in this Case, Related Proceedings, and the prior

PG&E Chapter 11 case, such as amicus briefs of the CPUC and others in Judge Alsup's Probation Case, and (e) my review of other relevant documents and information. If called upon to testify, I would testify competently to the facts set forth in this Declaration and defend my allegations.

3.      I am a licensed attorney, who retired from Morrison & Foerster, LCC, on 12/31/15. I still do some solo work on selected projects from my home office at the above address, both individually and through my professional corporation, Engel Law, PC. Apart from my wife on some occasions, I have no employees. Instead, I outsource various support functions, mostly remotely, both because of location differences and, more recently, Covid issues. Unfortunately, such remote support is periodically harmed by the same excessive PSPS problems at issue here, and cost-effective physical support in other places requires either effective internet that may also be disrupted by PSPS or long drives when Covid rules permit such contact.

4.      To perform work at my home office requires that I have reliable electricity, internet, and phone service, including such access to effective outsourced support, which PG&E's PSPS program excessively disrupts in ways that create Claims as described in my POC, Response #1, Declaration #1, and Reply. Since my work is often in the Bay Area, a three-hour drive away (one way) from my home office, such internet and phone connectivity here is critical to functionality at my standard. The PSPS at issue in the POC disrupts that functionality for time periods that are "excessive" (as explained in my Declaration #1 and Response #1, with specific PSPS data alleged by me below).

5.      Worse, those PSPS disruptions are expected to continue for at least a decade as planned by PG&E in its applicable Wildfire Mitigation Plan and much longer according to Monitor reports to probation Judge Alsup, as alleged herein. See Reply Exhibit 1 (where Judge Alsup predicts things about what I call excessive PSPS, although based on PG&E admissions and reports to the CPUC, such as Reply Exhibit 2, I worry that such PSPS delays may be longer.

6.      I allege that my such concerns and allegations are reasonable, especially considering PG&E's controversial Reply Exhibit 2 stated plan to deal with adjacent big trees at risk of falling on dangerous wires and gear and threatening to make my PSPS problems even more excessive. I allege that the data on which that PG&E plan is based illustrate and implicitly

admit how truly dangerous PG&E's "run it until it breaks" practices have made its neglected and dangerous system, thereby risking ever more extreme PSPS mitigation of Debtors' continuing wrongs alleged by me. Even worse, Reply Exhibit 3 illustrates how only 5% of the essential EVM work by PG&E in 2020 was in high-risk areas, such as mine, properly drawing a sharp rebuke from the CPUC and others. Considering what I allege about PG&E's long history of repeated wrongful conduct, evasions, and coverups, as well as other continuing reasons (e.g., PG&E's alleged historical selection of outsource contractors who too often fail to find fault with PG&E when it exists, and alleged PG&E middle and lower management issues, where these problems would not be easy for the high level executives to correct, even if they wished to do so), I believe that it is reasonable for me to expect and plan for such dangerous Debtor conduct to continue to my prejudice and Debtors' benefit, thus, for example, justifying my generator as risk and PSPS harm mitigation.

7.      What is described in my Reply Exhibits and RJN documents demonstrates that, among other things, PSPS is still an evolving mitigation effort in many ways to past and continuing PG&E wrongs and reactions thereto by the CPUC, Judge Alsup (in probation conditions), and others.  For example, what CPUC Investigation 19-11-013 illustrates in detail as I describe it below is that in 2019, among other things (and contrary to what I allege are Debtors' incorrect positions in this dispute), PG&E has repeatedly committed many documented violations of PSPS regulations (e.g., ESRB-8) and guidelines and PUC §451 safety requirements. Such RJN CPUC documents and Judge Alsup's Probation Case documents also support each other in ways that help make my case, although the CPUC documents are often less current and less critical, because they are often focused on overall regulation and policy, whereas Judge Alsup is rigorously pressing PG&E for the inconvenient truths that are at the core of my disputes and those of others suffering from Debtors' alleged continuing wrongful conduct.

8.      While Debtors appear to be incorrectly pressing for making this response into some kind of required trial brief on pain of dismissal as requested in their Objections, I am resisting that premature burden on the court (and me) in favor of simply supplying sufficient support for my clarified and supplemented allegations, so as to demonstrate the merit of my

positions and lay the foundation for a productive status conference, or, if Debtors decide to try their ADR process, a more useful process for resolving this. As to the future trial process for a comprehensive record of my allegations and evidence, I expect by then that there will be even more new developments in support for my case, such as from additional CPUC and Judge Alsup findings and rulings. Indeed, the specific CPUC website for "Public Safety Power Shutoff (PSPS)/De-Energization" (www.cpuc.gov/psps/) discloses many important ongoing investigations and proceedings, as well as many relevant documents that I expect to use at trial.

9.      Furthermore, besides being able to use (and, if required, duplicate) the CPUC findings and conclusions in various relevant proceedings, as I illustrate with CPUC PSPS Investigation 19-11-013 below, I also expect to be able to rebut and impeach Debtors' evidence and testimony based on matching their disputed positions in this case against what PG&E has had to admit to Judge Alsup in the continuing Probation Case in response to continuous questions from the bench and what the Judge has stated in his many rulings and orders. Much of that advances my case allegations. If Debtors take inconsistent positions in my case, they then will either make my case or prejudice their goals in the other CPUC Proceedings and Probation Case. I contend that these related disputes and matters require consistency from Debtors, and that supports my claims in this case.

10.      I regret the length and detail of my illustrations in this Declaration, as explained at the end of this Declaration. However, I allege that it is important not only to expose, for example, how the Debtors' incorrect claim of immunity under Tariff Rule 14 in their Objection #2 is not only wrong on the law (as shown in my Reply), but also contrary to relevant decisions and comments in these key cited CPUC Proceedings and Probation Cases. I allege that Debtors have not dared to assert such immunity theories (or their other overlapping attacks on my claim theories) in those other forums, and I hope addressing that inconsistency issue here may reduce such inconsistencies in this dispute. I allege that none of Debtors' relevant Rule 14 arguments (or Debtors' similar such Objection #2 arguments) disputed by me is reconcilable with my Reply Exhibits 1-3 or the RJN documents discussed in detail herein, such as I. 19-11-013 detailed below.

11. This is important to me, because I allege that I have good cause (e.g., Reply Exhibits 1-3) to fear that Debtors' continuing and excessive PSPS related wrongs will become worse, rather than better, on account of Debtors' disputed conduct such as illustrated in Reply Exhibits 1-3. Although it will be a while before the CPUC catches up with its Investigations of PSPS noncompliance in 2020, like the analysis the CPUC just completed in that 2019 Investigation, I expect more and different kinds of violations and wrong will be discovered in due course, such as I allege are illustrated by my Reply Exhibits 1 and 2 where PG&E appears to be trying to increase excessive PSPS in my high-risk area (Exhibit 2) and while neglecting the EVM compliance obligations in high risk areas like mine in favor of concentrating on easy work in lower risk areas as shown in Exhibit 3 as to Resolution M-4852 dated 3/17/21.

12. I recently became aware of a new PG&E response to that CPUC Resolution M-4852 exposé, which discussed alleged improvements by PG&E for 2021 in a new plan dated 5/6/21, entitled "Enhanced Oversight And Enforcement Process Corrective Action Plan Pursuant To Resolution M-4852" (herein called PG&E's "5/6/21 Corrective Action Plan"). I have not yet had an opportunity to study the 5/6/21 Corrective Action Plan. I allege PG&E is trying to distract from its M-4852 exposed 2020 wrongs by starting a new discussion of what PG&E contends to be new 2021 purported reforms. There is not sufficient time now for me to study and respond to this new development. However, a quick scan of the massive new PG&E document enables me to state that I see nothing that changes my filings, allegations, or positions. While this new plan seems written by PG&E to avoid express admissions and with the usual PG&E public relations "spin," there appear to be many implied admissions and data that I suspect will support my allegations and claims and defeat Debtors' Objection #2 arguments. One obvious fact to note is that this new plan seems irreconcilable with PG&E's incorrect attempt to defend excessive and unreasonable PSPS by (a) separating and isolating PSPS from (b) fire fuel and ignition risk that I allege has been wrongly created by PG&E in its continuous noncompliance with applicable laws and regulations, especially those vegetation management rules addressed in my Reply. I see many useful quotes to use against Debtors at trial.

13. And, just as I allege that Debtors failed to improve the right things in 2020 from

the lessons they should have learned from 2019, I also fear and allege that 2021 will be another year of increased problems instead of reform. I allege that CPUC has tried to improve PG&E compliance in the future by increasing its regulatory requirements (e.g., ESRB-8 enhancements in I.19-11-013) in order to prevent repetition of the 2019 PG&E wrongs and noncompliance chronicled in the 300-plus pages of the I.19-11-013 Decision identified below. However, I allege that real reform is not likely, unless PG&E chooses actual, meaningful reform (for which I see no convincing evidence that I find credible) instead of token projects and Debtors' public relations messaging. I therefore allege that the unsatisfactory history of Debtor wrongs and noncompliance (perhaps more cleverly and creatively than in the past—see my and CPUC comments of PSPS "sectionalization" below) seems doomed to repeat.

14. I allege that the real "inconvenient truth" problem is that the scope and scale of correcting the persistent, continuing dangers that Debtors have wrongfully created (e.g., what Judge Alsup called "robbing the safety budget") are more of an expense to their profitability goals than they are willing to accept in order for them to correct them in a timely manner. Thus, I allege that Debtors persist in only talking about this as an aging (run until it breaks) equipment issue being "addressed," when the real continuing issue is not just that such dangerous gear keeps **igniting fires**, but also the reality of so many dangerous big trees and other vegetation as **fire fuel** around the dangerous wires and gears that continue to exist in noncompliance with applicable laws and regulations (although nevertheless somehow being suffered by the regulators for another decade), while lesser evil, excessive PSPS continues to be a wrong in search of a remedy for people in high fire risk areas like mine.

15. **Specifically, I allege that, by the Utility's noncompliant actions and omissions included as one foundation of my POC claims, I believe that it is violating the CPUC rule that: "[u]nder no circumstances may the utilities employ de-energization solely as a means of reducing their own liability risk from utility-infrastructure wildfire ignitions…" D. 19-05-042 at 68.** If Debtors and Reorganized Debtors so persist, wrongly in their incomplete effort to restore such compliance in one area, without reducing the need for excessive PSPS there, before moving on to work fire risks in other areas, then I believe that several wrongful things are

happening together, especially as PG&E wrongly prioritizes remediation in lower risk areas over more needed work in high risk areas like mine, as the CPUC found was occurring in 2020 in M-4852 attached as Reply Exhibit 3 . First, I allege that PG&E is improperly so implementing such a "once over lightly everywhere" strategy in order to reduce (but not solve) their noncompliant exposure to fire liability risk in as many areas as possible as soon as possible, ignoring CPUC's such PSPS mandates. Second, I allege that they are creating and allowing conditions that tend to coerce people into either investing in self-defense generation or moving away from the excessive PSPS burdens, also in order to reduce that fire risk liability, contrary to such CPUC prohibition. Third, I allege that Debtors may be trying to create a two-tiered system that abuses their public trust monopoly, contrary to their obligation to serve under section 451 and otherwise, in order to be able to maximize the Debtors' profits from safer and higher profit urban and suburban areas, while minimizing their exposure to higher risk and cost/lower profit areas like mine. Thus, I further allege that the new Debtor proposal to expand work to big trees beyond the easement revealed in my Reply Exhibit 2 will have the effect of greatly increasing the excessive PSPS in high-risk areas like mine, which I understand Judge Alsup estimates from his data is a 12% customer problem (including me) facing a 55% increase in PSPS. See Reply Exhibit 1.

16.     As I have alleged and demonstrated in my Reply, none of the Debtors' *Gantner* or other Objection #2 regulatory defenses can save PG&E Corp. from its responsibility in participating in these alleged wrongs. Moreover, there is a CPUC regulatory focus on backup generation, such as discussed below, to moderate what CPUC recognizes as PSPS harms that make it a "last resort" as explained in the I.19-11-013 Decision referenced in my RJN. I allege that people like me who feel coerced by the threat of excessive PSPS for another decade are unjustly enriching these Debtor wrongdoers with our self-defense generators. That reality, nuisance, inverse condemnation, and B&PC §17200 entitle me to restitution at least for my generator, and, if not for the generator, there must be a mitigation recovery. Otherwise, I allege that Debtors have an incentive to reward themselves for their wrongs by coercing with excessive PSPS as many high risk area residents as possible into providing such self-defense generation in order to enhance the dangerous PG&E system and reduce political and regulatory pressure on

PG&E to actually improve and reform.

## II. Rebuttals of Specific Objection #2 Errors And Omissions by Debtors Arguing (Incorrectly And Without Any Substantiation or Declaration) That My POC Claim Essential Allegations Are Presently Insufficient, Deficient Or Missing.

17. This section supports my Reply rebuttal of at least a dozen places in Debtors' Objection #2 where they incorrectly accuse me (without any substantiation or even sufficiently stated basis) of "fatal" insufficiencies or omissions in my allegation. That happens often when they are trying (incorrectly) to squeeze me into their *Gantner only* negligence model. However, I provide evidence and allegations herein to rebut those Debtor Objection #2 efforts to ignore and mischaracterize my actual allegations in my POC, as already clarified and explained in my Response #1 and Declaration #1. Because that disputed Debtors' approach has scattered my allegations and case facts and theories across various filings, I address each such wrong below with a correction, and then later below I present an integrated narrative of my core claim data. For ease of identification, I highlight Debtors' incorrect allegations rebutted in each paragraph.

18. Debtors' Objection #2 begins with an erroneous claim (p.1 at lines 9-10) that: **"Nor do they [I] allege that PG&E violated the …CPUC … regulations that govern PSPS events and authorize de-energization. Instead …"** [stating at Objection #2 pp.1-2 a limited and less powerful version of my claims, which I rebut as shown herein and in the RJN (and also in my stated rebuttals of the Debtors' misstatements of the applicable law and regulations as shown in my Response #1 and Reply.] What Reply Exhibits 1-3 show and I allege to the contrary of Debtors' arguments are: (a) that PSPS issues cannot be separated from the fire risks with which they are inextricably integrated in my claims as I allege them, including as to those knowingly and willfully continuing wrongs caused by PG&E's creation, maintenance, and operation of its dangerous and noncompliant system, including PSPS mitigation as now a continuing part of that system's operation; and (b) that Debtors' continuing caused fire risks include the combination of fuel and ignition threats, which threats still occur here along most of PG&E's uninsulated wires and neglected gear adjacent to massive trees and vegetation that should never have existed under applicable laws and regulations that I have cited in my Reply, Response #1 or RJN (or referenced in such cited documents). PUC #8386, et seq. connect together all my PSPS, EVM, and other

alleged claim concerns as requirements in each PG&E annual Wildfire Mitigation Plan and related actions, as illustrated in the CPUC Wildfires webpage (www.cpuc.ca.gov/wildfires).

19.     Consider the following simplified analogous situation, where an electric utility served mostly modern stone and brick houses in lower fire risk areas, but also some older wood houses in high fire risk wooded areas, where the utility's uninsulated wires and old or neglected gear were surrounded closely by huge trees and vegetation that the utility continuously failed for decades to remove as required by applicable law and regulations. Rather than suffer the extra expense of dealing with the high-risk threat area that it had created over decades, assume the utility used excessive and unreasonable PSPS to mitigate its fire liability risk, while it slowly made a public relations show of its effort to return to gradual compliance with applicable law over a decade. The Utility was found to have repeatedly violated in at least 22 ways PSPS guidelines (creating section 451 violations) in its 2019 efforts, as illustrated in CPUC I.19-11-013. Then the utility spent its critical 2020 year doing 95% of its vegetation corrections and upgrades of its dangerous system in the lower risk areas, while only 5% of such efforts were made in the high-risk areas, as illustrated in CPUC M-4852 in Reply Exhibit 3. That is what I allege is happening here on a bigger scale. My Reply Exhibit 3 confirms that in my view and, I suspect from Exhibit 1 and other findings in Judge Alsup's probation case, that the Judge may share that view as well. Further support for my such allegations comes in Reply Exhibit 2, where PG&E proposes further increasing what I allege as excessive or unreasonable PSPS harms to high fire risk areas like mine on account of more tall trees that can (as I understand did happen in the Zogg fire) easily fall on the uninsulated wires to start a fire in the underlying and adjacent noncompliant or even remediated vegetation.

20.     Contrary to Debtors' disputed Objection #2 theory that under Rule 14 it can do whatever it decides in its sole opinion, that ignores my Reply and Exhibits, ERSB-8, especially as enhanced in CPUC I.19-11-913, CPUC debates over the Wildfire Mitigation Plan, and other regulations and guidance still being worked out by CPUC, as illustrated in the RJN. For example, Reply Exhibit 3 shows PG&E in violation of PSPS reasonableness standards by not prioritizing like Tier 3 Extreme Fire Risk areas like mine in its EVM work in 2020 (doing just 5%, while

DECLARATION IN SUPPORT OF
REPLY TO FURTHER OBJECTION
TO CLAIMS 80033 AND 80500

doing 95% easier work elsewhere). My allegations include that the PSPS here is extreme and unreasonable, contrary to ERSB-8 and other requirements of law and regulations. To be clear, I contend that nothing in the law requires me to suffer without compensation what excessive and unreasonable PSPS I allege. The US and State Constitutions require compensation for such inverse condemnation, as does other law applicable to my claims, as, for example, discussed in my Reply cited cases and as Exhibits 1-3 demonstrate.

21.     Objection #2 at p. 1, lines 21-25 incorrectly contends without any substantiation or foundation that: **"They [I] do not allege that they [I] suffered any hardships and costs as a result of their [my] power being shut off. They [I] chose to buy generators … as many people across the country choose to do – to avoid power interruptions of all kinds. That is not damages that flow from …PSPS."** I allege that Debtors are again flat wrong in their similar Objection #2 (at III.B and C.) arguments, such as that: **(a) I "do not allege that they [I] suffered hardships and cost as a result of their [my] power being shut off," that I "do not even claim damages arising out of PG&E events, like loss of habitability," and that I do not have any "cognizable damages," (b) I "chose to buy generators … in case of interruptions *from any cause*" [i.e., not on account of PSPS] from which Debtors somehow incorrectly speculate that I did not suffer any hardships at all after such purchase, (c) I "do not articulate any damages they [I] incurred" from PSPS, (d) I do "not so much as identify any PSPS events to which he [I] was subject, or identify when his [my] generator was installed" [note my purchase documents were attached to my POC and my Declaration #1], and (e) "They [the generator purchase] were voluntary steps taken … to avoid their [my] power being interrupted for any reason."** Those are all disputed and, I allege, wrong, as I again demonstrate herein without repeating what Debtors have ignored in my still correct and asserted POC, Response #1, and Declaration #1, as well as in my Reply and RJN.

22.     This PSPS I allege to be extreme and unreasonable is different in kind from such normal outages, as demonstrated in various ways herein. The difference between what I call "normal" power outages (e.g., what we were used to before PSPS started in 2019) and what I allege as excessive or unreasonable PSPS is not merely a difference in degree; i.e., tolerable in

historical context, because it was not excessive and it was not caused by PG&E alleged wrongs at issue here, but rather by acts of God and other such tolerable natural causes. While normal PG&E outages had been tolerable before PSPS, the excessive and unreasonable PSPS starting in 2019 threatened by PG&E to continue because of remediation work required to be done for more than a decade to come under its applicable Wildfire Mitigation Plan, and that would be intolerable, making that generator reasonable and necessary both for functionality (e.g., my home office work) and for safety responses (e.g., communications) against continuing local fire risks materially and wrongly increased by Debtors, such as on account of what I allege to be continuing noncompliance with Vegetation Legal Requirements and their reckless "run until it breaks" system practices. The generator is also a kind of safety insurance against fire risks, especially because PSPS interruption of communications can be lethal, especially here where the only road off my Banner Mountain requires a Paradise decision: go left or right?

23. It seems incontrovertible to me that Debtors are responsible for what I allege to be willfully and knowingly creating their dangerous system for profit (to quote Judge Alsup, "robbing the safety budget"), so that it is too dangerous to operate in on hot, dry, and windy days even at historically normal levels (e.g., 25 mph wind). I allege that Debtors did not need to so deprive the safety budget for any proper higher priority uses, but rather for what I understand were the $1Billion dividends and 11.2% rate of return benefits for the Parent and its shareholders in the years preceding the 2019 Chapter 11. Now, just as Debtors so previously prioritized such shareholders, I allege that they are still incorrectly prioritizing shareholders over at-high-risk PSPS and fire customers in vulnerable areas like mine. One reason for my frequent discussion of my generator, besides its ideal character as illustrating my legal claims for recovery, is that I rebel at the idea that on top of all these other alleged wrongs for the benefit of these shareholders I should have to unjustly enrich them with my self-defense generation, as explained in this and my other filings.

24. I allege that the more serious the fire risk, the worse the excessive and unreasonable PSPS can be expected to be, because Debtors fear the resulting fire liability, especially in places like my home, which have many risk factors similar to those creating Debtor

DECLARATION IN SUPPORT OF
REPLY TO FURTHER OBJECTION
TO CLAIMS 80033 AND 80500

liability at levels that may even concern Debtors, who historically seem to have seen their dangerous system-caused fires as a cost of business, like some manufacturers budget for product liability payments instead of reforming the product. See CPUC D.19-05-042 at 68: "…Under no circumstances may the utilities employ de-energization solely as a means of reducing their own liability risk from utility-infrastructure wildfire ignitions."

25.     But the cumulative effect of such Debtors' alleged wrongs and neglect (and their run it until it breaks practices) are finally overwhelming us all, as I allege their dangerous system finally begins to fail under such stresses, especially in high-risk places like this, where Debtors' remediation cannot keep pace with what is required to restore required safety. What causes people like me to apply early for self-defense generation is an appreciation of both what I allege to be (i) Debtor wrongs and created risks, and (ii) a belief based on history, experience, and conduct cited in this and my other filings that this two-time PG&E felon, with another indictment and various probation violations, has not sufficiently learned its lessons and truly committed to timely accomplishing the needed reforms and remediation. Why else would PG&E try to "sell" its proposed new doubling down on excessive PSPS in Reply Exhibit 2 on account of Zogg-like tree fall fires here, while still neglecting my high-risk area and others in its critical mitigation work in favor of lower-risk area work, as criticized by the CPUC again in Reply Exhibit 3? I am informed and believe that the answer to that is that Debtors plan to avoid more liability by more excessive and unreasonable PSPS in noncompliance with applicable laws and regulations like such cited in D.19-05-042. I don't believe that the Debtors are reforming at all sufficiently or timely, at least on my claim concerns where remediation matters to people like me here in the 12% at highest risk according to Judge Alsup's comments in Reply Exhibit 1. Stated another way, but for Debtors' wrongs, including PSPS threats and bad (or worse) character, I allege that I would not have purchased this expensive generator. I see myself like the homeowners in inverse condemnation-defense mitigation cases cited in my Reply, as where the owner installed braces to try to hold back the wrongly caused landslide coming at her.

26.     Moreover, as my Reply, Response #1, and my response above illustrate Debtors' Objections' focus on the narrow and distinguishable *Gantner* negligence and ignore my many

other claims I allege are not subject to Debtors' Objection arguments, those other claims of mine against Debtors I allege are unopposed and sufficiently pleaded, as are claims against the Parent, as to which the Debtors' regulatory arguments should have no application. More importantly, I allege with support from cases in my Reply that my generator purchase not only is recoverable as mitigation of my damages from such excessive and unreasonable PSPS related wrongs, but also by way of restitution for my unjustly enriching the Debtors by its acquisition. When the Debtors complain about my disputed failure to allege more specific harms, the point of my such **recoverable mitigation** was to reduce the harms I suffer. The Debtors cannot have it both ways. For example, my home office functionality has been enhanced compared to my PSPS non-functionality without the generator, although my generator does not restore my internet service or cell phone service with my self-defense electricity, which is a continuing harm because my local providers also suffer excessive and unreasonable PSPS and also need self-defense generation, which the CPUC is pushing PG&E to provide in Investigation 19-11-013 and other proceedings that recognize such communications as essential infrastructure. Moreover, for example, my inverse condemnation and nuisance damages are also about loss of property value, mitigation, and restitution. My section 17200 claims are also about restitution. And so on.

27.     As to the *Gantner* and other negligence claims, I did allege everything that *Gantner* plaintiffs alleged, but much more and on different bases, as distinguished here and in my Reply, Response #1, Declaration #1, and POC. My alleged "loss of habitability" has been partly addressed by my generator mitigation claim, since, but for my generator, I would be complaining louder about habitability and similar damages, but I continue to allege sufficient harms in order to support my inverse condemnation and nuisance claims. Moreover, and for example, electricity is essential to at least minimal communications. In high fire risk areas like mine, to which risks I allege Debtors have materially added by their wrongs, communications are essential to fire safety, as the CPUC has repeatedly confirmed in I.19-11-013 and other proceedings. I am like the PG&E soon-to-be victims in the Paradise fire or the Zogg fire, because there is only one road on and off Banner Mountain, leaving me with a choice: do I turn left or right? Safety concerns caused by Debtors' wrongs entitle me to decide that life or death choice on a more informed basis without

Case: 19-30088   Doc# 10642-1   Filed: 05/11/21   Entered: 05/11/21 16:54:33   Page 15 of 42

excessive PSPS obstacles. These and other things I allege are alleged continuing "cognizable" damages" that Objection #2 claims do not exist. More importantly, they are continuing bankruptcy "claims" (I contend post-petition) that look forward in time to the end of my suffering, as addressed in my Response #1.

28. As a further incorrect effort to squeeze me into their *Gantner* model, rebutted in my various such filings, Debtors also insist that I **"identify any PSPS events to which he [I] was subject, or identify when his [my] generator was installed"** [note that my purchase documents were attached to my POC and my Declaration #1 and service commenced 9/20/19]. As to PSPS events that I allege to be excess and unreasonable, that includes all of those that have occurred, although those that were threatened by PG&E and then cancelled were also actionable. Normally, these facts are in PG&E's control, but I will humor them with what I know, which is that my RJN shows a 450-page report PG&E filed at the CPUC, entitled, " De-energization Events Since Passing of ESRB-8," in which PG&E admits the following facts for the Brunswick §1105 circuit in Nevada City as of Feb. 25, 2021, and beginning 10/9/19 (which I understand and expect PG&E to confirm in discovery, since there seem to be many reports describing this Tier 3 Extreme Fire Risk circuit without identifying the boundaries compared with other adjacent Brunswick circuits): (a) §1105 serves 3407 residential customers from 12.25 MW circuit capacity; and (b) six PSPS events occurred involving 14.67 days or 352.08 hours on account of events 10/9/19-10/12/19, 10/23/19-10/25/19, 10/26/19-10/31/19, 9/7/20-9/9/20, 9/27/20-9/28/20, and 10/25/20-10/27/20. However, as Reply Exhibits 1-3 show, Debtors' noncompliance with applicable laws regarding vegetation additions to other high fire risk, including dangerous PG&E equipment fire ignition risks, are likely to substantially increase the amount, duration and severity of excessive or unreasonable PSPS. Whether it's Judge Alsup's 55% increase for the 12% including me (Reply Ex. 1) or double the present PSPS in PG&E's Reply Exhibit 2 proposal to the CPUC for increased PSPS, where trees are at risk of falling on uninsulated lines and dangerous gear (as in the Zogg fire), I alleged that the suffering and damages from these continuing Debtor wrongs will continue to increase. Considering how creative I allege the Debtors are in dodging and deflecting their accountability for the costs and liabilities for which they are responsible, it is hard to

1    imagine all of what Debtors will do to harm customers like me in the future as their wrongs

2    continue.

3        29.    Incidentally, when Debtors assert in Objection #2 (at pp. 1-2) without any

4    declaration or support that: **(a) I "cannot establish a sufficient causal connection between**

5    **generalized allegations of negligence about the upkeep of PG&E's grid and any shutoffs**

6    **that affected their [my] specific residences,"** and **(b) "Power shutoffs are dictated by the**

7    **weather on a line-by-line basis, not generalized historical maintenance practices,"** I decline

8    to take Debtors' word for – and therefore dispute – it. Besides, so what? What PG&E piously

9    claims as the basis for its disputed actions for the appearance of regulatory compliance and

10   political relations I allege is not always true or even credible and not something on which I would

11   rely for my safety. CPUC says (D.19-05-042) that PSPS is not supposed to be used to dodge fire

12   liability, but many of us would argue (and I allege) that is always one of Debtors' primary

13   considerations, even though it would be unwise for them to admit that wrong. But I allege the

14   reality to be that excess PSPS is about PG&E-caused fire risks, not just weather. And that fire risk

15   is about all of the local circuit conditions and situations. The fact that PG&E did 95% of its 2020

16   mitigation work outside of high-risk areas like mine and only 5% where it was needed most

17   (Reply Exhibit 3) demonstrates an example of such a causal connection.

18       30.    Again, only Debtors seem to believe that they are entitled somehow to artificially

19   disconnect and segregate for dodging accountability for such alleged wrongs. Matters like

20   excessive and unreasonable PSPS occur in a broader context of all-in risks, including those

21   Debtors created by their alleged wrongs. What I allege that Debtors keep ignoring is that their

22   whole wrongful conduct in this excessive and unreasonable PSPS context is noncompliance with

23   applicable laws and regulations as a two-time felon (indicted again and repeatedly dealing with

24   alleged parole violations), and, but for such conduct as I allege in my POC and other filings,

25   PG&E's PSPS affecting my home would be less excessive and unreasonable. Also, if PG&E had

26   conducted itself properly at all relevant times in compliance with applicable laws and regulations,

27   especially if it had followed the CPUC direction in I.19-11-013 to follow the SDG&E better

28   practices model, I allege that I would be less at fire risk and excessive PSPS risk.

31.     Debtors again attempt incorrectly to reinterpret my POC claims to fit their disputed *Gantner* negligence model. For example, I dispute that their allegation that my **"Claims rest in PG&E's alleged failure to maintain its equipment and not in PG&E's implementation of the PSPS events"** and that **"there are no specific [i.e., not "conclusor[y]"] allegations that could give rise to a cognizable claim."** Objection #2 at 13 of 15 lines 9-12 and 20-21. As an example, they insist that I state the **"specific circuits encompassing Claimants' homes . . . selected because of the condition of the equipment."** Id at lines 22-23. (They have my home address above, and it is near §1105 and other "Brunswick circuits" in or around Nevada City, and I satisfied this demand above.) For more examples and rebuttals and detailed cause of action and causation comments, besides my distinguishing *Gantner* above, see my Reply and its Exhibits and RJN.

32.     When I must evacuate my home for a fire (the last fire in Nevada City had an evacuation line only a couple of miles from my home), without communications how would I know whether to turn left or right to avoid the fire on the only road off my Banner Mountain community without communications needing electricity? (The forest blocks the view, and smoke is too vague a guide.) Safety issues in this Tier 3 Extreme Fire Risk area are not remote and cannot be reasonably discounted, which is one of many self-serving reasons I allege why PG&E has urged us to acquire generators, i.e., reducing Debtors' liability risk for their potentially causing my area to become the next Paradise-type victim.

33.     Among the more outrageous "spins" and "dodges" in Debtors' Objection #2 (at 2, lines 6-8) is the incorrect and inapposite argument that: **"Claimants do not—and cannot—allege that PG&E did not believe that any PSPS events were not necessary for public safety."** The point is not whether Debtors need "last resort" PSPS as "lesser evil" mitigation to lessen the impact of the continuing harms on account of the committed massive continuing wrongs I allege in creating a system too dangerous to use in high fire risk areas under certain conditions, to seem normal. The point is who has to pay for such harms that the lesser evil PSPS still continually causes. As my Reply authorities demonstrate, mitigating the harms Debtors create in the resulting emergency circumstances still requires compensation. My Reply analogy to

the Fukushima disaster applies here. It may be necessary to drain the radioactive toxic water into the ocean in order to avoid a bigger disaster, if that water killed the land. But either way those who caused the problem must pay the victims.

34. As I keep alleging and explaining, Debtors are wrong for many reasons to attempt to compress my claims into a single negligent equipment maintenance theory, as when they say in Objection #2 at p. 8 at lines 9-12: that all **my claims "rest in PG&E's alleged failure to maintain its equipment and not in PG&E's implementation of the PSPS events …"** They're also wrong to attempt to justify their wrongs, **because "utility companies all across California are conducting PSPS."** Id. The problems I allege include that PG&E's PSPS mitigation is more excess and unreasonable than the other utilities, including because its PSPS conduct is more problematic and contrary to the applicable guidelines and ESRB-8 than the others and the Debtors' system is in worse noncompliance with applicable laws and regulations in most respects than the other utilities. My commentary below on CPUC I.19-11-013 illustrates that alleged reality as CPUC makes PSPS comparison with SCE and SDG&E. That is one reason why I allege that PG&E is unique, as a two-time felon with a new third indictment and various parole violations. While that is my allegation and contention, it is also supported by the extensive record of PG&E wrongs in Judge Alsup's Probation Case and in various CPUC Proceedings addressed in Reply Exhibits 1-3 and the CPUC.

35. Similarly, that disputed Objection #2 further incorrectly asserts (at p 8, lines 16-19): "**In fact, Claimants do not allege that PG&E's implementation of PSPS events was itself negligent. This is fatal to the Claims because there is no causal connection between the alleged negligence and Claimants' injuries." Wrong again**. As with my Fukushima example, there is a bigger wrong at issue, and excessive and unreasonable PSPS is a lesser evil means of mitigating that. But PG&E has been found guilty of scores of violations of PSPS rules (which are often worse than negligence, but also negligent and subject to §2106 claims), as detailed below in my discussion of CPUC I.19-11-013. So, yes, I am alleging both negligent PSPS and causation in the few instances where that may be required for a particular POC claim, but I allege much more, as explained throughout this Declaration and my Reply. Because there is more PG&E reporting

DECLARATION IN SUPPORT OF
REPLY TO FURTHER OBJECTION
TO CLAIMS 80033 AND 80500

required by PG&E in I.19-11-013 to enhance ESRB-8, more evidence is going to be available for the continuing violations and wrongs reported in Related Proceedings I allege after 2019. I am also looking to more Debtor wrongs being more quickly exposed in Judge Alsup's case, similar to my Reply Exhibits 1-2, for more current confirmations of continuing wrongs, because the CPUC investigations of PG&E move slowly in trying to catch up with Debtors' continuing wrongs (i.e., the 2019 fire season report that was just released 4/20/21, for example).

36. As noted in different Debtor words rebutted earlier, Objection #2 (at 8, lines 19-24 and 9, lines 1-2) **again attacks as "conclusory" the assertion that PG&E did not adequately maintain its facilities, demanding "specific circuits" at my home that were affected by "the condition of the equipment**" (my allegations on this were done above, and again this dispute also includes the noncompliance with applicable laws as to vegetation management, which Debtors continue to ignore as the inconvenient wrong for which I allege they cannot imagine a credible response, but instead seek to divert the discussion to their neglected equipment, as if it were the only issue, which it is not). That Objection #2 also alleges that I lack **"nonconclusory allegations that PG&E's PSPS program was developed as a means of remedying poorly maintained equipment or that this was the reason CPUC has approved PSPS."** Again, I allege this is more wrongful Debtor compression of my broader allegations and claims to set up a *Gantner* argument that I have repeatedly disputed and distinguished in my Reply.

37. As explained, I allege that the problem is fire threat that is made worse by Debtors' entire dangerous and noncompliant system and practices, including its excessive and unreasonable PSPS. I allege that none of the many notable fires caused by Debtors are limited to their home circuit, since they spread. Another dangerous circuit within "fire range of my home" can ignite noncompliant trees and other vegetation to trigger either or both a fire or excessive PSPS at my home. As to the PSPS system origins, contrary to the stated rules that I believe Debtors ignore, PSPS is not supposed to be about dodging Debtors' fire liabilities for another decade (again, D.19-05-042 at 68). However, what I allege drives Debtors in material part is fear of more massive fire liabilities and another Chapter 11 (Chapter 33) for the same reasons as the last one. I do not recall being favorably impressed by any sincere safety concerns inspiring better

relevant practices by Debtors for the good of their customers, as distinct from their politically correct public relations advertising and token project, as illustrated by their neglect of high fire risk areas in 2020 vegetation work exposed again in Reply Exhibit 3. (Again, fire threat is Debtors wrongfully caused noncompliant fuel exposed to Debtors' neglected and dangerous equipment as ignition for that fuel to become such a fire.)

38.     Debtors finish their disputed re-writes of my allegations and claims in Objection #2 at p. 10, lines 7-9) by incorrectly **denying that I have alleged "facts that could subject PG&E to liability to its Customers for a service disruption."**  To reach that erroneous conclusion Debtors again (at Id.) attempt improperly to compress my many claims, facts, and allegations into a purported but illusory failure to make this supposedly essential allegation: "**there is no allegation that PG&E did not hold the view that the shutoffs were necessary for public safety.**" First, I dispute whether it is necessary for me to allege what may be PG&E's "views" although I have done so here. However, if I have to go there, my allegation would be that Debtors' view is that they want people to think the Debtors care about public safety and reform, but that doesn't mean they they really do. What I allege and explained Debtors really care about is their high profit and reputation for "shareholder value," which means to me that they also must care about dodging or minimizing liability high enough to threaten profit and other more self-interested goals, like minimizing effective regulatory oversight. That is why Judge Alsup correctly talks about "robbing the safety budget" in Reply Exhibit 1. My view is that Debtors' knowing and willful disregard of public safety has been proven not just by the long history of PG&E repeatedly causing avoidable fires, including a guilty plea and a new indictment, while disregarding the best practices of SDG&E (which learned its lesson and improved, while PG&E watched without improving).

39.     I allege that no utility can credibly claim to care enough about public safety, while watching for decades as tens of thousands of massive trees and vegetation grow around the uninsulated wires and old (run it until it breaks) gear in blatant noncompliance with applicable laws and regulations cited in my Response #1 and Reply (Note that PG&E's Reply Exhibit 2's plan to require more PSPS on account of huge trees falling on the lines and gear as in the Zogg

DECLARATION IN SUPPORT OF REPLY TO FURTHER OBJECTION TO CLAIMS 80033 AND 80500

fire greatly increases the scope and scale of Debtors' wrongs). I allege that no utility can credibly claim to care enough about public safety and mismanage PSPS as comprehensively as the CPUC found PG&E repeatedly did in 2019 in the I.19-11-053 Decision dated 4/20/21 attached to my RJN and discussed below. I allege that no utility can credibly claim to care enough about public safety, if you believe as I do what Judge Alsup has been repeatedly finding and reporting on his extensive probation record, of which Reply Exhibit 1 is just the most recent example.

40. Indeed, I allege that Probation Case record reflects many Monitor reports of repeated wrongful and unsafe conduct by PG&E over time, and, when Judge Alsup asks his hard questions and drills down with persistent follow-up questions, PG&E is forced to admit many wrongs that (as here) they try to evade or deflect in CPUC and other proceedings. **I allege that I am not alone in that concern about such evasive tactics by Debtors, since the CPUC Public Advocate's Office wrote a letter dated 3/17/21 to the CPUC commenting on Resolution M-4852 (attached to my Reply as Exhibit 3) that stated at p2: "Yet, even as PG&E agreed to plead guilty in state court, PG&E continued to deny responsibility in pleadings before the Commission. PG&E has never acknowledged to this Commission that it was culpable for violating the safety regulations by neglecting to inspect and maintain the equipment linked to the Camp Fire. [with footnotes to the same effect as to the Kincade Fire and Zogg Fire.]" And despite all the attention of victims, government, and regulators on PG&E, that Public Advocate's letter continues (Id.): "Since 2018, PG&E's safety record has remained poor."**

**III. Some Key Examples That Rebut Some of Debtors' Objection #2 Allegations And Contentions From CPUC I:19-11-013 dated 4/20/21, Which Specifically Finds Many Types of PG&E Noncompliance in 2019 with PSPS Guidelines And Law, So As to Cause Violations of PUC §451.**

41. This section of my Declaration illustrates why my Reply and this Declaration must be read as supporting my POC to defeat Debtors' Objections, such as those quoted above in the prior section, including by reference to my RJN attaching (a) CPUC Press Release dated 4/20/21, Dkt #: I.19-11-013 "CPUC Proposal Addresses Utilities Failures To Protect Public Safety During 2019 PSPS Events" dated 4/20/21, together with (b) selected excerpts from the more than 300 pages faulting PG&E in that referenced CPUC Proposed Decision Investigations 19-11-013

DECLARATION IN SUPPORT OF
REPLY TO FURTHER OBJECTION
TO CLAIMS 80033 AND 80500

(mailed 4/20/21) "Decision Addressing the Late 2019 Public Safety Power Shutoffs By Pacific Gas And Electric Company …[and others] To Mitigate the Risk of Wildfire Caused By Utility Infrastructure." This Decision is the result of the 11/13/19 Order Instituting Investigation I.19-11-013 at 2019 Cal. PUC Lexis 752, which also defers (with results still to come) some issues to a parallel Rulemaking 18-12-005 proceeding that was launched by Order Instituting Rulemaking To Examine Utility De-Energization of Power Lines in Dangerous Conditions, 2018 Cal. PUC Lexis 614.

42. There are other CPUC Proceedings of various kinds that are relevant to these disputes. They can be seen on links from the CPUC website to its more detailed relevant websites, such as the PSPS website by CPUC entitled "Public Safety Power Shutoff (PSPS)/De-Energization" (the CPUC/PSPS website"), and another by CPUC entitled "Utility Wildfire Mitigation Plans," which includes copies of each annual PG&E "Wildfire Mitigation Plan" and related proceedings and comments thereon. I expect to make use of various things from those sites to prove my case at trial. Attaching all those relevant documents now would be too burdensome and voluminous, and I dispute Debtors' attempt to make this my only chance to provide a full record for my case, as discussed at the end of this Declaration and in my Response #1. In particular, however, I incorporate from that CPUC/PSPS website as admissions PG&E's required reports on each PSPS event and other filings by PG&E pursuant to Resolution ESRB-8.

43. While the CPUC has addressed in I.19-11-013 many errors and omissions by PG&E, including almost two-score violations of PUC # 451 and PSPS guidelines as well as a CPUC critical comparison of PG&E to the better practices of SDG&E, these following excerpts are especially important in Section 9.11 Assess Needs of Critical Facilitate and Infrastructure for Backup Generation (starting at 214), citing relevant updates on ESRB-8 incorrectly ignored by PG&E as "discretionary, rather than mandatory" (at 216) and complaints of key parties like "The Joint Local Governments" (at fn 635), such as the CPUC conclusion at 223 that: "Based on the information in the SED Report and comments by parties regarding efforts - in advance of the 2019 fire season - that PG&E and SCE failed adequately to engage critical facilities and infrastructure about their need for backup power, **we find PG&E and SCE failed to reasonably**

**comply with the utility obligation to promote safety in PUB. Util. Code §451.**" (emphasis added). CPUC reminded PG&E (at 221) that, while ESRB-8 expressed some things as initially making backup power discretionary, "it was mandatory, under certain conditions, in D. 19-05-042" and that the CPUC "further modified this directive to provide backup power in 2020, explaining that the utilities must "work … to provide consultative assistance regrading backup generation to ensure critical infrastructure is not brought offline during a de-energization event." The CPUC also announced at p. 222 that it intends to provide "more guidance to stakeholders" on this matter in that proceeding, but CPUC also directs stakeholders to R. 18-12-005 (to which PG&E repeatedly deflects hard questions.)

44.    It is not practical to address all the relevant specifics in this CPCU Investigation supporting its many "**Findings of Fact**," "**Conclusions of Law**," and lengthy "**Order**," and I do not wish to unduly burden the Court with more rebuttals than may be required to defeat the incorrect allegations and contentions in Debtors' Objection #1, such as those addressed above attacking the sufficiency of my allegations and claims. Therefore, I allege that for 2019 PSPS the CPUC is correct in these Investigation statements, and for particularity focus on the following examples (emphasis is added by my bolding same):

(a)    **Finding of Fact** #'s: 2-4, 6, 11, 17, 21-23, 39, 44, **57**, **68**, 74, 81, 88-89, **91**-92, 101-102, which specify specific instances of **noncompliances or deficient** performance by PG&E on which the critical Conclusions of Law and Order numbers cited next below are based;

(b)    (for my rebuttals, if necessary, but less important now for this court) **Findings of Fact** #'s: 1, 5, 7-9, 14, 17, 20, 26, 29, 31, 33, 36, 42, 47-50, 54-55, 59, 62, 65, 77, 79-81, 83-**85**, 88-89, 91-92, 94, **96-97** (**PG&E reporting "complaints" as "inquiries**," so that CPUC had to define "complaints" for ESRB-8 reporting in order to get accurate data next time), 100, 101, and 102, which state **foundational matters** for important context and that also contradict PG&E's relevant positions or create important context for rejecting Debtors' allegations or arguments at issue in my dispute;

(c)    **Conclusions of Law** #'s: **11-12**, 13-14, **15-16**, **17-18**, **19-20**,25, 26-27, 30-31, **32**, 35+37, 39, 41, 44, 45, 48, 50, 52, **53**, **55**, 57, **58**, **60**, **62**, 63, 65, 80, and 82, which specifically

state noncompliance or deficient performance by PG&E sufficient to conclude that "PG&E failed to comply with their [its] obligation to promote safety set forth in Pub. Util. Code §451" or similar words to that same effect;

(d) **Conclusions of Law** #'s: **1-8**, 9, **15-16**, **19**, 22-25, 47, 67-68, 72-73 (modifying PSPS Guidelines to require certain reporting in R.18-12-005), 74-78 (defining "complaints" per above and improving reporting and tracking), and 80, which (i) reaffirm CPUC enforcement focus and insist on improvements in PG&E performance, (ii) add more requirements to ESRB-8 to improve utility performance (e.g., much more reporting and recordkeeping), and (iii) adding clarifications to ESRB-8 or other CPUC requirements in order to improve performance or stop evasions; and

(e) **Orders** # 1-83 that implement each of such Conclusions in detail, following **#1** in which PG&E is ordered to "forgo collection of [certain] rates from customers …" following the Conclusion #15-16 that, instead of punishing these many violations by PG&E, CPUC would craft incentives for improved PSPS conduct and reforms.

45.     This Investigation also supports my point that **PSPS** must be judged as part of the overall fire risk, defense, and response situation for the creation, operation, and safety of the dangerous system, **not just as the isolated issue PG&E asserts**. See, e.g.,  Findings #**79-81 (utilities must be prepared to act despite PSPS in the event of "concurrent emergencies [e.g., "beyond just fires"], "possibly even re-energizing" and noting how lack of communications during PSPS places "customers at risk of serious harm"**), and Conclusions of Law #62 (PG&E "failed to reasonably comply with the directive to work with public safety partners to plan for the possibility of concurrent emergencies").

46.     This Investigation also focused specifically on **backup generation** issues or related practical or policy priorities of the CPUC, such as Findings #81 (communications affected by PSPS are essential to customer safety), 83-85 (the CPUC goal is ensuring "backup power needs of critical facilities and infrastructure" "and, if necessary, provide backup generation," and those existing PSPS Guidelines will be enhanced), and Conclusions of Law #63 (failed to reasonably comply with the directive to engage in outreach …for backup generation").

Case: 19-30088   Doc# 10642-1   Filed: 05/11/21   Entered: 05/11/21 16:54:33   Page 25 of 42

47.     In its Objection #2 PG&E attacks my allegations and claims based on its focus on my local PG&E "circuits," ignoring that fire and PSPS problems often are started somewhere else. This CPUC Investigation reveals a new aspect of my disputes with PG&E relating to **"sectionalization,"** explained and defined in #10.10 as "separating loads within a circuit" for PSPS. To me, this causes me to expect and allege that PG&E will increasingly isolate places within a circuit to protect from excessive PSPS and others within the circuit to abuse with excessive or unreasonable PSPS, and I forecast and allege that high-risk areas like my "section" will suffer the excessive and unreasonable PSPS that I allege, even as PG&E responds to pressure from CPUC and others to improve PSPS with backup generation for more "critical infrastructure." The vaguely expressed anxiety of the CPUC that I consider to support my such concern is found, for example, in a special reporting mandate on PG&E considering and implementing sectionalization as Order # 71 at page 308, following Finding of Fact #100 (PG&E's failure to "reasonably explain" how sectionalization was considered and used in 2019 to "limit the scope of the power shutoff"), and Conclusion of Law #79 (PG&E  must improve explanations and reporting regarding sectionalization).

48.     Some **highlight examples** follow, where I have a more specific concern for the court of the type that I would expect to address at trial as one of my priorities:

(a)     PG&E is required by Pub. Util. Code §702 to "obey and comply with such [Code and CPUC] requirements, including the obligations to "promote" and "implement" "safety under Pub. Util. Code §451, which "is absolute and is a longstanding requirement" by which CPUC reviews PG&E's "proactive power shutoffs in late 2019 as a wildfire mitigation measure to protect public safety." Id. Conclusion #'s 1-5. The standard of review for this PSPS safety proceeding is "that which would put a reasonable person on notice is sufficient to put a utility on notice of a violation of …451," and the "question is whether, based on the notice provided, reasonable persons would know that their conduct is at risk." Id. #6. However, at #7 states: **"A utility can be found to have knowingly violated the broad safety obligations of …451 without a specific statute, rule, or order barring such conduct." Nowhere in these 300-plus pages of the Investigation can there be found any immunity reference as PG&E incorrectly**

asserts in its Objection #2 based on misreading its Tariff Rule 14. As demonstrated in my Reply, I allege that the entire PSPS regulatory situation is inconsistent with such PG&E arguments, as illustrated by the fact that all these CPUC Investigation issues are exclusively cast under ESRB-8, not Rule 14. (emphasis added)

(b)　Rejecting as "wholly unconvincing" PG&E's excuses at #9, Conclusion #8 states: **"A utility must show that its actions, practices, methods, and decisions show reasonable judgment in light of what it knew or should have known at the time, and in the interest of achieving safety. The burden of demonstrating that its decision to shut off power is necessary to protect public safety and other reasonableness factors shall apply to all electric IOUs."** (emphasis added).

(c)　More specifically, Id. at #10 states: **"To uphold the utility obligation to promote safety under §451…and comply with the PSPS Guidelines, the utilities need to identify, evaluate, weigh, and report the potential for harm to their customers resulting from a proactive de-energization."** Id. at #11 adds: **"In 2019, PG&E…failed to reasonably comply with the requirement in the 2019 Guidelines to identify, evaluate, and weigh the potential for harm to their customers resulting from a proactive de-energization."** Id. at #12 adds: **"[Therefore,] …PG&E…failed to comply with the obligation in …451 to promote the safety of customers."** (emphasis added). After that start, there are many (**at least 21**) similar **Conclusions and Findings** stating other specific violations of such Guidelines and section 451, as cited above.

(d)　To set up the PG&E rate recovery denial punishment in Order #1, the CPUC (at Id. #15 and 16) concluded: **"Because the utilities' failures in 2019 to reasonably identify, evaluate, weigh, and report public risks were grossly deficient and even non-existent, a monetary remedy is appropriate." …"In striking a balance…rather than adopt penalties, it is reasonable to adopt an ongoing incentive for utilities to improve their conduct … and to only use power shutoffs as a mitigation measure of last resort."**

(e)　To emphasize the importance of CPUC's such "**last resort mandate,**" CPUC stated PG&E's failure in 2019 to comply with PSPS reporting Guidelines (at #17), and added (at

#18): **"In the absence of [such] sufficient information…PG&E failed to reasonably comply with the requirement to perform 'last resort' analysis or consider alternatives and, as a result, failed to comply with the directive in …451 to promote the safety of customers."**

(f)     After reminding in #19 of its such PSPS Guidelines [again without any mention of Tariff Rule 14 on which PG&E exclusively relied in its Objection #2], the CPUC Conclusion #20 was that: **"…[N]otice provided by PG&E …in 2019 often failed to reasonably comply with the notice guidelines in D.12-04-024, Resolution ESRB-8, and D.19-05-042 and, as a result, PG&E…failed to comply with …451**."

(g)     After concluding that PG&E again violated §451 by failing to have a **"communications strategy for all"** (at #53), CPUC also Concluded (at #55) that in 2019: **"PG&E…failed to reasonably comply with the directive to develop notification and communications protocols and systems in the absence of electricity for PSPS events," thereby again violating §451. Conclusion #58 is a similar §451 communications violation.**

**IV.     Comments To Explain Some of My POC Allegations For Claim And Damages, Etc. Theories, And An Illustrative POC Core Theory.**

**A.     Generally Framing the Disputes My Way, As Opposed To the Debtors' Incorrect Way.**

49.     In the previous section I allege disputes against various identified Debtor allegations or arguments in Objection #2 and support my POC claims by alleging my reaffirmations or clarifications of my filed positions. This section approaches that same Debtor challenge by my explaining in more detail my allegations in a more integrated and affirmative way by more systematically illustrating together some of what I allege as facts and damages for my claims. I continue to dispute the relevant contentions in the Debtors' Objections #1 and 2 (#9460 and 10574) for the reasons alleged herein, which include those set forth in my Reply and RJN exhibits, as well as in my POC and prior Response #1 and Declaration #1.

50.     My goal in these allegations is (without waiving anything in my POC or other filings) to satisfy any such challenge in this Debtor-engineered claim dispute/ADR proceeding by defending my core POC claims for negligence, §2106, inverse condemnation, nuisance, B&PC §17200, and restitution for unjust enrichment, so that they are each sufficiently pleaded for this

purpose, each as separate and independent from Debtors' narrow *Gantner* negligence issues, such that if one such POC claim fails for any reason, my others can still achieve my goal of a fair and just recovery for Debtors' wrongs.

51.     For example, as I contend in my Reply, I allege that in Objection #2 Debtors try to defeat all my various claims by a single, disputed attack theory in four parts that incorrectly tries to squeeze all those separate POC claims into their disputed *Gantner* model that can only apply to a distinguishable narrow negligence claim of the kind asserted in that PSPS class action. To accomplish that, I allege Debtors ignore my inconvenient allegations and claims or mischaracterize them, as illustrated in my allegations in the prior section and in my Reply. This section attempts to organize my allegations for each such cause of action, for its own unique, distinguishing requirements and damages, from the common facts that I allege about Debtors' wrongs, using my own allegations, terms, and theories, rather than being defined incorrectly by Debtors' disputed perspective.

52.     The Civil Code Maxims of Jurisprudence §3523 assures me that: "For every wrong there is a remedy." I have alleged in my POC and prior filings, and I still now allege here, sufficient Debtor wrongs to entitle me for my requested remedies (further addressed below). My initial and still pending Response #1 asked the court for a status conference, so that I could better understand the court's preferences about my alternative processes, claims, and remedies on which to focus. I still believe that status discussion would be helpful. However, since the Debtors still prematurely pray in their Objections for dismissal of all my claims, even though they only attempted a meaningful contest of a narrow *Gantner* claim in their Objection #2, to some extent I may dispute that as some kind of inappropriate and premature motion to dismiss that does not yet apply in this process.

53.     Therefore, I further clarify my allegations again, but briefly in an oversimplified way that hopefully avoids more burden on the court. I hope that, pending a ruling on my Response #1 request to apply the adversary proceeding rules and a sufficient due process opportunity to make my actual case, that it is premature for Debtors to insist (as they seem to imply) that for some reason I must now plead all details of my such POC causes of action as I

would (i) not just in another lengthy complaint of the kind that other victims have filed against Debtors' for relevant wrongs that were incorporated by reference in my POC, or like those of the Plan Fire Victim Trustee, but (ii) in some premature trial brief.

54.    Thus, to oversimplify (without waiving the important details or any POC or Response #1 allegations or claims), I allege that my core POC claims allegations include claims like this:

(a)    As to some extent admissions de facto by PG&E to Judge Alsup, as demonstrated in Judge Alsups' rulings and evidence in his Probation Case and other POC referenced CPUC or other "Related Proceedings," and as persuasively alleged (often with supporting evidence and authority by various other parties in this Case), I allege that PG&E has continuously, knowingly, willfully, negligently, recklessly, and intentionally (depending on the component issues) created and continues to operate a flawed and dangerous electrical system in noncompliance with applicable laws and regulations, including the Reply's "Vegetation Legal Requirements," for the benefit of, and with the knowing participation of, its Parent as a joint tortfeasor, principal, participant, and unjustly enriched beneficiary. I allege that such "run until it breaks" maintenance approach, ignoring not only reasonable practices, but also fundamental safety considerations, has caused neglected equipment and uninsulated wires to be continuously at risk for igniting fires in adjacent trees and vegetation that are forbidden by law even to exist there, but which have nevertheless grown for decades there, for so long and in such extreme abundance that it will require at least a decade to remove or remediate them and then be able to return to compliance with such applicable laws and regulations (which now still continue to apply and be violated daily by PG&E, including around my home and neighborhood). I allege that Debtors cannot shift blame to the outsource workers whom they chose and who seem continuously to miss the dangers they are supposed to identify and fix, as Judge Alsup and his Monitor still continue to find is the case in the record of that Probation Case. Among the independent experts who support my allegations (without knowing it) are the entire commercial insurance industry, who ran from any more normal commercial insurance coverage for PG&E, thus forcing the State substitute bailout;

(b)     Similarly, I allege that Debtors have so continuously, knowingly, willfully, negligently, recklessly and intentionally operated and maintained that faulty system, causing or allowing it to become even more dangerous and noncompliant, so that it can be now too dangerous to use on even historically normal hot, dry, windy days (by historical standards the 25 mph threshold is not a severe wind) in such continuing noncompliant areas, where that dangerous system can still threaten to ignite such noncompliant trees and vegetation. I allege that we are at the end of Debtors' "run it until it breaks" cycle in which PG&E has been operating its dangerous system, and that the already too dangerous system is "breaking" too fast for PG&E to make sufficient progress in its repair/remediation efforts. I allege that causes or correlates with some other excessive dangers, such that more rigorous safety practices are required when operating such a breaking/end of life, dangerous system than responsibly operating a normally compliant system, thus making incorrect and worse PG&E's argument for being tested for reasonableness by such inapplicable normal practice standards. Also, I allege that PG&E must sincerely want to reform and be safe in order to be effective, which is contrary to Debtors' recent wrongful actions, such as those illustrated in Exhibits 1-3 to my Reply and the RJN, including largely ignoring remediation in 2020 of critical, noncompliant vegetation in high risk areas like mine, in favor of easier (and I assume less expensive) such Debtor work in less risky places (5% vs 95%) as recently revealed in CPUC Resolution M-4852.

(c)     Contrary to their public relations safety talk, I allege Debtors' priority is most about profits and Parent dividend and stock prices. I allege such excessive and unreasonable Debtor PSPS conduct is about achieving such selfish economic benefits and unjust enrichment, such as by coercing people like me into buying self-defense generators in order to enhance their system and reduce reform pressures for their own economic benefits. Among such unjust enrichment/benefits for Debtors I allege are (at little or no net cost to Debtors): (i) possibly reduced liability exposure of the Debtors for fires and for PSPS blackouts on account of such self-defense by homeowners like me at our own expense, (ii) enhanced profits for PG&E gas used by the generators when the electricity is off, (iii) reduced pressure and scrutiny from regulators, Judge Alsup, political and other critics, and customers than would otherwise exist greater for

quicker and more rigorous compliance by Debtors with applicable laws and regulations, if such harms caused by the Debtors were not so mitigated at their own expense by such homeowners like me, as windfall benefits to such Debtor wrongdoers, (iv) the grid and PG&E property is safer and enhanced by the presence of such supplemental generation by such private generators like mine, and (v) other reduction in liability and adverse consequences, because homeowners like me have mitigated their own damages at their own expense to keep their homes safe and functional and to allow their home offices to function.

(d)     To follow the projection of the reasonable worst case future damage directions of *County of San Diego v. Bressi* and similar precedents discussed in my Reply, I worry and allege that Debtors are playing the "long game" as such wrongdoers. I fear and allege that PG&E will abuse its monopoly and the related public trust to neglect and mistreat high cost/high risk areas like mine (e.g., as close to abandonment of §451 service as they imagine they might get away with), so that they can concentrate instead on lower risk/higher profit areas, since that is what they were just caught doing by Resolution M-4852 (Reply Exhibit 3) in Debtors' wrongful concentration of 2020 remediation work on lower risk areas and neglecting high risk areas like mine. See also my Declaration #1 predicting this kind of problem on a smaller scale, because I could see in my area that they were not completing their so-called hardening and remediation work before moving on to work lower risk places. By not fully fixing the problems that the Debtors have caused in such a high-risk area like mine, before moving on to the lower priority areas, I allege that the Debtors are leaving themselves more excuses for more excessive continuing PSPS for a longer period, while reducing (but not curing) their fire liability risk and continuing their such unjust enrichment benefits from homeowner self-defense generation, including by delaying the cost of a full cure in the highest PSPS areas.

(e)     Stated another way, I allege that, but for strict and timely enforcement of laws (e.g., PUC §451) and regulations (e.g., which is hard for the CPUC to do timely, and whose 2019 PSPS Investigation 19-11-013 was just released), aggressive monopolies like Debtors could hope to maximize their profits by focusing on high profit and low cost/low risk urban areas and ignoring higher cost and risk areas like my home area and community. By creating what I allege

to be such a continuously dangerous system by Debtors' continuing wrongs and noncompliance with applicable laws and regulations, I allege that the Debtors have wrongfully created what I allege to be a PSPS excuse for that exact wrongful profit strategy. Just as PG&E abandoned service to one PG&E wrongfully created high-risk service area outside Paradise after that fire as too expensive to fix, the Debtors could do more of that practical abandonment to a greater or lesser extent, whenever they thought they could get away with it, for high cost of remediation/high risk of fire areas. Recall that I allege they have created their system dangers by continuous, open and notorious violation of the vegetation laws and regulations for decades, so that does not suggest to me that they are afraid to do (what the shark players in our economy politely call) "bold things."

(f)     The only practical limitations on such wrongful strategy I allege are: (i) after the fact regulatory enforcement, often literally years too late (if history is a guide), although CPUC's imperfect enforcement process and tools do not seem to scare PG&E into compliance, or (ii) accountability to the Debtors' victims by liability (such as I am seeking) or by political actions or initiatives. If PG&E is not somehow to be held liable to me for such wrongs as the Debtors argue, and thereby enabling Debtors to evade what may be the only effective economic incentives for actual safety and compliance on account of such liability, then the sooner we all know that the better, so as to provide the clarity needed to inspire the last resort political and initiative remedies. Too often we have heard politicians and regulators talk about wrongs being fixed, so they never happen again. We have heard that about these Debtors, but I allege that bad things keep happening. I say this here, because my fears of future coming harms are aroused by two new developments I allege will increase my PSPS harms and damages. First, depending on who you ask, I allege that excessive and unreasonable PSPS could double or increase by 55% (compare the PG&E proposal for doubling excessive PSPS by expanded falling tree risk cutting in my Reply Exhibit 2, attempting to reduce the big tree falls onto lines and repetition of the Zogg fire, with Judge Alsup's reaction in Reply Exhibit 1, where he suggests that the PSPS expansion may only be by 55% and then concentrated to impose on only 12% of victims, like me.) Second, as noted above, I allege that Debtors appear to be acting consistent with the possible pursuit of the

DECLARATION IN SUPPORT OF
REPLY TO FURTHER OBJECTION
TO CLAIMS 80033 AND 80500

previously discussed, wrongful 2020 strategy of misuse of excess PSPS in high-risk areas like mine by prioritizing remediation of noncompliant vegetation in lower risk areas, as addressed in Resolution M-4852.

(g)     I allege that these Debtor wrongs and noncompliance, including that "run it until it breaks" strategy, noncompliance with vegetation management laws and regulations, and what Judge Alsup called "robbing the safety budget" (Reply Exhibit 1), were done by Debtors intending to maximize profits, dividends, and (what they consider) shareholder value and for the knowing unjust enrichment and benefit of PG&E's participating Parent. There was public relations talk of safety by Debtors, but I allege that no responsible safety-conscious utility could credibly allege a safety focus while allowing such decades of neglect and noncompliance as I have alleged with ample support from Judge Alsup's Probation Case record and other Related Proceedings, such as Reply Exhibits 1-3 and my RJN. Tens of thousands of dangerous large trees crowding dangerous PG&E systems, uninsulated wires, and aging and neglected equipment do not happen overnight and cannot be overlooked by anyone who did not choose to close his or her eyes;

(h)     I allege that those wrongfully created and continuing dangerous conditions of Debtors' system (including not only the uninsulated wires and neglected equipment, but also the noncompliant vegetation on or around PG&E easements; i.e., the system and the conditions PG&E creates and maintains in which it operates under Debtors' control or responsibility) readily threaten and cause lethal wildfires that otherwise would not have occurred. I allege that is especially a continuing high risk in the extreme high-risk area where I live, where one of such contributing fire risks is Debtors' continuing wrongful conduct and unreasonably dangerous and legally noncompliant system (including such dangerous equipment and noncompliant easement vegetation), as recognized by the fact that many homeowners here can no longer obtain conventional homeowners insurance from boycotting private insurers and have suffered erosion of value in our homes, which PG&E's excessive and unreasonable PSPS discussed herein makes worse. In judging PG&E conduct instead of empty words on safety, I allege that the real danger Debtors continue to impose is best recently illustrated in Reply Exhibit 3, where after all the

DECLARATION IN SUPPORT OF
REPLY TO FURTHER OBJECTION
TO CLAIMS 80033 AND 80500

Case: 19-30088    Doc# 10642-1    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page
34 of 42

prosecutions, litigation, bankruptcy disputes, CPUC and governmental investigations, Judge Alsup oversight, and other attention of Debtors' many critics and victims, PG&E still focused its noncompliant vegetation mitigation in 2020 away from the highest risk areas like mine in favor of easier to work and less endangered places, as the CPUC found in Resolution M-4852 (Reply Exhibit 3). To me and many others, that is a fatal blow to whatever shred of credibility Debtors might seek for their public relations safety pitches. More importantly, in trying to forecast the worst reasonable case of harm and damages to expect from Debtors during the coming decade, that experience piled on top of the many continuous historical horrors, makes my open-ended damages claims seem reasonable, and I so allege them to be. Those dangers are recognized in applicable laws and regulations, as well as in the records of the Related Proceedings (e.g., my Reply Exhibits and RJN), and I allege that they are implicitly or explicitly admitted by PG&E in such Related Proceedings, such as in their Wildfire Mitigation Plans and responses to hard questions from Judge Alsup or his Monitor on that record;

(i)     I allege that, because of the scope and scale of these continuing, noncompliant system and misconduct dangers, which Debtors' Wildfire Mitigation Plans contemplate needing at least a decade to correct and restore compliance with the Vegetation Legal Requirements and other applicable laws and regulations, PG&E performs PSPS blackouts as a "lesser evil," fire mitigation measure "of last resort" (e.g., CPUC I.19-11-013 RJN) that PG&E has to trigger more frequently and prolong for longer duration than would otherwise have been necessary in my home area, but for the Debtors' continuing noncompliance with the Vegetation Legal Requirements and other applicable laws and regulations, and but for Debtors impeding their own restoration work by such negligent, reckless and/or intentionally flawed performance in the execution of both their mitigation repair work and in their PSPS conduct; i.e., I allege all parts of what is "excessive" and "unreasonable" PSPS, which include what are cited as violations of the PG&E's PUC §451 obligation to serve safely, consistent with its public trust duties, **including for all of the more than 22 specific §451 and related PSPS violations listed by the CPUC in I.19.11.013 (see my RJN) discussed herein**. That I allege creates what I was describing as POC claim liability, among other things, under PUC §2106 and for negligence, for

inverse condemnation, nuisance, B&PC §17200, and unjust enrichment, including for such damages, mitigation and restitution liability, as I have identified or alleged herein or in my POC or other filings. I allege, for example, that, if PG&E had no noncompliant vegetation adjacent to dangerous equipment, I would suffer less extreme and unreasonable PSPS, as long as PG&E properly administered its then less dangerous system and PSPS in sincere and strict compliance with applicable laws and regulations and at least reasonable safety practices, such as those that at least match those of SDG&E to which the CPUC directed PG&E to consult in order to improve its worst performer status in the I.19-11-013 investigation of 2019 PSPS and other relevant proceedings. However, I do not expect that better case situation to occur in my lifetime for many reasons addressed herein and others, but especially because as I.19-11-013 shows how hard it is to regulate such chronic wrongdoers, who I allege, despite a long history of record-keeping violations and choosing "see no evil at PG&E" contractors, were still cited by the CPUC for records violations in that just-released investigation of 2019 PSPS;

(j)    I allege that such continuous, excessive and unreasonable PSPS and such noncompliance by Debtors with such applicable laws and regulations is also a nuisance and inverse condemnation taking that exacerbates the noncomplying vegetation nuisance, and that causes material disruption and damage as to the lives and homes of me and other residents in my area of the types addressed in the cases cited in my Reply as to my damages disputes with Debtors addressed herein, especially for mitigation by my generator of damages and the kinds of damages suffered by those like me working from home offices;

(k)    I allege that Debtors' many such listed wrongs and noncompliance with applicable laws and regulations are also unfair business practices under B&PC §17200, entitling me to restitution for unjust enrichment, including for my generator that enhances and unjustly enriches their system and does (at my expense) what Debtors should be doing for me and others, as well as mitigating my damages for their continuing wrongs.

(l)    I allege that the Debtors are jointly and severally liable on many POC legal theories under such circumstances as to different parts of these wrongs and with different remedies, including various of the same kinds of claims as the fire victims have asserted, such as

inverse condemnation, negligence, nuisance, unfair business practices under B&PC §17200, unjust enrichment restitution, and PUC §2106, especially as to such noncompliance with the Vegetation Legal Requirements, as well as both Debtors being unjustly enriched;

(m)     Just as I allege that PG&E is responsible and liable for its agents and contractors, I allege that it is also liable for its joint participation in wrongs by its Parent. Cases like *Uniwill v. City of LA* (inverse condemnation liability shared by utility despite its attempt to isolate the blame to the city), discussed in my Reply, illustrate that this joint participation exposure is not excused by its regulated utility status. For reasons asserted in my POC and other filings, I allege that the Parent is liable for and with PG&E on such shared liability for POC claims, and vice versa.

(n)     By PG&E's such continuing wrongs and threats of another decade of such PSPS that I reasonably expect and allege to be excessive and unreasonable, I allege that PG&E has coerced people like me in this high-risk area, subject to excessive and unreasonable PSPS, to buy generators as I have done to provide electricity for safety and functionality during PSPS events, as explained in my Declaration #1. I allege that PG&E has also recommended that its victims like me respond to the PSPS blackouts by investing in self-defense generation devices like the generator that I purchased as proven in my POC and Declaration #1, hoping that customers like me will unjustly enrich Debtors by enhancing their dangerous system and reducing their political and regulatory pressures to serve electricity safely under Section 451, ESRB-8 and other laws and regulations. I allege that Debtors should be doing that backup for me or reimbursing me, because they are wrongdoers obligated to mitigate damages for their own wrongs and noncompliance at their own expense. While I.19-11-013 and other RJN documents reflect PG&E doing such backup generation to protect essential infrastructure and medical situations, I allege that Debtors should be obligated to pay for the rest of us who seek that same backup protection from Debtors' wrongs. If the high-risk customers abused by excessive and unreasonable PSPS invest in such self-defense generation so unjustly enriching and benefitting Debtors, I allege that will ultimately save Debtors money from avoiding having to invest more themselves in local generation solutions that would reduce excessive and unreasonable PSPS

Case: 19-30088   Doc# 10642-1   Filed: 05/11/21   Entered: 05/11/21 16:54:33   Page
37 of 42

consequences and promote safety (that requires electricity to be on);

(o)     By making my property and family safer by my such self-defense generation, I may reduce Debtors' exposure to more liability claims, if and when my property is threatened by harm from fires. I allege that such excessive, unreasonable, and wrongful PSPS also creates fire claims, as Debtors will discover in the future, when those without electricity suffer fire harms, just as the CPUC fears in its I.19-11-013 findings and conclusions discussed above as among the reasons that the CPUC insists that PSPS be a "last resort;" PSPS is dangerous, because being in high fire risk country without electricity itself is dangerous. That is another reason why I allege that I bought my generator: for insurance in the sense of safety from both the risk of excessive and unreasonable PSPS and of PG&E-caused fires, including from the system dangers Debtors created at my home from PG&E gear and massive illegal adjacent trees  I see just across the street, as illustrated in my Declaration #1;

(p)     That allegation in the previous paragraph is not just an academic matter. In August 2020, the lightning-sparked Jones Fire in the South Yuba canyon burned 705 acres over 12 days requiring the evacuation of over 4000 residents and destroying 21 structures. The evacuation line came within a few miles of my home. But for my self-defense generator things would have been much worse for me. When PG&E disputes with me over its false choice between PSPS and fire safety, I allege that I am focused on both. I am like a resident (if any remain) of Fukushima who understand why the operators of that nuclear power plant were required to drain radioactive, toxic water into the ocean to stop it from flooding the land and causing even worse damage. But that ocean dumping mitigation is still a wrong that causes damage for which those operators as wrongdoers should be liable. I allege the same is true of excessive and unreasonable Debtor PSPS, because it is still harmful, as CPUC recognizes by requiring it to be the "last resort" (see I.19-11-013 in RJN) and because, but for Debtors' wrongs, I allege such PSPS here would not be so prolonged, frequent, excessive and unreasonable; and

(q)     I responded to Debtors' wrongs and threats of PSPS as I have alleged, including those stated in its applicable Wildfire Mitigation Plan and other matters in the relevant record, as described in my POC and Declaration #1, including by acquiring such a self-defense,

Case: 19-30088   Doc# 10642-1   Filed: 05/11/21   Entered: 05/11/21 16:54:33   Page 38 of 42

natural gas generator (using PG&E gas) as a means of mitigating my damages for the aforementioned wrongs and Debtor-caused or -worsened dangers and risks, thus unjustly enriching the Debtors and entitling me to damages, restitution and mitigation recovery, all as described herein.

**B.    Damages, Mitigation, Restitution And Remedy Allegations.**

55.    As the cases in my Reply illustrate, for example, if the court does not appreciate my alleged damages claims for my PUC §2106 or negligence claims, there is still my alleged mitigation claim thereunder for my generator, as well as my inverse condemnation and nuisance damages claims that overcome those Debtor issues by their own unique terms. The same is true of my unjust enrichment/restitution claims under B&PC §17200 and otherwise. If I cannot recover my generator cost as mitigation or restitution for some reason, money is fungible, and I will then pursue alternative recovery strategies allowed by my Reply and Response #1 cited authorities, such as my inverse condemnation or nuisance recovery for loss of property value, especially if Debtors increase my burdens in that recovery effort, as well as other damages, including those still to come from these continuing wrongs of Debtors.

56.    Please note that I allege that the Debtors' wrongs are continuing, and, as the annual Wildfire Mitigation Plans and other PG&E documents of record show, such wrongs are expected to continue for at least a decade and, I allege, likely longer, considering how far PG&E is behind schedule in correcting its cited wrongs.  In forecasting into the future to anticipate wrongs and damages, I allege that I am entitled to consider and allege the worst reasonably possible cases under the circumstances I allege, which include many horrors and risks, given Debtors' history of continuous and persistent, knowing and willful wrongful conduct at a level that has justified PG&E's two felony convictions, a new indictment, and probation violations and many other concerns, all the while with Debtors continuing to proclaim public relations, politically correct words, while I allege generally seeking to avoid both accountability and meaningful reforms that might adversely affect PG&E profit or dividends. The reasonableness of my mitigation defense expense should be supported by the extensive history of such wrongful Debtor conduct as likely continuing. For example, my Reply cites to the *County of San Diego v.*

Case: 19-30088    Doc# 10642-1    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page 39 of 42

*Bressi* inverse condemnation case, supporting my allegation that my claims may consider the worst conduct of the Debtors that is "reasonably possible," which explains one reason why my prior POC, Response and two Declarations described or alleged so many "bad acts" admitted, plausibly proven, or credibly asserted against Debtors, including so many incorporations by reference of major (often still ongoing) investigations and complaints by those harmed in other ways by the same core Debtors' wrongs or those representing the interests of Debtor victims, such as the Tort Claimants Committee, the fire victim plaintiffs, the fire crime prosecutors and Judge Alsup probation authority, securities PSPS plaintiffs, the earlier securities plaintiffs, and the opposition local governments continually seeking stronger reforms in the CPUC Proceedings. Under these circumstances I allege that such worst reasonable case against PG&E (a) ignores the impressive sounding self-serving and noncredible statements that PG&E or its Parent asserts about safety practices and goals, and, instead, (b) focuses on such alleged prior and continuing wrongful practices and conduct, which should now be sufficient to deny the Debtors any benefit of the doubt in forecasting future risks.

57.     I also refer without repetition to the many other discussions of harms that are noted above in the discussion of other aspects of alleged wrongs and my resulting claims.

**V.     Comments About Court Concerns As To The Broad Scope of My POC, and Status Conference Suggestions for Using Related Proceedings for Cost-Effective Resolutions With Less Burden On The Court, Including by Using PG&E Admissions In Related Proceedings And Useful Rule 30b-6 Admissions By the "Right" Witnesses.**

58.     At the prior status conference, this Court expressed certain concerns regarding the burdensome nature and extent of my POC, Response #1, and Declaration #1. I apologize for any burden on the court, but I feared the "process trap" that Debtors have created in the way they have designed and implemented their claim dispute process at issue here, where Debtors argue about my POC and demand a dismissal without my ever getting to the merits of the case in a normal dispute procedure. In other words, Debtors seem to want the benefit of a quickie motion to dismiss without the creditor having any of the procedural and substantive due process in the creditor's side of this procedure. The usual, cost-effective means of a creditor to counter such a process trap problem is at the first opportunity to make a sufficient and broad record that enables

the creditor to make any of various alternative claim cases on the alleged merits in response to whatever the debtor attempts to attack, rather than the creditor with a meager record suffering in the unsatisfying position of trying later to challenge that trap without any useful substantive record and just a due process and procedural argument about what (in the absence of a sufficient record) the creditor really had wished to dispute on the substantive merits. Debtors present that same approach in Objection #2, and again I counter, hoping not to overburden the court, but not having much choice except to do as I have done. I have "heard" the court, however, and I ask that the court consider this context.

59. For example, had certain adversary proceeding rules been in play, as suggested in my Response #1, this dispute would be in a different posture. I would have alleged my claims in a massive, traditional complaint (as other Debtor victims have as cross-referenced for incorporation in my POC), with better organized details and illustrations, such as detailing what was more generally alleged in my POC and other filings, as updated for new developments like those in my Reply Exhibits and RJN. Instead of Debtors' disputed and objectionable Objection #2 (note: my Response #1's reserved challenges to Debtors' process here are still pending), the Debtors would have had to make a normal motion to dismiss or, after more due process, a motion for summary judgment, both of which provide greater clarity and both of which better deal with identifying and narrowing substantive disputes than this Debtor-designed process. Had there actually been any kind of ADR process in these many months before the hearing (there was not), that alternative process could also have been simplified, assuming that the Debtors are not looking to make this a law reform project.

60. As to the Court's question in the prior hearing about whether my claim was limited to the recovery of my cost of my generator, I responded that was the core of my claim as a matter of principle. And, if there is ever a satisfactory ADR process before we get too far into this law reform effort, that could be much of our discussion. But if the Debtors' intent is to exhaust me in a prolonged and expensive process seeking to discourage me from a satisfactory result, then my instinct is to match their escalation with my own preserved expansive theories and counters in order to better balance the playing field and make them pay for any extra burdens they cause me.

1     61.    That said, I heard the court's concern about burdens on the court, and I have some

2     cost-effective suggestions to advocate as status conference topics. If the Debtors insist on making

3     this into a law reform process, I suggest the Court consider simplifying the creation of the factual

4     record and evidence by taking advantage of the many admissions of the Debtors in the Related

5     Proceedings. Some of those are concealed by Debtors' confidentiality arrangements or sealing,

6     even though they are not always privileged and often should be discoverable (although I expect at

7     some serious burdens, considering the Debtors' traditional approach). Fortunately, the Court can

8     save itself and everyone else many burdens by allowing meaningful use of such admissions from

9     the Related Proceedings and then requiring the "right" related Rule 30b-6 witnesses to address the

10    record of what has already been ruled, found, or said by Judge Alsup, the CPUC, or others. That

11    is, because the Debtors should be consistent, and because I should win, if the Debtors have to

12    admit such things, including that those Related Proceedings persons were correct. I expect that, if

13    those Debtor witness say something different to me, in conflict with such Debtor admissions or

14    with those such rulings, findings, or statements, then the Debtors will be creating bigger problems

15    for themselves than my claims, and I expect there will be more new developments to add to the

16    record in this case.

17    62.    Indeed, if the Debtors have to admit that what Judge Alsup, the CPUC, or a

18    relevant other has said is correct, then they ought to just stipulate to my comparable allegations

19    about the facts and then address the legal disputes on the merits as to the consequences of those

20    stipulated facts. I would prefer that approach, more quickly and efficiently getting to the

21    substance and legal merits directly, rather than whatever else the Debtors may prefer.

22    Pursuant to 28 U.S.C. section 1746, I declare under penalty of perjury that the foregoing is

23    true and correct to the best of my knowledge, information and belief. Executed this 11th day of

24    May, 2021, in Nevada City, California.

25                                            */s/ G. Larry Engel*
                                            G. Larry Engel
26

27

28