1  G. LARRY ENGEL (SBN 53484)
   **ENGEL LAW, PC**
2  12116 Horseshoe Lane
   Nevada City, California 95959
3  Telephone: (415) 370-5943
   larry@engeladvice.com
4
   Attorneys for
5  Creditor (who is also the Creditor himself
   and shares the same address and data for service
6  and otherwise, is the person with authority to reconcile,
   settle, or otherwise resolve the Objection as to Creditor)
7

8               UNITED STATES BANKRUPTCY COURT
                NORTHERN DISTRICT OF CALIFORNIA
9                  SAN FRANCISCO DIVISION

10 | In re:                          | CASE NO. 19-30088 (DM)

11 | PG&E CORPORATION                 | Chapter 11
                                     | (Lead Case – Jointly Administered)
12 | -and-
                                     | HEARING INFORMATION:
13 | PACIFIC GAS AND ELECTRIC
     COMPANY,                         | Date:   June 15, 2021
14 |                                 | Time:   10:00 AM (Pacific Time)
             Debtors.                | Place:  (Telephonic Appearances Only)
15 |                                 |         United State Bankruptcy Court
     Affects both Debtors            |         Courtroom 17, 16th Floor
16 |                                 |         San Francisco, CA. 94102

17 |                                 | Reply Deadline: 5/14/21

18        **REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF "REPLY" TO
          (1)"REORGANIZED DEBTORS' FURTHER OBJECTION TO
19        CLAIMS 80033 AND 80500" [DKT. 10574] ("OBJECTION #2"), RELATING TO
          (2) REORGANIZED DEBTORS' FORTY-SECOND OMNIBUS OBJECTION
20        TO CLAIMS (NO LIABILITY/PASS THROUGH CLAIMS) [DKT 9460]
          ("OBJECTION #1"); AND SUPPLEMENTING (3) ENGEL'S "RESPONSE
21        AND REQUEST FOR SECTION 105(D) STATUS CONFERENCE AND REQUEST
          FOR JUDICIAL NOTICE" [DKT 9653] ("RESPONSE #1"). RELATED
22                    COURT ORDER [DKT 10471]**

23        To: (A) The Honorable Dennis Montali, United State Bankruptcy Judge; (B) The Office of

24 the United States Trustee; (C) Debtors and Reorganized Debtors; and (D) Other Parties Entitled To

25 Notice:

26 **I.    Introduction And Explanation of Some Unusual Circumstances Relating To Debtors'
           Disputed Process**
27

28        I, G. Larry Engel, respectfully request this Court to take judicial notice in this "RJN" of certain

Case: 19-30088   Doc# 10642-2   Filed: 05/11/21   Entered: 05/11/21 16:54:33   Page 1
of 143

judicial, CPUC, and other records listed and attached or referenced below in support of my concurrent "Reply" and related "Declaration #2," which in turn support my Proof of Claims No. 80033 ("POC") and dispute the material allegations and arguments in the Debtors' "Objection #2" [Dkt. 10574].

As explained in my Reply, my "Response #1" [Dkt. 9653], and my "Declaration #1" related thereto, my POC, if properly read, also should defeat both of Debtors' "Objections #1 and #2." However, Debtors incorrectly argue for the first time in their Objection #2 that my filings have "fatally" insufficient allegations. This support for my Reply is intended further to defeat that disputed contention with even more specific allegations and additional responses from recent new developments on which the court should focus its analysis in any event. Besides Reply Exhibit 1 (Judge Alsup's 4/29/21 Order Dkt. 1386), Reply Exhibit 2 (CPUC's 4/20/21 letter brief Dkt. 1380 and the attached PG&E PSPS proposal Dkt. 1380-1), and Reply Exhibit 3 (CPUC Resolution M-4852, citing certain non-compliances by PG&E) (collectively, "Reply Exhibits"), as well as other incorporations that still apply in my such prior filings in this dispute, I have added or referenced the following additional documents and matters for rebuttal and impeachment of Debtors' such insufficiency claims specified for the first time in Objection #2. Like my Reply Exhibits, such referenced rebuttal documents and matters herein are well known to Debtors, but they nevertheless ignored what follows in their inconsistent new arguments in Objection #2.

For example, the Debtors incorrectly argue, in effect, that I failed to allege sufficient wrongs to state a cause of action against Debtors which involves their overlooking or misinterpreting the contents of my Response #1. Therefore, my Reply generally rebuts that argument, while my Declaration clarifies and details my challenged allegations in order to eliminate any doubt of the Debtors' error, such as by my citing and addressing at least 22 specific wrongs or non-compliances by PG&E that are identified by the CPUC as Finding of Facts and Conclusions of Law in its recent Investigation 19-11-013, a lengthy report which I have excerpted and attached hereto for judicial reference, so that the court may read it in fuller context than analyzed in my Declaration. While I could provide more such rebuttal evidence from "Related Proceedings" that support my POC and allegations, as noted below, I assume that what I have provided as illustrations here and in the Reply

Exhibits should be sufficient for now in this initial stage of this still disputed Debtor objection process.

As further explained in my Reply, the Debtors' wrongs are continuing post-petition and post-confirmation, and the related regulatory and judicial investigations, cases, and proceedings relevant to my POC and claims are also still continuing. Therefore, to the extent possible, a reference to a document or matter at one point in time should include what I expect to follow thereafter as this PSPS dispute continues in its broad context, including by involving relevant findings and rulings against a Debtor evolving in various such continuing Related Proceedings. As explained in my Reply and Declaration, such updated evidence and rulings appear on the special CPCU websites designed for Wildfires (www.cpuc.ca.gov/wildfires/) and for PSPS (www.cpuc.ca.gov/psps/), which are integrated consistent with PUC §8386 et seq. and the annual PG&E Wildfire Mitigation Plan and ESRB-8 and other PSPS requirements.

The same is true for Judge Alsup's Probation Proceeding in N.D. Cal. Case No. 3:14-cr-00175-WHA, where PG&E is regularly evaluated for compliance with the still evolving conditions of probation in comparison to relevant events and concerns, as well as amicus input from the CPUC. The same is true of the Judge's Monitor, who has issued on the record reports that disclose more PG&E admissions as well as the Monitor's own findings, and PG&E has sometimes responded to them on the record. Those PG&E responses and Monitor reports are important admissions by PG&E and evidence on the record that I intend to use as and when appropriate in this dispute.

Because such Related Proceedings records are so voluminous, and I do not wish prematurely to burden this court with more than is necessary at any applicable time in this disputed claim process, I am only attaching the Exhibits listed below. Notwithstanding that general restraint, because of the similarity and recency of the Zogg Fire causes and results, I illustrate the foregoing by this example of Judge Alsup issuing his "**Order Requesting Information Re Zogg Fire**" Dkt. 1246 dated 10/12/20, to which PG&E filed an initial "**Response To Order Requesting Information Re Zogg Fire And Order For Further Information Re Zogg Fire**" on 10/26/20 as Dkt. 1250, admitting some things supporting my claims. There was more to come on this back and forth and my Reply Exhibits 1 and 2 are key recent illustrations in this saga supporting my POC

claims.

This RJN is based upon Federal Rule of Evidence 201 and applicable precedents, such as *Harris v. County of Orange*, 682 F.3d 1126, 1132 (9th Cir. 2012); *Bennett v. Medtronic, Inc.*, 285 F.3d 801 (9th Cir. 2002; and *US ex rel. Robinson Rancheria Citizens Council v. Borneo*, 971 F.2d 244, 248 (9th Cir. 1992). My Reply explains the context for this request, although the use of this RJN is also in support of my Declaration #2, which addresses many specific facts in issue or dispute to which the CPUC Proceedings, Judge Alsup's Probation Case, or other referenced sources are important. What is attached therefrom are true and correct copies or links thereto accessed from the referenced public records and appropriate for judicial notice.

## II.    From CPUC Proceedings And/Or Websites.

### A.    Brunswick Circuit PSPS Data Demanded by Debtors

| Feeder Name | BRUNSWICK 1105 |
|---|---|
| Feeder Number | 152481105 |
| Nominal Circuit Voltage (kv) | 12kV |
| Circuit Capacity (MW) | 12.25 |
| Circuit Projected Peak Load | 9.13 |
| Substation Bank | 2 |
| Substation Bank Capacity (MW) | 39.599998 |
| Substation Bank Peak Load (MW) | 26.1 |
| Existing Distributed Generation (MW) | 1.97 |
| Queued Distributed Generation (MW) | 0.1 |
| Total Distributed Generation (MW) | 2.07 |
| Total Customers | 3699 |
| Residential Customers | 3407 |
| Commercial Customers | 229 |
| Industrial Customers | 55 |
| Agricultural Customers | 5 |
| Other Customers | 3 |

Based upon the long CPUC website report "dated as of February 25,2021, filed with the CPUC called "**De-energizing Events Since Passing of ESRB-8,**" it appears that such Brunswick Circuit 1105 reported 352.08 hours/14.67 days of PSPS outages between 10/9/19 and 10/25/20 affecting between 1748 and 3415 residential customers such as myself. For each of those events (i.e., 10/9-12/19, 10/23-25/19, 10/26-31/19, 9/7-9/20, 9/27-28/20, and 10/25-27/20) PG&E filed with the CPUC lengthy compliance reports pursuant to Resolution ESRB-8 and Decision 19-05-

042 also available on its website cited above. See attached Exhibit A: Brunswick 1105 CPUC PSPS Event Data (Oct. 2013 Through Dec. 2020), extracted from the CPUC PSPS Event Data Master Spreadsheet entitled CPUC PSPS Rollup: Oct. 2013 Through Dec. 31, 2020 found at https://www.cpuc.ca.gov/psps/.

### B. CPUC Enforcement And Other Concerns Regarding PG&E's PSPS Noncompliance

1.      Exhibit B attached hereto is: (a) **CPUC Press Release** dated 4/20/21, Dkt #: I.19-11-013 **"CPUC Proposal Addresses Utilities Failures To Protect Public Safety During 2019 PSPS Events**" dated 4/20/21, **together with** (b) selected **attached excerpts** from the more than 300 pages faulting PG&E in that referenced CPUC Proposed Decision **Investigations 19-11-013** (mailed 4/20/21) **"Decision Addressing the Late 2019 Public Safety Power Shutoffs By Pacific Gas And Electric Company …[and others] To Mitigate the Risk of Wildfire Caused By Utility Infrastructure.**" While the CPUC addressed therein many errors and omissions by PG&E, including by critical comparison to the better practices of SDG&E, these excerpts especially are important in Section 7.2 enforcement, Section 9.11 Assess Needs of Critical Facilities and Infrastructure for Backup Generation (starting at 214) citing relevant updates on ESRB-8 incorrectly ignored by PG&E as "discretionary, rather than mandatory" (at 216) and complaints of key parties like "The Joint Local Governments" (at fn 635), such as the CPUC conclusion at 223 that: "Based on the information in the SED Report and comments by parties regarding efforts – in advance of the 2019 fire season – that PG&E and SCE failed adequately to engage critical facilities and infrastructure about their need for backup power, **we find PG&E and SCE failed to reasonably comply with the utility obligation to promote safety in PUB. Util. Code §451.**" (emphasis added). CPUC reminded PG&E (at 221) that, while ESRB-8 expressed some things as initially making backup power discretionary, "it was mandatory, under certain conditions, in D. 19-05-042" and that the CPUC "further modified this directive to provide backup power in 2020 explaining that the utilities must "work … to provide consultative assistance regarding backup generation to ensure critical infrastructure is not brought offline during a de-energization event." The CPUC also announced at 222 that it intends to provide "more guidance to stakeholders on this

matter here, but directs stakeholders to R. 18-12-005, a proceeding designed to review the PSPS Guidelines in more detail." See also ***Order Instituting Rulemaking to Examine Electric Utility De-Energization of Power Lines in Dangerous Conditions*, 2018 Cal. PUC LEXIS 614 (2018); *Order Instituting Investigation on the Commission's Own Motion on the late 2019 Public Safety Power Shutoff Events*, 2019 Cal. PUC LEXIS 752 (2019).**

      2.      Exhibit C attached hereto is a **CPUC Press Release dated 1/30/20**, which is entitled "**CPUC Proposes Additional PSPS Guidelines For Utilities And Orders PG&E to Resume And Augment Corrective Action Reports**" regarding R.18-12-005. That 1/30/20 Rulemaking 18-12-005 filing, entitled, "**Assigned Commissioner's Ruling Regarding Pacific Gas And Electric Company's Post-Public Safety Shutoff Correction Action Reporting**," is found on such CPUC website and supports my claims. Perhaps further reforms may be coming in the current CPUC deliberations with PG&E over its PSPS practices.

      3.      Exhibit D is "**Comments of the Public Advocates Office on Draft Resolution M-4852**" dated 3/17/21, better reflecting my more cynical views and noting inconsistencies between what PG&E says to Judge Alsup compared to what it says to the CPUC (e.g., at Discussion "A." p.2: "Yet even as PG&E agreed to plead guilty in state court, PG&E continued to deny responsibility in pleadings before this Commission.")

      I also recently became aware of a PG&E response to that Resolution M-4852 exposé, which discussed alleged improvements by PG&E for 2021 in a new plan dated 5/6/21, entitled "**Enhanced Oversight And Enforcement Process Corrective Action Plan Pursuant To Resolution M-4852**." I have not had time to study that filing, but will consider what may be relevant for the court's attention by the June 15 hearing. Considering its length, I do not attach it because I do not wish to burden the court with more than the relevant excerpts.  Therefore, I respectfully request that the Court take judicial notice of such RJN Exhibits or cited/linked documents and matters.

Dated:  May 11, 2021

                        ENGEL LAW, PC

                        */s/ G. Larry Engel*
                        G. LARRY ENGEL
                        Attorney for Creditor

1

# TABLE OF EXHIBITS

2

| Exhibit | Description | Page |
|---|---|---|
| A | Brunswick 1105 CPUC PSPS Event Data (Oct. 2013 Through Dec. 2020), extracted from the CPUC PSPS Event Data Master Spreadsheet entitled CPUC PSPS Rollup: Oct. 2013 Through Dec. 31, 2020 found at https://www.cpuc.ca.gov/psps/ | 9 |
| B | CPUC Press Release dated 4/20/21:  CPUC Proposal Addresses Utilities Failures To Protect Public Safety During 2019 PSPS Events [Dkt #: I.19-11-013] and *Excerpts from* Investigations 19-11-013:  Decision Addressing the Late 2019 Public Safety Power Shutoffs By Pacific Gas And Electric Company …[and others] To Mitigate the Risk of Wildfire Caused By Utility Infrastructure [(mailed 4/20/21] | 11 |
| C | CPUC Press Release dated 1/30/20:  CPUC Proposes Additional PSPS Guidelines For Utilities And Orders PG&E to Resume And Augment Corrective Action Reports | 131 |
| D | Comments of the Public Advocates Office on Draft Resolution M-4852 dated 3/17/21 | 137 |

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Brunswick 1105 CPUC PSPS Event Data (Oct. 2013 Through Dec. 2020)

# EXHIBIT A

| Utility | Outage Start | Full Restoration | Outage Duration | Outage Days | Outage Hours | Circuit Name | HFTD | TOTAL CUSTOMERS IMPACTED | RESIDENTIAL CUSTOMERS | COMMERCIAL/INDUSTRIAL CUSTOMERS | MEDICAL BASELINE CUSTOMERS | OTHER CUSTOMERS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PG&E | 10/9/19 5:11 | 10/12/19 11:30 | 3 days,6 hrs,19 min | 3.263 | 78.32 | BRUNSWICK-1105 | TIER 2, TIER 3, PARTIALLY OUTSIDE HFTD | 3662 | 3362 | 272 | 165 | 28 |
| PG&E | 10/23/19 15:43 | 10/25/19 10:07 | 1 days,18 hrs,24 min | 1.767 | 42.40 | BRUNSWICK-1105 | TIER 3, PARTIALLY OUTSIDE HFTD | 3662 | 3391 | 265 | 166 | 6 |
| PG&E | 10/26/19 19:43 | 10/31/19 13:50 | 4 days,18 hrs,7 min | 4.755 | 114.12 | BRUNSWICK-1105 | TIER 3, TIER 2, PARTIALLY OUTSIDE HFTD | 3637 | 3371 | 260 | 166 | 6 |
| PG&E | 9/7/2020 22:10 | 9/9/2020 17:03 | 1 days,18 hrs,53 min | 1.787 | 42.88 | BRUNSWICK 1105 | Partially Outside HFTD, Tier 3, Tier 2 | 3675 | 3403 | 266 | 218 | 6 |
| PG&E | 9/27/2020 18:26 | 9/28/2020 17:15 | 0 days,22 hrs,49 min | 0.951 | 22.82 | BRUNSWICK 1105* | Tier 3 | 1831 | 1748 | 79 | 99 | 4 |
| PG&E | 10/25/2020 15:11 | 10/27/2020 18:44 | 2 days,3 hrs,33 min | 2.148 | 51.55 | BRUNSWICK 1105 | Partially Outside HFTD, Tier 3, Tier 2 | 3687 | 3415 | 266 | 226 | 6 |
| | | **TOTAL** | | **14.67** | **352.08** | | | | | | | |

*CPUC Press Release dated 4/20/21*
*and*

**EXCERPTS FROM**

**CPUC Investigation 19-11-013
PROPOSED DECISION OF ALJ
DEANGELIS (Mailed 4/20/2021)**

# EXHIBIT B



**California Public Utilities Commission**
**505 Van Ness Ave., San Francisco**

---

**FOR IMMEDIATE RELEASE**                                    **PRESS RELEASE**
Media Contact: Terrie Prosper, 415.703.1366, news@cpuc.ca.gov                Docket #: I.19-11-013

## CPUC PROPOSAL ADDRESSES UTILITY FAILURES TO PROTECT PUBLIC SAFETY DURING 2019 PSPS EVENTS

SAN FRANCISCO, April 20, 2021 – The California Public Utilities Commission (CPUC), in ongoing efforts to hold utilities accountable for safely implementing Public Safety Power Shutoff (PSPS) events, today issued a proposal that finds that Pacific Gas and Electric Company (PG&E), Southern California Edison (SCE), and San Diego Gas & Electric (SDG&E) each failed to comply with CPUC-required guidelines in many of their 2019 PSPS events. Based on this, the proposal recommends a financial remedy and a number of corrective actions. The proposal will be on the CPUC's May 20, 2021 Voting Meeting agenda.

In late 2019, PG&E, SCE, and SDG&E de-energized power to customers during high wildfire danger weather to reduce the risk of their infrastructure igniting catastrophic wildfires. In November 2019, the CPUC opened an investigation of those 2019 events to assess whether the utilities prioritized safety and complied with CPUC regulations and requirements when planning and implementing the PSPS events. The proposal issued today, called a Proposed Decision, focuses, among other things, on correcting future utility planning and implementation to drive utilities to safely execute any future PSPS events, including:

**Revenue Remedy**

- Forgo collection of revenues from customers that are associated with electricity not sold during future PSPS events until it can be demonstrated that utilities have made improvements in identifying, evaluating, weighing, and reporting public harm when determining whether to initiate a PSPS event.

**Corrective Actions**

- Take corrective actions to improve future compliance with the CPUC's existing PSPS guidelines.

1

California Public Utilities Commission

- Improve, among other things, communications with customers dependent on electricity for medical reasons, especially life support, before, during, and after a PSPS event.

**Continual Learning**
- Share best practices and lessons learned for initiating, communicating, reporting, and improving all aspects of PSPS events by regularly holding utility working group meetings.

**Emergency Training**
- Provide Standard Emergency Management System (SEMS) training for all personnel and contractors involved in PSPS planning.

**Reporting**
- File annual reports describing progress and status on improving compliance with PSPS guidelines.

**Transparency**
- Support the CPUC's Safety and Enforcement Division's development of a standardized 10-day post-event reporting template. Post-event reporting facilitates learning and improvement across utilities, state, and local public safety agencies and local jurisdictions.

In implementing the late 2019 PSPS events, PG&E, SCE, and SDG&E had, to different degrees, ineffective coordination with public safety partners, inadequate consideration of the access and functional needs communities, and lack of reasonable consideration of the public safety risks caused by PSPS events.

PG&E experienced communication network outages and lack of coordination of appropriate back-up power; inadequate notification efforts; inadequate outreach and education to identify additional resources available to the public; lack of outreach regarding Community Resource Centers (CRC), and inadequate services provided at CRCs; delays in coordinating with local jurisdictions to identify critical facilities and infrastructure; and difficulty providing Geographic Information System (GIS) shapefiles depicting PSPS information.

SCE provided illegible maps depicting PSPS event boundaries to the public; conducted insufficient outreach regarding CRCs, the number of CRCs, and services provided at the CRCs were insufficient; inadequately supported critical facilities and infrastructure providers who experienced outages

2

California Public Utilities Commission

without an alternative source of power; failed to communicate PSPS information in languages other than English; and had difficulty providing GIS shapefiles depicting PSPS information.

SDG&E did not provide sufficient information on how it considered geographic and cultural demographics when developing a notice strategy and did not sufficiently establish primary and secondary 24-hour points of contacts at critical facilities and infrastructure.

The CPUC's investigation, opened in November 2019, enabled a comprehensive review of both the effectiveness, and the impacts, of all phases of the 2019 PSPS events. The CPUC is also separately investigating PG&E's implementation of certain aspects of its 2019 PSPS events in an Order to Show Cause in R.18-12-005.

Since the 2019 PSPS events, the CPUC has taken a series of ongoing actions to further ensure utilities continue to reduce the scope and duration of PSPS events and prioritize customer safety. Among those actions:

- In 2019 and throughout 2020 required PG&E implement a series of actions to correct deficiencies in 2019 PSPS events;
- In May 2020, adopted refinements and improvements to existing PSPS guidelines and requirements in advance of 2020 wildfire season;
- In January 2021, required SCE implement a series of actions to correct deficiencies in 2020 PSPS events; and,
- In March 2021, issued staff proposal for additional refinements and improvements to existing PSPS guidelines and requirements in advance of 2021 wildfire season.

The proposal of the Administrative Law Judge assigned to the proceeding is available at https://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M378/K738/378738236.PDF.

Documents related to this proceeding are available at https://apps.cpuc.ca.gov/apex/f?p=401:56:0::NO:RP,57,RIR:P5_PROCEEDING_SELECT:I1911013. Members of the public can comment on the proposal by clicking on the "Public Comment" tab.

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page 13 of 143

More information on the CPUC's actions regarding PSPS events is available at www.cpuc.ca.gov/psps.

The CPUC regulates services and utilities, safeguards the environment, and assures Californians' access to safe and reliable utility infrastructure and services. For more information on the CPUC, please visit www.cpuc.ca.gov.

###



STATE OF CALIFORNIA                                                                    GAVIN NEWSOM, *Governor*

FILED
04/20/21
03:30 PM

# PUBLIC UTILITIES COMMISSION
505 VAN NESS AVENUE
SAN FRANCISCO, CA 94102-3298

April 20, 2021                                                        **Agenda ID #19436**
                                                                     **Ratesetting**


TO PARTIES OF RECORD IN INVESTIGATION 19-11-013:

This is the proposed decision of Administrative Law Judge Regina DeAngelis. Until and unless the Commission hears the item and votes to approve it, the proposed decision has no legal effect.  This item may be heard, at the earliest, at the Commission's May 20, 2021 Business Meeting.  To confirm when the item will be heard, please see the Business Meeting agenda, which is posted on the Commission's website 10 days before each Business Meeting.

Parties of record may file comments on the proposed decision as provided in Rule 14.3 of the Commission's Rules of Practice and Procedure.

The Commission may hold a Ratesetting Deliberative Meeting to consider this item in closed session in advance of the Business Meeting at which the item will be heard.  In such event, notice of the Ratesetting Deliberative Meeting will appear in the Daily Calendar, which is posted on the Commission's website.  If a Ratesetting Deliberative Meeting is scheduled, *ex parte* communications are prohibited pursuant to Rule 8.2(c)(4)(B).


  /s/  ANNE E. SIMON
Anne E. Simon
Chief Administrative Law Judge

AES:gp2
Attachment

**PROPOSED DECISION**

Decision **PROPOSED DECISION OF ALJ DEANGELIS (Mailed 4/20/2021)**

**BEFORE THE PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA**

| | |
|---|---|
| Order Instituting Investigation on the Commission's Own Motion on the Late 2019 Public Safety Power Shutoff Events. | Investigation 19-11-013 |

# DECISION ADDRESSING THE LATE 2019 PUBLIC SAFETY POWER SHUTOFFS BY PACIFIC GAS AND ELECTRIC COMPANY, SOUTHERN CALIFORNIA EDISON COMPANY, AND SAN DIEGO GAS & ELECTRIC COMPANY TO MITIGATE THE RISK OF WILDFIRE CAUSED BY UTILITY INFRASTRUCTURE

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page 16 of 143

## Table of Contents

**Title**                                                             **Page**

DECISION ADDRESSING THE LATE 2019 PUBLIC SAFETY POWER SHUTOFFS
BY PACIFIC GAS AND ELECTRIC COMPANY, SOUTHERN CALIFORNIA
EDISON COMPANY, AND SAN DIEGO GAS & ELECTRIC COMPANY TO
MITIGATE THE RISK OF WILDFIRE CAUSED
BY UTILITY INFRASTRUCTURE ................................................................. 2
Summary .................................................................................................................. 2
1.  Background ....................................................................................................... 4
   1.1.  Overview .................................................................................................... 5
   1.2.  Respondents .............................................................................................. 6
   1.3.  Related Commission Decisions and Proceedings .............................. 7
   1.4.  2003 - 2007 Related Commission Decisions and Proceedings ......... 8
   1.5.  2008 - 2009 Related Commission Decisions and Proceedings ......... 9
   1.6.  2010 – 2012 Related Commission Decisions and Proceedings ...... 15
   1.7.  2018 - Related Commission Decisions and Proceedings ................ 19
   1.8.  2019 - Related Commission Decisions and Proceedings ................ 26
   1.9.  Late 2019 – PSPS Events ....................................................................... 28
   1.10. Phase 1 ..................................................................................................... 29
   1.11. Phase 2 ..................................................................................................... 33
   1.12. Prehearing Conference ......................................................................... 33
   1.13. Scoping Memo ........................................................................................ 38
   1.14. Opening Comments ............................................................................... 39
   1.15. Reply Comments .................................................................................... 39
   1.16. No Evidentiary Hearings and the Record ......................................... 39
2.  Jurisdiction .................................................................................................... 39
3.  Standard of Review ...................................................................................... 41
4.  Burden of Proof ............................................................................................ 41
5.  Organization of Decision ............................................................................ 42
6.  Adequate Time to Prepare for Late 2019 Proactive Power Shutoffs ... 43
   6.1.  SED Report – Adequate Time to Prepare .......................................... 43
   6.2.  Utilities – Adequate Time to Prepare ................................................. 45
   6.3.  Parties – Adequate Time to Prepare ................................................... 46
   6.4.  Discussion – Adequate Time to Prepare ............................................ 46
   6.5.  Corrective Action – Adequate Time to Prepare ................................ 48
7.  Utility Decision-Making Process Immediately Prior to Late 2019 Proactive
   Power Shutoffs ............................................................................................... 48

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page
17 of 143

7.1.    Identify Public Safety Risks and Weigh Harms.................................. 48
     7.1.1.    SED Report – Identify Public Safety Risks and Weigh Harms ............... 49
     7.1.2.    Utilities – Identify Public Safety Risks and Weigh Harms...................... 50
     7.1.3.    Parties – Identify Public Safety Risks and Weigh Harms........................ 51
     7.1.4.    Discussion – Identify Public Safety Risks and Weigh Harms................. 55
     7.1.5.    Corrective Action - Identify Public
               Safety Risks and Weigh Harms ..................................................... 57
7.2.    Last Resort - PSPS as a Mitigation Measure of Last Resort, Alternatives
        Considered, and Mitigation Measure Employed ............................... 62
     7.2.1.    SED Report – Mitigation Measure of Last Resort and Alternatives
               Considered, and Mitigation Measure Employed.................................... 64
     7.2.2.    Utilities – Mitigation Measure of Last Resort and Alternatives
               Considered, and Mitigation Measure Employed.................................... 65
     7.2.3.    Parties – Mitigation Measures of Last Resort, Alternatives Considered,
               and Mitigation Measure Employed ................................................ 67
     7.2.4.    Discussion – Mitigation Measure of Last Resort, Alternatives
               Considered, and Mitigation Measure Employed..................................... 68
     7.2.5.    Corrective Action – Mitigation Measure of Last Resort, Alternatives
               Considered, and Mitigation Measure Employed..................................... 70
8.  Event Specific Requirements - Compliance with Laws, Rules, and Regulations
    Applicable to PSPS Events............................................................ 71
   8.1.    Notice in Preparation for, During, and After a PSPS Event ........................ 72
     8.1.1.    SED Report - Notice in Preparation for, During, and After a PSPS Event
               ........................................................................... 74
     8.1.2.    Utilities - Notice in Preparation for, During, and After a PSPS Event ... 82
     8.1.3.    Parties - Notice in Preparation for, During,
               and After a PSPS Event.............................................................. 85
     8.1.4.    Discussion - Notice in Preparation for, During,
               and After a PSPS Event.............................................................. 89
     8.1.5.    Corrective Action - Notice in Preparation for, During, and After a PSPS
               Event ................................................................................ 92
   8.2.    Information Sharing: Continuous Updates of Actual De-Energizations on
           Website Homepage and Dedicated Webpage ................................... 94
     8.2.1.    SED Report - Information Sharing: Continuous
               Updates of Actual De-Energizations on Website Homepage and
               Dedicated Webpage .................................................................. 95
     8.2.2.    Utilities – Information Sharing: Continuous Updates
               of Actual De-Energizations on Website Homepage and Dedicated
               Webpage................................................................................ 97

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page
                                    18 of 143

8.2.3.  Parties – Information Sharing: Continuous Updates of Actual De-Energizations on Website Homepage and Dedicated Webpage.......................................................................... 98

8.2.4.  Discussion – Information Sharing: Continuous Updates of Actual De-Energizations on Website Homepage and Dedicated Webpage.......................................................................... 100

8.2.5.  Corrective Action – Information Sharing: Continuous Updates of Actual De-Energizations on Website Homepage and Dedicated Webpage ........................................................ 101

8.3.  Information Sharing: Utilities Must Work Together, Share Best Practices, Ensure Sharing of Consistent Information with Public Safety Partners.................................................................. 102

8.3.1.  SED Report - Information Sharing: Utilities Must Work Together, Share Best Practices, Ensure Sharing of Consistent Information with Public Safety Partners............................................................................ 103

8.3.2.  Utilities - Information Sharing: Utilities Must Work Together, Share Best Practices, Ensure Sharing of Consistent Information with Public Safety Partners ............................................................................ 104

8.3.3.  Parties - Information Sharing: Utilities Must Work Together, Share Best Practices, Ensure Sharing of Consistent Information with Public Safety Partners ............................................................................ 105

8.3.4.  Discussion - Information Sharing: Utilities Must Work Together, Share Best Practices, Ensure Sharing of Consistent............................................. 107

8.3.5.  Corrective Action - Information Sharing: Utilities Must Work Together, Share Best Practices, Ensure Sharing of Consistent Information with Public Safety Partners ................................................................ 109

8.4.  Information Sharing: Seamless Communication with Emergency Responders and Local Governments ............................................................. 110

8.4.1.  SED Report - Information Sharing: Seamless Communication with Emergency Responders and Local Governments................................... 111

8.4.2.  Utilities - Information Sharing: Seamless Communication with Emergency Responders and Local Governments................................... 112

8.4.3.  Parties - Information Sharing: Seamless Communication with Emergency Responders and Local Governments................................... 115

8.4.4.  Discussion - Information Sharing: Seamless Communication with Emergency Responders and Local Governments................................... 116

8.4.5.  Corrective Action - Information Sharing: Seamless Communication with Emergency Responders and Local Governments................................... 118

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page 19 of 143

8.5.   Information Sharing: Timely Share Geographic Information System Data with Public Safety Partners via Secure Data Transfer ................................... 119

   8.5.1.   SED Report – Information Sharing: Timely Share Geographic Information System Data with Public Safety Partners via Secure Data Transfer ........................................................................ 120

   8.5.2.   Utilities - Information Sharing: Timely Share Geographic Information System Data with Public Safety Partners via Secure Data Transfer .................................................................... 121

   8.5.3.   Parties – Information Sharing: Timely Share Geographic Information System Data with Public Safety Partners via Secure Data Transfer .................................................................... 122

   8.5.4.   Discussion – Information Sharing: Timely Share Geographic Information System Data with Public Safety Partners via Secure Data Transfer ........................................................................ 123

   8.5.5.   Corrective Action – Information Sharing: Timely Share Geographic Information System Data with Public Safety Partners via Secure Data Transfer ........................................................................ 125

8.6.   Coordinate with Emergency Operations Centers and Incident Command Systems: Invite Water and Communications Infrastructure Providers to Utility Emergency Operations Centers ........................................................... 125

   8.6.1.   SED Report - Coordinate with Emergency Operations Centers and Incident Command Systems: Invite Water and Communications Infrastructure Providers to Utility Emergency Operations Centers ................................................................ 126

   8.6.2.   Utilities - Coordinate with Emergency Operations Centers and Incident Command Systems: Invite Water and Communications Infrastructure Providers to Utility Emergency Operations Centers .............................. 127

   8.6.3.   Parties - Coordinate with Emergency Operations Centers and Incident Command Systems: Invite Water and Communications Infrastructure Providers to Utility Emergency Operations Centers .............................. 130

   8.6.4.   Discussion - Coordinate with Emergency Operations Centers and Incident Command Systems: Invite Water and Communications Infrastructure Providers to Utility Emergency Operations Centers ..... 132

   8.6.5.   Corrective Action - Coordinate with Emergency Operations Centers and Incident Command Systems: Invite Water and Communications Infrastructure Providers to Utility Emergency Operations Centers ..................................................... 133

Case: 19-30088   Doc# 10642-2   Filed: 05/11/21   Entered: 05/11/21 16:54:33   Page 20 of 143

8.7.    Coordination with Emergency Operations Centers and Incident Command Systems: Embedded Utility Liaison at Local Emergency Operations Centers ........................................................... 133

    8.7.1.    SED Report – Coordination with Emergency Operations Centers and Incident Command Systems: Embedded Utility Liaison at Local Emergency Operations Centers ................................................. 134

    8.7.2.    Utilities – Coordination with Emergency Operations Centers and Incident Command Systems: Embedded Utility Liaison at Local Emergency Operations Centers ................................................. 135

    8.7.3.    Parties - Coordination with Emergency Operations Centers and Incident Command Systems: Embedded Utility Liaison at Local Emergency Operations Centers ................................................. 136

    8.7.4.    Discussion - Coordination with Emergency Operations Centers and Incident Command Systems: Embedded Utility Liaison at Local Emergency Operations Centers ................................................. 137

    8.7.5.    Corrective Action - Coordination with Emergency Operations Centers and Incident Command Systems: Embedded Utility Liaison at Local Emergency Operations Centers ................................................. 138

9.    Non-Event Specific Requirements – Compliance with Laws, Rules, and Regulations Applicable to PSPS Events ................................................. 139

9.1.    Identify Public Safety Partners ................................................. 140

    9.1.1.    SED Report - Identify Public Safety Partners ........................................... 142

    9.1.2.    Utilities - Identify Public Safety Partners ................................................. 143

    9.1.3.    Parties - Identify Public Safety Partners ................................................. 145

    9.1.4.    Discussion – Identify Public Safety Partners ........................................... 146

    9.1.5.    Corrective Action – Identify Public Safety Partners ................................. 147

9.2.    Identify Critical Facilities and Infrastructure ................................................. 148

    9.2.1.    SED Report - Identify Critical Facilities and Infrastructure .................. 149

    9.2.2.    Utilities - Identify Critical Facilities and Infrastructure ......................... 150

    9.2.3.    Parties - Identify Critical Facilities and Infrastructure ......................... 152

    9.2.4.    Discussion – Identify Critical Facilities and Infrastructure .................... 154

    9.2.5.    Corrective Action - Identify Critical Facilities and Infrastructure ........ 156

9.3.    Identify Primary and Secondary 24-hour Points of Contact for Critical Facilities and Infrastructure ................................................. 158

    9.3.1.    SED Report – Identify Primary and Secondary 24-hour Points of Contact for Critical Facilities and Infrastructure ................................. 158

    9.3.2.    Utilities - Identify Primary and Secondary 24-hour Points of Contact Critical for Facilities and Infrastructure ................................. 159

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page 21 of 143

9.3.3.   Parties - Identify Primary and Secondary 24-hour Points of Contact for Critical Facilities and Infrastructure ........................................................ 160

9.3.4.   Discussion - Identify Primary and Secondary 24-hour Points of Contact for Critical Facilities and Infrastructure .................................................... 160

9.3.5.   Corrective Action - Identify Primary and Secondary 24-hour Points of Contact for Critical Facilities and Infrastructure ..................................... 161

9.4.   Medical Baseline Customers: Update Contact Information and Provide Opportunity to Select Alternative Means of Contact.................................... 162

9.4.1.   SED Report - Medical Baseline Customers: Update Contact Information and Provide Opportunity to Select Alternative Means of Contact ....... 163

9.4.2.   Utilities - Medical Baseline Customers: Update Contact Information and Provide Opportunity to Select Alternative Means of Contact ............... 164

9.4.3.   Parties - Medical Baseline Customers: Update Contact Information and Provide Opportunity to Select Alternative Means of Contact ............... 166

9.4.4.   Discussion - Medical Baseline Customers: Update Contact Information and Provide Opportunity to Select Alternative Means of Contact ....... 167

9.4.5.   Corrective Action - Medical Baseline Customers:  Update Contact Information and Provide Opportunity to Select Alternative Means of Contact .......................................................................................................... 168

9.5.   Identify and Communicate with All in De-Energized Area, Including Visitors ................................................................................................................ 169

9.5.1.   SED Report – Identify and Communicate with All in De-Energized Area, Including Visitors ............................................................................... 170

9.5.2.   Utilities - Identify and Communicate with All in De-Energized Area, Including Visitors ................................................................................ 171

9.5.3.   Parties - Identify and Communicate with All in De-Energized Area, Including Visitors ................................................................................ 172

9.5.4.   Discussion - Identify and Communicate with All in De-Energized Area, Including Visitors ................................................................................ 174

9.5.5.   Corrective Action - Identify and Communicate with All in De-Energized Area, Including Visitors ................................................................ 175

9.6.   Develop Notification and Communication Protocols and Systems to Reach All Customers in Understandable Manner .................................................... 176

9.6.1.   SED Report – Develop Notification and Communication Protocols and Systems to Reach All Customers in Understandable Manner ............... 176

9.6.2.   Utilities – Develop Notification and Communication Protocols and Systems to Reach All Customers in Understandable Manner ............... 177

9.6.3.   Parties - Develop Notification and Communication Protocols and Systems to Reach All Customers in Understandable Manner ............... 178

Case: 19-30088   Doc# 10642-2   Filed: 05/11/21   Entered: 05/11/21 16:54:33   Page 22 of 143

9.6.4.   Discussion - Develop Notification and Communication
         Protocols and Systems to Reach All Customers in
         Understandable Manner ........................................................ 179
9.6.5.   Corrective Action - Develop Notification and
         Communication Protocols and Systems to Reach
         All Customers in Understandable Manner .............................. 181
9.7.   Develop Notification Strategies: Consider Geographic and Cultural
       Demographics ................................................................... 182
9.7.1.   SED Report – Develop Notification Strategies: Consider Geographic and
         Cultural Demographics ............................................... 183
9.7.2.   Utilities – Develop Notification Strategies: Consider Geographic and
         Cultural Demographics ............................................... 184
9.7.3.   Parties – Develop Notification Strategies: Consider Geographic and
         Cultural Demographics ............................................... 185
9.7.4.   Discussion – Develop Notification Strategies: Consider Geographic and
         Cultural Demographics ............................................... 186
9.7.5.   Corrective Action - Develop Notification Strategies: Consider
         Geographic and Cultural Demographics ............................... 188
9.8.   Develop a Communication Strategy, in Advance, for When Restrictions Due
       to Power Loss Exist ........................................................ 189
9.8.1.   SED Report - Develop a Communication Strategy, in Advance, for
         When Restrictions Due to Power Loss Exist ........................ 189
9.8.2.   Utilities - Develop Communication Strategy, in Advance, for When
         Restrictions Due to Power Loss Exist .............................. 190
9.8.3.   Parties - Develop Communication Strategy, in Advance, For When
         Restrictions Due to Power Loss Exist .............................. 192
9.8.4.   Discussion - Develop Communication Strategy, in Advance, for When
         Restrictions Due to Power Loss Exist .............................. 196
9.8.5.   Corrective Action - Develop Communication Strategy, in Advance, for
         When Restrictions Due to Power Loss Exist ........................ 198
9.9.   Upon Request, Provide Operational Coordination to
       Public Safety Partners ................................................... 198
9.9.1.   SED Report – Upon Request, Provide Operational Coordination with
         Public Safety Partners ............................................ 199
9.9.2.   Utilities – Upon Request, Provide Operational Coordination with Public
         Safety Partners .................................................. 200
9.9.3.   Parties – Upon Request, Provide Operational Coordination with Public
         Safety Partners .................................................. 202

Case: 19-30088   Doc# 10642-2   Filed: 05/11/21   Entered: 05/11/21 16:54:33   Page
                                23 of 143

9.9.4.  Discussion - Upon Request, Provide Operational Coordination with
Public Safety Partners ................................................................. 203

9.9.5.  Corrective Action - Upon Request, Provide Operational Coordination
with Public Safety Partners ...................................................... 207

9.10.  Work with Public Safety Partners to Prepare for Concurrent Emergencies:
Emergencies during PSPS Events ...................................................... 208

9.10.1.  SED Report - Work with Public Safety Partners to Prepare for
Concurrent Emergencies: Emergencies during PSPS Events................. 209

9.10.2.  Utilities - Work with Public Safety Partners to Prepare for Concurrent
Emergencies: Emergencies during PSPS Events ..................................... 209

9.10.3.  Parties - Work with Public Safety Partners to Prepare for Concurrent
Emergencies: Emergencies during PSPS Events ..................................... 210

9.10.4.  Discussion – Work with Public Safety Partners to Prepare for
Concurrent Emergencies: Emergencies during PSPS Events................. 211

9.10.5.  Corrective Action - Work with Public Safety Partners to
Prepare for Concurrent Emergencies: Emergencies during
PSPS Events ............................................................................. 213

9.11.  Assess Needs of Critical Facilities and Infrastructure for
Backup Generation ................................................................................. 214

9.11.1.  SED Report - Assess Needs of Critical Facilities and Infrastructure for
Backup Generation ...................................................................... 214

9.11.2.  Utilities - Assess Needs of Critical Facilities and Infrastructure for
Backup Generation ...................................................................... 216

9.11.3.  Parties - Assess Needs of Critical Facilities and Infrastructure for
Backup Generation ...................................................................... 219

9.11.4.  Discussion - Assess Needs of Critical Facilities and Infrastructure for
Backup Generation ...................................................................... 221

9.11.5.  Corrective Action - Assess Needs of Critical Facilities and Infrastructure
for Backup Generation ................................................................. 224

9.12.  Update Contacts of and Conduct Communication Exercises with Public
Safety Partners ....................................................................................... 226

9.12.1.  SED Report – Update Contacts of and Conduct Communication
Exercises with Public Safety Partners............................................. 227

9.12.2.  Utilities – Update Contacts of and Conduct Communication Exercises
with Public Safety Partners .......................................................... 227

9.12.3.  Parties – Update Contacts of and Conduct Communication Exercises
with Public Safety Partners .......................................................... 229

9.12.4.  Discussion – Update Contacts of and Conduct Communication
Exercises with Public Safety Partners............................................. 229

Case: 19-30088   Doc# 10642-2   Filed: 05/11/21   Entered: 05/11/21 16:54:33   Page
24 of 143

9.12.5. Corrective Action - Update Contacts of and Conduct Communication Exercises with Public Safety Partners ........................................ 231
10. Adequacy of Utilities' 2019 PSPS 10-Day Post-Event Reports ........................... 232
10.1. Timely Submission: Report Must Be Submitted Within 10 Business Days of Power Restoration ........................................................................ 234
10.2. Service of 10-Day Post-Event Report ...................................................... 236
10.3. Reporting Requirements of Resolution ESRB-8 ...................................... 239
10.4. Identify Decision Criteria Resulting in Proactive De-energization, Including Alternatives Considered and Fire Mitigation Measures Used .................... 246
10.5. Provide Copies of All Notices, Timing, Method of Publication, and Identify Initiator of Notice ................................................................................. 246
10.6. Address Failures to Provide Advanced Notice .......................................... 246
10.7. Address Engagement with Affected Local Jurisdiction & Public Safety Partners Before and During De-Energization ............................................. 246
10.8. Number of Affected Customers ............................................................... 247
10.9. Description of Customers Notified ........................................................... 248
10.10. Impact of Sectionalization .................................................................. 251
10.11. Explanation of How the Utility Determined that the Benefit of De-energization Outweighed Potential Public Safety Risks ..................... 252
10.12. Timeline and Steps Taken for Power Restoration ................................. 253
10.13. Lessons Learned .................................................................................. 254
11. Comments on Proposed Decision .............................................................. 256
12. Assignment of Proceeding ......................................................................... 257
Findings of Fact ............................................................................................... 257
Conclusions of Law .......................................................................................... 272
ORDER ............................................................................................................. 285

Case: 19-30088   Doc# 10642-2   Filed: 05/11/21   Entered: 05/11/21 16:54:33   Page 25 of 143

**DECISION ADDRESSING THE LATE 2019 PUBLIC SAFETY POWER SHUTOFFS BY PACIFIC GAS AND ELECTRIC COMPANY, SOUTHERN CALIFORNIA EDISON COMPANY, AND SAN DIEGO GAS & ELECTRIC COMPANY TO MITIGATE THE RISK OF WILDFIRE CAUSED BY UTILITY INFRASTRUCTURE**

## Summary

While the Commission agrees that electric utilities may proactively shut off electric power as a last resort mitigation measure to protect the public from catastrophic wildfires caused by utility infrastructure, known as Public Safety Power Shutoffs (PSPS) or proactive de-energizations, power shutoffs create major disruptions for the public, an entirely separate set of safety concerns, and, essentially, result in an emergency situation.  As such, electric utilities that elect to rely on power shutoffs to mitigate wildfire risks must do so in a manner that is consistent with their fundamental statutory obligation to protect the public safety set forth in Public Utilities Code (Pub. Util. Code) § 451.

This decision finds that in 2019, when proactively shutting off electric power to mitigate the risk of catastrophic wildfire caused by their infrastructure, California's three largest electric investor-owned utilities, Pacific Gas and Electric Company (PG&E), Southern California Edison Company (SCE), and San Diego Gas & Electric Company (SDG&E), failed in certain respects to reasonably comply with the obligation to promote safety in Pub. Util. Code § 451 and with many of the Commission's guidelines in Decision (D.) 19-05-042, Resolution ESRB-8 (July 12, 2018), and other applicable laws, rules, and regulations.

To address the failures of PG&E, SCE, and SDG&E to reasonably protect the public and adhere to state law and the Commission's rules and regulations pertaining to proactive power shutoffs used as a wildfire mitigation measure, the Commission directs utilities to, among other things:

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page
26 of 143

(1) forgo collection from customers of the portion of their authorized revenue requirement equal to all future unrealized volumetric sales due to all future proactive power shutoffs;

(2) immediately initiate efforts to engage in the sharing of best practices and lessons learned for initiating, communicating, reporting, and improving all aspects of proactive power shutoffs by regularly holding utility working group meetings;

(3) immediately initiate efforts to assist the Commission's Safety and Enforcement Division in developing a standardized 10-day post-event reporting template;

(4) file a report on an annual basis in Rulemaking (R.) 18-12-005 or a successor proceeding describing each utility's progress and status on improving compliance with the PSPS Guidelines, especially the progress and status of implementing those guidelines not addressed in 10-day post-event reports;

(5) undertake specific corrective actions, set forth below, to improve the utilities' future compliance with the PSPS Guidelines and Pub. Util. Code § 451;

(6) provide Standard Emergency Management System (SEMS) training for all personnel involved in PSPS planning;

(7) immediately initiate efforts to improve, among other things, communications with those customers dependent on electricity for medical reasons, especially life support, before, during, and after a proactive power shutoffs; and

(8) improve transparency in all aspects of utility decision-making related to initiating proactive power shutoffs.

In addition, the Commission's Safety and Enforcement Division will increase the transparency of its review process of the 10-day post-event reports by, as a first step, preparing a standard template for 10-day post-event reports, which will be issued for comments by parties in R.18-12-005; and, as a second step, establishing a single webpage on the Commission's website to function as a central repository for all the Commission's undertakings regarding the proactive power shutoffs that stakeholders, including the general public, can use to easily

Case: 19-30088   Doc# 10642-2   Filed: 05/11/21   Entered: 05/11/21 16:54:33   Page 27 of 143

access the different aspects of the Commission's review process of proactive power shutoff, such as identifying the division within the Commission undertaking a particular aspect of the review process and the subject matter of the review; and, as a third step, posting on this webpage the final documents related to the Safety and Enforcement Division's review of the 10-day post-event reports.

This proceeding is closed.

## 1. Background

In this proceeding, we review the use of power shutoffs (also known as Public Safety Power Shutoffs, PSPS events, proactive power shutoffs, and de-energization events)[1] in late 2019 by California's three largest electric investor-owned utilities, Pacific Gas and Electric Company (PG&E), Southern California Edison Company (SCE), San Diego Gas & Electric Company (SDG&E) (collectively herein "utilities" or "IOUs"), to mitigate against the potential ignition of catastrophic wildfires caused by utility infrastructure in hazardous weather conditions.

In 2019, when the events at issue occurred, the use of power shutoffs by electric utilities to protect against the potential ignition of wildfires caused by utility infrastructure in hazardous weather conditions was not new. These types of power shutoffs had been considered and used as a wildfire mitigation measure, although rarely, starting as far back as 2003, at least 16 years before the events at issue occurred. In the past decade, however, the use of these power

---

[1] The term de-energization is used throughout this decision to refer to the utility's act of turning off electric power. This term is used differently than the term PSPS event, which refers to the entire situation resulting from a de-energization by a utility for the specific purpose of mitigating the potential for catastrophic wildfire caused by utility infrastructure.

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page 28 of 143

shutoffs by utilities have taken on added urgency as wildfires ignited by utility infrastructure continue to grow in scope, frequency, and devastation across California. This urgency increased further in the past few years.

The Commission, in turn, has considered the use of de-energization in a number of different forums and provided utilities with a framework for evaluating the need to initiate a PSPS event and a process to minimize the impact of these power shutoffs on the public. To provide context for the Commission's evaluation of the PSPS events of late 2019, the history of the Commission's review of power shutoffs as a wildfire mitigation measure is summarized below together with an overview of this proceeding.

## 1.1. Overview

On November 13, 2019, the Commission opened Investigation (I.) 19-11-013 to review the use of electric power shutoffs as a wildfire mitigation measure by utilities in late 2019.[2] The Commission instituted this proceeding to determine whether California's electric investor-owned utilities prioritized safety and complied with the applicable laws, rules, and regulations when, in late 2019, the utilities relied upon power shutoffs as a wildfire mitigation measure to safeguard against potential catastrophic wildfire ignited by the utility's electric infrastructure, including vegetation-related impacts to utility infrastructure during hazardous weather conditions, such as high winds.

The Commission issued this Investigation in 2019 in response to serious concerns raised by communities, local and state governmental entities, individual customers, and organizations representing various customers,

---

[2]  I.19-11-013, *Order Instituting Investigation on the Commission's Own Motion on the Late 2019 Public Safety Power Shutoffs* (November 13, 2019) at 1.  This Investigation and all other documents filed in this proceeding are available on the Commission's website.

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page
29 of 143

including vulnerable populations, regarding the manner in which utilities conducted these power shutoffs.  These concerns included whether the utilities properly communicated or notified customers of the potential for these power shutoffs; whether the utilities properly executed the de-energizations, including taking all reasonable steps to lessen the impact of shutting off the electricity on the public; and, perhaps, most importantly, whether utilities identified the potential for public harm – across all customer classes - due to power shutoffs, properly balanced the need to provide reliable electric utility service with public safety, and only relied upon power shutoffs as a wildfire mitigation measure of last resort.

When issuing this Investigation proceeding in November 2019, the health and safety of all Californians was the Commission's most pressing concern.  As the Commission stated in I.19-11-013, when initiating this proceeding, "the Commission seeks to ensure that utility decisions to shut off power to prevent wildfires are only made when *absolutely necessary* and are based on actual and substantiated conditions. The Commission also seeks to ensure that such events are not conducted in an ineffective or haphazard way because of the *potential of such events to endanger the public health and safety*."[3]

## 1.2.  Respondents

The Commission named all California electric investor-owned utilities as respondents to this Investigation proceeding.  In today's decision, we review the use of these power shutoffs in late 2019 by California's three largest electric investor-owned utilities, PG&E, SCE, and SDG&E. The smaller California electric investor-owned utilities, Liberty Utilities/CalPeco Electric (Liberty), Bear Valley

---

[3]  I.19-11-013 at 2. (Emphasis added.)

Case: 19-30088     Doc# 10642-2     Filed: 05/11/21     Entered: 05/11/21 16:54:33     Page 30 of 143

Electric Service, Inc. (Bear Valley), and Pacific Power, a division of PacifiCorp (PacifiCorp), are named respondents to this proceeding but, because none of these smaller utilities relied upon power shutoffs as a wildfire mitigation measure in 2019, these smaller utilities are not subject to our review and we do not direct any actions by these smaller utilities by this decision.[4]

### 1.3.  Related Commission Decisions and Proceedings

This proceeding is related to a long line of Commission decisions, dating back to 2009, addressing the rules and regulations applicable to a utility's use of power shutoffs as a mitigation measure to protect the public safety under Pub. Util. Code §§ 451 and 399.2(a) from fires caused by utility infrastructure.  This proceeding is also related to several recent and ongoing Commission proceedings addressing wildfire prevention, safety, emergency response, microgrids, and climate change.  We refer to some of these proceedings below.

Due to the extensive nature of the Commission's consideration in the recent years of issues concerning wildfires caused by utility infrastructure in California, we only refer to the most relevant proceedings here and do not include a comprehensive discussion.  More information is available in R.18-12-005 and R.18-10-007.[5]  We also refer to recent legislation addressing the utilities' use of power shutoffs to mitigate the potential for catastrophic wildfires caused by utility infrastructure.  Our goal is to present a comprehensive picture

---

[4] December 13, 2019 Joint Response of Bear Valley, Liberty, and PacifiCorp to I.19-11-013 at 2 (confirming that the small electric utilities did not use power shutoffs in 2019.)

[5] R.18-12-005, *Order Instituting Rulemaking to Examine Electric Utility De-Energization of Power Lines in Dangerous Conditions* (December 19, 2018) and R.18-10-007, *Order Instituting Rulemaking to Implement Electric Utility Wildfire Mitigation Plans Pursuant to Senate Bill 901 (2018)* (October 25, 2018).

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page
31 of 143

of the events leading up to the 2019 power shutoffs.  Post-2019 matters are not fully addressed.

### 1.4.  2003 - 2007 Related Commission Decisions and Proceedings

Starting in 2003, SCE relied upon power shutoffs as a wildfire mitigation measure, albeit on a very limited basis, to guard against the threat of wildfire ignited by electric infrastructure from the large number of dead trees due to the bark beetle infestation.[6]

At that time, the Commission had not yet directly acknowledged electric utilities' authority to shut off power in hazardous weather conditions as a wildfire mitigation measure.  Instead, SCE, without explicit prior authorization from the Commission, relied upon its fundamental obligation under Pub. Util. Code §§ 451 to "promote the safety" of "patrons, employees, and the public"[7] to shut off power to prevent a wildfire.  The rationale supporting the power shutoffs was, essentially, that shutting off electric power to customers would result in less harm or damage than the potential wildfire caused by utility infrastructure.  Consequently, the utility would be protecting the overall safety of the public by shutting off power. Reliance on Pub. Util. Code § 451 and, later on

---

[6] As described by the Commission in D.09-09-030, in 2003, SCE "implemented a temporary program to shut off power to rural areas where the Governor had declared a state of emergency due to the fire risk posed by the large number of dead trees killed by bark beetles." D.09-09-030 at 42. "SCE implemented its power shut-off program in 2003 on its own initiative and obtained Commission authorization sometime later.  SCE terminated the program in August 2005, after the dead and diseased trees had been cleared from the region.  During the time SCE's power shut-off program was in effect, SCE shutoff power one time.  The shut-off occurred on October 26-27, 2003, in the Idyllwild area.  It affected approximately 4,000 customers and lasted 26 hours." D.09-09-030 at 42.

[7] Pub. Util. Code § 451.

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page 32 of 143

§ 399.2(a), as authority for these power shutoffs has evolved overtime but the utility's obligation has remained the same: protecting the public safety.

### 1.5.  2008 - 2009 Related Commission Decisions and Proceedings

In 2008, following the devastating 2007 fires in Southern California, including the Rice, Witch and Guejito wildfires, the Commission - for the first time - directly addressed the use of power shutoffs as a wildfire mitigation measure and began an in-depth review of a utility's use of power shutoffs to protect the public safety. At this time, SDG&E began exploring the use of power shutoffs as a wildfire mitigation measure in hazardous weather conditions, such as high winds, to protect public safety.[8]

In December of 2008, SDG&E formally filed a *Fire Preparedness Plan* with the Commission for review in Application (A.) 08-12-021.[9]  In its Application, SDG&E requested the Commission to consider its proposal to turn off electricity to certain regions in its service territory during periods of high fire danger to prevent its overhead power lines from igniting potentially catastrophic wildfires.[10]  In introducing its plan, SDG&E explained that:

> Pursuant to Public Utilities Code § 451… SDG&E files this Application for Commission review of the proactive de-energization measures in SDG&E's Fire Preparedness Plan. Proactive de-energization, as discussed in this Application, refers to those situations where under certain extreme weather conditions and in

---

[8] Small Business Utility Advocates (SBUA) refers to the Commission's history of addressing proactive power shutoff, specifically, the use of power shutoffs as a wildfire mitigation measure starting in 2007, in its October 16, 2020 Opening Comments at 3.

[9] A.08-12-021, *Application of San Diego Gas & Electric Company for Review of its Proactive De-Energization Measures and Approval of Proposed Tariff Revisions (U902E). filed December 22, 2008.* (filed on December 22, 2008).  This application and all documents filed in this proceeding are available on the Commission's website.

[10] D.09-09-030 at 2-3.

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page 33 of 143

### 6.5. Corrective Action – Adequate Time to Prepare

No corrective actions are adopted in response to the Commission's finding that the utilities had sufficient time to prepare for PSPS events before the 2019 wildfire season. However, we rely upon our finding in our below analysis of whether the utilities reasonably complied with the 2019 PSPS Guidelines and with Pub. Util. Code § 451 in late 2019.

## 7. Utility Decision-Making Process Immediately Prior to Late 2019 Proactive Power Shutoffs

Section 7 is organized as follows:

In Section 7.1, we address the topic of the risks and harms related to PSPS events and the laws, rules, and regulations that require utilities, before initiating a PSPS event, to identify public safety risks and weigh the harms of a PSPS event against the potential for catastrophic wildfire caused by utility infrastructure.

In Section 7.2, we address the topic of the use of PSPS as a mitigation measure of "last resort" and the laws, rules, and regulations the require utilities, before initiating a PSPS event, to consider alternatives to de-energization and only de-energize as a mitigation measure of last resort.

### 7.1. Identify Public Safety Risks and Weigh Harms

When deciding whether to proactively shut off electric power to customers to mitigate the potential for catastrophic wildfire due to utility infrastructure, a utility must first engage in a critical analysis:  identify and consider the safety risks to the public from shutting off electric power; and, after the utility identifies and considers these safety risks, then the utility must weigh the risks of a PSPS event against the benefits of initiating a PSPS event. The directive to weigh these harms and benefits has been part of the Commission's framework for proactive

Case: 19-30088   Doc# 10642-2   Filed: 05/11/21   Entered: 05/11/21 16:54:33   Page 34 of 143

de-energizations since 2012,[107] and later affirmed in 2018 and 2019.[108] In 2019, the Commission again affirmed this requirement in D.19-05-042, stating utilities must "provide [in the 10-day post-event reports] an explanation of how the utility determined that the benefit of de-energization outweighed potential public safety risks."[109] This directive that utilities must evaluate and weigh the public safety risks prior to a proactive de-energization is founded on their obligation to promote the safety of their customers in Pub. Util. Code § 451.

Below we review whether the utilities reasonably complied with this directive to identify, consider, and weigh the safety risks to the public from shutting off electric power against the benefits of initiating a PSPS event.  We also review whether the utilities reasonably complied with the related 10-day post-event reporting requirement on this topic. We review the utilities' reasonable compliance with these directives within the context of their obligation to promote safety under Pub. Util. Code § 451.

### 7.1.1.  SED Report – Identify Public Safety Risks and Weigh Harms

The SED Report is clear: the utilities failed to account for the safety risks to the public when deciding whether to shut off electric power in late 2019.[110]  The SED Report states that no evidence exists that the utilities identified the risks to the public, stating that "Nowhere in the three electric IOUs' post-event reports and Progress Reports was there a discussion of a comprehensive list of public

---

[107] D.12-04-024 at 33.

[108] Resolution ESRB-8 (July 12, 2018) at 5 and D.19-05-042, Appendix A at A24.

[109] D.19-05-042, Appendix A at A24.

[110] SED Report at 56-61.

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page
35 of 143

safety risks considered."[111]  On this basis, the SED Report concludes that, in the absence of any effort to identify the risks to the public resulting from shutting off power, the utilities failed to comply with the Commission directive to weigh the risks against the benefits of a PSPS event.  In summarizing its findings, the SED Report states,

> "The main focus of the utilities' decision to de-energize appeared to be reducing wildfire risks, which, while important, was not weighed against the impact on the public [of shutting off power]. The apparent delay in conducting the proper research in order to meet the requirement to consider all public safety risks, in addition to potential wildfires, appears to have led to numerous issues…, such as losing critical water facilities and all methods of communication, ineffective notifications for people/communities with access and functional needs, inadequate resources provided to mitigate PSPS impacts, etc."[112]

### 7.1.2.  Utilities – Identify Public Safety Risks and Weigh Harms

The utilities disagree with the conclusion of the SED Report and state, to various degrees, that they actually did identify the safety risks to the public resulting from shutting off power and did weigh these risks in determining whether to initiate a PSPS event.  In terms of the related reporting requirement, the utilities do not contest the SED Report's conclusion that the utilities failed to provide documentation of this critical exercise in post-event reporting.

In addition, PG&E suggests the issue here solely relates to the adequacy of its reporting and that matters pertaining to the 10-day post-event reports, such as identification of public safety risks, should be deferred to R.18-12-005.[113]

---

[111]  SED Report at 81.

[112]  SED Report at 81.

[113]  PG&E September 2, 2020 Opening Comments at 24.

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page 36 of 143

SCE states it worked closely with county emergency management offices prior to the 2019 PSPS events to identify potential public safety concerns and continues to coordinate with these agencies to mitigate risks throughout a power shutoff.[114] SCE further urges the Commission to reject parties' "meritless accusations," which incorrectly claim SCE did not appropriately consider public safety or weigh the costs and benefits of de-energization in decisions to de-energize.[115]

SDG&E provides slightly more information in response to the SED Report, stating that it sought to balance the risk that weather and other conditions may contribute to ignitions against the inconvenience and hardship customers face from power shutoffs.[116] SDG&E explains that it seeks to mitigate the public safety impacts of PSPS events through significant communications with customers and public safety partners, to ensure customers are prepared during these periods of extreme wildfire risk, with communications plans, generator programs and customer resource centers.[117]

### 7.1.3.  Parties – Identify Public Safety Risks and Weigh Harms

The parties overwhelmingly state that, based on their experience and their review of the 10-day post-event reports, all the utilities failed to adequately, or completely failed to, weigh the public safety risks of shutting off electricity prior to the events in late 2019.  The parties also overwhelmingly suggest that this failure was due, in large part, to the fact that PG&E and SCE never even sought

---

[114]  SCE September 2, 2020 Opening Comments at 32.

[115]  SCE November 16, 2020 Reply Comments at 6.

[116]  SDG&E September 2, 2020 Opening Comments at 30.

[117]  SDG&E September 2, 2020 Opening Comments at 30.

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page 37 of 143

to identify the specific harms the public could potentially suffer due to a power shutoff.  The parties suggest SDG&E performed better than PG&E and SCE in terms of identifying public risks related to shutting off the power but that SDG&E's performance was still unacceptable. The SED Report captures, in detail, many of the complaints and observations by parties related to this issue and we do not repeat those here.[118] This decision focuses on comments filed by parties in response to the SED Report.

In addressing this topic, Joint CCAs summarize the problem presented in 2019, as follows: "[I]n order to establish that an outage is necessary to protect public safety, an IOU must identify and estimate/quantify all reasonably foreseeable outage risks, and conduct a balancing analysis to ensure that the wildfire risks avoided by cutting power clearly outweigh the unmitigated outage risks created by de-energizing."[119] The utilities failed to do so, according to Joint CCAs, particularly PG&E, but SCE and SDG&E also underperformed.[120] "PG&E's 'customer impact' considerations in these [post-event] reports were limited to acknowledging of the number of customers (including critical and Medical Baseline customers) who would lose power as a result of the outage, without any further attempt to assess or quantify outage risks or to weigh outage risks against wildfire risks. Further, the analysis does begin to mention the direct impacts to local governments, emergency responders, and community-based

---

[118]  SED Report at 56-61.

[119]  Joint CCAs October 16, 2020 Opening Comments at 4.

[120]  Joint CCAs October 16, 2020 Opening Comments at 6.

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page 38 of 143

organizations that had to rally to provide support, care and basic needs for tens of thousands of people who were without power."[121]

Mussey Grade fully agrees with Joint CCAs and the SED Report regarding the utilities' lack of effort to identify customer and public harm from proactive de-energization. Joint CCAs and Mussey Grade point out that the failure of the utilities to identify risks and harms from a power shutoff was a "critical" failure. Mussey Grade also emphasizes the failure of the utilities to articulate the threshold for initiating a PSPS event.

In terms of weighing the risks and benefits of a power shutoff, Cal Advocates states all three utilities failed to fully describe how they weighed the benefits of de-energization against the public safety risks in their decision-making process.[122]  SBUA is more direct, stating the utilities' shallow answers regarding the "weighing of public safety are actually quite telling; the problem is that they never undertook the required analysis."[123]

Specifically regarding PG&E, Joint Local Governments found that its 10-day post-event reports failed to provide a meaningful discussion of how PG&E determined that the benefit of de-energization outweighed the potential public safety risks.[124]  Similarly, TURN concludes that, after engaging in probative discovery, PG&E did not conduct a cost benefit analysis and does not have any supporting documents or workpapers.[125]  Joint CCAs agrees, stating

---

[121]  Joint CCAs October 16, 2020 Opening Comments at 5-6.

[122]  Cal Advocates October 16, 2020 Opening Comments at 34.

[123]  SBUA November 16, 2020 Reply Comments at 2.

[124]  Joint Local Governments October 16, 2020 Opening Comments at 31-32.

[125]  TURN October 16, 2020 Opening Comments at 3.

Case: 19-30088   Doc# 10642-2   Filed: 05/11/21   Entered: 05/11/21 16:54:33   Page
39 of 143

that "[i]n order to determine that the benefit of de-energization outweighed potential public safety risks, PG&E would have needed to, but did not, conduct an analysis that considers the number of people that would be impacted by the PSPS event, the potential duration of the PSPS event, the potential safety risks for the affected population (particularly the vulnerable), and other factors.[126]

Regarding SCE, Joint Local Governments stated that SCE did not provide the required information about its decision-making process, whether it weighed the potential public safety harms of de-energization (or even understood them), or why the alternatives to de-energization were not viable.[127]

Regarding SDG&E, TURN concludes, again after probative discovery, that SDG&E did not conduct a cost benefit analysis and does not have any supporting documents or workpapers.[128]  CforAT states "SDG&E's strategy continues to be to minimize and deflect any risks or problems with its process for turning off the power, and to assert that everything is fine…and shunting the responsibility to others."[129] SBUA states SDG&E's "bald assertions of compliance" fails to demonstrate or illustrate compliance with the requirement to consider harms and that SDG&E violated the D.19-05-042 in this regard.[130] UCAN states SDG&E unilaterally and arbitrarily decided that the risk of a wildfire far outweighs the

---

[126] Joint CCAs October 16, 202 Opening Comments at 4.

[127] Joint Local Governments October 16, 2020 Opening Comments at 32.

[128] TURN October 16, 2020 Opening Comments at 6.

[129] CforAT October 16, 2020 Opening Comments at 14-15.

[130] SBUA October 16, 2020 Opening Comments at 9.

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page 40 of 143

costs of a power outage without conducting or providing analysis or evidence to support this assertion.[131]

### 7.1.4. Discussion – Identify Public Safety Risks and Weigh Harms

In 2019, the PSPS Guidelines, the Commission's decisions, and the utilities' obligation to "promote safety" set forth in § 451 of the Pub. Util. Code established a framework for protecting the safety of customers in the event of the need to shut off power to avoid a catastrophic wildfire. A key component of this framework required utilities to identify, evaluate, weigh, and report the potential safety risks resulting from a PSPS event.

Based on the evidence presented, all three of the utilities largely (1) failed to identify the possible safety risks resulting from an electric power shutoff – including obvious risks to school children, those medically dependent on electricity, as well as businesses and (2) failed to evaluate these safety risks as part of the analysis of weighing the benefits and risks/harms before deciding whether to shut off electric power to mitigate the potential for wildfire caused by utility infrastructure.

TURN's analysis was particularly persuasive. TURN focused its resources on the single question of how the utilities "determined that the benefit of de-energization outweighed potential public safety risks." TURN states that, at the conclusion of its discovery on this issue, it was:

> "exceedingly clear that the IOUs have not complied with this requirement. In fact, the IOUs have not even attempted to comply with this requirement. Rather, as shown below, the IOUs have

---

[131] UCAN October 16, 2020 Opening Comments at 3.

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page
41 of 143

arbitrarily declared that the benefits of de-energization outweighed potential public safety risks without conducting any analysis."[132]

The importance of this threshold question cannot be overstated. Non-compliance with this requirement may have resulted in more PSPS events than necessary in 2019, which would have been harmful to the public. PG&E, SCE, and SDG&E made little or no effort to even contest these findings by parties and the SED Report.

Accordingly, consistent with the SED Report and the statements by parties, we find that in late 2019, the utilities focused on the risks and harms related to wildfire, which, while critical, was only part of the necessary analysis.  To uphold the utility obligation to promote safety under § 451 of the Pub. Util. Code and comply with the PSPS Guidelines, the utilities needed to identify, evaluate, weigh, and report the potential for harm to their customers resulting from a proactive de-energization.  As such, we find that in late 2019, PG&E, SCE, and SDG&E failed to reasonably comply with the requirement in the 2019 PSPS Guidelines to identify, evaluate, and weigh the potential for harm to their customers resulting from a proactive de-energization. In failing to reasonably comply with the requirement to identify, evaluate, and weigh the potential for harm to their customers resulting from a proactive de-energization, PG&E, SCE, and SDG&E failed to comply with the obligation in Pub. Util. Code § 451 to promote safety of customers.  In addition, we find that, due to the absence of sufficient detail, PG&E, SCE, and SDG&E failed to comply with the related 10-day post-event reporting requirement in the PSPS Guidelines on this issue.

---

[132]  TURN October 16, 2020 Opening Comments at 2.

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page 42 of 143

### 7.1.5. Corrective Action - Identify Public Safety Risks and Weigh Harms

The SED Report and the parties make a number of suggestions regarding Commission remedies in response to the failures by the utilities in 2019 to identify, evaluate, weigh, and report public safety risks and harms of the PSPS events.  The SED Report and some parties suggest modifications to the utilities' PSPS protocols; other parties suggest a range of monetary remedies, including significant penalties.  Many parties urge the Commission to adopt large monetary penalties, either in this phase of the proceeding or in a future phase of the proceeding.  The need for monetary penalties – to provide accountability and improved compliance - was one of the most pressing concerns of parties.

The SED Report focuses primarily on how PG&E could improve its PSPS protocols.  The SED Report suggests that PG&E coordinate with stakeholders and public safety partners to identify essential services and assess the potential public safety risks posed by de-energization.  In addition, the SED Report states PG&E should document in a report its efforts to identify essential services and the public safety risks considered to determine the benefit of de-energization outweighed the potential public safety risks.[133]  The SED Report does not recommend monetary remedies, such as penalties.

Many of the parties focus on the need for utilities to more thoroughly address in the 10-day post-event reports the public safety risks considered in connection with a PSPS event.  For example, Mussey Grade recommends the Commission be as prescriptive as possible in detailing what information it expects utilities to provide in these reports and, in addition, aggressively pursue

---

[133]  SED Report at 56-61.

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page
43 of 143

the need for utilities to identify and quantify customer and resident risks and harms from de-energization in an appropriate proceeding, such as R.18-12-005.[134] Mussey Grade also states that some of the shortcomings associated with the utilities' lack of transparency in their decision-making process have already been addressed by D.20-05-051.[135]

Similarly, Cal Advocates states that the utilities should be required to clearly explain in the 10-day post-event reports risk models, risk assessment processes, cost-benefit analysis, and provide further documentation on how the power disruptions to customers and the general public is weighed against the benefits of a proactive de-energization.[136]  Cal Advocates further states that, in response to its discovery request, SDG&E was able to provide a detailed description of the criteria and analysis used to determine whether to initiate a de-energization and described the processes to assimilate a multitude of criteria into a decision on whether or not the risk is great enough to de-energize.[137]  Cal Advocates recommends SDG&E provide this level of detail of its criteria and analysis when reporting on the decision-making process in its future post-event reports.[138]

In addition to, or instead of, improved PSPS protocols, many parties suggest the Commission impose monetary remedies, such as penalties under Pub. Util. Code §§ 2107 and 2108, to send a strong message to the utilities that

---

[134]  Mussey Grade October 16, 2020 Opening Comments at 12.

[135]  Mussey Grade October 16, 2020 Opening Comments at 12.

[136]  Cal Advocates October 16, 2020 Opening Comments at 36.

[137]  Cal Advocates October 16, 2020 Opening Comments at 34.

[138]  Cal Advocates October 16, 2020 Opening Comments at 34.

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page 44 of 143

both their evaluation of, and reporting in, 2019 of public safety risks were wholly inadequate. Parties also suggest a monetary remedy is needed to prevent utilities from failing in the future to consider and weigh public safety risks against the benefits of the PSPS event. Parties also urge the Commission to adopt monetary remedy to somehow compensate customers for enduring the 2019 PSPS events, through bill credits or PSPS-related cost disallowances. PG&E has already voluntarily provided bill credits to some customers affected by its 2019 PSPS events.

Based upon the comments by parties, we are particularly concerned about deterring future utility noncompliance with Pub. Util. Code § 451 and the critical guideline to identify, evaluate, weigh, and report public risks. Because the utilities' failures in 2019 to reasonably identify, evaluate, weigh, and report public risks were grossly deficient and even non-existent, we find that a monetary remedy is appropriate.

In crafting a monetary remedy, we also seek to address our concern about the extent of the harm experienced by customers as a result of the 2019 PSPS events. While under appropriate circumstances, and consistent with the PSPS Guidelines, utilities may initiate PSPS events, the utilities in 2019 did not reasonably comply with the critical guideline to identify, evaluate, weigh, and report public risks. This requirement has existed since 2012 and is fundamental to the utilities' legal obligation to protect the public safety under Pub. Util. Code § 451. Moreover, as we mentioned above, if utilities had engaged in this analysis, their implementation of the 2019 PSPS events may have been more targeted and the resulting harms to customers may have been reduced.

In crafting a monetary remedy, our jurisdiction is, generally, limited to penalties, rate adjustments, bill credits, or other adjustments to a utility's

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page 45 of 143

ratemaking mechanisms. The Commission does not have jurisdiction to award damages to utility customers for losses of, for example, personal property, damage to real estate, lost wages, business losses, emotional distress, or personal injury.  Furthermore, Commission authority to adjust collected rates is limited by the certain restrictions prohibiting retroactive ratemaking.

In this proceeding, while the Commission has jurisdiction to impose penalties under Pub. Util. Code §§ 2107 and 2108 for the utilities' conduct in 2019, we are reluctant to impose monetary penalties because, in striking a balance between the need in 2019 for utilities to initiate PSPS events in response to evolving, dangerous conditions against the equally compelling need to conduct PSPS events in a safe manner, we find that, rather than adopt penalties, we should adopt a remedy to create ongoing incentives for utilities to improve their conduct related to their decision-making process leading up to initiating future PSPS events and only use power shutoffs as a mitigation measure of last resort.

For all these reasons, we find that a ratemaking remedy, in the form of a future downward rate adjustment for customers with the amount of the downward adjustment tied to the duration and scope of any future PSPS events will serve to address the Commission's concerns discussed above and recognize the undue harms caused to customers by overly broad PSPS events. To minimize the complexity of this ratemaking remedy, this downward rate adjustment will not apply retroactively to 2019.

The adopted ratemaking remedy will prevent utilities from recovering from customers any undercollections of authorized revenue requirement due to the lower volumetric sales caused by a power shutoff during a PSPS event, thereby providing all customers with lower rates based on the duration and

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page
46 of 143

scope of the PSPS event.[139]  The utilities will continue to recover all authorized costs and expenses related to preparing for and initiating PSPS events, such as training, operational facilities, staffing, outreach, technology, and other costs and expenses.

The ratemaking remedy we adopt is as follows:

PG&E, SCE, and SDG&E shall forgo collection in rates from customers of all authorized revenue requirement equal to unrealized volumetric sales resulting from PSPS events. Additionally, PG&E, SCE, and SDG&E shall (1) report the total amount of unrealized volumetric sales and unrealized revenue resulting from PSPS events in the ERRA compliance proceedings addressing the years in which the PSPS events occurred, and (2) detail the method of calculating the total amounts of unrealized sales and unrealized revenue and report these amounts in an annual report, with the details of this annual report, including the filing date, to be addressed by the Commission in R.18-12-005. Regarding any pending or future ERRA compliance proceeding, the utility shall request via email to the Administrative Law Judge (and the service list) whether additional testimony is required on this topic. The ERRA proceedings may be the appropriate forum to consider details regarding this directive,

---

[139] On March 10, 2021, the Administrative Law Judge issued a ruling directing the utilities to provide an accounting of the PSPS events that occurred in their service territories in 2019 and 2020 and an estimate of how those events impacted revenue collections. This ruling is available on the Commission's website at the *Docket Card*. The estimates by the utilities of unrealized revenues due to PSPS events in 2019 and 2020 are as follows: PG&E $13.8 million in 2019 and $4.9 million in 2020; SCE $563,000 in 2019 and $499,506 in 2020; and SDG&E $225,551 in 2019 and $359,757 in 2020.  The utility responses detailing their calculation methodologies can be found on the Commission's website at the *Docket Card* on the following links:  PG&E Unrealized Revenue 2019 and 2020:
https://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M376/K031/376031858.PDF; SCE Unrealized Revenue 2019 at page 177:
https://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M369/K691/369691925.PDF; SCE Unrealized Revenue 2020:
https://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M373/K420/373420325.PDF; SDG&E Unrealized Revenue 2019 and 2020:
https://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M375/K483/375483850.PDF.

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page 47 of 143

such as whether this rate disallowance should be increased to reflect sales, if any, of excess power due to a proactive power shutoff and whether a different methodology or standard methodology should be used by the utilities in calculating this disallowance. This directive shall remain effective until a utility demonstrates improvements in identifying, evaluating, weighing, and reporting public harm when determining whether to initiate a PSPS event.

Furthermore, in response to the above-noted deficiencies in the level of detail provided by utilities in 10-day post-event reports, we find PG&E, SCE, and SDG&E must provide significantly more information and analysis in 10-day post-event reports in the future.  We review the 2019 10-day post-event reports in more detail at Section 10, herein, and adopt additional corrective actions based on our review there.  We adopt the following corrective action pertaining to reporting of risks and harms from de-energizations below.

PG&E, SCE, and SDG&E shall identify and quantify customer, resident, and the general public risks and harms from de-energization and clearly explain in the 10-day post-event reports risk models, risk assessment processes, and provide further documentation on how the power disruptions to customers, residents, and the general public is weighed against the benefits of a proactive de-energization. PG&E, SCE, and SDG&E shall also explain, in detail, the threshold established for initiating a PSPS event in the 10-day post-event reports.

### 7.2.  Last Resort - PSPS as a Mitigation Measure of Last Resort, Alternatives Considered, and Mitigation Measure Employed

In 2019, one of the "overarching" PSPS Guidelines stated utilities "must deploy de-energization as a measure of last resort and must justify why de-energization was deployed over other possible measures or actions...."[140]  The Commission further addressed the related reporting requirement, stating utilities

---

[140]  D.19-05-042, Appendix A at A1.

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page 48 of 143

### 9.11. Assess Needs of Critical Facilities and Infrastructure for Backup Generation

In 2019, the PSPS Guidelines required utilities, in advance of wildfire season, to engage in outreach to assess the needs of critical facilities and infrastructure for backup generation and, if necessary, provide needed backup generation. The Commission in 2019 stated that utilities "in advance of the wildfire season, must proactively partner with critical facility and critical infrastructure representatives to assess the ability of each critical facility to maintain operations during de-energization events of varying lengths."[622] As part of this assessment, in 2019 the Commission stated, "utilities must help critical facility and critical infrastructure representatives assess the need for backup generation and determine whether additional equipment is needed, including providing generators to [critical] facilities or infrastructure that are not well prepared for a power shutoff."[623]

Below we review whether the utilities reasonably complied with this guideline within the context of the utility obligation to promote safety set forth in Pub. Util. Code § 451.

### 9.11.1. SED Report - Assess Needs of Critical Facilities and Infrastructure for Backup Generation

Regarding PG&E, the SED Report concludes PG&E initiated outreach but PG&E should improve, going forward, coordination and planning efforts for backup power for critical facilities or infrastructure not well-prepared for de-energization.[624] The SED Report states PG&E did not engage in outreach to

---

[622] D.19-05-042, Appendix A at A12.

[623] D.19-05-042, Appendix A at A12.

[624] SED Report at 21.

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page 49 of 143

assess backup power to hospitals, water facilities, and correctional facilities.[625]  In addition, the SED Report finds that, additional coordination for backup power would have potentially avoided the loss by the City and County of San Francisco (Castlewood Reservoir) and Contra Costa County (Pleasanton Well) of tens of thousands of gallons of water.[626]

Regarding SCE, the SED Report concludes, in each 2019 post-event report, SCE should have provided the Commission with more information about SCE's mobile backup generator program, including the number of mobile backup generators and how SCE determined which critical facilities received backup generators. The SED Report suggests this information be provided in each of SCE's future post-event reports.[627]  The SED Report further suggests SCE "properly assess the needs of its affected communities to identify specific locations where it can provide backup power."[628]

Regarding SDG&E, the SED Report finds SDG&E's responses regarding backup generation for critical facilities and infrastructure lacked sufficient specificity and information pertaining to the process relied upon for assessing backup power needs and the results of such assessments, e.g., whether the assessment resulted in SDG&E's providing backup generation or the customer purchasing it.[629]

---

[625]  SED Report at 21.

[626]  SED Report at 21, citing to City and County of SF January 10, 2020 Response at 2-3.

[627]  SED Report at 22.

[628]  SED Report at 22.

[629]  SED Report at 22.

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page 50 of 143

### 9.11.2. Utilities - Assess Needs of Critical Facilities and Infrastructure for Backup Generation

In response to the SED Report, PG&E states that, since 2019, it has continued to work with cities, counties, and critical facilities regarding their backup power needs. PG&E also states it has voluntarily provided backup generation to some facilities in 2020, including hospitals, medical stations, shelters, nursing centers, and voting places. PG&E states it interpreted the Commission's directive to provide backup generation in 2019 as discretionary, rather than mandatory.[630]  PG&E also explains the need to prioritize the provision of its own backup generation based on "PG&E's limited mobile generation resources."[631]

In response to comments by parties that PG&E did not do enough around backup power prior to the proactive power shutoffs in late 2019, PG&E further explains its extensive engagement efforts regarding backup power and claims, again, that in 2019 PG&E was not (and is not) responsible for providing backup power generation to critical facilities and infrastructure.[632]

PG&E relies on Resolution ESRB-8 (July 12, 2018) to support its position that its provision of backup power in late 2019 was discretionary, not mandatory, and cites to the following statement by the Commission in Resolution ESRB-8: "The requirement to provide generators and/or batteries to critical facilities was removed [from draft Resolution ESRB-8] since most critical facilities are required to have their own back-up power resources."[633]  PG&E does not address the

---

[630]  PG&E September 2, 2020 Opening Comments at 7-8.

[631]  PG&E September 2, 2020 Opening Comments at 7-8.

[632]  PG&E September 2, 2020 Opening Comments at 7-8, citing to Resolution ESRB-8 at 8.

[633]  PG&E September 2, 2020 Opening Comments at 7-8, citing to Resolution ESRB-8 at 8.

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page 51 of 143

more recent and controlling Commission directive in 2019, repeatedly found in D.19-05-042, ordering the utilities to assess backup power needs of critical facilities and infrastructure, "including utility-provided generators for facilities that are not well prepared for a power shutoff."[634] PG&E concludes that, while parties suggest PG&E's efforts were "not meaningful," parties fail to identify any evidence of a violation of D.19-05-042.[635]

In response to the SED Report, SCE explains its conducted outreach to critical facilities and infrastructure but did not coordinate with these entities in advance of the 2019 wildfire season to assess their ability to maintain operations during de-energization events.  SCE states it considered requests to provide mobile back-up generation in 2019 and deployed four mobile diesel generators during the October 27, 2019 de-energization to support public safety. According to SCE, existing laws or industry standards often require critical facilities and infrastructure customers to have back-up generation in place to sustain critical operations in the event of a power outage.  However, if these entities were unable to sustain critical life/safety operations during an extended power outage through their own resiliency planning, SCE considered and continues to consider requests to provide temporary mobile back-up generation.[636]  Going forward,

---

[634]  D.19-05-042 at 73-74.

[635]  PG&E November 16, 2020 Reply Comments at 12-13, citing to comments of Joint Local Governments:  "The Joint Local Governments complain that PG&E 'did not meaningfully partner with the critical facilities in its service territory to assess their resiliency and determine if additional backup generation was necessary….Even if PG&E did coordinate with some critical facilities before the 2019 fire season, it did not do so with a significant number of facilities or with the facilities in each county that were essential to public health and safety, such as hospitals, water facilities, or correctional facilities.'"

[636]  SCE September 2, 2020 Opening Comments at 24.

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page
52 of 143

SCE states it is exploring options to further expand its "resiliency zones," which would provide electricity to centrally located community resources serving local customers during a pro-active de-energization.  SCE explains it is currently targeting seven rural communities and as many as three sites per community, including a transfer switch to accommodate temporary backup generation that may be dispatched during the PSPS period of concern.[637]

> In response to the SED Report, SDG&E states,
>
> "As part of SDG&E's overall wildfire safety and PSPS communication and outreach plan, addressing backup power with critical customers is a dynamic, ongoing dialogue which is renewed on an annual basis prior to fire season. SDG&E's Account Executives work closely with their assigned accounts to assess their backup generation needs through meetings and conversations. For unassigned accounts, SDG&E used various tactics to reach critical facilities including mail, email and phone calls. The effort directs customers to a landing page where they were asked to update contact information and provide answers to the backup generation needs assessment."[638]

SDG&E further states it "does not provide backup power to critical facilities in PSPS or other emergency events. Consistent with the Commission's requirements, SDG&E meets with critical customers to discuss preparedness and to encourage critical customers to secure the appropriate amount of backup power necessary to meet their own resiliency requirements."[639]

---

[637] SCE September 2, 2020 Opening Comments at 25.

[638] SDG&E September 2, 2020 Opening Comments at 23.

[639]  SDG&E September 2, 2020 Opening Comments at 23-24.

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page 53 of 143

### 9.11.3. Parties - Assess Needs of Critical Facilities and Infrastructure for Backup Generation

Regarding PG&E, CforAT states more information is needed to understand how PG&E determined in 2019 which public safety partners to reach out to and whether those public safety partners included representatives from the Access and Functional Needs community. CforAT further states the only representative PG&E identified that it is working with on backup power is California Foundation for Independent Living Centers.[640]

City of San Jose states that during the PG&E October 9, 2019 de-energization, City of San Jose had to engage AT&T and T-Mobile to assist with energy needs and their ability to provide service to communication customers during the de-energization. City of San Jose concludes PG&E should have been working with both companies to resolve these electricity issues before shutting off power.[641]

Joint Local Governments state PG&E did not "meaningfully partner" with the critical facilities and infrastructure to assess their resiliency and determine if additional backup generation was necessary.[642]  Joint Local Governments acknowledge PG&E's improvement in this area in 2020, including a more hands-on approach to assessing the needs of critical facilities and infrastructure and increasing PG&E's temporary generation fleet in 2020 but also states that these improvements do not absolves PG&E of its shortcomings in 2019.[643]  In general,

---

[640]  CforAT October 16, 2020 Opening Comments at 22.

[641]  City of San Jose October 16, 2020 Opening Comments at 6.

[642]  Joint Local Governments October 16, 2020 Opening Comments at 15.

[643]  Joint Local Governments November 16, 2020 Reply Comments at 17-18.

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page 54 of 143

Joint Local Governments describe the results of all the utilities' failures in this area as follows:

> "utilities cannot make a reasoned decision to shut off the power if they do not understand the potential consequences to the public of de-energization.  But instead of doing the work to partner with critical facilities to assess resiliency and troubleshoot problems, the utilities hid behind a mantra of personal responsibility and self reliance."[644]

Regarding SCE, Acton states "no dispute" should exist that SCE failed to meet this guideline.[645] Acton states that, going forward, it would expect SCE to adopt a more robust and reliable approach to ensure communication facilities can withstand upcoming 2020 PSPS events.[646]

Joint Local Governments state they were not aware of any efforts in 2019 by SCE to partner with critical facilities to assess their backup generation capabilities but knows that SCE has done a better job in 2020.[647] Joint Local Governments describes SCE's 2019 efforts as "pre-packaged informational presentations about general de-energization triggers and protocols [which] are not, under any circumstances, partnership or coordination with public safety partners. Advocating self-reliance and preparation is not partnership or coordination to assess resiliency and the need for backup power. Moreover, SCE

---

[644]  Joint Local Governments October 16, 2020 Opening Comments at 15.

[645]  Acton October 16, 2020 Opening Comments at 12.

[646]  Acton October 16, 2020 Opening Comments at 13.

[647]  Joint Local Governments October 16, 2020 Opening Comments at 16; Joint Local Governments November 16, 2020 Reply Comments at 19.

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page 55 of 143

often failed to follow up on requests for additional information, collaboration, or support made during its informational presentations."[648]

### 9.11.4. Discussion - Assess Needs of Critical Facilities and Infrastructure for Backup Generation

A significant amount of confusion surrounded the extent of the utilities' obligations regarding backup power for critical facilities and infrastructure in late 2019.

To review, in D.19-05-042, the Commission directed the utilities to assess, determine, and - importantly for purposes of this discussion - provide, if necessary, backup power to critical facilities and infrastructure.  This 2019 directive was a departure from the prior Commission directive adopted in 2018 concerning backup power for these entities. Resolution ESRB-8 directed utilities to assess and determine backup power needs but made provision of backup power discretionary.  While the provision of backup power by utilities was discretionary in Resolution ESRB-8, it was mandatory, under certain conditions, in D.19-05-042.[649]  The Commission further modified this directive to provide backup power in 2020 explaining that the utilities must "work … to provide consultative assistance regarding backup generation to ensure critical infrastructure is not brought offline during a de-energization event."[650] In 2020,

---

[648]  Joint Local Governments November 16, 2020 Reply Comments at 18.

[649]  D.19-05-042, Appendix A at A12, "The electric investor-owned utilities must help critical facility and critical infrastructure representatives assess the need for backup generation and determine whether additional equipment is needed, including _providing_ generators to facilities or infrastructure that are not well prepared for a power shut off." (Emphasis added.)

[650]  D.20-05-051 at 76 and Appendix A at 7.  In 2020, the Commission stated that the utilities are not responsible for providing or procuring backup generation for critical infrastructure but will "be available" to the "governing body" of these entities to "consult on procurement and deployment" of backup power. D.20-05-051 at 76-77.

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page 56 of 143

the Commission removed the mandatory requirement to provide backup power but maintained the mandatory requirement to provide "consultative assistance."

As a result of the Commission's efforts to clarify and refine the obligations of utilities concerning backup power matters regarding critical facilities and infrastructure customers, some confusion resulted over the extent of the utilities' obligations around assessing and providing backup power needs for critical facilities and infrastructure.

The Commission will seek to provide more guidance to stakeholders on this matter here but also directs stakeholders to R.18-12-005, a proceeding designed to review the PSPS Guidelines in more detail. Below we also make findings on the utilities' compliance with the 2019 guidelines on backup power. First, we remind parties that all matters related to proactive power shutoffs are critical to safety. Therefore, the Commission urges parties to bring matters causing confusion to the Commission's attention immediately for resolution. For example, if a Commission directive is creating confusion when stakeholders seek to implement the directive, a motion filed in R.18-12-005 (or its successor proceeding), seeking clarification or other process may be appropriate.

Second, we find persuasive the analysis of the SED Report and the comments of Joint Local Governments, Acton, and City of San Jose and find that the utilities, going forward, must provide more information to the Commission on their provision of backup power, generally, in a report, such as an annual report, filed with the Commission. The utilities must also provide information on mobile backup power in an annual report. Information of any specific backup power provided immediately before or during a PSPS event (mobile or otherwise), must be addressed in the 10-day post-event reports.

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page 57 of 143

Third, we further find that the utilities should state their precise responsibilities in this annual report and address the responsibilities of the utilities versus critical facilities and infrastructure.

Based on the information in the SED Report and comments by parties regarding efforts - in advance of the 2019 fire season - that PG&E and SCE failed to adequately engage critical facilities and infrastructure about their need for backup power, we find PG&E and SCE failed to reasonably comply with this guideline in 2019, and, in doing so, PG&E and SCE failed to comply with the utility obligation to promote safety in Pub. Util. Code § 451. Based on the information in the record, we find SDG&E reasonably complied with this directive.

We acknowledge PG&E's and SCE's progress since 2019 to engage critical facilities and infrastructure customers regarding their backup power needs. However, we remain concerned that progress is not happening quickly enough. Therefore, we further find PG&E and SCE should immediately develop a program similar to SDG&E's program for assessing the needs of critical facilities and infrastructure for backup power. SDG&E's efforts to address backup power is more advanced. While we do not seek to specify each aspect of PG&E's and SCE's efforts to partner with critical facilities and infrastructure on backup power needs, we must see near-term improvements and accordingly direct PG&E and SCE to include in their backup power programs, at a minimum, the following aspects of SDG&E's program:  (1) approach addressing backup power with critical facilities and infrastructure customers as a dynamic, ongoing dialogue which is renewed on an annual basis prior to fire season;  (2) account executives, or other similar positions, must work closely with their assigned critical facilities and infrastructure accounts to assess their backup generation needs through

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page
58 of 143

meetings and conversations; (3) for unassigned accounts, PG&E and SCE must use various tactics to reach critical facilities and infrastructure, including mail, email, and phone calls; (4) all efforts to communication with critical facilities and infrastructure customers must also direct these customers to a landing page on the utility website where customers are asked to update contact information and provide answers to a backup generation needs assessment; and (5) engage with critical facilities and infrastructure customers to discuss preparedness and encourage these customers to secure the appropriate amount of backup power necessary to meet their own resiliency requirements.

In addition, to reduce the confusion around whether the critical facilities and infrastructure customer or the utility is responsible for providing backup power generators for PSPS events, PG&E, SCE, and SDG&E must clearly convey to critical facilities and infrastructure customers in writing whether the utility is responsible for providing the backup power and the extent of such responsibility.

We also expect SDG&E will continue to improve and refine its partnership with critical facilities and infrastructure customers on backup power needs and direct SDG&E to share any improvements in its program with PG&E and SCE.

We adopt the corrective actions set forth below.

### 9.11.5. Corrective Action - Assess Needs of Critical Facilities and Infrastructure for Backup Generation

PG&E, SCE, and SDG&E shall clearly convey, in writing, to critical facilities and infrastructure customers whether or not the utility is responsible for providing the backup power (mobile or otherwise) before or during a de-energization to critical facilities and infrastructure and the extent of any responsibilities regarding such backup power.

PG&E and SCE shall immediately initiate plans to develop a program similar to SDG&E's program for assessing, deploying, and providing, to the

extent required by law, for the needs of critical facilities and infrastructure customers for backup power during a de-energization. The program should consider the components used by SDG&E identified herein. SDG&E shall share its backup power program with PG&E and SCE to assist the utilities in further developing their backup power programs.

PG&E, SCE, and SDG&E shall immediately initiate a collaborative effort, to be referred to as the Joint Utility PSPS Working Group, which shall include, at a minimum, a monthly joint utility meeting to share all lessons learned and all best practices pertaining to all aspects of the backup power program and share all feedback from critical facilities and infrastructure customer on how the utilities are assisting these customers to meet their backup power needs related to de-energizations. PG&E, SCE, and SDG&E shall comply with the reporting requirement herein pertaining to the Joint Utility PSPS Working Group.

PG&E, SCE, and SDG&E shall provide the following information on backup power (including mobile backup power) provided to critical facility and infrastructure customers in 10-day post-event reports with the name/email address of a utility contact for customers for each topic: (1) a description of the backup generators available for critical facility and infrastructure customers before and during the de-energization, (2) the capacity and estimated maximum duration of operation of the backup generators available for critical facility and infrastructure customers before and during the de-energization, (3) the total number of backup generators provided to critical facility and infrastructure before and during a de-energization, (4) how the utility deployed this backup generation to the critical facility and infrastructure customer's site before or during the de-energization, (5) explain how the utility prioritized the distribution of available backup generation to critical facility and infrastructure customers before and during the de-energization, and (6) identify the critical facility and infrastructure customers that received backup generation before and during the de-energization.

PG&E, SCE, and SDG&E shall maintain updated information on their websites regarding how critical facility and infrastructure customers may request an assessment of their backup power needs. PG&E, SCE, and SDG&E also shall maintain updated information on their websites regarding the availability of mobile backup generation for critical facility and infrastructure customers and how these customers can request the utility to provide mobile backup power. This information shall include, at a minimum, an email address to make requests

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page 60 of 143

for information and all other relevant information. PG&E, SCE, and SDG&E shall promptly respond, within 24 hours, to all inquiries by critical facilities and infrastructure customers concerning backup power for use during a de-energization.

PG&E, SCE, and SDG&E shall file and serve an annual report in R.18-12-005 or a successor proceeding, which shall identify, among other things (1) actions taken to assess the overall backup power needs of critical facilities and infrastructure customers in advance of wildfire season, (2) the names of the critical facilities and infrastructure customers the utility engaged to assess backup power needs, the results of the utility assessment, and whether or not the critical facilities and infrastructure customer provided any needed backup power generation, and (3) actions taken to develop, implement, and improve utility partnerships with critical facilities and infrastructure customers on ongoing or evolving backup power needs. This customer information may be provided on a confidential basis, to the extent permitted by law. Further details of this annual report, including the date to be filed, shall be determined in R.18-12-005.

### 9.12. Update Contacts of and Conduct Communication Exercises with Public Safety Partners

In 2019, the PSPS Guidelines required utilities, in advance of wildfire season, to accomplish the following two tasks: update contacts of public safety partners and conduct communication exercises with public safety partners.[651] The Commission also noted, that more regular updates of contacts is encouraged "beyond the annual update required of the utilities."[652]

Below we review whether PG&E, SCE, and SDG&E reasonably complied with this guideline within the context of the utility obligation to promote safety set forth in Pub. Util. Code § 451.

---

[651]  D.19-05-042, Appendix A at A11.

[652]  D.19-05-042, Appendix A at A11.

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page 61 of 143

## 10.3. Reporting Requirements of Resolution ESRB-8

In 2019, some of the then-applicable reporting requirements had been adopted by the Commission in Resolution ESRB-8 (July 12, 2018).  These requirements directed the utilities to, in their 10-day post-event reports:

(1)  identify who the utility contacted in the community prior to de-energization and whether the affected areas are classified as Tier 1,[678] Tier 2, or Tier 3 per the definition in General Order 95, Rule 21.2-D22;

(2)  explain why notice could not be provided at least 2 hours prior to a de-energization event if such notice was not given;

(3)  identify the number of and a summary of the complaints received as a result of the de-energization events, including any claims filed against the utility because of de-energization;

(4)  provide a detailed description of the steps the utility used to restore power; and

(5)  address and describe each community assistance location during a de-energization event.[679]

The SED Report reviews some, but not all, of the above-noted reporting requirements set forth in Resolution ESRB-8.  The SED Report reviews the number of complaints received by PG&E in response to the 2019 PSPS events and finds it surprising that the number of complaints reported by PG&E is relatively low, especially due to the widespread impact of PG&E's 2019 PSPS events.  To further understand why the number of reported complaints was relatively low, SED issued a data request and, in response, PG&E explained that it only reports certain types of "complaints" by customers, stating "[a]ny customer issue where a customer contacts another line of business or our customer service Contact

---

[678]  Resolution ESRB-8 (July 12, 2018) at 5 incorrectly refers to Zone 1, rather than Tier 1.

[679]  D.19-05-042 at 9, citing to Resolution ESRB-8 (July 12, 2018) at 5.

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page 62 of 143

Center Operations is an 'inquiry' [not a complaint]."[680]  The SED Report concludes PG&E's counting and reporting method for complaints raises concerns and suggests the actual number of complaints made by customers (regardless of the form) is not accurately reflected in PG&E's post-event reports because many complaints may be missing. The SED Report concludes, due to the inadequacy of PG&E's reporting, that some manner of additional data collection would be required to verify the number of complaints made by customers.[681]

In response to the SED Report, SCE states it received 35 complaints from its October 2019 PSPS events. Acton disagrees with this number, claiming that just the residents of Acton and Agua Dulce submitted more than 50 complaints to SCE about the October 2019 PSPS events.  To further understand this apparent discrepancy, SED issued a data request, but, in its response, SCE did not explain how SCE reports, counts, identifies, or tracks complaints for purposes of PSPS events.  The SED Report concludes that without additional data collection, it is unclear whether SCE accurately determined the reported number of complaints.[682]

SDG&E's response to an SED data request regarding how SDG&E determines the figures for complaints in its post-event reports does not address how SDG&E identifies or tracks customer complaints for purposes of PSPS events.  Again, the SED Report concludes that without additional data collection, it is unclear whether SDG&E accurately determined the reported number of

---

[680]  SED Report at 61, citing to PG&E Response to SED-001, Question 35 Attachment, dated March 24, 2020.

[681]  SED Report at 61-62.

[682]  SED Report at 62.

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page 63 of 143

complaints.[683]  The SED Report also focuses on SDG&E's compliance with another element of the reporting requirements of Resolution ESRB-8, the required explanation for why notice was not provided according to the Commission's requirement that notice be provided at least two hours prior to de-energization.  According to the SED Report, SDG&E did not notify 495 customers at least two hours prior to its October 20, 2019 PSPS event and between October 28 - November 1, 2019, SDG&E did not provide 2-hour advance notice to 1,412 customers. The SED Report concludes SDG&E should have explained in its post-event reports why timely notice was not provided.[684]

PG&E states that it "tracks regulatory complaints based on utility industry standards for reporting and benchmarking consistent with longstanding practices created in cooperation with the Commission's Consumer Affairs Branch."[685]  In response to suggestions by parties (detailed below) that under-reporting of complaints occurred in 2019, PG&E disagrees but is open to future proposals to address this issue in another proceeding.[686]

SCE states it only tracks and includes formal complaints to its Consumer Affairs department or the Commission and "does not include grievances aired at community meetings or in calls to customer service related to PSPS events as formal complaints." SCE states it does not have formal record of the 50 complaints described by Acton.[687]

---

[683]  SED Report at 62.

[684]  SED Report at 44.

[685]  PG&E September 2, 2020 Opening Comments at 25.

[686]  PG&E November 16, 2020 Reply Comments at 32-33.

[687]  SCE September 2, 2020 Opening Comments at 67.

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page 64 of 143

SDG&E states that customer complaints and claims are generally received by SDG&E's customer contact center and are tracked internally to be used for PSPS post-event reporting.[688]   Regarding its reporting on failures to timely notice customers, SDG&E provides further information, stating that due to dynamic weather conditions, it was unable to provide notifications according to the guidelines.[689]

Acton suggests that the term "complaints" as used by the Commission in this context should be clarified, stating that the Commission in Resolution ESRB-8 does not dictate the manner in which claims must be received to be counted as complaints for purposes of reporting requirements for PSPS events.  Acton concludes that, since SCE failed to report all the complaints and claims it received during the 2019 PSPS events, SCE did not comply with ESRB-8 requirements. Acton is not satisfied that SCE's messaging regarding PSPS events only provides SCE's general customer service number and does not include how the public may contact SCE's "Consumer Affairs Department" with complaints about PSPS events. Acton further states SCE should more broadly track, record, and report complaints regarding PSPS events raised by customers at community meetings, through SCE's website, and by SCE's general customer service number.[690]

Mussey Grade states the number of complaints reported by PG&E is much lower than the numbers reported by SDG&E and SCE (with SCE's much lower than SDG&E's). Mussey Grade suggests that, because PG&E's conduct during

---

[688]  SED Report at 44.

[689]  SDG&E September 2, 2020 Opening Comments at 28.

[690]  Acton October 16, 2020 Opening Comments at 31.

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page 65 of 143

the 2019 PSPS events was significantly worse than the other utilities, the fact that these numbers do not reflect the relative mismanagement of PSPS events by the three utilities may reflect systemic problems in reporting of complaints and barriers making it difficult for customers to submit complaints. Mussey Grade concludes that PG&E and SCE suppressed complaints or under-reported them and recommends the Commission require utilities to report customer complaints that the utilities receive via phone calls regarding all PSPS problems and direct the utilities to survey customer satisfaction after PSPS to solicit feedback.[691] Mussey Grade also recommends the Commission examine the complaints and claims process at all of the major utilities to determine the root cause of irregularities in claims reporting.[692]

In reviewing the utilities' compliance with the Resolution ESRB-8 reporting requirements, we are concerned the utilities may have under-reported complaints received pertaining to their 2019 PSPS events. A number of parties raised possible inconsistency between the actual problems experienced by customers during the 2019 PSPS events and the relatively small number of complaints reported.  While PG&E explains its numbers are accurate and it used "utility industry standards" in defining and reporting complaints, SCE seems to take a different approach and explains it only reported, a subset of customer complaints, i.e., "formal" complaints. SDG&E appears to report complaints more broadly but it remains unclear how SDG&E defines the word complaint for PSPS reporting purposes.

_____

[691]  Mussey Grade October 16, 2020 Opening Comments at 13-15.

[692]  Mussey Grade November 16, 2020 Reply Comments at 6.

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page 66 of 143

For these reasons, we find that a significant amount of inconsistency existed in 2019 on how the utilities defined and reported complaints for purposes of PSPS events and, as a result, parties had difficulty understanding the significance, if any, of these numbers.  As parties made clear, no correlation existed between their actual experiences in 2019 and the number of complaints reported by the utilities in 2019. The SED Report confirms more clarity on the definition of complaints in this context would be helpful, in addition to clearer tracking and reporting requirements for complaints.

As such, we further find our guidelines in 2019 lacked sufficient clarity around the word "complaint," which resulted in confusion over the extent of the reporting requirement and the purpose of the data.  The Commission first adopted this reporting requirement in Resolution ESRB-8 and did not modify it in D.19-05-042.  The Commission stated in Resolution ESRB-8, that "The IOU shall summarize the number and nature of complaints received as the result of the de-energization event and include claims that are filed against the IOU because of de-energization."[693]

Going forward, we clarify the word "complaints" as used in the above reporting requirement set forth in Resolution ESRB-8 and, in addition, we add structure to the framework used by utilities to track complaints so future reviews of utility complaint data by parties and the Commission is more efficient and transparent.

First, we clarify that "complaints," as used in the context of utility reporting in 10-day post-event reports, means an "expression of grief, pain, or dissatisfaction," which is the common meaning of the word found in *Merriam-*

---

[693]  Resolution ESRB-8 (July 12, 2018) at 5.

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page
67 of 143

*Webster*. We direct utilities to report all complaints that fall within this common usage definition. In addition, we direct utilities to report any formal filings, such as court claims or Commission complaints. The Commission may further refine this definition in R.18-12-005 or any other proceeding.

Second, we find that the utilities must establish an internal tracking process for these complaints so that SED is able to access this data and confirm the utilities are accurately presenting the number of complaints received regarding PSPS events. The utilities are directed to collaborate with SED and to incorporate SED's input to ensure the tracking system is consistent with SED's expectations.

Lastly, we adopt clarifications to our existing guidelines (previously set forth in Resolution ESRB-8) for the 10-day post-event reports.

We make no finding on the reasonableness of the utilities' compliance with this reporting requirement because the guideline lacked sufficient clarity in 2019.

We adopt the following corrective actions.

PG&E, SCE, and SDG&E shall address, among other things, each element of Resolution ESRB-8 reporting requirements, as clarified herein, in the 10-day post-event reports, including, the below and, if no information is available, PG&E, SCE, and SDG&E shall respond to these Resolution ESRB-8 reporting requirements by indicating the reason this information is not available. PG&E, SCE, and SDG&E shall collaborate with SED and incorporate SED's input to develop a tracking system for complaints, as defined below, consistent with SED's expectations so that SED is able to access this data and confirm the utilities are accurately presenting the number of complaints received regarding PSPS events. PG&E, SCE, and SDG&E shall, among other things, in 10-day post-event reports: (1) identify who the utility contacted in the community prior to de-energization and whether the affected areas are classified as High Fire Threat District Tier 1, Tier 2, or Tier 3 (as defined in General Order 95, Rule 21.2-D22);

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page 68 of 143

(2) explain why notice could not be provided at least two hours prior to a de-energization, if such notice was not provided;

(3) identify the number of and a summary of the complaints, meaning any expression of grief, pain, or dissatisfaction, formally filed court claims, informal or formally filed Commission complaints, and all complaints received by the utility as a result of the PSPS event;

(4) provide a detailed description of the steps the utility used to restore power; and(5) address and describe each community assistance location during a de-energization event.[694]

PG&E, SCE, and SDG&E shall provide aggregate data, as identified above, in an annual report, including aggregate data that may not have been available at the time the utility filed the 10-day post-event report.

### 10.4. Identify Decision Criteria Resulting in Proactive De-energization, Including Alternatives Considered and Fire Mitigation Measures Used

This topic, including the sufficiency of the utility reporting on this topic, is addressed at Sections 7.1 and 7.2, herein.

### 10.5. Provide Copies of All Notices, Timing, Method of Publication, and Identify Initiator of Notice

This topic is addressed at Section 8.1, herein.

### 10.6. Address Failures to Provide Advanced Notice

This topic is addressed at Section 8.1 herein.

### 10.7. Address Engagement with Affected Local Jurisdiction & Public Safety Partners Before and During De-Energization

This topic is addressed at Sections 8.2-8.7, 9.1, 9.9, 9.10 and 9.12, herein.

---

[694] D.19-05-042 at 9, citing to Resolution ESRB-8 (July 12, 2018) at 5.

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page 69 of 143

### 10.10.        Impact of Sectionalization

In 2019, the PSPS Guidelines required the utilities to include, in the 10-day post-event reports, "A description of how sectionalization, i.e., separating loads within a circuit, was considered and implemented and the extent to which it impacted the size and scope of the de-energization event."[710]

The SED Report did not comment on this topic.

PG&E states that sectionalizing was implemented to the extent possible but does not present it as an alternative to de-energization.[711]  PG&E further states that recommendations for changes to post-event reporting should be addressed in R.18-12-005.[712]

SCE states that although it was not consistently described with detail in its post-event reports, SCE used sectionalization during the late 2019 PSPS events to minimize the number of customers de-energized. SCE states that in 2020, it will ensure that post-event reports clearly document the extent to which sectionalization was considered and implemented.[713]

SDG&E states that its 2019 post-event reports included a description of how sectionalization was considered and implemented and the extent to which it impacted the size and scope of the PSPS events.[714]

Acton states SCE's post-event reports fail to explain how sectionalization was considered and do not discuss the extent to which sectionalization efforts

---

[710]  D.19-05-042, Appendix A at A23.

[711]  PG&E November 16, 2020 Reply Comments at 27.

[712]  PG&E November 16, 2020 Reply Comments at 28.

[713]  SCE September 2, 2020 Opening Comments at 59.

[714]  SDG&E September 2, 2020 Opening Comments at 14.

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page
70 of 143

impacted the size and scope of the PSPS events.[715] Acton recommends that in future post-event reports, SCE should explain how sectionalization was considered and the extent to which it reduced the size and scope of the PSPS events.[716]

Mussey Grade states that the sectionalization information provided by the utilities in their 2019 post-event reporting was of limited value. Mussey Grade recommends that the utilities provide predicted and measured wind speeds at the circuit level to determine if sectionalization is adequate.[717]

Based on the record of this proceeding, we find that all three utilities should improve their explanation in the post-event reports of how sectionalization was considered and how it used sectionalization to limit the scope of the power shutoff.

> PG&E, SCE, and SDG&E shall clearly document, as required by D.19-05-043, the extent to which sectionalization was considered and implemented in the 10-day post-event reports and how sectionalization was used to limit the scope of a de-energization. PG&E, SCE, and SDG&E shall contact SED if the utility requires additional guidance to ensure adequate reporting on this requirement in the 10-day post-event reports.

### 10.11.  Explanation of How the Utility Determined that the Benefit of De-energization Outweighed Potential Public Safety Risks

This topic is addressed at Section 7.1., herein.

---

[715]  Acton October 16, 2020 Opening Comments at 23.

[716]  Acton October 16, 2020 Opening Comments at 32.

[717]  Mussey Grade October 16, 2020 Opening Comments at 10.

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page 71 of 143

### 10.12.  Timeline and Steps Taken for Power Restoration

In 2019, the PSPS Guidelines required utilities to include in the 10-day post-event reports, "The timeline for power restoration (re-energization,) in addition to the steps taken to restore power as required in Resolution ESRB-8."[718]

The SED Report finds that SCE provided inconsistent restoration times across post-event reports. In addition, restoration notification was missing for three of SCE's PSPS events.[719] The SED Report does not address SDG&E's compliance with this reporting requirement.

PG&E does not address this topic in its comments.

SCE states that it provided re-energization notifications to all customers except for one event. SCE included copies of the notifications in its post-event reports and has updated its processes to ensure that notice is consistently provided.[720]  SCE does not address whether it included its own timeline for power restoration in the post-event reports and steps taken to restore power.

SDG&E states that its 2019 post-event reports included the timeline for power restoration in addition to the steps taken to restore power.[721]

No parties commented on this topic.

Based on the record of this proceeding, we direct PG&E, SCE, and SDG&E to respond to this aspect of the post-event reports in the future by including their timeline for power restoration and steps taken to restore power. The utilities are

---

[718]  D.19-05-042, Appendix A at A24.

[719]  SED Report at 58-60.

[720]  SCE September 2, 2020 Opening Comments at 60-61.

[721]  SDG&E September 2, 2020 Opening Comments at 14.

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page
72 of 143

directed to contact SED if more guidance on the required information in the post-event reports is needed. We adopt the corrective action below.

PG&E, SCE, and SDG&E shall contact SED if the utility requires additional guidance to ensure adequate reporting on the requirement to provide a timeline and steps taken to restore power in the 10-day post-event reports.

### 10.13.  Lessons Learned

In 2019, the PSPS Guidelines required the utilities' post-event reports to include: "lessons learned from each de-energization event, including instances when de-energization protocols are initiated, but de-energization does not occur, in order to further refine de-energization practices."[722]

The SED Report finds PG&E should include its lessons learned in its post-event reports. While PG&E states in several post-event reports the cause of damage to some of its facilities could not be identified, the SED Report suggests additional information, as available for the 10-day post-event reports should include the cause of any equipment the failures and use lessons learned to prevent other similar failures.[723]

The SED Report finds SDG&E should consider additional lessons learned, such as specific improvements in thresholds to de-energize and improvements to its vegetation management operations or maintenance of its electric facilities. For example, the SED Report suggests SDG&E could review its criteria for high wind events and high wildfire risk after every event to identify any opportunities for reducing the scope of future PSPS events.[724]

---

[722]  D.19-05-042, Appendix A at A24.

[723]  SED Report at 64.

[724]  SED Report at 65.

Case: 19-30088   Doc# 10642-2   Filed: 05/11/21   Entered: 05/11/21 16:54:33   Page 73 of 143

The SED Report does not address SCE's compliance with this reporting guideline.

PG&E states that the reporting of lessons learned in the post-event reports should be considered in R.18-12-005 but agrees that it is imperative to investigate all damages discovered from a PSPS event, including damages not associated with wind or vegetation hazards. PG&E states it anticipates being able to attribute a cause to all damages going forward.[725]

SDG&E states that many teams across SDG&E compile lessons learned to identify and integrate specific improvements to PSPS operations to minimize the impact of future events.[726]

SCE does not address this topic.

Although the SED Report did not identify any issues with SCE's lessons learned reporting, Acton noted that SCE's lessons learned did not discuss the PSPS events SCE initiated without proper notice.[727]

Joint Local Governments agree with the SED Report that PG&E should include its de-energization threshold analyses in its lessons learned reporting and examine whether its thresholds are adequate and correctly applied in all de-energized areas.[728]

Mussey Grade states that the lessons learned presented by the utilities in the 2019 reports was, generally, inadequate and did not show a serious effort to

---

[725] PG&E September 2, 2020 Opening Comments at 25.

[726] SDG&E September 2, 2020 Opening Comments at 31.

[727] Acton October 16, 2020 Opening Comments at 19.

[728] Joint Local Governments October 16, 2020 Opening Comments at 33.

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page
74 of 143

collect information that would minimize the impact of future events.[729]  PG&E does not agree that the lessons learned sections were inadequate, but nevertheless states it is continuously improving its PSPS reporting and would not object to consideration of Mussey Grade's suggestions in the next phase of the PSPS rulemaking.[730]

Overall, the Commission's agrees with the general conclusion of the parties and of the SED Report that the utilities did not show a serious effort, in their post-event reports, to collect information to minimize the future impact of PSPS events.[731]  The utilities generally agree that improvements in reporting are possible and that they will work toward improvements in future reports. Based on the record in this proceeding, we find that the reporting included in the 10-day post-event reports should be improved and that PG&E, SCE, and SDG&E failed to reasonably comply with the reporting requirements applicable to the 10-day post-event reports.

We adopt the corrective action below.

PG&E, SCE, and SDG&E shall include, in the 10-day post-event report, a description of the de-energization threshold analyses, as part of its lessons learned reporting, and the results of the utility's examination of whether its thresholds are adequate and correctly applied in the de-energized areas.

## 11.  Comments on Proposed Decision

The proposed decision of ALJ Regina DeAngelis in this matter was mailed to the parties in accordance with Section 311 of the Public Utilities Code and

---

[729]  Mussey Grade October 16, 2020 Opening Comments at 8.

[730]  PG&E November 16, 2020 Reply Comments at 33.

[731]  Mussey Grade October 16, 2020 Opening Comments at 8.

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page 75 of 143

comments were allowed under Rule 14.3 of the Commission's Rules of Practice and Procedure.  Comments were filed on _____, and reply comments were filed on _____ by _____.

## 12.   Assignment of Proceeding

Marybel Batjer is the assigned Commissioner and Regina DeAngelis is the assigned Administrative Law Judge in this proceeding.

## Findings of Fact

1.  The utilities' arguments that they lacked sufficient time to prepare for the PSPS events of 2019 are unpersuasive because, since 2009, the Commission had in place a framework to assist utilities in preparing for these proactive power shutoffs.

2.  In 2019, the utilities largely (1) failed to identify the possible safety risks resulting from an electric power shutoff – including obvious risks to school children, those medically dependent on electricity, as well as businesses and (2) failed to evaluate these safety risks as part of the analysis of weighing the benefits and risks/harms before deciding whether to shut off electric power to mitigate the potential for wildfire caused by utility infrastructure.

3.  In 2019, the utilities focused on the risks and harms related to wildfire, which, while critical, was only part of the necessary analysis.

4.  In the absence of adequate reporting of how the utilities relied upon proactive de-energization as a mitigation measure of last resort and the alternatives considered, the utilities cannot assure the Commission or the public that the utilities are acting in a manner that promotes the safety of the public.

5.  Based on the post-event reports submitted for the 2019 PSPS events, neither the Commission nor parties were adequately apprised of the utility decision-making process related to the last resort analysis and, as a result,

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page 76 of 143

customers, governments, businesses, and vulnerable populations were left uninformed and angry.

6.  In any particular situation, additional content or more frequent notice may have been reasonable in 2019 to comply with the PSPS Guidelines and the utility obligation under Pub. Util. Code § 451 to promote the public safety.

7.  Certain notice guidelines would benefit from clarification or minor modifications and are made in this decision based on the record and the problems that occurred in 2019.

8.  The guidelines should be modified, to the extent necessary, to direct the utilities to provide customer information to cities, in addition to all other required entities.

9.  SED and parties encountered problems when analyzing the utilities' data demonstrating compliance with the notice guidelines, which, as described by SED, consisted of an "unorganized mass of data," and utilities should take steps to organize and present the data for analysis in a more accessible manner.

10.  Functional websites with, among other things, regularly updated information before, during, and after a de-energization with up-to-date map boundaries of the de-energized area accessible to all customers, including those with impairments or disabilities and in various languages, were and remain critical to effectively communicating with all types of customers to promote safety.

11.  Both PG&E and SCE, to various degrees, provided non-functional websites, an inadequate diversity of languages, inadequate accommodations for the access needs of customers with disabilities, inaccurate or no map boundaries, and untimely updates to relevant and required information on their websites, with PG&E's website completely failing on October 9, 2019.

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page
77 of 143

12.   In-language communications regarding PSPS events is basic to promoting safety under Pub. Util. Code § 451.

13.   Neither the SED Report nor parties raise website issues in 2019 regarding SDG&E.

14.   PG&E's and SCE's information-sharing problems hindered the ability of governments to plan and respond to the pro-active de-energizations.

15.   SCE admits it must provide more targeted information based on circuit-specific activity so that public safety partners get relevant information based on their locations.

16.   While the SED Report provides somewhat conflicting conclusions on SDG&E's compliance in 2019 with the guideline to provide consistent, accurate, relevant, and timely information to public safety partners before, during, and after a pro-active de-energization, no party raises issues regarding SDG&E.

17.   PG&E made little (or no) effort to share best practices with utilities in 2019 and makes no commitments to engage in the sharing of best practices going forward.

18.   SCE commits, on a going forward basis, to work with the other utilities but makes no mention of such efforts in 2019.

19.   SDG&E appears to state it engaged in efforts to share best practices with other utilities in 2019, provides no examples of such efforts, and states it will continue to engage in such efforts to share best practices with the other utilities in the future.

20.   The efforts by utilities to share best practices demonstrate a lack of initiative to promote safety and are wholly insufficient. As the Commission recognized in D.19-05-042, only by working together and sharing best practices

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page
78 of 143

will utilities be able to ensure all Californians receive the safest service before, during, and after a proactive de-energization.

21.  PG&E created barriers to seamless communications and significant confusion by requiring non-disclosure agreements during a 2019 PSPS event and, while PG&E states it contacted many local jurisdictions in advance of the late 2019 PSPS events, PG&E did not contact enough.

22.  PG&E did not act to secure necessary non-disclosure agreements before the 2019 PSPS events.

23.  PG&E admits it did not use SEMS as a resource to prepare for 2019.

24.  SCE's customers experienced problems due to, as stated in the SED Report, internal protocols that hindered communications.

25.  No evidence exists contrary to SCE's assertion that it followed SEMS in 2019.

26.  PG&E and SCE failed to seamlessly communicate with emergency responders and local governments in 2019.

27.  Neither the SED Report nor the parties raise issues specific to SDG&E regarding establishing seamless communications with emergency responders and local governments regarding PSPS events in 2019.

28.  All three utilities would benefit from further integration of the SEMS framework into their pro-active de-energization protocols and staffing and, therefore, the utilities must immediately begin this integration process for all protocols and with all personnel that are involved in PSPS.

29.  In 2019, failures occurred in PG&E's and SCE's execution of the directive to exchange with public safety partners geospatial information.

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page 79 of 143

30.   Neither the SED Report nor the parties raise issues specific to SDG&E regarding its accurate provision and timely exchange of geospatial information to public safety partners in 2019.

31.   In many instances, PG&E and SCE did not invite water and telecommunications infrastructure providers to the utility's emergency operations center or agree to another means to communicate regarding PSPS events in 2019.

32.   In 2019, the purpose of the Commission's directive to utilities to provide embedded liaisons, upon request, to local and state jurisdictions, was to ensure the timely and accurate exchange of information critical to the safety of the public during a PSPS event.

33.   PG&E efforts to convey and share important information through embedded utility liaisons at the emergency operations centers of the local or state jurisdictions was not adequate and, as a result, PG&E's communications with local and state jurisdiction during the 2019 PSPS events was impaired.

34.   Neither the SED Report nor the parties raise significant issues regarding SCE's or SDG&E's compliance in 2019 with the guideline to embed liaisons at the emergency operations center of the local or state jurisdiction, upon request, and to rely on these embedded liaisons to facilitate the timely and accurate exchange of information during a PSPS event to that jurisdiction.

35.   In 2019, SCE did not have an adequate communication system in place for public safety partners regarding PSPS events, even relying on "manual" transmissions.

36.   In 2019, PG&E did not have adequate communication systems in place for public safety partners regarding PSPS events, as some public safety parties state

notice was not provided and executives at PG&E in 2019 confirmed that coordinating with public safety partners was not the priority.

37.   Neither the SED Report nor the parties raise significant issues regarding SDG&E's compliance in 2019 with the guideline to identify, coordinate with, and provide priority notification to public safety partners.

38.   Lists of critical facilities and infrastructure are fundamental from an electric utility safety and emergency planning perspective.  No excuse justifies the utilities' failure to have prepared these lists and none were presented by the utilities.

39.   PG&E's lists of critical facilities and infrastructure were incomplete in 2019, making notification impossible.

40.   SCE did not verify or provide its list of critical facilities and infrastructure to Santa Barbara County, despite repeated requests.

41.   The SED Report and parties do not identify any significant failures to comply with the directive to identify critical facilities and infrastructure by SDG&E in 2019.

42.   It is unclear from the documentation on the 2019 proactive power shutoffs the full extent to which utilities complied with the directive to establish primary and secondary contacts at critical facilities and infrastructure for PSPS events.

43.   Maintaining comprehensive lists of critical facilities and infrastructure is commonsense utility safety planning. No excuse exists that these lists, with primary and secondary contacts, were not complete, up-to-date, accurate, verified by local governments, and prepared in a format to promote sharing immediately, as needed, for the 2019 fire season.

44.   To the extent PG&E and SCE failed to compile comprehensive lists of critical facilities and infrastructure in 2019, PG&E and SCE failed to reasonably

Case: 19-30088   Doc# 10642-2   Filed: 05/11/21   Entered: 05/11/21 16:54:33   Page
81 of 143

comply with the directive to establish primary and secondary 24-hour points of contacts at critical facilities and infrastructure.

45. SDG&E, while reasonably complying with the directive to compile lists of critical facilities and infrastructure in 2019, may have failed, as noted by the SED Report, to establish primary and secondary 24-hour points of contacts at critical facilities and infrastructure.

46. SCE and SDG&E addressed outreach to Medical Baseline customers prior to the 2019 fire season and both specifically indicated they sought information from Medical Baseline customers regarding any alternative means of contact for PSPS events.

47. Numerous deficiencies existed in PG&E's efforts to update contact information for Medical Baseline customers and provide these customers with an opportunity to select an alternative means of contact for PSPS events.

48. PG&E, SCE, and SDG&E should improve the methods used in 2019 for outreach to Medical Baseline customers and in documenting how the utilities sought to update contact lists of Medical Baseline customers and the actions taken by utilities to obtain alternative contact preferences for these customers in the event of a proactive power shutoffs.

49. Improvements by PG&E, SCE, and SDG&E must be made in identifying contact information for a particularly vulnerable subset of Medical Baseline customers, those customers that rely on electricity for life support.

50. PG&E's and SCE's statements that they adequately complied with the directive to work with local jurisdictions to develop a communication strategy for all, including visitors, in the event of a PSPS event, are unconvincing.

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page
82 of 143

51.  In 2019, SDG&E did not experience any significant failures to comply with the directive to work with local jurisdictions to develop a communication strategy for all, including visitors, in the event of a PSPS.

52.  Further documentation would be useful to substantiate claims by all the utilities that they adequately complied with the directive to work with local jurisdictions to develop a communication strategy for all, including visitors, in the event of a PSPS event.

53.  The utilities must be more proactive in working with local jurisdictions to develop a communication strategy for all, including visitors, in the event of a PSPS, to ensure the utilities "leverage all means" to communicate with all in the affected de-energized area.

54.  PG&E's and SCE's assertions are unconvincing that their non-compliance with the directive to develop notification and communication protocols and systems for PSPS events should be disregarded due to the lack of time to adequately prepare for the 2019 fire season or based on their bare assertions (with no documentation to substantiate their claims) of compliance, despite contradictory claims by parties.

55.  The Commission began establishing a framework for utility proactive power shutoffs in, at least, 2009.  A decade is enough time to prepare a notification system.

56.  SCE's noncompliance with this guideline is particularly troublesome in the Acton area where SCE failed to communicate to customers basic information needed in advance of the 2019 fire season, including "how to manage safely through a de-energization event, and the impacts if deployed."

57.  PG&E and SCE had no plans in place in late 2019 for communicating with customers during a proactive power shutoff in the absence of electricity and, in

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page
83 of 143

addition, SCE and PG&E failed to adequately substantiate their claims of compliance.

58.   In 2019, no significant failures were identified by SDG&E to develop notification and communication protocols and systems in the absence of electricity for PSPS events.

59.   All three utilities must further substantiate their claims of compliance with the required notification and communication protocols and systems for proactive power shutoffs.  The utilities must explain, for example, how they evaluated input from stakeholders at relevant meetings and what plans or goals the utilities developed as a result of the input provided by stakeholders during relevant meetings.

60.   In 2019, the Commission explained the critical nature of the directive to develop a notification strategy that considers geographic and cultural demographics as a means to "increase reliability of warning delivery and to provide a sense of corroboration that will encourage recipients to take protective actions."

61.   Without considering cultural demographic characteristics, such as prevalent languages, it is unclear how the utilities planned to provide customers with effective notice in 2019.

62.   PG&E's explanation that in 2019 it provided notice in two languages, English and Spanish, and also had translations available on its website, is not effective notice because many more languages were used in the affected areas and PG&E's website was often non-functional in 2019.

63.   SCE presents reasonable efforts to consider geographic and cultural demographics but is efforts largely occurred after the 2019 wildfire season.

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page
84 of 143

64.   Neither the SED Report nor SDG&E provide much information on SDG&E's compliance in advance of the 2019 fire season with the directive to consider geographic and cultural demographics when developing a notice strategy.

65.   The utilities must have a comprehensive communications strategy in place, prior to fire season, to rely upon during a pro-active de-energization when the availability of electricity is restricted and when most communications platforms are non-functional due to the loss of electricity.

66.   The Commission provided utilities with notice as far back as 2012 that a strategy to communicate with customers when access to electricity may be restricted would be needed, almost a decade before the events at issue; then again, in 2018, when the Commission stated utilities must have plans to provide "notification …during, a de-energization event," and again in 2019, when the Commission directed utilities to develop a plan to communicate with customers in the absence of power.

67.   The utilities had sufficient time and notice to develop a plan to communicate with customers when access to electricity was restricted prior to the 2019 PSPS events and could have started planning long in advance of the 2019 fire season.

68.   PG&E's and SCE's plans to communicate with customers when access to electricity was restricted or in the absence of electricity were deficient in many respects, and these deficiencies by PG&E and SCE jeopardized the safety of customers.

69.   In 2019, SCE's plans to communicate with customers in the absence of electricity or when the access to electricity was restricted appeared somewhat better than PG&E's but were still marred by inconsistencies, inaccuracies, and

Case: 19-30088   Doc# 10642-2   Filed: 05/11/21   Entered: 05/11/21 16:54:33   Page
85 of 143

failure to account for backup power to enable telecommunications in more remote rural areas.

70. SDG&E used a comprehensive strategy for communicating with customers during the power shutoffs in 2019 in the absence of electricity or when the access to electricity was restricted.

71. Operational coordination by utilities with public safety partners in preparation for wildfire season is fundamental to whether utilities succeed in mitigating the impact of power shutoffs on customers.

72. Utilities must continue to explore and innovate methods to continuously mitigate the impact of power shutoffs on customers.

73. Public safety partners are a critical link between the customer and the utilities to facilitate the transfer of information and the mitigation of harm regarding PSPS events.

74. In 2019, PG&E did not have adequate systems in place to ensure operational coordination with public safety partners.

75. In 2019, SCE did not have adequate systems in place to ensure operational coordination with public safety partners but performed better than PG&E.

76. Neither the SED Report or parties raise issues regarding SDG&E's compliance with the guideline to facilitate, upon request, operational coordination with public safety partners and provide consistent comprehensive reporting on this topic.

77. Improved operational coordination by PG&E and SCE will result from additional  initiatives regarding operational coordination with public safety partners similar to those of SDG&E, as detailed in its opening comments, including:  (1) develop a secure transfer for GIS files for public safety partners; (2) provide, upon request, relevant GIS data, including identification of critical

Case: 19-30088   Doc# 10642-2   Filed: 05/11/21   Entered: 05/11/21 16:54:33   Page 86 of 143

facilities, circuits, and number of Medical Baseline customers, to public safety partners in advance of wildfire season; (3) provide and make available information and situational awareness about de-energization in multiple ways to the community, share a document with public safety partners on PSPS policies and procedures, including considerations taken into account prior to a shutoff, the de-energization process, and the utility's notification process to customers, non-customers and other critical stakeholders; (4) provide resources to the community and public safety partners, including the availability and location of Community Resources Centers; (5) address the difference between an unplanned outage and an outage related to a de-energization; (6) develop on the utility's website a dedicated PSPS section, to which the public along with public safety partners are driven to as part of the utility's public education; (7) provide a secure data transfer of the de-energization boundaries to share real-time data with public safety partners; (8) encourage public safety partners to use the utility's dedicated de-energization webpage to obtain education and outreach provided prior to fire season, up-to-date information during a de-energization, including a depiction of the boundary of the de-energization event on the utility's website homepage and dedicated de-energization page; and (9) share on the utility's website and in relevant communications a 24-hour means of contact that customers and public safety partners may use to ask questions and/or seek information.

78.  The possibility of concurrent emergencies, e.g., a fire during a pro-active de-energization, is real.

79.  Pursuant to Pub. Util. Code § 451, utilities must be prepared to act, possibly even re-energizing, to protect public safety in the event of concurrent emergencies.

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page
87 of 143

80.   In 2019, the utilities underperformed in planning with public safety partners for concurrent emergencies.

81.   In 2019, the utilities should have planned for the possibility that other emergencies, beyond just fires, could have placed customers at risk of serious harm due to, among other things, the lack of communications.

82.   More specific directives are needed to require utilities to work with one type of public safety partner, fire agencies.

83.   In 2019, the PSPS Guidelines required utilities, in advance of wildfire season, to engage in outreach to assess the needs of critical facilities and infrastructure for backup generation and, if necessary, provide needed backup generation.  This directive has since been modified.

84.   The utilities, going forward, should provide more information to the Commission on their provision of backup power, generally, in a report, such as an annual report, filed with the Commission.  The utilities must also provide information on mobile backup power in an annual report.  Information of any specific backup power provided immediately before or during a PSPS event (mobile or otherwise), must be addressed in the 10-day post-event reports.

85.   The utilities should each clarify their understanding in an annual report of the precise responsibilities of the utilities versus critical facilities and infrastructure to reach the Commission's goal of ensuring that backup power needs of critical facilities and infrastructure during proactive de-energizations are met in advance of power shutoffs.

86.   SDG&E's approach to overall communications efforts with public safety partners as an open continuous dialogue to facilitate a partnership of working together to ensure the goal of safety during a proactive de-energization is consistent with the goals of the Commission.

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page
88 of 143

87.  SCE did not conduct communication exercises in 2019 with public safety partners.

88.  In 2019, PG&E's efforts to conduct communication exercises with public safety partners, by its own descriptions, were insufficient.

89.  In 2019, PG&E and SCE did not perform adequately in updating contact information or conducting communication exercises with public safety partners. PG&E and SCE offered no justifications for this failure and none exist.

90.  Updated contact lists for public safety partners and conducting communication exercises with these customers in advance of wildfire season is fundamental to promoting safety during a PSPS event.

91.  In advance of the 2019 wildfire season, PG&E and SCE failed to reasonably comply with the PSPS Guideline to update contact lists for public safety partners and conduct communication exercises with public safety partners, and, in failing to reasonably comply with this guideline, PG&E and SCE failed to comply with the directive to promote safety in Pub. Util. Code § 451.

92.  Taken as a whole, the extent of the deficiencies or complete absence of information provided by the utilities in response to some of the reporting requirements in the 10-day post-event reports, together with the difficulties experienced by parties and SED seeking to review these post-event reports, reinforces the need for the utilities to use a standardized template as a basis for organizing and gauging the appropriate level of detail required by in the 10-day post-event reports.

93.  In 2019, PG&E, SCE, and SDG&E timely submitted the 10-day post-event reports.  While the SED Report finds PG&E submitted some reports late, PG&E complied with the deadline based on counting business days, excluding days the Commission was closed.

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page 89 of 143

94.   Certain clarifications are warranted to the guideline pertaining to the submission of post-event reports to enhance the utilities' reporting on PSPS events in the future.

95.   The Commission must have accurate information to verify that the utilities provided their 10-day post-event reports to all affected public safety partners on a timely basis so that public safety partners have the opportunity to offer comments on the reports to the Commission.

96.   The SED Report reviews the number of complaints received by PG&E in response to the 2019 PSPS events and finds it surprising that the number of complaints reported by PG&E is relatively low, especially due to the widespread impact of PG&E's 2019 PSPS events.

97.   PG&E explained that it only reports certain types of complaints by customers, stating "[a]ny customer issue where a customer contacts another line of business or our customer service Contact Center Operations is an 'inquiry' [not a complaint]." Similarly, SCE and SDG&E only reported a certain type of complaints.

98.   In reviewing the utilities' compliance with the Resolution ESRB-8 reporting requirements, the utilities in 2019 may have under-reported complaints received pertaining to their PSPS events.

99.   A number of parties raised possible inconsistency between the actual problems experienced by customers during the 2019 PSPS events and the relatively small number of complaints reported.

100.   The utilities failed to reasonably explain in the 2019 post-event reports how sectionalization was considered and how it was used to limit the scope of the power shutoff.

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page
90 of 143

101.  In the 2019 10-day post-event reports, PG&E, SCE, and SDG&E failed to adequately explain each utility's own timeline for power restoration and steps taken to restore power.

102.  The utilities did not show a serious effort, in their 2019 10-day post-event reports, to collect information, such as lessons learned, to minimize the future impact of PSPS events on customers.

**Conclusions of Law**

1.  The California Constitution and the Public Utilities Code provide the Commission with broad jurisdiction to adopt and enforce regulations regarding the safety of utility facilities and operations.

2.  Utilities are required by Pub. Util. Code § 702 to "obey and comply" with such requirements.

3.  The Commission has broad authority to implement safety requirements for utilities under Pub. Util. Code § 451.

4.  Well-established precedent confirms that the obligation of utilities to promote safety under Pub. Util. Code § 451 is absolute and is a longstanding requirement since and before its enactment in 1951.

5.  Pursuant to this stated authority, the Commission reviews the use by PG&E, SCE, and SDG&E of proactive power shutoffs in late 2019 as a wildfire mitigation measure to protect public safety.

6.  The standard of review for this proceeding, which includes the safety of utility practices, is that which would put a *reasonable person on notice* is sufficient to put a utility on notice of a violation of Pub. Util. Code § 451. The question is whether, based on the notice provided, reasonable persons would know that their conduct is at risk.

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page 91 of 143

7.  A utility can be found to have knowingly violated the broad safety obligations of Pub. Util. Code § 451 without a specific statute, rule, or order barring the conduct.

8.  A utility must show that its actions, practices, methods, and decisions show reasonable judgment in light of what it knew or should have known at the time, and in the interest of achieving safety.  The burden of demonstrating that its decision to shut off power is necessary to protect public safety and other reasonableness factors shall apply to all electric IOUs.

9.  The utilities' arguments they were caught off guard in 2019, did not understand the extent of the possible public harm in 2019, or had inadequate time to better prepare for the events of 2019, are wholly unconvincing based on the overarching obligation of the utilities to promote safety under § 451 of the Pub. Util. Code.

10.  To uphold the utility obligation to promote safety under § 451 of the Pub. Util. Code and comply with the PSPS Guidelines, the utilities need to identify, evaluate, weigh, and report the potential for harm to their customers resulting from a proactive de-energization.

11.  In 2019, PG&E, SCE, and SDG&E failed to reasonably comply with the requirement in the 2019 PSPS Guidelines to identify, evaluate, and weigh the potential for harm to their customers resulting from a proactive de-energization.

12.  In failing to reasonably comply with the requirement to identify, evaluate, and weigh the potential for harm to their customers resulting from a proactive de-energization, PG&E, SCE, and SDG&E failed to comply with the obligation in Pub. Util. Code § 451 to promote safety of customers.

Case: 19-30088     Doc# 10642-2     Filed: 05/11/21     Entered: 05/11/21 16:54:33     Page
92 of 143

13.  In 2019, PG&E, SCE, and SDG&E failed to comply with the 10-day post-event reporting requirement in the PSPS Guidelines pertaining to potential for harm to their customers resulting from a proactive de-energization.

14.  It is reasonable to require PG&E, SCE, and SDG&E to provide significantly more information and analysis in 10-day post-event reports in the future on the risks and harms from a PSPS events.

15.  Because the utilities' failures in 2019 to reasonably identify, evaluate, weigh, and report public risks were grossly deficient and even non-existent, a monetary remedy is appropriate.

16.  In striking a balance between the need in 2019 for utilities to initiate PSPS events in response to evolving, dangerous conditions against the equally compelling need to conduct PSPS events in a safe manner, rather than adopt penalties, it is reasonable to adopt an ongoing incentive for utilities to improve their conduct related to their decision-making process leading up to initiating future PSPS events and to only use power shutoffs as a mitigation measure of last resort.

17.  In 2019, PG&E, SCE, and SDG&E failed to reasonably comply with the directive to include in their 10-day post-event reports the "last resort" analysis and alternatives considered.

18.  In the absence of sufficient information in these 2019 reports to show otherwise, PG&E, SCE, and SDG&E failed to reasonably comply with the requirement to perform "last resort" analysis or consider alternatives and, as a result, failed to comply with the directive in Pub. Util. Code § 451 to promote the safety of customers.

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page
93 of 143

19.  The guidelines adopted by the Commission in D.12-04-024, Resolution ESRB-8, and D.19-05-042 set forth the Commission's expectations of the utilities for the timing and content of notice before, during, and after a PSPS event.

20.  The content and the timing of the notice provided by PG&E and SCE in 2019 often failed to reasonably comply with the notice guidelines in D.12-04-024, Resolution ESRB-8, and D.19-05-042 and, as a result, PG&E and SCE failed to comply with Pub. Util. Code § 451.

21.  While SDG&E's provision of notice would benefit from certain improvements, overall, SDG&E reasonably complied with the 2019 PSPS Guidelines and Pub. Util. Code § 451.

22.  The term "adjacent jurisdictions," as used in the guidelines in D.19-05-042, Appendix A at A7, is clarified to direct utilities to provide priority notification to all adjacent jurisdictions because these jurisdictions are often called upon to assist neighboring jurisdictions during a de-energization and, therefore, should be promptly alerted to the circumstances surrounding a power shutoff nearby.

23.  Resolution L-598 (December 9, 2019) should be modified to include cities.  The *Order* of Resolution L-598 is modified as noted below:

> "The electric investor-owned utilities are authorized to share Medical Baseline information with county, city, and tribal government emergency response personnel, upon the county, city, or tribal government's request, when a PSPS protocol is initiated." (Resolution L-598 (December 9, 2019), Order 4 at 6.)

> "The electric investor-owned utilities are authorized to share with county, city, or tribal governments, upon the county, city, or tribal government's request, the addresses within their jurisdiction that are or will be impacted by planned or announced PSPS events." (Resolution L-598 (December 9, 2019), Order 4 at 6.)

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page 94 of 143

"The address data is to be shared solely for the purpose of allowing a county, city, or tribal government to identify with particularity the areas and addresses within the scope of a PSPS event and shall not be shared or used for any other purpose." (Resolution L-598 (December 9, 2019), Order 4 at 6.)

24.  Utilities should take steps to organize and present the data for analysis of compliance with notice guidelines in a more organized and accessible manner.

25.  The argument that the utilities lacked time to prepare for the 2019 PSPS events is unpersuasive. The Commission began addressing the potential for proactive power shutoffs over a decade ago and lack of time to prepare is simply not a convincing excuse for noncompliance.

26.  In 2019, PG&E and SCE failed to reasonably comply with the directive to establish an accessible website homepage and a dedicated page for PSPS and include, among other things, up-to-date maps for the affected areas.

27.  In failing to reasonably comply with the directive to establish an accessible website homepage and a dedicated page for PSPS and include, among other things, up-to-date maps for the affected areas, PG&E and SCE failed to comply with the obligation in Pub. Util. Code § 451 to promote safety of customers.

28.  SDG&E reasonably complied with the directive regarding PSPS websites and maps of affected areas.

29.  SDG&E's conduct reasonably complies with the PSPS Guidelines and Pub. Util. Code § 451 to provide consistent, accurate, relevant, and timely information to public safety partners before, during, and after a de-energization.

30.  PG&E and SCE failed to reasonably comply with the directive that utilities must provide consistent, accurate, relevant, and timely information to public safety partners before, during, and after a pro-active de-energization in

Case: 19-30088   Doc# 10642-2   Filed: 05/11/21   Entered: 05/11/21 16:54:33   Page 95 of 143

2019 and, in failing to reasonably comply with this directive, PG&E and SCE failed to comply with the obligation to promote safety in Pub. Util. Code § 451.

31.  In 2019, PG&E, SCE, and SDG&E failed to reasonably comply with this directive to collaborate on best practices and, in failing to reasonably collaborate on best practices, failed to comply with the obligation to promote safety in Pub. Util. Code § 451.

32.  In 2019, PG&E and SCE failed to reasonably comply with the directive to seamlessly communicate with emergency responders and local governments and, in failing to seamlessly communicate, failed to comply with the obligation to promote safety in Pub. Util. Code § 451.

33.  In 2019, SDG&E reasonably complied with the directive to establish seamless communications with emergency responders and local governments.

34.  The integration of the SEMS framework and PSPS should be mandatory, comprehensive, and accomplished expeditiously.

35.  In 2019, PG&E failed to reasonably comply with the guideline to accurately provide and timely exchange geospatial information for a number of reasons, including the insufficient level of detail in its shared geospatial information, the inaccuracies in the information it provided, and its problems with the secure web portal for public safety partners.

36.  In 2019, SCE failed to reasonably comply with the guideline to accurately provide and timely exchange geospatial information by not effectively communicating the availability of its geospatial data to public safety partners.

37.  In failing to accurately provide and timely exchange geospatial information with public safety partners in 2019, PG&E and SCE also failed to comply with the obligation to promote safety in Pub. Util. Code § 451.

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page
96 of 143

38.  In 2019, SDG&E reasonably complied with the guideline to accurately provide and timely exchange geospatial information with public safety partners.

39.  In 2019, PG&E and SCE failed to reasonably comply with the guideline to invite water and telecommunications infrastructure providers to the utility's emergency operations center or agree to another means to communicate regarding PSPS events, and in failing to reasonably comply with this guideline, failed to comply with the utility obligation to promote safety in Pub. Util. Code § 451.

40.  In 2019, SDG&E reasonably complied with the guideline to invite water and telecommunications infrastructure providers to the utility's emergency operations center or agree to another means to communicate.

41.  In 2019, PG&E failed to reasonably comply with the guideline to embed liaisons at the emergency operations center of the local or state jurisdiction, upon request, and to rely on these embedded liaisons to facilitate the timely and accurate exchange of information during a PSPS event for that jurisdiction, and, in failing to facilitate the exchange of timely and accurate information via embedded utility liaisons, PG&E also failed to comply with the obligation in Pub. Util. Code § 451 to promote safety.

42.  In 2019, SDG&E and SCE reasonably complied with the guideline to embed liaisons at the emergency operations center of the local or state jurisdiction, upon request, and to rely on these embedded liaisons to facilitate the timely and accurate exchange of information during a PSPS event to that jurisdiction.

43.  To the extent parties raised issues pertaining to the SCE liaisons' failures in 2019 to transfer information between liaisons at shift changes, further improvement in this area is needed.

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page 97 of 143

44.  PG&E failed to reasonably comply with the directive in 2019 to embed liaisons at the emergency operations center of the local or state jurisdiction, upon request, and to rely on these embedded liaisons to facilitate the timely and accurate exchange of information during a PSPS event to that jurisdiction but all three utilities would benefit from further refinement of the use of their embedded utility liaisons in their de-energization protocols.

45.  In 2019, PG&E and SCE failed to reasonably comply with the directives to identify, coordinate with, and provide priority notification to public safety partners, and, in failing to identify, coordinate with, and provide priority notification to public safety partners, PG&E and SCE also failed to comply with the obligation in Pub. Util. Code § 451 to promote safety.

46.  In 2019, SDG&E reasonably complied with the guideline to identify, coordinate with, and provide priority notification to public safety partners.

47.  All three utilities should demonstrate improvement in the area of identifying, coordinating with, and providing priority notification to public safety partners.

48.  PG&E and SCE failed to reasonably comply with the directive in 2019 to compile lists of critical facilities and infrastructure, and in doing so, failed to comply with the obligation to promote safety in Pub. Util. Code § 451.

49.  In 2019, SDG&E reasonably complied with the directive to identify critical facilities and infrastructure.

50.  In 2019, PG&E, SCE, and SDG&E failed to reasonably comply with the directive to establish primary and secondary 24-hour contacts at critical facilities and infrastructure, and in doing so, failed to comply with the obligation to promote safety in Pub. Util. Code § 451.

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page 98 of 143

51.  SCE and SDG&E in 2019 reasonably complied with the directive to update contact information for Medical Baseline customers and provide these customers with an opportunity to select an alternative means of contact for PSPS events.

52.  In 2019, PG&E failed to reasonably comply with the directive to update contact information for Medical Baseline customers and provide these customers with an opportunity to select an alternative means of contact for PSPS events and, as a result, failed to comply with its obligation to promote safety under Pub. Util. Code § 451.

53.  In 2019, PG&E and SCE failed to reasonably comply with the directive to work with local jurisdictions to develop a communication strategy for all, including visitors, in the event of a PSPS and, as a result, failed to comply with the utility obligation to promote safety in Pub. Util. Code § 451.

54.  In 2019, SDG&E reasonably complied with the directive to work with local jurisdictions to develop a communication strategy for all, including visitors, in the event of a PSPS.

55.  In 2019, PG&E and SCE failed to reasonably comply with the directive to develop notification and communication protocols and systems in the absence of electricity for PSPS events, and, as a result, failed to comply with their obligation to promote safety set forth in Pub. Util. Code § 451.

56.  In 2019, SDG&E reasonably complied with the directive to develop notification and communication protocols and systems in the absence of electricity for PSPS events.

57.  In 2019, PG&E, SCE, and SDG&E failed to reasonably comply with the directive that required utilities to consider geographic and cultural demographics in developing a notification strategy in advance of the 2019 fire

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page
99 of 143

season for affected areas and, in failing to consider these factors, failed to comply with the utility obligation to promote safety set forth in Pub. Util. Code § 451.

58.  In 2019, PG&E and SCE failed to reasonably comply with the directive to develop a communications strategy to use during a power shutoff when communications may be restricted due to the lack or complete absence of electricity and, as a result, we find PG&E and SCE failed to comply with the utility obligation to promote safety in Pub. Util. Code § 451.

59.  SDG&E acted reasonably with respect to the directive to develop a communications strategy during a power shutoff when communications may be restricted due to the lack of electricity.

60.  In 2019, PG&E and SCE failed to reasonably comply with the directive to, upon request, provide operational coordination with public safety partners and, in failing to reasonably comply with this directive, PG&E and SCE failed to comply with the utility obligation to promote safety in Pub. Util. Code § 451.

61.  SDG&E reasonably complied with the directive to, upon request, provide operational coordination with public safety partners.

62.  In 2019, PG&E, SCE, and SDG&E failed to reasonably comply with the directive to work with public safety partners to plan for the possibility of concurrent emergencies, and as a result of this failure, PG&E, SCE, and SDG&E failed to comply with the utility obligation to promote safety in Pub. Util. Code § 451.

63.  PG&E and SCE failed to reasonably comply with the directive in 2019, which required utilities, in advance of wildfire season, to engage in outreach to assess the needs of critical facilities and infrastructure for backup generation and, if necessary, provide needed backup generation, and, in doing so, PG&E and

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page
100 of 143

SCE failed to comply with the utility obligation to promote safety in Pub. Util. Code § 451.

64.  In 2019, SDG&E reasonably complied with the directive that required utilities, in advance of wildfire season, to engage in outreach to assess the needs of critical facilities and infrastructure for backup generation and, if necessary, provide needed backup generation.

65.  In 2019, PG&E and SCE failed to reasonably comply with the directive to update contact lists for public safety partners and conduct communication exercises with public safety partners and, in doing so, PG&E and SCE failed to comply with the utility obligation to promote safety in Pub. Util. Code § 451.

66.  In 2019, SDG&E reasonably complied with the directive to update contact lists for public safety partners and conduct communication exercises with public safety partners.

67.  PG&E and SCE should take immediate steps to improve performance in two critical areas, updating contact lists for public safety partners and conducting communication exercises with public safety partners, consistent with, at a minimum, SDG&E's program.

68.  To expedite the development of a standardized template for the 10-day post-event reports and adopt a more straightforward process for public input, the utilities should immediately initiate efforts to assist SED in developing a standardized template. The process for public input set forth in D.19-05-042 (the Tier 3 advice letter process) is modified and instead SED should issue, within 30 days of the effective date of this decision, a proposed template in R.18-12-005 for consideration and comments by parties.

69.  SED should establish a single webpage on the Commission's website to function as a central repository for all of the Commission's undertakings

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page
101 of 143

regarding the proactive power shutoffs, including 10-day post-event reports, comments to these reports, and the final documents related to SED's review of 10-day post-event reports so that stakeholders, including the general public, can easily access the different aspects of the Commission's review process of proactive power shutoff and identify the division within the Commission undertaking a particular aspect of the review process and the subject matter of the review.

70.  In the future, utilities should submit the 10-day post-event reports to the Director of SED via email.

71.  In the future, a utility should request an extension of time to submit a 10-day post-event report under Rule 16.6 of the Commission's Rules of Practice and Procedure. in compliance with the Commission's Rules of Practice and Procedure and concurrently serve this request via email on the Commission's SED Director

72.  To ensure the Commission is accurately apprised of the details of service of 10-day post-event reports, the PSPS Guidelines should be modified to require PG&E, SCE, and SDG&E to file these reports with the Commission in R.18-12-005 or a successor proceeding (in addition to submitting the Director of SED).

73.  The PSPS Guidelines should be modified to require parties to file (rather than submit to SED) comments to the 10-day post-event reports in R.18-12-005 or a successor proceeding to further enhance the transparency of SED's review of the 10-day post-event reports.

74.  Going forward, the word "complaints" as used in the 10-day post-event reporting requirement set forth in Resolution ESRB-8, means an "expression of

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page
102 of 143

grief, pain, or dissatisfaction," which is the common meaning of the word found in *Merriam-Webster.*

75. Utilities should report any formal filings, such as court claims, Commission complaints, and any informal complaints, such as informal Commission complaints and complaints to any division of the utility, in the 10-day post-event report.

76. Utilities should establish an internal tracking process for these complaints so that SED is able to access these data and confirm the utilities are accurately presenting the number of complaints received regarding PSPS events. The utilities should collaborate with SED and incorporate SED's input to ensure the tracking system is consistent with SED's expectations.

77. Additional clarifications to our existing guidelines (previously set forth in Resolution ESRB-8) for the 10-day post-event reports are warranted.

78. The utilities should provide additional information regarding the number of customers affected by the power shut off in their future 10-day post-event reports. To the extent a utility needs additional guidance on the type or amount of information required to be provided in response to this reporting requirement, the utility should seek guidance from SED.

79. The utilities should improve their explanation in the post-event reports of how sectionalization was considered and how each utility used sectionalization to limit the scope of the power shutoff.

80. PG&E, SCE, and SDG&E should respond to all aspect of the 10-day post-event reports, including the utility's timeline for power restoration and steps taken to restore power.

81. The utilities should contact SED if more guidance on the required information in the 10-day post-event reports is needed.

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page
103 of 143

82.  In 2019, PG&E, SCE, and SDG&E failed to reasonably comply with the reporting requirements for lessons learned applicable to the 10-day post-event reports.

# O R D E R

**IT IS ORDERED** that:

1.  Pacific Gas and Electric Company (PG&E), Southern California Edison Company (SCE), and San Diego Gas & Electric Company (SDG&E) must forgo collection in rates from customers of all authorized revenue requirement equal to unrealized volumetric sales resulting from Public Safety Power Shutoff (PSPS) events. Additionally, PG&E, SCE, and SDG&E must (1) report the total amount of unrealized volumetric sales and unrealized revenue resulting from PSPS events in the Energy Resource Recovery Account (ERRA) compliance proceedings addressing the years in which the PSPS events occurred, and (2) detail the method of calculating the total amounts of unrealized sales and unrealized revenue and report these amounts in an annual report, with the details of this annual report, including the filing date, to be addressed by the Commission in Rulemaking 18-12-005. The ERRA proceedings may be the appropriate forum to consider details regarding this directive, such as whether this rate disallowance should be increased to reflect sales, if any, of excess power due to a proactive power shutoff and whether a different methodology or standard methodology should be used by the utilities in calculating this disallowance. This order remains in effect until the utility demonstrates improvements in identifying, evaluating, weighing, and reporting public harm when determining whether to initiate a PSPS event.

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page 104 of 143

2.  Pacific Gas and Electric Company (PG&E), Southern California Edison Company (SCE), and San Diego Gas & Electric Company (SDG&E) must identify and quantify customer, resident, and the general public risks and harms from a proactive de-energization and clearly explain in the 10-day post-event reports their risk models and risk assessment processes, and provide further documentation on how the power disruptions to customers, residents, and the general public is weighed against the benefits of a proactive de-energization. PG&E, SCE, and SDG&E must each also explain, in detail, the threshold established for initiating a Public Safety Power Shutoff event in the 10-day post-event reports.

3.  Pacific Gas and Electric Company, Southern California Edison Company, and San Diego Gas & Electric Company must immediately implement a collaborative effort, to be referred to as the Joint Utility Public Safety Power Shutoff Working Group, which includes, at a minimum, a monthly joint utility meeting to share all lessons learned and best practices pertaining to the use of proactive de-energizations as a last resort mitigation measure, alternatives considered, and a robust reporting format to fully inform and assure the public and the Commission that these matters were adequately considered prior to proactively shutting off power.

4.  Pacific Gas and Electric Company (PG&E), Southern California Edison Company (SCE), and San Diego Gas & Electric Company (SDG&E) must memorialize each meeting of the Joint Utility Public Safety Power Shutoff Working Group in a joint report that includes, at a minimum, the date/time, attendees, topics discussed, and action items for each utility.  PG&E, SCE, and SDG&E must jointly file and serve these reports on or before 14 days after the date of the meeting in Rulemaking 18-12-005 or a successor proceeding. Reports

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page
105 of 143

may be designated as confidential to the extent permitted by law.  The Commission's Safety and Enforcement Division is authorized to require additional topics or further details be included in this report and revised reports shall be filed and served as directed herein. The Safety and Enforcement Division is authorized to establish a filing date of any revised reports..

5.  Pacific Gas and Electric Company, Southern California Edison Company and San Diego Gas & Electric Company must include separate sections in the 10-day post-event reports on the following topics required by Decision 19-05-042: (1) how the utility used proactive de-energization as a last resort mitigation measure, (2) the alternatives considered, and (3) the mitigation measures employed.

6.  Pacific Gas and Electric Company, Southern California Edison Company, and San Diego Gas & Electric Company must immediately initiate efforts to assist the Commission's Safety and Enforcement Division in developing a standardized 10-day post-event reporting template for indicating compliance with all the Public Safety Power Shutoff guidelines pertaining to notice and, in addition, ensure, in consultation with Safety and Enforcement Division, that any format used to report compliance with all notice guidelines is readily accessible for analysis by the Safety and Enforcement Division.

7.  Pacific Gas and Electric Company (PG&E), Southern California Edison Company (SCE), and San Diego Gas & Electric Company (SDG&E) must at the Joint Utility Public Safety Power Shutoff (PSPS) Working Group share all best practices and lessons learned relevant to development of a consistent format for reporting, in the 10-day post-event report, compliance with all the notice guidelines (both mandatory and discretionary) set forth in the PSPS Guidelines and any other applicable laws, rules, and regulations.  PG&E, SCE, and SDG&E

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page
106 of 143

must each provide information on the following notice topics, at a minimum, in the 10-day post-event reports:  (1) the time the utility activated its Emergency Operations Center, the time the utility determined it was likely to de-energize, and the time the utility notified public safety partners; (2) whether public safety partners/priority notification entities received notice 48-72 hours in advance of anticipated de-energization; (3) whether all other affected customers/populations received notice 24-48 hours in advance of anticipated de-energization; (4) whether all affected customers/populations received notice 1-4 hours in advance of anticipated de-energization; (5) whether all affected customers/populations received notice when the de-energization was initiated; (6) whether all affected customers/populations received notice immediately before re-energization begins; and (7) whether all affected customers/populations received notice when re-energization was complete. In a report, as designated by the Commission's Safety and Enforcement Division, each utility shall respond to any failure to provide notice consistent with the guidelines with an explanation of what caused these failures and how the utility will correct those failures.

8.  Pacific Gas and Electric Company, Southern California Edison Company, and San Diego Gas & Electric Company must file and serve an annual report in Rulemaking (R.) 18-12-005 or a successor proceeding, which shall identify, among other things, the dates/times when the Joint Utility Public Safety Power Shutoff Working Group convened and the webpage links to all meeting reports filed with the Commission. The details of the annual report, including the date to be filed, will be determined in R.18-12-005.

9.  Pacific Gas and Electric Company, Southern California Edison Company, and San Diego Gas & Electric Company must provide priority notification to all

Case: 19-30088   Doc# 10642-2   Filed: 05/11/21   Entered: 05/11/21 16:54:33   Page
107 of 143

adjacent jurisdictions, and, accordingly, Decision 19-05-012 (the first sentence of Appendix A at A7) is modified, as follows: "Consistent with the principles of the State Emergency Management System, whenever possible, priority notification should occur to the following entities, at a minimum: public safety partners, as defined herein, and adjacent ~~local~~ jurisdictions that may lose power as a result of de-energization or may be called upon to assist a de-energized area."

10.  Pacific Gas and Electric Company, Southern California Edison Company, and San Diego Gas & Electric Company are authorized to share Medical Baseline information with county, city, and tribal government emergency response personnel, upon the county, city, or tribal government's request, when a Public Safety Power Shutoff protocol is initiated.

11.  Pacific Gas and Electric Company, Southern California Edison Company, and San Diego Gas & Electric Company are authorized to share with county, city, or tribal governments, upon the county, city, or tribal government's request, the addresses within their jurisdiction that are or will be impacted by planned or announced Public Safety Power Shutoff events.

12.  Pacific Gas and Electric Company, Southern California Edison Company, and San Diego Gas & Electric Company must prepare, in consultation with parties to this proceeding, a joint utility recommendation for clarifying the entities required to receive notifications 48-72 hours in advance of the de-energization and file the recommendation as a motion in Rulemaking 18-12-005.

13.  Pacific Gas and Electric Company, Southern California Edison Company, and San Diego Gas & Electric Company at the Joint Utility Public Safety Power Shutoff (PSPS) Working Group must share all aspects of their PSPS webpages with the goal of collaborating on best practices to develop and deploy webpages before, during, and after a proactive de-energization.

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page
108 of 143

14.  Pacific Gas and Electric Company, Southern California Edison Company and San Diego Gas & Electric Company must at the Joint Utility Public Safety Power Shutoff Working Group share all lessons learned and best practices pertaining to all aspects of their communications practices with public safety partners, including all technology and all notifications, with the goal of collaborating on best practices for communication with public safety partners before, during, and after a proactive de-energization.

15.  Pacific Gas and Electric Company (PG&E) and Southern California Edison Company (SCE) must immediately develop and implement improvements to their communications protocol with all emergency responders and local governments so communication before, during, and after a de-energization is seamless.

16.  Pacific Gas and Electric Company, Southern California Edison Company, and San Diego Gas & Electric Company must expeditiously (1) integrate, to the fullest extent possible, all aspects of the Standardized Emergency Management System (SEMS) framework into their pro-active de-energization protocols and (2) provide training under the SEMS framework, to the fullest extent possible, to all Public Safety Power Shutoff personnel.

17.  Pacific Gas and Electric Company, Southern California Edison Company, and San Diego Gas & Electric Company must at the Joint Utility Public Safety Power Shutoff Working Group share all lessons learned and best practices pertaining to all aspects of their communications practices with emergency responders and local governments, including all technology and all notifications, to achieve the Commission's goal of ensuring the public receives timely notice of proactive de-energizations.

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page
109 of 143

18.  Pacific Gas and Electric Company and Southern California Edison Company must immediately develop and implement improvements to their protocols to enable the accurate provision to and timely exchange of geospatial information with public safety partners in preparation for an imminent Public Safety Power Shutoff (PSPS) event and during a PSPS event.

19.  Pacific Gas and Electric Company, Southern California Edison Company, and San Diego Gas & Electric Company must include a statement in the 10-day post-event reports verifying the availability to public safety partners of (1) accurate and timely geospatial information and (2) real time updates to the Geographic Information System shapefiles in preparation for an imminent Public Safety Power Shutoff (PSPS) event and during a PSPS event.

20.  Pacific Gas and Electric Company, Southern California Edison Company, and San Diego Gas & Electric Company must at the Joint Utility Public Safety Power Shutoff (PSPS) Working Group share all lessons learned and best practices pertaining to the exchange of geospatial information with public safety partners in preparation for an imminent PSPS event and during a PSPS event.

21.  Pacific Gas and Electric Company, Southern California Edison Company, and San Diego Gas & Electric Company must include in the 10-day post-event reports the names of all entities invited to the utility's emergency operations centers for a Public Safety Power Shutoff event, the method used to make this invitation, and whether a different form of communication was preferred by any entity invited to the utility's emergency operations center.

22.  Pacific Gas and Electric Company, Southern California Edison Company, and San Diego Gas & Electric Company must file and serve an annual report, with the details of this annual report to be determined in Rulemaking 18-

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page
110 of 143

12-005.  This annual report must include the names of all critical facilities and infrastructure customers that the utility contacted to assess backup power needs and the date of that contact.

23.  Pacific Gas and Electric Company, Southern California Edison Company, and San Diego Gas & Electric Company must adopt protocols to ensure all relevant information is timely transferred when employees in the role of the embedded utility liaison change during an ongoing Public Safety Power Shutoff event, such as during an employee shift change.

24.  Pacific Gas and Electric Company (PG&E) must specifically seek and consider protocols from Southern California Edison Company and San Diego Gas & Electric Company regarding how to effectively rely on embedded utility liaisons to facilitate the timely and accurate exchange of information during a Public Safety Power Shutoff event and use any information obtained to improve PG&E's compliance with this guideline.

25.  Pacific Gas and Electric Company, Southern California Edison Company, and San Diego Gas & Electric Company must at the Joint Utility Public Safety Power Shutoff (PSPS) Working Group share all lessons learned, best practices, and existing protocols related to embedding utility liaisons, upon request, at local and state jurisdictions emergency operations centers during PSPS events.

26.  Within 120 days of the effective date of this decision, Pacific Gas and Electric Company, Southern California Edison Company, and San Diego Gas & Electric Company must post on their existing secure Public Safety Power Shutoff (PSPS) webpages lists that include, at a minimum, the following:  (1) the names, email addresses, and phone numbers of the contact persons for purposes of proactive power shutoffs for all entities included as public safety partners,

Case: 19-30088   Doc# 10642-2   Filed: 05/11/21   Entered: 05/11/21 16:54:33   Page 111 of 143

including first/emergency responders at the local, state and federal level, water, wastewater and communication service providers, community choice aggregators and publicly-owned utilities/electrical cooperatives, the Commission, the California Governor's Office of Emergency Services and the California Department of Forestry and Fire Protection; and (2) the names, email addresses, and phone numbers of persons responsible for maintaining and updating this list for the utility so public safety partners can easily provide the appropriate utility with updated contact information. All relevant stakeholders with access to these secure websites should review the list on the utilities' existing secure PSPS webpages to verify that all public safety partners and the designated contact persons are correctly listed and, if errors or omission exist, contact the utility.  These lists may be designated as confidential, to the extent permitted by law but, in an effort to improve communications between public safety partners and the utilities, the Commission's intention is for public safety partners and the utilities to be able to view all the information on this list.  The utilities must revise these lists immediately upon receipt of updated information from public safety partners.

27.  Pacific Gas and Electric Company, Southern California Edison Company, and San Diego Gas & Electric Company must at the Joint Utility Public Safety Power Shutoff (PSPS) Working Group share all lessons learned and all best practices pertaining to all aspects of developing and maintaining updated lists of public safety partners on secure PSPS websites.

28.  Pacific Gas and Electric Company, Southern California Edison Company, and San Diego Gas & Electric Company must file and serve an annual report in Rulemaking (R.) 18-12-005 or a successor proceeding, which must identify, among other things, the status of the lists of public safety partners,

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page
112 of 143

including the last date updated, on their Public Safety Power Shutoff webpages. Further details of this annual report, including the date to be filed, will be determined in R.18-12-005.

29.  Within 120 days of the effective date of this decision, Pacific Gas and Electric Company, Southern California Edison Company, and San Diego Gas & Electric Company must post on their existing secure Public Safety Power Shutoff (PSPS) webpages, lists that include, at a minimum, the following:  (1) the names, email addresses, and phone numbers of the contact persons for purposes of proactive power shutoffs for all entities included as critical facilities and infrastructure customers; and (2) the names, email addresses, and phone numbers of persons responsible for maintaining and updating this list for the utility so critical facilities and infrastructure customers can easily provide the appropriate utility with updated contact information. All relevant stakeholders should review the lists on the utilities' secure PSPS webpages to verify that all critical facilities and infrastructure customers and the designated contact persons are correctly listed and, if errors or omission exist, contact the utility.  These lists may be designated as confidential, to the extent permitted by law. The utilities must revise these lists immediately upon receipt of updated information from critical facilities and infrastructure.

30.  Pacific Gas and Electric Company, Southern California Edison Company, and San Diego Gas & Electric Company must at the Joint Utility Public Safety Power Shutoff (PSPS) Working Group share all lessons learned and all best practices pertaining to all aspects of developing and maintaining updated lists of critical facilities and infrastructure customers on secure PSPS websites.

31.  Pacific Gas and Electric Company, Southern California Edison Company, and San Diego Gas & Electric Company must file and serve an annual

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page
113 of 143

report in Rulemaking (R.) 18-12-005 or a successor proceeding, which must identify, among other things, the status of the lists of critical facilities and infrastructure customers, including the last date updated, on their Public Safety Power Shutoff webpages.  Further details of this annual report, including the date to be filed, will be determined in R.18-12-005.

32.  Pacific Gas and Electric Company, Southern California Edison Company, and San Diego Gas & Electric Company must post on their existing secure Public Safety Power Shutoff (PSPS)webpages, within 120 days of the effective date of decision, lists that include, at a minimum, the following:  (1) the names, email addresses, and phone numbers of the 24-hour primary and secondary points of contact for purposes of proactive power shutoffs for all entities included as critical facilities and infrastructure customers; and (2) the names, email addresses, and phone numbers of persons responsible for maintaining and updating this list for the utility so critical facilities and infrastructure customers  can easily provide the appropriate utility with updated contact information. All relevant stakeholders should review the list on the utilities' existing secure PSPS webpages to verify that 24-hour primary and secondary points of contact for all critical facilities and infrastructure are correctly listed and, if errors or omission exist, to contact the utility.  These lists may be designated as confidential, to the extent permitted by law. The utilities must revise these lists immediately upon receipt of updated information from critical facilities and infrastructure customers.

33.  Pacific Gas and Electric Company, Southern California Edison Company, and San Diego Gas & Electric Company must at the Joint Utility Public Safety Power Shutoff Working Group share all lessons learned and all best practices pertaining to all aspects of developing and maintaining updated lists of

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page
114 of 143

critical facilities and infrastructure customer 24-hour primary/secondary points of contact.

34.  Pacific Gas and Electric Company, Southern California Edison Company, and San Diego Gas & Electric Company must file and serve an annual report in Rulemaking (R.) 18-12-005 or a successor proceeding, which identifies, among other things, the status of their lists, including the last date updated, of 24-hour primary and secondary points of contact for critical facilities and infrastructure customers.  Further details of this annual report, including the date to be filed, will be determined in R.18-12-005.

35.  Pacific Gas and Electric Company, Southern California Edison Company, and San Diego Gas & Electric Company must, for a minimum of five years, retain records of their efforts in advance of each wildfire season to: (1) contact Medical Baseline customers, at least annually, to update contact information; (2) seek an alternative means of contact from Medical Baseline customers for Public Safety Power Shutoff events; (3) contact all customers that use electricity for life support, at least annually, to update contact information; (4) seek an alternative means of contact from these customers for PSPS events; and (5) substantiate all efforts to work in advance of each wildfire season and during each wildfire season with local jurisdictions, in a proactive manner, to identify and communicate with all people in a de-energized area, including visitors. This documentation must be in a format readily accessible to Commission audit, as directed by the Commission's Safety and Enforcement Division.

36.  Pacific Gas and Electric Company, Southern California Edison Company, and San Diego Gas & Electric Company must at the Joint Utility Public Safety Power Shutoff (PSPS) Working Group share all lessons learned and

Case: 19-30088   Doc# 10642-2   Filed: 05/11/21   Entered: 05/11/21 16:54:33   Page
115 of 143

all best practices pertaining to developing and updating contact information and alternative means of contact regarding PSPS events for all Medical Baseline customers and customers that use electricity for life support.

37.  Pacific Gas and Electric Company, Southern California Edison Company, and San Diego Gas & Electric Company must file and serve an annual report in Rulemaking (R.) 18-12-005 or a successor proceeding, which confirms, among other things, that the utility (1) contacted its Medical Baseline customers, at least annually, to update contact information; (2) sought to obtain from Medical Baseline customers, at least annually, an alternative means of contact for Public Safety Power Shutoff (PSPS)events; (3) contacted all customers that use electricity for life support, at least annually, to update contact information; and (4) sought to obtain from these customers that use electricity for life support, at least annually, an alternative means of contact for PSPS events. Further details of the annual report, including the date to be filed, will be determined in R.18-12-005.

38.  Pacific Gas and Electric Company, Southern California Edison Company, and San Diego Gas & Electric Company must at the Joint Utility Public Safety Power Shutoff Working Group share all lessons learned and all best practices pertaining to working, in advance of each wildfire season and during each wildfire season, with local jurisdictions, in a proactive manner, to identify and communicate with all people in a de-energized area, including visitors.

39.  Pacific Gas and Electric Company, Southern California Edison Company, and San Diego Gas & Electric Company must file and serve an annual report in Rulemaking (R.) 18-12-005 or successor proceeding, which confirms, among other things, they worked, in advance of each wildfire season and during each wildfire season, with local jurisdictions, in a proactive manner, to identify

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page
116 of 143

and communicate with all people in a de-energized area, including visitors.
Further details of this annual report, including the date to be filed, will be
determined in R.18-12-005.

40.  Pacific Gas and Electric Company, Southern California Edison
Company, and San Diego Gas & Electric Company must, for a minimum of five
years, retain records to substantiate all efforts to develop notification and
communication protocols and systems to reach all customers and communication
in an understandable manner. This information must be in a format readily
accessible to Commission audit, as directed by the Commission's Safety and
Enforcement Division.

41.  Pacific Gas and Electric Company, Southern California Edison
Company,  and San Diego Gas & Electric Company must at the Joint Utility
Public Safety Power Shutoff Working Group share all lessons learned and all best
practices pertaining to developing notification and communication protocols and
systems to reach all customers and communication in an understandable
manner.

42.  Pacific Gas and Electric Company, Southern California Edison
Company, and San Diego Gas and Electric Company must file and serve an
annual report in Rulemaking (R.) 18-12-005 or successor proceeding, which
includes a detailed summary of efforts to develop, in advance of wildfire season,
notification and communication protocols and systems to reach all customers
and communicate in an understandable manner. This detailed summary must
include, at a minimum, an explanation of the actions taken by the utility to
ensure customers understand (1) the purpose of proactive de-energizations, (2)
the process relied upon by the utility for initiating a Public Safety Power Shutoff
(PSPS) event, (3) how to manage safely through a PSPS event, and (4) the impacts

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page
117 of 143

on customers if a proactive power shutoff is deployed by the utility. Further details of this annual report, including the date to be filed, will be determined in R.18-12-005.

43. Pacific Gas and Electric Company, Southern California Edison Company, and San Diego Gas & Electric Company must, for a minimum of five years, retain records to substantiate all efforts to develop notification strategy that considers, among other things, geographic and cultural demographics. (including a list of all languages used and where used and a list of all local and state public safety partners consulted) in advance of fire season. These records must be in a format readily accessible to Commission audit, as directed by the Commission's Safety and Enforcement Division.

44. Pacific Gas and Electric Company, Southern California Edison Company, and San Diego Gas & Electric Company must at the Joint Utility Public Safety Power Shutoff Working Group share all lessons learned and all best practices pertaining to developing a notification strategy that considers, among other things, geographic and cultural demographics (including all languages used and where used) in advance of fire season.

45. Pacific Gas and Electric Company, Southern California Edison Company, and San Diego Gas & Electric Company must, for a minimum of five years, retain records to substantiate all efforts to develop and implement, in advance of wildfire season, a communications strategy to rely on during a proactive de-energization when restrictions due to the power loss exist. These records must be in a format readily accessible to Commission audit, as directed by the Commission's Safety and Enforcement Division.

46. Pacific Gas and Electric Company, Southern California Edison Company, and San Diego Gas & Electric Company must at the Joint Utility

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page
118 of 143

Public Safety Power Shutoff Working Group share all lessons learned and all best practices pertaining to developing and implementing, in advance of wildfire season, a communications strategy to rely on during a proactive de-energization when restrictions due to the power loss exist.

47.  Pacific Gas and Electric Company, Southern California Edison Company, and San Diego Gas & Electric Company must file and serve an annual report in Rulemaking (R.) 18-12-005 or successor proceeding, which includes a detailed summary to substantiate all efforts to develop and implement, in advance of wildfire season, a communications strategy to rely on during a proactive de-energization when restrictions due to the power loss exist. This detailed summary must address how the utility worked in coordination with public safety partners to develop this communication strategy. Further details of this annual report, including the date to be filed, will be determined in R.18-12-005.

48.  Pacific Gas and Electric Company (PG&E), Southern California Edison Company (SCE), and San Diego Gas & Electric Company (SDG&E) must at the Joint Utility Public Safety Power Shutoff (PSPS) Working Group share all lessons learned and all best practices pertaining to operational coordination with public safety partners. The Joint Utility PSPS Working Group must also work together to share all the enumerated items noted in the decision and relied upon by SDG&E to promote operational coordination.  PG&E and SCE must incorporate these enumerated items into their de-energization protocols, to the greatest extent possible, within six months from the effective date of this decision.

49.  Pacific Gas and Electric Company, Southern California Edison Company, and San Diego Gas & Electric Company must file and serve an annual report in Rulemaking (R.) 18-12-005 or a successor proceeding, which identifies,

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page
119 of 143

among other things, all methods use to promote operational coordination with public safety partners. Further details of this annual report, including the date to be filed, will be determined in R.18-12-005.

50.  Pacific Gas and Electric Company , Southern California Edison Company, and San Diego Gas & Electric Company must, at a minimum, monthly, for 12 months after the effective date of this decision, jointly engage Joint Local Governments to better understand the needs of their members regarding operational coordination, including methods to improve transparency in operational coordination; the need of members for diligent and prompt follow-up to requests for additional information; and the specific needs, if any, of the Counties of Santa Barbara and Kern.

51.  Pacific Gas and Electric Company (PG&E), Southern California Edison Company (SCE), and San Diego Gas & Electric Company (SDG&E) must file and serve an annual report in Rulemaking 18-12-005 or successor proceeding, which identifies, among other things, the dates/times, attendees, and topics discussed and action items pertaining to each PG&E, SCE, and SDG&E monthly engagement with Joint Local Governments.

52.  Pacific Gas and Electric Company, Southern California Edison Company, and San Diego Gas & Electric Company each must, within 90 days of the effective date of this decision, engage, at a minimum six times, with (1) fire agencies located in their service territories in High Fire Risk Districts Tier 2 and 3 and work on plans to address the possibility of emergencies, including fires, arising during a proactive de-energization and (2) public safety partners (other than fire agencies) located in their service territories in High Fire Risk Districts Tier 2 and 3 to work on plans to address the possibility of emergencies arising

Case: 19-30088   Doc# 10642-2   Filed: 05/11/21   Entered: 05/11/21 16:54:33   Page
120 of 143

during a proactive de-energization. The engagements with fire agencies are separate from the engagements with other public safety partners.

53.  Pacific Gas and Electric Company, Southern California Edison Company, and San Diego Gas & Electric Company each must, within 30 days following the 90-day periods referred to above, file and serve reports in Rulemaking (R.) 18-12-005 describing the engagement with fire agencies and with all other public safety partners in their service territories in High Fire Risk Districts Tier 2 and 3, including the date/time of all meetings, attendees, topics discussed, and action items.

54.  Pacific Gas and Electric Company, Southern California Edison Company, and San Diego Gas & Electric Company must at the Joint Utility Public Safety Power Shutoff Working Group share all lessons learned and all best practices pertaining to feedback from public safety partners on how utilities can improve their response to concurrent emergencies.

55.  Pacific Gas and Electric Company, Southern California Edison Company, and San Diego Gas & Electric Company must file and serve an annual report in Rulemaking (R.) 18-12-005 or a successor proceeding, which identifies, among other things, all methods used to work with public safety partners to improve responses to concurrent emergencies.  Further details of this annual report, including the date to be filed, will be determined in R.18-12-005.

56.  Pacific Gas and Electric Company, Southern California Edison Company, and San Diego Gas & Electric Company must convey, in writing, to critical facilities and infrastructure customers whether or not the utility is responsible for providing the backup power (mobile or otherwise) before or during a de-energization to critical facilities and infrastructure and the extent of any responsibilities regarding such backup power.

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page
121 of 143

57.   Pacific Gas and Electric Company (PG&E) and Southern California Edison Company (SCE) must immediately initiate plans to develop a program similar to San Diego Gas & Electric Company's (SDG&E) program for assessing, deploying, and providing, to the extent required by law, for the needs of critical facilities and infrastructure customers for backup power during a de-energization, considering the components used by SDG&E identified in this decision. SDG&E must share its backup power program with PG&E and SCE to assist the utilities in further developing their backup power programs.

58.   Pacific Gas and Electric Company, Southern California Edison Company, and San Diego Gas & Electric Company must at the Joint Utility Public Safety Power Shutoff Working Group share all lessons learned and all best practices pertaining to all aspects of the backup power program and share all feedback from critical facilities and infrastructure customers on how the utilities are assisting these customers to meet their backup power needs related to pro-active de-energizations.

59.   Pacific Gas and Electric Company, Southern California Edison Company, and San Diego Gas & Electric Company must provide the following information on backup power (including mobile backup power) in 10-day post-event reports with the name/email address of a utility contact for customers for each topic: (1) a description of the backup generators available for critical facility and infrastructure customers during a de-energization, (2) the capacity and estimated maximum duration of operation of the backup generators available, both before and during a de-energization, for critical facility and infrastructure customers, (3) the total number of backup generators provided to critical facility and infrastructure customers before and during the de-energization, and (4) how the utility deployed this backup generation to the critical facility and

Case: 19-30088   Doc# 10642-2   Filed: 05/11/21   Entered: 05/11/21 16:54:33   Page 122 of 143

infrastructure customer's site before or during a de-energization, (5) an explanation of how the utility prioritized distribution of available backup generation before and during the de-energization, (6) an explanation of how the utility prioritized distribution of available backup power to customers before and during the de-energization, and (7) identification of the critical facility and infrastructure customers that received backup generation before and during the de-energization.

60.  Pacific Gas and Electric Company (PG&E), Southern California Edison Company (SCE), and San Diego Gas & Electric Company (SDG&E) must maintain updated information on their websites regarding how critical facilities and infrastructure customers may request an assessment of their backup power needs. PG&E, SCE, and SDG&E also must maintain updated information on their websites regarding the availability of mobile backup generation and how critical facilities and infrastructure customers can request the utility to provide mobile backup power.  This information must include, at a minimum, an email address to make requests for information and all other relevant information. PG&E, SCE, and SDG&E must promptly respond, within 24 hours, to all inquiries by critical facilities and infrastructure customers concerning backup power for use during a de-energization.

61.  Pacific Gas and Electric Company, Southern California Edison Company, and San Diego Gas & Electric Company must file and serve an annual report in Rulemaking (R.) 18-12-005 or a successor proceeding, which identifies, among other things (1) actions taken to assess the overall backup power needs of critical facilities and infrastructure customers in advance of wildfire season, (2) the names of the critical facilities and infrastructure customers the utility engaged to assess backup power needs, the results of the utility assessment, and

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page
123 of 143

whether or not the critical facilities and infrastructure customer provided any needed backup power generation, and (3) actions taken to develop, implement, and improve utility partnerships with critical facilities and infrastructure customers on ongoing or evolving backup power needs. This customer information may be provided on a confidential basis, to the extent permitted by law. Further details of this annual report, including the date to be filed, will be determined in R.18-12-005.

62.  Pacific Gas and Electric Company (PG&E) and Southern California Edison Company (SCE) must immediately initiate plans to develop a program similar to San Diego Gas & Electric Company's (SDG&E) program to (1) update contact lists for public safety partners on an ongoing basis and (2) conduct, at a minimum, two communications exercises prior to the wildfire season. The program should consider the components used by SDG&E identified herein. SDG&E must share its program to update its list of public safety partners and conduct communication exercises with public safety partners in advance of wildfire season with PG&E and SCE to assist the utilities to improve their programs.

63.  Pacific Gas and Electric Company, Southern California Edison Company, and San Diego Gas & Electric Company must immediately take actions to address any problems or deficiencies identified during a communication exercise with public safety partners so these problems or deficiencies are resolved before the wildfire season.

64.  Pacific Gas and Electric Company, Southern California Edison Company, and San Diego Gas & Electric Company must at the Joint Utility Public Safety Power Shutoff Working Group share all lessons learned and all best practices pertaining to all aspects of their programs to update lists of public

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page
124 of 143

safety partners and conduct communication exercises with public safety partners in advance of wildfire season.

65.  Pacific Gas and Electric Company, Southern California Edison Company, and San Diego Gas & Electric Company must immediately initiate efforts to assist the Commission's Safety and Enforcement Division in developing a standardized 10-day post-event reporting template.  The Safety and Enforcement Division will issue this template for the purpose of receiving comments by parties in Rulemaking18-12-005 within 30 days of the effective date of this decision.

66.  Pacific Gas and Electric Company, Southern California Edison Company, and San Diego Gas & Electric Company must serve, via email, the Commission's Safety and Enforcement Division Director with the 10-day post-event reports and, should a utility require an extension of time to submit the post-event reports, the utility must submit a request for an extension of time in compliance with the Commission's Rules of Practice and Procedure and concurrently serve this request via email on the Commission's Safety and Enforcement Division  Director.

67.  Pacific Gas and Electric Company, Southern California Edison Company, and San Diego Gas & Electric Company must file the 10-day post-event reports in Rulemaking (R.) 18-12-005. Parties must also file their comments in response to the 10-day post-event reports in R.18-12-005 and the public may provide informal comments via the Commission's website.

68.  Pacific Gas and Electric Company, Southern California Edison Company, and San Diego Gas & Electric Company must serve, on the same day as filed with the Commission, the 10-day post-event reports as follows: (1) serve the report, as an attachment, via email on the service lists of Rulemaking (R.) 18-

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page
125 of 143

12-005 and R.18-10-007  (or the successor proceedings) and all lead affected local and county public safety partners; (2) when serving the 10-day post-event report, include in the email a link to the report on utility's website; (3) when serving the report, include in the email instructions for how the public may submit comments (both formal and informal) to the Commission on the report; and (4) immediately after service of the 10-day post-event reports, reach out to all affected public safety partners, via email, phone calls, and any other methods, to encourage affected public safety partners to file comments on the report.

69.  Pacific Gas and Electric Company (PG&E), Southern California Edison Company (SCE), and San Diego Gas & Electric Company (SDG&E) must address, among other things, each element of Resolution ESRB-8 reporting requirements, as clarified herein, in the 10-day post-event reports, including the below and, if no information is available, PG&E, SCE, and SDG&E must respond to these Resolution ESRB-8 reporting requirements by indicating the reason this information is not available.  PG&E, SCE, and SDG&E must collaborate with the Commission's Safety and Enforcement Division and incorporate Safety and Enforcement Division 's input to develop a tracking system for complaints, as defined in this decision, consistent with Safety and Enforcement Division 's expectations so that Safety and Enforcement Division  is able to access this data and confirm the utilities are accurately presenting the number of complaints received regarding PSPS events.  Among other things, the 10-day post-event reports must:

> (a) identify who the utility contacted in the community prior to de-energization and whether the affected areas are classified as High Fire Threat District Tier 1, Tier 2, or Tier 3 (as defined in General Order 95, Rule 21.2-D22);

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page
126 of 143

(b) explain why notice could not be provided at least two hours prior to a de-energization, if such notice was not provided;

(c) identify the number of and a summary of the complaints, meaning any expression of grief, pain, or dissatisfaction, formally filed court claims, and informally or formally filed Commission complaints received as a result of the PSPS event;

provide a detailed description of the steps the utility used to restore power; and

(d) address and describe each community assistance location during a de-energization event.

70. Pacific Gas and Electric Company, Southern California Edison Company, and San Diego Gas & Electric Company must provide aggregate data, as identified above, in an annual report, including aggregate data that may not have been available at the time the utility filed the 10-day post-event report and must contact the Commission's Safety and Enforcement Division if the utility requires additional guidance to ensure adequate reporting on the requirement to provide information on affected customers in the 10-day post-event reports. Further details of this annual report, including the date to be filed, will be determined in Rulemaking 18-12-005.

71. Pacific Gas and Electric Company (PG&E), Southern California Edison Company (SCE), and San Diego Gas & Electric Company (SDG&E) must clearly document, as required by Decision 19-05-043, the extent to which sectionalization was considered and implemented in the 10-day post-event reports and how sectionalization was used to limit the scope of a de-energization. PG&E, SCE, and SDG&E must each contact the Commission's Safety and Enforcement Division if the utility requires additional guidance to ensure adequate reporting on this requirement in the 10-day post-event reports.

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page 127 of 143

72.  Pacific Gas and Electric Company, Southern California Edison Company, and San Diego Gas & Electric Company must contact the Commission's Safety and Enforcement Division if the utility requires additional guidance to ensure adequate reporting on the requirement to provide a timeline and steps taken to restore power in the 10-day post-event reports.

73.  Pacific Gas and Electric Company, Southern California Edison Company, and San Diego Gas & Electric Company must include, in the 10-day post-event report, a description of the de-energization threshold analyses, as part of lessons learned reporting, and the results of the utility's examination of whether its thresholds are adequate and correctly applied in the de-energized areas.

74.  Pacific Gas and Electric Company, Southern California Edison Company, and San Diego Gas & Electric Company must comply with all reporting requirements described herein pertaining to the Joint Utility Public Safety Power Shutoff (PSPS) Working Group.

83.  Resolution L-598 (December 9, 2019) is modified to include cities.  The *Order* of Resolution L-598 is modified as noted below:

> The electric investor-owned utilities are authorized to share Medical Baseline information with county, city, and tribal government emergency response personnel, upon the county, city, or tribal government's request, when a PSPS protocol is initiated. (Resolution L-598 (December 9, 2019), Order 4 at 6.)

> The electric investor-owned utilities are authorized to share with county, city, or tribal governments, upon the county, city, or tribal government's request, the addresses within their jurisdiction that are or will be impacted by planned or announced PSPS events. (Resolution L-598 (December 9, 2019), Order 4 at 6.)

> The address data is to be shared solely for the purpose of allowing a county, city, or tribal government to identify with particularity the

Case: 19-30088   Doc# 10642-2   Filed: 05/11/21   Entered: 05/11/21 16:54:33   Page
128 of 143

areas and addresses within the scope of a PSPS event and shall not
be shared or used for any other purpose. (Resolution L-598
(December 9, 2019), Order 4 at 6.)

75.  Investigation 19-11-013 is closed.

This order is effective today.

Dated _____, at San Francisco, California.

Case: 19-30088    Doc# 10642-2    Filed: 05/11/21    Entered: 05/11/21 16:54:33    Page
129 of 143

CPUC Press Release
dated 1/30/20

# EXHIBIT C



**California Public Utilities Commission**
**505 Van Ness Ave., San Francisco**

**FOR IMMEDIATE RELEASE**
Media Contact: Terrie Prosper, 415.703.1366, news@cpuc.ca.gov

**PRESS RELEASE**
Docket #: R.18-12-005

## CPUC PROPOSES ADDITIONAL PSPS GUIDELINES FOR UTILITIES AND ORDERS PG&E TO RESUME AND AUGMENT CORRECTIVE ACTION REPORTS

SAN FRANCISCO, January 30, 2020 – The California Public Utilities Commission (CPUC), in ongoing actions to help utilities prepare for and minimize the impacts of Public Safety Power Shut-offs (PSPS), today issued for public comment a series of proposed additional guidelines that utilities would be required to follow prior to the 2020 wildfire season, if approved by the CPUC. The CPUC also issued today a Ruling by President Marybel Batjer identifying serious deficiencies in Pacific Gas and Electric Company's (PG&E) weekly post-PSPS corrective action reports to the CPUC and requiring additional actions to improve PG&E's preparation efforts for the 2020 wildfire season and beyond.

### PSPS Proposed Guidelines

As part of its re-examination of how utilities use and institute PSPS events, the CPUC today issued through an Administrative Law Judge Ruling proposed guidelines from its staff that the state's investor-owned utilities would be required to follow, if approved by the CPUC, in order to ensure improved communication with their customers before and during PSPS events and to minimize the impact to customers when PSPS events are implemented by utilities. The proposed PSPS guidelines, which would augment the guidelines already established by the CPUC in Decision 19-05-042, are available at: http://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M325/K985/325985221.PDF. Members of the public who would like to comment can email public.advisor@cpuc.ca.gov, referencing proceeding number R.18-12-005. An Administrative Law Judge Proposed Decision for Commissioner consideration is expected in May 2020.

The proposed guidelines for the state's investor-owned utilities include:

1

 California Public Utilities Commission

- **Restore Service No Longer than 24 Hours After Event:** Ensure that power to impacted PSPS areas is restored as soon as possible and no longer than 24 hours following the conclusion of conditions that necessitate a PSPS event.

- **Engage in More Robust Regional Collaboration:** Convene, at least monthly, regionalized working groups with tribal and local government entities and public safety partners and coordinate advisory boards that consist of public safety partners, local and tribal government officials, business groups, non-profits, and academic organizations to advise on best practices for wildfire issues and safety, community preparedness, regional coordination, and the use of emerging technologies.

- **Conduct Exercises with Public Safety Agencies:** Collaborate with the CPUC, the California Department of Forestry and Fire Protection (CAL FIRE), the California Governor's Office of Emergency Services (Cal OES), and local emergency response officials to plan annual PSPS exercises throughout the utility service territories in the areas with the highest historical and forecasted risk for de-energization in advance of fire season.

- **Ensure Communication Resiliency:** Utilize all reasonable channels of communication to all populations potentially affected by a PSPS event and develop communication and notification plans with local authorities that anticipates the disruption of traditional communication channels.

- **Meet Specific Needs of Vulnerable Populations:** Design, test, and execute on a plan based on local demographic and survey data for meeting a variety of safety needs for vulnerable populations through the provision of community resource centers (CRCs) and in collaboration with public safety partners, local governments, and access and functional needs customer advocates, conduct a needs assessment.

- **Strengthen Online Information Accessibility:** Ensure there is available bandwidth capacity, either via a cloud service or on-premise, to manage a website that provides the public with access to information about the geographic areas impacted by potential PSPS events and all other critical information to maintain public safety prior to, during, and after a PSPS event.

- **Publicly Articulate PSPS Decision-Making Process:** Provide on utility websites a thorough and detailed indication of the quantitative and qualitative factors the utility considered in calling, sustaining, or curtailing each PSPS event (including information regarding why the

2

California Public Utilities Commission

PSPS event was a last resort option) and a specification of what factors must be present for the PSPS event to be concluded.

- **Notify Communications Carriers Proactively**: Provide communications carriers with the meter and circuit IDs to be de-energized and re-energized to ensure communication carriers receive actionable notification information that can inform proactive deployment of resources to minimize the impact of the PSPS events on communications infrastructure.

- **Address Transportation Impacts**: Implement a transportation resiliency taskforce with local, tribal, Federal, and State government agencies, and other private and public sector parties to develop a needs assessment and resilience plan in advance of fire season that would identify and describe transportation infrastructure and corridors throughout California in need of back up generation.

## President Batjer's Ruling on PG&E Post-PSPS Corrective Action Reports

On Oct. 14, 2019, President Batjer issued a letter to PG&E directing it to file updates on its progress toward a series of corrective actions intended to improve PG&E's planning and execution of PSPS events following the PSPS events in October. The Ruling issued today finds that PG&E filed substandard reports, and subsequently stopped filing reports. The Ruling orders PG&E to reinitiate corrective action reporting on a biweekly basis, and imposes additional reporting requirements, such as expanding the level of detail in the reports and assigning a process owner at the director level.

"PG&E's performance during PSPS events in 2019 was unacceptable and cannot be repeated in 2020," said President Batjer. "The reports that I ordered PG&E to submit are part of the CPUC's comprehensive review of the 2019 PSPS events. PG&E must invest the necessary resources to mitigate the need for, and impact of, future PSPS events, and it must demonstrate that both its internal and external communications regarding PSPS events has received the appropriate attention required."

President Batjer's Ruling also requires PG&E to take additional wildfire preparation actions, including:

- Provide the CPUC within 15 days a detailed plan that describes PG&E's current capabilities, planned improvements, and anticipated challenges/concerns with regards to anticipated PSPS events.

3          California Public Utilities Commission

- Update its PSPS operating protocols within 45 days and, at the discretion of the CPUC, be prepared to exercise them in collaboration with Cal OES, CAL FIRE, and CPUC staff. PG&E must also be prepared to hold a no-notice exercise to go through the process of executing on all necessary elements for an actual de-energization event.
- Establish within 30 days working groups with tribal and local governments across PG&E's service territory in which the needs of tribal and local governments during, before, and after a PSPS event are identified and addressed. PG&E must also develop its 2020 PSPS protocols using feedback from the working groups.

President Batjer's Ruling on PG&E's correction action reports is available at
http://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M326/K172/326172052.PDF.

### CPUC Actions
The CPUC has taken a number of steps to hold utilities accountable for PSPS events and minimize the impacts of future PSPS events, including:

- **Make Immediate Corrective Actions**: Ordered PG&E to take a multitude of immediate corrective actions after it encountered significant problems with communication, coordination, and management during the largest PSPS event in the history of California in October 2019;
- **Question Top Utility Executives**: Called an emergency meeting in October 2019 to publicly address the mistakes and operational gaps identified in PG&E's October PSPS events and to provide lessons learned to ensure they are not repeated;
- **Question Top Communications Executives**: Held a hearing on the operations of communications companies during the October PSPS events;
- **Investigate**: Launched a formal investigation to determine whether investor-owned utilities prioritized safety and complied with the CPUC's regulations and requirements with respect to their PSPS events in late 2019 (I.19-11-013).
- **Re-Examine Protocols**: Began an examination of PSPS protocol (R.18-12-005);
- **Do Not Charge for Services Not Provided**: Implementing measures to ensure utilities do not collect from their customers the charges that are a part of every customer's bill so that customers are not charged for services they do not receive during PSPS events;

4

California Public Utilities Commission

- **Expand Wildfire Mitigation Plans to Reduce Need for PSPS**: Directed utilities to expand their 2020 Wildfire Mitigation Plans to focus on increasing the safe performance of utilities, reduce the need for PSPS events, create more resilient communities, and provide results before the next wildfire season; and,
- **Emergency Disaster Relief**: Establishing an emergency disaster relief program for entities under CPUC jurisdiction (R.18-03-011).

The CPUC regulates services and utilities, safeguards the environment, and assures Californians' access to safe and reliable utility infrastructure and services. For more information on the CPUC, please visit www.cpuc.ca.gov.

###

5          California Public Utilities Commission

# Comments of the Public Advocates Office on Draft Resolution M-4852 dated 3/17/21

# EXHIBIT D



## PUBLIC ADVOCATES OFFICE

PUBLIC UTILITIES COMMISSION
505 VAN NESS AVENUE
SAN FRANCISCO, CA 94102-3298



March 17, 2021                              **<u>VIA ELECTRONIC MAIL</u>**

Rachel Peterson
Executive Director
California Public Utilities Commission
505 Van Ness Avenue
San Francisco, CA 94102
<u>ESRB_ComplianceFilings@cpuc.ca.gov</u>

**Subject:     Comments of the Public Advocates Office on Draft Resolution M-4852**

## <u>INTRODUCTION</u>

Pursuant to Rule 14.5 of the Rules of Practice and Procedure of the California Public Utilities Commission (Commission), the Public Advocates Office at the California Public Utilities Commission (Cal Advocates) submits these comments on Draft Resolution M-4852, *Resolution Placing Pacific Gas and Electric Company into Step 1 of the "Enhanced Oversight and Enforcement Process" Adopted in Decision 20-05-053* (Draft Resolution M-4852).

Commission Decision (D.) 20-05-053, which approved Pacific Gas and Electric Company's (PG&E's) reorganization and exit from bankruptcy, created an Enhanced Oversight and Enforcement Process (EOE Process).  The EOE Process has six steps with escalating remedies.  D.20-05-053 identifies triggering events for each step and conditions that PG&E must satisfy to be allowed to exit the process.

The Draft Resolution is a necessary and appropriate step to remedy important safety failures at the Pacific Gas and Electric Company (PG&E).  The Commission should exercise its authority to ensure that PG&E takes definite and speedy action to protect the safety of its customers and workers.

Cal Advocates supports Draft Resolution M-4852 and makes the following recommendations:

372117559

- The Commission should adopt Draft Resolution M-4852.

- The Commission should revise Draft Resolution M-4852 to include additional reasons for triggering the EOE Process and require Corrective Action Plans on the additional reasons.

## DISCUSSION

### A. The Commission should adopt the Draft Resolution.

The Draft Resolution is a necessary response to a pattern of safety failures at PG&E. In November 2018, PG&E's transmission facilities ignited the Camp Fire, which tragically killed at least 85 people. PG&E was convicted of 84 felony counts of involuntary manslaughter. Yet even as PG&E agreed to plead guilty in state court, PG&E continued to deny responsibility in pleadings before this Commission.[1] PG&E has never acknowledged to this Commission that it was culpable for violating safety regulations by neglecting to inspect and maintain the equipment linked to the Camp Fire.[2, 3]

Since 2018, PG&E's safety record has remained poor. The California Department of Forestry and Fire Protection (CAL FIRE) has reportedly concluded that a PG&E transmission structure ignited the Kincade Fire in October 2019.[4] A PG&E distribution line may have sparked the Zogg Fire, which killed four people near Redding in September 2020.[5, 6, 7] The Zogg Fire's cause remains under investigation. PG&E acknowledges that two line reclosers on the circuit near the origin of the Zogg Fire repeatedly recorded excess current, "although not for a long enough period for them to

---

[1] Investigation (I.) 19-06-015, *Pacific Gas and Electric Company's Appeal of Presiding Officer's Decision Approving Settlement Agreement with Modifications*, March 18, 2020, pp. 29-32.

[2] I.19-06-015, *Pacific Gas and Electric Company's Appeal of Presiding Officer's Decision Approving Settlement Agreement with Modifications*, March 18, 2020, pp. 29-32.

[3] In I.19-06-015, PG&E chose not to contest 14 violations, but did not admit any of the alleged violations. I.19-06-015, *Joint Motion of Pacific Gas and Electric Company (U 39 E), the Safety and Enforcement Division of the California Public Utilities Commission, Coalition of California Utility Employees, and the Office of the Safety Advocate for Approval of Settlement Agreement Public Version,* December 17, 2019 (Joint Motion). The Settlement Agreement is appended to the Joint Motion as Exhibit 1.

[4] San Francisco Chronicle, "PG&E equipment started 2019 Kincade Fire in Sonoma County, Cal Fire says," July 16, 2020. https://www.sfchronicle.com/california-wildfires/article/PG-E-started-2019-Kincade-Fire-in-Sonoma-County-15414134.php.

[5] Courthouse News, "PG&E May Have Failed to Remove Tree Suspected of Sparking Zogg Fire," November 18, 2020, https://www.courthousenews.com/pge-may-have-failed-to-remove-tree-suspected-of-sparking-zogg-fire/.

[6] U.S. District Judge William Alsup, *Order Requesting Information Re Zogg Fire*, October 12, 2020.

[7] PG&E, *Response to Order Requesting Information Re Zogg Fire and Order for Further Information Re Zogg Fire*, filed in U.S. District Court for the Northern District of California, October 26, 2020.

open and de-energize the line."[8]  Likewise, a circuit breaker at the substation recorded excess current but did not de-energize the line.  Minutes later, a geostationary weather satellite detected a fire in the area.[9]

PG&E also reports a high number of injuries to workers.  In 2020, PG&E reported that 10 employees and 60 contractors were injured while performing wildfire mitigation activities.  Again, the Draft Resolution is a necessary response to an ongoing pattern of safety failures at PG&E.

### B. The Commission should revise Draft Resolution M-4852 to include additional reasons for triggering the EOE Process.

Draft Resolution M-4852 identifies one reason for triggering Step 1 of the EOE Process: PG&E failed to target its enhanced vegetation management (EVM) work to the highest-risk circuits.[10]  This finding is correct and well documented in the Draft Resolution.

Cal Advocates has conducted discovery that confirms that PG&E's EVM program was not prioritized by risk.  In 2020, PG&E performed EVM on only 7.4 percent of distribution circuit-miles in the High Fire-Threat District (HFTD).  Focusing on only the 100 highest-risk circuits, PG&E likewise performed EVM on 7.4 percent of the circuit-miles.  This proportion remains approximately the same for the highest or lowest risk circuits in the HFTD, which reveals that PG&E's EVM workplan was not tailored to address the most severe risks first.[11]

Unfortunately, PG&E's lack of focus on risk in the EVM program was not a one-off occurrence.  In 2020, PG&E planned to perform climbing inspections of 967 transmission towers located in the HFTD.  PG&E internally planned to complete these inspections by August 31, 2020 "before peak wildfire season."[12, 13]  Yet by the end of August 2020, PG&E had not performed a single climbing inspection on a tower in the HFTD.[14]

---

[8] PG&E, *Response to Order Requesting Information Re Zogg Fire and Order for Further Information Re Zogg Fire*, filed in U.S. District Court for the Northern District of California, October 26, 2020, pp. 3-4.

[9] PG&E, *Response to Order Requesting Information Re Zogg Fire and Order for Further Information Re Zogg Fire*, filed in U.S. District Court for the Northern District of California, October 26, 2020, pp. 2-5.

[10] Draft Resolution M-4852, pp. 6-11.

[11] PG&E responses to data request CalAdvocates-PGE-R1810007-33, Question 6, February 2, 2021.

[12] PG&E's 2020 Wildfire Mitigation Plan set a deadline of December 31, 2020 for these inspections.  The August 31 date was PG&E's internal target.

[13] PG&E, *Response to Order Re Monitor Letter*, filed in U.S. District Court for the Northern District of California, November 3, 2020, pp. 3-4.

[14] U.S. District Judge William Alsup, *Order Re Monitor Letter*, October 20, 2020, Exhibit A, p. 4.

After explaining that the climbing inspections of transmission towers were delayed, PG&E admitted that when they began, PG&E started outside the High Fire-Threat District:

> At that time, the work execution group was not given specific guidance on where to initiate the inspections following the delay, and the decision was made to start in non-HFTD areas where about 60% of the 500 kV towers are located. This was a process breakdown.[15]

Cal Advocates' discovery on this issue also found that PG&E's management provided no strategic guidance to the staff. When asked who was responsible for setting priorities about where to perform the inspections, PG&E responded that decisions were decentralized and not guided by risk:

> There was no precise starting point specified for 2020 tower climbing inspections. The in-scope transmission structures were provided to the execution team with no specific physical starting point.[16]

PG&E recognizes that this represented a failure to "prioritize work in a risk-informed manner"[17] and states that in 2021 it will set interim deadlines for inspections based on risk priority.[18]

The Commission should include the failure to prioritize inspections by risk in Draft Resolution M-4852 and require PG&E to take correction actions to address this failure. It is a triggering event according to section A(iii) of the EOE process: "PG&E demonstrates insufficient progress toward approved safety or risk-driven investments related to the electric and gas business."[19]

Finally, PG&E's wildfire mitigation work has resulted in an unacceptable number of injuries to workers.[20] In 2020, PG&E reported that 10 employees and 60 contractors

---

[15] PG&E, *Response to Order Re Monitor Letter*, filed in U.S. District Court for the Northern District of California, November 3, 2020, p. 4.

[16] PG&E responses to data request CalAdvocates-PGE-R1810007-29, Question 4, December 18, 2020.

[17] PG&E, *Response to Order Re Monitor Letter*, filed in U.S. District Court for the Northern District of California, November 3, 2020, p. 4.

[18] PG&E responses to data request CalAdvocates-PGE-R1810007-29, Question 4, December 18, 2020.

[19] Draft Resolution M-4852, p. 4.

[20] The annual wildfire mitigation plan submissions require utilities to report how many employees or contractors suffered "OSHA-reportable" injuries related to wildfire mitigation work. OSHA-reportable injuries are serious, involving inpatient hospitalizations, amputations, loss of an eye, or heart attacks. See 36 Code of Federal Regulations 1904, Subpart E, https://www.osha.gov/laws-

were injured while performing wildfire mitigation activities.[21]  In 2019, PG&E reported that zero employees and 53 contractors were injured and one contractor (but no employees) died while performing wildfire mitigation activities.[22]

| Table 1: Employee and Contractor Injuries and Fatalities Related to Wildfire Mitigation | | | | |
|---|---|---|---|---|
| | 2019 | | 2020 | |
| | **Injuries** | **Fatalities** | **Injuries** | **Fatalities** |
| PG&E | 53 | 1 | 70 | 0 |

Unfortunately, PG&E filled out the worker injury data incorrectly in its 2021 wildfire mitigation plan.[23]  PG&E reported a broader category of injuries than SCE or SDG&E, which means that the data provided is not directly comparable.[24, 25]  PG&E has stated that it intends to file an errata to its wildfire mitigation plan.[26]

PG&E should submit complete and accurate data on worker injuries or fatalities to the Commission as soon as possible.  The data should include both OSHA-reportable and recordable injuries (separately).  PG&E should separate the data into incidents related to wildfire mitigation activities and those for the rest of the company.  PG&E should also disaggregate the data between direct employees and contractors.

---

regs/regulations/standardnumber/1904/1904.39.

[21] Fortunately, no PG&E workers died while performing wildfire mitigation work in 2020, although three PG&E contractors died in a helicopter crash unrelated to wildfire mitigation.  ABC7 News, "Helicopter contracted by PG&E crashes into power lines killing all on board near Fairfield," June 2, 2020, https://abc7news.com/pge-helicopter-crash-fairfield-in-lyon-road/6227679/.

[22] PG&E, 2021 Wildfire Mitigation Plan Update, February 5, 2021, Tables 4 and 5.

[23] PG&E responses to data request CalAdvocates-PGE-2021WMP-17, question 1, March 17, 2021.

[24] Instead of providing data on OSHA-**reportable** injuries (see footnote 20 above), PG&E provided data on OSHA-**recordable** injuries, a broader category.

[25] Recordable injuries include: "Any work-related injury or illness that results in loss of consciousness, days away from work, restricted work, or transfer to another job; any work-related injury or illness requiring medical treatment beyond first aid; any work-related diagnosed case of cancer, chronic irreversible diseases, fractured or cracked bones or teeth, and punctured eardrums" and certain other situations.  See https://www.osha.gov/recordkeeping.

[26] PG&E responses to data request CalAdvocates-PGE-2021WMP-17, question 1, March 17, 2021.

Since PG&E provided erroneous data in its 2021 wildfire mitigation plan submission, Cal Advocates cannot be certain how PG&E's worker safety record compares to those of its peers.

Nonetheless, PG&E's workplace safety record is troubling. A high number of worker injuries or fatalities is a triggering event under Section A(ii) of the EOE Process: insufficient progress on Safety and Operational Metrics and other safety performance goals.[27, 28] The Commission should take notice and include this concern as a possible triggering event in the Draft Resolution.

As time is of the essence on all safety matters, the Commission should include the concerns discussed above in Draft Resolution M-4852 and require PG&E to address them in its Corrective Action Plan. Both are serious problems that can be tolerated no longer.

## CONCLUSION

For all the foregoing reasons, the Commission should adopt the recommendations discussed herein. Please contact Henry Burton (henry.burton@cpuc.ca.gov) with any questions relating to these comments.

Sincerely,

/s/ __NATHANIEL W. SKINNER__
Nathaniel W. Skinner, PhD
Program Manager, Safety Branch

Public Advocates Office
California Public Utilities Commission
505 Van Ness Ave
San Francisco, CA 94102
Telephone: (415) 703-1393
E-mail: Nathaniel.Skinner@cpuc.ca.gov

---

[27] Draft Resolution M-4852, p. 4.

[28] There is no requirement under the EOE Process that the identification of the triggering events must originate from the Wildfire Safety Division or Safety and Enforcement Division. "The Commission may invoke the EOE Process if PG&E self-reports, or the Commission becomes aware of, Triggering Events covered by the EOE Process." Thus, PG&E's 2021 WMP submission and Cal Advocates' instant comments are sufficient to support the inclusion of this triggering event in Draft Resolution M-4852. See Draft Resolution M-4852, p. 3.

Rachel Peterson, Executive Director
March 17, 2021
Page 7


Cc:     Service list of R.18-10-007
        Service list of I.19-06-016
        wildfiresafetydivision@cpuc.ca.gov
        ESRB_ComplianceFilings@cpuc.ca.gov
        Caroline Thomas Jacobs, Wildfire Safety Division
        Lee Palmer, Safety Enforcement Division