BROWN RUDNICK LLP
David J. Molton (SBN 262075)
(DMolton@brownrudnick.com)
Seven Times Square
New York, New York 10036
Telephone:      (212) 209-4800
Facsimile:      (212) 209-4801

BROWN RUDNICK LLP
Joel S. Miliband (SBN 077438)
(JMiliband@brownrudnick.com)
2211 Michelson Drive, Seventh Floor
Irvine, California 92612
Telephone:      (949) 752-7100
Facsimile:      (949) 252-1514

*Attorneys for Fire Victim Trustee*

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| **In re:** | Bankruptcy Case No. 19-30088 (DM) |
| **PG&E CORPORATION** | Chapter 11<br>Lead Case, Jointly Administered |
| **-and-** | |
| **PACIFIC GAS AND ELECTRIC COMPANY,** | **NOTICE OF FILING OF TRANSCRIPT OF STATUS OF TRUST DISTRIBUTION VIDEO PRESENTATION BY JUSTICE JOHN TROTTER (RET.), TRUSTEE OF THE PG&E FIRE VICTIM TRUST** |
| **Debtors.** | |
| ☐      Affects PG&E Corporation<br>☐      Affects Pacific Gas and Electric Company<br>■      Affects both Debtors | |
| *All papers shall be filed in the Lead Case,*<br>*No. 19-30088 (DM)* | |

/ / /

/ / /

/ / /

/ / /

1  TO FIRE VICTIMS AND ALL OTHER INTERESTED PARTIES:

2       PLEASE TAKE NOTICE that The Honorable John K. Trotter (Ret.) in his capacity as the

3  Fire Victim Trustee, has filed a transcript (the "**Transcript**") of his video presentation to Fire Victims

4  on the Status of Trust Distribution (the "**Trustee Video Presentation**").  The Transcript is attached

5  hereto as Exhibit A.  The Trustee Video Presentation is available on the Fire Victim Trust Website

6  at www.firevictimtrust.com.

7

8  DATED:  May 17, 2021              BROWN RUDNICK LLP

9

10                 By:   /s/ JOEL S. MILIBAND

11                      Joel S. Miliband (SBN 077438)

                    (JMiliband@brownrudnick.com)

12                      2211 Michelson Drive

                    Seventh Floor

13                      Irvine, California 92612

14                      Telephone:    (949) 752-7100

                    Facsimile:    (949) 252-1514

15                      and

16

17                      BROWN RUDNICK LLP

                    David J. Molton (SBN 262075)

18                      (DMolton@brownrudnick.com)

                    Seven Times Square

19                      New York, New York 10036

20                      Telephone:    (212) 209-4800

                    Facsimile:    (212) 209-4801

21                      *Counsel for Fire Victim Trustee*

22

23

24

25

26

27

28

Case: 19-30088   Doc# 10654   Filed: 05/17/21   Entered: 05/17/21 10:37:53   Page 2
of 21
64072956 v2-WorkSiteUS-035945/0002

EXHIBIT "A"

Page 3

Case: 19-30088   Doc# 10654   Filed: 05/17/21   Entered: 05/17/21 10:37:53   Page 3
of 21

1               UNITED STATES BANKRUPTCY COURT

2               NORTHERN DISTRICT OF CALIFORNIA

3                    -oOo-

4  In Re:               )     Case No. 19-30088
                        )     Chapter 11

5                        )
  PG&E CORPORATION AND      )

6  PACIFIC GAS AND ELECTRIC   )
  COMPANY,              )

7                        )
                Debtors. )

8  _____ )

9

10

11

12

13             TRANSCRIPT OF VIDEO-RECORDED

14            *STATUS OF TRUST DISTRIBUTION*

15            Justice John Trotter (Ret.)

16        Trustee of the PG&E Fire Victim Trust

17

18

19

20

21

22  Transcribed By:
  TERRI NESTORE

23  CSR No. 5614, RPR, CRR

24

25

                                         1

```
 1              JUSTICE TROTTER:  Good afternoon.  My name is
 2    Justice John Trotter and I'm the trustee for your Fire
 3    Victims Trust.  I know you've heard my name but you
 4    haven't met me before, so I'd like to introduce myself.
 5              Even though my name is John, I've been known by
 6    "Jack" my entire life.  I'm a retired judge.
 7              So let me give you a little background about
 8    myself.  I was a lawyer and then a trial court judge on
 9    the Superior Court in Orange County.
10              After that, I was elevated to the appellate court
11    and at first, I was an assistant justice on the Court of
12    Appeal and then finally I became the presiding justice.
13              And then after that I became the administrative
14    presiding justice.  And so I had a lot of administrative
15    exposure, duties, et cetera.
16              Then I retired from the bench and I had always
17    held the belief that cases should be settled outside of
18    court sooner, rather than later, and 98 percent of all
19    cases settle anyway, so why not try to do it sooner.
20              So I left the court and started or went with a
21    firm and helped start a company called JAMS.  When I was
22    with JAMS, I handled cases involving mass torts, and a
23    mass tort is where the court or some other entity lumps
24    together groups of cases and tries to resolve them as one.
25              It's hard to do.  It requires a special
```

2

```
 1    technique, special approach, and that's kind of what your
 2    Trust is.  It isn't a mass tort but it's a collection of
 3    individual cases that need to be resolved.  And I've done
 4    that before and I'm here to help you do that again.

 5         So that's the reason I think that I'm in the
 6    position I'm in now, handling your Trust.  I do have the
 7    background and have done it for a very long time.

 8         A group of lawyers had gotten together and gone
 9    to PG&E and said, you know, we want to hire Justice
10    Trotter, we want to hire a claims administrator named
11    Cathy Yanni to help us begin to put together the process
12    that will ultimately be the methodology by which we
13    resolve these cases.

14         Now PG&E had no obligation to pay any money at
15    that time.  They were still in bankruptcy and the Trust
16    hadn't been funded yet, but they did work out a deal where
17    some pre-funding was arranged, and I don't have the
18    details about that but in April -- I think it was April --
19    we struck a deal with PG&E that they would pay tranches of
20    money that would be used to pay claims processing, and in
21    April I was still part-time, I was an advisor, I was
22    learning more about it, I was helping your lawyers write
23    the rules by which the Trust would be governed, the claims
24    resolution processes.

25         So I know there was some concern about the
```

3

Case: 19-30088   Doc# 10654   Filed: 05/17/21   Entered: 05/17/21 10:37:53   Page 6

1  accuracy and the amount of money that was paid early, was

2  it accounted for.  I can guarantee you that PG&E did not

3  pay one nickel more than they were required.  They got

4  credit for the amount of money that they prepaid, and

5  that's all a matter of record.

6          So as I got to know your lawyers, I became

7  impressed with their deep feeling about this case.  You

8  know, lawyers represent clients and sometimes they know

9  them well, sometimes they don't.  Sometimes they're really

10  involved, sometimes less so.  I had never seen a group of

11  lawyers who were so committed to what they were doing on

12  behalf of their clients as this group, and I didn't know

13  all of them but I knew some of them.  They really felt

14  your pain as much as they could, and that impressed me.

15          And so as I got further into it, they asked me if

16  I would become the trustee, and so I gave it some thought

17  and what really was the moving factor for me was the depth

18  of feeling that your lawyers had for your case.

19          So I said okay, I'd do that.

20          So I retired from JAMS.  I quit a job that I'd

21  had for over 30 years and I went to work for the Trust.

22  I'm a full-time employee, I have no other work.  I've

23  given up all my other work, I've retired from JAMS, and

24  I'm on a salary.  It's a very gracious salary and it's

25  very adequate, and the amount is recorded with the court.

4

1          My rate of pay is far less than what I was
2    charging as a consultant with JAMS.
3          And let me just add to that that there are no
4    40-hour weeks with the Trust.  We have dedicated,
5    hardworking people that are working at least ten hours a
6    day.  We have conferences over the weekend.
7          So it's a full-time job.
8          And I'm happy to be doing it because I too now
9    have the zeal that your lawyers have with regard to the
10   justification of your case and the reasons why you should
11   be treated so well and so quickly.
12          But I do want to share with you a lot of
13   information that I have and a lot of the reasons why this
14   Trust and this -- and the application of the Trust and the
15   way we're doing business is so different than other cases.
16          The uniqueness of this case, of course, involves
17   bankruptcy.  In the usual case, obviously there's no
18   bankruptcy.  The bankruptcy changed the whole dynamic
19   here.  Usually, in litigation, there are two sides.
20          There's the plaintiff and the defendant.
21          The plaintiff makes a claim and the defendant
22   investigates that claim to see if it's valid and to see if
23   they want to pay it.
24          The defendant in this case, had they not gone
25   bankrupt, was Pacific Gas & Electric.  The bankruptcy

occurred in January of 2019.

When bankruptcy occurs all litigation is stayed, and so the defendant, Pacific Gas & Electric, never got to hear the specific details of all your claims.

There were some generalized values that were given under rules of bankruptcy but the specific valuation that we need here, that specific information was never obtained by PG&E because of bankruptcy, as they would have in a normal case.

The Trust, we came into existence July 1st, 2000 -- I mean 2020. I keep saying 2000. 2020. So we've been in existence, what, ten months now. And when we came into existence, we were an empty vessel.

So we had to create a system that paralleled the court system, that would value your case fairly, give you the feeling that at least you were heard, so that your case was individually appreciated, looked at, evaluated, and paid.

So we had to set up that system and we had to set it up for 71,000 of you. That's how many claimants are in this Trust. We had to set it up for the number of claims you had, which total each of you have -- most of you have more than one claim.

We have over 250,000 separate claims.

So the enormity of this case is what also makes

```
 1    it different.  It was in bankruptcy and it's huge.

 2            It's the largest trust, I've been told, in the

 3    history of California.

 4            And so the claims process involves two distinct

 5    components; one is intake and the other is evaluation, and

 6    let's talk a little bit about intake.

 7            The Trust, as I said, came into existence in

 8    July.  In the middle of August, we said okay, we're open

 9    for you to submit your claim, and claims started to come

10    in.  They come in in the form of a claims questionnaire.

11            Now, more than one person can be on a claims

12    questionnaire.  Your family, mom and dad, and the kids,

13    they can all be on one claims questionnaire.

14            We have -- I have to go look at my notes here,

15    but I think we have 40,000 claims questionnaires.

16            These numbers I'm giving you are approximate.

17            So we have 40,000 claims questionnaires that

18    represent 71,000 people.  We put a deadline on it.

19            You had to get your claim questionnaire to us by

20    the end of February of this year.

21            So we have 40,000 claims questionnaires.  26,000

22    of them came in in the month of February.  That's just the

23    claim form.  That's just the claim form.

24            This is what we have to consider.

25            We have 45,830 structures of all different types
```

Case: 19-30088   Doc# 10654   Filed: 05/17/20   Entered: 05/17/21 10:37:53   Page 10 of 21

```
 1   and kinds; houses, et cetera.  Included in those we have
 2   51 wineries, we have 50 mobile home parks, we have
 3   hundreds and hundreds of mobile homes.  We have golf
 4   courses, we have a hospital and a clinic that burned.  We
 5   have over 60 medical offices that have burned.
 6           So we have a whole variety of types of structures
 7   that have been destroyed in this fire.  Each one of them
 8   has to be evaluated.  So let me go back.
 9           Claim comes in, the claim form, then the
10   documents supporting it come in.  Then that claim is ready
11   to be reviewed.  There aren't a lot of those, but there
12   are some.  And of the ones that are ready to be reviewed,
13   we have found that almost half, 43 percent, have one
14   component of the validation of the claim missing, so we
15   can't value it.  It's not ready to be valued because all
16   the supporting document hasn't been provided.
17           So that's where we are.
18           You have this giant amount of claims that came
19   in, 26,000 came in just a couple of months ago.  The
20   documents supporting them are now flooding in, and those
21   claims are getting fleshed out.
22           I don't know the number that are complete.  I
23   don't have that information.  But as they're complete,
24   they're being looked at, and as they're being looked at,
25   almost 50 percent of them are deficient -- and that's not
```

Case: 19-30088   Doc# 10654   Filed: 05/17/21   Entered: 05/17/21 10:37:53   Page 11
of 21

a criticism, it just shows you how hard it is not only on
our part, but on your part to give us the information.

There's a second very important part of this
process, and that is valuation. And this is very
difficult because as the trustee, I owe each one of you
the same duty and if I were to pay Mr. Jones more than his
claim was worth, I'm using your money. This is communal
money. There's a defined amount.

In a mass tort in a claims process, to speed
things up, you try to create default amounts and by that I
mean there's an amount that we will pay on a certain claim
that all you have to do is be under that amount on that
claim, provide the backup for it and it will be paid. If
it's over that amount, we have to look at it.

And the same is true with the rebuild.

So what we've done, believe it or not, is created
a system that has created the rebuild values as best we
can assess them by ZIP code in all of the burn fires.

Now, can you imagine how many ZIP codes that is?

And even within that ZIP code, there are
variances. You may have had the most expensive house on
the block, you may have had the most -- least expensive
house on the block. So we have to account for that.

But we have a model that has a default amount
that in ZIP code XYZ, if your rebuild cost doesn't exceed

9

Case: 19-30088   Doc# 10654   Filed: 05/17/21   Entered: 05/17/21 10:37:53   Page 12

this amount of money, it will automatically be approved
because that's what our model says is reasonable.

It isn't infinite and it isn't perfect and we
look at each case.  If it's below that, we don't have to
look at it, and the reason we did that is we wanted to
speed things up.  If it's over that, we have to look at it
because we're spending everybody's money on your case.

You may be right that you're entitled to an
amount above that but -- so that's what we provide the
claims adjuster, the claims processor, is that model.

It took a long time, a lot of money, a lot of
effort to build that model but we have it and that's -- so
things are going to start to go more quickly.

We have default numbers on lots of things -- not
everything, but a whole bunch of them.

The other way that valuation differs from intake
is that I then, and the Trust becomes -- we step into the
shoes of the defendant.  Remember, if this wasn't a
bankruptcy, you'd be suing PG&E and they would be
questioning your values.

The hardest decision I had to make when I became
trustee was whether or not I was going to hire a defense
firm to represent the Trust and all of these transactions
with you as to value.

If there were no bankruptcy, PG&E would have had

10

an army of lawyers out there questioning your values, up
and down, in and out, but I decided that -- I didn't like
the idea of using your money to hire someone to defeat
your claim, so I didn't hire a defense firm.

That made it harder for the Trust, when it comes
to valuation, because I can't just automatically accept
everything you tell us.  It has to be checked out, when
we're trying to make sure that we're not overspending,
that we're making sure that everybody is proving their
case to a certain degree.  The quantum of proof is much
less than if you were in a courtroom, but there still has
to be some quantum of proof.

So that's the valuation process.

So I have to value these cases and I need help in
doing that.  So here's the staff that I currently have to
help me do that:  I have Cathy Yanni, who is my claims
administrator, who is a wonderful, wonderful claims
administrator.  She's done this for years, she's highly
efficient, extremely capable and extremely competent.

And assisting her is the law firm of BrownGreer.
And so from BrownGreer I have 136 claims review -- I have
almost 300 people.  I have 136 claim reviewers.  I have
over 60 programmers.  That's 60 people that have created
-- I like to think of it as the blueprints.  You build a
house, you get one of the plans, the blueprint.

11

Case: 19-30088   Doc# 10654   Filed: 05/17/21   Entered: 05/17/21 10:37:53   Page 14

1    Well, the programmers created the blueprints for
2  the process that we're using for the intake.  They helped
3  us create the models that give us value.

4    We have great oversight.  We have an oversight
5  committee that did an audit.  I'm very, very conscious of
6  that.  I'm trying to keep this within one percent and, you
7  know, I've done a lot of trusts -- not a lot of trusts --
8  I've done a lot of mass torts and what the budgets are,
9  one percent is very low.  I don't know if I'm going to be
10  able to keep that, but I'm going to try.

11    If I hire more people, the overhead goes up.  If
12  I don't hire more people, it takes longer to get the money
13  out.  That's the push and pull that I'm always in, and I'm
14  trying to find the right balance as we go forward.

15    What we want to do is to, as best we can, is
16  replicate the conditions you would have and the experience
17  you would have if you were in the court system.

18    We can't get you in the court system, but if you
19  were in the court system, you would have the right to
20  appeal, and we created that right in our Trust.

21    Your lawyers were very concerned about whether,
22  if you got an award and you were unhappy with it, what
23  could you do?  So we created a system that allows you to
24  appeal that, just as if you were in the court system.

25    It's a different type of appeal because it's

12

1   one-sided.  We have hired, contracted with 33 retired

2   judges and we've trained them.

3         So after you get your award, which is as we

4   talked about earlier is broken down, you can appeal any

5   one of those claims and it goes in front of a retired

6   judge in what we call a de novo setting, that means brand

7   new.  You start over again.

8         We want you to be assured that you're going to be

9   fully heard, not just by a claims processor, but if it's a

10  claims processor that produces a result you're unhappy

11  with, you get to go in front of a retired judge and tell

12  them your story as to what you think it should have been,

13  why, what your lawyer can argue for, and there's no limits

14  and it's free and it's your right under the Trust

15  agreement.

16        We don't in any way doubt what you've been

17  through.  We can't -- we can only imagine it because we

18  haven't gone through it.  Your lawyers have convinced me

19  that this is the most heartbreaking case that they've ever

20  seen and I'm certain -- I certainly believe that.  So

21  we're working as hard as we can to get this done.

22        But I wanted you to understand some of the issues

23  that we face.  They're real.  I can't change them.  The

24  Trust didn't have anything to do with the settlement.  We

25  didn't create the settlement.  The Trust had nothing to do

Case: 19-30088   Doc# 10654   Filed: 05/17/21   Entered: 05/17/21 10:37:53   Page 16

```
 1   with the amount of money or the bankruptcy.  We're dealing
 2   the hand we were dealt and we're doing it the best we can.
 3           We're still walking uphill on this.  We're not
 4   near the top yet.  We're making progress.  We're getting
 5   there.  When we get to the top and go down the other side,
 6   it will go much more quickly, but I do have some numbers
 7   that I think I can give you that show that we have made
 8   some progress.
 9           We've issued 752 determination notices with a
10   value of $513 million.  That's a half a billion dollars
11   worth of determination notices.
12           Now remember, you're only getting paid 30 percent
13   of that, so what you're actually getting paid isn't that
14   but that's how much has been determined in value.
15           We started a process earlier, again -- I'm
16   running out of time -- but we call it preliminary payments
17   where, because of your need, all you had to do was file an
18   application and we paid you up to $25,000.
19           We paid $122 million under that program.
20           We paid 71 -- I think it's $71 million on a
21   pro rata basis.  We've got 752 determination notices out
22   there.  You have to say you want that, then we pay it.
23           That hasn't happened yet, but it's up to you;
24   tell us you want the money, and we'll pay it.
25           This is what we've paid so far and again, I'm
```

14

proud of it.  I'm sad that it isn't more but I'm proud
that we've been able to do this in this short period of
time.

       We have -- and again, maybe I haven't explained
this.  The way you find out what you're entitled to is you
get what's called a determination notice.  It determines
the value of all your claims, lumps it into one sum and
says:  Here is your claim.  It's worth a million dollars.

       Now, if you want to know what's behind that, what
are the values on each individual claims, all you have to
do is ask and that's provided.  If you have five claims,
they all added up to a million dollars, you get the
determination notice of a million dollars.

       Then you can accept it or you can appeal it.

       I'm going to come back in a week or so and do
another taping, so get your questions in before that, and
in that other taping I'm going to talk about pro rata, why
am I only getting 30 percent.  That needs to be explained
to you and I don't think we've done a very good job of
doing that yet.

       And I'm going to also talk to you about the
problem that we have with the stock and monetizing it.

       In order to pay you money, we have to turn the
stock into cash and we haven't been able to do that yet,
and I want to talk to you about that.

Case: 19-30088   Doc# 10654   Filed: 05/17/21   Entered: 05/17/21 10:37:53   Page 18
of 21

1    So I'm going to come back and tape those two
2    things in the next couple of weeks and that will be
3    released to you as soon as it's done.
4    So I hope...  I hope this has been helpful.
5    You know, there was a recent newspaper article
6    that kind of questioned what we were doing and it really
7    bothered me because I felt it gave you more to worry
8    about; that you're worried about whether the Trust is
9    wasting your money, et cetera, et cetera.
10   It seemed to say, without saying, that in these
11   first few months we've only paid out this little amount of
12   money, but look at all the money that the Trust has spent.
13   Well, they're not comparable.  You know, you've
14   built houses, especially those of you that are in the
15   process of doing it now.  You know that in building a
16   house, you pay as you go along.  That's what we're doing.
17   We're building the process by which you're going
18   to get paid.
19   I would think you'd be concerned if we weren't
20   spending money, if we weren't hiring 300 people to help
21   resolve your claims.  That's when you should worry.
22   But I didn't want you to misunderstand what we're
23   doing.  We're rounding the corner but as I said earlier,
24   we're still walking uphill.  This is a very, very, very
25   tough project, but we're doing our best and I just want

16

1  you to be able to have confidence in us that we're working

2  for you, because we are.

3          (End of recording.)

17

Case: 19-30088   Doc# 10654   Filed: 05/17/20   Entered: 05/17/21 10:37:53   Page 20

```
1                    C E R T I F I C A T E

2

3

4        I, TERRI NESTORE, Certified Shorthand Reporter/

5   Transcriptionist, do hereby certify that I was authorized

6   to transcribe the foregoing recorded proceeding, and that

7   the transcript is a true and accurate transcription of my

8   shorthand notes, to the best of my ability, taken while

9   listening to the provided recording.

10

11       I further certify that I am not of counsel or

12  attorney for either or any of the parties to said

13  proceedings, nor in any way interested in the events of

14  this cause, and that I am not related to any of the

15  parties thereto.

16

17

18  Dated this 16th day of May, 2021.

19

20

21                    _____
                      TERRI NESTORE, CSR 5614, RPR, CRR
22

23

24

25
```

18

Case: 19-30088   Doc# 10654   Filed: 05/17/21   Entered: 05/17/21 10:37:53   Page 21