WEIL, GOTSHAL & MANGES LLP
Theodore E. Tsekerides (*pro hac vice*)
(theodore.tsekerides@weil.com)
Jessica Liou (*pro hac vice*)
(jessica.liou@weil.com)
Matthew Goren (*pro hac vice*)
(matthew.goren@weil.com)
767 Fifth Avenue
New York, NY 10153-0119
Tel: 212 310 8000
Fax: 212 310 8007

KELLER BENVENUTTI KIM LLP
Tobias S. Keller (#151445)
(tkeller@kbkllp.com)
Peter J. Benvenutti (#60566)
(pbenvenutti@kbkllp.com)
Jane Kim (#298192)
(jkim@kbkllp.com)
650 California Street, Suite 1900
San Francisco, CA 94108
Tel: 415 496 6723
Fax: 650 636 9251

*Attorneys for Debtors and Reorganized Debtors*

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

**In re:**

**PG&E CORPORATION,**

**- and -**

**PACIFIC GAS AND ELECTRIC COMPANY,**

**Debtors.**

☐ Affects PG&E Corporation
☐ Affects Pacific Gas and Electric Company
☒ Affects both Debtors

* *All papers shall be filed in the Lead Case, No. 19-30088 (DM).*

Case No. 19-30088 (DM)
Chapter 11 (Lead Case) (Jointly Administered)

**MEMORANDUM OF LAW IN SUPPORT OF REORGANIZED DEBTORS' OBJECTION TO CONSOLIDATED EDISON DEVELOPMENT, INC.'S AMENDED CURE PAYMENT CLAIM DEMAND**

Date: August 10, 2021
Time: 11:00 a.m. (Prevailing Pacific Time)
Place: U.S. Bankruptcy Court, Courtroom 17, 16th Floor
San Francisco, CA 94102

Related Docket Nos.: 10613, 10617, 10721, 10730

**Response Due**: July 16, 2021

## Table of Contents

Page

I. Preliminary Statement ..... 2

II. Background ..... 4

A. The PPAs and IAs ..... 4

B. Con Ed's Third-Party Financing Agreements and the Consents and Agreements ..... 4

C. The Chapter 11 Cases ..... 5

D. The Plan and the Assumption of the PPAs and IAs ..... 6

E. Con Ed's Demand ..... 6

F. The Objection and the Scheduling Stipulation ..... 7

III. Argument ..... 7

A. Section 365(b)(2) of the Bankruptcy Code Expressly Bars Con Ed from Recovering Cure Damages Arising from a Bankruptcy Default Provision ..... 8

B. Fundamental Bankruptcy Policy, as Manifest in Numerous Provisions of the Bankruptcy Code, Otherwise Bars Con Ed from Enforcing an Ipso facto Clause Against the Debtors ..... 11

C. Damages Alleged to Have Been Triggered by Ipso Facto Clauses But Arising Under Cross-Default Provisions to Separate Agreements Need Not Be Cured in Order to Assume Executory Contracts Under Section 365 ..... 15

IV. Conclusion ..... 17

## Table of Authorities

**Case** **Page(s)**

*In re 53 Stanhope LLC*,
625 B.R. 573 (Bankr. S.D.N.Y. 2021) ..... 14

*In re B-Bar Tavern. Inc.*,
506 B.R. 879 (Bankr. D. Mont. 2013) ..... 14

*In re Bricker*,
43 B.R. 344 (Bankr. D. Ariz. 1984) ..... 12

*In re C.A.F. Bindery, Inc.*,
199 B.R. 828 (Bankr. S.D.N.Y. 1996) ..... 10

*In re Canuso*,
2021 WL 2144197 (Bankr. D.N.J. May 26, 2021) ..... 12

*In re Charter Commc'ns*,
419 B.R. 221 (Bankr. S.D.N.Y. 2009) ..... 9, 12, 16

*In re Chateaugay Corp.*,
No. 92-cv-7054 (PKL), 1993 WL 159969 (S.D.N.Y. May 10, 1993) ..... 9

*In re Claremont Acquisition Corp., Inc.*,
113 F.3d 1029 (9th Cir. 1997) ..... 9

*In re Computer Commc'ns, Inc.*,
824 F.2d 725 (9th Cir. 1987) ..... 13

*In re Denman*,
513 B.R. 720 (Bankr. W.D. Tenn. 2014) ..... 12

*In re Great Nw. Recreation Ctr., Inc.*,
74 B.R. 846 (Bankr. D. Mont. 1987) ..... 10

*In re Jennifer Convertibles, Inc.*,
447 B.R. 713 (Bankr. S.D.N.Y. 2011) ..... 4, 14, 16, 17

*In re Lehman Bros. Holdings Inc.*,
422 B.R. 407, 414 (Bankr. S.D.N.Y. 2010) ..... 12, 14

*In re Lehman Bros. Holdings Inc.*,
970 F.3d 91 (2d Cir. 2020) ..... 13

*Liberty Mut. Ins. Co. v. Greenwich Ins. Co.*,
417 F.3d 193 (1st Cir. 2005) ..... 12

*In re Manning*,
831 F.2d 205 (10th Cir. 1987) ..... 13

*Mellouli v. Lynch*,
575 U.S. 798 (2015) ........ 10

*In re Pak*,
252 B.R. 215 (Bankr. M.D. Fla. 2000) ........ 14

*In re Peaches Recs. & Tapes, Inc.*,
51 B.R. 583 (B.A.P. 9th Cir. 1985) ........ 9

*Queens Boulevard Wine & Liquor Corp. v. Blum*,
503 F.2d 202 (2d Cir. 1974) ........ 10

*In re Residential Cap., LLC*,
508 B.R. 851 (Bankr. S.D.N.Y. 2014) ........ 15

*Riggs Nat'l Bank of Washington, D.C. v. Perry (In re Perry)*,
729 F.2d 982 (4th Cir. 1984) ........ 14

*In re Rose*,
21 B.R. 272 (Bankr. D.N.J. 1982) ........ 10

*In re Ry. Reorganization Est., Inc.*,
133 B.R. 578 (Bankr. D. Del. 1991) ........ 10, 14

*In re Sambo's Restaurants, Inc.*,
24 B.R. 755 (Bankr. C.D. Cal. 1982) ........ 15

*Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*,
549 U.S. 443 (2007) ........ 9

*In re W.R. Grace & Co.*,
475 B.R. 34 (D. Del. 2012) ........ 13, 14

*In re Wheeling-Pittsburgh Steel Corp.*,
54 B.R. 772 (Bankr. W.D. Pa. 1985) ........ 16

*In re Yates Dev., Inc.*,
241 B.R. 247 (Bankr. M.D. Fla. 1999), *aff'd*, 256 F.3d 1285 (11th Cir. 2001) ........ 10, 14

**Statutes**

11 U.S.C. § 362 ........ 2, 3, 5, 13

11 U.S.C. § 363(*l*) ........ 2, 3, 13

11 U.S.C. § 365(b) ........ *passim*

11 U.S.C. § 365(e) ........ *passim*

11 U.S.C. § 541(c) ........ 2, 3, 12, 13

11 U.S.C. § 1124 .......... 2, 3, 10, 11

**Other Authorities**

H.R. Rep. No. 95-595 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5963 .......... 10

S. Rep. 95-989 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787 .......... 10, 12, 13

PG&E Corporation and Pacific Gas and Electric Company (the "**Utility**"), as debtors and reorganized debtors (collectively, the "**Debtors**" or "**Reorganized Debtors**," as applicable) in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), hereby submit this memorandum of law (the "**Memorandum of Law**") in support of the Reorganized Debtors' objection [Docket Nos. 10613, 10617] (the "**Objection**") to $11,844,598.00 in asserted cure claims for breach of contract and indemnification submitted by Consolidated Edison Development, Inc., on behalf of itself and certain of its affiliates (collectively, "**Con Ed**"). The amounts are purportedly owed as Cure Amounts[1] in connection with the assumption of certain power purchase agreements ("**PPAs**") and interconnection agreements ("**IAs**") between Con Ed and the Debtors (collectively, the "**CED Agreements**"). A copy of Con Ed's *Amended Cure Payment Claim Demand* is attached to the Reorganized Debtors' Objection as **Exhibit A** (the "**Demand**").[2]

Pursuant to the parties' stipulation of May 27, 2021 [Docket No. 10721] (the "**Scheduling Stipulation**"), as approved by Order of the Court dated May 28, 2021 [Docket No. 10730], the Reorganized Debtors submit this Memorandum of Law on the discrete legal issue of whether the Bankruptcy Code's prohibition on *ipso facto* clauses bars Con Ed from recovery on the claims set forth in its Demand.[3]

---

[1] Capitalized terms used but not herein defined have the meanings ascribed to them in the *Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization dated June 19, 2020* [Docket No. 8048] (the "**Plan**"), as confirmed by Order of the Court, dated June 20, 2020 [Docket No. 8053] (the "**Confirmation Order**").

[2] Due to the commercially sensitive nature of the CED Agreements, the Court previously authorized the Debtors in connection with the Objection to file the CED Agreements under seal and certain references to the CED Agreements within the Objection in redacted form. *See* Docket No. 10626. For those same reasons, certain references to the CED Agreements within this Memorandum of Law are also being filed with appropriate redactions. A motion authorizing the Reorganized Debtors to file the Memorandum of Law in redacted form is being filed contemporaneously herewith. Unredacted copies of this Memorandum of Law and the Objection (together with all exhibits thereto) will be provided to Con Ed and the Court.

[3] Pursuant to the Scheduling Stipulation, all other assertions, defenses, or arguments of the parties with respect to the Objection or the Demand have been reserved and are preserved.

## I. PRELIMINARY STATEMENT

Con Ed's Demand, alleging approximately $12 million in "direct" damages must be summarily rejected because it is completely contrary to and inconsistent with bedrock principles of bankruptcy law, enshrined in numerous statutory provisions, and recognized in virtually every case to consider the issue since the enactment of the Bankruptcy Code in 1978: a creditor cannot extract payment from a debtor solely because the debtor has availed itself of its statutory right to seek protection under the Bankruptcy Code. The Bankruptcy Code, congressional intent, and a substantial body of case law all confirm that bankruptcy default provisions, or *ipso facto* clauses, cannot be enforced against a debtor because doing so would hinder a debtor's ability to reorganize and undermine the fundamental policies of the Bankruptcy Code. *See* 11 U.S.C. §§ 363(*l*), 365(b)(2), 365(e)(1), 541(c), & 1124. This is precisely what Con Ed attempts to do in its Demand—it seeks to extract an additional $12 million from the Debtors and these estates (in addition to the more than $9.1 million in Cure Amounts already appropriately paid to Con Ed on the Effective Date) as amounts allegedly due solely as a result of the commencement of the Chapter 11 Cases and the imposition of the automatic stay and the other protections afforded the Debtors as debtors and debtors in possession under the Bankruptcy Code. Such a result cannot be allowed.

Con Ed does not even attempt to hide this. It concedes in its Demand that "[t]he Debtors' bankruptcy filing constituted a default" which, "[c]onsequentially," caused Con Ed to incur "direct damages" in the form of default interest, consent fees, and attorneys' fees and costs arising out of separate financing agreements that it entered into with its lenders (the "**Third-Party Financing Agreements**").[4] *See* Demand at 6. Con Ed similarly argues that the Debtors' failure to pay certain amounts that were stayed as a result of the imposition of the automatic stay under section 362 of the Bankruptcy Code also constituted a default; however, all of these amounts were paid in full with interest on the Effective Date of the Plan. Moreover, section 365(b)(2) of the Bankruptcy Code, makes clear that the Debtors need not cure "a default that is a breach of a provision" relating to "the

[4] The Debtors are not parties to the Third-Party Financing Agreements, which were all entered into after the CED Agreements—in many cases years after the CED Agreements—and were not privy to their terms.

insolvency or financial condition of the debtor at any time before the closing of the case" or "the commencement of a case under this title." 11 U.S.C. § 365(b)(2); *see also id.* § 1124(2)(A) (same). Accordingly, Con Ed's claims should be denied.

Con Ed cannot avoid this result by trying to repackage its Demand as premised on something other than an unenforceable *ipso facto* provision under the CED Agreements. Con Ed asserts that the damages it seeks arose under the Third-Party Financing Agreements and not under any executory contract with the Debtors. Yet Con Ed admits, as it must, that the Debtors' purported liability to Con Ed is based *entirely* upon alleged cross-defaults under the CED Agreements triggered by the filing of the Chapter 11 Cases and the imposition of the automatic stay under section 362. Con Ed cannot avoid the Bankruptcy Code's prohibition on the enforceability of *ipso facto* clauses merely by asserting that the damages it seeks arose under separate agreements to which the Debtors are not parties. This is a quintessential *ipso facto* provision and precisely the type of damages and "bankruptcy penalty" that Congress meant to prevent under section 365(b)(2) and other provisions of the Bankruptcy Code. *See, e.g.*, 11 U.S.C. § 365(e)(1) (a contract "may not be terminated or modified" on the basis of an *ipso facto* clause); 11 U.S.C. § 541(c) (a creditor may not seek forfeiture of estate assets on the basis of an *ipso facto* clause); 11 U.S.C. § 363(*l*) (a trustee generally controls the estate "notwithstanding" an *ipso facto* clause).

There is no dispute that the Debtors are not parties to the Third-Party Financing Agreements.[5] Yet Con Ed contends that because the Debtors assumed the CED Agreements, they must now also pay damages that Con Ed incurred under the Third-Party Financing Agreements that are all due solely as a result of the commencement of the Chapter 11 Cases. Cross-default provisions, such as the bankruptcy cross-default provisions relied upon by Con Ed, are "inherently suspect" and courts have routinely held that debtors are not required to pay cure amounts pursuant to such provisions because their enforcement "would contravene the federal bankruptcy policy against the enforcement of *ipso*

[5]

*facto* clauses and impermissibly hamper the Debtors' reorganization." *In re Jennifer Convertibles, Inc.*, 447 B.R. 713, 721 (Bankr. S.D.N.Y. 2011). The same principles apply here to bar Con Ed's claims.

Accordingly, Con Ed's Demand should be denied and no further amounts should be due and owing by the Reorganized Debtors in connection with the assumption of the CED Agreements.

## II. BACKGROUND

### *A. The PPAs and IAs*

As part of its normal business operations, the Utility enters into PPAs with numerous counterparties setting terms for the purchase of power and ancillary products from various energy generation facilities. In order to physically receive energy from a generator, the Utility also enters into IAs setting the terms for connecting the Utility's transmission system to the generating facility. Con Ed's PPAs generally contain substantially similar language, while the IAs follow one of two *pro forma* templates promulgated by the Federal Energy Regulatory Commission—a small generator IA ("**SGIA**") or a large generator IA ("**LGIA**"), depending on the size of the generating facility. The PPAs include an event of default in the event of a chapter 11 filing by the Debtors. The IAs have no such event of default.

### *B. Con Ed's Third-Party Financing Agreements and the Consents and Agreements*

Some time after entering into or acquiring the PPAs and IAs, Con Ed entered into the Third-Party Financing Agreements with its financing sources. The Reorganized Debtors are not parties to those Third-Party Financing Agreements.

To help Con Ed secure financing, and at Con Ed's request, the Debtors executed the Consents and Agreements, which permitted the third-party financiers to step into Con Ed's shoes in the event Con Ed defaulted on the Third-Party Financing Agreements or the CED Agreements. These Consents

---

6

and Agreements specifically provide that [redacted]

### *C. The Chapter 11 Cases*

On January 29, 2019 (the "**Petition Date**"), the Debtors commenced the Chapter 11 Cases. The Debtors made every effort to lessen the impact of the commencement of the Chapter 11 Cases on their suppliers, vendors, and contract counterparties, including Con Ed. The Debtors also timely made all postpetition payments due under the PPAs and all relevant IAs through the entirety of the Chapter 11 Cases.

Of course, the payment of certain prepetition amounts owed to Con Ed was stayed by operation of section 362 of the Bankruptcy Code upon the commencement of the Chapter 11 Cases (the "**Stayed Payments**"). These Stayed Payments, included, among others things, (i) certain amounts that came due in February 2019 for energy deliveries in the month preceding the Petition Date, and (ii) certain payments contemplated to be made under a prepetition settlement agreement entered into by Con Ed and the Debtors on July 12, 2018, which settlement was conditioned on approval of certain PPA amendments by the California Public Utilities Commission that were ultimately received after the Petition Date on April 17, 2019. In addition, certain payments due for Network Upgrade Reimbursements ("**NURs**") under two of Con Ed's IAs were also stayed by operation of the automatic stay. Nevertheless, in November 2019, the Debtors received authority from this Court to pay amounts due on account of NURs in full, with interest, during the Chapter 11 Cases and to make all ongoing

[7] [redacted]

NUR payments going forward, which the Debtors did. *See* Docket Nos. 4779, 4790. Con Ed's contention in its Demand that the Debtors did not make any NUR payments with respect to several projects until after the Effective Date is, therefore, both incorrect and irrelevant, Demand at 3, because the Debtors made all payments due under the IAs during the Chapter 11 Cases after receiving Court approval. Those Stayed Payments cannot serve as a basis for alleged damages recoverable by Con Ed in its Demand.

***D. The Plan and the Assumption of the PPAs and IAs***

The Plan was confirmed by the Court through the Confirmation Order on June 20, 2020. Pursuant to Paragraphs 32(b) and 43 of the Confirmation Order and Section 8.1 of the Plan, all power purchase agreements and interconnection agreements were assumed on the Effective Date of the Plan. Pursuant to Paragraph 43 of the Confirmation Order, the parties agreed to attempt to resolve any disputes related to assumption of the PPAs and IAs in the ordinary course, provided that if no resolution could be reached within 45 days of the Confirmation Order, either party may submit the dispute to this Court.

The Effective Date of the Plan occurred on July 1, 2020, and the Stayed Payments were repaid in full, with interest, in connection with the assumption of the CED Agreements on the Effective Date of the Plan.

***E. Con Ed's Demand***

On August 25, 2020, approximately two months following the Effective Date and approximately nineteen months after the commencement of the Chapter 11 Cases, the event which allegedly gave rise to the claims at issue here, Con Ed made its first demand on the Reorganized Debtors for additional amounts in connection with the assumption of the CED Agreements, including, among other claims, the default interest, consent fees, and attorneys' fees at issue in the Demand.[8] The parties engaged in mediation but were unable to resolve the dispute. Con Ed later amended its Demand as set forth in **Exhibit A** to the Objection. Although the mediation was not successful, the parties have narrowed their dispute to the issues currently before the Court.

[8] A copy of Con Ed's first *Cure Payment Claim Demand* is attached to the Reorganized Debtors' Objection as **Exhibit B**.

In its Demand, Con Ed asserts $11,844,598 allegedly owed as additional Cure Amounts comprised of: (1) $4,805,060 in default interest on its Third-Party Financing Agreements; (2) $6,000,000 in consent fees paid to Con Ed's financiers in lieu of default interest; and (3) $1,039,538 in attorneys' fees incurred in relation to Con Ed's project financing issues. Con Ed asserts these amounts are either direct damages of the Debtors' purported breaches or (in a substantially less developed argument) reimbursable indemnification obligations of the Debtors, payable as cure. All of the claimed damages, however, are premised entirely on the commencement of the Debtors' Chapter 11 Cases. [redacted]

*F. The Objection and the Scheduling Stipulation*

On May 3, 2021, the Reorganized Debtors filed their Objection to Con Ed's Demand. Thereafter, the parties agreed to brief the discrete legal issue relating to the Reorganized Debtors' objection that the Bankruptcy Code's prohibition on *ipso facto* clauses bars Con Ed from recovery on the Demand, as set forth in the Scheduling Stipulation that was approved by Order of the Court dated May 28, 2021 [Docket No. 10730].

## III. ARGUMENT

Con Ed's Demand presents a simple threshold legal issue: whether Con Ed's Demand should be disallowed because it is premised on an unenforceable *ipso facto* clause. Under the undisputed facts here, this is not a close call and the Demand should be disallowed.

As an initial matter, Con Ed's Demand plainly turns on an *ipso facto* clause—the default on which the entire Demand is premised is, quite literally and explicitly, a bankruptcy default provision.

*See* [redacted] There is similarly no question that the predicate for Con Ed's alleged damages is its allegation that "[t]he Debtors' bankruptcy filing constituted a default by the Utility under the PPAs," and that Con Ed "[c]onsequentially" "incurred … direct damages" in the form of default interest and consent fees under Con Ed's separate Third-Party Financing Agreements as well as "related attorneys' fees and costs." Demand at 6. The Debtors, Con Ed asserts, should be required to cure these cross-defaulted amounts in order to assume the CED Agreements. *See, e.g.*, Demand at 6; *see also id.* at 2 ("When the Debtors filed for bankruptcy in January 2019, they breached the CED Agreements by filing the bankruptcy petition…."); *id.* at 5 ("Upon assumption of the CED Agreements, PG&E was required to cure all defaults under such agreements in accordance with the terms of such agreements."); *id.* at 8 ("CED has suffered damages for which the Utility is obligated to reimburse CED as a cure payment as part of the assumption of the CED Agreements."); [redacted]

Con Ed's argument suffers from several fatal flaws, many of which the Reorganized Debtors have already set forth in their Objection. But no matter. Con Ed's theory of "direct" damages fails for the simple reason that the damages in question result solely from the purported breach of an unenforceable *ipso facto* provision—the commencement of the Chapter 11 Cases. No claim for contract cure can arise from such a default, and the Bankruptcy Code explicitly provides that the Debtors are not obligated to cure defaults arising from an alleged breach of an *ipso facto* clause. Moreover, courts have routinely held that debtors are not required to pay cure amounts triggered by cross-default provisions—including cross-default provisions triggered by *ipso facto* clauses—arising under separate agreements, such as those relied upon here by Con Ed. Con Ed's Demand must, therefore, be disallowed.

### *A. Section 365(b)(2) of the Bankruptcy Code Expressly Bars Con Ed from Recovering Cure Damages Arising from a Bankruptcy Default Provision*

The core of Con Ed's Demand rests on its contention that "[i]t is well-settled that a debtor cannot assume an executory contract without curing all its defaults and compensating the non-debtor party for the 'actual pecuniary loss' caused by those defaults." Demand at 8 (citing 11 U.S.C.

§ 365(b)). The Debtors agree that section 365 generally requires the Debtors to cure defaults for assumed contracts, and have diligently and fully discharged that requirement. The Debtors similarly agree that a damage claim arising from "an otherwise enforceable contract … is allowable in bankruptcy except where the Bankruptcy Code provides otherwise." *Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 448 (2007). The point that Con Ed ignores, and the reason why Con Ed's Demand must fail, however, is that the Bankruptcy Code "provides otherwise" here. This is set forth in subsection 365(b):

> Paragraph (1) of this subsection does not apply to a default that is a breach of a provision relating to—
>
> (A) ***the insolvency or financial condition of the debtor at any time before the closing of the case***;
>
> (B) ***the commencement of a case under this title*** ….

11 U.S.C. § 365(b)(2) (emphasis added). As section 365(b)(2) makes inescapably clear, the Debtors' duty to cure defaults under executory contracts "does not apply to a default that is a breach of a provision relating to" either "the insolvency or financial condition of the debtor" or "the commencement of a case under [the Bankruptcy Code]," which is clearly the case with respect to the amounts sought by Con Ed in its Demand.

It is settled that "[s]ection 365 abrogates the power of *ipso facto* clauses. No default may occur pursuant to an *ipso facto* clause and no reliance may be placed upon an alleged default where the only cause for default is the debtor's commencement of a bankruptcy case." *In re Chateaugay Corp.*, No. 92-cv-7054 (PKL), 1993 WL 159969, at *5 (S.D.N.Y. May 10, 1993). Numerous courts have reached the same straightforward conclusion. *See, e.g.*, *In re Claremont Acquisition Corp., Inc.*, 113 F.3d 1029, 1033 (9th Cir. 1997) ("[Section] 365(b)(2) sets forth an exclusive list of the monetary and nonmonetary breaches that a debtor need not cure before assuming and assigning a contract."); *In re Peaches Recs. & Tapes, Inc.*, 51 B.R. 583, 587 n.6 (B.A.P. 9th Cir. 1985) ("Section 365(b)(2) … provides that a default arising from a breach of such a clause need not be cured by the trustee in order to assume that executory contract or unexpired lease."); *In re Charter Commc'ns*, 419 B.R. 221, 250 (Bankr. S.D.N.Y. 2009) ("Section 365(b)(2) … specifies that those same two relevant categories of default need not be cured—*i.e.*, those relating to 'the insolvency or financial condition of the debtor

at any time before the closing of the case' and 'the commencement of a case under this title.'" (citing 11 U.S.C. § 365(b)(2)(A), (B))); *In re Yates Dev., Inc.*, 241 B.R. 247, 255 (Bankr. M.D. Fla. 1999) (noting that subparagraphs 365(b)(2)(A), (B) and (C) "provide that defaults in contracts relating to the debtor's insolvency or financial condition, the filing of the bankruptcy case itself, or the appointment of a trustee … do not have to be cured"), *aff'd*, 256 F.3d 1285 (11th Cir. 2001); *In re Great Nw. Recreation Ctr., Inc.*, 74 B.R. 846, 855 (Bankr. D. Mont. 1987) (noting that "[u]nder the *ipso facto* clause, however, such financial provision does not need cure, or adequate assurance of future performance since it is directly related to insolvency, or the financial condition of the Debtor").

Notably, subsection 365(b)(2)'s use of the term "relating to" indicates that the scope of this provision is broad, a further sign of Congress's clear intent to make *ipso facto* clauses unenforceable. *See Mellouli v. Lynch*, 575 U.S. 798, 815 (2015) (discussing the "expansive" meaning of "relating to," and noting that "[i]n interpreting such phrases, we must be careful to honor Congress' choice to use expansive language"). Courts accordingly have found that the Bankruptcy Code's prohibitions on the enforcement of *ipso facto* provisions are to be construed broadly. *See, e.g.*, *In re C.A.F. Bindery, Inc.*, 199 B.R. 828, 833 (Bankr. S.D.N.Y. 1996) (finding that *ipso facto* clauses "are construed broadly to effectuate the Bankruptcy Code's policy against forfeiture"); *In re Ry. Reorganization Est., Inc.*, 133 B.R. 578, 583 (Bankr. D. Del. 1991) ("Today courts continue to read the Code's *ipso facto* sections broadly to effectuate code policy and in recognition that bankruptcy matters are also inherently proceedings in equity." (cleaned up)).[9]

Were that not enough, Congress has dispelled whatever doubt could arise on this point elsewhere in the Bankruptcy Code. Section 1124 provides that

---

[9] Indeed, section 365(b)(2) was enacted as part of a comprehensive scheme to eradicate *ipso facto* clauses. Congress's intent, as reflected in the voluminous legislative history for the 1978 Bankruptcy Code, was to overhaul the treatment of *ipso facto* clauses, which were formerly analyzed under an equitable framework. *See, e.g.*, *Queens Boulevard Wine & Liquor Corp. v. Blum*, 503 F.2d 202, 206–207 (2d Cir. 1974). The Bankruptcy Code altered this analysis by providing a statutory framework that could be applied mechanically by the courts. Notably, while Congress recognized that section 365(b) "requires the trustee to cure any default in the contract," it took care to observe that "[t]his provision does not apply to defaults under ipso facto or bankruptcy clauses, which is a significant departure from present law." S. Rep. No. 95-989, at 136–37 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5844 (the "**Senate Report**"); *see also* H.R. Rep. No. 95-595, at 347 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6304 (providing same); *In re Rose*, 21 B.R. 272, 276 (Bankr. D.N.J. 1982) ("The legislative history indicates that bankruptcy-default clauses are to be invalid in all types of contracts, without limitation.").

> [A] class of claims or interests is impaired under a plan unless, with respect to each claim or interest of such class, the plan … cures any such default that occurred before or after the commencement of the case under this title, ***other than a default of a kind specified in section 365(b)(2) of this title or of a kind that section 365(b)(2) expressly does not require to be cured*** ….

11 U.S.C. § 1124 (emphasis added). By section 1124's plain terms, to render a claim unimpaired a plan must *generally* cure "any such default that occurred before or after the commencement of the case under this title," but once again—in much the same fashion as section 365(b)—it carves out defaults "of a kind specified in section 365(b)(2) of this title or of a kind that section 365(b)(2) expressly does not require to be cured." *Id.* And rightfully so: if such clauses were enforceable, then they would subject debtors to damages and penalties that are expressly designed to discourage potential debtors from exercising their statutory rights to seek protection under the Bankruptcy Code and impede their abilities to successfully reorganize. Con Ed's Demand thus fails as a matter of law and is antithetical to the intent and purpose of the Bankruptcy Code.

### *B. Fundamental Bankruptcy Policy, as Manifest in Numerous Provisions of the Bankruptcy Code, Otherwise Bars Con Ed from Enforcing an Ipso facto Clause Against the Debtors*

Even if Con Ed could somehow contend that its Demand was not barred by section 365(b)(2), either by trying to reformulate its Demand or by quibbling about the meaning of the PPAs, the Bankruptcy Code elsewhere reaffirms a clear congressional intent to render *ipso facto* clauses unenforceable against a debtor as a matter of bankruptcy policy. Congress—anticipating that creative creditors would look for other ways to extract payment from or otherwise undermine a debtor when it was availing itself of its federal rights under the Bankruptcy Code—also enacted several other provisions evincing a strong federal policy against enforcing *ipso facto* clauses against a debtor.

Begin with section 365(e)(1), which prohibits a counterparty from modifying or terminating a debtor's contracts upon the filing of bankruptcy:

> Notwithstanding a provision in an executory contract … an executory contract … may not be terminated or modified, and any right or obligation under such contract … may not be terminated or modified, at any time after the commencement of the case solely because of a provision in such contract … that is conditioned on—
>
> (A) the insolvency or financial condition of the debtor at any time before the closing of the case;

(B) the commencement of a case under this title ….

11 U.S.C. § 365(e)(1). By its plain terms, section 365(e) provides that "an executory contract … may not be terminated or modified … solely because of" either "the insolvency or financial condition of the debtor" or "the commencement of a case under this title." *Id.*; *see also Liberty Mut. Ins. Co. v. Greenwich Ins. Co.*, 417 F.3d 193, 198–99 (1st Cir. 2005) (observing that section 365(e)'s "purpose—avowed in both legislative history and case law—is to protect the bankruptcy estate, primarily against the loss of contractual rights that the estate might choose to assume and reaffirm"); *Charter Commc'ns*, 419 B.R. at 250 (explaining statutory scheme). Those are the same two conditions set out in section 365(b), and not by accident. "Subsection (e) invalidates ipso facto or bankruptcy clauses," and while clauses that "automatically terminate the contract" or "permit the other contracting party to terminate the contract" were "protected under [the] present law" of 1978, this "frequently hamper[ed] rehabilitation efforts" and was therefore proscribed by the Bankruptcy Code in Congress's sound judgment. *See* Senate Report at 59; *see also In re Lehman Bros. Holdings Inc.*, 422 B.R. 407, 414 (Bankr. S.D.N.Y. 2010) ("The Bankruptcy Code of 1978 effected a change in the treatment of contract or lease clauses that would seek to modify the relationships of contracting parties due to the filing of a bankruptcy petition—so-called *ipso facto* clauses."); *In re Bricker*, 43 B.R. 344, 347 (Bankr. D. Ariz. 1984) (observing that pre-Code cases are "now distinguishable due to enactment of the Code's prohibition on enforcement of [*ipso facto*] clauses").

Then there is section 541(c), which prevents creditors from using *ipso facto* clauses to take property out of the estate by relying, just as in sections 365(b) and 365(e), on "any provision in an agreement" that "is conditioned on the insolvency or financial condition of the debtor" or "on the commencement of a case under this title." 11 U.S.C. § 541(c)(1). Indeed, the scope of *ipso facto* provisions limited by section 541(c) is broad, applying to both the enforcement of security over physical collateral as well as to intangible property rights. *See In re Denman*, 513 B.R. 720, 727 (Bankr. W.D. Tenn. 2014) (holding that section 541(c) "invalidates" an *ipso facto* clause that "creates a right that occurs only upon the triggering event of a member's bankruptcy filing"); *see also In re Canuso*, 2021 WL 2144197, at *11 (Bankr. D.N.J. May 26, 2021) (holding that an agreement's

provision providing for an assignment of shares on a party's bankruptcy was "invalid and unenforceable" pursuant to section 541(c)).

Finally, section 363(*l*) provides that "the trustee may use, sell, or lease property … or a plan under chapter 11, 12, or 13 of this title may provide for the use, sale, or lease of property, notwithstanding any provision in a contract" that "is conditioned on the insolvency or financial condition of the debtor" or "the commencement of a case under this title," with section 363(*l*) further prohibiting, for good measure, any clause that "effects, or gives an option to effect, a forfeiture, modification or termination of the debtor's interest in the property." 11 U.S.C. § 363(*l*); *see In re Manning*, 831 F.2d 205, 211 (10th Cir. 1987) ("Sections 541(c) and 363(*l*) protect, respectively, the debtor's interest in and the trustee's right to sell property of the estate 'notwithstanding any provision' that is 'conditioned' on bankruptcy proceedings and that effects a modification or forfeiture of the debtor's interest in the property.").

Congress did not stop there. It also provided for numerous other instances where *ipso facto* clauses are rendered unenforceable against a debtor in order to facilitate the basic policies of chapter 11. *See* Senate Report at 62 (noting, in the context of the allowance of claims under § 502, that "[w]hether interest is matured or unmatured on the date of bankruptcy is to be determined without reference to any ipso facto or bankruptcy clause in the agreement creating the claim"); *id.* at 117 (observing, in the context of leasing aircraft equipment and vessels under § 1110, that a trustee has no obligation to cure defaults "under ipso facto or bankruptcy clauses"); *id.* at 136–37 (observing, in the context of curing defaults related to "rolling stock equipment" under 11 U.S.C. § 1175, that the "[d]efaults described in section 365(b)(2) … are, for obvious reasons, excepted" from the obligation to cure).

The Bankruptcy Code, thus, repeatedly effectuates a clear and unmistakable congressional intent to render *ipso facto* clauses unenforceable against a debtor, consistent with Congress's policy choice throughout the Bankruptcy Code "to protect debtors and creditors from piecemeal dismemberment of the debtor's estate." *In re Computer Commc'ns, Inc.*, 824 F.2d 725, 731 (9th Cir. 1987) (citing 11 U.S.C. § 362); *In re W.R. Grace & Co.*, 475 B.R. 34, 152 (D. Del. 2012) ("[T]he whole purpose of filing for bankruptcy is to provide the debtor with a 'fresh start,' and enforcement

of *ipso facto* clauses would punish debtors by negating this central purpose."); *see also, e.g.*, *In re Lehman Bros. Holdings Inc.*, 970 F.3d 91, 98–99 (2d Cir. 2020) (surveying statutory scheme and noting that "[t]hese anti-*ipso facto* provisions strip non-bankrupt counterparties of certain contractual rights they otherwise have and prevent them from collecting debts due from the bankrupt party"); *In re Lehman Bros. Holdings, Inc.*, 422 B.R. at 414–15 ("It is now axiomatic that *ipso facto* clauses are, as a general matter, unenforceable."); *In re Pak*, 252 B.R. 215, 217 n.1 (Bankr. M.D. Fla. 2000) ("A creditor cannot force a default upon a debtor by the use of the ipso facto clause of a contract solely because of a bankruptcy filing …. [T]he Court concludes that Debtor's filing of a bankruptcy petition did not, as a matter of law, constitute a default under the bankruptcy default clause, or ipso facto clause, of the Mortgage."); *Riggs Nat'l Bank of Washington, D.C. v. Perry (In re Perry)*, 729 F.2d 982, 984–85 (4th Cir. 1984) (observing that "enforcement of a default-upon-filing clause would clearly intrude upon" the Bankruptcy Code's policy of creating a fresh start for debtors and that such clauses are "unenforceable as a matter of law").

This comprehensive statutory scheme thus demonstrates a clear "[b]ankruptcy policy" that "generally prevents enforcement of *ipso facto* clauses." *In re B-Bar Tavern. Inc.*, 506 B.R. 879, 927 n.39 (Bankr. D. Mont. 2013); *see also Jennifer Convertibles*, 447 B.R. at 720–22 (recognizing the "federal bankruptcy policy against the enforcement of *ipso facto* clauses" that "impermissibly hamper the Debtors' reorganization"); *Yates*, 241 B.R. at 255 (noting "the bankruptcy policy of preventing the enforcement of ipso facto or bankruptcy termination clauses"). Accordingly, courts have "prohibited enforcement of *ipso facto* clauses on more general grounds," *W.R. Grace*, 475 B.R. at 153, including on the bases that they undermine the effectiveness of the automatic stay or a debtor's ability to reorganize. *See, e.g.*, *Riggs*, 729 F.2d at 984–85 ("The enactment of the Bankruptcy Code, and in particular the stay provision, evinced a clear Congressional purpose to create a way by which debtors may obtain a fresh start towards reorganization of their financial obligations …. This Court's enforcement of a default-upon-filing clause would clearly intrude upon that policy…."); *Ry. Reorganization*, 133 B.R. at 582 ("Not only are [*ipso facto*] clauses expressly unenforceable, but they contravene [Bankruptcy] Code policy of providing debtors with a fresh start."); *cf. In re 53 Stanhope LLC*, 625 B.R. 573, 583 (Bankr. S.D.N.Y. 2021) ("When the only default was the bankruptcy filing

itself, courts have properly held, that post-default interest[] should not be allowed"); *In re Residential Cap., LLC*, 508 B.R. 851, 862 (Bankr. S.D.N.Y. 2014) (declining to enforce bankruptcy default provision because "bankruptcy policy should not penalize a debtor for filing by awarding default interest when the only default was the filing itself").

Thus, even setting aside the fact that section 365(b)(2) itself mandates the disallowance of Con Ed's claims, other provisions of the Bankruptcy Code embodying a clear federal bankruptcy policy compel the same conclusion. Because the alleged breach in Con Ed's breach-of-contract claims—the legal theory that supposedly entitles it to "direct" contractual damages—is a default under an unenforceable *ipso facto* clause, Con Ed is barred from relying on it when seeking contract cure damages from the Debtors. Nor can Con Ed prevail through the artifice of asserting that the contractual losses in question arise from the Third-Party Financing Agreements, not the CED Agreements. Indeed, for Con Ed's losses to be recoverable against the Debtors, there *must* be some contractual nexus with the Debtors in the CED Agreements. Here, the only "nexus" for Con Ed's claimed damages is an *ipso facto* clause that Con Ed is attempting to enforce against the Debtors in contravention of the Bankruptcy Code and well-settled law. Con Ed's Demand should be disallowed.

### *C. Damages Alleged to Have Been Triggered by Ipso Facto Clauses But Arising Under Cross-Default Provisions to Separate Agreements Need Not Be Cured in Order to Assume Executory Contracts Under Section 365*

Finally, Con Ed's Demand must also fail because it seeks to force the Debtors to cure alleged losses that were not only triggered by the commencement of the Chapter 11 Cases, but that also arose from cross-defaults under entirely separate agreements to which the Debtors were not parties. This, too, violates fundamental bankruptcy policy. Con Ed cannot plead around the Bankruptcy Code's prohibition on *ipso facto* clauses by pointing to damages arising from cross-default provisions in the Third-Party Financing Agreements—especially when Con Ed concedes that these cross-default provisions were themselves triggered by *ipso facto* clauses. *See, e.g.*, Demand at 2 (contending that the Debtors' bankruptcy "caused defaults under the Financing Agreements").

Cross-default provisions are disfavored because they "operate as financial condition clauses" under which "[t]he inability to perform" under one contract is "indicative of … financial problems," and this is especially true when such provisions are employed as "an artful device for precluding

assumption." *In re Sambo's Restaurants, Inc.*, 24 B.R. 755, 757 (Bankr. C.D. Cal. 1982). Indeed, "[t]his reasoning is also consistent with the policy underlying the prohibition of *ipso facto* or bankruptcy termination clauses under § 365(e)," because "[t]he policy underlying the prohibition of bankruptcy termination clauses … is that such clauses restrict the debtor's ability to assume and assign executory contracts and leases where doing so would benefit the estate, thereby hampering the Debtors' rehabilitation efforts." *In re Wheeling-Pittsburgh Steel Corp.*, 54 B.R. 772, 778 (Bankr. W.D. Pa. 1985).

Cross-default provisions in separate agreements are, thus, "inherently suspect," as "they impede a debtor's right to assume a contract by conditioning assumption on the cure of defaults under entirely separate agreements." *Jennifer Convertibles*, 447 B.R. at 721 (citing *Charter Commc'ns*, 419 B.R. at 250–51). For that reason, courts "carefully scrutinize the facts and circumstances surrounding the particular transaction to determine whether enforcement of the provision would contravene an overriding federal bankruptcy policy and thus impermissibly hamper the debtor's reorganization." *Id.*

*Jennifer Convertibles* provides an apt example: There, a contract counterparty objected to the debtors' proposed assumption of a contract on the grounds that the debtors were incapable of curing a provision that "[could] only be read to require legal satisfaction of all claims of third party vendors as of the effective date." 447 B.R. at 721. Because the court found that this provision purportedly required the debtors "to pay third parties under entirely separate contracts," it declined to construe the contract that way on the grounds that it "would contravene the federal bankruptcy policy against the enforcement of *ipso facto* clauses and impermissibly hamper the Debtors' reorganization" by saddling the debtors with the burden of curing defaults under separate agreements. *Id.* at 720–22. The court therefore permitted the debtor to assume the contract without paying off third-party claims in full. *Id.* at 722.

The reasoning of *Jennifer Convertibles* is directly applicable here. Regardless of how Con Ed chooses to formulate its claims, it relies solely on the Debtors' bankruptcy as the event that triggered a cross-default under a separate set of contracts for which is now seeks to recover additional amounts from the Debtors. As set forth above, the Debtors are not parties to the Third-Party Financing Agreements, which were separately negotiated and entered into by Con Ed and its lenders (sometimes

years after the relevant CED Agreement). But even if Con Ed could show there was an actionable nexus between the Third-Party Financing Agreements' cross-default provisions and Con Ed's separate agreements with the Debtors (which it cannot), Con Ed's Demand would *still* be premised solely on a bankruptcy cross-default provision and the Debtors' chapter 11 filing as the only basis for its Demand. This clearly "contravene[s] the federal bankruptcy policy against the enforcement of *ipso facto* clauses" and "impermissibly hamper[s] the Debtors' reorganization." *Jennifer Convertibles*, 447 B.R. at 721–22.

Con Ed's Demand should, therefore, be disallowed on the basis that Con Ed cannot enforce a cross-default provision against the Debtors in these circumstances. If the damages sought by Con Ed in its Demand were alleged to have been incurred directly under the CED Agreements with the Debtors themselves, they would be disallowed without question as they were plainly triggered by an unenforceable *ipso facto* clause. Con Ed cannot plead its way around this barrier by pretending such damages are somehow now enforceable when they were incurred under separate agreements to which the Debtors are not parties and when those separate agreements are still expressly triggered by the same *ipso facto* clause and the commencement of the Debtors' Chapter 11 Cases. Were it otherwise, Con Ed could turn the Debtors' filing into a penalty for seeking protection—a result that Congress plainly did not intend.

## IV. CONCLUSION

For the reasons discussed above, Con Ed's Demand should be disallowed.

Dated: June 18, 2021

**WEIL, GOTSHAL & MANGES LLP**
**KELLER BENVENUTTI KIM LLP**

By: */s/ Theodore E. Tsekerides*
Theodore E. Tsekerides

*Attorneys for Debtors and Reorganized Debtors*