# EXHIBIT 5



May 7, 2021

Brian C. Walsh
Direct: +1 314 259 2717
brian.walsh@bclplaw.com

BRYAN CAVE LEIGHTON PAISNER LLP
One Metropolitan Square
211 North Broadway Suite 3600
St Louis MO 63102
T: +1 314 259 2000
F: +1 314 259 2020
bclplaw.com

Wayne R. Gross, Esq.
Greenberg Gross LLP
650 Town Center Dr., Suite 1700
Costa Mesa, California 92626

**Via E-Mail: WGross@GGTrialLaw.com**

Re:   Rule 2004 Subpoena Issued to PricewaterhouseCoopers LLP

Dear Mr. Gross:

I write in response to your letter of April 30, which is replete with distortions regarding PricewaterhouseCoopers LLP's ("PwC") good-faith efforts to comply with the March 27, 2020 Rule 2004 subpoena ("Subpoena"). Although you state that you are making "a final effort to meet and confer" regarding PwC's response, there is nothing in your letter about meeting and conferring. Your letter is simply an unjustified ultimatum accompanied by an inappropriate threat founded upon misrepresentations of fact.

Contrary to your assertions, there have been no "willful failures" by PwC in responding to the Subpoena. Nor has PwC has "steadfastly refused" to comply with the Subpoena or "blatantly failed and refused" to produce documents.

As you know, yours is the third law firm with which we have dealt in connection with PwC's response to the Subpoena. The tone and content of your letter suggest a vast departure from your predecessors and evidences that you are not aware of the nature and extent of our interactions with them. Moreover, it demonstrates that you are not aware of the full scope of the documents PwC has already produced and the agreements reached with your predecessors on what was not produced. Coming in at the eleventh hour does not permit you to unilaterally rewrite the history and understandings reached between the parties on this matter over many months of cooperative discussions.

While I write to correct the gross distortion of the facts portrayed by your letter, I write also to invite you to engage in and continue those cooperative discussions, consistent with the precedent set to date with your predecessors, about the documents in which you appear to be interested, many of which were not of interest or even raised by your predecessors.

**Productions by PwC to Date**

We will not bury the lede. PwC has made several productions, after engaging in continuing meet-and-confer discussions with your predecessors, responding to their specific questions and concerns related to particular projects. These productions, in addition to the numerous discussions with your predecessors over many months (until they went silent), refute the specious statements sprinkled throughout your letter that PwC has made no effort to comply with the Subpoena.



As you are aware, PwC served objections to the Subpoena on April 9, 2020, pointing out the extraordinary breadth of the Subpoena, as well as issues of undue burden and privilege. PwC's written objection, however, expressly invited further discussions with issuing counsel at Baker Hostetler. Notwithstanding the objections and the intention to discuss further with Baker Hostetler the issues and concerns with the breadth of the Subpoena, on the same date PwC served its objections, PwC also made its first production in response to the Subpoena, namely, the 2017 Master Services Agreement between PwC and PG&E.

In our earliest discussions with Baker Hostetler, it became clear that both sides understood that the Subpoena, on its face, called for the production of an enormous volume of documents that would be of no conceivable interest or relevance to the Official Committee of Tort Claimants. When Brown Rudnick succeeded Baker Hostetler and became involved in the discussions on behalf of the Fire Victim Trust, Brown Rudnick expressed the same understanding. In fact, your predecessors focused exclusively on particular projects or specific workstreams that appeared to be of interest to the Committee or the Trust. Your predecessors' interest in some projects and workstreams waned once they better understood the nature of PwC's engagement. For example, Baker Hostetler at first was intrigued by a vegetation-management project in which PwC was involved but lost interest after learning that PwC's role was to assist with the management of claims by adjacent landowners arising from trespasses and other instances of aggressive vegetation management, namely, unrelated to liability. PwC had no responsibility for wildfire safety.

The discussions with your predecessors were as much about what should not be produced as they were about what should be produced, and the scope of PwC's productions was consistent with that approach. At no time did any representative of either predecessor firm demand, as you do in your letter, that PwC produce "all PwC Contracts and all PwC Deliverables." In fact, quite the opposite. You need only review Brown Rudnick's October 20, 2020 letter to us to see one example of the cooperative approach the parties had taken prior to your letter relative to the scope of the Subpoena as well as production of documents. As another example, our letter of December 10, 2020 stated that we did not believe that PwC's work on three contracts identified by Brown Rudnick was in any way connected with the cause of the wildfires, but we produced several hundred pages of exemplary deliverables to permit your predecessor to consider whether it should request others.

PwC made seven productions throughout 2020, totaling 1,579 pages of documents, following discussions with your predecessors, summarized as follows:

| Date | Size | General Contents |
|---|---|---|
| April 9, 2020 | 48 pages | 2017 Master Services Agreement |
| June 12, 2020 | 705 pages | Insurance policies |
| June 23, 2020 | 246 pages | Contracts |
| August 22, 2020 | 142 pages | Contracts |
| September 2, 2020 | 45 pages | 2012 Master Services Agreement |
| October 30, 2020 | 80 pages | Contracts |
| December 17, 2020 | 313 pages | Deliverables |



The foregoing refutes the premise of your letter and your grossly unfounded misstatements that "PwC has blatantly failed and refused to produce relevant, responsive documents, even after specific requests for evidence pertaining to known PwC work on wildfire safety" and that "PwC has failed and refused to produce: (1) relevant PwC Contracts that undisputedly relate to wildfire safety, even after a request identifying known wildfire safety work by PwC; and (2) any PwC Deliverables whatsoever." In fact, based on discussions with your predecessors, PwC has produced hundreds of pages of contracts and deliverables.

In the nearly five months that have passed since our most recent production, we have received neither a response to our invitation for further discussions nor, until your letter, any hint that the production was incomplete. PwC has proceeded in good faith and has been constructive and practical in its previous interactions with your predecessors, producing a large volume of documents and leaving the door open for further discussions about requests for additional documents. Indeed, our principal contact at Baker Hostetler thanked us for our "courtesy and professional approach" as that firm exited the engagement. You merely had to pick up the phone, as your predecessors had, and continue the discussion. Why you chose instead to follow an unnecessarily inflammatory and grossly false approach is beyond us. That said, and as stated at the end of this letter, we stand ready to resume collaborative and constructive discussions based on the precedent set by your predecessors.

**General Rate Case and EPC Cross-Cutting**

In your letter, you take particular issue with what you describe as PwC's failure and refusal to produce documents related to PG&E's general rate case ("GRC") and the Engineering Procurement and Construction Cross-Cutting Program ("EPC CC"). As to both of these programs, your statements again are unfounded.

First, in meet-and-confer discussions throughout 2020 with your predecessors, neither firm ever suggested that the GRC was an item of interest. PwC has not refused to produce GRC-related documents and is not now necessarily refusing to produce them. The concern you now raise has simply never come up. Perhaps that was because PwC functioned in a management consulting role, often working on a privileged basis with and at the direction of PG&E's law department, to assist PG&E in gathering data and coordinating PG&E's resources in connection with the GRC. PwC did not advise PG&E on wildfire safety or risk mitigation and, contrary to your letter, PwC did not have any "responsibility for the circumstances that ultimately gave rise" to the 2017 and 2018 wildfires. Given the unreasonably short deadline imposed in your letter, following many months of silence from your predecessors and yourself, coupled with the fact that this project was not discussed in the many meet-and-confer discussions, we are not presently in a position to commit to any particular production scope, but we would be happy to discuss this topic with you.

By contrast, EPC CC was the first project mentioned by Baker Hostetler in our first call. After PwC provided Baker Hostetler an overview of the nature of the services PwC provided, they did not pursue the matter. Nevertheless, on June 23, 2020, we produced Contract Work Authorizations for EPC CC engagements at PwC-000766 and PwC-000774. According to my contemporaneous notes, the project came up only once more during our communications with Baker Hostetler; specifically, Baker Hostetler inquired whether the EPC CC project was issued under a different PwC master agreement than the 2017 agreement produced in our first production. Despite the imperfect information provided by Baker Hostetler, we eventually located the second master agreement and produced it at PwC-001142.

Brown Rudnick appeared to have more interest in EPC CC. In the October 20, 2020 letter mentioned above, one of Brown Rudnick's lawyers requested production of deliverables related to the two EPC CC contracts PwC had previously produced. We responded on December 10, 2020, stating that we did not



believe that PwC's work on EPC CC was plausibly connected to the cause of the wildfires, but nevertheless on December 17, 2020 produced several PowerPoint overview documents so that the Trust could consider the issue further (see PwC-001439 through 001579). This, again, refutes your claim that "PwC has failed and refused to produce: … any PwC Deliverables whatsoever." As noted above, we received no response from Brown Rudnick, and none from your firm until your out-of-the-blue letter.

**Community Wildfire Safety and Public Safety Power Shutoff**

Your letter also discusses the Community Wildfire Safety Program ("CWSP") and the Public Safety Power Shutoff Program ("PSPS") and asserts that PwC "has failed and refused to produce any PwC Contracts that relate to this work, as well as any related PwC Deliverables." This is, again, demonstrably false.

PwC's first work on the PSPS project was in 2019, after the 2018 Camp Fire. From our earliest conversations with Baker Hostetler, we understood that the Subpoena was focused on documents and projects that **preceded** the 2017 and 2018 fires and thus potentially were related to the causes of those fires. Nevertheless, in the interest of cooperation, we produced a Statement of Work relating to PSPS (see PwC-000783) and a series of additional PSPS contracts (see PwC-001187 through 001221). Several of these documents describe PSPS as a component of CWSP. Not surprisingly, we received no follow-up requests because the documents produced postdated the 2017 and 2018 fires and, consistent with your predecessors' view, were not the focus of the Subpoena.

CWSP is a broad term used by PG&E that does not correspond neatly to particular PwC engagements. Nevertheless, to the extent that we have been able to identify CWSP contracts that are distinct from PSPS contracts, those contracts are either (a) retrospective in nature, namely, services performed for PG&E after the fires, or (b) engagements by the PG&E legal department in connection with actual or anticipated litigation and thus, in the view of PG&E and its external counsel, subject to its attorney-client privilege or work-product protection. We are not in a position either to evaluate those privilege claims by PG&E or to waive those protections, and direct you to PG&E's counsel to the extent you have disagreement with such claims.

Following Baker Hostetler's request on June 29, 2020 for CWSP contracts, we investigated further, both internally and in consultation with PG&E's counsel. After Baker Hostetler exited this matter, we informed Brown Rudnick by telephone on August 19, 2020 that all contracts for what we understood to be CWSP projects had either been produced already (referring to the PSPS contracts and certain items on the docket of the bankruptcy case, to the extent that any of those projects should be considered part of CWSP) or post-dated the fires. Again, not surprisingly, neither on that call nor in our subsequent interactions did Brown Rudnick indicate that the Trust was seeking information about PwC's post-fire work. In short, your predecessors' approach as to the scope of the Subpoena was consistent and clear: documents relating to work after the 2017 and 2018 fires was not the focus of the Subpoena and need not be produced. Your letter represents a material and belated departure from this consistent position.

In sum, your assertion that "PwC has knowingly withheld and failed to produce highly relevant documents" relating to CWSP and PSPS is inaccurate and your current position as to the scope of the Subpoena is unsupported by positions and actions taken by your predecessors.

Your comment that a litigation hold notice was provided to certain PwC personnel in November 2017 also appears to be related to CWSP. This is not an issue that had been discussed or drawn to our attention by your predecessors because it reveals nothing about the nature or scope of PwC's work. Our preliminary understanding is that those PwC individuals who received the notice from PG&E were performing services related to one of the CWSP litigation-support projects that began after the 2017 fires, and potentially the PwC individuals came into possession of information about the fires in the course of their work with



PG&E's counsel. PG&E's distribution of hold notices in such circumstances does not, as you suggest, indicate that PwC had been performing work that might give rise to a claim or that PwC was engaged to provide consulting services related to wildfire safety.

**Work in 2019 and 2020**

You correctly state that PwC performed a variety of work for PG&E in 2019 and 2020. But, as discussed above, your predecessor firms were looking for contracts and other documents that preceded and were related to the causes of the fires, not documents generated after the fact. Your letter is the first suggestion of a new interpretation of the scope of the Subpoena, namely, that it might be intended to capture documents generated **after** the fires. With the exception of PSPS, discussed separately above, none of the projects discussed on pages 5 and 6 of your letter were the subject of any discussions with Baker Hostetler or Brown Rudnick, because, as previously stated, your predecessors were clear and consistent that such engagement post-fires were not in scope.

Your statement that PwC "willfully chose not to" produce documents relating to these 2019 and 2020 projects is flatly wrong and a mischaracterization of the facts. PwC did not produce any such documents (with the exception of PSPS) because your predecessors acknowledged that they were not seeking production of post-fire documents.

**Request for Privilege Log**

You also request that PwC provide a written privilege log identifying all documents withheld under a claim of privilege. This request is inappropriate and unduly burdensome in several respects.

First, to be clear, PwC is not currently withholding any documents from production based on an attorney-client or other privilege *held by PwC*. Of course, PwC reserves the right to assert any applicable privilege as to documents that may come within the scope of a potential production following further discussions, and we will provide a privilege log in that instance.

Second, we understand that PG&E has prepared and served a privilege log in response to discovery requests served by the Committee or the Trust. Regardless of your stated concerns about the quality of PG&E's recordkeeping or the removal of PwC's branding from documents (another issue raised for the first time in your letter), PG&E's log should contain the fundamental information you need "to evaluate the validity of any privilege claim." In any event, we are not in a position to create a privilege log for PG&E and its counsel.

Third, we have no doubt that your predecessors did not request a privilege log from PwC because the projects at issue and the nature of PwC's work made the validity of the privilege claim self-evident, such that insisting that PwC arrange for a detailed privilege log to substantiate PG&E's privilege claim (and to largely duplicate PG&E's own log) would serve only to burden PwC and PG&E with legal fees and expenses, with no corresponding benefit. Moreover, we assume that your predecessors would have raised any disagreements with PG&E's counsel's privilege assertions directly with PG&E's counsel. If you have any decisional law to support your view that a non-party must log all documents for a categorically privileged engagement, please provide such law to us. We are not aware of any such law.

**Conclusion**

Your letter grossly mischaracterizes the collaborative meet-and-confer and discussion process that was in place with your two predecessors and PwC prior to your involvement. Your letter insists that PwC produce a variety of documents that have never before been at issue during prior meet-and-confer discussions or



written communications between PwC's counsel and the firms representing the Committee or the Trust during the past year. Even more bizarrely, you suggest that PwC acted wrongfully when it did not produce documents in which your predecessor firms affirmatively disclaimed interest, and you also incorrectly assert that PwC refused to produce documents that it in fact produced.

We would have been happy to discuss, as we did with your predecessors, any issues or concerns you had related to the Subpoena in a phone call or in response to a letter that sought to continue the cooperation between your predecessors and PwC. The letter you chose to send, however, simply misrepresents the facts and circumstances and inappropriately threatens to bring issues that are not remotely ripe before the Bankruptcy Court. Should you follow through with that threat, we will provide the Court with the facts about PwC's cooperation, the absence of follow-up by your predecessors, the complete silence related to the Subpoena since our last production, and your new letter that attempts to, without the benefit of any discussion or even the basic facts related to this matter, unilaterally reinvent the understanding the parties have reached related to the scope of the Subpoena.

For all these reasons, PwC is not in a position to commit to produce "all PwC Contracts and PwC Deliverables," plus a log supporting PG&E's privilege claim, within the time frame you have arbitrarily chosen, particularly as the request is a jarring reset of the approach previously followed by Baker Hostetler and Brown Rudnick.

As stated above, a simple phone call on this matter was all that was needed. An ultimatum wrapped in a threat was unnecessary and unproductive. I remain, as I always have been with you and your predecessors, happy to discuss these matters with you. You should also feel free to reach out to my partner Jed White at (310) 576-2114. We look forward to your call to restart the collaborative process that was in place with your predecessors and PwC.

Very truly yours,

*Brian C. Walsh*

Brian C. Walsh

cc: Jed P. White