1  PILLSBURY WINTHROP SHAW PITTMAN LLP
   JONATHAN DOOLITTLE (SBN 290638)
2  jonathan.doolittle@pillsburylaw.com
   Four Embarcadero Center, 22nd Floor
3  San Francisco, CA 94111-5998
   Telephone:   415.983.1000
4  Facsimile:   415.983.1200

5  PILLSBURY WINTHROP SHAW PITTMAN LLP
   HUGH M. MCDONALD (*admitted pro hac vice*)
6  hugh.mcdonald@pillsburylaw.com
   31 West 52nd Street
7  New York, NY 10019-6131
   Telephone:   212.858.1000
8  Facsimile:   212.858.1500

9  *Attorneys for Consolidated Edison Development, Inc.*

10
11                    **UNITED STATES BANKRUPTCY COURT**
                      **NORTHERN DISTRICT OF CALIFORNIA**
12                       **SAN FRANCISCO DIVISION**

13  **In re:**                              | Case No. 19-30088 (DM)

14  **PG&E CORPORATION**                     | CHAPTER 11 (LEAD CASE)
                                             | (JOINTLY ADMINISTERED)
15       **- and -**

16  **PACIFIC GAS AND ELECTRIC**             | **CONSOLIDATED EDISON**
    **COMPANY,**                             | **DEVELOPMENT, INC.'S RESPONSE**
17                                           | **TO REORGANIZED DEBTORS'**
                      **Debtors.**           | **OBJECTION TO**
18                                           | **CONSOLIDATED EDISON**
                                             | **DEVELOPMENT, INC.'S AMENDED**
19  ☐ Affects PG&E Corporation              | **CURE PAYMENT CLAIM DEMAND**
    ☐ Affects Pacific Gas and Electric Company
20  ☑ Affects both Debtors                   | Date:     August 10, 2021
                                             | Time:     11:00 a.m.
21  * *All papers shall be filed in the Lead Case,* | Place:   U.S. Bankruptcy Court, Rm 17,
    *No. 19-30088 (DM).*                     | 16th Floor, San Francisco, CA 94102
22
                                             | Related Docket No.:  10827
23
                                             | **Reply Due:** July 30, 2021
24

25
26
27
28

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................................1

BACKGROUND ...................................................................................................................2

    A.    The PPAs and IAs ...................................................................................................3

        a.    Power Purchase Agreements ..................................................................3

        b.    Interconnection Agreements ....................................................................4

    B.    Project Financing ...................................................................................................4

    C.    PG&E Bankruptcy and Defaults ...........................................................................5

ARGUMENT .......................................................................................................................6

    A.    Section 365(b)(2) Does Not Expressly Bar CED From Recovering Direct Damages Arising from PG&E's Bankruptcy Filing ..............................................6

    B.    Section 365(e)'s Prohibition of Ipso Facto or Bankruptcy Clauses Does Not Apply ....................................................................................................................9

        a.    Direct Damages Arising from Bankruptcy Filing Do Not Cause Termination of the PPAs and IAs .........................................................12

        b.    Direct Damages Arising From the Bankruptcy Filing Do Not Alter Rights or Obligations under the PPAs and IAs ......................................12

        c.    Cross-Default Clause under Financing Agreement is an Enforceable Ipso Facto Clause ...............................................................................13

    C.    The Safe Harbor Protection of Section 556 Precludes Application of Section 365(e)'s Prohibition of Ipso Facto Clauses ..........................................................14

        a.    The PPAs are Forward Contracts ..........................................................15

        b.    Forward Contract Merchant ...................................................................17

            i.    CED is a Forward Contract Merchant .........................................18

            ii.    PGE is a Forward Contract Merchant .........................................18

    D.    Damages Triggered under a Cross-Default Clause by an Ipso Facto Clause are Curable ................................................................................................................18

CONCLUSION ...................................................................................................................22

# TABLE OF AUTHORITIES

Page(s)

Cases

*In re Borden Chems. & Plastics Operating Ltd.*,
336 B.R. 214 (Bankr. D. Del. 2006)..................................................................16, 18

*In re Cascade Grain Prods., LLC*,
465 BR 570 (Bankr. D. Or. 2011)..........................................................................16

*In re Claremont Acquisition Corp.*,
113 F.3d 1029 (9th Cir. 1997)..................................................................................7

*In re Clear Peak Energy, Inc.*,
488 B.R. 647 (Bankr. D. Ariz. 2013)..............................................15, 16, 17, 18

*In re Cutler*,
165 B.R. 275 (Bankr. D. Ariz. 1994)..................................................................9, 10

*In re First Energy Sols. Corp.*,
596 B.R. 631 (Bankr. N.D. Ohio 2019)..................................................................17

*In re Fleetwood Motel Corp.*,
335 F.2d 857 (3d Cir. 1964)....................................................................................10

*In re Gen. Growth Props., Inc.*,
451 B.R. 323 (Bankr. S.D.N.Y. 2011)....................................................................14

*In re Jennifer Convertibles, Inc.*,
447 B.R. 713 (Bankr. S.D.N.Y. 2011)..............................................................18, 19

*In re Kopel*,
232 B.R. 57 (Bankr. E.D.N.Y. 1999)..................................................7, 19, 20, 21

*In re L&J Anaheim Assocs.*,
995 F.2d 940 (9th Cir. 1993)....................................................................................8

*In re Laurel Valley Oil Co.*,
No. 05–64330, 2013 WL 832407 (Bankr. N.D. Ohio Mar. 5, 2013).....................17

*Liberty Mut. Ins. Co. v. Greenwich Ins. Co.*,
417 F.3d 193 (1st Cir. 2005)....................................................................................11

*In re Lighthouse Lodge, LLC*,
No. 09–52610–RLE, 2010 WL 4053984 (Bankr. N.D. Cal. Oct. 14, 2010)..............8

*In re Liljeberg Enters., Inc.*,
304 F.3d 410 (5th Cir. 2002)..............................................................................20, 21

*In re MBS Mgmt. Servs., Inc.*,
  432 B.R. 570 (Bankr. E.D. La. 2010), *aff'd*, 690 F.3d 352 (5th Cir. 2012).............................15

*In re Mirant Corp.*,
  310 B.R. 548 (Bankr. N.D. Tex. 2004)............................................................................17, 18

*In re Nat'l Gas Distribs., LLC*,
  556 F.3d 247 (4th Cir. 2009).............................................................................................15

*In re New Invs., Inc.*,
  840 F.3d 1137 (9th Cir. 2016).............................................................................................7

*In re Peaches Recs. & Tapes, Inc.*,
  51 B.R. 583 (B.A.P. 9th Cir. 1985)...................................................................................7, 10

*In re PPI Enters. (U.S), Inc.*,
  324 F.3d 197 (3d Cir. 2003)..................................................................................................8

*In re Queens Boulevard Wine & Liquor Corp.*,
  503 F.2d 202 (2d Cir. 1974)...........................................................................................10, 11

*In re R.M. Cordova Int'l, Inc.*,
  77 B.R. 441 (Bankr. D.N.J. 1987).......................................................................................15

*In re Saint Vincent's Catholic Med. Ctrs. of N.Y.*,
  440 B.R. 587 (Bankr. S.D.N.Y. 2010)............................................................................13, 14

*In re S. Pac. Funding Corp.*,
  268 F.3d 712 (9th Cir. 2001)................................................................................................9

*In re Stolz*,
  315 F.3d 80 (2d Cir. 2002)...................................................................................................7

*Summit Inv. & Dev. Corp. v. LeRoux*,
  Nos. 94-11251-DPW, 94-11252-DPW, 1995 WL 447800 (D. Mass. Oct. 20,
  1994)...................................................................................................................................10

*In re Taddeo*,
  685 F.2d 24 (2d Cir. 1982)...................................................................................................8

*Travelers Cas. & Sur. Co. v. Pac. Gas & Elec. Co.*,
  549 US 443 (2007)................................................................................................................8

*Weaver v. Hutson*,
  459 F.2d 741 (4th Cir. 1972), *cert. denied*, 409 U.S. 957 (1972)......................................10

*In re Wheeling-Pittsburgh Steel Corp.*,
  54 B.R. 772 (Bankr. W.D. Pa. 1985)..............................................................................11, 19

Statutes and Codes

United States Code

    Title 11, section 101 ................................................................................15, 16, 17, 18

    Title 11, section 365 ...........................................................................................*passim*

    Title 11, section 502 ................................................................................................8, 9

    Title 11, section 556 .....................................................................................14, 15, 22

    Title 11, section 1124 ...................................................................................................8

    Title 11, section 1126 ...................................................................................................8

Other Authorities

Berger, James M., *How PG&E financial stress is affecting projects*, Norton Rose
    Fulbright, Dec. 18, 2018, https://www.projectfinance.law/publications/how-pge-
    financial-stress-is-affecting-projects ......................................................................14

BLACK'S LAW DICTIONARY 1001 (7th ed. 1999) ...............................................17

H.R. Rep. No. 595 ........................................................................................................11

H.R. Rep. No. 8200, 95th Cong., 1st Sess. (1977), *reprinted in* 1978 U.S.C.C.A.N.
    5963 ..........................................................................................................................11

PG&E Corp. and Pacific Gas and Electric Co., Annual Report (Form 10-K) (Feb. 28,
    2019),
    https://www.sec.gov/Archives/edgar/data/75488/000100498019000006/pge-
    40119x8xk.htm.........................................................................................................17

S. Rep. No. 989, 95th Cong., 2nd Sess. (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787....................11

Webster's New College World Dictionary, 4th ed., Wiley Publishing, Inc. (2005) .........................17

Consolidated Edison Development, Inc. ("**CED**") on behalf of itself and its Affiliates[1] file this response (the "**Response**") to Pacific Gas and Electric Company's ("**PG&E**" and with its parent PG&E Corporation, the "**Debtors**", and together with CED, the "**Parties**") objection (the "**Objection**") to CED's cure demand of $11,844,598.00 for default interest, consent fees and attorney's fees arising from PG&E's defaults under the CED Agreements (defined below) as well as under the financing agreements (the "**Cure Claim**"). In support of the Response, CED submits the *Declaration of Frank Lindh* ("**Lindh Decl.**") attached as **Exhibit A** and the *Declaration of James J. Dixon* ("**Dixon Decl.**") attached as **Exhibit B**.

## PRELIMINARY STATEMENT

PG&E has a mandate from its regulator to change the utility's electric supply from dirty carbon emitting sources to clean renewable power. Dixon Decl. ¶ 7. To do this the California Public Utilities Commission ("**CPUC**") set up a program whereby developers were attracted and incented to develop, build, own and operate renewable energy generation plants and to sell the clean electricity produced to PG&E under power purchase agreements. *Id.* By doing so, CPUC has shifted the significant expense and risk of development of these necessary facilities from PG&E to third parties such as CED. *Id.* A key component to CPUC's plan is the developers' ability to provide the significant investment needed to build the clean energy generation facilities. *Id.* Often this was accomplished through financing collateralized by power purchase agreements. *Id.*

The result of CPUC's plan is that PG&E receives a supply of renewable energy without the burdens of constructing and maintaining the generation plants, which could not exist without the very financings PG&E now feigns ignorance about. *Id.* Through its objection to CED's Cure Claim, PG&E seeks to retain all the benefits from its contracts with CED while shedding its liability for the direct and foreseeable damages incurred by CED due to PG&E's defaults affecting the financing collateral.

---

[1] The relevant CED Affiliates are: Alpaugh 50, LLC, Alpaugh North, LLC, CED Avenal Solar, LLC, CED White River Solar, LLC, Copper Mountain Solar 2, LLC, Copper Mountain Solar 1, LLC, Copper Mountain Solar 1, LLC, Coram California Development, L.P. ("**Coram**"), CED Corcoran Solar 2, LLC, CED Corcoran Solar 3, LLC, CED Corcoran Solar, LLC, CED Lost Hills Solar, LLC, Mesquite Solar 1, LLC, CED Oro Loma Solar, LLC, Panoche Valley Solar, LLC, CED White River Solar 2, LLC. *See* Dixon Decl. ¶ 6.

PG&E required all prospective power suppliers to not only demonstrate committed financing, but also experience with such types of project financing. Lindh Decl. ¶ 10. Each wholesale power purchase agreement is contingent upon the completion of each plant and, likewise, each financing is contingent upon execution and approval of each power purchase agreement. *Id.* ¶ 8(A). In most instances, the financing term is based upon the initial term of the power purchase agreement, often 10-20 years. *Id.* ¶ 7. Thus, each power purchase agreement and attendant project financing is (1) completely dependent on the existence of the other and (2) integral to the ability of PG&E to acquire renewable energy and meet its Renewables Portfolio Standard goals. *Id.* ¶¶ 7, 8(A), and 10.

PG&E's Objection relies on a misreading and misapplication of the *ipso facto* provisions in the Bankruptcy Code and does not provide any basis for disallowing the claim. PG&E's position that no default can ever occur by virtue of the bankruptcy filing of a contract counterparty is wrong – the defaults occur, but most of the time the counterparty is prevented from taking any action to terminate or modify the contract. In pursuit to recover direct damages against PG&E, CED is not seeking to terminate or modify its power purchase agreements with PG&E (the "**PPAs**"). Such damages are recoverable under the PPAs and IAs (defined below) and are not expressly disallowed under sections 365(b)(2) and (e) of title 11 of the United States Code (the "**Bankruptcy Code**"). Moreover, the contracts at issue are safe-harbored forward contracts and were not subject to the *ipso facto* provisions from the outset of these cases.

## BACKGROUND

CED develops, owns and operates solar and wind renewable energy projects and has more than 1,800 MWac of renewable energy projects in three states (the "**Projects**"), including fifteen solar projects in Arizona, California and Nevada and, as of the effective date of the Plan on July 1, 2019 (the "**Effective Date**"), one wind project in California.[2] Certain CED Affiliates are parties to PPAs and/or interconnection agreements (the "**IAs**" together with the PPAs, the "**CED Agreements**"), as each may have been amended, supplemented, or otherwise modified from time to time, with PG&E. Dixon Decl. ¶¶ 4, 13. In connection with the CED Agreements, certain Affiliates entered into financing

---

[2] CED sold its wind project in June 2021. CED retained all its rights to prosecute the cure claim related to the wind project.

agreements with third-party financiers. *Id.* ¶ 16. PG&E knew of the significance of the CED Agreements to the financing agreements, so much that it consented to the pledge of the PPAs and IAs as collateral in the financings. *Id.* PG&E also knew that its failure to consent to the pledge of the CED Agreements would have prevented the financings from being put in place. *Id.* Thus, it was clear that PG&E was well aware of the integral nature of the CED Agreements and the financings.

When the Debtors announced their intention to file for bankruptcy and subsequently filed for bankruptcy, they breached the CED Agreements and then further breached by failing to make required payments both pre-and post-petition. *Id.* ¶ 17. As material agreements to the financing agreements, the breach of the CED Agreements caused defaults under the financing agreements. *Id.* Consequently, the Affiliates suffered significant monetary loss for which, under the CED Agreements, PG&E is obligated to pay as damages for its breaches. *Id.* ¶ 18.

Under the *Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization* (the "**Plan**"), confirmed on June 20, 2020, PG&E assumed the CED Agreements as of the Effective Date. As a condition to assumption, PG&E must cure all defaults and outstanding amounts owed, including those resulting from the defaults under the financings.

A. **The PPAs and IAs**

a. *Power Purchase Agreements*

The PPAs require a subsidiary or predecessor of CED to construct, own and operate a generating facility and sell energy and certain attributes generated to PG&E (including, "green attributes" such as Renewable Energy Certificates ("**RECs**")). Dixon Decl. ¶ 8. This enabled PG&E, among other things, to achieve its resource adequacy and renewable energy requirements mandated by CPUC. *Id.* Each PPA contains an event-of-default clause, which provides in part that the bankruptcy of a counterparty or a counterparty's failure to make payments required under the PPA, if not remedied within a period, constitutes a breach. *Id.* ¶ 9.

Article 5.1 of the PPA reads in part:

> Events of Default. An "Event of Default" shall mean, (a) with respect to a Party that is subject to the Event of Default, the occurrence of any of the following: (i) the failure to make, when due, any payment required pursuant to this Agreement if such failure is not remedied within five (5) Business Days after Written Notice is received by the

Party failing to make such payment . . . . [and] (v) such Party becomes Bankrupt . . . .

PPA Art. 5.1(a)(i) and (v).

In the event of a breach, Article 5.2 of the PPA states in part that the non-breaching party may terminate the PPAs or accelerate all obligations under the PPAs:

> Declaration of Early Termination Date. If an Event of Default with respect to a Defaulting Party shall have occurred and is continuing, the other Party ("Non-Defaulting Party") shall have the following rights: (b) accelerate all amounts owing between the Parties, terminate the Transaction and end the Delivery Term effective as of the Early Termination Date . . . .

*Id.* at 5.2(b). In the event of a breach, the PPAs also permit the non-breaching party to recover direct damages incurred as a result of the breaching party's actions. Particularly, the PPAs provide that the breaching party's "liability shall be limited to direct actual damages only . . . [and] such direct actual damages shall be the sole and exclusive remedy . . . ." PPA, Art. 7.1. CED did not seek and has not sought to terminate or accelerate any obligation under the PPAs pre-confirmation. Dixon Decl. ¶ 12. And it does not seek to do so post-confirmation, even if it could. Rather, CED seeks to recover the Cure Claim incurred as a result of PG&E's defaults as direct damages pursuant to Article 7.1.

### b. Interconnection Agreements

In addition to the PPAs, each Affiliate executed the IAs among the affiliate, the California Independent System Operator ("**CAISO**"), and PG&E, pursuant to which PG&E designed, procured, constructed, installed and owned certain additions, modifications, and upgrades to PG&E's transmission system required to accommodate the interconnection of each Project with the CAISO grid (the "**Network Upgrades**"). Dixon Decl. ¶ 13. Pursuant to each IA, the Affiliate bore the initial financial cost of the Network Upgrades. *Id.* After commercial operation of the Projects commenced, PG&E became obligated to reimburse the Affiliate for the cost of Network Upgrades. Reimbursements were to be made in either (i) direct payments made on a levelized basis over a five year period, or (ii) an alternative mutually agreed upon payment schedule. *Id.* ¶ 14.

### B. **Project Financing**

Financing plays a crucial role in the construction and development of renewable energy projects, which are expensive and come with risks. Lindh Decl. ¶ 7. For instance, a project may be

abandoned or terminated and there may be delays in the construction of interconnection lines, licensing and permit issues, risk of non-performance by a counterparty or counterparty credit risks. Dixon Decl. ¶ 15. Absent third-party financing and a reliable off-taker, there is no wholesale power purchase agreement. Lindh Decl. ¶ 7, 8(A). Thus, third-party financing is an integral part of the development and execution of a wholesale power purchase agreement. *Id.* ¶¶ 7, 8(A) and 10.

Following the execution of the PPAs and IAs with PG&E, certain Affiliates executed third-party financing agreements to finance the construction costs and operations of the Projects.[3] Dixon Decl. ¶ 16. PG&E was required to execute acknowledgements and consents for the lender and the Affiliate. *Id.* As contemplated by the PPAs and financings, PG&E also consented to assignments of the applicable PPA and IAs as collateral for each financing. *Id.* Each financing contained an event-of-default clause that was triggered by, among other things, the bankruptcy filing of a counterparty to a material project contract such as the PPAs and IAs and any defaults or breaches of such contracts. *Id.*

In addition to the express acknowledgements by PG&E of the financing agreements, PG&E admitted at the outset of the case that it was aware that renewable energy projects had been financed: "The Utility's entrance into these PPAs has ***financed*** the building of thousands of Megawatts of renewable energy generation resources, and in so doing contributed to significant price reductions for renewable energy resources currently available in the market." Declaration of Fong Wan in Support of Debtors' Motion for Preliminary Injunction, dated January 31, 2019 (Adv. Proc. Case No. 19-03003 -- Dkt No. 3) at ¶ 13 (emphasis added) ("**Wan Decl.**").

**C. PG&E Bankruptcy and Defaults**

On January 29, 2019 (the "**Petition Date**"), PG&E filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The filing constituted an event of default under the PPAs, and PG&E committed other defaults and breaches after the Petition Date. Dixon Decl. ¶ 17. CED, however, continued to perform all of its obligations under the PPAs and even delivered all RECs to

---

[3] PG&E asserts that the financings were negotiated and entered into some years after the CED Agreement. While the Coram financing was not contemporaneous with the execution of the original PPA, it was a financing that replaced the original project financing following CED's acquisition of Coram, which has the same effect as if this financing was executed contemporaneously. *See* Dixon Decl. ¶ 16.

5

PG&E. *Id.* However, PG&E, failed to pay for such RECs that were based upon electricity delivered before the Petition Date. *Id.*

As a result of PG&E's bankruptcy filing, certain third-party lenders sent notices to CED noting the occurrence of a default and reserving rights to seek, among other things, the payment of interest at the applicable default rate. *Id.* ¶ 18. After confirmation of the Plan, to avoid defaulting on the financings, CED Affiliates were required to pay interest at a default rate on project financings in the total amount of $4,805,060.00. *Id.* In addition, consent fees were incurred by two CED Affiliates pursuant to agreements reached with noteholders to waive the PG&E defaults and the requirement to pay default rate interest.[4] *Id.* The agreements enabled CED to reduce PG&E's exposure by mitigating the damages resulting from the defaults caused by the Debtors' bankruptcy and breaches of the CED Agreements. *Id.* ¶ 19. The consent fees, which are less than the amount that CED would have been obligated to pay as default interest absent the Consent Agreements, aggregate $6,000,000.00. *Id.* Finally, CED incurred $1,039,538.00 in attorneys' fees and costs to directly address the defaults under the financing agreements. *Id.*

## **ARGUMENT**

### **A. Section 365(b)(2) Does Not Expressly Bar CED From Recovering Direct Damages Arising from PG&E's Bankruptcy Filing**

In the Objection, PG&E asserts that section 365(b)(2) of the Bankruptcy Code expressly bars the Cure Claim because it is not obligated to cure defaults for breaches relating to the financial status of a debtor or a debtor's bankruptcy filing. As support, PG&E relies on cases which conclude that it is unnecessary for a debtor to cure a default arising from breach under an *ipso facto* clause in order to

---

[4] The Consent and Waiver Agreements for CED California Holdings, LLC and CED California Holdings 2, LLC have been provided to the Debtors' counsel on a confidential, "Attorneys' Eyes Only" basis.

assume an executory contract. The cases relied on, however, do not hold that defaults caused by a bankruptcy filing (or financial condition of the debtor) are expressly *disallowed*. [5]

The defaults occur, but the debtor is relieved of curing the default trigger—the bankruptcy filing—in order to assume the contract. However, damages resulting from the default are still recoverable. PG&E's interpretation that such defaults are expressly disallowed under section 365(b)(2) is incorrect. A correct reading of section 365(b)(2) confirms that defaults arising as a result of an *ipso facto* default are not expressly disallowed, and that a debtor can cure defaults triggered by an *ipso facto* default without being preempted from assuming an executory contract.

The Bankruptcy Code permits a debtor to assume executory contracts. 11 U.S.C. § 365(a). Before a debtor may assume an executory contract, it must, among other things, cure prepetition defaults or provide adequate assurance that it would promptly cure such defaults. 11 U.S.C. § 365(b)(1)(A). Section 365(b)(1)(A) makes the curing of prepetition defaults a precondition to assumption. *In re New Invs., Inc.*, 840 F.3d 1137, 1140 (9th Cir. 2016) ("A default is an event in the debtor-creditor relationship which triggers certain consequences. Curing a default commonly means taking care of the triggering event and returning to pre-default conditions. The consequences are thus nullified."); *In re Stolz*, 315 F.3d 80, 86 (2d Cir. 2002) (section 365(b) "requires a debtor to cure prepetition defaults as a precondition of assuming an executory contract"); *In re Kopel*, 232 B.R. 57, 65-66 (Bankr. E.D.N.Y. 1999) (section 365(b) "requires curing of defaults and adequate assurances of future payments as a precondition to assumption of an executory contract or unexpired lease"). Subparagraph (b)(2)(B), however, provides that a default arising from "breach of a provision relating to" the debtor's bankruptcy filing will not preempt a debtor from assuming an executory contract under section 365(a). 11 U.S.C. § 365(b)(2)(B). While curing of prepetition defaults is a precondition to assuming a contract under section 365(b)(1)(A), section 365(b)(2)(B) provides that such a

---

[5] *See, e.g.*, *In re Claremont Acquisition Corp.*, 113 F.3d 1029, 1033 (9th Cir. 1997) ("[Section] 365(b)(2) sets forth an exclusive list of the monetary and nonmonetary breaches that a debtor need not cure before assuming and assigning a contract."); *In re Peaches Recs. & Tapes, Inc.*, 51 B.R. 583, 587 n.6 (B.A.P. 9th Cir. 1985) ("Section 365(b)(2) . . . provides that a default arising from a breach of such a clause need not be cured by the trustee in order to assume that executory contract . . . .").

7

precondition does not extend to defaults due to the debtor's bankruptcy filing. That curing an *ipso facto* default is not a precondition to contract assumption, however, does not extinguish the default.

The same rationale applies equally to section 1124(2) of the Bankruptcy Code. That section permits a debtor to declare a claim unimpaired under a plan if the debtor cures a prepetition default "other than a default of a kind specified in section 365(b)(2) . . . or of a kind that section 365(b)(2) expressly does not require to be cured." 11 U.S.C. § 1124(2)(A). Section 1124(2)(A) merely requires a debtor to cure prepetition defaults other than *ipso facto* defaults to "render a claim 'unimpaired' in a plan." The term impairment is "is a term of art crafted by Congress to determine a creditor's standing in the confirmation phase of bankruptcy plans." *In re PPI Enters. (U.S), Inc.*, 324 F.3d 197, 202, 206 (3d Cir. 2003) (citing *In re L&J Anaheim Assocs.*, 995 F.2d 940, 942-43 (9th Cir. 1993)).

Satisfaction of section 1124(2)(A) to render a claim unimpaired, however, does not extinguish a default resulting from the bankruptcy filing. Satisfaction of section 1124(2)(A) is a strategic endeavor a debtor undertakes to determine who may or may not vote on a plan. *See* 11 U.S.C. § 1126(f) (solicitation of votes to accept a plan from creditors with unimpaired claims is not required because creditors holding such claims "are conclusively presumed to have accepted the plan"). As one court stated, "[s]ection 1124 determines who has the right to vote on a plan" and "'[s]ection 1124(2) merely takes away the creditor's right to vote in the event of [a] cure.'" *In re Lighthouse Lodge, LLC*, No. 09–52610–RLE, 2010 WL 4053984, at *4 (Bankr. N.D. Cal. Oct. 14, 2010) (quoting *In re Taddeo,* 685 F.2d 24, 29 (2d Cir. 1982)). Thus, whether a claim is impaired or unimpaired for purposes of plan voting is not dispositive of whether a claim resulting from a default arising under an *ipso facto* clause is allowed or disallowed. Although curing an *ipso facto* default is not a necessary condition for a court to find that a claim is unimpaired for purposes of plan voting, such a default still exists.

The Cure Claim here is an enforceable and allowable claim based on direct damages incurred as a result of PG&E's bankruptcy filing. The Supreme Court, when considering whether attorneys' fees incurred litigating bankruptcy issues are recoverable, held that "claims enforceable under applicable state law will be allowed in bankruptcy unless they are expressly disallowed." *Travelers Cas. & Sur. Co. v. Pac. Gas & Elec. Co.*, 549 US 443, 452 (2007) (citing 11 U.S.C. § 502(b)). Section 502 governs the allowance and disallowance of bankruptcy claims. *See* 11 U.S.C. §§ 502(a) and (b).

If an objection to a claim is filed, section 502(b) mandates the court to determine the amount of the claim and allow it, unless the claim falls in one of the enumerated categories under sections 502(b)(1)-(9). *See* 11 U.S.C. § 502(b)(1)-(9).

Among the category of claims that are either limited or disallowed under section 502(b), none provide for the disallowance or modification of defaults arising under an *ipso facto* clause. *See, e.g.*, 11 U.S.C. § 502(b)(1) (disallowing claims that are unenforceable against the debtor); (b)(2) (disallowing claims for unmatured interest); (b)(7) (limiting claims related to the termination of employment) and (b)(9) (barring untimely claims). Other provisions of the Bankruptcy Code that also call for disallowance of claims, sections 502(d), (e), (g)(2), (h), (i) and (h), do not disallow claims arising from defaults under an *ipso facto* clause.

In sum, section 365(b)(2) does not bar the Cure Claim. Section 365(b)(2) only provides that curing the condition that triggered an *ipso facto* default is not a precondition to assuming an executory contract. However, that curing of such default is not a precondition to assumption does not extinguish the default itself. Only section 502 specifies whether a claim shall be allowed or disallowed. And none of the category of claims listed under section 502(b) provide for the disallowance or modification of defaults arising under an *ipso facto* clause.

### B. Section 365(e)'s Prohibition of Ipso Facto or Bankruptcy Clauses Does Not Apply

Section 365(e) provides in part:

> an executory contract or unexpired lease of the debtor may not be *terminated or modified*, and *any right or obligation* under such contract or lease *may not be terminated or modified*, at any time after the commencement of the case *solely because of a provision in such contract* or lease *that is conditioned on . . . (B)* the commencement of a case under this title . . . .

11 U.S.C. § 365(e)(1)(B) (emphasis added).

Section 365(e) prevents the termination or modification of contract based upon the application of an *ipso facto* clause. *In re S. Pac. Funding Corp.*, 268 F.3d 712, 715-16 (9th Cir. 2001) (section 365(e) "was intended to deal with contractual *ipso facto* clauses"); *In re Cutler*, 165 B.R. 275, 280 (Bankr. D. Ariz. 1994) ("Section 365(e)(1) generally invalidates an '*ipso facto*' clause, i.e., a clause which modifies or terminates the rights of the trustee, as successor to the debtor, as a result of the

debtor's bankruptcy filing"). *Ipso facto* clauses are provisions in a contract that automatically terminate or alter the contracting parties' rights and obligations due to a party's insolvency or bankruptcy filing. *See In re Peaches*, 51 B.R. at 587 n.6 ("The so-called '*ipso facto*' clauses are those provisions in executory contracts and unexpired leases which result in a breach solely due to the financial condition or the bankruptcy filing of a party").

Prior to the enactment of section 365(e), *ipso facto* clauses were enforceable. *See In re Queens Boulevard Wine & Liquor Corp.*, 503 F.2d 202, 207 (2d Cir. 1974). Previously, a non-debtor could condition assumption of an executory contract upon satisfaction of an *ipso facto* default, sever the contractual relationship due to the debtor's insolvency or bankruptcy filing, or restrict the debtor's ability to assume and assign a contract. Considering the adverse effect of *ipso facto* clauses on debtors, such as depriving a debtor of valuable contracts and stifling reorganization efforts, courts invoked their equitable powers to invalidate the effect of *ipso facto* clauses. *See Queens Boulevard*, 503 F.3d at 205 (citing *Weaver v. Hutson*, 459 F.2d 741 (4th Cir. 1972), *cert. denied*, 409 U.S. 957 (1972); *In re Fleetwood Motel Corp.*, 335 F.2d 857 (3d Cir. 1964) [footnote omitted]).

In 1978, Congress adopted the equitable policy to restrict the application of *ipso facto* clauses by adding section 365(e) and reversing pre-Code policy of enforcing *ipso facto* clauses in a way that prevented assumption of executory contracts. *See Summit Inv. & Dev. Corp. v. LeRoux*, Nos. 94-11251-DPW, 94-11252-DPW, 1995 WL 447800, at *4 (D. Mass. Oct. 20, 1994) (explaining that the addition of section 365(e) "represented a policy reversal with respect to *ipso facto* clauses"). Legislative history of section 365(e) makes clear that while Congress sought to remove the impossibility of curing a bankruptcy filing event as a precondition to assumption, courts were to take into account the rights of counterparties and still provide them with the full benefit of their bargain:

> Subsection (e) invalidates *ipso factor [sic]* . . . clauses. These clauses . . . automatically terminate the contract or lease, or permit the other contracting party to terminate the contract or lease, in the event of bankruptcy. This frequently hampers rehabilitation efforts. If the trustee may assume or assign the contract under the limitations imposed by the remainder of the section, the contract or lease may be utilized to assist in the debtor's rehabilitation or liquidation.

> The unenforceability of ipso facto . . . clauses proposed under this section will require the courts to be sensitive to the rights of the nondebtor party to executory contracts . . . . If the trustee is to assume a contract or lease, the courts will have to insure that the trustee's

> performance under the contract . . . gives the other contracting party the full benefit of his bargain. . . .

H.R. Rep. 595 to accompany H.R. 8200, 95th Cong., 1st Sess., at 348 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6304 - 6305; S. Rep. No. 989, 95th Cong., 2nd Sess., at 59 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5845.

Against this backdrop, PG&E argues that section 365(e) expressly bars CED from relying on the *ipso facto* clause in the PPAs for its breach of contract claim. While PG&E tangos around the law on section 365(e), at no point, and rightfully so, does PG&E argue that CED's breach of contract claim terminates the PPAs and IAs or alters the Parties' rights or obligations.

Section 365(e) was designed to address *only* the potential forfeiture of valuable contracts and alteration of rights and obligations under pre-Code section 70 of the Bankruptcy Act. *See Liberty Mut. Ins. Co. v. Greenwich Ins. Co.*, 417 F.3d 193, 198 (1st Cir. 2005) (section 365(e) "prevents an executory contract or lease from being automatically terminated or modified by virtue of the other party's filing for bankruptcy. The aim is to protect the right of the bankruptcy estate to adopt, reaffirm and continue a contract or lease where this will serve the estate's interests"); *see also Queens Boulevard*, 503 F.2d at 207 (discussing pre-Code practice under section 70(b) of the Bankruptcy Act, which enforced *ipso facto* clauses, and noting that "[b]ankruptcy forfeiture provisions are necessary for the protection of landlords and generally are enforceable"); *In re Wheeling-Pittsburgh Steel Corp.*, 54 B.R. 772, 778 (Bankr. W.D. Pa. 1985) ("The policy underlying the prohibition of bankruptcy termination clauses under [section] 365(e) is that such clauses restrict the debtor's ability to assume and assign executory contracts and leases where doing so would benefit the estate, thereby hampering the Debtors' rehabilitation efforts").

The mere fact that an *ipso facto* clause exists does not necessarily trigger application of section 365(e). *See* Collier on Bankruptcy ¶ 365.08[1] (16th ed. 2021) ("Section 365(e) expressly invalidates *ipso facto* and other bankruptcy termination clauses that might otherwise prevent the estate from receiving the benefit of an executory contract or lease. Under section 365(e), a clause providing for the termination or modification of an executory contract . . . conditioned on the . . . the commencement of a bankruptcy case . . . is inoperative in a bankruptcy case"). Rather, application of

11

section 365(e) turns of whether: (a) contract rights are being terminated as a result of the debtor's bankruptcy filing; or (b) contracts rights or obligations are being modified due to the filing.

      a.  *Direct Damages Arising from Bankruptcy Filing Do Not Cause Termination of the PPAs and IAs*

Section 365(e) does not apply because payment of the Cure Claim would not terminate or modify the PPAs and IAs. Indeed, the PPAs and IAs have already been assumed under the Plan. That alone is enough to establish that section 365(e) does not apply.

Further, while the issue of the direct damages is not at stake here, recovery of direct damages incurred as a result of the bankruptcy filing are permitted without termination under the PPAs and IAs. The PPAs provide that the breaching party's "liability shall be limited to direct actual damages only . . . [and] such direct actual damages shall be the sole and exclusive remedy . . . ." PPA, Art. 7.1. The Small Generator Interconnection Agreement (SGIA) also provides that the breaching party's liability "shall be limited to the amount of direct damage actually incurred." SGIA, Art. 7.2.

CED incurred direct damages as a result of PG&E's bankruptcy filing. Recovery of such damages would not cause termination or modification of the PPAs and IAs. In fact, at no point has CED intended to terminate the PPAs and IAs. Termination would be inconsistent with CED's strategy in the bankruptcy case. Dixon Decl. ¶ 12.

For the foregoing reasons, section 365(e) does not apply because recovery of direct damages incurred as a result of the bankruptcy filing would not terminate the PPAs and IAs.

      b.  *Direct Damages Arising From the Bankruptcy Filing Do Not Alter Rights or Obligations under the PPAs and IAs*

Section 365(e) also does not apply because recovery of direct damages incurred as a result of the bankruptcy filing would not alter the parties' rights or obligations under the PPAs and IAs.

Article 3 of the PPAs sets forth several of the Parties' obligations. Under the PPAs, CED is obligated to deliver electricity to PG&E at a delivery point for a delivery term of twenty years. As part of its obligations, CED is responsible for any fees and costs associated with the Product's delivery up to the delivery point, and any costs assessed to CED under the IAs. Throughout the delivery term, CED is required to exclusively produce and sell the Product to PG&E, is prohibited

from relinquishing possession or exclusive control of the Project and unilaterally altering the Project in a way that would affect the minimum amount energy capacity or anticipated outputs. CED is also required to maintain interconnection and metering facilities, obtain electric system upgrades to ensure reliable delivery of energy from the Projects, and timely complete all electric system upgrades at its expense. Other CED obligations include dedicating all of its resource adequacy requirements to PG&E and arranging for enough interconnection, distribution and/or transmission services to deliver the Product to the delivery point for sale.

Under the PPAs, PG&E is obligated to purchase and receive the Product at the delivery point and make monthly payments to CED. PG&E is responsible for the fees and costs associated with the Product after receipt at and from the Delivery Point, fees, costs and charges associated with replacement capacity rules, and arranging for transmission of service at and from the delivery point. During the delivery term, PG&E has the exclusive right to obtain all of CED's resource adequacy requirements to allow it to meet its resource adequacy or successor program mandated by CPUC or CAISO and the right to curtail generation from the Projects provided it meets certain requirements. *See* PPA, Art. 3 and 4.

All these rights and obligations of the parties remain the same and would not be altered, amended, changed or modified based on CED's pursuit to recover direct damages incurred as a result of the bankruptcy filing. Accordingly, section 365(e) does not apply because the Parties' rights and obligations will not be affected by CED's Cure Claim.

    *c. Cross-Default Clause under Financing Agreement is an Enforceable Ipso Facto Clause*

Section 365(e) also does not apply to the extent the cross-default clause under the financing agreements is considered an *ipso facto* clause. By its terms, section 365(e) *only* applies to *ipso facto* clauses contained in executory contracts with the debtor. Section 365(e)(2) provides that section 365(e)(1)(B) does not apply to "contract[s] to make a loan, or extend other debt financing or financial accommodations, to or *for the benefit of the debtor*, or to issue a security of the debtor." 11 U.S.C. § 365(e)(2)(B) (emphasis added); *see also In re Saint Vincent's Catholic Med. Ctrs. of N.Y.*, 440 B.R. 587, 601-02 (Bankr. S.D.N.Y. 2010) (section 365(e)(1) does not apply to loan documents, which are non-executory contracts). Courts have upheld recoveries for default interest triggered by an *ipso facto*

clause. *See In re Gen. Growth Props., Inc.*, 451 B.R. 323, 330-31 (Bankr. S.D.N.Y. 2011) (enforcing lender's right to collect default interest triggered by an *ipso facto* clause and explaining that *ipso facto* clauses are not *per se* invalid); *Saint Vincent's*, 440 B.R. at 601-02 (enforcing an *ipso facto* clause that triggered the imposition of default interest).

Inasmuch as the financings were between CED and the third-party lenders, they are non-executory contracts that also were entered into for the benefit of PG&E. PG&E has been aware of the importance of project financing and having financeable power purchase agreements. Lind Decl. ¶ 10. Indeed, PG&E made it a requirement that any proposals for new power purchase agreements have financing for the project, and that project developers have experience in financing power generation facilities.[6] *Id.* Accordingly, PG&E's statements that it was unaware of the financings and their general terms is simply not credible. *See* Memorandum of Law in Support of Reorganized Debtors' Objection to Consolidated Edison Development, Inc.'s Amended Cure Payment Claim Demand, dated June 18, 2021 (Case No. 19-30088 -- Dkt No. 10827) at 2 n.4 ("The Debtors are parties to the Third-Party Financing Agreements . . . and were not privy to their terms").

Because the financing agreements are non-executory contracts with third-party lenders, the cross-default clauses thereunder are not subject to section 365(e)(1)(B).

### C. The Safe Harbor Protection of Section 556 Precludes Application of Section 365(e)'s Prohibition of Ipso Facto Clauses

Even if section 365(e) applied, section 556 of the Bankruptcy Code negates its application. Section 556 provides that the contractual right of a forward contract merchant to liquidate, terminate or accelerate a forward contract "because of a condition of the kind specified in section 365(e)(1)" is not subject to section 365(e)(1). 11 U.S.C. § 556(a). A condition of a kind specified in section

---

[6] It is widely known in the energy industry that a common term in project financings is a default provision based upon the bankruptcy or insolvency of a major project contract counterparty. "Many of the projects with PG&E PPAs were financed in the project finance market. These financings are privately negotiated and not generally available for review, but contain event-of-default clauses that are triggered if the power purchaser files for bankruptcy or admits insolvency. After a default, the lenders usually can accelerate all obligations and initiate foreclosure proceedings. However, if PG&E continues to perform under the power purchase agreement, the lenders may wait to take any action because they prefer not to foreclose so long as the debt is being paid. Being in default is never a comfortable position." James M. Berger, *How PG&E financial stress is affecting projects*, Norton Rose Fulbright, Dec. 18, 2018, https://www.projectfinance.law/publications/how-pge-financial-stress-is-affecting-projects.

365(e)(1) includes "the commencement of a case under this title." 11 U.S.C. § 365(e)(1)(B); *see also In re R.M. Cordova Int'l, Inc.*, 77 B.R. 441, 448 (Bankr. D.N.J. 1987). To obtain safe harbor protection, a party must establish that (a) the underlying contract is a forward contract, and (b) the party is a forward contract merchant. *See* 11 U.S.C. § 556(a).

     *a.   The PPAs are Forward Contracts*

     A forward contract is defined as:

> a contract (other than a commodity contract [ ]) for the purchase, sale, or transfer of a commodity . . . which is presently or in the future becomes the subject of dealing in the forward contract trade . . . with a maturity date more than two days after the date the contract is entered into . . . .

11 U.S.C. § 101(25)(A).

     The Ninth Circuit has not developed a test to determine what is a forward contract. However, courts in the Ninth Circuit have concluded that a contract is a forward contract if: (1) the subject of the contract is a commodity with substantially all of the expected costs of performance attributable to the expected costs of the underlying commodity; (2) the contract has a maturity date more than two days after the contracting date; (3) the price, quantity and time elements of the contract are fixed at the time of contracting; and (4) the contract has a relationship to the financial markets. *In re Clear Peak Energy, Inc.*, 488 B.R. 647, 656-57 (Bankr. D. Ariz. 2013) (citing *In re Nat'l Gas Distribs., LLC*, 556 F.3d 247, 259-60 (4th Cir. 2009)) (footnote omitted). *See also In re MBS Mgmt. Servs., Inc.*, 432 B.R. 570 (Bankr. E.D. La. 2010), *aff'd*, 690 F.3d 352 (5th Cir. 2012) (adopting a four-part test and adding that the contract must be executed by a forward contract merchant and not be subject to the rules of a contract board of trade).

     In *Clear Peak*, the court considered a renewable power purchase and sale agreement similar to the PPAs and determined that the agreement therein qualified as a forward contract. Applying the four-part test above, the court found that the subject of the agreement at issue was a commodity (electricity), that the agreement provided for a maturity date of more than two days, that the agreement specified the minimum quantity of power to be supplied over a specific period of time, and that the agreement had a substantial connection to the financial markets. *See Clear Peak*, 488 B.R. at 656-60. With respect to the fourth factor, the court found that a relationship to the financial markets existed because the

"primary purpose of the PPA [was] to hedge the price that [buyer had to] pay for power over the long term." *Id.* at 660.

Although the agreement was procured to allow the buyer to meet its renewable energy target in California, the court also found that agreement was part of a broader price-hedging scheme where the buyer acquired most of its power through short-and long-term wholesale power purchase agreements with both renewable and conventional resources. *Id.* The court also noted that CPUC approved all of the wholesale power purchase agreements and considered the reasonableness of the price as an important factor. *Id.* In conclusion, the court found that the fourth factor had been met because the buyer "created a complex mechanism to evaluate the [forward] contracts that will supply power to its customers" and allow it to hedge the price over the long term. *Id.*

As in *Clear Peak*, the PPAs here qualify as forward contracts. The first factor is satisfied because the subject of the PPAs is a commodity (electricity). With respect to the second factor, a court in the Ninth Circuit has defined maturity date, for purposes of section 101(25), as "the future date at which the commodity must be bought or sold. That is the date on which the benefit or detriment will be realized, depending on the market price, which is the date when ownership and risk of loss passes to the buyer. That is the date on which the buyer's obligation to pay matures, locking in the benefit or detriment of the contract." *In re Cascade Grain Prods., LLC*, 465 BR 570, 575 (Bankr. D. Or. 2011). Although the PPAs do not specify a maturity date for when supply of electricity will be due, the PPAs are scheduled to remain in effect until the conclusion of the delivery term, which are for periods of 15-20 years. Because the delivery term exceeds the maturity date test of more than two days, the second factor is satisfied. The third factor has also been satisfied because each of the PPAs specifies the amount of electricity to be supplied over the term of each agreement.

Finally, the PPAs have a relationship to the financial markets and thus the fourth factor is satisfied. The primary purpose of the PPAs is to allow PG&E to hedge against fluctuations in the price it must pay for electricity over the long term and thus each of the PPAs has a relationship to the financial markets. *See In re Borden Chems. & Plastics Operating Ltd.*, 336 B.R. 214, 220 (Bankr. D. Del. 2006) (forward contracts are designed to hedge against possible fluctuations in the price of a commodity). Although the PPAs were procured to allow PG&E to meet its renewable energy targets

in California, the PPAs also reflect a broader price-hedging scheme whereby PG&E acquires power through long-term power purchase agreements. As in *Clear Peak*, PG&E has created a complex scheme to evaluate its PPAs, assess commodity price risk and provide reasonable rates to customers, and comply with resource adequacy requirements.[7] CPUC approved all of the PPAs, and it considered the reasonableness of price as an important factor.

### b. *Forward Contract Merchant*

A forward contract merchant refers to:

> an entity the business of which consists in whole or in part of entering into forward contracts as or with merchants in a commodity (as defined in section 761) or any similar good, article, service, right, or interest which is presently or in the future becomes the subject of dealing in the forward contract trade.

11 U.S.C. § 101(26).

Under this definition, a forward contract merchant is one whose: (a) business consists in whole or in part of entering into forward contracts as or with merchants; and (b) the contract involves a commodity or similar good, article, service, right, or interest. *In re First Energy Sols. Corp.*, 596 B.R. 631, 638 (Bankr. N.D. Ohio 2019) (citing *In re Laurel Valley Oil Co.*, No. 05–64330, 2013 WL 832407, *4 (Bankr. N.D. Ohio Mar. 5, 2013)).

Although the term "merchant" is undefined in the Bankruptcy Code, it is understood to mean "a 'person whose business is buying and selling goods for a profit' or simply a 'trade.'" *Clear Peak*, 488 B.R. at 660 (quoting Webster's New College World Dictionary, 4th ed., Wiley Publishing, Inc. (2005)); *see also In re Mirant Corp.*, 310 B.R. 548, 567 (Bankr. N.D. Tex. 2004) ("a merchant is one that buys, sells or trades in a market") (citing BLACK'S LAW DICTIONARY 1001 (7th ed. 1999)). The term "business" has also been described as "something one engages in to generate a profit." *Id.* at 568 (citations omitted). Altogether, a forward contract merchant is "a person that, in order to profit, engages in the forward contract trade as a merchant or with merchants." *Id.* (footnote omitted).

---

[7] *See* PG&E Corp. and Pacific Gas and Electric Co., Annual Report (Form 10-K) at 11, 13, and 40 (Feb. 28, 2019), https://www.sec.gov/Archives/edgar/data/75488/000100498019000006/pge-40119x8xk.htm.

17

i.   *CED is a Forward Contract Merchant*

CED is as a forward merchant contract under the definitions in section 101(26) and *Mirant*.

CED is a utility company that owns various renewable and non-renewable plants across the country.

Dixon Decl. ¶ 4. The plants generate electricity and CED sells the electricity for a profit. *Id.* ¶ 8.

As part of its business, CED enters into wholesale power purchase agreements for the purchase, sale

and future delivery of electricity to transmission grids operated by an off-taker, such as PG&E. *Id.*

A majority of CED's revenue derives from the purchase and sale of electricity pursuant to wholesale

power purchase agreements. *Id.*

ii.   *PGE is a Forward Contract Merchant*

Even if CED does not qualify as a forward contract merchant, "[s]ection 101(26) only requires

that one party to the contract be so designated." *Clear Peak*, 488 B.R. at 661 (citing *Borden*, 336 B.R.

at 225). PG&E is a utility company engaged in the business of entering into forward contracts for the

purchase or sale of renewable and non-renewable resources for a profit. *See* Wan Decl. ¶¶ 10, 11, 17

and 19. As such, PG&E is a forward contract merchant under *Mirant*'s definition and section 101(26).

Based on the foregoing, the PPAs qualify as "forward contracts" and are exempt from the

application of section 365(e).

**D.   Damages Triggered under a Cross-Default Clause by an Ipso Facto Clause are Curable[8]**

Finally, PG&E argues that damages triggered by *ipso facto* clauses, but arising under cross-

default provisions to separate agreements, need not be cured to assume an executory contract.

As support, PG&E primarily relies upon *In re Jennifer Convertibles, Inc.*, 447 B.R. 713

(Bankr. S.D.N.Y. 2011), to argue that a debtor need not cure defaults under a cross-default clause prior

to assumption. *Jennifer Convertibles* involved a contract between the debtor and the contract

counterparty, which contained language requiring the debtor to cure defaults for amounts due to third

---

[8] CED will address the cross-default issue raised by PG&E even though the Parties agreed to brief only the *ipso facto* issue.  *See* Stipulation Regarding Scheduling With Respect To The Reorganized Debtors' Objection To Consolidated Edison Development, Inc.'s Amended Cure Payment Claim Demand, dated May 27, 2021, Dkt. No. 10721 (the Parties "have agreed to brief the discrete legal issue relating to the Reorganized Debtors' objection that the Bankruptcy Code's prohibition on ipso facto clauses bars Con Ed from recovery on the Demand").

party suppliers. The bankruptcy court found that it was unnecessary for the debtor to pay undisclosed third parties under entirely separate contracts.

*Jennifer Convertibles* is distinguishable for several reasons. One, CED is not requiring PG&E to cure defaults incurred under a cross-default clause prior to assuming the PPAs. The PPAs have already been assumed. Two, the financing agreements are not entirely separate contracts, and unlike the debtors in *Jennifer Convertibles*, PG&E is no stranger to the financings with the lenders. Lindh Decl. ¶ 11. The financings facilitated the construction of the Projects under the PPAs and IAs. While not always contemporaneous with execution of the PPAs and IAs, each agreement was wholly dependent on the existence of the other. *Id.* ¶¶ 6, 7. Three, even if PG&E were required to cure such defaults, enforcement of the cross-default clause would not have impermissibly hampered PG&E's reorganization and run afoul with sections 365(b)(2)(A) or 365(e)(1)(B).

Contrary to PG&E's argument, cross-default clauses are not *per se* invalid. *Kopel*, 232 B.R. at 64. *See also Wheeling-Pittsburgh*, 54 B.R. at 778 (Cross-default provisions are enforceable in bankruptcy when they do not "restrict the debtor's ability to assume . . . executory contracts . . . ."). In evaluating a cross-default clause, courts must "scrutinize the facts and circumstances surrounding the particular transaction to determine whether enforcement of the provision would contravene an overriding federal bankruptcy policy and thus impermissibly hamper the debtor's reorganization." *Kopel*, 232 B.R. at 64. Enforcement of a cross-default clause is offensive to federal bankruptcy policy "where the non-debtor party seeks enforcement of a cross-default provision in an effort to extract priority payments under an unrelated agreement." *Id.* at 65. Accordingly, "where the non-debtor party would have been willing, absent the existence of the cross-defaulted agreement, to enter into a contract that the debtor wishes to assume, the cross-default provision should not be enforced," but "enforcement of a cross-default provision should not be refused where to do so would thwart the non-debtor party's bargain." *Id.* at 66.

The court in *Kopel* enforced a cross-default clause and required the debtor to cure defaults under certain non-lease agreements after considering the principles discussed. There, the debtor and a non-debtor contemporaneously executed a lease agreement and certain non-lease agreements, all of which contained a cross-default clause. *Id.* at 59-62. Before bankruptcy, the debtor defaulted under

the non-lease agreements, triggering a cross-default under the lease. *Id.* at 59. The debtor sought a declaration that the cross-default clause in the lease agreement between the debtor and the non-debtor was unenforceable. *Id.* at 60. The non-debtor argued that the lease could be assumed only if the debtor cured defaults under the non-lease agreements. *Id.* at 61.

The court found that cross-default clause under the lease was enforceable and thus required the debtor to cure the defaults under the non-lease agreements prior to assuming the lease. *Id.* at 68-69. The non-debtor party did not seek to extract priority payments for unrelated obligations, but rather asserted the cross-default to "protect the very essence of the bargain" it made with the debtor and entered into the lease to facilitate a larger transaction, not simply to collect rent. *Id.* at 67-68. The court also noted that "[t]he fact that legally separate entities are parties to the various contracts does not of itself preclude enforcement of the cross-default provision." *Id.* (footnote omitted).

As in *Kopel*, the Fifth Circuit in *In re Liljeberg Enters., Inc.*, 304 F.3d 410 (5th Cir. 2002) found a cross-default clause enforceable. *Id.* at 446. There, a non-debtor party entered into a pharmacy agreement with the debtor and separately entered into two agreements with a hospital - a loan agreement to build a hospital and a lease agreement. *Id.* at 418-19. The lease was signed a month after the pharmacy agreement was executed, and the hospital would not have entered into the lease if the non-debtor party had not entered into the pharmacy agreement with the debtor. *Id.* at 445. The hospital defaulted under the loan, triggering a cross-default under the pharmacy agreement. *Id.* at 419-21.

On appeal, the debtor argued that the cross-default clause under the pharmacy agreement was invalid because it impermissibly hinged on its financial status and ability to pay. *Id.* at 444. The Fifth Circuit disagreed, finding that the cross-default clause was triggered by a judicial mortgage and lien to a third party and the subsequent sale of the hospital, all of which were forbidden under the loan agreement. *Id.* Relying on *Kopel*, the Fifth Circuit concluded that non-enforceability of the cross-default clause would have collapsed the pharmacy agreement and thwarted the non-debtor's bargain in agreeing to enter into the pharmacy agreement, which was "part of the overall transaction to finance the building of the hospital through a loan secured by a collateral mortgage." *Id.* at 446.

The matter at hand presents the same situation as those in *Kopel* and *Liljeberg*. Here, CED is not seeking to enforce the cross-default clause to extract priority payments from PG&E. The financing

agreements were an integral part of the development and execution of the PPAs. Absent such financing and a reliable off-taker, there is no PPA. Thus, the financings played a crucial role in the execution of the PPAs and non-enforcement of the cross-default clause would thwart CED's bargain in agreeing to enter into the PPAs.

Furthermore, CED entered into the financing agreements to facilitate the larger transactions (the construction of the project, interconnection with the grid and the long-term PPAs). The financings were integral to the execution and regulatory approval of the PPAs and operation of each plant, as demonstrated by PG&E's execution of acknowledgements and consent of the financings for the benefit of the financing party and the CED Affiliate. Lindh. Decl. ¶¶ 6, 7, 10; Dixon Decl. ¶ 16. In arguing that the cross-default clause is unenforceable, PG&E does not argue that CED could have entered into the PPAs and operate the plants without entering into the financing agreement and vice versa, a key metric in assessing whether a cross-default clause is enforceable. Enforcement of the cross-default clause due to the bankruptcy filing would not hamper PG&E's reorganization or infringe federal bankruptcy policy. PG&E emerged from bankruptcy a year ago, and thus payment of the Cure Claim cannot impede its ability to reorganize, and it also will not impede its ability to continue to enjoy a fresh start.

## CONCLUSION

For the foregoing reasons, the Court should overrule the Objection, enter an order confirming that section 365(b)(2) does not expressly bar the Cure Claim, and that section 365(e)'s prohibition of *ipso facto* clauses does not apply to CED's damages. Alternatively, the Court should enter an order confirming that section 556's safe harbor provision negates the application of section 365(e) and granting such other relief as the Court deems just and proper.

Dated: New York, NY
July 16, 2021

**PILLSBURY WINTHROP SHAW PITTMAN LLP**

By: */s/ Hugh M. McDonald*
　　Hugh M. McDonald (*admitted pro hac vice*)
　　31 West 52nd Street
　　New York, NY 10019-6131
　　Telephone: (212) 858-1000
　　Facsimile: (212) 858-1500
　　hugh.mcdonald@pillsburylaw.com
　　　　　-　　-　　-
　　Jonathan Doolittle (SBN 290638)
　　Four Embarcadero Center, 22nd Floor
　　San Francisco, CA 94111-5998
　　Telephone:　415.983.1000
　　Facsimile:　415.983.1200
　　jonathan.doolittle@pillsburylaw.com

　　*Attorneys for Consolidated Edison Development, Inc.*