# Exhibit A

Declaration of Frank R. Lindh

PILLSBURY WINTHROP SHAW PITTMAN LLP
JONATHAN DOOLITTLE (SBN 290638)
jonathan.doolittle@pillsburylaw.com
Four Embarcadero Center, 22nd Floor
San Francisco, CA 94111-5998
Telephone:  415.983.1000
Facsimile:  415.983.1200

PILLSBURY WINTHROP SHAW PITTMAN LLP
HUGH M. MCDONALD (*admitted pro hac vice*)
hugh.mcdonald@pillsburylaw.com
31 West 52nd Street
New York, NY 10019-6131
Telephone:  212.858.1000
Facsimile:  212.858.1500

*Attorneys for Consolidated Edison Development, Inc.*

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| **In re:**<br>**PG&E CORPORATION**<br>- and -<br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br>Debtors.<br><br>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>☒ Affects both Debtors<br><br>* *All papers shall be filed in the Lead Case, No. 19-30088 (DM).* | Case No. 19-30088 (DM)<br><br>CHAPTER 11 (LEAD CASE)<br>(JOINTLY ADMINISTERED)<br><br>**DECLARATION OF FRANK R. LINDH, ON BEHALF OF CONSOLIDATED EDISON DEVELOPMENT, INC.'S RESPONSE TO REORGANIZED DEBTORS' OBJECTION TO CONSOLIDATED EDISON DEVELOPMENT, INC.'S AMENDED CURE CLAIM DEMAND**<br><br>Date:  August 10, 2021<br>Time:  11:00 a.m.<br>Place:  U.S. Bankruptcy Court, Rm 17, 16th Floor, San Francisco, CA 94102<br>Judge:  Dennis Montali<br><br>Related Docket No.: 10827<br><br>**Reply Due:** July 30, 2021 |

DECLARATION OF FRANK R. LINDH     1

I, Frank R. Lindh, hereby declare as follows:

**BACKGROUND AND QUALIFICATIONS**

1. I am self-employed as an attorney in solo practice, based in San Rafael, California. I have worked continuously as an attorney in the field of energy law and regulation since graduating with honors from Georgetown Law Center in 1985, a period of 36 years. I have been doing this work in California since 1991, a period of 30 years. For the past decade, I have taught energy law and regulation as an adjunct professor at several law schools in the San Francisco Bay Area – the University of San Francisco School of Law, and the University of California Hastings College of the Law. I began my teaching career in 2009 as an Adjunct Professor at the University of California Berkeley School of Law. I served for six years, from 2008 until 2014, as General Counsel of the California Public Utilities Commission ("**CPUC**"). Prior to that, I was an in-house attorney at Pacific Gas and Electric Company ("**PG&E**"), one of the Reorganized Debtors, from 1993 until 2008. I served as an appellate attorney in the Office of the Solicitor of the Federal Energy Regulatory Commission ("**FERC**"), from 1987 until 1989. In 1996-1998, I held the position of General Counsel of a major FERC-regulated interstate natural gas pipeline company, an entity then known as Pacific Gas Transmission Company, which was at the time a wholly-owned subsidiary of PG&E. I also had the distinction of being the first person ever to serve as law clerk to the Solicitor General of the United States, during the Supreme Court's 1984 Term.

2. I have a deep familiarity, through extensive hands-on experience, with the intertwined commercial and governmental regulatory processes by which large, new energy infrastructure projects in the United States are permitted, financed, and constructed by private sector enterprises. These include electric power plants, electric transmission lines, and natural gas transmission pipelines. I have worked on such projects in several regions of the nation, but

most extensively here in California and the West. In my work, I have seen these kinds of major development projects from a variety of perspectives, working in some instances on behalf of the infrastructure developer, in other instances on behalf of a large off-take customer, and in other instances as an in-house attorney in government regulatory agencies with decisional authority over various aspects of such projects (CPUC and FERC).

3. In this Declaration, I respond, on behalf of Consolidated Edison Development, Inc. ("**CED**"), to a claim contained in the legal argument advanced by Debtors' counsel that the losses for which CED seeks to be made whole by means of CED's Cure Claim Demand "arose from cross defaults under entirely separate agreements to which the Debtors were not parties." The Debtors characterize as "a separate set of contracts," to which the Debtors "are not parties," certain Third Party Financing Agreements, which they represent "were separately negotiated and entered into by CED and its lenders (sometimes years after the relevant CED Agreement)."[1]

4. All facts set forth herein are based on my personal knowledge and experience as summarized above. If called upon to do so, I could and would testify competently to the facts and opinions set forth herein.

### DISCUSSION

5. The argument advanced by the Debtors mischaracterizes, as a factual matter, the subject Third Party Financing Agreements. The Debtors would have this Court view the financing agreements as something to which PG&E is a virtual stranger, using phrases such as "entirely separate" and "separately negotiated." I am confident that nobody who actually works in this industry, nor the professionals at the CPUC and FERC, would see these financing agreements the way the Debtors characterize them.

---

[1] *See* Memorandum of Law In Support of Reorganized Debtors' Objection to Consolidated Edison Development, Inc.'s Amended Cure Payment Claim Demand, dated June 18, 2021 at pp. 15-17.

DECLARATION OF FRANK R. LINDH 3

6. In order to successfully build and achieve commercial operation of a major energy infrastructure project, such as a large power plant or a natural gas transmission pipeline, three elements are necessary. Unless all three elements are present, the development will fail. It is helpful to think of this as a three-legged stool – without all three legs, the stool simply will not stand up.



7. In the illustration above, the "FINANCING" leg indicates the importance of obtaining project financing, on commercially reasonable terms, for the capital costs needed to construct the infrastructure project. Lenders must be satisfied that they have accounted for the risk of repayment of the money they put up for this purpose. Because of the large costs involved, these financing arrangements typically have lengthy repayment periods of ten to twenty years or even longer, which are often co-terminus with the initial term of an offtake agreement. For the project developer, it is essential that the financing be on commercially reasonable terms, in other words that the cost of financing be reasonable and not excessive. The offtake agreement must also be "financeable"; that is, on terms and pricing that can support the third party financing.

8. A. The best assurance a commercial lender can have is a binding, long-term contract between the project sponsor and a creditworthy offtake customer, represented by the "OFFTAKE" leg in the illustration above. In the case of power plants, the prototype offtake agreement is a long-term, firm Power Purchase Agreement ("**PPA**"). For both power plants and

DECLARATION OF FRANK R. LINDH  4

natural gas transmission pipelines, a typical and certainly the most desirable kind of off-taker is a creditworthy, regulated, monopoly electric or gas utility, with a captive retail load. Utility companies with a dedicated base of retail customers offer the best assurance of an ongoing market need for the infrastructure project's output over a ten- to twenty-year time horizon. Thus, it is common for a regulated electric or natural gas utility to be the sole customer, or at least the largest (or "anchor") customer, for a power plant or natural gas transmission line project. As I have often explained to the students in my energy law course, this is akin to a shopping mall developer's contracts with large "anchor" tenants like Nordstrom's and Macy's – you need long-term contracts with large, creditworthy tenants for your project to be commercially viable in the eyes of lenders. The offtake customer, meanwhile, has the same interest as the project developer in making sure that the project is financed on commercially reasonable terms – again, as stated in the foregoing paragraph, that the cost of financing be reasonable and not excessive.

B. In the case of an electric power plant, in addition to the offtake agreement (PPA), the developer also needs an interconnection agreement with the local electric utility company, so that its power can get onto the electric grid. (Usually this is the same company that is the customer under the offtake agreement.) Generator interconnection agreements, both for large generators (larger than 20 megawatts), and for small generators (20 megawatts or less), are overseen by FERC, and indeed FERC has prescribed forms of agreement the transmission utilities are obligated to use (the Large Generator Interconnection Agreement and the Small Generator Interconnection Agreement).

9. The "GOVERNMENT" in the illustration stands for regulatory approvals by governmental agencies, especially the CPUC and FERC. In California, the CPUC has a well-developed practice, codified in state law, of advance review and approval of utility company offtake agreements with the developers of power plants and natural gas transmission pipelines,

DECLARATION OF FRANK R. LINDH 5

before such agreements become binding and effective. Once the CPUC's regulatory approval of the offtake agreement has been obtained, the utility company has full assurance that it will be allowed to recoup all the costs it incurs under the agreement via the rates it charges to its retail electric and/or natural gas customers under the CPUC's retail rate-setting authority. At the federal level, with respect to interstate natural gas pipelines, FERC also reviews the strength of the offtake agreements to confirm that the project is "needed." The developer must present FERC with evidence of commercially sound offtake agreements with arms-length customers as a condition of receiving from FERC a Certificate of Public Convenience and Necessity authorizing construction and operation of the project.

10. Like any sophisticated player in this business, PG&E has been aware of the importance of project financing and having financeable PPAs long before it filed for bankruptcy. To choose one example, in a submission to the CPUC entitled "Renewables Portfolio Standard – 2011 Solicitation Protocol," dated May 4, 2011, PG&E provided that any proposals for new PPAs and projects needed to have milestones for, among other things, financing for the project. (p.26). In addition, any participant needed to provide their experience and history in financing power generation facilities. (p.28). The CPUC, for its part, recognizes that execution of PPAs is critical to obtaining third-party financing for power plants. *See, e.g.,* Decision Adopting the Renewable Auction Mechanism, CPUC Decision No. 10-12-048, issued December 17, 2010, at p.15 ("Next, we evaluate whether the fixed price approach and/or the market based RAM proposal result in contract prices that are reasonable – i.e., financeable to the developer and competitive for the ratepayer.").

## CONCLUSION

11. It is not correct to suggest that PG&E somehow is a disinterested stranger with respect to the Third-Party Financing Agreements between CED and its lenders. I believe this is a mischaracterization of the critically important role such agreements play in the commercial relationship between PG&E as off-taker and CED as service provider, in the context of this industry.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed at San Rafael, California on July 16, 2021.

*/s/ Frank Lindh*

Frank R. Lindh

DECLARATION OF FRANK R. LINDH   7