# Exhibit B

Declaration of James J. Dixon

PILLSBURY WINTHROP SHAW PITTMAN LLP
JONATHAN DOOLITTLE (SBN 290638)
jonathan.doolittle@pillsburylaw.com
Four Embarcadero Center, 22nd Floor
San Francisco, CA 94111-5998
Telephone:   415.983.1000
Facsimile:    415.983.1200

PILLSBURY WINTHROP SHAW PITTMAN LLP
HUGH M. MCDONALD (*admitted pro hac vice*)
hugh.mcdonald@pillsburylaw.com
31 West 52nd Street
New York, NY 10019-6131
Telephone:   212.858.1000
Facsimile:    212.858.1500

*Attorneys for Consolidated Edison Development, Inc.*

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| **In re:** <br><br> **PG&E CORPORATION** <br><br> - and - <br><br> **PACIFIC GAS AND ELECTRIC COMPANY,** <br><br> Debtors. <br><br> ☐ Affects PG&E Corporation <br> ☐ Affects Pacific Gas and Electric Company <br> ☒ Affects both Debtors <br><br> * *All papers shall be filed in the Lead Case, No. 19-30088 (DM).* | Case No. 19-30088 (DM) <br><br> CHAPTER 11 (LEAD CASE) <br> (JOINTLY ADMINISTERED) <br><br> **DECLARATION OF JAMES J. DIXON IN SUPPORT OF CONSOLIDATED EDISON DEVELOPMENT, INC.'S RESPONSE TO REORGANIZED DEBTORS' OBJECTION TO CONSOLIDATED EDISON DEVELOPMENT, INC.'S AMENDED CURE CLAIM DEMAND** <br><br> Date:   August 10, 2021 <br> Time:   11:00 a.m. <br> Place:   U.S. Bankruptcy Court, Rm 17, 16th Floor, San Francisco, CA 94102 <br> Judge:   Dennis Montali <br><br> Related Docket No.:  10827 <br><br> **Reply Due:** July 30, 2021 |

I, James J. Dixon, hereby declare as follows:

1. I am employed by Consolidated Edison Development, Inc. ("**CED**") as Senior Vice President and Chief Operating Officer.

2. I submit this declaration in support of CED's Response[1] and in opposition to PG&E's Objection.

3. All facts set forth herein are based on my personal knowledge of CED's operations and/or information learned from my review of relevant documents. I am authorized to submit this declaration on behalf of CED and, if called upon to testify, I could and would testify competently to the facts set forth herein.

4. CED is a wholly-owned subsidiary of Con Edison Clean Energy Businesses, Inc., a division of Consolidated Edison, Inc., one of the nation's largest renewable energy generation, storage and services companies. CED develops, owns, and operates large renewable energy infrastructure projects, including utility scale solar facilities throughout the United States, large wind farms in the Midwest, and battery storage operations. In addition, it operates an energy storage company based out of Tampa, Florida and a residential solar installation company in Danbury, Connecticut.

5. CED, through its affiliates, owns (or as of the PG&E bankruptcy, owned) the following renewable energy resources in California that are counter-parties to wholesale power purchase agreements ("**PPAs**") with PG&E: Alpaugh 50, LLC (50 MW), Alpaugh North, LLC (20 MW), CED White River Solar, LLC (20 MW), CED Corcoran Solar, LLC (20 MW), CED White River Solar 2, LLC (19.75 MW), CED Corcoran Solar 3, LLC (20 MW), CED Avenal Solar LLC (project A) (7.9 MW), CED Avenal Solar LLC (Project B) (7.9 MW), CED Oro Loma Solar LLC (Project A) (10 MW), CED Oro Loma Solar LLC (Project B) (10 MW), Coram California Development L.P. (102 MW) ("**Coram**"), and Great Valley Solar 4, LLC (20 MW). CED through its affiliates owns the following renewable energy resource in Arizona: Mesquite Solar 1, LLC (150 MW). CED through its affiliates owns the following renewable energy

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Response.

resources in Nevada: Copper Mountain Solar 2, LLC (150 MW), Copper Mountain Solar 1, LLC (48 MW), and Copper Mountain Solar 1, LLC (10 MW).

6. As of the date PG&E commenced its bankruptcy case, CED had more than 1,800 MWac of renewable energy projects in California, Nevada and Arizona (the "**Projects**"). Approximately 665 MW provide electricity and renewable energy credits to California and are the subject of wholesale power purchase agreements with PG&E, consisting of fifteen solar projects in Arizona, California and Nevada totaling 563 MW and one wind project in California totaling 102 MW[2].

7. PG&E has a mandate from its regulator to change the utility's electric supply from dirty carbon emitting sources to clean renewable power. To do this the California Public Utilities Commission ("**CPUC**") set up a program whereby developers were attracted and incented to develop, build, own and operate renewable energy generation plants and to sell the clean electricity produced to PG&E under power purchase agreements. By doing so, CPUC has shifted the significant expense and risk of development of these necessary facilities from PG&E to third parties such as CED. A key component to CPUC's plan is the developers' ability to provide the significant investment needed to build the clean energy generation facilities. Often this was accomplished through financing collateralized by power purchase agreements. The result of CPUC's plan is that PG&E receives a supply of renewable energy without the burdens of constructing and maintaining the generation plants, which could not exist without the very financing PG&E now feigns ignorance about.

8. As part of its business, CED entered into wholesale power purchase agreements (the "**PPAs**") with PG&E for the purchase and sale of renewable energy. Most of the revenues generated by CED are derived from the purchase and sale of electricity under a PPA. Under the terms of each PPA, a subsidiary of CED owns and operates a generating facility and sells the energy and certain attributes (including, without limitation, "green attributes" such as Renewable

---

[2] CED sold its wind project in June 2021.

Energy Certificates) generated thereby to PG&E to enable PG&E to, among other things, meet its resource adequacy and renewable energy requirements prescribed by CPUC.

9. The PPAs contain an event-of-default clause, which provide that the bankruptcy of a counterparty or a counterparty's failure to make payments required under the PPA, if not remedied within a certain period, constitutes a breach. Section 5.1 of the PPA reads in part:

> <u>Events of Default</u>. An "Event of Default" shall mean, (i) with respect to a Party that is subject to the Event of Default, the occurrence of any of the following: the failure to make, when due, any payment required pursuant to this Agreement if such failure is not remedied within five (5) Business Days after Written Notice is received by the Party failing to make such payment . . . . and (v) such Party becomes Bankrupt . . . .

PPA Art. 5.1(a)(i) and (v).

10. Article 5.2 of the PPA also provides that the non-breaching party has the option to terminate the PPAs or accelerate all obligations under the PPAs:

> <u>Declaration of Early Termination Date</u>. If an Event of Default with respect to a Defaulting Party shall have occurred and is continuing, the other Party ("Non-Defaulting Party") shall have the following rights: (b) accelerate all amounts owing between the Parties, terminate the Transaction and end the Delivery Term effective as of the Early Termination Date . . . .

*Id*. at 5.2(b).

11. Article 7.1 of the PPA provides that in the event of a breach, the breaching party's liability "liability shall be limited to direct actual damages only . . . [and] such direct actual damages shall be the sole and exclusive remedy . . . ." PPA, Art. 7.1.

12. During the bankruptcy case, CED did not seek to terminate the PPAs or accelerate the obligations therein. Termination or acceleration would have been inconsistent with CED's goals in the bankruptcy case to have PG&E assume the PPAs and continue performance.

13. In addition to the PPAs, each of CED's Affiliates executed Interconnection Agreements among the Affiliate, California Independent System Operator ("**CAISO**"), and PG&E ("**IA**", together with PPAs, the "**CED Agreements**"), pursuant to which PG&E designed, procured, constructed, installed and owned certain additions, modifications, and upgrades to

PG&E's transmission system required to accommodate the interconnection of each Project with the CAISO grid (the "**Network Upgrades**").

14. Pursuant to each IA, the CED Affiliate bore the initial financial cost of the Network Upgrades. After commercial operation of the Projects commenced, PG&E became obligated to reimburse the CED Affiliate for the cost of Network Upgrades. Reimbursements are made in the form of either (i) direct payments made on a levelized basis over a five (5) year period, or (ii) an alternative mutually agreed upon payment schedule.

15. As part of the development and execution of the PPAs and IAs, certain CED Affiliates enter into financing agreements with third-party financiers. The financings were crucial to the execution and development of the Projects because they are costly and come with various risks. During the development of a project under a wholesale power purchase agreement, a project may be abandoned or terminated and there may be delays in the construction of interconnection lines, licensing and permit issues, risk of non-performance by a counterparty or counterparty credit risks. As a result of these potential risks, project developers like CED enter into financing agreements to reduce their exposure and fund the construction of the projects.

16. Following the execution of the PPAs and IAs with PG&E, certain CED Affiliates entered into financing agreements with third-party financiers to finance the construction costs and operations of the Projects. The financing for the Coram project was put in place as part of the acquisition of the plant by CED and retired the prior project financing. In each instance, PG&E executed acknowledgements for the benefit of the financing party and the CED Affiliate and consented to assignment of the applicable PPA and IA as collateral for each financing. PG&E also knew that its failure to consent to the pledge of the CED Agreements would have prevented the financings from being put in place. The financing agreements contained cross-default provisions that would be triggered by, among other things, the bankruptcy of a counterparty to a material project contract, which included the PPAs and IAs.

17. When PG&E announced its intent to file for bankruptcy and then filed for bankruptcy, such acts constituted defaults under each PPA. PG&E also committed other defaults and breaches after the Petition Date. CED, however, continued to perform all of its obligations

under the PPAs and even delivered all RECs to PG&E. However, PG&E, failed to pay for such RECs that were based upon electricity delivered before the Petition Date.

18. As a result of PG&E's breaches and bankruptcy filing, certain third-party financiers sent notices to CED noting the occurrence of a default and reserving rights to seek, among other things, the payment of interest at the applicable default rate. After confirmation of the Plan, to avoid defaulting on the financings, the CED Affiliates were required to pay interest at a default rate on project financings in the total amount of $4,805,060.00. In addition, consent fees were incurred by two CED Affiliates pursuant to agreements reached with noteholders to waive the PG&E defaults and the requirement to pay default rate interest.[3]

19. The agreements enabled CED to reduce PG&E's exposure by mitigating the damages resulting from the defaults caused by the Debtors' bankruptcy and breaches of the CED Agreements. The consent fees, which are less than the amount that CED would have been obligated to pay absent the Consent Agreements, aggregate $6,000,000.00. Finally, CED incurred $1,039,538.00 in attorneys' fees and costs to directly address the defaults under the financing agreements.

Pursuant to 28 U.S.C. § 1746, I under penalty of perjury that the foregoing is the true and correct to the best of my knowledge and belief.

Dated: July 16, 2021            /s/ James J. Dixon
                                James J. Dixon

---

[3] Consent and Waiver Agreements were executed for CED California Holdings, LLC and CED California Holdings 2, LLC, each of which are intermediate holding companies for the project level entities.