# EXHIBIT 1

# Grizzly Development and Mokelumne Settlement Agreement

## between Pacific Gas And Electric Company and

## City of Santa Clara

## PG&E Rate Schedule FERC No. 248

Case: 19-30088    Doc# 11000-1    Filed: 07/30/21    Entered: 07/30/21 16:24:14    Exhibit 2
of 157

# GRIZZLY DEVELOPMENT AND MOKELUMNE SETTLEMENT AGREEMENT

## by and between
## PACIFIC GAS AND ELECTRIC COMPANY
## and
## CITY OF SANTA CLARA

### PREAMBLE

This Grizzly Development and Mokelumne Settlement Agreement (herein "Agreement") is made and entered into on this 8th day of March, 1990, by and between PACIFIC GAS AND ELECTRIC COMPANY, a California corporation (herein "PG&E"), and the CITY OF SANTA CLARA, a California municipal corporation (herein "Santa Clara"), either or both of which is and are hereinafter referred to individually as a "Party" or collectively as "Parties".

The Parties to this Agreement hereby agree as follows:

### RECITALS

WHEREAS:

A.     PG&E, a corporation organized under California law, is engaged in, among other things, the business of generating, transmitting, and distributing electric capacity and energy in northern and central California; and

B.     Santa Clara is a public body and body corporate and politic organized and existing under Cal. Stats 1865-66 Chapter 405 Operating under Charter of 1951; and

C.     PG&E and Santa Clara have agreed to settle Santa Clara's claims for compensation related to the Mokelumne River Project (FERC Project No. 137) in connection with Section 10 of the Electric Consumer Protection Act of 1986, Pub. L. No. 99-495 (herein "ECPA"), pursuant to provisions as described in this Agreement, subject to final review and approval by the Federal Energy Regulatory Commission (herein "FERC"). This settlement involves the exchange of a number of forms of mutual consideration, each of which is in consideration of the others and is integral to and a condition of the settlement hereby made, and

Case: 19-30088   Doc# 11000-1   Filed: 07/30/21   Entered: 07/30/21 16:24:14   Exhibit 13
of 157
Page 2 of 156

which, as a whole, the Parties agree constitute a mutually satisfactory compensation arrangement that is consistent with the provisions of the Federal Power Act; and

D.     PG&E is presently the licensee of the Bucks Creek Project (FERC Project No. 619) (herein "Bucks Creek") and owner of the water rights and all other rights connected therewith.

PG&E has received a license amendment (herein "Grizzly Amendment") from FERC, for permission to construct and operate a facility to be known as the Grizzly Powerhouse Development (herein "Grizzly") in conjunction with the Bucks Creek Project; and

E.     Santa Clara will become a joint licensee in the Bucks Creek Project and will finance and own Grizzly; and

F.     PG&E will cooperate with Santa Clara in becoming such a joint licensee and will convey to Santa Clara interests in the Bucks Creek Project license and in lands needed for Grizzly as necessary to accomplish the agreements herein contained; and

G.     Grizzly may revert to PG&E under the terms and conditions of, and subject only to the obligations of the Parties contained in, this Agreement; and

H.     Santa Clara and PG&E are Parties to an Interconnection Agreement which allows, among other things, for the scheduled delivery of capacity and energy between PG&E's electrical system and Santa Clara's electrical system.

I.     As part of a December 27, 2010 filing in Docket No. ER11-2530, this Agreement has been reformatted to address the FERC's eFiling requirements under Order No. 714 and rules and regulations. Subsequent to its execution on March 8, 1990, the Parties amended this Agreement on six occasions: Amendment No. 1, dated June 11, 1991, accepted by order dated September 18, 1991, under Project Nos. 137-018 and 619-023; Amendment No. 2, dated March 7, 1995, accepted by order dated July 14, 1995, in Docket no. ER95-778; Amendment No. 3, dated April 22, 1997, accepted by order dated September 18, 1997, in Docket No. ER97-3836; Amendment No. 4, dated June 5, 2002, accepted by order dated August 30, 2002, in Docket Nos. ER01-2998 and ER02-358; Amendment No. 5, dated August 26, 2003, accepted by order dated

Case: 19-30088    Doc# 11000-1    Filed: 07/30/21    Entered: 07/30/21 16:24:14    Exhibit 1
of 157
Page 3 of 156

May 21, 2009, in Docket No. ER09-912; Amendment No. 6, dated March 27, 2009, accepted by orders dated May 21, 2009, in Docket No. ER09-912, and September 22, 2009, in Docket No. ER09-1573. Amendment No. 4 was superseded by Amendment No. 6. As part of the eFiling process, Amendment Nos. 1, 2, 3 and 5 were incorporated into the body of the Agreement and Amendment No. 6 was attached to the e-filed Agreement as an Appendix.

NOW THEREFORE, in consideration of the promises and mutual covenants contained in this Agreement, the Parties hereby agree as follows:

## 1 GENERAL AGREEMENT

### 1.1 Definitions

Whenever used in this Agreement, these terms shall have the following meanings as applicable. The singular of a term shall include the plural and the plural shall include the singular.

1.1.1   Additional License Related Costs: Costs of Construction resulting from Grizzly license requirements that were not included as Cost items in the IPCT up to a maximum of two million six hundred and seven thousand dollars ($2,607,000). This maximum will be adjusted for delays pursuant to Section 11. Pursuant to Amendment No. One to this Agreement, six hundred and seven thousand dollars ($607,000) of Costs of Construction, incurred prior to June 11, 1991, and which do not otherwise meet the definition of Additional License Related Costs, shall be treated as all other Additional License Related Costs.  Additional License Related Costs, including this additional $607,000 shall remain capped at two million six hundred and seven thousand dollars ($2,607,000).

1.1.2   Administrative and General Costs: Those indirect and overhead costs, except PG&E financing costs, that would be charged to Grizzly using PG&E's standard accounting procedures as if Grizzly were owned by PG&E.

1.1.3   Agreement: This Development and Settlement Agreement.

Case: 19-30088   Doc# 11000-1   Filed: 07/30/21   Entered: 07/30/21 16:24:14   Exhibit 5
of 157
Page 4 of 156

1.1.4   ALL: The amount of energy allocated in megawatt-hours available to Santa Clara for scheduling each Calendar Month pursuant to Section 8.3.3.

1.1.5   APC: Actual Project Costs consisting of the sum of the Costs of Construction corresponding to the activities, accounts and anticipated license requirements that were used in preparing the IPCT. APC does not include Additional License Related Costs or Delay Costs pursuant to Section 11.1 c).

1.1.6   Bucks Creek: That hydroelectric development constructed under the Bucks Creek License, specifically excluding facilities constructed under the Grizzly Amendment.

1.1.7   Bucks Creek License: A hydroelectric license as amended and issued by FERC for Project No. 619.

1.1.8   Calendar Month: A period commencing at 0000 hours on the first day of any of the twelve (12) months recognized on the Gregorian calendar and ending at 2400 hours on the last day of that same month.

1.1.9   Calendar Year: A period commencing at 0000 hours on the first day of January and ending at 2400 hours on the last day of December, as such months are recognized on the Gregorian calendar.

1.1.10  [This Section Left Intentionally Blank]

1.1.11  [This Section Left Intentionally Blank]

1.1.12  CO: The carry over of energy, as either a surplus or deficit, to be included in the ALL for Santa Clara's use in a subsequent Calendar Month pursuant to Sections 8.3.3 and 8.4.

1.1.13  Commercial Operation Date: With respect to Grizzly, the Commercial Operation Date shall be 0000 hours on the day following the completion of the process set forth in Section 4.12.1. It is understood that the Commercial Operation Date, as defined herein, may not coincide with the commercial operation date or completion date as defined by FERC.

Case: 19-30088   Doc# 11000-1   Filed: 07/30/21   Entered: 07/30/21 16:24:14   Exhibit 6
of 157
Page 5 of 156

1.1.14 Completion of Construction Date: The date on which all Costs of Construction have been incurred and accounted for pursuant to this Agreement, as set forth in Section 4.12.3.

1.1.15 Construction Activities: All Grizzly related development activities through the Completion of Construction Date required in order to construct and complete Grizzly as provided in Sections 3 and 4 and to comply with license and other agency requirements related to development of Grizzly, including, but not limited to, obtaining the Grizzly Amendment and permits, acquisition of land rights, design, procurement, engineering, construction, construction management, material and equipment acquisition, equipment installation, testing and acceptance by the Development Manager of all components, start-up, and claims resolution.

1.1.16 Construction Contract Date: The date on which PG&E enters into the principal construction contract to be awarded for Grizzly.

1.1.17 Coordinating Committee: The Coordinating Committee as established in accordance with Section 3.7.

1.1.18 Costs: During the Ownership Period, all capital expenditures, expenses of labor and personnel, services, materials and supplies and transportation, expenses of operation and maintenance, Administrative and General Costs, and Santa Clara's administrative and general costs charged to Grizzly using Santa Clara's standard accounting procedures. Costs shall include taxes or payments in lieu of taxes, if any, incurred by, charged to, or assessed against PG&E or Santa Clara and related to Grizzly. Such taxes shall not include income taxes if imposed on PG&E by reason of receipt of payments for services or advances by Santa Clara.

1.1.19 Costs of Construction: All reasonable and necessary Costs incurred by PG&E in order to construct and complete Grizzly as provided in Sections 3 and 4 and to comply with FERC requirements related to development of Grizzly under the Grizzly Amendment. Such costs shall include, but not be limited to, those incurred for planning, design, engineering, procurement, equipment testing and acceptance, licensing, acquisition of land other than federal land including any eminent domain expenses, materials, construction, construction management, contract preparation and administration, installation, start-up, environmental control, real property or possessory interest taxes and sales, use, excise or other taxes, duties and

Case: 19-30088   Doc# 11000-1   Filed: 07/30/21   Entered: 07/30/21 16:24:14   Exhibit 1
of 157
Page 6 of 156

governmental assessments ascribable to Grizzly if paid by PG&E except as otherwise expressly provided in Section 14.4, third party claims resolution (including all costs relating to claims or dispute resolution, except for claims or disputes with respect to which Santa Clara indemnifies PG&E pursuant to this Agreement), costs incurred in administering or enforcing contractor and vendor warranties with respect to claims and other warranty matters arising prior to the Commercial Operation Date, and other necessary costs for safety, security and completion of Grizzly (including reasonable or necessary Costs incurred pursuant to Section 2.7.3 or other provisions of this Agreement related to obtaining all licenses, approvals or permits from regulatory agencies required for construction, initial operation, and ownership of Grizzly, except for those license application costs excluded in Sections 2.7.1 and 2.7.2) which are incurred prior to the Completion of Construction Date and accounted for in accordance with the FERC Uniform System of Accounts. Such costs also shall include the Costs of both goods provided and services rendered by PG&E hereunder, any costs directly incurred by Santa Clara at PG&E's request in connection with Grizzly, except as otherwise expressly provided, the cost of all insurance premiums incurred by or on behalf of PG&E pursuant to Sections 15.1 and 15.2, together with any deductibles (to the extent not already constituting Costs of Construction) incurred or paid by either Santa Clara or PG&E with respect to claims arising under such insurance (except for deductibles arising with respect to the coverages provided pursuant to Section 15.1.3 and deductibles excluded from Costs of Construction pursuant to Section 14.2.1), and costs or liabilities incurred in connection with Construction Activities prior to the Substantial Completion Date by PG&E pursuant to Sections 14.1.1 and 14.2.1, to the extent such costs or liabilities are not covered by proceeds of the insurance provided pursuant to Sections 15.1 and 15.2. Such costs shall also include the cost of purchasing and installing a new PG&E distribution line on the Grizzly transmission line poles as provided for by Section 2.6.7, removal of the present distribution line and poles, the span of transmission line between the Grizzly transmission line end structure and disconnect switch and PG&E's Caribou-Sycamore Creek transmission line, and any other facilities included in the definition of Grizzly and situated outside the Bucks Creek project boundary. For the purposes of this Agreement, such Costs of Construction shall not include any Costs incurred prior to January 1, 1989, costs incurred by PG&E or Santa Clara associated with developing this Agreement, costs of administering contractor or vendor

Case: 19-30088   Doc# 11000-1   Filed: 07/30/21   Entered: 07/30/21 16:24:14   Exhibit B
of 157

warranties with respect to claims and other warranty matters arising after the Commercial Operation Date, or late payment interest charges pursuant to Section 4.14 and 4.15.2.

1.1.20  Costs of Operation: All reasonable and necessary Costs directly incurred in operating and maintaining Grizzly after the Commercial Operation Date, including, but not limited to, Costs incurred in mobilizing and demobilizing, operating, maintaining, repairing, supervising, staffing, administering, and testing, real property or possessory interest taxes and sales, use, excise or other taxes, except as excluded in Section 14.4.2, duties and governmental assessments ascribable to Grizzly if paid by PG&E, protecting and preserving Grizzly, and meeting legal, regulatory, permit and license requirements with respect to Grizzly, and Costs incurred in administering or enforcing contractor and vendor warranties with respect to claims and other warranty matters arising after the Commercial Operation Date, but excluding any such Costs otherwise included as Costs of Construction or Costs of Plant, and excluding any regulatory fees as described in Section 5.8.2. Costs of Operation shall include any costs incurred by PG&E to obtain and maintain the insurance described in Section 15.3, to the extent such insurance is not obtained and maintained directly by Santa Clara, and shall include a mutually agreed upon mark-up with respect to PG&E's payroll costs of personnel performing work at the Grizzly Site to cover PG&E's workers compensation liability, whether or not PG&E purchases workers compensation insurance.

1.1.21  Costs of Plant: All reasonable and necessary Costs, which are not included in Costs of Construction or in Costs of Operation with respect to Grizzly which are directly or indirectly related to major improvements, additions, betterments, or replacements. Costs of Plant shall include any costs incurred on or after the Commercial Operation Date by Santa Clara pursuant to Sections 14.2.2 and 16.1.1 for repair of damage to Grizzly, to the extent such costs are not covered by proceeds of the insurance provided pursuant to Section 15.3.

1.1.22  CPUC: The California Public Utilities Commission or its regulatory successor.

1.1.23  DCP: Depreciated Costs of Plant on the Reverter Date is the Cost of Plant after each element of the Costs of Plant is depreciated on a straight line, element-specific basis. The

Case: 19-30088   Doc# 11000-1   Filed: 07/30/21   Entered: 07/30/21 16:24:14   Exhibit 9
of 157

estimated useful life of each element will be determined by PG&E in accordance with its standard FERC accounting practice.

1.1.24  ECPA: The Electric Consumer Protection Act of 1986, Public Law 99-495 (October 16, 1986).

1.1.25  Effective Date: The date on which this Agreement is made and entered into as set forth in the Preamble.

1.1.26  EPCLD: The Escalated Project Cost Less Depreciation consisting of the sum of SCAPC plus Net Interest During Construction, plus Santa Clara's bond-related issuance costs, plus Additional License Related Costs plus Delay Costs pursuant to section 11.1 c); said sum to be escalated by the change in the index described below and depreciated as further described below. The escalating index to be used is a weighted average of the latest available Engineering News Record Construction Cost Index (herein "ENR Index") and the latest available Bureau of Reclamation Composite Index for Water and Power Construction Costs (herein "BR Index"). The average shall be weighted seventy-five percent (75%) on the ENR Index and twenty-five (25%) percent on the BR Index. This weighted average escalation index will be the ratio of the latest available published indices existing as of the Reverter Date to the indices existing as of the Commercial Operation Date. The escalated result shall then be depreciated on a fifty-year (50-year), straight-line basis commencing on the Commercial Operation Date. If either or both of the referenced indices become unavailable or are so changed as to interfere with the use intended of them by the Parties, an equivalent index agreeable to the Parties will be used. EPCLD shall be determined as of the Reverter Date if its use becomes applicable under Section 12.4.

1.1.27  EPT: Excess Power Take is GCE scheduled by Santa Clara in excess of the amounts authorized by this Agreement.

1.1.28  FERC: The Federal Energy Regulatory Commission or its regulatory successor.

1.1.29  FERC Approval: Unless otherwise agreed to by the Parties, FERC Approval means final FERC approval of this Agreement and the Joint License, without change or condition unacceptable to either Party; provided, that if upon filing FERC enters into a hearing to

determine whether this Agreement is just and reasonable or otherwise lawful, such approval shall not be deemed to have occurred until the date when an order no longer subject to judicial review has been issued by FERC determining that this Agreement is just and reasonable. Each Party hereby reserves its right of appeal in the event of an unacceptable change to this Agreement by FERC.

1.1.30  FPCT: The Final Project Cost Target is the IPCT as adjusted, pursuant to Section 4.16, for any net increase in the actual award prices obtained by PG&E in Construction Activity contracts with third parties over the estimates of construction and Construction Activity costs used to prepare the IPCT, plus an additional contingency amount of two million dollars ($2,000,000), as such FPCT may be further adjusted pursuant to Section 11.1 and for up to $300,000 for design review not included in the IPCT, if performed under contract to PG&E. In no event, however, shall the FPCT be less than the IPCT. The dollar amount of the contingency contained in the FPCT shall be the same amount as contained in the IPCT.

1.1.31  GCE: Grizzly Combined Energy is the sum of Grizzly Generation (GEN), Grizzly Supplemental Power (GSP), Excess Power Take (EPT) and Maintenance Power scheduled by Santa Clara pursuant to Section 8.

1.1.32  GEN: Grizzly Generation is the amount of energy generated by Grizzly in a Calendar Month, in megawatt-hours measured at the high-voltage side of the Grizzly station transformers and then reduced for transmission losses as specified in Section 7.2.2, and plus or minus the CO from the previous Calendar Month.

1.1.33  Grizzly: A new hydroelectric development located in Plumas County, California, to be constructed and installed to generate electric power using water being released from Lower Bucks Lake, presently licensed to PG&E. Grizzly will enhance the hydropower features of the Buck's Creek License, and shall include the following features with approximate physical characteristics indicated:

a)     A tunnel intake structure of reinforced concrete and consisting of an entrance transition section about 51 feet long, 30 feet wide (maximum) and 34 feet high (maximum); a tower section about 17 by 16 feet in plan and 70 feet high; a gate house about 21 by 20 feet in

Case: 19-30088   Doc# 11000-1   Filed: 07/30/21   Entered: 07/30/21 16:24:14   Exhibit
Page
11 of 157
Page 10 of 156

plan and 21 feet high; and a tunnel approximately 12,174 feet long, unlined with a cross-section shape of a 12 foot circle (machine excavated);

    b)     a surge tank with reinforced concrete lining, 20-foot inside diameter and about 199 feet high;

    c)     a steel penstock about 4,578 feet long with a diameter varying from 8.0 feet to 4.0 feet;

    d)     a powerhouse consisting of a reinforced concrete structure of about 53 by 63 feet in plan, designed for unattended operation with supervisory control from PG&E's Rock Creek Powerhouse;

    e)     a single 26,400 HP vertical Francis turbine direct-coupled to a 22,000 KVA (0.9 power factor) generator;

    f)     a transmission line, nominally rated at 115 kV, of about 3.4 miles length and consisting of wood poles supporting 4/0 ACSR conductors, extending from the Grizzly powerhouse to and including the end structure and disconnect switch near Bucks Creek Powerhouse (FERC Project No. 619), and all other facilities necessary for interconnection with PG&E's transmission system but not including the final span between the end structure and the Caribou-Sycamore Creek transmission line (FERC Project No. 2105) and PG&E-owned distribution lines installed on the same wood poles as the Grizzly transmission line;

    g)     additional equipment in the switchyard consisting of a generator step-up transformer and a 115 kV power circuit breaker, structures and related equipment, necessary to connect with the PG&E transmission system;

    h)     telecommunication and telemetry facilities to the point of interconnection with pre-existing facilities;

    i)     recreation facilities as required by the Grizzly Amendment;

    j)     use of the Grizzly Site;

Case: 19-30088   Doc# 11000-1   Filed: 07/30/21   Entered: 07/30/21 16:24:14   Exhibit
12 of 157

k)      use of the water and use of the water rights in connection herewith;

l)      the Joint License necessary to allow the operation of this Agreement; and

m)      all renewals, replacements, repairs, additions, betterments, improvements, modifications and retirements thereto made pursuant to this Agreement.

1.1.34  Grizzly Amendment: The amendment to the Bucks Creek License granting permission and license for the construction and operation of Grizzly, as issued by FERC and as it may be modified on or after appeal.

1.1.35  Grizzly Management Committee: The Grizzly Committee as established in accordance with Section 18.2.

1.1.36  Grizzly Site: All land and land rights necessary for the construction and operation of Grizzly.

1.1.37  GSP: Grizzly Supplemental Power purchased by Santa Clara during the Ownership Period pursuant to Section 8.

1.1.38  Interconnection Agreement: The agreement between PG&E and Santa Clara, dated September 30, 1983, known as the Interconnection Agreement, and any other successor agreement, arrangement, or tariff, providing for interconnection between the PG&E system and the Santa Clara system and provision of services associated with such interconnection.

The first successor was the 2002 Interconnection Agreement ("2002 IA") between PG&E and the City of Santa Clara, Silicon Valley Power, Service Agreement No. 20 ("SA No. 20") under FERC Electric Tariff Volume No. 5. The 2002 IA was in effect from September 1, 2002 until July 31, 2017.

The second successor is the Interconnection Agreement, filed at FERC on June 1, 2017 in Docket No. ER17-1750-000, designated as Service Agreement No. 343 under PG&E FERC Electric Tariff Volume No. 5 ("2017 IA") as accepted by FERC effective August 1, 2017. As of August 1, 2017, further references to Interconnection Agreement will refer to Service Agreement

Case: 19-30088   Doc# 11000-1   Filed: 07/30/21   Entered: 07/30/21 16:24:14   Exhibit
13 of 157

No. 343, or its successor agreement, arrangement, or tariff, providing for interconnection between the PG&E system and the Santa Clara system and provision of services associated with such interconnection.

    1.1.39  Interest: Those property interests and estates in Grizzly as specified in Section 2.6.

    1.1.40  IPCT: Initial Project Cost Target is $57,360,000, or such amount as adjusted pursuant to Section 11. A summary of the cost estimates used in preparing the IPCT, prior to adjustment pursuant to Section 11, is included in Appendix C. IPCT does not include any Additional License Related Costs, Net Interest During Construction, any Santa Clara bond reserve costs, any Santa Clara costs associated with issuance of bonds, or Santa Clara's cost for auditing and inspecting PG&E's construction or administration of Grizzly or other like costs.

    1.1.41  Joint License: The joint PG&E and Santa Clara amendment to the Bucks Creek License envisioned by Section 2.7.

    1.1.42  Maintenance Power: Power in amounts required to replace the power output of Grizzly during scheduled maintenance outages and forced outages, as provided and under the terms of this Agreement.

    1.1.43  Minimum Monthly Allocation: The allocation of ALL set forth in Section 8.7.

    1.1.44  Mokelumne River Project: PG&E's FERC Project No. 137 and Santa Clara's FERC Project No. 2745.

    1.1.45  Net Interest During Construction: As defined by Generally Accepted Accounting Principles and the Financial Accounting Standards Board's Statement of Financial Standards No. 62.

    1.1.46  OCLD: The Original Cost Less Depreciation consisting of the sum of (1) SCAPC plus Santa Clara's Net Interest During Construction plus Santa Clara's bond related issuance costs, plus Additional License Related Costs plus Delay Costs pursuant to 11.1 c); (2) such sum then being depreciated on a fifty-year (50-year) straight-line basis commencing on the

Case: 19-30088   Doc# 11000-1   Filed: 07/30/21   Entered: 07/30/21 16:24:14   Exhibit
Page 14 of 157
Page 13 of 156

Commercial Operation Date and terminating on the Reverter Date; (3) but in no case shall the Net Interest During Construction be less than zero. OCLD shall be determined as of the Reverter Date if its use becomes applicable under Section 12.4.

1.1.47  Ownership Period: The period of time of Santa Clara's ownership of Grizzly, beginning on the Settlement Date and ending upon one of the following events, whichever is the first to occur: (1) the occurrence of the Reverter Date, (2) development of Grizzly is terminated as provided in Section 13, or (3) abandonment of the project by Santa Clara or condemnation as provided in Section 16.

1.1.48  Partial Requirements Power: The capacity and energy sold under the partial requirements rate schedule, excluding any transmission components, as shown in Rate Schedule A of Appendix B to this Agreement, Section B.5, Part II.1.

1.1.49  Party or Parties: PG&E and/or Santa Clara.

1.1.50  PG&E: The Pacific Gas and Electric Company, its successors or assigns.

1.1.51  Points of Delivery: Those Points of interconnection on the PG&E electrical grid at which PG&E transmits electrical power for the account of Santa Clara pursuant to, and subject to any limitations within, the Interconnection Agreement.

1.1.52  Possibility of Reverter: PG&E's future interest reversionary right to Grizzly and the Interest therein, as more fully described in Sections 2.6 and 12.

1.1.53  Power Sale: The sale of capacity and energy by PG&E to Santa Clara, pursuant to Section 10.1.

1.1.54  Preventive Maintenance Program: PG&E's preventive maintenance program which it uses for its hydroelectric powerhouses comparable in size and type to Grizzly, as defined in PG&E Hydro Bulletin No. 1, as such may be amended from time to time.

Case: 19-30088   Doc# 11000-1   Filed: 07/30/21   Entered: 07/30/21 16:24:14   Exhibit
Page 15 of 157

1.1.54a  PRP Energy Rate: The Partial Requirements Power Energy rate under Rate Schedule A of Appendix B to this Agreement, Section B.5 Part II.1, or its successor, or if there is no successor, a just and reasonable rate.

1.1.55  Prudent Utility Construction Practice: Any of the practices, methods, and acts at a particular time which, in the exercise of reasonable judgment in the light of the facts, including but not limited to the practices, methods, and acts engaged in or approved generally by the electric utility industry prior thereto, with special reference to that segment of the industry operating within the State of California known at the time the decision was made, would have been expected to accomplish the desired result at the lowest reasonable cost consistent with reliability, safety, and expedition. To apply the standard of Prudent Utility Construction Practice to any matter under this Agreement, equitable consideration should be given to the circumstances, requirements and obligations of each of the Parties, and there shall be taken into account the fact that the Parties have prescribed statutory powers, duties and responsibilities. It is recognized that Prudent Utility Construction Practice is not intended to be limited to the optimum practice, method or act to the exclusion of all others, but rather is a spectrum of possible practices, methods or acts which could have been expected to accomplish the desired result at the lowest reasonable cost consistent with reliability, safety and expedition.

1.1.56  Prudent Utility Practice: Those practices, methods, and equipment, including levels of reserves and provisions for contingencies, as modified from time to time, that are at least as good as those commonly used in the Service Area to operate, reliably and safely, electric power facilities to serve a utility's own customers dependably and economically, with due regard for the conservation of natural resources and the protection of the environment of the Service Area; provided, that such practices, methods and equipment are not unreasonably restrictive.

1.1.57  Public Works: Construction or improvements, excluding maintenance, repair, equipment purchase and consulting services, to public buildings or facilities owned by Santa Clara.

1.1.58  Receiving Station: Those Points of Delivery where Santa Clara receives power for resale to its retail customers.

Case: 19-30088   Doc# 11000-1   Filed: 07/30/21   Entered: 07/30/21 16:24:14   Exhibit
Page 16 of 157
Page 15 of 156

1.1.59  Reverter Date: The date on which Santa Clara's Interest in Grizzly terminates and the Interest in Grizzly reverts to PG&E as described in Section 12.3.

1.1.60  Sale Power: Capacity and energy sold by PG&E to Santa Clara in accordance with the Power Sale provided by Section 10.

1.1.61  Santa Clara: The City of Santa Clara, its successors or assigns.

1.1.62  SCADA: A system for providing remote Supervisory Control and Data Acquisition.

1.1.63  SCAPC: Santa Clara's Actual Project Cost shall consist of the sum of the Costs of Construction paid by Santa Clara corresponding to the activities and accounts that were used in preparing the IPCT, plus any underrun sharing paid by Santa Clara pursuant to Section 4.17.2 of this Agreement. SCAPC does not include Additional License Related Costs, Santa Clara's Net Interest During Construction, bond reserve or issuance-related costs, Delay Costs pursuant to Section 11.1 c), or costs incurred by Santa Clara, or at its request, to audit or inspect PG&E's administration of Grizzly construction, or any overrun costs paid by PG&E.

1.1.64  Service Area: That area within the exterior geographic boundaries of the several areas electrically served at retail, now or in the future, by PG&E, and those areas in northern and central California adjacent thereto.

1.1.65  Settlement Date: The date on which FERC Approval occurs or another date to which the Parties have agreed in a settlement option executed pursuant to Section 1.6, whichever is first to occur.

1.1.66  Spinning Reserves: Available unloaded capacity resources that are operating, online, synchronized to PG&E's system under SCADA and able instantaneously to take load on demand.

1.1.67  Substantial Completion Date: The date on which all physical construction of Grizzly is complete or deemed to be complete and accepted by Santa Clara as set forth in Section 4.12.2.

Case: 19-30088   Doc# 11000-1   Filed: 07/30/21   Entered: 07/30/21 16:24:14   Exhibit
17 of 157
Page 16 of 156

1.1.68  Target Commercial Operation Date: The Target Commercial Operation Date is January 1, 1994, subject to adjustment as provided in Section 11.1.

1.1.69  Test Energy: The net energy output of Grizzly prior to the Commercial Operation Date.

1.1.70  Uniform System of Accounts: FERC's Uniform System of Accounts prescribed for Class A and B Public Utilities and Licensees in effect as of the date of this Agreement, as such Uniform System of Accounts may be modified from time to time.

1.1.71  Year: Three hundred sixty-five (365) days or three hundred sixty-six (366) days if a February 29th is encountered in the course of a Year.

### 1.2     Representations Of The Parties

The following are representations made by the Parties:

1.2.1    PG&E Exists: PG&E warrants that it is a corporation organized under the laws of the State of California and that it is validly in existence as such at the Effective Date.

1.2.2    Santa Clara Exists: Santa Clara warrants that it is a charter city, a political subdivision of the State of California, and that it is validly in existence as such at the Effective Date.

1.2.3    Authority: Each Party warrants and represents that this Agreement has been duly authorized, executed and delivered by such Party and constitutes the legal, valid and binding obligation of such Party, enforceable against such Party in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, or similar laws effecting the enforcement of creditor's rights and subject to equitable principles.

1.2.4    Parties Shall Act: Each Party warrants that it shall promptly and with all due diligence, acting jointly or individually as appropriate, take all necessary actions and endeavor to obtain all approvals, licenses, orders, and permits necessary to carry out its obligations under this Agreement. Each Party recognizes that the rights and obligations of the Parties hereunder are

subject to the applicable regulations and orders of those governmental agencies and courts having jurisdiction. In the acquisition, construction, completion, ownership and operation of Grizzly pursuant to this Agreement, the Parties shall follow Prudent Utility Construction Practice and Prudent Utility Practice and comply with all applicable federal, state, and local statutes, ordinances, and rules and regulations. Both Parties shall carry out their obligations under this Agreement in accordance with Prudent Utility Construction Practice and Prudent Utility Practice, FERC licensing requirements, and any applicable federal or state laws and regulations, and, as applicable, in accordance with the principal architectural and engineering criteria and environmental commitments made to FERC and those commitments incorporated as license conditions.

### 1.3     Conditions to PG&E'S and Santa Clara's Obligations

Prior to the Settlement Date, either Party, at its sole discretion, upon written notice to the other Party, may elect to terminate this Agreement without further obligation. In the event of such termination, the Parties shall be restored to their original positions as they existed prior to entering into this settlement and nothing in this Agreement shall prejudice the rights of either Party in pursuing the remedies under ECPA. This Agreement and the negotiations leading to it shall not be offered by either Party in further ECPA or any other proceeding, other than for enforcement of this Agreement.

### 1.4     Non-Refundable Cash Payment

Within thirty (30) calendar days after the Settlement Date, PG&E shall pay to Santa Clara the sum of one million dollars ($1,000,000) by certified check. This cash payment shall not be subject to refund under any circumstances.

### 1.5     ECPA Settlement

1.5.1    Santa Clara hereby agrees and stipulates that this Agreement satisfies all of its claims for compensation related to the Mokelumne River Project pursuant to Section 10 of ECPA.

Case: 19-30088    Doc# 11000-1    Filed: 07/30/21    Entered: 07/30/21 16:24:14    Exhibit
Page
19 of 157
Page 18 of 156

1.5.2   The Parties hereby agree and stipulate that this Agreement and the exchange of considerations incorporated in it on the whole represent a mutually satisfactory compensation arrangement consistent with the Federal Power Act and that the compensation provided Santa Clara thereby does not exceed that provided by Section 10(e) of ECPA.

1.5.3   Effective on the Settlement Date, Santa Clara shall waive and release, and does hereby so waive and release as of that day, any and all claims, whether known or unknown, that may exist as of that day as to any compensation which may be owed to Santa Clara by PG&E, with regard to Section 10 of ECPA and Santa Clara's efforts to acquire a license for the Mokelumne River Project. Santa Clara also agrees not to institute any legal or regulatory proceedings with respect to or otherwise pursue any claim that would be waived and released pursuant to this Section 1.5, subsequent to the Settlement Date. Santa Clara expressly agrees that the release and waiver of claims contained in this Section 1.5 extends to and includes all unknown claims relating to the license for the Mokelumne River Project.

In so agreeing, Santa Clara hereby waives any and all rights or benefits which it may have under the terms of Section 1542 of the California Civil Code, which provides as follows:

"A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor."

### 1.6   Settlement Option

Because of the importance of expeditious construction of Grizzly to the balance of considerations agreed to by the Parties, at any time prior to FERC Approval, or if FERC approves or otherwise allows this Agreement to become effective with a change or changes or under terms or conditions unacceptable to either Party, the Parties may elect to enter into a settlement option in order to allow the development of Grizzly to proceed and to preserve the settlement and the balance of benefits represented by this Agreement.

Case: 19-30088   Doc# 11000-1   Filed: 07/30/21   Entered: 07/30/21 16:24:14   Exhibit
20 of 157

## 2    DEVELOPMENT AND OWNERSHIP OF GRIZZLY

### 2.1    Ownership Interests In Grizzly

Subject to other terms of this Agreement, Santa Clara will finance Grizzly and own one hundred percent (100%) of Grizzly within the project boundary described in the Bucks Creek License during the Ownership Period, but not including the final span of the Grizzly transmission line extending from the end structure and disconnect switch to the Caribou-Sycamore Creek transmission line, and not including the PG&E distribution line strung on the Grizzly transmission line poles.

### 2.2    Rights of Use

PG&E will obtain and convey or provide to Santa Clara the right to use all rights, permits, and interests reasonably necessary for construction, operation, and maintenance of Grizzly during the Ownership Period. The Parties understand and agree that PG&E will obtain necessary land rights in its own name and then convey these to Santa Clara in accordance with the intent specified in Section 2.6.

### 2.3    Water and Water Rights

PG&E shall provide the water and the right to use the water for generation of electricity by Grizzly at no cost to Santa Clara during the Ownership Period. PG&E will make all water scheduling and delivery decisions. Santa Clara shall support PG&E's water rights, and comply with all water scheduling and delivery decisions, so long as such decisions comply with all applicable local, state, and federal laws and regulations.

### 2.4    Santa Clara's Ownership Rights and Obligations

2.4.1    During the Ownership Period, Santa Clara will be responsible for fulfilling license conditions associated with Grizzly, except as they may be delegated by Santa Clara to PG&E and accepted by PG&E pursuant to Section 2.5.2 of this Agreement; provided, that Santa Clara will be responsible for the cost of fulfilling license conditions associated with Grizzly whether or not responsibility for fulfilling the conditions has been delegated to others.

Case: 19-30088    Doc# 11000-1    Filed: 07/30/21    Entered: 07/30/21 16:24:14    Exhibit
21 of 157

2.4.2    During the Ownership Period, Santa Clara will own and receive all energy generated by Grizzly, less transmission losses, as described herein.

### 2.5    PG&E's Rights and Development Obligations

2.5.1    Unless development of Grizzly is terminated as provided in Section 13 or as provided in Section 16 prior to the Completion of Construction Date, PG&E shall design, construct, and complete Grizzly in accordance with the description and standards contained in this Agreement. Grizzly shall be designed and constructed to be capable of generating 62.7 gWh per year under historical weighted average hydro year conditions and modeling assumptions used in PG&E's model (the program and the input data sets are stored under the filename "G.Final.Data" on PG&E's mainframe computer system), and incorporated in PG&E's application to FERC for the Grizzly Amendment. PG&E shall provide for Santa Clara's use a fully functional and operating hydroelectric facility consistent with FERC license conditions and the terms of this Agreement.

2.5.2    Santa Clara hereby delegates to PG&E all authority and responsibility for: 1) obtaining the Grizzly Amendment, 2) fulfilling license conditions associated with development of Grizzly and performing or causing to be performed all Construction Activities through Completion of Construction Date, and 3) operating Grizzly and fulfilling license conditions associated with operation of Grizzly while PG&E is Operation Manager. PG&E shall be responsible for fulfilling license conditions under the Bucks Creek License which pertain to the operation of facilities not part of Grizzly or to both Bucks Creek and Grizzly, and those which pertain to water scheduling and delivery decisions. The Parties shall cooperate with each other in meeting the responsibility for fulfilling the requirements of license conditions associated with Grizzly and shall cooperate with each other if either Party challenges any FERC directives associated with Grizzly.

### 2.6    Establishment of Property Interests In Grizzly

2.6.1    The Parties agree and stipulate that most of Grizzly will be constructed on lands owned by the United States of America and made available for use by the Parties as a hydroelectric project under FERC license and United States Forest Service permit, and will be

Case: 19-30088    Doc# 11000-1    Filed: 07/30/21    Entered: 07/30/21 16:24:14    Exhibit
22 of 157

subject to relicensing or recapture as provided by law. They further agree and stipulate that Grizzly is property in which there can and will be ownership interests and that, to the extent there may be any uncertainty in applicable law, it is their intent in implementing this Agreement to establish certain property interests and estates (herein "Interest") in the Grizzly Site, in Grizzly as constructed on it and in the Joint License and the said Forest Service permit issued thereon (herein "Grizzly"), whether those interests and estates are real or personal, legal or equitable. They further agree and stipulate that it is their intent that PG&E transfer a determinable Interest (viz., an Interest subject to a special limitation) in Grizzly to Santa Clara, retaining a future interest in the form of a Possibility of Reverter therein which shall take effect on the Reverter Date; that during the Ownership Period Santa Clara as the owner will enjoy and use Grizzly and all Interest therein; that Grizzly and all Interest therein will revert to PG&E on the Reverter Date; that the fact that a relicensing of Grizzly may be required prior to the Reverter Date does not render the Interest a mere possibility or expectancy rather than a true property interest under California law; and that, in the event any court, regulatory agency or other tribunal should ever be called upon to decide the nature of their respective Interests, the intentions and agreements stated in this Section 2.6 shall govern their rights as between themselves.

2.6.2    The Parties agree that all buildings, facilities, improvements, appurtenances, and equipment installed in or on Grizzly, except the final span of the Grizzly transmission line and the distribution line strung under that transmission line, shall be a part of Grizzly and none of them shall be considered trade fixtures, and that all tools, materials, supplies, reproducible prints of drawings, manuals, documents and records within Grizzly acquired for the operation and maintenance of Grizzly shall be included in the scope and meaning of Grizzly and subject to the Possibility of Reverter.

2.6.3    On the Settlement Date, or as soon thereafter as practicable, PG&E shall transfer all its Interest in Grizzly to Santa Clara until the occurrence of the Reverter Date; provided, that PG&E may retain the distribution line rights as provided in Section 2.6.7. Upon the Reverter Date Grizzly and all Interest therein shall revert automatically to PG&E. The Parties agree and stipulate that, in light of the complexity of this Agreement as it applies to Grizzly, the doctrine of

merger by deed shall have no application so that this Agreement will have continuing force in determining their rights even after PG&E conveys its Interest in Grizzly to Santa Clara.

2.6.4    PG&E agrees not to surrender its Possibility of Reverter in Grizzly and the Interest therein at any time prior to January 1, 2024, except as otherwise expressly provided in Section 16, or in the event of an assignment as provided in Section 19.1.

2.6.5    Santa Clara agrees not to contest the validity of PG&E's Possibility of Reverter or the reverter or reversion of Grizzly to PG&E on the Reverter Date.

2.6.6    If by some untoward event or circumstance PG&E is unable to enter into possession of Grizzly on the Reverter Date, which occurs after all conditions therefor set forth in Section 12 have been met, a resulting trust in favor of PG&E shall arise and Santa Clara shall thereafter hold Grizzly in trust for PG&E until PG&E can obtain such possession, and at PG&E's expense shall operate Grizzly for PG&E's benefit and deliver power generated at Grizzly to PG&E. The terms and conditions of the trust shall be as mutually agreed by the Parties, or in the absence of agreement as established by a court or regulatory agency of competent jurisdiction; however, until such terms and conditions are established, the provisions of Section 5, as may then be applicable, shall be used. Santa Clara shall be fully reimbursed for its expenses as acting as such trustee.

2.6.7    In conveying Grizzly to Santa Clara, PG&E shall retain an easement for the installation, operation and maintenance of, and for making replacements, additions and betterments to, an electric distribution line strung below the transmission line conductors on the wood poles of the Grizzly transmission line, along with all necessary rights of ingress and egress therefor.

### 2.7    Joint License

2.7.1    Santa Clara and PG&E shall file and diligently prosecute the application for the Joint License required to implement this Agreement with the FERC promptly upon execution of this Agreement. Santa Clara and PG&E agree that the costs associated with obtaining the Joint License will not be considered Costs of Construction, Costs of Plant, or Costs of Operation and

Case: 19-30088    Doc# 11000-1    Filed: 07/30/21    Entered: 07/30/21 16:24:14    Exhibit
                              24 of 157

that each Party shall bear its own legal and other costs associated with its efforts. Filing fees and other costs which the Parties agree are joint costs will be shared equally.

2.7.2    If further changes in the rights and responsibilities of the Parties provided for in this Agreement take place in the future which require additional license amendments, renewals or other FERC approvals, the Parties agree to pursue such amendments, renewals or approvals with diligence and to cooperate with each other in this effort. The Parties agree that the costs associated specifically with obtaining additional license amendments, renewals or other FERC approvals will not be considered Costs of Construction, Costs of Plant, or Costs of Operation, and that each Party shall bear its own legal costs associated with its efforts. Filing fees and other costs which the Parties agree are joint costs will be shared equally.

2.7.3.    PG&E shall take whatever action is reasonably necessary or appropriate to seek and obtain all licenses, permits, and other rights and regulatory approval necessary or appropriate to construct and operate Grizzly, except as otherwise set forth herein. Prior to filing with FERC, PG&E shall submit to Santa Clara for its review, all pleadings and or other documents that pertain to or directly affect Grizzly.

### 2.8    Regulatory Approvals

2.8.1    This Agreement shall be filed with FERC promptly after the Effective Date. Both Parties shall use their best efforts to obtain FERC Approval of this Agreement by June 1, 1990, including a request for waiver of FERC's filing notice and other requirements, if required.

### 3    COORDINATION AND COOPERATION

### 3.1    Cooperation In Achieving Agreed-To Objectives

The Parties shall cooperate and use all best efforts to coordinate the functioning of this Agreement with PG&E's licensing and operation of Bucks Creek, to acquire any amendment of the Bucks Creek License to allow the operation of this Agreement and to meet the following considerations and objectives:

Case: 19-30088    Doc# 11000-1    Filed: 07/30/21    Entered: 07/30/21 16:24:14    Exhibit
Page
25 of 157
Page 24 of 156

3.1.1    Allow Santa Clara to secure tax-exempt financing for the construction and its ownership of Grizzly;

3.1.2    At PG&E's election, have Grizzly revert to PG&E subject to the terms set forth in this Agreement;

3.1.3    Minimize costs associated with Grizzly due to additional licensing actions that result from implementing this Agreement or license applications;

3.1.4    Cooperate in obtaining the future renewal of the Bucks Creek License by PG&E, or by PG&E and Santa Clara as provided for in this Agreement; and

3.1.5    Limit Santa Clara's liabilities, responsibilities, and rights under the Bucks Creek License to matters that relate solely to Grizzly, unless specifically provided for elsewhere in this Agreement.

### 3.2    General Cooperation

3.2.1    The Parties shall cooperate in good faith in all activities relating to the development, construction, and operation of Grizzly, including, but not limited to, the filing of applications for authorizations, permits and licenses and the execution of such other documents as may be reasonably necessary to carry out the provisions of this Agreement.

3.2.2    The Parties shall use their best efforts and shall cooperate to obtain expeditiously all requisite governmental and regulatory approvals of the transactions contemplated hereby. The Parties shall discharge all obligations under this Agreement in good faith and in accordance with Prudent Utility Construction Practice, Prudent Utility Practice and any applicable laws, governmental rules, regulations, and orders pertaining to Grizzly. Each Party reserves its right of appeal as to any governmental or regulatory approval, authorization, permit or license which contains terms or conditions the Party determines to be unreasonable or unduly burdensome. The other Party is not obligated to intervene in or become a party to the appeal.

Case: 19-30088    Doc# 11000-1    Filed: 07/30/21    Entered: 07/30/21 16:24:14    Exhibit
26 of 157
Page 25 of 156

### 3.3 Information

3.3.1    With respect to Grizzly, during the period of construction of Grizzly and thereafter while PG&E is Operations Manager, PG&E shall, until the termination of this Agreement, keep Santa Clara informed as to the status of all the Costs and activities relating to Construction Activities and operation and maintenance, including but not limited to the following: planning and progress of construction, acquisition of materials and equipment, completion of scheduled activities, changes in construction schedules, changes in Costs of Construction, and significant matters pertaining to operation and maintenance to the extent performed by PG&E, and all insurance, contractor's claims and disputes administered by PG&E. PG&E shall furnish such information in written form each Calendar Month from the Effective Date until the Commercial Operation Date and thereafter from time to time. PG&E shall expeditiously convey such information to Santa Clara with the intent of providing sufficient time for Santa Clara to review it and submit comments and recommendations thereon before significant decisions are made, and to confer with PG&E as and whenever needs arise. PG&E shall give due consideration to comments and recommendations made by Santa Clara.

3.3.2    During the term of this Agreement, each Party shall furnish or make available to the other Party all information available to it relating to Grizzly, as reasonably requested by the other Party, including any studies or reports prepared by third parties and governmental agencies.

3.3.3    Nothing in this Section 3 shall require either Party to develop or report information that is in any way more detailed or complete than it would otherwise prepare or require if Grizzly were being built or operated for its ownership, unless otherwise required by this Agreement.

### 3.4 Governmental Agency Notice

During the Ownership Period, each Party shall provide the other notice of all correspondence, notifications, and reports relating to or materially affecting Grizzly, from FERC or other governmental agencies. During such period, each Party shall notify the other of all other governmental communications relating to Grizzly that the Party determines in good faith to be noteworthy.

Case: 19-30088    Doc# 11000-1    Filed: 07/30/21    Entered: 07/30/21 16:24:14    Exhibit
27 of 157

### 3.5 Preparation, Inspection And Audit Of Records

3.5.1 Either Party, when responsible for the duties of the Development Manager or Operation Manager, shall keep and maintain complete and accurate records regarding Costs of Construction, Costs of Plant, and Costs of Operation in accordance with the Uniform System of Accounts and Generally Accepted Accounting Practices (herein "GAAP") as applied by the Party in its normal accounting practices. Such records shall be preserved for the duration of this • Agreement. All such records kept by PG&E shall be made available at any time during the term of this Agreement for Santa Clara's inspection and audit to allow Santa Clara to determine that such Costs attributed to Grizzly by PG&E are appropriate. Only such records kept by Santa Clara regarding Costs of Plant shall be made available at any time during the term of this Agreement for PG&E's inspection and audit to allow PG&E to determine that such Costs attributed to Grizzly by Santa Clara are appropriate.

3.5.2 Santa Clara shall keep and maintain complete and accurate records regarding financing and interest costs during construction in accordance with GAAP. Such records shall be preserved for the duration of this Agreement. Such records kept by Santa Clara shall be made available at any time during the term of this Agreement for PG&E's inspection and audit to allow PG&E to determine that such costs attributed to Grizzly by Santa Clara are appropriate.

3.5.3 In its normal course of business and in accordance with its normal accounting practices, each Party shall arrange for annual audits of its accounts and records, which will include Grizzly. Such audits shall be performed by a firm of certified public accountants. This auditing firm shall certify that such accounts and records are maintained in accordance with GAAP. If either Party exercises its right to arrange additional or expanded audits of the Grizzly accounts and records pursuant to Sections 3.5.1 and 3.5.2, it shall be done at the expense of the Party requesting the audit. Each Party shall comply with any FERC request for audit of Grizzly costs.

3.5.4 Subsequent to the Completion of Construction Date and during the Ownership Period, Santa Clara shall assume responsibility for compliance with any FERC accounting, reporting and audit requirements. This responsibility shall be assumed by PG&E if and when the Reverter Date occurs and PG&E goes into possession of Grizzly.

Case: 19-30088   Doc# 11000-1   Filed: 07/30/21   Entered: 07/30/21 16:24:14   Exhibit
28 of 157

3.5.5    Each Party shall maintain all documents and records reasonably required to demonstrate compliance with this Agreement. Each Party shall have the right, at its own expense, to review and inspect all Grizzly-related documents and records of the other Party including, but not limited to, the following:

a)        documents submitted to FERC,

b)        drawings and specifications, and

c)        other job-related documents concerning Grizzly.

All such documents, drawings and specifications shall be made available for review and comment by the other Party before submission to FERC or before being issued for bidding or construction. Such documents, drawings and specifications shall be submitted and reviewed in a timely manner so as to avoid adverse cost and schedule impacts.

3.5.6    Review and inspection arrangements under this Section 3.5 shall be coordinated with the other Party in order to promote efficiency and reduce costs. All such reviews and inspections shall be conducted only after reasonable notice to the other Party and during normal business hours.

3.5.7    Either Party, at its sole discretion, may determine that certain Grizzly related information and documents are confidential in nature. Inspection of and/or disclosure of such confidential information and documents to third parties by the other Party will be allowed, subject to the confidentiality requirements as set forth in Appendix D, as such requirements are amended from time to time to reflect changes in law.

3.5.8    Either Party's rights of inspection or audit specifically do not extend to inspection of documents which are directly or indirectly related to the other Party's evaluation of the economics of Grizzly, or the evaluation of the settlement which is represented by this Agreement, or how PG&E will dispatch Grizzly as part of its interconnected system operations except as reasonably required to determine compliance with this Agreement.

Case: 19-30088   Doc# 11000-1   Filed: 07/30/21   Entered: 07/30/21 16:24:14   Exhibit
Page
29 of 157                                                                 Page 28 of 156

### 3.6    Letting Of Contracts

3.6.1    In negotiating and entering into contracts for the construction, operation, and maintenance of Grizzly, the Parties shall make a good faith effort to obtain the lowest reasonable costs consistent with Prudent Utility Practice and Prudent Utility Construction Practice.

3.6.2    As a matter of normal practice, contracts with third parties for Construction Activities shall be awarded as appropriate, in PG&E's judgment, to provide the lowest reasonable overall cost, consistent with high quality, Prudent Utility Construction Practice, the structure and requirements of this Agreement, and the requirements of governmental agencies having jurisdiction. Contracts, may be guaranteed price, lump sum, unit price, cost plus or other forms consistent with the requirements of this Section 3.6, and, whenever deemed prudent, may contain incentive and liquidated damages clauses. Subject to the requirements of Section 3.6.3, election of contract type shall be at PG&E's sole discretion.

3.6.3    Pursuant to Section 1310 of Santa Clara City Charter, all Public Works involving an expenditure of more than one thousand dollars ($1,000) shall be let to the lowest responsible qualified bidder after notice by publication in an official newspaper. Unless otherwise approved by Santa Clara, contracts not subject to the above restrictions shall be awarded, after appropriate evaluation, negotiation, and review, to the lowest evaluated and qualified bidder; provided, that nothing in this Agreement is intended to prohibit PG&E from specifying a specific manufacturer or model of equipment or from obtaining consulting services from a specific provider of such services. Subject to the requirements of this Section 3.6.3, determination of bidder minimum qualifications for Construction Activity contracts shall be at PG&E's sole discretion. Such requirements must be based on objective standards. All design, construction, equipment and other contracts related to Construction Activities which are executed subsequent to the Settlement Date shall be executed by PG&E as agent for and on behalf of Santa Clara.

Contract specifications, and the award of Construction Activity contracts based upon such specifications, involving an expenditure of more than one hundred thousand dollars ($100,000) shall be approved by Santa Clara. Such approval shall not be unreasonably withheld. Such contracts shall be submitted to and approved by Santa Clara in a timely manner so as to avoid adverse impact on the construction schedule.

Case: 19-30088    Doc# 11000-1    Filed: 07/30/21    Entered: 07/30/21 16:24:14    Exhibit
Page 30 of 157
Page 29 of 156

3.6.4    Unless otherwise agreed by the Parties, liquidated damages arising out of Construction Activity contract claims against third parties in connection with Grizzly (herein "Third Party Liquidated Damages") shall be administered in accordance with this Section. All such claims for Third Party Liquidated Damages shall be administered by PG&E, which shall have authority to settle and resolve such matters at its sole discretion. Any Third Party Liquidated Damages paid to PG&E pursuant to the foregoing shall be held by PG&E in a special account and applied by PG&E as follows:

a) Delay Damages. All such Third Party Liquidated Damages arising from delays, including delays in delivery and completion, shall be applied first, to mitigating any schedule or cost impact resulting from such delay; second, to off-setting, on a pro rata basis, any damages or losses actually sustained by either of the Parties as a result of such delay, as demonstrated to the other Party's reasonable satisfaction; and third, the balance, if any, shall be paid to Santa Clara on or before the Completion of Construction Date, or such later date as such Third Party Liquidated Damages are actually received by PG&E.

b) Performance Damages. All such Third Party Liquidated Damages arising from performance failures, including failures to achieve guaranteed levels of performance and failures to pass acceptance or performance testing, shall be applied first, to mitigating any such performance failure; and second, the balance, if any, shall be paid to Santa Clara on or before the Completion of Construction Date, or such later date as such Third Party Liquidated Damages are actually received by PG&E.

### 3.7    Appointment And Function Of Coordinating Committee

3.7.1    Promptly following the Effective Date, the Parties shall appoint a Coordinating Committee which will function during the Ownership Period. The Coordinating Committee will serve as a means for securing effective cooperation, interchange of information, consultation on a prompt and orderly basis, and provide a first level resource for interpreting this Agreement and resolving disputes arising from this Agreement.

3.7.2    The Coordinating Committee shall have four (4) members and four (4) alternative members. Each Party shall appoint two (2) members and two (2) alternates. Each appointment

shall be confirmed by written notice to the other Party. Each member and alternate member shall serve at the pleasure of the Party appointing that member.

3.7.3    The Coordinating Committee shall meet at least quarterly and consult periodically on an as-needed basis. Either Party may call for a meeting of the Coordinating Committee at its discretion. Each Party shall keep the Coordinating Committee informed concerning Grizzly licensing, design, construction, operation and maintenance.

3.7.4    Each member of the Coordinating Committee may invite other members of his organization or others, as his advisors, to attend meetings of the Coordinating Committee.

## 4    LICENSING AND CONSTRUCTION ACTIVITIES

### 4.1    Performance and Completion of Construction

All Construction Activities shall be performed in accordance with Prudent Utility Construction Practice. The Parties agree to use all due diligence to achieve the Commercial Operation Date by the Target Commercial Operation Date, and to complete construction in a timely manner.

### 4.2    Selection and Obligation of Grizzly Development Manager

Santa Clara hereby employs PG&E as Development Manager to perform as Santa Clara's agent for the development of Grizzly with authority on behalf of Santa Clara to take all actions necessary to perform the activities described in Section 4.3. PG&E hereby accepts that employment and agrees to act as Santa Clara's agent in this capacity through the Completion of Construction Date.

### 4.3    Scope of Work

As Development Manager, PG&E shall perform, or cause to be performed, with all due diligence, all Grizzly Construction Activities through the Completion of Construction Date. PG&E shall prepare, deliver, and administer all necessary applications, governmental submittals, notices, contracts and specifications, and shall perform or cause to be performed any other tasks required to construct Grizzly in order to achieve the Completion of Construction Date.

Case: 19-30088    Doc# 11000-1    Filed: 07/30/21    Entered: 07/30/21 16:24:14    Exhibit
Page 31 of 156
32 of 157

### 4.4 Development Manager Objectives

PG&E's principal objective as Development Manager is to provide Santa Clara a fully functional hydroelectric development and to achieve an appropriate balance among meeting the Target Commercial Operation Date, minimizing Costs of Construction and Costs of Operation over the life of Grizzly, consistent with licensing and environmental factors, safety, and reliability of service.

### 4.5 Obligation to Comply with Applicable Law

The Parties recognize that all Grizzly activities are subject to applicable laws, FERC licensing requirements and requirements of other governmental agencies. PG&E will keep informed as to both current laws and regulations affecting Grizzly and as to changes in such laws and regulations. In no event shall PG&E be required by Santa Clara to act or refrain from acting or to suffer any act or omission inconsistent with applicable law or FERC licensing requirements.

### 4.6 Authority to Perform

As Development Manager, PG&E is authorized, on an exclusive basis, to direct and control at its sole discretion Construction Activities except as otherwise provided in this Agreement. In addition, prior to the Completion of Construction Date, PG&E is authorized, on an exclusive basis, to exercise, in its sole discretion, all rights and remedies of Santa Clara under the contracts, subcontracts, purchase orders and other agreements entered into by PG&E as Development Manager on behalf of Santa Clara hereunder, including exercising remedies of Santa Clara with respect to warranty claims and claims for breach of contract arising thereunder; and PG&E shall not be obligated to incur any Costs of Construction in connection therewith, or to exercise any such rights or remedies, except to the extent determined reasonable or appropriate by PG&E, or as ordered by a court or agency of competent jurisdiction, or as required by this Agreement.

### 4.7 Incorporation of Santa Clara Comments

PG&E will make a fair and reasonable effort to determine if Santa Clara's comments and recommendations made in accordance with Section 3 are appropriate and consistent with the goals of this Agreement and will incorporate Santa Clara's comments and recommendations to the extent PG&E determines them to be appropriate and consistent with the goals of the Agreement.

### 4.8 No Other Agency

Except for the appointment of PG&E to act as Grizzly Development Manager for Santa Clara with respect to the functions specified in Sections 4.2 and 4.3, and except as otherwise provided for in this Agreement, neither Party shall be agent of or have a right or power arising out of this Agreement to bind the other Party.

### 4.9 Copy of Drawings and Specifications

4.9.1 PG&E shall keep one copy of all drawings, specifications, and submittals up-to-date and in good order and shall make them readily available to Santa Clara or its representatives. PG&E shall provide to Santa Clara, at the time of issuance by PG&E or receipt from a major system vendor, including but not limited to the turbine-generator, control board, and telemetry vendors, one copy of each major systems contract, specification, contract drawing, and submittal.

4.9.2 PG&E shall retain ownership of all drawings, specifications and other documents prepared by PG&E for Grizzly and shall retain all rights therein, including any copyright. PG&E shall provide Santa Clara copies, including a reproducible copy, of all such drawings, specifications and other documents for information and reference in connection with Santa Clara's use and ownership of Grizzly. Any and all such drawings, specifications and other documents shall be treated as confidential by Santa Clara and shall not be used or disclosed by Santa Clara except in connection with Grizzly. Any and all such drawings, specifications and other documents disclosed to third parties shall be accompanied by a statement of confidentiality and restrictions for further use or disclosure except in connection with Grizzly.

Case: 19-30088   Doc# 11000-1   Filed: 07/30/21   Entered: 07/30/21 16:24:14   Exhibit
Page
34 of 157
Page 33 of 156

### 4.10  Access To Grizzly Site By Santa Clara

During the performance of Construction Activities, and after prior notification to PG&E, Santa Clara and its agents may, during normal working hours and subject to PG&E's safety and security rules, enter upon the Grizzly Site at their own risk and PG&E shall provide proper and safe facilities therefor.

### 4.11  Startup Testing & Early Operation

4.11.1  PG&E shall be responsible for directing the startup testing of Grizzly.

4.11.2  Santa Clara shall sell and PG&E shall purchase energy generated by Grizzly prior to the Commercial Operation Date, at a rate to be agreed upon in advance by the Parties' power dispatching personnel.

4.11.3  Payments received by Santa Clara for Grizzly energy sold to PG&E prior to the Commercial Operation Date shall be credited against Costs of Construction.

4.11.4  Following Grizzly startup testing which in PG&E's judgment satisfactorily demonstrates the performance of Grizzly, PG&E shall not operate Grizzly, and Santa Clara shall not schedule operation of Grizzly, until the Commercial Operation Date, unless the Parties otherwise mutually agree.

### 4.12  Commercial Operation and Completion Notices

4.12.1  Commercial Operation Notices. Within ten (10) days of the date that PG&E determines by its customary inspections and tests, that Grizzly has reached such a degree of completion that it is capable of operating to deliver capacity and energy reliably into PG&E's system in accordance with Prudent Utility Practice (herein "Commercial Operation"), PG&E shall so notify Santa Clara in writing and provide Santa Clara all the available information and data supporting PG&E's determination. Within ten (10) days after receipt of such notice, Santa Clara shall advise PG&E in writing of any reason why Commercial Operation should be delayed and the corrective action which Santa Clara reasonably considers is required for Commercial Operation. Failure of Santa Clara to so notify PG&E within such period will be deemed to

Case: 19-30088   Doc# 11000-1   Filed: 07/30/21   Entered: 07/30/21 16:24:14   Exhibit
35 of 157

constitute acknowledgement of the readiness of Grizzly for Commercial Operation by Santa Clara. Upon receipt of any notice from Santa Clara of any corrective action to be performed, PG&E shall take such action as it reasonably considers appropriate, and the foregoing notice procedure shall be repeated until Santa Clara has approved or been deemed to have approved the plant for Commercial Operation (herein "Commercial Operation Date").

4.12.2  Substantial Completion Notice. When PG&E determines that physical construction of Grizzly has been completed in accordance with all applicable plans and specifications, including all work of the principal Grizzly construction contractor, PG&E shall so notify Santa Clara in writing. Santa Clara thereupon shall have ten (10) working days from the date of such notice to inspect the facility in accordance with an inspection and checkout procedure to be mutually agreed upon by the Parties. Within ten (10) working days after completion of its inspection, Santa Clara shall advise PG&E in writing of any discovered defects in the construction or of any Construction Activities at the Grizzly Site which have not been completed. Failure of Santa Clara to so notify PG&E within such period will be deemed to constitute acknowledgement of completion of physical construction and acceptance of the construction of Grizzly by Santa Clara. Upon receipt of any notice from Santa Clara of any defects or outstanding Construction Activities to be performed, PG&E shall correct, or cause to be corrected, such defects and/or perform, or cause to be performed, such work and the foregoing notice procedure shall be repeated until Santa Clara has accepted or been deemed to have accepted the completed construction (the "Substantial Completion Date"). The Parties agree, however, that the Substantial Completion Date may be achieved notwithstanding a mutually agreed upon punchlist of items still to be performed by PG&E or the principal Grizzly construction contractor, which items shall consist only of uncompleted Construction Activities which would have no material adverse effect on the continuous operation or performance level of Grizzly. The Substantial Completion Date shall not occur before the Commercial Operation Date.

4.12.3  Completion of Construction Notice. Within ten (10) working days of the date that PG&E determines that all Costs of Construction have been incurred and accounted for pursuant to this Agreement, including all costs of administering and resolving construction related claims

and disputes, PG&E shall so notify Santa Clara in writing, and shall provide Santa Clara with a full preliminary accounting and summary of such Costs of Construction. Santa Clara thereupon shall have ten (10) working days from the date of such notice to notify PG&E in writing that Santa Clara either agrees with such determination or considers that further Costs of Construction still remain to be incurred or accounted for. Failure of Santa Clara to so notify PG&E within such period shall be deemed to constitute acceptance by Santa Clara of PG&E's determination. Upon receipt of any notice from Santa Clara that it does not concur with PG&E's determination, PG&E shall either proceed in accordance with Santa Clara's instructions or initiate the dispute resolution procedure set forth in Section 18.3 to determine if all Costs of Construction have been incurred. In either case, upon resolution of the dispute or further action by PG&E, as appropriate, the foregoing notice procedure shall be repeated until such time as the Parties agree, or have been deemed to agree, that all Costs of Construction have been incurred and accounted for pursuant to this Agreement (herein "Completion of Construction Date").

### 4.13 Payment and Cost Estimates

4.13.1  PG&E shall be paid by Santa Clara for Costs of Construction incurred by it as Development Manager as provided in this Agreement. For purposes of this Section, the term "incurred" shall mean the actual payments made by PG&E to contractors, vendors and suppliers, and expenses booked by PG&E for costs relating to its own personnel, materials, and supplies charged to Grizzly, including appropriate indirects and overheads.

4.13.2  PG&E shall prepare cost estimates for Costs of Construction as provided in this Section 4.13. Within 30 days after the Settlement Date, PG&E shall submit to Santa Clara an estimate of the Costs of Construction to be incurred for each Calendar Month after the Settlement Date, beginning with the Calendar Month in which Construction Activities commence, together with detail reasonably adequate for the purpose of Santa Clara's review thereof. All such estimates shall be subject to revision periodically to reflect the most current information on Costs of Construction, and PG&E shall promptly submit to Santa Clara such revised estimates which in PG&E's judgment as Development Manager have a major impact on the activities, costs or timing of the Construction Activities.

Case: 19-30088   Doc# 11000-1   Filed: 07/30/21   Entered: 07/30/21 16:24:14   Exhibit
37 of 157

### 4.14    Initial Payment For Costs of Construction

After the Settlement Date, PG&E will send Santa Clara an invoice summarizing all Costs of Construction incurred by PG&E related to Grizzly after December 31, 1988 plus carrying interest determined in accordance with the provisions of Section 4.15.3 b). Santa Clara will pay the invoice amount within thirty (30) days of receipt of such invoice. Invoiced amounts not timely paid shall accrue late payment interest compounded monthly at a rate equal to the lesser of (a) the applicable first of the month reference rate of the Bank of America N.T. and S.A. for the month, or (b) the maximum rate permissible by law.

### 4.15    Subsequent Payments For Costs of Construction

4.15.1  Billing: On or before the last working day of each Calendar Month PG&E shall prepare and send to Santa Clara an invoice for all Costs of Construction estimated to be owed by Santa Clara and incurred by PG&E in the following Calendar Month. This invoice shall be due and payable on or before the last working day prior to the sixteenth (16th) day of the Calendar Month for which such invoice was drawn. The invoice will identify costs by labor, material, employee related, contract, other direct, indirect and overhead costs, plus the estimated net balance due PG&E (or minus such net balance if it represents an overpayment by Santa Clara) at the beginning of such following Calendar Month and the estimated interest to be due pursuant to Section 4.15.3, for such following Calendar Month. An addendum to the monthly invoice will show the actual costs incurred by PG&E and payments received from Santa Clara through the prior Calendar Month at the same level of detail as the invoice, including actual interest charges through that Calendar Month.

4.15.2  Payment: Santa Clara shall pay to PG&E or to others as directed by PG&E the amount specified in the invoice described above by wire transfer or other means acceptable to PG&E on or before the last working day prior to the sixteenth (16th) day of the Calendar Month for which such invoice was drawn. In addition, if Santa Clara determines at its sole discretion that PG&E's invoicing is creating an imbalance, Santa Clara may pay up to an additional twenty-five percent (25%) of the invoiced amount to avoid excess carrying interest charges. Invoices which are not paid in full by the above due date shall thereafter accrue a late payment interest charge, calculated on a daily basis at the interest rate specified in Section 4.15.3 b), from the date

Case: 19-30088    Doc# 11000-1    Filed: 07/30/21    Entered: 07/30/21 16:24:14    Exhibit
38 of 157

the invoice payment is due until such payment is received. Such late payment interest due at the end of each Calendar Month shall be added to any carrying interest due under Section 4.15.3 below at the end of each Calendar Month.

4.15.3  Carrying Interest: At the end of each Calendar Month, carrying interest shall be added to or subtracted from the amount due PG&E from Santa Clara and shall be calculated as follows:

a)      The carrying interest base for each Calendar Month shall be the average of the beginning and end of the Calendar Month net balance due PG&E, including actual costs incurred by PG&E and payments due from Santa Clara, but excluding the current Calendar Months' carrying and late payment interest from the end of month balance. When any such net balance is due Santa Clara, that net balance shall be treated as a negative amount. The carrying interest base shall not reflect overdue payments of invoiced amounts but shall include all unpaid late payment interest thereon from prior months.

b)      The carrying interest base for any Calendar Month shall be multiplied by an interest rate equal to the lesser of (1) the applicable first of the month reference rate of the Bank of America N.T. and S.A. for that Calendar Month, or (2) the maximum rate permitted by law.

c)      The interest amounts determined in Sections 4.15.2 and 4.15.3 b) for each Calendar Month shall be added to (if positive) or subtracted from (if negative) the net balance otherwise due PG&E at the end of that Calendar Month.

### 4.16    Calculation of FPCT

Upon determining the actual award prices obtained by PG&E in Construction Activities contracts with third parties, including prices for insurance supplied by or through contractors, suppliers and vendors pursuant to Sections 15.1 and 15.2, PG&E shall calculate the FPCT as defined in Section 1.1.30. PG&E shall notify Santa Clara of such calculation, and shall provide Santa Clara supporting information and documentation.

### 4.17 Cost Overruns and Underruns

4.17.1  If the APC exceeds the FPCT, Santa Clara shall pay APC up to the FPCT and each Party shall pay one-half (1/2) of the difference between the APC and the FPCT; provided, that under no circumstances shall Santa Clara pay a SCAPC greater than one hundred and five percent (105%) of the FPCT. PG&E shall pay all APC above one hundred and ten percent (110%) of the FPCT.

4.17.2  If at the Completion of Construction Date, the APC is less than the FPCT but more than the IPCT, Santa Clara shall pay the APC and shall pay to PG&E one-half (1/2) of the amount by which the APC underruns the FPCT. If, at the Completion of Construction Date, the APC is less than the IPCT, Santa Clara shall pay the APC and shall pay PG&E the sum of (1) one-half (1/2) of the difference between the IPCT and the FPCT, plus (2) the entire difference between the APC and the IPCT.

### 4.18 Final Completion Report and Payment

After the Completion of Construction Date, PG&E shall submit to Santa Clara a final completion report which shall include a complete accounting of all Costs of Construction and underrun payments, if any, a description of Grizzly "as built," including drawings submitted to FERC, and a summary of the Costs of Construction paid to PG&E by Santa Clara. Such summaries shall be provided within thirty (30) days after the Completion of Construction Date. Subject to the provisions of Section 4.17, Santa Clara shall pay all outstanding amounts within thirty (30) days after the receipt of the summary of the Costs of Construction with interest, compounded monthly, accruing on any late payments at the rate specified in Section 4.15.3 b). No further payments shall be made by Santa Clara for Costs of Construction, unless bills therefore are submitted within one hundred eighty (180) days following Santa Clara's receipt of the summary of Costs of Construction. Santa Clara shall have one hundred eighty (180) days after the receipt of the summary of the Costs of Construction to challenge the correctness of any charge or adjustment made by PG&E for Costs of Construction after which the correctness of such charge or adjustment shall be final. PG&E shall also prepare any construction-related accounting information required by FERC. Santa Clara promptly shall supply to PG&E any construction-related accounting information necessary to meet FERC requirements.

Case: 19-30088    Doc# 11000-1    Filed: 07/30/21    Entered: 07/30/21 16:24:14    Exhibit
40 of 157
Page 39 of 156

### 4.19    Correctness of Charges and Credits

No payment made shall constitute a waiver of any right of Santa Clara to contest the correctness of the charges and credits for Costs of Construction under this Agreement except as provided in Section 14.18.

### 4.20    Warranties

4.20.1  PG&E warrants that the design, engineering, procurement, and construction management services to be performed directly by PG&E pursuant to this Section 4 shall be in accordance with generally accepted professional standards of good engineering and sound construction practices and shall, comply with applicable requirements of federal, state and local laws, licenses, permits, and applicable engineering and construction codes and standards. Any construction or installation work performed directly by PG&E shall be performed in a workmanlike manner, in accordance with final drawings and specifications.

4.20.2  The term of the warranty set forth in Section 4.20.1 shall extend for a period of one (1) Year from the Commercial Operation Date. However, the warranty with respect to any services or work that is reperformed, repaired, replaced or otherwise modified by PG&E after the Commercial Operation Date shall extend until the date of expiration of the original warranty period set forth in the preceding sentence, or for a period of one (1) Year from the date of completion of such reperformance, repair, replacement or modification, whichever is later; provided, that in no event shall the warranty period extend for a period beyond two (2) Years from the Commercial Operation Date.

4.20.3  To enforce the warranty set forth in Section 4.20.1, Santa Clara or its Operation Manager shall promptly notify PG&E in writing of the discovery during the applicable warranty period of any breach of such warranties. As Santa Clara's sole and exclusive remedy for any such breach, PG&E, as soon as reasonably possible following PG&E's receipt of such notice, shall (1) reperform any deficient services, and (2) repair or, if necessary, replace or modify, or cause to be repaired, replaced, or modified, any deficient construction or installation work, including, if necessary, repair, replace or modify, or cause to be repaired or modified, any work performed or items furnished by other contractors, vendors or suppliers employed on Grizzly, if

Case: 19-30088    Doc# 11000-1    Filed: 07/30/21    Entered: 07/30/21 16:24:14    Exhibit
Page 41 of 157
Page 40 of 156

such repair, replacement or modification is required as a direct result of deficient work or services performed by PG&E; provided, that the choice among repairing, replacing or modifying work shall be made by PG&E on the same basis as if PG&E owned Grizzly. Subject to the provisions of Section 4.17, the cost of all such reperformance, repair, replacement or modification performed, or caused to be performed, by PG&E pursuant to the foregoing shall constitute a Cost of Construction for purposes of this Agreement, except to the extent such cost is covered by proceeds of the insurance provided pursuant to Section 15. In order to allow PG&E to perform such warranty work, Santa Clara shall provide PG&E reasonable access to Grizzly and to Grizzly's operating records and shall otherwise cooperate with PG&E during the performance of such work. During any period that PG&E is employed as Operation Manager under this Agreement, notice of any breach of warranty as required by this Section 4.20.3 shall be deemed given as of the time that the breach becomes known to PG&E's supervisor in charge of its operations as Operation Manager, and PG&E also shall give prompt written notice of such breach to Santa Clara.

4.20.4  The warranty obligations of PG&E under this Section 4.20 shall not extend to any repairs, replacements, modifications or maintenance which may be required as a result of normal wear and tear in the operation of Grizzly, normal corrosion or erosion, or as a result of misconduct or negligent operation of Grizzly by Santa Clara or its Operation Manager (if other than PG&E), or as a result of failure to operate or maintain Grizzly in accordance with PG&E's standard practices (if the Operation Manager is not PG&E), or operation of Grizzly at conditions of service more severe or at ratings in excess of those specified in the design therefor or mutually agreed to by the Parties, or as a result of any materials, services or other items furnished by Santa Clara, its Operation Manager (if other than PG&E), or any third party contractor, supplier or vendor.

4.20.5  In procuring materials and equipment for Grizzly, PG&E shall use reasonable efforts to obtain from the vendors and suppliers thereof, for the benefit of both Santa Clara and PG&E, warranties that such materials and equipment shall be (1) of the kind and quality described in the purchase order or contract, (2) free of defects in workmanship, material, design and title, (3) of good and merchantable quality, and (4) where appropriate, fit for their intended

Case: 19-30088    Doc# 11000-1    Filed: 07/30/21    Entered: 07/30/21 16:24:14    Exhibit
42 of 157

purpose. PG&E shall attempt to obtain standard warranty periods for such materials and equipment (it being understood that standard equipment warranties are in the range of one (1) to two (2) Years from the date the materials or equipment are placed in operation) and shall use reasonable efforts to obtain longer warranty periods, if such extended warranties do not materially increase the Costs of Construction. Similarly, in contracting for construction work and other services, PG&E shall use reasonable efforts to obtain from such contractors, for the benefit of both Santa Clara and PG&E, standard workmanship, service and repair warranties extending for the warranty term set forth in Section 4.20.2. All such warranties, to the extent not running directly to Santa Clara, shall be assigned over by PG&E to Santa Clara at or prior to the Commercial Operation Date. PG&E's sole obligation and liability with respect to such materials, equipment and contracted services, shall be, as a Cost of Construction hereunder with respect to claims arising prior to the Commercial Operation Date and as a Cost of Operation with respect to claims arising on or after the Commercial Operation Date, subject to Section 4.6, to administer such warranties for and on behalf of Santa Clara and to assist Santa Clara in enforcing such warranties. In no event shall PG&E itself be deemed to have warranted any such materials, equipment or contracted services, nor shall PG&E be deemed to have guaranteed any such warranties provided by vendors, suppliers or contractors.

4.20.6 THE WARRANTIES AND WARRANTY REMEDIES SET FORTH IN THIS SECTION 4.20 ARE, AS TO PG&E, EXCLUSIVE AND ARE IN LIEU OF ALL OTHER WARRANTIES AND WARRANTY REMEDIES, EXPRESS OR IMPLIED, AND PG&E DISCLAIMS AND SANTA CLARA WAIVES ANY IMPLIED WARRANTIES OR WARRANTIES IMPOSED BY LAW, INCLUDING IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, AND WARRANTIES ARISING FROM COURSE OF DEALING OR USAGE OR TRADE.

## 5  OPERATION AND MAINTENANCE

### 5.1  Grizzly Operation Manager

5.1.1 Santa Clara shall, at all times during the Ownership Period subsequent to the Commercial Operation Date, select and provide an Operation Manager for Grizzly. Such

Case: 19-30088   Doc# 11000-1   Filed: 07/30/21   Entered: 07/30/21 16:24:14   Exhibit
Page 43 of 157
Page 42 of 156

Operation Manager may either be Santa Clara or a contracted agent, including, but not limited to, PG&E. The Operation Manager must have demonstrated and significant experience and ability (1) in the operation and maintenance of hydroelectric facilities of a type similar to Grizzly, and (2) in compliance with FERC and other regulatory requirements applying to the operation and maintenance of such facilities. Santa Clara shall provide, and confer with PG&E on, the qualifications of candidates for Operation Manager and the Parties shall mutually agree upon which candidates are so qualified. Approval of the qualifications of any such candidate shall not be withheld unreasonably. Santa Clara shall be solely responsible for selecting and employing the Operation Manager from candidates so pre-qualified.

5.1.2    The Operation Manager shall operate Grizzly as scheduled or dispatched by PG&E, at a minimum maintain Grizzly in accordance with PG&E standards, and comply with this Agreement and all license and regulatory requirements. In the event of an emergency, the Operation Manager may deviate from PG&E's schedule or dispatch instructions for the duration of the emergency, in accordance with Prudent Utility Practice.

### 5.2    Scope Of Work

5.2.1    Pursuant to the provisions of Section 5.1, the Operation Manager shall operate and maintain Grizzly, including furnishing adequate qualified personnel and all supervision, labor, equipment, tools, materials, supplies, and incidentals. The Operation Manager shall maintain complete and accurate records regarding Costs of Operation and Costs of Plant in accordance with the Uniform System of Accounts and shall make available for Santa Clara's and PG&E's inspection and audit all records regarding such costs. The Operation Manager shall maintain complete and accurate records regarding its activities of operation and maintenance of Grizzly. In performing its obligations under this Section, the Operation Manager shall act with due diligence. Work shall be performed in accordance with Prudent Utility Practice and all applicable laws and FERC licensing requirements. Higher standards shall be followed if directed by Santa Clara.

5.2.2    The Operation Manager shall establish operating and maintenance practices and procedures, and perform all reasonable, necessary, and appropriate operation and maintenance

Case: 19-30088    Doc# 11000-1    Filed: 07/30/21    Entered: 07/30/21 16:24:14    Exhibit
Page 44 of 157
Page 43 of 156

services generally performed by PG&E for its own hydroelectric projects. As a minimum standard, these services shall conform to PG&E's standard practices and procedures, including its Preventive Maintenance Program, and be consistent with Prudent Utility Practice. Higher standards shall be followed if directed by Santa Clara. PG&E will provide Santa Clara with its current standard procedures and practices for the operation and maintenance of its hydroelectric projects, and with amendments and modifications to the procedures and practices as they are periodically implemented.

5.2.3   Santa Clara shall be responsible for seeing that the Operation Manager performs according to the standards of this Section 5 and keeps Grizzly in an operating condition consistent with Prudent Utility Practice.

5.2.4   In purchasing and installing any equipment or making any replacements, additions and betterments at Grizzly, including but not limited to contracting for work and services, Santa Clara shall attempt to obtain warranties which are comparable to those provided for Section 4.20.5 and to provide for their assignability to PG&E in the event of the occurrence of the Reverter Date.

### 5.3     Designation Of Operation Manager For Initial Term

For the initial term, specified in Section 5.5, Santa Clara hereby employs PG&E to act as Santa Clara's agent and Operation Manager as provided herein. PG&E hereby accepts that employment and agrees to act as Santa Clara's agent in this capacity. PG&E shall provide such services in a manner consistent with all applicable laws and regulations for tax-exempt financing, as such laws or regulations are subsequently amended from time to time, as necessary to preserve Santa Clara's tax-exempt financing for Grizzly. PG&E shall keep Santa Clara informed as to all significant developments with respect to the operation and maintenance of Grizzly.

### 5.4     No Other Agency

Except for the appointment of PG&E to act as Operation Manager, and except as otherwise provided herein, with respect to the functions specified in  Section 5.3, neither Party shall be agent of or have a right or power to bind the other Party.

Case: 19-30088    Doc# 11000-1    Filed: 07/30/21    Entered: 07/30/21 16:24:14    Exhibit
Page
45 of 157

### 5.5    Initial Term

The initial term of PG&E's obligation as Operation Manager shall commence on the Commercial Operation Date and shall terminate on the second anniversary of the Commercial Operation Date; provided, that either Santa Clara or PG&E may terminate PG&E's employment as Operation Manager at any time without cause upon ninety (90) days advance written notice. Prior to the end of such initial term, the Parties shall discuss whether or not Santa Clara will continue to employ PG&E as Operation Manager, and the terms and conditions of any such continuation. The Parties understand that any such continuation of PG&E as Operation Manager must be consistent with the then existing Internal Revenue Service regulations to preserve Santa Clara's tax-exempt financing.

### 5.6    Replacement Of PG&E As Operation Manager

If Santa Clara replaces PG&E as Operation Manager, all of the foregoing restrictions enumerated in Sections 5.1, 5.2, 5.3, and 5.4 shall apply to the entity chosen to fulfill the obligations of the Operation Manager. Santa Clara will assume responsibility and liability for operation and maintenance performed by the subsequent Operation Manager.

### 5.7    Maintenance Activities.

5.7.1    At least seventy (70) days prior to the end of each Calendar Year, the Operation Manager shall notify Santa Clara and PG&E of the proposed scheduled maintenance periods during the ensuing Calendar Year when Grizzly may be shut down. The Operation Manager will schedule the maintenance period(s). The Parties shall cooperate by scheduling such scheduled maintenance periods at times agreeable to both Parties. All maintenance outages must be cleared through PG&E Power Control.

5.7.2    The proposed maintenance schedule shall contain a description of planned work of sufficient detail to permit the Parties to confirm conformity with this Agreement. The schedule and description shall be updated quarterly for activities scheduled for the following quarter and remainder of the Calendar Year.

5.7.3   The Operation Manager shall prepare and  submit to Santa Clara for its approval, a recommended schedule, plan, and description of all capital improvements ordered by FERC or others, and of all replacement-type maintenance and extraordinary maintenance activities, including any specifications and drawings associated with the work.  Santa Clara shall provide a copy of these recommendations for PG&E's review and comment. Santa Clara will make a fair and reasonable effort to review and determine if PG&E's recommendations and comments are appropriate and consistent with the goals of this Agreement and will incorporate them to the extent that Santa Clara determines them to be appropriate and consistent with the goals of the Agreement.

5.7.4   If scheduled by PG&E pursuant to the terms of this Agreement, the Operation Manager shall at PG&E's direction bypass water through Grizzly for normal operation of downstream powerhouses during scheduled and unscheduled shutdowns of Grizzly Powerhouse. PG&E will schedule such bypass to the extent PG&E would bypass water if it owned Grizzly.

### 5.8   Payments To PG&E As Operation Manager

During the period that PG&E is employed by Santa Clara as Operation Manager, Santa Clara shall pay PG&E as follows:

5.8.1   Santa Clara will reimburse PG&E as Operation Manager for the Cost of Operation and Cost of Plant incurred by PG&E. In addition, Santa Clara shall pay to PG&E an amount equal to fifteen percent (15%) of the Cost of Operation.

5.8.2   Regulatory fees that apply to the entire Bucks Creek License will be allocated between PG&E and Santa Clara, based on the respective nameplate capacity of the Bucks Creek and Grizzly powerhouses. The fifteen percent (15%) markup referenced in Section 5.8.1 will not apply to Cost of Plant, any regulatory fees, or penalties assessed against either Grizzly or Bucks Creek.

5.8.3   Estimates of Costs of Operation and Costs of Plant: At least ninety (90) days prior to the estimated Commercial Operation Date, PG&E shall prepare and submit to Santa Clara a cost estimate; together with detail reasonably adequate for the purpose of Santa Clara's review

Case: 19-30088   Doc# 11000-1   Filed: 07/30/21   Entered: 07/30/21 16:24:14   Exhibit
47 of 157

thereof, of monthly Costs of Operation and Costs of Plant for the next eighteen (18) Calendar Months thereafter. For each Calendar Year in which PG&E is the Operation Manager, it shall prepare an estimate of the monthly Costs of Operation and Costs of Plant for the next eighteen (18) Calendar Months. The estimate shall be submitted to Santa Clara by January 1 of each Calendar Year. Such estimate shall be subject to revision periodically to reflect more current information on Costs of Operation and Costs of Plant.

### 5.9 Payment For Costs Of Operation and Costs of Plant

In the case of Costs of Operation and Costs of Plant relating to services provided by PG&E, PG&E shall submit to Santa Clara an invoice for the amount of such charges for the preceding Calendar Month on or prior to the twentieth (20th) day of each Calendar Month commencing with the Calendar Month after the Commercial Operation Date. Such invoice shall set forth each service provided, the hours of labor attributable to such service, an itemized list of any expenses incurred by PG&E associated with such service, including the fifteen percent (15%) markup referenced in Section 5.8.1. Santa Clara shall pay to PG&E within twenty (20) days of receipt of the invoice the amount of the invoice. Payment made more than twenty (20) days after receipt of invoice shall accrue late interest compounded monthly at a rate equal to the lesser of (1) the applicable first of the month reference rate of the Bank of America N.T. and S.A. for that Calendar Month or (2) the maximum rate permitted by law. In the event of a dispute of such payments, at Santa Clara's option, all subsequent payments shall be deposited in an escrow account pending resolution of the dispute. Other methods of payment may be used if mutually agreed to by the Parties.

### 5.10 Responsibility For Costs Of Plant

Costs of Plant as defined herein shall be paid by Santa Clara. If the Reverter Date occurs, PG&E will reimburse Santa Clara for the DCP (Depreciated Costs of Plant) as provided in Section 12.4.

Case: 19-30088    Doc# 11000-1    Filed: 07/30/21    Entered: 07/30/21 16:24:14    Exhibit
48 of 157
Page 47 of 156

### 5.11    Correctness Of Charges And Credits

No payment made pursuant to this Section 5 shall constitute a waiver of any right of Santa Clara to contest the correctness of the charges and credits for Costs of Operation and Costs of Plant under this Agreement.

### 5.12    Access To Grizzly.

5.12.1  Either Party, when Operation Manager, shall have access to Grizzly as necessary to perform all tasks required by Section 5.2.

5.12.2  When not Operation Manager, either Party after prior arrangement with Operation Manager and subject to Operation Manager's safety and security rules, shall have access to Grizzly at its own risk. However, when an event occurs which is covered by the Emergency Action Plan required by FERC, (herein "Plan"), or which is a threat to life or property or which poses an imminent risk to the health, safety, and welfare of employee(s) and property of the Parties or the public, or as necessary for the Parties to comply with the license conditions imposed by FERC, either Party shall have access to Grizzly for the purpose of taking such action(s) as appropriate and shall make a good faith effort to notify the Operation Manager and the other Party immediately of the circumstances.

### 5.13    Failure To Perform

If PG&E determines that the Operation Manager has failed to perform its obligations under this Agreement, PG&E shall immediately notify Santa Clara of the nature of such failure. Santa Clara promptly shall take appropriate action to remedy the failure or provide PG&E with substantiated reasons why it is in compliance with the provisions of this Agreement. If Santa Clara does not take appropriate action to remedy the failure or provide PG&E with substantiated reasons why it is in compliance with the provisions of this Agreement within five (5) working days of notification (or twenty-four (24) hours in the case of failure to comply with PG&E's dispatch schedule), PG&E, after notification to Santa Clara, shall have access to Grizzly to take action solely to correct the alleged failure in a manner consistent with Prudent Utility Practice at Santa Clara's expense; provided, that PG&E shall only have access under this Section 5.13 if it determines that the failure to perform is causing or is likely to cause PG&E to incur damage or

Case: 19-30088    Doc# 11000-1    Filed: 07/30/21    Entered: 07/30/21 16:24:14    Exhibit
Page 49 of 157
Page 48 of 156

expense or to have other adverse effects on PG&E's operations. In the event PG&E enters Grizzly pursuant to this Section, PG&E shall assume all liability, without condition, for all events occurring at Grizzly resulting from PG&E's actions. If a court or governmental agency determines that PG&E's actions were inappropriate, Santa Clara shall receive reimbursement from PG&E for any costs directly related to such PG&E actions, including expenses relating to the repair of any damages caused during such entry, and the value of any power Santa Clara lost as a result of PG&E's actions notwithstanding the limitations set forth in Section 14.5.1. Energy stored by holding water in reservoirs upstream of Grizzly shall not be considered power lost.

### 5.14   Obligation To Minimize Spill And Maintain Flow

PG&E shall schedule sufficient water through Grizzly Powerhouse to minimize spill at Bucks Lake and/or Lower Bucks Lake and to maintain scheduled generation at Grizzly and/or PG&E's downstream powerhouses. The Operation Manager shall comply with PG&E's dispatch schedule pursuant to Santa Clara's obligation under Sections 2.3 and 5.7.4.

## 6      LABOR, MATERIAL AND FACILITIES

### 6.1    Labor Discrimination

The Parties and any subcontractor under them shall comply with the requirements of the Labor Code regarding labor discrimination.

### 6.2    Executive Order 11246

With regard to performance of this Agreement and to the extent that Executive Order 11246 may be applicable to this Agreement, the Parties agree as follows:

6.2.1   The Parties will not discriminate against any employee or applicant for employment because of race, color, religion, sex, or national origin. The Parties will take affirmative action to ensure that, with respect to work as part of this Agreement, applicants are employed, and that employees are treated during employment, without regard to their race, religion, color, sex, or national origin. Such action shall include, but not be limited to, the following: employment, upgrading, promotion or transfer, recruitment or recruitment

Case: 19-30088    Doc# 11000-1    Filed: 07/30/21    Entered: 07/30/21 16:24:14    Exhibit
50 of 157

advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. The Parties agree to post in conspicuous places, available to employees and applicants for employment related to this Agreement, notices by setting forth the provisions of this nondiscrimination clause.

6.2.2    The Parties will, in all solicitations or advertisements related to this Agreement for employees placed by or on behalf of either Party, state that all qualified applicants will receive consideration for employment without regard to race, color, religion, sex, or national origin.

6.2.3    The Parties will send each labor union or representative of workers with which they have a collective bargaining agreement or other contract or understanding related to this Agreement, a notice, to be provided by the Parties' contracting officer, advising the labor union or workers' representative of the Party's commitments under Section 202 of Executive Order No. 11246 of September 24, 1965, and shall post copies of the notice in conspicuous places available to employees and applicants for employment related to this Agreement.

6.2.4    The Parties will comply with all provisions of Executive Order No. 11246 of September 24, 1965, and of the rules, regulations and relevant orders of the Secretary of Labor for work related to this Agreement.

6.2.5    The Parties will furnish all information and reports required by Executive Order No. 11246 of September 24, 1965, and by the rules, regulations and orders of the Secretary of Labor, or pursuant thereto, and each Party will permit access to its books, records, and accounts by the other Party and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations and orders.

6.2.6    The Parties will include the provisions of Sections 6.2.1 through 6.2.5 in every contract, subcontract or purchase order unless exempted by rules, regulations, or orders of the Secretary of Labor issued pursuant to Section 204 of Executive Order No. 11246 of September 24, 1965, so that such provisions will be binding upon each contractor, subcontractor or vendor. The Parties will take such action with respect to any contract, subcontract or purchase order as may be directed by the Secretary of Labor as a means of enforcing such provisions including

sanctions for noncompliance; provided, however, that in the event the Parties become involved in, or are threatened with, litigation with a contractor, subcontractor or vendor as a result of such direction, the Parties may request the United States to enter into such litigation to protect the interest of the United States.

## 7 RELATIONSHIP TO INTERCONNECTION AGREEMENT

### 7.1 No Change in Existing Contracts

This Agreement is entirely separate from and independent of the Interconnection Agreement, except insofar as certain terms and conditions of the 1983 Interconnection Agreement have been expressly incorporated in this Agreement. This Agreement does not and shall not be deemed to change any rights or obligations under previously executed contracts or agreements between the Parties except as expressly provided in this Agreement.

### 7.2 Grizzly Ratings

7.2.1 [This Section Left Intentionally Blank]

7.2.2 At the Receiving Stations, the capacity of Grizzly will be set, upon the Commercial Operation Date, at 17.66 MW without regard to Grizzly's capacity rating, and GEN will be determined using transmission losses of eight and seven-tenths percent (8.7%). For delivery of Grizzly power to any Points of Delivery other than the Receiving Stations, the capacity will be set, upon and after the Commercial Operation Date, at the lesser of 17.66 MW or the capacity calculated using a dependable Grizzly capacity of 20.0 MW at plant and the then-applicable ratemaking methodology for transmission losses as provided in Rate Schedule G and Appendix F of this Agreement. For delivery of Grizzly power to any Points of Delivery other than the Receiving Stations, GEN will be determined using transmission losses set at the greater of eight and seven-tenths percent (8.7%) or the percentage calculated by the then-applicable ratemaking methodology for transmission losses as applied in the Interconnection Agreement. Nothing herein shall be deemed to require PG&E to deliver Grizzly power to Points of Delivery other than the Receiving Stations except under the terms of this Agreement and the terms of the

Case: 19-30088    Doc# 11000-1    Filed: 07/30/21    Entered: 07/30/21 16:24:14    Exhibit
52 of 157

Interconnection Agreement. If the terms of this Agreement and the Interconnection Agreement conflict, the terms in this Agreement shall apply.

### 7.3 Capacity and Spinning Reserves

[This Section Left Intentionally Blank]

### 7.4 Modification Of Appendix A of the Interconnection Agreement

Appendix A of the Interconnection Agreement shall be revised as necessary to reflect the delivery of GCE and Grizzly capacity.

### 7.5 Termination Of Interconnection Agreement

In the event the Interconnection Agreement is terminated, modified, or amended in any way affecting this Agreement, the Parties agree to continue to abide by this Agreement, as if the Interconnection Agreement had not been terminated, modified or amended. The Parties will, in the event of termination, modification or amendment of the Interconnection Agreement, enter into good faith negotiations toward an agreement designed to restore or preserve the balance of benefits arising from this Agreement that would have inured to the Parties had the Interconnection Agreement not terminated, modified, or amended.

## 8 POWER DISPATCH AND SUPPLEMENTAL ENERGY

This Section 8 shall be applicable only during the Ownership Period.

### 8.1 Power Dispatch

Grizzly will be dispatched by PG&E in accordance with PG&E's operation of Bucks Creek and as if Grizzly were PG&E owned.

### 8.2 Powerplant Dispatch

8.2.1 PG&E shall be entitled to have Grizzly operated to meet PG&E's customer loads according to electric power needs of PG&E, including but not limited to operation for production of energy, frequency regulation, capacity and spinning reserves and provision of reactive power,

Case: 19-30088    Doc# 11000-1    Filed: 07/30/21    Entered: 07/30/21 16:24:14    Exhibit
Page
53 of 157                                                                    Page 52 of 156

under the same criteria and procedures and at the same levels that PG&E would use if it were the owner of Grizzly. Such operation shall not exceed the capabilities of the equipment or cause equipment warranties to be voided.

8.2.2    Santa Clara shall operate Grizzly to generate electric power in accordance with PG&E's schedules or SCADA signals, at PG&E's election.

8.2.3    Grizzly as constructed will be designed for remote operations under SCADA, and will have installed within it the equipment necessary for receiving and sending SCADA signals and for telemetering other data presently required by PG&E for operation of a facility comparable to Grizzly as a fully integrated generating facility on PG&E's system. Santa Clara shall maintain such equipment at Grizzly, and PG&E shall maintain on its system, equipment necessary for sending and receiving such signals and data in good working order and in operation at all times. Additionally, Santa Clara will, at PG&E's request, install and maintain any equipment additional to the initial installation necessary for receipt and implementation of  such schedules or signals, or for telemetering data, as may be reasonably required to allow Grizzly to continue functioning as a fully integrated generating facility on PG&E's System.

### 8.3    Scheduling

8.3.1    Santa Clara may schedule deliveries of Grizzly Combined Energy (herein "GCE") on a daily basis. Such scheduling will be done in a manner consistent with Appendix F to this Agreement.

8.3.2    Santa Clara shall be entitled to schedule GCE at a rate not to exceed the level determined in Section 7.2.2, or at any applicable lesser rate, down to and including zero.

8.3.3    The Allocation of GCE (herein "ALL") available to Santa Clara for scheduling each Calendar Month shall be determined, in MWh as follows:

a)    Each Calendar Month, PG&E shall forecast the amount of energy to be generated by Grizzly for the following Calendar Month (herein "Monthly Grizzly Energy Forecast"). PG&E shall conduct and complete this study and make the results available to Santa Clara at least eight (8) working days prior to the beginning of the following Calendar Month.

Case: 19-30088    Doc# 11000-1    Filed: 07/30/21    Entered: 07/30/21 16:24:14    Exhibit
Page
54 of 157
Page 53 of 156

b)  The ALL for any Calendar Month will be the greater of (1) the Monthly Grizzly Energy Forecast, minus the transmission losses specified in Section 7.2.2 and plus or minus the amount of Carryover (herein "CO") from the previous Calendar Month as described in Section 8.4; or (2) the Minimum Monthly Allocation for that Calendar Month as determined in Section 8.7, and plus or minus the CO from the previous Calendar Month.

c)  For the purpose of Section 8.4, a Calendar Month for which the ALL is determined by Section 8.3.3 b)(1) shall be referred to as a "Normal Allocation Month". A Calendar Month for which the ALL is determined by Section 8.3.3 b) (2) shall be referred to as a "Minimum Allocation Month."

8.3.4  PG&E and Santa Clara shall communicate as necessary regarding the actual and planned operation of Grizzly. In the absence of any contrary indications (e.g., planned outages), Santa Clara shall assume normal operation and shall so schedule GCE as to approach or equal, but not exceed, the ALL for that Calendar Month. Based on the communications described above, Santa Clara may elect to alter its monthly take from the ALL. In doing so, however, Santa Clara's monthly schedule shall not exceed the greater of the ALL or GEN. Also, Santa Clara's schedules shall not be below the lesser of the ALL or GEN.

8.3.5  It is not the intention of PG&E to deliver and it is not the intention of Santa Clara to schedule GCE such that monthly schedules will exceed the greater of the ALL or GEN, and as such, schedules which exceed such greater amount are not authorized by this Agreement; such excess energy scheduled (herein "Excess Power Take", or "EPT") shall be subject to a separate charge, specified in Section B.2 of Appendix B. The Parties agree that EPT is not a service offered by PG&E, but is power which is inadvertently scheduled and delivered. The Parties shall diligently endeavor to avoid schedules which might result in EPT. Charges for EPT are not intended to be service rates or power sale rates. The Parties agree that, in the event of a scheduling of EPT: (1) proof of loss would be exceedingly difficult because it is impossible at this time to ascribe a dollar value to such loss; (2) the legal and regulatory remedies available to PG&E would make it infeasible or extremely inconvenient to obtain an adequate remedy; (3) the EPT charge shall be used as a reasonable measure of the loss to PG&E resulting from EPT; and (4) the EPT charge is not intended to represent the cost to PG&E of EPT, but rather is intended

Case: 19-30088   Doc# 11000-1   Filed: 07/30/21   Entered: 07/30/21 16:24:14   Exhibit
Page 55 of 157

to minimize any economic incentive for Santa Clara to plan to rely on EPT. PG&E will not knowingly accept schedules including EPT; provided, that PG&E will have no liability to Santa Clara in the event it does accept such a schedule. The Parties understand and agree that EPT is an integral part of the settlement provided by this Agreement and shall not be precedent for any service to be provided by PG&E to Santa Clara or anyone else.

### 8.4    Determinations Involving Grizzly Power

The Parties agree that operation under this Agreement and application of those provisions may indicate the desirability or need to modify them in order to achieve the understandings of the Parties. In such event, they will cooperate in revising those provisions. In the event the Parties are not able to agree on such revisions promptly, then either Party may invoke the dispute resolution provisions of Section 18.3 in order to have determined how those provisions should be revised.

At the end of each Calendar Month, actual Grizzly Generation ("GEN"), will be compared to the amount of GCE scheduled by Santa Clara and the ALL. This comparison will set the CO and any Grizzly Supplemental Power ("GSP") and any amount of EPT for that Calendar Month. Each Calendar Month's accounting for the exchange of GEN and GSP will be as follows:

8.4.1    If GEN is greater than or equal to ALL, and

a)       If GCE is less than or equal to ALL, then CO will be GEN less ALL (a surplus), and GSP and EPT will be zero.

b)       If GCE is greater than ALL and less than or equal to GEN, then CO will be set equal to GEN less GCE (a surplus), and GSP and EPT will be zero.

c)       If GCE is greater than GEN, then CO will  be zero, GSP will be zero, and EPT will be GCE less GEN. Santa Clara is obligated not to schedule and PG&E is not obligated to deliver EPT.

8.4.2    If GEN is less than ALL, and

Case: 19-30088    Doc# 11000-1    Filed: 07/30/21    Entered: 07/30/21 16:24:14    Exhibit
56 of 157

a)      If GCE is less than or equal to GEN, then CO will be zero and GSP and EPT will be zero.

b)      If GCE is greater than GEN and less than or equal to ALL, and

1)      If the month is a Normal Allocation Month, then CO will be GEN less GCE (a deficit) and GSP and EPT will be zero.

2)      If the month is a Minimum Allocation Month, then CO will be zero, GSP will be GCE less GEN, and EPT will be zero.

c) If GCE is greater than ALL, and

1)      If the month is a Normal Allocation Month, then CO will be GEN less ALL (a deficit), GSP will be zero and EPT will be GCE less ALL. Santa Clara is obligated not to schedule and PG&E is not obligated to deliver EPT.

2)      If the month is a Minimum Allocation Month, then CO will be zero, GSP will be ALL less GEN, and EPT will be GCE less ALL. Santa Clara is obligated not to schedule and PG&E  is not obligated to deliver EPT.

8.4.3    To the extent that the difference between GCE and GEN or ALL is less than two (2) percent, the provisions of Sections 8.4.1 and 8.4.2 may be waived by the Parties and no monthly true-up will be required and CO, GSP, and EPT will be zero. The Parties agree that the intent of this two (2) percent deviation band is to minimize the administration burden of true-ups. Either Party may, at the end of the subsequent billing cycle, terminate further application of this Section 8.4.3 by written notice to the other Party in the event that the deviation band consistently favors the other Party. This Section 8.4.3 may be reinstated by a written administrative understanding signed by a PG&E Officer and the Santa Clara Director of Electric Utility.

Case: 19-30088   Doc# 11000-1   Filed: 07/30/21   Entered: 07/30/21 16:24:14   Exhibit
Page 57 of 157
Page 56 of 156

### 8.5 Grizzly Supplemental Power

If Santa Clara schedules it, PG&E will sell and Santa Clara shall purchase GSP, in the amounts and for the months as provided in Section 8.4. The rates for GSP are provided in Section B.1 of Appendix B.

### 8.6 Maintenance Power

PG&E will sell and Santa Clara may, at its option, purchase power in amounts required to replace the power output of Grizzly during scheduled maintenance outages and forced outages, as provided and under the terms of this Agreement. Such sale and purchase shall be made under this Agreement, at rates which are provided in Section B.3 of Appendix B.

### 8.7 Minimum Monthly Allocation

The Minimum Monthly Allocation of ALL that Santa Clara is entitled to schedule each Calendar Month shall be set as follows:

| Month | Minimum Monthly Allocation, in megawatt-hours |
|---|---|
| January | 1,971 |
| February | 1,780 |
| March | 1,971 |
| April | 2,543 |
| May | 3,942 |
| June | 4,450 |
| July | 4,599 |
| August | 4,599 |
| September | 5,722 |
| October | 3,942 |
| November | 1,907 |
| December | 1,971 |

### 8.8 Operating Communications And Records

8.8.1   Reporting Significant Events: Santa Clara shall promptly report significant operating events, by telephone, to PG&E's Rock Creek Switching Center or such other substation or switching center as may be designated by PG&E. Such reports shall include, but not be limited to, system and/or generating unit paralleling or separation, scheduled and unscheduled shutdown, and equipment clearances on transmission switches, breakers, transformers or any

Case: 19-30088   Doc# 11000-1   Filed: 07/30/21   Entered: 07/30/21 16:24:14   Exhibit
58 of 157

other electrical equipment that may affect PG&E's system. Santa Clara shall also report loading on lines and equipment and levels of operating voltages and power factors if requested to do so by PG&E. During such times that PG&E is Operations Manager, PG&E shall be solely responsible for such reporting.

8.8.2   Reporting Anticipated Problems: Santa Clara shall advise PG&E promptly of the possible occurrence of significant operating events, as described in Section 8.8.1, where Santa Clara has reason to believe these could happen. Reporting shall be done as provided in Section 8.8.3. During such times that PG&E is Operation Manager, PG&E shall be solely responsible for such reporting.

8.8.3   Reporting Meter Readings: Santa Clara shall report, by telephone, to PG&E's Rock Creek Switching Center or such other substation or switching center as may be designated by PG&E, twice a day (or such other intervals that the Parties may agree to) at times specified by PG&E's operators, water usage, the hourly readings in kilowatts of capacity and the daily energy in kilowatt hours delivered during the previous day by Santa Clara or for its account into PG&E's system; provided, that telemetering of such data as provided in Section 8.8.4 below shall satisfy these requirements. During such times that PG&E is Operation Manager, PG&E shall be solely responsible for such reporting.

8.8.4   Telemetering Data: Santa Clara shall telemeter the delivered maximum instantaneous output and energy information, including real power in kilowatts, reactive power in kilovars, and energy in kilowatt hours to PG&E's Energy Control Center in San Francisco or to such other location on PG&E's system as PG&E determines appropriate. PG&E may also require Santa Clara to telemeter breaker status and transmission kilowatt, kilovar and kilovolt data depending on the number of generators and transmission configuration. During such times that PG&E is Operation Manager, PG&E shall be solely  responsible for such reporting.

8.8.5   Operating Records: Santa Clara shall keep and provide PG&E such operating records as determined by PG&E to be necessary for the interconnected operation of the Parties' systems. Such records shall include but not be limited to Grizzly operating logs, daily and hourly generation, line loadings, voltages and reactive power. Grizzly operating logs shall be in a form

Case: 19-30088    Doc# 11000-1    Filed: 07/30/21    Entered: 07/30/21 16:24:14    Exhibit
Page
59 of 157                                                                    Page 58 of 156

acceptable to PG&E and shall include information on unit availability, maintenance outages, circuit breaker trip operations requiring a manual reset, and any other significant events relating to the operation of Grizzly. Grizzly records shall include records of power in kilowatts and voltage in kilovolts as measured and registered on a graphic recorder. During such times that PG&E is Operations Manager, it shall be responsible for such record keeping and shall provide Santa Clara access to such records for Santa Clara's review or duplication.

## 9    DELIVERY OF GRIZZLY POWER

### 9.1    Power Delivery

9.1.1    GCE and Grizzly capacity will be delivered to Santa Clara at Receiving Stations or other Points of Delivery; provided, that GSP will only be delivered to Receiving Stations.

9.1.2    Santa Clara shall deliver all electric power generated by Grizzly, during its Ownership Period, net of station use and losses, to PG&E at the interconnection of the PG&E-owned span of the Grizzly transmission line at the disconnect switch located on the Grizzly transmission line end structure near PG&E's Caribou-Sycamore Creek transmission line. PG&E shall deliver GCE and Grizzly capacity to Santa Clara at the times and amounts scheduled by Santa Clara in accordance with Section 8 of this Agreement, without regard to when the power was generated.

### 9.2    Rates

Prior to the first possible Reverter Date, Santa Clara will not be charged any separate or additional rates for the delivery of GCE or Grizzly capacity to Receiving Stations or other Points of Delivery. After the first possible Reverter Date, Santa Clara will pay PG&E an additional power delivery charge based upon 50 percent (50%) of PG&E's applicable transmission rates to Santa Clara for transmission service as listed in Rate Schedule G – Transmission Service, Section II.6 of Appendix B.

Case: 19-30088    Doc# 11000-1    Filed: 07/30/21    Entered: 07/30/21 16:24:14    Exhibit
Page 60 of 157
Page 59 of 156

### 9.3    Continuity Of Delivery

9.3.1    PG&E will endeavor to maintain continuity of service to Santa Clara and to take all reasonable steps to schedule and deliver GCE to Santa Clara under this Agreement.

9.3.2    Except in the case of emergency, PG&E shall endeavor to give as much advance notice as possible of any interruption or reduction in service and its probable duration and will coordinate any such action with Santa Clara to the extent practicable.

9.3.3    PG&E may temporarily interrupt or reduce any service under this Agreement, if PG&E determines that it would be prevented from delivering at the Points of Delivery under the following conditions:

a)    in case of system emergencies;

b)    in order to install, repair or replace equipment or facilities, or inspect or perform other work on PG&E's system;

c)    to prevent a hazard to life or property or unsatisfactory service to its retail customers;

d)    when the operation of PG&E's electric system is suspended, interrupted or interfered with as a result of forces or circumstances over which PG&E has no reasonable control, including, but not limited to, those identified in Section 20.2. PG&E will not interrupt or reduce service under this Agreement as a result of insufficient retail revenue receipts.

9.3.4    Since PG&E utilizes automatic protective devices in order to assist in maintaining the integrity and reliability of its electric system and to protect its customers from damage, injury or prolonged outages, service under this Agreement is subject to interruption in the event of operation of such devices.

### 10    POWER SALES

[This Section Left Intentionally Blank]

Case: 19-30088    Doc# 11000-1    Filed: 07/30/21    Entered: 07/30/21 16:24:14    Exhibit
61 of 157

## 11 ADJUSTMENTS FOR DELAY

### 11.1

In the event a delay of Construction Activities occurs or is forecast by PG&E and demonstrated to Santa Clara's reasonable satisfaction that such delay is likely to occur, as a result of a delay in issuing bonds, obtaining regulatory approvals, conditions caused by Santa Clara, or Force Majeure conditions as defined in Section 20.2 of this Agreement, the Parties shall endeavor to mitigate any cost and schedule impact resulting from or forecast to result from such delay through mutually agreeable means. PG&E shall not be obligated to incur any increased Costs of Construction or other costs in attempting to mitigate such delay without PG&E's agreement thereto, and without Santa Clara's prior approval and agreement to the adjustments therefor described in subsections b) or c) of this Section 11.1. In addition, upon determining the impact of any such delay or forecasted delay, the following adjustments shall be made with respect to this Agreement:

a)      the Power Sale shall continue until the earlier of:

(1)      the Commercial Operation Date; or

(2)      in the event of termination of Grizzly development, the applicable date provided in Section 13;

b)      if the delay or forecasted delay occurs prior to the Construction Contract Date, (1) all Costs resulting from the delay shall be Costs of Construction; and (2) the IPCT, FPCT and the two million six hundred and seven thousand dollars ($2,607,000) limitation on Additional License Related Costs to be paid by Santa Clara shall be adjusted (i) for the projected changes or, if identifiable to the mutual satisfaction of the Parties and different from the projected changes, the actual changes in Costs of Construction resulting from the passage of time or fluctuations in currency exchange rates during such delay or forecasted delay, and (ii) as may be mutually agreed with respect to Costs incurred by PG&E in mitigating any such delay;

c)      if the delay or forecasted delay occurs on or after the Construction Contract Date, Santa Clara shall pay all increased Costs resulting from such delay, including any Costs incurred

Case: 19-30088    Doc# 11000-1    Filed: 07/30/21    Entered: 07/30/21 16:24:14    Exhibit
Page 61 of 156
62 of 157

by PG&E and approved by Santa Clara in mitigating such delay, any increased Costs resulting from the passage of time or fluctuations in currency exchange rates, and any other Costs of PG&E resulting from such delay or forecasted delay (all of such Costs being referred to herein as "Delay Costs"), which Delay Costs shall be accounted for separately and shall be included in the determination of EPCLD and OCLD but shall not constitute Costs of Construction for purposes of this Agreement or for purposes of any other determination hereunder, including determination of the IPCT, FPCT, APC or SCAPC; provided, that for each one hundred and sixty thousand dollars ($160,000) of such Delay Costs borne by Santa Clara, the first possible Reverter Date, the second possible Reverter Date, and the third possible Reverter Date shall be delayed by thirty (30) days; and

d)      the December 31, 1997, deadline for the Commercial Operation Date specified in Section 13.4.2, and the Target Commercial Operation Date shall both be extended to reflect the net schedule impact of the delay or the forecasted delay.

**11.2**

Upon determining the net schedule and cost impact of any delay or forecasted delay, PG&E shall calculate the adjustments required in accordance with subsections a), b) and d) of Section 11.1 and, if applicable, shall determine the actual or forecasted Delay Costs resulting therefrom in accordance with subsection c) of Section 11.1. PG&E shall notify Santa Clara of such calculations and determinations, and shall provide Santa Clara supporting information and documentation. The method of calculating the projected or actual Costs resulting from a delay or forecasted delay covered by Section 11.1 shall be determined by PG&E, subject to approval by Santa Clara, or by a mutually agreed to third party retained by Santa Clara at its own expense. Any such approved Delay Costs of PG&E shall be invoiced by PG&E to Santa Clara and paid by Santa Clara in accordance with the invoicing and payment provisions set forth in Section 4.15.

Case: 19-30088    Doc# 11000-1    Filed: 07/30/21    Entered: 07/30/21 16:24:14    Exhibit
63 of 157

## 12 OCCURRENCE OF REVERTER

### 12.1 Possibility of Reverter

PG&E shall retain a Possibility of Reverter in Grizzly and all Interest therein, which shall occur and become effective on the occurrence of the Reverter Date as set forth in this Agreement. Full and complete title to all Interest in and to Grizzly shall be held by Santa Clara, as sole owner of such Interest, until the Reverter Date occurs. The Parties agree and stipulate that the Possibility of Reverter is and shall be vested as of the date of conveyance of Grizzly and the Interest therein by PG&E to Santa Clara.

### 12.2 Bucks Creek Relicensing

12.2.1  For and in consideration given and received by reason of this settlement, Santa Clara is agreeing to support the relicensing by PG&E of the Bucks Creek Project, whenever it occurs, by entering into the Bucks Creek Relicensing Agreement, a copy of which is attached hereto as Appendix E.

12.2.2  The Parties recognize that it may be necessary to apply for renewal of the Bucks Creek License prior to the Reverter Date. In such event, the Parties shall jointly file an application with FERC to renew the Bucks Creek License. The Parties agree to prosecute renewing the Bucks Creek License as specified in Section 2.7.2. The Parties further recognize that, prior to relicensing, FERC may issue annual license renewals following license expiration. Costs of prosecuting renewal of the Bucks Creek License shall not be included in the Costs of Operation or Costs of Plant. Subject to Section 12.2.3, PG&E will be responsible for the costs of all work authorized by PG&E relating to renewing the Bucks Creek License, including but not limited to environmental studies, agency consultation, and engineering studies.

12.2.3  If the Ownership Period extends beyond the expiration of the Joint License, Santa Clara will share in the cost of renewing the Bucks Creek License, and the cost of any FERC fees for annual license extensions which may be granted following the expiration of the Joint License. Santa Clara's share of such costs shall be determined as follows:

Case: 19-30088   Doc# 11000-1   Filed: 07/30/21   Entered: 07/30/21 16:24:14   Exhibit
64 of 157

(a)     Santa Clara's share of the relicensing cost shall be equal to the total relicensing cost multiplied by the ratio of the nameplate megawatt capacity of Grizzly to the total nameplate megawatt capacity of all facilities on the Bucks Creek License, and multiplied by the ratio of the number of years Santa Clara will be a joint licensee in the new license period to the term, in years, of the new license. The Parties recognize that the start of the new license term may not coincide with the end of the current license term, depending on then current FERC regulations.

(b)     Santa Clara's annual share of license extension fees shall be equal to the total annual license extension fee multiplied by the ratio of the nameplate megawatt capacity of Grizzly to the total nameplate megawatt capacity of all facilities on the Bucks Creek License.

### 12.3     Reversion Dates

12.3.1  There shall be six (6) possible dates or events upon which the Reverter Date may occur, and on such occurrence Santa Clara's Interest in Grizzly shall terminate and all Interest in Grizzly shall revert to PG&E. The Reverter Date shall occur as of 0000 hours on the first of the following dates to occur; provided, that PG&E has given Santa Clara any notice thereof as may be required pursuant to Sections 12.5, 13 or 16.1.2: (1) at any time after PG&E's conveyance of Grizzly and the Interest therein, upon the election of either Party to terminate development of Grizzly as provided in Section 13; (2) the fifteenth 15th) anniversary of the Commercial Operation Date ("first-possible- Reverter Date"); (3) the twentieth (20th) anniversary of the Commercial Operation Date ("second possible Reverter Date"); (4) the twenty-fifth (25th) anniversary of the Commercial Operation Date ("third possible Reverter Date"); (5) on or after January 1, 2034 or the third possible Reverter Date, whichever comes later ("fourth possible Reverter Date"); or (6) upon the election provided PG&E under Section 16.1.2. The date of the possible occurrence of the first, second, third, or fourth possible Reverter Dates shall be adjusted in the event of the circumstances provided for in Sections 11.1 c), 12.3.2 and 12.3.3 and 12.6. PG&E agrees not to exercise the first-possible-Reverter Date.

12.3.2  In the event that the SCAPC is one hundred two percent (102%) or more of the IPCT, the dates of the first possible Reverter Date, second possible Reverter Date, and third

Case: 19-30088    Doc# 11000-1    Filed: 07/30/21    Entered: 07/30/21 16:24:14    Exhibit
Page 65 of 157

possible Reverter Date will be delayed one (1) Year for each full two (2) percent that the IPCT is exceeded by the SCAPC.

12.3.3  a) Upon final acceptance of the new Grizzly Amendment and Joint License, including determination of any appeal of terms and conditions affecting energy production, PG&E shall perform a water and power study using the same computer model and input assumptions (the program and the input data sets are stored under the filename "G.Final.Data" on PG&E's mainframe computer system) used to determine the estimated 62.7 gWh weighted average annual energy upon which the Parties relied for this Agreement, with such input assumptions adjusted to reflect changes in license conditions as contained in the Grizzly Amendment and the Joint License that were not modeled in the original computer run, in order to evaluate the impact of those changed conditions on Santa Clara's anticipated benefits from owning and operating Grizzly. The impact will be calculated as the change in weighted average annual gWh between the two (2) runs divided by 125.4 gWh and multiplied by one hundred (100) to express the result as a percentage. PG&E shall preserve said file and model in an appropriate form so that the evaluation study may be made in the future on the same basis as the original study which the Parties relied upon for this Agreement.

b) In the event that the impact as calculated in Section 12.3.3 a) shows an adverse change exceeding two percent (2%), the first possible Reverter Date, second possible Reverter Date, and third possible Reverter Date will be delayed one (1) Year for each full two percent (2%) of adverse impact. This adjustment shall occur one time only.

12.3.4  The deferral provisions set forth in Sections 11.1 c), 12.3.2, 12.3.3, and 12.3.5 shall be cumulative.

12.3.5

a)  Upon final determination of the FPCT, the minimum cost-based delay in the first, second, and third possible Reverter Dates will be one (1) year for each two (2) percent that the FPCT exceeds the IPCT. The difference between the FPCT and the IPCT will be rounded up or down to the closest two percent (2%) increment of the IPCT.

Case: 19-30088   Doc# 11000-1   Filed: 07/30/21   Entered: 07/30/21 16:24:14   Exhibit
Page 66 of 157
Page 65 of 156

b)  After the completion cf the Grizzly development, if it is determined that the SCAPC is greater than the FPCT, the first, second and third possible Reverter Dates may be subject to further delays, using the delay calculation method pursuant to Section 12.3.2 of the Settlement Agreement. The actual delay shall be the greater of the minimum delay pursuant to the above paragraph or the delay calculated pursuant to Section 12.3.2 of the Settlement Agreement (using the full two percent (2%) method comparing the SCAPC to the IPCT).

c)  The Parties shall, within one (1) year of the Completion of Construction Date, calculate and agree upon the total amount of delay and the possible Reverter Dates.

d)  PG&E may, at its election, include in the transfer documents a limit on the time within which the fourth possible Reverter Date, as so revised, can be exercised. Such language shall not change the earliest date on which the fourth possible Reverter date will occur or cause the fourth possible Reverter Date to occur before the third possible Reverter Date.

### 12.4    Determination Of Reverter Reimbursement

It is the intent of the Parties that Santa Clara be made whole and reimbursed by PG&E for the fair market value of Grizzly upon the occurrence of the Reverter Date and the reverter or reversion of Grizzly to PG&E, except under the catastrophic damage circumstances described in Sections 12.8 and 16.1. Accordingly, the Parties agree and stipulate that the amount of such reimbursement shall be determined as follows, and that such amount is no less than fair market value and is just and reasonable:

a)      If the Reverter Date occurs on the first possible Reverter Date, the amount of reimbursement shall be EPCLD (for reimbursement of original capital construction costs, after depreciation)  + DCP (for reimbursement of capital costs incurred subsequent to original construction, after depreciation).

b)      If the Reverter Date occurs on the second possible Reverter Date, the amount of reimbursement shall be (EPCLD + OCLD)/2 + DCP.

Case: 19-30088   Doc# 11000-1   Filed: 07/30/21   Entered: 07/30/21 16:24:14   Exhibit
67 of 157

    c)      If the Reverter Date occurs on the third possible Reverter Date, the amount of reimbursement shall be OCLD (for reimbursement of original capital construction costs, after depreciation) + DCP.

    d)      If the Reverter Date occurs on the fourth possible Reverter Date, the amount of reimbursement shall be the OCLD + DCP.

    e)      If the Reverter Date occurs as a result of termination of development of Grizzly as provided in Section 13, no additional reimbursement will be in order since PG&E is to refund to Santa Clara moneys advanced by Santa Clara.

    f)      If the Reverter Date occurs as provided in Section 16.1.2, no reimbursement will be in order, it being agreed by the Parties that any loss borne by Santa Clara under such circumstances is an incident of the risks of ownership.

### 12.5    Notice

PG&E may at its option cause the Reverter Date to occur on the first possible Reverter Date, the second possible Reverter Date, the third possible Reverter Date, or the fourth possible Reverter Date by giving Santa Clara advance written notice thereof not less than three (3) Years prior to the intended Reverter Date. In the event that Grizzly is condemned or is not in a condition as would be normally expected for a facility of its age and operating experience, at PG&E's election its notice shall be deemed cancelled and the Reverter Date shall not occur. The occurrence of the Reverter Date under the circumstances of Sections 13 or 16.1.2 shall be governed by any applicable notice provisions in those Sections. Any notice by PG&E that will result in the occurrence of the Reverter Date shall be given in writing by certified mail, or by hand delivery, to the City Clerk of Santa Clara.

### 12.6    Payment of Reimbursement

In the event the Reverter date is to occur on either the first, second, third or fourth possible Reverter Dates, pursuant to notice given by PG&E, Santa Clara shall determine and advise PG&E, at least thirty (30) days in advance of the expected Reverter Date, of the amount of reimbursement determined as provided in Section 12.4. On or before the Reverter Date,

Case: 19-30088   Doc# 11000-1   Filed: 07/30/21   Entered: 07/30/21 16:24:14   Exhibit
Page 67 of 156
68 of 157

PG&E shall pay the amount of reimbursement as so determined by Santa Clara, or such lesser amount as the Parties may agree upon to adjust for any outstanding liens, encumbrances, restrictions or clouds on title on Grizzly or to place Grizzly in a condition as would normally be expected for a facility of its age and operating experience (herein "Adjustment"). If the Parties disagree on the amount of reimbursement to be made, or whether an Adjustment is to be made to it or the amount of such Adjustment, PG&E shall reimburse Santa Clara the undisputed amount of reimbursement less any Adjustment PG&E believes proper and shall deposit any disputed amount into a mutually satisfactory escrow. In the event Santa Clara has been unable or has failed to advise PG&E of the amount of reimbursement, PG&E shall pay Santa Clara the amount of reimbursement it determines or estimates is appropriate after any Adjustment; and the Parties thereafter shall endeavor promptly to agree on the amount of reimbursement, including any Adjustment, and promptly make any appropriate additional payment or refund, including interest. The Reverter Date shall occur only as of the first day following the day on which PG&E has both (1) paid Santa Clara the undisputed amount of reimbursement less any Adjustment and (2) deposited any disputed amounts thereof in escrow. If an escrow is established, if possible it shall be interest bearing and PG&E shall be entitled to manage the account. Upon resolution of the dispute, the escrowed funds, including interest, shall be distributed in accordance and in proportion with the resolution, and any appropriate refund or additional payment shall be made promptly. The Parties shall adjust the distribution from escrow and any refunds or additional payments to provide for interest at the rate provided in Section 10.5.4, allowing credit for any interest earned by the escrow account.

### 12.7    Clear Title

During its Ownership Period, or until and unless PG&E's Possibility of Reverter is surrendered in accordance with Section 16.1.2, whichever first occurs, unless otherwise mutually agreed by the Parties, Santa Clara shall not permit any liens, encumbrances, restrictions, or other clouds of title to be placed on Grizzly except as lawfully imposed by FERC or other regulatory or other governmental agency having jurisdiction in the premises. Santa Clara shall oppose the imposition of any such liens, encumbrances, restrictions, or other clouds of title and remove promptly any that are imposed, and PG&E will cooperate with Santa Clara's efforts to do so.

### 12.8 Catastrophic Events

As specified in Section 16.1, Santa Clara is not obligated to rebuild the facility in the event of a catastrophic event which results in damage to or destruction of any or all of the Grizzly facilities to such an extent that restoration of Grizzly is not economic in Santa Clara's sole judgment and FERC concurs on Grizzly's abandonment. If Santa Clara decides not to rebuild Grizzly, PG&E will have the ability to cause the Reverter Date to occur at no cost to PG&E and without payment to Santa Clara of any amount for reimbursement, and to rebuild Grizzly as a PG&E-owned facility. In the event PG&E rebuilds the facility, Santa Clara will pay PG&E the amount that Santa Clara would otherwise have expended for site restoration. Neither Santa Clara nor PG&E will be required to reimburse the other for the lost opportunity to continue to run or to transfer Interest in Grizzly in the event of catastrophic damage and a decision not to rebuild as described in Section 16.1.

### 12.9 Warranty Transfer on Reversion

Santa Clara shall assign all Grizzly warranties to PG&E on or promptly after occurrence of the Reverter Date and thereafter shall have no responsibility to PG&E as to the matters and facilities so warranted.

### 13 OPTIONS TO TERMINATE DEVELOPMENT OF GRIZZLY

Prior to the Construction Contract Date, options to terminate development of Grizzly, as defined in Sections 13.1 through 13.3, will be available to both PG&E and Santa Clara. Development termination options are also provided in Section 13.4 and may be exercised as provided therein. Any such termination of development shall not, of itself, terminate this Agreement but shall have the consequences identified in this Section 13.

### 13.1 PG&E's Options To Terminate (Regulatory Approval)

PG&E will have termination options in the event of adverse regulatory actions, as follows:

Case: 19-30088   Doc# 11000-1   Filed: 07/30/21   Entered: 07/30/21 16:24:14   Exhibit
Page 69 of 156
70 of 157

13.1.1  PG&E may terminate development of Grizzly if FERC license conditions adversely affect the operations of Bucks Creek or if the FERC license conditions adversely affect the economics of Grizzly. If PG&E wishes to terminate development of Grizzly on this basis, it must do so by giving Santa Clara written notice thereof not later than sixty (60) days following Settlement Date.

13.1.2  The Parties recognize that CPUC approval of the transactions contemplated by this Agreement will be required. If such CPUC approval is not obtained within six (6) months following the Settlement Date, on terms satisfactory to PG&E, PG&E may terminate development of Grizzly. In the event of inaction, non-approval, or approval by CPUC on terms unsatisfactory to PG&E and prior to the time when PG&E exercises its option to terminate such development, the Parties agree to attempt to negotiate necessary adjustments in this Agreement to permit PG&E to obtain favorable treatment from CPUC while preserving the balance of benefits for both Parties. If a good faith attempt to negotiate such an agreement is unsuccessful within nine (9) months following the Settlement Date or such other period as mutually agreed by the Parties, PG&E may either accept the CPUC treatment or exercise its option to terminate development of Grizzly by giving Santa Clara written notice of such termination; provided, that if PG&E does not notify Santa Clara of its decision to terminate such development within the negotiation period, PG&E shall be deemed to have accepted the CPUC treatment.

13.1.3  If PG&E exercises one of its options to terminate as set forth in this Section 13.1, the Power Sale shall continue to be effective except as modified below:

a) During the period of July 1, 1991 through December 31, 1997 PG&E shall sell at Points of Delivery and Santa Clara shall purchase 27.66 MW of capacity each Calendar Month. During this period, Santa Clara shall schedule power at a minimum level no less than 4.1 MW and at a maximum level no greater than 27.66 MW. During this period, in each Calendar Month, Santa Clara shall purchase no less than seven million eight hundred thousand (7,800,000) kWh. Santa Clara shall pay for this amount of energy in the event Santa Clara, for any reason, takes a lesser quantity of energy in a Calendar Month. The initial rate shall be the rate in effect on June 30, 1991 pursuant to Section 10.1.2. The energy rate shall be recalculated and adjusted in

Case: 19-30088   Doc# 11000-1   Filed: 07/30/21   Entered: 07/30/21 16:24:14   Exhibit
Page
71 of 157
Page 70 of 156

accordance with Appendix A and such adjusted rates shall be effective on April 1 of each year 1992 through 1997. The capacity price for Sale Power delivered to Receiving Stations shall be:

1)      nine dollars ($9) per kilowatt-month (take or pay) from July 1, 1991 through December 31, 1995;

2)      eleven dollars ($11) per kilowatt-month (take or pay) from January 1, 1996 through December 31, 1997.

For delivery of Sale Power to Points of Delivery other than Receiving Stations, the above capacity prices will be adjusted pursuant to the mechanism of Section 10.1.5.

b) During the period of January 1, 1998 through December 31, 2007, PG&E shall sell at Points of Delivery and Santa Clara shall purchase 27.66 MW of capacity each Calendar Month. During this period demand and energy prices for the Power Sale will be set at the then prevailing Partial Requirements Power capacity and energy rates. The Parties agree that, if at any time during this period there are no applicable Partial Requirements Power rates, the closest equivalents to such rates will apply. In no event shall Santa Clara pay for any cost associated with delivery of the Sale Power. If the Partial Requirements Power capacity or energy rates, or the closest equivalents referred to above, contain a transmission component, that transmission component will be subtracted from the applicable rate paid by Santa Clara.

c) Delivery of this Sale Power will be made available to Santa Clara at Points of Delivery without  additional charge by PG&E.

### 13.2     Santa Clara's Option To Terminate (Tax-Exempt Status)

13.2.1  At any time prior to six (6) months following the Settlement Date, Santa Clara may exercise an option to terminate development of Grizzly if Santa Clara is advised by bond counsel that conditions of this Agreement or changes in or interpretations of tax laws or regulations would prohibit or jeopardize the ability of Santa Clara to finance Grizzly on a tax-exempt basis, so that the expected benefits to Santa Clara are adversely affected. If CPUC approval is not obtained within six (6) months following the Settlement Date, on terms satisfactory to PG&E as provided in Section 13.1.2, Santa Clara's termination option shall be

Case: 19-30088    Doc# 11000-1    Filed: 07/30/21    Entered: 07/30/21 16:24:14    Exhibit
Page 71 of 156
72 of 157

extended for the period of the negotiations as provided in said Section. In the event that Santa Clara's expected benefits are so affected and prior to the time when Santa Clara may exercise its option, the Parties agree to attempt to negotiate adjustments in this Agreement to permit Santa Clara to obtain tax-exempt financing while preserving the balance of benefits for both Parties. If good faith attempts to negotiate such adjustments to this Agreement are unsuccessful within the period specified above, Santa Clara may elect to terminate development of Grizzly by giving PG&E written notice thereof; provided, that if Santa Clara does not notify PG&E of its decision to terminate such development within that period, Santa Clara shall be deemed to have waived this option to terminate.

     13.2.2 If Santa Clara exercises this option to terminate as set forth in Section 13.2.1 above, the Power Sale shall continue to be effective except as modified below:

     a)     During the period of July 1, 1991 through December 31, 1997, PG&E shall sell at Points of Delivery and Santa Clara shall purchase 27.66 MW of capacity each Calendar Month. During this period, Santa Clara shall schedule power at a minimum level no less than 4.1 MW and at a maximum level no greater than 27.66 MW. During this period, in each Calendar Month, Santa Clara shall purchase no less than seven million eight hundred thousand (7,800,000) kWh. Santa Clara shall pay for this amount of energy in the event Santa Clara, for any reason, takes a lesser quantity of energy in a Calendar Month. The initial rate shall be the rate in effect on June 30, 1991 pursuant to Section 10.1.2. The energy rate shall be recalculated and adjusted in accordance with Appendix A and such adjusted rates shall be effective on April 1 of each year 1992 through 1997.

     b)     The capacity price for Sale Power delivered to Receiving Stations shall be:

     1) ten dollars and twenty eight cents ($10.28) per kilowatt-month (take or-pay) from February 20, 1990 through December 31, 1995 applied retroactively as necessary; and

     2) eleven dollars ($11) per kilowatt-month (take or pay) from January 1, 1996 through December 31, 1997.

For delivery of Sale Power to Points of Delivery other than Receiving Stations, the above capacity prices will be adjusted pursuant to the mechanism of Section 10.1.5.

c)      Delivery of this Sale Power will be made available to Santa Clara at Santa Clara's Points of Delivery without additional charge by PG&E.

### 13.3    Santa Clara's Option To Terminate (Cost)

13.3.1  Santa Clara will also have an option to terminate development of Grizzly in the event that the percentage increase of the FPCT over the IPCT is greater than ten percent (10%). If Santa Clara terminates on this basis, it must do so by giving PG&E written notice thereof not later than eight (8) weeks after PG&E provides Santa Clara copies of all bids for contracts included in the FPCT calculation, or two (2) weeks following the date on which Santa Clara receives notice from PG&E of the amount of the FPCT, whichever is later. Notwithstanding the foregoing, Santa Clara agrees that it will not exercise this option to terminate development of Grizzly as a result of the substantial increase in the FPCT over the IPCT, except as provided in Section 13.4.5.

13.3.2  If Santa Clara exercises this option to terminate as set forth in Section 13.3.1 above, the Power Sale provisions of this Agreement shall continue to be effective  except as modified below:

a)      During the period of July 1, 1991 through December 31, 1997, PG&E shall sell at Points of Delivery and Santa Clara shall purchase 27.66 MW of capacity each Calendar Month. During this period, Santa Clara shall schedule power at a minimum level no less than 4.1 MW and at a maximum level no greater than 27.66 MW. During this period, in each Calendar Month, Santa Clara shall purchase no less than seven million eight hundred thousand (7,800,000) kWh. Santa Clara shall pay for this amount of energy in the event Santa Clara, for any reason, takes a lesser quantity of energy in a Calendar Month. The initial rate shall be the rate in effect on June 30, 1991 pursuant to Section 10.1.2. The energy rate shall be recalculated and adjusted in accordance with Appendix A and such adjusted rates shall be effective on April 1 of each year 1992 through 1997.

Case: 19-30088   Doc# 11000-1   Filed: 07/30/21   Entered: 07/30/21 16:24:14   Exhibit
74 of 157

b)     The capacity price for Sale Power delivered to Receiving Stations shall be ten dollars and twenty eight cents ($10.28) per kilowatt month (take-or pay) from February 20, 1990 through December 31, 1997, applied retroactively as necessary. For delivery of Sale Power to Points of Delivery other than Receiving Stations, the above capacity price will be adjusted pursuant to the mechanism of Section 10.1.5.

c) Delivery of this Sale Power will be made available to Santa Clara at Points of Delivery without additional charge by PG&E.

### 13.4     Other Termination Provisions

13.4.1  License Amendments Necessary For Santa  Clara Ownership

If any license amendments necessary to implement Santa Clara's ownership of Grizzly are not accepted in whole by PG&E and approved by FERC by December 31, 1990, unless mutually agreed otherwise by the Parties, the development of Grizzly will be terminated and the Power Sale shall continue to be effective with modifications described in Section 13.1.3.

13.4.2  Commercial Operation Delay

If Grizzly development has not been terminated, the Power Sale provisions for Period Three will be effective until the Commercial Operation Date. If the Commercial Operation Date is forecast to be delayed beyond December 31, 1997, except when such delay is due to circumstances described in Section 11.1, in which case the 1997 date shall be increased for one (1) day for each day of such delay, either Party shall have the option of terminating development of Grizzly by giving the other Party notice thereof. This termination option shall be exercised within thirty (30) days of receipt by Santa Clara of the forecast. If either Party chooses to terminate development under these circumstances, the Power Sale shall continue to be effective with the modifications described in Section 13.1.3.

13.4.3  Cost-Overruns of Greater Than Ten (10)  Percent

If PG&E estimates that the APC will exceed the FPCT by more than ten (10) percent or determines that it will be unduly burdensome to complete construction, including, without

Case: 19-30088    Doc# 11000-1    Filed: 07/30/21    Entered: 07/30/21 16:24:14    Exhibit
Page 74 of 156
75 of 157

limitation, a failure to obtain any necessary CPUC approval of the changes provided in Amendment No. One to this Agreement on satisfactory terms and conditions as determined by PG&E, PG&E has the option to terminate Grizzly development by giving Santa Clara notice thereof. If PG&E so notifies Santa Clara that it is exercising this option to terminate, the Power Sale shall continue to be effective with the modifications described in Section 13.1.3.

### 13.4.4  Inability to Obtain Permits

If PG&E is unable to obtain permits and approvals necessary for operations and construction other than FERC approvals, PG&E has the option to terminate Grizzly development by giving Santa Clara written notice thereof. If PG&E exercises this option to terminate, the Power Sale shall continue to be effective with the modifications described in Section 13.1.3.

### 13.4.5  Parties' Option to Terminate (FERC Approval or Acceptance):

Either Party shall have the right to terminate development in the event of a failure to obtain FERC approval of the changes provided in Amendment No. One to this Agreement on terms and conditions satisfactory to that Party, or if the FERC does not accept the Power Sale provisions of Amendment No. One to this Agreement on terms and conditions satisfactory to that Party.

13.4.5.1. If FERC accepts the Power Sale provisions of Amendment No. One to this Agreement but either Party subsequently exercises its option to terminate because of failure to obtain FERC approval of all provisions of Amendment No. One to this Agreement on terms and conditions acceptable to that Party, all interest in Grizzly shall revert to PG&E pursuant to Section 12 of this Agreement and the terms of this termination provision shall include the Power Sale provisions as provided in paragraph 10.1. If necessary, PG&E shall make such additional filings as may be necessary to secure such Power Sale provisions. The funds advanced by Santa Clara to PG&E for work done under Section 4 of this Agreement will be refunded as follows:

a) All funds advanced to PG&E on or before June 12, 1991, shall be refunded to Santa Clara without interest;

Case: 19-30088   Doc# 11000-1   Filed: 07/30/21   Entered: 07/30/21 16:24:14   Exhibit
76 of 157

b) Santa Clara will not be reimbursed for the first three million dollars ($3,000,000.00) of funds advanced after June 12, 1991; and

c) Santa Clara will be reimbursed for fifty percent (50%) of any funds advanced in excess of three million dollars ($3,000,000.00) after June 12, 1991.

13.4.5.2. If FERC does not accept the Power Sale provisions of Amendment No. One to this Agreement, and either Party exercises its option to terminate, all interest in Grizzly shall revert to PG&E pursuant to Section 12 of this Agreement and the terms of termination shall be those set forth in Sections 13.3.2, 13.5 (except for the interest payment included in Section 13.5) and 13.6 of this Agreement.

13.4.5.3. The Parties shall have, unless otherwise agreed in writing, fifteen (15) days after a FERC final order approving or rejecting Amendment No. One to this Agreement to exercise this option.

## 13.5    Refunds

If either Party exercises one of the above-listed options to terminate development of Grizzly, PG&E shall promptly refund to Santa Clara all funds advanced by Santa Clara to PG&E under Section 4. Any condemnation proceeds and any insurance proceeds intended for reconstruction and paid directly to Santa Clara shall be credited to such refund. The refund shall be with interest if termination is due to one of the termination options under Section 13.1 or Section 13.4. The annual interest rate shall be eight percent (8%) compounded monthly for the period PG&E holds funds advanced by Santa Clara.

## 13.6    Implementation of Termination By Either Party

If either Party terminates development of Grizzly as provided in this Section 13:

13.6.1  At the time Santa Clara or PG&E gives notice of termination, or on January 1, 1991 if Section 13.4.1 becomes applicable, all Interest in Grizzly will revert to PG&E  and Santa Clara will no longer have any rights or obligations imposed by Joint License requirements, so far as permissible under the Federal Power Act and the Joint License order as issued, except for the

Case: 19-30088    Doc# 11000-1    Filed: 07/30/21    Entered: 07/30/21 16:24:14    Exhibit
Page 77 of 157
Page 76 of 156

obligations which Santa Clara has agreed to accept under the terms and conditions of this Agreement.

13.6.2 Santa Clara will support PG&E's petition to remove Santa Clara from the Joint License.

## 14    INDEMNITIES AND LIABILITIES

For the purposes of this Section 14, the right to indemnification of PG&E and Santa Clara shall include indemnification of their respective officers, agents, employees, representatives, boards and councils.

### 14.1    Grizzly Development Ownership and Operation Indemnities

The provisions of this Section 14.1 apply to the Parties' performance of their respective obligations generally under this Agreement, except for Section 14.1.4 which applies to all indemnities, and except as expressly provided in Section 14.3 for performance under Sections 7, 8, 9 and 10 and as to the PG&E distribution line planned to be strung on the wood poles of the Grizzly transmission line as provided in Section 2.6.7.

14.1.1 Indemnities Relating to Grizzly Development

14.1.1.1 With respect to all Construction Activities performed prior to the Substantial Completion Date, and with respect to the punchlist items specifically agreed to by the Parties pursuant to Section 4.12.2, and except as otherwise  provided herein, PG&E shall defend, indemnify and hold harmless Santa Clara from and against all penalties and fines imposed by law and all loss, damage, expense and liability (including but not limited to court costs and reasonable attorneys' fees) resulting from injury to or death of persons, or damage to or loss of property, caused by or arising out of PG&E's actions or performance of activities under this Agreement, except to the extent the sole negligence or willful misconduct of Santa Clara proximately causes  the loss, damage, expense or liability. Santa Clara shall likewise defend, indemnify and hold harmless PG&E for claims arising from the sole negligence or willful misconduct of Santa Clara. The foregoing indemnity obligations shall include full indemnification from any of the foregoing caused by an indemnifying party's contractors,

Case: 19-30088    Doc# 11000-1    Filed: 07/30/21    Entered: 07/30/21 16:24:14    Exhibit
Page 77 of 156
78 of 157

subcontractors, vendors, suppliers, employees or representatives, including, in the case of PG&E, the contractors, vendors and suppliers retained by PG&E on behalf of Santa Clara for Grizzly pursuant to Sections 3 and 4 of this Agreement.

14.1.1.2 With respect to all Construction Activities performed prior to the Substantial Completion Date, and with respect to the punchlist items specifically agreed to by the Parties pursuant to Section 4.12.2, including the activities of contractors, subcontractors, vendors and suppliers retained by PG&E on behalf of Santa Clara pursuant to Sections 3 and 4, the Parties agree that all costs, expenses and liabilities incurred by PG&E pursuant to the indemnity set forth in Section 14.1.1.1, including liability for any insurance deductibles, to the extent not Covered by proceeds of the insurance provided pursuant to Sections 15.1 and 15.2, shall be treated as Costs of Construction for purposes of this Agreement, and, subject to Section 4.17, shall be accounted for and invoiced in accordance with the provisions of Section 4.15.

14.1.2  Indemnities Relating to Grizzly Ownership  and Operation

14.1.2.1 With respect to all actions and performance under this Agreement, other than Construction Activities performed prior to the Substantial Completion Date, PG&E's indemnification obligation  under this Agreement shall apply only to loss, damage, expense and liability caused by or arising out of PG&E's gross negligence or willful misconduct in connection with its actions or performance of activities under this Agreement. The Parties expressly agree that, as to any other loss, damage, expense or liability, other than those resulting from Construction Activities performed prior to the Substantial Completion Date and which is not caused by PG&E's gross negligence or willful misconduct, including  liability for insurance deductibles, it is the intent of the Parties to rely solely upon Santa Clara and upon the proceeds of the insurance required to be maintained by Santa Clara for the benefit of itself and PG&E pursuant to Section 15.3 to cover such loss, damage, expense or liability, and in the event Santa Clara fails to obtain and maintain such insurance or pay such deductibles, or in the event such insurance is inadequate in coverage or amount, Santa Clara hereby agrees to release, defend, indemnify and hold harmless PG&E from and against all penalties and fines imposed by law and all loss, damage, expense and liability (including, but not limited to, court costs and reasonable

Case: 19-30088   Doc# 11000-1   Filed: 07/30/21   Entered: 07/30/21 16:24:14   Exhibit
Page 78 of 156
79 of 157

attorneys' fees) resulting from injury to or death of persons, or damage to or loss of property, that is not so covered by insurance.

14.1.2.2 Notwithstanding the limitation on PG&E's indemnity liability set forth in Section 14.1.2.1, PG&E shall not be entitled to indemnification or reimbursement from Santa Clara pursuant to the second sentence of Section 14.1.2.1 with respect to workers' compensation claims against PG&E by its own employees or with respect to any personal injury or damage liability incurred by PG&E to third parties in connection with the transportation of PG&E's employees and representatives to and from the Grizzly Site; and PG&E shall bear all costs and liabilities in connection therewith.

### 14.1.3 Special Indemnity for Bucks Creek

Notwithstanding any provision herein to the contrary, PG&E at all times shall defend, indemnify and hold harmless Santa Clara from and against all penalties and fines imposed by law and all loss, damage, expense and liability (including but not limited to court costs and reasonable attorneys' fees), in excess of any proceeds of the insurance provided pursuant to Section 15, resulting from injury to or death of persons, or damage to or loss of property, caused by or arising out of PG&E's actions or operations in connection with Bucks Creek, except this indemnity obligation shall not apply if Santa Clara's sole negligence or willful misconduct proximately causes the loss, damage, expense or liability, and except to the extent such penalties, fines, loss, damage, expense or liability arises in connection with PG&E's actions or performance as Development Manager or Operation Manager under this Agreement, in which case the indemnities set forth in Sections 14.1.1 and 14.1.2 shall apply.

### 14.1.4 Notice of Claim

An indemnified party under Section 14 shall, within ten (10) days of the receipt of notice of the commencement of any legal action or of any claims against such indemnified party in respect of which indemnification may be sought pursuant to this Section 14, notify the indemnifying party in writing thereof. Failure of the indemnified party to give such notice will reduce the liability of the indemnifying party by the amount of damages attributable to the failure of the indemnified party to give such notice to the indemnifying party but the failure so to notify

Case: 19-30088   Doc# 11000-1   Filed: 07/30/21   Entered: 07/30/21 16:24:14   Exhibit
80 of 157

shall not relieve the indemnifying party from any liability which it may have other than under the indemnity agreements contained in this Section 14. In case any such claim or legal action shall be made or brought against an indemnified party and such indemnified party shall notify the indemnifying party thereof, the indemnifying party may, or if so requested by such indemnified party shall, assume the defense thereof, without any reservation of rights, with counsel reasonably satisfactory to such indemnified party, and after notice from the indemnifying party to such indemnified party of an election to assume the defense thereof and approval by the indemnified party of such counsel, will not be liable to such indemnified party under this Section for any legal fees and expenses subsequently incurred by such indemnified party in connection with the defense thereof. Any legal fees or expenses incurred by an indemnified party prior to the tender of a claim to the indemnifying party shall be for the account of the indemnified party. No indemnified party shall settle any indemnified claim with respect to which the indemnifying party has not been afforded the opportunity to assume the defense without the indemnifying party's approval, which approval shall not be unreasonably withheld. The indemnifying party shall control the settlement of all claims over which it has assumed the defense; provided, that the indemnifying party shall not conclude any settlement which requires any action or forbearance from action by an indemnified party or any of its affiliates without the prior approval of the indemnified party. The indemnified party shall provide reasonable assistance to the indemnifying party when the indemnifying party so requests, at the indemnifying party's expense, in connection with such legal action or claim. In all cases the indemnified party shall have the right to participate in and be represented by counsel of its own choice and at its own expense in any such legal action or with respect to any claim.

## 14.2     Treatment of Costs Arising From Damage to Grizzly

### 14.2.1   Construction Period

Subject to Section 16.1, all costs and expenses incurred by PG&E prior to the Substantial Completion Date to repair or replace, or cause to be repaired and replaced, any damage or destruction to Grizzly resulting from Construction Activities, and, subject to Sections 11.1 c) and 16.1, all costs and expenses incurred by PG&E prior to the Commercial Operation Date to repair, replace, or cause to be repaired or replaced, any damage or destruction to Grizzly resulting from

Case: 19-30088    Doc# 11000-1    Filed: 07/30/21    Entered: 07/30/21 16:24:14   Exhibit 81 of 157

Force Majeure (or any other adverse weather conditions at the Grizzly Site), to the extent not covered by proceeds of the insurance provided pursuant to Section 15, shall be treated as Costs of Construction for purposes of this Agreement, and, subject to Section 4.17, shall be accounted for and invoiced in accordance with the provisions of Section 4.15. It is understood, however, that PG&E shall have no obligation or liability, including liability to incur Costs of Construction, for any increase in Net Interest During Construction or, except as set forth in Section 11, other delay costs resulting from such damage or destruction, or for any damage or destruction to Grizzly resulting from the sole negligence or willful misconduct of Santa Clara; and Santa Clara hereby agrees to release, indemnify and hold harmless PG&E therefrom.

### 14.2.2 Operation Period

Notwithstanding any other provision of this Agreement to the contrary, on and after the Commercial Operation Date, except as otherwise expressly provided in Sections 14.1.2.2, 14.1.3 and 14.2.1, PG&E shall have no liability, except as otherwise provided herein, for loss of, damage or destruction to Grizzly resulting from any cause whatsoever, or any delay or shutdown arising therefrom, and all risk of loss with respect to Grizzly shall be borne by Santa Clara, subject to the provisions of Section 16.1, as it is the intent of the Parties to rely upon the proceeds of the insurance required to be maintained by Santa Clara pursuant to Section 15.3 as satisfaction in full for such loss, damage or destruction; and Santa Clara hereby agrees to release and, in the event Santa Clara fails to obtain and maintain such insurance or in the event such insurance is inadequate in coverage or amount, to indemnify and hold harmless PG&E therefrom, except to the extent of PG&E's gross negligence or willful misconduct. Deductibles paid and any costs incurred by PG&E in excess of such proceeds as a result of any such loss, damage, destruction or delay, except to the extent caused by PG&E's gross negligence or willful misconduct, shall be reimbursed to PG&E by or on behalf of Santa Clara as a Cost of Operation. In addition, PG&E shall have no liability for loss of or damage or destruction to other property owned by or leased to or otherwise in the custody of Santa Clara at Grizzly, except to the extent caused by PG&E's gross negligence or willful misconduct, and Santa Clara hereby agrees to release, indemnify and hold harmless PG&E therefrom.

Case: 19-30088   Doc# 11000-1   Filed: 07/30/21   Entered: 07/30/21 16:24:14   Exhibit
Page
82 of 157
Page 81 of 156

### 14.3 Indemnities Relating to Utility Operations

The provisions of this Section 14.3 apply only to the Parties' performance of their respective obligations as provided in Sections 7, 8, 9 and 10, and PG&E's ownership and operation of the distribution line planned to be strung on the wood poles of the Grizzly transmission line, as provided in Section 2.6.7.

14.3.1  Neither Party, its directors or members of its governing body, officers, employees or agents shall be liable to the other Party for any loss, damage, claim, cost, charge, or expense of any kind or nature incurred by the other Party, whether direct, indirect or consequential, and whether or not resulting from the negligence of a Party, its directors or members of its governing body, officers, employees or agents or any person or entity whose negligence would be imputed to such Party, arising from performance or nonperformance under this Agreement, except for any loss, damage, claim, cost, charge or expense resulting from gross negligence or willful misconduct or nonpayment of money due. Each party releases and shall hold harmless, defend and indemnify the other Party, its directors or members of its governing body, officers, employees and agents from any such liability except for any loss, damage, claim, cost, charge, or expense resulting from gross negligence, willful misconduct, or nonpayment of money due. No Party shall execute, levy or otherwise enforce a judgment for such liability, including recording or effecting a judgment lien against the other Party, its directors or members of its governing bodies, officers, employees and agents.

A Party whose electric customer shall make a claim or bring an action for any death, injury, loss or damage arising out of delivery of, or in connection with, electric service to such customer resulting from the implementation of this Agreement, shall indemnify, defend and hold harmless the other Party, its directors or members of its governing body, officers, employees and agents from and against any liability for such death, injury, loss or damage except for liability resulting from willful misconduct of the other Party. The term "electric customer" shall mean an electric consumer, as distinguished from an electric utility system to whom power is delivered for resale.

Case: 19-30088    Doc# 11000-1    Filed: 07/30/21    Entered: 07/30/21 16:24:14    Exhibit
Page 82 of 156
83 of 157

### 14.4    Taxes

14.4.1  Each Party assumes full and exclusive liability and responsibility for paying or withholding, as may be required by law, all federal, state and local taxes measured by such Party's own net income and the income of its employees, and each Party shall make all returns, reports and contributions required in connection therewith.

14.4.2  All other federal, state or local taxes relating to the ownership, construction, acquisition or operation of Grizzly which the Parties may incur, including without limitation tangible and intangible personal property taxes, sales, use, value-added, customs and other excise or transfer taxes, and real property and other possessory interest taxes, shall be paid or reimbursed as described below; provided, that the Parties agree to oppose jointly the imposition of any real or personal property taxes on Grizzly, and provided further that Santa Clara shall have the right, at its  expense, to contest the applicability of any other such taxes so long as this does not result in any additional cost to PG&E. If there is an exemption available for any sales, use, property or other taxes with respect to Grizzly, Santa Clara shall so advise PG&E, and the Parties shall take whatever actions may reasonably be required to take advantage of such exemption.

a)        Taxes arising from Construction Activities excluding those arising from 14.4.1 shall be treated as Costs of Construction; provided, that to the extent any such taxes were not reasonably foreseen in development of the IPCT, those taxes shall be paid by Santa Clara and shall be included in the determination of EPCLD and OCLD but shall not be treated as a Cost of Construction for purposes of this Agreement or any other determination hereunder, including determination of the IPCT, FPCT, APC or SCAPC.

b)        All other taxes arising during the Ownership Period and not included in Section 14.4.1 shall be paid or reimbursed by Santa Clara and shall not be treated as Costs of Construction, Costs of Plant or Costs of Operation for purposes of this Agreement or any determination hereunder, including determination of the IPCT, FPCT, APC, SCAPC, EPCLD or OCLD.

Case: 19-30088   Doc# 11000-1   Filed: 07/30/21   Entered: 07/30/21 16:24:14   Exhibit
Page
84 of 157

### 14.5    Limitation Of Liability

14.5.1  Waiver of Consequential Damages

Neither Party nor (except as expressly set forth in any contract, subcontract or purchase order) its contractors, subcontractors, suppliers and vendors, including with respect to PG&E, contractors, sub-contractors, suppliers and vendors retained on behalf of Santa Clara pursuant to Sections 3 and 4, shall be liable to the other Party, or to any third party claiming through the other Party whose claim is based on a contractual or customer relationship with the other Party, for any special, indirect, incidental, consequential or secondary losses or damages, including, but not limited to, loss of use, loss of profits, loss of revenues, debt service or rental payments, power purchases, loss of production by reason of plant shutdown or construction delay or inability to operate at rated capacity, or contractual damages incurred by the other Party or by any such third party. Each Party hereby releases the other Party and its contractors, subcontractors, suppliers and vendors from any such liability and agrees to defend and indemnify them with respect to any such claims by others.

14.5.2  Applicability of Liability Limitations

The Parties intend that the waivers and disclaimers of liability, releases from liability, limitations and apportionments of liability, exclusive remedy provisions,  and (except as expressly stated to the contrary therein) indemnity and hold harmless provisions expressed throughout this Agreement shall apply even in the event of the fault, negligence (in whole or in part), strict liability, or breach of contract of the Party released or whose liability is waived, disclaimed, limited, apportioned or fixed by such exclusive remedy provision, or who is indemnified or held harmless, and shall extend to such Party's related or affiliated entities and its and their partners, directors, officers, employees and agents. The Parties also intend and agree that such provisions shall continue in full force and effect notwithstanding the completion, termination, suspension, cancellation or rescission of this Agreement, or the conveyance or reconveyance of Grizzly. No officer, director, Santa Clara Council Member, employee, agent or other individual representative of either Party shall be personally responsible for any liability arising under this Agreement.

Case: 19-30088   Doc# 11000-1   Filed: 07/30/21   Entered: 07/30/21 16:24:14   Exhibit
85 of 157
Page 84 of 156

14.5.3  Protection of Equipment

Each Party shall be responsible for protecting its facilities from possible damage by reason of electrical disturbances or faults caused by the operation, faulty operation, or nonoperation of the other party's facilities, and such other Party shall not be liable for any such damages so caused.

14.5.4  Service Interruptions

Neither Party shall be liable to the other Party, and the other Party hereby releases the first Party and its directors, officers, employees and agents from and indemnifies them, to the fullest extent permitted by law, for any claim, demand, liability, loss or damage, whether direct, indirect or consequential, incurred by the other Party, which results from the interruption or curtailment of electric service under this Agreement.

## 14.6    Anti-Indemnity Statute

The Parties are aware of the provisions of Section 2782 of the California Civil Code. The Parties have negotiated and agreed to the provisions of this Agreement which address the apportionment of risk, such as the warranty, insurance, and liability provisions, and for adequate consideration both Parties have concluded this Agreement with the intent that the apportionment of risk in this Agreement be valid and binding under such code section and the laws of California in general.

## 14.7    Transfer of Ownership

Santa Clara represents that upon its acquisition of Grizzly it either shall be the sole owner of such property or shall be authorized to bind and shall bind all the owners thereof and others having any interest or lien in Grizzly to the releases and limitations of liability set forth in this Agreement. Santa Clara agrees that it will obtain from any future recipient of any interest or lien in Grizzly, or in Santa Clara's rights or interests under this Agreement, the agreement of such recipient to be bound by the releases and limitations of liability contained herein, such that the total aggregate liability of PG&E to Santa Clara and such recipients shall not exceed the limits of liability set forth in this Agreement.

Case: 19-30088    Doc# 11000-1    Filed: 07/30/21    Entered: 07/30/21 16:24:14    Exhibit
86 of 157

## 15    INSURANCE

### 15.1    PG&E Construction Period Insurance

15.1.1  From and after the Construction Contract Date and, except as otherwise expressly provided herein or as mutually agreed by the Parties, through and including the Substantial Completion Date, PG&E shall obtain and maintain, or cause to be obtained and maintained, as a Cost of Construction (except as otherwise expressly provided), the types of insurance with deductibles and limits set forth below with insurance companies mutually acceptable to both Santa Clara and PG&E and (1) licensed to do business in the State of California and rated "A" or better by Best's Insurance Guide and Key Ratings (or an equivalent rating by another nationally recognized insurance rating agency of similar standing if Best's Insurance Guide and Key Ratings shall no longer be published), (2) listed in the National Association of Insurance Commissioners Financial Review of Alien Insurers, or (3) otherwise acceptable to Santa Clara:

a) Builders Risk Insurance, covering all risks of physical loss or damage to Grizzly during the course of construction, and extending to Construction Activities performed on or prior to the Substantial Completion Date, including loss or damage to equipment installed or to be installed and to materials to be used in the construction of Grizzly while at the Grizzly Site, while temporarily stored elsewhere or while in transit, and including coverage for start-up and operational testing, and for loss caused by earthquake and land movement, flood and water damage, and if available at a price agreeable to the Parties, covering remediation and removal of contamination arising from insured peril, with limits and deductibles as follows:

<u>Limits</u>

Full replacement value up to $47,000,000 per occurrence (Construction Cost Limit)

<u>Sublimits</u>

Debris Removal:        25% of Construction Cost Limit

Transit:              $1,000,000        }        Limits to be increased if available at a price
                                        }        agreeable to the Parties, if exposure is higher
Offsite Storage:      $1,000,000        }

Case: 19-30088    Doc# 11000-1    Filed: 07/30/21    Entered: 07/30/21 16:24:14    Exhibit
Page 87 of 157

| | |
|---|---|
| Earthquake, Land Movement Flood: | At Construction Cost Limit or highest limit available at a price agreeable to the Parties at the time insurance is placed |

Deductibles

| | |
|---|---|
| For earthquake and land movement: | 5% of values at risk at the time and place of loss, subject to a $100,000 minimum |
| For Flood: | 2% of values at risk at time and place of loss, subject to a $100,000 minimum |
| For operational/ performance testing: | $100,000 |
| For all other perils: | $25,000 |

Such policy shall include Santa Clara, PG&E and the contractors, vendors, suppliers and subcontractors employed on Grizzly pursuant to Section 3 or Section 4 as named insureds, shall provide for a waiver of subrogation against any such person who is an insured under the policy, and shall provide that PG&E shall be the loss payee.

b) Commercial general liability insurance, covering bodily injury and property damage to third parties with respect to all activities and operations at Grizzly during the course of construction and extending to Construction Activities performed on or prior to the Substantial Completion Date, including coverage for: (1) premises and operations, (2) products and completed operations, (3) broad form property damage including completed operations, (4) explosion, collapse and underground hazards, (5) contractual liability, (6) personal injury liability, and (7) independent contractor, with limits and deductibles as follows:

Limits not less than:

$1,000,000 each occurrence (combined single limit for bodily injury and property damage)

$1,000,000 for Personal Injury Liability

Case: 19-30088    Doc# 11000-1    Filed: 07/30/21    Entered: 07/30/21 16:24:14    Exhibit
88 of 157
Page 87 of 156

$2,000,000 Aggregate for Products-Completed Operations (Annual Aggregate)

$2,000,000 General Aggregate (Annual Aggregate)

with excess liability coverage providing the following limits in excess of the limits provided above:

$14,000,000 each occurrence

$14,000,000 Products-Completed Operations Aggregate (Annual)

$14,000,000 General Aggregate (Annual)

Such policy shall designate PG&E as named insured and shall include Santa Clara, its officers, employees and council members as additional insureds; provided, that ten percent (10%) of the premium of such policy shall be borne by Santa Clara and shall not constitute a Cost of Construction or Cost of Plant for purposes of this Agreement. The policy shall be endorsed to stipulate that the insurance shall apply as primary insurance and that any other insurance or self-insurance carried directly by PG&E or Santa Clara, or their officers, directors, employees and council members shall be excess only and shall not contribute with such insurance.

15.1.2  In addition, during the period set forth in Section 15.1.1, and for such other period as appropriate, PG&E may obtain and maintain, or cause to be obtained and maintained, as a Cost of Construction, such other project insurance, including without limitation, workers compensation and employer's liability coverage, professional errors and omissions insurance, additional liability insurance, and automobile liability insurance, as PG&E may determine is reasonable or appropriate with respect to the activities and liabilities of PG&E as Development Manager hereunder. Any such insurance described in Section 15.1.1 or this Section 15.1.2 may be obtained by PG&E either directly for its own account or indirectly through insurance provided by one or more of the contractors, vendors or suppliers performing work at Grizzly, with the cost thereof in either case constituting a Cost of Construction hereunder, and for insurance purchased by contractors, vendors or suppliers, included in the determination of the FPCT pursuant to Section 4.16.

Case: 19-30088   Doc# 11000-1   Filed: 07/30/21   Entered: 07/30/21 16:24:14   Exhibit
Page 89 of 157
Page 88 of 156

15.1.3  Upon request of Santa Clara prior to the Construction Contract Date, and at Santa Clara's sole cost and expense, PG&E shall use reasonable efforts to obtain additional Grizzly construction period insurance for the benefit of Santa Clara, including delayed opening insurance, either directly or indirectly through insurance provided by one or more of the contractors, vendors or suppliers performing work at Grizzly; provided, that such insurance is available from customary sources and can be obtained and maintained without adverse impact on PG&E or such contractors, vendors or suppliers. Premiums, deductibles (unless otherwise constituting Costs of Construction hereunder) and other costs incurred in connection with any such insurance obtained pursuant to this Section 15.1.3 shall not constitute a Cost of Construction or Cost of Plant for purposes of this Agreement or for purposes of any other determination hereunder, including determination of the IPCT, FPCT, APC, SCAPC, EPCLD or OCLD.

15.1.4  All policies of insurance maintained by PG&E pursuant to Section 15.1.1 shall (1) require thirty (30) days prior notice to PG&E and Santa Clara of cancellation, non-renewal, or material change in coverage, and (2) include a cross-liability endorsement or provision providing that inasmuch as the policies are written to cover more than one insured, all terms and conditions, insuring agreements and endorsements, with the exception of limits of liability (which shall be applicable to all insureds as a group) and liability for premiums, shall operate in the same manner as if there were a separate policy covering each insured.

15.1.5  In the event PG&E fails to respond in a timely and appropriate manner to take any steps necessary or reasonably requested by Santa Clara to collect from insurers for any loss covered by the insurance required to be maintained pursuant to Section 15.1.1, Santa Clara shall have the right, without obligation, upon notice to PG&E, to make all proofs of loss, adjust all claims and receive all or any part of the proceeds of such insurance, either in its own name or in the name of PG&E.

15.1.6  On or prior to the Construction Contract Date, and at any time thereafter upon the request of Santa Clara, PG&E shall furnish Santa Clara copies of the insurance policies required pursuant to Section 15.1.1 and certificates of insurance evidencing that such policies are in effect. In the event PG&E fails to provide policies and certificates in accordance with the

Case: 19-30088    Doc# 11000-1    Filed: 07/30/21    Entered: 07/30/21 16:24:14    Exhibit
Page 90 of 157
Page 89 of 156

foregoing or in the event of any material change, reduction or cancellation of any such policy, Santa Clara may, at its option, upon notice to PG&E, without limiting any other rights or remedies it may have hereunder obtain its own substitute insurance, the cost of which shall be treated as a Cost of Construction for purposes of this Agreement.

15.1.7  Insurance proceeds with respect to the insurance maintained by PG&E pursuant to Section 15.1 shall be credited to Costs of Construction, except for proceeds paid directly to a third party to the extent the third party loss was not charged to Costs of Construction, and except for proceeds paid with respect to damage or loss arising from the sole negligence of Santa Clara or with respect to loss covered by insurance obtained pursuant to Section 15.1.3, both of which shall be paid to Santa Clara.

15.1.8  With respect to work done to complete punchlist items agreed to by the Parties pursuant to Section 4.12.2, the insurances provided by this Section 15.1 shall be extended as agreed upon by the Parties.

### 15.2     Contractor Construction Period Insurance

15.2.1  Unless otherwise agreed by the Parties, from and after the Construction Contract Date and, except as otherwise provided herein, PG&E shall endeavor to require all contractors, subcontractors and other parties performing work at Grizzly to obtain and maintain the following insurance, in addition to insurance which may be provided pursuant to Section 15.1.2:

a)      Worker's compensation and employer's liability insurance shall be provided as required by any applicable law or regulation. Employer's liability insurance shall be provided in amounts not less than one million dollars ($1,000,000) each accident for bodily injury by accident, one million dollars ($1,000,000) policy limit for bodily injury by disease, and one million dollars ($1,000,000) each employee for bodily injury by disease.

The workers compensation policy shall be endorsed to provide that the insurance company waives its rights of subrogation against Santa Clara, PG&E and their officers, directors, officials, employees, and council members.

Case: 19-30088   Doc# 11000-1   Filed: 07/30/21   Entered: 07/30/21 16:24:14   Exhibit
Page 91 of 157

b)      Automobile liability insurance, including coverage for owned, non-owned, and hired automobiles of not less than five million ($5,000,000) combined single limit of liability for bodily injury and property damage as a result of any one occurrence, with a severability of interest clause. Santa Clara and PG&E and their officers, directors, officials, employees, and council members shall be named as additional insureds with respect to work performed on Grizzly.

The policy shall stipulate that the insurance afforded the additional insureds shall apply as primary insurance and that any other insurance carried by Santa Clara and/or PG&E shall be excess only and shall not be called upon to contribute with this insurance.

c)      Commercial general liability insurance for bodily injury, property damage and personal injury, including coverage for premises operations, products/completed operations, explosion, collapse and underground hazards, contractual liability and broad form property damage, including completed operations and independent contractors, of not less than five million dollars ($5,000,000) combined single limit per occurrence, with a severability of interest clause and Santa Clara and PG&E and their officers, directors, officials, employees and council members named as additional insureds with respect to work performed on Grizzly.

The policy shall stipulate that the insurance afforded the additional insured shall apply as primary insurance and that any other insurance carried by Santa Clara and/or PG&E shall be excess only and shall not be called upon to contribute with this insurance.

d) Professional liability insurance, in the event such contractor's work requires professional design or engineering services such contractor shall carry professional liability (errors and omissions) insurance, for a  liability limit of not less than two million dollars ($2,000,000), such coverage to remain in effect for not less than three (3) years following substantial completion and acceptance of the contractor's work.

The policy shall be endorsed to provide contractual liability coverage for liability of Santa Clara and/or PG&E assumed under contract by such contractor which liability arises out of negligent acts or omissions of the contractor.

Case: 19-30088    Doc# 11000-1    Filed: 07/30/21    Entered: 07/30/21 16:24:14    Exhibit
Page
92 of 157
Page 91 of 156

15.2.2  Prior to any contractor or subcontractor commencing work at Grizzly, PG&E shall require certificates of insurance evidencing that such coverage is in place, and PG&E shall retain the right to inspect or obtain copies of the original insurance policies. Such certificates shall state that the coverage evidenced thereby: (1) requires at least thirty (30) days prior written notice to PG&E for cancellation, termination, alteration or material change, and (2) does not by reason of inclusion of PG&E and Santa Clara as additional insureds thereunder result in liability of such Parties for payment of premiums.

15.2.3  PG&E's responsibility under this Section 15.2 shall be limited to using its reasonable efforts to require that such insurance be maintained by contractors and subcontractors working at Grizzly for the benefit of PG&E and Santa Clara; provided, that without limiting PG&E's indemnity obligations set forth in Section 14.1.1.1, PG&E shall not be liable to Santa Clara for the absence of insurance proceeds in the event of any failure by any such person to maintain such insurance, or in the event such insurance is inadequate.

### 15.3     Operating Period Insurance

15.3.1  From and after the Commercial Operation Date, and, except as otherwise expressly provided herein or as mutually agreed by the Parties, for the remaining term of the Ownership Period, Santa Clara shall obtain and maintain at its sole cost and expense, or cause to be obtained and maintained, at its sole cost and expense, for the benefit of both Santa Clara and PG&E, the types of insurance, with deductibles and limits set forth below, with insurance companies mutually acceptable to both Santa Clara and PG&E:

a) Property insurance, covering all risks of physical loss or damage to Grizzly, its buildings, structures, equipment and other real (except land) and personal property, whether owned or leased by Santa Clara or for which Santa Clara is legally responsible in connection with the ownership or operation of Grizzly, caused by fire, explosion and other causes covered by special form, and extended to cover damage caused by earthquake or land movement, flood and water damage, and if available at a cost which does not exceed fifteen percent (15%) of the property insurance premium, to cover remediation and removal of contamination arising from an insured peril, with limits and deductibles as follows:

Case: 19-30088   Doc# 11000-1   Filed: 07/30/21   Entered: 07/30/21 16:24:14   Exhibit
Page 93 of 157
Page 92 of 156

Limits

Full replacement value or, if agreed by the Parties, the value of the maximum credible loss

Sublimits

Earthquake, Land Movement and Flood:      Limit of at least $5,000,000

Deductibles

Earthquake, Land Movement and Flood:      As required by underwriters

For all other perils: not to exceed $500,000 each occurrence

Such policy shall include PG&E and Santa Clara as named insureds and shall provide for a waiver of subrogation against any person who is an insured under the policy. Insurance proceeds, if any, shall be paid to Santa Clara.

b) Boiler and machinery insurance, providing broad form repair and replacement coverage for all mechanical and electrical breakdown excluded under the policy described in subsection 15.3.1 a) above, including breakdown of the turbine generator, pressure vessels, electrical motors, and other reciprocating or rotating machinery, and covering remediation and removal of contamination arising from an insured peril, with limits and deductibles as follows:

Limits

$10,000,000 combined for direct damage to property, loss of income and extra expense, or such higher limit as the Parties from time to time may agree is appropriate

Deductibles

Property:                    not to exceed $500,000

Loss of Income and Extra Expense:      At Santa Clara's sole option

Case: 19-30088    Doc# 11000-1    Filed: 07/30/21    Entered: 07/30/21 16:24:14    Exhibit
Page 94 of 157

Such policy shall include PG&E and Santa Clara as named insureds and shall provide for a waiver of subrogation against any person who is an insured under the policy. Insurance proceeds shall be paid to Santa Clara.

c) Commercial general liability insurance, during any period in which PG&E is acting as Operation Manager hereunder, covering bodily injury and property damage to third parties with respect to all activities and operations at Grizzly, including coverage for: (1) premises and operations, (2) products and completed operations, (3) broad form property damage, (4) explosion, collapse and underground hazards, (5) contractual liability, (6) personal injury liability, and (7) independent contractor, with limits and deductibles as follows:

Limits not less than (such limits may be changed from time to time upon either Party's reasonable request in order to reflect changes in physical conditions which affect the hazards originally contemplated; either Party may request changes in limits for reasons other than changes in physical conditions and such requests for these other changes shall be fairly considered by the other Party):

$1,000,000 each occurrence (combined single limit for bodily injury and property damage)

$2,000,000 Aggregate for Products-Completed operations (Annual Aggregate)

$2,000,000 General Aggregate (Annual Aggregate)

With excess liability coverage providing the following limits in excess of the limits provided above:

$9,000,000 each occurrence

$8,000,000 Products-Completed Operations

$8,000,000 General Aggregate (Annual)

Such policy shall designate Santa Clara as named insured and shall include PG&E, its officers, directors and employees as additional insureds. The policy shall be endorsed to stipulate

Case: 19-30088    Doc# 11000-1    Filed: 07/30/21    Entered: 07/30/21 16:24:14    Exhibit
Page
95 of 157

that the insurance shall apply as primary insurance and that any other insurance or self-insurance carried directly by PG&E, its officers, directors, and employees shall be excess only and shall not contribute with such insurance.

15.3.2   All policies of insurance maintained by Santa Clara pursuant to Section 15.3.1 shall: (1) require thirty (30) days prior notice to PG&E and each named or additional insured of cancellation, non-renewal, or material change in coverage, (2) provide that such insurance is primary without right of contribution from any other insurance or self-insurance which might otherwise be available to the insured Party, and (3) include a cross-liability endorsement providing that inasmuch as the policies   are written to cover more than one insured, all terms and conditions, insuring agreements and endorsements, with the exception of limits of liability (which shall be applicable to all insureds as a group) and liability for premiums, shall operate in the same manner as if there were a separate policy covering each insured.

15.3.3   Santa Clara shall pay or reimburse PG&E for all deductibles arising in connection with the insurance provided pursuant to Section 15.3.1, regardless of the cause or nature of the loss or damage giving rise to the deductible, and the cost thereof shall not constitute a Cost of Construction but may constitute a Cost of Plant to the extent such funds are used for reconstruction of Grizzly for purposes of this Agreement, except for deductibles arising from loss or damage caused by the gross negligence or willful misconduct of PG&E, which deductibles shall be paid by PG&E for its own account.

15.3.4   In the event Santa Clara fails to respond in a timely and appropriate manner to take any steps necessary or reasonably requested by PG&E to collect from insurers for any loss covered by the insurance required to be maintained pursuant to Section 15.3.1, PG&E shall have the right, without obligation, upon notice to Santa Clara, to make all proofs of loss, adjust all claims and receive all or any part of the proceeds of such insurance, either in its own name or in the name of Santa Clara.

15.3.5   On or prior to the Commercial Operation Date, and at any time thereafter upon the request of PG&E, Santa Clara shall furnish PG&E copies of the insurance policies required pursuant to Section 15.3.1 and certificates of insurance evidencing that such policies are in

Case: 19-30088   Doc# 11000-1   Filed: 07/30/21   Entered: 07/30/21 16:24:14   Exhibit
Page 96 of 157

effect. In the event Santa Clara fails to provide policies and certificates in accordance with the foregoing or in the event of any material change, reduction or cancellation of any such policy, PG&E may, at its option, upon notice to Santa Clara, without limiting any other rights or remedies it may have hereunder: (1) obtain, in the case of the insurance described in Section 15.3.1 a) or 15.3.1 b), its own substitute insurance, the cost of which shall be reimbursed by Santa Clara as a Cost of Operation hereunder (without the fifteen percent (15%) markup provided in Section 5.8.1), (2) obtain, with the prior approval of Santa Clara, in the case of the other insurances described in Section 15.3.1, substitute insurance, the cost of which shall be reimbursed by Santa Clara as a Cost of Operation hereunder (without the fifteen percent (15%) markup provided in Section 5.8.1), and/or (3) upon written notice to Santa Clara consistent with Section 5.5, terminate PG&E's employment as Operation Manager under this Agreement, or suspend such employment until such time as the insurance requirements of Section 15.3.1 are met.

15.3.6  With respect to the insurance maintained by Santa Clara pursuant to Sections 15.3.1 a) and b), insurance proceeds shall be paid directly to Santa Clara. With respect to the insurance maintained by Santa Clara pursuant to Section 15.3.1 c), insurance proceeds shall be paid directly to or for the account of the Party or Parties liable pursuant to this Agreement for the loss or damage giving rise to such proceeds.

## 16     DAMAGE, DESTRUCTION OR CONDEMNATION

### 16.1     Damage or Destruction

16.1.1  If there shall occur any damage or destruction of Grizzly on or after the Commercial Operation Date arising out of any cause whatsoever (except Construction Activities performed after the Commercial Operation Date but prior to the Substantial Completion Date) with respect to which there are adequate property insurance proceeds intended for repair or restoration of damage or destruction available to the Parties (after payment of deductibles as provided in this Agreement) under the insurance maintained pursuant to Section 15 ("Insurance Proceeds"), the Parties agree that such Insurance Proceeds shall promptly be applied to repair or restoration of such damage or destruction, regardless of the extent or magnitude thereof, and

Case: 19-30088    Doc# 11000-1    Filed: 07/30/21    Entered: 07/30/21 16:24:14    Exhibit
                                    Page 97 of 157
Page 96 of 156

Santa Clara shall make such repair or restoration. Insurance Proceeds shall be deemed adequate if equal to, or greater than, ninety percent (90%) of the cost of repair or restoration. PG&E may in its sole discretion contribute amounts which will be added to Insurance Proceeds to achieve such ninety percent (90%) level. Such Insurance Proceeds shall be deposited by the payee and held in a joint escrow account to be disbursed as provided for in this Section 16.1. Any excess insurance Proceeds available to the Parties upon completion of such repair or restoration shall be paid over to the account of Santa Clara. Any such excess paid to Santa Clara shall be credited against Costs of Plant, and, to the extent of amounts in excess of Costs of Plant, shall be carried forward as a credit against the amount of reimbursement which PG&E must make to Santa Clara under the terms of Section 12.4. Costs of repair or restoration in excess of Insurance Proceeds and any PG&E contributions, shall be treated as Costs of Plant. In the event there are not adequate Insurance Proceeds and PG&E contributions, if any, as defined in the second sentence of this Section, available to the Parties for such repair or restoration, Santa Clara, within ninety (90) days of such determination, may nevertheless elect to proceed with repair or restoration, in which case the costs thereof, in excess of the sum of available Insurance Proceeds and PG&E contributions, shall be treated as Costs of Plant.

16.1.2  In the event Insurance Proceeds and PG&E contributions, if any, are not adequate and Santa Clara does not elect to proceed with such repair or restoration at its own expense pursuant to the foregoing, Santa Clara promptly shall notify PG&E of its election not to proceed not later than the first working day following the expiration of Santa Clara's ninety (90) day election period. PG&E may, within ninety (90) days after receipt of such notice from Santa Clara, cause the Reverter Date to occur by giving written notice to Santa Clara of its election to do so. In such case, Santa Clara shall be entitled to all available Insurance Proceeds (and PG&E, for its part, shall release and pay over such Insurance Proceeds to Santa Clara to the extent it may hold such), and, as provided in Section 12.8, Santa Clara shall pay PG&E the amount that Santa Clara would have expended otherwise for site restoration. If PG&E does not elect to cause the Reverter Date to occur pursuant to the foregoing, PG&E promptly shall surrender completely its Possibility of Reverter and in such case, Santa Clara shall be entitled to all available Insurance Proceeds (and PG&E, for its part, shall release and pay over such Insurance Proceeds to Santa Clara to the extent it may hold such), and Santa Clara shall proceed with the salvage and

Case: 19-30088   Doc# 11000-1   Filed: 07/30/21   Entered: 07/30/21 16:24:14   Exhibit
Page
98 of 157
Page 97 of 156

disposition of Grizzly, subject to approval by FERC and other governmental agencies having jurisdiction. In such case, Santa Clara shall be responsible for, and shall indemnify and hold harmless PG&E with respect to any restoration of the Grizzly Site or other obligations with respect thereto, as required by FERC or any other governmental entities having jurisdiction in the premises.

### 16.2    Condemnation

16.2.1  If an exercise of eminent domain, condemnation or other compulsory transfer or taking with respect to Grizzly or the Grizzly Site (herein "Condemnation") shall be threatened on or after the Settlement Date, each Party (1) upon any such threat of which it is aware, shall provide written notice thereof promptly to the other Party, (2) shall diligently pursue all its rights to compensation against the State of California, or the United States, as the case may be, or against any agency, department, authority, commission, board, instrumentality or political subdivision thereof in respect of such Condemnation, (3) shall not, without the written consent of the other Party, compromise or settle any claim with respect to such Condemnation, (4) shall hold all amounts and proceeds received in respect of any Condemnation (herein "Condemnation Proceeds") in a joint escrow account for the benefit of both Parties, and (5) shall pay over and apply all such Condemnation Proceeds in accordance with the provisions of Section 16.2.2 below. To the extent that participation is legally available to both Parties, each Party may participate in the Condemnation proceedings, and both Parties shall use their best efforts to deliver all instruments requested by either Party to permit such participation.

16.2.2  In the event a Condemnation is temporary or partial, and such that repair or restoration of Grizzly at some level of commercial operation is technically feasible, such Condemnation, whether occurring before or after the Commercial Operation Date, shall be treated in the same manner as an occurrence of damage or destruction to Grizzly under Section 16.1.1 above, with available Condemnation Proceeds being applied in the same manner as available Insurance Proceeds thereunder. In the event, however, of a total Condemnation of Grizzly pursuant to which repair or restoration is not technically feasible, available Condemnation Proceeds shall be applied by the Parties as follows:

Case: 19-30088    Doc# 11000-1    Filed: 07/30/21    Entered: 07/30/21 16:24:14    Exhibit
Page 99 of 157

(1)    First, to any restoration of the Grizzly Site or other obligations with respect thereto, as required by FERC or any other governmental agency having jurisdiction in the premises;

(2)    Second, to Santa Clara in an amount not to exceed the pricing formula of the nearest possible Reverter Date, but determined as of the date of Condemnation. If the date of Condemnation is prior to the Commercial Operation Date, Condemnation Proceeds not to exceed APC plus interest, using the mechanism specified in Section 13.5, shall be paid to Santa Clara and the Power Sale provisions of Section 13.2.2 shall take effect; and

(3)    Third, the balance, if any, to PG&E.

### 16.3    Loss of Bucks Creek License

In the event the Bucks Creek License is recaptured by the United States or awarded to a third party, the Parties shall share in the proceeds arising from such recapture or award. Santa Clara shall receive an amount equal to its  net investment in Grizzly as determined by FERC, and PG&E shall receive an amount equal to its net investment in Bucks Creek as determined by FERC. In the event any compensation exceeds the combined net investment amounts, the excess shall be shared by the Parties on a pro rata basis determined by the relative nameplate capacities of Bucks Creek and Grizzly. In the event any compensation is less than the combined net investment amount, the amount received by each Party shall be reduced on a pro rata basis determined by the relative nameplate capacities of Bucks Creek and Grizzly. In the event that either Grizzly alone or Bucks Creek alone is recaptured or awarded to a third party, the Party who owned the asset shall receive all compensation. The other Party will not share in  the compensation nor will it have any obligation to provide any compensation to the first Party.

## 17    DEFAULTS

### 17.1    Defaults Defined

For purposes of this Section 17, the word "default" shall mean the failure of any Party to make payment or perform any material obligation in the time and manner provided by this

Case: 19-30088    Doc# 11000-1    Filed: 07/30/21    Entered: 07/30/21 16:24:14    Exhibit
Page
100 of 157                                        Page 99 of 156

Agreement. No default shall exist where such failure to discharge obligations (other than payment of money) is the result of Force Majeure as defined in Section 20.

### 17.2    Opportunity To Cure Default

Upon a Party's failure to make payment or perform any of its obligations except obligations which affect generation at Grizzly or downstream powerhouses, or which are required by the Grizzly Amendment, the other Party shall serve written notice upon such Party. The failing Party shall then have thirty (30) days from the date it receives such notice to make such payment or perform such obligation. Should that Party so pay or perform within the thirty (30) day period, the default of which that Party was notified shall cease to exist. Upon a Party's failure to perform any of its obligations which affect generation at Grizzly or downstream powerhouses, or which are required by the Grizzly Amendment, the other Party shall serve verbal or written notice upon such Party. The failing Party shall then have one (1) day from the time it receives such notice to perform such obligation. Should that Party so perform within the one (1) day period, the default of which that Party was notified shall cease to exist.

### 17.3    Procedure In Event Of Default

In the event of default which is not cured as provided in Section 17.2, the non-defaulting Party shall resolve the matter in accordance with Section 18, and additionally, if the default involves failure of Santa Clara to make payment under this Agreement, PG&E may at its  sole discretion suspend work until payment is made.

### 17.4    No Exclusive Remedy

Subject to the provisions of Section 18, no remedy conferred upon or reserved to the Parties in this Section 17 is intended to be exclusive of any other remedy or remedies available under this Agreement or existing at law, in equity, by statute or otherwise, but each and every such remedy shall be cumulative and shall be in addition to every other remedy under this Agreement or now or hereafter existing at law or in equity or otherwise provided by statute. The pursuit by any Party of any specific remedy shall not be deemed to be an election of that remedy

Case: 19-30088    Doc# 11000-1    Filed: 07/30/21    Entered: 07/30/21 16:24:14    Exhibit
Page 101 of 157
Page 100 of 156

to the exclusion of any other or others, whether provided hereunder or at law, in equity, by statute or otherwise.

### 17.5    Waivers

No waiver of any Default under this Agreement shall extend to or affect any subsequent default or shall impair any rights or remedies consequent thereto. No delay or omission to exercise any remedy available upon any default shall impair any Party's right to exercise such remedy or shall be construed to be a waiver thereof, but any such remedy may be exercised from time to time and as often as may be deemed expedient.

## 18    SETTLEMENT OF DISPUTES

### 18.1    Grizzly Coordinating Committee

The Parties shall establish a Grizzly Coordinating Committee in accordance with the provisions of Section 3.7.

### 18.2    Grizzly Management Committee

The Parties shall establish a Grizzly Management Committee, which shall consist of one (1) member from each Party. The PG&E member shall be the Vice President of Power Generation, the Vice President of Power Planning and Contracts or a person of equal or greater authority within PG&E. The Santa Clara member shall be the Director of Electric Utility or a person of equal or greater authority within Santa Clara.

*************ARBITRATION OF DISPUTES *************

### 18.3    Procedure For Settlement Of Disputes

18.3.1  The Parties agree to use their best efforts to settle all disputes between the Parties connected with this Agreement as a matter of normal business under this Agreement. The Parties hereby agree to the following procedure in the event that any such dispute is not settled.

Case: 19-30088   Doc# 11000-1   Filed: 07/30/21   Entered: 07/30/21 16:24:14   Exhibit
Page
102 of 157
Page 101 of 156

18.3.2  Disputes not settled in accordance with Section 18.3.1 will be submitted to the Grizzly Coordinating Committee. If the Grizzly Coordinating Committee cannot resolve the dispute, it shall be referred to the Grizzly Management Committee for settlement. All disputes referred to the Grizzly Management Committee shall be acted upon by the Grizzly Management Committee as soon as possible but in no case later than forty-five (45) days after submission of the dispute to the Grizzly Management Committee, unless agreed to by both Parties. Before the end of the forty-five (45) day time period, the Parties agree to prepare offers of settlement for consideration by the Grizzly Management Committee, and in the event that a dispute is not settled within that period, or within any other mutually agreed upon time period, the Parties shall either: (1) mutually agree upon mediation, another alternative dispute resolution procedure, or judicial or administrative proceedings to settle such dispute, or (2) submit the dispute to binding arbitration in accordance with Section 18.3.3.

18.3.3  Unless otherwise settled or resolved as provided in Section 18.3.2, all disputes and controversies of every kind and nature between the Parties arising out of or in connection with this Agreement, including but not limited to, disputes as to the construction, validity, interpretation or meaning, performance, nonperformance, enforcement, operation, breach, continuation or termination of the Agreement, shall be submitted to binding arbitration pursuant to the following procedure:

a)      Within thirty (30) days of the expiration of either the forty-five (45) day period specified in Section 18.3.2 or failure of mediation or another alternative dispute resolution procedure, the aggrieved Party may demand such arbitration in writing, which demand shall include a statement of the matters remaining in dispute, together with the name of one (1) arbitrator appointed by such aggrieved Party.

b)      Within twenty (20) days after receipt of such demand, the other Party shall appoint one (1) arbitrator, or in default thereof, such arbitrator shall be named as soon as practicable by the Arbitration Committee of the American Arbitration Association, and the two (2) arbitrators so appointed shall name a third (3d) arbitrator within ten (10) days, or, failing such agreement on a third (3d) arbitrator by the two (2) arbitrators so appointed, a third (3d) arbitrator shall be appointed by the Arbitration Committee of the American Arbitration Association.

Case: 19-30088   Doc# 11000-1   Filed: 07/30/21   Entered: 07/30/21 16:24:14   Page
103 of 157

c)        The arbitration hearing shall be held in San Francisco, California, on at least twenty (20) days prior written notice to the Parties. Except as otherwise provided herein, the proceedings shall be conducted in accordance with the arbitration rules and procedures of the American Arbitration Association. Any decision of the arbitrators, including a decision regarding an allocation of costs consistent with this Section 18.3.3, shall be joined in by at least two (2) of the arbitrators and shall be set forth in a written award which shall state the basis of the award and shall include both findings of fact and conclusions of law. An award rendered pursuant to the foregoing, which may include an award or decree of specific performance hereunder, shall be final and binding on the Parties, and judgment thereon may be entered or enforcement thereof sought by either Party in a court of competent jurisdiction.

d)        Notwithstanding the foregoing, nothing contained in this Section 18.3.3 shall be deemed to give the arbitrators appointed pursuant to the foregoing any authority, power or right to alter, change, amend, modify, waive, add to or delete from any of the provisions of this Agreement.

e)        Each Party shall bear the costs of its appointed arbitrator and its own attorneys' fees, and the costs of the third (3d) arbitrator incurred in accordance with the foregoing shall be shared equally by the Parties. Additional incidental costs of arbitration shall be paid for by the non-prevailing Party in the arbitration; provided, that where the final decision of the arbitrators is not clearly in favor of either Party, each Party shall bear a portion of  such incidental costs as determined by the arbitrators.

f)        The Parties agree that the provisions of this Section 18.3.3 shall be a complete defense to any suit, action or proceeding instituted in any federal or state court, or before any administrative tribunal with respect to any controversy or dispute arising under or pursuant to this Agreement and which is subject to arbitration as set forth herein. The arbitration provision of this Section 18.3.3 shall survive the termination or expiration of this Agreement, with respect to any controversy or dispute arising hereunder.

g)        Either Party may petition a tribunal of competent jurisdiction to correct or vacate the arbitrators' decision on the grounds and conditions stated in Sections 1286.2, .4, .6, and .8 of

Case: 19-30088    Doc# 11000-1    Filed: 07/30/21    Entered: 07/30/21 16:24:14    Exhibit
104 of 157

the California Code of Civil Procedure or on the grounds that decision is against the "public interest," as that term has been interpreted and applied by the United States Supreme Court under Sections 205 and 206 of the Federal Power Act in F.P.C. v. Sierra Pacific Power Co., 350 U.S. 348 (1956), in United Gas Pipe Line Co. v. Mobile Gas Service Corp., 350 U.S. 332 (1956), and in subsequent judicial opinions in the federal courts. The appealing Party may request a stay of the arbitrators' decision. If the stay is granted by the appellate body, neither Party shall be required to comply with the arbitrators' decision until the appeal is decided. If the appeal is decided in favor of the arbitrators' decision, the Parties shall immediately comply with the latter decision. If the appellate tribunal overturns the arbitrators' decision, the Parties shall immediately comply with the decision of the appellate body.

18.3.4  The existence of any dispute or controversy under this Agreement or the pendency of the dispute settlement or resolution procedures set forth herein shall not in and of themselves relieve or excuse either Party from its ongoing duties and obligations under this Agreement.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*

(Notice Required by CCP Section 1298)

NOTICE: BY INITIALLING IN THE SPACE BELOW YOU ARE AGREEING TO HAVE ANY DISPUTE ARISING OUT OF THE MATTERS INCLUDED IN THE "ARBITRATION OF DISPUTES" PROVISION DECIDED BY NEUTRAL ARBITRATION AS PROVIDED BY CALIFORNIA LAW AND YOU ARE GIVING UP ANY RIGHTS YOU MIGHT POSSESS TO HAVE THE DISPUTE LITIGATED IN A COURT OR JURY TRIAL. BY INITIALLING IN THE SPACE BELOW YOU ARE GIVING UP YOUR JUDICIAL RIGHTS TO DISCOVERY AND APPEAL, UNLESS THOSE RIGHTS ARE SPECIFICALLY INCLUDED IN THE "ARBITRATION OF DISPUTES" PROVISION. IF YOU REFUSE TO SUBMIT TO ARBITRATION AFTER AGREEING TO THIS PROVISION, YOU MAY BE COMPELLED TO ARBITRATE UNDER THE AUTHORITY OF THE CALIFORNIA CODE OF CIVIL PROCEDURE. YOUR AGREEMENT TO THIS ARBITRATION PROVISION IS VOLUNTARY.

WE HAVE READ AND UNDERSTAND THE FOREGOING AND AGREE TO SUBMIT DISPUTES ARISING OUT OF THE MATTERS INCLUDED IN THE "ARBITRATION OF DISPUTES" PROVISION TO NEUTRAL ARBITRATION.

City of Santa Clara                          Pacific Gas and Electric Company

By: /s/ JS (Initials)                        By:/s/ GMR (Initials)
Jennifer Sparacino                           Gregory M. Rueger
City Manager                                 Senior Vice President and
                                             General Manager -
                                             Electric Supply

By: /s/ ENS(Initials)
Everett N. Souza
Mayor

      **************

## 19    ASSIGNMENT

### 19.1    Right to Assign

Either Party may assign its rights and obligations pursuant to this Agreement to a third party, but only so long as such assignment does not adversely affect the other Party; provided, that Santa Clara shall not assign GSP since this power is provided solely to make GEN usable in Santa Clara's retail load. This Agreement, or any part thereof, shall not be assigned except upon prior written consent of the other Party hereto. Such consent shall not be unreasonably withheld.

### 19.2    Successors And Assigns

The covenants and obligations hereunder shall inure to the benefit of and be binding upon the Parties and all successors to and assigns

## 20    FORCE MAJEURE

### 20.1    Excuse Of Performance

Notwithstanding anything in this Agreement to the contrary, no Party shall be liable or responsible for failure to carry out any of its obligations (other than obligations to make payments) under this Agreement caused by Force Majeure.

### 20.2    Definition

The term "Force Majeure" as used herein shall mean any cause beyond the reasonable control of the Party or, in the case of PG&E, beyond the reasonable control of the contractors, subcontractors, suppliers or vendors employed by PG&E on Grizzly, consisting of the following or similar events:

a)    Acts of God, landslides, lightning, earthquakes, adverse weather at the Grizzly Site of greater duration or intensity than normally expected for the job area and time of year, storms and blizzards at other than the Grizzly Site, fires, explosions, floods, other natural catastrophes, sabotage, acts of a public enemy, acts of government or regulatory agencies, wars, blockades, embargoes, insurrections, riots or civil disturbances;

b)    Labor disputes, strikes, work slowdowns, work stoppages or labor disruptions, labor or material shortages, or failures, delays or disruptions of transportation;

c)    Orders and judgments of any federal, state or local court, administrative agency or governmental body;

d)    The adoption of or change in any federal, state or local laws, rules, regulations, ordinances, permits or licenses, or changes in the interpretation of such laws, rules, regulations, ordinances, permits or licenses, by a court or public agency having appropriate jurisdiction after the date of the execution of this Agreement;

e)    Any subsurface condition or other condition at the Grizzly Site that was not reasonably foreseeable through customary engineering or geotechnical studies, or review of reasonably available other written material, including, but not limited to, subsurface structures,

Case: 19-30088    Doc# 11000-1    Filed: 07/30/21    Entered: 07/30/21 16:24:14    Exhibit
Page
107 of 157

subsurface obstructions, or subsurface geological features, including underground streams or rivers; or

f)      With respect to PG&E, any default, breach, delay or other failure of performance of any contractor, vendor or supplier retained by PG&E on behalf of Santa Clara pursuant to this Agreement, to the extent caused by the insolvency, financial failure or other financial incapacity of such contractor, vendor or  supplier.

### 20.3    Continuation After Force Majeure Event

Any Party rendered unable to fulfill any of its obligations under this Agreement by reason of Force Majeure shall exercise due diligence to remove such inability with all reasonable dispatch; provided, that nothing contained in this Section 20.3 shall be construed as requiring a Party to settle any strike, work stoppage or other labor dispute in which it may be involved, or to accept any permit, certificate, license or other authorization on terms deemed unacceptable to such Party, or to enter into any contract or other undertaking on terms which the Party deems to be unduly burdensome or costly.

## 21      MISCELLANEOUS

### 21.1    Effective Date And Term

Except as provided herein, this Agreement, and the obligations of the Parties under this Agreement, shall become effective upon the Effective Date. Except as otherwise provided for herein and notwithstanding provisions of the Agreement necessary to complete payment of all bills or outstanding amounts and to complete any remaining or continuing obligations, this Agreement shall remain in effect until (1) development of Grizzly is terminated as provided in Section 13 or Grizzly is abandoned as provided in Sections 12.8 and 16.1, or the Reverter Date occurs, or a total condemnation of Grizzly occurs within the terms of Section 16.2.2, or after expiration of the Bucks Creek License the FERC issues a new license for and requires transfer of Grizzly to a third party, or the United States exercises its right to take over Grizzly, and (2) termination of the Power Sale.

Case: 19-30088    Doc# 11000-1    Filed: 07/30/21    Entered: 07/30/21 16:24:14    Exhibit
Page 108 of 157
Page 107 of 156

### 21.2 No Adverse Distinction

21.2.1 In discharging their responsibilities and obligations pursuant to this Agreement, the Parties agree:

a)      to pursue the development and construction of Grizzly with due diligence to meet the Target Commercial Operation Date;

b)      not to delay unilaterally the construction of Grizzly for reasons or situations for which it would be singularly advantageous to either Party;

c)      PG&E shall make no adverse distinction between Grizzly and any other generating unit(s) in which PG&E has or might have an ownership interest, in connection with the construction or operation of Grizzly, solely because of Santa Clara's ownership interest in Grizzly, except as otherwise provided in this Agreement; and

d)      Santa Clara shall make no adverse distinction between Grizzly and any other generating unit in which Santa Clara has or might have an ownership interest, in connection with the construction or operation of Grizzly, solely because of PG&E's Possibility of Reverter, except as otherwise provided in this Agreement.

21.2.2 In the event of a forced outage of plant or transmission, Grizzly will be restored to service on the same value-based schedule and priority as if it were a PG&E-owned facility. As used herein, "value-based" refers to the value of the power output to PG&E in comparison with other alternatives available to it, and the determination of such schedule and priorities shall include a consideration of relevant economic and operational considerations such as, but not limited to, the cost and availability of fuels for alternative generation sources, of power purchases, of demand-side management options, or the cost of unit start-up and maintenance. PG&E shall make the determination of such schedule and priority in its sole judgment, which judgment shall observe the standards presented in Section 21.9.

### 21.3    Adverse PG&E Developments

PG&E shall not engage in any new hydroelectric facility development upstream or downstream of Grizzly during the Ownership Period, which could result in adverse consequences to Grizzly or generation of power by it, without appropriate compensation to Santa Clara.

### 21.4    Governing Law

This Agreement shall be interpreted, governed by, and construed under, the laws of the State of California or the laws of the United States, as applicable, as if executed and to be performed wholly within the State of California.

### 21.5    Severability

Except as otherwise provided in Section 1.1.29 and as used in Sections 1.1.65 and 1.3, if any clause, sentence, section or part of this Agreement should for any reason be finally adjudged by any court, or any regulatory agency or body of competent jurisdiction to be invalid, such judgment shall not affect, impair or invalidate the remainder of this Agreement, but shall be confined in its operation to the clause, sentence, paragraph or any part thereof directly involved in the controversy.

### 21.6    Section Headings Not To Affect Meaning

The descriptive headings of the various Sections of this Agreement have been inserted for convenience of reference only and shall in no way modify or restrict any of the terms and provisions thereof.

### 21.7    Amendments

This Agreement may be amended by and only by a written instrument duly executed by the Parties, subject to any required regulatory approval.

Case: 19-30088    Doc# 11000-1    Filed: 07/30/21    Entered: 07/30/21 16:24:14    Exhibit
110 of 157

### 21.8 Integration

This Agreement shall constitute the entire understanding between the Parties hereto, superseding any and all previous understandings, oral or written, pertaining to the subject matter contained herein. The terms contained in this Agreement have been fully negotiated and mutually agreed upon by both Parties.

### 21.9 Judgment, Determinations and Forecasts

When the terms of this Agreement provide that an action may or must be taken or that the existence of a condition may be established based on a judgment, determination, or forecast of a Party, such judgment shall be exercised or such determination or forecast shall be made in good faith and fair dealing, in a timely manner, and shall not be arbitrary or capricious.

### 21.10 Appendices Incorporated

The following documents, as they may be revised from time to time, are attached to this Agreement as Appendices and are incorporated by reference as if herein fully set forth:

Appendix A - Prices For Power Sold

Appendix B - Rates For Service

Appendix C - Initial Project Cost Target Data

Appendix D - Confidentiality

Appendix E - Bucks Creek Relicensing Agreement

### 21.11 Expansion Of Obligations

The provisions of this Section 21.11 shall apply only to the Power Sale provided by this Agreement.

If the FERC, or any other regulatory body or agency or court of competent jurisdiction, orders or decides that this Agreement be interpreted, modified, or extended in such a manner that either or both Parties may be required to extend their obligations under this Agreement to third

Case: 19-30088   Doc# 11000-1   Filed: 07/30/21   Entered: 07/30/21 16:24:14   Exhibit
Page 111 of 157
Page 110 of 156

parties, or to incur new or different obligations to the other Party or to third parties not contemplated by this Agreement, then to the extent such extension or incurrence of obligations is (1) to the benefit of a Party, that Party agrees not to exercise extended or newly incurred rights without the consent of the other Party, or (2) to third parties, the Parties shall promptly attempt to negotiate modifications of this Agreement that will restore the benefits to each contemplated by the Power Sale. If the Parties are unable to negotiate such modifications promptly, either Party may resort to the dispute resolution procedures provided by Section 18.3, to restore the benefits to each contemplated by the Power Sale.

### 21.12   No Third Party Rights or Beneficiaries

Nothing in this Agreement shall be construed to create rights in, or duties or liabilities to, or any standard of care with reference to, or to grant remedies to, any person or entity not a Party. PG&E by entering into this Agreement does not hold itself out to furnish like or similar service to any other person or entity.

### 21.13   No Precedent

The Parties understand and agree that this Agreement establishes no precedent with regard to any other entity, agreement, or contract. Nothing contained in this Agreement shall establish any precedent for arrangements between the Parties for the transmission, sale, purchase or exchange of any other electric capacity or energy or otherwise. No Party shall use or submit this Agreement as evidence in any proceeding other than one in which this Agreement itself is involved.

### 21.14   Adverse Determinations

The provisions of this Section 21.14 shall apply only to the Power Sale provided by this Agreement.

If the FERC or any other regulatory body or agency or court of competent jurisdiction determines that this Agreement, whether by  itself or as an identifiable member of a class, its operation or effect is unjust, unreasonable, unlawful, imprudent or otherwise not in the public interest, and such determination results in adverse revenue impact on PG&E or Santa Clara, the

Case: 19-30088    Doc# 11000-1    Filed: 07/30/21    Entered: 07/30/21 16:24:14    Exhibit
112 of 157

Parties shall be relieved of their obligations to the extent necessary to eliminate such adverse regulatory or other determination and the Parties shall attempt promptly to negotiate modifications of this Agreement that will restore the benefits to each contemplated by the Power Sale. If the Parties are unable to negotiate such modifications promptly, then either Party after the entry of an order, judgment or decision containing such determination may resort to the dispute resolution procedures provided by Section 18.3, to restore the benefits to each contemplated by the Power Sale.

### 21.15 Time is of the Essence

Time is of the essence in the exercise of termination rights by either Party.

### 21.16 Limited Agency

Neither PG&E, nor its contractors, vendors or suppliers, nor the employees of any of them shall be deemed to be the servants, employees, or agents of Santa Clara, except to the extent of any express agency created hereunder.

### 21.17 Notices

21.17.1 Formal Notices

Any notice, request, demand, information, report or item otherwise required, authorized or provided for in this Agreement shall be given in writing, except as otherwise provided pursuant to Sections 12.5 and 21.17.2, and shall be deemed properly given if delivered personally or sent by United States Mail, postage prepaid, to the persons specified below:

(1) To PG&E:

Vice President - Power Generation
Pacific Gas and Electric Company
245 Market Street
San Francisco, CA 94106

(2) To Santa Clara:

Case: 19-30088    Doc# 11000-1    Filed: 07/30/21    Entered: 07/30/21 16:24:14    Exhibit
113 of 157

Director of Electric Utilities

1500 Warburton Avenue

Santa Clara, CA 95050

### 21.17.2        Routine Notices

Any notice of a routine character in connection with service under this Agreement or in connection with operation of facilities shall be given in such a manner as the Parties may determine from time to time, unless otherwise provided in this Agreement.

### 21.17.3        Changes of Notice Recipient

Either Party may change designation of the person who is to receive notices on its behalf by giving the other Party notice thereof in the manner above provided in Section 21.17.1.

## 22        SIGNATURE CLAUSE

The signatories hereto warrant and represent that they have been appropriately authorized to enter into this Agreement on behalf of the Party for whom they sign. This Agreement is executed in two counterparts, each of which shall be regarded as an original.

| | |
|---|---|
| APPROVED AS TO FORM: | CITY OF SANTA CLARA |
| By: /s/ <br> ROLAND D. PFEIFER <br> Assistant City Attorney | By: /s/ <br> JENNIFER SPARACINO <br> City Manager |
| ATTEST: | By: /s/ <br> EVERETT N. SOUZA <br> Mayor |
| By: /s/ <br> J. E. BOCCIGNONE <br> City Clerk | |
| | Address: |
| | 1500 Warburton Avenue <br> Santa Clara, California 95050 <br> Telephone: (408) 984-3000 |
| APPROVED AS TO FORM | PACIFIC GAS AND ELECTRIC <br> COMPANY |
| By: /s/ | By: /s/ |

Case: 19-30088    Doc# 11000-1    Filed: 07/30/21    Entered: 07/30/21 16:24:14    Exhibit
114 of 157
Page 113 of 156

GLENN WEST, JR.
Attorney

GREGORY M. RUEGER
Senior Vice President
and General Manager -
Electric Supply

Address:
77 Beale Street
San Francisco, California 94106
Telephone: (415) 972-7000

Case: 19-30088   Doc# 11000-1   Filed: 07/30/21   Entered: 07/30/21 16:24:14   Exhibit
115 of 157

## APPENDIX A PRICES FOR POWER SOLD

A.1 Energy Prices

[This Section Left Intentionally Blank]

Case: 19-30088   Doc# 11000-1   Filed: 07/30/21   Entered: 07/30/21 16:24:14   Exhibit
116 of 157

**APPENDIX B RATES FOR SERVICE**

The rates for services specified in this Appendix B have been developed and agreed to by the Parties.

Neither the principles nor the methodology underlying or embodied in the development of these rates shall be deemed to be precedential to any future proceedings of the Parties.

The Parties have agreed that the rates for services shall be as follows:

**B.1 Grizzly Supplemental Power (GSP)**

The price for any GSP scheduled by Santa Clara and sold by PG&E shall be equal to the rates shown below:

Demand Charge: $0.212/kW-day

Energy Charge: $0.01099/kWh + FCA

**B.2 Excess Power Take (EPT)**

B.2.1 The following formula shall apply for all EPT scheduled under Section 8:

EPT Charge =               10 times the Partial Requirements Power energy charges

The Partial Requirements Power energy charges shall be the energy-only portion of the Partial Requirements Power including the Fuel Cost Adjustment (herein "FCA") and non-FCA energy charges but excluding the balancing rate part of the FCA charge. The Parties intend to keep the cost components (cost components which make up the revenue requirement such as fuels, purchased power and other rate base and expense items currently classified to energy in PG&E's cost of service, including purchased power capacity payments) currently used in calculating the current Partial Requirements Power energy charges (herein "original methodology") as the basis for use in developing future EPT charges. This means that cost components currently included in demand rates will not be reclassified to energy and subsequently included in the Partial Requirements Power energy charges for the EPT charge. PG&E reserves the right to reclassify rates for Partial Requirements Power for purposes other

than calculating the EPT charge. No transmission related costs shall be included in the EPT charge calculation. The Partial Requirements Power energy charges in effect at the time of EPT shall be used in billing unless  reclassification occurs.

B.2.2 It is the intent of the Parties that, because the EPT charge calculated in Section B.2.1 is based on the Partial Requirements Power energy charges which are periodically adjusted and filed with FERC, the resulting new EPT charge need not be filed with FERC. However, if FERC should require filing under 18 CFR 35, the Parties agree jointly to support an abbreviated filing for such change pursuant to 18 CFR 35.13(a)(2)(B). In addition, if a reclassification as noted in Section B.2.1 takes place, PG&E will recalculate the Partial Requirements Power energy charges pursuant to the original methodology as in Section B.2.1 for use only in calculating the then current EPT charge. PG&E will file and get acceptance from FERC before billing for EPT using these Partial Requirements Power energy charges. Santa Clara agrees to support such filing but reserves the right to protest the filing only to the extent the recalculation of the Partial Requirements Power energy charges includes cost components which were not used in the original methodology at the time this Agreement was signed.

### B.3 Maintenance Power

The price for any Maintenance Power scheduled by Santa Clara and sold by PG&E shall be equal to the price then in effect for Maintenance Power Service - Rate Schedule C as specified in Appendix B, Part II.3 of this Agreement. The initial rate for this service, as specified in this Agreement, shall be as follows:

| | |
|---|---|
| Demand Charge: | $0.212/kW-day |
| Energy Charge: | first 16.8 kWh/kW-day: |
| | $0.01020/kWh + FCA |
| | over 16.8 kWh/kW-day: |
| | $0.01099/kWh + FCA |
| Transmission Charge: | If applicable, according to |
| | Appendix B, Part II.3.1 of this Agreement |

### B.4 [This Section Left Intentionally Blank]

### B.5 Rate Schedules

Case: 19-30088   Doc# 11000-1   Filed: 07/30/21   Entered: 07/30/21 16:24:14   Exhibit
Page 118 of 157
Page 117 of 156

II.1     PRP ENERGY RATE - RATE SCHEDULE A

Rate Schedule A is applicable for Excess Power Take as described in Section 8 of this Agreement and Section B.2 of this Appendix B. The rates for this service are:

Energy Charge:

| | |
|---|---|
| First 510 kWh per kW-mo: | $0.01020/kWh + FCA |
| Over 510 kWh per kW-mo: | $0.01099/kWh + FCA |

II.1.1. PROVISIONS

II.1.1.1 [This Section Left Intentionally Blank]

II.1.1.2 For application of this Rate Schedule A, the energy scheduled in any month is allocated to one of two energy blocks: the first is the amount of energy up to and including 510 KWh per kW of billing Demand, and the second is the energy in excess of 510 KWh per kW of billing Demand.

II.1.1.3 [This Section Left Intentionally Blank]

II.1.2 [This Section Left Intentionally Blank]

II.2     [This Section Left Intentionally Blank]

II.3     MAINTENANCE POWER SERVICE - RATE SCHEDULE C

Rate Schedule C is applicable to sales by PG&E to City of Maintenance Power as provided in Section 1.1.42 and Section B.3 of Appendix B of this Agreement. City shall schedule such Maintenance Power in accordance with Appendix F of this Agreement. The rates for this service are:

| | |
|---|---|
| Demand Charge: | $0.212/kW-day (1989) |
| Energy Charge: | First 16.8 kWh per kW-day: |
| | $0.01020/kWh (1989) + FCA |

Over 16.8 kWh per kW-day:

$0.01099/kWh (1989) + FCA

Transmission Charge: If applicable according to Paragraph II.3.1 below.

II.3.1 A transmission charge associated with Maintenance Power Service (in $/kW-day) will be charged pursuant to Paragraph II.6.2 of this Appendix B. The rate for each function will be the current rate under Paragraph II.6 divided by 30.42.

II.3.2 [This Section Left Intentionally Blank]

II.4 [This Section Left Intentionally Blank]

II.5 [This Section Left Intentionally Blank]

II.6 <u>TRANSMISSION SERVICE - RATE SCHEDULE G</u>

Rate Schedule G is applicable to transmission service provided to City by PG&E for Maintenance Power as described in Paragraph II.3 of this Appendix B, and delivery of Grizzly Power as described in Section 9.2 of this Agreement. The rates for this service are:

| | |
|---|---|
| System Interconnection: | $0.057/kW-month |
| Generation Tie: | $0.399/kW-month |
| Backbone: | $0.468/kW-month |
| Area: | $0.956/kW-month |

II.6.1 [This Section Left Intentionally Blank]

II.6.2 City will be billed based on the maximum daily scheduled Maintenance Power in accordance with Paragraph II.3 of this Appendix B applied separately to each of the following transmission functions as applicable: system interconnection, generation tie, and backbone, adjusted for losses to the input level of the appropriate transmission function. The loss factor for each transmission function and for the Area transmission function are shown below.

Case: 19-30088   Doc# 11000-1   Filed: 07/30/21   Entered: 07/30/21 16:24:14   Exhibit
Page
120 of 157

## Functionalized Transmission Losses

| Transmission Function | Loss Factor* (Applied to Transmission Output) | Loss Factor* (Applied to Transmission Input) |
| --- | --- | --- |
| System Interconnection | 1.000466 | 0.999534 |
| Generation Tie | 1.003262 | 0.996749 |
| Backbone | 1.018800 | 0.981547 |
| Area | 1.014610 | 0.985600 |
| Distribution | 1.014110 | 0.986086 |
| Other | (To be determined on a case-by-case basis for direct service facilities not covered by the above Transmission Functions.) | |

*Loss factors applied to delivery of capacity and energy utilizing the applicable transmission facilities listed above. Transmission losses for applicable transmission facilities shall be added to determine the total losses between Delivery Point and Point of Receipt.

## PART IV

### FUEL COST ADJUSTMENT

IV.1   The Parties agree that the fuel cost adjustment mechanism (FCA) which shall be used in calculating the energy charge for the partial requirements and supplemental services shall be the fuel cost adjustment provided below.

IV.2   Applicability

This fuel cost adjustment provision applies to bills for service to City under this Agreement.

IV.3   Billing Amount

The amount hereunder to be added to or subtracted from each bill determined at the Base Rate shall be the product of the total kilowatt-hours for which the bill is rendered less any kilowatt-hours supplied to City by PG&E under Rate Schedule B, (Emergency Power Service) Multiplied by the Adjustment Rate.

IV.4   Base Rates

The Base Rates are the rates for service under this Agreement.

IV.5    Base Weighted Average Cost of Thermal and Economy Energy

The Base Weighted Average Cost of Thermal and Economy Energy is $0.00233 per kilowatt-hour of sales to City. Thermal energy is electric energy where the source of energy for the prime mover is heat. Economy energy is electric energy produced from a source outside PG&E's system and substituted for energy that could have been produced by a less economical source in the PG&E system.

IV.6    Record Period

The volumes of thermal and economy energy, fuel related thereto, and electric energy consumed, purchased, and sold, shall be those recorded during the twelve calendar month period ending at the end of the second month prior to the month in which the Revision Date occurs.

IV.7    Revision Dates

Each Revision Date is the first day of each calendar month. On each Revision Date, PG&E shall, in accordance with the provisions of this Part IV, place into effect an increase or decrease in the Adjustment Rate then in effect to reflect changes in the average cost of thermal and economy energy.

IV.8    Adjustment Rate

IV.8.l    The Adjustment Rate, to become effective for meter readings on and after each Revision Date and continuing thereafter until the next Adjustment Rate becomes effective in accordance herewith, shall be the arithmetic sum of an Offset Rate and a Balancing Rate, each multiplied by 1.002 (to adjust for franchise expense) and carried to the nearest $0.00001 per kilowatt-hour.

IV.8.2    The Offset Rate shall be the difference, as set forth in Paragraph IV.9 below, between the current weighted average thermal and economy energy cost per kilowatt-hour of sales to City and the Base Weighted Average Cost of Thermal and Economy Energy.

Case: 19-30088    Doc# 11000-1    Filed: 07/30/21    Entered: 07/30/21 16:24:14    Exhibit
122 of 157
Page 121 of 156

IV.8.3 The Balancing Rate shall be an amount per kilowatt-hour of City sales necessary to amortize the accumulated balance in the Electric Energy Cost Adjustment Account (ECA-SC), FERC Account Nos. 186 and 253. If the accumulated balance in that account, whether debit or credit is ten percent or more of the annual offset revenue, calculated by utilizing the most current effective Offset Rate and the Record Period sales, the Balancing Rate, as set forth in Paragraph IV.11 below, will be increased by 25 percent and such adjustment will continue until such time as the balancing account is 5 percent or less of the product of the most recent Offset Rate and Record Period sales, at which time the 25 percent increase will cease. The procedures for maintaining the ECA-SC and for determining the Balancing Rate are set forth in Paragraphs IV.11 and IV.12 below.

IV.8.4 If at any Revision Date, City has not purchased energy from PG&E during the Record Period, PG&E shall use an Adjustment Rate which is based on the kilowatt-hour sales to all resale customers during the Record Period.

Following a month in which City again purchases energy from PG&E, the Adjustment Rate shall be computed in accordance with Parts 8.l through 8.3 of this Paragraph IV.8.

IV.9 Offset Rate

The Offset Rate shall be determined by dividing (1) the amount of the Current Cost of Thermal and Economy Energy determined as specified in Section IV.l0 of this Part IV, by (2) the Record Period kilowatt-hours of applicable City sales, and (3) subtracting the Base Weighted Average Cost of Thermal and Economy Energy, and (4) adjusting for franchise tax expense by multiplying by 1.002 and carried to the nearest $0.0000l.

IV.10 Current Cost of Thermal and Economy Energy

The Current Cost of Thermal and Economy Energy shall be: (1) the volumes of gas and of each type of oil and coal fuel used by PG&E for electric generation in

Case: 19-30088   Doc# 11000-1   Filed: 07/30/21   Entered: 07/30/21 16:24:14   Exhibit
123 of 157

the Record Period (excluding fuel receipts in payment for electric service), expressed in millions of Btu, and the volumes of geothermal production and of nuclear energy production, expressed in kilowatt-hours, multiplied by the current price of each set forth below; plus (2) the volumes of purchased thermal and economy energy in the Record Period multiplied by the actual average energy rates for such purchases in the most recent month in the Record Period for which such rates are available; multiplied by (3) the ratio of applicable sales to City to total PG&E system sales for the Record Period; and further multiplied by (4) 0.959 to reflect the estimated difference between system and jurisdictional losses. The current price of gas fuel shall be the applicable rate under CPUC Schedule No. G-55 or its successor expressed in dollars per million Btu in effect on the last day of the Record Period. The current price of oil and coal fuel shall be the average cost in dollars per million Btu of each type from inventory (FERC Account No. 151) in the last month of the Record Period. The current price of geothermal steam shall be the price per kilowatt-hour of geothermal plant output (including payments for effluent disposal) of steam producers effective for production in the last month of the Record Period. The current price of nuclear fuel shall be the weighted average unit rate of amortization expressed in dollars per kilowatt-hour of nuclear fuel assemblies in-core, including an allowance for lease charges, transportation, and storage of spent fuel assemblies, in the last month of the Record Period.

IV.11    Balancing Rate

The Balancing Rate per kilowatt-hour sold shall be determined by dividing (1) the balance in the ECA-SC at the end of the latest month at the time of the computation being made under the provisions of this Part IV, by (2) the Record Period kilowatt-hours of applicable sales to City.

IV.12    Electric Energy Cost Adjustment Account

Entries shall be made to the ECA-SC at the end of each month as follows:

IV.12.l A debit entry, if positive (credit entry, if negative) equal to:

Case: 19-30088    Doc# 11000-1    Filed: 07/30/21    Entered: 07/30/21 16:24:14    Exhibit
124 of 157

IV.12.l.l The City recorded expense for thermal energy and for purchased thermal and economy energy during the month, less

IV.12.1.2 The amount of revenue billed during the month under the Offset Rate (not including the associated adjustment for franchise expense), less

IV.12.1.3 An amount equal to the energy sold to City to which the Adjustment Rate is applicable, multiplied by the Base Weighted Average Cost of Thermal and Economy Energy, less

IV.12.1.4 The amount of total revenue billed during the month for the energy component of intersystem transactions allocated to applicable City sales as set forth in item IV.12.5 below, less

IV.12.1.5 City's portion of total recorded fuel expense associated with fuel receipts in payment for electric service, but not to exceed the expense for fuel actually used to provide such service.

IV.12.2 A credit entry, if positive (debit entry, if negative) equal to the amount of revenue billed during the month under the Balancing Rate (not including the associated adjustment for franchise expense).

IV.12.3 If PG&E received cash refunds including any associated interest from any of its gas or geothermal or purchased thermal and economy energy suppliers on and after the effective date of this Agreement, the amount thereof associated with sales of electricity to City shall be recorded as a credit to ECA-SC except that in the event the non-jurisdictional portion of any refund or refunds is passed through directly to other ratepayers, the portion of such refund or refunds attributable to City shall be passed through to City as a credit to bills, and PG&E shall not record such refund in this account. Cash refunds associated with purchases of coal, oil, or nuclear fuel shall be recorded as a credit to the appropriate inventory account.

IV.12.4 A debit entry, if the ECA-SC balance is positive (credit entry, if negative), for interest at an Interest Rate equal to 1/12 the ·rate determined in accordance with

Section 35.19a(a)(2)(iii)(A) of FERC Regulations, 18 C.F.R. § 35.19a(a)(2)(iii)(A), as it may be amended.

The Interest Rate will be applied to the average of the balance in this account at the beginning of the month and the balance in this account after entries 12.1, 12.2, and 12.3 above:

IV.12.5 Items 12.1.1, 12.1.4, 12.1.5 and 12.3 above in any month shall be determined by multiplying PG&E's total expense or revenue associated with such items by the ratio of applicable energy sales to City to total PG&E system sales.

IV.12.6 If at any time City does not purchase energy from PG&E for three (3) consecutive months or if the Interconnection Agreement terminates, any debit balance in the ECA-SC shall become due from City on demand by PG&E and any credit balance in the ECA-SC at such time shall be refunded to City by PG&E.

IV.12.7 Any balance in the ECA-SC of the present FCA which exists at the time a successor FCA becomes effective will be carried forward and fully amortized pursuant to the terms of the successor FCA provision contemplated under this Agreement. In addition, the successor FCA contemplated under this Agreement will provide for the amortization of any balances existing at the time any further amended or successor FCA provision is made effective.

Case: 19-30088   Doc# 11000-1   Filed: 07/30/21   Entered: 07/30/21 16:24:14   Exhibit
126 of 157

## APPENDIX C INITIAL PROJECT COST TARGET DATA

GRIZZLY POWERHOUSE PROJECT INITIAL PROJECT COST TARGET (IPCT)

ESTIMATED PROJECT COST EXCLUDING ADD'L LICENSE RELATED COSTS

COMMERCIAL OPERATION DATE 1/94

| ID | ACTIVITY DESCRIPTION | $1.000's |
|----|----------------------|----------|
| A | Obtain FERC License - Pay FERC Fees | 164 |
| B | Obtn Agency Agrmts/Apprvls/Permits | 64 |
| C | Updated Job Approval | 47 |
| D1 | Perform Land Engineering | 55 |
| D2 | Conduct Geotechnical Investigation | 30 |
| D3 | Develop Design Criteria | 27 |
| D4 | Prepare Engineering Design Drawings | 864 |
| E | Prepare Procurement Specs/EMMs | 85 |
| F1a | Bid & Award T-G Contract | - |
| F1b | Obtain Approved Vendor T-G Dwgs | 69 |
| F1c | Release for Fabrication | - |
| F1d | Obtain Vendor Fabrication Drwgs | - |
| F1e | Fabricate & Del Turbine-Generator | 4,375 |
| F1f | Procure Spare Parts | 71 |
| F1g | Procure Vendor Shop Drawings | 71 |
| F2 | Procure Switchyard Equip & Matls | 556 |
| F3 | Procure Other E&M Items | 521 |
| F4 | Procure Penstock Pipe & Air Valve | 4,296 |
| F5 | Procure Gates | 129 |
| F6 | Procure Telecom Equip & Matls | 364 |
| F7 | Procure Trans & Const Pwr Equip&Matls | 596 |
| F8 | Procure E&M Equip for Intake | 89 |
| F9 | Inspect Fabrication | 89 |
| G1a-g | Comply with FERC Constr Requiremnts | 49 |
| G1h | Retain Board of Consultants | - |
| G2 | Comply with FERC Envir Requiremnts | - |
| H1 | Prepare Construction Specifications | 58 |
| H2 | Prepare Construction Bid Packages | 38 |
| H3 | Bid & Eval Construction Contracts | 24 |
| I | Obtain Approvals & Award Contracts | - |
| J1 | Harvest Timber | 511 |
| J2 | Build Construction Headquarters | 453 |
| J3 | Construct & Maintain Project Roads | 501 |
| J4 | Prepare Portal | 65 |
| J5 | Construct Telecoms Facilities | 488 |
| J6a | Install Construction Power Facilities | 28 |
| J6b | Construct Transmission Facilities | 553 |
| J7a | Excavate Starter Tunnel | 213 |
| J7b1 | Excavate TBM Tunnel 1st Season | 6,198 |
| J7b2 | Excavate TBM Tunnel 2nd Season | 5,722 |
| J7b3 | Construct Tunnel Plug | 98 |
| J8 | Construct Surge Chamber | 1,197 |

Case: 19-30088   Doc# 11000-1   Filed: 07/30/21   Entered: 07/30/21 16:24:14   Exhibit
127 of 157

| ID | ACTIVITY DESCRIPTION | $1.000's |
|---|---|---|
| J9a | Construct Cofferdam | 32 |
| J9b | Construct Intake 1st Season | 590 |
| J9c | Construct Intake 2nd Season | 986 |
| J10a | Construct Penstock 1st Season | 1,034 |
| J10b | Construct Penstock 2nd Season | 1,096 |
| J11a | Prepare Site for PH Construction | 76 |
| J11b1 | Construct PH Civil Structures | 1,747 |
| J11b2 | Construct PH Arch Structures | 206 |
| J11c1 | Install Turbine | 362 |
| J11c2 | Install Generator | 196 |
| J11c3 | Install Other E&M Equipment | 519 |
| J12a | Construct Civil Switchyard Features | 109 |
| J12b | Construct E&M Switchyard Features | 162 |
| J13 | Perform Erosion Control & Reveg | 79 |
| J14a | Construct Road Improvements | 1,037 |
| J14b | Construct Recreation Facilities | 1,344 |
| J15 | Perform Start-Up Test | 459 |
| J17 | Demobilization and Clean-Up | 141 |
| J18 | Paint Powerhouse (GC Crew) | 63 |
| J19a | Provide Fld Eng/Suprvsn - Civ-Hyd | 1,822 |
| J19b | Provide Fld Eng/Suprvsn - Sta Const | 1,056 |
| J20a | Provide Civil Eng Supp During Const | 376 |
| J20b | Provide E&M Eng Support Dur Const | 113 |
| J20c | Provide TES/Consult Support Dur Const | 56 |
| J20d | Provide Vendor Rep Dur Const | 267 |
| J20e | Provide Operations Support Dur Const | 122 |
| K | Project Management | 579 |
| L1 | Resolve Punch List Items | 230 |
| L2 | Prepare PG&E As-Built Drawings | 131 |
| L3 | Prepare Description of Operation | 25 |
| LA | Resolve Claims | 96 |
| L5 | Prepare Cost Books | 36 |
| L6 | Prepare Project Critique | 8 |
| L7 | Prepare Project Files | 55 |
| L8 | Close Job Accounting | 7 |

| | |
|---|---|
| ACTIVITY DIRECT SUBTOTAL | 43,969 |
| INDIRECTS | 4,542 |
| OVERHEADS | 3,444 |
| ACTIVITY TOTAL | 51,955 |
| CONTINGENCY DIRECT SUBTOTAL | 4,567 |
| INDIRECTS | 480 |
| OVERHEADS | 358 |
| CONTINGENCY TOTAL | 5,405 |
| TOTAL PROJECT COST | 57,360 |

Case: 19-30088   Doc# 11000-1   Filed: 07/30/21   Entered: 07/30/21 16:24:14   Exhibit
Page 127 of 156
128 of 157

**APPENDIX D GRIZZLY CONFIDENTIALITY AGREEMENT**

1. The Parties to this Agreement anticipate that certain of the documents and information related to this Appendix D may include matters which one or the other believes to be proprietary or otherwise protected from public disclosure absent the other Party's consent. Accordingly, each Party agrees to protect the interest of the other Party by limiting access of third parties to specific documents and information and to take the action necessary to facilitate this understanding. Each Party agrees that it will not disclose or otherwise make use of documents which are provided it by the other Party which the other Party has labelled as "CONFIDENTIAL MATERIALS", except in accord with this Agreement and to the extent such information is required to be disclosed by State or Federal laws and regulations or by court or public agency order.

2. All documents and information furnished subject to the terms of this Appendix D shall be referred to as "CONFIDENTIAL MATERIALS". However, such "CONFIDENTIAL MATERIALS" shall not include any information or document contained in the public files of any federal, state or local agency or any other public power utility or agency, except where such information or document is in turn under confidentiality. "CONFIDENTIAL MATERIALS" also shall not include documents or information which at, or prior to, disclosure in relation to this Agreement, are or were of publication or disclosure by the Parties. By accepting documents provided by a Party pursuant to this Agreement, a Party does not concede that such documents are in fact proprietary or otherwise entitled to protection. A Party may only designate as protected those materials which customarily are treated by that Party as confidential or proprietary, which are not available to the public, and which, if disclosed freely, would subject that Party to risk of competitive disadvantage or other business injury. Such "CONFIDENTIAL MATERIALS" shall be made available, under the terms of this Agreement, only to participants and only through their authorized representatives as provided herein subject to the limitations provided in State or Federal disclosure and confidentiality laws and regulations.

3. The Parties may designate as "CONFIDENTIAL MATERIALS" those documents or portions thereof and other information and data relating to Grizzly, including but not limited to, plans, drawings, specifications, sketches, drawings, diagrams and calculations, data, computer tapes or discs, and files, as well as trade secrets, technologies, or internal business facts, financial

Case: 19-30088    Doc# 11000-1    Filed: 07/30/21    Entered: 07/30/21 16:24:14    Page
129 of 157

and operating information, and all other written documents produced by it which in good faith it believes contain proprietary information. Designation as "CONFIDENTIAL MATERIALS" shall be accomplished by marking each page of such documents, file folder, or tape case in which the information is located with the word, "CONFIDENTIAL." Copies of "CONFIDENTIAL MATERIALS" produced by the Parties shall bear this legend on each page or tape case. Any notes, memoranda, summaries, abstracts, studies, computer software, software documentation or other information derived from such "CONFIDENTIAL MATERIALS" or portions thereof prepared by the Parties shall be similarly marked, and reasonable precautions shall be taken to ensure that any such notes, memoranda, summaries, abstracts, studies, computer software, software documentation or other information are not viewed by any persons except those to whom "CONFIDENTIAL MATERIALS" may be disclosed under this Agreement.

4. Unless and until otherwise agreed by the Parties or ordered by a court of competent jurisdiction or as provided herein, documents and information which have been designated "CONFIDENTIAL MATERIALS", the contents thereof, and any notes, memoranda, summaries, abstracts, studies, computer software, software documentation or other information derived therefrom, shall be used only in connection with this Agreement and/or related litigation or disputes, and may be inspected by or disclosed only to the persons described in this Agreement and under the conditions herein established.

5. Except as otherwise provided herein, "CONFIDENTIAL MATERIALS" may be disclosed to and used by attorneys of record for the Parties to this Agreement or in any litigation proceeding arising from this Agreement and by persons who are regularly employed in such Party's attorneys' offices or engaged in or supervising the conduct of such litigation related to this Agreement. "CONFIDENTIAL MATERIALS" also may be disclosed to and used by bond counsel, insurance brokers, insurance companies, technical experts, consultants, expert witnesses, other witnesses, and persons regularly employed in the offices of such experts, consultants, or witnesses who are involved with this Agreement on behalf of a Party. Prior to disclosure of such "CONFIDENTIAL MATERIALS" to such persons, the Party's attorneys shall secure a statement from each such person stating that he or she has read this Appendix B, and that he or she will not divulge or use any "CONFIDENTIAL MATERIALS", or any portion

Case: 19-30088   Doc# 11000-1   Filed: 07/30/21   Entered: 07/30/21 16:24:14   Exhibit
Page
130 of 157

thereof, or any information derived therefrom, except in accordance with this Agreement. In the event that any person to whom disclosure of "CONFIDENTIAL MATERIALS" has been made ceases to be engaged in this Agreement, access to such materials by such person shall be terminated and such person shall return all copies of "CONFIDENTIAL MATERIALS" to the Party from whom they were received. Any such person shall continue to be bound by the provisions of this Agreement even if no longer so engaged.

6. In the event that a Party wishes to disclose "CONFIDENTIAL MATERIALS" to any person to whom disclosure is not authorized by this Agreement, or wishes to object to the designation of certain information or material as "CONFIDENTIAL MATERIALS", such participant will first make a good faith attempt to negotiate the matter with the other Party. If the Parties fail to reach agreement with respect to the disclosure of "CONFIDENTIAL MATERIALS", any Party may request by motion that the Presiding Judge of Santa Clara County or the City and County of San Francisco review the documents in camera and determine whether they should be protected from disclosure.

7. In the event any Party violates the terms of this Agreement, the Presiding Judge in Santa Clara or San Francisco County may order whatever sanctions he/she deems appropriate. Neither Party waives its right to seek additional administrative or judicial remedies after the presiding judge or officer renders a decision regarding protected materials or to seek a review of a denial of any appeal thereof. Nothing in this Agreement shall be deemed to preclude any party from independently seeking, through discovery in any administrative or judicial proceeding, information or materials produced during the term of this Agreement.

8. Except to the extent that the Parties shall agree otherwise, all "CONFIDENTIAL MATERIALS" in the possession of a Party and all copies made thereof shall be returned to the Parties at the termination of this Agreement. In addition, at the termination of this Agreement, each Party shall destroy any notes, memoranda, and other documents and information derived from "CONFIDENTIAL MATERIALS," and certify in writing to the other Party that such destruction has been accomplished.

Case: 19-30088   Doc# 11000-1   Filed: 07/30/21   Entered: 07/30/21 16:24:14   Exhibit
131 of 157
Page 130 of 156

9. The Parties agree that disclosure of "CONFIDENTIAL MATERIALS" in contrary to the terms of this Agreement will cause substantial harm to the Party which owns such materials and that the extent of such damages would be difficult or impossible to calculate. Accordingly, in addition to such other remedies as may be available to either Party, that Party is entitled to seek an injunction to enforce compliance with the terms of this Agreement.

Case: 19-30088   Doc# 11000-1   Filed: 07/30/21   Entered: 07/30/21 16:24:14   Exhibit Page 132 of 157

## APPENDIX E BUCKS CREEK RELICENSING AGREEMENT

BUCKS CREEK RELICENSING AGREEMENT BY AND BETWEEN PG&E AND SANTA CLARA

This Bucks Creek Project Relicensing Agreement (herein "Agreement") is made and entered into on this day of March 1990, by and between PACIFIC GAS AND ELECTRIC COMPANY, a California corporation (herein "PG&E"), and the CITY OF SANTA CLARA, a California municipal corporation (herein "Santa Clara"), either or both of which is and are hereinafter referred to individually as a "Party" or collectively as "Parties".

The Parties to this Agreement hereby agree as follows:

RECITALS

WHEREAS:

A.      The Parties are, of even date of entering into a Grizzly Development and Mokelumne Settlement Agreement ("Settlement Agreement") providing for, among other things, settlement of Santa Clara's claims against PG&E for compensation relating to the Mokelumne River Project (FERC Project No. 137) in connection with Section 10 of the Electric Consumer Protection Act of 1986, Pub.L. No. 99-495; and

B.      The settlement provides for PG&E's construction of the Grizzly Development, a hydroelectric generating facility licensed under the Bucks Creek Project FERC license (FERC License No. 619), for Santa Clara's ownership and operation of the Grizzly Development, for PG&E's possible reacquisition of that Development at a point in time beyond the period of the present Bucks Creek Project FERC license, and for PG&E and Santa Clara to cooperate in seeking a new license for the Bucks Creek Project at the expiration of the present license; and

C.      The Agreement is entered into in consideration of the execution by each Party of the Settlement Agreement; and

D.      The settlement further provides that Santa Clara shall support PG&E's efforts to obtain a new license for the Bucks Creek Project when the current license expires;

Case: 19-30088    Doc# 11000-1    Filed: 07/30/21    Entered: 07/30/21 16:24:14    Exhibit
Page 133 of 157

NOW THEREFORE, in consideration of the promises and mutual covenants contained in this Agreement and the Settlement Agreement, the Parties hereby agree as follows:

1.     Santa Clara hereby agrees that it will affirmatively support any future application made by PG&E for renewal of the Bucks Creek License whether or not Santa Clara is a party thereto by reason of its continued ownership of the Grizzly Development. If Santa Clara's ownership of Grizzly will extend into the new license period, Santa Clara shall not be obligated to support any provision of an application, except PG&E's continued ownership, which upsets the balance of benefits and burdens intended by the Parties as of the date of execution of the Grizzly Development and Mokelumne Settlement Agreement, without appropriate compensation to Santa Clara.

2.     If Santa Clara is a party to the application for renewal of the Bucks Creek License by reason of its continued ownership of the Grizzly Development, the Parties will share the costs of prosecuting such application in accordance with the terms of the Settlement Agreement.

3.     If Santa Clara is not a party to the application for renewal of the Bucks Creek License by reason of its continued ownership of the Grizzly Development, PG&E shall bear the costs involved in filing and pursuing such application.

4.     In the event Santa Clara's ownership of Grizzly will not end prior to expiration of the present license, and PG&E does not pursue renewal of the present Bucks Creek License, Santa Clara may pursue licensing of the Bucks Creek Project at its sole expense. PG&E shall not oppose any such relicensing application made by Santa Clara for reasons that do not have the potential for adversely affecting PG&E.

5.     This Agreement shall become effective on the Settlement Date as defined in the Settlement Agreement.

Case: 19-30088   Doc# 11000-1   Filed: 07/30/21   Entered: 07/30/21 16:24:14   Exhibit
134 of 157

     The signatories hereto warrant and represent that they have been appropriately authorized to enter into this Agreement on behalf of the Party for whom they sign. This Agreement is executed in two counterparts, each of which shall be regarded as an original.

| APPROVED AS TO FORM: | CITY OF SANTA CLARA |
|---|---|

By: /s/
ROLAND D. PFEIFER
Assistant City Attorney

ATTEST:

By: /s/
J. E. BOCCIGNONE
City Clerk

By: /s/
JENNIFER SPARACINO
City Manager

By: /s/
EVERETT N. SOUZA
Mayor

Address:

1500 Warburton Avenue
Santa Clara, California 95050
Telephone: (408) 984-3000

APPROVED AS TO FORM

By: /s/
GLENN WEST, JR.
Attorney

PACIFIC GAS AND ELECTRIC COMPANY

By: /s/
GREGORY M. RUEGER
Senior Vice President
and General Manager -
Electric Supply

Address:
77 Beale Street
San Francisco, California 94106
Telephone: (415) 972-7000

Case: 19-30088   Doc# 11000-1   Filed: 07/30/21   Entered: 07/30/21 16:24:14   Exhibit
Page 135 of 157

**APPENDIX F AMENDMENTS TO GRIZZLY SETTLEMENT AGREEMENT**

Amendment Number Six

to the Grizzly Development and Mokelumne Settlement Agreement

by and between Pacific Gas and Electric Company and City of Santa Clara

This AMENDMENT NUMBER SIX TO THE GRIZZLY DEVELOPMENT AND MOKELUMNE SETTLEMENT AGREEMENT ("Amendment") is entered into effective as of the Effective Date between Pacific Gas and Electric Company, a California corporation ("PG&E") and the City of Santa Clara, California, a chartered California municipal corporation doing business as Silicon Valley Power ("City"). PG&E and City may be referred to individually as "Party" or collectively as "Parties."

RECITALS

A. PG&E and City are parties to an Interconnection Agreement.

B. [This Section Left Intentionally Blank]

C. PG&E and City are parties to a June 5, 2002 Amendment Number Four to the Grizzly Development and Mokelumne Settlement Agreement ("Amendment No. 4"), which set forth scheduling procedures and general principles. The Parties intend this Amendment to replace Amendment No. 4 in its entirety.

D. PG&E and City are parties to an August 26, 2003 Amendment Number Five to the Grizzly Development and Mokelumne Settlement Agreement ("Amendment No. 5"), which modified the operating period insurance requirements.

E. The Parties acknowledge that changes have occurred, or are planned to occur, in the electricity market operated by the California Independent System Operator Corporation ("CAISO") since the execution of Amendments No. 4 and 5, including CAISO's proposed Market Redesign and Technology Upgrade ("MRTU") Tariff. This Amendment is intended to take into account these changes and formalizes certain informal operational practices previously utilized by the Parties. The Parties also acknowledge that the electricity market is currently

Case: 19-30088    Doc# 11000-1    Filed: 07/30/21    Entered: 07/30/21 16:24:14    Exhibit
136 of 157

undergoing restructuring and redesign such that the scheduling procedures set forth in Section 2 of this Amendment may require modification from time to time in the future. Accordingly, the Parties have developed general principles, set forth in Section 3 of this Amendment, to guide future negotiations regarding such modifications. Pursuant to Section 7.5 of the Grizzly Agreement, any further negotiations regarding such modifications shall be based on the 1983 PG&E SVP IA and its Appendices as if that Agreement had not terminated.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained in this Amendment and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree to amend the Grizzly Agreement as follows:

AGREEMENT

**Section 1.** **Definitions.** In addition to terms defined in the Recitals of this Amendment and in the Grizzly Agreement, the following terms, when used in this Amendment with the initial letters capitalized, whether in the singular, plural or possessive, shall have the meanings indicated below. Any capitalized words contained in the definitions themselves shall have the meaning as stated in the initially-operative CAISO MRTU Tariff unless the capitalized words are defined in the Recitals of this Amendment, the Grizzly Agreement, or this Section 1. Further, unless otherwise specified in a definition below, if one of the following terms is also defined in the initially-operative CAISO MRTU Tariff, the definition contained in the initially-operative CAISO MRTU Tariff shall govern.

1.1     Ancillary Services: Regulation, Spinning Reserve, Non-Spinning Reserve, Voltage Support and Black Start together with such other interconnected operations services as the CAISO may develop in cooperation with Market Participants to support the transmission of Energy from Generation resources to Loads while maintaining reliable operation of the CAISO Controlled Grid in accordance with Western Electricity Coordinating Council standards and Good Utility Practice.

Case: 19-30088   Doc# 11000-1   Filed: 07/30/21   Entered: 07/30/21 16:24:14   Exhibit
137 of 157
Page 136 of 156

1.2     CAISO:  The California Independent System Operator Corporation, a California non-profit public benefit corporation that operates the transmission facilities of all Participating Transmission Owners ("TO") and dispatches certain Generating Units and Loads.

1.3     CAISO Tariff:  The currently-effective CAISO Operating Agreement and Tariff, dated March 31, 1997, as it may be modified from time to time.

1.3.1     CAISO MRTU Tariff:  The CAISO FERC Electric Tariff, Fourth Replacement Volume No. 1, which is entitled the Market Redesign and Technology Upgrade Tariff and made the effective CAISO Tariff as of March 31, 2009.

1.4     COTP Terminus:   The point of Interconnection between the PG&E Electric System and the California-Oregon Transmission Project ("COTP"), located at the eastern boundary of the existing right-of-way of PG&E's Tesla-Los Banos No. 2 500 kV line, at which the COTP's conductors extending from the Tracy Substation Expansion meet PG&E's conductors extending from PG&E's Tesla-Los Banos No. 2 500 kV line.

1.5     Custom Load Aggregation Point ("Custom LAP"):  An aggregation of Load PNodes created by the CAISO based on a set of custom Load Distribution Factors ("LDFs") submitted by a Scheduling Coordinator, at which such Scheduling Coordinator may submit a single bid or schedule and settle Demand consistent with the CAISO MRTU Tariff rules, and for which the Scheduling Coordinator is required to submit to the CAISO Meter Data for the nodal Load represented in such aggregation.

1.6     Day-Ahead Market ("DAM"):  A series of processes conducted in the Day-Ahead that includes the Market Power Mitigation-Reliability Requirement Determination, the Integrated Forward Market and the Residual Unit Commitment.

1.7     Default LAP:  The Load Aggregation Point ("LAP") defined for the Transmission Access Charge ("TAC") Area at which all bids or schedules for Demand shall be submitted and settled, except as provided in Sections 27.2.1 and 30.5.3.2 of the CAISO MRTU Tariff.

Case: 19-30088   Doc# 11000-1   Filed: 07/30/21   Entered: 07/30/21 16:24:14   Exhibit
138 of 157

1.8    Energy:  The electrical energy produced, flowing or supplied by generation, transmission or distribution facilities, being the integral with respect to time of the instantaneous power, measured in units of watt-hours or standard multiples thereof, e.g., 1,000 Wh = 1kWh, 1,000 kwh = 1 MWh, etc.

1.9    Existing Transmission Contracts ("ETCs") or Existing Contracts:  The contracts which grant transmission service rights in existence on the CAISO Operations Date (including any contracts entered into pursuant to such contracts) as may be amended in accordance with their terms or by agreement between the parties thereto from time to time.

1.10    Existing Zone:  A region formerly referred to as NP-15, SP-15, or ZP26 prior to implementation of the CAISO Locational Marginal Price ("LMP") market design.

1.11    Existing Zone Generation Trading Hub ("EZ Gen Trading Hub"):  Trading Hubs specifically developed to represent the average price paid to generation resources within Existing Zones.

1.12    Hour-Ahead Scheduling Process ("HASP"):  The process conducted by the CAISO beginning at seventy-five minutes prior to the Trading Hour through which the CAISO conducts the following activities:  1) accepts Bids for Supply of Energy, including imports, exports and Ancillary Services imports to be supplied during the next Trading Hour that apply to the Market Power Mitigation – Reliability Requirement Determination ("MPM-RRD"), Real-Time Unit Commitment ("RTUC"), Short-Term Unit Commitment ("STUC"), and Real-Time Dispatch ("RTD"); 2) conducts the MPM-RRD on the Bids that apply to the RTUC, STUC, and RTD; and 3) conducts the RTUC for the hourly pre-dispatch of Energy and Ancillary Services.

1.13    Integrated Forward Market ("IFM"):  The pricing run conducted by the CAISO using Security Constrained Unit Commitment ("SCUC") in the Day-Ahead Market, after the MPM-RRD process, which includes Unit Commitment, Ancillary Service procurement, Congestion Management and Energy procurement based on Supply and Demand Bids.

1.14    IFM Load Uplift Obligation:    The obligation of a Scheduling Coordinator to pay its share of unrecovered IFM Bid Costs paid to resources through Bid Cost Recovery.

Case: 19-30088    Doc# 11000-1    Filed: 07/30/21    Entered: 07/30/21 16:24:14    Exhibit
                                        139 of 157

1.15    Inter-SC Trade ("IST"):   A trade between Scheduling Coordinators of Energy, Operating Reserve Obligations, or IFM Load Uplift Obligation in accordance with the CAISO MRTU Tariff.  Only as used in this Amendment, this definition of Inter-SC Trade replaces the definition of Inter-SC Trade set forth in the CAISO MRTU Tariff.

1.16    NCPA Data Portal:  A web service for scheduling developed and administered by the Northern California Power Agency ("NCPA").

1.17    Non-Spinning Reserves:   The portion of generating capacity that is capable of being synchronized and Ramping to a specified load in ten minutes (or Load that is capable of being interrupted in ten minutes) and that is capable of running (or being interrupted) for at least two hours.  Only as used in this Amendment, this definition of Non-Spinning Reserves replaces the definition of Non-Spinning Reserves set forth in the CAISO MRTU Tariff.

1.18    NP15: The transmission facilities of the CAISO Controlled Grid located north of transmission path 15.

1.19    Operating Reserves:   The combination of Spinning and Non-Spinning Reserve required to meet Applicable Reliability Criteria for reliable operation of the CAISO Balancing Authority Area.

1.20    Operating Reserve Obligation:   The obligation of a Scheduling Coordinator to pay its share of costs incurred by the CAISO in procuring Operating Reserves.

1.21    Real-Time:  The period of time during the Operating Hour.  Any time period during the twenty-four Operating Hours of any given day.

1.22    Real-Time Schedule:  A schedule or schedule revision for delivery of energy submitted subsequent to the close of the CAISO's deadline for the CAISO HASP.

1.23    Scheduling Coordinator ("SC"):    An entity certified by the CAISO for the purposes of undertaking the functions specified in Section 4.5.3 of the CAISO MRTU Tariff.

Case: 19-30088   Doc# 11000-1   Filed: 07/30/21   Entered: 07/30/21 16:24:14   Exhibit
140 of 157

1.24   Self-Schedule:   The Bid component that indicates the quantities in MWhs with no specification of a price that the SC is submitting to the CAISO, which indicates that the SC is a Price Taker, Regulatory Must-Run Generation or Regulatory Must-Take Generation, which includes ETC and TOR Self-Schedules and Self-Schedules for Converted Rights.

1.25   Spinning Reserves:   The portion of unloaded synchronized generating capacity that is immediately responsive to system frequency and that is capable of being loaded in ten minutes, and that is capable of running for at least two hours.  Only as used in this Amendment, this definition of Spinning Reserves replaces the definition of Spinning Reserves set forth in Section 1.1.66 of the Grizzly Agreement.

1.26   Transmission Rights and Transmission Curtailment Instructions ("TRTC Instructions"):   Operational directives developed (i) between Existing Rights holders and holders of Converted Rights and the Participating TO, submitted to the CAISO by the Participating TO, unless otherwise agreed to by the Participating TO and the Existing Rights or Converted Rights holder and (ii) by TOR holders, to facilitate the accommodation of Existing Rights, Converted Rights and TORs in the CAISO Markets.

### Section 2.   Scheduling and Settlement Procedures.

2.1   **Applicability**. The Parties intend the scheduling and settlement procedures in this Section 2 to be applicable upon the effective date of this Amendment.  At the request of either Party, the Parties shall negotiate in good faith to amend these procedures as necessary or desirable, consistent with Section 7.5 of the Grizzly Agreement.  Scheduling duties may be performed by the Parties, or by SCs to whom Parties may have assigned this responsibility.  In this Amendment, when referring specifically to the actual performance of scheduling tasks, the term "City" will also refer to "City's SC" and "PG&E" will also refer to "PG&E's SC."

### 2.2   **Scheduling Energy Prior to Real-Time Schedules.**

2.2.1   DAM and HASP Schedules submitted by SCs involving interactions with the CAISO must in every case be in accordance with the provisions of the then-current CAISO Tariff.

Case: 19-30088   Doc# 11000-1   Filed: 07/30/21   Entered: 07/30/21 16:24:14   Exhibit
141 of 157

2.2.2    City shall provide PG&E with DAM and HASP requests for energy via NCPA's Data Portal consistent with then-current deadlines imposed by the CAISO and at a time sufficient to allow both PG&E and City to conduct necessary scheduling operations with the CAISO.  This timing will be established at no less than twenty (20) minutes prior to the CAISO's deadline for submission of schedules (ETC supply and load schedules and ISTs) for the relevant market (DAM and HASP).  The Parties will make reasonable efforts to allow and make changes, if needed, within the twenty (20) minute period.  However, due to the number of changes inherent in the CAISO's MRTU program, the Parties have agreed that, for a period of sixty (60) days after MRTU is implemented, the timing for the City to provide PG&E with DAM and HASP requests for energy will be established at no less than ninety (90) minutes prior to the CAISO's deadline for submission of schedules into the DAM and HASP markets.  If either Party becomes dissatisfied with this timing or is unable to perform its obligations, the Parties agree to establish new timelines that meet the needs of both Parties and are consistent with Section 7.5 of the Grizzly Agreement.

2.2.3    The DAM and HASP Schedules for energy shall not exceed 17.66 MW (Grizzly capacity).  Pursuant to Section 2.3.2 of this Amendment, City may not schedule a combination of energy and Operating Reserves greater than 17.66 MW.

2.2.4    DAM energy will be scheduled by the Parties as an IST of energy at the NP15 EZ Gen Hub or at another mutually-acceptable trading location permitted by the CAISO (such as the PG&E Default LAP).

2.2.5    HASP energy schedule changes will be scheduled by Parties as an incremental or decremental IST (when compared to the DAM IST) of energy at the NP15 EZ Gen Hub (or other mutually-acceptable trading location permitted by the CAISO, such as the PG&E Default LAP).  If the City wants to increase the DAM energy in the HASP, then the incremental amount would consist of an IST from PG&E to the City.  If the City wants to reduce the DAM energy in the HASP, then the decremental amount would consist of an IST from the City to PG&E.

2.2.6    The location of the Energy IST is the source or sink of ETC mapping (the sink for PG&E's ETC path and the source for the City's ETC path).  The Parties anticipate they will

Case: 19-30088    Doc# 11000-1    Filed: 07/30/21    Entered: 07/30/21 16:24:14    Exhibit
Page
142 of 157

schedule for DAM and HASP energy deliveries using resources (PG&E) and loads (City) identified in the TRTC Instructions.

### 2.3 Real-Time Schedule Revision of Energy Scheduled in HASP or DAM

2.3.1    City may revise its final Schedules (DAM Schedules and/or HASP schedules) for energy deliveries after the final HASP Schedules have been submitted to the CAISO.  Initially, the Parties will continue the current Real-Time Schedule practice for energy to the extent that City may submit a single Real-Time Schedule revision to the final DAM and/or HASP schedule(s) for each half-hour period no later than twenty (20) minutes into the active half-hour. Real-Time Schedule revisions received within this period (no later than 20 minutes into the active half hour) will be populated into each ten-minute interval within the applicable half-hour, unless the City instead decides to have the Real-Time Schedule revision apply only prospectively to each remaining ten-minute interval within the applicable half-hour.

This Real-Time Schedule shall be communicated in the form of a revised final total Grizzly schedule, unless as otherwise mutually agreed by PG&E and City.  The Parties expect to communicate such Real-Time changes via NCPA's Data Portal, or via phone or facsimile communication if necessary.  In accordance with any requirements of the CAISO, the Parties shall communicate Real-Time Schedule changes to the CAISO after-the-fact via submitting a final resulting total (in MW) ETC schedule(s) for Grizzly deliveries.  (Initially, it is expected that PG&E's SC will provide communication to the CAISO of the involved generation/supply schedule(s) for Grizzly deliveries after-the-fact via final ETC generation schedule(s) submittals, and SVP's SC will provide communication to the CAISO of the related Custom LAP schedule after-the-fact via final meter submittals.)

2.3.2    City's ability to increase energy schedules in Real-Time Schedules shall be limited by any pre-scheduled use of Grizzly capacity (17.66 MW) for the supply of Operating Reserves pursuant to Section 2.4 (i.e., the total of the resulting Real-Time Schedules for energy plus final HASP Schedules for Operating Reserves cannot at any time exceed 17.66 MW).

Case: 19-30088   Doc# 11000-1   Filed: 07/30/21   Entered: 07/30/21 16:24:14   Exhibit
Page
143 of 157

**2.4     Usage, Scheduling and Settlement of Operating Reserves.**

2.4.1    City shall request Operating Reserves available to it under this Amendment and the Grizzly Agreement in accordance with the then-current CAISO Tariff and associated procedures and protocols.  Operating Reserves will be scheduled by PG&E's SC and SVP's SC as an Ancillary Services IST (Spinning Reserves and/or Non-Spinning Reserves) in the HASP/Real-Time – if the City and PG&E do not otherwise agree to a separate financial settlement for Operating Reserves provided under the Grizzly Agreement (see Section 2.4.6 below).  City may not request changes to Operating Reserve schedules after the CAISO's deadline for submissions into the HASP/Real-Time.

2.4.2    City may use Spinning Reserves available to it under the Grizzly Agreement to meet City's own load-serving Operating Reserve Obligations for Spinning Reserves or any of City's third party Operating Reserve Obligations for Spinning Reserves.  City may also use available Grizzly Agreement capacity to meet City's own load-serving Operating Reserve Obligations for Non-Spinning Reserves or any of City's third party Operating Reserve Obligations for Non-Spinning Reserves. Unless otherwise settled financially in accordance with Sections 2.4.1 and 2.4.6, this use shall be accomplished by the methods described in Sections 2.4.3 and 2.4.5.

2.4.3    Unless otherwise settled financially in accordance with Sections 2.4.1 and 2.4.6, the Parties will schedule Operating Reserves to City in a manner that transfers City's Operating Reserve Obligation to PG&E, as opposed to PG&E making physical resources available to City for real-time reserve dispatch by City or a third party.  The Parties intend to implement this through Ancillary Services (Spinning Reserves and/or Non-Spinning Reserves) ISTs.  The Parties will schedule such ISTs in the HASP in accordance with the timelines set forth in Section 2.4.1.

2.4.4    To the extent PG&E's SC and SVP's SC perform Ancillary Services ISTs for Operating Reserve Obligations, the City shall pay PG&E the CAISO's then-current Grid Management Charge (GMC) rate(s), as reflected in the CAISO MRTU Tariff, associated with Ancillary Services multiplied by the appropriate rate determinant(s), i.e. MWh quantity, non-

Case: 19-30088    Doc# 11000-1    Filed: 07/30/21    Entered: 07/30/21 16:24:14    Exhibit
Page
144 of 157
Page 143 of 156

zero MW schedule, non-zero MW IST schedule, etc. of Operating Reserve Obligation, scheduled using Ancillary Services ISTs in accordance with Section 2.4.3. The City will reimburse PG&E's GMC costs associated with ISTs of Ancillary Services covering Operating Reserve Obligations in accordance with Section 3.7. Upon the Parties developing and implementing a financial settlement mechanism in accordance with Sections 2.4.1 and 2.4.6, the City will no longer reimburse PG&E for GMC costs associated with ISTs of Ancillary Services covering Operating Reserve Obligations, as PG&E will no longer be charged such costs by the CAISO.

2.4.5   The Parties agree to conduct further negotiations consistent with rights and obligations under the Grizzly Agreement if any provisions of the CAISO MRTU Tariff or Business Practice Manuals treat the Grizzly powerhouse and City's preferred delivery point for Operating Reserves as being in different Operating Reserve scheduling locations (as compared to pre-MRTU conditions, where both are currently being scheduled in the NP15 zone).

2.4.6   In accordance with Section 3.3 below, the Parties will work together towards reaching an agreement on a mechanism to financially settle the value of Grizzly Agreement capacity that SVP chooses to utilize as Operating Reserves, as opposed to performing an Ancillary Services IST during the time periods when SVP desires to utilize Grizzly Agreement capacity as Operating Reserves. This financial settlement would transfer such value of Grizzly Agreement capacity as Operating Reserves from PG&E to SVP. In order to financially settle the value of Grizzly Agreement capacity that SVP chooses to utilize as Operating Reserves, the Parties will first work towards reaching an agreement on how the value of such Operating Reserves would be determined.

An agreement by the Parties, encompassing a valuation method and utilizing financial settlements for the value of Grizzly Agreement capacity that SVP chooses to utilize as Operating Reserves, will result in the City, using the methodology agreed upon, to calculate the value of the Grizzly Agreement capacity that it utilized as Operating Reserves. On a monthly basis, once the required CAISO settlement data is received/available and has been reviewed and finalized, the City will provide the above calculation with supporting documentation via an invoice provided to PG&E. PG&E will reimburse the City for the City's Operating Reserve costs in accordance with Section 3.7.

Case: 19-30088   Doc# 11000-1   Filed: 07/30/21   Entered: 07/30/21 16:24:14   Exhibit
Page 145 of 157

**2.5**     **Scheduling and Settlement of Load Uplift Obligations.**

2.5.1    The City will be exposed to an IFM Load Uplift Obligation cost allocation from the CAISO as a result of the City's DAM energy IST with PG&E pursuant to the Grizzly Agreement. Since the City would not be exposed to this IFM Load Uplift Obligation cost if the Grizzly Agreement generation were in the City's SC portfolio, PG&E will reimburse the City for this cost allocation. The Parties could perform an IST of IFM Load Uplift Obligation to cover this cost – in a similar fashion and process as described in Section 2.4 above for an Ancillary Services IST for Operating Reserve Obligation – but the Parties intend instead initially to utilize a financial settlement to cover the City's cost allocation.

The City will calculate this IFM Load Uplift Obligation cost allocation from the CAISO due to its DAM energy IST with PG&E pursuant to the Grizzly Agreement. On a monthly basis, once required CAISO settlement data is received/available and has been reviewed and finalized, the City will provide the above calculation with supporting documentation (which will include, at a minimum, the portion of the relevant CAISO settlement data which details the City's IFM Load Uplift Obligation charge and the City's own calculation of the amount of the charge allocated due to the absence of Grizzly Agreement generation in the City's SC portfolio) via an invoice provided to PG&E. PG&E will reimburse the City for this IFM Load Uplift Obligation cost allocation in accordance with Section 3.7.

**2.6**     **Accounting for Losses**

2.6.1    <u>DAM and HASP Locational Marginal Losses</u>: The City will be made financially neutral with regards to the CAISO losses for Grizzly deliveries since the City is already charged 8.7% for losses under Section 7.2.2 of the Grizzly Agreement. Settlement between the Parties will use an hourly rate based on the difference in the loss component of the LMPs in the DAM and separately the HASP and Real-Time. This difference in the loss component of the LMPs will be determined by the LMPs at the location of the energy IST and the City's specified Point of Delivery (Custom LAP, Midway, COTP Terminus, or Tracy 500/230 kV). Unless specifically told otherwise by SVP, the default sink, or point of delivery, of the Grizzly Agreement energy transactions will be the SVP Custom LAP. Volumes applied to the hourly rate will be based on

Case: 19-30088    Doc# 11000-1    Filed: 07/30/21    Entered: 07/30/21 16:24:14    Exhibit
Page 146 of 157

the IST of energy in the DAM and separately in the HASP and in Real-Time. Depending on the value of the CAISO loss component of the involved LMPs, this settlement may be a charge or a credit to PG&E from the City.

2.6.2 <u>CAISO Over-collection of DAM Losses</u>: The CAISO may assign a financial adjustment to the City for the CAISO's over-collection of locational marginal losses in the DAM (currently under Charge Code 6947 or as defined by the CAISO Tariff), due to Grizzly deliveries. The Parties will financially settle this adjustment, determining the portion (if any) of the overcollection that is due PG&E monthly, using the same methodology as the CAISO such that the City is financially neutral as to this adjustment. Consistent with Section 3 below, the Parties agree to get together in the future to further discuss the Parties financial adjustment, based on the process and content of the CAISO's reimbursement due to its locational marginal loss overcollection, if either Party is unable to accurately determine (or verify) what portion of the CAISO's loss reimbursement to the City is due to the City-incurred CAISO losses from the Grizzly energy schedules.

2.6.3 <u>CAISO Over-collection of HASP Losses</u>: The CAISO may assign a financial adjustment to the City for the CAISO's over-collection of locational marginal losses in the HASP (currently under Charge Code 6477 or as defined by the CAISO Tariff) and in Real-Time, due to Grizzly deliveries. The Parties agree not to conduct any settlement between each other for this adjustment. The Parties agree to preserve their rights to prospectively financially settle this adjustment some time in the future. This agreement is not intended to be precedent setting and has no implications to either Party's rights and obligations.

2.6.4 <u>Calculation of Losses</u>: The City will provide a monthly calculation to determine the amount of loss payment specified in Section 2.6.1 net of DAM credits as specified in Section 2.6.2 that should be paid by either PG&E or the City so the City is held financially neutral in regards to CAISO marginal losses and thus no additional CAISO loss charges due to the Grizzly Agreement schedules are incurred by the City above the contract loss amount already charged to the City by PG&E. On a monthly basis, once required CAISO settlement data is received/available and has been reviewed and finalized, the City will provide the above calculation with supporting documentation (which will include, at a minimum, the portion of the

Case: 19-30088   Doc# 11000-1   Filed: 07/30/21   Entered: 07/30/21 16:24:14   Exhibit
147 of 157
Page 146 of 156

relevant CAISO settlement data which details the applicable LMP loss factors and DAM credits and the City's own calculation of the amount invoiced to PG&E via an invoice provided to PG&E. PG&E will reimburse the City for the CAISO loss adjustment settlement in accordance with Section 3.7.

### 2.7 Settlement of Forward Energy Purchases and Sales GMC Charges

2.7.1 The City will be exposed to a Forward Energy Purchases and Sales GMC (Charge Code 4537) cost allocation from the CAISO as a result of the City's DAM energy IST with PG&E pursuant to the Grizzly Agreement. Since the City would not be exposed to this Forward Energy Purchases and Sales GMC cost if the Grizzly Agreement generation were in the City's SC portfolio, PG&E will reimburse the City for this cost allocation as specified in Section 2.7.2 below.

2.7.2 The City will calculate its Forward Energy Purchases and Sales GMC (Charge Code 4537) cost allocation from the CAISO due to its DAM energy IST with PG&E pursuant to the Grizzly Agreement. On a monthly basis, once required CAISO settlement data is received/available and has been reviewed and finalized, the City will provide the above calculation with supporting documentation (which will include, at a minimum, the portion of the relevant CAISO settlement data which details the City's Forward Energy Purchases and Sales GMC charge and the City's own calculation of the amount invoiced to PG&E) via an invoice provided to PG&E. PG&E will reimburse the City for these Forward Energy Purchases and Sales GMC costs in accordance with Section 3.7.

2.8 Energy Settlement for Incremental and Decremental Revisions to the Final DAM or HASP Energy Schedules Submitted to the CAISO – Uninstructed Deviation

2.8.1 To the extent the City requests a revision to its final DAM or HASP Schedule for energy deliveries after the final HASP Schedules have been submitted to the CAISO (incremental or decremental) in accordance with Section 2.3.1, a financial settlement between the City and PG&E will be required to account for the energy value associated with such a schedule revision. An incremental revision to the final DAM or HASP energy Schedule, made after the close of the HASP, will require a payment to be made from PG&E to the City equal to

Case: 19-30088   Doc# 11000-1   Filed: 07/30/21   Entered: 07/30/21 16:24:14   Exhibit
Page 148 of 157

the incremental change (in MW) multiplied by the Real-Time Locational Marginal Price established by the CAISO at the NP15 EZ Gen Trading Hub (or other mutually-acceptable trading location permitted by the CAISO, such as the PG&E Default LAP).  A decremental revision to the final DAM or HASP energy Schedule, made after the close of the HASP, will require a payment to be made from the City to PG&E equal to the decremental change (in MW) multiplied by the Real-Time Locational Marginal Price established by the CAISO at the NP15 EZ Gen Trading Hub (or other mutually-acceptable trading location permitted by the CAISO, such as the PG&E Default LAP).  Since the City would not be exposed to this uninstructed deviation (due to the revision to the final DAM or HASP Schedule for energy deliveries after the final HASP Schedules have been submitted to the CAISO) if the Grizzly Agreement generation was in the City's SC portfolio, the Parties will determine an appropriate reimbursement.

2.8.2    The City will calculate the value of the incremental or decremental adjustments for the applicable settlement intervals.  This calculation will be performed using a simple average of the two CAISO posted five-minute interval LMPs during each ten-minute period, which will result in one average LMP price to be used during each ten-minute interval of each half-hour/hour pursuant to attached examples in Appendix A.  On a monthly basis, once required CAISO settlement data is received/available and has been reviewed and finalized, the City will provide the above calculation with supporting documentation (which will include, at a minimum, the portion of the relevant CAISO settlement data which details the City's uninstructed deviation and the City's own calculation of the amount invoiced, or credited, to PG&E) via an invoice provided to PG&E.  The net amount due to the City or PG&E, as determined per the calculations performed by the City, will be reflected in such an invoice.  Reimbursement of such uninstructed deviation costs will be done in accordance with Section 3.7.

## 2. 9    ETC Self-Schedules and Inter-SC Trades

2.9.1    Parties recognize that the CAISO Tariff (including the CAISO MRTU Tariff) require that ETC Self-Schedules must be provided to the CAISO in accordance with the CAISO timelines and scheduling requirements in order to receive the CAISO's "perfect hedge" for ETC congestion charge treatment and be refunded any incurred congestion charges.  The Parties agree that any Real-Time Schedule under the Grizzly Agreement, which may be outside of the CAISO

Case: 19-30088    Doc# 11000-1    Filed: 07/30/21    Entered: 07/30/21 16:24:14    Exhibit
Page
149 of 157

timelines and scheduling requirements, must be honored by the CAISO due to the Grizzly Agreement being an ETC, and therefore the Parties fully expect the CAISO to extend the "perfect hedge" for ETC congestion charge treatment (reversal of any charges associated with the marginal cost of congestion component of LMPs) to Real-Time Schedules under the Grizzly Agreement.

2.9.2   If either Party submits Grizzly Agreement schedules into the CAISO's scheduling system after the timeline specified by the CAISO or submits Grizzly Agreement schedules that do not balance or match with the Grizzly Agreement schedules submitted by the other Party and posted on the NCPA Data Portal (with the potential exception of Real-Time Schedules communicated via phone or facsimile by the City in accordance with Section 2.3.1), or if either Party does not properly utilize the CAISO-provided Contract Reference Numbers for deliveries made under the Grizzly Agreement, the Party responsible for the scheduling error shall compensate the other Party for all CAISO Congestion costs incurred as a result of the scheduling error.

2.9.3    Additionally, if PG&E fails to timely submit a Grizzly Agreement schedule to the CAISO, where such failure is solely caused by PG&E's negligent or willful act or omission and, as a result, the City's load following MSS portfolio is rendered out-of-balance, PG&E shall compensate City, if requested by the City, for the costs associated with that imbalance.    Unless otherwise specified in this Section 2.9.3 such costs may only include energy costs (calculated as MWh multiplied by the appropriate market LMP at the SVP Custom Load Aggregation Point, or the "SVP Custom LAP") and any penalties imposed by the CAISO for exceeding City's permitted deviation band pursuant to the City-CAISO Metered Subsystem ("MSS") Agreement that are attributable to PG&E's failure to timely submit City's Grizzly Agreement schedule to the CAISO. Where the City is compensated by PG&E under this Section 2.9.3, the Parties shall treat the amount of related energy as if it were supplied under the Grizzly Agreement and such energy would count towards applicable Grizzly usage amount limits.  In the event that PG&E fails to submit a Grizzly Agreement schedule change in the HASP or Real-Time market that was to have decreased Grizzly energy (when compared to final Grizzly energy IST values in prior markets), where such failure is solely caused by PG&E's negligent or willful act or omission, the amount

Case: 19-30088   Doc# 11000-1   Filed: 07/30/21   Entered: 07/30/21 16:24:14   Exhibit
Page 150 of 157
Page 149 of 156

of untraded energy will not count towards applicable Grizzly usage amount limits if City passes through, to PG&E, any related CAISO settlements affects for excess energy provided due to such a failure. Further, if the above-mentioned failure results in a reduced amount of Operating Reserve Obligation traded between the Parties, PG&E shall compensate City for the costs (MW amount multiplied by the CAISO's applicable rate(s) for Operating Reserves) associated with the resulting lesser Ancillary Services IST schedule.

PG&E shall also compensate the City for any additional charges incurred by the City's SC of the types specified in Sections 2.5, 2.6 and 2.7, if such additional charges are due to PG&E's failure to timely submit a Grizzly Agreement schedule to the CAISO, where such failure is solely caused by PG&E's negligent or willful act or omission.

2.9.4    If the City fails to verify the CAISO charges for Grizzly deliveries and submit corrections and/or disputes to the CAISO via its SC, PG&E will not be responsible to financially compensate the City for these uncorrected CAISO charges – to the extent any such CAISO errors affect settlements of Grizzly deliveries under this Section 2.9.

**Section 3.    General Principles.**  The Parties recognize that the electricity market is undergoing restructuring and redesign that may require future modification of the scheduling procedures set forth in Section 2 of this Amendment.  The Parties have developed the following general principles to guide such future modifications to the scheduling procedures set forth in Section 2 of this Amendment.  These general principles do not create new or different rights and obligations under the Grizzly Agreement and do not affect or diminish the current rights and obligations under the Grizzly Agreement.

3.1    In executing the Grizzly Agreement, SVP agreed to provide PG&E the right to dispatch the Grizzly powerhouse, as if PG&E owned the Grizzly powerhouse, in order to coordinate the operation of the Grizzly powerhouse with other PG&E facilities in the Bucks Creek Project, FERC No. 619.  At the same time, PG&E gave City approximate rights and benefits which it would realize if it had the ability to physically dispatch the Grizzly powerhouse generation to meet its own needs.

Case: 19-30088    Doc# 11000-1    Filed: 07/30/21    Entered: 07/30/21 16:24:14    Exhibit
Page
151 of 157

3.2     Parties agree that Grizzly Agreement transactions under the CAISO's MRTU market design will be made using TRTC instructions agreed upon between City and PG&E and submitted to the CAISO by PG&E as the Participating TO.  In the event that the City and PG&E are unable to agree upon the current TRTC Instructions submitted to the CAISO or to any modifications to the TRTC Instructions that either Party believes is necessary, the Parties will use the dispute resolution procedures contained in Section 18 of the Grizzly Development and Mokelumne Settlement Agreement.

3.3     The Parties will work cooperatively and use best efforts to minimize CAISO and other third party charges explicitly or implicitly incurred by either Party for services relating to the scheduling of energy and capacity under the Grizzly Agreement.

3.4     The Grizzly Agreement is an ETC.

3.5     In addition to submitting DAM and HASP Schedules for energy in a manner consistent with the then-applicable CAISO Tariff, City may submit Real-Time Schedules for energy.  City must schedule Operating Reserves in a manner consistent with the then-applicable CAISO Tariff.   The Parties shall enter into good-faith negotiations as needed to develop additionally-detailed, mutually acceptable scheduling procedures.

3.6     The CAISO recovers costs associated with its various market operations services by charging fees to entities that have scheduled transactions or that have incurred unscheduled (uninstructed) deviations.  If the CAISO imposes changed or additional charges not addressed in the Grizzly Agreement, including this Amendment, or the Parties must establish a new settlement methodology, the Parties will negotiate settlement of those charges according to the following principles:  (a) if the charge is assessed for an action which one Party has an obligation to undertake under the Grizzly Agreement, that Party shall be financially responsible for such charge; (b) if the charge is assessed for an action which neither Party has an obligation to undertake under the Grizzly Agreement, then the Parties shall enter into good faith negotiations to reach an agreement that assigns financial responsibility for such charges in a way that preserves the balance of benefits arising from the Grizzly Agreement.

Case: 19-30088   Doc# 11000-1   Filed: 07/30/21   Entered: 07/30/21 16:24:14   Exhibit
152 of 157

3.7    Either Party shall promptly, in accordance with billing and related payment practices set forth in the Grizzly Agreement, pay the other Party for costs, costs adjustments or corrections specified in Sections 2.4 through 2.9 of this Amendment within 20 days of electronic receipt.   PG&E shall electronically invoice the City for applicable charges (including any offsetting credits) described in Section 2.4.4 of this Amendment.  The City shall separately electronically invoice PG&E for applicable charges (including any offsetting credits) described in Sections 2.4.6, 2.5, 2.6, 2.7, 2.8, and 2.9 of this Amendment.

3.8    For clarity, and without the intent to limit or exclude the application of any other term of the Grizzly Agreement not specifically mentioned, the Parties agree that any disputes on invoices, financial settlements, reimbursements, or other charges under this Section 3 or other terms of this Amendment shall be resolved pursuant to the provisions of Section 18 – Settlement of Disputes in the Grizzly Agreement.

**Section 4.    Effective Date.**  This Amendment shall be made effective on the latter of: (a) the start or "go live" date of the CAISO MRTU Tariff, or (b) the date that this Amendment is accepted by FERC ("Effective Date").

4.1    This Amendment is expressly conditioned upon acceptance by FERC of all provisions hereof, without material change or condition unacceptable to either Party, and shall not become effective in its entirety unless so accepted, unless otherwise agreed by the Parties. Notwithstanding the foregoing, if FERC orders a hearing to determine whether this Amendment is just and reasonable or otherwise lawful, or otherwise orders a modification of the Amendment which is unacceptable to either Party, the Amendment shall not become effective in its entirety until the date when an order issued by FERC determining this Amendment to be just and reasonable and lawful without material change or condition unacceptable to either Party is no longer subject to judicial review.

4.2    Provided, however, if implementation of the CAISO MRTU Tariff has become effective, but this Amendment has not been accepted and made effective by the FERC, the Parties will use the terms of this Amendment to interpret and implement the CAISO MRTU Tariff under the terms of the Grizzly Agreement and its amendments, to effectuate the intention

of the Parties as expressed in this Amendment, provided such interpretation and implementation is not prohibited by FERC order, other applicable judicial or governmental order, or operation of law, until such time as this Amendment is made effective by the FERC.

4.3     Provided further that if this Amendment has become effective, but CAISO exercises its rights under Section 44 of the CAISO MRTU Tariff, and returns its operations and settlements to the pre-MRTU CAISO Tariff, then the Parties will use the terms of the version of the Grizzly Agreement and Amendments in existence prior to this Amendment during such period that CAISO returns to the previously effective CAISO Tariff to interpret and implement the pre-MRTU CAISO Tariff.

**Section 5.     Counterparts.**  This Amendment may be executed in counterparts, each of which shall be deemed to be an original copy of this Amendment, but all of which, when taken together, shall constitute one and the same agreement.

**Section 6.     Signature Authority.**  Each person signing below warrants that he or she has been duly authorized by the Party for whom he or she signs to execute this Amendment on behalf of that Party.

[Signature Page Follows]

Case: 19-30088   Doc# 11000-1   Filed: 07/30/21   Entered: 07/30/21 16:24:14   Exhibit
154 of 157

IN WITNESS WHEREOF, the Parties have executed this Amendment to be effective as set forth in Section 4 above.

PACIFIC GAS AND ELECTRIC COMPANY,
a California corporation
By: /s/
Name:   JESS BROWN
Title:    Director, Service and Sales

APPROVED AS TO FORM      THE CITY OF SANTA CLARA, a chartered
California municipal corporation

By: /s/                                    By: /s/
HELENE LEICHTER                  Name: JENNIFER SPARACINO
City Attorney                            Title: City Manager

ATTEST:
/s/
ROD DIRIDON
City Clerk

Case: 19-30088    Doc# 11000-1    Filed: 07/30/21    Entered: 07/30/21 16:24:14    Exhibit
155 of 157

# APPENDIX A

## EXAMPLE 1

| INTERVAL | Pre real time change MW | Final MW | MW Diff | NP15 Price | Sub-Total | AVG NP15 price | MWh Involved | TOTAL | |
|---|---|---|---|---|---|---|---|---|---|
| | 10 | 17.6 | -7.6 | 52.87801 | 103.9556 | 51.9778 | -1.26667 | -65.8385 | PGE owes SVP |
| 1 | 10 | 17.6 | -7.6 | 51.07759 | | | | | |
| | 10 | 17.6 | -7.6 | 43.07591 | 87.85842 | 43.92921 | -1.26667 | -55.6437 | PGE owes SVP |
| 2 | 10 | 17.6 | -7.6 | 44.78251 | | | | | |
| | 10 | 17.6 | -7.6 | 54.40826 | 107.1381 | 53.56903 | -1.26667 | -67.8541 | PGE owes SVP |
| 3 | 10 | 17.6 | -7.6 | 52.7298 | | | | | |
| | 10 | 8 | 2 | 50.22966 | 93.59022 | 46.79511 | 0.333333 | 15.59837 | SVP owes PGE |
| 4 | 10 | 8 | 2 | 43.36056 | | | | | |
| | 10 | 8 | 2 | 43.64245 | 86.69443 | 43.34722 | 0.333333 | 14.44907 | SVP owes PGE |
| 5 | 10 | 8 | 2 | 43.05198 | | | | | |
| | 10 | 8 | 2 | 42.16799 | 84.33598 | 42.16799 | 0.333333 | 14.056 | SVP owes PGE |
| 6 | 10 | 8 | 2 | 42.16799 | | | | | |

-$145.23   PGE PAYS

| INTERVAL | Pre real time change MW | Final MW | MW Diff | NP15 Price | Sub-Total | AVG NP15 price | MWh Involved | TOTAL | |
|---|---|---|---|---|---|---|---|---|---|
| | 10 | 10 | 0 | 52.87801 | 103.9556 | 51.9778 | 0 | 0 | |
| 1 | 10 | 10 | 0 | 51.07759 | | | | | |
| | 10 | 10 | 0 | 43.07591 | 87.85842 | 43.92921 | 0 | 0 | |
| 2 | 10 | 10 | 0 | 44.78251 | | | | | |
| | 10 | 17.6 | -7.6 | 54.40826 | 107.1381 | 53.56903 | -1.26667 | -67.8541 | PGE owes SVP |
| 3 | 10 | 17.6 | -7.6 | 52.7298 | | | | | |
| | 10 | 10 | 0 | 50.22966 | 93.59022 | 46.79511 | 0 | 0 | |
| 4 | 10 | 10 | 0 | 43.36056 | | | | | |
| | 10 | 10 | 0 | 43.64245 | 86.69443 | 43.34722 | 0 | 0 | |
| 5 | 10 | 10 | 0 | 43.05198 | | | | | |
| | 10 | 8 | 2 | 42.16799 | 84.33598 | 42.16799 | 0.333333 | 14.056 | SVP owes PGE |
| 6 | 10 | 8 | 2 | 42.16799 | | | | | |

-$53.80   PGE PAYS

Case: 19-30088    Doc# 11000-1    Filed: 07/30/21    Entered: 07/30/21 16:24:14    Exhibit
156 of 157

## EXAMPLE 2

| INTERVAL | Pre real time change MW | Final MW | MW Diff | NP15 Price | Sub-Total | AVG NP15 price | MWh Involved | TOTAL | |
|---|---|---|---|---|---|---|---|---|---|
| | 15 | 17.6 | -2.6 | 52.87801 | 103.9556 | 51.9778 | -0.43333 | -22.5237 | PGE owes SVP |
| 1 | 15 | 17.6 | -2.6 | 51.07759 | | | | | |
| | 15 | 17.6 | -2.6 | 43.07591 | 87.85842 | 43.92921 | -0.43333 | -19.036 | PGE owes SVP |
| 2 | 15 | 17.6 | -2.6 | 44.78251 | | | | | |
| | 15 | 17.6 | -2.6 | 54.40826 | 107.1381 | 53.56903 | -0.43333 | -23.2132 | PGE owes SVP |
| 3 | 15 | 17.6 | -2.6 | 52.7298 | | | | | |
| | 15 | 8 | 7 | 50.22966 | 93.59022 | 46.79511 | 1.166667 | 54.5943 | SVP owes PGE |
| 4 | 15 | 8 | 7 | 43.36056 | | | | | |
| | 15 | 8 | 7 | 43.64245 | 86.69443 | 43.34722 | 1.166667 | 50.57175 | SVP owes PGE |
| 5 | 15 | 8 | 7 | 43.05198 | | | | | |
| | 15 | 8 | 7 | 42.16799 | 84.33598 | 42.16799 | 1.166667 | 49.19599 | SVP owes PGE |
| 6 | 15 | 8 | 7 | 42.16799 | | | | | |
| | | | | | | | | $89.59 | SVP PAYS |

| INTERVAL | Pre real time change MW | Final MW | MW Diff | NP15 Price | Sub-Total | AVG NP15 price | MWh Involved | TOTAL | |
|---|---|---|---|---|---|---|---|---|---|
| | 15 | 15 | 0 | 52.87801 | 103.9556 | 51.9778 | 0 | 0 | 0 |
| 1 | 15 | 15 | 0 | 51.07759 | | | | | |
| | 15 | 15 | 0 | 43.07591 | 87.85842 | 43.92921 | 0 | 0 | 0 |
| 2 | 15 | 15 | 0 | 44.78251 | | | | | |
| | 15 | 17.6 | -2.6 | 54.40826 | 107.1381 | 53.56903 | -0.43333 | -23.2132 | PGE owes SVP |
| 3 | 15 | 17.6 | -2.6 | 52.7298 | | | | | |
| | 15 | 15 | 0 | 50.22966 | 93.59022 | 46.79511 | 0 | 0 | 0 |
| 4 | 15 | 15 | 0 | 43.36056 | | | | | |
| | 15 | 15 | 0 | 43.64245 | 86.69443 | 43.34722 | 0 | 0 | 0 |
| 5 | 15 | 15 | 0 | 43.05198 | | | | | |
| | 15 | 8 | 7 | 42.16799 | 84.33598 | 42.16799 | 1.166667 | 49.19599 | SVP owes PGE |
| 6 | 15 | 8 | 7 | 42.16799 | | | | | |
| | | | | | | | | $25.98 | SVP PAYS |

Case: 19-30088    Doc# 11000-1    Filed: 07/30/21    Entered: 07/30/21 16:24:14    Page
157 of 157
Page 156 of 156