# EXHIBIT 9



**Pacific Gas and
Electric Company** ™

Keith T. Sampson

*Mailing Address*
P.O. Box 7442
San Francisco, CA 94120

*Street/Courier Address*
Law Department
77 Beale Street
San Francisco, CA 94105

(415) 973-5443
Fax: (415) 973-5520
E-mail: KTS1@pge.com

January 8, 2020

Ms. Kimberly D. Bose, Secretary
Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, DC 20426

**Re:    Amendment to the Grizzly Development and Mokelumne Settlement Agreement
between Pacific Gas and Electric Company and City of Santa Clara,
PG&E Rate Schedule FERC No. 248
Filing Code: 10 (Modification Other Than Rate Increase)**

Dear Ms. Bose:

In accordance with Section 205(d) of the Federal Power Act, 16 U.S.C. § 824d(d), and Section
35.13(a)(2)(iii) of the Federal Energy Regulatory Commission's ("Commission" or "FERC")
regulations, 18 C.F.R. § 35.13(a)(2)(iii), Pacific Gas and Electric Company ("PG&E"), submits
for filing and acceptance, revisions to the existing Grizzly Development and Mokelumne
Settlement Agreement ("Grizzly Agreement") between PG&E and the City of Santa Clara,
California, a chartered California municipal corporation doing business as Silicon Valley Power
("Santa Clara" or "SVP") (collectively, "Parties"), PG&E Rate Schedule FERC No. 248.

**BACKGROUND**

PG&E and Santa Clara originally entered into the Grizzly Agreement on March 8, 1990 to settle
Santa Clara's claims for compensation related to the Mokelumne River Project. Among other
things, the Grizzly Agreement provided for Santa Clara's right to own and operate the Grizzly
Powerhouse, located in Plumas County, California, and set forth the terms and conditions for
power scheduling between the parties. The Grizzly Agreement had been an attachment to the
now-expired 2002 Interconnection Agreement ("2002 IA") between PG&E and SVP[1] and the
Parties agreed that the Grizzly Agreement remain in effect upon the termination of the 2002 IA
as a stand-alone rate schedule. On June 1, 2017, in Docket No. ER17-1752-000, PG&E filed the
Grizzly Agreement as PG&E Rate Schedule FERC No. 248.

In a July 28, 2017 Deficiency Letter, the Commission requested that PG&E explain how
incorporating references to an expired agreement constitutes a full and complete rate schedule, or
alternatively, why the references to the 1983 IA need not be specified in the Grizzly Agreement.

---

[1] Service Agreement No. 20 under PG&E FERC Electric Tariff Volume No. 5.

Kimberly D. Bose, Secretary
January 8, 2020
Page 2

The Commission further stated that, if necessary, PG&E must amend the Grizzly Agreement accordingly to incorporate the necessary provisions or otherwise append the 1983 IA to the Grizzly Agreement.

On August 28, 2017, PG&E filed a response to the deficiency letter and further amended the Grizzly Agreement (Amended Grizzly Agreement) to address the Commission's concerns. On October 26, 2017, the Commission ruled the Amended Grizzly Agreement constitutes a full and complete stand-alone rate schedule and made it effective August 1, 2017.

The present filing submits for the Commission's acceptance revisions to PG&E Rate Schedule FERC No. 248 to incorporate the changes agreed to by the Parties in the attached Amendment No. 7 to the Grizzly Agreement ("Amendment No. 7 or Amendment").

## DESCRIPTION OF FILING

Amendment No. 7 is the result of negotiations between the Parties to resolve a dispute ongoing since 2015. The dispute involves Section 12.2 and related sections regarding the sharing of costs to renew the Bucks Creek License[2]. PG&E and Santa Clara are revising the Grizzly Agreement in order to incorporate the Relicensing Cost Dispute Settlement by adding language as provided in the Amendment to Section 12.2.2. The five new paragraphs proposed to be added to Section 12.2.2 include provisions that clarify the Parties' roles and responsibilities with respect to the Bucks Creek License renewal including relicensing and monitoring of work performed, and relicensing and monitoring costs incurred, both prior to and after the effective date of the Amendment.

The Amendment also adds two new Definitions to the Grizzly Agreement necessitated by the new language added to Section 12.2.2. These terms have been added to the end of Section 1.1 as new Sections 1.1.72 and 1.1.73 of the Grizzly Agreement.

## PROPOSED EFFECTIVE DATE

PG&E requests that the Commission accept the proposed revisions to the Grizzly Agreement and grant an effective date of March 9, 2020.

## REQUEST FOR WAIVERS

PG&E respectfully requests that the Commission grant any waivers of the Commission's regulations that may be necessary for acceptance of this filing under the Federal Power Act.

## ABBREVIATED FILING REQUIREMENTS APPLY

Because there are no rate increases under the proposed revisions to the Grizzly Agreement filed herein, the abbreviated filing requirements of Section 35.13(a)(2)(iii) are applicable. PG&E is

---

[2] The FERC docket number for the renewal of the Bucks Creek License is P-619-164.

Kimberly D. Bose, Secretary
January 8, 2020
Page 3

submitting only the information required in paragraphs (b) and (c) of Section 35.13 of the
Commission's regulations.

## CONCURRENCE

By execution of Amendment No. 7 to the Grizzly Agreement, Santa Clara has demonstrated its
concurrence with the proposed revisions in this filing.

## NO EXPENSES ALLEGED ILLEGAL

No expenses or costs associated with this filing have been alleged or judged, in any judicial or
administrative proceeding, to be illegal, duplicative, or unnecessary costs that are demonstrably
the product of discriminatory employment practices.

## SERVICE

Copies of this filing have been served upon Santa Clara and the California Public Utilities
Commission. In addition, copies of this filing are available for public inspection in a convenient
form and place during normal business hours at PG&E's General Office, located at 77 Beale
Street in San Francisco, California.

## ENCLOSURES

1. For reference only, Amendment No. 7 to the Grizzly Agreement

2. Certificate of Service;

3. eTariff Electronic Filing Package containing all required Tariff Record and Content Data,
   metadata, and the following Filing Attachments in PDF for posting to eLibrary:

   a. Clean and redlined versions of the modifications to the Grizzly Agreement; and

   b. Supporting documents required pursuant to Section 35.13(a)(2)(iii) of the
      Commission's rules and regulations.

## CORRESPONDENCE

PG&E requests that all correspondence, pleadings, and other communications concerning this
filing be served upon the following:

> Keith T. Sampson
> Attorney
> Pacific Gas and Electric Company
> Law Department
> Post Office Box 7452
> San Francisco, California 94120
> Keith.Sampson@pge.com

Kimberly D. Bose, Secretary
January 8, 2020
Page 4

> Joanne M. Myers, Manager
> FERC Electric Proceedings Department
> Pacific Gas and Electric Company
> 77 Beale Street, Room 2393, B23A
> San Francisco, California 94105
> Joanne.Myers@pge.com
>
> and
>
> Pacific Gas and Electric Company
> Regulatory File Room
> 77 Beale Street, Room 3120, B30A
> San Francisco, CA 94105
> LawFERCCases@pge.com

## CONCLUSION

For the foregoing reasons, PG&E respectfully requests that the Commission accept this filing and grant the effective date as described above.

Respectfully submitted,

*/s/ Keith T. Sampson*

Keith T. Sampson

Attorney for
PACIFIC GAS AND ELECTRIC COMPANY
P.O. Box 7442
San Francisco, California 94120-7442
Telephone: (415) 973-5443

Attachments and Enclosures

## AMENDMENT TO GRIZZLY DEVELOPMENT AND MOKELUMNE SETTLEMENT AGREEMENT

### Amendment Number Seven
### to the Grizzly Development and Mokelumne Settlement Agreement
### by and between Pacific Gas and Electric Company and City of Santa Clara

This AMENDMENT NUMBER SEVEN TO THE GRIZZLY DEVELOPMENT AND MOKELUMNE SETTLEMENT AGREEMENT ("Amendment") is entered into effective as of the Effective Date between Pacific Gas and Electric Company, a California corporation ("PG&E") and the City of Santa Clara, California, a chartered California municipal corporation doing business as Silicon Valley Power ("Santa Clara"). PG&E and Santa Clara may be referred to individually as "Party" or collectively as "Parties."

### RECITALS

A.     PG&E and Santa Clara are parties to the Grizzly Development and Mokelumne Settlement Agreement, dated March 8, 1990 (as amended, the "Grizzly Agreement"), which, among other things, governs the relationship of the Parties as co-licensees for the Bucks Creek License.

B.     The Parties have been in discussions to resolve a dispute, generally surrounding Grizzly Agreement Section 12.2 and related sections regarding the sharing of costs related to renewing the Bucks Creek License since 2015.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained in this Amendment and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree to amend the Grizzly Agreement as follows:

### AGREEMENT

**Section 1.     Definitions.** In addition to terms specifically defined in the Grizzly Agreement, the following terms, when used in this Amendment with the initial letters capitalized, whether in the singular, plural or possessive, shall have the meanings indicated below.

PACIFIC GAS AND ELECTRIC COMPANY
Rate Schedule FERC No. 248

1.1     CEQA:  The California  Environmental  Quality  Act

1.2     NEPA:  The National Environmental  Policy  Act

**Section 2.     Relicensing Cost Dispute Settlement.**

2.1     **Period of Applicability.**  This Amendment applies  to relicensing  work and
monitoring  work performed,  and relicensing  costs and monitoring  costs incurred,  both prior to and
after the effective  date of this Amendment.

2.2     **Revisions to Section 12.2.2 of the Grizzly Agreement**.  The final sentence of
Section 12.2.2 of the Grizzly  Agreement  shall  be eliminated  and in its place the following  five
paragraphs  will  be inserted:

> PG&E has lead responsibility  for the effort to renew the Bucks Creek License
> ("relicensing").  PG&E is responsible  for assuring  the performance  of all work
> necessary  for relicensing  ("relicensing  work") and all costs incurred  for relicensing
> ("relicensing  costs" or "costs of relicensing")  unless  it authorizes  others,  including
> Santa Clara,  to perform  such relicensing  work and incur such costs of relicensing.   In
> its relicensing  effort, PG&E shall  consult  with  Santa Clara,  and Santa Clara shall
> support  PG&E's  relicensing  effort.  All costs of relicensing  incurred  by PG&E and by
> others authorized  by PG&E (in aggregate  the "total  relicensing  cost") are subject  to the
> cost sharing  provisions  of Section 12.2.3.  Future cost responsibility  associated  with
> fulfillment  of license  conditions  of the new license,  such as Protection,  Mitigation,  and
> Enhancement  ("PM&E")  measures  and Management  Plans,  are not subject  to the cost
> sharing  provisions  of Section  12.2.3,  but instead  shall  be determined  in accordance
> with  Sections  1.1.33,  1.1.34,  2.4.1,  and 2.5.2.

> In addition  to any relicensing  work and relicensing  costs authorized  by PG&E, Santa
> Clara may, at its own initiative,  perform  work and incur costs to monitor  the
> relicensing  work ("monitoring  work" and "monitoring  costs",  respectively).   Such
> monitoring  costs incurred  by Santa Clara are not costs of relicensing  nor subject  to the
> cost sharing  provisions  of Section  12.2.3,  but are eligible  to be treated  by Santa Clara,

PACIFIC GAS AND ELECTRIC COMPANY
Rate Schedule FERC No. 248

at its sole discretion, as capital additions to the Costs of Plant, provided they are for staff costs, including overhead, consultant costs, legal costs, and other costs incurred for monitoring work, notwithstanding Sections 2.7.2 or 12.2.2 or any other provision of this Agreement to the contrary. All relicensing costs or costs of relicensing allocated to Santa Clara pursuant to Section 12.2.3 are also eligible to be treated by Santa Clara, at its sole discretion, as capital additions to the Costs of Plant, notwithstanding Sections 2.7.2 or 12.2.2 or any other provision of this Agreement to the contrary. All costs incurred by Santa Clara or allocated to Santa Clara by PG&E associated with fulfillment of license conditions of the new license, such as PM&E measures and Management Plans, that are related to the construction of new, or upgrades to existing, facilities are also eligible to be treated by Santa Clara, at its sole discretion, as capital additions to the Costs of Plant, notwithstanding Sections 2.7.2 or 12.2.2 or any other provision of this Agreement to the contrary.

Notwithstanding the second sentence of Section 2.7.2, each Party shall bear its own legal costs associated with its relicensing efforts except for legal costs incurred as relicensing work, which costs shall be allocated as provided in Section 12.2.3. Disputes regarding whether legal costs have been incurred as relicensing work shall be referred to the Grizzly Management Committee (Section 1.1.35 as established in accordance with Section 18.2) for resolution.

Santa Clara is serving as the CEQA lead agency to ensure compliance with CEQA for the relicensing effort ("CEQA work"). All CEQA work performed by Santa Clara, including staff, consultant and legal work, both prior to and after the effective date of this Amendment, shall be treated as relicensing work, the costs of which are subject to the cost sharing provisions of Section 12.2.3. Further, Santa Clara's allocated portion of the cost of relicensing related to CEQA compliance is eligible to be treated by Santa Clara, at its sole discretion, as capital additions to the Costs of Plant, notwithstanding Sections 2.7.2 or 12.2.2 or any other provision of this Agreement to the contrary. As encouraged by both CEQA and NEPA regulations and guidelines, Santa Clara will utilize FERC's NEPA document and process to the maximum extent practicable with

the goal of minimizing CEQA costs while still meeting the CEQA regulatory requirements.

Each Party shall keep and maintain accounting records of relicensing work and relicensing costs in accordance with the provisions of the Section 3.5. Forecasts of future relicensing work shall be provided in accordance with Section 5.8.3.

**Section 3.** **Effective Date.** This Amendment shall be made effective on the date that this Amendment is accepted by FERC ("Effective Date").

**Section 4.** **Counterparts.** This Amendment may be executed in counterparts, each of which shall be deemed to be an original copy of this Amendment, but all of which, when taken together, shall constitute one and the same agreement.

**Section 5.** **Signature Authority.** Each person signing below warrants that he or she has been duly authorized by the Party for whom he or she signs to execute this Amendment on behalf of that Party.

[Signature Page Follows]

PACIFIC GAS AND ELECTRIC COMPANY
Rate Schedule FERC No. 248

IN WITNESS WHEREOF, the Parties have executed this Amendment to be effective as
set forth in Section 3 above.

**PACTFIC GAS AND ELECTRIC COMPANY,**
a California corporation

By: _____

Name:  DEBBIE POWELL
Title:   Vice President, Power Generation

**THE CITY OF SANTA CLARA,**
a chartered California municipal corporation

By: _____

Name: DEANNA SANTANA
Title:   City Manager

APPROVED AS TO FORM:        By: _____

Name: BRIAN DOYLE
Title:   City Attorney

## CERTIFICATE OF SERVICE

I have caused the foregoing document to be served upon the following, pursuant to Rule 2010 of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.2010:

| NAME | ORGANIZATION/ADDRESS | E-MAIL ADDRESS |
| --- | --- | --- |
| Christine J. Hammond Assistant General Counsel | California Public Utilities Commission 505 Van Ness Avenue San Francisco, CA 94102 | Christine.hammond@cpuc.ca.gov |
| Manuel Pineda Chief Electric Utility Officer | City of Santa Clara 1500 Warburton Avenue Santa Clara, CA 95050 | MPineda@SantaClaraCA.gov |
| Lisa S. Gast, Attorney | Duncan, Weinberg, Genzer and Pembroke, P.C. 1667 K Street NW | Suite 700 | Washington, DC 20006 Duncan, Weinberg, Genzer and Pembroke, P.C. | LSG@dwgp.com |
| Brian Doyle City Attorney | City of Santa Clara 1500 Warburton Avenue Santa Clara, CA 95050 | BDoyle@SantaClaraCA.gov |

Dated at San Francisco, California, this 8th day of January, 2020.

          /s/ Joanne M. Myers

Joanne M. Myers
Pacific Gas and Electric Company
77 Beale Street, Room 2393, B23A
San Francisco, CA 94105
(415) 973–3397
Joanne.Myers@pge.com

## 1     GENERAL AGREEMENT

### 1.1     Definitions

Whenever used in this Agreement, these terms shall have the following meanings as applicable. The singular of a term shall include the plural and the plural shall include the singular.

1.1.1    Additional License Related Costs: Costs of Construction resulting from Grizzly license requirements that were not included as Cost items in the IPCT up to a maximum of two million six hundred and seven thousand dollars ($2,607,000). This maximum will be adjusted for delays pursuant to Section 11. Pursuant to Amendment No. One to this Agreement, six hundred and seven thousand dollars ($607,000) of Costs of Construction, incurred prior to June 11, 1991, and which do not otherwise meet the definition of Additional License Related Costs, shall be treated as all other Additional License Related Costs. Additional License Related Costs, including this additional $607,000 shall remain capped at two million six hundred and seven thousand dollars ($2,607,000).

1.1.2    Administrative and General Costs: Those indirect and overhead costs, except PG&E financing costs, that would be charged to Grizzly using PG&E's standard accounting procedures as if Grizzly were owned by PG&E.

1.1.3    Agreement: This Development and Settlement Agreement.

1.1.4    ALL: The amount of energy allocated in megawatt-hours available to Santa Clara for scheduling each Calendar Month pursuant to Section 8.3.3.

1.1.5    APC: Actual Project Costs consisting of the sum of the Costs of Construction corresponding to the activities, accounts and anticipated license requirements that were used in preparing the IPCT. APC does not include Additional License Related Costs or Delay Costs pursuant to Section 11.1 c).

PACIFIC GAS AND ELECTRIC COMPANY
Rate Schedule FERC No. 248

1.1.6   Bucks Creek: That hydroelectric development constructed under the Bucks Creek License, specifically excluding facilities constructed under the Grizzly Amendment.

1.1.7   Bucks Creek License: A hydroelectric license as amended and issued by FERC for Project No. 619.

1.1.8   Calendar Month: A period commencing at 0000 hours on the first day of any of the twelve (12) months recognized on the Gregorian calendar and ending at 2400 hours on the last day of that same month.

1.1.9   Calendar Year: A period commencing at 0000 hours on the first day of January and ending at 2400 hours on the last day of December, as such months are recognized on the Gregorian calendar.

1.1.10  [This Section Left Intentionally Blank]

1.1.11  [This Section Left Intentionally Blank]

1.1.12  CO: The carry over of energy, as either a surplus or deficit, to be included in the ALL for Santa Clara's use in a subsequent Calendar Month pursuant to Sections 8.3.3 and 8.4.

1.1.13  Commercial Operation Date: With respect to Grizzly, the Commercial Operation Date shall be 0000 hours on the day following the completion of the process set forth in Section 4.12.1. It is understood that the Commercial Operation Date, as defined herein, may not coincide with the commercial operation date or completion date as defined by FERC.

1.1.14  Completion of Construction Date: The date on which all Costs of Construction have been incurred and accounted for pursuant to this Agreement, as set forth in Section 4.12.3.

1.1.15  Construction Activities: All Grizzly related development activities through the Completion of Construction Date required in order to construct and complete Grizzly as provided in Sections 3 and 4 and to comply with license and other agency requirements related to development of Grizzly, including, but not limited to, obtaining the Grizzly Amendment and permits, acquisition of land rights, design, procurement, engineering, construction, construction

management, material and equipment acquisition, equipment installation, testing and acceptance by the Development Manager of all components, start-up, and claims resolution.

1.1.16 Construction Contract Date: The date on which PG&E enters into the principal construction contract to be awarded for Grizzly.

1.1.17 Coordinating Committee: The Coordinating Committee as established in accordance with Section 3.7.

1.1.18 Costs: During the Ownership Period, all capital expenditures, expenses of labor and personnel, services, materials and supplies and transportation, expenses of operation and maintenance, Administrative and General Costs, and Santa Clara's administrative and general costs charged to Grizzly using Santa Clara's standard accounting procedures. Costs shall include taxes or payments in lieu of taxes, if any, incurred by, charged to, or assessed against PG&E or Santa Clara and related to Grizzly. Such taxes shall not include income taxes if imposed on PG&E by reason of receipt of payments for services or advances by Santa Clara.

1.1.19 Costs of Construction: All reasonable and necessary Costs incurred by PG&E in order to construct and complete Grizzly as provided in Sections 3 and 4 and to comply with FERC requirements related to development of Grizzly under the Grizzly Amendment. Such costs shall include, but not be limited to, those incurred for planning, design, engineering, procurement, equipment testing and acceptance, licensing, acquisition of land other than federal land including any eminent domain expenses, materials, construction, construction management, contract preparation and administration, installation, start-up, environmental control, real property or possessory interest taxes and sales, use, excise or other taxes, duties and governmental assessments ascribable to Grizzly if paid by PG&E except as otherwise expressly provided in Section 14.4, third party claims resolution (including all costs relating to claims or dispute resolution, except for claims or disputes with respect to which Santa Clara indemnifies PG&E pursuant to this Agreement), costs incurred in administering or enforcing contractor and vendor warranties with respect to claims and other warranty matters arising prior to the Commercial Operation Date, and other necessary costs for safety, security and completion of Grizzly (including reasonable or necessary Costs incurred pursuant to Section 2.7.3 or other

provisions of this Agreement related to obtaining all licenses, approvals or permits from regulatory agencies required for construction, initial operation, and ownership of Grizzly, except for those license application costs excluded in Sections 2.7.1 and 2.7.2) which are incurred prior to the Completion of Construction Date and accounted for in accordance with the FERC Uniform System of Accounts. Such costs also shall include the Costs of both goods provided and services rendered by PG&E hereunder, any costs directly incurred by Santa Clara at PG&E's request in connection with Grizzly, except as otherwise expressly provided, the cost of all insurance premiums incurred by or on behalf of PG&E pursuant to Sections 15.1 and 15.2, together with any deductibles (to the extent not already constituting Costs of Construction) incurred or paid by either Santa Clara or PG&E with respect to claims arising under such insurance (except for deductibles arising with respect to the coverages provided pursuant to Section 15.1.3 and deductibles excluded from Costs of Construction pursuant to Section 14.2.1), and costs or liabilities incurred in connection with Construction Activities prior to the Substantial Completion Date by PG&E pursuant to Sections 14.1.1 and 14.2.1, to the extent such costs or liabilities are not covered by proceeds of the insurance provided pursuant to Sections 15.1 and 15.2. Such costs shall also include the cost of purchasing and installing a new PG&E distribution line on the Grizzly transmission line poles as provided for by Section 2.6.7, removal of the present distribution line and poles, the span of transmission line between the Grizzly transmission line end structure and disconnect switch and PG&E's Caribou-Sycamore Creek transmission line, and any other facilities included in the definition of Grizzly and situated outside the Bucks Creek project boundary. For the purposes of this Agreement, such Costs of Construction shall not include any Costs incurred prior to January 1, 1989, costs incurred by PG&E or Santa Clara associated with developing this Agreement, costs of administering contractor or vendor warranties with respect to claims and other warranty matters arising after the Commercial Operation Date, or late payment interest charges pursuant to Section 4.14 and 4.15.2.

    1.1.20 Costs of Operation: All reasonable and necessary Costs directly incurred in operating and maintaining Grizzly after the Commercial Operation Date, including, but not limited to, Costs incurred in mobilizing and demobilizing, operating, maintaining, repairing, supervising, staffing, administering, and testing, real property or possessory interest taxes and sales, use, excise or other taxes, except as excluded in Section 14.4.2, duties and governmental

PACIFIC GAS AND ELECTRIC COMPANY
Rate Schedule FERC No. 248

assessments ascribable to Grizzly if paid by PG&E, protecting and preserving Grizzly, and meeting legal, regulatory, permit and license requirements with respect to Grizzly, and Costs incurred in administering or enforcing contractor and vendor warranties with respect to claims and other warranty matters arising after the Commercial Operation Date, but excluding any such Costs otherwise included as Costs of Construction or Costs of Plant, and excluding any regulatory fees as described in Section 5.8.2. Costs of Operation shall include any costs incurred by PG&E to obtain and maintain the insurance described in Section 15.3, to the extent such insurance is not obtained and maintained directly by Santa Clara, and shall include a mutually agreed upon mark-up with respect to PG&E's payroll costs of personnel performing work at the Grizzly Site to cover PG&E's workers compensation liability, whether or not PG&E purchases workers compensation insurance.

1.1.21   Costs of Plant: All reasonable and necessary Costs, which are not included in Costs of Construction or in Costs of Operation with respect to Grizzly which are directly or indirectly related to major improvements, additions, betterments, or replacements. Costs of Plant shall include any costs incurred on or after the Commercial Operation Date by Santa Clara pursuant to Sections 14.2.2 and 16.1.1 for repair of damage to Grizzly, to the extent such costs are not covered by proceeds of the insurance provided pursuant to Section 15.3.

1.1.22   CPUC: The California Public Utilities Commission or its regulatory successor.

1.1.23   DCP: Depreciated Costs of Plant on the Reverter Date is the Cost of Plant after each element of the Costs of Plant is depreciated on a straight line, element-specific basis. The estimated useful life of each element will be determined by PG&E in accordance with its standard FERC accounting practice.

1.1.24   ECPA: The Electric Consumer Protection Act of 1986, Public Law 99-495 (October 16, 1986).

1.1.25   Effective Date: The date on which this Agreement is made and entered into as set forth in the Preamble.

PACIFIC GAS AND ELECTRIC COMPANY
Rate Schedule FERC No. 248

1.1.26  EPCLD: The Escalated Project Cost Less Depreciation consisting of the sum of
SCAPC plus Net Interest During Construction, plus Santa Clara's bond-related issuance costs,
plus Additional License Related Costs plus Delay Costs pursuant to section 11.1 c); said sum to
be escalated by the change in the index described below and depreciated as further described
below. The escalating index to be used is a weighted average of the latest available Engineering
News Record Construction Cost Index (herein "ENR Index") and the latest available Bureau of
Reclamation Composite Index for Water and Power Construction Costs (herein "BR Index").
The average shall be weighted seventy-five percent (75%) on the ENR Index and twenty-five
(25%) percent on the BR Index. This weighted average escalation index will be the ratio of the
latest available published indices existing as of the Reverter Date to the indices existing as of the
Commercial Operation Date. The escalated result shall then be depreciated on a fifty-year (50-
year), straight-line basis commencing on the Commercial Operation Date. If either or both of the
referenced indices become unavailable or are so changed as to interfere with the use intended of
them by the Parties, an equivalent index agreeable to the Parties will be used. EPCLD shall be
determined as of the Reverter Date if its use becomes applicable under Section 12.4.

1.1.27  EPT: Excess Power Take is GCE scheduled by Santa Clara in excess of the
amounts authorized by this Agreement.

1.1.28  FERC: The Federal Energy Regulatory Commission or its regulatory successor.

1.1.29  FERC Approval: Unless otherwise agreed to by the Parties, FERC Approval
means final FERC approval of this Agreement and the Joint License, without change or
condition unacceptable to either Party; provided, that if upon filing FERC enters into a hearing to
determine whether this Agreement is just and reasonable or otherwise lawful, such approval shall
not be deemed to have occurred until the date when an order no longer subject to judicial review
has been issued by FERC determining that this Agreement is just and reasonable. Each Party
hereby reserves its right of appeal in the event of an unacceptable change to this Agreement by
FERC.

1.1.30  FPCT: The Final Project Cost Target is the IPCT as adjusted, pursuant to Section
4.16, for any net increase in the actual award prices obtained by PG&E in Construction Activity

contracts with third parties over the estimates of construction and Construction Activity costs used to prepare the IPCT, plus an additional contingency amount of two million dollars ($2,000,000), as such FPCT may be further adjusted pursuant to Section 11.1 and for up to $300,000 for design review not included in the IPCT, if performed under contract to PG&E. In no event, however, shall the FPCT be less than the IPCT. The dollar amount of the contingency contained in the FPCT shall be the same amount as contained in the IPCT.

1.1.31 GCE: Grizzly Combined Energy is the sum of Grizzly Generation (GEN), Grizzly Supplemental Power (GSP), Excess Power Take (EPT) and Maintenance Power scheduled by Santa Clara pursuant to Section 8.

1.1.32 GEN: Grizzly Generation is the amount of energy generated by Grizzly in a Calendar Month, in megawatt-hours measured at the high-voltage side of the Grizzly station transformers and then reduced for transmission losses as specified in Section 7.2.2, and plus or minus the CO from the previous Calendar Month.

1.1.33 Grizzly: A new hydroelectric development located in Plumas County, California, to be constructed and installed to generate electric power using water being released from Lower Bucks Lake, presently licensed to PG&E. Grizzly will enhance the hydropower features of the Buck's Creek License, and shall include the following features with approximate physical characteristics indicated:

a)       A tunnel intake structure of reinforced concrete and consisting of an entrance transition section about 51 feet long, 30 feet wide (maximum) and 34 feet high (maximum); a tower section about 17 by 16 feet in plan and 70 feet high; a gate house about 21 by 20 feet in plan and 21 feet high; and a tunnel approximately 12,174 feet long, unlined with a cross-section shape of a 12 foot circle (machine excavated);

b)       a surge tank with reinforced concrete lining, 20-foot inside diameter and about 199 feet high;

c)       a steel penstock about 4,578 feet long with a diameter varying from 8.0 feet to 4.0 feet;

PACIFIC GAS AND ELECTRIC COMPANY
Rate Schedule FERC No. 248

d)     a powerhouse consisting of a reinforced concrete structure of about 53 by 63 feet in plan, designed for unattended operation with supervisory control from PG&E's Rock Creek Powerhouse;

e)     a single 26,400 HP vertical Francis turbine direct-coupled to a 22,000 KVA (0.9 power factor) generator;

f)     a transmission line, nominally rated at 115 kV, of about 3.4 miles length and consisting of wood poles supporting 4/0 ACSR conductors, extending from the Grizzly powerhouse to and including the end structure and disconnect switch near Bucks Creek Powerhouse (FERC Project No. 619), and all other facilities necessary for interconnection with PG&E's transmission system but not including the final span between the end structure and the Caribou-Sycamore Creek transmission line (FERC Project No. 2105) and PG&E-owned distribution lines installed on the same wood poles as the Grizzly transmission line;

g)     additional equipment in the switchyard consisting of a generator step-up transformer and a 115 kV power circuit breaker, structures and related equipment, necessary to connect with the PG&E transmission system;

h)     telecommunication and telemetry facilities to the point of interconnection with pre-existing facilities;

i)     recreation facilities as required by the Grizzly Amendment;

j)     use of the Grizzly Site;

k)     use of the water and use of the water rights in connection herewith;

l)     the Joint License necessary to allow the operation of this Agreement; and

m)     all renewals, replacements, repairs, additions, betterments, improvements, modifications and retirements thereto made pursuant to this Agreement.

PACIFIC GAS AND ELECTRIC COMPANY
Rate Schedule FERC No. 248

1.1.34  Grizzly  Amendment: The amendment to the Bucks Creek License granting permission and license for the construction and operation of Grizzly, as issued by FERC and as it may be modified on or after appeal.

1.1.35  Grizzly  Management Committee: The Grizzly Committee as established in accordance with Section 18.2.

1.1.36  Grizzly Site: All land and land rights necessary for the construction and operation of Grizzly.

1.1.37  GSP: Grizzly Supplemental Power purchased by Santa Clara during the Ownership Period pursuant to Section 8.

1.1.38  Interconnection Agreement: The agreement between PG&E and Santa Clara, dated September 30, 1983, known as the Interconnection Agreement, and any other successor agreement, arrangement, or tariff, providing for interconnection between the PG&E system and the Santa Clara system and provision of services associated with such interconnection.

The first successor was the 2002 Interconnection Agreement ("2002 IA") between PG&E and the City of Santa Clara, Silicon Valley Power, Service Agreement No. 20 ("SA No. 20") under FERC Electric Tariff Volume No. 5. The 2002 IA was in effect from September 1, 2002 until July 31, 2017.

The second successor is the Interconnection Agreement, filed at FERC on June 1, 2017 in Docket No. ER17-1750-000, designated as Service Agreement No. 343 under PG&E FERC Electric Tariff Volume No. 5 ("2017 IA") as accepted by FERC effective August 1, 2017. As of August 1, 2017, further references to Interconnection Agreement will refer to Service Agreement No. 343, or its successor agreement, arrangement, or tariff, providing for interconnection between the PG&E system and the Santa Clara system and provision of services associated with such interconnection.

1.1.39  Interest: Those property interests and estates in Grizzly as specified in Section 2.6.

PACIFIC GAS AND ELECTRIC COMPANY
Rate Schedule FERC No. 248

1.1.40 IPCT: Initial Project Cost Target is $57,360,000, or such amount as adjusted pursuant to Section 11. A summary of the cost estimates used in preparing the IPCT, prior to adjustment pursuant to Section 11, is included in Appendix C. IPCT does not include any Additional License Related Costs, Net Interest During Construction, any Santa Clara bond reserve costs, any Santa Clara costs associated with issuance of bonds, or Santa Clara's cost for auditing and inspecting PG&E's construction or administration of Grizzly or other like costs.

1.1.41 Joint License: The joint PG&E and Santa Clara amendment to the Bucks Creek License envisioned by Section 2.7.

1.1.42 Maintenance Power: Power in amounts required to replace the power output of Grizzly during scheduled maintenance outages and forced outages, as provided and under the terms of this Agreement.

1.1.43 Minimum Monthly Allocation: The allocation of ALL set forth in Section 8.7.

1.1.44 Mokelumne River Project: PG&E's FERC Project No. 137 and Santa Clara's FERC Project No. 2745.

1.1.45 Net Interest During Construction: As defined by Generally Accepted Accounting Principles and the Financial Accounting Standards Board's Statement of Financial Standards No. 62.

1.1.46 OCLD: The Original Cost Less Depreciation consisting of the sum of (1) SCAPC plus Santa Clara's Net Interest During Construction plus Santa Clara's bond related issuance costs, plus Additional License Related Costs plus Delay Costs pursuant to 11.1 c); (2) such sum then being depreciated on a fifty-year (50-year) straight-line basis commencing on the Commercial Operation Date and terminating on the Reverter Date; (3) but in no case shall the Net Interest During Construction be less than zero. OCLD shall be determined as of the Reverter Date if its use becomes applicable under Section 12.4.

1.1.47 Ownership Period: The period of time of Santa Clara's ownership of Grizzly, beginning on the Settlement Date and ending upon one of the following events, whichever is the first to occur: (1) the occurrence of the Reverter Date, (2) development of Grizzly is terminated

as provided in Section 13, or (3) abandonment of the project by Santa Clara or condemnation as provided in Section 16.

1.1.48  Partial Requirements Power: The capacity and energy sold under the partial requirements rate schedule, excluding any transmission components, as shown in Rate Schedule A of Appendix B to this Agreement, Section B.5, Part II.1.

1.1.49  Party or Parties: PG&E and/or Santa Clara.

1.1.50  PG&E: The Pacific Gas and Electric Company, its successors or assigns.

1.1.51  Points of Delivery: Those Points of interconnection on the PG&E electrical grid at which PG&E transmits electrical power for the account of Santa Clara pursuant to, and subject to any limitations within, the Interconnection Agreement.

1.1.52  Possibility of Reverter: PG&E's future interest reversionary right to Grizzly and the Interest therein, as more fully described in Sections 2.6 and 12.

1.1.53  Power Sale: The sale of capacity and energy by PG&E to Santa Clara, pursuant to Section 10.1.

1.1.54  Preventive Maintenance Program: PG&E's preventive maintenance program which it uses for its hydroelectric powerhouses comparable in size and type to Grizzly, as defined in PG&E Hydro Bulletin No. 1, as such may be amended from time to time.

1.1.54a  PRP Energy Rate: The Partial Requirements Power Energy rate under Rate Schedule A of Appendix B to this Agreement, Section B.5 Part II.1, or its successor, or if there is no successor, a just and reasonable rate.

1.1.55  Prudent Utility Construction Practice: Any of the practices, methods, and acts at a particular time which, in the exercise of reasonable judgment in the light of the facts, including but not limited to the practices, methods, and acts engaged in or approved generally by the electric utility industry prior thereto, with special reference to that segment of the industry operating within the State of California known at the time the decision was made, would have

PACIFIC GAS AND ELECTRIC COMPANY
Rate Schedule FERC No. 248

been expected to accomplish the desired result at the lowest reasonable cost consistent with reliability, safety, and expedition. To apply the standard of Prudent Utility Construction Practice to any matter under this Agreement, equitable consideration should be given to the circumstances, requirements and obligations of each of the Parties, and there shall be taken into account the fact that the Parties have prescribed statutory powers, duties and responsibilities. It is recognized that Prudent Utility Construction Practice is not intended to be limited to the optimum practice, method or act to the exclusion of all others, but rather is a spectrum of possible practices, methods or acts which could have been expected to accomplish the desired result at the lowest reasonable cost consistent with reliability, safety and expedition.

1.1.56  Prudent Utility Practice: Those practices, methods, and equipment, including levels of reserves and provisions for contingencies, as modified from time to time, that are at least as good as those commonly used in the Service Area to operate, reliably and safely, electric power facilities to serve a utility's own customers dependably and economically, with due regard for the conservation of natural resources and the protection of the environment of the Service Area; provided, that such practices, methods and equipment are not unreasonably restrictive.

1.1.57  Public Works: Construction or improvements, excluding maintenance, repair, equipment purchase and consulting services, to public buildings or facilities owned by Santa Clara.

1.1.58  Receiving Station: Those Points of Delivery where Santa Clara receives power for resale to its retail customers.

1.1.59  Reverter Date: The date on which Santa Clara's Interest in Grizzly terminates and the Interest in Grizzly reverts to PG&E as described in Section 12.3.

1.1.60  Sale Power: Capacity and energy sold by PG&E to Santa Clara in accordance with the Power Sale provided by Section 10.

1.1.61  Santa Clara: The City of Santa Clara, its successors or assigns.

1.1.62  SCADA: A system for providing remote Supervisory Control and Data Acquisition.

PACIFIC GAS AND ELECTRIC COMPANY
Rate Schedule FERC No. 248

1.1.63  SCAPC: Santa Clara's Actual Project Cost shall consist of the sum of the Costs of Construction paid by Santa Clara corresponding to the activities and accounts that were used in preparing the IPCT, plus any underrun sharing paid by Santa Clara pursuant to Section 4.17.2 of this Agreement. SCAPC does not include Additional License Related Costs, Santa Clara's Net Interest During Construction, bond reserve or issuance-related costs, Delay Costs pursuant to Section 11.1 c), or costs incurred by Santa Clara, or at its request, to audit or inspect PG&E's administration of Grizzly construction, or any overrun costs paid by PG&E.

1.1.64  Service Area: That area within the exterior geographic boundaries of the several areas electrically served at retail, now or in the future, by PG&E, and those areas in northern and central California adjacent thereto.

1.1.65  Settlement Date: The date on which FERC Approval occurs or another date to which the Parties have agreed in a settlement option executed pursuant to Section 1.6, whichever is first to occur.

1.1.66  Spinning Reserves: Available unloaded capacity resources that are operating, online, synchronized to PG&E's system under SCADA and able instantaneously to take load on demand.

1.1.67  Substantial Completion Date: The date on which all physical construction of Grizzly is complete or deemed to be complete and accepted by Santa Clara as set forth in Section 4.12.2.

1.1.68  Target Commercial Operation Date: The Target Commercial Operation Date is January 1, 1994, subject to adjustment as provided in Section 11.1.

1.1.69  Test Energy: The net energy output of Grizzly prior to the Commercial Operation Date.

1.1.70  Uniform System of Accounts: FERC's Uniform System of Accounts prescribed for Class A and B Public Utilities and Licensees in effect as of the date of this Agreement, as such Uniform System of Accounts may be modified from time to time.

1.1.71 Year: Three hundred sixty-five (365) days or three hundred sixty-six (366) days if a February 29th is encountered in the course of a Year.

1.1.72 CEQA: The California Environmental Quality Act

1.1.73 NEPA: The National Environmental Policy Act

## 1.2    Representations Of The Parties

The following are representations made by the Parties:

1.2.1    PG&E Exists: PG&E warrants that it is a corporation organized under the laws of the State of California and that it is validly in existence as such at the Effective Date.

1.2.2    Santa Clara Exists: Santa Clara warrants that it is a charter city, a political subdivision of the State of California, and that it is validly in existence as such at the Effective Date.

1.2.3    Authority: Each Party warrants and represents that this Agreement has been duly authorized, executed and delivered by such Party and constitutes the legal, valid and binding obligation of such Party, enforceable against such Party in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, or similar laws effecting the enforcement of creditor's rights and subject to equitable principles.

1.2.4    Parties Shall Act: Each Party warrants that it shall promptly and with all due diligence, acting jointly or individually as appropriate, take all necessary actions and endeavor to obtain all approvals, licenses, orders, and permits necessary to carry out its obligations under this Agreement. Each Party recognizes that the rights and obligations of the Parties hereunder are subject to the applicable regulations and orders of those governmental agencies and courts having jurisdiction. In the acquisition, construction, completion, ownership and operation of Grizzly pursuant to this Agreement, the Parties shall follow Prudent Utility Construction Practice and Prudent Utility Practice and comply with all applicable federal, state, and local statutes,

PACIFIC GAS AND ELECTRIC COMPANY
Rate Schedule FERC No. 248

ordinances, and rules and regulations. Both Parties shall carry out their obligations under this Agreement in accordance with Prudent Utility Construction Practice and Prudent Utility Practice, FERC licensing requirements, and any applicable federal or state laws and regulations, and, as applicable, in accordance with the principal architectural and engineering criteria and environmental commitments made to FERC and those commitments incorporated as license conditions.

### 1.3     Conditions to PG&E'S and Santa Clara's Obligations

Prior to the Settlement Date, either Party, at its sole discretion, upon written notice to the other Party, may elect to terminate this Agreement without further obligation. In the event of such termination, the Parties shall be restored to their original positions as they existed prior to entering into this settlement and nothing in this Agreement shall prejudice the rights of either Party in pursuing the remedies under ECPA. This Agreement and the negotiations leading to it shall not be offered by either Party in further ECPA or any other proceeding, other than for enforcement of this Agreement.

### 1.4     Non-Refundable Cash Payment

Within thirty (30) calendar days after the Settlement Date, PG&E shall pay to Santa Clara the sum of one million dollars ($1,000,000) by certified check. This cash payment shall not be subject to refund under any circumstances.

### 1.5     ECPA Settlement

1.5.1    Santa Clara hereby agrees and stipulates that this Agreement satisfies all of its claims for compensation related to the Mokelumne River Project pursuant to Section 10 of ECPA.

1.5.2    The Parties hereby agree and stipulate that this Agreement and the exchange of considerations incorporated in it on the whole represent a mutually satisfactory compensation arrangement consistent with the Federal Power Act and that the compensation provided Santa Clara thereby does not exceed that provided by Section 10(e) of ECPA.

1.5.3    Effective on the Settlement Date, Santa Clara shall waive and release, and does hereby so waive and release as of that day, any and all claims, whether known or unknown, that may exist as of that day as to any compensation which may be owed to Santa Clara by PG&E, with regard to Section 10 of ECPA and Santa Clara's efforts to acquire a license for the Mokelumne River Project. Santa Clara also agrees not to institute any legal or regulatory proceedings with respect to or otherwise pursue any claim that would be waived and released pursuant to this Section 1.5, subsequent to the Settlement Date. Santa Clara expressly agrees that the release and waiver of claims contained in this Section 1.5 extends to and includes all unknown claims relating to the license for the Mokelumne River Project.

In so agreeing, Santa Clara hereby waives any and all rights or benefits which it may have under the terms of Section 1542 of the California Civil Code, which provides as follows:

"A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor."

### 1.6    Settlement Option

Because of the importance of expeditious construction of Grizzly to the balance of considerations agreed to by the Parties, at any time prior to FERC Approval, or if FERC approves or otherwise allows this Agreement to become effective with a change or changes or under terms or conditions unacceptable to either Party, the Parties may elect to enter into a settlement option in order to allow the development of Grizzly to proceed and to preserve the settlement and the balance of benefits represented by this Agreement.

## 12    OCCURRENCE OF REVERTER

### 12.1    Possibility of Reverter

PG&E shall retain a Possibility of Reverter in Grizzly and all Interest therein, which shall occur and become effective on the occurrence of the Reverter Date as set forth in this Agreement. Full and complete title to all Interest in and to Grizzly shall be held by Santa Clara, as sole owner of such Interest, until the Reverter Date occurs. The Parties agree and stipulate that

the Possibility of Reverter is and shall be vested as of the date of conveyance of Grizzly and the Interest therein by PG&E to Santa Clara.

### 12.2    Bucks Creek Relicensing

12.2.1  For and in consideration given and received by reason of this settlement, Santa Clara is agreeing to support the relicensing by PG&E of the Bucks Creek Project, whenever it occurs, by entering into the Bucks Creek Relicensing Agreement, a copy of which is attached hereto as Appendix E.

12.2.2  The Parties recognize that it may be necessary to apply for renewal of the Bucks Creek License prior to the Reverter Date. In such event, the Parties shall jointly file an application with FERC to renew the Bucks Creek License. The Parties agree to prosecute renewing the Bucks Creek License as specified in Section 2.7.2. The Parties further recognize that, prior to relicensing, FERC may issue annual license renewals following license expiration. Costs of prosecuting renewal of the Bucks Creek License shall not be included in the Costs of Operation or Costs of Plant.

PG&E has lead responsibility for the effort to renew the Bucks Creek License ("relicensing"). PG&E is responsible for assuring the performance of all work necessary for relicensing ("relicensing work") and all costs incurred for relicensing ("relicensing costs" or "costs of relicensing") unless it authorizes others, including Santa Clara, to perform such relicensing work and incur such costs of relicensing. In its relicensing effort, PG&E shall consult with Santa Clara, and Santa Clara shall support PG&E's relicensing effort. All costs of relicensing incurred by PG&E and by others authorized by PG&E (in aggregate the "total relicensing cost") are subject to the cost sharing provisions of Section 12.2.3. Future cost responsibility associated with fulfillment of license conditions of the new license, such as Protection, Mitigation, and Enhancement ("PM&E") measures and Management Plans, are not subject to the cost sharing provisions of Section 12.2.3, but instead shall be determined in accordance with Sections 1.1.33, 1.1.34, 2.4.1, and 2.5.2.

In addition to any relicensing work and relicensing costs authorized by PG&E, Santa Clara may, at its own initiative, perform work and incur costs to monitor the relicensing work

PACIFIC GAS AND ELECTRIC COMPANY
Rate Schedule FERC No. 248

("monitoring work" and "monitoring costs", respectively). Such monitoring costs incurred by Santa Clara are not costs of relicensing nor subject to the cost sharing provisions of Section 12.2.3, but are eligible to be treated by Santa Clara, at its sole discretion, as capital additions to the Costs of Plant, provided they are for staff costs, including overhead, consultant costs, legal costs, and other costs incurred for monitoring work, notwithstanding Sections 2.7.2 or 12.2.2 or any other provision of this Agreement to the contrary. All relicensing costs or costs of relicensing allocated to Santa Clara pursuant to Section 12.2.3 are also eligible to be treated by Santa Clara, at its sole discretion, as capital additions to the Costs of Plant, notwithstanding Sections 2.7.2 or 12.2.2 or any other provision of this Agreement to the contrary. All costs incurred by Santa Clara or allocated to Santa Clara by PG&E associated with fulfillment of license conditions of the new license, such as PM&E measures and Management Plans, that are related to the construction of new, or upgrades to existing, facilities are also eligible to be treated by Santa Clara, at its sole discretion, as capital additions to the Costs of Plant, notwithstanding Sections 2.7.2 or 12.2.2 or any other provision of this Agreement to the contrary.

Notwithstanding the second sentence of Section 2.7.2, each Party shall bear its own legal costs associated with its relicensing efforts except for legal costs incurred as relicensing work, which costs shall be allocated as provided in Section 12.2.3. Disputes regarding whether legal costs have been incurred as relicensing work shall be referred to the Grizzly Management Committee (Section 1.1.35 as established in accordance with Section 18.2) for resolution.

Santa Clara is serving as the CEQA lead agency to ensure compliance with CEQA for the relicensing effort ("CEQA work"). All CEQA work performed by Santa Clara, including staff, consultant and legal work, both prior to and after the effective date of this Amendment, shall be treated as relicensing work, the costs of which are subject to the cost sharing provisions of Section 12.2.3. Further, Santa Clara's allocated portion of the cost of relicensing related to CEQA compliance is eligible to be treated by Santa Clara, at its sole discretion, as capital additions to the Costs of Plant, notwithstanding Sections 2.7.2 or 12.2.2 or any other provision of this Agreement to the contrary. As encouraged by both CEQA and NEPA regulations and guidelines, Santa Clara will utilize FERC's NEPA document and process to the maximum extent

practicable with the goal of minimizing CEQA costs while still meeting the CEQA regulatory requirements.

Each Party shall keep and maintain accounting records of relicensing work and relicensing costs in accordance with the provisions of the Section 3.5. Forecasts of future relicensing work shall be provided in accordance with Section 5.8.3.

12.2.3 If the Ownership Period extends beyond the expiration of the Joint License, Santa Clara will share in the cost of renewing the Bucks Creek License, and the cost of any FERC fees for annual license extensions which may be granted following the expiration of the Joint License. Santa Clara's share of such costs shall be determined as follows:

(a)     Santa Clara's share of the relicensing cost shall be equal to the total relicensing cost multiplied by the ratio of the nameplate megawatt capacity of Grizzly to the total nameplate megawatt capacity of all facilities on the Bucks Creek License, and multiplied by the ratio of the number of years Santa Clara will be a joint licensee in the new license period to the term, in years, of the new license. The Parties recognize that the start of the new license term may not coincide with the end of the current license term, depending on then current FERC regulations.

(b)     Santa Clara's annual share of license extension fees shall be equal to the total annual license extension fee multiplied by the ratio of the nameplate megawatt capacity of Grizzly to the total nameplate megawatt capacity of all facilities on the Bucks Creek License.

### 12.3    Reversion Dates

12.3.1 There shall be six (6) possible dates or events upon which the Reverter Date may occur, and on such occurrence Santa Clara's Interest in Grizzly shall terminate and all Interest in Grizzly shall revert to PG&E. The Reverter Date shall occur as of 0000 hours on the first of the following dates to occur; provided, that PG&E has given Santa Clara any notice thereof as may be required pursuant to Sections 12.5, 13 or 16.1.2: (1) at any time after PG&E's conveyance of Grizzly and the Interest therein, upon the election of either Party to terminate development of Grizzly as provided in Section 13; (2) the fifteenth 15th) anniversary of the Commercial Operation Date ("first-possible- Reverter Date"); (3) the twentieth (20th) anniversary of the

PACIFIC GAS AND ELECTRIC COMPANY
Rate Schedule FERC No. 248

Commercial Operation Date ("second possible Reverter Date"); (4) the twenty-fifth (25th) anniversary of the Commercial Operation Date ("third possible Reverter Date"); (5) on or after January 1, 2034 or the third possible Reverter Date, whichever comes later ("fourth possible Reverter Date"); or (6) upon the election provided PG&E under Section 16.1.2. The date of the possible occurrence of the first, second, third, or fourth possible Reverter Dates shall be adjusted in the event of the circumstances provided for in Sections 11.1 c), 12.3.2 and 12.3.3 and 12.6. PG&E agrees not to exercise the first-possible-Reverter Date.

12.3.2 In the event that the SCAPC is one hundred two percent (102%) or more of the IPCT, the dates of the first possible Reverter Date, second possible Reverter Date, and third possible Reverter Date will be delayed one (1) Year for each full two (2) percent that the IPCT is exceeded by the SCAPC.

12.3.3 a) Upon final acceptance of the new Grizzly Amendment and Joint License, including determination of any appeal of terms and conditions affecting energy production, PG&E shall perform a water and power study using the same computer model and input assumptions (the program and the input data sets are stored under the filename "G.Final.Data" on PG&E's mainframe computer system) used to determine the estimated 62.7 gWh weighted average annual energy upon which the Parties relied for this Agreement, with such input assumptions adjusted to reflect changes in license conditions as contained in the Grizzly Amendment and the Joint License that were not modeled in the original computer run, in order to evaluate the impact of those changed conditions on Santa Clara's anticipated benefits from owning and operating Grizzly. The impact will be calculated as the change in weighted average annual gWh between the two (2) runs divided by 125.4 gWh and multiplied by one hundred (100) to express the result as a percentage. PG&E shall preserve said file and model in an appropriate form so that the evaluation study may be made in the future on the same basis as the original study which the Parties relied upon for this Agreement.

b) In the event that the impact as calculated in Section 12.3.3 a) shows an adverse change exceeding two percent (2%), the first possible Reverter Date, second possible Reverter Date, and third possible Reverter Date will be delayed one (1) Year for each full two percent (2%) of adverse impact. This adjustment shall occur one time only.

12.3.4  The deferral provisions  set forth in Sections 11.1 c), 12.3.2, 12.3.3, and 12.3.5 shall be cumulative.

12.3.5

a)  Upon final determination  of the FPCT, the minimum  cost-based delay in the first, second, and third possible  Reverter Dates will  be one (1) year for each two (2) percent that the FPCT exceeds the IPCT. The difference between the FPCT and the IPCT will  be rounded up or down to the closest two percent (2%) increment  of the IPCT.

b)  After the completion  of the Grizzly  development, if it is determined that the SCAPC is greater than the FPCT, the first, second and third possible  Reverter Dates may be subject to further delays, using  the delay calculation method pursuant to Section 12.3.2 of the Settlement Agreement. The actual delay shall  be the greater of the minimum  delay pursuant to the above paragraph or the delay calculated  pursuant to Section 12.3.2 of the Settlement Agreement (using the full two percent (2%) method comparing  the SCAPC to the IPCT).

c)  The Parties shall,  within one (1) year of the Completion  of Construction  Date, calculate and agree upon the total amount of delay and the possible  Reverter Dates.

d)  PG&E may, at its election,  include in the transfer documents a limit  on the time within  which the fourth possible  Reverter Date, as so revised, can be exercised. Such language shall not change the earliest date on which the fourth possible  Reverter date will  occur or cause the fourth possible  Reverter Date to occur before the third possible  Reverter Date.

### 12.4    Determination Of Reverter Reimbursement

It is the intent of the Parties that Santa Clara be made whole and reimbursed by PG&E for the fair market value of Grizzly  upon the occurrence of the Reverter Date and the reverter or reversion of Grizzly  to PG&E, except under the catastrophic  damage circumstances  described in Sections 12.8 and 16.1. Accordingly,  the Parties agree and stipulate that the amount of such reimbursement  shall be determined as follows,  and that such amount is no less than fair market value and is just and reasonable:

PACIFIC GAS AND ELECTRIC COMPANY
Rate Schedule FERC No. 248

a)      If the Reverter Date occurs on the first possible Reverter Date, the amount of reimbursement shall be EPCLD (for reimbursement of original capital construction costs, after depreciation) + DCP (for reimbursement of capital costs incurred subsequent to original construction, after depreciation).

b)      If the Reverter Date occurs on the second possible Reverter Date, the amount of reimbursement shall be (EPCLD + OCLD)/2 + DCP.

c)      If the Reverter Date occurs on the third possible Reverter Date, the amount of reimbursement shall be OCLD (for reimbursement of original capital construction costs, after depreciation) + DCP.

d)      If the Reverter Date occurs on the fourth possible Reverter Date, the amount of reimbursement shall be the OCLD + DCP.

e)      If the Reverter Date occurs as a result of termination of development of Grizzly as provided in Section 13, no additional reimbursement will be in order since PG&E is to refund to Santa Clara moneys advanced by Santa Clara.

f)      If the Reverter Date occurs as provided in Section 16.1.2, no reimbursement will be in order, it being agreed by the Parties that any loss borne by Santa Clara under such circumstances is an incident of the risks of ownership.

### 12.5   Notice

PG&E may at its option cause the Reverter Date to occur on the first possible Reverter Date, the second possible Reverter Date, the third possible Reverter Date, or the fourth possible Reverter Date by giving Santa Clara advance written notice thereof not less than three (3) Years prior to the intended Reverter Date. In the event that Grizzly is condemned or is not in a condition as would be normally expected for a facility of its age and operating experience, at PG&E's election its notice shall be deemed cancelled and the Reverter Date shall not occur. The occurrence of the Reverter Date under the circumstances of Sections 13 or 16.1.2 shall be governed by any applicable notice provisions in those Sections. Any notice by PG&E that will

PACIFIC GAS AND ELECTRIC COMPANY
Rate Schedule FERC No. 248

result in the occurrence of the Reverter Date shall be given in writing by certified mail, or by hand delivery, to the City Clerk of Santa Clara.

### 12.6   Payment of Reimbursement

In the event the Reverter date is to occur on either the first, second, third or fourth possible Reverter Dates, pursuant to notice given by PG&E, Santa Clara shall determine and advise PG&E, at least thirty (30) days in advance of the expected Reverter Date, of the amount of reimbursement determined as provided in Section 12.4. On or before the Reverter Date, PG&E shall pay the amount of reimbursement as so determined by Santa Clara, or such lesser amount as the Parties may agree upon to adjust for any outstanding liens, encumbrances, restrictions or clouds on title on Grizzly or to place Grizzly in a condition as would normally be expected for a facility of its age and operating experience (herein "Adjustment"). If the Parties disagree on the amount of reimbursement to be made, or whether an Adjustment is to be made to it or the amount of such Adjustment, PG&E shall reimburse Santa Clara the undisputed amount of reimbursement less any Adjustment PG&E believes proper and shall deposit any disputed amount into a mutually satisfactory escrow. In the event Santa Clara has been unable or has failed to advise PG&E of the amount of reimbursement, PG&E shall pay Santa Clara the amount of reimbursement it determines or estimates is appropriate after any Adjustment; and the Parties thereafter shall endeavor promptly to agree on the amount of reimbursement, including any Adjustment, and promptly make any appropriate additional payment or refund, including interest. The Reverter Date shall occur only as of the first day following the day on which PG&E has both (1) paid Santa Clara the undisputed amount of reimbursement less any Adjustment and (2) deposited any disputed amounts thereof in escrow. If an escrow is established, if possible it shall be interest bearing and PG&E shall be entitled to manage the account. Upon resolution of the dispute, the escrowed funds, including interest, shall be distributed in accordance and in proportion with the resolution, and any appropriate refund or additional payment shall be made promptly. The Parties shall adjust the distribution from escrow and any refunds or additional payments to provide for interest at the rate provided in Section 10.5.4, allowing credit for any interest earned by the escrow account.

PACIFIC GAS AND ELECTRIC COMPANY
Rate Schedule FERC No. 248

### 12.7    Clear Title

During its Ownership Period, or until and unless PG&E's Possibility of Reverter is surrendered in accordance with Section 16.1.2, whichever first occurs, unless otherwise mutually agreed by the Parties, Santa Clara shall not permit any liens, encumbrances, restrictions, or other clouds of title to be placed on Grizzly except as lawfully imposed by FERC or other regulatory or other governmental agency having jurisdiction in the premises. Santa Clara shall oppose the imposition of any such liens, encumbrances, restrictions, or other clouds of title and remove promptly any that are imposed, and PG&E will cooperate with Santa Clara's efforts to do so.

### 12.8    Catastrophic Events

As specified in Section 16.1, Santa Clara is not obligated to rebuild the facility in the event of a catastrophic event which results in damage to or destruction of any or all of the Grizzly facilities to such an extent that restoration of Grizzly is not economic in Santa Clara's sole judgment and FERC concurs on Grizzly's abandonment. If Santa Clara decides not to rebuild Grizzly, PG&E will have the ability to cause the Reverter Date to occur at no cost to PG&E and without payment to Santa Clara of any amount for reimbursement, and to rebuild Grizzly as a PG&E-owned facility. In the event PG&E rebuilds the facility, Santa Clara will pay PG&E the amount that Santa Clara would otherwise have expended for site restoration. Neither Santa Clara nor PG&E will be required to reimburse the other for the lost opportunity to continue to run or to transfer Interest in Grizzly in the event of catastrophic damage and a decision not to rebuild as described in Section 16.1.

### 12.9    Warranty Transfer on Reversion

Santa Clara shall assign all Grizzly warranties to PG&E on or promptly after occurrence of the Reverter Date and thereafter shall have no responsibility to PG&E as to the matters and facilities so warranted.

PACIFIC GAS AND ELECTRIC COMPANY
Rate Schedule FERC No. 248

## 1    GENERAL AGREEMENT

### 1.1    Definitions

Whenever used in this Agreement, these terms shall have the following meanings as applicable. The singular of a term shall include the plural and the plural shall include the singular.

1.1.1    Additional License Related Costs: Costs of Construction resulting from Grizzly license requirements that were not included as Cost items in the IPCT up to a maximum of two million six hundred and seven thousand dollars ($2,607,000). This maximum will be adjusted for delays pursuant to Section 11. Pursuant to Amendment No. One to this Agreement, six hundred and seven thousand dollars ($607,000) of Costs of Construction, incurred prior to June 11, 1991, and which do not otherwise meet the definition of Additional License Related Costs, shall be treated as all other Additional License Related Costs.  Additional License Related Costs, including this additional $607,000 shall remain capped at two million six hundred and seven thousand dollars ($2,607,000).

1.1.2    Administrative and General Costs: Those indirect and overhead costs, except PG&E financing costs, that would be charged to Grizzly using PG&E's standard accounting procedures as if Grizzly were owned by PG&E.

1.1.3    Agreement: This Development and Settlement Agreement.

1.1.4    ALL: The amount of energy allocated in megawatt-hours available to Santa Clara for scheduling each Calendar Month pursuant to Section 8.3.3.

1.1.5    APC: Actual Project Costs consisting of the sum of the Costs of Construction corresponding to the activities, accounts and anticipated license requirements that were used in preparing the IPCT. APC does not include Additional License Related Costs or Delay Costs pursuant to Section 11.1 c).

1.1.6    Bucks Creek: That hydroelectric development constructed under the Bucks Creek License, specifically excluding facilities constructed under the Grizzly Amendment.

1.1.7    Bucks Creek License: A hydroelectric license as amended and issued by FERC for Project No. 619.

1.1.8    Calendar Month: A period commencing at 0000 hours on the first day of any of the twelve (12) months recognized on the Gregorian calendar and ending at 2400 hours on the last day of that same month.

1.1.9    Calendar Year: A period commencing at 0000 hours on the first day of January and ending at 2400 hours on the last day of December, as such months are recognized on the Gregorian calendar.

1.1.10  [This Section Left Intentionally Blank]

1.1.11  [This Section Left Intentionally Blank]

1.1.12  CO: The carry over of energy, as either a surplus or deficit, to be included in the ALL for Santa Clara's use in a subsequent Calendar Month pursuant to Sections 8.3.3 and 8.4.

1.1.13  Commercial Operation Date: With respect to Grizzly, the Commercial Operation Date shall be 0000 hours on the day following the completion of the process set forth in Section 4.12.1. It is understood that the Commercial Operation Date, as defined herein, may not coincide with the commercial operation date or completion date as defined by FERC.

1.1.14  Completion of Construction Date: The date on which all Costs of Construction have been incurred and accounted for pursuant to this Agreement, as set forth in Section 4.12.3.

1.1.15  Construction Activities: All Grizzly related development activities through the Completion of Construction Date required in order to construct and complete Grizzly as provided in Sections 3 and 4 and to comply with license and other agency requirements related to development of Grizzly, including, but not limited to, obtaining the Grizzly Amendment and permits, acquisition of land rights, design, procurement, engineering, construction, construction

management, material and equipment acquisition, equipment installation, testing and acceptance by the Development Manager of all components, start-up, and claims resolution.

1.1.16  Construction Contract Date: The date on which PG&E enters into the principal construction contract to be awarded for Grizzly.

1.1.17  Coordinating Committee: The Coordinating Committee as established in accordance with Section 3.7.

1.1.18  Costs: During the Ownership Period, all capital expenditures, expenses of labor and personnel, services, materials and supplies and transportation, expenses of operation and maintenance, Administrative and General Costs, and Santa Clara's administrative and general costs charged to Grizzly using Santa Clara's standard accounting procedures. Costs shall include taxes or payments in lieu of taxes, if any, incurred by, charged to, or assessed against PG&E or Santa Clara and related to Grizzly. Such taxes shall not include income taxes if imposed on PG&E by reason of receipt of payments for services or advances by Santa Clara.

1.1.19  Costs of Construction: All reasonable and necessary Costs incurred by PG&E in order to construct and complete Grizzly as provided in Sections 3 and 4 and to comply with FERC requirements related to development of Grizzly under the Grizzly Amendment. Such costs shall include, but not be limited to, those incurred for planning, design, engineering, procurement, equipment testing and acceptance, licensing, acquisition of land other than federal land including any eminent domain expenses, materials, construction, construction management, contract preparation and administration, installation, start-up, environmental control, real property or possessory interest taxes and sales, use, excise or other taxes, duties and governmental assessments ascribable to Grizzly if paid by PG&E except as otherwise expressly provided in Section 14.4, third party claims resolution (including all costs relating to claims or dispute resolution, except for claims or disputes with respect to which Santa Clara indemnifies PG&E pursuant to this Agreement), costs incurred in administering or enforcing contractor and vendor warranties with respect to claims and other warranty matters arising prior to the Commercial Operation Date, and other necessary costs for safety, security and completion of Grizzly (including reasonable or necessary Costs incurred pursuant to Section 2.7.3 or other

provisions of this Agreement related to obtaining all licenses, approvals or permits from regulatory agencies required for construction, initial operation, and ownership of Grizzly, except for those license application costs excluded in Sections 2.7.1 and 2.7.2) which are incurred prior to the Completion of Construction Date and accounted for in accordance with the FERC Uniform System of Accounts. Such costs also shall include the Costs of both goods provided and services rendered by PG&E hereunder, any costs directly incurred by Santa Clara at PG&E's request in connection with Grizzly, except as otherwise expressly provided, the cost of all insurance premiums incurred by or on behalf of PG&E pursuant to Sections 15.1 and 15.2, together with any deductibles (to the extent not already constituting Costs of Construction) incurred or paid by either Santa Clara or PG&E with respect to claims arising under such insurance (except for deductibles arising with respect to the coverages provided pursuant to Section 15.1.3 and deductibles excluded from Costs of Construction pursuant to Section 14.2.1), and costs or liabilities incurred in connection with Construction Activities prior to the Substantial Completion Date by PG&E pursuant to Sections 14.1.1 and 14.2.1, to the extent such costs or liabilities are not covered by proceeds of the insurance provided pursuant to Sections 15.1 and 15.2. Such costs shall also include the cost of purchasing and installing a new PG&E distribution line on the Grizzly transmission line poles as provided for by Section 2.6.7, removal of the present distribution line and poles, the span of transmission line between the Grizzly transmission line end structure and disconnect switch and PG&E's Caribou-Sycamore Creek transmission line, and any other facilities included in the definition of Grizzly and situated outside the Bucks Creek project boundary. For the purposes of this Agreement, such Costs of Construction shall not include any Costs incurred prior to January 1, 1989, costs incurred by PG&E or Santa Clara associated with developing this Agreement, costs of administering contractor or vendor warranties with respect to claims and other warranty matters arising after the Commercial Operation Date, or late payment interest charges pursuant to Section 4.14 and 4.15.2.

1.1.20 Costs of Operation: All reasonable and necessary Costs directly incurred in operating and maintaining Grizzly after the Commercial Operation Date, including, but not limited to, Costs incurred in mobilizing and demobilizing, operating, maintaining, repairing, supervising, staffing, administering, and testing, real property or possessory interest taxes and sales, use, excise or other taxes, except as excluded in Section 14.4.2, duties and governmental

PACIFIC GAS AND ELECTRIC COMPANY
Rate Schedule FERC No. 248

assessments ascribable to Grizzly if paid by PG&E, protecting and preserving Grizzly, and meeting legal, regulatory, permit and license requirements with respect to Grizzly, and Costs incurred in administering or enforcing contractor and vendor warranties with respect to claims and other warranty matters arising after the Commercial Operation Date, but excluding any such Costs otherwise included as Costs of Construction or Costs of Plant, and excluding any regulatory fees as described in Section 5.8.2. Costs of Operation shall include any costs incurred by PG&E to obtain and maintain the insurance described in Section 15.3, to the extent such insurance is not obtained and maintained directly by Santa Clara, and shall include a mutually agreed upon mark-up with respect to PG&E's payroll costs of personnel performing work at the Grizzly Site to cover PG&E's workers compensation liability, whether or not PG&E purchases workers compensation insurance.

1.1.21  Costs of Plant: All reasonable and necessary Costs, which are not included in Costs of Construction or in Costs of Operation with respect to Grizzly which are directly or indirectly related to major improvements, additions, betterments, or replacements. Costs of Plant shall include any costs incurred on or after the Commercial Operation Date by Santa Clara pursuant to Sections 14.2.2 and 16.1.1 for repair of damage to Grizzly, to the extent such costs are not covered by proceeds of the insurance provided pursuant to Section 15.3.

1.1.22  CPUC: The California Public Utilities Commission or its regulatory successor.

1.1.23  DCP: Depreciated Costs of Plant on the Reverter Date is the Cost of Plant after each element of the Costs of Plant is depreciated on a straight line, element-specific basis. The estimated useful life of each element will be determined by PG&E in accordance with its standard FERC accounting practice.

1.1.24  ECPA: The Electric Consumer Protection Act of 1986, Public Law 99-495 (October 16, 1986).

1.1.25  Effective Date: The date on which this Agreement is made and entered into as set forth in the Preamble.

1.1.26  EPCLD: The Escalated Project Cost Less Depreciation consisting of the sum of SCAPC plus Net Interest During Construction, plus Santa Clara's bond-related issuance costs, plus Additional License Related Costs plus Delay Costs pursuant to section 11.1 c); said sum to be escalated by the change in the index described below and depreciated as further described below. The escalating index to be used is a weighted average of the latest available Engineering News Record Construction Cost Index (herein "ENR Index") and the latest available Bureau of Reclamation Composite Index for Water and Power Construction Costs (herein "BR Index"). The average shall be weighted seventy-five percent (75%) on the ENR Index and twenty-five (25%) percent on the BR Index. This weighted average escalation index will be the ratio of the latest available published indices existing as of the Reverter Date to the indices existing as of the Commercial Operation Date. The escalated result shall then be depreciated on a fifty-year (50-year), straight-line basis commencing on the Commercial Operation Date. If either or both of the referenced indices become unavailable or are so changed as to interfere with the use intended of them by the Parties, an equivalent index agreeable to the Parties will be used. EPCLD shall be determined as of the Reverter Date if its use becomes applicable under Section 12.4.

1.1.27  EPT: Excess Power Take is GCE scheduled by Santa Clara in excess of the amounts authorized by this Agreement.

1.1.28  FERC: The Federal Energy Regulatory Commission or its regulatory successor.

1.1.29  FERC Approval: Unless otherwise agreed to by the Parties, FERC Approval means final FERC approval of this Agreement and the Joint License, without change or condition unacceptable to either Party; provided, that if upon filing FERC enters into a hearing to determine whether this Agreement is just and reasonable or otherwise lawful, such approval shall not be deemed to have occurred until the date when an order no longer subject to judicial review has been issued by FERC determining that this Agreement is just and reasonable. Each Party hereby reserves its right of appeal in the event of an unacceptable change to this Agreement by FERC.

1.1.30  FPCT: The Final Project Cost Target is the IPCT as adjusted, pursuant to Section 4.16, for any net increase in the actual award prices obtained by PG&E in Construction Activity

contracts with third parties over the estimates of construction and Construction Activity costs used to prepare the IPCT, plus an additional contingency amount of two million dollars ($2,000,000), as such FPCT may be further adjusted pursuant to Section 11.1 and for up to $300,000 for design review not included in the IPCT, if performed under contract to PG&E. In no event, however, shall the FPCT be less than the IPCT. The dollar amount of the contingency contained in the FPCT shall be the same amount as contained in the IPCT.

1.1.31  GCE: Grizzly Combined Energy is the sum of Grizzly Generation (GEN), Grizzly Supplemental Power (GSP), Excess Power Take (EPT) and Maintenance Power scheduled by Santa Clara pursuant to Section 8.

1.1.32  GEN: Grizzly Generation is the amount of energy generated by Grizzly in a Calendar Month, in megawatt-hours measured at the high-voltage side of the Grizzly station transformers and then reduced for transmission losses as specified in Section 7.2.2, and plus or minus the CO from the previous Calendar Month.

1.1.33  Grizzly: A new hydroelectric development located in Plumas County, California, to be constructed and installed to generate electric power using water being released from Lower Bucks Lake, presently licensed to PG&E. Grizzly will enhance the hydropower features of the Buck's Creek License, and shall include the following features with approximate physical characteristics indicated:

a)      A tunnel intake structure of reinforced concrete and consisting of an entrance transition section about 51 feet long, 30 feet wide (maximum) and 34 feet high (maximum); a tower section about 17 by 16 feet in plan and 70 feet high; a gate house about 21 by 20 feet in plan and 21 feet high; and a tunnel approximately 12,174 feet long, unlined with a cross-section shape of a 12 foot circle (machine excavated);

b)      a surge tank with reinforced concrete lining, 20-foot inside diameter and about 199 feet high;

c)      a steel penstock about 4,578 feet long with a diameter varying from 8.0 feet to 4.0 feet;

PACIFIC GAS AND ELECTRIC COMPANY
Rate Schedule FERC No. 248

d)     a powerhouse consisting of a reinforced concrete structure of about 53 by 63 feet in plan, designed for unattended operation with supervisory control from PG&E's Rock Creek Powerhouse;

e)     a single 26,400 HP vertical Francis turbine direct-coupled to a 22,000 KVA (0.9 power factor) generator;

f)     a transmission line, nominally rated at 115 kV, of about 3.4 miles length and consisting of wood poles supporting 4/0 ACSR conductors, extending from the Grizzly powerhouse to and including the end structure and disconnect switch near Bucks Creek Powerhouse (FERC Project No. 619), and all other facilities necessary for interconnection with PG&E's transmission system but not including the final span between the end structure and the Caribou-Sycamore Creek transmission line (FERC Project No. 2105) and PG&E-owned distribution lines installed on the same wood poles as the Grizzly transmission line;

g)     additional equipment in the switchyard consisting of a generator step-up transformer and a 115 kV power circuit breaker, structures and related equipment, necessary to connect with the PG&E transmission system;

h)     telecommunication and telemetry facilities to the point of interconnection with pre-existing facilities;

i)     recreation facilities as required by the Grizzly Amendment;

j)     use of the Grizzly Site;

k)     use of the water and use of the water rights in connection herewith;

l)     the Joint License necessary to allow the operation of this Agreement; and

m)     all renewals, replacements, repairs, additions, betterments, improvements, modifications and retirements thereto made pursuant to this Agreement.

PACIFIC GAS AND ELECTRIC COMPANY
Rate Schedule FERC No. 248

1.1.34  Grizzly Amendment: The amendment to the Bucks Creek License granting permission and license for the construction and operation of Grizzly, as issued by FERC and as it may be modified on or after appeal.

1.1.35  Grizzly Management Committee: The Grizzly Committee as established in accordance with Section 18.2.

1.1.36  Grizzly Site: All land and land rights necessary for the construction and operation of Grizzly.

1.1.37  GSP: Grizzly Supplemental Power purchased by Santa Clara during the Ownership Period pursuant to Section 8.

1.1.38  Interconnection Agreement: The agreement between PG&E and Santa Clara, dated September 30, 1983, known as the Interconnection Agreement, and any other successor agreement, arrangement, or tariff, providing for interconnection between the PG&E system and the Santa Clara system and provision of services associated with such interconnection.

The first successor was the 2002 Interconnection Agreement ("2002 IA") between PG&E and the City of Santa Clara, Silicon Valley Power, Service Agreement No. 20 ("SA No. 20") under FERC Electric Tariff Volume No. 5. The 2002 IA was in effect from September 1, 2002 until July 31, 2017.

The second successor is the Interconnection Agreement, filed at FERC on June 1, 2017 in Docket No. ER17-1750-000, designated as Service Agreement No. 343 under PG&E FERC Electric Tariff Volume No. 5 ("2017 IA") as accepted by FERC effective August 1, 2017. As of August 1, 2017, further references to Interconnection Agreement will refer to Service Agreement No. 343, or its successor agreement, arrangement, or tariff, providing for interconnection between the PG&E system and the Santa Clara system and provision of services associated with such interconnection.

1.1.39  Interest: Those property interests and estates in Grizzly as specified in Section 2.6.

1.1.40  IPCT: Initial Project Cost Target is $57,360,000, or such amount as adjusted pursuant to Section 11. A summary of the cost estimates used in preparing the IPCT, prior to adjustment pursuant to Section 11, is included in Appendix C. IPCT does not include any Additional License Related Costs, Net Interest During Construction, any Santa Clara bond reserve costs, any Santa Clara costs associated with issuance of bonds, or Santa Clara's cost for auditing and inspecting PG&E's construction or administration of Grizzly or other like costs.

1.1.41  Joint License: The joint PG&E and Santa Clara amendment to the Bucks Creek License envisioned by Section 2.7.

1.1.42  Maintenance Power: Power in amounts required to replace the power output of Grizzly during scheduled maintenance outages and forced outages, as provided and under the terms of this Agreement.

1.1.43  Minimum Monthly Allocation: The allocation of ALL set forth in Section 8.7.

1.1.44  Mokelumne River Project: PG&E's FERC Project No. 137 and Santa Clara's FERC Project No. 2745.

1.1.45  Net Interest During Construction: As defined by Generally Accepted Accounting Principles and the Financial Accounting Standards Board's Statement of Financial Standards No. 62.

1.1.46  OCLD: The Original Cost Less Depreciation consisting of the sum of (1) SCAPC plus Santa Clara's Net Interest During Construction plus Santa Clara's bond related issuance costs, plus Additional License Related Costs plus Delay Costs pursuant to 11.1 c); (2) such sum then being depreciated on a fifty-year (50-year) straight-line basis commencing on the Commercial Operation Date and terminating on the Reverter Date; (3) but in no case shall the Net Interest During Construction be less than zero. OCLD shall be determined as of the Reverter Date if its use becomes applicable under Section 12.4.

1.1.47  Ownership Period: The period of time of Santa Clara's ownership of Grizzly, beginning on the Settlement Date and ending upon one of the following events, whichever is the first to occur: (1) the occurrence of the Reverter Date, (2) development of Grizzly is terminated

as provided in Section 13, or (3) abandonment of the project by Santa Clara or condemnation as provided in Section 16.

1.1.48  Partial Requirements Power: The capacity and energy sold under the partial requirements rate schedule, excluding any transmission components, as shown in Rate Schedule A of Appendix B to this Agreement, Section B.5, Part II.1.

1.1.49  Party or Parties: PG&E and/or Santa Clara.

1.1.50  PG&E: The Pacific Gas and Electric Company, its successors or assigns.

1.1.51  Points of Delivery: Those Points of interconnection on the PG&E electrical grid at which PG&E transmits electrical power for the account of Santa Clara pursuant to, and subject to any limitations within, the Interconnection Agreement.

1.1.52  Possibility of Reverter: PG&E's future interest reversionary right to Grizzly and the Interest therein, as more fully described in Sections 2.6 and 12.

1.1.53  Power Sale: The sale of capacity and energy by PG&E to Santa Clara, pursuant to Section 10.1.

1.1.54  Preventive Maintenance Program: PG&E's preventive maintenance program which it uses for its hydroelectric powerhouses comparable in size and type to Grizzly, as defined in PG&E Hydro Bulletin No. 1, as such may be amended from time to time.

1.1.54a  PRP Energy Rate: The Partial Requirements Power Energy rate under Rate Schedule A of Appendix B to this Agreement, Section B.5 Part II.1, or its successor, or if there is no successor, a just and reasonable rate.

1.1.55  Prudent Utility Construction Practice: Any of the practices, methods, and acts at a particular time which, in the exercise of reasonable judgment in the light of the facts, including but not limited to the practices, methods, and acts engaged in or approved generally by the electric utility industry prior thereto, with special reference to that segment of the industry operating within the State of California known at the time the decision was made, would have

been expected to accomplish the desired result at the lowest reasonable cost consistent with reliability, safety, and expedition. To apply the standard of Prudent Utility Construction Practice to any matter under this Agreement, equitable consideration should be given to the circumstances, requirements and obligations of each of the Parties, and there shall be taken into account the fact that the Parties have prescribed statutory powers, duties and responsibilities. It is recognized that Prudent Utility Construction Practice is not intended to be limited to the optimum practice, method or act to the exclusion of all others, but rather is a spectrum of possible practices, methods or acts which could have been expected to accomplish the desired result at the lowest reasonable cost consistent with reliability, safety and expedition.

1.1.56  Prudent Utility Practice: Those practices, methods, and equipment, including levels of reserves and provisions for contingencies, as modified from time to time, that are at least as good as those commonly used in the Service Area to operate, reliably and safely, electric power facilities to serve a utility's own customers dependably and economically, with due regard for the conservation of natural resources and the protection of the environment of the Service Area; provided, that such practices, methods and equipment are not unreasonably restrictive.

1.1.57  Public Works: Construction or improvements, excluding maintenance, repair, equipment purchase and consulting services, to public buildings or facilities owned by Santa Clara.

1.1.58  Receiving Station: Those Points of Delivery where Santa Clara receives power for resale to its retail customers.

1.1.59  Reverter Date: The date on which Santa Clara's Interest in Grizzly terminates and the Interest in Grizzly reverts to PG&E as described in Section 12.3.

1.1.60  Sale Power: Capacity and energy sold by PG&E to Santa Clara in accordance with the Power Sale provided by Section 10.

1.1.61  Santa Clara: The City of Santa Clara, its successors or assigns.

1.1.62  SCADA: A system for providing remote Supervisory Control and Data Acquisition.

PACIFIC GAS AND ELECTRIC COMPANY
Rate Schedule FERC No. 248

1.1.63 SCAPC: Santa Clara's Actual Project Cost shall consist of the sum of the Costs of Construction paid by Santa Clara corresponding to the activities and accounts that were used in preparing the IPCT, plus any underrun sharing paid by Santa Clara pursuant to Section 4.17.2 of this Agreement. SCAPC does not include Additional License Related Costs, Santa Clara's Net Interest During Construction, bond reserve or issuance-related costs, Delay Costs pursuant to Section 11.1 c), or costs incurred by Santa Clara, or at its request, to audit or inspect PG&E's administration of Grizzly construction, or any overrun costs paid by PG&E.

1.1.64 Service Area: That area within the exterior geographic boundaries of the several areas electrically served at retail, now or in the future, by PG&E, and those areas in northern and central California adjacent thereto.

1.1.65 Settlement Date: The date on which FERC Approval occurs or another date to which the Parties have agreed in a settlement option executed pursuant to Section 1.6, whichever is first to occur.

1.1.66 Spinning Reserves: Available unloaded capacity resources that are operating, online, synchronized to PG&E's system under SCADA and able instantaneously to take load on demand.

1.1.67 Substantial Completion Date: The date on which all physical construction of Grizzly is complete or deemed to be complete and accepted by Santa Clara as set forth in Section 4.12.2.

1.1.68 Target Commercial Operation Date: The Target Commercial Operation Date is January 1, 1994, subject to adjustment as provided in Section 11.1.

1.1.69 Test Energy: The net energy output of Grizzly prior to the Commercial Operation Date.

1.1.70 Uniform System of Accounts: FERC's Uniform System of Accounts prescribed for Class A and B Public Utilities and Licensees in effect as of the date of this Agreement, as such Uniform System of Accounts may be modified from time to time.

1.1.71 Year: Three hundred sixty-five (365) days or three hundred sixty-six (366) days if a February 29th is encountered in the course of a Year.

1.1.72 CEQA:  The California Environmental Quality Act

1.1.73 NEPA:  The National Environmental Policy Act

### 1.2     Representations Of The Parties

The following are representations made by the Parties:

1.2.1    PG&E Exists: PG&E warrants that it is a corporation organized under the laws of the State of California and that it is validly in existence as such at the Effective Date.

1.2.2    Santa Clara Exists: Santa Clara warrants that it is a charter city, a political subdivision of the State of California, and that it is validly in existence as such at the Effective Date.

1.2.3    Authority: Each Party warrants and represents that this Agreement has been duly authorized, executed and delivered by such Party and constitutes the legal, valid and binding obligation of such Party, enforceable against such Party in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, or similar laws effecting the enforcement of creditor's rights and subject to equitable principles.

1.2.4    Parties Shall Act: Each Party warrants that it shall promptly and with all due diligence, acting jointly or individually as appropriate, take all necessary actions and endeavor to obtain all approvals, licenses, orders, and permits necessary to carry out its obligations under this Agreement. Each Party recognizes that the rights and obligations of the Parties hereunder are subject to the applicable regulations and orders of those governmental agencies and courts having jurisdiction. In the acquisition, construction, completion, ownership and operation of Grizzly pursuant to this Agreement, the Parties shall follow Prudent Utility Construction Practice and Prudent Utility Practice and comply with all applicable federal, state, and local statutes, ordinances, and rules and regulations. Both Parties shall carry out their obligations under this Agreement in accordance with Prudent Utility Construction Practice and Prudent Utility Practice,

PACIFIC GAS AND ELECTRIC COMPANY
Rate Schedule FERC No. 248

FERC licensing requirements, and any applicable federal or state laws and regulations, and, as applicable, in accordance with the principal architectural and engineering criteria and environmental commitments made to FERC and those commitments incorporated as license conditions.

### 1.3    Conditions to PG&E'S and Santa Clara's Obligations

Prior to the Settlement Date, either Party, at its sole discretion, upon written notice to the other Party, may elect to terminate this Agreement without further obligation. In the event of such termination, the Parties shall be restored to their original positions as they existed prior to entering into this settlement and nothing in this Agreement shall prejudice the rights of either Party in pursuing the remedies under ECPA. This Agreement and the negotiations leading to it shall not be offered by either Party in further ECPA or any other proceeding, other than for enforcement of this Agreement.

### 1.4    Non-Refundable Cash Payment

Within thirty (30) calendar days after the Settlement Date, PG&E shall pay to Santa Clara the sum of one million dollars ($1,000,000) by certified check. This cash payment shall not be subject to refund under any circumstances.

### 1.5    ECPA Settlement

1.5.1    Santa Clara hereby agrees and stipulates that this Agreement satisfies all of its claims for compensation related to the Mokelumne River Project pursuant to Section 10 of ECPA.

1.5.2    The Parties hereby agree and stipulate that this Agreement and the exchange of considerations incorporated in it on the whole represent a mutually satisfactory compensation arrangement consistent with the Federal Power Act and that the compensation provided Santa Clara thereby does not exceed that provided by Section 10(e) of ECPA.

1.5.3    Effective on the Settlement Date, Santa Clara shall waive and release, and does hereby so waive and release as of that day, any and all claims, whether known or unknown, that

may exist as of that day as to any compensation which may be owed to Santa Clara by PG&E, with regard to Section 10 of ECPA and Santa Clara's efforts to acquire a license for the Mokelumne River Project. Santa Clara also agrees not to institute any legal or regulatory proceedings with respect to or otherwise pursue any claim that would be waived and released pursuant to this Section 1.5, subsequent to the Settlement Date. Santa Clara expressly agrees that the release and waiver of claims contained in this Section 1.5 extends to and includes all unknown claims relating to the license for the Mokelumne River Project.

In so agreeing, Santa Clara hereby waives any and all rights or benefits which it may have under the terms of Section 1542 of the California Civil Code, which provides as follows:

"A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor."

### 1.6    Settlement Option

Because of the importance of expeditious construction of Grizzly to the balance of considerations agreed to by the Parties, at any time prior to FERC Approval, or if FERC approves or otherwise allows this Agreement to become effective with a change or changes or under terms or conditions unacceptable to either Party, the Parties may elect to enter into a settlement option in order to allow the development of Grizzly to proceed and to preserve the settlement and the balance of benefits represented by this Agreement.

## 12    OCCURRENCE OF REVERTER

### 12.1    Possibility of Reverter

PG&E shall retain a Possibility of Reverter in Grizzly and all Interest therein, which shall occur and become effective on the occurrence of the Reverter Date as set forth in this Agreement. Full and complete title to all Interest in and to Grizzly shall be held by Santa Clara, as sole owner of such Interest, until the Reverter Date occurs. The Parties agree and stipulate that the Possibility of Reverter is and shall be vested as of the date of conveyance of Grizzly and the Interest therein by PG&E to Santa Clara.

### 12.2  Bucks Creek Relicensing

12.2.1  For and in consideration given and received by reason of this settlement, Santa Clara is agreeing to support the relicensing by PG&E of the Bucks Creek Project, whenever it occurs, by entering into the Bucks Creek Relicensing Agreement, a copy of which is attached hereto as Appendix E.

12.2.2  The Parties recognize that it may be necessary to apply for renewal of the Bucks Creek License prior to the Reverter Date. In such event, the Parties shall jointly file an application with FERC to renew the Bucks Creek License. The Parties agree to prosecute renewing the Bucks Creek License as specified in Section 2.7.2. The Parties further recognize that, prior to relicensing, FERC may issue annual license renewals following license expiration. Costs of prosecuting renewal of the Bucks Creek License shall not be included in the Costs of Operation or Costs of Plant. Subject to Section 12.2.3, PG&E will be responsible for the costs of all work authorized by PG&E relating to renewing the Bucks Creek License, including but not limited to environmental studies, agency consultation, and engineering studies.

PG&E has lead responsibility for the effort to renew the Bucks Creek License ("relicensing").  PG&E is responsible for assuring the performance of all work necessary for relicensing ("relicensing work") and all costs incurred for relicensing ("relicensing costs" or "costs of relicensing") unless it authorizes others, including Santa Clara, to perform such relicensing work and incur such costs of relicensing.  In its relicensing effort, PG&E shall consult with Santa Clara, and Santa Clara shall support PG&E's relicensing effort.  All costs of relicensing incurred by PG&E and by others authorized by PG&E (in aggregate the "total relicensing cost") are subject to the cost sharing provisions of Section 12.2.3.  Future cost responsibility associated with fulfillment of license conditions of the new license, such as Protection, Mitigation, and Enhancement ("PM&E") measures and Management Plans, are not subject to the cost sharing provisions of Section 12.2.3, but instead shall be determined in accordance with Sections 1.1.33, 1.1.34, 2.4.1, and 2.5.2.

In addition to any relicensing work and relicensing costs authorized by PG&E, Santa Clara may, at its own initiative, perform work and incur costs to monitor the relicensing work ("monitoring work" and "monitoring costs", respectively).  Such monitoring costs incurred by

Santa Clara are not costs of relicensing nor subject to the cost sharing provisions of Section 12.2.3, but are eligible to be treated by Santa Clara, at its sole discretion, as capital additions to the Costs of Plant, provided they are for staff costs, including overhead, consultant costs, legal costs, and other costs incurred for monitoring work, notwithstanding Sections 2.7.2 or 12.2.2 or any other provision of this Agreement to the contrary. All relicensing costs or costs of relicensing allocated to Santa Clara pursuant to Section 12.2.3 are also eligible to be treated by Santa Clara, at its sole discretion, as capital additions to the Costs of Plant, notwithstanding Sections 2.7.2 or 12.2.2 or any other provision of this Agreement to the contrary. All costs incurred by Santa Clara or allocated to Santa Clara by PG&E associated with fulfillment of license conditions of the new license, such as PM&E measures and Management Plans, that are related to the construction of new, or upgrades to existing, facilities are also eligible to be treated by Santa Clara, at its sole discretion, as capital additions to the Costs of Plant, notwithstanding Sections 2.7.2 or 12.2.2 or any other provision of this Agreement to the contrary.

Notwithstanding the second sentence of Section 2.7.2, each Party shall bear its own legal costs associated with its relicensing efforts except for legal costs incurred as relicensing work, which costs shall be allocated as provided in Section 12.2.3. Disputes regarding whether legal costs have been incurred as relicensing work shall be referred to the Grizzly Management Committee (Section 1.1.35 as established in accordance with Section 18.2) for resolution.

Santa Clara is serving as the CEQA lead agency to ensure compliance with CEQA for the relicensing effort ("CEQA work"). All CEQA work performed by Santa Clara, including staff, consultant and legal work, both prior to and after the effective date of this Amendment, shall be treated as relicensing work, the costs of which are subject to the cost sharing provisions of Section 12.2.3. Further, Santa Clara's allocated portion of the cost of relicensing related to CEQA compliance is eligible to be treated by Santa Clara, at its sole discretion, as capital additions to the Costs of Plant, notwithstanding Sections 2.7.2 or 12.2.2 or any other provision of this Agreement to the contrary. As encouraged by both CEQA and NEPA regulations and guidelines, Santa Clara will utilize FERC's NEPA document and process to the maximum extent practicable with the goal of minimizing CEQA costs while still meeting the CEQA regulatory requirements.

Each Party shall keep and maintain accounting records of relicensing work and relicensing costs in accordance with the provisions of the Section 3.5. Forecasts of future relicensing work shall be provided in accordance with Section 5.8.3.

12.2.3  If the Ownership Period extends beyond the expiration of the Joint License, Santa Clara will share in the cost of renewing the Bucks Creek License, and the cost of any FERC fees for annual license extensions which may be granted following the expiration of the Joint License. Santa Clara's share of such costs shall be determined as follows:

(a)     Santa Clara's share of the relicensing cost shall be equal to the total relicensing cost multiplied by the ratio of the nameplate megawatt capacity of Grizzly to the total nameplate megawatt capacity of all facilities on the Bucks Creek License, and multiplied by the ratio of the number of years Santa Clara will be a joint licensee in the new license period to the term, in years, of the new license. The Parties recognize that the start of the new license term may not coincide with the end of the current license term, depending on then current FERC regulations.

(b)     Santa Clara's annual share of license extension fees shall be equal to the total annual license extension fee multiplied by the ratio of the nameplate megawatt capacity of Grizzly to the total nameplate megawatt capacity of all facilities on the Bucks Creek License.

### 12.3    Reversion Dates

12.3.1  There shall be six (6) possible dates or events upon which the Reverter Date may occur, and on such occurrence Santa Clara's Interest in Grizzly shall terminate and all Interest in Grizzly shall revert to PG&E. The Reverter Date shall occur as of 0000 hours on the first of the following dates to occur; provided, that PG&E has given Santa Clara any notice thereof as may be required pursuant to Sections 12.5, 13 or 16.1.2: (1) at any time after PG&E's conveyance of Grizzly and the Interest therein, upon the election of either Party to terminate development of Grizzly as provided in Section 13; (2) the fifteenth 15th) anniversary of the Commercial Operation Date ("first-possible- Reverter Date"); (3) the twentieth (20th) anniversary of the Commercial Operation Date ("second possible Reverter Date"); (4) the twenty-fifth (25th) anniversary of the Commercial Operation Date ("third possible Reverter Date"); (5) on or after January 1, 2034 or the third possible Reverter Date, whichever comes later ("fourth possible

PACIFIC GAS AND ELECTRIC COMPANY
Rate Schedule FERC No. 248

Reverter Date"); or (6) upon the election provided PG&E under Section 16.1.2. The date of the possible occurrence of the first, second, third, or fourth possible Reverter Dates shall be adjusted in the event of the circumstances provided for in Sections 11.1 c), 12.3.2 and 12.3.3 and 12.6. PG&E agrees not to exercise the first-possible-Reverter Date.

12.3.2  In the event that the SCAPC is one hundred two percent (102%) or more of the IPCT, the dates of the first possible Reverter Date, second possible Reverter Date, and third possible Reverter Date will be delayed one (1) Year for each full two (2) percent that the IPCT is exceeded by the SCAPC.

12.3.3  a) Upon final acceptance of the new Grizzly Amendment and Joint License, including determination of any appeal of terms and conditions affecting energy production, PG&E shall perform a water and power study using the same computer model and input assumptions (the program and the input data sets are stored under the filename "G.Final.Data" on PG&E's mainframe computer system) used to determine the estimated 62.7 gWh weighted average annual energy upon which the Parties relied for this Agreement, with such input assumptions adjusted to reflect changes in license conditions as contained in the Grizzly Amendment and the Joint License that were not modeled in the original computer run, in order to evaluate the impact of those changed conditions on Santa Clara's anticipated benefits from owning and operating Grizzly. The impact will be calculated as the change in weighted average annual gWh between the two (2) runs divided by 125.4 gWh and multiplied by one hundred (100) to express the result as a percentage. PG&E shall preserve said file and model in an appropriate form so that the evaluation study may be made in the future on the same basis as the original study which the Parties relied upon for this Agreement.

b) In the event that the impact as calculated in Section 12.3.3 a) shows an adverse change exceeding two percent (2%), the first possible Reverter Date, second possible Reverter Date, and third possible Reverter Date will be delayed one (1) Year for each full two percent (2%) of adverse impact. This adjustment shall occur one time only.

12.3.4  The deferral provisions set forth in Sections 11.1 c), 12.3.2, 12.3.3, and 12.3.5 shall be cumulative.

PACIFIC GAS AND ELECTRIC COMPANY
Rate Schedule FERC No. 248

12.3.5

a) Upon final determination of the FPCT, the minimum cost-based delay in the first, second, and third possible Reverter Dates will be one (1) year for each two (2) percent that the FPCT exceeds the IPCT. The difference between the FPCT and the IPCT will be rounded up or down to the closest two percent (2%) increment of the IPCT.

b) After the completion cf the Grizzly development, if it is determined that the SCAPC is greater than the FPCT, the first, second and third possible Reverter Dates may be subject to further delays, using the delay calculation method pursuant to Section 12.3.2 of the Settlement Agreement. The actual delay shall be the greater of the minimum delay pursuant to the above paragraph or the delay calculated pursuant to Section 12.3.2 of the Settlement Agreement (using the full two percent (2%) method comparing the SCAPC to the IPCT).

c) The Parties shall, within one (1) year of the Completion of Construction Date, calculate and agree upon the total amount of delay and the possible Reverter Dates.

d) PG&E may, at its election, include in the transfer documents a limit on the time within which the fourth possible Reverter Date, as so revised, can be exercised. Such language shall not change the earliest date on which the fourth possible Reverter date will occur or cause the fourth possible Reverter Date to occur before the third possible Reverter Date.

### 12.4    Determination Of Reverter Reimbursement

It is the intent of the Parties that Santa Clara be made whole and reimbursed by PG&E for the fair market value of Grizzly upon the occurrence of the Reverter Date and the reverter or reversion of Grizzly to PG&E, except under the catastrophic damage circumstances described in Sections 12.8 and 16.1. Accordingly, the Parties agree and stipulate that the amount of such reimbursement shall be determined as follows, and that such amount is no less than fair market value and is just and reasonable:

a)    If the Reverter Date occurs on the first possible Reverter Date, the amount of reimbursement shall be EPCLD (for reimbursement of original capital construction costs, after

PACIFIC GAS AND ELECTRIC COMPANY
Rate Schedule FERC No. 248

depreciation) + DCP (for reimbursement of capital costs incurred subsequent to original construction, after depreciation).

b)      If the Reverter Date occurs on the second possible Reverter Date, the amount of reimbursement shall be (EPCLD + OCLD)/2 + DCP.

c)      If the Reverter Date occurs on the third possible Reverter Date, the amount of reimbursement shall be OCLD (for reimbursement of original capital construction costs, after depreciation) + DCP.

d)      If the Reverter Date occurs on the fourth possible Reverter Date, the amount of reimbursement shall be the OCLD + DCP.

e)      If the Reverter Date occurs as a result of termination of development of Grizzly as provided in Section 13, no additional reimbursement will be in order since PG&E is to refund to Santa Clara moneys advanced by Santa Clara.

f)      If the Reverter Date occurs as provided in Section 16.1.2, no reimbursement will be in order, it being agreed by the Parties that any loss borne by Santa Clara under such circumstances is an incident of the risks of ownership.

### 12.5    Notice

PG&E may at its option cause the Reverter Date to occur on the first possible Reverter Date, the second possible Reverter Date, the third possible Reverter Date, or the fourth possible Reverter Date by giving Santa Clara advance written notice thereof not less than three (3) Years prior to the intended Reverter Date. In the event that Grizzly is condemned or is not in a condition as would be normally expected for a facility of its age and operating experience, at PG&E's election its notice shall be deemed cancelled and the Reverter Date shall not occur. The occurrence of the Reverter Date under the circumstances of Sections 13 or 16.1.2 shall be governed by any applicable notice provisions in those Sections. Any notice by PG&E that will result in the occurrence of the Reverter Date shall be given in writing by certified mail, or by hand delivery, to the City Clerk of Santa Clara.

PACIFIC GAS AND ELECTRIC COMPANY
Rate Schedule FERC No. 248

### 12.6    Payment of Reimbursement

In the event the Reverter date is to occur on either the first, second, third or fourth possible Reverter Dates, pursuant to notice given by PG&E, Santa Clara shall determine and advise PG&E, at least thirty (30) days in advance of the expected Reverter Date, of the amount of reimbursement determined as provided in Section 12.4. On or before the Reverter Date, PG&E shall pay the amount of reimbursement as so determined by Santa Clara, or such lesser amount as the Parties may agree upon to adjust for any outstanding liens, encumbrances, restrictions or clouds on title on Grizzly or to place Grizzly in a condition as would normally be expected for a facility of its age and operating experience (herein "Adjustment"). If the Parties disagree on the amount of reimbursement to be made, or whether an Adjustment is to be made to it or the amount of such Adjustment, PG&E shall reimburse Santa Clara the undisputed amount of reimbursement less any Adjustment PG&E believes proper and shall deposit any disputed amount into a mutually satisfactory escrow. In the event Santa Clara has been unable or has failed to advise PG&E of the amount of reimbursement, PG&E shall pay Santa Clara the amount of reimbursement it determines or estimates is appropriate after any Adjustment; and the Parties thereafter shall endeavor promptly to agree on the amount of reimbursement, including any Adjustment, and promptly make any appropriate additional payment or refund, including interest. The Reverter Date shall occur only as of the first day following the day on which PG&E has both (1) paid Santa Clara the undisputed amount of reimbursement less any Adjustment and (2) deposited any disputed amounts thereof in escrow. If an escrow is established, if possible it shall be interest bearing and PG&E shall be entitled to manage the account. Upon resolution of the dispute, the escrowed funds, including interest, shall be distributed in accordance and in proportion with the resolution, and any appropriate refund or additional payment shall be made promptly. The Parties shall adjust the distribution from escrow and any refunds or additional payments to provide for interest at the rate provided in Section 10.5.4, allowing credit for any interest earned by the escrow account.

### 12.7    Clear Title

During its Ownership Period, or until and unless PG&E's Possibility of Reverter is surrendered in accordance with Section 16.1.2, whichever first occurs, unless otherwise mutually

agreed by the Parties, Santa Clara shall not permit any liens, encumbrances, restrictions, or other clouds of title to be placed on Grizzly except as lawfully imposed by FERC or other regulatory or other governmental agency having jurisdiction in the premises. Santa Clara shall oppose the imposition of any such liens, encumbrances, restrictions, or other clouds of title and remove promptly any that are imposed, and PG&E will cooperate with Santa Clara's efforts to do so.

### 12.8    Catastrophic Events

As specified in Section 16.1, Santa Clara is not obligated to rebuild the facility in the event of a catastrophic event which results in damage to or destruction of any or all of the Grizzly facilities to such an extent that restoration of Grizzly is not economic in Santa Clara's sole judgment and FERC concurs on Grizzly's abandonment. If Santa Clara decides not to rebuild Grizzly, PG&E will have the ability to cause the Reverter Date to occur at no cost to PG&E and without payment to Santa Clara of any amount for reimbursement, and to rebuild Grizzly as a PG&E-owned facility. In the event PG&E rebuilds the facility, Santa Clara will pay PG&E the amount that Santa Clara would otherwise have expended for site restoration. Neither Santa Clara nor PG&E will be required to reimburse the other for the lost opportunity to continue to run or to transfer Interest in Grizzly in the event of catastrophic damage and a decision not to rebuild as described in Section 16.1.

### 12.9    Warranty Transfer on Reversion

Santa Clara shall assign all Grizzly warranties to PG&E on or promptly after occurrence of the Reverter Date and thereafter shall have no responsibility to PG&E as to the matters and facilities so warranted.

## SUPPORTING DOCUMENTS PURSUANT TO
## SECTION 35.13(a)(2)(iii) OF THE COMMISSION'S RULES AND REGULATIONS

Because the proposed seventh amendment to the Grizzly Agreement will result in no change to Pacific Gas and Electric Company's revenues, PG&E is making this filing under the abbreviated filing requirements of Section 35.13(a)(2)(iii) of the Commission's regulations.

### SECTION 35.13(b) - GENERAL INFORMATION

The general information required under Section 35.13(b) is provided in the body of the transmittal letter of this filing.

*PG&E's responses to Section 35.13(c) is as follows:*

### SECTION 35.13(c) (1) – STATEMENT OF SALES, SERVICES AND REVENUES

This filing will result in no change in revenues.

### SECTION 35.13(c)(2) - COMPARISON TO OTHER WHOLESALE RATES

There are no rate changes as a result of this filing, so there are no rates to compare.

### SECTION 35.13(c)(3) – DIAGRAM OF INSTALLED FACILITIES

There are no facilities installed as a result of this filing.

FERC rendition of the electronically filed tariff records in Docket No. ER20-00757-000
Filing Data:
CID: C000388
Filing Title: Amendment to Silicon Valley Power Agreement (RS 248)
Company Filing Identifier: 1266
Type of Filing Code: 10
Associated Filing Identifier:
Tariff Title: Other Tariffs and Rate Schedules (Tariff ID 3100)
Tariff ID: 3100
Payment Confirmation:
Suspension Motion:


Tariff Record Data:
Record Content Description, Tariff Record Title, Record Version Number, Option Code:
 1, GENERAL AGREEMENT, 2.0.0, A
Record Narative Name:
Tariff Record ID: 2951
Tariff Record Collation Value: 260071424      Tariff Record Parent Identifier: 2944
Proposed Date: 2020-03-09
Priority Order: 1000000000
Record Change Type: CHANGE
Record Content Type: 1
Associated Filing Identifier:

## 1     GENERAL AGREEMENT

### 1.1     Definitions

Whenever used in this Agreement, these terms shall have the following meanings as applicable. The singular of a term shall include the plural and the plural shall include the singular.

1.1.1    Additional License Related Costs: Costs of Construction resulting from Grizzly license requirements that were not included as Cost items in the IPCT up to a maximum of two million six hundred and seven thousand dollars ($2,607,000). This maximum will be adjusted for delays pursuant to Section 11. Pursuant to Amendment No. One to this Agreement, six hundred and seven thousand dollars ($607,000) of Costs of Construction, incurred prior to June 11, 1991, and which do not otherwise meet the definition of Additional License Related Costs, shall be treated as all other Additional License Related Costs.   Additional License Related Costs, including this additional $607,000 shall remain capped at two million six hundred and seven thousand dollars ($2,607,000).

1.1.2    Administrative and General Costs: Those indirect and overhead costs, except PG&E financing costs, that would be charged to Grizzly using PG&E's standard accounting

procedures as if Grizzly were owned by PG&E.

    1.1.3   Agreement: This Development and Settlement Agreement.

    1.1.4   ALL: The amount of energy allocated in megawatt-hours available to Santa Clara for scheduling each Calendar Month pursuant to Section 8.3.3.

    1.1.5   APC: Actual Project Costs consisting of the sum of the Costs of Construction corresponding to the activities, accounts and anticipated license requirements that were used in preparing the IPCT. APC does not include Additional License Related Costs or Delay Costs pursuant to Section 11.1 c).

    1.1.6   Bucks Creek: That hydroelectric development constructed under the Bucks Creek License, specifically excluding facilities constructed under the Grizzly Amendment.

    1.1.7   Bucks Creek License: A hydroelectric license as amended and issued by FERC for Project No. 619.

    1.1.8   Calendar Month: A period commencing at 0000 hours on the first day of any of the twelve (12) months recognized on the Gregorian calendar and ending at 2400 hours on the last day of that same month.

    1.1.9   Calendar Year: A period commencing at 0000 hours on the first day of January and ending at 2400 hours on the last day of December, as such months are recognized on the Gregorian calendar.

    1.1.10 [This Section Left Intentionally Blank]

    1.1.11 [This Section Left Intentionally Blank]

    1.1.12 CO: The carry over of energy, as either a surplus or deficit, to be included in the ALL for Santa Clara's use in a subsequent Calendar Month pursuant to Sections 8.3.3 and 8.4.

    1.1.13 Commercial Operation Date: With respect to Grizzly, the Commercial Operation Date shall be 0000 hours on the day following the completion of the process set forth in Section 4.12.1. It is understood that the Commercial Operation Date, as defined herein, may not coincide

with the commercial operation date or completion date as defined by FERC.

1.1.14  Completion of Construction Date: The date on which all Costs of Construction have been incurred and accounted for pursuant to this Agreement, as set forth in Section 4.12.3.

1.1.15  Construction Activities: All Grizzly related development activities through the Completion of Construction Date required in order to construct and complete Grizzly as provided in Sections 3 and 4 and to comply with license and other agency requirements related to development of Grizzly, including, but not limited to, obtaining the Grizzly Amendment and permits, acquisition of land rights, design, procurement, engineering, construction, construction management, material and equipment acquisition, equipment installation, testing and acceptance by the Development Manager of all components, start-up, and claims resolution.

1.1.16  Construction Contract Date: The date on which PG&E enters into the principal construction contract to be awarded for Grizzly.

1.1.17  Coordinating Committee: The Coordinating Committee as established in accordance with Section 3.7.

1.1.18  Costs: During the Ownership Period, all capital expenditures, expenses of labor and personnel, services, materials and supplies and transportation, expenses of operation and maintenance, Administrative and General Costs, and Santa Clara's administrative and general costs charged to Grizzly using Santa Clara's standard accounting procedures. Costs shall include taxes or payments in lieu of taxes, if any, incurred by, charged to, or assessed against PG&E or Santa Clara and related to Grizzly. Such taxes shall not include income taxes if imposed on PG&E by reason of receipt of payments for services or advances by Santa Clara.

1.1.19  Costs of Construction: All reasonable and necessary Costs incurred by PG&E in order to construct and complete Grizzly as provided in Sections 3 and 4 and to comply with FERC requirements related to development of Grizzly under the Grizzly Amendment. Such costs shall include, but not be limited to, those incurred for planning, design, engineering, procurement, equipment testing and acceptance, licensing, acquisition of land other than federal land including any eminent domain expenses, materials, construction, construction management, contract preparation and administration, installation, start-up, environmental control, real

property or possessory interest taxes and sales, use, excise or other taxes, duties and governmental assessments ascribable to Grizzly if paid by PG&E except as otherwise expressly provided in Section 14.4, third party claims resolution (including all costs relating to claims or dispute resolution, except for claims or disputes with respect to which Santa Clara indemnifies PG&E pursuant to this Agreement), costs incurred in administering or enforcing contractor and vendor warranties with respect to claims and other warranty matters arising prior to the Commercial Operation Date, and other necessary costs for safety, security and completion of Grizzly (including reasonable or necessary Costs incurred pursuant to Section 2.7.3 or other provisions of this Agreement related to obtaining all licenses, approvals or permits from regulatory agencies required for construction, initial operation, and ownership of Grizzly, except for those license application costs excluded in Sections 2.7.1 and 2.7.2) which are incurred prior to the Completion of Construction Date and accounted for in accordance with the FERC Uniform System of Accounts. Such costs also shall include the Costs of both goods provided and services rendered by PG&E hereunder, any costs directly incurred by Santa Clara at PG&E's request in connection with Grizzly, except as otherwise expressly provided, the cost of all insurance premiums incurred by or on behalf of PG&E pursuant to Sections 15.1 and 15.2, together with any deductibles (to the extent not already constituting Costs of Construction) incurred or paid by either Santa Clara or PG&E with respect to claims arising under such insurance (except for deductibles arising with respect to the coverages provided pursuant to Section 15.1.3 and deductibles excluded from Costs of Construction pursuant to Section 14.2.1), and costs or liabilities incurred in connection with Construction Activities prior to the Substantial Completion Date by PG&E pursuant to Sections 14.1.1 and 14.2.1, to the extent such costs or liabilities are not covered by proceeds of the insurance provided pursuant to Sections 15.1 and 15.2. Such costs shall also include the cost of purchasing and installing a new PG&E distribution line on the Grizzly transmission line poles as provided for by Section 2.6.7, removal of the present distribution line and poles, the span of transmission line between the Grizzly transmission line end structure and disconnect switch and PG&E's Caribou-Sycamore Creek transmission line, and any other facilities included in the definition of Grizzly and situated outside the Bucks Creek project boundary. For the purposes of this Agreement, such Costs of Construction shall not include any Costs incurred prior to January 1, 1989, costs incurred by PG&E or Santa Clara associated with developing this Agreement, costs of administering contractor or vendor

warranties with respect to claims and other warranty matters arising after the Commercial Operation Date, or late payment interest charges pursuant to Section 4.14 and 4.15.2.

1.1.20  Costs of Operation: All reasonable and necessary Costs directly incurred in operating and maintaining Grizzly after the Commercial Operation Date, including, but not limited to, Costs incurred in mobilizing and demobilizing, operating, maintaining, repairing, supervising, staffing, administering, and testing, real property or possessory interest taxes and sales, use, excise or other taxes, except as excluded in Section 14.4.2, duties and governmental assessments ascribable to Grizzly if paid by PG&E, protecting and preserving Grizzly, and meeting legal, regulatory, permit and license requirements with respect to Grizzly, and Costs incurred in administering or enforcing contractor and vendor warranties with respect to claims and other warranty matters arising after the Commercial Operation Date, but excluding any such Costs otherwise included as Costs of Construction or Costs of Plant, and excluding any regulatory fees as described in Section 5.8.2. Costs of Operation shall include any costs incurred by PG&E to obtain and maintain the insurance described in Section 15.3, to the extent such insurance is not obtained and maintained directly by Santa Clara, and shall include a mutually agreed upon mark-up with respect to PG&E's payroll costs of personnel performing work at the Grizzly Site to cover PG&E's workers compensation liability, whether or not PG&E purchases workers compensation insurance.

1.1.21  Costs of Plant: All reasonable and necessary Costs, which are not included in Costs of Construction or in Costs of Operation with respect to Grizzly which are directly or indirectly related to major improvements, additions, betterments, or replacements. Costs of Plant shall include any costs incurred on or after the Commercial Operation Date by Santa Clara pursuant to Sections 14.2.2 and 16.1.1 for repair of damage to Grizzly, to the extent such costs are not covered by proceeds of the insurance provided pursuant to Section 15.3.

1.1.22  CPUC: The California Public Utilities Commission or its regulatory successor.

1.1.23  DCP: Depreciated Costs of Plant on the Reverter Date is the Cost of Plant after each element of the Costs of Plant is depreciated on a straight line, element-specific basis. The estimated useful life of each element will be determined by PG&E in accordance with its standard FERC accounting practice.

1.1.24  ECPA: The Electric Consumer Protection Act of 1986, Public Law 99-495 (October 16, 1986).

1.1.25  Effective Date: The date on which this Agreement is made and entered into as set forth in the Preamble.

1.1.26  EPCLD: The Escalated Project Cost Less Depreciation consisting of the sum of SCAPC plus Net Interest During Construction, plus Santa Clara's bond-related issuance costs, plus Additional License Related Costs plus Delay Costs pursuant to section 11.1 c); said sum to be escalated by the change in the index described below and depreciated as further described below. The escalating index to be used is a weighted average of the latest available Engineering News Record Construction Cost Index (herein "ENR Index") and the latest available Bureau of Reclamation Composite Index for Water and Power Construction Costs (herein "BR Index"). The average shall be weighted seventy-five percent (75%) on the ENR Index and twenty-five (25%) percent on the BR Index. This weighted average escalation index will be the ratio of the latest available published indices existing as of the Reverter Date to the indices existing as of the Commercial Operation Date. The escalated result shall then be depreciated on a fifty-year (50-year), straight-line basis commencing on the Commercial Operation Date. If either or both of the referenced indices become unavailable or are so changed as to interfere with the use intended of them by the Parties, an equivalent index agreeable to the Parties will be used. EPCLD shall be determined as of the Reverter Date if its use becomes applicable under Section 12.4.

1.1.27  EPT: Excess Power Take is GCE scheduled by Santa Clara in excess of the amounts authorized by this Agreement.

1.1.28  FERC: The Federal Energy Regulatory Commission or its regulatory successor.

1.1.29  FERC Approval: Unless otherwise agreed to by the Parties, FERC Approval means final FERC approval of this Agreement and the Joint License, without change or condition unacceptable to either Party; provided, that if upon filing FERC enters into a hearing to determine whether this Agreement is just and reasonable or otherwise lawful, such approval shall not be deemed to have occurred until the date when an order no longer subject to judicial review has been issued by FERC determining that this Agreement is just and reasonable. Each Party

hereby reserves its right of appeal in the event of an unacceptable change to this Agreement by FERC.

1.1.30  FPCT: The Final Project Cost Target is the IPCT as adjusted, pursuant to Section 4.16, for any net increase in the actual award prices obtained by PG&E in Construction Activity contracts with third parties over the estimates of construction and Construction Activity costs used to prepare the IPCT, plus an additional contingency amount of two million dollars ($2,000,000), as such FPCT may be further adjusted pursuant to Section 11.1 and for up to $300,000 for design review not included in the IPCT, if performed under contract to PG&E. In no event, however, shall the FPCT be less than the IPCT. The dollar amount of the contingency contained in the FPCT shall be the same amount as contained in the IPCT.

1.1.31  GCE: Grizzly Combined Energy is the sum of Grizzly Generation (GEN), Grizzly Supplemental Power (GSP), Excess Power Take (EPT) and Maintenance Power scheduled by Santa Clara pursuant to Section 8.

1.1.32  GEN: Grizzly Generation is the amount of energy generated by Grizzly in a Calendar Month, in megawatt-hours measured at the high-voltage side of the Grizzly station transformers and then reduced for transmission losses as specified in Section 7.2.2, and plus or minus the CO from the previous Calendar Month.

1.1.33  Grizzly: A new hydroelectric development located in Plumas County, California, to be constructed and installed to generate electric power using water being released from Lower Bucks Lake, presently licensed to PG&E. Grizzly will enhance the hydropower features of the Buck's Creek License, and shall include the following features with approximate physical characteristics indicated:

a)      A tunnel intake structure of reinforced concrete and consisting of an entrance transition section about 51 feet long, 30 feet wide (maximum) and 34 feet high (maximum); a tower section about 17 by 16 feet in plan and 70 feet high; a gate house about 21 by 20 feet in plan and 21 feet high; and a tunnel approximately 12,174 feet long, unlined with a cross-section shape of a 12 foot circle (machine excavated);

b)      a surge tank with reinforced concrete lining, 20-foot inside diameter and about

199 feet high;

    c)      a steel penstock about 4,578 feet long with a diameter varying from 8.0 feet to 4.0 feet;

    d)      a powerhouse consisting of a reinforced concrete structure of about 53 by 63 feet in plan, designed for unattended operation with supervisory control from PG&E's Rock Creek Powerhouse;

    e)      a single 26,400 HP vertical Francis turbine direct-coupled to a 22,000 KVA (0.9 power factor) generator;

    f)      a transmission line, nominally rated at 115 kV, of about 3.4 miles length and consisting of wood poles supporting 4/0 ACSR conductors, extending from the Grizzly powerhouse to and including the end structure and disconnect switch near Bucks Creek Powerhouse (FERC Project No. 619), and all other facilities necessary for interconnection with PG&E's transmission system but not including the final span between the end structure and the Caribou-Sycamore Creek transmission line (FERC Project No. 2105) and PG&E-owned distribution lines installed on the same wood poles as the Grizzly transmission line;

    g)      additional equipment in the switchyard consisting of a generator step-up transformer and a 115 kV power circuit breaker, structures and related equipment, necessary to connect with the PG&E transmission system;

    h)      telecommunication and telemetry facilities to the point of interconnection with pre-existing facilities;

    i)      recreation facilities as required by the Grizzly Amendment;

    j)      use of the Grizzly Site;

    k)      use of the water and use of the water rights in connection herewith;

    l)      the Joint License necessary to allow the operation of this Agreement; and

    m)      all renewals, replacements, repairs, additions, betterments, improvements,

modifications and retirements thereto made pursuant to this Agreement.

1.1.34  Grizzly Amendment: The amendment to the Bucks Creek License granting permission and license for the construction and operation of Grizzly, as issued by FERC and as it may be modified on or after appeal.

1.1.35  Grizzly Management Committee: The Grizzly Committee as established in accordance with Section 18.2.

1.1.36  Grizzly Site: All land and land rights necessary for the construction and operation of Grizzly.

1.1.37  GSP: Grizzly Supplemental Power purchased by Santa Clara during the Ownership Period pursuant to Section 8.

1.1.38  Interconnection Agreement: The agreement between PG&E and Santa Clara, dated September 30, 1983, known as the Interconnection Agreement, and any other successor agreement, arrangement, or tariff, providing for interconnection between the PG&E system and the Santa Clara system and provision of services associated with such interconnection.

The first successor was the 2002 Interconnection Agreement ("2002 IA") between PG&E and the City of Santa Clara, Silicon Valley Power, Service Agreement No. 20 ("SA No. 20") under FERC Electric Tariff Volume No. 5. The 2002 IA was in effect from September 1, 2002 until July 31, 2017.

The second successor is the Interconnection Agreement, filed at FERC on June 1, 2017 in Docket No. ER17-1750-000, designated as Service Agreement No. 343 under PG&E FERC Electric Tariff Volume No. 5 ("2017 IA") as accepted by FERC effective August 1, 2017. As of August 1, 2017, further references to Interconnection Agreement will refer to Service Agreement No. 343, or its successor agreement, arrangement, or tariff, providing for interconnection between the PG&E system and the Santa Clara system and provision of services associated with such interconnection.

1.1.39  Interest: Those property interests and estates in Grizzly as specified in Section 2.6.

1.1.40  IPCT: Initial Project Cost Target is $57,360,000, or such amount as adjusted pursuant to Section 11. A summary of the cost estimates used in preparing the IPCT, prior to adjustment pursuant to Section 11, is included in Appendix C. IPCT does not include any Additional License Related Costs, Net Interest During Construction, any Santa Clara bond reserve costs, any Santa Clara costs associated with issuance of bonds, or Santa Clara's cost for auditing and inspecting PG&E's construction or administration of Grizzly or other like costs.

1.1.41  Joint License: The joint PG&E and Santa Clara amendment to the Bucks Creek License envisioned by Section 2.7.

1.1.42  Maintenance Power: Power in amounts required to replace the power output of Grizzly during scheduled maintenance outages and forced outages, as provided and under the terms of this Agreement.

1.1.43  Minimum Monthly Allocation: The allocation of ALL set forth in Section 8.7.

1.1.44  Mokelumne River Project: PG&E's FERC Project No. 137 and Santa Clara's FERC Project No. 2745.

1.1.45  Net Interest During Construction: As defined by Generally Accepted Accounting Principles and the Financial Accounting Standards Board's Statement of Financial Standards No. 62.

1.1.46  OCLD: The Original Cost Less Depreciation consisting of the sum of (1) SCAPC plus Santa Clara's Net Interest During Construction plus Santa Clara's bond related issuance costs, plus Additional License Related Costs plus Delay Costs pursuant to 11.1 c); (2) such sum then being depreciated on a fifty-year (50-year) straight-line basis commencing on the Commercial Operation Date and terminating on the Reverter Date; (3) but in no case shall the Net Interest During Construction be less than zero. OCLD shall be determined as of the Reverter Date if its use becomes applicable under Section 12.4.

1.1.47  Ownership Period: The period of time of Santa Clara's ownership of Grizzly, beginning on the Settlement Date and ending upon one of the following events, whichever is the first to occur: (1) the occurrence of the Reverter Date, (2) development of Grizzly is terminated

as provided in Section 13, or (3) abandonment of the project by Santa Clara or condemnation as provided in Section 16.

1.1.48  Partial Requirements Power: The capacity and energy sold under the partial requirements rate schedule, excluding any transmission components, as shown in Rate Schedule A of Appendix B to this Agreement, Section B.5, Part II.1.

1.1.49  Party or Parties: PG&E and/or Santa Clara.

1.1.50  PG&E: The Pacific Gas and Electric Company, its successors or assigns.

1.1.51  Points of Delivery: Those Points of interconnection on the PG&E electrical grid at which PG&E transmits electrical power for the account of Santa Clara pursuant to, and subject to any limitations within, the Interconnection Agreement.

1.1.52  Possibility of Reverter: PG&E's future interest reversionary right to Grizzly and the Interest therein, as more fully described in Sections 2.6 and 12.

1.1.53  Power Sale: The sale of capacity and energy by PG&E to Santa Clara, pursuant to Section 10.1.

1.1.54  Preventive Maintenance Program: PG&E's preventive maintenance program which it uses for its hydroelectric powerhouses comparable in size and type to Grizzly, as defined in PG&E Hydro Bulletin No. 1, as such may be amended from time to time.

1.1.54a  PRP Energy Rate: The Partial Requirements Power Energy rate under Rate Schedule A of Appendix B to this Agreement, Section B.5 Part II.1, or its successor, or if there is no successor, a just and reasonable rate.

1.1.55  Prudent Utility Construction Practice: Any of the practices, methods, and acts at a particular time which, in the exercise of reasonable judgment in the light of the facts, including but not limited to the practices, methods, and acts engaged in or approved generally by the electric utility industry prior thereto, with special reference to that segment of the industry operating within the State of California known at the time the decision was made, would have been expected to accomplish the desired result at the lowest reasonable cost consistent with

reliability, safety, and expedition. To apply the standard of Prudent Utility Construction Practice to any matter under this Agreement, equitable consideration should be given to the circumstances, requirements and obligations of each of the Parties, and there shall be taken into account the fact that the Parties have prescribed statutory powers, duties and responsibilities. It is recognized that Prudent Utility Construction Practice is not intended to be limited to the optimum practice, method or act to the exclusion of all others, but rather is a spectrum of possible practices, methods or acts which could have been expected to accomplish the desired result at the lowest reasonable cost consistent with reliability, safety and expedition.

1.1.56  Prudent Utility Practice: Those practices, methods, and equipment, including levels of reserves and provisions for contingencies, as modified from time to time, that are at least as good as those commonly used in the Service Area to operate, reliably and safely, electric power facilities to serve a utility's own customers dependably and economically, with due regard for the conservation of natural resources and the protection of the environment of the Service Area; provided, that such practices, methods and equipment are not unreasonably restrictive.

1.1.57  Public Works: Construction or improvements, excluding maintenance, repair, equipment purchase and consulting services, to public buildings or facilities owned by Santa Clara.

1.1.58  Receiving Station: Those Points of Delivery where Santa Clara receives power for resale to its retail customers.

1.1.59  Reverter Date: The date on which Santa Clara's Interest in Grizzly terminates and the Interest in Grizzly reverts to PG&E as described in Section 12.3.

1.1.60  Sale Power: Capacity and energy sold by PG&E to Santa Clara in accordance with the Power Sale provided by Section 10.

1.1.61  Santa Clara: The City of Santa Clara, its successors or assigns.

1.1.62  SCADA: A system for providing remote Supervisory Control and Data Acquisition.

1.1.63  SCAPC: Santa Clara's Actual Project Cost shall consist of the sum of the Costs of

Construction paid by Santa Clara corresponding to the activities and accounts that were used in preparing the IPCT, plus any underrun sharing paid by Santa Clara pursuant to Section 4.17.2 of this Agreement. SCAPC does not include Additional License Related Costs, Santa Clara's Net Interest During Construction, bond reserve or issuance-related costs, Delay Costs pursuant to Section 11.1 c), or costs incurred by Santa Clara, or at its request, to audit or inspect PG&E's administration of Grizzly construction, or any overrun costs paid by PG&E.

1.1.64  Service Area: That area within the exterior geographic boundaries of the several areas electrically served at retail, now or in the future, by PG&E, and those areas in northern and central California adjacent thereto.

1.1.65  Settlement Date: The date on which FERC Approval occurs or another date to which the Parties have agreed in a settlement option executed pursuant to Section 1.6, whichever is first to occur.

1.1.66  Spinning Reserves: Available unloaded capacity resources that are operating, online, synchronized to PG&E's system under SCADA and able instantaneously to take load on demand.

1.1.67  Substantial Completion Date: The date on which all physical construction of Grizzly is complete or deemed to be complete and accepted by Santa Clara as set forth in Section 4.12.2.

1.1.68  Target Commercial Operation Date: The Target Commercial Operation Date is January 1, 1994, subject to adjustment as provided in Section 11.1.

1.1.69  Test Energy: The net energy output of Grizzly prior to the Commercial Operation Date.

1.1.70  Uniform System of Accounts: FERC's Uniform System of Accounts prescribed for Class A and B Public Utilities and Licensees in effect as of the date of this Agreement, as such Uniform System of Accounts may be modified from time to time.

1.1.71 Year: Three hundred sixty-five (365) days or three hundred sixty-six (366) days if a February 29th is encountered in the course of a Year.

1.1.72 CEQA:  The California Environmental Quality Act

1.1.73 NEPA:  The National Environmental Policy Act

## 1.2     Representations Of The Parties

The following are representations made by the Parties:

1.2.1    PG&E Exists: PG&E warrants that it is a corporation organized under the laws of the State of California and that it is validly in existence as such at the Effective Date.

1.2.2    Santa Clara Exists: Santa Clara warrants that it is a charter city, a political subdivision of the State of California, and that it is validly in existence as such at the Effective Date.

1.2.3    Authority: Each Party warrants and represents that this Agreement has been duly authorized, executed and delivered by such Party and constitutes the legal, valid and binding obligation of such Party, enforceable against such Party in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, or similar laws effecting the enforcement of creditor's rights and subject to equitable principles.

1.2.4    Parties Shall Act: Each Party warrants that it shall promptly and with all due diligence, acting jointly or individually as appropriate, take all necessary actions and endeavor to obtain all approvals, licenses, orders, and permits necessary to carry out its obligations under this Agreement. Each Party recognizes that the rights and obligations of the Parties hereunder are subject to the applicable regulations and orders of those governmental agencies and courts having jurisdiction. In the acquisition, construction, completion, ownership and operation of Grizzly pursuant to this Agreement, the Parties shall follow Prudent Utility Construction Practice and Prudent Utility Practice and comply with all applicable federal, state, and local statutes, ordinances, and rules and regulations. Both Parties shall carry out their obligations under this Agreement in accordance with Prudent Utility Construction Practice and Prudent Utility Practice, FERC licensing requirements, and any applicable federal or state laws and regulations, and, as

applicable, in accordance with the principal architectural and engineering criteria and environmental commitments made to FERC and those commitments incorporated as license conditions.

### 1.3     Conditions to PG&E'S and Santa Clara's Obligations

Prior to the Settlement Date, either Party, at its sole discretion, upon written notice to the other Party, may elect to terminate this Agreement without further obligation. In the event of such termination, the Parties shall be restored to their original positions as they existed prior to entering into this settlement and nothing in this Agreement shall prejudice the rights of either Party in pursuing the remedies under ECPA. This Agreement and the negotiations leading to it shall not be offered by either Party in further ECPA or any other proceeding, other than for enforcement of this Agreement.

### 1.4     Non-Refundable Cash Payment

Within thirty (30) calendar days after the Settlement Date, PG&E shall pay to Santa Clara the sum of one million dollars ($1,000,000) by certified check. This cash payment shall not be subject to refund under any circumstances.

### 1.5     ECPA Settlement

1.5.1     Santa Clara hereby agrees and stipulates that this Agreement satisfies all of its claims for compensation related to the Mokelumne River Project pursuant to Section 10 of ECPA.

1.5.2     The Parties hereby agree and stipulate that this Agreement and the exchange of considerations incorporated in it on the whole represent a mutually satisfactory compensation arrangement consistent with the Federal Power Act and that the compensation provided Santa Clara thereby does not exceed that provided by Section 10(e) of ECPA.

1.5.3     Effective on the Settlement Date, Santa Clara shall waive and release, and does hereby so waive and release as of that day, any and all claims, whether known or unknown, that may exist as of that day as to any compensation which may be owed to Santa Clara by PG&E,

with regard to Section 10 of ECPA and Santa Clara's efforts to acquire a license for the Mokelumne River Project. Santa Clara also agrees not to institute any legal or regulatory proceedings with respect to or otherwise pursue any claim that would be waived and released pursuant to this Section 1.5, subsequent to the Settlement Date. Santa Clara expressly agrees that the release and waiver of claims contained in this Section 1.5 extends to and includes all unknown claims relating to the license for the Mokelumne River Project.

In so agreeing, Santa Clara hereby waives any and all rights or benefits which it may have under the terms of Section 1542 of the California Civil Code, which provides as follows:

"A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor."

### 1.6     Settlement Option

Because of the importance of expeditious construction of Grizzly to the balance of considerations agreed to by the Parties, at any time prior to FERC Approval, or if FERC approves or otherwise allows this Agreement to become effective with a change or changes or under terms or conditions unacceptable to either Party, the Parties may elect to enter into a settlement option in order to allow the development of Grizzly to proceed and to preserve the settlement and the balance of benefits represented by this Agreement.

Record Content Description, Tariff Record Title, Record Version Number, Option Code:
 12, OCCURRENCE OF REVERTER, 1.0.0, A
Record Narative Name:
Tariff Record ID: 2962
Tariff Record Collation Value: 260139008     Tariff Record Parent Identifier: 2944
Proposed Date: 2020-03-09
Priority Order: 1000000000
Record Change Type: CHANGE
Record Content Type: 1
Associated Filing Identifier:

## 12     OCCURRENCE OF REVERTER

### 12.1   Possibility of Reverter

PG&E shall retain a Possibility of Reverter in Grizzly and all Interest therein, which shall

occur and become effective on the occurrence of the Reverter Date as set forth in this Agreement. Full and complete title to all Interest in and to Grizzly shall be held by Santa Clara, as sole owner of such Interest, until the Reverter Date occurs. The Parties agree and stipulate that the Possibility of Reverter is and shall be vested as of the date of conveyance of Grizzly and the Interest therein by PG&E to Santa Clara.

### 12.2    Bucks Creek Relicensing

12.2.1  For and in consideration given and received by reason of this settlement, Santa Clara is agreeing to support the relicensing by PG&E of the Bucks Creek Project, whenever it occurs, by entering into the Bucks Creek Relicensing Agreement, a copy of which is attached hereto as Appendix E.

12.2.2  The Parties recognize that it may be necessary to apply for renewal of the Bucks Creek License prior to the Reverter Date. In such event, the Parties shall jointly file an application with FERC to renew the Bucks Creek License. The Parties agree to prosecute renewing the Bucks Creek License as specified in Section 2.7.2. The Parties further recognize that, prior to relicensing, FERC may issue annual license renewals following license expiration. Costs of prosecuting renewal of the Bucks Creek License shall not be included in the Costs of Operation or Costs of Plant.

PG&E has lead responsibility for the effort to renew the Bucks Creek License ("relicensing"). PG&E is responsible for assuring the performance of all work necessary for relicensing ("relicensing work") and all costs incurred for relicensing ("relicensing costs" or "costs of relicensing") unless it authorizes others, including Santa Clara, to perform such relicensing work and incur such costs of relicensing.   In its relicensing effort, PG&E shall consult with Santa Clara, and Santa Clara shall support PG&E's relicensing effort.   All costs of relicensing incurred by PG&E and by others authorized by PG&E (in aggregate the "total relicensing cost") are subject to the cost sharing provisions of Section 12.2.3.   Future cost responsibility associated with fulfillment of license conditions of the new license, such as Protection, Mitigation, and Enhancement ("PM&E") measures and Management Plans, are not subject to the cost sharing provisions of Section 12.2.3, but instead shall be determined in accordance with Sections 1.1.33, 1.1.34, 2.4.1, and 2.5.2.

In addition to any relicensing work and relicensing costs authorized by PG&E, Santa Clara may, at its own initiative, perform work and incur costs to monitor the relicensing work ("monitoring work" and "monitoring costs", respectively).   Such monitoring costs incurred by Santa Clara are not costs of relicensing nor subject to the cost sharing provisions of Section 12.2.3, but are eligible to be treated by Santa Clara, at its sole discretion, as capital additions to the Costs of Plant, provided they are for staff costs, including overhead, consultant costs, legal costs, and other costs incurred for monitoring work, notwithstanding Sections 2.7.2 or 12.2.2 or any other provision of this Agreement to the contrary.   All relicensing costs or costs of relicensing allocated to Santa Clara pursuant to Section 12.2.3 are also eligible to be treated by Santa Clara, at its sole discretion, as capital additions to the Costs of Plant, notwithstanding Sections 2.7.2 or 12.2.2 or any other provision of this Agreement to the contrary.   All costs incurred by Santa Clara or allocated to Santa Clara by PG&E associated with fulfillment of license conditions of the new license, such as PM&E measures and Management Plans, that are related to the construction of new, or upgrades to existing, facilities are also eligible to be treated by Santa Clara, at its sole discretion, as capital additions to the Costs of Plant, notwithstanding Sections 2.7.2 or 12.2.2 or any other provision of this Agreement to the contrary.

Notwithstanding the second sentence of Section 2.7.2, each Party shall bear its own legal costs associated with its relicensing efforts except for legal costs incurred as relicensing work, which costs shall be allocated as provided in Section 12.2.3.   Disputes regarding whether legal costs have been incurred as relicensing work shall be referred to the Grizzly Management Committee (Section 1.1.35 as established in accordance with Section 18.2) for resolution.

Santa Clara is serving as the CEQA lead agency to ensure compliance with CEQA for the relicensing effort ("CEQA work").   All CEQA work performed by Santa Clara, including staff, consultant and legal work, both prior to and after the effective date of this Amendment, shall be treated as relicensing work, the costs of which are subject to the cost sharing provisions of Section 12.2.3.   Further, Santa Clara's allocated portion of the cost of relicensing related to CEQA compliance is eligible to be treated by Santa Clara, at its sole discretion, as capital additions to the Costs of Plant, notwithstanding Sections 2.7.2 or 12.2.2 or any other provision of this Agreement to the contrary.   As encouraged by both CEQA and NEPA regulations and guidelines, Santa Clara will utilize FERC's NEPA document and process to the maximum extent

practicable with the goal of minimizing CEQA costs while still meeting the CEQA regulatory requirements.

Each Party shall keep and maintain accounting records of relicensing work and relicensing costs in accordance with the provisions of the Section 3.5.   Forecasts of future relicensing work shall be provided in accordance with Section 5.8.3.

12.2.3  If the Ownership Period extends beyond the expiration of the Joint License, Santa Clara will share in the cost of renewing the Bucks Creek License, and the cost of any FERC fees for annual license extensions which may be granted following the expiration of the Joint License. Santa Clara's share of such costs shall be determined as follows:

(a)     Santa Clara's share of the relicensing cost shall be equal to the total relicensing cost multiplied by the ratio of the nameplate megawatt capacity of Grizzly to the total nameplate megawatt capacity of all facilities on the Bucks Creek License, and multiplied by the ratio of the number of years Santa Clara will be a joint licensee in the new license period to the term, in years, of the new license. The Parties recognize that the start of the new license term may not coincide with the end of the current license term, depending on then current FERC regulations.

(b)     Santa Clara's annual share of license extension fees shall be equal to the total annual license extension fee multiplied by the ratio of the nameplate megawatt capacity of Grizzly to the total nameplate megawatt capacity of all facilities on the Bucks Creek License.

### 12.3     Reversion Dates

12.3.1  There shall be six (6) possible dates or events upon which the Reverter Date may occur, and on such occurrence Santa Clara's Interest in Grizzly shall terminate and all Interest in Grizzly shall revert to PG&E. The Reverter Date shall occur as of 0000 hours on the first of the following dates to occur; provided, that PG&E has given Santa Clara any notice thereof as may be required pursuant to Sections 12.5, 13 or 16.1.2: (1) at any time after PG&E's conveyance of Grizzly and the Interest therein, upon the election of either Party to terminate development of Grizzly as provided in Section 13; (2) the fifteenth 15th) anniversary of the Commercial Operation Date ("first-possible- Reverter Date"); (3) the twentieth (20th) anniversary of the

Commercial Operation Date ("second possible Reverter Date"); (4) the twenty-fifth (25th) anniversary of the Commercial Operation Date ("third possible Reverter Date"); (5) on or after January 1, 2034 or the third possible Reverter Date, whichever comes later ("fourth possible Reverter Date"); or (6) upon the election provided PG&E under Section 16.1.2. The date of the possible occurrence of the first, second, third, or fourth possible Reverter Dates shall be adjusted in the event of the circumstances provided for in Sections 11.1 c), 12.3.2 and 12.3.3 and 12.6. PG&E agrees not to exercise the first-possible-Reverter Date.

12.3.2  In the event that the SCAPC is one hundred two percent (102%) or more of the IPCT, the dates of the first possible Reverter Date, second possible Reverter Date, and third possible Reverter Date will be delayed one (1) Year for each full two (2) percent that the IPCT is exceeded by the SCAPC.

12.3.3  a) Upon final acceptance of the new Grizzly Amendment and Joint License, including determination of any appeal of terms and conditions affecting energy production, PG&E shall perform a water and power study using the same computer model and input assumptions (the program and the input data sets are stored under the filename "G.Final.Data" on PG&E's mainframe computer system) used to determine the estimated 62.7 gWh weighted average annual energy upon which the Parties relied for this Agreement, with such input assumptions adjusted to reflect changes in license conditions as contained in the Grizzly Amendment and the Joint License that were not modeled in the original computer run, in order to evaluate the impact of those changed conditions on Santa Clara's anticipated benefits from owning and operating Grizzly. The impact will be calculated as the change in weighted average annual gWh between the two (2) runs divided by 125.4 gWh and multiplied by one hundred (100) to express the result as a percentage. PG&E shall preserve said file and model in an appropriate form so that the evaluation study may be made in the future on the same basis as the original study which the Parties relied upon for this Agreement.

b) In the event that the impact as calculated in Section 12.3.3 a) shows an adverse change exceeding two percent (2%), the first possible Reverter Date, second possible Reverter Date, and third possible Reverter Date will be delayed one (1) Year for each full two percent (2%) of adverse impact. This adjustment shall occur one time only.

12.3.4  The deferral provisions set forth in Sections 11.1 c), 12.3.2, 12.3.3, and 12.3.5 shall be cumulative.

12.3.5

a)  Upon final determination of the FPCT, the minimum cost-based delay in the first, second, and third possible Reverter Dates will be one (1) year for each two (2) percent that the FPCT exceeds the IPCT. The difference between the FPCT and the IPCT will be rounded up or down to the closest two percent (2%) increment of the IPCT.

b)  After the completion of the Grizzly development, if it is determined that the SCAPC is greater than the FPCT, the first, second and third possible Reverter Dates may be subject to further delays, using the delay calculation method pursuant to Section 12.3.2 of the Settlement Agreement. The actual delay shall be the greater of the minimum delay pursuant to the above paragraph or the delay calculated pursuant to Section 12.3.2 of the Settlement Agreement (using the full two percent (2%) method comparing the SCAPC to the IPCT).

c)  The Parties shall, within one (1) year of the Completion of Construction Date, calculate and agree upon the total amount of delay and the possible Reverter Dates.

d)  PG&E may, at its election, include in the transfer documents a limit on the time within which the fourth possible Reverter Date, as so revised, can be exercised. Such language shall not change the earliest date on which the fourth possible Reverter date will occur or cause the fourth possible Reverter Date to occur before the third possible Reverter Date.

### 12.4   Determination Of Reverter Reimbursement

It is the intent of the Parties that Santa Clara be made whole and reimbursed by PG&E for the fair market value of Grizzly upon the occurrence of the Reverter Date and the reverter or reversion of Grizzly to PG&E, except under the catastrophic damage circumstances described in Sections 12.8 and 16.1. Accordingly, the Parties agree and stipulate that the amount of such reimbursement shall be determined as follows, and that such amount is no less than fair market value and is just and reasonable:

a)      If the Reverter Date occurs on the first possible Reverter Date, the amount of reimbursement shall be EPCLD (for reimbursement of original capital construction costs, after depreciation)   + DCP (for reimbursement of capital costs incurred subsequent to original construction, after depreciation).

b)      If the Reverter Date occurs on the second possible Reverter Date, the amount of reimbursement shall be (EPCLD + OCLD)/2 + DCP.

c)      If the Reverter Date occurs on the third possible Reverter Date, the amount of reimbursement shall be OCLD (for reimbursement of original capital construction costs, after depreciation) + DCP.

d)      If the Reverter Date occurs on the fourth possible Reverter Date, the amount of reimbursement shall be the OCLD + DCP.

e)      If the Reverter Date occurs as a result of termination of development of Grizzly as provided in Section 13, no additional reimbursement will be in order since PG&E is to refund to Santa Clara moneys advanced by Santa Clara.

f)      If the Reverter Date occurs as provided in Section 16.1.2, no reimbursement will be in order, it being agreed by the Parties that any loss borne by Santa Clara under such circumstances is an incident of the risks of ownership.

### 12.5    Notice

PG&E may at its option cause the Reverter Date to occur on the first possible Reverter Date, the second possible Reverter Date, the third possible Reverter Date, or the fourth possible Reverter Date by giving Santa Clara advance written notice thereof not less than three (3) Years prior to the intended Reverter Date. In the event that Grizzly is condemned or is not in a condition as would be normally expected for a facility of its age and operating experience, at PG&E's election its notice shall be deemed cancelled and the Reverter Date shall not occur. The occurrence of the Reverter Date under the circumstances of Sections 13 or 16.1.2 shall be governed by any applicable notice provisions in those Sections. Any notice by PG&E that will result in the occurrence of the Reverter Date shall be given in writing by certified mail, or by

hand delivery, to the City Clerk of Santa Clara.

### 12.6    Payment of Reimbursement

In the event the Reverter date is to occur on either the first, second, third or fourth possible Reverter Dates, pursuant to notice given by PG&E, Santa Clara shall determine and advise PG&E, at least thirty (30) days in advance of the expected Reverter Date, of the amount of reimbursement determined as provided in Section 12.4. On or before the Reverter Date, PG&E shall pay the amount of reimbursement as so determined by Santa Clara, or such lesser amount as the Parties may agree upon to adjust for any outstanding liens, encumbrances, restrictions or clouds on title on Grizzly or to place Grizzly in a condition as would normally be expected for a facility of its age and operating experience (herein "Adjustment"). If the Parties disagree on the amount of reimbursement to be made, or whether an Adjustment is to be made to it or the amount of such Adjustment, PG&E shall reimburse Santa Clara the undisputed amount of reimbursement less any Adjustment PG&E believes proper and shall deposit any disputed amount into a mutually satisfactory escrow. In the event Santa Clara has been unable or has failed to advise PG&E of the amount of reimbursement, PG&E shall pay Santa Clara the amount of reimbursement it determines or estimates is appropriate after any Adjustment; and the Parties thereafter shall endeavor promptly to agree on the amount of reimbursement, including any Adjustment, and promptly make any appropriate additional payment or refund, including interest. The Reverter Date shall occur only as of the first day following the day on which PG&E has both (1) paid Santa Clara the undisputed amount of reimbursement less any Adjustment and (2) deposited any disputed amounts thereof in escrow. If an escrow is established, if possible it shall be interest bearing and PG&E shall be entitled to manage the account. Upon resolution of the dispute, the escrowed funds, including interest, shall be distributed in accordance and in proportion with the resolution, and any appropriate refund or additional payment shall be made promptly. The Parties shall adjust the distribution from escrow and any refunds or additional payments to provide for interest at the rate provided in Section 10.5.4, allowing credit for any interest earned by the escrow account.

### 12.7    Clear Title

During its Ownership Period, or until and unless PG&E's Possibility of Reverter is surrendered in accordance with Section 16.1.2, whichever first occurs, unless otherwise mutually agreed by the Parties, Santa Clara shall not permit any liens, encumbrances, restrictions, or other clouds of title to be placed on Grizzly except as lawfully imposed by FERC or other regulatory or other governmental agency having jurisdiction in the premises. Santa Clara shall oppose the imposition of any such liens, encumbrances, restrictions, or other clouds of title and remove promptly any that are imposed, and PG&E will cooperate with Santa Clara's efforts to do so.

### 12.8    Catastrophic Events

As specified in Section 16.1, Santa Clara is not obligated to rebuild the facility in the event of a catastrophic event which results in damage to or destruction of any or all of the Grizzly facilities to such an extent that restoration of Grizzly is not economic in Santa Clara's sole judgment and FERC concurs on Grizzly's abandonment. If Santa Clara decides not to rebuild Grizzly, PG&E will have the ability to cause the Reverter Date to occur at no cost to PG&E and without payment to Santa Clara of any amount for reimbursement, and to rebuild Grizzly as a PG&E-owned facility. In the event PG&E rebuilds the facility, Santa Clara will pay PG&E the amount that Santa Clara would otherwise have expended for site restoration. Neither Santa Clara nor PG&E will be required to reimburse the other for the lost opportunity to continue to run or to transfer Interest in Grizzly in the event of catastrophic damage and a decision not to rebuild as described in Section 16.1.

### 12.9    Warranty Transfer on Reversion

Santa Clara shall assign all Grizzly warranties to PG&E on or promptly after occurrence of the Reverter Date and thereafter shall have no responsibility to PG&E as to the matters and facilities so warranted.

Document Content(s)

Trans Letter Amd to Grizzly Settlement.PDF................................1
Amendment to Silicon Valley Power clean.PDF.............................11
Amendment to Silicon Valley Power marked.PDF............................35
Amendment to the Grizzly Agreement Supporting Documents.PDF.............59
FERC GENERATED TARIFF FILING.RTF.......................................60