WEIL, GOTSHAL & MANGES LLP
Theodore E. Tsekerides (*pro hac vice*)
(theodore.tsekerides@weil.com)
Jessica Liou (*pro hac vice*)
(jessica.liou@weil.com)
Matthew Goren (*pro hac vice*)
(matthew.goren@weil.com)
767 Fifth Avenue
New York, NY 10153-0119
Tel: 212 310 8000
Fax: 212 310 8007

KELLER BENVENUTTI KIM LLP
Tobias S. Keller (#151445)
(tkeller@kbkllp.com)
Peter J. Benvenutti (#60566)
(pbenvenutti@kbkllp.com)
Jane Kim (#298192)
(jkim@kbkllp.com)
650 California Street, Suite 1900
San Francisco, CA 94108
Tel: 415 496 6723
Fax: 650 636 9251

*Attorneys for Debtors and Reorganized Debtors*

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF CALIFORNIA
# SAN FRANCISCO DIVISION

| | |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION,**<br><br>- and -<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br><br>  Debtors.<br><br>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>☒ Affects both Debtors<br><br>*\* All papers shall be filed in the Lead Case, No. 19-30088 (DM).* | Case No. 19-30088 (DM)<br>Chapter 11 (Lead Case) (Jointly Administered)<br><br>**REORGANIZED DEBTORS' REPLY IN SUPPORT OF *IPSO FACTO* OBJECTION TO CONSOLIDATED EDISON DEVELOPMENT, INC.'S AMENDED CURE PAYMENT CLAIM DEMAND**<br><br>Date: August 10, 2021<br>Time: 11:00 a.m. (Prevailing Pacific Time)<br>Place: U.S. Bankruptcy Court, Courtroom 17, 16th Floor<br>San Francisco, CA 94102<br><br>Related Docket Nos.: 10613, 10617, 10721, 10730, 10827, 10948 |

# TABLE OF CONTENTS

                                                                                       **Page**

I. PRELIMINARY STATEMENT ...................................................................................1

II. ARGUMENT .................................................................................................................4

      A. Section 365(b)(2) of the Bankruptcy Code Plainly Bars Con Ed from Recovering Damages Arising from the Breach of a Bankruptcy Default Provision ...........................................................................................4

      B. Other Provisions of the Bankruptcy Code Confirm Congress's Intent to Bar Damages Arising from *Ipso Facto* Clauses ..........................................8

      C. Section 502(b) Bars Con Ed's Recovery for Alleged Damages Arising from a Breach of an *Ipso Facto* Clause ......................................................10

      D. Con Ed's Discussion of Sections 365(e) and 556 Is Wholly Irrelevant to the Issue of the Enforcement of its Impermissible *Ipso Facto* Clauses Against the Debtors ......................................................................10

      E. Damages Alleged to Have Been Triggered by *Ipso Facto* Clauses But Arising Under Cross-Default Provisions in Separate Agreements Need Not Be Cured to Assume Executory Contracts Under Section 365 ............13

III. CONCLUSION ............................................................................................................15

**TABLE OF AUTHORITIES**

Page(s)

**Cases**

*In re Amcor Funding Corp.*,
    117 B.R. 549 (D. Ariz. 1990)................................................................................12

*Bank of China v. Huang (In re Huang)*,
    275 F.3d 1173 (9th Cir. 2002) .................................................................................5

*In re Child World, Inc.*,
    161 B.R. 349 (Bankr. S.D.N.Y. 1993)......................................................................6

*In re Convenience USA, Inc.*,
    No. 01 81478, 2003 WL 23211573 (Bankr. M.D.N.C. Dec. 9, 2003).................5, 8

*In re Edison Mission Energy*,
    No. 12-49219, 2013 WL 5220139 (Bankr. N.D. Ill. Sept. 16, 2013) ...................6, 7

*In re Enron Corp.*,
    No. 01 B 16034 (AJG), 2005 WL 3874285 (Bankr. S.D.N.Y. Oct. 5, 2005)..........12

*In re FKA FC, LLC*,
    545 B.R. 567 (Bankr. W.D. Mich. 2016)..................................................................5

*Great W. Bank & Tr. v. Entz-White Lumber & Supply, Inc. (In re Entz-White Lumber & Supply, Inc.)*,
    850 F.2d 1338 (9th Cir. 1988) ..............................................................................6, 7

*L.R.S.C. Co. v. Rickel Home Ctrs., Inc. (In re Rickel Home Ctrs., Inc.)*,
    209 F.3d 291 (3d Cir. 2000)......................................................................................6

*In re New Invs., Inc.*,
    840 F.3d 1137 (9th Cir. 2016) ..............................................................................6, 7

*Oasis W. Realty, LLC v. Goldman*,
    51 Cal. 4th 811 (2011) ..............................................................................................7

*Travelers Cas. & Sur. Co. of Am. v. PG&E*,
    549 U.S. 443 (2007)................................................................................................10

*In re Tru Block Concrete Prods., Inc.*,
    27 B.R. 486 (Bankr. S.D. Cal. 1983) ........................................................................5

*U.S. Bank Tr. Nat'l Ass'n v. AMR Corp. (In re AMR Corp.)*,
    730 F.3d 88 (2d Cir. 2013).......................................................................................6

*United States v. Castleman*,
    572 U.S. 157 (2014)..................................................................................................8

*United States v. Jicarilla Apache Nation*,
    564 U.S. 162 (2011) ............................................................................................................. 9

*United States v. Tamman*,
    782 F.3d 543 (9th Cir. 2015) ............................................................................................. 14

*In re W. Asbestos Co.*,
    313 B.R. 832 (Bankr. N.D. Cal. 2003) .............................................................................. 10

*In re Yow*,
    No. 11-06011-5-SWH, 2019 WL 267780 (Bankr. E.D.N.C. Jan. 18, 2019) ...................... 10

**Statutes**

11 U.S.C. § 363(l) .......................................................................................................... 8, 9, 10

11 U.S.C. § 365(b) .............................................................................................................. *passim*

11 U.S.C. § 365(e) .............................................................................................................. *passim*

11 U.S.C. § 502(b) ................................................................................................................... 10

11 U.S.C. § 541(c) ......................................................................................................... 8, 9, 10

11 U.S.C. § 556 ..................................................................................................... 2, 10, 11, 12

11 U.S.C. § 1124(2) ............................................................................................................ 9, 10

**Other Authorities**

3 Collier on Bankruptcy ¶ 365.06 (16th ed. 2021) ............................................................... 4, 6

*In re Lehman Brothers Holdings, Inc.*,
    Case No. 08-13555, Hearing Transcript (Bankr. S.D.N.Y. Sept. 15, 2009) ............ 11, 12, 13

PG&E Corporation and Pacific Gas and Electric Company (the "**Utility**"), as debtors and reorganized debtors (collectively, the "**Debtors**" or "**Reorganized Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), hereby submit this reply to Consolidated Edison Development, Inc.'s *Response to Reorganized Debtors' Objection to Consolidated Edison Development, Inc.'s Amended Cure Payment Claim Demand* [Docket No. 10948] (the "**Response**"):

## I. PRELIMINARY STATEMENT[1]

Con Ed's Response completely misses the mark. In addition to espousing a reading of the Bankruptcy Code that would turn well-settled jurisprudence on its head, the Response relies on supporting declarations and factual contentions that are utterly irrelevant to the sole legal issue before the Court: whether the Bankruptcy Code's prohibition on *ipso facto* clauses bars Con Ed from recovery on the cure claims set forth in its Demand. The linchpin of Con Ed's argument is that, even though the Reorganized Debtors are excused from curing any defaults arising out of a breach of an *ipso facto* clause, the Reorganized Debtors are nevertheless still responsible for paying $12 million in damages Con Ed alleges it has sustained as a result of that breach. This argument makes no sense. The entire intent of section 365(b)(2) is to excuse any requirement for a debtor to cure defaults arising from the filing of a chapter 11 case, which obviously includes any damages allegedly incurred by such breach. Indeed, section 365(b)(2) would be completely eviscerated if this were otherwise. It is, therefore, not surprising that Con Ed can find no authority to support its misguided contention that, while the need for curing the breach (what it calls the trigger) is excused, paying damages for the breach is not. This may also explain why Con Ed stands alone as the only PPA counterparty to advance such an illogical argument that is directly at odds with the Bankruptcy Code and the body of caselaw interpreting section 365(b)(2).

Con Ed's argument that its claims are somehow untethered from the cure analysis under section 365 makes even less sense when Con Ed itself has asserted these amounts as a cure demand. *See*

---

[1] Capitalized terms used but not herein defined have the meanings ascribed to them in the *Memorandum of Law in Support of Reorganized Debtors' Objection to Consolidated Edison Development, Inc.'s Amended Cure Payment Claim Demand* [Docket No. 10827] (the "**Opening Brief**") and the *Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization dated June 19, 2020* [Docket No. 8048] (the "**Plan**"), as confirmed by Order of the Court, dated June 20, 2020 [Docket No. 8053] (the "**Confirmation Order**").

Demand at 2 ("As a condition to assumption, the Utility must cure all defaults and outstanding amounts owed, including those resulting from the default of the Financing Agreements."). Con Ed repeats this assertion in its Response as well. *See* Response at 3. This flatly contradicts the legal gymnastics argued by Con Ed in the Response in its attempt to cleave section 365(b)(2) into separate cures of breaches and claims for damages allegedly arising from those breaches. If Con Ed was correct, counterparties could, and would, include liquidated damages provisions triggered by a chapter 11 filing in each and every contract, which would be payable on assumption. If this was permitted, the intent of section 365(b)(2), and the rehabilitative purpose of chapter 11, would be substantially impaired.

Con Ed's other arguments fare no better. Rather than address the obvious fact that the Bankruptcy Code represents a categorical bar to the enforcement of *ipso facto* clauses meant to encourage—not penalize—debtors seeking a fresh start, Con Ed expounds at great length on the supposed meaning of section 365(e)(1) and why it does not apply to the CED Agreements. But none of that has anything to do with Con Ed's Demand. Nor do any of the matters at issue here concern the rights that a party may or may not have been permitted to exercise during the Chapter 11 Cases under section 556 or the other safe harbor provisions of the Bankruptcy Code. Con Ed's statements in the Response concerning its purported rights under the Bankruptcy Code's safe harbor provisions—rights it never raised or attempted to exercise during the entire seventeen months of the Chapter 11 Cases—have no bearing on the requirements of a debtor for curing or assuming executory contracts under section 365(b). Moreover, Con Ed's bald assertion that the safe harbor provisions somehow render section 365(b)(2) inapplicable to the CED Agreements is without any support under the Bankruptcy Code or otherwise.

Con Ed's response to the Reorganized Debtors' references to cross-defaults also misses the point. The Reorganized Debtors included a brief discussion about cross-defaults in their moving brief to address Con Ed's contention that somehow, because the damages alleged here arose from other contracts, the prohibition against *ipso facto* clauses did not apply. In fact, as the Reorganized Debtors made plain, because the damages sought here (under whichever contract Con Ed claims) are all predicated on the Reorganized Debtors' chapter 11 filing, there can be no basis for recovery against

3

the Reorganized Debtors.  For this reason, among others, the declarations Con Ed submitted in support of its Response are utterly irrelevant.

Putting aside that the declaration from Frank R. Lindh is not based on any personal knowledge about facts relevant to the relationship between the parties, it fails to address any issue pertinent to the *ipso facto* arguments at hand.  The declaration from James J. Dixon is similarly irrelevant.  Both of these declarations have been submitted to establish that the Reorganized Debtors were on notice that Con Ed required financing in order to deliver Product under the CED Agreements.  Con Ed then oscillates between arguing and implying that its Third-Party Financing Agreements were either "integral" or "integrated" to the CED Agreements.  But the Reorganized Debtors are not disputing that they were generally aware that Con Ed would require financing in connection with the CED Agreements.  Indeed, third-party financing is a necessity that many, if not most, counterparties require in order to fund their operations.  However, Con Ed's Third-Party Financing Agreements plainly are not part of, or integrated into, the CED Agreements.  If the Court were to accept Con Ed's interpretation, any debtor would be directly accountable to all of its counterparties for the terms of the counterparties' own third-party financing.  This clearly is not the law and is directly antithetical to the intent and purpose of section 365(b)(2).

But even if the Third-Party Financing Agreements were integrated into and part of the CED Agreements as Con Ed implies, but which the facts directly contradict, it does not change the fact that the default in question, upon which all of Con Ed's alleged damages depend, is a breach of an *ipso facto* clause and arises solely as a result of the commencement of the Chapter 11 Cases.  Therefore, whether under its own contracts with the Debtors or those Con Ed separately entered into with its lenders upon which it claims it sustained damages, because the damages Con Ed seeks arise out of a purported breach of an *ipso facto* clause and are premised on the Reorganized Debtors filing for chapter 11 protection, Con Ed's Demand must be disallowed.

## II. ARGUMENT

### A. Section 365(b)(2) of the Bankruptcy Code Plainly Bars Con Ed from Recovering Damages Arising from the Breach of a Bankruptcy Default Provision

Con Ed's Response confirms that its Demand rests on the purported breach of *ipso facto* clauses in the PPAs triggered by the commencement of the Chapter 11 Cases. *See* Response at 3 ("When the Debtors announced their intention to file for bankruptcy and subsequently filed for bankruptcy, they breached the CED Agreements …."); *see id.* at 6 (arguing that "[a]s a result of PG&E's bankruptcy filing," Con Ed incurred losses due to these "breaches"); *see id.* at 8 ("The Cure Claim here is an enforceable and allowable claim based on direct damages incurred as a result of PG&E's bankruptcy filing.").[2] Accordingly, Con Ed's Demand is barred by the Bankruptcy Code and must be disallowed.

Section 365 plainly and unequivocally excuses the Reorganized Debtors from curing a default that is a breach of a provision relating to the commencement of a bankruptcy case. As the Reorganized Debtors demonstrated in their Opening Brief, section 365(b)(2) provides that the cure requirement "does not apply to a default that is a breach of a provision relating to" either "the insolvency or financial condition of the debtor" or "the commencement of a case under this title." Opening Brief at 8–11; 11 U.S.C. § 365(b)(2). This provision is broad: Congress's use of "relating to" in section 365 evinces a clear intent to root out *ipso facto* clauses. *See* Opening Brief at 10; 3 Collier on Bankruptcy ¶ 365.06 (16th ed. 2021) ("The scope of section 365(b)(2) is broad. It applies not only to defaults triggered by a bankruptcy filing, but also to defaults triggered by events or conditions that are likely to occur or exist around the time that a case is commenced.").

Notably, Con Ed has not challenged the breadth or scope of this provision. Instead, Con Ed contends that section 365(b)(2) only means that "the debtor is relieved of curing the default trigger— the bankruptcy filing" but must still pay damages for that default. Response at 7. But as noted, this

---

[2] The Reorganized Debtors reserve all rights to contest Con Ed's argument that any damages allegedly arising from the breach of the PPAs' *ipso facto* clauses are "direct damages." Con Ed's Demand undeniably presents a claim for consequential damages, which are barred by both the PPAs and the IAs. Those contentions, and all other arguments, are expressly reserved in the event the Court does not disallow Con Ed's Demand based on the Reorganized Debtors' *ipso facto* arguments.

contention makes no sense. If being excused from curing a default does not excuse the damages arising from that default, then the debtor has not been excused from curing the default at all.

Consider, for example, a contract that contains a liquidated damages provision requiring a debtor to pay a counterparty $10 million in the event it files for chapter 11 protection. Under Con Ed's logic, to assume that contract the debtor would be relieved of having to cure the trigger (*e.g.*, filing for bankruptcy), but would still be required to pay $10 million in damages simply because the debtor availed itself of its federal right to seek protection under the Bankruptcy Code. This is not what Congress intended under section 365(b)(2), and permitting "bankruptcy penalties" such as this and what Con Ed seeks would permit counterparties to impose damages arising purely out of a debtor's decision to file for bankruptcy. Such provisions are akin to contracting away a party's right to even file for bankruptcy, which courts have routinely found to be void as against public policy. *See Bank of China v. Huang (In re Huang)*, 275 F.3d 1173, 1177 (9th Cir. 2002) ("It is against public policy for a debtor to waive the prepetition protection of the Bankruptcy Code. This prohibition of prepetition waiver has to be the law; otherwise, astute creditors would routinely require their debtors to waive." (citing *Hayhoe v. Cole (In re Cole)*, 226 B.R. 647, 651–54 (B.A.P. 9th Cir. 1998)); *see also In re Tru Block Concrete Prods., Inc.*, 27 B.R. 486, 492 (Bankr. S.D. Cal. 1983) ("It is a well settled principal that an advance agreement to waive the benefits conferred by the bankruptcy laws is wholly void as against public policy.").

Contrary to Con Ed's tortured interpretation of section 365(b)(2), **numerous courts applying section 365(b)(2) have recognized that a debtor is not required to cure and pay damages resulting from the alleged breach of an ipso facto provision**. *See, e.g.*, *In re Convenience USA, Inc.*, No. 01 81478, 2003 WL 23211573, at **2, 5 (Bankr. M.D.N.C. Dec. 9, 2003) (disallowing claim where damages sought were based on alleged breach of *ipso facto* provisions finding "there is no requirement to cure such a default nor to compensate for any pecuniary damages resulting from such a default," because "under § 365(b)(2)(B) such a default is not a default for purposes of § 365(b)(1)."); *In re FKA FC, LLC*, 545 B.R. 567, 571, 575 (Bankr. W.D. Mich. 2016) (disallowing claims and finding that a provision purporting to trigger event of default under lease agreement due solely to a debtor's bankruptcy "is an ipso facto clause that is unenforceable in bankruptcy," and thereby, "the Debtors'

bankruptcy filing alone did not trigger an event of default under the Lease."); *In re Child World, Inc.*, 161 B.R. 349, 354 (Bankr. S.D.N.Y. 1993) ("Section 365 abrogates the power of ipso facto clauses. No default may occur pursuant to an ipso facto clause and no reliance may be placed upon an alleged default where the only cause for default is the debtor's commencement of a bankruptcy case."); *L.R.S.C. Co. v. Rickel Home Ctrs., Inc. (In re Rickel Home Ctrs., Inc.)*, 209 F.3d 291, 298 (3d Cir. 2000) (holding that the requirements of section 365(b)(1) to cure defaults "do not apply to defaults triggered by provisions relating to the insolvency or financial condition of the debtor, the commencement of a Chapter 11 case, or the appointment of a trustee in the case or a custodian before the case."); *U.S. Bank Tr. Nat'l Ass'n v. AMR Corp. (In re AMR Corp.)*, 730 F.3d 88, 110 (2d Cir. 2013) (finding that a debtor "was not required to pay off [] accelerated debt" incurred from a default under an *ipso facto* clause (citing 11 U.S.C. § 365(b)(2)); *In re Edison Mission Energy*, No. 12-49219, 2013 WL 5220139, at *8 (Bankr. N.D. Ill. Sept. 16, 2013) ("[B]ankruptcy filings are not defaults as bankruptcy law does not recognize defaults based on filings for protection under the Bankruptcy Code."); *see also* 3 Collier on Bankruptcy ¶ 365.06 (16th ed. 2021) ("This exception to the general rule requiring cure of defaults furthers the bankruptcy policy of preventing the enforcement of ipso facto or optional bankruptcy termination clauses."). The courts in each of these cases applied section 365(b)(2) in accordance with its plain and direct meaning and held that the respective debtors were not required to pay damages or amounts arising out of purported breaches of *ipso facto* clauses as cure payments or otherwise.

Con Ed's principal response to this settled law is that "default" does not mean what it means in ordinary English. Con Ed argues that "the debtor is relieved of curing the default trigger—the bankruptcy filing" but, notwithstanding that relief, "damages resulting from the default are still recoverable." *See* Response at 7. In support of this argument, Con Ed relies on *In re New Invs., Inc.*, 840 F.3d 1137 (9th Cir. 2016), which cited an earlier case, *Entz-White*, for the proposition that:

> A default is an event in the debtor-creditor relationship which triggers certain consequences. Curing a default commonly means taking care of the triggering event and returning to pre-default conditions. The consequences are thus nullified. This is the concept of 'cure' used throughout the Bankruptcy Code.

*Id.* at 1140 (citing *Great W. Bank & Tr. v. Entz-White Lumber & Supply, Inc. (In re Entz-White Lumber & Supply, Inc.)*, 850 F.2d 1338, 1340 (9th Cir. 1988)).

Although Con Ed's reasoning is difficult to follow, Con Ed seems to be relying on *Entz-White* to argue that the Reorganized Debtors are merely excused from having to cure the default trigger (*i.e.*, the filing of the Chapter 11 Cases) but are not excused from curing the alleged damages caused by the default itself, as is plainly stated in section 365(b)(2). This argument is patently incorrect, and the cases cited do not support Con Ed's contention. Significantly, both *In re New Investments* and *Entz-White* considered pre-bankruptcy payment defaults—not payments or damages arising from breaches of *ipso facto* provisions.[3] Those cases considered whether the debtor was required to pay default or regular interest in curing such defaults; they did not consider the question at bar as to whether a debtor is at all required to cure a breach of an *ipso facto* provision, which is not even considered a default under settled law. Indeed, if the Court were to accept Con Ed's argument, every contract would include a liquidated damages clause triggered by a chapter 11 filing—completely negating the intent of section 365(b)(2) and the rehabilitative purpose of chapter 11.

Furthermore, Con Ed's argument also fails from a fundamental contract law perspective. As every first-year law student knows, a party pleading a breach-of-contract claim must satisfy the elements of both breach and damages; there must be a breach for damages to be recoverable, and there must be damages for a breach to be actionable. Without one or the other the claim fails, yet Con Ed argues that the Reorganized Debtors are excused from curing the **breach** but not the **damages**. But the two concepts cannot be separated in this way. *See Oasis W. Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821 (2011) ("[T]he elements of a cause of action for breach of contract are (1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff."). As noted above, numerous courts have confirmed that a breach of an *ipso facto* clause is not a breach at all. *See, e.g.*, *In re Edison Mission*, 2013 WL 5220139, at *8 ("[B]ankruptcy filings are not defaults as bankruptcy law does not recognize defaults based on

---

[3] *See In re New Invs.*, 840 F.3d at 1139 ("New Investments defaulted on the note in 2009. When Pacifica commenced non-judicial foreclosure proceedings, New Investments filed for Chapter 11 bankruptcy."); *see also In re Entz-White*, 850 F.2d at 1339 ("The note was due by its own terms on June 1, 1984. Entz-White did not pay the amount due, and filed a Chapter 11 bankruptcy petition on August 17, 1984.").

filings for protection under the Bankruptcy Code."); *In re Convenience USA, Inc.*, 2003 WL 23211573, at *5 (finding "there is no requirement to cure such a [bankruptcy] default nor to compensate for any pecuniary damages resulting from such a default," because "under § 365(b)(2)(B) such a default is not a default for purposes of § 365(b)(1)."). Con Ed's position is logically untenable, and (unsurprisingly) the Bankruptcy Code rejects this by endorsing in its treatment of cure claims the common-sense principles of contract law.

Ultimately, Con Ed's Response boils down to the argument that the Reorganized Debtors are not entitled to any relief at all under section 365(b)(2). Yet that is not the law, because "Congress presumably does not enact useless laws." *United States v. Castleman*, 572 U.S. 157, 178 (2014) (Scalia, J., concurring). If that were the law, then any time a debtor filed for chapter 11 relief, it would be subject to numerous claims from contract and lease counterparties seeking to penalize it just for filing a chapter 11 case. As stated, counterparties would include liquidated damages provisions triggered by bankruptcy filings. As a result, a critical aspect of the flexibility and protections offered to debtors by the Bankruptcy Code to reorganize would be eviscerated. Con Ed offers no explanation—nor can it—for this untenable result.

**B.    Other Provisions of the Bankruptcy Code Confirm Congress's Intent to Bar Damages Arising from *Ipso Facto* Clauses**

The plain text of the Bankruptcy Code also demonstrates that Con Ed is wrong. By its terms, section 365 addresses executory contracts and breaches, and the very provisions that Con Ed cites confirm that the Reorganized Debtors are under no obligation to cure "a default that is a ***breach*** of a provision relating to" either "the insolvency or financial condition of the debtor" or "the commencement of a case under this title." 11 U.S.C. § 365(b)(2) (emphasis added). This section is oriented to the actions of contractual counterparties, and we know this because the same language is used in three other provisions of the Bankruptcy Code that work to invalidate *ipso facto* clauses in executory contracts. *See* Opening Brief at 11–15 (discussing legislative history and 11 U.S.C. §§ 365(e)(1), 541(c), & 363(l)).

While Con Ed ignores these textual arguments, this legislative framework further underscores why Con Ed's Demand must fail: (i) section 365(e)(1) prevents a counterparty from terminating or

modifying an executory contract on the basis of an *ipso facto* clause; (ii) section 541(c) prevents a counterparty from seeking the forfeiture of estate property on the basis of an *ipso facto* clause; and (iii) section 363(l) ensures that a debtor may use property "notwithstanding" an *ipso facto* clause. Just like these three provisions, section 365(b)(2) prevents a counterparty from making a cure demand on the basis of a breach of an *ipso facto* clause. Given this framework, Con Ed's argument that section 365(b)(2) is about a debtor being relieved from curing ***its own bankruptcy*** simply has no basis in reality and would make section 365(b)(2) inconsistent with textually identical provisions throughout the Bankruptcy Code.

Con Ed contends that section 365(b)(2) was enacted so that the debtor would not be "preempt[ed] … from assuming an executory contract." Response at 7. Of course, an *ipso facto* clause cannot "preempt" a debtor from assuming an executory contract due to bankruptcy. But Con Ed is wrong that section 365(b)(2) achieves this purpose, because section 365(e)(1) ***already*** ensures that a counterparty cannot prevent a debtor from assuming a contract through devices that "terminate[] or modif[y]" an executory contract on the basis of an *ipso facto* clause. *See* 11 U.S.C. § 365(e)(1); Opening Brief at 11–12. Con Ed's argument, therefore, must be rejected because it would render section 365(b)(2) meaningless surplusage. *Cf. United States v. Jicarilla Apache Nation*, 564 U.S. 162, 185 (2011) ("As our cases have noted in the past, we are hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law." (quoting *Mackey v. Lanier Collection Agency & Serv., Inc.*, 486 U.S. 825, 837 (1988))).

Con Ed's other efforts to undermine the plain meaning of section 365(b)(2) similarly fail. Con Ed contends that section 1124(2) of the Bankruptcy Code is no obstacle to its Demand, reasoning that even though "curing an *ipso facto* default is not a necessary condition for a court to find that a claim is unimpaired," it remains the case that "such a default still exists" and that Con Ed is, therefore, still entitled to damages. Response at 8. Yet even accepting Con Ed's argument that a default "exists" when the Reorganized Debtors do not have to cure it, that does not mean Con Ed can extract payment from the Reorganized Debtors because they sought chapter 11 protection. Consistent with section 365(b)(2), section 1124(2) excuses a debtor from curing defaults "of a kind specified in section 365(b)(2) … or of a kind that section 365(b)(2) expressly does not require to be cured" to render a

claim unimpaired. 11 U.S.C. § 1124(2)(A). It cannot be the case that a claimant is "unimpaired"—meaning there has not been any alteration of a claimant's legal or equitable rights except as required under the Bankruptcy Code or otherwise applicable law—but at the same time a default exists that requires the payment of millions of dollars to be cured. *See, e.g.*, *In re W. Asbestos Co.*, 313 B.R. 832, 836 (Bankr. N.D. Cal. 2003) ("Impairment means any alteration of a claimant's or interest holder's legal or equitable rights"). Just as with sections 365(e)(1), 541(c), and 363(l), Congress left no doubt as to its intentions in section 1124(2).

        **C.**        **Section 502(b) Bars Con Ed's Recovery for Alleged Damages Arising from a Breach of an *Ipso Facto* Clause**

Con Ed is wrong that its misguided arguments align with the Bankruptcy Code's provisions for the allowance or disallowance of claims. Con Ed argues that, because section 502(b) does not expressly provide for "the disallowance or modification of defaults arising under an *ipso facto* clause," it, therefore, follows that Con Ed's Demand should be allowed. Response at 9; *see also id.* at 7. However, section 502(b) clearly provides that a claim against a debtor is not allowed to the extent that "such claim is unenforceable against the debtor and property of the debtor, under any … applicable law." 11 U.S.C. § 502(b)(1). As should be obvious, "any applicable law" includes the Bankruptcy Code. *See Travelers Cas. & Sur. Co. of Am. v. PG&E*, 549 U.S. 443, 451–52 (2007) (observing disallowance of claim was erroneous when not done under "applicable nonbankruptcy law" or under any "provision of the Bankruptcy Code"); *In re Yow*, No. 11-06011-5-SWH, 2019 WL 267780, at *3 (Bankr. E.D.N.C. Jan. 18, 2019) ("The term 'applicable law' encompasses not only applicable state law but also bankruptcy law." (citing *Travelers*, 549 U.S. at 451–52)). Because Con Ed's Demand is unenforceable against the Debtors under section 365(b)(2), any resulting claim must be disallowed under section 502(b)(1).

        **D.**        **Con Ed's Discussion of Sections 365(e) and 556 Is Wholly Irrelevant to the Issue of the Enforcement of its Impermissible *Ipso Facto* Clauses Against the Debtors**

Rather than address the intent of the statutory scheme and bankruptcy policy barring counterparties from enforcing *ipso facto* clauses against a debtor, Con Ed wrongly suggests that the Reorganized Debtors are contending section 365(e) bars its damages claim, and Con Ed relies on an

irrelevant discussion on whether the PPAs and Con Ed qualify under the safe harbor provisions of section 556 of the Bankruptcy Code. Neither argument is relevant here.

The Reorganized Debtors do not argue that section 365(e)(1) explicitly bars Con Ed's damages claim. *See* Opening Brief at 11. Rather, the Reorganized Debtors referenced that section to make the point—not refuted by Con Ed—that Congress enacted a comprehensive scheme barring the enforcement of *ipso facto* clauses against a debtor. Con Ed, thus, misses the point when it argues that "section 365(e) does not apply because recovery of direct damages incurred as a result of the bankruptcy filing would not terminate the PPAs and IAs." Response at 12.

Similarly, section 556 has no relevance here. That provision provides, in relevant part:

> The contractual right of a … forward contract merchant to cause the liquidation, termination, or acceleration of a commodity contract, as defined in section 761 of this title, or forward contract because of a condition of the kind specified in section 365(e)(1) of this title, and the right to a variation or maintenance margin payment received from a trustee with respect to open commodity contracts or forward contracts, shall not be stayed, avoided, or otherwise limited by operation of any provision of this title or by the order of a court in any proceeding under this title.

11 U.S.C. § 556.

None of this has anything to do with Con Ed's Demand or the assumption and cure of the CED Agreements. The Bankruptcy Code's safe harbor protections for financial contracts only protect a counterparty's rights to terminate, liquidate, or accelerate such contracts—rights which Con Ed never sought to exercise with respect to the CED Agreements. *See In re Lehman Brothers Holdings, Inc.*, Case No. 08-13555 (JMP), Hearing Transcript [Docket No. 5261] at 107–09 (Bankr. S.D.N.Y. Sept. 15, 2009) [hereinafter "**Lehman Brothers**"] (discussing analogous language in sections 560 and 561 of the Code, and providing that "the safe harbor provisions … protect a non-defaulting swap counterparty's contractual rights ***solely*** to liquidate, terminate or accelerate one or more swap agreements because of a condition of the kind specified in Section 365(e)(1)…. All other uses of ipso facto provisions remain unenforceable under the Bankruptcy Code." (emphasis added)).

Whether Con Ed had the right during the Chapter 11 Cases to liquidate, terminate, or accelerate amounts due under its CED Agreements notwithstanding the imposition of the automatic stay under

section 362 is not at issue here. The fact remains that, during the seventeen months the Debtors were in chapter 11, Con Ed never once sought to apply the safe harbor provisions with respect to its CED Agreements, and Con Ed did not terminate, liquidate, or accelerate any amounts due under those agreements (notwithstanding the fact that Con Ed allegedly incurred $12 million in damages as a result of the commencement of the cases). Even if Con Ed's rights under section 556 were somehow relevant, its inaction over the course of the Chapter 11 Cases clearly waived these rights, which must be exercised promptly following a bankruptcy filing. *See Lehman Brothers* at 111:13–22 ("[A] counterparty's action under the safe harbor provisions must be made fairly contemporaneously with the bankruptcy filing, less the contract be rendered just another ordinary executory contract."); *In re Enron Corp.*, No. 01 B 16034 (AJG), 2005 WL 3874285, at *4 (Bankr. S.D.N.Y. Oct. 5, 2005) ("To avail itself of the 'safe harbor' provisions of the Bankruptcy Code, however, the swap participant must opt for the early termination of the swap agreement based upon one of the reasons enumerated in section 365(e)(1) of the Bankruptcy Code and if based upon the bankruptcy filing, the election to terminate must be made fairly contemporaneously with the bankruptcy filing."); *In re Amcor Funding Corp.*, 117 B.R. 549, 553 (D. Ariz. 1990) (discussing the analogous provisions in section 555, and providing that "[t]he Court cannot permit Drexel, twelve months into Amcor's bankruptcy, to convert this exception into an offensive sword with which to ease its own bankrupt condition.").

Furthermore, Con Ed asserts that because, in its view, it qualifies for relief under the Bankruptcy Code's safe harbor provisions, that somehow exempts the CED Agreements from the application of section 365(b)(2). This is wholly without merit and unsupported. There is nothing in section 365(b) that references section 556 or any of the Bankruptcy Code's other safe harbor provisions to suggest that section 365(b)(2) does not apply to an agreement that may meet the definition of a safe harbored contract. There is similarly nothing in section 556 that is relevant to an analysis of cure demands under section 365(b)(2). Moreover, if the CED Agreements were safe harbored contracts (which the Reorganized Debtors do not concede), then Con Ed was free to seek to terminate its agreements during the Chapter 11 Cases notwithstanding the imposition of the automatic stay. Con Ed did not do so and, as a result, the CED Agreements were assumed under the Plan on the

12

Case: 19-30088    Doc# 11001    Filed: 07/30/21    Entered: 07/30/21 17:14:55    Page 16 of 19

Effective Date subject to the applicable provisions of section 365—including section 365(b)(2)'s prohibition on the enforcement of *ipso facto* clauses. *See Lehman Brothers* at 107–11.

This is a straightforward cure damages dispute and, as such, Con Ed's claim is barred by section 365(b)(2) and the broad sweep of Congress's pronouncements throughout the Bankruptcy Code.

E. **Damages Alleged to Have Been Triggered by *Ipso Facto* Clauses But Arising Under Cross-Default Provisions in Separate Agreements Need Not Be Cured to Assume Executory Contracts Under Section 365**

Con Ed misapprehends the significance of the rule against requiring the cure of defaults in separate agreements triggered by cross-default provisions and the purpose for which the Reorganized Debtors addressed that issue in their Opening Brief. That rule, just like the Bankruptcy Code's broad invalidation of *ipso facto* clauses, prevents a counterparty from using a contractual provision to extract payment from a debtor or otherwise undermine a debtor's federal right to file for bankruptcy. *See* Opening Brief at 15–17. The rule thus illustrates yet another example of the broad bankruptcy policy invalidating contract provisions that purport to restrain a debtor from filing for bankruptcy. While cross-default provisions are not *"per se* invalid" because they may be enforced in certain circumstances, such provisions cannot be enforced against a debtor when they arise from a bankruptcy default provision—as are the circumstances here.

Con Ed contends it "is not requiring PG&E to cure defaults incurred under a cross-default clause prior to assuming the PPAs," because "[t]he PPAs have already been assumed." Response at 19. But this is pure sophistry, as the fact remains that Con Ed is asserting its claim of $12 million as part of a cure demand and has stated that these amounts must be paid "as a condition to assumption" of the CED Agreements. *See* Demand at 2. The Demand is exactly that: a demand made in the context of what obligations, if any, the Reorganized Debtors have to cure in connection with their assumption of the CED Agreements. As demonstrated in the Opening Brief and again here, the Reorganized Debtors have paid Con Ed everything it is entitled to in connection with that assumption, and Con Ed is not entitled to anything more.

Furthermore, the only reason why Con Ed now seeks to have the Reorganized Debtors cure defaults *after* the assumption of its contracts is because the Plan provides, and the parties agreed, that

any issues with respect to cure disputes arising from Energy Procurement Agreements (which include the CED Agreements) would be handled following confirmation of the Plan and the Effective Date. *See* Confirmation Order ¶ 43 ("The parties to any such Energy Procurement Agreements shall attempt to resolve any Claims, Causes of Action or defaults in the ordinary course; provided that if no such resolution is reached within forty-five (45) days following the entry of the Confirmation Order, either party may submit the dispute to the Court"). Con Ed cannot now argue that, because the parties agreed and the Plan provides for the resolution of any Cure Disputes following the Effective Date and that the CED Agreements would be assumed under the Plan, the rule against cross-default provisions, as exemplified by *Jennifer Convertibles*, does not apply here. Of course it does.

Con Ed is also wrong that "the financing agreements are not entirely separate contracts," reasoning that "PG&E is no stranger to the financings with the lenders." Response at 19. Again, Con Ed cites no authority for the proposition that its separate contracts with separate parties are somehow integrated with the CED Agreements. Con Ed conveniently ignores that the Consent and Agreements submitted as Exhibit D to the Objection, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ There is, therefore, no basis to say that Con Ed's Third-Party Financing Agreements are "not entirely separate" from the PPAs. They are, in fact and in law, separate contracts.

The only thing Con Ed offers in support of its argument is the Declaration of Frank R. Lindh, which, despite its author's credentials and colorful metaphors about stools, does not give Con Ed a leg to stand on either. As an initial matter, Mr. Lindh's opinions on whether a contract is integrated do not help Con Ed because "an expert cannot testify to a matter of law amounting to a legal conclusion." *United States v. Tamman*, 782 F.3d 543, 552 (9th Cir. 2015) (citing Fed. R. Evid. 702(a)). But even if Mr. Lindh were competent to testify about legal conclusions that Con Ed has utterly failed to support, his observations that the Reorganized Debtors were "aware of the importance of project financing"

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

are as unremarkable as they are irrelevant. Lindh Decl. ¶ 10. The Reorganized Debtors have never disagreed that project financing for Con Ed can be important—this is obvious with or without an expert declaration—but more to the point, the Reorganized Debtors' general knowledge of project financing does not constitute acquiescence to the terms of Con Ed's agreements with its lenders, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

In any event, even if Con Ed were correct that the Third-Party Financing Agreements were somehow integrated with the PPAs, any damages arising from those contracts would be barred by the Bankruptcy Code. If, as Con Ed appears to allege, the Third-Party Financing Agreements were integrated and part of the CED Agreements, then the default provisions in those agreements would be unenforceable against the Reorganized Debtors for the same reason the PPAs are: A counterparty cannot enforce an *ipso facto* clause against a debtor in pursuit of cure damages. Con Ed's arguments must, therefore, be rejected.

### III. CONCLUSION

For the reasons discussed above, Con Ed's Demand should be disallowed.

Dated: July 30, 2021

**WEIL, GOTSHAL & MANGES LLP**
**KELLER BENVENUTTI KIM LLP**

By: /s/ *Theodore E. Tsekerides*
　　　Theodore E. Tsekerides

*Attorneys for Debtors and Reorganized Debtors*