William B. Abrams
end2endconsulting@gmail.com
1519 Branch Owl Place
Santa Rosa, CA, 95409
Tel: 707 397 5727

*Pro Se Claimant and*

*Party to California Public Utilities Commission Proceeding I.15-08-019 to Determine whether Pacific Gas and Electric Company and PG&E's Corporation's Organizational Culture and Governance Prioritizes Safety*

*Party to California Public Utilities Commission Proceeding A.20-06-011 which is the Application of Pacific Gas and Electric Company for Approval of Regionalization Proposal*

*Party to California Public Utilities Commission Proceeding R.18-10-007 which is the Order Instituting Rulemaking to Implement Electric Utility Wildfire Mitigation Plans Pursuant to Senate Bill 901*

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| In re:<br><br>PG&E CORPORATION,<br><br>    -and-<br><br>PACIFIC GAS AND ELECTRIC COMPANY,<br>               Debtors.<br><br>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>☑ Affects both Debtors<br><br>*\* All papers shall be filed in the lead case, No. 19-30088 (DM)* | Bankr. Case No. 19-30088 (DM)<br>Chapter 11<br>(Lead Case)<br>(Jointly Administrated)<br><br><br>**WILLIAM B. ABRAMS MOTION TO ENFORCE DISCLOSURE REQUIREMENTS OR RECONSTITUTE THE FIRE VICTIM TRUST OVERSIGHT COMMITTEE GIVEN NEW EVIDENCE OF SELF DEALING AND CONFLICTS OF INTEREST PURSUANT TO U.S.C. §§ 327(a) AND BANKRUPTCY RULE 2014**<br><br>No response is required until the court determines whether to permit further consideration of the motion |

## **PRELIMINARY STATEMENT**

This case and the oversight of the Fire Victim Trust has been hijacked to enable a new type of industry here in California. This new industry is built upon utility caused wildfires and the revictimization of the public to benefit certain rarefied utility investors and the attorneys in this case who have been influenced through perverse incentives. The conflicts of interest that are clearly evident in this case should not be ignored and are certainly self-evident in the extrajudicial actions of certain attorneys and other parties to undermine processes and procedures in this case and to advance the long-term interests in profiteering from California's utility caused wildfires.

This case and the Victim Trust more specifically, continue to be weaponized to advance financial interests of a few stakeholders and in so doing undermines the financial interests of victims and the safety and security of Californians. As the court has reminded me on many occasions, it is bound by California State Law which is why the powerful and well monied parties in this case chose to target Assembly Bill 1054 ("**AB1054**") as a vehicle to drive the direction of this case and future wildfire cases that will come before this court. This case and these extrajudicial actions cannot be separated as this has been a strategic and well-coordinated effort to circumvent the bankruptcy laws and procedures that are designed to provide fairness and justice. The actors that maintain conflicts of interest in this case both inserted themselves within key functions of this case such as the Tort Claimant Committee **("TCC")** and on the Trust Oversight Committee (**"TOC")** to both undermine the representation of victims and to actively engage in activities that subverted the authority of these bodies. This imbalance was designed to mute dissenting voices on these committees and drove certain parties to resign from the TCC on moral grounds. Indeed, provisions were secured to silence these same dissenting voices in the form of the TCC Restructuring Support Agreement ("**RSA**") and to undermine related processes at the California Public Utilities Commission ("**CPUC**") and within California legislative matters central to the unjust outcomes in this case. These same influences now have successfully elongated the timeline for victim claims administration and the monetization of the stock portion of the Trust in order to advance the interests of investors who have relied upon the need of certain attorneys to secure lines of credit and litigation financing so they can engage in the newly created wildfire litigation industry here in California.

The Dixie Fire that now rages in Northern California and which Pacific Gas and Electric Company ("**PG&E**") has admitted to causing is just the latest in a series of utility-caused fires post-

bankruptcy exit where just outcomes for the public and victims have been undermined by the parties in this case. This case created a window of opportunity for certain attorneys to build an industry around wildfire profiteering and to capitalize on the legislative and regulatory opportunities driven by this case to operate unbound by prior liability standards or threats of public or ratepayer takeovers of these Investor-Owned Utilities ("**IOUs**"). There was a general understanding that investors and victim attorneys would benefit from "first-mover" advantages if they were able to get a foothold in California. However, the upfront investment to be a class-action-player in this new wildfire arena was substantial and required lines of credit and litigation financing with favorable terms. Some attorneys noted this at the time like Mr. Roy Miller, a prominent Sonoma County attorney that "there is no firm in Sonoma County with the financial wherewithal to pursue litigation against PG&E."[1] This realization prompted attorneys to team up with the Watts Guerra firm that had self-described "lines of credit" with favorable terms partially funded through Centerbridge Partners who has interests adverse to victims in this case. It would also take the right regulatory environment and legislation to create conditions where IOUs had the funds to pay for wrongdoing to victims with few investor or corporate consequences for utility-caused wildfires. The manner in which certain parties to this proceeding were compromised and conflicted due to financial ties to PG&E investors is central to this case and central to the lack of Fire Victim Trust oversight.

  This motion will layout new evidence of these financial conflicts of interest and their ongoing unjust implications in this case. I will identify how the TOC is operating in violation of US Bankruptcy Law and contrary to the terms of the Fire Victim Trust Agreement and in particular their fiduciary duties to victims in this case. I will propose remedies and hope that the court and those attorneys motivated to right the wrongs in this case will support this motion despite the substantial forces and side agreements that have been created to undermine transparency for victims and this court. I have been personally threatened for exposing these issues in the case and understand first-hand the risks of engagement. Despite these threats, I will now layout the legal basis and the evidentiary record to substantiate this motion and respectfully request that a hearing be set.

---

[1] See "Lawyers Converge on Santa Rosa for Wildfire Litigation", Press Democrat, November 4, 2017, https://www.tortreform.com/news/lawyers-converge-on-santa-rosa-for-wildfire-litigation/

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. JURISDICTION

The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, the *Order Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges*, General Order 24 (N.D. Cal.), and Bankruptcy Local Rule 5011-1(a). This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## II. BACKGROUND

On July1, 2020 I filed the "WILLIAM B. ABRAMS MOTION FOR JUST TREATMENT OF VICTIMS THROUGH THE RECONSTITUTION OF THE FIRE VICTIM TRUST OVERSIGHT COMMITTEE AND EQUITABLE APPLICATION OF THE JUDICIAL REVIEW PROVISIONS PURSUANT TO U.S.C. §§ 1123(A)(4)" ("**Motion For Just Treatment**") which was denied without hearing on July 22, 2020 through the "ORDER DENYING MOTIONS FOR RECONSIDERATION" [Dkt. 8478] ("**Order Denying Reconsideration**").

After this Motion For Just Treatment, I discovered new evidence regarding the extent of the conflicts of interest in this case. Subsequently, on May 6, 2021 I filed the "WILLIAM B. ABRAMS MOTION TO AMEND JUDGEMENT AND REPLACE ALL THE MEMBERS OF THE FIRE VICTIM TRUST OVERSIGHT COMMITTEE AND TO SUPPORT EFFICIENT TRUST ADMINISTRATION PURSUANT TO U.S.C. §§ 1123(A)(4) AND BANKRUPTCY RULE 9023 AND 9024" [Dkt. 10715] which was denied without hearing on June 1, 2021 through the "ORDER DENYING MOTION BY WILLIAM B. ABRAMS AND REQUEST BY KENNETH ROY VINEY" [Dkt. 10738] which stated that "*the court is quite willing to provide significant leniency to parties acting in pro se*" yet stated that my motion would be denied in part because it did not include "*a preliminary statement, with proper citation to authority, of the jurisdiction and ability of this court to afford them whatever relief they may be seeking.*"

In response to this order on June 6, 2021, I filed the "WILLIAM B. ABRAMS MOTION TO ENFORCE THE VICTIM TRUST AGREEMENT AND REPLACE ALL MEMBERS OF THE FIRE VICTIM TRUST OVERSIGHT COMMITTEE AND TO SUPPORT EFFICIENT TRUST ADMINISTRATION PURSUANT TO U.S.C. §§ 1123(A)(4) AND FIRE VICTIM TRUST

AGREEMENT SECTION 6.2" [Dkt. 10748] and the "DECLARATION OF WILLIAM B. ABRAMS IN SUPPORT OF WILLIAM B. ABRAMS MOTION TO ENFORCE THE VICTIM TRUST AGREEMENT AND REPLACE ALL MEMBERS OF THE FIRE VICTIM TRUST OVERSIGHT COMMITTEE AND TO SUPPORT EFFICIENT TRUST ADMINISTRATION PURSUANT TO U.S.C. §§ 1123(A)(4) AND FIRE VICTIM TRUST AGREEMENT SECTION 6.2" [Dkt. 10750] and the "MEMORANDUM OF POINTS AND AUTHORITIES TO SUPPORT WILLIAM B. ABRAMS MOTION TO ENFORCE THE VICTIM TRUST AGREEMENT AND REPLACE ALL MEMBERS OF THE FIRE VICTIM TRUST OVERSIGHT COMMITTEE AND TO SUPPORT EFFICIENT TRUST ADMINISTRATION PURSUANT TO U.S.C. §§ 1123(A)(4) AND FIRE VICTIM TRUST AGREEMENT SECTION 6.2" [Dkt. 10751]

In response to this motion and without hearing on June 10, 2021 the court issued the "ORDER DENYING WILLIAM B. ABRAMS' MOTION TO ENFORCE THE VICTIM TRUST AGREEMENT AND REPLACE ALL MEMBERS OF THE FIRE VICTIM TRUST OVERSIGHT COMMITTEE, ETC." [Dkt. 10768] which in part stated that "*The Motion to Enforce, if allowed to remain on the court's calendar and be considered, can only force numerous professionals and the Trustee to have to spend money to oppose the Motion to Enforce and to defend these wide-sweeping criticisms.*" and then went onto state "*the court will not set for further hearing any similar motion Mr. Abrams decides to file unless he first requests permission from the court to do so after a preliminary review of what he wants and his basis for doing so.*"

After inquiring with the Courtroom Deputy regarding the proper procedure for how to go about requesting this special "preliminary review" on June 16, 2021, I was provided with direction on July 1, 2021 that stated "*The judge does not require you to obtain court approval before filing. Rather, you should not set the motion for hearing or require a response from another party until he reviews the motion and decides that it merits scheduling and noticing for hearing, followed by responses by affected parties. The front page of any motion should indicate that no response is required until the court determines whether to permit further consideration of the motion, and you provide notice of the hearing on that motion.*"

I respectfully request as a pro se claimant, that the court conduct this "preliminary review" and grant a hearing for this motion so that evidence can be presented to the court and that remedies

can be applied pursuant to U.S.C. §§ 327(a) and Bankruptcy Rule 2014. If a hearing is scheduled, I will promptly notice parties as directed by the court.

### III.    BASIS FOR RELIEF REQUESTED

Section 327(a) imposes two requirements for retention of professionals by a trustee. Professionals like those represented on the Trust Oversight Committee (TOC) must be both (1) disinterested and (2) not hold or represent any interest adverse to the estate.[2] The Bankruptcy Code defines "disinterested" as an individual who "does not have an interest materially adverse to the interest of the estate or any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in the debtor, or for any other reason."[3] The arguments that I have put forward in this case identify evidence that members of the TOC absolutely have interests materially adverse to the interest of victims and therefore should not have any role associated with the oversight responsibilities of the Victim Trust.

The Fifth Circuit in West Delta Oil determined that a party has an adverse interest to the estate if it "(1) [ ] possess[es] or assert[s] any economic interest that would tend to lessen the value of the bankruptcy estate or that would create either an actual or potential dispute in which the estate is a rival claimant; or (2) possess[es] a predisposition under circumstances that render such a bias against the estate."[4] There is clear evidence in this case that certain members of the TOC have engaged in matters that have lessened the value of the Trust and delayed the claims administration process to advantage shareholders and others that have adverse interests in this case.

Bankruptcy Rule 2014 imposes certain disclosure requirements to enable the court and interested parties to determine whether a professional is disinterested or holds an interest materially adverse to the estate.[5] Without full disclosure the court cannot determine whether retention of the

---

[2] 11 U.S.C. § 327(a); *In re American Intern. Refinery, Inc.*, 676 F.3d 455, 461 (5th Cir. 2012)

[3] 11 U.S.C. § 101(14).

[4] *In re West Delta Oil Co.*, 432 F.3d at 356.

[5] *See* FED. R. BANKR. P . 2014.

proposed professional is proper or not.[6]  There are specific disclosure requirements under Bankruptcy Rule 2014 which direct professionals like the TOC members and indicates that such professionals "must disclose all facts that bear on disinterestedness and cannot usurp the court's functions by selectively incorporating materials the proposed professional deems important."[7]  Certain members of the TOC, the TCC and Fire Claimant Professionals have hinted and indirectly pointed to facts that bear on disinterestedness but these hints are not disclosures and don't meet the standards set by Bankruptcy Rule 2014.

Moreover, full disclosure is a continuing responsibility and an attorney is under a duty to promptly notify the court if any potential conflict arises for the duration of his employment in the case.[8]  Firms that fail to timely and completely disclose connections risk revocation of their employment and denial of compensation.[9]  All of these remedies should be considered by the court in relation to members of the TOC after each member has fully disclosed their conflicts of interest in this case.

In Mitchell v. Metro Life Ins. Co., Inc., "a group of plaintiffs asserted a gender discrimination suit against Metropolitan Life Insurance Company ("Metlife").[10]  The complaint alleged that Metlife discriminated on gender grounds in all aspects of employment, including hiring, promotions, and compensation. One of the two law firms hired to represent the plaintiffs against Metlife was Lieff, Cabraser, Heimann & Bernstein, LLP ("Lieff Cabraser").  Wendy R. Fleishman ("Fleishman") was the partner whose conflict of interest Metlife argued should disqualify Lieff Cabraser from representing the plaintiffs. Fleishman joined the firm two months prior to the filing of the plaintiffs' cause of action, coming from Skadden, Arps, Slate, Meagher, and Flom LLP ("Skadden"). While at Skadden, Fleishman had been involved in defending the specific group within Metlife being sued by the plaintiffs. The court found that, while Fleishman was not involved in defending Metlife against

---

[6] See "Use of Conflicts Counsel and Ethical Walls to Resolve Ethical Conflicts", pg. 3, Wayne Kitchens, Randall A. Rios, Timothy A. Million, Simon R. Mayer, https://www.txs.uscourts.gov/sites/txs/files/UseofConflicts.pdf

[7] *In re Enron Corp.*, 2002 WL 32034346, at *5 (Bankr. S.D.N.Y . May 23, 2002).

[8] *In re West Delta Oil Co.*, 432 F.3d at 355.

[9] *Id.* (citing *In re Crivello*, 134 F.3d 831, 836 (7th Cir. 1998)).

[10] 2002 WL 441194 (S.D.N.Y. Mar. 21, 2002).

employment discrimination suits, she was sufficiently involved with the group to be familiar with confidential information about the group's operations, policies, and procedures, information that would be highly relevant at trial. In fact, the Court noted that in the two years prior to joining Leiff Cabraser, Fleishman had amassed 1,800 and 1,540 hours on Metlife matters, respectively. The court used the American Bar Association's Code of Professional Responsibility to evaluate the nature of Fleishman's conflict. The court agreed with Metlife that Fleishman was subject to a personal conflict of interest based on the facts above. The court then imputed that conflict of interest to the entire firm despite Lieff Cabraser's attempt to prove that Fleishman was effectively screened from any involvement or input in the Metlife suit."[11] Similarly, this court should leverage the American Bar Association's Code of Professional Responsibility in this case to understand the extent of conflicts given the facts that I have presented within this motion, prior motions and the disclosures of conflicts from members of the TOC that I hope will be forthcoming.

In keeping with the Victim Trust Agreement and the legal basis cited, I am filing this motion to introduce "*newly discovered evidence*" and to demonstrate that unbeknownst to the court the Trust Oversight Committee (TOC) was constituted in a manner with clear conflicts of interest and self-dealing which are in direct violation of their fiduciary duties. The Fire Victim Trust Agreement Section 6.2 states "*The members of the TOC shall serve in a fiduciary capacity representing current holders of Fire Victim Claims in the administration of the Trust. The TOC shall not have any fiduciary duties or responsibilities to any party other than holders of Fire Victim Claims, provided that the TOC shall be entitled to the protections and limitations of duties provided for herein even with respect to the holders of Fire Victim Claims.*" As the evidence provided within my motion will make clear, there are clear violations of these fiduciary duties. The depth and breadth of these violations have persisted after plan confirmation and should be disclosed according to U.S.C. §§ 327(a), Bankruptcy Rule 2014 and the American Bar Association's Code of Professional Responsibility.

---

[11] See "Use of Conflicts Counsel and Ethical Walls to Resolve Ethical Conflicts", pg. 9-10, Wayne Kitchens, Randall A. Rios, Timothy A. Million, Simon R. Mayer, https://www.txs.uscourts.gov/sites/txs/files/UseofConflicts.pdf

# ARGUMENT

The Trust Oversight Committee (TOC) members and other Fire Claimant Professionals have been consistently engaging in a manner "adverse to victim interests" in violation of Section 327(a) and must disclose conflicts of interest in keeping with the "disinterestedness" test according to Bankruptcy Rule 2014. It is clear that TOC member actions have been adverse to victim interest and consistently aligned with investor interests who have benefitted from their lack of follow through regarding their Trust oversight responsibilities. Consider that the Trust Agreement prescribes broad fiduciary and oversight responsibilities for the TOC members including but not limited to the following categories:

1. **Consent** – "*Trustee is required to obtain the consent of the TOC pursuant to any provision in the Trust Documents, the Plan and the Confirmation Order, the Trustee shall provide the TOC with a written notice stating that its consent is being sought, describing in detail the nature and scope of the action the Trustee proposes to take… If the TOC does not consent to the Emergency Consent Matter, the Trustee may immediately seek the Bankruptcy Court's intervention.*"[12]

2. **Consultation** – "*The Trustee shall consult with the TOC (i) on matters not contemplated by this Trust Agreement regarding the general implementation and administration of the Trust, (ii) on matters not contemplated by this Trust Agreement regarding the general implementation and administration of the CRP and (iii) on such other matters as may be required under this Trust Agreement and the CRP…. The Trustee shall execute the Sell-Down Plan from time to time in consultation with the TOC.*"[13]

3. **Panel of Neutrals** – "*The Trustee, Claims Administrator, Claims Processor, and TOC shall work with a neutrals experienced in resolution of wildfire claims and related matters in resolving issues relating to the liquidation and settlement of claims against the Trust.*"[14]

4. **Stock and Trust Voting Rights** – "*Subject to the terms of any agreements entered into pursuant to the Plan that provide otherwise, including, but not limited to, the Trust RRA (as defined in the Parties' Joint Stipulation Regarding the Registration Rights Agreement and Related Agreements of the Fire Victim Trust [Docket No. 7913]), exercise the right to vote given to owners of New HoldCo Common Stock that are included in the Trust Assets, except that in exercising the right to vote for the election of members of the Board of*

---

[12] PG&E Fire Victim Trust Agreement, July 1, 2020, pg. 33, Section 6.6(c).
[13] PG&E Fire Victim Trust Agreement, July 1, 2020, pg. 13, Section 2.2(e), pg. 19, Section 3.2(b), pg. pg. 32, Section 6.6(b)
[14] PG&E Fire Victim Trust Agreement, July 1, 2020, pg. 34, Section 7.1.

*Directors of New HoldCo, to the extent applicable, the Trustee shall do so only after obtaining the consent of the TOC;"[15]*

5. **Other Duties as Assigned** – Certain TOC members like Mr. Pitre have taken on special responsibilities on behalf of the Victim Trust like taking over the PG&E "derivative" claim on behalf of the company to pursue former PG&E directors and officers alleging that they breached their fiduciary responsibilities.

Given these broad oversight responsibilities, the following actions taken by TOC members are clearly adverse to victim interests and should be very troubling to victims and the other victim attorneys in this case that have represented victims with high ethical standards:

1. **"Shadow Lobbying" Activities** – Certain TCC members and Fire Claimant Professionals circumvent the TCC to form a lobbying organization using dark money to promote activities adverse to the interests of victims in this case and advantageous to the interests of certain shareholders and attorneys seeking standing and the financial capacity to engage in future wildfire litigation

2. **Promoting Shares Over Cash Settlement Offer** – Advancing activities that moved victims away from a $13.5B all cash proposal to a proposal reliant upon stock designed to shield investments of other core parties within this case

3. **Preventing Critical Disclosures to Assure Victims Yes Vote** – TOC members actively worked to exclude information from the victim disclosure statement key to understanding the risks associated with the Fire Victim Trust and Trust Administration Procedures

4. **Leveraging Victim Stock Position to Shield Shareholder Interests** – The Registration Rights Agreement was designed to be negotiated after the victim vote to bolster the use of the victim stock position to shield the investments of others with adverse interests to victims

5. **Leveraging Victims to Enable Future Wildfire Litigation** – Provisions within AB1054 were designed by TOC members to sacrifice the interests of victims in this case and to promote more attorney conducive settlements for future wildfires such as the Kincade Fire, Zogg Fire and Dixie Fire while preventing public or ratepayer owned utility options that would be less advantageous for current wildfire victim attorneys

---

[15] PG&E Fire Victim Trust Agreement, July 1, 2020, pg. 34, Section 2.1(e)(2)

6. **Trust Design Dysfunction to Elongate Claims Administration Process –** The Trust Administration Procedures, the Registration Rights Agreement and the Trust administration compensation structures were designed to delay the sale of victim stock until after the 2021 wildfire season

Without TOC members fully disclosing the conflicts of interest in accordance with Bankruptcy Rule 2014 we are left without adequate information to ascertain the extent to which attorney's adverse interests to those of victims have led to unjust outcomes in this case and poor oversight of the Fire Victim Trust. Moreover, victims without these disclosures are unable to determine whether or not members should serve on the TOC. It is important to note that to date there has been no substantive vote, referral process or adequate vetting of Trust Oversight Committee members by victim claimants. Accordingly, these disclosures in keeping with Bankruptcy Rule 2014 must be thorough and complete. TOC members "must disclose all facts that bear on disinterestedness and cannot usurp the court's functions by selectively incorporating materials the proposed professional deems important."[16]

**What is absolutely clear is that certain TOC members have indeed hidden facts that bear on "disinterestedness" as defined by U.S.C. §§ 327(a) and therefore must be required to disclose according to Bankruptcy Rule 2014. Without these disclosures the court is unable to understand the extent to which these individuals have substantive conflicts of interest in this case that are of an adverse nature to the interests of victims.**

The "NOTICE OF APPOINTMENT OF FIRE VICTIM TRUST OVERSIGHT COMMITTEE IN ACCORDANCE WITH CONFIRMATION ORDER [Dkt. No. 8053] FILED BY FIRE VICTIM TRUSTEE" [Dkt. 8195] indicated the following Trust Oversight Committee Members:

- Amy Bach, Esq., United Policyholders
- Douglas Boxer, Esq., Law Office of Douglas Boxer
- Elizabeth Cabraser, Esq., Lieff Cabraser Heimann & Bernstein, LLP
- Michael Kelly, Esq., Walkup, Melodia, Kelly & Schoenberger

---

[16] *In re Enron Corp.*, 2002 WL 32034346, at *5 (Bankr. S.D.N.Y . May 23, 2002).

- Frank M. Pitre, Esq., Cotchett, Pitre & McCarthy, LLP
- Amanda L. Riddle, Esq., Corey, Luzaich, de Ghetaldi & Riddle LLP
- Bill Robins, Esq., Robins Cloud LLP
- Gerald Singleton, Esq., Singleton Law Firm
- Steven J. Skikos, Esq., Skikos, Crawford, Skikos & Joseph, LLP

I will now provide additional evidence some of which was presented in prior motions and in different context that bear on the disinterestedness test of TOC members. Central to the conflicts of interests that have been withheld from this court and victims are the actions of members through the Up from the Ashes Coalition ("**UFTA**") which subverted court processes while pursuing activities adverse to victim interests. This organization had a substantive role in writing, advising and lobbying for AB-1054 which largely dictated the direction of this case. Indeed, UFTA was one of only two organizations called by the authors of this bill to be witnesses at the California State Senate Energy, Utilities and Communications Committee on July 8, 2019. The other witness called was the International Brotherhood of Electrical Workers Local #1245 ("**IBEW**"). The public facing leadership of UFTA that represented that organization in all public venues including in these hearings were not any of the officers and directors on record for this organization. UFTA formed as a 501(c)4 organization on May 17, 2018 and according to their filed Articles of Incorporation (Attachment A) and the IRS form 990 (Attachment B) the following were the officers of the organization:

- President - Steve Campora Esq., Dreyer, Babich, Baccola, Wood & Campora Law Firm
- Director/Secretary – Michael A. Kelly, Walkup, Melodia, Kelly & Schoenberger
- Director/Treasurer – Frank Pitre, Cotchett, Pitre & McCarthy, LLP

These officers and directors did not represent themselves in any public way within this case or outside this case as an organization instrumental in the writing and passage of AB1054 which was the signature legislation that directed this case and set the table for how utility caused wildfires would be treated in the State of California. I have direct first-hand knowledge that staff of this organization wrote parts of this legislation which were adverse to the interests of victims, beneficial to investor interests and beneficial to the standing of certain attorneys in their ongoing efforts to pursue other litigation outside the bounds of this case. Not only did these officers and directors (TOC members) not disclose their role in UFTA to this court but none of the official coalition members disclosed their

significant financial contribution towards this organization and the public officials that were key to the passage of the legislation and the direction of this case. I have attached Form 635 (Attachment C) which names 21 different "Coalition Members" of UFTA which not coincidentally include ALL of the Trust Oversight Committee Members with the exception of Amy Bach Esq., United Policyholders whose organization was the sole beneficiary when UFTA prematurely dissolved on August 14, 2020 (Attachment D). Many Tort Claimant Committee (TCC) member attorneys are also on this list of UFTA "Coalition Members." However, it is important to note that the attorneys who resigned from the TCC on "moral grounds" were not affiliated with UFTA.

What is absolutely clear and what should be troubling to this court is that these officers, directors and coalition members did not associate themselves with UFTA publicly or in this courtroom and instead chose to manipulate players indirectly through a financial and political campaign designed to circumvent bankruptcy law, the TCC and associated procedures. These circumvented procedures are exactly the processes that are relied upon by this court to provide fairness and just outcomes in this case. While victims are concerned with just financial claims through the Fire Victim Trust and the safety and security of their communities, these attorneys focused their efforts on defining the terms and conditions of their compensation in the growing industry of litigating utility-caused wildfires. These interests conveniently aligned with the interests of institutional utility investors who did not want PG&E to become a public or ratepayer owned utility. AB1054 and other related regulatory and legislative efforts defined not only the manner in which wildfire litigation would be conducted but also provided the regulatory framework and financial means for attorney compensation into the future. The California approved Wildfire Fund in many ways is a readily available fund for victim attorneys who can rely upon it for future wildfire related compensation. This is particularly true when these same attorneys secured "lines of credit" and "litigation funding" from shareholders and organizations like Centerbridge Partners who have a vested interest in PG&E and other Investor Owned Utilities ("**IOUs**") but certainly have adverse interests to victims in this case. Indeed, the common ground for certain victim attorneys and the PG&E investors in this case included the following:

- **Block Public and Ratepayer Owned Options** – As the risks of utility-caused wildfires increased it was important for certain victim attorneys to ensure that proposals like "Golden State Energy" never see the light of day. Publicly owned

organizations are much harder to litigate against then those that are investor-owned and of course entrenched and institutional utility investors don't want to see investor-owned corporations like PG&E give way to public or ratepayer models.

- **Easy Access to Attorney Compensation through Litigation** – The California Wildfire Fund enabled through AB1054 while having some public benefits mostly is a vehicle to shield utility investors and to create a fund to compensate victim attorneys while minimizing the damage to investor return when utilities cause wildfires.

- **Wildfire Liabilities** – The expected utility wildfire post-bankruptcy exit were recognized as unmitigated risks by savvy investors. The bondholder and shareholder alliances produced through the eventual plan of reorganization would only be effectual if they had some way to shield their financial position in the short-term. Here is where the victim attorneys could lend a hand if somehow, they could be convinced to accept compensation in stock and acquiesce to a registration rights agreement (stock rules) that would prevent quick stock sales and the quick processing of claims through the Fire Victim Trust.

These three points of common ground above are clearly not in the interests of victims but are absolutely in the financial interest of IOUs, utility investors and victim attorneys. The challenges to aligning shareholder, bondholder and victim attorney interests with the administration of the Victim Trust had to do with timing. If victims were compensated with cash instead of stock as was proposed by the bondholder group, then the shareholders would be left to fend for themselves during wildfire season. They would be exposed to the risks and liabilities associated with the Kincade Fire and future fires like the Zogg Fire and Dixie Fire. These eventualities were recognized as highly likely given that nothing within the bankruptcy proceeding restructured the company around safety objectives. However, if the Victim Trust could be structured in a way that would disadvantage victims and shield entrenched investors, this is something that both bondholders and shareholders could agree upon.

This also leaves victim attorneys and utility investors with a huge challenge which is how to get victims to vote yes on a plan before a registration rights agreement detrimental to their interests is defined. Through undue influence of UFTA Coalition Members, AB1054 set a June 30 date which provided a key ultimatum to hang over the heads of victims. Now victim attorneys would need to

ensure victims voted while remaining in the dark regarding how their stock position was being used by hedge fund managers and other investors to shield their investments. As a Pro Se claimant, I tried to get the disclosure of these issues included within the victim disclosure statement but they were not supported by the TCC, Fire Claimant Professionals and other core parties who were supposed to be representing the interests of victims in this case. The "WILLIAM B. ABRAMS OBJECTION PURSUANT TO 11 U.S.C §§ 1129(A) AND U.S.C. §§ 1125 TO PROPOSED DISCLOSURE STATEMENT FOR DEBTORS' AND SHAREHOLDER PROPONENTS' JOINT CHAPTER 11 PLAN OF REORGANIZATION" [Dkt. 6151] identified a number of disclosures central to the decision making of victims and included the following:

- In the "Fire Victims Claim Resolution Procedures Summary" [Dkt. 873-1] strike ~~NOTHING IN THE PLAN OR TRUST AGREEMENT REQUIRES YOU TO RECEIVE PAYMENT IN STOCK~~" and replace with "THE TRUST AGREEMENT SIGNIFICANTLY LIMITS THE ABILITY OF THE TRUST MANAGER TO FREELY MANAGE THE TRUST TO THE BENEFIT OF VICTIMS. THE TRUST AGREEMENT DOES NOT AFFORD VICTIMS THE SAME INVESTOR FLEXIBILITY OF OTHER SHAREHOLDERS SO WILL LIKELY DISADVANTAGE THE MANAGEMENT OF THE TRUST"

- Strike page 5, line 6 ~~Accordingly, no Fire Victim Claim will be satisfied in stock.~~ and replace with "Accordingly, the Fire Victim Claim Trust is associated with significant financial risk."

- On page 5, in the box on line 8 statement "No Fire Victim will receive stock of Reorganized PG&E Corp. directly" add "Victim stock will be managed by a trust manager with additional investment constraints not typical of other shareholders which will limit prudent management"

- On page 6 (line 3-7) strike **~~IT IS THE OPINION OF THE PLAN PROPONENTS, THE AD HOC SUBROGATION GROUP, AND THE PUBLIC ENTITIES THAT CONFIRMATION AND IMPLEMENTATION OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS' ESTATES, CREDITORS (INCLUDING ALL FIRE VICTIMS), AND SHAREHOLDERS. THEREFORE,~~**

**THE DEBTORS AND ALL OF THE ABOVE GROUPS RECOMMEND THAT ALL CLAIMANTS AND SHAREHOLDERS, WHO ARE ENTITLED TO VOTE, VOTE TO ACCEPT THE PLAN.** Instead, state "**THIS PLAN WILL TETHER THE FINANCIAL INTERESTS OF VICTIMS TO THE DEBTORS. THESE FINANCIAL INTERESTS ARE INEXTRICABLY LINKED TO THE DEGREE TO WHICH PG&E WILL BE ABLE TO SUCCESSFULLY MITIGATE RISKS AND PROVIDE SAFE AND RELIABLE SERVICE. OTHER CLAIMANT CLASSES HAVE BEEN PAID IN CASH OR HAVE BEEN PROVIDED SECURED INVESTMENTS. IT IS ONLY THE INDIVIDUAL VICTIMS THAT HAVE BEEN PROVIDED UNSECURED STOCK THROUGH THIS TRUST."**

- On page 28 (line 4) add "The Trustee will not have any financial incentives to maximize return for fire victims. The hourly and quarterly costs associated with the management of the trust will be deducted from the victim's settlement."

The point of listing these objections is not to request reconsideration by the court or to relitigate these issues. It is to point out that what might be seen as common sense to disclose to victims was not supported by the TCC and those that are now TOC members. Indeed, I am not an attorney and do not have fiduciary responsibilities to anyone other than my family. The TCC and Fire Claimant Professionals who understood these risks and had the professional and fiduciary duty to disclose these risks to their clients DID NOT. The question that still looms large as it relates to the members of the Trust Oversight Committee and the ongoing trust administration is… WHY NOT? Why even after a letter was approved by the court to be sent to victims to inform them to hold their vote until the registration rights agreement was negotiated did the TCC and Fire Claimant Professionals still NOT send the letter and withhold that key fact?

Now, while it is true that the financial interests of victim attorneys are marginally aligned with the victim's interest through their compensation structure, this is only true in the short-term IF unfettered by conflicts of interest. This true statement certainly does not meet the "disinterestedness" test as defined by U.S. Bankruptcy Code and does not meet the discloser requirements according to Bankruptcy Rule 2014. Moreover, just because these disclosure requirements were not enforced earlier in the case, does not mean they should be ignored now that evidence has been brought before

the court demonstrating that members of the TOC have been engaged in a manner clearly adverse to the interests of victims. I will now layout more evidence, some of which was called out in my prior motions which were denied without hearing but are now proven to be material to the administration of the Fire Victim Trust given recent events like the Dixie Fire and compounding problems with the ineffectual nature and designed dysfunction of the Fire Victim Trust.

As stated earlier in my arguments, IBEW Local #1245 along with UFTA were the two organizations called as witnesses to support AB1054 in the California State Senate Energy, Utilities and Communications Committee on July 8, 2019. However, it is important to consider that IBEW was vehemently opposed to AB1054 but in the end supported the bill. On May 2, 2018 IBEW was opposed to the bill and filed this complaint against Up From The Ashes stating in part that UFTA "*is a front organization created to conceal the identities of law firms who do not want the public to know they are paying lobbyists to persuade the government to preserve billions of dollars in legal fees... the public has a right to determine if UFTA is nothing more than a means for a group of trial lawyers to profit off the tragic fires, one part of a public misinformation campaign conducted while hiding their identities behind UFTA... Trial lawyers are paying a seasoned lobbyist to wage an influence campaign on their behalf and using UFTA as a front company to conceal their involvement while their lobbyist publicly misrepresents the nature of that front company as an association of fire victims*" (Attachment E). In my prior motion, the court questioned the validity of this complaint so I have attached a direct link to the document which resides on the official IBEW Local 1245 website.[17] In response to this complaint, Patrick McCallum who was the primary public facing voice of this organization responded within press reports by saying "*he discloses the consumer attorneys' connection in private conversations with lawmakers and often walks into meetings with a lawyer by his side.*" and in regards to his testimony in a Senate hearing he stated "*You don't lead with who funds you. Who does in lobbying?*"[18] I have referenced the article from the Sacramento Bee as requested by the court to further substantiate the complaint from IBEW against UFTA. What is critical for the court to consider is that the nonprofit formation documents make it clear that the public statements from UFTA designees like Mr. McCallum are inaccurate regarding the role of certain victim

---

[17] Official IBEW Local 1245 Website, "Complaint and Request for Investigation of Violations of The Political Reform Act", May 1, 2018, http://ibew1245.com/wp-content/uploads/2018/05/Complaint-re-Up-from-the-Ashes-5-1-18-FINAL.pdf
[18] See Sacramento Bee, "Union, Lawyers Spar over wildfire 'Shadow Lobbying' at California Capital, May 3, 2018, https://www.sacbee.com/news/politics-government/capitol-alert/article210308079.html

attorneys in this case.  These attorneys are not listed just as individuals "who fund" but are in fact officers, directors and "coalition members."

The factual basis of the organization members is also in stark contrast with how UFTA publicly describes itself and although their website was quickly removed after the passage of AB1054, their Facebook page still self describes the organizations as "*We are a coalition of fire victims who have come together to fight PG&E, the company suspected of causing the fires that destroyed our homes and devastated our lives.*"  It doesn't mention that their coalition members are attorneys in this case and does not disclose that their funding comes from these very same attorneys and other undisclosed investors.  I have included a screenshot of that page and the other materials that were circulated by UFTA through their lobbying activities related to AB1054 (Attachment F).

Also, it is important to note that after filing this complaint with the Fair Political Practices Commission, the IBEW was able to secure certain provisions for their members within the PG&E Plan of Reorganization including but not limited to collective bargaining extensions, a 3.75% general wage increase, additional health benefits, and other assurances.[19]  Subsequently, the IBEW dropped their complaint and ended up being a strong proponent of AB1054.  As stated in my earlier motions, I have no doubt that IBEW Local #1245 pursued these benefits in good faith on behalf of their members and should be commended for these efforts and their strong advocacy.  This motion should not be used to impugn the reputation of the IBEW or their members who support our utilities like PG&E and the public.

What is still unclear regarding the Up From the Ashes Coalition is how they were able to direct so much money to elected officials and other key influencers in the AB1054 legislative effort. UFTA IRS filings seem to conflict with their filings through the Secretary of State and other government agencies.  Moreover, it is clear that this organization conducted significant lobbying activities including contributions to elected officials on behalf of these "coalition members" with seemingly no other purpose than to gain access to decision-makers and influence key legislation (Attachment G).  Other organizations that made significant contributions to these same AB1054 lobbying activities according to publicly available records include Centerbridge Partners L.P., Elliot Management Corporation and Abrams Capital Management L.P. which were all called out by Mr.

---

[19] See the "Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization Dated January 31, 2020" [Dkt. 5590] pg. 99-100

Mikal Watts of Watts Guerra LLP and identified in my earlier motion "WILLIAM B. ABRAMS MOTION TO DESIGNATE IMPROPERLY SOLICITED VOTES" [Dkt. 6799].

TOC members and Certain Fire Claimant Professionals also leveraged UFTA to restrict victim access to the Governor, Legislators and other decision makers key to the passage of AB1054. I have included an email that myself and other victims received from a UFTA staffer that made it clear that if victims did not support AB1054 they were not welcome in the UFTA planned meetings with Governor Newsom and to attend meetings facilitated by UFTA with Legislators key to the passage of this legislation (Attachment H). It was stated **"We'd like to emphasize that tomorrow's activities are in support of AB 1054. If after today's briefing you are not in support, while we respect and encourage your right to oppose this bill on your own time, we respectfully ask that you not use this platform and these resources for that purpose."** What is also important to note is that during this "briefing" and at no time did UFTA forward the actual bill to victims but rather told victims "it's complicated" and handed them talking points of what to say to legislators. Indeed, on July 8, 2019, the day of the Senate Energy Committee hearing for AB-1054, UFTA members weeded out those victims that had questions about AB1054 or wanted to amend the bill. These victims were disinvited and removed from the meeting with Governor Newsom by Patrick McCallum and were redirected to attend a lunch or other diversions instead of the Senate hearing to ensure that only victim voices that supported their talking points would be heard on this UFTA planned "Lobby Day." Despite these diversion tactics, I chose to testify against AB1054 as I saw provisions within that bill as detrimental to the interests of wildfire victims and the public. I was and am still confident that Governor Newsom and State Legislators welcome diverse views and input from victims. However, UFTA's mischaracterization of victims was a disservice to Governor Newsom and California Legislators who were making an honest attempt to balance the difficult issues that surround utility caused wildfires and just treatment of victims.

Of course, there are reasonable differences of opinion regarding the tradeoffs and balance struck with AB1054 which is not the point of my motion. I certainly respect different views on the legislation although the recent "Safety Certification" among new PG&E ignited wildfires and growing criminal charges demonstrates a clear need for amendments. Despite differing views of AB1054, it is clear to all those close to the legislative effort that UFTA advanced interests adverse to victims in this case to ensure more ready access to funds for future litigation and stated interests

favorable to PG&E investors.  At least in certain circumstances, these same PG&E investors provided lines of credit and other litigation financing to support particular outcomes in this case.  Yes, UFTA and these "coalition members" many of whom are now TOC members also advocated for payments to victims in this case but those efforts were undermined and often secondary to their broader interests to secure a position within the growing wildfire litigation industry.  Certainly, the degree to which these conflicts of interest impeded their representation of PG&E victims in this case is still an open question.  Only through disclosures according to Bankruptcy 2014 will we learn the extent to which conflicts of interest drove unjust outcomes.

However, what is absolutely clear is that the designed dysfunction of the Fire Victim Trust has been driven by these TOC members particularly as it relates to the monetization of the victim stock.  The intent of the Fire Victim Trust design and associated registration rights agreement has been to delay the monetization of the victim stock and to shield the financial interests of other investors.  The fact that TOC members have not engaged in any substantive way to speed up the claims administration process or to provide any real oversight further demonstrates the degree to which their interests do not align with the interests of victims.

## CONCLUSION AND REMEDIES

It is clear that no core parties in this case other than the victims themselves want to insist upon disclosures of self-dealing and conflicts of interest in this case.  Indeed, attorneys like those representing members of the TCC that resigned on moral grounds are largely prevented from being whistleblowers related to these conflicts due to agreements they made while in their TCC role.  It is equally clear that I am a reluctant and imperfect messenger of these issues.  I am not an attorney and don't pretend to have a deep understanding of bankruptcy law other than the research I have done to prepare the motions and other filings in this case.  I have felt compelled to engage because I see the far-reaching effects of the injustices enabled and often times encouraged in this case.  I see that the conflicts of interest in this case have led to great misfortune as victims wait on a deliberately impaired trust administration process that prevents them from rebuilding their lives.  I see that these conflicts of interest have enabled PG&E to continue their path of destruction unfettered by prior constraints through their undeserved "safety certification."  I see that the same players in this case using the same playbook to push away common-sense solutions for climate change adaptation to line

the pockets of rarefied investors and certain attorneys that are somehow able to contort and subvert bankruptcy law meant to provide just outcomes and restructure worthwhile corporations.

I have been threatened publicly and privately by well-resourced and politically influential attorneys in this case and expect that more fire will come my way if this court upholds my motion and finally grants me the opportunity to be heard. I also understand that since the facts and evidence are not on the side of these attorneys, they will turn to argue process and continue to attack me. However, it is my hope that if they have nothing to hide, they will instead file a simple disclosure statement or declaration that would state something like "I have no financial interests in this case that are adverse to those of victims. I have no litigation financing or lines of credit tied to shareholders, bondholders or other PG&E investors. I have not engaged in activities to undermine the value of the Fire Victim Trust or to slow the Trust Administration process. I have not in any way compromised my fiduciary duties in this case and can continue to serve on the Trust Oversight Committee." This later path of providing a disclosure statement would certainly be a relief to me and other victims and provide a general sense of trust in the trust oversight. I sincerely hope that some TOC members will pursue this path if for no other reason than to ease the minds of victims that are concerned with corrupt influences within this case. If these disclosure statements are not forthcoming, I respectfully ask the court to require these disclosures pursuant to Section 327(a) and Bankruptcy Rule 2014.

I urge the court to take decisive actions to restore some semblance of checks and balances back into the administration of the Trust. As I have discussed in prior motions, the Trust Oversight Committee has avoided key opportunities to advocate for victim interests and neglected to pursue substantive oversight to the benefit of victims. Whether this is due solely to their continued conflicts of interest, an over-reliance on indemnifications, pure complacency or other reasons is still unclear. However, we should not wait any longer if TOC members are unable or unwilling to provide sufficient disclosures. Instead, we should replace all the members of the TOC with individuals that can adhere to the "disinterestedness" standard set by Section 327(a) and Bankruptcy Rule 2014.

Dated: August 2, 2021

Respectfully submitted,

William B. Abrams

Pro Se Claimant