ALSTON & BIRD, LLP
DIANE C. STANFIELD (CA Bar No. 106366)
DOUGLAS J. HARRIS (CA Bar No. 329946)
diane.stanfield@alston.com
douglas.harris@alston.com
333 S. Hope Street 16th Floor
Los Angeles, California 90071
Telephone:    213.576.1000
Facsimile:    213.576.1100

Attorneys for
Fulcrum Credit Partners LLC

DOWNEY BRAND LLP
JAMIE P. DREHER (CA Bar No. 209380)
Email: jdreher@downeybrand.com
TYLER J. HORN (CA Bar No. 323982)
Email: thorn@downeybrand.com
621 Capitol Mall, 18th Floor
Sacramento, California 95814
Telephone:    916.444.1000
Facsimile:    916.444.2100

Attorneys for
Tuscan Ridge Associates, LLC

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| In re<br><br>PG&E Corporation,<br><br>and<br><br>PACIFIC GAS AND ELECTRIC COMPANY,<br><br>Debtors.<br><br>[ ] Affects PG&E Corporation<br>[x] Affects Pacific Gas and Electric Company<br>[ ] Affects both Debtors<br><br>*All papers shall be filed in the Lead Case, No. 19-30088-DM, | Case No. 19-30088-DM<br><br>Chapter 11<br>Lead Case, Jointly Administered<br><br>**MOTION FOR RELIEF FROM PLAN INJUNCTON, TO COMPEL ARBITRATION AND/OR FOR ABSTENTION**<br><br>Date:        September 14, 2021<br>Time:       10:00 a.m.<br>Crtrm.:      Courtroom 17<br>               450 Golden Gate Avenue<br>               San Francisco, CA 94102<br>Judge:      Hon. Dennis Montali<br><br>Objection deadline: August 31, 2021 |

///

# I. INTRODUCTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C § 1334, 157 and 11 U.S.C. §§ 362 and 524. This Motion seeks Relief From and/or Modification of the Plan Injuction, to Compel Arbitration and/or for Abstention (the "Motion"). The request for relief from the Plan Injunction is a core proceeding pursuant to 28 U.S.C §§ 157(b)(2)(A) and (G) and the request to compel arbitration involves a non-core matter. Venue is proper pursuant to 28 U.S.C §§ 1408 and 1409.

Pacific Gas & Electric Company ("PG&E") filed its Voluntary Chapter 11 Bankruptcy Petition ("the Petition") on January 29, 2019 in the United States Bankruptcy Court for the Northern District of California.

# II. RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

Tuscan Ridge Associates, LLC ("Tuscan") is the owner of real property located in Butte County, California and commonly identified as Assessor's Parcel Nos. 040-520-103 and 040-520-100 (collectively the "Property"). (Declaration of Scott Bates In Support of Motion for Relief from Plan Injunction, to Compel Arbitration, and/or For Abstention. ("Bates Decl."), ¶ 1.)

In 2001, an 18-hole golf course – Tuscan Ridge Golf Course – was constructed. Since November 2005, Tuscan and its predecessors have been working to entitle and develop the Property as a residential golf course community. ("Bates Decl."), ¶ 2.)

On or about October 26, 2010 (and amended on November 6, 2012 ), after considerable costs and effort expended by Tuscan, Butte County updated its general plan rezoning the Property as a future planned unit development, which allowed for residential uses "provided that the golf course is also maintained." (*See* Butte County General Plan 2030 Land Use Element 4-32). Tuscan planned to begin development of the Property in the Spring of 2019.

On November 8, 2018, the deadliest and most destructive wildfire in California history, caused by PG&E, began ravaging Butte County. This historically destructive fire has come to be known as the "Camp Fire." Immediately after the Camp Fire began, PG&E, without Tuscan's consent — and without even informing Tuscan of the full extent of its occupation — commandeered the Property, unlawfully trespassed, and took over possession of approximately 53

acres of the Property for use as a base camp for its personnel and equipment needed to restore utility service to the areas devastated by the Camp Fire. (Bates Decl. ¶ 3.)

Instantly, the Property was overwhelmed and swarming with hundreds of PG&E's personnel and heavy machinery. (*Id.*) After discussions with Tuscan regarding PG&E's takeover of the golf course and surrounding areas, PG&E graded large sections of the golf course, and dumped a layer of base rock covering much of the Property to support PG&E's heavy machinery. (Bates Decl. ¶ 4.)

PG&E's use of the Property effectively destroyed the golf course. In the wake of PG&E's occupancy of the Property, and Tuscan of course being willing to provide whatever it could to the community in light of the tragedy caused by PG&E, Tuscan and PG&E negotiated a "Letter Agreement" dated November 2018 (the "Agreement"). (Bates Decl. ¶ 5 Ex. A.) The Agreement sets forth PG&E's restoration obligations relative to the areas of the Property which it destroyed. (*Id.*)

Pursuant to the express terms of the Agreement, at the end of its occupation of the Property, PG&E was required restore the area subject to the Agreement (the "License Area"), including the roads and parking lots and any areas of ingress and egress, "in as good of condition as it was prior to PG&E's use of the area." (*Id.*; Exh. A at p. 3.) PG&E expressly agreed and acknowledged that "the Baseline Condition includes the Property's current condition as of the date of this Letter Agreement, prior to the grading and winterization activities that Owner will perform for PG&E." (*Id.*) It further agreed that Baseline Condition "includes the currently closed 18-hole golf course improvements on the Property, including the fairways and greens (that is, the grading and contours of such fairways and greens but excluding any sod, turf and grass in such areas), bunkers, ponds, sprinkler systems, and related improvements." (*Id.*)

Upon expiration or earlier termination of the Agreement, PG&E was required to meet and confer with Tuscan as to the nature and scope of the restoration work needed to restore the Property to its Baseline Condition. (*Id.*; Exh. A at p 3.) The Agreement further provides that if Tuscan and PG&E could not agree upon the scope of PG&E's restoration obligation, the Parties would engage a third party neutral arbitrator to estimate the cost to restore the License Area to the

Baseline Condition, after which Tuscan had the option of requiring PG&E to perform the restoration or pay Tuscan the estimated cost of restoration. (*Id.*; Exh. A at p 3.)

In February 2019, PG&E informed Tuscan that it would not need the Property for the entire period provided for in the Agreement. (Bates Decl. ¶ 6.) PG&E vacated the Property in February of 2019. (*Id.*) Shortly thereafter, PG&E's representatives and Tuscan met at the Property to discuss restoration of the Property. (Bates Decl. ¶ 7.) However, no agreement was reached. Following those meet and confer efforts, PG&E refused to further engage with Tuscan concerning the restoration of the Property. (*Id.*)

On or about October 17, 2019, Tuscan filed a Proof of Claim for the then-estimated cost of restoration of the Property to its Baseline Condition ("Claim"). (Claim No. 58562.)[1]

In accordance with this Court's Procedures Order, on or about December 17, 2020, Tuscan submitted its response to PG&E's Information Questionnaire. On or about February 16, 2021, Tuscan and Fulcrum received the "Notice of Standard Mediation," wherein Tuscan and Fulcrum were notified that they were required to attend non-binding mediation relating to the Claim. The mediation was scheduled for April 26, 2021, but at PG&E's request was continued to July 19, 2021. Unfortunately, the July 19, 2021 mediation did not result in a resolution of the Claim; consequently the mediator, Honorable Risë Pichon (Ret.), terminated the mediation at the end of that same day.

For that reason, Tuscan and Fulcrum now seek a resolution of the Claim. In accordance with the Agreement, the cost to restore the License Area to the Baseline Condition is to be estimated by an arbitrator with no less than ten years of experience in the construction industry. Tuscan and Fulcrum respectfully request relief from stay along with an order compelling the Parties to Arbitrate the dispute or, alternatively, an order of abstention. Such relief is appropriate because the Claim is predicated solely on state law claims, and the relief will promote judicial

---

[1] Tuscan subsequently transferred its claim against PG&E to Fulcrum Credit Partners, LLC ("Fulcrum") on or about March 16, 2021.[1] (Dkt. No. 10437.) Despite the transfer of the claim to Fulcrum, both parties continue to be active in the prosecution of the claim.

economy and will be in the best interest of all Parties concerned for the reasons given below. Therefore, Tuscan and Fulcrum respectfully request that the Bankruptcy Court grant the relief requested herein.

### III. THE PARTIES' AGREEMENT TO ARBITRATE THE CONTRACTUAL DISPUTES REPRESENTS GOOD CAUSE FOR RELIEF FROM THE DISCHARGE INJUNCTION

Although what constitutes "cause" for granting relief from the automatic stay is decided on a case-by-case basis, (*In re Tucson Estates, Inc.*, 912 F.2d 1162, 1166 (9th Cir. 1990); *see also In re Castlerock Props.*, 781 F.2d 159, 163 (9th Cir. 1986)), "a contractual provision requiring mandatory arbitration of disputes constitutes 'cause' for granting relief from the stay." [2] Grounds for Relief from Stay, Cal. Prac. Guide Bankruptcy Ch. 8(II) [8:1161].

Indeed, "[i]**n non-core proceedings, the bankruptcy court generally does not have discretion to deny enforcement of a valid prepetition arbitration agreement**." *In re Thorpe Insulation Co.*, 671 F.3d 1011, 1021 (9th Cir. 2012) (emph. added). Non-core proceedings are those that "do not depend on the Bankruptcy Code for their existence and they could proceed in another court." *In re Ray*, 624 F.3d 1124, 1131 (9th Cir. 2010); s*ee also In re Ebell Media, Inc.*, No. CV 09-752 SVW, 2010 U.S.Dist.LEXIS 151886, at *22-23 (C.D. Cal. Mar. 30, 2010) ("[Debtor] does not appear to contest the Bankruptcy Court's conclusion that valid arbitration provisions are enforceable during the pendency of parallel bankruptcy proceedings. In any event, the strong weight of caselaw suggests that arbitration provisions are enforceable during bankruptcy proceedings. *** [W]here a party seeks to enforce a debtor-derivative pre-petition contract claim, a court does not have the discretion to deny enforcement of an otherwise applicable arbitration clause.") (citations omitted); *McCleskey v. Stockton (In re Stockton),* Nos. NV-04-1238-MaRP, NV-04-1271-MaRP, NV-04-1345-MaRP, 2005 Bankr. LEXIS 3375, at *16 (B.A.P. 9th Cir. June 22, 2005) ("It is now well-settled law that federal courts must give deference to the Federal Arbitration Act (FAA), which established a federal policy favoring arbitration, and

---

[2] Although less encompassing than the automatic stay, the Plan Injunction similarly prohibits certain acts against the Debtor from which relief should be granted upon a showing of cause. Cases decided pursuant to 11 U.S.C. § 362(d)(1) are instructive.

rigorously enforce agreements to arbitrate.").

It is undisputed that Tuscan's claims are purely pre-petition contract claims which do not depend on the Bankruptcy Code to exist. Further, the Parties contractually agreed that if they could not informally resolve claims arising under the Agreement, an arbitrator, with ten (10) plus years of construction experience, would be selected to determine the amount of Tuscan's claim. The liquidation of Tuscan's claims is a non-core proceeding and as a result, cause exists to grant relief from and/or modification to the Plan Injunction and to compel the contractually agreed arbitration.

## IV. EVEN IF THE CLAIM WERE TO BE FOUND TO BE A CORE MATTER, THE COURT NEVERTHELESS HAS DISCRETION TO COMPEL ARBITRATION

Despite the clear non-core nature of the Claim, it is anticipated that PG&E will argue it is subject to the claim objection process and thus constitutes a "core" matter. On the contrary, the Bankruptcy Appellate Panel for the Ninth Circuit has observed:

> State law contract claims against a bankruptcy debtor are "noncore" matters, which may be related to the bankruptcy case but which do not invoke a substantive right created by the Bankruptcy Code. *See Piombo Corp. v. Castlerock Props. (In re Castlerock Props.*), 781 F.2d 159, 161-62 (9th Cir. 1986); *Krasnoff v. Marshack (In re Gen. Carriers Corp.),* 258 B.R. 181, 189 (9th Cir. BAP 2001) (explaining core and noncore claims). For arbitration purposes, noncore matters "are those that do not involve issues of law unique to bankruptcy or substantive rights created exclusively by the Bankruptcy Code," **even if they arise in a 28 U.S.C. § 157(b) core proceeding.**

*McCleskey v. Stockton (In re Stockton)* (Bankr. 9th Cir. June 22, 2005, Nos. NV-04-1238-MaRP, NV-04-1271-MaRP, NV-04-1345-MaRP) 2005 Bankr. LEXIS 3375, at *12, fn. 10 (emph. added).

However, it is unnecessary for this Court to conclude that the matter is noncore to grant the relief sought. It is decided in the Ninth Circuit that, even in core matters, courts possess the discretion to compel arbitration so long as the arbitration will not conflict with the underlying purposes of the Bankruptcy Code. *In re Thorpe Insulation Co.*, 671 F.3d at 1021 ("[E]ven in a core proceeding, *** a bankruptcy court has discretion to decline to enforce an otherwise applicable arbitration provision **only if arbitration would conflict with the underlying purposes of the Bankruptcy Code**. *See McMahon*, 482 U.S. at 227; *In re Elec. Mach. Enters.*, 479 F.3d at 796 (Eleventh Circuit); *In re Mintze*, 434 F.3d at 231 (Third Circuit); *In re White Mountain*

*Mining*, 403 F.3d at 169-70 (Fourth Circuit); *In re U.S. Lines*, 197 F.3d at 640 (Second Circuit); *In re Nat'l Gypsum*, 118 F.3d at 1069-70 (Fifth Circuit)."); *see also In re Wire Comm Wireless, Inc.*, 2008 WL 4279407, at *3 (E.D. Cal. Sept. 16, 2008) ("[T]he bankruptcy judge here had to evaluate the nature of the underlying claims and their effect upon the bankruptcy proceedings before determining whether he had the discretion to deny arbitration."). Stated differently, "even where 'core' bankruptcy jurisdiction is present, if a dispute is not based on federal bankruptcy law, bankruptcy courts have regularly permitted arbitration to continue (or commence) despite the presence of such 'core' jurisdiction." *Id.* (citing *In re Nat'l Gypsum Co.*, 118 F.3d 1056, 1067 (5th Cir. 1997)).

Here, compelling arbitration would not conflict with the underlying purposes of the Bankruptcy Code. Unlike *In re Thorpe*, this case does not involve centralization of disputes concerning a debtor's legal obligations in a case governed by 11 U.S.C. § 524(g), such as the 12,000 asbestos related claims asserted there. Likewise, it will not result in "piecemeal" litigation, since the facts and nature of this Claim are unique to these parties, and must be litigated in one forum or another. Delay of confirmation of a Plan is not in issue here; indeed, the confirmed Plan in this case provides for payment in full of general unsecured claims, so other creditors' recoveries will not be affected by the outcome. PG&E can point to no potential conflict with the underlying purposes of the Bankruptcy Code, and for that reason as well, arbitration should be compelled.

## V. ALTERNATIVELY, THE BANKRUPTCY COURT SHOULD ABSTAIN FROM DECIDING THE VALIDITY AND AMOUNT OF TUSCAN'S CLAIMS

Even where the Court has jurisdiction to determine the validity and amount of a claim, the Court may abstain from hearing a matter related to the bankruptcy case in the interest of justice or in the interest of comity with the State courts or respect for State law. *See* 28 U.S.C § 1334(c)(1); *see also In re Tucson Estates, Inc.*, 912 F.2d 1162, 1166 (9th Cir. 1990*); In re Middlesex Power Equipment and Marine,* 292 F.3d 61, 68 (1st Cir. 2002). Such comity with the broad public policy in favor of arbitration supports the conclusion that the Bankruptcy Court should abstain from deciding the validity and amount of Tuscan's claims, which are based solely on California state law and California state law causes of action, and are the subject of a valid arbitration agreement.

Additionally, the interests of justice demand that the Court abstain from deciding the validity and amount of Tuscan's claims. Tuscan and Fulcrum have suffered long, highly prejudicial delays despite the Parties' binding agreement to arbitrate this dispute which should have resulted in a prompt resolution long ago. With obvious good reason, the Parties agreed that arbitration by a neutral with ten (10) plus years of construction experience is the most well-equipped forum in which to resolve the question of the restoration costs, yet they have expended substantial sums complying with the Court mandated ADR And Related Procedures for Resolving General Claims, responding to a detailed Information Questionnaire and participating in mediation. Two years later, they still await resolution. The interests of justice support this Court's abstention so that the matter can be resolved expeditiously and as agreed by the parties.

## VI. CONCLUSION

As set forth herein, Tuscan and Fulcrum have a contractual agreement to arbitrate their claims which arise purely under California state law. There is no prejudice to PG&E (who must defend the claim in one forum or another) or to other creditors (whose allowed claims will be paid in full regardless of the outcome of the litigation), and no conflict with underlying Bankruptcy policy. For all the foregoing reasons, this Court is compelled to uphold the strong public policy in favor of arbitration. As such, Fulcrum respectfully requests the Court grant this Motion in its entirety, on such terms as the Court may deem just and reasonable.

DATED: August 17, 2021                ALSTON & BIRD, LLP


By: /s/ Diane C. Stanfield
    DIANE C. STANFIELD
    Attorneys for Fulcrum Credit Partners, LLC