# EXHIBIT E

**LABATON SUCHAROW LLP**
THOMAS A. DUBBS (*pro hac vice*)
LOUIS GOTTLIEB (*pro hac vice*)
JEFFREY A. DUBBIN (#287199)
JAMES L. OSTASZEWSKI (*pro hac vice*)
WENDY TSANG (*pro hac vice*)
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email: tdubbs@labaton.com
lgottlieb@labaton.com
jdubbin@labaton.com
jostaszewski@labaton.com
wtsang@labaton.com
*Counsel for Lead Plaintiff the Public Employees Retirement*
*Association of New Mexico and Lead Counsel for the Class*

**KERR & WAGSTAFFE LLP**
JAMES M. WAGSTAFFE (#95535)
FRANK BUSCH (#258288)
101 Mission Street, 18th Floor
San Francisco, California 94105
Telephone: (415) 371-8500
Facsimile: (415) 371-0500
Email: wagstaffe@kerrwagstaffe.com
busch@kerrwagstaffe.com
*Liaison Counsel for the Class*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE PG&E CORPORATION SECURITIES LITIGATION | Civil Action No. 3:18-cv-03509-RS<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

1

# TABLE OF CONTENTS

2   I.      INTRODUCTION ................................................................................................. 1

3           A.  Summary of the Case ............................................................................. 1

4           B.  Claims Being Asserted ........................................................................... 4

5   II.     JURISDICTION AND VENUE ......................................................................... 5

6   III.    PARTIES ............................................................................................................ 5

7   IV.     FACTUAL BACKGROUND ............................................................................. 7

8           A.  PG&E Operates Within a Robust Legal Regime .................................... 7

9               1.  California Law Required PG&E to Maintain a Safe Distance Between Its
                    Electrical Equipment and Nearby Vegetation ............................... 7

10              2.  PG&E Is Regulated by the CPUC ................................................. 8

11
                3.  Cal Fire Is the Duly Authorized Investigative Arm of the State of
12                  California for Wildfires ................................................................. 9

13              4.  Under California's Inverse Condemnation Law, PG&E Would Not Bear
                    the Cost of Wildfires It Causes If It Proved That It Acted Reasonably and
14                  Prudently ....................................................................................... 10

15          B.  PG&E's Vegetation Management Expenditures Did Not Materially Change
                from Year to Year During the Class Period, Let Alone Double at Any Point ............ 10
16
            C.  PG&E's Tree Trimming and Removal Did Not Come Close to Doubling
17              During the Class Period ......................................................................... 12

18          D.  After the North Bay Fires, PG&E Started Reporting Inflated Numbers for
                Tree Removal .......................................................................................... 12
19
            E.  PG&E Concealed Its Unsafe Use of Reclosers During the Class Period ............ 13
20
                1.  PG&E Used Reclosers to Prioritize Convenience Over Safety ........... 13
21
                2.  PG&E Concealed Its Use of Reclosers From Investors During the Class
22                  Period ............................................................................................ 14

23          F.  PG&E Engaged in an Unsafe Pattern of Noncompliance with Vegetation
                Management Requirements That Caused Many of the North Bay Fires ............ 15
24
                1.  PG&E Was Convicted of Negligence for Starting a Wildfire in 1994 ............ 15
25
                2.  PG&E's Unsafe Noncompliance Continued Through 2010 ................... 15
26
                3.  PG&E's Unsafe, Noncompliant Vegetation Management Caused the Butte
27                  Fire in 2015 .................................................................................. 16

28              4.  PG&E's Compliance Measures Allowed More than One Million
                    Vegetation Management Violations During the Class Period ............ 16

Case: 19-30088   Doc# 11169-6   Filed: 08/31/21   Entered: 08/31/21 14:49:59   Page 3
of 78

5.  PG&E's History of Safety Violations Shows that the Company Knew of Its Numerous and Widespread Violations of California Safety Regulations Throughout the Class Period, But Did Nothing to Change Them ....................... 18

V.  DEFENDANTS' FALSE AND MISLEADING CLASS PERIOD STATEMENTS ...... 19

A.  Overview of Defendants' Fraudulent Course of Conduct ............................................19

B.  Defendants Made Materially False and Misleading Statements and Omissions Regarding Its Vegetation Management Activities and Compliance with Wildfire Safety Regulations Before the North Bay Fires ............................................20

1.  April 29, 2015 – Misstatement No. 1 ................................................... 20

2.  October 16, 2015 – Misstatement No. 2 ............................................... 21

3.  November 18, 2015 – Misstatement No. 3 ............................................ 22

4.  October 6, 2016 – Misstatement No. 4 ................................................. 23

5.  August 9, 2017 – Misstatement No. 5 .................................................. 24

C.  Defendants Tied the Company's Dividend to Safety Compliance, Making Materially False and Misleading Statements and Omissions Regarding Its Dividend and Safety Before the North Bay Fires ............................................26

1.  May 23, 2016 – Misstatement No. 6 .................................................... 26

2.  November 4, 2016 – Misstatement No. 7 .............................................. 27

3.  May 31, 2017 – Misstatement No. 8 .................................................... 28

D.  After the North Bay Fires Erupted, the Truth Began to Emerge ...............................29

E.  After the North Bay Fires Were Contained, the Company Made Additional False and Misleading Statements and Omissions Regarding Compliance with Wildfire-Related Safety Regulations ............................................30

1.  October 31, 2017 – Misstatement No. 9 ............................................... 30

2.  November 2, 2017 – Misstatement No. 10 ............................................ 30

3.  November 2, 2017 – Misstatement No. 11 ............................................ 32

4.  November 5, 2017 – Misstatement No. 12 ............................................ 34

5.  May 25, 2018 – Misstatement No. 13 .................................................. 35

VI.  MATERIALITY ....................................................................................................... 36

VII.  LOSS CAUSATION .................................................................................................. 37

A.  Defendants' False and Misleading Statements Artificially Inflated the Price of PG&E's Common Stock ............................................37

Case: 19-30088   Doc# 11169-6   Filed: 08/31/21   Entered: 08/31/21 14:49:59   Page 4 of 78

B. PG&E's Safety Violations Proximately Caused the Devastating North Bay Fires.................................................................................................................37

C. When the Market Learned the Truth, the Price of PG&E's Common Stock Fell Dramatically ............................................................................................38

   1. October 12, 2017 – Corrective Disclosure and/or Materialization of Concealed Risk ........................................................................................38

      (a) The Market Began to Learn the Extent and Effects of PG&E's Responsibility for the North Bay Fires ....................................38

      (b) Market Commentators Confirmed the Cause of PG&E's Share Price Decline on October 12, 2017 ....................................39

   2. October 13-16, 2017 – Corrective Disclosure and/or Materialization of Concealed Risk ........................................................................................41

      (a) The Market Continued to Learn the Extent and Effects of PG&E's Responsibility for the North Bay Fires .........................41

      (b) Market Commentators Confirmed the Cause of PG&E's Share Price Decline on October 13, 2017 ....................................41

   3. December 20, 2017 – Corrective Disclosure and/or Materialization of Concealed Risk ........................................................................................42

      (a) The Market Continued to Learn the Extent and Effects of PG&E's Responsibility for the North Bay Fires .........................42

      (b) Market Commentators Confirmed the Proximate Cause of PG&E's Share Price Decline on December 20, 2017 ................43

   4. May 25, 2018 – Corrective Disclosure and/or Materialization of Concealed Risk ........................................................................................44

      (a) The Market Continued to Learn the Extent and Effects of PG&E's Responsibility for the North Bay Fires .........................44

      (b) Market Commentators Confirmed that the News Regarding Safety Violations Proximately Caused PG&E's Share Price Decline on May 25-29, 2018 ........................................................................46

   5. June 8, 2018 – Corrective Disclosure and/or Materialization of Concealed Risk ........................................................................................46

      (a) The Market Learned the Truth of PG&E's Continued, Unsafe Use of Reclosers........................................................................49

      (b) The Market Continued to Learn the Extent and Effects of PG&E's Responsibility for the North Bay Fires .........................49

      (c) Market Commentators Confirmed that the Number and Range of Safety Violations Proximately Caused PG&E's Share Price Decline on June 8-11, 2018........................................................................50

1  VIII.   POST-CLASS PERIOD DEVELOPMENTS ............................................................ 51

2  IX.    SCIENTER ........................................................................................................ 52

3        A.  PG&E's  Safety Practices Continued to Violate the Law Even After Being on
            Notice of the Butte Fire Safety Violations .............................................................52
4
         B.  Safety Was Core to PG&E's Operations, and the Individual Defendants Were
5            Directly Involved in It .........................................................................................52

6        C.  PG&E's Noncompliance with Safety Regulations Was Well-Known
             Throughout the Company, Including at the Highest Levels with Real-Time
7            Access to a Database of Known Safety Violations ...................................................55

8            1.  PG&E Recorded Its Violations of Safety Regulations in a Sophisticated
                 Database, Readily Accessible by the Individual Defendants............................... 55
9
             2.  PG&E Instituted a Culture of Reporting Problems Up Among its On-the-
10               Ground Employees, Which Upper Management Was Aware of and
                 Monitored ................................................................................................. 56
11
         D.  PG&E's Compliance Statements Were Authorized by Defendant Kane and
12           Made under Her Ultimate Authority ......................................................................58

13       E.  The Threat of a Potential Bankruptcy Gave Defendants a Strong Motive to
             Mislead Investors ...............................................................................................60
14
    X.    APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND FRAUD ON THE
15  MARKET ..................................................................................................................... 61

16  XI.   CLASS ACTION ALLEGATIONS .......................................................... 62

17  XII.  CAUSES OF ACTION ........................................................................... 64

18

19

20

21

22

23

24

25

26

27

28

Lead Plaintiff Public Employees Retirement Association of New Mexico ("PERA" or "Lead Plaintiff"), individually and on behalf of all other persons similarly situated, allege the following against PG&E Corporation, Pacific Gas and Electric Company (the "Utility," and together with PG&E Corporation, "PG&E" or the "Company"), and Anthony F. Earley, Jr., Geisha J. Williams, Nickolas Stavropoulos, Julie M. Kane, Christopher P. Johns, and Patrick M. Hogan (collectively, the "Individual Defendants" and together with PG&E, the "Defendants") based upon personal knowledge as to Lead Plaintiff's own acts, and upon information and belief as to all other matters. Lead Plaintiff's information and belief is based on the investigation conducted by and through their attorneys, which included a review of the Company's Securities and Exchange Commission ("SEC") filings, conference call transcripts and press releases; media and analyst reports about the Company; and other public information regarding the Defendants. Lead Plaintiff believes that substantial additional evidentiary support for the allegations set forth herein will be produced through discovery.

## I.     INTRODUCTION

### A.     Summary of the Case

1.     This federal securities class action arises out of the false and misleading statements that Defendants made to investors from April 29, 2015 through June 8, 2018 (the "Class Period") to conceal the Company's lax wildfire safety practices, including its numerous and widespread violations of California safety regulations for power lines. PG&E's ability to maintain safe power lines, compliant with California safety regulations, is vital to the Company's financial health. One of the most important functions PG&E must perform in this area is clearing vegetation, including dead or dying trees, away from its power lines as required by California law. PG&E's failure to do so resulted in numerous and widespread wildfires in October 2017, causing enormous property destruction and loss of life.

2.     Between PG&E's history of causing wildfires and California's drought conditions, PG&E knew it was essential to assure investors that the Company's wildfire safety measures were adequate and that it complied with applicable laws and regulations. PG&E

Case: 19-30088   Doc# 11169-6   Filed: 08/31/21   Entered: 08/31/21 14:49:59   Page 7 of 78

wanted investors to believe that the Company was not cutting corners with its vegetation management. So PG&E repeatedly represented to its investors that:

- "***PG&E's Vegetation Management***" was "***in compliance with relevant laws***";

- Its "***vegetation management program*** . . . ***compl[ies] with state and federal regulations***";

- "***PG&E follows all applicable federal and state vegetation clearance requirements***" to "***help to reduce*** outages or ***fires caused by trees or other vegetation***"; and

- "***PG&E meets or exceeds all applicable federal and state vegetation clearance requirements***."[1]

3.      These statements, and others, were materially false and misleading because they misrepresented PG&E's level of compliance with California law, and consequently the extent to which shareholders would be exposed to liability for damages caused by wildfires.

4.      The fraud began to unravel when investors learned about PG&E's responsibility – and liability – for the wildfires that devastated Northern California in October 2017 (the "North Bay Fires").[2] These fires burned approximately 249,000 acres, destroyed 8,898 structures, and killed 44 people across nine counties: Napa, Sonoma, Mendocino, Lake, Humboldt, Butte, Nevada, Solano, and Yuba. They resulted in damages estimated at **more than $17 billion**.[3] The size of this liability imperiled the financial viability of the Company. In fact, several of Defendants' false and misleading statements were made in the months before PG&E openly expressed its fear that its liability for the North Bay Fires could send the Company into bankruptcy.

---

[1] The statements made by Defendants that are ***bolded and italicized*** are the statements alleged to be false and misleading. All other emphasis is in **bold**.

[2] There may have been as many as 170 individual fires, but many smaller fires combined into larger fires as they burned. Taking that into consideration, the North Bay Fires consisted of eighteen main fires.

[3] This $17 billion estimate is approximately six times greater than the second most expensive California wildfire, the October 1991 Tunnel Fire in Oakland, which, according to a May 27, 2011 article in *Scientific American*, caused $2.687 billion in insured property damage. https://www.scientificamerican.com/article/graphic-science-how-much-do-fires-cost-property-damage/

Case: 19-30088   Doc# 11169-6   Filed: 08/31/21   Entered: 08/31/21 14:49:59   Page 8 of 78

5.     Of the **seventeen** main North Bay Fires for which the State of California's investigation has been completed by the California Department of Forestry and Fire Protection ("Cal Fire"), the truth emerged over time that **all seventeen** were caused by PG&E equipment. Cal Fire has not found a single instance where one of the North Bay Fires was caused by arson, lightning, fireworks, hikers, children playing with matches, or any other such cause. Cal Fire has determined that **eleven** of these fires, across seven counties, evidenced violations of California safety regulations – contradicting Defendants' false representations of compliance with those regulations. California's investigation into the eighteenth and final North Bay Fire (the Tubbs Fire, which was the largest and most destructive) remains ongoing.

6.     Accordingly, PG&E's statements of compliance with safety regulations during the Class Period at issue here misrepresented current facts and were not statements of opinion.

7.     Defendants' false and misleading misrepresentations and omissions came at a crucial time for the Company. As described below, over the past three decades, PG&E caused a series of wildfires and other disasters in California. For example, in September 2015, its violations of California safety regulations regarding vegetation clearance caused a wildfire known as the "Butte Fire," which burned over 70,000 acres, destroyed 921 structures, and killed two people – making it the seventh most destructive wildfire in California history at the time.

8.     Revealingly, just months before the North Bay Fires began, in an April 2017 non-public deposition concerning PG&E's responsibility for the Butte Fire, a PG&E Vegetation Program Manager named Richard Yarnell admitted: "PG&E—to the best of my knowledge, **we have not made any changes as a result of this fire**." Thus, despite being on notice of its dangerous safety violations and their deadly consequences, neither the Company nor its officers took any steps to improve safety or compliance between the Butte Fire and the far more disastrous North Bay Fires. Over this time period, Defendants either knew, or should have known, that the Company's wildfire-related safety violations continued unabated.

9.     Though the North Bay Fires began on a windy night, they were not the result of an unexpected or unique event. Rather, the circumstance of PG&E causing seventeen (or more) concurrent fires across **nine counties** shows that the Company tolerated numerous and

Case: 19-30088    Doc# 11169-6    Filed: 08/31/21    Entered: 08/31/21 14:49:59    Page 9 of 78

1   widespread violations of California safety regulations across its territory. As detailed herein, the

2   underlying explanation for these near-simultaneous North Bay Fires is neither unusual weather

3   nor coincidence, but PG&E's failure to comply with even minimal legal requirements.

4   Accordingly, PG&E and its officers knew, or deliberately disregarded, that the Company's

5   power lines were often not in compliance with California safety requirements when making false

6   and misleading statements to the contrary.

7       10.     Notwithstanding PG&E's false and misleading statements to the marketplace,

8   investors learned over time that PG&E's safety violations were responsible for most of the North

9   Bay Fires. As this information emerged between October 12, 2017 and June 11, 2018, investors

10  were surprised, given Defendants' numerous public statements during the Class Period touting

11  the Company's compliance, safety measures, and its intertwined financial health. As the truth

12  regarding PG&E's inadequate safety measures came to light, PG&E's artificially inflated share

13  price dropped significantly. Thus, as a result of Defendants' wrongful acts and omissions, Lead

14  Plaintiff and other Class members have suffered significant damages.

15      **B.    Claims Being Asserted**

16      11.     Lead Plaintiff asserts the claims herein against PG&E and certain of its executives

17  and officers, seeking to recover for its damages suffered due to these declines in PG&E's

18  publicly traded securities. The action is brought on behalf of a class of all persons and entities

19  that purchased or otherwise acquired PG&E publicly traded securities during the period from

20  April 29, 2015 through June 8, 2018, inclusive (the "Class Period"). Excluded from the class are:

21  (i) Defendants; (ii) members of the immediate family of any Individual Defendant; (iii) any

22  person who was an officer or director of PG&E during the Class Period; (iv) any firm, trust,

23  corporation, or other entity in which any Defendant has or had a controlling interest; (v) PG&E's

24  employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they

25  made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs,

26  successors-in-interest, or assigns of any such excluded person. Lead Plaintiff seeks to recover

27  compensable damages caused by Defendants' violations of the federal securities laws and to

28

CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO. 3-18-CV-03509-RS                                                                4

1    pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the

2    "Exchange Act") and Rule 10b-5 promulgated thereunder.

3    **II.    JURISDICTION AND VENUE**

4        12.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of

5    the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the

6    SEC (17 C.F.R. § 240.10b-5).

7        13.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C.

8    §1331 and Section 27 of the Exchange Act.

9        14.    Venue is proper in this Judicial District pursuant to Section 27 of the Exchange

10   Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as PG&E's principal executive offices are located

11   within this Judicial District.

12       15.    In connection with the acts, conduct and other wrongs alleged in this Complaint,

13   Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

14   including but not limited to, the United States mail, interstate telephone communications and the

15   facilities of the national securities exchange.

16   **III.   PARTIES**

17       16.    Lead Plaintiff PERA was established in 1947 and manages a retirement system

18   for state, county, and municipal employees including police, firefighters, judges, magistrates,

19   legislators and volunteer firefighters. PERA oversees assets of more than $15 billion on behalf of

20   its members, retirees, and beneficiaries. As set forth in the Certification accompanying the

21   motion for appointment as Lead Plaintiff (ECF No. 29), PERA purchased securities of PG&E at

22   artificially inflated prices during the Class Period and was damaged as the result of Defendants'

23   wrongdoing as alleged in this Complaint. On September 10, 2018, this Court appointed PERA to

24   serve as the Lead Plaintiff in this action pursuant to the Private Securities Litigation Reform Act

25   of 1995 (the "PSLRA").

26       17.    Defendant PG&E Corporation is a publicly traded corporation that is

27   headquartered in San Francisco, California, with principal executive offices located at 77 Beale

28   Street, P.O. Box 770000, San Francisco, California 94177. PG&E's securities trade on the New

York Stock Exchange ("NYSE") under the ticker symbol "PCG." It is a holding company that holds, directs the actions of, and controls energy-based businesses such as the Utility.

18.     Defendant Utility, the Pacific Gas and Electric Company, is a wholly-owned subsidiary of PG&E and operates as a public utility in California. It generates revenue by selling and delivering electricity and natural gas to its customers, also known as "rate-payers." The Utility effectively acts as an alter ego of PG&E; the two entities share the same address, have overlapping directors, intermix finances, and file joint annual reports with the SEC on Form 10-K. Indeed, all of the Utility's shares are owned by PG&E.  Alternatively, PG&E Corporation controls the Utility as detailed herein.  Accordingly, this Complaint refers to the Utility and PG&E interchangeably as "PG&E" or the "Company," unless otherwise specified.

19.     Defendant Anthony F. Earley, Jr. ("Earley") served as PG&E Corporation's President, Chief Executive Officer ("CEO"), and Chairman of the Board from September 13, 2011 to March 1, 2017, and as its Executive Chairman from March 1, 2017 to December 2017.

20.     Defendant Geisha J. Williams ("Williams") has served as PG&E Corporation's CEO and President since March 1, 2017, and served as the President of Electric Operations at the Utility from August 17, 2015 to February 28, 2017. Prior to that, she served as Executive Vice President of Electric Operations at the Utility from June 1, 2011 to August 16, 2015.

21.     Defendant Nickolas Stavropoulos ("Stavropoulos") served as the President and COO of PG&E Corporation from March 1, 2017 to September 30, 2018, and served as President of Gas Operations at the Utility from August 17, 2015 to February 28, 2017. Prior to that, he served as Executive Vice President of Gas Operations at the Utility from June 13, 2011 to August 16, 2015.

22.     Defendant Julie M. Kane ("Kane") has served as Senior Vice President, Chief Ethics and Compliance Officer, and Deputy General Counsel for PG&E Corporation since May 18, 2015. Kane is named as a Defendant solely in her capacity as Chief Ethics and Compliance Officer.

23.     Defendant Christopher P. Johns ("Johns") served as the President of Pacific Gas and Electric Company from August 1, 2009 to August 17, 2015.

24. Defendant Patrick M. Hogan has served as the Utility's Senior Vice President of Electric Operations from March 2016 through the present, and previously served as the Utility's Vice President of Electric Operations Asset Management from November 2013 through February 2016.

25. The Defendants referenced above in ¶¶19-24 are referred to herein as the "Individual Defendants."

26. The Individual Defendants, because of their high-level positions of control and authority as senior executive officers of PG&E or the Utility, possessed the power and authority to control, and did control, the contents of PG&E's SEC filings, press releases, and other market communications during the Class Period. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions within the Company and/or Utility, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

## IV.   FACTUAL BACKGROUND

### A.   PG&E Operates Within a Robust Legal Regime

27. As detailed herein, electricity transmission and distribution is a heavily regulated industry in California.

#### 1.   California Law Required PG&E to Maintain a Safe Distance Between Its Electrical Equipment and Nearby Vegetation

28. To ensure public safety from wildfires, California has laws and regulations that require PG&E to keep its electrical equipment clear from vegetation growth or hazardous trees, and otherwise safe.

29. Pursuant to California Public Resources Code §4292, for instance:

[A]ny person that owns, controls, operates, or maintains any electrical transmission or distribution line upon any mountainous land, or forest-covered land, brush-covered land, or grass-covered land shall, during such times and in such areas as are determined to be necessary by the director or the agency which has primary responsibility for fire protection of such areas, maintain around and adjacent to any pole or tower which supports a switch, fuse, transformer, lightning arrester, line junction, or dead end or corner pole, a firebreak which consists of a clearing of not less than 10 feet in each direction from the outer circumference of such pole or tower.

30.      Similarly, California Public Resources Code §4293 provides that:

[A]ny person that owns, controls, operates, or maintains any electrical transmission or distribution line upon any mountainous land, or in forest-covered land, brush-covered land, or grass-covered land shall, during such times and in such areas as are determined to be necessary by the director or the agency which has primary responsibility for the fire protection of such areas, maintain a clearance of the respective distances which are specified in this section in all directions between all vegetation and all conductors which are carrying electric current: (a) For any line which is operating at 2,400 or more volts, but less than 72,000 volts, four feet. (b) For any line which is operating at 72,000 or more volts, but less than 110,000 volts, six feet. (c) For any line which is operating at 110,000 or more volts, 10 feet. In every case, such distance shall be sufficiently great to furnish the required clearance at any position of the wire, or conductor when the adjacent air temperature is 120 degrees Fahrenheit, or less. **Dead trees, old decadent or rotten trees, trees weakened by decay or disease and trees or portions thereof that are leaning toward the line which may contact the line from the side or may fall on the line shall be felled, cut, or trimmed so as to remove such hazard**.

31.      Under California Public Utilities Code §451, PG&E was further required to "furnish and maintain such adequate, efficient, just, and reasonable service, instrumentalities, equipment, and facilities, including telephone facilities, as defined in Section 54.1 of the Civil Code, as are necessary to promote the safety, health, comfort, and convenience of its patrons, employees, and the public."

### 2.      PG&E Is Regulated by the CPUC

32.      PG&E's primary regulator is the California Public Utilities Commission ("CPUC"). The CPUC promulgates safety regulations and adjudicates PG&E's annual General Rate Cases – essentially determining which costs PG&E may pass on to rate-payers, and which costs PG&E must bear. The CPUC was created under Article XII of the California State

Case 19-30088   Doc# 11169   Filed: 08/31/21   Entered: 08/31/21 14:49:59   Page 14 of 78

1    Constitution, and derives its regulatory authority from Section 701 of the California Public

2    Utilities Code.

3         33.    Pursuant to CPUC General Order 95, Rule 35, PG&E was required "to establish

4    necessary and reasonable clearances" between overhead conductors and nearby vegetation, with

5    certain "minimum clearances" set forth by CPUC. Furthermore, this rule required that:

> When a supply or communication company has actual knowledge,
> obtained either through normal operating practices or notification
> to the company, that dead, rotten or diseased trees or dead, rotten
> or diseased portions of otherwise healthy trees overhang or lean
> toward and may fall into a span of supply or communication lines,
> said trees or portions thereof should be removed.

* * *

> When a supply or communication company has actual knowledge,
> obtained either through normal operating practices or notification
> to the company, that its circuit energized at 750 volts or less shows
> strain or evidences abrasion from vegetation contact, the condition
> shall be corrected by reducing conductor tension, rearranging or
> replacing the conductor, pruning the vegetation, or placing
> mechanical protection on the conductor(s).

**3.    Cal Fire Is the Duly Authorized Investigative Arm of the State of California for Wildfires**

16        34.    The California Department of Forestry and Fire Protection ("Cal Fire") is an

17   agency of the State of California that, pursuant to Title 14 of California's Code of Regulations, is

18   administratively in charge of both the state's fire departments and its law enforcement with

19   regard to state fire and forest laws. As a result, it is responsible for both fighting fires as they

20   occur and for investigating the causes of fires after they have been contained. Cal Fire conducts

21   official investigations as an arm of the State of California to determine the causes of wildfires

22   within the state, as well as any violations of state laws and regulations.

23        35.    Pursuant to an agreement with the U.S. Department of the Interior and the U.S.

24   Department of Agriculture, Cal Fire is the state agency that is authorized to make fire cause and

25   origin determinations for wildfires – such as the North Bay fires – that fall within its jurisdiction.

1
2

> **4.** **Under California's Inverse Condemnation Law, PG&E Would Not Bear the Cost of Wildfires It Causes If It Proved That It Acted Reasonably and Prudently**

3

36.     The California Supreme Court has interpreted Article 1, Section 19 of the

4

California Constitution as imposing a doctrine known as "inverse condemnation," whereby

5

public utilities such as PG&E are required to compensate individuals whose real property has

6

been damaged by the utility under a strict liability regime. However, importantly, a utility such

7

as PG&E is able to recover those same costs from the CPUC – effectively passing the costs from

8

the shareholders to the rate payers – if it can "affirmatively prove that it reasonably and

9

prudently operated and managed its system." Order Denying Rehearing of Decision (D.) 17-11-

10

033 at 3, App. of SDG&E for Authorization to Recover Costs Related to the 2007 Southern Cal.

11

Wildfires Recorded in the Wildfire Expense Memo Account, App. No. 15-09-010, Decision 18-

12

07-025 (July 12, 2018).

13

37.     In other words, PG&E will be left to bear the costs of wildfires causes unless it

14

can prove that it was "reasonable and prudent," meaning "that at a particular time any of the

15

practices, methods, and acts engaged in by a utility follows the exercise of reasonable judgment

16

in light of facts known or which should have been known at the time the decision was made." *Id.*

17

Embodied in this standard, at minimum, is compliance with state safety laws and regulations.

18

> **B.** **PG&E's Vegetation Management Expenditures Did Not Materially Change from Year to Year During the Class Period, Let Alone Double at Any Point**

19

20

38.     The State of California declared a state of emergency due to drought conditions in

January 2014,[4] which ended in April 2017.[5] In October 2015, California also declared a state of

21

emergency regarding tree mortality due to both the ongoing effects of the drought and an

22

epidemic of insect infestations causing millions of trees to die annually.[6] These conditions

23

significantly increased the danger of wildfires in the North Bay region of California. PG&E

24

knew about these conditions and its obligations to ensure safety from wildfires in spite of these

25

26

---

[4] https://www.gov.ca.gov/2014/01/17/news18368/

27

[5] https://www.gov.ca.gov/2017/04/07/news19747/

[6] https://www.gov.ca.gov/wp-

28

content/uploads/2017/09/10.30.15_Tree_Mortality_State_of_Emergency.pdf

Case 19-30088   Doc# 11169-5   Filed: 08/31/21   Entered: 08/31/21 14:49:59   Page
16 of 78

1   environmental factors. For example, the "Proclamation of a State of Emergency" regarding tree

2   mortality made explicit: **"[U]tilities . . . to the extent required by their existing**

3   **responsibilities to protect the public health and safety, shall undertake efforts to remove**

4   **dead or dying trees in these high hazard zones that threaten power lines**. . . ."

5     39. Based on information released by CPUC, PG&E spent $194,094,406 on

6   vegetation management in 2015, $198,735,579 in 2016, and $201,456,193 in 2017 – increases of

7   only 2.4% and 1.4%, respectively.[7] Each year's spending was substantially identical to the

8   amounts PG&E requested, and the amounts CPUC approved, in PG&E's 2015, 2016, and 2017

9   General Rate Cases – notwithstanding the state of emergency directive above. In contrast,

10   inflation rose 5.48% over the same three-year period.[8] Thus, PG&E's spending did not even

11   keep pace with inflation during the Class Period.

12     40. CPUC released the following chart confirming that PG&E's vegetation

13   management spending underwent only modest increases over the relevant time period:

14   **Table showing 2011-2017 history of PG&E annual spending ($ million) on vegetation management**

| | PG&E Requested | CPUC Authorized | PG&E Spent |
|---|---|---|---|
| **2017** | $201.0 | $201.0 | *$150.4 YTD* |
| **2016** | $198.8 | $198.8 | $198.7 |
| **2015** | $194.2 | $194.2 | $194.1 |
| **2014** | $190.0 | $190.0 | $189.7 |
| **2013** | $180.0 | $161.5 | $161.6 |
| **2012** | $180.0 | $161.5 | $161.5 |
| **2011** | $180.0 | $161.5 | $161.6 |

23     41. While Defendants falsely represented on November 2, 2017 that PG&E

24   "*doubled*" vegetation management expenditures in 2016 (*see* ¶¶102 & 105), tellingly, they made

---

26   [7] https://www.pge.com/tariffs/tm2/pdf/ELEC_4827-E.pdf
27   https://www.pge.com/tariffs/assets/pdf/adviceletter/ELEC_5036-E.pdf;
https://www.pge.com/tariffs/assets/pdf/adviceletter/ELEC_5402-E.pdf

28    [8] https://www.bls.gov/data/inflation_calculator.htm

Case: 19-30088   Doc# 11169-6   Filed: 08/31/21   Entered: 08/31/21 14:49:59   Page
17 of 78

1    this claim only after the North Bay Fires. At no point did the Company identify any specific

2    budget item indicating that its vegetation management budget had, in fact, doubled.

3        **C.**    **PG&E's Tree Trimming and Removal Did Not Come Close to Doubling**
             **During the Class Period**

4

5        42.    Nor did the Company's reported numbers for trees that it trimmed or removed

     double during this time period, or come close to doubling. During the Class Period, the Company

6    touted the results of its vegetation management expenditures, slowly inflating the numbers it was

7    reporting. Initially, it touted that its tree trimming and removal amounted to "**1.2 million trees**"

8    total (November 18, 2015, statement of Hogan) or generally "**more than 1 million trees each**

9    **year**" (May 4, 2016, statement of Earley). At first, it stated that these totals included "about

10   **236,000 dead or dying trees**" as "part of its comprehensive response to tree mortality in the

11   state" (May 3, 2017, Press Release).

12       43.    Soon, however, it was touting that 2016's "**236,000 dead or dying trees**"

13   removed were "in addition to the **1.2 million trees** that PG&E works **each year**" (May 10, 2017,

14   Press Release).

15       **D.**    **After the North Bay Fires, PG&E Started Reporting Inflated Numbers for**
             **Tree Removal**

16

17       44.    Then, after the North Bay Fires, PG&E's numbers crept up by 100,000 trees:

18   "Typically, we spend about **$200 million** every year to line clear or remove **1.3 million trees** to

19   mitigate both the risk of wildfires and to prevent electric outages" **in addition to** the

20   "**incremental 236,000 dead or dying trees**" (November 2, 2017, statement of Williams). This is

21   the same statement where PG&E began to falsely and/or misleadingly tout to investors that it had

22   "*doubl[ed]*" vegetation management expenditures in 2016, *i.e.*, to $400 million (*see* ¶102, *infra*).

23       45.    Then, when negative news emerged on May 25, 2018 about PG&E's safety

24   violations causing many of the North Bay Fires, the Company's reported number of cleared trees

25   crept up by another 100,000 trees: "Under PG&E's industry-leading Vegetation Management

26   Program, we . . . prune or remove approximately **1.4 million trees annually**" (May 25, 2018,

27   press release).

28

---

CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO. 3-18-CV-03509-RS

12

1    **E.     PG&E Concealed Its Unsafe Use of Reclosers During the Class Period**

2         **1.     PG&E Used Reclosers to Prioritize Convenience Over Safety**

3         46.     "Reclosers" are devices that are affixed to power line poles, to send pulses of

4    electricity into lines when service has become briefly interrupted. Although reclosers can in

5    some instances prevent blackouts, it is well known in the industry that they are dangerous in

6    certain circumstances. For instance, if a power line has come into contact with nearby vegetation,

7    it would be dangerous to send an additional pulse of electricity through the line because this

8    could start a fire.

9         47.     San Diego Gas & Electric Co. and Southern California Edison are two other

10   utility companies that operate in California, along with PG&E. According to a complaint filed in

11   the state court litigation concerning the North Bay Fires,[9] these two utility companies are aware

12   of the dangers of using reclosers, and they have a practice of blocking reclosers from working

13   during fire season.[10]

14        48.     Prior to the North Bay Fires, PG&E knew that its reclosers posed a great risk of

15   causing wildfires. PG&E was specifically warned of this hazard in a May 2013 report that the

16   Liberty Consulting Group (the "Liberty Report") submitted to the Safety and Enforcement

17   Division of the CPUC. Moreover, at a November 18, 2015 hearing before the California Senate

18   Sub-Committee on Gas, Electric, and Transportation Safety, the Utility's Vice President of

19   Electrical Operations Asset Management, Defendant Hogan, stated that PG&E had the ability to

20   reprogram its reclosers during fire season so that they did not attempt to restart lines that had

21   been stopped. Hogan acknowledged that shutting down power means "you take the reliability hit,

22   but you gain the wildfire benefit." This statement evidenced that PG&E recognized the downside

23   to disabling its reclosers (because it would increase the risk of blackouts, *i.e.*, the "reliability hit,"

24   which would lead to consumer complaints), but that PG&E also understood this measure would

25   _____

     [9] https://www.norcalfirelawyers.com/wp-content/uploads/2018/01/atlas-fire.pdf

26   [10] Wildfire season is a portion of the year, generally 6 to 8 months in the summer and fall in
     California, declared such by the responsible public agency fire administrator. This declaration is
27   based on fuel and weather conditions conducive to the ignition and spread of wildland fires.
     http://cdfdata.fire.ca.gov/incidents/incidents_terminology?filter=F
28

Case 19-30088   Doc 11169   Filed: 08/31/21   Entered: 08/31/21 14:49:59   Page
19 of 78

improve safety (*i.e.*, the "wildfire benefit").  Unbeknownst to investors, the Company chose reliability over safety.

> **2.    PG&E Concealed Its Use of Reclosers From Investors During the Class Period**

49.     On November 18, 2015, Defendant Hogan assured the public that PG&E was "***just about done***" with the process of disabling its recloser devices as of that date. He represented that reclosers would be disabled "***first***" in "***high wildfire risk areas***," followed by "126" of "about 130 some odd locations . . . this year," *i.e.*, 2015, which left only "six for next year."

50.     However, PG&E did not disable all of its reclosers during fire season, like San Diego Gas & Electric Co. and Southern California Edison did. Rather, during the time of the North Bay Fires, some of PG&E's devices were programmed to try up to three times to restore power by sparking electricity. Hogan's statement concealed that PG&E kept at least certain of its reclosers dangerously in use in a high wildfire risk area through October 2017: PG&E reclosers were to blame for at least one of the North Bay Fires, known as the Pythian Fire.

51.     As is discussed in more detail below, it was not until **after** the deadly North Bay Fires that PG&E finally disabled these reclosers.[11] Notably, State Senator Jerry Hill was quoted by NBC on January 3, 2018 as saying that he felt "misled" by PG&E's executives into believing that the Company had followed the lead of its counterparts and shut off its reclosers in all 132 of its high risk fire areas by the start of 2017:

> Hill said he was surprised the company's recloser shutdown was so limited, given that a top PG&E official assured him back in 2015 that the company would be able to shut down reclosers in all 132 of the high risk fire areas by the start of 2017.
>
> "I think that's the troubling part," Hill said, "that **they misled us in that**.
>
> "Had they said they did not have that system in place, then we would have followed up with more questions to try to find what the problem was -- and may have been able to focus in on that a couple of years ago that may have prevented these fires in October."

---

[11] http://www.cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/Safety/Response%20to%20Data%20Request.pdf

Case 18-30088   Doc# 11169   Filed: 08/31/21   Entered: 08/31/21 14:49:59   Page 20 of 78

1    Likewise, investors were misled by PG&E's recloser statements.

2          F.    **PG&E Engaged in an Unsafe Pattern of Noncompliance with Vegetation Management Requirements That Caused Many of the North Bay Fires**

3

4          52.    Despite the important safety measures imposed by California law, PG&E has a

5    long history of causing deadly wildfires through its failure to comply with the legal requirements

6    for vegetation management. Between causing the devastating Trauner Fire in 1994 and the

7    deadly Butte Fire in 2015, PG&E repeatedly violated California's vegetation management laws

8    and regulations.  PG&E assured investors during the Class Period that it had changed, stating in

9    its 2015, 2016, and 2017 Corporate Responsibility and Sustainability Reports that its "vegetation

10   management" was now "*in compliance with relevant laws*" or "*complying with state and*

11   *federal regulations.*"  Notably, in its 2018 Corporate Responsibility and Sustainability Report

12   issued **after** the public learned the true causes of the North Bay Fires, PG&E **no longer**

13   represents to investors that its vegetation management complies with California's safety laws.

14         **1.**    **PG&E Was Convicted of Negligence for Starting a Wildfire in 1994**

15         53.    One of the most notable of the pre-Class Period fires was the "Trauner Fire,"

16   where PG&E was convicted of 739 counts of criminal negligence and required to pay $24

17   million in penalties due to the Company's deficient vegetation management systems.[12]

18         **2.**    **PG&E's Unsafe Noncompliance Continued Through 2010**

19         54.    Subsequently, PG&E's deficient vegetation management practices ignited other

20   fires, including the Pendola Fire (1999),[13] the Sims Fire (2004), and the Whiskey Fire (2008).

21         55.    Moreover, according to documents released by The Utility Reform Network

22   ("TURN"), PG&E planned to replace a segment of the San Bruno pipeline in 2007 that it had

23

---

24      [12] In 1994, PG&E's failure to maintain vegetation surrounding its electrical equipment caused the Trauner Fire that burned approximately 500 acres, destroyed 12 homes, and burned 22

25   structures in the town of Rough and Ready. The fire began when a power line brushed against a tree limb that PG&E was supposed to keep trimmed. Investigators found numerous safety

26   violations involving contact between vegetation and PG&E's power lines.

27      [13] PG&E paid a $14.75 million settlement to the U.S. Forest Service, and a $22.7 million settlement with CPUC after PG&E had been reprimanded for not spending money that had been

28   earmarked for tree trimming and removal.

Case: 19-30088   Doc# 11169-5   Filed: 08/31/21   Entered: 08/31/21 14:49:59   Page
21 of 78

1   identified as one of the riskiest natural gas pipelines in PG&E's system. PG&E collected $5

2   million from its customers to complete the project by 2009, but instead deferred the project and

3   repurposed the money to other priorities. On September 9, 2010, the San Bruno pipeline

4   exploded, killing 8 people, injuring over 50 more, and destroying 38 homes.

5       56.     On August 9, 2016, a California federal jury found PG&E guilty of five criminal

6   counts for violating minimum federal safety standards under the Natural Gas Pipeline Safety Act,

7   as well as one count for obstructing an agency proceeding after it failed to provide all of its

8   records to the National Transportation Safety Board during an investigation into the San Bruno

9   explosion.

10          **3.      PG&E's Unsafe, Noncompliant Vegetation Management Caused the
               Butte Fire in 2015**

11

12      57.     In 2015, five months after PG&E made Misstatement No. 1, PG&E's vegetation

13   management program once again failed, causing the Butte Fire that killed two people, destroyed

14   921 homes, and scorched more than 70,000 acres over 22 days.

15      58.     On April 28, 2016, Cal Fire issued a press release announcing its conclusion that

16   the Butte Fire was caused by PG&E's safety violations, including evidence of negligence. Cal

17   Fire also referred its investigation to the two relevant district attorneys for the counties the Butte

     Fire burned.

18      59.     There is currently pending litigation over PG&E's liability for the Butte Fire,

19

20   including an April 13, 2017 lawsuit in which Cal Fire sued PG&E for $87 million to recover the

21   costs that the agency devoted to fighting that fire. Cal Fire's lawsuit alleges that PG&E

     negligently caused the Butte Fire by maintaining an inadequate vegetation management system.

22          **4.      PG&E's Compliance Measures Allowed More than One Million
               Vegetation Management Violations During the Class Period**

23

24      60.     Internally, PG&E's numerous and widespread violations of California safety laws

25   are shown by the fact that the Company's internal controls were designed to permit vegetation

26   management violations to go unchecked.  Investigative journalists and attorneys have uncovered

27   that PG&E internally accepts that its vegetation management practices leave 1 of every 100 trees

28   noncompliant with California regulations, and further reportedly "cheats" on its internal

1  compliance reviews, in order to give a misleading impression of compliance with tree clearance

2  requirements when it is in fact noncompliant. According to a report from NBC reporter Jaxon

3  Van Derbeken on November 6, 2017, published a month after the North Bay Fires began,

4  PG&E's own internal inspectors allow one out of 100 trees they check to violate state power line

5  clearance standards:

6      **PG&E auditors allow one out of 100 trees they check to violate**
       **state power line clearance standards**, NBC Bay Area has
7      learned.

8                                    * * *

9      [I]t emerged during the Butte fire litigation that [internal] auditors
       were giving out a passing grade when one out of 100 trees they
10     checked turned out to be too close to power lines under state
       standards.

11                                   * * *

12
       When [PG&E] failed to reach that 99 percent compliance rate in
13     the area around the fire . . . the company just expanded the
       universe of trees covered in a particular audit.
14
       "So what PG&E does when it doesn't pass, it basically cheats,"
15     [Amanda Riddle, one of the attorneys participating in a lawsuit
       against PG&E related to the Butte Fire] said. "It adds more miles
16     and more miles until it reaches a passing grade."

17     61.    With approximately 123 million trees under PG&E's control,[14] this means

18  approximately 1.2 million trees may not be in compliance with state safety laws at any given

19  time. The measurement of 1.2 million safety violations is a conservative estimate when

20  combined with the detail that PG&E "cheats" to get its rate of violations down to 1%, hence

21  PG&E's real rate of noncompliance may be even higher.

22     62.    According to the plaintiffs litigating against PG&E for injuries caused by the

23  2015 Butte Fire, Defendant Hogan's and another PG&E employee's deposition testimony

24  purportedly showed that "PG&E knows and accepts that 1-in-100 trees will be non-compliant,

25

26  _____
       [14] See PG&E's Response to Safety and Enforcement Divisions' 10/14/17 Questions, Oct. 17,
27  2017, *available at*
    http://www.cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/Safety/Response%20to
28  %20Data%20Request.pdf

CONSOLIDATED CLASS ACTION COMPLAINT                                          17
CIVIL ACTION NO. 3-18-CV-03509-RS

and that 1-in-1000 will be touching its powerlines." Using the same metrics, this means that PG&E knows that it allows approximately 123,000 safety violations in the nature of trees touching its powerlines at any given time.

63.     Thus, PG&E has been on notice for many years that its vegetation management practices did not comply with California safety regulations and never disclosed that their own internal compliance reviews showed a lack of compliance on a huge scale.

**5.     PG&E's History of Safety Violations Shows that the Company Knew of Its Numerous and Widespread Violations of California Safety Regulations Throughout the Class Period, But Did Nothing to Change Them**

64.     Even though PG&E suffered from endemic wildfire safety problems, the Company did not meaningfully change its practices even after the deadly Butte Fire that occurred in 2015. As noted above, in a deposition transcript that has not yet been made publicly available, PG&E's Vegetation Program Manager (Stockton Division)[15] Richard Yarnell reportedly testified under oath: "**PG&E—to the best of my knowledge, we have not made any changes as a result of this fire**" as of April 10, 2017. Accordingly, the **known** noncompliance that caused the Butte Fire in 2015 continued unabated throughout the Class Period.

65.     Moreover, the vegetation management problems detailed herein were institutionally entrenched by certain incentive structures PG&E put in place. According to a lawsuit that was filed in California Superior Court against PG&E on December 21, 2017 (Case No. CGC-17-563293), which asserted claims on behalf of victims of North Bay Fires, PG&E provided monetary incentives to its employees that had the effect of discouraging the implementation of vegetation safety measures.

66.     For instance, PG&E's Vegetation Management Program adopted a Vegetation Management Incentive Initiative ("VMII") program, which was purportedly designed to reduce the "annual routine compliance" tree work of PG&E and to shift resources to "reliability" work that focused on urban consumer satisfaction instead of overall safety. By doing so, PG&E

---

[15] PG&E's Stockton Division is a geographic subdivision within the Company that contained the Butte Fire.

Case 19-30088   Doc# 11169   Filed: 08/31/21   Entered: 08/31/21 14:49:59   Page 24 of 78

effectively shifted its resources away from rural areas that were more prone to wildfires (where the "annual routine compliance" work was typically done), and towards more densely populated urban areas (where the "reliability" work was done). For example, pursuant to this program, PG&E set a goal to reduce "routine" work by 7.5% annually from 2014 through 2016. PG&E's bonus incentive program therefore (like its policy of not shutting off its reclosers during wildfire season) put safety at risk in an effort to reduce consumer complaints.

67.     According to the same lawsuit, Robert Urban, a regional officer for a PG&E contractor, stated that he had a concern that the bonus system incentivized his employees to not do their job, but PG&E chose to keep this program despite knowing this risk.

68.     It was in this context that Defendants touted PG&E's vegetation management to investors, falsely representing that it was in full compliance with all relevant regulations throughout the Class Period. *E.g.*, ¶76 (Misstatement No. 2, October 16, 2015 ); ¶86 (Misstatement No. 5, August 9, 2017); ¶100 (Misstatement No. 9, October 31, 2017); and ¶109 (Misstatement No. 12, November 5, 2017).  As noted above, though PG&E falsely assured investors during the Class Period that its vegetation management failures had been resolved after the Butte Fire, the Company's own employee Richard Yarnell later admitted that nothing of substance had changed over the same time period.

## V.     DEFENDANTS' FALSE AND MISLEADING CLASS PERIOD STATEMENTS

69.     In light of PG&E's history of causing wildfires and the drought conditions in California, investors and analysts were focused on the Company's compliance with wildfire-related safety regulations during the Class Period. With an eye towards artificially inflating its share price, PG&E responded to this interest with false and misleading reassurances that PG&E was in compliance with safety regulations. PG&E also significantly raised its quarterly dividend during the Class Period, repeatedly touting that such a move was based, in part, on its success in ensuring safety. As detailed below, Defendants' fraud proximately caused investors' losses.

### A.     Overview of Defendants' Fraudulent Course of Conduct

70.     Of the **seventeen** main North Bay Fires for which Cal Fire's investigations have been completed, **all seventeen** were caused by PG&E equipment. Among those, **eleven** of these

1    fires evidenced violations of California safety regulations, in **seven** different counties at the **same**

2    **time**.

3        71.     PG&E was responsible for all the North Bay Fires.  Even though Cal Fire's

4    investigations have not found evidence of violations for six of the fires, PG&E's numerous,

5    widespread safety violations actually caused or exacerbated **all** of the North Bay Fires. PG&E's

6    safety violations exacerbated even the fires that lacked evidence of violations, in two ways. First,

7    some of the eleven fires caused by PG&E's safety violations merged into and strengthened other

8    fires. Second, PG&E's safety violations diverted scarce firefighting resources to contain the

9    eleven North Bay Fires which never should have ignited, leading to the other fires causing more

10    damage. As such, PG&E's safety violations were responsible, in full or in part, for **all** of the

11    North Bay Fires.

12        72.     The news about PG&E's responsibility for causing the North Bay Fires directly

13    impacted the Company's bottom line, because California law requires PG&E to bear the cost of

14    wildfire property damage and personal injury caused by its violations of California safety

15    regulations. In other words, those costs likely could not be passed on to ratepayers. And, given

16    the conclusions of Cal Fire's investigations into these fires to date – where Cal Fire has referred

17    at least eleven of its investigations to the appropriate counties' district attorneys' offices to

18    review for potential criminal violations – the market understood that the financial consequences

19    to PG&E would be huge.

20        73.     As of the filing of this Complaint, Cal Fire has not yet completed its

21    investigations into the Tubbs Fire, and may find that it, too, was caused by PG&E's safety

22    violations.

23       **B.**      **Defendants Made Materially False and Misleading Statements and**

24              **Omissions Regarding Its Vegetation Management Activities and Compliance with Wildfire Safety Regulations Before the North Bay Fires**

25           **1.**      **April 29, 2015 – Misstatement No. 1**

26        74.     The Class Period begins on April 29, 2015, when PG&E held a conference call to

27    discuss the Company's financial and operating results for the first financial quarter of 2015,

28

1   which ended March 31, 2015. During the call, Defendant Johns, then President of the Utility,

2   misleadingly assured investors of the Company's commitment to safety:

> As California enters its fourth year of drought, we're working hard
> to help the state meet this challenge by reducing water usage at our
> own facilities, encouraging customers to conserve by offering
> rebates for more efficient washers and agricultural pumps. ***We're
> stepping up our vegetation management activities to mitigate
> wildfire risk*** and improve access for firefighters.

75.    This statement was materially false and/or misleading because PG&E did not

materially increase its vegetation management budget in 2015. In fact, based on information

released by CPUC, PG&E underspent its vegetation management budget in both 2014 and 2015:

whereas CPUC approved PG&E to spend $190,000,000 and $194,153,000 in 2014 and 2015,

respectively, PG&E actually spent only $189,617,402 and $194,094,406, respectively.

Moreover, this small budget increase of 2.4% between 2014 and 2015 was only 1.28 percentage

points above inflation, which rose 1.12% over the same time period.[16] Accordingly, PG&E had

not meaningfully "stepp[ed] up" its vegetation management activities.[17]

### 2.    October 16, 2015 – Misstatement No. 2

76.    On October 16, 2015, PG&E issued its 2015 Corporate Responsibility and

Sustainability Report. This report falsely assured investors that PG&E's "vegetation

management" was "in compliance with relevant laws":

**Vegetation Management**

***Each year, PG&E's Vegetation Management department***, in
consultation with utility arborists and foresters, ***inspects every mile
of power line in our service area for public safety*** and electric
reliability. ***We do so in compliance with relevant laws*** and with a
focus on public involvement, including extensive "Right Tree,
Right Place" outreach. PG&E has been recognized by the National
Arbor Day Foundation as a Tree Line USA recipient for 20
consecutive years for demonstrating best practices in utility
arboriculture.

---

[16] https://www.bls.gov/data/inflation_calculator.htm

[17] PG&E also omitted that it was supposed to perform $441,192 (the total amount by which
PG&E underspent its allowance in 2014 and 2015) in additional vegetation management during
2015, but failed to do so.

Case 19-30088   Doc# 11169   Filed: 08/31/21   Entered: 08/31/21 14:49:59   Page
27 of 78

77.     Because PG&E's vegetation management practices failed to follow relevant California safety laws, PG&E's vegetation management activities were decidedly not "in compliance with relevant laws." According to reports released in subsequent corrective disclosures on May 25 and June 8, 2018, PG&E violated relevant California laws, including Public Resources Code section 4293, multiple times. Further, Cal Fire found sufficient evidence of violations of state law to refer PG&E to the relevant district attorneys for eleven of the North Bay fires. *See* Sections VII.C.4-5, *infra*. Thus, this statement was materially false and/or misleading because of PG&E's numerous and widespread violations of safety regulations, including regulations specifically related to vegetation management – regulations which were essential for preventing devastating wildfires. In fact, PG&E's violations were so pervasive that they caused multiple North Bay Fires all at the same time in seven different counties – therefore they cannot be explained away as an isolated lapse.

78.     This statement regarding compliance was reviewed and authorized by Defendant Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer. According to the same 2015 Corporate Responsibility and Sustainability Report:

> Within senior leadership, ethics and compliance are managed by a Chief Ethics and Compliance Officer, a position created in 2015 as part of our commitment to achieve a best-in-class ethics and compliance program. The position reports to the PG&E Corporation CEO and has additional reporting responsibility to the Audit Committees of the Board of Directors, and the Compliance and Public Policy Committee of PG&E Corporation.
>
> The new position is responsible for:
>
> - Building a best-in-class ethics and **compliance** program and **overseeing its implementation**,
>
> - **Overseeing company-wide programs for compliance reporting and related investigatory processes**. . . .

79.     Kane therefore was responsible for both "overseeing . . . implementation" of PG&E's compliance **and "overseeing . . . compliance reporting,"** including this report.

### 3.     November 18, 2015 – Misstatement No. 3

80.     On November 18, 2015, Hogan publicly testified before the California Senate Energy, Utilities and Communication Subcommittee on Gas and Electric Infrastructure Safety.

Case 19-30088   Doc# 11169   Filed: 08/31/21   Entered: 08/31/21 14:49:59   Page 28 of 78

During that testimony, Hogan assured the public that PG&E was "just about done" implementing

a program that would remotely disable the Company's recloser devices in areas that included

"high wildfire risk areas":

> So as I mentioned earlier, our SCADA capabilities where we are
> able to **take our reclosers out of service remotely**, we first **focus
> on the wildfire areas** and then we have about 130 some odd
> locations, we are going to complete about 126 of those this year,
> **just about done with that program**, which leaves six for next year,
> which will be completed.

81.     This statement was materially false and/or misleading because PG&E

misleadingly said that it had implemented policies and procedures to disable recloser devices

from areas that were at high risk for wildfires, which includes the areas where the North Bay

Fires occurred, by the end of 2015 (approximately 1 month away). Hogan's statement concealed

that PG&E dangerously kept reclosers in use through at least October 2017; Cal Fire has

determined that PG&E reclosers caused one of the North Bay Fires, known as the Pythian Fire.

Thus, PG&E did not have the safety policies and procedures in place that they said they had.

### 4.     October 6, 2016 – Misstatement No. 4

82.     On October 6, 2016, PG&E issued its 2016 Corporate Responsibility and

Sustainability Report. This report provided false assurances to investors regarding PG&E's

compliance with relevant regulations:

> **Vegetation Management**
>
> Each year, PG&E's Vegetation Management department and its
> contracting arborists and foresters inspect miles of power lines in
> our service area for public safety and electric reliability. **We do so
> in compliance with relevant laws** and with a focus on public
> involvement, including extensive "Right Tree, Right Place"
> outreach. PG&E has been recognized by the National Arbor Day
> Foundation as a Tree Line USA recipient for 21 consecutive years
> for demonstrating best practices in energy sector arboriculture.

83.     Because PG&E's vegetation management practices failed to follow relevant

California safety laws, PG&E's vegetation management activities were decidedly not "in

compliance with relevant laws." According to reports released in subsequent corrective

disclosures, PG&E violated California's Public Resources Code section 4293 multiple times.

Further, Cal Fire found sufficient evidence of violations of state law to refer PG&E to the

Case 19-30088   Doc# 11169   Filed: 08/31/21   Entered: 08/31/21 14:49:59   Page
29 of 78

1  relevant district attorneys for eleven of the North Bay fires. *See* Sections VII.C.4-5, *infra*. Thus,

2  this statement was materially false and/or misleading because of PG&E's numerous and

3  widespread violations of safety regulations, including regulations specifically related to

4  vegetation management – regulations which were essential for preventing devastating wildfires.

5  In fact, PG&E's violations were so pervasive that they caused at least 11 of the North Bay Fires

6  all at the same time in **seven** different counties – therefore they cannot be explained away as an

7  isolated lapse.

8        84.    This statement regarding compliance was reviewed and authorized by Defendant

9  Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer. According to the same

10  2016 Corporate Responsibility and Sustainability Report:

11          Within senior leadership, ethics and compliance are managed by
        the Chief Ethics and Compliance Officer (CECO), who reports to
12          the PG&E Corporation Chairman and CEO. The CECO has
        additional reporting responsibility to the Audit Committees of the
13          PG&E Corporation and Pacific Gas and Electric Company Boards
        of Directors, and the Compliance and Public Policy Committee of
14          the PG&E Corporation Board.

15          The CECO is responsible for:

16          • Building a best-in-class ethics and **compliance** program
          and **managing its implementation**,

17

18          • **Overseeing enterprise-wide programs for compliance
          monitoring, reporting**, assessment and remediation. . . .

19        85.    Kane therefore was responsible for both "managing . . . implementation" of

20  PG&E's compliance **and "overseeing . . . compliance monitoring [and] reporting,"** including

21  this report.

22        **5.**    **August 9, 2017 – Misstatement No. 5**

23        86.    On August 9, 2017, PG&E issued its 2017 Corporate Responsibility and

24  Sustainability Report. This report provided false assurances to investors regarding PG&E's

25  compliance with relevant regulations:

26          **Vegetation Management**

27          PG&E prunes and removes trees growing too close to power lines
        while maintaining as much vegetation as possible to balance land
28          use and environmental stewardship with customer needs. Through
        a well-established and innovative vegetation management

Case: 19-30088   Doc# 11169-6   Filed: 08/31/21   Entered: 08/31/21 14:49:59   Page
30 of 78

program, **PG&E balances the need to maintain a vast system of trees growing along power lines while complying with state and federal regulations and delivering safe**, reliable and affordable **electric service**.

87.     Because PG&E's vegetation management practices failed to follow relevant California safety laws, PG&E's vegetation management activities were decidedly not "complying with state and federal regulations and delivering safe . . . electric service." According to reports released in subsequent corrective disclosures, PG&E violated California's Public Resources Code section 4293 multiple times. Further, Cal Fire found sufficient evidence of violations of state law to refer PG&E to the relevant district attorneys for eleven of the North Bay fires. *See* Sections VII.C.4-5, *infra*. Thus, this statement was materially false and/or misleading because of PG&E's numerous and widespread violations of safety regulations, including regulations specifically related to vegetation management – regulations which were essential for preventing devastating wildfires. In fact, PG&E's violations were so pervasive that they caused multiple North Bay Fires all at the same time in seven different counties – therefore they cannot be explained away as an isolated lapse.

88.     This statement regarding compliance was reviewed and authorized by Defendant Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer. According to the same 2017 Corporate Responsibility and Sustainability Report:

> Within senior leadership, compliance and ethics are managed by the Senior Vice President, Chief Ethics and Compliance Officer and Deputy General Counsel (CECO), who reports to the PG&E Corporation Chief Executive Officer (CEO) and President. The CECO has additional reporting responsibility to the Audit Committees of the PG&E Corporation and Pacific Gas and Electric Company Boards of Directors, and the Compliance and Public Policy Committee of the PG&E Corporation Board.
>
> The CECO is responsible for:
>
> - Building a best-in-class **compliance** and ethics program **and managing its implementation**,
>
> - **Overseeing enterprise-wide programs for compliance monitoring, reporting**, assessment and remediation. . . .

Case: 19-30088   Doc# 11169   Filed: 08/31/21   Entered: 08/31/21 14:49:59   Page 31 of 78

89.     Kane therefore was responsible for both "managing implementation" of PG&E's compliance **and "overseeing . . . compliance monitoring [and] reporting,"** including this report.

### C.     Defendants Tied the Company's Dividend to Safety Compliance, Making Materially False and Misleading Statements and Omissions Regarding Its Dividend and Safety Before the North Bay Fires

90.     Throughout the Class Period, Defendants repeatedly tied the sustainability of its quarterly cash dividend to safety. In fact, PG&E increased its dividend during the Class Period for the first time in six years, and then raised it again – touting the Company's "progress on safety" and "improvements we have made in safety." Yet PG&E's violations of California's safety regulations were so numerous and widespread that they caused and worsened the North Bay Fires, resulting in PG&E having to suspend its dividend entirely on December 20, 2017.

### 1.     May 23, 2016 – Misstatement No. 6

91.     Less than three weeks after its May 4, 2016 earnings call, PG&E issued a press release titled "PG&E Corporation Raises Common Stock Dividend, Highlights Progress at Annual Shareholder Meeting." It stated:

> PG&E Corporation (NYSE: PCG) today announced that it is raising its quarterly common stock dividend to 49 cents per share, an increase of 3.5 cents per share, beginning with dividends for the second quarter of 2016.
>
> * * *
>
> The increase, which is the company's first in six years, is a meaningful step toward gradually returning the company's dividend payout to levels that are comparable with those of similar utilities.
>
> * * *
>
> ***Earley and other senior executives also discussed continued progress on safety***, reliability and other goals, as well as PG&E's strategy for the future [at the annual shareholder meeting].
>
> Earley said, '***We've continued to demonstrate leadership and commitment on safety.*** We're delivering the most reliable service in our company's history.

92.     This statement was materially false and/or misleading because it affirmed that PG&E's dividend would not be negatively impacted by the Company's role in causing wildfires.

Case: 19-30088   Doc# 11169   Filed: 08/31/21   Entered: 08/31/21 14:49:59   Page 32 of 78

1   Indeed, it affirmed to investors that PG&E had attained "progress on safety," specifically

2   connecting purported safety achievements to its ability to increase its dividend, importantly, "to

3   levels that are comparable with those of similar utilities." In reality, PG&E lacked the touted

4   "progress on safety." It fell so far short of this touted achievement that its safety violations, and

5   resulting responsibility for wildfires, would cause PG&E to suspend its dividend entirely on

6   December 20, 2017 due to PG&E's responsibility for the North Bay Fires. This statement gave

7   investors a false impression that safety risks would not imperil the Company's dividend, which is

8   precisely what occurred on December 20, 2017. Further, this statement touting PG&E's

9   "commitment on safety" materially omitted that the Company's spending on vegetation

10  management barely kept pace with inflation at that time.

11          **2.      November 4, 2016 – Misstatement No. 7**

12         93.     On November 4, 2016, PG&E hosted a conference call with analysts to discuss its

13  financial results for the third quarter of 2016. In his prepared remarks, Earley stated as follows:

14         ***The improvements we have made in safety*** and reliability ***over the***
           ***last six years have put us in a position to deliver strong financial***

15         ***results going forward.***

16         Earlier this year, we announced our first dividend increase in six
           years, and we have committed to achieving a roughly 60% payout

17         ratio by 2019. Combined with our expected rate based growth, we
           are confident we can deliver a strong overall return for our

18         shareholders.

19         94.     The statement was materially false and/or misleading because PG&E **did not**

20  **make** "improvements" in wildfire "safety . . . over the last six years." In fact, a PG&E

21  Vegetation Program Manager, Richard Yarnell, later testified that for the entire period from

22  September 2015 to April 10, 2017, "PG&E—to the best of my knowledge, we have not made

23  any changes" to improve safety. Nor was the Company "in a position to deliver strong financial

24  results going forward." In reality, PG&E's responsibility for causing multiple wildfires – as the

25  results of its numerous, widespread safety violations – had such a significant **negative** impact on

26  PG&E's financial results and financial outlook that PG&E had to suspend its dividend entirely

27  on December 20, 2017 due to PG&E's responsibility for causing the North Bay Fires. This

28

Case 19-30088   Doc# 11169   Filed: 08/31/21   Entered: 08/31/21 14:49:59   Page
33 of 78

1   statement gave investors a false impression that concealed safety risks would not imperil the

2   Company's dividend, which is precisely what occurred on December 20, 2017.

3          **3.**      **May 31, 2017 – Misstatement No. 8**

4        95.     On May 31, 2017, PG&E issued a press release titled "PG&E Corporation Raises

5   Common Stock Dividend, Shareholders Elect Former Secretary of Homeland Security Jeh C.

6   Johnson to Boards of Directors." The release stated:

> PG&E Corporation (NYSE: PCG) today announced that it is
> raising its quarterly common stock dividend by 4 cents per share to
> 53 cents per share, beginning with the dividend for the second
> quarter of 2017. On an annual basis, this action increases PG&E
> Corporation's dividend by 8 percent, from $1.96 per share to $2.12
> per share.
>
>             * * *
>
> Yesterday, in remarks at the joint annual shareholders meeting of
> PG&E Corporation and Pacific Gas and Electric Company, [CEO]
> Williams highlighted the companies' ***progress on safety, reliability***
> and reducing greenhouse gas emissions, among other
> accomplishments. ***She reaffirmed PG&E's commitment to safety***
> ***and operational excellence***, delivering for customers and leading
> the way to achieve California's clean energy goals.

16        96.     This statement falsely connected PG&E's decision increasing its dividend to

17   "progress on safety" and PG&E's "commitment to safety and operational excellence," only

18   months before the Company's pervasive failure to comply with safety regulations caused at least

19   eleven of the North Bay Fires all at the same time in seven different counties. Indeed, it omitted

20   that there was no progress on wildfire safety, as confirmed by PG&E's own Vegetation Program

21   Manager Richard Yarnell, **only one month before the statement was made,** when he reportedly

22   testified under oath: "PG&E—to the best of my knowledge, we have not made any changes as a

23   result of th[e Butte] fire," *i.e.*, from September 2015 to April 10, 2017 (when Yarnell so

24   testified). PG&E's above statement on May 31, 2017 gave investors a false impression that

25   concealed safety risks would not imperil the Company's dividend, which is precisely what

26   occurred on December 20, 2017.

Case: 19-30088   Doc# 11169-6   Filed: 08/31/21   Entered: 08/31/21 14:49:59   Page
34 of 78

D.      **After the North Bay Fires Erupted, the Truth Began to Emerge**

97.     The North Bay Fires began on Sunday evening, October 8, 2017. However, it was not until Thursday, October 12, 2017 that the market began to understand that PG&E's safety regulation violations were a major cause. On that date, as detailed below (*see* Section VII.C.1, *infra*), CPUC sent PG&E a litigation hold letter reminding PG&E that it (a) "must preserve any factual or physical evidence … includ[ing] all failed poles, conductors and associated equipment from each fire event" and (b) "must inform all employees and contractors that they must preserve all electronic (including emails) and non-electronic documents related to potential causes of the fires, vegetation management, maintenance and/or tree-trimming." This was the first disclosure indicating that PG&E caused any of the North Bay Fires. In response to this news, PG&E's share price declined 6.7%.

98.     Late the next day, PG&E issued a statement explaining to investors that: "The causes of these fires are being investigated by [Cal Fire], including the possible role of [PG&E's] power lines and other facilities." It reported that the Company "has approximately $800 million in liability insurance for potential losses that may result from these fires" – to prepare investors for the possibility that "the amount of insurance is insufficient to cover the Utility's liability," in which case, its "financial condition or results of operations could be materially affected." The market had understood that PG&E would be reimbursed by rate-payers for damages by fires it caused while nevertheless acting as a prudent manager; hence, the Company's discussion of liability and insurance signaled to the market that at least some of the North Bay Fires were proximately caused by PG&E's negligence or worse. In response to this news, PG&E's share price continued to decline until the end of the next trading day, Monday, October 16, 2017, falling by approximately 16.5%.

99.     Thereafter, PG&E's management attempted to reassure investors, falsely, as detailed below.

Case 19-30088   Doc# 11169-6   Filed: 08/31/21   Entered: 08/31/21 14:49:59   Page 35 of 78

**E.** **After the North Bay Fires Were Contained, the Company Made Additional False and Misleading Statements and Omissions Regarding Compliance with Wildfire-Related Safety Regulations**

**1.** **October 31, 2017 – Misstatement No. 9**

100.    On October 31, 2017, PG&E issued a press release titled "Facts About PG&E's Electric Vegetation Management Efforts." The release stated: "***PG&E follows all applicable federal and state vegetation clearance requirements and performs regular power line tree safety activities in accordance with industry standards, guidelines, and acceptable procedures that help to reduce outages or fires caused by trees or other vegetation***."

101.    This statement was materially false and/or misleading because PG&E did **not** follow "all applicable … state vegetation clearance requirements." According to reports released in subsequent corrective disclosures, PG&E violated California's Public Resources Code section 4293 multiple times. Further, Cal Fire found sufficient evidence of violations of state law to refer PG&E to the relevant district attorneys for eleven of the North Bay fires. *See* Sections VII.C.4-5, *infra*. This statement concealed the sizeable risk that PG&E's numerous and widespread violations of safety regulations would **worsen** rather than "help to reduce . . . fires caused by trees or other vegetation." Thus, this statement was materially false and/or misleading because of PG&E's numerous and widespread violations of safety regulations, including regulations specifically related to vegetation management – regulations which were essential for preventing devastating wildfires. In fact, PG&E's violations were so pervasive that they caused multiple North Bay Fires all at the same time in seven different counties – therefore they cannot be explained away as an isolated lapse.

**2.** **November 2, 2017 – Misstatement No. 10**

102.    On November 2, 2017, PG&E hosted a conference call with analysts to discuss its financial results for the third quarter of 2017. In her prepared remarks, now-CEO Williams falsely reassured investors regarding the effectiveness of PG&E's vegetation management:

> Thank you, Chris, and good morning, everyone. Given the recent
> wildfires impacting our customers and communities, our
> discussion today will be different from our usual earnings call. . . .

\* \* \*

Now I know there's a lot of interest in how these fires started and in how PG&E assets might have been involved in or impacted by the wildfires. Our communities deserve answers and we are committed to learning what happened. It's critical that we identify anything that will help us to keep our customers and communities safe in the future. That is our goal as we work with CAL FIRE and the CPUC.

\* \* \*

**Many of you have reached out with questions about the potential impact of the wildfires to the company's financials and also about the doctrine of inverse condemnation in California.** At this time, the known financial impact of the wildfires is limited to the cost of the unprecedented response and restoration efforts, costs related to our liability insurance and some legal expenses, and Jason [Wells] will cover these later this morning.

\* \* \*

**I know there's a lot of interest in our pole maintenance and vegetation management programs**, so let me address these as well. First, we routinely inspect, maintain and replace our electric poles. This includes annual scheduled patrols, 5-year visual inspections, an intrusive testing and treating on our wood poles on a frequency that significantly exceeds CPUC requirements.

**We also have one of, if not, the most comprehensive vegetation management programs in the country.** Our vegetation management program manages about 123 million trees across the service territory. And every year, we inspect every segment of the 99,000 miles of overhead line and we clear vegetation as needed. This is well beyond what is typical in our industry where most utilities have a 3-year vegetation management cycle or sometimes longer. **Typically, we spend about $200 million every year to line clear or remove 1.3 million trees to mitigate both the risk of wildfires and to prevent electric outages. With the drought and the tree mortality crisis we've experienced in California, we have been expanding our vegetation management work since 2014.**

***In 2016, we spent an additional $200 million, essentially doubling our typical vegetation management spending last year***. We've removed an incremental 236,000 dead or dying trees, and we enhanced our tree maintenance work with additional patrols in areas of high fire danger, including a combination of boots on the ground, aerial patrols, and sophisticated LiDAR technology.

103.    These statements were materially false and/or misleading because PG&E did not "doubl[e]" its "typical vegetation management spending last year." As explained in Section IV.B., *supra*, PG&E's Vegetation Management Balancing Accounts for the relevant years

1    indicate that PG&E spent $194,094,406 on vegetation management in 2015, $198,735,579 in

2    2016, and $201,456,193 in 2017 – increases of only 2.4% and 1.4%, respectively.[18] The lack of

3    improvement to PG&E's vegetation management practices was confirmed by PG&E's own

4    Vegetation Program Manager Richard Yarnell, who reportedly testified under oath that, even by

5    April 10, 2017: "PG&E—to the best of my knowledge, **we have not made any changes** as a

6    result of th[e September 2015 Butte] fire."

7    　　　104.　　Further, PG&E failed to comply with safety regulations – including regulations

8    specifically related to vegetation management. Thus, when Williams touted PG&E's vegetation

9    management program as "one of, if not, the most comprehensive vegetation management

10   programs in the country," she gave investors the false impression that PG&E's vegetation

11   management did not fall short of applicable safety regulations, when in fact it did. Given

12   PG&E's numerous and widespread violations of safety regulations, its "vegetation management

13   programs" were **not** "comprehensive."

14   　　　　　　**3.　　November 2, 2017 – Misstatement No. 11**

15   　　　105.　　Later on the same call, an analyst asked the Company for more detail about

16   PG&E's vegetation management practices. President and COO Nickolas Stavropoulos replied as

17   follows:

18   　　　　　[ANALYST:] And then, I guess, ***can you discuss your vegetation***
　　　　　***practices for trees that are located near power lines?*** I guess

19   　　　　　we've seen sort of end reports that have come out for some of your
　　　　　peers that they sort of track vegetation that's within certain

20   　　　　　distances from the lines, and they basically make their decisions on
　　　　　what to do based on sort of updates.

21   
　　　　　[Stavropoulos:] Thank you for the question. So as Geisha

22   　　　　　mentioned, we have a very aggressive vegetation management
　　　　　program across our 70,000-mile -- square mile territory. We

23   　　　　　manage about 123 million trees that are near and adjacent to our
　　　　　facilities. ***And over the last 2 years, we've doubled the amount***

24   　　　　　***that we've invested in veg[etation] management.*** That includes
　　　　　line clearing to remove parts of trees that are adjacent to our

25   　　　　　facilities as well as removal of dead and dying trees. So the
　　　　　program involves year-round effort to identify these dead and

26   　　　　　dying trees through inspection processes where we use foot and

27   ────────────────────

28   　　[18] This spending did not differ more than $100,000 from the amounts PG&E requested, and
the amounts CPUC approved, in PG&E's 2015, 2016, and 2017 General Rate Cases.

Case 19-30088   Doc 11169-6   Filed: 08/31/21   Entered: 08/31/21 14:49:59   Page
38 of 78

aerial patrols; we use LiDAR, which is light, detecting and ranging technology, to identify the trees that need to be worked. ***We inspect all of our overhead lines every year, and we do second patrols in high fire danger areas at least twice a year. In some areas, we do as often as 4x a year.*** So it's a very aggressive program. There are specific requirements around line clearing, and it depends upon the voltage of the lines. And it can range up to feet [sic] to as much a sort of 18 inches away from the facility. So there are all sorts of different requirements, depending upon where the facilities are located and the voltage of the facilities.

106.     This statement was materially false and/or misleading because PG&E did not "doubl[e] the amount that we've invested in veg[etation] management." As explained in Section IV.B., *supra*, PG&E's Vegetation Management Balancing Accounts for the relevant years indicate that PG&E spent $194,094,406 on vegetation management in 2015, $198,735,579 in 2016, and $201,456,193 in 2017. Moreover, the lack of improvement to PG&E's vegetation management practices was confirmed by PG&E's own Vegetation Program Manager Richard Yarnell, who reportedly testified under oath that, even by April 10, 2017: "PG&E—to the best of my knowledge, we have not made any changes as a result of th[e Butte] fire," *i.e.*, since September 2015.

107.     Further, PG&E failed to comply with safety regulations specifically related to vegetation management. By representing that it "inspect[s] all of [its] overhead lines every year," and inspects some trees "twice" or "4x" each year, Stavropoulos falsely created the impression that PG&E would prevent many violations from occurring, especially in "high fire danger areas" such as those where the North Bay Fires erupted. In reality, violations were so pervasive that they caused at least eleven fires at the same time in **seven** different counties. In touting its "very aggressive vegetation management program," the statement actionably omitted the widespread failure of these measures to bring PG&E into compliance. Indeed, if PG&E had been properly "inspect[ing] all of our overhead lines "every year," "twice a year," or "4x a year," many of the causes of the North Bay Fires would have been discovered. For instance, in addition to the fires caused by dead or dying trees, Cal Fire found that the Cascade Fire was caused "by sagging power lines coming into contact" and the Blue Fire was caused when "a PG&E power line conductor separated from a connector."

1

### 4.      November 5, 2017 – Misstatement No. 12

2      108.     At all relevant times, PG&E's Media Relations department maintained a news

3   website named Currents,[19] providing news, information, and commentary about PG&E's

4   activities, including the delivery of electricity and the operation, maintenance, and safety of the

5   Company's electric services. Through the website, PG&E repeatedly touted the safety of its

6   electricity lines, the Company's vegetation management programs, and its success mitigating

7   wildfire risk.

8      109.     In one such article, dated November 5, 2017 and titled "Facts About PG&E's

9   Wildfire and Prevention Safety Efforts," PG&E reassured investors that "***PG&E meets or***

10  ***exceeds all applicable federal and state vegetation clearance requirements***."[20]

11     110.     This statement was materially false and/or misleading because PG&E did not

12  "meet" – much less "exceed" – "all applicable … state vegetation clearance requirements."

13  According to reports released in subsequent corrective disclosures, PG&E violated California's

14  Public Resources Code section 4293 multiple times. *See* Section VII.C.4., *infra*. Further, Cal Fire

15  found sufficient evidence of violations of state law to refer PG&E to the relevant district

16  attorneys for eleven of the North Bay fires. *See* Sections VII.C.4-5, *infra*. Thus, this statement

17  was materially false and/or misleading because of PG&E's numerous and widespread violations

18  of safety regulations, including regulations specifically related to vegetation management –

19  regulations which were essential for preventing devastating wildfires. In fact, PG&E's violations

20  were so pervasive that they caused multiple North Bay Fires all at the same time in seven

21  different counties – therefore they cannot be explained away as an isolated lapse.

22

23

24

25

---

26  [19] http://www.pgecurrents.com, last visited on November 6, 2018.

27  [20] On November 14, 2017, PG&E spokesperson Greg Snapper repeated this false and
misleading reassurance *verbatim* in an NBC article titled "Utility Company's Risk Assessment at
Issue in NorCal Wildfires." *See* https://www.nbcconnecticut.com/troubleshooters/national-

28  investigations/PGE-Risk-Assessment-at-Issue-in-North-Bay-Wildfires-457356963.html

Case: 19-30088   Doc# 11169-5   Filed: 08/31/21   Entered: 08/31/21 14:49:59   Page
40 of 78

5.      **May 25, 2018 – Misstatement No. 13**

111.    On May 25, 2018, PG&E issued a press release to respond to Cal Fire's reports regarding some of the October 2017 Northern California wildfires to reassure investors that PG&E had met all state regulations concerning fire safety. The press release stated:

- Following Governor Brown's January 2014 Drought State of Emergency Proclamation and the California Public Utilities Commission's Resolution ESRB-4, PG&E has added enhanced measures to address areas particularly affected by drought and bark beetles including:

- Increased foot and aerial patrols along power lines in high fire-risk areas;

- Removed approximately 236,000 dead or dying trees in 2016 and 140,000 dead or dying trees in 2017; these tree removals were in addition to approximately 30,000 trees removed per year prior to the drought;

- Launched daily aerial fire detection patrols during high fire season to improve fire spotting and speed of fire response;

- Since 2014, provided $11.4 million to local Fire Safe Councils (FSCs) for fuel reduction projects in communities; and

- Provided $1.7 million to local FSCs for 28 highly programmable remote-sensing cameras for critical fire lookout towers.

- ***PG&E meets or exceeds regulatory requirements for pole integrity management***, using a comprehensive database to manage multiple patrol and inspection schedules of our more than two million poles.

112.    This statement was materially false and/or misleading because PG&E did not "meet" – much less "exceed" – "regulatory requirements for pole integrity management." According to a report released in a subsequent corrective disclosure, PG&E violated California's safety regulations multiple times. Indeed, on June 8, 2018, Cal Fire disclosed that its "investigators have determined that 12 Northern California wildfires in the October 2017 Fire Siege were caused by electric power and distribution lines, conductors **and the failure of power poles**." Indeed, at least one of the North Bay Fires – the Sulphur Fire – "was caused by the failure of a PG&E owned power pole" evidencing "violations of state law" sufficient to be referred to the relevant district attorney. Further, Cal Fire found enough evidence of violations of

Case 19-30088   Doc# 11169-5   Filed: 08/31/21   Entered: 08/31/21 14:49:59   Page 41 of 78

1  state law to refer PG&E to the relevant district attorneys for eight of these twelve North Bay

2  fires. *See* Section VII.C.5., *infra*. Thus, this statement was materially false and/or misleading

3  because of PG&E's numerous and widespread violations of safety regulations – regulations

4  which were essential for preventing devastating wildfires. In fact, PG&E's violations were so

5  pervasive that they caused multiple North Bay Fires all at the same time in seven different

6  counties – therefore they cannot be explained away as an isolated lapse.

7  **VI.   MATERIALITY**

8         113.   PG&E's reassurances to investors about its safety, prudence, and compliance with

9  the law were especially important to investors because of California's legal regime known as

10  inverse condemnation. As described in more detail above (*see* Section IV.A.4., *supra*), PG&E is

11  strictly liable for the property costs of wildfires it caused. However, during the Class Period, it

12  could be reimbursed for those costs by ratepayers by petitioning CPUC and showing that it had

13  acted as a prudent manager. On such a showing, CPUC could have rate payers reimburse PG&E

14  for some or all of its liability.

15         114.   PG&E's shareholders understood that PG&E would bear the costs of wildfires it

16  caused, and that PG&E's ability to pass some or all of those costs on to ratepayers was limited

17  by PG&E's prudence. For example, an analyst report issued by Evercore ISI on December 21,

18  2017 stated:

19         On the 3Q17 call PCG indicated company operations were
        conducted properly leading up to and after the fire, but they still
20        had little information regarding the cause of the fire or potential
        shareholder exposure.

21                                    * * *

22
        PCG reiterated the company routinely inspects, maintains, and
23        replaces poles, and tests and treats wood poles on a frequency that
        significantly exceeds CPUC requirements. The company claims to
24        have one of, if not the most comprehensive vegetation
        management programs in the country. Further, the company
25        doubled its vegetation management spending in 2016 due to the
        drought and tree mortality crisis in California. That being said, we
26        still do not know and likely will not know what caused the various
        fires for some time, **whether or not PCG's equipment was solely**
27        **or partly the cause**, and whether or not the facts will support a
        ruling at CPUC that PCG **acted prudently** should they be
28        successfully sued under inverse condemnation.

115.     In light of these provisions of California law, PG&E's repeated reassurances to its investors – *e.g.*, that it complied with relevant safety regulations and doubled its vegetation management spending – effectively communicated that the Company would be able to recover any property damage liabilities from wildfires caused by its systems, through the CPUC. Those reassurances, when revealed to have been false and misleading, impacted the Company's valuation by at least the amount of damage caused by the North Bay Fires.

116.     In total, PG&E's share price declined $25.80 per share on the five corrective disclosures and/or materializations of concealed risk herein alleged. Given that the Company had approximately 514.9 million shares outstanding as of February 1, 2018, it implies that the losses caused by PG&E's fraud exceed $13.28 billion.

117.     Indeed, as detailed further below (*see* Section IX.E., *infra*), PG&E believed that the liabilities it faced put it at risk of bankruptcy.

## VII.   LOSS CAUSATION

### A.     Defendants' False and Misleading Statements Artificially Inflated the Price of PG&E's Common Stock

118.     As a result of their purchases of PG&E's securities during the Class Period, Lead Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws. Defendants' false and misleading statements had the intended effect and caused PG&E securities to trade at artificially inflated levels throughout the Class Period, reaching as high as $71.56 per share on September 11, 2017 – a month before the truth started to emerge on October 12, 2017.

### B.     PG&E's Safety Violations Proximately Caused the Devastating North Bay Fires

119.     PG&E caused the North Bay Fires. To date, Cal Fire has not found a single instance where one of the North Bay Fires was caused by arson, lightning, fireworks, hikers, children playing with matches, or any other such cause. Of the seventeen fires for which Cal Fire has determined the cause, it has determined that **all seventeen were caused by PG&E equipment**.

120.    Of these seventeen fires, Cal Fire determined that **eleven were due to PG&E's violation of California safety regulations**. Under California law, PG&E bears the cost for the destruction caused by these fires unless it can show to CPUC that its violations were "reasonable." Together, these fires were responsible for **more than 100,000 acres of land devastated**, **more than 2,000 structures destroyed,** and **9 of the 44 North Bay Fire fatalities.**

121.    Six more of the North Bay Fires were also deemed to have been caused by PG&E electrical lines; though Cal Fire found no specific evidence of safety violations for these six fires, PG&E may still be found liable under California's legal regime known as inverse condemnation, which provides strict liability for utilities when their power lines are involved in wildfires that lead to property damage. Together, these fires were responsible for an additional **more than 50,000 acres of land devastated**, **more than 800 structures destroyed**, and **13 of 44 fatalities.** Necessarily, these six fires would have been more easily contained, and accordingly less destructive, if not for the fires caused by PG&E's violations.

122.    Cal Fire's investigation of the Tubbs fire – the largest and most destructive of the North Bay Fires – is still ongoing.

## C.    When the Market Learned the Truth, the Price of PG&E's Common Stock Fell Dramatically

123.    On or about October 8, 2017, eighteen major wildfires started in California, burning at least 249,000 acres and devastating properties across nine California counties.

### 1.    October 12, 2017 – Corrective Disclosure and/or Materialization of Concealed Risk

#### (a)    The Market Began to Learn the Extent and Effects of PG&E's Responsibility for the North Bay Fires

124.    It was not until Thursday, October 12, 2017 that the market began to understand that PG&E's safety regulation violations were a proximate cause of the North Bay Fires. On that date, CPUC sent PG&E a litigation hold letter informing the Company of its "obligation to preserve all evidence with respect to the Northern California wildfires in Napa, Sonoma, and Solano Counties." Although this letter was made public on October 12, 2017, it "affirm[ed] a verbal communication" of the same obligation by CPUC Safety Enforcement Division Program

1    Manager Charlotte TerKeurst to PG&E "at approximately 6:00 p.m. on October 10, 2017." The

2    public disclosure on October 12, 2017 also revealed that "Ms. TerKeurst reminded PG&E of the

3    need to preserve all evidence, and PG&E acknowledged that it would do so."

4        125.    Further, the disclosure made clear that PG&E (a) "must preserve any factual or

5    physical evidence … includ[ing] **all failed poles, conductors and associated equipment from**

6    **each fire event**" and (b) "must inform all employees and contractors that they must preserve all

7    electronic (including emails) and non-electronic documents related to **potential causes of the**

8    **fires, vegetation management, maintenance and/or tree-trimming**." This was the first

9    indication that PG&E failures caused any of the North Bay Fires.

10       126.    On this news that PG&E would likely bear at least some responsibility for the

11   fires, PG&E's stock dropped $4.65 per share, from a closing price of $69.15 on October 11 to a

12   closing price of $64.50 on October 12, or -6.7%, with unusually heavy trading volume of almost

13   13 million shares (compared to a Class Period daily average trading volume of 3.2 million[21]).

14                    **(b)    Market Commentators Confirmed the Cause of PG&E's Share**
                            **Price Decline on October 12, 2017**
15

16       127.    The following morning, news outlets began to report that PG&E was being

17   connected with the causes of some of the North Bay fires. For example, at 10:54 a.m. on October

18   13, 2017, CNBC published an article titled "PG&E shares plunge on concern its power lines may

19   have started California wildfires."[22] The article began by observing: "The California Public

20   Utilities Commission sent a letter on Thursday to PG&E reminding them to preserve 'all

21   evidence with respect to the Northern California wildfires in Napa, Sonoma and Solano

22   Counties,' according to multiple reports." It continued to note that PG&E's share price decline

23   was "on concerns its power lines may have started the massive wildfires that have ravaged

24   California recently." The article also repeated market commentary that the decline in PG&E's

25

26

27   _____
     [21] This average excludes alleged corrective disclosure dates.

28   [22] This article was published prior to the Company's corrective disclosure later that day,
     discussed *infra*.

1   share price reflected investors' understanding that PG&E was financially responsible for the

2   North Bay Fires:

3           The drop in the stock "reflects the following assumptions: 1) the
        fire was caused by PCG's negligence, 2) insurance coverage for
4       3rd party liabilities will be very limited, 3) damage costs per acre
        far larger than those for the 2015 Butte fire and 4) material fines
5       and penalties will be assessed," Christopher Turnure, an analyst at
        JPMorgan, said in a note Thursday. "We appreciate the severity of
6       the fires and the legal challenges of operating in California, but
        estimate this loss of value as approaching a worst-case scenario for
7       PCG shares."

8       128.    Similarly, on the same date, *SF Gate* published an article observing: "[T]**he state**

9   **agency that regulates utilities has told PG&E to save every piece of damaged equipment**

10  **from the area as evidence for the investigations to come**." The article concluded by stating

11  that PG&E's vegetation management practices caused the North Bay Fires: "In all, **the company**

12  **spent $198 million in 2016 on 'vegetation management**.' But those efforts and that money –

13  all of it coming from PG&E's customers – **may not have been enough**."[23]

14      129.    Investors started to be concerned regarding whether PG&E violated any

15  regulations with respect to the North Bay fires. For example, Wells Fargo stated in its analyst

16  report the very next day:

17          Yesterday (10/12), shares of PCG underperformed the S&P
        Utilities by roughly 720 bps. We attribute the material decline in
18      price to the revelation that the company's power lines might have
        played a role in the Northern California fires. Over the weekend
19      Northern California experienced winds in excess of 70 miles per
        hour, which could have caused trees to impact power lines that
20      could have sparked fires particularly given the very dry vegetation.
        While there is still significant uncertainty in what caused the fires,
21      apparently investigators are looking into the role of PCG's
        infrastructure. **The concern for investors is whether PCG did**
22      **not adequately trim trees around their power lines it is our**
        **understanding that in California utilities are required to clear**
23      **vegetation within 10 feet of power lines. In the absence of**
        **inadequate tree trimming, we think that property damage**
24      **attributable to PCG's infrastructure should be largely covered**
        **by insurance.**

25

26

27  _____
        [23] https://www.sfgate.com/bayarea/article/PG-E-millions-fire-prevention-Santa-Rosa-
28  wildfires-12277237.php

Case: 19-30088   Doc# 11169   Filed: 08/31/21   Entered: 08/31/21 14:49:59   Page
46 of 78

130.     Similarly, an October 13, 2017 report by a Guggenheim stock analyst stated that the decline was caused by "media reports linking the company to some of the most destructive wildfires experienced in CA, which continued to burn."

       **2.**      **October 13-16, 2017 – Corrective Disclosure and/or Materialization of Concealed Risk**

       **(a)**      **The Market Continued to Learn the Extent and Effects of PG&E's Responsibility for the North Bay Fires**

131.     Late on October 13, 2017, PG&E filed a Form 8-K with the SEC shortly before the close of trading. Therein, the Company stated in relevant part:

**Investigation of Northern California Fires**

Since October 8, 2017, several catastrophic wildfires have started and remain active in Northern California. The causes of these fires are being investigated by the California Department of Forestry and Fire Protection (Cal Fire), **including the possible role of power lines and other facilities of Pacific Gas and Electric Company's (the "Utility"), a subsidiary of PG&E Corporation**.

It currently is unknown whether the Utility would have any liability associated with these fires. **The Utility has approximately $800 million in liability insurance for potential losses that may result from these fires. If the amount of insurance is insufficient to cover the Utility's liability or if insurance is otherwise unavailable, PG&E Corporation's and the Utility's financial condition or results of operations could be materially affected**.

132.     On these disclosures, PG&E's share price continued its decline. From its opening price of $63.95 per share that day to its closing price of $53.43 per share at the end of the next trading day (Monday, October 16, 2017), PG&E's stock declined $10.52 per share, or approximately 16.5%. Over the same two-day period, it experienced unusually heavy trading volume of over 68.5 million shares.

       **(b)**      **Market Commentators Confirmed the Cause of PG&E's Share Price Decline on October 13, 2017**

133.     Investors understood the Company's October 13, 2017 8-K filing as a disclosure that PG&E's conduct was greater in severity than previously disclosed and was a proximate cause of at least some of the North Bay Fires. Because the market understood that PG&E would be reimbursed for damages by fires it innocently caused, the Company's discussion of liability

Case: 19-30088   Doc# 11169   Filed: 08/31/21   Entered: 08/31/21 14:49:59   Page 47 of 78

1    signaled to the market that at least some of the North Bay Fires were caused by PG&E's

2    negligence or worse. For example, a Guggenheim stock analyst published a report that day

3    reacting to this news, noting that PG&E "had slid even further in the early afternoon actually as

4    well, following the company's 8-K disclosing the utility's $800mm in liability insurance, which

5    we noted had not been disclosed previously (since it had been renewed following the Butte

6    fire)."

7          134.    PG&E's announcement and resulting share price decline were proximately caused

8    by PG&E's inadequate safety practices and violations that resulted in the North Bay Fires.

9          **3.**    **December 20, 2017 – Corrective Disclosure and/or Materialization of Concealed Risk**

10

11             **(a)**    **The Market Continued to Learn the Extent and Effects of PG&E's Responsibility for the North Bay Fires**

12         135.    On December 20, 2017, after the market closed, PG&E issued a press release

13   titled "PG&E Announces Suspension of Dividend, Citing Uncertainty Related to Causes and

14   Potential Liabilities Associated with Northern California Wildfires." The filing also included, as

15   exhibit 99.1, a press release in which the Company announced that it would be suspending its

16   quarterly cash dividend. In the press release, PG&E stated in pertinent part:

17           **SAN FRANCISCO, Calif.**-PG&E Corporation (NYSE: PCG) today announced that its Board of Directors has determined to

18           **suspend the quarterly cash dividend on the Corporation's common stock**, beginning with the fourth quarter of 2017, **citing**

19           **uncertainty related to causes and potential liabilities associated with the extraordinary October 2017 Northern California**

20           **wildfires**.

21           In addition, the Board of Directors of the Corporation's utility subsidiary, Pacific Gas and Electric Company, determined to

22           suspend the dividend on the utility's preferred stock, beginning with the three-month period ending Jan. 31, 2018, citing the same

23           uncertainty.

24           No causes have yet been identified for any of the unprecedented wildfires, which continue to be the subject of ongoing

25           investigations.

26           However, California is one of the only states in the country in which courts have applied inverse condemnation **to events caused**

27           **by utility equipment**. This means that if a utility's equipment is found to have been a substantial cause of the damage in an event

28           such as a wildfire - even if the utility has followed established inspection and safety rules - **the utility may still be liable for**

**property damages and attorneys' fees associated with that event**.

"After extensive consideration and in light of the uncertainty associated with the causes and potential liabilities associated with these wildfires as well as state policy uncertainties, the PG&E boards determined that suspending the common and preferred stock dividends is prudent with respect to cash conservation and is in the best long-term interests of the companies, our customers and our shareholders," said PG&E Corporation Chair of the Board Richard C. Kelly.

136.    On this news, PG&E's share price fell $6.62, or 12.95%, to close at $44.50 on December 21, 2017, the following trading day. The stock experienced its heaviest single-day trading volume of the Class Period that day, with over 52 million shares trading hands.

137.    Though PG&E had previously intertwined safety, fires, and its dividend (*see* ¶90), investors were shocked by this unexpected suspension of the dividends due to Defendants' intervening false reassurances of progress on safety and compliance with safety regulations. Only six months prior, on May 31, 2017, PG&E had announced that it was **increasing** its dividend due to the Company's "***progress on safety***." Even more recently, on October 31, 2017, PG&E had reassured investors that it "***follows all applicable federal and state vegetation clearance requirements and performs regular power line tree safety activities in accordance with industry standards, guidelines, and acceptable procedures that help to reduce outages or fires caused by trees or other vegetation***." And on November 2, 2017, PG&E had repeatedly reassured investors that it had "***doubl[ed]***" its vegetation management expenditures. Accordingly, the true likelihood of PG&E's responsibility for the North Bay Fires remained concealed from the market.

        (b)    **Market Commentators Confirmed the Proximate Cause of PG&E's Share Price Decline on December 20, 2017**

138.    When PG&E announced it would suspend its dividend entirely, investors understood that as a revelation that PG&E would bear a higher level of responsibility, and thus liability, for the North Bay Fires.

139.    For example, a RBC Capital Markets analysts report issued on December 21, 2017, stated: "We downgrade PCG to Sector Perform following the Board's decision to suspend

Case: 19-30088   Doc#: 11169-5   Filed: 08/31/21   Entered: 08/31/21 14:49:59   Page
49 of 78

the dividend. **This unexpected decision suggests greater risk than we had assumed surrounding regulatory treatment of the October 2017 Northern California wildfires.**"

140.    Similarly, an analyst report issued by Evercore ISI the same day stated:

> On the 3Q17 call PCG indicated company operations were conducted properly leading up to and after the fire. . . . PCG also indicated they found instances of wires down, vegetation near PCG facilities and some broke poles. PCG reiterated the company routinely inspects, maintains, and replaces poles, and tests and treats wood poles on a frequency that significantly exceeds CPUC requirements. The company claims to have one of, if not the most comprehensive vegetation management programs in the country.

141.    PG&E's suspension of its dividend and resulting share price decline were proximately caused by PG&E's inadequate safety practices and violations that resulted in the North Bay Fires.

### 4.    May 25, 2018 – Corrective Disclosure and/or Materialization of Concealed Risk

#### (a)    The Market Continued to Learn the Extent and Effects of PG&E's Responsibility for the North Bay Fires

142.    On May 25, 2018, Cal Fire issued a press release announcing the cause of four wildfires in Butte and Nevada counties ("May 2018 Press Release"), stating in relevant part:

> **CAL FIRE Investigators Determine Cause of Four Wildfires in Butte and Nevada Counties**
>
> Sacramento - After extensive and thorough investigations, CAL FIRE investigators have determined that four Northern California wildfires in last year's October Fire Siege were caused by trees coming into contact with power lines. The four fires, located in Butte and Nevada counties, are the first fire investigations from last October to be completed.
>
> CAL FIRE investigators were dispatched to the fires last year and immediately began working to determine their origin and cause. The Department continues to investigate the remaining 2017 fires, both in October and December, and will release additional reports as they are completed.
>
> The October 2017 Fire Siege involved more than 170 fires and charred more than 245,000 acres in Northern California. More than 11,000 firefighters from 17 states helped battle the blazes.
>
> Below is a summary of the four completed investigations:
>
> • The La Porte Fire, in Butte County, started in the early morning hours of Oct. 9 and burned a total of 8,417 acres, destroying 74 structures. There were no injuries to civilians

Case: 19-30088   Doc# 11169-6   Filed: 08/31/21   Entered: 08/31/21 14:49:59   Page 50 of 78

1

2

3

or firefighters. CAL FIRE has determined the fire was caused by tree branches falling onto PG&E power lines. CAL FIRE investigators determined there were no violations of state law related to the cause of this fire.

- The McCourtney Fire, in Nevada County, started the evening of Oct. 8 and burned a total of 76 acres, destroying 13 structures. There were no injuries to civilians or firefighters. CAL FIRE has determined the fire was caused by a tree falling onto PG&E power lines. **The investigation found evidence that PG&E allegedly failed to remove a tree from the proximity of a power line, in violation of the state Public Resources Code section 4293.**

- The Lobo Fire, in Nevada County, started the evening of Oct. 8 and burned a total of 821 acres, destroying 47 structures. There were no injuries to civilians or firefighters. **CAL FIRE has determined the fire was caused by a tree contacting PG&E power lines. The investigation found evidence that Public Resources Code section 4293, which requires adequate clearance between trees and power lines, was allegedly violated.**

- The Honey Fire, in Butte County, started in the early morning hours of Oct. 9 and burned a total of 76 acres. There were no injuries to civilians or firefighters and no structures were destroyed. **CAL FIRE has determined the fire was caused by an Oak branch contacting PG&E power lines. The investigation found evidence that Public Resources Code 4293, which requires adequate clearance between trees and power lines, was allegedly violated.**

The McCourtney, Lobo, Honey investigations have been referred to the appropriate county District Attorney's offices for review.

143.   Then, early on May 29, 2018, prior to the start of trading, PG&E filed a Current Report on Form 8-K with the SEC. The filing quoted extensively from the May 25, 2018 Cal Fire release described above, including the role of PG&E equipment in starting all four of the relevant North Bay Fires, Cal Fire's findings that three of the fires were caused by violations of California safety laws, and Cal Fire's decision to refer criminal investigations regarding these three fires to the relevant district attorneys' offices. The filing also stated: "It is reasonably possible that facts could emerge that lead PG&E Corporation and the Utility to believe that a loss is probable, resulting in an accrued liability in the future, the amount of which could be substantial."

144.     On this news, PG&E's share price fell $2.32, or 5.19%, to close at $42.34 on May 29, 2018, the following trading day. The stock experienced unusually high trading volume that day, with over 5.7 million shares changing hands on May 29, 2018.

**(b)     Market Commentators Confirmed that the News Regarding Safety Violations Proximately Caused PG&E's Share Price Decline on May 25-29, 2018**

145.     Analysts were surprised by the results of the Cal Fire reports. For example, Deutsche Bank stated in its May 28, 2018 report:

> From the investor perspective the market should not be particularly surprised that PG&E's lines have been found to be involved in starting the fires. **That said, the fact that this was the case in all four of the fires – and that violations were found in three of the four instances – will likely be seen as a negative data point.** Reading through the LaPorte fire investigation for other data points, investors may be concerned to note that the wind speeds around the time of the ignition do not seem to have been particularly high – with a maximum gust of 29mph.

146.     One Citigroup analyst wrote on May 29, 2018 that the new Cal Fire reports specifically "link the fires to [PG&E's] equipment," "claim improper vegetation management for three of the fires," and were "suggesting negligence" on PG&E's part. Based on this, the Cal Fire reports "will support 'causation' and likely lead to [PG&E] bearing the liability for damages under Inverse Condemnation." Moreover, the analyst noted that PG&E might even be liable for "Gross Negligence," and could be barred from recovering costs from ratepayers insofar as it would be "tough to meet" the "prudent manager" standard that is necessary for such a recovery.

147.     Accordingly, the new information contained in these disclosures, including the severity of PG&E's conduct and the role of its violations of California safety laws in causing the North Bay Fires, proximately caused PG&E's share price decline.

**5.     June 8, 2018 – Corrective Disclosure and/or Materialization of Concealed Risk**

148.     On Friday, June 8, 2018, after the market closed, Cal Fire issued another press release announcing the causes of twelve wildfires in Mendocino, Humboldt, Butte, Sonoma, Lake, and Napa Counties, stating in relevant part:

**CAL FIRE Investigators Determine Causes of 12 Wildfires in Mendocino, Humboldt, Butte, Sonoma, Lake, and Napa Counties**

**Sacramento** – After extensive and thorough investigations, CAL FIRE investigators have determined that 12 Northern California wildfires in the October 2017 Fire Siege were caused by electric power and distribution lines, conductors and the failure of power poles.

The October 2017 Fire Siege involved more than 170 fires and burned at least 245,000 acres in Northern California. About 11,000 firefighters from 17 states and Australia helped battle the blazes.

CAL FIRE investigators were dispatched to the fires last year and immediately began working to determine their origin and cause. CAL FIRE investigators continue to investigate the remaining 2017 fires, both in October and December, and will release additional reports as they are completed. The cause of four Northern California fires were released on May 25.

Below is a summary of the findings from the 12 completed investigations:

The **Redwood Fire**, in Mendocino County, started the evening of Oct. 8 and burned a total of 36,523 acres, destroying 543 structures. There were nine civilian fatalities and no injuries to firefighters. CAL FIRE has determined the fire started in two locations and was caused by tree or parts of trees falling onto PG&E power lines.

The **Sulphur Fire**, in Lake County, started the evening of Oct. 8 and burned a total of 2,207 acres, destroying 162 structures. There were no injuries. CAL FIRE investigators determined the fire was caused by the failure of a PG&E owned power pole, resulting in the power lines and equipment coming in contact with the ground.

The **Cherokee Fire**, in Butte County, started the evening of Oct. 8 and burned a total of 8,417 acres, destroying 6 structures. There were no injuries. CAL FIRE investigators have determined the cause of the fire was a result of tree limbs coming into contact with PG&E power lines.

The **37 Fire**, in Sonoma County, started the evening of Oct. 9 and burned a total of 1,660 acres, destroying 3 structures. There were no injuries. CAL FIRE investigators have determined the cause of the fire was electrical and was associated with the PG&E distribution lines in the area.

The **Blue Fire**, in Humboldt County, started the afternoon of Oct. 8 and burned a total of 20 acres. There were no injuries. CAL FIRE investigators have determined a PG&E power line conductor separated from a connector, causing the conductor to fall to the ground, starting the fire.

The Norrbom, Adobe, Partrick, Pythian and Nuns fires were part of a series of fires that merged in Sonoma and Napa counties. These fires started in the late-night hours of Oct. 8 and burned a combined total of 56,556 acres, destroying 1355 structures. There were three civilian fatalities.

CAL FIRE investigators determined the Norrbom Fire was caused by a tree falling and coming in contact with PG&E power lines.

CAL FIRE investigators determined the Adobe Fire was caused by a eucalyptus tree falling into a PG&E powerline.

CAL FIRE investigators determined the Partrick Fire was caused by an oak tree falling into PG&E powerlines.

CAL FIRE investigators determined **the Pythian Fire was caused by a downed powerline after PG&E attempted to reenergize the line**

CAL FIRE investigators determined the Nuns Fire was caused by a broken top of a tree coming in contact with a power line.

The **Pocket Fire**, in Sonoma County, started the early morning hours of Oct. 9 and burned a total of 17,357 acres, destroying 6 structures. There were no injuries. CAL FIRE has determined the fire was caused by the top of an oak tree breaking and coming into contact with PG&E power lines.

The **Atlas Fire**, in Napa County, started the evening of Oct. 8 and burned a total of 51,624 acres, destroying 783 structures. There were six civilian fatalities. CAL FIRE investigators determined the fire started in two locations. At one location, it was determined a large limb broke from a tree and came into contact with a PG&E power line. At the second location, investigators determined a tree fell into the same line.

**CAL FIRE's investigations have been referred to the appropriate county District Attorney's offices for review in eight of the 12 fires - Sulphur, Blue, Norrbom, Partrick, Pythian, Adobe, Pocket and Atlas - due to evidence of alleged violations of state law.**

149. While this news release did not discuss specific violations found, it disclosed that Cal Fire referred its investigations to the relevant district attorneys of five counties due to evidence Cal Fire discovered of state law violations.

#### (a) The Market Learned the Truth of PG&E's Continued, Unsafe Use of Reclosers

150.    By stating that "CAL FIRE investigators determined the Pythian Fire was caused by a downed powerline after PG&E attempted to reenergize the line," this press release revealed that the Pythian Fire had been proximately caused by PG&E's use of reclosers.

#### (b) The Market Continued to Learn the Extent and Effects of PG&E's Responsibility for the North Bay Fires

151.    On Saturday, June 9, 2018, *Bloomberg* published an article entitled "PG&E May Face Criminal Charges After Probe of Deadly Wildfires." The article reported, in part, that following an investigation into the causes of wildfires "that altogether killed 44 people, consumed thousands of homes and racked up an estimated $10 billion in damages" in October 2017, California's fire agency "found evidence of alleged violations of law by PG&E in connection with" the fires. Specifically, the state's investigation found "that PG&E equipment caused at least 12 of the wine country blazes."

152.    Early on Monday, June 11, 2018, prior to the start of trading, PG&E filed a Current Report on Form 8-K with the SEC. The filing quoted extensively from the June 8, 2018 Cal Fire release described above, including the role of PG&E equipment in starting all 12 of the relevant North Bay Fires and Cal Fire's decision to refer criminal investigations regarding eight of the fires to the relevant district attorneys' offices "due to evidence of alleged violations of state law." The filing also admitted that Defendants expected to "record a **significant liability for losses associated with**" at least 14 of the North Bay Fires, as follows:

> Although the Utility's analysis is ongoing regarding the fires that were the subject of the June 8, 2018 and May 25, 2018 CAL FIRE news releases:
>
> - for the La Porte, McCourtney, Lobo, Honey, Redwood, Sulphur, Cherokee, Blue, Pocket and Sonoma/Napa merged fires (which include Nuns, Norrbom, Adobe, Partrick and Pythian), based on the current state of the law on inverse condemnation, the information currently available to the Utility, and the CAL FIRE determinations of cause, **PG&E Corporation and the Utility currently expect that they will record a significant liability for losses associated with such fires** in PG&E Corporation and the Utility's condensed consolidated financial statements to be included in their Form 10-Q for the quarterly period ending June 30, 2018 (the "Q2 financial statements"); and

1
2
3
4

- for the Atlas and Highway 37 fires, PG&E Corporation and the Utility do not believe a loss is probable at this time, given the information currently available. However, **it is reasonably possible that facts could emerge that lead PG&E Corporation and the Utility to believe that a loss is probable**, resulting in the accrual of a liability in the future, the amount of which could be significant.

5       153.    Following these disclosures, PG&E's share price fell $1.69, or 4.08%, to close at

6   $39.76 on June 11, 2018, the following trading day. The stock experienced unusually high

7   trading volume that day, with over 12.6 million shares trading hands on June 11, 2018.

8                       **(c)      Market Commentators Confirmed that the Number and Range**
9                                  **of Safety Violations Proximately Caused PG&E's Share Price**
                                    **Decline on June 8-11, 2018**

10      154.    The market was surprised by the number and range of alleged violations of safety

11  laws in the Cal Fire report. For example, in J.P. Morgan's analyst report on June 10, 2018, it

12  stated that "**[w]ith this batch of reports, we find the range of 'alleged' law violations**

13  **noteworthy. CAL FIRE opined on law regarding not just vegetation management but also**

14  **pole and conductor failure and the re-energizing of equipment by the company**." Deutsche

15  Bank also stated in its June 10, 2018 analyst report that "**[o]verall, Friday's data points are**

16  **likely to be read as another negative for PCG, given the high percentages of incidents**

17  **blamed on the company's lines and referred to DAs**." Guggenheim further reiterated its "Sell"

18  recommendation on June 10, 2018 because "[o]ut of the 16 fires now investigated thus far, **PCG**

19  **was found to have allegedly violated state law in 11 of those instances with Cal Fire**

20  **referring tis evidence to the District Attorney – likely a strong indictment to potential**

21  **criminal and civil cases/lawsuits against the company**." The analyst from Guggenheim noted

22  that "all signs seem to point to PCG being imprudent operators in the majority of instances,

23  which would therefore mean it should assume liability." Accordingly, the number and range of

24  safety violations proximately caused PG&E's Share Price Decline on June 8-11, 2017.

25      155.    On June 11, 2018, *Bloomberg* published an article reporting: "The company said

26  Monday it expects to record a 'significant liability' for fires, and the shares plunged the most in

27  five months at the open" of trading. The article also noted that "[t]he alleged violations could

28  also expose PG&E to criminal charges only two years after the San Francisco company was

Case 18-30088   Doc 11169   Filed: 08/31/21   Entered: 08/31/21 14:49:59   Page
56 of 78

1    convicted of breaking safety rules that led to a deadly gas pipeline explosion in San Bruno,

2    California."

3          156.    Accordingly, the new information contained in these June 8 and 11 disclosures,

4    including the severity of PG&E's conduct, the role of its violations of California safety laws in

5    causing the North Bay Fires, and the "significant liability" it would incur as a result, proximately

6    caused PG&E's share price decline.

7                                    *          *          *

8          157.    As a result of Defendants' wrongful acts and omissions, and the precipitous

9    decline in the market value of the Company's securities, Lead Plaintiff and other Class members

10   have suffered significant losses and damages.

11   **VIII.   POST-CLASS PERIOD DEVELOPMENTS**

12         158.    As of the date of this filing, thousands of separate plaintiffs have filed hundreds of

13   complaints against PG&E in relation to the North Bay Fires. PG&E has been producing

14   discovery in connection with those cases and is scheduled to proceed to trial on certain claims in

15   early 2019.

16         159.    As of the date of this filing, PG&E is still under investigation for potential

17   criminal violations of California's safety regulations. In addition, Cal Fire has yet to release its

18   report on the cause of the final North Bay Fire, the Tubbs Fire.

19         160.    During the October 2018 wildfire season, PG&E chose to shut off electricity for

20   nearly 60,000 Northern California customers, acknowledging that doing so was necessary to

21   prevent further wildfires from occurring. PG&E's spokesperson, Paul Doherty, simply

22   commented on this drastic measure – in an implicit admission that PG&E's power lines are still

23   not safe – that "We're adapting our electric system our operating practices to improve safety and

24   reliability. That's really the bottom line for us."

25         161.    On August 16, 2018, PG&E released its 2018 "Corporate Responsibility and

26   Sustainability Report." Unlike the Company's reports from 2015, 2016, and 2017 alleged above,

27   its most recent iteration **no longer** represents to investors that PG&E's vegetation management is

28

---

in "compliance with relevant laws," or that its vegetation management "complies with state and federal regulations."

## IX.    SCIENTER

162.    Throughout the Class Period, Defendants acted with scienter by either knowingly misleading the public about PG&E's financial health and compliance with relevant safety rules and regulations, or doing so in a deliberately reckless manner.

### A.    PG&E's  Safety Practices Continued to Violate the Law Even After Being on Notice of the Butte Fire Safety Violations

163.    As detailed above, PG&E's safety lapses caused the 2015 Butte Fire when a tree came into contact with PG&E's power line due to PG&E violating multiple safety regulations. At the time, the Butte Fire was the seventh most destructive wildfire in California history; it killed two people, destroyed 921 homes, and destroyed more than 70,000 acres over 22 days.

164.    Even after the disastrous Butte Fire revealed the seriousness of PG&E's fire safety lapses, PG&E made **no changes at all** to improve its vegetation management or compliance with safety regulations. In a deposition transcript that has not yet been made publicly available, PG&E's Vegetation Program Manager Richard Yarnell reportedly testified under oath: "PG&E—to the best of my knowledge, we have not made any changes as a result of this fire." Despite being on notice of its dangerous safety violations, neither the Company nor its officers made any changes to improve safety or compliance. Thus, they either knew, or should have presumed, that its violations continued unabated.

### B.    Safety Was Core to PG&E's Operations, and the Individual Defendants Were Directly Involved in It

165.    During the Class Period, PG&E repeatedly acknowledged that "[s]afety is at the heart of everything we do at PG&E" (Geisha Williams, July 27, 2017 Analyst Call), that safety was PG&E's "top priority" (Patrick Hogan, November 18, 2015 California Senate Sub-Committee Hearing), and that "[n]othing is more important than the safety of our customers, employees and the communities we serve" (Kevin Dasso, vice president of Electric Asset Management, May 10, 2017 Press Release). PG&E further represented to the public that PG&E's safety and compliance were closely monitored by the Company's management and the

Case 19-30088    Doc# 11169-5    Filed: 08/31/21    Entered: 08/31/21 14:49:59    Page
58 of 78

1   Individual Defendants. For instance, the PG&E Board's Finance Committee was alleged in a

2   separate lawsuit over the Butte Fire – where litigation is still ongoing – to have been "actively

3   involved in, and responsible for, assisting the Boards in their oversight of safety risk through its

4   review of strategies to manage the largest individual risks identified in the enterprise risk

5   management program," including the risk of "wildfire." Indeed, because the Company faced the

6   possibility of strict liability for property damages caused by wildfires, and such liability could be

7   extraordinary, wildfire safety was a particular focus of the Individual Defendants, who spoke

8   personally on the subject with investors and regulators throughout the Class Period. Further,

9   Defendants' repeated misrepresentations about PG&E's safety and compliance record concerned

10  the Company's core operations. Therefore, the Individual Defendants, by virtue of the

11  importance of safety to the Company and their positions as its leaders, reasonably had

12  knowledge about PG&E's safety and regulatory failures during the Class Period.

13          166.    As discussed in Sections IV.C. and IV.D., *supra*, the Individual Defendants

14  repeatedly spoke to investors on the specifics of PG&E's vegetation management procedures and

15  results. For example, they kept investors apprised about how many hundreds of thousands of

16  trees the Company was trimming and removing, including how many thousands were "dead or

17  dying." Not only that, but the Individual Defendants also inflated these numbers over time

18  without explanation, raising the number of trees supposedly trimmed or removed from 1.2

19  million to 1.4 million. In both reporting and inflating these numbers, the Individual Defendants

20  showed they knew that vegetation management and compliance was important to investors.

21          167.    A core operation concerns a company's primary products or services, and it

22  extends to matters of importance that might significantly impact the company's bottom line.

23  There is no question that PG&E's safety policies and procedures were critically important to the

24  Company's operations. In addition to the fact that PG&E repeatedly acknowledged this reality, it

25  is also notable that PG&E is potentially facing $17 billion of liability due to its failures, and that

26  the California legislature has imposed a regulatory regime that imposes significant liability for

27  PG&E's vegetation management failures. This is strong evidence of the centrality of the

28  Company's wildfire safety and compliance regime.

168.    In a separate lawsuit that was filed in connection with the Butte Fire, it was publicly alleged – based on discovery and deposition testimony that has **not** yet been publicly revealed – that Individual Defendants Williams and Hogan both served on an Executive Officer Risk & Compliance Committee that was charged with monitoring vegetation management issues. Further, according to the parties litigating against PG&E for injuries caused by the 2015 Butte Fire, Defendant Hogan's and another individual's[24] deposition testimony purportedly showed that "PG&E knows and accepts that 1-in-100 trees will be non-compliant, and that 1-in-1000 will be touching its powerlines."  As noted above, this means noncompliance for approximately 1.2 million trees in PG&E's territory of 123 million trees, approximately 123,000 of which are safety violations in the nature of trees touching its powerlines at any given time.  *See* Section IV.F.4.

169.    Just months before the North Bay Fires broke out, Judge Thelton E. Henderson in the Northern District of California ordered that PG&E work with federal prosecutors to retain a monitor to oversee the Company's compliance and ethics programs, and implement "policies and procedures that address threats caused by vegetation," in light of the deadly San Bruno explosion. *U.S. v. Pacific Gas and Electric Co.*, No. 14-cr-175, Order at 3, ECF No. 916, (N.D. Cal. Jan. 26, 2017). As part of the sentencing process, PG&E had promised the Court that Defendant Julie Kane – as Chief Ethics and Compliance Officer of the Company – "reports directly to PG&E Corporation's Chairman and CEO" regarding PG&E's compliance efforts, and that "PG&E's senior executives" regularly reviewed the Company's safety and compliance, such that "high-level personnel of the organization ensure its effectiveness." *Id.,* Def's Sentencing Memo. at 6-7, ECF No. 906 (N.D. Cal. Jan. 9, 2017).

170.    Because the Defendants represented that they closely monitored PG&E's safety and compliance, they knew – or were deliberately reckless in not knowing – that PG&E's level of safety with respect to vegetation management and wildfire prevention did not comport with state law.

---

[24] Court filings identify this individual as Dean McFarren, PG&E's Quality Assurance Supervisor.

Case 19-30088   Doc# 11169-6   Filed: 08/31/21   Entered: 08/31/21 14:49:59   Page
60 of 78

C.     **PG&E's Noncompliance with Safety Regulations Was Well-Known Throughout the Company, Including at the Highest Levels with Real-Time Access to a Database of Known Safety Violations**

1.     **PG&E Recorded Its Violations of Safety Regulations in a Sophisticated Database, Readily Accessible by the Individual Defendants**

171.     PG&E maintained a database of inspection data to document the condition of its power lines, which provided its personnel with ready access to information about instances of noncompliance with state safety regulations. In a November 8, 2017 article about its pole management and maintenance efforts, PG&E states that it "**uses a comprehensive database to manage these multiple patrol and inspection schedules of our 2.4 million poles.**"[25]

172.     This information was used to develop the company's *Mobile Asset Inspection* application that provided "electric power inspectors in the field with real-time information including maps, customer information, safety and access information."[26] The system was developed in 2016 and had become sophisticated enough by 2017 to win *InformationWeek*'s IT Excellence Award in the Data and Analytics category.[27] The article further states that "**[s]atellite maps were layered with the location of PG&E's two million electric poles along with decades' worth of data on each individual pole.**"[28] PG&E's 2016 Corporate Responsibility and Sustainability Report announced that a Margaret Mooney Award for Innovation was awarded to its "Data Visualization—Google Earth SAP team, which created a new technology that provides work crews with a dramatically enhanced data visualization of **work in progress**." The report further mentioned "[t]he development of an SAP-based **compliance tool** that can analyze trends and inform [PG&E's] risk management efforts." Thus, PG&E used sophisticated software to kept track of safety regulation noncompliance for its powerlines and poles.

---

[25] http://www.pgecurrents.com/2017/11/08/facts-about-pge-pole-management-and-maintenance/, last visited on November 8, 2018.

[26] http://investor.pgecorp.com/news-events/press-releases/press-release-details/2017/Innovative-App-for-PGE-Field-Crews-Earns-InformationWeek-IT-Excellence-Award/default.aspx, last visited on November 8, 2018.

[27] *Id.*

[28] *Id.*

173.    PG&E assigns a unique "pole SAP ID number" that corresponds to each pole's data.[29] According to an *InformationWeek* article about PG&E's mobile application, "**[t]he status of a pole's inspection is tracked in SAP [database technology] so the inspection team knows when it's time to inspect each pole**. That information flows into the enterprise platform PG&E built, which pushes electronic lists to inspectors' iPad Pros."[30] The data collected is extensive enough to enable "an enterprise data and analytics organization that is using advanced analytics to predict when poles will fail."[31] And by 2017, the PG&E Corporate Responsibility and Sustainability Report mentions that the company's "SAP-based tool" was used to analyze trends in environmental compliance. Thus, PG&E's records of safety regulation violations were stored in a readily accessible database.  Defendants Earley, Williams, Stavropoulos, Kane, Johns, and Hogan each had easy access to this database.

174.    Consequently, to the extent that PG&E was noncompliant with safety regulations concerning vegetation management and pole integrity, such facts would have been documented electronically, stored in an accessible SAP database, and available to PG&E personnel throughout the Company in real-time.

### 2.    PG&E Instituted a Culture of Reporting Problems Up Among its On-the-Ground Employees, Which Upper Management Was Aware of and Monitored

175.    PG&E repeatedly touted the culture among its lower-level employees that encouraged reporting safety problems up the chain of management. Further, the Individual Defendants touted their knowledge and familiarity with this practice at the Company, indicating either they personally received information of safety violations this way, or they knew where to find such information but deliberately avoided it.

---

[29] https://www.pge.com/pge_global/common/pdfs/safety/yard-safety/powerlines-and-trees/pole-data-request-form.pdf, last visited on November 8, 2018.

[30] https://www.informationweek.com/big-data/pgandes-winning-recipe-for-a-mobile-asset-inspection-app/d/d-id/1329251, last visited on November 8, 2018.

[31] *Id.*

176.    On August 18, 2016, PG&E issued a press release titled "PG&E Becomes First Natural Gas Utility to Receive Process Safety." It contained a description of an internal Company policy termed "**The Corrective Action Program, a program that empowers employees at all levels of PG&E to speak up and identify issues that are in need of improvement**."

177.    On November 4, 2016, PG&E hosted a conference call with analysts to discuss its financial results for the third quarter of 2016. In his prepared remarks, Earley elaborated on PG&E's culture of encouraging "every employee" to report safety violations up the chain of command, as follows:

> **We also wanted to make sure that every employee felt comfortable raising concerns, no matter how big or small, so we made a number of changes to encourage all employees to speak up when something doesn't seem right. For example, we worked with our unions to develop a non-punitive self-reporting policy.**
>
> We've also adapted the nuclear industry's corrective action program **across the Company**, to **make it easy for employees to report things that need to be fixed. In fact, employees can now report corrective action items through a simple app on their smart devices. And we've created a number of awards to publicly recognize employees when they do speak up, so that we are encouraging and reinforcing that behavior.**
>
> * * *
>
> **The improvements we have made in safety and reliability over the last six years have put us in a position to deliver strong financial results going forward.**
>
> **Earlier this year, we announced our first dividend increase in six years, and we have committed to achieving a roughly 60% payout ratio by 2019.** Combined with our expected rate based growth, we are confident we can deliver a strong overall return for our shareholders.

178.    Thus, PG&E went significantly beyond making employees feel safe "report[ing] things that need to be fixed." The CEO himself took credit for "mak[ing] sure that every employee felt comfortable raising concerns" and "encourag[ing] all employees to speak up" "**across the Company**" – *i.e.,* **not just at the lower levels.** Further, by virtue of the fact that the CEO personally took credit for this phenomenon within the company, it indicates his awareness

1   of what employees actually reported. Indeed, he stated that he was involved in "publicly

2   recogniz[ing] employees when they do speak up."

3       179.    As a result, the persistence of safety violations cannot be attributed to their being

4   unknown. Rather, such problems persisted because of what the Individual Defendants did – or

5   neglected to do – to mitigate safety problems once they were reported. Indeed, PG&E's long

6   history of inadequate safety compliance did not stem from a lack of information but rather a lack

7   of willingness to devote sufficient Company funds to remediate problems, as detailed above (*see*

8   Sections IV.B.-F., *supra*).

9       180.    Earley's statement also affirms the direct connection between PG&E's treatment

10  of safety issues, the Company's long-term financial results, and the size of its dividend. Indeed,

11  as the truth emerged regarding PG&E's insufficient safety compliance during the Class Period

12  (as alleged above, *see* Section VII, *supra*), the market understood the connection between the

13  Company's safety violations and the foreseeable, material detriment they would have on the

14  Company's financial results and dividend.

15      **D.      PG&E's Compliance Statements Were Authorized by Defendant Kane and
                  Made under Her Ultimate Authority**
16

17      181.    Defendant Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer

18  ("CECO"), controlled and authorized all of PG&E's statements regarding compliance during the

19  Class Period. These statements were approved and made under her ultimate authority as CECO.

20      182.    PG&E established the CECO role on March 24, 2015 "to strengthen its ethics and

21  compliance program and performance,"[32] a role which Kane assumed on May 18, 2015 and held

22  through the end of the Class Period. As CECO, she was responsible for both managing

23  implementation of PG&E's legal compliance efforts as well as overseeing compliance

24  monitoring and reporting during almost the entirety of the Class Period. When PG&E was being

25

26  [32] PG&E Press Release,
    https://www.pge.com/en/about/newsroom/newsdetails/index.page?title=20150324_pge_appoints
27  _julie_m_kane_to_new_position_as_senior_vice_president_and_chief_ethics_and_compliance_
    officer_company_takes_next_step_toward_goal_of_establishing_a_best-in-
28  class_corporate_ethics_program

1  sentenced for its criminal negligence in causing the San Bruno explosion, it admitted in its

2  January 9, 2017 sentencing memorandum that "Ms. Kane is responsible for **overseeing** the

3  Company-wide compliance and ethics program, including **compliance management**, risk-

4  mitigation and **reporting**; **overseeing employee-investigatory processes**; and reinforcing

5  PG&E's ethics and compliance culture, among many other compliance and ethics program

6  elements." The same filing confirmed that "The CECO, Julie Kane, reports directly to PG&E

7  Corporation's Chairman and CEO, and is accountable to PG&E Corporation's and PG&E's

8  Boards of Directors, with additional reporting responsibility to the Compliance and Public Policy

9  Committee of PG&E Corporation's Board and the Audit Committees of PG&E Corporation's

10 and PG&E's Boards."

11        183.    Accordingly, Kane was apprised of any compliance violations reported within the

12 Company, including violations reported by PG&E's lower-level employees and logged in

13 PG&E's central database detailed *supra*, at all times when PG&E misrepresented to investors

14 that it was in compliance (*e.g.*, ¶76 (Misstatement No. 2, October 16, 2015); ¶82 (Misstatement

15 No. 4, October 6, 2016); ¶86 (Misstatement No. 5, August 9, 2017); ¶100 (Misstatement No. 9,

16 October 31, 2017); ¶108 (Misstatement No. 12, November 5, 2017); and ¶111 (Misstatement No.

17 13, May 25, 2018)).

18        184.    The CECO position was sufficiently senior such that Kane's scienter can be

19 imputed to the Company regarding knowledge of legal compliance with California vegetation

20 management and safety regulations.

21        185.    Additionally, because Kane reported directly to the CEO in her capacity as

22 CECO, her knowledge of safety violations can be imputed to both CEOs, Earley and Williams.[33]

23 Because Kane was institutionally installed to advise the CEO of PG&E's compliance and safety,

24 Kane would have told Earley and Williams what she knew regarding the Company's

25 noncompliance with vegetation management regulations, or Earley and Williams would have

26

27 ────────────────

28 [33] Further, she reported directly to the Company's Chairman of the Board, a position which
   was also occupied by Earley during the Class Period.

been deliberately reckless in speaking on the subjects of compliance and safety without input from their CECO.

### E.   The Threat of a Potential Bankruptcy Gave Defendants a Strong Motive to Mislead Investors

186.   PG&E is currently facing approximately **$17 billion** in liability over the North Bay Fires that began on October 8, 2017. This immense exposure dwarfs the $1.6 billion that the Company earned in the full year 2017. In fact, it would take PG&E more than ten years of similar earnings to pay off such a liability.

187.   It is clear from Defendants' statements and actions that PG&E's liability over the North Bay Fires could have severe repercussions for the Company as a whole, and consequently for the careers of the Individual Defendants.

188.   One California legislator reported on June 15, 2018 that "[i]n this Capitol, they [P&E] keep talking about the sky is falling, that they're going to go bankrupt and what are we going to do, and they're creating a lot of fear in the Capitol."

189.   NBC News reported on February 2, 2018 that after the North Bay Fires broke out, PG&E "sent out letter[s] to dozens of its non-profit 'community partners' warning them that a potentially 'unlimited' North Bay wildfire liability could imperil funding unless the legislature eases that legal burden." In those letters, PG&E's external affairs vice president Travis Kiyota implicitly threatened the funding for charitable endeavors: "This type of unlimited liability may affect our charitable giving and other non-profit community activities."

190.   On July 31, 2018, *Reuters* further reported that an anonymous source had leaked that PG&E hired a prominent law firm to "explore debt restructuring options," as well as the possibility of "breaking up the company."

191.   On August 1, 2018, California Governor Jerry Brown even cautioned the public that "there is concern that we could lose our utilities."

192.   The reason for these dire warnings was simple: PG&E wanted to rush through legislation that would grant it additional defenses and a lower bar to be reimbursed for their part in causing the North Bay Fires.

193.    It was within this context that PG&E falsely and misleadingly told investors, *inter alia*, that "PG&E meets or exceeds all applicable federal and state vegetation clearance requirements," and that "we've doubled the amount that we've invested in veg[etation] management." PG&E had an unusual motive to make these and other statements after the North Bay Fires erupted: to conceal its wrongdoing long enough to secure the liability bailout it was seeking from the California legislature.

194.    Indeed, this would not be the first time that a large potential liability caused PG&E to act unethically. When PG&E faced a substantially **lower** liability for its role in the deadly San Bruno explosion, the Company engaged in improper "back-channel" communications with its regulators that ultimately resulted in a $97.5 million fine that was imposed in April 2018. A federal jury also found PG&E to be guilty of six criminal charges, including obstruction of justice, related to that blast that killed eight people.

# X.    APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND FRAUD ON THE MARKET

195.    Lead Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    The omissions and misrepresentations were material;

(c)    The Company's stock traded in an efficient market;

(d)    The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

(e)    Lead Plaintiff and other members of the Class purchased PG&E common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

196.    At all relevant times, the market for PG&E shares was efficient for the following reasons, among others:

Case: 19-30088   Doc# 11169-6   Filed: 08/31/21   Entered: 08/31/21 14:49:59   Page 67 of 78

1        (a)      PG&E stock met the requirements for listing, and was listed and actively

2    traded on the NYSE, a highly efficient and automated market;

3        (b)      As a regulated issuer, PG&E filed periodic public reports with the SEC

4    and the NYSE;

5        (c)      PG&E regularly communicated with public investors via established

6    market communication mechanisms, including through the regular dissemination of press

7    releases on the major newswire services and through other wide-ranging public disclosures, such

8    as communications with the financial press, securities analysts and other similar reporting

9    services; and

10        (d)      PG&E was followed by numerous securities analysts employed by major

11    brokerage firms who wrote reports that were distributed to the sales forces and certain customers

12    of their respective brokerage firms. Each of those reports was publically available and entered

13    the public marketplace.

14    197.    As a result of the foregoing, the market for PG&E common stock promptly

15    digested current information regarding PG&E from publicly available sources and reflected such

16    information in PG&E's stock price. Under these circumstances, all purchasers of PG&E common

17    stock during the Class Period suffered similar injury because of their purchases of common stock

18    at artificially inflated prices and a presumption of reliance applies.

19    198.    Lead Plaintiff is also entitled to a presumption of reliance under the Supreme

20    Court's decision in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), and its progeny,

21    as Defendants' misstatements throughout the Class Period included omissions, in that they failed

22    to inform investors of PG&E's safety and regulatory failures.

23  **XI.    CLASS ACTION ALLEGATIONS**

24    199.    Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil

25    Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or

26    otherwise acquired PG&E securities traded on the NYSE during the Class Period (the "Class")

27    and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the

28    Class are Defendants herein, the officers and directors of the Company, members of their

1   immediate families and their legal representatives, heirs, successors or assigns and any entity in

2   which Defendants have or had a controlling interest.

3       200.    The members of the Class are so numerous that joinder of all members is

4   impracticable. Throughout the Class Period, PG&E securities were actively traded on the NYSE.

5   While the exact number of Class members is unknown to Lead Plaintiff at this time and can be

6   ascertained only through appropriate discovery, Lead Plaintiff believes that there are hundreds or

7   thousands of members in the proposed Class. Record owners and other members of the Class

8   may be identified from records maintained by PG&E or its transfer agent and may be notified of

9   the pendency of this action by mail, using the form of notice similar to that customarily used in

10  securities class actions.

11      201.    Lead Plaintiff's claims are typical of the claims of the members of the Class as all

12  members of the Class are similarly affected by Defendants' wrongful conduct in violation of

13  federal law that is complained of herein.

14      202.    Lead Plaintiff will fairly and adequately protect the interests of the members of

15  the Class and has retained counsel competent and experienced in class and securities litigation.

16  Lead Plaintiff has no interests antagonistic to or in conflict with those of the Class.

17      203.    Common questions of law and fact exist as to all members of the Class and

18  predominate over any questions solely affecting individual members of the Class. Among the

19  questions of law and fact common to the Class are:

20          •   whether the federal securities laws were violated by Defendants' acts as

21              alleged herein;

22          •   whether statements made by Defendants to the investing public during the

23              Class Period misrepresented material facts about the financial condition,

24              business, operations, and safety of PG&E;

25          •   whether Defendants caused PG&E to issue false and misleading financial

26              statements during the Class Period;

27          •   whether Defendants acted knowingly or recklessly in issuing false and

28              misleading financial statements;

- whether the prices of PG&E securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

204.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

205.     Lead Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine, as discussed above in ¶¶195-197.

206.     Based upon the foregoing, Lead Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## XII.     CAUSES OF ACTION

### FIRST CLAIM

**For Violation of Section 10(b) of**
**The Exchange Act and Rule 10b-5 Against All Defendants**

207.     Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

208.     This Count is asserted against PG&E and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

209.     During the Class Period, PG&E and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

210.    PG&E and the Individual Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of PG&E securities during the Class Period.

211.    PG&E and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of PG&E were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These Defendants by virtue of their receipt of information reflecting the true facts of PG&E, their control over, and/or receipt and/or modification of PG&E allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning PG&E, participated in the fraudulent scheme alleged herein.

212.    Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Lead Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other PG&E personnel to members of the investing public, including Lead Plaintiff and the Class.

213.    As a result of the foregoing, the market price of PG&E securities was artificially inflated during the Class Period. In ignorance of the falsity of PG&E's and the Individual Defendants' statements, Lead Plaintiff and the other members of the Class relied on the

1   statements described above and/or the integrity of the market price of PG&E securities during

2   the Class Period in purchasing PG&E securities at prices that were artificially inflated as a result

3   of PG&E's and the Individual Defendants' false and misleading statements.

4       214.    Had Lead Plaintiff and the other members of the Class been aware that the market

5   price of PG&E securities had been artificially and falsely inflated by PG&E's and the Individual

6   Defendants' misleading statements and by the material adverse information which PG&E's and

7   the Individual Defendants did not disclose, they would not have purchased PG&E's securities at

8   the artificially inflated prices that they did, or at all.

9       215.    As a result of the wrongful conduct alleged herein, Lead Plaintiff and other

10   members of the Class have suffered damages in an amount to be established at trial.

11       216.    By reason of the foregoing, PG&E and the Individual Defendants have violated

12   Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the

13   plaintiff and the other members of the Class for substantial damages which they suffered in

14   connection with their purchase of PG&E securities during the Class Period.

15   **SECOND CLAIM**

16   **For Violation of Section 20(a) of**
**The Exchange Act Against PG&E Corporation**

17

18       217.    Lead Plaintiff repeats and realleges each and every allegation contained in the

19   foregoing paragraphs as if fully set forth herein.

20       218.    This Count is asserted pursuant to Section 20(a) of the Exchange Act against

21   Defendant PG&E Corporation.

22       219.    During the Class Period, PG&E Corporation participated in the operation and

23   management of the Utility. PG&E Corporation conducted and participated, directly and

24   indirectly, in the conduct of the Utility's business affairs. For the years of 2015-2017, **100%** of

25   PG&E Corporation's directors also sat on the board of the Utility, and **over 90%** of the Utility's

26   directors also sat on the board of PG&E Corporation.[34]  Further, both companies filed joint

27   ───────────

28   [34] 2015: Lewis Chew, Earley, Fred J. Fowler, Maryellen C. Herringer, Richard C. Kelly,
Roger H. Kimmel, Richard A. Meserve, Forrest E. Miller, Rosendo G. Parra, Barbara L. Rambo,

Case 19-30088   Doc# 11169-5   Filed: 08/31/21   Entered: 08/31/21 14:49:59   Page
72 of 78

1  annual reports on Form 10-K with the SEC throughout the Class Period, the entirety of which

2  filings were certified pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by officers of **both**

3  Companies. Further, because of its 100% ownership and authority, PG&E Corporation knew the

4  adverse non-public information regarding the Company's financial condition and noncompliance

5  with relevant laws and regulations.

6      220.    Through its position as sole owner of the Utility and placement of its own

7  Independent Directors on the Utility's Board of Directors, PG&E Corporation had a duty to

8  disseminate accurate and truthful information with respect to the Utility's financial condition and

9  results of operations, and to correct promptly any public statements issued by the Utility which

10  had become materially false or misleading.

11      221.    Because of its position as sole owner of the Utility and placement of its own

12  Independent Directors on the Utility's Board of Directors, PG&E Corporation was able to, and

13  did, control the contents of the various reports, press releases and public filings which the Utility

14  disseminated in the marketplace during the Class Period. Throughout the Class Period, PG&E

15  Corporation exercised its power and authority to cause the Utility to engage in the wrongful acts

16  complained of herein. PG&E Corporation, therefore, was a "controlling person" of the Utility

17  within the meaning of Section 20(a) of the Exchange Act. In this capacity, it participated in the

18  unlawful conduct alleged which artificially inflated the market price of PG&E securities.

19      222.    By reason of the above conduct, PG&E Corporation is liable pursuant to Section

20  20(a) of the Exchange Act for the violations committed by the Utility.

21  _____

*(continued)*

22  Anne Shen Smith, and Barry Lawson Williams were directors of both PG&E Corporation and
the Utility, whereas Johns was a director of the Utility only.

23      2016: Lewis Chew, Earley, Fred J. Fowler, Maryellen C. Herringer, Richard C. Kelly, Roger

24  H. Kimmel, Richard A. Meserve, Forrest E. Miller, Rosendo G. Parra, Barbara L. Rambo, Anne
Shen Smith, and Barry Lawson Williams were directors of both PG&E Corporation and the

25  Utility, whereas Stavropoulos and Williams were directors of the Utility only.

26      2017: Lewis Chew, Earley, Fred J. Fowler, Maryellen C. Herringer, Jeh C. Johnson, Richard
C. Kelly, Roger H. Kimmel, Richard A. Meserve, Forrest E. Miller, Eric D. Mullins, Rosendo G.

27  Parra, Barbara L. Rambo, Anne Shen Smith, Barry Lawson Williams, and Williams were
directors of both PG&E Corporation and the Utility, whereas Stavropoulos was director of the

28  Utility only.

Case: 19-30088   Doc# 11169-6   Filed: 08/31/21   Entered: 08/31/21 14:49:59   Page
73 of 78

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### THIRD CLAIM

**For Violation of Section 20(a) of**
**The Exchange Act Against The Individual Defendants**

223.    Lead Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

224.    During the Class Period, the Individual Defendants participated in the operation and management of PG&E.  The Individual Defendants conducted and participated, directly and indirectly, in the conduct of PG&E's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's financial condition and noncompliance with relevant laws and regulations.

225.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to PG&E's financial condition and results of operations, and to correct promptly any public statements issued by PG&E which had become materially false or misleading.

226.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which PG&E disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause PG&E to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of PG&E within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of PG&E securities.

227.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by PG&E.

### FOURTH CLAIM

**Alter Ego Liability for Violation of Section 10(b) of**
**The Exchange Act and Rule 10b-5 Against PG&E Corporation**

228.    Lead Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

229.     PG&E Corporation is jointly and severally liable for the misstatements and omissions of the Utility, insofar as:

(a)     PG&E Corporation and the Utility operate as a single business enterprise operating out of the same building located at 77 Beale Street, San Francisco, California, for the purpose of effectuating and carrying out PG&E Corporation's business and operations and/or for the benefit of PG&E Corporation;

(b)     PG&E Corporation and the Utility do not operate as completely separate entities, but rather integrate their resources to achieve a common business purpose;

(c)     the Utility is so organized and controlled, and its decisions, affairs, and business are so conducted as to make it a mere instrumentality, agent, conduit, or adjunct of PG&E Corporation;

(d)     PG&E Corporation's and the Utility's officers and management are intertwined and do not act completely independently of one another;

(e)     PG&E Corporation has control and authority to choose and appoint the Utility's board members as well as its other top officers and managers;

(f)     PG&E Corporation and the Utility are insured by the same carriers and provide uniform or similar pension, health, life, and disability insurance plans for employees;

(g)     PG&E Corporation and the Utility have unified 401(k) Plans, pension and investment plans, bonus programs, vacation policies, and paid time off from work schedules and policies;

(h)     PG&E Corporation and the Utility have unified personnel policies and practices and/or a consolidated personnel organization or structure;

(i)     PG&E Corporation and the Utility are represented by common legal counsel;

(j)     PG&E Corporation and the Utility acknowledged in their joint 10-K statement for the year 2015 that eight separate officers were "executive officers of both PG&E Corporation and the Utility;"

1      (k)     PG&E Corporation and the Utility acknowledged in their joint 10-K

2 statement for the year 2016 that nine separate officers were "executive officers of both PG&E

3 Corporation and the Utility;"

4      (l)     PG&E Corporation's officers, directors, and other management make

5 policies and decisions to be effectuated by the Utility and/or otherwise play roles in providing

6 directions and making decisions for the Utility;

7      (m)     PG&E Corporation's officers, directors, and other management direct

8 certain financial decisions for the Utility including the amount and nature of capital outlays;

9      (n)     PG&E Corporation's written guidelines, policies, and procedures control

10 the Utility's employees, policies, and practices;

11      (o)     PG&E Corporation files consolidated earnings statements factoring in all

12 revenue and losses from the Utility, as well as consolidated tax returns, including those seeking

13 tax relief; and

14      (p)     PG&E Corporation generally directs and controls the Utility's relationship

15 with, requests to, and responses to inquiries from, the CPUC and uses such direction and control

16 for the benefit of PG&E Corporation.

17     230.    For purposes of this litigation, it would be inequitable to treat the misstatements

18 and actions of the Utility as those of the Utility only, and not also of PG&E Corporation.

19     231.    By reason of the above allegations, any misstatements made by the Utility –

20 including, but not limited to, Misstatement Nos. 1 and 3 – were made by an "alter ego" of PG&E

21 Corporation, and PG&E Corporation is therefore equally liable for violations of Section 10(b) of

22 the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other

23 members of the Class for substantial damages which they suffered in connection with their

24 purchase of PG&E securities during the Class Period.

25                           **PRAYER FOR RELIEF**

26 WHEREFORE, Lead Plaintiff demands judgment against Defendants as follows:

27     A.     Determining that this action may be maintained as a class action under Rule 23 of

28 the Federal Rules of Civil Procedure, and certifying Lead Plaintiff as the Class representative;

1        B.      Requiring Defendants to pay damages sustained by Lead Plaintiff and the Class

2 by reason of the acts and transactions alleged herein;

3        C.      Awarding Lead Plaintiff and the other members of the Class prejudgment and

4 post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs;

5 and

6        D.      Awarding such other and further relief as this Court may deem just and proper.

7 **DEMAND FOR TRIAL BY JURY**

8      Lead Plaintiff hereby demands a trial by jury.

9

10 DATED: November 9, 2018             */s/ Thomas A. Dubbs*

Thomas A. Dubbs (*pro hac vice*)
Louis Gottlieb (*pro hac vice*)
Jeffrey A. Dubbin (#287199)
James L. Ostaszewski (*pro hac vice*)
Wendy Tsang (*pro hac vice*)
**LABATON SUCHAROW LLP**
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email: tdubbs@labaton.com
lgottlieb@labaton.com
jdubbin@labaton.com
jostaszewski@labaton.com
wtsang@labaton.com

*Counsel for Lead Plaintiff the Public Employees Retirement Association of New Mexico*

**KERR & WAGSTAFFE LLP**
JAMES M. WAGSTAFFE (#95535)
FRANK BUSCH (#258288)
101 Mission Street, 18th Floor
San Francisco, California 94105
Telephone: (415) 371-8500
Facsimile: (415) 371-0500
Email: wagstaffe@kerrwagstaffe.com
busch@kerrwagstaffe.com

*Liaison Counsel for the Class*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on November 9, 2018, I electronically filed the foregoing with

the Clerk of Court using the CM/ECF system, which will send a Notice of Electronic Filing to all

counsel of record.

/s/ Thomas A. Dubbs
THOMAS A. DUBBS

CERTIFICATE OF SERVICE
CIVIL ACTION NO. 5:18-CV-03509-RS