# EXHIBIT H

1   **LABATON SUCHAROW LLP**
    THOMAS A. DUBBS (*pro hac vice*)
2   LOUIS GOTTLIEB (*pro hac vice*)
    JEFFREY A. DUBBIN (#287199)
3   JAMES L. OSTASZEWSKI (*pro hac vice*)
    WENDY TSANG (*pro hac vice*)
4   140 Broadway
    New York, New York 10005
5   Telephone: (212) 907-0700
    Facsimile: (212) 818-0477
6   Email: tdubbs@labaton.com
    lgottlieb@labaton.com
7   jdubbin@labaton.com
    jostaszewski@labaton.com
8   wtsang@labaton.com
    *Counsel for Lead Plaintiff the Public Employees Retirement*
9   *Association of New Mexico and Lead Counsel for the Class*

10  **WAGSTAFFE, VON LOEWENFELDT, BUSCH & RADWICK, LLP**
    JAMES M. WAGSTAFFE (#95535)
11  FRANK BUSCH (#258288)
    100 Pine Street, Suite 725
12  San Francisco, California 94111
    Telephone: (415) 357-8900
13  Facsimile: (415) 371-0500
    Email: wagstaffe@wvbrlaw.com
14  busch@wvbrlaw.com
    *Liaison Counsel for the Class*

15

16          **UNITED STATES DISTRICT COURT**
            **NORTHERN DISTRICT OF CALIFORNIA**
17              **SAN FRANCISCO DIVISION**

18                                    | Civil Action No. 3:18-cv-03509-RS

19                                    | SECOND AMENDED CONSOLIDATED CLASS
    IN RE PG&E CORPORATION            | ACTION COMPLAINT FOR VIOLATION OF
20  SECURITIES LITIGATION             | THE FEDERAL SECURITIES LAWS

21                                    | JURY TRIAL DEMANDED

22

23

24

25

26

27

28

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO. 3:18-CV-03509-RS

**TABLE OF CONTENTS**

I.    INTRODUCTION ............................................................................................... 1

      A.  Summary of the Case ..............................................................................1

      B.  PG&E's Failure to Comply with Safety Regulations Proximately Caused
          Wildfires in 2017 and Investors' Consequent Losses................................2

      C.  PG&E's Failure to Prioritize Safety Continued Unabated, Proximately
          Causing a Disastrous Wildfire in November 2018 as Well as Further Investor
          Losses .....................................................................................................4

          1.  PG&E Continued to Make False and Misleading Statements and
              Omissions......................................................................................... 4

          2.  Evidence Emerged that a Defective PG&E Electrical Transmission Line
              Tower, and Vegetation Underneath, Caused the Camp Fire ................... 6

      D.  Claims Being Asserted................................................................................8

II.   JURISDICTION AND VENUE ......................................................................... 9

III.  PARTIES ........................................................................................................... 9

IV.   SUBSTANTIVE ALLEGATIONS ................................................................... 11

      A.  PG&E Operates Within a Robust Legal Regime .......................................11

          1.  California Law Required PG&E to Maintain a Safe Distance Between Its
              Electrical Equipment and Nearby Vegetation....................................... 11

          2.  California Law Required PG&E to Safely Maintain Its Electrical
              Equipment and Infrastructure ............................................................. 12

          3.  PG&E Is Regulated by the CPUC ....................................................... 13

              (a)  CPUC's General Orders 95 and 165 Impose Strict Safety
                   Regulations on PG&E............................................................. 13

              (b)  CPUC's Resolution ESRB-8 Imposes on PG&E an Obligation to
                   Adopt, Promulgate and Follow the ESRB-8 Shutoff Protocol ................... 14

              (c)  PG&E Must Follow CPUC's Regulations Under Penalty of Law ............. 16

          4.  Cal Fire Is the Duly Authorized Investigative Arm of the State of
              California for Wildfires....................................................................... 16

          5.  Under California's Inverse Condemnation Law, PG&E Would Not Bear
              the Cost of Wildfires It Causes If It Could Prove That It Acted Reasonably
              and Prudently ................................................................................... 17

      B.  PG&E's Vegetation Management Expenditures Did Not Materially Change
          from Year to Year During the Class Period, Let Alone Double at Any Point............17

C. PG&E's Tree Trimming and Removal Did Not Come Close to Doubling During the Class Period ........................................................................ 19

D. After the North Bay Fires, PG&E Started Reporting Inflated Numbers for Tree Removal ........................................................................ 20

E. PG&E Concealed Its Unsafe Use of Reclosers During the Class Period ................. 20

    1. PG&E Used Reclosers to Prioritize Convenience Over Safety ........................... 20

    2. PG&E Concealed Its Use of Reclosers from Investors During the Class Period ........................................................................ 21

F. PG&E Engaged in an Unsafe Pattern of Noncompliance with Safety Requirements Before and Throughout the Class Period ........................................... 22

    1. PG&E Was Convicted of Negligence for Starting a Wildfire in 1994 ............... 23

    2. PG&E's Unsafe and Knowing Noncompliance with Safety Regulations Continued Through the Class Period ........................................................... 23

    3. PG&E's Unsafe, Noncompliant Vegetation Management Caused the Butte Fire in 2015 ........................................................................ 24

    4. PG&E's Compliance Measures Allowed More than One Million Vegetation Management Violations During the Class Period ........................... 25

    5. PG&E's History of Safety Violations Shows that the Company Knew of Its Numerous and Widespread Violations of California Safety Regulations Throughout the Class Period, But Did Nothing to Change Them ...................... 27

G. Investors Could Not Have Reasonably Expected The Extent of PG&E's Unsafe Pattern of Noncompliance that Caused the North Bay Fires and the Camp Fire ........................................................................ 29

    1. PG&E's Noncompliance with Vegetation Management and Pole Integrity Requirements Caused the North Bay Fires ................................................ 29

    2. PG&E's Noncompliance with Vegetation Management and Pole Integrity Requirements Caused the Camp Fire ........................................................... 30

        (a) The Camp Fire's First Ignition Point Was Caused by PG&E Safety Violations ........................................................................ 30

        (b) The Camp Fire's Second Ignition Point Was Also Caused by PG&E Safety Violations ........................................................................ 31

H. PG&E's ESRB-8 Shutoff Protocol Was Illusory, and Its Failure to Adhere Thereto Was a Proximate Cause of the Camp Fire ........................................... 32

    1. PG&E Admitted that All of the Non-Weather Criteria Weighed in Favor of Shutting Off the Power ........................................................................ 35

        (a) Criterion 1: the National Fire Danger Rating System Rated Jarbo Gap as Having an "Extreme" Fire Danger Threat Level ........................... 35

(b)  Criterion 2: the National Weather Service Declared a "Red Flag Warning" for the Area ............................................... 37

(c)  Criterion 6: "Critically Dry Vegetation" (*i.e.*, Wildfire Fuel) Weighed in Favor of a Shutoff ............................................ 37

(d)  Criterion 7: PG&E's On-the-Ground Observations Weighed in Favor of a Shutoff ............................................................... 38

2.  All of the Weather Criteria Weighed in Favor of Shutting Off the Power .......... 39

(a)  Criterion 3: The Jarbo Gap Recorded Sufficiently Low Humidity Levels .............................................................. 41

(b)  Criterion 4: The Jarbo Gap Recorded Sufficiently High Wind Speed ........ 42

(c)  Criterion 5: Site-Specific Conditions Further Favored Shutoff .................. 43

3.  PG&E Knew, or Recklessly Disregarded, that All Seven Criteria Weighed in Favor of Shutting Off the Power ..................................... 43

V.  DEFENDANTS' FALSE AND MISLEADING CLASS PERIOD STATEMENTS ...... 45

A.  Overview of Defendants' Fraudulent Course of Conduct ........................... 45

B.  Defendants Made Materially False and Misleading Statements and Omissions Regarding Its Vegetation Management Activities and Compliance with Wildfire Safety Regulations Before the North Bay Fires ................................ 46

1.  April 29, 2015 – Misstatement No. 1 ........................................... 46

2.  October 16, 2015 – Misstatement No. 2 ........................................ 47

3.  November 18, 2015 – Misstatement No. 3 ...................................... 49

4.  October 6, 2016 – Misstatement No. 4 ......................................... 49

5.  August 9, 2017 – Misstatement No. 5 .......................................... 51

C.  Defendants Tied the Company's Dividend to Safety Compliance, Making Materially False and Misleading Statements and Omissions Regarding Its Dividend and Safety Before the North Bay Fires ................................ 52

1.  May 23, 2016 – Misstatement No. 6 ............................................ 53

2.  November 4, 2016 – Misstatement No. 7 ....................................... 54

3.  May 31, 2017 – Misstatement No. 8 ............................................ 55

D.  After the North Bay Fires Erupted, the Truth Began to Emerge ................... 56

E.  After the North Bay Fires Were Contained, the Company Made Additional False and Misleading Statements and Omissions Regarding Compliance with Wildfire-Related Safety Regulations ........................................... 57

1.  October 31, 2017 – Misstatement No. 9 ........................................ 57

|   |   |   |   |
|---|---|---|---|
| 2. | November 2, 2017 – Misstatement No. 10 | ............... | 58 |
| 3. | November 2, 2017 – Misstatement No. 11 | ............... | 60 |
| 4. | November 5, 2017 – Misstatement No. 12 | ............... | 61 |
| 5. | May 25, 2018 – Misstatement No. 13 | ............... | 63 |

F.  While the Truth Regarding PG&E's Role in Causing the North Bay Fires
Emerged, the Company Made Additional False and Misleading Statements
and Omissions Regarding Compliance with Wildfire-Related Safety
Regulations, Including Its ESRB-8 Shutoff Protocol ................... 64

| 1. | June 8, 2018 – Misstatement No. 14 | ............... | 65 |
| 2. | June 8, 2018 – Misstatement No. 15 | ............... | 66 |
| 3. | September 27, 2018 – Misstatement No. 16 | ............... | 67 |
| 4. | October 9, 2018 – Misstatement No. 17 | ............... | 69 |
| 5. | October 9, 2018 – Misstatement No. 18 | ............... | 70 |
| 6. | November 9, 2018 – Misstatement No. 19 | ............... | 71 |

VI.   MATERIALITY ................... 71

VII.  LOSS CAUSATION ................... 73

A.  Defendants' False and Misleading Statements Artificially Inflated the Price of
PG&E's Common Stock ................... 73

B.  PG&E's Safety Violations Proximately Caused the Devastating North Bay
Fires ................... 73

C.  PG&E's Safety Violations Proximately Caused the Devastating Camp Fire ................... 74

D.  When the Market Learned the Truth, the Price of PG&E's Common Stock
Fell Dramatically ................... 74

1.  October 12, 2017 – Corrective Disclosure and/or Materialization of
Concealed Risk ................... 74

(a)  The Market Began to Learn the Extent and Effects of PG&E's
Responsibility for the North Bay Fires ................... 74

(b)  Market Commentators Confirmed the Cause of PG&E's Share Price
Decline on October 12, 2017 ................... 75

2.  October 13-16, 2017 – Corrective Disclosure and/or Materialization of
Concealed Risk ................... 77

(a)  The Market Continued to Learn the Extent and Effects of PG&E's
Responsibility for the North Bay Fires ................... 77

   (b) Market Commentators Confirmed the Cause of PG&E's Share Price Decline on October 13, 2017 ............................................................ 77

  3. December 20, 2017 – Corrective Disclosure and/or Materialization of Concealed Risk ........................................................................................ 78

   (a) The Market Continued to Learn the Extent and Effects of PG&E's Responsibility for the North Bay Fires .................................................. 78

   (b) Market Commentators Confirmed the Proximate Cause of PG&E's Share Price Decline on December 20, 2017 ............................... 79

  4. May 25, 2018 – Corrective Disclosure and/or Materialization of Concealed Risk ........................................................................................ 80

   (a) The Market Continued to Learn the Extent and Effects of PG&E's Responsibility for the North Bay Fires .................................................. 80

   (b) Market Commentators Confirmed that the News Regarding Safety Violations Proximately Caused PG&E's Share Price Decline on May 25-29, 2018 ............................................................................................. 82

  5. June 8, 2018 – Corrective Disclosure and/or Materialization of Concealed Risk ........................................................................................ 82

   (a) The Market Learned the Truth of PG&E's Continued, Unsafe Use of Reclosers ............................................................................................... 84

   (b) The Market Continued to Learn the Extent and Effects of PG&E's Responsibility for the North Bay Fires ............................................ 85

   (c) Market Commentators Confirmed that the Number and Range of Safety Violations Proximately Caused PG&E's Share Price Decline on June 8-11, 2018 .................................................................................... 86

  6. November 8-9, 2018 – Corrective Disclosure and/or Materialization of Concealed Risk .................................................................................... 87

   (a) The Market Began to Learn the Extent and  Effects of PG&E's Responsibility for the Camp Fire ........................................................... 87

   (b) Market Commentators Confirmed the Cause of PG&E's November 9, 2018 Share Price Decline ..................................................................... 88

  7. November 9-12, 2018 – Corrective Disclosure and/or Materialization of Concealed Risk .................................................................................... 89

   (a) The Market Continued to Learn the Extent and Effects of PG&E's Responsibility for the Camp Fire .................................................. 89

   (b) Market Commentators Confirmed the Cause of PG&E's November 9-12, 2018 Share Price Decline. ..................................................... 90

  8. November 14, 2018 – Corrective Disclosure and/or Materialization of Concealed Risk ........................................................................................ 91

(a) The Market Continued to Learn the Extent and Effects of PG&E's Responsibility for the Camp Fire ............................................................. 91

(b) Market Commentators Confirmed the Cause of PG&E's Share Price Decline on November 14, 2018 ................................................................. 92

9. November 15, 2018 – Corrective Disclosure and/or Materialization of Concealed Risk ....................................................................................... 93

(a) The Market Continued to Learn the Extent and Effects of PG&E's Responsibility for the Camp Fire ............................................................. 93

(b) Market Commentators Confirmed the Cause of PG&E's Share Price Decline on November 15, 2018 ................................................................. 94

VIII. SCIENTER ..................................................................................................... 95

A. PG&E's Safety Practices Continued to Violate the Law Even After PG&E Was on Notice of the Butte Fire Safety Violations ...................................... 95

B. Safety Was Core to PG&E's Operations, and the Individual Defendants Were Directly Involved in It ................................................................................. 95

C. The Federal Court Overseeing PG&E's Safety Monitoring Program Is Investigating Whether PG&E Recklessly Caused the Camp Fire in Violation of California Criminal Law and the Company's Parole ............................... 98

D. PG&E's Noncompliance with Safety Regulations Was Well-Known Throughout the Company, Including at the Highest Levels with Real-Time Access to a Database of Known Safety Violations .......................................... 99

1. PG&E Recorded Its Violations of Safety Regulations in a Sophisticated Database, Readily Accessible by the Individual Defendants ............................... 99

2. PG&E Instituted a Culture of Reporting Problems Up Among its On-the-Ground Employees, Which Upper Management Was Aware of and Monitored ...................................................................................................... 101

E. PG&E's Compliance Statements Were Authorized by Defendant Kane and Made under Her Ultimate Authority ............................................................. 103

F. The Threat of a Potential Bankruptcy Gave Defendants a Strong Motive to Mislead Investors ........................................................................................... 104

G. After PG&E Failed to Follow Its ESRB-8 Shutoff Protocol and Caused the Camp Fire, PG&E Attempted to Cover It Up ................................................ 106

IX. APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND FRAUD ON THE MARKET ............................................................................................................. 110

X. CLASS ACTION ALLEGATIONS .............................................................. 111

XI. CAUSES OF ACTION ................................................................................... 113

Lead Plaintiff Public Employees Retirement Association of New Mexico ("PERA" or "Lead Plaintiff"), individually and on behalf of all other persons similarly situated, alleges the following against PG&E Corporation, Pacific Gas and Electric Company (the "Utility," and together with PG&E Corporation, "PG&E" or the "Company"), and Anthony F. Earley, Jr., Geisha J. Williams, Nickolas Stavropoulos, Julie M. Kane, Christopher P. Johns, and Patrick M. Hogan (collectively, the "Individual Defendants" and together with PG&E, the "Defendants") based upon personal knowledge as to Lead Plaintiff's own acts, and upon information and belief as to all other matters. Lead Plaintiff's information and belief is based on the investigation conducted by and through its attorneys, which included a review of the Company's Securities and Exchange Commission ("SEC") filings, conference call transcripts and press releases; media and analyst reports about the Company; and other public information regarding the Defendants. Lead Plaintiff believes that substantial additional evidentiary support for the allegations set forth herein will be produced through discovery.

## I.      INTRODUCTION

### A.      Summary of the Case

1.      This federal securities class action arises out of the false and misleading statements that Defendants made to investors from April 29, 2015 through November 15, 2018 (the "Class Period") to conceal the Company's lax wildfire safety practices, including its numerous and widespread violations of California safety regulations for power lines. PG&E's ability to maintain safe power lines, compliant with California safety regulations, is vital to the Company's financial health. One of the most important functions PG&E must perform in this respect is clearing vegetation, including dead or dying trees, away from its power lines as required by California law.  As of July 16, 2018, another important safety regulation requires PG&E to temporarily shut off its power lines when certain dangerous conditions are met that make an area susceptible to wildfires, including high wind speed and low humidity.  PG&E's failure to follow these safety requirements resulted in numerous and widespread wildfires in October 2017 and November 2018, causing enormous loss of life and destruction of property.

1    Among these fires was the Camp Fire, the deadliest and most destructive wildfire California has

2    ever faced.

3          2.      Because of PG&E's history of causing wildfires and California's drought

4    conditions, Defendants knew it was essential to assure investors that the Company's wildfire

5    safety measures were adequate and that it complied with applicable laws and regulations.

6          **B.    PG&E's Failure to Comply with Safety Regulations Proximately Caused
             Wildfires in 2017 and Investors' Consequent Losses**

7

8          3.      Throughout the Class Period (April 29, 2015 through November 15, 2018),

     Defendants wanted investors to believe that PG&E was not cutting corners with its vegetation

9

10   management. So PG&E repeatedly represented to its investors that:

11   • "***PG&E's Vegetation Management***" was "***in compliance with relevant laws***";

12   • Its "***vegetation management program . . . compl[ies] with state and federal***

13      ***regulations***";

14   • "***PG&E follows all applicable federal and state vegetation clearance requirements***" to

        "***help to reduce*** outages or ***fires caused by trees or other vegetation***"; and

15

16   • "***PG&E meets or exceeds all applicable federal and state vegetation clearance***

        ***requirements***."[1]

17

18         4.      These statements, and others, were materially false and misleading because they

19   misrepresented PG&E's level of compliance with California law, and consequently the extent to

     which shareholders would be exposed to liability for damages caused by wildfires.

20

21         5.      The fraud began to unravel when investors learned about PG&E's responsibility –

22   and liability – for the wildfires that devastated Northern California in October 2017 (the "North

     Bay Fires").[2] These fires burned approximately 249,000 acres, destroyed 8,898 structures, and

23

24   killed 44 people across nine counties: Napa, Sonoma, Mendocino, Lake, Humboldt, Butte,

25   ───────────────

26   [1] The statements made by Defendants that are ***bolded and italicized*** are the statements alleged
     to be false and misleading. All other emphasis is in **bold**.

27   [2] There may have been as many as 170 individual fires, but many smaller fires combined into
     larger fires as they burned. Taking that into consideration, the North Bay Fires consisted of

28   eighteen main fires.

─────────────────────────────

1   Nevada, Solano, and Yuba. They resulted in damages estimated at **more than $17 billion**.[3] The

2   size of this liability imperiled the financial viability of the Company. In fact, several of

3   Defendants' false and misleading statements were made in the months before PG&E openly

4   expressed its fear that its liability for the North Bay Fires could send the Company into

5   bankruptcy.

6      6. Of the **seventeen** main North Bay Fires for which the State of California's

7   investigation has been completed by the California Department of Forestry and Fire Protection

8   ("Cal Fire"), the truth emerged over time that **all seventeen** were caused by PG&E equipment.

9   Cal Fire has not found a single instance where one of the North Bay Fires was caused by arson,

10  lightning, fireworks, hikers, children playing with matches, or any other such cause.  Instead, Cal

11  Fire has determined that **eleven** of these fires, across seven counties, evidenced violations of

12  California safety regulations – contradicting Defendants' false representations of compliance

13  with those regulations. California's investigation into the eighteenth and final North Bay Fire

14  (the Tubbs Fire, which was the largest and most destructive) remains ongoing.

15     7. Defendants' false and misleading misrepresentations and omissions came at a

16  crucial time for the Company. As described below, over the past three decades, PG&E caused a

17  series of wildfires and other disasters in California. For example, in September 2015, its

18  violations of California safety regulations regarding vegetation clearance caused a wildfire

19  known as the "Butte Fire," which burned over 70,000 acres, destroyed 921 structures, and killed

20  two people – making it then the seventh most destructive wildfire in California history.

21     8. Revealingly, just months before the North Bay Fires began, in an April 2017 non-

22  public deposition concerning PG&E's responsibility for the Butte Fire, a PG&E Vegetation

23  Program Manager named Richard Yarnell admitted: "PG&E—to the best of my knowledge, **we**

24  **have not made any changes as a result of this fire**." Thus, despite being on notice of its

25

26    [3] This $17 billion estimate is approximately six times greater than the second most expensive
    California wildfire, the October 1991 Tunnel Fire in Oakland, which, according to a May 27,

27  2011 article in *Scientific American*, caused $2.687 billion in insured property damage.
    https://www.scientificamerican.com/article/graphic-science-how-much-do-fires-cost-property-

28  damage/ (last visited Dec. 12, 2018)

---

dangerous safety violations and their deadly consequences, neither the Company nor its officers took any steps to improve safety or compliance between the Butte Fire and the far more disastrous North Bay Fires. Over this time period, Defendants either knew or should have known that the Company's wildfire-related safety violations continued unabated.

9.    Though the North Bay Fires began on a windy night, they were not the result of an unexpected or unique event. Rather, the circumstance of PG&E causing seventeen (or more) concurrent fires across **nine counties** shows that the Company tolerated numerous and widespread violations of California safety regulations across its territory. As detailed herein, the underlying explanation for these near-simultaneous North Bay Fires is neither unusual weather nor coincidence, but PG&E's failure to comply with even minimal legal requirements. Accordingly, PG&E and its officers knew, or deliberately disregarded, that the Company's power lines were often not in compliance with California safety requirements when making false and misleading statements to the contrary.

**C.    PG&E's Failure to Prioritize Safety Continued Unabated, Proximately Causing a Disastrous Wildfire in November 2018 as Well as Further Investor Losses**

**1.    PG&E Continued to Make False and Misleading Statements and Omissions**

10.    After the public learned of PG&E's responsibility for the North Bay Fires, the Company faced a new crisis: the widespread belief that it failed to prioritize safety in maintaining its power lines and preventing wildfires.  It also faced a financial crisis, as its liabilities for the North Bay Fires threatened to bankrupt the Company.

11.    As a result, PG&E needed the public, including investors, to believe that it would prioritize safety thereafter.  So when Cal Fire announced its conclusions that PG&E caused the preponderance of the North Bay Fires (on June 8, 2018), and PG&E's share price continued to decline as its financial situation deteriorated, PG&E responded that same day by reassuring its investors that, *e.g.*:

4

1   • Its "***Programs Overall Met [California]'s High Standards***," including "***Vegetation***
2   ***Management***," and "***meets or exceeds regulatory requirements for pole integrity***
3   ***management***";

4   • "To address the growing threats posed by wildfires and extreme weather, and in light of
5   the wildfires throughout our state last year, ***PG&E has launched . . . a program to***
6   ***proactively turn off electric power for safety when extreme fire danger conditions***
7   ***occur***";

8   12.   Indeed, one month later, on July 16, 2018, PG&E's primary state regulator
9   **mandated** that PG&E formalize and publicize its protocol for proactively turning off its power
10  lines to prevent further wildfires, enacting a regulation known as Resolution ESRB-8.  The
11  Company announced its response to this new safety requirement on or about September 27, 2018
12  (the "ESRB-8 Shutoff Protocol"), including:

13  • "PG&E's Community Wildfire Safety Program implements additional precautionary
14  measures intended to reduce wildfire threats. ***It includes . . . executing protocols to***
15  ***temporarily turn off electric power for safety when extreme fire danger conditions are***
16  ***occurring***."

17  • "***PG&E has created a set of procedures for . . . [d]etermining what combination of***
18  ***conditions necessitates turning off lines for safety***."

19  13.   While the Company was finalizing its protocol, on September 21, 2018,
20  California enacted S.B. 901, a law to rescue PG&E from the threat of bankruptcy due to its
21  responsibility for the North Bay Fires. The resulting law put in place a financial stress test to
22  monitor PG&E's financial health, as well as a method to raise capital should PG&E's liability for
23  the North Bay Fires cause it to fail the test.  The same law made it less likely that PG&E would
24  bear the costs of wildfires it caused in 2019 or later.

25  14.   However, the new law did not help the Company bear the financial consequences
26  of any wildfires it might cause in the remaining months of 2018.

27

28

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO. 3-18-CV-03509-RS

5

15.     Put differently, PG&E's vegetation management, proactive power line shutoff program, and other touted means of safety compliance would have to ensure wildfire safety for the remainder of 2018.

16.     PG&E continued to assure the public that it had implemented these measures successfully.  For example, when the news broke on October 9, 2018 that Cal Fire had concluded PG&E was the cause of yet another one of the prior year's North Bay Fires, the Cascade Fire, the Company attempted to reassure investors by stating:

- "[W]e are continuing to focus on ***implementing additional precautionary measures*** intended to further reduce wildfire threats, such as ***working to remove and reduce dangerous vegetation, improving weather forecasting, upgrading emergency response warnings, [and] making lines and poles stronger in high fire threat areas***, and taking other actions to make our system, and our customers and communities, ***even safer*** in the face of a growing wildfire threat"; and

- "***PG&E has launched . . . a program to proactively turn off electric power for safety when extreme fire danger conditions occur***."

17.     All of the above statements, and others, were materially false and misleading because PG&E had **not** meaningfully improved its safety practices—as would soon be revealed by a wildfire even more devastating than any of the North Bay Fires.  By pitching the statements to convince the investing public that PG&E had resolved its safety failures and would prioritize safety thereafter, Defendants concealed the true extent to which the Company was exposed to liability for causing further wildfires, inflating PG&E's share price.

### 2.     Evidence Emerged that a Defective PG&E Electrical Transmission Line Tower, and Vegetation Underneath, Caused the Camp Fire

18.     This continuation of the fraud unraveled when evidence emerged that PG&E was responsible for the Camp Fire, which devastated Northern California in November 2018, burning 153,336 acres, destroying 18,793 structures, and killing at least 86 people[4] – with 3 people still

---

[4] http://www.fire.ca.gov/current_incidents/incidentdetails/Index/2277 (last visited Dec. 12, 2018)

1 | unaccounted for.[5]  It has resulted in damages estimated up to $13 billion.  The Camp Fire is the

2 | single most destructive and deadliest fire in California history.

3 |      19.     The Camp Fire began when a PG&E electrical tower – carrying a high-voltage

4 | 115 kilovolt transmission line – failed.  PG&E has also acknowledged a second ignition point for

5 | the Camp Fire that exhibited damaged and downed poles, vegetation on top of downed wires,

6 | and other signs of safety violations.

7 |      20.     As a result, vegetation underneath the lines ignited at two ignition points

8 | approximately 30 minutes apart.  PG&E's failure to remove such vegetation violated California

9 | Public Resources Code §4293, and its failure to maintain the integrity of its poles and towers

10 | violated California Public Utilities Code §451.

11 |      21.     Starting with two PG&E admissions at the end of the day the Camp Fire began, it

12 | emerged that PG&E's promises to prioritize safety over customer complaints were false and

13 | misleading.  PG&E's statements promoting its ESRB-8 Shutoff Protocol encapsulated this

14 | prioritization by promising to shut off electricity broadly rather than risk further wildfires.  Soon,

15 | however, it emerged that PG&E's ESRB-8 Shutoff Protocol was illusory: the protocol dictated

16 | that the electrical lines that caused the Camp Fire **should have been shut off, but PG&E**

17 | **flouted it.** Investors learned not only that PG&E's ESRB-8 Shutoff Protocol should have

18 | prevented the fire entirely, but also that PG&E needlessly imperiled lives rather than risk

19 | upsetting customers.

20 |      22.     PG&E would later attempt to justify its inaction by claiming that its ESRB-8

21 | Shutoff Protocol did not apply to high-voltage transmission lines like the one that caused the

22 | Camp Fire.  However, Plaintiff's investigation has uncovered that this explanation is

23 | demonstrably false.  The fact is that PG&E's ESRB-8 Shutoff Protocol would have prevented the

24 | Camp Fire if only it were followed.  The Company's attempt to cover it up substantiates not only

25 | that PG&E's safety failures caused the Camp Fire, but further that PG&E's false and misleading

26 |

27 |

28 |     [5] https://www.chicoer.com/2018/12/09/editorial-list-helped-camp-fires-lost-get-found/ (last visited Dec. 12, 2018)

1   statements—concealing how the Company was not sufficiently prioritizing safety— were made

2   with knowledge of their falsity or at least deliberate recklessness.

3        23.     Accordingly, the true risks leading to the Camp Fire were concealed by PG&E's

4   materially false and misleading statements assuring investors of the Company's compliance with

5   California safety regulations, including the ESRB-8 Shutoff Protocol.

6        **D.**    **Claims Being Asserted**

7        24.     Notwithstanding PG&E's false and misleading statements to the marketplace,

8   investors learned over time that PG&E's safety violations were responsible for most of the North

9   Bay Fires. As this information emerged between October 12, 2017 and November 15, 2018,

10   investors were surprised, given Defendants' numerous public statements during the Class Period

11   touting the Company's compliance, safety measures, and its intertwined financial health. As the

12   truth regarding PG&E's inadequate safety measures came to light, PG&E's artificially inflated

13   share price dropped significantly. Thus, as a result of Defendants' wrongful acts and omissions,

14   Lead Plaintiff and other Class members have suffered significant damages.

15        25.     Lead Plaintiff asserts the claims herein against PG&E and certain of its executives

16   and officers, seeking to recover for its damages suffered due to these declines in PG&E's

17   publicly traded securities. The action is brought on behalf of a class of all persons and entities

18   that purchased or otherwise acquired PG&E publicly traded securities during the period from

19   April 29, 2015 through November 15, 2018, inclusive (the "Class Period"). Excluded from the

20   class are: (i) Defendants; (ii) members of the immediate family of any Individual Defendant; (iii)

21   any person who was an officer or director of PG&E during the Class Period; (iv) any firm, trust,

22   corporation, or other entity in which any Defendant has or had a controlling interest; (v) PG&E's

23   employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they

24   made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs,

25   successors-in-interest, or assigns of any such excluded person. Lead Plaintiff seeks to recover

26   compensable damages caused by Defendants' violations of the federal securities laws and to

27   pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the

28   "Exchange Act") and Rule 10b-5 promulgated thereunder.

---

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO. 3:18-CV-03509-RS

8

26.     PG&E's statements of compliance with safety regulations during the Class Period misrepresented current facts and were not statements of opinion.

## II.     JURISDICTION AND VENUE

27.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

28.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and Section 27 of the Exchange Act.

29.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as PG&E's principal executive offices are located within this Judicial District.

30.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## III.     PARTIES

31.     Lead Plaintiff PERA was established in 1947 and manages a retirement system for state, county, and municipal employees including police, firefighters, judges, magistrates, legislators and volunteer firefighters. PERA oversees assets of more than $15 billion on behalf of its members, retirees, and beneficiaries. As set forth in the Certification accompanying the motion for appointment as Lead Plaintiff (ECF No. 29), PERA purchased securities of PG&E at artificially inflated prices during the Class Period and was damaged as the result of Defendants' wrongdoing as alleged in this Complaint. On September 10, 2018, this Court appointed PERA to serve as the Lead Plaintiff in this action pursuant to the Private Securities Litigation Reform Act of 1995 (the "PSLRA").

32.     Defendant PG&E Corporation is a publicly traded corporation that is headquartered in San Francisco, California, with principal executive offices located at 77 Beale Street, P.O. Box 770000, San Francisco, California 94177. PG&E's securities trade on the New

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO. 3-18-CV-03509-RS

9

1    York Stock Exchange ("NYSE") under the ticker symbol "PCG." It is a holding company that

2    holds, directs the actions of, and controls energy-based businesses such as the Utility.

3         33.    Defendant Utility, the Pacific Gas and Electric Company, is a wholly-owned

4    subsidiary of PG&E and operates as a public utility in California. It generates revenue by selling

5    and delivering electricity and natural gas to its customers, also known as "rate-payers." The

6    Utility effectively acts as an alter ego of PG&E; the two entities share the same address, have

7    overlapping directors, intermix finances, and file joint annual reports with the SEC on Form 10-

8    K. Indeed, all of the Utility's shares are owned by PG&E.  Alternatively, PG&E Corporation

9    controls the Utility as detailed herein.  Accordingly, this Complaint refers to the Utility and

10   PG&E interchangeably as "PG&E" or the "Company," unless otherwise specified.

11        34.    Defendant Anthony F. Earley, Jr. ("Earley") served as PG&E Corporation's

12   President, Chief Executive Officer ("CEO"), and Chairman of the Board from September 13,

13   2011 to March 1, 2017, and as its Executive Chairman from March 1, 2017 to December 2017.

14        35.    Defendant Geisha J. Williams ("Williams") has served as PG&E Corporation's

15   CEO and President since March 1, 2017, and served as the President of Electric Operations at the

16   Utility from August 17, 2015 to February 28, 2017. Prior to that, she served as Executive Vice

17   President of Electric Operations at the Utility from June 1, 2011 to August 16, 2015.

18        36.    Defendant Nickolas Stavropoulos ("Stavropoulos") served as the President and

19   COO of PG&E Corporation from March 1, 2017 to September 30, 2018, and served as President

20   of Gas Operations at the Utility from August 17, 2015 to February 28, 2017. Prior to that, he

21   served as Executive Vice President of Gas Operations at the Utility from June 13, 2011 to

22   August 16, 2015.

23        37.    Defendant Julie M. Kane ("Kane") has served as Senior Vice President, Chief

24   Ethics and Compliance Officer, and Deputy General Counsel for PG&E Corporation since May

25   18, 2015. Kane is named as a Defendant solely in her capacity as Chief Ethics and Compliance

26   Officer.

27        38.    Defendant Christopher P. Johns ("Johns") served as the President of Pacific Gas

28   and Electric Company from August 1, 2009 to August 17, 2015.

39.     Defendant Patrick M. Hogan has served as the Utility's Senior Vice President of Electric Operations from March 2016 through the present, and previously served as the Utility's Vice President of Electric Operations Asset Management from November 2013 through February 2016.

40.     The Defendants referenced above in ¶¶32-39 are referred to herein as the "Individual Defendants."

41.     The Individual Defendants, because of their high-level positions of control and authority as senior executive officers of PG&E, possessed the power and authority to control, and did ultimately control, the contents of PG&E's SEC filings, press releases, content on the Company's website and official Twitter.com account, and other market communications during the Class Period. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions within the Company and/or Utility, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     PG&E Operates Within a Robust Legal Regime

42.     As detailed herein, electricity transmission and distribution is a heavily regulated industry in California.

#### 1.     California Law Required PG&E to Maintain a Safe Distance Between Its Electrical Equipment and Nearby Vegetation

43.     To ensure public safety from wildfires, California has laws and regulations that require PG&E to keep its electrical equipment clear from vegetation growth or hazardous trees, and otherwise safe.

44.     Pursuant to California Public Resources Code §4292, for instance:

1
2
3
4
5
6

> [A]ny person that owns, controls, operates, or maintains any electrical transmission or distribution line upon any mountainous land, or forest-covered land, brush-covered land, or grass-covered land shall, during such times and in such areas as are determined to be necessary by the director or the agency which has primary responsibility for fire protection of such areas, maintain around and adjacent to any pole or tower which supports a switch, fuse, transformer, lightning arrester, line junction, or dead end or corner pole, a firebreak which consists of a clearing of not less than 10 feet in each direction from the outer circumference of such pole or tower.

7    45.    Similarly, California Public Resources Code §4293 provides that:

8
9
10
11
12
13
14
15
16
17
18

> [A]ny person that owns, controls, operates, or maintains any electrical transmission or distribution line upon any mountainous land, or in forest-covered land, brush-covered land, or grass-covered land shall, during such times and in such areas as are determined to be necessary by the director or the agency which has primary responsibility for the fire protection of such areas, maintain a clearance of the respective distances which are specified in this section in all directions between all vegetation and all conductors which are carrying electric current: (a) For any line which is operating at 2,400 or more volts, but less than 72,000 volts, four feet. (b) For any line which is operating at 72,000 or more volts, but less than 110,000 volts, six feet. (c) For any line which is operating at 110,000 or more volts, 10 feet. In every case, such distance shall be sufficiently great to furnish the required clearance at any position of the wire, or conductor when the adjacent air temperature is 120 degrees Fahrenheit, or less. **Dead trees, old decadent or rotten trees, trees weakened by decay or disease and trees or portions thereof that are leaning toward the line which may contact the line from the side or may fall on the line shall be felled, cut, or trimmed so as to remove such hazard**.

19    46.    Under California Public Utilities Code §451, PG&E was further required to

20 "furnish and maintain such adequate, efficient, just, and reasonable service, instrumentalities,

21 equipment, and facilities, including telephone facilities, as defined in Section 54.1 of the Civil

22 Code, as are necessary to promote the safety, health, comfort, and convenience of its patrons,

23 employees, and the public."

24          **2.    California Law Required PG&E to Safely Maintain Its Electrical Equipment and Infrastructure**

25    47.    In addition to the vegetation management regulations discussed above, California

26 laws and regulations further require PG&E to safely maintain its electrical equipment and

27
28

---

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO. 3-18-CV-03509-RS

12

1    infrastructure, including an obligation to maintain the towers and poles that carry its transmission

2    and distribution lines.

3         48.    Pursuant to California Public Utilities Code §451:

4              Every public utility shall furnish and maintain such adequate,
               efficient, just, and reasonable service, instrumentalities, equipment,
5              and facilities, including telephone facilities, as defined in Section
               54.1 of the Civil Code, as are necessary to promote the safety,
6              health, comfort, and convenience of its patrons, employees, and the
               public.

7         49.    California Health & Safety Code §13007 further provides:

8              Any person who personally or through another wilfully,
9              negligently, or in violation of law, sets fire to, allows fire to be set
               to, or allows a fire kindled or attended by him to escape to, the
10             property of another, whether privately or publicly owned, is liable
               to the owner of such property for any damages to the property
11             caused by the fire.

12        50.    Accordingly, California law required PG&E to maintain its electrical equipment

13   and infrastructure, including electrical towers and poles, sufficiently to prevent wildfires from

14   being caused by the failure of its towers and poles.

15              **3.    PG&E Is Regulated by the CPUC**

16        51.    PG&E's primary regulator is the California Public Utilities Commission

17   ("CPUC"). The CPUC promulgates safety regulations and adjudicates PG&E's annual General

18   Rate Cases – essentially determining which costs PG&E may pass on to rate-payers, and which

19   costs PG&E must bear. The CPUC was created under Article XII of the California State

20   Constitution, and derives its regulatory authority from Section 701 of the California Public

21   Utilities Code.

22              **(a)    CPUC's General Orders 95 and 165 Impose Strict Safety
                         Regulations on PG&E**

23

24        52.    Pursuant to CPUC General Order 95, Rule 35, PG&E was required "to establish

25   necessary and reasonable clearances" between overhead conductors and nearby vegetation, with

     certain "minimum clearances" set forth by CPUC. Furthermore, this rule required that:

26
               When a supply or communication company has actual knowledge,
27             obtained either through normal operating practices or notification
               to the company, that dead, rotten or diseased trees or dead, rotten
28             or diseased portions of otherwise healthy trees overhang or lean

1  
2  

        toward and may fall into a span of supply or communication lines, said trees or portions thereof should be removed.

3  

        * * *

4  
5  
6  

        When a supply or communication company has actual knowledge, obtained either through normal operating practices or notification to the company, that its circuit energized at 750 volts or less shows strain or evidences abrasion from vegetation contact, the condition shall be corrected by reducing conductor tension, rearranging or replacing the conductor, pruning the vegetation, or placing mechanical protection on the conductor(s).

7  

       53.    CPUC General Order 95 provides further details regarding the maintenance and

8  

upkeep of PG&E's power lines and infrastructure. Among other things, it provides that "[a]ll

9  

lines and portions of lines shall be maintained in such condition as to provide safety factors not

10  

less than those specified in Rule 44.3." Rule 44, in turn, details the safety factors that apply to

11  

"Poles Towers and Structures," and provides that "[i]n no case shall the application of this rule

12  

be held to permit the use of structures or any member of any structure with a safety factor less

13  

than one." This order further provides certain requirements intended to, among other things,

14  

guard against corrosion.[6]

15  
16  

       54.    Pursuant to CPUC General Order 165, PG&E must also follow certain

17  

"requirements for electric distribution and transmission facilities (excluding those facilities

18  

contained in a substation) regarding inspections in order to ensure safe and high-quality electrical

19  

service." In relevant part, General Order 165 requires that: "Each utility subject to this General

20  

Order shall conduct inspections of its distribution facilities, as necessary, to ensure reliable, high-

21  

quality, and safe operation."[7]

22  

      **(b)**    **CPUC's Resolution ESRB-8 Imposes on PG&E an Obligation to Adopt, Promulgate and Follow the ESRB-8 Shutoff Protocol**

23  

       55.    On July 16, 2018, the CPUC issued Resolution ESRB-8. Recognizing that the

24  

"2017 California wildfire season was the most destructive wildfire season on record," the

25  

---

26  

    [6] http://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M217/K418/217418779.pdf (last

27  

visited Dec. 12, 2018).

    [7] http://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M209/K552/209552704.pdf (last

28  

visited Dec. 12, 2018).

1   resolution required California's utilities, including PG&E, to adopt, promulgate and follow "de-

2   energization policy and procedures" pursuant to which each utility will "de-energize power

3   lines" as a means to mitigate wildfire risks "to ensure public safety."  It further established

4   notification, mitigation, and reporting requirements.

5        56.   Resolution ESRB-8 included the following directives:

6   PROPOSED OUTCOME:
    This Resolution extends the de-energization reasonableness, public

7   notification, mitigation and reporting requirements in Decision
    (D.) 12-04-024 to all electric Investor Owned Utilities (IOUs)

8   [including PG&E] and adds new requirements.  It also places a
    requirement on utilities to make all feasible and appropriate

9   attempts to notify customers of a de-energization event prior to
    performing de-energization.

10

11  SAFETY CONSIDERATIONS:
    De-energizing electric facilities during dangerous conditions can

12  save lives and property and can prevent wildfires. This resolution
    provides guidelines that IOUs must follow and strengthens public

13  safety requirements when an IOU decides to de-energize its
    facilities during dangerous conditions.

14                    *        *        *

15  PG&E reports that prior to 2018, it did not have a policy to de-
    energize lines as a fire prevention measure. PG&E reported that it

16  did not proactively de-energize lines due to extreme fire weather
    conditions in 2017. However, in March 2018 PG&E announced

17  that it is developing a program to de-energize lines during periods
    of extreme fire conditions and has been meeting with local

18  communities to gather feedback.

19                    *        *        *

20      ▪   The IOU shall ensure that de-energization policies and
            procedures are well-communicated and made publicly

21          available, including the following:

22              •   **Make available and post a summary of de-
                    energization policies and procedures on its**

23                  **website**.

24              •   Meet with representatives from local communities
                    that may be affected by de-energization events,

25                  before putting the practice in effect in a particular
                    area.

26

27              •   Provide its de-energization and restoration policy **in
                    full**, and in summary form, to the affected

28                  community officials before de-energizing its
                    circuits.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                      15
CIVIL ACTION NO. 3-18-CV-03509-RS

1                    \*       \*      \*

2            De-energization of electric facilities could save lives, protect
property, and prevent fires.

3

                **(c)**      **PG&E Must Follow CPUC's Regulations Under Penalty of**

4                           **Law**

5         57.      The CPUC's regulations have the full force of law, and PG&E has a legal

6 obligation to follow them, including the general orders and resolutions listed above, under

7 penalty of law.

8         58.      For example, California Public Utilities Code §702 provides that:

9            Every public utility shall obey and comply with every order,
decision, direction, or rule made or prescribed by the commission

10            in the matters specified in this part, or any other matter in any way
relating to or affecting its business as a public utility, and shall do

11            everything necessary or proper to secure compliance therewith by
all of its officers, agents, and employees.

12

13         59.      Further, under California Public Utilities Code §2106:

14            Any public utility which does, causes to be done, or permits any
act, matter, or thing prohibited or declared unlawful, or which

15            omits to do any act, matter, or thing required to be done, either by
the Constitution, any law of this State, or any order or decision of

16            the commission, shall be liable to the persons or corporations
affected thereby for all loss, damages, or injury caused thereby or
resulting therefrom. If the court finds that the act or omission was

17            wilful, it may, in addition to the actual damages, award exemplary
damages.

18

                **4.**       **Cal Fire Is the Duly Authorized Investigative Arm of the State of**

19                           **California for Wildfires**

20         60.      The California Department of Forestry and Fire Protection ("Cal Fire") is an

21 agency of the State of California that, pursuant to Title 14 of California's Code of Regulations, is

22 administratively in charge of both the state's fire departments and its law enforcement related to

23 state fire and forest laws. As a result, it is responsible for both fighting fires as they occur and for

24 investigating the causes of fires after they have been contained. Cal Fire conducts official

25 investigations as an arm of the State of California to determine the causes of wildfires within the

26 state, as well as any violations of state laws and regulations.

27         61.      Pursuant to an agreement with the U.S. Department of the Interior and the U.S.

28 Department of Agriculture, Cal Fire is the state agency that is authorized to make fire cause and

---

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                     16
CIVIL ACTION NO. 3:18-CV-03509-RS

origin determinations for wildfires – such as the North Bay fires and Camp Fire – that fall within its jurisdiction.

> **5.** **Under California's Inverse Condemnation Law, PG&E Would Not Bear the Cost of Wildfires It Causes If It Could Prove That It Acted Reasonably and Prudently**

62.     The California Supreme Court has interpreted Article 1, Section 19 of the California Constitution as imposing a doctrine known as "inverse condemnation," whereby public utilities such as PG&E are required to compensate individuals whose real property has been damaged by the utility under a strict liability regime. However, importantly, a utility such as PG&E is able to recover those same costs from the CPUC – effectively passing the costs from the shareholders to the rate payers – if it can "affirmatively prove that it reasonably and prudently operated and managed its system." Order Denying Rehearing of Decision (D.) 17-11-033 at 3, App. of SDG&E for Authorization to Recover Costs Related to the 2007 Southern Cal. Wildfires Recorded in the Wildfire Expense Memo Account, App. No. 15-09-010, Decision 18-07-025 (July 12, 2018).

63.     In other words, PG&E bears the costs of wildfires it causes unless it can prove that it was "reasonable and prudent," meaning "that at a particular time any of the practices, methods, and acts engaged in by a utility follows the exercise of reasonable judgment in light of facts known or which should have been known at the time the decision was made." *Id.* Embodied in this standard, at minimum, is compliance with state safety laws and regulations.

> **B.** **PG&E's Vegetation Management Expenditures Did Not Materially Change from Year to Year During the Class Period, Let Alone Double at Any Point**

64.     The State of California declared a state of emergency due to drought conditions in January 2014,[8] which ended in April 2017.[9] In October 2015, California also declared a state of emergency regarding tree mortality due to both the ongoing effects of the drought and an

---

[8] https://www.gov.ca.gov/2014/01/17/news18368/ (last visited Dec. 12, 2018).
[9] https://www.gov.ca.gov/2017/04/07/news19747/ (last visited Dec. 12, 2018).

1  epidemic of insect infestations causing millions of trees to die annually.[10] These conditions

2  significantly increased the danger of wildfires in the North Bay region of California. PG&E

3  knew about these conditions and its obligations to ensure safety from wildfires in spite of these

4  environmental factors. For example, the "Proclamation of a State of Emergency" regarding tree

5  mortality made explicit: **"[U]tilities . . . to the extent required by their existing**

6  **responsibilities to protect the public health and safety, shall undertake efforts to remove**

7  **dead or dying trees in these high hazard zones that threaten power lines**. . . ."

8       65.    Based on information released by CPUC, PG&E spent $194,094,406 on

9  vegetation management in 2015, $198,735,579 in 2016, and $201,456,193 in 2017 – increases of

10  only 2.4% and 1.4%, respectively.[11] Each year's spending was substantially identical to the

11  amounts PG&E requested, and the amounts CPUC approved, in PG&E's 2015, 2016, and 2017

12  General Rate Cases – notwithstanding the state of emergency directive above. In contrast,

13  inflation rose 5.48% over the same three-year period.[12] Thus, PG&E's spending did not even

14  keep pace with inflation during the Class Period.

15       66.    CPUC released the following chart confirming that PG&E's vegetation

16  management spending underwent only modest increases over the relevant time period:

---

24     [10] https://www.gov.ca.gov/wp-content/uploads/2017/09/10.30.15_Tree_Mortality_State_of_Emergency.pdf  (last visited Dec. 12, 2018).

25  [11] https://www.pge.com/tariffs/tm2/pdf/ELEC_4827-E.pdf  (last visited Dec. 12, 2018);

26  https://www.pge.com/tariffs/assets/pdf/adviceletter/ELEC_5036-E.pdf  (last visited Dec. 12, 2018); https://www.pge.com/tariffs/assets/pdf/adviceletter/ELEC_5402-E.pdf  (last visited Dec. 12, 2018)

28     [12] https://www.bls.gov/data/inflation_calculator.htm (last visited Dec. 14, 2018).

**Table showing 2011-2017 history of PG&E annual spending ($ million) on vegetation management**

|      | PG&E Requested | CPUC Authorized | PG&E Spent |
|------|----------------|-----------------|------------|
| 2017 | $201.0 | $201.0 | *$150.4 YTD* |
| 2016 | $198.8 | $198.8 | $198.7 |
| 2015 | $194.2 | $194.2 | $194.1 |
| 2014 | $190.0 | $190.0 | $189.7 |
| 2013 | $180.0 | $161.5 | $161.6 |
| 2012 | $180.0 | $161.5 | $161.5 |
| 2011 | $180.0 | $161.5 | $161.6 |

67.     While Defendants falsely represented on November 2, 2017 that PG&E "*doubled*" vegetation management expenditures in 2016 (*see* ¶¶208 & 211), tellingly, they made this claim only after the North Bay Fires. At no point did the Company identify any specific budget item indicating that its vegetation management budget had, in fact, doubled.

68.     In fact, it was only after the Camp Fire that PG&E announced in December 2018 that it plans to spend an additional $5 billion on wildfire safety programs over five years, with a focus on improving its vegetation management efforts. This post-Class-Period development strongly supports the inference that the Company's previous vegetation management expenditures of around $200 million per year had been dangerously inadequate.[13]

**C.      PG&E's Tree Trimming and Removal Did Not Come Close to Doubling During the Class Period**

69.     Nor did the Company's reported numbers for trees that it trimmed or removed double during this time period, or come close to doubling. During the Class Period, the Company touted the results of its vegetation management expenditures, slowly inflating the numbers it was reporting. Initially, it touted that its tree trimming and removal amounted to "**1.2 million trees**" total (November 18, 2015, statement of Hogan) or generally "**more than 1 million trees each year**" (May 4, 2016, statement of Earley). At first, it stated that these totals included "about

---

[13] http://www.ktvu.com/news/pg-e-asking-state-regulators-to-charge-customers-up-to-12-more-a-month (last visited Dec. 14, 2018).

**236,000 dead or dying trees**" as "part of its comprehensive response to tree mortality in the state" (May 3, 2017, Press Release).

70.     Soon, however, it was touting that 2016's "**236,000 dead or dying trees**" removed were "in addition to the **1.2 million trees** that PG&E works **each year**" (May 10, 2017, Press Release).

**D.     After the North Bay Fires, PG&E Started Reporting Inflated Numbers for Tree Removal**

71.     Then, after the North Bay Fires, PG&E's numbers crept up by 100,000 trees: "Typically, we spend about **$200 million** every year to line clear or remove **1.3 million trees** to mitigate both the risk of wildfires and to prevent electric outages" **in addition to** the "**incremental 236,000 dead or dying trees**" (November 2, 2017, statement of Williams). This is the same statement where PG&E began to falsely and/or misleadingly tout to investors that it had "*doubl[ed]*" vegetation management expenditures in 2016, *i.e.*, to $400 million (*see* ¶205, *infra*).

72.     Then, when negative news emerged on May 25, 2018 about PG&E's safety violations causing many of the North Bay Fires, the Company's reported number of cleared trees crept up by another 100,000 trees: "Under PG&E's industry-leading Vegetation Management Program, we . . . prune or remove approximately **1.4 million trees annually**" (May 25, 2018, press release).

**E.     PG&E Concealed Its Unsafe Use of Reclosers During the Class Period**

**1.     PG&E Used Reclosers to Prioritize Convenience Over Safety**

73.      "Reclosers" are devices that are affixed to power line poles, to send pulses of electricity into lines when service has become briefly interrupted (*i.e.*, an outage). Although reclosers can in some instances prevent blackouts, it is well known in the industry that they are dangerous in certain circumstances. For instance, if a power line has come into contact with nearby vegetation, it would be dangerous to send an additional pulse of electricity through the line because this could start a fire.

74.     San Diego Gas & Electric Co. and Southern California Edison are two other utility companies that operate in California, along with PG&E. According to a complaint filed in

the state court litigation concerning the North Bay Fires,[14] these two utility companies are aware of the dangers of using reclosers, and they have a practice of blocking reclosers from working during fire season.[15]

75.     Prior to the North Bay Fires, PG&E knew that its reclosers posed a great risk of causing wildfires. PG&E was specifically warned of this hazard in a May 2013 report that the Liberty Consulting Group (the "Liberty Report") submitted to the Safety and Enforcement Division of the CPUC. Moreover, at a November 18, 2015 hearing before the California Senate Sub-Committee on Gas, Electric, and Transportation Safety, the Utility's Vice President of Electrical Operations Asset Management, Defendant Hogan, stated that PG&E had the ability to reprogram its reclosers during fire season so that they did not attempt to restart lines that had been stopped. Hogan acknowledged that shutting down power means "you take the reliability hit, but you gain the wildfire benefit." This statement evidenced that PG&E recognized the downside to disabling its reclosers (because it would increase the risk of blackouts, *i.e.*, the "reliability hit," which would lead to consumer complaints), but that PG&E also understood this measure would improve safety (*i.e.*, the "wildfire benefit").  Unbeknownst to investors, the Company chose reliability over safety.[16]

### 2.     PG&E Concealed Its Use of Reclosers from Investors During the Class Period

76.     On November 18, 2015, Defendant Hogan assured the public that PG&E was "***just about done***" with the process of disabling its recloser devices as of that date. He represented that reclosers would be disabled "***first***" in "***high wildfire risk areas***," followed by

---

[14] https://www.norcalfirelawyers.com/wp-content/uploads/2018/01/atlas-fire.pdf (last visited Dec. 12, 2018).

[15] Wildfire season is a portion of the year, generally 6 to 8 months in the summer and fall in California, declared such by the responsible public agency fire administrator. This declaration is based on fuel and weather conditions conducive to the ignition and spread of wildland fires. http://cdfdata.fire.ca.gov/incidents/incidents_terminology?filter=F (last visited Dec. 12, 2018).

[16] Notably, PG&E's ESRB-8 Shutoff Protocol embodied the same tradeoff.  As a protocol that required PG&E to proactively shut off power when certain conditions were met, it similarly purported to prioritize safety over reliability.  Likewise, a failure to abide by the ESRB-8 Shutoff Protocol would evidence another example of the Company choosing reliability over safety, unbeknownst to investors.

1   "126" of "about 130 some odd locations . . . this year," *i.e.*, 2015, which left only "six for next

2   year."

3          77.     However, PG&E did not disable all of its reclosers during fire season, like San

4   Diego Gas & Electric Co. and Southern California Edison did. Rather, during the time of the

5   North Bay Fires, some of PG&E's devices were programmed to try up to three times to restore

6   power by sparking electricity. Hogan's statement concealed that PG&E kept at least certain of its

7   reclosers dangerously in use in a high wildfire risk area through October 2017: PG&E reclosers

8   were to blame for at least one of the North Bay Fires, known as the Pythian Fire.

9          78.     Notably, State Senator Jerry Hill was quoted by NBC on January 3, 2018 as

10  saying that he felt "misled" by PG&E's executives into believing that the Company had followed

11  the lead of its counterparts and shut off its reclosers in all 132 of its high risk fire areas by the

12  start of 2017:

13          Hill said he was surprised the company's recloser shutdown was so
            limited, given that a top PG&E official assured him back in 2015
14          that the company would be able to shut down reclosers in all 132
            of the high risk fire areas by the start of 2017.
15
            "I think that's the troubling part," Hill said, "that **they misled us in**
16          **that**.

17          "Had they said they did not have that system in place, then we
            would have followed up with more questions to try to find what the
18          problem was -- and may have been able to focus in on that a couple
            of years ago that may have prevented these fires in October."
19
20  Likewise, investors were misled by PG&E's recloser statements.

21          79.     As is discussed in more detail below, it was not until **2018** that PG&E finally

22  committed to disabling these reclosers.[17]

23      **F.      PG&E Engaged in an Unsafe Pattern of Noncompliance with Safety**
                **Requirements Before and Throughout the Class Period**

24          80.     Despite the important safety measures imposed by California law, PG&E has a

25  long history of causing deadly wildfires through its failure to comply with the legal requirements

26

27  _____

    [17] http://cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/News_Room/Public-
28  Safety-Power-Shutoff-Policies-and-Procedures-September-2018.pdf  (last visited Dec. 12, 2018).

_____

1   for vegetation management, pole maintenance, and other safety requirements. Between causing

2   the devastating Trauner Fire in 1994 and the deadly Butte Fire in 2015, PG&E repeatedly

3   violated California's vegetation management laws and other regulations.  PG&E assured

4   investors during the Class Period that it had changed, stating in its 2015, 2016, and 2017

5   Corporate Responsibility and Sustainability Reports that its "vegetation management" was now

6   "*in compliance with relevant laws*" or "*complying with state and federal regulations*."

7          81.     Notably, in its 2018 Corporate Responsibility and Sustainability Report issued

8   **after** the public learned the true causes of the North Bay Fires, PG&E **no longer** represents to

9   investors that its vegetation management complies with California's safety laws.

10             **1.**     **PG&E Was Convicted of Negligence for Starting a Wildfire in 1994**

11          82.     One of the most notable of the pre-Class Period fires was the "Trauner Fire,"

12   where PG&E was convicted of 739 counts of criminal negligence and required to pay $24

13   million in penalties due to the Company's deficient vegetation management systems.[18]

14             **2.**     **PG&E's Unsafe and Knowing Noncompliance with Safety Regulations Continued Through the Class Period**

15

16          83.     Subsequently, PG&E's deficient vegetation management practices ignited other

17   fires, including the Pendola Fire (1999),[19] the Sims Fire (2004), and the Whiskey Fire (2008).

18          84.     Moreover, according to documents released by The Utility Reform Network

19   ("TURN"), PG&E planned to replace a segment of the San Bruno pipeline in 2007 that it had

20   identified as one of the riskiest natural gas pipelines in PG&E's system. PG&E collected $5

21   million from its customers to complete the project by 2009, but instead deferred the project and

22

23

---

24   [18] In 1994, PG&E's failure to maintain vegetation surrounding its electrical equipment caused the Trauner Fire that burned approximately 500 acres, destroyed 12 homes, and burned 22

25   structures in the town of Rough and Ready. The fire began when a power line brushed against a tree limb that PG&E was supposed to keep trimmed. Investigators found numerous safety

26   violations involving contact between vegetation and PG&E's power lines.

27   [19] PG&E paid a $14.75 million settlement to the U.S. Forest Service, and a $22.7 million settlement with CPUC after PG&E had been reprimanded for not spending money that had been

28   earmarked for tree trimming and removal.

repurposed the money to other priorities. On September 9, 2010, the San Bruno pipeline exploded, killing 8 people, injuring over 50 more, and destroying 38 homes.

85.     On August 9, 2016, a California federal jury found PG&E guilty of five criminal felony counts for violating minimum federal safety standards under the Natural Gas Pipeline Safety Act, as well as one count for obstructing an agency proceeding after it failed to provide all of its records to the National Transportation Safety Board during an investigation into the San Bruno explosion.

86.     On December 14, 2018, the CPUC opened a case against PG&E alleging, *inter alia*, that **the Company falsified records and data** concerning the safety of its gas pipelines, did not employ an adequate number of pipeline inspectors, and pressured supervisors to unsafely rush work over a five-year period from 2012 to 2017.  These deliberate efforts to cut corners defraud regulators and the public about the safety of PG&E's utilities continued up to and including the Class Period.  The strong inference is that PG&E's statements concealing the inadequate safety of its electrical utilities, during the Class Period, were also made with a intent to defraud.[20]

### 3.     PG&E's Unsafe, Noncompliant Vegetation Management Caused the Butte Fire in 2015

87.     In 2015, five months after PG&E made Misstatement No. 1, PG&E's vegetation management program once again failed, causing the Butte Fire that killed two people, destroyed 921 homes, and scorched more than 70,000 acres over 22 days.

88.     On April 28, 2016, Cal Fire issued a press release announcing its conclusion that the Butte Fire was caused by PG&E's safety violations, including evidence of negligence. Cal Fire also referred its investigation to the two relevant district attorneys for the counties the Butte Fire burned.

89.     There is currently pending litigation over PG&E's liability for the Butte Fire, including an April 13, 2017 lawsuit in which Cal Fire sued PG&E for $87 million to recover the

---

[20] https://www.mercurynews.com/2018/12/14/pge-accused-of-gas-pipeline-violations-falsifying-records-regulators/ (last visited Dec. 14, 2018).

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                    24
CIVIL ACTION NO. 3-18-CV-03509-RS

1   costs that the agency devoted to fighting that fire. Cal Fire's lawsuit alleges that PG&E

2   negligently caused the Butte Fire by maintaining an inadequate vegetation management system.

    **4.      PG&E's Compliance Measures Allowed More than One Million**
    **Vegetation Management Violations During the Class Period**

3

4

5        90.      Internally, PG&E's numerous and widespread violations of California safety laws

6   are shown by the fact that the Company's internal controls were designed to permit vegetation

7   management violations to go unchecked.  Investigative journalists and attorneys have uncovered

8   that PG&E internally accepts that its vegetation management practices leave 1 of every 100 trees

9   noncompliant with California regulations, and further reportedly "cheats" on its internal

10  compliance reviews, in order to give a misleading impression of compliance with tree clearance

11  requirements when it is in fact noncompliant. According to a report from NBC reporter Jaxon

12  Van Derbeken on November 6, 2017, published a month after the North Bay Fires began,

13  PG&E's own internal inspectors allow one out of 100 trees they check to violate state power line

14  clearance standards:

15          **PG&E auditors allow one out of 100 trees they check to violate**
            **state power line clearance standards**, NBC Bay Area has
            learned.

16

17                                  * * *

18          [I]t emerged during the Butte fire litigation that [internal] auditors
            were giving out a passing grade when one out of 100 trees they
            checked turned out to be too close to power lines under state
            standards.

19

20                                  * * *

21          When [PG&E] failed to reach that 99 percent compliance rate in
            the area around the fire . . . the company just expanded the
            universe of trees covered in a particular audit.

22

23          "So what PG&E does when it doesn't pass, it basically cheats,"
            [Amanda Riddle, one of the attorneys participating in a lawsuit
            against PG&E related to the Butte Fire] said. "It adds more miles
            and more miles until it reaches a passing grade."

24

25

26

27

28

91.     With approximately 123 million trees under PG&E's control,[21] this means approximately 1.2 million trees may not be in compliance with state safety laws at any given time. The measurement of 1.2 million safety violations is a conservative estimate when combined with the detail that PG&E "cheats" to get its rate of violations down to 1%, hence PG&E's real rate of noncompliance may be even higher.

92.     According to the plaintiffs litigating against PG&E for injuries caused by the 2015 Butte Fire, Defendant Hogan's and another PG&E employee's deposition testimony purportedly showed that "PG&E knows and accepts that 1-in-100 trees will be non-compliant, and that 1-in-1000 will be touching its powerlines." Using the same metrics, this means that PG&E knows that it allows approximately 123,000 safety violations in the nature of trees touching its powerlines at any given time.

93.     Thus, PG&E has been on notice for many years that its vegetation management practices did not comply with California safety regulations and never disclosed that their own internal compliance reviews showed a lack of compliance on a huge scale.

94.     According to data released by the CPUC,[22] PG&E equipment caused 1,486 vegetation fires between June 10, 2014 and December 29, 2017.  Among those vegetation fires, 69 were caused by transmission lines like the line implicated in causing the Camp Fire, including 26 fires caused by lines of the exact same high voltage, 115 kilovolts.  PG&E supplied the CPUC with this information under the regulator's Decision 14-02-015, which enacted a "Fire Incident Data Collection Plan."[23]

---

[21] See PG&E's Response to Safety and Enforcement Divisions' 10/14/17 Questions, Oct. 17, 2017, *available at* http://www.cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/Safety/Response%20to%20Data%20Request.pdf (last visited Dec. 12, 2018).

[22] http://www.cpuc.ca.gov/uploadedFiles/CPUC_Website/Content/About_Us/Organization/Divisions/News_and_Outreach_Office/PGE_Fire%20Incident%20Data%202014-2017.pdf (last visited Dec. 12, 2018).

[23] http://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M087/K892/87892306.PDF (last visited Dec. 12, 2018).  Pursuant to the Fire Incident Data Collection Plan, PG&E and other investor-owned electric utilities must "collect and report data to SED regarding power-line fires." *Id.* ("SED" refers to CPUC's  Safety and Enforcement Division).

**5.      PG&E's History of Safety Violations Shows that the Company Knew of Its Numerous and Widespread Violations of California Safety Regulations Throughout the Class Period, But Did Nothing to Change Them**

95.      Even though PG&E suffered from endemic wildfire safety problems, the Company did not meaningfully change its practices even after the deadly Butte Fire that occurred in 2015. As noted above, in a deposition transcript that has not yet been made publicly available, PG&E's Vegetation Program Manager (Stockton Division)[24] Richard Yarnell reportedly testified under oath: "**PG&E—to the best of my knowledge, we have not made any changes as a result of this fire**" as of April 10, 2017. Accordingly, the **known** noncompliance that caused the Butte Fire in 2015 continued unabated throughout the Class Period, contrary to PG&E's public statements.

96.      Moreover, the vegetation management problems detailed herein were institutionally entrenched by certain incentive structures PG&E put in place. According to a lawsuit that was filed in California Superior Court against PG&E on December 21, 2017 (Case No. CGC-17-563293), which asserted claims on behalf of victims of the North Bay Fires, PG&E provided monetary incentives to its employees that had the effect of discouraging the implementation of vegetation safety measures.

97.      For instance, PG&E's Vegetation Management Program adopted a Vegetation Management Incentive Initiative ("VMII") program, which was purportedly designed to reduce the "annual routine compliance" tree work of PG&E and to shift resources to "reliability" work that focused on urban consumer satisfaction instead of overall safety. By doing so, PG&E effectively shifted its resources away from rural areas that were more prone to wildfires (where the "annual routine compliance" work was typically done), and towards more densely populated urban areas (where the "reliability" work was done). For example, pursuant to this program, PG&E set a goal to reduce "routine" work by 7.5% annually from 2014 through 2016. PG&E's

---

[24] PG&E's Stockton Division is a geographic subdivision within the Company that contained the Butte Fire.

Case 19-30088   Doc# 11169-8   Filed: 08/31/21   Entered: 08/31/21 14:49:59   Page 35 of 129

1    bonus incentive program therefore (like its policy of not shutting off its reclosers during wildfire

2    season) put safety at risk in an effort to reduce consumer complaints.

3        98.     According to the same lawsuit, Robert Urban, a regional officer for a PG&E

4    contractor, stated that he had a concern that the bonus system incentivized his employees to not

5    do their job, but PG&E chose to keep this program despite knowing this risk.

6        99.     PG&E also knew, but concealed, that its aging infrastructure had dangerously

7    decayed.  In December 2012, during windy conditions, five steel towers supporting the Caribou-

8    Palermo transmission line, originally built in 1919, collapsed.  In a July 16, 2013 letter to the

9    CPUC, PG&E proposed replacing the five collapsed towers on the Caribou-Palermo line

10   "[s]panning Plumas-Butte County border" in a row "up slope and west of Highway 70 and

11   generally parallel to the unpaved Pulga Road in a remote area of the Feather River Canyon

12   within Plumas National Forest"[25]—that is, to say, near the first Camp Fire ignition point.

13       100.    The rest of the aging towers on the line, including the tower believed to have

14   started the Camp Fire, were not replaced during that project.[26]  The age of these remaining

15   towers created a strong, undisclosed risk that corrosion, metal fatigue, or other age-related

16   factors would fail to support transmission line cables and cause fires.  Indeed, the relevant tower

17   included uninsulated "jumper" lines used to switch currents between transmission lines, making

18   the risk of fire even greater.[27]  Tellingly, the cross arm from that transmission tower, which was

19   attached to the "jumper" line, has been removed by Cal Fire investigators as part of its probe into

20   the cause of the Camp Fire.[28]

21       101.    It was in this context that Defendants touted PG&E's vegetation management and

22   infrastructure maintenance to investors, falsely representing that it was in full compliance with

23   _____

24   [25] https://www.pge.com/nots/rates/tariffs/tm2/pdf/ELEC_4256-E.pdf  (last visited Dec. 12,
     2018).

25   [26] https://www.chicoer.com/2018/12/05/why-did-fire-investigators-remove-pge-transmission-
     tower-part-in-camp-fire-probe/ (last visited Dec. 12, 2018).

26   [27] https://www.mercurynews.com/2018/12/07/it-was-originally-built-in-1919-what-failed-on-
     pge-tower-at-heart-of-camp-fire-probe/ (last visited Dec. 12, 2018).

27   [28] https://www.chicoer.com/2018/12/05/why-did-fire-investigators-remove-pge-transmission-
28   tower-part-in-camp-fire-probe/ (last visited Dec. 12, 2018).

1   all relevant regulations throughout the Class Period. *E.g.*, ¶159 (Misstatement No. 2, October 16,

2   2015); ¶177 (Misstatement No. 5, August 9, 2017); ¶198 (Misstatement No. 9, October 31,

3   2017); ¶213 (Misstatement No. 12, November 5, 2017); ¶220 (Misstatement No. 13, May 25,

4   2018); ¶226 (Misstatement No. 14, June 8, 2018).

5       102.    As noted above, though PG&E falsely assured investors during the Class Period

6   that its compliance failures had been resolved after the Butte Fire, the Company's own employee

7   Richard Yarnell later admitted that nothing of substance had changed over much of the same

8   time period.

9   **G.   Investors Could Not Have Reasonably Expected The Extent of PG&E's Unsafe Pattern of Noncompliance that Caused the North Bay Fires and the Camp Fire**

10

11   **1.   PG&E's Noncompliance with Vegetation Management and Pole Integrity Requirements Caused the North Bay Fires**

12

13       103.    Of the **seventeen** main North Bay Fires for which Cal Fire's investigations have

14   been completed, **all seventeen** were caused by PG&E equipment. **Eleven** of these fires

15   evidenced violations of California safety regulations, in **seven** different counties at the **same**

16   **time**. Most of these violations pertained to PG&E's failures to clear vegetation or maintain the

17   integrity of its poles.

18       104.    Even though Cal Fire's investigations have not found evidence of violations for

19   six of the fires, PG&E's numerous, widespread safety violations actually caused or exacerbated

20   **all** of the North Bay Fires. PG&E's safety violations exacerbated even the fires that lacked

21   evidence of violations, in two ways. First, some of the eleven fires caused by PG&E's safety

22   violations merged into and strengthened other fires. Second, PG&E's safety violations diverted

23   scarce firefighting resources to contain the eleven North Bay Fires which never should have

24   ignited, leading to the other fires causing more damage. As such, PG&E's safety violations were

25   responsible, in full or in part, for **all** of the North Bay Fires.

26       105.    As of the filing of this Complaint, Cal Fire has not yet completed its

27   investigations into the Tubbs Fire, and may find that it, too, was caused by PG&E's safety

28   violations.

1

2

       **2.**    **PG&E's Noncompliance with Vegetation Management and Pole Integrity Requirements Caused the Camp Fire**

3

      106.    Though Cal Fire has not completed its official investigation into the Camp Fire's

4

causes, other sources have revealed that PG&E's safety violations were its cause.

5

          **(a)**    **The Camp Fire's First Ignition Point Was Caused by PG&E Safety Violations**

6

      107.    According to firefighter radio transmissions and the journalist whose investigation

7

made them public late on November 9, 2018, firefighters were dispatched to a vegetation fire

8

"under the high tension power lines" across the Feather River from Poe Dam in Butte County on

9

November 08, 2018 at 6:33 a.m.[29]—matching the location where Cal Fire officials pinpointed

10

the Camp Fire's origin four minutes earlier.[30] As one firefighter described the fire to dispatch: "It

11

is on the west side of the river underneath the transmission lines."

12

      108.    Independently that evening, PG&E admitted to the CPUC that one of its 115-

13

kilovolt transmission lines on Pulga Road in Butte County experienced an outage at 6:15 a.m.

14

that day, and noted that the site was near the Camp Fire.[31]  Cal Fire has listed Pulga Road as the

15

Camp Fire starting point.[32]

16

      109.    The same report acknowledged that an aerial patrol later that day, "in the

17

afternoon," observed "damage to a transmission tower" on the same 115 kilovolt transmission

18

line. In a supplemental report filed with the CPUC on December 11, 2018, PG&E further

19

specified that this observed damage included the separation of a suspension insulator, meant to

20

21

22

---

23

   [29] https://www.mercurynews.com/2018/11/09/pge-power-lines-may-have-sparked-deadly-butte-county-wildfire-according-to-radio-transmissions/ (last visited Dec. 13, 2018).

24

   [30] http://cdfdata.fire.ca.gov/admin8327985/cdf/images/incidentfile2277_4319.pdf (last visited Dec. 13, 2018).

25

   [31] http://s1.q4cdn.com/880135780/files/doc_downloads/2018/wildfire/11/Electric-Safety-Incident-Reported-Pacific-Gas-Electric-Incident-No-181108-9002.pdf (last visited Dec. 13, 2018); *see also* https://www.fresnobee.com/news/state/california/article221448500.html (last visited Dec. 13, 2018).

26

27

   [32] http://www.fire.ca.gov/current_incidents/incidentdetails/Index/2277 (last visited Dec. 13, 2018).

28

1    support a transposition jumper, from an arm on the tower.[33]   PG&E also observed a broken C-

2    hook attached to the separated suspension insulator that once connected the suspension insulator

3    to a tower arm.[34]   According to the report, the connection point showed signs of wear; a flash

4    mark was visible close to where the transposition jumper was suspended; and there was damage

5    to the transposition jumper and suspension insulator.[35]

6         110.    Moreover, just one day prior to the Camp Fire's ignition, PG&E had contacted a

7    Pulga landowner named Betsy Ann Cowley regarding transmission line poles on her property

8    that "were having problems with sparks."[36]

9         111.    Accordingly, the truth has emerged that a PG&E electrical pole carrying a high-

10   voltage 115 kilovolt transmission line lost its integrity, in whole or in part, on the morning of

11   November 8, 2018.  Shortly thereafter, vegetation underneath the line ignited.  PG&E's apparent

12   failure to maintain a clearance for vegetation up to 10 feet away from this transmission line,

13   inclusive of all vegetation underneath, violated California Public Resources Code §4293.

14   Further, PG&E's failure to maintain the integrity of its poles and prevent their loss of function

15   violated California Public Utilities Code §451.

16              **(b)     The Camp Fire's Second Ignition Point Was Also Caused by
                         PG&E Safety Violations**

17

18        112.    On November 15, 2018, Cal Fire announced that it had identified a possible

19   second ignition point for the Camp Fire.[37]   On November 16, 2018, PG&E admitted to CPUC

20

21

22

23        [33] http://s1.q4cdn.com/880135780/files/doc_downloads/2018/wildfire/12/12-11-18.pdf (last
     visited Dec. 13, 2018).

24        [34] *Id.*

25        [35] *Id.*  The same report noted that, at a neighboring tower, an "insulator hold down anchor"
     had become disconnected.  *Id.*

26        [36] https://www.mercurynews.com/2018/11/12/state-regulators-investigating-pge-socal-edison-
     for-roles-in-deadly-camp-woolsey-fires/ (last visited Dec. 13, 2018).

27        [37] https://www.chicoer.com/2018/11/15/camp-fire-investigation-leads-to-another-area-away-
     from-pulga/ (last visited Dec. 13, 2018).

28

1   that the same day the Camp Fire ignited (indeed, minutes later at 6:45 a.m.), it experienced a

2   second outage on another power line in a nearby part of Butte County near Concow, California.[38]

3           113.    In PG&E's December 11, 2018 supplemental report to CPUC, PG&E further

4   admitted that it discovered a broken pole on the second power line on November 9, 2018; that

5   the pole was on the ground, along with pole equipment; and that the pole had a line recloser.[39]

6   The supplemental report also detailed a second inspection of the area on November 12, 2018,

7   where a PG&E employee found damaged and downed poles, several snapped trees, downed

8   wires, and some snapped trees on top of the downed wires.[40]   The presence of the line recloser

9   further calls into question PG&E's prior representation that it was "just about done" disabling

10  recloser devices in "high wildfire risk areas" as of November 18, 2015 (Misstatement No. 3).

11          114.    Accordingly, the truth emerged that the Camp Fire's second ignition point also

12  exhibited evidence of failures regarding vegetation management, pole integrity, and the possible

13  use of a recloser in further violation of California safety regulations, including Public Resources

14  Code §§4292, 4293 and Public Utilities Code §451.

**H.      PG&E's ESRB-8 Shutoff Protocol Was Illusory, and Its Failure to Adhere Thereto Was a Proximate Cause of the Camp Fire**

15
16          115.    On July 16, 2018, the CPUC passed Resolution ESRB-8.  As noted above, this

17  regulation mandated that PG&E formalize and publicize a program to de-energize power lines

18  for safety when extreme fire danger conditions occur.  PG&E announced its response to this new

19  safety requirement on September 27, 2018 (the "ESRB-8 Shutoff Protocol"), and touted its

20  existence throughout the rest of the Class Period.

21          116.    PG&E also stated that its ESRB-8 Shutoff Protocol applied to **all** of its

22  powerlines, without qualification. Its protocol stated: "PG&E's Wildfire Safety Operations

23

24  ─────────────────
    [38]

25  http://www.cpuc.ca.gov/uploadedFiles/CPUCWebsite/Content/News_Room/NewsUpdates/2018/
    EIR_IncidentNo181116-9015.pdf; https://www.cnbc.com/2018/11/19/pge-reports-another-

26  outage-on-the-morning-when-california-camp-fire-started.html (last visited Dec. 13, 2018).

27  [39] http://s1.q4cdn.com/880135780/files/doc_downloads/2018/wildfire/12/12-11-18.pdf (last visited Dec. 13, 2018).

28  [40] *Id.*

─────────────────

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO. 3-18-CV-03509-RS

32

1    Center team will monitor conditions **across our system** and evaluate whether to temporarily turn

2    off **electric power lines**, in the interest of public safety."  Thus, PG&E's ESRB-8 Shutoff

3    Protocol applied to both higher-voltage transmission power lines and lower-voltage distribution

4    power lines.

5           117.    Under the ESRB-8 Shutoff Protocol, PG&E represented that it would balance

6    seven criteria when determining whether to shut off electricity for safety:

- **"Extreme" fire danger threat level**, as classified by the National Fire Danger Rating System

- **A Red Flag Warning declared** by the National Weather Service

- **Low humidity levels**, generally 20 percent and below

- **Sustained winds** above approx. 25 mph and wind gusts in excess of approx. 45 mph

- **Site-specific conditions** such as temperature, terrain and local climate

- **Critically dry vegetation** that could serve as fuel for a wildfire

- **On-the-ground, real-time observations** from PG&E field crews

17   (Emphasis original.)   PG&E stated that "no single factor will drive a Public Safety Power

18   Shutoff," and never identified any other criteria, during the Class Period or since.

19          118.    All seven criteria were met or exceeded when the Camp Fire was ignited by

20   PG&E's lines on November 8.  Indeed, PG&E had warned customers in that area on November 6

21   – two days before the Camp Fire began – that it may need to "proactively turn off power for

22   safety starting on Thursday, November 8."[41]

23          119.    PG&E had only shut off electricity under its ESRB-8 Shutoff Protocol once

24   before, on October 14 through 17, 2018, when it shut off eight transmission power line circuits

25

26   _____
     [41]

27   https://www.pge.com/en/about/newsroom/newsdetails/index.page?title=20181106_pge_notifyin

     g_customers_in_parts_of_nine_counties_about_extreme_weather_forecasts_and_potential_for_p

28   ublic_safety_power_shutoff (last visited Dec. 14, 2018).

---

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                    33
CIVIL ACTION NO. 3:18-CV-03509-RS

1   and thirty-three distribution power line circuits, in seven counties.  Though PG&E found damage

2   to its equipment before restoring power, it nevertheless faced strong backlash from customers

3   who were affected by the shutoff.

4        120.   On November 8, 2018 at 6:14 p.m. EST (3:14 p.m. PST), PG&E announced, via

5   its official Twitter.com account: "PG&E has determined that it will not proceed with plans today

6   for a Public Safety Power Shutoff in portions of 8 Northern CA counties, **as weather conditions**

7   did not warrant this safety measure."[42]  The three weather-relevant criteria are humidity levels (at

8   20% or below), wind speed (with sustained winds around 25 miles per hour or stronger, and

9   wind gusts around 45 miles per hour or stronger), and general site-specific conditions (*e.g.*, local

10  climate and terrain).

11       121.   However, as detailed below, **each of these factors weighed in favor of a shutoff**.

12  Where and when the Camp Fire started, humidity was around or below 20%, wind speeds were

13  measured above 25 (sustained) and 45 (gusts) miles per hour, and a myriad of site-specific

14  conditions contributed to the ignition of the most destructive and deadliest fire in California

15  history.

16       122.   The Camp Fire originated at "Pulga Road at Camp Creek Road near Jarbo Gap."[43]

17  Jarbo Gap is a geographical area in Butte County and contains a weather station located at 39°

18  44' 09" N (Latitude), 121° 29' 20" W (Longitude),[44] approximately six miles from the Camp

19  Fire's origin.[45]  The Jarbo Gap weather station provided the most accurate record of weather

20  conditions at the time and place where the Camp Fire ignited.

---

[42] https://twitter.com/PGE4Me/status/1060672000929267713 (last visited Dec. 14, 2018).

[43] http://www.fire.ca.gov/current_incidents/incidentdetails/Index/2277 (last visited Dec. 13, 2018).

[44] https://raws.dri.edu/cgi-bin/rawMAIN.pl?caCJAR (last visited Dec. 13, 2018).

[45] http://www.fire.ca.gov/current_incidents/incidentdetails/Index/2277 (last visited Dec. 13, 2018).

1

            **1.**      **PG&E Admitted that All of the Non-Weather Criteria Weighed in Favor of Shutting Off the Power**

2

3

       123.    On November 6 and 7, 2018, just before the Camp Fire ignited, PG&E admitted

4

in three press releases that all seven criteria weighed in favor of a shutoff—providing only small

caveats that weather-related factors might change.

5

           **(a)**      **Criterion 1: the National Fire Danger Rating System Rated Jarbo Gap as Having an "Extreme" Fire Danger Threat Level**

6

7

       124.    The area where the Camp Fire ignited was classified as having an "Extreme" fire

8

danger threat level by the National Fire Danger Rating System ("NFDRS").  The U.S. Forest

9

Service "Wildland Fire Assessment System" ("WFAS") archives historical NFDRS ratings in

10

map[46] and data[47] form, both of which confirm that the Jarbo Gap was rated "Extreme" on

11

November 8, 2018.  The graphic on the following page has modified the WFAS map to

12

highlight, with a red circle, the "Extreme" rating received by the Jarbo Gap weather station on

13

November 8, 2018:

14

15

16

17

18

19

20

21

22

23

24

25

---

26

[46] https://www.wfas.net/archive/www.fs.fed.us/land/wfas/archive/2018/11/08/fd_class.png (last visited Dec. 14, 2018).

27

[47] *See* https://www.wfas.net/archive/www.fs.fed.us/land/wfas/archive/2018/11/08/fdr_obs.txt (row labeled "Jarbo Gap," column labeled "ADJ" for "adjective," data entry "E" for "Extreme")

28

(last visited Dec. 14, 2018).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15



16    125.    As the U.S. Department of Agriculture Forest Service explained the NFDRS:

17           When the fire danger is "extreme", fires of all types start quickly
18           and burn intensely.  All fires are potentially serious and can spread
             very quickly with intense burning.  Small fires become big fires
             much faster than at the "very high" level.  Spot fires are probable,
19           with long-distance spotting likely.  These fires are very difficult to
             fight and may become very dangerous and often last for several
20           days.[48]

21    126.    Indeed, in a press release on November 7, 2018, PG&E admitted that "Due to

22    expected **extreme fire danger conditions** . . . PG&E may temporarily turn off power in portions

23    of the following communities: Butte County (including . . . Paradise)" on November 8, 2018.[49]

24    _____
      [48]

25    https://www.fs.usda.gov/detail/cibola/landmanagement/resourcemanagement/?cid=stelprdb5368
      839 (last visited Dec. 13, 2018).
26           [49]

27    https://www.pge.com/en/about/newsroom/newsdetails/index.page?title=20181107_pge_continue
      s_to_notify_customers_in_parts_of_nine_counties_about_the_potential_for_public_safety_powe
28    r_shutoff_due_to_forecasted_extreme_weather (last visited Dec. 13, 2018).

1

**(b)     Criterion 2: the National Weather Service Declared a "Red Flag Warning" for the Area**

2

127.    The National Weather Service issued a "Red Flag Warning" for Butte County on

3

November 8, 2018,[50] as PG&E admitted in a November 6, 2018 Press Release: "Due to expected

4

extreme fire danger conditions, **including the Red Flag warning from the National Weather**

5

**Service** and several other weather factors, Pacific Gas and Electric Company (PG&E) today

6

began notifying customers in portions of nine counties that the company may proactively turn off

7

power for safety starting on Thursday, November 8" including "Butte County."[51]

8

**(c)     Criterion 6: "Critically Dry Vegetation" (*i.e.*, Wildfire Fuel) Weighed in Favor of a Shutoff**

9

10

128.    Throughout the area where the Camp Fire ignited, the soil and vegetation were

11

unusually dry, as there had been almost no rainfall since April 2018.  As PG&E admitted in a

12

November 27, 2018 filing to the CPUC, its decision not to shut off the power "was preceded by

13

an extended period of dry fall weather, only one rain event since May, and periods of dry north

14

winds which caused the moisture content of live and dry fuels to remain low."[52]

15

129.    PG&E confirmed this conclusion in a November 7, 2018 press release: "Due to

16

forecasted high winds **and dry vegetation**, PG&E may temporarily turn off power in portions of

17

the following communities: **Butte County** (including Berry Creek, Chico, Forest Ranch,

18

Magalia, Oroville, **Paradise**). . . ."[53]

19

20

[50] Shirin Rajaee, "PG&E Could Cut Power to 63,000 Amid Red Flag Warning," CBS13 Sacramento (Nov. 8, 2018 12:17 A.M.), *available at*

21

https://sacramento.cbslocal.com/2018/11/08/red-flag-warning-pge/ (last visited Dec. 13, 2018).

22

[51]

https://www.pge.com/en/about/newsroom/newsdetails/index.page?title=20181106_pge_notifyin

23

g_customers_in_parts_of_nine_counties_about_extreme_weather_forecasts_and_potential_for_p

24

ublic_safety_power_shutoff (last visited Dec. 13, 2018).

[52]

25

http://www.cpuc.ca.gov/uploadedFiles/CPUCWebsite/Content/News_Room/NewsUpdates/2018/

26

11-27-18%20PGE%20PSPS%20Report.pdf (last visited Dec. 13, 2018).

[53]

27

https://www.pge.com/en/about/newsroom/newsdetails/index.page?title=20181107_pge_continue

28

s_to_notify_customers_in_parts_of_nine_counties_about_the_potential_for_public_safety_powe

r_shutoff_due_to_forecasted_extreme_weather (last visited Dec. 13, 2018).

---

1    130.    As Pulitzer Prize winning journalist Matthias Gafni would later report,

2    information from the National Aeronautics and Space Administration ("NASA") showed that

3    California's moisture levels that month were "at the lowest levels in [the] last four years."[54] As

4    the graphic below confirms, this led to extremely dry vegetation:

## Root Zone Soil Moisture Percentile






        **(d)    Criterion 7: PG&E's On-the-Ground Observations Weighed in
                Favor of a Shutoff**

23    131.    PG&E's on-the-ground observations favored a shutoff.  In a press release dated

24    November 7, 2018, PG&E warned customers that it was considering a shutoff due to "expected

---

[54] Matthias Gafni, |"Why didn't PG&E shut down power in advance of deadly Camp Fire?
Here's the data." Bay Area News Group (Nov. 18, 2018 5:00 p.m.) *available at*
https://www.chicoer.com/2018/11/18/why-didnt-pge-shut-down-power-in-advance-of-deadly-
camp-fire-heres-the-data/ (last visited Dec. 13, 2018).

1  extreme fire danger conditions," and that "[f]actors that PG&E considers when deciding to

2  initiate" a shutoff included its "on-the-ground observations."[55]

3    132.    This conclusion is corroborated by PG&E's admission in a November 8, 2018

4  press release that *only weather factors* weighed against shut-off: "[PG&E] has determined that it

5  will not proceed with plans today for a Public Safety Power Shutoff in portions of eight Northern

6  California counties, **as weather conditions did not warrant this safety measure**."[56]

7           **2.    All of the Weather Criteria Weighed in Favor of Shutting Off the Power**

8

9    133.    As described above, PG&E attributed its decision not to shut off power to weather

10 conditions.  Specifically, in a November 27, 2018 filing to the CPUC , PG&E explained that the

11 primary weather condition that fell short was wind speed:

12       On Wednesday, November 7, 2018, PG&E refined the forecasted
         impact down to 63,000 customers and eight counties (Butte, Lake,
13       Napa, Nevada, Placer, Plumas, Sierra and Yuba). **Weather
         conditions stayed consistent, nearing but not reaching
14       forecasted levels that would warrant temporarily turning off
         power for customer safety**.

15       By around 13:00 on Thursday, November 8, **winds were
         decreasing**, and conditions were no longer forecast to approach
16       [Public Safety Power Shutoffs] criteria. Based on the forecasted
         information, PG&E no longer anticipated a possible need to de-
17       energize.

18   134.    However, all weather factors – including wind speed – weighed in favor of an

19 electricity shutoff in Jarbo Gap on November 7-8, 2018.  The charts[57] on the following page

20 show weather conditions at the Jarbo Gap Weather Station from late November 7, 2018 through

21 the next day:

22

23 _____
   55
24 https://www.pge.com/en/about/newsroom/newsdetails/index.page?title=20181107_pge_continue
   s_to_notify_customers_in_parts_of_nine_counties_about_the_potential_for_public_safety_powe
25 r_shutoff_due_to_forecasted_extreme_weather (last visited Dec. 13, 2018).

26 56
   https://www.pge.com/en/about/newsroom/newsdetails/index.page?title=20181108_pge_determin
27 es_to_not_proceed_with_public_safety_power_shutoff_planned_for_portions_of_eight_northern
   _california_counties (last visited Dec. 13, 2018).

28   57 Source: https://raws.dri.edu/cgi-bin/rawMAIN.pl?caCJAR (last visited Dec. 13, 2018).

## Jarbo Gap California

Daily Summary for

### November 7, 2018

| Hour of Day Ending at L.S.T. | Total Solar Rad. ° ly. | Ave. mph | Wind V. Dir. Deg | Max. mph | Air Temperature Mean Deg. F. | Fuel Temperature Mean Deg. F. | Fuel Moisture Mean Percent | Relative Humidity Mean Percent | Dew Point Deg. F. | Wet Bulb Deg. F. | Baro. Press. in. Hg. | Total Precip. inches |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 9 pm | 0.0 | 25.0 | 39 | 43.0 | 56.0 | 54.0 | 4.7 | 15 | 9 | 38 | | 0.00 |
| 10 pm | 0.0 | 25.0 | 40 | 41.0 | 54.0 | 53.0 | 4.7 | 16 | 9 | 37 | | 0.00 |
| 11 pm | 0.0 | 27.0 | 35 | 44.0 | 53.0 | 52.0 | 4.7 | 18 | 11 | 37 | | 0.00 |
| 12 am | 0.0 | 27.0 | 37 | 45.0 | 52.0 | 51.0 | 4.7 | 19 | 11 | 36 | | 0.00 |

## Jarbo Gap California

Daily Summary for

### November 8, 2018

| Hour of Day Ending at L.S.T. | Total Solar Rad. ° ly. | Ave. mph | Wind V. Dir. Deg | Max. mph | Air Temperature Mean Deg. F. | Fuel Temperature Mean Deg. F. | Fuel Moisture Mean Percent | Relative Humidity Mean Percent | Dew Point Deg. F. | Wet Bulb Deg. F. | Baro. Press. in. Hg. | Total Precip. inches |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 am | 0.0 | 29.0 | 37 | 48.0 | 51.0 | 50.0 | 4.7 | 21 | 12 | 36 | | 0.00 |
| 2 am | 0.0 | 24.0 | 38 | 44.0 | 50.0 | 48.0 | 4.7 | 22 | 13 | 36 | | 0.00 |
| 3 am | 0.0 | 31.0 | 37 | 50.0 | 49.0 | 48.0 | 4.7 | 22 | 12 | 35 | | 0.00 |
| 4 am | 0.0 | 32.0 | 38 | 52.0 | 49.0 | 48.0 | 4.7 | 22 | 12 | 35 | | 0.00 |
| 5 am | 0.0 | 30.0 | 42 | 51.0 | 48.0 | 47.0 | 4.7 | 23 | 12 | 34 | | 0.00 |
| 6 am | 0.0 | 18.0 | 33 | 40.0 | 48.0 | 46.0 | 4.7 | 23 | 12 | 34 | | 0.00 |
| 7 am | 0.6 | 14.0 | 33 | 28.0 | 49.0 | 46.0 | 4.7 | 21 | 11 | 35 | | 0.00 |
| 8 am | 4.5 | 6.0 | 14 | 25.0 | 51.0 | 51.0 | 4.7 | 18 | 9 | 35 | | 0.00 |
| 9 am | 13.1 | 14.0 | 33 | 21.0 | 53.0 | 55.0 | 4.9 | 17 | 9 | 36 | | 0.00 |
| 10 am | 37.3 | 18.0 | 37 | 30.0 | 55.0 | 58.0 | 4.9 | 16 | 10 | 38 | | 0.00 |
| 11 am | 45.2 | 14.0 | 29 | 29.0 | 58.0 | 61.0 | 5.0 | 14 | 9 | 39 | | 0.00 |
| 12 pm | 47.8 | 16.0 | 31 | 33.0 | 60.0 | 64.0 | 5.0 | 13 | 9 | 40 | | 0.00 |
| 1 pm | 40.7 | 12.0 | 38 | 32.0 | 61.0 | 63.0 | 5.2 | 12 | 8 | 40 | | 0.00 |
| 2 pm | 37.3 | 15.0 | 42 | 24.0 | 63.0 | 67.0 | 4.9 | 11 | 8 | 41 | | 0.00 |
| 3 pm | 21.8 | 10.0 | 40 | 28.0 | 61.0 | 60.0 | 4.8 | 12 | 8 | 40 | | 0.00 |
| 4 pm | 7.5 | 8.0 | 37 | 25.0 | 60.0 | 58.0 | 4.8 | 12 | 7 | 40 | | 0.00 |
| 5 pm | 0.8 | 13.0 | 27 | 23.0 | 58.0 | 55.0 | 4.7 | 11 | 4 | 38 | | 0.00 |
| 6 pm | 0.0 | 15.0 | 27 | 27.0 | 57.0 | 54.0 | 4.6 | 12 | 5 | 38 | | 0.00 |
| 7 pm | 0.0 | 18.0 | 31 | 30.0 | 56.0 | 53.0 | 4.6 | 12 | 4 | 37 | | 0.00 |
| 8 pm | 0.0 | 19.0 | 28 | 34.0 | 55.0 | 52.0 | 4.6 | 12 | 3 | 37 | | 0.00 |

135.    Accordingly, PG&E's November 27, 2018 statement to the CPUC that its decision not to shut off power was justified in part by the fact that "[b]y around 13:00 on Thursday, November 8, winds were decreasing," was misdirection.  The Camp Fire had already begun over six hours before that point.  And indeed, as shown in the chart above, wind speed

weighed in favor of a shutoff in the hours before the fire started. In fact, all of the weather factors weighed in favor of a shut off in the hours before the fire started, as detailed below.

**(a)     Criterion 3: The Jarbo Gap Recorded Sufficiently Low Humidity Levels**

136.     Throughout the night on November 7, 2018, humidity was below the "generally 20%" level, supporting a shutoff. From 9:00 p.m. to midnight, humidity never exceeded 19%. In the ten hours before the Camp Fire, average humidity was 20.1%. Over the 24-hour period, humidity averaged a mere 16.42%.

137.     Throughout November 8, 2018, humidity at the Jarbo Gap was at or below the "generally 20%" level that supported a shutoff. Between 6 a.m. and 7 a.m., when the Camp Fire ignited, humidity was between 23% and 21% and falling precipitously; it would drop to as low as 11% in the coming hours.

138.     PG&E knew that the humidity would drop precipitously because National Weather Service's forecast of a red flag warning that day—the same red flag warning PG&E mentioned in its press release late the previous evening[58]—warned that "Afternoon [Relative Humidity] values of 5-15% will be common across the area."[59]

139.     In fact, humidity weighed even more strongly in favor of a shutdown that day than it did on October 14, 2018, the day on which PG&E had previously determined that a power shutoff was necessary. The National Weather Service's forecast of humidity under 15% and as low as 5% was even more severe than its red flag warning on October 14, 2018, where it predicted relative humidity "into the 7-15% range for much of this region."[60]

---

[58] https://www.pge.com/en/about/newsroom/newsdetails/index.page?title=20181107_pge_continues_to_closely_monitor_weather_conditions_ahead_of_possible_public_safety_power_shutoff_in_parts_of_eight_counties (last visited Dec. 13, 2018).

[59] https://www.spc.noaa.gov/products/fire_wx/2018/181108_1200_fwdy1_print.html (last visited Dec. 13, 2018).

[60] https://www.spc.ncep.noaa.gov/products/fire_wx/2018/181014_1200_fwdy1_print.html (last visited Dec. 13, 2018).

1

2

#### (b)   Criterion 4: The Jarbo Gap Recorded Sufficiently High Wind Speed

140.   As noted above (*see* ¶133), PG&E informed the CPUC on November 27, 2018 that the primary reason it did not shut off the power was wind speed.

141.   Yet throughout the night on November 7, 2018, sustained winds at the Jarbo Gap were at or above the "approx. 25 mph" level that weighed in favor of a shutoff.  Similarly, wind gusts reached the "approx. 45 mph" level by midnight, further supporting a shutoff.  In the ten hours leading up to the Camp Fire, average sustained winds and gusts were 26.8 and 45.8 miles per hour, respectively.

142.   At 5 a.m. on November 8, 2018, approximately an hour and a half before the Camp Fire erupted, sustained winds reached 30 miles per hour, with gusts of 51 miles per hour. Overall, wind conditions strongly weighed in favor of a shutoff in the hours before the Camp Fire's ignition.

143.   PG&E knew that sustained winds would be high because National Weather Service's forecast of a red flag warning that day—the same red flag warning PG&E mentioned in its press release late the previous evening[61]—warned of winds "during the morning and afternoon" with a "[s]trong northerly/northeasterly flow of 20-25 mph."[62]

144.   In fact, sustained wind speed weighed even more strongly in favor of a shutdown that day than it did on October 14, 2018, the day on which PG&E had previously determined that a power shutoff was necessary.  The National Weather Service's forecast of sustained winds of 20-25 miles per hour was even more severe than its red flag warning on October 14, 2018, which

---

[61] https://www.pge.com/en/about/newsroom/newsdetails/index.page?title=20181107_pge_continues_to_closely_monitor_weather_conditions_ahead_of_possible_public_safety_power_shutoff_in_parts_of_eight_counties (last visited Dec. 13, 2018).

[62] https://www.spc.noaa.gov/products/fire_wx/2018/181108_1200_fwdy1_print.html (last visited Dec. 13, 2018).

1   predicted "Strong/gusty east-northeasterly winds of 15-20 mph. . . where sustained winds are

2   forecast to reach 20-25 mph for a few hours."[63]

3                 **(c)      Criterion 5: Site-Specific Conditions Further Favored Shutoff**

4          145.    The specific conditions beneath PG&E's 115 kilovolt transmission line where the

5   Camp Fire ignited were highly conducive to wildfires.  Just one day earlier, PG&E contacted

6   Betsy Ann Cowley regarding transmission line poles on her property in Pulga that "were having

7   problems with sparks," indicating that conditions were hazardous.[64]  Further, it is indisputable

8   that dry vegetation existed underneath the transmission line given reports of vegetation burning

9   beneath it (*see* ¶107, *supra*).  Notably, PG&E identified nothing about the area's terrain,

10  temperature or climate in its November 27, 2018 letter to the CPUC explaining its decision not to

11  shut off its lines.[65]

12                 **3.      PG&E Knew, or Recklessly Disregarded, that All Seven Criteria
                            Weighed in Favor of Shutting Off the Power**

13

14         146.    PG&E knew that severe weather conditions requiring a shutoff were in effect.

15  First, the Company admitted it had been monitoring the weather in the area for days; its

16  November 7 press release confirmed that "PG&E meteorologists continuously monitor weather

17  conditions."  Second, the Company had its own "network of PG&E weather stations to enhance

18  weather forecasting and modeling," and stated that the Company had the capability of

19

20

21  ───────────────
    [63] https://www.spc.ncep.noaa.gov/products/fire_wx/2018/181014_1200_fwdy1_print.html
    (last visited Dec. 13, 2018).

22  [64] https://www.mercurynews.com/2018/11/12/state-regulators-investigating-pge-socal-edison-
    for-roles-in-deadly-camp-woolsey-fires/ (last visited Dec. 13, 2018).

23
    [65] The remoteness and ruggedness of the relevant terrain where the Camp Fire started further
24  supported a shutoff.  In a July 16, 2013 letter to the CPUC concerning the exact same Caribou-
    Palermo transmission line, PG&E described the relevant terrain as being "in a remote area" with
25  "extreme topography."  *See* https://www.pge.com/nots/rates/tariffs/tm2/pdf/ELEC_4256-E.pdf
    (last visited Dec. 13, 2018).  After the Camp Fire, an article reported on the terrain immediately
26  around the same transmission line as making fire containment more difficult: "The remoteness
    and rugged terrain around the tower would make any firefight by hand crews nearly impossible."
27  *See* https://www.mercurynews.com/2018/12/07/it-was-originally-built-in-1919-what-failed-on-
    pge-tower-at-heart-of-camp-fire-probe/  (last visited Dec. 13, 2018).
28

───────────────
SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                              43
CIVIL ACTION NO. 3:18-CV-03509-RS

1   "[m]onitoring wildfire risks **in real time** from our new Wildfire Safety Operations Center."[66]

2   Finally, the weather data referenced above was publicly available.  Indeed, for the hour from

3   midnight to 1 a.m. on November 8, 2018 just before the Camp Fire started, the Jarbo Gap

4   weather station reported that **all weather conditions were met**: humidity at 19%, sustained

5   winds at 27 miles per hour, and wind gusts at 45 miles per hour.  Accordingly, PG&E either

6   knew that weather conditions existed that weighed in favor of a shutoff, or deliberately

7   disregarded such information.

8       147.    Every factor weighed in favor of shutting off PG&E's transmission line running

9   through the Jarbo Gap outside of Paradise, California.  PG&E knew or should have known that

10   all such factors were met.  But shutting off its high voltage transmission lines would have

11   deprived approximately 70,000 customers of electricity.  Evidently, PG&E prioritized temporary

12   customer satisfaction over safety.

13       148.    Indeed, PG&E had only shut off electricity in the face of wildfire conditions once

14   before, in October 2018.  The backlash to that shutoff was strong, and PG&E received numerous

15   customer complaints.[67]  PG&E noted in its October 31, 2018 report to the CPUC that as of

16   October 24, "17 residential customers have complained to the CPUC as a result of the PSPS

17   [Public Safety Power Shutoffs] event since the first customer notification on October 13."[68]

18   Moreover, PG&E reported to the CPUC that it had "received a total of 146 claims as of October

19   24, 2018," including claims for property damage, business interruption, and spoiled food.

20

---

21   [66] http://cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/News_Room/Public-Safety-Power-Shutoff-Policies-and-Procedures-September-2018.pdf (last visited Dec. 13, 2018).

22   [67] For instance, the *San Francisco Gate* reported that many were "upset" and "frustrated" over PG&E's decision, including one consumer who said that PG&E's decision was "totally

23   irresponsible" and made her "angry." Another member of the community believed that PG&E

24   "didn't take care of what needed to be taken care of in the past, and now we're having to pay the price for that." This resident continued to state "That's what I'm hearing on social media really

25   loudly." https://www.sfgate.com/california-wildfires/article/PG-E-warns-it-may-shut-off-power-amid-red-flag-13306256.php (last visited Dec. 13, 2018).

26   [68]

27   http://cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/Utilities_and_Industries/Energy_-_Electricity_and_Natural_Gas/PGE%20PSPS%20Report%20Letter%2020181031.pdf (last

28   visited Dec. 13, 2018).

---

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                           44
CIVIL ACTION NO. 3-18-CV-03509-RS

149.    In sum, all seven criteria weighed in favor of a shutoff that never happened.  From the beginning, the Company misrepresented to investors that it would prioritize safety over customer satisfaction and reliability under the requirements of CPUC's Resolution ESRB-8.  The strongest inference from PG&E's failure to shut off power on November 8, 2018 is that its ESRB-8 Shutoff Protocol was illusory, and that the Company did not believe itself bound by the seven criteria it told the public and investors were the crucial criteria.  By PG&E's statements listing these – and only these – criteria in its ESRB-8 Shutoff Protocol, investors were entitled to believe that when **all** criteria were met, PG&E would prioritize safety and shut off the power rather than risk causing wildfires.

150.    In the alternative, PG&E had a duty to update investors once it decided to abandon its ESRB-8 Shutoff Protocol and risk the chance of wildfire.  The result was the deadliest and most destructive wildfire California has ever faced.

## V.    DEFENDANTS' FALSE AND MISLEADING CLASS PERIOD STATEMENTS

151.    In light of PG&E's history of causing wildfires and the drought conditions in California, investors and analysts were focused on the Company's compliance with wildfire-related safety regulations during the Class Period. With an eye towards artificially inflating its share price, PG&E responded to this interest with false and misleading reassurances that PG&E was in compliance with safety regulations. PG&E also significantly raised its quarterly dividend during the Class Period, repeatedly touting that such a move was based, in part, on its success in ensuring safety. As detailed below, Defendants' fraud proximately caused investors' losses.

### A.    Overview of Defendants' Fraudulent Course of Conduct

152.    PG&E was responsible for all the North Bay Fires.  Of the **seventeen** main North Bay Fires for which Cal Fire's investigations have been completed, **all seventeen** were caused by PG&E equipment. Among those, **eleven** of these fires evidenced violations of California safety regulations, in **seven** different counties at the **same time**.

153.    Furthermore, PG&E was responsible for the Camp Fire, which began when a PG&E electrical tower – carrying a high-voltage 115 kilovolt transmission line – failed.  PG&E acknowledged a second ignition point for the Camp Fire that exhibited damaged and downed

Case 19-30088   Doc# 11169   Filed: 08/31/21   Entered: 08/31/21 14:49:59   Page 53 of 129

1    poles, vegetation on top of downed wires, and a recloser.  As a result, vegetation underneath the

2    lines ignited in two ignition points approximately 30 minutes apart.  PG&E's failure to remove

3    such vegetation violated California Public Resources Code §4293.  PG&E's failure to maintain

4    the integrity of its poles violated California Public Utilities Code §451.

5        154.    Moreover, PG&E's ESRB-8 Shutoff Protocol required that the responsible power

6    lines be shut off.  While the ESRB-8 Shutoff Protocol requires that PG&E consider seven criteria

7    when determining whether a shutoff would be appropriate, **all seven criteria were satisfied** in

8    the hours leading up to the Camp Fire in the precise location where it started.  Though adhering

9    to the ESRB-8 Shutoff Protocol would have prevented the Camp Fire entirely, PG&E flouted it.

10       155.    Tellingly, the CPUC is investigating whether PG&E violated CPUC rules and

11   standards.

12       156.    The news about PG&E's responsibility for causing the North Bay Fires and Camp

13   Fire directly impacted the Company's bottom line, because California law requires PG&E to

14   bear the cost of wildfire-related property damage and personal injury caused by its violations of

15   California safety regulations. In other words, those costs likely could not be passed on to

16   ratepayers. And, given the information that has emerged, including the conclusions of Cal Fire's

17   investigations into these fires to date – where Cal Fire has referred at least eleven of its

18   investigations to the appropriate counties' district attorneys' offices to review for potential

19   criminal violations – the market has come to understand that the financial consequences to

20   PG&E are extraordinary.

21       **B.    Defendants Made Materially False and Misleading Statements and**
         **Omissions Regarding Its Vegetation Management Activities and Compliance**
22       **with Wildfire Safety Regulations Before the North Bay Fires**

23           **1.    April 29, 2015 – Misstatement No. 1**

24       157.    The Class Period begins on April 29, 2015, when PG&E held a conference call to

25   discuss the Company's financial and operating results for the first financial quarter of 2015,

26   which ended March 31, 2015. During the call, Defendant Johns, then President of the Utility,

27   misleadingly assured investors of the Company's commitment to safety:

28           As California enters its fourth year of drought, we're working hard
             to help the state meet this challenge by reducing water usage at our

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                    46
CIVIL ACTION NO. 3:18-CV-03509-RS

own facilities, encouraging customers to conserve by offering rebates for more efficient washers and agricultural pumps. ***We're stepping up our vegetation management activities to mitigate wildfire risk*** and improve access for firefighters.

158.     This statement was materially false and/or misleading because PG&E did not materially increase its vegetation management budget in 2015. In fact, based on information released by CPUC, PG&E underspent its vegetation management budget in both 2014 and 2015: whereas CPUC approved PG&E to spend $190,000,000 and $194,153,000 in 2014 and 2015, respectively, PG&E actually spent only $189,617,402 and $194,094,406, respectively. Moreover, this small budget increase of 2.4% between 2014 and 2015 was only 1.28 percentage points above inflation, which rose 1.12% over the same time period.[69] Accordingly, PG&E had not meaningfully "stepp[ed] up" its vegetation management activities.[70]

### 2.     October 16, 2015 – Misstatement No. 2

159.     On October 16, 2015, PG&E issued its 2015 Corporate Responsibility and Sustainability Report. This report falsely assured investors that PG&E's "vegetation management" was "in compliance with relevant laws":

**Vegetation Management**

***Each year, PG&E's Vegetation Management department***, in consultation with utility arborists and foresters, ***inspects every mile of power line in our service area for public safety*** and electric reliability. ***We do so in compliance with relevant laws*** and with a focus on public involvement, including extensive "Right Tree, Right Place" outreach. PG&E has been recognized by the National Arbor Day Foundation as a Tree Line USA recipient for 20 consecutive years for demonstrating best practices in utility arboriculture.

160.     Because PG&E's vegetation management practices failed to follow relevant California safety laws, PG&E's vegetation management activities were decidedly not "in compliance with relevant laws."

---

[69] https://www.bls.gov/data/inflation_calculator.htm (last visited Dec. 14, 2018).

[70] PG&E also omitted that it was supposed to perform $441,192 (the total amount by which PG&E underspent its allowance in 2014 and 2015) in additional vegetation management during 2015, but failed to do so.

161.    First, according to reports released in subsequent corrective disclosures on May 25 and June 8, 2018, PG&E violated relevant California laws, including Public Resources Code section 4293, multiple times.

162.    Second, Cal Fire found sufficient evidence of violations of state law to refer PG&E to the relevant district attorneys for eleven of the North Bay fires. *See* Sections VII.D.4-5, *infra*.

163.    Third, investigations into the causes of the Camp Fire have already disclosed evidence that this most destructive and deadly wildfire in California history was caused by PG&E violating California Public Resources Code §4293 and California Public Utilities Code §451, among other safety regulations.

164.    Thus, this statement was materially false and/or misleading because of PG&E's numerous and widespread violations of safety regulations, including regulations specifically related to vegetation management – regulations which were essential for preventing devastating wildfires. In fact, PG&E's violations were so pervasive that they caused the Camp Fire as well as multiple North Bay Fires all at the same time in seven different counties – therefore they cannot be explained away as an isolated lapse.

165.    This statement regarding compliance was reviewed and authorized by Defendant Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer. According to the same 2015 Corporate Responsibility and Sustainability Report:

> Within senior leadership, ethics and compliance are managed by a Chief Ethics and Compliance Officer, a position created in 2015 as part of our commitment to achieve a best-in-class ethics and compliance program. The position reports to the PG&E Corporation CEO and has additional reporting responsibility to the Audit Committees of the Board of Directors, and the Compliance and Public Policy Committee of PG&E Corporation.
>
> The new position is responsible for:
>
> - Building a best-in-class ethics and **compliance** program and **overseeing its implementation**,
>
> - **Overseeing company-wide programs for compliance reporting and related investigatory processes**. . . .

166. Kane therefore was responsible for both "overseeing . . . implementation" of PG&E's compliance **and "overseeing . . . compliance reporting,"** including this report.

### 3. November 18, 2015 – Misstatement No. 3

167. On November 18, 2015, Hogan publicly testified before the California Senate Energy, Utilities and Communication Subcommittee on Gas and Electric Infrastructure Safety. During that testimony, Hogan assured the public that PG&E was "just about done" implementing a program that would remotely disable the Company's recloser devices in areas that included "high wildfire risk areas":

> So as I mentioned earlier, our SCADA capabilities where we are able to *take our reclosers out of service remotely*, we first *focus on the wildfire areas* and then we have about 130 some odd locations, we are going to complete about 126 of those this year, *just about done with that program*, which leaves six for next year, which will be completed.

168. This statement was materially false and/or misleading because PG&E misleadingly said that it had implemented policies and procedures to disable recloser devices from areas that were at high risk for wildfires, which includes the areas where the North Bay Fires occurred, by the end of 2015 (approximately 1 month away). Hogan's statement concealed that PG&E dangerously kept reclosers in use through at least October 2017; Cal Fire has determined that PG&E reclosers caused one of the North Bay Fires, known as the Pythian Fire. Indeed, a recloser was found on a broken PG&E pole at the second ignition point for the Camp Fire. Thus, PG&E did not have the safety policies and procedures in place that they said they had.

### 4. October 6, 2016 – Misstatement No. 4

169. On October 6, 2016, PG&E issued its 2016 Corporate Responsibility and Sustainability Report. This report provided false assurances to investors regarding PG&E's compliance with relevant regulations:

**Vegetation Management**

Each year, PG&E's Vegetation Management department and its contracting arborists and foresters inspect miles of power lines in our service area for public safety and electric reliability. *We do so in compliance with relevant laws* and with a focus on public involvement, including extensive "Right Tree, Right Place"

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO. 3-18-CV-03509-RS

49

> outreach. PG&E has been recognized by the National Arbor Day
> Foundation as a Tree Line USA recipient for 21 consecutive years
> for demonstrating best practices in energy sector arboriculture.

170. Because PG&E's vegetation management practices failed to follow relevant California safety laws, PG&E's vegetation management activities were decidedly not "in compliance with relevant laws."

171. First, according to reports released in subsequent corrective disclosures, PG&E violated California's Public Resources Code section 4293 multiple times.

172. Second, Cal Fire found sufficient evidence of violations of state law to refer PG&E to the relevant district attorneys for eleven of the North Bay fires. *See* Sections VII.D.4-5, *infra*.

173. Third, investigations into the causes of the Camp Fire have already disclosed evidence that this most destructive and deadly wildfire in California history was caused by PG&E violating California Public Resources Code §4293 and California Public Utilities Code §451, among other safety regulations.

174. Thus, this statement was materially false and/or misleading because of PG&E's numerous and widespread violations of safety regulations, including regulations specifically related to vegetation management – regulations which were essential for preventing devastating wildfires. In fact, PG&E's violations were so pervasive that they caused the Camp Fire as well as at least 11 of the North Bay Fires all at the same time in **seven** different counties – therefore they cannot be explained away as an isolated lapse.

175. This statement regarding compliance was reviewed and authorized by Defendant Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer. According to the same 2016 Corporate Responsibility and Sustainability Report:

> Within senior leadership, ethics and compliance are managed by
> the Chief Ethics and Compliance Officer (CECO), who reports to
> the PG&E Corporation Chairman and CEO. The CECO has
> additional reporting responsibility to the Audit Committees of the
> PG&E Corporation and Pacific Gas and Electric Company Boards
> of Directors, and the Compliance and Public Policy Committee of
> the PG&E Corporation Board.
>
> The CECO is responsible for:

- Building a best-in-class ethics and **compliance** program and **managing its implementation**,

- **Overseeing enterprise-wide programs for compliance monitoring, reporting**, assessment and remediation. . . .

176.    Kane therefore was responsible for both "managing . . . implementation" of PG&E's compliance **and "overseeing . . . compliance monitoring [and] reporting,"** including this report.

### 5.    August 9, 2017 – Misstatement No. 5

177.    On August 9, 2017, PG&E issued its 2017 Corporate Responsibility and Sustainability Report. This report provided false assurances to investors regarding PG&E's compliance with relevant regulations:

**Vegetation Management**

PG&E prunes and removes trees growing too close to power lines while maintaining as much vegetation as possible to balance land use and environmental stewardship with customer needs. Through a well-established and innovative vegetation management program, ***PG&E balances the need to maintain a vast system of trees growing along power lines while complying with state and federal regulations and delivering safe***, reliable and affordable ***electric service***.

178.    Because PG&E's vegetation management practices failed to follow relevant California safety laws, PG&E's vegetation management activities were decidedly not "complying with state and federal regulations and delivering safe . . . electric service."

179.    First, according to reports released in subsequent corrective disclosures, PG&E violated California's Public Resources Code section 4293 multiple times.

180.    Second, Cal Fire found sufficient evidence of violations of state law to refer PG&E to the relevant district attorneys for eleven of the North Bay fires. *See* Sections VII.D.4-5, *infra*.

181.    Third, investigations into the causes of the Camp Fire have already disclosed evidence that this most destructive and deadly wildfire in California history was caused by PG&E violating California Public Resources Code §4293 and California Public Utilities Code §451, among other safety regulations.

182.     Thus, this statement was materially false and/or misleading because of PG&E's numerous and widespread violations of safety regulations, including regulations specifically related to vegetation management – regulations which were essential for preventing devastating wildfires. In fact, PG&E's violations were so pervasive that they evidently caused the Camp Fire as well as multiple North Bay Fires all at the same time in seven different counties – therefore they cannot be explained away as an isolated lapse.

183.     This statement regarding compliance was reviewed and authorized by Defendant Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer. According to the same 2017 Corporate Responsibility and Sustainability Report:

> Within senior leadership, compliance and ethics are managed by the Senior Vice President, Chief Ethics and Compliance Officer and Deputy General Counsel (CECO), who reports to the PG&E Corporation Chief Executive Officer (CEO) and President. The CECO has additional reporting responsibility to the Audit Committees of the PG&E Corporation and Pacific Gas and Electric Company Boards of Directors, and the Compliance and Public Policy Committee of the PG&E Corporation Board.
>
> The CECO is responsible for:
>
> - Building a best-in-class **compliance** and ethics program **and managing its implementation**,
>
> - **Overseeing enterprise-wide programs for compliance monitoring, reporting**, assessment and remediation. . . .

184.     Kane therefore was responsible for both "managing implementation" of PG&E's compliance **and "overseeing . . . compliance monitoring [and] reporting**," including this report.

**C.     Defendants Tied the Company's Dividend to Safety Compliance, Making Materially False and Misleading Statements and Omissions Regarding Its Dividend and Safety Before the North Bay Fires**

185.     Throughout the Class Period, Defendants repeatedly tied the sustainability of its quarterly cash dividend to safety. In fact, PG&E increased its dividend during the Class Period for the first time in six years, and then raised it again – touting the Company's "progress on safety" and "improvements we have made in safety." Yet PG&E's violations of California's

1 safety regulations were so numerous and widespread that they caused and exacerbated the North

2 Bay Fires, resulting in PG&E having to suspend its dividend entirely on December 20, 2017.

### 1. May 23, 2016 – Misstatement No. 6

4 186. Less than three weeks after its May 4, 2016 earnings call, PG&E issued a press

5 release titled "PG&E Corporation Raises Common Stock Dividend, Highlights Progress at

6 Annual Shareholder Meeting." It stated:

> PG&E Corporation (NYSE: PCG) today announced that it is
> raising its quarterly common stock dividend to 49 cents per share,
> an increase of 3.5 cents per share, beginning with dividends for the
> second quarter of 2016.
>
> * * *
>
> The increase, which is the company's first in six years, is a
> meaningful step toward gradually returning the company's
> dividend payout to levels that are comparable with those of similar
> utilities.
>
> * * *
>
> ***Earley and other senior executives also discussed continued
> progress on safety***, reliability and other goals, as well as PG&E's
> strategy for the future [at the annual shareholder meeting].
>
> Earley said, '***We've continued to demonstrate leadership and
> commitment on safety.*** We're delivering the most reliable service
> in our company's history.

18 187. This statement was materially false and/or misleading because it affirmed that

19 PG&E's dividend would not be negatively impacted by the Company's role in causing wildfires.

20 Indeed, it affirmed to investors that PG&E had attained "progress on safety," specifically

21 connecting purported safety achievements to its ability to increase its dividend, importantly, "to

22 levels that are comparable to those of similar utilities." In reality, PG&E lacked the touted

23 "progress on safety." It fell so far short of this touted achievement that its safety violations, and

24 resulting responsibility for wildfires, would cause PG&E to suspend its dividend entirely on

25 December 20, 2017 due to PG&E's responsibility for the North Bay Fires. This statement gave

26 investors a false impression that safety risks would not imperil the Company's dividend, which is

27 precisely what occurred on December 20, 2017. Further, this statement touting PG&E's

1    "commitment on safety" materially omitted that the Company's spending on vegetation

2    management barely kept pace with inflation at that time.

3         188.    The false and misleading nature of this statement was further revealed in a series

4    of events from November 8-15, 2018, as evidence emerged that PG&E's safety violations caused

5    the Camp Fire: the most destructive and deadly wildfire in California history.

6        **2.    November 4, 2016 – Misstatement No. 7**

7         189.    On November 4, 2016, PG&E hosted a conference call with analysts to discuss its

8    financial results for the third quarter of 2016. In his prepared remarks, Earley stated as follows:

9           ***The improvements we have made in safety*** and reliability ***over the***
10          ***last six years have put us in a position to deliver strong financial***
       ***results going forward.***

11          Earlier this year, we announced our first dividend increase in six
12          years, and we have committed to achieving a roughly 60% payout
       ratio by 2019. Combined with our expected rate based growth, we
13          are confident we can deliver a strong overall return for our
       shareholders.

14        190.    The statement was materially false and/or misleading because PG&E **did not**

15   **make** "improvements" in wildfire "safety . . . over the last six years." In fact, a PG&E

16   Vegetation Program Manager, Richard Yarnell, later testified that for the entire period from

17   September 2015 to April 10, 2017, "PG&E—to the best of my knowledge, we have not made

18   any changes" to improve safety. Nor was the Company "in a position to deliver strong financial

19   results going forward." In reality, PG&E's responsibility for causing multiple wildfires – as the

20   results of its numerous, widespread safety violations – had such a significant **negative** impact on

21   PG&E's financial results and financial outlook that PG&E had to suspend its dividend entirely

22   on December 20, 2017 due to PG&E's responsibility for causing the North Bay Fires. This

23   statement gave investors a false impression that concealed safety risks would not imperil the

24   Company's dividend, which is precisely what occurred on December 20, 2017.

25        191.    The false and misleading nature of this statement was further revealed in a series

26   of events from November 8-15, 2018, as evidence emerged that PG&E's safety violations

27   caused the Camp Fire: the most destructive and deadly wildfire in California history.

28

1

### 3.     May 31, 2017 – Misstatement No. 8

2       192.    On May 31, 2017, PG&E issued a press release titled "PG&E Corporation Raises

3   Common Stock Dividend, Shareholders Elect Former Secretary of Homeland Security Jeh C.

4   Johnson to Boards of Directors." The release stated:

5               PG&E Corporation (NYSE: PCG) today announced that it is
                raising its quarterly common stock dividend by 4 cents per share to
6               53 cents per share, beginning with the dividend for the second
                quarter of 2017. On an annual basis, this action increases PG&E
7               Corporation's dividend by 8 percent, from $1.96 per share to $2.12
                per share.

8                                              * * *

9
10              Yesterday, in remarks at the joint annual shareholders meeting of
                PG&E Corporation and Pacific Gas and Electric Company, [CEO]
11              Williams highlighted the companies' **progress on safety, reliability**
                and reducing greenhouse gas emissions, among other
12              accomplishments. **She reaffirmed PG&E's commitment to safety
                and operational excellence**, delivering for customers and leading
13              the way to achieve California's clean energy goals.

14      193.    This statement falsely connected PG&E's decision increasing its dividend to

15  "progress on safety" and PG&E's "commitment to safety and operational excellence," only

16  months before the Company's pervasive failure to comply with safety regulations caused at least

17  eleven of the North Bay Fires all at the same time in seven different counties. Indeed, it omitted

18  that there was no progress on wildfire safety, as confirmed by PG&E's own Vegetation Program

19  Manager Richard Yarnell, **only one month before the statement was made,** when he reportedly

20  testified under oath: "PG&E—to the best of my knowledge, we have not made any changes as a

21  result of th[e Butte] fire," *i.e.*, from September 2015 to April 10, 2017 (when Yarnell so

22  testified). PG&E's above statement on May 31, 2017 gave investors a false impression that

23  concealed safety risks would not imperil the Company's dividend, which is precisely what

24  occurred on December 20, 2017.

25      194.    The false and misleading nature of this statement was further revealed in a series

26  of events from November 8-15, 2018, as evidence emerged that PG&E's safety violations caused

27  the Camp Fire: the most destructive and deadly wildfire in California history.

28

1

**D.      After the North Bay Fires Erupted, the Truth Began to Emerge**

2       195.    The North Bay Fires began on Sunday evening, October 8, 2017. However, it was

3   not until Thursday, October 12, 2017 that the market began to understand that PG&E's safety

4   regulation violations were a major cause. On that date, as detailed below (*see* Section VII.D.1,

5   *infra*), CPUC sent PG&E a litigation hold letter reminding PG&E that it (a) "must preserve any

6   factual or physical evidence … includ[ing] all failed poles, conductors and associated equipment

7   from each fire event" and (b) "must inform all employees and contractors that they must preserve

8   all electronic (including emails) and non-electronic documents related to potential causes of the

9   fires, vegetation management, maintenance and/or tree-trimming." This was the first disclosure

10  indicating that PG&E caused any of the North Bay Fires. In response to this news, PG&E's share

11  price declined 6.7%.

12      196.    Late the next day, PG&E issued a statement explaining to investors that: "The

13  causes of these fires are being investigated by [Cal Fire], including the possible role of [PG&E's]

14  power lines and other facilities." It reported that the Company "has approximately $800 million

15  in liability insurance for potential losses that may result from these fires" – to prepare investors

16  for the possibility that "the amount of insurance is insufficient to cover the Utility's liability," in

17  which case, its "financial condition or results of operations could be materially affected." The

18  market had understood that PG&E would be reimbursed by rate-payers for damages by fires it

19  caused while nevertheless acting as a prudent manager; hence, the Company's discussion of

20  liability and insurance signaled to the market that at least some of the North Bay Fires were

21  proximately caused by PG&E's negligence or worse. In response to this news, PG&E's share

22  price continued to decline until the end of the next trading day, Monday, October 16, 2017,

23  falling by approximately 16.5%.

24      197.    Thereafter, PG&E's management attempted to reassure investors, falsely, as

25  detailed below.

26

27

28

1

E.     **After the North Bay Fires Were Contained, the Company Made Additional False and Misleading Statements and Omissions Regarding Compliance with Wildfire-Related Safety Regulations**

2

3

1.     **October 31, 2017 – Misstatement No. 9**

4

198.     On October 31, 2017, PG&E issued a press release titled "Facts About PG&E's

5    Electric Vegetation Management Efforts." The release stated: "*PG&E follows all applicable*

6    *federal and state vegetation clearance requirements and performs regular power line tree*

7    *safety activities in accordance with industry standards, guidelines, and acceptable procedures*

8    *that help to reduce outages or fires caused by trees or other vegetation*."

9    199.     This statement was materially false and/or misleading because PG&E did **not**

10    follow "all applicable … state vegetation clearance requirements."

11    200.     First, according to reports released in subsequent corrective disclosures, PG&E

12    violated California's Public Resources Code section 4293 multiple times.

13    201.     Second, Cal Fire found sufficient evidence of violations of state law to refer

14    PG&E to the relevant district attorneys for eleven of the North Bay fires. *See* Sections VII.D.4-5,

15    *infra.*

16    202.     Third, investigations into the causes of the Camp Fire have already disclosed

17    evidence that this most destructive and deadly wildfire in California history was caused by

18    PG&E violating California Public Resources Code §4293 and California Public Utilities Code

19    §451, among other safety regulations.  This statement concealed the sizeable risk that PG&E's

20    numerous and widespread violations of safety regulations would **worsen** rather than "help to

21    reduce . . . fires caused by trees or other vegetation."

22    203.     Thus, this statement was materially false and/or misleading because of PG&E's

23    numerous and widespread violations of safety regulations, including regulations specifically

24    related to vegetation management – regulations which were essential for preventing devastating

25    wildfires. In fact, PG&E's violations were so pervasive that they evidently caused the Camp Fire

26    as well as multiple North Bay Fires all at the same time in seven different counties – therefore

27    they cannot be explained away as an isolated lapse.

28

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO. 3-18-CV-03509-RS

57

204.    This statement regarding compliance was reviewed and authorized by Defendant Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer.  Kane was responsible for both "overseeing . . . implementation" of PG&E's compliance and "overseeing . . . compliance reporting," including this press release.  Because of her senior position within the Company, Kane had ultimate authority to control the content of this statement.

### 2.    November 2, 2017 – Misstatement No. 10

205.    On November 2, 2017, PG&E hosted a conference call with analysts to discuss its financial results for the third quarter of 2017. In her prepared remarks, now-CEO Williams falsely reassured investors regarding the effectiveness of PG&E's vegetation management:

> Thank you, Chris, and good morning, everyone. Given the recent wildfires impacting our customers and communities, our discussion today will be different from our usual earnings call. . . .
>
> * * *
>
> Now I know there's a lot of interest in how these fires started and in how PG&E assets might have been involved in or impacted by the wildfires. Our communities deserve answers and we are committed to learning what happened. It's critical that we identify anything that will help us to keep our customers and communities safe in the future. That is our goal as we work with CAL FIRE and the CPUC.
>
> * * *
>
> **Many of you have reached out with questions about the potential impact of the wildfires to the company's financials and also about the doctrine of inverse condemnation in California.** At this time, the known financial impact of the wildfires is limited to the cost of the unprecedented response and restoration efforts, costs related to our liability insurance and some legal expenses, and Jason [Wells] will cover these later this morning.
>
> * * *
>
> **I know there's a lot of interest in our pole maintenance and vegetation management programs**, so let me address these as well. First, we routinely inspect, maintain and replace our electric poles. This includes annual scheduled patrols, 5-year visual inspections, an intrusive testing and treating on our wood poles on a frequency that significantly exceeds CPUC requirements.
>
> **We also have one of, if not, the most comprehensive vegetation management programs in the country.** Our vegetation management program manages about 123 million trees across the service territory. And every year, we inspect every segment of the

99,000 miles of overhead line and we clear vegetation as needed. This is well beyond what is typical in our industry where most utilities have a 3-year vegetation management cycle or sometimes longer. **Typically, we spend about $200 million every year to line clear or remove 1.3 million trees to mitigate both the risk of wildfires and to prevent electric outages. With the drought and the tree mortality crisis we've experienced in California, we have been expanding our vegetation management work since 2014.**

***In 2016, we spent an additional $200 million, essentially doubling our typical vegetation management spending last year.*** We've removed an incremental 236,000 dead or dying trees, and we enhanced our tree maintenance work with additional patrols in areas of high fire danger, including a combination of boots on the ground, aerial patrols, and sophisticated LiDAR technology.

206.     These statements were materially false and/or misleading because PG&E did not "doubl[e]" its "typical vegetation management spending last year." As explained in Section IV.B., *supra*, PG&E's Vegetation Management Balancing Accounts for the relevant years indicate that PG&E spent $194,094,406 on vegetation management in 2015, $198,735,579 in 2016, and $201,456,193 in 2017 – increases of only 2.4% and 1.4%, respectively.[71] The lack of improvement to PG&E's vegetation management practices was confirmed by PG&E's own Vegetation Program Manager Richard Yarnell, who reportedly testified under oath that, even by April 10, 2017: "PG&E—to the best of my knowledge, **we have not made any changes** as a result of th[e September 2015 Butte] fire."

207.     Further, PG&E failed to comply with safety regulations – including regulations specifically related to vegetation management. Thus, when Williams touted PG&E's vegetation management program as "one of, if not, the most comprehensive vegetation management programs in the country," she gave investors the false impression that PG&E's vegetation management did not fall short of applicable safety regulations, when in fact it did. Given PG&E's numerous and widespread violations of safety regulations, including those violations that would cause multiple of the North Bay Fires as well as evidently cause the Camp Fire, its "vegetation management programs" were **not** "comprehensive."

---

[71] This spending did not differ more than $100,000 from the amounts PG&E requested, and the amounts CPUC approved, in PG&E's 2015, 2016, and 2017 General Rate Cases.

1

### 3.   November 2, 2017 – Misstatement No. 11

2

208.   Later on the same call, an analyst asked the Company for more detail about

3   PG&E's vegetation management practices. President and COO Nickolas Stavropoulos replied as

4   follows:

5          [ANALYST:] And then, I guess, *can you discuss your vegetation*
           *practices for trees that are located near power lines?* I guess
6          we've seen sort of end reports that have come out for some of your
           peers that they sort of track vegetation that's within certain
7          distances from the lines, and they basically make their decisions on
           what to do based on sort of updates.

8
           [Stavropoulos:] Thank you for the question. So as Geisha
9          mentioned, we have a very aggressive vegetation management
           program across our 70,000-mile -- square mile territory. We
10         manage about 123 million trees that are near and adjacent to our
           facilities. *And over the last 2 years, we've doubled the amount*
11         *that we've invested in veg[etation] management.* That includes
           line clearing to remove parts of trees that are adjacent to our
12         facilities as well as removal of dead and dying trees. So the
           program involves year-round effort to identify these dead and
13         dying trees through inspection processes where we use foot and
           aerial patrols; we use LiDAR, which is light, detecting and ranging
14         technology, to identify the trees that need to be worked. *We*
           *inspect all of our overhead lines every year, and we do second*
15         *patrols in high fire danger areas at least twice a year. In some*
           *areas, we do as often as 4x a year.* So it's a very aggressive
16         program. There are specific requirements around line clearing, and
           it depends upon the voltage of the lines. And it can range up to feet
17         [sic] to as much a sort of 18 inches away from the facility. So there
           are all sorts of different requirements, depending upon where the
18         facilities are located and the voltage of the facilities.

19         209.   This statement was materially false and/or misleading because PG&E did not

20   "doubl[e] the amount that we've invested in veg[etation] management." As explained in Section

21   IV.B., *supra*, PG&E's Vegetation Management Balancing Accounts for the relevant years

22   indicate that PG&E spent $194,094,406 on vegetation management in 2015, $198,735,579 in

23   2016, and $201,456,193 in 2017. Moreover, the lack of improvement to PG&E's vegetation

24   management practices was confirmed by PG&E's own Vegetation Program Manager Richard

25   Yarnell, who reportedly testified under oath that, even by April 10, 2017: "PG&E—to the best of

26   my knowledge, we have not made any changes as a result of th[e Butte] fire," *i.e.*, since

27   September 2015.

28

210.     Further, PG&E failed to comply with safety regulations specifically related to vegetation management. By representing that it "inspect[s] all of [its] overhead lines every year," and inspects some trees "twice" or "4x" each year, Stavropoulos falsely created the impression that PG&E would prevent many violations from occurring, especially in "high fire danger areas" such as those where the North Bay Fires and Camp Fire erupted. In reality, violations were so pervasive that they evidently caused the Camp Fire as well as at least eleven fires at the same time in **seven** different counties. In touting its "very aggressive vegetation management program," the statement actionably omitted the widespread failure of these measures to bring PG&E into compliance. Indeed, if PG&E had been properly "inspect[ing] all of our overhead lines "every year," "twice a year," or "4x a year," many of the causes of the North Bay Fires and Camp Fire would have been discovered. For instance, in addition to the fires caused by dead or dying trees, Cal Fire found that the Cascade Fire was caused "by sagging power lines coming into contact" and the Blue Fire was caused when "a PG&E power line conductor separated from a connector."

211.     As another example, in the afternoon of November 8, 2018, PG&E's aerial inspection of the 115 kilovolt transmission line that caused the Camp Fire discovered "damage to a transmission tower" carrying that electrical line.  PG&E has also acknowledged a second ignition point for the Camp Fire that exhibited damaged and downed poles, vegetation on top of downed wires, and other signs of safety violations.

### 4.     November 5, 2017 – Misstatement No. 12

212.     At all relevant times, PG&E's Media Relations department maintained a news website named *Currents*,[72] providing news, information, and commentary about PG&E's activities, including the delivery of electricity and the operation, maintenance, and safety of the Company's electric services. Through the website, PG&E repeatedly touted the safety of its power lines, the Company's vegetation management program, and its purported success mitigating wildfire risk.

---

[72] http://www.pgecurrents.com (last visited Dec. 13, 2018).

213.    In one such article, dated November 5, 2017 and titled "Facts About PG&E's Wildfire and Prevention Safety Efforts," PG&E reassured investors that "***PG&E meets or exceeds all applicable federal and state vegetation clearance requirements***."[73]

214.    This statement was materially false and/or misleading because PG&E did not "meet" – much less "exceed" – "all applicable … state vegetation clearance requirements."

215.    First, according to reports released in subsequent corrective disclosures, PG&E violated California's Public Resources Code section 4293 multiple times. *See* Section VII.D.4., *infra*.

216.    Second, Cal Fire found sufficient evidence of violations of state law to refer PG&E to the relevant district attorneys for eleven of the North Bay fires. *See* Sections VII.D.4-5, *infra*.

217.    Third, investigations into the causes of the Camp Fire have already disclosed evidence that this most destructive and deadly wildfire in California history was caused by PG&E violating California Public Resources Code §4293 and California Public Utilities Code §451, among other safety regulations.

218.    Thus, this statement was materially false and/or misleading because of PG&E's numerous and widespread violations of safety regulations, including regulations specifically related to vegetation management – regulations which were essential for preventing devastating wildfires. In fact, PG&E's violations were so pervasive that they evidently caused the Camp Fire as well as multiple North Bay Fires all at the same time in seven different counties – therefore they cannot be explained away as an isolated lapse.

219.    This statement regarding compliance was reviewed and authorized by Defendant Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer.  Kane was responsible for both "overseeing . . . implementation" of PG&E's compliance and "overseeing . . .

---

[73] On November 14, 2017, PG&E spokesperson Greg Snapper repeated this false and misleading reassurance *verbatim* in an NBC article titled "Utility Company's Risk Assessment at Issue in NorCal Wildfires." *See* https://www.nbcconnecticut.com/troubleshooters/national-investigations/PGE-Risk-Assessment-at-Issue-in-North-Bay-Wildfires-457356963.html (last visited Dec. 13, 2018).

1   compliance reporting," including this news release. Because of her senior position within the

2   Company, Kane had ultimate authority to control the content of this statement.

3           **5.**      **May 25, 2018 – Misstatement No. 13**

4         220.    On May 25, 2018, PG&E issued a press release to respond to Cal Fire's reports

5   regarding some of the October 2017 North Bay Fires (*see* Section VII.D.4, *infra*), to reassure

6   investors that PG&E had met all state regulations concerning fire safety. The press release stated:

7           •  Following Governor Brown's January 2014 Drought State
8              of Emergency Proclamation and the California Public
           Utilities Commission's Resolution ESRB-4, PG&E has
9              added enhanced measures to address areas particularly
           affected by drought and bark beetles including:

10           •  Increased foot and aerial patrols along power lines in high
           fire-risk areas;

11

12           •  Removed approximately 236,000 dead or dying trees in
           2016 and 140,000 dead or dying trees in 2017; these tree
13              removals were in addition to approximately 30,000 trees
           removed per year prior to the drought;

14           •  Launched daily aerial fire detection patrols during high fire
15              season to improve fire spotting and speed of fire response;

16           •  Since 2014, provided $11.4 million to local Fire Safe
           Councils (FSCs) for fuel reduction projects in
17              communities; and

18           •  Provided $1.7 million to local FSCs for 28 highly
           programmable remote-sensing cameras for critical fire
19              lookout towers.

20           •  ***PG&E meets or exceeds regulatory requirements for pole
           integrity management***, using a comprehensive database to
           manage multiple patrol and inspection schedules of our
21              more than two million poles.

22         221.    This statement was materially false and/or misleading because PG&E did not

23   "meet" – much less "exceed" – "regulatory requirements for pole integrity management."

24   According to a report released in a subsequent corrective disclosure, PG&E violated California's

25   safety regulations multiple times. Indeed, on June 8, 2018, Cal Fire disclosed that its

26   "investigators have determined that 12 Northern California wildfires in the October 2017 Fire

27   Siege were caused by electric power and distribution lines, conductors **and the failure of power**

28   **poles**." In fact, at least one of the North Bay Fires – the Sulphur Fire – "was caused by the failure

---

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT           63
CIVIL ACTION NO. 3:18-CV-03509-RS

1   of a PG&E owned power pole" evidencing "violations of state law" sufficient to be referred to

2   the relevant district attorney. Further, Cal Fire found enough evidence of violations of state law

3   to refer PG&E to the relevant district attorneys for eight of these twelve North Bay fires. *See*

4   Section VII.D.5., *infra*.

5          222.   Additionally, PG&E acknowledged that an aerial patrol of the Camp Fire's origin

6   later the same day showed "damage to a transmission tower" or pole that PG&E failed to

7   maintain, as well as a second ignition point that exhibited damaged and downed poles, in

8   violation of §451.  Thus, PG&E did **not** "meet[] or exceed[] regulatory requirements for pole

9   integrity management" – regulations which were essential for preventing devastating wildfires.

10  PG&E's representation to the contrary was materially false and/or misleading.

11         223.   Overall, this statement was materially false and/or misleading because of PG&E's

12  numerous and widespread violations of safety regulations – regulations which were essential for

13  preventing devastating wildfires. In fact, PG&E's violations were so pervasive that they

14  evidently caused the Camp Fire as well as multiple North Bay Fires all at the same time in seven

15  different counties – therefore they cannot be explained away as an isolated lapse.

16         224.   This statement regarding compliance was reviewed and authorized by Defendant

17  Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer.  Kane was responsible

18  for both "overseeing . . . implementation" of PG&E's compliance and "overseeing . . .

19  compliance reporting," including this press release.  Because of her senior position within the

20  Company, Kane had ultimate authority to control the content of this statement.

21         **F.     While the Truth Regarding PG&E's Role in Causing the North Bay Fires
                    Emerged, the Company Made Additional False and Misleading Statements
22                  and Omissions Regarding Compliance with Wildfire-Related Safety
                    Regulations, Including Its ESRB-8 Shutoff Protocol**
23

24         225.   As detailed below (*see* Section VII.D., *infra*), PG&E's share price declined

25  precipitously as the truth about its responsibility for the North Bay Fires emerged.  As liabilities

26  for the North Bay Fires threatened the Company's financial viability, Defendants would realize

27  that the Company needed a legislative bailout to avoid bankruptcy.  As a result, PG&E needed

28  the public, including investors, to believe that it would prioritize safety thereafter.

---

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                    64
CIVIL ACTION NO. 3-18-CV-03509-RS

1          **1.      June 8, 2018 – Misstatement No. 14**

2          226.    On June 8, 2018, Cal Fire announced its conclusions that PG&E caused the

3  preponderance of the North Bay Fires (*see* Section VII.D.5, *infra*), PG&E's share price

4  continued its decline, and its financial situation deteriorated.  Later that day, PG&E issued a

5  press release to respond to Cal Fire's report, falsely and misleadingly reassuring investors that

6  PG&E had met all state regulations concerning fire safety.  The press release, titled "PG&E

7  Responds to Latest CAL FIRE Announcement" stated, in relevant part:

8                  ***Programs Overall Met State's High Standards***

9                  We look forward to the opportunity to carefully review the
                   CAL FIRE reports to understand the agency's perspectives.
10
                   Based on the information we have so far, we continue to
11                 believe our overall programs met our state's high standards.

12                 For example, ***PG&E meets or exceeds regulatory
                   requirements for pole integrity management***, using a
13                 comprehensive database to manage multiple patrol and
                   inspection schedules of our more than two million poles.
14
                   Similarly, ***under PG&E's industry-leading Vegetation
15                 Management Program***, we inspect and monitor every PG&E
                   overhead electric transmission and distribution line each year,
16                 with some locations patrolled multiple times. We also prune or
                   remove approximately 1.4 million trees annually.
17
           227.    Because PG&E's compliance violations would soon cause the Camp Fire, the
18
   most destructive and deadly wildfire in California history, PG&E's "Vegetation Management
19
   Program" and "pole integrity management" decidedly did not meet California's "High
20
   Standards."  Investigations into the causes of the Camp Fire have already uncovered evidence
21
   that it was caused by PG&E violating California Public Resources Code §4293 and California
22
   Public Utilities Code §451, among other safety regulations.
23
           228.    First, the Camp Fire was described in initial communications between firefighters
24
   and dispatch as a vegetation fire "underneath the transmission lines," which vegetation should
25
   have been cleared by PG&E pursuant to §4293.
26

27

28

229.    Second, PG&E acknowledged that an aerial patrol of the Camp Fire's origin later the same day showed "damage to a transmission tower" or pole that PG&E failed to maintain, in violation of §451.

230.    Third, PG&E has also acknowledged a second ignition point for the Camp Fire that exhibited damaged and downed poles, vegetation on top of downed wires, and other signs of safety violations.

231.    Thus, PG&E did **not** "meet[] or exceed[] regulatory requirements for pole integrity management" or "Vegetation Management" – regulations which were essential for preventing devastating wildfires.  PG&E's representation to the contrary was materially false and/or misleading.

232.    This statement regarding compliance was reviewed and authorized by Defendant Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer.  Kane was responsible for both "overseeing . . . implementation" of PG&E's compliance and "overseeing . . . compliance reporting," including this press release.  Because of her senior position within the Company, Kane had ultimate authority to control the content of this statement.

### 2.    June 8, 2018 – Misstatement No. 15

233.    The same press release contained a further false and/or misleading statement:

> **To address the growing threats posed by wildfires and extreme weather, and in light of the wildfires throughout our state last year, *PG&E has launched the Community Wildfire Safety Program*** to help keep our customers and communities safe. Among the key components of the new program are. . .
>
> - Public Safety Power Shutoff: As a last resort, ***a program to proactively turn off electric power for safety when extreme fire danger conditions occur***, while helping customers prepare and providing early warning notification, when and where possible.

234.    PG&E's representation that it "has launched . . . a program to proactively turn off electric power for safety when extreme fire danger conditions occur" was false and misleading. It was false because the touted program, which would eventually become its ESRB-8 Shutoff Protocol, was illusory; hence, PG&E never "launched" it.  Further, it was misleading because

1   any guidelines PG&E did develop were a mere pretense of safety that the Company never felt

2   bound to follow.  Even when all seven relevant "extreme fire danger conditions" **did** "occur,"

3   weighing strongly in favor of shutting off PG&E's transmission lines near the Jarbo Gap on

4   November 7 and 8, 2018, PG&E flouted its own supposed program.  PG&E's failure to shut off

5   its transmission line caused the Camp Fire: the most destructive and deadly wildfire in California

6   history.  By touting a wildfire safety program PG&E did not adhere to, and where its

7   nonadherence would risk devastating wildfires, PG&E misrepresented existing and material facts

8   to investors.

9           235.  This press release regarding compliance was reviewed and authorized by

10   Defendant Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer.  Kane was

11   responsible for both "overseeing . . . implementation" of PG&E's compliance and "overseeing . .

12   . compliance reporting," including this press release.  Because of her senior position within the

13   Company, Kane had ultimate authority to control the content of this statement.

14           **3.      September 27, 2018 – Misstatement No. 16**

15           236.  On July 16, 2018, the CPUC enacted Resolution ESRB-8, which required PG&E

16   to adopt, promulgate and follow "de-energization policy and procedures" to "de-energize power

17   lines" in the face of unprecedented wildfire threats "to ensure public safety."  It was the

18   Company's official announcement of its de-energization policy and procedures implementing

19   Resolution ESRB-8, detailed below, that materially misled investors.

20           237.  On or about September 27, 2018, PG&E announced the full details of its ESRB-8

21   Shutoff Protocol in a filing with CPUC[74] that was also posted on its website.[75]  The ESRB-8

22   Shutoff Protocol stated:

23                 PG&E's Community Wildfire Safety Program implements
                additional precautionary measures intended to reduce wildfire
24                 threats. ***It includes*** . . . ***executing protocols to temporarily turn off***

25

26     [74] http://cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/News_Room/Public-
Safety-Power-Shutoff-Policies-and-Procedures-September-2018.pdf (last visited Dec. 13, 2018).

27     [75] https://www.pge.com/pge_global/common/pdfs/safety/emergency-preparedness/natural-
disaster/wildfires/Public-Safety-Power-Shutoff-Policies-and-Procedures-September-2018.pdf
28   (last visited Dec. 13, 2018).

---

1

*electric power for safety when extreme fire danger conditions are*
*occurring*."

2

. . .

3

Public Safety Power Shutoff is one component of the Community
Wildfire Safety Program.  ***PG&E has created a set of procedures***
***for. . . [d]etermining what combination of conditions necessitates***
***turning off lines for safety***.

4

5

. . .

6

PG&E will take a combination of many criteria into consideration,
including:

7

8

- **"Extreme" fire danger threat level**, as classified by the
National Fire Danger Rating System

9

10

- **A Red Flag Warning declared** by the National Weather
Service

11

12

- **Low humidity levels**, generally 20 percent and below

13

- **Sustained winds** above approx. 25 mph and wind gusts in
excess of approx. 45 mph

14

- **Site-specific conditions** such as temperature, terrain and
local climate

15

16

- **Critically dry vegetation** that could serve as fuel for a
wildfire

17

- **On-the-ground, real-time observations** from PG&E field
crews

18

(Emphasis original.)

19

238.   PG&E's representation that it had "implement[ed] additional precautionary

20

measures" including "determining what combination of conditions necessitates turning off lines

21

for safety" was false and misleading.  It was false because the ESRB-8 Shutoff Protocol was

22

illusory; hence, PG&E did not "implement" it, as required by law.  Further, it was misleading

23

because any guidelines PG&E did develop were a mere pretense of safety that the Company

24

never felt bound to follow.  Even when all seven relevant "criteria" weighed in favor of shutting

25

off PG&E's transmission lines near the Jarbo Gap on November 7 and 8, 2018, PG&E

26

nevertheless flouted its protocol.  PG&E's failure to shut off its transmission line caused the

27

Camp Fire: the most destructive and deadly wildfire in California history.  By touting a wildfire

28

1   safety program PG&E did not adhere to, where its nonadherence would risk devastating

2   wildfires, PG&E misrepresented existing and material facts to investors.

3        239.   This statement regarding compliance was reviewed and authorized by Defendant

4   Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer.  Kane was responsible

5   for both "overseeing . . . implementation" of PG&E's compliance and "overseeing . . .

6   compliance reporting," including this report. Because of her senior position within the Company,

7   Kane had ultimate authority to control the content of this statement.

8                    **4.    October 9, 2018 – Misstatement No. 17**

9        240.   On October 9, 2018 Cal Fire announced its conclusions that PG&E equipment

10   caused another of the North Bay Fires, known as the Cascade Fire.  Later the same day, PG&E

11   issued a press release to respond to Cal Fire's report, falsely and misleadingly reassuring

12   investors that PG&E had met all state regulations concerning fire safety.  The press release, titled

13   "PG&E Responds to Cascade Wildfire Announcement" stated, in relevant part:

> [W]e are continuing to focus on ***implementing additional
> precautionary measures*** intended to further reduce wildfire
> threats, such as ***working to remove and reduce dangerous
> vegetation, improving weather forecasting, upgrading
> emergency response warnings, [and] making lines and poles
> stronger in high fire threat areas***, and taking other actions to
> make our system, and our customers and communities, ***even
> safer*** in the face of a growing wildfire threat.

19        241.   It was false and misleading for PG&E to tout "implementing additional

20   precautionary measures . . . to remove and reduce dangerous vegetation" and "mak[e] lines and

21   poles stronger in high fire threat areas."  Indeed, just one month later, PG&E would cause the

22   Camp Fire through its failure to remove vegetation and maintain its poles, in violation of

23   California Public Resources Code §4293 and California Public Utilities Code §451, among other

24   safety regulations.

25        242.   As noted above, the Camp Fire was described in initial communications between

26   firefighters and dispatch as a vegetation fire "underneath the transmission lines," which

27   vegetation should have been cleared by PG&E under §4293.  Second, PG&E acknowledged that

28   an aerial patrol of the Camp Fire's origin later the same day showed "damage to a transmission

---

1    tower" or pole that PG&E failed to maintain, as well as a second ignition point that exhibited

2    damaged and downed poles, in violation of §451.  PG&E's representation to the contrary was

3    materially false and/or misleading.

4            243.    This statement regarding compliance was reviewed and authorized by Defendant

5    Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer.  Kane was responsible

6    for both "overseeing . . . implementation" of PG&E's compliance and "overseeing . . .

7    compliance reporting," including this press release.  Because of her senior position within the

8    Company, Kane had ultimate authority to control the content of this statement.

9                      **5.      October 9, 2018 – Misstatement No. 18**

10           244.    The same press release contained a further false and/or misleading statement:

11                    To address the growing threats posed by wildfires and extreme
                     weather, and in light of the wildfires throughout our state last
12                    year, ***PG&E has launched the Community Wildfire Safety***
                     ***Program*** to help keep our customers and communities safe ***by***
13                    ***implementing additional precautionary measures*** intended to
                     further reduce wildfire threats. Among the key components of
14                    the new program are. . .

15                    •  Public Safety Power Shutoff: As a last resort, ***a program to***
                        ***proactively turn off electric power for safety when***
16                       ***extreme fire danger conditions occur***, while helping
                        customers prepare and providing early warning
17                       notification, when and where possible.

18           245.    PG&E's representation that it "has launched" and "implement[ed] . . . a program

19    to proactively turn off electric power for safety when extreme fire danger conditions occur" was

20    false and misleading.  It was false because the touted program, its ESRB-8 Shutoff Protocol, was

21    illusory from the beginning; hence, PG&E never "launched" or "implement[ed]" it.

22           246.    Further, it was misleading because any guidelines PG&E did develop were a mere

23    pretense of safety that the Company never felt bound to follow.  Even when all seven relevant

24    "extreme fire danger conditions" **did** "occur," weighing in favor of shutting off PG&E's

25    transmission lines near the Jarbo Gap on November 7 and 8, 2018, PG&E nevertheless flouted

26    its supposed program.

27           247.    PG&E's failure to shut off its transmission line caused the Camp Fire: the most

28    destructive and deadly wildfire in California history.  By touting a wildfire safety program

1  PG&E did not adhere to, where its nonadherence would risk devastating wildfires, PG&E

2  misrepresented existing and material facts to investors.

3      248.    This statement regarding compliance was reviewed and authorized by Defendant

4  Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer.  Kane was responsible

5  for both "overseeing . . . implementation" of PG&E's compliance and "overseeing . . .

6  compliance reporting," including this press release.  Because of her senior position within the

7  Company, Kane had ultimate authority to control the content of this statement.

8      **6.    November 9, 2018 – Misstatement No. 19**

9      249.    On November 8, 2018, the Camp Fire started after PG&E decided not to shut off

10  its power.  Before the public became aware of PG&E's true role in causing the Camp Fire, the

11  Company announced via its official Twitter.com account at 6:14 p.m. that day: "PG&E has

12  determined that it will not proceed with plans today for a Public Safety Power Shutoff in portions

13  of 8 Northern CA counties, as *weather conditions did not warrant this safety measure*."[76]

14      250.    This statement was affirmatively false: weather conditions did, in fact, warrant a

15  shutoff.  As detailed above, all seven criteria that PG&E deemed relevant, including those related

16  to weather conditions, weighed in favor of a shutoff under PG&E's ESRB-8 Shutoff Protocol.

17  *See* Section IV.H., *supra*.

18      251.    This statement regarding compliance was reviewed and authorized by Defendant

19  Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer.  Kane was responsible

20  for both "overseeing . . . implementation" of PG&E's compliance and "overseeing . . .

21  compliance reporting," including this announcement.  Because of her senior position within the

22  Company, Kane had ultimate authority to control the content of this statement.

23  **VI.    MATERIALITY**

24      252.    PG&E's reassurances to investors about its safety, prudence, and compliance with

25  the law were especially important to investors because of California's legal regime known as

26  inverse condemnation. As described in more detail above (*see* Section IV.A.5., *supra*), PG&E is

27

28     [76] https://twitter.com/PGE4Me/status/1060672000929267713  (last visited Dec. 14, 2018).

---

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO. 3-18-CV-03509-RS

71

1  strictly liable for the property costs of wildfires it caused. However, during the Class Period, it

2  could be reimbursed for those costs by ratepayers by petitioning CPUC and showing that it had

3  acted as a prudent manager. On such a showing, CPUC could have rate payers reimburse PG&E

4  for some or all of its liability.

5        253.    PG&E's shareholders understood that PG&E would bear the costs of wildfires it

6  caused, and that PG&E's ability to pass some or all of those costs on to ratepayers was limited

7  by PG&E's prudence. For example, an analyst report issued by Evercore ISI on December 21,

8  2017 stated:

9          On the 3Q17 call PCG indicated company operations were
        conducted properly leading up to and after the fire, but they still

10          had little information regarding the cause of the fire or potential
        shareholder exposure.

11

                                           * * *

12

13          PCG reiterated the company routinely inspects, maintains, and
        replaces poles, and tests and treats wood poles on a frequency that

14          significantly exceeds CPUC requirements. The company claims to
        have one of, if not the most comprehensive vegetation

15          management programs in the country. Further, the company
        doubled its vegetation management spending in 2016 due to the

16          drought and tree mortality crisis in California. That being said, we
        still do not know and likely will not know what caused the various

17          fires for some time, **whether or not PCG's equipment was solely
        or partly the cause**, and whether or not the facts will support a

18          ruling at CPUC that PCG **acted prudently** should they be
        successfully sued under inverse condemnation.

19        254.    In light of these provisions of California law, PG&E's repeated reassurances to its

20  investors – *e.g.*, that it complied with relevant safety regulations and doubled its vegetation

21  management spending – effectively communicated that the Company would be able to recover

22  any property damage liabilities from wildfires caused by its systems, through the CPUC. Those

23  reassurances, when revealed to have been false and misleading, impacted the Company's

24  valuation by at least the amount of damage caused by the North Bay Fires and Camp Fire.

25        255.    In total, PG&E's share price declined $55.60 per share on the nine corrective

26  disclosures and/or materializations of concealed risk herein alleged. Given that the Company had

27  between approximately 514.4 and 518.6 million shares outstanding from October 24, 2017 to

28  October 25, 2018, it implies that the losses caused by PG&E's fraud exceed $28.71 billion.

---

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO. 3:18-CV-03509-RS

72

1    256.    Indeed, as detailed further below (*see* Section VIII.F., *infra*), PG&E believed that

2    the liabilities it faced put it at risk of bankruptcy.

3    **VII.    LOSS CAUSATION**

4         **A.    Defendants' False and Misleading Statements Artificially Inflated the Price of PG&E's Common Stock**

5    257.    As a result of their purchases of PG&E's securities during the Class Period, Lead

6    Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal

7    securities laws. Defendants' false and misleading statements had the intended effect and caused

8    PG&E securities to trade at artificially inflated levels throughout the Class Period, reaching as

9    high as $71.56 per share on September 11, 2017 – a month before the truth started to emerge on

10   October 12, 2017.

11        **B.    PG&E's Safety Violations Proximately Caused the Devastating North Bay Fires**

12

13   258.    PG&E caused the North Bay Fires. To date, Cal Fire has not found a single

14   instance where one of the North Bay Fires was caused by arson, lightning, fireworks, hikers,

15   children playing with matches, or any other such cause. Of the seventeen fires for which Cal Fire

16   has determined the cause, it has determined that **all seventeen were caused by PG&E**

17   **equipment**.

18   259.    Of these seventeen fires, Cal Fire determined that **eleven were due to PG&E's**

19   **violation of California safety regulations**. Under California law, PG&E bears the cost for the

20   destruction caused by these fires unless it can show to CPUC that its violations were

21   "reasonable." Together, these fires were responsible for **more than 100,000 acres of land**

22   **devastated**, **more than 2,000 structures destroyed,** and **at least 9 of the 44 North Bay Fire**

23   **fatalities.**

24   260.    Six more of the North Bay Fires were also deemed to have been caused by PG&E

25   electrical lines; though Cal Fire found no specific evidence of safety violations for these six fires,

26   PG&E may still be found liable under California's legal regime known as inverse condemnation,

27   which provides strict liability for utilities when their power lines are involved in wildfires that

28   lead to property damage. Together, these fires were responsible for an additional **more than**

1    **50,000 acres of land devastated**, **more than 800 structures destroyed**, and **at least 13 of 44**

2    **fatalities.** Necessarily, these six fires would have been more easily contained, and accordingly

3    less destructive, if not for the fires caused by PG&E's violations.

4          261.   Cal Fire's investigation of the Tubbs fire – the largest and most destructive of the

5    North Bay Fires – is still ongoing.

6          **C.    PG&E's Safety Violations Proximately Caused the Devastating Camp Fire**

7          262.   At or about 6:29 a.m. on November 8, 2018, the Camp Fire was started in Pulga,

8    California by faulty PG&E equipment on Pulga Road and Camp Creek Road, near the Jarbo

9    Gap.[77]  A second ignition point, also caused by faulty PG&E equipment, began approximately

10   15 minutes later near the community of Concow.  The combined Camp Fire soon devastated

11   several surrounding communities, largely destroying Paradise, Concow, Magalia, and Parkhill.

12         **D.    When the Market Learned the Truth, the Price of PG&E's Common Stock
           Fell Dramatically**

13
14         263.   On or about October 8, 2017, eighteen major wildfires known as the North Bay

15   Fires started in California, burning at least 249,000 acres and devastating properties across nine

     California counties.

16
17         **1.    October 12, 2017 – Corrective Disclosure and/or Materialization of
                   Concealed Risk**

18                 **(a)    The Market Began to Learn the Extent and Effects of PG&E's
                           Responsibility for the North Bay Fires**

19
20         264.   It was not until Thursday, October 12, 2017 that the market began to understand

21   that PG&E's safety regulation violations were a proximate cause of the North Bay Fires. On that

22   date, CPUC sent PG&E a litigation hold letter informing the Company of its "obligation to

23   preserve all evidence with respect to the Northern California wildfires in Napa, Sonoma, and

24   Solano Counties." Although this letter was made public on October 12, 2017, it "affirm[ed] a

25   verbal communication" of the same obligation by CPUC Safety Enforcement Division Program

26   Manager Charlotte TerKeurst to PG&E "at approximately 6:00 p.m. on October 10, 2017." The

27
28         [77] http://cdfdata.fire.ca.gov/admin8327985/cdf/images/incidentfile2277_4326.pdf (last visited
     Dec. 13, 2018).

---

public disclosure on October 12, 2017 also revealed that "Ms. TerKeurst reminded PG&E of the need to preserve all evidence, and PG&E acknowledged that it would do so."

265.    Further, the disclosure made clear that PG&E (a) "must preserve any factual or physical evidence … includ[ing] **all failed poles, conductors and associated equipment from each fire event**" and (b) "must inform all employees and contractors that they must preserve all electronic (including emails) and non-electronic documents related to **potential causes of the fires, vegetation management, maintenance and/or tree-trimming**." This was the first indication that PG&E failures caused any of the North Bay Fires.

266.    On this news that PG&E would likely bear at least some responsibility for the fires, PG&E's stock dropped $4.65 per share, from a closing price of $69.15 on October 11 to a closing price of $64.50 on October 12, or -6.7%, with unusually heavy trading volume of almost 13 million shares (compared to a Class Period daily average trading volume of 3.5 million[78]).

#### (b)    Market Commentators Confirmed the Cause of PG&E's Share Price Decline on October 12, 2017

267.    The following morning, news outlets began to report that PG&E was being connected with the causes of some of the North Bay fires. For example, at 10:54 a.m. on October 13, 2017, CNBC published an article titled "PG&E shares plunge on concern its power lines may have started California wildfires."[79] The article began by observing: "The California Public Utilities Commission sent a letter on Thursday to PG&E reminding them to preserve 'all evidence with respect to the Northern California wildfires in Napa, Sonoma and Solano Counties,' according to multiple reports." It continued to note that PG&E's share price decline occurred "on concerns its power lines may have started the massive wildfires that have ravaged California recently." The article also repeated market commentary that the decline in PG&E's share price reflected investors' understanding that PG&E was financially responsible for the North Bay Fires:

---

[78] This average excludes alleged corrective disclosure and/or materialization of risk dates.

[79] This article was published prior to the Company's corrective disclosure later that day, discussed *infra*.

Case 18-30088   Doc# 11169-8   Filed: 08/31/21   Entered: 08/31/21 14:49:59   Page
83 of 129

The drop in the stock "reflects the following assumptions: 1) the fire was caused by PCG's negligence, 2) insurance coverage for 3rd party liabilities will be very limited, 3) damage costs per acre far larger than those for the 2015 Butte fire and 4) material fines and penalties will be assessed," Christopher Turnure, an analyst at JPMorgan, said in a note Thursday. "We appreciate the severity of the fires and the legal challenges of operating in California, but estimate this loss of value as approaching a worst-case scenario for PCG shares."

268.    Similarly, on the same date, *SF Gate* published an article observing: "[T]**he state agency that regulates utilities has told PG&E to save every piece of damaged equipment from the area as evidence for the investigations to come**." The article concluded by stating that PG&E's vegetation management practices caused the North Bay Fires: "In all, **the company spent $198 million in 2016 on 'vegetation management**.' But those efforts and that money – all of it coming from PG&E's customers – **may not have been enough**."[80]

269.    Investors started to be concerned regarding whether PG&E violated any regulations with respect to the North Bay fires. For example, Wells Fargo stated in its analyst report the very next day:

Yesterday (10/12), shares of PCG underperformed the S&P Utilities by roughly 720 bps. We attribute the material decline in price to the revelation that the company's power lines might have played a role in the Northern California fires. Over the weekend Northern California experienced winds in excess of 70 miles per hour, which could have caused trees to impact power lines that could have sparked fires particularly given the very dry vegetation. While there is still significant uncertainty in what caused the fires, apparently investigators are looking into the role of PCG's infrastructure. **The concern for investors is whether PCG did not adequately trim trees around their power lines it is our understanding that in California utilities are required to clear vegetation within 10 feet of power lines. In the absence of inadequate tree trimming, we think that property damage attributable to PCG's infrastructure should be largely covered by insurance.**

270.    Similarly, an October 13, 2017 report by a Guggenheim stock analyst stated that the decline was caused by "media reports linking the company to some of the most destructive wildfires experienced in CA, which continued to burn."

---

[80] https://www.sfgate.com/bayarea/article/PG-E-millions-fire-prevention-Santa-Rosa-wildfires-12277237.php (last visited Dec. 13, 2018).

2.      **October 13-16, 2017 – Corrective Disclosure and/or Materialization of Concealed Risk**

(a)      **The Market Continued to Learn the Extent and Effects of PG&E's Responsibility for the North Bay Fires**

271.      Late on October 13, 2017, PG&E filed a Form 8-K with the SEC shortly before the close of trading. Therein, the Company stated in relevant part:

**Investigation of Northern California Fires**

Since October 8, 2017, several catastrophic wildfires have started and remain active in Northern California. The causes of these fires are being investigated by the California Department of Forestry and Fire Protection (Cal Fire), **including the possible role of power lines and other facilities of Pacific Gas and Electric Company's (the "Utility"), a subsidiary of PG&E Corporation**.

It currently is unknown whether the Utility would have any liability associated with these fires. **The Utility has approximately $800 million in liability insurance for potential losses that may result from these fires. If the amount of insurance is insufficient to cover the Utility's liability or if insurance is otherwise unavailable, PG&E Corporation's and the Utility's financial condition or results of operations could be materially affected**.

272.      On these disclosures, PG&E's share price continued to decline. From its opening price of $63.95 per share that day to its closing price of $53.43 per share at the end of the next trading day (Monday, October 16, 2017), PG&E's stock declined $10.52 per share, or approximately 16.5%. Over the same period, it experienced unusually heavy trading volume of over 68.5 million shares.

(b)      **Market Commentators Confirmed the Cause of PG&E's Share Price Decline on October 13, 2017**

273.      Investors understood the Company's October 13, 2017 8-K filing as a disclosure that PG&E's conduct was greater in severity than previously disclosed and was a proximate cause of at least some of the North Bay Fires. Because the market understood that PG&E would be reimbursed for damages by fires it innocently caused, the Company's discussion of liability signaled to the market that at least some of the North Bay Fires were caused by PG&E's negligence or worse. For example, a Guggenheim stock analyst published a report that day reacting to this news, noting that PG&E "had slid even further in the early afternoon actually as

1    well, following the company's 8-K disclosing the utility's $800mm in liability insurance, which

2    we noted had not been disclosed previously (since it had been renewed following the Butte

3    fire)."

4          274.    PG&E's announcement and resulting share price decline were proximately caused

5    by PG&E's inadequate safety practices and violations that resulted in the North Bay Fires.

6          **3.    December 20, 2017 – Corrective Disclosure and/or Materialization of Concealed Risk**

7

8                **(a)    The Market Continued to Learn the Extent and Effects of PG&E's Responsibility for the North Bay Fires**

9          275.    On December 20, 2017, after the market closed, PG&E issued a press release

10   titled "PG&E Announces Suspension of Dividend, Citing Uncertainty Related to Causes and

11   Potential Liabilities Associated with Northern California Wildfires." The filing also included, as

12   exhibit 99.1, a press release in which the Company announced that it would be suspending its

13   quarterly cash dividend. In the press release, PG&E stated in pertinent part:

14         **SAN FRANCISCO, Calif.**-PG&E Corporation (NYSE: PCG)
           today announced that its Board of Directors has determined to
15         **suspend the quarterly cash dividend on the Corporation's
           common stock**, beginning with the fourth quarter of 2017, **citing
16         uncertainty related to causes and potential liabilities associated
           with the extraordinary October 2017 Northern California
17         wildfires**.

18         In addition, the Board of Directors of the Corporation's utility
           subsidiary, Pacific Gas and Electric Company, determined to
19         suspend the dividend on the utility's preferred stock, beginning
           with the three-month period ending Jan. 31, 2018, citing the same
20         uncertainty.

21         No causes have yet been identified for any of the unprecedented
           wildfires, which continue to be the subject of ongoing
22         investigations.

23         However, California is one of the only states in the country in
           which courts have applied inverse condemnation **to events caused
24         by utility equipment**. This means that if a utility's equipment is
           found to have been a substantial cause of the damage in an event
25         such as a wildfire - even if the utility has followed established
           inspection and safety rules - **the utility may still be liable for
26         property damages and attorneys' fees associated with that
           event**.

27
           "After extensive consideration and in light of the uncertainty
28         associated with the causes and potential liabilities associated with
           these wildfires as well as state policy uncertainties, the PG&E

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                    78
CIVIL ACTION NO. 3-18-CV-03509-RS

boards determined that suspending the common and preferred stock dividends is prudent with respect to cash conservation and is in the best long-term interests of the companies, our customers and our shareholders," said PG&E Corporation Chair of the Board Richard C. Kelly.

276.    On this news, PG&E's share price fell $6.62, or 12.95%, to close at $44.50 on December 21, 2017, the following trading day. The stock experienced heavy trading volume, with over 52 million shares trading hands.

277.    Though PG&E had previously intertwined safety, fires, and its dividend (*see* ¶185), investors were shocked by this unexpected suspension of the dividends due to Defendants' intervening false reassurances of progress on safety and compliance with safety regulations. Only six months prior, on May 31, 2017, PG&E had announced that it was **increasing** its dividend due to the Company's "***progress on safety***." Even more recently, on October 31, 2017, PG&E had reassured investors that it "***follows all applicable federal and state vegetation clearance requirements and performs regular power line tree safety activities in accordance with industry standards, guidelines, and acceptable procedures that help to reduce outages or fires caused by trees or other vegetation***." And on November 2, 2017, PG&E had repeatedly reassured investors that it had "***doubl[ed]***" its vegetation management expenditures. Accordingly, the true likelihood of PG&E's responsibility for the North Bay Fires remained concealed from the market.

**(b)    Market Commentators Confirmed the Proximate Cause of PG&E's Share Price Decline on December 20, 2017**

278.    When PG&E announced it would suspend its dividend entirely, investors understood that as a revelation that PG&E would bear a higher than expected level of responsibility, and thus liability, for the North Bay Fires.

279.    For example, a RBC Capital Markets analysts report issued on December 21, 2017, stated: "We downgrade PCG to Sector Perform following the Board's decision to suspend the dividend. **This unexpected decision suggests greater risk than we had assumed surrounding regulatory treatment of the October 2017 Northern California wildfires**."

280.    Similarly, an analyst report issued by Evercore ISI the same day stated:

On the 3Q17 call PCG indicated company operations were conducted properly leading up to and after the fire. . . . PCG also indicated they found instances of wires down, vegetation near PCG facilities and some broke poles. PCG reiterated the company routinely inspects, maintains, and replaces poles, and tests and treats wood poles on a frequency that significantly exceeds CPUC requirements. The company claims to have one of, if not the most comprehensive vegetation management programs in the country.

281.    PG&E's suspension of its dividend and resulting share price decline were proximately caused by PG&E's inadequate safety practices and violations that resulted in the North Bay Fires.

4.    **May 25, 2018 – Corrective Disclosure and/or Materialization of Concealed Risk**

(a)    **The Market Continued to Learn the Extent and Effects of PG&E's Responsibility for the North Bay Fires**

282.    On May 25, 2018, Cal Fire issued a press release announcing the cause of four wildfires in Butte and Nevada counties ("May 2018 Press Release"), stating in relevant part:

**CAL FIRE Investigators Determine Cause of Four Wildfires in Butte and Nevada Counties**

Sacramento - After extensive and thorough investigations, CAL FIRE investigators have determined that four Northern California wildfires in last year's October Fire Siege were caused by trees coming into contact with power lines. The four fires, located in Butte and Nevada counties, are the first fire investigations from last October to be completed.

CAL FIRE investigators were dispatched to the fires last year and immediately began working to determine their origin and cause. The Department continues to investigate the remaining 2017 fires, both in October and December, and will release additional reports as they are completed.

The October 2017 Fire Siege involved more than 170 fires and charred more than 245,000 acres in Northern California. More than 11,000 firefighters from 17 states helped battle the blazes.

Below is a summary of the four completed investigations:

- The La Porte Fire, in Butte County, started in the early morning hours of Oct. 9 and burned a total of 8,417 acres, destroying 74 structures. There were no injuries to civilians or firefighters. CAL FIRE has determined the fire was caused by tree branches falling onto PG&E power lines. CAL FIRE investigators determined there were no violations of state law related to the cause of this fire.

Case: 19-30088   Doc#: 11169-8   Filed: 08/31/21   Entered: 08/31/21 14:49:59   Page 88 of 129

- The McCourtney Fire, in Nevada County, started the evening of Oct. 8 and burned a total of 76 acres, destroying 13 structures. There were no injuries to civilians or firefighters. CAL FIRE has determined the fire was caused by a tree falling onto PG&E power lines. **The investigation found evidence that PG&E allegedly failed to remove a tree from the proximity of a power line, in violation of the state Public Resources Code section 4293.**

- The Lobo Fire, in Nevada County, started the evening of Oct. 8 and burned a total of 821 acres, destroying 47 structures. There were no injuries to civilians or firefighters. **CAL FIRE has determined the fire was caused by a tree contacting PG&E power lines. The investigation found evidence that Public Resources Code section 4293, which requires adequate clearance between trees and power lines, was allegedly violated.**

- The Honey Fire, in Butte County, started in the early morning hours of Oct. 9 and burned a total of 76 acres. There were no injuries to civilians or firefighters and no structures were destroyed. **CAL FIRE has determined the fire was caused by an Oak branch contacting PG&E power lines. The investigation found evidence that Public Resources Code 4293, which requires adequate clearance between trees and power lines, was allegedly violated.**

The McCourtney, Lobo, Honey investigations have been referred to the appropriate county District Attorney's offices for review.

283.    Then, early on May 29, 2018, prior to the start of trading, PG&E filed a Current Report on Form 8-K with the SEC. The filing quoted extensively from the May 25, 2018 Cal Fire release described above, including the role of PG&E equipment in starting all four of the relevant North Bay Fires, Cal Fire's findings that three of the fires were caused by violations of California safety laws, and Cal Fire's decision to refer criminal investigations regarding these three fires to the relevant district attorneys' offices. The filing also stated: "It is reasonably possible that facts could emerge that lead PG&E Corporation and the Utility to believe that a loss is probable, resulting in an accrued liability in the future, the amount of which could be substantial."

284.    On this news, PG&E's share price fell $2.32, or 5.19%, to close at $42.34 on May 29, 2018, the following trading day. The stock experienced unusually high trading volume that day, with over 5.7 million shares changing hands on May 29, 2018.

1
2

        **(b)**    **Market Commentators Confirmed that the News Regarding Safety Violations Proximately Caused PG&E's Share Price Decline on May 25-29, 2018**

3     285.    Analysts were surprised by the results of the Cal Fire reports. For example,

4 Deutsche Bank stated in its May 28, 2018 report:

5
6
7
8
9
10

> From the investor perspective the market should not be particularly surprised that PG&E's lines have been found to be involved in starting the fires. **That said, the fact that this was the case in all four of the fires – and that violations were found in three of the four instances – will likely be seen as a negative data point.** Reading through the LaPorte fire investigation for other data points, investors may be concerned to note that the wind speeds around the time of the ignition do not seem to have been particularly high – with a maximum gust of 29mph.

11     286.    One Citigroup analyst wrote on May 29, 2018 that the new Cal Fire reports

12 specifically "link the fires to [PG&E's] equipment," "claim improper vegetation management for

13 three of the fires," and were "suggesting negligence" on PG&E's part. Based on this, the Cal Fire

14 reports "will support 'causation' and likely lead to [PG&E] bearing the liability for damages

15 under Inverse Condemnation." Moreover, the analyst noted that PG&E might even be liable for

16 "Gross Negligence," and could be barred from recovering costs from ratepayers insofar as it

17 would be "tough to meet" the "prudent manager" standard that is necessary for such a recovery.

18     287.    Accordingly, the new information contained in these disclosures, including the

19 severity of PG&E's conduct and the role of its violations of California safety laws in causing the

20 North Bay Fires, proximately caused PG&E's share price decline.

21     **5.**    **June 8, 2018 – Corrective Disclosure and/or Materialization of Concealed Risk**

22     288.    On Friday, June 8, 2018, after the market closed, Cal Fire issued another press

23 release announcing the causes of twelve wildfires in Mendocino, Humboldt, Butte, Sonoma,

24 Lake, and Napa Counties, stating in relevant part:

25
26

> **CAL FIRE Investigators Determine Causes of 12 Wildfires in Mendocino, Humboldt, Butte, Sonoma, Lake, and Napa Counties**

27
28

> **Sacramento** – After extensive and thorough investigations, CAL FIRE investigators have determined that 12 Northern California wildfires in the October 2017 Fire Siege were caused by electric

power and distribution lines, conductors and the failure of power poles.

The October 2017 Fire Siege involved more than 170 fires and burned at least 245,000 acres in Northern California. About 11,000 firefighters from 17 states and Australia helped battle the blazes.

CAL FIRE investigators were dispatched to the fires last year and immediately began working to determine their origin and cause. CAL FIRE investigators continue to investigate the remaining 2017 fires, both in October and December, and will release additional reports as they are completed. The cause of four Northern California fires were released on May 25.

Below is a summary of the findings from the 12 completed investigations:

The **Redwood Fire**, in Mendocino County, started the evening of Oct. 8 and burned a total of 36,523 acres, destroying 543 structures. There were nine civilian fatalities and no injuries to firefighters. CAL FIRE has determined the fire started in two locations and was caused by tree or parts of trees falling onto PG&E power lines.

The **Sulphur Fire**, in Lake County, started the evening of Oct. 8 and burned a total of 2,207 acres, destroying 162 structures. There were no injuries. CAL FIRE investigators determined the fire was caused by the failure of a PG&E owned power pole, resulting in the power lines and equipment coming in contact with the ground.

The **Cherokee Fire**, in Butte County, started the evening of Oct. 8 and burned a total of 8,417 acres, destroying 6 structures. There were no injuries. CAL FIRE investigators have determined the cause of the fire was a result of tree limbs coming into contact with PG&E power lines.

The **37 Fire**, in Sonoma County, started the evening of Oct. 9 and burned a total of 1,660 acres, destroying 3 structures. There were no injuries. CAL FIRE investigators have determined the cause of the fire was electrical and was associated with the PG&E distribution lines in the area.

The **Blue Fire**, in Humboldt County, started the afternoon of Oct. 8 and burned a total of 20 acres. There were no injuries. CAL FIRE investigators have determined a PG&E power line conductor separated from a connector, causing the conductor to fall to the ground, starting the fire.

The Norrbom, Adobe, Partrick, Pythian and Nuns fires were part of a series of fires that merged in Sonoma and Napa counties. These fires started in the late-night hours of Oct. 8 and burned a combined total of 56,556 acres, destroying 1355 structures. There were three civilian fatalities.

1
2

         CAL FIRE investigators determined the Norrbom Fire was caused by a tree falling and coming in contact with PG&E power lines.

3
4

         CAL FIRE investigators determined the Adobe Fire was caused by a eucalyptus tree falling into a PG&E powerline.

5

         CAL FIRE investigators determined the Partrick Fire was caused by an oak tree falling into PG&E powerlines.

6
7

         CAL FIRE investigators determined **the Pythian Fire was caused by a downed powerline after PG&E attempted to reenergize the line**

8
9

         CAL FIRE investigators determined the Nuns Fire was caused by a broken top of a tree coming in contact with a power line.

10
11

The **Pocket Fire**, in Sonoma County, started the early morning hours of Oct. 9 and burned a total of 17,357 acres, destroying 6 structures. There were no injuries. CAL FIRE has determined the fire was caused by the top of an oak tree breaking and coming into contact with PG&E power lines.

12
13
14
15

The **Atlas Fire**, in Napa County, started the evening of Oct. 8 and burned a total of 51,624 acres, destroying 783 structures. There were six civilian fatalities. CAL FIRE investigators determined the fire started in two locations. At one location, it was determined a large limb broke from a tree and came into contact with a PG&E power line. At the second location, investigators determined a tree fell into the same line.

16
17
18
19

**CAL FIRE's investigations have been referred to the appropriate county District Attorney's offices for review in eight of the 12 fires - Sulphur, Blue, Norrbom, Partrick, Pythian, Adobe, Pocket and Atlas - due to evidence of alleged violations of state law.**

20

    289.    While this news release did not discuss specific violations found, it disclosed that Cal Fire referred its investigations to the relevant district attorneys of five counties due to evidence Cal Fire discovered of state law violations.

21
22
23

         (a)    **The Market Learned the Truth of PG&E's Continued, Unsafe Use of Reclosers**

24
25
26

    290.    By stating that "CAL FIRE investigators determined the Pythian Fire was caused by a downed powerline after PG&E attempted to reenergize the line," this press release revealed that the Pythian Fire had been proximately caused by PG&E's use of reclosers.

27
28

1

                (b)     **The Market Continued to Learn the Extent and Effects of PG&E's Responsibility for the North Bay Fires**

2

3
       291.    On Saturday, June 9, 2018, *Bloomberg* published an article entitled "PG&E May

4
Face Criminal Charges After Probe of Deadly Wildfires." The article reported, in part, that

5
following an investigation into the causes of wildfires "that altogether killed 44 people,

6
consumed thousands of homes and racked up an estimated $10 billion in damages" in October

7
2017, California's fire agency "found evidence of alleged violations of law by PG&E in

8
connection with" the fires. Specifically, the state's investigation found "that PG&E equipment

9
caused at least 12 of the wine country blazes."

10
       292.    Early on Monday, June 11, 2018, prior to the start of trading, PG&E filed a

11
Current Report on Form 8-K with the SEC. The filing quoted extensively from the June 8, 2018

12
Cal Fire release described above, including the role of PG&E equipment in starting all 12 of the

13
relevant North Bay Fires and Cal Fire's decision to refer criminal investigations regarding eight

14
of the fires to the relevant district attorneys' offices "due to evidence of alleged violations of

15
state law." The filing also admitted that Defendants expected to "record a **significant liability**

16
**for losses associated with**" at least 14 of the North Bay Fires, as follows:

17
          Although the Utility's analysis is ongoing regarding the fires that were the subject of the June 8, 2018 and May 25, 2018 CAL FIRE news releases:

18

19
      •   for the La Porte, McCourtney, Lobo, Honey, Redwood, Sulphur, Cherokee, Blue, Pocket and Sonoma/Napa merged fires (which include Nuns, Norrbom, Adobe, Partrick and Pythian), based on the current state of the law on inverse condemnation, the information currently available to the Utility, and the CAL FIRE determinations of cause, **PG&E Corporation and the Utility currently expect that they will record a significant liability for losses associated with such fires** in PG&E Corporation and the Utility's condensed consolidated financial statements to be included in their Form 10-Q for the quarterly period ending June 30, 2018 (the "Q2 financial statements"); and

20

21

22

23

24

25
      •   for the Atlas and Highway 37 fires, PG&E Corporation and the Utility do not believe a loss is probable at this time, given the information currently available. However, **it is reasonably possible that facts could emerge that lead PG&E Corporation and the Utility to believe that a loss is probable**, resulting in the accrual of a liability in the future, the amount of which could be significant.

26

27

28

1    293.    Following these disclosures, PG&E's share price fell $1.69, or 4.08%, to close at

2    $39.76 on June 11, 2018, the following trading day. The stock experienced unusually high

3    trading volume that day, with over 12.6 million shares trading hands on June 11, 2018.

4            **(c)    Market Commentators Confirmed that the Number and Range**
             **of Safety Violations Proximately Caused PG&E's Share Price**
5            **Decline on June 8-11, 2018**

6    294.    The market was surprised by the number and range of alleged violations of safety

7    laws in the Cal Fire report. For example, in J.P. Morgan's analyst report on June 10, 2018, it

8    stated that "**[w]ith this batch of reports, we find the range of 'alleged' law violations**

9    **noteworthy. CAL FIRE opined on law regarding not just vegetation management but also**

10   **pole and conductor failure and the re-energizing of equipment by the company**." Deutsche

11   Bank also stated in its June 10, 2018 analyst report that "**[o]verall, Friday's data points are**

12   **likely to be read as another negative for PCG, given the high percentages of incidents**

13   **blamed on the company's lines and referred to DAs**." Guggenheim further reiterated its "Sell"

14   recommendation on June 10, 2018 because "[o]ut of the 16 fires now investigated thus far, **PCG**

15   **was found to have allegedly violated state law in 11 of those instances with Cal Fire**

16   **referring its evidence to the District Attorney – likely a strong indictment to potential**

17   **criminal and civil cases/lawsuits against the company**." The analyst from Guggenheim noted

18   that "all signs seem to point to PCG being imprudent operators in the majority of instances,

19   which would therefore mean it should assume liability." Accordingly, the number and range of

20   safety violations proximately caused PG&E's Share Price Decline on June 8-11, 2017.

21   295.    On June 11, 2018, *Bloomberg* published an article reporting: "The company said

22   Monday it expects to record a 'significant liability' for fires, and the shares plunged the most in

23   five months at the open" of trading. The article also noted that "[t]he alleged violations could

24   also expose PG&E to criminal charges only two years after the San Francisco company was

25   convicted of breaking safety rules that led to a deadly gas pipeline explosion in San Bruno,

26   California."

27   296.    Accordingly, the new information contained in these June 8 and 11 disclosures,

28   including the severity of PG&E's conduct, the role of its violations of California safety laws in

---

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO. 3:18-CV-03509-RS                                        86

1   causing the North Bay Fires, and the "significant liability" it would incur as a result, proximately

2   caused PG&E's share price decline.

3       **6.  November 8-9, 2018 – Corrective Disclosure and/or Materialization of**

4         **Concealed Risk**

5      297.  The Camp Fire began in the early morning of November 8, 2018 and grew

6   steadily throughout the day.  However, as of the close of trading that day, no prominent news

7   sources had reported that PG&E may have caused it.

8         **(a)  The Market Began to Learn the Extent and**

9             **Effects of PG&E's Responsibility for the Camp Fire**

10     298.  After the close of trading on November 8, 2018, PG&E announced via its official

11  Twitter.com account that it had decided not to implement its procedure for shutting power lines

12  during dangerous weather conditions.  This communication was the first indication that PG&E's

13  equipment and decisions may have contributed to the Camp Fire, undermining the Company's

14  assurances to investors that it would comply with safety regulations and prioritize safety, detailed

15  above.  While the announcement began to disclose the truth regarding PG&E's responsibility for

16  the Camp Fire, it also contained a further false reassurance that PG&E's decision was because

17  "***weather conditions did not warrant this safety measure***," as detailed above.

18     299.  Also after the close of trading on November 8, 2018, PG&E filed an Electric

19  Incident Report with the CPUC stating that PG&E had experienced a problem with its Caribou-

20  Palermo high-voltage transmission line on "Pulga Rd. Pulga, Butte County" only fourteen

21  minutes before the Camp Fire began, "in the area of the Camp Fire."  The same report

22  acknowledged that an aerial patrol later in the day showed "damage" to the same transmission

23  tower.  However,  this information undermining PG&E's statements about compliance and

24  prioritizing safety during the Class Period would not be reported by major news outlets until the

25  next day, November 9, 2018.

26     300.  On this news, PG&E's share price fell $7.88, or approximately 19.7% to close at

27  $39.92 on November 9, 2018, the following trading day.  The stock experienced unusually high

28  trading volume of 23,627,100 shares.

1

2

            **(b)**      **Market Commentators Confirmed the Cause of PG&E's November 9, 2018 Share Price Decline**

3

     301.    Market commentators confirmed that PG&E's share price declined due to the

4

Camp Fire, the true risk of which was concealed by PG&E's false and misleading statements and

omissions.

5

     302.    On November 9, 2018, CNBC published an article entitled "Shares of electricity

6

provider PG&E have worst day since 2002 as wildfires ravage California."[81]  The article noted

7

that "Shares of PG&E plunged more than 16 percent on Friday as wildfires continued to rage

8

through California. This was the biggest one-day decline for the stock since Aug. 8, 2002. . . ."

9

It further observed: "PG&E also traded 23.6 million shares, about five time its average 30-day

10

volume."  The article was initially published at 1:03 p.m. Eastern Time (*i.e.,* prior to the close of

11

trading) and updated at 4:19 p.m. the same day (after the close of trading), yet made no mention

12

of PG&E's Electric Incident Report tying the Company's equipment to the origin of the Camp

13

Fire.

14

     303.    On November 9, 2018, Deutsche Bank described how investors were

15

"understandably concerned" given the emerging news of the Camp Fire and S.B. 901's lack of

16

provisions regarding 2018 wildfires:

17

> While there has been no specific indication of utility lines being
> involved in these ignitions, investors are understandably concerned
> considering that the recently passed wildfire bill (SB901) left
> utilities particularly exposed to 2018 fires if their infrastructure
> ends up being implicated. This is due to the fact that the so-called
> stress test or customer harm threshold is only applicable to 2017
> fire losses. Meanwhile, the new reasonableness standard which the
> CPUC will use to determine eligibility for recovery of liability
> costs from customers only kicks in from 2019.

18

19

20

21

22

     304.    A Barclays report from the same day supported the conclusion that investor

23

concern regarding the Camp Fire and its lack of coverage by S.B. 901 were contributing to the

24

stock price drop:

25

> **We believe the lack of explicit language for 2018 wildfires in
> SB 901 may be increasing market pressure**. SB 901 specifically

26

27

---

[81] https://www.cnbc.com/2018/11/09/shares-of-electricity-provider-pge-plunge-as-wildfires-ravage-california.html (last visited Dec. 13, 2018).

28

addresses 2017 wildfire liability by tasking the CPUC with creating a cap on IOU liability to ensure safe and affordable service. The bill addresses wildfire liability in 2019 and beyond by creating a securitization mechanism. However, specific language addressing 2018 liability coverage is noticeably absent. The general consensus among CA stakeholders is that 2018 will be treated in a similar fashion to 2017, however the lack of a specific prescription may be heightening investor concern if the Camp Fire is found to be started by PCG.

305.    While this report stated that there was no indication yet that electrical equipment had caused the Camp Fire, it emphasized that PG&E's decision not to de-energize its lines could become a source of liability if PG&E equipment was found to be involved: "we expect PCG's decision not to de-energize lines after warning of high fire risk will be investigated if the fire is found to have been sparked by PCG equipment."

> **7.    November 9-12, 2018 – Corrective Disclosure and/or Materialization of Concealed Risk**
>
> **(a)    The Market Continued to Learn the Extent and Effects of PG&E's Responsibility for the Camp Fire**

306.    Because PG&E had concealed the extent of its safety violations and failures to prioritize safety, the market was shocked to learn how much evidence supported the conclusion that PG&E had not only caused the Camp Fire, but did so in a manner that violated state safety regulations.  Thus, investors began to learn the true likelihood and extent to which PG&E would bear financial responsibility for the Camp Fire's destruction, *i.e.*, without eligibility for reimbursement by ratepayers.  *See* Section VI, *supra*.

307.    After the close of trading on Friday, November 9, 2018, news outlets began to report that there was evidence PG&E caused the Camp Fire based on PG&E's incident report the previous evening.  The first such report, written by Pulitzer Prize-winning journalist Matthias Gafni and published in *Mercury News*, occurred at 5:49 p.m. EST on November 9, 2018.[82]

---

[82] https://www.mercurynews.com/2018/11/09/pge-power-lines-may-have-sparked-deadly-butte-county-wildfire-according-to-radio-transmissions/ (last visited Dec. 13, 2018).

308.     On Saturday, November 10, 2018, it was reported that the town of Paradise was destroyed as the Camp Fire continued to spread.[83]  It was further reported that the fire had raced through the communities of Concow and Magalia, causing at least nine fatalities and the loss of at least 6,453 homes and 260 commercial buildings.[84]  The Camp Fire grew in size and severity over the weekend, with reports on Saturday that it had already consumed 70,000 acres and was only 5 percent contained—with winds pushing it toward Chico and Yankee Hill.  By Sunday November 11, 2018, it was reported that more than 200 people were missing, the death toll had risen to 29, and the fire—which had by then consumed 111,000 acres—was only 25 percent contained.[85]

309.     Then on Monday, November 12, 2018, the next trading day, it was reported that BetsyAnn Cowley, a property owner in Pulga, received an email from PG&E the **day before** the Camp Fire ignited; the email communicated that the Utility needed access to her property to repair a transmission line that was "sparking."  It was further reported that the incident occurred near the origin point of the Camp Fire, with Cowley's property next to the junction of Pulga and Camp Creek Road.

310.     On this news, PG&E's share price fell $6.94, or 17.385%. to close at $32.98 on November 12, 2018.  The stock experienced a trading volume of 44,033,200 on November 12, 2018.

**(b)     Market Commentators Confirmed the Cause of PG&E's November 9-12, 2018 Share Price Decline.**

311.     Investors were concerned over this evidence of PG&E causing the Camp Fire, including the impact on PG&E's likely liability of Cowley's comments to the press regarding PG&E's knowledge of transmission line problems in the area.  As a result, PG&E's stock price continued to drop.  As the *San Francisco Chronicle* reported on November 12, 2018, "Cowley's

---

[83] https://www.chicoer.com/2018/11/10/our-town-has-burned-most-of-paradise-is-lost-after-camp-fire-ravages-the-area/ (last visited Dec. 13, 2018).

[84] *Id.*

[85] https://www.sfchronicle.com/california-wildfires/article/100-missing-in-Camp-Fire-butte-county-death-toll-13382433.php (last visited Dec. 13, 2018).

1  revelation came as shares of Pacific Gas and Electric Co.'s parent company plummeted Monday

2  amid concerns from investors about the utility's liability connected to the Camp Fire."[86]

3      312.    Similarly, a Wells Fargo analyst report observed the same day that "[t]he Camp

4  Fire is in PCG's service territory and there are initial indications that the company's transmission

5  infrastructure may have been a root cause of the fire pending an investigation by Cal Fire."

6      313.    A Macquarie Research analyst report on November 13, 2018 estimated PG&E's

7  fire-related liabilities at $8 billion, while noting that the real measure of PG&E's liability could

8  be higher given that the Camp Fire was not yet contained:

9          We've reduced our [target price] to US$45 from US$57, is based
           on 10.4x our '20E EPS vs 13.6x previously. Our new [target price]
10         reflects incremental ~US$8bn in fire-related liabilities, which we
           hope proves excessive given the stress test included in the SB901,
11         but we have no way to assess the potential liabilities as the fire is
           only 30% contained.

12     314.    A November 13, 2018 Bloomberg Intelligence report remarked that the analyst

13  **expected** PG&E's liability to **exceed its total equity valued** absent additional assistance from

14  the California government, and that such a bailout was not certain: "Unless mitigated by

15  regulators, we expect PG&E's write-offs could exceed the company's total equity.  California's

16  utility owners are dangerously squeezed between two forces: Onerous inverse-condemnation rule

17  makes utilities liable for most of the billions in fire damage, but powerful political resistance

18  prevents customer bills from rising much above inflation."

19          **8.    November 14, 2018 – Corrective Disclosure and/or Materialization of
               Concealed Risk**

20

21          **(a)    The Market Continued to Learn the Extent and Effects of
                PG&E's Responsibility for the Camp Fire**

22     315.    After the close of trading on November 13, 2018, PG&E released a Form 8-K that

23  showed a much bleaker picture of PG&E's deteriorating financial situation than investors had

24  reason to expect, even calling into question its ability to remain solvent in the face of mounting

25  evidence of its liability for the Camp Fire.  The SEC filing admitted, among other things, that

26

27  ──────────────

28  [86] https://www.sfchronicle.com/california-wildfires/article/PG-E-stock-hammered-on-wildfire-fallout-13384830.php (last visited Dec. 13, 2018).

1   PG&E's and the Utility's revolving credit facilities were fully drawn and that its liability for the

2   Camp Fire could exceed its insurance:

3        **Item 2.03. Creation of a Direct Financial Obligation or an
         Obligation Under an Off-Balance Sheet Arrangement of a**
4        **Registrant**

5            As of November 13, 2018, Pacific Gas and Electric
         Company ("Utility"), a subsidiary of PG&E Corporation, and
6        PG&E Corporation have aggregate borrowings outstanding under
         their respective revolving credit facilities of $3.0 billion and $300
7        million, respectively. . . .  **No additional amounts are available
         under the Utility's and PG&E Corporation's respective**
8        **revolving credit facilities**.

9                                        *        *        *

10       **Item 8.01 Other Events.**

11           *Camp Fire*

12           On November 8, 2018, a wildfire began near the city of
         Paradise, Butte County, California (the "Camp Fire"), located in
13       the service territory of the Utility. . . .

14           As previously reported, during the third quarter of 2018,
         PG&E Corporation and the Utility renewed their liability insurance
15       coverage for wildfire events in an aggregate amount of
         approximately $1.4 billion for the period from August 1, 2018
16       through July 31, 2019. . . .

17           While the cause of the Camp Fire is still under
         investigation, if the Utility's equipment is determined to be the
18       cause, the Utility could be subject to significant liability in excess
         of insurance coverage that would be expected to have a material
19       impact on PG&E Corporation's and the Utility's financial
         condition, results of operations, liquidity, and cash flows.

20

21       316.    On this news, PG&E's share price fell $7.13, or 21.791%. to close at $25.59 on

22   November 14, 2018.  The stock experienced high trading volume of 53,543,100.

23           **(b)     Market Commentators Confirmed the Cause of PG&E's Share
                     Price Decline on November 14, 2018**

24       317.    Analyst commentary attributed the drop in PG&E's stock price to news about

25   PG&E's insufficient insurance coverage and deteriorating financial situation, including the

26   chance of bankruptcy, revealed in PG&E's Form 8-K disclosures published after the market

27   closed the previous day.

28

---

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                    92
CIVIL ACTION NO. 3:18-CV-03509-RS

318. CNBC reported that PG&E's Form 8-K disclosures were responsible for the drop in stock price on November 14, 2018:

> Shares of utility PG&E fell 21 percent on Wednesday after the company said that if its equipment is responsible for the "Camp Fire" burning in Northern California, the cost of the damage would exceed its insurance coverage and **harm its financial health**. . . . "With these borrowings, the entire credit facility has been drawn and PG&E now has $3.5 billion of cash on its balance sheet," Citi analyst Praful Mehta wrote in a note Wednesday. "We think the primary driver could be a concern around a downgrade to a non-investment grade credit rating and the liquidity requirements as a result of the downgrade."[87]

319. Similarly, a November 14, 2018 Bloomberg Intelligence report also connected PG&E's Form 8-K disclosures to its share price decline afterward, stating that the filing indicated the Company's own concern about bankruptcy:

> **The abrupt drawdown of its entire $3.3 billion in revolving credit suggests to us that PG&E (PCG -22%) is concerned about a near-term cash and credit crunch**. The company warned of bankruptcy earlier this year, and **the situation is more desperate now**. If found liable for California's Camp Fire, which may match or surpass 2017's $15 billion in damages, the total exceeds PG&E's book equity and annual revenue.

**9.      November 15, 2018 – Corrective Disclosure and/or Materialization of Concealed Risk**

**(a)      The Market Continued to Learn the Extent and Effects of PG&E's Responsibility for the Camp Fire**

320. On November 15, 2018, Cal Fire announced that it had identified a possible second ignition point for the Camp Fire.[88] This news further evidenced the extent of PG&E's responsibility for the Camp Fire, undermining the Company's assurances to investors that it would comply with safety regulations and prioritize safety, detailed above.

321. On this news, PG&E's share price fell $7.85, or 30.676%. to close at $17.74 on November 15, 2018. The stock experienced its highest trading volume during the Class Period of 107,155,700 on November 15, 2018.

---

[87] https://www.cnbc.com/2018/11/14/pge-plunges-20percent-after-disclosing-an-electric-incident-just-before-fire.html (last visited Dec. 13, 2018).

[88] https://www.chicoer.com/2018/11/15/camp-fire-investigation-leads-to-another-area-away-from-pulga/ (last visited Dec. 13, 2018).

**(b)     Market Commentators Confirmed the Cause of PG&E's Share Price Decline on November 15, 2018**

322.     Market commentary confirmed that the November 15, 2018 decline in PG&E's share price was due to mounting evidence of PG&E's liability for the Camp Fire and chance of bankruptcy, the true risk of which was concealed by PG&E's false and misleading statements and omissions.  Indeed, PG&E's share price declined until CPUC President Michael Picker commented after the close of trading that day that he did not want the Company to become bankrupt.  A *Bloomberg* article reported: "His comments capped a roller-coaster week for PG&E shares. They lost about two-thirds of their value during several days of free fall, then partially rebounded Friday after Picker said he doesn't want the company to slide into bankruptcy."[89]

323.     A J.P. Morgan report from November 16, 2018 noted that the market was affected by continued uncertainty over California's willingness to aid PG&E:

> **if one assumes for sake of argument a $30Bn grand total of liabilities for the 2017-18 events for PCG, a 40 year amortization of securitized debt would still only be $10/month for the average customer; this would be even less if a multibillion dollar stress test cap was absorbed by the company;** it is a small price to pay for safe electric service and environmental goals. We remain focused on upcoming policymaker statements on the issue, and the pending CPUC implementation of securitization and stress-test mandates created with SB901. We acknowledge the long and challenging road ahead for investors, but see too much at stake for the state to realistically abandon utilities given the above considerations

\*          \*          \*

324.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Lead Plaintiff and other Class members have suffered significant losses and damages.

---

[89] https://www.bloomberg.com/news/articles/2018-11-16/pg-e-soars-after-regulator-eases-concern-on-bankruptcy-risk (last visited Dec. 13, 2018).

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO. 3-18-CV-03509-RS

94

1

## VIII.  SCIENTER

2

325.    Throughout the Class Period, Defendants acted with scienter by either knowingly

3

misleading the public about PG&E's financial health and compliance with relevant safety rules

4

and regulations, or doing so in a deliberately reckless manner.

5

### A.    PG&E's  Safety Practices Continued to Violate the Law Even After PG&E Was on Notice of the Butte Fire Safety Violations

6

7

326.    As detailed above, PG&E's safety lapses caused the 2015 Butte Fire when a tree

came into contact with PG&E's power line due to PG&E violating multiple safety regulations.

8

At the time, the Butte Fire was the seventh most destructive wildfire in California history; it

9

killed two people, destroyed 921 homes, and destroyed more than 70,000 acres over 22 days.

10

327.    Even after the disastrous Butte Fire revealed the seriousness of PG&E's fire

11

safety lapses, PG&E made **no changes at all** to improve its vegetation management or

12

compliance with safety regulations. In a deposition transcript that has not yet been made publicly

13

available, PG&E's Vegetation Program Manager Richard Yarnell reportedly testified under oath:

14

"PG&E—to the best of my knowledge, we have not made any changes as a result of this fire."

15

Despite being on notice of its dangerous safety violations, neither the Company nor its officers

16

made any changes to improve safety or compliance. Thus, they either knew, or should have

17

presumed, that its violations continued unabated.

18

### B.    Safety Was Core to PG&E's Operations, and the Individual Defendants Were Directly Involved in It

19

20

328.    During the Class Period, PG&E repeatedly acknowledged that "[s]afety is at the

21

heart of everything we do at PG&E" (Geisha Williams, July 27, 2017 Analyst Call), that safety

22

was PG&E's "top priority" (Patrick Hogan, November 18, 2015 California Senate Sub-

23

Committee Hearing), and that "[n]othing is more important than the safety of our customers,

24

employees and the communities we serve" (Kevin Dasso, vice president of Electric Asset

25

Management, May 10, 2017 Press Release). PG&E further represented to the public that PG&E's

26

safety and compliance were closely monitored by the Company's management and the

27

Individual Defendants. For instance, the PG&E Board's Finance Committee was alleged in a

28

separate lawsuit over the Butte Fire – where litigation is still ongoing – to have been "actively

1    involved in, and responsible for, assisting the Boards in their oversight of safety risk through its

2    review of strategies to manage the largest individual risks identified in the enterprise risk

3    management program," including the risk of "wildfire." Indeed, because the Company faced the

4    possibility of strict liability for property damages caused by wildfires, and such liability could be

5    extraordinary, wildfire safety was a particular focus of the Individual Defendants, who spoke

6    personally on the subject with investors and regulators throughout the Class Period. Further,

7    Defendants' repeated misrepresentations about PG&E's safety and compliance record concerned

8    the Company's core operations. Therefore, the Individual Defendants, by virtue of the

9    importance of safety to the Company and their positions as its leaders, reasonably had

10   knowledge about PG&E's safety and regulatory failures during the Class Period.

11        329.    As discussed in Sections IV.C. and IV.D., *supra*, the Individual Defendants

12   repeatedly spoke to investors on the specifics of PG&E's vegetation management procedures and

13   results. For example, they kept investors apprised about how many hundreds of thousands of

14   trees the Company was trimming and removing, including how many thousands were "dead or

15   dying." Not only that, but the Individual Defendants also inflated these numbers over time

16   without explanation, raising the number of trees supposedly trimmed or removed from 1.2

17   million to 1.4 million. In both reporting and inflating these numbers, the Individual Defendants

18   showed they knew that vegetation management and compliance was important to investors.

19        330.    A core operation concerns a company's primary products or services, and it

20   extends to matters of importance that might significantly impact the company's bottom line.

21   There is no question that PG&E's safety policies and procedures were critically important to the

22   Company's operations. In addition to the fact that PG&E repeatedly acknowledged this reality, it

23   is also notable that PG&E is potentially facing $17 billion of liability due to its failures, and that

24   the California legislature has imposed a regulatory regime that imposes significant liability for

25   PG&E's vegetation management failures. This is strong evidence of the centrality of the

26   Company's wildfire safety and compliance regime.

27        331.    In a separate lawsuit that was filed in connection with the Butte Fire, it was

28   publicly alleged – based on discovery and deposition testimony that has **not** yet been publicly

---

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                    96
CIVIL ACTION NO. 3:18-CV-03509-RS

1   revealed – that Individual Defendants Williams and Hogan both served on an Executive Officer

2   Risk & Compliance Committee that was charged with monitoring vegetation management issues.

3   Further, according to the parties litigating against PG&E for injuries caused by the 2015 Butte

4   Fire, Defendant Hogan's and another individual's[90] deposition testimony purportedly showed

5   that "PG&E knows and accepts that 1-in-100 trees will be non-compliant, and that 1-in-1000 will

6   be touching its powerlines."  As noted above, this means noncompliance for approximately 1.2

7   million trees in PG&E's territory of 123 million trees, approximately 123,000 of which are safety

8   violations in the nature of trees touching its powerlines at any given time.  *See* Section IV.F.4.

9       332.    Just months before the North Bay Fires broke out, United States District Judge

10  Thelton E. Henderson in the Northern District of California ordered that PG&E work with

11  federal prosecutors to retain a monitor to oversee the Company's compliance and ethics

12  programs, and implement "policies and procedures that address threats caused by vegetation," in

13  light of the deadly San Bruno explosion. *U.S. v. Pacific Gas and Electric Co.*, No. 14-cr-175,

14  Order at 3, ECF No. 916, (N.D. Cal. Jan. 26, 2017). As part of the sentencing process, PG&E

15  had promised the Court that Defendant Julie Kane – as Chief Ethics and Compliance Officer of

16  the Company – "reports directly to PG&E Corporation's Chairman and CEO" regarding PG&E's

17  compliance efforts, and that "PG&E's senior executives" regularly reviewed the Company's

18  safety and compliance, such that "high-level personnel of the organization ensure its

19  effectiveness." *Id.,* Def's Sentencing Memo. at 6-7, ECF No. 906 (N.D. Cal. Jan. 9, 2017).

20      333.    Because the Defendants represented that they closely monitored PG&E's safety

21  and compliance, they knew – or were deliberately reckless in not knowing – that PG&E's level

22  of safety with respect to vegetation management and wildfire prevention did not comport with

23  state law.

---

[90] Court filings identify this individual as Dean McFarren, PG&E's Quality Assurance Supervisor.

1

**C.**     **The Federal Court Overseeing PG&E's Safety Monitoring Program Is Investigating Whether PG&E Recklessly Caused the Camp Fire in Violation of California Criminal Law and the Company's Parole**

2

3       334.    As described above, *see supra* Section IV.F.2., PG&E was convicted of five

4   felony counts for knowingly and willfully violating federal safety standards in causing the deadly

5   San Bruno explosion in September 2010.  On January 26, 2017, Judge Henderson sentenced

6   PG&E to an expansive program of probation,  including a corporate compliance and ethics

7   monitorship program, 10,000 hours of community service, expenditure of $3 million to inform

8   the public of its criminal conduct, and refraining from any further criminal behavior. *U.S. v.*

9   *Pacific Gas and Electric Co.*, No. 14-cr-175, Order, ECF No. 916, (N.D. Cal. Jan. 26, 2017) (the

10   "San Bruno Order").

11       335.    The first condition to PG&E's probation is that it "Not Commit Another Federal,

12   State, or Local Crime During the Term of the Probation." PG&E did not object to this term in its

13   responsive sentencing memorandum. *U.S. v. Pacific Gas and Electric Co.*, No. 14-cr-175, PG&E

14   Sentencing Memorandum at 15, ECF No. 905-1, (N.D. Cal. Jan. 9, 2017).  PG&E reassured the

15   Court, prosecutors, the public, and its investors that it would not engage in further criminal acts,

16   including criminally negligent or reckless safety violations.  This condition of PG&E's probation

17   applied to PG&E's electrical operations and gas operations alike.

18       336.    On August 14, 2017, United States District Judge William Alsup was assigned to

19   preside over the criminal case.

20       337.    After the deadly Camp Fire, Judge Alsup ordered the parties on November 27,

21   2018 to answer the following questions by December 31, 2018:

22             1. What requirements of the judgment herein, including the requirement against further federal, state, or local crimes, might be implicated were any wildfire started by **reckless operation or maintenance of PG&E power lines**?

23

24

25             2. What requirements of the judgment herein might be implicated by any inaccurate, slow, or failed reporting of information about any wildfire by PG&E?

26

27             3. What specific steps has the monitor herein taken to monitor and improve PG&E safety and reporting with respect to power lines and wildfires?

28

4. **Provide an accurate and complete statement of the role, if any, of PG&E in causing and reporting the recent Camp Fire in Butte County** and all other wildfires in California since the judgment herein.

338.     On December 5, 2018, Judge Alsup requested "that the Office of the California Attorney General advise the Court of its view on one aspect of this question, namely, the extent to which, if at all, **the reckless operation or maintenance of PG&E power lines would constitute a crime under California law**." He further stated: "The Court would appreciate receiving an amicus brief on this issue by December 31."

339.     While PG&E has not yet answered, these developments indicate that Judge Alsup is investigating whether PG&E may be criminally liable for recklessly causing the Camp Fire in violation of PG&E's court-imposed probation and California law.  This permits an inference that further evidence of PG&E's criminal responsibility the Camp Fire exists and will emerge.  It further implies that PG&E knew of such conduct due to its ongoing monitoring and reporting obligations.  Accordingly, these facts support the inferences that Defendants knew, or had reason to know, that it failed to comply with relevant laws and regulations when making the false and misleading statements detailed above.

D.     **PG&E's Noncompliance with Safety Regulations Was Well-Known Throughout the Company, Including at the Highest Levels with Real-Time Access to a Database of Known Safety Violations**

1.     **PG&E Recorded Its Violations of Safety Regulations in a Sophisticated Database, Readily Accessible by the Individual Defendants**

340.     PG&E maintained a database of inspection data to document the condition of its power lines, which provided its personnel with ready access to information about instances of noncompliance with state safety regulations. In a November 8, 2017 article about its pole management and maintenance efforts, PG&E states that it "**uses a comprehensive database to manage these multiple patrol and inspection schedules of our 2.4 million poles.**"[91]

---

[91] http://www.pgecurrents.com/2017/11/08/facts-about-pge-pole-management-and-maintenance/ (last visited Dec. 13, 2018).

341.     This information was used to develop the company's *Mobile Asset Inspection* application that provided "electric power inspectors in the field with real-time information including maps, customer information, safety and access information."[92] The system was developed in 2016 and had become sophisticated enough by 2017 to win *InformationWeek*'s IT Excellence Award in the Data and Analytics category.[93] The article further states that "**[s]atellite maps were layered with the location of PG&E's two million electric poles along with decades' worth of data on each individual pole.**"[94] PG&E's 2016 Corporate Responsibility and Sustainability Report announced that a Margaret Mooney Award for Innovation was awarded to its "Data Visualization—Google Earth SAP team, which created a new technology that provides work crews with a dramatically enhanced data visualization of **work in progress**." The report further mentioned "[t]he development of an SAP-based **compliance tool** that can analyze trends and inform [PG&E's] risk management efforts." Thus, PG&E used sophisticated software to kept track of safety regulation noncompliance for its powerlines and poles.

342.     PG&E assigns a unique "pole SAP ID number" that corresponds to each pole's data.[95] According to an *InformationWeek* article about PG&E's mobile application, "**[t]he status of a pole's inspection is tracked in SAP [database technology] so the inspection team knows when it's time to inspect each pole**. That information flows into the enterprise platform PG&E built, which pushes electronic lists to inspectors' iPad Pros."[96] The data collected is extensive enough to enable "an enterprise data and analytics organization that is using advanced analytics to predict when poles will fail."[97] And by 2017, the PG&E Corporate Responsibility and

---

[92] http://investor.pgecorp.com/news-events/press-releases/press-release-details/2017/Innovative-App-for-PGE-Field-Crews-Earns-InformationWeek-IT-Excellence-Award/default.aspx  (last visited Dec. 13, 2018).

[93] *Id.*

[94] *Id.*

[95] https://www.pge.com/pge_global/common/pdfs/safety/yard-safety/powerlines-and-trees/pole-data-request-form.pdf  (last visited Dec. 13, 2018).

[96] https://www.informationweek.com/big-data/pgandes-winning-recipe-for-a-mobile-asset-inspection-app/d/d-id/1329251 (last visited Dec. 13, 2018).

[97] *Id.*

---

1   Sustainability Report mentions that the company's "SAP-based tool" was used to analyze trends

2   in environmental compliance. Thus, PG&E's records of safety regulation violations were stored

3   in a readily accessible database.  Defendants Earley, Williams, Stavropoulos, Kane, Johns, and

4   Hogan each had easy access to this database.

5       343.   Consequently, to the extent that PG&E was noncompliant with safety regulations

6   concerning vegetation management and pole integrity, such facts would have been documented

7   electronically, stored in an accessible SAP database, and available to PG&E personnel

8   throughout the Company in real-time.

9       **2.   PG&E Instituted a Culture of Reporting Problems Up Among its On-the-Ground Employees, Which Upper Management Was Aware of and Monitored**

10

11      344.   PG&E repeatedly touted the culture among its lower-level employees that

12   encouraged reporting safety problems up the chain of management. Further, the Individual

13   Defendants touted their knowledge and familiarity with this practice at the Company, indicating

14   either they personally received information of safety violations this way, or they knew where to

15   find such information but deliberately avoided it.

16      345.   On August 18, 2016, PG&E issued a press release titled "PG&E Becomes First

17   Natural Gas Utility to Receive Process Safety." It contained a description of an internal

18   Company policy termed "**The Corrective Action Program, a program that empowers**

19   **employees at all levels of PG&E to speak up and identify issues that are in need of**

20   **improvement**."

21      346.   On November 4, 2016, PG&E hosted a conference call with analysts to discuss its

22   financial results for the third quarter of 2016. In his prepared remarks, Earley elaborated on

23   PG&E's culture of encouraging "every employee" to report safety violations up the chain of

24   command, as follows:

25          **We also wanted to make sure that every employee felt comfortable raising concerns, no matter how big or small, so we made a number of changes to encourage all employees to speak up when something doesn't seem right. For example, we worked with our unions to develop a non-punitive self-reporting policy.**

26

27

28

We've also adapted the nuclear industry's corrective action program **across the Company**, to **make it easy for employees to report things that need to be fixed. In fact, employees can now report corrective action items through a simple app on their smart devices. And we've created a number of awards to publicly recognize employees when they do speak up, so that we are encouraging and reinforcing that behavior.**

\* \* \*

**The improvements we have made in safety and reliability over the last six years have put us in a position to deliver strong financial results going forward.**

**Earlier this year, we announced our first dividend increase in six years, and we have committed to achieving a roughly 60% payout ratio by 2019.** Combined with our expected rate based growth, we are confident we can deliver a strong overall return for our shareholders.

347.    Thus, PG&E went significantly beyond making employees feel safe "report[ing] things that need to be fixed." The CEO himself took credit for "mak[ing] sure that every employee felt comfortable raising concerns" and "encourag[ing] all employees to speak up" "**across the Company**" – *i.e.,* **not just at the lower levels.** Further, by virtue of the fact that the CEO personally took credit for this phenomenon within the company, it indicates his awareness of what employees actually reported. Indeed, he stated that he was involved in "publicly recogniz[ing] employees when they do speak up."

348.    As a result, the persistence of safety violations cannot be attributed to their being unknown. Rather, such problems persisted because of what the Individual Defendants did – or neglected to do – to mitigate safety problems once they were reported. Indeed, PG&E's long history of inadequate safety compliance did not stem from a lack of information but rather a lack of willingness to devote sufficient Company funds to remediate problems, as detailed above (*see* Sections IV.B.-H., *supra*).

349.    Earley's statement also affirms the direct connection between PG&E's treatment of safety issues, the Company's long-term financial results, and the size of its dividend. Indeed, as the truth emerged regarding PG&E's insufficient safety compliance during the Class Period (as alleged above, *see* Section VII, *supra*), the market understood the connection between the

1    Company's safety violations and the foreseeable, material detriment they would have on the

2    Company's financial results and dividend.

3        **E.      PG&E's Compliance Statements Were Authorized by Defendant Kane and
              Made under Her Ultimate Authority**

4        350.    Defendant Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer

5    ("CECO"), controlled and authorized all of PG&E's statements regarding compliance during the

6    Class Period. These statements were approved and made under her ultimate authority as CECO.

7        351.    PG&E established the CECO role on March 24, 2015 "to strengthen its ethics and

8    compliance program and performance,"[98] a role which Kane assumed on May 18, 2015 and held

9    through the end of the Class Period. As CECO, she was responsible for both managing

10   implementation of PG&E's legal compliance efforts as well as overseeing compliance

11   monitoring and reporting during almost the entirety of the Class Period. When PG&E was being

12   sentenced for its criminal negligence in causing the San Bruno explosion, it admitted in its

13   January 9, 2017 sentencing memorandum that "Ms. Kane is responsible for **overseeing** the

14   Company-wide compliance and ethics program, including **compliance management**, risk-

15   mitigation and **reporting**; **overseeing employee-investigatory processes**; and reinforcing

16   PG&E's ethics and compliance culture, among many other compliance and ethics program

17   elements." The same filing confirmed that "The CECO, Julie Kane, reports directly to PG&E

18   Corporation's Chairman and CEO, and is accountable to PG&E Corporation's and PG&E's

19   Boards of Directors, with additional reporting responsibility to the Compliance and Public Policy

20   Committee of PG&E Corporation's Board and the Audit Committees of PG&E Corporation's

21   and PG&E's Boards."

22       352.    Accordingly, Kane was apprised of any compliance violations reported within the

23   Company, including violations reported by PG&E's lower-level employees and logged in

24

25   _____

26       [98] PG&E Press Release,
     https://www.pge.com/en/about/newsroom/newsdetails/index.page?title=20150324_pge_appoints
27   _julie_m_kane_to_new_position_as_senior_vice_president_and_chief_ethics_and_compliance_
     officer_company_takes_next_step_toward_goal_of_establishing_a_best-in-
28   class_corporate_ethics_program (last visited Dec. 13, 2018).

---

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                              103
CIVIL ACTION NO. 3-18-CV-03509-RS

1  PG&E's central database detailed *supra*, at all times when PG&E misrepresented to investors

2  that it was in compliance (*e.g.*, ¶159 (Misstatement No. 2, October 16, 2015); ¶169

3  (Misstatement No. 4, October 6, 2016); ¶177 (Misstatement No. 5, August 9, 2017); ¶198

4  (Misstatement No. 9, October 31, 2017); ¶213 (Misstatement No. 12, November 5, 2017); ¶220

5  (Misstatement No. 13, May 25, 2018); ¶¶226, 233 (Misstatement Nos. 14 & 15, June 8, 2016);

6  ¶237 (Misstatement No. 16, September 27, 2018); ¶¶240, 244 (Misstatement Nos. 17-18,

7  October 9, 2018); and ¶249 (Misstatement No. 19, November 9, 2018)).

8        353.    The CECO position was sufficiently senior such that Kane's scienter can be

9  imputed to the Company regarding knowledge of legal compliance with California vegetation

10  management and safety regulations.

11        354.    Additionally, because Kane reported directly to the CEO in her capacity as

12  CECO, her knowledge of safety violations can be imputed to both CEOs, Earley and Williams.[99]

13  Because Kane was institutionally installed to advise the CEO of PG&E's compliance and safety,

14  Kane would have told Earley and Williams what she knew regarding the Company's

15  noncompliance with vegetation management regulations, or Earley and Williams would have

16  been deliberately reckless in speaking on the subjects of compliance and safety without input

17  from their CECO.

18       **F.    The Threat of a Potential Bankruptcy Gave Defendants a Strong Motive to Mislead Investors**

19

20        355.    PG&E is currently facing approximately **$17 billion** in liability over the North

21  Bay Fires that began on October 8, 2017. This immense exposure dwarfs the $1.6 billion that the

22  Company earned in the full year 2017. In fact, it would take PG&E more than ten years of

23  similar earnings to pay off such a liability.  Further, PG&E's liability for the Camp Fire has been

24  estimated at up to $13 billion.

25

26

27

28  [99] Further, she reported directly to the Company's Chairman of the Board, a position which was also occupied by Earley during the Class Period.

356.     It is clear from Defendants' statements and actions that PG&E's liability over the North Bay Fires could have severe repercussions for the Company as a whole, and consequently for the careers of the Individual Defendants.

357.     One California legislator reported on June 15, 2018 that "[i]n this Capitol, they [PG&E] keep talking about the sky is falling, that they're going to go bankrupt and what are we going to do, and they're creating a lot of fear in the Capitol."

358.     NBC News reported on February 2, 2018 that after the North Bay Fires broke out, PG&E "sent out letter[s] to dozens of its non-profit 'community partners' warning them that a potentially 'unlimited' North Bay wildfire liability could imperil funding unless the legislature eases that legal burden." In those letters, PG&E's external affairs vice president Travis Kiyota implicitly threatened the funding for charitable endeavors: "This type of unlimited liability may affect our charitable giving and other non-profit community activities."

359.     On July 31, 2018, *Reuters* further reported that an anonymous source had leaked that PG&E hired a prominent law firm to "explore debt restructuring options," as well as the possibility of "breaking up the company."

360.     On August 1, 2018, California Governor Jerry Brown even cautioned the public that "there is concern that we could lose our utilities."

361.     The reason for these dire warnings was simple: PG&E wanted to rush through legislation that would grant it additional defenses and a lower bar to be reimbursed for their part in causing the North Bay Fires.

362.     It was within this context that PG&E falsely and misleadingly told investors, *inter alia*, that "PG&E meets or exceeds all applicable federal and state vegetation clearance requirements," and that "we've doubled the amount that we've invested in veg[etation] management." PG&E had an unusual motive to make these and other statements after the North Bay Fires erupted: to conceal its wrongdoing long enough to secure the liability bailout it was seeking from the California legislature.

363.     Indeed, this would not be the first time that a large potential liability caused PG&E to act unethically. When PG&E faced a substantially **lower** liability for its role in the

1    deadly San Bruno explosion, the Company engaged in improper "back-channel"

2    communications with its regulators that ultimately resulted in a $97.5 million fine that was

3    imposed in April 2018. A federal jury also found PG&E to be guilty of six criminal charges,

4    including obstruction of justice, related to that blast that killed eight people.

5          **G.    After PG&E Failed to Follow Its ESRB-8 Shutoff Protocol and Caused the**
     **Camp Fire, PG&E Attempted to Cover It Up**

6

7          364.    As noted above, the public learned after the Camp Fire erupted that PG&E did not

     shut down its Caribou-Palermo transmission line that ignited the Camp Fire, despite the

8    Company's ESRB-8 Shutoff Protocol.  As further detailed above, PG&E faced criticism from a

9    variety of sources for that decision, as well as significant decreases to its share price.  *See*

10   Section VII.D.6, *supra*.

11         365.    While the Camp Fire continued to burn, the Company insisted that its ESRB-8

12   Shutoff Protocol would not have included the Caribou-Palermo transmission line.

13         366.    For example, in a November 16, 2018 statement reported by *KQED News*, PG&E

14   spokeswoman Deanna Contreras stated in an email to the reporter: "However, in light of the

15   potential public safety issues resulting from de-energizing higher voltage transmission lines,

16   including the potential to impact millions of people and create larger system stability issues for

17   the grid, PG&E has not extended the (shutoff) program to transmission lines that operate at

18   115kV or above."[100]

19         367.    Similarly, in a November 22, 2018 statement reported by *Mercury News*, PG&E

20   spokeswoman Lynsey Paulo said to the reporter: "In light of the potential public safety issues

21   resulting from de-energizing higher voltage transmission lines, including the potential to impact

22   millions of people and create larger system stability issues for the grid, PG&E has not extended

23   the (shutoff) program to transmission lines that operate at 115kV or above."[101]  Spokeswoman

24   Paulo "added that the Federal Energy Regulatory Commission (FERC) regulates transmission

25

26      [100] https://www.kqed.org/news/11706846/pge-high-voltage-transmission-lines-not-covered-
     by-fire-safety-shutdown-plan (last visited Dec. 13, 2018).

27      [101] https://www.mercurynews.com/2018/11/22/maps-show-where-pge-had-planned-to-shut-
28   down-power-ahead-of-camp-fire/ (last visited Dec. 13, 2018).

---

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO. 3-18-CV-03509-RS

106

1    lines and such an emergency shutdown would need to be coordinated with the California

2    Independent System Operator, which oversees the state's power grid."  But as the article further

3    reported:

4                    But state and federal regulators say PG&E can shut down
                     transmission lines of any size at its own discretion.

5
                     "The transmission owners are solely responsible for operating their
6                    transmission and distribution lines and they can de-energize
                     transmission and distribution lines without seeking approval from
7                    the ISO, with or without prior notice," Cal ISO spokesman Steven
                     Greenlee said. "The transmission owner tells us that they are de-
8                    energizing a line and if a 230kV or 500kV line is de-energized it
                     may require (us) to re-dispatch generation if the remaining lines
9                    become heavily loaded. This is a practice we perform every day
                     with scheduled work and unplanned outages."
10
                     CPUC spokeswoman Terrie Prosper also said the decision is up to
11                   the individual utility.

12                   "Utilities can de-energize whatever lines and voltage they deem
                     appropriate," Prosper said. "They typically de-energize distribution
13                   lines because those lines are more localized than transmission
                     lines."
14
                     FERC Spokesman Craig Cano said PG&E would not need its
15                   approval to cut power to high-voltage lines for safety reasons.

16                   "FERC-approved standards address transmission system reliability
                     and explicitly exclude safety matters, which could be the reason
17                   for shutting down a power line in response to wildfires or to
                     mitigate the risk of fires," he said.

18
        368.    Indeed, PG&E's entire response, including its denial that its ESRB-8 Shutoff
19
     Protocol would not have included the Caribou-Palermo transmission line, was not true.
20
        369.    First, PG&E's published ESRB-8 Shutoff Protocol never mentioned a limitation
21
     on 115-kilovolt transmission lines or in fact any transmission lines.[102]  However, pursuant to
22
     CPUC's Resolution ESRB-8, PG&E was required to both "Make available and post a summary
23
     of de-energization policies and procedures on its website" and "Provide its de-energization and
24
     restoration policy **in full**, and in summary form, to the affected community officials before de-
25

26
     _____
27       [102] *See generally* https://www.pge.com/pge_global/common/pdfs/safety/emergency-
     preparedness/natural-disaster/wildfires/Public-Safety-Power-Shutoff-Policies-and-Procedures-
28   September-2018.pdf (last visited Dec. 13, 2018).

1   energizing its circuits."[103]   Because a limitation on transmission lines was never mentioned in

2   PG&E's ESRB-8 Shutoff Protocol, it did not exist.

3          370.    Second, PG&E had never mentioned this exclusion for 115-kilovolt transmission

4   lines, even unofficially, until **after** it faced criticism for deciding not to shut down its Caribou-

5   Palermo transmission line and causing the Camp Fire.

6          371.    Third, when PG&E first shut off electricity under its ESRB-8 Shutoff Protocol on

7   October 14 through 17, 2018, by its own admission, PG&E shut off **both** transmission and

8   distribution lines.  Specifically, PG&E shut off eight transmission power line circuits and thirty-

9   three distribution power line circuits, as detailed in its later filing to CPUC.[104]  This admission

10  confirms that PG&E's ESRB-8 Shutoff Protocol did not include a limitation on shutting down

11  transmission lines.

12         372.    The same conclusion is confirmed by a telling revision PG&E made to otherwise

13  identical text in two succeeding reports to the CPUC—the first being its October "Public Safety

14  Power Shutoff Report" regarding the October shutoff,[105] and the second being its November

15  "Public Safety Power Shutoff Report" **after the Camp Fire**.  Therein, PG&E made the

16  following revelatory insertion:

17              [PG&E has] reached out to more than 570,000 homes and
            businesses that are served by our electric lines, operating at 70kV
18              and lower, that run through extreme fire-threat areas. We have
            communicated to these customers through several formats (letter,
19              email, TV and print ads, social media and news stories) that, if
            extreme fire danger conditions were forecasted, it might be
20              necessary to temporarily turn off power to their neighborhood or
            community for safety.

21

22  _____

23  [103] http://docs.cpuc.ca.gov/publisheddocs/published/g000/m218/k186/218186823.pdf (last visited Dec. 13, 2018).

24  [104]

25  http://cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/Utilities_and_Industries/Energy_-_Electricity_and_Natural_Gas/PGE%20PSPS%20Report%20Letter%2020181031.pdf (last visited Dec. 13, 2018).

26  [105]

27  http://cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/Utilities_and_Industries/Energy_-_Electricity_and_Natural_Gas/PGE%20PSPS%20Report%20Letter%2020181031.pdf (last visited Dec. 13, 2018).

28

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT          108
CIVIL ACTION NO. 3-18-CV-03509-RS

1   (Underlining added to signify PG&E's addition.)  The absence of such language in its October

2   2018 shutoff report, in an otherwise identical paragraph, confirms that an exclusion for 115-

3   kilovolt transmission lines was never part of PG&E's ESRB-8 Shutoff Protocol.

4   　　　373.   Finally, PG&E was required to answer questions posed by the CPUC's Safety and

5   Enforcement Division after the North Bay Fires, which PG&E submitted on October 17, 2017.[106]

6   The Safety and Enforcement Division asked: "Has PG&E proactively de-energized power lines

7   in the last 10 days without being requested to do so by CAL FIRE? If so, please provide

8   information about location, duration and reasons for doing so."  In response, PG&E stated that it

9   had de-energized **two** 115-kilovolt lines in 2017 to prevent wildfires:

10   　　　　PG&E de-energized multiple transmission lines as described below
　　　　without the direction of CAL FIRE:

11   

12   　　　　. . .

13   　　　　3.  On 10/9 at 0644, PG&E de-energized the Fulton-Santa Rosa
　　　　#1-**115kV line** due to fire in the area. The line was returned to
　　　　service on 10/9 at 1455.

14

15   　　　　4. On 10/9 at 0644, PG&E de-energized the Fulton-Santa Rosa #2-
　　　　**115kV line** due to fire in the area. The line was returned to service
　　　　on 10/14 at 1044.

16

17   　　　374.   As such, it was affirmatively false that PG&E's ESRB-8 Shutoff Protocol

18   excluded transmission lines of any kind.  It was also false that PG&E's ESRB-8 Shutoff Protocol

19   excluded 115-kilovolt transmission lines in particular.

20   　　　375.   PG&E's statements representing such exclusions after the Camp Fire amount to a

21   cover-up, and evidence the Company's scienter.  It is a continuation of PG&E's deliberate efforts

22   to conceal the unsafe operations of its utilities, as further exposed by CPUC's allegations that the

23   Company falsified records and data concerning the safety of its utilities from 2012 through 2017.

24   *See* ¶86, *supra*.

25

26

27   [106] http://www.cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/Safety/Response%20to

28   %20Data%20Request.pdf (last visited Dec. 13, 2018).

## IX.   APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND FRAUD ON THE MARKET

376.   Lead Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)   Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)   The omissions and misrepresentations were material;

(c)   The Company's stock traded in an efficient market;

(d)   The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

(e)   Lead Plaintiff and other members of the Class purchased PG&E common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

377.   At all relevant times, the market for PG&E shares was efficient for the following reasons, among others:

(a)   PG&E stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)   As a regulated issuer, PG&E filed periodic public reports with the SEC and the NYSE;

(c)   PG&E regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases on the major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services; and

(d)   PG&E was followed by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales forces and certain customers of their respective brokerage firms. Each of those reports was publically available and entered the public marketplace.

1    378.    As a result of the foregoing, the market for PG&E common stock promptly

2  digested current information regarding PG&E from publicly available sources and reflected such

3  information in PG&E's stock price. Under these circumstances, all purchasers of PG&E common

4  stock during the Class Period suffered similar injury because of their purchases of common stock

5  at artificially inflated prices and a presumption of reliance applies.

6    379.    Lead Plaintiff is also entitled to a presumption of reliance under the Supreme

7  Court's decision in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), and its progeny,

8  as Defendants' misstatements throughout the Class Period included omissions, in that they failed

9  to inform investors of PG&E's safety and regulatory failures.

10  **X.    CLASS ACTION ALLEGATIONS**

11    380.    Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil

12  Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or

13  otherwise acquired PG&E securities traded on the NYSE during the Class Period (the "Class")

14  and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the

15  Class are Defendants herein, the officers and directors of the Company, members of their

16  immediate families and their legal representatives, heirs, successors or assigns and any entity in

17  which Defendants have or had a controlling interest.

18    381.    The members of the Class are so numerous that joinder of all members is

19  impracticable. Throughout the Class Period, PG&E securities were actively traded on the NYSE.

20  While the exact number of Class members is unknown to Lead Plaintiff at this time and can be

21  ascertained only through appropriate discovery, Lead Plaintiff believes that there are hundreds or

22  thousands of members in the proposed Class. Record owners and other members of the Class

23  may be identified from records maintained by PG&E or its transfer agent and may be notified of

24  the pendency of this action by mail, using the form of notice similar to that customarily used in

25  securities class actions.

26    382.    Lead Plaintiff's claims are typical of the claims of the members of the Class as all

27  members of the Class are similarly affected by Defendants' wrongful conduct in violation of

28  federal law that is complained of herein.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO. 3:18-CV-03509-RS

111

383.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Lead Plaintiff has no interests antagonistic to or in conflict with those of the Class.

384.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and safety of PG&E;

- whether Defendants caused PG&E to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of PG&E securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

385.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

386.    Lead Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine, as discussed above in ¶¶376-378.

387.   Based upon the foregoing, Lead Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## XI.   CAUSES OF ACTION

### FIRST CLAIM

**For Violation of Section 10(b) of**
**The Exchange Act and Rule 10b-5 Against All Defendants**

388.   Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

389.   This Count is asserted against PG&E and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

390.   During the Class Period, PG&E and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

391.   PG&E and the Individual Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;
- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of PG&E securities during the Class Period.

392.   PG&E and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of PG&E were materially false and/or misleading; knew that such statements or documents would be issued or

1   disseminated to the investing public; and knowingly and substantially participated, or acquiesced

2   in the issuance or dissemination of such statements or documents as primary violations of the

3   securities laws. These Defendants by virtue of their receipt of information reflecting the true

4   facts of PG&E, their control over, and/or receipt and/or modification of PG&E allegedly

5   materially misleading statements, and/or their associations with the Company which made them

6   privy to confidential proprietary information concerning PG&E, participated in the fraudulent

7   scheme alleged herein.

8       393.   Individual Defendants, who are the senior officers and/or directors of the

9   Company, had actual knowledge of the material omissions and/or the falsity of the material

10  statements set forth above, and intended to deceive Lead Plaintiff and the other members of the

11  Class, or, in the alternative, acted with reckless disregard for the truth when they failed to

12  ascertain and disclose the true facts in the statements made by them or other PG&E personnel to

13  members of the investing public, including Lead Plaintiff and the Class.

14      394.   As a result of the foregoing, the market price of PG&E securities was artificially

15  inflated during the Class Period. In ignorance of the falsity of PG&E's and the Individual

16  Defendants' statements, Lead Plaintiff and the other members of the Class relied on the

17  statements described above and/or the integrity of the market price of PG&E securities during

18  the Class Period in purchasing PG&E securities at prices that were artificially inflated as a result

19  of PG&E's and the Individual Defendants' false and misleading statements.

20      395.   Had Lead Plaintiff and the other members of the Class been aware that the market

21  price of PG&E securities had been artificially and falsely inflated by PG&E's and the Individual

22  Defendants' misleading statements and by the material adverse information which PG&E's and

23  the Individual Defendants did not disclose, they would not have purchased PG&E's securities at

24  the artificially inflated prices that they did, or at all.

25      396.   As a result of the wrongful conduct alleged herein, Lead Plaintiff and other

26  members of the Class have suffered damages in an amount to be established at trial.

27      397.   By reason of the foregoing, PG&E and the Individual Defendants have violated

28  Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the

---

plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of PG&E securities during the Class Period.

## SECOND CLAIM

### For Violation of Section 20(a) of
### The Exchange Act Against PG&E Corporation

398.    Lead Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

399.    This Count is asserted pursuant to Section 20(a) of the Exchange Act against Defendant PG&E Corporation.

400.    During the Class Period, PG&E Corporation participated in the operation and management of the Utility. PG&E Corporation conducted and participated, directly and indirectly, in the conduct of the Utility's business affairs. For the years of 2015-2017, **100%** of PG&E Corporation's directors also sat on the board of the Utility, and **over 90%** of the Utility's directors also sat on the board of PG&E Corporation.[107]  Further, both companies filed joint annual reports on Form 10-K with the SEC throughout the Class Period, the entirety of which filings were certified pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by officers of **both** Companies. Further, because of its 100% ownership and authority, PG&E Corporation knew the adverse non-public information regarding the Company's financial condition and noncompliance with relevant laws and regulations.

---

[107] 2015: Lewis Chew, Earley, Fred J. Fowler, Maryellen C. Herringer, Richard C. Kelly, Roger H. Kimmel, Richard A. Meserve, Forrest E. Miller, Rosendo G. Parra, Barbara L. Rambo, Anne Shen Smith, and Barry Lawson Williams were directors of both PG&E Corporation and the Utility, whereas Johns was a director of the Utility only.

2016: Lewis Chew, Earley, Fred J. Fowler, Maryellen C. Herringer, Richard C. Kelly, Roger H. Kimmel, Richard A. Meserve, Forrest E. Miller, Rosendo G. Parra, Barbara L. Rambo, Anne Shen Smith, and Barry Lawson Williams were directors of both PG&E Corporation and the Utility, whereas Stavropoulos and Williams were directors of the Utility only.

2017: Lewis Chew, Earley, Fred J. Fowler, Maryellen C. Herringer, Jeh C. Johnson, Richard C. Kelly, Roger H. Kimmel, Richard A. Meserve, Forrest E. Miller, Eric D. Mullins, Rosendo G. Parra, Barbara L. Rambo, Anne Shen Smith, Barry Lawson Williams, and Williams were directors of both PG&E Corporation and the Utility, whereas Stavropoulos was director of the Utility only.

401.     Through its position as sole owner of the Utility and placement of its own Independent Directors on the Utility's Board of Directors, PG&E Corporation had a duty to disseminate accurate and truthful information with respect to the Utility's financial condition and results of operations, and to correct promptly any public statements issued by the Utility which had become materially false or misleading.

402.     Because of its position as sole owner of the Utility and placement of its own Independent Directors on the Utility's Board of Directors, PG&E Corporation was able to, and did, control the contents of the various reports, press releases and public filings which the Utility disseminated in the marketplace during the Class Period. Throughout the Class Period, PG&E Corporation exercised its power and authority to cause the Utility to engage in the wrongful acts complained of herein. PG&E Corporation, therefore, was a "controlling person" of the Utility within the meaning of Section 20(a) of the Exchange Act. In this capacity, it participated in the unlawful conduct alleged which artificially inflated the market price of PG&E securities.

403.     By reason of the above conduct, PG&E Corporation is liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Utility.

### THIRD CLAIM

**For Violation of Section 20(a) of**
**The Exchange Act Against The Individual Defendants**

404.     Lead Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

405.     During the Class Period, the Individual Defendants participated in the operation and management of PG&E.  The Individual Defendants conducted and participated, directly and indirectly, in the conduct of PG&E's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's financial condition and noncompliance with relevant laws and regulations.

406.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to PG&E's

1    financial condition and results of operations, and to correct promptly any public statements

2    issued by PG&E which had become materially false or misleading.

3         407.    Because of their positions of control and authority as senior officers, the

4    Individual Defendants were able to, and did, control the contents of the various reports, press

5    releases and public filings which PG&E disseminated in the marketplace during the Class Period.

6    Throughout the Class Period, the Individual Defendants exercised their power and authority to

7    cause PG&E to engage in the wrongful acts complained of herein. The Individual Defendants

8    therefore, were "controlling persons" of PG&E within the meaning of Section 20(a) of the

9    Exchange Act. In this capacity, they participated in the unlawful conduct alleged which

10   artificially inflated the market price of PG&E securities.

11        408.    By reason of the above conduct, the Individual Defendants are liable pursuant to

12   Section 20(a) of the Exchange Act for the violations committed by PG&E.

13                                **FOURTH CLAIM**

14             **Alter Ego Liability for Violation of Section 10(b) of**
               **The Exchange Act and Rule 10b-5 Against PG&E Corporation**

15        409.    Lead Plaintiff repeats and realleges each and every allegation contained in the

16   foregoing paragraphs as if fully set forth herein.

17        410.    PG&E Corporation is jointly and severally liable for the misstatements and

18   omissions of the Utility, insofar as:

19        (a)     PG&E Corporation and the Utility operate as a single business enterprise

20   operating out of the same building located at 77 Beale Street, San Francisco, California, for the

21   purpose of effectuating and carrying out PG&E Corporation's business and operations and/or for

22   the benefit of PG&E Corporation;

23        (b)     PG&E Corporation and the Utility do not operate as completely separate

24   entities, but rather integrate their resources to achieve a common business purpose;

25        (c)     the Utility is so organized and controlled, and its decisions, affairs, and

26   business are so conducted as to make it a mere instrumentality, agent, conduit, or adjunct of

27   PG&E Corporation;

28

---

1            (d)     PG&E Corporation's and the Utility's officers and management are

2 intertwined and do not act completely independently of one another;

3            (e)     PG&E Corporation has control and authority to choose and appoint the

4 Utility's board members as well as its other top officers and managers;

5            (f)     PG&E Corporation and the Utility are insured by the same carriers and

6 provide uniform or similar pension, health, life, and disability insurance plans for employees;

7            (g)     PG&E Corporation and the Utility have unified 401(k) Plans, pension and

8 investment plans, bonus programs, vacation policies, and paid time off from work schedules and

9 policies;

10            (h)     PG&E Corporation and the Utility have unified personnel policies and

11 practices and/or a consolidated personnel organization or structure;

12            (i)     PG&E Corporation and the Utility are represented by common legal

13 counsel;

14            (j)     PG&E Corporation and the Utility acknowledged in their joint 10-K

15 statement for the year 2015 that eight separate officers were "executive officers of both PG&E

16 Corporation and the Utility;"

17            (k)     PG&E Corporation and the Utility acknowledged in their joint 10-K

18 statement for the year 2016 that nine separate officers were "executive officers of both PG&E

19 Corporation and the Utility;"

20            (l)     PG&E Corporation's officers, directors, and other management make

21 policies and decisions to be effectuated by the Utility and/or otherwise play roles in providing

22 directions and making decisions for the Utility;

23            (m)     PG&E Corporation's officers, directors, and other management direct

24 certain financial decisions for the Utility including the amount and nature of capital outlays;

25            (n)     PG&E Corporation's written guidelines, policies, and procedures control

26 the Utility's employees, policies, and practices;

27

28

1          (o)     PG&E Corporation files consolidated earnings statements factoring in all

2  revenue and losses from the Utility, as well as consolidated tax returns, including those seeking

3  tax relief; and

4          (p)     PG&E Corporation generally directs and controls the Utility's relationship

5  with, requests to, and responses to inquiries from, the CPUC and uses such direction and control

6  for the benefit of PG&E Corporation.

7        411.    For purposes of this litigation, it would be inequitable to treat the misstatements

8  and actions of the Utility as those of the Utility only, and not also of PG&E Corporation.

9        412.    By reason of the above allegations, any misstatements made by the Utility –

10  including, but not limited to, Misstatement Nos. 1 and 3 – were made by an "alter ego" of PG&E

11  Corporation, and PG&E Corporation is therefore equally liable for violations of Section 10(b) of

12  the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other

13  members of the Class for substantial damages which they suffered in connection with their

14  purchase of PG&E securities during the Class Period.

15                             **PRAYER FOR RELIEF**

16      WHEREFORE, Lead Plaintiff demands judgment against Defendants as follows:

17      A.     Determining that this action may be maintained as a class action under Rule 23 of

18  the Federal Rules of Civil Procedure, and certifying Lead Plaintiff as the Class representative;

19      B.     Requiring Defendants to pay damages sustained by Lead Plaintiff and the Class

20  by reason of the acts and transactions alleged herein;

21      C.     Awarding Lead Plaintiff and the other members of the Class prejudgment and

22  post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs;

23  and

24      D.     Awarding such other and further relief as this Court may deem just and proper.

25

26

27

28

1

**DEMAND FOR TRIAL BY JURY**

2

Lead Plaintiff hereby demands a trial by jury.

3

4     DATED: December 14, 2018                    */s/ Thomas A. Dubbs*

Thomas A. Dubbs (*pro hac vice*)
5                                                Louis Gottlieb (*pro hac vice*)
Jeffrey A. Dubbin (#287199)
6                                                James L. Ostaszewski (*pro hac vice*)
Wendy Tsang (*pro hac vice*)
7                                                **LABATON SUCHAROW LLP**
140 Broadway
8                                                New York, NY 10005
Telephone: (212) 907-0700
9                                                Facsimile: (212) 818-0477
Email: tdubbs@labaton.com
10                                               lgottlieb@labaton.com
jdubbin@labaton.com
11                                               jostaszewski@labaton.com
wtsang@labaton.com
12

13                                               *Counsel for Lead Plaintiff the Public*
*Employees Retirement Association of New*
14                                               *Mexico*

15                                               **WAGSTAFFE, VON LOEWENFELDT,**
**BUSCH & RADWICK, LLP**
16                                               JAMES M. WAGSTAFFE (#95535)
FRANK BUSCH (#258288)
17                                               100 Pine Street, Suite 725
San Francisco, California 94111
18                                               Telephone: (415) 357-8900
Facsimile: (415) 371-0500
19                                               Email: wagstaffe@wvbrlaw.com
busch@wvbrlaw.com
20

21                                               *Liaison Counsel for the Class*

22

23

24

25

26

27

28

---

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                    120
CIVIL ACTION NO. 5:18-CV-03509-RS

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on December 14, 2018, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a Notice of Electronic Filing to all counsel of record.

*/s/ Thomas A. Dubbs*
THOMAS A. DUBBS

CERTIFICATE OF SERVICE
CIVIL ACTION NO. 3:18-CV-03509-RS