# EXHIBIT J

1  **LABATON SUCHAROW LLP**
   THOMAS A. DUBBS (*pro hac vice*)
2  LOUIS GOTTLIEB (*pro hac vice*)
   JEFFREY A. DUBBIN (#287199)
3  ARAM BOGHOSIAN (*pro hac vice*)
   140 Broadway
4  New York, New York 10005
   Telephone: (212) 907-0700
5  Facsimile: (212) 818-0477
   Email: tdubbs@labaton.com
6  lgottlieb@labaton.com
   jdubbin@labaton.com
7  aboghosian@labaton.com

8  *Counsel for Lead Plaintiff the Public Employees Retirement*
   *Association of New Mexico and Lead Counsel for the Class*
9
   **WAGSTAFFE, VON LOEWENFELDT, BUSCH & RADWICK, LLP**
10 JAMES M. WAGSTAFFE (#95535)
   FRANK BUSCH (#258288)
11 100 Pine Street, Suite 725
   San Francisco, California 94111
12 Telephone: (415) 357-8900
   Facsimile: (415) 371-0500
13 Email: wagstaffe@wvbrlaw.com
   busch@wvbrlaw.com
14
   *Liaison Counsel for the Class*
15

16            **UNITED STATES DISTRICT COURT**
             **NORTHERN DISTRICT OF CALIFORNIA**
17                **SAN FRANCISCO DIVISION**

18
19                                  Civil Action No. 3:18-cv-03509-EJD
20 IN RE PG&E CORPORATION             THIRD AMENDED CONSOLIDATED CLASS
   SECURITIES LITIGATION             ACTION COMPLAINT FOR VIOLATION OF
21                                  THE FEDERAL SECURITIES LAWS

22                                  JURY TRIAL DEMANDED
23
24
25
26
27
28

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO. 3:18-CV-03509-EJD

1

**TABLE OF CONTENTS**

2

I.   INTRODUCTION ....................................................................................................... 1

3

II.   NATURE OF THE CASE ........................................................................................... 4

4

III.   JURISDICTION AND VENUE .................................................................................. 5

5

IV.   OVERVIEW OF THE EXCHANGE ACT VIOLATIONS ........................................ 5

6

A.   PG&E's Failure to Comply with Safety Regulations Proximately Caused
Wildfires in 2017 and Investors' Consequent Losses .......................................... 6

7

B.   PG&E's Failure to Prioritize Safety Continued Unabated, Proximately
Causing a Disastrous Wildfire in November 2018 as Well as Further Investor
Losses ................................................................................................................... 8

8

9

1.   After the North Bay Fires, PG&E Continued to Make False and
Misleading Statements and Omissions ................................................... 8

10

2.   PG&E's Continuing Noncompliance With Safety Regulations Caused the
Camp Fire ............................................................................................. 10

11

12

C.   Exchange Act Claims Being Asserted ............................................................... 12

13

V.   THE EXCHANGE ACT PARTIES ......................................................................... 13

14

VI.   SUBSTANTIVE ALLEGATIONS SUPPORTING THE EXCHANGE ACT CLAIMS 15

15

A.   PG&E Operates Within a Robust Legal Regime ............................................... 15

16

1.   California Law Required PG&E to Maintain a Safe Distance Between Its
Electrical Equipment and Nearby Vegetation ....................................... 15

17

2.   California Law Required PG&E to Safely Maintain Its Electrical
Equipment and Infrastructure ............................................................... 16

18

19

3.   PG&E Is Regulated by the CPUC ........................................................ 17

20

(a)   CPUC's General Orders 95 and 165 Impose Strict Safety
Regulations on PG&E .............................................................. 17

21

22

(b)   CPUC's Resolution ESRB-8 Imposes on PG&E an Obligation to
Adopt, Promulgate and Follow the ESRB-8 Shutoff Protocol ... 19

23

(c)   PG&E Must Follow CPUC's Regulations Under Penalty of Law ... 20

24

4.   Cal Fire Is the Duly Authorized Investigative Arm of the State of
California for Wildfires ......................................................................... 20

25

5.   Under California's Inverse Condemnation Law, PG&E Would Not Bear
the Cost of Wildfires It Causes if It Could Prove That It Acted Reasonably
and Prudently ....................................................................................... 21

26

27

6.   Federal Law Also Requires PG&E to Follow Minimum Safety Standards ........ 21

28

Case: 19-30088   Doc# 11168-10   Filed: 08/31/21   Entered: 08/31/21 14:49:59   Page
3 of 229

B.  PG&E's Vegetation Management Expenditures Did Not Materially Change from Year to Year During the Class Period, Let Alone Double at Any Point ............ 22

C.  PG&E's Tree Trimming and Removal Did Not Come Close to Doubling During the Class Period ............................................................................................ 24

D.  After the North Bay Fires, PG&E Started Reporting Inflated Numbers for Tree Removal ................................................................................................... 25

E.  PG&E Concealed Its Unsafe Use of Reclosers During the Class Period ................. 25

    1.  PG&E Used Reclosers to Prioritize Convenience Over Safety ........................... 25

    2.  PG&E Concealed Its Use of Reclosers from Investors During the Class Period .............................................................................................................. 27

F.  PG&E Engaged in an Unsafe Pattern of Noncompliance with Safety Requirements Before and Throughout the Class Period ........................................... 28

    1.  PG&E Was Convicted of Negligence for Starting a Wildfire in 1994 ................ 28

    2.  PG&E Unsafely Flouts Safety Regulations ......................................................... 28

    3.  PG&E's Unsafe, Noncompliant Vegetation Management Caused the Butte Fire in 2015 ....................................................................................................... 30

    4.  PG&E's Insufficient Safety Practices Allowed Numerous, Company-Wide Vegetation Management and Other Safety Violations During the Class Period ................................................................................................................ 30

        (a)  PG&E Documented and Tolerated Thousands of Dangerous Safety Violations Across Its Territory During the Class Period ........................... 30

        (b)  PG&E Had Actual Knowledge That Its Insufficient Safety Practices Had the Potential to Allow for Dangerous Safety Violations on the Order of Hundreds of Thousands to a Million Wildfire Hazards ............... 32

G.  Investors Could Not Have Reasonably Expected the Extent of PG&E's Unsafe Pattern of Noncompliance that Caused the North Bay Fires and the Camp Fire ........ 33

    1.  PG&E's Noncompliance with Vegetation Management and Pole Integrity Requirements Caused the North Bay Fires ........................................................ 33

    2.  PG&E's Noncompliance with Vegetation Management and Pole Integrity Requirements Caused the Camp Fire ................................................................ 34

        (a)  The Camp Fire's First Ignition Point Was Caused by PG&E Safety Violations ........................................................................................... 34

        (b)  The Camp Fire's Second Ignition Point Was Also Caused by PG&E's Safety Violations ............................................................................ 37

H.  PG&E's Repeated Vegetation Management and Pole Integrity Safety Violations Show that the Company Knew of Its Numerous and Widespread Violations of Fire Safety Regulations Throughout the Class Period, but Did

Not Change Its Practices to Reduce, Much Less Eliminate, Those Safety Violations ........................................................................................................ 38

    1.  PG&E Did Not Improve Its Inadequate Safety Practices After Its Safety Violations Caused the Deadly Butte Fire ................................................... 38

    2.  PG&E Internally Acknowledged, Extensively Documented, and Tolerated for Years the Safety Violations that Caused the Camp Fire ............................ 39

I.  PG&E's ESRB-8 Shutoff Protocol Was Illusory, and PG&E's Failure to Follow It Was a Proximate Cause of the Camp Fire ........................................ 43

    1.  PG&E Admitted that All of the Non-Weather Criteria Weighed in Favor of Shutting Off the Power .................................................................. 45

        (a)  Criterion 1: the National Fire Danger Rating System Rated Jarbo Gap as Having an "Extreme" Fire Danger Threat Level .......................... 45

        (b)  Criterion 2: the National Weather Service Declared a "Red Flag Warning" for the Area ........................................................................ 47

        (c)  Criterion 6: "Critically Dry Vegetation" (*i.e.*, Wildfire Fuel) Weighed in Favor of a Shutoff ...................................................... 47

        (d)  Criterion 7: PG&E's On-the-Ground Observations Weighed in Favor of a Shutoff ...................................................................... 49

    2.  All of the Weather Criteria Weighed in Favor of Shutting Off the Power .......... 50

        (a)  Criterion 3: The Jarbo Gap Recorded Sufficiently Low Humidity Levels ............................................................................................ 52

        (b)  Criterion 4: The Jarbo Gap Recorded Sufficiently High Wind Speed ........ 53

        (c)  Criterion 5: Site-Specific Conditions Further Favored Shutoff .................. 54

    3.  PG&E Knew, or Recklessly Disregarded, that All Seven Criteria Weighed in Favor of Shutting Off the Power .................................................................. 54

J.  PG&E's Bankruptcy and Other Post-Class-Period Developments ............................ 56

VII.    DEFENDANTS' FALSE AND MISLEADING CLASS PERIOD STATEMENTS UNDER THE EXCHANGE ACT ....................................................................... 59

A.  Overview of Defendants' Fraudulent Course of Conduct ........................................... 59

B.  Defendants Made Materially False and Misleading Statements and Omissions Regarding Its Vegetation Management Activities and Compliance with Wildfire Safety Regulations Before the North Bay Fires ................................................ 61

    1.  April 29, 2015 – Misstatement No. 1 .............................................................. 61

    2.  October 16, 2015 – Misstatement No. 2 ......................................................... 62

    3.  November 18, 2015 – Misstatement No. 3 ...................................................... 64

4. October 6, 2016 – Misstatement No. 4 .................................................. 65

5. August 9, 2017 – Misstatement No. 5 .................................................. 67

C. Defendants Tied the Company's Dividend to Safety Compliance, Making Materially False and Misleading Statements and Omissions Regarding Its Dividend and Safety Before the North Bay Fires ........................................ 69

1. May 23, 2016 – Misstatement No. 6 .................................................. 70

2. November 4, 2016 – Misstatement No. 7 .......................................... 71

3. May 31, 2017 – Misstatement No. 8 .................................................. 72

D. After the North Bay Fires Erupted, the Truth Began to Emerge ............... 74

E. After the North Bay Fires Were Contained, the Company Made Additional False and Misleading Statements and Omissions Regarding Compliance with Wildfire-Related Safety Regulations ...................................................... 75

1. October 31, 2017 – Misstatement No. 9 ............................................ 75

2. November 2, 2017 – Misstatement No. 10 ........................................ 76

3. November 2, 2017 – Misstatement No. 11 ........................................ 79

4. November 5, 2017 – Misstatement No. 12 ........................................ 81

5. May 25, 2018 – Misstatement No. 13 ................................................ 83

F. While the Truth Regarding PG&E's Role in Causing the North Bay Fires Emerged, the Company Made Additional False and Misleading Statements and Omissions Regarding Compliance with Wildfire-Related Safety Regulations, Including Its ESRB-8 Shutoff Protocol ........................................ 85

1. June 8, 2018 – Misstatement No. 14 .................................................. 85

2. June 8, 2018 – Misstatement No. 15 .................................................. 87

3. September 27, 2018 – Misstatement No. 16 ...................................... 88

4. October 9, 2018 – Misstatement No. 17 ............................................ 90

5. October 9, 2018 – Misstatement No. 18 ............................................ 91

6. November 8, 2018 – Misstatement No. 19 ........................................ 92

VIII. MATERIALITY UNDER THE EXCHANGE ACT ............................................ 93

IX. LOSS CAUSATION UNDER THE EXCHANGE ACT ...................................... 94

A. Defendants' False and Misleading Statements Artificially Inflated the Price of PG&E's Securities ............................................................................ 94

B. PG&E's Safety Violations Caused the Devastating North Bay Fires ......... 95

C.  PG&E's Safety Violations Caused the Devastating Camp Fire ...................................95

D.  As the Market Learned About the Effects and Extent of PG&E's Inadequate
Safety Practices, the Price of PG&E's Securities Fell Dramatically .........................96

    1.  October 12, 2017 – Corrective Disclosure and/or Materialization of
Concealed Risk .................................................................................................. 96

        (a)  The Market Began to Learn the Extent and Effects of PG&E's
Responsibility for the North Bay Fires ................................................ 96

        (b)  Market Commentators Confirmed the Cause of PG&E's Share Price
Decline on October 12, 2017 ................................................................ 97

    2.  October 13-16, 2017 – Corrective Disclosure and/or Materialization of
Concealed Risk .................................................................................................. 99

        (a)  The Market Continued to Learn the Extent and Effects of PG&E's
Responsibility for the North Bay Fires ................................................ 99

        (b)  Market Commentators Confirmed the Cause of PG&E's Share Price
Decline on October 13, 2017 ................................................................ 99

    3.  December 20, 2017 – Corrective Disclosure and/or Materialization of
Concealed Risk ................................................................................................ 100

        (a)  The Market Continued to Learn the Extent and Effects of PG&E's
Responsibility for the North Bay Fires .............................................. 100

        (b)  Market Commentators Confirmed the Proximate Cause of PG&E's
Share Price Decline on December 20, 2017 ...................................... 101

    4.  May 25, 2018 – Corrective Disclosure and/or Materialization of
Concealed Risk ................................................................................................ 102

        (a)  The Market Continued to Learn the Extent and Effects of PG&E's
Responsibility for the North Bay Fires .............................................. 102

        (b)  Market Commentators Confirmed that the News Regarding Safety
Violations Proximately Caused PG&E's Share Price Decline on May
25-29, 2018 ........................................................................................ 104

    5.  June 8, 2018 – Corrective Disclosure and/or Materialization of Concealed
Risk .................................................................................................................. 105

        (a)  The Market Learned the Truth of PG&E's Continued, Unsafe Use of
Reclosers ............................................................................................ 107

        (b)  The Market Continued to Learn the Extent and Effects of PG&E's
Safety Violations and Responsibility for the North Bay Fires ................ 107

        (c)  Market Commentators Confirmed that the Number and Range of
Safety Violations Proximately Caused PG&E's Share Price Decline
on June 8-11, 2018 ............................................................................ 108

6. November 8-9, 2018 – Corrective Disclosure and/or Materialization of Concealed Risk ................................................................................. 109

    (a) The Market Began to Learn the Extent and Effects of PG&E's Responsibility for the Camp Fire ................................................. 109

    (b) Market Commentators Confirmed the Cause of PG&E's November 9, 2018 Share Price Decline ................................................ 110

7. November 9-12, 2018 – Corrective Disclosure and/or Materialization of Concealed Risk ................................................................................. 112

    (a) The Market Continued to Learn the Extent and Effects of PG&E's Responsibility for the Camp Fire ................................................. 112

    (b) Market Commentators Confirmed the Cause of PG&E's November 9-12, 2018 Share Price Decline. ............................................. 113

8. November 13-14, 2018 – Corrective Disclosure and/or Materialization of Concealed Risk ................................................................................. 114

    (a) The Market Continued to Learn the Extent and Effects of PG&E's Responsibility for the Camp Fire ................................................. 114

    (b) Market Commentators Confirmed the Cause of PG&E's Share Price Decline on November 14, 2018 ........................................... 115

9. November 15, 2018 – Corrective Disclosure and/or Materialization of Concealed Risk ................................................................................. 116

    (a) The Market Continued to Learn the Extent and Effects of PG&E's Responsibility for the Camp Fire ................................................. 116

    (b) Market Commentators Confirmed the Cause of PG&E's Share Price Decline on November 15, 2018 ........................................... 117

X.   SCIENTER UNDER THE EXCHANGE ACT ................................................ 118

A. PG&E Knew that Its Safety Practices Continued to Violate the Law Even After PG&E Was on Notice of the Butte Fire Safety Violations ......................... 118

B. Safety Was Core to PG&E's Operations, and the Exchange Act Individual Defendants Were Directly Involved in It ................................................ 120

C. The Federal Court Overseeing PG&E's Probation, Including Safety Monitoring, Has Uncovered Additional Facts Supporting Scienter ..................... 123

D. PG&E's Noncompliance with Safety Regulations Was Well-Known Throughout the Company, Including at the Highest Levels, with Real-Time Access to a Database of Known Safety Violations ................................................ 129

    1. PG&E Recorded Its Violations of Safety Regulations in a Sophisticated Database, Readily Accessible by the Exchange Act Individual Defendants ...... 129

2.  PG&E Instituted a Culture Among Its On-the-Ground Employees of Reporting Problems up the Corporate Chain, Which Upper Management Was Aware of and Monitored .......................................................... 131

E.  PG&E's Compliance Statements Were Authorized by Defendant Kane and Were Made under Her Ultimate Authority ....................................................133

F.  The Threat of a Potential Bankruptcy Gave Defendants a Strong Motive to Mislead Investors ....................................................................................135

G.  After PG&E Failed to Follow Its ESRB-8 Shutoff Protocol and Caused the Camp Fire, PG&E Attempted to Cover It Up ..........................................136

H.  PG&E's Unprecedented Departure of Officers and Directors Strengthens the Inference of Scienter ..............................................................................140

XI.    APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND FRAUD ON THE MARKET FOR THE EXCHANGE ACT CLAIMS ........................................................ 141

XII.   CLASS ACTION ALLEGATIONS FOR THE EXCHANGE ACT CLAIMS.............. 142

XIII.  CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT ......................................... 144

XIV.   NATURE OF THE SECURITIES ACT CLAIMS .......................................................... 151

XV.    OVERVIEW OF THE SECURITIES ACT VIOLATIONS ........................................... 151

XVI.   THE SECURITIES ACT PARTIES ................................................................................. 153

A.  Securities Act Named Plaintiffs ............................................................................153

B.  Bankrupt Entities ....................................................................................................154

C.  Securities Act Individual Defendants ....................................................................154

D.  Underwriter Defendants ..........................................................................................159

XVII.  SUBSTANTIVE ALLEGATIONS SUPPORTING THE SECURITIES ACT CLAIMS 162

A.  PG&E's Systemic Failure to Take Measures to Mitigate Wildfires and Safety Violations ................................................................................................................162

1.  Overview of Laws and Regulations Governing PG&E's Operations................. 162

2.  PG&E's Lax Safety Practices, Safety Violations and Resulting Wildfires ....... 164

XVIII. THE SECURITIES ACT DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS IN THE OFFERING DOCUMENTS FOR THE NOTES OFFERINGS ..................................................................................................................... 186

A.  The Securities Act Defendants Misled Investors Regarding PG&E's Safety Practices, Policies and Compliance .......................................................................187

1.  The Offering Documents Omitted PG&E's Widespread Safety Failures and the Existing Risks Associated with Its Inadequate Safety Practices ........ 188

2. The Offering Documents Did Not Disclose PG&E's Investments in, Commitment to, and Practices Related to Safety Were Inadequate .................. 194

B. The Securities Act Defendants Materially Misled Investors Regarding PG&E's Liability for Wildfires ............................................................. 203

C. PG&E's Offering Documents Misled Investors by Failing to Comply with Item 303's Disclosure Requirements and Disclosure Safety Violations .................. 208

XIX. NO SAFE HARBOR FOR THE SECURITIES ACT CLAIMS .................................... 211

XX. CLASS ACTION ALLEGATIONS FOR THE SECURITIES ACT CLAIMS ............ 212

XXI. CLAIMS FOR RELIEF UNDER THE SECURITIES ACT ......................................... 214

XXII. PRAYER FOR RELIEF ............................................................................................ 216

1    Court-appointed Lead Plaintiff, the Public Employees Retirement Association of New

2    Mexico ("PERA" or "Lead Plaintiff"), individually and on behalf of all other persons similarly

3    situated, alleges the following against PG&E Corporation, Pacific Gas and Electric Company

4    (the "Utility," and together with PG&E Corporation, "PG&E" or the "Company"), the Exchange

5    Act Individual Defendants (defined below), the Securities Act Individual Defendants (defined

6    below), and the Underwriter Defendants (defined below).  In addition, named Plaintiff York

7    County on behalf of the County of York Retirement Fund, City of Warren Police and Fire

8    Retirement System and Mid-Jersey Trucking Industry & Local No. 701 Pension Fund

9    (collectively, the "Securities Act Plaintiffs," and together with Lead Plaintiff, "Plaintiffs"),

10   individually and on behalf of all others similarly situated, allege violations of the Securities Act

11   of 1933 ("Securities Act") against the Securities Act Individual Defendants and the Underwriter

12   Defendants. These allegations are based upon personal knowledge as to Plaintiffs' own acts, and

13   upon information and belief as to all other matters.  Plaintiffs' information and belief is based on

14   the investigation conducted by and through its attorneys, which included a review of the

15   Company's Securities and Exchange Commission ("SEC") filings, conference call transcripts

16   and press releases, media and analyst reports about the Company, court filings, and other public

17   information regarding the Defendants.  Plaintiffs believe that substantial additional evidentiary

18   support for the allegations set forth herein will be produced through discovery.

19   **I.    INTRODUCTION**

20        1.    The investing public depends on PG&E to be honest when talking about its safety

21   practices and level of compliance with vital safety regulations.  This federal securities class

22   action arises out of the materially false statements that Defendants made to investors from April

23   29, 2015 through November 15, 2018 (the "Class Period").  Their statements and omissions

24   misled investors about PG&E's wildfire safety practices, including their representations of

25   achieving full legal compliance and investing in safety, notwithstanding the Company's

26   numerous and widespread violations of powerline safety regulations.

27        2.    For example, in just 14 months from October 2017 through November 2018,

28   California experienced some of the deadliest and most destructive wildfire events of its recorded

---

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO. 3:18-CV-03509-EJD                                    1

1   history.  This narrow time period included both the 2017 North Bay Fires and the 2018 Camp

2   Fire.  One thing these fires have in common is that they were started or exacerbated by

3   noncompliant PG&E electrical equipment and vegetation management: an astounding fact to

4   those who believed PG&E's public statements that it complied with California and federal safety

5   regulations.  The other thing these fires have in common is that they incited a series of

6   investigations, which have revealed PG&E's gross deficiencies in the area of safety compliance.

7        3.      The timing of these catastrophic fires is no coincidence; they occurred at the

8   height of PG&E's knowing noncompliance with safety regulations.  Among the many details that

9   have emerged, the Honorable William Alsup of the United States District Court for the Northern

10  District of California, in presiding over PG&E's criminal probation, has found as fact "that as of

11  **June 2017**, there were 3,962 unworked trees which PG&E had identified **in 2016** as hazardous

12  with the potential to 'fall into or otherwise impact the [electrical] conductors, towers or guy

13  wires before the next inspection cycle.'"  By June 2017, PG&E had known about these

14  thousands of vegetation fire hazards for six to eighteen months (*i.e.*, as far back as January 2016)

15  – yet did nothing other than to internally record their existence.  Judge Alsup based this finding

16  on PG&E's own admissions.

17       4.      Thus, mere months before its vegetation safety violations would cause and

18  exacerbate the 2017 North Bay Fires, PG&E actually knew it was not addressing thousands of

19  violations in the form of vegetation fire hazards, even while falsely assuring investors over the

20  same time period that its vegetation management was, *e.g.*, "*in compliance with relevant laws*"

21  (October 6, 2016 – Misstatement No. 4), and "*complying with state and federal regulations and*

22  *delivering safe, reliable and affordable electric service*" (August 9, 2017 – Misstatement No. 5).

23       5.      The public did not immediately know that PG&E was responsible for the North

24  Bay Fires—information that would threaten the Company's financial condition.  So PG&E

25  doubled down on misinformation in order to build up the public perception of its safety and

26  compliance before the tide of public opinion could turn against it.  For example, after the North

27  Bay Fires erupted, Defendants falsely insisted that the Company had "*doubl[ed] our typical*

28  *vegetation management spending last year*" and "*inspect[ed] all of our overhead lines*"

1  (November 2, 2017 – Misstatement Nos. 10 & 11), when **it had not**. Similarly, the Company

2  reiterated that it "***meets or exceeds all applicable federal and state vegetation clearance***

3  ***requirements***" (November 5, 2017 – Misstatement No. 12), yet soon thereafter, state

4  investigators would link evidence of PG&E's violations of California safety regulations to at

5  least **eleven** of the North Bay Fires.

6        6.     Even as the truth began to emerge about PG&E's insufficient safety practices, and

7  PG&E continued to falsely insist on its compliance, California imposed additional safety

8  regulations on the Company.  This included a mandate that PG&E formalize a protocol for

9  proactively turning off its power lines when certain extreme conditions were met, to prevent any

10  further wildfires.  By the deadline, PG&E stated that it had "***created a set of procedures for . . .***

11  ***[d]etermining what combination of conditions necessitates turning off lines for safety***"

12  (September 27, 2018 – Misstatement No. 16).  Yet less than two months later, on a day when

13  hazardous weather and other conditions required PG&E to shut off certain lines, the Camp Fire

14  erupted.  Not only is it now known that **those very power lines caused the Camp Fire**, but facts

15  have emerged suggesting that PG&E's shutoff program **was not in effect when Defendants said**

16  **it was** – facts which PG&E has tried to cover up.

17        7.     PG&E's false and misleading statements destroyed billions of dollars of economic

18  value in the Company's stocks and bonds.  When the true nature and extent of PG&E's

19  responsibility for these fires materialized, investors holding PG&E's publicly traded securities

20  experienced compensable losses.

21        8.     PG&E's ability to maintain safe power lines, compliant with federal and

22  California safety regulations, is essential to the Company's financial health. PG&E has admitted

23  that it is probable it will incur billions of dollars in losses for claims in connection with the North

24  Bay and Camp wildfires.  According to a recent SEC filing, the Company has, to date, recorded

25  charges exceeding $14.2 billion, an amount which it believes is at the "lower end of the range of

26  . . . reasonably estimated losses."[1]

27

28        [1] PG&E recently announced in its May 2, 2019 Form 10-Q that the SEC is "conducting an investigation related to PG&E Corporation's and the Utility's public disclosures and accounting

1      9.      Indeed, PG&E's responsibility for the North Bay Fire and Camp Fire catastrophes

2   has caused the Company to file for bankruptcy under Chapter 11 of Title 11 of the United States

3   Code (11 U.S.C. § 101 et seq.).  The Company's bankruptcy filings stated that it was facing

4   $51.7 billion in liabilities, including more than $30 billion in potential liabilities tied to the North

5   Bay and Camp Fires.[2]

6      10.     Because it was vital for PG&E's business to be perceived as making safety its

7   highest priority, Defendants assured investors that the Company's wildfire safety measures were

8   adequate and compliant with applicable laws and regulations.  However, the investigations

9   following these devastating fires have revealed that PG&E's assurances were false: evidence has

10  emerged that PG&E's safety violations caused at least twelve of these devastating fires,

11  including the Camp Fire—California's deadliest and most destructive wildfire ever.

12  **II.    NATURE OF THE CASE**

13     11.     This is a federal securities class action brought pursuant to the Securities

14  Exchange Act of 1934 (the "Exchange Act") on behalf of a class of all persons and entities who,

15  during the period from April 29, 2015 through November 15, 2018, inclusive (the "Class

16  Period"), purchased or otherwise acquired publicly traded PG&E securities and were damaged

17  thereby.  Excluded from the class are: (i) all defendants in the Action; (ii) members of the

18  immediate family of any individual defendant; (iii) any person who is or was an officer or

19  director of PG&E during or after the Class Period; (iv) any firm, trust, corporation, or other

20  entity in which any defendant has or had a controlling interest; (v) PG&E's employee retirement

21  and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases

22  through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or

23  assigns of any such excluded person.  Lead Plaintiff seeks to recover compensable damages

24  caused by defendants' violations of the federal securities laws and to pursue remedies under

25  _____

*(continued)*
26  for losses associated with the 2017 and 2018 Northern California wildfires and the 2015 Butte
    Fire."  *See* ¶¶663-72, *infra*.
27     [2] Amended Decl. of Jason P. Wells at 3 & 7, Case No. 19-bk-30088 (N.D. Cal. Feb. 1, 2019),
28  ECF No. 263.

1    Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule

2    10b-5 promulgated thereunder.  This Action also is brought pursuant to the Securities Act of

3    1933 (the "Securities Act") as set forth in Sections XIV-XII, *infra*.

4    **III.    JURISDICTION AND VENUE**

5            12.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of

6    the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the

7    SEC (17 C.F.R. § 240.10b-5), as well as Sections 11 and 15 of the Securities Act (15 U.S.C.

8    §§77k and 77o).

9            13.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C.

10   §1331, Section 27 of the Exchange Act, and Section 22 of the Securities Act.

11           14.    Venue is proper in this Judicial District pursuant to Section 27 of the Exchange

12   Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as PG&E's principal executive offices are located

13   within this Judicial District.  Further, many of the acts and practices complained of herein

14   occurred in substantial part in this Judicial District.

15           15.    In connection with the acts, conduct and other wrongs alleged in this Complaint,

16   Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

17   including but not limited to, the United States mail, interstate telephone communications and the

18   facilities of the national securities markets.

19   **IV.    OVERVIEW OF THE EXCHANGE ACT VIOLATIONS**

20           16.    PG&E's false statements began on April 29, 2015 and continued through

21   February 8, 2018.  As detailed herein, they misled investors about PG&E's wildfire safety

22   practices, including representations that the Company was in full legal compliance and

23   continuing to invest in safety, notwithstanding the Company's numerous and widespread

24   violations of safety regulations and inadequate safety practices.

25

26

27

28

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                                    5
CIVIL ACTION NO. 3:18-CV-03509-EJD

A.   **PG&E's Failure to Comply with Safety Regulations Proximately Caused Wildfires in 2017 and Investors' Consequent Losses**

17.   Throughout the Class Period, Defendants wanted investors to believe that PG&E was not cutting corners with its vegetation management. So PG&E repeatedly represented to its investors that:

- "***PG&E's Vegetation Management***" was "***in compliance with relevant laws***" (October 6, 2016 – Misstatement No. 4);

- Its "***vegetation management program*** . . . ***compl[ies] with state and federal regulations***" (August 9, 2017 – Misstatement No. 5);

- "***PG&E follows all applicable federal and state vegetation clearance requirements***" to "***help to reduce*** outages or ***fires caused by trees or other vegetation***" (October 31, 2017 – Misstatement No. 9); and

- "***PG&E meets or exceeds all applicable federal and state vegetation clearance requirements***" (November 5, 2017 – Misstatement No. 12).[3]

18.   These statements, and others, were materially false and misleading because they misrepresented PG&E's level of compliance with California and federal law, and consequently the extent to which shareholders would be exposed to liability for damages caused by wildfires and additional costs to improve their inadequate wildfire safety practices.

19.   The fraud began to unravel when investors learned about PG&E's responsibility – and liability – for the wildfires that devastated Northern California in October 2017 (the "North Bay Fires").[4]  These fires burned approximately 249,000 acres, destroyed 8,898 structures, and killed 44 people across nine counties: Napa, Sonoma, Mendocino, Lake, Humboldt, Butte, Nevada, Solano, and Yuba. They resulted in damages estimated at **more than $17 billion**.[5]  The

---

[3] The statements made by Defendants that are ***bolded and italicized*** are the statements alleged to be false and misleading. All other emphasis is in **bold**.

[4] There may have been as many as 170 individual fires, but many smaller fires combined into larger fires as they burned. Taking that into consideration, the North Bay Fires consisted of eighteen main fires.

[5] This $17 billion estimate is approximately six times greater than the second most expensive California wildfire at the time, the October 1991 Tunnel Fire in Oakland, which, according to a

1   size of this liability imperiled the financial viability of the Company.  In fact, several of

2   Defendants' false and misleading statements were made in the months before PG&E openly

3   expressed its fear that its liability for the North Bay Fires could send the Company into

4   bankruptcy.

5          20.     As the State of California's official investigations into the eighteen North Bay

6   Fires were completed by the California Department of Forestry and Fire Protection ("Cal Fire"),

7   the truth emerged over time that **at least seventeen** were caused by PG&E equipment.  Indeed,

8   Cal Fire has determined that **eleven** of these fires, across seven counties, evidenced violations of

9   California safety regulations – contradicting Defendants' false representations of compliance

10  with those regulations.

11         21.     Defendants' false and misleading misrepresentations and omissions came at a

12  crucial time for the Company.  As described below, over the past three decades, PG&E caused a

13  series of wildfires and other disasters in California.  For example, in September 2015, its

14  violations of California safety regulations regarding vegetation clearance caused a wildfire

15  known as the "Butte Fire," which burned over 70,000 acres, destroyed 921 structures, and killed

16  two people – making it then the seventh most destructive wildfire in California history, but small

17  compared to the North Bay and Camp Fires that would follow.

18         22.     Revealingly, just months before the North Bay Fires began, in an April 2017 non-

19  public deposition concerning PG&E's responsibility for the Butte Fire, a PG&E Vegetation

20  Program Manager named Richard Yarnell admitted: "PG&E—to the best of my knowledge, **we**

21  **have not made any changes as a result of this fire**."  Thus, despite being on notice of its

22  dangerous safety violations and their deadly consequences, neither the Company nor its officers

23  took any steps to improve safety or compliance between the Butte Fire and the far more

24

25

26  _(continued)_
    May 27, 2011 article in _Scientific American_, caused $2.687 billion in insured property damage.

27  Mark Fischetti, _How Much Do Wildfires Cost in Terms of Property Damage?_ Scientific
    American (May 27, 2011), https://www.scientificamerican.com/article/graphic-science-how-

28  much-do-fires-cost-property-damage/?redirect=1.

1   disastrous North Bay Fires.  Over this time period, Defendants either knew or should have

2   known that the Company's wildfire-related safety violations continued unabated.

3          23.     Though the North Bay Fires began on a windy night, they were not the result of

4   an unexpected or unique event. Rather, the circumstance of PG&E causing **seventeen** concurrent

5   fires across **nine counties** shows that the Company tolerated numerous and widespread

6   violations of California safety regulations across its territory. As detailed herein, the underlying

7   explanation for these near-simultaneous North Bay Fires is neither unusual weather nor

8   coincidence, but PG&E's failure to comply with even minimal legal requirements. Accordingly,

9   PG&E and its officers knew, or deliberately disregarded, that the Company's power lines and

10  other electrical infrastructure were often not in compliance with federal and California safety

11  requirements when making false and misleading statements to the contrary.

12  **B.     PG&E's Failure to Prioritize Safety Continued Unabated, Proximately
            Causing a Disastrous Wildfire in November 2018 as Well as Further Investor**

13  **Losses**

14          **1.     After the North Bay Fires, PG&E Continued to Make False and
                    Misleading Statements and Omissions**

15

16         24.     After the public came to understand PG&E's responsibility for the North Bay

17  Fires over the course of five events from October 12, 2017 and June 11, 2018 (*see* Sections

18  IX.D.1-5, *infra*), the Company faced a new crisis: the widespread belief that it failed to prioritize

19  safety in maintaining its power lines and preventing wildfires.  It also faced a financial crisis, as

    its liabilities for the North Bay Fires threatened to bankrupt the Company.

20
           25.     As a result, PG&E needed the public, including investors, to believe that it would

21  prioritize safety thereafter.  So when Cal Fire announced (on June 8, 2018) its conclusions that

22  PG&E had caused the preponderance of the North Bay Fires, and PG&E's share price continued

23  to decline as its financial situation deteriorated, PG&E responded that same day by reassuring its

24  investors that, *e.g.*:

25  • Its "*Programs Overall Met [California]'s High Standards*," including "*Vegetation*

26     *Management*," and "*meets or exceeds regulatory requirements for pole integrity*

27     *management*" (May 25, 2018 – Misstatement No. 13);

28

---

1  • "To address the growing threats posed by wildfires and extreme weather, and in light of

2  the wildfires throughout our state last year, ***PG&E has launched . . . a program to***

3  ***proactively turn off electric power for safety when extreme fire danger conditions***

4  ***occur***" (June 8, 2018 – Misstatement No. 15);

5  26.      Indeed, one month later, on July 16, 2018, PG&E's primary state regulator

6  **mandated** that PG&E formalize and publicize its protocol for proactively turning off its power

7  lines to prevent further wildfires, enacting a regulation known as Resolution ESRB-8.  The

8  Company announced its response to this new safety requirement on or about September 27, 2018

9  (the "ESRB-8 Shutoff Protocol"), including:

10  • "PG&E's Community Wildfire Safety Program implements additional precautionary

11  measures intended to reduce wildfire threats. ***It includes*** . . . ***executing protocols to***

12  ***temporarily turn off electric power for safety when extreme fire danger conditions are***

13  ***occurring***" and "***PG&E has created a set of procedures for . . . [d]etermining what***

14  ***combination of conditions necessitates turning off lines for safety***" (September 27, 2018

15  – Misstatement No. 16).

16  27.      While the Company was finalizing its protocol, on September 21, 2018,

17  California enacted S.B. 901, a law to rescue PG&E from the threat of bankruptcy due to its

18  responsibility for the North Bay Fires.  The resulting law put in place a financial stress test to

19  monitor PG&E's financial health, as well as a method to raise capital should PG&E's liability for

20  the North Bay Fires cause it to fail the test.  The same law made it less likely that PG&E would

21  bear the costs of wildfires it caused in 2019 or later.

22  28.      However, the new law did not help the Company bear the financial consequences

23  of any wildfires it might cause in the remaining months of 2018.

24  29.      Put differently, PG&E's vegetation management, proactive power line shutoff

25  program, and other touted means of safety compliance would have to ensure wildfire safety for

26  the remainder of 2018, or their failure would drive the Company to ruin.

27  30.      PG&E continued to assure the public that it had implemented these measures

28  successfully.  For example, when the news broke on October 9, 2018 that Cal Fire had concluded

Case: 19-30088   Doc# 11169-10   Filed: 08/31/21   Entered: 08/31/21 14:49:59   Page
19 of 229

that PG&E was the cause of yet another one of the prior year's North Bay Fires, the Cascade Fire, the Company reassured investors by stating:

- "[W]e are continuing to focus on ***implementing additional precautionary measures*** intended to further reduce wildfire threats, such as ***working to remove and reduce dangerous vegetation, improving weather forecasting, upgrading emergency response warnings, [and] making lines and poles stronger in high fire threat areas***, and taking other actions to make our system, and our customers and communities, ***even safer*** in the face of a growing wildfire threat" (October 9, 2018 – Misstatement No. 17); and

- "***PG&E has launched . . . a program to proactively turn off electric power for safety when extreme fire danger conditions occur***" (October 9, 2018 – Misstatement No. 18).

31.    Such statements were materially false and misleading because PG&E had **not** meaningfully improved its safety practices—as would soon be revealed by the Camp Fire.  By pitching their statements to convince the investing public that PG&E had resolved its fire safety failures and would prioritize fire safety thereafter, Defendants concealed the true extent to which the Company was exposed to massive liability for causing further wildfires, thereby significantly inflating PG&E's share price.

32.    Ultimately, the North Bay Fires resulted in damages estimated up to $17 billion, for which the Company has already taken a charge of $3.5 billion, admitting the likelihood that it will be liable for, and bear the costs of, at least some of these fires.[6]

### 2.    PG&E's Continuing Noncompliance With Safety Regulations Caused the Camp Fire

33.    This continuation of the fraud unraveled when evidence emerged that PG&E was responsible for the Camp Fire, which devastated Northern California in November 2018, burning 153,336 acres, destroying 18,804 structures, and killing at least 85 people[7]—making it

---

[6] Press Release, PG&E, *PG&E Provides Update on Financial Impact of 2017 and 2018 Wildfires* (Feb. 28, 2019) (filed with Form 8-K), https://www.sec.gov/Archives/edgar/data/75488/000119312519055751/d710309dex991.htm.

[7] Press Release, Cal Fire, *CAL FIRE Investigators Determine Cause of the Camp Fire* (May 15, 2019), https://calfire.ca.gov/communications/downloads/newsreleases/2019/CampFire_Cause.pdf.

---

1   the single most destructive and deadliest wildfire in California history.  It has resulted in

2   damages estimated up to $13 billion, for which the Company has already taken a $10.5 billion

3   charge, admitting the likelihood that it will be liable for, and bear the costs of, the Camp Fire.[8]

4   Moreover, Cal Fire has confirmed that PG&E's electrical equipment caused the Camp Fire.[9]

5         34.      The Camp Fire began when a PG&E electrical tower, carrying a high-voltage 115

6   kilovolt transmission line, failed.  PG&E has also acknowledged a second ignition point for the

7   Camp Fire that exhibited damaged and downed poles, vegetation on top of downed wires, and

8   other signs of safety violations.

9         35.      As a result, vegetation underneath the lines ignited at two ignition points

10  approximately 30 minutes apart.  PG&E's failure to remove such vegetation violated California

11  Public Resources Code Section 4293, and its failure to maintain the integrity of its poles and

12  towers violated California Public Utilities Code Section 451.

13        36.      Starting with two PG&E admissions at the end of the day the Camp Fire began

14  (November 8, 2019), it emerged that PG&E's promises to prioritize fire safety were false and

15  misleading.  PG&E's statements promoting its ESRB-8 Shutoff Protocol were a prime example

16  of this prioritization, promising to shut off electricity broadly rather than risk further wildfires.

17  Soon, however, it emerged that PG&E's ESRB-8 Shutoff Protocol was illusory: the protocol

18  dictated that the electrical lines that caused the Camp Fire **should have been shut off, but

19  PG&E flouted it.**  Investors learned not only that PG&E's ESRB-8 Shutoff Protocol should

20  have prevented the fire entirely, but also that PG&E needlessly imperiled lives rather than risk

21  upsetting customers.

22

23

24  _____
    [8]

25      Press Release, PG&E, PG&*E Corporation Provides Update on Financial Impact of 2017 and
    2018 Wildfires* (Feb. 28, 2019) (filed with Form 8-K),

26      https://www.sec.gov/Archives/edgar/data/75488/000119312519055751/d710309dex991.htm.
    [9] Press Release, Cal Fire, *CAL FIRE Investigators Determine Cause of the Camp Fire* (May

27  15, 2019),

28  https://calfire.ca.gov/communications/downloads/newsreleases/2019/CampFire_Cause.pdf.

37.     PG&E would later attempt to justify its inaction by claiming that its ESRB-8 Shutoff Protocol did not apply to high-voltage transmission lines like the one that caused the Camp Fire.  However, Plaintiff's investigation has uncovered that this explanation is demonstrably false.  The fact is that PG&E's promised ESRB-8 Shutoff Protocol would have prevented the Camp Fire if only it were followed.  The Company's attempt to cover it up substantiates not only that PG&E's safety failures caused the Camp Fire, but further that PG&E's false and misleading statements—concealing how the Company was not sufficiently prioritizing safety—were made with knowledge of their falsity, or at least deliberate recklessness.

38.     Accordingly, the true risks leading to the Camp Fire were concealed by PG&E's materially false and misleading statements assuring investors of the Company's compliance with California safety regulations, including the ESRB-8 Shutoff Protocol.

**C.     Exchange Act Claims Being Asserted**

39.     Notwithstanding PG&E's false and misleading statements to the marketplace, investors learned over time that PG&E's safety violations were numerous and widespread. Indeed, they were responsible for most of the North Bay Fires and the Camp Fire. As information regarding the impact of PG&E's deficient safety practices emerged between October 12, 2017 and November 15, 2018, investors were surprised, given Defendants' numerous public statements during the Class Period touting the Company's compliance, safety measures, and its intertwined financial health. As information came to light relating to PG&E's inadequate safety measures and/or the effects thereof, PG&E's artificially inflated share price dropped significantly.  Thus, as a result of Defendants' wrongful acts and omissions, Lead Plaintiff and other Class members have suffered significant damages.

40.     Lead Plaintiff asserts the claims herein against PG&E and certain of its executives and officers, seeking to recover for its damages suffered due to these declines in PG&E's publicly traded securities.  PG&E's statements of compliance with safety regulations during the Class Period misrepresented current facts and were not statements of opinion.

## V.   THE EXCHANGE ACT PARTIES

41.    Lead Plaintiff PERA was established in 1947 and manages a retirement system for state, county, and municipal employees including police, firefighters, judges, magistrates, legislators and volunteer firefighters. PERA oversees assets of more than $15 billion on behalf of its members, retirees, and beneficiaries.  As set forth in its Certification (attached hereto as "Attachment A"), PERA purchased securities of PG&E at artificially inflated prices during the Class Period and was damaged as the result of Defendants' wrongdoing as alleged in this Complaint.  On September 10, 2018, this Court appointed PERA to serve as the Lead Plaintiff in this action pursuant to the Private Securities Litigation Reform Act of 1995 (the "PSLRA").

42.    Defendant PG&E Corporation is a publicly traded corporation that is headquartered in San Francisco, California, with principal executive offices located at 77 Beale Street, P.O. Box 770000, San Francisco, California 94177.  PG&E's securities trade on the New York Stock Exchange ("NYSE") under the ticker symbol "PCG." It is a holding company that holds, directs the actions of, and controls energy-based businesses such as the Utility.

43.    Defendant Utility, the Pacific Gas and Electric Company, is a wholly-owned subsidiary of PG&E and operates as a public utility in California. It generates revenue by selling and delivering electricity and natural gas to its customers, also known as "rate-payers." The Utility effectively acts as an alter ego of PG&E; the two entities share the same address, have overlapping directors, intermix finances, and file joint annual reports with the SEC on Form 10-K. Indeed, all of the Utility's shares are owned by PG&E Corporation.  Alternatively, PG&E Corporation controls the Utility as detailed herein.  Accordingly, this Complaint refers to the Utility and PG&E interchangeably as "PG&E" or the "Company," unless otherwise specified.

44.    It is understood that the action against the PG&E Defendants (PG&E Corporation and Pacific Gas and Electric Company) is stayed pursuant to the automatic stay provisions of 11 U.S.C. § 362.

45.    Defendant Anthony F. Earley, Jr. ("Earley") served as PG&E Corporation's President, Chief Executive Officer ("CEO"), and Chairman of the Board from September 13, 2011 to March 1, 2017, and as its Executive Chairman from March 1, 2017 to December 2017.

46.     Defendant Geisha J. Williams ("Williams") served as PG&E Corporation's CEO and President from March 1, 2017 until her resignation on January 13, 2019.  Previously, she served as the President of Electric Operations at the Utility from August 17, 2015 to February 28, 2017.  Prior to that, she served as Executive Vice President of Electric Operations at the Utility from June 1, 2011 to August 16, 2015.  Additionally, Williams was a director of PG&E Corporation from May 2017 to January 2019 and a director of the Utility from August 2015 to January 2019.

47.     Defendant Nickolas Stavropoulos ("Stavropoulos") served as the President and COO of PG&E Corporation from March 1, 2017 to September 30, 2018, and served as President of Gas Operations at the Utility from August 17, 2015 to February 28, 2017. Prior to that, he served as Executive Vice President of Gas Operations at the Utility from June 13, 2011 to August 16, 2015.  Stavropoulos was a director of the Utility from August 2015 to September 2018.

48.     Defendant Julie M. Kane ("Kane") has served as Senior Vice President, Chief Ethics and Compliance Officer, and Deputy General Counsel for PG&E Corporation since May 18, 2015. Kane is named as a Defendant solely in her capacity as Chief Ethics and Compliance Officer.

49.     Defendant Christopher P. Johns ("Johns") served as the President of Pacific Gas and Electric Company from August 1, 2009 to August 17, 2015.

50.     Defendant Patrick M. Hogan ("Hogan") served as the Utility's Senior Vice President of Electric Operations from March 2016 through January 8, 2019, and he retired from the Utility on January 28, 2019.  Prior to that, he served as the Utility's Vice President of Electric Operations Asset Management from November 2013 through February 2016.

51.     The Defendants referenced above in ¶¶45-50 are referred to herein as the "Exchange Act Individual Defendants."

52.     The Exchange Act Individual Defendants, because of their high-level positions of control and authority as senior executive officers of PG&E, possessed the power and authority to control, and did ultimately control, the contents of PG&E's SEC filings, press releases, content

on the Company's website and official Twitter.com account, and other market communications during the Class Period. The Exchange Act Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions within the Company and/or Utility, and their access to material information available to them but not to the public, the Exchange Act Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations being made were then materially false and misleading. The Exchange Act Individual Defendants are liable for the false statements and omissions pleaded herein.

## VI.  SUBSTANTIVE ALLEGATIONS SUPPORTING THE EXCHANGE ACT CLAIMS

### A.  PG&E Operates Within a Robust Legal Regime

53.    As detailed herein, electricity transmission and distribution is a heavily regulated industry in California.

#### 1.  California Law Required PG&E to Maintain a Safe Distance Between Its Electrical Equipment and Nearby Vegetation

54.    To ensure public safety from wildfires, California has laws and regulations that require PG&E to keep its electrical equipment clear from vegetation growth or hazardous trees, and otherwise safe.

55.    Pursuant to California Public Resources Code Section 4292, for instance:

> [A]ny person that owns, controls, operates, or maintains any electrical transmission or distribution line upon any mountainous land, or forest-covered land, brush-covered land, or grass-covered land shall, during such times and in such areas as are determined to be necessary by the director or the agency which has primary responsibility for fire protection of such areas, maintain around and adjacent to any pole or tower which supports a switch, fuse, transformer, lightning arrester, line junction, or dead end or corner pole, a firebreak which consists of a clearing of not less than 10 feet in each direction from the outer circumference of such pole or tower.

56.    Similarly, California Public Resources Code Section 4293 provides that:

1
2
3
4
5
6
7
8
9
10
11

> [A]ny person that owns, controls, operates, or maintains any electrical transmission or distribution line upon any mountainous land, or in forest-covered land, brush-covered land, or grass-covered land shall, during such times and in such areas as are determined to be necessary by the director or the agency which has primary responsibility for the fire protection of such areas, **maintain a clearance of the respective distances which are specified in this section in all directions between all vegetation and all conductors which are carrying electric current**: (a) For any line which is operating at 2,400 or more volts, but less than 72,000 volts, four feet. (b) For any line which is operating at 72,000 or more volts, but less than 110,000 volts, six feet. (c) For any line which is operating at 110,000 or more volts, 10 feet. In every case, such distance shall be sufficiently great to furnish the required clearance at any position of the wire, or conductor when the adjacent air temperature is 120 degrees Fahrenheit, or less. **Dead trees, old decadent or rotten trees, trees weakened by decay or disease and trees or portions thereof that are leaning toward the line which may contact the line from the side or may fall on the line shall be felled, cut, or trimmed so as to remove such hazard**.

12   57.   Cal Fire interprets this law to "mean[] that a tree, or portion thereof, that is

13   leaning toward the line, must be 'felled, cut, or trimmed' regardless of its health, if it 'may

14   contact the line from the side or may fall on the line.'"  The law also "requires utilities to identify

15   and remove such hazards."  Thus, Section 4293 not only "mandates that utilities trim or remove

16   limbs overhanging powerlines if those limbs are inside the statutory clearance distances," but

17   further "also mandates that utilities trim or remove, among other hazards, trees or portions

18   thereof that are leaning toward the powerlines, including overhanging limbs, if those trees or

19   limbs **may** contact the line from the side or fall on the line."  Cal Fire also makes clear that "[a]

20   utility's compliance with Section 4293 is mandatory, not discretionary."[10]

21   **2.   California Law Required PG&E to Safely Maintain Its Electrical Equipment and Infrastructure**

22

23   58.   In addition to the vegetation management regulations discussed above, California

24   laws and regulations further require PG&E to safely maintain its electrical equipment and

25

26

27   ─────────────
[10] Supplemental Response of Cal Fire following Jan. 30. 2019 Hearing on Order to Show Cause, *U.S. v. Pacific Gas and Electric Co.*, No. 14-cr-175 ("PG&E Criminal Proceedings")

28   (N.D. Cal. Feb. 6, 2019), ECF No. 1012.

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO. 5:18-CV-03509-EJD                                                      16

1    infrastructure, including an obligation to maintain the towers and poles that carry its transmission

2    and distribution lines.

3         59.    Pursuant to California Public Utilities Code Section 451:

4             Every public utility shall furnish and maintain such adequate,
              efficient, just, and reasonable service, instrumentalities, equipment,
5             and facilities, including telephone facilities, as defined in Section
              54.1 of the Civil Code, as are necessary to promote the safety,
6             health, comfort, and convenience of its patrons, employees, and the
              public.

7         60.    California Health & Safety Code Section 13007 further provides:

8
              Any person who personally or through another wilfully,
9             negligently, or in violation of law, sets fire to, allows fire to be set
              to, or allows a fire kindled or attended by him to escape to, the
10            property of another, whether privately or publicly owned, is liable
              to the owner of such property for any damages to the property
11            caused by the fire.

12        61.    Accordingly, California law required PG&E to maintain its electrical equipment

13   and infrastructure, including electrical towers and poles, sufficiently to prevent wildfires from

14   being caused by the failure of its towers and poles.

15        **3.    PG&E Is Regulated by the CPUC**

16        62.    PG&E's primary regulator is the California Public Utilities Commission

17   ("CPUC"). The CPUC promulgates safety regulations and adjudicates PG&E's annual General

18   Rate Cases – essentially determining which costs PG&E may pass on to rate-payers, and which

19   costs PG&E must bear. The CPUC was created under Article XII of the California State

20   Constitution, and derives its regulatory authority from Section 701 of the California Public

21   Utilities Code.

22        **(a)    CPUC's General Orders 95 and 165 Impose Strict Safety
               Regulations on PG&E**

23
          63.    Pursuant to CPUC General Order 95, Rule 35, PG&E was required "to establish
24
     necessary and reasonable clearances" between overhead conductors and nearby vegetation, with
25
     certain "minimum clearances" set forth by CPUC. Furthermore, this rule required that:
26
              When a supply or communication company has actual knowledge,
27            obtained either through normal operating practices or notification
              to the company, that dead, rotten or diseased trees or dead, rotten
28            or diseased portions of otherwise healthy trees overhang or lean

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                          17
CIVIL ACTION NO: 3:18-CV-03509-EJD

> toward and may fall into a span of supply or communication lines, said trees or portions thereof should be removed.
>
> * * *
>
> When a supply or communication company has actual knowledge, obtained either through normal operating practices or notification to the company, that its circuit energized at 750 volts or less shows strain or evidences abrasion from vegetation contact, the condition shall be corrected by reducing conductor tension, rearranging or replacing the conductor, pruning the vegetation, or placing mechanical protection on the conductor(s).

64.     CPUC General Order 95 provides further details regarding the maintenance and upkeep of PG&E's power lines and infrastructure. Among other things, it provides that "[a]ll lines and portions of lines shall be maintained in such condition as to provide safety factors not less than those specified in Rule 44.3." Rule 44, in turn, details the safety factors that apply to "Poles Towers and Structures," and provides that "[i]n no case shall the application of this rule be held to permit the use of structures or any member of any structure with a safety factor less than one." This order further provides certain requirements intended to, among other things, guard against corrosion.[11]

65.     Pursuant to CPUC General Order 165, PG&E must also follow certain "requirements for electric distribution and transmission facilities (excluding those facilities contained in a substation) regarding inspections in order to ensure safe and high-quality electrical service." In relevant part, General Order 165 requires that: "Each utility subject to this General Order shall conduct inspections of its distribution facilities, as necessary, to ensure reliable, high-quality, and safe operation."[12]

---

[11] CPUC General Order 95, *Rules for Overhead Electric Line Construction* (May 2018), http://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M217/K418/217418779.pdf

[12] CPUC General Order 165, *Inspection Requirements for Electric Distribution and Transmission Facilities* (Dec. 2017), http://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M209/K552/209552704.pdf.

         **(b)**    **CPUC's Resolution ESRB-8 Imposes on PG&E an Obligation to Adopt, Promulgate and Follow the ESRB-8 Shutoff Protocol**

66.    On July 16, 2018, the CPUC issued Resolution ESRB-8.  Recognizing that the "2017 California wildfire season was the most destructive wildfire season on record," the resolution required California's utilities, including PG&E, to adopt, promulgate and follow "de-energization policy and procedures" pursuant to which each utility will "de-energize power lines" as a means to mitigate wildfire risks "to ensure public safety."  It further established notification, mitigation, and reporting requirements.

67.    Resolution ESRB-8 included the following directives:

PROPOSED OUTCOME:
This Resolution extends the de-energization reasonableness, public notification, mitigation and reporting requirements in Decision (D.) 12-04-024 to all electric Investor Owned Utilities (IOUs) [including PG&E] and adds new requirements.  It also places a requirement on utilities to make all feasible and appropriate attempts to notify customers of a de-energization event prior to performing de-energization.

SAFETY CONSIDERATIONS:
De-energizing electric facilities during dangerous conditions can save lives and property and can prevent wildfires. This resolution provides guidelines that IOUs must follow and strengthens public safety requirements when an IOU decides to de-energize its facilities during dangerous conditions.

          *     *     *

PG&E reports that prior to 2018, it did not have a policy to de-energize lines as a fire prevention measure. PG&E reported that it did not proactively de-energize lines due to extreme fire weather conditions in 2017. However, in March 2018 PG&E announced that it is developing a program to de-energize lines during periods of extreme fire conditions and has been meeting with local communities to gather feedback.

          *     *     *

- The IOU shall ensure that de-energization policies and procedures are well-communicated and made publicly available, including the following:

  - **Make available and post a summary of de-energization policies and procedures on its website**.

  - Meet with representatives from local communities that may be affected by de-energization events,

before putting the practice in effect in a particular
area.

- Provide its de-energization and restoration policy **in
full**, and in summary form, to the affected
community officials before de-energizing its
circuits.

\*         \*         \*

De-energization of electric facilities could save lives, protect
property, and prevent fires.

### (c)    PG&E Must Follow CPUC's Regulations Under Penalty of Law

68.   The CPUC's regulations have the full force of law, and PG&E has a legal
obligation to follow them, including the general orders and resolutions listed above, under
penalty of law.

69.   For example, California Public Utilities Code Section 702 provides that:

Every public utility shall obey and comply with every order,
decision, direction, or rule made or prescribed by the commission
in the matters specified in this part, or any other matter in any way
relating to or affecting its business as a public utility, and shall do
everything necessary or proper to secure compliance therewith by
all of its officers, agents, and employees.

70.   Further, under California Public Utilities Code Section 2106:

Any public utility which does, causes to be done, or permits any
act, matter, or thing prohibited or declared unlawful, or which
omits to do any act, matter, or thing required to be done, either by
the Constitution, any law of this State, or any order or decision of
the commission, shall be liable to the persons or corporations
affected thereby for all loss, damages, or injury caused thereby or
resulting therefrom. If the court finds that the act or omission was
wilful, it may, in addition to the actual damages, award exemplary
damages.

### 4.    Cal Fire Is the Duly Authorized Investigative Arm of the State of California for Wildfires

71.   Cal Fire is an agency of the State of California that, pursuant to Title 14 of
California's Code of Regulations, is administratively in charge of both the state's fire
departments and its law enforcement related to state fire and forest laws. As a result, it is
responsible for both fighting fires as they occur and for investigating the causes of fires after they
have been contained. Cal Fire conducts official investigations as an arm of the State of California

1   to determine the causes of wildfires within the state, as well as any violations of state laws and

2   regulations.

3       72.    Pursuant to an agreement with the U.S. Department of the Interior and the U.S.

4   Department of Agriculture, Cal Fire is the state agency that is authorized to make fire cause and

5   origin determinations for wildfires – such as the North Bay fires and Camp Fire – that fall within

6   its jurisdiction.

7       **5.    Under California's Inverse Condemnation Law, PG&E Would Not
            Bear the Cost of Wildfires It Causes if It Could Prove That It Acted**

8       **Reasonably and Prudently**

9       73.    The California Supreme Court has interpreted Article 1, Section 19 of the

10  California Constitution as imposing a doctrine known as "inverse condemnation," whereby

11  public utilities such as PG&E are required to compensate individuals whose real property has

12  been damaged by the utility under a strict liability regime. However, importantly, a utility such

13  as PG&E is able to recover those same costs from the CPUC – effectively passing the costs from

14  the shareholders to the rate payers – if it can "affirmatively prove that it reasonably and

15  prudently operated and managed its system." Order Denying Rehearing of Decision (D.) 17-11-

16  033 at 3, App. of SDG&E for Authorization to Recover Costs Related to the 2007 Southern Cal.

17  Wildfires Recorded in the Wildfire Expense Memo Account, App. No. 15-09-010, Decision 18-

18  07-025 (July 12, 2018).

19      74.    In other words, PG&E bears the costs of wildfires it causes unless it can prove

20  that it was "reasonable and prudent," meaning "that at a particular time any of the practices,

21  methods, and acts engaged in by a utility follows the exercise of reasonable judgment in light of

22  facts known or which should have been known at the time the decision was made." *Id.* Embodied

23  in this standard, at a minimum, is compliance with state safety laws and regulations.

24      **6.    Federal Law Also Requires PG&E to Follow Minimum Safety
            Standards**

25

26      75.    PG&E is also required by law to adhere to a number of federal laws and

26  regulations.  FERC Electric Reliability Standard FAC-003-4, for example, "requires that trees

27

28

Case: 19-30088   Doc# 11169-10   Filed: 08/31/21   Entered: 08/31/21 14:49:59   Page
31 of 229

1   and other vegetation growing in or adjacent to the power line right-of-way be trimmed to prevent

2   power outages caused by tree contact with a transmission line."[13]

3        76.    FAC-003-4 also imposes minimum vegetation clearance distances that depend on

4   the type of current (alternating or direct), the nominal and maximum system voltages, and the

5   altitude of the conductor above sea level. FAC-003-4 also imposes other requirements on owners

6   and operators of transmission facilities, including but not limited to annual inspections, annual

7   completion of necessary work, timely notification and correction of urgent conditions and

8   documentation of vegetation management practices.[14]

9        **B.    PG&E's Vegetation Management Expenditures Did Not Materially Change
          from Year to Year During the Class Period, Let Alone Double at Any Point**

10       77.    The State of California declared a state of emergency due to drought conditions in

11  January 2014,[15] which ended in April 2017.[16] In October 2015, California also declared a state of

12  emergency regarding tree mortality due to both the ongoing effects of the drought and an

13  epidemic of insect infestations causing millions of trees to die annually.[17] These conditions

14  added to the already existing danger of wildfires in the North Bay region of California as a result

15  of PG&E's safety violations. PG&E knew about these conditions and its obligations to ensure

16  safety from wildfires in spite of these environmental factors. For example, the "Proclamation of a

17  State of Emergency" regarding tree mortality made explicit: **"[U]tilities . . . to the extent**

18

19       [13] *See* FERC, *Tree Trimming & Vegetation Management* (updated Apr. 10, 2018),
20  https://www.ferc.gov/industries/electric/indus-act/reliability/vegetation-mgt.asp;  FERC, *FAC-
    003-4 Transmission Vegetation Management*, https://www.ferc.gov/industries/electric/indus-
21  act/reliability/vegetation-mgt/fac-003-4.pdf; *see also* Order Adopting New Conditions of
    Probation, PG&E Criminal Proceedings, (N.D. Cal. Apr. 3, 2019), ECF No. 1040.

22       [14] *See* PG&E Response to Request for Information at 4, PG&E Criminal Proceedings (N.D.
23  Cal. Feb. 22, 2019), ECF No. 1016.

         [15] California Drought, *State Water Board Approves State and Federal Water Projects Petition
24  to Conserve Water During Drought Conditions*, Drought News Release Archive (Jan. 31, 2014),
    https://drought.ca.gov/news/story-21.html.

25       [16] California Executive Dept., *Executive Order B-40-17* (Apr. 7, 2017),
26  https://www.gov.ca.gov/wp-content/uploads/2017/09/4.7.17_Exec_Order_B-40-17.pdf.

         [17] California Executive Dept., *Proclamation Of A State of Emergency* (Oct. 30, 2015),
27  https://www.gov.ca.gov/wp-
28  content/uploads/2017/09/10.30.15_Tree_Mortality_State_of_Emergency.pdf.

1  **required by their existing responsibilities to protect the public health and safety, shall**

2  **undertake efforts to remove dead or dying trees in these high hazard zones that threaten**

3  **power lines**. . . ."

4     78.    Based on information released by CPUC, PG&E spent $194,094,406 on

5  vegetation management in 2015, $198,735,579 in 2016, and $201,456,193 in 2017 – increases of

6  only 2.4% and 1.4%, respectively.[18] Each year's spending was substantially identical to the

7  amounts PG&E requested, and the amounts CPUC approved, in PG&E's 2015, 2016, and 2017

8  General Rate Cases – notwithstanding the state of emergency directive above and PG&E's

9  continued deficient safety practices. In contrast, inflation rose 5.48% over the same three-year

10  period.[19] Thus, PG&E's spending did not even keep pace with inflation during the Class Period.

11     79.    CPUC released the following chart confirming that PG&E's vegetation

12  management spending underwent only modest increases over the relevant time period:

### Table showing 2011-2017 history of PG&E annual spending ($ million) on vegetation management

|      | PG&E Requested | CPUC Authorized | PG&E Spent |
|------|------|------|------|
| 2017 | $201.0 | $201.0 | *$150.4 YTD* |
| 2016 | $198.8 | $198.8 | $198.7 |
| 2015 | $194.2 | $194.2 | $194.1 |
| 2014 | $190.0 | $190.0 | $189.7 |
| 2013 | $180.0 | $161.5 | $161.6 |
| 2012 | $180.0 | $161.5 | $161.5 |
| 2011 | $180.0 | $161.5 | $161.6 |

[18] Letter from CPUC to PG&E re: Advice Letter 4827-E (June 3, 2016), https://www.pge.com/tariffs/tm2/pdf/ELEC_4827-E.pdf; Letter from CPUC to PG&E re: Advice Letter 5036-E (Apr. 25, 2017), https://www.pge.com/tariffs/assets/pdf/adviceletter/ELEC_5036-E.pdf.; Letter from CPUC to PG&E re: Advice Letter 5402-E (Nov. 29, 2018), https://www.pge.com/tariffs/assets/pdf/adviceletter/ELEC_5402-E.pdf.

[19] CPI Inflation Calculator, Bureau of Labor Statistics, https://www.bls.gov/data/inflation_calculator.htm.

1    80.    While Defendants falsely represented on November 2, 2017 that PG&E

2  "*doubled*" vegetation management expenditures in 2016 (*see* ¶¶258 & 264), tellingly, they made

3  this claim only after the North Bay Fires. At no point did the Company identify any specific

4  budget item indicating that its vegetation management budget had, in fact, doubled.  Nor did it

5  disclose these expenditures were inadequate to reasonably ensure safety.  Indeed, as Judge Alsup

6  later found, "PG&E's performance with respect to vegetation management has been **dismal.**"

7    81.    It was only after the Camp Fire that PG&E announced in December 2018 that it

8  plans to spend an additional $5 billion on wildfire safety programs over five years, with a focus

9  on improving its vegetation management efforts. This post-Class-Period development strongly

10  supports the inference that the Company's previous vegetation management expenditures of

11  around $200 million per year had been dangerously inadequate.[20]  In fact, it was not until

12  PG&E's 2019 vegetation management plan, detailed further below, that the Company indicated

13  that it was materially increasing its vegetation management spending, to more than $338 million.

14  **C.    PG&E's Tree Trimming and Removal Did Not Come Close to Doubling
         During the Class Period**

15    82.    Likewise, the Company's reported numbers for trees that it trimmed or removed

16  during this time period did **not** double, or come close to doubling. During the Class Period, the

17  Company reported the results of its vegetation management expenditures, slowly inflating the

18  numbers it was reporting.  Initially, it touted that its tree trimming and removal amounted to "**1.2**

19  **million trees**" total (November 18, 2015, statement of Hogan) or generally "**more than 1**

20  **million trees each year**" (May 4, 2016, statement of Earley). At first, it stated that these totals

21  included "about **236,000 dead or dying trees**" as "part of its comprehensive response to tree

22  mortality in the state" (May 3, 2017, Press Release).

---

[20] *PG&E asking state regulators to charge customers up to $12 more a month*, KTVU Fox 2
(Dec. 14, 2018), http://www.ktvu.com/news/pg-e-asking-state-regulators-to-charge-customers-up-to-12-more-a-month.

83.     Soon, however, it was touting that 2016's "**236,000 dead or dying trees**" removed were "in addition to the **1.2 million trees** that PG&E works **each year**" (May 10, 2017, Press Release).

### D.     After the North Bay Fires, PG&E Started Reporting Inflated Numbers for Tree Removal

84.     Then, after the North Bay Fires, PG&E's numbers crept up by 100,000 trees: "Typically, we spend about **$200 million** every year to line clear or remove **1.3 million trees** to mitigate both the risk of wildfires and to prevent electric outages" **in addition to** the "**incremental 236,000 dead or dying trees**" (November 2, 2017, statement of Williams). This is the same statement where PG&E began to falsely and/or misleadingly tout to investors that it had "*doubl[ed]*" vegetation management expenditures in 2016, *i.e.*, to $400 million (*see* ¶258, *infra*).

85.     Then, when negative news emerged on May 25, 2018 about PG&E's safety violations causing many of the North Bay Fires, the Company's reported number of cleared trees crept up by another 100,000 trees: "Under PG&E's industry-leading Vegetation Management Program, we . . . prune or remove approximately **1.4 million trees annually**" (May 25, 2018, press release).

### E.     PG&E Concealed Its Unsafe Use of Reclosers During the Class Period

#### 1.     PG&E Used Reclosers to Prioritize Convenience Over Safety

86.     "Reclosers" are devices that are affixed to power line poles, to send pulses of electricity into lines when service has become briefly interrupted (*i.e.*, an outage). Although reclosers can in some instances prevent blackouts, it is well known in the industry that they are dangerous in certain circumstances. For instance, if a power line has come into contact with nearby vegetation, it would be dangerous to send an additional pulse of electricity through the line because this could start a fire.

87.     San Diego Gas & Electric Co. and Southern California Edison are two other utility companies that operate in California, along with PG&E. According to a complaint filed in

1  the state court litigation concerning the North Bay Fires,[21] these two utility companies are aware

2  of the dangers of using reclosers, and they have a practice of blocking reclosers from working

3  during fire season.[22]

4       88.    Prior to the North Bay Fires, PG&E knew that its reclosers posed a great risk of

5  causing wildfires. PG&E was specifically warned of this hazard in a May 2013 report that the

6  Liberty Consulting Group (the "Liberty Report") submitted to the Safety and Enforcement

7  Division of the CPUC. Moreover, at a November 18, 2015 hearing before the California Senate

8  Sub-Committee on Gas, Electric, and Transportation Safety, the Utility's Vice President of

9  Electrical Operations Asset Management, Defendant Hogan, stated that PG&E had the ability to

10 reprogram its reclosers during fire season so that they did not attempt to restart lines that had

11 been stopped. Hogan acknowledged that shutting down power means "you take the reliability hit,

12 but you gain the wildfire benefit." This statement evidenced that PG&E recognized the downside

13 to disabling its reclosers (because it would increase the risk of blackouts, *i.e.*, the "reliability hit,"

14 which would lead to consumer complaints), but that PG&E also understood this measure would

15 improve safety (*i.e.*, the "wildfire benefit").  Unbeknownst to investors, the Company chose

16 short-term "reliability" over safety.[23]

17

18

19

20    _____

   [21] Senate Bill Policy Committee Analysis, Assembly Committee on Utilities and Energy

21 (amended June 7, 2018),
   https://autl.assembly.ca.gov/sites/autl.assembly.ca.gov/files/SB%20901%20%28Dodd%29%20U

22 %26E%20Analysis%206-25-18.pdf.
      [22] Wildfire season is a portion of the year, generally 6 to 8 months in the summer and fall in

23 California, declared such by the responsible public agency fire administrator. This declaration is
   based on fuel and weather conditions conducive to the ignition and spread of wildland fires.  Cal

24 Fire Incident Information, Fire Terminology page,
   http://cdfdata.fire.ca.gov/incidents/incidents_terminology?filter=F.

25    [23] Notably, PG&E's ESRB-8 Shutoff Protocol embodied the same tradeoff.  As a protocol that

26 required PG&E to proactively shut off power when certain conditions were met, it similarly
   purported to prioritize safety over reliability.  Likewise, a failure to abide by the ESRB-8 Shutoff

27 Protocol would evidence another example of the Company choosing reliability over safety,
   unbeknownst to investors.

28

---

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO. 3:18-CV-03509-EJD

26

2.      **PG&E Concealed Its Use of Reclosers from Investors During the Class Period**

89.     On November 18, 2015, Defendant Hogan assured the public that PG&E was "***just about done***" with the process of disabling its recloser devices as of that date. He represented that reclosers would be disabled "***first***" in "***high wildfire risk areas***," followed by "126" of "about 130 some odd locations . . . this year," *i.e.*, 2015, which left only "six for next year."

90.     However, PG&E did not disable all of its reclosers during fire season, like San Diego Gas & Electric Co. and Southern California Edison did. Rather, during the time of the North Bay Fires, some of PG&E's devices were programmed to try up to three times to restore power by sparking electricity. Hogan's statement concealed that PG&E kept at least certain of its reclosers dangerously in use in a high wildfire risk area through October 2017: PG&E reclosers were to blame for at least one of the North Bay Fires, known as the Pythian Fire.

91.     Notably, State Senator Jerry Hill was quoted by NBC on January 3, 2018 as saying that he felt "misled" by PG&E's executives into believing that the Company had followed the lead of its counterparts and shut off its reclosers in all 132 of its high risk fire areas by the start of 2017:

> Hill said he was surprised the company's recloser shutdown was so limited, given that a top PG&E official assured him back in 2015 that the company would be able to shut down reclosers in all 132 of the high risk fire areas by the start of 2017.

> "I think that's the troubling part," Hill said, "that **they misled us in that**.

> "Had they said they did not have that system in place, then we would have followed up with more questions to try to find what the problem was -- and may have been able to focus in on that a couple of years ago that may have prevented these fires in October."

Likewise, investors were misled by PG&E's recloser statements.

Case: 19-30088   Doc# 11168-10   Filed: 08/31/21   Entered: 08/31/21 14:49:59   Page
37 of 229

92.      Yet, even as late as **2018**, PG&E was still stating that it would need to commit to disabling these reclosers.[24]

**F.      PG&E Engaged in an Unsafe Pattern of Noncompliance with Safety Requirements Before and Throughout the Class Period**

93.      Despite the important safety measures imposed by California law, PG&E has caused deadly wildfires through its failure to comply with the legal requirements for vegetation management, pole maintenance, and other safety requirements. Between causing the devastating Trauner Fire in 1994 and the deadly Butte Fire in 2015, PG&E repeatedly violated California's vegetation management laws and other regulations.  PG&E assured investors during the Class Period that it had changed, stating in its 2015, 2016, and 2017 Corporate Responsibility and Sustainability Reports that its "vegetation management" was now "*in compliance with relevant laws*" or "*complying with state and federal regulations*."

94.      Notably, in its undated 2018 Corporate Responsibility and Sustainability Report issued **after** the public learned the true causes of the North Bay Fires, PG&E **no longer** represents to investors that its vegetation management complies with California's safety laws.

**1.      PG&E Was Convicted of Negligence for Starting a Wildfire in 1994**

95.      One of the most notable of the pre-Class Period fires was the "Trauner Fire," where PG&E was convicted of 739 counts of criminal negligence and required to pay $24 million in penalties due to the Company's deficient vegetation management systems.[25]

**2.      PG&E Unsafely Flouts Safety Regulations**

96.      Subsequently, PG&E's deficient vegetation management practices ignited other fires, including the Pendola Fire (1999).[26]

---

[24] PG&E Public Safety Power Shutoff Policies and Procedures, CPUC website (Sept. 2018), http://cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/News_Room/Public-Safety-Power-Shutoff-Policies-and-Procedures-September-2018.pdf.

[25] In 1994, PG&E's failure to maintain vegetation surrounding its electrical equipment caused the Trauner Fire that burned approximately 500 acres, destroyed 12 homes, and burned 22 structures in the town of Rough and Ready. The fire began when a power line brushed against a tree limb that PG&E was supposed to keep trimmed. Investigators found numerous safety violations involving contact between vegetation and PG&E's power lines.

97.     Moreover, according to documents released by The Utility Reform Network ("TURN"), PG&E planned to replace a segment of the San Bruno pipeline in 2007 that it had identified as one of the riskiest natural gas pipelines in PG&E's system. PG&E collected $5 million from its customers to complete the project by 2009, but instead deferred the project and repurposed the money to other priorities. On September 9, 2010, the San Bruno pipeline exploded, killing 8 people, injuring over 50 more, and destroying 38 homes.

98.     On August 9, 2016, a California federal jury found PG&E guilty of five criminal felony counts for violating minimum federal safety standards under the Natural Gas Pipeline Safety Act, as well as one count for obstructing an agency proceeding after it failed to provide all of its records to the National Transportation Safety Board during an investigation into the San Bruno explosion.

99.     On December 14, 2018, the CPUC opened a case against PG&E alleging, *inter alia*, that **the Company falsified records and data** concerning the safety of its gas pipelines, did not employ an adequate number of pipeline inspectors, and pressured supervisors to unsafely rush work over a five-year period from 2012 to 2017.  These deliberate efforts to cut corners, and defraud regulators and the public about the safety of PG&E's utilities, continued up to and including the Class Period.  The strong inference is that PG&E's statements concealing the inadequate safety of its electrical utilities, during the Class Period, were likewise made with an intent to defraud.[27]  On December 21, 2018, the CPUC issued a Scoping Memo and Ruling, which found that "PG&E has had serious safety problems with both its gas and electric operations for many years" and failed "to develop a comprehensive enterprise-wide approach to address safety."  CPUC concluded that it "was, and remains, concerned that the safety problems

---

*(continued)*

[26] PG&E paid a $14.75 million settlement to the U.S. Forest Service, and a $22.7 million settlement with CPUC after PG&E had been reprimanded for not spending money that had been earmarked for tree trimming and removal.

[27] George Avalos, *PG&E Accused of Gas Pipeline Violations, Falsifying Records: Regulator*, Mercury News (updated Dec. 17, 2018 4:06 am), https://www.mercurynews.com/2018/12/14/pge-accused-of-gas-pipeline-violations-falsifying-records-regulators/.

being experienced by PG&E were **not just one-off situations or bad luck, but indicated a deeper and more systemic problem**."

### 3. PG&E's Unsafe, Noncompliant Vegetation Management Caused the Butte Fire in 2015

100.     In September of 2015, five months after PG&E made Misstatement No. 1 touting its vegetation management, PG&E's vegetation management program once again failed, causing the Butte Fire that killed two people, destroyed 921 homes, businesses, and other structures, and scorched more than 70,000 acres over 22 days.

101.     On April 28, 2016, Cal Fire issued a press release announcing its conclusion that the Butte Fire was caused by PG&E's safety violations. Cal Fire also referred its investigation to the two relevant district attorneys for the counties the Butte Fire burned.

102.     There is currently pending litigation over PG&E's liability for the Butte Fire, including an April 13, 2017 lawsuit in which Cal Fire sued PG&E for $87 million to recover the costs that the agency devoted to fighting that fire. Cal Fire's lawsuit alleges that PG&E caused the Butte Fire by maintaining an inadequate vegetation management system.

### 4. PG&E's Insufficient Safety Practices Allowed Numerous, Company-Wide Vegetation Management and Other Safety Violations During the Class Period

103.     Internally, PG&E's numerous and widespread violations of relevant safety laws are shown by the fact that the Company's internal controls were designed to permit vegetation management and other violations to go unchecked on a dangerous scale.

#### (a) PG&E Documented and Tolerated Thousands of Dangerous Safety Violations Across Its Territory During the Class Period

104.     On March 5, 2019, the U.S. District Court presiding over PG&E's criminal probation (Judge Alsup) issued a revised Order to Show Cause relating to PG&E's lack of compliance with vegetation management and other safety regulations.  The Order stated that PG&E's "**unsafe conduct** led to a deadly pipeline explosion and to six felony convictions," and found that PG&E's conduct had now "**led to recurring deadly wildfires caused by its electrical system**."  It contained the following findings summarizing the results of the federal

Case: 19-30088   Doc# 11168-10   Filed: 08/31/21   Entered: 08/31/21 14:49:59   Page 40 of 229

court's probe into PG&E's actual knowledge of safety violations leading up to the North Bay and Camp Fires:

> PG&E's filings have included several relevant **admissions**. Significantly, PG&E acknowledged "that vegetation contact is the primary risk driver with respect to ignitions on its distribution lines." ("Vegetation" means trees and limbs in this context.) In 2016 alone, PG&E experienced approximately **1,400** wires down caused by vegetation contact. As PG&E reported to the CPUC, during 2015 and 2016, vegetation contact with conductors was the leading cause of the **486** fire ignitions associated with PG&E facilities, causing **37%** of those fires. **PG&E further admitted that as of June 2017, there were 3,962 unworked trees which PG&E had identified in 2016 as hazardous with the potential to "fall into or otherwise impact the conductors, towers or guy wires before the next inspection cycle."**[28]

105.    Thus, PG&E has admitted that it had **actual knowledge since 2015** that its vegetation management practices did not comply with California safety regulations on the order of **thousands of violations per year**. PG&E has further admitted to **actually knowing** that its violations have **caused hundreds of wildfires per year since 2015**.  However, PG&E never disclosed that their own internal compliance reviews showed a lack of compliance on such a huge scale.

106.    According to data released by the CPUC,[29] PG&E equipment caused a total of 1,486 vegetation fires between June 10, 2014 and December 29, 2017.  Among those vegetation fires, 69 were caused by transmission lines like the line implicated in causing the Camp Fire, including 26 fires caused by lines of the exact same high voltage, 115 kilovolts.  PG&E supplied the CPUC with this information under the regulator's Decision 14-02-015, which enacted a "Fire Incident Data Collection Plan."[30]

---

[28] Second Order to Show Cause Why PG&E's Conditions of Probation Should Not Be Modified, PG&E Criminal Proceedings (N.D. Cal. Mar. 5, 2019), ECF No. 1027.

[29] PG&E Fire Incident Data Collection Plan Report Data Compiled from 2014-2017, CPUC website, http://www.cpuc.ca.gov/uploadedFiles/CPUC_Website/Content/About_Us/Organization/Divisions/News_and_Outreach_Office/PGE_Fire%20Incident%20Data%202014-2017.pdf.

[30] Decision Adopting Regulations To Reduce The Fire Hazards Associated With Overhead Electric Utility Facilities and Aerial Communications Facilities, CPUC Decision 14-02-015 (CPUC Feb. 5, 2014), http://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M087/K892/87892306.PDF. Pursuant to

---

1      107.     Similarly, according to documents described in a report by *NBC Bay Area*, PG&E

2    completed a review of its transmission towers' safety compliance immediately after the Camp

3    Fire.  As a result, "PG&E's inspections of thousands of transmission towers since the deadly

4    Camp Fire in Butte County found more than 450 safety violations, including 59 that posed

5    serious safety hazards."[31]

6            **(b)**       **PG&E Had Actual Knowledge That Its Insufficient Safety Practices Had the Potential to Allow for Dangerous Safety**

7                  **Violations on the Order of Hundreds of Thousands to a Million Wildfire Hazards**

8

9      108.     Investigative journalists and attorneys have uncovered that PG&E internally

10   accepts that its vegetation management practices leave 1 of every 100 trees noncompliant with

11   California regulations, and further reportedly "cheats" on its internal compliance reviews, in

12   order to give a misleading impression of compliance with tree clearance requirements when it is

13   in fact noncompliant. According to a report from NBC reporter Jaxon Van Derbeken on

14   November 6, 2017, published a month after the North Bay Fires began, PG&E's own internal

15   inspectors allow one out of 100 trees they check to violate state power line clearance standards:

16        **PG&E auditors allow one out of 100 trees they check to violate state power line clearance standards**, NBC Bay Area has

17        learned.

18                           * * *

19        [I]t emerged during the Butte fire litigation that [internal] auditors were giving out a passing grade when one out of 100 trees they

20        checked turned out to be too close to power lines under state standards.

21                           * * *

22        When [PG&E] failed to reach that 99 percent compliance rate in the area around the fire . . . the company just expanded the

23        universe of trees covered in a particular audit.

24

*(continued)*

25   the Fire Incident Data Collection Plan, PG&E and other investor-owned electric utilities must

26   "collect and report data to SED regarding power-line fires."  *Id.* ("SED" refers to CPUC's Safety and Enforcement Division).

27   [31] Jaxon van Derbeken, *PG&E Inspectors Find Hundreds of Safety Issues on Electrical Towers*, NBC Bay Area (Apr. 12, 2019), https://www.nbcbayarea.com/investigations/PGE-

28   Inspectors-Find-Hundreds-of-Safety-Issues-on-Electrical-Towers-508344011.html.

1
2
"So what PG&E does when it doesn't pass, it basically cheats,"
[Amanda Riddle, one of the attorneys participating in a lawsuit
against PG&E related to the Butte Fire] said. "It adds more miles
and more miles until it reaches a passing grade."

3
4
5
6
7
8
9
109.    With approximately 123 million trees under PG&E's control,[32] this means that PG&E knew during the Class Period that it may have been tolerating as many as approximately 1.2 million trees to be noncompliant with state safety laws at any given time.  The measurement of 1.2 million safety violations is a conservative estimate when combined with the detail that PG&E "cheats" to get its rate of violations down to 1%, hence PG&E's real rate of noncompliance may be even higher.

10
11
12
13
14
110.    According to the plaintiffs litigating against PG&E for injuries caused by the 2015 Butte Fire, Defendant Hogan's and another PG&E employee's deposition testimony purportedly showed that "PG&E knows and accepts that 1-in-100 trees will be non-compliant, and that 1-in-1000 will be touching its powerlines." Using the same metrics, this means that PG&E knows that it could be allowing as many as approximately 123,000 safety violations in the nature of trees touching its powerlines at any given time.

15
16
17
**G.    Investors Could Not Have Reasonably Expected the Extent of PG&E's Unsafe Pattern of Noncompliance that Caused the North Bay Fires and the Camp Fire**

17
18
**1.    PG&E's Noncompliance with Vegetation Management and Pole Integrity Requirements Caused the North Bay Fires**

19
20
21
22
23
111.    Of the eighteen main North Bay Fires for which Cal Fire's investigations have been completed, **seventeen** were caused by PG&E equipment. **Eleven** of these fires evidenced violations of California safety regulations, in **seven** different counties at the **same time**. Most of these violations pertained to PG&E's failures to clear vegetation or maintain the integrity of its poles.

24
25
26
27
28

---

[32] *See* PG&E's Response to Safety and Enforcement Divisions' 10/14/17 Questions, CPUC website (Oct. 17, 2017),
http://www.cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/Safety/Response%20to%20Data%20Request.pdf.

112.     Even though Cal Fire's investigations have not found evidence of violations for six of the fires, PG&E's numerous, widespread safety violations actually caused or exacerbated **all** of the North Bay Fires. PG&E's safety violations exacerbated even the fires that lacked evidence of violations, in two ways. First, some of the eleven fires caused by PG&E's safety violations merged into and strengthened other fires. Second, PG&E's safety violations diverted scarce firefighting resources to contain the eleven North Bay Fires which never should have ignited, leading to the other fires causing more damage. As such, PG&E's safety violations were responsible, in full or in part, for **all** of the North Bay Fires, thereby negatively impacting the Company's financial condition.

### 2.     PG&E's Noncompliance with Vegetation Management and Pole Integrity Requirements Caused the Camp Fire

113.     On May 15, 2019, Cal Fire issued a press release announcing its determination that PG&E's electrical equipment caused the Camp Fire.[33]  Cal Fire further concluded, "[a]fter a very meticulous and thorough investigation," that PG&E caused **both** of the Camp Fire's two ignition points.  Cal Fire also referred its investigation to the Butte County District Attorney to review for potential criminal violations.  As noted above, PG&E expects to bear at least $10.5 billion, if not more, in liability for causing this fire.

### (a)     The Camp Fire's First Ignition Point Was Caused by PG&E Safety Violations

114.     The Camp Fire's first ignition point was "in the Pulga area," according to Cal Fire, and "was caused by electrical transmission lines owned and operated by Pacific Gas and Electric[]."[34]  Per its May 15, 2019 press release, "PG&E accepts this determination."[35]

---

[33] Press Release, Cal Fire, *CAL FIRE Investigators Determine Cause of the Camp Fire* (May 15, 2019),
https://calfire.ca.gov/communications/downloads/newsreleases/2019/CampFire_Cause.pdf.

[34] Press Release, Cal Fire, *CAL FIRE Investigators Determine Cause of the Camp Fire* (May 15, 2019),
https://calfire.ca.gov/communications/downloads/newsreleases/2019/CampFire_Cause.pdf.

[35] Press Release, PG&E, *PG&E Responds to Camp Fire Announcement from CAL FIRE* (May 15, 2019),
https://www.pge.com/en/about/newsroom/newsdetails/index.page?title=20190515_pge_responds
_to_camp_fire_announcement_from_cal_fire.

115.    According to firefighter radio transmissions and the journalist whose investigation made them public late on November 9, 2018, firefighters were dispatched to a vegetation fire "under the high tension power lines" across the Feather River from Poe Dam in Butte County on November 08, 2018 at 6:33 a.m.[36]—matching the location where Cal Fire officials pinpointed the Camp Fire's origin four minutes earlier.[37] As one firefighter described the fire to dispatch: "It is on the west side of the river underneath the transmission lines."

116.    Independently that evening, PG&E admitted to the CPUC that one of its 115-kilovolt transmission lines on Pulga Road in Butte County experienced an outage at 6:15 a.m. that day, and noted that the site was near the Camp Fire.[38]  Cal Fire has listed Pulga Road as the Camp Fire starting point.[39]

117.    The same report acknowledged that an aerial patrol later that day, "in the afternoon," observed "damage to a transmission tower" on the same 115 kilovolt transmission line. In a supplemental report filed with the CPUC on December 11, 2018, PG&E identified the tower as number ":27/222" and further specified that this observed damage included the separation of a suspension insulator, meant to support a transposition jumper, from an arm on the tower.[40]  PG&E also observed a broken C-hook attached to the separated suspension insulator

---

[36] Matthias Gafni, *PG&E Power Lines May Have Sparked Deadly Camp Fire, According To Radio Transmissions,* Mercury News (updated Nov. 12, 2018 12:03 pm), https://www.mercurynews.com/2018/11/09/pge-power-lines-may-have-sparked-deadly-butte-county-wildfire-according-to-transmissions/.

[37] Camp Fire Incident Update, CAL FIRE Incident Information (Nov. 22, 2018 7:00 pm), http://cdfdata.fire.ca.gov/admin8327985/cdf/images/incidentfile2277_4319.pdf .

[38] CPUC Email re: Electric Safety Incident Reported - PG&E Incident No: 181108-9002 (Nov. 8, 2018), http://s1.q4cdn.com/880135780/files/doc_downloads/2018/wildfire/11/Electric-Safety-Incident-Reported-Pacific-Gas-Electric-Incident-No-181108-9002.pdf; *see also,* Tony Bizjak, *PG&E Reports Power Line Problem In Butte County Near Time and Place Where Wildfire Sparked*, The Fresno Bee (updated Nov. 10, 2018 7:51 PM), https://www.fresnobee.com/news/state/california/article221448500.html.

[39] Camp Fire Incident Information, CAL FIRE Incident Information (last modified May 15, 2019), http://cdfdata.fire.ca.gov/incidents/incidents_details_info?incident_id=2277.

[40] PG&E Letter to CPUC re: Supplements the Notices provided Nov. 8, 2018 (Dec. 11, 2018), http://s1.q4cdn.com/880135780/files/doc_downloads/2018/wildfire/12/12-11-18.pdf.

1    that once connected the suspension insulator to a tower arm.[41]  According to the report, the

2    connection point showed signs of wear; a flash mark was visible close to where the transposition

3    jumper was suspended; and there was damage to the transposition jumper and suspension

4    insulator.[42]

5          118.    PG&E had not inspected Tower :27/222 since August 2014, and prior to that, not

6    since 2009, pursuant to an internal policy whereby "Steel structures on PG&E's 115 kV

7    transmission lines, such as Tower :27/222, are subject to maintenance patrols annually and

8    detailed inspections every five years."  PG&E has admitted that an aerial patrol is not an

9    inspection, as it is only "[d]uring a detailed inspection of a transmission line" that "PG&E

10   personnel are instructed to look for and document abnormalities or circumstances that will

11   negatively impact safety, reliability, or asset life."[43]

12         119.    Moreover, just one day prior to the Camp Fire's ignition, PG&E had contacted a

13   Pulga landowner named Betsy Ann Cowley regarding transmission line poles on her property

14   that "were having problems with sparks."[44]

15         120.    Accordingly, it emerged that a PG&E electrical pole carrying a high-voltage 115

16   kilovolt transmission line lost its integrity, in whole or in part, on the morning of November 8,

17   2018.  Shortly thereafter, vegetation underneath the line ignited.  PG&E's failure to maintain a

18   clearance for vegetation up to 10 feet away from this transmission line, inclusive of all

19   vegetation underneath, violated California Public Resources Code Section 4293.  Further,

20   PG&E's failure to maintain the integrity of its poles and prevent their loss of function violated

21   California Public Utilities Code Section 451.

22

23         [41] *Id.*

24         [42] *Id.*  The same report noted that, at a neighboring tower, an "insulator hold down anchor"
     had become disconnected.  *Id.*

25         [43] PG&E Camp Fire Incident Description & Factual Summary at 4, PG&E Criminal
     Proceedings (N.D. Cal. Dec. 31, 2018), ECF No. 956-1.

26         [44] Matthias Gafni, *Update: PG&E says email to Camp Fire Victim Focused on Different*
27   *Transmission Line,* Mercury News (updated Nov. 14, 2018 3:59 PM),
     https://www.mercurynews.com/2018/11/12/state-regulators-investigating-pge-socal-edison-for-
28   roles-in-deadly-camp-woolsey-fires/.

1

2

      **(b)  The Camp Fire's Second Ignition Point Was Also Caused by PG&E's Safety Violations**

3

   121.  Cal Fire determined that the Camp Fire also had a second ignition point, which

4

began "near the intersection of Concow Rd. and Rim Rd" before merging with the first fire

5

PG&E caused at first ignition point.[45]  According to Cal Fire's report: "The cause of the second

6

fire was determined to be vegetation into electrical distribution lines owned and operated by

7

PG&E," a violation of California Public Resources Code Sections 4292 and 4293, as well as

8

California Public Utilities Code Section 451.  Thus, Cal Fire has concluded that PG&E's

9

violation of safety regulations caused at least one of the Camp Fire's two ignition points.

10

   122.  Cal Fire first announced that it had identified a second ignition point for the Camp

11

Fire on November 15, 2018.[46]  On November 16, 2018, PG&E admitted to CPUC that the same

12

day the Camp Fire ignited (indeed, minutes later at 6:45 a.m.), it experienced a second outage on

13

another power line in a nearby part of Butte County near Concow, California.[47]

14

   123.  In PG&E's December 11, 2018 supplemental report to CPUC, PG&E further

15

admitted that it discovered a broken pole on the second power line on November 9, 2018; that

16

the pole was on the ground, along with pole equipment; and that the pole had a line recloser.[48]

17

The supplemental report also detailed a second inspection of the area on November 12, 2018,

18

where a PG&E employee found damaged and downed poles, several snapped trees, downed

---

19

  [45] Press Release, Cal Fire, *CAL FIRE Investigators Determine Cause of the Camp Fire* (May 15, 2019),

20

http://calfire.ca.gov/communications/downloads/newsreleases/2019/CampFire_Cause.pdf.

21

  [46] Andre Byik, *Camp Fire Investigation Leads To Possible Second Origin Away From Pulga*, Enterprise-Record (updated Nov. 15, 2018 10:06 PM),

22

https://www.chicoer.com/2018/11/15/camp-fire-investigation-leads-to-another-area-away-from-pulga/.

23

  [47] CPUC Email re: Electric Safety Incident Reported - PG&E Incident No: 181116-9015 (Nov. 16, 2018),

24

http://www.cpuc.ca.gov/uploadedFiles/CPUCWebsite/Content/News_Room/NewsUpdates/2018/

25

EIR_IncidentNo181116-9015.pdf; *PG&E Reports Another Outage On The Morning When California Camp Fire Started*, CNBC (Nov. 19, 2018 6:43 AM),

26

https://www.cnbc.com/2018/11/19/pge-reports-another-outage-on-the-morning-when-california-camp-fire-started.html.

27

  [48] PG&E Letter to CPUC re: Supplements the Notices provided Nov. 8, 2018 (Dec. 11, 2018),

28

http://s1.q4cdn.com/880135780/files/doc_downloads/2018/wildfire/12/12-11-18.pdf.

---

1   wires, and some snapped trees on top of the downed wires.[49]  The presence of the line recloser

2   further calls into question PG&E's prior representation that it was "just about done" disabling

3   recloser devices in "high wildfire risk areas" as of November 18, 2015 (Misstatement No. 3).

4       124.    Accordingly, the truth emerged that the Camp Fire's second ignition point also

5   exhibited evidence of failures regarding vegetation management, pole integrity, and the possible

6   use of a recloser in further violation of California safety regulations, including Public Resources

7   Code Sections 4292, 4293 and Public Utilities Code Section 451.  Cal Fire's investigation later

8   confirmed these facts.

9       **H.    PG&E's Repeated Vegetation Management and Pole Integrity Safety
        Violations Show that the Company Knew of Its Numerous and Widespread**
10      **Violations of Fire Safety Regulations Throughout the Class Period, but Did
        Not Change Its Practices to Reduce, Much Less Eliminate, Those Safety**
11      **Violations**

12          **1.    PG&E Did Not Improve Its Inadequate Safety Practices After Its
            Safety Violations Caused the Deadly Butte Fire**

13      125.    Even though PG&E suffered from endemic wildfire safety problems, the

14   Company did not meaningfully change its practices even after the deadly Butte Fire that occurred

15   in 2015. As noted above, in a deposition transcript that has not yet been made publicly available,

16   PG&E's Vegetation Program Manager (Stockton Division)[50] Richard Yarnell reportedly testified

17   under oath: "**PG&E—to the best of my knowledge, we have not made any changes as a**

18   **result of this fire**" as of April 10, 2017. Accordingly, the **known** noncompliance that caused the

19   Butte Fire in 2015 continued unabated throughout the Class Period, contrary to PG&E's public

20   statements.

21      126.    Moreover, the vegetation management problems detailed herein were

22   institutionally entrenched by certain incentive structures PG&E put in place. According to a

23   lawsuit that was filed in California Superior Court against PG&E on December 21, 2017 (Case

24   No. CGC-17-563293), which asserted claims on behalf of victims of the North Bay Fires, PG&E

25

26   _____

27   [49] *Id.*

28   [50] PG&E's Stockton Division is a geographic subdivision within the Company that contained
     the Butte Fire.

provided monetary incentives to its employees that had the effect of discouraging the implementation of vegetation safety measures.

127.    For instance, PG&E's Vegetation Management Program adopted a Vegetation Management Incentive Initiative ("VMII") program, which was purportedly designed to reduce the "annual routine compliance" tree work of PG&E and to shift resources to "reliability" work that focused on urban consumer satisfaction instead of overall safety. By doing so, PG&E effectively shifted its resources away from rural areas that were more prone to wildfires (where the "annual routine compliance" work was typically done), and towards more densely populated urban areas (where the "reliability" work was done). For example, pursuant to this program, PG&E set a goal to reduce "routine" work by 7.5% annually from 2014 through 2016. PG&E's bonus incentive program therefore (like its policy of not shutting off its reclosers during wildfire season) put safety at risk in an effort to reduce consumer complaints. *See* ¶569, *infra*.

128.    According to the same lawsuit, Robert Urban, a regional officer for a PG&E contractor, stated that he had a concern that the bonus system incentivized his employees to not do their job, but PG&E chose to keep this program despite knowing this risk.

129.    As noted above, though PG&E **falsely and repeatedly** assured investors during the Class Period that its compliance failures had been resolved after the Butte Fire, the Company's own employee Richard Yarnell later admitted that nothing of substance had changed over much of the same time period. Accordingly, PG&E's repeated safety violations show that the Company knew of its numerous and widespread violations of California safety regulations throughout the Class Period, but did nothing to change them.

### 2.    PG&E Internally Acknowledged, Extensively Documented, and Tolerated for Years the Safety Violations that Caused the Camp Fire

130.    PG&E's Caribou-Palermo transmission powerline was originally built in 1919, and was responsible for causing the first ignition point of the Camp Fire.

131.    PG&E knew, but concealed, that this powerline had dangerously deteriorated.  In December 2012, five steel towers supporting the Caribou-Palermo transmission line collapsed due to windy conditions.  In a July 16, 2013 letter to the CPUC, PG&E proposed replacing the

1    five collapsed towers, and one additional tower, on the Caribou-Palermo line "[s]panning

2    Plumas-Butte County border" in a row "up slope and west of Highway 70 and generally parallel

3    to the unpaved Pulga Road in a remote area of the Feather River Canyon within Plumas National

4    Forest"[51]—that is, to say, near the first Camp Fire ignition point.

5        132.    The rest of the aging towers on the line, including the tower alleged to have

6    started the Camp Fire, were not replaced during that project.[52]  The age of these remaining

7    towers created a strong, undisclosed risk that corrosion, metal fatigue, or other age-related

8    factors would fail to support transmission line cables and cause wildfires.  Indeed, the relevant

9    tower included uninsulated "jumper" lines used to switch currents between transmission lines,

10   making the risk of fire even greater.[53]  Tellingly, the cross arm from that transmission tower,

11   which was attached to the "jumper" line, was removed by Cal Fire investigators as part of its

12   probe into the cause of the Camp Fire.[54]  And Cal Fire's investigation has not only concluded

13   that PG&E equipment caused the Camp Fire in a manner evidencing safety violations, but also

14   referred the matter to the Butte County district attorney for a criminal investigation.

15       133.    In a July 26, 2017 FERC filing that news outlets have reported on extensively,[55]

16   PG&E proposed considerable work for the Caribou-Palermo line as part of the Company's

17

18       [51] Letter from CPUC to PG&E re: Advice Letter 4256-E (Sept. 6, 2013),
19   https://www.pge.com/nots/rates/tariffs/tm2/pdf/ELEC_4256-E.pdf.

20       [52] Ivan Penn, et al., *How PG&E Ignored Fire Risks in Favor of Profits*, New York Times
     (Mar. 18, 2019), https://www.nytimes.com/interactive/2019/03/18/business/pge-california-
     wildfires.html.

21       [53] Matthias Gafni, *It was originally built in 1919. What failed on PG&E tower at heart of
22   Camp Fire probe?* Mercury News (updated Dec. 10, 2018 4:09 AM),

23   https://www.mercurynews.com/2018/12/07/it-was-originally-built-in-1919-what-failed-on-
     pge-tower-at-heart-of-camp-fire-probe/.

24       [54] Matthias Gafni, et al., *Why Did Fire Iinvestigators Remove PG&E Transmission Tower
     Part in Camp Fire Probe*, Enterprise-Record (updated Dec. 6, 2018 8:07 AM),
25   https://www.chicoer.com/2018/12/05/why-did-fire-investigators-remove-pge-transmission-
     tower-part-in-camp-fire-probe.

26       [55] *E.g.*, George Avalos, *PG&E Knew For Years That Repairs Were Needed On Transmission
     Lines In Area Of Fatal Camp Fire*, Mercury News (updated Feb. 28, 2019 6:05 AM),
27   https://www.mercurynews.com/2019/02/27/pge-delayed-repairs-for-years-on-transmission-line-
     linked-to-lethal-camp-fire/.

28

---

1    annual request to FERC for rate changes.  PG&E reported that "[t]he Caribou-Palermo 115

2    kilovolt circuit was analyzed as part of [a] 2013 NERC Assessment," referring to an analysis by

3    the North American Electric Reliability Corporation ("NERC").  The filing indicated that the

4    2013 NERC study examined 455 spans of the of the transmission line and found that vegetation

5    or trees were allowed to grow too close to 127 (27.9%) of them: "The completed [NERC]

6    analysis identified 127 spans with clearance issues out of the 455 spans on the electric

7    transmission line."  PG&E never fixed the identified issues from the time it learned about them

8    in 2013 as reflected in the July 2017 filing.  PG&E's Caribou-Palermo transmission system

9    would later be implicated in the 2018 Camp Fire.

10          134.    On March 18, 2019, *The New York Times* published an exposé on PG&E titled,

11   "How PG&E Ignored California Fire Risks in Favor of Profits."  The article discussed an internal

12   Company email, sent long before the Camp Fire, which noted that a group of structures including

13   the transmission tower implicated in the Camp Fire, Tower :27/222, were at risk of collapse due

14   to their age and windy conditions in the area.  Indeed, the Company noted that corrosion on

15   another tower in the vicinity was so severe that it had endangered crews attempting to repair it.

16   The Company's own guidelines had warned that **the tower was a quarter-century past its**

17   **useful life**, yet PG&E failed to repair or replace the aging tower.

18          135.    The article also portrayed a corporate culture at the Company which disregarded

19   safety risks and avoided paying for necessary fire prevention precautions in favor of short-term

20   operating results.  The article quoted Mike Florio, a former California utilities commissioner,

21   who observed, "There was very much a focus on the bottom line over everything [at PG&E]:

22   'What are the earnings we can report this quarter? . . .  And **things really got squeezed on the**

23   **maintenance side**."  The article also quoted California's Governor Gavin Newsom, who

24   expressed a similar sentiment:  "**[PG&E] have simply been caught red-handed over and over**

25   **again, lying, manipulating or misleading the public. . .  They cannot be trusted.**"  The article

26   contrasted the lack of focus on safety at the Company with the approach taken by another

27   California utility facing similar risks, San Diego Gas & Electric, which had significantly

28   revamped its safety protocols to respond to increased wildfire dangers.

136.    Also on March 18, 2019, a coalition of law firms representing fire victims published excerpts of internal Company emails demonstrating that PG&E had identified the transmission lines implicated in the 2018 Camp Fire as unsafe long before the fire started.[56]  For example, **internal Company documents showed that in December 2012 five aging towers along the Caribou-Palermo transmission line had collapsed, and a 2014 internal Company email stated that "the likelihood of failed structures happening is high"** – a risk PG&E concealed from the public.

137.    Similarly, a November 1, 2016 PG&E document detailed the failure of necessary hardware along the transmission line, with a support hook snapping off during routine painting.  PG&E documents internally acknowledged that the supports "had been compromised through corrosion."[57]

138.    Despite the internal acknowledgment that the Caribou-Palermo lines were in need of repair and posed a significant risk of collapse, PG&E never had the lines fixed.  Instead, the Company reasoned that any collapse would not impact a sufficient number of customers to warrant the repairs and that the risks would be mitigated because any fire may be extinguished by rain.  Tragically, needed repairs were never undertaken, and **the Caribou-Palermo line caused the first ignition point of the Camp Fire** in 2018.

139.    Accordingly, PG&E had actual knowledge about the safety violations that caused the Camp Fire, months if not years in advance.

140.    It was in this context that Defendants touted PG&E's vegetation management and infrastructure maintenance to investors, falsely representing that it was in full compliance with all relevant regulations throughout the Class Period. *E.g.*, ¶197 (Misstatement No. 2, October 16, 2015); ¶222 (Misstatement No. 5, August 9, 2017); ¶249 (Misstatement No. 9, October 31,

---

[56]    *Northern California Fire Lawyers Obtain Documents That Show PG&E Knew About Risk of Caribou-Palermo Line Failure*, MarketWatch (Mar. 18, 2019), https://www.marketwatch.com/press-release/northern-california-fire-lawyers-obtain-documents-that-show-pge-knew-about-risk-of-caribou-palermo-line-failure-2019-03-18.

[57]    *Id.*

2017); ¶270 (Misstatement No. 12, November 5, 2017); ¶280 (Misstatement No. 13, May 25, 2018); ¶287 (Misstatement No. 14, June 8, 2018).

**I.     PG&E's ESRB-8 Shutoff Protocol Was Illusory, and PG&E's Failure to Follow It Was a Proximate Cause of the Camp Fire**

141.    After the North Bay Fires but before the Camp Fire, on July 16, 2018, the CPUC passed Resolution ESRB-8.  As noted above, this regulation mandated that PG&E formalize and publicize a program to de-energize power lines for safety when extreme fire danger conditions occur.  PG&E announced its response to this new safety requirement on September 27, 2018 (the "ESRB-8 Shutoff Protocol"), and touted its existence throughout the rest of the Class Period.

142.    PG&E also stated that its ESRB-8 Shutoff Protocol applied to **all** of its powerlines, without qualification. Its protocol stated: "PG&E's Wildfire Safety Operations Center team will monitor conditions **across our system** and evaluate whether to temporarily turn off **electric power lines**, in the interest of public safety."  Thus, PG&E's ESRB-8 Shutoff Protocol applied to both higher-voltage transmission power lines and lower-voltage distribution power lines.

143.    Under the ESRB-8 Shutoff Protocol, PG&E represented that it would balance seven criteria when determining whether to shut off electricity for safety:

- **"Extreme" fire danger threat level**, as classified by the National Fire Danger Rating System

- **A Red Flag Warning declared** by the National Weather Service

- **Low humidity levels**, generally 20 percent and below

- **Sustained winds** above approx. 25 mph and wind gusts in excess of approx. 45 mph

- **Site-specific conditions** such as temperature, terrain and local climate

- **Critically dry vegetation** that could serve as fuel for a wildfire

- **On-the-ground, real-time observations** from PG&E field crews

1   (Emphasis original.)   PG&E stated that "no single factor will drive a Public Safety Power

2   Shutoff," and never identified any other criteria, during the Class Period or since.

3         144.   When PG&E's lines ignited the Camp Fire on November 8, all seven criteria had

4   been met or exceeded – a fact of which PG&E could not have been ignorant.  Indeed, PG&E had

5   warned customers in that area as early as November 6 – two days before the Camp Fire began –

6   that it may need to "proactively turn off power for safety starting on Thursday, November 8."[58]

7         145.   PG&E had only shut off electricity under its ESRB-8 Shutoff Protocol once

8   before, on October 14 through 17, 2018, when it shut off eight transmission power line circuits

9   and thirty-three distribution power line circuits, in seven counties.  Though PG&E found damage

10  to its equipment before restoring power, it nevertheless faced strong backlash from customers

11  who were affected by the shutoff.

12        146.   On November 8, 2018 at 6:14 p.m. EST (3:14 p.m. PST), PG&E announced, via

13  its official Twitter.com account: "PG&E has determined that it will not proceed with plans today

14  for a Public Safety Power Shutoff in portions of 8 Northern CA counties, **as weather conditions**

15  did not warrant this safety measure."[59]  The three weather-relevant criteria are humidity levels (at

16  20% or below), wind speed (with sustained winds around 25 miles per hour or stronger, and

17  wind gusts around 45 miles per hour or stronger), and general site-specific conditions (*e.g.*, local

18  climate and terrain).

19        147.   However, as detailed below, **each of these factors weighed in favor of a shutoff**.

20  Where and when the Camp Fire started, humidity was around or below 20%, wind speeds were

21  measured above 25 (sustained) and 45 (gusts) miles per hour, and a myriad of site-specific

22  conditions contributed to the ignition of the most destructive and deadliest fire in California

23

24      [58] Press Release, PG&E, *PG&E Notifying Customers in Parts of Nine Counties About

25  *Extreme Weather Forecasts and Potential for Public Safety Power Shutoff* (Nov. 6, 2018),
    https://www.pge.com/en/about/newsroom/newsdetails/index.page?title=20181106_pge_notifyin

26  g_customers_in_parts_of_nine_counties_about_extreme_weather_forecasts_and_potential_for_p
    ublic_safety_power_shutoff.

27      [59] PG&E Twitter Account Post (Nov. 8, 2018 3:14PM),

28  https://twitter.com/PGE4Me/status/1060672000929267713.

1   history.   As Cal Fire later confirmed in its determination that PG&E caused the Camp Fire: "The

2   tinder dry vegetation and Red Flag conditions consisting of strong winds, low humidity and

3   warm temperatures promoted this fire and caused extreme rates of spread, rapidly burning into

4   Pulga to the east and west into Concow, Paradise, Magalia and the outskirts of east Chico."[60]

5        148.    The Camp Fire originated at "Pulga Road at Camp Creek Road near Jarbo Gap."[61]

6   Jarbo Gap is a geographical area in Butte County and contains a weather station located at 39°

7   44' 09" N (Latitude), 121° 29' 20" W (Longitude),[62] approximately six miles from the Camp

8   Fire's origin.[63]   The Jarbo Gap weather station provided the most accurate record of weather

9   conditions at the time and place where the Camp Fire ignited.

**1.    PG&E Admitted that All of the Non-Weather Criteria Weighed in Favor of Shutting Off the Power**

        149.    On November 6 and 7, 2018, just before the Camp Fire ignited, PG&E admitted

in three press releases that all seven criteria weighed in favor of a shutoff—providing only small

caveats that weather-related factors might change.

**(a)    Criterion 1: the National Fire Danger Rating System Rated Jarbo Gap as Having an "Extreme" Fire Danger Threat Level**

        150.    The area where the Camp Fire ignited was classified as having an "Extreme" fire

danger threat level by the National Fire Danger Rating System ("NFDRS").  The U.S. Forest

Service "Wildland Fire Assessment System" ("WFAS") archives historical NFDRS ratings in

map[64] and data[65] form, both of which confirm that the Jarbo Gap was rated "Extreme" on

---

[60] Press Release, Cal Fire, *CAL FIRE Investigators Determine Cause of the Camp Fire* (May 15, 2019),
http://calfire.ca.gov/communications/downloads/newsreleases/2019/CampFire_Cause.pdf.

[61] Camp Fire Incident Information, CAL FIRE Incident Information (last modified May 15, 2019), http://cdfdata.fire.ca.gov/incidents/incidents_details_info?incident_id=2277.

[62] Jarbo Gap California Weather Station Information, RAWS USA Climate Archive, https://raws.dri.edu/cgi-bin/wea_info.pl?caCJAR.

[63] Camp Fire Incident Information, CAL FIRE Incident Information (last modified May 15, 2019), http://cdfdata.fire.ca.gov/incidents/incidents_details_info?incident_id=2277.

[64] Observed Fire Danger Class, WFAS-Maps Graphics Fire Behavior Research (Nov. 8, 2018), https://www.wfas.net/archive/www.fs.fed.us/land/wfas/archive/2018/11/08/fd_class.png.

November 8, 2018.  The graphic on the following page has modified the WFAS map to

highlight, with a red circle, the "Extreme" rating received by the Jarbo Gap weather station on

November 8, 2018:



151.    As the U.S. Department of Agriculture Forest Service explained the NFDRS:

> When the fire danger is "extreme", fires of all types start quickly
> and burn intensely.  All fires are potentially serious and can spread
> very quickly with intense burning.  Small fires become big fires
> much faster than at the "very high" level.  Spot fires are probable,
> with long-distance spotting likely.  These fires are very difficult to
> fight and may become very dangerous and often last for several
> days.[66]

---

*(continued)*

[65] *See* Data Chart of Fire Weather Observations from WIMS at 1700 Mountain Time (Nov. 8, 2018),  https://www.wfas.net/archive/www.fs.fed.us/land/wfas/archive/2018/11/08/fdr_obs.txt (row labeled "Jarbo Gap," column labeled "ADJ" for "adjective," data entry "E" for "Extreme").

[66] USDA Forest Service, National Fire Danger Rating System, https://www.fs.usda.gov/detail/cibola/landmanagement/resourcemanagement/?cid=stelprdb5368839.

152.     Indeed, in a press release on November 7, 2018, PG&E admitted: "Due to expected **extreme fire danger conditions** . . . PG&E may temporarily turn off power in portions of the following communities: Butte County (including . . . Paradise)" on November 8, 2018.[67]

**(b)     Criterion 2: the National Weather Service Declared a "Red Flag Warning" for the Area**

153.     The National Weather Service issued a "Red Flag Warning" for Butte County on November 8, 2018,[68] as PG&E admitted in a November 6, 2018 Press Release: "Due to expected extreme fire danger conditions, **including the Red Flag warning from the National Weather Service** and several other weather factors, Pacific Gas and Electric Company (PG&E) today began notifying customers in portions of nine counties that the company may proactively turn off power for safety starting on Thursday, November 8" including "Butte County."[69]

**(c)     Criterion 6: "Critically Dry Vegetation" (*i.e.*, Wildfire Fuel) Weighed in Favor of a Shutoff**

154.     Throughout the area where the Camp Fire ignited, the soil and vegetation were unusually dry, as there had been almost no rainfall since April 2018.  As PG&E admitted in a November 27, 2018 filing to the CPUC, its decision not to shut off the power "was preceded by

---

[67] Press Release, PG&E, *PG&E Continues to Notify Customers in Parts of Nine Counties About the Potential for Public Safety Power Shutoff Due to Forecasted Extreme Weather* (Nov. 7, 2018), https://www.pge.com/en/about/newsroom/newsdetails/index.page?title=20181107_pge_continues_to_notify_customers_in_parts_of_nine_counties_about_the_potential_for_public_safety_power_shutoff_due_to_forecasted_extreme_weather.

[68] Shirin Rajaee, *PG&E Could Cut Power to 63,000 Amid Red Flag Warning*, CBS13 Sacramento (Nov. 8, 2018 12:17 A.M.), https://sacramento.cbslocal.com/2018/11/08/red-flag-warning-pge/.

[69] Press Release, PG&E, *PG&E Notifying Customers in Parts of Nine Counties About Extreme Weather Forecasts and Potential for Public Safety Power Shutoff Due to* (Nov. 6, 2018), https://www.pge.com/en/about/newsroom/newsdetails/index.page?title=20181106_pge_notifying_customers_in_parts_of_nine_counties_about_extreme_weather_forecasts_and_potential_for_public_safety_power_shutoff .

1  an extended period of dry fall weather, only one rain event since May, and periods of dry north

2  winds which caused the moisture content of live and dry fuels to remain low."[70]

3      155.   PG&E confirmed this conclusion in a November 7, 2018 press release: "Due to

4  forecasted high winds **and dry vegetation**, PG&E may temporarily turn off power in portions of

5  the following communities: **Butte County** (including Berry Creek, Chico, Forest Ranch,

6  Magalia, Oroville, **Paradise**). . . ."[71]

7      156.   As Pulitzer Prize winning journalist Matthias Gafni would later report,

8  information from the National Aeronautics and Space Administration ("NASA") showed that

9  California's moisture levels that month were "at the lowest levels in [the] last four years."[72] As

10  the graphic below confirms, this led to extremely dry vegetation:

11

12

13

14

15

16

17

18

19

20

---

21   [70] PG&E Letter to CPUC re: Compliance Report (Nov. 27, 2018),
     http://www.cpuc.ca.gov/uploadedFiles/CPUCWebsite/Content/News_Room/NewsUpdates/2018/
22   11-27-18%20PGE%20PSPS%20Report.pdf.

23   [71] Press Release, PG&E, *PG&E Continues to Notify Customers in Parts of Nine Counties
     About the Potential for Public Safety Power Shutoff Due to Forecasted Extreme Weather* (Nov.
24   7, 2018),
     https://www.pge.com/en/about/newsroom/newsdetails/index.page?title=20181107_pge_continue
25   s_to_notify_customers_in_parts_of_nine_counties_about_the_potential_for_public_safety_powe
     r_shutoff_due_to_forecasted_extreme_weather .
26   [72] Matthias Gafni, *Why Didn't PG&E Shut Down Power In Advance Of Deadly Camp Fire?
     Here's The Data,* Bay Area News Group (Nov. 18, 2018 5:00 P.M.),
27   https://www.chicoer.com/2018/11/18/why-didnt-pge-shut-down-power-in-advance-of-deadly-
     camp-fire-heres-the-data/.
28

---

# Root Zone Soil Moisture Percentile






**(d)   Criterion 7: PG&E's On-the-Ground Observations Weighed in Favor of a Shutoff**

157.    PG&E's on-the-ground observations favored a shutoff.  In a press release dated November 7, 2018, PG&E warned customers that it was considering a shutoff due to "expected extreme fire danger conditions," and that "[f]actors that PG&E considers when deciding to initiate" a shutoff included its "on-the-ground observations."[73]

---

[73] Press Release, PG&E, *PG&E Continues to Notify Customers in Parts of Nine Counties About the Potential for Public Safety Power Shutoff Due to Forecasted Extreme Weather* (Nov. 7, 2018),
https://www.pge.com/en/about/newsroom/newsdetails/index.page?title=20181107_pge_continue s_to_notify_customers_in_parts_of_nine_counties_about_the_potential_for_public_safety_powe r_shutoff_due_to_forecasted_extreme_weather.

158.    This conclusion is corroborated by PG&E's admission in a November 8, 2018 press release that *only weather factors* weighed against shut-off: "[PG&E] has determined that it will not proceed with plans today for a Public Safety Power Shutoff in portions of eight Northern California counties, **as weather conditions did not warrant this safety measure**."[74]

### 2.    All of the Weather Criteria Weighed in Favor of Shutting Off the Power

159.    As described above, PG&E attributed its decision not to shut off power to weather conditions.  Specifically, in a November 27, 2018 filing to the CPUC, PG&E explained that the primary weather condition that fell short was wind speed:

> On Wednesday, November 7, 2018, PG&E refined the forecasted impact down to 63,000 customers and eight counties (Butte, Lake, Napa, Nevada, Placer, Plumas, Sierra and Yuba). **Weather conditions stayed consistent, nearing but not reaching forecasted levels that would warrant temporarily turning off power for customer safety**.

> By around 13:00 on Thursday, November 8, **winds were decreasing**, and conditions were no longer forecast to approach [Public Safety Power Shutoffs] criteria. Based on the forecasted information, PG&E no longer anticipated a possible need to de-energize.

160.    However, all weather factors – including wind speed – weighed in favor of an electricity shutoff in Jarbo Gap on November 7-8, 2018.  The charts[75] on the following page show weather conditions at the Jarbo Gap Weather Station from late November 7, 2018 through the next day:

---

[74] Press Release, PG&E, *PG&E Determines to Not Proceed with Public Safety Power Shutoff Planned for Portions of Eight Northern California Counties* (Nov. 8, 2018), https://www.pge.com/en/about/newsroom/newsdetails/index.page?title=20181108_pge_determines_to_not_proceed_with_public_safety_power_shutoff_planned_for_portions_of_eight_northern_california_counties.

[75] Weather Station Summary for Jarbo Gap California (Nov. 7, 2018), https://raws.dri.edu/cgi-bin/wea_daysum2.pl?stn=cjar&day=7&mon=11&yea=18&unit=E; Weather Station Summary for Jarbo Gap California (Nov. 8, 2018), https://raws.dri.edu/cgi-bin/wea_daysum2.pl?stn=cjar&day=8&mon=11&yea=18&unit=E.

## Jarbo Gap California

Daily Summary for

### November 7, 2018

| Hour of Day Ending at L.S.T. | Total Solar Rad. ° ly. | Ave. mph | Wind V. Dir. Deg | Max. mph | Air Temperature Mean Deg. F. | Fuel Temperature Mean Deg. F. | Fuel Moisture Mean Percent | Relative Humidity Mean Percent | Dew Point Deg. F. | Wet Bulb | Baro. Press. in. Hg. | Total Precip. inches |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 9 pm | 0.0 | 25.0 | 39 | 43.0 | 56.0 | 54.0 | 4.7 | 15 | 9 | 38 | | 0.00 |
| 10 pm | 0.0 | 25.0 | 40 | 41.0 | 54.0 | 53.0 | 4.7 | 16 | 9 | 37 | | 0.00 |
| 11 pm | 0.0 | 27.0 | 35 | 44.0 | 53.0 | 52.0 | 4.7 | 18 | 11 | 37 | | 0.00 |
| 12 am | 0.0 | 27.0 | 37 | 45.0 | 52.0 | 51.0 | 4.7 | 19 | 11 | 36 | | 0.00 |

## Jarbo Gap California

Daily Summary for

### November 8, 2018

| Hour of Day Ending at L.S.T. | Total Solar Rad. ° ly. | Ave. mph | Wind V. Dir. Deg | Max. mph | Air Temperature Mean Deg. F. | Fuel Temperature Mean Deg. F. | Fuel Moisture Mean Percent | Relative Humidity Mean Percent | Dew Point Deg. F. | Wet Bulb | Baro. Press. in. Hg. | Total Precip. inches |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 am | 0.0 | 29.0 | 37 | 48.0 | 51.0 | 50.0 | 4.7 | 21 | 12 | 36 | | 0.00 |
| 2 am | 0.0 | 24.0 | 38 | 44.0 | 50.0 | 48.0 | 4.7 | 22 | 13 | 36 | | 0.00 |
| 3 am | 0.0 | 31.0 | 37 | 50.0 | 49.0 | 48.0 | 4.7 | 22 | 12 | 35 | | 0.00 |
| 4 am | 0.0 | 32.0 | 38 | 52.0 | 49.0 | 48.0 | 4.7 | 22 | 12 | 35 | | 0.00 |
| 5 am | 0.0 | 30.0 | 42 | 51.0 | 48.0 | 47.0 | 4.7 | 23 | 12 | 34 | | 0.00 |
| 6 am | 0.0 | 18.0 | 33 | 40.0 | 48.0 | 46.0 | 4.7 | 23 | 12 | 34 | | 0.00 |
| 7 am | 0.6 | 14.0 | 33 | 28.0 | 49.0 | 46.0 | 4.7 | 21 | 11 | 35 | | 0.00 |
| 8 am | 4.5 | 6.0 | 14 | 25.0 | 51.0 | 51.0 | 4.7 | 18 | 9 | 35 | | 0.00 |
| 9 am | 13.1 | 14.0 | 33 | 21.0 | 53.0 | 55.0 | 4.9 | 17 | 9 | 36 | | 0.00 |
| 10 am | 37.3 | 18.0 | 37 | 30.0 | 55.0 | 58.0 | 4.9 | 16 | 10 | 38 | | 0.00 |
| 11 am | 45.2 | 14.0 | 29 | 29.0 | 58.0 | 61.0 | 5.0 | 14 | 9 | 39 | | 0.00 |
| 12 pm | 47.8 | 16.0 | 31 | 33.0 | 60.0 | 64.0 | 5.0 | 13 | 9 | 40 | | 0.00 |
| 1 pm | 40.7 | 12.0 | 38 | 32.0 | 61.0 | 63.0 | 5.2 | 12 | 8 | 40 | | 0.00 |
| 2 pm | 37.3 | 15.0 | 42 | 24.0 | 63.0 | 67.0 | 4.9 | 11 | 8 | 41 | | 0.00 |
| 3 pm | 21.8 | 10.0 | 40 | 28.0 | 61.0 | 60.0 | 4.8 | 12 | 8 | 40 | | 0.00 |
| 4 pm | 7.5 | 8.0 | 37 | 25.0 | 60.0 | 58.0 | 4.8 | 12 | 7 | 40 | | 0.00 |
| 5 pm | 0.8 | 13.0 | 27 | 23.0 | 58.0 | 55.0 | 4.7 | 11 | 4 | 38 | | 0.00 |
| 6 pm | 0.0 | 15.0 | 27 | 27.0 | 57.0 | 54.0 | 4.6 | 12 | 5 | 38 | | 0.00 |
| 7 pm | 0.0 | 18.0 | 31 | 30.0 | 56.0 | 53.0 | 4.6 | 12 | 4 | 37 | | 0.00 |
| 8 pm | 0.0 | 19.0 | 28 | 34.0 | 55.0 | 52.0 | 4.6 | 12 | 3 | 37 | | 0.00 |

161.    Accordingly, PG&E's November 27, 2018 statement to the CPUC that its decision not to shut off power was justified in part by the fact that "[b]y around 13:00 on Thursday, November 8, winds were decreasing," was misdirection.  The Camp Fire had already begun over six hours before that point.  And indeed, as shown in the chart above, wind speed

weighed in favor of a shutoff in the hours before the fire started. In fact, all of the weather factors weighed in favor of a shut off in the hours before the fire started, as detailed below.

### (a)   Criterion 3: The Jarbo Gap Recorded Sufficiently Low Humidity Levels

162.   Throughout the night on November 7, 2018, humidity was below the "generally 20%" level, supporting a shutoff. From 9:00 p.m. to midnight, humidity never exceeded 19%. In the ten hours before the Camp Fire, average humidity was 20.1%. Over the 24-hour period, humidity averaged a mere 16.42%.

163.   Throughout November 8, 2018, humidity at the Jarbo Gap was at or below the "generally 20%" level that supported a shutoff. Between 6 a.m. and 7 a.m., when the Camp Fire ignited, humidity was between 23% and 21% and falling precipitously; it would drop to as low as 11% in the coming hours.

164.   PG&E knew that the humidity would drop precipitously because National Weather Service's forecast of a red flag warning that day—the same red flag warning PG&E mentioned in its press release late the previous evening[76]—warned that "Afternoon [Relative Humidity] values of 5-15% will be common across the area."[77]

165.   In fact, humidity weighed even more strongly in favor of a shutdown that day than it did on October 14, 2018, the day on which PG&E had previously determined that a power shutoff was necessary. The National Weather Service's forecast of humidity under 15% and as low as 5% was even more severe than its red flag warning on October 14, 2018, where it predicted relative humidity "into the 7-15% range for much of this region."[78]

---

[76] Press Release, PG&E, *PG&E Continues to Closely Monitor Weather Conditions Ahead of Possible Public Safety Power Shutoff in Parts of Eight Counties* (Nov. 7, 2018), https://www.pge.com/en/about/newsroom/newsdetails/index.page?title=20181107_pge_continues_to_closely_monitor_weather_conditions_ahead_of_possible_public_safety_power_shutoff_in_parts_of_eight_counties.

[77] Storm Prediction Center Day 1 Fire Weather Outlook, NOAA (Nov. 8, 2018 07:51:02 UTC), https://www.spc.noaa.gov/products/fire_wx/2018/181108_1200_fwdy1_print.html.

[78] Storm Prediction Center Day 1 Fire Weather Outlook, NOAA (Oct. 14, 2018 06:58:03 UTC), https://www.spc.ncep.noaa.gov/products/fire_wx/2018/181014_1200_fwdy1_print.html.

Case: 19-30088   Doc# 11168-10   Filed: 08/31/21   Entered: 08/31/21 14:49:59   Page 62 of 229

1

2

        **(b)**    **Criterion 4: The Jarbo Gap Recorded Sufficiently High Wind Speed**

3

166.    As noted above (*see* ¶159), PG&E informed the CPUC on November 27, 2018

4

that the primary reason it did not shut off the power was wind speed.

5

167.    Yet throughout the night on November 7, 2018, sustained winds at the Jarbo Gap

6

were at or above the "approx. 25 mph" level that weighed in favor of a shutoff.  Similarly, wind

7

gusts reached the "approx. 45 mph" level by midnight, further supporting a shutoff.  In the ten

8

hours leading up to the Camp Fire, average sustained winds and gusts were 26.8 and 45.8 miles

9

per hour, respectively.

10

168.    At 5 a.m. on November 8, 2018, approximately an hour and a half before the

11

Camp Fire erupted, sustained winds reached 30 miles per hour, with gusts of 51 miles per hour.

12

Overall, wind conditions strongly weighed in favor of a shutoff in the hours before the Camp

13

Fire's ignition.

14

169.    PG&E knew that sustained winds would be high because National Weather

15

Service's forecast of a red flag warning that day—the same red flag warning PG&E mentioned

16

in its press release late the previous evening[79]—warned of winds "during the morning and

17

afternoon" with a "[s]trong northerly/northeasterly flow of 20-25 mph."[80]

18

170.    In fact, sustained wind speed weighed even more strongly in favor of a shutdown

19

that day than it did on October 14, 2018, the day on which PG&E had previously determined that

20

a power shutoff was necessary.  The National Weather Service's forecast of sustained winds of

21

20-25 miles per hour was even more severe than its red flag warning on October 14, 2018, which

22

23

24

[79] Press Release, PG&E, *PG&E Continues to Closely Monitor Weather Conditions Ahead of Possible Public Safety Power Shutoff in Parts of Eight Counties* (Nov.  7, 2018), https://www.pge.com/en/about/newsroom/newsdetails/index.page?title=20181107_pge_continue s_to_closely_monitor_weather_conditions_ahead_of_possible_public_safety_power_shutoff_in_ parts_of_eight_counties.

[80] Storm Prediction Center Day 1 Fire Weather Outlook, NOAA (Nov. 8, 2018 07:51:02 UTC), https://www.spc.noaa.gov/products/fire_wx/2018/181108_1200_fwdy1_print.html.

25

26

27

28

1    predicted "Strong/gusty east-northeasterly winds of 15-20 mph. . . . where sustained winds are

2    forecast to reach 20-25 mph for a few hours."[81]

3                    (c)      **Criterion 5: Site-Specific Conditions Further Favored Shutoff**

4            171.    The specific conditions beneath PG&E's 115 kilovolt transmission line where the

5    Camp Fire ignited were highly conducive to wildfires.  Just one day earlier, PG&E contacted

6    Betsy Ann Cowley regarding transmission line poles on her property in Pulga that "were having

7    problems with sparks," indicating that conditions were hazardous.[82]  Further, it is indisputable

8    that dry vegetation existed underneath the transmission line given reports of vegetation burning

9    beneath it (*see* ¶115, *supra*).  Notably, PG&E identified nothing about the area's terrain,

10   temperature or climate in its November 27, 2018 letter to the CPUC explaining its decision not to

11   shut off its lines.[83]

12           **3.      PG&E Knew, or Recklessly Disregarded, that All Seven Criteria
                      Weighed in Favor of Shutting Off the Power**

13

14           172.    PG&E knew that severe weather conditions requiring a shutoff were in effect.

15   First, the Company admitted it had been monitoring the weather in the area for days; its

16   November 7 press release confirmed that "PG&E meteorologists continuously monitor weather

17   conditions."  Second, the Company had its own "network of PG&E weather stations to enhance

18   _____

19   [81] Storm Prediction Center Day 1 Fire Weather Outlook, NOAA (Oct. 14, 2018 06:58:03
     UTC), https://www.spc.ncep.noaa.gov/products/fire_wx/2018/181014_1200_fwdy1_print.html.

20   [82] Matthias Gafni, *Update: PG&E says email to Camp Fire Victim Focused on Different
     Transmission Line,* Mercury News (updated Nov. 14, 2018 3:59 PM),
21   https://www.mercurynews.com/2018/11/12/state-regulators-investigating-pge-socal-edison-for-
     roles-in-deadly-camp-woolsey-fires/.

22   [83] The remoteness and ruggedness of the relevant terrain where the Camp Fire started further
     supported a shutoff.  In a July 16, 2013 letter to the CPUC concerning the exact same Caribou-
23   Palermo transmission line, PG&E described the relevant terrain as being "in a remote area" with
     "extreme topography."  *See* Letter from CPUC to PG&E re: Advice Letter 4256-E (Sept. 6,
24   2013), https://www.pge.com/nots/rates/tariffs/tm2/pdf/ELEC_4256-E.pdf.  After the Camp Fire,
     an article reported on the terrain immediately around the same transmission line as making fire
25   containment more difficult: "The remoteness and rugged terrain around the tower would make
     any firefight by hand crews nearly impossible."  *See* Matthias Gafni, *It was originally built in
26   1919. What failed on PG&E tower at heart of Camp Fire probe?* Mercury News (updated Dec.
     10, 2018 4:09 AM), https://www.mercurynews.com/2018/12/07/it-was-originally-built-in-1919-
27   what-failed-on-pge-tower-at-heart-of-camp-fire-probe/.

28

1  weather forecasting and modeling," and stated that the Company had the capability of

2  "[m]onitoring wildfire risks **in real time** from our new Wildfire Safety Operations Center."[84]

3  Finally, the weather data referenced above was publicly available.  Indeed, for the hour from

4  midnight to 1 a.m. on November 8, 2018 just before the Camp Fire started, the Jarbo Gap

5  weather station reported that **all weather conditions were met**: humidity at 19%, sustained

6  winds at 27 miles per hour, and wind gusts at 45 miles per hour.  Accordingly, PG&E either

7  knew that weather conditions existed that weighed in favor of a shutoff, or deliberately

8  disregarded such information.

9     173.    Every factor weighed in favor of shutting off PG&E's transmission line running

10  through the Jarbo Gap outside of Paradise, California.  PG&E knew or should have known that

11  all such factors were met.

12     174.    Indeed, PG&E had only shut off electricity in the face of wildfire conditions once

13  before, in October 2018.  The backlash to that shutoff was strong, and PG&E received numerous

14  customer complaints. PG&E noted in its October 31, 2018 report to the CPUC that as of October

15  24, "17 residential customers have complained to the CPUC as a result of the PSPS [Public

16  Safety Power Shutoffs] event since the first customer notification on October 13."[85]  Moreover,

17  PG&E reported to the CPUC that it had "received a total of 146 claims as of October 24, 2018,"

18  including claims for property damage, business interruption, and spoiled food.

19     175.    In sum, all seven criteria weighed in favor of a shutoff that never happened.  From

20  the beginning, the Company misrepresented to investors that it would prioritize safety over

21  customer satisfaction and reliability under the requirements of CPUC's Resolution ESRB-8.  The

22  strongest inference from PG&E's failure to shut off power on November 8, 2018 is that its

23  ESRB-8 Shutoff Protocol was illusory, and that the Company did not believe itself bound by the

24

25  [84] PG&E Public Safety Power Shutoff Policies and Procedures, CPUC website (Sept. 2018),
   http://cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/News_Room/Public-Safety-

26  Power-Shutoff-Policies-and-Procedures-September-2018.pdf.

27  [85] Letter from PG&E to CPUC re: Compliance Report (Oct. 31, 2018),
   http://cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/Utilities_and_Industries/En

28  ergy_-_Electricity_and_Natural_Gas/PGE%20PSPS%20Report%20Letter%2020181031.pdf.

1    seven criteria it told the public and investors were the crucial criteria.  By PG&E's statements

2    listing these – and only these – criteria in its ESRB-8 Shutoff Protocol, investors were entitled to

3    believe that when **all** criteria were met, PG&E would prioritize safety and shut off the power

4    rather than risk causing wildfires and the resulting economic as well as reputational harm to

5    PG&E.

6        176.    In the alternative, PG&E had a duty to update investors once it decided to

7    abandon its ESRB-8 Shutoff Protocol and risk the chance of wildfire.  The result of PG&E's

8    non-adherence to the protocol was the deadliest and most destructive wildfire California has ever

9    faced.

10       **J.    PG&E's Bankruptcy and Other Post-Class-Period Developments**

11       177.    Following PG&E's felony convictions for knowingly and willfully violating

12   safety standards in causing the deadly San Bruno gas explosion and obstructing justice (*see*

13   *supra* Section VI.F.2.), PG&E's sentence included criminal probation.  Since November 27,

14   2018, the U.S. District Court presiding over PG&E's probation instituted further proceedings to

15   determine whether, *inter alia*, PG&E's safety violations causing the North Bay and Camp Fires

16   may have violated its probation.  These proceedings remain ongoing as of the filing of this

17   Complaint, and are detailed in Section X.C., *infra*.

18       178.    On January 14, 2019, PG&E filed a current report on Form 8-K stating that it

19   expected to file for Chapter 11 bankruptcy on or about January 29, 2019.  The reason the

20   Company provided for the expected bankruptcy was the "series of catastrophic wildfires that

21   occurred in Northern California in 2017 and 2018" – namely, the North Bay and Camp Fires.[86]

22       179.    On January 29, 2019, PG&E declared Chapter 11 bankruptcy.  The Company's

23   bankruptcy filings stated that it was facing $51.7 billion in liabilities, including more than $30

24   billion in potential liabilities tied to the North Bay and Camp Fires.[87]

25

26   _____

[86] PG&E Corp., Current Report (Form 8-K) (Jan. 13, 2019),

27   https://www.sec.gov/Archives/edgar/data/75488/000095015719000032/form8k.htm.

[87] Amended Decl. of Jason P. Wells at 3 & 7, Case No. 19-br-30088, (N.D. Cal. Feb. 1, 2019),

28   ECF No. 263.

180.     On February 6, 2019, PG&E submitted to CPUC its new wildfire mitigation plan, as required by SB 901.  PG&E later corrected the filing on February 12, 2019 and amended it on February 14, 2019 (the "2019 Mitigation Plan").  On April 29, 2019, the CPUC largely approved PG&E's 2019 Mitigation Plan, with the exception of "several aspects of the company's planned mitigation that require improvement or other follow-up activity," including improved "[a]nalysis of data to determine whether PG&E's new vegetation-pole clearances have contributed to reduced ignitions, especially during critical weather conditions."[88]  As detailed below, the dramatic expansion of safety practices and expenditures in PG&E's 2019 Mitigation Plan confirms the inadequacy of PG&E's prior activities, showing that PG&E did far less than it should have during the Class Period.

181.     PG&E's 2019 Mitigation Plan stated that the Company would substantially increase its vegetation management efforts.  First, the plan provided that approximately 375,000 "additional" hazard trees should be trimmed or cleared in 2019, a 235% increase compared to PG&E's purported totals of 160,000 in 2018 (estimated), 156,344 in 2017 (actual), 225,168 in 2016 (actual), 18,557 in 2015 (actual), and 8,042 in 2014 (actual).  Second, it called for performing 2,450 miles of "enhanced vegetation management" (including fuel reduction and overhang clearing,) in 2019, an increase of 320% from its 2018 target of only 760 miles.  In approving this proposal, the CPUC noted that "PG&E proposes to spend between $800 million and $1.3 billion to support [this] expansion of its vegetation management program."

182.     PG&E's 2019 Mitigation Plan also stated that the Company would substantially increase its inspections.  Instead of just routinely inspecting 517,500 electricity distribution poles, PG&E would also commit to conducting "enhanced inspections" of 685,000 electricity distribution poles in High Fire Threat Districts "in addition to routine inspections" over the course of just "five months." (Emphasis original.)  "Enhanced Inspection" was described as

---

[88] Although PG&E submitted a second corrected plan on April 25, 2019 "proposing to extend the timelines on many of its major wildfire mitigation efforts," the CPUC determined it was "filed too late to be considered and to receive party comment," and thus "not act on those proposals."  *See* Proposed Decision of Administrative Law Judge re: 18-10-007 (Apr. 29, 2019), http://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M285/K712/285712576.pdf.

1   "includ[ing] ground inspections, drone and helicopter inspections where needed, and climbing

2   inspections of every transmission tower," implying such measures had not been undertaken in

3   the past.  Similarly, for its electricity transmission structures, PG&E committed to conducting

4   enhanced inspections for 40,600 structures in addition to 76,000 routine inspections (up from

5   9,400 and 76,000, respectively).  PG&E also committed to conducting "enhanced risk-based

6   inspections" of 200 electricity substations in High Fire Threat Districts.

7       183.    The CPUC noted that these increased inspections were expected to cost PG&E

8   **between $798 million and $1.396 billion—**"**an increase from $15 million authorized in**

9   **PG&E's last [General Rate Case]**."

10      184.    The 2019 Mitigation Plan also proposed that the Company would significantly

11  expand the geographic regions where it might preemptively shutoff power pursuant to its ESRB-

12  8 Shutoff Protocol, estimating that the protocol would now cover as many as 5.4 million

13  customers, a **950% increase** from what previously covered approximately 570,000 consumers.

14      185.    Thus, PG&E's 2019 Mitigation Plan described dramatic increases in safety

15  practices and expenditures compared to prior years.  These and other aspects of PG&E's

16  expensive proposals represented that it was finally providing the necessary, dramatic expansion

17  of its safety practices and increases in expenditures, which had been absent.  Accordingly, the

18  vastly expanded scope of PG&E's 2019 wildfire plan strongly demonstrates the inadequacy of

19  PG&E's prior safety practices, showing that PG&E did far less than it should have during the

20  Class Period.

21      186.    Following the plan's release, the *Associated Press* summarized the general

22  reaction, "Lawyers, industry watchdogs and a federal judge alike wonder: *What took so long*?"[89]

23      187.    On February 28, 2019, PG&E issued a press release providing an update on the

24  financial impact of the North Bay and Camp Fires, along with the Company's fourth quarter and

25  full-year 2018 financial results.  The release stated that the Company "believes it is probable that

26

27  _____

28  [89] Paul Elias, *Critics Ask What Took PG&E So Long on Wildfire Safety Effort*, Associated
    Press (Feb. 7, 2019), https://www.apnews.com/c1d0e16811914177a9b4b473f1eeebee.

1   its equipment will be determined to be an ignition point of the 2018 Camp Fire," half-

2   anticipating Cal Fire's determination three months later implicating PG&E in both of the Camp

3   Fire's ignition points.  The press release also stated that the Company would be recording a

4   **$10.5 billion charge** related to the 2018 Camp Fire.  It also reported an additional $1 billion

5   charge related to the North Bay Fires, "in addition to the previously recorded $2.5 billion charge

6   in the second quarter of 2018" related to the same fires.  As a result, the Company reported full-

7   year *net losses of $6.9 billion*, compared to 2017 net income of $1.6 billion.  It further stated:

8   "Management has concluded that these circumstances raise substantial doubt about PG&E

9   Corporation's and the Utility's ability to continue as going concerns…."

10  **VII.   DEFENDANTS' FALSE AND MISLEADING CLASS PERIOD STATEMENTS UNDER THE EXCHANGE ACT[90]**

11

12  188.   Investors and analysts were focused on the Company's compliance with wildfire-

13  related safety regulations during the Class Period. With an eye towards artificially inflating its

14  share price, PG&E responded to this interest with false and misleading reassurances that PG&E

15  was in compliance with safety regulations. PG&E also significantly raised its quarterly dividend

16  during the Class Period, repeatedly touting that such a move was based, in part, on its success in

17  ensuring safety. As detailed below, Defendants' fraud proximately caused investors' losses.

18  **A.   Overview of Defendants' Fraudulent Course of Conduct**

19  189.   PG&E was responsible for the North Bay Fires.  Of the eighteen main North Bay

20  Fires for which Cal Fire's investigations have been completed, **seventeen** were caused by PG&E

21  equipment. Among those, **eleven** of these fires evidenced violations of California safety

22  regulations, in **seven** different counties at the **same time**.

23  190.   Furthermore, PG&E was responsible for the Camp Fire, which began when a

24  PG&E electrical tower – carrying a high-voltage 115 kilovolt transmission line – failed.  On May

25  15, 2019, Cal Fire issued a news release confirming that its investigation had "determined that

26  the Camp Fire was caused by electrical transmission lines owned and operated by Pacific Gas

27  _____

28  [90] All references to "Defendants" in Sections I & IV-XIII refer to the Exchange Act Defendants (PG&E and the Exchange Act Individual Defendants).

1   and Electric[]."[91]   PG&E acknowledged a second ignition point for the Camp Fire that exhibited

2   damaged and downed poles, vegetation on top of downed wires, and a recloser.  As a result,

3   vegetation underneath the lines ignited in two ignition points approximately 30 minutes apart.

4   PG&E's failure to remove such vegetation violated California Public Resources Code §4293.

5   PG&E's failure to maintain the integrity of its poles violated California Public Utilities Code

6   §451.  Cal Fire's investigation also confirmed: "The cause of the second fire was determined to

7   be vegetation into electrical distribution lines owned and operated by PG&E."[92]

8          191.   Moreover, PG&E's ESRB-8 Shutoff Protocol required that the responsible power

9   lines be shut off.  While the ESRB-8 Shutoff Protocol requires that PG&E consider seven criteria

10  when determining whether a shutoff would be appropriate, **all seven criteria were satisfied** in

11  the hours leading up to the Camp Fire in the precise location where it started.   This, too, Cal Fire

12  confirmed in its determination that PG&E caused the Camp Fire: "The tinder dry vegetation and

13  Red Flag conditions consisting of strong winds, low humidity and warm temperatures promoted

14  this fire and caused extreme rates of spread…."[93]   Though adhering to the ESRB-8 Shutoff

15  Protocol would have prevented the Camp Fire entirely, PG&E flouted it.

16         192.   Tellingly, the CPUC is investigating whether PG&E violated CPUC rules and

17  standards.  And since determining that PG&E is responsible for the Camp Fire, Cal Fire has

18  forwarded its investigative report to the Butte County District Attorney.

19         193.   The news about PG&E's responsibility for causing the North Bay Fires and Camp

20  Fire directly impacted the Company's bottom line, because California law requires PG&E to

21  bear the cost of wildfire-related property damage and personal injury caused by its violations of

22

23  _____

     [91] Press Release, Cal Fire, *CAL FIRE Investigators Determine Cause of the Camp Fire* (May
24   15, 2019),
     http://calfire.ca.gov/communications/downloads/newsreleases/2019/CampFire_Cause.pdf.
25       [92] Press Release, Cal Fire, *CAL FIRE Investigators Determine Cause of the Camp Fire* (May
     15, 2019),
26   http://calfire.ca.gov/communications/downloads/newsreleases/2019/CampFire_Cause.pdf.
27       [93] Press Release, Cal Fire, *CAL FIRE Investigators Determine Cause of the Camp Fire* (May
     15, 2019),
28   http://calfire.ca.gov/communications/downloads/newsreleases/2019/CampFire_Cause.pdf.

California safety regulations.  In other words, those costs likely could not be passed on to ratepayers.  And, given the information that has emerged, including the conclusions of Cal Fire's investigations into these fires to date – where Cal Fire has referred at least twelve of its investigations to the appropriate counties' district attorneys' offices to review for potential criminal violations – the market has come to understand that the financial consequences to PG&E are extraordinary.

**B.**     **Defendants Made Materially False and Misleading Statements and Omissions Regarding Its Vegetation Management Activities and Compliance with Wildfire Safety Regulations Before the North Bay Fires**

**1.**     **April 29, 2015 – Misstatement No. 1**

194.     The Class Period begins on April 29, 2015, when PG&E held a conference call to discuss the Company's financial and operating results for the first financial quarter of 2015, which ended March 31, 2015. During the call, Defendant Johns, then President of the Utility, misleadingly assured investors of the Company's commitment to safety:

> As California enters its fourth year of drought, we're working hard to help the state meet this challenge by reducing water usage at our own facilities, encouraging customers to conserve by offering rebates for more efficient washers and agricultural pumps. ***We're stepping up our vegetation management activities to mitigate wildfire risk*** and improve access for firefighters.

195.     This statement was materially false and/or misleading because PG&E did not materially increase its vegetation management budget in 2015. In fact, based on information released by CPUC, PG&E underspent its vegetation management budget in both 2014 and 2015: whereas CPUC approved PG&E to spend $190,000,000 and $194,153,000 in 2014 and 2015, respectively, PG&E actually spent only $189,617,402 and $194,094,406, respectively. Moreover, this small budget increase of 2.4% between 2014 and 2015 was only 1.28 percentage points above inflation, which rose 1.12% over the same time period.[94]  Indeed, Judge Alsup held that the "large number of trees that should have been removed by PG&E but weren't . . . was a major contributing factor, maybe the single-biggest factor, in causing the fires in 2017 and 2018

---

[94] CPI Inflation Calculator, Bureau of Labor Statistics, https://www.bls.gov/data/inflation_calculator.htm.

1  in Northern California," and he concluded that "PG&E's performance with respect to vegetation

2  management has been **dismal**."  Accordingly, PG&E had not meaningfully "stepp[ed] up" its

3  vegetation management activities.[95]

4    196. Further, this statement materially omitted the numerous and widespread safety

5  violations that would not be fixed by PG&E's "stepp[ed] up . . . vegetation management

6  activities."

7      **2.  October 16, 2015 – Misstatement No. 2**

8    197. On October 16, 2015, PG&E issued its 2015 Corporate Responsibility and

9  Sustainability Report. This report falsely assured investors that PG&E's "vegetation

10  management" was "in compliance with relevant laws":

11    **Vegetation Management**

12    ***Each year, PG&E's Vegetation Management department***, in
  consultation with utility arborists and foresters, ***inspects every mile***

13    ***of power line in our service area for public safety*** and electric
  reliability. ***We do so in compliance with relevant laws*** and with a

14    focus on public involvement, including extensive "Right Tree,
  Right Place" outreach. PG&E has been recognized by the National

15    Arbor Day Foundation as a Tree Line USA recipient for 20
  consecutive years for demonstrating best practices in utility

16    arboriculture.

17    198. Because PG&E's vegetation management practices failed to follow relevant

18  federal and California safety laws, PG&E's vegetation management activities were decidedly not

19  "in compliance with relevant laws."

20    199. First, according to reports released in subsequent corrective disclosures, including

21  on May 25 and June 8, 2018, PG&E violated relevant wildfire safety laws, including California

22  Public Resources Code Section 4293, multiple times.

23    200. Second, Cal Fire found sufficient evidence of violations of state law to refer

24  PG&E to the relevant district attorneys for eleven of the North Bay fires. *See* Sections IX.D.4-5,

25  *infra*.

26

27    [95] PG&E also omitted that it was supposed to perform at least $441,192 (the total amount by
which PG&E underspent its allowance in 2014 and 2015) in additional vegetation management

28  during 2015, but failed to do so.

---

1    201.   Third, investigations into the causes of the Camp Fire have already disclosed

2    evidence that this most destructive and deadly wildfire in California history was caused by

3    PG&E violating California Public Resources Code Section 4293 and California Public Utilities

4    Code Section 451, among other safety regulations.   Indeed, Cal Fire has found that PG&E

5    equipment was responsible for both ignition points of the Camp Fire and has since reported

6    PG&E to the Butte County District Attorney based on evidence of safety violations.

7    202.   Fourth, it has been documented that PG&E actually knew that it was not in

8    compliance with relevant safety laws and best practices at the time of this statement.  In

9    proceedings related to PG&E's criminal probation before Judge Alsup, PG&E has admitted "that

10   as of June 2017, there were 3,962 unworked trees which PG&E had identified in 2016 as

11   hazardous with the potential to 'fall into or otherwise impact the conductors, towers or guy wires

12   before the next inspection cycle.'" *See* ¶104.

13   203.   Fifth, PG&E has admitted that it did not "inspect[] every mile of power line"

14   "each year," because at the time this statement was made, it did not inspect Tower :27/222 of the

15   Caribou-Palermo transmission line since August 2014.  This lack of annual inspection

16   contributed to Tower :27/222's failure on November 8, 2018, which was part of the Camp Fire's

17   first ignition point.

18   204.   Sixth, this statement materially omitted the true risk that PG&E would cause

19   wildfires serious enough to imperil the Company's financial condition.

20   205.   Thus, this statement was materially false and/or misleading because of PG&E's

21   numerous and widespread violations of safety regulations, including regulations specifically

22   related to vegetation management – regulations which were essential for preventing devastating

23   wildfires.  *See* Section VI.F.4.  As Judge Alsup held, PG&E's "**unsafe conduct has led to**

24   **recurring deadly wildfires caused by its electrical system**" and the "large number of trees that

25   should have been removed by PG&E but weren't . . . was a major contributing factor, **maybe the**

26   **single-biggest factor, in causing the fires** in 2017 and 2018 in Northern California."  In fact,

27   PG&E's violations were so pervasive that they caused multiple North Bay Fires all at the same

28

---

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO: 3:18-CV-03509-EJD

63

1    time in seven different counties, and then caused both of the Camp Fire's two ignition points a

2    year later – therefore the violations cannot be explained away as an isolated lapse.

3         206.    This statement regarding compliance was reviewed and authorized by Defendant

4    Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer. According to the same

5    2015 Corporate Responsibility and Sustainability Report:

6              Within senior leadership, ethics and compliance are managed by a
               Chief Ethics and Compliance Officer, a position created in 2015 as
7              part of our commitment to achieve a best-in-class ethics and
               compliance program. The position reports to the PG&E
8              Corporation CEO and has additional reporting responsibility to the
               Audit Committees of the Board of Directors, and the Compliance
9              and Public Policy Committee of PG&E Corporation.

10             The new position is responsible for:

11             •   Building a best-in-class ethics and **compliance** program
                   and **overseeing its implementation**,
12
               •   **Overseeing company-wide programs for compliance
13                 reporting and related investigatory processes**. . . .

14        207.    Kane therefore was responsible for both "overseeing . . . implementation" of

15   PG&E's compliance **and "overseeing . . . compliance reporting,"** including this report.

16             **3.      November 18, 2015 – Misstatement No. 3**

17        208.    On November 18, 2015, Hogan publicly testified before the California Senate

18   Energy, Utilities and Communication Subcommittee on Gas and Electric Infrastructure Safety.

19   During that testimony, Hogan assured the public that PG&E was "just about done" implementing

20   a program that would remotely disable the Company's recloser devices in areas that included

21   "high wildfire risk areas":

22             So as I mentioned earlier, our SCADA capabilities where we are
               able to *take our reclosers out of service remotely*, we first *focus*
23             *on the wildfire areas* and then we have about 130 some odd
               locations, we are going to complete about 126 of those this year,
24             *just about done with that program*, which leaves six for next year,
               which will be completed.
25
          209.    This statement was materially false and/or misleading because PG&E
26
     misleadingly said that it had implemented policies and procedures to disable recloser devices
27
     from areas that were at high risk for wildfires, which includes the areas where the North Bay
28

1    Fires occurred, by the end of 2015 (approximately 1 month away). Hogan's statement concealed

2    that PG&E dangerously kept reclosers in use through at least October 2017; Cal Fire has

3    determined that PG&E reclosers caused one of the North Bay Fires, known as the Pythian Fire.

4    Indeed, a recloser was found on a broken PG&E pole at the second ignition point for the Camp

5    Fire.  Thus, PG&E did not have the safety policies and procedures in place that they led investors

6    to believe they had.

7        210.    This statement materially omitted the true risk that PG&E would cause wildfires

8    serious enough to imperil the Company's financial condition.

9                    **4.    October 6, 2016 – Misstatement No. 4**

10       211.    On October 6, 2016, PG&E issued its 2016 Corporate Responsibility and

11   Sustainability Report. This report provided false assurances to investors regarding PG&E's

12   compliance with relevant regulations:

13              **Vegetation Management**

14              ***Each year,*** PG&E's Vegetation Management department and its
            contracting arborists and foresters ***inspect miles of power lines in***
15          ***our service area for public safety and electric reliability. We do so***
            ***in compliance with relevant laws*** and with a focus on public
16          involvement, including extensive "Right Tree, Right Place"
            outreach. PG&E has been recognized by the National Arbor Day
17          Foundation as a Tree Line USA recipient for 21 consecutive years
            for demonstrating best practices in energy sector arboriculture.

18       212.    Because PG&E's vegetation management practices failed to follow relevant

19   federal and California safety laws, PG&E's vegetation management activities were decidedly not

20   "in compliance with relevant laws."

21       213.    First, according to reports released in subsequent corrective disclosures, including

22   on May 25 and June 8, 2018, PG&E violated relevant wildfire safety laws, including California

23   Public Resources Code Section 4293, multiple times.

24       214.    Second, Cal Fire found sufficient evidence of violations of state law to refer

25   PG&E to the relevant district attorneys for eleven of the North Bay fires. *See* Sections IX.D.4-5,

26   *infra*.

27

28

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                    65
CIVIL ACTION NO. 3:18-CV-03509-EJD

215.     Third, investigations into the causes of the Camp Fire have already disclosed evidence that this most destructive and deadly wildfire in California history was caused by PG&E violating California Public Resources Code Section 4293 and California Public Utilities Code Section 451, among other safety regulations.  Indeed, Cal Fire has found that PG&E equipment was responsible for both ignition points of the Camp Fire and has since reported PG&E to the Butte County District Attorney based on evidence of safety violations.

216.     Fourth, it has been documented that PG&E actually knew that it was not in compliance with relevant safety laws and best practices at the time of this statement.  In proceedings related to PG&E's criminal probation before Judge Alsup, PG&E has admitted "that as of June 2017, there were 3,962 unworked trees which PG&E had identified in 2016 as hazardous with the potential to 'fall into or otherwise impact the conductors, towers or guy wires before the next inspection cycle.'"  *See* ¶104.

217.     Fifth, PG&E has admitted that it did not "inspect" all of its powerlines "each year," because at the time this statement was made, it did not inspect Tower :27/222 of the Caribou-Palermo transmission line since August 2014.  This lack of annual inspection contributed to Tower :27/222's failure on November 8, 2018, which was part of the Camp Fire's first ignition point.

218.     Sixth, this statement materially omitted the true risk that PG&E would cause wildfires serious enough to imperil the Company's financial condition.

219.     Thus, this statement was materially false and/or misleading because of PG&E's numerous and widespread violations of safety regulations, including regulations specifically related to vegetation management – regulations which were essential for preventing devastating wildfires. *See* Section VI.F.4.  As Judge Alsup held, PG&E's "**unsafe conduct has led to recurring deadly wildfires caused by its electrical system**" and the "large number of trees that should have been removed by PG&E but weren't . . . was a major contributing factor, **maybe the single-biggest factor, in causing the fires** in 2017 and 2018 in Northern California."  In fact, PG&E's violations were so pervasive that they caused at least 11 of the North Bay Fires all at the

1    same time in **seven** different counties, and then caused both of the Camp Fire's two ignition

2    points a year later – therefore the violations cannot be explained away as an isolated lapse.

3        220.    This statement regarding compliance was reviewed and authorized by Defendant

4    Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer. According to the same

5    2016 Corporate Responsibility and Sustainability Report:

6            Within senior leadership, ethics and compliance are managed by
             the Chief Ethics and Compliance Officer (CECO), who reports to
7            the PG&E Corporation Chairman and CEO. The CECO has
             additional reporting responsibility to the Audit Committees of the
8            PG&E Corporation and Pacific Gas and Electric Company Boards
             of Directors, and the Compliance and Public Policy Committee of
9            the PG&E Corporation Board.

10           The CECO is responsible for:

11           • Building a best-in-class ethics and **compliance** program
               and **managing its implementation**,

12
             • **Overseeing enterprise-wide programs for compliance
13             monitoring, reporting**, assessment and remediation. . . .

14       221.    Kane therefore was responsible for both "managing . . . implementation" of

15    PG&E's compliance **and "overseeing . . . compliance monitoring [and] reporting,"** including

16    this report.

17           **5.    August 9, 2017 – Misstatement No. 5**

18       222.    On August 9, 2017, PG&E issued its 2017 Corporate Responsibility and

19    Sustainability Report. This report provided false assurances to investors regarding PG&E's

20    compliance with relevant regulations:

21           **Vegetation Management**

22           ***PG&E prunes and removes trees growing too close to power lines***
             while maintaining as much vegetation as possible to balance land
23           use and environmental stewardship with customer needs. Through
             a well-established and innovative vegetation management
24           program, ***PG&E balances the need to maintain a vast system of
             trees growing along power lines while complying with state and
25           federal regulations and delivering safe***, reliable and affordable
             ***electric service***.

26

27

28

223.    Because PG&E's vegetation management practices failed to follow relevant federal and California safety laws, PG&E's vegetation management activities were decidedly not "complying with state and federal regulations and delivering safe . . . electric service."

224.    First, according to reports released in subsequent corrective disclosures, including on May 25 and June 8, 2018, PG&E violated relevant wildfire safety laws, including California Public Resources Code Section 4293, multiple times.

225.    Second, Cal Fire found sufficient evidence of violations of state law to refer PG&E to the relevant district attorneys for eleven of the North Bay fires. *See* Sections IX.D.4-5, *infra*.

226.    Third, investigations into the causes of the Camp Fire have already disclosed evidence that this most destructive and deadly wildfire in California history was caused by PG&E violating California Public Resources Code Section 4293 and California Public Utilities Code Section 451, among other safety regulations.  Indeed, Cal Fire has found that PG&E equipment was responsible for both ignition points of the Camp Fire and has since reported PG&E to the Butte County District Attorney based on evidence of safety violations.

227.    Fourth, it has been documented that PG&E actually knew that it was not in compliance with relevant safety laws and best practices at the time of this statement.  In proceedings related to PG&E's criminal probation before Judge Alsup, PG&E has admitted "that as of June 2017, there were 3,962 unworked trees which PG&E had identified in 2016 as hazardous with the potential to 'fall into or otherwise impact the conductors, towers or guy wires before the next inspection cycle.'" *See* ¶104.

228.    Fifth, this statement materially omitted the true risk that PG&E would cause wildfires serious enough to imperil the Company's financial condition.

229.    Thus, this statement was materially false and/or misleading because of PG&E's numerous and widespread violations of safety regulations, including regulations specifically related to vegetation management – regulations which were essential for preventing devastating wildfires.  *See* Section VI.F.4.  As Judge Alsup held, PG&E's "**unsafe conduct has led to recurring deadly wildfires caused by its electrical system**" and the "large number of trees that

1   should have been removed by PG&E but weren't . . . was a major contributing factor, **maybe the**

2   **single-biggest factor, in causing the fires** in 2017 and 2018 in Northern California." In fact,

3   PG&E's violations were so pervasive that they evidently caused multiple North Bay Fires all at

4   the same time in seven different counties, and then caused both of the Camp Fire's two ignition

5   points a year later – therefore the violations cannot be explained away as an isolated lapse.

6       230.   This statement regarding compliance was reviewed and authorized by Defendant

7   Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer. According to the same

8   2017 Corporate Responsibility and Sustainability Report:

> Within senior leadership, compliance and ethics are managed by
> the Senior Vice President, Chief Ethics and Compliance Officer
> and Deputy General Counsel (CECO), who reports to the PG&E
> Corporation Chief Executive Officer (CEO) and President. The
> CECO has additional reporting responsibility to the Audit
> Committees of the PG&E Corporation and Pacific Gas and Electric
> Company Boards of Directors, and the Compliance and Public
> Policy Committee of the PG&E Corporation Board.
>
> The CECO is responsible for:
>
> - Building a best-in-class **compliance** and ethics program
>   **and managing its implementation**,
>
> - **Overseeing enterprise-wide programs for compliance
>   monitoring, reporting**, assessment and remediation. . . .

    231.   Kane therefore was responsible for both "managing implementation" of PG&E's

compliance **and "overseeing . . . compliance monitoring [and] reporting**," including this

report.

    **C.   Defendants Tied the Company's Dividend to Safety Compliance, Making
Materially False and Misleading Statements and Omissions Regarding Its
Dividend and Safety Before the North Bay Fires**

    232.   Throughout the Class Period, Defendants repeatedly tied the sustainability of its

quarterly cash dividend to safety. In fact, PG&E increased its dividend during the Class Period

for the first time in six years, and then raised it again – touting the Company's "progress on

safety" and "improvements we have made in safety." Yet PG&E's violations of relevant safety

regulations were so numerous and widespread that they caused and exacerbated the North Bay

Fires, resulting in PG&E having to suspend its dividend entirely on December 20, 2017.

1

### 1.   May 23, 2016 – Misstatement No. 6

2      233.   Less than three weeks after its May 4, 2016 earnings call, PG&E issued a press

3   release titled "PG&E Corporation Raises Common Stock Dividend, Highlights Progress at

4   Annual Shareholder Meeting." It stated:

5           PG&E Corporation (NYSE: PCG) today announced that it is
            raising its quarterly common stock dividend to 49 cents per share,
6           an increase of 3.5 cents per share, beginning with dividends for the
            second quarter of 2016.

7                                    * * *

8
            The increase, which is the company's first in six years, is a
9           meaningful step toward gradually returning the company's
            dividend payout to levels that are comparable with those of similar
10          utilities.

11                                   * * *

12          ***Earley and other senior executives also discussed continued
            progress on safety***, reliability and other goals, as well as PG&E's
13          strategy for the future [at the annual shareholder meeting].

14          Earley said, '***We've continued to demonstrate leadership and
            commitment on safety.*** We're delivering the most reliable service
15          in our company's history.

16      234.   This statement was materially false and/or misleading because it affirmed that

17   PG&E's dividend would not be negatively impacted by the Company's role in causing wildfires.

18   Indeed, it affirmed to investors that PG&E had attained "progress on safety," specifically

19   connecting purported safety achievements to its ability to increase its dividend, importantly, "to

20   levels that are comparable with those of similar utilities."  In reality, PG&E lacked the touted

21   "progress on safety" as well as "leadership and commitment on safety" for all the reasons found

22   by Judge Alsup (*see* ¶¶104-105 & 411) that led him to conclude: "**it's not really true. Safety is**

23   **not your number one thing**."   PG&E's purported "leadership and commitment on safety" is

24   belied by each unaddressed safety violation and safety deficiency alleged herein, and

25   corroborated by the fact that PG&E's electrical equipment caused far more, and more serious,

26   wildfires than comparable utilities in California (¶412).[96]

27   _____

28   [96] Furthermore, this statement is false and misleading for all of the reasons discussed in
     ¶¶649-658, *infra*.

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT          70
CIVIL ACTION NO. 3:18-CV-03509-EJD

1    235.    PG&E fell so far short of this touted achievement that its safety violations, and

2  resulting responsibility for wildfires, would cause PG&E to suspend its dividend entirely on

3  December 20, 2017 due to PG&E's responsibility for the North Bay Fires. This statement gave

4  investors a false impression that safety risks would not imperil the Company's dividend, which is

5  precisely what occurred on December 20, 2017.  Further, this statement touting PG&E's

6  "commitment on safety" materially omitted that the Company's spending on vegetation

7  management was inadequate and barely kept pace with inflation at that time.  It also materially

8  omitted the true risk that PG&E would cause wildfires serious enough to imperil the Company's

9  financial condition.

10    236.    The false and misleading nature of this statement was further revealed in a series

11  of events from November 8-15, 2018, as evidence emerged that PG&E's safety violations caused

12  the Camp Fire: the most destructive and deadly wildfire in California history.

13                    **2.    November 4, 2016 – Misstatement No. 7**

14    237.    On November 4, 2016, PG&E hosted a conference call with analysts to discuss its

15  financial results for the third quarter of 2016. In his prepared remarks, Earley stated as follows:

16         ***The improvements we have made in safety*** and reliability ***over the***
           ***last six years have put us in a position to deliver strong financial***
17         ***results going forward.***

18         Earlier this year, we announced our first dividend increase in six
           years, and we have committed to achieving a roughly 60% payout
19         ratio by 2019. Combined with our expected rate based growth, we
           are confident we can deliver a strong overall return for our
20         shareholders.

21    238.    The statement was materially false and/or misleading because PG&E **did not**

22  **make** substantial "improvements" in wildfire "safety . . . over the last six years." In fact, a

23  PG&E Vegetation Program Manager, Richard Yarnell, later testified that for the entire period

24  from September 2015 to April 10, 2017, "PG&E—to the best of my knowledge, we have not

25  made any changes" to improve safety. Nor was the Company "in a position to deliver strong

26  financial results going forward." In reality, PG&E's responsibility for causing multiple wildfires

27  – as the results of its numerous, widespread safety violations – had such a significant **negative**

28  impact on PG&E's financial results and financial outlook that PG&E had to suspend its dividend

1   entirely on December 20, 2017 due to PG&E's responsibility for causing the North Bay Fires.

2   This statement gave investors a false impression that concealed safety risks would not imperil the

3   Company's dividend, which is precisely what occurred on December 20, 2017.   Further, this

4   statement touting PG&E's "improvements . . . made in safety" materially omitted that the

5   Company's deficient investments in safety, including inadequate spending on vegetation

6   management that barely kept pace with inflation at that time.  It also materially omitted the true

7   risk that PG&E would cause wildfires serious enough to imperil the Company's financial

8   condition.

9        239.   In addition, it has been documented that PG&E actually knew that it was not in

10  compliance with relevant safety laws and best practices at the time of this statement.  In

11  proceedings related to PG&E's criminal probation before Judge Alsup, PG&E has admitted "that

12  as of June 2017, there were 3,962 unworked trees which PG&E had identified in 2016 as

13  hazardous with the potential to 'fall into or otherwise impact the conductors, towers or guy wires

14  before the next inspection cycle.'"  *See* ¶104.

15       240.   The false and misleading nature of this statement was further revealed in a series

16  of events from November 8-15, 2018, as evidence emerged that PG&E's safety violations

17  caused the Camp Fire: the most destructive and deadly wildfire in California history.

18           **3.      May 31, 2017 – Misstatement No. 8**

19       241.   On May 31, 2017, PG&E issued a press release titled "PG&E Corporation Raises

20  Common Stock Dividend, Shareholders Elect Former Secretary of Homeland Security Jeh C.

21  Johnson to Boards of Directors." The release stated:

22           PG&E Corporation (NYSE: PCG) today announced that it is
             raising its quarterly common stock dividend by 4 cents per share to
23           53 cents per share, beginning with the dividend for the second
             quarter of 2017. On an annual basis, this action increases PG&E
24           Corporation's dividend by 8 percent, from $1.96 per share to $2.12
             per share.
25
                                    * * *
26
             Yesterday, in remarks at the joint annual shareholders meeting of
27           PG&E Corporation and Pacific Gas and Electric Company, [CEO]
             Williams highlighted the companies' ***progress on safety, reliability***
28           and reducing greenhouse gas emissions, among other

1
2

accomplishments. ***She reaffirmed PG&E's commitment to safety and operational excellence***, delivering for customers and leading the way to achieve California's clean energy goals.

3      242.    This statement falsely connected PG&E's decision increasing its dividend to

4  "progress on safety" and PG&E's "commitment to safety and operational excellence," only

5  months before the Company's pervasive failure to comply with safety regulations caused at least

6  eleven of the North Bay Fires all at the same time in seven different counties. Indeed, it omitted

7  that there was no progress on wildfire safety, as confirmed by PG&E's own Vegetation Program

8  Manager Richard Yarnell, **only one month before the statement was made,** when he reportedly

9  testified under oath: "PG&E—to the best of my knowledge, we have not made any changes as a

10 result of th[e Butte] fire," *i.e.*, from September 2015 to April 10, 2017 (when Yarnell so

11 testified).  In reality, PG&E lacked the touted "progress on safety" as well as "commitment to

12 safety and operational excellence" for all the reasons found by Judge Alsup (*see* ¶¶104-105 &

13 411) that led him to conclude: "**it's not really true. Safety is not your number one thing**" and

14 "**PG&E's performance with respect to vegetation management has been dismal**."

15     243.    PG&E's above statement on May 31, 2017 gave investors a false impression that

16 concealed safety risks would not imperil the Company's dividend, which is precisely what

17 occurred on December 20, 2017.  Further, this statement materially omitted the true risk that

18 PG&E would cause wildfires serious enough to imperil the Company's financial condition.

19     244.    In addition, it has been documented that PG&E actually knew that it was not in

20 compliance with relevant safety laws and best practices at the time of this statement.  In

21 proceedings related to PG&E's criminal probation before Judge Alsup, PG&E has admitted "that

22 as of June 2017, there were 3,962 unworked trees which PG&E had identified in 2016 as

23 hazardous with the potential to 'fall into or otherwise impact the conductors, towers or guy wires

24 before the next inspection cycle.'"  *See* ¶104.

25     245.    The false and misleading nature of this statement was further revealed in a series

26 of events from November 8-15, 2018, as evidence emerged that PG&E's safety violations caused

27 the Camp Fire: the most destructive and deadly wildfire in California history.

28

**D.     After the North Bay Fires Erupted, the Truth Began to Emerge**

246.     The North Bay Fires began on Sunday evening, October 8, 2017. However, it was not until Thursday, October 12, 2017 that the market began to understand that PG&E's safety regulation violations were likely a major cause. On that date, as detailed below (*see* Section VII.D.1, *infra*), CPUC sent PG&E a litigation hold letter reminding PG&E that it (a) "must preserve any factual or physical evidence … includ[ing] all failed poles, conductors and associated equipment from each fire event" and (b) "must inform all employees and contractors that they must preserve all electronic (including emails) and non-electronic documents related to potential causes of the fires, vegetation management, maintenance and/or tree-trimming." This was the first disclosure indicating that PG&E caused any of the North Bay Fires. In response to this news, PG&E's share price declined 6.7%.

247.     Late the next day, PG&E issued a statement explaining to investors that: "The causes of these fires are being investigated by [Cal Fire], including the possible role of [PG&E's] power lines and other facilities." It reported that the Company "has approximately $800 million in liability insurance for potential losses that may result from these fires" – to prepare investors for the possibility that "the amount of insurance is insufficient to cover the Utility's liability," in which case, its "financial condition or results of operations could be materially affected." The market had understood that PG&E would be reimbursed by rate-payers for damages by fires it caused while nevertheless acting as a prudent manager; hence, the Company's discussion of liability and insurance signaled to the market that at least some of the North Bay Fires were proximately caused by PG&E's negligence or worse. In response to this news, PG&E's share price continued to decline until the end of the next trading day, Monday, October 16, 2017, falling by approximately 16.5%.

248.     Thereafter, PG&E's management attempted to reassure investors, falsely, as detailed below.

1

      **E.**    **After the North Bay Fires Were Contained, the Company Made Additional False and Misleading Statements and Omissions Regarding Compliance with Wildfire-Related Safety Regulations**

2

3

      **1.**    **October 31, 2017 – Misstatement No. 9**

4

      249.    On October 31, 2017, PG&E issued a press release titled "Facts About PG&E's

5

Electric Vegetation Management Efforts." The release stated: "***PG&E follows all applicable***

6

***federal and state vegetation clearance requirements and performs regular power line tree***

7

***safety activities in accordance with industry standards, guidelines, and acceptable procedures***

8

***that help to reduce outages or fires caused by trees or other vegetation***."

9

      250.    This statement was materially false and/or misleading because PG&E did **not**

10

follow "all applicable … state vegetation clearance requirements."

11

      251.    First, according to reports released in subsequent corrective disclosures, including

12

on May 25 and June 8, 2018, PG&E violated relevant wildfire safety laws, including California

13

Public Resources Code Section 4293, multiple times.

14

      252.    Second, Cal Fire found sufficient evidence of violations of state law to refer

15

PG&E to the relevant district attorneys for eleven of the North Bay fires. *See* Sections IX.D.4-5,

16

*infra.*

17

      253.    Third, investigations into the causes of the Camp Fire have already disclosed

18

evidence that this most destructive and deadly wildfire in California history was caused by

19

PG&E violating California Public Resources Code Section 4293 and California Public Utilities

20

Code Section 451, among other safety regulations.  Indeed, Cal Fire has found that PG&E

21

equipment was responsible for both ignition points of the Camp Fire and has since reported

22

PG&E to the Butte County District Attorney based on evidence of safety violations.  This

23

statement concealed that, far from "help[ing] to reduce . . . fires caused by trees or other

24

vegetation," PG&E's vegetation management practices tolerated numerous and widespread

25

violations of safety regulations that would **worsen** the risk of fires.

26

      254.    Fourth, it has been documented that PG&E actually knew that it was not in

27

compliance with relevant safety laws and best practices at the time of this statement.  In

28

proceedings related to PG&E's criminal probation before Judge Alsup, PG&E has admitted "that

1    as of June 2017, there were 3,962 unworked trees which PG&E had identified in 2016 as

2    hazardous with the potential to 'fall into or otherwise impact the conductors, towers or guy wires

3    before the next inspection cycle.'"  *See* ¶104.

4        255.    Fifth, this statement materially omitted the true risk that PG&E would cause

5    wildfires serious enough to imperil the Company's financial condition.

6        256.    Thus, this statement was materially false and/or misleading because of PG&E's

7    numerous and widespread violations of safety regulations, including regulations specifically

8    related to vegetation management – regulations which were essential for preventing devastating

9    wildfires.  *See* Section VI.F.4.  As Judge Alsup held, PG&E's "**unsafe conduct has led to**

10   **recurring deadly wildfires caused by its electrical system**" and the "large number of trees that

11   should have been removed by PG&E but weren't . . . was a major contributing factor, **maybe the**

12   **single-biggest factor, in causing the fires** in 2017 and 2018 in Northern California."  In fact,

13   PG&E's violations were so pervasive that they evidently caused multiple North Bay Fires all at

14   the same time in seven different counties, and then caused both of the Camp Fire's two ignition

15   points a year later – therefore the violations cannot be explained away as an isolated lapse.

16       257.    This statement regarding compliance was reviewed and authorized by Defendant

17   Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer.  Kane was responsible

18   for both "overseeing . . . implementation" of PG&E's compliance and "overseeing . . .

19   compliance reporting," including this press release.  Because of her senior position within the

20   Company, Kane had ultimate authority to control the content of this statement.

21               **2.    November 2, 2017 – Misstatement No. 10**

22       258.    On November 2, 2017, PG&E hosted a conference call with analysts to discuss its

23   financial results for the third quarter of 2017. In her prepared remarks, now-CEO Williams

24   falsely reassured investors regarding the effectiveness of PG&E's vegetation management:

25            Thank you, Chris, and good morning, everyone. Given the recent
             wildfires impacting our customers and communities, our
26            discussion today will be different from our usual earnings call. . . .

27                                    * * *

28

---

Now I know there's a lot of interest in how these fires started and in how PG&E assets might have been involved in or impacted by the wildfires. Our communities deserve answers and we are committed to learning what happened. It's critical that we identify anything that will help us to keep our customers and communities safe in the future. That is our goal as we work with CAL FIRE and the CPUC.

* * *

**Many of you have reached out with questions about the potential impact of the wildfires to the company's financials and also about the doctrine of inverse condemnation in California.** At this time, the known financial impact of the wildfires is limited to the cost of the unprecedented response and restoration efforts, costs related to our liability insurance and some legal expenses, and Jason [Wells] will cover these later this morning.

* * *

**I know there's a lot of interest in our pole maintenance and vegetation management programs**, so let me address these as well. First, we routinely inspect, maintain and replace our electric poles. This includes annual scheduled patrols, 5-year visual inspections, an intrusive testing and treating on our wood poles on a frequency that significantly exceeds CPUC requirements.

***We also have one of, if not, the most comprehensive vegetation management programs in the country.*** Our vegetation management program manages about 123 million trees across the service territory. ***And every year, we inspect every segment of the 99,000 miles of overhead line and we clear vegetation as needed.*** This is well beyond what is typical in our industry where most utilities have a 3-year vegetation management cycle or sometimes longer. **Typically, we spend about $200 million every year to line clear or remove 1.3 million trees to mitigate both the risk of wildfires and to prevent electric outages. With the drought and the tree mortality crisis we've experienced in California, we have been expanding our vegetation management work since 2014.**

***In 2016, we spent an additional $200 million, essentially doubling our typical vegetation management spending last year***. We've removed an incremental 236,000 dead or dying trees, and we enhanced our tree maintenance work with additional patrols in areas of high fire danger, including a combination of boots on the ground, aerial patrols, and sophisticated LiDAR technology.

259.    These statements were materially false and/or misleading because PG&E did not "doubl[e]" its "typical vegetation management spending last year." As explained in Section IV.B., *supra*, PG&E's Vegetation Management Balancing Accounts for the relevant years

1    indicate that PG&E spent $194,094,406 on vegetation management in 2015, $198,735,579 in

2    2016, and $201,456,193 in 2017 – increases of only 2.4% and 1.4%, respectively.[97] The lack of

3    improvement to PG&E's vegetation management practices was confirmed by PG&E's own

4    Vegetation Program Manager Richard Yarnell, who reportedly testified under oath that, even by

5    April 10, 2017: "PG&E—to the best of my knowledge, **we have not made any changes** as a

6    result of th[e September 2015 Butte] fire."

7            260.    Second, PG&E failed to comply with safety regulations – including regulations

8    specifically related to vegetation management. Thus, when Williams touted PG&E's vegetation

9    management program as "one of, if not, the most comprehensive vegetation management

10   programs in the country," she gave investors the false impression that PG&E's vegetation

11   management did not fall short of applicable safety regulations, when in fact it did. Given

12   PG&E's numerous and widespread violations of safety regulations, including those violations

13   that would cause multiple of the North Bay Fires as well as evidently cause the Camp Fire, its

14   "vegetation management programs" were **not** "comprehensive."

15           261.    Third, PG&E has admitted that it did not "every year . . . inspect every segment of

16   the 99,000 miles of overhead line," because at the time this statement was made, it did not

17   inspect Tower :27/222 of the Caribou-Palermo transmission line since August 2014.  This lack of

18   annual inspection contributed to Tower :27/222's failure on November 8, 2018, which was part

19   of the Camp Fire's first ignition point.

20           262.    Fourth, PG&E did **not** "have one of, if not, the most comprehensive vegetation

21   management programs in the country" for all the reasons found by Judge Alsup (*see* ¶¶104-105

22   & 411) that led him to conclude: "**PG&E's performance with respect to vegetation**

23   **management has been dismal**."

24           263.    Fifth, this statement materially omitted the true risk that PG&E would cause

25   wildfires serious enough to imperil the Company's financial condition.

26

27

28

---

[97] This spending did not differ more than $100,000 from the amounts PG&E requested, and the amounts CPUC approved, in PG&E's 2015, 2016, and 2017 General Rate Cases.

1

### 3.   November 2, 2017 – Misstatement No. 11

2      264.   Later on the same call, an analyst asked the Company for more detail about

3   PG&E's vegetation management practices. President and COO Nickolas Stavropoulos replied as

4   follows:

> [ANALYST:] And then, I guess, ***can you discuss your vegetation***
> ***practices for trees that are located near power lines?*** I guess
> we've seen sort of end reports that have come out for some of your
> peers that they sort of track vegetation that's within certain
> distances from the lines, and they basically make their decisions on
> what to do based on sort of updates.
>
> [Stavropoulos:] Thank you for the question. So as Geisha
> mentioned, we have a very aggressive vegetation management
> program across our 70,000-mile -- square mile territory. We
> manage about 123 million trees that are near and adjacent to our
> facilities. ***And over the last 2 years, we've doubled the amount***
> ***that we've invested in veg[etation] management.*** That includes
> line clearing to remove parts of trees that are adjacent to our
> facilities as well as removal of dead and dying trees. So the
> program involves year-round effort to identify these dead and
> dying trees through inspection processes where we use foot and
> aerial patrols; we use LiDAR, which is light, detecting and ranging
> technology, to identify the trees that need to be worked. ***We***
> ***inspect all of our overhead lines every year, and we do second***
> ***patrols in high fire danger areas at least twice a year. In some***
> ***areas, we do as often as 4x a year.*** So it's a very aggressive
> program. There are specific requirements around line clearing, and
> it depends upon the voltage of the lines. And it can range up to feet
> [sic] to as much a sort of 18 inches away from the facility. So there
> are all sorts of different requirements, depending upon where the
> facilities are located and the voltage of the facilities.

19      265.   This statement was materially false and/or misleading because PG&E did not

20   "doubl[e] the amount that we've invested in veg[etation] management." As explained in Section

21   VI.B., *supra*, PG&E's Vegetation Management Balancing Accounts for the relevant years

22   indicate that PG&E spent $194,094,406 on vegetation management in 2015, $198,735,579 in

23   2016, and $201,456,193 in 2017. Moreover, the lack of improvement to PG&E's vegetation

24   management practices was confirmed by PG&E's own Vegetation Program Manager Richard

25   Yarnell, who reportedly testified under oath that, even by April 10, 2017: "PG&E—to the best of

26   my knowledge, we have not made any changes as a result of th[e Butte] fire," *i.e.*, since

27   September 2015.

28

266.    Second, PG&E failed to comply with safety regulations specifically related to vegetation management. By representing that it "inspect[s] all of [its] overhead lines every year," and inspects some trees "twice" or "4x" each year, Stavropoulos falsely created the impression that PG&E would prevent many safety violations from occurring, especially in "high fire danger areas" such as those where the North Bay Fires and Camp Fire erupted. In reality, safety violations were so pervasive that they evidently caused both ignition points of the Camp Fire as well as at least eleven fires at the same time in **seven** different counties. In touting its "very aggressive vegetation management program," the statement actionably omitted the widespread failure of these measures to bring PG&E into compliance. Indeed, if PG&E had been properly "inspect[ing] all of our overhead lines "every year," "twice a year," or "4x a year," many of the causes of the North Bay Fires and Camp Fire would have been discovered and the fires prevented. For instance, in addition to the fires caused by dead or dying trees, Cal Fire found that the Cascade Fire was caused "by sagging power lines coming into contact" and the Blue Fire was caused when "a PG&E power line conductor separated from a connector."

267.    As another example, in the afternoon of November 8, 2018, PG&E's aerial inspection of the 115 kilovolt transmission line that caused the Camp Fire discovered "damage to a transmission tower" carrying that electrical line.  PG&E has also acknowledged a second ignition point for the Camp Fire that exhibited damaged and downed poles, vegetation on top of downed wires, and other signs of safety violations. Cal Fire has determined that PG&E caused both of these ignition points.

268.    Third, PG&E has admitted that it did not "inspect all of our overhead lines every year," much less "twice a year" or "4x a year," because at the time this statement was made, it did not inspect Tower :27/222 of the Caribou-Palermo transmission line since August 2014. This lack of annual inspection contributed to Tower :27/222's failure on November 8, 2018, which was part of the Camp Fire's first ignition point.

269.    Fourth, this statement materially omitted the true risk that PG&E would cause wildfires serious enough to imperil the Company's financial condition.

1

### 4.    November 5, 2017 – Misstatement No. 12

2    270.    At all relevant times, PG&E's Media Relations department maintained a news

3    website named *Currents*,[98] providing news, information, and commentary about PG&E's

4    activities, including the delivery of electricity and the operation, maintenance, and safety of the

5    Company's electric services. Through the website, PG&E repeatedly touted the safety of its

6    power lines, the Company's vegetation management program, and its purported success

7    mitigating wildfire risk.

8    271.    In one such article, dated November 5, 2017 and titled "Facts About PG&E's

9    Wildfire and Prevention Safety Efforts," PG&E reassured investors that "***PG&E meets or***

10   ***exceeds all applicable federal and state vegetation clearance requirements***."[99]

11   272.    This statement was materially false and/or misleading because PG&E did not

12   "meet" – much less "exceed" – "all applicable … state vegetation clearance requirements."

13   273.    First, according to reports released in subsequent corrective disclosures, including

14   on May 25 and June 8, 2018, PG&E violated relevant wildfire safety laws, including California

15   Public Resources Code Section 4293, multiple times. *See* Section VII.D.4., *infra*.

16   274.    Second, Cal Fire found sufficient evidence of violations of state law to refer

17   PG&E to the relevant district attorneys for eleven of the North Bay fires. *See* Sections IX.D.4-5,

18   *infra*.

19   275.    Third, investigations into the causes of the Camp Fire have already disclosed

20   evidence that this most destructive and deadly wildfire in California history was caused by

21   PG&E violating California Public Resources Code Section 4293 and California Public Utilities

22   Code Section 451, among other safety regulations.  Indeed, Cal Fire has found that PG&E

23

24

[98] *Currents*, PG&E, http://www.pgecurrents.com.

25   [99] On November 14, 2017, PG&E spokesperson Greg Snapper repeated this false and

26   misleading reassurance *verbatim* in an NBC article titled "Utility Company's Risk Assessment at Issue in NorCal Wildfires." *See* Jaxon Van Derbeken, *Utility Company's Risk Assessment at*

27   *Issue in NorCal Wildfires*, NBC Universal Media (Nov. 14, 2017), https://www.nbcconnecticut.com/troubleshooters/national-investigations/PGE-Risk-Assessment-

28   at-Issue-in-North-Bay-Wildfires-457356963.html.

---

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO: 3:18-CV-03509-EJD

81

1   equipment was responsible for both ignition points of the Camp Fire and has since reported

2   PG&E to the Butte County District Attorney based on evidence of safety violations.

3       276.   Fourth, it has been documented that PG&E actually knew that it was not in

4   compliance with relevant safety laws and best practices at the time of this statement.  In

5   proceedings related to PG&E's criminal probation before Judge Alsup, PG&E has admitted "that

6   as of June 2017, there were 3,962 unworked trees which PG&E had identified in 2016 as

7   hazardous with the potential to 'fall into or otherwise impact the conductors, towers or guy wires

8   before the next inspection cycle.'"  *See* ¶104.

9       277.   Fifth, this statement materially omitted the true risk that PG&E would cause

10  wildfires serious enough to imperil the Company's financial condition.

11      278.   Thus, this statement was materially false and/or misleading because of PG&E's

12  numerous and widespread violations of safety regulations, including regulations specifically

13  related to vegetation management – regulations which were essential for preventing devastating

14  wildfires.  *See* Section VI.F.4.  As Judge Alsup held, PG&E's "**unsafe conduct has led to**

15  **recurring deadly wildfires caused by its electrical system**" and the "large number of trees that

16  should have been removed by PG&E but weren't . . . was a major contributing factor, **maybe the**

17  **single-biggest factor, in causing the fires** in 2017 and 2018 in Northern California."  In fact,

18  PG&E's violations were so pervasive that they evidently caused multiple North Bay Fires all at

19  the same time in seven different counties, and then caused both of the Camp Fire's two ignition

20  points a year later – therefore the violations cannot be explained away as an isolated lapse.

21      279.   This statement regarding compliance was reviewed and authorized by Defendant

22  Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer.  Kane was responsible

23  for both "overseeing . . . implementation" of PG&E's compliance and "overseeing . . .

24  compliance reporting," including this news release. Because of her senior position within the

25  Company, Kane had ultimate authority to control the content of this statement.

26

27

28

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                              82
CIVIL ACTION NO. 3:18-CV-03509-EJD

1          **5.     May 25, 2018 – Misstatement No. 13**

2          280.    On May 25, 2018, PG&E issued a press release to respond to Cal Fire's reports

3   regarding some of the October 2017 North Bay Fires (*see* Section VII.D.4, *infra*), to reassure

4   investors that PG&E had met all state regulations concerning fire safety. The press release stated:

5              • Following Governor Brown's January 2014 Drought State
                 of Emergency Proclamation and the California Public
6                Utilities Commission's Resolution ESRB-4, PG&E has
                 added enhanced measures to address areas particularly
7                affected by drought and bark beetles including:

8              • Increased foot and aerial patrols along power lines in high
                 fire-risk areas;
9
               • Removed approximately 236,000 dead or dying trees in
10               2016 and 140,000 dead or dying trees in 2017; these tree
                 removals were in addition to approximately 30,000 trees
11               removed per year prior to the drought;

12             • Launched daily aerial fire detection patrols during high fire
                 season to improve fire spotting and speed of fire response;
13
               • Since 2014, provided $11.4 million to local Fire Safe
14               Councils (FSCs) for fuel reduction projects in
                 communities; and
15
               • Provided $1.7 million to local FSCs for 28 highly
16               programmable remote-sensing cameras for critical fire
                 lookout towers.
17
               • ***PG&E meets or exceeds regulatory requirements for pole***
18               ***integrity management***, using a comprehensive database to
                 manage multiple patrol and inspection schedules of our
19               more than two million poles.

20         281.    This statement was materially false and/or misleading because PG&E did not

21  "meet" – much less "exceed" – "regulatory requirements for pole integrity management."

22  According to a report released in a subsequent corrective disclosure, PG&E violated California's

23  safety regulations multiple times. Indeed, on June 8, 2018, Cal Fire disclosed that its

24  "investigators have determined that 12 Northern California wildfires in the October 2017 Fire

25  Siege were caused by electric power and distribution lines, conductors **and the failure of power**

26  **poles**." In fact, at least one of the North Bay Fires – the Sulphur Fire – "was caused by the failure

27  of a PG&E owned power pole" evidencing "violations of state law" sufficient to be referred to

28  the relevant district attorney.  Further, Cal Fire found enough evidence of violations of state law

Case: 19-30088   Doc# 11169-10   Filed: 08/31/21   Entered: 08/31/21 14:49:59   Page
93 of 229

1    to refer PG&E to the relevant district attorneys for eight of these twelve North Bay fires. *See*

2    Section VII.D.5., *infra*.

3        282.    Second, PG&E acknowledged that an aerial patrol of the Camp Fire's origin later

4    the same day showed "damage to a transmission tower" or pole that PG&E failed to maintain, as

5    well as a second ignition point that exhibited damaged and downed poles, in violation of Section

6    451.  Thus, PG&E did **not** "meet[] or exceed[] regulatory requirements for pole integrity

7    management" – regulations which were essential for preventing devastating wildfires.  PG&E's

8    representation to the contrary was materially false and/or misleading.  Cal Fire has since

9    confirmed that PG&E equipment was responsible for both of the Camp Fire's ignition points,

10   and referred its investigations to the relevant district attorney based on evidence of safety

11   violations.

12       283.    Overall, this statement was materially false and/or misleading because of PG&E's

13   numerous and widespread violations of safety regulations – regulations which were essential for

14   preventing devastating wildfires.  In fact, PG&E's violations were so pervasive that they

15   evidently caused multiple North Bay Fires all at the same time in seven different counties, and

16   then caused both of the Camp Fire's two ignition points a year later – therefore the violations

17   cannot be explained away as an isolated lapse.  This statement materially omitted the true risk

18   that PG&E would cause wildfires serious enough to imperil the Company's financial condition.

19       284.    It has additionally been documented that PG&E actually knew that it was not in

20   compliance with relevant safety laws and best practices at the time of this statement.  In

21   proceedings related to PG&E's criminal probation before Judge Alsup, PG&E has admitted "that

22   as of June 2017, there were 3,962 unworked trees which PG&E had identified in 2016 as

23   hazardous with the potential to 'fall into or otherwise impact the conductors, towers or guy wires

24   before the next inspection cycle.'"  *See* ¶104.

25       285.    This statement regarding compliance was reviewed and authorized by Defendant

26   Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer.  Kane was responsible

27   for both "overseeing . . . implementation" of PG&E's compliance and "overseeing . . .

28

1  compliance reporting," including this press release.  Because of her senior position within the

2  Company, Kane had ultimate authority to control the content of this statement.

3       **F.**     **While the Truth Regarding PG&E's Role in Causing the North Bay Fires Emerged, the Company Made Additional False and Misleading Statements and Omissions Regarding Compliance with Wildfire-Related Safety Regulations, Including Its ESRB-8 Shutoff Protocol**

4

5

6       286.     As detailed below (*see* Section VII.D., *infra*), PG&E's share price declined

7  precipitously as the truth about its responsibility for the North Bay Fires emerged.  As liabilities

8  for the North Bay Fires threatened the Company's financial viability, Defendants would realize

9  that the Company needed a legislative bailout to avoid bankruptcy.  As a result, PG&E needed

10  the public, including investors, to believe that it would prioritize safety thereafter.

11       **1.**     **June 8, 2018 – Misstatement No. 14**

12       287.     On June 8, 2018, Cal Fire announced its conclusions that PG&E caused the

13  preponderance of the North Bay Fires (*see* Section VII.D.5, *infra*), PG&E's share price

14  continued its decline, and its financial situation deteriorated.  Later that day, PG&E issued a

15  press release to respond to Cal Fire's report, falsely and misleadingly reassuring investors that

16  PG&E had met all state regulations concerning fire safety.  The press release, titled "PG&E

17  Responds to Latest CAL FIRE Announcement" stated, in relevant part:

18       ***Programs Overall Met State's High Standards***

19       We look forward to the opportunity to carefully review the CAL FIRE reports to understand the agency's perspectives.

20       Based on the information we have so far, we continue to believe our overall programs met our state's high standards.

21

22       For example, ***PG&E meets or exceeds regulatory requirements for pole integrity management***, using a comprehensive database to manage multiple patrol and inspection schedules of our more than two million poles.

23

24       Similarly, ***under PG&E's industry-leading Vegetation Management Program***, we inspect and monitor every PG&E overhead electric transmission and distribution line each year, with some locations patrolled multiple times. We also prune or remove approximately 1.4 million trees annually.

25

26

27       288.     Because PG&E's compliance violations would soon cause the Camp Fire, the

28  most destructive and deadly wildfire in California history, PG&E's "Vegetation Management

1   Program" and "pole integrity management" decidedly did not meet California's "High

2   Standards."  Investigations into the causes of the Camp Fire have already uncovered evidence

3   that it was caused by PG&E violating California Public Resources Code Section 4293 and

4   California Public Utilities Code Section 451, among other safety regulations.  Indeed, Cal Fire

5   has found that PG&E equipment was responsible for both ignition points of the Camp Fire and

6   has since reported PG&E to the Butte County District Attorney based on evidence of safety

7   violations.

8          289.   First, the Camp Fire was described in initial communications between firefighters

9   and dispatch as a vegetation fire "underneath the transmission lines," which vegetation should

10   have been cleared by PG&E pursuant to Section 4293.

11          290.   Second, PG&E acknowledged that an aerial patrol of the Camp Fire's origin later

12   the same day showed "damage to a transmission tower" or pole that PG&E failed to maintain, in

13   violation of Section 451.

14          291.   Third, PG&E has also acknowledged a second ignition point for the Camp Fire

15   that exhibited damaged and downed poles, vegetation on top of downed wires, and other signs of

16   safety violations. Cal Fire has since confirmed that PG&E equipment was responsible for both of

17   the Camp Fire's ignition points, and referred its investigations to the relevant district attorney

18   based on evidence of safety violations.

19          292.   Fourth, it has been documented that PG&E actually knew that it was not in

20   compliance with relevant safety laws and best practices at the time of this statement.  In

21   proceedings related to PG&E's criminal probation before Judge Alsup, PG&E has admitted "that

22   as of June 2017, there were 3,962 unworked trees which PG&E had identified in 2016 as

23   hazardous with the potential to 'fall into or otherwise impact the conductors, towers or guy wires

24   before the next inspection cycle.'"  *See* ¶104.

25          293.   Fifth, this statement materially omitted the true risk that PG&E would cause

26   wildfires serious enough to imperil the Company's financial condition.

27          294.   Thus, PG&E did **not** "meet[] or exceed[] regulatory requirements for pole

28   integrity management" or "Vegetation Management" – regulations which were essential for

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO. 3:18-CV-03509-EJD

86

1    preventing devastating wildfires.  *See* Section VI.F.4.  As Judge Alsup held, PG&E's "**unsafe**

2    **conduct has led to recurring deadly wildfires caused by its electrical system**" and the "large

3    number of trees that should have been removed by PG&E but weren't . . . was a major

4    contributing factor, **maybe the single-biggest factor, in causing the fires** in 2017 and 2018 in

5    Northern California."  PG&E's representation to the contrary was materially false and/or

6    misleading.

7        295.    This statement regarding compliance was reviewed and authorized by Defendant

8    Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer.  Kane was responsible

9    for both "overseeing . . . implementation" of PG&E's compliance and "overseeing . . .

10   compliance reporting," including this press release.  Because of her senior position within the

11   Company, Kane had ultimate authority to control the content of this statement.

12                    **2.    June 8, 2018 – Misstatement No. 15**

13       296.    The same press release contained a further false and/or misleading statement:

> **To address the growing threats posed by wildfires and extreme weather, and in light of the wildfires throughout our state last year, *PG&E has launched the Community Wildfire Safety Program* to help keep our customers and communities safe. Among the key components of the new program are. . .**
>
> • Public Safety Power Shutoff: As a last resort, ***a program to proactively turn off electric power for safety when extreme fire danger conditions occur***, while helping customers prepare and providing early warning notification, when and where possible.

297.    PG&E's representation that it "has launched . . . a program to proactively turn off

electric power for safety when extreme fire danger conditions occur" was false and misleading.

It was false because the touted program, which would eventually become its ESRB-8 Shutoff

Protocol, was illusory; hence, PG&E never "launched" it.  Further, it misleadingly omitted that

any guidelines PG&E did develop were a mere pretense of safety that the Company did not

follow.  Even when all seven relevant "extreme fire danger conditions" **did** "occur," weighing

strongly in favor of shutting off PG&E's transmission lines near the Jarbo Gap on November 7

and 8, 2018, PG&E flouted its own supposed program.  PG&E's failure to shut off its

1  transmission line caused the Camp Fire: the most destructive and deadly wildfire in California

2  history.  By touting a wildfire safety program PG&E did not adhere to, and where its

3  nonadherence would risk devastating wildfires, PG&E misrepresented existing and material facts

4  to investors.

5       298.   This press release regarding compliance was reviewed and authorized by

6  Defendant Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer.  Kane was

7  responsible for both "overseeing . . . implementation" of PG&E's compliance and "overseeing . .

8  . compliance reporting," including this press release.  Because of her senior position within the

9  Company, Kane had ultimate authority to control the content of this statement.

10                    **3.    September 27, 2018 – Misstatement No. 16**

11      299.   On July 16, 2018, the CPUC enacted Resolution ESRB-8, which required PG&E

12 to adopt, promulgate and follow "de-energization policy and procedures" to "de-energize power

13 lines" in the face of unprecedented wildfire threats "to ensure public safety."  It was the

14 Company's official announcement of its de-energization policy and procedures implementing

15 Resolution ESRB-8, detailed below, that materially misled investors.

16      300.   On or about September 27, 2018, PG&E announced the full details of its ESRB-8

17 Shutoff Protocol in a filing with CPUC[100] that was also posted on its website.[101]  The ESRB-8

18 Shutoff Protocol stated:

19          PG&E's Community Wildfire Safety Program implements
            additional precautionary measures intended to reduce wildfire
20          threats. ***It includes . . . executing protocols to temporarily turn off***
            ***electric power for safety when extreme fire danger conditions are***
21          ***occurring*."

22          . . .

23          Public Safety Power Shutoff is one component of the Community
            Wildfire Safety Program.  ***PG&E has created a set of procedures***

---

25    [100] PG&E Public Safety Power Shutoff Policies and Procedures, CPUC website (Sept. 2018),
      http://cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/News_Room/Public-Safety-
26    Power-Shutoff-Policies-and-Procedures-September-2018.pdf.

27    [101] PG&E Public Safety Power Shutoff Policies and Procedures, PG&E website (Sept. 2018),
      https://www.pge.com/pge_global/common/pdfs/safety/emergency-preparedness/natural-
28    disaster/wildfires/Public-Safety-Power-Shutoff-Policies-and-Procedures-September-2018.pdf.

---

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                              88
CIVIL ACTION NO. 3:18-CV-03509-EJD

1

*for. . . [d]etermining what combination of conditions necessitates turning off lines for safety.*

2

. . .

3

PG&E will take a combination of many criteria into consideration, including:

4

5

- **"Extreme" fire danger threat level**, as classified by the National Fire Danger Rating System

6

7

- **A Red Flag Warning declared** by the National Weather Service

8

- **Low humidity levels**, generally 20 percent and below

9

- **Sustained winds** above approx. 25 mph and wind gusts in excess of approx. 45 mph

10

11

- **Site-specific conditions** such as temperature, terrain and local climate

12

- **Critically dry vegetation** that could serve as fuel for a wildfire

13

14

- **On-the-ground, real-time observations** from PG&E field crews

15

(Emphasis original.)

16

301.    PG&E's representation that it had "implement[ed] additional precautionary

17

measures" including "determining what combination of conditions necessitates turning off lines

18

for safety" was false and misleading.  It was false because the ESRB-8 Shutoff Protocol was

19

illusory; hence, PG&E did not "implement" it, as required by law.  Further, it misleadingly

20

omitted that any guidelines PG&E did develop were a mere pretense of safety that the Company

21

did not follow.  Even when all seven relevant "criteria" weighed in favor of shutting off PG&E's

22

transmission lines near the Jarbo Gap on November 7 and 8, 2018, PG&E nevertheless flouted

23

its protocol.  PG&E's failure to shut off its transmission line caused the Camp Fire: the most

24

destructive and deadly wildfire in California history.  By touting a wildfire safety program

25

PG&E did not adhere to, where its nonadherence would risk devastating wildfires, PG&E

26

misrepresented existing and material facts to investors.

27

302.    This statement regarding compliance was reviewed and authorized by Defendant

28

Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer.  Kane was responsible

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO. 3:18-CV-03509-EJD

89

1   for both "overseeing . . . implementation" of PG&E's compliance and "overseeing . . .

2   compliance reporting," including this report. Because of her senior position within the Company,

3   Kane had ultimate authority to control the content of this statement.

4                    **4.      October 9, 2018 – Misstatement No. 17**

5           303.    On October 9, 2018 Cal Fire announced its conclusions that PG&E equipment

6   caused another of the North Bay Fires, known as the Cascade Fire.  Later the same day, PG&E

7   issued a press release to respond to Cal Fire's report, falsely and misleadingly reassuring

8   investors that PG&E had met all state regulations concerning fire safety.  The press release, titled

9   "PG&E Responds to Cascade Wildfire Announcement" stated, in relevant part:

10                      [W]e are continuing to focus on ***implementing additional***
                        ***precautionary measures*** intended to further reduce wildfire
11                      threats, such as ***working to remove and reduce dangerous***
                        ***vegetation, improving weather forecasting, upgrading***
12                      ***emergency response warnings, [and] making lines and poles***
                        ***stronger in high fire threat areas***, and taking other actions to
13                      make our system, and our customers and communities, ***even***
                        ***safer*** in the face of a growing wildfire threat.
14
15          304.    It was false and misleading for PG&E to tout "implementing additional

16   precautionary measures . . . to remove and reduce dangerous vegetation" and "mak[e] lines and

17   poles stronger in high fire threat areas."  Indeed, just one month later, PG&E would cause the

18   Camp Fire through its failure to remove vegetation and maintain its poles, in violation of

19   California Public Resources Code Section 4293 and California Public Utilities Code Section 451,

20   among other safety regulations.

21          305.    As noted above, the Camp Fire was described in initial communications between

22   firefighters and dispatch as a vegetation fire "underneath the transmission lines," which

23   vegetation should have been cleared by PG&E under Section 4293.  Second, PG&E

24   acknowledged that an aerial patrol of the Camp Fire's origin later the same day showed "damage

25   to a transmission tower" or pole that PG&E failed to maintain, as well as a second ignition point

26   that exhibited damaged and downed poles, in violation of Section 451.  PG&E's representation

27   to the contrary was materially false and/or misleading.   Indeed, Cal Fire has found that PG&E

28

---

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                    90
CIVIL ACTION NO: 3:18-CV-03509-EJD

1   equipment was responsible for both ignition points of the Camp Fire and has since reported

2   PG&E to the Butte County District Attorney based on evidence of safety violations.

3        306.   Moreover, PG&E was **not** "making lines and poles stronger in high fire threat

4   areas."  For example, PG&E never performed planned safety work on, or otherwise updated, the

5   100 year-old Caribou-Palermo transmission line even though it knew that its lines and poles were

6   weak and that "**the likelihood of failed structures happening is high**" (¶136).  The same

7   transmission line would soon cause the Camp Fire's first ignition point, as found by Cal Fire and

8   accepted by PG&E (¶138).

9        307.   Further, this statement materially omitted the true risk that PG&E would cause

10   wildfires serious enough to imperil the Company's financial condition.

11        308.   This statement regarding compliance was reviewed and authorized by Defendant

12   Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer.  Kane was responsible

13   for both "overseeing . . . implementation" of PG&E's compliance and "overseeing . . .

14   compliance reporting," including this press release.  Because of her senior position within the

15   Company, Kane had ultimate authority to control the content of this statement.

16        **5.    October 9, 2018 – Misstatement No. 18**

17        309.   The same PG&E press release contained a further false and/or misleading

18   statement:

> To address the growing threats posed by wildfires and extreme
> weather, and in light of the wildfires throughout our state last
> year, ***PG&E has launched the Community Wildfire Safety
> Program*** to help keep our customers and communities safe ***by
> implementing additional precautionary measures*** intended to
> further reduce wildfire threats. Among the key components of
> the new program are. . .
>
> • Public Safety Power Shutoff: As a last resort, ***a program to
>   proactively turn off electric power for safety when
>   extreme fire danger conditions occur***, while helping
>   customers prepare and providing early warning
>   notification, when and where possible.

26        310.   PG&E's representation that it "has launched" and "implement[ed] . . . a program

27   to proactively turn off electric power for safety when extreme fire danger conditions occur" was

28

1  false and misleading.  It was false because the touted program, its ESRB-8 Shutoff Protocol, was

2  illusory from the beginning; hence, PG&E never "launched" or "implement[ed]" it.

3         311.  Further, it misleadingly omitted that any guidelines PG&E did develop were a

4  mere pretense of safety that the Company did not follow.  Even when all seven relevant "extreme

5  fire danger conditions" **did** "occur," weighing in favor of shutting off PG&E's transmission lines

6  near the Jarbo Gap on November 7 and 8, 2018, PG&E nevertheless flouted its supposed

7  program.

8         312.  PG&E's failure to shut off its transmission line caused the Camp Fire: the most

9  destructive and deadly wildfire in California history.  By touting a wildfire safety program

10  PG&E did not adhere to, where its nonadherence would risk devastating wildfires, PG&E

11  misrepresented existing and material facts to investors.

12         313.  This statement regarding compliance was reviewed and authorized by Defendant

13  Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer.  Kane was responsible

14  for both "overseeing . . . implementation" of PG&E's compliance and "overseeing . . .

15  compliance reporting," including this press release.  Because of her senior position within the

16  Company, Kane had ultimate authority to control the content of this statement.

17        **6.  November 8, 2018 – Misstatement No. 19**

18         314.  On November 8, 2018, the Camp Fire started after PG&E decided not to shut off

19  its power.  Before the public became aware of PG&E's true role in causing the Camp Fire, the

20  Company announced via its official Twitter.com account at 6:14 p.m. that day: "PG&E has

21  determined that it will not proceed with plans today for a Public Safety Power Shutoff in portions

22  of 8 Northern CA counties, as ***weather conditions did not warrant this safety measure***."[102]

23         315.  This statement was affirmatively false: weather conditions did, in fact, warrant a

24  shutoff.  As detailed above, all seven criteria that PG&E deemed relevant, including those related

25

26

27  _____

    [102] PG&E Twitter Account Post (Nov. 8, 2018 3:14PM),

28  https://twitter.com/PGE4Me/status/1060672000929267713.

1  to weather conditions, weighed in favor of a shutoff under PG&E's ESRB-8 Shutoff Protocol.

2  *See* Section IV.H., *supra*.

3     316.   This statement regarding compliance was reviewed and authorized by Defendant

4  Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer.  Kane was responsible

5  for both "overseeing . . . implementation" of PG&E's compliance and "overseeing . . .

6  compliance reporting," including this announcement.  Because of her senior position within the

7  Company, Kane had ultimate authority to control the content of this statement.

8  **VIII.   MATERIALITY UNDER THE EXCHANGE ACT**

9     317.   PG&E's reassurances to investors about its safety, prudence, and compliance with

10  the law were especially important to investors because of California's legal regime known as

11  inverse condemnation. As described in more detail above (*see* Section VI.A.5., *supra*), PG&E is

12  strictly liable for the property costs of wildfires it caused. However, during the Class Period, it

13  could be reimbursed for those costs by ratepayers by petitioning CPUC and showing that it had

14  acted as a prudent manager. On such a showing, CPUC could have rate payers reimburse PG&E

15  for some or all of its liability.

16     318.   PG&E's investors understood that PG&E would bear the costs of wildfires it

17  caused, and that PG&E's ability to pass some or all of those costs on to ratepayers was limited

18  by PG&E's prudence. For example, an analyst report issued by Evercore ISI on December 21,

19  2017 stated:

20         On the 3Q17 call PCG indicated company operations were
          conducted properly leading up to and after the fire, but they still
21         had little information regarding the cause of the fire or potential
          shareholder exposure.
22
                              * * *
23
          PCG reiterated the company routinely inspects, maintains, and
24         replaces poles, and tests and treats wood poles on a frequency that
          significantly exceeds CPUC requirements. The company claims to
25         have one of, if not the most comprehensive vegetation
          management programs in the country. Further, the company
26         doubled its vegetation management spending in 2016 due to the
          drought and tree mortality crisis in California. That being said, we
27         still do not know and likely will not know what caused the various
          fires for some time, **whether or not PCG's equipment was solely
28         or partly the cause**, and whether or not the facts will support a

ruling at CPUC that PCG **acted prudently** should they be successfully sued under inverse condemnation.

319. In light of these provisions of California law, PG&E's repeated reassurances to its investors – *e.g.*, that it complied with relevant safety regulations, doubled its vegetation management spending, inspected all of its powerlines every year, and would adhere to a formal ESRB-8 Shutoff Protocol – effectively communicated that the Company would be able to recover any property damage liabilities from wildfires caused by its systems, through the CPUC. Those reassurances, when revealed to have been false and misleading, impacted the Company's valuation by at least the amount of damage it caused by starting or exacerbating the North Bay and Camp Fires. The impact of these misstatements, and their importance to the Company's financial condition, is underscored by PG&E's decision to file for Chapter 11 bankruptcy based on its anticipated $30 billion in potential liabilities tied to the North Bay and Camp Fires, and related concern that as a result, neither PG&E Corporation nor the Utility would be able "to continue as going concerns."

320. In total, PG&E's share price declined $55.60 per share on the nine corrective disclosures and/or materializations of concealed risk herein alleged. Given that the Company had between approximately 514.4 and 518.6 million shares outstanding from October 24, 2017 to October 25, 2018, the losses caused by PG&E's fraud under the Exchange Act were in the billions of dollars.

## IX. LOSS CAUSATION UNDER THE EXCHANGE ACT

### A. Defendants' False and Misleading Statements Artificially Inflated the Price of PG&E's Securities

321. As a result of their purchases of PG&E's securities during the Class Period, Lead Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws. Defendants' false and misleading statements had the intended effect and caused PG&E securities to trade at artificially inflated levels throughout the Class Period, reaching as high as $71.56 per share on September 11, 2017 – a month before the truth started to emerge on October 12, 2017.

**B.      PG&E's Safety Violations Caused the Devastating North Bay Fires**

322.     PG&E caused the North Bay Fires.  Of the eighteen fires for which Cal Fire has determined the cause, it has determined that **seventeen were caused by PG&E equipment**.

323.     Of these seventeen fires, Cal Fire determined that **eleven were due to PG&E's violation of California safety regulations**. Under California law, PG&E bears the cost for the destruction caused by these fires unless it can show to CPUC that its violations were "reasonable." Together, these fires were responsible for **more than 100,000 acres of land devastated**, **more than 2,000 structures destroyed,** and **at least 9 of the 44 North Bay Fire fatalities.**

324.     Six more of the North Bay Fires were also deemed to have been caused by PG&E electrical lines; though Cal Fire found no specific evidence of safety violations for these six fires, PG&E may still be found liable under California's legal regime known as inverse condemnation, which provides strict liability for utilities when their power lines are involved in wildfires that lead to property damage. Together, these fires were responsible for an additional **more than 50,000 acres of land devastated**, **more than 800 structures destroyed**, and **at least 13 of 44 fatalities.** Necessarily, these six fires would have been more easily contained, and accordingly less destructive, if not for the fires caused by PG&E's violations and inadequate safety practices.[103]

**C.      PG&E's Safety Violations Caused the Devastating Camp Fire**

325.     At or about 6:29 a.m. on November 8, 2018, the Camp Fire was started in Pulga, California by faulty PG&E equipment on Pulga Road and Camp Creek Road, near the Jarbo Gap.[104]  A second ignition point, also caused by faulty PG&E equipment, began approximately 15 minutes later near the community of Concow.  The combined Camp Fire soon devastated

---

[103] Similarly, another of the North Bay Fires known as the Tubbs fire (which burned 36,807 acres, destroyed 5,636 structures, and resulted in 22 fatalities) would have been more easily contained, and accordingly less destructive, if not for the fires caused by PG&E's violations and inadequate safety practices at the same time.

[104] Camp Fire Incident Update (Nov. 25, 2018 7:00AM), http://cdfdata.fire.ca.gov/admin8327985/cdf/images/incidentfile2277_4326.pdf.

several surrounding communities, largely destroying Paradise, Concow, Magalia, and Parkhill. The Camp Fire incinerated 153,336 acres, destroyed 18,804 structures, and killed at least 85 people.

326.    As noted above, Cal Fire has concluded that PG&E caused both of the Camp Fire's two ignition points under circumstances evidencing violations of safety regulations and referred its investigation to the Butte County District Attorney.

**D.     As the Market Learned About the Effects and Extent of PG&E's Inadequate Safety Practices, the Price of PG&E's Securities Fell Dramatically**

327.    On or about October 8, 2017, eighteen major wildfires known as the North Bay Fires started in California, burning at least 249,000 acres and devastating properties across nine California counties.

**1.     October 12, 2017 – Corrective Disclosure and/or Materialization of Concealed Risk**

**(a)     The Market Began to Learn the Extent and Effects of PG&E's Responsibility for the North Bay Fires**

328.    It was not until Thursday, October 12, 2017 that the market began to understand that PG&E's safety regulation violations were likely a proximate cause of the North Bay Fires. On that date, CPUC sent PG&E a litigation hold letter informing the Company of its "obligation to preserve all evidence with respect to the Northern California wildfires in Napa, Sonoma, and Solano Counties." Although this letter was made public on October 12, 2017, it "affirm[ed] a verbal communication" of the same obligation by CPUC Safety Enforcement Division Program Manager Charlotte TerKeurst to PG&E "at approximately 6:00 p.m. on October 10, 2017." The public disclosure on October 12, 2017 also revealed that "Ms. TerKeurst reminded PG&E of the need to preserve all evidence, and PG&E acknowledged that it would do so."

329.    Further, the disclosure made clear that PG&E (a) "must preserve any factual or physical evidence … includ[ing] **all failed poles, conductors and associated equipment from each fire event**" and (b) "must inform all employees and contractors that they must preserve all electronic (including emails) and non-electronic documents related to **potential causes of the**

1  **fires, vegetation management, maintenance and/or tree-trimming**." This was the first

2  indication that PG&E failures caused any of the North Bay Fires.

3      330.    On this news that PG&E would likely bear at least some responsibility for the

4  fires, PG&E's stock dropped $4.65 per share, from a closing price of $69.15 on October 11 to a

5  closing price of $64.50 on October 12, or -6.7%, with unusually heavy trading volume of almost

6  13 million shares (compared to a Class Period daily average trading volume of 3.5 million[105]).

7  The price of PG&E securities, however, remained artificially inflated.

8          **(b)    Market Commentators Confirmed the Cause of PG&E's Share
               Price Decline on October 12, 2017**

9

10      331.    The following morning, news outlets began to report that PG&E was being

connected with the causes of some of the North Bay fires. For example, at 10:54 a.m. on October

11

13, 2017, CNBC published an article titled "PG&E shares plunge on concern its power lines may

12

have started California wildfires."[106] The article began by observing: "The California Public

13

Utilities Commission sent a letter on Thursday to PG&E reminding them to preserve 'all

14

evidence with respect to the Northern California wildfires in Napa, Sonoma and Solano

15

Counties,' according to multiple reports." It continued to note that PG&E's share price decline

16

occurred "on concerns its power lines may have started the massive wildfires that have ravaged

17

California recently." The article also repeated market commentary that the decline in PG&E's

18

share price reflected investors' understanding that PG&E was financially responsible for the

19

North Bay Fires:

20

21          The drop in the stock "reflects the following assumptions: 1) the
        fire was caused by PCG's negligence, 2) insurance coverage for

22          3rd party liabilities will be very limited, 3) damage costs per acre
        far larger than those for the 2015 Butte fire and 4) material fines
        and penalties will be assessed," Christopher Turnure, an analyst at

23          JPMorgan, said in a note Thursday. "We appreciate the severity of
        the fires and the legal challenges of operating in California, but

24          estimate this loss of value as approaching a worst-case scenario for
        PCG shares."

25

26

27      [105] This average excludes alleged corrective disclosure and/or materialization of risk dates.

    [106] This article was published prior to the Company's corrective disclosure later that day,

28  discussed *infra*.

332.     Similarly, on the same date, *SF Gate* published an article observing: "**[T]he state agency that regulates utilities has told PG&E to save every piece of damaged equipment from the area as evidence for the investigations to come**." The article concluded by stating that PG&E's vegetation management practices caused the North Bay Fires: "In all, **the company spent $198 million in 2016 on 'vegetation management**.' But those efforts and that money – all of it coming from PG&E's customers – **may not have been enough**."[107]

333.     Investors started to be concerned regarding whether PG&E violated any regulations (*e.g.*, failed to adequately trim trees) with respect to the North Bay Fires. For example, Wells Fargo stated in its analyst report the very next day:

> Yesterday (10/12), shares of PCG underperformed the S&P Utilities by roughly 720 bps. We attribute the material decline in price to the revelation that the company's power lines might have played a role in the Northern California fires. Over the weekend Northern California experienced winds in excess of 70 miles per hour, which could have caused trees to impact power lines that could have sparked fires particularly given the very dry vegetation. While there is still significant uncertainty in what caused the fires, apparently investigators are looking into the role of PCG's infrastructure. **The concern for investors is whether PCG did not adequately trim trees around their power lines it is our understanding that in California utilities are required to clear vegetation within 10 feet of power lines. In the absence of inadequate tree trimming, we think that property damage attributable to PCG's infrastructure should be largely covered by insurance.**

334.     Similarly, an October 13, 2017 report by a Guggenheim stock analyst stated that the decline was caused by "media reports linking the company to some of the most destructive wildfires experienced in CA, which continued to burn."

---

[107] David R. Baker, *PG&E Spent Millions on Fire Prevention; It May Not Have Been Enough*, San Francisco Gate (Oct. 13, 2017), https://www.sfgate.com/bayarea/article/PG-E-millions-fire-prevention-Santa-Rosa-wildfires-12277237.php.

1

**2.**      **October 13-16, 2017 – Corrective Disclosure and/or Materialization of Concealed Risk**

2

3

(a)      **The Market Continued to Learn the Extent and Effects of PG&E's Responsibility for the North Bay Fires**

4        335.    Late on October 13, 2017, PG&E filed a Form 8-K with the SEC shortly before

5   the close of trading.  Therein, the Company stated in relevant part:

6          **Investigation of Northern California Fires**

7          Since October 8, 2017, several catastrophic wildfires have started
           and remain active in Northern California. The causes of these fires

8          are being investigated by the California Department of Forestry
           and Fire Protection (Cal Fire), **including the possible role of**

9          **power lines and other facilities of Pacific Gas and Electric
           Company's (the "Utility"), a subsidiary of PG&E Corporation**.

10
           It currently is unknown whether the Utility would have any

11         liability associated with these fires. **The Utility has
           approximately $800 million in liability insurance for potential**

12         **losses that may result from these fires. If the amount of
           insurance is insufficient to cover the Utility's liability or if**

13         **insurance is otherwise unavailable, PG&E Corporation's and
           the Utility's financial condition or results of operations could**

14         **be materially affected**.

15       336.    On these disclosures, PG&E's share price continued to decline. From its opening

16   price of $63.95 per share that day to its closing price of $53.43 per share at the end of the next

17   trading day (Monday, October 16, 2017), PG&E's stock declined $10.52 per share, or

18   approximately 16.5%. Over the same period, it experienced unusually heavy trading volume of

19   over 68.5 million shares.  The price of PG&E securities, however, remained artificially inflated.

20              (b)      **Market Commentators Confirmed the Cause of PG&E's Share
                         Price Decline on October 13, 2017**

21

22       337.    Investors understood the Company's October 13, 2017 8-K filing as a disclosure

23   that PG&E's conduct with respect to causing the North Bay Fires was greater in severity than

24   previously disclosed and was a proximate cause of at least some of the North Bay Fires.  Because

25   the market understood that PG&E would be reimbursed for damages by fires it innocently

26   caused, the Company's discussion of liability signaled to the market that at least some of the

27   North Bay Fires were caused by PG&E's negligence or worse. For example, a Guggenheim

28   stock analyst published a report that day reacting to this news, noting that PG&E "had slid even

1    further in the early afternoon actually as well, following the company's 8-K disclosing the

2    utility's $800mm in liability insurance, which we noted had not been disclosed previously (since

3    it had been renewed following the Butte fire)."

4         338.    PG&E's announcement and resulting share price decline were proximately caused

5    by PG&E's inadequate safety practices and violations that resulted in the North Bay Fires.

6              **3.    December 20, 2017 – Corrective Disclosure and/or Materialization of
                       Concealed Risk**

7
                   **(a)    The Market Continued to Learn the Extent and Effects of
8                          PG&E's Responsibility for the North Bay Fires**

9         339.    On December 20, 2017, after the market closed, PG&E filed a press release on

10   Form 8-K with the SEC titled "PG&E Announces Suspension of Dividend, Citing Uncertainty

11   Related to Causes and Potential Liabilities Associated with Northern California Wildfires." The

12   filing also included, as exhibit 99.1, a press release in which the Company announced that it

13   would be suspending its quarterly cash dividend. In the press release, PG&E stated in pertinent

14   part:

15            **SAN FRANCISCO, Calif.**-PG&E Corporation (NYSE: PCG)
              today announced that its Board of Directors has determined to
16            **suspend the quarterly cash dividend on the Corporation's
              common stock**, beginning with the fourth quarter of 2017, **citing
17            uncertainty related to causes and potential liabilities associated
              with the extraordinary October 2017 Northern California
18            wildfires**.

19            In addition, the Board of Directors of the Corporation's utility
              subsidiary, Pacific Gas and Electric Company, **determined to
20            suspend the dividend on the utility's preferred stock, beginning
              with the three-month period ending Jan. 31, 2018**, citing the
21            same uncertainty.

22            No causes have yet been identified for any of the unprecedented
              wildfires, which continue to be the subject of ongoing
23            investigations.

24            However, California is one of the only states in the country in
              which courts have applied inverse condemnation **to events caused
25            by utility equipment**. This means that if a utility's equipment is
              found to have been a substantial cause of the damage in an event
26            such as a wildfire - even if the utility has followed established
              inspection and safety rules - **the utility may still be liable for
27            property damages and attorneys' fees associated with that
              event**.

28

---

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                              100
CIVIL ACTION NO. 3:18-CV-03509-EJD

"After extensive consideration and in light of the uncertainty associated with the causes and potential liabilities associated with these wildfires as well as state policy uncertainties, the PG&E boards determined that suspending the common and preferred stock dividends is prudent with respect to cash conservation and is in the best long-term interests of the companies, our customers and our shareholders," said PG&E Corporation Chair of the Board Richard C. Kelly.

340.    On this news, PG&E's share price fell $6.62, or 12.95%, to close at $44.50 on December 21, 2017, the following trading day. The stock experienced heavy trading volume, with over 52 million shares trading hands.

341.    Though PG&E had previously intertwined safety, fires, and its dividend (*see* ¶232), investors were shocked by this unexpected suspension of the dividends due to Defendants' intervening false reassurances of progress on safety and compliance with safety regulations. Only six months prior, on May 31, 2017, PG&E had announced that it was **increasing** its dividend due to the Company's "***progress on safety***." Even more recently, for example on October 31, 2017, PG&E had reassured investors that it "***follows all applicable federal and state vegetation clearance requirements and performs regular power line tree safety activities in accordance with industry standards, guidelines, and acceptable procedures that help to reduce outages or fires caused by trees or other vegetation***." And on November 2, 2017, PG&E had repeatedly reassured investors that it had "***doubl[ed]***" its vegetation management expenditures. Accordingly, the true likelihood of PG&E's responsibility for the North Bay Fires remained concealed from the market, and the price of PG&E securities remained artificially inflated.

### (b)    Market Commentators Confirmed the Proximate Cause of PG&E's Share Price Decline on December 20, 2017

342.    When PG&E announced it would suspend its dividend entirely, investors understood that as a revelation that Defendants' prior representations regarding its safety operations may have been misleading and PG&E would bear a higher than expected level of responsibility, and thus liability, for the North Bay Fires.

343.    For example, a RBC Capital Markets analysts report issued on December 21, 2017, stated: "We downgrade PCG to Sector Perform following the Board's decision to suspend

Case: 19-30088   Doc# 11168-10   Filed: 08/31/21   Entered: 08/31/21 14:49:59   Page 111 of 229

1   the dividend. **This unexpected decision suggests greater risk than we had assumed**

2   **surrounding regulatory treatment of the October 2017 Northern California wildfires.**"

3        344.    Similarly, an analyst report issued by Evercore ISI the same day stated:

> **On the 3Q17 call PCG indicated company operations were conducted properly leading up to and after the fire**. . . . PCG also indicated they found instances of wires down, vegetation near PCG facilities and some broke poles. PCG reiterated the company routinely inspects, maintains, and replaces poles, and tests and treats wood poles on a frequency that significantly exceeds CPUC requirements. The company claims to have one of, if not the most comprehensive vegetation management programs in the country.

345.    PG&E's suspension of its dividend and resulting share price decline were proximately caused by PG&E's inadequate safety practices and violations that resulted in the North Bay Fires.

**4.    May 25, 2018 – Corrective Disclosure and/or Materialization of Concealed Risk**

**(a)    The Market Continued to Learn the Extent and Effects of PG&E's Responsibility for the North Bay Fires**

346.    On May 25, 2018, Cal Fire issued a press release announcing the cause of four wildfires in Butte and Nevada counties ("May 2018 Press Release"), stating in relevant part:

> **CAL FIRE Investigators Determine Cause of Four Wildfires in Butte and Nevada Counties**
>
> Sacramento - After extensive and thorough investigations, CAL FIRE investigators have determined that four Northern California wildfires in last year's October Fire Siege were caused by trees coming into contact with power lines. The four fires, located in Butte and Nevada counties, are the first fire investigations from last October to be completed.
>
> CAL FIRE investigators were dispatched to the fires last year and immediately began working to determine their origin and cause. The Department continues to investigate the remaining 2017 fires, both in October and December, and will release additional reports as they are completed.
>
> The October 2017 Fire Siege involved more than 170 fires and charred more than 245,000 acres in Northern California. More than 11,000 firefighters from 17 states helped battle the blazes.
>
> Below is a summary of the four completed investigations:

- The La Porte Fire, in Butte County, started in the early morning hours of Oct. 9 and burned a total of 8,417 acres, destroying 74 structures. There were no injuries to civilians or firefighters. CAL FIRE has determined the fire was caused by tree branches falling onto PG&E power lines. CAL FIRE investigators determined there were no violations of state law related to the cause of this fire.

- The McCourtney Fire, in Nevada County, started the evening of Oct. 8 and burned a total of 76 acres, destroying 13 structures. There were no injuries to civilians or firefighters. CAL FIRE has determined the fire was caused by a tree falling onto PG&E power lines. **The investigation found evidence that PG&E allegedly failed to remove a tree from the proximity of a power line, in violation of the state Public Resources Code section 4293.**

- The Lobo Fire, in Nevada County, started the evening of Oct. 8 and burned a total of 821 acres, destroying 47 structures. There were no injuries to civilians or firefighters. **CAL FIRE has determined the fire was caused by a tree contacting PG&E power lines. The investigation found evidence that Public Resources Code section 4293, which requires adequate clearance between trees and power lines, was allegedly violated.**

- The Honey Fire, in Butte County, started in the early morning hours of Oct. 9 and burned a total of 76 acres. There were no injuries to civilians or firefighters and no structures were destroyed. **CAL FIRE has determined the fire was caused by an Oak branch contacting PG&E power lines. The investigation found evidence that Public Resources Code 4293, which requires adequate clearance between trees and power lines, was allegedly violated.**

The McCourtney, Lobo, Honey investigations have been referred to the appropriate county District Attorney's offices for review.

347.   Then, early on May 29, 2018, prior to the start of trading, PG&E filed a Current Report on Form 8-K with the SEC.  Rather than contradicting any of Cal Fire's findings, the filing quoted extensively from the May 25, 2018 Cal Fire release described above, including the role of PG&E equipment in starting all four of the relevant North Bay Fires, Cal Fire's findings that three of the fires were caused by violations of California safety laws, and Cal Fire's decision to refer criminal investigations regarding these three fires to the relevant district attorneys' offices. The filing also stated: "It is reasonably possible that facts could emerge that lead PG&E

1    Corporation and the Utility to believe that a loss is probable, resulting in an accrued liability in

2    the future, the amount of which could be substantial."

3         348.    On this news, PG&E's share price fell $2.32, or 5.19%, to close at $42.34 on May

4    29, 2018, the following trading day. The stock experienced unusually high trading volume that

5    day, with over 5.7 million shares changing hands on May 29, 2018.  The price of PG&E

6    securities, however, remained artificially inflated.

7             **(b)**      **Market Commentators Confirmed that the News Regarding**

8                          **Safety Violations Proximately Caused PG&E's Share Price Decline on May 25-29, 2018**

9         349.    Analysts were surprised by the results of the Cal Fire reports. For example,

10   Deutsche Bank stated in its May 28, 2018 report:

11               From the investor perspective the market should not be particularly

12               surprised that PG&E's lines have been found to be involved in
            starting the fires. **That said, the fact that this was the case in all**

13               **four of the fires – and that violations were found in three of the**
            **four instances – will likely be seen as a negative data point.**

14               Reading through the LaPorte fire investigation for other data

15               points, investors may be concerned to note that the wind speeds
            around the time of the ignition do not seem to have been

16               particularly high – with a maximum gust of 29 mph.

17        350.    One Citigroup analyst wrote on May 29, 2018 that the new Cal Fire reports

18   specifically "link the fires to [PG&E's] equipment," "claim improper vegetation management for

19   three of the fires," and were "suggesting negligence" on PG&E's part. Based on this, the Cal Fire

20   reports "will support 'causation' and likely lead to [PG&E] bearing the liability for damages

21   under Inverse Condemnation." Moreover, the analyst noted that PG&E might even be liable for

22   "Gross Negligence," and could be barred from recovering costs from ratepayers insofar as it

23   would be "tough to meet" the "prudent manager" standard that is necessary for such a recovery.

24        351.    Accordingly, the new information contained in these disclosures, including the

25   severity of PG&E's conduct and the role of its violations of California safety laws in causing the

26   North Bay Fires, proximately caused PG&E's share price decline.

27        352.    Defendants, however, continued to mislead investors regarding the extent of

28   PG&E's safety deficiencies and the impact thereof.

5. **June 8, 2018 – Corrective Disclosure and/or Materialization of Concealed Risk**

353. On Friday, June 8, 2018, after the market closed, Cal Fire issued another press release announcing the causes of twelve wildfires in Mendocino, Humboldt, Butte, Sonoma, Lake, and Napa Counties, stating in relevant part:

> **CAL FIRE Investigators Determine Causes of 12 Wildfires in Mendocino, Humboldt, Butte, Sonoma, Lake, and Napa Counties**
>
> **Sacramento** – After extensive and thorough investigations, CAL FIRE investigators have determined that 12 Northern California wildfires in the October 2017 Fire Siege were caused by electric power and distribution lines, conductors and the failure of power poles.
>
> The October 2017 Fire Siege involved more than 170 fires and burned at least 245,000 acres in Northern California. About 11,000 firefighters from 17 states and Australia helped battle the blazes.
>
> CAL FIRE investigators were dispatched to the fires last year and immediately began working to determine their origin and cause. CAL FIRE investigators continue to investigate the remaining 2017 fires, both in October and December, and will release additional reports as they are completed. The cause of four Northern California fires were released on May 25.
>
> Below is a summary of the findings from the 12 completed investigations:
>
> The **Redwood Fire**, in Mendocino County, started the evening of Oct. 8 and burned a total of 36,523 acres, destroying 543 structures. There were nine civilian fatalities and no injuries to firefighters. CAL FIRE has determined the fire started in two locations and was caused by tree or parts of trees falling onto PG&E power lines.
>
> The **Sulphur Fire**, in Lake County, started the evening of Oct. 8 and burned a total of 2,207 acres, destroying 162 structures. There were no injuries. **CAL FIRE investigators determined the fire was caused by the failure of a PG&E owned power pole**, resulting in the power lines and equipment coming in contact with the ground.
>
> The **Cherokee Fire**, in Butte County, started the evening of Oct. 8 and burned a total of 8,417 acres, destroying 6 structures. There were no injuries. CAL FIRE investigators have determined the cause of the fire was a result of tree limbs coming into contact with PG&E power lines.

The **37 Fire**, in Sonoma County, started the evening of Oct. 9 and burned a total of 1,660 acres, destroying 3 structures. There were no injuries. CAL FIRE investigators have determined the cause of the fire was electrical and was associated with the PG&E distribution lines in the area.

The **Blue Fire**, in Humboldt County, started the afternoon of Oct. 8 and burned a total of 20 acres. There were no injuries. CAL FIRE investigators have determined a PG&E power line conductor separated from a connector, causing the conductor to fall to the ground, starting the fire.

The Norrbom, Adobe, Partrick, Pythian and Nuns fires were part of a series of fires that merged in Sonoma and Napa counties. These fires started in the late-night hours of Oct. 8 and burned a combined total of 56,556 acres, destroying 1355 structures. There were three civilian fatalities.

CAL FIRE investigators determined the Norrbom Fire was caused by a tree falling and coming in contact with PG&E power lines.

CAL FIRE investigators determined the Adobe Fire was caused by a eucalyptus tree falling into a PG&E powerline.

CAL FIRE investigators determined the Partrick Fire was caused by an oak tree falling into PG&E powerlines.

CAL FIRE investigators determined **the Pythian Fire was caused by a downed powerline after PG&E attempted to reenergize the line**

CAL FIRE investigators determined the Nuns Fire was caused by a broken top of a tree coming in contact with a power line.

The **Pocket Fire**, in Sonoma County, started the early morning hours of Oct. 9 and burned a total of 17,357 acres, destroying 6 structures. There were no injuries. CAL FIRE has determined the fire was caused by the top of an oak tree breaking and coming into contact with PG&E power lines.

The **Atlas Fire**, in Napa County, started the evening of Oct. 8 and burned a total of 51,624 acres, destroying 783 structures. There were six civilian fatalities. CAL FIRE investigators determined the fire started in two locations. At one location, it was determined a large limb broke from a tree and came into contact with a PG&E power line. At the second location, investigators determined a tree fell into the same line.

**CAL FIRE's investigations have been referred to the appropriate county District Attorney's offices for review in eight of the 12 fires - Sulphur, Blue, Norrbom, Partrick, Pythian, Adobe, Pocket and Atlas - due to evidence of alleged violations of state law.**

354.    While this news release did not discuss specific violations found, it disclosed that the causes of the fires involved PG&E equipment and vegetation, as well as the facts that Cal Fire referred its investigations to the relevant district attorneys of five counties due to evidence Cal Fire discovered of state law violations.

                **(a)    The Market Learned the Truth of PG&E's Continued, Unsafe Use of Reclosers**

355.    By stating that "CAL FIRE investigators determined the Pythian Fire was caused by a downed powerline after PG&E attempted to reenergize the line," this press release revealed that the Pythian Fire had been proximately caused by PG&E's use of reclosers.

                **(b)    The Market Continued to Learn the Extent and Effects of PG&E's Safety Violations and Responsibility for the North Bay Fires**

356.    On Saturday, June 9, 2018, *Bloomberg* published an article entitled "PG&E May Face Criminal Charges After Probe of Deadly Wildfires." The article reported, in part, that following an investigation into the causes of wildfires "that altogether killed 44 people, consumed thousands of homes and racked up an estimated $10 billion in damages" in October 2017, California's fire agency "found evidence of alleged violations of law by PG&E in connection with" the fires. Specifically, the state's investigation found "that PG&E equipment caused at least 12 of the wine country blazes."

357.    Early on Monday, June 11, 2018, prior to the start of trading, PG&E filed a Current Report on Form 8-K with the SEC. Rather than contradicting any of Cal Fire's findings, the filing quoted extensively from the June 8, 2018 Cal Fire release described above, including the role of PG&E equipment in starting all 12 of the relevant North Bay Fires and Cal Fire's decision to refer criminal investigations regarding eight of the fires to the relevant district attorneys' offices "due to evidence of alleged violations of state law." The filing also admitted that Defendants expected to "record a **significant liability** for losses associated with" at least 14 of the North Bay Fires, as follows:

> Although the Utility's analysis is ongoing regarding the fires that were the subject of the June 8, 2018 and May 25, 2018 CAL FIRE news releases:

- for the La Porte, McCourtney, Lobo, Honey, Redwood, Sulphur, Cherokee, Blue, Pocket and Sonoma/Napa merged fires (which include Nuns, Norrbom, Adobe, Partrick and Pythian), based on the current state of the law on inverse condemnation, the information currently available to the Utility, and the CAL FIRE determinations of cause, **PG&E Corporation and the Utility currently expect that they will record a significant liability for losses associated with such fires** in PG&E Corporation and the Utility's condensed consolidated financial statements to be included in their Form 10-Q for the quarterly period ending June 30, 2018 (the "Q2 financial statements"); and

- for the Atlas and Highway 37 fires, PG&E Corporation and the Utility do not believe a loss is probable at this time, given the information currently available. However, **it is reasonably possible that facts could emerge that lead PG&E Corporation and the Utility to believe that a loss is probable**, resulting in the accrual of a liability in the future, the amount of which could be significant.

358.     Following these disclosures, PG&E's share price fell $1.69, or 4.08%, to close at $39.76 on June 11, 2018, the following trading day. The stock experienced unusually high trading volume that day, with over 12.6 million shares trading hands on June 11, 2018.  The price of PG&E securities, however, remained artificially inflated.

> **(c)     Market Commentators Confirmed that the Number and Range of Safety Violations Proximately Caused PG&E's Share Price Decline on June 8-11, 2018**

359.     The market was surprised by the number and range of alleged violations of safety laws in the Cal Fire report. For example, in J.P. Morgan's analyst report on June 10, 2018, it stated that "**[w]ith this batch of reports, we find the range of 'alleged' law violations noteworthy. CAL FIRE opined on law regarding not just vegetation management but also pole and conductor failure and the re-energizing of equipment by the company.**" Deutsche Bank also stated in its June 10, 2018 analyst report that "**[o]verall, Friday's data points are likely to be read as another negative for PCG, given the high percentages of incidents blamed on the company's lines and referred to DAs.**" Guggenheim further reiterated its "Sell" recommendation on June 10, 2018 because "[o]ut of the 16 fires now investigated thus far, **PCG was found to have allegedly violated state law in 11 of those instances with Cal Fire referring its evidence to the District Attorney – likely a strong indictment to potential**

**criminal and civil cases/lawsuits against the company**." The analyst from Guggenheim noted that "all signs seem to point to PCG being imprudent operators in the majority of instances, which would therefore mean it should assume liability." Accordingly, the number and range of safety violations proximately caused PG&E's Share Price Decline on June 8-11, 2017.

360.    On June 11, 2018, *Bloomberg* published an article reporting: "The company said Monday it expects to record a 'significant liability' for fires, and the shares plunged the most in five months at the open" of trading. The article also noted that "[t]he alleged violations could also expose PG&E to criminal charges only two years after the San Francisco company was convicted of breaking safety rules that led to a deadly gas pipeline explosion in San Bruno, California."

361.    Accordingly, the new information contained in these June 8 and 11 disclosures, including the severity of PG&E's conduct, the role of its violations of California safety laws in causing the North Bay Fires, and the "significant liability" it would incur as a result, proximately caused PG&E's share price decline.

362.    Defendants, however, continued to mislead investors regarding the extent of PG&E's safety deficiencies and the impact thereof.

> **6.    November 8-9, 2018 – Corrective Disclosure and/or Materialization of Concealed Risk**

363.    The Camp Fire began in the early morning of November 8, 2018 and grew steadily throughout the day.  However, as of the close of trading that day, no prominent news sources had reported that PG&E may have caused it.

> **(a)    The Market Began to Learn the Extent and Effects of PG&E's Responsibility for the Camp Fire**

364.    After the close of trading on November 8, 2018, PG&E announced via its official Twitter.com account that it had decided not to implement its procedure for shutting power lines during dangerous weather conditions.  This communication was the first indication that PG&E's equipment and decisions may have contributed to the Camp Fire, undermining the Company's assurances to investors that it would comply with safety regulations and prioritize safety, detailed above.  While the announcement began to disclose the truth regarding PG&E's responsibility for

1    the Camp Fire, it also contained a further false reassurance that PG&E's decision was because

2    "***weather conditions did not warrant this safety measure***," as detailed above.

3    365.    Also after the close of trading on November 8, 2018, PG&E filed an Electric

4    Incident Report with the CPUC stating that PG&E had experienced a problem with its Caribou-

5    Palermo high-voltage transmission line on "Pulga Rd. Pulga, Butte County" only fourteen

6    minutes before the Camp Fire began, "in the area of the Camp Fire."  The same report

7    acknowledged that an aerial patrol later in the day showed "damage" to the same transmission

8    tower.  However,  this information undermining PG&E's statements about compliance and

9    prioritizing safety during the Class Period would not be reported by major news outlets until the

10   next day, November 9, 2018.

11   366.    On this news, PG&E's share price fell $7.88, or approximately 19.7% to close at

12   $39.92 on November 9, 2018, the following trading day.  The stock experienced unusually high

13   trading volume of 23,627,100 shares.  The price of PG&E securities, however, remained

14   artificially inflated.

15   **(b)    Market Commentators Confirmed the Cause of PG&E's**
     **November 9, 2018 Share Price Decline**

16

17   367.    Market commentators confirmed that PG&E's share price declined due to news

18   connecting PG&E to the Camp Fire, the true risk of which was concealed by PG&E's false and

     misleading statements and omissions.

19

20   368.    On November 9, 2018, CNBC published an article entitled "Shares of electricity

21   provider PG&E have worst day since 2002 as wildfires ravage California."[108]  The article noted

22   that "Shares of PG&E plunged more than 16 percent on Friday as wildfires continued to rage

23   through California. This was the biggest one-day decline for the stock since Aug. 8, 2002. . . ."

24   It further observed: "PG&E also traded 23.6 million shares, about five time [sic] its average 30-

     day volume."  The article was initially published at 1:03 p.m. Eastern Time (*i.e.,* prior to the

25

26

27   [108] Fred Imbert, *Shares of Electricity Provider PG&E Have Worst Day Since 2002 as*
     *Wildfires Ravage California*, CNBC (Nov. 9, 2018), https://www.cnbc.com/2018/11/09/shares-
28   of-electricity-provider-pge-plunge-as-wildfires-ravage-california.html.

1   close of trading) and updated at 4:19 p.m. the same day (after the close of trading), yet made no

2   mention of PG&E's Electric Incident Report tying the Company's equipment to the origin of the

3   Camp Fire.

4          369.   On November 9, 2018, Deutsche Bank described how investors were

5   "understandably concerned" given the emerging news of the Camp Fire and S.B. 901's lack of

6   provisions regarding 2018 wildfires:

7              While there has been no specific indication of utility lines being
               involved in these ignitions, investors are understandably concerned
8              considering that the recently passed wildfire bill (SB901) left
               utilities particularly exposed to 2018 fires if their infrastructure
9              ends up being implicated. This is due to the fact that the so-called
               stress test or customer harm threshold is only applicable to 2017
10             fire losses. Meanwhile, the new reasonableness standard which the
               CPUC will use to determine eligibility for recovery of liability
11             costs from customers only kicks in from 2019.

12         370.   A Barclays report from the same day supported the conclusion that investor

13  concern regarding the Camp Fire and its lack of coverage by S.B. 901 were contributing to the

14  stock price drop:

15             **We believe the lack of explicit language for 2018 wildfires in
               SB 901 may be increasing market pressure**. SB 901 specifically
16             addresses 2017 wildfire liability by tasking the CPUC with
               creating a cap on IOU [Investor-Owned Utility] liability to ensure
17             safe and affordable service. The bill addresses wildfire liability in
               2019 and beyond by creating a securitization mechanism.
18             However, specific language addressing 2018 liability coverage is
               noticeably absent. The general consensus among CA stakeholders
19             is that 2018 will be treated in a similar fashion to 2017, however
               the lack of a specific prescription may be heightening investor
20             concern if the Camp Fire is found to be started by PCG.

21         371.   While this report stated that there was no indication yet that electrical equipment

22  had caused the Camp Fire, it emphasized that PG&E's decision not to de-energize its lines could

23  become a source of liability if PG&E equipment was found to be involved: "we expect PCG's

24  decision not to de-energize lines after warning of high fire risk will be investigated if the fire is

25  found to have been sparked by PCG equipment."

26

27

28

7.       **November 9-12, 2018 – Corrective Disclosure and/or Materialization of Concealed Risk**

(a)      **The Market Continued to Learn the Extent and Effects of PG&E's Responsibility for the Camp Fire**

372.     Because PG&E had concealed the extent of its safety violations and failures to prioritize safety, the market was shocked to learn how much evidence supported the conclusion that PG&E had not only caused the Camp Fire, but did so in a manner that violated state safety regulations.  Thus, investors began to learn the true likelihood and extent to which PG&E would bear financial responsibility for the Camp Fire's destruction, *i.e.*, without eligibility for reimbursement by ratepayers.  *See* Section VIII, *supra*.

373.     After the close of trading on Friday, November 9, 2018, news outlets began to report that there was evidence PG&E caused the Camp Fire based on PG&E's incident report the previous evening.  The first such report, written by Pulitzer Prize-winning journalist Matthias Gafni and published in *Mercury News*, occurred at 5:49 p.m. EST on November 9, 2018.[109]

374.     On Saturday, November 10, 2018, it was reported that the town of Paradise was destroyed as the Camp Fire continued to spread.[110]  It was further reported that the fire had raced through the communities of Concow and Magalia, causing at least nine fatalities and the loss of at least 6,453 homes and 260 commercial buildings.[111]  The Camp Fire grew in size and severity over the weekend, with reports on Saturday that it had already consumed 70,000 acres and was only 5 percent contained—with winds pushing it toward Chico and Yankee Hill.  By Sunday November 11, 2018, it was reported that more than 200 people were missing, the death toll had

---

[109] Matthias Gafni, *PG&E Power Lines May Have Sparked Deadly Camp Fire, According To Radio Transmissions,* Mercury News (updated Nov. 12, 2018 12:03 PM), https://www.mercurynews.com/2018/11/09/pge-power-lines-may-have-sparked-deadly-butte-county-according-to-radio-transmissions/.

[110] Anna Sciacca and Lisa Krieger, *'Our Town Has Burned': Most of Paradise is Lost After Camp Fire Ravages the Area*, Enterprise Record (Nov. 10, 2018), https://www.chicoer.com/2018/11/10/our-town-has-burned-most-of-paradise-is-lost-after-camp-fire-ravages-the-area/.

[111] *Id.*

---

1   risen to 29, and the fire—which had by then consumed 111,000 acres—was only 25 percent

2   contained.[112]

3       375.    Then on Monday, November 12, 2018, the next trading day, it was reported that

4   BetsyAnn Cowley, a property owner in Pulga, received an email from PG&E the **day before** the

5   Camp Fire ignited; the email communicated that the Utility needed access to her property to

6   repair a transmission line that was "sparking."  It was further reported that the incident occurred

7   near the origin point of the Camp Fire, with Cowley's property next to the junction of Pulga and

8   Camp Creek Road.

9       376.    On this news, PG&E's share price fell $6.94, or 17.385%. to close at $32.98 on

10  November 12, 2018.  The stock experienced a trading volume of 44,033,200 on November 12,

11  2018.  The price of PG&E securities, however, remained artificially inflated.

12          **(b)    Market Commentators Confirmed the Cause of PG&E's
                November 9-12, 2018 Share Price Decline.**

13

14      377.    Investors were concerned over this evidence that PG&E's safety violations likely

15  caused the Camp Fire, including the impact on PG&E's likely liability of Cowley's comments to

16  the press regarding PG&E's knowledge of transmission line problems in the area.  As a result,

17  PG&E's stock price continued to drop.  As the *San Francisco Chronicle* reported on November

18  12, 2018, "Cowley's revelation came as shares of Pacific Gas and Electric Co.'s parent company

19  plummeted Monday amid concerns from investors about the utility's liability connected to the

20  Camp Fire."[113]

21      378.    Similarly, a Wells Fargo analyst report observed the same day that "[t]he Camp

22  Fire is in PCG's service territory and there are initial indications that the company's transmission

23  infrastructure may have been a root cause of the fire pending an investigation by Cal Fire."

24

25  [112] Melody Gutierrez, *More than 200 Remain Missing in Camp Fire*, San Francisco Chronicle (Nov. 8, 2018), https://www.sfchronicle.com/california-wildfires/article/100-missing-in-Camp-Fire-butte-county-death-toll-13382433.php.

26  [113] J.D. Morris and Kurtis Alexander, *Homeowner's Claim on PG&E Work Raises Questions on Camp Fire's Origin*, San Francisco Chronicle (Nov. 12, 2018), https://www.sfchronicle.com/california-wildfires/article/PG-E-stock-hammered-on-wildfire-fallout-13384830.php.

27

28

379.   A Macquarie Research analyst report on November 13, 2018 estimated PG&E's fire-related liabilities at $8 billion, while noting that the real measure of PG&E's liability could be higher given that the Camp Fire was not yet contained:

> We've reduced our [target price] to US$45 from US$57, is based on 10.4x our '20E EPS vs 13.6x previously. Our new [target price] reflects incremental ~US$8bn in fire-related liabilities, which we hope proves excessive given the stress test included in the SB901, but we have no way to assess the potential liabilities as the fire is only 30% contained.

380.   A November 13, 2018 Bloomberg Intelligence report remarked that the analyst **expected** PG&E's liability to **exceed its total equity valued** absent additional assistance from the California government, and that such a bailout was not certain: "Unless mitigated by regulators, we expect PG&E's write-offs could exceed the company's total equity.  California's utility owners are dangerously squeezed between two forces: Onerous inverse-condemnation rule makes utilities liable for most of the billions in fire damage, but powerful political resistance prevents customer bills from rising much above inflation."

**8.   November 13-14, 2018 – Corrective Disclosure and/or Materialization of Concealed Risk**

**(a)   The Market Continued to Learn the Extent and Effects of PG&E's Responsibility for the Camp Fire**

381.   After the close of trading on November 13, 2018, PG&E released a Form 8-K that showed a much bleaker picture of PG&E's deteriorating financial situation than investors had reason to expect, even calling into question its ability to remain solvent in the face of mounting evidence of its liability for the Camp Fire.  The SEC filing admitted, among other things, that PG&E's and the Utility's revolving credit facilities were fully drawn and that its liability for the Camp Fire could exceed its insurance:

> **Item 2.03. Creation of a Direct Financial Obligation or an Obligation Under an Off-Balance Sheet Arrangement of a Registrant**
>
> As of November 13, 2018, Pacific Gas and Electric Company ("Utility"), a subsidiary of PG&E Corporation, and PG&E Corporation have aggregate borrowings outstanding under their respective revolving credit facilities of $3.0 billion and $300 million, respectively. . . .  **No additional amounts are available under the Utility's and PG&E Corporation's respective**

1       **revolving credit facilities**.

2                     *       *       *

3       **Item 8.01 Other Events.**

4          ***Camp Fire***

5              On November 8, 2018, a wildfire began near the city of Paradise, Butte County, California (the "Camp Fire"), located in the service territory of the Utility. . . .

7              As previously reported, during the third quarter of 2018, PG&E Corporation and the Utility renewed their liability insurance coverage for wildfire events in an aggregate amount of approximately $1.4 billion for the period from August 1, 2018 through July 31, 2019. . . .

10              While the cause of the Camp Fire is still under investigation, if the Utility's equipment is determined to be the cause, the Utility could be subject to significant liability in excess of insurance coverage that would be expected to have a material impact on PG&E Corporation's and the Utility's financial condition, results of operations, liquidity, and cash flows.

382.    On this news, PG&E's share price fell $7.13, or 21.791%. to close at $25.59 on November 14, 2018.  The stock experienced high trading volume of 53,543,100.  The price of PG&E securities, however, remained artificially inflated.

               **(b)**     **Market Commentators Confirmed the Cause of PG&E's Share Price Decline on November 14, 2018**

383.    Analyst commentary attributed the drop in PG&E's stock price to news about PG&E's insufficient insurance coverage and deteriorating financial situation, including the chance of bankruptcy, revealed in PG&E's Form 8-K disclosures published after the market closed the previous day.

384.    CNBC reported that PG&E's Form 8-K disclosures were responsible for the drop in stock price on November 14, 2018:

> Shares of utility PG&E fell 21 percent on Wednesday after the company said that if its equipment is responsible for the "Camp Fire" burning in Northern California, the cost of the damage would exceed its insurance coverage and **harm its financial health**. . . .
> "With these borrowings, the entire credit facility has been drawn and PG&E now has $3.5 billion of cash on its balance sheet," Citi

1           analyst Praful Mehta wrote in a note Wednesday. "We think the
2   primary driver could be a concern around a downgrade to a non-
    investment grade credit rating and the liquidity requirements as a
3   result of the downgrade."[114]

4        385.    Similarly, a November 14, 2018 Bloomberg Intelligence report also connected

5   PG&E's Form 8-K disclosures to its share price decline afterward, stating that the filing

6   indicated the Company's own concern about bankruptcy:

7           **The abrupt drawdown of its entire \$3.3 billion in revolving
    credit suggests to us that PG&E (PCG -22%) is concerned
8   about a near-term cash and credit crunch**. The company warned
    of bankruptcy earlier this year, and **the situation is more
9   desperate now**. If found liable for California's Camp Fire, which
    may match or surpass 2017's \$15 billion in damages, the total
10  exceeds PG&E's book equity and annual revenue.

11       **9.**     **November 15, 2018 – Corrective Disclosure and/or Materialization of
    Concealed Risk**

12            **(a)**     **The Market Continued to Learn the Extent and Effects of
    PG&E's Responsibility for the Camp Fire**

13       386.    On November 15, 2018, Cal Fire announced that it had identified a second

14  ignition point for the Camp Fire.[115]  This news further evidenced the extent of PG&E's

15  responsibility for the Camp Fire, undermining the Company's assurances to investors that it

16  would comply with safety regulations and prioritize safety, detailed above.

17       387.    On this news, PG&E's share price fell \$7.85, or 30.676%. to close at \$17.74 on

18  November 15, 2018.  The stock experienced its highest trading volume during the Class Period

19  of 107,155,700 on November 15, 2018.

20

21

22

23

24  _____
    [114] Thomas Franck, *PG&E Plunges 21% Amid Disclosure of an 'Electric Incident' Just
25  Before Wildfire*, CNBC (Nov. 14, 2018), https://www.cnbc.com/2018/11/14/pge-plunges-
    20percent-after-disclosing-an-electric-incident-just-before-fire.html.
26  [115] Andre Byik, *Camp Fire Investigation Leads To Possible Second Origin Away From Pulga*,
    Enterprise-Record (updated Nov. 15, 2018 10:06 PM),
27  https://www.chicoer.com/2018/11/15/camp-fire-investigation-leads-to-another-area-away-from-
    pulga/.
28

1

         **(b)**      **Market Commentators Confirmed the Cause of PG&E's Share Price Decline on November 15, 2018**

2

3           388.    Market commentary confirmed that the November 15, 2018 decline in PG&E's

share price was due to mounting evidence of PG&E's liability for the Camp Fire and chance of

4

bankruptcy, the true risk of which was concealed by PG&E's false and misleading statements

5

and omissions.  Indeed, PG&E's share price declined until CPUC President Michael Picker

6

commented after the close of trading that day that he did not want the Company to become

7

bankrupt.  A *Bloomberg* article reported: "His comments capped a roller-coaster week for PG&E

8

shares. They lost about two-thirds of their value during several days of free fall, then partially

9

rebounded Friday after Picker said he doesn't want the company to slide into bankruptcy."[116]

10

11           389.    A J.P. Morgan report from November 16, 2018 noted that the market was affected

by continued uncertainty over California's willingness to aid PG&E:

12

> **if one assumes for sake of argument a $30Bn grand total of liabilities for the 2017-18 events for PCG, a 40 year amortization of securitized debt would still only be $10/month for the average customer; this would be even less if a multibillion dollar stress test cap was absorbed by the company;** it is a small price to pay for safe electric service and environmental goals. We remain focused on upcoming policymaker statements on the issue, and the pending CPUC implementation of securitization and stress-test mandates created with SB901. We acknowledge the long and challenging road ahead for investors, but see too much at stake for the state to realistically abandon utilities given the above considerations

13

14

15

16

17

18

19                                \*       \*       \*

20           390.    As a result of Defendants' wrongful acts and omissions, and the precipitous

21

decline in the market value of the Company's securities, Lead Plaintiff and other Class members

22

have suffered significant losses and damages.

23

24

25

26

---

[116] David R. Baker, Mark Chediak & Romy Varghese, *PG&E State Review Puts Board Shuffle and Breakup on the Table*, Bloomberg (updated Nov. 17, 2018 12:00AM), https://www.bloomberg.com/news/articles/2018-11-16/pg-e-soars-after-regulator-eases-concern-on-bankruptcy-risk.

27

28

1    X.    **SCIENTER UNDER THE EXCHANGE ACT**

2           391.    The public was surprised to learn the extent to which PG&E had misled everyone

3    about its lack of safety procedures related to wildfire prevention and responsibility for the North

4    Bay and Camp Fires.  Based on the extensive, widespread, and egregious nature of PG&E's

5    underlying noncompliance and disregard for safety, there is a strong inference that PG&E itself,

6    and the officers who spoke on its behalf and controlled its public statements, knew or should

7    have known the truth.  As detailed below, they either knew the material, adverse facts about

8    PG&E's lack of safety undermining and contradicting their public representations, or were

9    culpably reckless in avoiding knowledge of and/or disregarding that reality.  Thus, throughout

10   the Class Period, Defendants acted with scienter (a) by making false and misleading statements

11   and omissions about PG&E's financial health and compliance with relevant safety rules and

12   regulations while having actual knowledge of their false or misleading nature, and/or (b) by

13   acting in a deliberately reckless manner.

14          A.    **PG&E Knew that Its Safety Practices Continued to Violate the Law Even**
                  **After PG&E Was on Notice of the Butte Fire Safety Violations**
15

16          392.    As detailed above, PG&E's safety lapses caused the 2015 Butte Fire when a tree

17   came into contact with PG&E's power line due to PG&E violating multiple safety regulations.

18   At the time, the Butte Fire was the seventh most destructive wildfire in California history; it

19   killed two people, destroyed 921 homes, and destroyed more than 70,000 acres over 22 days.  As

20   noted above (¶¶127-28) and described in more detail below (¶569), PG&E had a company policy

     to perversely incentivize its contractors to clear less vegetation than is safe.
21

22          393.    Even after PG&E caused the disastrous Butte Fire through its serious fire safety

23   lapses, PG&E made **no changes at all** to improve its vegetation management or compliance with

24   safety regulations. In a deposition transcript that has not yet been made publicly available,

25   PG&E's Vegetation Program Manager Richard Yarnell reportedly testified under oath:

26   "PG&E—to the best of my knowledge, we have not made any changes as a result of this fire."

27   Despite being on notice of its dangerous safety violations, neither the Company nor its officers

28

1   made any changes to improve safety or compliance.  Thus, they either knew, or should have

2   presumed, that its violations continued unabated.

3        394.    On March 5, 2019, Judge Alsup, presiding over PG&E's criminal probation,

4   issued a revised Order to Show Cause relating to PG&E's lack of compliance with vegetation

5   management and other safety regulations.  The Order contained the following findings

6   summarizing the results of the federal court's probe into PG&E's actual knowledge of safety

7   violations leading up to the North Bay and Camp Fires:

8           PG&E's filings have included several relevant admissions.
            Significantly, PG&E acknowledged "that vegetation contact is the
9           primary risk driver with respect to ignitions on its distribution
            lines." ("Vegetation" means trees and limbs in this context.) In
10          2016 alone, PG&E experienced approximately 1,400 wires down
            caused by vegetation contact. As PG&E reported to the CPUC,
11          during 2015 and 2016, vegetation contact with conductors was the
            leading cause of the 486 fire ignitions associated with PG&E
12          facilities, causing 37% of those fires. PG&E further admitted that
            as of June 2017, there were 3,962 unworked trees which PG&E
13          had identified in 2016 as hazardous with the potential to "fall into
            or otherwise impact the conductors, towers or guy wires before the
14          next inspection cycle."[117]

15       395.    Thus, PG&E has admitted its **actual knowledge from 2015 to 2017** that its

16   vegetation management practices did not comply with California safety regulations on the order

17   of **thousands of violations per year**.  PG&E has further admitted to **actually knowing** that its

18   violations have **caused hundreds of wildfires per year since 2015**.  However, PG&E never

19   disclosed to investors that their own internal compliance reviews showed a lack of compliance

20   on a huge scale.

21       396.    In the time period of 2017 to 2018, after the North Bay Fires and leading up to the

22   Camp Fire, PG&E's notice of its numerous and widespread safety violations was even stronger.

23   For example, PG&E had known about the dangerous noncompliance of its Caribou-Palermo

24   transmission line – the same line whose failure would cause the Camp Fire's first ignition point –

25

26

27   ───────────────
     [117] Second Order to Show Cause Why PG&E's Conditions of Probation Should Not Be
28   Modified, PG&E Criminal Proceedings (N.D. Cal. Mar. 5, 2019), ECF No. 1027.

since a **2014 internal Company email stated that "the likelihood of failed structures** [on the Caribou-Palermo line] **happening is high.**"

    **B.**    **Safety Was Core to PG&E's Operations, and the Exchange Act Individual Defendants Were Directly Involved in It**

397.    In a January 16, 2019 filing to the CPUC, PG&E stated unequivocally that safety is its "core business," and as such, was the "focus" of Defendant Williams's activities as CEO: "Since the Utility is the sole operating subsidiary of PG&E Corporation, the activities of the PG&E Corporation CEO and President **focus on** the Utility's **core business**, including most notably **safety**."[118]

398.    During the Class Period, PG&E repeatedly acknowledged that "[s]afety is at the heart of everything we do at PG&E" (Geisha Williams, July 27, 2017 Analyst Call), that safety was PG&E's "top priority" (Patrick Hogan, November 18, 2015 California Senate Sub-Committee Hearing), and that "[n]othing is more important than the safety of our customers, employees and the communities we serve" (Kevin Dasso, vice president of Electric Asset Management, May 10, 2017 Press Release). PG&E further represented to the public that PG&E's safety and compliance were closely monitored by the Company's management and the Exchange Act Individual Defendants. For instance, the PG&E Board's Finance Committee was alleged in a separate lawsuit over the Butte Fire – where litigation is still ongoing – to have been "actively involved in, and responsible for, assisting the Boards in their oversight of safety risk through its review of strategies to manage the largest individual risks identified in the enterprise risk management program," including the risk of "wildfire." Indeed, because the Company faced the possibility of strict liability for property damages caused by wildfires, and such liability could not only be extraordinary but also non-reimbursable if its officers had not acted "prudently," wildfire safety was a particular focus of the Exchange Act Individual Defendants, who spoke personally on the subject with investors and regulators throughout the Class Period. Further,

---

[118] Summary of Corporate Structure of Pacific Gas and Electric Company (U 39 M) and PG&E Corporation (Cal. Public Utilities Commission filed Jan. 16, 2019), http://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M263/K658/263658434.PDF.

1    Defendants' repeated misrepresentations about PG&E's safety and compliance record concerned

2    the Company's core operations. Therefore, the Exchange Act Individual Defendants, by virtue of

3    the importance of safety to the Company and their positions as its leaders, reasonably had

4    knowledge about PG&E's safety and regulatory failures during the Class Period.

5        399.    As discussed in Sections VI.C. and VI.D., *supra*, the Exchange Act Individual

6    Defendants repeatedly spoke to investors on the specifics of PG&E's vegetation management

7    procedures and results. For example, they kept investors apprised about how many hundreds of

8    thousands of trees the Company was trimming and removing, including how many thousands

9    were "dead or dying." Not only that, but the Exchange Act Individual Defendants also inflated

10   these numbers over time without explanation, raising the number of trees supposedly trimmed or

11   removed from 1.2 million to 1.4 million.  In both reporting and inflating these numbers, the

12   Exchange Act Individual Defendants showed they knew that vegetation management and

13   compliance was important to investors on a granular level.

14       400.    A core operation concerns a company's primary products or services, and it

15   extends to matters of importance that might significantly impact the company's bottom line.

16   There is no question that PG&E's safety policies and procedures were critically important to the

17   Company's operations. In addition to the fact that PG&E repeatedly acknowledged this reality, it

18   is also notable that PG&E is potentially facing $30 billion of liability or more due to its failures,

19   and that California's regulatory regime imposes significant liability for PG&E's vegetation

20   management and other safety failures. This is strong evidence of the centrality of the Company's

21   wildfire safety and compliance regime.

22       401.    In a separate lawsuit that was filed in connection with the Butte Fire, it was

23   publicly alleged – based on discovery and deposition testimony that has **not** yet been publicly

24   revealed – that Exchange Act Individual Defendants Williams and Hogan both served on an

25   Executive Officer Risk & Compliance Committee that was charged with monitoring vegetation

26   management issues. Further, according to the parties litigating against PG&E for injuries caused

27

28

by the 2015 Butte Fire, Defendant Hogan's and another individual's[119] deposition testimony purportedly showed that "PG&E knows and accepts that 1-in-100 trees will be non-compliant, and that 1-in-1000 will be touching its powerlines."  As noted above, this means noncompliance for approximately 1.2 million trees in PG&E's territory of 123 million trees, approximately 123,000 of which are safety violations in the nature of trees touching its powerlines at any given time.  *See* Section IV.F.4.

402.    Just months before the North Bay Fires broke out, United States District Judge Thelton E. Henderson in the Northern District of California ordered that PG&E work with federal prosecutors to retain a monitor to oversee the Company's compliance and ethics programs, and implement "policies and procedures that address threats caused by vegetation," in light of the deadly San Bruno explosion. Order at 3, PG&E Criminal Proceedings, (N.D. Cal. Jan. 26, 2017), ECF No. 916 (the "San Bruno Order"). As part of the sentencing process, PG&E had promised the Court that Defendant Julie Kane – as Chief Ethics and Compliance Officer of the Company – "reports directly to PG&E Corporation's Chairman and CEO" regarding PG&E's compliance efforts, and that "PG&E's senior executives" regularly reviewed the Company's safety and compliance, such that "high-level personnel of the organization ensure its effectiveness." *Id.,* Def's Sentencing Memo. at 6-7, PG&E Criminal Proceedings (N.D. Cal. Jan. 9, 2017), ECF No. 906.  Accordingly, Exchange Act Individual Defendants Kane, Earley, and Williams had actual knowledge of PG&E's lack of compliance.

403.    Because the Defendants represented that they closely monitored PG&E's critically important safety and compliance, and because PG&E's fire safety practices resulted in thousands of fire safety violations during the Class Period, they knew – or were deliberately reckless in not knowing – that PG&E's level of safety with respect to vegetation management and wildfire prevention did not comport with state law.

---

[119] Court filings identify this individual as Dean McFarren, PG&E's Quality Assurance Supervisor.

### C.    The Federal Court Overseeing PG&E's Probation, Including Safety Monitoring, Has Uncovered Additional Facts Supporting Scienter

404.    As described above, *see supra* Section IV.F.2., PG&E was convicted of five felony counts for knowingly and willfully violating federal safety standards in causing the deadly San Bruno explosion in September 2010.  On January 26, 2017, Judge Henderson sentenced PG&E to an expansive program of probation, including a corporate compliance and ethics monitorship program, 10,000 hours of community service, expenditure of $3 million to inform the public of its criminal conduct, and a mandate to refrain from any further criminal behavior.  San Bruno Order.

405.    The first condition to PG&E's probation is that it "Not Commit Another Federal, State, or Local Crime During the Term of the Probation." PG&E did not object to this term in its responsive sentencing memorandum. PG&E Sentencing Memorandum at 15, PG&E Criminal Proceedings (N.D. Cal. Jan. 9, 2017), ECF No. 906.  PG&E reassured the Court, prosecutors, the public, and its investors that it would not engage in further criminal acts, including criminally negligent or reckless safety violations.  This condition of PG&E's probation applied to PG&E's electrical operations and gas operations alike.  Accordingly, as of January 8, 2017, PG&E had an unusual motive to deceive investors and conceal its lack of compliance with safety regulations: it needed investors to believe it was meeting the terms of its probation.

406.    On August 14, 2017, Judge Alsup was assigned to preside over the criminal case and PG&E's resulting probation.

407.    After the deadly Camp Fire, Judge Alsup ordered the parties on November 27, 2018 to answer the following questions by December 31, 2018:

> 1. What requirements of the judgment herein, including the requirement against further federal, state, or local crimes, might be implicated were any wildfire started by **reckless operation or maintenance of PG&E power lines**?
>
> 2. What requirements of the judgment herein might be implicated by any inaccurate, slow, or failed reporting of information about any wildfire by PG&E?
>
> 3. What specific steps has the monitor herein taken to monitor and improve PG&E safety and reporting with respect to power lines and wildfires?

1
2

    4. **Provide an accurate and complete statement of the role, if any, of PG&E in causing and reporting the recent Camp Fire in Butte County** and all other wildfires in California since the judgment herein.

3
4
5
6
7
8
9
10
11

    408.    On December 5, 2018, Judge Alsup requested "that the Office of the California Attorney General advise the Court of its view on one aspect of this question, namely, the extent to which, if at all, **the reckless operation or maintenance of PG&E power lines would constitute a crime under California law**." In response, the Attorney General of California replied that PG&E's actions or failures to act could constitute a range of criminal violations if the Utility was found to be "reckless" in causing California wildfires.[120]  The listed potential offenses ranged from "misdemeanor offenses related to vegetation and power lines" to "implied-malice murder and involuntary manslaughter."

12
13
14
15

    409.    On January 17, 2019, Judge Alsup issued a tentative finding that "the single most recurring cause of the large 2017 and 2018 wildfires attributable to PG&E's equipment has been **the susceptibility of PG&E's distribution lines to trees or limbs falling onto them** during high-wind events."[121]

16
17
18
19
20
21
22
23
24

    410.    On January 30, 2019, Judge Alsup held a probationary hearing to determine whether PG&E's conduct had violated the terms of its probation.  Part of the hearing concerned PG&E's failure to inform the probation officer that the Butte County District Attorney's Office was investigating PG&E's role starting several of the North Bay Fires, that the District Attorney considered criminal prosecution, and that it executed a settlement with PG&E to avoid such prosecution.  The court made a "**find[ing] that PG&E violated the conditions of probation**," with sentencing to be determined at a later date.[122]  Judge Alsup also reminded the Company:

> [O]ne of the conditions of probation is you will not commit another federal, state, or local crime. It doesn't have to be a pipeline or a natural gas. It can be any crime. You cannot – you've

25
26
27
28

---

[120] Attorney General's Amicus Brief Regarding PG&E's Potential Criminal Liability, PG&E Criminal Proceedings (N.D. Cal. Dec. 28, 2018), ECF No. 954.

    [121] U.S. Response to Court's Order to Show Cause and Request for Comment, PG&E Criminal Proceedings (N.D. Cal. Jan. 17, 2019), ECF No. 970.

    [122] Transcript of Proceedings, PG&E Criminal Proceedings (N.D. Cal. Jan. 31 2019), ECF No. 999.

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO. 3:18-CV-03509-EJD

124

got to be on your absolute best behavior. No more crimes. . . .
That's what PG&E is up against now.

411.    During the hearing, Judge Alsup reportedly stated: "**[T]here is one very clear-cut pattern here: That PG&E is starting these fires**. . . .  PG&E, according to Cal Fire, started the fire. Global warming did not start the fire. According to Cal Fire, PG&E started it, all 17 of them." Judge Alsup continued, "what do we do[?]  Does the judge just turn a blind eye and say, 'PG&E, continue your business as usual.  Kill more people by starting more fires'?"[123]  Judge Alsup heard testimony from PG&E's probation officer, Jennifer Hutchings, concerning the Honey Fire – one of the North Bay Fires for which Cal Fire found evidence of a safety violation and referred further criminal investigation to the relevant district attorney for Butte County. Probation Officer Hutchings testified: "I discovered that there had actually been an extensive investigation done by Butte County, that they were fully prepared to bring criminal charges against Pacific Gas and Electric; that Pacific Gas and Electric had entered into a settlement agreement with them in order to avoid these charges being brought."  **The court then made a "find[ing] that PG&E violated the conditions of probation as charged in the Form 12."** Thereafter, the court turned to address whether it "should not impose further condition on PG&E to help protect the public from possible further other crimes of the offender," including the following exchange with PG&E representative:

> The Court:    Okay. When you say "mitigate," why can't the risk [of wildfire] be zero? Why is it that PG&E should be permitted to start a single wildfire?"
>
> PG&E:    Well, the answer to the first question is bringing the risk to zero is an incredibly complicated series of policy decisions that have to factor in reliability, cost, safety, and there's a tremendous amount of analysis that goes into how best to, for instance, make vegetation management decisions and how aggressive vegetation management should be versus the cost of –
>
> . . .

---

[123] Transcript of Proceedings, PG&E Criminal Proceedings (N.D. Cal. Jan. 31 2019), ECF No. 999.

| The Court: | So why is it PG&E says all the time "Safety is our number one thing"?  I hear it all the time, "Safety. Safety. Safety," **but it's not really true. Safety is not your number one thing**. |

At the conclusion of this proceeding, PG&E accepted that full compliance with safety regulations, rather than "mitigation," was both possible and PG&E's goal: "[U]ltimately we agree with Your Honor's goal. We think that Your Honor's goal of trying to eliminate the risk is exactly what we all need to be working towards."

412.   On February 6, 2019, attorneys for fire victims provided a submission to Judge Alsup in response to the January 30, 2019 probationary hearing.[124]  The submission compiled data from PG&E's regulators which demonstrated that the Company posed a far greater risk to the public than its peers.  For example, according to the submission, Southern California Edison ("SoCalEd") serves 15 million people across approximately 50,000 square-miles, operating and maintaining 91,375 miles of distribution lines and 1,433,336 electric poles.  By comparison, PG&E services approximately 16 million people throughout a 70,000-square-mile service area, operating and maintaining between 81,000 miles and 115,000 miles of distribution lines and 2,400,000 electric poles.  Yet, despite these similarities in service size and miles of distribution lines, *PG&E's electrical equipment caused 1,208 more wildfires than SoCalEd's equipment between 2014 to 2017* as self-reported to the CPUC.  In total, PG&E's equipment caused 1,552 wildfires, while SoCalEd only caused 344 fires over the same time period.  Put differently, PG&E's equipment caused *4.5 times more wildfires* than SoCalEd.  PG&E's equipment was also responsible for more large-scale fires, including 43 more fires than SoCalEd that burned between 10-99 acres, three more between 100-299 acres, and two more between 300-999 acres.  Similarly, since 2014, the electrical equipment of San Diego Gas & Electric ("SDG&E") caused 109 wildfires with only one wildfire burning over 10 (and below 300) acres.  By contrast, PG&E caused 1,552 wildfires during that same timeframe with 68 of those fires burning over 10 acres.

---

[124] Submission of Attorneys Pitre and Campora in Response to Order dated Jan. 30, 2019, PG&E Criminal Proceedings (N.D. Cal. Feb. 6, 2019), ECF No. 1005.

413.    On March 5, 2019, Judge Alsup issued a revised order to show cause as to why

the court should not modify the terms of PG&E's probation in light of subsequent

submissions.[125]  Judge Alsup's Revised Order further found that this **"record demonstrates that**

**PG&E's performance with respect to vegetation management has been dismal**."  Although

PG&E had previously balked at new conditions of probation that would require full compliance

on the grounds that they would be impossible to achieve, Judge Alsup's March 5, 2019 order

rejected that notion:

> To address PG&E's complaints that the vegetation-management
> conditions proposed in the January 9 order would be unduly
> expensive, require superhuman efforts, and exceed the
> requirements of state and federal law, the above conditions would
> now simply require full compliance with existing law and with the
> metrics proposed in PG&E's own wildfire mitigation plan. This
> order rejects PG&E's back-up contention that "perfect
> compliance" with Section 4293 is impossible due to "densely
> forested, highly dynamic, living environments, in which conditions
> can rapidly change" (Dkt. No. 1016 at 9). **The record
> demonstrates that PG&E's performance with respect to
> vegetation management has been dismal.** And, not only does the
> offender provide no evidentiary support for its claim, but anyone
> who knows the terrain and its vegetation knows that it takes years
> for trees to grow to the height of PG&E's lines. Regular
> inspections could easily spot trees that are high enough to present a
> hazard. If state or federal law is too strict, moreover, PG&E's
> remedy would be to seek the relaxation of such laws through its
> well-oiled lobbying efforts. . . .  The proposed conditions would
> help ensure that, going forward, funds are adequately allocated to
> PG&E's vegetation management and wildfire mitigation costs.[126]

414.    On April 2, 2019, Judge Alsup held a hearing on his second order to show cause

in PG&E's probation proceedings.  At the hearing, Judge Alsup stated:

> PG&E over several years allowed the trees that needed to be
> removed to be built up and did not remove them, did not trim them
> so that we wound up with a large number of trees that should have
> been removed by PG&E but weren't.  And that was a major
> contributing factor, maybe the single-biggest factor, in causing the
> fires in 2017 and 2018 in Northern California.[127]

---

[125] Second Order to Show Cause Why PG&E's Conditions of Probation Should Not Be
Modified, PG&E Criminal Proceedings (N.D. Cal. Mar. 5, 2019), ECF No. 1027.

[126] Second Order to Show Cause Why PG&E's Conditions of Probation Should Not Be
Modified, PG&E Criminal Proceedings (N.D. Cal. Mar. 5, 2019), ECF No. 1027.

[127] Transcript of Proceedings at 6-7, PG&E Criminal Proceedings (N.D. Cal. Apr. 2, 2019),
ECF No. 1047.

1    Judge Alsup also explained "as we've gotten into the evidence, and I've studied quite a lot of it,

2    again I want to say it's quite clear that PG&E . . . let the tree budget wither so that a lot of trees

3    that should have been taken down were not."  He concluded, "[t]his is a crisis, a crisis that

4    California faces on these wildfires, and PG&E is the single-most culpable entity in the mix. . . .

5    PG&E has started more than – way more than its share of these fires. . .  This is a problem of

6    your own making."

7         415.    Under these circumstances, PG&E's violation of court-imposed probation and

8    California law, while under monitoring and reporting obligations regarding its purported

9    compliance throughout the Class Period, support strong inferences that Defendants knew, or

10   were severely reckless in not knowing, that it failed to comply with relevant laws and regulations

11   when making the false and misleading statements detailed above.

12        416.    As a result, on April 3, 2019, Judge Alsup issued an Order Adopting New

13   Conditions of Probation.  The court modified the terms of PG&E's probation to require it to (i)

14   "fully comply with all applicable laws concerning vegetation management and clearance

15   requirements";  (ii) "fully comply with the specific targets and metrics set forth in its" 2019

16   Mitigation Plan, and (iii) not issue dividends until it was in compliance with all applicable

17   vegetation management requirements, among other conditions.[128]

18        417.    On May 7, 2019, Judge Alsup conducted a sentencing hearing for PG&E's

19   violation of probation.  In a colloquy with PG&E's new CEO William D. Johnson, the Court

20   stated: "one of the biggest problems we've had is that PG&E has been starting a lot of fires, and

21   they had that horrible explosion in San Bruno, and **I just don't think PG&E has put safety**

22   **first.**"  He further reminded the new CEO: "your company **admitted** that it started 17 of those

23   fires in 2017 just in the Wine Country."[129]

24

25

26   ───────────────
     [128] Order Adopting New Conditions of Probation, PG&E Criminal Proceedings (N.D. Cal.
     Apr. 3, 2019), ECF No. 1040.

27   [129] Transcript of Proceedings at 11, PG&E Criminal Proceedings, (N.D. Cal. May 7, 2019),
     ECF No. 1061.

28

418.    During the sentencing hearing, Judge Alsup also observed that while there are other causes of fire, "**no one has started more fires than PG&E.**"

419.    The magnitude of PG&E's failures show that the Company and Exchange Act Individual Defendants either knew these facts, or were deliberately reckless in not knowing them.  The inference of scienter is made even stronger when combined with the fact that safety was a core operation of PG&E's, as discussed in Section X.B., *supra*.

> **D.    PG&E's Noncompliance with Safety Regulations Was Well-Known Throughout the Company, Including at the Highest Levels, with Real-Time Access to a Database of Known Safety Violations**
>
> **1.    PG&E Recorded Its Violations of Safety Regulations in a Sophisticated Database, Readily Accessible by the Exchange Act Individual Defendants**

420.    PG&E maintained a database of inspection data to document the condition of its power lines, which provided its personnel with ready access to information about instances of noncompliance with state safety regulations. In a November 8, 2017 article about its pole management and maintenance efforts, PG&E stated that it "**uses a comprehensive database to manage these multiple patrol and inspection schedules of our 2.4 million poles.**"[130]

421.    This information was used to develop the company's *Mobile Asset Inspection* application that provided "electric power inspectors in the field with real-time information including maps, customer information, safety and access information."[131] The system was developed in 2016 and had become sophisticated enough by 2017 to win *InformationWeek*'s IT Excellence Award in the Data and Analytics category.[132]  The article further states that "**[s]atellite maps were layered with the location of PG&E's two million electric poles along with decades' worth of data on each individual pole.**"[133]  PG&E's 2016 Corporate

---

[130] *Facts about PG&E Pole Management and Maintenance*, Currents, PG&E (Nov. 8, 2017), http://www.pgecurrents.com/2017/11/08/facts-about-pge-pole-management-and-maintenance/.

[131] Press Release, PG&E, *Innovative App for PGE Field Crews Earns InformationWeek IT Excellence Award* (May 22, 2017), http://investor.pgecorp.com/news-events/press-releases/press-release-details/2017/Innovative-App-for-PGE-Field-Crews-Earns-InformationWeek-IT-Excellence-Award/default.aspx.

[132] *Id.*

[133] *Id.*

Case: 19-30088   Doc# 11168-20   Filed: 08/31/21   Entered: 08/31/21 14:49:59   Page 139 of 229

1   Responsibility and Sustainability Report announced that a Margaret Mooney Award for

2   Innovation was awarded to its "Data Visualization—Google Earth SAP team, which created a

3   new technology that provides work crews with a dramatically enhanced data visualization of

4   **work in progress**." The report further mentioned "[t]he development of an SAP-based

5   **compliance tool** that can analyze trends and inform [PG&E's] risk management efforts."  Thus,

6   PG&E used sophisticated software that kept track of its safety regulation noncompliance for its

7   powerlines and poles in real time.

8          422.    PG&E assigns a unique "pole SAP ID number" that corresponds to each pole's

9   data.[134] According to an *InformationWeek* article about PG&E's mobile application, "**[t]he**

10  **status of a pole's inspection is tracked in SAP [database technology] so the inspection team**

11  **knows when it's time to inspect each pole**. That information flows into the enterprise platform

12  PG&E built, which pushes electronic lists to inspectors' iPad Pros."[135] The data collected is

13  extensive enough to enable "an enterprise data and analytics organization that is using advanced

14  analytics to predict when poles will fail."[136] And by 2017, the PG&E Corporate Responsibility

15  and Sustainability Report mentions that the company's "SAP-based tool" was used to analyze

16  trends in environmental compliance. Thus, PG&E's records of safety regulation violations were

17  stored in a readily accessible database.  Defendants Earley, Williams, Stavropoulos, Kane, Johns,

18  and Hogan each had easy access to this database.

19         423.    Furthermore, in its submissions to Judge Alsup in the Company's criminal

20  probation, PG&E represented that it conducts quality assurance audits to obtain "real time"

21  assessments of its vegetation management compliance:

22              PG&E has also implemented checks on its contractors' vegetation
                management work as another way to monitor compliance. For
23              example, PG&E conducts audits and reviews of its vegetation

---

24  [134] PG&E Pole Data Request Form, PG&E (Aug. 9, 2017),

25  https://www.pge.com/pge_global/common/pdfs/safety/yard-safety/powerlines-and-trees/pole-
    data-request-form.pdf.

26  [135] Lisa Morgan, *PG&E's Winning Recipe for a Mobile Asset Inspection App*,

27  InformationWeek (June 29, 2017), https://www.informationweek.com/big-data/pgandes-
    winning-recipe-for-a-mobile-asset-inspection-app/d/d-id/1329251.

28  [136] *Id.*

management program to assess the quality of contractors' work and compliance with PG&E's standards and legal requirements, including Public Resource Code § 4293. PG&E's audit and review process consists primarily of two programs, Quality Control ("QC") and Quality Assurance ("QA"). . . . .

**PG&E's QA audits are designed to obtain a "real-time" assessment of PG&E's vegetation management program and whether the conditions in its service territory are consistent with PG&E's legal obligations**. To ascertain a **true "real-time" condition** of the program, audits are performed throughout the year. . . .  The audits indicate whether any identified issues pose compliance violations or potential violations (e.g., potential violation may occur within 90 days).[137]

424.    Further, in those same criminal probation proceedings, Judge Alsup found that PG&E has admitted "that as of June 2017, there were 3,962 unworked trees which PG&E had identified in 2016 as hazardous with the potential to 'fall into or otherwise impact the conductors, towers or guy wires before the next inspection cycle.'"  Such a precise admission confirms the existence of such a database, awareness of its contents showing that vegetation management violations were widespread during the Class Period, and access to that information by the highest levels.

425.    Consequently, it is clear that PG&E was noncompliant with safety regulations concerning vegetation management and pole integrity, and that such facts would have been documented electronically, stored in an accessible SAP database, and available to PG&E personnel throughout the Company in real-time.  Defendants Earley, Williams, Stavropoulos, Kane, Johns, and Hogan each had easy access to this database.

2.    **PG&E Instituted a Culture Among Its On-the-Ground Employees of Reporting Problems up the Corporate Chain, Which Upper Management Was Aware of and Monitored**

426.    PG&E repeatedly touted the culture among its lower-level employees that encouraged reporting safety problems up the chain of management. Further, the Exchange Act Individual Defendants touted their knowledge and familiarity with this practice at the Company,

---

[137] PG&E Response to Request for Information at 12, PG&E Criminal Proceedings (N.D. Cal. Feb. 22, 2019), ECF No. 1016.

1   indicating either they personally received information of safety violations this way, or they knew

2   where to find such information but deliberately avoided it.

3       427.   On August 18, 2016, PG&E issued a press release titled "PG&E Becomes First

4   Natural Gas Utility to Receive Process Safety." It contained a description of an internal

5   Company policy termed "**The Corrective Action Program, a program that empowers**

6   **employees at all levels of PG&E to speak up and identify issues that are in need of**

7   **improvement**."

8       428.   On November 4, 2016, PG&E hosted a conference call with analysts to discuss its

9   financial results for the third quarter of 2016. In his prepared remarks, Earley elaborated on

10  PG&E's culture of encouraging "every employee" to report safety violations up the chain of

11  command, as follows:

> **We also wanted to make sure that every employee felt comfortable raising concerns, no matter how big or small, so we made a number of changes to encourage all employees to speak up when something doesn't seem right. For example, we worked with our unions to develop a non-punitive self-reporting policy.**
>
> We've also adapted the nuclear industry's corrective action program **across the Company**, to **make it easy for employees to report things that need to be fixed. In fact, employees can now report corrective action items through a simple app on their smart devices. And we've created a number of awards to publicly recognize employees when they do speak up, so that we are encouraging and reinforcing that behavior.**
>
> * * *
>
> **The improvements we have made in safety and reliability over the last six years have put us in a position to deliver strong financial results going forward.**
>
> **Earlier this year, we announced our first dividend increase in six years, and we have committed to achieving a roughly 60% payout ratio by 2019.** Combined with our expected rate based growth, we are confident we can deliver a strong overall return for our shareholders.

25      429.   Thus, PG&E went significantly beyond making employees feel safe "report[ing]

26  things that need to be fixed." The CEO himself took credit for "mak[ing] sure that every

27  employee felt comfortable raising concerns" and "encourag[ing] all employees to speak up"

1    "**across the Company**" – *i.e.,* **not just at the lower levels.** Further, by virtue of the fact that the

2    CEO personally took credit for this phenomenon within the company, it indicates his awareness

3    of what employees actually reported. Indeed, he stated that he was involved in "publicly

4    recogniz[ing] employees when they do speak up."

5        430.    As a result, the persistence of safety violations cannot be attributed to their being

6    unknown.  Rather, such problems persisted because of what the Exchange Act Individual

7    Defendants did – or failed to do – to mitigate safety problems once they were reported.  Indeed,

8    PG&E's inadequate safety compliance did not stem from a lack of information but rather a lack

9    of willingness to devote sufficient Company funds to remediate problems, as detailed above (*see*

10   Sections VI.B.-J., *supra*).

11       431.    Earley's statement also affirms the direct connection between PG&E's treatment

12   of safety issues, the Company's long-term financial results, and the size of its dividend.  Indeed,

13   as the truth emerged regarding PG&E's insufficient safety compliance during the Class Period

14   (as alleged above, *see* Section IX, *supra*), the market understood the connection between the

15   Company's safety violations and the foreseeable, material detriment they would have on the

16   Company's financial results and dividend.

17       **E.    PG&E's Compliance Statements Were Authorized by Defendant Kane and
                 Were Made under Her Ultimate Authority**

18

19       432.    Defendant Kane, in her capacity as PG&E's Chief Ethics and Compliance Officer

20   ("CECO"), controlled and authorized all of PG&E's statements regarding compliance during the

     Class Period. These statements were approved and made under her ultimate authority as CECO.

21

22       433.    PG&E established the CECO role on March 24, 2015 "to strengthen its ethics and

23   compliance program and performance,"[138] a role which Kane assumed on May 18, 2015 and held

24   _____

25   [138] Press Release, PG&E, *PG&E Appoints Julie M. Kane to New Position as Senior Vice
     President and Chief Ethics and Compliance Officer; Company Takes Next Step Toward Goal of
     Establishing a Best-in-Class Corporate Ethics Program* (Mar. 25, 2015),

26   https://www.pge.com/en/about/newsroom/newsdetails/index.page?title=20150324_pge_appoints
     _julie_m_kane_to_new_position_as_senior_vice_president_and_chief_ethics_and_compliance_

27   officer_company_takes_next_step_toward_goal_of_establishing_a_best-in-
     class_corporate_ethics_program.

28

---

1   through the end of the Class Period.  As CECO, she was responsible for both managing

2   implementation of PG&E's legal compliance efforts as well as overseeing compliance

3   monitoring and reporting during almost the entirety of the Class Period.  When PG&E was being

4   sentenced for its criminal negligence in causing the San Bruno explosion, it admitted in its

5   January 9, 2017 sentencing memorandum that "Ms. Kane is responsible for **overseeing** the

6   Company-wide compliance and ethics program, including **compliance management**, risk-

7   mitigation **and reporting**; **overseeing employee-investigatory processes**; and reinforcing

8   PG&E's ethics and compliance culture, among many other compliance and ethics program

9   elements."  The same filing confirmed that "The CECO, Julie Kane, reports directly to PG&E

10  Corporation's Chairman and CEO, and is accountable to PG&E Corporation's and PG&E's

11  Boards of Directors, with additional reporting responsibility to the Compliance and Public Policy

12  Committee of PG&E Corporation's Board and the Audit Committees of PG&E Corporation's

13  and PG&E's Boards."

14        434.    Accordingly, Kane was apprised of any compliance violations reported within the

15  Company, including violations reported by PG&E's lower-level employees and logged in

16  PG&E's central database detailed *supra*, at all times when PG&E misrepresented to investors

17  that it was in compliance (*e.g.*, ¶197 (Misstatement No. 2, October 16, 2015); ¶211

18  (Misstatement No. 4, October 6, 2016); ¶222 (Misstatement No. 5, August 9, 2017); ¶249

19  (Misstatement No. 9, October 31, 2017); ¶270 (Misstatement No. 12, November 5, 2017); ¶280

20  (Misstatement No. 13, May 25, 2018); ¶¶287, 296 (Misstatement Nos. 14 & 15, June 8, 2016);

21  ¶300 (Misstatement No. 16, September 27, 2018); ¶¶303, 309 (Misstatement Nos. 17-18,

22  October 9, 2018); and ¶314 (Misstatement No. 19, November 8, 2018)).

23        435.    The CECO position was sufficiently senior such that Kane's scienter can be

24  imputed to the Company regarding knowledge of legal compliance with California vegetation

25  management and safety regulations.

26        436.    Additionally, because Kane reported directly to the CEO in her capacity as

27  CECO, her knowledge of safety violations can be imputed to both CEOs, Earley and

28

---

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                    134
CIVIL ACTION NO. 3:18-CV-03509-EJD

1    Williams.[139] Because Kane was institutionally installed to advise the CEO of PG&E's

2    compliance and safety, Kane would have told Earley and Williams what she knew regarding the

3    Company's noncompliance with vegetation management regulations, or Earley and Williams

4    would have been deliberately reckless in speaking on the subjects of compliance and safety

5    without input from their CECO.

6        **F.    The Threat of a Potential Bankruptcy Gave Defendants a Strong Motive to
              Mislead Investors**

7
8        437.    PG&E is currently facing approximately $17 billion in liability over the North

     Bay Fires and $13 billion for the Camp Fire, of which the Company has already recorded
9
     anticipated losses totaling over $14 billion. This immense exposure dwarfs the $1.6 billion that
10
     the Company reported it earned in the full year 2017—a performance not likely to be repeated
11
     given the substantial increase in PG&E's required vegetation management and other safety
12
     compliance expenditures.
13
         438.    Once the North Bay Fires began, it was clear to Defendants that PG&E's liability
14
     could have severe repercussions for the Company's financial condition, and for the careers of the
15
     Exchange Act Individual Defendants.  This was true even before the flight of PG&E's officers
16
     and directors and the Company's bankruptcy.
17
         439.    One California legislator reported on June 15, 2018 that "[i]n this Capitol, they
18
     [PG&E] keep talking about the sky is falling, that they're going to go bankrupt and what are we
19
     going to do, and they're creating a lot of fear in the Capitol." On July 31, 2018, *Reuters* further
20
     reported that an anonymous source had leaked that PG&E hired a prominent law firm to "explore
21
     debt restructuring options," as well as the possibility of "breaking up the company."  On August
22
     1, 2018, California Governor Jerry Brown even cautioned the public that "there is concern that
23
     we could lose our utilities."
24
         440.    The reason for these dire warnings was simple: PG&E wanted to rush through
25
     legislation that would grant it additional defenses and a lower bar to be reimbursed for their part
26
27    _____

     [139] Further, she reported directly to the Company's Chairman of the Board, a position which
28    was also occupied by Earley during the Class Period.

1    in causing the North Bay Fires.  After the North Bay Fires had erupted, the threat of bankruptcy

2    and the narrow possibility of a legislative bail-out gave PG&E and the Exchange Act Individual

3    Defendants had an unusual motivation to hide their culpability.

4            441.    It was within this context that PG&E falsely and misleadingly told investors, *inter*

5    *alia*, that "***PG&E meets or exceeds all applicable federal and state vegetation clearance***

6    ***requirements***," and that "***we've doubled the amount that we've invested in veg[etation]***

7    ***management***." PG&E had an unusual motive to make these and other statements after the North

8    Bay Fires erupted: to conceal its wrongdoing long enough to secure the liability bailout it was

9    seeking from the California legislature.

10           442.    Indeed, this would not be the first time that a large potential liability caused

11   PG&E to act unethically.  When PG&E faced a substantially *lower* liability for its role in the

12   deadly San Bruno explosion, the Company engaged in improper "back-channel"

13   communications with its regulators that ultimately resulted in a $97.5 million fine that was

14   imposed in April 2018. A federal jury also found PG&E to be guilty of six criminal charges,

15   including obstruction of justice, related to that blast that killed eight people.

16       **G.    After PG&E Failed to Follow Its ESRB-8 Shutoff Protocol and Caused the**
         **Camp Fire, PG&E Attempted to Cover It Up**
17

18           443.    As noted above, the public learned after the Camp Fire erupted that PG&E did not

19   shut down its Caribou-Palermo transmission line that ignited the Camp Fire, despite the

20   Company's ESRB-8 Shutoff Protocol.  As further detailed above, PG&E faced criticism from a

21   variety of sources for that decision, as well as significant decreases to its share price. *See*

22   Section IX.D.6, *supra*.

23           444.    While the Camp Fire continued to burn, the Company insisted that its ESRB-8

24   Shutoff Protocol would not have included the Caribou-Palermo transmission line.

25           445.    For example, in a November 16, 2018 statement reported by *KQED News*, PG&E

26   spokeswoman Deanna Contreras stated in an email to the reporter: "However, in light of the

27   potential public safety issues resulting from de-energizing higher voltage transmission lines,

28   including the potential to impact millions of people and create larger system stability issues for

1    the grid, PG&E has not extended the (shutoff) program to transmission lines that operate at

2    115kV or above."[140]

3         446.    Similarly, in a November 22, 2018 statement reported by *Mercury News*, PG&E

4    spokeswoman Lynsey Paulo said to the reporter: "In light of the potential public safety issues

5    resulting from de-energizing higher voltage transmission lines, including the potential to impact

6    millions of people and create larger system stability issues for the grid, PG&E has not extended

7    the (shutoff) program to transmission lines that operate at 115kV or above."[141]   Spokeswoman

8    Paulo "added that the Federal Energy Regulatory Commission (FERC) regulates transmission

9    lines and such an emergency shutdown would need to be coordinated with the California

10   Independent System Operator, which oversees the state's power grid."   But as the article further

11   reported:

12            But state and federal regulators say PG&E can shut down
             transmission lines of any size at its own discretion.

13
             "The transmission owners are solely responsible for operating their
14           transmission and distribution lines and they can de-energize
             transmission and distribution lines without seeking approval from
15           the ISO, with or without prior notice," Cal ISO spokesman Steven
             Greenlee said. "The transmission owner tells us that they are de-
16           energizing a line and if a 230kV or 500kV line is de-energized it
             may require (us) to re-dispatch generation if the remaining lines
17           become heavily loaded. This is a practice we perform every day
             with scheduled work and unplanned outages."
18
             CPUC spokeswoman Terrie Prosper also said the decision is up to
19           the individual utility.

20           "Utilities can de-energize whatever lines and voltage they deem
             appropriate," Prosper said. "They typically de-energize distribution
21           lines because those lines are more localized than transmission
             lines."
22
             FERC Spokesman Craig Cano said PG&E would not need its
23           approval to cut power to high-voltage lines for safety reasons.

24   —————————————

25   [140] Dan Brekke, *PG&E: High-Voltage Transmission Lines Not Covered by Fire Safety
     Shutdown Plan*, KQED (Nov. 16, 2018), https://www.kqed.org/news/11706846/pge-high-
     voltage-transmission-lines-not-covered-by-fire-safety-shutdown-plan.

26   [141] Matthias Gafni, *Camp Fire: Map Shows Where PG&E Had Planned to Shut Down Power
     Ahead of Blaze*, Mercury News (Nov. 22, 2018),
27   https://www.mercurynews.com/2018/11/22/maps-show-where-pge-had-planned-to-shut-down-
     power-ahead-of-camp-fire/.
28

"FERC-approved standards address transmission system reliability and explicitly exclude safety matters, which could be the reason for shutting down a power line in response to wildfires or to mitigate the risk of fires," he said.

447.    PG&E's entire response, including its denial that its ESRB-8 Shutoff Protocol would not have included the Caribou-Palermo transmission line, **was not true**.

448.    First, PG&E's published ESRB-8 Shutoff Protocol never mentioned a limitation on 115-kilovolt transmission lines or in fact any transmission lines.[142]  However, pursuant to CPUC's Resolution ESRB-8, PG&E was required to both "Make available and post a summary of de-energization policies and procedures on its website" and "Provide its de-energization and restoration policy **in full**, and in summary form, to the affected community officials before de-energizing its circuits."[143]  Because a limitation on transmission lines was never mentioned in PG&E's ESRB-8 Shutoff Protocol, it did not exist.

449.    Second, PG&E had never mentioned this exclusion for 115-kilovolt transmission lines, even unofficially, until **after** it faced criticism for deciding not to shut down its Caribou-Palermo transmission line and causing the Camp Fire.

450.    Third, when PG&E first shut off electricity under its ESRB-8 Shutoff Protocol on October 14 through 17, 2018, by its own admission, PG&E shut off **both** transmission and distribution lines.  Specifically, PG&E shut off eight transmission power line circuits and thirty-three distribution power line circuits, as detailed in its later filing to CPUC.[144]  This admission confirms that PG&E's ESRB-8 Shutoff Protocol did not include a limitation on shutting down transmission lines.

---

[142] *See generally* PG&E Public Safety Power Shutoff Policies and Procedures, PG&E website (Sept. 2018), https://www.pge.com/pge_global/common/pdfs/safety/emergency-preparedness/natural-disaster/wildfires/Public-Safety-Power-Shutoff-Policies-and-Procedures-September-2018.pdf.

[143] Resolution Extending De-Energization Reasonableness, Notification, Mitigation And Reporting Requirements In Decision 12-04-024 To All Electric Investor Owned Utilities, (Cal. Public Utilities Commission July 16, 2018), http://docs.cpuc.ca.gov/publisheddocs/published/g000/m218/k186/218186823.pdf.

[144] Letter from PG&E to CPUC re: compliance report (Oct. 31, 2018), http://cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/Utilities_and_Industries/Energy_-_Electricity_and_Natural_Gas/PGE%20PSPS%20Report%20Letter%2020181031.pdf.

451.    The same conclusion is confirmed by a telling revision PG&E made to otherwise identical text in two succeeding reports to the CPUC—the first being its October "Public Safety Power Shutoff Report" regarding the October shutoff,[145] and the second being its November "Public Safety Power Shutoff Report" **after the Camp Fire**.  Therein, PG&E made the following revelatory insertion:

> [PG&E has] reached out to more than 570,000 homes and businesses that are served by our electric lines, operating at 70kV and lower, that run through extreme fire-threat areas. We have communicated to these customers through several formats (letter, email, TV and print ads, social media and news stories) that, if extreme fire danger conditions were forecasted, it might be necessary to temporarily turn off power to their neighborhood or community for safety.

(Underlining added to signify PG&E's addition.)  The absence of such language in its October 2018 shutoff report, in an otherwise identical paragraph, confirms that an exclusion for 115-kilovolt transmission lines was never part of PG&E's ESRB-8 Shutoff Protocol.

452.    Finally, PG&E was required to answer questions posed by the CPUC's Safety and Enforcement Division after the North Bay Fires, which PG&E submitted on October 17, 2017.[146] The Safety and Enforcement Division asked: "Has PG&E proactively de-energized power lines in the last 10 days without being requested to do so by CAL FIRE? If so, please provide information about location, duration and reasons for doing so."  In response, PG&E stated that it had de-energized **two** 115-kilovolt lines in 2017 to prevent wildfires:

> PG&E de-energized multiple transmission lines as described below without the direction of CAL FIRE:
>
> . . .
>
> 3.  On 10/9 at 0644, PG&E de-energized the Fulton-Santa Rosa #1-**115kV line** due to fire in the area. The line was returned to service on 10/9 at 1455.

---

[145] Letter from PG&E to CPUC re: compliance report (Oct. 31, 2018), http://cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/Utilities_and_Industries/Energy_-_Electricity_and_Natural_Gas/PGE%20PSPS%20Report%20Letter%2020181031.pdf.

[146] PG&E's Response to Safety and Enforcement Divisions' 10/14/17 Questions, CPUC website (Oct. 17, 2017), http://www.cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/Safety/Response%20to%20Data%20Request.pdf.

4. On 10/9 at 0644, PG&E de-energized the Fulton-Santa Rosa #2-**115kV line** due to fire in the area. The line was returned to service on 10/14 at 1044.

453.    As such, it was affirmatively false that PG&E's ESRB-8 Shutoff Protocol excluded transmission lines of any kind.  It was also false that PG&E's ESRB-8 Shutoff Protocol excluded 115-kilovolt transmission lines in particular.

454.    PG&E's representations after the Camp Fire that such exclusions existed – when they did not exist – amount to a cover-up, and evidence the Company's scienter.  It is a continuation of PG&E's deliberate efforts to conceal the unsafe operations of its utilities, as further exposed by CPUC's allegations that the Company falsified records and data concerning the safety of its utilities from 2012 through 2017.  *See* ¶99, *supra*.

**H.    PG&E's Unprecedented Departure of Officers and Directors Strengthens the Inference of Scienter**

455.    On January 13, 2019, PG&E announced the abrupt departure of its CEO and President, Defendant Williams.[147]  To explain Williams's unceremonious departure—less than two years after she became CEO in March 2017—PG&E's May 17, 2019, preliminary proxy statement began with a letter to shareholders from the PG&E Board of Directors, stating:

> "The tragic events of the past few years have made clear that the energy system status quo is no longer working for California. We have heard the calls for change and are committed to answering them with strong actions that will help us re-earn the trust of all our stakeholders. **This starts at the top. We replaced PG&E Corporation's CEO and the vast majority of our Boards of Directors with experienced people with the commitment and expertise necessary to redirect our safety culture** and navigate one of the most complex corporate reorganizations ever."

456.    Thus, shortly after Williams's departure, PG&E admitted that she lacked the commitment and expertise necessary for safety.  In the same letter, PG&E argued its Chapter 11 bankruptcy would ultimately provide "a reorganized enterprise with refreshed management and Board members who are committed to safety and reliability in all aspects of our business."

---

[147] J.D. Morris, *PG&E CEO Geisha Williams Out Amid Utility's Widening Financial Crisis*, San Francisco Chronicle (Jan, 13, 2019), https://www.sfchronicle.com/business/article/PG-E-CEO-Geisha-Williams-out-amid-utility-s-13530807.php.

457.     In addition to Williams's departure, three senior executives in PG&E's electric division also left the Company after the 2017 or 2018 fires.  Earley left his position as Executive Chairman of the Company in December 2017, Stavropoulos left his position as COO in September 2018, and Hogan left his position as Senior Vice President of Electric Operations in January 2019.  As a consequence, it may be inferred that the Company had widespread dissatisfaction with its officers' and directors' commitment and expertise necessary for safety beyond just Williams.

458.     Indeed, on February 11, 2019, PG&E issued a press release stating that it would be replacing the majority of its Boards.  As of today, only two Board members out of 13 have not been replaced.  In a further expression of lack of support for the Company's previous leadership, the release acknowledged "that **PG&E must re-earn trust and credibility** with its customers, regulators, the communities it serves and all of its stakeholders . . . ."

## XI.     APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND FRAUD ON THE MARKET FOR THE EXCHANGE ACT CLAIMS

459.     For the Exchange Act claims, Lead Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     The omissions and misrepresentations were material;

(c)     The Company's securities traded in an efficient market;

(d)     The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e)     Lead Plaintiff and other members of the Class purchased PG&E securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

460.     At all relevant times, the market for PG&E securities was efficient for the following reasons, among others:

---

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO. 3:18-CV-03509-EJD

141

1        (a)     PG&E stock met the requirements for listing, and was listed and actively

2  traded on the NYSE, a highly efficient and automated market;

3        (b)     As a regulated issuer, PG&E filed periodic public reports with the SEC

4  and the NYSE;

5        (c)     PG&E regularly communicated with public investors via established

6  market communication mechanisms, including through the regular dissemination of press

7  releases on the major newswire services and through other wide-ranging public disclosures, such

8  as communications with the financial press, securities analysts and other similar reporting

9  services; and

10        (d)     PG&E was followed by numerous securities analysts employed by major

11  brokerage firms who wrote reports that were distributed to the sales forces and certain customers

12  of their respective brokerage firms. Each of those reports was publically available and entered

13  the public marketplace.

14       461.    As a result of the foregoing, the market for PG&E securities promptly digested

15  current information regarding PG&E from publicly available sources and reflected such

16  information in PG&E's stock price. Under these circumstances, all purchasers of PG&E

17  securities during the Class Period suffered similar injury because of their purchases of securities

18  at artificially inflated prices and a presumption of reliance applies.

19       462.    Lead Plaintiff is also entitled to a presumption of reliance under the Supreme

20  Court's decision in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), and its progeny,

21  as Defendants' misstatements throughout the Class Period included omissions, in that they failed

22  to inform investors of PG&E's safety and regulatory failures.

23  **XII.    CLASS ACTION ALLEGATIONS FOR THE EXCHANGE ACT CLAIMS**

24       463.    Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil

25  Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or

26  otherwise acquired PG&E securities traded on the NYSE during the Class Period (the "Class")

27  and were damaged thereby. Excluded from the Class are the excluded persons defined in ¶11,

28  *supra*.

464.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, PG&E securities were actively traded on the NYSE. While the exact number of Class members is unknown to Lead Plaintiff at this time and can be ascertained only through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by PG&E or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

465.     Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

466.     Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Lead Plaintiff has no interests antagonistic to or in conflict with those of the Class.

467.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and safety of PG&E;
- whether Defendants caused PG&E to issue false and misleading financial statements during the Class Period;
- whether Defendants acted with actual knowledge of falsity or recklessly in issuing false and misleading financial statements;
- whether the prices of PG&E securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein;

- whether some or all of Defendants' false and misleading misstatements or omissions served to maintain PG&E's inflated securities prices; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

468.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

469.    Lead Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine, as discussed above in ¶¶459-462.

470.    Based upon the foregoing, Lead Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## XIII.  CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### FIRST CLAIM

**For Violation of Section 10(b) of The Exchange Act and Rule 10b-5
Against PG&E and the Exchange Act Individual Defendants**

471.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

472.    This Count is asserted against PG&E and the Exchange Act Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

473.    During the Class Period, PG&E and the Exchange Act Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

474.    PG&E and the Exchange Act Individual Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;
- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of PG&E securities during the Class Period.

475.    PG&E and the Exchange Act Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of PG&E were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These Defendants by virtue of their receipt of information reflecting the true facts of PG&E, their control over, and/or receipt and/or modification of PG&E's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning PG&E, participated in the fraudulent scheme alleged herein.

476.    Exchange Act Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Lead Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other PG&E personnel to members of the investing public, including Lead Plaintiff and the Class.

477.    As a result of the foregoing, the market price of PG&E securities was artificially inflated during the Class Period. In ignorance of the falsity of PG&E's and the Exchange Act Individual Defendants' statements, Lead Plaintiff and the other members of the Class relied on

1   the statements described above and/or the integrity of the market price of PG&E securities

2   during the Class Period in purchasing PG&E securities at prices that were artificially inflated as

3   a result of PG&E's and the Exchange Act Individual Defendants' false and misleading

4   statements.

5       478.   Had Lead Plaintiff and the other members of the Class been aware that the market

6   price of PG&E securities had been artificially and falsely inflated by PG&E's and the Exchange

7   Act Individual Defendants' misleading statements and by the material adverse information which

8   PG&E's and the Exchange Act Individual Defendants did not disclose, they would not have

9   purchased PG&E's securities at the artificially inflated prices that they did, or at all.

10      479.   As a result of the wrongful conduct alleged herein, Lead Plaintiff and other

11  members of the Class have suffered damages in an amount to be established at trial.

12      480.   By reason of the foregoing, PG&E and the Exchange Act Individual Defendants

13  have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are

14  liable to the plaintiff and the other members of the Class for substantial damages which they

15  suffered in connection with their purchase of PG&E securities during the Class Period.

16                                **SECOND CLAIM**

17                    **For Violation of Section 20(a) of
                  The Exchange Act Against PG&E Corporation**

18

19      481.   Lead Plaintiff repeats and realleges each and every allegation contained in the

    foregoing paragraphs as if fully set forth herein.
20

21      482.   This Count is asserted pursuant to Section 20(a) of the Exchange Act against

22  Defendant PG&E Corporation.

23      483.   During the Class Period, PG&E Corporation participated in the operation and

24  management of the Utility. PG&E Corporation conducted and participated, directly and

    indirectly, in the conduct of the Utility's business affairs. For the years of 2015-2017, **100%** of
25
    PG&E Corporation's directors also sat on the board of the Utility, and **over 90%** of the Utility's
26

27

28

---

1  directors also sat on the board of PG&E Corporation.[148]  Further, both companies filed joint

2  annual reports on Form 10-K with the SEC throughout the Class Period, the entirety of which

3  filings were certified pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by officers of **both**

4  Companies. Further, because of its 100% ownership and authority, PG&E Corporation knew the

5  adverse non-public information regarding the Company's financial condition and noncompliance

6  with relevant laws and regulations.

7      484.    Through its position as sole owner of the Utility and placement of its own

8  Independent Directors on the Utility's Board of Directors, PG&E Corporation had a duty to

9  disseminate accurate and truthful information with respect to the Utility's financial condition and

10 results of operations, and to correct promptly any public statements issued by the Utility which

11 had become materially false or misleading.

12     485.    Because of its position as sole owner of the Utility and placement of its own

13 Independent Directors on the Utility's Board of Directors, PG&E Corporation was able to, and

14 did, control the contents of the various reports, press releases and public filings which the Utility

15 disseminated in the marketplace during the Class Period. Throughout the Class Period, PG&E

16 Corporation exercised its power and authority to cause the Utility to engage in the wrongful acts

17 complained of herein. PG&E Corporation, therefore, was a "controlling person" of the Utility

18 within the meaning of Section 20(a) of the Exchange Act. In this capacity, it participated in the

19 unlawful conduct alleged which artificially inflated the market price of PG&E securities.

20

---

21   [148] 2015: Lewis Chew, Earley, Fred J. Fowler, Maryellen C. Herringer, Richard C. Kelly,
Roger H. Kimmel, Richard A. Meserve, Forrest E. Miller, Rosendo G. Parra, Barbara L. Rambo,
22 Anne Shen Smith, and Barry Lawson Williams were directors of both PG&E Corporation and
the Utility, whereas Johns was a director of the Utility only.
23      2016: Lewis Chew, Earley, Fred J. Fowler, Maryellen C. Herringer, Richard C. Kelly, Roger
H. Kimmel, Richard A. Meserve, Forrest E. Miller, Rosendo G. Parra, Barbara L. Rambo, Anne
24 Shen Smith, and Barry Lawson Williams were directors of both PG&E Corporation and the
Utility, whereas Stavropoulos and Williams were directors of the Utility only.
25      2017: Lewis Chew, Earley, Fred J. Fowler, Maryellen C. Herringer, Jeh C. Johnson, Richard
26 C. Kelly, Roger H. Kimmel, Richard A. Meserve, Forrest E. Miller, Eric D. Mullins, Rosendo G.
Parra, Barbara L. Rambo, Anne Shen Smith, Barry Lawson Williams, and Williams were
27 directors of both PG&E Corporation and the Utility, whereas Stavropoulos was director of the
Utility only.
28

486.     By reason of the above conduct, PG&E Corporation is liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Utility.

## THIRD CLAIM

### For Violation of Section 20(a) of The Exchange Act
### Against The Exchange Act Individual Defendants

487.     Lead Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

488.     During the Class Period, the Exchange Act Individual Defendants participated in the operation and management of PG&E.  The Exchange Act Individual Defendants conducted and participated, directly and indirectly, in the conduct of PG&E's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's financial condition and noncompliance with relevant laws and regulations.

489.     As officers and/or directors of a publicly owned company, the Exchange Act Individual Defendants had a duty to disseminate accurate and truthful information with respect to PG&E's financial condition and results of operations, and to correct promptly any public statements issued by PG&E which had become materially false or misleading.

490.     Because of their positions of control and authority as senior officers, the Exchange Act Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which PG&E disseminated in the marketplace during the Class Period. Throughout the Class Period, the Exchange Act Individual Defendants exercised their power and authority to cause PG&E to engage in the wrongful acts complained of herein. The Exchange Act Individual Defendants therefore, were "controlling persons" of PG&E within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of PG&E securities.

491.     By reason of the above conduct, the Exchange Act Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by PG&E.

# FOURTH CLAIM

## Alter Ego Liability for Violation of Section 10(b) of
## The Exchange Act and Rule 10b-5 Against PG&E Corporation

492.    Lead Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

493.    PG&E Corporation is jointly and severally liable for the misstatements and omissions of the Utility, insofar as:

(a)    PG&E Corporation and the Utility operate as a single business enterprise operating out of the same building located at 77 Beale Street, San Francisco, California, for the purpose of effectuating and carrying out PG&E Corporation's business and operations and/or for the benefit of PG&E Corporation;

(b)    PG&E Corporation and the Utility do not operate as completely separate entities, but rather integrate their resources to achieve a common business purpose;

(c)    the Utility is so organized and controlled, and its decisions, affairs, and business are so conducted as to make it a mere instrumentality, agent, conduit, or adjunct of PG&E Corporation;

(d)    PG&E Corporation's and the Utility's officers and management are intertwined and do not act completely independently of one another;

(e)    PG&E Corporation has control and authority to choose and appoint the Utility's board members as well as its other top officers and managers;

(f)    PG&E Corporation and the Utility are insured by the same carriers and provide uniform or similar pension, health, life, and disability insurance plans for employees;

(g)    PG&E Corporation and the Utility have unified 401(k) Plans, pension and investment plans, bonus programs, vacation policies, and paid time off from work schedules and policies;

(h)    PG&E Corporation and the Utility have unified personnel policies and practices and/or a consolidated personnel organization or structure;

1        (i)     PG&E Corporation and the Utility are represented by common legal

2  counsel;

3        (j)     PG&E Corporation and the Utility acknowledged in their joint 10-K

4  statement for the year 2015 that eight separate officers were "executive officers of both PG&E

5  Corporation and the Utility;"

6        (k)     PG&E Corporation and the Utility acknowledged in their joint 10-K

7  statement for the year 2016 that nine separate officers were "executive officers of both PG&E

8  Corporation and the Utility;"

9        (l)     PG&E Corporation's officers, directors, and other management make

10  policies and decisions to be effectuated by the Utility and/or otherwise play roles in providing

11  directions and making decisions for the Utility;

12        (m)     PG&E Corporation's officers, directors, and other management direct

13  certain financial decisions for the Utility including the amount and nature of capital outlays;

14        (n)     PG&E Corporation's written guidelines, policies, and procedures control

15  the Utility's employees, policies, and practices;

16        (o)     PG&E Corporation files consolidated earnings statements factoring in all

17  revenue and losses from the Utility, as well as consolidated tax returns, including those seeking

18  tax relief; and

19        (p)     PG&E Corporation generally directs and controls the Utility's relationship

20  with, requests to, and responses to inquiries from, the CPUC and uses such direction and control

21  for the benefit of PG&E Corporation.

22     494.    For purposes of this litigation, it would be inequitable to treat the misstatements

23  and actions of the Utility as those of the Utility only, and not also of PG&E Corporation.

24     495.    By reason of the above allegations, any misstatements made by the Utility –

25  including, but not limited to, Misstatement Nos. 1 and 3 – were made by an "alter ego" of PG&E

26  Corporation, and PG&E Corporation is therefore equally liable for violations of Section 10(b) of

27  the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other

28

1  members of the Class for substantial damages which they suffered in connection with their

2  purchase of PG&E securities during the Class Period.

3  **XIV.   NATURE OF THE SECURITIES ACT CLAIMS**

4       496.   Securities Act Plaintiffs (defined below) bring claims for violations of the

5  Securities Act, individually and on behalf of all persons or entities that acquired PG&E senior

6  notes in or traceable to the Company's Notes Offerings, as detailed herein, against certain of the

7  Company's officers and directors, and the underwriters of the Notes Offerings.[149]  Since

8  March 2016, PG&E has issued over $4 billion worth of senior notes registered with the SEC.

9  According to a PG&E filing in the United States District Court for the Northern District of

10  California, "PG&E consistently spends more cash than it generates through its operations and

11  cannot fund all its infrastructure investments without external financing from the debt and equity

12  markets."[150]

13       497.   The Securities Act claims set forth herein are based on strict liability and

14  negligence and are not based on any allegation that any defendant engaged in fraud or intentional

15  misconduct.  The Securities Act Plaintiffs specifically disclaim any reference to or reliance on

16  allegations of fraud.

17  **XV.   OVERVIEW OF THE SECURITIES ACT VIOLATIONS**

18       498.   PG&E's failure to follow safety requirements and prudent practices, including

19  regulations and laws, resulted in numerous devastating wildfires in 2015, 2017 and 2018, causing

20  catastrophic loss of life and destruction of property.

21

22

23  [149]  "Notes Offerings" refers to the Company's March 2016 public offering of senior notes (the "March 2016 Notes Offering"), the Company's December 2016 public offering of senior

24  notes (the "December 2016 Notes Offering"), the Company's March 2017 public offering of senior notes (the "March 2017 Notes Offering"), and the Company's April 2018 public offering

25  of senior notes (the "April 2018 Notes Offering").  The "Offering Documents" refers to the Registration Statement and Prospectus (to include all amendments and supplements thereto for

26  each offering, together with all documents incorporated by reference in each Registration Statement and Prospectus).  *See* ¶ 630(a)-(d).

27  [150]  Response to Second Order to Show Cause Why PG&E's Conditions of Probation Should

28  Not Be Modified at 11, PG&E Criminal Proceedings, (N.D. Cal. Mar. 22, 2019), ECF No. 1032.

499.     In all, the Company has been implicated in causing *more than 1,500 fires* between June 2014 and November 2018,[151] including some of the most widespread and destructive wildfires in California history.  PG&E failed to implement required safety precautions even as the risk of wildfires increased.  The Company has filed Chapter 11 bankruptcy, as it faces a host of regulatory investigations, criminal probes, and civil lawsuits.  PG&E estimates it could be liable for more than $30 billion in costs, expenses and other losses from the North Bay and Camp Fires excluding any penalties, fines, or punitive damages.

500.     In addition to liability for causing destructive wildfires, PG&E recently announced in the Company's May 2, 2019 Form 10-Q that the SEC is "conducting an investigation related to PG&E Corporation's and the Utility's public disclosures and accounting for losses associated with the 2017 and 2018 Northern California wildfires and the 2015 Butte Fire."

501.     At the same time that PG&E's equipment and operations were posing an unreasonable risk to the lives and property of California residents – indeed, even as the Company's equipment was in the midst of setting hundreds of wildfires – PG&E raised billions of dollars from investors through the sale of senior notes.  From March 2016 to May 2018, PG&E offered and sold approximately $4.35 billion worth of senior notes that it registered with the SEC to ensure that the notes could be widely sold and distributed to the investing public.

502.     Specifically, PG&E offered and sold: (i) $600 million worth of 2.95% PG&E senior notes due March 1, 2026 pursuant to the March 2016 Notes Offering; (ii) $250 million worth of floating rate PG&E senior notes due November 30, 2017 and $400 million worth of 4.00% PG&E senior notes due December 1, 2046 pursuant to the December 2016 Notes Offering; (iii) $400 million worth of 3.30% PG&E senior notes due March 15, 2027 and $200 million worth of 4.00% PG&E senior notes due December 1, 2046 pursuant to the March 2017 Notes Offering; and (iv) up to $500 million worth of floating rate PG&E senior notes due

---

[151] *The Wall Street Journal* reported on January 13, 2019 that PG&E started more than 1,500 fires between June 2014 and December 2017.  In November 2018, PG&E also caused the Camp Fire.  *See* Fn 168, *infra*.

1   November 28, 2018, $1.15 billion worth of 3.30% PG&E senior notes due December 1, 2027,

2   and $850 million worth of 3.95% PG&E senior notes due December 1, 2047 pursuant to the

3   April 2018 Notes Offering.

4       503.    PG&E's Offering Documents to the Notes Offerings materially misled investors

5   as to *inter alia*: (i) the safety of the Company's equipment by highlighting its commitment to

6   safety and touting upgrades and investments; (ii) the real risk of wildfires by emphasizing the

7   important role of the Company's vegetation management activities; (iii) the risks associated with

8   and impact of wildfires on PG&E;  (iv) the sufficiency of the Company's investments in safety to

9   prevent wildfires; (v) the Company's liability with respect to wildfires; and (vi) the known

10  adverse trends impacting PG&E.

11      504.    PG&E's conduct has subsequently been revealed to contradict the representations

12  made to investors in the Offering Documents, and now poses an existential threat to the

13  Company.  Subsequent to, and due to, Defendants' omission of the true state of PG&E's business

14  and operations and the risks posed by the Company's lax wildfire safety practices and inadequate

15  investment in safety, the value of the senior notes associated with the Notes Offerings has

16  substantially declined.

17      505.    For example, subsequent to the Notes Offerings, on November 13, 2018, the price

18  of the 2.95% note sold in the March 2016 Notes Offering closed at $86.46 per unit, or ***more than***

19  ***13% below par***; the price of the 4.00% note sold in the December 2016 Notes Offering closed at

20  $72.26 per unit, or ***more than 27% below par***; the price of the 3.3% note sold in the March 2017

21  Notes Offering closed at $82.82 per unit, or ***more than 17% below par***; the price of the 3.3%

22  note sold in the April 2018 Notes Offering closed at $81.38 per unit, or ***more than 18% below***

23  ***par***; and the price of the 3.95% note sold in the April 2018 Notes Offering closed at $72.23 per

24  unit, or ***more than 27% below par***.

25  **XVI.  THE SECURITIES ACT PARTIES**

26      **A.    Securities Act Named Plaintiffs**

27      506.    Plaintiff York County on behalf of the County of York Retirement Fund acquired

28  PG&E senior notes issued in the March 2016 Notes Offering and the April 2018 Notes Offering

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT        153
CIVIL ACTION NO. 3:18-CV-03509-EJD

1 │ as described in the Certification attached hereto (as "Attachment B") and incorporated by

2 │ reference, and has been damaged thereby.

3 │      507.    Plaintiff City of Warren Police and Fire Retirement System acquired PG&E

4 │ senior notes issued in the April 2018 Notes Offering as described in the Certification attached

5 │ hereto (as "Attachment C") and incorporated by reference, and has been damaged thereby.

6 │      508.    Plaintiff Mid-Jersey Trucking Industry & Local No. 701 Pension Fund acquired

7 │ PG&E senior notes issued in the December 2016 Notes Offering and the March 2017 Notes

8 │ Offering as described in the Certification attached hereto (as "Attachment D") and incorporated

9 │ by reference, and has been damaged thereby.

10 │     **B.**    **Bankrupt Entities**

11 │      509.    Pacific Gas and Electric Company is a California public utility operating in

12 │ northern and central California, with headquarters in San Francisco. The Utility is the registrant

13 │ and issuer of the PG&E senior notes issued in the Notes Offerings. The Utility has declared

14 │ bankruptcy and is therefore not named as a defendant in this action due to the automatic stay of

15 │ proceedings under the federal bankruptcy laws. But for the automatic stay of proceedings, the

16 │ Utility would be named as a defendant for all counts asserted herein.

17 │      510.    PG&E Corporation is a holding company whose primary operating subsidiary is

18 │ Pacific Gas and Electric Company. PG&E Corporation is headquartered in the same San

19 │ Francisco building as the Utility, and it shared an overlapping board of directors with the Utility.

20 │ As the parent and owner of the Utility, PG&E Corporation also issued and sold the PG&E senior

21 │ notes issued in the Notes Offerings. Like the Utility, PG&E Corporation has declared bankruptcy

22 │ and is therefore not named as a defendant in this action due to the automatic stay of proceedings

23 │ under the federal bankruptcy laws. But for the automatic stay of proceedings, PG&E Corporation

24 │ would be named as a defendant for all counts asserted herein.

25 │     **C.**    **Securities Act Individual Defendants**

26 │      511.    The following current or former directors and/or officers are named as Defendants

27 │ for the Securities Act claims.

28 │

512.     Defendant Anthony F. Earley, Jr. ("Earley") served as PG&E Corporation's President, Chief Executive Officer ("CEO"), and Chairman of the Board from September 13, 2011 to March 1, 2017, and as its Executive Chairman from March 1, 2017 to December 2017. Earley was a director of the Utility at the time of the March 2016 Notes Offering, the December 2016 Notes Offering and the March 2017 Notes Offering.  Earley signed the registration statement for the March 2016 Notes Offering and the December 2016 Notes Offering and the registration statement for the March 2017 Notes Offering.

513.     Defendant Geisha J. Williams ("Williams") served as PG&E Corporation's CEO and President from March 1, 2017 until her resignation on January 13, 2019.  Previously, she served as the President of Electric Operations at the Utility from August 17, 2015 to February 28, 2017. Prior to that, she served as Executive Vice President of Electric Operations at the Utility from June 1, 2011 to August 16, 2015. Williams was a director of the Utility at the time of the March 2016 Notes Offering, the December 2016 Notes Offering, the March 2017 Notes Offering and the April 2018 Notes Offering.  Williams signed the registration statement for the March 2017 Notes Offering and the registration statement for the April 2018 Notes Offering.

514.     Defendant Nickolas Stavropoulos ("Stavropoulos") served as the President and COO of PG&E Corporation from March 1, 2017 to September 30, 2018, and served as President of Gas Operations at the Utility from August 17, 2015 to February 28, 2017. Prior to that, he served as Executive Vice President of Gas Operations at the Utility from June 13, 2011 to August 16, 2015.  Stavropolous was a director of the Utility at the time of the March 2016 Notes Offering, the December 2016 Notes Offering, the March 2017 Notes Offering and the April 2018 Notes Offering.  Stavropolous signed the registration statement for the March 2017 Notes Offering and the registration statement for the April 2018 Notes Offering.

515.     Defendant Barbara L. Rambo ("Rambo") was a director of the Utility at the time of the March 2016 Notes Offering, the December 2016 Notes Offering, the March 2017 Notes Offering and the April 2018 Notes Offering.  Rambo signed the registration statement for the March 2016 Notes Offering, the registration statement for the December 2016 Notes Offering, the registration statement for the March 2017 Notes Offering, and the registration statement for

the April 2018 Notes Offering.  Rambo was appointed a director of PG&E in 2005. On April 3, 2019, PG&E announced that Rambo would be replaced at the next Board meeting.  As of May 2, 2019, Rambo was no longer a director.

516.    Defendant David S. Thomason ("Thomason") was the Vice President, Chief Financial Officer ("CFO") and Controller of the Utility at the time of the December 2016 Notes Offering, the March 2017 Notes Offering and the April 2018 Notes Offering.  Thomason signed the registration statement for the March 2017 Notes Offering and the registration statement for the April 2018 Notes Offering. Thomason has worked in various roles at PG&E since 2001, and as CFO, VP and controller since June 2016.

517.    Defendant Dinyar B. Mistry ("Mistry") was the Vice President, CFO and Controller of the Utility at the time of the March 2016 Notes Offering, and PG&E's Senior Vice President of Human Resources during the December 2016 Notes Offering, the March 2017 Notes Offering and the April 2018 Notes Offering.  Mistry signed the registration statement for the March 2016 Notes Offering and the December 2016 Notes Offering.  According to PG&E, Mistry joined Pacific Gas and Electric Company in 1994 and has held various positions since then, including Vice President and Controller of Pacific Gas and Electric Company; as Vice President, Regulation and Rates; as Vice President, Internal Audit and Compliance; and most recently as Vice President and Chief Risk and Audit Officer.

518.    Defendant Lewis Chew ("Chew") was a director of the Utility at the time of the March 2016 Notes Offering, the December 2016 Notes Offering, the March 2017 Notes Offering and the April 2018 Notes Offering.  Chew signed the registration statement for the March 2016 Notes Offering, the registration statement for the December 2016 Notes Offering, the registration statement for the March 2017 Notes Offering and the registration statement for the April 2018 Notes Offering.  Chew was appointed a director of PG&E in 2009. On April 3, 2019, PG&E announced that Chew would be replaced at the next Board meeting.  As of May 2, 2019, Chew was no longer a director.

519.    Defendant Fred J. Fowler ("Fowler") was a director of the Utility at the time of the March 2016 Notes Offering, the December 2016 Notes Offering, the March 2017 Notes

1   Offering and the April 2018 Notes Offering.  Fowler signed the registration statement for the

2   March 2016 Notes Offering, the registration statement for the December 2016 Notes Offering,

3   the registration statement for the March 2017 Notes Offering, and the registration statement for

4   the April 2018 Notes Offering. Fowler has been a PG&E director since 2012.

5         520.    Defendant Maryellen C. Herringer ("Herringer") was a director of the Utility at

6   the time of the March 2016 Notes Offering and the December 2016 Notes Offering.  Herringer

7   signed the registration statement for the March 2016 Notes Offering, the registration statement

8   for the December 2016 Notes Offering and the registration statement for the March 2017 Notes

9   Offering.  Herringer was appointed a director of PG&E in 2009. On April 3, 2019, PG&E

10  announced that Herringer would be replaced at the next Board meeting.  As of May 2, 2019,

11  Herringer was no longer a director.

12        521.    Defendant Richard C. Kelly ("Kelly") was a director of the Utility at the time of

13  the March 2016 Notes Offering, the December 2016 Notes Offering, the March 2017 Notes

14  Offering and the April 2018 Notes Offering.  He was also Chairman of the Board of PG&E

15  Corporation beginning in December 2017.  Kelly signed the registration statement for the March

16  2016 Notes Offering, the registration statement for the December 2016 Notes Offering, the

17  registration statement for the March 2017 Notes Offering, and the registration statement for the

18  April 2018 Notes Offering.  Kelly has been a PG&E director from 2013 until his resignation

19  from the Board as announced by PG&E on April 22, 2019.

20        522.    Defendant Roger H. Kimmel ("Kimmel") was a director of the Utility at the time

21  of the March 2016 Notes Offering, the December 2016 Notes Offering, the March 2017 Notes

22  Offering and the April 2018 Notes Offering.  Kimmel signed the registration statement for the

23  March 2016 Notes Offering, the registration statement for the December 2016 Notes Offering,

24  the registration statement for the March 2017 Notes Offering, and the registration statement for

25  the April 2018 Notes Offering.  Kimmel was appointed a director of PG&E in 2009. On April 3,

26  2019, PG&E announced that Kimmel would be replaced at the next Board meeting.  As of May

27  2, 2019, Kimmel was no longer a director.

28

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                157
CIVIL ACTION NO. 3:18-CV-03509-EJD

523.     Defendant Richard A. Meserve ("Meserve") was a director of the Utility at the time of the March 2016 Notes Offering, the December 2016 Notes Offering, the March 2017 Notes Offering and the April 2018 Notes Offering.  Meserve signed the registration statement for the March 2016 Notes Offering, the registration statement for the December 2016 Notes Offering, the registration statement for the March 2017 Notes Offering, and the registration statement for the April 2018 Notes Offering.  Meserve was appointed a director of PG&E in 2006. On April 3, 2019, PG&E announced that Meserve would be replaced at the next Board meeting.  As of May 2, 2019, Meserve was no longer a director.

524.     Defendant Forrest E. Miller ("Miller") was a director of the Utility at the time of the March 2016 Notes Offering, the December 2016 Notes Offering, the March 2017 Notes Offering and the April 2018 Notes Offering, and Chairman of the Utility's Board since May 2017.  Miller signed the registration statement for the March 2016 Notes Offering, the registration statement for the December 2016 Notes Offering, the registration statement for the March 2017 Notes Offering, and the registration statement for the April 2018 Notes Offering.  Miller was appointed a director of PG&E in 2009. On April 3, 2019, PG&E announced that Miller would be replaced at the next Board meeting.  As of May 2, 2019, Miller was no longer a director.

525.     Defendant Barry Lawson Williams ("B. Williams") was a director of the Utility at the time of the March 2016 Notes Offering and the December 2016 Notes Offering, during which time he served as Chairman of the Utility's Board of Directors.  B. Williams signed the registration statement for the March 2016 Notes Offering, the registration statement for the December 2016 Notes Offering and the registration statement for the March 2017 Notes Offering.   B. Williams was appointed a director of PG&E in 1996. On April 3, 2019, PG&E announced that B. Williams would be replaced at the next Board meeting.  As of May 2, 2019, B. Williams was no longer a director.

526.     Defendant Rosendo G. Parra ("Parra") was a director of the Utility at the time of the March 2016 Notes Offering, the December 2016 Notes Offering, the March 2017 Notes Offering and the April 2018 Notes Offering.  Parra signed the registration statement for the

1    March 2017 Notes Offering and the registration statement for the April 2018 Notes Offering.

2    Parra was appointed a director of PG&E in 2009. On April 3, 2019, PG&E announced that Parra

3    would be replaced at the next Board meeting.  As of May 2, 2019, Parra was no longer a director.

4           527.    Defendant Anne Shen Smith ("Smith") was a director of the Utility at the time of

5    the March 2016 Notes Offering, the December 2016 Notes Offering, the March 2017 Notes

6    Offering and the April 2018 Notes Offering.  Smith signed the registration statement for the

7    March 2017 Notes Offering and the registration statement for the April 2018 Notes Offering.

8    Smith was appointed a director of PG&E in 2015. On April 3, 2019, PG&E announced that

9    Smith would be replaced at the next Board meeting.  As of May 2, 2019, Smith was no longer a

10   director.

11          528.    Defendant Eric D. Mullins ("Mullins") was a director of the Utility at the time of

12   the December 2016 Notes Offering, the March 2017 Notes Offering and the April 2018 Notes

13   Offering. Mullins signed the registration statement for the March 2017 Notes Offering and the

14   registration statement for the April 2018 Notes Offering.  Mullins has been a PG&E director

15   since 2016.

16          529.    The defendants identified in ¶¶512-28 are referred to herein as the "Securities Act

17   Individual Defendants."  The Individual Securities Act Defendants signed the registration

18   statements for one or more of the Notes Offerings as detailed herein, and, as directors and/or

19   executive officers of the Company, participated in the solicitation and sale of PG&E senior notes

20   to investors in the Notes Offerings for their own benefit and the benefit of PG&E.

21          **D.    Underwriter Defendants**

22          530.    In addition to the above, the following underwriters are named as defendants for

23   the Securities Act claims for the Notes Offerings for which they served as underwriters.

24          531.    Defendant Barclays Capital Inc. served as a lead underwriter for the March 2016

25   Notes Offering.

26          532.    Defendant BNP Paribas Securities Corp. served as a lead underwriter for the

27   March 2016 Notes Offering and the March 2017 Notes Offering.

28

533.     Defendant Morgan Stanley & Co. LLC served as a lead underwriter for the March 2016 Notes Offering.

534.     Defendant MUFG Securities Americas, Inc. f/k/a Mitsubishi UFJ Securities (USA), Inc. served as a lead underwriter for the March 2016 Notes Offering.

535.     Defendant The Williams Capital Group, L.P. served as a lead underwriter for the March 2016 Notes Offering.

536.     Defendant Citigroup Global Markets Inc. served as a lead underwriter for the December 2016 Notes Offering.

537.     Defendant J.P. Morgan Securities LLC served as a lead underwriter for the December 2016 Notes Offering.

538.     Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated served as a lead underwriter for the December 2016 Notes Offering.

539.     Defendant Mizuho Securities USA LLC served as a lead underwriter for the December 2016 Notes Offering.

540.     Defendant Goldman, Sachs & Co., LLC served as a lead underwriter for the March 2017 Notes Offering.

541.     Defendant RBC Capital Markets, LLC served as a lead underwriter for the March 2017 Notes Offering.

542.     Defendant Wells Fargo Securities, LLC served as a lead underwriter for the March 2017 Notes Offering.

543.     Defendant BNY Mellon Capital Markets, LLC served as an underwriter for the March 2016 Notes Offering and the March 2017 Notes Offering.

544.     Defendant TD Securities (USA) LLC served as an underwriter for the March 2016 Notes Offering and the March 2017 Notes Offering.

545.     Defendant C.L. King & Associates, Inc. served as an underwriter for the March 2016 Notes Offering.

546.     Defendant Great Pacific Securities served as an underwriter for the March 2016 Notes Offering.

547.   Defendant CIBC World Markets Corp. served as an underwriter for the December 2016 Notes Offering.

548.   Defendant SMBC Nikko Securities America, Inc. served as an underwriter for the December 2016 Notes Offering.

549.   Defendant U.S. Bancorp Investments, Inc. served as an underwriter for the December 2016 Notes Offering.

550.   Defendant Lebenthal & Co., LLC served as an underwriter for the December 2016 Notes Offering.

551.   Defendant Mischler Financial Group, Inc. served as an underwriter for the December 2016 Notes Offering.

552.   Defendant Blaylock Van, LLC served as an underwriter for the March 2017 Notes Offering.

553.   Defendant Samuel A. Ramirez & Company, Inc. served as an underwriter for the December 2016 Notes Offering.

554.   Defendant MFR Securities, Inc. served as an underwriter for the March 2017 Notes Offering.

555.   The defendants identified in ¶¶531-554 are referred to herein as the "Underwriter Defendants." The Underwriter Defendants served as underwriters for the Notes Offerings and sold billions of dollars' worth of PG&E senior notes in the Note Offerings, for which they collectively received tens of millions of dollars in fees and commissions. The Underwriter Defendants drafted and disseminated the offering documents used to effectuate each of the Note Offerings for which they served as underwriters. The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein with respect to the Securities Act claims. The Underwriter Defendants are not alleged to be defendants for the April 2018 Notes Offering at this time.

556.   The Individual Securities Act Defendants, together with the Underwriter Defendants, are collectively referred to as the "Securities Act Defendants" and are named as defendants with respect to the Securities Act Claims alleged herein.

**XVII.  SUBSTANTIVE ALLEGATIONS SUPPORTING THE SECURITIES ACT CLAIMS**

    **A.      PG&E's Systemic Failure to Take Measures to Mitigate Wildfires and Safety Violations**

    557.    PG&E engaged in a pattern and practice of ignoring laws and California safety regulations and failed to take appropriate measures to mitigate wildfire hazards.  Results of government investigations, media coverage, analyst coverage, SEC filings, court filings, admissions before and findings of the Honorable William Alsup of the United States District Court for the Northern District of California, and other public information regarding PG&E and the Securities Act Defendants, all demonstrate that each of the Offering Documents for the Notes Offerings contained materially false and/or misleading statements.

    **1.      Overview of Laws and Regulations Governing PG&E's Operations**

    558.    PG&E's ability to maintain safe electrical equipment that complies with state regulations and minimizes the risk of causing wildfires is critical to the Company's business and prospects.  California law includes a doctrine of inverse condemnation as explained in detail in §VI.A.5.  Inverse condemnation imposes strict liability for damages and takings as a result of the design, construction and maintenance of utility facilities, including its electric transmission and distribution lines.  If a utility such as PG&E affirmatively proves "that it reasonably and prudently operated and managed its system" it can recover payments made to property owners for damages caused by a wildfire from the CPUC.  In other words proof "that at a particular time any of the practices, methods, and acts engaged in by a utility follows the exercise of reasonable judgment in light of facts known or which should have been known at the time the decision was made."  This would include proof that it complied with the following laws and CPUC regulations.

    559.    **California Law**.  As explained in detail in §V.A.1-2, PG&E was required by California law, including California Public Utilities Code §702 and §2106, to adequately maintain its equipment and infrastructure, including electrical towers and poles, to prevent fires from being caused by its equipment or infrastructure, and was liable to property owners for damage caused for failure to do so.  For example, California law required PG&E to: (i) maintain

1   equipment that promotes the safety and health of the public pursuant to California Public

2   Utilities Code §451; and (ii) regularly service and maintain its equipment, including by clearing

3   vegetation away from its power lines pursuant to California law, including California Public

4   Resources Codes §4292 and §4293.  And PG&E was liable to the owners of property for any

5   damages to the property caused by fire for negligently or in violation of law setting a fire or

6   allowing a fire to be set pursuant to California Health & Safety Code §13007.

7      560.  **CPUC Regulations**.  PG&E was also required by law to adhere to CPUC

8   regulations as explained in detail in §VI.A.3.  These regulations include the requirements under

9   General Order 95 that PG&E: (i) "establish necessary and reasonable clearances" between

10   overhead conductors and nearby vegetation, with certain "minimum clearances"; and (ii) ensure

11   that that "[a]ll lines and portions of lines shall be maintained in such condition as to provide

12   safety factors not less than those specified in Rule 44.3," which in turn prohibits the use of poles,

13   towers and structures "with a safety factor less than one."  The regulations also include the

14   requirement under General Order 165 that PG&E "shall conduct inspections of its distribution

15   facilities, as necessary, to ensure reliable, high-quality, and safe operation."  As explained in

16   detail in §VI.A.3(b), as of July 2018, another California safety regulation, CPUC Resolution

17   ESRB-8, also required PG&E to temporarily shut off its power lines when certain dangerous

18   conditions are present that make an area susceptible to wildfires, including high wind speed and

19   low humidity.  On September 27, 2018 PG&E indicated that it had implemented measures in

20   response to ESRB-8.

21      561.  PG&E violated California laws and CPUC regulations with respect to maintaining

22   the Company's equipment, engaging in adequate vegetation management practices and shutting

23   down power when weather conditions warrant such a safety precaution to prevent wildfires.

24      562.  **Federal Regulations**.  PG&E is also required by law to adhere to a number of

25   federal laws and regulations as explained in detail in §VI.A.6.  FERC Electric Reliability

26   Standard FAC-003-4, for example, "requires that trees and other vegetation growing in or

27

28

1   adjacent to the power line right-of-way be trimmed to prevent power outages caused by tree

2   contact with a transmission line."[152]  PG&E failed to comply with this requirement.

**2.    PG&E's Lax Safety Practices, Safety Violations and Resulting Wildfires**

3

4

5       563.    On September 9, 2015, the 2015 Butte Fire was started when a tree came into

6   contact with a power line.  The fire, which killed two people, destroyed more than 500 homes

7   and more than 400 other properties and structures, and scorched more than 70,000 acres over 22

8   days, is described in more detail *supra*.  ¶¶100-102.

9       564.    Cal Fire, which is authorized to make fire cause and origin determinations for

10  wildfires as explained in §VI.A.4 above, launched an investigation "as part of the initial response

11  to the Butte Fire" at which time its investigators "immediately began working to determine the

12  origin and cause of the fire."[153]

13      565.    On March 1, 2016, PG&E issued and delivered the notes offered in the March

14  2016 Notes Offering.  The notes were offered pursuant to a shelf registration, with the prospectus

15  supplement filed on February 23, 2016 with the SEC and the final prospectus supplement filed

16  February 24, 2016.

17      566.    On April 28, 2016, Cal Fire issued a press release announcing its conclusion that

18  the 2015 Butte Fire was caused by PG&E's safety violations, including evidence of negligence.

19  Cal Fire has indicated it would seek $90 million for costs of suppressing the 2015 Butte Fire and

20  PG&E called that estimate reasonable in a May 2, 2016 Form 8-K filing.[154]  Cal Fire also

21  referred its investigation to the two relevant district attorneys for the counties in which the 2015

22

23      [152]   *See* FERC, *Tree Trimming & Vegetation Management* (updated Apr. 10, 2018),
    https://www.ferc.gov/industries/electric/indus-act/reliability/vegetation-mgt.asp; FERC, *FAC-
24  003-4 Transmission Vegetation Management*, https://www.ferc.gov/industries/electric/indus-
    act/reliability/vegetation-mgt/fac-003-4.pdf?csrt=10652948532787038938.

25      [153]   Press Release, Cal Fire, *Cal Fire Investigators Determine Cause of Destructive Butte Fire*
    (Apr. 28, 2016),
26  calfire.ca.gov/communications/downloads/newsreleases/2016/ButteFireCause.pdf.

27      [154]   *See also* Press Release, CAL FIRE, *Cal Fire Investigators Determine Cause of
    Destructive Butte Fire* (Apr. 28, 2016),
28  calfire.ca.gov/communications/downloads/newsreleases/2016/ButteFireCause.pdf.

1  Butte Fire burned.  On June 22, 2017, California Superior Court Judge Allen Sumner found

2  PG&E liable in Inverse Condemnation for damages for the 2015 Butte Fire.[155]

3          567.    Part of the evidence regarding the 2015 Butte Fire includes an internal PG&E

4  May 8, 2008 slide presentation filed in the *Butte Fire Cases*, No. JCCP 4853 (Cal. Super. Ct.

5  Sacramento Cty. Nov. 2, 2018) titled "2008 Utility Offsite Strategy Discussion."  The slide

6  presentation was for a meeting which PG&E's CEO Williams testified in deposition on July 7,

7  2017 that she recalled attending.  It includes a slide which asks, "What is up for debate?" and the

8  response includes among less than ten items, "Safety."  It also asks, "What is not up for debate?"

9  and the response includes "8% EPS growth":

---

[155]    *Butte Fire Cases*, No. JCCP 4853, Ruling on Submitted Matter: Inverse Condemnation

Motions (Cal. Super. Ct. Sacramento Cty. June 22, 2017).

568.     Similarly, other evidence indicates that PG&E did not provide adequate resources for safety.  According to the October 15, 2018 deposition testimony of Janaize Markland, filed in the PG&E Criminal Proceedings before Judge Alsup, the director of PG&E's Enterprise and Operational Risk and Insurance Department testified regarding prepared testimony dated May 1, 2015.  According to the prepared testimony referred to in the deposition and Ms. Markland's deposition it was possible to improve tree-related outages "but that would require a level of investment greater than what PG&E is making today."[156]  The prepared testimony went on to indicate "[w]ith limited resources, PG&E cannot do everything and must decide at what point it's okay not to mitigate the risk further.  Tradeoff decisions must be made," which Ms. Markland testified was "a true statement."  She further testified that a tradeoff decision "has to do with at what point can you reduce risk further and at what cost."[157]

569.     Evidence submitted in the *Butte Fire Cases* also includes the depositions of contractors who worked for PG&E and who described incentives PG&E provided to not clear as much vegetation as was required for safety purposes so as to save PG&E money.[158]   For example, Robert Urban was deposed on May 16, 2017 as the person most qualified to testify on behalf of a PG&E contractor, ACRT, that worked on PG&E's behalf to, among other services, clear vegetation.  According to Mr. Urban's testimony, PG&E paid its contractors bonuses if they identified and cleared fewer trees as well as other vegetation, incentivizing contractors to clear less vegetation than is safe:

> Q. And under the VMII [bonus] program – correct me if I'm wrong – the way it was set up is if ACRT listed fewer trees than the target number and it ended up fewer trees than the target number were worked, there would be a bonus provided ACRT met certain other metrics; right?
>
> Urban: That is correct.

---

[156] Excerpts of Deposition Transcript of Janaize Markland, PG&E Criminal Proceedings (N.D. Cal. Feb. 6, 2019), ECF No. 1008-1; PG&E Response to Request for Information, PG&E Criminal Proceedings (N.D. Cal. Feb. 22, 2019), ECF No. 1016.

[157] Excerpts of Deposition Transcript of Janaize Markland, PG&E Criminal Proceedings, (N.D. Cal. Feb. 6, 2019), ECF No. 1008-1.

[158] *See generally* Declaration of Kristine K. Meredith , *Butte Fire Cases*, No. JCCP 4853, (Cal. Super. Ct. Sacramento Cty. Dec. 21, 2018).

1

Q. All right. And if ACRT met those certain other metrics, then there would be an amount per tree not worked that would be paid to ACRT; true?

2

Urban: There would be an incentive paid for trees that came – for unit count that came in under target. That is correct.

3

4

\*      \*      \*

5

Q. So for every tree underneath – or every tree less than the VMII target, assuming the other metrics had been met, ACRT would receive seven bucks per tree; correct?

6

7

Urban: That is correct.  Seven bucks per unit.

8

Q. Okay.  That's right.  Because a unit might be a brush, for example; right?

9

10

Urban: It may.

11

\*      \*      \*

12

Q. Did you ever harbor that belief yourself that, hey, this bonus system kind of incentivizes my people to not do their job?

13

Urban: That is a concern.

14

570.     Additional evidence regarding PG&E's insufficient safety practices includes

15

PG&E quality assurance audits of the Jackson District where the 2015 Butte Fire occurred.

16

Those audits showed a trend from 2012 through 2015 of an extremely high concentration of

17

potentially hazardous non-compliant trees in that District.  For example, PG&E conducted an

18

audit in the summer of 2015 (June 8, 2015 to July 10, 2015) which identified in a sample of

19

48.71 line miles, 15 non-compliant trees, 87% of those trees were in the Jackson District.

20

571.     PG&E employee Kelly O'Flinn, deposed on November 3, 2016 pursuant to the

21

*Butte Fire Cases*, No. JCCP 4853 (Cal. Super. Ct. Sacramento Cty. Jan. 17, 2019), was asked

22

about the same audit and incidence of noncompliant trees in Jackson.  O'Flinn confirmed that the

23

vegetation issues were a negative trend affecting PG&E:

24

Q: There is a paragraph there [in the audit] that says, "Regulatory compliance has declined slightly for the last three consecutive SRA audits and fallen below 99.50 percent for the first time since 2009."  . . . Would you consider that to be a trend?

25

26

O'Flinn: I would say, yes, it's a trend.

27

Q: And that is a trend in the wrong direction, right?

28

1                                    *        *        *

2              O'Flinn: Slight – slight downward trend. [159]

3        572.    On December 1, 2016, PG&E issued and delivered the notes offered in the

4   December 2016 Notes Offering.  The notes were offered pursuant to a shelf registration, with the

5   prospectus supplement filed with the SEC on November 28, 2016, and final prospectus

6   supplement filed November 29, 2016.

7        573.    And on March 10, 2017, PG&E issued and delivered the notes offered in the

8   March 2017 Notes Offering.  The notes were offered pursuant to the Registration Statement filed

9   with the SEC on January 4, 2017 (and as amended on January 19, 2017), and the prospectus

10  supplement and final prospectus supplement filed with the SEC March 7 and March 8, 2017,

11  respectively.

12       574.    Then, in October 2017, a series of devastating fires, which became known as the

13  North Bay Fires, ravaged at least 245,000 acres of land and killed 44 people.  At the time, the

14  fires were the most destructive in California history and are responsible for billions in damages.

15       575.    Many sources pointed to the cause of the deadly North Bay Fires.  According to a

16  report from NBC reporter Jaxon Van Derbeken published on November 6, 2017, a month after

17  the North Bay Fires began, PG&E's own internal inspectors allow one out of 100 trees they

18  check to violate state power line clearance standards and "cheated" when too many violations

19  were found:

20              **PG&E auditors allow one out of 100 trees they check to violate
            state power line clearance standards, NBC Bay Area has
21          learned.**

22                                   *        *        *

23              . . .[I]t emerged during the Butte fire litigation that [internal]
            auditors were giving out a passing grade when one out of 100 trees
24          they checked turned out to be too close to power lines under state
            standards.
25
                                     *        *        *
26

27  _____

        [159]   *Butte Fire Cases*, No. JCCP 4853, Exhibit G to the Declaration of Kristine K. Meredith,
28  at 45:12-24 (Cal. Super. Ct. Sacramento Cty. Dec. 21, 2018); *see also* at 124:3-12.

1

. . .When [PG&E] failed to reach that 99 percent compliance rate
in the area around the fire . . . **the company just expanded the**
2
**universe of trees covered in a particular audit.**

3
"So what PG&E does when it doesn't pass, it basically cheats,"
[Amanda Riddle, one of the attorneys participating in a lawsuit
4
against PG&E related to the Butte Fire] said.  "It adds more miles
and more miles until it reaches a passing grade."

5

6
576.    Shortly thereafter, in a press release on December 20, 2017, PG&E announced

7
that its "Board of Directors has determined to suspend the quarterly cash dividend on the

8
Corporation's common stock, beginning with the fourth quarter of 2017, citing uncertainty

related to causes and potential liabilities associated with the extraordinary October 2017
9

Northern California wildfires."
10

577.    With respect to the wildfires, on January 3, 2018, State Senator Jerry Hill was
11

12
quoted by NBC as saying that he felt "misled" by PG&E's executives into believing that the

13
Company had followed the lead of its counterparts and shut off its reclosers – a type of "smart"

switch that can automatically turn power back on – in all 132 of its high risk fire areas by the
14

15
start of 2017:

16
Hill said he was surprised the company's recloser shutdown was so
limited, given that a top PG&E official assured him back in 2015
that the company would be able to shut down reclosers in all 132
17
of the high risk fire areas by the start of 2017.

18
"I think that's the troubling part," Hill said, "that they misled us in
that.
19

"Had they said they did not have that system in place, then we
20
would have followed up with more questions to try to find what the
problem was – and may have been able to focus in on that a couple
21
of years ago that may have prevented these fires in October."

22
578.    On April 2, 2018, PG&E filed with the SEC the registration statement for the

23
April 2018 Notes Offering.  On April 13, 2018, PG&E filed the prospectus for the offering.  The

24
exchange offer under the April 2018 Notes Offering ran until 5pm ET on May 14, 2018.

25
579.    On May 25, 2018, Cal Fire issued a press release announcing the results of its

26
investigation into four of the North Bay Fires.  The agency found that **all four had begun as a**

27
**result of downed vegetation disrupting PG&E power lines, and that three of the four were**

28
**due to PG&E's apparent violations of California safety regulations** regarding the necessary

1   clearance between trees and power lines.  The violations were of such a nature that Cal Fire

2   referred these incidents to the appropriate district attorneys' offices for further review.

3        580.    Less than a month later, on June 8, 2018, Cal Fire issued a press release

4   announcing the results of its investigation into 12 additional wildfires that occurred during the

5   North Bay Fires.  The agency determined that **all 12 wildfires were caused by PG&E**

6   **equipment**.  The agency also stated that eight of the 12 had been referred to the appropriate

7   district attorneys' offices for further review "due to evidence of alleged violations of state law."

8        581.    The next day, on June 9, 2018, *Bloomberg* published an article titled "PG&E May

9   Face Criminal Charges After Probe of Deadly Wildfires."  The article stated that PG&E was

10  exposed to potential criminal liability due to Cal Fire's finding that PG&E's failure to follow the

11  law had led to a majority of the North Bay Fires investigated to date.

12       582.    On June 10, 2018, analysts at Guggenheim issued a research report on PG&E that

13  recommended investors sell PG&E securities.  The report stated: "At this point, we question

14  whether the applicability of inverse condemnation even matters when **all signs seem to point to**

15  **PCG being imprudent operators in the majority of instances, which would therefore mean**

16  **it should assume liability."**

17       583.    On June 21, 2018, PG&E announced that it would take an estimated pre-tax

18  charge in the amount of *2.5 billion* for the quarter ending June 30, 2018, for claims related to

19  the North Bay Fires.

20       584.    On October 9, 2018, Cal Fire issued a press release announcing the results of its

21  investigation into the Cascade Fire, part of the North Bay Fires.  Again, PG&E equipment was

22  found to be the cause of the fire.

23       585.    PG&E's admitted exposure for the North Bay Fires continued to increase.  On

24  February 28, 2019, PG&E issued a press release indicating the Company was taking an

25  additional $1 billion charge for the quarter ending December 31, 2018 for the North Bay Fires.

26  Accordingly, a total of $3.5 billion in charges for the North Bay Fires had been taken to date.

27       586.    By the time PG&E filed its quarterly report on Form 10-Q on May 2, 2019,

28  PG&E would report that "Cal Fire has issued its determination on the causes of 19 of the 2017

1    Northern California wildfires, and alleged that all of these fires, with the exception of the Tubbs

2    fire, involved [PG&E's] equipment.  Cal Fire has not publicly announced any determination of

3    cause on the remaining wildfires."  PG&E has also indicated in this latest Form 10-Q, filed with

4    the SEC on May 2, 2019, that "[i]n light of the current state of the law on inverse condemnation

5    and the information currently available to the Utility, including, among other things, the Cal Fire

6    determinations of cause as stated in Cal Fire's press releases and their released reports, PG&E

7    Corporation and the Utility have determined that it is probable they will incur a loss for claims in

8    connection with 17 of the 2017 Northern California wildfires."

9          587.    Following the North Bay Fires, on November 8, 2018, the Camp Fire began near

10   the town of Paradise, Butte County.  The fire would grow to surpass the North Bay Fires – **which**

11   **PG&E equipment had played a central role in igniting nearly all only one year previously**.

12   The 2018 Camp Fire is the most destructive and fatal wildfire in California history.  The fire

13   burned 153,336 acres, caused at least 85 fatalities, with total damages estimated on the low-end

14   at $16.5 billion.  The fire was considered the costliest natural disaster in the world in 2018.

15         588.    Cal Fire, as it did with the 2015 Butte Fire and North Bay Fires, conducted an

16   investigation.  PG&E equipment was implicated as the cause of the Camp Fire. Specifically, Cal

17   Fire identified the location of the fire as near a PG&E transmission line, which the Company

18   revealed in a December 11, 2018 electric incident report had relayed and de-energized shortly

19   before the fire began.  A PG&E employee also reported a fire in the vicinity of the transmission

20   line to 911 the morning the Camp Fire started, and an aerial patrol identified a suspension

21   insulator supporting a transposition jump at the transmission tower that had separated.

22         589.    On November 13, 2018, PG&E filed a report on Form 8-K with the SEC stating

23   that PG&E had submitted an electric incident report to the CPUC suggesting that PG&E's

24   equipment was at fault for the Camp Fire, and that PG&E had significantly increased their

25   liability insurance, as follows:

26                  The cause of the Camp Fire is under investigation.  On November
                    8, 2018, the Utility submitted an electric incident report to the
27                  California Public Utilities Commission (the "CPUC") indicating
                    that "on November 8, 2018 at approximately 0615 hours, PG&E
28                  experienced an outage on the Caribou-Palermo 115 kV

Transmission line in Butte County. **In the afternoon of November 8, PG&E observed by aerial patrol damage to a transmission tower on the Caribou-Palermo 115 kV Transmission line**, approximately one mile north-east of the town of Pulga, in the area of the Camp Fire. This information is preliminary."  Also on November 8, 2018, acting governor Gavin Newsom issued an emergency proclamation for Butte County, due to the effect of the Camp Fire.

As previously reported, during the third quarter of 2018, PG&E Corporation and the Utility renewed their liability insurance coverage for wildfire events in an aggregate amount of approximately $1.4 billion for the period from August 1, 2018 through July 31, 2019.

590.   PG&E has also acknowledged (¶190) that another ignition point for the Camp Fire had exhibited damaged and downed poles, vegetation on top of downed wires, and other signs of safety violations.  At times approximately 30 minutes apart, vegetation underneath the lines ignited at two ignition points.  At the same time, despite PG&E's ESRB-8 Shutoff Protocol, PG&E had canceled plans to shut off power as a precaution against fires in parts of Butte County, where the fire ignited.  Additionally, media reports (¶375) have indicated that a PG&E crew was planning to address sparking transmission lines in a location near the origin of the Camp Fire.

591.   On November 14, 2018, *Reuters* published an article describing the market's reaction to the news about PG&E's liability for wildfires, titled "UPDATE 3-PG&E shares and bonds plunge as California wildfire risks mount."[160]

592.   On November 15, 2018, Moody's downgraded PG&E's debt.  As *Bloomberg* described in a November 15, 2018 article titled "PG&E Credit Cut to Brink of Junk by Moody's on Wildfire Risk":

PG&E Corp.'s credit rating was cut to the brink of junk amid doubt about its ability to manage liabilities from the California wildfires.

Moody's Investors Service lowered the rating to Baa3 from Baa2, the second-lowest level of investment grade, with the possibility of

---

[160]   Dan Burns, *UPDATE 3-PG&E Shares and Bonds Plunge as California Wildfire Risks Mount*, Reuters (Nov. 14, 2018), https://www.reuters.com/article/california-wildfires-pge/update-3-pge-shares-and-bonds-plunge-as-california-wildfire-risks-mount-idUSL2N1XP0UP.

further downgrade, according to a statement. PG&E's grade reflects an exposure of about $10 billion to the 2017 wildfires, and uncertainty around 2018 liabilities, said Moody's, which also reduced the utility's Pacific Gas & Electric Co. subsidiary to Baa2.

**"The rating downgrade reflects the material exposure to new potential liabilities associated with the Camp Fire** and the uncertainties associated with how the fire-related liabilities will be recovered," Moody's analyst Jeff Cassella said in the statement.

California's biggest utility said this week it exhausted its credit facilities to boost cash, a move that was widely seen to be in anticipation of a credit rating downgrade, and raising concerns it may have to eventually file for bankruptcy.

593.    On November 27, 2018, Judge Alsup ordered PG&E to provide written answers to several questions regarding the Company's role in starting the Camp Fire and any other fires in the last three years.[161]   Judge Alsup is presiding over PG&E's probation proceedings following its 2016 conviction related to the explosion of a PG&E gas pipeline in San Bruno, California, that killed eight people and destroyed 38 homes.

594.    Despite the 2015 Butte Fire and North Bay Fires, on December 10, 2018, *The San Diego Union-Tribune* reported that PG&E had never produced a report for wildfire mitigation risks two years after the law requiring the production of such a report was enacted.  Under California Senate Bill 1028 ("SB 1028") – enacted in September 2016 – PG&E and other California utilities were required to produce an annual report detailing efforts to limit the risks from wildfires and specifying who was responsible for implementing safety provisions in the plans.  State Senator Jerry Hill, who introduced SB 1028, said of utility regulators' failure to oversee PG&E's implementation of the report: **"They have done absolutely nothing in those two years."**  In part to rectify this delinquency, the California State Legislature passed California Senate Bill 901 ("SB 901") in the Fall of 2018 in order to force California utilities to develop and submit their wildfire mitigation plans no later than February 2019.  According to a submission of

---

[161] *See* Notice re California Wilfires, PG&E Criminal Proceedings (N.D. Cal. Nov. 27, 2018), ECF No. 951.

1    the CPUC in the probation proceedings pending before Judge Alsup, on February 6, 2019,

2    PG&E finally submitted said plan.[162]

3         595.    In addition to not producing a plan for wildfire mitigation risks, PG&E is alleged

4    to have falsified safety data and records for five years.  As PG&E noted in a press release, filed

5    on January 14, 2019 with the SEC on a Form 8-K, the CPUC announced on December 14, 2018

6    that it had opened a case against PG&E for allegedly falsifying its data and safety records.

7    While the documented violations related to the intentional falsification of pipeline data, the

8    agency stated that the findings were an example of why it was "investigating PG&E's safety

9    culture" and considering the forced implementation of measures that "address systemic safety

10   issues at PG&E."  In other words, according to the CPUC, the Company's falsification of

11   pipeline safety data implicated the Company's entire operations and approach to safety.

12   According to the CPUC's annual report for 2018, PG&E falsified records from 2012 through

13   2017.[163]

14        596.    Thereafter, on December 21, 2018, the CPUC issued a Scoping Memo and Ruling

15   (the "Ruling") regarding its efforts to reform PG&E's corporate safety culture.  The Ruling

16   found that "PG&E has had serious safety problems with both its gas and electric operations for

17   many years" and stated that, despite these shortcomings, **the Company had failed "to develop a**

18   **comprehensive enterprise-wide approach to address safety**."  The Ruling stated that the

19   CPUC "was, and remains, concerned that the safety problems being experienced by PG&E were

20   **not just one-off situations or bad luck, but indicated a deeper and more systemic problem**."

21        597.    On December 28, 2018, the Attorney General of California filed an amicus brief

22   in connection with PG&E's probation proceedings before Judge Alsup.  The brief stated that

23   PG&E's actions or failures to act could constitute a range of criminal violations if the Utility was

24

25   [162] Comments of the CPUC in Response to Second Order to Show Cause at 1, PG&E
     Criminal Proceedings (N.D. Cal. Mar. 22, 2019), ECF No. 1033.

26   [163] *See* CPUC 2018 Annual Report at 9,
     http://www.cpuc.ca.gov/uploadedFiles/CPUCWebsite/Content/About_Us/Organization/

27   Divisions/Office_of_Governmental_Affairs/Legislation/2019/CPUC%20Annual%20Report%20

28   2019%20-%20page%20view%20only.pdf.

1   found to be "reckless" in causing California wildfires.[164]  The listed potential offenses ranged

2   from misdemeanors to implied-malice murder.

3       598.    On January 9, 2019, in PG&E's probation proceedings before Judge Alsup, a U.S.

4   probation officer filed a Petition for Summons for Offender Under Supervision, which: (i) found

5   "probable cause to believe that Pacific Gas and Electric Company violated the conditions of their

6   Probation" stemming from the San Bruno pipeline explosion;[165] (ii) cited the Company's failure

7   to report the investigation by the Butte County District Attorney's Office into PG&E's role in

8   starting several fires that formed part of the North Bay Fires; and (iii) cited PG&E's failure to

9   report Cal Fire's findings of responsibility for the Honey Fire (part of the North Bay Fires), that

10  there was the possibility of criminal prosecution stemming from PG&E's role in starting this fire,

11  or that the Company had entered into a settlement agreement with Butte County to avoid such

12  criminal prosecution.

13      599.    On January 9, 2019, Judge Alsup also issued an order to show cause as to why the

14  terms of PG&E's probation should not be modified "[i]n order to protect the public from further

15  wrongs by the offender, to deter similar wrongs by other utilities, and to promote the

16  rehabilitation of the offender."[166]  The order cited Cal Fire's finding that **PG&E had caused 18**

17  **wildfires in 2017, 12 of which it had referred to criminal prosecution**, and suggested the

18  Company significantly bolster its vegetation management activities and re-inspect its entire

19  electrical grid in "light of PG&E's history of falsification of inspection reports," among other

20  proposed modifications to the terms of the Company's probation.[167]

21

22

23      [164] Attorney General's Amicus Brief Regarding PG&E's Potential Criminal Liability, PG&E
        Criminal Proceedings (N.D. Cal. Dec. 28, 2018), ECF No. 954.

24      [165] Petition for Summons for Offender Under Supervision at 4, PG&E Criminal Proceedings
        (N.D. Cal. Dec. 28, 2018), ECF No. 960.

25
26      [166] Order to Show Cause Why PG&E's Conditions of Probation Should Not Be Modified at 1,
        PG&E Criminal Proceedings (N.D. Cal. Jan. 9, 2019), ECF No. 961.

27      [167] PG&E has been found responsible by Cal Fire for at least *18 of the 19 major fires*
        stemming from the 2017 Northern California wildfires that Cal Fire had investigated up until that

28  point.  Only the Tubbs Fire had not been found to have been PG&E's fault.

600.   On January 13, 2019, *The Wall Street Journal* reported that PG&E had **started more than 1,500 fires** between June 2014 and December 2017, or more than one a day on average.[168]  The newspaper provided the following graphic, which illustrates the shocking extent of PG&E's contribution to fires throughout California with incidents reported across essentially *all* of the Utility's service area:



_____

[168] Russell Gold et al., *PG&E Sparked at Least 1,500 California Fires. Now the Utility Faces Collapse*, Wall Street J. (Jan. 13, 2019), https://www.wsj.com/articles/pg-e-sparked-at-least-1-500-california-fires-now-the-utility-faces-collapse-11547410768.

Case: 19-30088   Doc# 11168-30   Filed: 08/31/21   Entered: 08/31/21 14:49:59   Page 186 of 229

601.     On January 14, 2019, PG&E filed with the SEC a report on Form 8-K stating that the Company expected to file for Chapter 11 bankruptcy on or about January 29, 2019.  The reason the Company provided for the expected bankruptcy filing was the "series of catastrophic wildfires that occurred in Northern California in 2017 and 2018."

602.     On January 15, 2019, *MarketWatch* reported in an article titled "PG&E's slide into bankruptcy would mark third largest investment-grade default since 1998,"[169] that PG&E faced a significant risk of defaulting on its bonds:

> If Pacific Gas & Electric Co. follows through with its bankruptcy announcement, the country's largest utility would record the third largest default in the U.S. investment-grade corporate bond market since 1998.
>
> PG&E announced it would file for bankruptcy by Jan. 29 after devastating California wildfires in 2017 and 2018 left it facing billions in potential liabilities.  The company also said it would not pay an interest payment due on bonds maturing in 2040 on Wednesday, which would also trigger a default.
>
> *          *          *
>
> PG&E's bankruptcy would mark a dramatic collapse for a company that was once seen as an attractive bet among hedge funds.  More than $17 billion of its bonds would be facing default, according to analysts at Bank of America Merrill Lynch.
>
> *          *          *
>
> In terms of sheer scale of a default from an investment-grade issuer, BAML found only Lehman Bros. and WorldCom would rank above the PG&E.

603.     On January 17, 2019, Judge Alsup issued a request for comment on his tentative finding that "**the single most recurring cause of the large 2017 and 2018 wildfires attributable to PG&E's equipment has been the susceptibility of PG&E's distribution lines to trees or limbs falling onto them during high-wind events.**"

---

[169] Sunny Oh, *PG&E's Slide Into Bankruptcy Would Mark Third Largest Investment-Grade Default Since 1998*, MarketWatch (Jan. 15, 2019), https://www.marketwatch.com/story/pges-slide-into-bankruptcy-would-mark-third-largest-investment-grade-default-since-1998-2019-01-15.

604.     On January 29, 2019, PG&E declared Chapter 11 bankruptcy.  The Company's bankruptcy filings stated that it was facing $51.7 billion in liabilities, including more than $30 billion in possible liabilities tied to the Camp Fire and the North Bay Fires.

605.     On January 30, 2019, Judge Alsup, during a probationary hearing, stated: "**[T]here is one very clear-cut pattern here: That PG&E is starting these fires**."[170] Judge Alsup continued, "what do we do[?]  Does the judge just turn a blind eye and say, 'PG&E, continue your business as usual.  Kill more people by starting more fires'?"  On the subject of whether PG&E had made safety a priority, Judge Alsup reportedly stated: "**[I]t's not really true. Safety is not your number one thing**."

606.     On February 6, 2019, PG&E finally filed a wildfire mitigation plan as required by SB 901.  PG&E's wildfire plan stated that the Company would significantly expand its public-safety power shutoff program, from about 570,000 affected consumers to as many as 5.4 million customers, substantially increase its tree-clearing practices, beef up inspections of its equipment and install more weather stations and cameras for earlier risk detection.

607.     Accordingly, the expanded scope of PG&E's 2019 wildfire plan further demonstrates the inadequacy of PG&E's prior safety practices and investment in safety, showing that PG&E did far less than it should have previously done.

608.     Similarly, the 2019 wildfire mitigation plan provided for more $2 billion in new expenditures and significant increases in inspections and other measures over what PG&E had done in 2018.  Those new measures included the following:

- remove 375,000 trees in 2019, after cutting down 160,000 in 2018;

- 2,450 miles of Enhanced Vegetation Management in 2019, a 320% increase from the 760 miles of assorted related practices in 2018;

- increase enhanced transmission structure inspections from 9,400 in 2018 to 40,600 in 2019; and

---

[170] Transcript of Proceedings at 12-13, 24, PG&E Criminal Proceedings (N.D. Cal. Jan. 31, 2019), ECF No. 999.

1        • enhanced inspections of 685,000 distribution poles,
           including climbing of all transmission towers, after making
2          517,500 routine inspections of distribution poles in 2018.

3        609.    Following the plan's release, the *Associated Press* summarized the general

4   reaction, "Lawyers, industry watchdogs and a federal judge alike wonder: *What took so long*?"

5   However, at the hearing on the second order to show cause in PG&E's probation proceedings

6   before Judge Alsup, counsel for PG&E stated that the plan was not final.  He explained, "the

7   wildfire mitigation plan is still in the process of being reviewed and there isn't a final one . . . that

8   plan is still in flux."[171]

9        610.    Also on February 6, 2019, attorneys for fire victims provided a submission to

10  Judge Alsup in response to the January 30, 2019 probationary hearing.[172]  The submission

11  compiled data from PG&E's regulators which demonstrated that the Company posed a far

12  greater risk to the public than its peers.  For example, according to the submission, Southern

13  California Edison ("SoCalEd") serves 15 million people across approximately 50,000 square-

14  miles, operating and maintaining 91,375 miles of distribution lines and 1,433,336 electric poles.

15  By comparison, PG&E services approximately 16 million people throughout a 70,000-square-

16  mile service area, operating and maintaining between 81,000 miles and 115,000 miles of

17  distribution lines and 2,400,000 electric poles.  Yet, despite these similarities in service size and

18  miles of distribution lines, **PG&E's electrical equipment caused 1,208 more wildfires than**

19  **SoCalEd's equipment between 2014 to 2017** as self-reported to the CPUC.  In total, PG&E's

20  equipment caused 1,552 wildfires, while SoCalEd only caused 344 fires over the same time

21  period.  Put differently, PG&E's equipment caused **4.5 times more wildfires** than SoCalEd.

22  PG&E's equipment was also responsible for more large-scale fires, including 43 more fires than

23  SoCalEd that burned between 10-99 acres, three more between 100-299 acres, and two more

24  between 300-999 acres.  Similarly, since 2014, the electrical equipment of San Diego Gas &

25  ─────────────────────────

26  [171] Transcript of Proceedings at 10, PG&E Criminal Proceedings (N.D. Cal. Apr. 2, 2019),
    ECF No. 1047. To date, PG&E has filed two amended plans, on February 12, 2019 and April 25,
    2019.

27  [172] Submission of Attorneys Pitre and Campora in Response to Order dated Jan. 30, 2019,
28  PG&E Criminal Proceedings (N.D. Cal. Feb. 6, 2019), ECF No. 1005.

1 Electric ("SDG&E") caused 109 wildfires with only one wildfire burning over 10 acres.  By

2 contrast, PG&E caused 1,552 wildfires during that same timeframe with 68 of those fires burning

3 over 10 acres.

4   611. On February 11, 2019, PG&E issued a press release stating that it would be

5 replacing the majority of its Board.  As of today, only two Board members out of 13 have not

6 been replaced.  This announcement followed the departure of several Company executives,

7 including PG&E's CEO defendant Williams and three senior executives in PG&E's electric

8 division.  The release acknowledged "that **PG&E must re-earn trust and credibility** with its

9 customers, regulators, the communities it serves and all of its stakeholders . . . ."

10   612. On February 27, 2019, *The Wall Street Journal* published an article titled, "PG&E

11 Delayed Safety Work on Power Line That Is Prime Suspect in California Wildfire."  The article

12 stated that the Company had delayed for several years needed repairs to its high-voltage Caribou-

13 Palermo transmission line, the likely source of the Camp Fire.  PG&E had failed to fix the **100-**

14 **year old line** despite informing federal regulators of its plans to repair and replace damaged

15 sections of the line as early as 2013.  Similarly, in a July 2017 federal filing, PG&E proposed

16 overhauling the line, noting that more than **one in four wire spans between towers were too**

17 **close to vegetation**.  The plan involved swapping 61 lattice towers with modern tubular-steel

18 poles, and replacing wire and hardware connecting it to the towers.  But PG&E never began the

19 work.  The article also detailed PG&E's antiquated safety monitoring procedures and lack of

20 transparency in transmission line spending.  According to the article, "An internal PG&E audit

21 from 2013 found that the company focused mainly on spending its allotted budget, not ensuring

22 expenditures were prudent and effective, and that it lacked performance data and other records

23 for many projects."

24   613. Also on February 26, 2019, *The Mercury News* published an article titled, "PG&E

25 knew for years that repairs were needed on transmission lines in area of fatal Camp Fire."

26 According to the article, energy officials had been warning PG&E about its fast-aging system of

27 transmission lines for the better part of a decade.  For example, according to a May 2017 CPUC

28 filing, "In 2010 and again in 2015, the California Independent System Operator transmission

1   plan identified the need to improve and upgrade this system to address potential overloads and

2   power outages that would affect customers in the service area."

3       614.    PG&E likewise stated in a July 2017 filing to FERC that it would embark on

4   numerous repairs of the Caribou-Palermo system.  The planned repairs and maintenance

5   included new tower frames, steel poles, improved line tension and hardware upgrades.  As

6   PG&E stated in the filing:  "The project has a forecasted capital expenditure of $30.3 million."

7       615.    PG&E also proposed in July 2017 considerable work for the Caribou-Palermo

8   line as part of the Company's annual request to FERC for rate changes.  "The Caribou-Palermo

9   115 kilovolt circuit was analyzed as part of the 2013 NERC Assessment," PG&E stated,

10  referring to an analysis by the North American Electric Reliability Corporation.  The filing

11  indicated the 2013 NERC study determined that well over 100 transmission line spans were

12  perilously close to vegetation or trees.  "The completed analysis identified 127 spans with

13  clearance issues out of the 455 spans on the electric transmission line," PG&E stated in its 2017

14  FERC filing.  PG&E never fixed the identified issues from the time it learned about them in 2013

15  as reflected in the July 2017 filing.  PG&E's Caribou-Palermo transmission system would later

16  be implicated in the 2018 Camp Fire.

17      616.    On February 28, 2019, PG&E issued a press release providing an update on the

18  financial impact of the Camp Fire and the North Bay Fires, along with the Company's fourth

19  quarter and full-year 2018 financial results.  The release stated that PG&E "believes it is

20  probable that its equipment will be determined to be an ignition point of the 2018 Camp Fire."  It

21  also stated that the Company would be taking a *$10.5 billion charge* related to the Camp Fire.

22  As set forth in ¶¶583 & 585, the Company also stated that it expected a $1 billion charge related

23  to the North Bay Fires, which was on top of the prior $2.5 billion charge that the Company had

24  previously taken in connection with the fires.  According to the Company, primarily due to the

25  large number of third-party claims against PG&E, the Company reported full-year **net losses of**

26  **$6.9 billion**, compared to 2017 net income of $1.6 billion.  As a result of the "extraordinary

27  challenges" caused by the wildfires, the release stated that PG&E **may not be able to continue**

28  **as a going concern**.

617.    On March 5, 2019, Judge Alsup issued a revised order to show cause as to why the court should not modify the terms of PG&E's probation in light of subsequent submissions.[173] In the order, Judge Alsup found that PG&E's "**unsafe conduct** led to a deadly pipeline explosion and to six felony convictions" and had now "**led to recurring deadly wildfires caused by its electrical system**."

618.    Judge Alsup's order noted that in its submissions, PG&E had made several **admissions** including that: (i) vegetation contact was the primary risk driver with respect to ignitions along PG&E's distribution lines; (ii) PG&E agreed "that vegetation presents an acute risk of wildfire ignition across PG&E's service territory"; (iii) in 2016 alone, PG&E had experienced approximately 1,400 downed wires caused by vegetation contact; (iv) during 2015 and 2016, PG&E had reported to the CPUC that vegetation contact with conductors was the leading cause of the 486 fire ignitions associated with PG&E facilities, causing 37% of such fires; (v) as of June 2017, there remained 3,962 unworked trees which PG&E had identified in 2016 as hazardous with the potential to "fall into or otherwise impact the conductors, towers or guy wires before the next inspection cycle"; and (vi) the Company believed its equipment caused the Camp Fire.

619.    Judge Alsup further found that the "**record demonstrates that PG&E's performance with respect to vegetation management has been dismal**." As a result, the court modified the terms of PG&E's probation to require it to comply with state laws regarding vegetation management and its wildfire prevention plan, among other remedial measures, and suspended PG&E's dividend until it could demonstrate that the Company had complied with the modified probation terms.

620.    On March 18, 2019, a coalition of law firms representing fire victims published excerpts of internal PG&E emails demonstrating that PG&E had identified the transmission lines

---

[173] Second Order to Show Cause Why PG&E's Conditions of Probation Should Not Be Modified, PG&E Criminal Proceedings (N.D. Cal. Mar. 5, 2019), ECF No. 1027.

1    implicated in the Camp Fire as unsafe long before the fire started.[174]  For example, **internal**

2    **Company documents showed that in December 2012 five aging towers along the Caribou-**

3    **Palermo transmission line had collapsed, and a 2014 internal Company email stated that**

4    **"the likelihood of failed structures happening is high**."  Similarly, a November 1, 2016 PG&E

5    document detailed the failure of necessary hardware along the transmission line, with a support

6    hook snapping off during routine painting.  PG&E documents internally acknowledged that the

7    supports "had been compromised through corrosion."[175]  Despite the internal acknowledgment

8    that the Caribou-Palermo lines were in need of repair and posed a significant risk of collapse,

9    PG&E never had the lines fixed.  Instead, the Company reasoned that any collapse would not

10   impact a sufficient number of customers to warrant the repairs and that the risks would be

11   mitigated because any fire may be extinguished by rain.  Tragically, needed repairs were never

12   undertaken, and **the Caribou-Palermo line became the devastating source of the Camp Fire**

13   later that year.

14        621.   Also on March 18, 2019, *The New York Times* published an exposé on PG&E

15   titled, "How PG&E Ignored California Fire Risks in Favor of Profits."  The article portrayed a

16   corporate culture at PG&E which disregarded safety risks and neglected necessary fire

17   prevention precautions in favor of short-term operating results.  For example, an internal PG&E

18   email had noted that the transmission tower implicated in the Camp Fire, tower 27/222, was at

19   risk of collapse long before the blaze was ignited.  The Company's own guidelines also warned

20   that **the tower was a quarter-century past its useful life**, yet PG&E did not repair or replace

21   the aging tower.  The article quoted Mike Florio, a former California utilities commissioner, who

22   observed, "There was very much a focus on the bottom line over everything [at PG&E]:  'What

23   are the earnings we can report this quarter? . . .  And **things really got squeezed on the**

24   **maintenance side**."  The article also quoted California's Governor Gavin Newsom, who

25

26   [174]*Northern California Fire Lawyers Obtain Documents That Show PG&E Knew About Risk of Caribou-Palermo Line Failure*, MarketWatch (Mar. 18, 2019),
https://www.marketwatch.com/press-release/northern-california-fire-lawyers-obtain-documents-that-show-pge-knew-about-risk-of-caribou-palermo-line-failure-2019-03-18.

27

28   [175]*Id.*

1   expressed a similar sentiment:  "**[PG&E] have simply been caught red-handed over and over**

2   **again, lying, manipulating or misleading the public. . .  They cannot be trusted.**"  The article

3   contrasted the lack of safety focus at the Company with the approach taken by another California

4   utility facing similar risks, SDG&E, that had significantly revamped its safety protocols to

5   respond to increased wildfire dangers.  According to one industry expert quoted in the article, if

6   PG&E had followed the lead of SDG&E its equipment would have caused far fewer destructive

7   fires.  This expert concluded that "**[PG&E's] culture of a lack of safety is unique**" amongst

8   utilities.

9        622.    On April 2, 2019, Judge Alsup held a hearing on his second order to show cause

10   in PG&E's probation proceedings.  At the hearing, Judge Alsup stated: **"PG&E over several**

11   **years allowed the trees that needed to be removed to be built up and did not remove them**,

12   did not trim them so that we wound up with a large number of trees that should have been

13   removed by PG&E but weren't.  And that was a major contributing factor, maybe the single-

14   biggest factor, in causing the fires in 2017 and 2018 in Northern California."[176]  Judge Alsup

15   also explained "as we've gotten into the evidence, and I've studied quite a lot of it, again I want

16   to say it's quite clear that PG&E pumped out $4.5 billion in the last five years in dividends and

17   **let the tree budget wither so that a lot of trees that should have been taken down were not."**

18   As Judge Alsup concluded, "[t]his is a crisis, a crisis that California faces on these wildfires, and

19   **PG&E is the single-most culpable entity in the mix**. . . .  PG&E has started more than – way

20   more than its share of these fires. . .  This is a problem of your own making.  A lot of money

21   went out in dividends that should have gone to the tree budget."

22        623.    On April 12, 2019, *NBC Bay Area* published an article titled "PG&E Inspectors

23   Find Hundreds of Safety Issues on Electrical Towers."  The article indicated that "PG&E's

---

[176] Transcript of Proceedings at 6-7, PG&E Criminal Proceedings (N.D. Cal. Apr. 4, 2019), ECF No. 1047.

1    inspections of thousands of transmission towers since the deadly Camp Fire in Butte County

2    found more than 450 safety violations, including 59 that posed serious safety hazards."[177]

3        624.    On May 2, 2019, PG&E filed its Q1 2019 Form 10-Q with the SEC wherein,

4    PG&E reinforced that "PG&E Corporation and the Utility are facing extraordinary challenges

5    relating to a series of catastrophic wildfires that occurred in Northern California in 2017 and

6    2018. . . . Uncertainty regarding these matters raises substantial doubt about PG&E

7    Corporation's and the Utility's abilities to continue as going concerns."

8        625.    According to PG&E's Q1 2019 Form 10-Q, it estimates that its liabilities for

9    wildfire-related claims remains at over $14.2 billion, including the 2015 Butte Fire ($212

10   million), the North Bay Fires ($3.5 billion) and the Camp Fire ($10.5 billion).  These estimated

11   liabilities do not include liabilities for the Camp Fire or North Bay Fires for, among other things,

12   "potential penalties or fines that may be imposed by governmental entities on PG&E Corporation

13   or the Utility, or punitive damages, if any, or any losses related to future claims for damages that

14   have not manifested yet, each of which could be significant."  As reported in the same Form 10-

15   Q, PG&E's "liability could exceed $30 billion" if it were found to be liable for the Camp Fire

16   and the North Bay Fires.

17       626.    PG&E also remains subject to criminal liability.  According to PG&E's Q1 2019

18   Form 10-Q, the Butte County District Attorney's Office and the California Attorney General are

19   investigating the Camp Fire and that a grand jury has been empaneled in Butte County.

20       627.    PG&E also reported in its Q1 2019 Form 10-Q that its operating and maintenance

21   expenses had increased by $443 million, or 35%, over the same quarter the prior year "primarily

22   due to $210 million related to enhanced and accelerated inspections and repairs of transmission

23   and distribution assets and $179 million for clean-up and repair costs relating to the 2018 Camp

24   Fire."

25

26

27   [177] Jaxon van Derbeken, *PG&E Inspectors Find Hundreds of Safety Issues on Electrical Towers*, NBC Bay Area (Apr. 12, 2019), https://www.nbcbayarea.com/investigations/PGE-

28   Inspectors-Find-Hundreds-of-Safety-Issues-on-Electrical-Towers-508344011.html.

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO. 3:18-CV-03509-EJD

185

628.     On May 7, 2019, Judge Alsup conducted a sentencing hearing for PG&E's violation of probation.  When speaking to PG&E's new CEO Johnson he noted that PG&E "admitted that it started 17 of those fires in 2017 just in the Wine Country."[178]  He further exclaimed that here in California "We have six to seven months of no rain.  And **you can't blame it on global warming** because I have been here a long time and it's been that way every summer."  During the sentencing hearing, Judge Alsup also observed that while there are other causes of fire, "no one has started more fires than PG&E."

629.     On May 15, 2019, Cal Fire issued a release finding PG&E at fault for the Camp Fire: "[a]fter a very meticulous and thorough investigation, Cal Fire has determined that **the Camp Fire was caused by electrical transmission lines owned and operated by [PG&E]** located in the Pulga area."  As to the second ignition site of the Camp Fire Cal Fire found: **"[t]he cause of the second fire was determined to be vegetation into electrical distribution lines owned and operated by PG&E."**  PG&E issued a press release the following day accepting the determination that PG&E electrical lines located near Pulga were a cause of the Camp Fire.  On May 22, 2019, PG&E acknowledged in a Schedule 14A filing with the SEC that "[t]he tragic wildfires of the past two years have been extraordinarily challenging, and have made clear that the energy status quo is no longer working for California."

## XVIII. THE SECURITIES ACT DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS IN THE OFFERING DOCUMENTS FOR THE NOTES OFFERINGS

630.     Each of PG&E's Prospectuses filed on February 24, 2016, November 29, 2016, March 8, 2017, and April 13, 2018, incorporated by reference the corresponding registration statement (hereinafter, "Offering Documents"), as well as a number of other PG&E filings and reports including the following:

---

[178] Transcript of Proceedings at 11, PG&E Criminal Proceedings (N.D. Cal. May 7, 2019), ECF No. 1061.

Case: 19-30088    Doc# 11168-10    Filed: 08/31/21    Entered: 08/31/21 14:49:59    Page
196 of 229

(a)     The February 24, 2016 Offering Documents for the March 2016 Notes Offering incorporated by reference PG&E's: Annual Report on Form 10-K for FY15 filed with the SEC on February 18, 2016;

(b)     The November 29, 2016 Offering Documents for the December 2016 Notes Offering incorporated by reference PG&E's: Annual Report on Form 10-K for FY15 filed with the SEC on February 18, 2016;

(c)     The March 8, 2017 Offering Documents for the March 2017 Notes Offering incorporated by reference PG&E's: Annual Report on Form 10-K for FY15 filed with the SEC on February 18, 2016; Annual Report on Form 10-K for FY16 filed with the SEC on February 16, 2017; and Press release, filed on Form 8-K with the SEC on May 23, 2016; and

(d)     The April 13, 2018 Offering Documents for the April 2018 Notes Offering incorporated by reference PG&E's: Annual Report on Form 10-K for FY17 filed with the SEC on February 9, 2018.

631.    The statements in or incorporated by the Offering Documents alleged to be materially false and/or misleading for purposes of the Securities Act Claims alleged herein are set out in Exhibit A attached hereto.[179]

## A.     The Securities Act Defendants Misled Investors Regarding PG&E's Safety Practices, Policies and Compliance

632.    The Offering Documents, including the documents incorporated by reference therein, omitted material adverse information from investors regarding PG&E's deficient safety practices and policies while simultaneously falsely assuring investors that PG&E complied with safety laws and regulations, sufficiently invested in safety, and provided for public safety by clearing vegetation around its equipment, updating equipment, and inspecting its equipment.  In contrast to what investors were led to believe in the Offering Documents, PG&E's "unsafe

---

[179] For purposes of this complaint not all of the statements alleged to be materially false and misleading are set forth in the text of the complaint as many are repetitive and are false and misleading for the same reasons as nearly identical statements.  They are however, alleged in Exhibit A and incorporated by reference herein.  References to Exhibit A are referred to herein as "Ex. A."

1   conduct" led to deadly wildfires and "PG&E's performance with respect to vegetation

2   management has been dismal." Nor had PG&E expended sufficient resources to reasonably

3   prevent wildfires.

4       **1.   The Offering Documents Omitted PG&E's Widespread Safety**

5           **Failures and the Existing Risks Associated with Its Inadequate Safety Practices**

6       633.   Each of the Offering Documents referenced risk factors, including warnings that

7   droughts, climate change, wildfires and other events ***could*** cause a material impact on PG&E's

8   financial results. These statements were materially misleading because they did not disclose the

9   already existing negative impact on PG&E as a result of PG&E's subpar safety practices that

10  caused wildfires resulting in death, destruction and liability. PG&E faces more than $30 billion

11  in potential liability and has filed bankruptcy as a result. Cal Fire has found PG&E caused

12  wildfires in 2015, 2017 and 2018.

13      634.   The Offering Documents for each of the Notes Offerings did not disclose the true

14  existing risks facing PG&E as a result of its deficient safety practices and policies, including the

15  extent of the risks or that they had already come to fruition. For example, the prospectus filed on

16  February 24, 2016, pursuant to the March 2016 Notes Offering, stated:

17          Some of the ***factors that could cause future results to differ***

18          ***materially from those expressed or implied*** by the forward-looking statements, ***or from historical results, include*** . . .

19                   \*        \*        \*

20          •  ***the impact of droughts or other weather-related***

21             ***conditions or events, wildfires (including the Butte fire in***
               ***September 2015***, which affected portions of Amador and

22             Calaveras counties), ***climate change***, natural disasters, acts
               of terrorism, war, or vandalism (including cyber-attacks),

23             ***and other events***, that can cause unplanned outages, reduce
               generating output, disrupt the our [sic] service to
               customers, or damage or disrupt the facilities, operations,

24             or information technology and systems owned by us, our
               customers, or third parties on which we rely; ***whether we***

25             ***incur liability to third parties for property damage or***
               ***personal injury caused by such events; and whether the***

26             ***we [sic] are subject to civil, criminal, or regulatory***
               ***penalties in connection with such events***. See Ex. A,

27             Stmt. No. 1.

28

635.    The Offering Documents for the December 2016 Notes Offering, the March 2017 Notes Offering and the April 2018 Notes Offering each repeated in substantially similar language the same purported warning.  *See* Ex. A, Stmt. Nos. 10-11, 20.  So too did the FY15 Form 10-K, FY16 Form 10-K, and FY17 Form 10-K.  *See* Ex. A, Stmt. Nos. 2, 23, 24.

636.    Similarly, PG&E's annual report for FY17 filed with the SEC on Form 10-K incorporated by the Offering Documents for the April 2018 Notes Offering misleadingly purported to warn that:

> ***Severe weather conditions, extended drought and shifting climate patterns could materially affect PG&E Corporation's and the Utility's business, financial condition, results of operations, liquidity, and cash flows.***
>
> Extreme weather, extended drought and shifting climate patterns have intensified the challenges associated with wildfire management in California.  Environmental extremes, such as drought conditions followed by periods of wet weather, can drive additional vegetation growth (which then fuel any fires) and influence both the likelihood and severity of extraordinary wildfire events.  ***In California, over the past five years, inconsistent and extreme precipitation, coupled with more hot summer days, have increased the wildfire risk and made wildfire outbreaks increasingly difficult to manage.  In particular, the risk posed by wildfires has increased in the Utility's service area (the Utility has approximately 82,000 distribution overhead circuit miles and 18,000 transmission overhead circuit miles) as a result of an extended period of drought, bark beetle infestations in the California forest and wildfire fuel increases due to record rainfall following the drought, among other environmental factors.***  Other contributing factors include local land use policies and historical forestry management practices.  The combined effects of extreme weather and climate change also impact this risk.  *See* Ex. A, Stmt. No. 26.

637.    In addition, each of the Company's Forms 10-K referenced by the Offering Documents also represented climate change as a risk to the Company's financial condition while omitting the real risks stemming from PG&E's woefully inadequate safety practices.  For example, the "Risk Factors" section of PG&E's FY15 and FY16 annual reports on Forms 10-K purported to warn that "***The Utility's future operations may be affected by climate change that may have a material impact on PG&E Corporation's and the Utility's financial condition, results of operations, and cash flows***," and that climate change could "***increase the occurrence of wildfires.***"  Ex. A, Stmt.  Nos. 5, 13.

638.    The same FY15 and FY16 Forms 10-K, along with PG&E's FY17 Form 10-K, went on to falsely reassure investors, in substantially similar language, that PG&E had studied climate change but omitted the negative impact and risk of PG&E's safety violations and deficient safety practices:

> The Utility has been studying the potential effects of climate change (increased temperatures, changing precipitation patterns, rising sea levels) on the Utility's operations and is developing contingency plans to adapt to those events and conditions that the Utility believes are most significant.  Scientists project that climate change will increase electricity demand due to more extreme, persistent and hot weather.  Increasing temperatures and changing levels of precipitation in the Utility's service territory would reduce snowpack in the Sierra Mountains.  If the levels of snowpack were reduced, the Utility's hydroelectric generation would decrease and the Utility would need to acquire additional generation from other sources at a greater cost.
>
> If the Utility increases its reliance on conventional generation resources to replace hydroelectric generation and to meet increased customer demand, it may become more costly for the Utility to comply with GHG emissions limits.  ***In addition, increasing temperatures and lower levels of precipitation could increase the occurrence of wildfires in the Utility's service territory causing damage to the Utility's facilities or the facilities of third parties on which the Utility relies to provide service, damage to third parties for loss of property, personal injury, or loss of life***.  In addition, flooding caused by rising sea levels could damage the Utility's facilities, including hydroelectric assets such as dams and canals, and the electric transmission and distribution assets.  ***The Utility could incur substantial costs to repair or replace facilities, restore service, compensate customers and other third parties for damages or injuries***.  The Utility anticipates that the increased costs would be recovered through rates, but as rate pressures increase, the likelihood of disallowance or non-recovery may increase.  *See* Ex. A, Stmt. Nos. 6, 14, 27.

639.    The foregoing statements in ¶¶634-638 were materially false and misleading because contrary to the impression created by the Offering Documents, PG&E's safety practices were deficient and the Company's deficient safety practices had already caused wildfires.  The Offering Documents' repeatedly represented that: (i) PG&E's financial results could be impacted by weather-related conditions, wildfires, climate change or other events, or that they could incur liability caused by such events; and (ii) the climate change, increasing temperatures, or other events could increase the occurrence of wildfires which could result in substantial costs or

1   damages.  These representations were contradicted by material adverse facts that existed at the

2   time of the statements, including, *inter alia*, that:

3          (a)     PG&E's widespread safety deficiencies and violations had already

4   increased the risk of wildfires, caused wildfires and liability for those wildfires (*see generally*

5   §XVII.A.2.);

6          (b)     PG&E had caused hundreds or thousands of fires across California since

7   June 2014, averaging more than one fire a day – significantly more than, SoCalEd, for example,

8   a utility operating under similar conditions and legal and regulatory framework (¶¶600, 610, 628;

9   *see also* ¶621);

10         (c)     Rather than weather related events, the real risk of wildfires (and in fact

11  the cause of many) were a result of PG&E not sufficiently investing in providing its services in a

12  safe manner.  For example, PG&E's "dismal" vegetation management practices resulted in

13  wildfires (¶619).  As Judge Alsup  noted, PG&E has admitted that: (i) vegetation contact was the

14  primary risk driver with respect to ignitions along PG&E's distribution lines; (ii) in 2016 alone,

15  PG&E had experienced approximately 1,400 downed wires caused by vegetation contact; and

16  (iii) during 2015 and 2016, PG&E had reported to the CPUC that vegetation contact with

17  conductors was the leading cause of the 486 fire ignitions associated with PG&E facilities,

18  causing 37% of such fires. (¶618). Further, as PG&E Vegetation Program Manager Richard

19  Yarnell testified, for the entire period from September 2015 to April 10, 2017, "PG&E—to the

20  best of my knowledge, we have not made any changes" to improve safety. (¶22);

21         (d)     In addition, PG&E's lax tree clearing practices threatened the safety of

22  PG&E's operations.   For example, PG&E auditors had given PG&E a passing grade despite too

23  many trees found to violate state regulations by improperly expanding the area under review to

24  artificially increase PG&E's compliance rate (¶575).  Similarly, an internal PG&E audit,

25  conducted in the summer of 2015 revealed a negative trend of non-compliant trees in the same

26  district in which the Butte Fire started (¶570).  And, as Judge Alsup observed, PG&E has

27  admitted that as late as June 2017, there remained 3,962 unworked trees which PG&E had

28  identified in 2016 as hazardous with the potential to "fall into or otherwise impact the

1  conductors, towers or guy wires before the next inspection cycle" (¶618).  Judge Alsup also

2  indicated that "PG&E over several years allowed the trees that needed to be removed to be built

3  up and did not remove them, did not trim them so that we wound up with a large number of trees

4  that should have been removed by PG&E but weren't" which was a contributing factor to the

5  causes of wildfires (¶622);

6          (e)     PG&E had incentivized its contractors to identify and clear fewer trees

7  and vegetation by paying them for reporting under the target number (¶569);

8          (f)     Outdated PG&E equipment was not replaced or updated – for example,

9  the Company had never, as planned, addressed dangerously encroaching vegetation by replacing

10  old lattice towers with modern tubular steel poles or replacing wire and hardware connecting

11  those to towers, or updated the 100 year-old Caribou-Palermo transmission line that presented a

12  high likelihood of failure (¶¶612, 620; *see also* ¶613-615).  Likewise, despite assurances in 2015

13  that the Company would be able to shut down reclosers in high risk fire areas, they did not have

14  the system in place to do so causing wildfires (¶¶577, 606);

15          (g)     PG&E did not sufficiently invest in wildfire safety.  For example, Judge

16  Alsup observed, PG&E "let the tree budget wither so that a lot of trees that should have been

17  taken down were not" (¶622).  And PG&E internal documents show that tree-related outages

18  could have been reduced if PG&E was willing to invest more (¶¶620-622).  Likewise, safety was

19  up for debate at the Company but not earnings growth (¶¶567, 606);

20          (h)     At the time of the issuance of each of the Offering Documents, PG&E's

21  warning of weather-related conditions or climate change potentially impacting PG&E did not

22  disclose the then existing risks as a result of the safety violations and deficient practices (¶¶568,

23  570-571, 575, 577, 594-596, 598-599, 603, 605, 607-608, 610, 612-618, 620-623).  As Judge

24  Alsup indicated, you can't blame the fires "on global warming because I have been here a long

25  time and it's been that way every summer" (¶628);

26          (i)     As a result of the extent and nature of PG&E's safety deficiencies and

27  numerous violations, PG&E was unable to prove "it reasonably and prudently operated and

28  managed its system" rendering it liable for the wildfires that it had already caused (¶558);

1         (j)     At the time of the issuance of the March 2016, December 2016 and March

2   2017 Notes Offerings' Offering Documents, rather than the risk of wildfires (including the 2015

3   Butte Fire) potentially impacting PG&E (*see* ¶¶566, 579, 584, 588, 599, 600, 617, 628, 629), the

4   true facts were that PG&E's safety deficiencies and violations caused wildfires.  The Offering

5   Documents failed to disclose the then existing risk to PG&E's financial condition as a result of

6   the Company's widespread safety violations.  For example, the 2015 Butte Fire – which killed

7   two people and destroyed more than 500 homes – was caused by PG&E's safety violations

8   (¶566).  Additionally, the Offering Documents omitted the existing risk of wildfires from the

9   already identified problems with PG&E's equipment along the Caribou-Palermo transmission

10  line, the likely source of the Camp Fire and PG&E's overall dismal vegetation management

11  practices (¶¶619-622).  PG&E's own inspections of transmission towers showed 450 safety

12  violations, with 59 posing a serious safety hazard (¶623).  When speaking on risks relating to

13  wildfires, the Securities Act Defendants did not disclose the extent of PG&E's wildfire inducing

14  safety deficiencies and violations (¶¶568, 570-571, 575, 577, 594-596, 598-599, 603, 605, 607-

15  608, 610, 612-618, 620-623);  and

16        (k)     At the time of the issuance of the April 2018 Notes Offerings' Offering

17  Documents, the Securities Act Defendants warned of conditions that could impact PG&E's

18  financial results (¶¶582, 583, 685-686, 601-602, 604, 616, 625; *see also* ¶624; ¶667) without

19  disclosing the then existing widespread safety violations and insufficient safety practices (¶¶568,

20  570-571, 575, 577, 594-596, 598-599, 603, 605, 607-608, 610, 612-618, 620-623).  Nor did the

21  Offering Documents disclose what PG&E has now admitted to Judge Alsup– "that it started 17

22  of those fires in 2017 just in the Wine Country" (¶628).  At the time of the issuance of the

23  Offering Documents for the April 2018 Notes Offering, the Securities Act Defendants' misled

24  investors regarding the then existing risks as a result of adverse facts, including the likelihood of

25  failed structures, use of a transmission tower a quarter-century past its useful life, or the "dismal"

26  vegetation practices of the Company (¶¶619-621).  When speaking on the risks related to

27  wildfires, the Securities Act Defendants did not disclose PG&E's widespread safety lapses and

28

1  violations (¶¶568, 570-571, 575, 577, 594-596, 598-599, 603, 605, 607-608, 610, 612-618, 620-

2  623).

3         **2.  The Offering Documents Did Not Disclose PG&E's Investments in, Commitment to, and Practices Related to Safety Were Inadequate**

4

5       640.  PG&E's Forms 10-K incorporated by reference in the Offering Documents falsely

6  emphasized PG&E's safety efforts by investing in its energy distribution system, in particular by

7  clearing vegetation to prevent wildfires.  For example, the annual reports for FY15 and FY16

8  filed with the SEC on Forms 10-K incorporated in the Offering Documents for the March 2016,

9  December 2016 and March 2017 Notes Offerings misleadingly stated as follows:

10         With respect to electric operations, climate scientists project that, sometime in the next several decades, climate change will lead to increased electricity demand due to more extreme, persistent, and

11         frequent hot weather.  The Utility believes its strategies to reduce GHG emissions through energy efficiency and demand response

12         programs, infrastructure improvements, and the use of renewable energy and energy storage are effective strategies for adapting to

13         the expected increase [changes] in demand for electricity.  ***The Utility is making substantial investments to build a more modern***

14         ***and resilient system that can better withstand extreme weather and related emergencies.  The Utility's vegetation management***

15         ***activities also reduce the risk of wildfire impacts on electric*** and gas facilities.  Over the long-term, the Utility also faces the risk of

16         higher flooding and inundation potential at coastal and low elevation facilities due to sea level rise combined with high tides,

17         storm runoff and storm surges.  *See* Ex. A, Stmt. Nos. 4, 12.

18       641.  The Company's FY17 Form 10-K, incorporated in the Offering Documents for

19  the April 2018 Notes Offering contained similarly false language:

20         With respect to electric operations, climate scientists project that, sometime in the next several decades, climate change will lead to

21         increased electricity demand due to more extreme, persistent, and frequent hot weather.  The Utility believes its strategies to reduce

22         GHG emissions through energy efficiency and demand response programs, infrastructure improvements, and the use of renewable

23         energy and energy storage are effective strategies for adapting to the expected changes in demand for electricity.  ***The Utility is***

24         ***making substantial investments to build a more modern and resilient system that can better withstand extreme weather and***

25         ***related emergencies.***  Over the long-term, the Utility also faces the risk of higher flooding and inundation potential at coastal and low

26         elevation facilities due to sea level rise combined with high tides, storm runoff and storm surges.  ***As the state continues to face***

27         ***increased risk of wildfire, the Utility's vegetation management activities will continue to play an important role to help reduce***

28         ***the risk of wildfire and its impact on electric and gas facilities.***

1     *See* Ex. A, Stmt. No. 29.

2    642. PG&E's FY15 and FY16 Forms 10-K referenced in the Offering Documents for

3 the March 2016, December 2016 and March 2017 Notes Offerings also misleadingly emphasized

4 that PG&E had developed plans and strategies to mitigate the impact of climate change and

5 respond effectively to emergencies as well as prioritizing infrastructure investments minimizing

6 the real risks PG&E faced with respect to wildfires as a result of dismal safety practices and

7 insufficient funding to prevent wildfires:

8     *Climate Change Mitigation and Adaptation Strategies.*  During

9     2015 [2016], the Utility ***continued its programs*** to develop
     strategies to mitigate the impact of the Utility's operations

10     (including customer energy usage) on the environment and to plan
     for the actions that it will need to take to adapt to the likely impacts

11     of climate change on the Utility's future operations.  The Utility
     regularly reviews the most relevant scientific literature on climate

12     change such as sea level rise, temperature changes, rainfall and
     runoff patterns, and ***wildfire risk, to help the Utility identify and***

13     ***evaluate climate change-related risks and develop the necessary***
     ***adaptation strategies.  The Utility maintains emergency response***

14     ***plans and procedures to address a range of near-term risks,***
     including extreme storms, heat waves and ***wildfires*** and ***uses its***

15     ***risk-assessment process to prioritize infrastructure investments***
     for longer-term risks associated with climate change.  The Utility

16     also engages with leaders from business, government, academia,
     and non-profit organizations to share information and plan for the

17     future.  *See* Ex. A, Stmt. Nos. 3, 15.

18    643. Following the 2017 North Bay Fires, the Company's 2017 Form 10-K

19 incorporated in the Offering Documents for the April 2018 Notes Offering misleadingly

20 represented that PG&E had developed "resilience strategies" to mitigate the impacts of climate

21 change on PG&E:

22     *Climate Change Resilience Strategies*

23     ***During 2017, the Utility continued its programs to mitigate the***
     ***impact of the Utility's operations (including customer energy***

24     ***usage) on the environment and to plan for the actions that it will***
     ***need to take to increase its resilience in light of the likely impacts***

25     ***of climate change on the Utility's operations***.  The Utility
     regularly reviews the most relevant scientific literature on climate

26     change such as rising sea levels, major storm events, increasing
     temperatures and heatwaves, ***wildfires,*** drought and land

27     subsidence, ***to help the Utility identify and evaluate climate***
     ***change-related risks and develop the necessary resilience***

28     ***strategies.  The Utility maintains emergency response plans and***
     ***procedures to address a range of near-term risks, including***

*wildfires*, extreme storms, and heat waves and ***uses its risk-assessment process to prioritize infrastructure investments*** for longer-term risks associated with climate change.  The Utility also engages with leaders from business, government, academia, and non-profit organizations to share information and plan for the future.  *See* Ex. A, Stmt. No. 28.

644.     Similarly, each of PG&E's Forms 10-K incorporated by the Offering Documents also materially misled investors by regarding the safety of its operations emphasizing the Company's upgrades to its equipment.  For example, the Company's FY15, FY16 and FY17 Forms 10-K stated:

At December 31, 2015 [2016; 2017], the Utility owned approximately 18,400 [19,200] circuit miles of interconnected transmission lines operating at voltages ranging from 60 kV to 500 kV.  The Utility also operated 91 [92] electric transmission substations with a capacity of approximately 63,400 [64,600; 64,700] MVA.

*            *            *

***Throughout 2015 [2016; 2017], the Utility upgraded several critical substations and re-conductored a number of transmission lines to improve maintenance and system flexibility, reliability and safety.***  The Utility expects to undertake various additional transmission projects over the next several years to upgrade and expand the capacity of its transmission system to accommodate system load growth, secure access to renewable generation resources, replace aging or obsolete equipment and improve system reliability.  The Utility also has taken steps to improve the physical security of its transmission substations and equipment.  *See* Ex. A, Stmt. Nos. 7, 16, 30.

645.     The same electricity distribution passage from each of PG&E's Forms 10-K for FY15, FY16, and FY17 thereafter concluded with the following materially misleading statement, which did not disclose that PG&E did not have adequate systems or policies in place to shut down reclosers to prevent wildfires:

***In 2015 [2016; 2017], the Utility continued to deploy its Fault Location, Isolation, and Service Restoration circuit technology which involves the rapid operation of smart switches to reduce the duration of customer outages.  Another 83 [89; 92] circuits were outfitted with this equipment, bringing the total deployment to 700 [789; 882] of the Utility's 3,200 distribution circuits.  [The Utility also installed or replaced 20 distribution substation transformer banks to improve reliability and provide capacity to accommodate growing demand.]***  The Utility plans to ***continue*** performing work ***to improve the reliability and safety of its electricity distribution operations*** in 2016 [2017; 2018].  *See* Ex.

1          A, Stmt. Nos. 8, 17, 31.

2          646.    In addition, each of PG&E's Forms 10-K incorporated by the Offering

3    Documents materially misled investors by warning that the Company's equipment might fail, a

4    risk falsely described as "beyond the Utility's control."  For example, PG&E's Forms 10-K for

5    FY15 and FY16, as well as PG&E's Form 10-K for FY17, misleadingly purported to warn

6    investors as follows:

7                  Utility's ability to safely and reliably operate, maintain, construct
                   and decommission its facilities is *subject to numerous risks*, *many*
8                  *of which are beyond the Utility's control*, including those that
                   arise from:
9
                     • *the breakdown or failure of equipment, electric*
10                     *transmission or distribution lines*, or natural gas
                       transmission and distribution pipelines, *that can cause*
11                     *explosions, fires, or other catastrophic events*;[180]

12                             *        *        *

13                   • *the failure to take expeditious or sufficient action to*
                       *mitigate operating conditions, facilities, or equipment,*
14                     *that the Utility has identified, or reasonably should have*
                       *identified, as unsafe, which failure then leads to a*
15                     *catastrophic event (such as a wild land fire or natural gas*
                       *explosion)*, [and the failure to respond effectively to a
16                     catastrophic event.][181]  *See* Ex. A, Stmt. Nos. 9, 18, 32.

17         647.    PG&E's 2017 Form 10-K incorporated by reference in the Offering Documents

18   for the April 2018 Notes Offering added false assurances to investors that PG&E had taken steps

19   to safely operate and maintain its equipment:

20                 On April 12, 2017, the Utility retained a third-party monitor at the
                   Utility's expense as part of its compliance with the sentencing
21                 terms of the Utility's January 27, 2017 federal criminal conviction,
                   which sentenced the Utility to, among other things, a five-year
22                 corporate probation period and oversight by a third-party monitor
                   for a period of five years, with the ability to apply for early
23                 termination after three years.  *The goal of the monitor is to help*
                   *ensure that the Utility takes reasonable and appropriate steps to*
24                 *maintain the safety of its gas and electric operations and*
                   *maintains effective ethics, compliance, and safety related*
25
     _____
26        [180] This language is included in each of PG&E's Forms 10-K incorporated in the Offering
     Documents, and similar language is also included in the registration statement for the April 2018
27   Notes Offering.  *See* Ex. A, Stmt. Nos. 9, 18, 21, 22, 32.

28        [181]   The Form 10-K for FY 2017 removed the part of the sentence ending "and the failure to
     respond effectively to a catastrophic event."

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                      197
CIVIL ACTION NO. 3:18-CV-03509-EJD

1

2

*incentive programs on a Utility-wide basis*.  *See* Ex. A, Stmt. No. 33.

648.     In addition to PG&E's annual reports, the Company's May 23, 2016 press release filed with the SEC on a Form 8-K (and as incorporated by the March 2017 Offering Documents), also falsely represented that PG&E "'continued to demonstrate leadership and commitment on safety'":

> PG&E Corporation (NYSE: PCG) today announced that it is raising its quarterly common stock dividend to 49 cents per share, an increase of 3.5 cents per share, beginning with dividends for the second quarter of 2016.
>
> \*          \*          \*
>
> The increase, which is the company's first in six years, is a meaningful step toward gradually returning the company's dividend payout to levels that are comparable with those of similar utilities.
>
> \*          \*          \*
>
> [Earley:] ***"We've continued to demonstrate leadership and commitment on safety. We're delivering the most reliable service in our company's history."*** *See* Ex. A, Stmt. No. 19.

649.     The foregoing statements in ¶¶640-648 were materially false and misleading because contrary to the impression created by the Offering Documents, PG&E was not making substantial investments in its systems, its safety practices were deficient and the Company's deficient safety practices had already caused wildfires.  The Offering Documents repeatedly represented that: (i) PG&E was making "substantial investments" in its system; (ii) the Utility had a risk-assessment process to  prioritize infrastructure investments for risks associated with climate change; (iii) the Utility's vegetation management activities were adequate and reduced the risk of wildfire impact; (iv) the Utility had the programs and strategies to address wildfire risks as a result of climate change; (v) the Utility had upgraded critical substations and improved a number of transmission lines; (vi) the Utility continued to deploy technology related to its reclosers to improve reliability and safety; (vii) the risk of equipment failures or the failure to sufficiently mitigate operating conditions could have an adverse material impact of the Company implying that such adverse events were "beyond the Utility's control"; and (viii) that PG&E

1   "demonstrated leadership and commitment on safety."  These representations misled investors

2   because they omitted the true state of PG&E's operations related to safety – namely, PG&E's

3   systemic safety deficiencies.

4          650.   At the time the issuance of  each of the Offering Documents for each of the Note

5   Offerings material adverse facts existed that contradicted the representations made therein,

6   including that: (i) PG&E had committed widespread safety violations including violations of

7   California law and regulations as well as federal law (¶¶571, 595, 599; 618; *see generally*  ¶¶568,

8   570-571, 575, 577, 594-596, 598-599, 603, 605, 607-608, 610, 612-618, 620-623 *for safety*

9   *violations*); (ii) PG&E's vegetation management programs were deficient (¶¶568, 570-571, 575,

10   577, 594-596, 598-599, 603, 605, 607-608, 610, 612-618, 620-623); (iii) compared to the

11   industry in California, PG&E's electrical equipment caused far more wildfires (¶¶610, 628); (iv)

12   PG&E had not updated its outdated equipment (¶¶599, 605, 612-616, 618-623); and (v) PG&E

13   had not sufficiently invested in safety and had not made safety a priority (¶¶582, 583, 585-586,

14   601-602, 604, 616, 625; *see also* ¶624; ¶667).

15          651.   Contrary to assurances in the Offering Documents for the March 2016, December

16   2016, March 2017 and April 2018 Notes Offerings that PG&E's vegetation management

17   practices reduced the risk of wildfire impact, PG&E's practices were dismal and increased, not

18   reduced, wildfire impact and caused wildfires (¶619; *see generally* ¶¶568, 570-571, 575, 577,

19   594-596, 598-599, 603, 605, 607-608, 610, 612-618, 620-629). As Judge Alsup noted, PG&E

20   has admitted that: (i) vegetation contact was the primary risk driver with respect to ignitions

21   along PG&E's distribution lines; (ii) in 2016 alone, PG&E had experienced approximately 1,400

22   downed wires caused by vegetation contact; and (iii) during 2015 and 2016, PG&E had reported

23   to the CPUC that vegetation contact with conductors was the leading cause of the 486 fire

24   ignitions associated with PG&E facilities, causing 37% of such fires.  A 2013 NERC study also

25   determined that that well over 100 transmission line spans, out of 455 total spans, were

26   perilously close to vegetation or trees (¶615).  Further, PG&E had incentivized its contractors to

27   identify and clear fewer trees and vegetation by paying them for reporting under the target

28   number (¶569).  And, as PG&E Vegetation Program Manager Richard Yarnell testified,  for the

1    entire period from September 2015 to April 10, 2017, "PG&E—to the best of my knowledge, we

2    have not made any changes" to improve safety (¶22).

3         652.    Contrary to the impression the Offering Documents for the March 2016,

4    December 2016, March 2017 and April 2018 Notes Offerings gave investors by emphasizing the

5    substantial investments PG&E was purportedly making with respect to the Utility's system,

6    PG&E was not sufficiently investing in safety, and any risk-assessment process it had to

7    prioritize infrastructure investments was inadequate.  Instead, PG&E had: "let the tree budget

8    wither so that a lot of trees that should have been taken down were not" (¶622); engaged in

9    dismal vegetation management practices (¶619); did not have a sufficient system in place to

10   shutdown reclosers (¶¶577, 606); failed to update equipment known to be outdated (¶¶599, 605,

11   612-616, 618-623); "focused mainly on spending its allotted budget, not ensuring expenditures

12   were prudent and effective" (¶612); failed, according to the CPUC, "to develop a comprehensive

13   enterprise-wide approach to address safety" (¶596);  and had not engaged in a level of

14   investment that would promote safety (¶22, 78, 568-569, 571, 594-595, 599, 605, 607-608, 612-

15   616, 618-623). In addition, PG&E's 2019 wildfire plan illustrates that a dramatic increase in

16   resources to mitigate wildfires was needed; it calls for more than doubling tree removal, and

17   increasing vegetation management by 320% and inspections from 9,400 transmission structures

18   to 40,600 (¶608).

19        653.    For the same reasons as ¶652 above, the representations in the Offering

20   Documents for the March 2016, December 2016 and March 2017 Notes Offerings that PG&E

21   had: (i) the necessary adaption strategies with respect to wildfire risk; and (ii) procedures to

22   address wildfires were materially false and misleading.  These representations omitted that

23   PG&E was plagued with safety deficiencies.  And rather than prioritizing infrastructure

24   investments, PG&E had not committed sufficient resources for safety.

25        654.    For the same reasons as ¶651 above, the similar representations in the Offering

26   Documents for the April 2018 Notes Offering regarding procedures to address wildfires,

27   prioritizing infrastructure and mitigation programs were materially false and misleading.  In

28

---

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO. 3:18-CV-03509-EJD

200

1    addition, rather than prioritizing infrastructure in 2017, PG&E spent only $201,456,193 on

2    vegetation management in 2017, failing to keep pace with inflation (¶78);

3         655.    Contrary to the representations in the Offering Documents for the March 2016,

4    December 2016, March 2017 and April 2018 Notes Offerings that PG&E had "re-conductored a

5    number of transmission lines to improve . . . safety" and made other upgrades, PG&E's

6    equipment was outdated and hazardous.  For example, there was significant damage to and other

7    problems with PG&E's equipment along the Caribou-Palermo transmission line, the likely

8    source of the Camp Fire including: (i) the collapse of aging towers in 2012; (ii) the

9    acknowledgment in 2014 that "the likelihood of failed structures happening is high"; (iii) the

10   identification of failed hardware in 2016; and (iv) the acknowledgement that the transmission

11   tower implicated in the Camp Fire was at risk of collapse long before the blaze was ignited and

12   that it was a quarter-century past its useful life (¶¶612-615, 619-622).  In addition, contrary to the

13   Utility's technology improving safety, PG&E did not have adequate systems in place to shut

14   down reclosers (¶¶577, 606).

15        656.    Purported warnings in the Offering Documents for the March 2016, December

16   2016,  March 2017 and April 2018 Notes Offerings that equipment might fail or that the failure

17   to sufficiently mitigate operating conditions could impact the Company, while implying that

18   such adverse events were "beyond the Utility's control," were materially false and misleading.

19   The Securities Act Defendants omitted that these risks had, in fact, already materialized as a

20   result of the Utility's conduct – including inadequate vegetation management programs and tree

21   clearing practices and the failure to update PG&E's system as described above. The Utility's

22   choice not to provide adequate resources towards safety or, for example, to incentivize its

23   contractors to not report or clear hazardous trees was within its control (¶569).

24        657.    In addition, investors were misled by the representation in PG&E's May 23, 2016

25   press release specifically incorporated by reference in the Offering Documents for the March

26   2017 Offering that PG&E "continued to demonstrate leadership and commitment on safety".

27   Rather than being a leader with respect to safety,  PG&E's electrical equipment caused far more

28   wildfires than industry peers in California (¶¶610, 621, 628).  And rather than being committed

1    to safety the truth was that PG&E was plagued with safety deficiencies and did not sufficiently

2    invest in fire mitigation.  For example, the following contradicts that PG&E was committed to

3    safety:

4                    (a)      Judge Alsup has observed that: "There is one very clear-cut pattern here:

5    That PG&E is starting these fires."  He continued, "What do we do[?] Does the judge just turn a

6    blind eye and say, 'PG&E, continue your business as usual. Kill more people by starting more

7    fires'?"  When Company representatives stated that PG&E had made safety a priority, Judge

8    Alsup reportedly responded: "It's not really true. Safety is not your number one thing."  Judge

9    Alsup has also found that the "record demonstrates that PG&E's performance with respect to

10   vegetation management has been dismal."  (¶619);

11                   (b)      Judge Alsup has also observed in January 2019 that "PG&E pumped out

12   $4.5 billion in the last five years in dividends and let the tree budget wither so that a lot of trees

13   that should have been taken down were not" (¶622);

14                   (c)      PG&E had not, according to PG&E Vegetation Manager Richard Yarnell,

15   made any changes to improve safety from September 2015 to April 10, 2017 (¶22); and

16                   (d)      The CPUC ruled in December 2018:  "PG&E has had serious safety

17   problems with both its gas and electric operations for many years" and the Company had failed

18   "to develop a comprehensive enterprise-wide approach to address safety."  The Ruling stated that

19   the CPUC "was, and remains, concerned that the safety problems being experienced by PG&E

20   were not just one-off situations or bad luck, but indicated a deeper and more systemic problem"

21   (¶596).

22           658.    For the same reasons as set forth in ¶¶650-652 above, the representation in the

23   Offering Documents for the April 2018 Notes Offering that assured investors that PG&E had

24   taken steps to safely operate and maintain its equipment when explaining the role of third-party

25   monitor "to help ensure" such steps were taken was materially false and misleading.  Contrary to

26   this statement, PG&E had systemic failures with respect to wildfire safety and failed to update or

27   maintain its equipment as explained above.   In addition, the representation misled investors with

28

regard to its "safety related incentive programs" by not disclosing that it had incentivized its contractors to not report or clear hazardous trees (¶569).

**B.     The Securities Act Defendants Materially Misled Investors Regarding PG&E's Liability for Wildfires**

659.    The Offering Documents for the April 2018 Notes Offering, including the documents incorporated by reference therein, misled investors by insinuating that PG&E may not have caused and might not be liable for the destruction of life and property resulting from fires that PG&E caused, or the costs associated with wildfires.

660.    PG&E's Offering Documents for the April 2018 Notes Offering (including the registration statement for the offering and PG&E's FY17 Form 10-K incorporated by reference), misleadingly represented that it was only a possibility that PG&E caused or would face liability for the fires following investigations, stating:

> *[T]he impact of the Northern California wildfires, including the costs of restoration of service to customers and repairs to the [Company] facilities, and whether the [Company] is able to recover such costs through a [Catastrophic Event Memorandum Account]; the timing and outcome of the wildfire investigations, including into the causes of the wildfires; whether the [Company] may have liability associated with these fires*; if liable for one or more fires, whether the [Company] would be able to recover all or part of such costs through insurance or through regulatory mechanisms, to the extent insurance is not available or exhausted; and potential liabilities in connection with fines or penalties that could be imposed on the [Company] if the [California Department of Forestry and Fire Protection and the California Public Utilities Commission] ("CPUC") or any other law enforcement agency brought an enforcement action and determined that the [Company] failed to comply with applicable laws and regulations.   *See* Ex. A, Stmt. Nos. 24, 34.

661.    The same Form 10-K for FY17 incorporated into the April 2018 Offering Documents also misleadingly claimed that it was not "***probable***" that PG&E would face liability for the fires, stating that PG&E "***could*** be liable for property damage, interest, and attorneys' fees without having been found negligent… *[i]f* the Utility's facilities, such as its electric distribution and transmission lines, are determined to be the cause of one or more fires, and the doctrine of inverse condemnation applies."  The Form 10-K for FY17 also stressed that "*[g]iven the preliminary stages of investigations and the uncertainty as to the causes of the fires,*

1   ***PG&E Corporation and the Utility do not believe a loss is probable at this time***.”  *See* Ex. A,

2   Stmt. No. 25.[182]

3        662.    PG&E's 10-K for FY17 further misleadingly claimed that even if PG&E were

4   found liable for the fires, PG&E's liability insurance and ability to recover through regulatory

5   mechanisms would mitigate any costs to PG&E arising from its liability for the fires.  As stated

6   in PG&E's Form 10-K, ***while additional facts "could emerge" rendering a loss probable***, "[t]he

7   Utility has liability insurance from various insurers, which provides coverage for third-party

8   liability attributable to the Northern California Fires in an aggregate amount of approximately

9   $800 million" and could also "apply for cost recovery." *See* Ex. A, Stmt. No. 25.

10       663.    The foregoing statements in ¶¶660-662 were materially false and misleading

11  because contrary to the impression created by the Offering Documents for the April 2018 Notes

12  Offering regarding PG&E's liability for the North Bay Fires, the Company's deficient safety

13  practices had caused the majority of those wildfires and liability for those wildfires.  There was

14  no reasonable basis for the Securities Act Individual Defendants to claim that there was

15  "uncertainty as to the causes of the fires" or that additional facts were necessary to render a loss

16  probable.  Given PG&E's safety deficiencies and the facts known at the time, it was probable

17  that PG&E caused many of the North Bay Fires.

18       664.    Sufficient facts pertaining to the causes of the Northern California wildfires

19  existed to properly conclude that a loss was probable as of December 31, 2017, in accordance

20  with Generally Accepted Accounting Principles ("GAAP"), Accounting Standards Codification

21  ("ASC") 450, *Loss Contingencies*.[183]  As a result, PG&E materially understated operating

22

23       [182] PG&E's consolidated balance sheet as of December 31, 2017 filed with the SEC on
    PG&E's FY17 Form 10-K materially understated operating expenses (reported ~$14.2 billion)
24  and pretax income (reported ~$2.2 billion) by $10.0 billion, and materially understated total
    liabilities (reported ~$48.5 billion) and overstated total equity (reported ~$13 billion) by $10.0
25  billion.

26       [183] GAAP are the principles established by the Financial Accounting Standards Board that
    are recognized by the accounting profession as the conventions, rules, and procedures necessary
27  to define accepted accounting practice at a particular time.  SEC Regulation S-X (17 C.F.R.
    §210.4-01(a)(1)) states that financial statements filed with the SEC that are not prepared in
28  compliance with GAAP are presumed to be misleading and inaccurate, despite footnotes and

---

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                     204
CIVIL ACTION NO. 3:18-CV-03509-EJD

1   expenses and pretax income by $10.0 billion on PG&E's consolidated statement of income for

2   FY 2017, and materially understated total liabilities and overstated total equity by $10.0 billion

3   on PG&E's consolidated balance sheet as of December 31, 2017.

4          665.    According to GAAP, an estimated loss from a loss contingency shall be accrued

5   by a charge to income and by the establishment of a liability when both of the following

6   conditions are met:

7              a.  Information available before the financial statements are issued
               or are available to be issued [] indicates that it is probable that an
8              asset had been impaired or a liability had been incurred at the date
               of the financial statements

9              b.  The amount of loss can be reasonably estimated.[184]

10   ASC 450-20-25-2.[185]

11          666.    GAAP also provided specific instructions to the Company on assessing the

12   probability of the occurrence (ASC 450-20-55-12) and required PG&E to assess whether the

13   events were probable, reasonably possible or remote (ASC-450-20-55-14).

14          667.    PG&E was obligated to report and properly disclose wildfire-related operating

15   expenses and wildfire-related liabilities as of December 31, 2017 because both requirements of

---

*(continued)*

other disclosure.  Regulation S-X requires that interim financial statements must also comply
with GAAP, with the exception that interim financial statements need not include disclosures
that would be duplicative of disclosures accompanying annual disclosures, pursuant to 17 C.F.R.
§210.10-01(a).

[184]   GAAP states regarding this second provision that the "requirement shall not delay accrual
of a loss until only a single amount can be reasonably estimated."  ASC 450-20-25-5.  "To the
contrary, when the condition in [ASC] 450-20-25-2(a) is met and information available indicates
that the estimated amount of loss is within a range of amounts, it follow that some amount of loss
has occurred and can be reasonably estimated."  *Id.*  GAAP further instructs that "[i]f some
amount within a range of loss appears at the time to be a better estimate than any other amount
within the range, that amount shall be accrued."  ASC 450-20-30-1.  "When no amount within
the range is a better estimate than any other amount, however, the minimum amount in the range
shall be accrued."  *Id.*

[185]   In assessing ASC 450's requirements, Defendants were also required by ASC 855 to
consider "subsequent events" that occurred after the December 31, 2017 balance sheet date, but
before PG&E filed the FY17 Form 10-K on February 9, 2018, including, subsequent events that
provide additional evidence about conditions that existed at the balance sheet date that should be
recognized in the financial statements.

---

ASC 450 were met when PG&E issued its FY17 Form 10-K incorporated into the Offering Documents for the April 2018 Notes Offering; specifically that: (i) the wildfire-related expenses and liabilities were probable as a result of the Northern California wildfires; and (ii) the minimum amount of the potential damages in connection with the Northern California wildfires was estimable.

668.    A loss was probable because: (i) PG&E had for years before the North Bay Fires engaged in a pattern and practice of ignoring laws and California safety regulations and failed to take appropriate measures to mitigate or prevent wildfire hazards from occurring; (ii) the facts, evidence, and circumstances that existed strongly supported that PG&E's liability for damages in connection with the 2017 wildfires was probable as of December 31, 2017; and (iii) "inverse condemnation" liability laws applied to the 2017 North Bay Fires.

669.    PG&E did not properly maintain its power lines (including the Utility's failure to maintain and repair distribution and transmission lines), and had failed to properly perform vegetation management in the regions affected by the 2017 North Bay Fires (¶¶579-580).   In addition, in November 2017 it was reported that PG&E auditors permitted one out of 100 trees checked to violate clearance standards (¶575) and in January 2018 that PG&E had only engaged in a limited recloser shutdown (¶¶577, 606).  "The conditions [pertaining to the recognition of loss contingencies] are not intended to be so rigid that they required virtual certainty before a loss is accrued."  ASC 450-20-25-3.  GAAP did ***not*** permit PG&E to wait until the ongoing investigations by the California Department of Forestry and Fire Protection and the California Public Utilities Commission made it a "virtual certainty" that PG&E would be held liable before recognizing that a loss was probable.  As one analyst observed, when signs pointed to PG&E being "imprudent operators in the majority of instances…it should assume liability." (¶582).

670.    The loss also could have been reasonably estimated under ASC 450-20-25-2(b). First, On January 31, 2018, the California Department of Insurance issued a press release announcing an update on property losses in connection with the October and December 2017 wildfires in California, stating that, as of such date, "insurers have received nearly 45,000

insurance claims totaling more than $11.79 billion in losses," of which approximately $10.0 billion related to statewide claims from the October 2017 wildfires.[186]

671.    Second, PG&E admitted that the magnitude of the loss from the North Bay Fires could be greater than $10.0 billion in its FY17 Form 10-K.

> If the Utility were to be found liable for certain or all of such other costs and expenses, the amount of PG&E Corporation's and the Utility's liability could be higher than the approximately $10 billion estimated in respect of the wildfires that occurred in October 2017, depending on the extent of the damage in connection with such fire or fires.

672.    The Offering Documents were false and misleading because they claimed further investigation was needed and uncertainty surrounding PG&E's liability for the 2017 North Bay wildfires was such that a loss was not probable at the time.  There was no reasonable basis for these representations based on the adverse facts existing at the time or reasonably available to the issuers of the Offering Documents.

673.    In addition to the above, the foregoing statements in ¶672 were contradicted by adverse facts that existed at the time of the statements including, *inter alia*, that:

(a)    PG&E started and was at fault for the vast majority of the 2017 North Bay Fires.  (¶¶579-580, 584, 586).  Cal Fire investigations have confirmed that PG&E equipment caused at least the significant majority of these fires.  Cal Fire has referred the cases of many of the individual fires to the appropriate District Attorneys' offices, and the Company faced potential criminal liability as well, for offenses ranging from misdemeanors to implied-malice murder. (¶¶582, 583, 585-586, 601-602, 604, 616, 625; s*ee also* ¶624; ¶667);

(b)    PG&E – unlike other utilities – did not shut off reclosers, increasing the danger and likelihood of wildfires in cases where vegetation has fallen onto power lines, including in 132 high risk areas in 2017 (¶¶577, 606);

---

[186] The press release does not account for uninsured losses, interest, attorneys' fees, fire suppression costs, evacuation costs, medical expenses, personal injury and wrongful death damages or other costs.

1     (c)     In the two years prior to the Camp Fire, including roughly the year before

2 the 2017 North Bay Fires, PG&E did "absolutely nothing" to produce an annual wildfire safety

3 plan, as required by state law (¶594), and indeed failed to develop any "comprehensive

4 enterprise-wide approach to address safety," a sign of "systemic problem[s]" at the Company

5 (¶596);

6     (d)     PG&E Vegetation Program Manager, Richard Yarnell, testified that for

7 the entire period from September 2015 to April 10, 2017, "PG&E—to the best of my knowledge,

8 we have not made any changes" to improve safety (¶22); and

9     (e)     As demonstrated by admissions made by PG&E in PG&E's probation

10 proceedings before Judge Alsup, in 2016 alone, PG&E had experienced approximately 1,400

11 downed wires caused by vegetation contact, and, as of June 2017, there remained 3,962

12 unworked trees which PG&E had identified in 2016 as hazardous with the potential to "fall into

13 or otherwise impact the conductors, towers or guy wires before the next inspection cycle" (¶618).

14    **C.**    **PG&E's Offering Documents Misled Investors by Failing to Comply with Item 303's Disclosure Requirements and Disclosure Safety Violations**

15

16     674.    Item 303 of SEC Regulation S-K requires the Management's Discussion &

17 Analysis ("MD&A") section of registration statements to "[d]escribe any unusual or infrequent

18 events or transactions . . . that materially affected the amount of reported income from continuing

19 operations and, in each case, indicate the extent to which income was so affected" and

20 "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably

21 expects will have a material favorable or unfavorable impact on net sales or revenues or income

22 from continuing operations." 17 C.F.R. §229.303(a)(3)(i)-(ii).

23     675.    The SEC has provided guidance concerning the MD&A requirements, including

24 Item 303:

25     The purpose of MD&A is not complicated. It is to provide readers information "necessary to an understanding of [a company's] financial condition, changes in financial condition and results of operations." The MD&A requirements are intended to satisfy three principal objectives:

26

27

28

- to provide a narrative explanation of a company's financial statements that enables investors to see the company through the eyes of management;

- to enhance the overall financial disclosure and provide the context within which financial information should be analyzed; and

- to provide information about the quality of, and potential variability of, a company's earnings and cash flow, so that investors can ascertain the likelihood that past performance is indicative of future performance.

676.    To effectuate that purpose, Item 303 requires "companies to provide investors and other users with material information that is necessary to an understanding of the company's financial condition and operating performance, as well as its prospects for the future."

677.    The Offering Documents (including the registration statements) for the Notes Offerings  failed to provide the information required by Item 303, including the omission of information necessary to understand the Company's financial condition, changes in financial condition, and results of operations.

678.    The March 2016, December 2016, March 2017, and April 2018 Notes Offering' Offering Documents (specifically the registration statements associated with each of the Notes Offerings) failed to disclose that PG&E had systematically violated California regulations regarding fire prevention and failed to take reasonable steps or investments to mitigate fire dangers.  They also violated 17 C.F.R. §229.303(a)(3)(ii),[187] because they did not disclose facts that were known to PG&E and would (and did) have an unfavorable impact on the Company's earnings and income from continuing operations. This failure also violated 17 C.F.R. §229.503(c), because specific risks were not adequately disclosed, or disclosed at all, even

---

[187] Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(a)(3)(ii) ("Item 303"), requires Defendants to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  Similarly, Item 503 of SEC Regulation S-K, 17 C.F.R. §229.503(c) ("Item 503"), requires, in the "Risk Factors" section of registration statements and prospectuses, "a discussion of the most significant factors that make . . . the offering speculative or risky" and requires each risk factor to "adequately describe[] the risk."

1  though they were some of the most significant factors that made an investment in PG&E notes

2  speculative or risky.

3       679.    At the time of the issuance of the Offering Documents for each of the Notes

4  Offerings (including the registration statements for each offering) the known trends adversely

5  impacting PG&E included: (i) the fact that despite suffering from serious safety problems for

6  years, the Company had failed to develop a comprehensive approach to address safety (¶22, 594,

7  596); (ii) the Company's deficient safety practices related to wildfire safety and widespread

8  safety violations, including the systemic failure to clear vegetation and trees as required by

9  regulations (¶¶568, 570-571, 575, 577, 594-596, 598-599, 603, 605, 607-608, 610, 612-618, 620-

10  623); (iii) PG&E's failure to update outdated equipment or flawed systems (¶¶599, 605, 612-

11  616, 618-623); and (iv) the Company's failure to allocate sufficient resources or investments in

12  safety (¶¶22, 78, 568-569, 571, 594-595, 599, 605, 607-608, 612-618, 618-623).  Each of these

13  adverse trends increased the risk of wildfires and liability which the Offering Documents

14  (including the registration statements) did not sufficiently disclose so that investors understood

15  the true state of PG&E's financial condition (including the quality of its earnings) or operations.

16       680.    These known trends impacting PG&E's financial condition, operations and future

17  performance were not disclosed when the Offering Documents for the March 2016 and

18  December 2016 Notes Offerings (including the registration statements) were filed with the SEC

19  despite adverse facts existing at the time including, *inter alia*, that: (i) PG&E had caused

20  hundreds or thousands of fires across California since June 2014, averaging more than one fire a

21  day (¶600); (ii) its vegetation management practices were deficient (¶¶568, 570-571, 575, 577,

22  594-596, 598-599, 603, 605, 607-608, 610, 612-618, 620-623;); (iii) in 2014 the Company had

23  documented that the "likelihood of failed structures happening [was] high" with respect to the

24  transmission line at the center of the subsequent Camp Fire (¶620); and (iv) as PG&E Vegetation

25  Program Manager Richard Yarnell testified,  for the entire period from September 2015 to April

26  10, 2017, "PG&E—to the best of my knowledge, we have not made any changes" to improve

27  safety (¶22).

28

681.     These known trends were similarly not disclosed when the Offering Documents for the March 2017 Notes Offering (including the registration statement) were filed with the SEC despite adverse facts existing at the time including those above (¶¶679-680) and *inter alia*, that: (i) the Company had never, as planned, addressed dangerously encroaching vegetation or replaced old lattice towers with modern tubular steel poles or replaced wire and hardware connecting those to towers (¶612); (ii) there remained 3,962 unworked trees which PG&E had identified in 2016 as hazardous with the potential to "fall into or otherwise impact the conductors, towers or guy wires before the next inspection cycle" (¶618); and (iii) the Company's vegetation management was dismal, inadequate, and it had allowed its tree budget to wither (¶¶619, 622). The March 2017 registration statement failed to disclose the known adverse safety trends that were unfavorably impacting PG&E.

682.     Likewise, at the time the Offering Documents for the April 2018 Notes Offering (including the registration statement), these known trends were not disclosed despite adverse facts existing at the time include those above (¶¶679-681) and *inter alia*, that the Company still had failed to create a "comprehensive enterprise-wide approach to address safety" or address the "systemic problem[s]" at the Company, with the result that a "very clear-cut pattern" had established itself by 2018: "PG&E is starting these fires" (¶¶596, 605).  The April 2018 registration statement failed to disclose PG&E's known adverse safety trends that were unfavorably impacting PG&E.

## XIX.   NO SAFE HARBOR FOR THE SECURITIES ACT CLAIMS

683.     The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the false or misleading statements or material omissions pleaded with respect to the Securities Act claims.

684.     First, none of the misstatements complained of herein were forward-looking statements.  Rather, they were misstatements concerning current facts and conditions existing at the time the statements were made.  None of the historic or present tense statements made by the Securities Act Defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions

1   underlying or relating to any projection or statement of future economic performance when

2   made, nor were any of the projections or forecasts made by the Securities Act Defendants

3   expressly related to or stated to be dependent on those historic or present tense statements when

4   made.

5       685.    Second, to the extent that any statements may be construed as forward-looking,

6   those statements were not accompanied by meaningful cautionary language identifying important

7   facts that could cause actual results to differ materially from those in the statements.  As set forth

8   in detail above, then-existing facts contradicted the Securities Act Defendants' statements.

9   Given the then-existing facts contradicting the Securities Act Defendants' statements, the

10  generalized risk disclosures made by the Securities Act Defendants were not sufficient to

11  insulate the Securities Act Defendants from liability for their materially false or misleading

12  statements and material omissions.

13      686.    Third, to the extent any statement that may be construed as a false or misleading

14  forward-looking statement, at the time each forward-looking statement was purportedly made,

15  the speaker also knew the forward-looking statement was false or misleading and the forward-

16  looking statement was authorized and/or approved by an executive officer of PG&E who knew

17  that the forward-looking statement was false.

18  **XX.    CLASS ACTION ALLEGATIONS FOR THE SECURITIES ACT CLAIMS**

19      687.    The Securities Act Plaintiffs bring the Securities Act claims on behalf of

20  themselves and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure

21  consisting of all persons or entities that acquired PG&E senior notes in or traceable to one or

22  more of the Notes Offerings and corresponding Offering Documents, and who were damaged

23  thereby (the "Securities Act Subclass").  Excluded from the Securities Act Subclass are: (i) all

24  defendants in the Action; (ii) members of the immediate family of any individual defendant; (iii)

25  any person who is or was an officer or director of PG&E during or after the Class Period; (iv)

26  any firm, trust, corporation, or other entity in which any defendant has or had a controlling

27  interest; (v) PG&E's employee retirement and benefit plan(s) and their participants or

28

1    beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal

2    representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

3         688.    The members of the Securities Act Subclass are so numerous that joinder of all

4    members is impracticable.  PG&E notes are traded on the New York Stock Exchange ("NYSE"),

5    and over $4 billion worth of PG&E notes were sold in the Notes Offerings.  While the exact

6    number of the Securities Act Subclass members is unknown to the Securities Act Plaintiffs at

7    this time and can only be ascertained through appropriate discovery, the Securities Act Plaintiffs

8    believe that there are hundreds of members in the proposed Securities Act Subclass.  Record

9    owners and other members of the Subclass may be identified from records maintained by PG&E

10   or its transfer agent and may be notified of the pendency of this action by mail, using the form of

11   notice similar to that customarily used in securities class actions.

12        689.    Securities Act Plaintiffs' claims are typical of the claims of the members of the

13   Securities Act Subclass, as all members of the Securities Act Subclass are similarly affected by

14   Securities Act Defendants' conduct in violation of the Securities Act that is complained of

15   herein.

16        690.    Securities Act Plaintiffs will fairly and adequately protect the interests of the

17   members of the Securities Act Subclass and have retained counsel competent and experienced in

18   class and securities litigation.

19        691.    Common questions of law and fact exist as to all members of the Securities Act

20   Subclass and predominate over any questions solely affecting individual members of the

21   Securities Act Subclass.  Among the questions of law and fact common to the Securities Act

22   subclass are:

23             (a)    whether the Securities Act Defendants violated the Securities Act;

24             (b)    whether statements made by the Securities Act Defendants to the investing

25   public in the Offering Documents for the Notes Offerings misrepresented or omitted material

26   facts about the business and operations of PG&E; and

27             (c)    to what extent the members of the Securities Act Subclass have sustained

28   damages and the proper measure of damages.

692.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Securities Act Subclass members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Securities Act Subclass to individually redress the wrongs done to them.  There will be no difficulty in the management of the Securities Act Subclass as a class in this action.

## XXI.     CLAIMS FOR RELIEF UNDER THE SECURITIES ACT

### FIFTH CLAIM

**For Violations of §11 of the Securities Act**
**Against All Securities Act Defendants**

693.     This Claim is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Securities Act Subclass, against all Securities Act Defendants.

694.     This Claim does not sound in fraud.  Securities Act Plaintiffs do not allege that the Securities Act Individual Defendants or the Underwriter Defendants had scienter or fraudulent intent for this Claim, which are not elements of a §11 claim.  This Claim is based solely on negligence.  Securities Act Plaintiffs specifically disclaim any allegation of fraud, scienter or recklessness in this §11 claim.

695.     Securities Act Plaintiffs repeat and reallege ¶¶12-15 & 496-694 by reference.

696.     The registration statements for the Notes Offerings were inaccurate and misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

697.     The Utility, a subsidiary of PG&E Corporation, is the registrant for the senior notes sold in the Notes Offerings.  The Utility and PG&E Corporation would be named as defendants herein for this Claim but for their declaration of bankruptcy and the imposition of the automatic bankruptcy stay under federal law.

698.     The Securities Act Defendants named herein were responsible for the contents and dissemination of the registration statements for the Notes Offerings.  None of the Securities

1   Act Defendants named herein made a reasonable investigation or possessed reasonable grounds

2   for the belief that the statements contained in the registration statements for the Notes Offerings

3   were true and without omissions of any material facts and were not misleading.

4        699.   By reason of the conduct alleged herein, each Securities Act Defendant violated,

5   and/or controlled a person who violated, §11 of the Securities Act.

6        700.   Securities Act Plaintiffs acquired PG&E senior notes sold in the Notes Offerings

7   traceable to the registration statements for the Notes Offerings.

8        701.   Securities Act Plaintiffs and the Securities Act Subclass have sustained damages.

9        702.   At the time of their purchases of the PG&E notes sold in the Notes Offerings,

10  Securities Act Plaintiffs and other members of the Securities Act Subclass were without

11  knowledge of the facts concerning the wrongful conduct alleged herein.  Less than one year has

12  elapsed from the time that Securities Act Plaintiffs discovered or reasonably could have

13  discovered the facts upon which this Complaint is based to the time that Securities Act Plaintiffs

14  filed their initial complaint on February 22, 2019.  Less than three years elapsed between the

15  time that the securities upon which this Count is brought were offered to the public and the time

16  Securities Act Plaintiffs filed their initial complaint.

17                                      **SIXTH CLAIM**

18                         **For Violation of §15 of the Securities Act**
                 **Against the Securities Act Individual Defendants**
19

20       703.   This Claim is brought pursuant to §15 of the Securities Act, 15 U.S.C. §77o, on

21  behalf of all members of the Securities Act Subclass against the Securities Act Individual

     Defendants.
22

23       704.   This Claim does not sound in fraud.  Securities Act Plaintiffs do not allege that

24  the Securities Act Individual Defendants had scienter or fraudulent intent, which are not

25  elements of a §15 claim. This Claim is based solely on negligence.  Securities Act Plaintiffs

26  specifically disclaim any allegation of fraud, scienter or recklessness in this §15 claim.

27       705.   Securities Act Plaintiffs repeat and reallege ¶¶12-15 & 496-704 by reference.

28

---

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                      215
CIVIL ACTION NO. 3:18-CV-03509-EJD

706.	The Securities Act Individual Defendants each were control persons of PG&E by virtue of their positions as directors and/or senior officers of PG&E.  The Individual Securities Act Defendants oversaw the Notes Offerings, including the preparation and dissemination of the registration statements for the Notes Offerings, and took steps to ensure that the Notes Offerings were successfully completed, including, for example, by signing the registration statements for the Notes Offerings.

## XXII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A.	Determining that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiff as the Class representative and the Securities Act Plaintiffs as representatives of the Securities Act Subclass;

B.	Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.	Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.	Awarding such other and further relief as this Court may deem just and proper.

1

## DEMAND FOR TRIAL BY JURY

2          Plaintiffs hereby demand a trial by jury.

3
   DATED: May 28, 2019                    /s/ Thomas A. Dubbs
4                                          THOMAS A. DUBBS (*pro hac vice*)
                                           LOUIS GOTTLIEB (*pro hac vice*)
5                                          JEFFREY A. DUBBIN (#287199)
                                           ARAM BOGHOSIAN (*pro hac vice*)
6                                          **LABATON SUCHAROW LLP**
                                           140 Broadway
7                                          New York, NY 10005
                                           Telephone: (212) 907-0700
8                                          Facsimile: (212) 818-0477
                                           Email: tdubbs@labaton.com
9                                          lgottlieb@labaton.com
                                           jdubbin@labaton.com
10                                         aboghosian@labaton.com
11
                                           *Counsel for Lead Plaintiff the Public*
12                                         *Employees Retirement Association of New*
                                           *Mexico and Lead Counsel for the Class*
13

14                                         **WAGSTAFFE, VON LOEWENFELDT,**
                                           **BUSCH & RADWICK, LLP**
15                                         JAMES M. WAGSTAFFE (#95535)
                                           FRANK BUSCH (#258288)
16                                         100 Pine Street, Suite 725
                                           San Francisco, California 94111
17                                         Telephone: (415) 357-8900
                                           Facsimile: (415) 371-0500
18                                         Email: wagstaffe@wvbrlaw.com
                                           busch@wvbrlaw.com
19
                                           *Liaison Counsel for the Class*
20
                                           ROBBINS GELLER RUDMAN
21                                           & DOWD LLP
                                           DARREN J. ROBBINS (#168593)
22                                         BRIAN E. COCHRAN (#286202)
                                           655 West Broadway, Suite 1900
23                                         San Diego, CA 92101
                                           Telephone: (619) 231-1058
24                                         Facsimile: (619) 231-7423
                                           Email:darrenr@rgrdlaw.com
25                                         bcochran@rgrdlaw.com

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ROBBINS GELLER RUDMAN
  & DOWD LLP
WILLOW E. RADCLIFFE (#200087)
KENNETH J. BLACK (#291871)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone: (415) 288-4545
Facsimile: (415) 288-4534
Email: willowr@rgrdlaw.com
kennyb@rgrdlaw.com

*Counsel for the Securities Act Plaintiffs*

VANOVERBEKE, MICHAUD &
  TIMMONY, P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI  48201
Telephone: (313) 578-1200
Facsimile: (313) 578-1201
Email: tmichaud@vmtlaw.com

*Additional Counsel for the Securities Act
Plaintiffs*

1

**CERTIFICATE OF SERVICE**

2        I HEREBY CERTIFY that on May 28, 2019, I electronically filed the foregoing with the

3   Clerk of Court using the CM/ECF system, which will send a Notice of Electronic Filing to all

4   counsel of record.

5                                    */s/ Thomas A. Dubbs*
                                    THOMAS A. DUBBS
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CERTIFICATE OF SERVICE
CIVIL ACTION NO. 5:18-CV-03509-EJD