**Entered on Docket**
**September 08, 2021**
EDWARD J. EMMONS, CLERK
U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

**Signed and Filed: September 8, 2021**

_____
**DENNIS MONTALI**
**U.S. Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re:<br><br>PG&E CORPORATION,<br><br>      - and -<br><br>PACIFIC GAS AND ELECTRIC COMPANY,<br><br>    Reorganized Debtors.<br><br>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>☒ Affects both Debtors<br><br>* *All papers shall be filed in the Lead Case, No. 19-30088 (DM).* | Bankruptcy Case No. 19-30088-DM<br><br>Chapter 11<br><br>Jointly Administered |

<u>MEMORANDUM DECISION REGARDING DEBTORS' OBJECTION TO CONSOLIDATED EDISON DEVELOPMENT, INC.'S AMENDED CURE PAYMENT DEMAND</u>

On August 10, 2021, this court held a hearing on the objection by PG&E Corporation and Pacific Gas and Electric Company (the "Utility" and collectively, "Debtors") to the amended cure claim demand of Consolidated Edison Development, Inc. ("ConEd" or "CED") in the amount of $11,844,598.00 (the

-1-

"Amended Cure Demand").[1] The Amended Cure Demand arose out of Debtors' assumption of certain power purchase agreements ("PPAs") and interconnection agreements ("IAs") (collectively, the "CED Agreements") that Utility entered with ConEd or its affiliates. For the reasons set forth below, the court is sustaining Debtors' claim objection (the "Objection").

I. THE UNDERLYING TRANSACTIONS AND THE AMENDED CURE DEMAND

ConEd's subsidiaries or predecessors built, own and operate energy generating facilities and sell the energy and certain attributes generated (including "green attributes" such as Renewable Energy Certificates) to the Utility. This enables the Utility to, among other things, meet its resource adequacy and renewable energy requirements prescribed by the California Public Utilities Commission ("CPUC"). See Amended Cure Demand, ECF pgs. 3-4. There is no doubt that the PPAs, the relationship between the Utilities and ConEd, and the related financing obligations undertaken by ConEd in connection with those activities were and are an integral part of the PPAs and the California renewable energy presence as regulated by the CPUC.

There is also no doubt that ConEd made no attempt to terminate or accelerate its rights under the CED agreements at any time before or after confirmation of Debtors' Chapter 11 Plan of Reorganization dated June 19, 2020 (dkt. 8048), confirmed on June 20, 2020 (dkt. 8053) (the "Plan").

---

[1] The Amended Cure Demand is attached as Exhibit A to the Objection at dkt. 10613-1.
.

-2-

Finally, there is no doubt that ConEd is limited to recovery of "direct" damages under those agreements and that the sole stated rationale for its assertion of the Amended Cure Amount is the assertion of damages by its financers specifically caused by Debtors' bankruptcy. No other "trigger" is identified.

ConEd has received payment of approximately $9.1 million curing all monetary defaults under the CED Agreements in full (including post-petition default interest as required for assumption). The other monetary defaults that were cured when the Plan became effective were for pre-petition deliveries that became due in the first month after the bankruptcy cases were filed; settlement obligations arising in July, 2018, that were only approved by the CPUC in April, 2019; and payment of Network Upgrade Reimbursements due under IAs with two of ConEd's affiliates.

ConEd nonetheless contends that it is entitled to additional cure damages in the amount of $11,844,598.00 because the commencement of the underlying cases triggered other events of default under Article 5.1 of the PPAs:

> Events of Default. An "Event of Default" shall mean, (a) with respect to a Party that is subject to the Event of Default, the occurrence of any of the following: (i) the failure to make, when due, any payment required pursuant to this Agreement if such failure is not remedied within five (5) Business Days after Written Notice is received by the Party failing to make such payment . . . . [and] (v) such Party becomes Bankrupt . . . .

PPA Art. 5.1(a)(i) and (v) (emphasis added).  ConEd asserts that Debtors' commencement of these bankruptcy cases caused it to default on its agreements with its own lenders (the "Third Party Lenders") and thus incur additional liability to them.  *See* Notices of Defaults and related correspondence filed under seal as Exhibit E to the Objection.  Notably, Debtors were not parties to the loan agreements between ConEd and its Third Party Lenders.  ConEd refers generally to "cross-default" provisions in those agreements with the Third Party Lenders, but contends specifically only that Debtors' bankruptcy caused defaults under them.

ConEd's Amended Cure Demand is comprised of default interest ($4,805,060.00), consent fees ($6,000,000.00) and attorneys' fees ($1,039,538.00) that it purportedly had to pay its Third Party Lenders as a consequence of the underlying bankruptcy cases.  As stated in its Amended Cure Demand:

> The Debtors' bankruptcy filing constituted a default by the Utility under the PPAs and the Utility's failure to perform under the IAs post-petition constituted further defaults and breaches of the agreements.

*See* Part V of the Amended Cure Demand, ECF pg. 7.  ConEd also asserts that Debtors defaulted in payments that became due under the PPAs in January 2019.  These are the payments Debtors made as part of their cure when the Plan became effective.

In response, Debtors assert that they were not parties to ConEd's agreements with the Third Party Lenders, nor were they aware of the terms and conditions of such third-party financing agreements.  They also observe that even if they had been

-4-

parties to these agreements, the Bankruptcy Code[2] and other governing law precludes the enforcement of bankruptcy default provisions or *ipso facto* clauses. Debtors also repeat that they cured all monetary defaults under the PPAs through the $9.1 million payment.

Debtors also argue that even if ConEd could prevail on the merits of its claims, its damages are consequential in nature and barred by the express terms of the CED Agreements. The court accepts Debtors' principal arguments (discussed below). It declines the temptation to address this alternative argument, except to identify it.

II. ISSUES

1. Is ConEd's Amended Cure Demand, based on the filing of the underlying bankruptcy cases by Debtors, barred by the Bankruptcy Code's prohibition against enforcement of *ipso facto* clauses, or bankruptcy default provisions? YES.
2. Do the safe harbor provisions of section 556 preclude application of the *ipso facto* clauses? NO.
3. Do any enforceable cross-default provisions of the CED Agreements alter the outcome? NO.
4. Even if ConEd's claims were not barred by the Bankruptcy Code, are they barred by the terms of the CED Agreements prohibiting the recovery of consequential or similar damages? NOT DECIDED.

---

[2] Unless otherwise indicated, all section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532.

-5-

## III. DISCUSSION

### A. ConEd may not recover from PG&E because the *ipso facto* provisions are unenforceable.

While ConEd has set forth interesting and creative theories in support of its Amended Cure Demand, the claim itself is not allowable as a matter of law. Debtors were not parties to ConEd's third-party financing agreements. Whether they were aware of those agreements, which clearly is the case, is irrelevant. ConEd has not produced any financing agreement between it and a Third Party Lender that was executed by or joined by Debtors. Any benefit they would have derived from the Third Party Lender financing is too remote and incidental to justify imposition of liability.[3] The agreements with the Third Party Lenders were not a part of, or integrated into, the CED Agreements. But even if the court could somehow determine that Debtors assumed liability under the contracts between ConEd and the Third Party Lenders, governing bankruptcy law precludes enforcement of such agreements.

Debtors cured all defaults under the CED Agreements pursuant to and through the Plan. No monetary defaults exist. The event giving rise to ConEd's disputed cure demand is the filing of the underlying bankruptcy cases (*"(v) such party becomes Bankrupt"*). In its Amended Cure Demand and its Response, ConEd contended that but for Debtors' bankruptcy

---

[3] In order to procure the financing, ConEd requested Debtors to execute certain consents and agreements to permit it to pledge the PPAs as collateral on its Third Party Financing Agreements. Debtors agreed, but this does not constitute an amendment of the CED Agreements or an assumption of liability of ConEd's obligations to its Third Party Lenders.

-6-

filings, it would not have incurred damages arising from its obligations under contracts to which Debtors were non-parties.[4] Specifically, ConEd stated "[t]he Debtors' bankruptcy filing constituted a default" which "[c]onsequentially" caused it to suffer "direct damages" in the form of default interest, consent fees, and other costs.

Section 365(b)(2)(A) expressly excludes defaults that must be cured upon assumption under section 365(b)(1), "a default that is a breach of a provision relating to . . . the insolvency or financial condition of the debtor *at any time before the closing of the case*." 11 U.S.C. § 365(b)(2)(A)(emphasis added). More significantly, section 365(b)(2)(B) excuses debtors from curing a default relating to "the commencement of a [bankruptcy] case. . . ." 11 U.S.C. § 365(b)(2)(B). Thus, the act of filing for bankruptcy cannot be a cognizable ground for default. *See also* 11 U.S.C. § 1124(2)(A) (a claim is unimpaired even if debtor defaulted on an *ipso facto* clause by filing bankruptcy). To the extent the Bankruptcy Code explicitly excuses Debtors from curing defaults arising from filing their bankruptcy petitions, ConEd's Amended Cure Amount claim based on such filings is not allowable. *See* 11 U.S.C. § 502(b)(1); see also *Travelers Cas. and Sur. Co. of America v. Pacific Gas and Elec. Co.*, 549 U.S. 443, 449, 451-52 (2007) (recognizing that a claim

---

[4] In addition, in its notice of default correspondence to Debtors, Con Ed stated that the event of default under its financing agreements with the Third Party Lenders was "on account of the January 29, 2019 filing by [Debtors] for bankruptcy protection." *See* Debtors' MPA in Support of Objection to ConEd's Claim (sealed) at dkt. 10830 and Exh. E. to the Objection (also sealed).

-7-

may be disallowed if unenforceable under "applicable law", including the Bankruptcy Code. To conclude otherwise would eviscerate Section 365(b)(2).[5]

ConEd stresses that defaults caused by a bankruptcy trigger are not expressly disallowed. That is true, literally, but overlooks that they are also not expressly allowed, and what must be paid as part of the cure upon assumption are expressly excluded from the cure. It also argues that while curing *ipso facto* defaults is not a precondition to assumption, it "does not extinguish the default." That also may literally be a true statement, but as a practical matter, it neutralizes the effect of the default and renders it meaningless, at least between the Utility and its contractual counter-party, ConEd. Whatever the consequence vis-à-vis ConEd and any of the Third Party Lenders is not the point. Any asserted damages by such lenders is not "direct", particularly since the only cited trigger is the very same *ipso facto* one that section 365(b)(2) deals with.

Debtors did not seek to assume any Third Party Lenders' obligations, but only the contractual agreements with ConED, the CED Agreements. Absent evidence of a direct non-incidental benefit to Debtors of ConEd's financing with the Third Party

---

[5] Numerous courts are in accord. See, *In re Peaches Recs. & Tapes, Inc.*, 51 B.R. 583 (B.A.P. 9th Cir. 1985); *In re Charter Commc'ns*, 419 B.R. 221 (Bankr. S.D.N.Y. 2009); *In re Chateaugay Corp.*, No. 92-cv-7054 (PKL), 1993 WL 159969 (S.D.N.Y. May 10, 1993); *In re Claremont Acquisition Corp., Inc.*, 113 F.3d 1029 (9th Cir. 1997); *In re Yates Dev., Inc.*, 241 B.R. 247 (Bankr. M.D. Fla. 1999), *aff'd*, 256 F.3d 1285 (11th Cir. 2001); *In re Jennifer Convertibles, Inc.*, 447 B.R. 713 (Bankr. S.D.N.Y. 2011).

Lenders, ConEd's claim cannot survive the Bankruptcy Code's prohibition against the enforcement of *ipso facto* clauses where, like here, it simply asserts that the filing and existence of the bankruptcy case triggered the claims.

Finally, ConEd did not seek to terminate or modify any provision of any CED Agreement, so there was nothing to implicate Section 365(e).

### B. The Safe Harbor Provisions of Section 556 Are Inapplicable.

For the first time since the commencement of these cases, and only after confirmation of the Plan and cure of its defaults under section 365, ConEd contends that the PPAs are forward contracts, which the Bankruptcy Code defines as

> a contract (other than a commodity contract [ ]) for the purchase, sale, or transfer of a commodity . . . which is presently or in the future becomes the subject of dealing in the forward contract trade . . . with a maturity date more than two days after the date the contract is entered into . . . .

11 U.S.C. § 101(25)(A). ConEd further argues that section 556 purportedly exempts it from the application of section 365(e).

> The contractual right of a . . . forward contract merchant to cause the liquidation, termination, or acceleration of a commodity contract, as defined in section 761 of this title, or forward contract because of a condition of the kind specified in section 365(e)(1) of this title, and the right to a variation or maintenance margin payment received from a trustee with respect to open commodity contracts or forward contracts, shall not be stayed, avoided, or otherwise limited by operation of any provision of this title or by the order of a court in any proceeding under this title.

-9-

11 U.S.C. § 556. These safe harbor provisions protect the counterparty's rights to terminate, liquidate or accelerate forward contracts. As previously noted, ConEd never sought termination, liquidation, or acceleration of the CED Agreements during the course of this case. For that reason, section 556 is irrelevant even if the CED Agreement could be considered a forward contract, an issue the court does not need to resolve.

### C. The Cross-Default Provisions do not change the result.

ConEd further argues that Debtors must cure cross-defaults arising from the agreements with ConEd's Third Party Lenders, citing, *inter alia*, *In re Liljeberg Enters.Inc.*, 304 F.3d 410 (5th Cir. 2002) and *In re Kopel,* 232 B.R. 57 (Bankr. E.D.N.Y. 1999). In order to assume a particular executory contract or unexpired lease, a trustee or debtor-in-possession is only required to perform under that discrete contract or lease, not under other, substantially unrelated agreements. This principle applies even where distinct agreements are set out in the same document. *Stewart Title Guar. Co. v. Old Republic Nat'l Title Ins. Co.*, 83 F.3d 735, 741 (5th Cir. 1996) ("If a single contract contains separate, severable agreements the debtor may reject one agreement and not another.").

Many courts also agree that cross-default provisions do not integrate two or more separate contractual obligations for the purposes of assumption. *See, e.g., In re Plitt Amusement Co. of Washington, Inc.*, 233 B.R. 837, 847-48 (Bankr. C.D. Cal. 1999) ("It is well-settled that, in the bankruptcy context, cross-default provisions do not integrate otherwise separate

-10-

transactions or leases . . . The cross-default provisions must be disregarded in the bankruptcy law analysis, because they are impermissible restrictions on assumption and assignment").

Courts enforcing cross-default provisions generally examine whether the failure to enforce the clause would deprive the non-debtor party of an essential part of its bargain.

For example, in *Liljeberg*, the debtor was part of a corporate group that constructed and owned a hospital with financing from a corporate lending group that operated hospitals. There were complicated and inter-related agreements, including: a mortgage note and mortgage; a lease and an agreement the debtor sought to assume, allowing the debtor to operate a pharmacy. *Liljeberg*, 304 F.3d at 419. The debtor defaulted under a separate loan agreement, resulting in a judgment causing the hospital to be sold. *Id.* at 420-21. The pharmacy agreement contained a cross-default clause providing that the agreement would terminate if the hospital was sold. *Id.* at 441. In the context of the overall transaction, the court found that the pharmacy agreement "functioned much like an overriding royalty payment," *id.* at 433, providing one element of the consideration for the debtor's leasing its hospital. Thus, to allow the debtor to assume the pharmacy contract after the debtor's default regarding the hospital would "thwart [the lending group's] bargain in agreeing to enter into the pharmacy agreement, all a part of the overall transaction to finance the building of the hospital through a loan secured by a collateral mortgage." *Id.* at 446.

Similarly, in *Kopel v. Campanile (In re Kopel)*, 232 B.R. 57 (Bankr. E.D.N.Y. 1999), the court enforced a cross-default provision linking agreements executed in conjunction with the sale of a veterinary practice. One agreement was an installment sale of the practice itself; another was a lease of the space in which the practice was conducted. The lease contained a provision requiring its termination if the tenant defaulted under the purchase agreement. The court found that this cross-default provision was inserted in the lease so that the selling veterinarian could resume his old practice if the buyer defaulted in the purchase of the practice, and thus protected "the very essence of the bargain." 232 B.R. at 67. "Had the cross-default provision been absent from the Lease, [the seller's] one essential condition to the sale -- that he be entitled to step in quickly and operate the business in the event of any default -- would have been thwarted." *Id.*

The agreements in *Liljeberg* and *Kopel* containing the cross-default clauses were economically interdependent: the consideration for one agreement supported the other. The courts observed that the non-debtor party would not have entered into one agreement without the other. *Liljeberg*, 304 F.3d at 445; *Kopel*, 232 B.R. at 67 ("[Debtor] has not even argued that he could have entered into the Lease without also entering into the Non-Lease Agreements."). They both involved significant extant defaults as of the petition date that needed to be cured.

Here, however, Debtors cured the defaults in full when they assumed their agreements with ConEd. Notwithstanding the large dollar amounts at stake here, and the obvious reason for ConEd's

-12-

Case: 19-30088    Doc# 11204    Filed: 09/08/21    Entered: 09/08/21 12:51:36    Page 12 of 15

development of the generation facilities, there is insufficient similarity with those illustrative cases to disregard the applicability of section 365(b)(2). As noted previously, the only so-called cross-default relied on by ConEd is the very same *ipso facto* clause that runs afoul of that section. No other provision of the third party financing has been identified.

ConEd might have insisted on enforceable cross-default provisions in the PPAs, but it did not. It might have insisted on Debtors' adoption or guarantee of the obligation to the Third Party Lenders, but it did not. The court will not re-write those operative agreements. To permit ConEd to enforce bankruptcy default provisions and non-specific cross default provisions would be to disregard sections 365(b)(2), 365(e)(1), 541(c) and other provisions of the Bankruptcy Code.

> D. Regardless of the applicable *ipso facto* provisions, ConEd likely may not recover consequential damages.

The parties focused on the narrow *ipso facto* issue as just discussed, but flagged this alternative argument.

Even if ConEd had pled a claim for relief that did not violate the various *ipso facto* clauses set forth in the Bankruptcy Code, the express terms of the CED Agreements suggest that the damages it seeks are consequential, incidental or indirect in nature. Section 7.1 of the PPAs bar such consequential damages: "[n]either party shall be liable for consequential, incidental, punitive, exemplary or indirect damages, lost profits or other business interruption damages, by statute, in tort or contract, under any indemnity provision or otherwise." The IAs similarly provide that

-13-

> "In no event shall any Party be liable under any provision of this [IA] for any losses, damages, costs or expenses for any special, indirect, incidental, consequential, or punitive damages, including but not limited to loss of profit or revenue, loss of the use of equipment, cost of capital, cost of temporary equipment or services, whether based in whole or in part in contract, in tort, including negligence, strict liability, or any other theory of liability."

Here, ConEd argues that the commencement of Debtors' cases caused it to default on its obligations owed to the Third Party Lenders and seeks damages arising from those defaults. Yet Debtors were not parties to or guarantors of ConEd's agreements with the Third Party Lenders. ConEd's alleged damages did not arise from any term or obligation set forth in the PPAs and IAs; to the contrary, all defaults relating to those documents were cured as of the Effective Date of the Plan. But even if ConEd had further legitimate claims against Debtors, the damages it seeks do appear incidental, indirect or consequential. But for the filing of the bankruptcy petitions, they would not exist. The purported damages are a consequence of the bankruptcy but not of a breach of the CED Agreements.

The court leaves this question for further consideration if and when appropriate.

IV. CONCLUSION

ConEd's Amended Cure Demand arises from Debtors' act of filing the underlying bankruptcy cases; but for the commencement of these chapter 11 cases, these claims would not exist. Consequently, the claims are not cognizable under the Bankruptcy Code. Therefore, for the reasons stated above, the court

SUSTAINS Debtors' Objection to ConEd's Amended Cure Demand seeking an additional cure payment of $11,844,598.00

The court is concurrently issuing an order consistent with this memorandum decision.

* * END OF MEMORANDUM DECISION * *