# Exhibit D

Decision 13-05-034  May 23, 2013

**BEFORE THE PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA**

| | |
|---|---|
| Order Instituting Rulemaking To Continue Implementation and Administration of California Renewables Portfolio Standard Program. | Rulemaking 11-05-005 (Filed May 5, 2011) |

**DECISION ADOPTING JOINT STANDARD CONTRACT FOR
SECTION 399.20 FEED-IN TARIFF PROGRAM AND GRANTING, IN PART,
PETITIONS FOR MODIFICATION OF DECISION 12-05-035**

Case: 19-30088   Doc# 11231-4   Filed: 09/09/21   Entered: 09/09/21 18:28:10   Page 2 of 100

COM/FER/acr/avs/gd2

# TABLE OF CONTENTS

**Title**                                                                                               **Page**

DECISION ADOPTING JOINT STANDARD CONTRACT FOR
    SECTION 399.20 FEED-IN TARIFF PROGRAM AND GRANTING,
    IN PART, PETITIONS FOR MODIFICATION OF DECISION 12-05-035 ....... 1
1. Summary ................................................................................................. 2
2. Background.............................................................................................. 3
    2.1. Feed-In Tariff Program – D.07-07-027 and D.12-05-035 ............................ 4
    2.2. Procedural History.............................................................................. 6
3. Policy Guidelines ................................................................................... 8
4. Petitions for Modification to D.12-05-035 ........................................ 9
    4.1. Modified Renewable Market Adjusting Tariff (ReMAT) Mechanism ... 10
    4.2. Additional Modifications Proposed by SEIA ...................................... 15
    4.3. Adding Megawatts Back into FiT Program ......................................... 17
    4.4. Subscriptions May Not Exceed the Amount of
        Megawatts Offered During a Bi-Monthly Period ..................................... 18
    4.5. Interconnection Queue Position not
        Relevant to FiT Program Number ........................................................... 21
    4.6. RAM Participation Restriction is Retained .......................................... 23
    4.7. Interconnection under Federal Wholesale Tariffs or
        Electric Tariff Rule 21 – Generator's Choice .......................................... 23
    4.8. Seller Concentration Provision is Removed from
        Project Viability Criteria......................................................................... 24
    4.9. Additional Modifications Proposed by
        CALSEIA and Clean Coalition................................................................. 25
    4.10. No Increase in the Program's Total Megawatts ...................................... 26
    4.11. No Price Floor ....................................................................................... 26
    4.12. No Change to Locational Adder, Strategically
        Located, or Environmental Compliance Costs ........................................ 27
    4.13. No Further Extension to the Commercial Operation Date ..................... 30
5. FiT Joint Standard Contract - Power Purchase Agreement.............................. 31
    5.1. Length of Contract is Reasonable ........................................................ 31
    5.2. Clarify Function of a Commission-Approved Standard Contract ........ 33
    5.3. Clarify Meaning of "Standard Terms and
        Conditions" and "Non-Modifiable" Terms ............................................. 34
    5.4. Clean Coalition's Proposed Standard Contract is Rejected .................... 36
    5.5. No Need for Separate Contract for Smaller Projects (under 1 MW) ...... 37

Case: 19-30088   Doc# 11231-4   Filed: 09/09/21   Entered: 09/09/21 18:28:10   Page 3
of 100

## TABLE OF CONTENTS
## (Cont'd)

**Title**                                                                        **Page**

5.6. Separate Provision for Bioenergy Addressed with SB 1122 .................. 38

6. Discussion of Specific Sections of the FiT Joint Standard Contract .................................................... 38

Section 2 – Definition of Product .................................................... 38

Sections 2.8 and 2.9 - Commercial Operation Date and Extension ...................... 39

Section 2.8.2.4 - Related Damages for Failure to Meet Guaranteed Commercial Operation Date .................... 41

Section 3.2 - Contract Quantity over Term of Contract ........................................... 41

Section 3.5 - Contract Term .................................................... 42

Section 3.5.4 – Commercial Operation Date and Collateral Requirement ........... 42

Section 3.7 - Billing and Payment Terms .................................................... 43

Section 4.1 - Green Attributes .................................................... 44

Section 4.3 - WREGIS .................................................... 44

Section 4.4.3 - Resource Adequacy Requirements ........................................... 46

Section 4.6 - Compliance Expenditure Cap .................................................... 47

Section 4.7 - Eligible Intermittent Resources Protocol Requirements .................. 48

Sections 4.8 and 5.3.6 - Qualifying Facility Status .................................................... 48

Section 5.3.2 - Seller's Representations, Warranties, and Covenants ................... 49

Section 5.3.8 - Seller's Representations, Warranties, and Covenants ................... 49

Section 5.3.9 - Other Product Transactions .................................................... 50

Sections 5.3.12 and 5.3.13 - Interconnection .................................................... 51

Section 6.5.1 - Administrative Logs .................................................... 51

Section 6.12 - Reporting and Record Retention .................................................... 52

Section 6.12.3 - Women, Minority and Disabled Veteran-owned Business Enterprises (WMDVBE) ........................... 53

Section 6.14 - Modification to Facility .................................................... 54

Section 10 - Insurance Requirements .................................................... 55

Section 11 - Force Majeure .................................................... 56

Section 12 - Guaranteed Energy Production .................................................... 56

Section 13 - Collateral Requirements .................................................... 57

Section 13.5.3 - Payment of Interest on Collateral .................................................... 59

Section 13.6 - Letter of Credit Requirements .................................................... 59

Section 14.9 - Transmission Costs & Termination Rights ...................................... 60

Section 15 and Appendix D - Forecasting .................................................... 61

Section 16.2 - Recording Phone Conversations .................................................... 62

Case: 19-30088   Doc# 11231-4   Filed: 09/09/21   Entered: 09/09/21 18:28:10   Page 4 of 100

**TABLE OF CONTENTS**
**(Cont'd)**

**Title**                                                      **Page**

Section 17 and Appendices K and L - Assignment ................................... 62

Section 19.1 - Dispute Resolution and Recovery of Costs ...................... 63

Section 20.3 - Amendments .................................................................. 64

Appendix F - Telemetry ........................................................................ 65

7. The FiT Tariffs .............................................................................. 66

    7.1. Effective Date of Tariff and Initiation of Program ................... 67

    7.2. Developer Experience .......................................................... 69

    7.3. Cure Period for Deficient Program Participation Requests.......... 70

    7.4. Process to Confirm a FiT Eligible Electric Generation Facility ........ 72

    7.5. Non-Disclosure Agreement .................................................. 73

    7.6. Re-Study Requirement and Loss of FiT Program Number ........... 73

    7.7. Participation in Other Incentive Programs .............................. 75

    7.8. Uniform Process for Subscription to FiT Price ........................ 76

    7.9. Clarification of Miscellaneous Tariff Provision ....................... 77

8. Comments on Proposed Decision .................................................... 77

9. Assignment of Proceeding .............................................................. 78

Findings of Fact ................................................................................... 78

Conclusions of Law ............................................................................. 86

ORDER ............................................................................................... 96

Case: 19-30088   Doc# 11231-4   Filed: 09/09/21   Entered: 09/09/21 18:28:10   Page 5 of 100

**DECISION ADOPTING JOINT STANDARD CONTRACT FOR
SECTION 399.20 FEED-IN TARIFF PROGRAM AND GRANTING, IN PART,
PETITIONS FOR MODIFICATION OF DECISION 12-05-035**

## 1.    Summary

This decision orders Pacific Gas and Electric Company (PG&E), Southern California Edison Company (SCE), and San Diego Gas & Electric Company (SDG&E) to revise their Feed-in Tariff (FiT) programs to include a new streamlined standard contract and revised tariffs.  The new streamlined standard contract incorporates the FiT program requirements adopted in Decision (D.) 12-05-035,[1] as modified.[2]  The terms of the standard contract and the provisions of the related tariff are adopted herein and will be implemented through a Tier 2 advice letter filing.

The FiT program is established pursuant to Pub. Util. Code § 399.20,[3] as amended, by Senate Bill (SB) 380 (Kehoe, Stats. 2008, ch. 544, § 1), SB 32 (Negrete McLeod, Stats. 2009, ch. 328, § 3.5), and SB 2 of the 2011-2012 First Extraordinary

---

[1] D.12-05-035, *Decision Revising Feed-In Tariff Program, Implementing Amendments To Public Utilities Code Section 399.20 Enacted By Senate Bill 380, Senate Bill 32, and Senate Bill 2 1X And Denying Petitions for Modification of Decision 07-07-027 By Sustainable Conservation and Solutions for Utilities, Inc.* ("FiT Decision" or  "D.12-05-035.")

[2] In today's decision, the Commission modifies D.12-05-035 in response to two petitions for modification.  These petitions for modification are discussed in detail here.  The Commission also modified D.12-05-035 in response to several applications for rehearing.  The Commission's decision on rehearing is D.13-01-041, *Order Modifying Decision 12-05-035, and Denying Rehearing of Decision, as modified* (issued January 28, 2013, Rulemaking 11-05-005.)

[3] All statutory references are to the Public Utilities Code unless otherwise indicated.

Case: 19-30088   Doc# 11231-4   Filed: 09/09/21   Entered: 09/09/21 18:28:10   Page 6
of 100

Session (Simitian, Stats. 2011, ch. 1) (SB 2 1X).[4] This decision does not address the recently effective amendments to § 399.20, enacted by SB 1122 (Rubio, Stats. 2012, ch. 612).[5] We will address SB 1122, and modify the FiT program accordingly, in a subsequent decision.

This decision also modifies certain FiT program requirements adopted in D.12-05-035 in response to two petitions for modification. The modifications include changes to the process used by the utilities to determine the amount of megawatts available for subscription for the three product types during each bi-monthly period. This modification and others are further described in the decision.

This proceeding remains open.

## 2.    Background

Today's decision implements a part of the state's Renewables Portfolio Standard Program[6] (RPS program) applicable to smaller renewable generation projects, commonly referred to as distributed generation.[7] Specifically, today's

---

[4] The FiT program was first added to the Pub. Util. Code by AB 1969 (Yee, Stats. 2006, ch. 731), effective 2007, which the Commission implemented in D.07-07-027.

[5] SB 1122 requires the Commission, as part of the FiT program requirements, to direct electrical corporations to collectively procure 250 megawatts (MW) from developers of specified categories of bioenergy projects.

[6] § 399.11 *et seq.*

[7] Additional details about the state's RPS program and the Commission's implementation of that program can be found in Decision (D.)12-05-035 at 4-6.

Case: 19-30088    Doc# 11231-4    Filed: 09/09/21    Entered: 09/09/21 18:28:10    Page 7 of 100

decision focuses on the Feed-in Tariff (FiT) program implemented pursuant to § 399.20.[8]

Section 399.20 declares the Legislature's intent and the policy of the state to encourage electrical generation from small distributed generation that qualifies as an "eligible renewable energy resource" under the RPS program with an effective capacity of three megawatts or less and, among other things, is strategically located[9] and priced to reflect the "value of different electricity products, including baseload, peaking, and as-available."[10]  Under § 399.20, utilities have certain "must-take" obligations to electric generators seeking procurement contracts, and every kilowatt hour of electricity a utility purchases from these electric generators counts toward meeting an electrical corporation's RPS procurement quantity requirements, as determined by statute.

The events leading up to today's decision and a brief history of the FiT program follow.

### 2.1.  Feed-In Tariff Program – D.07-07-027 and D.12-05-035

The Commission first addressed the FiT program in July 2007 in D.07-07-027.[11]  In D.07-07-027, the Commission implemented Assembly Bill

---

[8] All references to § 399.20 are to that section as amended by Senate Bill (SB) 380 (Stats. 2008, ch.544), SB 32 (Stats. 2009. ch.328), and SB 2 1X (2011-2012 First Extraordinary Session, Stats. 2011, ch.1) unless otherwise noted.

[9] *See* § 399.20(a) and (b)(1)-(4).

[10] *See* § 399.20(d)(2)(C).

[11] D.07-07-027, in which the Commission implemented AB 1969 for eligible facilities up to 1.5 MW, is discussed in detail in D.12-05-035 at 6-9.

Case: 19-30088    Doc# 11231-4    Filed: 09/09/21    Entered: 09/09/21 18:28:10    Page 8 of 100

(AB) 1969 and established a FiT program for eligible facilities up to 1.5 MW. In 2012, the Commission issued D.12-05-035 adopting a revised and larger program consistent with SB 380 (Kehoe, Stats. 2008, ch. 544, § 1), SB 32 (Negrete McLeod, Stats. 2009, ch. 328, § 3.5), and SB 2 1X (Simitian, Stats. 2011, ch. 1).[12]

D.12-05-035 adopted new program requirements consistent with the above legislation but did not fully implement the program. The Commission deferred consideration of two components of the FiT program: the terms and conditions of a standard contract (the power purchase agreement or PPA) and the tariffs.[13]

Today's decision addresses these previously deferred components of the program and orders Pacific Gas and Electric Company (PG&E), Southern California Edison Company (SCE), and San Diego Gas & Electric Company (SDG&E) (collectively referred to as utilities or IOUs) to revise their FiT programs to include a streamlined joint standard contract and revised tariffs. The streamlined joint standard contract and tariffs incorporate the FiT program requirements adopted in D.12-05-035, as modified.[14]

To implement the joint standard contract and tariffs, the IOUs are ordered to file a Tier 2 Advice Letter for approval of both 30 days after the effective date of this decision. More details are set forth in Section 7.1 herein.

---

[12] The history of the FiT program is also found in D.12-05-035 at 3-9.

[13] D.12-05-035 was subsequently addressed on rehearing by the Commission in D.13-01-041, *Order Modifying Decision 12-05-035, and Denying Rehearing of Decision, as Modified* (issued January 28, 2013, Rulemaking (R.) 11-05-005.)

[14] The provisions of the revised FiT program as set forth in today's decision and in D.12-05-035, as modified.

This decision does not address the recently effective amendments to
§ 399.20, enacted by SB 1122 (Rubio, Stats. 2012, ch. 612).  The Commission will
address SB 1122 and modify the FiT program consistent with the recently
effective legislation in a subsequent decision.

## 2.2.  Procedural History

In response to a directive from the assigned Commissioner and the
Administrative Law Judge (ALJ) to develop a single PPA for the FiT program
with uniform provisions for all three IOUs, to the greatest extent possible, the
IOUs filed a draft joint standard contract on February 15, 2012.[15]  Energy Division
held a workshop to discuss the provisions of the draft joint standard contract on
February 22, 2012.  Parties provided verbal comments on the draft joint standard
contract at the workshop and then filed written comments on March 5, 2012.

On March 16, 2012, the IOUs submitted a revised draft to incorporate
comments from the parties and proposed their own additional modifications.

On March 20, 2012, the ALJ issued a proposed decision (FiT PD) setting
forth initial details for the revised FiT program requirements incorporating the
requirements of SB 380, SB 32, and SB 2 1X.[16]  The ALJ subsequently ordered the

---

[15] This directive is set forth in the Joint Assigned Commissioner's and Administrative
Law Judge's Ruling Setting Workshop on a Utility Standard Form Contract for
Section 399.20 Feed-In Tariff Program, issued January 10, 2012, R.11-05-005.

[16] *Proposed Decision Revising Feed-In Tariff Program, Implementing Amendments To Public
Utilities Code Section 399.20 Enacted By Senate Bill 380, Senate Bill 32, and Senate Bill 2 1X
And Denying Petitions for Modification of Decision 07-07-027 By Sustainable Conservation
and Solutions for Utilities, Inc.*  This proposed decision is available on the Commission's
website.

Case: 19-30088    Doc# 11231-4    Filed: 09/09/21    Entered: 09/09/21 18:28:10    Page
10 of 100

IOUs to update the revised draft joint standard contract to reflect changes consistent with the FiT PD. The IOUs filed this second draft joint standard contract on April 30, 2012.

In response to the FiT PD, the Commission issued a final decision dated May 31, 2012. This final decision, D.12-05-035, differed from the FiT PD. Therefore, on June 26, 2012, the ALJ directed the IOUs to conform the draft joint standard contract to the provisions of D.12-05-035. On the same date, the ALJ directed the IOUs to file draft FiT tariffs. These next filings, dated July 18, 2012, represented the third revised joint standard contract and the first proposed draft tariffs. Parties filed comments on August 15, 2012 and reply comments on August 29, 2012.

On January 7, 2013, the ALJ further directed the IOUs to file revised FiT tariffs to achieve greater uniformity in the provisions found in their respective tariffs. The IOUs filed revised FiT tariffs on January 18, 2013 and parties filed comments on these revisions on January 25, 2013.

Finally, the Commission issued a decision on rehearing of D.12-05-035 on January 28, 2013. This decision, D.13-01-041, modified and denied rehearing of D.12-05-035. To the extent the modifications set forth in D.13-01-041 need to be incorporated into the FiT joint standard contract and the FiT tariffs, we address those modifications herein.

This proceeding remains open and the procedural schedule is included in the January 9, 2013 Scoping Memo Ruling.[17]  The implementation of SB 1122 is the Commission's next priority for the FiT program.

## 3.    Policy Guidelines

In D.12-05-035 we established five core policy guidelines to assist us in adopting the revised FiT program requirements.[18]  In today's decision, we continue to rely on these five core policy guidelines as we evaluate the merits of provisions of the draft joint standard contract and tariffs.  These five policy guidelines are as follows:[19]

1. Establish a feed-in tariff price based on quantifiable ratepayer avoided costs that will stimulate market demand;
2. Contain costs and ensure maximum value to the ratepayer and the utility;
3. Ensure administrative ease and lower transaction costs for the buyer, seller, and regulator;
4. Use existing transmission and distribution infrastructure efficiently; and
5. Establish project viability criteria to increase probability of successful projects within the program.

---

[17] *Second Amended Scoping Memo and Ruling of Assigned Commissioner*, dated January 9, 2013, R.11-05-005 at 2 and 6.

[18] D.12-05-035 at 18-19.

[19] In D.12-05-035 at 19, we stated "Overall, we find that these guidelines provide an important secondary source of guidance as we implement SB 320, SB 32, and SB 2 1X. Our primary source of guidance, as stated above, is derived from the rules of statutory construction."

Case: 19-30088    Doc# 11231-4    Filed: 09/09/21    Entered: 09/09/21 18:28:10    Page 12 of 100

Today's decision applies the above policy guidelines to balance the various interests involved in this proceeding and to achieve reasonable outcomes that facilitate a successful FiT program. We also rely on these policy guidelines to evaluate the merits of two petitions for modification of D.12-05-035. We discuss these petitions for modification below.

## 4. Petitions for Modification to D.12-05-035

Solar Energy Industries Association (SEIA), California Solar Energy Industries Association (CALSEIA), and Clean Coalition filed petitions to modify of D.12-05-035.[20] These petitions address the revised FiT program requirements adopted in D.12-05-035. PG&E and SCE filed a joint response to SEIA's petition for modification.[21] All three IOUs filed a joint response to CALSEIA's and Clean Coalition's petition for modification.[22] We grant, in limited part, these petitions. In doing so, we modify a few FiT program requirements, including the process

---

[20] On July 31, 2012, SEIA filed *Petition of the Solar Energy Industries Association for Modification of Decision 12-05-035*. On November 13, 2012, CALSEIA and Clean Coalition jointly filed *Clean Coalition and California Solar Energy Industries Association Petition for Modification of D.12-05-035*.

[21] On August 30, 2012, PG&E and SCE filed a joint response to SEIA's petition for modification. On August 31, 2012, CALSEIA filed a response in support of SEIA's petition for modification.

[22] On December 12, 2012 the IOUs filed a joint response to CALSEIA's and Clean Coalition's petition for modification, stating at 2: "Just six months after the Commission approved D.12-05-035 and before the new Re-MAT program could even be implemented, Clean Coalition and CALSEIA seek to re-litigate several issues that were thoroughly litigated earlier in this proceeding and decided in D.12-05-035. The Clean Coalition/CALSEIA PFM provides no new information to justify modifying the Commission's earlier determinations."

Case: 19-30088    Doc# 11231-4    Filed: 09/09/21    Entered: 09/09/21 18:28:10    Page 13 of 100

for IOUs to offer megawatts for subscription. We also clarify, among other things, how megawatts are returned to the FiT program after a project failure and we remove the seller concentration provision from the program viability criteria. Because both petitions request that we modify the FiT program's price-adjustment intervals from bi-monthly to monthly and that we reduce the length of the program from 24 to 12 months, we address these common issues first. Then we turn to the remaining issues raised in the petitions for modification.

### 4.1. Modified Renewable Market Adjusting Tariff (ReMAT) Mechanism

In response to the petitions for modification, we find that the megawatt allocation process adopted in D.12-05-035 for PG&E, SCE, and SDG&E may hinder the advancement of the program because it may result in too few megawatts being offered during each bi-monthly program period. In some cases, as SEIA, Clean Coalition, and CALSEIA recognize, less than one megawatt would be offered for each product type per bi-monthly program period under the process adopted in D.12-05-035.[23]

Accordingly, we modify, in part, the process for offering the FiT program megawatts.[24] We retain the bi-monthly price-adjustment intervals but increase the total number of megawatts that the IOUs must offer for each product type[25]

---

[23] SEIA petition for modification at 3; CALSEIA and Clean Coalition petition for modification at 3.

[24] D.12-05-035 (Section 6.5) at 49-50.

[25] The term product type is described in D.12.05-035 when the Commission ordered the IOUs to assign an equal portion of their allocated capacity to three product types, i.e.,

*Footnote continued on next page*

in each bi-monthly program period.[26]  We also adopt changes to the program to contain costs.[27]

D.12-05-035 allocated the total available program megawatts among the three IOUs in proportion to their percentage share of retail sales, as required by § 399.20.[28]  We do not change this aspect of D.12-05-035 today.  D.12-05-035 further ordered the IOUs to assign an equal portion of their program's megawatts to three product types, i.e., baseload, peaking as-available, and non-peaking as-available.[29]  We do not change this aspect of D.12-05-035 today.

D.12-05-035 then ordered the IOUs to equally assign their megawatts to 12 two-month program periods and offer one-twelfth of the available megawatts (distributed among the three product types) for subscription each bi-monthly

---

baseload, peaking as-available, and non-peaking as-available.  D.12-05-035 (Section 6.5) at 49-50; § 399.20(d)(2)(C).

[26] In response to comments to the March 19, 2013 proposed decision filed by PG&E, SDG&E, SCE, DRA, and TURN on April 8, 2013 and April 15, 2013, we revise the proposed decision to decrease the recommended allocation of 10 MW to 5 MW for PG&E and SCE and to 3 MW for SDG&E to address concerns that, under a 10 MW allocation framework, the FiT price would never reach equilibrium, that it would be very hard for the price to decrease and easy to increase, and therefore would fail to "minimize ratepayer exposure to a large number of non-competitively priced contracts while ensuring that some capacity is available for each product type…" (D.12-05-035 at 51).

[27] PG&E April 8, 2013 comments at 2.

[28] D.12-05-035 (Section 12.3) at 74-77 and D.13-01-041 at 16-18 (the FiT allocation process for megawatts adopted in D.12-05-035 is clarified on rehearing).

[29] D.12-05-035 (Section 6.5) at 49-50; § 399.20(d)(2)(C).

Case: 19-30088    Doc# 11231-4    Filed: 09/09/21    Entered: 09/09/21 18:28:10    Page
15 of 100

program period.[30]  Under D.12-05-035, in the event that the offered megawatts were unsubscribed in a program period those unsubscribed megawatts rolled forward to Months 25-26.[31]  Today, we modify these aspects of the program in an effort to make a more workable amount of megawatts available during each bi-monthly program period.

We modify D.12-05-035 to direct PG&E and SCE to offer 5 MW for each of the three product types for each bi-monthly program period until the available megawatts for that product type falls below 5 MW.  SDG&E must offer 3 MW per product type in each bi-monthly program period because the size of SDG&E's program is smaller than PG&E's and SCE's.  The IOUs must continue to offer the remaining megawatts for the product type until the megawatts go to zero or the program ends as described below.

In addition, we modify two aspects of the program to protect against unreasonable price increases.  We establish a cap on the total price period adjustment at $12 to avoid excess bi-monthly price adjustments.[32]  We also change the threshold for triggering a price increase in a subsequent program period to less than 20%, rather than 50%, of capacity for the current period.[33]

---

[30] D.12-05-035 at 49-50; D.13-01-041 at 16-18 (the FiT megawatt allocation process for megawatts adopted in D.12-05-035 is clarified on rehearing).

[31] D.12-05-035 at 49-50; D.13-01-041 at 16-18 (the FiT MW allocation process adopted in D.12-05-035 is clarified on rehearing).

[32] DRA April 8, 2013 comments at 4-5, DRA points out that cap may reduce ratepayer costs due to overpriced contracts.

[33] PG&E April 8, 2013 comments at 3-4.

Case: 19-30088    Doc# 11231-4    Filed: 09/09/21    Entered: 09/09/21 18:28:10    Page 16 of 100

Also, as a result of this change to the megawatt allocation rules, in combination with the determination in Section 4.4 herein, we find it reasonable to change a condition used to determine whether a price adjustment will be triggered. In D.12-05-035, we established conditions for a price adjustment, including one tied to the level of program subscription in a bi-monthly program period. For example, the condition for a price decrease was if subscription equaled 100% or more of the initial capacity allocation for a product type. However, by not allowing subscriptions to exceed the megawatts offered in a bi-monthly program period (as discussed in Section 4.4 herein), it is likely that subscription will fall below 100% subscription even if the market demand exceeds that amount, and thus no price adjustment will be triggered (5 MW for PG&E and SCE, 3 MW for SDG&E). This change, described below, will more appropriately tie the price adjustment mechanism to market demand, which is better reflected by the applicants that express willingness to execute a PPA at an applicable ReMAT price, rather than the applicants that are awarded ReMAT PPAs.

As modified today, a price decrease adjustment will be triggered if the total capacity of the projects for which applicants have indicated that they would be willing to execute a ReMAT PPA based on the applicable contract price for a period is at least 100% of the capacity allocation for that period (i.e., 5 MW or less only if the available capacity for that product has fallen below a total of 5 MW, or 3 MW or less for SDG&E).

Also, as modified today, a price increase adjustment will be triggered if the total capacity of the projects for which applicants have indicated a willingness to execute a ReMAT PPA based on the applicable contract price for a period is less than 20% of the capacity allocation for that period.

Case: 19-30088    Doc# 11231-4    Filed: 09/09/21    Entered: 09/09/21 18:28:10    Page
17 of 100

Also, as modified today, a price will remain unchanged in the subsequent bi-monthly period if the total capacity of the projects for which applicants have indicated that they would be willing to execute a ReMAT PPA based on the applicable contract price for a period is at least 20% of the capacity allocation for that period but a price decrease has also not been triggered.

Under today's approach, the duration of the program remains fixed but we modify D.12-05-035 to establish the end date at 24 months after the first product type goes to zero MW or goes to a *de minimis* amount approaching zero.[34] An end date for the program is important because, otherwise, the program could go into perpetuity with a minuscule amount of megawatts being offered each bi-monthly period.[35] An end date also promotes administrative ease by defining the length of time the Commission and the utilities must dedicate resources to this program.[36]

Moreover, consistent with D.12-05-035, we clarify that each IOU must publicly notice on the first business day of each bi-monthly program period[37] the number of megawatts offered for each product type during that bi-monthly

---

[34] PG&E April 8, 2013 comments at 4.

[35] PG&E April 8, 2013 comments at 4.

[36] PG&E April 8, 2013 comments at 4.

[37] The IOUs shall also make this information public on the date that the revised standard contracts and tariffs become effective so that the market is aware of the program size at the commencement of the revised FiT program.

Case: 19-30088   Doc# 11231-4   Filed: 09/09/21   Entered: 09/09/21 18:28:10   Page
18 of 100

program period, the number of megawatts remaining for each product type, and the total number of megawatts remaining in the IOU's FiT program.[38]

Accordingly, PG&E and SCE must offer 5 MW and SDG&E must offer 3 MW at the start of each bi-monthly program period for each product type unless less than 5 MW are available for a particular product type for PG&E and SCE and less than 3 MW are available for a particular product type for SDG&E, in which case, the IOU must offer all remaining megawatts for the product type. Any megawatts remaining at the end of a program period will be retained within the same product type. The total price adjustment will be capped at $12. The threshold for triggering a price increase will be less than 20% of capacity for the current period. The price adjustment mechanism will, in part, be triggered by the amount of capacity associated with the applicants providing notice to the IOU of their willingness to accept the offered price. Each IOU shall publicly notice the amount of megawatts offered and remaining for each bi-monthly program period, in addition to other existing notice requirements. The IOU's program will end 24 months after the capacity for a product type reaches zero or approaches a *de minimis* amount.

### 4.2. Additional Modifications Proposed by SEIA

We now address the remaining issues raised by SEIA in its petition for modification. SEIA suggests that the Commission modify D.12-05-035 as follows:

(1)  specify how megawatts are placed back into program due to, for example, contract termination;

---

[38] D.12-05-035 at 49.

Case: 19-30088   Doc# 11231-4   Filed: 09/09/21   Entered: 09/09/21 18:28:10   Page 19 of 100

(2)   allow contracts for amounts above the allotted megawatts when the last project in the queue results in exceeding bi-monthly megawatt allocation;

(3)   change the megawatt allocation process because, consistent with the first-come, first-served program requirement, the IOU must offer a contract to a developer even if the IOU has exceeded its bi-monthly megawatt allocation;

(4)   elaborate on the meaning of "PPR [Program Participation Request] is deemed completed"[39] in D.12-05-035 because this event triggers a critical event, the designation of a project's FiT program number, so if more than one PPR is "deemed complete" by the IOU on the same day the IOU should determine the FiT program number by the project's interconnection queue position;

(5)   remove the restriction on participation in the Renewable Auction Mechanism (RAM) program because smaller solar projects (3 MW and under) cannot bid into RAM and very few megawatts are available in the FiT program;[40]

(6)   permit developers to choose to interconnect to the distribution system under Electric Tariff Rule 21 or the federal wholesale tariffs, known as WDAT,[41] or, alternatively, permit developers now interconnecting

---

[39] A "Program Participation Request" is the request used by applicants to establish eligibility to participate in an IOU's FiT program. This process is described in the FiT tariff.

[40] RAM or the Renewable Auction Mechanism is a Commission program adopted in D.10-12-048 and subsequently modified by numerous Commission resolutions.

[41] The term "WDAT" is used herein to refer to the IOUs' federal wholesale interconnection FiT tariffs.

under WDAT to continue to complete the process under WDAT; and

(7) remove the seller concentration provision[42] from the FiT Project Viability Criteria because the definition is unclear and seller concentration is not a problem due to the inclusion of three product types.

We address each of these issues below.

### 4.3. Adding Megawatts Back into FiT Program

In response to the first issue, we modify D.12-05-035 to clarify how megawatts are added back into the FiT program after a change in circumstances, including, but not limited to, the termination of a project. SEIA suggests that megawatts from terminated projects should be added to the total megawatts available to each IOU. SEIA's suggestion is similar to the IOUs' proposal.

The IOUs propose the following language to address "terminated" megawatts in their January 18, 2013 draft tariffs:

Any capacity associated with CREST, WATER, or Re-MAT PPAs that are terminated prior to delivering electricity during the Initial Program Phase will be allocated by SCE to one or more Product Types and Periods beginning in an Initial Program Phase Period that has less than the Initial Allocation (or the 3 MW minimum) or to the Second Program Phase. Any capacity associated with CREST, WATER, or Re-MAT PPAs

---

[42] The seller concentration provision adopted in D.12-05-035 is discussed in more detail later and generally provides for seller concentration limit of 10 MW per seller.

that are terminated after delivering electricity or during the
Second Program Phase will not be re-allocated.[43]

We find merit in the IOUs' proposal but find that the IOUs should revise the above to clarify that megawatts procured through the revised FiT program are placed back into the product types of the terminated project. IOUs should remove the restriction on adding megawatts back into the program after the second program Phase as this decision eliminates a separate Second Program Phase. In adopting this process, we seek to reasonably balance our goal of administrative ease and transparency with the goal of creating opportunity for developers to create successful projects. This process will not apply to projects terminated after delivery of electricity begins due to the numerous transactional complications that could arise. The megawatts from these projects will not be added back into the program. Projects governed by the FiT program under D.07-07-027 and AB 1969 do not include product types. Therefore, if a project is terminated that was initiated when the FiT program was solely governed by D.07-07-027 and AB 1969, those megawatts will be placed back into the IOU's total program megawatts to be equally divided among all three product types.

This request for modification of D.12-05-035 is granted.

### 4.4. Subscriptions May Not Exceed the Amount of Megawatts Offered During a Bi-Monthly Period

D.12-05-035 did not address either the second or third issue listed above. SEIA seeks clarification of these issues in both its petition for modification and in comments on the IOUs' July 18, 2012 draft tariffs. SEIA states that the

---

[43] SCE's January 18, 2013 draft tariff at section G(5).

Case: 19-30088    Doc# 11231-4    Filed: 09/09/21    Entered: 09/09/21 18:28:10    Page
22 of 100

Commission should permit the IOUs to accept a bid if that bid meets but then exceeds the megawatts allocated to a product type within a bi-monthly program period by pulling extra megawatts from a later program period. In response to the SEIA's request, and as explained further here, we clarify that no subscriptions will be permitted above the number of megawatts offered for a product type within any bi-monthly program period.

In contrast to SEIA's suggestion, PG&E's July 18, 2012 draft tariff provides that requests for contracts that exceed the megawatts allocated to a product type within bi-monthly period will not be accepted. The relevant language from PG&E's July 18, 2012 draft tariff provides:

> If the Contract Capacity of the next Applicant, in Queue Number order, for a Product Type is larger than the remaining Bi-Monthly Product Type Allocation, the Bi-Monthly Product Type Allocation will be deemed to be fully subscribed.

In other words, PG&E's July 18, 2012 draft tariff states that if insufficient megawatts exist in the product type allocation for that bi-monthly program period, then the IOU will not award a contract to the next project in the queue and the IOU will not accept any additional subscriptions for that product type during that bi-monthly program period. SCE's July 18, 2012 draft tariff has a comparable provision. SDG&E's July 18, 2012 draft tariff is unclear on this matter.

The IOUs' January 18, 2013 draft tariffs present a uniform provision on this topic that retains the restriction on bids for amounts above the remaining allocated megawatts. The relevant provision from SDG&E's January 18, 2013 draft tariff follows:

> If the Contract Capacity of the next Project, in Re-MAT Queue Number order, for a Product Type is larger than the remaining Available Allocation, that next Applicant will not be awarded a Re-MAT PPA and SDG&E will deem the Available Allocation to be fully subscribed (Deemed Fully Subscribed).

D.12-05-035 did not address this issue. Today, we adopt a limit on the amount of megawatts available in a product type during a bi-monthly period. We find that the proposal set forth in the IOUs' January 18, 2013 tariffs is reasonable. While this limit may result in developers having to wait and then decide whether to request a contract at the offered rate in the next bi-monthly program period, we find that this result reasonably balances the goals of providing transparency and guidance to the market with the goal of providing sufficient opportunity for developers.

Furthermore, we find that the first-come, first-served program requirement[44] does not mean that the IOU must accept a request for a contract if insufficient megawatts remain in a product type for the bi-monthly program period.[45] The Commission has authority to structure the program within the guidelines provided by the statute. This result reasonably balances our goal of creating a clear and administratively enforceable means of establishing when a

---

[44] § 399.20(f).

[45] Clean Coalition argues that the IOUs will violate the first-come, first-served provision if they fail to offer a contract to the next project in line even if that project exceeds the megawatt cap for a product type within a bi-monthly period. Clean Coalition September 10, 2012 comments at 8-9.

product type in a bi-monthly program period has been fully subscribed with the goal of providing developers with opportunities for successful projects.

Accordingly, D.12-05-035 is modified as set forth above and we adopt the proposed language as set forth in the January 18, 2013 draft tariffs. This request for modification of D.12-05-035 is denied.

### 4.5. Interconnection Queue Position not Relevant to FiT Program Number

In response to the fourth issue above, we find that no further elaboration is warranted on the term "deemed completed" in D.12-05-035 when referring to a PPR.[46] We also reject SEIA's request that the FiT program number be determined by the project's interconnection queue position if more than one PPR is "deemed complete" by the IOU on same day.[47]

D.12-05-035 states that: "Once the participation request form is deemed complete, the IOU will establish a queue on a first-come, first-served basis for each product type."[48] We recognize that this language permits the IOUs to establish their own internal method of determining how a PPR is "deemed complete." We find that while this process is not entirely transparent, the first-come, first-served statutory mandate provides enough guidance to the IOUs to ensure a fair process. In addition, the IOUs elaborate on this process in their tariffs. Moreover, we find that this process must be implemented based on date

---

[46] D.12-05-035 at 45.

[47] Clean Coalition raises the same issue in its comments on the IOUs' July 18, 2012 draft tariffs. Clean Coalition September 10, 2012 comments at 3.

[48] D.12-05-035 at 45.

Case: 19-30088    Doc# 11231-4    Filed: 09/09/21    Entered: 09/09/21 18:28:10    Page
25 of 100

and time of PPR submittal; not on a project's position in the interconnection queue. The incorporation of the queue position adds an unduly complicated additional administrative component to the program.

We find one exception to this principle. This exception is narrow and properly tailored to effectuate the goal of the statutory language while also minimizing confusion when the program is first open to receipt of PPRs. We recognize the likelihood of significant market response on the first day of the program and find that assigning queue numbers based on the exact date and time of the PPR may present significant administrative and technical challenges should there be any issues with the IOUs application process.[49] The IOUs will be implementing web-based software program to process the PPR and while this software should be user-friendly, some difficulties may arise.[50] To minimize the impact of any technical concerns, those applications received within the first five business days of the program will be deemed received at the same time and their program number will be assigned by lottery or otherwise on a random basis.[51]

Accordingly, we find no further directive to the IOUs on this topic is warranted. We will address this matter further if actual problems arise. This request for modification is denied.

---

[49] PG&E April 8, 2013 comments at 6-7.

[50] PG&E April 8, 2013 comments at 6-7.

[51] PG&E April 8, 2013 comments at 6-7.

Case: 19-30088   Doc# 11231-4   Filed: 09/09/21   Entered: 09/09/21 18:28:10   Page 26 of 100

### 4.6. RAM Participation Restriction is Retained

In response to the fifth issue above, we do not remove the restriction on participating in the RAM program. D.12-05-035 prohibits a project with a nameplate capacity of 3 MW or less from participating in RAM if the project meets other eligibility criteria for the FiT program, and if the capacity for the relevant FiT product type has not yet been reached.[52] We adopted this restriction to guard against gaming between the two programs and to promote administrative efficiency by eliminating substantially similar duplicative procurement mechanisms for these projects. Our concerns remain the same. We note that there is no similar restrictions in the RPS annual solicitations or related to bilateral contracts with an IOU.

Accordingly, as clarified above, we make no change to this aspect of D.12-05-035. This request for modification is denied.

### 4.7. Interconnection under Federal Wholesale Tariffs or Electric Tariff Rule 21 – Generator's Choice

In response to the sixth issue above, we clarify our intent in D.12-05-035 to provide developers with a choice of the federal or state interconnection tariffs.

SEIA requests that we clarify our statement in D.12-05-035 that "…until the Commission makes a final determination in R.11-09-009…utilities shall allow generators to choose which interconnection processes to use, either the process set forth in Rule 21 Tariff or WDAT."[53] Clean Coalition, IREC, and SEIA point

---

[52] D.12-05-035 at 67-69.

[53] D.12-05-035 at 100.

Case: 19-30088    Doc# 11231-4    Filed: 09/09/21    Entered: 09/09/21 18:28:10    Page
27 of 100

out that this same issue appears in the July 18, 2012 draft tariffs and requires clarification.

Accordingly, today we clarify that our statement in D.12-05-035 means that if both federal and state interconnection tariffs are applicable in a given situation, the developer is permitted to choose whether to proceed under Electric Tariff Rule 21 or the federal tariffs, until the Commission makes a determination otherwise.

### 4.8. Seller Concentration Provision is Removed from Project Viability Criteria

In response to the seventh issue above, we remove the seller concentration provision from the FiT program's Project Viability Criteria adopted in D.12-05-035.  D.12-05-035 provides for a seller concentration limit of 10 MW per seller and states that "[t]he definition of seller should be further explored in the standard contract phase of this proceeding."[54]

The Commission adopted a seller concentration limit of 10 MW per seller in D.12-05-035 to facilitate participation in the FiT program by different developers.[55]  In adopting the seller concentration limit, the Commission recognized that it would need to address additional details related to the seller concentration before implementation and stated that the Commission would revisit the definition of seller concentration when reviewing the IOUs' draft standard contracts.[56]

---

[54] D.12-05-035 at 69-70.

[55] D.12-05-035 at 69-70.

[56] D.12-05-035 at 70.

Case: 19-30088    Doc# 11231-4    Filed: 09/09/21    Entered: 09/09/21 18:28:10    Page 28 of 100

Now, upon further review of the seller concentration limit, we find merit in SEIA's proposal to remove it. We find that implementation of a seller concentration limit as a Project Viability Criterion is a complex undertaking. Furthermore, we agree with SEIA that, at least for now, our reliance on three product types provides sufficient opportunity for different market segments to participate in the FiT program.

Accordingly, we remove the seller concentration limit from the Project Viability Criteria. This request for modification of D.12-05-035 is granted.

### 4.9. Additional Modifications Proposed by CALSEIA and Clean Coalition

We now address the remaining issues raised by CALSEIA and Clean Coalition in their petition for modification. They suggest that the Commission modify D.12-05-035 as follows:

(1) add additional megawatts to the FiT program above the amount set forth in § 399.20;

(2) include a price floor in the FiT pricing mechanism;

(3) include a locational adder (as referenced in § 399.20(e)) to the price to capture the benefits of grid planning and procurement methodology;

(4) add environmental compliance costs to the price, as set forth in § 399.20(d)(1);

(5) refine the definition of "strategically located," as referenced in § 399.20(b)(3) to, among other things, account for a piece of equipment sometimes

needed for interconnection of a project, a Direct Transfer Trip;[57] and

(6)   extend the Commercial Operation Date (also referred to as the COD) due to unpredictable interconnection delays.

We address each of these issues below.

### 4.10.  No Increase in the Program's Total Megawatts

In response to the first issue above, we do not modify D.12-05-035 to increase the overall number of megawatts in the FiT program.  Instead, we seek to address the concerns raised by CALSEIA and Clean Coalition related to the limited number of total megawatts in the FiT program by increasing the capacity offered for each product type during each bi-monthly program period to 5 MW for PG&E and SCE, and to 3 MW for SDG&E, as described above in Section 4.1 herein.

This request for modification is denied.

### 4.11.  No Price Floor

In response to the second issue above, we do not adopt CALSEIA's and Clean Coalition's request that we modify D.12-05-035 to adopt a price floor. Clean Coalition raised this issue in its April 9, 2012 comments and its April 16, 2012 reply comments to the FiT PD.

In its April 16, 2012 comments, Clean Coalition wrote:

A price cap should, however, be paired with a price floor, set at the normalized RAM clearing price, as we recommended in

---

[57] This term is found in CALSEIA and Clean Coalition petition for modification at 15.

our opening comments. The price cap ensures that ratepayers are not made to pay beyond a certain level for SB 32 projects; the price floor ensures that the "race to unviability" will be avoided and allow developers to plan ahead with the certainty that the contract price will never fall below a certain level.[58]

Clean Coalition and CALSEIA provide no new information now. When Clean Coalition raised this issue in the past, the Commission did not adopt this recommendation because the FiT program already incorporates several mechanisms to guard against unreasonably low pricing.

This request for modification is denied.

### 4.12. No Change to Locational Adder, Strategically Located, or Environmental Compliance Costs

In response to the third, fourth, and fifth issues above, we first point out that the term called "locational adder" is often used to refer to different concepts. The term is sometimes used to refer to the costs described in § 399.20(e), which are correctly "locational adders."[59] The term is also used to convey the concept captured in § 399.20(b)(2), which is more appropriately known as "strategically located."[60] At other times, the term is used to refer to the costs described in § 399.20(d)(1), which are instead "environmental compliance costs."[61]

--------

[58] Clean Coalition April 16, 2012 comments at 3-4.

[59] § 399.20(e) states, in part: "The commission shall consider and may establish a value for an electric generation facility located on a distribution circuit that generates electricity at a time and in a manner so as to offset the peak demand on the distribution circuit."

[60] § 399.20(b) states, in part: "As used in this section, "electric generation facility" means an electric generation facility located within the service territory of, and developed to

*Footnote continued on next page*

Case: 19-30088    Doc# 11231-4    Filed: 09/09/21    Entered: 09/09/21 18:28:10    Page 31 of 100

CALSEIA's and Clean Coalition's petition for modification requests additional Commission action on all three topics: locational adder, strategically located, and environmental compliance costs. We address these three topics below.

Regarding locational adders, the Commission is working toward developing a methodology to value avoided transmission and distribution costs, if possible. The Commission's Energy Division held a workshop in R.11-05-005 related to this topic on January 31, 2013 and will continue to work on this matter. More information on this topic will be provided later in the proceeding.[62]

Regarding "strategically located," today's decision confirms our previously adopted definition of strategically located in D.12-05-035.[63] We

---

sell electricity to, an electrical corporation that meets all of the following criteria:…(3) Is strategically located and interconnected to the electrical transmission and distribution grid in a manner that optimizes the deliverability of electricity generated at the facility to load centers."

[61] § 399.20(d)(1) states: "The tariff shall provide for payment for every kilowatthour of electricity purchased from an electric generation facility for a period of 10, 15, or 20 years, as authorized by the commission. The payment shall be the market price determined by the commission pursuant to paragraph (2) and shall include all current and anticipated environmental compliance costs, including, but not limited to, mitigation of emissions of greenhouse gases and air pollution offsets associated with the operation of new generating facilities in the local air pollution control or air quality management district where the electric generation facility is located."

[62] Clean Coalition alleges that the Commission failure to adopt a location adder is a violation of SB 32 in its April 8, 2013 comments at 15. The Commission disposed of this allegation in D.13-01-041 at 12-14 stating, "Clean Coalition/Sierra Club allege that the Decision violates this provision of SB 32 by failing to adopt a location or transmission adder. (Clean Coalition/Sierra Club Rehrg. App., pp. 5-6.) This allegation lacks merit."

[63] D.12-05-035 (Section 6.9) at 56.

continue to find that our definition of strategically located appropriately balances the goal of using the existing transmission and distribution system efficiently and containing costs while ensuring maximum value to ratepayers with making the program as accessible as possible for developers. Our definition is consistent with Section 14.9.2 of the draft joint standard contract which is designed to address the situation where the seller's interconnection study showed transmission network upgrades of $300,000 or less but that such costs subsequently exceed $300,000 after execution of the contracts.[64] In these circumstances, the seller can buy-down its transmission network upgrades in excess of $300,000 to avoid termination of the contract. This provision does not permit sellers whose interconnection studies or agreements show they have more than $300,000 in transmission network upgrades before they receive a contract to be eligible for the FiT program as such a change would render "strategically located" meaningless.

Regarding environmental compliance costs, the Commission found in D.13-01-041, that "…because the Re-MAT is a market-based price, it should include all of the generator's costs, including current and anticipated environmental compliance costs."[65] In other words, the ReMAT[66] pricing

---

[64] Several parties address the interplay between Section 14.9.2 of the draft joint standard contract and the definition of strategically located in D.12-05-035, including Clean Coalition April 8, 2013 comments at 16; Placer District April 8, 2013 comments at 6-7, SCE April 15, 2013 comments at 3-4.

[65] D.13-01-041 at 6.

[66] The term ReMAT is an acronym for "Renewable Market Adjusting Tariff" and refers to the pricing methodology adopted for the revised FiT program. (D.12-05-035 at 38.)

Case: 19-30088    Doc# 11231-4    Filed: 09/09/21    Entered: 09/09/21 18:28:10    Page 33 of 100

structure theoretically includes all costs incurred by a generator, including the generator's environmental compliance costs.  As such, the issue raised by CALSEIA and Clean Coalition is now resolved.

The petition for modification by CALSEIA and Clean Coalition is denied.

### 4.13.  No Further Extension to the Commercial Operation Date; Single 6-Month Extension Permitted

In response to the sixth issue above, we do not extend the COD based on Clean Coalition's and CALSEIA's claims related to unpredictable interconnection delays.  As adopted in D.12-05-035, the COD includes 24 months and a 6-month extension.[67]  Requests to extend and then further extend the COD have been made numerous times in this proceeding.  Clean Coalition raised this matter in its April 16, 2012 reply comments to the FiT PD issued prior to D.12-05-035.[68] Clean Coalition and CALSEIA present no new information now.  We do not reconsider this matter again today.  We do, however, find it reasonable to require the IOUs to modify the draft joint standard contract to change from the day-for-day extension for a maximum of 6 months to a single 6-month extension and include an obligation for sellers to provide documentation to demonstrate that the seller did not cause the delays at issue.[69]

Clean Coalition's and CALSEIA's request for modification of the COD is denied, except as pertaining to the single 6-month extension.

---

[67] D.12-05-035 at 70.

[68] Clean Coalition April 16, 2012 comments at 6-7.

[69] Clean Coalition April 8, 2013 comments at 25-26; SEIA April 8, 2013 comments at 2.

Case: 19-30088    Doc# 11231-4    Filed: 09/09/21    Entered: 09/09/21 18:28:10    Page 34 of 100

## 5. FiT Joint Standard Contract - Power Purchase Agreement

The parties in this proceeding achieved a major goal.[70]  They worked diligently to create one contract for the FiT program to be used by all three IOUs.  The majority of the terms in the joint standard contract apply to all three IOUs.  While parties made great strides in reaching consensus on numerous contract topics, the IOUs did not agree to all terms.  Any differences among the IOUs are captured and specifically noted within the joint standard contract.  The discussion below at Section 6 identifies and resolves areas of dispute among the parties and is organized by the separate contract sections.  First, however, we address several overarching issues regarding the terms and condition of the draft joint standard contract.[71]

### 5.1. Length of Contract is Reasonable

Clean Coalition claims that, contrary to the intent of SB 32, the draft joint standard contract represents an increase in complexity and burden when compared with the previously existing contracts under the FiT program.[72]

---

[70] The joint single contract was formed in response to a directive from the Assigned Commissioner and ALJ.  This directive is set forth in the *Joint Assigned Commissioner's and Administrative Law Judge's Ruling Setting Workshop on a Utility Standard Form Contract for Section 399.20 Feed-In Tariff Program*, issued January 10, 2012, R.11-05-005.

[71] SCE notes in comments filed on April 15, 2013 that, in compliance with D.13-02-004 at 41 (Ordering Paragraph 2), SCE must incorporate a term into the joint standard contract (applicable only to SCE) that addresses certain matters pertaining to the closure of the Mohave Generating Station and the Hopi Tribe.

[72] Clean Coalition September 10, 2012 comments at 2-3.

Case: 19-30088    Doc# 11231-4    Filed: 09/09/21    Entered: 09/09/21 18:28:10    Page 35 of 100

We find the joint standard contract to be a reasonable length. As we stated above, the draft joint standard contract is lengthier than the previously existing contract because all relevant materials, such as attachments and forms, for each IOU are combined into one single document. As a result, the overall length of the contract increased but the benefits of a single joint standard contract instead of three separate contracts are significant.

These benefits include, among others, that developers and regulators will be able to source information in the joint standard contract quickly by referring to a single document rather than multiple documents. Developers and regulators will no longer have to cross-reference three separate contracts to compare contract details, which is cumbersome and time-consuming. As regulators, we will be able to respond more efficiently to questions from the public regarding the status of, for example, a particular provision of the joint standard contract as all the materials will be found in a single document.

We are not persuaded by Clean Coalition's claim that the contract is too complex for small developers. The projects eligible for the FiT program may be smaller than other projects in this industry but FiT projects still generate significant revenues. For instance, a 1.5 MW project could generate a revenue stream of approximately $7 million.[73] This level of revenue requires a relatively sophisticated contract to ensure proper administration of the transaction.

_____

[73] For example, $7,003,271 in gross revenue could be expected based on the $89.23/MWh starting price for ReMAT with a 1.5 MW project, averaging 3.92 GWh/year of generation which, over a 20 year contract term, would be 78.49 GWh (or 78,486 MWh) (which is pre-Time-of-Delivery).

Case: 19-30088    Doc# 11231-4    Filed: 09/09/21    Entered: 09/09/21 18:28:10    Page 36 of 100

### 5.2. Clarify Function of a Commission-Approved Standard Contract

In response to questions raised by parties regarding the purpose of a standard contract, we clarify the difference between standard contracts and other contracts relied upon in the RPS program.  Our explanation includes describing the streamlined nature of standard contracts.

The Commission's programs implemented under or in support of the RPS program, including FiT, rely upon contracts to memorialize the purchase of renewable energy.  In some circumstances, such as the contracts executed as a result of the annual RPS solicitations, the terms and conditions of these contracts are negotiable, with the exception of specific terms required by the Commission.  After these contracts are executed, parties must obtain Commission approval of the terms and conditions.

In contrast, the FiT program relies upon a standard contract.[74]  These contracts are referred to as "standard" contracts because, among other reasons, the same form contract is offered to all eligible developers and the Commission pre-approves the terms and conditions of a standard contract for the later use by parties.  This pre-approval process includes the finding by the Commission that the IOUs are entitled to full cost recovery through rates for these Commission-approved contracts.  Therefore, parties are not required to obtain

---

[74] The Commission's use of a standard contract for the FiT program is supported by § 399.20(g), which provides the Commission with the option of using standard contracts for the FiT program.

Case: 19-30088   Doc# 11231-4   Filed: 09/09/21   Entered: 09/09/21 18:28:10   Page 37 of 100

approval from the Commission after executing the contract, which could be a time consuming process.

For this reason, standard contracts inherently represent a streamlined process. The Commission's use of a standard contract for the FiT program is one means used by the Commission to streamline the FiT program as standard contracts eliminate the need to seek Commission approval after a deal is finalized. This process is ideal for the FiT program because smaller developers have, perhaps, more limited resources to devote to the process of obtaining contract approval from the Commission.

Importantly, to the extent parties agree to terms and conditions that differ from the Commission-approved standard contract, parties will need to seek approval of the contract from the Commission.[75]

### 5.3. Clarify Meaning of "Standard Terms and Conditions" and "Non-Modifiable" Terms

We also clarify the meaning of "standard terms and conditions," also known as STCs, and of "non-modifiable," as referred to in the joint standard contract. In D.07-07-027, the Commission discussed the merits of adopting, in whole or in part, "standard terms and conditions" or STCs for the FiT program. STCs include contract provisions adopted by the Commission for the power purchase agreements used by the broader RPS program.[76]

---

[75] As stated in D.07-07-027, "A seller may elect to engage in negotiations, but the resulting deal would then be a bilateral or other type of contract, and outside the scope of the § 399.20 tariff/standard contract program." D.07-07-027 at 8.

[76] D.04-06-014 as modified by D.07-02-011 and D.07-05-057, D.08-08-028, D.10-03-021 and D.11-01-025 (decisions addressing STCs in the context of the RPS program).

In D.07-07-027, the Commission incorporated many of these STCs in the FiT contract.[77] Some of these STCs are "non-modifiable," meaning that a change to those terms is only permissible in limited circumstances, which are not relevant here because the FiT contract is a standard contract not subject to change without Commission approval.[78]

However, to clarify these concepts in the FiT joint standard contract, PG&E, SCE, and SDG&E are directed to make the below modification to the July 18, 2012 draft joint standard contract. On page (i) of the draft joint standard contract, above the name of the contract and in highlighted bold, is the following language:

> Standard contract terms and condition that "may not be modified" per CPUC Decision 07-11-025, and CPUC Decision 10-03-021, as modified by CPUC Decision 11-01-025, are shown in shaded text.

This language shall be deleted and replaced with the following:

> This contract has been approved by the Commission in D.[insert today's decision number]. Modification of the terms and conditions of this contract will result in the need to obtain additional Commission approval of the contract. The contract approved by D.[insert today's decision number] includes terms and conditions that "may not be modified" pursuant to prior Commission decisions, including Decision 07-11-025, Decision 08-08-028 and Decision 10-03-021, as modified by

---

[77] D.07-07-027, D.08-08-028, D.10-03-021, and D.11-01-025 at 26-32.

[78] More details on the need for Commission approval to modify STC can be found at D.04-06-014 as modified by D07-02-011 and D.07-05-057 (decisions addressing STCs in the context of the RPS program).

Decision 11-01-025, and these terms and conditions are shown in shaded text.

Moreover, regarding the "non-modifiable" terms and conditions, the IOUs are directed to identify them by highlighting these terms throughout the document and include an explanation.

## 5.4. Clean Coalition's Proposed Standard Contract is Rejected

On August 15, 2012, Clean Coalition filed a contract in this proceeding, referred to as a "model contract" to be used in lieu of the draft joint standard contract developed by the IOUs at the direction of the assigned Commissioner and ALJ. We deny Clean Coalition's request.

By ruling dated January 10, 2012, the assigned Commissioner and ALJ in this proceeding directed the IOUs to file a standard contract. During the proceeding, parties had several opportunities to comment on this contract.[79] The Commission also directed the parties to meet and confer on several different occasions to resolve disputes regarding the proposed terms and conditions. The Agricultural Energy Consumers Association (AECA) and Sierra Club state support for the alternative contract on the basis that it is workable but does not elaborate further.[80] Several parties state their opposition to Clean Coalition's contract.

---

[79] *Joint Assigned Commissioner's and Administrative Law Judge's Ruling Setting Workshop on a Utility Standard Form Contract for Section 399.20 Feed-In Tariff Program,* issued January 10, 2012, R.11-05-005.

[80] AECA September 10, 2012 comments at 4. Sierra Club September 11, 2012 comments at 7.

Clean Coalition submitted this contract late in the consideration of this issue and in a manner that can be viewed as inconsistent with the process established by the assigned Commissioner and ALJ. Specifically, the model contract was not vetted by all parties; rather we received only a few reply comments on it. While Clean Coalition claims that its proposal will further streamline the contracting process, we find that the contract we adopt today, which has been vetted by parties over approximately 12 months, strikes the appropriate balance between necessary detail and brevity by including all the information needed to protect parties with substantial investments from potential risks. That said, we considered Clean Coalition's comments regarding the needs of small developers and address them in our discussion of specific sections of the standard contract, in Section 6 herein.

Clean Coalition's request is denied.

### 5.5. No Need for Separate Contract for Smaller Projects (under 1 MW)

CALSEIA states that a second simplified standard contract is needed to facilitate smaller projects (under 1 MW).[81] CALSEIA suggests that a 500 Kilowatt (kW) project is unable to meet the same insurance, telemetry, forecasting, meteorological and collateral requirements as a 3 MW project. For now, we will not consider creating another standard contract. We have adopted a process, which includes the joint standard contract for the FiT program, that is efficient and streamlined. Creating an additional contract at this point will unnecessarily

---

[81] CALSEIA August 15, 2012 comments at 4.

Case: 19-30088    Doc# 11231-4    Filed: 09/09/21    Entered: 09/09/21 18:28:10    Page
41 of 100

complicate the administration of the program and provide limited, if any, additional cost savings for developers.

CALSEIA's request is denied.

## 5.6. Separate Provision for Bioenergy Addressed with SB 1122

AECA suggests that the draft joint standard contract be modified to reflect specific characteristics of bioenergy projects where the biogas capture and energy generation are separate activities at energy generation sites. AECA also claims that the provision in the contract prohibiting additional "state incentives" could preclude grants for improved methane capture and destruction. Regarding AECA's point about the specific characteristics of bioenergy projects being reflected in the joint standard contract, we will be addressing many issues specific to bioenergy when we implement SB 1122 and will consider AECA's issue in that context.

## 6. Discussion of Specific Sections of the FiT Joint Standard Contract

The discussion below identifies and resolves each disputed provision in the draft joint standard contract and is organized by the separate Sections of the draft contract.

## Section 2 – Definition of Product

Placer County Air Pollution Control District (Placer District) states that the definition of "Product" should be clarified to exclude non-electric energy produced by the facility, such as biochar and heat.[82]

---

[82] Placer District August 15, 2012 comments at 7.

We find that the definition of Product set forth in the draft contract is sufficiently clear and no need exists for modification at this time. Nevertheless, Placer District's concerns reflect the potential need to further refine the joint standard contract to more specifically address the needs of projects that fall within the parameters of SB 1122.

We will be addressing many issues specific to bioenergy when we implement SB 1122 and will consider Placer District's issue in that context.

**Sections 2.8 and 2.9 - Commercial Operation Date and Extension**

Some parties request a longer time period before the COD[83] (24 months) is triggered and a longer time period under the Notice of Permitted Extension[84] (six months).[85] Other parties suggest a shorter time period for both the COD and Notice of Permitted Extension.

In comments dated April 8, 2013, Clean Coalition clarifies that it requests a shorter COD but unlimited extensions for delays outside of the control of the developer.[86] Clean Coalition suggests that interconnection delays are an example of a delay outside of the control of the developer.[87] However, no evidence exists in the record that all interconnection delays are outside the control of the developer. Importantly, projects must complete a study showing the ability to interconnect with the distribution system to be eligible for a FiT contract. Allowing unlimited extensions to the COD could also result in program capacity being occupied, potentially for many years, by non-viable projects

---

[83] The Commercial Operation Date is found in Section 2.8 of the draft joint standard contract.

[84] Notice of Permitted Extension is found in Section 2.9 of the draft joint standard contract.

[85] Clean Coalition August 15, 2012 comments at 5; Placer District August 15, 2012 comments at 2-3; SEIA August 15, 2012 comments at 11, Henwood Associates, Inc. (Henwood) August 15, 2012 comments at 7-8.

[86] Clean Coalition April 8, 2013 comments at 21-22.

[87] Clean Coalition April 8, 2013 comments at 21-22.

Case: 19-30088   Doc# 11231-4   Filed: 09/09/21   Entered: 09/09/21 18:28:10   Page
43 of 100

crowding out more viable projects. Clean Coalition's suggestion for unlimited extensions also introduces further delays by requiring a determination of which party to the contract is responsible for the delay before a further extension will be granted. For these reasons, Clean Coalition's suggestion is not adopted.

In D.12-05-035, the Commission provided for a 24 month period for the COD plus a permitted extension of six months (via a Notice of Permitted Extension).[88] We considered this matter in D.12-05-035. No new information has been provided by parties to persuade us to change our determination.

As a result, we decline to modify the previously adopted 24 month period before the COD plus a permitted extension of 6 months (via a Notice of Permitted Extension). Accordingly, we adopt the term in the July 18, 2012 draft joint standard contract.

SEIA and Placer District raise the issue that the proposed contract would require the seller to provide 60 days' notice to the buyer before the COD.[89] Placer District states that developers of small-scale forest biopower represent relatively new technology in rural areas and lack experience in permitting and, as a result, the 60 days' notice is a difficult time-line to meet.[90] The IOUs state that 60 days is required to provide for coordinating the scheduling of the power and other administrative functions.[91]

We find that it is reasonable to request that the seller provide 60 days' notice to the buyer before COD so that the buyer can make necessary arrangements for the scheduling of power and other administrative functions.

Accordingly, we adopt the term in the July 18, 2012 draft joint standard contract.

---

[88] D.12-05-035 at 70.

[89] Draft joint standard contract at Section 2.8.1.

[90] Placer District August 15, 2012 comments at 2.

[91] IOUs September 10, 2012 joint comments at 10.

Case: 19-30088    Doc# 11231-4    Filed: 09/09/21    Entered: 09/09/21 18:28:10    Page 44 of 100

## Section 2.8.2.4 - Related Damages for Failure to Meet Guaranteed Commercial Operation Date

Placer District states that the damages provision associated with failure to meet the Guaranteed Commercial Operation Date, as set forth in Section 2.8.2.4, is problematic because the damages provision prevents financing of small projects. Placer District recommends that this provision be replaced with a fixed amount or capped amount based on the value of contract.[92]  Placer District presents no evidence that this damages provision hinders financing.

We find that the provision appropriately balances the need to protect ratepayers from project failure by including actual damages when the party fails to perform and our effort to streamline project financing by clearly stating the potential costs associated with the contract.

Accordingly, we adopt the term in the July 18, 2012 draft joint standard contract.

## Section 3.2 - Contract Quantity over Term of Contract

Placer District states that the seller should be permitted to update the Contract Quantity one time each year during the term of the contract.[93]  Contract terms include 10, 15 and 20 years.  Clean Coalition states that Section 3.2 (Contract Quantity) should be entirely stricken to, presumably, permit changes to Contract Quantity upon request.[94]  The IOUs state that this contract term permits the seller to modify the Contract Quantity once after the Contract Capacity has been confirmed and deliveries have begun and that changing the Contract Quantity more often makes it difficult for the IOUs to plan the amount of RPS-eligible energy needed in advance to meet the 33% RPS requirement.[95]  The City of San Diego contends that in an excess sales situation, it is unreasonable to require the Seller to predict Contract Quantity because the site load is often unpredictable.[96]

---

[92] Placer District August 15, 2012 comments at 2.

[93] Placer District August 15, 2012 comments at 4.

[94] Clean Coalition August 15, 2012 comments at 6.

[95] IOUs September 10, 2012 joint comments at 10.

[96] City of San Diego April 8, 2013 comments at 3-5.

Case: 19-30088    Doc# 11231-4    Filed: 09/09/21    Entered: 09/09/21 18:28:10    Page
45 of 100

We find predictability in Contract Quantity to be a fundamental element of the standard contract and that the proposed provision, only permitting a one-time change, is a reasonable means of providing the buyer and seller with the ability to plan accordingly.  Regarding the concerns raised by the City of San Diego, we will monitor the impact of the contract provision in the context of excess sales.

Accordingly, we adopt the term in the July 18, 2012 draft joint standard contract.

## Section 3.5 - Contract Term

Clean Coalition requests that the Commission add a 25-year contract term option for the FiT program.[97]  The IOUs state that Clean Coalition's proposed 25-year contract term is inconsistent with the explicit language of § 399.20(d)(1), which states that "[t]he tariff shall provide for payment for every kilowatthour of electricity purchased from an electric generating facility for a period of 10, 15, or 20 years, as authorized by the Commission."[98]

Consistent with § 399.20(d)(1), the draft joint standard contract correctly gives the seller the option of a 10, 15, or 20-year contract term.  To require the IOUs to provide a 25-year contract term would conflict with the language of § 399.20. The request is denied.

Accordingly, we adopt the provision in the July 18, 2012 draft joint standard contract.

## Section 3.5.4 – Commercial Operation Date and Collateral Requirement

Clean Coalition states that Section 3.5.4 should be stricken since no Collateral Requirement should apply after the Commercial Operation Date.[99]  Clean Coalition provides no rationale to support its recommendation.

---

[97] Clean Coalition August 15, 2012 comments at 6; Henwood August 15, 2012 comments at 6.

[98] IOUs September 10, 2012 joint comments at 11.

[99] Clean Coalition August 15, 2012 comments at 6.

Case: 19-30088    Doc# 11231-4    Filed: 09/09/21    Entered: 09/09/21 18:28:10    Page
46 of 100

TURN notes that non-performance is one concern but that collateral also protects ratepayers from a seller intentionally breaching a contract if opportunities arise to sell to another party at a higher price.[100]

We find it reasonable to maintain the Collateral Requirements after the Commercial Operation Date since ratepayers continue to be at risk until the full contract term expires and performance has been delivered according to the terms of the contract.

Accordingly, we adopt the provision in the July 18, 2012 draft joint standard contract.

## Section 3.7 - Billing and Payment Terms

Clean Coalition objects to the contract provision requiring sellers to provide buyers with a billing invoice on the basis that billing is administratively burdensome and costly for small developers.[101]  The IOUs respond that monthly billing is a requirement in other programs and that no evidence exists that monthly billing imposes an undue burden on sellers.[102]  The IOUs further state that monthly billing is standard practice for business transactions and that it benefits both sellers and buyers by helping to mitigate billing disputes early.[103]

While developers may gain slight administrative efficiencies from a longer billing period, we find that greater benefits will be achieved over the term of these contracts with the more frequent monthly billing, which is the standard practice.  Monthly billing will provide the contracting parties with more frequent opportunities to communicate on payment, which is a critical aspect of the contracting relationship.

---

[100] TURN April 15, 2013 comments at 5.

[101] Clean Coalition August 15, 2012 comments at 6.

[102] IOUs September 10, 2012 joint comments at 11-12.

[103] IOUs September 10, 2012 joint comments at 11-12.

Accordingly, we adopt the provision in the July 18, 2012 draft joint standard contract.

## Section 4.1 - Green Attributes

Placer District states that the "non-modifiable" standard term and condition in the draft joint standard contract "Green Attributes" is outdated.[104]

As noted in the October 5, 2012 Assigned Commissioner's Ruling,[105] review of this "non-modifiable" standard term and condition will take place during our overall review of the RPS procurement process in this proceeding.[106] We anticipate that we will address and, perhaps, revise this term at that time. At that time, we will direct the utilities to conform the FiT program as needed. Accordingly, we adopt the provision in the July 18, 2012 draft joint standard contract.

## Section 4.3 - WREGIS

Clean Coalition and Henwood state that PG&E and SDG&E should conform to SCE's proposal in the draft joint standard contract and act as the Qualified Reporting Entities (QREs) for the Western Renewable Energy Generation Information System[107] (WREGIS) purposes for all of their FiT projects.[108] At Section 4.3 of the draft joint standard contract, PG&E and SDG&E present one proposal and SCE presents a different proposal.

---

[104] Placer District August 15, 2012 at 8.

[105] *Second Assigned Commissioner's Ruling Issuing Procurement Reform Proposals and Establishing a Schedule for Comments on Proposals,* dated October 5, 2012, in R.11-05-005 (October 5, 2012 ACR).

[106] October 5, 2012 ACR at 38.

[107] WREGIS is an independent, renewable energy tracking system for the region covered by the Western Electricity Coordinating Council. WREGIS tracks renewable energy generation from units that register in the system by using verifiable data and creating renewable energy certificates (REC) for this generation.

[108] Clean Coalition August 15, 2012 comments at 6-7; Henwood August 15, 2012 comments at 8.

Case: 19-30088   Doc# 11231-4   Filed: 09/09/21   Entered: 09/09/21 18:28:10   Page 48 of 100

In response to Clean Coalition and Henwood, PG&E and SDG&E state that they do not act as QREs for any of the renewable resources they have under contract and that requiring them to do so only for FiT projects would be administratively burdensome and inefficient given their existing systems. They further state that such a requirement could lead to errors because in some cases they would be acting as the QRE with FiT but not in other cases.[109]

Henwood and Clean Coalition do not claim that developers will gain significant benefits from this change. Therefore, given the administrative challenges in creating an exception for FiT projects from PG&E's and SDG&E's standard administrative practices, Henwood's and Clean Coalition's proposal is not adopted. SCE may retain a different contract term for Section 4.3 than PG&E and SDG&E.

PG&E and SDG&E submitted a clarification to this standard contract provision in a September 12, 2012 email sent to the service list. This email is incorporated into the record of the proceeding and content of this email is reflected here.[110] In addition, this clarification, which pertains to QRE function for projects under 1 MW, should be reflected in the joint standard contract.

Accordingly, we adopt the provisions in the July 18, 2012 draft joint standard contract.

---

[109] IOUs September 10, 2012 joint comments at 12.

[110] After filing comments on September 10, 2012, PG&E and SDG&E learned of an error pertaining to WREGIS and the utilities acting as QRE. To correct this error, PG&E and SDG&E sent an email to the service list on September 12, 2012. This email clarified that although they generally do not serve as the QRE or Account Holder for the seller's facilities in WREGIS, under PG&E's and SDG&E's AB 1969 FIT Program exceptions are made for facilities under 1 MW without a CAISO meter. In these circumstances, PG&E and SDG&E have offered to serve as the QRE for the Seller. Across all PG&E and SDG&E renewable procurement program, all facilities with a CAISO meter obtain a QRE agreement with the CAISO. PG&E and SDG&E do not serve as WREGIS Asset Managers for facilities participating in renewable procurement programs, including the FIT program.

Case: 19-30088    Doc# 11231-4    Filed: 09/09/21    Entered: 09/09/21 18:28:10    Page
49 of 100

## Section 4.4.3 - Resource Adequacy Requirements

Section 4.4.3 provides that "Seller shall cooperate in good faith with Buyer to pursue and obtain any and all Capacity Attributes…." SEIA claims that Section 4.4.3 is inconsistent with D.12-05-035 and should be removed from the draft joint standard contract because it requires sellers (as opposed to providing sellers with the option) to pursue resource adequacy in certain circumstances.[111] Clean Coalition states that the term is overbroad and should be stricken.[112]

The IOUs explain that the contract does not require sellers to undertake any upgrades to obtain Full Capacity Deliverability Status but only requires sellers to perform administrative tasks such as submitting documents to be deemed eligible for RA credit *if* the Commission at a future date adopts a decision, or takes other official action, to find certain energy automatically qualifies as Fully Deliverable.[113] The IOUs further state that they are willing to modify the provision to establish a $1,000 cap on seller's total out-of-pocket costs under this provision and that buyer will reimburse seller for any additional expenses.[114]

Pursuant to § 399.20(i), sellers must be provided with the option to change RA status.[115] In accordance with D.12-05-035, sellers are not required to pursue resource adequacy but sellers have the option of converting to Full Capacity Deliverability Status at any time during the term of the Contract.[116] However, sellers should not refuse to take action required to participate in unburdensome requests that would enable the IOUs and CAISO to assign resource adequacy value to the generation. Furthermore, *if* the Commission at some future date adopts a rule that "deems the energy subject to a FiT contract eligible for RA status," as suggested by the IOUs, we will revise the contracts to reflect this

---

[111] SEIA August 15, 2012 comments at 11-12.

[112] Clean Coalition August 15, 2012 comments at 7.

[113] IOUs September 10, 2012 joint comments at 13-15.

[114] AECA September 9, 2012 comments at 3; CALSEIA August 29, 2012 comments at 3.

[115] D.12-05-035 at 54-56.

[116] D.12-05-035 at 54-56.

Case: 19-30088    Doc# 11231-4    Filed: 09/09/21    Entered: 09/09/21 18:28:10    Page
50 of 100

change in law, as needed. Sellers are obliged to abide by the rules of the Commission on resource adequacy and the rules of other jurisdictions, such as the CAISO. The Commission does not limit the ability of the IOUs to require a FiT generator to comply with the rules of other jurisdictions on this matter.

Accordingly, the IOUs are directed to revise the draft joint standard contract to clarify that sellers are provided the option to convert, at their discretion, to Full Capacity Deliverability Status in accordance with § 399.20(i) and D.12-05-035.

## Section 4.6 - Compliance Expenditure Cap

SEIA and Clean Coalition state that the yearly Compliance Expenditure Cap of $25,000 for costs related to changes in California Energy Commission (CEC) Pre-Certification, CEC Certification or CEC Verification regulations during the term of the contract and pertaining to ensuring the energy is from an eligible renewable energy resource is too high and should be determined on a case-by-case basis based on the size of the project or limited to $5,000 annually.[117]

The IOUs state that the $25,000 cap (for each year for the term of contract) reflects efforts to share exposure to increased costs resulting from changes in law or regulation between buyer and seller and is appropriate based on the size of the FiT projects.[118] The IOUs further state that the cap applicable to larger RPS projects is typically higher and that a cap of $25,000 is a small percentage of total potential revenues.[119]

We find the yearly cap of $25,000 is a reasonable means of sharing the risk of additional costs that would be potentially incurred with changes in the law. We

---

[117] SEIA August 15, 2012 comments at 14; Clean Coalition August 15, 2012 comments at 7. In Clean Coalition's September 10, 2012 comments at 21, Clean Coalition requests that this cap be limited to $5000 annually and suggests that the compliance expenditure cap extends to interconnection fees, legal fees and other costs. Clean Coalition is incorrect. This cap applies to fees only as described above.

[118] IOUs September 10, 2012 joint comments at 15.

[119] IOUs September 10, 2012 joint comments at 15.

acknowledge that the primary obligation to pay costs will be placed on the seller but that such an outcome is consistent with the seller's obligation to ensure that its facility is operating consistent with the regulations of the CEC pertaining to renewable facilities.  Under this term, amounts exceeding $25,000 will be paid by either the seller or the buyer in amounts to be determined by the parties.

Accordingly, we adopt the provision in the July 18, 2012 draft joint standard contract.

## Section 4.7 - Eligible Intermittent Resources Protocol Requirements

Clean Coalition states that Eligible Intermittent Resources Protocol (EIRP) Requirements described in Section 4.7 should only apply to facilities over 1 MW.[120]  Section 4.7 provides, in part, that "If at any time during the Term the Facility is eligible for EIRP, Seller shall provide Buyer with a copy of the notice from CAISO certifying the Facility as a Participating Intermittent Resource as soon as practicable …." No rationale is given to support this request.

The IOUs do not address this issue in their September 10, 2012 comments.

We adopt the term in the July 18, 2012 draft joint standard contract but will monitor this matter for potential disputes and consider revising this term as needed in the future should additional information arise to further inform the issue.

## Sections 4.8 and 5.3.6 - Qualifying Facility Status

Placer District states that the FERC requirements exempt participating generators less than 1 MW from filing the FERC Qualifying Facility Registration Form 556 and, therefore, the Commission should exempt those FiT projects sized less than 1 MW from complying with the Form 556 requirements.[121]  The IOUs state that Placer District misinterprets the Form 556 requirements and that generators under 1 MW are not automatically Qualifying Facilities (QFs).[122]

---

[120] Clean Coalition August 15, 2012 comments at 7.

[121] Placer District August 15, 2012 comments at 7.

[122] IOUs September 10, 2012 joint comments at 15.

In response, we clarify that the program offered under the draft joint standard contract is only available to sellers that are QFs. We encourage sellers to formally obtain this status through FERC to reduce the uncertainties in the contracting process but we will not order the filing of a form when not required by FERC. In short, the seller must be a QF to participate in the FiT program. It is the responsibility of the sellers to complete all necessary documents with FERC. If FERC does not require any action be taken to be a QF, we will not require any.

Accordingly, we adopt the terms set forth in the July 18, 2012 draft joint standard contract but modified to indicate that if no action before FERC is required to confirm a seller's status as a QF, the IOUs will likewise not require any. This finding represents a modification to D.12-05-035.[123]

## Section 5.3.2 - Seller's Representations, Warranties, and Covenants

Section 5.3.2 states that "Seller's execution of this Agreement will not violate Public Utilities Code Section 2821(d)(1), if applicable." Clean Coalition states that this term should be clarified so that it only applies to hydro projects.[124] Clean Coalition provides no rationale to support its request. The IOUs do not address this issue. We find that no clarification is needed as the code section speaks for itself. Accordingly, we adopt the provision in the July 18, 2012 draft joint standard contract.

## Section 5.3.8 - Seller's Representations, Warranties, and Covenants

Clean Coalition states that Section 5.3.8 should be moved to the general representations, warranties and covenants section of the joint standard contract so that it applies to buyers and sellers, rather than to just sellers.[125] Section 5.3.8 states that the seller "is acting for its own account, has made its own independent decision to enter into this Agreement…." Clean Coalition provides no rationale to support its request. The IOUs do not address this issue in their September 10, 2012 comments.

---

[123] D.12-05-035 at 102.

[124] Clean Coalition August 15, 2012 comments at 7.

[125] Clean Coalition August 15, 2012 comments at 7.

We do not accept Clean Coalition's suggestion to move Section 5.3.8 to general representations, warranties, covenants  Section so that it applies to the buyer and seller as it provides protections to the seller, as potentially the less sophisticated party, not needed for the buyer.

Accordingly, we adopt the term in the July 18, 2012 draft joint standard contract.

## Section 5.3.9 - Other Product Transactions

Placer District states its intent to sell power to buyers not covered by the FiT program.  It requests approval to engage in such transactions and suggests that Section 5.3.9 prohibits these arrangements.[126]

The language in the draft joint standard contract does not appear to prohibit or even address such sales but, instead, the relevant language appears to prohibit a seller from entering into a sale (and other types of transactions) of the Product subject to the contract.  The July 18, 2012 draft joint standard contract provides as follows:

> Section 5.3.9.  As of the Execution Date and throughout the Term:  (a) Seller will not convey, transfer, allocate, designate, award, report or otherwise provide any or all of the Product, or any portion thereof, or any benefits derived there from, to any party other than Buyer; and (b) Seller will not start-up or operate the Facility per instruction of or for the benefit of any third party, except as required by other Laws or, in the case of excess sale arrangements, to serve any Site Host Load;[127]

---

[126] Placer District August 15, 2012 comments at 3-4.

[127] In April 15, 2013 comments to the proposed decision on this matter, Placer District suggests that this provision could be further clarified by replacing the phrase "except as required by other Laws" with "except as allowed by other Laws."[127]  We agree.  SCE suggests that additional language be added to further clarify that the joint standard contract is already net of "site host load" for excess sales arrangement, specifically, add the following phrase "or, in the case of excess sale arrangements, to serve any Site Host Load."  We agree.

With these clarifications, we find that the above provision does not prohibit the type of additional sales transactions described by Placer District.

Accordingly, we adopt the term in the July 18, 2012 draft joint standard contract.

## Sections 5.3.12 and 5.3.13 - Interconnection

Clean Coalition states that Sections 5.3.12 and 5.3.13, which concern interconnection issues, are over-reaching and should be removed as beyond the scope of a power purchase agreement.[128]  These Sections provide as follows:

> Section 5.3.12  No other person or entity, including any other generating facility has any rights in connection with Sellers' interconnection agreement or Seller's Interconnection Facilities and no other persons or entities shall have any such rights during the Term; and

> Section 5.3.13  During the Term, Seller shall not allow any other person or entity, including any other generating facility, to use Seller's Interconnection Facilities.

Clean Coalition provides no rationale to support its request.  The IOUs do not address this issue in comments.

We find these terms promote administrative ease by providing a reasonable means of ensuring that FiT contracts proceed in an expeditious and non-controversial fashion.

Accordingly, we adopt the term in the July 18, 2012 draft joint standard contract.

## Section 6.5.1 - Administrative Logs

Placer District states that the requirement that sellers maintain a daily log of material operations and maintenance information, to provide to the buyer within twenty days of the buyer's request, is too onerous, particularly when no changes

---

[128] Clean Coalition August 15, 2012 comments at 8.

or actions occur.[129] Placer District provides specific suggestions to modify the contract language. The IOUs state that because the provision is limited to "material" information, it is not overly burdensome.[130]

We are not convinced that the concerns noted by Placer District outweigh the benefits – especially safety related - derived from maintaining a daily log of material operations and maintenance information.

Accordingly, we adopt the term in the July 18, 2012 draft joint standard contract.

## Section 6.12 - Reporting and Record Retention

Clean Coalition states the requirement for reporting and record retention as overly burdensome and a financial hardship.[131] Section 6.12.1 of the draft joint standard contract provides "Seller shall provide Project development status reports in a format and a frequency, which shall not exceed one (1) report per month, specified by the Buyer." Specifically, Clean Coalition states that Section 6.12.1 should require less frequent reports, and Section 6.12.4 should require Commission approval instead of simply buyer's "sole discretion."[132] Clean Coalition provides no further rationale to support its request. In comments on the proposed decision and alternate proposed decision, Clean Coalition emphasizes that the reporting requirement is a time burden.[133]

The IOUs state that preparing a monthly status report allows the buyer and seller to coordinate on the administration of the contract so that both parties can respond to any changes to the project in a timely manner, that monthly progress reporting is a standard practice for many renewable projects, and that an IOU

---

[129] Placer District August 15. 2012 comments at 6.

[130] IOUs September 10, 2012 joint comments at 16.

[131] Clean Coalition August 15, 2012 comments at 8.

[132] Clean Coalition August 15, 2012 comments at 8.

[133] Clean Coalition April 8, 2013 comments at 9.

Case: 19-30088    Doc# 11231-4    Filed: 09/09/21    Entered: 09/09/21 18:28:10    Page
56 of 100

may request a report less than once per month (e.g., quarterly, semi-annually, or annually), which means there may be even less of a burden on sellers.[134]

We find that the term in the draft joint standard contract provides a reasonable balance between ensuring the timely exchange of information between the contracting parties to support efficient and safe transactions and streamlining the contracting process to meet the specific needs of FiT developers.

Accordingly, we adopt the term in the July 18, 2012 draft joint standard contract.

### Section 6.12.3 - Women, Minority and Disabled Veteran-owned Business Enterprises (WMDVBE)

Placer District states that the requirement in the contract to provide a list of all WMDVBE that supplied goods and services is overly burdensome unless the IOUs pay for this effort.[135]  It also claims that this acronym is not defined and no legal requirement is cited.[136]

The definition is included at Appendix A of the draft contract.  We further direct the IOUs to define the acronym, which reflects "Women, Minority and Disabled Veteran-owned Business Enterprises."  Moreover, we do not find this contract term to be overly burdensome but, instead, it achieves a reasonable balance between the buyer's need for information to ensure compliance with laws related to WMDVBE and the seller's need to assist with the compliance of such laws. We do not accept the proposal for the IOUs to pay for any work related to the IOUs' requests to sellers related to WMDVBE.

Accordingly, we adopt the terms in the July 18, 2012 draft joint standard contract.

---

[134] IOUs September 10, 2012 joint comments at 17.

[135] Placer District August 15, 2012 comments at 6-7.

[136] Placer District August 15, 2012 comments at 6-7.

## Section 6.14 - Modification to Facility

Placer District objects to the requirement that the seller obtain the buyer's consent to a modification to the generating facility on the basis that the facility modifications are outside of the buyer's purview and that requiring buyer's consent creates a disincentive for modifications that could boost productivity.[137] Clean Coalition generally agrees.[138] The IOUs state that, as a party to the FiT contract, an IOU has a vested interest in a facility producing the product it is buying and that if, for example, an IOU enters into a contract for a 1.5 MW project, but the seller transforms that project it into a 3 MW project, the 3 MW project is no longer the same project from which the IOU agreed to purchase energy under the contract.[139] SCE clarifies that oversight of facility modifications is important but that the intention is not to prevent every possible modification to a generating facility, no matter how small.[140] Instead, SCE proposes to limit the IOUs' right to consent based on the materiality of the change.

We find that requiring the seller to obtain the buyer's consent before making any modifications to its facility imposes an unreasonably vague burden on the seller. The benefits, if any, of such a requirement are outweighed by the goal of streamlining the contracting process for projects under the FiT program. However, we find that a requirement that the seller obtain the buyer's consent to material modifications of the generating facility is reasonable as this requirement promotes cost containment by restricting modifications to facilities that change the capacity of the project or type of technology used for generation.[141]

Accordingly, we do not adopt this term in the July 18, 2012 draft joint standard contract. Instead, we direct the IOUs to incorporate a materiality standard into

---

[137] Placer District August 15, 2012 comments at 4.

[138] Clean Coalition August 15, 2012 comments at 8.

[139] IOUs September 10, 2012 joint comments at 17.

[140] SCE April, 2013 comments at 13.

[141] The language provided in SCE's April 8, 2013 comments at 14 is acceptable for reflecting the materiality standard.

Case: 19-30088    Doc# 11231-4    Filed: 09/09/21    Entered: 09/09/21 18:28:10    Page
58 of 100

this provision.  We also acknowledge  that other laws and requirements may apply in such a situation to require the seller to inform the buyer of a modification to a facility.

## Section 10 - Insurance Requirements

Clean Coalition, SEIA, and Henwood object to the insurance provisions in the draft joint standard contract.  They assert that no insurance beyond general liability should be required, that the level of insurance required is too high, and that insurance should not have to be in place at the time of contract signing.[142] CALSEIA and AECA agree.[143]

In response, the IOUs state that the insurance requirements protect ratepayers from potentially significant liability and reflect commercially reasonable risk management practices for both the buyers and sellers that are ubiquitous in similar commercial transactions.  The insurance provision proposed in the draft joint standard contract is similar to the insurance provisions from SCE's Solar Photovoltaic Program (SPVP) PPA for generators less than 5 MW.  The IOUs state that generators have executed SCE's SPVP PPA, secured financing and achieved commercial operation under that PPA.  In short, the IOUs state that no evidence exists that the proposed insurance provision will hinder project development or financing.  The IOUs further state that, because the IOUs are exposed to liability risk beginning upon execution of the PPA (e.g., such as risks arising from development and construction activities), sellers should be required to provide insurance concurrently with the execution of the standard contract. Finally, the IOUs note that, in their experience, smaller projects do not have commensurately smaller risks, as the costs associated with a death or injury are not different just because a project is smaller and that the proposed insurance requirements are consistent with the IOUs' market risk exposure and industry standards.[144]

---

[142] Clean Coalition August 15, 2012 comments at 8; SEIA comments at 14-15; Henwood August 15, 2012 comments at 9.

[143] CALSEIA reply comments August 29, 2012 at 3; AECA reply comments September 9, 2012 at 2.

[144] IOUs September 10, 2012 joint comments at 18-19.

We find that the risks to ratepayers throughout the contracting term are sufficiently high to justify the requirements imposed upon sellers by the draft joint standard contract term. We are committed to streamlining and reducing the overall costs related to the FiT contracting process but find this area sufficiently important to justify the imposition of the proposed insurance provision. To ease the administration burden on sellers, we require the IOUs to provide that sellers must offer evidence of insurance 60 days after contract execution or before construction begins.[145]

Accordingly, we adopt the term in the July 18, 2012 draft joint standard contract.

## Section 11 - Force Majeure

AECA states that the 1-year period for Force Majeure that triggers contract termination options does not appropriately take into consideration Force Majeure events at dairy and other biogas projects, such as a catastrophic animal disease, which merit additional discretion and flexibility.[146] The IOUs provide no response. This issue was raised in reply comments and, as such, other parties may not have been aware of the issue and the record remains undeveloped with the exception of AECA's stated concern. In addition, we will be addressing many issues specific to bioenergy when we implement SB 1122. AECA's concerns should be raised in that context.

## Section 12 - Guaranteed Energy Production

Clean Coalition and Placer District state that the Guaranteed Energy Production provision in the draft joint standard contract should be stricken or, at the very least, that the buyer must justify the required production quantity with empirical data.[147] These parties state that this provision hinders financing.[148]

---

[145] TURN April 15, 2013 comments at

[146] AECA September 9, 2012 comments at 3-4.

[147] Clean Coalition August 15, 2012 comments at 9; Placer District at 5.

[148] Clean Coalition August 15, 2012 comments at 9; Placer District at 5.

The IOUs state that sellers must already specify the expected energy production from the generator in the draft joint standard contract and, as a result, meeting the Guaranteed Energy Production should not be problematic. [149]  In addition, the provision provides a cushion that allows for a reasonable amount of over- or under-generation.[150]

We find that the proposed term reasonably balances the buyer's need to have a high level of certainty regarding the expected generation and the seller's need for flexibility to account for unknowns by permitting a specific amount of over- or under-generation.  We do not, however, agree with the IOUs that Section 12 serves to implement § 399.20(j)(1).[151]

Accordingly, we adopt the term in the July 18, 2012 draft joint standard contract.

## Section 13 - Collateral Requirements

Clean Coalition and Henwood state that the IOUs' proposed development security requirements ($50/kW for projects over 1 MW, and $20/kW for projects under 1 MW) are too high and state that the collateral requirements should only apply until the project's Commercial Operation Date.[152]

The IOUs respond that the increased amounts in the draft joint standard contract assist in distinguishing viable projects from non-viable projects.[153]  The IOUs

---

[149] IOUs September 10, 2012 joint comments 19-20.

[150] IOUs September 10, 2012 joint comments 19-20.

[151] § 399.20(j)(1) provides that "The commission shall establish performance standards for any electric generation facility that has a capacity greater than one megawatt to ensure that those facilities are constructed, operated, and maintained to generate the expected annual net production of electricity and do not impact system reliability."

[152] Clean Coalition August 15, 2012 comments at 9; Henwood August 15, 2012 comments at 9-10.

[153] IOUs September 10, 2012 joint comments at 20-21. The IOUs propose $20/kW for under 1 MW projects and $50/kW for over 1 MW projects.

Case: 19-30088    Doc# 11231-4    Filed: 09/09/21    Entered: 09/09/21 18:28:10    Page
61 of 100

further state that other renewable projects with similar credit and collateral requirements have secured financing and have begun commercial operations, which demonstrates that the proposed credit and collateral provisions are not an unreasonable burden on generators.[154]  In response to the claim that collateral requirements should only apply until the project's Commercial Operation Date, the IOUs state that collateral is required after the Commercial Operation Date because it keeps the IOUs' customers whole if the seller fails to perform consistent with its contractual obligations.[155]  The IOUs point out that, in the event of the seller's non-compliance with the energy output requirements, the buyer will not necessarily have the option to buy replacement energy on the market at a lower price.[156]

In the context of FiT, we most recently addressed the issue of collateral used for development security in D.11-11-012.[157]  In. D.11-11-012, we modified SCE's then-existing CREST contract (SCE's FiT contract under AB 1969).  We found then that $20/kW for collateral used for development security in that contract was a reasonable balance between discouraging non-viable projects from participating in the program, while protecting ratepayers in the event projects fail, with providing smaller developers with streamlined access to the program.[158]  Our position on this topic remains unchanged.  We also recognize the need for collateral through the term of the contract.

Accordingly, we adopt an amount lower than the IOUs proposed in the July 18, 2012 draft joint standard contract for project development security. The amount we adopt is $20/kW for all eligible FiT projects and we allow the IOUs

---

[154] IOUs September 10, 2012 joint comments at 20-21.

[155] IOUs September 10, 2012 joint comments at 20-21.

[156] IOUs September 10, 2012 joint comments at 20-21.

[157] D.11-11-012, *Decision Granting, with Modifications, the Motion by Clean Coalition for Immediate Amendments of the Southern California Edison Company AB 1969 CREST Power Purchase Agreement* (issued November 17, 2011), R.11-05-005.

[158] D.11-11-012 at 33-34.

to maintain the collateral requirement through the term of the contract. The IOUs shall modify the joint standard contract accordingly.

## Section 13.5.3 - Payment of Interest on Collateral

Mr. L. Jan Reid (Reid) states that Section 13.5.3 incorrectly cites Section 3.7.9 as setting forth the applicable interest rate when that rate is, instead, found in Appendix A.[159] In comments to the proposed decision, SCE clarified that the citation is correct but perhaps should be clarified.[160] We agree that additional clarification of Section 13.5.3 would be helpful. Accordingly, to correct this citation error, the IOUs shall change Section 13.5.3 of the July 18, 2012 draft joint standard contract to read "Payment of Interest. Buyer shall pay simple interest on cash held to satisfy the Collateral Requirements at the rate and in the manner set forth in Section 3.7.9."

## Section 13.6 - Letter of Credit Requirements

Henwood requests that the Commission provide greater latitude in the selection of banks that are permitted to issue letters of credit for FiT financing than provided for under the draft joint standard contract.[161] The IOUs state that, since the draft joint standard contract was first circulated, the credit rating requirement has been reduced to allow a Moody's A3 rating or an S&P A-rating with a stable outlook, but that further reducing the requirement may put ratepayers at risk.[162] The IOUs further state that using a letter of credit is a standard commercial practice that is appropriate to protect customers and ensure that they receive any funds or amounts owed under the FiT standard contract.[163]

Under the terms of the draft joint standard contract, the letter of credit requirements would be consistent across the large-scale RPS program, the RAM program and FiT. We reduce the letter of credit requirements as noted by the

---

[159] Reid August 15, 2012 comments at 6.

[160] SCE April 8, 2013 comments at 15.

[161] Henwood August 15, 2012 comments at 10.

[162] IOUs September 10, 2012 joint comments at 22.

[163] IOUs September 10, 2012 joint comments at 22.

Case: 19-30088    Doc# 11231-4    Filed: 09/09/21    Entered: 09/09/21 18:28:10    Page
63 of 100

IOUs but no further. We find that, by requiring the above credit rating for banks issuing letters of credit to developers, we are reasonably balancing the need to protect ratepayers from risk of loss with the need to provide developers with increased access to more banks in order to secure financing.

Accordingly, we adopt the letter of credit requirements in the July 18, 2012 draft joint standard contract.

## Section 14.9 - Transmission Costs & Termination Rights

Several parties raise questions about Section 14.9 of the draft joint standard contract, which provides, generally, that a termination right becomes effective within 60-days if the Aggregate Network Upgrade Costs exceeds $300,000 or if the buyer must procure transmission service from any other transmission/distribution owner, which is not reimbursed or paid by the seller.

Reid states that the 60-day notice provisions in the draft joint standard contract at Section 14.9.1 that provides the buyer the right to terminate the contract after the seller provides the results of certain interconnection studies is too long. Reid requests a 30-day notice period.[164] AECA states that the cap on transmission cost of $300,000 needs to be more flexible to accommodate fixed-location technologies, such as bioenergy.[165] Clean Coalition states that the cap on transmission costs is problematic for all the reasons raised in its application for rehearing[166] but does not provide any further specifics.[167]

In response to Reid, the IOUs state that 60 days is a reasonable balance between the desire for certainty by the parties regarding the terms of the transaction, verifying transmission costs, and researching options available to the parties

---

[164] Reid August 15, 2012 comments at 6-7.

[165] AECA September 10, 2012 comments at 3.

[166] Clean Coalition filed a timely application for rehearing of D.12-05-035 on June 29, 2012. This application for rehearing was denied, with modification, in D.13-01-041.

[167] Clean Coalition August 15, 2012 comments at 10.

going forward.[168]  We agree.  The IOUs do not address the points raised by Clean Coalition and AECA.

Clean Coalition alleges that the cost cap unlawfully eliminates a substantial portion of potential FiT projects but fails to identify any law which is violated.[169] We found no legal error in D.13-01-041 when addressing this same issue when raised by Clean Coalition in its Application for Rehearing.  Likewise, because Clean Coalition provides no new information now, we make no modifications to the transmission cap adopted in D.12-05-035 or the provision in the draft joint standard contract.  Regarding AECA's point that the termination rights do not properly account for fixed-location generation, such as biogas, we will be addressing issues specific to bioenergy when we implement SB 1122 and AECA may raise this issue in that context.

Accordingly, we adopt the language in the July 18, 2012 draft joint standard contract.

## Section 15 and Appendix D - Forecasting

Section 15 and Appendix D of the draft joint standard contract requires sellers be responsible for forecasts.

Clean Coalition states that, to achieve greater efficiencies, the buyer should be responsible for forecasts (not seller).[170]  In the alternative, Clean Coalition proposes that sellers only be required to provide a single, monthly forecast of expected generation.  SEIA, CALSEIA, Sierra Club, AECA suggest that sellers have the option to forecast (Appendix D of draft joint standard contract) and pay buyer a reasonable cost for this service.  The IOUs do not address this issue.

We find that providing sellers with the option of paying buyer a reasonable fee for the forecasting service is reasonable.  This outcome furthers our goal of

---

[168] IOUs September 10, 2012 joint comments 23.

[169] D.13-01-041 at 15-16.

[170] Clean Coalition August 15, 2012 comments at 10.

Case: 19-30088   Doc# 11231-4   Filed: 09/09/21   Entered: 09/09/21 18:28:10   Page
65 of 100

streamlining the FiT contracting process by reducing the burden on the small developers without subjecting ratepayers to additional costs or risks.

## Section 16.2 - Recording Phone Conversations

Clean Coalition states that Section 16.2 of the draft joint standard contract, which permits the recording of phone conversations in certain circumstances related to the scheduling of energy, should be stricken as over-reaching.[171]

The IOUs state that, in conformance with the law, they routinely record conversations between electricity schedulers and generators to retain an accurate record in case disputes later arise regarding the communication during the telephone call.[172]  The IOUs explain that Section 16.2 serves to notify the sellers that phone conversations may be recorded and provides each party's consent to recording,[173] which is a standard provision in energy contracts (including renewable contracts).[174]

We find that the IOUs are operating within the law in recording conversations and, while developers may perceive this recording as an intrusion on privacy, the recording of conversations is a reasonable means of minimizing disputes and managing the public safety aspects of scheduling energy.

Accordingly, we adopt the provision in the July 18, 2012 draft joint standard contract.

## Section 17 and Appendices K and L - Assignment

Clean Coalition states that, contrary to Section 17 of the draft joint standard contract, sellers should not need to obtain buyer's prior consent to assignment and, instead, only notification should be required.[175]  The IOUs provide no response.

---

[171] Clean Coalition August 15, 2012 comments at 10.

[172] IOUs September 10, 2012 joint comments 23.

[173] IOUs September 10, 2012 joint comments 23.

[174] IOUs September 10, 2012 joint comments 23.

[175] Clean Coalition August 15, 2012 comments at 10.

Case: 19-30088    Doc# 11231-4    Filed: 09/09/21    Entered: 09/09/21 18:28:10    Page 66 of 100

The contracts in the RPS program and the RAM program require prior consent for assignment, with certain exceptions. Because assignment transfers all the rights and responsibilities to a third-party, we find reasonable the need to obtain the consent of the buyer rather than just notifying the buyer. This provision promotes administrative ease by reasonably balancing the seller's need for flexibility to assign the contract with the buyer's need to ensure that the assignee is able to perform as required under the contract. Consent to assignment should not be unreasonably withheld.[176]

Accordingly, we adopt the provision in the July 18, 2012 draft joint standard contract.

## Section 19.1 - Dispute Resolution and Recovery of Costs

Clean Coalition states that the arbitration process described in Section 19 of the draft joint standard contract should not be the sole remedy for parties and that, for example, parties should be permitted to seek court remedies.[177] Reid states that the recovery of costs by a prevailing party to a dispute should be limited to reasonable costs.[178] The IOUs state that the arbitration provision prevents forum shopping and promotes cost containment.[179]

We find that the arbitration provision reasonably balances the goal of streamlining the administration of FiT contracts with providing developers' the opportunity to successfully develop projects.

---

[176] In April 15, 2013 comments, PG&E requests a modification to Section 17.2 to clarify that Appendix L represents the extent of PG&E's required consent by adding two references to "Appendix L." SCE requests a minor modification to the draft joint standard contract to enable SCE to rely on Appendix L (Financing Consent to Assignment form). We find these modifications reasonable.

[177] Clean Coalition August 15, 2012 comments at 10.

[178] Reid August 15, 2012 comments at 7.

[179] IOUs September 10, 2012 joint comments 23-24.

Case: 19-30088    Doc# 11231-4    Filed: 09/09/21    Entered: 09/09/21 18:28:10    Page
67 of 100

Accordingly, we adopt the language as proposed in the July 18, 2012 draft joint standard contract.  The Commission's complaint forum is also available as noted in the July 18, 2012 draft joint standard contract

## Section 20.3 - Amendments

Section 20.3 addresses additions or modifications to the joint standard contract. Reid requests that this provision be stricken.[180]  In response, the IOUs explain that Section 20.3 of the draft joint standard contract protects both parties from having the agreement amended by a mere action or unsigned writings.[181]  The IOUs further note that, under general contract law, regardless of the provisions in the contract, parties can always amend an agreement by a writing signed by both parties and that the Section 20.3 in the draft joint standard contract serves to limit amendments to a certain specific method (written and by both parties) and to protect against disputes that could occur under an amendment that is not in writing and executed by the parties (e.g., a verbal agreements to amend).

The contract that we approve today is a standard contract.  The objectives of a standard contract are to promote administrative ease, reduce transaction costs, and protect the rights of the parties.  If amendments are permitted, on even seemly minor matters, our efforts to balance these objectives may be compromised.

We recognize, however, that administrative amendments that do not impact the Commission approved standard terms and conditions of the underlying contract, for example, typos or other administrative changes, are appropriate.[182]  We permit administrative amendments to joint standard contract because, otherwise overall contract administration costs will increase as well as the burden of administrating these contracts. Commission approval is not required for these types of amendments to the standard contract.

---

[180] Reid August 15, 2012 comments at 7.

[181] IOUs September 10, 2012 joint comments at 24.

[182] PG&E April 8, 2013 comments at 7.

Case: 19-30088    Doc# 11231-4    Filed: 09/09/21    Entered: 09/09/21 18:28:10    Page
68 of 100

Accordingly, except in the limited circumstances as described above, we reject all language permitting amendments to this contract unless Commission approval of the contract, as modified, is obtained.

**Appendix F - Telemetry**

The July 18, 2012 draft joint standard contract includes a provision for telemetry for PG&E and SCE and a separate telemetry provision for SDG&E. These two provisions are found at Appendix F.

Regarding PG&E's and SCE's contract provision, Clean Coalition states that recurring telemetry costs should be capped at $100 per month.[183] Clean Coalition does not oppose the $20,000 cap on installation costs for telemetry for facilities that are 500 kW and less. CALSEIA agrees.[184] Clean Coalition offers no proposal as to what happens if the $100/month amount is exceeded. Henwood proposes a similar cost cap for the remaining facilities, 1 MW and above.[185] Henwood also claims that telemetry is not needed because real-time data is not used for projects of this size.[186]

The IOUs state that limiting recurring telemetry costs to $100 is not reasonable because these total costs are unknown during the potential duration of the contracts, up to 20 years.[187] The IOUs also state that real-time data is used in scheduling resources of 500 kW and above in the CAISO market.[188]

We find that the IOUs' proposal allowing projects under 500 kW to aggregate telemetry costs and to limit those costs with a $20,000 cap is a reasonable means of balancing the CAISO's need for visibility of these generators and providing the data needed so that these small generators can be scheduled (on an aggregate

---

[183] Clean Coalition August 15, 2012 comments at 11.

[184] CALSEIA August 29, 2012 comments at 3.

[185] Henwood August 15, 2012 comments at 7.

[186] Henwood August 15, 2012 comments at 7.

[187] IOUs September 10, 2012 joint comments 26.

[188] IOUs September 10, 2012 joint comments 26.

Case: 19-30088    Doc# 11231-4    Filed: 09/09/21    Entered: 09/09/21 18:28:10    Page 69 of 100

basis) and participate in the CAISO market.[189]  We adopt the provisions in the July 18, 2012 draft joint standard contract.

Henwood also states that, overall, SDG&E has taken a more reasonable approach to telemetry than PG&E and SCE.[190]  SDG&E states, in part, at Appendix F of the draft contract that "If the nameplate rating of the Project is 1 MW or greater, a Telemetering System at the metering location may be required at the Seller's expense."  Unlike SDG&E, PG&E and SCE do not provide for different requirements for telemetry based on the size of the project.  Henwood suggests that the Commission direct all of the IOUs to utilize the approach proposed by SDG&E.

We find the differences between SDG&E's provision and PG&E's and SCE's provision justified by the differences in their underlying distribution and transmission systems.

Accordingly, we adopt the provisions in the July 18, 2012 draft joint standard contract.

## 7.    The FiT Tariffs

The IOUs filed draft tariffs on July 18, 2012.  Parties filed comments on these draft tariffs.  In response to these comments and to a January 8, 2013 ALJ ruling seeking greater uniformity among the provisions of the IOUs' tariffs, the IOUs filed revised draft tariffs on January 18, 2013.  We have reviewed these tariffs and comments.  We discuss the tariffs below.  The IOUs shall file a Tier 2 Advice Letter with tariffs (and the joint standard contract) consistent with the below 30 days following the effective date of this decision.

---

[189] IOUs September 10, 2012 joint comments 26.

[190] Clean Coalition September 10, 2012 comments at 16-17.

Case: 19-30088    Doc# 11231-4    Filed: 09/09/21    Entered: 09/09/21 18:28:10    Page
70 of 100

### 7.1. Effective Date of Tariff and Initiation of Program

In the IOUs' July 18, 2012 draft tariffs, each of the three IOUs propose a different effective date for the tariffs and start date of the FiT program. Clean Coalition and SEIA express support for a uniform effective date and program start-up. SEIA identifies PG&E's proposed tariff language as providing the most certainty and expediency to the market because it includes an effective date soon after Commission approval of the tariffs and includes a timeline for expeditious receipt of PPRs following that date.[191]

PG&E's July 18, 2012 draft tariff proposes an effective date of the first day of the calendar month following the latter of: (1) Commission approval of the FiT tariff, or (2) the standard contract with applicants being allowed to submit their PPR and associated documentation five days after the latter effective date.

In the IOUs' January 18, 2013 revised tariffs, the IOUs harmonize this provision and request that the effective date of the FiT tariffs be specified by the Commission in its final decision on the tariff and that such effective date: (1) be no earlier than the date that the Commission's approval of the tariff is final and non-appealable; and (2) add an additional approximately 60 days to provide sufficient time for the IOUs to conform their tariffs and joint standard contract to the final decision and to set up their administrative processes, systems, and materials.

---

[191] Clean Coalition September 10, 2012 comments at 3; SEIA August 15, 2012 comments at 2.

Case: 19-30088    Doc# 11231-4    Filed: 09/09/21    Entered: 09/09/21 18:28:10    Page 71 of 100

We have considered the requests by the IOUs to allow sufficient time to implement the administration of the program and the other parties' requests to expedite implementation, and we adopt the following process:

Each IOU is ordered to file a Tier 2 Advice Letter for approval of its FiT tariffs and the joint standard contract, consistent with the terms of this decision, 30 days after the effective date of this decision. Unless the Advice Letter is suspended by the Commission, this Advice Letter (and the attached tariffs and joint standard contract) will become effective 30 days after the filing date of the Tier 2 Advice Letter (Effective Date).[192] This means that the IOUs shall begin accepting PPR for projects on and after the first business day of the month that is 60 days after the Effective Date. The IOUs shall initiate the first bi-monthly program period (Period 1) on the first business day of the month that is 90 days after the Effective Date. The FiT program shall close to new applicants upon the full subscription of total program capacity.

We find the IOUs' proposed tariff language that suggests that the Effective Date be held until the tariffs or related Commission decisions are "final and non-appealable" is unreasonably vague. Instead, the tariff provisions, revised per the above, reasonably balance the need for the IOUs to accomplish administrative tasks associated with implementation of the program with Clean Coalition's and SEIA's request to initiate the program as soon as possible. The revised provision also achieves uniformity across the three IOUs.

_____

[192] As of this Effective Date, IOUs must no longer accept contracts under the AB 1969 FiT program.

In addition, SDG&E suggests that the Commission address at what point the IOUs must stop accepting contracts under the AB 1969 program.[193]  We agree that additional clarification on this matter would be helpful.  On the effective date of the new tariffs, the IOUs shall no longer accept contracts under the AB 1969 program.

Accordingly, the IOUs are directed to remove the language relating to postponing the tariff effective date until matters are "final and non-appealable." from their January 18, 2013 draft tariffs.  With that revision, we adopt the language in the January 18, 2013 draft tariffs regarding effective date.  We also adopt the January 18, 2013 draft tariff language on PPRs and program periods, revised in accordance with the above to compress the timeframe until the start of the first bi-monthly program period.

## 7.2.  Developer Experience

Regarding the provision of the tariff on Developer Experience (which is part of the Project Viability Criteria adopted in D.12-05-035), Reid states that PG&E's interpretation of Developer Experience, as requiring a member of the development team to have completed at least one project sized no more than one megawatt smaller than the proposed project, is overly restrictive. D.12-05-035 requires a showing to establish developer experience in the industry. One option for satisfying this showing includes the developer attesting that one member of the development team has completed at least one project of

---

[193] SDG&E April 8, 2013 comments at 11.

similar technology and capacity.[194]  Reid states that PG&E's distinction should be deleted as little difference exists between the complexity of a 1 MW project and, for example, a 3 MW project.[195]  We agree that PG&E's interpretation of this provision is overly restrictive.  In the revised tariffs dated January 18, 2013, the IOUs harmonized this provision and addressed Reid's concern by proposing that:

> A project less than 1 MW will be deemed to be similar capacity to a Project up to 1 MW.  A project between 1 MW to 3 MW will be deemed to be a similar capacity to a Project up to 3 MW.  For example, for a 3 MW Project, a project of similar capacity cannot be smaller than 1 MW.

We find the IOUs revised and harmonized provision satisfies the Developer Experience requirement (Project Viability Criteria) adopted in D.12-05-035 by reasonably balancing the need to promote administrative ease and the success of projects.  Accordingly, this revised provision is adopted.

### 7.3.  Cure Period for Deficient Program Participation Requests

Clean Coalition and SEIA state that a uniform method of addressing incomplete PPRs across the three IOUs would minimize confusion in the market. They prefer SCE's proposed process for addressing incomplete PPRs and suggest it should be required for all three IOUs.[196]  In the initial tariff filings dated July 18, 2012, each of the IOUs proposed a unique process for addressing

---

[194] D.12-05-035 at 69.

[195] Reid August 15, 2012 comments at 9.

[196] Clean Coalition September 10, 2012 comments at 5.

Case: 19-30088    Doc# 11231-4    Filed: 09/09/21    Entered: 09/09/21 18:28:10    Page 74 of 100

incomplete PPRs. SCE would afford the applicant, upon notice from SCE, 10 business days to cure the deficiency. PG&E would afford the applicant five business days. In contrast, SDG&E does not provide for a definitive cure period but simply states that if the PPR is incomplete, then the applicant will be asked to resubmit.

In the revised tariffs filed on January 18, 2013, the IOUs harmonized this provision and proposed a 10 business day period for applicants to cure a deficiency in a submitted PPR but limits the cure period to "minor" deficiencies so that parties do not misuse this cure period by knowingly submitting an incomplete PPR to secure a higher FiT program number.

Consistency among the IOUs on this topic promotes a streamlined program. Furthermore, a relatively short and definitive time period for resubmission of deficient PPRs ensures that deficiencies in the PPR are more in the realm of a minor technicalities rather than overarching substantive problems with project eligibility. The uniform proposal set forth in the IOUs' January 18, 2013 revised tariffs, which allows ten business days to cure a deficiency, achieves the right balance between providing the developer sufficient time to correct the noted shortcoming in its PPR and assuring that the cure period does not become a period in which to attempt overhauling a project to meet eligibility requirements. We adopt the IOUs' revised proposal, as noted in the January 18, 2013 filings, for all three IOUs.

Case: 19-30088    Doc# 11231-4    Filed: 09/09/21    Entered: 09/09/21 18:28:10    Page
75 of 100

### 7.4. Process to Confirm a FiT Eligible Electric Generation Facility

Clean Coalition states that the method used by IOUs to confirm that an applicant's generation facility meets all the requirements to be a FiT Eligible Electric Generation Facility should be specified.[197]  For example, Clean Coalition points out that SCE's July 18, 2012 draft tariff (Special Conditions - Section 1) provides that "…SCE will confirm whether the applicant's Program Participation Request is complete" but SCE does not elaborate upon this confirmation process.

In the January 18, 2013 draft tariffs, SCE and the other IOUs harmonized this provision of their tariffs.  The IOUs also added the language, "in its sole discretion."  The relevant excerpt from SDG&E's January 18, 2013 tariff is below:

> Review Period and Re-MAT Queue Number Assignment:
> Within twenty (20) business days of receiving a PPR, SDG&E, in its sole discretion, will confirm whether the Applicant's PPR is deemed complete and satisfies the Eligibility Criteria.  Applicants will be assigned a program position (Re-MAT Queue Number) once the PPR is deemed complete.  If the PPR is deemed complete, the Re-MAT Queue Number assignment will be based on the date and time that the PPR was received by SDG&E.

We will refrain from requiring IOUs to incorporate a more specific process for confirming that an applicant's generation facility meets all the requirements to be a FiT Eligible Electric Generation Facility.  We permit the IOUs some flexibility in implementing and establishing this process because this result reasonably balances our goal of streamlining the program by placing responsibility for some implementation details in the hands of the IOUs, which

---

[197] Clean Coalition September 10, 2012 comments at 5-6.

know their internal processes best, with our goal of program transparency. At this time we impose no further requirements on IOUs for this confirmation process.

Accordingly, the above tariff language is adopted.

### 7.5. Non-Disclosure Agreement

Clean Coalition states that the requirement in SCE's July 18, 2012 draft tariff (Special Conditions 1 - Section 1) that requires an applicant to submit an executed non-disclosure agreement as part of an applicant's PPR is not needed.[198]

The IOUs' January 18, 2013 draft tariffs removed this provision. It is unclear what information this non-disclosure agreement sought to protect. The IOUs do not address this matter in their January 18, 2013 filings accompanying the tariffs. For these reasons, we agree with Clean Coalition that a non-disclosure agreement is not needed.

Accordingly, the January 18, 2013 draft tariff provision (without reference to a non-disclosure agreement) is adopted. The IOUs must not require a non-disclosure agreement as part of establishing eligibility to participate in the program.

### 7.6. Re-Study Requirement and Loss of FiT Program Number

Clean Coalition states that an applicant should not lose its FiT program number if the applicant must engage in the restudy process to further

---

[198] Clean Coalition September 10, 2012 comments at 6.

interconnection.[199] Clean Coalition refers to SCE's July 18, 2012 draft tariff (Special Condition - Section 1) and requests this provision be stricken.[200] The language in SCE's tariff appears to result in the loss of a FiT program number if the applicant no longer meets any program eligibility requirements, one of which is having obtained an interconnection study or the equivalent. A similar term is found in PG&E's July 18, 2012 tariff.[201] In support of its request, Clean Coalition states that D.12-05-035 did not find that the re-study process would result in the loss of a FiT program number and that this requirement introduces an unacceptable level of risk to the process.[202]

In the IOUs' January 18, 2013 revised tariffs, this reference to the "restudy" process is removed but the relevant tariff provision continues to state that failure to meet the eligibility requirements (one of which is an interconnection or equivalent) results in the loss of the FiT program number.

> Change in Eligibility: If an Applicant and/or Project previously deemed eligible to participate in E-ReMAT no longer meets the Eligibility Criteria, the Applicant must immediately notify PG&E and shall relinquish its E-ReMAT Queue Number for the applicable PPR. The PPR will be deemed to be rejected, as described in Program Participation Request, Section E.1.e. above.

---

[199] We prefer to refer to this term as "FiT program number" while SCE's July 18, 2012 tariff refers to the term as "ReMAT Program Number."

[200] Clean Coalition September 10, 2012 comments at 6.

[201] Clean Coalition September 10, 2012 comments at 10.

[202] Clean Coalition September 10, 2012 comments at 6.

Case: 19-30088    Doc# 11231-4    Filed: 09/09/21    Entered: 09/09/21 18:28:10    Page
78 of 100

With the removal of the specific reference to the "restudy" process, Clean Coalition's concern may be addressed. We acknowledge that disputes may arise regarding an applicant's subsequent non-compliance with the program requirements, such as the interconnection study requirement, but find that, in the interest of tariff provisions with predictable outcomes, we will refrain from addressing a problem until one is presented to us.

### 7.7. Participation in Other Incentive Programs

Clean Coalition refers to both SCE's and PG&E's July 18, 2012 tariff and suggests that the restrictions on participation in FiT and either the California Solar Initiative (CSI) or the Small Generator Incentive Program (SGIP) be clarified as applying to generators rather than the owners of the generators.[203] We also take this opportunity to clarify the application of the restrictions on participation in net-energy metering (NEM). D.12-05-035 states that eligible electric generation facilities receiving service under FiT must first terminate participation in any NEM program for the same facility seeking service under FiT. D.12-05-035 further states that a generator that previously received incentives under CSI or SGIP can participate in FiT after it has been online and operational for at least 10 years from that date. Section 399.20(k) states that owners must refund any incentives. We clarify that the restrictions on participation in NEM, SGIP, and CSI apply to individual generators but the owner of the generator is ultimately responsible for remitting any necessary refund. We find that this interpretation facilitates broad participation in the FiT

---

[203] Clean Coalition September 10, 2012 comments at 7 and 9.

Case: 19-30088    Doc# 11231-4    Filed: 09/09/21    Entered: 09/09/21 18:28:10    Page
79 of 100

program and promotes administrative ease in determining the qualification of the entity seeking to participate in FiT.

Accordingly, the IOUs are directed to modify their tariffs to clarify that these restrictions on SGIP, NEM, and CSI are applicable to each generator, not the owner but that the owner is ultimately responsible for any refunds required.

### 7.8. Uniform Process for Subscription to FiT Price

SEIA states that the Commission should adopt a uniform method for the IOUs' acceptance of the price and execution of the standard PPA.[204] The IOUs' July 18, 2012 draft tariffs propose different procedures for acceptance of price and execution of the joint standard contract by an applicant. SEIA suggests the Commission adopt SDG&E's proposed process, which is a more streamlined version of processes proposed by SCE and PG&E. The IOUs' January 18, 2013 draft tariffs harmonized this process and they propose a streamlined version that reflects the July 18, 2012 proposal by SDG&E. The revised and uniform proposals present a straightforward means of implementing the subscription process and responds to the concern of lack of uniformity raised by SEIA. Accordingly, we adopt the proposed language as set forth in the IOUs' January 18, 2013 draft tariffs.

---

[204] SEIA August 15, 2012 comments at 7-8.

Case: 19-30088    Doc# 11231-4    Filed: 09/09/21    Entered: 09/09/21 18:28:10    Page
80 of 100

### 7.9. Clarification of Miscellaneous Tariff Provision

The below includes clarification to a miscellaneous tariff provision:

(1) Regarding the tariff language on the pricing structure, known as ReMAT, the IOUs are directed to clarify that, when establishing whether five different applicants exist for purposes of applying the ReMAT price adjusting mechanism, the IOUs should make this determination at the beginning of a bi-monthly period, as opposed to the end of the prior bi-monthly period.

## 8. Comments on Proposed Decision

The proposed decision of the ALJ in this matter was mailed to the parties in accordance with Section 311 of the Public Utilities Code and comments were allowed under Rule 14.3 of the Commission's Rules of Practice and Procedure. Comments were filed on April 8, 2013 and reply comments were filed on April 15, 2013. To the extent required, revisions have been incorporated to reflect the substance of these comments.

In addition, parties raised in comments whether submission of an advice letter is the appropriate means for a utility to seek authorization to procure beyond the capacity allocation for its tariffs as set forth in D.07-07-027.

We note that in D.07-07-027 the Commission authorized the IOUs to voluntarily procure megawatts in excess of the capacity allocation targets for their FiT tariffs. In that decision, the Commission authorized the IOUs to file an advice letter for such excess procurement. Accordingly, this process is available

to evaluate the projects above the capacity allocation for SCE's Schedule CREST, which were filed in Advice Letter 2870-E/E-A.[205]

## 9. Assignment of Proceeding

Mark J. Ferron is the assigned Commissioner and Regina M. DeAngelis is the assigned ALJ in this proceeding.

### Findings of Fact

1. In many instances, too few megawatts would be offered by the IOUs under the megawatt allocation process adopted in D.12-05-035, which may hinder the advancement of the program by providing insufficient opportunities for eligible projects.

2. It is reasonable to modify aspects of the ReMAT mechanism to prevent unreasonable price increases and promote administrative ease.

3. D.12-05-035 is unclear on how megawatts are added back into the FiT program after a change in circumstances, including, but not limited to, the termination of a project.

4. D.12-05-035 requires modification to indicate whether subscriptions beyond the allocated megawatts for a product type for each program period are permitted.

---

[205] We are aware that SCE has filed AL 2870-E (filed March 26, 2013) and AL 2870-E-A (filed April 22, 2013) citing the process established in D.07-07-027 for obtaining Commission review by an advice letter for FiT projects procured beyond the approved capacity allocation.

Case: 19-30088    Doc# 11231-4    Filed: 09/09/21    Entered: 09/09/21 18:28:10    Page
82 of 100

5.  Assigning a random program number to applications received within the first 5 business days of the program will minimize impact of any technical concerns.

6.  D.12-05-035 is unclear as to whether generators have the option to choose to interconnect under Rule 21 or WDAT.

7.  Implementing the seller concentration provision adopted in D.12-05-035 as a Project Viability Criterion is a complex undertaking.

8.  Insufficient justification exists to modify D.12-05-035 to: (1) rely on the generator's interconnection queue number when determining the FiT program number, and (2) remove the restriction on participation in RAM.

9.  Insufficient justification exists to modify D.12-05-035 to:

> (1) add additional megawatts into the FiT program above the amount allocated by statute;

> (2) include a price floor in the ReMAT pricing;

> (3) include a locational adder in the price as referenced in § 399.20(e) to capture the benefits of grid planning and procurement methodology;

> (4) add environmental compliance costs to the price, as set forth in § 399.20(d)(1);

> (5) refine the definition of "strategically located," as referenced in § 399.20(b)(3) to, among other things, account for a piece of equipment sometimes needed for interconnection of a project, a Direct Transfer Trip; and

> (6) extend the COD due to unpredictable interconnection delays.

10.  The draft FiT joint standard contract is lengthier than the existing FiT contracts because all relevant materials, such as attachments and forms, for each IOU are combined into one single document rather than three documents.

11.  The Commission's use of standard contracts promotes a streamlined regulatory process.

12.  Clean Coalition's proposed FiT contract, referred to as a "model contract," to be used in lieu of the draft FiT joint standard contract, was submitted late in the consideration of this issue and submitted in a manner that can be viewed as inconsistent with the process adopted by the ALJ and Assigned Commissioner.

13.  The FiT program, which includes the joint standard contract, is efficient and streamlined.  For now, a separate contract for smaller projects, 500 kW or less, is not needed.

14.  Many issues specific to bioenergy will be addressed when the Commission implements SB 1122.

15.  D.12-05-035 adopted a COD of 24 months plus a 6-month extension.

16.  The draft contract requires the seller to provide 60-day notice to the buyer before COD so that the buyer can make necessary arrangements for the scheduling of power and other administrative functions.

17.  The draft contract's damages provisions associated with the failure to meet the Guaranteed Commercial Operation Date do not hinder financing.

18.  Frequently changing key terms in contracts, such as the seller updating Contract Quantity each year, results in excessive uncertainty.

19.  The FiT program does not include a 25-year contract term.

20.  Collateral requirements in the FiT program should apply as long as ratepayers continue to be at risk.

21.  Monthly billing is a requirement in other programs and no evidence exists that monthly billing imposes an undue burden on sellers in the FiT program.

Case: 19-30088    Doc# 11231-4    Filed: 09/09/21    Entered: 09/09/21 18:28:10    Page
84 of 100

22.  As noted in the October 5, 2012 Assigned Commissioner's Ruling, review of the term "green attributes" will take place during our overall review of the RPS procurement process in this proceeding.

23.  No evidence exists to support a requirement that PG&E and SDG&E conform to SCE's proposal and act as the QREs for WREGIS purposes for all FiT projects. Certain exceptions exist for smaller projects.

24.  The FiT program provides the developers with various options regarding seeking Fully Deliverable status.

25.  A cap of the costs associated with complying with changes in the law during the term of the contract is needed to share the risk of those costs.

26.  The FiT program offered under the draft joint standard contract is only available to sellers that are QFs.  Sellers are responsible for completing all necessary documents with FERC.

27.  Section 5.3.2 of the draft FiT joint standard contract is sufficiently clear.

28.  Section 5.3.8 of the draft FiT joint standard contract appropriately applies to sellers, as potentially the less sophisticated party.

29.  Section 5.3.9 of the draft FiT joint standard contract does not prohibit or even address sales to buyers not covered by the FiT program.

30.  Section 5.3.12 and 5.3.13 of the draft FiT joint standard contract promote administrative ease by providing a reasonable means of ensuring that FiT contracts proceed in an expeditious and non-controversial fashion.

31.  The safety related benefits derived from maintaining a daily log of material operations and maintenance by sellers outweighs the burdens of this requirement.

Case: 19-30088    Doc# 11231-4    Filed: 09/09/21    Entered: 09/09/21 18:28:10    Page
85 of 100

32.  Section 6.12 of the draft FiT joint standard contract provides a reasonable balance between ensuring the timely exchange of information between the contracting parties to support efficient and safe transactions and streamlining the contracting process to meet the specific needs of FiT developers.

33.  Section 6.12.3 of the draft FiT joint standard contract is not overly burdensome but, instead, it achieves a reasonable balance between the buyer's need for information to ensure compliance with laws related to WMDVBE and the seller's need to assist with the compliance of such laws.

34.  IOUs should not pay for any work related to the IOUs' requests to sellers related to WMDVBE.

35.  By requiring the seller to obtain the buyer's consent before making any modifications to its facility, Section 6.14 of draft FiT joint standard contract imposes an unreasonably vague burden on the seller.  The benefits, if any, of such a requirement are outweighed by the goal of streamlining the contracting process for projects under the FiT program. Buyer's consent of material modifications promotes the interests of the contracting parties.

36.  The insurance provisions in Section 10 of the draft FiT joint standard contract are appropriate based on the risks to ratepayers throughout the contracting term.

37.  The record is currently insufficiently developed on the issue that Section 11 of the draft FiT joint standard contract (the 1-year period for Force Majeure that triggers contract termination) does not appropriately take into consideration Force Majeure events at dairy and other biogas projects, such as catastrophic animal disease.

Case: 19-30088    Doc# 11231-4    Filed: 09/09/21    Entered: 09/09/21 18:28:10    Page
86 of 100

38.  No evidence exists that Section 12 of the draft FiT joint standard contract, Guaranteed Energy Production, hinders seller financing.  Instead, the provision reasonably balances the buyer's and seller's interests.

39.  Consistent with D.11-11-012, appropriate protections are afforded by a lower amount for project development security, $20/kW for all eligible FiT projects, and IOUs should be allowed to maintain the collateral requirement through the term of the contract.

40.  The letter of credit requirements in the draft FiT standard contract reasonably balance the need to protect ratepayers from risk of loss with the need to provide developers with increased access to more banks in order to secure financing.

41.  No new evidence was presented regarding the reasonableness of the termination rights set forth in Section 14.9 of the draft FiT joint standard contract that refer to Network Upgrade Costs exceeding $300,000.

42.  The 60 days provision in Section 14.9 of the draft FiT joint standard contract is a reasonable balance between the desire for certainty by the parties regarding the terms of the transaction, verifying transmission costs, and researching options available to the parties going forward.

43.  Providing the seller with the option of paying the buyer a reasonable fee for the forecasting service furthers our goal of streamlining the FiT contracting process by reducing the burden on the small developers without subjecting ratepayers to additional costs or risks.

44. IOUs are operating within the law in recording conversations, as set forth in Section 16.2 of the draft FiT joint standard contract and the recording of conversations is a reasonable means of minimizing disputes involving and managing the public safety aspects of scheduling energy.

Case: 19-30088    Doc# 11231-4    Filed: 09/09/21    Entered: 09/09/21 18:28:10    Page
87 of 100

45.  Because assignment transfers all the rights and responsibilities to a third-party, we find reasonable the need set forth in Section 17 of the draft FiT joint standard contract to obtain the consent of buyer rather than just notifying buyer.

46.  Section 17 of the draft FiT joint standard contract, as revised herein, promotes administrative ease by reasonably balancing the seller's need for flexibility to assign the contract with the buyer's need to ensure that the assignee is able to perform as required under the contract.

47.  Consent to assignment should not be unreasonably withheld.

48.  The arbitration provision in Section 19.1 of the draft FiT joint standard contract reasonably balances the goal of streamlining the administration of FiT contracts with providing the opportunity to successfully develop projects.

49.  The objectives of a standard contract are, generally, to promote administrative ease, reduce transaction costs, and protect the rights of the parties and, if amendments are permitted to the FiT joint standard contract, on even seemly minor matters, our efforts to balance these objectives may be compromised.

50.  No amendments to the FiT joint standard contract will be permitted, with the exception of administrative amendments, unless Commission approval of the contract, as modified, is obtained.

51.  The IOUs' proposal that FiT projects under 500 kW aggregate telemetry costs and to limit those costs with a $20,000 cap balances the CAISO's need for visibility of these generators with the developer's need to limit costs on telemetry. The differences between SDG&E's provision versus PG&E's and SCE's provision is based on differences in their underlying distribution and transmission systems.

Case: 19-30088    Doc# 11231-4    Filed: 09/09/21    Entered: 09/09/21 18:28:10    Page
88 of 100

52.  The language in the January 18, 2013 draft tariffs that the tariff shall become effective when "final and non-appealable" is unreasonably vague.

53.  The January 18, 2013 draft tariff provision satisfies the Developer Experience requirement (Project Viability Criteria) adopted in D.12-05-035 by reasonably balancing the need to promote administrative ease and the success of projects.

54.  The uniform proposal set forth in the IOUs' January 18, 2013 tariffs, which allows 10 business days to cure a "minor" deficiency in a PPR, achieves the right balance between providing the developer sufficient time to correct the noted shortcoming and assuring that the cure period does not become a period in which generators attempt to overhaul a project to meet eligibility requirements.

55.  Permitting the IOUs some flexibility in implementing and establishing a process for determining whether an applicant's generation facility meets all the requirements to be a FiT Eligible Electric Generation Facility reasonably balances our goal of streamlining the program by placing responsibility for some implementation details in the hands of the IOUs, which know their internal processes best, with our goal of transparency.

56.  No evidence exists that the IOUs should require a non-disclosure agreement as part of establishing eligibility to participate in the program.

57.  Applicant should not lose its FiT program number because it must engage in a re-study process as part of its interconnection process but other factors may lead to this result; the draft FiT joint standard contract reasonably establishes a process by which eligibility may be maintained if the applicant, not ratepayers, fund any network upgrades exceeding $300,000 resulting from any re-study process.

58.  To properly implement § 399.20(k), which states that owners must refund any incentives, the restrictions on participation in NEM, SGIP, and CSI applies to individual generators but the owner of the generator is ultimately responsible for remitting any necessary refund.

59.  The IOUs' January 18, 2013 draft tariffs present a straightforward means of implementing the subscription process.

60.  D.07-07-027 stated that utilities could voluntarily purchase energy consistent with the FiT program from projects beyond the capacity allocation.

61.  D.07-07-027 required Commission review, via advice letter, of utility purchases of FiT program energy beyond the capacity allocation.

62.  SCE's Advice Letter 2870-E/E-A seeks Commission approval of FiT contracts beyond the capacity allocation.

## Conclusions of Law

1.  The July 31, 2012 *Petition of the Solar Energy Industries Association for Modification of Decision 12-05-035* and the November 13, 2012, *Clean Coalition and California Solar Energy Industries Association Petition for Modification of D.12-05-035* should be granted, in part.  As a result, the process used by IOUs to offer megawatts during each bi-monthly period should be modified as described herein in an effort to make more megawatts available earlier in the program.

2.  The ReMAT mechanism should be modified to protect against unreasonable price increases and to promote administrative ease.

3.  A total price period adjustment cap of $12 should be adopted.

4.  Certain conditions for triggering a price adjustment should be modified such that a price decrease is triggered if the total capacity of the projects for which the applicants have indicated they would be willing to execute a ReMAT PPA based on the applicable contract price for a period is at least 100% of the

capacity allocation for that period; and a price increase is triggered if the total capacity of the projects for which applicants have indicated a willingness to execute a ReMAT PPA based on the applicable contract price for a period is less than 20% of the capacity allocation for that period.

5.  The duration of the program should remain fixed, but D.12-05-035 should be modified to establish the end date at 24 months after the first product type goes to zero MW or goes to a *de minimis* amount approaching zero.

6.  D.12-05-035 should be clarified such that each IOU should publicly notice on the first business day of each bi-monthly program period, and on the date that the tariffs and standard contracts adopted herein are effective, the number of megawatts that will be offered in the next bi-monthly period for each product type, the number of megawatts remaining for each product type, and the total number of megawatts remaining in the IOU's FiT program.

7.  The July 31, 2012 *Petition of the Solar Energy Industries Association for Modification of Decision 12-05-035* should be granted in part.  As a result, the process for adding megawatts back into the FiT program after a change in circumstances, including, but not limited to, the termination of a project, is clarified to require IOUs to place the megawatts back into the product type of the terminated project unless the terminated project was initiated under the D.07-07-027 and AB 1969 program, in which case, IOUs should be required to place the megawatts back into the IOU's total program capacity to be equally divided among the three product types.

8.  The July 31, 2012 *Petition of the Solar Energy Industries Association for Modification of Decision 12-05-035* should be granted in part.  As a result, D.12-05-035 should be modified to include the requirement that subscriptions beyond the allocated amount will not be permitted.

9.  The July 31, 2012 *Petition of the Solar Energy Industries Association for Modification of Decision 12-05-035* should be granted in part.  As a result, D.12-05-035 should be clarified to mean that if both federal and state interconnection tariffs are applicable in a given situation, the developer is permitted to choose whether to proceed under Rule 21 or the federal wholesale tariffs until the Commission makes a determination otherwise.

10. The July 31, 2012 *Petition of the Solar Energy Industries Association for Modification of Decision 12-05-035* should be granted in part.  As a result, D.12-05-035 should be modified to remove the seller concentration provision as it is overly complex to implement.

11. The July 31, 2012 *Petition of the Solar Energy Industries Association for Modification of Decision 12-05-035* should be denied, in part, as insufficient justification exists to modify D.12-05-035 to:  (1) rely on the generator's interconnection queue number when determining the FiT program number, and (2) remove the restriction on participation in RAM.

12. The November 13, 2012 *Clean Coalition and California Solar Energy Industries Association Petition for Modification of D.12-05-035* should be denied as to the following requests:

(1)  add additional megawatts into the FiT program above the amount allocated by statute;

(2)  include a price floor in the ReMAT pricing;

(3)  include a locational adder to the price;

(4)  add environmental compliance costs to the price, as set forth in § 399.20(d)(1);

(5)  refine the definition of "strategically located," as referenced in § 399.20(b)(3) to, among other things, account for a piece of equipment sometimes

- 88 -

needed for interconnection of a project, a Direct
Transfer Trip; and

(6) extend the COD due to unpredictable
interconnection delays.

13. The length of the FiT joint standard contract is reasonable because, while the joint contract is now longer than any one of the IOU's pre-existing contracts, the benefits of a single joint standard contract instead of three separate contracts are significant.

14. The use of a standard contract for the FiT program is reasonable as it promotes a streamlined regulatory process.

15. The cost of power procured by PG&E, SCE, and SDG&E through the tariffs/standard contracts authorized by this decision and D.12-05-035 (as modified by D.13-01-041) are reasonable and recoverable in rates subject to Commission review of the administration of these contracts.

16. The contract filed by Clean Coalition on August 15, 2012, referred to as a "model contract," should be denied.

17. The draft FiT joint standard contract should not be modified to reflect specific characteristics of bioenergy projects because more record development is needed and these matters will be appropriately addressed when the Commission implements SB 1122.

18. Changes to the COD adopted in D.12-05-035 are not reasonable except to require a single 6-month extension because no new information was otherwise presented.

19. It is reasonable to request that the seller provide 60-day notice to the buyer before COD so that the buyer can make necessary arrangements for the scheduling of power and other administrative functions.

Case: 19-30088    Doc# 11231-4    Filed: 09/09/21    Entered: 09/09/21 18:28:10    Page
93 of 100

20.  The draft contract's provision related to damages for failure to meet the Guaranteed Commercial Operation Date appropriately balances the need to protect ratepayers from project failure by including actual damages when the party fails to perform and our effort to streamline project financing by clearly stating the potential costs associated with the contract.

21.  The FiT program offers a 5, 10, and 20-year contract term and it is not reasonable to offer a 25-year contract term because § 399.20 does not include a 25-year contract term.

22.  It is reasonable to maintain collateral requirements after the COD because ratepayers continue to be at risk.

23.  Monthly billing is reasonable because, while developers may gain slight administrative efficiencies from longer billing periods, greater benefits will be achieved over the term of the contract with the more frequent monthly billing.

24.  Review of the *green attributes* term is more appropriately addressed during the Commission's overall review of the RPS procurement process in this proceeding.

25.  Based on differences in their internal processes, it is not reasonable to require PG&E and SDG&E to conform to SCE's proposal and act as the QREs for WREGIS purposes for all of their FiT projects.

26.  Developers have the option to seek Fully Deliverable status.  Developers are obliged to follow the rules of other jurisdictions, such as the CAISO, and to obtain Fully Deliverable status if not burdensome.

27.  The Compliance Expenditure Cap of $25,000 yearly for costs related to changes in CEC Pre-Certification, CEC Certification or CEC Verification during the term of the contract and pertaining to ensuring the energy is from an eligible renewable energy resource is reasonable.

Case: 19-30088   Doc# 11231-4   Filed: 09/09/21   Entered: 09/09/21 18:28:10   Page 94 of 100

28. Sellers should formally obtain QF status through FERC to reduce the uncertainties in the contracting process.

29. Because Section 5.3.2 of the draft FiT joint standard contract is sufficiently clear, it is not necessary to clarify how the provision applies to hydro projects.

30. Section 5.3.8 of the draft FiT joint standard contract does not need modification because the provision should not also be applicable to buyers.

31. Section 5.3.9 of the draft FiT joint standard contract does not need modification because the provision does not prohibit sales to other buyers.

32. Section 5.3.12 and 5.3.13 of the draft FiT joint standard contract do not need modification as these terms promote administrative ease by providing a reasonable means of ensuring that FiT contracts proceed in an expeditious and non-controversial fashion.

33. Section 6.5.1 of the draft FiT joint standard contract does not require modification because the safety related benefits derived from maintaining a daily log of material operations and maintenance by sellers outweighs the burdens of this requirement.

34. Section 6.12 of the draft FiT joint standard contract does not require modification because the provision provides a reasonable balance between ensuring the timely exchange of information between the contracting parties to support efficient and safe transactions and streamlining the contracting process to meet the specific needs of FiT developers.

35. Section 6.12.3 of the draft FiT joint standard contract does not require modification because the provision is not overly burdensome but, instead, it achieves a reasonable balance between the buyer's need for information to ensure compliance with laws related to WMDVBE and the seller's need to assist with the compliance of such laws.

36.  Section 6.14 of the draft FiT joint standard contract, which requires the seller to obtain the buyer's consent before making any modifications to its facility, should be removed as the provision imposes an unreasonably vague burden on the seller.  The contact provision recommended by SCE which only requires buyer's consent when the modification is material is reasonable as it protects the interests of the contracting parties.

37.  The insurance provisions in Section 10 of the draft FiT joint standard contract do not require modification, except to provide the seller with 60 days to provide evidence of insurance, because the provisions reasonably reflect the risks to ratepayers throughout the contracting term.

38.  It is reasonable to review Section 11 of the draft FiT joint standard contract (the 1-year period for Force Majeure that triggers contract termination) in the proceeding when the Commission implements SB 1122.

39.  Section 12 of the draft FiT joint standard contract, Guaranteed Energy Production, does not require modification as the provision reasonably balances the buyer's need to have a high level of certainty regarding the expected generation and the seller's need for flexibility to account for unknowns by permitting a specific amount of over- or under-generation.

40.  It is reasonable to require Section 13 of the draft FiT joint standard contract be modified, consistent with D.11-11-012, to include a lower amount for project development security, $20/kW for all eligible FiT projects, and allow IOUs to maintain the collateral requirement through the term of the contract.

41.  The letter of credit requirements in Section 13.6 of the draft FiT joint standard contract should be modified to reasonably balance the need to protect ratepayers from risk of loss with the need to provide developers with increased access to more banks in order to secure financing.

Case: 19-30088    Doc# 11231-4    Filed: 09/09/21    Entered: 09/09/21 18:28:10    Page
96 of 100

42. The 60 days provision in Section 14.9 if the draft FiT joint standard contract does not require modification because it reasonably balances the desire for certainty by the parties regarding the terms of the transaction, verifying transmission costs, and researching options available to the parties going forward.

43. It is reasonable to modify Section 15 and Appendix D of the draft FiT joint standard contract to provide sellers with the option of paying buyer a reasonable fee for the forecasting service as this outcome furthers the Commission's goal of streamlining the FiT contracting process by reducing the burden on the small developers without subjecting ratepayers to additional costs or risks.

44. Section 16.2 of the draft FiT joint standard contract should not be modified because IOUs are operating within the law in recording conversations and recording of conversations is a reasonable means of minimizing disputes involving and managing the public safety aspects of scheduling energy.

45. Section 17 of the draft FiT joint standard contract does not require modification because it promotes administrative ease by reasonably balancing the seller's need for flexibility to assign the contract with the buyer's need to ensure that the assignee is able to perform as required under the contract. Consent to assignment should not be unreasonably withheld.

46. The arbitration provision in Section 19.1 of the draft FiT joint standard contract does not require modification as it reasonably balances the goal of streamlining the administration of FiT contracts with providing developers the opportunity to successfully develop projects.

47. The draft FiT joint standard contract should be modified, including Section 20.3, so that no amendments to the contract are permitted, with the

Case: 19-30088   Doc# 11231-4   Filed: 09/09/21   Entered: 09/09/21 18:28:10   Page
97 of 100

exception of administrative amendments, unless Commission approval of the contract, as modified, is obtained.

48.  No modification to Appendix F of the draft FiT joint standard contract is required as the IOUs' proposal to aggregate the telemetry costs for projects under 500 kW aggregate and to limit those costs with a $20,000 cap is a reasonable means of achieving the CAISO's need for visibility of these generators by providing the data needed so that these small generators can be scheduled (on an aggregate basis) and participate in the CAISO market.

49.  The tariff will become effective consistent with the rules applicable to Tier 2 Advice Letters.  Upon the effective date of the tariff, no contracts will be accepted under the AB 1969 FiT tariffs.

50.  The unreasonably vague language in the January 18, 2013 draft tariffs that the tariff shall become effective when "final and non-appealable" should be removed.

51.  The January 18, 2013 draft tariff provision on Developer Experience (Project Viability Criteria) is reasonable as it is consistent with D.12-05-035.

52.  The proposal set forth in the IOUs' January 18, 2013 draft tariffs, which allows 10 business days to cure a "minor" deficiency in a PPR, reasonably balances the need to provide the developer sufficient time to correct the noted shortcoming in its PPR and to assure that the cure period does not become a period in which to attempt overhauling a project to meet eligibility requirements.

53.  The proposal set forth in the IOUs' January 18, 2013 draft tariffs, permitting the IOUs some flexibility in implementing and establishing a process for determining whether an applicant's generation facility meets all the requirements to be a FiT Eligible Electric Generation Facility reasonably balance the goal of streamlining the program by placing responsibility for some

Case: 19-30088    Doc# 11231-4    Filed: 09/09/21    Entered: 09/09/21 18:28:10    Page 98 of 100

implementation details in the hands of the IOUs, which know their internal processes best, with the goal of program transparency.

54.  The January 18, 2013 draft tariff language without reference to a non-disclosure agreement is reasonable as no evidence exists that IOUs should require a non-disclosure agreement as part of establishing eligibility to participate in the program.

55.  It is reasonable to remove the provision in the IOUs' January 18, 2013 draft tariffs that references the "restudy" interconnection process.  If the "restudy" interconnection process shows that the project requires network upgrades exceeding $300,000, Section 14.2 of the draft FiT standard contract ensures that ratepayers bear no risk associated with such excess costs.

56.  To facilitate broad participation in the FiT program and promote administrative ease in determining the qualification of the entity seeking to participate in FiT, it is reasonable to find that restrictions on NEM, SGIP, and CSI apply to individual generators but the owner of the generator is ultimately responsible for remitting any necessary refund.

57.  The language in the IOUs' January 18, 2013 draft tariffs which harmonized the process for subscription to the FiT price is reasonable as it presents a straightforward means of implementing the subscription process.

58.  An Advice Letter is appropriate for review of utility requests to voluntarily purchase energy under the FiT program beyond the capacity allocation.

59.  The Advice Letter process is appropriate for SCE's Advice Letter 2870-E/E-A.

Case: 19-30088    Doc# 11231-4    Filed: 09/09/21    Entered: 09/09/21 18:28:10    Page 99 of 100

# O R D E R

**IT IS ORDERED** that:

1. The Pacific Gas and Electric Company, Southern California Edison Company, and San Diego Gas & Electric Company shall each file a Tier 2 Advice Letter for approval of the § 399.20 Feed-In Tariff (FiT) joint standard contract and tariffs 30 days after the effective date of this decision. The FiT joint standard contract shall be consistent with the July 18, 2012 filing as modified herein. The FiT tariffs shall be consistent with the January 18, 2013 filings as modified herein.

2. The July 31, 2012 *Petition of the Solar Energy Industries Association for Modification of Decision 12-05-035* is granted, in part.

3. The November 13, 2012, *Clean Coalition and California Solar Energy Industries Association Petition for Modification of D.12-05-035* is granted, in part.

4. Rulemaking 11-05-005 remains open.

This order is effective today.

Dated May 23, 2013, at San Francisco, California.

MICHAEL R. PEEVEY
President
MICHEL PETER FLORIO
CATHERINE J.K. SANDOVAL
MARK J. FERRON
CARLA J. PETERMAN
Commissioners

Case: 19-30088   Doc# 11231-4   Filed: 09/09/21   Entered: 09/09/21 18:28:10   Page 100 of 100