KELLER BENVENUTTI KIM LLP
Tobias S. Keller (#151445)
(tkeller@kbkllp.com)
Jane Kim (#298192)
(jkim@kbkllp.com)
David A. Taylor (#247433)
(dtaylor@kbkllp.com)
650 California Street, Suite 1900
San Francisco, CA 94108
Tel: 415 496 6723
Fax: 650 636 9251

GOUGH & HANCOCK LLP
Gayle L. Gough (#154398)
(gayle.gough@ghcounsel.com)
Laura L. Goodman (#142689)
(laura.goodman@ghcounsel.com)
50 California Street, Suite 1500
San Francisco, CA 94111
Tel: 415.848.8918

*Attorneys for Debtors and Reorganized Debtors*

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION,**<br><br>- and -<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br><br>                            **Debtors.**<br><br>☐ Affects PG&E Corporation<br>☒ Affects Pacific Gas and Electric Company<br>☐ Affects both Debtors<br><br>*\* All papers shall be filed in the Lead Case, No. 19-30088 (DM).* | Bankruptcy Case No. 19-30088 (DM)<br><br>Chapter 11<br><br>(Lead Case) (Jointly Administered)<br><br>**REORGANIZED DEBTORS' OPPOSITION TO MOTION FOR RELIEF FROM PLAN INJUNCTION, TO COMPEL ARBITRATION AND/OR FOR ABSTENTION**<br><br>[Relates to Docket No. 11066]<br><br>Date:   September 29, 2021<br>Time:  10:00 a.m. (Pacific Time)<br>Place:  (Tele/Videoconference Appearances Only)<br>        United States Bankruptcy Court<br>        Courtroom 17, 16th Floor<br>        San Francisco, CA 94102 |

# Table of Contents

I.     PRELIMINARY STATEMENT ................................................................................ 1

II.    BACKGROUND ................................................................................................... 3

       A.    The Proof of Claim ........................................................ **Error! Bookmark not defined.**

       B.    Facts ................................................................................................... 5

       C.    PG&E's Objection to the Claims ................................................................ 7

III.   ARGUMENT ........................................................................................................ 8

       A.    The Scope of the Arbitration Provision is Exceedingly Narrow ..................... 8

       B.    Resolution of the Fulcrum Claim is a Core Proceeding ............................... 11

       C.    Fulcrum Must Show Cause to Modify the Plan Injunction ........................... 13

       D.    The *Curtis* Factors Favor the Court's Exercise of Its Discretion to Determine the
             Legal Issues Before Sending the "Cost Estimate" to Arbitration ................... 14

       E.    Abstention Is Not Warranted ................................................................... 15

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**<u>Table of Authorities</u>**

**Cases**

*Bono v. David*, 147 Cal. App. 4th 1055 (2007) ...............................................................................8, 9

*Brayton Purcell LLP v. Recordon & Recordon*, 2006 U.S. Dist. LEXIS 82145 (N.D. Cal. Oct. 31, 2006) .......................................................................................................................................8

*Christensen v. Tucson Estates, Inc. (In re Tucson Estates, Inc.)*, 912 F.2d 1162 (9th Cir. 1990)...............................................................................................................................................13, 16

*Continental Ins. Co. v. Thorpe Insulation Co. (In re Thorpe Insulation Co.)*, 671 F.3d 1011 (9th Cir. 2012) ...................................................................................................................12, 13, 15

*Durkin v. Benedor Corp. (In re G.I. Indus. Inc.)*, 204 F.3d 1276 (9th Cir. 2000) ..................................12

*Freeman v. State Farm Mut. Auto Ins. Co.*, 14 Cal. 3d 473 (1975)..........................................................9

*Goldman Sachs & Co. v. City of Reno*, 747 F.3d 733 (9th Cir. 2014).......................................................8

*Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287 (2010) ..........................................................8

*Hacienda Hotel v. Culinary Works Union*, 175 Cal. App. 3d 1127 (1985)............................................11

*Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149 (3d Cir. 1989) ................12

*Hopkins & Carley, ALC v. Thompson Elite,* 2011 U.S. Dist. LEXIS 38396 (N.D. Cal. Apr. 6, 2011)....9

*In re Conejo Enterprises, Inc.*, 96 F.3d 346 (9th Cir. 1996)............................................................13, 15

*In re Curtis*, 40 B.R. 795 (Bankr. D. Utah 1984) ...................................................................................14

*In re Ebell Media, Inc.*, 2010 U.S. Dist. LEXIS 151886 (C.D. Cal. Mar. 30, 2010).......................12, 15

*In re Farmland Indus., Inc.*, 309 B.R. 14 (Bankr. W.D. Mo. 2004) ........................................................16

*In re Plumberex Specialties Prods., Inc.*, 311 B.R. 551 (Bankr. C.D. Cal. 2004).................................13

*In re SquareTwo Fin. Servs. Corp.*, 2017 Bankr. LEXIS 2570 (Bankr. S.D.N.Y. Sept. 11, 2017)........13

*J.W. McClenahan Co. v. Mech. Techs. Corp.*, 2020 U.S. Dist. LEXIS 71064 (N.D. Cal. Apr. 21, 2020) ................................................................................................................................................12

*Kronemyer v. Am. Contrs. Indem. Co. (In re Kronemyer)*, 405 B.R. 915 (B.A.P. 9th Cir. 2009)..........14

*Law Offices of John F.L. Hebb v. Ateco, Inc. (In re Ateco, Inc.)*, 2013 Bankr. LEXIS 4644 (B.A.P. 9th Cir., July 15, 2013) .......................................................................................................................8

*McCleskey v. Stockton (In re Stockton)*, 2005 Bankr. LEXIS 3375 (B.A.P. 9th Cir. June 22, 2005) ................................................................................................................................................12, 14

*Mundi v. Union Sec. Life Ins. Co.*, 555 F.3d 1042 (9th Cir. 2009)...........................................................8

*Parker v. Twentieth Century-Fox Film Corp.*, 118 Cal. App. 3d 895 (1981)......................................9, 10

*Radnet, Inc. v. Travelers Prop. Cas. Co. of Am.*, 2012 U.S. Dist. LEXIS 199677 (C.D. Cal. Feb. 21, 2012) .......................................................................................................................................9

*Rice v. Downs*, 248 Cal. App. 4th 175 ......................................................................................................9

*Schulman v. California (In re Lazar)*, 237 F.3d 967 (9th Cir. 2001).......................................................16

*Security Farms v. International Bhd. of Teamsters*, 124 F.3d 999 (9th Cir. 1997)..................................16

*Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716 (9th Cir. 1999) ......................................................................9

*Titolo v. Cano*, 157 Cal. App. 4th 310 (2007) .........................................................................................8

*Victoria v. Superior Court*, 40 Cal. 3d 734 (1985) ..................................................................................9

Case: 19-30088    Doc# 11263    Filed: 09/15/21    Entered: 09/15/21 19:57:26    Page 3 of 21

**Statutes**

11 U.S.C. § 362(d)(1) ................................................................................................ 13, 16

11 U.S.C. § 522(f) .......................................................................................................... 14

28 U.S.C. § 157(b)(2) ..................................................................................................... 12

28 U.S.C. § 1334(c) ....................................................................................................... 16

Cal. Code Civ. Proc. § 1281.2 ....................................................................................... 13

PG&E Corporation ("**PG&E Corp.**") and Pacific Gas and Electric Company (the "**Utility**"), as debtors and reorganized debtors (collectively, "**PG&E**" or the "**Debtors**" or as reorganized pursuant to the Plan (as defined below), the "**Reorganized Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), respectfully submit this opposition (the "**Opposition**") to the Motion for Relief from Plan Injunction, to Compel Arbitration and/or for Abstention [Docket No. 11066] (the "**Motion**") filed by Fulcrum Credit Partners LLC ("**Fulcrum**") as transferee[1] of Proof of Claim No. 58562 (the "**Proof of Claim**") filed by Tuscan Ridge Associates, LLC ("**TRA**"). Fulcrum seeks relief from the plan injunction to prosecute the claims asserted in the Proof of Claim (the "**Claim**") in arbitration. In support of the Opposition, the Reorganized Debtors submit the Declaration of Laura L. Goodman, filed contemporaneously herewith.

## PRELIMINARY STATEMENT

Nearly two years after TRA filed its Proof of Claim, Fulcrum as the transferee of TRA's claims moves the Court for relief from the plan injunction to compel arbitration based on a narrow provision in the parties' November 18, 2018 License Agreement ("**Letter Agreement**"). That provision expressly limits the authority of the arbitrator to "estimating costs" for restoration of property.[2] The arbitrator has no authority to determine the relevant predicate legal and equitable claims and defenses in this dispute, which determinations are absolutely necessary before any determination of estimated restoration costs. The Court's determination of the legal and equitable claims may render any arbitration of "cost estimates" unnecessary.

Fulcrum brings claims against PG&E for breach of contract under the Letter Agreement and consequential damages, along with claims for trespass and waste. PG&E denies that it breached the Letter Agreement and claims that PG&E's performance of its restoration obligations were excused and prevented by TRA's conduct in immediately letting the property to a third-party contractor for Cal Recycle (defined below) for the extensive excavation, construction and use of the entire property.

---

[1] *See* Docket No. 10437.

[2] TRA did not file an action in state court nor did it file a petition to compel arbitration prior to the Motion. Indeed, it never demanded arbitration in its Proof of Claim nor did it raise any objections when the confirmation of the Debtors' Plan (defined below) was being actively litigated, and when it would have had the opportunity to object to the terms of the Plan Injunction.

TRA and ECC (defined below) made full use of the PG&E improvements and provided for the same in their lease agreement entitling PG&E to a setoff. PG&E also asserts that TRA breached the implied covenant of good faith and fair dealing with respect to the Letter Agreement. PG&E denies that it committed trespass or waste. PG&E denies that TRA has suffered any damage.

None of these legal and equitable claims can be decided by the arbitrator under the arbitration provision in the Letter Agreement. Fulcrum's claims and PG&E's defenses to those claims present significant non-arbitrable matters and the single arbitral issue is one that comes into play *only if and after* liability is determined by the Court. The Court should first determine the extensive non-arbitrable legal and equitable claims and defenses and order arbitration later in the event that the Court finds that Fulcrum is to be awarded certain restoration costs such that a "cost estimate" arbitration is necessary.

Fulcrum requests, in the alternative, that the Court abstain from deciding its claims altogether, purporting to rely on principles of comity and efficiency. When coupled with its petition to compel arbitration, Fulcrum's motion is no more than inartful forum shopping. None of Fulcrum's claims nor any of PG&E's defenses thereto are based on any specialized aspect of California law that this Court is incapable of determining and which it frequently applies to determine claims as a matter of course. This Court is in the best position to hear and determine the merits of the parties' claims which, in turn, will avoid piecemeal litigation and provide both parties with a final determination in an efficient and effective manner. Should the Court determine that PG&E is liable for certain "restoration costs," if any, the parties can proceed to arbitrate the amount of those costs pursuant to the parties' agreement. If the Court determines that PG&E has no liability to Fulcrum, there will be no need for arbitration and the claim will be disallowed.

For the reasons set forth herein, in the event that Court determines that the arbitration provision is enforceable as to the discrete "cost estimate" issue referenced therein, PG&E asserts that the Court should first determine the parties' respective legal and equitable claims and make its legal liability determinations in this matter, including whether PG&E caused damages or has any liability to TRA, in light of PG&E's legal and equitable defenses, and any proportionate reduction of such liability under the Letter Agreement or otherwise. After those determinations are made, if the Court finds that PG&E

is liable for certain restoration costs, the amount of such costs can be determined by arbitration. There is simply no reasonable basis for the Court to abstain from exercising its jurisdiction and determining this matter. Abstaining from this matter will not result in a prompt and efficient determination of the Claim but rather will result in time-consuming, unduly expensive, piecemeal, and potentially unnecessary litigation.

## BACKGROUND

On January 29, 2019 (the "**Petition Date**"), the Debtors commenced with the Court voluntary cases under chapter 11 of the Bankruptcy Code. Prior to the Effective Date (as defined below), the Debtors continued to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner was appointed in either of the Chapter 11 Cases. The Chapter 11 Cases are being jointly administered for procedural purposes only pursuant to Bankruptcy Rule 1015(b).

By Order dated June 20, 2020 [Dkt. No. 8053], the Bankruptcy Court confirmed the *Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization Dated June 19, 2020* (as may be further modified, amended or supplemented from time to time, and together with any exhibits or schedules thereto, the "**Plan**"). The Effective Date of the Plan occurred on July 1, 2020 (the "**Effective Date**"). *See* Dkt. No. 8252.

The Plan enjoins any person or entity from, among other things, "(i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, any proceeding in a judicial, arbitral, administrative, or other forum) against or affecting, directly or indirectly, a Debtor, a Reorganized Debtor, or an estate or the property of any of the foregoing, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this subsection (i) or any property of any such transferee or successor." Plan at § 10.6.

### A.    The Proof of Claim

TRA, through its counsel at Downey Brand, LLP, filed its Proof of Claim against the Utility on

October 17, 2019, for "at least $9,500,000 to $12,000,000 according to proof." [Exh. A, p. 2.][3] Declaration of Laura L. Goodman ("**Goodman Decl.**").] TRA alleges that it owns 172 acres that includes a golf course located at 3100 Skyway Road in Paradise, California. It claims that Butte County had zoned the Property for a future planned unit development, including residential use "provided that the golf course is also maintained." [Exh. A, Attachment 1, p. 1.] TRA alleges "[e]verything was on track to commence the work of developing the Property in or around the Spring of 2019." [*Id.*] TRA alleges that it had licensed a portion of the Property from September 9, 2018, to November 8, 2018, to PG&E for its wildfire risk reduction operations that allowed PG&E to use the driving range area for staging vehicles, landing helicopters and storing equipment, supplies and materials. [*Id.*] TRA alleges that the Camp Fire occurred "in the midst of PG&E vacating the site" on November 8, 2018. [*Id.*]

TRA alleges that, without informing TRA and without TRA's consent, PG&E "commandeered" the Property by "unlawfully trespassing and taking over possession of about 53 acres of the Property for use as a base camp." [*Id.*] It also alleges that, "[u]pon informing TRA of the need to expand its footprint on the site, PG&E contracted with one of [TRA's] members to grade large sections of the golf course, and dump a layer of base rock covering much of the Property" which "effectively destroyed the golf course." [*Id.*] It alleges that "based on assurances from PG&E that it would restore the Property to its original condition" a new license agreement was reached. [*Id.*]

TRA asserts a claim for restoration under the Letter Agreement in the amount of $8,824,989 but reserves the right to amend this claim and assert a greater amount if the costs of restoration increase. It further alleges that the amount of the Claim will likely increase with the passage of time and that TRA's consequential damages will continue to accrue. [*Id.* at p. 2.] TRA alleges that it has *significant consequential damages* and that if TRA cannot restore the golf course, substantially greater consequential damages may accrue. [*Id.*] The Proof of Claim further states: "[i]n addition to asserting contractual claims under the License, Tuscan Ridge *also asserts its claims based upon trespass and/or alternatively waste of the Property*." [*Id.* (emphasis added).]

---

[3] All Exhibits ("Exh.") refer to Exhibits to the Declaration of Laura L. Goodman ("Goodman Decl."), filed concurrently herewith.

B.    **Facts**

PG&E does not dispute that it entered into the Letter Agreement with TRA following the November 8, 2018 Camp Fire.  [Exh. B.]  The Letter Agreement provided PG&E with temporary use of a portion TRA's property from November 19, 2018, to May 20, 2019.  [*Id*. at p. 1.]  As part of the Letter Agreement, PG&E agreed to restore the license area on the TRA property to the same condition that it was in as of November 19, 2018.  [*Id*. at p. 3.]  Based on representations by TRA that TRA was required to maintain its 18-hole golf course and that TRA needed to retain the currently existing improvements for the 18-hole golf course, PG&E agreed that such limited restoration would include the grading and contours of the golf course *as it existed at the time*.  [*Id.* at p. 3.]  Under the Letter Agreement, TRA agreed to "winterize" the property for PG&E by bringing in and laying gravel and rock at PG&E's sole expense.  [*Id.* at p. 2.]  PG&E expected to remove the base rock and gravel at the end of its license.

PG&E was provided with a non-exclusive right to use the License Area along with the right of ingress and egress because TRA was also seeking to obtain economic consideration from other agencies involved in Camp Fire restoration efforts for their use of the property.  [*Id.* at p. 1.]  The Letter Agreement provided that if TRA consented to use by other public agencies, PGE would work in good faith with the TRA and such agencies to jointly use the property.  [*Id*. at pp. 1-2.]  The license was irrevocable unless a public agency sought to use the property after January 15, 2019, for Camp Fire restoration.  The Letter Agreement provided that if TRA terminated the license to allow others to use the property, PG&E's restoration obligations would be reduced by the use of the other agencies occupying the license area.  [*Id.* at p. 2.]

While PG&E was still occupying the property, TRA was negotiating an extensive lease of the property to ECC Constructors ("**ECC**").  ECC had been awarded a contract from the California Department of Resources Recycling and Recovery ("**Cal Recycle**") for hundreds of millions of dollars to dispose of debris from the Camp Fire.[4]  The Cal Recycle Contract required ECC to develop and

---

[4]   TRA sued ECC, and the matter was sent to a JAMS arbitration pursuant to a broad arbitration provision in the ECC lease.  On April 19, 2021, the arbitrator in that matter issued a Partial Final Award which found that ECC started discussions with TRA in early February 2019.

1 construct a workers' camp and all related infrastructure necessary to house, feed and care for

2 approximately 1500-3000 workers who would perform the disposal and cleanup work. [*See* Exh. C,

3 TRA Verified Complaint against ECC.]

4      TRA and ECC executed the lease for the property on March 22, 2019, *several months before*

5 *the termination of PG&E's license*. [Exh. D, TRA Errata to Verified Complaint against ECC (exhibit

6 B thereto, Lease Agreement) (the "**ECC Lease**").] The ECC Lease provided for significant site

7 excavation and development work, including the construction of permanent improvements to benefit

8 TRA for its future development of the property. These included, but were not limited to, a wastewater

9 disposal and treatment facility with enormous holding ponds and permanent electrical improvements to

10 the property, much of which was at the expense of Cal Recycle. [*Id.*] Under the ECC Lease, TRA

11 required ECC to make use of the PG&E crushed rock and gravel in conducting its excavation and

12 grading work, also requiring that ECC leave six inches of the PG&E crushed rock and gravel in place.

13 [*Id.* at Exhibit -1-Page 3.] Both ECC and TRA made extensive use of the PG&E improvements to the

14 property during the ECC Lease. By leasing out PG&E's rock and gravel and allowing use of the area

15 licensed by PG&E, TRA prevented PG&E from restoring the property. TRA breached its contract

16 with PG&E and profited therefrom.

17      On March 20, 2019, *two days prior to execution of the ECC Lease*, TRA prepared a "PG&E

18 Restoration Estimate – Revised" in the amount of approximately $9,000,000. [Exh. A, Attachment 3.]

19 Of course, when TRA sent the golf course "restoration" estimates, TRA did not inform PG&E of the

20 ECC Lease, nor did TRA advise PG&E that it was releasing the property for imminent construction

21 and improvements and thereby making "restoration" impossible.[5]

22      TRA *admitted that ECC used the entirety of the PG&E license area and that ECC caused*

23 *further damage to the TRA property*. On March 5, 2020, TRA filed a lawsuit against ECC for breach

24 of contract, breach of the implied covenant of good faith and fair dealing and arbitration, alleging that

25 ECC failed to make certain improvements to the TRA property. In its *verified complaint* TRA

26

27 [5]   The ECC Lease indicated that it would be futile for TRA to obtain restoration from PG&E once
ECC had taken over the property, and TRA and ECC commenced the extensive development and

28 construction work called for under the lease. [Exh. D (exhibit B, ECC Lease at p. 3; Attachment A-1
to ECC Lease at p. 2, and exhibit C (First Amendment to ECC Lease).]

admitted that "[a]lthough Defendant [ECC] leased only a portion of the Real Property (82.6 acres), *Defendant has utilized with the permission of Plaintiff, a majority of the remaining unleased 80 acres for the purpose of staging vehicles and equipment without any compensation to Plaintiff*." [Exh. C at ¶ 10.] Scott Bates, a member of TRA, submitted a Declaration in support of a writ of attachment against ECC attesting to the accuracy of information in the verified complaint and stating that TRA "further intends to amend its complaint upon the departure of ECC from the Real Property to include damages caused the real property by ECC in breach of the lease. For example, currently the *Real Property has been stripped of all surface dirt*." [Exh. E, ¶ 6.] Bates further declared that "ECC is scheduled to depart the Real Property by the end of March, 2020" and is leaving "the Real Property in a scorched and decimated condition while it has reaped millions and contributed a bare fraction of the funds it was required to pay to Tuscan for its benefit." [*Id*. at ¶ 9.]

**C.    PG&E's Objection to the Claims**

The Reorganized Debtors participated in a mediation with Fulcrum on July 19, 2021, but that mediation did not result in resolution of the Claim. The parties then began to discuss how to proceed with the liquidation and allowance or disallowance of the Claim but were unable to reach agreement. On August 17, 2021, Fulcrum filed the Motion.

As Fulcrum is aware, PG&E disputes the validity and amount of the Claim, and, in the absence of a consensual resolution, planned to object to the Proof of Claim. Indeed, PG&E is preparing an objection to Fulcrum's Proof of Claim, which it will file shortly. PG&E denies liability for breach of contract, alleges that its restoration obligations were excused or limited by ECC's and TRA's use of the property, that TRA prevented PG&E from performance, that TRA breached the implied covenant of good faith and fair dealing, that TRA has unclean hands and has been unjustly enriched, and that PG&E is due a setoff, including, but not limited to, based on TRA's use of PG&E's improvements for its own economic gain.

Resolution of PG&E's objection to the Claim will require discovery and an evidentiary hearing on the factual disputes that PG&E submits are appropriately before this Court.

1

## ARGUMENT

2    Through its motion to compel arbitration and request abstention, Fulcrum is trying to end run

3 around the jurisdiction that this Court has to properly determine the merits of Fulcrum's claims and

4 PG&E's defenses thereto.

5 **A.    The Scope of the Arbitration Provision is Exceedingly Narrow**

6    Fulcrum does not argue whether the Federal Arbitration Act ("**FAA**") or the California

7 Arbitration Act ("**CAA**") applies to this dispute.  In at least one decision, the Bankruptcy Appellate

8 Panel for the Ninth Circuit found that the CAA applies to bankruptcy disputes under contracts that do

9 not involve a maritime transaction or a contract evidencing transaction in interstate commerce.  *See*

10 *Law Offices of John F.L. Hebb v. Ateco, Inc. (In re Ateco, Inc.)*, 2013 Bankr. LEXIS 4644 (B.A.P. 9th

11 Cir., July 15, 2013) (holding that CAA, not FAA, applied to dispute with debtor under contract that did

12 not involve a maritime transaction or a contract evidencing transaction in interstate commerce); *see*

13 *also Brayton Purcell LLP v. Recordon & Recordon*, 2006 U.S. Dist. LEXIS 82145 (N.D. Cal. Oct. 31,

14 2006) ("[A]pplication of the FAA is limited to arbitration provisions in (1) contracts evidencing a

15 transaction involving interstate commerce or (2) maritime transactions.").

16    The outcome of the Motion and this Opposition does not depend on the applicable statute,

17 however:  under both the FAA and the CAA, the "first principle" of arbitration is that arbitration is

18 strictly a matter of consent and "thus is a way to resolve those disputes – *but only those disputes* – that

19 the parties have agreed to submit to arbitration."  *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S.

20 287, 297 and 299 (2010) (quotation omitted) ("a court may order arbitration of a particular dispute

21 only where the court is satisfied that the parties agreed to arbitrate *that dispute*") (emphasis in

22 original); *Goldman Sachs & Co. v. City of Reno*, 747 F.3d 733, 742 (9th Cir. 2014); *Bono v. David*,

23 147 Cal. App. 4th 1055, 1063 (2007) ("[T]here is no policy compelling persons to accept arbitration of

24 controversies which they have not agreed to arbitrate."); *Titolo v. Cano*, 157 Cal. App. 4th 310, 317

25 (2007) ("[N]o dispute may be ordered to arbitration unless it is within the scope of the arbitration

26 agreement.").

27    When determining whether parties have agreed to submit to arbitration, the court applies

28 general state-law principles of contract interpretation.  *Mundi v. Union Sec. Life Ins. Co.*, 555 F.3d

1042, 1044 (9th Cir. 2009); *Hopkins & Carley, ALC v. Thompson Elite,* 2011 U.S. Dist. LEXIS 38396 at *7 (N.D. Cal. Apr. 6, 2011). Arbitration is based on a contractual agreement and therefore the court must look to the wording and scope of the arbitration clause in the parties' contract to determine its application. *Parker v. Twentieth Century-Fox Film Corp.*, 118 Cal. App. 3d 895, 901 (1981) (citing *Freeman v. State Farm Mut. Auto Ins. Co.*, 14 Cal. 3d 473, 479 (1975)). The Court "should attempt to give effect to the parties' intentions, in light of the usual and ordinary meaning of the contractual language and the circumstances under which the agreement was made." *Victoria v. Superior Court*, 40 Cal. 3d 734, 744 (1985); *Bono*, 147 Cal. App. 4th at 1063.

The court engages in a two-step inquiry, first determining whether the arbitration clause is broad or narrow in scope and then applying the breadth of the provision to the legal claims asserted to determine whether they must be arbitrated. *See Radnet, Inc. v. Travelers Prop. Cas. Co. of Am.*, 2012 U.S. Dist. LEXIS 199677 at *7-8 (C.D. Cal. Feb. 21, 2012) (citing *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 720-26 (9th Cir. 1999)). A "broad" clause includes those using language such as "*any claim* arising from or *related to* this agreement" or "arising in connection with this agreement." *Rice v. Downs*, 248 Cal. App. 4th 175, 186 (2016) (emphasis in original). A broad clause reaches every dispute between the parties and may extend to tort claims that may arise under or from the contractual relationship. *See id.*; *Simula*, 175 F.3d at 721. By contrast, a "narrow" clause is one that only employs language such as "arising from" or "arising out of" an agreement, excluding more broader language such as "relating to" or "in connection with." *Rice v. Downs*, 248 Cal. App. 4th at 186.

Here, the arbitration provision is far narrower than a "narrow" clause. It expressly limits the authority of the arbitrator (and necessarily the arbitration proceeding) to "estimate the cost to restore the License area to the Baseline Condition":

> At the expiration or earlier termination of this Agreement, PG&E shall meet and confer with Owner as to the nature and scope of the restoration work. If PG&E and Owner cannot agree on the extent of PG&E's restoration obligations set forth above, *then the parties shall engage a third party neutral (the "Arbitrator") to estimate the cost to restore the License Area to the Baseline Condition*, as set forth above. The Arbitrator shall have at least ten (10) years of experience in the construction industry. The cost of the Arbitrator shall be shared equally between PG&E and Owner. At the option of Owner, Owner may elect to have PG&E cause the completion of the restoration obligations at PG&E's sole cost and expense, or the Owner may elect for PG&E to pay to the Owner the amount estimated by the Arbitrator to complete the

1   restoration, due and payable within (30) days following PG&E's receipt of written
notice from Owner of such election.

2 [Exh. B.]

3    The arbitration provision applies *solely* to *determining the cost* of performing any restoration

4 work necessary to return the property to its condition as of November 18, 2018.  It does *not*

5 encompass, nor give the arbitrator authority to determine, Fulcrum's breach of contract, trespass, waste

6 and consequential damages claims.  It also does not encompass PG&E's legal and equitable defenses

7 to Fulcrum's claims including that it did not breach the contract, that PG&E's restoration obligations

8 were excused or limited by ECC's and TRA's use of the property, TRA's prevention of PG&E's

9 performance, breach of the implied covenant of good faith and fair dealing, failure to mitigate, and

10 setoff.

11    In *Parker v. Twentieth Century-Fox Film Corp.*, 118 Cal. App. 3d 895 (1981), the parties had

12 entered into a joint venture agreement to produce, distribute and otherwise exploit a film television

13 series – "Daniel Boone."  The net profits derived from the sale, lease, license or exploitation of the

14 series were to be divided among the parties.  Fox was to compute the net profits and provide written

15 statements which were deemed final and conclusive unless, within two years from rendition, a

16 controversy arose in which event the controversy was to be submitted for determination by an

17 independent firm of certified public accountants.  The arbitration provision provided:

18     In case any controversy shall arise between the parties hereto as to any action by
Fox with respect to the receipts and proceeds from the distribution of the series

19     or the expenses pertaining thereto, the questions in controversy shall be
submitted for determination to certified public accountants in the City of Los

20     Angeles, acceptable to the parties hereto, and if the parties cannot agree upon
such accountants, then such Los Angeles firm of certified public accountants as

21     shall be designated by the American Arbitration Association upon application by
either party hereto.  The decision of such independent firm of accountants on the

22     matters so submitted shall be final and conclusive upon the parties hereto.

23 *Id.* at 899.  The complaint filed in that action contained eleven causes of action, certain of which

24 involved financial issues but many of which went far beyond mere accounting issues.  The plaintiffs

25 conceded that issues in the complaint, if standing alone, could be determined by the CPA arbitrator,

26 but argued that the trial court was correct in denying arbitration because many of the key issues could

27 only be decided by a court of law.  While not disputing that some issues need to be decided by the

28 court, Fox maintained that the "principal issues will be decided by an accounting, therefore the entire

proceeding should commence with arbitration and if the certified public accountant does not resolve all the controversies, then the court can pick up the remaining pieces." *Id*. at 902.

In denying the motion to compel arbitration, the trial court recognized the provision as an "arbitration clause" but found it to be "far too narrow to encompass the issues present" in the action. *Id*. at 903. The Court of Appeal affirmed, noting that "[m]ost arbitration clauses found in the contracts between parties seek to resolve *any* and *all* issues of controversy arising out of the contract." *Id.* at 903 (emphasis in original). The Court of Appeal found that the controversies subject to arbitration were expressly restricted to receipts and proceeds and expenses pertaining to distribution. *Id.* The court rejected Fox's argument that the provision gave the accountant broad power to determine the scope of the audit, holding that "[j]udicial determination of the jurisdiction and scope of the accounting will be required." *Id*. at 905. The court held that it could not ignore the arbitration provision but that the timing and scope of the arbitration accounting would be subject to the court's determination at the appropriate time in the litigation. *Id.* at 906.

Here, as in *Parker*, the language of the arbitration provision here is narrowly drawn and expressly limits the authority of the arbitrator to estimating restoration costs. The arbitrator has no authority to make the legal determinations in this case essential to determine liability on Fulcrum's claims and PG&E's defenses thereto. *See Hacienda Hotel v. Culinary Works Union*, 175 Cal. App. 3d 1127, 1131 (1985) (the powers of the arbitrator also derive from the contract). All of these claims and issues require the Court's legal determinations. In light of the exceedingly limited scope of the arbitration provision and the predicate issues that must be determined before a "cost estimate" is necessary, PG&E respectfully requests that, if the Court enforces the arbitration clause, the Court exercise its discretion and jurisdiction to first determine the predicate legal and equitable issues. Once these legal and equitable issues are determined, the Court can then submit any restoration "cost estimate" to arbitration as appropriate.

**B.      <u>Resolution of the Fulcrum Claim is a Core Proceeding</u>**

Even to the extent that a portion of the Proof of Claim is arbitrable, the Court should not modify the plan injunction to permit the arbitration to proceed until after the non-arbitrable issues have been decided by this Court.

First, Fulcrum contends that the Claim is a non-core matter and therefore this Court is somehow required to immediately compel the limited "cost estimate" arbitration. Fulcrum is wrong that the Claim is a non-core matter. Fulcrum suggests that the mere fact that the Claim asserts a state law contract claim is sufficient for it to be a non-core matter. But 28 U.S.C. § 157(b)(2)(B) expressly includes the "allowance or disallowance of claims against the estate" as a core proceeding. Because Claimant filed a proof of claim – even if the underlying claim sounds in state law – the allowance or disallowance of that claim is a core proceeding. The Ninth Circuit's decision in *In re Thorpe Insulation Co.* – a case on which Fulcrum relies but misapplies – could not be clearer on this point:

> Here, we agree with the bankruptcy court and the district court that the resolution of Continental's claim is a core proceeding. Continental argues that its "state law breach of contract claim" is non-core because "it is based on state law and arose outside of and independent of Thorpe's bankruptcy." Yet regardless of how Continental characterizes its claim, Continental filed a proof of claim, and Thorpe objected to the claim, so under 28 U.S.C. § 157(b)(2)(B), the allowance or disallowance of that claim was a core proceeding.

*Continental Ins. Co. v. Thorpe Insulation Co. (In re Thorpe Insulation Co.)*, 671 F.3d 1011, 1021 (9th Cir. 2012) (citing *Durkin v. Benedor Corp. (In re G.I. Indus. Inc.)*, 204 F.3d 1276, 1279-80 (9th Cir. 2000) ("The filing of a proof of claim is the prototypical situation involving the 'allowance or disallowance of claims against the estate,' a core proceeding under 28 U.S.C. § 157(b)(2).")).[6] *See also J.W. McClenahan Co. v. Mech. Techs. Corp.*, 2020 U.S. Dist. LEXIS 71064 at *3-4 (N.D. Cal. Apr. 21, 2020) ("Given that the filing of the proof of claim in the bankruptcy subjects the claim to the bankruptcy court's jurisdiction, the Court agrees that the filing extends to the interrelated actions . . .") (citation omitted).

---

[6]  The cases cited by Fulcrum to support its assertion that the Claim is non-core (Motion pp. 5-6) are inapposite in that, in each, either there was no proof of claim at issue, or there was a pre-petition litigation or arbitration that was not core. *In re Ray*, 624 F.3d 1124 (9th Cir. 2010), involved a lawsuit brought by the buyer of the debtor's property against the debtor and its non-debtor co-seller. The buyer did not file a proof of claim, and the bankruptcy court had already dismissed and closed the debtor's chapter 11 case. The discussion in *In re Ebell Media, Inc.*, 2010 U.S. Dist. LEXIS 151886 (C.D. Cal. Mar. 30, 2010), about non-core "debtor-derivative pre-petition contract claims" is a quote from a Third Circuit case involving contract claims brought by the bankruptcy trustee. *Id.* at *23 (citing *Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149 (3d Cir. 1989)). The footnote in *McCleskey v. Stockton (In re Stockton)*, 2005 Bankr. LEXIS 3375 (B.A.P. 9th Cir. June 22, 2005), cited at page 6 of the Motion, is a discussion of the state law claims asserted in the pending prepetition arbitration proceeding (not in a proof of claim), which, while related to the bankruptcy case, are undeniably core. In any event, the BAP affirmed denial of a motion for relief from stay in that case.

Under *Thorpe Insulation*, therefore, the allowance or disallowance of the Claim, as a proof of claim filed against the estate, is similarly a core proceeding. *In re Thorpe Insulation Co.*, 671 F.3d at 1021; *see also In re Conejo Enters., Inc.*, 96 F.3d 346, 354 (9th Cir. 1996) ("Once [a party] filed its proof of claim, it subjected its claim to the core jurisdiction of the bankruptcy court."). As such, the Court has discretion to retain jurisdiction over the Claim, and it should exercise its discretion to decide the non-arbitrable issues before it, prior to sending the estimate of restoration costs to arbitration.[7] *See* Cal. Code Civ. Proc. § 1281.2 ("If the court determines that there are other issues between [the parties] which are not subject to arbitration and which are the subject of a pending action or special proceeding between [the parties] and that a determination of such issues may make the arbitration unnecessary, *the court may delay its order to arbitrate until the determination of such other issues*.") (emphasis added). If the Court determines that Fulcrum is entitled to restoration costs, and what the scope of such restoration costs is, the Court can then send this matter to arbitration to determine the amount thereof.

C.      **Fulcrum Must Show Cause to Modify the Plan Injunction**

Courts apply the same principles of "cause" to requests to modify a plan injunction as are applicable to motions for relief from the automatic stay. *See, e.g.*, *In re SquareTwo Fin. Servs. Corp.*, 2017 Bankr. LEXIS 2570 at *10-11 (Bankr. S.D.N.Y. Sept. 11, 2017). Section 362(d)(1) of the Bankruptcy Code authorizes a court to modify or terminate the automatic stay for "cause," which "has no clear definition and is determined on a case-by-case basis." *Christensen v. Tucson Estates, Inc. (In re Tucson Estates, Inc.)*, 912 F.2d 1162, 1166 (9th Cir. 1990) (citation omitted). The party requesting stay relief bears the burden of making a prima facie showing of cause under section 362(d)(1). *See In re Plumberex Specialties Prods., Inc.*, 311 B.R. 551, 557 (Bankr. C.D. Cal. 2004); 3 Collier on Bankruptcy ¶ 362.10 (2019) ("Failure to prove a prima facie case requires denial of the requested relief.").

As explained below, Fulcrum has failed to meet its burden, and its Motion should be denied.

---

[7]   Even if resolution of the Claim were not a core proceeding, this Court still has discretion under the *Curtis* factors discussed below, to the extent cause exists – and, as discussed below, cause exists here – to enforce the arbitration provision only after it has resolved the related non-arbitrable matters for the sake of judicial economy.

### D. The *Curtis* Factors Favor the Court's Exercise of Its Discretion to Determine the Legal and Equitable Issues Before Sending the "Cost Estimate" to Arbitration

In determining whether cause exists to permit an action to proceed in a non-bankruptcy forum, courts analyze the twelve factors set forth in *In re Curtis*, 40 B.R. 795 (Bankr. D. Utah 1984);[8] *see also Kronemyer v. Am. Contrs. Indem. Co. (In re Kronemyer)*, 405 B.R. 915, 921 (B.A.P. 9th Cir. 2009) ("We agree that the *Curtis* factors are appropriate, nonexclusive, factors to consider in deciding whether to grant relief from the automatic stay to allow pending litigation to continue in another forum.").

The *Curtis* factors which are applicable here are:

(1) Whether the relief will result in partial or complete resolution of the issues (the first *Curtis* factor).

(2) Whether there is a foreign proceeding that has progressed to the point where the parties are prepared for trial (the third and eleventh *Curtis* factors).

(3) The interests of judicial economy and the expeditious and economical determination of litigation for the parties (the tenth *Curtis* factor).

Each of these factors favor the Court's exercise of discretion in declining to modify the Plan injunction until after it has resolved the related non-arbitrable issues.

First, as discussed above, arbitration will only resolve the cost estimate issues and not any of the other issues raised through the Claim and PG&E's defenses, which are not subject to arbitration.

Second, unlike the cases cited by Fulcrum, there is no pending arbitration (or any other non-bankruptcy proceeding) here. *Cf. McCleskey v. Stockton (In re Stockton)*, 2005 Bankr. LEXIS 3375

---

[8] The *Curtis* factors are: (1) whether the relief will result in partial or complete resolution of issues; (2) the lack of any connection with or interference with the bankruptcy case; (3) whether the foreign proceeding involves the debtor as a fiduciary; (4) whether a specialized tribunal has been established to hear the particular cause of action and whether the tribunal has expertise to hear such cases; (5) whether the debtor's insurance carrier has assumed full financial responsibility for defending the litigation; (6) whether the action essentially involves third parties, and the debtor functions only as a bailee or conduit for the goods or proceeds in question; (7) whether the litigation in another forum would prejudice the interests of other creditors, the creditors' committee and other interested parties; (8) whether the judgment claim arising from the foreign action is subject to equitable subordination; (9) whether movant's success in the foreign proceeding would result in a judicial lien avoidable by the debtor under section 522(f); (10) the interest of judicial economy and the expeditious and economical determination of litigation for the parties; (11) whether the foreign proceedings have progressed to a point where the parties are prepared for trial; and (12) the impact of the stay on the parties and the "balance of hurt." 40 B.R. at 799-800.

1  (B.A.P. 9th Cir. June 22, 2005); *In re Ebell Media, Inc.*, 2010 U.S. Dist. LEXIS 151886 (C.D. Cal.

2  Mar. 30, 2010), cited in Motion at 5.

3     Third, the interests of judicial economy and the expeditious determination of the Claim are best

4  served by not modifying the Plan injunction until after the non-arbitrable issues have been decided.

5  *See In re Thorpe Insulation Co.*, 671 F.3d at 1023 n.9 (observing that "judicial economy and

6  centralization of disputes" may be "sufficient bases for nonenforcement of an otherwise applicable

7  arbitration clause" in bankruptcy).

8     Fulcrum argues that there is no risk of "piecemeal" litigation and no concern about the

9  centralization of disputes as there was in *Thorpe Insulation*.  But Fulcrum ignores the fact that *the*

10 *arbitration provision is extremely narrow* and does not include Fulcrum's claims for breach of

11 contract, trespass, waste and consequential damages nor the legal and equitable claims and defenses

12 that will be raised in PG&E's Objections.[9]  Instead, Fulcrum simply refuses to acknowledge the non-

13 arbitrable claims asserted.  The adjudication of these inextricably intertwined non-arbitrable issues,

14 while sending what is essentially *part* of a damages issue to arbitration, epitomizes the risk of

15 piecemeal litigation, potentially inconsistent rulings, and the waste of judicial and the parties'

16 resources.

17    Instead, judicial economy and the interests of the parties would be promoted by this Court

18 adjudicating the non-arbitrable issue and referring to arbitration any arbitrable issue regarding

19 "restoration costs" that may remain after such determination.

20 **E.**    **Abstention Is Not Warranted**

21    Finally, because there is no cause to modify the plan injunction here, Fulcrum's request in the

22 alternative, that the Court abstain from deciding the Claim, similarly fails.  Although the Motion seeks

23 abstention in the alternative, Fulcrum's ultimate desire to arbitrate hinges upon an order from this

24 Court modifying the plan injunction.  *See In re Conejo Enterprises, Inc.*, 96 F.3d 346, 352 (9th Cir.

25 ─────────────

26 [9]   To the extent that there had been any uncertainty as to the timing of resolution of the Claim in the
   absence of a pending claim objection, such concerns are mooted by PG&E's anticipated filing of the
   objection to the Claim, which will permit resolution and allowance or disallowance of the Claim to
27 proceed in accordance with the claims resolution process before this Court.

28

1996) (holding that "a finding that mandatory abstention applies to [a] state [court] action does not preclude denial of relief from § 362's automatic stay").  The Court need not reach the abstention issue in the first instance because the request to modify the plan injunction should be denied for the reasons explained above.  *See In re Farmland Indus., Inc.*, 309 B.R. 14, 18 n.3 (Bankr. W.D. Mo. 2004) (finding that when no cause existed to lift automatic stay, court did not need to address issue of permissive abstention pursuant to 28 U.S.C. § 1334(c)(1)). Nevertheless, the Court should likewise deny Fulcrum's abstention request because Fulcrum's Motion fails to set forth evidence showing that the circumstances of their claim – the adjudication of which is a core proceeding – and the Chapter 11 Cases weigh in favor of abstention.

Furthermore, unlike in *Tucson Estates*, cited by Fulcrum in its Motion at page 7, there is no pending arbitration or state court proceeding in favor of which this Court should abstain.  In the absence of a pending parallel proceeding, abstention should not be available to Fulcrum.  *Security Farms v. International Bhd. of Teamsters*, 124 F.3d 999, 1009 (9th Cir. 1997) ("Abstention can exist only where there is a parallel proceeding in state court.  That is, inherent in the concept of abstention is the presence of a pendent state action in favor of which the federal court must, or may, abstain.") (citations omitted); *see also Schulman v. California (In re Lazar)*, 237 F.3d 967 (9th Cir. 2001) ("Accordingly, because there is no pending state proceeding, §§ 1334(c)(1) [permissive abstention] and 1334(c)(2) [mandatory abstention] are simply inapplicable to this case."); *In re Tucson Estates*, 912 F.2d 1162, 1167 (9th Cir. 1990) (recognizing as a factor for permissive abstention the presence of a related proceeding commenced in state court or other nonbankruptcy court).  Moreover, while there may be disputed issues of fact and disagreements on the interpretation and application of the License Agreement and the claims for waste and trespass that are alleged in the Claim, as well as the defenses that will be raised by PG&E, the state law issues are neither difficult nor unsettled.  *Cf. Id.* at 1166-67.  As discussed above, Fulcrum's complaints of prejudicial delay are disingenuous given that judicial economy is better served by litigating the non-arbitrable issues before this Court.  Because, for the reasons set forth above, cause does not exist to modify the Plan injunction, Fulcrum's request that the Court abstain from deciding the Claim should also be denied.

WHEREFORE, the Reorganized Debtors respectfully request entry of an order (i) denying the Motion, and (ii) granting such other and further relief as the Court may deem just and appropriate.

Dated:  September 15, 2021

**KELLER BENVENUTTI KIM LLP**
**GOUGH & HANCOCK LLP**

By: _/s/ Gayle L. Gough_
Gayle L. Gough

*Attorneys for Debtors and Reorganized Debtors*