KELLER BENVENUTTI KIM LLP
Tobias S. Keller (#151445)
(tkeller@kbkllp.com)
Jane Kim (#298192)
(jkim@kbkllp.com)
David A. Taylor (#247433)
(dtaylor@kbkllp.com)
650 California Street, Suite 1900
San Francisco, CA 94108
Tel: 415 496 6723
Fax: 650 636 9251

GOUGH & HANCOCK LLP
Gayle L. Gough (#154398)
(gayle.gough@ghcounsel.com)
Laura L. Goodman (#142689)
(laura.goodman@ghcounsel.com)
50 California Street, Suite 1500
San Francisco, CA 94111
Tel: 415.848-8918

*Attorneys for Debtors and Reorganized Debtors*

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION,**<br><br>- and -<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br><br>Debtors.<br><br>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>☒ Affects both Debtors<br><br>* *All papers shall be filed in the Lead Case, No. 19-30088 (DM).* | Bankruptcy Case No. 19-30088 (DM)<br><br>Chapter 11<br><br>(Lead Case) (Jointly Administered)<br><br>**REORGANIZED DEBTORS' OBJECTION TO PROOF OF CLAIM NO. 58562 FILED BY FULCRUM CREDIT PARTNERS LLC AS TRANSFEREE OF TUSCAN RIDGE ASSOCIATES, LLC**<br><br>**Response Deadline:**<br>**October 26, 2021, 4:00 p.m. (Pacific Time)**<br><br>**Hearing Information If Timely Response Made:**<br>Date: November 9, 2021<br>Time: 10:00 a.m. (Pacific Time)<br>Place: (Tele/Videoconference Appearances Only)<br>United States Bankruptcy Court<br>Courtroom 17, 16th Floor<br>San Francisco, CA 94102 |

**Table of Contents**

I. JURISDICTION .................................................................................................................. 1
II. BANKRUPTCY BACKGROUND ...................................................................................... 1
III. THE PROOF OF CLAIM ..................................................................................................... 3
IV. PG&E STATEMENT OF FACTS ........................................................................................ 4
V. DISCUSSION ....................................................................................................................... 7
    A. Fulcrum Bears the Burden of Proof on its Claim ..................................................... 7
    B. PG&E Did Not Breach the Letter Agreement .......................................................... 8
        1. TRA Prevented PG&E's Performance and Breached the Implied Covenant of Good Faith and Fair Dealing ............................................. 9
        2. The Letter Agreement Expressly Recognizes that PG&E was Not Required to Restore Property Used by Others ..................................... 10
        3. TRA Appropriated PG&E's Improvements for its Own Economic Gain .......... 11
        4. The Letter Agreement Provided for Restoration of the License Area to its Prior Condition -- Not Payment of Millions of Dollars to TRA for its Redevelopment Plans and/or Enrichment ............................................ 12
    C. PG&E is Not Liable for Trespass or Waste ............................................................ 12
    D. Further Discovery Is Required ................................................................................ 13
VI. RESERVATION OF RIGHTS ............................................................................................ 13
VII. NOTICE ............................................................................................................................... 13

## Table of Authorities

**Cases**

*Ashford v. Consolidated Pioneer Mortgage (In re Consolidated Pioneer Mortgage)* 178 B.R. 222 (B.A.P. 9th Cir. 1995) ................................................................................................................. 8
*Butchers' Union v. Cudahy Packing Co.*, 66 Cal. 2d 925 (1967) .................................................. 9
*Carma Developers, Inc. v Marathon Development California, Inc.*, 2 Cal. 4th 342 (1992) ................ 10
*Girard v. Ball*, 125 Cal. App. 3d 772 (1981) .............................................................................. 12
*In re Allegheny Int'l, Inc.*, 954 F.2d 167 (3d Cir. 1992) ............................................................... 8
*In re Fidelity Holding Co.,* 837 F.2d 696 (5th Cir. 1988) ............................................................. 8
*Kendall-Jackson Winery, Ltd. v. Superior Court*, 76 Cal. App .4th 970 (1999) ............................. 10
*Lectrodryer v. Seoulbank*, 77 Cal. App. 4th 723 (2000) ............................................................. 11
*Legacy Vulcan Corp. v. Superior Court*, 185 Cal. App. 4th 677 (2010) ........................................ 8
*Lundell v. Anchor Constr. Specialists, Inc.*, 223 F.3d 1035 (9th Cir. 2000) ................................... 8
*Racine & Laramie, Ltd. v. Department of Parks & Recreation*, 11 Cal. App. 4th 1026 (1992) ........ 10
*Spencer v. Pugh (In re Pugh)*, 157 B.R. 898 (BAP 9th Cir. 1993) ................................................ 8
*Wright v. Holm (In re Holm)*, 931 F.2d 620 (9th Cir. 1991) ........................................................ 8

**Statutes**

11 U.S.C. § 502(a) ................................................................................................................. 7
11 U.S.C. § 502(b)(1) ............................................................................................................. 8
Cal. Civ. Code §§ 1511-1514 .................................................................................................. 9
Cal. Civ. Code § 1636 ............................................................................................................. 8
Cal. Civ. Code § 1639 ............................................................................................................. 8
Cal. Civ. Code § 1647 ............................................................................................................. 8

**Other Authorities**

CACI No. 325 ..................................................................................................................... 10
3 L. King, *Collier on Bankruptcy* § 502.02 at 502-22 (15th ed. 1991) ......................................... 8

**TO:** **(A) THE HONORABLE DENNIS MONTALI, UNITED STATES BANKRUPTCY JUDGE; (B) THE OFFICE OF THE UNITED STATES TRUSTEE; (C) THE AFFECTED CLAIMANT; AND (D) OTHER PARTIES ENTITLED TO NOTICE:**

PG&E Corporation ("**PG&E Corp.**") and Pacific Gas and Electric Company (the "**Utility**"), as debtors and reorganized debtors (collectively, "**PG&E**" or the "**Debtors**," or as reorganized pursuant to the Plan (as defined below), the "**Reorganized Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**") file this objection (the "**Objection**") to Proof of Claim No. 58562 (the "**Proof of Claim**" or "**Claim**")[1] of Fulcrum Credit Partners LLC ("**Fulcrum**") as transferee[2] of Tuscan Ridge Associates, LLC ("**TRA**," and together with Fulcrum, "**Claimant**"), and in support thereof, submit the Declaration of Elouise Jadhav ("**Jadhav Decl.**") and the Declaration of Laura L. Goodman ("**Goodman Decl.**"), both filed contemporaneously herewith, and further state the following:

**I.     JURISDICTION**

This Court has jurisdiction over this Objection under 28 U.S.C. §§ 157 and 1334; the *Order Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges*, General Order 24 (N.D. Cal.); and Rule 5011-1(a) of the Bankruptcy Local Rules for the United States District Court for the Northern District of California (the "**Bankruptcy Local Rules**"). This matter is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested are section 502 of Title 11 of the United States Code (the "**Bankruptcy Code**") and Rule 3007 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 3007-1 of the Bankruptcy Local Rules for the Northern District of California (the "**Local Rules**").

**II.    BANKRUPTCY BACKGROUND**

On January 29, 2019 (the "**Petition Date**"), the Debtors commenced with the Court voluntary cases under chapter 11 of the Bankruptcy Code. Prior to the Effective Date (as defined below), the Debtors continued to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner was appointed

---

[1] A copy of the Proof of Claim is attached to the Goodman Declaration as Exhibit A.

[2] *See* Docket No. 10437.

in either of the Chapter 11 Cases. The Chapter 11 Cases are being jointly administered for procedural purposes only pursuant to Bankruptcy Rule 1015(b).

Additional information regarding the circumstances leading to the commencement of the Chapter 11 Cases and information regarding the Debtors' businesses and capital structure is set forth in the *Amended Declaration of Jason P. Wells in Support of the First Day Motions and Related Relief* [Docket No. 263].

On July 1, 2019, the Court entered the *Order Pursuant to 11 U.S.C. §§ 502(b)(9) and 105(a), Fed. R. Bankr. P. 2002, 3003(c)(3), 5005, and 9007, and L.B.R. 3003-1 (I) Establishing Deadline for Filing Proofs of Claim, (II) Establishing the Form and Manner of Notice Thereof, and (III) Approving Procedures for Providing Notice of Bar Date and Other Information to All Creditors and Potential Creditors* [Docket No. 2806] (the "**Bar Date Order**"). The Bar Date Order set the deadline to file all proofs of claim in respect of any prepetition claim (as defined in section 101(5) of the Bankruptcy Code), including all claims of Fire Claimants (as defined therein), Wildfire Subrogation Claimants (as defined therein), Governmental Units (as defined in section 101(27) of the Bankruptcy Code), and Customers, and for the avoidance of doubt, including all secured claims and priority claims, against either of the Debtors as October 21, 2019, at 5:00 p.m. Pacific Time (the "**Bar Date**"). The Bar Date later was extended solely with respect to unfiled, non-governmental Fire Claimants to December 31, 2019 [Docket No. 4672][3]; and subsequently with respect to certain claimants that purchased or acquired the Debtors' publicly held debt and equity securities and may have claims against the Debtors for rescission or damages to April 16, 2020 [Docket No. 5943].

By Order dated June 20, 2020 [Docket No. 8053], the Bankruptcy Court confirmed the *Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization Dated June 19, 2020* (as may be further modified, amended or supplemented from time to time, and together with any exhibits or scheduled thereto, the "**Plan**"). The Effective Date of the Plan occurred on July 1, 2020 (the "**Effective Date**"). *See* Docket No. 8252.

---

[3] The claims of Fire Claimants will be administered through the Fire Victim Trust and the claims of Wildfire Subrogation Claimants through the Subrogation Wildfire Trust in accordance with the Plan.

### III. THE PROOF OF CLAIM

TRA, through its counsel at Downey Brand, LLP, filed its Proof of Claim against the Utility on October 18, 2019, for "at least $9,500,000 to $12,000,000 according to proof." [Goodman Decl., Exh. A, p. 2.] TRA alleges that it owns 172 acres that includes a golf course located at 3100 Skyway Road in Paradise, California. It claims that Butte County had zoned the Property for a future planned unit development, including residential use "provided that the golf course is also maintained." [Goodman Decl., Exh. A, Attachment 1, p. 1.] TRA alleges "[e]verything was on track to commence the work of developing the Property in or around the Spring of 2019." [*Id.*] TRA alleges that it had licensed a portion of the Property, from September 9, 2018, to November 8, 2018, to PG&E for its wildfire risk reduction operations that allowed PG&E to use the driving range area for staging vehicles, landing helicopters and storing equipment, supplies and materials. [*Id.*] TRA alleges that the Camp Fire occurred "in the midst of PG&E vacating the site" on November 8, 2018. [*Id.*]

TRA alleges that, without informing TRA and without TRA's consent, PG&E "commandeered" the Property by "unlawfully trespassing and taking over possession of about 53 acres of the Property for use as a base camp." [*Id.*] It also alleges that, "[u]pon informing TRA of the need to expand its footprint on the site, PG&E contracted with one of [TRA's] members to grade large sections of the golf course, and dump a layer of base rock covering much of the Property" which "effectively destroyed the golf course." [*Id.*] It alleges that "based on assurances from PG&E that it would restore the Property to its original condition" a new license agreement was reached. [*Id.*]

TRA asserts a claim for restoration under the Letter Agreement (defined below) in the amount of $8,824,989 but reserves the right to amend the Proof of Claim and assert a greater amount if the costs of restoration increase. It further alleges that the amount of the Claim will likely increase with the passage of time and that TRA's consequential damages will continue to accrue. [*Id.* at p. 2.] TRA alleges that it has *significant consequential damages* and that if TRA cannot restore the golf course, substantially greater consequential damages may accrue. [*Id.*] The Proof of Claim further states: "[i]n addition to asserting contractual claims under the License, Tuscan Ridge *also asserts its claims based upon trespass and/or alternatively waste of the Property*." [*Id.* (emphasis added).]

The Reorganized Debtors participated in a mediation with Claimant on July 19, 2021, but that

mediation did not result in resolution of the Proof of Claim. On August 17, 2021, Fulcrum filed a *Motion for Relief from or Modification of Plan Injunction, to Compel Arbitration and/or for Abstention* [Docket No. 11067] ("**Motion to Compel Arbitration**"). The Reorganized Debtors opposed the Motion to Compel Arbitration [Docket No. 11263], and it is scheduled to be heard on September 29, 2021.

## IV. PG&E STATEMENT OF FACTS

PG&E originally entered into an agreement with TRA for use of the TRA property at 3100 Skyway Road, Chico, (the "**Property**") as a support site in connection with PG&E's Wildfire Risk Reduction efforts. By agreement dated September 13 and 14, 2018 ("**Initial Letter Agreement**"), PG&E's use of the original license area (the "**Original License Area**") commenced September 9, 2018, and ended December 10, 2018, or the date that PG&E demobilized and vacated the Original License Area. [Jadhav Decl., ¶2, Exh. A.] PG&E paid rent to TRA for use of Property under the Initial Letter Agreement from the commencement of the Initial Letter Agreement through November 19, 2018. [Jadhav Decl., ¶4, Exh. C.]

Following the start of the Camp Fire on November 8, 2018, but prior to termination of the Initial Letter Agreement, PG&E began negotiating with TRA for a new license agreement to use the Property as a support site and base camp in connection with PG&E's Camp Fire restoration work. [Jadhav Decl., ¶3.] The negotiations resulted in a new license agreement between TRA and PG&E dated November 20, 2018 ("**Letter Agreement**"). [Jadhav Decl., ¶3, Exh. B.] The Letter Agreement provided PG&E with temporary use of a portion of TRA's Property (as defined in the Letter Agreement) from November 19, 2018 to May 20, 2019. [*Id*. at p. 1.]

Upon the expiration or termination of the Letter Agreement, PG&E agreed to restore the License Area (as defined in the Letter Agreement) to the same condition that it was in as of November 19, 2018. [*Id*. at p. 3.] Based on express representations by TRA that TRA was required by Butte County to maintain its *then currently existing* 18-hole golf course on the Property, PG&E agreed that such limited restoration would include the grading and contours of the golf course *as it existed at the time*. [*Id*. at p. 3.] TRA agreed to "winterize" the property for PG&E by bringing in and laying gravel and rock, which was done at PG&E's sole expense. [*Id*. at p. 2.] PG&E expected to remove the base

rock and gravel at the end of its license.

PG&E was provided with a non-exclusive right to use the License Area along with the right of ingress and egress because TRA was also seeking to obtain economic consideration for the use of the Property from other parties involved in Camp Fire restoration efforts. [*Id.* at p. 1.] The Letter Agreement provided that if TRA consented to use by other public agencies, PG&E would work in good faith with TRA and other agencies to jointly use the Property and the License Area. [*Id*. at pp. 1-2.] The license was irrevocable unless a public agency sought to use the Property for Camp Fire restoration after January 15, 2019. The Letter Agreement provided that if TRA terminated the license *to allow others to use the property, PG&E's restoration obligations would be reduced by the use of the other agencies occupying the license area*. [*Id*. at p. 2. (emphasis added.)]

PG&E paid rent to TRA under the Letter Agreement from November 19, 2018, *through May 20, 2019*. [Jadhav Decl., ¶ 4, Exh. C.] In addition, PG&E paid TRA the "Independent Consideration" (as defined in the Letter Agreement) as additional consideration on execution of the November 20, 2018 Letter Agreement and reimbursed TRA for the cost of all grading and winterization work at the property. [Jadhav Decl., ¶ 4, Exh. C.]

While the property was licensed to, and occupied by, PG&E under the Letter Agreement, TRA was negotiating an extensive lease of the property to ECC Constructors ("**ECC**"). ECC had been awarded a contract from the California Department of Resources Recycling and Recovery ("**Cal Recycle**") for hundreds of millions of dollars to dispose of debris from the Camp Fire.[4] The Cal Recycle contract required ECC to develop and construct a workers' camp and all related infrastructure necessary to house, feed and care for approximately 1500-3000 workers who would perform the disposal and cleanup work. [*See* Goodman Decl., Exh. C.]

TRA and ECC executed the lease for the property (the "**ECC Lease**") on March 22, 2019, *several months before the termination of PG&E's license*. [Goodman Decl., Exh. D (exhibit B thereto, Lease Agreement).] The ECC Lease provided for significant site excavation and development work,

---

[4] TRA sued ECC and the matter was sent to a JAMS arbitration pursuant to a broad arbitration provision in the ECC Lease. On April 19, 2021, the arbitrator in that matter issued a Partial Final Award which found that ECC started discussions with TRA in early February 2019.

1  including the construction of permanent improvements to benefit TRA for its future development of

2  the Property.  These included, but were not limited to, a wastewater disposal and treatment facility

3  with enormous holding ponds and permanent electrical improvements to the Property, much of which

4  was at the expense of Cal Recycle.  [*Id.*]  Under the ECC Lease, TRA required ECC to make use of the

5  PG&E crushed rock and gravel in conducting its excavation and grading work, also requiring that ECC

6  leave six inches of the PG&E crushed rock and gravel in place.  [*Id.* at Exhibit 1, p. 3.]  Both ECC and

7  TRA made extensive use of the PG&E improvements to the property during the ECC Lease.

8        On March 5, 2019, TRA shared a restoration cost estimate with PG&E.  [Goodman Decl., Exh.

9  A, "preliminary estimate . . . shared with PG&E".]  PG&E did not know about the proposed ECC

10 Lease nor was it aware that ECC and TRA had plans to *immediately* use and build upon PG&E's

11 improvements for their own purposes when TRA shared the restoration cost estimate.  On March 19,

12 2019, TRA notified PG&E that ECC would store portable base camp housing units on the property,

13 asked if PG&E objected to ECC's use of the site before it had an agreement with TRA, and asked

14 PG&E to continue to maintain security at the property (which PG&E did).  [Jadhav Decl., ¶5.]  On

15 March 20, 2019, *two days prior to execution of the ECC Lease*, TRA provided PG&E a revised

16 restoration estimate in the amount of approximately $9,000,000.  [Goodman Decl., Exh. A, Attachment

17 3.]  When TRA produced the golf course "restoration" estimates, TRA did not provide PG&E with the

18 ECC Lease, nor did TRA advise PG&E that it was releasing the property for imminent construction

19 and improvements that would make "restoration" impossible.[5]

20       On March 25, 2019, TRA informed PG&E that it had entered into the ECC Lease.  [Jadhav

21 Decl., ¶ 6.]  On March 27, 2019, PG&E expressed its concern to TRA about ECC's substantial grading

22 work at the Property, which exceeded the scope of the permits obtained by PG&E.  [Jadhav Decl., ¶ 7,

23 Exh. D.]  TRA responded that ECC had a storm water pollution prevention plan in place for ECC's

24 work at the premises.  [Jadhav Decl., ¶ 7.]

25       TRA admitted that ECC used the entirety of the PG&E License Area and that ECC caused

---

[5] The ECC Lease acknowledged that it would be futile for TRA to obtain restoration from PG&E once ECC had taken over the property and TRA and ECC commenced the extensive development and construction work called for under the lease. [Goodman Decl., Exh. D, (exhibit B at p. 3, at A-1, p. 2, and exhibit C).]

further damage to the Property.  On March 5, 2020, TRA filed a lawsuit against ECC for breach of contract, breach of the implied covenant of good faith and fair dealing, and arbitration, alleging that ECC failed to make certain improvements to the Property.  In its verified complaint TRA admitted that "[a]lthough Defendant [ECC] leased only a portion of the Real Property (82.6 acres), *Defendant has utilized with the permission of Plaintiff, a majority of the remaining unleased 80 acres for the purpose of staging vehicles and equipment without any compensation to Plaintiff*."  [Goodman Decl., Exh. C at ¶ 10.]  Scott Bates, a member of TRA, submitted a Declaration in support of a writ of attachment against ECC attesting to the accuracy of information in the verified complaint and stating that TRA "further intends to amend its complaint upon the departure of ECC from the Real Property to include damages caused the real property by ECC in breach of the lease.  For example, currently the *Real Property has been stripped of all surface dirt*."  [Goodman Decl., Exh. E, ¶ 6.]  Bates further declared that "ECC is scheduled to depart the Real Property by the end of March, 2020" and is leaving "the Real Property in a scorched and decimated condition while it has reaped millions and contributed a bare fraction of the funds it was required to pay to Tuscan for its benefit."  [*Id*. at ¶ 9.]

## V. DISCUSSION

The Reorganized Debtors file this Objection pursuant to section 502(b)(1) of the Bankruptcy Code, seeking entry of an order disallowing and expunging the Proof of Claim.  The Reorganized Debtors dispute the validity and amount of the Proof of Claim, and submit that this Objection involves factual disputes that will require an evidentiary hearing following the opportunity for the Reorganized Debtors to take discovery.

### A. Fulcrum Bears the Burden of Proof on its Claim

A filed proof of claim is "deemed allowed, unless a party in interest . . . objects."  11 U.S.C. § 502(a).[6]  Section 502(b)(1) of the Bankruptcy Code, however, provides in relevant part that a claim

---

[6] Upon the Reorganized Debtors' request, the deadline under Section 7.1 of the Plan for the Reorganized Debtors to bring objections to Claims initially was extended through and including June 26, 2021 (except for Claims of the United States, which deadline was extended to March 31, 2021) [Docket No. 9563]. That deadline has been further extended through December 23, 2021, except for Claims of the California Department of Forestry and Fire Protection, which deadline was extended to September 30, 2021, without prejudice to the right of the Reorganized Debtors seek further extensions thereof [Docket No. 10494].  The deadline with respect to Claims of the United States have twice been further extended by stipulation and order [Docket Nos. 10459, 10463, 10983, and 10986].

may not be allowed if "such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law." 11 U.S.C. § 502(b)(1). Once the objector raises "facts tending to defeat the claim by probative force equal to that of the allegations of the proofs of claim themselves," *Wright v. Holm (In re Holm)*, 931 F.2d 620, 623 (9th Cir. 1991), quoting 3 L. King, *Collier on Bankruptcy* § 502.02 at 502-22 (15th ed. 1991), then "the burden reverts to the claimant to prove the validity of the claim by a preponderance of the evidence," *Ashford v. Consolidated Pioneer Mortgage (In re Consolidated Pioneer Mortgage)* 178 B.R. 222, 226 (B.A.P. 9th Cir. 1995) (quoting *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173-74 (3d Cir. 1992)), *aff'd without opinion* 91 F.3d 151 (9th Cir. 1996). "[T]he ultimate burden of persuasion is always on the claimant." *Holm*, 931 F.2d at 623 (quoting King, *Collier on Bankruptcy*); *see also Lundell v. Anchor Constr. Specialists, Inc.*, 223 F.3d 1035, 1039 (9th Cir. 2000), *Spencer v. Pugh (In re Pugh)*, 157 B.R. 898, 901 (BAP 9th Cir. 1993); *In re Fidelity Holding Co.,* 837 F.2d 696, 698 (5th Cir. 1988).

As set forth below, Claimant has failed to meet its burden of proof.[7]

### B. PG&E Did Not Breach the Letter Agreement

It is undisputed that PG&E rightfully occupied and used the Property and paid all consideration due under the Letter Agreement up through May 2019, well after TRA executed the ECC Lease and ECC and TRA began excavating, trenching, grading and performing extensive construction on the property. ECC continuously used the property from a date prior to expiration of PG&E's license until at least March 2020. [Goodman Decl., Exh. E, p. 3 ¶ 9.]

A contract must be interpreted to give effect to the mutual intention of the parties at the time the contract was executed. Cal. Civ. Code § 1636. It is to be interpreted as a whole under the circumstances in which it was made. Cal. Civ. Code §§ 1636, 1639, and 1647 (contracts are explained by the circumstances under which they were made and the matters to which they relate); *see Legacy Vulcan Corp. v. Superior Court*, 185 Cal. App. 4th 677, 688 (2010) ("We consider the contract as a

---

[7] Fulcrum has never identified the specifics of any areas requiring restoration nor the "Baseline Condition" (as defined in the Letter Agreement) and has not provided any detailed descriptions of the precise restoration work proposed to be performed and the purpose of that work. There was in fact no restoration work to be performed because ECC and TRA used all of the PG&E improvements, used the area with the "golf course improvements" and TRA has no intention of now restoring the 18-hole golf course, let alone the golf course as it existed in November 2018.

whole and interpret its language in context so as to give effect to each provision, rather than interpret contractual language in isolation."). "It is fundamental that an interpretation of a contract which will make it reasonable, fair and just should be accepted over an equally consistent interpretation which would make it unreasonable, unfair and unjust." *Butchers' Union v. Cudahy Packing Co.*, 66 Cal. 2d 925, 943 (1967).

The Letter Agreement, read as a whole, clearly reflects the mutual intention of the parties that TRA would allow PG&E to use the License Area in exchange for monetary consideration, and that at the end of its occupancy, PG&E would repair any damage it caused to the License Area so as to return it to the same condition it was in on November 18, 2018. Further, the Letter Agreement unequivocally provides that any PG&E restoration obligation would be appropriately reduced upon early termination of the license and the subsequent use of the Property by others. The circumstances surrounding negotiation and execution of the Letter Agreement establish that PG&E's agreement to perform *limited* golf course restoration was based on the representation of TRA that it was required to maintain the then-existing 18-hole golf course improvements by Butte County and in order to develop the Property. The Letter Agreement is clear that PG&E was only required to restore the License Area to its *baseline condition* – the condition of the property as it existed on November 19, 2018. It was never contemplated that PG&E would restore the property after it was used by others or that PG&E would pay millions of dollars to TRA to restore a golf course that TRA has since not restored, and has no intention of ever restoring.

1. <u>TRA Prevented PG&E's Performance and Breached the Implied Covenant of Good Faith and Fair Dealing</u>

At the time of the Letter Agreement, it was contemplated that PG&E would restore the License Area to its baseline condition upon termination of PG&E's use of the property. TRA and ECC's work at the property immediately after PG&E's departure, and as required under the ECC Lease, excused and negated PG&E's restoration obligations under the Letter Agreement, which were to be performed at or before termination of the Letter Agreement. [*See* Cal. Civ. Code §§ 1511-1514.] In every contract there is an implied covenant of good faith and fair dealing that prevents a party from doing anything to unfairly interfere with the right of the other party to receive the benefits of the contract.

*See Carma Developers, Inc. v Marathon Development California, Inc.*, 2 Cal. 4th 342, 371-72 (1992); *Racine & Laramie, Ltd. v. Department of Parks & Recreation*, 11 Cal. App. 4th 1026, 1031-32 (1992). Good faith means honesty of purpose without any intention to mislead or take undue advantage of another. CACI No. 325. PG&E also alleges the defense of unclean hands. *Kendall-Jackson Winery, Ltd. v. Superior Court*, 76 Cal. App .4th 970, 978 (1999) ("doctrine demands that a plaintiff act fairly in the matter for which he seeks a remedy.")

PG&E's performance of any restoration obligation was excused and prevented by TRA's own conduct, from which it profited and through which it received significant permanent improvements to the property from Cal Recycle, under its contract with ECC. PG&E contracted and paid TRA for use of the License Area through May 2019, but TRA effectively terminated PG&E's use of the License Area when TRA leased the property to ECC, thereby precluding PG&E from conducting any potential restoration. TRA's termination of PG&E's occupancy to allow for ECC's use of the premises excused and prevented PG&E from restoring the area used by ECC. TRA's entry into the ECC Lease clearly indicated that TRA no longer intended to restore the property to its "baseline condition". Moreover, TRA did not and does not intend to restore the 18-hole golf course as it existed on November 19, 2021.[8]

2. <u>The Letter Agreement Expressly Recognizes that PG&E was Not Required to Restore Property Used by Others</u>

The language of the contract also shows the mutual intent of the parties that PG&E would not be responsible for any restoration obligations when others used and altered the License Area. Specifically, the Letter Agreement states that if a public agency desires to use all or part of the Property after January 15, 2019, for activities related to the Camp Fire, PG&E will coordinate with those public agencies. If the use is not compatible with PG&E's activities under the Letter Agreement, TRA could terminate the Letter Agreement on 45-day notice and reimburse PG&E for any prepaid compensation, in which event "PG&E's restoration obligations under this Letter Agreement shall be

---

[8] Based on publicly available documents, TRA never had an approval from Butte County to begin development of the property in the Spring of 2019 as alleged in its Proof of Claim. The development plans in existence at the time of the Letter Agreement did not maintain the 18-hole golf course as it existed in November 2018, and TRA's current development plans are for a housing and commercial development with no golf course – only a "golf practice area."

proportionately reduced based on the use of any other public agency occupying the License Area." [Jadhav Decl., Exh. B, p. 2.] The intent is clear that PG&E would not be responsible for any restoration obligations to the extent that others used the licensed area with or after PG&E. The reason is obvious. It would be patently unfair to require PG&E to restore property altered, developed, and used by others and for which PG&E received no consideration.[9]

### 3. TRA Appropriated PG&E's Improvements for its Own Economic Gain

TRA was unjustly enriched through receipt of rent payments by PG&E after it entered into the ECC Lease and through its appropriation of the PG&E improvements for its own use and the use of ECC. *See Lectrodryer v. Seoulbank*, 77 Cal. App. 4th 723, 726 (2000) (unjust enrichment is the "receipt of a benefit and unjust retention of the benefit at the expense of another.") TRA accepted all payments made by PG&E under the Letter Agreement for the PG&E license term through May 20, 2019. TRA has admitted that ECC used all of the PG&E License Area. Not only did TRA and ECC make use of PG&E's improvements (including PG&E's rock and gravel), but TRA expressly required ECC to maintain those improvements under its lease agreement. TRA (and ECC) used the PG&E staging and parking areas and transported heavy equipment over the PG&E improvements for the purpose of constructing the permanent improvements and the ECC camps. TRA did not reimburse any part of the consideration paid by PG&E, as required by the Letter Agreement, which provides for reimbursement of "prepaid compensation allocated to periods after termination of the letter agreement." [Jadhav Decl., ¶¶ 3, 4, Ex. B, Ex. C.] In the event that TRA can meet its burden of demonstrating any liability for restoration owed by PG&E, which it likely cannot, TRA will need to compensate PG&E for the cost and its use of PG&E's base camp improvements, and the rent and security paid by PG&E after TRA leased the property to ECC. Not only does TRA have no damage,

---

[9] As Scott Bates of TRA verified in TRA's complaint against ECC, ECC used all parts of the TRA Property. [*See* Goodman Decl., Exh. C at ¶ 10; Exh. E, ¶ 5.] There is no question that the ECC housing development and use of the Property was well within the PG&E License Area. TRA and ECC also used heavy equipment and machinery on the PG&E access road, staged and parked heavy equipment in the PG&E parking areas and set up structures in the License Area. In short, it was never the intention of the parties that PG&E would pay to restore an area that was subsequently heavily developed and used by ECC and TRA.

1  let alone "consequential damages," but PG&E's improvements actually benefitted TRA and facilitated
2  the ECC Lease.

    4. <u>The Letter Agreement Provided for Restoration of the License Area to its Prior Condition -- Not Payment of Millions of Dollars to TRA for its Redevelopment Plans and/or Enrichment</u>

TRA seeks millions of dollars from PG&E that it does not intend to use to "restore" anything related to the Baseline Condition. Instead, TRA is seeking to completely redevelop the property into a commercial and housing development *without* an 18-hole golf course and without the 'improvements" that existed on the Property as of November 19, 2018. This is wholly contrary to the intent of the Letter Agreement. Not only does PG&E have no obligation to restore property used by TRA for constructing improvements or used by ECC during its extensive camp operations, but PG&E is not obligated to pay for TRA's new development plans. The ECC Lease and TRA's publicly available development plans make clear that TRA did not and does not intend to restore the Property to the "Baseline Condition" it was in when PG&E and TRA entered into the Letter Agreement. If any restoration were to be required of PG&E, it cannot be for a golf course that will not exist, or for other "Baseline" conditions that will no longer exist. The fundamental premise of PG&E's restoration obligation under the Letter Agreement is that TRA would return the golf course, upon PG&E's departure, to the same condition it was in when PG&E entered into the Letter Agreement. It was never contemplated that PG&E would pay for any other work, or undertake restoration following the tenancy of a subsequent user, or that TRA would not restore the golf course improvements.

    **C.    PG&E is Not Liable for Trespass or Waste**

TRA alleges that PG&E trespassed, committed waste, and unlawfully took possession of the Property for use as a base camp. Trespass is the unlawful interference with possession of property. *Girard v. Ball*, 125 Cal. App. 3d 772, 788 (1981). PG&E denies any trespass. To the contrary, PG&E contracted with TRA for use of the License Area and had all necessary consent. PG&E paid all rent due to TRA for use of the License Area pursuant to the Initial Letter Agreement, from the commencement of that agreement through November 19, 2018. [Jadhav Decl., ¶¶ 2, 4, Exh. C.] Before the end of the term of the Initial Letter Agreement, PG&E proposed a new agreement for use of a license area at 3100 Skyway Road as a support site and base camp in connection with Camp Fire

restoration work. [Jadhav Dec., ¶3.] TRA and PG&E signed that Letter Agreement on November 20, 2018, for the term commencing November 19, 2018, and expiring May 20, 2019. [Jadhav Decl., ¶3, Exh. B.] Pursuant to the Letter Agreement, and with the consent of TRA, PG&E expanded its use of the property at 3100 Skyway Road. [*Id.*] PG&E paid the independent consideration, rent, and winterization costs due through May 20, 2019, well after ECC took over the TRA property in March 2019. PG&E denies any liability for trespass, waste, or any unlawful possession of the property.

### D. Further Discovery Is Required

Bankruptcy Local Rule 3007-1(b) states that "[w]here a factual dispute is involved, the initial hearing on an objection shall be deemed a status conference at which the Court will not receive evidence." The Reorganized Debtors submit that the Proof of Claim and this Objection involve disputed facts, which will require development through discovery. At the initial hearing and status conference on the Objection, the Reorganized Debtors will seek a schedule for discovery and summary judgment briefing.

## VI. RESERVATION OF RIGHTS

The Reorganized Debtors hereby reserve the right to object, as applicable, in the future to the Proof of Claim on any ground, and to amend, modify, or supplement this Objection to the extent an objection to a claim is not granted, and to file other objections to any proofs of claims filed in these cases, including, without limitation, objections as to the amounts asserted therein, or any other claims (filed or not) against the Debtors, regardless of whether such claims are subject to this Objection. A separate notice and hearing will be scheduled for any such objections. Should the grounds of objection specified herein be overruled or withdrawn, wholly or in part, the Reorganized Debtors reserve the right to object to the Proof of Claim on any other grounds that the Reorganized Debtors may discover or deem appropriate. The Reorganized Debtors also reserve the right to assert any counterclaims or affirmative defenses, whether in connection with this Objection or in an adversary proceeding or other litigation, which counterclaims and defenses are expressly reserved.

## VII. NOTICE

Notice of this Objection will be provided to (i) Fulcrum and TRA; (ii) the Office of the U.S. Trustee for Region 17 (Attn: Andrew R. Vara, Esq. and Timothy Laffredi, Esq.); (iii) all counsel and

parties receiving electronic notice through the Court's electronic case filing system; and (iv) those persons who have formally appeared in these Chapter 11 Cases and requested service pursuant to Bankruptcy Rule 2002. The Reorganized Debtors respectfully submit that no further notice is required.

      WHEREFORE the Reorganized Debtors respectfully request entry of an order granting (i) the relief requested herein as a sound exercise of the Reorganized Debtors' business judgment and in the best interests of their estates, creditors, shareholders, and all other parties' interests, and (ii) such other and further relief as the Court may deem just and appropriate.

Dated: September 22, 2021

**KELLER BENVENUTTI KIM LLP**
**GOUGH & HANCOCK LLP**

By:   */s/ Gayle L. Gough*
        Gayle L. Gough

*Attorneys for Debtors and Reorganized Debtors*