# EXHIBIT E

**(March 11, 2020 Declaration of Scott Bates)**

Sara M. Knowles (SBN 216139)
**LELAND, MORRISSEY & KNOWLES** LLP
1660 Humboldt Road, Suite 6
Chico, CA 95928

Telephone: (530) 342-4500
Facsimile: (530) 345-6836

Attorney for Plaintiff TUSCAN RIDGE ASSOCIATES, LLC.

Superior Court of California
County of Butte

3/11/2020

By _____ Deputy
Electronically FILED

# SUPERIOR COURT OF CALIFORNIA,
# COUNTY OF BUTTE

| | |
|---|---|
| TUSCAN RIDGE ASSOCIATES, LLC. | CASE NO. 20CV00694 |
| Plaintiff, | **DECLARATION OF SCOTT BATES IN SUPPORT OF EX PARTE APPLICATION FOR WRIT OF ATTACHMENT** |
| v. | |
| ECC CONSTRUCTORS LLC., A DELAWARE LIMITED LIABILTY COMPANY, AND DOES 1-50 | |
| Defendants. | Date: March 12, 2020<br>Time: 4:00 p.m.<br>Dept: TBD |

I, Scott Bates, declare as follows:

1.      I am the manager of Tuscan Ridge Associates, LLC ("Tuscan"), the Plaintiff in this action. I have personal knowledge of the facts and matters described herein and could and would faithfully testify as set forth herein.

2.      Attached hereto and incorporated herein by reference as Exhibit "A", is a copy of the Verified Complaint, which I signed. All of the information contained therein is true and correct with the exception of those items corrected by the Errata, which is attached hereto and incorporated herein by reference as Exhibit "B."

3.      As set forth in the verified complaint, Tuscan is owed funds from ECC. As of December 27, 2019, ECC had received over $59,400,000 from the California Department of Resources Recycling and Recovery ("Cal Recycle") for invoices related to the "Base Camp." The Base Camp refers the occupation of the real property, leased by ECC, and known as Butte

1

County Assessor's Parcel Nos 040-520-004 through 040-520-011 (the "Real Property") pursuant to a written lease ("Lease") between Tuscan and ECC.

4. Attached hereto and incorporated herein by reference as Exhibit "C" is a true and correct email from the Chief Counsel of Cal Recycle indicating that ECC was paid for the site infrastructure, lease and permits. Attached to the email is an approval sheet from Cal Recycle, ECC's invoice dated April 17, 2019, ECC's ledger as well as a memo from Cal Recycle referencing that ECC was to be paid "25% of the power distribution, 50% of other infrastructure costs and **100% of the lease** and permitting fees." (emphasis added)

5. Tuscan is owed, at a minimum, $5,324,649.06 by Defendant, ECC Constructors, LLC ("ECC"). An itemization of these items are as follows:

| | |
|---|---|
| Rent payments | $666,666.66 |
| (and accruing by $83,333.33 a month beginning April 1, 2020) | |
| PG & E | $684,941.36 |
| Wastewater System fees | $222,246.57 |
| | $346,818.06 |
| | $95,964.47 |
| I-5 Rentals, Inc. & Swan Engineering | $722,149.60 |
| Left Hand Turn Lane | $1,500,000 |
| Damage to main entrance | $600,000 |
| Big Valley Pumping | $800,000 |

6. Tuscan further intends to amend its complaint upon the departure of ECC from the Real Property to include damages caused to the real property by ECC, in breach of the lease. For example, currently the Real Property has been stripped of all surface dirt. The Lease provided, at Pages 24-25, ¶19.2, that ECC leave the Real Property in "good order and condition as reasonably determined by landlord." (See Exhibit "A" to the Complaint).

7. ECC has already been paid for the lease, but it refuses to pay Tuscan. ECC has been paid from government funds, i.e. taxpayer dollars. ECC was awarded a contract of at least

1   $300,000,000. Of this amount, $96,000,000.00 was earmarked for the costs related to the Lease,
2   indicating site improvements and construction of infrastructure. See Exhibit "D" attached hereto
3   and incorporated herein by reference, which are true and correct copies of invoices submitted by
4   ECC to Cal Recycle for costs of the "Camp Fire Base Camp." To date, ECC has clearly received
5   nearly 60 million dollars as and for costs associated with the Lease and Base Camp pursuant to
6   their contract with Cal Recycle. There is approximately 36 million dollars remaining and
7   earmarked, for costs related to the Lease between ECC and Tuscan, pursuant to the Cal
8   Recycle/ECC Contract. A minimum of $5,500,000 should be attached to protect the chances of
9   recovery by Tuscan of the sums owed by ECC to Tuscan.

10       8.      Tuscan is a local entity. It contributed its land, to ECC, in order to receive benefits
11  as outlined in the parties' contract. ECC has received its benefit, but Tuscan has not. ECC has
12  been paid moneys from Cal Recycle to cover its lease obligations, but it refuses to pay Tuscan!

13       9.      ECC is scheduled to depart the Real Property by the end of March, 2020. It will
14  leave the Real Property in a scorched, and decimated condition while it has recouped millions
15  and contributed a bare fraction of the funds it was required to pay to Tuscan or for its benefit.

16       10.     Tuscan will seek to increase the amount of any Writ of Attachment by the amount
17  necessary to cover any additional damage but Tuscan needs protection now.

18       11.     Mediation in this matter occurred in early January, 2020. Since then, ECC has
19  been dragging its feet with respect to having this matter arbitrated. Each day that goes by means
20  the greater the damage to the Real Property, and the reduced ability for Tuscan to recover. ECC
21  will bill Cal Recycle, pocket the money, and leave Tuscan to try to clean up the mess. That's just
22  not right.

23       12.     Any award ultimately rendered in arbitration will be rendered ineffectual without
24  provisional relief because ECC has the ability to transfer funds to its out of country accounts and
25  has other mechanisms available to it to hinder any attempts at collection.

26  //

27  //

28  //

Case BUTTE COUNTY CASE NO. 20CV00469 DECLARATION OF SCOTT BATES IN SUPPORT OF EX PARTE APPLICATION FOR WRIT OF ATTACHMENT
of 108

1         13. Tuscan reserves its right to arbitrate this matter pursuant to the parties' Lease.

2         I declare under penalty of perjury under the laws of the State of California that the

3 foregoing is true and correct.

4

5 Dated: 3 - 11 - 20

6

        Scott Bates, Manager

7         Tuscan Ridge Associates, LLC

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BUTTE COUNTY CASE NO. 20CV00694 DECLARATION OF SCOTT BATES IN SUPPORT OF EX PARTE APPLICATION FOR WRIT OF ATTACHMENT

# EXHIBIT "A"

Sara M. Knowles (SBN 216139)
**LELAND, MORRISSEY & KNOWLES LLP**
1660 Humboldt Road, Suite 6
Chico, CA 95928

Telephone: (530) 342-4500
Facsimile: (530) 345-6836

Superior Court of California
County of Butte

**F I L E D**

3/5/2020

Kimberly Flener, Clerk
By _____ Deputy
Electronically FILED

Attorney for Plaintiff TUSCAN RIDGE ASSOCIATES, LLC.

## SUPERIOR COURT OF CALIFORNIA,

### COUNTY OF BUTTE

| | |
|---|---|
| TUSCAN RIDGE ASSOCIATES, LLC. | CASE NO. 20CV00694 |
| Plaintiff, | **COMPLAINT FOR BREACH OF CONTRACT, FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING; PETITION TO COMPEL ARBITRATION** |
| v. | |
| ECC CONSTRUCTORS LLC., A DELAWARE LIMITED LIABILTY COMPANY, AND DOES 1-50 | |
| Defendants. | |

Plaintiff Tuscan Ridge Associates, LLC ("Plaintiff") alleges as follows:

1.     Plaintiff is a limited liability company organized and existing under the laws of the State of California, with its principal place of business located in Butte County, California.

2.     Defendant ECC Constructors LLC ("Defendant") is a limited liability company organized and existing under the laws of the State of Delaware, doing business within Butte County, California.

3.     Plaintiff is the owner of real property located in the County of Butte, commonly known as Assessor's Parcel Nos. 040-520-004 through 040-520-011 (hereinafter referred to as the "Real Property"). The Real Property is adjacent to the Skyway, the only road that runs from Chico, California to Paradise, California. The Real Property is approximately six miles east of Chico, and approximately four miles west of Paradise and consists of approximately 160 acres. Exhibit "A" attached hereto and incorporated herein by reference is a true and correct copy of

1

1   Butte County Assessor's Map, Book 40, Page 52 with the Real Property highlighted in yellow.

2       4.      On November 8, 2018, the deadliest and most destructive wildfire in California

3   history occurred in Butte County. This fire has come to be known as the "Camp Fire", due to its

4   place or origin. The Camp Fire destroyed over 18,000 structures, covered an area of 153,336

5   acres and caused 85 fatalities. The towns of Paradise and Concow were nearly completely

6   destroyed, with each losing 95% of all structures. The town of Magalia, located above Paradise,

7   suffered a loss of roughly half of all of its structures.

8       5.      Defendant contracted with the California Department of Resources Recycling and

9   Recovery ("Cal Recycle") to remove fire related debris from Paradise at a cost of 359 million

10  dollars.

11      6.      Plaintiff does not know the true names of Defendant DOES 1-50, inclusive, sued

12  herein and, therefore, sues such Defendants by those fictitious names.

13      7.      Plaintiff is informed and believes, and on that basis alleges, that at all times

14  mentioned herein, Defendants were the agents and/or employees of their co-defendants and, in

15  doing the things alleged in this Complaint, were acting within the course and scope of such

16  agency and/or employment.

17      8.      Due to the contract between Defendant and Cal Recycle, ECC was in need of

18  housing for approximately 1,500 to 3,000 workers in order to perform its obligations. As a

19  result, Defendant leased 82.6 acres of the Real Property for a temporary workforce housing

20  complex from Plaintiff. This work camp included 20.1 acres known as the PG & E Base Camp,

21  30 acres known as Base Camp 1 and 32.5 acres known as Base Camp 2. A true and correct copy

22  of the lease, dated March 22, 2019, is attached hereto and incorporated herein by reference as

23  Exhibit "B"

24      9.      An amendment to the lease was executed by the parties, a true and correct copy of

25  this amendment is attached hereto and incorporated herein by reference as Exhibit "C".

26      10.     Although Defendant leased only a portion of the Real Property (82.6 acres),

27  Defendant has utilized, with the permission of Plaintiff, a majority of the remaining unleased 80

28  acres for the purpose of staging vehicles and equipment without any compensation to Plaintiff.

11.     Prior to the Camp Fire, Plaintiff had plans to develop the Real Property for housing. These plans would have required Plaintiff to make certain improvements to the Real Property, including the installation of electrical power and a wastewater treatment facility.

12.     The Lease states that "…Tenant will be paying for the completion of numerous improvements that will permanently benefit the property…" In return, Defendant would receive a partial rent credit. This contract term is referred to as the "Threshold Amount" and described in Exhibits A-1 of the Lease and Exhibit "C."

13.     The Lease, at Exhibit A - I, provided that either party was entitled to terminate the lease within ten (10) business days to allow each side to investigate certain risks (referred to within the Lease as "Remaining Risks"). In the event that Defendant refused to cover such risks, then either party was entitled to terminate the Lease, relieving each of any obligations.

14.     The Lease was not terminated, and Defendant agreed to cover certain costs as specified in the Lease and the amendment. These costs included, but were not limited to PG & E work, which was known by the parties to "likely push the costs of Landlord's work over the revised threshold" (See Exhibit "C", page 1, ¶ 3.)

15.     Within the Lease and amendment, the parties agreed that Defendant would be responsible to cover costs above an amount of $2,964,800, which is known as the "Threshold Amount."

16.     Rent payments were to commence in August 2019, the first month following completion of Permanent Improvements. Since ECC agreed to absorb the cost of Landlord's work over the Revised Threshold Amount of $2,964,800 without an offset in rent, $1,000,000 was required to be paid to Plaintiff and amortized equally over the Lease Term.

17.     No rent has been paid, and the sum of $666,666.66 is due and owing as of March 1, 2020, with such amounts continuing to accrue at the rate of $333,333.00 per month.

18.     The Lease further provides that Defendant is responsible for the installation of permanent power to the Real Property, including but not limited to, advancing payment for the 12KV line service and step-down transformers, trenching and installing underground conduit from the 12 KV drop locations to the transformer pads and installing the service to step-down

3

transformers. Defendant is also responsible for advancing the costs and installation of three pole-mounted step-down transformers.

19.     In furtherance of these obligations, Defendant met with PG & E several times at the site to discuss the plan to bring power to the site and on March 4, 2019, Defendant paid $5,000 to PG & E to begin the process of getting power to its site. Attached hereto and incorporated herein by reference is Exhibit "D", a true and correct copy of the receipt. This receipt specifies the following:

> "IMPORTANT: By going forward with this project and paying the engineering advance to PG&E you are also agreeing to pay PG&E for all costs PG&E incurs for your project in the event that your project is cancelled, even if the costs PG&E incurs are more than this advance."

20.     Defendant, however, refused to advance the costs of the permanent power as specified herein. Instead, Defendant provided temporary power to its site via diesel generators.

21.     As a result of Defendant's breach, there is due and owing the sum of $684,941.36 to PG&E.

22.     Defendant has received invoices for the wastewater system in the amount of $220,246.57 on July 31, 2019 and $346,818.06 on September 24, 2019. Since Defendant has received these invoices, Plaintiff has been forced to incur an additional $95,964.47 in costs relating to the wastewater system. The Lease specifies that Defendant is required to issue payment within seven (7) days after receipt of Landlord's notice. The foregoing amounts are still outstanding and due to Plaintiff.

23.     Defendant has incurred additional costs to I-5 Rentals, Inc. and Swan Engineering, totaling $722,149.60 for work performed on the wastewater system and storage ponds. As a result of Defendant's failure to pay these amounts, the Real Property is now subject to mechanics liens in this amount. Plaintiff has contested the validity of these claims with each provider, however since such works relates to work that Defendant is obligated to cover, such fees are Defendant's responsibility and Defendant is required to pay for the Scheduled Improvements. Therefore, Defendant is necessarily responsible for these costs.

4

24. Defendant agreed in the Lease that it would install a new left turning lane from westbound Skyway Drive into the northeast corner of the Real Property. In furtherance of this obligation, which was due to be completed within a reasonable time, Defendant commissioned a traffic study in May of 2019. Defendant has taken no further steps to meet its obligations, and has indicated to Plaintiff that it does not intend to complete this promised improvement. It is estimated that it will cost approximately $1,500,000 to install this left hand turning lane. In lieu of installing the left hand turning lane as required under the Lease, Defendant directed all truck traffic through the property main gate and destroyed the main entrance. The Lease requires Defendant to repair this damage, which is estimated at a minimum of $600,000.

25. In addition to the sums outlined above, Plaintiff is entitled to interest on the unpaid amounts, as specified in the Lease, as well as default interest, and late charges.

26. Defendant incurred approximately $800,000 in sewage costs, owed to Big Valley Pumping. The Lease provides that costs incurred by Defendant in furnishing utility serves after the 45 day deadline to complete the wastewater treatment facility could be offset against Rent or charged to Landlord. However, the Lease also contains a "force majeure' cause which excuses the requirement to have the wastewater treatment facility completed by Plaintiff. Instead, the 45 day deadline to install the wastewater treatment facility was extended to June 21, 2019 due to inclement weather. Any costs incurred for Big Valley Pumping's services incurred prior to June 21, 2019 are the sole responsibility of Defendant, without offset.

27. Additionally, Defendant would not have been able to utilize the wastewater system until Defendant provided the necessary electrical power to the system, which did not occur until July 25, 2019, (and was accomplished via diesel generator). Any pumping that occurred was done due to the fact that Defendant did not perform its obligations under the terms of the Lease.

28. The Lease contains an attorneys' fees clause at page 29, paragraph 24.11, of Exhibit 2.

29. The Lease further provides that the parties will mediate any disputes. An attempt at mediation occurred on January 7, 2020.

5

COMPLAINT FOR BREACH OF CONTRACT, FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING;

30.     The lease also contains a provision that specifies that the parties will participate in arbitration. To date, no such arbitration has been scheduled, nor has the case been formally referred to arbitration.

## FIRST CAUSE OF ACTION

### BREACH OF CONTRACT
### (AGAINST ALL DEFENDANTS)

31.     Plaintiff incorporates herein by reference paragraphs 1-30 as if set forth fully herein.

32.     Defendant has refused to perform its obligations under the terms of the Lease, including but not limited to, failing to provide permanent power, failure to install the left turn lane, failure to pay costs and rental amounts due and owing as well as interest, default amounts and late fees as specified herein.

33.     Plaintiff has performed all conditions of the Contract that are required to be performed by Plaintiff.

34.     Defendant's failure and refusal to perform its obligations under the Contract constituted a breach and damaged Plaintiff in a dollar amount according to proof, which exceeds the minimum jurisdictional limit of this Court.

35.     The Contract between Plaintiff and Defendant provides for an award of attorneys' fees and costs incurred to enforce the Contract.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth herein below.

### SECOND CAUSE OF ACTION
### BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (AGAINST ALL DEFENDANTS)

34.     Plaintiff incorporates herein by reference paragraphs 1-35 set forth hereinabove as if set forth fully herein.

35.     The Contract between the parties gives rise to an implied covenant of good faith and fair dealing. Such covenant requires that each party not do anything to unfairly interfere

6

with the rights of any other party to receive the benefits of the Contract. This covenant also requires that the parties engage in fair dealing with respect to the performance and enforcement of the Contract.

36.     Plaintiff did all, or substantially all, of the significant things that the Contract required it to do prior to Defendant's unilateral and wrongful breaches.

37.     All conditions required for Plaintiff's performance under the Contract occurred prior to Defendant's breach.

38.     Defendant unfairly interfered with Plaintiff's right to receive benefits under the Contract.

39.     Plaintiff was harmed by Defendant's conduct not only in terms of loss of the funds under the terms and conditions of the Contract, but also due to: 1) Defendant's unilateral refusal to install the left turn lane, and 2) Defendant's failure to install permanent PG & E.

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as set forth herein below.

### THIRD CAUSE OF ACTION
### PETITION FOR ARBITRATION
### (AS TO ALL DEFENDANTS)

40.     Plaintiff incorporates herein by reference paragraphs 1-39 set forth hereinabove as if set forth fully herein.

41.     The Lease provides that in the event that a dispute arose between the parties that such dispute would be resolved by arbitration.

42.     The Lease is in full force and effect and a dispute has arisen regarding sums owed to Plaintiff as specified herein.

43. Plaintiff has provided a written request to Defendant that it wishes to resolve the dispute in arbitration and has suggested the arbitrators. Defendant has acknowledged Petitioner's request and on February 21, 2020 indicated that it would reply as to either arbitrator suggested by Defendant within one week. As of the filing of this Complaint, Defendant has

7

1  failed and refused to provide any meaningful response with respect to its selection of an

2  arbitrator or its commitment to attend arbitration.

3      44. Plaintiff has not waived its right to the have the dispute resolved by arbitration and

4  no grounds exist for the revocation of the agreement.

5      Wherefore, Plaintiff prays for judgment as set forth below:

6      1.    That Defendant corporation, and/or its agents and/or successors-in-interest, pay to

7  Plaintiff monetary damages for all harm suffered by Plaintiff due to Defendant's breach of

8  contract in an amount according to proof;

9      2.    For monetary damages in the amount according to proof due to Defendant's

10  unilateral and wrongful breach of the implied covenant of good faith and fair dealing;

11      3.    For attorney's fees in an amount determined by the Court to be reasonable as

12  authorized by the Contract and according to proof;

13      4.    For an order requiring Defendant to participate in arbitration as provided in the

14  agreement and by law in order to resolve the controversy and dispute between the parties arising

15  out of their written agreement.

16      5.    For costs to suit herein; and

17      6.    For such other and further relief as the Court deems just and proper.

18

19      Respectfully submitted,

20      **LELAND, MORRISSEY & KNOWLES, LLP**

21

22  Dated: March 5, 2020

23      Sara M. Knowles

24      Attorney for Tuscan Ridge Associates, LLC.

25

26

27

28

## VERIFICATION

I, Scott Bates, am a managing member of Tuscan Ridge Associates, LLC. I have read the Complaint for Breach of Contract, for Breach of the Implied Covenant of Good Faith and Fair Dealing; Petition to Compel Arbitration and verify the contents thereof. I have personal knowledge of the facts therein alleged, except as to those facts alleged on information and belief and, as to such facts, I believe them to be true.

I declare under the penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 5th day of March, 2020 at Chico, California.

_____
Scott Bates, Managing Member
Tuscan Ridge Associates, LLC

# EXHIBIT "B"

Sara M. Knowles (SBN 216139)
LELAND, MORRISSEY & KNOWLES LLP
1660 Humboldt Road, Suite 6
Chico, CA 95928

Telephone: (530) 342-4500
Facsimile: (530) 345-6836

Attorney for Plaintiff TUSCAN RIDGE ASSOCIATES, LLC.

Superior Court of California
County of Butte

F I L E D

3/9/2020

Kimberly Flener, Clerk
By _____ Deputy
Electronically FILED

SUPERIOR COURT OF CALIFORNIA,

COUNTY OF BUTTE

| | |
|---|---|
| TUSCAN RIDGE ASSOCIATES, LLC. | CASE NO. 20CV00694 |
| Plaintiff, | ERRATA TO COMPLAINT FOR BREACH OF CONTRACT, FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING; PETITION TO COMPEL ARBITRATION |
| v. | |
| ECC CONSTRUCTORS LLC., A DELAWARE LIMITED LIABILTY COMPANY, AND DOES 1-50 | |
| Defendants. | |

Petitioner herein, Tuscan Ridge Associates, LLC, submits this Errata to the Complaint for Breach of Contract, For Breach of the Implied Covenant of Good Faith and Fair Dealing; Petition to Compel Arbitration ("Complaint") filed in the Butte County Superior Court on March 5, 2020.

1.    Paragraph 17 contains a typographical error. The monthly rent which will continue to accrue is $83,333.33, not $333,333.

2.    Exhibits "A", "B", "C" and "D" to the Complaint are attached hereto and incorporated herein by reference

Respectfully submitted,

LELAND, MORRISSEY & KNOWLES, LLP

Dated: March 6, 2020

Sara M. Knowles
Attorney for Tuscan Ridge Associates, LLC.

1

# EXHIBIT "A"

PTN. SECS. 30 & 31, T.22N. R.3E. M.D.B.&M.
PTN. SECS. 35 & 36, T.22N. R.2E. M.D.B.&M.

40--52



Butte County Assessor's Map
Book 40, Page 52

# EXHIBIT "B"

LEASE

between

TUSCAN RIDGE ASSOCIATES, LLC

A CALIFORNIA LIMITED LIABILITY COMPANY

as Owner/Landlord

and

ECC CONSTRUCTORS LLC

A DELAWARE LIMITED LIABILITY COMPANY

as Tenant

For the lease of

APPROXIMATELY 83 ACRES FOR TEMPORARY WORKFORCE HOUSING

BUTTE COUNTY, CALIFORNIA

Dated for reference purposes only as of
March 22, 2019

*S 67*

TUSCAN RIDGE – ECC CONSTRUCTORS LEASE

15321136.9

# TABLE OF CONTENTS

| | | | Page |
|---|---|---|---|
| 1. | BASIC LEASE INFORMATION | | 4 |
| 2. | PREMISES | | 6 |
| 3. | TERM | | 6 |
| | 3.1. | Term of Lease | 6 |
| | 3.2. | Delay in Delivery of Possession | 8 |
| | 3.3. | Extension Options | 8 |
| 4. | RENT | | 8 |
| | 4.1. | Rent | 8 |
| | 4.2. | Interest on Past Due Obligations | 9 |
| | 4.3. | Payment of Real Estate Taxes | 9 |
| | 4.4. | Payment of Other Taxes | 9 |
| | 4.5. | Security Deposit | 9 |
| 5. | USE | | 9 |
| | 5.1. | Permitted Use | 9 |
| | 5.2. | Manner of Use | 10 |
| 6. | LEASEHOLD IMPROVEMENTS | | 10 |
| | 6.1. | Landlord's Obligation to Construct Improvements | 10 |
| | 6.2. | Tenant's Work | 11 |
| 7. | ALTERATIONS | | 12 |
| | 7.1. | Alterations by Tenant | 12 |
| | 7.2. | Tenant's Property | 12 |
| | 7.3. | Minimizing Interference | 13 |
| | 7.4. | Title to Improvements | 13 |
| | 7.5. | Signs/Structures | 14 |
| 8. | REPAIRS AND MAINTENANCE | | 14 |
| | 8.1. | Landlord's Obligations | 14 |
| | 8.2. | Shared Obligations | 15 |
| | 8.3. | Tenant's Obligations | 15 |
| | 8.4. | Liens | 16 |
| | 8.5. | Loss or Damage | 16 |
| | 8.6. | Dispute Resolution | 16 |

TUSCAN RIDGE – ECC CONSTRUCTORS LEASE

15321136.0

$\mathcal{S}6\mathcal{B}$

9. UTILITIES AND SERVICES ........................................................................................ 16
    9.1. Utilities ........................................................................................................ 16
    9.2. Services ........................................................................................................ 17
10. COMPLIANCE WITH LAWS; PREMISES CONDITION ...................................... 17
    10.1 Premises Condition .................................................................................. 17
    10.2. Tenant's Compliance with Laws .......................................................... 17
11. SUBORDINATION ................................................................................................... 17
12. DAMAGE AND DESTRUCTION ........................................................................... 18
13. EMINENT DOMAIN ................................................................................................ 19
    13.1. General ........................................................................................................ 19
    13.2. Total Taking; Automatic Termination .............................................. 19
    13.3. Partial Taking; Election to Terminate ............................................... 19
    13.4. Rent; Award ............................................................................................. 19
    13.5. Partial Taking; Continuation of Lease .............................................. 20
    13.6. Temporary Taking ................................................................................. 20
14. ASSIGNMENT AND SUBLETTING ...................................................................... 20
    14.1. General ........................................................................................................ 20
15. DEFAULT; REMEDIES ............................................................................................ 21
    15.1. Events of Default by Tenant ................................................................ 21
    15.2. Landlord Remedies ................................................................................ 21
    15.3. Tenant's Remedies .................................................................................. 22
    15.4. Dispute Resolution ................................................................................. 22
16. GENERAL INDEMNITIES ....................................................................................... 22
    16.1. Tenant's Indemnification ...................................................................... 22
    16.2. Landlord's Indemnification .................................................................. 23
    16.3. Scope of Indemnity ................................................................................ 23
    16.4. Survival of Indemnities ......................................................................... 23
17. INSURANCE ................................................................................................................ 23
    17.1. Tenant's Insurance .................................................................................. 23
    17.2. Landlord's Insurance .............................................................................. 23
    17.3. Waiver of Subrogation .......................................................................... 24
18. ESTOPPEL CERTIFICATES ..................................................................................... 24
19. HOLDOVER; SURRENDER OF PREMISES .......................................................... 24

TUSCAN RIDGE – ECC CONSTRUCTORS LEASE

15321136.9

SoB

19.1. Holding Over ..................................................................................................24

19.2. Surrender of Premises ........................................................................................24

20. HAZARDOUS MATERIALS ..................................................................................25

20.1. Landlord's Representations and Covenants.........................................................25

20.2. Landlord's Environmental Indemnity .................................................................25

20.3. Tenant's Covenants.............................................................................................25

20.4. Tenant's Environmental Indemnity ....................................................................25

21. SPECIAL PROVISIONS ........................................................................................26

21.1. Landlord's Right to Assign..................................................................................26

22. LANDLORD'S REPRESENTATIONS AND RESERVED RIGHTS ........................26

22.1. Authority; Knowledge ........................................................................................26

22.2. Quiet Enjoyment and Title .................................................................................26

22.3. Bankruptcy .......................................................................................................26

22.4. Right of Entry ...................................................................................................26

23. SPECIAL PROVISIONS ........................................................................................27

23.1. Prevailing Wages ...............................................................................................27

24. GENERAL PROVISIONS ......................................................................................27

24.1. Notices ..............................................................................................................27

24.2. No Implied Waiver .............................................................................................27

24.3. Force Majeure ...................................................................................................27

24.4. Amendments .....................................................................................................28

24.5. Standard for Approval........................................................................................28

24.6. Successors and Assigns.......................................................................................28

24.7. Brokers ..............................................................................................................28

24.8. Severability .......................................................................................................28

24.9. Governing Law ..................................................................................................29

24.10. Entire Agreement ...........................................................................................29

24.11. Attorneys' Fees ..............................................................................................29

24.12. Cumulative Remedies .....................................................................................29

24.13. Time of Essence ..............................................................................................29

24.14. Counterparts ...................................................................................................29

24.15. Effective Date .................................................................................................29

24.16. Interpretation of Lease ....................................................................................29

S6b

TUSCAN RIDGE – ECC CONSTRUCTORS LEASE

14321136.4

24.17. Definitions.................................................................................................30

LIST OF EXHIBITS:

EXHIBIT A – Description of the Property and Premises

EXHIBIT A-1 – Scheduled Improvements to the Property and Premises

EXHIBIT B - Landlord's Work

EXHIBIT C – Tenant's Work

EXHIBIT D - Dispute Resolution Procedures

EXHIBIT E – Insurance Requirements



TUSCAN RIDGE – ECC CONSTRUCTORS LEASE

153211369

# LEASE

**THIS LEASE** (this "Lease"), is dated for reference purposes only as of March 22, 2019; it is entered into by and between TUSCAN RIDGE ASSOCIATES, LLC, a California limited liability company, as Owner ("Landlord"), and the ECC Constructors LLC, a Delaware limited liability company, as tenant ("Tenant"). The Tenant and Landlord are at times referred to herein as a "Party" and collectively as "Parties." Refer to Section 24.17 (Definitions) for additional definitions and locations of defined terms used in this Lease.

## RECITALS

A.     Landlord owns certain real property located at 3160 Skyway Rd, Paradise, Butte County. State of California 95969, comprising approximately 160 acres, and commonly referenced by the following Assessor's Parcel Numbers:  APNs 040-520-1000 and 040-520-103 (the "Property"). The legal description of the Property is included in Exhibit A, attached hereto. Landlord hereby leases to Tenant and Tenant hereby hires from Landlord a portion of the Property, as described in Section 1, below and in Exhibit A, attached to this Lease and made a part of its terms ("Premises"). Furthermore, during the Term of this Lease (as defined below), Landlord grants to Tenant and its Agents and Invitees a right to access those portions of the Property needed to enter the Premises from the Main Gate while Tenant pursues the completion of a secondary access point to the Property from Skyway Drive and will create a new drive lane from Skyway Drive via the Main Gate and on to the Premises, as shown on Exhibit A ("New Road")as shown on Exhibit A, and as noted in Exhibit A-1, III. Item 3) and to further access those portions of the Property where the Permanent Improvements (defined below) are operated and maintained to provide water and sewer/septic services to the Premises and the Worker's Camp Facilities, specifically including all access roads and conduits.  Tenant will promptly install temporary turn lanes at the existing temporary entrance on the Premises (as shown on Exhibit A), which will serve as the Tenant's primary access point from Skyway Drive when completed.

B.     Tenant is entering into this Lease for the purpose of developing and operating a temporary "worker's camp" and staging area for a series of restoration and remediation work projects that Tenant is contracted to complete in Butte County. The staging areas are intended to provide areas in which Tenant can and will store and operate heavy construction equipment, trucks, stack supplies, store equipment, and pursue all activities customary to heavy demolition and restoration of areas suffering catastrophic physical events ("Staging Areas"), such as the "Camp Fire", and is generally reflected by the details shown in Exhibit A and in the description of the required improvements to the Property and Premises reflected in Exhibit A-1 attached to this Lease and titled *Scheduled Improvements to Property and Premises* ("Scheduled Improvements").

The worker's camp is intended to house and serve up to 3,000 persons who will live at the Premises (the "Community") during the Term of the Lease ("Worker's Camp"). The Worker's Camp must provide fully functional housing and living systems for the Community, including parking, recreational, cooking and laundry facilities, among others (all of which must be permitted, completed and be operated consistent with worker safety, housing and all other

1

TUSCAN RIDGE – ECC CONSTRUCTORS LEASE

1521136.9



standards imposed by law); the required facilities to provide such housing and living quarters and systems is herein referred to as the "Worker's Camp Facilities." The Worker's Camp Facilities are more fully described in Exhibit A-1 attached to this Lease, and are part of the Scheduled Improvements to the Property and Premises required under this Lease.

Development of the fully functional Worker's Camp, and establishing functional Staging Areas (including access, parking, utilities and all ancillary support systems) is herein referred to as the "Project"). The preliminary utility requirements are believed to be as follows, expressed in load calculations for Water, Sewer, and Power:

- Power: up to 9 MW of electricity, subject to PG&E imposed limitations
- Gas: None
- Water: 75,000 gallons/day shall be exclusive to and prioritized for Tenant's operations at the Premises, with any balance available on a non-exclusive basis; the costs for pumping and treating this water shall be equitably apportioned between Landlord and Tenant, based on percentage of use. Tenant shall install a water meter for its main line going to Tenant's holding tank.
- Sewage/Septic: Treatment/handling capacity of 75,000 gallons of waste water/day

All of the required utility infrastructure for the Project will have to be part of the work of improvement to the Premises and are included in the design-build requirements to complete the Worker's Camp Facilities. Exhibit A-1 specifies the standards that Landlord must meet to complete Landlord's Work and achieve "Substantial Completion" of Landlord's Work.

It is contemplated that the Project will consist of two stages: (i) a "Preliminary Phase" where the Scheduled Improvements are being pursued to completion (with completion dates as set out for the Scheduled Improvements on Exhibit A-1), and temporary utility functions will be required to meet the needs of the Project, and (ii) a "Second Phase" where permanent utilities and facilities have been installed to provide the required Worker Camp Facilities and final Staging Area improvements. The milestones, process, deadlines and contingencies required to complete the Project through such Preliminary Phase and Second Phase are delineated in Exhibit A-1.

C.   In connection with this Lease, Tenant will be paying for the completion of numerous improvements that will permanently benefit the Property (these improvements are identified and referenced as the "Permanent Improvements" set forth in Exhibit A-1 and Attachments to that exhibit), and Tenant may offset all such payments for Permanent Improvements against the Rent due under this Lease. Moreover, Landlord recognizes that Tenant will make a very substantial investment of several million dollars to install the Worker's Camp and the Staging Areas and complete the Project on an expedited basis in order to meet Tenant's own obligations under third party contracts to remediate the effects of the Camp Fire. As such, the completion of these Scheduled Improvements as required by this Lease is critical to Tenant's realization of the benefits of this Lease, and time is of the essence. Furthermore, in recognition that some of the Scheduled Improvements will constitute an investment and will be "Permanent Improvements" to the Property, Tenant will be permitted to off-set the costs of such

2

TUSCAN RIDGE – ECC CONSTRUCTORS LEASE

15521136.0

S 6b


Case: 19-30088    Doc# 11291-5    Filed: 09/22/21    Entered: 09/22/21 16:04:19    Page 28 of 108

Permanent Improvements against the Rent due under this Lease, on a dollar for dollar basis, as detailed in Exhibit A-1.

D.  In entering into this Lease, Landlord has warranted to Tenant that: (i) it is validly formed, qualified to do business, and in good standing with the Secretary of State, and it has good title to the Property; (ii) there are no mortgages, liens, encumbrances or claims pending against the Property or Landlord except those disclosed to Tenant in writing on or before February 25, 2019 and revealed in the preliminary (title) report available for the Property, and none present any credible possibility that Tenant's quiet enjoyment of the Premises for the full term of the Lease will be impaired; (iii) it is not aware of any threat of condemnation associated with the Property; (iv) there are no competing rights to exercise any rights of possession or control over the Premises that will interfere in any material way with Tenant's rights of possession during the Term of the Lease except as disclosed in writing to Tenant (subject to PG&E's rights to access the Property for purposes of its restoration responsibilities following its vacating the Property); (v) it has current and existing rights to draw and use a sufficient quantity of potable water to meet ECC's intended uses, and these amounts are available to serve the Premises and will suffice to serve the Community and Service Areas; (vi) it will endeavor to obtain all of the necessary permits to install and provide septic services sufficient to serve the Community not later than as scheduled in Exhibit A-1 for their completion; (vii) except for the need to complete permitting for the completion of the wastewater system specified in this Lease, the reliance on PG&E power improvements, and constraints from physical conditions at the Premises, it is not aware of any current impediment to providing all of the Scheduled Improvements that form part of Landlord's Work under this Lease in a timely manner; (viii) the proposed uses of the Premises by Tenant are permitted under Landlord's existing zoning and land use permits; (ix) to Landlord's "actual present knowledge", which is defined to be the knowledge of any member of Landlord, there are no Hazardous Materials located or stored on the Premises; (x) it has completed all required authorizations under its governance structure and is duly authorized to enter into this Lease; and (xi) the person executing this Lease on behalf of Tenant is authorized to do so.

E.  In entering into this lease, Tenant has warranted to Landlord that: (i) it is validly formed, qualified to do business in the State of California, and in good standing with the Secretary of State (ii) it has completed all required authorizations under its governance structure and is duly authorized to enter into this Lease; and (iii) the person executing this Lease on behalf of Tenant is authorized to do so.

3

TUSCAN RIDGE – ECC CONSTRUCTORS LEASE

15321136.9

## 1.   BASIC LEASE INFORMATION

The Recitals above are fully incorporated into this Lease and form a part of its terms and conditions.

The following is a summary of basic lease information (the "Basic Lease Information"). Each item below will be deemed to incorporate all of the terms in this Lease pertaining to the item. In the event of any conflict between the information in the Basic Lease Information and any more specific provision of this Lease, the more specific provision will control.

| | |
|---|---|
| Landlord: | Tuscan Ridge Associates, LLC, a California limited liability company |
| Tenant: | ECC Constructors LLC, a Delaware limited liability company |
| Premises (Article 2): | All of approximately 82.6 acres of land as delineated in the site plans attached as *Exhibit A*, consisting of: |
| | o The areas shown in Exhibit A and in Attachment 1 to Exhibit A-1 |
| Term (Section 3.1): | 1 year, beginning on the Rent Commencement Date, plus options (see Section 3.3). |
| Rent Commencement Date (Section 3.1) | As provided in Section 3.1. |
| Expiration Date (Section 3.1). | See Section 3.1. |
| Extension Options (Section 3.3): | Six (6) seriatim options to extend the Lease, each for an additional one month term. The first Extension Option must be exercised, if at all, by written notice to Landlord at least three (3) months prior to the initial Term. Thereafter, each Extension Option will be exercised automatically by Tenant unless Tenant has (i) notified Landlord that it will not exercise the next available option, or (ii) Tenant has caused an Event of Default |

4

15321136.9


$S 68$

Case: 19-30088    Doc# 11291-5    Filed: 09/22/21    Entered: 09/22/21 16:04:19    Page 30 of 108

| | |
|---|---|
| Security Deposit (Section 4.5): | $330,400 to be paid on the Rent Commencement Date, as provided in Exhibit A-1, VII. 2. |
| Base Rent (Section 4.1): | Monthly Base Rent: $4,000 per acre of the Premises, payable monthly in advance on the first day of the applicable month (or partial month). |
| Permitted Uses (Section 5.1): | Tenant may use the Premises for the uses contemplated for the Project. |
| Utilities (Section 9.1): | Subject to the provisions relating to Landlord's Work and other obligations under Section 8.1, Tenant will be responsible for the costs of all utilities serving the Premises. |
| Services (Section 9.2): | Tenant will be responsible for the payment and performance of all services to the Premises, subject to the terms of Article 9 and Exhibit A-1. |
| Notice Address for Landlord (Section 24.1): | c/o Scott Bates, Mo West, Mark West 15032 LITTLE RON ROAD CHICO CA 95973 |
| With a copy (which shall not constitute notice) to: | Courtney McAlister, Esq. Law Offices of Courtney L. McAlister 1510 Poole Blvd, Suite 105 Yuba City, CA 95993 (916) 496-2581 (mobile) (530) 755-2607 (office) comcalister@yahoo.com |
| Key Contact for Landlord: | Mark West |
| Landlord Contact Telephone No.: | (530) 624-4454 |
| Notice Address for Tenant (Section 24.1): | 1240 Bayshore Highway, Ste. 301 Burlingame, California 94010 |

5

TUSCAN RIDGE – ECC CONSTRUCTORS LEASE

15321136.9

Case: 19-30088   Doc# 11291-5   Filed: 09/22/21   Entered: 09/22/21 16:04:19   Page 31 of 108

with a copy to:

Rory J. Campbell
Hanson Bridgett LLP
425 Market Street, 26th Floor
San Francisco, CA 94105
email: [illegible]

Key Contact for Tenant:

Scott Hayward:

ECC Senior Program Manager

Email: shayward@ecc.net

Mobile: (571) 723-2774

EXHIBITS:

- EXHIBIT A – DESCRIPTION OF PROPERTY AND PREMISES

- EXHIBIT A-1 – SCHEDULED IMPROVEMENTS TO PROPERTY AND PREMISES

- EXHIBIT B – LANDLORD'S WORK

- EXHIBIT C – TENANT'S WORK

- EXHIBIT D · DISPUTE RESOLUTION PROCEDURES

- EXHIBIT E · INSURANCE REQUIREMENTS

2. **PREMISES**

Landlord leases to Tenant and Tenant leases from Landlord, subject to the provisions of this Lease, the land and appurtenances comprising the Premises, as indicated in the Basic Lease Information and shown in Exhibit A (the "Premises").

3. **TERM**

3.1. Term of Lease, Rent Commencement Date and Offsets.

6

TUSCAN RIDGE – ECC CONSTRUCTORS LEASE

153211136.9

S63

(a)     This Lease will be effective upon its mutual execution ("Effective Date"). As of the Effective Date, the Premises are leased for a term (the "Term") with possession expected to commence on March 22, 2019.

(b)     The Tenant's obligation to pay Rent shall commence (the "Rent Commencement Date") when Landlord has completed the Critical Milestones for all electrical, potable water and wastewater improvements that are Scheduled Improvements (as set forth in Landlord's Work) so that these improvements can service the required potable water and wastewater treatment requirements for the Second Phase (as defined in Exhibit A-1, attached - i.e. for a Community of at least 1500 workers on the Premises); provided, further:

(i)     if the Scheduled Improvements for completing the potable water through the Second Phase are not completed within thirty (30) days of the Decision Date (as defined below in Exhibit A-1), Landlord shall absorb all of Tenant's costs for providing alternative potable water to the Project for Second Phase levels of service, until such facilities are Substantially Completed (i.e. Landlord shall absorb the costs of failing to timely complete the potable water improvements required by the Critical Milestones set out in Exhibit B within the required 30 days from the Decision Date), and

(ii)     if the Scheduled Improvements for installing the wastewater facilities through the Second Phase are not completed within forty-five (45) days of the later of the Occupation Date (defined in Section 9, below) or the Decision Date, then Landlord shall absorb all of Tenant's costs for providing alternative wastewater treatment and disposal to the Project for Second Phase levels of service until such facilities are Substantially Completed (i.e. Landlord shall absorb the costs of matching these required levels of service set out in Exhibit B once the 45-day period from the Occupation Date has run).

(iii)     to the extent that Landlord is duly absorbing all of the costs of maintaining and providing alternative potable water and wastewater treatment facilities to the Premises as needed to achieve the Second Phase level of service (i.e. serve a Worker's Camp used by 1500 workers), Landlord will be deemed to have "Substantially Completed" the potable water and wastewater portions of Landlord's Work for purposes of determining if Landlord has achieved the start of the Rent Commencement Date.

(c)     The Lease will end one year after the Rent Commencement Date (the "Expiration Date"), unless Tenant elects to extend the Term under its available Extension Options pursuant to Section 3.3, below.  Tenant will not incur or be obligated to pay any Base Rent until the Rent Commencement Date.

(d)     Within ten (10) days of the Rent Commencement Date, as determined pursuant to the terms of this Lease, the Parties shall execute a mutual confirmation of the actual Rent Commencement Date. However, a Party's failure to do so shall not affect the commencement of the Term.

7

TUSCAN RIDGE – LCC CONSTRUCTORS LEASE

15321136.9



3.2.   Delay in Delivery of Possession.  Landlord shall deliver possession of the Premises not later than March 22, 2019, as required, then, unless Tenant elects to terminate the Lease for such failure by notice to Landlord, (i) the validity of this Lease shall not be affected, and (ii) Tenant's obligations to pay Rent or any other charges shall not commence until such time as Landlord meets the conditions to start the Rent Commencement Date).  If Landlord has not completed the "Critical Milestones" within the time periods specified in Exhibit A-1, Tenant may undertake and complete the Landlord's Work (and any Scheduled Improvements that are behind schedule) in place of the Landlord.  This shall include, e.g. having Tenant take over and pursue Landlord's rights under all contracts for Landlord's Work (as the designated third party beneficiary), and if that occurs, then Landlord shall be held harmless and indemnified against any additional costs reasonably incurred above the budget set for Landlord's Work under this Lease (as such costs may be updated from time to time by the Parties). If Tenant so elects to complete Landlord's Work, Landlord shall permit Tenant and its Agents access to those portions of the Property necessary to achieve Landlord's Work, and fully cooperate with Tenant to minimize the costs and time required to deliver possession of the Premises with all of Landlord's Work "Substantially Completed", as defined below.  Upon any such termination, Tenant will remove any of Personal Property Tenant may have placed on the Premises and, other than any indemnity obligations that have accrued from Tenant's entry on the Premises, Tenant will have no other obligation or liability under this Lease.  Notwithstanding anything to the contrary contained herein, so long as Landlord is pursuing commercially reasonable efforts in good faith to complete Landlord's Work and Landlord is meeting all of its requirements under Section 3.1(b) and Section 9.1 below, Tenant shall not have the right to undertake and complete the Landlord's Work involving the wastewater or potable water scope of Landlord's Work. Where Landlord fails to meet these requirements, Tenant shall have the right to pursue the completion of any such delinquency in Landlord's Work, as provided for in this Lease.

3.3.   Extension Options.  Tenant will have the right to extend the initial Term of this Lease (the "Extension Options") for up to six successive one-month extensions (each, an "Extended Term").  The terms and conditions of this Lease will apply during the Extended Terms.  The first Extension Option must be exercised, if at all, by written notice to Landlord at least three (3) months prior to the initial Term.  Thereafter, the Extension Options shall be deemed automatically elected unless: (i) Tenant has caused an Event of Default, in which case no option can be exercised; or (ii) Tenant has issued a termination notice of the Lease.  If Tenant validly enters into an Extension Term under this Section, the "Term" will include the Extended Term and the "Expiration Date" shall mean the day that the last Extended Term expires.

4.    RENT

4.1.   Rent.

(a)    Tenant will pay to Landlord during the Term the Base Rent specified in the Basic Lease Information, which is $4,000 per month per acre (prorated for any partial acre) for 82.6 acres during the 12-month initial Term, or a monthly sum of $330,400.00, with such payment due on or before the 1st day of each month during the Term starting on the Rent Commencement Date.   All payment of Rent is subject to Tenant's right to set off the applicable

8

TUSCAN RIDGE – ECC CONSTRUCTORS LEASE

153211369



Rent against costs advanced for the design and construction of any Permanent Improvements; such offset shall only extend to payments actually made by Tenant for such costs.

(b)     Tenant will pay Base Rent without any prior demand and without any deductions or setoff except as expressly provided for in this Lease (e.g. the costs allocated to any Permanent Improvements as specified in Exhibit A-1). Any charges or other amounts Tenant must pay to Landlord under this Lease besides Base Rent ("Additional Charges") will be considered "Rent," including when determining Landlord's remedies for nonpayment.

(c)     Tenant's failure to pay Rent promptly may cause Landlord to incur unanticipated costs. The exact amount of such costs is impractical or extremely difficult to ascertain. Such costs may include, but are not limited to, processing and accounting charges and late charges that may be imposed on Landlord by any mortgage or deed of trust encumbering the Premises. Therefore, if Landlord does not receive any Base Rent payment on or before the 10th day of each month it becomes due, or Other Charges that are not paid within thirty (30) days of invoicing, the Tenant shall pay Landlord a late charge equal to five percent (5%) of overdue amount. The Parties agree that such late charge represents a fair and reasonable estimate of the costs Landlord will incur by reason of such late payment.

4.2.     Interest on Past Due Obligations.  Any amount owed by a Party to a counterparty under this Lease that is not paid when due shall bear interest at the rate of eight percent (8%) per annum ("Interest Rate") from the date it was due and payable. The payment of interest on such amounts shall not excuse or cure any default by Tenant under this Lease. If the Interest Rate is higher than the maximum non-usurious rate permitted by Law, the Interest Rate will automatically adjust to be fifty (50) basis points below the maximum legal interest rate then permitted by Law.

4.3.     Payment of Real Estate Taxes.  During the Term, Landlord will be solely responsible for the Real Estate Taxes for the Premises.

4.4.     Payment of Other Taxes  During the Term, Tenant is solely responsible for paying all taxes, fees, franchise taxes, and charges attributable or due to Tenant's use and operation of Premises imposed by any political subdivision of the United States of America, the State of California, or any city or the County of Butte. In addition, Tenant is responsible for paying all personal property taxes attributable to Tenant's Property, and any privilege tax, excise tax, gross receipts tax or the like. If Tenant fails to pay any amounts due under this Section within 30 days after they are due, then Landlord may pay those amounts on Tenant's behalf. Tenant will reimburse Landlord for the amounts paid with the next monthly payment of Base Rent due after receiving notice of the payment made by Landlord.

4.5.     Security Deposit.  $330,400 (see Exhibit B.)

5.     USE

5.1.     Permitted Use.  Tenant may use the Premises for the Permitted Uses specified in the Basic Lease Information, and for no other use without Landlord's prior written consent, which will not be unreasonably withheld or delayed.

9



Case: 19-30088    Doc# 11291-5    Filed: 09/22/21    Entered: 09/22/21 16:04:19    Page 35 of 108

5.2.  Manner of Use.  Tenant will not cause or permit the Premises to be used in any way that constitutes a violation of any Laws or that constitutes a nuisance or waste.

5.  LEASEHOLD IMPROVEMENTS

6.1.  Landlord's Obligation to Construct Improvements.  Landlord, through its general contractor, shall perform the work and make the installations in the Premises identified in Exhibit B, and in accordance with the provisions of this Section 6.1 and Exhibit A-1.  Such work and installations are referred to as the "Landlord's Work."

(a)  Plans and Specifications.  Landlord shall undertake to complete the Landlord's Work identified in Exhibit B in accordance with its provisions and the provisions of Exhibit A-1 as applicable to Landlord's Work; Tenant shall advance all costs associated with such Landlord's Work (including the Permanent Improvements), and Tenant shall be responsible for the costs of such Landlord's Work except that Landlord shall be obligated to pay for all Permanent Improvements, as these are set out in Exhibit A-1.  The Parties acknowledge that the Landlord's Work encompasses a "design-build" formula, and that Tenant can modify the requirements imposed on Landlord as specified in this Lease to achieve the results required to build out the Worker's Camp Facilities: in case Tenant so directs Landlord to modify the specifications, Landlord shall complete the work as so modified, provided Tenant will pay for the additional costs of such a modification, if any.

(b)  Permits.  Landlord shall secure any permits and approvals, licenses and inspections necessary for the proper performance and completion of Landlord's Work.  Promptly following the Effective Date, Landlord shall immediately pursue all required permits, approvals, or licenses necessary to complete the Landlord's Work, and shall provide copies to Tenant promptly following receipt thereof.  Landlord shall be responsible for arranging for all inspections required by any agency issuing permits for Landlord's Work or exercising jurisdiction over Landlord's Work.

(c)  Construction.  Landlord's Work shall be completed diligently and competently in a good and workmanlike manner, in compliance with applicable laws and all permits and the provisions of this Lease.  Landlord shall immediately pursue all work and all administrative steps required for the prompt completion of Landlord's Work and shall cause the Landlord's Work to be completed in a good and professional manner in accordance with sound engineering and construction practices.  Landlord shall comply with and give notices required by all Laws, building restrictions, and lawful orders of public authorities bearing on construction of the Landlord's Work.

(d)  Construction Schedule.  It is anticipated that Landlord will be undertaking Landlord's Work substantially contemporaneously with the scope of Tenant's work of improvement scheduled in Exhibit C, attached hereto ("Tenant's Work").  The Parties acknowledge that all of the construction to be completed by Landlord and Tenant must be completed as quickly as is practicable, and that the Parties must (i) fully cooperate with each other throughout the work of improvement; and (ii) promptly respond to any requests for clarification relating to the scope of the work, required modifications or other alterations associated with the work to be done.

10


S 68

(e)    Substantial Completion.  For purposes of this Lease, Landlord's Work shall be deemed to be "Substantially Completed" or has achieved "Substantial Completion" when the Landlord's Work shall have been sufficiently completed in accordance with this Lease (i.e. the "Substantial Completion" of all of Landlord's Work has occurred to deliver functionality for the Second Phase, as described in Exhibit A-1), and meets all applicable Laws. so that Tenant can physically and legally occupy the Premises and conduct its business for its intended uses at the Second Phase level.  Tenant shall have a right to present to Landlord an additional written punch list of any latent defects in the Premises first discovered after the Rent Commencement Date, provided it is submitted not later than thirty (30) days after the Rent Commencement Date, and if so submitted, Landlord shall complete all defective or incomplete items identified in such punch list within sixty (60) days after Tenant's submittal, subject to Force Majeure.  The obligation to pay Rent shall not be affected by the issuance of this punch list unless the defect renders the Premises or a portion of it unsuitable for Tenant's intended use of the Premises (in which case, Rent shall be equitably abated proportional to the impairment of use).  Tenant's failure to include any item on such list shall not alter the Landlord's responsibility hereunder to complete all Landlord's Work in accordance with this Lease and all applicable Laws

Should Landlord fail to meet its obligations to timely complete Landlord's Work (e.g. by missing the "Critical Deadlines" set out in Exhibit B), then Tenant shall have the option, exercisable on three (3) business days' notice, to suspend any further work by Landlord in pursuing Landlord's Work, and pursue the completion of the Landlord's Work in its stead, including having the right to assume and take over all contracts relating the Landlord's Work; provided, however, so long as Landlord is pursuing commercially reasonable efforts in good faith to complete Landlord's Work, and Landlord is meeting all of its requirements under Section 3.1(b) and Section 9.1 below, Tenant shall not have the right to undertake and complete the Landlord's Work involving the wastewater or potable water scope of Landlord's Work.  Where Landlord fails to meet these requirements, Tenant shall have the right to pursue the completion of any delinquency in such Landlord's Work, as provided for in this Lease.

(f)    To facilitate this, Landlord shall include in its contracts for Landlord's Work that Tenant is a third party beneficiary of such contract and the contractor is obligated to attorn to Tenant if Tenant elects to take over such contract from Landlord due to Landlord's failure to timely pursue and perform its obligations.

(g)    No approval by Tenant or any of its Agents of the completion of the Landlord's Work for purposes of this Lease shall be deemed to constitute approval of any governmental or regulatory authority with jurisdiction over the Premises, and nothing herein shall limit Landlord's obligations to obtain all such approvals.

6.2.    Tenant's Work.  Tenant shall perform the work and make the installations in the Premises identified as Tenant's Work, all in accordance with the provisions of this Section 6.2 and Exhibit A-1.

(a)    Permits.  Unless otherwise stated in Exhibit A-1, Tenant shall secure all permits and approvals, government fees, licenses and inspections necessary for the proper

11

TUSCAN RIDGE – ECC CONSTRUCTORS LEASE

15321136.9

S63

performance and completion of Tenant's Work and for operation of the Worker's Camp. Promptly following the Effective Date, Tenant shall apply for any permits, approvals, or licenses necessary to complete such construction and shall provide copies to Landlord promptly following receipt thereof. Tenant shall be responsible for arranging for all inspections required by any agency issuing a permit for Tenant's Work or exercising jurisdiction over Tenant's Work.

(b)     Construction. Immediately upon Tenant's procurement of all necessary permits and approvals, Tenant shall commence construction and shall cause the Tenant's Work to be completed in a good and professional manner in accordance with sound engineering and construction practices.

(c)     No Joint Venture. Nothing in this Lease or its provisions shall establish that Landlord has any authority to act on behalf of Tenant, nor is it intended to create any form of partnership or joint venture between the Parties.

7.     ALTERATIONS

7.1.     Alterations by Tenant

(a)     The term "Alterations" is not intended to supersede the provisions for each Party's maintenance and repair obligations under Article 8, or to modify Landlord's Work or Tenant's Work; although any repairs that Tenant must do under this Lease shall be subject to the provisions of this Article 7 as well. During the Term, Tenant may make Alterations to the Premises without notice to or the consent of Landlord if they are within the scope of the Scheduled Improvements or repair of the same, and, upon surrender of the Premises, will not materially and detrimentally affect the value or utility of the Premises. For any other Alterations, Tenant shall not undertake such Alterations without Landlord's prior consent, which Landlord shall not unreasonably withhold or delay. Unless otherwise expressly stated to the contrary in this Lease, any Tenant Alterations will be made at Tenant's cost, with duly licensed contractors for the trades involved, in a competent and professional manner, and in compliance with applicable Laws. All of Tenant's Work shall be treated as "approved" under this Subsection 7.1(a).

(b)     Landlord agrees to cooperate with Tenant in securing building and other permits and authorizations needed in connection with all of the Scheduled Improvements and any Alterations, including those constituting "Tenant's Work." Tenant will provide Landlord upon request with copies of final permits and authorizations, plans and specifications and as-built drawings, if any, for any Alterations. Landlord will not be required to incur any costs by cooperating with Tenant, nor will Landlord be entitled to any construction or other administrative fee in connection with any Alteration.

(c)     Tenant will have no obligation to remove any Alterations upon the expiration or sooner termination of this Lease.

7.2.     Tenant's Property.

12

15321136 9



(a) Tenant will bring and install various equipment, trade fixtures and other movable personal property; such property, including anything installed in the Premises by or for Tenant's account and that can be removed without structural or other substantial damage to the original Premises will be and remain Tenant's property (collectively, "Tenant's Property"). At any time during or at the expiration of the Term, Tenant may remove any of Tenant's Property. By the Expiration Date, Tenant shall remove Tenant's Property from the Premises in accordance with Article 19 (Holdover; Surrender of Premises) except Tenant has no obligation to remove: (i) Scheduled Improvements installed below grade; and (ii) any other improvements approved by Landlord as Personal Property that can remain.

(b) Landlord acknowledges that some of Tenant's Property may be purchased by secured financing, or owned by an equipment company and leased to Tenant. Landlord, upon Tenant's reasonable request, will execute and deliver any document reasonably required by any supplier, lessor, or lender in connection with the installation in the Premises of any items of Tenant's Property, under which Landlord waives any rights it may have or acquire with respect to Tenant's Property, so long as the supplier, equipment lessor or lender agrees to: (i) remove Tenant's Property from the Premises on or before the Expiration Date and repair any damage caused by the removal of Tenant's Property; or (ii) if not so removed in a timely manner, automatically waive any rights it may have had to Tenant's Property. With regard to any access agreement reasonably required by any supplier, lessor, or lender in connection with the installation in the Premises of any items of Tenant's Property it shall be reasonable for Landlord to require, in exchange for Landlord's agreement to grant access to such lender, supplier, lessor or lienholder ("Claimant"), that (1) Claimant will indemnify, defend, and hold harmless Landlord against any Claims by Tenant arising from Claimant's exercise of the rights so granted, (2) Tenant waive any duty of Landlord to protect Tenant's interests in the Tenant's Property or to protect it from the Claimant's exercise of its rights under such agreement, (3) Landlord is not obligated to obtain Tenant's permission before granting access or to notify Tenant of Claimant's exercise of any rights under such document, and (4) Tenant hold harmless, defend and indemnify Landlord from any Claims against Landlord arising from granting such access to the Premises by the Claimant or its Agents. Subject to these requirements, Landlord will recognize the rights of a Claimant who has an interest in any items of Tenant's Property to enter the Premises and remove the property at any time during the Term under such access document. Nothing in this Section will require Landlord to subordinate its interest in the Premises.

7.3. <u>Minimizing Interference</u>. During any alterations, installations, additions or improvements to the Premises by Landlord or Tenant, each Party will use commercially reasonable efforts to minimize interference with or disruption to the other Party's use and occupancy of the Premises or Property. Each Party agrees to immediately remedy any interference or disruption promptly following notice from the other Party.

7.4. <u>Title to Improvements</u>. Except for Tenant's Property, all appurtenances, fixtures, improvements, equipment, additions, and other property installed in the Premises during the Term will be and remain Landlord's property upon surrender of the Premises. Tenant may not remove Landlord's property without Landlord's consent except to replace it in the performance of Tenant's repair and maintenance obligations or as permitted under this Lease.

13

TUSCAN RIDGE – ECC CONSTRUCTORS LEASE

15321136.9



7.5.    Signs/Structures.

(a)    Tenant may erect or post signs on or about the Premises, consistent with applicable laws and ordinances. Tenant's signage must be removed from the Premises upon Lease termination.

(b)    Tenant may erect a satellite dish and other communication devices at the Premises, as required for the Project.

8.    REPAIRS AND MAINTENANCE

8.1.    Landlord's Obligations

(a)    At Landlord's sole cost, and regardless of the cost, Landlord must do all of the following:

(i)    maintain and repair the Permanent Improvements that are located off the Premises (and on the Property) to ensure that all such Permanent Improvements are complete and fully functioning, as contemplated in Exhibit A-1); and

(ii)    promptly and diligently make any engineering and other upgrades or improvements to the Premises as required by any existing or future Laws unless these are solely due to the unique use of the Premises by Tenant (in which case they shall be the sole responsibility of Tenant).

(iii)    Landlord agrees that if Landlord fails to maintain and repair any part of the Permanent Improvements, or in any way impairs or interferes with the delivery of the waste water treatment or potable water systems, or with the delivery of other utilities needed for the operations of the Worker's Camp, then without the need for further action by Tenant, Landlord grants to Tenant a license that is irrevocable during the Term of this Lease, to access those portions of the Property that must be accessed in order to repair, replace or otherwise correct the conditions or defects that are preventing the full functioning of the Project.

(b)    Notwithstanding the foregoing, Landlord's obligation under this subsection shall not extend to repairs required due to a casualty event including, but not limited to, earthquake, flood, act of terrorism, or war, except to the extent those costs are covered by insurance or Tenant offers to cover the uninsured costs of such work. As used in this subsection, "uninsured costs" shall not include deductibles or self-insured retention in any applicable insurance policy. To the extent deductibles or self-insured retention are applicable, Landlord must pay for such costs or repair or replacement to the extent of such deductibles or retention in addition to the available insurance proceeds. Moreover, this provision shall not insulate Landlord from its obligations to repair where any uninsured costs are caused by Landlord's failure to carry the insurance required by Section 17.2. In the event that Landlord fails or refuses to repair or replace systems or facilities damaged or destroyed by such casualty event on account of uninsured costs, Tenant may, in addition to its rights pursuant to subsection 8.1(c) below, in its sole discretion terminate this Lease, with no obligation to restore, make repairs, remove any

14

15321136.9

Case: 19-30088    Doc# 11291-5    Filed: 09/22/21    Entered: 09/22/21 16:04:19    Page 40 of 108

Alterations or any other obligation of Tenant related to condition of the Premises whether during the Term or upon surrender.

    (c)    The provisions of this subsection 8.1(c) do not supersede the provisions of the Lease applicable to repairs required due to a casualty or condemnation; if those circumstances apply then the duties of the Parties are subject those provisions. In all other instances, if Tenant's use of or access to any portion of the Premises is materially and adversely interrupted as a result of the Premises being rendered unsafe for human occupancy due to Landlord's failure to comply with its obligations under this Lease, then Landlord must immediately undertake all commercially reasonable steps to correct such deficient condition. If the deficient condition continues for 3 days or more after Tenant notifies Landlord of the condition, (i) Rent will be equitably abated in proportion to the impairment of Tenant's use until Landlord corrects the condition rendering any portion of the Premises untenantable or unsuitable for continued use by Tenant for its intended purposes or otherwise materially adversely affects Tenant's normal operations in the Premises; and (ii) Tenant shall have the option to correct the condition and offset the reasonable cost thereof against the Rent, and charge interest at the interest Rate. Nothing in this Section will limit Tenant's rights with respect to any disruption due to casualty under Article 12 (Damage and Destruction).

    8.2.    <u>Shared Obligations</u>

    (a)    Intentionally deleted.

    8.3.    <u>Tenant's Obligations</u>.

    (a)    Tenant will be solely responsible for the costs of any claims, liability, damage, or destruction in or about the Premises or to the Permanent Improvements if it was caused by the acts or omissions (including, for example, the negligence or willful misconduct, but excluding ordinary wear and tear, as defined in Section 24.17 (Definitions)) of Tenant, Tenant's Agents, or any Tenant Invitees during the Term ("Tenant Damages"). Tenant Damages are not the basis for an Event of Default unless Tenant fails to meet its obligations (after notice and the expiration of applicable cure periods) when Tenant Damages occur to correct the same in a commercially timely manner.

    (b)    Landlord will be solely responsible for the costs of any claims, liability, damage, or destruction in or about the Premises or to the Permanent Improvements if it was caused by the acts or omissions (including, for example, the negligence or willful misconduct of Landlord, Landlord Agents, or any Landlord Invitees during the Term ("Landlord Damages"). Landlord Damages are not the basis for an Event of Default unless Landlord fails to meet its obligations (after notice and the expiration of applicable cure periods) when Landlord Damages occur to correct the same in a commercially timely manner.

    (c)    Except for obligations assigned to Landlord under this Article 8, Tenant, at Tenant's cost, will be responsible for all necessary and routine maintenance and repair to any of the Worker's Camp Facilities. Tenant will have the sole right to select contractors to perform maintenance and repairs for which Tenant is responsible, provided that any contractor is licensed

15

15321136.9

S.ob

(if required) and insured, and was selected according to commercially reasonable property management practices.

8.4.  Liens.

(a)  Tenant will keep the Premises free from liens arising out of any work performed, material furnished, or obligations incurred by Tenant during the Term. Landlord will have the right to post on the Premises any notices permitted or required by Law or that are needed for the protection of Landlord or the Premises from mechanics' and material suppliers' liens.

(b)  Should any claim or lien be filed against, or should Tenant learn of any intention of any third party to file any claim or lien against, or should any action be commenced affecting the Premises and/or Landlord's interest in the Premises, Tenant will give Landlord notice of the lien or intention or action within 10 days after Tenant receives notice of the same. If Tenant does not, within 30 days following the imposition of any lien, cause the lien to be released of record by payment or posting a bond, Landlord will have the right but not the obligation to cause the same to be released by any means it deems proper. including payment of the claim giving rise to the lien or filing of a bond in favor of any lien claimant. All sums paid by Landlord and all costs incurred in connection therewith, including any reasonable and actual attorneys' fees and costs, will be payable to Landlord by Tenant as Additional Charges with the next monthly payment of Base Rent payable no more than 30 days after delivery to Tenant of evidence of Landlord's payment.

8.5.  Loss or Damage.  Unless caused by the gross negligence or willful misconduct of Landlord or Landlord's Agents, or it is due to Landlord's breach of its obligations under the Lease, Landlord will not be liable for any third party Claims due to: (a) fire, earthquake, flood or explosions, or other casualty: (b) Act of God or force majeure; (c) theft or vandalism; or (d) lack of habitability or other physical condition of the Premises.

8.6.  Dispute Resolution.  Landlord and Tenant agree to engage in good faith efforts to resolve any disputes over repair and maintenance obligations on an informal basis as promptly as practicable.  If the Parties are unable to resolve the dispute informally within three (3) business days of a notice from a Party of such dispute, either Party may invoke the dispute resolution procedures and qualifications set forth in Exhibit D (Dispute Resolution Procedures).

9.  UTILITIES AND SERVICES

9.1.  Utilities.  For all purposes in this Lease, the reference to "Occupation Date" shall mean the first day after the Effective Date on which temporary housing is located on the Premises and there is human habitation occurring on the Premises. The Base Rent includes the right to receive from Landlord as Landlord's Work adequate potable water at the existing well head within thirty (30) days of the Decision Date, and adequate wastewater treatment facilities within forty-five (45) days after the later of the Occupation Date or Decision Date (at no additional cost to Tenant) at services levels required to meet the needs of the Second Phase. Should Landlord fail to have "Substantially Completed" Landlord's Work for these two utility installations by these two deadlines, then Landlord shall be responsible for all additional costs

16

1532/136.9



Tenant occurs in furnishing equivalent utility service levels for potable water and wastewater treatment facilities to the Worker's Camp Facilities to permit it to be fully operational. Without in any way limiting Landlord's Work obligations, to the extent these services are needed, then Tenant will be responsible for the costs of any temporary measures required to provide to its Worker's Camp Facilities at Tenant's sole cost: (i) any needed potable water within the first thirty (30) days after the Decision Date, and (ii) any needed wastewater treatment or service requirements within the first forty-five (45) days after the later of the Occupation Date or the Decision Date. So long as Landlord is meeting its requirements under Section 3.1(b) above and in this Section 9.1, Landlord's failure to complete Landlord's Work in furnishing the potable water and the wastewater treatment facilities within the stated 30 days and 45 days, respectively, shall not be an Event of Default. Any additional costs incurred by Tenant in furnishing these equivalent utility services after such 30-day and 45-day deadline can be off-set against Rent or charged to Landlord. Landlord remains obligated to timely install the electrical services required as part of Landlord's Work. The aggregate costs shifted to Landlord under this provision shall be no more than the Threshold Amount; the Parties recognize that the cost-shifting is due to the effect of not being able to timely complete the required Scheduled Improvements due to "force majeure" events

9.2.    Services    Landlord will not be responsible or liable for any damages resulting from any failure or interruption of utility services except to the extent stated under Section 9.1, or where caused by Landlord's willful misconduct or bad faith.

10.    COMPLIANCE WITH LAWS; PREMISES CONDITION

10.1.    Premises Condition.   Landlord represents and warrants that it has no actual knowledge of any circumstance, or of any physical or other condition affecting the Property that would (i) impair Tenant from realizing the prompt completion of the Scheduled Improvements to the Premises after the Effective Date (other than as qualified in Recital D), or (ii) impair Tenant's ability to quietly enjoy the Premises for the Term of this Lease.

10.2.    Tenant's Compliance with Laws.   Tenant must use the Premises during the Term in compliance with applicable Laws. Subject to Landlord's obligations under Article 6 (Landlord's Work) and Section 10.2 (Landlord's Compliance with Laws), Tenant must make any Alterations, additions or other modifications required to comply with applicable Laws where the modifications are due to the Tenant's particular use and it is not otherwise Landlord's responsibility under this Lease.

11.    SUBORDINATION

At Landlord's election, and subject to the provisions of the sentence that follows, this Lease is and will be subject and subordinate to the following (each an "Encumbrance"): (a) any reciprocal easement agreements and ground leases or other underlying leases that may now exist or hereafter be executed affecting any portion of Landlord's interest in the Premises; and (b) the lien of any mortgage or deed of trust that may now exist or hereafter be executed by Landlord in any amount for which any part of the Premises, any ground leases or underlying leases, or Landlord's interest or estate in this Lease, is security. Landlord will have the right to subordinate

17

15321136.9

$S6B$

or cause to be subordinated to this Lease any Encumbrance, provided that Landlord provides from the holder of the Encumbrance to Tenant a nondisturbance and attornment agreement in form and substance approved by Tenant, which approval will not be unreasonably withheld or delayed. The agreement must provide that, if any ground lease or underlying lease terminates for any reason or any mortgage or deed of trust is foreclosed or a conveyance in lieu of foreclosure is made for any reason: (x) the successor landlord will recognize this Lease and will not disturb Tenant's possession of the Premises under this Lease except as provided in this Lease; and (y) Tenant will pay subsequent Rent and attorn to and become the tenant of the successor landlord, at the option of the successor-in-interest, provided that Tenant has received proper written notice of the succession and the name and address of the successor landlord. The provisions of this Article will be self-operative and no further instrument will be required other than as provided in this Article. Tenant agrees, however, to execute upon request by Landlord and in a form reasonably acceptable to Tenant, any additional documents evidencing the priority or subordination of this Lease with respect to an Encumbrance.

12.     DAMAGE AND DESTRUCTION

If the Permanent Improvements are damaged by fire or other casualty, Landlord must repair the same without delay if it is not due to Tenant Damages. Provided, however, that Tenant may at any time within ten (10) days of the casualty, elect to complete all necessary repairs by notice to Landlord, and if that election is made, then all available insurance proceeds shall be applied against the costs of completing such repairs and Tenant shall diligently complete such repairs (and Landlord will provide full access to the Property to permit such repairs to be promptly completed) and the costs of such repairs and restoration may be set off by Tenant against the Rent that is or becomes due. If the damage is due to Tenant Damages, the entire cost of repair shall be Tenant's responsibility (however, Tenant shall be entitled to any actual proceeds covered by insurance to the extent it is devoted to restoring the Premises).

Where Landlord is obligated to make the required repairs, Landlord must promptly repair the damage by fire or other casualty to restore the Premises to condition existing immediately prior to the fire or other casualty after Landlord obtains all necessary permits for the repairs and insurance proceeds attributable to the damage, but not later than 30 days after the date of the damage (the "Repair Period"). During any repair under this Article, this Lease will remain in full force and effect, except that Tenant will be entitled to abatement of Rent while the repairs are being made. The abatement in Rent will be based upon the extent to which the damage and the making of the repairs renders the Premises untenantable or unsuitable for continued use by Tenant for its intended purposes or otherwise materially adversely affects Tenant's normal operations in the Premises, equitably adjusted, but it shall exclude any rent abatement if caused by Tenant Damages (except to the extent covered by insurance required under Section 17). Landlord's obligations to complete repairs will not include any damage by fire or other cause to Tenant's Property, or any damage caused due to Tenant Damages, except to the extent actually covered by insurance (or supplemented by Tenant to cover the shortfall). If Tenant fails to restore full functionality of all of the Permanent Improvements within fifteen (15) days of the casualty, then (i) either Party may elect to terminate this Lease, and (ii) if either Party elects to terminate the Lease, then any portion of the costs advanced by Tenant for the Permanent

18

S 6B

*15321136.9

Improvements that have not been already set off against Rent shall be reimbursed by Landlord as of the date of termination.

In case of termination, Tenant shall be entitled to an equitable abatement of the Rent after the date of the casualty through the date of termination.

The Parties intend that the provisions of this Article will govern fully their rights and obligations in the event of damage or destruction, and Landlord and Tenant each hereby waives and releases any right to terminate this Lease in whole or in part under California Civil Code sections 1932(2), 1933(4), 1941, and 1942, or under any similar Law, to the extent the statutory rights are inconsistent with this Lease.

13.   EMINENT DOMAIN

13.1.   General.  If during the Term a Taking or Partial Taking of the Premises or any interest in this Lease occurs, the rights and obligations of the Parties will be determined under this Article.  Tenant and Landlord intend that this Article will govern fully in the event of a Taking or Partial Taking and accordingly, the Parties each waive any right to terminate this Lease in whole or in part under California Code of Civil Procedure sections 1265.110, 1265.120, 1265.130, and 1265.140, or under any similar Law.

13.2   Total Taking; Automatic Termination.  If a total Taking occurs, then this Lease will terminate as of the Date of Taking.

13.3.   Partial Taking; Election to Terminate

(a)      If a Partial Taking occurs, then this Lease will terminate in its entirety at Tenant's election, if any of the following exist: (i) the Partial Taking, in Tenant's reasonable judgment, renders the remaining portion of the Premises untenantable or unsuitable for continued use by Tenant for its intended purposes or otherwise materially adversely affects Tenant's normal operations in the Premises; (ii) the condition rendering the Premises untenantable or unsuitable either is not curable or is curable but Landlord is unwilling or unable to immediately cure the condition.

(b)      Tenant may elect to terminate this Lease by giving written notice to Landlord within 20 days after the Date of Taking, and thereafter this Lease will terminate upon the later of the 30th day after the written notice is given or the Date of Taking.

13.4.   Rent; Award.  Upon termination of this Lease under Section 13.3 (Partial Taking; Election to Terminate), then: (a) Tenant's obligation to pay Rent will continue up until the date of termination, and thereafter will cease, except that Rent will be reduced to the extent of any partial taking, as provided in Section 13.5 (Partial Taking; Continuation of Lease) for any period during which this Lease continues in effect after the Date of Taking; and (b) Landlord will be entitled to the entire Award in connection with the Partial Taking, except that portion of the Award, if any, made specifically for Tenant's relocation costs or the interruption of or damage to Tenant's business or damage to Tenant's Property. Under no circumstances shall any award be

19

153211369

given to Tenant based on a determination that the Rents under the Lease are below prevailing fair market rents.

13.5.  Partial Taking; Continuation of Lease.  If a Partial Taking occurs under circumstances where this Lease is not terminated in its entirety under Section 13.3 (Partial Taking: Election to Terminate), then this Lease will terminate as to the portion of the Premises so taken, but will remain in full force and effect as to the portion not taken, and the rights and obligations of the Parties will be as follows: (a) Base Rent will be reduced by an equitable amount (for example, by the same ratio to the Base Rent as the area of the Premises taken bears to the area of the Premises before the Date of Taking; but calculated separately for the residential and commercial portions of the Premises); and (b) Landlord will be entitled to the entire Award in connection with the Partial Taking, except that portion of the Award, if any, made specifically for Tenant's relocation costs or the interruption of or damage to Tenant's business or damage to Tenant's Property.

13.6.  Temporary Taking.  If a Taking occurs with respect to the Premises for a period of time not in excess of 60 consecutive days, this Lease will be unaffected, and Tenant will continue to pay Rent and to perform all of the terms, conditions, and covenants of this Lease.  In the event of a temporary Taking, Tenant will be entitled to receive that portion of any Award representing compensation for the use or occupancy of the Premises during the Term up to the proportion of the total Base Rent owing by Tenant for the period of the Taking, where the proportion is equal to the proportion of the square footage of the Premises subject to the Taking.

14.  ASSIGNMENT AND SUBLETTING

14.1.  General.

(a)  It is understood that Tenant's use of the Premises contemplates that Tenant will interact with multiple parties, hire subcontractors and their forces and that Tenant expects, from time to time, to have such forces operating on and using the Premises as part of Tenant's approved use under this Lease.  This includes housing such forces pursuant to such subcontracting arrangements.  Landlord shall have no right to object to any such arrangements as this is a core consideration for Tenant in entering into this Lease.  However, where Tenant intends to enter into subleasing arrangements for the Premises (i.e. where Tenant is subleasing and granting exclusive rights of possession to portions of the Premises to third parties), Landlord shall be informed of such subleases, the terms of the sublease and the parties involved.  So long as the sublease is to parties in good standing, and the proposed sublease activity is within the approved use (and any insurance requirements are met by such subtenant or the risk management offered is substantially equivalent to it), Landlord shall not object to such subleases.

(b)  Subject to Landlord's prior written consent, which consent may not be unreasonably withheld or delayed, Tenant will have the right to sublet the entire Premises as a whole ("Premises Sublease"), or to assign its rights and obligations under this Lease, to any person or entity: (a) whose activities and business at the Premises are comparable in nature to the activities of Tenant at the Premises before the Premises Sublease or assignment; and (b) who will conduct the activities and business at the Premises under an agreement with Tenant or another governmental entity.  No subletting of all or any portion of the Premises or assignment will

20

TUSCAN RIDGE – ECC CONSTRUCTORS LEASE

15321136.9


S 6 T

release Tenant's obligation or alter the primary liability of Tenant to pay Rent and to perform all other obligations to be performed by Tenant under this Lease, except as otherwise expressly permitted by Landlord in writing. Tenant will deliver to Landlord promptly upon request a fully executed copy of any assignment or Premises Sublease. Any Premises Sublease or assignment between Tenant and a third party must explicitly state that the agreement is subject to and controlled by all terms of this Lease. Tenant acknowledges that it shall be reasonable for Landlord to withhold its consent if any of the following are true: (i) the transferee is not financially competent to meet the obligations under the Lease, (ii) the effect of the transfer will materially increase the Landlord's costs or risks; or (iii) the transferee has a history of bankruptcy or has been held found liable in litigation related to leased premises.

15. **DEFAULT; REMEDIES**

15.1. <u>Events of Default by Tenant</u>. Any of the following will constitute an event of default under this Lease (each, an "Event of Default"):

(a) A Party fails to make any timely payment due under the Lease, and then fails to cure the nonpayment within 5 days after notice of such default; or

(b) Tenant abandons the Premises (within the meaning of California Civil Code section 1951.3); or

(c) A Party fails to perform any other covenant or obligation of such Party under this Lease (not involving the payment of money) and then fails to cure the non-performance within 30 days after the date of receipt of notice of such default.

15.2. <u>Landlord Remedies</u>. Upon the occurrence of any Tenant Event of Default, Landlord will have all rights and remedies available under Law or granted under this Lease, including:

(a) Landlord will have the right to terminate Tenant's right to possession of the Premises by any lawful means, and in such case, Tenant will surrender possession of Premises to Landlord. In such event, Landlord shall be entitled to recover from Tenant all damages incurred by Landlord by reason of Tenant's default, including:

(i) The worth at the time of award of the unpaid Rent Landlord would have earned at the time of termination; plus

(ii) The worth at the time of award of the amount by which the unpaid Rent Landlord would have earned after termination until the time of award exceeds the amount of any rental loss that Tenant proves could have been reasonably avoided by Landlord; plus

(iii) The worth at the time of award of the amount by which the unpaid Rent Tenant would have paid for the balance of the Lease Term after the time of the award exceeds the amount of the loss of Rent that Tenant proves could be reasonably avoided by Landlord; plus

21

1532113b.0



Case: 19-30088   Doc# 11291-5   Filed: 09/22/21   Entered: 09/22/21 16:04:19   Page 47 of 108

(iv)    The "worth at the time of award" of the amounts referred to in clauses (i) and (ii) above will be computed by allowing interest at an annual rate equal to the lesser of 10% per annum or the maximum non-usurious rate Landlord is permitted by Law to charge. The "worth at the time of award" of the amount referred to in clause (iii) will be computed by discounting the amount at the rate of 1% above the discount rate of the Federal Reserve Bank of San Francisco at the time of award.

(b)    Landlord will have the right to maintain Tenant's right to possession, in which case this Lease will continue in effect whether or not Tenant has abandoned the Premises, and Landlord will be entitled to enforce all of Landlord's rights and remedies under this Lease, including the right to recover Base Rent and Additional Charges as they become due.

(c)    If Tenant has abandoned the Premises, Landlord will have the option of (i) retaking possession of the Premises and recovering from Tenant the amounts specified in Subdivision (a); or (ii) proceeding under Subdivision (b).

15.3.    Tenant's Remedies. Tenant will have all rights and remedies available under Law or granted under this Lease, including:

(a)    If Landlord fails to cure any default within the cure period provided above, then, Tenant may cause the cure of such default at Landlord's cost (and all such costs are then recoverable from Landlord, together with interest at the Interest Rate). Whether or not Tenant elects to cure Landlord's default as provided in this Lease, Rent will be abated to the extent to which the default renders all or any portion of the Premises unsuitable for continued use by Tenant for its intended purposes or otherwise materially adversely affects Tenant's normal operations in the Premises.

(b)    If any default by Landlord continues beyond the period set forth in Section 15.1(c) above, and impairs Tenant's ability to carry on its business in the Premises, then Tenant will have the right to terminate this Lease upon written notice to Landlord. Such termination shall not limit Tenant's rights to recover its damages, as allowed by Law.

15.4.    Dispute Resolution. If there is an alleged default that is contested, and the Parties are unable to resolve the dispute informally within three (3) business days of a notice from a Party of such dispute, either Party may invoke the dispute resolution procedures and qualifications set forth in Exhibit D (Dispute Resolution Procedures). A contested default shall not suspend the running of the deadlines set out above for any default, but shall be the procedure for determining the available remedies to a Party.

16.    GENERAL INDEMNITIES

16.1.    Tenant's Indemnification. In addition to its indemnification obligations under other provisions of this Lease, Tenant must indemnify, defend, protect and hold Landlord and its Agents free and harmless from and against any and all third party Claims: (a) resulting from any breach of this Lease by Tenant; (b) by Subtenants arising from events that occur during the Term of this Lease; (c) arising from Tenant's occupancy or use of the Premises, or occasioned wholly or in part by any act or omission of Tenant or its Agents, or any accident, injury or damage to

22

TUSCAN RIDGE - ECC CONSTRUCTORS LEASE

15321136.9



Case: 19-30088    Doc# 11291-5    Filed: 09/22/21    Entered: 09/22/21 16:04:19    Page 48 of 108

any person or property, occurring in or about the Premises during the Term; or (d) reasonably and actually incurred or suffered by Landlord as a direct result of Tenant's holding over. In addition, Tenant shall defend and indemnify Landlord from and against any loss, liability, damage, claims and costs (including all attorney's fees and court costs) arising from any breach of a representation or warranty of Tenant under this Lease.

16.2.  Landlord's Indemnification. Subject to any limitations in this Lease, in addition to its indemnification obligations under other provisions of this Lease, Landlord must indemnify, defend, protect and hold Tenant and its Agents free and harmless from and against any third party Claims: (a) resulting from any breach of this Lease by Landlord; (b) caused by any negligence or willful misconduct of Landlord or its Agents in, on or about the Premises or the Property and (c) arising from any Claims or assertion that interferes with Tenant's right to quiet enjoyment of the Premises under this Lease. In addition, Landlord shall defend and indemnify Tenant from and against any loss, liability, damage, claims and costs (including all attorney's fees and court costs) arising from any breach of a representation or warranty of Landlord under this Lease.

16.3.  Scope of Indemnity. Indemnification obligations under this Lease will not apply to damages resulting from the indemnified Party's (or its Agents') gross negligence or willful acts or omissions, unless the loss is otherwise covered by an insurance policy that Party has or is required to have by the Lease. Each Party specifically acknowledges and agrees that, with respect to each of the indemnities contained in this Lease, the indemnitor has an immediate and independent obligation to defend the indemnitees from any claim that actually or potentially falls within the indemnity provision even if the allegation is or may be groundless, fraudulent or false, and the obligation arises at the time the claim is tendered to the indemnitor by the indemnitee and continues at all times until finally resolved. Whether or not a judicial or nonjudicial proceeding is initiated, the indemnitor will have the right, at its sole option, to defend the indemnitee and its Agents by attorneys selected by the indemnitor. The indemnitor will have the right to control the defense and to determine the settlement or compromise of any action or proceeding, and the indemnitee will have the right, but not the obligation, to participate in its defense at its sole cost.

16.4.  Survival of Indemnities. Termination of this Lease will not affect the right of either Party to enforce any and all indemnities under this Lease.

17.  INSURANCE

17.1.  Tenant's Insurance. Tenant shall maintain the insurance specified in Exhibit E, attached to this Lease. If there is a Premises Sublease, then Tenant shall require the subtenant under the Premises Sublease to carry commercially reasonable insurance consistent with the requirements stated in Exhibit E, attached hereto, including the obligation to name Landlord as an additional insured on any commercial general liability policy.

17.2.  Landlord's Insurance. At all times during the Term, Landlord shall maintain the insurance specified in Exhibit E. Landlord hereby waives any rights against Tenant for loss or damage to any part of the Premises, to the extent covered by Landlord's property insurance.

TUSCAN RIDGE – ECC CONSTRUCTORS LEASE

153211369

S68

17.3.  Waiver of Subrogation. Notwithstanding anything to the contrary in this Lease, each Party hereby waives any right of recovery against its counter-Party for any loss or damage relating to the Premises or any operations or contents therein (whether or not such loss is caused by the fault or negligence of the Party so waiving the right) to the extent such loss or damage is covered by insurance that the Party is required to purchase under this Lease or is otherwise actually recovered from insurance held by such Party or recoverable through its Agents. Each Party agrees to obtain a waiver of subrogation endorsement from applicable insurance carriers issuing policies relating to the Premises. A Party's failure to do so shall not affect the above waiver.

## 18.  ESTOPPEL CERTIFICATES

Either Party, from time to time during the Term upon not less than 10 days' prior written notice from the other Party, agrees to execute, acknowledge and deliver to the other Party, or the persons or entities designated by the other Party, a certificate stating: (a) the Commencement Date and Expiration Date of this Lease; (b) that this Lease is unmodified and in full force and effect (or, if there have been modifications, that the Lease is in full force and effect as modified and stating the modifications); (c) that there are no defaults under this Lease (or if so, specifying the same); (d) the date to which Base Rent has been paid, and (e) any other information that may be reasonably required.

## 19.  HOLDOVER; SURRENDER OF PREMISES

19.1.  Holding Over. If Tenant holds over in possession of the Premises after the expiration of the Term with the written consent of the Landlord, the holding over shall be based on the terms agreed to, and shall not otherwise be deemed to further extend the Term or renew this Lease. If holding over occurs without Landlord's written consent, and it constitutes an unlawful detainer, then Landlord shall have all of the remedies at Law, and Tenant shall be liable for all damages (including consequential damages) reasonably and actually incurred or suffered by Landlord. Upon a consensual holdover, (i) Tenant shall continue as a month-to-month tenant until either Party terminates the tenancy by giving the other Party at least 30 days' prior written notice of termination, and (ii) such tenancy shall be on the terms agreed upon for such holdover, or if not expressly modified from those in the Lease, then on the terms and conditions set forth in this Lease, except monthly Base Rent will be 110% of the monthly Base Rent in effect during the last month of the Term.

19.2.  Surrender of Premises. On the Expiration Date, Tenant must surrender the Premises to Landlord in good order and condition as reasonably determined by Landlord, ordinary wear and tear, and damage by fire or other casualty excepted; the Parties agree that reasonable wear and tear and casualty does not include Tenant Damages, and any such Tenant Damages are to be remedied at Tenant's cost. Notwithstanding anything to the contrary in this Lease, Tenant shall not be required to demolish or remove from the Premises any of the Landlord's Work or subsurface improvements that are part of the Scheduled Improvements. Tenant's obligations under this Section will survive the expiration or termination of this Lease.

24

TUSCAN RIDGE – ECC CONSTRUCTORS LEASE

15321136.9

S 6 ^

# 20. HAZARDOUS MATERIALS

**20.1. Landlord's Representations and Covenants.** Limited to Landlord's actual present knowledge and without imputation and without any duty of inquiry or investigation, Landlord represents and warrants to Tenant that the Property is not in violation of any Environmental Laws; (b) the Property is not now and has not been used for the manufacture, use, storage, discharge, deposit, transportation or disposal of any Hazardous Material; (c) the Property does not consist of any landfill or contain any underground storage tanks; (d) the Property does not consist of any non-encapsulated asbestos-containing materials or building materials that contain any other Hazardous Material; (e) no Release of any Hazardous Material exists or has occurred in, on or under the Property; and (f) the Property is not subject to any claim by any Environmental Regulatory Agency or third party related to the Release of any Hazardous Material, or any inquiry by any Environmental Regulatory Agency with respect to the presence of Hazardous Material in, on, or under the Property, or the migration of Hazardous Material from or to other real property. In performing its obligations under this Lease, Landlord agrees to comply with all Environmental Laws that could affect the health, safety, and welfare of Tenant's employees or Tenant's use, occupancy or enjoyment of the Premises for their intended purposes.

**20.2. Landlord's Environmental Indemnity.** In addition to Landlord's other indemnity obligations under this Lease, Landlord shall indemnify Tenant and its Agents against any and all Claims arising: (a) as a result of any breach of any of Landlord's representations, warranties or covenants in the preceding Section 20.1; or (b) in connection with any presence or Release of Hazardous Material in, on or under the Property, but only to the extent it is shown that Landlord or its Agents caused the Release. Landlord's obligations under this Section shall survive the expiration or termination of this Lease.

**20.3. Tenant's Covenants.** Tenant agrees to comply with all Environmental Laws related to its use of the Premises. Neither Tenant nor its Agents may cause any Hazardous Material to be brought upon, kept, used, stored, generated or disposed of in, on or throughout the Premises, or transported to or from the Premises, in violation of any Environmental Laws, provided that Tenant may use substances containing Hazardous Materials in limited amounts as is customary and commonly required to maintain, operate or repair the Premises, so long as the use is in compliance with all applicable Laws.

**20.4. Tenant's Environmental Indemnity.** If Tenant breaches its obligations under Section 20.3 (Tenant's Covenants), or if Tenant, Tenant's Invitees, or its Agents cause the Release of Hazardous Material from, in, on or about the Premises (collectively, a "Hazardous Materials Violation"), then Tenant must indemnify Landlord against any and all Claims arising during or after the Term of this Lease as a result of any Hazardous Materials Violation, except to the extent Landlord or its Agents are responsible for the Hazardous Materials Violation. Tenant's obligations under this Section will include defending Landlord against any cost, loss, demand, claim, or liability, including reasonable and actual attorneys' fees and disbursements and costs incurred in connection with any investigation of site conditions or any cleanup, remediation, removal or restorative work required by any Environmental Regulatory Agency resulting from a Hazardous Materials Violation. Tenant's obligation under this Section will not include any Claims resulting from the non-negligent aggravation by Tenant or its Agents,

25

TUSCAN RIDGE – ECC CONSTRUCTORS LEASE

1532113690


S603

Invitees or Subtenants of physical conditions of the Premises existing before Tenant's occupancy.

21. **SPECIAL PROVISIONS**

21.1. <u>Landlord's Right to Assign</u>. Landlord will have the right to transfer its interest in the Property, the Premises, or the Lease to any other financially responsible person or entity, subject to the conditions set forth in this Section 21.1. Following a transfer, Landlord will be relieved of any obligations accruing under this Lease from and after the date of the transfer, provided that Landlord has provided timely notice to Tenant of the name and address of Landlord's successor(s) and a copy of an executed contract (redacted of all extraneous information, such as the economic terms of the transaction) under which the transferee assumes all of Landlord's obligations under this Lease.

22. **LANDLORD'S REPRESENTATIONS AND RESERVED RIGHTS**

22.1. <u>Authority; Knowledge</u>. Landlord represents and warrants to Tenant that the execution and delivery of this Lease by Landlord has been duly authorized and does not violate any provision of any agreement or Law to which Landlord or the Premises is subject, including all agreements, easements and encumbrances and any other title matters affecting the Premises.

22.2. <u>Quiet Enjoyment and Title</u>. Subject to the express provisions of this Lease, and upon paying the Rent and performing its other obligations under this Lease, Landlord covenants that Tenant will peaceably and quietly have, hold and enjoy the Premises and all appurtenances during the full Term of this Lease as against all persons or entities claiming by and through Landlord or on account of any action, inaction or agreement of Landlord or its Agents.

22.3. <u>Bankruptcy</u>. Landlord represents and warrants that Landlord has neither filed nor been the subject of any filing of a petition under the federal bankruptcy Law or any federal or state insolvency Laws for composition of indebtedness or for the reorganization of debtors, and, to the best of Landlord's knowledge, no filing is threatened. Landlord and Tenant agree that Tenant's leasehold estate includes all rights to receive and enjoy all services, facilities and amenities of the Premises as provided in this Lease, and that if any of the services, facilities or amenities are terminated, or materially limited or restricted on account of an insolvency case or proceeding, or for any other reason, then in addition to any other remedies provided in this Lease, Tenant will have the right to contract directly with any third-party provider of the services, facilities or amenities to obtain the same.

22.4. <u>Right of Entry</u>. Landlord reserves for itself and any designated Agent the right to enter the Premises at all reasonable times and, except in cases of emergency (in which event Landlord must use commercially reasonable efforts, but will not be required, to give any prior notice), after giving Tenant at least 24 hours' advance written or oral notice, for the purpose of: (a) inspecting the Premises; (b) supplying any service to be provided by Landlord under this Lease; (c) showing the Premises to any prospective tenants, purchasers, mortgagees, insurers, appraisers and claims adjusters; (d) posting notices of non-responsibility; and (e) altering, improving or repairing the Premises and any portion of the Premises in accordance with this Lease, provided that Landlord shall not interfere with Tenant's use or enjoyment of the Premises.

26

TUSCAN RIDGE – ECC CONSTRUCTORS LEASE

15321136.9

S6B

Case: 19-30088   Doc# 11291-5   Filed: 09/22/21   Entered: 09/22/21 16:04:19   Page 52 of 108

23. **SPECIAL PROVISIONS**

23.1. <u>Prevailing Wages</u>. Landlord agrees that any person performing labor in the construction of the Landlord's Work or other improvements to the Premises that Landlord provides under this Lease and are paid for in whole or in part out of public funds, as defined in California Labor Code Section 1720 (including any construction, alteration, demolition, installation, repair, carpet laying, or refuse hauling), Landlord shall include, in any contract for construction of such Landlord's Work or other improvements to the Premises, a requirement that all persons performing labor under such contract shall be paid not less than the highest prevailing rate of wages for the labor so performed. Landlord shall require any contractor to provide, and shall deliver to Tenant upon request, certified payroll reports with respect to all persons performing labor in the construction of any Landlord's Work or other improvements to the Premises.

24. **GENERAL PROVISIONS**

24.1. <u>Notices</u>. Except as otherwise specifically provided in this Lease, any notice given under this Lease must be in writing and be given by personal delivery, by express mail or commercial overnight courier, or by sending it by first-class mail, certified mail, return receipt requested, or express mail, return receipt requested, with postage prepaid, to: (a) Tenant at Tenant's address set forth in the Basic Lease Information; or (b) Landlord at Landlord's address set forth in the Basic Lease Information; or (c) any other address either Landlord or Tenant designates as its new address for notice by notice given to the other in accordance with this Section. Any notice given in accordance with this Section will be deemed to have been given and received 2 days after the date when it is mailed if sent by first-class, certified mail, the business day after the date of deposit if sent by express mail or overnight courier, or on the date personal delivery is made. In any case where delivery is attempted but refused, notice will be deemed delivered on the date of refusal.

24.2. <u>No Implied Waiver</u>. No failure by either Party to insist upon the strict performance of any obligation of the other Party under this Lease or to exercise any right, power or remedy consequent upon a breach thereof will constitute a waiver of breach of the term, covenant or condition. No acceptance of full or partial Rent by Landlord while Tenant is in default under this Lease will constitute a waiver of the default by Landlord. No express written waiver of any default or the performance of any provision hereof will affect any other default or performance, or cover any other period of time, other than the default, performance, or period of time specified in the express waiver. One or more written waivers of a default or the performance of any provision hereof will not be deemed to be a waiver of a subsequent default or performance. The consent of Landlord or Tenant given in one instance under the terms of this Lease will not relieve the other Party of any obligation to secure the consent to any other or future instance under the terms of this Lease.

24.3. <u>Force Majeure</u>. The occurrence of any of the following events will excuse, for the duration of the event, performance of any obligation under this Lease if rendered impossible to perform: strikes; lockouts; labor disputes, acts of nature including inclement weather; inability to obtain labor, materials or reasonable substitutes therefore; governmental restrictions, regulations

27

TUSCAN RIDGE – ECC CONSTRUCTORS LEASE

15321136.9

or controls; judicial orders; enemy or hostile governmental actions; civil commotions; fire or other casualty; and other causes beyond the reasonable control of the Party obligated to perform. Performance will be excused only if the Party to be excused has provided notice to the other Party within 30 days after the occurrence or commencement of the event or events.

24.4. Amendments. Neither this Lease nor any terms or provisions hereof may be changed, waived, discharged, or terminated, except by a written instrument signed by the Party against which the enforcement of the change, waiver, discharge, or termination is sought. No waiver of any breach will affect or alter this Lease, but each and every term, covenant and condition of this Lease will continue in full force and effect with respect to any other then-existing or subsequent breach thereof.

24.5. Standard for Approval. Except as otherwise specifically provided in this Lease, wherever in this Lease Landlord or Tenant is required or requested to give its consent or approval to any matter or action by the other, the consent or approval will not be unreasonably withheld or delayed and the reasons for disapproval of consent must be stated in reasonable detail in writing.

24.6. Successors and Assigns. Subject to the provisions of Article 14 (Assignment and Subletting), the terms, covenants and conditions contained in this Lease will bind and inure to the benefit of Landlord and Tenant and, except as otherwise provided in this Lease, their personal representatives and successors and assigns. There are no third-party beneficiaries to this Lease, including any management agent with which Tenant may contract for management of the Premises and any participants in Tenant's programs directed toward providing services and/or nonexclusive use of the Premises for temporary stabilization of homeless persons, and this Lease shall not be deemed to have conferred any rights, express or implied, upon any other person.

24.7. Brokers. Neither Party has had any contact or dealings regarding the leasing of the Premises, or any communication in connection therewith, through any licensed real estate broker or other person who could claim a right to a commission or finder's fee in connection with the lease contemplated in this Lease, except for the broker, if any, identified in the Basic Lease Information, whose commission, if any is due, will be the sole responsibility of Landlord under a separate written agreement between Landlord and the broker, and Tenant will have no liability therefor. If any other broker or finder perfects a claim for a commission or finder's fee based upon contact, dealings or communication, the Party through whom the broker or finder makes his claim will be responsible for the commission or fee and will indemnify the other Party from any and all Claims incurred by the indemnified Party in defending against the same. The provisions of this Section will survive any termination of this Lease.

24.8. Severability. If any provision of this Lease or the application thereof to any person, entity or circumstance is invalid or unenforceable to any extent, the remainder of this Lease, or the application of the provision to persons, entities or circumstances other than those as to which it is invalid or unenforceable, will not be affected thereby, and each other provision of this Lease will be valid and be enforceable to the full extent permitted by Law.

28

TUSCAN RIDGE – ECC CONSTRUCTORS LEASE

S6B

15321136.9



24.9. Governing Law. This Lease must be construed and enforced in accordance with the laws of the State of California.

24.10. Entire Agreement. The Parties intend this Lease (including all of the attached exhibits, which are made a part of this Lease) to be the final expression of their agreement with respect to its subject matter, which may not be contradicted by evidence of any prior or contemporaneous written or oral agreements or understandings. The Parties further intend that this Lease will constitute the complete and exclusive statement of its terms and that no extrinsic evidence whatsoever (including prior drafts and changes) may be introduced in any judicial, administrative or other legal proceeding involving this Lease.

24.11. Attorneys' Fees. If either Landlord or Tenant fails to perform any of its obligations under this Lease or in the event a dispute arises concerning the meaning or interpretation of any provision of this Lease or any obligations arising from it, the prevailing party shall recover its actual attorney's fees and costs (whether or not the action is prosecuted to final judgment).

24.12. Cumulative Remedies. All rights and remedies of either Party set forth in this Lease will be cumulative, except as may otherwise be provided.

24.13. Time of Essence. Time is of the essence with respect to all provisions of this Lease in which a definite time for performance is specified.

24.14. Counterparts. This Lease may be executed in two or more counterparts, each of which will be deemed an original, but all of which taken together will constitute one and the same instrument.

24.15. Effective Date. This Lease will be effective on the date that this Lease is duly executed by the Parties.

24.16. Interpretation of Lease.

(a) References in this Agreement to Tenant's acts or omissions will mean acts or omissions by Tenant and its Agents and Invitees unless the context requires otherwise.

(b) References in this Agreement to Landlords' acts or omissions will mean acts or omissions by Landlord and its Agents and Invitees unless the context requires otherwise.

(c) Whenever an exhibit or schedule is referenced, it means an attachment to this Agreement unless otherwise specifically identified. All exhibits and schedules are incorporated in this Agreement by reference.

(d) Whenever a section, article, or paragraph is referenced, it refers to this Agreement unless otherwise specifically provided. The captions preceding the articles and sections of this Agreement and in the table of contents have been inserted for convenience of reference only and must be disregarded in the construction and interpretation of this Agreement. Wherever reference is made to any provision, term, or matter "in this Agreement," "in this

29

TUSCAN RIDGE – ECC CONSTRUCTORS LEASE

15321136.9

Sᴏ⁶³

Agreement" or "hereof" or words of similar import, the reference will be deemed to refer to any reasonably related provisions of this Agreement in the context of the reference, unless the reference refers solely to a specific numbered or lettered section, subdivision, or paragraph of this Agreement.

(e) References to all Laws, including specific statutes, relating to the rights and obligations of either Party mean the Laws in effect on the effective date of this Agreement and as they are amended, replaced, supplemented, clarified, or superseded at any time during the term of this Agreement or while any obligations under this Agreement are outstanding, whether or not foreseen or contemplated by the Parties.

(f) The terms "include," "included," "including" and "such as" or words of similar import when following any general term, statement, or matter may not be construed to limit the term, statement, or matter to the specific items or matters, whether or not language of non-limitation is used, but will be deemed to refer to all other items or matters that could reasonably fall within the broadest possible scope of the term, statement, or matter, and will be deemed to be followed by the phrase "without limitation" or "but not limited to."

(g) This Agreement has been negotiated at arm's length between persons sophisticated and knowledgeable in the matters addressed. In addition, each Party has been represented by experienced and knowledgeable legal counsel, or has had the opportunity to consult with counsel. Accordingly, the provisions of this Agreement must be construed as a whole according to their common meaning in order to achieve the intents and purposes of the Parties, without any presumption (including a presumption under California Civil Code § 1654) against the Party responsible for drafting any part of this Agreement.

(h) The Party on which any obligation is imposed in this Agreement will be solely responsible for paying all costs incurred in performing the obligation, unless the provision imposing the obligation specifically provides to the contrary.

(i) Whenever required by the context, the singular includes the plural and vice versa, the masculine gender includes the feminine or neuter genders and vice versa, and defined terms encompass all correlating forms of the terms (for example, the definition of "waive" applies to "waiver," waived," waiving").

24.17. Definitions. Definitions used in this Lease are found in the specified locations in this Lease or are set forth below.

"Additional Charges" is defined in Section 4.1.

"Agents" when used with reference to either Party to this Lease or any other person, means the officers, directors, employees, agents, and contractors of the Party or other person, and that Party's (or person's) respective heirs, legal representatives, successors, and assigns. The term "Agents" shall not apply so as to make a counterparty an "Agent" of a Party unless an express agency is in effect under the terms of this Lease.

30

Case: 19-30088   Doc# 11291-5   Filed: 09/22/21   Entered: 09/22/21 16:04:19   Page 56 of 108

"Alterations" means any alterations, installations, additions, or improvements to the Premises.

"Award" means all compensation, sums or anything of value paid, awarded or received for a Taking, whether under judgment, agreement, settlement or otherwise.

"Basic Lease Information" means the terms and conditions to this Lease summarized in Article 1 of this Lease.

"Business day" means any weekday during which businesses are generally open for business, excluding local, state, and federal holidays observed by the federal or state courts.

"Claims" means any of the following, or any combination thereof: all damages, losses, claims, demands, actions, arbitrations, judicial reference proceedings, damages, liability and expense incurred by a Party (including reasonable attorneys' fees and costs of investigation with respect to any claim, demand or action).

"County" means Butte County, State of California.

"Date of Taking" means the earlier of the date upon which title to any portion of the Premises taken passes to and vests in the condemnor or the date on which Tenant is dispossessed.

"Disabilities Laws" means the Americans With Disabilities Act of 1990, 42 U.S.C. §§ 12101 et seq., Title 24 of the California Code of Regulations and all other applicable federal, state, local and administrative laws, rules, regulations, orders and requirements intended to provide equal accessibility for persons with disabilities.

"Effective Date" is defined in Section 24.15.

"Encumbrance" is defined in Article 11.

"Environmental Law" means any Law relating to industrial hygiene, environmental conditions, or Hazardous Material.

"Environmental Regulatory Agency" means any federal, state, local regulatory agency or political subdivision, including the United States Environmental Protection Agency, the California Environmental Protection Agency, the California Department of Toxic Substances Control, the Regional Water Quality Control Board, the San Francisco Department of Public Health, and any other regulatory body with the authority to regulate Hazardous Materials.

"Estimated Commencement Date" is defined in Section 3.1.

"Expiration Date" is defined in Section 3.1.

"Extended Term" is defined in Section 3.3.

"Extension Options" is defined in Section 3.3.

31

TUSCAN RIDGE – ECC CONSTRUCTORS LEASE

15321136 0

SGB

"**Hazardous Material**" means any material that, because of its quantity, concentration or physical or chemical characteristics, is deemed by any federal, state, or local governmental authority to pose a present or potential hazard to human health or safety or to the environment. Hazardous Material includes any material or substance defined as a "hazardous substance," or "pollutant" or "contaminant" under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA," also commonly known as the "Superfund" law), as amended (42 U.S.C. §§ 9601 et seq.), or under Section 25316 of the California Health & Safety Code; any "hazardous waste" listed under Section 25140 of the California Health & Safety Code; any asbestos and asbestos containing materials whether or not the materials are part of the structure of the Premises or are naturally occurring substances on or about the Premises; and petroleum, including crude oil or any fraction thereof, natural gas or natural gas liquids.

"**Hazardous Material Violation**" is defined in Section 20.4.

"**Interest Rate**" is the rate of interest to be charged against a monetary amount due and owing to a Party, as detailed in Section 4.2.

"**Invitee**" means invitees, licensees, patrons, guests, contractors, Agents and any other person whose entry into the Premises is permitted (directly or indirectly) by a Party then exercising rights over the Premises or Property under this Lease.

"**Landlord**" is defined in the preamble.

"**Landlord's actual present knowledge**", shall have the meaning given to it in Recital D.

"**Landlord's Work**" is defined in Section 5.1 and identified in Exhibits A-1 and Exhibit B.

"**Law**" means any present or future federal, state, local or administrative law, statute, ordinance, code, resolution, rule, regulation, judicial decision, requirement, proclamation, order, decree, policy of any governmental agency with jurisdiction over any portion of the Premises (including all equitable rules, remedies, and determinations of general application), whether in effect when this Lease is executed or at any later time and whether or not within the present contemplation of the Parties.

"**Lease**" is defined in the preamble.

"**Lease Date**" is the effective date of this Lease.

"**Lease Year**" means the 12-month period immediately following the Rent Commencement Date and any subsequent 12-month period, if any, during the Term.

"**Partial Taking**" means a Taking of any portion (but less than all) of the Premises.

"**Party**" means Tenant and its successors and assigns or Landlord and its successors or assigns.

32

15321136.9



"Permitted Use" means the uses specified in the Basic Lease Information.

"person" means any individual, partnership, corporation (including any business trust), limited liability company, joint stock company, trust, unincorporated association, joint venture, Regulatory Agency, or any other entity or association.

"Premises" is defined in Articles 1 and 2 and shown on Exhibit A.

"prevailing party" means the Party that substantially obtains or defeats, as the case may be, the relief sought in the action or proceeding, whether by compromise, settlement, judgment, or the other Party's abandonment of its claim or defense.

"Property" is defined in Articles 1 and 2 and shown on Exhibit A.

"Real Estate Taxes" means all taxes, assessments and charges levied upon or with respect to the Premises, including all general real property taxes and general and special assessments, charges, fees, or assessments for transit, housing, police, fire, or other governmental services thereof, service payments in lieu of taxes, and any tax, fee, or excise on the act of entering into this Lease or any other lease of space in the Premises or any part thereof, or on the rent payable under any lease or in connection with the business of renting space in the Premises, that are now or hereafter levied or assessed against Landlord by the United States of America, the State of California or any political subdivision thereof, public corporation, district, or any other political or public entity, and will also include any other tax, fee or other excise, however described, that may be levied or assessed as a substitute for, or as an addition to, in whole or in part, any other Real Estate Taxes, whether or not now customary or in the contemplation of the Parties on the date of this Lease.

"Release" when used with respect to Hazardous Material includes any actual or imminent spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into or inside the Premises, or in, on, under or about the Premises.

"Rent" is defined in Section 4.1(a).

"Rent Commencement Date" is defined in Section 3.1(a).

"Repair Period" is defined in Article 12.

"Sublease" means any agreement by which Tenant leases, subleases, demises or grants to any person in conformity with the provisions of this Lease the right to exclusively occupy a portion of the Premises to the exclusion of all other Persons.

"Substantial Completion" is defined in Section 6.1(e).

"Subtenant" means any person leasing, or occupying any portion of the Premises under and by virtue of a legally enforceable agreement providing for exclusive use of some or all of the

33

TUSCAN RIDGE – ECC CONSTRUCTORS LEASE



15321136.9

Premises, including a Sublease. "Subtenants" shall not include licensees under a revocable license (for example, participants in Tenant's operations who are temporarily on the Premises.

"Taking" means a taking or damaging, including severance damage, by eminent domain, inverse condemnation or for any public or quasi-public use under Law of all of the Premises or the interest under this Lease, and is consummated by recording a final order of condemnation, or by voluntary sale or conveyance in lieu of condemnation or in settlement of a condemnation action.

"Tenant" means the Party identified as Tenant in the preamble.

"Event of Default" is defined in Section 15.1.

"Tenant's Invitees" means Tenant's clients, licensees, invitees, patrons, guests, Subtenants, and any other person whose entry into the Premises is permitted or allowed by Tenant or its Subtenants or invitees, or whose rights of access arise through any of them, but shall exclude Landlord and Landlord's Agents.

"Tenant's Property" is defined in Section 7.2(a)

"Term" is defined in Section 3.1.

"uninsured costs" is defined in Section 8.1(b).

"worth at the time of the award" is defined in Section 15.2(a)(iv).

[SIGNATURE PAGE FOLLOWS]

34

TUSCAN RIDGE – ECC CONSTRUCTORS LEASE

15321136.9



Landlord and Tenant have executed this Lease as of the date first written above.

LANDLORD:                         TUSCAN RIDGE ASSOCIATES, LLC

                                  By: _____
                                      SCOT G. BATES
                                      Its: Manager

TENANT:                           ECC CONSTRUCTORS LLC, a limited liability
                                  company

                                  By: _____
                                  Name: Paul Sabharwal, Manager

35

TUSCAN RIDGE – ECC CONSTRUCTORS LEASE

153211965

## EXHIBIT A

## DESCRIPTIONS OF THE PROPERTY AND PREMISES

**Property:** The Property is located in Butte County, State of California and is identified as follows: APNs 040-520-1000 and 040-520-103

THE LAND REFERRED TO HEREIN IS DESCRIBED AS FOLLOWS:

ALL THAT CERTAIN REAL PROPERTY SITUATE IN THE COUNTY OF BUTTE, STATE OF CALIFORNIA, DESCRIBED AS FOLLOWS:

BEING A PORTION OF SECTIONS 1 AND 2 TOWNSHIP 21 NORTH, RANGE 2 EAST, M, D, B, & M. AND A PORTION OF SECTIONS 35 AND 36, TOWNSHIP 22 NORTH, RANGE 2 EAST, M, D, B, & M. MORE PARTICULARLY DESCRIBED AS FOLLOWS:

ALL THOSE PORTIONS OF THE FOLLOWING DESCRIBED PARCELS LYING SOUTHEASTERLY OF THE SOUTHEASTERLY SKYWAY RIGHT-OF-WAY LINE AND NORTHERLY AND NORTHWESTERLY OF THE SOUTHERLY RIGHT-OF-WAY LINE OF THE BUTTE COUNTY RAILROAD AS REFERENCED IN THAT CERTAIN DEED TO GILBERT ALM, RECORDED ON MARCH 3, 1951, IN BOOK 567 OF BUTTE COUNTY OFFICIAL RECORDS, AT PAGE 300:

THE NORTHWEST ONE-QUARTER OF SAID SECTION 1, THE SOUTH ONE-HALF AND THE SOUTHWEST ONE-QUARTER OF THE NORTHEAST ONE-QUARTER OF SAID SECTION 36 AND THE SOUTHEAST ONE-QUARTER OF THE SOUTHEAST ONE QUARTER OF SAID SECTION 35.

TOGETHER WITH THE FOLLOWING DESCRIBED REAL PROPERTY:

BEGINNING AT THE NORTHEAST CORNER OF SECTION 2, TOWNSHIP 21 NORTH RANGE 2 EAST, M, D, B, & M, AS SHOWN ON THAT CERTAIN RECORD OF SURVEY MAP, RECORDED IN THE OFFICE OF THE RECORDER OF THE COUNTY OF BUTTE, STATE OF CALIFORNIA, ON SEPTEMBER 14, 1989, IN BOOK 114 OF MAPS, AT PAGE(S) 55 AND 56; THENCE SOUTH 00° 46' 31" EAST 694.13 FEET ALONG THE EASTERLY LINE OF SAID SECTION 2 TO THE SOUTHERLY LINE OF THE BUTTE COUNTY RAILROAD; THENCE ALONG SAID SOUTHERLY LINE, NORTH 67° 10' 19" WEST, 529.58 FEET TO THE BEGINNING OF A 1700.00 FOOT RADIUS CURVE CONCAVE ... THENCE NORTHWESTERLY 89.47 FEET ALONG SAID CURVE AND LINE THROUGH A CENTRAL ANGLE OF 02° 42' 44" TO THE BEGINNING OF A COMPOUND 750.00 FOOT RADIUS CURVE CONCAVE SOUTHERLY; THENCE WESTERLY 208.29 FEET ALONG SAID CURVE AND A LINE THROUGH A CENTRAL ANGLE OF 15° 41' 00" TO THE BEGINNING OF A COMPOUND 565.00 FOOT RADIUS CURVE CONCAVE SOUTHERLY; THENCE WESTERLY 87.86 FEET ALONG SAID CURVE AND LINE THROUGH A CENTRAL ANGLE OF 08° 54' 39" WESTERLY, 184.14 FEET ... ALONG SAID LINE ... WEST ... THENCE NORTH 00° 46' WEST ... TO AN ANGLE POINT IN THE SOUTHERLY LINE OF THAT CERTAIN DEED OUTFALL LINE AS DESCRIBED IN THAT CERTAIN DEED TO THE COUNTY OF BUTTE RECORDED IN VOLUME 1965 OF BUTTE COUNTY OFFICIAL RECORDS, AT PAGE 55 ... BUTTE COUNTY RECORDER'S OFFICE, THENCE ALONG SAID LINE, NORTH 10° 05' 5" WEST, 66.14 FEET; THENCE NORTH 75° 42' 12" EAST, 175.56 FEET, ALONG SAID ...

## EXHIBIT A - Page 1

## TUSCAN RIDGE – ECC CONSTRUCTORS LEASE

15321136.9

## EXHIBIT A

## DESCRIPTIONS OF THE PROPERTY AND PREMISES

LINE; THENCE NORTH 73° 56' 30" EAST, 265.24 FEET ALONG SAID LINE; THENCE
NORTH 64° 58' 36" EAST, 263.91 FEET ALONG SAID LINE; THENCE NORTH 57° 49' 06"
EAST, 298.15 FEET ALONG SAID LINE; THENCE NORTH 55° 38' 27" EAST, 11.17 FEET
ALONG SAID LINE TO THE NORTHERLY LINE OF SAID SECTION 2; THENCE NORTH
89° 39' 50" EAST, 857.86 FEET ALONG SAID NORTHERLY LINE TO THE POINT OF
BEGINNING.

THE BASIS OF BEARINGS FOR THE HEREINABOVE DESCRIBED PARCEL IS SAID MAP
BOOK 114, PAGES 54, 55 AND 56.

PARCEL HEREIN IS PURSUANT TO A MERGER APPROVED BY THE COUNTY OF
BUTTE, RECORDED SEPTEMBER 6, 2000, UNDER BUTTE COUNTY RECORDER'S
SERIAL NO. 2000-36590.

AP NO. 040-520-100 AND 040-520-101

EXHIBIT A - Page 2

TUSCAN RIDGE – ECC CONSTRUCTORS LEASE

15321136.9

# EXHIBIT A

## DESCRIPTIONS OF THE PROPERTY AND PREMISES

Premises: The "Premises" will be comprised of the elements of the PG&E Base Camp (20.1 acres), Base Camp #2 (30.0 acres) and Base Camp #1 (32.5 acres)=82.6 acres) i.e. the area east of the purple road described below.

### PG&E BASE CAMP



EXHIBIT A - Page 3

TUSCAN RIDGE · ECC CONSTRUCTORS LEASE

15321136.9

S6ß



EXHIBIT A - Page 4

TUSCAN RIDGE – ECO CONSTRUCTORS LEASE

15321136.9





EXHIBIT A - Page 5

TUSCAN RIDGE – ECC CONSTRUCTORS LEASE

15321136.9

$S 6 B$

Case: 19-30088   Doc# 11291-5   Filed: 09/22/21   Entered: 09/22/21 16:04:19   Page 66 of 108



**EXHIBIT A - Page 6**

**TUSCAN RIDGE – ECC CONSTRUCTORS LEASE**

15321136.9

$3\,6\overline{3}$

# EXHIBIT A-1

## SCHEDULED IMPROVEMENTS TO PREMISES AND PROPERTY

### I.    General Project Scope

Tenant's goal in leasing the Premises is to address its contract needs with CalRecycle, a third party agency supporting the remediation and cleanup of the Camp Fire that devastated Butte County, including the town of Paradise. Tenant intends to construct the Worker's Camp Facilities so that the Worker's Camp is set up to house up to 3000 personnel. Tenant shall have the right to adjust the scope of the Scheduled Improvements as may be required from time to time (including reducing the load factors for potable water and wastewater set out below); and Landlord shall provide for such adjustment in its contracts for Landlord's Work. To the extent such reductions drop the costs of the Permanent Improvements below the "Threshold Amount" specified in Section VII.2, below, it will mean that the Rent offset is diminished by an equivalent sum.

Tenant has contracted with a modular facility provider, ATCO Ltd. of Canada ("ATCO"), to provide the required housing (approximately 750 modular multi resident units and associated support facilities comprised of dining, laundry, first aid, recreational and similar facilities – "Support Facilities"). A preliminary laydown of these housing units and Support Facilities is set forth in Attachment 1 to this Exhibit A-1. [ATCO is currently redesigning the layout of the Worker Camp Facilities within the Premises.]

Notwithstanding any contrary provision in this Lease, the Parties acknowledge that (i) they have a preliminary budget estimate for the completion of the Scheduled Improvements and that budget contemplates an estimated PG&E cost for the electrical Scheduled Improvements, (ii) they agree that the budget is not expected to exceed $3,964,800.00 (i.e. the "Threshold Amount" comprised of the aggregate of 12 months of Base Rent at $4,000/acre), but such budget may be adversely affected by costs scheduled by PG&E for the power needs of the Worker's Camp Facilities. In addition, the budget costs may be adversely affected by permitting requirements of the Central Valley Regional Water Quality Control Board (the "CVRWQCB") and site constraints for the wastewater system unless these obligations are waived pursuant to the emergency orders issued by the California Governor's Office.

By way of background, on November 8, 2018, the Acting Governor of the State of California proclaimed a State of Emergency for Butte County pursuant to the California Emergency Services Act, and on November 14, 2018, the Governor issued Executive Order B-57-18 concerning the Camp Fire. Finally, on November 12, 2018, the President of the United States declared the existence of a major disaster in the State of California, providing assistance from many federal agencies, including FEMA. These prior emergency declarations have been offered by Landlord in support of the Parties' request for an emergency exemption from CEQA for the wastewater system application. Specifically, under Section 15269 of the CEQA guidelines, emergency projects for utility facilities "in a disaster stricken area in which a state of emergency

TUSCAN RIDGE – ECC CONSTRUCTORS LEASE

153211369

$S6b$

Case: 19-30088    Doc# 11291-5    Filed: 09/22/21    Entered: 09/22/21 16:04:19    Page 68 of 108

has been proclaimed by the Governor" are to be exempt from the requirements of CEQA. These guidelines also exempt from CEQA emergency projects to privately owned service facilities essential to the public health, safety or welfare. As the Project will directly facilitate ECC's rapid cleanup of the Town of Paradise, it is believed that the Project is essential to the public health, safety and welfare of Butte County and will qualify for the exemption from the CEQA review process. A final determination of the CEQA exemption has not yet been received by the Parties. Separately, PG&E entered into a lease with Landlord and had certain restoration obligations under that lease ("Restoration Obligations"). Landlord is negotiating with PG&E over its Restoration Obligations and those negotiations are continuing; they are expected to result in a resolution within a matter of weeks.

In light of these risks, the Parties agree that they have up to the date that is ten (10) business days after the Effective Date (the "Decision Date") to confirm that (i) PG&E's Restoration Obligations have been adequately resolved; (ii) the PG&E costs for bringing power to the Premises, and the costs of installing the Permanent Improvements will not exceed the Threshold Amount, and (iii) that the Critical Milestones set forth in Exhibit B will not be materially and adversely impacted by the CVRWQCB's permitting requirements or site constrains; in particular, the Parties are concerned that the county's grading permit for the holding pond may impose added costs and delays, and the Governor's emergency declaration will be insufficient to result in an expedited CEQA review (or its waiver), and this will cause both delays in meeting the Critical Milestones set forth in Exhibit B as Landlord's Work. or will cause a shifting of additional costs to Landlord not contemplated by the existing scope of Scheduled improvements and associated budget ("Remaining Risks").

Within ten (10) business days of the Decision Date, the Parties may terminate this Lease due to one of the Remaining Risks if: (i) the resolution of PG&E's Restoration Obligations to Landlord fails to yield a result satisfactory to Landlord; (ii) the PG&E costs to provide electrical services exceed an amount acceptable to Landlord, and Tenant does not agree to absorb the excess costs above the Threshold Amount minus $1,000,000 (without an offset against Rent); (iii) it is determined that the Critical Milestones set forth in Exhibit B will be materially and adversely impacted by the failure of CVRWQCB's permitting requirements to qualify for the CEQA exemption and Tenant does not then agree to (A) grant Landlord additional time to complete such Critical Milestones to accommodate such mandates from the CVRWQCB and (B) cover the additional costs so imposed on Landlord because the required CEQA exemption was not granted under the Governor's emergency order; and (iv) if the grading permits for the holding ponds will impose material and adverse delays or if the costs to excavate the holding ponds exceed an amount acceptable to Landlord, and Tenant does not agree to absorb such additional time and costs above the Threshold Amount minus $1,000,000 (without an offset against Rent). Absent Tenant's election to cover these risk factors as so stated, then either Party may terminate this Lease by notice by midnight Pacific Daylight Time on the Decision Date. Upon such termination, the Parties shall be relieved of any obligation to perform the terms and conditions of the Lease. This interim period between the Effective Date and the date that is the Decision Date is deemed fully covered as a suspension of obligations for both Parties as a "Force Majeure" event. Regardless of the foregoing, and provided that Tenant has procured the insurance required by the Lease and obtained all applicable permits, Tenant shall be entitled to enter the

EXHIBIT A-1 - Page 2

TUSCAN RIDGE – ECC CONSTRUCTORS LEASE

15321136.9

S 63

Premises and engage in activities that implement the Preliminary Phase of the Scheduled Improvements, and to the extent that Tenant does so, if the Lease is terminated on or before the Decision Date, then Tenant shall, at its sole cost, (i) cause all such installations to be removed and promptly restore the Premises to substantially the condition they were in as of the Effective Date, and (iii) promptly remove all of its personal property from the Premises.

## II.    Overall Schedule

The Worker's Camp Facilities are to be immediately installed and constructed in a phased manner. The Preliminary Phase must be sufficient to accommodate 350 personnel (approximately 70 five-room modular multi resident units and Support Facilities) installed and operational with the required temporary utilities within 14 days from the Decision Date. The Second Phase must be such that it can serve and accommodate approximately 1500 personnel (approximately 300 five-room modular housing units and Support Facilities) as turnkey and fully operational with potable water from the existing wellhead to be provided within 30 days of the Decision Date and operational wastewater treatment facilities to be provided within 45 days of the Occupation Date. As noted in Section 9 of the Lease, above. Tenant shall absorb the costs of furnishing temporary potable water supplies as needed to serve the Worker's Camp Facilities within the first thirty (30) days after the Decision Date at its sole cost, and will absorb the costs of furnishing temporary wastewater treatment and disposal for the first forty-five (45) days after the later of the Occupation Date or Decision Date. Thereafter, the obligation to provide such utilities is Landlord's responsibility as part of Landlord's Work. Any failure of Landlord to provide the required potable water at the well head within 30 days of the Decision Date, and any failure of Landlord to complete the required wastewater utilities scheduled as part of Landlord's Work shall make Landlord responsible for all of the cost imposed on Tenant of continuing to furnish such utility services through temporary means beyond the 30-day and 45-day deadline set out above.

## III.    Site Civil Work

**Item 1 – Storm Water Pollution Prevention**: Install silt fencing, wattles, etc. as necessary and in accordance with best management practices prior to commencing site work for all of the areas designated for Tenant's use.

**Item 2 – Site Preparation Earthwork and Crushed Stone**: Remove trees as required for all planned site improvements. Grade approximately 80 acres within the boundaries shown on page 2 of Attachment 1 sufficiently to minimize abrupt changes in elevation. Cut high area and fill and compact low areas maximizing the use of existing earth and existing crushed stone from high areas and existing crushed stone from areas with the stone layer exceeding three inches. Install and compact a minimum three-inch thick crushed stone cover in areas that do not currently have a stone cover maximizing the use of existing stone and, if needed, importing additional stone to match existing.

Landlord agrees Tenant shall have access to Landlord property during construction in order to remove excess existing crushed stone installed for the previous Pacific Gas and Electric (PGE)

EXHIBIT A-1 – Page 3

TUSCAN RIDGE – ECC CONSTRUCTORS LEASE

15321136.9


$S\,\hat{\hat{o}}\hat{v}$

camp for use on the leased premises. Operations to remove excess stone will ensure no less than 6 inches of stone thickness remains, will ensure smooth transitions from excavated areas, and will ensure existing drainage is not negatively impacted or, if practicable, improved. Location of existing stone removal will be coordinated between Landlord and Tenant before any removal occurs.

Item 3 – Skyway Turning Lane: Install a temporary left turning lane from westbound Skyway Drive into the Northwest corner of the site as reflected on Exhibit A ("Skyway Turning Lane"), including obtaining any required permit and furnishing a temporary means of ingress and egress other than the Main Gate. Until such Skyway Turning Lane has been fully permitted and this alternative means for ingress and egress to the Premises is completed, the Parties agree that (i) the Tenant's access to the Premises shall be through the Main Gate (as shown in Exhibit A); (ii) Tenant, at its cost, will create a new drive lane from the public road via the Main Gate and on to the Premises, as shown on Exhibit A-1 ("New Road"), and Tenant agrees to provide appropriate signage and security (as needed) to direct all traffic that is scheduled for entry to the Premises and minimize any interference with Landlord's use of the existing Skyway Road. Tenant shall have no obligation to restore the area of the Premises affected by the New Road and Skyway Turning Lane.

Item 4 – Access Road to Wastewater Treatment Facility: Landlord to design and construct an access road to the wastewater treatment facility as required for maintenance including sludge removal from the primary septic tanks including obtaining any required permits.

## IV.    Water Production, Treatment and Distribution:

Item 1 - Water Production and Service: Design and construct a potable water production and treatment system for a daily consumption of at least 75,000 gallons for approximately 1500 camp occupants including obtaining required permit or permit amendment. This potable water system shall draw water from its existing permitted well and pump it to a newly constructed holding / treatment facility. All such water must pass state and federal potable water standards.

Landlord is responsible for the permit amendment required for a modification to Landlord's existing permitted potable water production system to deliver potable water to the Premises boundary, treated as required by Law, at a rate sufficient to meet the expected daily demand of 75,000 gallons per day and expected peak demand of 13,800 gallons per hour (230 gallons per minute) to the Premises boundary. The temporary storage and treatment facility is to be located at the SE corner of the Premises.

Tenant is responsible for supplying and installing the temporary tank and demand booster pump and controls necessary to pressurize the Tenant installed temporary distribution system to the Worker Camp Facilities.

Item 2 – Water Distribution: Tenant to design and construct a pressurized water distribution system that will connect the Tenant-designed temporary storage and treatment facility to all

EXHIBIT A-1 – Page 4

TUSCAN RIDGE - ECC CONSTRUCTORS LEASE

15321136.9

$S 63$

Worker's Camp Facilities. Connect potable water to all residential units and all Support Facilities, as these arrive on the Premises.

Item 3 – Short Term Water Storage and Distribution: Until the permanent water production system is operational, interim measures will be necessary to accommodate the first 350 personnel (approximately 70 housing units and Support Facilities). This will include providing and installing potable water holding tank(s), temporary booster pump and portable diesel generator and temporary pipe caps in order to pressurize the portion of the distribution system serving the first 70 housing units and Support Facilities. Holding tank(s) shall have a minimum capacity of 5,000 gallons. It also requires connecting potable water to all residential units, and all Support Facilities, as these arrive on the Premises.

## V. Wastewater Collection and Treatment

Item 1 – Wastewater Collection: Tenant to design and construct a wastewater collection system from all Worker's Camp Facilities on Premises including gravity main(s) to Landlord's treatment facility. The collection system and gravity main shall be designed to accommodate approximately 1500 camp occupants. Estimated sewage generation is 50 gallons per day per capita or up to 75,000 gallons per day. Connect sewage lines to all residential units and all Support Facilities, as these arrive on the Premises.

Item 2 – Wastewater Treatment: Landlord to design and construct a Presby Advanced Enviro-Septic wastewater treatment facility including obtaining required permit(s). This system shall be capable of treating 75,000 GPD.

Item 3 – Short Term Waste Water Collection: Until the permanent wastewater treatment facility is operational (with an outside deadline for completion of 120 days after the Decision Date), interim measures will be necessary to accommodate 1,500 personnel including all multi resident units and Support Facilities. Temporary measures to manage wastewater are to be installed within 14 days of the Decision Date to serve the first 70 multi-unit housing units and Support Facilities. Promptly after the Decision Date, Tenant to provide a 10,000 gallon holding tank at the location shown on Exhibit A for interim storage of wastewater, and install such sewage holding tank(s) to allow daily (or more frequent) removal and offsite disposal. Holding tank(s) shall have a minimum capacity of 10,000 gallons. Tenant to connect sewer to all residential units and all Support Facilities, as these arrive on the Premises.

## VI. Electrical Work

Item 1 – Main Camp Electrical Service: Coordinate with Tenant, Tenant's electrical subcontractor and PGE to obtain approval from PGE for the installation of an overhead electrical service to the Worker's Camp Facilities main power station(s). PG&E plans to install a 277/480 V primary service to the site. Tenant will be responsible for advancing payment for the 12 KV line service and step-down transformer(s). The cost of 12 KV line service shall be an offset to Rent as a "Permanent Improvement"; the cost of the step-down transformer will not be offset against the Rent. Trench and install the underground conduit from the 12 KV drop location(s) to

TUSCAN RIDGE – ECC CONSTRUCTORS LEASE

15331136.9



the transformer pad(s) in accordance with the Tenant or PGE design. Tenant, Tenant's electrical subcontractor or PGE will install the service to step-down transformers and transformer(s) at Tenant's cost. Connect electricity to all residential units and all Support Facilities, as these arrive or the Premises.

Item 2 – Wastewater Treatment Facility Electrical Service: Coordinate with Tenant, Tenant's electrical subcontractor and PGE to obtain approval from PGE for the installation of a 12 KV electrical service drop to the wastewater treatment facility and existing water production facility and club house facility connection location. PG&E plans to install a 277/480 V primary service to the site. Tenant will be responsible for advancing the costs for three (3) pole-mounted step down transformers, which will be offset against the Rent as a Permanent Improvement so long as the transformers are in a location suitable for the long term development of the Property by Landlord. Otherwise, the cost for such transformers will not be offset against Rent. Trench, install conduit and backfill the low voltage service to the existing water pumping station, club house and wastewater treatment facility connection location. Tenant's electrical subcontractor or PGE will install the conductors, the cost of which will be offset against the Rent as a Permanent Improvement.

## VII. Project Management and Costs

1. **Project Management:**

Landlord's Project Manager shall be <u>Mark West</u> unless this is changed by notice to Tenant. Tenant's Project Manager shall be <u>Scott Hayward</u> unless this is changed by notice to Landlord.

Regardless of any contrary provision in this Exhibit A-1 or any contrary provision elsewhere in the Lease, Tenant shall have no liability to Landlord or any third party contracting with Landlord respecting any obligation arising out of Improvements to the Property unless and until Tenant has confirmed in writing that it has a notice to proceed from CalReserals and the Effective Date has occurred.

With respect to all of the Scheduled Improvements to be installed on the Property under the provisions of this Exhibit A-1, the following requirements apply to the Party responsible for the scheduled work (so that if the scope of the work is Tenant's Work, the responsibility will be on Tenant to comply with all of these requirements, and vice versa): (i) all work shall be completed in compliance with applicable Law and the responsible Party shall not create or maintain nuisance conditions in or about the Property; (ii) each responsible Party shall ensure that liens do not attach against the Property as a result of the work of improvement referenced in this Exhibit A-1, and if a lien attaches, that it is promptly bonded around or released not later than thirty (30) days after it attaches to the Premises or Property; (iii) all work shall be completed in compliance with the standard of care for the trade or industry involved (i.e. in a non-negligent manner) and shall be functional and effective; (iv) the Party will at all times maintain reasonable books and records and comply with any regulatory requirements to meet its obligations under the Lease; (v) all work requiring a license shall only be completed by those licensed in that trade; (vi) Landlord's contractor for Landlord's Work will be Chico West, Inc. dba Community

EXHIBIT A-1 – Page 6

TUSCAN RIDGE – ECC CONSTRUCTORS LEASE

15321136.9



Construction ("Community Construction"), or a replacement contractor reasonably acceptable to Tenant; (vii) Landlord's contracts for Landlord's Work shall specifically provide that Tenant is a third party beneficiary under each such contract (or subcontract or contract for materials), shall meet commercially reasonable standards, and shall provide that Tenant may assume Landlord's rights under such contract, and a copy of each such contract for Landlord's Work shall be provided to Tenant upon execution. None of these contracts can be assigned to third parties without Tenant's written approval, determined in its reasonable discretion.

2.  Reimbursement and Costs:

Within two (2) business days of the Rent Commencement Date, Landlord will provide to Tenant a Security Deposit equal to $330,400. The Security Deposit shall be maintained in a separate account from Landlord's general funds and shall only be used by Landlord in case there is an Event of Default by Tenant, and then it may be used to address any failure of Tenant to perform its obligations under this Lease. If the Lease is terminated under the provisions for the Decision Date contingencies, any unused portion of the Security Deposit shall be immediately returned to Tenant.

Tenant has agreed to advance all costs reasonably necessary to complete the Scheduled Improvements contemplated by this Exhibit A-1 (including the reasonable costs for permits as well as any fees charged to gain the right to complete the construction of these improvements), provided such costs are within such budget or meet the requirements set forth below regarding the prior approval of such costs.

The approved budget for the completion of the Scheduled Improvements comprising Landlord's Work is set forth in Attachment 2 to this Exhibit A-1. The Parties will finalize the budget and update prior to the Decision Date.

No change in the budgeted costs for the Permanent Improvements or Landlord's Work is permitted unless approved by Tenant. If Landlord alleges that it has incurred costs that are entitled to payment and this is disputed by Tenant, Tenant may elect to make such payments under protest and reserve all rights to contest such payment and recover any excess payments from Landlord through the Dispute Resolution Process or by other means permitted under this Lease.

Moreover, the Parties agree that the following improvements set forth in this Exhibit A-1 create a permanent improvement and add value to the Property; those improvements are herein referred to as "Permanent Improvements":

- The design, permitting and completion of all facilities necessary to:
  - o  provide potable water at the well head, treated as required by Law, at a rate sufficient to meet expected daily demand of 75,000 gallons per day and expected peak demand of 13,800 gallons per hour (230 gallons per minute).
  - o  complete the installation of 12 KV line for permanent electrical power to the Landlord's water treatment and pumping system and to the Premises.

EXHIBIT A-1 – Page 7

TUSCAN RIDGE – ECC CONSTRUCTORS LEASE

15321136.0


S 6

- o complete the installation of the wastewater treatment systems as described in the Attachments to this Exhibit A-1 (e.g. NexGen Septics, LLC)

Within the designation of costs for any "Permanent Improvement" are all soft and hard costs of installing such a Permanent Improvement through its completion as a "turnkey" improvement. Tenant will be responsible for advancing the costs of installing the Permanent Improvements (as well as the remaining Scheduled Improvements comprising Landlord's Work), provided such costs are within the amount budgeted or have been separately approved in writing by Tenant, and the aggregate sum of all such costs do not exceed $3,964,800.00 (i.e. the "Threshold Amount"). Any accounting by Landlord for reimbursement of these costs shall delineate in reasonable detail whether the costs arise for Permanent Improvements or not. Landlord will promptly provide to Tenant all backup for such charges that are reasonably requested by Tenant. The Parties anticipate that the costs for the Permanent Improvements will be less than the Threshold Amount. The Parties further agree that Tenant may off-set against the Rent under the Lease all of the costs incurred by Tenant for the Permanent Improvements, except as otherwise specified in this Lease. If the costs of installing the Permanent Improvements are less than the Threshold Amount, Tenant shall pay the Rent remaining on the difference between such costs and the Threshold Amount to Landlord via a revised amortization of such remaining Rent, such revised Rent payments to commence with the first month following the completion of the Permanent Improvements, and amortized equally over the balance of the Lease term.

Landlord and Tenant shall each have approval rights for any change in the scope of the Landlord's Work that will cause the aggregate costs of all of the Permanent Improvements to exceed the Threshold Amount. Such approval rights shall be promptly and reasonably exercised by both Parties.

If the costs for the completion of the Permanent Improvements exceed the Threshold Amount, then (unless Tenant has agreed to assume such costs prior to the Decision Date as set forth in Exhibit A-1 above), at Tenant's election, Tenant may either apply the excess (which shall in no event exceed Five Hundred Thousand Dollars ($500,000)) against any Rent incurred for any Extension Option exercised by Tenant, or it shall be treated as a short-term loan to Landlord that will carry interest on the principal amount outstanding from time to time at the Interest Rate, and such loan must be repaid in full to Tenant within not more than three (3) months after the Lease Term ends. Should it not be timely repaid, then the interest rate on such loan will increase without further notice to ten percent (10%) per annum, but in no event more than the maximum allowed by Law.

15321136.9



### Exhibit B – Landlord's Work
### [preliminary listing]

Landlord recognizes that the Premises currently have certain deficiencies that would adversely affect Tenant's operations at the Premises. Pursuant to Exhibit A-1, Landlord is scheduled to complete certain specified improvements and repairs that are referred to as "Landlord's Work." All such Landlord's Work shall: (i) be expeditiously completed, (ii) by licensed trades where a license is required, (iii) in a competent manner, (iv) and with a view to promptly creating the functionality associated with such Landlord Work.

Schedule: The Worker's Camp Facilities are to be constructed in a phased manner to accommodate an initial 350 personnel (approximately 70 five-room modular housing units and Support Facilities – the "Preliminary Phase"), and to thereafter accommodate 1500 personnel (approximately 300 five-room modular housing units and support facilities) (the "Second Phase"), and to accommodate up to 3000 personnel within a timeframe thereafter, to be determined by Tenant.

Expedient design, permitting, procurement and construction for the Landlord's Work is of the essence. Completion of critical milestones shall not be later than the time periods indicated below. Payment for the completion of Landlord's Work associated with achieving each "Critical Milestone" set out below (which payment will be offset against Rent due under the Lease), will be made as such costs are incurred by Landlord within seven (7) days after receipt of Landlord's invoice and reasonable accounting associated with such Landlord's Work. Invoices shall correspond to the amounts negotiated for each such installment of Landlord's Work and set forth in the budget (or shall be separately approved by Tenant), and shall be accompanied by Landlord's certification that all such work has been completed or is in progress. Tenant may issue a joint check to Landlord and to Community Construction Inc. (or other contractors) for the payment of Landlord's Work, unless alternate arrangements reasonably satisfactory to the Parties are agreed upon. Landlord and its contractor must maintain full books and records to account for all charges submitted for payment. A failure to maintain adequate books and records for such Landlord Work shall eliminate the obligation to pay for the undocumented work. Tenant shall have the right to audit any and all charges so submitted as an invoice, and Landlord shall fully cooperate with Tenant in providing the required books and records to substantiate the charges.

| Critical Milestone(s) | Outside Completion Date |
|---|---|
| Design of wastewater treatment facility and gravity main(s) from leased property boundary to treatment facility. | 14 calendar days after Decision Date |
| Deleted | Deleted |
| Order wastewater treatment facility and gravity main(s) components | 7 calendar days after Decision Date |

TUSCAN RIDGE – ECC CONSTRUCTORS LEASE

153211369

$S\ 6B$

| | |
|---|---|
| Deleted | Deleted |
| Deleted | Deleted |
| Deleted | Deleted |
| Receive wastewater treatment facility and gravity main(s) components | 30 calendar days after Decision Date |
| Deleted | Deleted |
| Deleted | Deleted |
| Deleted | Deleted |

**Site Civil Work:**

**Item 1 – Storm Water Pollution Prevention:** Install silt fencing, wattles, etc. as necessary and in accordance with best management practices prior to commencing site work at the wastewater treatment facility and water treatment and pump station and any other areas of Landlord's Work as required by law.

**Item 2 – Access Road to Wastewater Treatment Facility:** Design and construct an access road to the wastewater treatment facility as required for maintenance including sludge removal from the primary septic tanks including obtaining any required permit(s).

**Item 3 – Skyway Turning Lane:** Deleted. See Tenant's Work, Exhibit B.

**Water Production, Treatment and Distribution:**

**Item 1 – Water Production and Service:** Within thirty (30) days of the Decision Date the "Permanent Improvement" portion of the potable water production and treatment system at the well head for a daily consumption of at least 75,000 gallons for up to 1500 camp occupants. (Estimated consumption is at least 75,000 gallons per day.) Landlord is responsible for obtaining any permit amendment required for a modification to Landlord's existing permitted potable water production system to deliver potable water, treated as required by Law, at a rate sufficient to meet the expected daily demand of 75,000 gallons per day and expected peak demand of 13,800 gallons per hour (230 gallons per minute). All such potable water must pass state and federal potable water standards.

**Wastewater Collection and Treatment**

**Item 1 – Wastewater Treatment:** Design and construct a Presby Advanced Enviro-Septic wastewater treatment facility including obtaining required permit(s). System shall be capable of treating 75,000 GPD.

**Electrical Work**

**Item 1 – Main Camp Electrical Service:** Coordinate with Tenant, Tenant's electrical subcontractor and PGE to obtain approval from PGE for the installation of an overhead electrical

TUSCAN RIDGE – ECC CONSTRUCTORS LEASE

15321136.9



S 617

Case: 19-30088   Doc# 11291-5   Filed: 09/22/21   Entered: 09/22/21 16:04:19   Page 77 of 108

service to the Worker's Camp Facilities main power station(s) in accordance with the PG&E approved design. PGE to install the conductors and transformer(s).

Item 2 – Wastewater Treatment Facility Electrical Service: Coordinate with Tenant, Tenant's electrical subcontractor and PGE to obtain approval from PGE for the installation of a 12 KV electrical service drop to the wastewater treatment facility and existing water production facility and club house facility connection location. PG&E plans to install a 277/480 V primary service to the site. Tenant will be responsible for advancing the costs for three (3) pole-mounted step down transformers. which will be offset against the Rent as a Permanent Improvement so long as the transformers are in a location suitable for the long term development of the Property by Landlord. Otherwise, the cost for such transformers will not be offset against Rent. Trench, install conduit and backfill the low voltage service to the existing water pumping station, club house and wastewater treatment facility connection location. The sewer line running from the Premises to the wastewater treatment facility is considered a temporary improvement, the cost of which shall not be an offset against Rent.

Landlord's Work shall be deemed to have achieved Substantial Completion when all of the specified scopes of work set out above for completion of the Second Phase are done (so that the wastewater system, the availability of potable water at the well head and all of the base work required for PG&E connections at the Worker's Camp Facilities have been completed and are fully functional) and such systems can serve and accommodate at least 1500 personnel (approximately 300 five-room modular housing units and Support Facilities) as turnkey and fully operational.

$S 6/3$

# EXHIBIT C

## TENANT'S WORK

**Schedule:** The Worker's Camp Facilities are to be constructed in a phased manner as described in Exhibit A-1. Tenant's Work is set out below.

**Site Civil Work:**

**Item 1 - Storm Water Pollution Prevention:** Install silt fencing, wattles, etc. as necessary on the Premises and in accordance with best management practices prior to commencing site work for the Worker's Camp Facilities.

**Item 2 – Site Preparation Earthwork and Crushed Stone:** Remove trees as required for site improvements. Grade approximately 80 acres within the Premises to minimize abrupt changes in elevation. Cut high area and fill and compact low areas maximizing the use of existing earth and existing crushed stone from high areas and existing crushed stone from areas with the stone layer exceeding three inches. Install and compact a minimum three-inch thick crushed stone cover in areas that do not currently have a stone cover maximizing the use of existing stone and, if needed, importing additional stone to match existing.

**Item 3 - Skyway Turning Lane:** Install the Skyway Turning Lane as a temporary access point, including obtaining any required permit and furnishing a temporary means of ingress and egress other than the Main Gate. Until such Skyway Turning Lane has been fully permitted and this alternative means for ingress and egress to the Premises is completed, the Parties agree that (i) the Tenant's access to the Premises shall be through the Main Gate (as shown in Exhibit A); (ii) Tenant, at its cost. will create a new drive lane from the public road via the Main Gate and on to the Premises, as shown on Exhibit A ("New Road"), and Tenant agrees to provide appropriate signage and security (as needed) to direct all traffic that is scheduled for entry to the Premises and minimize any interference with Landlord's use of the existing Skyway Road.

**Item 4** - At its cost, Tenant shall erect fencing between the Premises and the Property at the east-west boundary areas shown on Attachment 1.

**Water Production, Treatment and Distribution:**

**Item 1 – Water Distribution:** Any improvements required to install the 10,000 gallon holding tank, pressurizing system and coordinating the distribution lines within the Premises.

**Item 2 – Short Term Water Storage and Distribution:** Until the permanent water production system is operational, interim measures will be necessary to accommodate the first 350 personnel (70 housing units plus Support Facilities) within 14 days of the Decision Date. Provide and

EXHIBIT C - Page 1

TUSCAN RIDGE – ECC CONSTRUCTORS LEASE

15321136.9

install potable water holding tank(s), temporary booster pump and portable diesel generator and temporary pipe caps in order to pressurize the portion of the distribution system serving the first 70 housing units. Holding tank(s) shall have a minimum capacity of 5,000 gallons.

## Wastewater Collection and Treatment

**Item 1 – Wastewater Collection:** Until the permanent wastewater treatment facility is operational, interim measures will be necessary to accommodate the first 350 personnel (including, e.g. approximately 70 housing units) starting 14 days from the Occupation Date. Not later than 14 days after the Decision Date, provide and install one 10,000 gallon septic tank (that eventually will be integrated into the permanent treatment facility) to allow daily removal by vacuum truck and install a temporary connection to the portion of the collection system serving the Worker's Camp. ECC will reimburse Landlord for the reasonable costs to install a temporary gravity main line connecting the septic tank to the Premises boundary. Provide gravity sewer main (including trenching) from the Premises boundary and all required connections and equipment to connect it to the wastewater treatment facility. Design and construct the portion of the gravity waste water collection system and connections located within the Premises that is to serve approximately 1500 camp occupants as part of the Worker's Camp Facilities, including the Support Facilities. Estimated sewage generation is 50 gallons per day per capita or up to 75,000 gallons per day, provide continuous installment/connection of additional housing and Support Facilities as they arrive. [The construction of the treatment facilities and all connections off the Premises (i.e. west of the gravity main at the Premises boundary) will be Landlord's Work.]

## Electrical Work

**Item 1 – Main Camp Electrical Service Distribution:** Tenant and Tenant's electrical subcontractor to install the underground conduit and a temporary distribution system from the low side of the Worker's Camp Facilities transformers to all facilities except the wastewater treatment facility.

EXHIBIT C - Page 2

TUSCAN RIDGE – ECC CONSTRUCTORS LEASE

S 68

15321126.9

DISPUTE RESOLUTION PROCEDURES

It is the desire and intention of the Parties to agree upon a mechanism and procedure under which controversies and disputes arising out of this Lease or related to the Premises will be resolved in a prompt and expeditious manner. Accordingly, except with respect to actions for determination of an unlawful or forcible detainer, injunctive or provisional relief (all of which may be tried in court), any dispute, claim, action, proceeding or counterclaim brought by either Party hereto against the other (and/or against its officers, directors, employees, agents or subsidiaries or affiliated entities) on any matters arising out of or in any way connected with this Lease other than matters within the jurisdiction of the Smalls Claims Court, including anything involving Tenant's use or occupancy of the Premises and/or any claim of injury or damage, whether sounding in contract, tort, or otherwise ("Dispute"), shall be addressed under the provisions of this Exhibit D. The invocation of this dispute resolution process shall not limit the rights of the Parties under the Lease, nor extend any deadline set forth in the Lease.

(a)     The venue of any Dispute proceedings shall be Butte County, California. If any Dispute arises the Parties agree to first attempt in good faith to settle the Dispute by non-binding mediation before resorting to court action or binding arbitration. The mediation obligation shall be for not more than four hours of good faith negotiations, all of which shall occur promptly after either Party invokes a right to mediate; the mediation shall be conducted by a neutral in the Mediation Society of San Francisco or reasonable equivalent. Mediation fees shall be paid equally by Buyer and Seller. Any Party that fails or refuses to mediate as required by this subparagraph (a), shall not be entitled to any attorney's fees award under this Lease for pursuing the Dispute, even if it is the prevailing party at the conclusion of the matter. (Any court action filed to obtain a provisional remedy, including a notice of pending action or to stop the expiration of a statute of limitations, shall not be a violation of this subparagraph, so long as the Party commencing the action agrees to a stay of the court action pending mediation.

(b)     Any Dispute shall be decided by neutral binding arbitration before a single arbitrator in accordance with the California Arbitration Act ("CAA") (Code of Civil Procedure section 1280 et seq.). The arbitration shall include the right to conduct discovery, and the Parties agree to keep the details of the proceedings confidential other than as required to fulfill their arbitration obligations and to enforce the judgment on any award. The Arbitrator can award compensatory damages and/or order specific performance, injunctive relief and declaratory relief. Judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

EXHIBIT D - Page 1

TUSCAN RIDGE – ECC CONSTRUCTORS LEASE

S 613

153211369

The capitalized terms set out below shall have the same meaning as such term has under the Lease, unless separately defined below.

1.    TENANT'S INSURANCE.

    A.    During the Term of the Lease, at Tenant's sole cost and expense, Tenant must obtain, maintain and keep in full force and effect, for the protection of Tenant, Landlord and mortgagees of Landlord, as their interests may appear, the following insurance:

        (1)    Property insurance (at least as broad as ISO Special Form Causes of Loss CP 1030) upon property of every description and kind owned by Tenant and located on the Premises or for which Tenant is legally liable or installed by or on behalf of Tenant, including, without limitation, the Permanent Improvements, Tenant Alterations, and Tenant's tangible Personal Property, in an amount not less than one hundred percent (100%) of the full replacement cost thereof under special form coverage (and with an eighty percent (80%) co-insurance provision);

        (2)    Commercial General Liability ("CGL") Insurance (comparable to the ISO CGL policy form CG 00 01) with limits not less than Two Million Dollars ($2,000,000.00) per occurrence and Four Million Dollars ($4,000,000.00) annual aggregate. Said CGL policy to provide at least the following:

            a)    Products/Completed Operations (CG 24070196 or comparable),

            b)    Business Auto Coverage (NIAC-AL-NPC, or comparable);

            c)    Social Service Professional Liability Coverage (NIAC–2320117 or comparable);

            d)    Additional Insured Primary & Non-Contributory Endorsement (NIAC-E620215. Schedule to include Landlord);

            e)    Additional Insured –Owners, Lessees or Contractors –- Completed Operations (CG 20370413, Schedule to include Landlord); and

            f)    Coverage to include personal injury, bodily injury, property damage, contractual liability, products and completed operations liability arising out of or relating (directly or indirectly) to Tenant's business operations, conduct, assumed liabilities or use or occupancy of the Premises or the Property; and

        (3)    Worker's Compensation Insurance, as required by California law, and Employers Liability Insurance with limits of One Million Dollars ($1,000,000.00) Per Accident/One

EXHIBIT E – Page 1

TUSCAN RIDGE – ECC CONSTRUCTORS LEASE

S 6 17

15321136.9

Million Dollars ($1,000,000.00) Per Disease/One Million Dollars ($1,000,000.00) Policy Limit Insurance (and in all events not less than what is mandated by Law).

B.    All policies shall be taken out with third party insurers admitted in California with an A.M. Best rating of A- VII or better.  In all events, Tenant must at all times meet the requirements of Law regarding any workers on the Premises other than Landlord's Agents.  The commercial general liability and automobile policies shall name Landlord as an additional insured.  The additional insured status for the commercial general liability policy shall be secured through use of an endorsement comparable to the Commercial General Liability ISO form CG 20 11 (Additional Insured-Managers or Landlords of Premises).  If any such insurance is written on a claims-made form, it shall continue for three (3) years following the expiration or termination of this Lease and the insurance shall have a retroactive date prior to or coinciding with the earlier of the Effective Date of this Lease or such date upon which Tenant is required to obtain insurance under the terms of the Lease.  If a claims-made policy is canceled, non-renewed or converted to an occurrence policy, Tenant shall obtain extended reporting (tail) coverage for the remainder of the three (3) year period.  All policies shall contain an agreement by the insurers to notify Landlord and the mortgagees of Landlord in writing not less than thirty (30) days prior to any material change, reduction in coverage by endorsement, cancellation or other termination thereof, except that a notice of cancellation for failure to pay the applicable premium shall be sufficient if given ten (10) days before the cancellation date.

C.    Tenant agrees that Tenant will not keep, use, sell or offer for sale in or upon the Premises any article that may be prohibited by any insurance policy in force from time to time covering the Property, the Premises or the leasehold improvements.  Tenant shall promptly comply with all reasonable requirements of the insurance authority or of any insurer now or hereafter in effect relating to the Premises.

2.    LANDLORD'S INSURANCE

A.    During the Term of the Lease, at Landlord's sole cost and expense, Landlord must obtain, maintain and keep in full force and effect for the protection of Tenant, the following insurance:

(1)    To the extent it becomes available in the market place at a commercially reasonable cost, Landlord Property insurance (at least as broad as ISO Special Form Causes of Loss CP 1030) upon property of every description and kind owned by Landlord and located on the Property or for which Landlord is legally liable or installed by or on behalf of Landlord under the Lease, including, without limitation, the Permanent Improvements in an amount not less than one hundred percent (100%) of the full replacement cost thereof under special form coverage (and with an eighty percent (80%) co-insurance provision);

(2)    Commercial General Liability ("CGL") Insurance (comparable to the ISO CGL policy form CG 00 01) with limits not less than One Million Dollars ($1,000,000.00) per occurrence and Two Million Dollars ($2,000,000.00) annual aggregate.  Said CGL policy to provide at least the following:

g)   Products/Completed Operations (CG 24070196 or comparable);

h)   Business Auto Coverage (NIAC-AL-NPO, or comparable);

EXHIBIT E – Page 2

TUSCAN RIDGE – ECC CONSTRUCTORS LEASE

$S\,6\,\widetilde{J}$

15321136.9

i) Additional Insured Primary & Non-Contributory Endorsement (NIAC-E620215, Schedule to include Tenant and its Agents);

j) Additional Insured –Owners, Lessees or Contractors – Completed Operations (CG 20370413, Schedule to include Tenant); and

k) Coverage to include personal injury, bodily injury, property damage, contractual liability, products and completed operations liability arising out of or relating (directly or indirectly) to Landlord's business operations in or about the Property and Premises (e.g. during construction of the Permanent Improvements, and

(2) To the extent required by the use of employees by Landlord, Worker's Compensation Insurance, as required by California law, and Employers Liability Insurance with limits of One Million Dollars ($1,000,000.00) Per Accident/One Million Dollars ($1,000,000.00) Per Disease/One Million Dollars ($1,000,000.00) Policy Limit Insurance (and in all events not less than what is mandated by Applicable Law). It shall be Landlord's responsibility to ensure that Landlord's Agents or Invitees provide such insurance for any persons on the Premises to the extent required by Law.

(3) If any such insurance is written on a claims-made form, it shall continue for three (3) years following the expiration or termination of this Lease and the insurance shall have a retroactive date prior to or coinciding with the earlier of the Effective Date of this Lease or such date upon which Landlord is required to obtain insurance under the terms of the Lease. If a claims-made policy is canceled, non-renewed or converted to an occurrence policy, Landlord shall obtain extended reporting (tail) coverage for the remainder of the three (3) year period. All policies shall contain an agreement by the insurers to notify Tenant in writing not less than thirty (30) days prior to any material change, reduction in coverage by endorsement, cancellation or other termination thereof, except that a notice of cancellation for failure to pay the applicable premium shall be sufficient if given ten (10) days before the cancellation date.

EXHIBIT E – Page 3

TUSCAN RIDGE – ECC CONSTRUCTORS LEASE

15321136.9

S 613

# EXHIBIT "C"

# FIRST AMENDMENT TO LEASE

THIS FIRST AMENDMENT TO LEASE ("Amendment") is made and entered into effective as of the 4th day of April, 2019, by and between TUSCAN RIDGE ASSOCIATES, LLC, a California limited liability company ("Landlord"), and ECC CONSTRUCTORS LLC, a Delaware limited liability company ("Tenant").

## WITNESSETH:

A. Landlord and Tenant are parties to that certain Lease with an Effective Date of March 22, 2019 (the "Lease"), pursuant to which Landlord leases to Tenant approximately 82.6 acres of real property in Butte County, California, more specifically described in the Lease.

B. Landlord and Tenant now wish to enter into this Amendment in order to confirm the Decision Date (as defined in the Lease) and to confirm certain aspects of the budget and cost sharing responsibilities of Landlord and Tenant related to Landlord's Work.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Seller and Buyer hereby agree as follows:

1. **Definitions**. All capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in the Lease.

2. **Budget**. Landlord and Tenant agree that the estimated budget for the design and construction of the Presby Advanced Enviro-Septic wastewater treatment facility, including obtaining required permit(s) is $2,317,237.48 and the estimated budget for the costs to excavate the holding ponds is $590,193.00. Still unknown to Landlord and Tenant is the PG&E costs to provide electrical services to the Worker's Camp Facilities and the wastewater treatment facility.

3. **Tenant's Agreement to Absorb Excess Costs**. Pursuant to Exhibit A-1 of the Lease, Landlord can terminate the Lease on or before the Decision Date of April 5, 2019 if the PG&E costs to provide electrical services exceed an amount acceptable to Landlord, and Tenant does not agree to absorb the excess costs above the Threshold Amount minus $1,000,000 (without an offset against Rent). Landlord and Tenant hereby acknowledge and agree that the Threshold Amount minus $1,000,000 equals $2,964,800 (the "Revised Threshold"). Inasmuch as the PG&E costs are likely to push the costs of Landlord's Work over the Revised Threshold, Tenant hereby confirms and agrees that Tenant shall absorb the excess costs of Landlord's Work above the Revised Threshold (without an offset against Rent).

4. **Decision Date**. In consideration for Tenant's agreement to absorb the excess costs of Landlord's Work above the Revised Threshold (without an offset against Rent), Landlord hereby confirms that Landlord shall not terminate the Lease and confirms that the Lease is in full force and effect. Solely for the purposes of confirming the timing of Critical Milestones and other completion deadlines in the Lease, Landlord and Tenant hereby acknowledge and agree that the Decision Date is April 5, 2019.



Case: 19-30088    Doc# 11291-5    Filed: 09/22/21    Entered: 09/22/21 16:04:19    Page 86 of 108

5.      **Entire Agreement**.  The entire agreement of the parties is as set forth in this Amendment and the Lease (as amended hereby).

6.      **Agreement in Full Force and Effect**.  Except as expressly amended hereby, the terms and conditions of the Lease are hereby ratified and confirmed, and shall continue in full force and effect.  In the event of any conflict or inconsistency between the terms set forth herein and the terms of the Lease, the terms contained in this Amendment shall govern and control.

7.      **Counterparts; Facsimile; E-Mail**.  This Amendment may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  For purposes of this Amendment, any signature transmitted by facsimile or electronically via e-mail shall be considered to have the same legal and binding effect as any original signature.

IN WITNESS WHEREOF, the parties have set their hands or caused duly authorized and incumbent officers or members to set their hands as of the day and year set forth above.

**LANDLORD:**

TUSCAN RIDGE ASSOCIATES, LLC,
a California limited liability company

By: _____

    Its: Manager

**TENANT:**

ECC CONSTRUCTORS LLC,
a Delaware limited liability company

By:_____

    Its: Manager

2

# EXHIBIT "D"


9997000782080710000500000000500000

| Invoice Number | Invoice Date | Amount Due | Amount Enclosed |
|---|---|---|---|
| 0007820807-1 | 03/04/2019 | $ 5,000.00 | |

WILLIAM L BIGELOW
1240 BAY SHORE HWY
BURLINGAME CA  94010

PG&E
Box 997300
Sacramento, CA
95899-7300

To Pay Online, please go to *http://www.pge.com/ProjectPayments* or
Please return this portion with your payment.  Thank you.                    *

*When Making Inquiries or Address Changes,
Please Contact :*

| Customer Number |
|---|
| 2293325 |

Lindsay Moulton
530-894-4731

| Invoice Number |
|---|
| 0007820807-1 |

In connection with your application for new gas and/or electric service and as explained in the application, PG&E will require a cash payment in advance for your project.  This advance payment is required for the cost of an engineering review, design work, and cost development. The amount of the advance is based upon PG&E's current costs, utilizing the information submitted in your application for new service addressing the scope of your project.

Your project manager will review the scope of work needed to complete a construction quality estimate.  If the billed engineering advance is insufficient to cover PG&E's design and project management costs or other work as required, PG&E may require an additional advance before proceeding.

The engineering advance will be applied to the total contract cost upon completion of the design and cost estimate.  Any difference between the engineering advance and contract cost will either be refunded (without interest) or billed, as applicable.  At any time you may request that we stop your project, however, we may retain all or a portion of the engineering advance and bill any costs incurred above that amount.  This fee is dependent upon the amount of work PG&E has performed at the time of cancellation.

If this requested advance payment is not received by PG&E within 90 days from the date of this invoice, PG&E reserves the right to cancel this application for service.

**IMPORTANT: By going forward with this project and paying the engineering advance to PG&E you are also agreeing to pay PG&E for all costs PG&E incurs for your project in the event that your project is cancelled, even if the costs PG&E incurs are more than this advance.**

Notification :  116583929
Project Description : EP BUCOCAMP 3100 SKYWAY RD "MANCAMP" PAR

| | |
|---|---|
| Line Item Subtotal | 5,000.00 |
| **AMOUNT NOW DUE  $** | **5,000.00** |

WILLIAM L BIGELOW
1240 BAY SHORE HWY
BURLINGAME CA   94010

PG&E
Box 997300
Sacramento, CA
95898-7300

*When Making Inquiries or Address Changes,*
*Please Contact :*

Lindsay Moulton
530-894-4731

Customer Number
2293325

Invoice Number
0007820807-1

NOTE :  This invoice reflects current charges only.
          Any past due amounts will be billed separately.

# EXHIBIT "C"

(530) 755-2607 (office)

comcalister@yahoo.com

On Friday, December 27, 2019, 02:03:49 PM PST, Block, Elliot@CalRecycle <elliot.block@calrecycle.ca.gov> wrote:

I apologize for the daily in responding.

For ECC, we have paid the following invoices related to the base camp:

| 433600001-1C | $ 35,932,205.44 |
|---|---|
| 43360001-2C | $ 10,480,327.23 |
| 43360001-3C-REV 1 | $    501,728.47 |
| 43360001-4C-REV1 | $  3,749,043.74 |
| 43360001-5C | $  8,781,787.03 |

These amounts include lump sum items and operational items.

Lump sum items include: Housing Units, Generators, Site infrastructure, Mobilization/Demobilization costs, and Lease and permits.

Operational items include staff, supplies, sewer dumps, trash, fuel, etc. which are paid based on time and material.

Elliot Block

Chief Counsel

Department of Resources Recycling and Recovery (CalRecycle)

(916) 341-6080

**From:** Courtney McAlister <comcalister@yahoo.com>
**Sent:** Friday, December 27, 2019 10:31 AM
**To:** Zamboanga, Alan@CalRecycle <Alan.Zamboanga@calrecycle.ca.gov>
**Cc:** Darbee, Ron@CalRecycle <Ron.Darbee@calrecycle.ca.gov>; Mindermann, Wes@CalRecycle <Wes.Mindermann@CalRecycle.ca.gov>
**Subject:** Re: ECC Constructors / Butte County Base Camp

[[ EXTERNAL ]]

Alan,

What is the status of this request? Please get back to me asap.

Courtney McAlister

Law Offices of Courtney L. McAlister

1510 Poole Blvd, Suite 105

Yuba City, CA 95993

(916) 496-2581 (mobile)

(530) 755-2607 (office)

comcalister@yahoo.com

On Thursday, December 19, 2019, 10:26:35 AM PST, Courtney McAlister <comcalister@yahoo.com> wrote:

Alan,

What is the status of this request?

Courtney McAlister

Law Offices of Courtney L. McAlister

1510 Pocle Blvd, Suite 105

Yuba City, CA 95993

(916) 496-2581 (mobile)

(530) 755-2607 (office)

comcalister@yahoo.com

On Friday, December 6, 2019, 01:19:08 PM PST, Zamboanga, Alan@CalRecycle <alan.zamboanga@calrecycle.ca.gov> wrote:

Courtney,

I am forwarding your correspondence to our attorney Ron Darbee. I hope you have a good weekend.

Alan

**From:** Courtney McAlister <comcalister@yahoo.com>
**Sent:** Friday, December 6, 2019 8:01 AM
**To:** Zamboanga, Alan@CalRecycle <Alan.Zamboanga@calrecycle.ca.gov>
**Subject:** Re: ECC Constructors / Butte County Base Camp

Mr. Zamboanga,

I'm following up on my email to you of Nov. 21. Please provide me with the details of what OES has paid ECC to date for its base camp at Tuscan Ridge. Thank you.

Courtney McAlister

Law Offices of Courtney L. McAlister

1510 Poole Blvd, Suite 105

Yuba City, CA 95993

(916) 496-2581 (mobile)

(530) 755-2607 (office)

comcalister@yahoo.com

On Thursday, November 21, 2019, 08:07:41 AM PST, Courtney McAlister <comcalister@yahoo.com> wrote:

Mr. Zamboanga,

I represent Tuscan Ridge Associates, LLC, the company that owns the Tuscan Ridge base camp that ECC operates in Butte County for the Camp Fire clean up. Can you please provide me with the details of what OES has paid ECC to date for its base camp at Tuscan Ridge? Thank you.

Courtney McAlister

Law Offices of Courtney L. McAlister

1510 Poole Blvd, Suite 105

Yuba City, CA 95993

(916) 496-2581 (mobile)

(530) 755-2607 (office)

comcalister@yahoo.com

| ROUTE TO: | | | CONTRACT #: | **DRR18098** |
|---|---|---|---|---|
| Division: Waste | MS# | 10A | SB ☐ | DVBE ☐ |
| Name: Alan Zamboanga | | | INVOICE # | 433600001-1C |
| Date: 4/18/2019 | | | Date Received: | 4/16/2019 |

| **PLEASE RETURN TO:** Mark Cortez (19-01E) | IN ACCOUNTING IN | 15 | **Days** |
|---|---|---|---|

The Contract Manager is responsible for reviewing the integrity of the invoice before giving his/her approval. Undisputed invoices that take more than 30 calendar days to process may cost your Division late payment penalties.

**Note: Original invoice must be sent directly to Accounting.** The Accounting Office will send a copy of the invoice to the Contract Manager with this form (CalRecycle 10A). Any notes by the Contract Manager should be made on the copy. For more information on how to complete this form, please contact the Accounting staff in the Administration and Finance Division

**DIVISION REVIEW (15 CALENDAR DAYS)**

**APPROVAL**

**Requires two (2) levels of review and signatures.** The Contract Manager indicates approval by signing and dating the copy of the invoice and this approval/route slip. The Contract Manager's Supervisors signature is required on the invoice approval/route slip only. Please make a copy of the invoice for your records.

☑ **Progress Payment:** Has the Contract Manager received the deliverables as outlined in the Scope of Work:
☑ Yes ☐ No (If no, then invoice needs to be disputed)

☐ **Final Payment:** Has the Contract Manager received the following:

| | | **Multiple PCA Coding** | |
|---|---|---|---|
| • Final Report by contractor | PCA | 3700000954 | 3700000955 |
| • Other deliverables | | $0.00 | $35,932,205.44 |
| • Invoice for 10% Withhold/Retention | | | |

☐ Travel charges are included in invoices.    Retainage    $0.00    $3,992,467.27

**10% Withhold/Retention:**
☑ Yes Withhold        ☐ No, Do Not Withhold
☐ Release the Retention

**ALL SIGNATURES BELOW INDICATE THAT THE INVOICE AND SUPPORTING DOCUMENTATION HAVE BEEN REVIEWED AND ARE APPROVED FOR PAYMENT**

Contract Manager
(Print)                Alan Zamboanga

Contract Manager
Signature

Date Signed            4/23/2019

Contract Manager
Supervisor's Signature/Date    4/23/19

Division Liasion
Initial/Date

| | | |
|---|---|---|
| Original Invoice | $ | 39,924,672.71 |
| Less Adjustment | $ | - |
| Subtotal | $ | 39,924,672.71 |
| Less Retention | $ | 3,992,467.27 |
| **Approved for Payment** | **$** | **35,932,205.44** |

**DISPUTE**
https://www.documents.dgs.ca.gov/dgs/fme/pdf/std209.pdf
STD. 209, Invoice Dispute Notification Process (Contract Manager)
    • Send original to contractor within 15 days of postmark date of invoice.
    • Send copy to Accounting
    • Retain copy in program file
**When dispute is resolved**, Contract Manager obtains required authorized signatures and forwards Route Slip and corrected invoice to Accounting to process the payment.



From: **ECC Constructors, LLC**
**1240 Bayshore Highway**
**Burlingame, CA 94010**

To: **Department of Resources Recycling and Recovery**

Contract: **Camp Fire Base Camp**

Invoice: **43360001-1C**
Invoice Date: **4/17/2019**
Application #: **1**
Agreement Number: **DRR18098**
Change Order No. **EC01**
Invoice Period: **thru 4/16/2019**
ECC Project No. **4336.001**

| | |
|---|---|
| CONTRACT AMOUNT | 96,000,000.00 |
| COST TO DATE | 39,924,672.71 |
| PREVIOUS INVOICED AMOUNT | - |
| PREVIOUS RETAINAGE | - |
| AMOUNT THIS INVOICE | 39,924,672.71 |
| RETAINAGE THIS INVOICE 0% | - |
| AMOUNT DUE THIS INVOICE | 39,924,672.71 |
| BUDGET REMAINING | 56,075,327.29 |

Please remit payment to:

**ECC Constructors, LLC**
**1240 Bayshore Highway**
**Burlingame, CA 94010**

Phone: (650) 347-1555
Fax: (650) 347-8789

www.ecc.net

| INVOICE AMOUNT | $ | 39,924,672.71 |
|---|---|---|

| LINE | PST | PST NAME | PROJECT ID | ACTIVITY DESCRIPTION | CATEGORY | RETENTION | | PAYMENT |
|---|---|---|---|---|---|---|---|---|
| 1 | 3700000555 | BUTTE-ELIGIBLE | 2018CAMP | RESIDENTIAL | PARADISE | $ | 2,994,350.45 | $ 26,949,154.08 |
| 2 | 3700000555 | BUTTE-ELIGIBLE | 2018CAMP | RESIDENTIAL | NON-PARADISE | | | |
| 3 | 3700000555 | BUTTE-ELIGIBLE | 2018CAMP | COMMERCIAL | PARADISE | $ | 998,116.82 | $ 8,983,051.36 |
| 4 | 3700000555 | BUTTE-ELIGIBLE | 2018CAMP | COMMERCIAL | NON-PARADISE | | | |
| | | | | | | | | |
| TTL | | | | | | $ | 3,992,467.27 | $ 35,932,205.44 |

Initials  _MA  4/22/20q_



## DEPARTMENT OF RESOURCES RECYCLING AND RECOVERY

1001 I STREET, SACRAMENTO, CALIFORNIA 95814 • WWW.CALRECYCLE.CA.GOV • (916) 322-4027
P.O. BOX 4025, SACRAMENTO, CALIFORNIA 95812

*M E M O R A N D U M*

**To:**      **Derek Link**                                    **Date:**  4/22/2019

**From:**

Alan Zamboanga, Contract Manager – Camp Fire Response
DEPARTMENT OF RESOURCES RECYCLING AND RECOVERY

**Subject:**     **ECC BASE CAMP OBSERVATIONS**

The contract manager is the authorized representative of the State of California responsible for administering a contract and monitoring the contractor's performance. The contract manager serves as a liaison with the contractor and may perform administrative tasks ranging from the request of contract services through the performance and final payment for completed services. The contracts manager is responsible for ensuring that the contractor honors its commitments to CalRecycle and monitors the consultant's performance.

On April 16, 2019 Cody Oquendo and I inspected the ECC basecamp located at the former Tuscan Ridge Golf Club at 3100 Skyway Rd, Paradise, CA 95969 and recommend payment for 50% of the housing units, 25% of the power distribution, 50% of other infrastructure costs, and 100% of the lease and permitting fees.

For any questions, or if you would like to schedule a meeting to discuss, please feel free to contact me directly at (916)341-6450.

Thank you,

Alan Zamboanga,

ORIGINAL PRINTED ON 100 % POSTCONSUMER CONTENT, PROCESS CHLORINE FREE PAPER

PROGRESS BILL

# DAILY PROJECT STATUS



ECC Fires 1500 Camp

Date: 4/15/19





## OVERALL PROJECT COMMENTS

| Description | |
|---|---|
| **Client:** ECC Constructors LLC | **Signed Contract:** ASL 3/18/2019 (1500 beds) |
| **Purpose:** House ECC truck drivers for the fire cleanup | **Term:** 9 Month with 12+ month extensions likely |
| **Location:** Chico/Paradise California | **ASL Total Install Duration:** 45 days (5/2/2019) |
| **Turnkey Offering:** ASL USA providing lease product | **ATCO Frontec Scope:** Camp operations |
| **Initial Contract:** 1500 beds | |

## OVERALL PROJECT SCHEDULE

| Delivery, block, level & anchor (utilities/tie-ins by client) | Days Remain | Units | Complete | Due |
|---|---|---|---|---|
| Phase 1 – Initial 350 beds and Common Facilities | 0 | 94 | 94 | Complete |
| Phase 2 – 1000 beds installed - 30 days | 2 | 148 | 82 | 4/17/2019* |
| Phase 3 – 1500 beds installed - 45 days | 17 | 143 | 0 | 5/2/2019 |
| *NTP vs. Pad Access Dates (delays accessing pads). Note: All common buildings set leveled 4/9, internal trim completed 4/11/2019. | | | | |

## OVERALL PROJECT PROGRESS

| Location | Description | Beds | Total Units | Teardown Units | Shipped Units | On site Units | Installed Units | Decked Units |
|---|---|---|---|---|---|---|---|---|
| ID, TX | 5-Man Sleepers | 310 | 62 | 62 | 62 | 62 | 61 | 60 |
| Diboll | Kitchen/Diner | N/A | 11 | 11 | 11 | 11 | 11 | 0 |
| Diboll | Recreation | N/A | 7 | 7 | 7 | 7 | 7 | 0 |
| Diboll | Coin Laundry | N/A | 2 | 2 | 2 | 2 | 2 | 0 |
| Diboll | Commercia Laundry | N/A | 2 | 2 | 2 | 2 | 2 | 0 |
| Moss Lake | 4-Person Apartment | 396 | 99 | 99 | 99 | 98 | 81 | 41 |
| Moss Lake | 5-Man Sleeper | 745 | 149 | 102 | 58 | 34 | 17 | 0 |
| Colorado | Colorado | 75 | 53 | 0 | 0 | 0 | 0 | 0 |
| **Total** | | 1526 | 385 | 285 | 241 | 216 | 181 | 101 |

# Paradise Site Location

## WEATHER

| Current | | | Weather Delay Days: | |
|---|---|---|---|---|
| Paradise, CA 9:00 AM Cloudy | | 50°F | See Site Access Section | |
| Monday 4/15 | Tuesday 4/16 | Wednesday 4/17 | Thursday 4/18 | Friday 4/19 |
| 52° 42° | 61° 46° | 73° 53° | 78° 53° | 77° 53° |

## PROJECT STAFFING

| Company | Scope | Beds | Workforce | Notes |
|---|---|---|---|---|
| CMHS | Accommodation Units, Decking | 1276 Beds | 23 | Full crew, onsite 4/5 |
| Team Modul | Common Bldgs., 50 Sleepers | Common Bldgs. + 250 Beds | 20 | Kitchen set 4/9 trim out complete 4/11 |
| ATCO | Repairs & Maintenance | N/A | 14 | Preparing phase 1 for client turn over |

## SITE ACCESS

| Description | Beds | Units | NTP Date | Site Access Date | NTP vs. Access |
|---|---|---|---|---|---|
| Phase 1 Pad | 320 | 62 | 3/18/2019 | 3/30/2019 | 12 |
| Common Bldg. Pad | N/A | 22 | 3/18/2019 | 4/2/2019 | 15 |
| MLV Apartments Pad | 396 | 99 | 3/18/2019 | 4/6/2019 | 19 |
| MLV Sleeper Pad | 745 | 149 | 3/18/2019 | 4/12/2019 | 25 |
| Colorado Sleeper Pad | 75 | 53 | 3/18/2019 | 4/12/2019 | 25 |

## INSTALLATION

| Description | Accountable | Due |
|---|---|---|
| Phase 1 – 60 units blocked leveled and anchored | N/A | Complete |
| Phase 1 – 60 units decking - 18% project completion | N/A | Complete |
| Phase 1 – 60 units ready for client signoff | N/A | Complete |
| Common Buildings – 11 units Kitchen 7 unit Rec installed 4/9 | N/A | Complete |
| Common Buildings – Flooring for Kitchen & Rec. completed 4/11 | N/A | Complete |
| Common Buildings – Expected client hand over (Kitchen, Rec, & Laundry) | N/A | Complete |
| Apartments – 81 units installed | N/A | N/A |
| Apartments – Team Modul will set 250 beds once common buildings complete | N/A | N/A |
| Average 14-18 units set per day, expected to increase after common bldgs. set | N/A | N/A |
| 216 Units have been delivered to site | N/A | N/A |
| TetraTec Office, 10 plex – Team Modul to install – units arrive on 4/22 | N/A | 4/26/2019 |
| Access for MLV Sleeper Pad – pad access 4/13 | N/A | N/A |

STATUS PHOTOS

 

| Phase 1, 5 Mans Installed (60 Units - Top Left) | Apartment Installation – (57 Units - Bottom Right) |



# EXHIBIT "D"



From: **ECC Constructors, LLC**
**1240 Bayshore Highway**
**Burlingame, CA 94010**

To: **Department of Resources Recycling and Recovery**

Contract: **Camp Fire Base Camp**

| | |
|---|---|
| Invoice: | **43360001-1C** |
| Invoice Date: | **4/17/2019** |
| Application #: | **1** |
| Agreement Number: | **DRR18098** |
| Change Order No. | **EC01** |
| Invoice Period: | **thru 4/16/2019** |
| ECC Project No. | **4336.001** |

| | | |
|---|---|---|
| **CONTRACT AMOUNT** | | 96,000,000.00 |
| **COST TO DATE** | | 39,924,672.71 |
| **PREVIOUS INVOICED AMOUNT** | | - |
| **PREVIOUS RETAINAGE** | | - |
| **AMOUNT THIS INVOICE** | | 39,924,672.71 |
| **RETAINAGE THIS INVOICE** | 0% | - |
| **AMOUNT DUE THIS INVOICE** | | 39,924,672.71 |
| **BUDGET REMAINING** | | 56,075,327.29 |

**Please remit payment to:**

**ECC Constructors, LLC**
**1240 Bayshore Highway**
**Burlingame, CA 94010**

Phone: (650) 347-1555
Fax: (650) 347-8789

www.ecc.net



| From: | ECC Constructors, LLC | Invoice: | 43360001-3C-REV 1 |
|---|---|---|---|
| | 1240 Bayshore Highway | Invoice Date: | 7/2/2019 |
| | Burlingame, CA 94010 | Application #: | 3 |
| | | Agreement Number: | DRR18098 |
| To: | Department of Resources Recycling and Recovery | Change Order No. | EC01 |
| | | Invoice Period: | thru 5/31/2019 |
| Contract: | Camp Fire Base Camp | ECC Project No. | 4336.001 |

| | | |
|---|---|---|
| CONTRACT AMOUNT | | 96,000,000.00 |
| COST TO DATE | | 52,126,956.82 |
| PREVIOUS INVOICED AMOUNT | | 51,569,480.74 |
| PREVIOUS RETAINAGE | | 5,156,948.07 |
| AMOUNT THIS INVOICE | | 557,476.08 |
| RETAINAGE THIS INVOICE | 10% | 55,747.61 |
| AMOUNT DUE THIS INVOICE | | 501,728.47 |
| BUDGET REMAINING | | 43,873,043.18 |

Please remit payment to:

ECC Constructors, LLC
1240 Bayshore Highway
Burlingame, CA 94010

Phone: (650) 347-1555
Fax: (650) 347-8789

www.ecc.net