# EXHIBIT A

1        SUPERIOR COURT OF THE STATE OF CALIFORNIA

2             FOR THE COUNTY OF SANTA CLARA

3

4    SPIRO JANNINGS,                    )

5                                       )

6              Plaintiff,               )

7                                       )

8          vs.                          ) Case No.

9                                       )

10   PACIFIC GAS & ELECTRIC, and DOES   ) 17CV315033

11   1-50,                              )

12                                      )

13              Defendants.             )

14                                      )

15

16            DEPOSITION OF SPIRO JANNINGS

17              SAN JOSE, CALIFORNIA

18            Tuesday, January 8, 2019

19

20

21

22   REPORTED BY:

23   Theresa Nadeau, CSR No. 10526

24   Job No. SF 3181290

25   Pages 1- 215

                                        Page 1

Case: 19-30088   Doc# 11391-1   Filed: 10/08/21   Entered: 10/08/21 17:26:46   Page 2
of 36

```
 1              SUPERIOR COURT OF THE STATE OF CALIFORNIA
 2                    FOR THE COUNTY OF SANTA CLARA
 3
      SPIRO JANNINGS,                    )
 4                                       )
                    Plaintiff,           )
 5                                       )
              vs.                        )  Case No.
 6                                       )
      PACIFIC GAS & ELECTRIC, and DOES   )  17CV315033
 7    1-50,                              )
                                         )
 8                  Defendants.          )
                                         )
 9
10
11
12
13
14
15
16
17
18
19
20            Deposition of SPIRO JANNINGS, taken on behalf
21    of Defendant, at the Law Offices of Littler Mendelson,
22    50 West San Fernando Street, 7th Floor, San Jose,
23    California, at 10:12 a.m. on Tuesday, January 8, 2019,
24    before Theresa Nadeau, Certified Shorthand Reporter No.
25    10526.
```

                                                        Page 2

Case: 19-30088   Doc# 11391-1   Filed: 10/08/21   Entered: 10/08/21 17:26:46   Page 3
of 36

```
1                    APPEARANCES
2

    FOR THE PLAINTIFF:
3            LAW OFFICES OF SCOTT S. FURSTMAN
             BY:  SCOTT S. FURSTMAN
4            1190 South Bascom Avenue, Suite 213
             San Jose, California 95128
5            (650) 666-2785
             scottfurstman@gmail.com
6

7    FOR THE DEFENDANTS:
8            LITTLER MENDELSON, P.C.
             BY:  ELISA NADEAU
9            50 West San Fernando Street, 7th Floor
             San Jose, California  95113
10           (408) 998-4150
             enadeau@littler.com
11

12   Also present:  Jason Sayler, videographer
13
                        --oOo--
14

15

16

17

18

19

20

21

22

23

24

25

                                            Page  3
```

```
 1                      I N D E X
 2     WITNESS
 3     SPIRO JANNINGS
 4     Examination by:                        Page
 5      Ms. Nadeau                             7
 6
 7
 8
 9
10                    E X H I B I T S
11     Number        Description                    Page
12     Exhibit 1    Résumé of Spiro Jannings, Bates PGE000414-415    25
13     Exhibit 2    Hiring Hall Employment Application,    29
                    Bates PGE000402-403
14
       Exhibit 3    01/11/2013 letter to Spiro Jannings from PG&E,    44
15                  Bates PGE000409-412
16     Exhibit 4    Compliance Obligations, Bates PGE000028-32    51
17     Exhibit 5    Excerpt from Policies and Procedures,    56
                    Bates PGE000126
18
       Exhibit 6    Grievance No. 23183, Bates PGE000208    88
19
       Exhibit 7    Email chain, Bates PGE000005-6    93
20
       Exhibit 8    Pacific Gas & Electric Company Referral to    106
21                  Pre-Review Committee, Grievance No. 23183,
                    Bates PGE000296
22
       Exhibit 9    Pre-Review Committee findings,    111
23                  Bates PGE000297-298
24     Exhibit 10   August 27, 2015 letter to Spiro Jannings    119
                    from Jeff Carroll, Bates PGE000416
25
```

Page 4

Case: 19-30088   Doc# 11391-1   Filed: 10/08/21   Entered: 10/08/21 17:26:46   Page 5 of 36

```
 1              E X H I B I T S  (Continued)
 2     Number        Description                    Page
 3     Exhibit 11    August 6, 2015 Summary of Investigative    123
                     Findings, Bates PGE000149-194
 4
       Exhibit 12    Local Investigating Committee Report,      130
 5                   Bates PGE000006-44
 6     Exhibit 13    E-mail chain, Bates PGE000001-3            140
 7     Exhibit 14    Review Committee findings, 23334, Bates    141
                     PGE000301-302
 8
       Exhibit 15    Complaint for Wages, Demand for a Jury Trial   150
 9
       Exhibit 16    E-mail chain, Bates SJ-RES1-043-044        175
10
       Exhibit 17    Fremont Police Department report, Bates    179
11                   SJ-RES1-039-042
12     Exhibit 18    Request for Records to California Highway   185
                     Patrol, Bates SJ-RES1-117-118
13
       Exhibit 19    Reporter's Transcript of Audio Proceedings,   188
14                   February 23, 2016, Bates SJ-RES1-073-112
15     Exhibit 20    Union dues records produced by plaintiff,   190
                     Bates SJ-RES1-119-134
16
       Exhibit 21    Photocopy of journal pages, Bates          194
17                   SJ-RES1-195-196
18     Exhibit 22    Order Denying Plaintiff Spiro Jannings'    207
                     Motion to Compel Further Responses to
19                   Requests for Documents and Award of
                     Monetary Sanctions to Defendant
20
       Exhibit 23    Plaintiff's Response to Defense's Form     208
21                   Interrogatories
22
                             --oOo--
23
24
25
                                                      Page  5
```

```
 1                    SAN JOSE, CALIFORNIA

 2           Tuesday, January 8, 2019, 10:12 a.m.-4:55 p.m.

 3

 4              THE VIDEOGRAPHER:  Good morning.  We are going

 5      on the record at 10:12 a.m. on January 8, 2019.  Please      10:12

 6      note that the microphones are sensitive and may pick up

 7      whispering, private conversations and cell interference.

 8      Please turn off all cell phones or place them away from

 9      the microphones, as they can interfere with the

10      deposition audio.  Audio and video recording will           10:12

11      continue to take place until all parties agree to go off

12      the record.

13              This is media unit number one of the video

14      recorded deposition of Spiro Jannings taken by counsel

15      for the defendant in the matter of Spiro Jannings versus    10:13

16      Pacific Gas and Electric, et al., filed in the Superior

17      Court of the State of California, for the County of

18      Santa Clara.

19              This deposition is being held at Littler

20      Mendelson, PC, located at 50 West San Fernando Street,      10:13

21      on the seventh floor, in the city of San Jose,

22      California.

23              My name is Jason Sayler and I am the

24      videographer, and the court reporter is Theresa Nadeau,

25      both of us on behalf of Veritext Legal Solutions.  I am     10:13
```

Page 6

1    not related to any party in this action nor am I

2    financially interested in the outcome.

3            Counsel and all present in the room will now

4    state their appearances and affiliations for the record.

5            MS. NADEAU:  Good morning.  Elisa Nadeau on        10:14

6    behalf of defendant PG&E.

7            MR. FURSTMAN:  Good morning.  Scott Furstman,

8    F-u-r-s-t-m-a-n, on behalf of the plaintiff Spiro

9    Jannings.

10           THE VIDEOGRAPHER:  Will the court reporter        10:14

11   please administer the oath and then we can begin.

12                        SPIRO JANNINGS,

13             the plaintiff herein, after having been

14             administered the oath by the court

15             reporter, was examined and testified

16             as follows:

17                   E X A M I N A T I O N

18   BY MS. NADEAU:

19       Q.   Good morning, Mr. Jannings.  As I mentioned

20   earlier, and you and I have spoken a few times in the      10:14

21   past before you were represented, my name is Elisa

22   Nadeau, and I represent defendant PG&E in this action.

23   And have you ever been deposed before?

24       A.   No.

25       Q.   So we're here today for me to ask questions       10:15

Case: 19-30088   Doc# 11391-1   Filed: 10/08/21   Entered: 10/08/21 17:26:46   Page 8 of 36

| | |
|---|---|
| 1 | Q. Did you say Valerie Lawson? |
| 2 | A. Yes. |
| 3 | Q. And how long did you say that was that she was |
| 4 | your supervisor? |
| 5 | A. Couple of years. No, I would say about a year, 11:06 |
| 6 | year and a quarter. |
| 7 | Q. Did you get along with Mr. -- Ms. Lawson? |
| 8 | A. I had no problem with her. |
| 9 | Q. When you began working for PG&E as a PG&E |
| 10 | employee, you were still a union member, correct? 11:07 |
| 11 | A. I was a union member, correct. |
| 12 | Q. I'm holding a letter Bates labeled PG&E 409 |
| 13 | through 412, and I'm handing a copy of it to opposing |
| 14 | counsel. I'm handing another copy to the court reporter |
| 15 | to be marked Defense Exhibit 3. 11:08 |
| 16 | (Defendants' Exhibit 3 was marked for |
| 17 | identification.) |
| 18 | BY MS. NADEAU: |
| 19 | Q. Mr. Jannings, this appears to be -- Defense |
| 20 | Exhibit 3 appears to be your offer letter from PG&E; is 11:08 |
| 21 | that correct? |
| 22 | A. That is correct. |
| 23 | Q. And it says here that your supervisor would be |
| 24 | Tim Bellinghausen. |
| 25 | A. That is correct. I brought that up earlier. 11:08 |

Page 44

1    Q.    And it also says that your salary may be

2    increased pursuant to the International Brotherhood of

3    Electrical Workers collective bargaining agreement.  Do

4    you see that?

5    A.    Yes, I do see it.                              11:08

6    Q.    And is it your understanding that your

7    employment was subject to a collective bargaining

8    agreement as you were a union member?

9    A.    Yes.

10   Q.    How long have you been a member of the IBEW?    11:09

11   A.    Since '95, I stepped foot on the property over

12   there, until I was fired.  Thirteen -- '15.

13   Q.    Did you stop working at PG&E in 2011?  Is that

14   right?

15   A.    I stopped working for them.                     11:09

16   Q.    I'm asking.

17   A.    I quit working in San Carlos and went to work

18   in Cupertino.

19   Q.    But also for PG&E through the hiring hall; is

20   that right?                                           11:10

21   A.    That's correct.

22   Q.    So was there any gap in employment with PG&E

23   from 2011 to 2013?

24   A.    Probably there was one in '11.  Maybe eight

25   months to a year.                                     11:10

Veritext Legal Solutions
866 299-5127

```
 1              Did you have an understanding -- what was your

 2    understanding as to whether or not you could be

 3    terminated from your job at PG&E?

 4         A.   I don't understand the question.  Can you

 5    repeat it again?                                      11:13

 6         Q.   Did PG&E have to have a reason to terminate you

 7    or could they terminate you just because they decided

 8    to?

 9         A.   I understood that they had to have a reason to

10    terminate you.                                        11:13

11         Q.   And how did you have that understanding?

12         A.   Was told to me by my union rep.

13         Q.   Did you understand that it was part of the

14    collective bargaining agreement?

15         A.   That was never brought up.                  11:14

16         Q.   So who told you that you needed to have a

17    reason in order to be terminated from PG&E -- or that

18    PG&E had to have a reason in order to terminate your

19    employment?

20         A.   I do believe it was Lou Mennel.  Union rep.  11:14

21         Q.   Okay.  Do you remember when he told you that?

22         A.   I don't recall.

23         Q.   If I told you that it was part of the

24    collective bargaining agreement, would you have any

25    reason to dispute that?                               11:14
```

Page 48

1    sent it to you.  Everything I got from the union.

2        Q.   Let's go back to the second grievance regarding

3    the written reminder.  Do you have an understanding as

4    to the outcome of the second grievance?

5        A.   No.  I don't have an -- I didn't have an          13:15

6    outcoming or whatever you're stating there.

7        Q.   You don't know what happened?

8        A.   These were all sitting in limbo while I was

9    terminated.

10       Q.   Looking at defense exhibit -- do you understand    13:15

11   whether the written reminder was referred to

12   fact-finding, the written reminder grievance 23183 was

13   referred to fact-finding?

14       A.   I wouldn't know.

15       Q.   I'm handing a piece of paper to opposing           13:15

16   counsel that is Bates labeled PG&E -- PGE 416.  I'm

17   handing a copy to the court reporter to be marked

18   Defense Exhibit 9.

19            (Defendants' Exhibit 10 was marked for

20            identification.)                                    13:16

21            MR. FURSTMAN:  It's ten.

22            MS. NADEAU:  Sorry.  Ten.  Thank you.

23            THE WITNESS:  Here we go.

24   BY MS. NADEAU:

25       Q.   What is Defense Exhibit 10?                         13:16

                                                    Page 119

Case: 19-30088   Doc# 11391-1   Filed: 10/08/21   Entered: 10/08/21 17:26:46   Page 12 of 36

1    A.   My termination letter.

2    Q.   Is this the termination letter that you

3  received from PG&E on or about August 27, 2015?

4    A.   That's correct.

5    Q.   What is your understanding of why your                13:17

6  employment was terminated?

7    A.   You've been concluded that your actions are

8  disrespectful treatment, threats of violence towards a

9  supervisor in violation of employee code of conduct.

10  Based on your severity of your behavior, your employment    13:17

11  has been terminated.

12    Q.   All right.  What did PG&E say that you said?

13    A.   Well, William Pierce had wrote up a thing in a

14  corporate security report saying that I said

15  disrespectful things to Mrs. -- about Mrs. Redacted         13:17

16    Q.   Okay.  What did he say that you said?

17    A.   I'm not going to say it because I never said

18  it, and they're disrespectful.

19    Q.   Is it your testimony that you never said

20  anything about Miss Redact that was disrespectful?          13:18

21    A.   To Mr. Redacted?  I mean to --

22    Q.   About Ms. Redacted.

23    A.   About Ms. Redacted to Mr. Pierce?

24    Q.   To anyone.

25    A.   Never.  I never said anything.                       13:18

Page 120

1    A.   If I had it, I would have sent it to you in

2    that packet.

3    Q.   I have another document with the Bates label

4    PGE 301.  It's a two-page document.  I'm handing a copy

5    to opposing counsel and another copy to the court        14:24

6    reporter to be marked Defense Exhibit 14.

7         (Defendants' Exhibit 14 was marked for

8         identification.)

9    BY MS. NADEAU:

10   Q.   This is a letter from the review committee       14:24

11   that's dated November 16, 2016.  Is this the letter you

12   were referring to?

13   A.   Yes.

14   Q.   So you received a copy of this.

15   A.   Yes, from Lou.                                    14:25

16   Q.   It says here that -- if you turn to the second

17   page, there's a paragraph that has a heading Decision,

18   and it says, "The committee agreed the discipline was

19   issued for just cause.  This case is closed without

20   adjustment."                                           14:25

21        So is this the language you were referring to

22   when you said it appeared that the union had opined with

23   the company?

24   A.   Yeah.  Opined is shop talk has been -- these

25   have been credible threats.  He would have reported     14:25

Veritext Legal Solutions
866 299-5127

1       Q.    What was your understanding of the decision?

2       A.    I don't know how they could make that just

3    cause, you know, on hearsay.  Just no corroboration of

4    anybody.  It's the famous old he said, she said.  No one

5    heard me say anything to Bill.  No one even saw me with          14:27

6    Bill.  They recollect they saw me talking to him, which

7    I admit to on Monday.

8       Q.    You admit you talked to him on Monday but not

9    Tuesday; is that right?

10      A.    I didn't talk to him on the 15th at all.              14:27

11      Q.    On the 15th.

12      A.    That's correct.  I wasn't even there.

13      Q.    Okay.

14      A.    Their own corporate security report shows it.

15      Q.    So I understand that you feel that the company         14:27

16   relied upon hearsay to terminate you; is that right?

17      A.    Well, it was brought to my attention that Bill

18   Pierce is a supervisor or superintendent and I have no

19   credibility.  He has more than I do.  Jeff Carroll told

20   me that.  Vanessa Parker told me that.                          14:27

21      Q.    In other words, the company chose to believe

22   Bill Pierce versus what you had said; is that right?

23      A.    Yes.  That's correct.

24      Q.    So it says here -- so do you have an

25   understanding regarding the members of the review             14:28

Page 143

Case: 19-30088   Doc# 11391-1   Filed: 10/08/21   Entered: 10/08/21 17:26:46   Page
15 of 36

| | |
|---|---|
| 1 | THE WITNESS: You talked in a riddle. |
| 2 | BY MS. NADEAU: Of course. |
| 3 | Q. What are all the reasons that you think this |
| 4 | case did not proceed to arbitration? |
| 5 | A. Because they were going to lose and they're     14:30 |
| 6 | standing up for a woman in the workplace. |
| 7 | Q. I'm not asking for the motivation, but I'm |
| 8 | asking you why you think that the case didn't go on to |
| 9 | the next step which is arbitration? |
| 10 | A. You have to ask the company that question.     14:30 |
| 11 | Q. You don't know. |
| 12 | A. Don't know. |
| 13 | Q. Do you know if it was a choice by the union? |
| 14 | A. No. |
| 15 | Q. Is it possible -- so as far as you know, would     14:30 |
| 16 | you have any evidence to disprove the contention that |
| 17 | the union agreed not to pursue the case to arbitration? |
| 18 | A. No. I don't have any of that. It was brought |
| 19 | to my attention from Lou, when the corporate security |
| 20 | report came out, there was nothing there.     14:31 |
| 21 | Q. Who decided to terminate your employment? |
| 22 | A. Jeff Carroll. |
| 23 | Q. And how do you know it was Jeff Carroll? |
| 24 | A. He's the one that handed me my paperwork. I |
| 25 | don't know if it was him. It could have been Joel Dixon     14:31 |

Veritext Legal Solutions
866 299-5127

1　　that you made the threat about ▮Redacted▮

2　　　　A.　I don't understand the question.

3　　　　Q.　Well, first of all, do you think Jeff Carroll

4　　believed Mr. Pierce when Mr. Pierce said that you made

5　　that threat against ▮Redacted▮　　　　　　　　　　　14:38

6　　　　A.　Obviously he did.

7　　　　Q.　And you said that also Joel Dixon may have been

8　　involved in the decision to terminate your employment.

9　　Do you have any -- do you believe --

10　　　　A.　His name was at the top.　So the way I　　14:39

11　　understand it, it goes Joel Dixon -- it goes John

12　　Higgins, Joel Dixon, Jeff Carroll and then all their

13　　other people underneath them.　So those are the three

14　　top brass.

15　　　　Q.　And they would have been involved in the　　14:39

16　　decision to terminate your employment?

17　　　　A.　I understand Higgins was real upset about me

18　　being terminated.

19　　　　Q.　Okay.　Do you have any evidence to suggest that

20　　the people who terminated your employment didn't　　14:39

21　　honestly believe Mr. Pierce about what Mr. Pierce said

22　　about the threat?

23　　　　A.　They believed him.　I mean where am I at now?

24　　Terminated.　I don't know what honestly part of that is

25　　you're talking about.　　　　　　　　　　　　　　　14:39

Case: 19-30088　Doc# 11391-1　Filed: 10/08/21　Entered: 10/08/21 17:26:46　Page
17 of 36

```
 1                     identification.)

 2        BY MS. NADEAU:

 3             Q.    Do you recognize Defense Exhibit 15?

 4             A.    What part of it?

 5             Q.    Do you recognize any of it?  Have you reviewed      14:44

 6        this document before?

 7             A.    Yes, I have.

 8             Q.    Okay.  So this complaint includes a breach of

 9        contract cause of action, right?  If you turn to page

10        four, it says, "First cause of action, breach of          14:44

11        contract."  Actually, let's just back up.

12                  You said you reviewed -- did you review -- have

13        you reviewed this complaint?  It is -- looks like the

14        actual complaint is eight pages.

15             A.    I reviewed it when Mr. Emanuel was alive at the    14:44

16        time.  I don't recall much of anything anymore.

17             Q.    When you reviewed it, was it accurate?

18             A.    At the time it was.

19             Q.    Okay.  You're qualifying it by saying at the

20        time.  Is there anything in here that you think is now      14:45

21        inaccurate?

22             A.    No.

23             Q.    The first cause of action is based -- is a

24        breach of contract action.  What contract were you --

25        are you relying upon?                                       14:46
```

                                                        Page 151

Case: 19-30088   Doc# 11391-1   Filed: 10/08/21   Entered: 10/08/21 17:26:46   Page
18 of 36

1        A.    I have no idea.  You'd have to ask Mr. Emanuel.

2    He's the one that wrote it up.  I didn't write this up.

3        Q.    Okay.  So you don't have any understanding

4    regarding the contract that is at issue in the first

5    cause of action?                                        14:46

6        A.    No.  I don't have any.

7        Q.    So it says in paragraph 22 on page four that

8    PG&E and you entered into an implied contract that you

9    would not be discharged unless there was good cause to

10   do so.  Is that your understanding?                     14:46

11       A.    That's my understanding.

12       Q.    Is the basis for this lawsuit that you were

13   terminated without good cause?

14       A.    Yes.

15       Q.    And the factual support for that is that you   14:46

16   didn't actually make the threat that was the reason for

17   your termination; is that right?

18       A.    That's correct.

19       Q.    Is there anything else we haven't talked about

20   that would be at issue in this breach of contract claim?  14:47

21   For example, are there other provisions of any other

22   contract that you think were not complied with?

23       A.    No.

24       Q.    If you turn to page five, you'll see there's a

25   second cause of action there, and it states that it's    14:47

                                                    Page 152

1    for breach of implied covenant of good faith and fair

2    dealing.  And in paragraph 29 it says that "plaintiff

3    was employed by defendant for three years and reasonably

4    relied on the representation from defendant that he

5    would not be terminated without just and fair cause."          14:48

6    Is that accurate?

7        A.   That's accurate.

8        Q.   Now, we talked earlier about how Lou Mennel

9    told you that you could not be fired except for just

10    cause, right?                                                  14:48

11        A.   Right.

12        Q.   Were there any other people who told you that?

13        A.   No.

14        Q.   Any place you saw that written?

15        A.   No.                                                   14:48

16        Q.   Are there any other agreements that you think

17    were violated that you're arguing were violated in this

18    breach of -- in the second cause of action?

19        A.   No.

20        Q.   So then it seems to me that the facts             14:49

21    supporting the first cause of action and the second are

22    the same, that you were terminated without good cause

23    and that was in violation of an agreement you had with

24    PG&E; is that right?

25        A.   I don't know if I had an agreement with them.      14:49

Page 153

Case: 19-30088   Doc# 11391-1   Filed: 10/08/21   Entered: 10/08/21 17:26:46   Page
20 of 36

1 and defendant would not discharge him without good and

2 just cause." Are there any facts -- I think I've

3 already asked this, but -- I'm going to move on.

4     A. I already read it, so --

5     Q. Okay. Let's turn to the third cause of action,   14:51

6 page six, intentional infliction of emotional distress.

7 This claim argues that PG&E's conduct towards you was

8 extreme, outrageous and beyond all bounds of human

9 decency recognized in a civilized society. What conduct

10 are you referring to in that -- in that allegation?   14:51

11     A. I'm not referring to none of it. My lawyer

12 referred to it.

13     Q. Are you saying it's not accurate?

14     A. I'm not saying it's not accurate.

15     Q. Okay. Well, are there any facts that you have   14:51

16 supporting the contention that PG&E was extreme,

17 outrageous and beyond all --

18     A. Yeah.

19     Q. -- bounds of human decency recognized in a

20 civilized society?   14:52

21     A. Hearsay. It's right there in the corporate

22 security report. And even the LIC report, Bill can't

23 back it up.

24     Q. Can you please explain what you mean by that?

25     A. Simple. Someone says something, he waits eight   14:52

Case: 19-30088   Doc# 11391-1   Filed: 10/08/21   Entered: 10/08/21 17:26:46   Page
21 of 36

1    days, doesn't say nothing, then he says something, and

2    then it gets escalated into something on hearsay, and

3    then corporate security does a full-blown investigation.

4    I'm not even there.  And then they toss me on the

5    pretense that I was two point -- 1.5 to two -- 3.3 miles          14:52

6    away, on hearsay.  No corroboration, no one heard it.

7    It's his word against mine.

8         Q.  Are there any other facts that you think

9    show --

10        A.  No.                                                      14:52

11        Q.  -- that PG&E acted in an extreme or outrageous

12   manner?

13        A.  Doing that, fired me on hearsay.  That's what I

14   feel.

15        Q.  Anything else?                                           14:53

16        A.  No.

17        Q.  Okay.  Any actions other than your termination

18   that would suggest that PG&E acted beyond all bounds of

19   human decency recognized in a civilized society?

20        MR. FURSTMAN:  Do you understand the question?              14:53

21   Can you answer yes or no?

22        THE WITNESS:  Repeat the question again.

23        MS. NADEAU:  Can we have it read back.

24        (Record read.)

25        THE WITNESS:  Yes, they acted on it.                        14:53

Page 156

Case: 19-30088   Doc# 11391-1   Filed: 10/08/21   Entered: 10/08/21 17:26:46   Page
22 of 36

1    BY MS. NADEAU:

2        Q.    Sorry?

3        A.    Yes, they acted on it.

4        Q.    Acted on what?

5        A.    Terminating me.                                    14:53

6        Q.    Okay.  Because they terminated you.

7        A.    Yeah.

8        Q.    It also says that defendant terminated

9    plaintiff's employment in the presence of plaintiff's

10   coworkers.  Is that right, were you terminated in the     14:53

11   presence of coworkers?

12       A.    Yes, I was.

13       Q.    And who were those coworkers?

14       A.    Let's see.  The head coworker was Jeff Carroll,

15   Eugene Sanchez and whoever the other guy was that was     14:54

16   from the San Jose office.  Don't know who it was.

17       Q.    All right.  It says that you were verbally

18   abused with epithets and personal remarks.  Is that

19   true?

20       A.    I don't understand the question.                 14:54

21       Q.    Do you know what an epithet is?

22       A.    No.

23       Q.    Were you insulted during the termination

24   meeting?

25       A.    No.                                              14:54

                                                    Page 157

1 because you filed -- or your attorney filed this

2 document?

3   A. Yeah. I understand it, but you're talking in

4 riddles.

5   Q. I'm not talking in riddles. I'm quoting your  14:56

6 own complaint to you, and I understand you didn't draft

7 it, but this is --

8   A. So you're asking me questions that I can't

9 answer.

10   Q. Okay. So I'd like to know what things in this  14:56

11 complaint are not accurate. So that's why I'm asking

12 you about it.

13   A. Okay. I feel the whole thing's accurate.

14   Q. Okay. You just said that nobody insulted you

15 during the termination meeting. Now I'm asking you --  14:57

16   A. I did say that. No one insulted me. But you

17 asked me earlier if they went after -- how I felt about

18 it. I told you how I felt about it. There's a

19 difference from being insulted and how you felt.

20   Q. All right. <u>Now I'm just asking you did anyone</u>  <u>14:57</u>

21 <u>insult your character and professional competence, and</u>

22 <u>if so, I'd like to know --</u>

23   <u>A.</u> <u>Verbally?</u>

24   <u>Q.</u> <u>Yes, with words.</u>

25   <u>A.</u> <u>No.</u>  14:57

Page 159

Case: 19-30088 Doc# 11391-1 Filed: 10/08/21 Entered: 10/08/21 17:26:46 Page 24 of 36

1   Q.   So nobody insulted your character or

2   professional competence; is that true?

3   A.   That's true.

4   Q.   Do you have any facts to suggest that PG&E

5   intended to inflict severe emotional distress on you?    14:57

6   A.   No.

7   Q.   Okay.  Let's turn to the fourth cause of

8   action, which is on page seven.  Is the basis for your

9   unfair business practices claim that you were terminated

10  or is there some other basis?                            14:58

11  A.   I don't understand the question.

12  Q.   So in your complaint that was filed by your

13  attorney, there is a claim for unfair business

14  practices.  Do you see that on page seven?

15  A.   I see unlawful business practice.              14:59

16  Q.   No, it's unfair business practices.

17  A.   Unlawful.  Am I reading something wrong here?

18  Q.   Yeah.  In paragraph 41 it refers to the statute

19  Business and Professions Code Section 17200 which

20  prohibits any unlawful, unfair or fraudulent business    14:59

21  practice.  Is that where you're referring to?  It

22  doesn't matter, but for my purposes I'd like to know --

23  well, let's just go through the complaint.  It will be

24  easier.

25          Do you have any evidence that PG&E behaved     15:00

Page 160

Case: 19-30088   Doc# 11391-1   Filed: 10/08/21   Entered: 10/08/21 17:26:46   Page
25 of 36

1    towards you in an unlawful or unfair -- I'm sorry.    Do

2    you have any evidence that PG&E committed an unlawful,

3    unfair or fraudulent business practice?

4         A.    Yeah.    They fired me on hearsay.    Shows it in

5    their corporate security report and their LIC meeting.    15:00

6         Q.    And why do you think that is unlawful?

7         A.    Why do I think it's unlawful?

8         Q.    Yes.

9         A.    You just can't go firing people on hearsay.

10        Q.    Do you know if that violates any statute?    15:00

11        A.    No, I don't know.

12        Q.    Any other reason that you think PG&E conducted

13   an unlawful, unfair or fraudulent business practice?

14        A.    I don't understand the question.

15        Q.    Do you think that PG&E, other than firing you,    15:01

16   committed any unlawful, unfair or fraudulent business

17   practice?

18        A.    How they conducted their business?    I don't

19   understand what you mean.    Does this include me or this

20   is what their -- what they do as a company?    15:01

21        Q.    This is about your complaint that you're

22   pursuing, and I just would like to know what unfair or

23   unlawful or fraudulent business practices you're

24   contending in this lawsuit?

25        A.    Wrongfully terminated.    15:01

Case: 19-30088    Doc# 11391-1    Filed: 10/08/21    Entered: 10/08/21 17:26:46    Page
26 of 36

1     Q.   Anything else?

2     A.   No.

3     Q.   This complaint also says that PG&E acted

4  towards you with malice, oppression, fraud and a willful

5  and conscious disregard of your rights.  Setting aside     15:02

6  the termination, is there anything that PG&E did towards

7  you that you think shows they had malice, oppression,

8  fraud or willful and conscious disregard of your rights?

9     A.   When they terminated me.

10     Q.   Anything else?     15:02

11     A.   No.

12     Q.   So my understanding is that this whole lawsuit

13  has to do with the fairness or unfairness of your

14  termination.  Is that right?

15     A.   Correct.     15:03

16     Q.   And there aren't other sorts of claims that you

17  would like to make against PG&E; is that correct?

18     A.   No.

19     Q.   There are not.

20     A.   No.     15:03

21     Q.   What employers did you apply to work for after

22  you were fired from PG&E?

23     A.   Valley Transit Authority and Cannis.  Well, no,

24  they approached me.  I didn't approach them.

25     Q.   And that's a good point.  I'd like to know even     15:03

Page 162

Case: 19-30088   Doc# 11391-1   Filed: 10/08/21   Entered: 10/08/21 17:26:46   Page 27 of 36

```
 1          A.   From you or --

 2          Q.   I'm handing it to opposing counsel and I'm

 3     handing a copy to the court reporter to be marked

 4     Defense Exhibit 22.

 5               (Defendants' Exhibit 22 was marked for        16:25

 6               identification.)

 7               THE WITNESS:  Yeah, I got this.

 8     BY MS. NADEAU:

 9          Q.   Okay.  So you understand that the court denied

10     your motion to compel and awarded sanctions; is that     16:25

11     right?

12          A.   That's correct.

13          Q.   Have you paid the sanctions?

14          A.   No.  No one's ever told me who to pay.

15          Q.   You would pay me.                              16:26

16          A.   Okay.

17          Q.   So -- and in fact, there's been a second order

18     also awarding sanctions.

19          A.   So I write the check to Littler Mendelson?

20          Q.   Yes.  When do you plan to pay -- to write the   16:26

21     check?

22               MR. FURSTMAN:  Well, I think this is something

23     that would most appropriately be discussed off the

24     record.  We're not here for an OEX.  It will be taken

25     care of, as Mr. Jannings has indicated.  I'm not trying   16:26
```

```
 1                    REPORTER'S CERTIFICATE

 2              I, Theresa Nadeau, do hereby certify:

 3              That I am a licensed, Certified Shorthand

 4     Reporter, duly qualified and certified as such by the

 5     State of California;

 6              That prior to being examined, the witness

 7     named in the foregoing deposition was by me duly sworn

 8     to testify to the truth, the whole truth and nothing but

 9     the truth;

10              That the said deposition was by me recorded

11     stenographically at the time and place first therein

12     mentioned; and the foregoing pages constitute a full,

13     true, complete and correct record of the testimony given

14     by the said witness;

15              That I am a disinterested person, not being in

16     any way interested in the outcome of said action, nor

17     connected with, nor related to any of the parties in

18     said action, or to their respective counsel, in any

19     manner whatsoever.

20              Dated this 21st day of January, 2019.

21

22

23

24              Theresa Nadeau, CSR No. 10526

25
```

Page 215

Case: 19-30088    Doc# 11391-1    Filed: 10/08/21    Entered: 10/08/21 17:26:46    Page
29 of 36



**Pacific Gas and Electric Company**®

01/11/2013

Spiro Jannings
1304 Shortridge Ave. Unit
C
SAN JOSE CA 95116
USA

Hello Spiro,

On behalf of Pacific Gas and Electric, I am pleased that you have accepted the offer for the position of Fieldperson. Your supervisor is Tim TJB Bellinghausen and your position is based in San Carlos. You will be paid bi-weekly. Your rate will be $      34.65 per hour (subject to payroll system rounding).

Your base salary may be increased as detailed in the International Brotherhood of Electrical Workers (IBEW) Collective Bargaining Agreement.

You are eligible for      80 hours of Vacation annually. Vacation hours are accrued on an "as you go" basis, and you begin accruing from your first day of employment.

For Exempt employees, paydays are on the 23rd of the month, or the previous workday if the 23rd falls on a Saturday, Sunday, or holiday.
For Non-Exempt employees, paydays are every other Friday, or on the previous workday if the Friday is a holiday.
If your base pay rate is changed, you will be notified seven days in advance of the effective date of the change.
Pacific Gas and Electric Company does not provide additional cash allowances.

Before we can confirm your start date of 01/28/2013, you must successfully complete all required pre-employment activities. Pre-employment requirements include:

• Verification of the content of your completed Job Application
• Criminal background check
• Reference checks
• Passing a drug analysis examination
• Verification of your eligibility to work in the United States, as defined in the Immigration and Control Act. Pacific Gas and Electric Company reserves the right to terminate your employment should you fail to possess or maintain such work authorization, or if such work authorization expires.
• Confirmation of your identity with a government-issued ID or other acceptable document.

When you receive your confirmation, you'll find details about what to expect and where to report on

EXHIBIT 3
WIT: Jannings
DATE: 1-8-19
Theresa Nadeau, CSR

PGE000409

your first day.

It is important to note that you will be an employee at will. This means that either you or Pacific Gas and Electric Company may end your employment at any time, with or without cause, and with or without notice

Information and instructions on how to enroll in health plan benefits will be provided to you within 10 days of your first day of employment. The benefits options you choose will be effective the first of the month after your enrollment form is received by the Human Resources Service Center. Questions about benefits can be directed to the Human Resources Service Center by calling 1-800-788-2363. More details about pay, benefits, time off and work/life programs are available on the HR intranet site when you start work.

We look forward to you becoming a part of our exceptional team of employees. If you have any questions please feel free to contact me.

**Your Next Steps:**

**1. Pre-employment drug screen information and instructions:**
You should have already received an email from donotreply@escreen.com with all of your pre-employment drug screen appointment details. If you have not already received an e-mail from eScreen, please contact me ASAP (Laura Shrader ).

Please bring a valid driver's license or photo ID to the clinic. You will be providing the clinic with a urine sample for drug screening.

Please carefully read the following instructions regarding your drug test:
• You have 3 business days from the time you accept the job offer to take your drug test.
• Failure to complete the drug testing within 3 business days is considered a rejection of the Company conditional employment offer.
• Be aware of your fluid intake prior to testing. Do not drink excessive fluids. If you produce a diluted urine specimen, you will be allowed one re-test. Two tests with diluted results will preclude you from any future employment opportunities with PG&E. (Please drink coffee, juice, soda or water intake less than 40 oz.)
• Once you have signed in at the drug testing facility, if you do not provide a sufficient urine sample for any reason or choose to abandon the testing process, your actions will result in your test being viewed as a positive drug test, and your job offer will be rescinded.

**Required forms:**
You need to complete and return the following forms within 24 hours.

**DOT Drug and Alcohol Testing Policy Handbook**
The remainder of the pre-employment process will also begin immediately, however, results may take up to 10 business days.

The following is the link to the "DOT Drug and Alcohol Testing Policy and Handbook" that you must read prior to reporting on your first day of employment.

(Please click on the link to open the handbook):
DOT Drug and Alcohol Testing Policy and Handbook

Complete the last page of the handbook "ACKNOWLEDGEMENT OF RECEIPT DOT DRUG AND

PGE000410

ALCOHOL TESTING POLICY" and fax the form to (925) 459-7345.

**DOT History Form**
Following is the link·to the "Release of DOT drug and alcohol testing information form".
(Please click on the link to open the form):
DOT History and Release Form

Please complete the "Release of DOT drug and alcohol testing information form". There are four
sections to the form. Please fill out the sections as follows:

Section 1: **You must fill out this section**
Section 2: Fill out this section if you have held a DOT-regulated position during the past three years
(i.e. as a commercial driver or pipeline employee). If you are unsure whether you were subject to
these regulations, please contact Kathy Oceguera at (925) 270-2944.
Section 3: **You must fill out this section**
Section 4: Leave this section blank
Fax all 3 pages of the "Release of DOT drug and alcohol testing information form" to (925)
459-7345. This form needs to be received and processed before you are able to be cleared for
hire. If you have any questions regarding the form, please contact Kathy Oceguera at (925)
270-2944.

**2. Background Check:**
You need to complete documentation required to process a background investigation within 48
hours. You will shortly receive one email from customersupport@hireright.com with instructions to
initiate this process.

Once the pre-employment process is completed, you will be contacted by email to confirm the start
date and other related information. Please feel free to contact me if you have any questions.


Best regards, ·

Laura Shrader
Recruiting Department
Pacific Gas and Electric Company
L3SH@PGE.COM


Replies to the e-mail address that sent this message are undeliverable and will not reach the
Recruiting Team. Please do not reply directly to this email.


**Pacific Gas and Electric Company**

# VEHICLE DRIVER
## QUALIFICATION FORM

| Employee Name (Print): Spiro Jennings | Employee Signature: |
|---|---|
| Personnel# 49709 | Date: 2/18/14 |
| PCC# 15288 | Area: Sfm Jose | Department: M/L | Location: 10900 N Blaney Ave. Cupertino 95014 |
| Driv.Lic. #: REDACTED | Class: A | Expire. Date: 04/23/16 | Med Exp: 1/25/15 | Vehicle Number: Peter Bilt 826528   Trailer — 824297 |
| Instructor Name (Print): Bob Bruce  R3BE  3235 | Course Code: **EQIP-0034** | Transmission Type: **NW Allison** |
| Instructor Signature: Bob Bruce | Equipment Description: Peter Bilt 10 yd Dump Trailer Trans 5 Dr |

| PRESTART INSPECTION | S | N | N/A |
|---|---|---|---|
| 1. Check for fluids under vehicle | ✓ | | |
| 2. Perform walk around inspection | ✓ | | |
| 3. Perform brake operation tests | ✓ | | |
| 4. Correctly interpret in-cab gauges and controls | ✓ | | |
| 5. State brake slack adjuster limits | ✓ | | |
| 6. Indicate GVWR, load capacity | ✓ | | |
| 7. Connect trailer | ✓ | | |
| 8. Determine width and height limits | ✓ | | |
| 9. Secure load | | | ✓ |
| 10. Complete daily inspection book | ✓ | | |

| DRIVING SKILLS | S | N | N/A |
|---|---|---|---|
| 11. Operate vehicle in a safe manner, follows regulations | ✓ | | |
| 12. Operate transmission proficiently | ✓ | | |
| 13. Demonstrate retarder operation | ✓ | | |
| 14. Scan mirrors periodically | ✓ | | |
| 15. Back vehicle proficiently | ✓ | | |

| APPARATUS OPERATION | S | N | N/A |
|---|---|---|---|
| 16. Engage PTO properly | | | ✓ |
| 17. Operate attachments (i.e., pipe rack, auto crane, winch, capston) (Outriggers, upper and lower boom, digger derrick.) | | | ✓ |
| 18. Exhaust Regeneration | ✓ | | |

S = Satisfactory          N = Needs improvement          NA = Not Applicable

☐ Written test administered and passed
☒ Qualified to drive
☐ Needs Improvement - May drive only under direct supervision of a qualified driver having a license equal to, or greater than the student driver RETEST REQUIRED

Comments: _____

S:\V&E\Forms\Qualification Forms\Backup of Vehicle Driver Qualification.wbk

PGE000412

 **Pacific Gas and Electric Company**™

#49709

August 27, 2015

Spiro Jannings
1304 Shortridge Ave. Unit C
San Jose, CA 95116

Spiro Jannings:

Effective today August 27, 2015, your employment with Pacific Gas And Electric Company is being terminated.

Your termination of employment is based on the findings of a Corporate Security Investigation into your conduct. It has been concluded that you're your actions of disrespectful treatment and threat of violence towards your supervisor is in violation of the Employee Code of Conduct. Based on the severity of your behavior, your employment has been terminated.

You will be ineligible for rehire as a regular employee or hiring hall employee, agency worker or contractor assigned to work on PG&E facilities.

All Company property including keys, ID card, gate entry card and Company tools in your possession are to be returned immediately.

Your final paycheck is enclosed. You will receive benefit information from the HR Service Center in approximately two weeks. In the meantime, you may contact the HR Service Center directly at (415) 973-2363 or at (800) 788-2363.

Sincerely,

Jeff Carroll
Superintendent

cc: Labor Relations

EXHIBIT _10_
WIT: _Jannings_
DATE: _1-8-19_
Theresa Nadeau, CSR

PGE000416



# REVIEW COMMITTEE



PACIFIC GAS AND ELECTRIC COMPANY
LABOR RELATIONS DEPARTMENT
375 N. WIGET LANE, SUITE 130
WALNUT CREEK, CA 94598
(415) 973-8599

INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS, AFL-CIO
LOCAL UNION 1245, I.B.E.W.
P.O. BOX 2547
VACAVILLE, CALIFORNIA 94696
(707) 452-2700

CLAIRE IANDOLI, CHAIRPERSON
⊔  DECISION
⊓  LETTER DECISION
⊐  PRE-REVIEW REFERRAL

KIT STICE, SECRETARY

## Review Committee Number 23334
## Gas – Locate & Mark – Hayward

Vanessa Parker
Company Member
Local Investigating Committee

Lou Mennel
Union Member
Local Investigating Committee

Subject of the Grievance

This case concerns the termination of a Field Person at the Hayward Service Center for Code of Conduct violations including disrespectful treatment and threats of sexual violence toward his supervisor.

Facts of the Case

The Grievant is a Field Person with 3 years of service. Grievant was on an active Written Reminder at the time of his discharge for issues relating to arriving late to assignments, leaving the work site early, and failing to record his hours accurately on timecards.

Prior to his dismissal, the Grievant reported to a female Locate and Mark Supervisor who had issued the Written Reminder.

A Corporate Security Investigation initiated on July 23, 2015 found that Grievant had made vulgar and inappropriate comments of a sexual nature about his female Supervisor to another male Supervisor. As a result, Grievant was terminated on August 27, 2015.

Although Grievant denied the specific threats of sexual assault, he did not deny that he had a conversation with the male Supervisor regarding his female Supervisor and admitted that he told the male Supervisor, "... we had a little bit of a problem." Grievant also spoke to another co-worker about his Supervisor and said, "She's out to get me."

Discussion

The Union argued two points: 1) The male Supervisor who heard these comments did not act on the comments immediately and waited 6 days before telling the female Supervisor of

EXHIBIT  14
WIT: Jannings
DATE: 1-8-19

Grievant's threats. The Union opined this was "shop talk" and had these been credible threats, he would have reported them immediately. 2. The Union argued the GPS records did not indicate that Grievant was in the yard later in the day when the male Supervisor said the conversation took place. Accordingly, the Union argued for a reduction in the penalty.

The Company acknowledged the male Supervisor did not report the incident as quickly as he should have, but that does not negate the fact that the conversation took place. Even the Grievant admitted the conversation took place but denies making the vulgar comments. Further, in the interest of protecting his job, Grievant had a motive to lie but he could not provide a motive as to why the male Supervisor or any of his co-workers would fabricate these stories against him. Finally, GPS is only triggered for Locate and Mark employees when they are entering information into the computer. Therefore, when Grievant was in the yard speaking to the male Supervisor, GPS was not tracking him because he was not inputting data into the computer.

<u>Decision</u>

This is not the first case that has come before the Review Committee involving threats made to a Supervisor. Pre-Review Committee Decision Nos. 18746, 12913, 12884, 12694, and 20560 also support discharge. The Committee agreed the discipline was issued for just cause. This case is closed without adjustment.

*s/Claire Iandoli*      11/16/16                    *s/Kit Stice*      11/16/16
Claire Iandoli, Chairman   Date                     Kit Stice, Secretary   Date
Review Committee                                    Review Committee