ALSTON & BIRD, LLP
DIANE C. STANFIELD (CA Bar No. 106366)
DOUGLAS J. HARRIS (CA Bar No. 329946)
diane.stanfield@alston.com
douglas.harris@alston.com
333 S. Hope Street 16th Floor
Los Angeles, California 90071
Telephone: 213.576.1000
Facsimile: 213.576.1100

Attorneys for
Fulcrum Credit Partners LLC

DOWNEY BRAND LLP
JAMIE P. DREHER (CA Bar No. 209380)
Email: jdreher@downeybrand.com
TYLER J. HORN (CA Bar No. 323982)
Email: thorn@downeybrand.com
621 Capitol Mall, 18th Floor
Sacramento, California 95814
Telephone: 916.444.1000
Facsimile: 916.444.2100

Attorneys for
Tuscan Ridge Associates, LLC

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| In re<br><br>PG&E Corporation,<br><br>and<br><br>PACIFIC GAS AND ELECTRIC COMPANY,<br><br>Debtors.<br><br>[ ] Affects PG&E Corporation<br>[ ] Affects Pacific Gas and Electric Company<br>[x] Affects both Debtors<br><br>*All papers shall be filed in the Lead Case, No. 19-30088-DM,* | Case No. 19-30088-DM<br><br>Chapter 11<br>Lead Case, Jointly Administered<br><br>**RESPONSE TO REORGANIZED DEBTORS' OBJECTION TO PROOF OF CLAIM NO. 58562 FILED BY FULCRUM CREDIT PARTNERS LLC AS TRANSFEREE OF TUSCAN RIDGE ASSOCIATES, LLC**<br><br>Date: November 9, 2021<br>Time: 10:00 a.m.<br>Place: (Tele/Videoconference Appearances Only)<br>Courtroom 17<br>450 Golden Gate Avenue<br>San Francisco, CA 94102<br><br>Objection deadline: October 26, 2021 |

## TABLE OF CONTENTS

| | Page(s) |
|---|---|
| INTRODUCTION | 1 |
| RELEVANT FACTUAL BACKGROUND | 2 |
| ARGUMENT | 5 |
| I. PG&E'S OBJECTIONS SHOULD BE OVERRULED | 5 |
|     A. Neither ECC's Lease Nor Its Use of the Property Negates PG&E's Contract Obligations | 6 |
|     B. Tuscan's Own Use of its Property Subsequent to PG&E's Use Does Not Negate PG&E's Contract Obligations | 11 |
| CONCLUSION | 13 |

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Carma Developers (Cal.), Inc. v. Marathon Dev. Cal., Inc.*,
 2 Cal.4th 342 (1992) .................................................................................................... 11

*Nelson v. Reisner*,
 51 Cal.2d 161 (Cal. 1958) ........................................................................................... 13

*Schellinger Bros. v. Cotter*,
 2 Cal. App. 5th 984 (Cal. App. 2016) .......................................................................... 13

Fulcrum Credit Partners LLC ("Fulcrum"), as transferee, and Tuscan Ridge Associates, LLC ("Tuscan"), as transferor, hereby submit this response to Reorganized Debtor's Objection to Proof of Claim No. 58562 filed by Fulcrum Credit Partners LLC as transferee of Tuscan Ridge Associates, LLC ("Claim Objection"),[1] as follows:

## INTRODUCTION

Tuscan owns and operated a popular and pristine 18-hole golf course in Paradise, California (the "Golf Course") plus the surrounding land totaling approximately 160 acres (the "Property"). Tuscan has spent years preparing the Property for eventual development, including working toward approval of the 2010 Butte County general plan update; that update rezoned the Property as a planned unit development and allows for residential uses on the express condition that a Golf Course is maintained. After spending significant amounts of time, money, and effort on positioning the Property for development, Tuscan anticipated beginning the process of securing the necessary permits and other required project-level entitlements in the Spring of 2019. In order to focus on those development efforts, Tuscan had closed the Golf Course in 2017, so when Pacific Gas & Electric Company ("PG&E") asked to use portions of the Property for purposes of wildfire risk reduction operations, Tuscan agreed, and entered into a License Agreement for that purpose.

PG&E had completed its risk reduction activities and was in the process of moving out of the Property when the most destructive wildfire in California history, well known as the Camp Fire, broke out. Without notifying Tuscan, PG&E stormed back in, bringing heavy equipment and personnel and commandeering an expanded portion of the Property as its base camp to restore utilities to those affected by the wildfire and otherwise deal with the emergency. Acknowledging the obvious urgent need, Tuscan quickly acceded, and entered into a Letter Agreement with PG&E days later setting forth the terms on which PG&E would be permitted to continue to utilize the Property for those purposes. Although Tuscan recognized that the Golf Course would be damaged, it agreed to the use because PG&E agreed to restore it, or pay to restore it, to the condition in which

---

[1] Tuscan transferred its claim against PG&E to Fulcrum on or about March 16, 2021. (Dkt. No. 10437.) Despite the transfer of the claim to Fulcrum, both parties continue to have an interest in and be active in the prosecution of the claim.

PG&E found it.

PG&E's use would, in the end, result in a near complete demolition of the portions of the Golf Course used by PG&E, essentially erasing the topography, damaging soil, and wiping out asphalt paths, irrigation and trees. Shockingly, however—after vacating Tuscan's Property in or about February 2019 and continuing to the present—PG&E has steadfastly refused to honor its contractual obligations; it has not paid a penny toward the restoration. Instead, PG&E now looks to pass the buck and avoid liability in any way it can.

## **RELEVANT FACTUAL BACKGROUND**

In 2001, an 18-hole Golf Course, known as Tuscan Ridge Golf Course, was constructed on the Property, which is owned by Tuscan. Since November 2005, Tuscan and its predecessors have been working to entitle and develop the Property as a residential golf course community. (Declaration of Scott Bates In Support of Response to Claim Objection ("Bates Decl.") at ¶¶ 2-5.) On or about October 26, 2010, after considerable costs and effort expended by Tuscan, Butte County updated its general plan rezoning the Property as a future planned unit development, which allowed for residential uses "provided that the golf course is also maintained." (*See* Request for Judicial Notice in Support of Response to Claim Objection ("RJN"), Exh. A (relevant pages of Butte County General Plan 2030 Land Use Element 4-32, as amended on November 6, 2012)). Tuscan was expecting to apply for final permits and entitlements which would allow development of the residential golf course community to begin in Spring of 2019. (Bates Decl. at ¶ 5.) In order to focus on that process, Tuscan temporarily closed the Golf Course in 2017. (Bates Decl. at ¶ 3.)

In September of 2018, PG&E and Tuscan entered into a Temporary License Agreement permitting PG&E to occupy portions of the Golf Course as part of its staging area for wildfire risk reduction operations in the Paradise, California area. (Declaration of Elouise Jadhav in Support of Claim Objection [Dkt. No. 11289] ("Jadhav Decl.") at Exh. A, p. 6 of 36; Declaration of Courtney McAlister In Support of Response to Claim Objection ("McAlister Decl.") at ¶ 3). That agreement permitted PG&E to use the driving range area and parking lot for the staging of vehicles, landing of helicopters, storing of equipment, supplies and materials used in connection with its electric and gas utility operations and vegetation management. The license was set to expire on December 10, 2018;

however, on November 6, 2018, PG&E notified Tuscan that it had completed its fire prevention activities and would vacate the Property. (McAlister Decl. at ¶ 4.)

On November 8, 2018, the Camp Fire—the deadliest and most destructive wildfire in California history—began ravaging Butte County. Immediately after the Camp Fire began, PG&E—without obtaining Tuscan's prior consent or even informing Tuscan of the full extent of its occupation—overtook the Property. Instantly, the Golf Course was overwhelmed and swarming with hundreds of PG&E's personnel and heavy machinery as PG&E took over an expanded area of the Golf Course for use as a basecamp for its personnel and equipment needed to restore utility service to the areas devastated by the Camp Fire. (Declaration of Mark West In Support of Response to Claim Objection ("West Decl.") at ¶ 4).[2] Shortly thereafter, Tuscan and PG&E executed the Letter Agreement dated November 20, 2018 ("Letter Agreement") to address and provide for PG&E's use of the Golf Course, including its obligations relative to the damage that had been and would be caused by its use. (Bates Decl. at ¶ 11 & Exh. C thereto (Letter Agreement).)

Pursuant to the express terms of the Letter Agreement, PG&E was required to restore the area of the Golf Course it licensed pursuant to the Letter Agreement (the "License Area"), including the roads and parking lots and any areas of ingress and egress, to "as good of condition as it was prior to PG&E's use of the area." (Letter Agreement at p. 3.) Specifically, the Letter Agreement provides:

> PG&E shall, at its sole cost and expense, maintain and restore the License Area, including the roads and parking lot(s), including any areas of ingress and egress, in as good of condition as it was prior to PG&E's use of the area (the "Baseline Condition") *** PG&E's restoration obligation at the end of the term of this Letter Agreement includes restoring the License Area in a professional manner to the Baseline Condition … at PG&E's sole cost and expense.

(Letter Agreement at p. 3).

"Baseline Condition" is defined, in turn, as "the Property's current condition as of the date of this Letter Agreement, prior to the grading and winterization activities that Owner will perform

---

[2] Contrary to PG&E's implication, the negotiation of the Letter Agreement came after PG&E's expanded and unauthorized use commenced.

for PG&E" [at PG&E's cost] and "includes the currently closed 18-hole golf course improvements on the Property, including the fairways and greens (that is, the grading and contours of such fairways and greens but excluding any sod, turf and grass in such areas), bunkers, ponds, sprinkler systems and related improvements."[3]

Before even signing the Letter Agreement, PG&E engaged Chico West Incorporated dba Community Construction, owned by Tuscan member Mark West (ultimately hiring multiple additional contractors in the interest of speed) to "grade and winterize" the License Area, leveling large portions of the Golf Course and dumping a layer of base rock over much of it to provide an all-weather ("winterized") surface so that PG&E's equipment and machinery would not sink in the soft dirt. (West Decl. at ¶ 5-8; Bates Decl. at ¶ 10.) PG&E brought in hundreds of truckloads of gravel which ultimately was spread over 80 acres of the Property (West Decl. at ¶¶ 7-8; Bates Decl. at ¶ 10).

Thereafter, PG&E's use of the Property for fire-related activities continued for several months. However, in February 2019, PG&E informed Tuscan that it would not need the Property for the entire period provided for in the Letter Agreement and expected to vacate by the end of that month. (Bates Decl. at ¶ 12; McAlister Decl. at ¶¶ 6, 8, 9 and Exh. C thereto.) Indeed, PG&E concluded its activities and vacated at or near the time it had indicated. (Bates Decl. at ¶ 12.)

The Letter Agreement required PG&E to meet and confer with Tuscan as to the nature and scope of the restoration work needed to restore the Property to its Baseline Condition following PG&E's use. (Bates Decl. at ¶ 14; Letter Agreement at p. 3.)[4] In compliance with that requirement, immediately after PG&E gave notice that it would be vacating, Tuscan began that process. As

---

[3] PG&E will make much of the fact that the golf course was not in operation when it came in; that is not disputed. Indeed, Tuscan had allowed the grass to die because the Golf Course was closed to allow Tuscan to focus on development of the surrounding residential community, which is the reason sod, turf and grass were excluded from "Baseline Condition." (Bates Decl. at ¶ 3.)

[4] The damage was extensive to say the least, as demonstrated by the pictures attached as Exhibits A and B to the Bates Declaration. Indeed, when Tuscan met in February 2019 with representatives from PG&E and its contractor, Turner Construction, Turner's representative stated his opinion that it would cost at least $12,000,000 to restore the Property to its Baseline Condition-- remarking that Turner would not even make the trip for less. (Bates Decl. at ¶ 15.)

further described below, early in the meet and confer process and repeatedly throughout, PG&E made it clear that its preference and intention was to make a payment for the cost of restoration of the Property, rather than perform the work. Accordingly, the meetings and communications focused entirely on the cost. (McAlister Decl. at ¶¶ 6-10 & 12-16; Bates Decl. at ¶16.).

As set forth below, beginning on February 6, 2019 and continuing through late March 2019 and beyond, the parties met, discussed, e-mailed and reviewed drafts of the cost estimates provided by Tuscan. However, despite Tuscan's meet & confer efforts, no agreement was reached. As a result of these failed discussions, Tuscan filed its Proof of Claim (Exhibit A to the Declaration of Laura L. Goodman in Support of Claim Objection [Dkt. No. 11291] ("Goodman Decl.")) on or about October 17, 2019 (reserving the right to amend it). Tuscan subsequently obtained a detailed Opinion of Probable Cost ("OPC") which estimated that restoration of the Property to its Baseline Condition will cost at least $13,306,426.[5]

Despite its clear-cut contractual obligation, PG&E has refused to pay even a penny of restoration costs—and now it is grasping at every straw to avoid liability altogether. It is extremely disappointing to see PG&E turn its back on parties who were there when PG&E most needed them. As set forth below, PG&E's defenses are meritless, and the claim should be allowed in an amount to be determined through arbitration.[6]

## ARGUMENT

**I.     PG&E'S OBJECTIONS SHOULD BE OVERRULED**

The language of the Letter Agreement could not be clearer. PG&E must pay for the cost of restoring the Property to its Baseline Condition. Its defenses are disingenuous and are meritless as a matter of law.

---

[5] A true and correct copy of the OPC is attached to the Moreno Decl. as Exhibit B; Fulcrum anticipates submitting an amendment to the Proof of Claim consistent with that and any further updated OPC.

[6] The Letter Agreement provides that if Tuscan and PG&E could not agree upon the scope of PG&E's restoration obligation, the Parties would engage a third party neutral arbitrator to estimate the cost to restore the License Area to the Baseline Condition, after which Tuscan had the option of requiring PG&E to perform the restoration or pay Tuscan the estimated cost of restoration. (Letter Agreement at p. 3.)   This arbitration provision is the subject of Fulcrum's Motion for Relief From Plan Injunction, to Compel Arbitration and/or for Abstention [Dkt. No. 11066].

PG&E's defenses to the claim can be distilled into two arguments: (1) because Tuscan entered into a lease to allow a subsequent use of its Property, PG&E is somehow excused from its contractual obligations, and (2) Tuscan doesn't really plan to rebuild the Golf Course in its prior condition anyway, so PG&E's obligations to pay for the damage it caused simply go away. Those arguments are addressed in turn below.

### A.    Neither ECC's Lease Nor Its Use of the Property Negates PG&E's Contract Obligations

The first of PG&E's arguments, although presented through much smoke and mirror, can be disposed of by reference to the Letter Agreement and the lease entered into with ECC Constructors LLC, a Delaware limited liability company ("ECC"), a copy of which is attached as part of Exhibit C to the Goodman Decl. (at p. 47 of 224) (the "ECC Lease"). PG&E's argument centers around the fact that, after it vacated Tuscan's Property, Tuscan entered into the ECC Lease for a portion of the Property, which ECC in turn used for its own base camp operations in connection with a series of *separate* restoration and remediation operations which ECC had contracted separately to perform. (*Id*. at p. 53.) PG&E argues that ECC's leasing of the Property somehow "excused and prevented" performance of PG&E's restoration obligations (Claim Objection at 13:7-9); that it breached the implied covenant of good faith and fair dealing (*Id*. at 12:20-21); and that the Letter Agreement "Expressly Recognizes that PG&E was Not Required to Restore Property Used by Others." (*Id*. at 13:17-18.) These arguments are belied by the language of the Letter Agreement, and are categorically wrong.

First, the Letter Agreement *expressly contemplates* a subsequent use, and sets forth the extent, if any, to which such a use would impact PG&E's restoration obligations. Indeed, PG&E acknowledges as much, stating in its Claim Objection: "PG&E was provided with a non-exclusive right to use the License area … because [Tuscan] was also seeking to obtain economic consideration for the use of the Property from other parties involved in Camp Fire restoration efforts." (*Id*. at 8:2-4). Consistent with that, the Letter Agreement provides at page 2:

> [A]fter January 15, 2019, in the event a public agency, such as the ones set forth above, desires to utilize all or part of the Property for activities related to the Camp Fire restoration, PG&E will coordinate with those public agencies. **If such use is not compatible with PG&E's Activities hereunder, Owner may terminate this**

**Letter Agreement on forty-five (45) days' written notice to PG&E,** in which case Owner shall reimburse PG&E any prepaid compensation … allocated to periods after the termination, in whole or in part, of this Letter Agreement. **In the event of such termination, PG&E's restoration obligations under this Letter Agreement shall be proportionately reduced based on the use of any other public agency occupying the License Area.**

(Goodman Decl. at Exh. A, p. 19 of 224 (emphasis added).)

Nothing in the Letter Agreement provides that a subsequent use would *excuse* PG&E's obligations; at best, it would make them subject to a "proportionate reduction." Moreover, and more importantly, any potential proportionate reduction of PGE's restoration obligations could arise only if (i) the owner (Tuscan) terminated the Letter Agreement, giving 45 days' written notice to PG&E (ii) because another public agency desired to use the Property (iii) for a use not compatible with PG&E's activities.

These conditions precedent to a "proportionate reduction" simply did not occur. Tuscan did not terminate the Letter Agreement, and PG&E does not suggest otherwise; it points to no evidence (and there is none) that Tuscan gave 45 days' written notice of termination. On the contrary, *PG&E notified Tuscan* on February 6, 2019 that it "expects to vacate the property by the end of February if not sooner." (McAlister Decl. at ¶ 8 & Exh. C thereto.) Indeed, PG&E had vacated the Property in or near the end of February 2019—prior to the ECC Lease, and prior to ECC's use of the Property (which use, although the Lease was dated March 22, 2019, commenced on or about April 14, 2019). (McAlister Decl. at ¶ 11; Bates Decl. at ¶ 18.) Because Tuscan did not terminate the Letter Agreement, this condition precedent did not occur, and PG&E's restoration obligation was not subject to being proportionately reduced—never mind excused.[7] Further, the ECC Lease was not with another public agency (ECC is a private entity), nor was its use incompatible with PG&E's activities, which had concluded. PG&E attempts to spin this provision, asserting that "the Letter Agreement unequivocally provides that any PG&E restoration obligation would be appropriately reduced upon early termination of the license and the subsequent use of the Property by others."

---

[7] In fact, PG&E now asserts that it paid rent through the expiration of the term of the Letter Agreement in May 2019 (Claim Objection at 8:11-12); apparently PG&E was never of the view that the Letter Agreement had been "terminated." Certainly, Tuscan never gave written notice of such a termination. (Bates Decl. at ¶ 20.)

(Claim Objection at 12:9-11.) PG&E's casual "interpretation" of the provision, however, is inconsistent with its express terms, and must be disregarded.

Nor did ECC's use hinder PG&E's ability to conduct restoration activities on the Property had it desired to do so. First, the ECC Lease expressly acknowledges PG&E's right to access the Property to fulfill its restoration obligations, stating:

> In entering into this Lease, Landlord [Tuscan] has warranted to Tenant [ECC] that:…(iv) there are no competing rights to exercise any rights of possession or control over the Premises that will interfere in any material way with Tenant's rights of possession during the Term of the Lease except as disclosed in writing to Tenant (**subject to PG&E's rights to access the Property for purposes of its restoration responsibilities following its vacating the Property**)….

(Goodman Decl. at Exh. D, p. 145 of 224 (emphasis added).)

For that reason, ECC would have been required to allow access to PG&E had it desired to conduct restoration activities on the Property. More to the point, however, PG&E had notified Tuscan not later than March 21, 2019 that it had elected to *pay for the restoration costs* rather than do the work itself. (Bates Decl. at ¶ 16; McAlister Decl. at ¶ 14 & Exh. F thereto.) Indeed, correspondence with PG&E about estimating those costs began as early as February 6, 2019 (McAlister Decl. at ¶¶ 7-9 and 13-15); the email chain includes the following:

> February 6, 2019, Courtney McAlister to Steven Norvell and Elouise del Rosario of PG&E: "Tomorrow (Thur) at around 9:30, Mo and Mark West will be at the site with Gail Pulley and Algie Pulley of Pulley Development. The purpose of the visit is to start the work of estimating restoration costs. Pulley Development was the original golf course developer/architect for Tuscan Ridge."

> February 6, 2019, Elouise del Rosario to Courtney McAlister: "I have forwarded your email to the security team and onsite lead. Also, I confirmed with the team yesterday that PG&E expects to vacate the property by the end of February if not earlier. I should have a more solid date by next week, we can continue discussions on how to proceed with restoration."

> February 6, 2019, Grant Guerra, inside counsel for PG&E to Courtney McAlister: "Courtney, I spoke with Eloise today and she updated me on her earlier message to you about PG&E's plans to surrender use of the Property. Although Eloise's message was describing PG&E's plans for use of the Property of the basecamp, we recognize there is an [sic] restoration obligation in the License. I understand your client is preparing a cost estimate for this restoration work, which we will consider once received. We are also independently evaluating performing the restoration work using our own contractors, in which case we would not be vacating the Property by the end of February. We can't identify a date certain for the return of the Property to your clients until we determine how we will complete the restoration work. So please keep this in mind, the date to vacate will be influenced by the restoration work. We have not yet evaluated the full scope of the work, and there is a possibility PG&E

will need to continue to occupy the property through the Expiration Date specified in the License, May 20."

McAlister Decl., Exhs. B-D.

Mr. Guerra's mention of performing the restoration work was the last time it was raised by PG&E. Following March 19, 2019 WebEx meetings noted in the email chain (*see* McAlister Decl., Exh. F), it was clear the focus was exclusively on PG&E's payment for the cost of restoration:

<u>March 21, 2019, Courtney McAlister to (among recipients) Tom Crowley, Elouise del Rosario and Grant Guerra of PG&E</u>: "I spoke with Grant Guerra today about a way to resolve the restoration issues. As I think you know, we're going to work on a short agreement that obligates PG&E to make a payment to Tuscan Ridge in exchange for termination of the license agreement and release of remaining obligations under the license agreement. ***.[8] As you know from our meeting on Tuesday, those figures were subject to change based on the damages to the two additional golf course holes. Greg Melton's revised estimate is attached."

<u>March 22, 2019, Tom Crowley to Courtney McAlister</u>: "Thank you for the message and the attached estimate. I understand you are working with Grant to determine the form of our agreement. In the meantime, I will review the estimate and also work to quantify the extent of damage and/or required restoration so we can agree on extent. **After that we will work on agreeing to a value**…."

McAlister Decl., Exhs. F-G (emphasis added).

Outside of those emails, PG&E confirmed to Tuscan repeatedly its intent to pay for—rather than perform—its restoration obligations. (McAlister Decl. at ¶¶ 6, 10, 13-15 & 18; Bates Decl. at ¶ 16.). Accordingly, PG&E never asked to enter the Property to perform restoration work, and of course never complained that it was being denied access or that its performance was prevented. (Bates Decl. at ¶ 19; McAlister Decl. at ¶ 16.) For all those reasons, PG&E's protests more than two years later that it was prevented from doing the work—and thus excused from the entire restoration obligation—are disingenuous.

PG&E makes unsupported allegations that Tuscan had not informed PG&E of the ECC Lease when it sent its revised Restoration Estimate on March 20, 2019. Passing for a moment on the complete irrelevance of that allegation, that too is contradicted by the evidence; Courtney

---

[8] Although Fulcrum does not concede that the balance of the email chain is protected as a settlement communication, out of an abundance of caution portions related to discussion of the amount and form of agreement are omitted here.

McAlister emailed PG&E on that same date confirming a conversation with PG&E about ECC's use, indicating the expectation of a "formal agreement" with them. (McAlister Decl. at Exh. E). PG&E did not protest; instead, it quickly resumed discussions about a payment of the estimated costs.

Nor is it otherwise relevant that Tuscan leased a portion of the Property to ECC allowing its use after PG&E vacated. As set forth below, the cost estimates for restoration of damage caused by PG&E were prepared before ECC even began its use, and were based on the condition of the Property when PG&E vacated. The claim against PG&E is based solely on damage caused by PG&E's use as demonstrated by the cost estimate upon which the Claim is based, which is dated March 20, 2019. (Goodman Decl., Exh. A at p. 24 of 224.) The same is true of the updated Opinion of Probable Cost prepared by John Moreno of Sierra West,[9] who based his OPC on the same data used in the original cost estimate, confirming measurements using Google Earth and CAD software, and utilizing nationally recognized Pricing Guides to prepare his estimate. (Declaration of John Moreno in Support of Response to Claim Objection ("Moreno Decl.") at ¶¶ 6-8 and Exhs. A and B thereto.)

PG&E's hazy assertion that Tuscan breached the implied covenant of good faith and fair dealing by entering into the ECC Lease is not cognizable. First, as discussed above, the Letter Agreement expressly provided the right for Tuscan to enter into such a lease, and there can be no implied covenant which contradicts the express terms of the contract. As stated in a seminal ruling on the matter by the California Supreme Court (also relied upon by PG&E): "[A]s to acts and conduct authorized by the express provisions of the contract, no covenant of good faith and fair dealing can be implied which forbids such acts and conduct. And if defendants were given the right to do what they did by the express provisions of the contract there can be no breach." *Carma Developers (Cal.), Inc. v. Marathon Dev. Cal., Inc.*, 2 Cal.4th 342, 374 (1992) (internal quotations and citations omitted). Of course, nothing in the ECC Lease deprived PG&E of any benefit of the

---

[9] Mr. Moreno is the chief estimator for Sierra West Group, one of California's leading construction cost estimators, with 19 years of experience preparing estimated cost analyses for major public and private construction projects. Moreno Decl. at ¶¶ 1 & 2.

Letter Agreement; PG&E had concluded its use, and the ECC Lease specifically provided for PG&E's continuing right to come on the Property to perform restoration. There was no surprise, and certainly nothing nefarious, about Tuscan "profiting" from its own Property after PG&E concluded its activities there.

Finally, PG&E's suggestion that Tuscan "Appropriated PG&E's Improvements" (Claim Objection at 14:6) is particularly difficult to swallow. PG&E deposited hundreds of tons of gravel on the Property (the presumed "improvements"), wiped out the topography, destroyed pathways and irrigation systems, and left a barren patch of land in place of what was a functional golf course prior to its use. PG&E did not reserve any ownership interests in the rock and gravel, and nothing in the Letter Agreement prohibits Tuscan from using it or allowing a third party to do so; moreover, of note, despite the fact that ECC vacated the Property over a year ago, at no time has PG&E ever indicated any intention or interest in removing the base rock. (Bates Decl. at ¶ 19.)

### B. Tuscan's Own Use of its Property Subsequent to PG&E's Use Does Not Negate PG&E's Contract Obligations

PG&E also claims to have relied on purported "representations" by Tuscan that it was required by Butte County to maintain the Golf Course (Claim Objection, 7:24-27), arguing (without any pretense of evidentiary support) that Tuscan instead was "seeking to completely redevelop the property into a commercial and housing development without a 18-hole golf course and without the 'improvements' that existed on the Property as of November 19, 2018." (Claim Objection, 15:6-8.) Once again, however, the Letter Agreement expressly precludes PG&E's argument that it relied on representations by Tuscan, as it contains an integration clause stating that it "supersedes all previous oral and written agreements between and representation by or on behalf of the parties and constitutes the entire agreement of the parties with respect to the subject matter hereof." (Letter Agreement at p. 3.) Had Tuscan in fact made such a representation, it does not appear in the Letter Agreement, and thus it was superseded. Moreover, to the extent PG&E contends that any such representation would have been untrue, it is demonstrably wrong. The General Plan for Butte County did at the time, and does today, provide for maintenance of a golf course as a prerequisite to Tuscan's plans for a residential development. (RJN, Exh. A.) For that reason, even if PG&E actually relied on any

such representation, it was not only superseded but was true and accurate.

Finally, although Tuscan owes no explanations, it bears pointing out that if Tuscan changes its specific plans for the Golf Course, it will be *because of PG&E's breach* of the Letter Agreement. As a direct result of PG&E's wrongful conduct, Tuscan has been unable to restore the Golf Course, and because of PG&E's indefensible delays and the exponentially increasing costs of construction in the area (*see* Moreno Decl. at ¶ 9), Tuscan does not know if it will ever be able to rebuild what was. For that reason, Tuscan has indeed begun to explore whether it can satisfy the General Plan with a smaller golf course. However, that circumstance was necessitated by PG&E's own wrongdoing, and PG&E should not be permitted to benefit from it. *See Schellinger Bros. v. Cotter*, 2 Cal. App. 5th 984, 1006 (Cal. App. 2016) ("A party to a contract cannot take advantage of his own act or omission to escape liability thereon. Where a party to a contract prevents the fulfillment of a condition or its performance by the adverse party, he cannot rely on such condition to defeat his liability.") (quoting *Nelson v. Reisner*, 51 Cal.2d 161, 171 (Cal. 1958)).

All of that said, even if Tuscan did pivot to a different use for its Property consistent with local requirements, that would be its absolute right—and nothing in the Letter Agreement prohibits such a change. PG&E's efforts to imply such a limitation on Tuscan's use of its own Property is completely unsupported and contrary to well-established tenets of real property law.

Finally, PG&E argues that Tuscan's purported change of plans is "wholly contrary to the intent of the Letter Agreement." Claim Objection at 15:8-9. Respectfully, PG&E speaking to the intent of the Letter Agreement when it has breached it in the most fundamental respect is more than a little insincere. Both the letter and the spirit of the Letter Agreement were to make Tuscan whole after PG&E's use—and *that* spirit has been breached and broken.

//
//
//
//
//
//
//
//
//
//

## CONCLUSION

This matter falls very much in the category of "no good deed goes unpunished." Tuscan provided a critical base for PG&E to assist the community which had been decimated by a fire caused by it, for which Tuscan has been rewarded with more than two years of litigation and stonewalling. For the foregoing reasons, Fulcrum and Tuscan respectfully request that the Court overrule Debtor's objection.

DATED: October 26, 2021　　　　　　　　ALSTON & BIRD, LLP


By: /s/ Diane C. Stanfield
　　　DIANE C. STANFIELD
　　Attorneys for Fulcrum Credit Partners, LLC