ALSTON & BIRD, LLP
DIANE C. STANFIELD (CA Bar No. 106366)
DOUGLAS J. HARRIS (CA Bar No. 329946)
diane.stanfield@alston.com
douglas.harris@alston.com
333 S. Hope Street 16th Floor
Los Angeles, California 90071
Telephone: 213.576.1000
Facsimile: 213.576.1100

Attorneys for
Fulcrum Credit Partners LLC

DOWNEY BRAND LLP
JAMIE P. DREHER (CA Bar No. 209380)
Email: jdreher@downeybrand.com
TYLER J. HORN (CA Bar No. 323982)
Email: thorn@downeybrand.com
621 Capitol Mall, 18th Floor
Sacramento, California 95814
Telephone: 916.444.1000
Facsimile: 916.444.2100

Attorneys for
Tuscan Ridge Associates, LLC

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| In re<br><br>PG&E Corporation,<br><br>and<br><br>PACIFIC GAS AND ELECTRIC COMPANY,<br><br>Debtors.<br><br>[ ] Affects PG&E Corporation<br>[] Affects Pacific Gas and Electric Company<br>[x] Affects both Debtors<br><br>*All papers shall be filed in the Lead Case, No. 19-30088-DM, | Case No. 19-30088-DM<br><br>Chapter 11<br>Lead Case, Jointly Administered<br><br>**DECLARATION OF SCOTT BATES IN SUPPORT OF RESPONSE TO REORGANIZED DEBTORS' OBJECTION TO PROOF OF CLAIM NO. 58562**<br><br>Date: November 9, 2021<br>Time: 10:00 a.m.<br>Crtrm.: Courtroom 17<br>450 Golden Gate Avenue<br>San Francisco, CA 94102<br>Judge: Hon. Dennis Montali |

///

I, Scott Bates, declare as follows:

1. I provide this declaration in support of Fulcrum Credit Partners, LLC's Response to the Pacific Gas & Electric Company's ("PG&E") Objection to Proof of Claim No. 58562, provide this testimony based on my personal knowledge, and would testify consistently herewith if called to do so.

2. I am the managing member of Tuscan Ridge Associates, LLC ("Tuscan"). Tuscan is the owner of real property located in Paradise California commonly identified as Assessor's Parcel Nos. 040-520-103 and 040-520-100 (the "Property").

3. Previously, the Property included an 18 hole golf course with rolling hills and breathtaking views. True and correct copies of pictures taken from the internet which accurately depict the Property's original topography and views are attached hereto as **Exhibit A**. [1] In an attempt to take advantage of this prime real estate, since as early as 2005, it has always been Tuscan and its predecessor's plan to develop a residential community on the Property. As part of this plan, Tuscan made the decision to close the golf course in 2017 and focus on development of the Property.

4. In developing the Property, Tuscan must maintain a golf course on the Property, as required by the Butte County General Plan 2030 Land Use Element 4-32.

5. Tuscan expended considerable time, effort, and resources to prepare the Property for development. Based on these efforts, Tuscan was expecting to apply for final permits and entitlements which would allow development of the residential golf course community to begin in Spring of 2019.

6. In September 2018, Tuscan entered into an Agreement with Pacific Gas & Electric Company ("PG&E") which allowed PG&E to use portions (i.e. the driving range and parking lot) of the Property to store its vegetation management and fire prevention equipment.

///

---

[1] To be clear, Tuscan acknowledges that the Property was not lush and green as depicted in these pictures at the time PG&E used the Property because the Golf Course had been closed

7.      In early November 2018, I learned that PG&E had finished its vegetation and fire management activities and no longer needed the use of the Property and planned to vacate the Property. As such, PG&E began to significantly reduce its presence on the Property.

8.      Then on November 8, 2018, the "Camp Fire" ravaged Paradise, California and surrounding Butte County.

9.      Shortly after the "Camp Fire" leveled Paradise, PG&E, and despite previous statements that it would be vacating the Property, drastically increased its presence on the Property. PG&E also commandeered significant portions of the Property for use as a basecamp for its employees, as they worked to restore utilities for those affected by the Camp Fire that were not part of the previous agreement where the Property would be used to store vegetation and fire prevention equipment.

10.     Recognizing the urgent need, we (Tuscan and its partners) immediately began to discuss terms authorizing PG&E's existing and future use of the Property with PG&E. Quickly, PG&E informed us that they needed to level and winterize the Property. Based on PG&E's agreement that the Property would be restored to its the condition it was in prior to PG&E's use, we agreed. Thereafter, PG&E leveled the once rolling hills on the Property and dumped a layer of road base (i.e. gravel) on approximately 80 acres of the Golf Course. The gravel that PG&E brought onto the Property contains lime and as result has the potential to cause additional damage to the soil. True and correct copies of pictures showing PG&E's base camp and equipment on the Property are attached hereto as **Exhibit B**.

11.     On or about November 20, 2018, Tuscan and PG&E executed the Letter Agreement (the "Agreement") which memorialized, among other terms, PG&E's restoration and maintenance obligations relative to the Property. A true and correct copy of the Letter Agreement is attached hereto as **Exhibit C**.

12.     In early February of 2019, PG&E informed Tuscan that it would not need the Property for the entire duration of the Agreement, and that PG&E would be vacating the Property early. Consistent with this statement, PG&E vacated the property in or about the end of February.

///

13. In late February, Tuscan hired Algie Pulley, the architect of the golf course, and Melton Design Group to prepare a cost estimate relating to PG&E's restoration obligation. The initial cost estimate was dated March 5, 2019.

14. Shortly thereafter on or about March 7, 2019, I met with PG&E and representatives from its outside contractor, Turner Construction, to meet and confer as required by the Agreement regarding PG&E's obligations with respect to the restoration of the Property to its Baseline Condition,. Specifically, I met with Tom Crowley from PG&E and Tim Blood from Turner Construction. During this meeting, I provided PG&E with a copy of the initial cost estimate, which consisted of an initial conceptual model from Melton Design Group and Mr. Pulley.

15. When I presented PG&E and the representatives from Turner Construction with that initial estimate, I was told that it was way too low. In fact, representatives from Turner Construction, Tim Blood, stated that they would not even make the trip to the Property to begin the restoration for less than $12,000,000. Specifically, Mr. Blood indicated that some of the line items were below industry standard and other line items that Turner would account for were missing from our conceptual model.

16. Additionally, PG&E representatives told me that it intended to make a monetary payment to Tuscan as opposed to actually performing the restoration work itself. As such, Tuscan asked Mr. Pulley and Melton Design Group to revise the cost estimate based on PG&E's input.

17. On or about March 21, 2019, Tuscan provided PG&E with Mr. Pulley's and Melton Group's revised cost estimate concerning PG&E's restoration obligation.

18. Although Tuscan Ridge executed the lease agreement with ECC Constructors LLC's ("ECC") on or about March 22, 2019, ECC did not begin occupying any portion of the Property until April 14, 2019.

19. I did not thereafter hear from PG&E until approximately June 26, 2020, when Mr. Crowley appeared at the Property. Had PG&E requested to access the Property to perform its restoration obligation, I was prepared to work with PG&E and ECC to make the Property available to PG&E and allow the restoration work to be completed. However, at no point in time did Mr. Crowley or any other PG&E representative contact me to discuss ECC's presence on the

Property, object to ECC's use of the Property, or request access to the Property to perform restoration activities. Moreover, at no point in time did any PG&E representative express any intention or request to enter the Property to remove the gravel.

20. At no point in time before or after Tuscan's execution of the lease agreement with ECC did Tuscan indicate in any way that it was terminating the Letter Agreement with PG&E.

I declare under penalty of perjury under the law of the United States of America that the foregoing statements are true and correct.

October 26, 2021

By: _____
SCOTT BATES

# EXHIBIT A

# EXHIBIT A


A view of hole #4 at Tuscan Ridge Golf Club. Tuscan Ridge GC


A look back on the 3rd hole at Tuscan Ridge.





# EXHIBIT B

# EXHIBIT B




# EXHIBIT C

# EXHIBIT C



Elouise Del Rosario
PG&E – Land Acquisition
245 Market Street, San Francisco, CA 94105
C: (628) 219-8228
Elouise.DelRosario@pge.com

**LETTER AGREEMENT**

November 20, 2018

Tuscan Ridge Associates, LLC
c/o E. M. West
6774 Woodland Drive
Paradise, CA 95969

RE: Temporary License for Use of Portion of Parcel of Land
3100 Skyway Road, Chico, CA, APN: 040-520-103; 040-520-100

Dear Mr. West:

Public records indicate that Tuscan Ridge Associates, LLC is the owner ("Owner") of the parcel of land referenced above (the "Property"). Pacific Gas and Electric Company ("PG&E") would like to memorialize its temporary use of a portion of the Property, commencing November 19, 2018, and expiring on May 20, 2019 (the "Expiration Date"), as a support site and base camp in connection with the Camp Fire restoration, that will include significant alterations to the Property, necessitated by the Camp Fire. Notwithstanding the foregoing, in the event PG&E's Activities continue beyond the Expiration Date, with the consent of Owner, such use shall be on a month to month basis, terminable on forty-five (45) days' advance written notice by either party, in which case the Owner shall reimburse PG&E any prepaid compensation allocated to periods after the termination of this letter agreement ("Letter Agreement").

This Letter Agreement sets forth the terms and conditions of PG&E's temporary use of the "License Area" outlined in red on the attached drawing labeled "Exhibit A" When countersigned by PG&E and returned to you, this Letter Agreement shall serve to memorialize your grant of a temporary license, not coupled with an interest, to PG&E. This Letter Agreement supersedes all previous oral and written agreements between and representations by or on behalf of the parties and constitutes the entire agreement of the parties with respect to the subject matter hereof. This Letter Agreement may not be amended except by a written agreement executed by both parties.

PG&E will use the License Area in connection with its emergency response operations in the area. PG&E and its employees, contractors, agents and representatives ("PG&E Representatives") may enter the License Area for the sole purpose of establishing a base camp and staging area to support the command, control and coordination of emergency response, which may include the staging of vehicles, equipment, supplies, and materials used in connection with PG&E's electric and gas utility operations, the disposal of used, treated wood poles, the landing of helicopters, and the temporary residency of PG&E Representatives ("PG&E's Activities").

During the term of this Letter Agreement, PG&E has the non-exclusive right to use the License Area, along with the right of ingress and egress thereto. The license granted hereunder is personal to PG&E and may not be assigned by PG&E without the prior written consent of Owner. PG&E agrees and acknowledges that other public agencies (such as the County of Butte, FEMA, OES, GSA, etc.) may desire to use all or some of the Property, including the License Area. If Owner consents to such other use(s), PG&E agrees to reasonably cooperate in good faith with Owner and such other public agencies to

1

Case: 19-30088    Doc# 11479-1    Filed: 10/26/21    Entered: 10/26/21 15:58:42    Page 12 of 16

jointly use the Property and the License Area in whatever manner reasonably necessary to further the restoration efforts. Subject to the foregoing, PG&E has the right to erect and maintain temporary fencing and gates with a locking device to enclose the License Area, and shall remove such fencing and gates when PG&E has demobilized and vacated the License Area. Subject to PG&E's obligations to reasonably cooperate with Owner and other agencies as set forth above, the license granted hereunder will be irrevocable during the term of PG&E's Activities, except in the case of a material breach of the terms of this Letter Agreement. Notwithstanding the foregoing, after January 15, 2019, in the event a public agency, such as the ones set forth above, desires to utilize all or part of the Property for activities related to the Camp Fire restoration, PG&E will coordinate with those public agencies. If such use is not compatible with PG&E's Activities hereunder, Owner may terminate this Letter Agreement on forty-five (45) days' written notice to PG&E, in which case Owner shall reimburse PG&E any prepaid compensation (both Rental Fee and Independent Consideration) allocated to periods after the termination, in whole or in part, of this Letter Agreement. In the event of such termination, PG&E's restoration obligations under this Letter Agreement shall be proportionately reduced based on the use of any other public agency occupying the License Area.

In consideration for your willingness to enter into this Letter Agreement with PG&E to support the emergency response initiative, PG&E hereby offers to pay you the following:

**Twenty-Five Thousand dollars ($25,000.00)** per week as compensation for use of the License Area for PG&E's Activities, one thousand dollars ($1,000.00) per week for the use of the "Club House," seven hundred fifty dollars ($750.00) per week for the use of the "Pro Shop," as designated on Exhibit A and collectively referred to as the License Area. These fees of **$26,750.00 per week for a total of $695,500** shall be referred to herein as the "Rental Fee" and PG&E shall pay Three Hundred Forty-Seven Thousand Seven Hundred Fifty Dollars **($347,750.00)** in advance, and shall continue to pay **$26,750.00** per week, on a weekly basis until the Rental Fee is paid in full.

Within fourteen days of full execution of this Letter Agreement, PG&E shall pay Owner Five Hundred Thousand Dollars ($500,000) (the "Independent Consideration") as additional consideration for Owner's execution, delivery and performance of this Letter Agreement. The Independent Consideration is in addition to and independent of the Rental Fee, provided, however, that Owner shall reimburse PG&E that portion of the Independent Consideration allocated to periods after any termination, in whole or in part, of this Letter Agreement.

PG&E will furnish and install a water pump with generator and water meter monitor as well as pump discharge facilities to bring in water from a nearby irrigation pond to supply the on-site water for dust abatement. PG&E will pay $5/per acre foot to the owner for the water service. Owner shall grade and winterize the site for PG&E's use following PG&E's provided scope of work and schedule PG&E will reimburse the Owner for the costs of grading and winterization at the standard industry rates for such services. Payment is due and payable bi-weekly within 10 days after invoice is submitted to PG&E. In exercising the rights granted under this Letter Agreement, PG&E shall comply with all laws, ordinances, and regulations pertaining to its use of the License Area. PG&E shall be responsible for the payment of any increase in property taxes and assessments resulting from a reassessment of the Property related to PG&E's Activities. PG&E shall keep the License Area and Property free from any and all liens, including, without limitation, mechanics' liens, arising out of the work performed, materials furnished, or obligations incurred by PG&E. Owner may post and keep posted on the Premises notices of non-responsibility.

PG&E agrees to indemnify, defend and hold Owner, its partners, employees, agents and consultants harmless against any losses, costs, damages, expenses or liabilities connected with or resulting from the injury to or death of any person, or damage to or loss or destruction of any property arising out of the

negligent acts or omissions of PG&E, its employees, agents, subcontractors or invitees, under this Letter Agreement.

PG&E shall, at its sole cost and expense, maintain and restore the License Area, including the roads and parking lot(s), including any areas of ingress and egress, in as good of condition as it was prior to PG&E's use of the area (the "Baseline Condition"), provided, however, PG&E shall not be required to replace the existing sod, turf and grass within the License Area. PG&E agrees and acknowledges that the Baseline Condition includes the Property's current condition as of the date of this Letter Agreement, prior to the grading and winterization activities that Owner will perform for PG&E. The Baseline Condition includes the currently closed 18-hole golf course improvements on the Property, including the fairways and greens (that is, the grading and contours of such fairways and greens but excluding any sod, turf and grass in such areas), bunkers, ponds, sprinkler systems and related improvements. Inasmuch as Owner's grading and winterization activities, as well as PG&E's Activities, will cause permanent damage to the golf course improvements, PG&E's restoration obligations at the end of the term of this Letter Agreement include restoring the License Area in a professional manner to the Baseline Condition (including the golf course improvements as described above), at PG&E's sole cost and expense. All other existing improvements located on the Property are to be protected in place, unless otherwise agreed to by Owner. PG&E shall make no alteration, improvements, borings, installations or fixtures to the Property without prior written consent by Owner. Any damage to the Property or License Area caused by PG&E's Activities shall be promptly repaired by PG&E at its sole cost and expense.

At the expiration or earlier termination of this Agreement, PG&E shall meet and confer with Owner as to the nature and scope of the restoration work. If PG&E and Owner cannot agree on the extent of PG&E's restoration obligations set forth above, then the parties shall engage a third party neutral (the "Arbitrator") to estimate the cost to restore the License Area to the Baseline Condition, as set forth above. The Arbitrator shall have at least ten (10) years of experience in the construction industry. The cost of the Arbitrator shall be shared equally between PG&E and Owner. At the option of Owner, Owner may elect to have PG&E cause the completion of the restoration obligations at PG&E's sole cost and expense, or the Owner may elect for PG&E to pay to Owner the amount estimated by the Arbitrator to complete the restoration, due and payable within thirty (30) days following PG&E's receipt of written notice from Owner of such election to complete the restoration..

PG&E shall have the right to self-insure with respect to any of the insurance requirements required under this Letter Agreement. PG&E's self-insurance program is in full force and effect and in compliance with and subject to all the terms, agreements, covenants, conditions and provisions of this Letter Agreement and shall at a minimum include (a) commercial general liability insurance covering PG&E's Activities, with a combined single limit for bodily injury and property damage of not less than $5,000,000 per occurrence and $10,000,000 in the aggregate, (b) Worker's Compensation Insurance (at the minimum required by law) for all persons employed in carrying out activities in the License Area, and (iii) Automobile Liability insurance covering all owned, hired and non-owned vehicles brought onto the License Area, with limits of at least $2,000,000 combined single limit per occurrence for bodily or personal injury or death, for property damage and loss of use thereof.

The Letter Agreement signed on September 14, 2018 and Amendment on October 16, 2018 is hereby terminated. This Letter Agreement supersedes all previous oral and written agreements between and representation by or on behalf of the parties and constitutes the entire agreement of the parties with respect to the subject matter hereof.

If the terms and conditions of this Letter Agreement are acceptable to you, please acknowledge your agreement by signing this letter. Please return a copy to E1DQ@pge.com. A fully-executed copy of this Letter Agreement will be provided to you for your records.

If you have any questions regarding this Letter Agreement, please contact me at 628-219-8228. Thank you for your willingness to work with PG&E during the Camp Fire wildfire emergency response. Your support is truly making a difference in the community.

Sincerely,

Elouise Del Rosario
Land Acquisition

I/we hereby accept the foregoing terms and conditions of this Letter Agreement, and acknowledge that I/we am/are duly authorized to execute this Letter Agreement:

PROPERTY OWNER

By: _____
Elmo West, signing on behalf of Tuscan Ridge Associates, LLC

Date: 11-20-18

PACIFIC GAS AND ELECTRIC COMPANY

By: _____
~~Emad Gholami~~ Aimee Crawford
AC ~~Supervisor, Land Acquisition~~ Director, Land Management

Date: 11/20/2018

4

Case: 19-30088    Doc# 11479-1    Filed: 10/26/21    Entered: 10/26/21 15:58:42    Page 15 of 16

# Exhibit A
Tuscan Ridge, 3100 Skyway Road, Chico, CA

☐ License Area, approximately 100 Acres Total



Contact:
Mark West, 530-624-4454, westm15@gmail.com
Mo West, 530-520-4529, emowesthill@gmail.com

5