| | |
|---|---|
| KELLER BENVENUTTI KIM LLP<br>Tobias S. Keller (#151445)<br>(tkeller@kbkllp.com)<br>Jane Kim (#298192)<br>(jkim@kbkllp.com)<br>David A. Taylor (#247433)<br>(dtaylor@kbkllp.com)<br>650 California Street, Suite 1900<br>San Francisco, CA 94108<br>Tel: 415 496 6723<br>Fax: 650 636 9251 | GOUGH & HANCOCK LLP<br>Gayle L. Gough (#154398)<br>(gayle.gough@ghcounsel.com)<br>Laura L. Goodman (#142689)<br>(laura.goodman@ghcounsel.com)<br>50 California Street, Suite 1500<br>San Francisco, CA 94111<br>Tel: 415.848-8918 |

*Attorneys for Debtors and Reorganized Debtors*

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF CALIFORNIA
# SAN FRANCISCO DIVISION

| | |
|---|---|
| In re:<br><br>PG&E CORPORATION,<br><br>- and -<br><br>PACIFIC GAS AND ELECTRIC COMPANY,<br><br>Debtors.<br><br>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>☒ Affects both Debtors<br><br>* *All papers shall be filed in the Lead Case, No. 19-30088 (DM).* | Bankruptcy Case No. 19-30088 (DM)<br><br>Chapter 11<br><br>(Lead Case) (Jointly Administered)<br><br>**REORGANIZED DEBTORS' REPLY IN SUPPORT OF OBJECTION TO PROOF OF CLAIM NO. 58562 FILED BY FULCRUM CREDIT PARTNERS LLC AS TRANSFEREE OF TUSCAN RIDGE ASSOCIATES, LLC AND REQUEST FOR SCHEDULING ORDER**<br><br>**[Related to Docket Nos. 11288, 11479]**<br>Date: November 9, 2021<br>Time: 10:00 a.m. (Pacific Time)<br>Place: (Tele/Videoconference Appearances Only)<br>United States Bankruptcy Court<br>Courtroom 17, 16th Floor<br>San Francisco, CA 94102 |

**TABLE OF CONTENTS**

I. INTRODUCTION ................................................................................................................. 1

II. REPLY TO FULCRUM'S ALLEGATIONS ..................................................................... 2

III. REPLY TO FULCRUM'S LEGAL CONTENTIONS ...................................................... 5

    A. PG&E Did Not Breach the Letter Agreement ............................................... 5

        1. TRA Prevented PG&E's Performance and Breached the Implied Covenant of Good Faith and Fair Dealing ......................................................................... 7

        2. Under the Letter Agreement, PG&E Is Not Required to Restore Property Used by Others ................................................................................................ 8

    B. TRA Appropriated PG&E's Improvements for Its Own Economic Gain ...................... 10

    C. The Letter Agreement Provided for Restoration of the License Area to Its Prior Condition, Not Payment of Millions of Dollars to TRA for Its Redevelopment Plans and/or Enrichment ............................................................................... 11

    D. PG&E Is Not Liable for Trespass or Waste ................................................. 12

IV. PG&E REQUESTS THAT THE COURT ISSUE A SCHEDULING ORDER ........................ 12

V. RESERVATION OF RIGHTS ........................................................................................ 13

# TABLE OF AUTHORITIES

**Cases**

*Butchers' Union v. Cudahy Packing Co.,* 66 Cal. 2d 925, 943 (1967) .................................................. 4, 9

*Carma Developers, Inc. v Marathon Development California, Inc.*, 2 Cal.4th 342, 371-72 (1992) ..... 7-8

*Harris v. Klure*, 205 Cal. App. 2d 574, 578 (1962) ............................................................................... 9

*Howe v. American Baptist Homes of West, Inc.*, 112 Cal. App. 3d, 622, 627 (1980) ......................... 6, 9

*Lectrodryer v. Seoulbank*, 77 Cal. App. 4th 723, 727 (2000) ................................................................ 11

*Legacy Vulcan Corp. v. Superior Court*, 185 Cal. App. 4th 677, 688 (2010) ......................................... 6

*Racine & Laramie, Ltd. v. Department of Parks & Recreation*, 11 Cal.App.4th 1026, 1031-32 (1992) . 8

*Wright v. Coberley-West Co.*, 250 Cal.App.2d 31, 36 (1967) ................................................................. 9

**Statutes and Rules**

Bankruptcy Local Rule 3007-1(b) ......................................................................................................... 12

Cal. Civ. Code §§ 1636 ........................................................................................................................... 6

Cal. Civ. Code § 1638 ............................................................................................................................. 9

Cal. Civ. Code §§ 1639 ........................................................................................................................... 6

Cal. Civ. Code §§ 1647 ........................................................................................................................... 6

Fed. R. Evid. 408 .................................................................................................................................... 4

**Other Authorities**

CACI No. 325 ....................................................................................................................................... 11

In advance of the November 9, 2021, 10:00 a.m. omnibus hearing (the "**Hearing**"), PG&E Corporation ("**PG&E Corp.**") and Pacific Gas and Electric Company (the "**Utility**"), as debtors and reorganized debtors (collectively, "**PG&E**," the "**Debtors**" or the "**Reorganized Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), hereby submit this reply brief in support of the *Reorganized Debtors' Objection to Proof of Claim No. 58562 Filed by Fulcrum Credit Partners LLC as Transferee of Tuscan Ridge Associates, LLC* [Docket No. 11288] (the "**Objection**")[1] and in reply to the *Response to Reorganized Debtors' Objection to Proof of Claim No. 58562 Filed by Fulcrum Credit Partners LLC as Transferee of Tuscan Ridge Associates, LLC* [Docket No. 11479] (the "**Response**").

## I. INTRODUCTION

Fulcrum's Response to PG&E's Objection does little more than affirm that this Claim involves highly disputed questions of material facts that will need to be resolved in determining the merit of Fulcrum's claims and PG&E's defenses thereto. This is a significant matter involving a large sum of money and presenting a multitude of legal and factual issues. As Fulcrum's $12,000,000-plus claim was first made in this bankruptcy proceeding, no discovery has yet occurred.[2] Resolution of the issues presented by PG&E's Objection and Fulcrum's Response thereto will require an evidentiary hearing. There are a number of factual inaccuracies in Fulcrum's Response and its supporting declarations, as to which PG&E will be able to present the full evidence following the necessary discovery, including examination of Fulcrum's witnesses in depositions.

The parties have met and conferred on a schedule for discovery and resolution of the Claim and PG&E's Objection, but have not yet reached agreement. In the absence of a consensual schedule, PG&E respectfully requests that the Court issue a scheduling order at the initial hearing and status conference on November 9, 2021, to provide the parties with sufficient time to exchange written discovery, conduct third-party discovery, take witness depositions, set periodic status conferences, and

---

[1] Capitalized terms used but not defined herein have the meanings ascribed to them in the Objection.

[2] During the parties' informal discussions, PG&E requested essential documents from Fulcrum, which Fulcrum claimed it did not need to provide and refused to provide.

dates for an evidentiary hearing.

## II. REPLY TO FULCRUM'S ALLEGATIONS

PG&E disputes nearly all of Fulcrum's allegations and arguments, including many of the allegations made in the declarations submitted with Fulcrum's Response.

Prior to the Camp Fire, the Tuscan Ridge golf course had fallen into a state of disrepair. While Fulcrum contends that it simply stopped irrigating the golf course in 2017, the golf course improvements suffered from much more than a lack of irrigation. TRA also filed a separate Fire Victim Trust Proof of Claim claiming that it suffered compensable property damage (as well as loss of use and other damages claims) as a result of the November 8, 2018 Camp Fire. [Proof of Claim No. 45321.]

Fulcrum continues to repeat the argument that PG&E somehow was not authorized to occupy the license area but "commandeered" it. Fulcrum is wrong. PG&E was authorized by TRA to use the license area at all times relevant herein. After the Camp Fire, TRA expressly authorized PG&E to use the new license area for its response operations, which authorization was subsequently memorialized in the November 20, 2018 Letter Agreement. It cannot reasonably be disputed that PG&E had the right to use the license area and paid rent to TRA for its use thereof. (Jadhav Decl., ¶¶ 2-4 and Exs. A-C.)

The Letter Agreement provides that TRA would license the property to PG&E in exchange for payment of rent, additional consideration and other obligations in the Letter Agreement. The Letter Agreement also establishes that TRA represented to PG&E that it was to maintain the golf course *as it existed on November 19, 2018* after the Camp Fire, that PG&E (at PG&E's expense) would winterize a portion of the license area through grading, gravel and rock sufficient to support PG&E equipment and operations, and that upon expiration of the license, PG&E would return the license area to the condition it was in on November 19, 2018, provided that TRA did not permit incompatible use by another party.

PG&E advised TRA in early February 2019 that it might be interested in an early termination of the license. The parties engaged in *compromise negotiations* at this time concerning a potential early termination of the license. Right away TRA was telling PG&E that it was going to obtain

1   "restoration estimates," none of which PG&E requested nor otherwise agreed to pay as PG&E had the
2   absolute right to perform any necessary restoration to the "Baseline Condition" (as defined in the
3   Letter Agreement) itself, and PG&E was still planning when it would leave the property.
4       In early March 2019, PG&E sent contractors to the property for the purpose of conducting its
5   own site reconnaissance. When TRA learned that the PG&E contractors were visiting the property,
6   TRA advised PG&E that it wanted to meet and provide PG&E with TRA's "cost of restoration"
7   estimate during PG&E's visit. Again, PG&E had not requested any restoration estimate be prepared
8   nor provided by TRA, never agreed to pay TRA such "estimated" cost, never waived its contractual
9   right to perform the restoration work itself, and was still planning when it would leave the property.
10      TRA's initial and supplemental estimate of "restoration costs" raised significant questions for
11  PG&E concerning the scope of the work TRA claimed needed to be performed in light of the known
12  Baseline Condition of the Property. The estimates were prepared by Pulley, the original designer and
13  architect of the TRA golf course back in the early 2000s and a company named Melton, which had
14  prepared a conceptual site model for TRA's future development that was inconsistent with the property
15  as it existed on November 19, 2018. Neither Pulley nor Melton had knowledge of the actual condition
16  of the license area as it existed on November 19, 2018 and the estimates were not in accordance
17  therewith. Further, neither Pulley nor Melton took into account TRA's decision to allow ECC onto the
18  property and ECC's use of the property, which was incompatible with TRA's agreement with PG&E.
19      Shortly after receiving TRA's "updated restoration estimate," and before TRA executed the
20  ECC Lease, PG&E discontinued the compromise negotiations. TRA nonetheless continuously and
21  aggressively sought a multi-million dollar monetary payment from PG&E in lieu of having PG&E
22  perform the restoration work that would be necessary to remove the PG&E earthwork improvements or
23  otherwise work on the property.
24      At no time during these negotiations did TRA disclose that it was actively negotiating the ECC
25  Lease, which required large-scale excavation, trenching and construction for temporary and permanent
26  improvements to the property along with a housing camp and related facilities sufficient to house and
27  feed over a thousand ECC workers. TRA did not disclose that the work to be performed would
28

necessitate heavy use of the PG&E license area as well significant construction in and on the license area, the area that was to be restored to the Baseline Condition at the end of PG&E's use of the property.

TRA did not disclose that the restoration work under the Letter Agreement would not and could not be performed consistent with the expected use of ECC and TRA. TRA did not disclose and still does not acknowledge that ECC's occupancy was incompatible with any restoration work at the end of PG&E's term. At no time during any settlement discussions did PG&E agree to make any payment to TRA in lieu of performing its restoration obligation.

PG&E did not learn that TRA executed the ECC Lease until late March 2019, after the settlement negotiations had failed. On April 5, 2019, Courtney McAllister of TRA advised PG&E that: "in light of PG&E's unwillingness to execute the settlement agreement," PG&E could not terminate its SWPPP (storm water pollution prevention plan) obligations for the property, which TRA insisted that PG&E continue to maintain, and which PG&E did maintain.

PG&E objects to Fulcrum's use of the parties' *inadmissible compromise negotiations* to attempt to prove something that never happened. The fact is that PG&E never agreed to pay for alleged restoration work in lieu of performing any necessary restoration work itself, which was PG&E's right under the Letter Agreement. The settlement discussions are not relevant and they are inadmissible under Federal Rule of Evidence 408 to prove or disprove the validity of Fulcrum's claim or that PG&E allegedly desired to pay money as opposed to perform restoration itself.[3] Further, TRA elected to proceed with the ECC lease that was incompatible with any restoration at the end of PG&E's term.

Fulcrum's claim that ECC did not "occupy" the property until April 2019 is likewise misleading. Whether it was ECC or TRA performing the work required under the ECC Lease, in March 2019, there were workers and heavy equipment in and using PG&E's license area and improvements. Fulcrum's claim and statements of its agents that PG&E never raised any concerns

---

[3] *See* Fed. R. Evid. 408 (conduct or a statement made during compromise negotiations about a claim are not admissible either to prove or disprove the validity or amount of a disputed claim).

about use or occupation of the property after March 19, 2019 are incorrect. As set forth in the Jadhav Declaration, on or about March 19, 2019, PG&E raised issues about ECC's use of PG&E's basecamp and was told by TRA that it did not yet have an agreement with ECC, that TRA's use of the site was just temporary for staging, and that PG&E was required to maintain (at PG&E's sole cost and expense) the security of the site under the License Agreement, which PG&E did. (Jadhav Decl., ¶ 5.) PG&E raised additional concerns on or about March 27, 2019 after it learned that substantial grading work was occurring on the property that exceeded the scope of PG&E's permits and presented significant erosion issues providing TRA with photographs taken March 27, 2019 showing the work being conducted. (Jadhav Decl., ¶ 7 and Exh. D.)

PG&E paid rent and retained its license through May 20, 2019. After expiration of the PG&E license on May 20, 2019, PG&E went to the property for the purpose of assessing its restoration obligations. *At that visit PG&E learned that restoration to "Baseline Condition" was impossible. ECC and TRA were making full use of the PG&E license area and PG&E's winterization improvements were now functioning as crowded parking lots. The PG&E access road was being extensively used by heavy construction equipment. One of the holes on the former golf course was now the site of TRA's new septic system. Another hole on the former golf course that had been on the periphery of the PG&E license area was supporting TRA's new storage ponds*. It became apparent that, since at least February 2019, TRA had no intention of allowing PG&E to perform the restoration work – all of PG&E's license area, property, material and work was going to be used and in fact was used by ECC and TRA to temporarily and permanently improve the TRA property, with the benefit of the PG&E improvements, in connection with TRA's housing and commercial development project that does not maintain the 18-hole golf course that existed on November 19, 2018.

### III. REPLY TO FULCRUM'S LEGAL CONTENTIONS

PG&E's Objection spells out PG&E's legal contentions. Fulcrum chooses not to address many of those legal contentions in its Response.

A. **PG&E Did Not Breach the Letter Agreement**

Fulcrum's Response ignores the applicable principles of contract interpretation that must give

effect to the mutual intention of the parties at the time the contract was executed. Cal. Civ. Code §§ 1636, 1639, 1647 (contracts are explained by the circumstances under which they were made and the matters to which they relate); *see Legacy Vulcan Corp. v. Superior Court*, 185 Cal. App. 4th 677, 688 (2010) ("We consider the contract as a whole and interpret its language in context so as to give effect to each provision, rather than interpret the contractual language in isolation."); *Butchers' Union v. Cudahy Packing Co.,* 66 Cal. 2d 925, 943 (1967) ("It is fundamental that an interpretation of a contract which will make it reasonable, fair and just should be accepted over an equally consistent interpretation which would make it unreasonable unfair and unjust."); *Howe v. American Baptist Homes of West, Inc.*, 112 Cal. App. 3d, 622, 627 (1980) ("[T]he court shall avoid an interpretation which will make a contract extraordinary, harsh, unjust, inequitable or which would result in an absurdity.") (internal citations omitted).

Under Fulcrum's theory of the case, TRA was allowed to appropriate and make heavy use of PG&E's improvements and the PG&E license area to develop the property, make permanent and temporary improvements to the property, disrupting the work that PG&E performed and otherwise would have been required to restore, and turn the majority of the PG&E improvements into a parking lot for ECC. Under Fulcrum's theory, when the ECC Lease expired after using the premises to the exclusion of PG&E, PG&E would be required to pay Fulcrum for restoration work that PG&E was excluded from performing and that TRA did not want performed at the end of PG&E's term. In other words, Fulcrum claims that the Letter Agreement now requires PG&E to pay millions of dollars (for what was intended to be a limited restoration based on the condition of the property on November 18, 2018 and PG&E's use of the property) *after TRA contracted with ECC and ECC made full use* of the PG&E license area, materials and improvements, which served the economic benefit of TRA.

As set forth in PG&E's Objection and not disputed by Fulcrum, the Letter Agreement, read as a whole, evidences the mutual intention of the parties that TRA would allow PG&E to use the License Area in exchange for monetary consideration, and that at the end of its occupancy, PG&E would restore any damage to the License Area *resulting from PG&E's use to the same condition it was in on November 18, 2018*. PG&E's agreement that it would perform *limited* golf course restoration was

based on the representation of TRA that it was required by Butte County to maintain the then-existing 18-hole golf course improvements and in order to develop the property. Regardless of whether that representation was true, *it was never contemplated that PG&E would restore the property after it was used by others or that PG&E would pay to perform a restoration that could not be performed.*

    **1.**  **TRA Prevented PG&E's Performance and Breached the Implied Covenant of Good Faith and Fair Dealing**

As discussed above, it was impossible for PG&E to restore the license area to its Baseline Condition upon expiration of the PG&E's license agreement in May 2020 because it was actively being used by ECC and TRA. Much of PG&E's rock and gravel was sitting under ECC's housing camp and related facilities, and the earthwork that remained was turned into a parking lot full of ECC and TRA vehicles. TRA's construction of new ponds and septic system was in the PG&E license area and was encroaching on portions of the golf course.

Fulcrum misunderstands the nature of PG&E's claim that TRA breached the implied covenant of good faith and fair dealing. PG&E does not claim that TRA did not have the right to enter into the ECC Lease. ECC was the contractor for a public agency responsible for Camp Fire response and clean-up work. Leasing to ECC was TRA's choice. TRA, however, was obligated to act fairly, honestly and in good faith with PG&E. TRA knew that ECC's use would be wholly incompatible and inconsistent with PG&E's restoration obligation. TRA must accept the consequences of its decisions. TRA chose to subject PG&E's license area to heavy use that was incompatible with PG&E's ability to restore the license area to its Baseline Condition.

TRA breached the implied covenant *because it unfairly prevented PG&E from being able to perform its restoration work* consistent with the Letter Agreement. PG&E could not remove and re-grade the enormous portions of the license area that TRA and ECC turned into a parking lot, repave the PG&E access road that was being used by heavy machinery, and restore golf holes that had been built over or next to. The implied covenant prevents a party to a contract from doing anything that unfairly interferes with the right of the other party to receive the benefits of the contract.[4] *Carma Developers,*

---

[4] As set forth in PG&E's Objection, TRA *admitted that ECC used the entirety of the PG&E license area and that ECC caused further damage to the TRA property*. This included ECC's use, with the permission of TRA, of a majority of the PG&E license area for the purpose of "staging vehicles and

8

*Inc. v Marathon Development California, Inc.*, 2 Cal.4th 342, 371-72 (1992); *Racine & Laramie, Ltd. v. Department of Parks & Recreation*, 11 Cal.App.4th 1026, 1031-32 (1992).

TRA did not act with honesty of purpose and without intent to mislead or take undue advantage of PG&E with respect to PG&E's restoration obligation. *See* CACI No. 325. Instead, TRA decided to take undue advantage of the Letter Agreement and PG&E. TRA knew full well that having PG&E perform the restoration at the expiration of the license period would have required PG&E to remove its material and re-grade the license area to its November 19, 2019 "golf course" condition while TRA and ECC were fully occupying the area as parking lots for ECC workers and TRA. PG&E could not have ordered ECC to move its housing camp and related facilities so that PG&E could extract the PG&E base rock and gravel on which the housing camp and related facilities were built. TRA also knew that TRA and ECC needed full access to the PG&E access road so that ECC and TRA could move their heavy construction equipment. The only conclusion that can reasonably be drawn is that TRA seeks to unduly profit at the expense of PG&E after expiration of the other use and the ECC Lease.

    **2.    Under the Letter Agreement, PG&E Is Not Required to Restore Property Used by Others**

Fulcrum concedes that the Letter Agreement provides for a *proportional reduction of PG&E's restoration obligation based on use of the Property*, including the License Area, by public agencies for activities related to the Camp Fire restoration. Specifically, the Letter Agreement provides, in relevant part:

> PG&E agrees and acknowledges that other public agencies (such as the County of Butte, FEMA, OES, GSA, etc.) may desire to use some or all of the Property, including the License Area. If Owner consents to such other use(s), PG&E agrees to reasonably cooperate with Owner and such other public agencies to jointly use

---

equipment and without any compensation to plaintiff." (Goodman Decl. Ex. C at ¶ 10.) Scott Bates not only attested to the accuracy of this information, but stated TRA's intention to assert that ECC caused damages to TRA's property, including, for example, "currently the *Real Property has been stripped of all surface dirt*." (Goodman Decl. Ex. E, ¶ 6.) Bates further declared that ECC is leaving "the Real Property in a scorched and decimated condition while it has reaped millions and contributed a bare fraction of the funds it was required to pay to Tuscan for its benefit." (Goodman Decl. Ex. E at ¶ 9.)

> the Property and the License Area in whatever manner reasonably necessary to further the restoration efforts. . . . Subject to PG&E's obligations to reasonably cooperate with Owner and other agencies as set forth above, the license granted hereunder will be irrevocable during the term of PG&E's Activities, except in the case of a material breach of this Letter Agreement. Notwithstanding the foregoing, after January 15, 2019, in the event a public agency, such as the ones set forth above, desires to utilize all or part of the Property for activities related to the Camp Fire restoration, PG&E will coordinate with those public agencies. If such use is not compatible with PG&E's activities hereunder, Owner may terminate this Letter Agreement on forty-five (45) days' written notice to PG&E, in which case Owner shall reimburse PG&E any prepaid compensation (both Rental Fee and Independent Consideration) allocated to periods after the termination in whole or in part, of this Letter Agreement. In the event of such termination, PG&E's restoration obligations under this Letter Agreement shall be proportionately reduced based on the use of any other public agency occupying the License Area.

(Jadhav Decl., ¶3, Exh. B, at pages 1-2.)

The intent of this provision is clear. PG&E's restoration obligation would be proportionally reduced based on a public agency's use of the PG&E license area incompatible with PG&E's rights under the Letter Agreement. Fulcrum's argument that a proportional reduction can only apply if TRA elected to send a written termination notice is a manifestly unreasonable interpretation of the Letter Agreement and the intent of the parties at the time of contracting. It was the intent of the parties and the only reasonable interpretation of this provision that PG&E would restore to the November 18, 2018 condition the damage *that PG&E caused* to the license area, if any, and that PG&E would not be responsible for any other public agency's use of the PG&E license area. The fact that TRA unilaterally chose not to send the written termination notice cannot mean that PG&E's restoration obligation is grossly expanded to encompass the subsequent incompatible use by TRA and ECC of the PG&E license area in connection with the ECC Lease and TRA's development of the property.

"It is fundamental that an interpretation of a contract which will make it reasonable, fair and just should be accepted over an equally consistent interpretation which would make it unreasonable unfair and unjust." *Butchers' Union,* 66 Cal.2d at 943. A court "must seek to avoid an interpretation which will make the contract harsh, unjust or inequitable." *Howe*, 112 Cal.App.3d at 627 (citing Cal. Civ. Code § 1638; *Wright v. Coberley-West Co.*, 250 Cal.App.2d 31, 36 (1967); *Harris v. Klure*, 205 Cal. App. 2d 574, 578 (1962)). Fulcrum ignores these well-established canons of contract interpretation, as well as the mutual intent of the parties at the time of contracting, in arguing for an unreasonable, unjust and absurd interpretation of the proportionate reduction provision. Fulcrum's

other argument that ECC was not a "public agency" is without merit. The whole purpose of the ECC Lease was for ECC to comply with and perform its contract with the California Department of Resources Recycling and Recovery ("**Cal Recycle**"), which was responsible for cleanup and disposal of debris from the Camp Fire. The Cal Recycle contract required ECC to develop and construct a workers' camp and all related infrastructure necessary to house, feed and care for approximately 1500-3000 workers who would perform the Camp Fire disposal and cleanup work. The parties never intended that PG&E would pay to restore an area that was to be subsequently heavily developed and used by ECC and TRA.

B. **TRA Appropriated PG&E's Improvements for Its Own Economic Gain**

While Fulcrum takes exception to PG&E's claim that TRA appropriated, used, and profited from PG&E's material and improvements, that is exactly what happened. TRA and ECC agreed that ECC would use PG&E's base rock and gravel for the earthwork required beneath the ECC housing development and related infrastructure, which it did. The other earthwork performed by PG&E was converted by TRA and ECC into a large parking lot so that ECC and TRA would have a place to park, stage, and store vehicles and equipment. Fulcrum's statement that PG&E "wiped out the topography, destroyed pathways and irrigation systems, and left a barren patch of land in place of what was a functional golf course prior to its use" is strikingly similar to the allegations TRA made against ECC when TRA sued ECC in March of 2020. *See, e.g.*, Goodman Decl., Exh. E, ¶ 6. TRA, not PG&E, elected to pursue a use of the License Area that was incompatible and inconsistent with PG&E's restoration obligation under the Letter Agreement. TRA chose to receive the lucrative consideration under the ECC Lease and the permanent improvements to its property in lieu of having PG&E restore the license area after expiration of PG&E's license in May 2019.

The Letter Agreement also provides for a *reimbursement of "prepaid compensation allocated to periods after termination of the letter agreement*." (Jadhav Decl., ¶¶ 3, 4, Ex. B, Ex. C.) While TRA did not send a written notice of termination, there is no question that TRA effectively terminated PG&E's use of the property when it decided to permit uses by a party *other than PG&E* that were

incompatible and inconsistent with the Letter Agreement and PG&E's right to perform restoration thereunder.

In the event that Fulcrum can meet its burden of demonstrating any restoration required by PG&E, which it likely cannot, PG&E has a counterclaim for reimbursement and unjust enrichment against TRA for the cost and use of PG&E's base camp improvements and the rent and security pre-paid by PG&E for the full term through May 2019, although the incompatible occupancy and use by TRA and ECC commenced well before the end of PG&E's use of the License Area and continued thereafter. *See Lectrodryer v. Seoulbank*, 77 Cal. App. 4th 723, 727 (2000) (unjust enrichment available notwithstanding existence of contract that had expired).

### C. The Letter Agreement Provided for Restoration of the License Area to Its Prior Condition, Not Payment of Millions of Dollars to TRA for Its Redevelopment Plans and/or Enrichment

Fulcrum is unable to justify its placement of blame on PG&E for any impact to TRA's development efforts.[5] Any issue that has arisen or may arise regarding TRA's ability to develop the property rests squarely on TRA. TRA made the decision to enter into the ECC Lease and make full use of the PG&E License Area so as to deprive PG&E of the ability to return the License Area, including any affected portion of the golf course, to its Baseline Condition at the expiration of the Letter Agreement.[6] The point of PG&E's Objection, however, is that the clear intent of the parties to

---

[5] As part of the ECC Lease, TRA was able to obtain permanent improvements necessary for eventual development of the Property, including but not limited to, a full wastewater treatment system and permanent power. Fulcrum's submission of a page from the 2010 Butte County General Plan states that it is nothing more than an "overview of the vision" for these planning areas. In 2016, Butte County approved a Tentative Parcel Map for TRA for the purposes of financing only. The Approval states that "[t]he General Plan and zoning designations on the project site were approved by the Board of Supervisors as part of the 2010 General Plan 2030 Update and 2012 Zoning Map update at the request of the property owner. The PD zone allows for specific uses as specified in an approved PD Development Plan. There is no approved PD Development Plan for the project site and no application for such is pending." In October 2018, TRA applied for and received an extension of the Tentative Parcel Map. After expiration of the ECC Lease, TRA has submitted multiple "project descriptions" to the County, none of which include a golf course, let alone the 18-hole golf course as it existed on November 19, 2018. None of TRA's many development plans appear to even be in Butte County's Pre-development Planning. TRA's last Pre-development Planning work was in 2007.

[6] Fulcrum's submission of the Moreno Declaration, stating that he used the March 2019 TRA conceptual site model prepared by Melton, is irrelevant. Neither Moreno, Melton, nor Pulley (TRA's "estimators") purport to have any knowledge of the condition of the license area *as it existed on November 19, 2018*, the relevant date for determining the Baseline Condition.

the Letter Agreement was that PG&E would perform the limited restoration necessary to return the License Area to the condition that it existed in on November 18, 2018, because TRA represented to PG&E that it needed to maintain the grading of the golf course, holes and bunkers for its development. It was never the intent of the parties in entering into the Letter Agreement to require PG&E to pay millions of dollars to TRA toward its new housing and commercial development plans *that do not include a golf course* and when TRA does not intend to "restore" anything to Baseline Condition. The fundamental premise of PG&E's restoration obligation in the Letter Agreement is that, upon PG&E's departure, the golf course would be restored to the same condition it was in when PG&E entered into the Letter Agreement, because that is what TRA needed. It was never contemplated that PG&E would perform any other work, or undertake to pay any money under the guise of "restoration," after the incompatible use by a subsequent occupant, that was not for the purpose of actually restoring the property to its November 19, 2018 condition.

### D. PG&E Is Not Liable for Trespass or Waste

Fulcrum does not respond to PG&E's Objection to TRA's allegations that PG&E trespassed, committed waste, and unlawfully took possession of the property for use as a base camp.

### IV. PG&E REQUESTS THAT THE COURT ISSUE A SCHEDULING ORDER

Bankruptcy Local Rule 3007-1(b) states that "[w]here a factual dispute is involved, the initial hearing on an objection shall be deemed a status conference at which the Court will not receive evidence." As the above arguments make clear, the numerous disputed facts in this matter require development through discovery. That discovery will include: (a) written discovery to Tuscan Ridge Associates, including but not limited to discovery regarding the use, operations, conditions, infrastructure, maintenance, and occupancy of the premises; employees, contractors, occupants, and users of the premises; and contracts, agreements, records, and accountings during relevant periods; (b) depositions and deposition subpoenas requesting documents served on agents, representatives, contractors and employees of Tuscan Ridge Associates, users of the Tuscan Ridge Associates

premises, and entities with relevant contracts related to the premises; and (c) discovery of expert reliance materials, writings, and opinions.

The Reorganized Debtors respectfully request a scheduling order for discovery, dispositive motions, and an evidentiary hearing. The Reorganized Debtors propose the following schedule:

Written discovery – completed by April 30, 2022

Fact witness depositions – completed by May 15, 2022

Expert discovery – completed by June 15, 2022

Dispositive motions – hearings completed by July 31, 2022

Evidentiary hearing/trial – September 2022

Counsel for the Reorganized Debtors and Fulcrum met and conferred on the above schedule proposed by the Reorganized Debtors, but the parties have not yet reached agreement. To the extent the parties are unable to agree on a proposed schedule, the Reorganized Debtors will ask that the Court set a schedule for the parties at the initial hearing and status conference on the Objection.

## V. RESERVATION OF RIGHTS

The Reorganized Debtors hereby reserve the right to object, as applicable, in the future to the Proof of Claim on any ground, and to amend, modify, or supplement the Objection to the extent an objection to a claim is not granted, and to file other objections to any proofs of claims filed in these cases, including, without limitation, objections as to the amounts asserted therein, or any other claims (filed or not) against the Debtors, regardless of whether such claims are subject to the Objection. A separate notice and hearing will be scheduled for any such objections. Should the grounds of objection specified herein and in the Objection be overruled or withdrawn, wholly or in part, the Reorganized Debtors reserve the right to object to the Proof of Claim on any other grounds that the Reorganized Debtors may discover or deem appropriate. The Reorganized Debtors also reserve the right to assert any counterclaims or affirmative defenses, whether in connection with the Objection or in an adversary proceeding or other litigation, which counterclaims and defenses are expressly reserved.

| | |
|---|---|
| Dated: November 2, 2021 | **KELLER BENVENUTTI KIM LLP**<br>**GOUGH & HANCOCK LLP**<br><br>By:    */s/ Gayle L. Gough*<br>        Gayle L. Gough<br><br>*Attorneys for Debtors and Reorganized Debtors* |