# EXHIBIT A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

UNITED ENERGY TRADING, LLC,

    Plaintiff,

    v.

PACIFIC GAS & ELECTRIC CO., et al.,

    Defendants.

Case No. 15-cv-02383-RS

**ORDER DENYING MOTION TO DISMISS**

### I. INTRODUCTION

This is the third time up for plaintiff United Energy Trading, LLC ("UET") in its quest to state an "attempt to monopolize" claim against defendant Pacific Gas & Electric Company ("PG&E"). *See* 15 U.S.C. § 2. UET swung and missed on its first two tries, but here it puts the ball in play. PG&E's motion to dismiss the Sherman Act claim will be denied. Pursuant to Civil Local Rule 7-1(b), the motion set for August 11, 2016, is suitable for disposition without oral argument, and the hearing will be vacated.

### II. BACKGROUND[1]

PG&E is the traditional public utility in northern California. Until 1991, it held a state-sanctioned monopoly over the distribution of natural gas in that area. PG&E thus owns and operates the entire infrastructure that physically stores and transports natural gas to customers in northern California. PG&E is regulated by the California Public Utilities Commission ("CPUC"), which requires PG&E to set its natural gas rates through use of a pre-approved formula. The

---

[1] The factual background is based on the averments in the amended complaint, which must be taken as true for purposes of a motion to dismiss. The background was set forth in greater detail in the prior orders and is repeated here only as it pertains to UET's new allegations.

formula does not vary, but PG&E exercises discretion over certain variables, including the calculation of its purchase price, its expenses, and its overcharges.

UET is a Core Transportation Agent ("CTA"), meaning it buys gas on the open market and sells it to customers using PG&E's distribution system. If UET cancels a customer, they revert to PG&E as the default natural gas provider. UET specifically competes with PG&E to provide natural gas to "core customers."[2] The geographical boundaries of that market span from Eureka in the north to Bakersfield in the south, and from the Pacific Ocean in the west to the Sierra Nevada mountains in the east. The gas UET and PG&E supply is fungible in composition and function. UET is one of twenty-two CTAs that compete with PG&E in this market.

Proposed CTAs must fulfill exacting standards to operate in California, among them, completing an application, submitting executives' fingerprints, establishing creditworthiness, and posting a bond. As one aspect of deregulation, PG&E must offer CTAs the opportunity to consolidate their bills with those of PG&E. Under a program called "Optional Consolidated PG&E Billing," both the CTA's charges and PG&E's charges appear on a consolidated statement, and the customer pays both sets of charges with a single check to PG&E. Under Consolidated Billing, PG&E also acts as the CTA's collections agent. In that capacity, PG&E sends notices to the CTA's customers informing them of unpaid balances, collects from the CTA's customers the balance of unpaid charges, and takes other actions to help recover from customers any unpaid amounts owed to the CTA. After PG&E receives money from a customer, it is required to pay the CTA the amounts paid to PG&E for the CTA's charges. In 2012, UET elected to participate in the Optional Consolidated PG&E Billing program. Approximately eighteen CTAs in total use PG&E as their billing and collections agent.

UET submits CTAs cannot practically or reasonably establish their own billing and

---

[2] Core customers are "all residential customers within the Relevant Geography regardless of load size, commercial customers with annual loads below 250,000 therms, and those commercial customers with annual loads above 250,000 therms who elect to receive the higher reliability associated with core service." Compl. ¶ 120.

CASE NO. 15-cv-02383-RS

collection services while continuing to offer natural gas to core customers at competitive prices. Though the CPUC compelled PG&E to share its services to eliminate that barrier to entry, UET insists the CPUC lacks the effective power to regulate the scope, terms, and manner in which those services are provided to CTAs.

The instant dispute centers on predatory and exclusionary acts PG&E allegedly commits in its capacity as the billing and collections agent for the CTAs. Specifically, in the "Payment Withholding Scheme," PG&E uses its role as the CTAs' billing agent to withhold money owed to the CTAs, misleading them into believing the customer is not paying. In the "Energy Credit Scheme," PG&E applies credits from its own services and programs to CTAs' charges, effectively misappropriating them to offset the money PG&E owes to its own customers. In the "Reversal Scheme," PG&E simply disconnects core customers from the CTAs' natural gas service and returns them to PG&E's natural gas service. These fraudulent schemes lack any legitimate business justification, in UET's eyes, and allegedly are perpetrated against CTAs based not on competitive zeal, but anticompetitive malice. Indeed, UET avers PG&E intentionally leverages its monopoly over billing and collection services to expand its market share and destroy competition for natural gas commodity service.

UET insists the schemes have several anti-competitive results. To begin, they significantly increase CTAs' operating expenses by forcing them to expend large sums on marketing in an effort to maintain their dwindling customer bases.[3] Given the schemes eliminate customers as quickly as CTAs can add them, however, UET contends CTAs as a practical matter have no ability to expand their output in response to PG&E's conduct. Next, the schemes leave CTAs with large carrying costs because they ensure payment will be late or never received. UET notes this cash flow disruption prevents it from accurately projecting revenue or managing its credit facilities.

UET reports it has lost about half of its customers as a result of the schemes. Other CTAs,

---

[3] These activities include "engaging in direct-mail marketing, door-to-door marketing, internet and print campaigns, and other activities." Compl. ¶ 42.

CASE NO. 15-cv-02383-RS

including North Star Gas Company and Tiger Energy, attribute similar losses to the schemes. More generally, between 2012 and 2014—prior to implementation of the schemes—the firm pipeline capacity (or "load") for all CTAs grew from approximately 12 percent to 19 percent. Since implementation of the alleged schemes, however, UET avers the load is now down to 15.4 percent. Similarly, UET undersold PG&E by about seventeen percent prior to the schemes. Today, UET's prices are only about five percent less than PG&E's as a result of the anti-competitive conduct. Taken together, UET avers the schemes deny CTAs reasonable access to an essential facility controlled by PG&E, drive up the CTAs' expenses, and, by winnowing their customer bases, reduce the CTAs' effective economies of scale, preventing CTAs from pricing natural gas as competitively as they once could.

UET further maintains the schemes have increased consumer prices, despite an ample supply of natural gas and decreasing wholesale prices. Between 2014 and the present, for instance, the monthly California price of natural gas delivered to residential consumers has increased from $10 to $12 per thousand cubic feet. During that same period, the Citygate price for natural gas in California has decreased from roughly $6.00 to $3.00 per thousand cubic feet. By UET's calculation, since the schemes were implemented, consumers are paying 20 percent more for natural gas even though the Citygate price of the commodity is 50 percent less than it was in 2014.

UET avers several companies that retail natural gas in other states, such as Colorado-based Aurora NG, will not attempt entry as a result of PG&E's predatory practices. Other CTAs, according to UET, have allowed the Reversal Scheme to dwindle their customer bases to the point they have decided ultimately to withdraw from the market. One such CTA has seen its customer base decline from 40,000 to just around 5,000, and has decided not to invest in acquiring additional customers because of the schemes. All told, UET maintains PG&E's schemes have made entry and expansion in the market unprofitable due to the increased costs of marketing, customer retention, and the significant carrying costs.

On August 31, 2015, PG&E moved to dismiss the complaint on various jurisdictional

CASE NO. 15-cv-02383-RS

1  grounds and for failure adequately to plead claims for relief.  The motion was granted as to the
2  breach of contract claim, and granted with leave to amend as to the *respondeat superior*, Sherman
3  Act, and conversion claims. Dkt. No. 74.  UET filed the First Amended Complaint ("FAC") on
4  December 18, 2015, and PG&E moved to dismiss the FAC about six weeks later.  The motion was
5  granted with leave to amend as to the Sherman Act and conversion claims, and denied as to the
6  *respondeat superior* claim.  UET filed the Second Amended Complaint ("SAC") on May 13,
7  2016, and PG&E moved to dismiss the SAC shortly thereafter.

### III. LEGAL STANDARD

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  While "detailed factual allegations are not required," a complaint must have sufficient factual allegations to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible "when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  This standard asks for "more than a sheer possibility that a defendant acted unlawfully." *Id.*  The determination is a context-specific task requiring the court "to draw on its judicial experience and common sense." *Id*. at 679.

Additionally, Rule 9(b) of the Federal Rules of Civil Procedure requires that "[i]n allegations of fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  To satisfy the rule, a plaintiff must allege the "who, what, where, when, and how" of the charged misconduct. *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997).  In other words, "the circumstances constituting the alleged fraud must be specific enough to give defendants notice of the particular misconduct so that they can defend against the charge and not just deny that they have done anything wrong." *Vess v. Ciba–Geigy Corp. U.S.A.*, 317 F.3d 1097, 1106 (9th Cir. 2003).

A motion to dismiss a complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the claims alleged in the complaint. *See Parks Sch. of*

CASE NO. 15-cv-02383-RS

1   *Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995).  Dismissal under Rule 12(b)(6) may
2   be based on either the "lack of a cognizable legal theory" or on "the absence of sufficient facts
3   alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699
4   (9th Cir. 1990).  When evaluating such a motion, the court must accept all material allegations in
5   the complaint as true, even if doubtful, and construe them in the light most favorable to the non-
6   moving party.  *Twombly*, 550 U.S. at 570.  "[C]onclusory allegations of law and unwarranted
7   inferences," however, "are insufficient to defeat a motion to dismiss for failure to state a claim."
8   *Epstein v. Wash. Energy Co.*, 83 F.3d 1136, 1140 (9th Cir. 1996); *see also Twombly*, 550 U.S. at
9   555 ("threadbare recitals of the elements of the claim for relief, supported by mere conclusory
10  statements," are not taken as true).

## IV. DISCUSSION

The sole focus of this motion is UET's "attempt to monopolize" claim.  UET's previous complaint failed adequately to plead PG&E's market power, and the additional elements required to state satisfactorily a Sherman Act claim.  The SAC connects the dots and contains several new allegations that significantly remedy the prior defects.  PG&E's motion to dismiss the Sherman Act claim will accordingly be denied.

**A. Sherman Act**

Section 2 of the Sherman Act outlaws anticompetitive conduct that monopolizes or threatens actual monopolization. 15 U.S.C. § 2.  To make out a claim for an attempt to monopolize, UET must specify the market PG&E targeted and PG&E's economic power within that market.  UET also must demonstrate: "(1) specific intent to control prices or destroy competition; (2) predatory or anticompetitive conduct directed at accomplishing that purpose; (3) a dangerous probability of achieving monopoly power; and (4) causal antitrust injury." *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1432–33 (9th Cir. 1995) (internal quotation marks omitted).

As a threshold matter, PG&E contends the claim is subject to Rule 9(b), but that is correct only in part.  Sherman Act claims need not generally be pleaded with specificity, *see Cost Mgmt.*

CASE NO. 15-cv-02383-RS

*Servs., Inc. v. Wash. Nat. Co.*, 99 F.3d 937, 950 (9th Cir. 1996), and Rule 9(b) "does not require that allegations supporting a claim be stated with particularity when those allegations describe non-fraudulent conduct." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1104 (9th Cir. 2003). UET does aver PG&E's fraudulent schemes constitute anti-competitive conduct, but those allegations have been found already to satisfy the Rule's heightened pleading standard.  As only allegations of "fraudulent conduct" must arise to meet Rule 9(b), the remainder of UET's Sherman Act claim is subject to Rule 8.  *See Vess*, 317 F.3d at 1104 ("[W]e now join [our sister circuits] in holding that in a case where fraud is not an essential element of a claim, only allegations ('averments') of fraudulent conduct must satisfy the heightened pleading requirements of Rule 9(b).  Allegations of non-fraudulent conduct need satisfy only the ordinary notice pleading standards of Rule 8(a).").

*1. Relevant Market and PG&E's Economic Power Within that Market.*

The product market UET identifies is the commodity natural gas market specific to core customers who reside in northern California.  The geographical boundaries of that market span from Eureka in the north to Bakersfield in the south, and from the Pacific Ocean along the coast to the Sierra Nevada mountains in the east.  These allegations are adequate because CTAs compete with PG&E in this arena to provide a wholly interchangeable product.

To demonstrate market power, UET must show "the defendant owns a dominant share of th[e] market," "there are significant barriers to entry," and "existing competitors lack the capacity to increase their output in the short run."[4] *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995).  "There is no requirement that these elements of the antitrust claim be pled with specificity." *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008).

UET avers PG&E's share of the market is "70-90" percent.  Compl. ¶ 2.  UET also notes CTAs must fulfill exacting standards to operate in California, among them, completing an

---

[4] In *Rebel Oil*, a market share of forty-four percent was sufficient to find market power, assuming "entry barriers are high and competitors are unable to expand their output in response to supracompetitive pricing." 51 F.3d at 1438.

CASE NO. 15-cv-02383-RS
7

1    application, submitting executives' fingerprints, establishing creditworthiness, and posting a bond.
2    UET further insists CTAs cannot remain competitive while establishing their own billing and
3    collection services, and thus PG&E's provision of consolidating billing upon unreasonable terms
4    amounts to a barrier to entry.  In fact, several companies that retail natural gas in other states
5    refuse to enter, according to UET, in light of PG&E's display of predatory conduct.  Finally, given
6    the schemes eliminate customers as quickly as CTAs can add them, UET contends CTAs as a
7    practical matter have no ability to expand their output in response to PG&E's behavior.  Drawing
8    reasonable inferences in favor of UET, the SAC pleads adequately PG&E's market power.

                    *2. Anticompetitive Conduct.*

         UET must allege PG&E has engaged in anti-competitive conduct.  An act is
anticompetitive "when it harms both allocative efficiency and raises the prices of goods above
competitive levels." *Rebel Oil*, 51 F.3d at 1433 (emphasis omitted).

                    *a. Essential Facilities Doctrine.*

         UET first argues PG&E has engaged in anti-competitive conduct by denying CTAs
reasonable access to consolidated billing, an asserted "essential facility."  "The 'essential
facilities' doctrine imposes on the owner of a facility that cannot reasonably be duplicated and
which is essential to competition in a given market a duty to make that facility available to its
competitors on a nondiscriminatory basis." *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124,
1128 (9th Cir. 2004) (quotation marks omitted).  Here, UET must allege (1) PG&E is a monopolist
in control of an essential facility, (2) PG&E's competitors are unable reasonably or practically to
duplicate the facility, (3) PG&E has refused to provide CTAs access to the facility, and (4) it is
feasible for PG&E to provide such access.  *See id.* at 1128–29.

         UET avers PG&E's billing and collection services are essential to effective competition,
and lie within the exclusive province of PG&E by definition.  Though CTAs have the option of
performing their own billing, UET insists CTAs cannot practically or reasonably duplicate
PG&E's consolidated billing service while competitively servicing core customers in PG&E's
area.  UET further argues the service is afforded to CTAs on unfair and unreasonable terms

1   because PG&E commits the alleged fraudulent schemes in connection with consolidated billing.
2   Finally, UET asserts consolidated billing could be provided to CTAs without committing fraud.
3         The problem with UET's theory is that it has not sufficiently grappled with the role of the
4   CPUC.  According to the Supreme Court, "the indispensable requirement for invoking the doctrine
5   is the unavailability of access to the 'essential facilities'; where access exists, the doctrine serves
6   no purpose."  *Verizon Commc'ns Inc. v Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 411
7   (2004).  Thus, "essential facility claims should be denied where a state or federal agency has
8   effective power to compel sharing and to regulate its scope and terms."  *Id.* (quotation marks and
9   alteration omitted).  Recognizing as much, UET alleges that in light of the fraudulent schemes,
10  "the CPUC lacks the effective power to regulate the scope, terms, and manner in which
11  [consolidated billing] services are provided to CTAs."  Compl. ¶ 124.  This conclusory allegation
12  appears insufficient, but in light of the alternative allegations, the issue need not be reached.
13        *b. Alternative Allegations.*
14        The key allegation newly articulated in the SAC is that "[t]he Schemes are perpetuated
15  against *all* CTAs using PG&E's billing and collections services."  Compl. ¶ 131 (emphasis added).
16  The fraudulent conduct detailed in the schemes is plainly anti-competitive because it diminishes
17  competition—harming allocative efficiency—and allegedly drives up prices.  For instance,
18  reversals strip CTAs of their customers unlawfully and without any notice, and the Energy Credit
19  Scheme misappropriates CTAs' charges so PG&E can cover its own expenses.  These actions
20  force CTAs to expend large sums on marketing to maintain their customer bases, and saddle them
21  with carrying costs that detract from their flexibility in running their businesses.  Further, by
22  winnowing down the customer bases, the schemes reduce the CTAs' effective economies of scale,
23  preventing CTAs from pricing natural gas as competitively as they once could.   This conduct
24  detracts from the CTAs' ability to pressure PG&E into applying for rate reductions, with the
25  upshot that PG&E can maintain consumer prices higher than it otherwise would.  On that front,
26  UET calculates, since the schemes were implemented, consumers are paying 20 percent more for
27  natural gas even though the Citygate price of the commodity is 50 percent less than it was in 2014.
28

United States District Court
Northern District of California

CASE NO. 15-cv-02383-RS
9

1  In light of these allegations, UET pleads adequately anti-competitive conduct on behalf of PG&E.

2  *3. Dangerous Probability of Achieving Monopoly Power.*

3  Monopoly power is "the power to control prices or exclude competition." *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966) (quotation marks omitted). "[T]o determine whether there is a dangerous probability of monopolization," courts "consider the relevant market and the defendant's ability to lessen or destroy competition in that market." *Spectrum Sports*, 506 U.S. at 456.

Here, the SAC pleads adequately there is a dangerous probability PG&E will obtain monopoly power over the market for providing natural gas to core customers in PG&E's service area. To start, UET avers several companies that retail natural gas in other states, such as Colorado-based Aurora NG, will not attempt entry as a result of PG&E's predatory schemes. Other CTAs, according to UET, have allowed the Reversal Scheme to dwindle their customer bases to the point they have decided ultimately to withdraw from the market. One such CTA has seen its customer base decline from 40,000 to just around 5,000, and has decided not to invest in acquiring additional customers because of the schemes.

Taking things in the aggregate, between 2012 and 2014—prior to implementation of the schemes—UET avers the load for all CTAs grew from approximately 12 percent to 19 percent. Since implementation of the alleged schemes, however, the load has decreased to 15.4 percent. Put differently, since the schemes took effect, PG&E's share of the natural gas load has increased from eighty-one (81) to eight-four (84) percent. The mechanism for this change is described in UET's averment that use of PG&E's service is a practical necessity to compete, and PG&E allegedly administers consolidated billing in a manner that subjects the CTAs to the schemes, effectively driving them out of business. Lacking the downward pressure on natural gas prices PG&E allegedly experienced prior to the schemes, its conduct artificially inflates the price notwithstanding its regulation by the CPUC.

PG&E counters there are competing CTAs who do not utilize consolidated billing, but that argument is unavailing because the complaint does not specify whether they compete for core

CASE NO. 15-cv-02383-RS
10

customers in PG&E's service area.  In any event, assuming they do, these competitors have not been able to counteract PG&E's supra-competitive pricing, according to the allegations detailed by UET above.  At bottom, drawing reasonable inferences in favor of UET, the SAC evinces PG&E erected unlawful barriers to entry and reduced competition, creating a dangerous probability it will attain monopoly power and continue to charge supra-competitive prices.

*4. Specific Intent*

The Sherman Act "directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993).  As such, UET must plead "specific intent to control prices or destroy competition." *Rebel Oil*, 51 F.3d at 1433.  Such intent may be inferred from well-pleaded allegations of predatory or anti-competitive conduct.  *See Spectrum Sports*, 506 U.S. at 459 (noting unfair or predatory tactics "may be sufficient to prove the necessary intent to monopolize"); *William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co.*, 668 F.2d 1014, 1027 (9th Cir. 1981) ("[T]he existence of specific intent may be established not only by direct evidence of unlawful design, but by circumstantial evidence, principally of illegal conduct.").

Here, the SAC contains allegations sufficient to infer PG&E's anti-competitive intent.  The alleged fraudulent schemes—which have been pleaded in great detail with respect to UET—seek to enrich PG&E unlawfully at the direct expense of its natural gas competitors.  The complaint also notes "other CTAs, such as Tiger Energy, have reported that PG&E carries out the [same] Schemes against their Core Customers in the Relevant Geography and that, similar to UET and North Star, each CTA has reported loss of customer and market share." Compl. ¶ 131.  Given the fraud alleged lacks any legitimate business justification, UET plausibly pleads the schemes are perpetrated against CTAs based not on competitive zeal, but anti-competitive malice.

PG&E argues the SAC does not show how its administration of consolidated billing evinces the intent to control retail prices for natural gas or to prevent CTAs from entering or expanding their market share.  As noted above, however, UET avers use of PG&E's service is a practical necessity to compete, and PG&E allegedly administers the service in a manner that

1  subjects the CTAs to the schemes, unlawfully dwindling their customer bases.  Once again,

2  lacking the ability to undercut PG&E on its prices as they had been able to prior to the schemes,

3  PG&E's conduct artificially inflates commodity gas prices notwithstanding its regulation by the

4  CPUC.  These allegations are sufficient to support a plausible inference of the requisite intent.

5          *5. Antitrust Injury*

6      To establish antitrust injury, a plaintiff must allege "(1) unlawful conduct, (2) causing an

7  injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of

8  the type the antitrust laws were intended to prevent."[5]  *Somers v. Apple, Inc.*, 729 F.3d 953, 963

9  (9th Cir. 2013) (quoting *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1055 (9th

10  Cir. 1999)).  "Where the defendant's conduct harms the plaintiff without adversely affecting

11  competition generally, there is no antitrust injury."  *Paladin Assocs., Inc. v. Mont. Power Co.*, 328

12  F.3d 1145, 1158 (9th Cir. 2003).

13      UET plausibly pleads the requisite elements.  It avers unlawful conduct on behalf of PG&E

14  by virtue of the fraudulent schemes.  This predatory conduct also harms CTAs in a number of

15  different ways: the Payment Withholding Scheme imposes carrying costs; the Energy Credit

16  Scheme misappropriates CTAs' charges; and the Reversal Scheme strips CTAs unlawfully of their

17  customers.  UET avers these schemes have been designed and implemented to destroy

18  competition.  Indeed, PG&E's share of the gas load has allegedly increased from eighty-one (81)

19  to eight-four (84) percent since implementing the schemes, and some companies have had their

20  customer bases dwindle to the point they have decided ultimately to withdraw from the market.

21  Finally, consumers have allegedly been injured by PG&E's ability to charge supra-competitive

22  prices.

---

[5] With respect to the second element, a plaintiff must allege "some credible injury caused by the unlawful conduct.  There can be no antitrust injury if the plaintiff stands to gain from the alleged unlawful conduct."  *Somers*, 729 F.3d at 963.  There is also "a fifth element—that the injured party be a participant in the same market as the alleged malefactors, meaning the party alleging the injury must be either a consumer of the alleged violator's goods or services or a competitor of the alleged violator in the restrained market."  *Id.* (internal quotation marks omitted).

PG&E notes CTAs currently offer lower prices than its regulated rate, and CTAs in general benefit from higher prices for natural gas.  Taking these issues in turn, the schemes prevent CTAs from undercutting PG&E as much as they once had, and thus CTAs lack the same ability to pressure PG&E into applying for rate reductions.  The upshot is consumers are nonetheless harmed by artificially inflated prices today.[6]  Next, even if CTAs benefit from charging consumers higher prices, UET still avers competitors suffer injury through PG&E's anti-competitive act of unilaterally reverting customers back to its own service.  At bottom, drawing reasonable inferences in favor of UET, the SAC pleads adequately antitrust injury.

### V. CONCLUSION

PG&E's motion to dismiss UET's Sherman Act claim is denied.  Defendants shall file an answer within twenty-one (21) days of the date of this order.  The case management conference previously set for August 11, 2016, at 1:30 p.m. will now be held that same morning at 11:00 a.m.  All parties shall appear telephonically and must contact Court Conference at (866) 582-6878 at least one week prior to the Conference to arrange their participation.

**IT IS SO ORDERED**.

Dated: August 4, 2016

_____
RICHARD SEEBORG
United States District Judge

---

[6] As detailed above, by UET's calculation, since the schemes were implemented, consumers are paying 20 percent more for natural gas even though the Citygate price of the commodity is 50 percent less than it was in 2014.  Compl. ¶ 86.  Additionally, PG&E's observation that CTAs have gained 3.4% market share since 2012 is misleading.  The allegations charge CTA market share has decreased monotonically since implementation of the schemes.