EXHIBIT H

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED ENERGY TRADING, LLC,<br><br>Plaintiff,<br><br>v.<br><br>PACIFIC GAS & ELECTRIC CO.,<br><br>Defendant. | Case No. 15-cv-02383-RS<br><br>**ORDER DENYING UNITED ENERGY TRADING, LLC'S MOTION TO EXCLUDE & PACIFIC GAS AND ELECTRIC COMPANY'S MOTION TO EXCLUDE** |

## I. INTRODUCTION

United Energy Trading, LLC ("UET") and Pacific Gas and Electric Company ("PG&E") bring motions to exclude expert testimony under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).[1] UET moves to exclude the testimony of PG&E's experts Daniel Ray and Michael Quinn, Ph. D. PG&E moves to exclude the testimony of UET's expert Jesse David, Ph. D. For the reasons explained below, both UET's and PG&E's motions are denied.

---

[1] The facts of this case are set forth in this Court's prior order regarding motions for partial summary judgment and need not be repeated here.

## II. LEGAL STANDARD

To testify at trial as an expert, Rule 702 of the Federal Rules of Evidence requires that the witness be qualified by "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. Even if a witness is qualified as an expert in a particular field, any scientific, technical, or specialized testimony is admissible only if it (a) "will help the trier of fact to understand the evidence or to determine a fact in issue," (b) "is based upon sufficient facts or data," (c) "is the product of reliable principles and methods," and (d) " the expert has reliably applied the principles and methods to the facts of the case." *Id.*

Rule 702 does not permit irrelevant or unreliable testimony. *Daubert*, 509 U.S. at 589. Expert opinions are relevant if the knowledge underlying them has a "valid connection to the pertinent inquiry." *United States v. Sandoval-Mendoza*, 472 F.3d 645, 654 (9th Cir. 2006) (internal quotation marks and alteration omitted). "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 590 (citing 3 Weinstein & Berger ¶ 702[02], p. 702-18) (internal quotation marks omitted). Expert opinion testimony is reliable if such knowledge has a "basis in the knowledge and experience of [the relevant] discipline." *Id.* at 592. Courts should consider the following factors when evaluating whether an expert's proposed testimony is reliable: (1) "whether a theory or technique can be (and has been) tested," (2) "whether the theory or technique has been subjected to peer review and publication," (3) the known or potential error rate of the particular scientific theory or technique, and (4) the degree to which the scientific technique or theory is accepted in a relevant scientific community. *Id.* at 593-94. This list is not exhaustive, however, and the standard is flexible. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 151 (1999). The *Daubert* inquiry "applies not only to testimony based on 'scientific' knowledge but also to testimony based on 'technical' and other 'specialized' knowledge." *Id.* at 141.

The task is not to "decid[e] whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969-70 (9th Cir. 2013). Courts may not exclude testimony because it is

impeachable. *Id.* at 969. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky and admissible evidence." *Daubert*, 509 U.S. at 596. The focus of the inquiry is thus on the principles and methodology employed, not the conclusions reached by the expert. See *id.* at 595. Ultimately, the purpose of the assessment is to exclude speculative or unreliable testimony to ensure accurate, unbiased decision-making by the trier of fact. "Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Kumho*, 526 U.S. at 157 (internal quotation marks omitted). Further, although an expert may not adopt another's data without verifying the validity and reliability of that data, Rule 703 allows an expert to depend on facts or data relied upon by experts in the particular field in forming opinions or inferences upon the subject; an expert is not required to testify only upon data the expert has personally gathered or tested. *See* Fed. R. Evid. 703.

### III. DISCUSSION

*A. UET's Motions*

1. Motion to Exclude Daniel Ray

PG&E's expert Daniel Ray is a Certified Public Accountant, a Certified Fraud Examiner, Certified in Financial Forensics, and a former Federal Bureau of Investigations agent. Ray has 35 years of experience analyzing accounting records and dealing with fraud-related issues. Ray offers opinions regarding PG&E's billing practices. Specifically, his testimony details how PG&E's billing practices function and opines that there is no indicia of fraud or an intent to defraud UET by PG&E under any of UET's theories. UET advances several arguments for excluding Ray's expert testimony, labelling his opinions as unreliable, proffering impermissible legal conclusions, and lacking any appreciable methodology, such that Ray's opinions will not assist the jury. UET's arguments ultimately are appropriate for cross-examination but not exclusion under *Daubert*.

UET's main criticisms of Ray's reliability focus on his parroting of PG&E's position

without independently verifying the information PG&E provided to him, or analyzing additional documents such as customer blue bills. UET further contends that Ray fails to articulate why his review of 35 customer accounts, many of which were highlighted in UET's complaint and identified by UET's expert Gregory Thaler as exemplars of the fraud schemes, reliably allowed him to extrapolate opinions about all of UET's approximately 120,000 accounts. UET presents reasons to question or discredit Ray's opinions. It has not, however, shown that his opinions are methodologically flawed as opposed to fodder for cross examination.

First, while UET is correct that an expert may not rely merely on the self-serving projections of his client, there is nothing in the record to suggest that Ray rested his valuation on PG&E's mere "say-so." *Clear-View Techs., Inc. v. Rasnick*, No. 13-cv-02744-BLF, 2015 WL 3505003, at *3 (N.D. Cal. June 2, 2015). Ray engaged in his own independent analysis of the customer data PG&E provided to him, consistent with his obligations as an expert under Rule 702 and *Daubert*. The validity of the underlying data on which Ray relies may be open to attack, but his approach to analyzing that data is not outside the realm of proper expert testimony. The same goes for Ray's lack of reliance on other sources, such as customer blue bills, as the focal point of his analysis or his decision to limit review to 35 accounts.

While UET may disagree with Ray's decision to limit the scope of his expert analysis, his methods are not so inherently suspect as to warrant excluding his testimony altogether. None of the cases UET invokes stand for the proposition that expert testimony is admissible only where it relies on expansive sampling, as UET seems to suggest. *See Alaska Rent-A-Car*, 738 F.3d at 969-70 (concluding that expert's extrapolation from 5% of the statewide rental car market went to impeachment, not admissibility). UET's reliance on *Abu-Lughod v. Calis* is readily distinguishable. In that case, an expert failed to provide any sound explanation for non-random sampling of the data and her chosen sample sizes such that the court could not be confident the expert applied the sampling methodology appropriately. *Abu-Lughod v. Calis*, No. CV 13-2792 DMG (GJSx), 2015 WL 12731921, at *4 (C.D. Cal. July 1, 2015). By contrast, in *Alaska Rent-A-Car*, the court concluded the expert provided adequate reasoning for limiting his analysis to one

city as a means of extrapolating statewide figures. *Alaska Rent-A-Car*, 738 F.3d at 968.

Here, Ray provides reasons for limiting his analysis to the 35 accounts, the bulk of which were highlighted in UET's complaint and the report of UET's expert, Thaler. (*See* UET Ex. O to Capritta Decl. at 187:9–188:11 (Dkt. 250-16) ("Ray Deposition") (explaining that 15 of the accounts he analyzed were identified in UET's complaint and Thaler's report as exemplars of the Credit Energy Scheme and why he analyzed them).) That Ray did not review all approximately 120,000 accounts, or used some other means to analyze a representative sample of the total population, goes to the weight of his opinions, not their admissibility. "Challenges that go to the weight of the evidence are within the province of a fact finder, not a trial court judge." *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014).

UET further argues that Ray's opinions in both his report and deposition are "riddled" with legal opinions and conclusions such that they are wholly inadmissible as a matter of law. Specifically, UET contends that Ray in essence will tell the jury that PG&E complied with the applicable laws and regulations, and that such testimony constitutes a legal issue on which an expert may not give an opinion. (*See, e.g.* UET Ex. P to Capritta Decl. at 13 (Dkt. 250-17) ("Ray Report") ("[O]n those occasions when PG&E did not remit any payment, or did not remit a full payment, to UET, PG&E was following the payment allocation procedure mandated by state law and the CPUC as set forth in PG&E's CPUC-approved Gas Rules."); Ray Deposition at 80:3–12 ("[Question] [Y]ou've . . . offered the opinion . . . that what PG&E is doing is appropriate under the gas rules, correct? [Answer] Correct, with respect to the . . . application of . . . partial payments to first satisfy its outstanding debt in connection with past-due debt . . . consistent with the tariffs and the gas rules.").) Moreover, UET insists Ray's opinion contradicts this Court's prior summary judgment order regarding testimony relative to compliance or non-compliance with the Gas Rules, tariffs, or CPUC decisions.

While the Ninth Circuit has held that an expert may not offer a legal conclusion, *United States v. Diaz*, 876 F.3d 1194, 1197 (9th Cir. 2017), the court has also held that "if the terms used by an expert witness do not have a specialized meaning in law" and "do not represent an attempt

to instruct the jury on the law," or "how to apply the law to the facts of the case, the testimony is not an impermissible legal conclusion." *Id.* at 1199. In *Diaz*, expert testimony was deemed admissible because it operated to assist the jury, was based on a review of the relevant facts, used legal terms in their ordinary, everyday sense, and did not substitute the expert's opinion for that of the jury. *Id.* Applying the court's reasoning to these facts, expert testimony may assist the jury with regard to understanding PG&E's billing practices. Accounting principles are not a matter of common knowledge for the majority of the public, and so Ray's testimony potentially could enlighten the jury on how to analyze accounts for fraud. Ray's opinions are grounded on a review of PG&E's billing practices, customer accounts, the tariffs, and the CPUC decision. Ray did not use any specialized legal terms to describe PG&E's compliance with proper billing practices. *Cf. Pokorny v. Quixtar, Inc.*, No. 07-00201 SC, 2007 WL 1932922, at *3 (N.D. Cal. June 29, 2007) (barring admission of an expert opinion for expressing a legal opinion on a distinct legal term: "unconscionable"). Ray did not substitute his judgment for the jury's, but instead provides his professional opinion about whether PG&E's conduct acted in conformance with its understanding of the Gas Rules. This does not suggest, of course, that Ray or any other expert will be free to opine that PG&E did not violate federal law, for that remains a question for the jury to determine.

Turning to this Court's prior summary judgment order, UET carries it too far. That order does not state that PG&E's belief in its compliance with Gas Rule 23 was definitively wrong. Rather, the order simply precludes PG&E from asserting that the California Public Utilities Commission ("CPUC") unambiguously decided that PG&E's allocation practices were and are compliant with Gas Rule 23. PG&E remains free to argue that its interpretation of Gas Rule 23 remains correct.[2] Accordingly, the motion to exclude Ray's testimony is denied.

---

[2] UET's contention that Ray is incompetent to opine on PG&E's compliance with applicable laws and regulations because he is not an expert on the interpretation of Gas Rules, tariffs, and CPUC decisions is off the mark. Ray is qualified to opine on indicia of accounting fraud, and his report and deposition focuses on that subject. Moreover, UET has not shown how accounting in the natural gas industry is sufficiently different from other industries such that Ray's accounting expertise would be inapplicable to that industry.

### 2. Motion to Exclude Michael Quinn

UET also moves to exclude Michael Quinn's testimony, arguing that his opinions are unreliable, fail to apply principles and methodology to the facts of this case, and will not assist the jury. Quinn is an expert in economics with over 20 years of experience in the natural gas industry. His initial report focused generally on the background of the natural gas market and the regulatory structure governing PG&E and Core Transport Agents ("CTAs"). Quinn's rebuttal report addressed the opinions of Jesse David, UET's proffered expert on lost profits. UET attacks Quinn's opinions in both respects as inadmissible for different reasons. These points, however, are better made in cross-examination.

First, UET argues that Quinn's initial report should be excluded as providing irrelevant history, the facts of which are not contested in this case and would not be helpful to the jury. Quinn's opinions, however, could provide valuable background for the jury that is likely unaccustomed to the natural gas market in California and thereby assist it in understanding the complex regulatory background governing the role of PG&E and the CTAs. *Cf. Stambolian v. Novartis Pharm. Corp.*, No. 12 Civ. 4378, 2013 WL 6345566, at *8 (C.D. Cal. Dec. 6, 2013) (admitting expert testimony concerning the "complex regulatory framework governing . . . pharmaceutical medical products" because it "will be helpful to members of the jury who are likely not familiar with the intricacies of FDA pharmaceutical drug approval and regulation process"). Although Quinn does not present himself as a regulatory expert per se, he is an expert in the economics of the natural gas industry. *See id.* ("Qualification is viewed liberally and may be based on a broad range of skills, knowledge, training, and experience.").

Second, UET asserts that Quinn's rebuttal report testimony, in which he calculated UET's mitigation profits and attacked the conclusion of UET's expert, should be excluded. UET reasons that Quinn relied on insufficient sources and improperly asserted economic platitudes that failed to analyze the reality of UET and PG&E's circumstances. None of UET's reasoning is persuasive. UET criticizes Quinn for basing his opinions regarding mitigation (whereby UET sold "green gas" to customers who paid a premium to purchase carbon offsets paired with their gas to offset their

greenhouse gas emissions, in addition to purchasing renewable energy certificates (Ex. S to Capritta Decl. at 5 (Dkt. 250-20) ("Quinn Rebuttal Report"))) on the unsupported assumption that UET would not have marketed "green gas" if not for PG&E's fraud. Quinn relied upon the declaration of Michael Huggins, UET's managing director, for the fact that in 2015, UET began exploring "green gas" marketing efforts as a result of PG&E's allegedly improper practices. (Quinn Rebuttal Report at 5 (citing Huggins Decl. at 4); *see also* Ex. 6 to Sias Decl. ¶¶ 18–19 (Dkt. 234-8) ("Huggins Declaration") ("[W]e explored selling carbon offsets and renewable energy credits bundled with our gas service. PG&E's fraudulent billing practices caused UET to change its marketing practices.").) Given that one of UET's executives affirmatively stated UET engaged in "green gas" marketing due to PG&E's alleged fraudulent behavior, Quinn's assumption was not so outside the realm of reasonable expert opinion as to warrant excluding his testimony. UET fails to demonstrate why it is unreasonable for an expert to rely on statements made in a sworn, signed declaration absent evidence rebutting the underlying statements. *Abu-Lughod*, 2015 WL 12731921, at *4. UET's frustration with Quinn's inference that "green gas" customers would have purchased regular brown gas instead of another premium product in the absence of PG&E's alleged conduct can be used to attack the weight of his opinions, but not their admissibility.

UET also attacks Quinn's use of Huggins's "Green Gas and Customer Rec Spreadsheet" (Ex. T to Capritta Decl. (Dkt. 250-21)) as dependent on unreliable internal calculations that Quinn should have compared against UET's actual financial information. UET, however, does not provide evidence to suggest the numbers contained on the spreadsheet are incorrect. Moreover, Huggins admitted at his deposition that the number of customers in the spreadsheet "is based on weekly reports that I would get . . . saying they signed up X amount of green customers, and then I would just put them in here." (UET Ex. A to Capritta Decl. at 322:22–25 (Dkt. 250-2) ("Huggins Deposition").)[3]

---

[3] UET also criticizes Quinn's purported reliance on Huggins's 2013 "Blue Spruce Projected Revenue" spreadsheet (Ex. U to Capritta Decl.), however this document is not cited in his report.

UET condemns Quinn's opinion, reflected in both his rebuttal report and deposition, attacking its expert's conclusion UET decided to curtail marketing in 2014 for economically rational reasons, without offering his own opinion on what was economically rational for UET to do at that time. UET can certainly bring to the jury's attention the fact that Quinn limited his opinion to a criticism of UET expert David's conclusions but offered none of his own. At this stage, however, Quinn's opinion, however limited, is not so inherently suspect as to bar its consideration by the jury. UET does not suggest why an expert must do more than contradict another expert opinion's evidentiary basis in order to survive *Daubert*.

Finally, UET dismisses Quinn's rebuttal report and deposition as containing mostly generalities regarding market principles and conclusions, without applying them to the specific facts of this case. The deposition transcript, however, reveals that much of what UET laments as generalities were actually repeated attempts by UET to get Quinn to give an opinion on whether UET's marketing decision was rational or irrational. (*See, e.g.*, Ex. R to Capritta Decl. at 167:4–171:19 (Dkt. 250-19) ("Quinn Deposition") (extended dialogue between UET's counsel and Quinn).) In any case, UET does not explain how such "generalities" by Quinn taint the overall admissibility of his opinions. The one case UET invokes in support is inapposite: in that case, an expert opinion was excluded because the expert pointed to no authority in support of his foundational assumptions, nor identified any support derived from the reports he did consult. *Newkirk v. ConAgra Goods, Inc.*, 727 F. Supp. 2d 1006, 1017 (E.D. Wash. 2010). Furthermore, Quinn does state how his general market principles apply to this case. (Quinn Deposition at 190:14–17 ("Nothing I've looked at for this case would cause me to conclude . . . that [the] generally accepted theory and empirical observation in a number of industries [that it becomes more difficult to acquire customers the more of them you already have] doesn't hold here.").) Accordingly, the motion to exclude Quinn's testimony is denied.

B. *PG&E's Motion*

1. Motion to Exclude Jesse David

UET's economics expert Jesse David has over 20 years of experience performing

economic analysis. David offers opinions regarding how much lost profits UET incurred due to PG&E's averred fraudulent conduct and on UET's 2014 decision to scale back its marketing. He uses a "but-for" model to calculate UET's alleged lost profits incurred as a result of PG&E's purported improper conduct. (*See* UET Ex. E to Capritta Decl. at 96:2–25 (Dkt. 247) ("David Deposition"); Ex. 4 to Sias Decl. ¶¶ 8, 13–14 (Dkt. 234-6) ("David Report").) According to David, "but-for" PG&E's conduct and UET's shift in marketing strategy, UET would have reached its target number of customers and UET is entitled to the lost profits associated with those "lost" customers. David subsequently provided an alternative calculation alongside his original one, whereby he stopped calculating damages in June 2015 instead of continuing through to the end of the year. Additionally, David opines that it was "economically rational" for UET to scale back its marketing around the beginning of 2014 in response to PG&E's alleged behavior. (David Report ¶ 13.) PG&E challenges David's testimony on numerous grounds, claiming that his methodology in calculating UET's lost profits is inherently flawed and provides no analysis to support his opinion that UET's decision was "economically rational." PG&E's arguments likely comprise appropriate impeachment material with which to attack David's opinions, but do not amount to grounds for excluding them.

PG&E contends that David's failure to subtract UET's additional profits when it shifted to selling "green gas" offsets and RECs in response to PG&E's alleged conduct from his calculation of alleged lost profits is fatal to his opinion's admissibility. In PG&E's view, UET"s "green gas" mitigation strategy would not have occurred "but-for" PG&E's alleged conduct in the same way that UET lost profits in the same time frame, and so any damages calculation must account for both mitigation and lost profits. PG&E, however, provides no analysis demonstrating that David applied flawed methodology in his calculation of UET's lost profits. PG&E simply claims that David is incorrect with regard to *ultimate* damages: lost profits minus mitigation. There is nothing showing that David was wrong in his approach in determining UET's losses in the first instance. Contrary to PG&E's interpretation, *Brandon & Tibbs v. George Kevorkian Accountancy Corp.*, 226 Cal. App. 3d 442 (1990) does not dictate otherwise. That case was not about expert

admissibility, but instead concerned the trial court's failure to account for plaintiff's mitigation of its losses when *awarding* damages. *See id.* at 461, 463. What, if anything, UET is ultimately *entitled* to recover is for the trier of fact to decide. PG&E may make its case to the jury for why it is not ultimately responsible for any of UET's lost profits in light of its "green gas" mitigation efforts—if it is established at trial that they indeed are a form of mitigation—but it has not shown that David's methodology is too flawed to prevent the jury from considering his testimony.

The same goes for David's alternative calculation. PG&E sees that analysis, whereby he stops his lost profits analysis in June 2015 when UET began to turn a profit from "green gas," as an arbitrary way to avoid having to account for the profits UET made in shifting its marketing strategy. While it certainly is coincidental that David would proffer a calculation that conveniently terminates damages at the moment UET's "green gas" became profitable, this goes to impeachment of David's testimony, not exclusion. The alternative calculation used the same methods and data as the original calculation, which as just discussed is admissible. (David Deposition at 157:12–18.)

Finally, PG&E asserts David provided no analysis to support his opinion that UET's decision in 2014 to curtail marketing in response to PG&E's alleged impropriety was an "economically rational" decision. PG&E invokes the fact that UET was still profitable when it cut back on marketing, and that UET's actual revenue as a share of billed revenue increased between 2012 and 2013, as calculated by David. These arguments, however, represent fodder for cross-examination, not the basis for exclusion under *Daubert*. Similar to its adversary's arguments above, PG&E attacks David's opinion for not undertaking an independent analysis, but instead relying upon data provided by UET and the testimony of its officials. These arguments are unpersuasive. Additionally, PG&E's proffered cases are readily distinguishable. *Conde v. Velsicol Chem. Corp.* dealt with several experts' opinions that were contradicted by nineteen formal peer-reviewed studies. 24 F.3d 809, 813-14 (6th Cir. 1994). There is no such direct contradiction of David's testimony. Likewise, in *Three Crown Ltd. P'ship v. Salomon Bros., Inc.*, an expert opinion's assumptions had *no basis in the record*. 906 F. Supp. 876, 894 (S.D.N.Y.

1995). Here, David has grounded his opinion in the record. Accordingly, the motion to exclude David's testimony is denied.

*C. Sealing Motions*

In connection with their motions to exclude, UET and PG&E have submitted five sealing motions either to redact or seal entirely exhibits relied upon in their motions to exclude (or, in some cases, portions of the briefs). (*See* Dkt. 233, Dkt. 246, Dkt. 249, Dkt. 251, Dkt. 255.) In many instances, the parties fail to comply with the local rules regarding sealing motions, such as failing to file a responsive declaration establishing documents they designated qualify as sealable, per Local Rule 79-5(e). For example, UET never filed a responsive declaration for PG&E's sealing motion (Dkt. 233) filed in conjunction with PG&E's motion to exclude. In several other instances, the parties fail to offer a basis for sealing other than the fact that the document was marked confidential pursuant to a protective order. (*See, e.g.*, Capritta Decl., Dkt. 251.) Local Rule 79-5(d)(1)(A) explicitly states, "[r]eference to a stipulation or protective order that allows a party to designate certain documents as confidential is not sufficient to establish that a document, or portions thereof, are sealable." Other times, there appears to be confusion between the parties as to what document is proposed to be sealed. (*Compare* Capritta Decl., Dkt. 251, *with* Sias Decl., Dkt. 253 regarding Exhibit E.) The parties also fail, at times, to highlight portions of documents to indicate which portions of the unredacted version of the document should be omitted from the redacted version per Local Rule 79-5(d)(1)(A)(D), (d)(2). (*See, e.g.*, Dkt. 251, Ex. E, Ex. P.)

Some of the documents, however, appear appropriate for redactions or sealing. For example, the parties are correct to note that confidential and personally identifiable information regarding PG&E's customers should be kept from public view. (*See, e.g.*, Dkt. 233, Ex. 14.) In other instances, there has been an adequate showing that material qualifies as trade secrets eligible for sealing. (*See* Dkt. 251, Ex. L.)

Accordingly, no later than October 25, 2018, the parties shall engage in meet and confer negotiations to attempt to agree on the narrowest possible sealing order, and shall jointly submit such a proposed order no later than November 1, 2018. The proposed order shall clearly identify

any documents, or portions thereof, that the parties agree should be filed under seal (either entirely or with redactions), and concisely state the basis for such sealing. The parties shall clearly indicate where their respective declarations, either already submitted or new declarations, provide sufficient grounds to seal each document requested to be sealed. To the extent the parties are unable to reach agreement as to the propriety of sealing any particular material, the proposed order should include brackets or other indications sufficient to allow the Court to decide the dispute and enter the proposed order by accepting or rejecting the bracketed language. The proposed order should be one document, which in one fashion or another, will dispose of all five sealing motions identified above.

## IV. CONCLUSION

For the reasons stated above, UET's motions to exclude and PG&E's motion to exclude are each denied.

**IT IS SO ORDERED**.

Dated: October 16, 2018

RICHARD SEEBORG
United States District Judge

| | |
|---|---|
| From: | ECF-CAND@cand.uscourts.gov |
| Sent: | Tuesday, October 16, 2018 2:03 PM |
| To: | efiling@cand.uscourts.gov |
| Subject: | Activity in Case 3:15-cv-02383-RS United Energy Trading, LLC v. Pacific Gas & Electric Co. et al Order on Motion for Miscellaneous Relief |

This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.
***NOTE TO PUBLIC ACCESS USERS*** There is no charge for viewing opinions.

## U.S. District Court

## California Northern District

## Notice of Electronic Filing

The following transaction was entered on 10/16/2018 at 2:03 PM and filed on 10/16/2018
**Case Name:** United Energy Trading, LLC v. Pacific Gas & Electric Co. et al
**Case Number:** 3:15-cv-02383-RS
**Filer:**
**Document Number:** 258

**Docket Text:**
ORDER by Judge Richard Seeborg denying [234] Motion ; denying [250] Motion to Exclude. (cl, COURT STAFF) (Filed on 10/16/2018)


3:15-cv-02383-RS Notice has been electronically mailed to:

**Charles Lagrange Coleman , III**     ccoleman@hklaw.com, david.holtzman@hklaw.com

**David Ilan Holtzman**     david.holtzman@hklaw.com, denise.harmon@hklaw.com, robert.jimenez@hklaw.com

**Garrett S. Garfield**     garrett.garfield@hklaw.com, teresa.armendariz@hklaw.com

**Laurie Edelstein**     ledelstein@steptoe.com, dpetitta@steptoe.com, eng@steptoe.com

**Leah E. Capritta**     leah.capritta@hklaw.com, Elizabeth.austin@hklaw.com, lori.labash@hklaw.com

**Michael Dockterman**     mdockterman@steptoe.com

**Nicholas Brian Melzer**     nicholas.melzer@hklaw.com, bobb.mack@hklaw.com

**Seth Reed Sias**     ssias@steptoe.com, eng@steptoe.com, estephan@steptoe.com

**Tara S. Kaushik**     tara.kaushik@hklaw.com, cindy.ly@hklaw.com

Thomas Drew Leland   thomas.leland@hklaw.com, elizabeth.austin@hklaw.com, lori.labash@hklaw.com

3:15-cv-02383-RS Please see Local Rule 5-5; Notice has NOT been electronically mailed to:

The following document(s) are associated with this transaction:

Document description:Main Document
Original filename:N:\ecf\15-cv-02383-RS-UET_v_PG&E_-_Order_Denying_Daubert.pdf
Electronic document Stamp:
[STAMP CANDStamp_ID=977336130 [Date=10/16/2018] [FileNumber=15255394-0
] [b31da06519af1ed45f00f87418b126c2cae0dd2016616c456abe4e0116c4f1170ee
198f22f208a707e832cf54c89f59634a14c91d0f8145b17a1acb559583f2a]]