**Exhibit C**

# 1997 Cal. PUC LEXIS 973; 76 CPUC2d 230

California Public Utilities Commission

October 22, 1997

Decision No. 97-10-065, Application No. 97-02-005 (Filed February 3, 1997)

*CA Public Utilities Commission  Decisions*

**Reporter**
1997 Cal. PUC LEXIS 973 *; 76 CPUC2d 230

# Application of Pacific Gas and Electric Company for Authority to Change Core Procurement Rates on a Monthly Basis

# Core Terms

monthly, customer, cost, winter, procurement, gas bill, was, notice, meter, heat, residential customer, message, cycle, advice letter, estimate, forecast, season, tariff, update, shock, usage, evidentiary hearing, residential, consumer

**Panel:** P. Gregory Conlon, President, Jessie J. Knight, Jr., Henry M. Duque, Josiah L. Neeper, Richard A. Bilas, Commissioners

# Opinion

OPINION

Summary

We will authorize Pacific Gas and Electric Company (PG&E) to adopt a new core gas procurement rate tariff to provide for monthly revisions to rates.

Procedural Background

PG&E filed its application on February 3, 1997. It was noticed in the Daily Calendar on February 6, 1997. The Utility Reform Network (TURN) filed a protest on March 10, 1997, and Enron Capital and Trade Resources (Enron) filed a response in support of the application on the same date. PG&E nominated this proceeding as an "included proceeding" pursuant to the Experimental Rules and Procedure to Gain Experience, Where Practicable, With

Case: 19-30088    Doc# 11701-3    Filed: 12/15/21    Entered: 12/15/21 09:30:22    Page 2
Dara Silveira
of 9

Management of Commission Proceedings Under Requirements of SB 960, as adopted by the Commission in Resolution ALJ-170 dated January 13, 1997, and proposed that it be classified as a ratesetting proceeding. At its conference of April 9, 1997, the Commission preliminarily determined this matter as a ratesetting proceeding, assigned this proceeding to Commissioner Bilas, and assigned an administrative law judge (ALJ) to assist him. A prehearing [*2] conference (PHC) was held on May 27, 1997, at which no party had any comment on the categorization of this matter. Following the PHC, the assigned Commissioner filed an Assigned Commissioner's Scoping Memo Pursuant to Resolution ALJ-170 on June 9, 1997, in which (1) the categorization of this matter as "ratesetting" was confirmed; (2) it was determined that no evidentiary hearings were necessary; and (3) it was determined that the issues in this application were legal and policy issues: (a) should PG&E be authorized to adopt the core gas procurement rate tariff as set forth in Appendix A to the testimony attached to its application? (b) should PG&E be permitted to file an advice letter to implement the tariffs proposed by its application? and (c) should PG&E be permitted to file advice letters containing monthly revisions to the core gas procurement rate and the affected bundled core tariffs to be effective not later than the fifth business day of each month? The matter was submitted on the opening briefs of the parties filed on June 27, 1997, and the reply briefs of PG&E and Enron filed on July 7, 1997. On July 23, 1997, the assigned Commissioner and ALJ conducted a public participation [*3] hearing in Modesto, California to hear comments from customers regarding difficulty in obtaining information regarding the application from PG&E.

Discussion

Background

PG&E currently establishes its core gas [1] procurement rate in its Biennial Cost Allocation Proceeding, based on an estimate of gas commodity market prices for a two-year period. The difference between the estimate and the actual cost of core gas supplies is reflected in a balancing account. Periodically, rates are adjusted to amortize amounts in the balancing account or, alternatively, one-time refunds may be ordered. The result has been that the effects of variations in the supply and demand for natural gas do not affect core customers until long after the event, and core customers in any given short period are likely to be paying either more or less than they would pay otherwise.

In our Decision (D.) 95-07-048, we authorized PG&E, Southern California [*4] Gas Company (SoCalGas), and San Diego Gas & Electric Company (SDG&E) to change rates annually (instead of every other year), and we directed them to show the monthly cost of gas on consumer bills. SoCalGas and SDG&E subsequently sought, and obtained, authority to implement monthly pricing of core gas, in D.96-05-071 and D.96-08-037. PG&E now seeks similar authority.

Description of the Application

---

[1] "Core gas" customers are generally residential and small commercial customer accounts.

Case: 19-30088    Doc# 11701-3    Filed: 12/15/21    Entered: 12/15/21 09:30:22    Page 3 of 9

Dara Silveira

PG&E proposes a new core gas procurement rate with the following components: (1) a monthly forecast of its weighted average cost of gas (WACOG), including storage withdrawals when applicable; (2) an amount for franchise fees and uncollectible amounts; (3) a monthly amortization of balances in its core purchased gas account to true-up differences between the forecast and actual cost of gas for prior months; (4) the applicable core brokerage fee; (5) the Canadian demand charges; and (6) shrinkage.

To implement this rate, PG&E's proposed monthly core gas procurement tariff (Schedule G-CP), Preliminary Statement and existing bundled core tariffs would be revised monthly to reflect the current core gas procurement rate. PG&E proposes to do this by advice letter filing, as the only changes [*5] involved are numeric changes to the core gas rates.

### Whether Public Utilities (PU) Code Section 1708 Requires a Hearing

TURN argues that the adoption of PG&E's proposal would reverse the outcome of D.95-12-053, and, therefore, PU Code Section 1708 requires an evidentiary hearing if any party requests one. TURN was given an opportunity to identify disputed issues of material fact that require an evidentiary hearing, but it could not identify any disputed factual issues.

### Lack of Dispute Regarding Non-residential Customers

The protest filed by TURN does not raise any issues with respect to nonresidential core gas customers; all of TURN's concerns are directed to the effects of PG&E's proposal on residential customers. However, TURN agrees with PG&E that a timely connection between costs and rates is a desirable goal.

### Effect on Residential Customers

### Rate Shock

Under PG&E's proposal, gas rates would adjust monthly, instead of every other year. As a consequence, it can be expected that rates will be lower during the summer months and higher during the winter months, even if no difference in the average month occurred. This is due simply to replacing a 24-month [*6] forecast (in which all months are assumed to have equal gas costs) with a monthly estimate (in which the winter months, in which demand is higher, are expected to have higher rates than the average of winter and summer months). In addition, because of the increased usage of gas for heating in winter months, the quantity of gas consumed is also higher. In combination, these two factors can be expected to result in heating season bills that are higher than current levels even if *total* bills on an annual basis are little changed. [2] TURN acknowledges that the risk of rate shock is

---

[2] PG&E estimates that most of its customers will experience annual gas bill increases of less than 1.7%, and that the average core customer would experience an increase of only about 0.1%. However, *for an individual household*, the burden, or at least the perception of burden, of a higher bill than an averaged bill is a different matter. Thus, a consumer who was used to $ 85 gas bills in the winter and $ 35 gas bills in the summer, for example, might experience "rate shock" from a $ 100 gas bill in the winter even it were offset by a $ 20 gas bill in the summer.

unlikely, but regards it as serious. While variability in gas bills as a result of monthly differences in usage and wholesale gas prices is inevitable under PG&E's proposal, TURN believes that the risk should not be assumed unless some greater benefit to residential ratepayers is realized.

[*7]

PG&E analyzed April 1996 through March 1997 bills of average customers in the three climate zones of northern California that it serves. During that time, the average bills of customers in the coastal portion of Humboldt County would have declined by as much as $ 3.14 (October 1996) and increased by as much as $ 6.86 (January 1997). In the inland portion of the San Francisco Bay Area, the decrease would have been as much as $ 2.34 (April 1996), and the increase as much as $ 8.42 (January 1997). In Shasta, Trinity, Lassen, and the non-coastal part of Humboldt County, the decrease would have been as much as $ 3.75 (April 1996) and the increase as much as $ 10.19 January 1997). TURN states that it does not disagree with PG&E's data.

A $ 7-10 per month increase in the peak winter month average gas bills does not strike us as a "rate shock, " any more than a $ 2-4 per month decrease in spring/fall gas bills strikes us as a consumer windfall. However, we note that this data covers only one year and a colder (or warmer) year could cause more significant increases or decreases. For those customers for whom month-to-month variation in the cost of utility bills presents a household budgeting [*8] challenge, PG&E provides an optional balanced payment plan (BPP) that permits customers to average gas bills, based on the most-recent 12 months of usage.

Billing Cycle

TURN observes that because residential meters are read only once a month and are not time-of-use meters, and because different customers are on different billing cycles, the bill in any given month will almost always represent an average of two monthly periods. When one period has a higher gas cost than the other, customers may complain that they were unfairly billed because all of their usage was in the lower cost period, due to vacation, for example.

The solution to this problem is metering that records the time that the service was delivered. The costs of time-of-use metering may be prohibitive, but the record contains no evidence on this issue. However, we feel that the potential benefits of improved "price signals" outweigh the problem of an occasional high or low bill.

We also note that SoCal and SDG&E have this same program.

What Notice of Price Changes Should be Required

PG&E proposes to implement price changes on the fifth business day of each month. Through advice letter filings, customers will have [*9] the theoretical opportunity to learn in advance what the applicable rate will be for the coming month. That theoretical opportunity is made somewhat more practical by the availability of additional notice by telephone and Internet. TURN thinks such means are "useful but not sufficient" and suggests that PG&E should be required to advertise gas prices in newspapers and to explore other alternatives.

We are uncertain what the reaction of most residential customers would be to advertisement information that core gas procurement rates were about to change from $ 1.2195/MMBTU to $ 1.2238/MMBTU. It is beyond the efforts of most of us to calculate that the resulting effect on our next month's gas bill, if we were to use the same amount of gas, might be an increase of $ 4.00, and to resolve to turn down the heat for the night 15 minutes earlier to avoid that increase. Rather, we expect that most residential customers would sit down to pay their PG&E bill, notice that it is higher than the previous month, see that usage is about the same, and conclude the costs must have gone up. If this "price signal" is sharp enough, customers might start keeping the house a little cooler, depending on lifestyle [*10] and income. Sudden discontinuities in prices, moreover, are likely to receive widespread coverage in the media, which will alert customers to impending changes in gas costs. Since the costs of advertising and other means of communicating monthly prices changes are borne by all ratepayers, before we were to require it, we would want to have better evidence that such costs would be offset by savings to ratepayers.

TURN's suggestion that PG&E explore other alternatives has merit, as shown by the comments received at the public participation hearing. Members of the public who requested information from PG&E in response to its notice of this application experienced delay, received information concerning applications other than this one, and were unable to understand the application after they did receive it. In addition, they were able to receive only brief summaries in Spanish, which is their preferred language. They also complained about difficulties in communicating with PG&E on customer service issues not directly related to this application.

We are requiring additional notice of this change and we hope this mitigates some of the concerns.

*Whether Mitigation Measures Should be* [*11] *Required*

**Periodic Reports of Bills Based on Actual Meter Readings**

If PG&E's application is approved, TURN believes that PG&E should be required to establish a goal of making 99% of all bills based on actual meter readings, rather than estimates, and to report monthly data every quarter. PG&E asserts that it is already reading more than 99% for gas and electrical service on an annual basis, that estimates, rather than actual meter readings, are made for reasons beyond PG&E's control, and that no useful purpose would be served by requiring regular reports. We are not convinced that the "potential for dramatic bill impacts and increased customer complaints under monthly" pricing that TURN cites as its reason exists, and we will not require the reports in connection with this application.

**Changes to Residential Billing Procedures**

TURN suggests that if the application is approved, the Commission "should also require PG&E to develop a proposal for implementing monthly pricing for residential customers in a more effective manner. If the Commission is serious about bringing competitive choices to residential gas customers, it must implement changes which bring meaningful choice. [*12] TURN lacks the technical expertise with PG&E's billing system which is necessary to design a residential monthly pricing proposal which truly benefits customers. " However, TURN does not amplify its suggestion to indicate what it believes to be the shortcomings that such a proposal would address, other than to suggest, indirectly, that it has something to do with PG&E's billing system. TURN's

suggestion is insufficiently developed for us to act upon it at this time. However, the Commission may consider changes to billing and metering for residential customer in the Natural Gas Strategy.

We are concerned that PG&E's core customers be adequately informed about the changes in their gas bills that will result from this decision. This is particularly true given that this decision will be effective immediately, which is close to the start of the winter heating season. Therefore, for 1997, we will require PG&E to inform all of its affected core customers through a bill insert, notice on their bill, or other appropriate means. This message should convey the following points; 1) the reason for the change in billing; 2) that the customer's winter bill is likely to be higher than it was in previous [*13] years; 3) that the customer's bills for the other months of the year may be lower than they otherwise would have been; and 4) reminding customers of their level payment plan options. This message should be presented during the earliest possible billing cycle for each customer that is practical. For 1998, PG&E should provide a similar message to its affected core customers during the billing cycle that precedes the start of the winter heating season. PG&E should work with our Energy Division to finalize the form, content, and timing of this message for 1997 and 1998. At the present time, we will not require PG&E to provide this message to its customers beyond 1998, since we hope that customers will have become accustomed to the new billing patterns by then.

Findings of Fact

1. PG&E is a public utility subject to the jurisdiction of this Commission.

2. PG&E filed its application on February 3, 1997.

3. Notice appeared in the Daily Calendar on February 6, 1997.

4. TURN filed a protest to the application.

5. TURN did not state facts that it would present at an evidentiary hearing.

6. Enron filed a response in support of the application.

7. More frequent forecasts of gas procurement [*14] costs would reduce the difference between costs and rates, thus providing consumers with more accurate price signals.

8. Rate shock for residential customers due to changing to monthly core gas pricing is unlikely.

9. For those customers for whom month-to-month variation in the cost of utility bills present a household budgeting challenge, PG&E provides a BPP that permits customers to average gas bills, based on the most recent 12 months of usage.

10. There is no evidence that time-of-use metering, periodic reports on the percentage of meters read for each billing cycle, or unspecified improvements in billing practices are necessary.

11. Core gas customers should receive adequate notice of changes to core gas pricing prior to the commencement of the 1997 and 1998 winter heating seasons.

Conclusions of Law

1. An evidentiary hearing is not necessary for purposes of determining PG&E's request to implement monthly core gas pricing.

2. Rate shock due to changing to monthly core gas pricing is not a sufficiently serious problem to justify rejecting the application.

3. PG&E should be permitted to establish a new rate schedule, Schedule G-CP-- "Gas Procurement to Core End-Use Customers, " [*15] to show the gas procurement cost included in PG&E's core rates.

4. The Schedule G-CP rate should consist of the following components, updated monthly, as appropriate: (a) a monthly forecast of PG&E's WACOG, including storage withdrawals, when applicable; (b) a monthly amortization component for PG&E's core purchased gas account; (c) Canadian capacity charges; (d) shrinkage; (e) the core brokerage fee; (f) interstate capacity charges (upon approval of Application 96-09-029); and (g) an amount for franchise fees and uncollectible amounts.

5. PG&E's Preliminary Statement, Part--"Default Tariff Rate Components," and the following core rate schedules should be updated monthly to reflect the updated Schedule G-CP rate: (a) G-1; (b) GM; (c) GS; (d) GT; (e) GL-1; (f) GML; (g) GSL); (h) GTL; (i) G-NR1; (j) G-NR2; (k) G-CT; (1) G-NGV1; and (m) G-NGV2.

6. We should require PG&E to provide notice for its affected core customers prior to the commencement of the 1997 and 1998 winter heating seasons.

ORDER

IT IS ORDERED that:

1. Pacific Gas and Electric Company (PG&E) may establish a new rate schedule, Schedule G-CP--"Gas Procurement to Core End-Use Customers, " to show the gas procurement [*16] cost included in PG&E's core rates.

2. The Schedule G-CP rate shall consist of the following components, updated monthly, as appropriate: (a) a monthly forecast of PG&E's weighted average cost of gas, including storage withdrawals, when applicable; (b) a monthly amortization component for PG&E's core purchased gas account; (c) Canadian capacity charges; (d) shrinkage; (e) the core brokerage fee; (f) interstate capacity charges (upon approval of Application (A.) 96-09-029); and (g) an amount for franchise fees and uncollectible amounts.

3. PG&E's Preliminary Statement, Part--"Default Tariff Rate Components," and the following core rate schedules shall be updated monthly by advice letter filing to reflect the updated Schedule G-CP rate: (a) G-1; (b) GM; (c) GS; (d) GT; (e) GL-1; (f) GML; (g) GSL); (h) GTL; (i) G-NR1; (j) G-NR2; (k) G-CT; (l) G-NGV1; and (m) G-NGV2.

These monthly advice letter filings shall become effective on the fifth business day of the month, be filed at least five days before the effective date, and include workpapers detailing the derivation of the requested rate change.

4. PG&E shall inform all of its affected core customers through a bill insert, notice on their [*17] bill, or other appropriate means, to be developed in consultation with the Commission's Energy Division, which shall convey (a) the reason for the change in billing; (b) that the customer's winter bill is likely to be higher than it was in previous years; (c) that the customer's bills for the other months of the year may be lower than they otherwise would have been; and (d) level payment plan options. This message shall be delivered during the earliest practical billing cycle for each customer. For 1998, PG&E shall provide a similar message to its affected core customers during the billing cycle that precedes the start of the winter heating season.

5. A.97-02-005 is closed.

This order is effective today.

Dated October 22, 1997, at San Francisco, California.

CA Public Utilities Commission    Decisions

End of Document