1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Exhibit A**

COM/CAP/ek4                                  **Date of Issuance 4/25/2016**

Decision  16-04-026  April 21, 2016

**BEFORE THE PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA**

Order Instituting Rulemaking to Consider
Single Methodology to Calculate                    Rulemaking 14-03-016
Remittance Under Municipal Surcharge               (Filed March 27, 2014)
Act.

**DECISION ADOPTING UNIFORM MUNICIPAL PUBLIC LANDS USE
SURCHARGE METHODOLOGY**

160165217

Table of Contents

**Title**                                                                    Page

DECISION ADOPTING UNIFORM MUNICIPAL PUBLIC LANDS USE
SURCHARGE METHODOLOGY ................................................................1

Summary ..........................................................................................2

1.   Proceeding Background ...............................................................2

2.   Prior Commission Action ............................................................5

3.   Current Remittance Methodologies............................................9

4.   Discussion ..................................................................................12

    4.1.   Should the Commission Adopt a  Consistent Remittance
    Methodology? .............................................................................12

    4.2.   Which Uniform Methodology Should the Commission Adopt? ........13

    4.3.   The Impact of a Single Remittance Methodology ................16

5.   Remittance Shock Mitigation Measures....................................19

6.   Conclusion ..................................................................................21

7.   Comments on Proposed Decision ............................................22

8.   Assignment of Proceeding ........................................................23

Findings of Fact ..............................................................................23

Conclusions of Law ........................................................................24

ORDER ............................................................................................25

Case: 19-30088    Doc# 11847-1    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 3
of 28

## DECISION ADOPTING UNIFORM MUNICIPAL PUBLIC LANDS USE SURCHARGE METHODOLOGY

### Summary

Today's decision directs that a uniform methodology be used by the Pacific Gas and Electric Company, Southern California Edison Company, San Diego Gas & Electric Company, and Southern California Gas Company to calculate municipal surcharge remittances pursuant to California Public Utilities Code section 6354(b).[1]  Consistent with the discussion within, the San Diego Gas & Electric Company and Southern California Gas Company shall modify their remittance calculation methodology such that it is consistent with the methodology currently used by the Pacific Gas and Electric Company and the Southern California Edison Company.  Today's decision only relates to the distribution of proceeds collected pursuant to California Public Utilities Code section 6354(b); it does not address the methodology used to collect franchise fees (which is not disputed by the parties), or the reasonableness of prior surcharge remittance methodologies.  This decision closes the proceeding.

### 1. Proceeding Background

In Complaint (C.) 11-08-022, the Cities of Concord, Taft, Kerman, Madera, and Clovis (the Cities) challenged Pacific Gas and Electric Company's (PG&E) method of calculating municipal surcharge revenue remittances pursuant to the Municipal Public Lands Surcharge Act, Public Utilities Code Sections 6352-6354.1 (Surcharge Act).[2]  Specifically, the Cities argued that PG&E's methodology did

---

[1] Unless otherwise stated, all references herein are to the California Public Utilities Code.

[2] Prior to "unbundling" and other changes in the regulatory environment, the IOUs paid cities and municipalities franchise fees as compensation for being able to run their pipes, wires, and

*Footnote continued on next page*

not reflect the payment of franchise fees in the energy transporter's agreement as required by the Surcharge Act. According to the Cities, PG&E's methodology has resulted in some cities and municipalities being underpaid remittances for several years. By way of relief, in C.11-08-022 the Cities requested that the California Public Utilities Commission (Commission) order PG&E to modify its remittance methodology and reimburse the Cities for past underpayments.

Over the course of subsequent discussions, the Cities and PG&E agreed that the relief requested in C.11-08-022 raised certain issues, the resolution of which could impact the surcharge remittance methodology employed by PG&E, the Southern California Edison Company (SCE), the San Diego Gas & Electric Company (SDG&E), and the Southern California Gas Company (SoCalGas), (collectively, the utilities) throughout the state.[3] The Cities and PG&E thereafter agreed that the Commission should institute a separate rulemaking proceeding to establish a uniform methodology for use by all Utilities when calculating future municipal surcharge remittances. In anticipation of the Commission's institution of a separate rulemaking proceeding on August 5, 2013, the Cities and PG&E thereafter agreed to dismiss C.11-08-022 without prejudice.[4] On September 11, 2013, pursuant to Pub. Util. Code § 1708.5, the Cities and PG&E jointly filed Petition (P.) 13-09-006, asking the Commission to initiate a rulemaking proceeding to establish a single statewide remittance methodology consistent with the Surcharge Act.

---

product in, on, and through the cities and municipalities. The municipal surcharge is intended to replace, but not to increase those franchise fees.

[3] SDG&E and SoCalGas may jointly be referred to as Sempra.

[4] On August 5, 2013, the Cities and PG&E filed a joint motion to dismiss C.11-08-022.

Case: 19-30088   Doc# 11847-1   Filed: 01/21/22   Entered: 01/21/22 11:46:37   Page 5 of 28

On March 27, 2014, the Commission issued Rulemaking (R.) 14-03-016, which closed P.13-09-006 and instituted a proceeding to determine whether a single statewide methodology should be used to calculate the remittances provided for by California Public Utilities Code Sections 6354(b).[5]  As set forth in the rulemaking, comments were sought on the following issues:

1. Whether the Commission should direct the Utilities to use the PG&E methodology, the Sempra Methodology, or some other methodology to calculate franchise fee remittances under the Surcharge Act;

2. What, if any, impact(s) the adoption of the PG&E methodology, the Sempra Methodology, or some other methodology to calculate remittances under the Surcharge Act will have on ratepayers in the Utilities' jurisdictions;

3. What, if any, impact(s) the adoption of the PG&E methodology, the Sempra Methodology, or some other methodology to calculate remittances under the Surcharge Act will have on cities and counties in the Utilities' jurisdictions; and

4. What, if any, impact(s) the adoption of the PG&E methodology, the Sempra Methodology, or some other methodology to calculate remittances under the Surcharge Act will have on the Utilities.

Neither the methodology used to collect franchise fees nor the reasonableness of prior surcharge remittance methodologies was identified as an issue to be considered in this proceeding.[6]

---

[5] R.14-03-016 directed the Utilities to inform the municipalities in their jurisdiction of the issues being addressed in this proceeding.

[6] R.14-03-016, at 8.

Comments on the above issues were filed on August 4, 2014, by PG&E, the Cities, SCE, and SoCalGas and SDG&E.[7]  Reply comments were filed on September 4, 2014, by PG&E, the Cities, SCE, the County of Lake, and Sempra.

The Proposed Decision (PD) in this proceeding mailed on August 31, 2015. In an abundance of caution, by ruling dated September 25, 2015, the assigned Commissioner clarified that proposals to mitigate potential remittance-shock caused by adoption of a uniform surcharge remittance methodology are within the scope of the proceeding and provided parties the opportunity to propose and respond to proposed methods to mitigate the potential "remittance-shock."

## 2.    Prior Commission Action

The Commission has previously addressed municipal surcharge remittance issues.  In Decision (D.) 02-02-052, we allocated the California Department of Water Resources (DWR) revenue requirement among customers in the service territories of the Utilities.  In D.02-02-052, we authorized certain interim measures pending a final resolution of the dispute relating to franchise fees following analysis of the legal and factual issues involved.  However, during the course of the proceedings a dispute arose involving whether, or on what basis, franchise fees may be assessed, collected, and remitted to municipalities for electric power sales made by DWR to customers pursuant to Assembly Bill (AB) 1 of the First Extraordinary Session (Stats. 2001, Ch. 4), (hereafter, AB1X). This was addressed in D.03-02-032.

In D.03-02-032, we directed the utilities to treat DWR like other third-party suppliers, to use the municipal surcharge approach specified in Pub. Util. Code §§ 6352-6354.1 to calculate the fees to be collected and remitted to municipalities,

---

[7]  SoCalGas and SDG&E jointly, are referred to as Sempra.

Case: 19-30088    Doc# 11847-1    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 7 of 28

and concluded that "previously authorized accounting and ratemaking measures adopted in D.02-02-052 adequately provide for the ongoing collection and remittance of municipal surcharges related to DWR revenues and that no additional measures need to be authorized for purposes of the instant order."[8] Also, in D.03-02-032 PG&E raised questions as to whether the amounts it previously remitted to municipalities based on DWR sales revenues represented the correct amounts due.

Based on its interpretation of Pub. Util. Code § 6353(d), PG&E proposed to calculate and remit municipal surcharges relating to DWR power by multiplying DWR revenues times the franchise fee percentage factor adopted in its last General Rate Case. At PG&E's request, the Commission provided for a workshop to discuss technical issues regarding the calculation of proper remittances of surcharges to municipalities for electric power sales by DWR. Among other things, parties were asked to address the issue of uniformity and consistency among the utilities in the methodology and process for applying the applicable statutes for calculating and remitting municipal surcharge fees. To the extent there were differences in calculation or remittance methodologies, parties were to address what revisions were warranted in order to bring each of the utilities into uniform compliance with the applicable statutory provisions discussed in D.03-02-032.[9]

---

[8] D.03-02-032 at 19.

[9] In addition to the service list of the proceeding, PG&E was directed to serve a copy of its workshop report on all of the municipalities in its service area. PG&E filed and served a status report on the results of the workshop on May 2, 2003. By ALJ ruling dated May 29, 2003, parties and affected municipalities were provided notice and the opportunity to comment on the workshop report. The workshop report and party comments provided the basis for D.03-10-040.

Case: 19-30088    Doc# 11847-1    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 8 of 28

In comments on the workshop report, PG&E and other parties expressed the belief that there is value in using a consistent approach for all of the power provided by DWR to the customers of the state's electric utilities. In substantially similar fashion to the current dispute, SDG&E's comments on the workshop report noted that while they agreed with PG&E's method for calculating and collecting franchise fees from retail customers relating to DWR charges, they disagreed with PG&E's method of calculating the DWR surcharge remittance to municipalities. As set forth in Decision (D.) 03-10-040:

> While PG&E would use the same general rate case franchise fee factor for calculating the municipal surcharge fee due to each municipality, SDG&E and SCE, by contrast, believe Pub. Util. Code §§ 6352(d) and 6354(b) require them to remit surcharges to municipalities per the rate prescribed for each individual municipality in their respective franchise agreement.

SDG&E also noted that its methodology includes DWR revenues in the calculation of franchise fees as if the DWR charges were part of the utility's gross revenues.[10]

In D.03-10-040, we compared PG&E's approach to municipal surcharge remittances with that of SDG&E and SCE and found:

- The proper application of the statute should provide the same level of remittances to the municipality as they would have received under the franchise fee formula. By adopting this approach, each of the three utilities shall both collect and remit municipal surcharges on a consistent basis.

---

[10] D.03-10-040 at 9.

Case: 19-30088   Doc# 11847-1   Filed: 01/21/22   Entered: 01/21/22 11:46:37   Page 9 of 28

- The remittance of municipal surcharge revenues should be done in accordance with the remittance requirements specified in each respective franchise agreements.

- Rather than simply applying a weighted average remittance rate to every municipality, remittances of surcharge fees to each municipality should utilize the same percentage factor that is specified in the specific franchise agreement applicable to the franchisor municipality in question.

- Application of a uniform average factor to all municipalities violates the statutory provisions of Section 6350 governing the municipal surcharge that specifies that the surcharge will "replace, but not increase, franchise fees that would have been collected…".

Based on these findings, in D.03-10-040 we directed PG&E to calculate and remit DWR municipal surcharge fees "based upon the prescribed rates called for in the respective franchise agreement applicable to each municipality, and on a basis consistent with the remittance methodology already being employed by Southern California Edison Company and San Diego Gas & Electric Company."[11]

However, these decisions are not controlling here.  As noted above, D.02-02-052, D.03-02-032, and D.03-10-040 only addressed the remittance of municipal surcharges in the context of DWR power sales.  The DWR power sales surcharge applied to all electricity customers evenly in all municipalities.  Here, the number of customers paying the surcharge may vary from municipality to municipality.  The PG&E/SCE methodology allocates all surcharge revenue collected in each municipality to that municipality.  This "pass-through" approach ensures that amounts collected in a municipality are received by that

---

[11]  D.03-10-040, OP 1.

Case: 19-30088    Doc# 11847-1    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page
10 of 28

municipality and not others. Moreover, neither the differences between the PG&E/SCE and Sempra methodologies nor the potential financial consequences for various cities and counties was an issue in D.03-10-040.[12] Thus, while the Commission addressed municipal surcharge remittances pursuant to Pub. Util. Code §§ 6352-6354.1 some 12 years ago, and has expressed a preference for a uniform methodology that provides for remittances to be calculated based upon the prescribed rates called for in municipalities' franchise agreements, our prior cases are not controlling in this instance.[13]

### 3. Current Remittance Methodologies

Direct access enabled Californians to purchase energy as a commodity from third party energy service providers.[14] The Surcharge Act provides for a surcharge to replace, but not increase, franchise fees that would have been collected by the Utilities, if not for changes in the regulatory environment related to the adoption of direct access. Where Section 6352(a) of the Surcharge Act

---

[12] D.03-10-040, OP 1 directs PG&E to remit municipal surcharge revenues on a consistent basis with the remittance method already being utilized by SCE and SDG&E.

[13] In D.06-05-005 we found no basis to expand the limited scope of the review of municipal surcharge fees in D.03-10-040, and affirmed that D.03-10-040 does not address PG&E's remittance methodology for municipal surcharges generally but is instead limited in applicability to DWR revenues.

[14] Prior to energy deregulation, the utilities offered "bundled" utility services, where the Utilities distributed and sold at retail almost 100% of the electricity and natural gas consumed in California. As a result of energy deregulation, natural gas and electricity services were "unbundled," allowing customers the option to buy electricity and natural gas directly from third party suppliers and producers rather than the Utilities. Because customers now had "direct access" to third party suppliers and producers, the Utilities now only transported the commodity from the supplier to the customer. Because the Utilities were no longer receiving revenue from the sale of the commodity at retail to these customers, third party commodity sales would no longer be included in the calculation of the franchise fee remittance to the municipality under the Utilities' franchise agreement, resulting in lower franchise payments to municipalities.

Case: 19-30088    Doc# 11847-1    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 11 of 28

provides for the collection of a surcharge, Section 6354(b) of the Surcharge Act addresses dispensation of the franchise fee and provides that:

> Surcharges collected from the transportation customer shall be remitted to the municipality granting a franchise pursuant to this division in the manner and at the time prescribed for payment of franchise fees in the energy transporter's franchise agreement.[15]

While the Utilities appear to use a uniform methodology to calculate the surcharge collected and claim to remit 100% of the revenue they collect, the remittance methodology used by PG&E and SCE differ significantly from that used by SoCalGas and SDG&E. As a result, even with all other things being equal, municipal entities will likely receive different amounts of compensation, depending on which IOU serves their territory.

PG&E remits the electric surcharges to 256 municipal entities and remits the gas surcharge to 245 municipal entities. After PG&E collects surcharges, it calculates the surcharge remittance for a given jurisdiction by multiplying a "franchise fee factor" by the third party revenues from customers within that jurisdiction.[16] PG&E uses this "pass-through" methodology to remit 100% of what it collects from end users in each municipality back to that same municipality. According to PG&E, because its methodology does not pool the surcharges that are collected, it does not result in cross-subsidization (*i.e.* where the end users in one municipality subsidize those in another municipality).

---

[15] Section 6354(b) also provides that "the energy transporter may retain interest earned on cash balances resulting from the timing difference between the monthly collection of the surcharge and the remittance thereof, as required by individual Franchise agreements."

[14] The franchise fee factor is a weighted average of the percentages applied under the various franchise agreements of all the jurisdictions within the utility's service territory.

Case: 19-30088    Doc# 11847-1    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 12 of 28

SCE reports that in 2012 it paid the surcharge to approximately 199 of the 206 jurisdictions in which it maintains a franchise.  SCE calculates the surcharge utilizing the franchise fee factor adopted by the Commission in SCE's most recent general rate case.[17]  SCE collects the surcharge from the applicable transportation customers and remits such payments to its cities and counties in the time and form (*i.e.* check or charge) set forth in its respective franchise agreements.  This is the same pass-through methodology used by PG&E.

Though this approach does not incorporate the percentage payments called for in the city and county franchise agreements, both PG&E and SCE argue that this approach comports with the section 6354(b) requirement that remittances be made in the manner and at the time prescribed for payment of franchise fees in the energy transporter's franchise agreement.

Like PG&E and SCE, Sempra claims to calculate municipal surcharge remittances using the franchise fee calculation formulas found in each individual franchise agreement.[18]  The Cities further explain that the Sempra Methodology treats the surcharges collected from transport customers in jurisdictions where transport customers are located, that are subject to a Commission approved franchise fee factor, as though they were receipts subject to the jurisdiction's franchise agreement.[19]  The treatment of receipts subject to the franchise agreements is in turn governed by The Franchise Act of 1937, Pub. Util. Code §§ 6201 *et seq.* (the "1937 Act"), which applies to nearly all cities' franchises.

---

[17]  *See* Advice Filing No. 2336-E.

[18]  Sempra Opening Comments at 3.

[19]  Where Sempra and the Cities appear to suggest that surcharge collections/remittances in one jurisdiction are independent of surcharge collections/remittances in another jurisdiction, SCE argues the contrary position and asserts that the Sempra method results in pooling.

Case: 19-30088   Doc# 11847-1   Filed: 01/21/22   Entered: 01/21/22 11:46:37   Page 13 of 28

Pursuant to the 1937 Act, the franchise agreements provide that the city receive a franchise fee that is the greater of:

- 1% or ½% or a negotiated percentage of the gross receipts "from the sale of electricity within the municipality" (hereinafter referred to as the "Gross Receipts Calculation"), or

- 2% of the gross receipts "arising from the use, operation or possession of the franchise" (hereinafter referred to as the "Broughton Calculation").

In effect, after surcharges are collected from transport customers and subjected to a Commission approved franchise fee factor, the Sempra methodology performs additional calculations to incorporate the franchise agreements set forth in the 1937 Act.[20]

## 4.  Discussion

### 4.1.  Should the Commission Adopt a Consistent Remittance Methodology?

Fairness, efficiency, and clarity argue for a uniform method of calculating remittances under the Surcharge Act, and no party contends that the Commission either cannot or should not require adoption of a uniform remittance methodology.  Instead, each party contends that their preferred methodology should be adopted by the Commission as the uniform remittance methodology.  For example, where Sempra states that it does not believe that the Commission must adopt a uniform Surcharge Act remittance methodology (because the legislature already provides sufficient guidance with which it

---

[20]  The parties' comments do not make clear whether this calculation is applied to all cities and counties in the Sempra jurisdictions, just those that entered into franchise agreements, or some variant thereof.

Case: 19-30088   Doc# 11847-1   Filed: 01/21/22   Entered: 01/21/22 11:46:37   Page 14 of 28

complies), and the Cities contend that the statewide adoption of the Sempra methodology is consistent with the Surcharge Act, SCE argues that, to the extent the Commission finds it necessary to establish a uniform remittance formula, the Commission should clarify that the appropriate methodology is the one used by SCE and PG&E.[21]

### 4.2. Which Uniform Methodology Should the Commission Adopt?

The different remittance approaches adopted by the Utilities reflect their different interpretations of the requirement that surcharges collected from the transportation customer must be remitted to the municipality granting a franchise in the "manner and at the time prescribed for payment of franchise fees in the energy transporter's franchise agreement."[22] Where PG&E and SCE read this language as requiring them to forward the remittance in the manner (i.e. cash, check, or etc.) and time set forth in the recipient's franchise agreement (which they calculate using the franchise fee factor), Sempra reads this language as requiring the remittance to be calculated and forwarded as provided for in the municipality's franchise agreement. In essence, where PG&E and SCE read Section 6354(b) as addressing the mechanics of the remittance, Sempra and the Cities read it as addressing the calculation of the remittance.

SCE argues that the plain language of Section 6354(b) supports the PG&E/SCE interpretation. After citing *City of Pasadena v. AT&T Communications of California, Inc.* 103 Cal. App. 4th 981, (Cal. App. 2d 2002), for the proposition

---

[21] *See* Sempra Opening Comments at 2, the Cities' Opening Comments at 1, and SCE Opening Comments at 3.

[22] Section 6354(b) (emphasis added).

Case: 19-30088   Doc# 11847-1   Filed: 01/21/22   Entered: 01/21/22 11:46:37   Page 15 of 28

that the term "remitted" simply means to send, SCE argues that the phrase "manner and at the time" used in Section 6354(b) only speaks to the timing and method for the payment, and does not relate to the calculation of the remittance. The Cities take issue with SCE's plain language interpretation and note that this Commission has used the term "the manner" in the same context, to reference a method of calculation.[23]

SCE also argues that the legislature established a system for calculating and remitting surcharges using the 'franchise fee factor' established by the Commission.[24] According to SCE, as evidenced by its having instructed the Utilities to calculate the surcharge by using the "franchise fee factor," the legislature knew the difference between the "franchise fee factor" and the "franchise fee rate." SCE concludes that "[h]ad the legislature wanted the utilities to remit collected Surcharges in accordance with the 'franchise fee rates' it would have said so."[25]

In contrast, Sempra and the Cities note that Article 1 of the Surcharge Act states: "'[t]here is hereby created a surcharge … to replace, but not increase, franchise fees that would have been collected' if not for unbundling." Sempra and the Cities read this language as evidencing the intent to make each municipality whole for lost franchise fee revenues.[26] In this regard, Sempra points out that the June 18, 1993 Legislative Bill Analysis of Senate Bill (SB) 278,

---

[23] The Cities' Reply Comments at 7-8, citing D.03-10-040 and D.06-05-005.

[24] SCE Comments at 9.

[25] This argument seems somewhat circular in that it assumes, as SCE argues, that in drafting Section 6354(b) the legislature used the term "the manner" to refer to the mechanics rather than the calculation of the remittance payment.

[26] *See* the Cities' Reply Comments at 3 and Sempra Reply Comments at 6.

Case: 19-30088    Doc# 11847-1    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 16 of 28

which ultimately added the Surcharge Act to the Public Utilities Code, notes that "the passage of SB 278 is essential for county government to maintain its existing revenue authority to charge a franchise fee for the transportation of natural gas through the county."  Sempra further notes that, at the time SB278 was enacted, most counties in the SoCalGas and SDG&E service territories received franchise fee revenues from SoCalGas and SDG&E pursuant to their franchise agreements. Sempra points out that, prior to the Surcharge Act, charter cities could choose to negotiate their own franchise agreement terms and were not necessarily restricted to the payment dates or formulas required by general law cities' franchises and concludes that "in order to replace lost franchise fees for both general law and charter cites, the Surcharge Act instructed Investor Owned Utilities … to remit surcharges collected from the transportation customers to the municipalities that granted franchises to the Utilities in the manner and at the time prescribed for payment of franchise fees in the energy transporter's franchise agreement.[27]

While we agree with Sempra and the Cities that in enacting the Surcharge Act the legislature intended to replace lost franchise fees, we do not believe that, as used in the Surcharge Act, the term "replace" means to make whole. Specifically, while Article 1 of the Surcharge Act plainly evidences the intent to replace franchise fees that would have been collected if not for unbundling, the Surcharge Act is devoid of language requiring that municipal entities be made whole.

---

[27]  Sempra Reply Comments at 3-4, citing Pub. Util. Code § 6354(b).

Case: 19-30088    Doc# 11847-1    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 17 of 28

To the contrary, by incorporating the franchise fee factor, which has the potential to reduce collections and payments below what the franchise agreements called for, the legislation appears to anticipate that municipal entities may not be made whole.

We are also troubled by claims that the Sempra methodology results in some counties receiving more surcharge remittances than they should.[28] In addition to arguing that the Sempra method allows for remittances to cities and/or counties that may not have transportation customers, SCE argues that because the Sempra calculation method pools surcharge remittances, it provides excess payments to municipal entities with franchise agreements that provide for remittances that are below the pooled rate the Sempra methodology calculates.[29] As noted by Sempra, the Surcharge Act was not intended to increase franchise fees that would have been collected if not for unbundling. The PG&E/SCE methodology collects municipal surcharge revenues from transportation customers as required by section 6353 and remits those revenues to the municipality in which the customer is located as required by section 6354(b).

### 4.3. The Impact of a Single Remittance Methodology

As noted above, at the outset of this proceeding we directed the parties to identify the likely impacts the transition to a single uniform methodology would have on municipalities, ratepayers, and the Utilities. By way of response, the Utilities argued in favor of their existing approach, and no party proposed a new

---

[28] PG&E Reply Comments at 11-12.

[29] Though the Cities assert that the PG&E/SCE methodology results in a few cities receiving significantly more revenue than they otherwise would have received in franchise fees prior to deregulation, this contention is not sufficiently explained. See the Cities Reply Comments at 6.

Case: 19-30088    Doc# 11847-1    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 18 of 28

or modified approach.  Accordingly, the parties' assessment of impacts was limited to impacts that would result from an IOU's shift from one methodology to the other.  These impacts range from nominal or non-existent to likely significant depending on whether we are referring to ratepayers, the Utilities, or municipalities.

For example, no party anticipates that a shift to a uniform remittance methodology will have a significant impact on the Utilities.  While Sempra does not believe there would be any significant long-term impacts to any of the Utilities, PG&E argues that a shift to its methodology will benefit the other Utilities.[30]  Similarly, no party anticipates that significant ratepayer impact will follow a shift to a uniform remittance methodology.  Where PG&E concludes that adoption of a uniform remittance methodology should have no impact on ratepayers, the response of Sempra is more nuanced.  Sempra agrees with PG&E that adoption of a particular uniform remittance methodology would not have a direct impact on ratepayers in any of the Utilities' jurisdictions, it points out that, to the extent that remittances are used to support municipal programs and personnel, there could be some indirect or unintended impacts on ratepayers in municipalities that receive an increase or decrease in revenues under one of the remittance methodologies.[31]

---

[30]  According to PG&E, because its methodology requires much less staff time to administer than the Sempra methodology, Utilities that adopt its approach may realize efficiency gains in the administration of surcharge remittances.

[31]  For example, given an increase (decrease) in surcharge revenues a municipality might determine to increase (decrease) what it spends on infrastructure such as roads.  This could indirectly affect ratepayers by decreasing (increasing) what they need to spend on automotive repairs and maintenance.

Case: 19-30088    Doc# 11847-1    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 19 of 28

However, the parties agree that adopting a uniform municipal surcharge remittance methodology will result in increases and decreases in surcharge remittances for cities and counties, and that some cities and counties will be profoundly impacted by such a change.  The parties summarize these impacts in their Comments.[32]  While the total remittance increase generally matches the total remittance decrease in each of the Utility's service territories, the cities and counties in the Utility's service territories do not bear these changes equally.

In the SoCalGas service territory, about 40 municipalities should receive an increase in their gas and/or electric surcharge remittance while almost 200 would receive a decrease if the PG&E/SCE methodology is adopted.  Similarly, in the SDG&E service territory, 20 municipalities should receive an increase while 26 would receive a decrease if the PG&E/SCE methodology is adopted.[33] By way of example, Sempra notes that while under the current methodology the City of Carson receives a remittance of $2,811,437 from SoCalGas, under the PG&E methodology the City of Carson would receive $4,099,014, an increase of almost 45%.  Conversely, municipalities which have no large manufacturing or power plants within their boundaries will see a decrease in revenue.[34] Again, by way of example, Sempra notes that while the City of Lancaster currently receives a remittance of $148,272 from SoCalGas, under the PG&E methodology the City of Lancaster's remittance would be reduced by more than 90% to $11,598. Similarly, in PG&E's service territory, a switch to the Sempra methodology

---

[32]  *See* Sempra Opening Comments, Exhibit A; PG&E Opening Comments at 15-17; and the Cities Opening Comments at 7.

[33]  Sempra Opening Comments at Exhibit A.

[34]  *See* Sempra Opening Comments at 5 and Exhibit A.

Case: 19-30088   Doc# 11847-1   Filed: 01/21/22   Entered: 01/21/22 11:46:37   Page 20 of 28

would, among other things, result in San Jose receiving an additional $1,560,344 in remittances while Benicia, Richmond, and the unincorporated counties of Contra Costa, Fresno, Merced, Monterey and Sutter would experience a combined loss of more than $6 million.

## 5.    Remittance Shock Mitigation Measures

Given the impacts above, we believe it appropriate to delay the implementation of today's decision until July of 2016 and ensure that impacted municipal governments receive detailed notice of any pending changes, to allow them the opportunity to adjust their budgets.

Indeed, in an abundance of caution, by ruling dated September 25, 2015, the assigned Commissioner clarified that proposals to mitigate potential remittance-shock caused by adoption of a uniform surcharge remittance methodology are within the scope of the proceeding and provided parties the opportunity to propose and respond to proposed methods to mitigate this potential "remittance-shock."  PG&E responded to this ruling on October 15, 2015.  SCE and SDG&E/SoCalGas responded to the ruling on October 16, 2015.  PG&E and SCE filed Reply Comments on October 29 and 30, 2015, respectively.

In their Comments, both PG&E and SCE urge that utilities with impacted jurisdictions be allowed to propose ways to mitigate rate shock.  In particular, SCE notes that such proposals may include increased noticing coupled with updated projections to enable jurisdictions to prepare for a reduction in Surcharge remittances.[35]  The SDG&E/SoCalGas response to the question of

---

[35] SCE October 16, 2015 Comments at 2-3.

Case: 19-30088    Doc# 11847-1    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 21 of 28

how to deal with potential remittance shock was three-fold.  Specifically, SDG&E/SoCalGas argue first that its methodology should be used as the single uniform remittance methodology, second that the Commission should hold workshops so that all parties, cities, and counties can understand how each methodology works and express to the Commission how changing to a uniform methodology will affect them before a final decision is made, and finally that the Commission should delay implementation of a uniform methodology in order to ensure that cities and counties have sufficient time to adjust their fiscal planning.

We agree with PG&E and SCE that rather than address the issue presented, SDG&E/SoCalGas's first argument seeks to reargue its established position.  As such, arguments are both outside the scope of the September 25, 2015 ruling and, having already been heard and considered, we decline to address them once again.  We also agree with PG&E that the SDG&E/SoCalGas proposal to hold workshops is not a genuine measure to mitigate potential remittance-shock. Indeed, the lengthy history of this litigation establishes both that all parties have a sound understanding of the various methodologies used, and that the cities and counties in each of the IOU's jurisdictions were previously afforded notice and an opportunity to participate in this proceeding.

While there appears to be some question about the appropriate amount of time, SDG&E/SoCalGas's third proposal is not genuinely contested.  For example, SDG&E/SoCalGas recommends, "the implementation of the uniform methodology be made only after the passing on one full calendar year beyond

Case: 19-30088    Doc# 11847-1    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 22 of 28

the date [on which] the final decision is effective."[36]  However, according to SDG&E/SoCalGas, "if a final decision is effective as of February 2016, the first day in which the utility could implement a uniform remittance methodology would be January 1, 2018."[37]  SDG&E/SoCalGas neither explains its reasoning on this point, nor argues that an implementation date of July 2016 is less than adequate.  As PG&E notes:

> [T]he remittances made by Sempra for surcharges collected in calendar year 2016 (paid in March/April of 2017) would represent six months of remittances under the Sempra methodology (i.e. those collected in the period January through June, 2016) and 6 months of remittances under the 'pass-through' methodology (i.e. those collected in the period July through December, 2016).  Sempra would not fully implement the pass-through methodology for an entire calendar year until 2017.[38]

We agree with PG&E that by providing for implementation in July of 2016 we effectively provide for a phasing in of the effects of a change in remittance methodology.

## 6.  Conclusion

No party opposes imposition of a uniform method of calculating remittances under section 6354(b) of the Surcharge Act.  As set forth above, based on the Comments and Reply Comments provided by the parties, we conclude that the PG&E/SCE pass-through approach is more consistent with the language and intent of the Surcharge Act.

---

[36] Sempra October 16, 2015 Comments at 6.

[37] Sempra October 16, 2015 Comments at 6.

[38] PG&E October 29, 2015 Reply Comments at 3.

Case: 19-30088    Doc# 11847-1    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 23 of 28

We therefore conclude that the PG&E/SCE methodology should be extended to the Sempra service territories.  To mitigate the impact of this change on municipalities in Sempra's service territories, we will delay the effective date of this change in methodology to July 1, 2016.  SoCalGas and SDG&E shall notify each city and county in their respective service areas of the change in methodology and explain exactly how and when the new methodology will affect municipal surcharge payments to them within 30 days of the effective date of today's decision.

## 7.    Comments on Proposed Decision

The Proposed Decision in this matter was mailed to the parties in accordance with Section 311 of the Public Utilities Code and comments were allowed under Rule 14.3 of the Commission's Rules of Practice and Procedure.  Comments were filed on September 21, 2015, by the City of Escondido, the City and County of San Francisco, PG&E, SCE, and SDG&E/SoCalGas, and Reply Comments were filed on September 28, 2015, by PG&E, SCE, and SDG&E/SoCalGas.

With one exception, the Comments and Reply Comments of the parties have been considered and, where appropriate, integrated into today's decision. The sole exception referenced above relates to the City of Escondido's claim that it is uniquely situated and its request that the PG&E Methodology be modified and applied to agreements relating to Surcharge Act remittances such as it has with SDG&E.  As the proceeding record is silent on this issue, we do not make any determinations as to whether such relief is in order at this time.  However, nothing in this decision should be construed as a bar to the City of Escondido's pursuing such an order in a subsequent proceeding.

Case: 19-30088    Doc# 11847-1    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 24 of 28

## 8. Assignment of Proceeding

Carla J. Peterman is the assigned Commissioner and Darwin E. Farrar is the assigned ALJ in this proceeding.

## Findings of Fact

1. The Utilities appear to use a uniform methodology to calculate the surcharge collected.

2. The Commission has expressed a preference for a uniform remittance methodology.

3. No party opposes a uniform method of calculating remittances under the Surcharge Act.

4. D.02-02-052, D.03-02-032, and D.03-10-040 only addressed the remittance of municipal surcharges in the context of DWR power sales and did not address municipal surcharges collected from transportation customers unevenly distributed among municipalities.

5. Both the PG&E/SCE and Sempra surcharge methodologies remit to each municipality all municipal surcharge revenue they collect.

6. Consistency, efficiency, and administrative economy argue for a single, uniform method of calculating remittances under the Surcharge Act.

7. There should not be any significant long-term impacts to any of the Utilities as a result of the adoption of one remittance methodology over the other.

8. Adoption of a uniform remittance methodology should have no direct impact on ratepayers.

9. Adopting a uniform municipal surcharge remittance methodology will result in increases and decreases in surcharge remittances that could significantly impact some cities and counties.

Case: 19-30088   Doc# 11847-1   Filed: 01/21/22   Entered: 01/21/22 11:46:37   Page 25 of 28

10. Each of the utilities has made good faith efforts to faithfully and lawfully follow the Municipal Surcharge Act.

**Conclusions of Law**

1. As used in section 6354(b) of the Surcharge Act, the term "manner" refers to the mechanics of payment of the remittance.

2. The Surcharge Act intended to replace some of the revenues municipal entities lost due to certain changes caused by deregulation in the gas and electric fields.

3. The Surcharge Act does not allow a municipal entity to receive more revenue in surcharge remittances than it would have received in franchise fees prior to passage of the Surcharge Act.

4. The PG&E/SCE "pass-through" methodology is consistent with the Surcharge Act.

5. The Sempra remittance methodology is less clearly consistent with the Surcharge Act to the extent that it can result in payments greater than what any city or county in its service territory would have received under its franchise agreement.

Case: 19-30088    Doc# 11847-1    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 26 of 28

6.   The impact on municipal governments in the Southern California Gas Company and San Diego Gas & Electric Company service territories of the changes adopted in today's decision should be mitigated by delaying the effective date to July 1, 2016.

## O R D E R

**IT IS ORDERED** that:

1.   The Southern California Gas Company and San Diego Gas & Electric Company shall adopt the methodology used by the Pacific Gas and Electric Company and Southern California Edison Company to calculate Municipal Public Lands Use Surcharge remittances paid to cities and counties in their respective service territories.

2.   The Southern California Gas Company and San Diego Gas & Electric Company shall implement the adopted methodology for all Municipal Public Land Surcharge payments made after July 1, 2016.

3.   Southern California Gas Company and San Diego Gas & Electric Company shall notify each city and county in their respective service territories that the methodology used by the Pacific Gas and Electric Company and Southern California Edison Company will be used to calculate their Municipal Public Land Surcharge remittances payable after July 1, 2016, and explain exactly how and when the new methodology will affect the payments to be received by each city and county.

Case: 19-30088   Doc# 11847-1   Filed: 01/21/22   Entered: 01/21/22 11:46:37   Page 27 of 28

4. This proceeding is closed.

This order is effective today.

Dated April 21, 2016, at San Francisco, California.

                    MICHAEL PICKER
                         President
                    MICHEL PETER FLORIO
                    CATHERINE J.K. SANDOVAL
                    CARLA J. PETERMAN
                    LIANE M. RANDOLPH
                        Commissioners