**Exhibit B**

Decision 04-08-010  August 19, 2004

**BEFORE THE PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA**

| | |
|---|---|
| Order Instituting Rulemaking on the Establishment of a Public Purpose Program Surcharge Pursuant to Assembly Bill (AB) 1002. | Rulemaking 02-10-001 (Filed October 3, 2002) |

**(See Appendix A for List of Appearances)**

**OPINION REGARDING IMPLEMENTATION OF
ASSEMBLY BILL 1002, ESTABLISHING A
NATURAL GAS SURCHARGE**

Case: 19-30088    Doc# 11847-2    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 2 of 59

# TABLE OF CONTENTS

**Title**                                                                                                          **Page**

OPINION REGARDING IMPLEMENTATION OF ASSEMBLY BILL 1002,
ESTABLISHING A NATURAL GAS SURCHARGE.................................................... 2
Summary.................................................................................................................... 2
Procedural Background ............................................................................................ 3
Phase One Issues – Policy and Implementation of AB 1002 .................................. 5
  Is the Gas Surcharge a Tax or a Fee? ................................................................. 8
  BOE Remittances to Utilities ............................................................................... 8
  PG&E AL 2440-G ................................................................................................. 11
  Gas Volumes Used to Set Surcharge Rates ......................................................... 11
  Formulas for Calculating Surcharge Rates .......................................................... 13
  Customer Surcharge Exemptions ........................................................................ 14
  Franchise Fees and Uncollectibles (F&U) .......................................................... 16
  Re-Allocating PPP Costs from Exempt Customers
       to Non-Exempt Customers........................................................................... 17
  Interest Bearing Account for Surcharge Collections........................................... 19
  Allocation of Commission and BOE Administrative Costs.................................. 20
  Interstate Pipeline Customers Outside of Service Territories ............................. 21
  Intrastate Pipeline Customers Served by a Utility Different
       from the Utility Operating that Service Territory....................................... 22
  Third Party Gas Storage Providers...................................................................... 23
Research and Development ...................................................................................... 23
  Definition of Public Interest Research and Development.................................... 23
  Additional Project Criteria................................................................................... 26
  Administration ...................................................................................................... 29
  Commission R&D Program Oversight ................................................................. 32
  R&D Funding Level............................................................................................... 33
  Allocating R&D Costs and Remittances .............................................................. 38
  Other Issues .......................................................................................................... 39
  Commercialization of R&D Benefits ................................................................... 42
Implementing Annual Surcharge Rates .................................................................. 42
Comments on Proposed Decision ........................................................................... 43
Assignment of Proceeding ...................................................................................... 45
Findings of Fact........................................................................................................ 45
Conclusions of Law ................................................................................................. 47
ORDER ..................................................................................................................... 48
Appendix A – Appearance List

Case: 19-30088    Doc# 11847-2    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 3
of 59

## OPINION REGARDING IMPLEMENTATION OF ASSEMBLY BILL 1002, ESTABLISHING A NATURAL GAS SURCHARGE

**Summary**

In this decision, we implement Assembly Bill (AB) 1002 (stats. 2000, Ch. 932), establishing a natural gas surcharge to fund gas related public purpose programs (PPP) such as low-income customer assistance, energy efficiency and public interest research and development (R&D).[1] We adopt the Energy Division's AB 1002 Workshop Report (Workshop Report) and address and resolve Workshop Report implementation issues raised by parties. Many of these implementation issues involve the State Board of Equalization (BOE), which is charged under AB 1002 with collecting surcharge revenues for deposit in the gas surcharge fund (Fund). This decision also initiates a public interest R&D program, and appoints an administrator, the California Energy Commission (CEC), to improve gas energy efficiency and environmental quality, develop renewable technologies, and otherwise provide benefits to the public.

Our decision resolves issues concerning the exemption of certain customers as required by AB 1002. We also establish procedures to improve the efficiency of the surcharge collection and remittance process, and increase the dollars available for PPP by requiring that interest is paid on customer revenues in the possession of utilities.

Our adopted R&D program establishes project criteria and provides an opportunity for other parties to suggest beneficial R&D projects to the

---

[1]  AB 1002 is codified in Public Utilities Code Sections 890 *et seq.*

Case: 19-30088    Doc# 11847-2    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 4 of 59

administrator, subject to approval by the Commission. We adopt a zero-based budget for 2005 capped at $12 million for the first year, and provide flexibility to increase funding thereafter. We also provide that any commercial benefits resulting from public interest R&D accrue to ratepayers.

**Procedural Background**

The Commission issued Order Instituting Rulemaking (R.) 02-10-001 on October 3, 2002, to determine broad policy issues and adopt a long-term framework to implement AB 1002 (Stats 2000, Ch. 932). R.02-10-001 divided the proceeding into two parts: Gas Surcharge Determination and Program Administration. In each area, questions were posed addressing accounting, documentation, customer exemptions, cash flow and R&D. The Commission preliminarily determined that R.02-10-001 is a quasi-legislative proceeding, as that term is defined in Rule 5(d) of the Commission's Rules of Practice and Procedure (Rules).

Respondent parties[2] submitted comments and reply comments to the questions posed in R.02-10-001 on November 12 and 27, 2002, respectively.

---

[2] R.02-10-001 names Pacific Gas and Electric Company (PG&E), Southern California Gas Company (SoCalGas), San Diego Gas and Electric Company (SDG&E), Avista Utilities (Avista), Alpine Natural Gas Operating Company (Alpine), Southern California Edison Company (Edison) Southwest Gas Corporation (Southwest) West Coast Gas Company (West Coast) and Mountain Utilities as Respondents. SoCalGas and SDG&E are jointly represented by Sempra Energy Utilities (Sempra).

On October 16, 2002, Mountain Utilities requested by letter that it be excused from participation in the proceeding as it only sells propane, and that as provided in Sections 222, 216, and 221 of the Public Utilities Code, propane companies are not considered natural gas corporations. In letters dated October 31, 2002, and November 21, 2002, Edison requested that it be excused as a respondent in the proceeding since it only provides liquefied petroleum gas and propane to Santa Catalina Island customers. On February 10, 2003, West Coast requested by letter that it be excused from participation

*Footnote continued on next page*

Case: 19-30088    Doc# 11847-2    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 5 of 59

A prehearing conference (PHC) was held February 5, 2003 to establish a service list, and address procedural issues and scheduling matters. Parties at the PHC agreed that issues concerning the policy and implementation of AB 1002 could be resolved through workshops and data requests. Two parties recommended that evidentiary hearings be held to address R&D issues.

On April 22, 2003, the Assigned Commissioner, Loretta M. Lynch, issued an Assigned Commissioner's Ruling (ACR) determining the category, need for hearing, scope and schedule of the proceeding. The ACR divided R.02-10-001 into two phases. The First Phase addresses issues concerning policy and implementation of AB 1002 through a workshop. The ACR attached a list of questions and issues to be resolved in the Phase One workshop. A workshop on Phase One issues was held from May 7, 2003, through May 9, 2003, led by the Energy Division.[3]

---

in the proceeding due to a lack of resources, and because the costs of participation are significant relative to the small number of customers served by West Coast. On February 12, 2003, Avista filed a motion for exemption from in-person participation in the R&D portion of the proceeding. Avista explains that it has limited R&D activities and that the costs of participation may be significant relative to the small number of customers served by Avista. On March 7, 2003, Alpine filed a motion to be excused from participation in this proceeding due to a lack of resources that may negatively impact its service to customers. On April 14, 2003, Southwest filed a motion requesting that it be excused from participation in the R&D phase of this proceeding. Southwest explains that it does not conduct any R&D, and that its customers will best be served if Southwest's participation is limited to monitoring the R&D portion of the proceeding. These requests and motions are unopposed, and for the reasons stated by these utilities, the requests and motions from further participation are granted.

[3] On May 7, 2003, Sempra filed a motion to modify the ACR to provide issuance of an interim decision on Phase One issues after parties file comments on the Workshop Report. However, the Workshop Report was not filed until December 9, 2003, and comments were not received until January 12, 2004. As a matter of efficiency,

*Footnote continued on next page*

Case: 19-30088    Doc# 11847-2    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 6 of 59

Phase Two addresses R&D issues, including defining public interest R&D, project identification and evaluation, and establishing funding levels.  On June 3, 2003, a ruling by the assigned Administrative Law Judge (ALJ) established a schedule, and posed questions for parties to be addressed in Phase Two of the proceeding.[4]  PG&E, Sempra, The University of California, California Institute for Energy Efficiency (UC), CEC and Southern California Generation Coalition (SCGC) submitted opening testimony on August 15, 2003.  PG&E, Sempra, UC and CEC submitted reply testimony on September 5, 2003.  Evidentiary hearings were held September 25 and 26, 2003.  Opening and reply briefs were filed on October 22 and November 5, 2003, respectively.  The matter was deemed submitted on November 5, 2003.

On December 9, 2003, the Energy Division filed its Workshop Report on Phase One issues.  PG&E, Sempra, Avista and Southwest[5] filed comments on the Workshop Report on January 12, 2004.

**Phase One Issues – Policy and Implementation of AB 1002**

We adopt the following unopposed Workshop Report recommendations requiring the utilities to:

a. Identify all customers exempt from paying the surcharge and establish procedures to prevent surcharge billing of exempt customers.

---

Phase One and Phase Two issues are combined in this decision and Sempra's motion is denied.

[4]  *See* ALJ Ruling, Attachment A.

[5]  Southwest filed a motion to accept its comments one day late on January 13, 2004. That motion is unopposed and is granted.

Case: 19-30088    Doc# 11847-2    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 7 of 59

b. Recompense exempt customers who previously paid the surcharge.  Amounts returned to exempt customers should include applicable balancing account interest.[6]

c. Publish the approved surcharge by customer class, including exemptions, in a separate tariff rate schedule.

d. Present the surcharge as a separate line item on customers' invoices with a description of the surcharge purpose.[7]

e. Submit annual advice letters (AL) by October 31 with proposed surcharge rates.[8]  ALs shall include workpapers showing the derivation of the surcharge rates, supporting documentation for any forecasts, and citations identifying commission decisions authorizing each element of the proposed rates (*e.g.,* authorized PPP costs, split between gas and electric operations, etc.)

f. Use the most recently adopted PPP budgets for the calculation of proposed surcharge rates.  If a current program year budget for California Alternative Rates for Energy (CARE) subsidy costs has not been adopted by the Commission, utilities may use forecasts of expected CARE subsidy costs based on a reasonable estimate of future gas prices (using a credible, published source) and CARE customer penetration rates.  Balancing account amortization shall be in accordance with prevailing Commission policy (*e.g.* whether over-collections should be carried-over, etc.).

g. Return exempt customer surcharge revenue collected between January 1, 2001, and July 1, 2001, including interest.  Amounts will be returned from utilities to the affected exempt customers.[9]

---

[6] Prior to issuing refunds, the utilities should confer with BOE to ensure payments were not previously made by the Board, in which case the refunds shall not be made.

[7] We will allow utilities to make required billing system changes, along with regular monthly changes, following the six-month deadline for this modification.

[8] Annual ALs will calculate proposed surcharge rates to be effective January 1.  This date is changed from September 30, as approval will be by Energy Division, without need for a Commission resolution.

[9] Prior to issuing refunds, the utilities should confer with BOE to ensure payments were not previously made by the Board, in which case the refunds shall not be made.

h. Modify balancing and memorandum accounts, if necessary, to implement the unbundling of PPP costs from rates. Requested revisions should not seek to change the nature of any account currently authorized by the Commission (*e.g.*, one-way or two-way balancing account, carry forward of over collections, etc.). Any requested accounting changes shall be made via an AL within 30 days of the effective date of this decision.

i. Each balancing account shall specify that while the surcharge collections are in the possession of the State, the applicable interest that applies is the actual amount of interest that accrued while the remittances were on deposit in the Fund.

In addition, we adopt the following unopposed Workshop Report recommendations for implementing AB 1002:

a. The use of the default rate will be discontinued. All utilities should calculate surcharge rates based on their specific PPP costs.[10]

b. Utilities may request a change in surcharge rates during the year. Such rate changes are only justified if failure to make the rate change would result in a forecasted total rate increase of 10% or more on January 1 of the next year. Requested rate changes will be through the AL process. The AL must include justification for the rate change and be filed at least 40 days prior to the beginning of the next quarter with an effective date to be determined by the Energy Division in consultation with BOE.[11]

c. Non-exempt interstate pipeline customer remittances to BOE, including applicable interest, are to be returned to the public utility in whose service territory the customer resides, and recorded in the appropriate PPP balancing accounts.

---

[10] Utilities subject to the default rate shall file an AL October 31, 2004, with a requested effective date of January 1, 2005, containing their proposed cost based PPP surcharge rates according to the formula adopted herein which will be used for remittances to BOE and customer collections including associated tariff pages.

[11] Energy Division shall notify BOE of surcharge rate changes.

Case: 19-30088    Doc# 11847-2    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 9 of 59

d.  Utilities should receive interest accrued in the Fund, and credit this interest to PPP balancing accounts.  Interest on R&D funds shall be held in the Fund until applied for future R&D activities.

Below we discuss Workshop Report proposals of the Energy Division, which parties contested in their comments, or which require clarification.

**Is the Gas Surcharge a Tax or a Fee?**

PG&E and Sempra believe that the surcharge is a tax.  PG&E argues that there are accounting and franchise fee issues that depend on this determination.  Alternatively, Avista and Southwest contend the surcharge is a fee.  Southwest notes that there are administrative problems in identifying exempt customers if it is determined that the surcharge is a tax.

We find that it is unnecessary to determine whether the surcharge is a tax or fee in order to address the issues we actually need to decide in order to implement this program.  For example, Sections 890(b) and 898,[12] clearly specify those customers who pay the surcharge and those customers that are exempt.  Therefore, we decline to find whether the surcharge is a tax or a fee, and instead we will direct utilities in those matters not addressed by AB 1002, including accounting and franchise fees.

**Remittances to Utilities**

The Workshop Report recommends that BOE return remittances to utilities after a year-end review of surplus amounts in the Fund.  However, the utilities[13] recommend that BOE remittances be returned in full to utilities during the year, so that over-collections may be retained by utility customers.

---

[12]  All references are to the Public Utilities Code unless otherwise noted.

[13]  PG&E, Avista, Sempra and Southwest.

Case: 19-30088    Doc# 11847-2    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 10 of 59

Sempra argues that when the non-remitted funds remain at BOE, ratepayers do not receive associated interest.  Furthermore, leaving excess funds at BOE introduces too much uncertainty into excess fund balances that could result in cross-subsidization between utilities or loss of the funds to the California General Fund.  Sempra prefers that funds are returned within 30 to 45 days of remittance to BOE.

PG&E recommends returning funds to utilities on at least a quarterly basis. PG&E points out that the recommended policy of the Workshop Report[14] would result in an additional administrative layer, and potential funding of PPP by the utility, or payment of an excess surcharge by ratepayers.  PG&E points out that funds remitted from BOE to the utilities remain in balancing accounts fully subject to the Commission's jurisdiction.

Southwest asserts that customer surcharge revenue must be returned in full to utilities in order that shareholders not pay for certain PPP costs. Southwest explains that because the Low-Income Energy Efficiency (LIEE) program is a one-way balancing account, if LIEE program costs in any year exceed reimbursements from the surcharge, and the excess revenues are not remitted to the utilities, then shareholders pay for any excess costs.  Southwest also notes that to the extent CARE costs are less than CARE revenues, customers funding CARE costs should receive the benefit of any overcollection.

---

[14] The Workshop Report recommends the filing of an annual AL requesting return from BOE of excess funds; however it is unclear whether all of the excess funds would be returned to utilities.

Case: 19-30088    Doc# 11847-2    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page
11 of 59

We agree with the utilities that all funds remitted to BOE should be returned to the utilities in a timely manner, except for R&D funds,[15] BOE and Commission administration costs, and deductions for any refunds issued by BOE.[16] Since remittances to BOE are done quarterly, dispersals from the Fund shall be conducted on a quarterly basis as well. Energy Division will administer dispersements from the Fund to the utilities, R&D Administrator and other entities as necessary. (*See* Section 895(a).) We share the utilities' concerns regarding excess funds, and desire that all collected funds be available to the utilities for PPP costs. Therefore, the Energy Division should work with BOE, other appropriate state agencies and the utilities[17] to accomplish the timely return of surcharge remittances, including interest accrued in the Fund, to the utilities.[18] These funds are to be recorded to the appropriate PPP balancing accounts. Interest should be apportioned to utilities according to the amount of remittances and the length of time remittances were held in the Fund and invested from the implementation of AB 1002 on January 1, 2001. [19]Energy

---

[15] R&D funds will be provided to reimburse utilities for R&D activities conducted in 2004.

[16] BOE should inform the Energy Division of refund payments which BOE issues.

[17] Remittances from a municipality, district or public agency should be fully returned to the municipality, district or public agency, including applicable interest, less any BOE refunds paid to these customers. (*See* Section 898.)

[18] BOE should provide Energy Division copies of Natural Gas Surcharge Returns quarterly from all accounts, and information showing amounts remitted.

[19] Energy Division will develop interest allocation methods and procedures in consultation with the utilities and other entities, as necessary, and make periodic distribution to the utilities.

Case: 19-30088   Doc# 11847-2   Filed: 01/21/22   Entered: 01/21/22 11:46:37   Page 12 of 59

Division shall also work with BOE or other appropriate state agency to establish utility specific accounts in the Fund, if feasible.

### PG&E AL 2440-G

PG&E filed AL 2440-G on January 27, 2003, and AL 2440–G–A on May 26, 2004, to separately identify PPP revenue requirements from other base revenue and establish a new memorandum account to track surcharge collections remitted to BOE. PG&E's AL 2440-G and AL 2440 – G - A is approved subject to the following modifications:

1. The proposed preliminary statement referred to as "PPP-EE/LIEE/RDD" describing the accounting treatment of energy efficiency, LIEE, and R&D must be structured so that each PPP has a separate and distinct balancing account, and maintains the authorized treatment and amortization of any balances. (*e.g.,* one-way balancing account, etc.)

2. Each balancing account shall specify that the amortization of any balance is in accordance with the policies established by the Commission for the treatment of these funds.

3. Each balancing account shall specify that while the surcharge collections are in the possession of the State, the applicable interest that applies is the actual amount of interest that accrued while the remittances were on deposit in the Fund.

PG&E shall file a supplement to AL 2440-G – A within 30 days of the effective date of this decision reflecting these modifications.

### Gas Volumes Used to Set Surcharge Rates

Although the Workshop Report recommends using past gas usage to calculate the surcharge, PG&E and Sempra recommend the continued use of

Biennial Cost Allocation Proceeding (BCAP) estimates for "throughput" volumes of gas.[20]

Sempra points out that BCAP volumes are more accurate estimates since they are weather adjusted, and thus will reduce potential interim rate changes. Sempra also notes that BCAP estimates have been reviewed and approved by the Commission.

PG&E argues that there is nothing in the language in AB 1002 to prohibit the use of BCAP estimates. PG&E also recommends that the Energy Division provide the utilities with exempt gas volumes, and interstate gas pipeline volumes so that utilities can adjust their estimated surcharge rates. In order to file timely ALs, so that surcharge rates can be effective January 1 for each surcharge year, PG&E believes information should be supplied by the Energy Division to the utilities. PG&E recommends that this information be provided by August 31 of the year prior to the January 1 effective date.

Southwest, which does not have a BCAP, recommends use of test year gas volumes to calculate the most accurate surcharge rate.

We agree with the utilities that BCAP estimated throughput volumes, or recent test year estimates are the most accurate gas volume projections for calculating the surcharge. However, we are concerned that BCAP estimates may not be timely available for surcharge calculations due to delays in BCAP proceedings. In addition, for the smaller gas utilities, there are no BCAP proceedings to provide gas estimates, and the use of test year estimates, as proposed by Southwest, is of limited use in the years between test years.

---

[20] BCAPs usually are held every two years for PG&E, SoCalGas, and SDG&E. There are no BCAPs for the other gas utilities.

Case: 19-30088    Doc# 11847-2    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 14 of 59

Therefore, we will adopt a method that uses BCAP estimates when these are available and are less than three-years old, and have been adopted by the Commission. In all other instances utilities should use a three-year average (consecutive 36 month period) based upon the most recently available billed gas volumes. Utilities should state in their surcharge calculations, which of these two estimating methods are used. Energy Division should also obtain interstate pipeline customer gas volumes,[21] and provide these to the appropriate utilities for determining surcharge rates.

**Formulas for Calculating Surcharge Rates**

Surcharge rates should continue to be segregated by customer class based on CARE participation. Thus, two formulas are necessary to determine surcharge rates for CARE and non-CARE customers.

Derivation of the cost components of the PPP surcharge rates are:

<u>CARE cost surcharge component</u> = [CARE administration expenses + CARE subsidy + authorized CARE balancing account amortization][22] / [non–CARE, non-exempt utility + non-CARE, non-exempt interstate pipeline gas volumes by customer class]

<u>LIEE + EE + R&D cost surcharge component</u> = [Energy efficiency + LIEE + R&D expenses + authorized PPP non -CARE balancing account amortization[23]+ administrative

---

[21] We expect BOE to provide copies of natural gas surcharge returns showing gas volumes used for remittances to the Energy Division by August 31 of each year.

[22] Balancing Account amortization shall be in accordance with authorized PPP accounting methods.

[23] Balancing Account amortization shall be in accordance with authorized PPP accounting methods.

Case: 19-30088    Doc# 11847-2    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 15 of 59

costs][24] / [non-exempt utility + non-exempt interstate pipeline
gas volumes by customer class]

Thus, the PPP surcharge rates are:

**1) CARE customer surcharge rate** = LIEE +EE + R&D cost surcharge component

**2) Non-CARE customer surcharge rate** = [LIEE +EE +R&D cost surcharge component] + [CARE cost surcharge component]

Utilities shall provide workpapers showing these calculations with citations identifying Commission authorization for program expenses and customer class cost allocations included in AL filings for proposed surcharge rates and related information. PPP expenses to be included in surcharge rates are those described under unopposed workshop report recommendations paragraph (f). Pipeline gas volumes to be used in the calculation are as described in this decision.

Utilities shall allocate PPP costs to customer classes pursuant to authorized procedures as updated in Commission allocation proceedings, except for R&D, and BOE and Commission administrative costs as discussed herein.

### Customer Surcharge Exemptions

PG&E recommends that BOE or the Commission issue regulations defining exempt customers. PG&E would refund any surcharges paid by exempt customers, including applicable credit interest,[25] directly to exempt customers. PG&E also recommends that BOE require interstate pipeline companies to identify non-exempt customers consistent with the status notification requirement under Section 891(d).

---

[24] Commission and BOE administrative costs.

[25] PG&E requests that BOE calculate earned credit interest and the timing for the utility to make refunds.

Case: 19-30088    Doc# 11847-2    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page
16 of 59

Sempra believes its current tariff procedures have identified exempt customers, and that current processes are sufficient to return any surcharges paid by exempt customers.  Sempra requests that the Commission order a return of any surcharges collected from exempt customers paid during the first half of calendar year 2001.  Sempra also recommends that the utilities return collected surcharges to exempt customers, and not BOE.

We note that Section 890(h) requires BOE to collect surcharges from non-exempt customers on interstate pipelines that might otherwise avoid surcharge payments, while Section 896 exempts certain customers from surcharge payments.  In addition, exemptions include customer consumption of natural gas which this state is prohibited from taxing under the United States (U.S.) Constitution or the California Constitution.[26]  It is apparent from the Workshop Report, that adopting procedures implementing these two provisions has proven difficult.

In order to identify non-exempt customers on interstate pipelines, we request BOE to query all interstate pipeline companies[27] for lists of customers and determine whether the customer qualifies for exemption under Section 896.  The Energy Division should assist BOE in this effort, and utilities are directed to provide the names and address of interstate pipeline customers to BOE, if known.  We also recognize California Energy Resources Surcharge Regulations 2315 and 2316, as identifying exempt customers under the California or U.S. Constitutions.

---

[26]  *See* California Energy Resources Surcharge Regulations, Regulations 2315 and 2316, Workshop Report, Appendix D.

[27]  *See* Section 891(d).

Case: 19-30088    Doc# 11847-2    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 17 of 59

In order to identify all exempt customers, utilities are directed to review customer lists within six months of the effective date of this decision. Following this initial review, the utilities are directed to conduct an annual review of their customer accounts to identify any exempt customers. Questions regarding exemptions should be directed to BOE. All exempt customers should receive any past surcharges that have been paid, plus applicable balancing account interest. The utilities are responsible for these refunds in the event BOE has not made previous payments to these customers and shall notify BOE to prevent duplicate refunds.[28] PG&E requests that language qualifying customers for exemption be included in the appropriate tariff, rather than on individual customer bills. As tariffs are intended to provide qualifications for service, this proposal is acceptable.

### Franchise Fees and Uncollectibles (F&U)

Southwest recommends that F&U be included in the surcharge rate. Southwest explains that it pays franchise fees on all revenue, including surcharge revenue. Thus, Southwest believes excluding franchise fees in surcharge calculations results in a mismatch between surcharge revenues paid to BOE and surcharge amounts collected from customers. Similarly, Southwest asserts that excluding uncollectibles from the surcharge also results in a mismatch between amounts paid and amounts collected from customers. Southwest points out that although uncollected amounts for CARE are recovered through the CARE

---

[28] We note BOE administers the surcharge in accordance with Section 893. Therefore, should a utility fail to issue a corrected billing, the customer should have the right to file a claim for refund with BOE. In order that duplicate refunds not occur, BOE should exchange information on customer refunds with the appropriate utility, for past and any future refunds.

Case: 19-30088   Doc# 11847-2   Filed: 01/21/22   Entered: 01/21/22 11:46:37   Page 18 of 59

balancing account, this is not true for LIEE uncollectibles. Southwest contends that since LIEE is a one-way balancing account, excluding uncollectibles from LIEE results in shareholders absorbing LIEE uncollectibles amounts.

PG&E agrees with the Workshop Report recommendation that F&U expenses are not directly related to PPP and therefore should not be included in the surcharge.

As explained in the Workshop Report, interstate pipeline customers are not obligated to pay franchise fees. In addition, franchise fees are not directly related to the PPP, and for these reasons no franchise fees should be paid on surcharge revenues. All utilities are directed to exclude surcharges in calculating franchise fee payments.

Although some surcharges will not be paid due to uncollectible customer revenues, Section 890 (2) addresses the problem of worthless accounts.[29]

As these two provisions provide for F&U, we determine that F&U should not be included in the calculation of the surcharge.

### Re-Allocating PPP Costs from Exempt Customers to Non-Exempt Customers

As a result of implementing AB 1002, newly exempt customers are no longer required to pay the surcharge, resulting in a shortfall in surcharge revenues. Sempra states that for SDG&E the shortfall amounts to $1 million

---

[29] Section 890(2) states, in part, "that a public utility is relieved from liability to collect the surcharge insofar as the base upon which the surcharge is imposed is represented by accounts which have been found worthless and charged off in accordance with generally accepted accounting principles. If the public utility gas corporation has previously paid the amount of the surcharge it may, under regulations prescribed by the State Board of Equalization, take as a deduction on its return the amount found to be worthless and charged off."

Case: 19-30088    Doc# 11847-2    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 19 of 59

per year.  Sempra recommends that the re-allocation of the shortfall to non-exempt customers occur as part of this proceeding.  Sempra argues that resolving this matter now minimizes future revenue shortfalls, and minimizes rate shock.  Sempra also notes that its exempt customers paid the surcharge between January 1, 2001, and July 1, 2001, when the surcharge was included in Sempra's gas rates.  As a result Sempra overcollected surcharge revenues in 2001.

Case: 19-30088    Doc# 11847-2    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 20 of 59

The Energy Division recommends that this allocation of costs occur in the next BCAP, a position supported by PG&E.

R.02-10-001 is a quasi-legislative proceeding.  Accordingly, some parties representing customer classes that might otherwise be interested in ratemaking have not participated in this proceeding.  Therefore, although costs paid by exempt customers must be re-allocated to other customers, that re-allocation should occur in either a BCAP, or other appropriate ratemaking proceeding. Utilities that do not have BCAPs may file an AL to accomplish the re-allocation of PPP costs.

### Interest Bearing Account for Surcharge Collections

The Energy Division recommends that surcharge collections be deposited in an interest bearing account prior to remittance to BOE, a position supported by PG&E[30] and other utilities, except Sempra.  Sempra opposes this recommendation for two reasons.  First, Sempra argues that the surcharge is a tax, and therefore is not revenue.  Sempra asserts that taxes should not be recorded in interest bearing accounts.  Secondly, Sempra contends that the Energy Division's proposal would require the addition of interest *before* the surcharge funds are received.  In its comments, Sempra provides an illustration showing how revenue lags in customer payments result in the use of shareholder monies to fund shortfalls in revenue collections.  Simply stated, Sempra remits approximately 3% of its billed revenues to BOE before these revenues are received.  Although the revenue shortfall is eventually received, final receipt is many days after Sempra has made its remittances to BOE.

---

[30]  PG&E states that all PG&E surcharge revenues accrue interest regardless of when amounts are remitted to BOE.

Case: 19-30088    Doc# 11847-2    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 21 of 59

We have generally held that ratepayers should receive interest on deposited revenues in balancing accounts held by utilities. Typically, the interest on these accounts accrues at the three-month commercial paper rate. Although we have not determined whether the surcharge is a tax or a fee, we find no reason that the surcharge balancing accounts should not also accrue interest. Therefore, we will direct that interest be paid on surcharge amounts in the possession of utilities prior to remittance to BOE, and be credited to the appropriate PPP balancing accounts. In order to address Sempra's problem resulting from a timing difference between payments and collections, we note that utilities are provided a "working cash allowance," an adjustment to rate base in general rate cases (GRC).[31] The need for a working cash allowance compensates investors for funds provided by them for the purpose of paying expenses in advance of receipt of offsetting revenues. As Sempra's problem appears to be a result of a delay in customer revenues, Sempra may pursue this matter in its next GRC.

### Allocation of Commission and BOE Administrative Costs

The Energy Division recommends that Commission and BOE administrative costs be allocated to utilities according to the number of utilities remitting into the surcharge fund. Sempra and Avista recommend the allocation be based on gas volumes or a similar method. Avista points out that allocating administrative costs based on the number of utilities would result in Avista customers paying over 200 times the administrative costs paid by PG&E customers.

---

[31] *See* Commission Standard Practice U-16, Determination of Working Cash Allowance, September 13, 1968.

Case: 19-30088    Doc# 11847-2    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 22 of 59

It would be unfair to small utility customers to allocate administrative costs based on the number of utilities paying into the Fund. We believe Sempra's and Avista's alternative administrative cost allocation method based on utility gas volumes is reasonable. Therefore, BOE and Commission administrative costs allocated to each utility shall be based upon each utility's proportion of the total amount of throughput reported to BOE used to calculate remittances for the prior calendar year. Costs to be included in the surcharge will be any uncollected amounts for prior year (s) expenses and expected costs for the upcoming year, adjusted for any previous overcollections. In order to include administrative costs in the January 1 surcharge rates, we will direct the Energy Division to obtain BOE and Commission administrative costs by September 30 of the prior year, and provide these costs to the utilities for their October 31 surcharge filings. Administrative costs shall be allocated to customer classes on an equal-cents-per-therm basis. We direct the utilities to identify Commission and BOE administrative cost amounts in their quarterly remittances to BOE. Utilities shall send copies of the quarterly remittances to the Energy Division showing the amounts collected for these costs, following filing with BOE.

**Interstate Pipeline Customers Outside of Service Territories**

Although parties have not identified any current interstate pipeline customers outside of existing utility service territories, identification of all interstate pipeline customers continues. Southwest hypothesizes the existence of non-exempt interstate pipeline customers who do not reside in any current utility service territory. If any interstate pipeline customers outside of existing utility service territories are identified, the surcharge rate of the nearest utility service territory should be applied to such customers. Accordingly, any

Case: 19-30088   Doc# 11847-2   Filed: 01/21/22   Entered: 01/21/22 11:46:37   Page
23 of 59

surcharge amounts remitted to BOE from such customers should go to the utility whose service territory is nearest the customer.

### Intrastate Pipeline Customers Served by a Utility Different from the Utility Operating that Service Territory

Southwest explains that several customers in its Southern California division take all or most of their service from PG&E through PG&E's intrastate pipeline, although these customers are located in Southwest's service territory.[32] Southwest argues that the surcharges paid by these customers should benefit customers in Southwest's service territory and not PG&E customers.

AB 1002 does not specifically address the disposition of surcharge funds when non-exempt interstate pipeline customers are served by one utility, but are located in the service territory of a different utility.  However, Section 890(e) states "The Commission shall annually establish a surcharge rate for each class of customer for the service territory of each public utility gas corporation.  A customer of an interstate gas pipeline, as defined in Section 891 shall pay the same surcharge rate as the customer would pay if the customer received service from the public utility gas corporation in whose service territory the customer is located.  The Commission shall determine the total volume of retail natural gas transported within the service territory of a utility gas provider, that is not subject to exemption pursuant to Section 896, for the purpose of establishing the surcharge rate."

---

[32] PG&E's intrastate pipeline runs through Southwest's service territory.  PG&E is certificated to serve these customers.

Case: 19-30088    Doc# 11847-2    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page
24 of 59

As this issue concerns intrastate pipeline customers, and we have previously determined that these are certificated PG&E customers,[33] surcharge amounts should be collected by PG&E and used for PG&E PPP purposes.

### Third Party Gas Storage Providers[34]

Sempra and PG&E recommend that third party gas storage providers be required to provide lists of their non-utility end use customers in an effort to identify all non-exempt customers.

AB 1002 does not exempt customers of third party gas storage providers unless the customer qualifies for exemption under Section 896. Thus, third party gas storage non-exempt customers should be expected to pay the surcharge. In order that such customers may be identified, we will direct third party gas storage providers to provide customer lists to BOE and the Commission. Non-exempt customers of third party gas storage providers should be assessed the surcharge rate for the utility service territory in which they reside.[35] Remittances from non-exempt third party gas storage customers should be returned to the utilities in whose service territory the third party gas storage customer resides.

## Research and Development

### Definition of Public Interest Research and Development

The definition of public interest R&D is important as it delineates the types of projects that will qualify as public interest gas R&D.

---

[33] *See* D.88-12-090.

[34] Third party gas storage providers are regulated by the Commission as public utilities. (*See* Decision (D.) 03-04-038.)

[35] Third party gas storage providers may be instructed by the Commission to bill these non-exempt customers.

Case: 19-30088    Doc# 11847-2    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 25 of 59

CEC and UC recommend adoption of the definition of public interest R&D contained in the 1996 "Working Group Report on Public Interest RD&D activities"[36] which is: "Public Interest RD&D activities are directed towards developing science or technology, 1) the benefits of which [sic] accrue to California citizens, and 2) are not adequately addressed by competitive or regulated entities." SCGC also supports this definition if it is interpreted to remove certain existing R&D programs from rates. We address SCGC's request separately in our discussion of R&D funding.

PG&E believes that the definition used in the Working Group Report is too general, and that there is no "bright line boundary" between public interest R&D and regulated and competitive R&D.[37] As an alternative, PG&E believes that the definition of public interest R&D should evolve through an oversight committee representing key stakeholders. PG&E offers that the oversight committee should evaluate R&D projects individually based on four criteria:

1. R&D projects that are *not funded* through the competitive market, and consistent with the gas objectives of Section 740 would be considered as public interest R&D.

2. R&D projects that are consistent with the gas objectives of Section 740 and *should not be funded* by the competitive market would also be considered as public interest R&D.

---

[36] Item A by reference, Working Group Report on Public Interest RD&D Activities, September 6, 1996, submitted in R.94-04-031, pp. ES-2 and 2-7.

[37] Competitive R&D activities are directed toward developing science or technology, the benefits of which can be appropriated by the private-sector entity making the investment. Regulated R&D activities are directed toward developing science or technology, the benefits of which are related to the regulated functions of the entity making the investment. (Working Group Report, p. ES-2.)

Case: 19-30088    Doc# 11847-2    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 26 of 59

3. The type of research conducted.  R&D that is fundamental, higher risk, long-term, basic research, and oriented towards public policy would be considered public interest R&D.

4. Ownership of the R&D product.  Whether the results of particular R&D projects are be owned by the public, by the utility for the benefit of the utility and its ratepayers, or by a competitive entity for potential licensing and profit, would be another factor in determining if the R&D is public interest.

We agree with UC and CEC that the definition contained in the 1996 Working Group Report on Public Interest RD&D activities is appropriate to define gas public interest R&D.  This definition is relatively simple, although applying the definition to particular projects may be more difficult.  Thus, our adopted definition is:

> Public interest gas R&D activities are directed towards developing science or technology, 1) the benefits of which [sic] accrue to California citizens and 2) are not adequately addressed by competitive or regulated entities.

We appreciate PG&E's concern that a bright line may not always be apparent between competitive and public interest projects, and that an oversight committee should be appointed to help evolve the definition.  In consideration of this concern, our adopted R&D program will include Commission oversight through our Energy Division.  This oversight will ensure that all R&D projects funded through the gas surcharge meet the definition of public interest, and additional criteria adopted herein.

Case: 19-30088    Doc# 11847-2    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page
27 of 59

**Additional Project Criteria**

The June 3, 2003 ALJ ruling requested parties to provide criteria useful to identifying and choosing gas public interest R&D projects.[38]  PG&E recommends that any project meet the requirements of Sections 740.1 and 890(a), and supplemental objectives established by the Commission.[39]  Sempra also offers Section 740.1 as a guide, as well as the following criteria for project selection:

---

[38]  ALJ Ruling, Attachment A.

[39]  *See* D.90-09-045, Appendix C, 37 CPUC 2d 390, pp. 397-398.

Case: 19-30088    Doc# 11847-2    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page
28 of 59

A. More than 50% of potential benefits target the general public.

B. The project/technology provides one or more of the following public benefits:

    1) Improvements to environmental quality

    2) Enhanced transmission and distribution system reliability or integrity

    3) Increased overall energy efficiency, and

    4) Improved safety.

C. Other R&D funding sources would not otherwise provide adequate funding for the proposed project due to the fact that:

    1) The project is too long in duration (5 years or greater)

    2) The project is very risky from a technical perspective

    3) Technology and/or product is projected to be too costly, and

    4) Technology is either at too early a stage or is considered a radical breakthrough.

UC and CEC do not state specific criteria, but provide a list of potential areas for study including energy efficiency, load management, insulation, indoor air quality, heating ducts, building commissioning, distillation, development of biomass and landfill gas, and technologies to reduce environmental impacts of gas use. CEC adds that projects should be prioritized through development of an R&D action plan that reflects energy policy, detailed R&D plans, use of R&D subject areas to develop specific projects and a merit review process with peer experts. CEC recommends that the administrator make decisions for funding.

We agree criteria should be established for the selection of projects, and to provide guidance to the administrator. However, we also want to provide flexibility to the administrator, so that worthwhile projects will not be excluded, including those that may involve collaboration with other entities. Section 740.1

Case: 19-30088    Doc# 11847-2    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 29 of 59

provides guidance; however this section is intended for R&D proposed by electric and gas utilities, and includes certain criteria pertaining to corporate operations. Therefore, in addition to meeting the adopted definition of public interest R&D, we expect that approved gas R&D projects will meet the following criteria:

1) Focus on energy efficiency, renewable technologies, conservation and environmental issues

2) Support State Energy policy

3) Offer a reasonable probability of providing benefits to the general public, and

4) Consider opportunities for collaboration and co-funding opportunities with other entities.

Our adoption of an annual gas R&D program, proposed by the administrator, and approved through the Commission, does not mean we are excluding the input of other parties to the list of potential gas R&D projects. Both the utilities, and other parties, have unique knowledge regarding particular energy problems that may help define worthwhile R&D projects. Therefore, we request that the utilities, and other parties, provide potential gas R&D projects to the administrator and the Commission for consideration and inclusion in annual gas R&D programs. In order to minimize potential delay in adopting annual gas R&D programs, we request that any potential projects be provided to the administrator and the Energy Division by July 31 of the year preceding the year for adopting the next annual gas R&D program.[40] Submitted gas R&D projects should explain how the project meets our adopted criteria, including the

Case: 19-30088   Doc# 11847-2   Filed: 01/21/22   Entered: 01/21/22 11:46:37   Page 30 of 59

definition of public interest gas R&D, and include expected project costs and benefits. We expect that the administrator in coordination with the Commission will consider these projects in developing annual gas R&D programs. Annual gas R&D programs will be approved by the Commission.

**Administration**

The administrator of public interest R&D has the responsibility to offer public interest projects for approval, and provide oversight so that projects are performed in a timely manner, within a budget, and at a reasonable cost.

Sempra recommends that the utilities administer the gas program, or in the alternative, Sempra through SoCalGas should be selected as a statewide administrator. If utilities elect not to mange their own R&D programs, Sempra states that its experience, resources, and relations with R&D organizations qualify SoCalGas to act as administrator. Sempra provides a detailed proposal for administering the R&D program including Commission jurisdiction, program funding, and the role of the California Utility Research Council (CURC)[41] as an advisory body.

PG&E recommends that an oversight committee of interested and qualified stakeholders should serve as administrator. PG&E believes that the oversight committee should include both utilities and other interested parties, including state agencies. Although PG&E would serve on an oversight committee, PG&E does not want to act as sole administrator.

---

[40] In recognition of the effective date of this decision, potential projects should be provided to the administrator and Energy Division by September 30, 2004 for the 2005 R&D program.

[41] CURC was established in 1984 to coordinate gas and electric R&D programs in California. (*See* Sections 9202-03.)

Case: 19-30088   Doc# 11847-2   Filed: 01/21/22   Entered: 01/21/22 11:46:37   Page
31 of 59

UC sets out criteria for choosing an administrator, and explains why UC best meets these criteria. UC submits that an administrator must have a public interest focus, coordinate an R&D program with other energy goals and research programs in the state, and manage the R&D program efficiently and cost-effectively. UC argues that the public interest focus should be administered by an entity devoted to the public interest, and not by an entity with conflicting interests, such as the utilities. UC believes the administrator should not be involved in the actual research, but should focus on management of the R&D program. UC asserts that a single statewide administrator provides a single point of contact and thus the most efficient coordination. UC further contends that efficient administration requires an existing research management structure.

UC applies its recommended criteria to the utilities, and concludes that the utilities are unsuitable to serve as an administrator. UC argues the utilities represent multiple entities, do not respect the boundary between public interest R&D and competitive R&D, and do not have a public interest focus. Furthermore, UC points out that utilities focus on their service territories, and except for Sempra, show little interest in acting as a statewide administrator. UC also notes that CURC is not a current functioning organization, and its structure appears to prohibit inclusion of UC or CEC, although in reply, Sempra states that UC and CEC could be included in CURC.

CEC believes there is substantial agreement between the parties regarding the appropriate criteria for administration. Agreed upon criteria include administration on a statewide basis, a single administrator, a program that supports state energy policies, Commission review and approval of the overall R&D program and budget, appointment of a capable and experienced administrator, efficient and publicly accountable, avoidance of conflict of

Case: 19-30088    Doc# 11847-2    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page
32 of 59

interest, and ability to coordinate with other energy programs. CEC argues that application of these criteria lead to the conclusion that CEC should be the administrator. CEC asserts it already administers an electric research program,[42] and develops and enforces statewide energy policies. CEC states it has extensive, ongoing experience in research management, and would be the most efficient administrator. CEC points out that internal Public Interest Energy Research (PIER) oversight and administration is already housed in the CEC, and as a result, overhead costs of administering the gas R&D program would be minimal.[43] CEC believes it has the highest degree of public accountability as it is subject to the Bagley-Keene Open Meeting Act and the Public Records Act.[44] CEC contends that unlike the utilities that conduct competitive R&D, and UC that conducts publicly-funded energy R&D, CEC is without any similar conflicts of interest. Finally, CEC argues that it is best qualified to coordinate public interest R&D due to its current administration of the PIER program, and its participation and knowledge of R&D in state and federal organizations.

In choosing an administrator for public purpose gas R&D programs, we have considered the arguments, qualifications, and experience of Sempra, UC and CEC. As a starting point, we look to D.95-12-063 addressing electric restructuring,[45] in which we stated "We do not intend for the surcharge to collect funds to pursue research that the competitive market will provide on its own.

---

[42] The PIER program is codified in Section 399.7.

[43] CEC states that administrative overhead for the PIER program ranged from 4% to 12 % annually, while the utilities administrative costs have ranged between 17% to 23% annually, and UC estimates its administrative costs at 15% to 20% annually.

[44] Government Code Sections 11120 *et seq.* and 6250*, et seq.*

[45] D.95-12-063, as modified by D.96-01-009, pp. 112-113.

Case: 19-30088    Doc# 11847-2    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page
33 of 59

**After a transition period, perhaps by January 1, 1998, the funds collected through a surcharge for public goods research should be administered by an independent, non-utility entity**." The application of this language to gas R&D leads us to conclude that the administrator should be a non-utility entity.

Eliminating the utilities means that either UC or CEC could act as administrator. Both UC and CEC have a public interest focus, could implement an R&D program on a statewide basis, and have R&D program experience. However, between these two entities, CEC currently manages the PIER program, and central to its mission is the development of public energy policy. In addition, CEC is subject to the Bagley-Keene Open Meeting Act and the Public Records Act requirements that help ensure public accountability. Consequently we believe CEC is best suited to act as administrator for the gas R&D program. In the event that CEC chooses not to act as administrator, we believe that UC could serve as an alternate administrator. Consistent with our conclusion that the administrator should be a non-utility entity, the administrator should not sub-contract with investor-owned utilities for the administration of any R&D programs.

### Commission R&D Program Oversight

We agree with the parties that there is a need for an oversight role by this Commission. We are responsible for adopting the R&D program, and for setting the surcharge to fund the R&D program; therefore, we must necessarily approve and resolve administration, funding, project approval, or other matters, and make a final decision. In this instance, the Energy Division, serving as the Commission's advisor, will assist us in this role. Any request for approval or changes in the adopted R&D program should be by letter, directed to the administrator, with a copy to the Commission's Energy Division. Proposed

Case: 19-30088    Doc# 11847-2    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page
34 of 59

program changes should include an explanation of the reasons for the proposed changes.  Changes proposed by the administrator should be brought to the Energy Division for approval.  The annual proposed R&D program should be provided by the administrator to the Energy Division by August 31.[46]

At this time we will not establish any additional committees, boards or other entities to oversee the administrator.  We are concerned that an oversight committee will add an unnecessary layer of administration, and may delay projects.  We agree with CEC that the administrator should manage daily activities and R&D projects, including planning, project procurement, project accounting and program evaluation.  The Commission will review and approve the annual plans for R&D projects to be funded.

### R&D Funding Level

There is wide variation in the parties' recommended funding levels. Sempra recommends that R&D spending remain at the current annual level of approximately $4.5 million.  PG&E recommends a similar level of initial spending, although PG&E would allow this amount to increase to approximately $11 million, if worthwhile R&D projects can be identified.  UC recommends spending at least $15 million annually, while CEC recommends funding be at least $24 million.  Sempra argues that the intent of the Legislature in adopting AB 1002 was to limit R&D spending to the current level of about $4.5 million.[47]

---

[46] The project list should explain how each project meets our adopted criteria, the estimated cost of each project, the administrator shall also include a list of projects that have been rejected.

In recognition of the effective date of this decision, the proposed R&D program for 2005 should be provided by the administrator to the Energy Division by October 31, 2004.

[47] The Legislative Counsel's Digest for AB 1002, Section 1, states:

*Footnote continued on next page*

Case: 19-30088    Doc# 11847-2    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 35 of 59

Sempra derives this figure from an assessment reflecting 20 years of experience, and asserts that no party demonstrated that $4.5 million is an unreasonable funding level. Sempra contends that CEC's funding recommendation, based on parity with electric public interest R&D, is not appropriate as the electric R&D funding level was established under separate legislation without an analysis of needs. PG&E supports Sempra's contention that the legislature intended to limit R&D spending to current levels. Alternatively, PG&E recommends that any increase in R&D spending above $4.5 million should be justified by a zero-based budgeting approach.[48]

UC argues that a zero-based budgeting approach should not be used to determine additional R&D spending. UC contends zero-based budgeting would unnecessarily delay research work, and may result in rejecting worthwhile R&D projects that are not as cost effective as other projects. UC also rejects limiting R&D spending to current levels. UC argues that current gas R&D funding is insufficient to make a significant contribution to overall energy change. Thus,

---

"It is the intent of the Legislature to continue public policy programs in an equitable manner that will ensure that all gas consumers will provide a fair share of adequate funding for these programs without increasing the current funding levels for these programs." (Item by Reference B, p. 1.)

[48] Under zero-based budgeting, projects that qualify would be identified, including cost and benefit analysis, and then summed. The Commission would determine the total appropriate funding, and include this amount in determining a surcharge. In the event a zero based budget has not been set in time for January 1 surcharge rate updates, the surcharge will be set using the amount of the annual program spending cap. Over or under collections (including balances in excess of project costs) of R&D costs will be adjusted for in the following January 1 surcharge rates.

Case: 19-30088    Doc# 11847-2    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page
36 of 59

UC recommends an annual funding amount of at least $15 million, based on UC's professional judgment.[49]

CEC argues that gas R&D funding levels have declined dramatically over the past 10 years, despite the availability of many public interest cost-effective projects with benefit-to-cost ratios between 2/1 and 9/1.  CEC states that this significant decline in R&D funding occurred during a period when the consumption of gas continued to substantially increase.  CEC estimates its recommended funding level of $24 million using an average of three methodologies, "social investment," "historic gap," and "parity."  The social investment methodology estimates R&D funding as equal to 1% of the gross operating gas revenues in California, or $30 million.  The gap methodology uses CEC's estimate of public interest R&D funding by utilities in the early 1990s to estimate current R&D needs of $22 million.  The parity methodology estimates gas R&D based on establishing funding equivalent to electric funding in the PIER program, resulting in an estimate of $20 million.  The average of these three methodologies is $24 million, CEC's recommended funding level.  CEC further contends that funding at the much lower level proposed by Sempra would continue the inequity of "free-ridership" and "unfair competition" between the electricity funded PIER program and gas R&D funding.

SCGC's testimony focuses on one issue.  SCGC advocates removal of Low Emission Vehicle (LEV) program costs from gas rates, and funding this program through the PPP surcharge.  In D.03-10-086[50] adopted October 30, 2003, we

---

[49]  TR 2, p. 135.

[50]  *See* D.03-10-086, p. 48, in Application 02-03-047, a SoCalGas and SDG&E application for authority to continue funding of LEV programs.

Case: 19-30088    Doc# 11847-2    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 37 of 59

denied the same request by SCGC.  We find no reason to change this policy, and therefore will not adopt SCGC's request.

The R&D funding level must provide adequate R&D funding for worthwhile public interest programs and the opportunity for reasonable program growth.  Gas is a vital resource in the economic future of California, and nationwide.  Clearly, as a matter of important public policy, we must adopt the means to maximize the effectiveness and efficiency of our gas resources.  Therefore, we reject Sempra's recommendation to limit future R&D funding to current levels, as well as Sempra's contention that the Commission has no authority to set the R&D budget.  We cannot conclude that the Legislature, in enacting AB 1002, intended that R&D spending would not increase above current levels.  As CEC notes, in determining legislative intent the courts require statutes to be read as a whole, harmonizing the various elements by considering each clause and section in the context of the overall statutory framework.[51]  AB 1002, which grants the Commission authority and discretion to determine appropriate natural gas funding levels for low-income, energy efficiency and public interest R&D activities, is consistent and in harmony with Public Utilities Code Sections 890(a) and 890(d), because these statutes direct the Commission to establish a natural gas surcharge for certain specified public policy programs and annually determine the amounts "required" to administer and fund these programs for each utility.  If we accepted Sempra's interpretation, the Commission would be restricted from determining the gas surcharge to fund these programs, including the R&D program.  Thus, an interpretation of Legislative intent that freezes these

---

[51] *People v. Jenkins*, 10 Cal.4th 234, 246; 40 Cal. Rptr. 2nd 903, 910 (1995).

Case: 19-30088    Doc# 11847-2    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 38 of 59

amounts cannot be harmonized with these statutory provisions.  This restrictive interpretation would make the Commission's determination of annual funding meaningless surplusage, a conclusion we reject.

Furthermore, it is unreasonable to conclude that the Legislature intended to ignore the factors that cause PPP costs to increase.  These factors include significant increases in the cost of gas, general inflation, and the number of customers that qualify for these programs.  If we accepted Sempra's restrictive interpretation, the value of these programs would diminish as the costs of the programs increased and the funding level remained unchanged.[52]  No party, including the utilities, has asserted that this outcome is reasonable.

Although we assert our authority to set a reasonable gas R&D budget, we will not adopt a specific level of R&D funding.  We are beginning a new R&D program, under a new administrator, along with Commission oversight.  In order to allow the R&D program to develop, we will adopt a zero-based budget subject to approval by the Commission.  We shall request that the administrator provide a prioritized list of projects that meet our adopted project criteria,[53] to the Commission by August 31 of each year,[54] prior to the January 1 R&D program effective date.  The projects will be reviewed and approved by the

---

[52] *See* for example D.02-09-021, Attachment 2, which increases the CARE, budgets for SDG&E and SoCalGas by $11.7 million, and $4.5 million, respectively.  Under Sempra's interpretation of AB 1002 these increases would be illegal resulting in some combination of restricting the number of CARE customers or reducing the subsidy per customer provided by the CARE program.

[53] The project list should explain how each project meets our adopted criteria, and the estimated cost of each project.  The administrator shall also include a list of projects that have been rejected.

[54] Except for R&D program year 2005, that should be provided by October 31, 2004.

Case: 19-30088    Doc# 11847-2    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page
39 of 59

Commission. We also agree with PG&E that, at least initially, there should be a cap on first year R&D program costs. In consideration of the parties recommended funding levels, we will adopt a first year cap of $12 million beginning January 1, 2005.[55] We will further provide that this initial cap can be increased by up to $3 million annually pending identification and approval of additional R&D projects, to a maximum cap of $24 million after four years; these amounts shall include all necessary R&D administrative costs. After four years, we will assess the reasonableness of the funding level, and the overall R&D program.

As recommended by both CEC and UC, we will order the utilities to continue their public interest research, although we will direct them to provide updated R&D plans to the Commission within 60 days of the effective date of this decision. These updated plans should detail how the utilities will end current public interest R&D projects or transfer these projects to the administrator by December 31, 2004. Utilities shall report any unspent R&D funds to the Energy Division as of December 31, 2004. Any unspent R&D funds shall be used for future R&D programs.

### Allocating R&D Costs and Remittances

R&D costs shall be allocated among utilities on the basis of throughput gas volumes as discussed in Allocation of Commission and BOE administrative

---

[55] We will allow CEC to access up to $1 million in the Fund during 2004 if necessary to begin their administration of the R&D program. We note that PG&E has collected approximately $5.5 million of unspent R&D funds through the surcharge on deposit in the Fund. The start-up funds for CEC will come from these PG&E collections and an adjustment will be made to future surcharge rates so that these costs are apportioned to all the utilities. The start-up funds are to be included in the R&D spending cap for program year 2005.

Case: 19-30088    Doc# 11847-2    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 40 of 59

costs. The Energy Division will then notify each utility of its R&D costs so that utility specific R&D costs may be included in the October 31 surcharge ALs.

We will also direct utilities to identify R&D amounts in quarterly remittances to BOE. Utilities shall send copies of the quarterly remittances to the Energy Division and the R&D administrator that show the dollar amount of the remittance representing R&D funding following filing with BOE.[56] Returns are to be held on a confidential basis.

**Other Issues**

In addition to a definition of public interest R&D, determining an administrator, and funding levels, parties make other recommendations for implementing an R&D program. Sempra recommends that the Commission require annual reports concerning program administration. PG&E recommends that the R&D program costs be remitted quarterly to the BOE, with reimbursement within 30 days of the date a claim is submitted. PG&E also agrees with CEC's proposal that R&D funds be deposited into a separate fund to assume timely payments to contractors. Furthermore, PG&E recommends that the annual authorized amount for R&D funding, including administrative overhead, would be added to other surcharge costs, collected quarterly, and retained in a BOE fund for distribution to the R&D project administrator to cover R&D project costs. PG&E advocates allocation of R&D revenue and costs through a separate rate component to non-exempt customer classes based on equal-percent-of-marginal-cost. CEC recommends that following initiation of the

---

[56] PG&E estimates that it has already collected and remitted about $5.5 million to BOE between 2001-2003. We agree with PG&E that these funds be made available as a part of PG&E's contribution to R&D on behalf of its customers. Future PG&E PPP surcharges should reflect this contribution.

Case: 19-30088    Doc# 11847-2    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page
41 of 59

R&D program, funding should be implemented on a five-year funding cycle beginning in January 2005.

Case: 19-30088    Doc# 11847-2    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 42 of 59

We direct the Energy Division to work with appropriate state agencies to establish a separate R&D account in the Fund, if feasible. Additionally, the utilities should amend their balancing accounts via an AL, if necessary, to reflect the collection of revenues for public interest R&D through the PPP surcharge, remittances to BOE and disbursements from the Fund to a non-utility administrator. The utilities shall also report to BOE the amounts collected from the surcharge for R&D with their quarterly remittances and furnish a copy to the Energy Division. The utilities should maintain existing authorized R&D cost allocation procedures. Proposed allocation of R&D costs to customers using equal-percent-of-marginal-cost is an issue for BCAP or other ratemaking proceedings.[57] However, we note initiating an R&D program, collecting R&D surcharge revenues, and establishing accounting procedures, may cause some initial problems in paying contractors while the fund is being established. We expect the administrator to address any R&D funding, project financing, or payment problems that may evolve as a result of the difference between quarterly deposits by utilities to the Fund, remittances from the Fund, and payments to contractors. Disbursements from the Fund to the R&D administrator shall not exceed the adopted zero-based R&D budget. Energy Division will issue instructions for Fund disbursements to CEC.

---

[57] Utilities that currently do not have R&D costs and thus do not use an allocation procedure for R&D costs, should allocate R&D costs to customer classes using equal-cents-per-therm.

Case: 19-30088    Doc# 11847-2    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page
43 of 59

We also will adopt Sempra's recommendation for annual reports by the administrator.  We expect that the annual reports will provide information on costs, balances of approved project budgets and expenses, benefits and progress of R&D projects.  The reports should be filed annually with the Energy Division by March 31.

### Commercialization of R&D Benefits

In embarking on a public interest R&D program, parties have noted the potential for commercial benefits from R&D projects.  Clearly, if any commercial benefits result, we expect that these benefits would accrue to the ratepayers who are funding the program through the gas surcharge.  Accordingly, we expect the administrator to inform the Energy Division if and when any commercial benefits result from the gas R&D projects funded through the gas surcharge. Commercial benefits may be used to offset future R&D costs, reduce the gas surcharge, or be returned to ratepayers, upon determination of the Commission.

### Implementing Annual Surcharge Rates

After the filing of appropriate ALs, utility surcharge rates for 2001, 2002, 2003 and 2004 were adopted by Commission resolutions.  In order to increase the efficiency of approving surcharge rate changes, we will allow future surcharge rate changes to be approved by the Energy Division.[58]  This change in policy assumes that ALs requesting surcharge rate changes are unopposed.  ALs that are protested and not subsequently corrected will continue to be approved only through Commission resolution.

---

[58] As discussed in R&D Funding Level, the R&D budget will be authorized by Commission resolution.

Case: 19-30088    Doc# 11847-2    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 44 of 59

We also direct the Energy Division to furnish BOE with a listing of authorized surcharge rates by public utility service territory, customer class, and effective surcharge dates.

No party opposed the filing of separate tariff rate schedules to reflect the adopted surcharge, although this issue was not resolved in the Workshop Report. Therefore, we will direct utilities to file separate tariff rate schedules reflecting the surcharge rates in their October 31 AL filings, and when changes are requested at other times.

## Comments on Proposed Decision

The proposed decision of the Assigned Commissioner in this matter was mailed to the parties in accordance with Pub. Util. Code § 311(d) and Rule 77.1 of the Rules of Practice and Procedure. Comments were received from CEC and UC, filing jointly, and PG&E, Sempra, BOE, SCGC, and The Utility Reform Network.

We have carefully considered the comments on the issues addressed in today's decision. In response to comments, we have modified the draft decision to clarify certain accounting and implementation instructions, and provided R&D definitions. We have also carefully considered parties' comments regarding the R&D program, and concluded that CEC should act as administrator, although we have not modified the R&D funding mechanism or oversight by this Commission.

Case: 19-30088    Doc# 11847-2    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 45 of 59

### Due Dates for AB 1002 Implementation Program

The following table summarizes certain dates and deadlines actions are to be undertaken on an ongoing basis. Refer to the discussion in the decision and ordering paragraphs for further details on the instructions to be followed.

| Due Date: | Party responsible: | Action: |
|---|---|---|
| Quarterly | Energy Division | Disperse remittances deposited in the Fund to utilities less adjustments for Commission and BOE administrative costs, R&D funding and BOE refunds. |
| Quarterly | BOE | Provide Energy Division with copies of Natural Gas Surcharge Returns from utilities and consumers and identify amounts paid. |
| Quarterly | Utilities | Provide Energy Division and R&D Administrator copies of BOE returns showing amounts collected and remitted for R&D program funding. |
| Quarterly | Utilities | Provide Energy Division copies of BOE returns showing amounts collected and remitted for Commission and BOE administrative expenses. |
| March 31 | R&D Administrator | Provide Energy Division with Annual Report on R&D activities and spending. |
| July 31 (except for program Year 2005) | R&D project developers | Provide descriptions of potential R&D projects to Energy Division and R&D Administrator for consideration in upcoming year. |
| August 31 | BOE | Unless previously submitted, provide copies of Natural Gas Surcharge Returns for utilities and consumers showing gas volumes used to calculate remittances. |
| August 31 (except for program Year 2005) | R&D Administrator | Provide proposed annual R&D program to the Energy Division. |
| September 30 | Energy Division | Obtain Commission and BOE costs for administering AB 1002 recoverable through the surcharge. |
| Prior to October 31 | Energy Division | Provide utilities with allocation of R&D, Commission and BOE administrative costs, and interstate pipeline customer gas volumes used for setting surcharge rates. |
| October 31 | Utilities | File ALs with proposed surcharge rates with requested effective date of January 1. Energy Division to promptly notify BOE of approved surcharge rates. |
| Annually | Utilities | Review customer accounts for collections received from exempt customers and issue refunds according to instructions discussed in decision. |
| Annually | Third Party Gas Storage | Submit customer lists to BOE and the Commission. |

Case: 19-30088    Doc# 11847-2    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page
46 of 59

**Assignment of Proceeding**

　　Loretta M. Lynch is the Assigned Commissioner and Bruce DeBerry is the assigned ALJ in this proceeding.

**Findings of Fact**

　1.　The surcharge supports low-income programs that embody public policy goals not directly related to the provision for gas service.

　2.　All funds remitted to BOE should be returned to the utilities in a timely manner to fund PPP.

　3.　BCAP estimated throughput gas volumes, or recent test year estimates, are the most accurate gas volume projections for calculating the surcharge.

　4.　Utility tariffs are intended to provide qualifications for service.

　5.　Interstate pipeline customers are not obligated to pay franchise fees.

　6.　AB 1002 was passed into law by more than a two-thirds vote of the Legislature.

　7.　As a result of implementing AB 1002, newly exempt customers are no longer required to pay the surcharge resulting in a shortfall in surcharge revenues.

　8.　This is a quasi-legislative proceeding; thus, some parties interested in ratemaking may not have participated.

　9.　Ratepayers should receive interest on deposited amounts in balancing accounts held by utilities.

　10.　A working cash allowance compensates investors for funds provided by them for the purpose of paying expenses in advance of receipt of offsetting revenues.

　11.　It would be unfair to small utility customers to allocate administrative costs based on the number of utilities paying into the Fund.

Case: 19-30088　　Doc# 11847-2　　Filed: 01/21/22　　Entered: 01/21/22 11:46:37　　Page 47 of 59

12. Allocating administrative costs based on utility gas volumes is reasonable.

13. Utility surcharge rates should reflect utility specific PPP costs.

14. If past default rates exceeded utility specific surcharge rates, then the over-remitted funds should be returned to the utilities, and applied to appropriate surcharge-related accounts.

15. A reasonable surcharge rate for non-exempt customers residing outside of any utility service territory is the rate used in the service territory in closest proximity to the customer.

16. Customer surcharges should be remitted to the utility in whose service territory the customer resides regardless of the utility serving the customer.

17. Third party gas storage non-exempt customers should pay the surcharge to the utility that operates in the utility service territory in which the customer resides.

18. The adopted definition of public interest R&D defines the types of projects that qualify as public interest gas R&D.

19. Public interest R&D activities are those directed towards developing science or technology, the benefits of which accrue to California citizens and are not adequately addressed by competitive or regulated entities.

20. The R&D administrator shall provide a list of recommended R&D projects to the Commission by August 31, prior to the January 1 effective R&D program date.

21. CURC is not currently functioning as an organization.

22. Parties agree that R&D administration should be conducted on a statewide basis, support state energy policy, include Commission review and approval of R&D programs and budgets, avoid conflicts of interest, utilize an efficient and

Case: 19-30088    Doc# 11847-2    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 48 of 59

capable administrator, coordinate with other energy programs, and consist of a single administrator.

23.  CEC currently administers the PIER program, and develops and enforces statewide energy policies under legislative authority.

24.  UC currently administers several energy programs.

25.  Public interest gas R&D funding levels have declined over the past 10 years.

26.  Gas is a vital resource in the economic future of California and the nation.

27.  Adopting an R&D funding level equivalent to current amounts, and without opportunity to increase, would diminish the value of R&D programs.

28.  A zero-based R&D budget with a cap of $12 million beginning in 2005 is a reasonable approach for funding gas R&D.

29.  It is reasonable to allow the R&D funding level to increase in future years in order to maintain the value of R&D programs.

30.  The Commission should have a role in overseeing gas R&D programs and budgets.

31.  Section 740.1 provides a guide for determining the selection of R&D projects.

32.  Reasonable criteria for R&D project selection include a focus on energy efficiency, renewable technologies, conservation and environmental issues, support of State energy policy, a reasonable probability of providing benefits to the general public, and opportunities for collaboration and co-funding with other entities.

**Conclusions of Law**

1.  Section 890(h) authorizes BOE to collect the gas surcharge from interstate non-exempt pipeline customers who might otherwise avoid surcharge payments.

Case: 19-30088    Doc# 11847-2    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 49 of 59

2. Section 896, and California Energy Resources Surcharge Regulations 2315 and 2316, exempt certain gas customers from surcharge payments.

3. Section 890(2) provides utilities with a solution to the problem of worthless customer accounts.

4. AB 1002 does not state that R&D funding levels must be maintained at current levels.

5. Sections 890(a) and (d) direct the Commission to establish a natural gas surcharge for certain specified PPPs and annually determine the amounts required to administer and fund these programs for each utility.

# O R D E R

**IT IS ORDERED** that:

1. Assembly Bill (AB) 1002 shall be implemented in accordance with the Energy Division's Workshop Report as filed on December 9, 2003, except as otherwise addressed in this decision.

2. Pacific Gas and Electric Company's (PG&E) Advice letters (AL) 2440-G and 2440 – G – A are approved subject to the modifications discussed in this decision. PG&E shall file a supplement to AL 2440-G-A within 30 days of the effective date of this decision reflecting these modifications, subject to Energy Division approval.

3. Respondent utilities shall identify the gas surcharge as a separate line item on customers' bills within six months of the effective date of this decision. Required billing system changes can be implemented along with regular monthly rate changes immediately following the six-month deadline.

4. Respondent utilities shall identify all exempt customers who they serve within six months of the effective date of this decision.

Case: 19-30088    Doc# 11847-2    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 50 of 59

5. Respondent utilities shall annually review their customer accounts, and refund surcharge revenues received from exempt customers, or any over-payments plus applicable interest and return these amounts within 30 days after identification, unless previously refunded by State Board of Equalization (BOE).

6. Respondent utilities shall inform the BOE of any refunds issued.

7. Respondent utilities shall refund any surcharge amounts received from exempt interstate pipeline customers or over-payments from non-exempt interstate pipeline customers, plus applicable interest, within 30 days after identification, unless previously refunded by BOE.

8. Respondent utilities shall return with accrued interest, any surcharge amount that was collected from exempt customers, within 60 days following the implementation of system changes required in Ordering Paragraph 3, unless previously refunded by BOE.

9. Respondent utilities shall provide the BOE with the names and addresses of all known California interstate pipeline customers.

10. Respondent utilities shall calculate surcharge rates using the surcharge formulas provided in this decision.

11. Respondent utilities shall exclude gas surcharge amounts in determining franchise payments.

12. Respondent utilities shall pay interest at the three-month commercial paper rate on surcharge amounts in the possession of utilities before remittance to BOE and credit this interest to the appropriate PPP balancing accounts.

13. Respondent utilities shall file ALs to establish or modify their balancing and/or memorandum accounts to facilitate the unbundling of public purpose program costs from their rates, treatment of interest accrued in the Fund, and to

Case: 19-30088    Doc# 11847-2    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 51 of 59

account for the adopted research and development (R&D) procedures, within 30 days of the effective date of this decision.

14. Commission and BOE administrative costs, and public interest R&D incurred as a result of implementing AB 1002, shall be allocated to utilities based on gas volumes used by the utilities in calculating remittances to BOE.

15. Third party gas storage providers shall provide annual customer lists to BOE and the Commission.

16. Non-exempt third party gas storage customers shall pay gas surcharges to the utility in whose service territory the customer resides. The surcharge shall be based on the appropriate surcharge for the service territory in which the customer resides.

17. Approved R&D projects shall meet the criteria discussed in this decision.

18. The California Energy Commission is appointed as administrator of the gas R&D program until further action by the Commission.

19. The funding level, including administration, for R&D in 2005 will be determined upon review and approval by the Commission, subject to a cap of $12 million, to be funded by the gas PPP surcharge. Additional increases in annual gas R&D budgets after 2005 will be considered and approved as discussed in this opinion.

20. R&D funds shall be remitted by the utilities quarterly to BOE used for distribution to the administrator to cover R&D project and administration costs consistent with the zero based budget and spending cap.

21. Any commercial benefits that result from the expenditures authorized in this opinion shall be brought to the Commission by the administrator to the Energy Division, and the Commission shall determine the disposition of such commercial benefits.

22.  Respondent utilities shall file annual ALs, with proposed surcharge rates, by October 31, with a requested effective date of January 1 of the next year.

23.  Respondent utilities shall provide copies of quarterly BOE remittances, including R&D amounts, to the Energy Division and the R&D administrator with returns held on a confidential basis.

24.  Respondent utilities shall continue public interest R&D and end, or transfer, projects to the administrator by December 31, 2004 and report any unspent R&D funds to the Energy Division for use in future R&D programs.  (*See* p. 36, supra.)

25.  Respondent utilities shall file separate tariff rate schedules that reflect the adopted surcharge rates no later than January 1, 2005.

26.  The administrator shall file an R&D report by March 31 each year. (*See* p. 39, supra.)

27.  Rulemaking 02-10-001 is closed.

This order is effective today.

Dated August 19, 2004, at San Francisco, California.

MICHAEL R. PEEVEY
President
CARL W. WOOD
LORETTA M. LYNCH
GEOFFREY F. BROWN
SUSAN P. KENNEDY
Commissioners

Case: 19-30088    Doc# 11847-2    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page
53 of 59

# APPENDIX A
## ************* APPEARANCE *************

************* **APPEARANCES** *************

Kathy Mitchell
AVISTA UTILITIES
PO BOX 3727
SPOKANE WA 99220
(541) 858-4743
rateca@avistacorp.com
For: Avista Utilities

M. Judith Nelson
BOARD OF EQUALIZATION
PO BOX 942879, MIC82
SACRAMENTO CA 94279
(916) 324-2641
judy.nelson@boe.ca.gov

David Abelson
Attorney At Law
CALIFORNIA ENERGY COMMISSION
1516 9TH STREET, MS-14
SACRAMENTO CA 95814
(916) 654-3951
dabelson@energy.state.ca.us

Jennifer Tachera
CALIFORNIA ENERGY COMMISSION
1516 - 9TH STREET
SACRAMENTO CA 95814
(916) 654-3870
jtachera@energy.state.ca.us

Jody London
GRUENEICH RESOURCE ADVOCATES
582 MARKET STREET, SUITE 1020
SAN FRANCISCO CA 94104
(415) 834-2300
jlondon@gralegal.com
For: UC-California Institute for Energy Efficiency (CIEE)

Larry Gutterridge
Attorney At Law
HANNA AND MORTON LLP
444 S. FLOWER STREET, SUITE 1500
LOS ANGELES CA 90071
(213) 430-2507
lgutterridge@hanmor.com
For: Southern California Generation Coalition

Susan E. Brown
ENRIQUE GALLARDO
LATINO ISSUES FORUM

Monica L. McCrary
Legal Division
RM. 5134
505 VAN NESS AVE
San Francisco CA 94102
(415) 703-1288
mlm@cpuc.ca.gov
For: Office of Ratepayer Advocates

Devra Bachrach
NATURAL RESOURCES DEFENSE COUNCIL
111 SUTTER STREET, 20TH FLOOR
SAN FRANCISCO CA 94104
(415) 875-6100
dbachrach@nrdc.org

Evelyn C. Lee
Attorney At Law
PACIFIC GAS AND ELECTRIC COMPANY
77 BEALE STREET, RM 3135
SAN FRANCISCO CA 94105-1814
(415) 973-2786
ecl8@pge.com
For: Pacific Gas and Electric Company

Robert B. Mclennan
Attorney At Law
PACIFIC GAS AND ELECTRIC COMPANY
PO BOX7442
77 BEALE STREET, 31ST FLOOR, B30A
SAN FRANCISCO CA 94120
(415) 973-2069
rbm4@pge.com
For: Pacific Gas & Electric Company

Daniel W. Meek
Attorney At Law
RESCUE
10949 S.W. 4TH AVENUE
PORTLAND OR 97219
(503) 293-9021
dan@meek.net
For: Residential Energy Services Companies United Effort
(RESCUE)

Georgetta J. Baker
SEMPRA ENERGY
101 ASH STREET
SAN DIEGO CA 92101
(619) 699-5064
gbaker@sempra.com
For: SDG&E & SoCal Gas/Sempra

Case: 19-30088   Doc# 11847-2   Filed: 01/21/22   Entered: 01/21/22 11:46:37   Page 54 of 59

785 MARKET STREET, NO. 300
SAN FRANCISCO CA 94103
(415) 284-7220
lifcentral@lif.org
For: Latino Issues Forum

Steven D. Patrick
Attorney At Law
SEMPRA ENERGY
555 WEST 5TH STREET
LOS ANGELES CA 90013
(213) 244-2954
spatrick@sempra.com
For: SoCal Gas/SDG & E

Richard Esteves
SESCO, INC.
77 YACHT CLUB DRIVE, SUITE 1000
LAKE HOPATCONG NJ 07849-1313
(973) 663-5125
sesco@optonline.net
For: SESCO, INC

Marcel Hawiger
Attorney At Law
THE UTILITY REFORM NETWORK
711 VAN NESS AVENUE, SUITE 350
SAN FRANCISCO CA 94102
(415) 929-8876 X 311
marcel@turn.org
For: The Utility Reform Network  (TURN)

Karen Notsund
Assistant Director
UC ENERGY INSTITUTE
2547 CHANNING WAY
BERKELEY CA 94720-5180
(510) 642-9588
knotsund@uclink.berkeley.edu

Carl Blumstein
UC-CALIF. INST. FOR ENERGY EFFICIENCY
1333 BROADWAY, SUITE 240
OAKLAND CA 94612-1918
(510) 643-0505
blumstei@socrates.berkeley.edu
For: UC-California Institute for Energy Efficiency

Raymond J. Czahar
Chief Financial Officer
WEST COAST GAS CO., INC.
9203 BEATTY DR.
SACRAMENTO CA 95826-9702
(916) 364-4100
westgas@aol.com

********** **STATE EMPLOYEE** ***********

Zaida Amaya-Pineda
Energy Division
770 L STREET, SUITE 1050
Sacramento CA 95814
(916) 324-8684
zca@cpuc.ca.gov

Terry Surles
CALIFORNIA ENERGY COMMISSION
TECHNOLOGY SYSTEMS DIVISION
1516 9TH STREET, MS 51
SACRAMENTO CA 95814
(916) 654-4878
tsurles@energy.state.ca.us

Eugene Cadenasso
Energy Division
AREA 4-A
505 VAN NESS AVE
San Francisco CA 94102
(415) 703-1214
cpe@cpuc.ca.gov
For: Energy Division

Sherrene Chew
Energy Division
770 L STREET, SUITE 1050
Sacramento CA 95814
(916) 445-1410
spc@cpuc.ca.gov

Bruce DeBerry
Administrative Law Judge Division
RM. 5043
505 VAN NESS AVE
San Francisco CA 94102
(415) 703-1279
bmd@cpuc.ca.gov

Barbara A. Morton
Telecommunications Division
AREA 3-F
505 VAN NESS AVE
San Francisco CA 94102
(415) 703-5263
bam@cpuc.ca.gov

Richard A. Myers

Energy Division
AREA 4-A
505 VAN NESS AVE
San Francisco CA 94102
(415) 703-1228
ram@cpuc.ca.gov
For: Energy Division

Stephen J. Rutledge
Energy Division
AREA 4-A
505 VAN NESS AVE
San Francisco CA 94102
(415) 703-1809
sjr@cpuc.ca.gov

Maria E. Stevens
Executive Division
RM. 500
320 WEST 4TH STREET SUITE 500
Los Angeles CA 90013
(213) 576-7012
mer@cpuc.ca.gov

Terrie J. Tannehill
Energy Division
AREA 4A
505 VAN NESS AVE
San Francisco CA 94102
(415) 703-1224
tjt@cpuc.ca.gov

Thomas W. Thompson
Office of Ratepayer Advocates
RM. 4102
505 VAN NESS AVE
San Francisco CA 94102
(415) 703-2881
ttt@cpuc.ca.gov
For: Office of Ratepayer Advocates

Donna L. Wagoner
Energy Division
AREA 4-A
505 VAN NESS AVE
San Francisco CA 94102
(415) 703-3175
dlw@cpuc.ca.gov

********* **INFORMATION ONLY** **********

Catherine E. Yap
BARKOVICH AND YAP
114 RICARDO AVENUE
PIEDMONT CA 94611

Bruno Jeider
Power Resources Manager
BURBANK WATER AND POWER
164 WEST MAGNOLIA BOULEVARD
BURBANK CA 91502
(818) 238-3700
bjeider@ci.burbank.ca.us

Robert E. Burt
4153 NORTHGATE BLVD. NO.6
SACRAMENTO CA 95834-1218
bburt@macnexus.org
For: INSULTATION CONTRACTORS ASSOCIATION

Jonathan Teague
CALIFORNIA DEPT. OF GENERAL SERVICES
717 K STREET, SUITE 409
SACRAMENTO CA 95814
(916) 322-8808
jonathan.teague@dgs.ca.gov

Donald J. Aumann
Pier Buildings Program
CALIFORNIA ENERGY COMMISSION
1516 NINTH ST., MS:43
SACRAMENTO CA 95814
(916) 654-4588
daumann@energy.state.ca.us
For: CALIFORNIA ENERGY COMMISSION

Steven G. Lins
CITY OF GLENDALE
OFFICE OF THE CITY ATTORNEY
613 EAST BROADWAY, SUITE 220
GLENDALE CA 91206-4394
(818) 548-3397
slins@ci.glendale.ca.us

Eric Klinkner
CITY OF PASADENA
150 LOS ROBLES AVENUE, SUITE 200
PASADENA CA 91101-2437
(626) 744-4478
eklinkner@ci.pasadena.ca.us

Marshall D. Clark
Energy Services & Policy

Case: 19-30088   Doc# 11847-2   Filed: 01/21/22   Entered: 01/21/22 11:46:37   Page
56 of 59

(510) 652-9778
ceyap@earthlink.net

Carolyn M. Kehrein
ENERGY MANAGEMENT SERVICES
1505 DUNLAP COURT
DIXON CA 95620-4208
(707) 678-9506
cmkehrein@ems-ca.com

Kevin J. Simonsen
ENERGY MANAGEMENT SERVICES
646 EAST THIRD AVENUE
DURANGO CO 81301
(970) 259-1748
kjsimonsen@ems-ca.com

Clyde S. Murley
GRUENEICH RESOURCE ADVOCATES
582 MARKET STREET, SUITE 1020
SAN FRANCISCO CA 94104
(415) 834-2300
cmurley@gralegal.com

Jack P. Mcgowan
GRUENEICH RESOURCE ADVOCATES
582 MARKET STREET, SUITE 1020
SAN FRANCISCO CA 94104
(415) 834-2300
docket-control@gralegal.com

Norman A. Pedersen
Attorney At Law
HANNA AND MORTON LLP
444 SOUTH FLOWER ST., SUITE 1500
LOS ANGELES CA 90071-2916
(213) 430-2510
npedersen@hanmor.com

John Steffen
IMPERIAL IRRIGATION DISTRICT
333 EAST BARIONI BOULEVARD
IMPERIAL CA 92251
(760) 339-9224
jsteffen@iid.com

Kurt J. Kammerer
K. J. KAMMERER & ASSOCIATES
11264 PORTOBELO DRIVE
SAN DIEGO CA 92124
(858) 292-2909
KJK@KJKammerer.com

DEPARTMENT OF GENERAL SERVICES
717 K STREET, SUITE 409
SACRAMENTO CA 95814
(916) 324-1283
Marshall.Clark@dgs.ca.gov

Enrique Gallardo
Senior Program Manager
LATINO ISSUES FORUM
785 MARKET STREET, SUITE 300
SAN FRANCISCO CA 94103
(415) 284-7220
enriqueg@lif.org
For: LATINO ISSUES FORUM

Andrew J. Skaff
Attorney At Law
LAW OFFICE OF ANDREW J. SKAFF
220 THE KNOLL
ORINDA CA 94563
(925) 254-9975
andy@skafflaw.com
For: Alpine Natural Gas Company Operating Company

Karen Lindh
LINDH & ASSOCIATES
7909 WALERGA ROAD, NO. 112, PMB 119
ANTELOPE CA 95843
(916) 729-1562
karen@klindh.com
For: CALIFORNIA MANUFATURERS & TECHNOLOGY
ASSN.

Robert L. Pettinato
LOS ANGELES DEPT. OF WATER & POWER
111 NORTH HOPE STREET RM 1151
LOS ANGELES CA 90012
(213) 367-1735
robert.pettinato@ladwp.com

Matthew V. Brady
Attorney At Law
MATTHEW V. BRADY & ASSOCIATES
2339 GOLD MEADOW WAY
GOLD RIVER CA 95670
(916) 442-5600
matt@bradylawus.com

Peter W. Hanschen
Attorney At Law
MORRISON & FOERSTER LLP
101 YGNACIO VALLEY ROAD, SUITE 450
WALNUT CREEK CA 94596
(925) 295-3450
phanschen@mofo.com

Gene Ferris
MOUNTAIN UTILITIES
PO BOX. 205
KIRKWOOD CA 95646
(209) 258-7331
gferris@ski-kirkwood.com

Sheryl Carter
NATURAL RESOURCES DEFENSE COUNCIL
111 SUTTER STREET, 20/F
SAN FRANCISCO CA 94104
(415) 875-6100
scarter@nrdc.org
For: Natural Resources Defense Council

Central Files
SAN DIEGO GAS & ELECTRIC
8330 CENTURY PARK COURT
SAN DIEGO CA 92123-1530
centralfiles@semprautilities.com
For: SAN DIEGOGAS & ELECTRIC

Darcy Morrison
PACIFIC GAS AND ELECTRIC COMPANY
77 BEALE STREET, MAILCODE B9A
SAN FRANCISCO CA 94105
(415) 973-5813
d2mr@pge.com

Joy C. Yamagata
SDG&E AND SOCAL GAS
8330 CENTURY PARK COURT, CP-32B
SAN DIEGO CA 92123
(858) 654-1755
jyamagata@semprautilities.com

Gerald D. Pine
717 K STREET, SUITE 504
SACRAMENTO CA 95814
(916) 444-3400
gdpine@sbcglobal.net

Judy Peck
SEMPRA ENERGY UTILITIES
601 VAN NESS AVENUE, SUITE 2060
SAN FRANCISCO CA 94102
(415) 202-9986
jpeck@semprautilities.com

Allan Rago
QUALITY CONSERVATION SERVICES, INC.
12921 RAMONA BLVD., SUITE C
IRWINDALE CA 91706
(626) 939-9161
arago@qcsca.com
For: QUALITY CONSERVATION SERVICES, INC.

Gloria M. Ing
DOUGLAS K. PORTER
Attorney At Law
SOUTHERN CALIFORNIA EDISON COMPANY
2244 WALNUT GROVE AVENUE
ROSEMEAD CA 91770
(626) 302-1999
gloria.ing@sce.com

Michael Briggs
RELIANT RESOURCES
801 PENNSYLVANIA AVENUE, N.W.
WASHINGTON DC 20004-2604
(202) 783-7220
mbriggs@reliant.com

Keith Mccrea
Attorney At Law
SUTHERLAND, ASBILL & BRENNAN
1275 PENNSYLVANIA AVENUE, NW
WASHINGTON DC 20004-2415
(202) 383-0705
keith.mccrea@sablaw.com
For: CALIFORNIA MANUFACTURERS & TECHNOLOGY ASSN

Joe Williams
Ceo
RICHARD HEATH AND ASSOCIATES, INC.
590 W. LOCUST AVENUE, STE 103
FRESNO CA 93650
(559) 447-7000
joe@rhainc.com

Michael Shames
Attorney At Law
UTILITY CONSUMERS' ACTION NETWORK
3100 FIFTH AVENUE, SUITE B
SAN DIEGO CA 92103
(619) 696-6966
mshames@ucan.org

Kristine Lucero
RICHARD HEATH AND ASSOCIATES, INC.
590 W. LOCUST AVENUE, SUITE 103
FRESNO CA 93650

- 5 -

(559) 447-7000
kristine@rhainc.com

Lulu Weinzimer
695 9TH AVE. NO. 2
SAN FRANCISCO CA 94118
(415) 387-1025
lisaweinzimer@sbcglobal.net

Alex Goldberg
WILLIAMS COMPANIES, INC.
ONE WILLIAMS CENTER, SUITE 4100
TULSA OK 74172
(918) 573-3901
alex.goldberg@williams.com

Wallis J. Winegar
WINEGARD ENERGY, INC
1818 FLOWER AVE
DUARTE CA 91010
(626) 256-0440
wallis@winegardenergy.com
For: WINEGARD ENERGY, INC.

# **(END OF APPENDIX A)**