**Exhibit D**

ALJ/JMH/ek4                                      **Date of Issuance  10/23/2015**

Decision 15-10-032  October 22, 2015

**BEFORE THE PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA**

Order Instituting Rulemaking to Address
Natural Gas Distribution Utility Cost and                    Rulemaking 14-03-003
Revenue Issues Associated with                              (Filed March 13, 2014)
Greenhouse Gas Emissions.


**DECISION ADOPTING PROCEDURES NECESSARY FOR NATURAL GAS
CORPORATIONS TO COMPLY WITH THE CALIFORNIA CAP ON
GREENHOUSE GAS EMISSIONS AND MARKET-BASED COMPLIANCE
MECHANISMS (CAP-AND-TRADE PROGRAM)**

155330024

Case: 19-30088   Doc# 11847-4   Filed: 01/21/22   Entered: 01/21/22 11:46:37   Page 2
of 87

# Table of Contents

**Title**                                                                    **Page**

DECISION ADOPTING PROCEDURES NECESSARY FOR NATURAL GAS CORPORATIONS TO COMPLY WITH THE CALIFORNIA CAP ON GREENHOUSE GAS EMISSIONS AND MARKET-BASED COMPLIANCE MECHANISMS (CAP-AND-TRADE PROGRAM) .................................................... 1

1. Summary ................................................................................ 2
2. Background ............................................................................ 3
3. Procedural History .............................................................. 5
4. Discussion and Analysis of the Phase Two Issues ............ 9
4.1. Preliminary Statements: 2015 Forecast  Proceeds and Costs ............ 9
4.1.1. Forecast Allowance Proxy Price ................................. 10
4.1.2. Forecast Allowance Proceeds ................................... 11
4.1.3. Forecast Compliance Obligation .............................. 13
4.1.4. Forecast Compliance Cost ........................................ 14
4.1.5. Administrative Cost .................................................. 15
4.2. Cost Recovery and Rate Design .................................... 16
4.3. PG&E Balancing Account .............................................. 22
4.4. Cost Allocation ............................................................ 23
4.5. Minimum Consignment ................................................ 24
4.6. Exempt Customers ...................................................... 27
4.7. Use of GHG Allowance Proceeds ................................. 30
4.8. GHG Costs in Customer Bills ....................................... 38
4.9. Tariff Changes ............................................................. 42
4.10. Marketing and Outreach of the Natural Gas GHG Program ...................... 44
4.11. Confidentiality ........................................................... 52
5. Motion to File Under Seal ................................................. 55
6. Safety Considerations ...................................................... 55
7. Categorization and Need for Hearing ............................... 56
8. Comments on Proposed Decision ..................................... 56
9. Assignment of Proceeding ................................................ 57
Findings of Fact ..................................................................... 57
Conclusions of Law ............................................................... 59
O R D E R ............................................................................... 62

Appendix A - Natural Gas Utility Reporting Templates and Notes

Case: 19-30088   Doc# 11847-4   Filed: 01/21/22   Entered: 01/21/22 11:46:37   Page 3 of 87

DECISION ADOPTING PROCEDURES NECESSARY FOR NATURAL GAS
CORPORATIONS TO COMPLY WITH THE CALIFORNIA CAP ON
GREENHOUSE GAS EMISSIONS AND MARKET-BASED COMPLIANCE
MECHANISMS (CAP-AND-TRADE PROGRAM)

## 1.  Summary

This decision adopts procedures necessary for natural gas corporations to comply with the California Cap on Greenhouse Gas (GHG) Emissions and Market-Based Compliance Mechanisms[1] (Cap-and-Trade Program) regulations imposed by California Air Resources Board (ARB) as a result of the California Global Warming Solutions Act of 2006 (Assembly Bill (AB) 32).[2]  The ARB regulations are contained in Title 17 of the California Code of Regulations (Title 17). Pursuant to Sections 95851(b), and 95852(c) of Title 17, suppliers of natural gas, including Pacific Gas and Electric Company (PG&E), Southern California Gas Company (SoCalGas), San Diego Gas & Electric Company (SDG&E), and Southwest Gas Company (SWG) (collectively, the utilities), must comply with the Cap-and-Trade regulations.

Today's decision approves methodologies for natural gas utilities to use when calculating forecast and recorded GHG allowance proceeds and GHG costs associated with complying with Cap-and-Trade, and it approves an advice letter process for the utilities to use when forecasting and reconciling reasonable GHG costs and allowance proceeds.  Today's decision approves the 2015 forecasts presented in the utilities' preliminary statements and requires the utilities to include GHG costs in customers' rates on an equal-cents-per-therm basis.  The

---

[1]  Title 17, California Code of Regulations, Sections 95801-96022.

[2]  Statutes of 2006, Chapter 488.

Case: 19-30088    Doc# 11847-4    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 4
of 87

decision also adopts a natural gas California Climate Credit for residential customers of those utilities.

This decision resolves the issues in Phase Two of the proceeding. The rulemaking is closed.

## 2. Background

On March 19, 2014, the Commission issued Rulemaking (R).14-03-003 to address issues related to GHG cost and proceeds resulting from the implementation of the ARB's GHG Cap-and-Trade Program, which affects natural gas corporations under the Commission's jurisdiction.

In response to AB 32, ARB established an economy-wide cap on major sources of GHG emissions, including large point-source emitters, electricity deliverers and fuel suppliers, and created a market-based mechanism, called Cap-and-Trade, to encourage covered entities to make efficient decisions about how to reduce emissions.

ARB adopted the GHG Cap-and-Trade Program in December 2011, and the regulation became effective on January 1, 2012. ARB phased in the types of entities[3] whose GHG emissions are covered under the Cap-and-Trade Program. Those subject to a compliance obligation are deemed "covered entities."

Effective January 1, 2015, natural gas suppliers became covered entities and have a compliance obligation under Cap-and-Trade. Natural gas suppliers must fulfill their compliance obligations under the Cap-and-Trade Program by obtaining and surrendering to ARB an amount of compliance instruments

---

[3] Entities having a compliance obligation under the Cap-and-Trade Program are responsible for possessing and ultimately surrendering an amount of compliance instruments (either GHG allowances or offsets) equal to their GHG emissions.

Case: 19-30088    Doc# 11847-4    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 5 of 87

equivalent to their compliance obligation – "the emissions of GHG that would result from full combustion or oxidation of the quantities of the fuels...which are imported and/or delivered to California,"[4] less the fuel that natural gas suppliers deliver to covered entities that are separately covered by Cap-and-Trade.

Beginning on January 1, 2015, the natural gas utilities under the Commission's jurisdiction became covered entities as suppliers of natural gas that distribute or use natural gas in California.[5]

The gas utilities' compliance obligation creates new procurement costs for gas corporations that could affect gas rates. Gas utilities have two potential sources of Cap-and-Trade-related costs: as regulated natural gas suppliers that deliver gas to California end-users, and as owners and operators of facilities that directly emit at least 25,000 $MTCO_2e$ per year and are covered entities under the Cap-and-Trade regulation. Some natural gas corporations own and operate compressor stations that ARB currently regulates as covered entities. Others may operate compressor stations that currently fall below the 25,000 $MTCO_2e$ emissions threshold but that may, at a later date, exceed this threshold, and therefore become covered entities. Thus, when the Commission considers Cap-and-Trade-related costs that natural gas corporations experience, we must consider their dual costs as gas suppliers and as owners of covered facilities.

ARB established deadlines by which covered entities must submit to ARB an amount of compliance instruments equal to the GHG emissions that the covered entity emitted during that period. These compliance instruments can be a combination of GHG emission allowances and a limited number of emission

---

[4] 17 CCR § 95812(d)(1).

[5] 17 CCR § 95811(c).

offsets. Each allowance is a tradeable permit representing one metric ton of carbon dioxide equivalent gas. The market price of allowances represents the cost of a unit of GHG emissions, and it provides incentives for the market to find efficient ways to reduce emissions.

Under the Cap-and-Trade Program, ARB allocates GHG allowances to natural gas utilities for the benefit of their ratepayers,[6] and ARB requires the utilities to consign a minimum percentage of these allowances for sale in ARB's allowance auctions, with consignment requirements beginning at 25 percent in 2015, and increasing 5 percent annually through 2020.[7] The proceeds from the sale of these GHG allowances may not be used for the benefit of entities or persons other than the utilities' ratepayers; they must be used in a manner consistent with the goals of AB 32; and they may not be returned to customers in a volumetric manner.[8]

## 3. Procedural History

Pursuant to the Assigned Commissioner and Administrative Law Judge Ruling and Scoping Memo, issued on July 7, 2014, the highest priority issues necessary to allow natural gas utilities to begin compliance with the Cap-and-Trade Program were addressed in Phase One of this proceeding. Decision (D.) 14-12-040 was issued on December 19, 2014.

In D.14-12-040, we modified and adopted a settlement agreement (Joint Settlement) between SoCalGas, SDG&E, PG&E, SWG, and the Office of Ratepayer Advocates (ORA). D.14-12-040 authorized the utilities to file Tier 1

---

[6] 17 CCR § 95893(a).

[7] 17 CCR § 95893 Table 9-4

[8] 17 CCR § 95893(d)

Case: 19-30088   Doc# 11847-4   Filed: 01/21/22   Entered: 01/21/22 11:46:37   Page 7 of 87

advice letters to establish new, two-way balancing accounts to track and record the costs incurred to comply with the ARB's Cap-and-Trade Program, as well as proceeds received from the consignment of natural gas utilities' allowances under the ARB program. D.14-12-040 also authorized the utilities to create new memorandum accounts to track the administrative costs incurred to comply with the Cap-and-Trade Program.

D.14-12-040 declined to approve the utilities' forecasts of 2015 Cap-and-Trade-related costs and proceeds presented in the Joint Settlement, finding that the Joint Settlement did not provide sufficient information to determine whether the utilities' forecasts were reasonable. Instead, the decision required the utilities to file, within 30 days, preliminary statements including data and supporting information in sufficient detail for the Commission to evaluate and authorize the 2015 GHG cost forecasts and determine whether the forecasting methodologies are reasonable and consistent with the law. The natural gas utilities were required to defer including Cap-and-Trade-related costs in natural gas rates until the forecasts of 2015 Cap-and-Trade-related costs and rate design requirements are approved.

In compliance with Ordering Paragraph 8 of D.14-12-040, on January 20, 2015, PG&E, SDG&E and SoCalGas (jointly) and SWG filed preliminary statements including revised forecasts of 2015 Cap-and-Trade-related compliance costs and allowance proceeds and proposals for rate design. PG&E filed an amendment to its preliminary statement on February 10, 2015.

On January 29, 2015, the Assigned Commissioner and Administrative Law Judge issued a Ruling and Scoping Memo (Ruling and Scoping Memo) that identified that schedule and scope for Phase Two of the proceeding. As

Case: 19-30088    Doc# 11847-4    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 8
of 87

indicated in the Ruling and Scoping Memo, the issues to be decided in Phase Two include:

1. The methodology, format and procedural mechanism the natural gas corporations should use to forecast and reconcile annual Cap-and-Trade-related costs, allowance revenue and administrative expenses;

2. Whether the natural gas corporations can rely on public, non-confidential data to report forecasts publicly without violating ARB confidentiality rules that prevent disclosure of market-sensitive information;

3. How Cap-and-Trade costs should be allocated between core and noncore customers;

4. Any tariff changes or new tariffs that natural gas utilities should use to recover GHG costs;

5. How GHG costs should be reflected on customer bills;

6. Detailed utility proposals regarding how utilities will identify customers that should be excluded from having GHG costs in rates and how to ensure, in tariffs, that these customers' rates exclude GHG costs;

7. How utilities should address instances when customers that are not covered entities when ARB issues its annual covered entity exclusion, become covered entities in the subsequent year, and thus have a Cap-and-Trade compliance obligation for emissions incurred during a period when they may also have GHG costs in their natural gas rates. Customers in this circumstance should be referred to as "newly covered entities;"

8. Describe how the utilities should address "newly excluded entities." Newly excluded entities are customers whose emissions were greater than the 25,000 $MTCO_2e$/year threshold at any time during 2009 through 2012 and were therefore covered entities during the first Cap-and-Trade compliance period, but who may not have a compliance obligation during the second compliance period, 2015-2017, because their

Case: 19-30088    Doc# 11847-4    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 9 of 87

emissions did not exceed the 25,000 MTCO$_2$e/year threshold in 2013 and 2014.

9. The minimum quantity of directly allocated allowances the natural gas utilities should consign to auction and why, if at all, this should be different from ARB's requirements;

10. Whether it is reasonable to return all allowance revenue on an equal, non-volumetric basis to each residential gas customer, similar to the California Climate Credit allocated to each residential electricity customer as authorized in D.12-12-033;

11. The scope and objectives of any marketing and outreach necessary to inform customers about the natural gas Cap-and-Trade allowance revenue and revenue allocation;

12. Whether the Commission should authorize the natural gas corporations to track and record outreach costs in memorandum accounts;

13. Whether any marketing and outreach activities necessary to inform customers about the natural gas Cap-and-Trade allowance revenue and revenue allocation should be consolidated with the electric GHG marketing and outreach activities under consideration in Application (A.) 13-08-026. Whether each natural gas corporation should annually publish the Cap-and-Trade-related costs that may be present in natural gas rates and tariffs, and whether the natural gas corporations can publish such costs without violating ARB confidentiality rules regarding disclosure of market-sensitive information;

14. Whether there are any safety issues raised by this proceeding; and

15. Whether evidentiary hearings are necessary to resolve any of the issues identified above.

Case: 19-30088    Doc# 11847-4    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 10 of 87

Comments on the Preliminary Statements and Phase Two issues were filed on February 27, 2015 by ORA, PG&E, SDG&E and SoCalGas (jointly), SWG, Southern California Edison Company (SCE), the Bioenergy Association of California (BAC), the Center for Sustainable Energy (CSE), California Solar Energy Industries Association (CALSEIA), the Green Power Institute(GPI), and the Greenlining Institute.

Reply comments were filed by the Environmental Defense Fund (EDF) and the Natural Resources Defense Council (NRDC) (jointly), SoCalGas and SDG&E (jointly), PG&E, ORA, and CSE on March 13, 2015.  These comments included discussion of the merits of many of the policies and the alignment with the ARB's rules and regulations.  Through this comment process, we have developed a full record on which to resolve the issues discussed in this decision.

## 4.  Discussion and Analysis of the Phase Two Issues

### 4.1.  Preliminary Statements: 2015 Forecast Proceeds and Costs

In developing their forecasts of 2015 GHG compliance costs and allowance proceeds, D.14-12-040 directed the utilities to look to the methodologies and templates the electric utilities use when forecasting and reconciling GHG costs and proceeds, as approved in D.14-10-033 and corrected by D.14-10-055 and D.15-01-024.   D.14-12-040 also adopted guidelines regarding how the natural gas utilities should forecast GHG costs and allowance proceeds.  D.14-12-040 required the utilities to calculate, at a minimum:

1. The public unit price of compliance instruments used to estimate the cost of the net compliance obligation, and the methodology used to estimate this price.

2. The utilities' expected net compliance obligation for 2015 in terms of $MTCO_2e$, and information to substantiate this

Case: 19-30088   Doc# 11847-4   Filed: 01/21/22   Entered: 01/21/22 11:46:37   Page 11 of 87

forecasted obligation, including forecasts of allowances that the utility will receive from ARB.

3. Evidence that each utility's forecasted compliance obligation excludes the emissions from customers that are covered entities under ARB's Cap-and-Trade program. This includes adequate rate design proposals that demonstrate the utilities are capable of identifying customers that should be excluded from carbon pricing in natural gas rates.[9]

The Preliminary Statements describe the utilities' forecasted proxy price, allowance proceeds, compliance costs, and rate design proposals. ORA states that the utilities' Preliminary Statements forecasting 2015 GHG costs and allowance proceeds appear to comply with the requirements of D.14-12-040 and D.14-10-033. No other party objects or otherwise commented on the utilities' statements. As described in further detail in the subsections below, we agree that each utility's methodology to forecast 2015 GHG costs and allowance proceeds is reasonable.

### 4.1.1. Forecast Allowance Proxy Price

A proxy price is used to forecast the price of GHG allowances. To protect confidential information related to GHG allowance prices and bid strategies, D.14-10-033 directed the electric utilities to set a forecast allowance proxy price using the daily settlement price of a California Carbon Allowance on the Intercontinental Exchange (ICE) with a vintage year and delivery in December of the forecast year.[10] D.14-10-033 permitted each utility to set its own forecast

---

[9] D.14-10-033, as corrected by D.14-10-099 and D.15-01-024 at 22.

[10] D.14-10-033 at 12, Attachment B, at 1.

Case: 19-30088    Doc# 11847-4    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 12 of 87

proxy price, as long as it "uses a reasonable methodology based on the forward ICE settlement prices and explains its methodology."[11]

SoCalGas' and SDG&E's Forecast Allowance Proxy Price methodology for forecast year 2015 is based on December 2015 ICE contracts, specifically the five day average of January 5, 2015 – January 9, 2015. The resulting Forecast Proxy Price is $13.06 per $MTCO_2e$.

PG&E's Forecast Allowance Proxy Price for forecast year 2015, represents the published ICE settlement price of a vintage 2015 California Carbon Allowance Future with a December 2015 delivery date for the five-day trading period between January 8, 2015, and January 15, 2015. The resulting Forecast Proxy Price for PG&E is $12.99 per $MTCO_2e$.

SWG's Forecast Allowance Proxy Price is the January 16, 2015 futures settlement price for vintage year 2015 allowances for delivery in December 2015, obtained from the ICE Futures Daily Market Report for Physical Environmental, "CAN-California Carbon Allowance Future-Vintage 2015." SWG states that this methodology is consistent with SWG methodology for forecasting gas supply prices. The resulting Forecast Allowance Proxy Price for SWG is $12.96 per $MTCO_2e$.

The utilities' 2015 Forecast Allowance Proxy Prices are reasonable.

### 4.1.2. Forecast Allowance Proceeds

Consistent with D.14-12-040 and D.14-10-033, the utilities calculated Forecast Allowance Proceeds by multiplying the Forecast Allowance Proxy Price by the minimum number of allowances required to be placed in their Limited

---

[11] D.14-10-033 at 12.

Case: 19-30088   Doc# 11847-4   Filed: 01/21/22   Entered: 01/21/22 11:46:37   Page 13 of 87

Use Holding Accounts, inclusive of franchise fees and uncollectibles (FF&Us). Each year, gas utilities must inform ARB by September 1, or the first business day thereafter, of the amount of allowances to be placed into their Compliance and Limited Use Holding Accounts for the following budget year.  Allowances placed in the Limited Use Holding Accounts must be consigned to auction and may not be used for complying with Cap-and-Trade.

For 2015, gas utilities receive as directly allocated allowances 94.4% (the 2015 Cap Adjustment Factor) of their 2011 base year emissions, and must place 25% of these allowances in their Limited Use Holding Accounts.[12]

Natural gas utilities are not required to place all of their directly allocated allowances in their Limited Use Holding Accounts.  Each utility must use those allowances not placed into its Limited Use Holding Account directly for Cap-and-Trade compliance.

Although the utilities may have consigned more than the minimum 25% in 2015, in order to maintain confidentiality of their market position, the utilities forecasted their 2015 allowance proceeds by multiplying the proxy allowance price by the minimum number of allowances ARB required them to in their Limited Use Holding Accounts.  Actual proceeds received will be trued up in future years through the GHG balancing accounts.  The utilities' approach for calculating the Forecast Allowance Proceeds is reasonable and consistent with the confidentiality needs and transparency goals of the Commission, ARB, and the parties.

---

[12] Title 17, CCR, § 95893.

Case: 19-30088   Doc# 11847-4   Filed: 01/21/22   Entered: 01/21/22 11:46:37   Page 14 of 87

### 4.1.3. Forecast Compliance Obligation

To fulfill their compliance obligations under Cap-and-Trade, the natural gas utilities will need to obtain and surrender compliance instruments equivalent to their compliance obligation, which is equal to "the emissions of GHG that would result from full combustion or oxidation of the quantities of the fuels…which are imported and/or delivered to California"[13] and the emissions associated with any of its compressor stations.

The utilities calculate their 2015 Forecast Compliance Obligation using their total forecast covered emissions (which excludes natural gas delivered to customers that are covered entities), less the amount of allowances that ARB directly allocated to the utility that the utility may use for its own compliance obligation.

PG&E calculated its compliance obligation using a forecast of 2015 emissions, based on 1-in-2 average temperature year scenario, excluding the forecasted emissions of customers with a direct compliance obligation under ARB's Cap-and-Trade program ("exempt customers"). PG&E currently records and recovers its compressor station-related GHG costs in its Gas Operations Balancing Account.[14] It is therefore appropriate that PG&E did not also include those costs in its 2015 forecast in this proceeding.

SoCalGas and SDG&E calculated their respective compliance obligations using a public forecast of their 2015 throughput from the most recent California Gas Report, less the throughput attributable to exempt customers. For the compliance obligation associated with covered facilities owned by the

---

[13] 17 CCR § 95812(d)(1).

[14] D.13-03-017, Ordering Paragraph 6.

Case: 19-30088   Doc# 11847-4   Filed: 01/21/22   Entered: 01/21/22 11:46:37   Page 15 of 87

companies, SoCalGas and SDG&E used an average of the most recent three years of emissions data available.[15]

The utilities' approaches to calculating their Forecast Compliance Obligations are reasonable. No party objected.

### 4.1.4. Forecast Compliance Cost

Consistent with D.14-12-040 and D.14-10-033, a reasonably accurate forecast of GHG emissions costs is important for setting rates sufficient to cover the costs of GHG compliance instruments. There are two components to the natural gas utilities; GHG compliance costs: costs associated with their Cap-and-Trade obligations as natural gas suppliers, which the utilities call their "End-User Compliance Cost" in their preliminary statements, and costs associated with their ownership and operation of facilities (such as compressor stations) are separately covered entities under Cap-and-Trade because they emit more than 25,000 $MTCO_2e$ per year. In their Preliminary Statements, the utilities calculated their End-User Compliance Cost by multiplying their Forecast Allowance Proxy Price by their End-User Forecast Procurement Need. The End-User Forecast Procurement Need is equal to the number of allowances the utility expects it will need to cover its ARB supplier-related compliance obligation less the amount of allowances ARB directly allocated to the utility that the utility may use for Cap-and-Trade compliance. For utility owned or operated facilities that have a compliance obligation, the utilities forecasted these compliance costs by multiplying the forecasted emissions from these facilities by the allowance proxy price.

---

[15] SoCalGas and SDG&E Preliminary Statement at 6.

Case: 19-30088   Doc# 11847-4   Filed: 01/21/22   Entered: 01/21/22 11:46:37   Page 16 of 87

Each utility appropriately applied its FF&U factor to the total forecast compliance costs to determine its total revenue requirement for 2015.

### 4.1.5. Administrative Cost

D.14-12-040 authorized the utilities to establish memorandum accounts to track the incremental administrative costs incurred to comply with the ARB's Cap-and-Trade Program. SoCalGas and SDG&E provide initial estimates of the administrative costs. For SoCalGas, the preliminary estimates include labor and non-labor costs associated with staff time and resources dedicated to GHG procurement activities. SoCalGas also included labor and non-labor costs associated with GHG program management activities. SDG&E expects to be able to leverage many of the processes and functions already developed for its electric GHG compliance, and therefore only estimates labor and non-labor costs associated with GHG procurement activities.

SoCalGas and SDG&E state that the administrative cost estimates are allocated between the "End-Users" and "Facilities" functions based on the relative number of forecast allowances required for compliance for the two functions.[16] Neither PG&E nor SWG provided an estimate of administrative costs for 2015.

At present, all necessary administrative costs to implement the natural gas supplier Cap-and-Trade program should be recovered from GHG allowance proceeds. In order to ensure that adequate funding is available, each utility must forecast administrative costs and identify the portion of the natural gas GHG

---

[16] *Id*, at 9.

Case: 19-30088    Doc# 11847-4    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 17 of 87

allowance proceeds necessary to cover administrative costs before distribution of net allowance proceeds to customers through the Climate Credit.

Actual administrative costs should be recorded in the authorized GHG memorandum accounts for consideration through the annual natural gas true-up advice letters (as detailed further below). The annual natural gas true-up advice letters must include a detailed accounting of actual administrative costs incurred. As stated in D.14-12-040, administrative costs are subject to reasonableness review.

### 4.2. Cost Recovery and Rate Design

This section of the decision describes the process each utility should use to include forecast and reconciled costs in rates and to distribute forecast and reconciled proceeds to customers.

As discussed above, D.14-12-040 authorized each utility to establish a two-way balancing account to track and record costs incurred to comply with the Cap-and-Trade Program as a natural gas supplier and owner of covered facilities (e.g. gas compressor stations), as well as the proceeds received from consigning allowances for sale in ARB auctions. D.14-12-040 also authorized each utility to establish a memorandum account to track administrative costs associated with GHG compliance not recorded elsewhere. These accounts were created in 2015 through the advice letter process.[17]

**Party Positions**

In its Preliminary Statement, PG&E proposes to recover its annual GHG compliance costs for the following year on a forecast basis through separate

---

[17] PG&E Advice Letter 3351-G; SDG&E Advice Letter 2354-G; SoCalGas Advice Letter 4740-G; SWG Advice Letter 967-G.

Case: 19-30088   Doc# 11847-4   Filed: 01/21/22   Entered: 01/21/22 11:46:37   Page 18 of 87

advice letter filings in June and updated in October of each year.  Through this advice letter process, GHG compliance costs would be collected on a forecast basis through base rates, subject to annual true-up and subject to the existing right of ORA and other parties to challenge any costs that are inconsistent with a utility's procurement authority.[18]

Like PG&E, SoCalGas and SDG&E propose that the utilities be authorized to file Tier 2 advice letters in the summer to forecast the next year's GHG compliance costs and allowance proceeds.  The Greenhouse Gas Balancing Account (GHGBA) and Greenhouse Gas Memorandum Account (GHGMA) balances would be updated in the annual October and year-end natural gas true-up advice letter filings.[19]  Tariffs would then be updated in the consolidated year-end filings and GHG compliance costs would be recovered on a forecast basis through base transportation rates, subject to annual true-up and subject to the existing right of ORA and other parties to challenge any costs that are inconsistent with a utility's procurement authority.  Compliance costs related to company facilities would also be recovered on a forecast basis through the annual natural gas true-up advice letter process.

PG&E also recommends that the Commission authorize recovery of reasonable administrative and outreach costs in balancing accounts, rather than memorandum accounts, as required by D.14-12-040.  PG&E suggests that memorandum accounts are unnecessary because the Commission will have an

---

[18]  PG&E Opening Comments at 7.

[19]  SoCalGas Opening Comments at 18.

Case: 19-30088    Doc# 11847-4    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 19 of 87

opportunity through the forecast process to review the outreach plans and administrative costs before they are incurred.[20]

The utilities recommend that the Commission authorize the forecasts and forecast methodologies presented in the preliminary statements, which follow the methodologies established in D.14-10-033.[21]

PG&E recommends that its Tier 2 advice letter that forecasts natural gas procurement forecasts and corresponding limits be filed at the same time as its advice letter for its electric utility procurement limits.  Specifically, PG&E points to Ordering Paragraph 9 of D.12-04-046, which allows electric utilities to "update their greenhouse gas compliance forecasts (and corresponding purchase limits) as necessary via Tier 2 advice letter.[22]  D.14-12-040 approved a formula to limit the quantity of compliance instruments that the natural gas utilities purchase in any year, but did not address the need for or timing of any advice letters to update their procurement limit and/or provide a procurement plan.

**Discussion**

Each natural gas utility has an existing advice letter process in which it annually projects the year-end balances in various balancing accounts to be amortized in core and noncore gas transportation rates on January 1 of the following year.  We authorize each utility to forecast and reconcile its natural gas GHG compliance costs and allowance proceeds as part of this existing true-up advice letter process.  PG&E, SoCalGas, and SDG&E currently file:  (1) a Tier 2 advice letter in October or November and (2) a Tier 1 advice letter at the end of

---

[20] PG&E Opening Comments at 8.

[21] Southwest Gas Opening Comments at 1, PG&E Opening Comments at 6-7.

[22] PG&E Opening Comments at 16, citing D.12-04-046, at 57.

Case: 19-30088    Doc# 11847-4    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page
20 of 87

December that updates the data in the October/November advice letter. PG&E, SoCalGas and SDG&E should include their GHG forecasts into both of these advice letters.

SWG files an annual Tier 2 advice letter in November to update balancing account surcharges and to adjust transportation and storage rates. SWG should include its GHG forecast in this advice letter filing.

For all utilities, the annual advice letters should contain a new section related to GHG costs and allowance proceeds. This section of the advice letters should include (1) a narrative summary describing activities completed in the current year, including any deviations from what was forecasted for the current year, and projecting activities in the forecast year and (2) the completed tables (provided in Appendix A) to show the current year's recorded costs and proceeds and the next year's forecast costs and proceeds. For example, in fall of 2015, each utility should forecast its 2016 costs and proceeds, and also record the 2015 costs and proceeds it expects by the end of 2015.

The tables are based on those approved for the electric utilities in D.14-10-033[23] and are accompanied by notes that describe any applicable data sources and calculation methodologies needed to complete the tables. The table notes and the confidentiality protocols in Appendix B also indicate any data that should be kept confidential. Table A shows the calculation of the revenue requirement associated with GHG costs. Table B shows the calculation of recorded GHG costs using the weighted average cost methodology. Table C shows the calculation of GHG allowance proceeds received and available for

---

[23] As corrected by D.14-10-055 and D.15-01-024.

Case: 19-30088   Doc# 11847-4   Filed: 01/21/22   Entered: 01/21/22 11:46:37   Page 21 of 87

distribution as the California Climate Credit.  Table D shows the details of outreach and administrative expenses.  Table E shows the utility's compliance obligation over time.   If, in its annual review of the tables through the advice letter process, Energy Division discovers that there is a more transparent or efficient way to provide data, Energy Division may propose changes to the Commission's adopted tables and methodologies by issuance of a resolution with opportunity for party comment.

Utility rates are set on a forecast basis.  The advice letters the utilities file in fall of 2015 should include the forecast of 2016 GHG costs and proceeds to be included in 2016 rates.  Additionally, because forecast 2015 GHG costs and proceeds were not included in 2015 rates, these amounts should also be included in the fall 2015 advice letters.  The costs or balancing account balances included in the utilities' end-of-year advice letters are typically introduced into rates beginning January 1 of the following year.  However, given the timing of this decision, it might not be possible for all the utilities to make the necessary billing system changes in time to include GHG costs in rates beginning on January 1, 2016.  We therefore require the utilities to file a one-time Tier 1 Advice Letter no later than April 1, 2016 to include forecast 2015 and 2016 GHG costs approved in this decision into rates.  If a utility is not able to implement this rate change via its fall true-up advice letter, it should still include in this fall true-up advice letter the illustrative rate impacts of GHG costs, as outlined in Table A of Appendix A to this decision.

The utilities should amortize their 2015 forecast costs and allowance proceeds equally between 2016 and 2017 so that 50% of forecast 2015 costs are included in 2016 rates and 50% are included in 2017 rates.  The utilities should begin introducing GHG costs and allowance proceeds into rates on April 1, 2016,

Case: 19-30088   Doc# 11847-4   Filed: 01/21/22   Entered: 01/21/22 11:46:37   Page 22 of 87

so that 2016 forecast GHG costs and 50% of forecast 2015 GHG costs are included in rates for the remaining months of 2016.

We decline to adopt PG&E's proposal to shift administrative costs from the memorandum accounts authorized in D.14-12-040 to balancing accounts. Balancing accounts are appropriate for categories of costs associated with new, incremental programs and regulatory policies that have generally been pre-authorized for recovery, such as the cost of GHG compliance instruments, and for which only the actual recorded amounts must be reviewed by the Commission for reasonableness. A memorandum account, on the other hand, allows the utility to book amounts for tracking purposes and for which the utilities may later ask for recovery. The utilities currently recover the majority of their administrative and general costs through their periodic general rate cases or similar proceedings. For administrative costs that are incremental to those administrative costs previously approved through a utility's general rate case or similar proceeding, due to a new regulatory program or policy adopted between rate case cycles, a memorandum account authorizes the utility to track the incremental expenses for future recovery. As part of the utilities' request for recovery of administrative costs, the utility must demonstrate not only that the costs are reasonable, but also that the costs are incremental.

Memorandum accounts should sunset once the utility has the opportunity to request approval for the new category of costs through a general rate case or similar proceeding. The memorandum accounts adopted in this proceeding should sunset once the utilities have the opportunity to request approval of natural gas GHG-related administrative costs in their next general rate case or similar proceeding.

Case: 19-30088    Doc# 11847-4    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page
23 of 87

The utilities should calculate their GHG compliance instrument procurement limit each year though the annual advice letters. The formula to calculate the procurement limit was approved in D.14-12-040. Utilities should use the annual GHG allowance consignment percentages specified in this instant decision to calculate their procurement limits. Providing the procurement limit in the advice letter provides administrative simplicity as the advice letter will include similar information about a utility's forecast compliance obligation. Whereas the forecast compliance obligation for the purposes of ratemaking can be based on publicly-available data, utilities may separately forecast their compliance obligation using confidential internal forecasts, and "net remaining natural gas compliance obligation to date." Therefore, procurement limits shall be provided confidentially, consistent with the Confidentiality Protocols initially approved in D.14-10-033 and adopted herein.

### 4.3. PG&E Balancing Account

In the Phase One Decision of this proceeding, the Commission stated that "[f]ollowing a decision in Phase 2 of this proceeding regarding the appropriate recovery of GHG compliance costs in rates, PG&E will be required to update the Compressor Station GHG Cost Subaccount of its GOBA balancing account to no longer record costs associated with the ARB natural gas supplier Cap-and-Trade program."[24] The Decision reasoned that it was preferable to consolidate PG&E's recording of natural gas supplier costs and company facility (compressor station) costs.

---

[24] D.14-12-040 at 19.

Case: 19-30088    Doc# 11847-4    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page
24 of 87

PG&E should file a Tier 2 advice letter to no longer record company facility costs in its Gas Operations Balancing Account and to instead record these costs in a subaccount of its Gas Programs Balancing Account, which is used to track GHG costs and proceeds. Any GHG compliance cost balances in the Compressor Station GHG Cost Subaccount of the Gas Operations Balancing Account should be transferred to the new subaccount.

### 4.4. Cost Allocation

Consistent with D.14-12-040, the Preliminary Statements provide that GHG compliance costs would be collected from core and non-core customers. Covered entities subject to direct regulation under the ARB's rules should be exempt from the portion of GHG costs associated with supplying natural gas to end use customers, as covered entities are already responsible for their direct emissions associated with any natural gas combustion at their facility. We agree with ORA and the utilities that GHG compliance costs should be allocated between customer classes on an equal-cents-per-therm basis. For cost allocation and rate design purposes, each utility's currently-adopted gas transportation volume throughput forecast should be adjusted to exclude exempt volumes associated with exempt customers (covered entities).

Certain costs identified by SoCalGas and SDG&E, but that are applicable to all utilities, are related to all customers, not just the non-covered entities, and should be allocated to all customers and included in base transportation rates. These costs include any costs relating to company facilities, since these costs are related to operations, regardless of whether or not a customer has a direct

Case: 19-30088    Doc# 11847-4    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 25 of 87

compliance obligation for their emissions,[25] and the small component of supplier-related compliance obligation that is attributable to lost and unaccounted for gas (LUAF gas).

In order to ensure that noncore customers with a direct compliance obligation are properly charged for their portion of emission costs associated with LUAF gas, emissions costs associated with LUAF gas should be separately identified and recorded to a new subaccount in the GHGBA. This subaccount should then be amortized in gas transportation rates and allocated between all core and noncore customers consistent with the current allocation of LUAF gas.[26] Each utility should file a Tier 2 advice letter to revise its GHGBA.

### 4.5. Minimum Consignment

During Phase One of this rulemaking, the parties disagreed as to whether the Commission should require the utilities to consign more than the minimum consignment percentage adopted by ARB. The ARB requirements are set forth in Table 9-4 of the Cap-and-Trade Regulation. The ARB minimum consignment percentage is set at 25% for 2015 and increases 5 percentage points per year until it is 50% in 2020. D.14-12-020 declined to require utilities to consign more than the ARB minimum in 2015 on the basis that the record did not provide sufficient evidence to warrant a deviation from the ARB's minimum consignment percentages, and left the issue open for further consideration in Phase Two.[27]

---

[25] Southwest Gas does not have any facility costs (e.g., compressor stations) that are subject to ARB's Cap-and-Trade regulations in any of its California rate jurisdictions (SWG Preliminary Statement, Appendix 1, at 1)

[26] SoCalGas and SDG&E Opening Comments at 14.

[27] *Id*, at FOF 12, at 37.

Case: 19-30088    Doc# 11847-4    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 26 of 87

The Phase Two Ruling and Scoping Memo requested that parties address "the minimum quantity of directly allocated allowances the natural gas utilities should consign to auction and why, if at all, this should be different from the ARB requirements."[28]

Several parties, including CalSEIA and EDF/NRDC request that the Commission require the utilities to consign a larger percentage of the directly allowances to auction, suggesting that consigning 100% of the allowances to auction and incorporating a stronger carbon price signal in customer rates is consistent with the Commission's first policy objective in D.12-12-033. These parties suggest that consigning the minimum number of credits will not provide a sufficient price signal for customers to invest in efficiency and reduce natural gas use.[29]

CalSEIA argues that we should address the natural gas sector differently from the electricity sector because while the price of electricity has increased for decades and remains high, and further increases may result in excessive rate impacts, "natural gas prices are near historic lows, the Commission has the opportunity to incorporate the full carbon price signal into rates now without excessive impacts on natural gas affordability."[30]

ORA disagrees, recommending that the Commission continue to require the utilities to consign only the ARB minimum, stating that since natural gas

---

[28] Scoping Ruling, at 2

[29] EDF/NRDC Opening Comments at 4.

[30] CalSEIA Opening Comments at 2.

Case: 19-30088   Doc# 11847-4   Filed: 01/21/22   Entered: 01/21/22 11:46:37   Page
27 of 87

infrastructure improvements are causing consumer costs to rise, we should prevent "compounding cost increases" that could lead to rate shock. [31]

PG&E and Sempra maintain that the Commission should not revisit the minimum consignment percentages adopted by ARB, arguing that ARB's regulations already gradually increase the carbon price signal so that customers are incentivized to transition to GHG-reducing activities, while mitigating abrupt impacts on customer costs. PG&E and Sempra explain that since ARB developed its regulations and the adopted percentages though a public process, during which several alternative consignment proposals were considered but not adopted, we should not revisit ARB's percentages.[32] They also point out that no new evidence has been presented as to why it would be cost-effective or warranted for the gas utilities to consign more allowances to auction than ARB required. SWG agrees, but requests that the Commission grant the utilities the flexibility to consign more if they find that would mitigate costs to customers.[33]

We understand the desire on the part of several interested parties to include a strong GHG price signal in customer rates; however, we remain concerned about increasing the costs of GHG compliance for customers. We must continually balance the need to communicate a carbon price signal with the need to minimize the risk of excessive bill volatility and bill impacts. Consigning more allowances to auction means that fewer allowances will be available to meet the utilities' compliance obligations on behalf of end users, and that the cost of gas will be higher to reflect the costs of compliance instruments utilities must

---

[31] ORA Opening Comments at 12-13.

[32] PG&E Opening Comments at 2-3.

[33] SWG Opening Comments at 9.

Case: 19-30088   Doc# 11847-4   Filed: 01/21/22   Entered: 01/21/22 11:46:37   Page 28 of 87

purchase.  As ORA points out, this higher price signal would accrue to the same customers who are already facing increased costs due to necessary natural gas infrastructure improvements.

In developing its regulation, ARB considered stakeholder comments that suggested increasing the consignment percentage, but ARB decided to maintain the consignment levels as they had proposed with the idea that consignment levels could continue to increase to 100% after 2020.[34]  Therefore, we find no compelling reason to deviate from ARB's minimum consignment percentages. To create certainty and transparency about GHG costs in natural gas rates, we require the utilities each year to consign the minimum percentages as specified in the Cap-and-Trade Regulation.  The utilities may consign more than the minimum percentage if they find that doing so will be beneficial to their ratepayers.

### 4.6.  Exempt Customers

Under ARB's Cap-and-Trade regulations, customers with direct emissions of 25,000 $MTCO_2e$ or more per year are directly regulated by ARB and considered covered entities.  Covered entities are responsible for their direct emissions, which may result from the combustion of natural gas they receive from their utility.  As covered entities, these facilities already pay the costs associated with their direct GHG emissions, by purchasing and surrendering compliance instruments.  D.14-12-040 directed the utilities to describe in detail the process necessary for excluding covered entities from GHG costs in utility

---

[34]  Amendments to the California Cap on Greenhouse Gas Emissions and Market-Based Compliance Mechanisms. Final Statement of Reasons at 66. http://www.arb.ca.gov/regact/2013/capandtrade13/ctfsor.pdf.

Case: 19-30088   Doc# 11847-4   Filed: 01/21/22   Entered: 01/21/22 11:46:37   Page 29 of 87

rates. All parties agree that covered entities should not have to double pay for their GHG emissions, both by purchasing compliance instruments to satisfy their Cap-and-Trade compliance obligation and through their transportation rate at the utility.

The utilities propose to identify covered entities who are exempt from supplier-related natural gas GHG compliance costs either using ARB information or through the utility's own customer usage data. However, for newly exempt or newly excluded entities, because ARB will not provide updated exemption data until September 30 of the following year, utilities must adopt procedures to ensure that customers with a direct compliance obligation are not double-charged.

In its Preliminary Statement, PG&E proposes that it will conduct a review of customer accounts and verify all exempt customers when it has a complete list of exempt customers for a particular compliance year. PG&E would then refund the GHG cost paid by exempt customers, including interest, for the period in which the covered entity was also required to surrender GHG allowances to ARB. If non-exempt customers or customers with non-exempt emissions that have not paid PG&E's GHG costs are identified, PG&E proposes to retroactively bill those customers for the unpaid amount. Going forward, PG&E would flag customers ARB identifies as exempt, unless ARB removes the customers from the published list of covered entities. PG&E also proposes to flag exempt emissions on an annual basis. PG&E states that it will update its billing system every year based on the updated list from ARB. PG&E states that it will determine exempt customers using the ARB list, and not from PG&E's data on customer natural gas usage.

Case: 19-30088   Doc# 11847-4   Filed: 01/21/22   Entered: 01/21/22 11:46:37   Page 30 of 87

SoCalGas and SDG&E propose to identify customers who are exempt from supplier-related Cap-and-Trade compliance costs by their usage. SoCalGas and SDG&E would implement procedures similar to those proposed by PG&E to exclude these customers, as well as any others identified and verified by the ARB as covered entities from supplier-related GHG compliance costs. [35] SoCalGas and SDG&E note that their respective tariff rules, Tariff Rule 16 and Tariff Rule 18, permit them to make any necessary billing adjustments for up to 36 billing periods.[36] SoCalGas and SDG&E oppose PG&E's proposal "to apply interest to credits returned to newly excluded entities is inappropriate, stating that their billing rules do not provide for including interest on returns to customers. [37]

SWG proposes to identify covered entities in its billing system and exclude them from the GHG cost component, but does not offer specific details of how it will do so. SWG states that it is able to identify exempt customers "through information provided by the ARB as well as the Company's own usage data."[38]

ORA supports the approach in the Preliminary Statements of PG&E and SoCalGas/SDG&E and recommends SWG follow this approach. SCE also supports PG&E's approach.

We find the approach proposed by PG&E reasonable. Each utility should use data from ARB to identify its customers that ARB identifies as covered entities and thus should be excluded from the costs associated with the

---

[35] SoCalGas and SDG&E Comments at 6.

[36] Id, at 17.

[37] Id, at 18.

[38] Southwest Gas Reply Comments at 3.

Case: 19-30088    Doc# 11847-4    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page
31 of 87

combustion of natural gas by end users.  Covered entities should not be excluded from the costs associated with LUAF gas or with company facilities.

As stated in the Cap-and-Trade Regulation, "ARB shall provide the supplier of natural gas a listing of all customers and aggregate natural gas (in MMBtu) and emissions calculated from the supplier's natural gas delivered to covered entities."[39]  Utilities should review the ARB list of covered entities annually to determine if any facilities are newly covered or newly excluded, and adjust customer charges accordingly.  Newly covered entities will receive a credit for any GHG costs charged by the utility while they were covered entities, so they are not double charged for their pollution during any year.  Newly excluded entities would not have paid GHG costs in their natural gas rates for a period of time.  The utility should adjust applicable customers' bills to ensure they are charged for the GHG costs for the period of time that they were excluded from paying GHG costs but not a covered entity.  Each utility should follow its existing rules regarding billing adjustments to account for any newly covered or newly excluded entities.[40]  The utilities should record any under- or over-collections associated with exempt entities in their GHG balancing accounts.

### 4.7.  Use of GHG Allowance Proceeds

The Ruling and Scoping Memo directed parties to comment on whether it is reasonable to return all allowance proceeds on an equal, non-volumetric basis to each residential gas customer, similar to the semi-annual California Climate

---

[39]  17 CCR §95852(c)(3).

[40]  SoCalGas Tariff Rule 16, Section C; SDG&E Tariff Rule 18, Section C; PG&E Electric and Gas Rule 17.1; Southwest Gas California Tariff Rule No. 9, Section K and Rule No. 17, Section B.

Case: 19-30088    Doc# 11847-4    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page
32 of 87

Credit (Climate Credit) for electric customers adopted in D.12-12-033.  Party comments offer two general suggestions:  use allowance proceeds to offset GHG costs in rates to all customers, or dedicate a portion of the allowance proceeds to fund clean energy or energy efficiency programs.

PG&E, SoCalGas, SDG&E and SWG recommend that natural gas-related GHG allowance proceeds be returned volumetrically to all core and non-core customers, except those customers that are "covered entities."  These parties maintain that a volumetric return supports the objective of equitable distribution of allowance proceeds based on cost-causation while at the same time communicating a carbon price signal and avoiding customer bill volatility. PG&E suggests that a fixed return at periodic and arbitrary intervals, like the Climate Credit, would result in customers receiving a large return that is unrelated to their current usage, creating a major disconnection between their costs and proceeds.[41]  However, if an on-bill Climate Credit is adopted, the utilities recommend that the credit occur in a different month from the electric Climate Credit.  According to the utilities, returning allowance proceeds in the winter could provide the most impact and allow for the best messaging as bills are higher this time of year.  The utilities suggest February or March, a time frame during which customers' natural gas bills tend to be higher.

SWG states that a volumetric return is most appropriate for its customers, explaining that while a volumetric return and a non-volumetric return would yield similar results for its average residential customer, a non-volumetric return would lead to higher administrative costs for SWG.[42]

---

[41]  PG&E Opening Comments at 5.

[42]  SWG Opening Comments at 3.

Case: 19-30088    Doc# 11847-4    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 33 of 87

Other parties, including GPI, BAC, and CalSEIA, recommend using a portion of GHG allowance proceeds to fund clean energy or energy efficiency programs. SoCalGas and SDG&E also support using a portion of allowance proceeds to fund clean energy projects. These parties express concern that using the allowance proceeds for customer credits would eliminate the carbon price signal that the Cap-and-Trade program is designed to promote.

CalSEIA recommends that the Commission allocate a portion of allowance proceeds to clean energy or energy efficiency programs and create a new phase of this proceeding to consider proposals for the use of the funds and determine which proposals would produce the maximum amount of greenhouse gas reduction. [43] CAlSEIA suggests that the Commission limit proposals to programs that reduce the carbon intensity of non-utility activities where heat has been supplied by the combustion of natural gas.

GPI also suggests that the Commission solicit and consider alternative proposals for the use of allowance proceeds, rather than limiting the allowance proceeds to customer rebates. GPI suggests using some or all of the allowance proceeds for purposes of making investments that will permanently reduce the utility's future requirements for procuring emissions allowances.[44] Based on the data provided in the preliminary statements, GPI estimates that consignment allowances for 2015 will produce an aggregate pool of funds valued at approximately $150 million, increasing in subsequent years, as the quantity of allowances available in the marketplace decreases and the percentage of allowances designated for consignment increases.

---

[43] CalSEIA Opening Comments at 5.

[44] GPI Opening Comments at 2-3.

Case: 19-30088   Doc# 11847-4   Filed: 01/21/22   Entered: 01/21/22 11:46:37   Page 34 of 87

BAC recommends that the Commission allocate at least 25% of the natural gas GHG allowance proceeds to meet the pipeline biomethane requirements established in D.14-01-034 (implementing AB 1900). BAC suggests that pipeline biomethane can provide greater GHG reductions than any other alternative to natural gas, including electrification, and, as a result, will provide the greatest ratepayer benefit by maximizing greenhouse gas reduction, and providing significant environmental benefits such as the reduction of landfill waste.[45] BAC maintains that the 15% cap on the use of electric GHG allowance proceeds for clean energy projects should not set a precedent for the natural gas side. BAC explains that "[W]hile the electricity sector is already quite diverse, with multiple low carbon alternatives to fossil fuels and long-standing incentive programs, the gas sector is not at all diverse and the only low carbon alternative – biomethane - is not yet a mature industry in California. The gas sector has also, traditionally, had far fewer incentives to promote renewable gas."

EDF and NRDC point out that the Cap-and-Trade Regulation requires that any proceeds returned to ratepayers should be done in a non-volumetric manner. EDF and NRDC also recommend that the Commission's natural gas policies should help lower-income residents and small businesses.[46]

SoCalGas and SDG&E also support dedicating a percentage of allowance proceeds to clean energy projects. Although Public Utilities Code Section 745 (c), which permits the Commission to set aside up to 15% of the allowance proceeds for clean energy and energy efficiency measures, applies specifically to electric

---

[45] BAC Comments at 4-5, citing Carbon Intensity Values for bio-methane in ARB's LCFS Lookup Tables as of December 2012.
http://www.arb.ca.gov/fuels/lcfs/lu_tables_11282012.pdf.

[46] EDF/NRDC Opening Comments at 5-6.

Case: 19-30088    Doc# 11847-4    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 35 of 87

utilities, SoCalGas and SDG&E suggest that allowance proceeds should be made available for clean energy and energy efficiency projects in the same way as for electric utilities. SoCalGas and SDG&E agree with CalSEIA and BAC that projects such as those supporting biomethane interconnections have the potential to benefit natural gas utility ratepayers by reducing the Cap-and-Trade compliance costs incurred on behalf of end-use natural gas customers. SoCalGas and SDG&E suggest that up to 15% of net allowance proceeds would be sufficient to encourage the development of GHG reducing projects, or a cap of $15 million for SoCalGas and $2 million for SDG&E. Rather than opening a new phase of this proceeding to review and approve proposed projects, SoCalGas and SDG&E suggest that the final decision issued in Phase Two of this proceeding should direct the Assigned Commissioners and Administrative Law Judges in the appropriate, dedicated proceedings to issue rulings to solicit clean energy project proposals. They propose to declare the amount of proceeds available in their annual advice letters and record any authorized project costs in their GHG Revenue Balancing Account.[47] SoCalGas and SDG&E maintain that BAC's and CalSEIA's recommendations contain unnecessary restrictions.

Greenlining filed limited comments supporting the distribution of natural gas allowance proceeds to residential customers on an equal-per-household basis to ensure that a greater proportional benefit would accrue to lower income households, who would bear a disproportionate burden from any increased costs that may arise from the Cap-and-Trade program.[48]

---

[47] SoCalGas and SDG&E Opening Comments at 6-7.

[48] Greenlining Opening Comments at 1-2.

Case: 19-30088    Doc# 11847-4    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 36 of 87

ORA recommends returning proceeds to residential customers in a non-volumetric manner in November and February as an on-bill credit, with any excess value carried over into subsequent months until it is exhausted.[49] ORA suggests that a November distribution date would provide customers with transition assistance into the winter season while a February distribution would provide mid-season relief.

**Discussion**

As reflected in the comments, the options for allocation of natural gas allowance proceeds include allocating a portion of the proceeds to clean energy and energy efficiency measures or returning proceeds to some or all customers.

In today's decision, we decline to allocate any portion of natural gas supplier-related GHG allowance proceeds toward clean energy or energy efficiency projects. As ORA and others point out, we are including natural gas supplier-related GHG compliance costs in gas rates at the same time as natural gas infrastructure costs are increasing. Given the upward pressure on natural gas rates associated with these costs, we prefer to use allowance proceeds to mitigate the upward pressure on customer bills while maintaining a strong price signal to conserve energy and use natural gas efficiently.

With respect to the parties' specific proposals to dedicate allowance proceeds specifically to biomethane or other projects, we reiterate our discussion in D.12-12-033, in which we stated that while it is appealing to use GHG allowance proceeds to invest in certain technologies or carbon mitigation activities, we are reluctant to earmark allowance proceeds solely as a means of correcting for market failures such as these. We believe that the presence of a

---

[49] ORA Opening Comments at 13-14.

Case: 19-30088    Doc# 11847-4    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 37 of 87

carbon price signal should serve to assist in overcoming hurdles for new and improved low-carbon technologies, and the Commission will continue to promote and deploy clean energy and energy efficiency measures through many other Commission proceedings.

We therefore find that it is appropriate to return allowance proceeds to customers as a bill credit in an equal, non-volumetric manner, consistent with the requirements of the Cap-and-Trade Regulation.[50]  We will refer to this credit as the natural gas California Climate Credit.  A non-volumetric credit preserves the carbon price signal, which the Commission previously adopted as a policy objective for distributing proceeds to customers of electric utilities.[51]

The total amount of allowance proceeds that will be available for customers is dependent on the ARB auction clearing price of greenhouse gas allowances and the number of allowances the utilities consign to auction.  As noted by the utilities, ARB directly allocates allowances to natural gas utilities based on a percentage of the natural gas utilities' 2011 emissions.[52]  As PG&E points out, ARB did not award additional allowances to natural gas suppliers for "early actions" on energy efficiency and renewable energy that were awarded to electrical distribution utilities.  As a result of this, and, primarily, the lower minimum consignment percentage for natural gas utilities, the total amount of natural gas GHG allowance proceeds is forecast to be much less than for the electric utilities.  Based on the utilities' forecasts of allowances proceeds in their

---

[50]  17 CCR §95893(d)(3).

[51]  Preserving the carbon price signal is a high priority policy objective for determining how to allocate electric utility allowance proceeds in D.12-12-033, Finding of Fact 39.

[52]  17 CCR §95893(a).

Case: 19-30088    Doc# 11847-4    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 38 of 87

preliminary statements net of forecast administrative expenses, as well as each utility's estimated number of residential customers, the estimated 2015 California Climate Credit per residential customer would be as follows:

Table 1:  Estimate of 2015 Climate Credit

|  | 2015 Forecast Proceeds (net of expenses) | No. Residential Customers | California Climate Credit |
|---|---|---|---|
| PG&E | $62,448,000 | 4,194,209 | $14.89 |
| SDG&E | $10,004,000 | 835,745 | $11.97 |
| SoCalGas | $71,977,000 | 5,432,358 | $13.25 |
| SWG | $2,399,140 | 179,352 | $13.38 |

Given the potential allowance proceeds available, it is reasonable to limit the natural gas California Climate Credit to residential customers. Finally, by returning GHG allowance proceeds to residential customers, we reduce the potential adverse impacts of Cap-and-Trade on low-income households.

The residential California Climate Credit shall be calculated as the forecast GHG allowance proceeds remaining after subtracting the administrative and outreach expenses from the total allowance proceeds and dividing the result by the number of residential households.  The per-household credit should appear on residential customers' bills once per year, since the value of the credit will be relatively small.

Consistent with our reasoning in D.12-12-033 for the electric utilities, the credit should be "meaningful and understandable while minimizing interference

Case: 19-30088    Doc# 11847-4    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 39 of 87

with the conservation price signals."[53] The natural gas Climate Credit should therefore appear as a line item on customer's bills in April, a time of relatively low natural gas usage, to provide a meaningful bill impact to customers. Distributing the natural gas Climate Credit in April will also allow for potential synergies with the electric Climate Credit marketing and outreach activities. Each utility shall file a Tier 2 advice letter to update its gas rate schedules to indicate that residential customers will receive an annual Climate Credit.

Although the natural gas Climate Credit will be an annual credit, the utilities should implement the natural gas California Climate Credit in a similar manner as the electric utilities implement the electric residential California Climate Credit. The natural gas utilities should use the electric utilities' implementation plans, as approved by D.13-12-003, as guidance in implementing the natural gas Climate Credit. We also clarify that like the electric Climate Credit, the natural gas Climate Credit should not be considered a reduction in an individual customer's electricity bill. It is a credit from the State of California and not from the utilities.

### 4.8. GHG Costs in Customer Bills

The issue of how GHG costs should be reflected on customer bills was reserved for further discussion in Phase Two. In their comments in response to the Ruling and Scoping Memo, the utilities and ORA maintain that a separate line item charge for supplier-related GHG costs would ensure that the price signal that the Commission seeks to include in rates is clearly shown in each monthly bill, highlighting for customers the value of reducing their carbon

---

[53] D.12-12-033 at 123.

Case: 19-30088    Doc# 11847-4    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 40 of 87

usage.  The utilities state that a separate line-item charge is also the most transparent way to ensure that customers who have a direct compliance obligation are properly exempt from paying supplier-related GHG compliance costs.  The utilities also state that with a line-item charge, customers would be easily able to tell whether they have been charged for supplier-related GHG compliance costs.  Alternatively, if GHG costs are included in rates rather than shown as a separate line item, the utilities suggest that a line-item credit must be created for exempt customers.[54]

PG&E explains that unlike electric GHG costs, which are applied to all bundled customers in a given customer class, natural gas supplier-related GHG costs only apply to certain customers depending on their emissions level (i.e., whether they are a covered entity under the Cap-and-Trade Program or not) and not the customer class or type of service. PG&E maintains that a separate line item for GHG costs is particularly important because the ARB does not provide the natural gas utilities with a complete list of exempt customers for a particular emissions year until approximately October of the following year.  According to PG&E, a separate line item would provide customers the transparency to verify from month to month whether they are being charged for GHG costs and correct potential discrepancies promptly.  PG&E maintains that embedding GHG costs in the natural gas transportation rate would result in customer confusion and frequent inquiries regarding the GHG rate and PG&E's billing practices.

SoCalGas and SDG&E state that their new GHG rate schedule would be displayed on a customer's bill in the Gas Charges section, and included in the

---

[54] SoCalGas and SDG&E Opening Comments at 17.

Case: 19-30088   Doc# 11847-4   Filed: 01/21/22   Entered: 01/21/22 11:46:37   Page 41 of 87

"Total Gas Charges" subtotal. In this way, any subsequent billing adjustments that are made to Total Gas Charges, such as application of the 20% CARE bill discount or applicable taxes and supplemental franchise fees, would also apply to the GHG costs.  SoCalGas and SDG&E would need 120 days from the date of this decision to implement bill system updates to implement a line item surcharge.

ORA agrees that natural gas GHG costs should appear as a separate line item on customer bills to recover natural gas GHG costs with as much transparency as possible, so that the price signal intended by the Cap-and-Trade program can have its desired effect. Citing to a September 2014 Opinion Dynamics report to the Commission staff reporting the result of the California Climate Credit marketing campaign, ORA finds that most people who were familiar with the Climate Credit saw it on their bill.

 ORA also supports a separate line item for natural gas supplier-related GHG costs as an effective and transparent way to ensure that covered entities do not pay twice for GHG costs both by satisfying their compliance obligation with ARB and through their utility natural gas transportation rate.[55]

SWG initially recommended including the GHG surcharge in the "Charges and Adjustments" section of its bill, and incorporating the surcharge as a component of the "Gas Usage Rate" on customer bills such that GHG costs would not be reflected as a separate line item.[56]  However, in reply comments SWG stated that it is "willing to make billing modifications similar to those

---

[55]  ORA Opening Comments at 9.

[56]  Southwest Gas Opening Comments at 2.

Case: 19-30088   Doc# 11847-4   Filed: 01/21/22   Entered: 01/21/22 11:46:37   Page 42 of 87

proposed by PG&E, SoCalGas and SDG&E, such that the GHG surcharge is shown as a separate line-item on customer bills."[57]

EDF and NRDC state that no matter how GHG costs are reflected on bills, that information should be presented in a clear manner and inform the customer about opportunities to save energy.

While a line item charge is preferred by most parties, we prefer that the utilities recover natural gas GHG compliance costs through base transportation rates already present on customers' bills to minimize customer confusion. The utilities' existing transportation rates are comprised of costs from many balancing accounts (e.g., AB 32 Cost of Implementation Fee, Core Brokerage Fee Balancing Account, Hazardous Substance Mechanism) that are consolidated into one rate component. The GHG costs are just one of many costs that should be rolled up in the transportation charge, rather than displayed separately on the bill.

The utilities suggest there would be administrative difficulty in excluding certain customers from the GHG cost component if it were part of the transportation charge. However, utilities currently exempt Covered Entities from AB 32 Cost of Implementation Fees. For PG&E, SDG&E, and SoCalGas, the AB 32 Cost of Implementation Fee is included in transportation rates, but covered entities receive a bill credit to exclude them from this fee. For Southwest Gas, the AB 32 Cost of Implementation Fee is included in transportation rates for all customers except Southwest Gas' covered entity. Likewise, the utilities can

---

[57] SWG Reply Comments at 2.

Case: 19-30088   Doc# 11847-4   Filed: 01/21/22   Entered: 01/21/22 11:46:37   Page
43 of 87

ensure that exempt customers do not pay the portion of natural gas supplier GHG costs.

For exempt customers, utilities may use a line-item credit to demonstrate that exempt customers do not pay twice for natural gas GHG compliance costs. The line-item credit should be called "Cap-and-Trade Cost Exemption."

### 4.9.  Tariff Changes

PG&E, SoCalGas, and SDG&E propose to collect the natural gas GHG compliance costs through a new tariff schedule applicable to all core and noncore customers except covered entities.  SWG believes it can update its existing tariffs to collect the supplier-related GHG compliance costs without a new tariff.

According to PG&E, without a separate tariff for supplier-related natural gas GHG costs, these GHG costs will be included in the gas transportation rates paid by all customers, including covered entities. PG&E would then need to credit the covered entity the amount of GHG costs it paid to PG&E, which is more administratively complicated.[58]

PG&E proposes to collect its natural gas-related GHG compliance costs through a new gas rate schedule G-GHG – "Greenhouse Gas Surcharge."  As directed by D.14-12-040, rate schedule G-GHG will apply to all customers except those who are covered entities as defined under the ARB's Cap-and-Trade regulations and as determined by the list of covered entities provided to PG&E by ARB.  PG&E states that under its current billing system, transportation rates are applied to all customers within a given customer class.  As a result, absent a separate tariff, exempt customers would first be charged the total transportation

---

[58]  PG&E Opening Comments at 10.

Case: 19-30088    Doc# 11847-4    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page
44 of 87

rate, and would then need to be credited back the amount of the utility GHG costs they paid, to avoid double payment. PG&E states that its proposed treatment is consistent with the treatment of other state-mandated, non-utility costs collected through utility bills (e.g., G-PPP – Public Purpose Program Surcharge, G-SUR – Franchise Fee Surcharge), which are levied through separate tariffs.

SoCalGas and SDG&E suggest that if company facility GHG costs are recovered in transportation rates, no additional tariff is necessary. However, SoCalGas and SDG&E agree that a separate rate schedule is preferable to including supplier-related GHG costs within the existing rate schedules.

ORA supports the utilities' proposal for a separate tariff and a separate line item on customer's bills for natural gas supplier-related GHG compliance costs on the basis that it would promote customer awareness of the natural gas Cap-and-Trade program and provide an additional incentive for customers to reduce their usage of natural gas. [59]

For company facilities and LUAF gas, emissions costs would be recorded to subaccounts in the GHG balancing accounts and then amortized in transportation rates and allocated between all core and noncore customers, including covered entities.

In their Opening Comments, SoCalGas and SDG&E present an illustrative calculation of a supplier-related GHG tariff rate, shown in Table 2 below.

---

[59] ORA Opening Comments at 8.

Case: 19-30088    Doc# 11847-4    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page
45 of 87

Table 2: SoCalGas and SDG&E Forecast Rate Impacts

|  | SoCalGas | SDG&E |
|---|---|---|
| End Users Forecast Compliance Cost | $78,995 | $13,169 |
| Adjusted Average Year Throughput, Mth | 4,088,158 | 585,560 |
| GHG Rate $/therm | $0.01932 | $0.02249 |

As we discuss above, GHG costs, including supplier-related costs, company facility costs, and LUAF costs should be included in base transportation rates. Therefore, utilities do not need to create a new tariff to include GHG costs in rates. Utilities should file a Tier 2 Advice Letter to update their existing transportation tariffs to include GHG costs in transportation rates. The preliminary statement should specify how the utility will exclude covered entities from paying the supplier-related costs.

### 4.10. Marketing and Outreach of the Natural Gas GHG Program

The Ruling and Scoping Memo requested comment on the scope and objectives of any marketing, education and outreach necessary to inform natural gas customers about the GHG allowance proceeds and proceed allocation and provide awareness about the state's efforts to fight climate change through the Cap-and-Trade Program. In D.12-12-033, the Commission directed the electric utilities to distribute a portion of the proceeds from the electric Cap-and-Trade Program to residential and small business customers via the California Climate Credit (Climate Credit). In 2014, the Climate Credit was distributed through customers' electric bills and, as directed by Resolution E-4611, the current

Case: 19-30088   Doc# 11847-4   Filed: 01/21/22   Entered: 01/21/22 11:46:37   Page 46 of 87

administrator of Energy Upgrade California (EUC) conducted outreach and marketing for the Climate Credit through the existing statewide Energy Upgrade California effort.  The Commission is currently evaluating the appropriate objectives, goals, mechanisms and administrative structure for future electric GHG marketing and outreach efforts in A.13-08-026, et al.  The Ruling and Scoping Memo also asked for comment on whether the Commission should consolidate the natural gas GHG marketing, education and outreach efforts with the electric GHG outreach efforts under consideration in A.13-08-026 et al.

In this proceeding, all parties agree that some degree of outreach to inform gas customers of the purpose of the GHG Climate Credit is necessary and consistent with AB 32.

SoCalGas and SDG&E note that a 2014 assessment performed by Opinion Dynamics of the California Climate Credit marketing and outreach campaign to electric utility customers demonstrates that only 3% of credit recipients made the connection between the California Climate Credit and the State's efforts to fight Climate change.   According to SoCalGas and SDG&E, the Opinion Dynamics study found that,

> "Most of the residents did not know why they received a credit (74%).  When asked directly, approximately one-quarter of Californians had heard about the Climate Credit (27%). Just over one-quarter of those who had heard of the Climate Credit knew that the state of California provided the credit (28%).  Slightly under one in five correctly identified the purpose of the Climate Credit as encouraging Californians to save energy  (17%)."[60]

---

[60] SoCalGas and SDG&E Opening Comments at 8, citing Opinion Dynamics, "Climate Credit Assessment" (Sept. 2014).

Case: 19-30088    Doc# 11847-4    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 47 of 87

SoCalGas and SDG&E also note that the Opinion Dynamics assessment confirms the findings of the *California Climate Dividend Public Outreach Program: Report and Strategic Road Map* that it is difficult to break through to Californians as they are "busier than ever, distracted by day-to-day obligations and facing an increasingly cluttered media market. [61]

Therefore, SoCalGas and SDG&E suggest that the Commission consider a different, supplemental approach for the natural gas utilities in marketing and outreach for the California Climate Credit.  SoCalGas and SDG&E recommend augmenting the ongoing statewide marketing, education, and outreach effort to electric customers though the Energy Upgrade California brand with a more personalized and targeted outreach approach for gas customers.  Based on lessons learned from the electric efforts, SoCalGas and SDG&E suggest providing personalized direct mail and electronic communications to SoCalGas' customers.  Working with Opower, SoCalGas would conduct a randomized control trial to test the effectiveness of innovative and personalized customer communications.  Half of SoCalGas-customers would receive the targeted outreach, and the other half would serve as a control group.  This design will allow SoCalGas to measure the effectiveness of the targeted outreach in comparison to the control group, which would only receive the basic statewide outreach.  The proposed outreach program would focus on successfully conveying to customers information regarding:  1) the purpose of the California Climate Credit Initiative is to slow climate change and reduce pollution; 2) the credit was provided by the State of California; and 3) the credit helps customers to take some form of action to

---

[61] Targetbase, "*California Climate Dividend Public Outreach Program: Report and Strategic Road Map*" at 19 (2013).

Case: 19-30088   Doc# 11847-4   Filed: 01/21/22   Entered: 01/21/22 11:46:37   Page 48 of 87

improve personal energy efficiency or participate in existing energy efficiency programs.

SoCalGas explains that because customers tend to look to their utility first for information about energy usage and tips related to energy savings, it can leverage this position and work with Opower to analyze customer data, segment and target customers, and send personalized print and digital communications. SoCalGas would then use the randomized control trial design to measure the effectiveness of the Climate Credit Education Campaign and evaluate any difference in knowledge, actions, and behaviors between the group receiving personalized messages and the group exposed only to the statewide marketing campaign and bill inserts.[62]

SoCalGas states that although the initial proposal is for SoCalGas' customers only, it could be expanded to include SDG&E. SoCalGas and SDG&E forecast the cost of the supplemental outreach effort for SoCalGas customers as follows:

**Table 3: SoCalGas and SDG&E Proposed Outreach and Administrative Costs**

| Cost Category | SoCalGas | SDG&E |
|---|---|---|
| Climate Credit Education Campaign Costs | $1,900,000 | N/A |
| Bill Insert Costs | $50,000 | $10,000 |
| Utility Administrative Costs | $50,000 | N/A |
| Total Costs | $2,000,000 | $10,000 |

---

[62] SoCalGas and SDG&E Opening Comments at 8-11.

Case: 19-30088    Doc# 11847-4    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 49 of 87

SoCalGas and SDG&E propose to track and record outreach costs in the GHG Memorandum Account.

PG&E recommends that natural gas-related GHG outreach activities be separate from electric GHG outreach activities because different utilities are involved in each, and consolidation could delay outreach to natural gas customers. PG&E recommends utility-specific marketing and outreach to inform customers about natural gas-related GHG compliance costs and allowance proceeds including bill inserts, on-bill messaging, e-mails to customers, and website content. PG&E states that it would administer the natural gas outreach efforts identically for customers receiving their natural gas commodity service from PG&E and customers receiving their natural gas commodity service from third parties. PG&E did not propose a budget for its proposed outreach effort.[63]

Since its California customer base is smaller and more homogenous than those of the other respondent utilities, SWG suggests its marketing and outreach activities should be low cost and reasonable in scope.[64] SWG supports consolidating outreach efforts of electric and gas utilities to minimize costs for natural gas customers already experiencing costs via electricity outreach costs. SWG suggests that outreach costs be tracked in the existing GHG balancing account and recovered in a manner similar to the GHG compliance costs.

ORA agrees that the Commission should consider changes to GHG marketing, education and outreach so that customers better understand the Climate Credit and actions they can take to reduce energy usage and therefore GHG emissions, but does not recommend SoCalGas' approach, since it would

---

[63] PG&E Opening Comments at 14-15.
[64] SWG Opening Comments at 3.

Case: 19-30088    Doc# 11847-4    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page
50 of 87

not reach all of SoCalGas' ratepayers.  ORA believes that consolidating electric and gas GHG outreach efforts into a single campaign for all ratepayers is preferable to individual utility campaigns to promote coherent, consistent, and targeted messaging.[65]  Given the low level of knowledge regarding the Climate Credit demonstrated by the Opinion Dynamics research, ORA, along with EDF and NRDC, recommend monitoring and measuring the effectiveness of the outreach campaign.  EDF and NRDC recommend that the utilities' education and outreach programs should explicitly provide for tracking and measurement of program effectiveness.

CSE supports consolidating marketing education and outreach issues with the electric Climate Credit marketing and outreach issues currently under consideration in A.13-08-026, et al. CSE explains that D.12-05-015 and D.12-12-038 directed CSE to administer and implement Energy Upgrade California, the statewide market transformation initiative to integrate marketing, education and outreach for California residents and small businesses for energy management actions and opportunities.  In 2014, CSE launched EUC, as a social marketing effort with paid, earned, and social media and education and outreach channels, including retail, grants and training to community-based organizations, youth enrichment outreach, partnerships, and a website featuring content about a broad array of energy management topics.[66]  CSE also states that, as directed by Resolution E-4611, it conducted a California Climate Credit education and outreach campaign in March and April 2014, with a budget of approximately $3.85 million as part of the statewide marketing, education, and

---

[65] ORA Opening Comments at 15-17.
[66] CSE Reply comments at 2-3.

Case: 19-30088    Doc# 11847-4    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 51 of 87

outreach. Commission staff also directed CSE to allocate a portion of the Energy Upgrade California budget to limited Climate Credit education and outreach for March through May 2015. CSE agrees with ORA that the Commission should consolidate marketing, education and outreach about the natural gas GHG proceeds with the electric Climate Credit marketing, education and outreach activities. CSE further suggests that the Commission should leverage utility channels, such as newsletters and websites, to cost-effectively distribute consistent messaging developed by Energy Upgrade California and direct customers to the Energy Upgrade California website. CSE recommends that this be accomplished consistent with the "competitive neutrality" constraints placed on the electric IOUs in D.12-12-033 and Resolution E-4611.

Greenlining states that the Commission and utilities should use "best practices" for reaching disadvantaged and hard-to-reach communities and should use the Climate Credit as an opportunity to further educate customers about energy efficiency but does not provide any detail regarding their suggestions.[67]

As noted above, review of the statewide marketing, education and outreach program is underway already in A.13-08-026 et al, so we will not opine on that program here. However, of relevance and particular concern in this proceeding is the low level of utility communication with their customers regarding the Climate Credit. In comments to the proposed decision, CSE notes that the Opinion Dynamics report cited by SDG&E and SoCalGas also shows that when asked where Californians heard about the Climate Credit, 59% of those

---

[67] Greenlining Opening Comments at 2.

Case: 19-30088    Doc# 11847-4    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 52 of 87

aware of the Climate Credit answered that they learned about it from the media, specifically media facilitated though the Energy Upgrade California program.

Nevertheless, we find it compelling that not leveraging the utilities' existing customer relationships to promote the Cap-and-Trade and the Climate Credit represents a lost opportunity to achieve the state's goals. Although limited, SoCalGas' proposed approach to work with Opower to deliver targeted messaging to customers is appealing in that it may yield complementary results regarding customer awareness of the Climate Credit consistent with the broader, statewide marketing, education and outreach efforts. We note that this outreach effort should not be in conflict with the Energy Upgrade California efforts, and instead, should strive to complement the statewide program with consistent messaging. We find SoCalGas' proposal and budget to be a reasonable, thoughtful effort to potentially increase customers' knowledge and awareness of the natural gas GHG program.

Given the limited amount of time before the first natural gas Climate Credit will be distributed, we find it reasonable for PG&E, SDG&E, and SWG to conduct limited outreach and education activities in 2016 targeted to customers that will receive the natural gas Climate Credit. These activities should include bill inserts, bill onserts, e-mail notices, newsletters, and information on the utilities' websites. Since the proposed programs are intended to be relatively low-cost and complementary to the statewide marketing, education and outreach program conducted under the Energy Upgrade California brand, they should not include mass-market media tools such as radio and television. Each of the utilities' proposed education and outreach programs should include mechanisms for tracking and measuring its effectiveness. The Commission's Energy Division should have authority to review and approve all utility outreach materials before

the utilities implement these outreach activities to ensure consistency with the statewide education and outreach program and competitive neutrality.

If the utilities would like to conduct a more extensive outreach program, they should file a Tier 2 Advice Letter to propose an outreach plan, budget, scope, and timeline.

As existing memorandum accounts only allow utilities to track administrative expenses,[68] the utilities are authorized to file a Tier 1 advice letter to update their existing memorandum account preliminary statements to allow the recording of outreach costs in these accounts. All expenditures shall be reviewed for reasonableness through the annual true-up advice letters discussed in Section 4.2, above.

We authorize SoCalGas to expend the necessary funds to undertake its proposed supplemental outreach program with Opower and include the proposed budget in its annual advice letters. SoCalGas shall reduce its proceeds available for the Climate Credit by its forecast costs for the supplemental outreach program. PG&E, SDG&E and SWG shall also forecast and reconcile GHG outreach costs in their annual true-up advice letters.

## 4.11. Confidentiality

As we stated in D.14-10-033, *Phase 2 Decision Adopting Standard Procedures for Electric Utilities to File Greenhouse Gas Forecast Revenue and Reconciliation Requests*, in order to prevent market collusion, ARB's Cap-and-Trade regulations

---

[68] PG&E: Greenhouse Gas Expense Memorandum Account-Gas; SDG&E: Greenhouse Gas Administrative Costs Memorandum Account; SoCalGas: Greenhouse Gas Memorandum Account; SWG: Greenhouse Gas Memorandum Account.

prohibit disclosure of auction-related information in most circumstances.[69],[70]  In particular, ARB's Cap-and-Trade regulations provide that entities registered in the Cap-and-Trade Program, as well as their direct or indirect corporate associations and advisors, shall not release any of the following information:

- Intent to participate, or not participate, at auction, auction approval status, maintenance of continued auction approval;
- Bidding strategy;
- Bid price or bid quantity information; and
- Information on the bid guarantee it provided to the financial services administration.

17 CCR Section 95914(c)(2)(d) allows a Commission-regulated utility to release auction information pursuant to rules, order, or decisions of the Commission.  When complying with such a rule, order, or decision, the utility must notify ARB and provide reference to the applicable order, decision or ruling.[71]

The Commission also has its own rules to protect the confidentiality of market sensitive information.  D.06-06-066, which established guidelines and a reporting matrix for the confidential treatment of electricity procurement-related information, ensures that market sensitive information will be protected from public disclosure.  D.06-06-066 provides that "information is material, and thus market sensitive," if it "affects the market price an energy buyer pays for

---

[69]  D.14-10-033, citing 17 CCR Section 95914(c).

[70]  D.14-10-033 was modified by D.14-10-055 and D.15-01-024.

[71]  *Id*. At 42.

Case: 19-30088    Doc# 11847-4    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 55 of 87

electricity.[72]  While the ARB regulations do not set a limit on the period of time information must remain confidential, D.06-06-066 generally provides this protection for up to three years.  D.06-06-066 adopted guidelines and a reporting matrix for the confidential treatment of procurement-related information.  D.14-10-033 adopted specific Confidentiality Protocols and found that the Confidentiality Protocols "may be applicable to other proceedings and activities within the Commission's jurisdiction" that address GHG Cap-and-Trade procurement information.  Attachment A to D.14-10-033 set forth the adopted Confidentiality Protocols and included a GHG Confidential Information Matrix.

Each of the utilities and ORA recommends that the Commission authorize the utilities to rely on non-confidential data to forecast natural gas GHG compliance costs, specifically an estimated need for allowances, based on publicly available information, and a proxy price to forecast natural gas-related GHG compliance costs.  The utilities and ORA also recommend that the Commission adopt an approach similar to the confidentiality protocols adopted in D.14-10-033 to identify which information is subject to confidentiality protection.

The Ruling and Scoping Memo invited parties to comment on whether natural gas utilities should annually publish the Cap-and-Trade-related costs that may be present in natural gas rates and tariffs, and whether such costs can be published without violating ARB confidentiality rules regarding disclosure of market sensitive information.  PG&E suggests that aggregate GHG costs can be made public, but the utilities should not disclose information that would "show,

---

[72]  D.06-06-066, at 42.

Case: 19-30088    Doc# 11847-4    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page
56 of 87

or enable derivation of, individual transactions for compliance instruments."
SWG agrees that the rate impact and rates can be published without violating
ARB confidentiality.

Appendix B to this decision sets forth the adopted Confidentiality
Protocols for the natural gas utilities' calculation of GHG compliance costs and
allowance proceeds.

## 5.    Motion to File Under Seal

On July 3, 2015, PG&E filed a motion to file the confidential attachment to
its 2015 Annual Report of Natural Gas Compliance Instrument Sales and
Purchases of Pacific Gas and Electric Company (U39E) (Annual Report) under
seal. PG&E states that the confidential attachment contains information about
natural gas compliance instrument sales and purchases as well as information
concerning GHG compliance instrument procurement strategy and activities.

The information referenced in the motion to file under seal constitutes
commercially sensitive material and information that falls under the
"Confidential" category in the Confidentiality Matrix included in the
Confidentiality Protocols attached to today's decision as Appendix B.  PG&E's
motion to file under seal is granted.

## 6.    Safety Considerations

The health and safety impacts of GHG are well known and were one of the
reasons that Legislature enacted AB 32.  Specifically, the Legislature found and
declared that global warming caused by GHG "poses a serious threat to the
economic well-being, public health, natural resources, and the environment of

Case: 19-30088    Doc# 11847-4    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page
57 of 87

California."[73]  The potential adverse impacts associated with global warming include the exacerbation of air quality problems, among other issues.  This decision implements a key part of the GHG reduction program envisioned by AB 32, and, in doing so, will improve the health and safety of California residents.

## 7.    Categorization and Need for Hearing

The January 29, 2015, Scoping Memo and Ruling of the Assigned Commissioner and Administrative Law Judge affirmed the categorization of this proceeding as ratesetting and determined that no hearings would be necessary for Phase Two.

## 8.    Comments on Proposed Decision

The proposed decision of the ALJ in this matter was mailed to the parties in accordance with Section 311 of the Public Utilities Code and comments were allowed under Rule 14.3 of the Commission's Rules of Practice and Procedure. Comments were filed on October 12, 2015 by SDG&E and SoCalGas (jointly), PG&E, ORA, CalSEIA, Greenlining, CSE and the California Manufacturers & Technology Association (CMAT).  Reply comments were filed on October 19, 2015, by SDG&E and SoCalGas (jointly) PG&E, Greenlining, and CMAT.

In comments on the proposed decision, SDG&E and SoCalGas state that they would need 120 days from the date of a final decision to update their billing systems to establish a new line-item charge for GHG costs, but less time to include GHG costs in transportation rates as the proposed decision describes.[74]

---

[73] AB 32 Findings and Declarations.

[74] SoCalGas and SDG&E Comments on Proposed Decision at 7.

Case: 19-30088     Doc# 11847-4     Filed: 01/21/22     Entered: 01/21/22 11:46:37     Page 58 of 87

In its comments on the proposed decision, PG&E requests "a one-time delay in incorporating forecast 2015 and 2016 natural gas GHG costs and revenues into 2016 rates for not to exceed six months beyond the January 1, 2016, [annual gas true-up] rate changes."[75]  We recognize that in the first year utilities include GHG costs in transportation rates, the utilities may need to update their billing systems and undertake other IT work to appropriately exclude covered entities from costs, and we modified the proposed decision accordingly to allow the utilities until April 1, 2016 to include GHG costs and allowance proceeds in rates.

## 9.  Assignment of Proceeding

Carla J. Peterman is the assigned Commissioner and Julie M. Halligan is the assigned ALJ in this proceeding.

## Findings of Fact

1. Using a proxy price to forecast GHG allowance prices when estimating forecast GHG costs and allowance proceeds will provide transparency.

2. ARB does not require natural gas utilities to place all of their directly allocated allowances in their Limited Use Holding Accounts; a portion of their allowances can be used directly for compliance.

3. The methodology and procedures for calculating forecasted natural gas utilities' GHG costs, allowance proceeds, and related administrative expenses as described in this decision are reasonable.

4. The 2015 forecasts of Cap-and-Trade compliance costs presented in the preliminary statements filed by PG&E, SoCalGas, SDG&E and SWG are reasonable.

---

[75]  PG&E Comments on Proposed Decision at 3.

Case: 19-30088    Doc# 11847-4    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page
59 of 87

5. Each natural gas utility has an existing advice letter process in which it annually projects the year-end balances in various balancing accounts to be amortized in core and noncore gas transportation rates on January 1 of the following year.

6. The methodology and timing for annually reconciling forecast GHG costs and allowance proceeds with recorded amounts is reasonable. The total amount of allowance proceeds that will be available for customers is dependent on the ARB auction clearing price of GHG allowances and the number of allowances consigned to auction.

7. In developing its Cap-and-Trade Regulation, ARB considered stakeholder comments that suggested increasing the consignment percentage.

8. Covered entities under the Cap-and-Trade Program already pay the costs associated with their direct GHG emissions by purchasing and surrendering compliance instruments.

9. ARB directly allocates allowances to natural gas utilities based on a percentage of the natural gas utilities' 2011 emissions.

10. ARB did not award additional allowances to natural gas suppliers for "early actions" on energy efficiency and renewable energy that were awarded to electric distribution utilities. The lack of additional allowances for "early actions," combined with the lower minimum consignment percentage for natural gas utilities, results in a forecast of the total amount of natural gas GHG allowance proceeds that is much less than for the electric utilities.

11. The Confidentiality Protocols adopted in D.14-10-033, as modified by D.14-10-055 and D.15-01-024, and including the additional modifications adopted herein provide an adequate framework for determining what types of information should be subject to confidential treatment.

Case: 19-30088    Doc# 11847-4    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page
60 of 87

12. The information subject to the motion to file under seal described above constitutes material that is entitled to confidential treatment by the Commission.

## Conclusions of Law

1. The utilities' approaches to calculating their Forecast Compliance Obligation contained in the preliminary statements filed on January 20, 2015 and February 10, 2015 are reasonable and should be approved.

2. In order to provide for an approved 2015 forecast of the GHG costs associated with complying with Cap-and-Trade as soon as possible, the Commission should approve the forecasts presented in the preliminary statements filed in this proceeding on January 20, 2015 and February 10, 2015.

3. The utilities should forecast and reconcile greenhouse gas costs and proceeds through their existing annual natural gas true-up advice letter process.

4. The utilities should use Appendix A to provide information in their annual natural gas true-up advice letters.

5. The utilities should use the balancing accounts authorized in D.14-12-040 to track GHG costs and allowance proceeds.

6. It is reasonable to return natural gas allowance proceeds, net of administrative and outreach costs, to customers as a bill credit.

7. Given the potential allowance proceeds available, it is reasonable to limit the natural gas return of allowance proceeds to residential customers.

8. The return of allowance proceeds to residential customers should be done in an equal, non-volumetric manner.

9. Each utility's natural gas California Climate Credit should be calculated as the forecast GHG allowance proceeds remaining after subtracting administrative and outreach expenses from the total allowance proceeds and dividing the result by the number of residential customers.

Case: 19-30088    Doc# 11847-4    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 61 of 87

10.  The per-household credit should appear on residential customers' bills once per year.

11.  The credit should appear as a line-item on residential customer's bills in April.

12.  Natural gas greenhouse gas compliance costs should be recovered from all core and non-core customers, excluding exempt customers, on an equal-cents-per-therm basis through base transportation rates already present on customers' bills.

13.  Covered entities should not be excluded from the costs associated with LUAF gas or with natural gas utility company facilities that are covered entities.

14.  For exempt customers, the utilities should be authorized to use a line-item credit to demonstrate that exempt customers do not pay twice for their greenhouse gas emissions.  The line-item credit should be called "Cap-and-Trade Cost Exemption."

15.  GHG costs are just one of many costs that should be included in the transportation charge, rather than displayed separately on customer bills.

16.  The utilities should continue to use memorandum accounts to track the administrative costs associated with their GHG compliance.

17.  Actual administrative expenses recorded in the memorandum accounts should be subject to reasonableness review.

18.  The memorandum accounts adopted in this proceeding should sunset for each utility once that utility has had the opportunity to request approval of natural gas GHG-related administrative costs in its next general rate case or similar proceeding.

19.  The minimum consignment percentage should remain the same as that adopted by the California Air Resources Board.

Case: 19-30088    Doc# 11847-4    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page
62 of 87

20. End-use customers who emit 25,000 metric tons of $CO_2e$ or more per year and are directly regulated by ARB for their GHG compliance obligation should be exempt from the supplier-related greenhouse gas costs imposed by the natural gas utilities.

21. The utilities should file a one-time Tier 1 Advice Letter no later than April 1, 2016 to include forecast 2015 and 2016 GHG costs and allowance proceeds approved in this decision into rates. If a utility is not able to implement this rate change via its fall true-up advice letter, it should still include in this fall true-up advice letter the illustrative rate impacts of GHG costs, as outlined in Table A of Appendix A to this decision.

22. The utilities should amortize their 2015 forecast GHG costs equally between 2016 and 2017 so that 50 percent of forecast 2015 costs and allowance proceeds are included in 2016 rates and 50 percent are included in 2017 rates.

23. The utilities should begin introducing GHG costs into rates no later than April 1, 2016 so that 2016 forecast GHG costs and 50% of forecast 2015 GHG costs are included in rates for the remaining months of 2016.

24. Given the limited amount of time before the first natural gas Climate Credit will be distributed, it is reasonable for PG&E, SDG&E, and SWG to conduct limited outreach and education activities in 2016. The utilities' outreach activities should include bill inserts, bill onserts, e-mail notices, newsletters, and information on their websites; they should not include mass-market media tools such as radio and television.

25. PG&E, SDG&E, and SWG should work with the Commission's Energy Division to develop outreach materials.

26. Energy Division should have authority to review and approve all utility outreach materials related to GHG costs and the California Climate Credit.

Case: 19-30088   Doc# 11847-4   Filed: 01/21/22   Entered: 01/21/22 11:46:37   Page 63 of 87

27. The utilities should be authorized to file a Tier 2 Advice Letter to propose an outreach plan, budget, scope, and timeline if they would like to implement a more extensive outreach and education program.

28. The Confidentiality Protocols adopted in D.14-10-033, as modified by D.14-10-055 and D.15-01-024 and including the additional modifications discussed herein, should be adopted in this rulemaking for natural gas supplier compliance with ARB's Cap-and-Trade program.

29. It is reasonable for the information referenced in PG&E's motion to file under seal described above to remain under seal for the amount of time required by D.06-06-066.

30. The decision should be effective today.

## O R D E R

**IT IS ORDERED** that:

1. Each of Pacific Gas and Electric Company, Southern California Gas Company, San Diego Gas and Electric Company, and Southwest Gas Company's 2015 forecasts of GHG allowance proceeds and GHG costs are approved and should be included in the annual advice letter filings for recovery in rates.

2. Pacific Gas and Electric Company, Southern California Gas Company, San Diego Gas and Electric Company, and Southwest Gas Company shall use the methodologies and procedures described in this decision for calculating forecasted natural gas supplier greenhouse gas cost compliance costs, allowance proceeds, and related administrative expenses.

3. We adopt the Confidentiality Protocols adopted in D.14-10-033, as modified by D.14-10-099 and D.15-01-024, and including the additional modifications discussed herein for use in this proceeding. The adopted Confidentiality Protocols are attached to this decision as Appendix B.

Case: 19-30088    Doc# 11847-4    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page
64 of 87

4. The calculations, methodologies, and procedures described in Appendix A to this decision for forecasting greenhouse gas compliance costs, expenses, and proceeds are adopted.

5. Pacific Gas and Electric Company, Southern California Gas Company, San Diego Gas and Electric Company, and Southwest Gas Company shall annually forecast and reconcile its natural gas greenhouse gas compliance costs and allowance proceeds as part of its existing annual natural gas true-up advice letters that set transportation rates. The advice letter should also include a calculation of the compliance instrument procurement limit.

6. Pacific Gas and Electric Company, Southern California Gas Company, San Diego Gas and Electric Company, and Southwest Gas Company shall include Appendix A, and provide reasonable supporting information regarding methodologies and assumptions when filing forecast and reconciliation requests as part of their annual natural gas true-up advice letters.

7. Pacific Gas and Electric Company, Southern California Gas Company, San Diego Gas and Electric Company, and Southwest Gas Company shall file a one-time Tier 1 Advice Letter no later than April 1, 2016 to include forecast GHG costs into rates.

8. Pacific Gas and Electric Company, Southern California Gas Company, San Diego Gas and Electric Company, and Southwest Gas Company shall amortize 2015 forecast costs and allowance proceeds equally between 2016 and 2017 so that 50 percent of forecast 2015 costs are included in 2016 rates and 50 percent are included in 2017 rates. The utilities shall begin introducing GHG costs into rates no later than April 1, 2016 so that 2016 forecast GHG costs and 50 percent of forecast 2015 GHG costs are included in rates for the remaining months of 2016.

Case: 19-30088    Doc# 11847-4    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 65 of 87

9.  Pacific Gas and Electric Company shall file a Tier 2 advice letter within 30 days of the effective date of this decision to no longer record company facility costs in its Gas Operations Balancing Account and to instead record these costs in a subaccount of its Gas Programs Balancing Account.

10.  For purposes of cost recovery, greenhouse gas emissions costs shall be addressed in the same manner as other gas procurement costs and shall be included in base transportation rates.

11.  Natural gas greenhouse gas compliance costs shall be recovered from all core and non-core customers, excluding exempt customers, on an equal-cents-per-therm basis.

12.  Pacific Gas and Electric Company, San Diego Gas & Electric Company, Southern California Gas Company and Southwest Gas Company shall each file a Tier 2 advice letter within 30 days of the effective date of this decision to revise their Greenhouse Gas Balancing Accounts to record the portion of their natural gas supplier emissions costs associated with lost and unaccounted for gas in a new subaccount.

13.  Pacific Gas and Electric Company, San Diego Gas & Electric Company, Southern California Gas Company and Southwest Gas Company shall annually use the minimum greenhouse gas allowance consignment percentages as specified in the Cap-and-Trade Regulation.

14.  Greenhouse gas allowance proceeds, net of reasonable greenhouse gas compliance costs and expenses, should be returned to residential customers as a natural gas "California Climate Credit."  Pacific Gas and Electric Company, San Diego Gas & Electric Company, Southern California Gas Company and Southwest Gas Company shall each file a Tier 2 advice letter within 30 days of the effective date of this decision to update their gas rate schedules to indicate

Case: 19-30088   Doc# 11847-4   Filed: 01/21/22   Entered: 01/21/22 11:46:37   Page 66 of 87

that residential customers will receive an annual Climate Credit each April, beginning in 2016.

15.   Pacific Gas and Electric Company, San Diego Gas & Electric Company, Southern California Gas Company and Southwest Gas Company shall each file a Tier 2 Advice Letter within 30 days of the effective date of this decision to update their existing transportation tariffs to include GHG costs in transportation rates.

16.   The supplemental customer education and outreach plan, referred to as the "Climate Credit Education Campaign," proposed by Southern California Gas Company is approved.  Southern California Gas may track and record outreach costs in its greenhouse gas memorandum account.

17.   Pacific Gas and Electric Company, San Diego Gas and Electric Company, and Southwest Gas Company shall work with the Commission's Energy Division to develop the messaging included in the low-cost, natural gas-specific education and outreach activities targeted to customer that will receive the natural gas Climate Credit.   Energy Division shall review and approve all utility outreach materials related to GHG costs and the California Climate Credit.

18.   Pacific Gas and Electric Company, San Diego Gas and Electric Company, and Southwest Gas Company may each file a Tier 2 advice letter to propose more extensive outreach and education activities.  If the utilities choose to file such an advice letter, it shall include a proposed outreach plan, budget, scope, and timeline.  The advice letters shall describe their proposed customer education and outreach plans, including the scope and timing of activities, and shall provide Energy Division an opportunity to review outreach messaging and materials.

Case: 19-30088   Doc# 11847-4   Filed: 01/21/22   Entered: 01/21/22 11:46:37   Page 67 of 87

19.  This proceeding is closed.

This order is effective today.

Dated October 22, 2015, at Sacramento, California.

MICHAEL PICKER
President
MICHEL PETER FLORIO
CATHERINE J.K. SANDOVAL
CARLA J. PETERMAN
LIANE M. RANDOLPH
Commissioners

Case: 19-30088    Doc# 11847-4    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 68 of 87

**Appendix A: Natural Gas Utility Reporting Templates and Notes**

Appendix A consists of five templates that each natural gas utility should complete and submit as part of its advice letter filings in which it forecasts greenhouse gas costs and allowance proceeds. Clarifying notes follow each template to provide guidance for completing the template.

Each year, a utility should forecast the next year's costs and proceeds. After the forecast year ends, the utility should also record the actual costs and proceeds values for that year.

Gray shading in the templates indicates confidential information. In the annual advice letter filings, utilities must justify why this and any other data must be kept confidential.

**Table A: Forecast Revenue Requirement**

| Line | Description | Year t Forecast | Recorded |
|------|-------------|-----------------|----------|
| 1 | Gross Throughput (MMcf) | | |
| 2 | Throughput to Covered Entities (MMcf) | | |
| 3 | Net Throughput to End Users (MMcf) (Line 1 + Line 2) | | |
| 4 | Lost and Unaccounted for Gas (MMcf) | | |
| 5 | **Total Supplied Gas (MMcf)** (Line 3 + Line 4) | | |
| 6 | Emissions Conversion Factor (MTCO$_2$e/MMcf) | | |
| 7 | Compliance Obligation for End Users and LUAF (MTCO$_2$e) (Line 5 * Line 6) | | |
| 8 | Compliance Obligation for Company Facilities (MTCO$_2$e) | | |
| 9 | **Gross Compliance Obligation (MTCO$_2$e)** (Line 7 + Line 8) | | |
| 10 | Directly Allocated Allowances | | |
| 11 | Percentage Consigned to Auction | | |
| 12 | Consigned Allowances (Line 10 * Line 11) | | |
| 13 | **Net Compliance Obligation (MTCO$_2$e)** (Line 9 + Line 10+ Line 12) | | |
| 14 | Proxy GHG Allowance Price | | |
| 15 | Compliance Instrument Cost | | |
| 16 | Interest | | |
| 17 | Franchise Fees & Uncollectibles | | |
| 18 | **Revenue Requirement** (Line 15 + Line 16 + Line 17) | | |
| 19 | Previous Year's Cost Balancing Subaccount Balance | | |
| 20 | **Revenue Requirement to be Included in Rates** (Line 18 + Line 19) | | |
| 21 | Covered Entity Rate Impact ($/therm) | | |
| 22 | Non-Covered Entity Rate Impact ($/therm) | | |

Case: 19-30088    Doc# 11847-4    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 70 of 87

**Table A Notes**

Line 1: Gross Throughput (MMcf)

- Use data reported for the forecast year in the most recent CA Gas Report[76] at the time of the advice letter filing. The estimates should be consistent with the table "Annual Gas Supply and Requirements" that each utility provides in the Report.

- If a utility does not report its forecast throughput in the CA Gas Report, it should provide a forecast of throughput from a comparable source, state why this source is appropriate, and note whether the data are confidential.

Line 2: Throughput to Covered Entities (MMcf)

- Each utility should use a reasonable methodology to identify the throughput associated with covered entities and should explain this methodology in the advice letter narrative. (Note: The workpapers each utility uses to calculate this throughput are confidential.)

- Entered in the template as a negative value.

Line 3: Net Throughput to End Users (MMcf)

- Volume of gas delivered to customers that are not Covered Entities.

Line 4: Lost and Unaccounted for Gas (MMcf)

- Calculated using the LUAF factor approved in utility's most recent General Rate Case (GRC) or Cost Allocation Proceeding multiplied by gross throughput.

- In the advice letter narrative, each utility should identify the LUAF factor and Commission Decision that authorized this factor.

Line 5: Total Supplied Gas (MMcf)

---

[76] Available online at:
http://www.pge.com/pipeline/library/regulatory/cgr/index.page.

Case: 19-30088   Doc# 11847-4   Filed: 01/21/22   Entered: 01/21/22 11:46:37   Page 71 of 87

- Total volume of gas for which the utility has a compliance obligation as a Natural Gas Supplier.

Lines 1-5 "Recorded" column:
- The recorded information in lines 1 through 5 is for informational purposes only and is not used to calculate actual costs.

Line 6: Emissions Conversion Factor (MTCO2e/MMcf)
- The MMcf to MTCO2e conversion factor is calculated using the following conversion calculation:

$(0.053156 \text{ MTCO}_2/\text{MMBtu})$[77] $*(1.028 \text{ MMBtu/Mcf})$[78]$*(1{,}000 \text{ Mcf/MMcf})$.

Line 8: Compliance Obligation for Company Facilities (MTCO2e)
- Compliance obligation for applicable compressor stations that are Covered Entities.

Line 9: Gross Compliance Obligation (MTCO2e)
- Includes End Users, LUAF, and Company Facilities.

Line 10: Directly Allocated Allowances
- As specified in 17 CCR §95893.

- Entered in the template as a negative value.

Line 11: Percentage Consigned to Auction
- Use the percentage specified in this instant decision.

Line 12: Consigned Allowances
- Entered in the template as a positive value.

Line 14: Proxy GHG Allowance Price
- The forward Intercontinental Exchange (ICE) settlement price of a California Carbon Allowance with December delivery of the forecast year.

---

[77] ARB Scoping Plan, Appendix II (2008)

[78] http://www.eia.gov/tools/faqs/faq.cfm?id=45&t=8

Case: 19-30088   Doc# 11847-4   Filed: 01/21/22   Entered: 01/21/22 11:46:37   Page 72 of 87

- The utility should use reasonable quote dates to determine this price and state the quote dates in its advice letter narrative.

Line 15: Compliance Instrument Cost
- Accrual based cost of compliance instruments necessary to meet that year's GHG obligation.

- The Forecast Compliance Instrument Cost is calculated by multiplying the forecast Net Compliance Obligation by the Proxy GHG Allowance Price.

- The Recorded Compliance Instrument Cost is calculated in Table B.

Line 16: Interest
- If applicable for Recorded Costs, the total monthly interest recorded in the GHG cost subbalancing account.

Line 17: Franchise Fees & Uncollectibles
- Calculated by multiplying the utility's GRC-authorized FF&U factor by the Compliance Instrument Cost.

- Each utility should provide the FF&U factor and the decision that authorized this factor in the advice letter narrative.

Line 18: Revenue Requirement
- Total revenue requirement for the forecast year's GHG Costs.

Line 19: Previous Year's Balancing Account Balance
- Previous year's under- (over)-collection is the projected year-end balance in the GHG cost subaccounts.[79]

---

[79] PG&E: Greenhouse Gas Compliance Subaccount of the Gas Programs Balancing Account; SDG&E and SoCalGas: End Users GHG Compliance Cost Subaccount and Company Facility GHG Compliance Subaccount of the Greenhouse Gas Balancing Account; SW Gas: supplier Cap-and-Trade Program costs Subaccount in the Greenhouse Gas Balancing Account.

Case: 19-30088    Doc# 11847-4    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 73 of 87

- The balance should take into account any differences between the forecast and recorded costs, and any under- (over)-collections of costs in rates.

Line 21: Covered Entity Rate Impact ($/therm)
- Calculated using the revenue requirement attributable to Covered Entities and associated with the emissions from (1) lost and unaccounted for gas and (2) company facilities. This revenue requirement is then divided by the forecast therms of natural gas delivered to the covered entities.

Line 22: Non-Covered Entity Rate Impact ($/therm)
- Calculated using the revenue requirement attributable to non-Covered Entities and associated with (1) lost and unaccounted for gas, (2) company facilities, and (3) net throughput to end users. This revenue requirement is then divided by the forecast therms of natural gas delivered to non-covered customers.

Case: 19-30088    Doc# 11847-4    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 74 of 87

**Table B: Recorded GHG Costs**

**Compliance Period:**

| Month | Transaction Date | Transaction Type | Quantity | Cost ($/Compliance Instrument) | Sales Price ($/Compliance Instrument) | Total Cost ($) | Total Sales ($) | Inventory Balance ($) | Total Qty in Inventory | WAC ($) |
|---|---|---|---|---|---|---|---|---|---|---|
| Jan-15 | | | | | | | | | | |
| Jan-15 | | | | | | | | | | |
| Jan-15 | | | | | | | | | | |
| Jan-15 | | | | | | | | | | |
| Jan-15 | | | | | | | | | | |
| Jan-15 | | | | | | | | | | |
| Jan-15 | | | | | | | | | | |
| Feb-15 | | | | | | | | | | |
| Feb-15 | | | | | | | | | | |
| Feb-15 | | | | | | | | | | |
| Feb-15 | | | | | | | | | | |
| Feb-15 | | | | | | | | | | |
| Feb-15 | | | | | | | | | | |
| Feb-15 | | | | | | | | | | |

**Monthly Cost Calculations**

| Month | Jan-15 |
|---|---|
| End of Month WAC | |
| Monthly Emissions (MT) | |
| Monthly GHG Cost | |

| Month | Feb-15 |
|---|---|
| End of Month WAC | |
| Monthly Emissions (MT) | |
| Monthly GHG Cost | |

**Sum of Monthly GHG Costs**

Emissions Data Updated as of:

**Table B Notes**

Each month, a utility records its GHG costs to its respective balancing account. These costs are calculated as the weighted average cost (WAC) of compliance instruments held in inventory at the end of a month multiplied by the quantity of emissions generated in that month for which the utility has a compliance obligation. The recorded costs for the year are the sum of the monthly GHG expense entries for the year.

When a utility purchases or otherwise receives compliance instruments, it records in Table B:

- Transaction Date;
- Transaction Type (ARB Auction Purchase, offset purchase etc.);
- Vintage (if applicable);
- Quantity of compliance instruments for transaction;
- Cost per compliance instrument for transaction;
- Total Cost of compliance instruments for this transaction calculated as the quantity multiplied by the cost; and
- Inventory Balance in dollars;
- Total Quantity of compliance instruments in inventory; and
- WAC of all compliance instruments to date.

When a utility sells, transfers, retires, or otherwise removes compliance instruments from its inventory, it records in Table B:

- Transaction Date;
- Transaction Type (sale, retirement to ARB etc.);
- Vintage (if applicable);
- Quantity of compliance instruments for transaction (recorded as a negative value);

Case: 19-30088    Doc# 11847-4    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 76 of 87

- Sales (removal from inventory) price for transaction;
- Total Cost calculated as quantity of compliance instruments for transaction multiplied by the current WAC;
- Total Sales of compliance instruments for this transaction calculated as the quantity multiplied by the sales price; Inventory Balance in dollars;
- Total Quantity of compliance instruments in inventory; and
- WAC of all eligible compliance instruments to date.

At any period of time, the WAC is calculated as the total cost of all compliance instruments held in inventory, divided by the total quantity of compliance instruments held in inventory.

When the WAC is calculated at the end of the month, a utility will calculate recorded costs for the month as follows:

$$GHG\ Costs_{month} = WAC\ \times Emissions\ Quantity_{month}$$

*Where*:

"WAC" is the weighted average cost of all compliance instruments held in inventory that are eligible for that cap-and-trade compliance period.

"Emissions Quantity" is the emissions for the entire month calculated in accordance with ARB standards, regardless of whether compliance instruments have been surrendered for these emissions.

The calculation of monthly costs for the year should match the total emissions expenses in the utility's cost subbalancing account for the year. A utility may revise its monthly emissions from time to time as more accurate data becomes available or verified. When the utility revises monthly emissions (MT)

Case: 19-30088    Doc# 11847-4    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 77 of 87

in Table B, it should ensure the Sum of Monthly GHG Costs calculated in Table B matches the total emissions expenses recorded in the subbalancing account.

Any allowances with a vintage in a future compliance period must be excluded from the current WAC calculations and included in a separate calculation for the next compliance period. For example, when recording 2015 costs, a utility shall calculate its WAC based on its inventory of all offsets and allowances with vintage years 2015, 2016 and 2017, plus any 2013 or 2014 allowances or offsets not used to meet its obligation in the first compliance period.

If the Total Quantity in Inventory at the end of a month is equal to zero, the utility shall use the most recent ARB allowance auction clearing price instead of the WAC to calculate that month's emissions cost. The utility will record the auction clearing price in place of the "End of Month WAC" in the "Monthly Cost Calculations" section of Table B.

Case: 19-30088    Doc# 11847-4    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page
78 of 87

**Table C: GHG Allowance Proceeds**

| Line | Description | Year t | |
|---|---|---|---|
| | | Forecast | Recorded |
| 1 | Proxy GHG Allowance Price ($/MT) | | |
| 2 | Directly Allocated Allowances | | |
| 3 | Percentage Consigned to Auction | | |
| 4 | Consigned Allowances | | |
| 5 | Allowance Proceeds (Line 1 * Line 4) | | |
| 6 | Previous Year's Revenue Balancing Subaccount Balance | | |
| 7 | Interest | | |
| 8 | **Subtotal Allowance Proceeds ($)** (Line 5 + Line 6 + Line 7) | | |
| 9 | **Outreach and Admin Expenses ($)** (from Table D) | | |
| 10 | **Net GHG Proceeds Available for Customer Returns ($)** (Line 8 + Line 9) | | |
| 11 | Number of Residential Households | | |
| 12 | **Per Household California Climate Credit ($)** (Line 10 / Line 11) | | |

**Table C Notes**

Line 1: Proxy GHG Allowance Price
- The forward Intercontinental Exchange (ICE) settlement price of a California Carbon Allowance with December delivery of the forecast year.

- The utility should use reasonable quote dates to determine this price and state the quote dates in the advice letter narrative.

Line 2: Directly Allocated Allowances
- As specified in 17 CCR §95893.

Line 3: Percentage Consigned to Auction
- Use the percentage specified in this instant decision.

Line 4: Consigned Allowances
- Number of allowances consigned to ARB's auctions during the forecast year.

Line 5: Allowance Proceeds
- Forecast of allowance proceeds received in the year is calculated by multiplying the proxy GHG Allowance Price by the number of consigned allowances.

- Recorded allowance proceeds are the total of all proceeds received from consigning allowances to auction in that year.

- Entered in the template as a negative value.

Line 6: Previous Year's Revenue Balancing Subaccount Balance
- Include the end of year under (over)-collection in the balancing subaccount,[80] inclusive of any interest. The balance will take into account

---

[80] SDG&E and SoCalGas: Consignment Revenues Subaccount; PG&E: Greenhouse Gas Revenues Subaccount; and Southwest Gas: Greenhouse Gas Balancing Account Revenue Subaccount.

Case: 19-30088   Doc# 11847-4   Filed: 01/21/22   Entered: 01/21/22 11:46:37   Page 80 of 87

any differences between the forecast of allowance proceeds available and the actual returns to customers on their bills that year.

Line 7: Interest
- If applicable.

Line 9: Outreach and Admin Expenses
- Include the total Outreach and Administrative Expenses from Table D.

Line 10: Net GHG Proceeds Available for Customer Returns
- Equals the Subtotal Allowance Proceeds minus Outreach and Admin Expenses.

Line 11: Number of Residential Households
- Number of utility's residential households eligible to receive the Climate Credit in the forecast year.

Line 12: Per Household California Climate Credit
- Value of the Climate Credit that each household will receive in the forecast year.
- Report this number as a positive value.

Case: 19-30088   Doc# 11847-4   Filed: 01/21/22   Entered: 01/21/22 11:46:37   Page 81 of 87

**Table D: GHG Outreach and Administrative Expenses**

| Line | Description | Year t | |
|---|---|---|---|
| | | **Forecast** | **Recorded** |
| 1 | Outreach Expenses | | |
| 2 | Detail of Outreach Activity ($) | | |
| 3 | **Subtotal Outreach ($)** | | |
| | | | |
| 4 | Administrative Expenses | | |
| 5 | Deatil of Administrative Activity ($) | | |
| 6 | **Subtotal Administrative ($)** | | |
| | | | |
| 7 | Subtotal Outreach and Administrative ($) | | |
| 8 | Interest ($) | | |
| 9 | **Total ($)** | | |

Case: 19-30088    Doc# 11847-4    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 82 of 87

**Table D Notes**

Line 2: Detail of Outreach Activities
- Insert description(s) of outreach activities and corresponding expenses. Insert additional lines if necessary.

Line 5: Detail of Administrative Activities
- Insert description(s) of administrative activities and corresponding expenses. Insert additional lines if necessary.

Line 8: Interest
- If applicable.

Line 9: Total
- Total of outreach and administrative expenses, inclusive of any applicable interest.

Case: 19-30088    Doc# 11847-4    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 83 of 87

**Table E: Compliance Obligation Over Time**

| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|
| Natural Gas Fuel Supplier Compliance Obligation (MTCO$_2$e) | | | | | | |
| Company Facility Compliance Obligation (MTCO$_2$e) | | | | | | |

**Table E Notes**

Each utility should report its annual compliance obligation, as verified by ARB, for each year. Verified data will be reported on a lag.

**(END OF APPENDIX A)**

Case: 19-30088    Doc# 11847-4    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 84 of 87

**Appendix B Greenhouse Gas Information Confidentiality Protocols**

1. Pursuant to the ARB GHG non-disclosure regulations, Public Utilities Code Section 454(g), and CPUC D.06-06-066 as modified by D.08-04-023, the following current or forecast confidential GHG information will not be disclosed to the public:

a.  Utility AB 32 GHG auction participation, including but not limited to:

- Qualification status (ability to participate)
- Intent to participate in an auction, auction approval status, maintenance of continued auction approval
- Participation in an auction
- Auction bidding strategy
- Bid price or bid quantity information
- Bid guarantee information

b.  Utility AB 32 GHG allowance procurement or proceed return positions. Specifically:

- Utility GHG price forecasts internally derived for utility procurement planning purposes
- Utility GHG compliance instrument inventories or quantities that can be used to derive GHG compliance instrument holdings

c.  Utility AB 32 GHG transactions, bilateral or under a Request for Offer,. Specifically:

- Utility counterparty information submitted pursuant to a non-disclosure agreement or solicitation protocol
- Negotiated contract terms or non-public contract terms

d.  Other utility procurement-related information subject to confidentiality protection pursuant to the terms of D.06-06-066 as modified by D.08-04-023, that pertains to GHG compliance.  Specifically:

i.  ARB allowance or offset procurement quantity targets internally derived for utility procurement planning purposes

ii.  CPUC-approved procurement limits

2.  Pursuant to CPUC regulatory litigation discovery requirements in formal proceedings under the Public Utilities Code, confidential information under #1, above, may be disclosed to interested parties or their representatives in formal CPUC proceedings if the interested parties and their representatives (a) are not market participants under D.06-06-066; (b) are not registered entities, auction participants, voluntary associated entities, or other participants in GHG allowance or offset markets under the ARB AB 32 regulations; (c) execute appropriate non-disclosure agreements and agree to comply with these Confidentiality Protocols and an appropriate CPUC-approved Protective Order in the proceeding;[81] and (d) are not prohibited by other law or privilege from receiving or reviewing the information. Confidential information under Section 1 of these protocols may not be disclosed to market participants, which include market participants designated in D.06-06-006, covered entities, auction participants, voluntary associated entities, or other participants in the ARB-regulated Cap-and-Trade market.  For clarity, since voluntary associated entities in the cap-and-trade program may be individuals, market participants should include organizations that have employees who are voluntary associated entities.

3.  Information that is not confidential GHG information as described in #1, above, may be disclosed to the public unless protected from public disclosure under other laws, judicial rulings or regulations, such as privileged, proprietary or confidential information restricted from disclosure under Section 583 of the Public Utilities Code, CPUC General Order 66-C, the California Public Records Act, the California Evidence Code or other laws or rules.

4.  Parties requesting confidential treatment under these Greenhouse Gas Information Confidentiality Protocols will follow standard Commission procedures for requesting confidential treatment, including use of standard non-disclosure agreements, and motions for protective orders as appropriate.

5. The following table applies to these confidentiality protocols.

---

[81]  The Office of Ratepayer Advocates is subject to specific statutory confidentiality restrictions under Public Utilities Code Section 583 and therefore does not need to execute an NDA, as long as it agrees in writing to comply with these GHG Confidentiality Protocols and any applicable Protective Order.

## GHG CONFIDENTIAL INFORMATION MATRIX

| Information | Treatment |
|---|---|
| Forecast Proxy GHG Allowance Price ($/MTCO$_2$e) | Public |
| Forecast Gross Throughput (MMcf) | Public, if a utility can rely on a public source of data, such as the California Gas Report. Confidential, if a utility must rely on a confidential internal forecast |
| Forecast Throughput to Covered Entities (MMcf) | Public, unless a utility has only one covered entity customer |
| Forecast Net Compliance Obligation (MTCO$_2$e) | Confidential, unless subject to disclosure in another Commission proceeding |
| Covered Entity Rate Impact ($/therm) | Public |
| Non-Covered Entity Rate Impact ($/therm) | Public |
| Weighted Average Cost (WAC) of compliance instruments, and the calculation of WAC ($) | Confidential |
| Verified Natural Gas Fuel Supplier Compliance Obligation (MTCO$_2$e) | Public |
| Verified Company Facility Compliance Obligation (MTCO$_2$e) | Public |

**(END OF APPENDIX B)**

Case: 19-30088   Doc# 11847-4   Filed: 01/21/22   Entered: 01/21/22 11:46:37   Page 87 of 87