1

**Exhibit E**

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ALJ/UNC/lil/jt2                                        **Date of Issuance  3/29/2018**

Decision 18-03-017  March 22, 2018

**BEFORE THE PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA**

| | |
|---|---|
| Order Instituting Rulemaking to Address Natural Gas Distribution Utility Cost and Revenue Issues Associated with Greenhouse Gas Emissions. | Rulemaking 14-03-003 |

**DECISION MODIFYING DECISION 15-10-032**

Case: 19-30088    Doc# 11847-5    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 2 of 59

# Table of Contents

**Title**                                                                                 **Page**

DECISION MODIFYING DECISION 15-10-032 ................................................. 1
Summary ............................................................................................................ 2
1.  Background ................................................................................................. 3
    1.1.  Rehearing of D.15-10-032 ................................................................ 5
    1.2.  Natural Gas GHG Costs and Proceeds in Rates ........................... 6
    1.3.  Procedural Background ..................................................................... 7
2.  Issues Before the Commission ................................................................ 9
3.  Legal Authority Governing Disbursement of Natural Gas Greenhouse
    Gas Allowance Proceeds ....................................................................... 11
    3.1.  Pub. Util. Code § 453.5 ................................................................... 11
        3.1.1.  Conflict Between Pub. Util. Code § 453.5
                and 17 CCR § 95893(d) ..................................................... 12
        3.1.2.  Applicability of § 453.5 to GHG Allowance Proceeds ... 14
        3.1.3.  SO2 Case Analogy ............................................................. 23
        3.1.4.  Conclusion ........................................................................... 24
    3.2.  17 CCR 95893(d)(3):  Method of Return ..................................... 25
    3.3.  Authority to Return GHG Allowance Proceeds Solely to
          Residential Customers ..................................................................... 28
4.  Adopted Methodology to Return GHG Proceeds to Residential
    Customers ................................................................................................ 35
5.  GHG Compliance Costs and Proceeds  Accrued to Date ................ 36
6.  GHG Costs and Proceeds on a Going Forward Basis ...................... 39
7.  Implementation of the Residential Climate Credit ........................... 39
    7.1.  Tier 2 Advice Letter Filing ............................................................ 40
8.  Hearing ...................................................................................................... 42
9.  Comments on Proposed Decision ........................................................ 42
10. Assignment of Proceeding ................................................................... 46
Findings of Fact ............................................................................................ 47
Conclusions of Law ...................................................................................... 50
ORDER ............................................................................................................ 53

## DECISION MODIFYING DECISION 15-10-032

## Summary

By this decision the Commission distributes greenhouse gas (GHG) allowance proceeds solely to residential customers of the natural gas utilities and provides the necessary legal rationale for that decision, pursuant to the limited rehearing granted by Decision (D.) 16-04-013. The Commission finds that Public Utilities Code Section 453.5 does not apply to allocation of GHG allowance proceeds for the natural gas utilities. Pursuant to California Code of Regulations Chapter 17 Section 95893(d), the Commission adopts an allocation methodology that distributes greenhouse gas proceeds solely to residential natural gas customers on a non-volumetric basis.

This allocation methodology will remain in effect unless or until the Commission updates or adopts new policies for the period beyond December 31, 2020. The Commission will not distribute GHG allowance proceeds to emissions-intensive and trade-exposed customers at this time (customers eligible for Industry Assistance,) but may consider doing so in a subsequent Order Instituting Rulemaking addressing the period beyond 2020.

The residential natural gas California Climate Credit must be distributed in April of each year. However, for 2018, the California Climate Credit shall be distributed in October, in order to allow sufficient time to comply with the provisions of this decision, unless disposition of the utilities' Tier 2 Advice Letters necessitates a delay.

As of issuance of this decision, natural gas ratepayers are facing almost three years of accrued GHG allowance proceeds and compliance costs. To mitigate against rate shock, the natural gas utilities must net accrued GHG compliance costs for the years 2015, 2016 and 2017 against GHG allowance

Case: 19-30088   Doc# 11847-5   Filed: 01/21/22   Entered: 01/21/22 11:46:37   Page 4 of 59

proceeds (less administrative and outreach costs, as directed in D.15-10-032) for the same years.  In the event that GHG compliance costs exceed proceeds, net costs must be amortized in rates over a 12-month period.  If GHG proceeds exceed GHG costs, remaining proceeds must be included in the 2018 California Climate Credit.

On a going forward basis, GHG compliance costs should be included in rates beginning July 1, 2018, unless disposition of the utilities' Tier 2 Advice Letter filings necessitates a delay.  GHG proceeds for the year 2018 should be distributed according to the methodology and timeline adopted herein and using the procedures adopted in D.15-10-032.  Inclusion of GHG compliance costs in rates beginning in July of 2018 will require the natural gas utilities to amortize 2018 costs over eighteen months.

The Commission requires the utilities to file a Tier 2 Advice Letter in order to fully implement the residential California Climate Credit as well as to implement the inclusion of GHG costs in rates beginning in July of 2018 and the netting of 2015-2017 GHG compliance costs and proceeds.

## 1.   Background

In late 2015, the Commission adopted Decision (D).15-10-032.  That decision approved methodologies for natural gas utilities to use when calculating forecast and recorded natural gas-related greenhouse gas (GHG) allowance proceeds and GHG costs associated with complying with the California Cap-and-Trade program (Cap-and-Trade).  Among other actions, D.15-10-032 required gas utility ratepayers not individually covered by Cap-and-Trade to pay for the cost of the utilities' compliance with the Cap-and-Trade program by requiring utilities to include GHG compliance costs in natural gas rates on an equal cents-per-therm basis.  As a result, natural gas rates will rise for all retail

Case: 19-30088    Doc# 11847-5    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 5 of 59

ratepayers of the natural gas utilities, except for covered entities that are directly regulated by the California Air Resources Board (ARB) for their compliance obligation ("exempt ratepayers").[1]

Under the Cap-and-Trade laws adopted in Assembly Bill (AB) 32[2] and regulations adopted by ARB, the natural gas utilities are required to consign to auction a certain portion of the allowances they receive, with the proceeds to be used exclusively for the benefit of retail ratepayers (*see*, 17 California Code of Regulations (CCR) § 95893). These proceeds are referred to as GHG allowance proceeds. The natural gas utilities also incur costs from purchasing compliance instruments (allowances and offsets) and surrendering them to ARB. These costs are referred to as GHG compliance costs.[3]

In D.15-10-032, the Commission opted to return GHG allowance proceeds solely to the residential customers of the natural gas utilities.[4] The GHG allowance proceeds were to be distributed to residential customers as a credit

---

[1] Ratepayers that are individually covered (covered entities) by Cap-and-Trade must comply on an individual basis with the Cap-and-Trade program. Such ratepayers are exempt from paying GHG costs to their utility and do not see GHG costs in natural gas rates. Covered entities are those end-use customers who emit 25,000 metric tons of carbon-dioxide equivalent or more per year and are directly regulated by ARB for their GHG compliance obligation.

[2] Stats of 2006, ch. 488.

[3] In this decision, any reference to GHG costs refers to GHG compliance costs, which are the costs borne by utility ratepayers to meet the GHG compliance obligation of the natural gas utility. There are also administrative and outreach costs associated with delivering GHG proceeds to customers. These costs are explicitly named as administrative and outreach costs and are small in amount.

[4] D.15-10-032 at 37.

Case: 19-30088    Doc# 11847-5    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 6 of 59

disbursed in equal amounts to each customer account.[5]  The distribution of GHG allowance proceeds was named the California Climate Credit.[6]

## 1.1. Rehearing of D.15-10-032

On November 23, 2016, the California Manufacturers & Technology Association (CMTA) applied for rehearing of D.15-10-032.  Pacific Gas and Electric Company (PG&E) filed a response in support of the rehearing request.  CMTA argued that D.15-10-032 erred by ordering that GHG allowance proceeds be returned only to residential customers instead of all retail ratepayers of the natural gas utility.

According to CMTA, GHG allowance proceeds are "rates" that must be distributed to all retail customers in accordance with Public Utilities Code (Pub. Util. Code) § 453.5,[7] not solely to residential customers.  Furthermore, CMTA argues that Pub. Util., Code § 748.5, which limits GHG allowance proceeds to certain customer groups of *electric* ratepayers, does not apply to *natural gas* ratepayers.[8]  Without the limitation in § 748.5, CMTA asserts, the Commission

---

[5] 17 CCR § 95893(d) provides for return of natural gas GHG proceeds on a non-volumetric basis.

[6] D.15-10-032 at 36.

[7] In this decision, references to sections of the Public Utilities Code will always contain three numbers before the decimal point, e.g. § 453.5, and references to the Cap-and-Trade regulation, Chapter 17 of the California Code of Regulations, will always contain five digits, e.g. § 95893.

[8] Section 748.5 provides, in pertinent part "(a) [T]he commission shall require revenues, including any accrued interest, received by an electrical corporation as a result of the direct allocation of greenhouse gas allowances to electric utilities pursuant to subdivision (b) of Section 95890 of Title 17 of the California Code of Regulations to be credited directly to the *residential, small business, and emissions-intensive trade-exposed retail customers* of the electrical corporation." (Emphasis added.)  No such statute exists with regard to proceeds received by a natural gas corporation.

Case: 19-30088    Doc# 11847-5    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 7 of 59

must order distribution to all retail ratepayers, and not only residential customers.

The Commission, in D.16-04-013 (*Order Granting Limited Rehearing of D.15-10-032*), stated that "No party provided legal support for that limitation [return of GHG allowance proceeds solely to residential customers], and D.15-10-032 does not discuss legal authority for requiring natural gas utilities to restrict disbursement of GHG credits solely to one class of retail ratepayer."[9] The Commission recognized that Title 17 of the California Code of Regulations provides: "Any allowances allocated to natural gas suppliers must be used exclusively for the benefit of retail ratepayers of each such natural gas supplier, consistent with the goals of AB 32, and may not be used for the benefit of entities or persons other than such ratepayers." (17 CCR, § 95893(a)).[10] As such, the Commission granted limited rehearing to reconsider the issue of disbursement of GHG allowance proceeds.

### 1.2. Natural Gas GHG Costs and Proceeds in Rates

Natural gas utilities' obligation to comply with the Cap-and-Trade Program began on January 1, 2015; therefore, GHG compliance costs that must be borne by the retail ratepayers of the natural gas utility began to accrue on the same date. D.15-10-032 was issued late in 2015, but no GHG compliance costs have been included in retail rates to date. The Commission authorized each utility to forecast and reconcile its natural gas GHG compliance costs and

---

[9] D.16-04-013 at 5.

[10] *Id.* at 4 (emphasis added).

Case: 19-30088   Doc# 11847-5   Filed: 01/21/22   Entered: 01/21/22 11:46:37   Page 8 of 59

allowance proceeds as part of an existing advice letter process. D.15-10-032 required the utilities to amortize 2015 forecast costs and allowance proceeds equally between 2016 and 2017 so that 50 percent of forecast 2015 costs would be included in 2016 rates and 50 percent would be included in 2017 rates. The decision initially ordered GHG costs and allowance proceeds to be included in rates commencing April 1, 2016.[11]

Decision 16-04-013, granting limited rehearing, vacated the order in D.15-10-032 that required the utilities to begin introducing costs into rates.[12] The Commission's Energy Division, by letter, also ordered the natural utilities to cease activities related to implementing the Climate Credit[13] and clarified that natural gas utilities should continue to hold GHG compliance costs and proceeds in balancing accounts while awaiting further direction from the Commission. In the autumn of 2016, Energy Division directed the natural gas utilities to file their advice letters with two different illustrative scenarios showing the impact of amortizing both 2015 and 2016 GHG costs into rates.

### 1.3. Procedural Background

On December 16, 2016, the assigned Administrative Law Judge (ALJ) in this proceeding issued a ruling setting a prehearing conference (PHC), presenting a proposed scope and requesting prehearing conference statements. CMTA, Southern California Gas Company and San Diego Gas & Electric Company (SoCalGas and SDG&E, jointly named Sempra), Southwest Gas

---

[11] D.15-12-032 at 20-21.

[12] D.16-04-013, Ordering Paragraph 4.

[13] *See* D.15-12-032 at 35 for a discussion of the natural gas Climate Credit.

Case: 19-30088    Doc# 11847-5    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 9 of 59

Company, PG&E and the Office of Ratepayer Advocates (ORA) filed PHC statements on January 5, 2017.  CMTA, Sempra and Southwest Gas filed replies on January 9, 2017.  On January 11, 2017, the assigned ALJ convened a PHC to determine parties, discuss the scope, schedule, and other procedural matters.  At the PHC, the assigned ALJ granted party status to The Utility Reform Network (TURN) and California State University (CSU).

On January 27, 2017, the assigned Commissioner and ALJ issued the Scoping Memo and Ruling of the Assigned Commissioner and Administrative Law Judge (Scoping Memo) setting the scope and schedule of this proceeding to address rehearing.  Pursuant to the direction of the Scoping Memo, PG&E, Sempra, Southwest Gas Company, ORA, CMTA and CSU filed concurrent opening comments on the issues ruled within the scope on February 24, 2017. PG&E, Sempra, Southwest Gas Company, ORA, CMTA and CSU filed concurrent reply comments on March 10, 2017.[14]

On July 26, 2017, the assigned ALJ issued a ruling incorporating into the record a proposed GHG allowance proceeds allocation methodology developed by the Commission's Energy Division, known as a Rank Allocation Methodology.  PG&E, Sempra, CMTA, CSU, Southwest Gas, and ARB[15] filed comments on the Energy Division Proposal on August 16, 2017.

On October 16, 2017, the assigned ALJ issued a proposed decision addressing rehearing of D.15-10-032.  The Commission received opening

---

[14]  TURN did not file opening or reply comments.

[15]  Concurrently with its comments, ARB moved for party status.  The assigned ALJ granted the motion on August 18, 2017.

Case: 19-30088   Doc# 11847-5   Filed: 01/21/22   Entered: 01/21/22 11:46:37   Page 10 of 59

comments from CMTA, ORA, PG&E, Sempra and ARB.  CMTA, Sempra and PG&E submitted reply comments.  Based upon comments received, the assigned ALJ revised the proposed decision and issued the proposed decision for a second 30-day comment period (Revision 1).

## 2.    Issues Before the Commission

D.16-04-013 determined that rehearing must consider the following issues:

1)    The specific law(s) authorizing disbursement of natural greenhouse gas GHG allowance proceeds to gas utility ratepayers;

2)    The classes of gas utility ratepayers that are authorized or required by said law(s) to receive natural gas greenhouse gas allowance proceeds; and

3)    The methodologies and procedures to be used by each gas utility subject to Cap-and-Trade regulations for calculating and disbursing natural gas GHG allowance proceeds to the appropriate retail ratepayers.

The Scoping Memo requested comment on the issues set forth below.  The issues broadly divide into two categories:  legal authority and methodology of return, including distribution of GHG revenues and inclusion of GHG compliance costs in rates.  Legal authority is addressed in Section 3, below.  In Section 4 this decision, discusses the methodology to disburse GHG allowance proceeds to residential natural gas retail ratepayers on a going forward basis.  Finally, in Section 5, this decision adopts a methodology for allocating GHG costs and distributing GHG allowance proceeds accrued from January 1, 2015 to June 20, 2018.  Issues in the scope of this proceeding addressing rehearing are:

1.    How should the Commission reconcile the following two provisions?

a.    17 CCR § 95893(d), which prohibits the return of GHG proceeds to natural gas ratepayers on a volumetric basis; and

Case: 19-30088    Doc# 11847-5    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 11 of 59

    b.   Pub. Util. Code § 453.5, which requires that refunds be returned to utility customers on an "equitable pro rata basis" defined as "in proportion to the amount originally paid for the utility service involved, or in proportion to the amount of such utility service actually received."

2.   What other specific laws and regulations (in addition to those stated above) must the Commission consider in distributing natural gas GHG proceeds to ratepayers?

3.   What classes of natural gas utility ratepayers are "retail ratepayers" eligible to benefit from GHG proceeds, and how should those customers be identified (e.g., by rate class)?

4.   If the Commission concludes that 17 CCR, § 95893(d) prohibits a volumetric return of GHG proceeds to natural gas ratepayers, how should the Commission determine the appropriate allocation of GHG proceeds for each eligible customer class and each individual customer within that class?

5.   D.15-10-032 directed that GHG costs would be included in rates commencing April 1, 2016, with 2015 costs to be amortized equally across 2016 and 2017. Given that GHG costs and proceeds are as of yet not included in rates:

    a.   When should GHG costs and allowance proceeds be included in rates on a going forward basis?

    b.   How should accruing GHG costs and proceeds be amortized? Are the informational scenarios included in the utilities' advice letter filings[16] the appropriate scenarios or should the Commission consider other scenarios?

    c.   What goals or issues should the Commission consider in amortizing GHG costs and proceeds?

---

[16] Contained in Advice Letters 5054 (SoCalGas), 2523-G (SDG&E), 3780-G (PG&E), and 1023 (Southwest Gas).

Case: 19-30088   Doc# 11847-5   Filed: 01/21/22   Entered: 01/21/22 11:46:37   Page 12 of 59

6.    Any other issue presented in the decision granting rehearing of D.15-10-032.

## 3.    Legal Authority Governing Disbursement of Natural Gas Greenhouse Gas Allowance Proceeds

### 3.1.    Pub. Util. Code § 453.5

At the heart of CMTA's application for rehearing is the applicability of Pub. Util. Code § 453.5.  In D.15-10-032, the Commission determined that "given the potential allowance proceeds available, it is reasonable to limit the natural gas California Climate Credit to residential customers. … by returning GHG allowance proceeds to residential customers, we reduce the potential adverse effects of Cap-and-Trade on low-income households."[17]  CMTA argues that the Commission erred in allocating GHG allowance proceeds only to residential customers, in violation of § 453.5.[18]

Pub. Util. Code § 453.5 states, in relevant part:

Whenever the commission orders rate refunds to be distributed, the commission shall require public utilities to pay refunds to all current utility customers…on an equitable pro rata basis without regard as to whether or not the customer is classifiable as a residential or commercial tenant, landlord, homeowner, business, industrial, educational, governmental, nonprofit, agricultural, or any other type of entity.

For the purposes of this section, "equitable pro rata basis" shall mean in proportion to the amount originally paid for the utility service involved, or in proportion to the amount of such utility service actually received.  (Emphasis added.)

---

[17]  D.15-10-032 at 37.

[18]  17 CCR 95893 *et seq.*

Case: 19-30088    Doc# 11847-5    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 13 of 59

CMTA, in its Application for Rehearing, states:

> The return of [California Climate Credit] proceeds to ratepayers is subject to the same process and legal requirements as the return of other ratepayer funds held by utilities for eventual return to their ratepayers.  Therefore, whether characterized by the Commission as a refund or "bill credit,"[19] the return of the allowance proceeds to ratepayers must comply with Pub. Util. Code § 453.5.[20]

Stated differently, CMTA argues that GHG allowance proceeds are "rate refunds" under § 453.5 and that case law interpreting § 453.5 requires the Commission to distribute such "refunds" to all natural gas customers "on an equitable pro rata basis."  Because the natural gas-related GHG revenues are not subject to the same limiting statute as electricity-related revenues (§ 748.5), CMTA contends, the revenues must be distributed not only to residential customers but also to commercial ratepayers.[21]

### 3.1.1. Conflict Between Pub. Util. Code § 453.5 and 17 CCR § 95893(d)

The threshold issue before the Commission is whether GHG revenues are "rate refunds" covered by the requirement of § 453.5.  If they are not "rate refunds," as we find here, the Commission need not reconcile any "conflict" between § 453.5 and 17 CCR § 95893(d), which requires non-volumetric distribution of proceeds from freely allocated Cap-and-Trade allowances.[22]  That

---

[19] D.15-10-032 Conclusion of Law (COL) 6.

[20] CMTA Application for Rehearing, November 23, 2015, at 2-3.

[21] *See California Mfrs. Assn. v. Public Utilities Com.* (1979) 24 Cal.3d 836, 847.  CMTA also cites to *Assembly v. Public Util. Com.* (1995) 12 Cal.4th87 [48 Cal. Rptr. 2d 54].

[22] The Commission acknowledges that in the case of a conflict between statute and regulation, statute governs.

is, the Commission must determine whether the return of allowance proceeds to ratepayers is subject to both the statute and the ARB regulation.  If this return is not a "rate refund" under § 453.5, any possible conflict between the statute and the regulation will be moot.

In the Scoping Memo, the assigned Commissioner asked parties for input on the interaction between § 453.5 and 17 CCR § 95893(d).  The requirement of § 453.5 to return refunds on an "equitable pro rata basis" may be in conflict with 17 CCR § 95893(d), which requires GHG allowance proceeds be returned on a non-volumetric basis (not in direct proportion to costs[23] incurred).  As such, most parties filed comments based on the possibility that the Commission might determine that GHG revenues are "rate refunds."  On that basis, parties offered proposals for the distribution of GHG allowance proceeds that comport with both § 453.5 and the ARB regulation.

ORA, however, in its reply comments to the Scoping Memo, questioned whether GHG proceeds are indeed refunds under § 453.5.  ORA states "GHG proceeds appear less like supplier refunds or utility overcharges and more like proceeds from the sale of sulfur dioxide emissions credits, which the Commission distributed notwithstanding Section 453.5."[24]  ORA cites Application (A.) 06-12-022 (Application of Southern California Edison Company Regarding the distribution of SO2 Allowance Sale Proceeds Related to the Suspended Operation of Mohave Generation Station), where the Commission

---

[23]  GHG costs are incurred based on usage of natural gas.  Thus, individual GHG costs are dependent entirely on the amount of natural gas used.

[24]  ORA March 10, 2017 Reply Comments in Response to Scoping Memo.

Case: 19-30088    Doc# 11847-5    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 15 of 59

determined that, through application of existing case law, § 453.5 did not govern.[25]  In other words, ORA asserts there is no conflict between § 453.5 and § 95893(d) because § 453.5 does not apply.  GHG allowance proceeds and sulfur dioxide (SO2) proceeds share many similarities in how they are monetized and distributed to ratepayers, as discussed later in this decision.

### 3.1.2.  Applicability of § 453.5 to GHG Allowance Proceeds

The seminal California Supreme Court cases interpreting § 453.5 are *California Manufacturers Association v. Public Utilities Commission*, 24 Cal.3d 836 (1979) (*California Mfrs. Assn.*) and *Assembly v. Public Utilities Commission*, 12 Cal.4th 87 (1995) (*Assembly*).  In *California Mfrs. Assn.*, the term "rate refund" was held to refer to "prior direct rebates received by utilities from their suppliers for past overcharges, and earmarked by commission-approved tariffs for 'refund' to customers."[26]  Thus, the term in that context referred to "overcharges" and "direct rebates from suppliers."

In *Assembly*, the court found that the Commission's action in earmarking a portion of an adjudicated overcharge for "school telecommunications infrastructure development and consumer education" also violated § 453.5.  The court's focus was not on whether the amount at issue was a "refund" but whether the Commission had discretion to allocate such a refund as it did.  The court noted that "official pronouncements of the legislative and executive branches of state government repeatedly and emphatically [had] stressed the

---

[25] *See* Administrative Law Judge's Ruling on Treatment of Proceeds from Sulfur Dioxide Allowance Sales by Southern California Edison Company, April 7, 2011 at 16-20.

[26] *California Mfrs. Assn*, 24 Cal.3d at 848.

Case: 19-30088    Doc# 11847-5    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 16 of 59

importance of furthering the development of an advanced telecommunications infrastructure in California and the vital nature of the role of our state's education system in this endeavor."[27] Nonetheless, the narrow issue at stake was "the legality, rather than the wisdom" of the Commission's decision.[28]

In the case of GHG allowance proceeds, as discussed in more detail below, however broadly one may construe *California Mfrs. Assn.* and *Assembly*, there are no "prior direct rebates received by utilities from their suppliers for past overcharges, and earmarked by commission-approved tariffs for 'refund' to customers" (*California Mfrs. Assn.*) and no use of funds previously paid by ratepayers for other societal purposes (*Assembly*).

Faced with the foregoing court decisions, the Commission later upheld a ruling in the above-discussed SO2 allowances case that found persuasive the argument that the SO2 allowance were not § 453.5 refunds:

> A rate refund under §453.5, as interpreted by the California Supreme Court in *California Manufacturers Association v. Public Utilities Commission*, 24 Cal.3d 836 (1979) and *Assembly v. Public Utilities Commission*, 12 Cal.4th 87 (1995), has three specific characteristics:
>
> 1. The funds to be refunded were previously collected in rates from ratepayers. In *California Mfrs. Assn.*, the California utilities had collected in rates on natural gas provided to their industrial customers based on the charges the utilities paid to their natural gas suppliers (24 Cal.3d at 839-40.) In *Assembly*, the telephone utility had collected in rates from retail telephone customers' monies that were used in part to fund research and development of cellular telephone technology. (12 Cal.4th at 91.)

---

[27] *Assembly*, 12 Cal.4th at 98.

[28] *Id.* at 98-99.

Case: 19-30088    Doc# 11847-5    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 17 of 59

2.  The funds were previously ordered to be refunded to customers by a regulatory agency.  In *California Mfrs. Assn*., the Commission had authorized the gas rates on the condition that, if the Federal Power Commission (FPC)[29] concluded that gas suppliers had overcharged the utilities, the overcharges would be refunded to utility customers.  The FPC did find that supplier rates were excessive and required that the gas suppliers rebate the excess charges to the utilities.  (24 Cal.3d 840).  In *Assembly*, the Commission determined that telephone company ratepayers were entitled to refunds for certain cellular technology research and development charges that the Federal Communications Commission (FCC) had earlier found ratepayers should not have funded.  (12 Cal.4th at 91-92).

3.  The refunds are to be made, to the extent practicable, to the customers who paid the excessive rates.  This is a statutory requirement.  In *California Mfrs. Assn*., the California Supreme Court held that the Commission's assignment of the gas overcharge rebates to balancing accounts for the affected utilities was not consistent with that requirement.  (24 Cal.3d at 848).  In *Assembly*, the California Supreme Court agreed with the Commission that it was impractical to try to make refunds to prior customers, but found that the Commission was required to refund the entire amount of principal and interest to current customers, rather than assigning part of the interest to another public purpose. (12 Cal.4th at 100-101).[30]

The legal ruling in A.06-12-022 found that the proceeds from the sale of

SO2 emissions allowances from the closure of the Mohave Generating Station

were not rate refunds pursuant to § 453.5:

---

[29] This is the predecessor agency to the present Federal Energy Regulatory Commission.

[30] Ruling of Administrative Law Judge Anne E. Simon on Treatment of Proceeds from Sulfur Dioxide Allowance Sales by Southern California Edison Company, filed April 7, 2011 in A.06-12-022, at 17-18 (Legal Ruling), affirmed by the Commission in D.13-02-004, *mimeo*. at 13, 27.

None of these three central characteristics is present in the sales of the Mohave SO2 allowances.

1. Ratepayers did not previously pay excessive rates for the allowances, because nobody paid for the allowances at all. Under the federal Clean Air Act, SO2 allowances are distributed to power plant owners without charge.

2. Neither this Commission nor any other regulatory body has previously made an order about the disposition of the SO2 allowance proceeds; indeed, it is in this proceeding that such an order is supposed to be made.

3. Refunds cannot be made to customers who paid the excessive rates, because there were no charges in rates for the SO2 allowances.[31]

As in the case of SO2 allowance proceeds in A.06-12-022, none of the three central characteristics discussed above is present with regards to GHG allowance proceeds. In both *California Mfrs. Assn.* and *Assembly*, ratepayers had borne costs later ordered refunded. Here, natural gas utility ratepayers did not previously pay excessive rates for GHG allowances because no ratepayer paid for the allowances at all.

Under the Cap-and-Trade regulations, GHG allowances are freely and directly allocated to each natural gas utility.[32] These directly allocated allowances are not paid for by the natural gas utilities or their ratepayers. Thus, the GHG proceeds are distinguishable from funds collected in rates. GHG allowance proceeds are generated when the utility consigns its directly allocated allowances to auction as required by the Cap-and-Trade regulation. The natural

---

[31] *Id.* at 18.

[32] Sections 95870(f), 95890(f), and 95893 of 17 CCR provide rules related to the direct allocation of allowances to natural gas utilities.

Case: 19-30088    Doc# 11847-5    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 19 of 59

gas utilities are required to sell a portion of their directly allocated allowances in an amount that increases by five percent each year.[33] The amount of proceeds is determined by the market clearing price for allowances sold at a particular auction.

The amount of allowance proceeds to be distributed to ratepayers is determined separately from any GHG compliance costs that utility customers pay in rates. As described earlier, utilities participate in the Cap-and-Trade program and must purchase allowances to cover their pollution compliance obligation, as required by ARB. The cost of purchasing allowances for compliance is passed through to ratepayers, but the costs are completely separate from the proceeds of selling directly allocated free allowances. That is to say, there is no direct relationship between GHG costs collected from an individual customer for their natural gas usage and the allowance proceeds available for disbursement to that customer.

Therefore, the funds discussed in *California Mfrs. Assn.* and *Assembly* look nothing like the GHG proceeds at issue here. In *California Mfrs. Assn.*, the refunds to ratepayers arose from natural gas supplier rate increases to the utilities that were later determined to be "excessive," requiring rebates to the utilities that would then be "refunded" to the ratepayers.[34] Natural gas costs had increased and PG&E and SoCalGas requested rate increases with the Commission to offset the anticipated increase in costs during the ensuing year.[35]

---

[33] Table 9-4, Section 95893 of 17 CCR.

[34] *California Manufacturers Association v. Public Utilities Commission*, 24 Cal.3d at 840.

[35] *Id.*

Case: 19-30088    Doc# 11847-5    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 20 of 59

The Commission approved tariffs to pass through to ratepayers the increased costs provided that any amounts reimbursed to the utilities would be refunded to utility customers.[36]  The court in *California Mfrs. Assn.* looked to the legislative history and language of § 453.5 in determining that the term "rate refunds" pertains to "specific amounts held by utilities as rebates from their suppliers and earmarked for customer 'refunds' by prior commission orders and utility tariffs."[37]

In *Assembly*, the FCC in 1982 had ordered AT&T to reimburse all of the Bell Operating Companies or "Baby Bells" (including Pacific Bell) for certain cellular research and development expenses, explicitly directing that all expenses incurred prior to June 30, 1982, "must be reimbursed to ratepayers" who had absorbed these costs through the rates they had been charged.[38]  Pacific Bell (one of the Baby Bells) received its funds from AT&T, but rather than passing them to ratepayers, the company "pocketed" the refund.  This Commission later ordered Pacific Bell to refund the monies to customers.[39]

The two court cases are distinguishable from the facts at issue in this proceeding and demonstrate that GHG allowance revenues are not rate refunds under § 453.5.  Unlike the rates in *California Mfrs. Assn.* and *Assembly*, in the case of GHG allowance proceeds, ratepayers are not receiving refunds for expenses that they have already incurred or overcharges for which they were billed.

---

[36] *Id.*

[37] *Id.* at 845.

[38] *Assembly v. Public Utilities Commission*, 12 Cal.4th 87 (1995).

[39] *Id.*

Case: 19-30088   Doc# 11847-5   Filed: 01/21/22   Entered: 01/21/22 11:46:37   Page 21 of 59

Ratepayers have not directly paid at all for freely allocated GHG allowances. Rather, ratepayers are receiving part of the proceeds from the sale of directly and freely allocated GHG emission credits (allowances), which are not factored into rates.

Only the compliance instruments paid for by the utility, that is allowances that are purchased by the utility for the amount of carbon dioxide equivalent emitted by that utility, are reflected in GHG costs that are put into rates. By contrast, freely allocated allowances have no cost; therefore, the proceeds generated from their sale are not rate refunds under *California Mfrs. Assn*.

Further, unlike the funds discussed in *California Mfrs. Assn.* and *Assembly,* there is a specific regulation, 17 CCR § 95893 *et seq.,* that expressly gives the Commission the authority to impose limitations on the distribution of GHG allowance proceeds so long as that distribution is consistent with ARB requirements. The express intent of AB 32, the statute that gave rise to the regulation, is to reduce GHG emissions. Returning proceeds to ratepayers volumetrically, as CMTA contends would be required under § 453.5, would undermine the goal of AB 32, contravene established Commission policy regarding preservation of the carbon price signal, violate 17 CCR § 95893(d), and result in an overall contradictory situation where customers receive conflicting incentives regarding natural gas usage. (This is discussed more fully in Section 3.2)

Furthermore, no agency has ordered a "rate refund," as was the case in *California Mfrs. Assn.* Here, although ARB requires that allowances be monetized

Case: 19-30088    Doc# 11847-5    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 22 of 59

and proceeds "used exclusively for the benefit of retail ratepayers,"[40] and ARB requires that allowances be sold at auction, ARB is not ordering a refund of previously collected funds. Allowance proceeds do not represent an over-collection of previously collected rates warranting a refund.

As stated earlier, ARB expressly delegates authority to the Commission to impose limitations and additional requirements on proceeds obtained from the monetization of GHG allowances.[41] The instant proceeding represents the first time that the Commission has imposed such limitations and requirements on natural gas GHG allowance proceeds. The requirements adopted in the instant proceeding represent the implementation of the ARB regulation inclusive of the authority delegated to the Commission. To view the Commission's actions as separate from the initial ARB order, as argued by CMTA in comments to the October 16, 2017 Proposed Decision, ignores that it is the order to distribute allowance proceeds (which are not refunds of previously collected rates) *subject to* limitations and restrictions imposed by the Commission, that results in full implementation. The ARB regulation combined with the policies and procedures adopted in this decision represent the first order to distribute GHG allowance proceeds.

Refunds cannot be made to customers who paid "excessive rates" because there were no charges in rates for the freely allocated GHG allowances that are consigned to auction resulting in GHG proceeds. As stated above, allowances were distributed freely to the natural gas utilities under the structure of the ARB

---

[40] § 95893(d)(3).

[41] § 95893(d)(2).

Case: 19-30088    Doc# 11847-5    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 23 of 59

regulations promulgating AB 32. No retail ratepayer of a natural gas utility paid any rate (excessive or otherwise) for freely allocated allowances; therefore, no refund is warranted.

While the court in *Assembly* held that the term "rate refund," used in § 453.5, "did not exclude from the operation of section 453.5 other types of refund monies that constitute rate refunds," this does not mean that all proceeds from any source fall within the scope of § 453.5, as described above. The Commission acknowledges the holding in *California Mfrs. Assn.* that "acceptance of the premise that section 453.5 applies only when the commission chooses to call its actions 'refunds' would permit the commission, by a simple *ipse dixit,* to avoid the statute in every case."[42]

That is not what the Commission has done here; rather, it has compared the allowance proceeds at issue here with proceeds that have been found in case law to be "refunds," relied on its prior treatment of SO2 allowances, and come to the conclusion based on those comparisons that the allowance proceeds here do not fall under § 453.5. As discussed below, the emissions allowances are akin to SO2 allowances, and look nothing like the refunds at issue in *Assembly* or *California Mfrs. Assn.* Finally, to the extent that the Commission has referred to GHG allowance proceeds as "refunds" or discussed "refunding GHG allowance proceeds" in other contexts (*see*, e.g. D.12-12-033), that language was vernacular in its intent and was not denoting the very specific definition, as determined by the courts, under §453.5.

---

[42] *California Mfrs. Assn.*, 24 Cal.3d at 847.

Case: 19-30088   Doc# 11847-5   Filed: 01/21/22   Entered: 01/21/22 11:46:37   Page 24 of 59

### 3.1.3. SO2 Case Analogy

The proceeds at issue closely resemble the SO2 proceeds at issue in A.06-12-022. In both cases, free emissions allowances are being analyzed to determine whether § 453.5 applies. In both cases, statutory compliance requires the distribution of instruments to mitigate environmental damage. In both cases, there is no prior overcharge being refunded, but instead a newly created program requires action. The very notion of a "refund" simply is inapposite in this context. A "refund" connotes paying something back, while distribution of allowance proceeds involves distributing new funds in the first instance.

In its comments on the Proposed Decision, CMTA suggests that an irrelevant distinction between the case at issue and SO2 allowances in A.06-12-022 dictates a different outcome:

> For example, the ALJ Ruling [in A.06-12-022] determined that the sulfur dioxide allowance proceeds were not rate refunds subject to PUC § 453.5 because the allowances were "available for sale precisely because of the shutdown of Mohave renders the allowances unnecessary to serve utility customers." However, in the instant case, the GHG allowances provided to the utilities by the ARB are precisely to serve utility customers. Further, the ALJ Ruling distinguished prior Commission cases dealing with emissions allowances on the grounds that "the emissions allowances discussed in those cases were used for ongoing operations of utility-owned generation facilities, not surplus allowances still being allocated by the federal [Environmental Protection Agency] to a facility that the utility has shut down." In the instant case, the GHG allowances proceeds are being provided by the ARB to the utilities to mitigate the upward pressure on customer bills resulting from the

Case: 19-30088    Doc# 11847-5    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 25 of 59

inclusion of GHG compliance costs, associated with the ongoing operations of utility owned generation facilities, in rates.[43]

However, as noted above, the ALJ based the ruling on the following findings:

1. Ratepayers did not previously pay excessive rates for the allowances, because nobody paid for the allowances at all.  Under the federal Clean Air Act, SO2 allowances are distributed to power plant owners without charge.

2. Neither this Commission nor any other regulatory body has previously made an order about the disposition of the SO2 allowance proceeds; indeed, it is in this proceeding that such an order is supposed to be made.

3. Refunds cannot be made to customers who paid the excessive rates, because there were no charges in rates for the SO2 allowances.[44]

Whatever CMTA may believe about the usefulness of these factors to a § 453.5 analysis, they apply equally to the GHG allowances here as to the SO2 allowances at issue in A.06-12-022.  The portions of the Legal Ruling that CMTA quotes relate to a "secondary argument" a party made that the judge found inapposite.  However, the judge did not, in rejecting the cases the party cited, recant the foregoing three findings.[45]

### 3.1.4.  Conclusion

The Commission concludes, consistent with the interpretation of the California Supreme Court, that § 453.5 does not apply to the distribution of GHG

---

[43]  Opening Comments of [CMTA] on the Proposed Decision of ALJ Semcer, filed November 6, 2017, at 11 (citations omitted).

[44]  Legal Ruling in A.06-12-022, at 18.

[45]  *Id.*

Case: 19-30088   Doc# 11847-5   Filed: 01/21/22   Entered: 01/21/22 11:46:37   Page 26 of 59

allowance proceeds to the retail ratepayers of natural gas utilities. GHG allowance proceeds are not rate refunds under the code section. Therefore, the Commission is bound only by the ARB regulation in determining the appropriate distribution of GHG allowance proceeds. There are no other express restrictions in the Public Utilities Code on the Commission's authority to determine how to distribute GHG allowance proceeds. Because § 453.5 does not apply, the Commission need not resolve any conflict between § 453.5 and 17 CCR § 95893(d); the regulation governs.

### 3.2. 17 CCR 95893(d)(3): Method of Return

As stated above, because § 453.5 is inapplicable to the distribution of GHG allowance proceeds, and therefore there is no conflict between direction given in the Public Utilities Code and that contained in the ARB regulation, the adopted allocation methodology must comport with the ARB regulation. In 17 CCR 95893(d)(3), ARB requires that "any revenue returned to ratepayers must be done on a non-volumetric basis."

In comments to the Scoping Memo, parties provided diverse proposals on how to distribute the GHG proceeds to natural gas customers. CMTA, PG&E, and CSU, all of whom argue that § 453.5 applies, propose that allowance proceeds be distributed in proportion to GHG costs incurred, a volumetric return, but that the amount of proceeds for distribution be collected over time and returned on some time interval, such as semi-annually. Stated differently, even though the amount of GHG proceeds available will not directly equal the amount of GHG costs incurred, since freely allocated allowances sold at auction do not equate to allowances purchased to meet a utility's compliance obligation, CMTA, PG&E and CSU propose that proceeds be distributed to offset compliance costs incurred.

Case: 19-30088   Doc# 11847-5   Filed: 01/21/22   Entered: 01/21/22 11:46:37   Page 27 of 59

The Commission finds that any allocation of GHG allowance proceeds that relies directly upon the GHG costs borne by each individual customer and returns proceeds in direct relationship to those costs would violate the prohibition of volumetric distributions under § 95893(d)(3).  The violation occurs even if proceeds are distributed at a different time than costs were incurred or are aggregated, e.g. if proceeds are returned semi-annually.  Section 95893(d)(3) is explicit on this issue:  "Any revenue returned to ratepayers must be done in a *non-volumetric* manner."  (Emphasis added.)

Not only does volumetric distribution violate § 95893(d)(3), it also contravenes the legislative directive in AB 32 to ameliorate GHG emissions.  *See, e.g.,* Cal. Health & Safety Code § 38560 ("The state board shall adopt rules and regulations in an open public process to achieve the *maximum technologically feasible and cost-effective greenhouse gas emission reductions* from sources or categories of sources, subject to the criteria and schedules set forth in this part." (Emphasis added.)

The legislative history and genesis of AB 32 demonstrate that distributing revenues volumetrically is counter to the intent and goals of that statute.  The California Legislature passed AB 32 in response to the "serious threat" global warming poses to the "economic well-being, public health, natural resources, and the environment of California."[46]  To combat these issues, the legislature tasked ARB with developing and implementing regulations to adopt limits and reduce GHG emissions to 1990 levels by 2020.[47]

---

[46]  Stats. of 2006, ch. 488 (codified at Cal Health & Safety Code § 38501(a)).

[47]  Cal Health & Safety Code § 38550.

Case: 19-30088    Doc# 11847-5    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page
28 of 59

In this directive, the Legislature outlines nine policy goals that the ARB must consider when designing the regulations.[48]  These goals include minimizing costs and maximizing benefits to California; encouraging and crediting early voluntary action to reduce GHG emissions; considering the overall societal benefits for the economy, environment, and public health; and ensuring that low-income communities are not disproportionally impacted.[49]  The plain language of the mandated directive and the legislative history indicate that the Legislature intended for the ARB to consider these goals in crafting and implementing policy and regulations, such as the distribution of GHG allowance revenues.

Distributing revenues volumetrically contravenes the policy objectives of AB 32 because it has the effect of encouraging consumption by rewarding inefficient consumers of natural gas.  This is problematic because it will have negative exponential impacts on disadvantaged communities, cause environmental degradation, and raise public health costs because of the increase (or lack of reduction) in GHG emissions and the associated respiratory health impacts from pollution.  The Commission, in avoiding a volumetric distribution wherever possible to electric customers similarly found that "to create a GHG price signal only to offset it through the [volumetric] allocation of allowances would short-circuit the basic economic functioning of this process by preventing

---

[48]  Cal Health & Safety Code § 38562(b).

[49]  Cal Health & Safety Code § 38562(b).

Case: 19-30088    Doc# 11847-5    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 29 of 59

producers, and ultimately consumers, from seeing that price signal. This would negate the point of the Cap-and-Trade policy.[50]

Thus, the Commission is not free to distribute GHG revenues to natural gas ratepayers on a volumetric, or usage, basis nor would it choose to do so, except where necessary, from a policy standpoint. To the extent the Commission has returned GHG allowance proceeds on a volumetric basis previously (*see*, e.g., return of GHG allowance proceeds to small business electric customers,) it has done so as a last resort and as a temporary means of transition assistance towards inclusion of a carbon price signal in rates.[51]

### 3.3. Authority to Return GHG Allowance Proceeds Solely to Residential Customers

In D.15-10-032, the Commission elected to return GHG allowance revenue only to residential natural gas ratepayers stating "[g]iven the potential allowance proceeds available, it is reasonable to limit the natural gas California Credit to residential customers."[52] Relying on the governing authority in 17 CCR § 95893, in D.16-04-013, the Commission found that D.15-10-032 lacked sufficient legal basis to allocate GHG allowance proceeds solely to residential customers.

As described above, § 453.5 does not apply to the distribution of GHG allowance proceeds because there is no "rate refund." Therefore, the sole governing authority is 17 CCR § 95893 *et seq*. The fundamental question that

---

[50] D.12-12-033 at 63.

[51] *See* D.12-12-033 at 104-107 and D.13-12-002. Note also that the volumetric prohibition does not apply to the allocation of GHG proceeds to electric customers.

[52] D.15-10-032 at 37.

Case: 19-30088   Doc# 11847-5   Filed: 01/21/22   Entered: 01/21/22 11:46:37   Page 30 of 59

must be answered is whether 17 CCR § 95893(a) affords the Commission the legal authority to return allowance proceeds solely to residential ratepayers. Chapter 17 CCR § 95893(a) states:

> Any allowances allocated to natural gas suppliers must be used exclusively for the benefit of retail ratepayers of each such natural gas supplier, consistent with the goals of AB 32, and may not be used for the benefit of entities or persons other than such ratepayers.[53]

When previously allocating allowance proceeds to electric utility ratepayers, the Commission limited distribution to residential, small business and industries requiring Industry Assistance.[54]  There, unlike in the case of natural gas ratepayers, the Commission was governed by Pub. Util. Code § 748.5, which required distribution of GHG allowance proceeds to those specific customer groups.  The Commission, in construing § 748.5, determined it to be limiting, meaning the Commission was prohibited from distributing GHG allowance proceeds to any customer classes not explicitly named in the statute.[55]  Absent an equivalent statute for natural gas, the Commission, in D.15-10-032, had to determine which groups of ratepayers should receive GHG allowance proceeds.

In D.12-12-033, the Commission stated a clear policy position that, aside from those industries requiring Industry Assistance, it was most appropriate to return most GHG allowance proceeds to residential ratepayers while preserving

---

[53]  D.16-04-013 at 4.

[54]  *See* D.12-12-033 at 17 for a discussion on the definition of Industry Assistance and characteristics of Emissions-Intensive and Trade-Exposed industries.

[55]  *Id.* at 72.

Case: 19-30088    Doc# 11847-5    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 31 of 59

the carbon price signal.[56]  The Commission stated "we believe that preservation of the carbon price signal is a high priority objective."[57]  In Finding of Fact 30, the Commission further found that "[i]n most cases, increased costs of electricity production as a result of the Cap-and-Trade program will ultimately be passed through to the end user of electricity – the retail electricity ratepayer– resulting in higher retail electricity rates."  The Commission, in discussion of the distribution of allowance proceeds to small business customers, also stated:[58]

> Though we are directed to return allowance revenue to small businesses, we do not believe the presence of carbon pricing in electricity rates for small businesses will necessarily result in emissions or economic leakage, excluding those businesses that operate in industries eligible for Industry Assistance.  The presence of a carbon price in electricity rates, and the reflection of that cost in the price of goods and services, provides a critical incentive to shift toward economic activities that result in fewer GHG emissions.  It is our intent that small businesses should see a carbon price signal in their electricity rates.

The Commission adopted a small business distribution methodology for electric customers whereby small businesses received allowance proceeds volumetrically (citing a desire to mirror as closely as possible the transition

---

[56]  D.12-12-033 at 59 states: "… [i]n considering various ways of using the allowance revenues, we stray from this fundamental objective only in extenuating circumstances where preserving the carbon price signal is impractical or otherwise infeasible.  D.12-12-033 at 69 states:  "To create a GHG price signal only to offset it through the allocation of allowances would short-circuit the basic economic functioning of this process by preventing producers, and ultimately consumers, from seeing that price signal.  This would negate the point of the Cap-and-Trade policy."

[57]  *Id*. at 59.

[58]  *Id*. at 105.

Case: 19-30088   Doc# 11847-5   Filed: 01/21/22   Entered: 01/21/22 11:46:37   Page 32 of 59

assistance provided to entities receiving Industry Assistance) on a declining trajectory over time.[59]

Although not explicitly stated in D.15-10-032, the Commission, by returning GHG allowance proceeds solely to residential customers, upheld its previously stated finding in D.12-12-033 that Cap-and-Trade costs will ultimately be passed through to the end user of, in this case, natural gas, resulting in higher natural gas rates.  The allocation methodology also conformed to the Commission's rationale in regards to electric customers, which equally applies to natural gas customers, that providing electric allowance proceeds to residential customers "is more equitable and comports with the idea of common ownership of the atmosphere given that residential ratepayers will ultimately bear the increased costs as a result of the Cap-and-Trade program."[60]

In the October 16, 2017 Proposed Decision, the assigned ALJ states:

> ... while the Commission has a strong policy rationale to return natural gas GHG allowance proceeds solely to residential customers, it is unclear whether the Commission has the legal authority to support such an allocation.  Section 95893(a) requires that GHG allowance proceeds be used 'exclusively for the benefit of retail ratepayers of each such natural gas supplier.'  Section 95893(d)(2), however, states that "proceeds obtained from the monetization of allowances directly allocated to public utility gas corporations shall be subject to any limitations imposed by the California Public Utilities Commission...."  It is not readily apparent whether § 95893(d)(2) provides the Commission sufficient legal authority to allocate allowance proceeds to a subset of retail ratepayers absent a qualifier to that effect in § 95893(a), even if to do so could

---

[59]  *Id.* at 105-106.

[60]  D.12-12-033, at 69.

Case: 19-30088    Doc# 11847-5    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page
33 of 59

presumably be to the benefit of all retail ratepayers by freeing up monetary resources of those who will ultimately be unable to pass on costs associated with the Cap-and-Trade program.[61]

When asked in the Scoping Memo which classes of natural gas utility ratepayers are "retail ratepayers" eligible to benefit from GHG allowance proceeds, parties universally agreed that eligible ratepayers are those who are required to pay for natural gas GHG compliance costs pursuant to Ordering Paragraph 11 of D.15-10-032, that is all core and non-core customers, excluding exempt customers.[62] What is unclear is whether eligibility to receive allowance proceeds under § 95893(a) equates to a requirement to receive GHG allowance proceeds. As such, in the October 16, 2017 Proposed Decision, the ALJ set forth a conservative approach whereby the Commission would return GHG allowance proceeds to all eligible natural gas ratepayers and solicited clarification on the extent of the Commission's authority under § 95893.

In comments on the October 16, 2017 Proposed Decision, ARB, in interpreting its own regulation, requested that the Commission "revert to its initial decision to distribute allowance proceeds to residential customers alone as set forth in D.15-10-032."[63] ARB states:

---

[61] D.12-12-033 at 109 states "the revenue returned to households will largely, if not entirely, flow back into the economy, helping to mitigate the overall impacts of the program on demand for the goods and services those businesses provide."

[62] In D.15-10-032 beginning at page 27, the Commission defined eligible customers to be those that are not deemed to be covered entities by ARB (end-use customers who emit 25,000 metric tons of carbon-dioxide equivalent or more per year and are directly regulated by ARB for their GHG compliance obligation).

[63] ARB Opening Comments on October 16, 2017 Proposed Decision, November 6, 2017, at 5.

Case: 19-30088    Doc# 11847-5    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 34 of 59

The [October 16, 2017] Proposed Decision broaches the question of whether section 95893(a) of the [ARB] regulation requires that allowance proceeds benefit *all* ratepayers. CARB asserts that it does not. [§ 95893(a)] merely requires that allowance proceeds benefit retail ratepayers (as opposed to non-ratepayers), not that all retail ratepayers must benefit from the allowance proceeds. Indeed, under section 95893(d)(2) of the [ARB] regulation, the Commission may impose limitations on natural gas utilities' use of allowance proceeds. Section 95893(d)(2) provides the Commission with sufficient latitude to distribute allowance proceeds to residential ratepayers alone, and Section 95893(a) does not prohibit the Commission from doing so.

ARB continues:

Given the direction in the [ARB] regulation and the [October 16, 2017] Proposed Decision's conclusion that § 453.5 does not govern the distribution of allowance proceeds, the Commission has discretion to return all proceeds to residential ratepayers as it initially determined in D.15-10-032. Doing so would provide residential customers, and low-income customers in particular, with mitigation for increases in the costs of goods and services due to increasing natural gas prices, a guiding principle in the [October 16, 2017] Proposed Decision and D.15-10-032, which is not yet reflected in the [October 16, 2017] Proposed Decision's methodology to distribute allowance proceeds.

Recognizing the authority of ARB to interpret its own regulation[64] and consistent with the stated policy direction of this Commission, as described

---

[64] *See Bay Area Citizens v. Association of Bay Area Governments* (2016) 248 Cal. App. 4th 966, 1003 (Air Board contemporaneous interpretation of greenhouse gas regulation entitled to deference); *Exxon Mobil Corp. v. Office of Environmental Health Hazard Assessment* (2009) 169 Cal. App. 4th 1264, 1276-77, *mod on other grounds* 2009 Cal. App. LEXIS 108 ("As a general matter, courts 'will be deferential to government agency interpretations of their own regulations, particularly when the interpretation involves matters within the agency's expertise and does not plainly conflict with a statutory mandate. …[W]e will not disturb the agency's determination without a demonstration that it is clearly unreasonable.'")

Case: 19-30088   Doc# 11847-5   Filed: 01/21/22   Entered: 01/21/22 11:46:37   Page 35 of 59

above and in D.12-12-033, the Commission upholds its determination in D.15-10-032 to return GHG allowance proceeds solely to the residential customers of the natural gas utilities. Given that § 453.5 is inapplicable to the distribution of GHG allowance proceeds and § 95893 gives the Commission the express authority to place limitations and requirements on the distribution of allowance proceeds, the Commission elects to return all GHG allowance proceeds solely to the residential retail ratepayers of the natural gas utilities. This distribution comports with the guiding principles of AB 32 while recognizing that residential customers will see the vast majority of cost increases in the price of goods and services as a result of increasing natural gas prices and therefore should be provided protection as directed under § 95893.

The Scoping Memo requested input from parties on how to identify non-residential ratepayers and methods to distribute GHG allowance proceeds to non-residential customers. In addition, the Commission's Energy Division released a staff proposal, known as the Rank Allocation Methodology, as an alternate method of distributing allowance proceeds to all eligible retail customers. However, given the Commission's direction under § 95893, this decision will not include an analysis of the various proposals, including the Rank Allocation Methodology.

The Commission also rejects at this time ARB's suggestion that, if the Commission were to forego a distribution solely to residential ratepayers, the Commission should allocate proceeds to emissions-intensive and trade-exposed entities (EITE, designated as eligible for Industry Assistance under the ARB regulation) in addition to residential ratepayers. First, in D.15-10-032, the Commission limited the distribution of GHG allowance proceeds to those customers that are not listed as Covered Entities under the Cap-and-Trade

Case: 19-30088   Doc# 11847-5   Filed: 01/21/22   Entered: 01/21/22 11:46:37   Page
36 of 59

regulation, that is customers with emissions less than 25,000 metric tonnes of $CO_2$ equivalent. That finding was not the subject of rehearing;[65] thus developing a methodology to distribute allowance proceeds to EITE customers subject to that limitation would result in disparate treatment of similarly situated entities based solely upon annual emissions rates. Second, the Commission lacks sufficient record in this proceeding to develop an appropriate EITE-specific methodology, and to take the time to do so would create undue additional instability within a nascent program that has already been significantly delayed. The Commission may elect to revisit this issue in a subsequent Order Instituting Rulemaking (OIR) for years beyond 2020.

The Commission intends that its adopted allocation methodology will remain in effect unless or until the Commission updates or adopts new policies for the period beyond December 31, 2020 or new Cap-and-Trade regulations adopted for the period beyond December 31, 2020 conflict with the direction adopted in this decision.

## 4. Adopted Methodology to Return GHG Proceeds to Residential Customers

This decision interprets § 95893 to allow distribution of GHG allowance proceeds to residential customers. Residential customers will receive a bill credit, known as the California Climate Credit, in an equal, non-volumetric

---

[65] The Scoping Memo in this proceeding listed as Issue 3, "What classes of natural gas utility ratepayers are "retail ratepayers" eligible to benefit from GHG proceeds, and how should those customers be identified (e.g., by rate class)?" This item was meant to elicit comment on which classes, beyond the residential class, are eligible to receive GHG allowance proceeds. It was not intended to relitigate findings in D.15-10-032 regarding eligibility regarding annual emissions rates.

Case: 19-30088 Doc# 11847-5 Filed: 01/21/22 Entered: 01/21/22 11:46:37 Page 37 of 59

manner, annually in April. The method of distribution to residential customers was not the subject of rehearing granted in D.16-04-013; rather, it was the legal rationale to support a distribution to residential customers that was under consideration

Natural gas utilities are required to distribute GHG allowance proceeds to residential customers pursuant to the rules adopted in D.15-10-032. As discussed in subsequent sections, the Commission will net GHG compliance costs and proceeds for 2015-2017. The first residential California Climate Credit will be for the year 2018.

## 5. GHG Compliance Costs and Proceeds Accrued to Date

The decision granting rehearing vacated the orders in D.15-10-032 that required the utilities to begin introducing GHG compliance costs into rates.[66] Therefore, to date, no GHG compliance costs have been included in the rates of natural gas ratepayers. In addition, while the Commission addressed rehearing, GHG proceeds have also been withheld from distribution to natural gas ratepayers. Thus, as of issuance of this decision, natural gas ratepayers are facing more than three years of accrued compliance costs and proceeds.

In D.15-10-032, the Commission directed that GHG compliance costs be included in rates commencing April 1, 2016, with 2015 costs to be amortized equally across 2016 and 2017.[67] In comments to the Scoping Memo, parties provided feedback on how and when GHG compliance costs and allowance

---

[66] D.16-04-013, Ordering Paragraph 4.

[67] D.15-10-032 at 20.

Case: 19-30088    Doc# 11847-5    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 38 of 59

proceeds accrued to date should be included in rates.  The inclusion of GHG compliance costs in rates and distribution of GHG allowance proceeds on a going forward basis upon adoption of this decision is addressed in the next section.

PG&E, ORA, and Sempra, in comments on the Scoping Memo, suggest that amortizing 2015 and 2016 compliance costs into natural gas rates in the near future would result in a significant increase in natural gas rates.  Indeed, as ORA notes in its comments, utility analyses of two different amortization scenarios contained in their Fall 2016 advice letters show that amortization of 2015 and 2016 compliance costs could result in rate increases ranging from 35 to 85 percent.[68]  To mitigate against rate spikes, PG&E, Southwest Gas, and Sempra recommend netting accrued GHG compliance costs for the years 2015 and 2016, against GHG proceeds (less administrative and outreach costs, as directed in D.15-10-032) for the same years.  ORA recommends the same approach, but includes 2017 compliance costs and proceeds.[69]  If the net amount is positive, remaining GHG proceeds would be added onto proceeds distributed in the current year to eligible customer classes and individual customers (excluding exempt customers).  If the amount is negative, remaining GHG compliance costs would be added to forecast compliance instrument costs.  No party disagreed with this approach.

---

[68] In their Fall 2016 advice letters, the utilities were required to analyze two different amortization scenarios.  In the first, both 2015 and 2016 costs would be amortized equally across 2017 and 2018.  In the second, 2015 costs would be amortized equally across 2017 and 2018, and 2016 costs would be amortized equally across 2019 and 2020.  The advice letters did not contemplate 2017 GHG costs.

[69] PG&E and Sempra, in comments on the October 16, 2017 Proposed Decision, also support the inclusion of 2017 costs and proceeds.

Case: 19-30088   Doc# 11847-5   Filed: 01/21/22   Entered: 01/21/22 11:46:37   Page 39 of 59

The netting approach proposed by parties is reasonable and is adopted here. Given the issuance date of this decision and the time the utilities will need to implement the provisions of this decision, it is reasonable to include 2017 in this netting approach. Given also that the current Cap-and-Trade compliance period ends in 2020, utility ratepayers are facing three years of accrued GHG compliance costs that could only be amortized across the remaining three years, resulting in significant rate spikes.

While it is the goal and intent of AB 32 and Commission policy to send a clear carbon price signal to ratepayers, amortization of three years of accrued GHG compliance costs over such a short timeframe would overinflate the impact of GHG and send a distorted price signal. Similarly, inclusion of three years of GHG proceeds would overstate the benefit of that tool. It is a missed opportunity to include the carbon price signal in rates; however, the Commission agrees with parties that the prudent approach for addressing accrued GHG compliance costs and GHG proceeds for the years 2015, 2016 and 2017 is to net GHG compliance costs for those three years against GHG proceeds and distribute the net positive or negative amount to eligible natural gas ratepayers.

To implement this approach, the utilities are required to calculate the total actual GHG End User and Lost and Unaccounted For gas (LUAF) costs for 2015, 2016 and 2017, including interest, and net those costs against the available GHG proceeds for 2015, 2016, and 2017, including interest. Available GHG proceeds are those remaining after accounting for administrative costs recorded in the utilities' Greenhouse Gas Memorandum Accounts (GHGMA). In the event that GHG compliance costs exceed proceeds, net costs must be amortized in rates over a 12-month period beginning when 2018 greenhouse gas compliance costs first appear in rates. Net GHG compliance costs, should they exist, must be

Case: 19-30088   Doc# 11847-5   Filed: 01/21/22   Entered: 01/21/22 11:46:37   Page
40 of 59

included in base transportation rates as directed in D.15-10-032 (*see* page 41). If GHG proceeds exceed GHG compliance costs, remaining proceeds shall be included in the 2018 California Climate Credit.

## 6.    GHG Costs and Proceeds on a Going Forward Basis

Southwest Gas and Sempra requested that GHG costs and proceeds on a going forward basis begin to be included in rates as of October 2017. Given the issuance date of this decision, an October 2017 date is not feasible. Furthermore, the Commission has elected to net all 2017 GHG compliance costs and proceeds as set forth in the previous section. Therefore, GHG compliance costs should begin to be included in rates beginning July 1, 2018.[70] GHG proceeds for the year 2018 should be distributed according to the methodology and timeline adopted herein and using the procedures adopted in D.15-10-032. Inclusion of GHG compliance costs in rates beginning in July of 2018 will require the natural gas utilities to amortize 2018 costs. The amortization must occur over eighteen months.

## 7.    Implementation of the Residential Climate Credit

The Commission directs that each utility delivers its residential California Climate Credit pursuant to the timing adopted in D.15-10-032, that is annually in

---

[70] In the event that disposition of the Tier 2 Advice Letter filings set forth in Section 7 necessitates a delay of inclusion of GHG costs in rates, GHG costs shall be included in rates beginning the month after final disposition of the advice letters. 2018 GHG costs will be amortized over eighteen months.

Case: 19-30088    Doc# 11847-5    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 41 of 59

April of each year. Given the date of issuance of this decision, for 2018 only, the residential Climate Credit shall be distributed in October of 2018.[71]

### 7.1. Tier 2 Advice Letter Filing

The Commission will require a Tier 2 advice letter filing from the utilities in order to fully implement the residential California Climate Credit as well as to implement the inclusion of GHG costs in rates beginning in July of 2018[72] and the netting of 2015-2017 costs and proceeds. The Commission requires the following information:

- Each natural gas utility must file a Tier 2 Advice Letter within 45 days of this decision to include the following:

    o Detailed calculations showing the amount of GHG proceeds available for residential ratepayers in 2018. Utilities must provide the 2018 Residential California Climate Credit. This information shall be displayed using the format of Table C, adopted in Appendix A to D.15-10-032.

    o Detailed calculations of GHG compliance costs to be included in rates beginning in July of 2018,[73] including calculations showing the amortization of 2018 compliance costs. This information shall be displayed using the format of Table A and Table B, adopted in Appendix A to D.15-10-032.

---

[71] In the event that disposition of the Tier 2 Advice Letter filings set forth in Section 7 necessitates a delay in distribution of the 2018 California Climate Credit, the 2018 California Climate Credit shall be distributed in the month after final disposition of the advice letters.

[72] Subject to the provisions set forth in Footnotes 70 and 71.

[73] Subject to the provisions set forth in Footnotes 70 and 71

Case: 19-30088    Doc# 11847-5    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 42 of 59

- o Detailed accounting of the netting of 2015-2017 greenhouse gas compliance costs and proceeds for residential customers as well as an amortization schedule for residual greenhouse gas compliance costs, if any. If there are residual residential greenhouse proceeds, utilities should include a final calculated 2018 residential Climate Credit reflecting the inclusion of the net surplus.

- o Detailed accounting of the GHG outreach and administrative expenses for 2015-2017 period. This information shall be displayed using the format of Table D, adopted in Appendix A to D.15-10-032.

- o Report of annual compliance obligations. This information shall be displayed using the format of Table E, adopted in Appendix A to D.15-10-032.

On a going forward basis, excluding the advice letter filings required in this decision, the utilities shall file forecast and actual GHG costs and proceeds pursuant to the templates and timeframes adopted in D.15-10-032.

## 7.2. Education and Outreach

In D.15-10-032, the Commission adopted education and outreach provisions regarding distribution of the California Climate Credit. The Commission also ordered SoCalGas to undertake its proposed Climate Credit Education Campaign and adopted SoCalGas' proposed budget. On March 7, 2016, Energy Division ordered the utilities to cease activities related to implementation of the California Climate Credit, including the Climate Credit Education Campaign.

During the pendency of this proceeding modifying D.15-10-032, the contract between SoCalGas and OPower (now Oracle) to undertake the Climate Credit Education Campaign expired. In comments to Revision 1 of the proposed decision, SoCalGas asked for authority to undertake the contracting process again and for authority to solicit bids from other providers, in addition to

Case: 19-30088   Doc# 11847-5   Filed: 01/21/22   Entered: 01/21/22 11:46:37   Page
43 of 59

negotiating with Oracle.  However, recognizing the time involved in the contracting and development process, SoCalGas asked for authority to launch the Climate Credit Education Campaign in April of 2019 should SoCalGas be unable to complete the campaign by the time the 2018 California Climate Credit is distributed.

Utilities should commence education and outreach efforts that were suspended after adoption of D.16-04-013 as soon as practicable after issuance of this decision.  SoCalGas is authorized to solicit bids to undertake the Climate Credit Education Campaign approved in D.15-10-032, in addition to negotiating with Oracle.  SoCalGas shall endeavor to launch the Climate Credit Education Campaign in time for the distribution of the 2018 California Climate Credit; however, if the Climate Credit Education Campaign is not ready by that time, SoCalGas may launch the campaign in April 2019.

## 8.    Hearing

The Scoping Memo determined that this proceeding addressing limited rehearing could be addressed without the need for formal evidentiary hearings; however, parties were afforded the opportunity to request hearings concurrent with the February 24, 2017 opening comments.  No party made such a request, and the Commission resolved this proceeding based on the existing record. Therefore, the preliminary determination that hearings are not needed remains undisturbed.

## 9.    Comments on Proposed Decision

The October 16, 2017 proposed decision of the ALJ in this matter was mailed to the parties in accordance with Section 311 of the Public Utilities Code and comments were allowed under Rule 14.3 of the Commission's Rules of Practice and Procedure.  CMTA, ORA, ARB, PG&E and Sempra filed timely filed

Case: 19-30088    Doc# 11847-5    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page
44 of 59

opening comments to the October 16, 2017 proposed decision on November 6, 2017.  CMTA, PG&E and Sempra timely filed reply comments to the October 16, 2017 proposed decision on November 13, 2017.  In response, corrections and clarifications are made throughout this decision.  The Commission addresses certain comments below.

In response to ARB's Opening Comments, the Commission elects to distribute GHG allowance proceeds solely to the residential customers of the natural gas utilities.  In Opening Comments, ORA states that treatment of remaining free allowances in the calculation of natural gas utilities' GHG compliance costs was not able to be resolved informally as encouraged by the ALJ in the PHC.  This issue was ruled out of scope of limited rehearing; ORA has other procedural mechanisms, such as a petition for modification, to reach resolution.  PG&E, in Opening Comments, recommends that the Climate Credit be distributed in a month other than April, citing bill volatility.  Sempra supports PG&E's recommendation in its Reply Comments.  The timing of distribution of the Climate Credit was not subject to rehearing and is therefore not changed in this decision.

Further comments were filed on March 7, 2018 by CMTA, ARB, ORA, PG&E and Sempra, and further reply comments were filed on March 12, 2018 by CMTA, ORA and Sempra.  In response, additional clarifications and corrections have been made throughout the decision.  The following substantive changes are adopted in response to comments:

1. The 2018 California Climate Credit distribution will occur in October of 2018 instead of September, subject to the provisions of #3, below.

Case: 19-30088    Doc# 11847-5    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page
45 of 59

2. January-June GHG costs will be amortized over eighteen months, instead of six months, to mitigate against rate spikes, subject to the provisions of #3, below.

3. In the Tier 2 Advice Letter filings, the utilities will be required to include Tables A-E as set forth in D.15-10-032. In the event that disposition of the Tier 2 Advice Letters is delayed beyond July of 2018, GHG costs must begin to be included in rates the first month after final disposition. In the event that disposition of the Tier 2 Advice Letters is delayed beyond October of 2018, the 2018 California Climate Credit must be returned in the first month following final disposition.

4. SoCalGas is authorized to solicit bids to undertake the Climate Credit Education Campaign approved in D.15-10-032 in addition to negotiating with Oracle. SoCalGas shall endeavor to launch the Climate Credit Education Campaign in time for the distribution of the 2018 California Climate Credit; however, if the Climate Credit Education Campaign is not ready by that time, SoCalGas may launch the campaign in April of 2019.

We respond to CMTA's comments as follows.

CMTA claims that this Commission has already determined that the regulation requires that the credit be distributed to the ratepayers CMTA represents. However, in context, it is clear that the rehearing was granted based on a need for additional legal support for the conclusion the Commission reached. As the quotation CMTA furnishes notes:

[G]iven the potential allowance proceeds available, it is reasonable to limit the natural gas California Climate Credit to residential customers. . . . No party provided legal support for that limitation, *and D.15-10-032 does not discuss legal authority for requiring natural gas utilities* to restrict disbursement of GHG credits solely to one class of retail ratepayer. Having reviewed each and every allegation raised,

Case: 19-30088   Doc# 11847-5   Filed: 01/21/22   Entered: 01/21/22 11:46:37   Page 46 of 59

we have determined that there is good cause for granting a limited rehearing as set forth herein.[74]

The Commission has now explained the basis for its conclusion, which includes ARB's interpretation of its own regulation, AB 32, and the fact that – as with electric customers – residential ratepayers will ultimately bear increased costs as a result of the Cap-and-Trade program. It is within the Commission's discretion to reach such a conclusion.

CMTA's invocation of *Christopher v SmithKline Beecham Corp*. (2012) 567 U.S. 142, is likewise without merit. That case, in which the Roberts Supreme Court limited the federal courts' deference to federal administrative interpretation of their own regulations, is not applicable to state courts interpreting state law. The seminal California cases regarding deference to agency interpretation are *Yamaha Corp. v. State Bd. of Equalization* (1998) 19 Cal.4th 1 and *Ramirez v. Yosemite Water Co*. (1999) 20 Cal. 4th 785,[75] which hold that agency interpretations of the meaning and legal effect of statutes and regulations are entitled to consideration and respect by the courts where, as here, the agency has special familiarity and presumed expertise with the applicable legal and regulatory issues. As we stated recently in D.17-06-031:

> Generally, an agency's interpretation of a statute within its jurisdiction is entitled to great weight unless it fails to bear a reasonable relation to the purpose of the statute. Courts may also look to the nature of the decisionmaking, and apply certain

---

[74] CMTA Opening Comments p. 2, citing D.16-04-013, p. 2 (emphasis added).

[75] *See also New Cingular Wireless PCS, LLC v. Public Utilities Com. (2016)* 246 Cal. App. 4th 784.

Case: 19-30088   Doc# 11847-5   Filed: 01/21/22   Entered: 01/21/22 11:46:37   Page 47 of 59

situational factors to determine the appropriate standard of review. For example, they may look to: (1) the agency's expertise and technical knowledge in a particular subject matter; (2) whether a statute is complex, open-ended, or entwined with issues of fact, policy, and discretion; and ([3]) whether the agency has been consistent in its view.[76]

Further, the case is distinguishable.  This is not a situation in which the agency's "interpretation of ambiguous regulations [would] impose potentially massive liability on respondent for conduct that occurred well before that interpretation was announced," as was the case in *Christopher*.[77]  Indeed, in the federal courts alone, *Christopher* has been distinguished in almost 30 cited cases.

We thus make no changes to the proposed decision based on CMTA's arguments.

## 10.  Assignment of Proceeding

Carla J. Peterman is the assigned Commissioner and Melissa K. Semcer is the assigned ALJ in this proceeding.

---

[76] D.17-06-031, p. 10, citing *Greyhound Lines, Inc. v. Public Utilities Commission* (1968) 68 Cal.2d 406, 410-411.  *See also Exxon Mobil Corp. v. Office of Environmental Health Hazard Assessment* (2009) 169 Cal. App. 4th 1264, 1276-1277, *mod on other grounds* 2009 Cal. App. LEXIS 108 ("As a general matter, courts 'will be deferential to government agency interpretations of their own regulations, particularly when the interpretation involves matters within the agency's expertise and does not plainly conflict with a statutory mandate. …[W]e will not disturb the agency's determination without a demonstration that it is clearly unreasonable.'").

[77] *Christopher,* 567 U.S. at 155-156.

Case: 19-30088    Doc# 11847-5    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 48 of 59

**Findings of Fact**

1. Natural gas utilities are directly allocated free GHG allowances under the California Cap-and-Trade Program.

2. GHG allowance proceeds are generated when directly allocated, free GHG allowances are consigned to auction by the natural gas utilities.

3. The amount of GHG allowance proceeds available for distribution to eligible customers of the natural gas utilities is determined by the market clearing price of GHG allowances sold at a particular auction.

4. Natural gas utilities have a compliance obligation to purchase and surrender GHG allowances pursuant to the California Cap-and-Trade Program.

5. Greenhouse gas compliance costs are the costs borne by utility ratepayers to meet the GHG compliance obligation of the natural gas utility under the California Cap-and-Trade Program.

6. The amount of GHG proceeds to be distributed to eligible ratepayers is determined separately from any GHG compliance costs that eligible utility customers pay in rates. Only the compliance instruments paid for by the utility, that is allowances and/or offsets that are purchased by the utility for the amount of carbon dioxide equivalent emitted by that utility, are reflected in GHG costs that are put into rates.

7. GHG proceeds are similar to sulfur dioxide allowance proceeds.

8. GHG proceeds are not funds that were previously collected in rates from ratepayers.

9. Natural gas utility customers are not charged in rates for the GHG allowances that are consigned to auction that result in GHG proceeds.

10. A volumetric distribution of GHG allowance proceeds dampens the carbon price signal in rates.

Case: 19-30088    Doc# 11847-5    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 49 of 59

11.  Natural gas GHG costs will, in most cases, ultimately be passed through to residential customers as a result of higher gas rates being embedded in the cost of goods and services.

12.  In D.15-10-032, the Commission determined that natural gas customers eligible to receive GHG allowance proceeds are those that are not considered to be covered entities by ARB.

13.  The GHG allowance proceeds distribution methodology for residential customers was not the subject of rehearing.

14.  Providing GHG allowance proceeds to residential customers is more equitable and comports with the idea of common ownership of the atmosphere given that residential ratepayers will ultimately bear the increased costs as a result of the Cap-and-Trade program.

15.  Distributing GHG proceeds to residential customers will help to reduce adverse impacts on low-income households.

16.  Distributing GHG allowance proceeds to EITE customers without a compliance obligation (who emit less than 25,000 metric tonnes carbon dioxide equivalent per year) would result in disparate treatment between large and small EITE emitters based solely on the amount of emissions generated.

17.  To date, no GHG compliance costs have been included in the rates of natural gas ratepayers.  GHG proceeds that have accrued to date have also not been distributed to natural gas ratepayers.  Natural gas ratepayers are facing more than three years of accrued GHG compliance costs and GHG allowance proceeds.

18.  Amortization of accrued 2015-2017 GHG compliance costs over the remaining time period of the first Cap-and-Trade program (through the end of 2020) could result in rate spikes for natural gas utility customers.

Case: 19-30088    Doc# 11847-5    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page
50 of 59

19.  Amortization of GHG compliance costs over a three-year time period (2018-2020) would overinflate the impact of GHG and send a distorted carbon price signal.

20.  Amortization of three years of GHG proceeds (2015-2017) over the remaining years of the program (2018-2020) would overstate the benefit of GHG proceeds to natural gas ratepayers.

21.  Netting total 2015-2017 accrued GHG compliance costs against total 2015-2017 GHG proceeds, while a missed opportunity to include the carbon price signal in rates, is a prudent approach to avoid rate spikes.

22.  Inclusion of GHG compliance costs in rates beginning in July of 2018 will require the natural gas utilities to amortize 2018 costs.

23.  In D.15-10-032, the Commission adopted procedures for accounting for GHG compliance costs and GHG proceeds and methodologies to deliver GHG proceeds to utility customers.

24.  In D.15-10-032, the Commission ordered the natural gas utilities to distribute the residential California Climate Credit once annually in April of each year.

25.  Due to the date of issuance of this decision, it is not possible to distribute the 2018 residential California Climate Credit in April of 2018.

26.  As a result of issuance of the March 7, 2016 Energy Division letter ceasing outreach and education activities and the pendency of this proceeding, the contract between SoCalGas and OPower (now Oracle) to undertake the Climate Credit Education Campaign expired.

27.  No party requested evidentiary hearings pursuant to the direction of the Scoping Memo.

28.  All matters of rehearing have been addressed by this decision.

Case: 19-30088    Doc# 11847-5    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page
51 of 59

**Conclusions of Law**

1.  GHG allowances that the utilities must consign to auction are freely and directly allocated to each natural gas utility pursuant to 17 CCR §§ 95879(f), 95890(f) and 95893.

2.  GHG allowance proceeds are not analogous to the funds found to qualify as "rate refunds" in *California Manufacturer's Association v. Public Utilities Commission*, 24 Cal3d. 836 (1979) and *Assembly v. Public Utilities Commission* (1995) 23 Cal.4th87.

3.  Pub. Util. Code § 453.5 does not apply to the distribution of GHG allowance proceeds.

4.  Pursuant to 17 CCR § 95893(d)(3), the Commission is required to return GHG allowance proceeds in a non-volumetric manner.

5.  A volumetric distribution of GHG allowance proceeds contravenes the legislative directive of AB 32 to ameliorate GHG emissions.

6.  GHG proceeds allocation proposals that returns GHG proceeds in direct relationship to GHG costs borne by each individual customer violate 17 CCR § 95893(d), even if proceeds are distributed in an aggregated manner and not in the same time period in which the GHG costs were incurred.

7.  17 CCR § 95893(a) requires that GHG allowance proceeds be used "exclusively for the benefit of the retail ratepayers of each natural gas supplier."

8.  Pub. Util. Code § 748.5 applies only to the distribution of GHG allowance proceeds to electricity customers.

9.  Because Pub Util. Code § 453.5 does not govern, the Commission is not required to allocate GHG allowance proceeds to each customer class (residential, non-residential core and non-residential non-core) in proportion to GHG compliance costs incurred by that class.

Case: 19-30088    Doc# 11847-5    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page
52 of 59

10.   The order to distribute GHG allowance proceeds subject to limitations imposed by the Commission,  as set forth in§ 95893(d)(2), represents the full implementation of ARB's Cap-and-Trade regulation as it pertains to investor-owned natural gas utilities.

11.   Aside from Public Utilities Code that governs generally, the sole regulation governing the distribution of GHG allowance proceeds to natural gas utilities is 17 CCR § 95893.  There is no reason to disturb the residential GHG allocation methodology adopted in D.15-10-032.  Residential customers should receive a California Climate Credit distributed on an equal, non-volumetric manner.

12.   A regulatory agency's interpretation of its own regulation is given deference.

13.   The Commission possesses the authority under §95893 (d)(2) to distribute GHG allowance proceeds solely to residential customers of the natural gas utility.

14.   The GHG proceeds allocation methodology adopted in this decision conforms to 17 CCR § 95893 and should be adopted.

15.   It is reasonable to net total 2015-2017 accrued GHG compliance costs against total 2015-2017 accrued GHG proceeds.

16.   On a going forward basis, GHG compliance costs should be included in rates beginning July 1, 2018, unless disposition of the Tier 2 Advice Letters ordered in this decision necessitates a delay.  The natural gas utilities should amortize 2018 GHG compliance costs over eighteen months.

17.   Natural gas utilities should distribute GHG proceeds using the procedures adopted in D.15-10-032, as updated by this decision.

Case: 19-30088    Doc# 11847-5    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page
53 of 59

18.  It is reasonable to continue to distribute the residential California Climate Credit once annually in April of each year, as adopted in D.15-10-032, except for 2018, in which the California Climate Credit should be distributed in October, unless disposition of the Tier 2 Advice Letters ordered in this decision necessitates a delay.

19.  Unless explicitly stated, no part of this decision should supplant the direction adopted in D.15-10-032.  The utilities should continue to follow all direction adopted in D.15-10-032, except where superseded or changed by this decision.

20.  The mandates of D.15-10-032 and this decision should remain in effect unless or until the Commission adopts updated policies or unless new Cap-and-Trade regulations for the period beyond 2020 conflict with policies and procedures adopted to date.

21.  The utilities should file a Tier 2 advice letter within 45 days of issuance of this decision to implement the provisions of this decision.

22.  SoCalGas should be authorized to solicit bids to undertake the Climate Credit Education Campaign authorized in D.15-10-032 in addition to negotiating with Oracle.  If SoCalGas is unable to complete the Climate Credit Education Campaign in time for the distribution of the 2018 California Climate Credit, SoCalGas should be authorized to launch the Climate Credit Education Campaign in April of 2019.

23.  The Commission's preliminary determination that hearings were not needed to resolve this proceeding should remain undistributed.

Case: 19-30088    Doc# 11847-5    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 54 of 59

24. R.14-03-003 should be closed.

# O R D E R

**IT IS ORDERED** that:

1. Pacific Gas and Electric Company, Southern California Gas Company, San Diego Gas & Electric Company and Southwest Gas Company must distribute greenhouse gas allowance proceeds to all eligible residential retail customers, as eligible customers are defined in Decision 15-10-032, according to the provisions set forth in subsequent ordering paragraphs and pursuant to the methodology adopted in Decision 15-10-032.

2. The greenhouse gas proceeds allocation methodology adopted herein will remain in effect unless or until the Commission adopts updated policies or unless new Cap-and-Trade regulations for the period beyond 2020 conflict with the adopted policies and procedures.

3. Pacific Gas and Electric Company, Southern California Gas Company, San Diego Gas & Electric Company and Southwest Gas Company must only distribute the California Climate Credit to customers that are active at the time of disbursement of the credit. Active customers shall receive the full amount of the California Climate Credit no matter the length of time as a customer.

4. Pacific Gas and Electric Company, Southern California Gas Company, San Diego Gas & Electric Company and Southwest Gas Company must calculate the total actual greenhouse gas End User and Lost and Unaccounted For gas compliance costs for 2015, 2016 and 2017, including interest, and net those costs against total available greenhouse gas proceeds for 2015, 2016 and 2017, including interest. Available greenhouse gas proceeds are those remaining after

Case: 19-30088   Doc# 11847-5   Filed: 01/21/22   Entered: 01/21/22 11:46:37   Page
55 of 59

accounting for administrative costs included in the utilities' Greenhouse Gas Memorandum Accounts. Pacific Gas and Electric Company, Southern California Gas Company, San Diego Gas & Electric Company and Southwest Gas Company must calculate the accrued actual greenhouse gas costs and proceeds for the years 2015, 2016 and 2017 using the calculations, methodologies and procedures adopted in Decision 15-10-032.

5. In the event that netted 2015-2017 greenhouse gas compliance costs exceed netted 2015-2017 greenhouse gas proceeds, Pacific Gas and Electric Company, Southern California Gas Company, San Diego Gas & Electric Company and Southwest Gas Company must amortize remaining greenhouse gas costs for the 2015-2017 time period over a 12-month period beginning when 2018 greenhouse gas compliance costs first appear in rates. Net greenhouse compliance costs, should they exist, must be included in base transportation rates as directed in Decision 15-10-032.

6. In the event that netted 2015-2017 greenhouse gas proceeds exceed netted 2015-2017 greenhouse gas compliance costs, Pacific Gas and Electric Company, Southern California Gas Company, San Diego Gas & Electric Company and Southwest Gas Company must distribute remaining proceeds with the 2018 California Climate Credit.

7. Pacific Gas and Electric Company, Southern California Gas Company, San Diego Gas & Electric Company and Southwest Gas Company must include 2018 greenhouse gas compliance costs in rates beginning July 1, 2018. Greenhouse gas compliance costs for 2018 must be amortized over eighteen months. In the event that disposition of the Tier 2 Advice Letters ordered in Ordering Paragraph 9 results in a delay in the inclusion of greenhouse gas costs in rates and/or the distribution of the 2018 California Climate Credit, inclusion of greenhouse gas

Case: 19-30088    Doc# 11847-5    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 56 of 59

costs and/or distribution of the California Climate Credit shall occur in the first month after final disposition of the Tier 2 Advice Letters.

8.  Pacific Gas and Electric Company, Southern California Gas Company, San Diego Gas & Electric Company and Southwest Gas Company must distribute the residential California Climate Credit in April of each year, with the exception of 2018, in which the California Climate Credit shall be distributed in September.

9.  Within 45 days of issuance of this decision, Pacific Gas and Electric Company, Southern California Gas Company, San Diego Gas & Electric Company and Southwest Gas Company must file a Tier 2 Advice Letter providing information necessary to implement the residential California Climate Credit and to include greenhouse gas compliance costs in rates, including the netting of greenhouse gas cost and proceeds for the years 2015, 2016, and 2017. The advice letters must include the following information:

   a.  Detailed calculations showing the amount of greenhouse gas proceeds available for residential ratepayers in 2018.  Utilities must provide the 2018 Residential California Climate Credit. This information should be displayed using the format of Table C, adopted in Appendix A to Decision 15-10-032.

   b.  Detailed calculations of greenhouse gas compliance costs to be included in rates beginning in July of 2018, including calculations showing the amortization of 2018 compliance costs.  This information shall be displayed using the format of Table A and Table B, adopted in Appendix A to Decision 15-10-032.

   c.  Detailed accounting of the netting of 2015-2017 greenhouse gas compliance costs and proceeds for residential customers as well as an amortization schedule for residual greenhouse gas compliance costs, if any.  If there are residual residential greenhouse proceeds, the utilities shall include a final calculated 2018 residential Climate Credit reflecting the inclusion of the net surplus.

Case: 19-30088    Doc# 11847-5    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page
57 of 59

    d. Detailed accounting of the greenhouse outreach and administrative expenses for 2015-2017 time period. This information shall be displayed using the format of Table D, adopted in Appendix A to Decision 15-10-032.

    e. Report of annual compliance obligations. This information shall be displayed using the format of Table E, adopted in Appendix A to Decision 15-10-032.

10. On a going forward basis, Pacific Gas and Electric Company, Southern California Gas Company, San Diego Gas & Electric Company and Southwest Gas Company must file forecast and actual greenhouse costs and proceeds pursuant to the templates and timeframes adopted in Decision 15-10-032.

11. Pacific Gas and Electric Company, Southern California Gas Company, San Diego Gas & Electric Company and Southwest Gas Company must continue to follow the mandates adopted in Decision 15-10-032 unless explicitly superseded by this decision.

12. Pacific Gas and Electric Company, Southern California Gas Company, San Diego Gas & Electric Company and Southwest Gas Company shall commence education and outreach efforts that were suspended after adoption of Decision 16-04-013 as soon as practicable after issuance of this decision. Southern California Gas Company is authorized to solicit bids to undertake the Climate Credit Education Campaign, approved in Decision 15-10-032, in addition to negotiating with Oracle. Southern California Gas Company shall endeavor to launch the Climate Credit Education Campaign in time for distribution of the 2018 California Climate Credit; however, if the Climate Credit Education Campaign is not ready by that time, Southern California Gas Company may launch the campaign in April 2019.

Case: 19-30088    Doc# 11847-5    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 58 of 59

13. The original determination that hearings are not necessary is confirmed.

14.  Rulemaking 14-03-003 is closed.

This order is effective today.

Dated March 22, 2018, at San Francisco, California.


MICHAEL PICKER
President
CARLA J. PETERMAN
LIANE M. RANDOLPH
MARTHA GUZMAN ACEVES
CLIFFORD RECHTSCHAFFEN
Commissioners

Case: 19-30088    Doc# 11847-5    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page
59 of 59