**<u>Exhibit F</u>**

| | |
|---|---|
| 1 | RICHARD DOYLE, City Attorney (#88625) |
| 2 | GEORGE RIOS, Assistant City Attorney (#77908)<br>SHANNON SMYTH-MENDOZA, Deputy City Attorney (#188509) |
| 3 | Office of the City Attorney<br>200 East Santa Clara Street |
| 4 | San Jose, California 95113-1905<br>Telephone: (408) 535-1900 |

(ENDORSED)
FILED

DEC 22 05

ER/CLERK
OF CA
CLARA
DEPUTY

5 Attorneys for Plaintiff
CITY OF SAN JOSE and
6 THE PEOPLE OF THE STATE OF CALIFORNIA

**A. Avila**

7

8 SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA

9 UNLIMITED JURISDICTION

10 CITY ATTORNEY OF THE CITY OF SAN     Case Number: **1 05 C V 05 5100**

11 JOSE, a municipal corporation, and THE
PEOPLE OF THE STATE OF

12 CALIFORNIA,                          **COMPLAINT FOR INJUNCTIVE**
                                        **RELIEF FOR VIOLATION OF SAN**
13               Plaintiff(s),          **JOSE MUNICIPAL CODE AND STATE**
                                        **LAW; DECLARATORY RELIEF; AND**
14          v.                          **BREACH OF (FRANCHISE)**
                                        **AGREEMENT; BOOK ACCOUNT**
15 PACIFIC GAS AND ELECTRIC, a
California corporation and DOES 1-10,
16 inclusive,

17               Defendant(s).

| | |
|---|---|
| CALENDARED | |
| PLEADINGS | |
| DUE: 2/22/06 | |
| Stated: | Computed: X |

18 Plaintiff City of San Jose alleges against Defendants, and each of them, as follows:

19 **GENERAL ALLEGATIONS**

20    1.    Plaintiff City of San Jose is and at all times herein mentioned was a municipal

21 corporation located in the County of Santa Clara, State of California.

22    2.    The City of San Jose, as a municipal corporation in the County of Santa Clara,

23 State of California, acting to protect the public health, safety and welfare, has a population in

24 excess of 750,000.

25    3.    Richard Doyle, as City Attorney of the City of San Jose, acting to protect the

26 public from health and safety hazards, and from unfair and unlawful business practices,

27 brings this action in the public interest in the name of the City of San Jose and the People of

28 the State of California (hereinafter "Plaintiff").

1

Civil Complaint                                                    316946

1    4.    Plaintiff is informed and believes that at all times herein mentioned, Defendant
2    Pacific Gas and Electric Company (hereinafter "Defendant"), is a California Corporation,
3    operating in San Jose, California, within the County of Santa Clara.

4    5.    Plaintiff is informed and believes and on that ground alleges that DOES 1
5    through 10, inclusive, each participated in the scheme set out in this Complaint. Plaintiff is
6    ignorant of these fictitiously named Defendants, but will amend this Complaint to state each
7    such Defendant's true name when such information has been ascertained. Plaintiff is
8    informed and believes and thereon alleges that at all times relevant herein, each of the
9    Defendants was the agent, servant, or employee of the remaining defendants.

10    6.    Whenever reference is made in this Complaint to any act of Defendant, such
11    allegations shall be deemed to mean the act of each and every Defendant acting
12    individually and jointly.

13    7.    On or about June 5, 1984, the San Jose City Council approved an
14    amendment (Ordinance No. 21676) to Ordinance No. 15879, at San Jose, in the County of
15    Santa Clara, State of California, granting Defendant an indeterminate franchise for the sale
16    of natural gas within the City of San Jose, which was accepted by Defendant. Pursuant to
17    the amended Ordinance, as an express condition of granting the franchise for the sale of
18    gas within the City of San Jose and in consideration thereof, Defendant is required to pay
19    as a franchise fee (which is in lieu of a "municipal surcharge" as set forth in the California
20    Public Utilities Code Chapter 6201 that is calculated based on the specific franchise fee
21    factor pursuant to the franchise agreement), 2% of Defendant's gross receipts during each
22    calendar year following the effective date of the Ordinance.

23    8.    On or about June 5, 1984, the San Jose City Council approved an
24    amendment (Ordinance No. 21677) to Ordinance No. 15880, at San Jose, in the County of
25    Santa Clara, State of California, granting Defendant an indeterminate franchise for the sale
26    of electricity within the City of San Jose, which was accepted by Defendant. Pursuant to
27    the amended Ordinance, as an express condition of granting the franchise for the sale of
28    electricity within the City of San Jose and in consideration thereof, Defendant is required to

2

Civil Complaint                                                                316946

Case: 19-30088    Doc# 11847-6    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 3
of 62

1  pay as a franchise fee (which is in lieu of a "municipal surcharge" as set forth in the
2  California Public Utilities Code Chapter 6201 that is calculated based on the specific
3  franchise fee factor pursuant to the franchise agreement), 2% of Defendant's gross receipts
4  during each calendar year following the effective date of the Ordinance.

5      9.      Contrary to express provisions of the San Jose City ordinances, PG&E has
6  taken the position that, with regard to third party energy service provider ("ESP") revenues it
7  receives, it should be allowed to remit to the City of San Jose a franchise fee using the
8  averaged franchise fee factor from its General Rate Case ("GRC"). This is an amount that
9  is significantly less than the franchise fee formula contained in the City ordinances. PG&E
10 takes this position despite the fact that PG&E's position was expressly rejected by the
11 California Public Utilities Commission ("CPUC") in its Decision 03-10-040 and is in direct
12 contravention of State law. Although PG&E concedes that it is bound by the CPUC
13 decision with respect to how municipal surcharges are calculated and remitted for
14 Department of Water Resources (DWR) revenues it receives, it does object to using the
15 ordinance required remittance methodology for ESP revenues.

16     10.      In CPUC Decision 03-10-040, a true and correct copy of which is attached
17 hereto as Exhibit "A", PG&E was ordered by the CPUC to remit surcharge fees to each
18 municipality using the same percentage factor that is set forth in the specific franchise
19 agreement applicable to the franchisor municipality in question. This remittance
20 methodology is the same for DWR revenues and ESP revenues.

21     11.      Pursuant to Public Utilities Code Section 6352(d), energy transporters (natural
22 gas and/ or electricity) such as PG&E who are not CPUC-regulated are required to pay a
23 surcharge based on their individually negotiated franchise fee agreements with each
24 municipality. Specifically, subsection (d) provides that the Municipal Surcharge Act shall
25 not, in any way, "affect the rights of the parties to existing franchise agreements executed
26 pursuant to this division that are in force on the effective date of this chapter."

27 ///

28 ///

3

1    12.    The Historical and Statutory Notes of SB 278 [the Municipal Public Lands Use
2    Surcharge Act ("Municipal Surcharge Act")] provide as follows:

3
4            "In enacting this chapter, the Legislature finds and declares that
             changes in the public utility regulatory environment have
5            inadvertently provided for the potential erosion of the franchise fee
             base upon which local government has become quite dependent
6            for its financial stability. Further, the Legislature has determined
             that there exists the possibility that these same regulatory changes
7            may not ensure equitable treatment between customers
             purchasing gas or electricity from a utility and customers
8            purchasing gas or electricity from other sources. Therefore, the
             purpose of this Act is to provide protection for the financial integrity
9            of local government to ensure that all customers purchasing gas or
             electricity on transmission systems that are subject to a franchise
10           agreement share equitably in the burden of compensating local
             government for the private use of public lands." (Stats. 1993,
11           Chapter 233, Section 1, SB 278).

12    13.    Plaintiff is informed and believes and on such information and belief alleges,
13    that at all times mentioned herein, Defendant has engaged in the violations of the San Jose
14    Ordinance and the Municipal Surcharge Act as alleged herein, in regard to the sale of gas
15    and electricity, within the City of San Jose, State of California, County of Santa Clara by
16    failing to pay the required franchise fees.

17    14.    As a consequence of the continuing violations of the law, Defendants have
18    engaged in, and continue to engage in, unfair competition under Business and Professions
19    Code Section 17200, which state that "unfair competition shall mean and include unlawful,
20    unfair or fraudulent business practice... ." Business and Professions Code Section 17203
21    authorizes injunctive relief for any act of unfair competition, and permits a court to issue any
22    orders as may be necessary to prevent unfair competition. Section 17206 provides for civil
23    penalties for each act of unfair competition of up to $2,500.00 per day per violation.

24    15.    Plaintiff, by this action, seeks to enjoin Defendant from engaging in the acts
25    constituting a public nuisance, violations of the law, and unfair and unlawful business
26    practices, based upon the conduct alleged herein.

27    ///
28    ///

4

**FIRST CAUSE OF ACTION**

**(Violation of San Jose Municipal Code and Municipal
Public Lands Use Surcharge Act and Public Nuisance Pursuant to the San Jose
Municipal Code)**

16. Plaintiff incorporates by reference paragraphs 1 through 15 as though set forth in full herein.

17. San Jose Municipal Code §1.08.010F provides that: "Any condition existing in violation of any of the provisions of this code or any other city ordinance shall be deemed a public nuisance and may be abated by the city."

18. San Jose Municipal Code § 1.08.010E provides that: **"Each such** person shall be guilty of a separate offense for each and every day during any portion of which any violation of any provision this code or of any other city ordinance is committed, continued or permitted by such person**, and shall be punishable accordingly." (Emphasis added.)**

19. Pursuant to San Jose Municipal Code Chapter 15.32 (Gas and Electric Franchises), the City has the power to grant gas and electric franchises.

20. Government Code section 38771 provides that, by ordinance, the City legislative body may declare what constitutes a public nuisance.

    A. San Jose Municipal Code section 1.08.010.E provides that:

        Each such person shall be guilty of a separate offense for each and every day during any portion of which any violation of any provision of this code or of any other city ordinance is committed, continued or permitted by such person, and shall be punishable accordingly.

    B. San Jose Municipal Code section 1.08.010.F provides that:

        Any condition existing in violation of any of the provisions of this code or any other city ordinance shall be deemed a public nuisance and may be abated by the city.

    C. San Jose Municipal Code sections 1.08.015.A and 1.08.015.B provide that:

        1) In addition to all other remedies provided by law, any provision of this code may be enforced by injunction issued by the superior court upon a suit brought by the City of San Jose.

        2) In addition to all other remedies, as part of any civil action brought by the City, a Court may assess a

5

1    civil penalty in an amount not to exceed two
     thousand five hundred dollars per violation for each
2    day, payable to the City, against any person who
     commits, continues, operates, allows or maintains
     any violation of any provision of this code.
3
     D.  San Jose Municipal Code section 1.04.110 provides that:
4
          Whenever in this code any act or omission is made unlawful, it
5         shall include causing, permitting, aiding, abetting, suffering or
          concealing the facts of such act or omission.
6
7    21.  Despite repeated requests for compliance, Defendants have failed to come

     into compliance pursuant to the San Jose Municipal Code and Municipal Surcharge Act
8
     provisions alleged herein and continue to violate said provisions.
9
10   22.  Defendant's actions are in direct violation of the San Jose Municipal Code,

     including, but not limited to SJMC §§ 15.32.120(A) and (B), as well as San Jose Amended
11
     Ordinances, numbers 21676 and 21677, and the Municipal Surcharge Act as codified in
12
     California Public Utilities Code §§ 6351-6354.1.
13
     Wherefore Plaintiffs pray for the relief requested below.
14
                            **SECOND CAUSE OF ACTION**
15
                  **(Declaratory Relief, Code Civ. Proc. §1060)**
16
17   23.  Plaintiff refers to and incorporates herein by reference paragraphs 1 through

     22 of the complaint herein.
18
19   24.  An actual controversy has arisen and now exists between Plaintiff and

     Defendant concerning their respective rights and duties in that Plaintiff contends that the
20
     franchise ordinances are enforceable, requiring Defendant pay 2% of Defendant's gross
21
     receipts for the sale of both gas and electricity for the years 1999 to the present
22
     25.  Plaintiff desires a judicial determination of its rights and duties, under the
23
     terms and conditions of the franchise ordinances, enforcement thereof and a determination
24
     that Defendant's actions are violative of it.
25
     26.  A judicial declaration is necessary and appropriate at this time under the
26
     circumstances in order that Plaintiff may collect from Defendant all past, continuing, and
27
     future municipal surcharges owed by Defendant as required by the City ordinances.
28
     27.  Plaintiff has attempted in good faith to resolve this dispute.

                                       6

     Civil Complaint                                                          316946

1    Wherefore Plaintiff prays for the relief requested below.

2                              **FOURTH CAUSE OF ACTION**

3                          **(Breach of Franchise Fee Agreement)**

4        28.    Plaintiff refers to and incorporates herein by reference paragraphs 1 through

5    27 of the complaint herein.

6        29.    Despite Plaintiff's repeated demands for full payments, Defendants, and each

7    of them, breached the terms and conditions of the Franchise Agreements as set forth in

8    San Jose Ordinances, numbers 21676 and 21677, by failing to make the full scheduled

9    payments to Plaintiff from 1999 and continuing through the present.

10       30.    Defendants, and each of them, have failed and refused, and continue to fail

11   and refuse, to pay the remaining balance due and owing on the Franchise Agreement in the

12   following amounts: $5,126,5671.00, through December 31, 2004, for the electric surcharge;

13   and $ 290,466.00, through December 31, 2004, for the gas surcharge, as set forth in the

14   spreadsheet attached hereto as Exhibit "B".

15       31.    Pursuant to Public Utilities Code §6352, regarding surcharges for gas and

16   electric transmission:

17               Nothing in this chapter shall in any way affect the rights of the
18               parties to existing franchise agreements executed pursuant to
                 this division that are in force on the effective date of this chapter.

19   Public Util. Code §6352(d)

20       32.    The City has incurred administrative and legal costs and expenses in pursuing

21   its claim in an amount to be proven at the trial of this matter, and which amount is within the

22   jurisdiction of this Court.

23       Wherefore Plaintiff prays for the relief requested below.

24                              **FIFTH CAUSE OF ACTION**

25   **(Unfair Business Practices Pursuant To Bus. & Prof. Code §§17200 *et seq.*)**

26       33.    Plaintiff incorporates by reference paragraphs 1 through 32 as though set

27   forth in full herein.

28       34.    Defendant has violated California Business and Professions Code sections

                                            7

1  17200 *et seq.* by engaging in acts of unfair competition and unlawful business practices
2  including, but not limited to, the acts and violations of State and local law set forth herein
3  regarding Defendant's failure to comply with the terms and conditions of the Franchise Fee
4  Agreements for the sale of gas and electricity within the City of San Jose.

5      35.      Unless enjoined from doing so, Defendant will continue to perform acts of
6  unfair competition within the City of San Jose.

7      36.      Plaintiffs have no other adequate remedy at law.
8  Wherefore Plaintiffs pray for the relief requested below.

9                                    **PRAYER**

10     **WHEREFORE**, plaintiff prays for judgment against Defendants and each of them as
11  set forth below:

12     1.      That judgment be rendered in favor of Plaintiff and against Defendants;
13     2.      For damages in the sum of $5,417,07.00, and continuing, together with
14             interest and penalties which remain due and owed by Defendants, and each
15             of them, to Plaintiff under the Franchise Agreement;
16     3.      For civil penalties in the amount of up to $2,500 per day for each violation of
17             the San Jose Municipal Code according to proof;
18     4.      For daily civil penalties in the amount of $2,500 for each of the Defendant's
19             violations of law in accordance with the Unfair Competition Act (Bus. & Prof.
20             Code § 17200 *et seq.*);
21     5.      For costs of suit incurred herein including attorneys' fees; and
22     6.      For such other further relief as the court may deem just and proper.

23  Dated:  December 22, 2005                    RICHARD DOYLE, City Attorney
24
25                                               By:
26                                                    SHANNON SMYTH-MENDOZA
27                                                    Deputy City Attorney
                                                 Attorneys for Plaintiff
28                                               CITY OF SAN JOSE

                                         8

Civil Complaint                                                          316946

**EXHIBIT A**

Decision 03-10-040  October 16, 2003

### BEFORE THE PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA

| | |
|---|---|
| Application of Southern California Edison Company (E333-E) for Authority to Institute a Rate Stabilization Plan with a Rate Increase and End of Rate Freeze Tariffs. | Application 00-11-038 (Filed November 16, 2000) |
| Emergency Application of Pacific Gas and Electric Company to Adopt a Rate Stabilization Plan. (U 39 E) | Application 00-11-056 (Filed November 22, 2000) |
| Petition of THE UTILITY REFORM NETWORK for Modification of Resolution E-3527. | Application 00-10-028 (Filed October 17, 2000) |

### OPINION ON MUNICIPAL FEE REMITTANCE METHODOLOGY RELATING TO ELECTRICITY SALES BY CALIFORNIA DEPARTMENT OF WATER RESOURCES

## I. Background

This decision resolves issues regarding the collection and remittance of municipal surcharge fees in connection with electric power sales of the California Department of Water Resources (DWR) pursuant to Assembly Bill (AB) 1 of the First Extraordinary Session (Stats. 2001, Ch. 4), hereafter referred to as AB1X. In Decision (D.) 03-02-032, we addressed issues relating to the manner in which municipalities are to be compensated associated with revenues attributable to DWR-supplied power. We required in D.03-02-032 that the investor-owned utilities (i.e., Pacific Gas & Electric Company (PG&E), Southern California Edison Company (SCE), and San Diego Gas & Electric Company (SDG&E)) continue to

Case: 19-30088    Doc# 11847-6    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 11 of 62

remit funds to the municipalities for DWR sales as prescribed in D.02-02-052, but clarified that such remittances are properly classified as municipal surcharges under the provisions of Code Sections 6352-6354.1, rather than "franchise fees" under Sections 6000-6302.

D.02-02-052 allocated the DWR revenue requirement among customers in the service territories of the IOUs. During the course of those proceedings, however, a dispute arose involving whether, or on what basis, franchise fees may be assessed, collected, and remitted to municipalities for electric power sales made by DWR to customers pursuant to AB1X. D.02-02-052 directed the assigned Administrative Law Judge (ALJ) to take comments on these issues as a basis for further Commission action.

An ALJ's ruling, issued on April 3, 2002, solicited comments on the above-referenced issues. After review and deliberation of comments received, the Commission issued D.03-02-032. In D.03-02-032, we ordered the utilities to treat DWR like other third-party suppliers and to use the municipal surcharge approach specified in Pub. Util. Code §§ 6352-6354.1 for calculating the fees to be collected and remitted to municipalities. In D.03-02-032, we noted that PG&E had raised questions as to whether amounts it previously remitted to municipalities based on DWR sales revenues represented the correct amounts due. PG&E claimed that it did not have enough information based on the requirements of D.03-02-032 to calculate the correct municipal surcharge remittance amount due to each municipality. Because PG&E could not verify if it had made the proper remittances for its past obligations to each municipality, we reserved judgment in D.03-02-032 concerning the extent to which PG&E may need to recalculate surcharge revenues related to past collections of DWR revenues.

Case: 19-30088    Doc# 11847-6    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page
12 of 62

In D.03-02-032, we granted PG&E's request for a workshop to discuss technical issues regarding the calculation of proper remittances of surcharges to municipalities for electric power sales by DWR. Because the workshop issues identified by PG&E were specific to it, SCE and SDG&E were not required to participate in the workshop

In addition to parties to this proceeding, notice of the workshop was served on affected municipalities. The workshop was held on April 15, 2003. The workshop also addressed issues as to the method PG&E was using to make prospective remittances of municipal surcharges related to DWR revenues. Based on its interpretation of Pub. Util. Code § 6353(d),[1] PG&E proposed to calculate and remit municipal surcharges relating to DWR power by multiplying the franchise fee percentage factor adopted from its last General Rate Case by DWR revenues. During the workshop process, it was noted that there might be inconsistencies between PG&E's proposed remittance calculation and that implemented by SCE and SDG&E based on differing interpretations of the applicable statutory provisions.

PG&E filed and served a written status report on the results of the workshop on May 2, 2003. In addition to the service list of this proceeding, PG&E was directed to serve a copy of its workshop report on municipalities within its service area.

---

[1] Section 6353(d) states, "Determine the surcharge applicable to each transportation customer by multiplying the product determined pursuant to subdivision (c) by the sum of the franchise fee factor plus any franchise fee surcharge authorized for the energy transporter as approved by the commission in the energy transporter's most recent proceeding in which those factors and surcharges were set. An energy transporter not regulated by the commission shall multiply the product determined in subdivision (c) by the franchise fee rate contained in its individual franchise agreement in effect in each municipality."

Case: 19-30088    Doc# 11847-6    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 13 of 62

An ALJ ruling issued on May 29, 2003 provided parties, as well as affected municipalities, notice and opportunity to comment on the workshop report. In addition to parties on the service list, the ruling was mailed to municipalities that were previously notified regarding the workshop with an opportunity for their review and comment.

In particular, comments were solicited on what obligations, if any, PG&E has to determine and remit and/or refund additional municipal fees for periods prior to 2003 based upon the use of the prospective 2003 methodology. To the extent any parties believe that additional information is needed to resolve outstanding issues, they should specify what additional information is needed and what process they would propose to produce that information.

In addition, parties were to address the issue of uniformity and consistency among the utilities in the methodology and process for applying the applicable statutes for calculating and remitting municipal surcharge fees. To the extent there are differences in calculation or remittance methodologies among the utilities, or differences in interpretation of the statutes as to collection and remittance of fees, parties were to address what revisions are warranted in order to bring each of the utilities into uniform compliance with applicable statutory provisions as discussed in D.03-02-032. Parties should address whether the utilities should be required to recalculate prior remittances to municipalities based upon a determination of the adopted prospective remittance methodology prescribed in D.03-02-032.

## II. Positions of Parties

Formal comments on the workshop report were filed by municipal interests representing the City of San Jose (San Jose) and the League of California Cities (League). Informal letters were sent by the City of Sunnyvale (Sunnyvale),

Case: 19-30088    Doc# 11847-6    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 14 of 62

the City of Vacaville (Vacaville) and by Contra Costa County (Contra Costa).[2] PG&E, SCE and SDG&E also filed comments on the workshop report.

Sunnyvale registered dissatisfaction with the notification process for the PG&E workshop, claiming that the workshop was poorly noticed and poorly attended. Sunnyvale also expressed objection to D.03-02-032, based on Sunnyvale's belief that it would not receive the franchise fees to which it was entitled. Sunnyvale requested an immediate deferral of implementation of D.03-02-032 pending what it characterized as "properly noticed and conducted hearings."

Vacaville is concerned that PG&E's proposed methodology of calculating franchise payments to municipalities is inconsistent with the methodologies used by SCE and SDG&E. Although Vacaville would stand to benefit slightly from PG&E's proposal, it is concerned that other municipalities within PG&E's service area would stand to loose a significant amount of franchise fee revenue if the proposed change is implemented. Vacaville feels strongly that there should be uniform application of the Commission rules governing both the collection and remittance of franchise fee amounts, and not left to differing interpretations by the utilities. Given the statewide magnitude of the dollar amounts involved and the importance of franchise fee revenue to municipalities, Vacaville feels more time and consideration needs to be given to this important matter perhaps in the form of additional workshops, and that better notification of affected agencies be provided.

Contra Costa argues that PG&E should calculate surcharge revenues using the same percentage factor it uses for payment of franchise fees on other

---

[2] The informal letters will be made a part of the correspondence file of this proceeding.

Case: 19-30088   Doc# 11847-6   Filed: 01/21/22   Entered: 01/21/22 11:46:37   Page 15 of 62

revenues which applies a "G-SUR" rate. Contra Costa computes that it would receive approximately 21.55% more surcharge revenues using the actual G-SUR rate compared to the 0.6% rate proposed by PG&E. Contra Costa also requested that PG&E provide definitions of various terms used by PG&E during the workshop in describing its proposed calculation approach. Contra Costa also requested that PG&E provide detailed support for its projected 2003 surcharge revenue from DWR sources applicable to Contra Costa.

The League believes that California cities need to better understand the statutory methodology for calculating the municipal surcharge due cities on DWR sales, and understand how each utility calculates the surcharge based on their interpretation of the applicable statutory provisions. To accomplish this, the League recommends that a workshop be held with representatives from each of the utilities, the Commission and local governments in each of the service areas. The League is concerned about the notification process and the disproportionately small number of government representatives that attended the April workshop, and propose to facilitate distribution of materials and notification of any further workshop on the surcharge fee calculation.

In its formal comments, San Jose claims that PG&E's workshop report should be disregarded because the workshop exceeded the limited scope of issues that were authorized to be addressed therein, as determined by ALJ ruling. San Jose contends that the workshop was granted for the sole purpose of resolving deficiencies in the billing system of PG&E relating to its ability to calculate DWR revenues. Instead, San Jose claims, PG&E used the workshop as an opportunity to attempt to recalculate the surcharges owed to the cities.

PG&E disputes San Jose's claim that its Workshop Report goes beyond the scope of issues for which the workshop was ordered. PG&E notes that the workshop was not simply intended to address billing system deficiencies, but

also the amount of DWR-supplied power, the cost of that power, and the factor
to be applied to the resulting revenues. PG&E also notes that the workshop
notice specifically identified the question of how remittances are to be calculated
as one of the discussion topics.

San Jose contends that PG&E's approach would deprive that municipality
of almost 70% of the surcharge revenue due it, by applying a factor of 0.006368
rather than the 2% called for under its franchise agreement. San Jose argues that
there is no credible basis for PG&E to deviate from the 2% obligation that is
called for under its franchise agreement.

San Jose asserts that PG&E's proposed methodology directly contravenes
state law and D.03-02-032 based on its interpretation of legislative intent behind
the municipal surcharge to protect revenues to municipalities as gas and electric
service to retail customers was opened to non-utility suppliers. PG&E does not
view the general intent of the municipal surcharge as necessarily requiring that
remittance levels exactly equal what would have gone to municipal entities if
utility service had not been unbundled. Instead, PG&E argues, Section 6353
identifies certain elements to be used in the calculation of the surcharge
amounts.[3] Specifically, Section 6353(d) sets the surcharge fee at the level adopted
by "the commission in the energy transporter's most recent proceeding in which
those factors and surcharges were set." This statutory language provides a
specific reference for where the rate is set and who sets the rate, i.e. the most
recent adopted rate set by the Commission.

---

[3] For instance, Section 6353(b) describes the gas and electric commodity cost
components that should be used to price gas and electric commodity in the surcharge
calculation.

Case: 19-30088   Doc# 11847-6   Filed: 01/21/22   Entered: 01/21/22 11:46:37   Page
17 of 62

PG&E believes its interpretation of D.03-02-032 conforms with the Commission's findings and the law. The Commission found that the franchise statutes did not apply, but that municipal surcharge statutes do. Thus, PG&E has looked to Section 6353 for guidance in implementing the municipal surcharge under D.03-02-032. And the applicable statutory language requires the utility transporter to use the last commission adopted franchise fee surcharge for the utility. When the Commission authorizes a modified or new methodology for the surcharge, PG&E believes that new factor will become the proper one to use under Section 6353.

San Jose argues that PG&E should not recalculate surcharge remittances prior to 2003 paid to municipal entities. PG&E agrees that it should not recalculate prior surcharge payments, but disagrees with the reasoning offered by San Jose. PG&E believes that when payments have been made in the past, they have been proper under the decisions in effect at the time. For instance, prior to D.03-02-032, PG&E remitted surcharges to municipal entities per the rate prescribed for each individual municipality in their respective franchise agreement. PG&E believes that because the approach it followed was required on an interim basis by D.02-02-052, payments made pursuant to that Decision should not be recalculated. PG&E's next payment, for 2003, will not be due until early 2004. At that time, PG&E agrees to employ whatever method the Commission directs to be used for the payment to be made in 2004.

SCE and SDG&E agree with PG&E's interpretation of D.03-02-032 that the *calculation and collection* of franchise fees from retail customers relating to DWR charges should be based on the franchise fee factor adopted in each utility's general rate case. SCE and SDG&E disagree, however, with PG&E's interpretation as to the *remittance* of surcharges to municipalities relating to DWR revenues. While PG&E would use the same general rate case franchise fee factor

for calculating the municipal surcharge fee due to each municipality, SDG&E and SCE, by contrast, believe Pub. Util. Code §§ 6352(d)[4] and 6354(b)[5] require them to remit surcharges to municipalities per the rate prescribed for each individual municipality in their respective franchise agreement. The SCE/SDG&E methodology includes DWR revenues in the calculation of franchise fees as if the DWR charges were part of the utility's gross revenues.

Prior to issuance D.03-02-032, PG&E used the SCE/SDG&E approach. PG&E believes that that approach was required, on an interim basis, by D.02-02-052. There does not appear to be any disagreement on the approach that was to be used prior to D.03-02-032.

PG&E has interpreted D.03-02-032 differently from SCE and SDG&E. PG&E expresses no objection to the SCE/SDG&E interpretation so long as the Commission makes it clear that the SCE/SDG&E approach is the approach the Commission wants PG&E to take in remitting municipal surcharges for electric power sales by DWR. PG&E believes there is a value in using a consistent approach for all of the power provided by DWR to the customers of the state's electric utilities.

---

[4] Section 6352(d) states, "Nothing in this chapter shall in any way affect the rights of the parties to existing franchise agreements executed pursuant to this division that are in force on the effective date of this chapter."

[5] Section 6354(b) states in part, "Surcharges collected from the transportation customer shall be remitted to the municipality granting a franchise pursuant to this division in the manner and at the time prescribed for payment of franchise fees in the energy transporter's franchise agreement."

Case: 19-30088   Doc# 11847-6   Filed: 01/21/22   Entered: 01/21/22 11:46:37   Page 19 of 62

If the Commission directs PG&E to use the SCE/SDGE approach, this will not create any difficulties in the payment of the appropriate amounts to cities and counties. For 2002, PG&E made its payments pursuant to D.02-02-052, which adopted the SCE/SDG&E method on an interim basis. Payments for 2003 will not be due until early 2004, so PG&E agrees to employ whatever method the Commission directs for that payment.

Regardless of what method it directs be used, PG&E asks that the Commission make clear that if the adopted approach is successfully challenged in court, that should not create any disallowance that would fall upon the utility's shareholders.

PG&E does not believe any more workshops or other investigative activities are necessary[*] for the Commission to make its final determination, particularly if the Commission adopts the SCE/SDG&E approach. The essence of that approach is that DWR revenues are treated as PG&E revenues for calculation of payments to cities and counties. The effect is that payments to cities and counties are unaffected by the fact that DWR is providing some of the power consumed by the utilities' customers.

## III. Discussion

We conclude that PG&E's interpretation of D.03-02-032 and of the pertinent statutory language regarding the method of remittances of municipal surcharge fees to individual municipalities is improper. D.03-02-032 determined that for purposes of meeting their franchise obligations to municipalities

---

[*] PG&E commits to continue to work with cities and counties, as discussed in the League's comments, to enable them to understand how PG&E calculates the payments PG&E makes to them. Commission-sponsored workshops are not necessary, or appropriate, for this purpose.

Case: 19-30088    Doc# 11847-6    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page
20 of 62

associated with DWR power, the utilities were to make remittances in the form of municipal surcharges under the provisions of Code Sections 6352-6354.1, rather than "franchise fees" under Sections 6000-6302.

In seeking to implement D.03-02-032, PG&E focused on language in Section 6353(d) which bases the surcharge factor on the most recent commission determination of franchise fees for the "energy transporter" (i.e., the utility acting on behalf of DWR):

> "...the franchise fee factor plus any franchise fee surcharge
> authorized for the energy transporter **as approved by the
> commission in the energy transporter's most recent
> proceeding** in which those factors and surcharges were set."
> (Section 6353 (d), emphasis added.)

PG&E thus proposed to apply the most recent Commission adopted franchise fee percentage from its 1999 GRC Decision to calculate the municipal surcharge on DWR power to be paid to municipal entities, applied uniformly to all of its franchisor municipalities. Under PG&E's approach, the uniform factor would be applied irrespective of the terms of any individual franchise agreements and the contractual franchise fee percentage explicitly stated therein.

We conclude that while PG&E is correct in its interpretation with respect to calculating the total revenues *collected* from customers that is attributable to the municipal surcharge obligation, PG&E is incorrect with respect to the calculation of *remittances* due to each individual municipality. The provisions of the municipal surcharge do not change the rights of municipalities to receive revenues at the same level that apply under the provisions of franchise fees. As stated in Section 6352(d): "Nothing in this chapter shall in any way affect the rights of parties to existing franchise agreements executed pursuant to this division that are in force on the effective date of this chapter."

Case: 19-30088   Doc# 11847-6   Filed: 01/21/22   Entered: 01/21/22 11:46:37   Page
21 of 62

Accordingly, PG&E's proposed method would unduly deprive municipalities of remittances to which they are entitled under the statutes. PG&E shall be required to remit municipal surcharge revenues in accordance with the remittance requirements specified in each respective franchise agreement on a consistent basis with the remittance method already being utilized by SCE and SDG&E. Rather than simply applying a weighted average remittance rate to every municipality, PG&E shall remit surcharge fees to each municipality utilizing the same percentage factor that is specified in the specific franchise agreement applicable to the franchisor municipality in question. PG&E shall not simply apply a uniform average factor to all municipalities based on its 1999 GRC. Such an approach as contemplated by PG&E violates the statutory provisions of Section 6350 governing the municipal surcharge that specify that the surcharge will "replace, but not increase, franchise fees that would have been collected…"

By using a simple average remittance rate, PG&E would necessarily remit municipal surcharges that exceed the comparable franchise fees for some municipalities and fees that fall short for others. The proper application of the statute should provide the same level of remittances to the municipality as they would have received under the franchise fee formula. By adopting this approach, each of the three utilities shall both collect and remit municipal surcharges on a consistent basis.

The correction in PG&E's remittance methodology as adopted in this order addresses the concerns raised by various municipalities relating to their receipt of proper levels of municipal surcharges relating to DWR revenues. Accordingly, we conclude that no further rounds of comments or workshops are necessary to resolve issues relating to PG&E's prospective municipal remittances.

Case: 19-30088   Doc# 11847-6   Filed: 01/21/22   Entered: 01/21/22 11:46:37   Page 22 of 62

Likewise, no further workshops are necessary to address the issue of retroactive calculations or adjustments to prior period municipal surcharge fees.

The correction in remittance methodology ordered in this decision applies to PG&E's remittances for the years 2003 and forward. If PG&E used the proper remittance methodology prior to the issuance of D.03-02-032 on a consistent basis with that used by SCE and SDG&E, municipalities may have already received the proper level of municipal surcharge remittances from PG&E for years prior to 2003. Thus, there may be no need for PG&E to recalculate any past remittances to municipalities for periods prior to 2003 as a result of this order.

## IV. Comments on the ALJ Draft Decision

The Draft Decision of Administrative Law Judge Thomas R. Pulsifer was filed and served on parties on September 16, 2003. Comments on the Draft Decision were filed on October 3, 2003. We have taken the comments in account, as appropriate in finalizing this order.

## V. Assignment of Proceeding

Loretta M. Lynch and Geoffrey F. Brown are the Assigned Commissioners and Thomas R. Pulsifer is the assigned Administrative Law Judge in this proceeding.

## Findings of Fact

1. In D.03-02-032, the Commission determined that each of the IOUs shall bear responsibility for making remittances to municipalities for DWR revenues under the provisions of the municipal surcharge set forth in Pub. Util. Code §§ 6350 *et seq.*

2. In response to questions raised by PG&E concerning how to determine the proper amounts to be remitted to each municipality in compliance with D.03-02-032, a workshop was held.

Case: 19-30088    Doc# 11847-6    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 23 of 62

3. If prior to 2003, PG&E calculated and made its municipal surcharge payments pursuant to D.02-02-052, which adopted the SCE/SDG&E method on an interim basis, no retroactive adjustment for remittances to municipalities may be necessary.

4. After issuance of D.03-02-032, PG&E employed a different method for determining the level of municipal surcharge fees applicable to 2003 revenues due to individual municipalities relating to DWR revenues; PG&E's method was inconsistent with the methodology used by SCE and SDG&E.

5. PG&E's proposed approach for remittances is simply to apply the Commission adopted surcharge percentage from its 1999 GRC Decision to calculate and remit the municipal surcharge fee on DWR power to be paid to each municipal entity.

6. Section 6352(d) states, "Nothing in this chapter shall in any way affect the rights of the parties to existing franchise agreements executed pursuant to this division that are in force on the effective date of this chapter."

7. PG&E's proposed remittance methodology for municipal fees due pursuant to D.03-02-032 would affect the rights of municipal parties to individual franchise agreements by increasing the fees otherwise due to some municipalities while reducing the fees due to others.

8. Municipal surcharge payments for 2003 will not be due from PG&E until early 2004.

9. PG&E agrees to employ whatever method the Commission directs be used for the municipal surcharge payment due in 2004.

## Conclusions of Law

1. The method proposed by PG&E for determining the level of municipal surcharge fees due to individual municipalities pursuant to D.03-02-032 is improper and does not comply with the statutory provisions of Section 6350.

Case: 19-30088    Doc# 11847-6    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 24 of 62

2. Remittance of municipal surcharge fees based on a weighted average factor developed in PG&E's last general rate case would be inconsistent with Section 6350 governing the municipal surcharge, specifying that the surcharge will "replace, but not increase, franchise fees that would have been collected..."

3. PG&E should calculate and remit municipal surcharge fees due to individual municipalities for 2003 and subsequent years pursuant to D.03-02-032 on a consistent basis with the approach already being used by SCE and SDG&E and by applying the specific franchise factor called for under the applicable franchise agreement for each individual municipality.

4. No retroactive calculation may be necessary for remittances paid by PG&E to municipalities attributable to DWR revenues for years prior to 2003 if PG&E calculated and remitted using the appropriate remittance method for those prior periods.

5. No further workshops or other filings are necessary for PG&E to implement the necessary corrections to its accounting and cash disbursement systems in order to comply with this order.

Case: 19-30088   Doc# 11847-6   Filed: 01/21/22   Entered: 01/21/22 11:46:37   Page 25 of 62

# ORDER

**IT IS ORDERED** that:

1. Pacific Gas & Electric Company (PG&E) shall implement necessary corrections to its accounting and disbursement systems to calculate and remit municipal surcharge fees to each municipality pursuant to Decision 03-02-032 for 2003 and subsequent years based upon the prescribed rates called for in the respective franchise agreement applicable to each municipality, and on a basis consistent with the remittance methodology already being employed by Southern California Edison Company and San Diego Gas & Electric Company.

2. No retroactive calculations may be necessary for remittances of municipal surcharge fees paid by PG&E to municipalities attributable to DWR revenues shall be made for years prior to 2003 if PG&E calculated and remitted using the appropriate remittance method for those periods.

This order is effective today.

Dated October 16, 2003, at San Francisco, California.

MICHAEL R. PEEVEY
President
CARL W. WOOD
LORETTA M. LYNCH
GEOFFREY F. BROWN
SUSAN P. KENNEDY
Commissioners

CITY ATTORNEY
CITY OF SAN JOSE

OCT 20 2003

**RECEIVED**

Case: 19-30088    Doc# 11847-6    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page
26 of 62

ALJ/TRP/avs

Decision 03-02-032  February 13, 2003

**BEFORE THE PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA**

| | |
|---|---|
| Application of Southern California Edison Company (E333-E) for Authority to Institute a Rate Stabilization Plan with a Rate Increase and End of Rate Freeze Tariffs. | Application 00-11-038 (Filed November 16, 2000) |
| Emergency Application of Pacific Gas and Electric Company to Adopt a Rage Stabilization Plan. (U 39 E) | Application 00-11-056 (Filed November 22, 2000) |
| Petition of THE UTILITY REFORM NETWORK for Modification of Resolution E-3527. | Application 00-10-028 (Filed October 17, 2000) |

**OPINION ON MUNICIPAL FEES RELATING TO ELECTRICITY SALES BY CALIFORNIA DEPARTMENT OF WATER RESOURCES**

141134

- 1 -

# TABLE OF CONTENTS

**TITLE**                                                                    **Page**

OPINION ON MUNICIPAL FEES RELATING TO ELECTRICITY SALES BY
CALIFORNIA DEPARTMENT OF WATER RESOURCES ......................................... 2
  I. Background ................................................................................................... 2
  II. Municipalities' Rights to Franchise Fees and Municipal Surcharges ............ 3
    A. Positions of Parties ............................................................................3
    B.   Discussion ........................................................................................9
  III. Need for Further Legislative Remedies .......................................... 15
    A. Parties' Position ............................................................................15
    B.   Discussion ........................................................................................16
  IV. Ratemaking Considerations ............................................................ 16
    A. Background ......................................................................................16
    B.   Parties' Positions ...........................................................................17
    C. Discussion .........................................................................................19
  V. Comments on Draft Decision ........................................................... 21
    A. Comments of PG&E ........................................................................21
    B. Comments of SCE ............................................................................24
    C. Comments of CCSF ........................................................................25
  VI. Assignment of Proceeding ............................................................... 26

Case: 19-30088    Doc# 11847-6    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page
28 of 62

## OPINION ON MUNICIPAL FEES RELATING TO ELECTRICITY SALES BY CALIFORNIA DEPARTMENT OF WATER RESOURCES

## I. Background

This decision resolves issues regarding the collection and remittance of franchise fees in connection with electric power sales of the California Department of Water Resources (DWR) pursuant to Assembly Bill (AB) 1 of the First Extraordinary Session (Stats. 2001, Ch. 4), hereafter referred to as AB1X. We address this issue pursuant to Decision (D.) 02-02-052, in which we allocated the DWR revenue requirement among customers in the service territories of the major electric investor-owned utilities (IOUs): Pacific Gas & Electric Company (PG&E), Southern California Edison Company (SCE), and San Diego Gas & Electric Company (SDG&E).

As prescribed under Public Utilities Code Sections 6000- 6302, municipalities grant franchises to IOUs to use public rights-of-way to construct and maintain the physical facilities necessary for the IOUs to provide gas and electric service to customers. The IOUs are authorized to locate facilities on public property in exchange for the payment of a franchise fee. During the course of the DWR revenue requirement proceeding, however, a dispute arose involving the question of whether, or on what basis, franchise fees may be assessed, collected, and remitted to municipalities for electric power sales made by DWR to customers pursuant to AB1X.

Issues in dispute include what are the legal rights of municipalities to be paid franchise fees on DWR power sales, and what are the legal obligations of DWR to collect and/or remit franchise fees associated with its power sales. There are also unresolved questions as to the IOUs' obligations to remit franchise fees to municipalities on DWR power sales, and the extent to which current IOU

- 2 -

retail rates already include (or should include) a provision for such franchise fees. In D.02-02-052, we did not reach a final resolution of these questions, but directed the assigned Administrative Law Judge (ALJ) to take further comments on the pertinent legal and factual issues as a basis for further Commission action.

In accordance with the directive in D.02-02-052, an ALJ's ruling was issued on April 3, 2002, soliciting comments on the above-referenced issues. Comments were filed by PG&E, SDG&E, and SCE. Various parties representing local government interests also filed comments. These included the City of San Diego and the City and County of San Francisco (CCSF). CCSF is joined in its comments by the following cities: Berkeley, Davis, San Leandro, and Sunnyvale. The County of Los Angeles filed separate comments. The mayors and municipal administrators of various cities, although not parties to the proceeding, sent letters to the ALJ in support of the comments of the parties representing municipal interests.[1] DWR is not a formal party to the proceeding, but submitted a memorandum to the Commission, served on parties, expressing its views on the subject. The filed comments form the record for the conclusions we reach in this order.

## II. Municipalities' Rights to Franchise Fees and Municipal Surcharges

### A. Positions of Parties

DWR asserts that it is not responsible for the collection or remittance to municipalities of franchise fees relating to electric power sales that it makes under AB1X. DWR did not include any provision for franchise fees in its revenue requirement implemented in D.02-02-052. Although DWR-provided power flows

---

[1] These letters shall be placed in the correspondence file for this proceeding.

Case: 19-30088    Doc# 11847-6    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page
30 of 62

over IOU facilities that are subject to the franchise authority of municipalities, DWR, itself, does not own physical facilities in public rights-of-way. DWR has no franchise agreement with any municipality nor does it operate a franchise.[2] The emergency legislation establishing the DWR's responsibilities for buying and selling power identifies the categories of charges the DWR is to collect, but does not include municipal surcharges or franchise fees.[3] Since the state legislature has carefully delimited the fees and expenses that the DWR may collect, DWR argues that municipal charters may not expand the DWR's statutory role to include remittance of franchise fees.

DWR recommends that the IOUs continue to collect surcharges and remit franchise fees to municipalities on revenues from sales of DWR power in accordance with the IOUs' franchise fee agreements, subject to an appropriate cost recovery mechanism for these payments.

The IOUs argue that they have no legal obligation to remit franchise fees on DWR-supplied power. Under the provisions of Public Utilities Code Section 6006, franchise fees are calculated based upon the "gross annual receipts of the grantee arising from the use, operation, or possession of the franchise." Since the "grantee" of the franchise is the IOU, they argue, only the "gross annual receipts" from IOU sales are subject to franchise fees. The IOUs exclude those revenues that are not sources of IOU earnings for franchise fee purposes. Such excluded revenues include interdepartmental sales and collections from others, *e.g.*, users taxes.

---

[2] *See e.g., Saathoff v. City of San Diego* (1995) 35 Cal. App. 4th 697

[3] *See*, California Water Code Sections 80106, 80110.

Case: 19-30088    Doc# 11847-6    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page
31 of 62

The IOUs argue that they are not obligated to remit franchise fees for DWR-provided power under the terms of their franchise agreements, because the DWR-provided power is not the property of the IOU. Under Water Code Section 80110, DWR retains title to power that it sells to end users. The IOUs thus view the "gross revenues" from DWR sales as belonging to DWR, whereas franchise fees referenced in Public Utilities Code Sections 6000 through 6302 apply solely to the revenues belonging to the IOU. Thus, they argue, revenue from the sale of power by DWR is not "receipts of the grantee" that the IOUs include for computing franchise fees pursuant to Section 6006.

While contending they are not responsible for franchise fees on DWR revenues under Sections 6000-6302, SDG&E and SCE do believe that local governments are entitled to "municipal surcharges" on DWR revenues as prescribed by Public Utilities Code Sections 6352 through 6354.1. These sections codify provisions of the Municipal Lands Surcharge Act ("the Act") which was created in 1993 by Senate Bill (SB) 278 which imposed a surcharge on gas and electric sales by entities other than the incumbent utility.[4]

The statutory provisions authorizing municipal surcharges were enacted in response to changes in California gas and electricity industries as they began to be partially deregulated, permitting entities other than the IOUs to sell to retail customers. Because then-existing statutory requirements for remittance of franchise fees only applied to revenue from sales of electricity by IOUs, non-utility commodity sales would result in reduced IOU revenues and,

---

[4] SB 278 requires the surcharge to be applied to gas and electricity sales, but did not provide for the computation of the surcharge on electricity sales. That requirement was added by SB 703 (1997).

Case: 19-30088   Doc# 11847-6   Filed: 01/21/22   Entered: 01/21/22 11:46:37   Page 32 of 62

consequently, reduced franchise fees paid by IOUs to municipalities. The Legislature recognized that reducing franchise revenues simply because the commodity was supplied by an entity other than the franchised IOU would be unfair both to municipalities and customers.

SDG&E and SCE believe that, consistent with the intent of SB 278, customers obtaining power from DWR have a separate obligation under Section 6352 through 6354.1 of the Code to pay such "municipal surcharges" to local governments. Likewise, SDG&E and SCE believe that the IOUs have an obligation to bill, collect, and remit such municipal surcharges. SDG&E believes that end-use customers receiving DWR energy are responsible for municipal surcharge payments.

PG&E disagrees with SCE and SDG&E on this point. PG&E argues that under current law, neither utility franchise fees nor municipal surcharge fees are payable to cities and counties on the power delivered by DWR. PG&E does not believe that current franchise fee and municipal surcharge statutes adequately address how cities and counties should be compensated related to DWR power sales. Under the statutory scheme, "energy transporters" are responsible for collecting the surcharges and remitting fees. PG&E argues that under the Act, DWR serves the role of such an energy transporter in similar fashion to electric service providers (ESPs).[5] Yet, the statute defines a "transportation customer" as an entity *other than* "the State of California or a political subdivision thereof." Therefore, PG&E believes the unintended consequence of AB1X is to exempt DWR, as an agency of the State of California, from the municipal surcharge.

---

[5] *See*, Water Code § 80106.

- 6 -

DWR claims that it is not an "energy transporter" as defined by Public Utilities Code Section 6351, and thus is not required or authorized to collect surcharges or remit franchise fees to municipalities under that statutory provision. DWR argues that Public Utilities Code Sections 6353 and 6354 require the energy transporter (*i.e.*, the IOU) and not the seller (*i.e.*, DWR) to calculate, collect, and remit municipal surcharges. DWR does not consider itself responsible for collecting municipal surcharges pursuant to the California Public Utilities Code Section 6350 *et seq.*

Parties representing municipalities argue that they are entitled to compensation on DWR power sales, and that the Commission should order DWR or the IOUs to remit appropriate fees. The Cities generally contend that both the IOUs and DWR are jointly liable for the payment of franchise fees on DWR power sales. The Cities argue that under an "implied covenant of good faith and fair dealing," the IOUs must honor their obligations to the municipalities, including the payment of franchise fees. Because DWR stands in the shoes of the IOUs for purposes of purchasing power, the cities claim, the IOUs should be obligated to collect franchise fees on this power and provide such fees in full to the municipalities. The municipalities claim the Commission has sufficient discretion to require remittance of franchise fees on power supplied by DWR for utility customers without additional legislation or "clarification."

City of San Diego argues that under city charters, franchise fee obligations are not confined to revenue from transmission and distribution, but also include revenue from generation sold to users. The City argues that the franchise fee obligation applies irrespective of whether the generation is supplied by the IOU, a third party, or DWR. The San Diego City Charter Section 103.1

- 7 -

states that no person may "establish and carry on any business within the said City which is designed to or does furnish services of a public utility nature" to the inhabitants of the City without consent of the City manifested by ordinance. The City argues that selling power is such a business even if DWR does not own the lines. Section 105 of the San Diego City Charter requires payment of franchise fees by persons furnishing such service.

Since both SDG&E and DWR are jointly involved in DWR's electric energy sales in the City, and because DWR could not sell its power without the participation of the utility, City of San Diego argues that they are jointly and severally liable for franchise fees on all revenue derived from the entirety of those sales. City of San Diego claims that while DWR is not obligated to charge franchise fees to its customers as a line item, it is legally obligated to pay a percentage of its gross revenue to the City as a franchise fee.

City of San Diego claims that the municipal surcharge was not intended to apply to DWR, but was designed instead solely for the direct access market to address the fact that unbundling would inadvertently put multiple service providers in a position of doing business with the cities, resulting in disparity in franchise fee burdens for customers and uncertainty for the cities. (See Stats.1993 ch 233 Section 1, effective July 30, 1993). City of San Diego claims the municipal surcharge was the legislature's expedient approach to addressing an inadvertently created problem, but does not recognize the constitutional basis of the charter cities' rights to franchise fees, and it does not replace those rights. Thus, the City claims it is not legally obliged to permanently accept municipal surcharges as a substitute for franchise fees.

Both the City of San Diego and CCSF claim that municipal surcharges only partially protect the cities' financial interest, and that franchise fee

- 8 -

remittances on DWR sales should therefore be required. Otherwise, they believe the status quo should continue until a more permanent solution is adopted to avoid serious harm to the municipalities and claims of rate discrimination. The County of Los Angeles, however, expresses no objection to receiving municipal surcharges (in lieu of franchise fees) on DWR sales. Likewise, several mayors and city administrators throughout California (although they are not parties to this proceeding) sent letters to the ALJ in favor of municipal surcharges as an acceptable form of compensation for DWR power sales.

### B. Discussion

The question before us is whether the rights of the municipalities to be compensated for the sale of electric power utilizing IOU facilities that are subject to a franchise agreement apply to sales by DWR made pursuant to AB1X.

#### 1. Obligations to Pay "Franchise Fees"

Under the provisions of Code Section 6006, the relevant determinant of franchise fee liability depends upon whether the funds in question constitute "receipts" belonging to the IOU (*i.e.*, the "grantee" of the franchise). Under the legal provisions of Water Code Section 80110, DWR retains legal title to all power sold by it to end use customers. Although the IOU acts as collection agent for DWR, the IOU never takes title to the power, and accordingly, is merely a temporary custodian of the receipts from the sale of DWR power.[6] Thus, DWR revenues do not constitute "receipts" belonging to the IOU for purposes of

---

[6] Water Code Section 80104 further states that: "[u]pon the delivery of power to them, the retail end use customers shall be deemed to have purchased that power from the Department. Payment for any sale shall be a direct obligation of the retail end user to the Department."

Case: 19-30088    Doc# 11847-6    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 36 of 62

computing franchise fees. If we were to treat DWR receipts as property of the IOU, we would be in violation of Water Code Section 80110.

Moreover, there is nothing in the Water Code that identifies either franchise fees or municipal surcharges as elements of the revenue requirement that DWR collects. Likewise, because DWR has responsibility to make the determination that its revenue requirement is "just and reasonable" under Public Utilities Code Section 451, we cannot compel DWR to collect such fees on its power sales, or to remit fees to municipalities.

DWR is not legally liable for remittance of franchise fees under those provisions of the Code that apply only to franchisees. DWR does not own facilities subject to a franchise or hold a franchise agreement with any municipality. The terms of DWR power sales are not defined by municipal charter, but by statewide emergency legislation. DWR procurement under AB1X is not subject to municipal charter authority.[7] The emergency legislation under AB1X creating the DWR's power purchase responsibilities stated that the problems addressed by the legislation had a statewide impact. Although cities may legislate upon matters of statewide concern, in the event of conflict with state law, state law controls.[8] Moreover, the courts have instructed that any doubt about whether a matter is a municipal affair or has broader state concern must be resolved in favor of the legislative authority of the state.[9]

---

[7] *See*, California Water Code § 80000(a).

[8] *See, e.g., Pipoly v. Benson* (1942) 20 Cal.2d 366, 369-370, 125 P.2d 482.

[9] *See, e.g., Abbott v. City of Los Angeles* (1960) 53 Cal.2d 674, 681, 3 Cal.Rptr. 158, 349 P.2d 974; *Younger v. Berkeley City Council* (1975) 45 Cal.App.3d 825, 830, 119 Cal.Rptr. 830.

- 10 -

The mere fact that the DWR sales are delivered utilizing facilities of the IOU that are subject to a franchise agreement does not, of itself, make DWR subject to remittance of franchise fees. Otherwise, if nonutility third-party sales were subject to franchise fees merely by virtue of being delivered over franchised facilities, there would have been no need for the California Legislature to enact statutory provisions establishing municipal surcharges for such sales pursuant to Code Sections 6360-6354.1. Yet, the Legislature expressly recognized that because third party sellers of electricity do not have franchise agreements with municipalities, their sales are not subject to franchise fees, and thus, an alternative funding source was needed to protect against loss of revenues by municipalities.

Accordingly, we conclude that the requirements for remittance of franchise fees under Code Sections 6000-6302 apply only to the revenues on sales made by the franchisee (*i.e.,* the IOU) within the limits of the municipality for which the franchise is awarded. Because the power sold by DWR is not the property of the IOU, the revenues on the sale of DWR power likewise is not the property of the IOU franchisee. Thus, the IOU is not liable for remittance of a franchise fee on DWR sales pursuant to Code Sections 6000-6302.

## 2. Obligations to Pay "Municipal Surcharges"

We conclude, however, that the key to resolving the municipalities' concerns regarding compensation for DWR sales lies in the provisions of Public Utilities Code Sections 6350 through 6354.1. Although DWR power purchases under AB1X were not specifically contemplated at the time the municipal surcharge was enacted, the statute nonetheless required customers purchasing power from a third party to be liable for the municipal surcharge. We recognize that DWR's entry into the electric market under AB1X was intended to backstop

- 11 -

the IOUs rather than to compete against them. Nonetheless, the end result still entailed the sale of electric power to end use customers by an entity other than the IOU. The stated legislative intent behind enactment of the municipal surcharge was to protect the financial integrity of local government as a portion of the traditional IOU revenue base for gas and electric service was opened up to the competitive market. Thus, whether the loss of IOU revenue was due to competition or due to DWR backstopping the IOU, the underlying legislative intent still is the same. Therefore, we conclude that DWR sales are a special category of third-party electricity sales that are subject to municipal surcharges under the provisions of Code Sections 6351 through 6354.1 which codified the Municipal Public Lands Use Surcharge Act.

The legislative intent of the Act was to keep municipalities financially whole in the changing regulatory environment of the 1990's, recognizing that customers receiving power over IOU facilities should not escape their obligation to pay franchise fees because the power was purchased by a non-utility seller. Those customers would have paid franchise fees on such power had it been purchased from the IOU. It would be inconsistent with the intent behind the municipal surcharge act to deprive municipalities of compensation for DWR sales merely by virtue of the fact that the IOUs rely upon DWR to provide a portion of the power that they previously supplied to their own customers.

Under the Act, the municipal surcharge is assessed on "transportation customers," and provided to cities and counties. In this regard, Section 6352 (a) states that "[n]otwithstanding any other provision of law, a transportation customer who receives transportation service on [an] electric transmission or distribution system . . . subject to a franchise agreement executed pursuant to this

Case: 19-30088    Doc# 11847-6    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 39 of 62

division from an energy transporter shall be subject to a surcharge as defined in Section 6353." ·

A "transportation customer" is defined under Section 6351(c) to include every person (other than certain state entities) purchasing electricity from a third party and transporting such electricity on an energy transporter's transmission or distribution system. The exclusion of political subdivisions of the state of California from the definition of "transportation customer" raises the question of whether DWR is a "transportation customer" and whether its sales are thereby exempt from the municipal surcharge. Although DWR is a political subdivision of the state of California, we conclude that DWR power sales revenues nonetheless give rise to surcharge revenues under the Act because it is the end use customer, not DWR who is considered as the "transportation customer" under Section 6351.

DWR is more properly designated as a third-party supplier (referred to in Section 6351(c)) from whom the retail customer purchases electricity. The IOU serves the role of "energy transporter," as defined under Section 6351(b), since its facilities are used to deliver DWR power. We conclude therefore that end use customers of DWR are "transportation customers" and are responsible for municipal surcharges on DWR power sales in that capacity. There is no reason to treat sales by DWR differently than sales through other third-party suppliers, where the IOU acts as a collection agent, collecting from transportation customers and paying the municipality a surcharge based on such third-party sales pursuant to Section 6350 *et seq*. The IOUs already have in place a process for collecting and remitting municipal surcharges relating to third-party revenues. It is appropriate, therefore, for the IOUs to bear responsibility for

- 13 -

collecting and remitting municipal surcharges owed to the municipalities by customers of DWR, as well.

Parties representing municipalities provide no citation to support the claim that municipal surcharges only "partially" protect cities' financial interest in comparison to franchise fees. Section 6350 expressly states that the intent of the municipal surcharge is "to replace, but not increase, franchise fees that would have been collected pursuant to this division if not for changes in the regulatory environment such as the 'unbundling' of the gas industry." Moreover, as prescribed in Section 6353(d), the municipal surcharge is calculated by applying the franchise fee percentage factor to revenues generated by transportation customers. Thus, as a replacement for franchise fees under Sections 6000-6302, we find no basis to conclude that receipt of municipal surcharges on DWR revenues would financially disadvantage the municipalities, as compared with franchise fees.

We therefore require the IOUs to continue to remit funds to the municipalities for DWR sales as prescribed in D.02-02-052, but clarify that such remittances are properly classified as municipal surcharges under the provisions of Code Sections 6352-6354.1, rather than "franchise fees" under Sections 6000-6302. To the extent there are administrative costs associated with having IOUs calculate, bill, collect and remit Municipal Surcharges, SCE states that such costs should not be significant and should be recoverable from DWR under the terms of SCE's Servicing Agreement with DWR. SCE does not see any impediments assuming that it is allowed to recover from its customers the municipal surcharges it remits on the DWR electric power.

- 14 -

## III. Need for Further Legislative Remedies

### A. Parties' Position

PG&E claims that legislation is necessary and appropriate to resolve this issue, and to ensure that cities and counties are not harmed by DWR's stepping into the shoes of the utilities to meet their net short positions. PG&E believes that in the interim until this issue is addressed by the Legislature, however, the Commission should not require the utilities to remit funds to cities and counties that is not due and owing under state franchise fee law.

SCE does not believe that legislation is necessary to resolve the franchise fee issue. SDG&E believes that one clarification of the law may be appropriate. In the event that a separate DWR bond charge line-item appears on the customers bill – not bundled with an energy charge line-item as is done today – the separate DWR bond charge line-item should be subject to the Municipal Surcharge. The charge is a financing cost of providing energy – *i.e.,* a charge that would reasonably be part of the commodity charge an ESP might impose on its customers. Under this reasoning, SDG&E explains, the bond charge would be added to the DWR commodity charge and form the basis for the Municipal Surcharge. SDG&E believes the responsibility for pursuing legislative clarification should fall to local government, if they believe it necessary, in cooperation with DWR and the utilities.

The Cities argue that if this Commission authorizes PG&E to collect franchise fees, the appropriate means to mount any challenge to the collection would be via appeal of the Commission's order, not a collateral attack via state court or elsewhere. Moreover, the Cities believe that any diminution of franchise fee payments due to this circumstance will almost certainly result in litigation

Case: 19-30088    Doc# 11847-6    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page
42 of 62

against the utilities on behalf of customers complaining of discriminatory rates and on behalf of municipalities.

## B. Discussion

In view of the provision we adopt in this order for municipalities to be compensated for DWR sales based on the applicable municipal surcharge provisions as discussed above, we find no need to pursue further legislative action on this issue. If any municipality or other party believes that further legislative remedies are warranted or desirable to define or clarify the municipalities legal rights to compensation related to DWR sales under AB1X, they are free to pursue such actions as they deem appropriate.

## IV. Ratemaking Considerations

### A. Background

We next address the question of whether any further ratemaking or accounting measures need to be adopted in this order as a result of the instant order. In D.02-02-052, we authorized certain interim measures pending a final resolution of the dispute relating to franchise fees following analysis of the legal and factual issues involved.

We directed each IOU to continue remitting franchise fees to the municipalities related to the portion of gross receipts attributable to DWR power sales revenue and to establish a memorandum account to track franchise fee remittances associated with DWR sales. The memorandum account allows for segregation of DWR-related franchise fee remittances from other remittances, and provides appropriate record keeping for any subsequent ratemaking adjustments that might be warranted for shortfalls or surpluses in IOU cost recovery caused by variations in remittances.

- 16 -

We recognize that because municipal surcharges will be remitted as a percentage of DWR sales revenue, the portion of revenues collected from ratepayers that will be attributable to the municipal surcharge on DWR sales will fluctuate monthly. Since we did not change overall retail rate levels to reflect DWR costs at the time we adopted the DWR revenue requirement in D.02-02-052, there was likewise no change in the level of franchise fee remittances to municipalities.[10] We directed the IOUs to draw upon funds generated from then- existing rate levels as a basis to remit the franchise fees associated with DWR power sales.

### B. Parties' Positions

SDG&E does not believe any further ratemaking or accounting measures are necessary in its case, but recommends that the Commission simply continue SDG&E's ratemaking treatment of franchise fees and municipal surcharges as previously implemented under D.01-09-059 and approved in D.01-10-035 (in which a provision for the recovery of franchise fees on DWR power sales was included.) This provision for franchise fees was reflected in the revised tariff sheets filed by SDG&E on September 27, 2001 in compliance with D.01-09-059. In response to D.01-09-059 SDG&E filed tariffs, customers taking power from DWR are billed the municipal surcharge (pursuant to Sections 6350 to 6354 of the Public Utilities Code) to compensate local government for the use of public lands. Under these tariffs, SDG&E states that it is already collecting the municipal surcharge for DWR sales and remitting those amounts to municipalities in accordance with D.01-05-059 and D.01-10-035 (which denied rehearing of D.01-09-059).

---

[10] Prior to the adoption of D.02-02-052, the IOUs had already been remitting franchise fees to the municipalities based on gross sales receipts, including sales by DWR.

SCE believes that the Commission should clarify what mechanism will be used for IOUs to be compensated for municipal surcharges remitted on power sold by DWR. SCE argues that the IOUs should not be required to subsidize municipal surcharges or bear any risk of undercollection of these costs. If the Commission does not authorize retail rates sufficient for SCE to recover franchise fees (or equivalent municipal surcharges) on power sold by DWR, SCE claims that DWR will be responsible for reimbursing SCE for those costs under Section 7.3(b) of the Servicing Agreement between DWR and SCE.

PG&E and SCE were authorized by the Commission to collect a surcharge on power delivered to its customers[11] that was intended to be used, in part, for payment of funds to DWR for power procured under AB1X. At the time the surcharge was authorized, the precise amount of the DWR revenue requirement had not yet been determined. Likewise, at the time that the DWR revenue requirement was implemented in D.02-02-052, we did not make specific findings on precisely what portion of the surcharge authorized in D.01-03-082 would be required to cover DWR remittances. Likewise, no specific findings have been made concerning whether the surcharge was intended to include franchise fees or municipal surcharges.

SCE states that the Commission has not considered how the collection of franchise fees (or municipal surcharges) might be affected by the requirement under D.02-02-052 that IOUs pay DWR a fixed amount for each kWh of power DWR supplies to IOU customers. SCE also states that the Commission has not

---

[11] PG&E and SCE were each authorized a 3 cents/kWh surcharge in D. 01-03-082 to provide funds to pay DWR-related obligations. The 3 cents/kWh surcharge took effect on June 3, 2001 pursuant to D.01-05-064.

Case: 19-30088    Doc# 11847-6    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 45 of 62

clarified whether its previously authorized surcharges include, or should be "grossed-up" for, franchise fees or municipal surcharges.

PG&E did not offer specific comments concerning ratemaking considerations, but its position is that no funds should be remitted to municipalities under present statutory requirements.

## C. Discussion

We conclude that previously authorized accounting and ratemaking measures adopted in D.02-02-052 adequately provide for the ongoing collection and remittance of municipal surcharges related to DWR revenues and that no additional measures need to be authorized for purposes of the instant order. To the extent that future rates may be adjusted to reflect variances between collections and remittances to municipalities, those adjustments can be considered as part of the overall review and revision of URG rate levels. On an ongoing monthly basis, any fluctuations in remittances of municipal surcharges can be accounted for through the memorandum accounts that have already been established for that purpose. These fluctuations can be taken into account in determining URG revenue needs through the same process as we described in D.02-02-052 with respect to remittances of charges to DWR. As we stated therein:

> "With fixed retail tariffed rates and a fixed per kWh charge payable to DWR, there is, in effect, an amount that the utility is entitled to receive for its own account for the kWh that it supplies to its retail customers. We will call this amount the "imputed utility rate." To the extent that the actual percentage of DWR sales to each utility's retail customers is either less than or exceeds the forecast percentage of DWR sales to those customers for any month, the customers' bills for that month will not reflect exactly the imputed utility rate for the kWh the utility

- 19 -

> provides. The balancing account mechanisms that we have
> authorized elsewhere in this order are intended to ensure
> that over time, the utility recovers its imputed utility rate
> by segregating the effects of DWR sales and providing for a
> true up of estimated to actual DWR sales and allocated
> costs." (*Mimeo.*, at 99.)

Since the municipal surcharges are remitted as a direct percentage of

DWR revenues, the accounting and ratemaking procedures for the municipal

surcharges logically should mirror the procedures previously established to

segregate and true up URG revenues for variances in forecasted versus actual

DWR sales. Accordingly, fluctuations in monthly remittances of municipal

surcharges for DWR revenues will correspondingly affect the "imputed utility

rate" reflected in the customer's bill for recovery of utility retained generation

URG-related costs. Consistent with D.02-02-052, however, this order is not the

appropriate place to determine or adopt specific retail rate adjustments in

response to municipal surcharge fluctuations. The memorandum accounting

records already being maintained by the IOUs provide a satisfactory vehicle for

keeping track of actual collections and remittances, and for making any

subsequent ratemaking adjustments that may be deemed appropriate.

To the extent that the funds collected under the surcharge previously

authorized for PG&E and SCE in D.01-03-082 exceed remittances to DWR, any

residual amount remains available to cover the municipal surcharges remitted

relating to DWR sales. To the extent that remittances to DWR and remittances of

municipal surcharges relating DWR sales revenues impact revenues collected by

PG&E and SCE to recover URG costs, the Commission can address any necessary

ratemaking adjustments as part of the overall review and revision of retail rates,

- 20 -

as discussed in D.02-02-052.[12]  We reiterate our prohibition in D.02-02-052, however, on any double recovery of franchise fees on DWR sales from customers.

## V. Comments on Draft Decision

The draft decision of Administrative Law Judge Thomas R. Pulsifer in this matter was mailed to the parties in accordance with Section 311(g)(1) and Rule 77.7 of the Rules of Practice and Procedure.  Comments were filed on January 30, 2003, and reply comments were filed on February 4, 2003.

Comments on the draft decision  were filed by PG&E, SCE, and the City and County of San Francisco and other municipalities ("CCSF").  SDG&E filed only reply comments.  We have reviewed parties' comments and taken them into account in finalizing this order, as discussed below.

### A. Comments of PG&E

PG&E asks the Commission to affirm that the amounts already remitted to cities and counties for franchise fee payments should not be recalculated based on the "municipal surcharges" approach.  PG&E argues that the Commission should state this expressly to avoid confusion or disagreement between the utilities and the cities and counties.  To the extent that previously submitted amounts were required to be recalculated, PG&E believes there is a possibility that additional payments to cities and counties would be necessary, or that refunds would have to be obtained from cities and counties during a period of very significant financial stress.

---

[12] Any revision of retail rates for PG&E is subject to the Plan of Reorganization ultimately to be adopted for PG&E by U.S. Bankruptcy Court (Case No.01-30923 DM). Any revision of retail rates for SCE is subject to the terms of the Settlement Agreement entered into between SCE and the Commission on October 2, 2001.

- 21 -

PG&E also claims there is not enough information in the draft decision to allow the utilities to calculate the municipal surcharge associated with DWR power for a given municipality. PG&E identifies the components needed to make the calculation as (1) the amount of power provided by DWR to customers in each municipality, (2) the assumed cost of the power, and (3) the appropriate factor to be applied to the resulting revenues.[13] PG&E agrees that the third component is straightforward, and no modification is necessary to address that variable. However, PG&E believes that a method to estimate the amount delivered by DWR into each municipality is needed, as well as the amount that should be applied for the assumed cost of power.

PG&E recommends that the parties be allowed to provide additional input on these issues through a workshop, possibly followed by comments. The Commission would then address the approach to be used to estimate the amount of DWR power delivered into each municipality, and the assumed power cost that should be used, to calculate the municipal surcharge.

Neither SCE nor SDG&E support PG&E's proposal for a workshop. SCE states that because its billing system differs from that of PG&E, SCE does not share PG&E's problem as to how to calculate surcharge obligations to individual municipalities. SCE already knows the amount of DWR power each of its customers use and the DWR revenue associated with that usage.

SDG&E already has Commission-approved tariffs implementing the Municipal Surcharge, and is remitting those surcharge amounts to municipalities in accordance with D.01-09-059 and D.01-10-035 (which denied rehearing of

---

[13] *See*, Public Utilities Code Section 6353.

Case: 19-30088   Doc# 11847-6   Filed: 01/21/22   Entered: 01/21/22 11:46:37   Page
49 of 62

D.01-09-059). SDG&E, therefore, expresses no interest in, nor need for, a workshop, as proposed by PG&E.

The problems identified by PG&E in calculating the municipal surcharge associated with DWR power for a given municipality appear to be unique to PG&E's billing system, and no similar difficulty exists for SCE or SDG&E. Accordingly, SCE and SDG&E should not be required to participate in any workshop that relates to billing system issues unique to PG&E. Because of the limitations in PG&E's billing system, however, further steps will be required to produce sufficient delineation of DWR-related revenues for PG&E to determine the correct remittances to each municipality. We, therefore, grant PG&E's request for a workshop for this purpose, but excuse SCE and SDG&E from participating in it.

PG&E shall submit a proposed workshop agenda within 20 calendar days from the effective date of this order, to be filed and served on parties of record, identifying more specifically what technical issues need to be addressed through the workshop, as well as identifying the municipalities that should be notified concerning any workshop. We direct the staff of the Commission's Energy Division to coordinate with PG&E representatives, as warranted, to initiate further steps toward conducting a workshop and facilitating resolution of the billing system issues raised by PG&E.

PG&E also asks the Commission to confirm that any amounts it has already remitted to the municipalities should not be recalculated. We agree that where a utility has properly remitted municipal surcharge revenues to municipalities in accordance with applicable statutory provisions, there is no need to recalculate past remittances relating to DWR power as a result of this order. Yet, PG&E raises doubts as to whether any amounts it may have

Case: 19-30088    Doc# 11847-6    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 50 of 62

previously remitted to municipalities based on DWR sales revenues represent the correct amounts due, since PG&E claims that it does not have enough information from the Commission to calculate the correct municipal surcharge remittance amount due to each municipality. Accordingly, it would be wrong for the Commission to state positively that no recalculations of PG&E's prior remittances shall be made, knowing that PG&E cannot presently verify if it has made the proper remittances for its past obligations to each municipality. Accordingly, we reserve judgment concerning the extent to which PG&E may need to recalculate the correct amounts of surcharge revenues related to past collections of DWR revenues pending the results of the workshop to be scheduled.

## B. Comments of SCE

SCE asks that the Commission permit the IOUs to incorporate municipal surcharges associated with DWR's power purchases into its URG or generation revenue requirements in the event that the utility's total rate level is no longer frozen.

If utility rates are no longer frozen, SCE argues, no residual revenues will be available to cover such municipal surcharges. With the end of the rate freeze, SCE believes that revenue requirements and rate components are likely to be calculated in a "bottoms-up" manner. SCE thus proposes that the Commission address, as part of this order, the methodology for recovering municipal franchise fee surcharges upon the implementation of "bottoms-up" billing.

SDG&E disagrees with SCE on the need for the instant order to address recovery methodologies for municipal surcharges in anticipation of a time when "utility rates are no longer frozen." SDG&E argues that the Municipal Surcharge

- 24 -

is simply a line item on the bill that is the sole obligation of the customer to pay. Public Utilities Code Sections 6354 (c) and (d) specifically hold the utility harmless and allow the municipality to enforce the collection of the surcharge from the customer. Making the surcharge a component of a utility's revenue requirement would contravene the direct language and intent of the Legislature.

PG&E notes that the Commission has not addressed any generation-related or DWR power charge rate components for PG&E upon which to base bottoms-up billing. The Commission has stated that it will adopt generation- and procurement-related revenue requirements and rate components for PG&E in a later decision. Therefore, PG&E believes that the Commission should address the methodology for recovering municipal franchise fee surcharges under bottoms up billing at the same time that other related revenue requirement or billing methodologies are addressed.

We conclude that it is premature and beyond the scope of this order to adopt policies governing how, or to what extent, utility retail rate elements may warrant revision to reflect remittances of municipal surcharges associated with DWR revenues. At the time and in the proceeding where we take up the issue of adopting utility generation-related or DWR power charge retail rate components based on bottoms-up billing, we shall also address, as appropriate, the manner and extent of any adjustments for municipal surcharges associated with DWR revenues.

## C. Comments of CCSF

CCSF claims that there is no basis in the record for the Draft Decision's finding that DWR revenues do not constitute receipts of the utilities. CCSF argues that this finding would require, at a minimum, an interpretation of specific franchise agreements between franchising parties, which is beyond the

- 25 -

jurisdiction of the Commission. Given that the Commission already has the authority to require collection of franchise fees, CCSF argues that the Commission should address this issue only if it later determines that municipal surcharges should be discontinued.

CCSF claims that the Commission should require collection of franchise fees rather than municipal surcharges on DWR supplied power, and that the Commission must ensure that franchise fees are remitted by the IOUs on revenues associated with power purchased by DWR for utility customers as well as on utility revenues.

We disagree with CCSF in claiming that there is no basis for finding that DWR revenues do not constitute receipts of the utilities. There is no need to examine specific terms of any franchise agreements to support this finding since we are relying on the provisions of the Water Code. The effect of Water Code Section 80110 is to make the utilities only billing and collection agents for delivery of power on behalf of DWR. Thus, pursuant to the Water Code, DWR's revenue requirement, although collected by the utilities, does not belong to the utilities. It is, therefore, proper to exclude DWR's revenues from the utilities' gross receipts for purposes of calculating franchise fee requirement. Otherwise, local governments could double recover the same revenue stream: once in having the utilities use it once in their own franchise fee calculation and then a second time in calculating the municipal franchise fee surcharge.

## VI. Assignment of Proceeding

Loretta M. Lynch and Geoffrey F. Brown are the Assigned Commissioners and Thomas R. Pulsifer is the assigned Administrative Law Judge in this proceeding.

Case: 19-30088    Doc# 11847-6    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page 53 of 62

**Findings of Fact**

   1. Under the provisions of AB1X, the DWR took over responsibility for procuring and selling a portion of the electric power supplied to end use customers in the service territories of the three IOUs beginning in early 2001.

   2. Because DWR retains title to the electric power that it has procured under Water Code Section 80110, and sold to end use customers, DWR sales revenue are not "receipts of the grantee" that form the basis for IOU remittances of franchise fees under Public Utilities Code Section 6006.

   3. DWR has not included franchise fees as an element of its revenue requirement under AB1X, and has not remitted franchise fees to municipalities related to AB1X sales revenue.

   4. Senate Bill 278 (1993) adopted the Municipal Lands Surcharge Act ("the Act" or "SB 278") which imposed a surcharge on gas and electric sales by entities other than the incumbent utility.

   5. Public Utilities Code Section 6350 states that the intent of the municipal surcharge is "to replace, but not increase, franchise fees that would have been collected pursuant to this division if not for changes in the regulatory environment such as the 'unbundling' of the gas industry."

   6. Public Utilities Code Section 6352 (a) states that "[n]otwithstanding any other provision of law, a transportation customer who receives transportation service on [an] electric transmission or distribution system . . . subject to a franchise agreement executed pursuant to this division from an energy transporter shall be subject to a surcharge as defined in Section 6353."

   7. In response to D.01-09-059 SDG&E filed tariffs under which customers taking power from DWR are billed the municipal surcharge (pursuant to

Case: 19-30088    Doc# 11847-6    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page
54 of 62

Sections 6350 to 6354 of the Public Utilities Code) to compensate local
government for the use of public lands.

8. Under its tariffs SDG&E is already collecting the municipal surcharge for
DWR sales and remitting those amounts to municipalities in accordance with
D.01-05-059 and D.01-10-035 (which denied rehearing of D.01-09-059).

9. PG&E's billing system does not produce a sufficiently detailed delineation
to calculate the correct municipal surcharge remittance amount relating to DWR
revenues due to each municipality.

10. Further steps will be required to produce sufficient delineation of DWR-
related revenues for PG&E to determine the correct remittances to each
municipality.

**Conclusions of Law**

1. The municipalities should not be deprived of receipts that would
otherwise be realized merely because DWR took over procurement responsibility
to meet the residual net short requirements of the IOUs pursuant to AB1X.

2. DWR revenues are not a component of the "receipts of the grantee" which
form the basis for franchise fees under Public Utilities Code Section 6006. Title to
the underlying electric power (and sales there from) is held by DWR, not the
IOU.

3. End-use customers purchasing power from DWR are subject to the
municipal surcharge created by SB 278 (1993) as refined by SB 703 (1997).

4. End-use customers that purchase power from DWR under AB1X are
"transportation customers" under the provisions of the municipal charge.

5. Since the municipal surcharges to be remitted will be determined as a
percentage of DWR revenues, the accounting procedures for the municipal
surcharges should mirror the procedures previously established to segregate and

Case: 19-30088    Doc# 11847-6    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page
55 of 62

true up URG revenues as a result of fluctuations in DWR sales as a percentage of total sales to endues customers.

6. It is not necessary for new legislation to be initiated in order to resolve the dispute over franchise fees.

7. To the extent that remittances of charges to DWR and remittances of municipal surcharges to municipalities relating DWR sales revenues impact revenues available to recover URG costs, the Commission can address any necessary ratemaking adjustments for municipal surcharges in the same manner and under the same time frame as for remittances of DWR revenue requirement charges.

8. It is premature and beyond the scope of this order to adopt policies governing how, or to what extent, utility retail rate elements may warrant revision to reflect remittances of municipal surcharges associated with DWR revenues.

9. To the extent that a utility has properly remitted past municipal surcharge revenues to municipalities in accordance with applicable statutory provisions, there is no need to recalculate past remittance obligations relating to DWR power merely as a result of this order.

10. PG&E's request should be granted for a workshop addressing how the requisite data can be developed to facilitate the proper remittances of surcharges to municipalities.

11. Any determination of whether recalculation of PG&E's prior remittances to municipalities are necessary will be made after conclusion of the workshop, and the filing of a status report by PG&E as ordered below.

Case: 19-30088   Doc# 11847-6   Filed: 01/21/22   Entered: 01/21/22 11:46:37   Page 56 of 62

12. SCE and SDG&E should be excused from participating in the PG&E workshop since their billing systems already provide for proper calculation of municipal surcharge remittances.

# O R D E R

**IT IS ORDERED** that:

1. Each of the investor-owned utilities (IOUs) shall bear responsibility for making remittances to municipalities for Department of Water Resources (DWR) revenues under the provisions of the municipal surcharge set forth in Public Utilities Code Sections 6350 *et. seq.*

2. Each IOU shall continue to maintain the memorandum accounts that were authorized in D.02-02-052 established for the purpose of tracking remittances made to municipalities relating to DWR revenues, and to account for any differences between proceeds collected and funds remitted for the municipal surcharges on DWR revenues, pending further notice and disposition by the Commission.

3. Further disposition of any differences between collections and remittances by each IOU for municipal surcharges for DWR revenues shall be addressed in a manner consistent with the Commission's ratemaking treatment of under/overcollections in utility retained generation URG revenues due to the effects of DWR revenue requirement remittances.

4. PG&E's request is hereby granted for a workshop to address how the requisite data can be developed to facilitate the proper remittances of surcharges to municipalities.

5. SCE and SDG&E are excused from participating in the PG&E workshop.

Case: 19-30088    Doc# 11847-6    Filed: 01/21/22    Entered: 01/21/22 11:46:37    Page
57 of 62

6. PG&E shall submit a proposed workshop agenda within 20 calendar days from the effective date of this order, to be filed and served on parties of record, identifying more specifically what technical issues need to be addressed through the workshop, as well as identifying the municipalities that should be notified concerning any workshop.

- 31 -

A.00-11-038 et al. AL,, TRP/avs

7. Upon conclusion of the workshop, PG&E shall promptly file and serve a
written status report indicating the disposition of issues. The Commission's
Energy Division will not be required to submit any workshop report.

This order is effective today.

Dated February 13, 2003, at San Francisco, California.

                                   MICHAEL R. PEEVEY
                                          President
                                   CARL W. WOOD
                                   LORETTA M. LYNCH
                                   GEOFFREY F. BROWN
                                   SUSAN P. KENNEDY
                                          Commissioners

- 32 -

**EXHIBIT B**

# Surcharge 1999 thru 2004

**City of San Jose**
**Franchise Fee Compliance Review**

## Underreported Municipal Surcharges (Electricity)

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **ELECTRIC SURCHARGE 1999-2002** | | | | | | | |
| | Sur Amt. Received | Sur Rate | Gross Revenue Calculated | FF @ 2% | Additional FF Due the City | Uncollectible Adjustments | Net Revenue Due the City |
| 1999 | 170,091 | 0.007278 | 23,370,566 | 467,411 | 297,320 | 12 | 297,309 |
| 2000 | 644,286 | 0.006540 | 98,510,879 | 1,970,218 | 1,325,931 | 58 | 1,325,874 |
| 2001 | 384,281 | 0.006368 | 60,345,616 | 1,206,912 | 822,631 | 312 | 822,319 |
| 2002 | 276,998 | 0.006368 | 43,498,400 | 869,968 | 592,970 | 9 | 592,961 |
| Total | 1,475,656 | 0.00653739 | 225,725,460 | 4,514,509 | 3,038,853 | 390 | 3,038,463 |

**Total Due:** 3,038,463

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **ELECTRIC SURCHARGE 2003-2004** | | | | | | | |
| | Sur Amt. Received | Sur Rate | Gross Revenue Calculated | FF @ 2% | Additional FF Due the City | Uncollectible Adjustments | Net Revenue Due the City |
| 2003 | 300,104 | 0.006368 | 47,126,922 | 942,538 | 642,434 | 1 | 642,433 |
| 2004 | 691,394 | 0.006368 | 108,573,236 | 2,171,465 | 1,480,070 | 34,395 | 1,445,676 |
| Total | 991,499 | 0.006368 | 155,700,159 | 3,114,003 | 2,122,505 | 34,396 | 2,088,108 |

**Total Due:** 2,088,108

## Underreported Municipal Surcharges (Gas)

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **GAS SURCHARGE 1999-2002** | | | | | | | |
| | Sur Amt. Received | Sur Rate | Gross Revenue Calculated | FF @ 2% | Additional FF Due the City | Uncollectible Adjustments | Net Revenue Due the City |
| 1999 | 60,209 | 0.010025 | 6,005,908 | 120,118 | 59,909 | 0 | 59,909 |
| 2000 | 104,543 | 0.013366 | 7,821,587 | 156,432 | 51,889 | 252 | 51,637 |
| 2001 | 187,364 | 0.014997 | 12,493,433 | 249,869 | 62,505 | 47 | 62,458 |
| 2002 | 66,337 | 0.014997 | 4,423,339 | 88,467 | 22,130 | 9 | 22,121 |
| Total | 418,453 | 0.01361077 | 30,744,267 | 614,885 | 196,432 | 308 | 196,125 |

**Total Due:** 196,125

| GAS SURCHARGE 2003-2004 | | | | | | |
|---|---|---|---|---|---|---|
| | Surch. Received | Surcharge | Gross Revenue Calculated | Fee @ 2% | Additional Fee (due to ...) | Inadvertent Adjustment | Refund Due to Cli |
| 2003 | 111,946 | 0.014997 | 7,464,563 | 149,291 | 37,345 | 297 | 37,048 |
| 2004 | 88,274 | 0.012128 | 7,278,352 | 145,567 | 57,293 | 3 | 57,290 |
| Total | 200,220 | 0.01358076 | 14,742,915 | 294,858 | 94,638 | 300 | 94,338 |

Total Due: 94,341