1  ROB BONTA
   Attorney General of California
2  MARGARITA PADILLA
   Supervising Deputy Attorney General
3  ANNADEL A. ALMENDRAS
   Supervising Deputy Attorney General
4  State Bar No. 192064
     455 Golden Gate Avenue, Suite 11000
5    San Francisco, CA  94102-7004
     Telephone:  (415) 510-3367
6    Fax:  (415) 703-5480
     E-mail:  Annadel.Almendras@doj.ca.gov
7
   PAUL J. PASCUZZI, SBN 148810
8  NICHOLAS L. KOHLMEYER, SBN 299087
   FELDERSTEIN FITZGERALD
9  WILLOUGHBY PASCUZZI & RIOS LLP
     500 Capitol Mall, Suite 2250
10   Sacramento, CA  95814
     Telephone: (916) 329-7400
11   Fax: (916) 329-7435
     ppascuzzi@ffwplaw.com
12   nkohlmeyer@ffwplaw.com

13 Attorneys for California Department of Water
   Resources, by and through the State Water Project
14

15            IN THE UNITED STATES BANKRUPTCY COURT

16           FOR THE NORTHERN DISTRICT OF CALIFORNIA

17                  SAN FRANCISCO DIVISION

| | |
|---|---|
| **In re:** | CASE NO. 19-30089(DM) |
| **PG&E CORPORATION** | Chapter 11 |
| And | (Lead Case)<br>(Joint Administered) |
| **PACIFIC GAS AND ELECTRIC COMPANY,** | **CALIFORNIA DEPARTMENT OF WATER RESOURCES' MOTION FOR ORDER DETERMINING THAT THE CASTLE ROCK AGREEMENT WITH PG&E CANNOT BE ASSUMED AND THAT THE DEPARTMENT OF WATER RESOURCES' CLAIM NO. 78104 BE PAID** |
| Debtor. | |
| ☐   Affects PG&E Corporation | |
| ☐   Affects Pacific Gas and Electric Company | Date:     March 2, 2022<br>Time:     10:00 a.m.<br>Place:    Courtroom 17<br>Judge:   Dennis Montali |
| ☑   Affects both Debtors | |

# TABLE OF CONTENTS

Page

I.   Jurisdiction ........................................................................................................... 2

II.  Issues Presented/Requested Relief ...................................................................... 3

III. Background .......................................................................................................... 4

    A.   DWR Terminated Its Participation in the Castle Rock Agreement, Effective August 1, 2019 .................................................................... 4

    B.   FERC Rejected PG&E's Proposal to Add Language to the Castle Rock Agreement Providing that DWR's Termination Would Be Effective Pending Payment of Future Removal Costs. ............................... 8

    C.   PG&E Objects to Paying DWR's Claim and Continues to Bill DWR for Annual Charges. .......................................................................... 9

    D.   Over Three Years After DWR's Notice of Termination, and After Utilizing the Court's Authorized ADR Procedures, PG&E Seeks to Enforce Arbitration Under the Agreement. .............................................. 10

IV.  Argument ............................................................................................................ 11

    A.   DWR Properly Terminated Its Participation in the Castle Rock Agreement. ............................................................................................... 12

    B.   The Effective Date of DWR's Termination From the Castle Rock Agreement Was Not Contingent on Payment of Future Removal Costs. ........................................................................................................ 13

    C.   PG&E Owes DWR $101,026.75 Plus Post-Petition Interest for Overpayments of Operation and Maintenance Charges. ........................... 14

    D.   The Arbitration Provisions in the Castle Rock Agreement Do Not Preclude Payment of DWR's Claim. ....................................................... 15

V.   Conclusion ......................................................................................................... 19

Case: 19-30088   Doc# 11887   Filed: 02/01/22   Entered: 02/01/22 16:34:31   Page 2 of 26

1

**TABLE OF AUTHORITIES**

2
                                                                                              <u>Page</u>

3

**CASES**

4

5    *Agent Sys., Inc. v. Capital Metro. Transp. Auth. (In re Agent Sys., Inc.)*
         289 B.R. 828 (Bankr.N.D.Tex.2002) ........................................................................ 17

6    *First Options of Chicago, Inc. v. Kaplan*
7        514 U.S. 938 (1995) ............................................................................................... 15

8    *Freeman v. State Farm Mut. Auto Ins. Co.*
         14 Cal. 3d 473 (1975) ............................................................................................ 15
9
     *Goldman Sachs & Co. v. City of Reno*
10       747 F.3d 733 (9th Cir. 2014) ................................................................................. 15

11   *Granite Rock Co. v. Int'l Bhd. of Teamsters*
12       561 U.S. 287 (2010) ............................................................................................... 15

13   *In re Conejo Enters., Inc.*
         96 F.3d 346 (9th Cir. 1996) ................................................................................... 18
14
     *In re Sigel & Co.*
15       923 F.2d 142 (9th Cir. 1991) ................................................................................. 11

16   *In re Thorpe Insulation Co.*
17       671 F.3d 1011 (9th Cir. 2012) .......................................................................... 17, 18

18   *Integral Dev. Corp. v. Tolat*
         No. 12-CV-06575-JSW (JSC), 2016 U.S. Dist. LEXIS 187832 (N.D. Cal. Dec.
19       23, 2016) ................................................................................................................ 13

20   *J.W. McClenahan Co. v. Mech. Techs. Corp.*
         2020 U.S. Dist. LEXIS 71064 (N.D. Cal. Apr. 21, 2020) ..................................... 18
21
     *Liona Corp., N.V. v. PCH Assoc. (In re PCH Assoc.)*
22       60 B.R. 870 (S.D.N.Y.1986) .................................................................................. 17

23   *Moody v. Amoco Oil Co.*
24       734 F.2d 1200 (7th Cir. 1984) ............................................................................... 11

25   *Mundi v. Union Sec. Life Ins. Co.*
         555 F.3d 1042 (9th Cir. 2009) ............................................................................... 15
26
     *Parker v. Twentieth Century-Fox Film Corp.*
27       118 Cal. App. 3d 895 (Cal. Ct. App. 2 Dist. 1981) .............................................. 15

28

ii

*Platt Pacific, Inc. v. Andelson*
   6 Cal. 4th 307 (1993) .......................................................................................... 18

*Point Blank Solutions, Inc. v. Robbins Geller Rudman & Dowd LLP (In re Point Blank Solutions, Inc.)*
   449 B.R. 446 (Bankr. D. Del. 2011) ................................................................... 17

*Republic Underwriters Ins. Co. v. DBSI Republic, LLC (In re DBSI, Inc.)*
   409 B.R. 720 (Bankr.D.Del.2009) ...................................................................... 17

*Rice v. Downs*
   248 Cal. App. 4th 175 (Cal. Ct. App. 2 Dist. 2016)........................................... 16

*Simula, Inc. v. Autoliv, Inc.*
   175 F.3d 716 (9th Cir. 1999)......................................................................... 15, 16

*Victoria v. Superior Court*
   40 Cal. 3d 734 (1985) ......................................................................................... 15

*Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.*
   489 U.S. 468 (1989).............................................................................................. 15

*Vons Companies, Inc. v. United States Fire Ins. Co.*
   78 Cal. App. 4th 52 (2000) ................................................................................. 13

**STATUTES**

28 U.S.C.
   § 157................................................................................................................... 2
   § 157(b)............................................................................................................... 2
   § 157(b)(2) ........................................................................................................ 18
   § 157(b)(2)(A), (B), (C), and (O)..................................................................... 17
   § 157(b)(2)(B) ................................................................................................... 18
   § 1334.................................................................................................................. 2

Bankruptcy Code
   § 365......................................................................................................... 1, 2, 17
   § 365(b)(1) .......................................................................................................... 2

Federal Power Act
   § 205(d) ............................................................................................................... 8

Case: 19-30088    Doc# 11887    Filed: 02/01/22    Entered: 02/01/22 16:34:31    Page 4
of 26

**COURT RULES**

Bankruptcy Local Rules of the United States Bankruptcy Court for the Northern
District of California
Rule 5011-1(a) ................................................................................................... 2
Rule 6006-1 ....................................................................................................... 1

Federal Rules of Bankruptcy Procedure
Rule 6006 ........................................................................................................... 1

**OTHER AUTHORITIES**

Castle Rock Agreement
Section 2.2.2.5 .................................................................................................. 7
Section 14.3 ....................................................................................................... 5
Section 14.4 ....................................................................................................... 5
Section 14.5 .................................................................................................... 5, 6
Section 14.6 ....................................................................................................... 6

Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization
dated June 19, 2020
Article VIII ........................................................................................................ 1
Section 11.1 ....................................................................................................... 2
Section 11.1(a) ................................................................................................. 12
Section 8.1(a) ................................................................................................... 11
Section 8.2(c) ..................................................................................................... 2

Order Confirming Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of
Reorganization dated June 19, 2020
Paragraph 32 ...................................................................................................... 1
Paragraph 35 ...................................................................................................... 1
Paragraph 67 ...................................................................................................... 1
Paragraph 78 ...................................................................................................... 1

Order Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges,
General Order 24 ............................................................................................... 2

iv

The California Department of Water Resources, by and through the State Water Project ("DWR"), hereby moves the Court for an order determining that: (1) DWR's cotenant interest in the Castle Rock Agreement (defined below) terminated on its own terms, effective August 1, 2019, based on DWR's July 30, 2018, written notice to Pacific Gas & Electric Company ("PG&E") and the other cotenants to the Agreement; (2) the terms of the Castle Rock Agreement did not require that DWR pay for any future estimated costs of removing the transmission line before its termination from the Agreement could become effective; (3) because DWR's termination of its cotenant interest in the Castle Rock Agreement became effective on August 1, 2019, it is not an executory contract that could have been assumed by Co-Debtors PG&E and PG&E Corporation in connection with the Plan and Confirmation Order (both terms defined below) on June 19, 2020; (4) DWR's proof of claim No. 78104 in the principal amount of $101,026.75 for a refund of prepaid annual operating and maintenance expenses under the Castle Rock Agreement should be paid with post-petition interest under the Plan; (5) the arbitration provisions contained in the Castle Rock Agreement do not preclude the Court from determining whether DWR's proof of claim should be paid;[1] and (6) for such other and further relief as the Court deems just.

This Motion is based on section 365 of the Bankruptcy Code, Rule 6006 of the Federal Rules of Bankruptcy Procedure, Rule 6006-1 of the Bankruptcy Local Rules of the United States Bankruptcy Court for the Northern District of California and the Court's authority over unresolved Contract Assumption or Rejection Disputes reserved in Article VIII of the Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization dated June 19, 2020 (Dkt. 8048) (the "Plan") and this Court's retained jurisdiction, as specified in paragraphs 32 through 35, 67 and 78 of the Order Confirming Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization dated June 19, 2020 (Dkt. 8053) ("Confirmation Order"). This Motion also is related to and supplements the California State Agencies' Objection to Schedule of Executory Contracts and Unexpired Leases to be Assumed Pursuant to the Plan and Proposed Cure Amounts (Dkt. 7276) and constitutes a Contract Assumption or Rejection Dispute that remains unresolved,

---

[1] DWR raises the arbitration issue because it anticipates that PG&E may raise it in its opposition to this Motion. DWR reserves the right to supplement its arguments on the arbitration issue in its reply.

1

as provided in paragraph 32(c) of the Confirmation Order.

The Motion is supported by the Declaration of Ghassan AlQaser ("AlQaser Declaration") and the exhibits thereto, all other pleadings and papers cited or submitted herewith, and the pleadings, filings and documents in the Debtors' cases. In support of the Motion, DWR respectfully represents as follows:

## I. JURISDICTION

The Court has jurisdiction over this Motion pursuant to section 11.1 of the Plan, paragraphs 32 through 35, 67 and 78 of the Confirmation Order, 28 U.S.C. sections 157 and 1334, the Order Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges, General Order 24 (N.D. Cal.) and Rule 5011-1(a) of the Bankruptcy Local Rules. This is a core proceeding pursuant to 28 U.S.C. section 157(b).

Paragraph 34(a) of the Confirmation Order specifically reserves jurisdiction in this Court to resolve any "Cure Disputes" as follows (emphasis added):

34. <u>Determination of Cure Disputes.</u>

a. Pursuant to Section 8.2(c) of the Plan, **in the event of an unresolved dispute regarding** (i) any Cure Amount, (ii) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the executory contract or unexpired lease to be assumed, or **(iii) any other matter pertaining to assumption, assumption and assignment, or the Cure Amounts required by section 365(b)(1) of the Bankruptcy Code (each, a "Cure Dispute"), such Cure Dispute shall be resolved by a Final Order of the Court**, which may be entered after the Effective Date.

See also, Plan at ¶ 8.2(c). Further, paragraph 67(d) of the Confirmation Order also specifically reserves jurisdiction in this Court to resolve any disputes over the assumption of executory contracts involving Governmental Parties, including DWR as follows (emphasis added):

67. <u>Governmental Performance Obligations.</u>

d. Notwithstanding anything in this Confirmation Order, the Plan, or the Plan Documents, the listing of a matter as an "executory contract" or an "unexpired lease" in the Debtors' schedules or Plan Documents (a "Potentially Assumed Contract/Lease") is without prejudice to any contention by any Governmental Unit that the matter is not in fact an executory contract or unexpired lease as set forth in section 365 of the Bankruptcy Code. With respect to any Cure Amount for a Potentially Assumed Contract/Lease for which the United States or any department, agency, or instrumentality of the State of California (collectively, the "Governmental Parties") is listed as the Non-Debtor Counterparty, all parties reserve all rights to

2

dispute such Cure Amount. **If any Governmental Party disputes (i) that any Potentially Assumed Contract/Lease is in fact an executory contract or unexpired lease** or (ii) any Cure Amount, such Governmental Party shall have no later than ninety (90) days after the Confirmation Date (or such later date as may be mutually agreed upon between the applicable Governmental Party and the Debtors or Reorganized Debtors) to file and serve an objection setting forth such dispute, and **any such dispute shall be resolved by the Bankruptcy Court.**

Further, paragraph 78 of the Confirmation Order provides that this Court retains jurisdiction with respect to all matters arising from or related to the implementation of the Confirmation Order. ("The Court shall retain jurisdiction with respect to all matters arising from or related to the implementation of this Confirmation Order and as provided in Section 11.1 of the Plan.").

## II. ISSUES PRESENTED/REQUESTED RELIEF

Did DWR give proper notice that it was terminating its participation in the Agreement of Co-tenancy in the Castle Rock Junction-Lakeville 230-kV Transmission Line ("Castle Rock Agreement" or "Agreement") to PG&E and the other, remaining Cotenants (collectively, "Remaining Cotenants")[2] prior to the Petition Date?

Did the Castle Rock Agreement terminate as to DWR effective August 1, 2019, pursuant to DWR's termination notice?

Did the terms of the Castle Rock Agreement require that DWR pay for any future, estimated costs of removing the transmission line before its termination could be effective?

Did the Castle Rock Agreement constitute an executory contract that could be assumed as to DWR under the Plan at the time of plan confirmation?

Is DWR's Proof of Claim No. 78104 seeking a refund for overpayment of operation and maintenance fees in the principal amount of $101,026.75 allowed and payable by the Debtors?

Do the arbitration provisions in the Castle Rock Agreement preclude the Court from determining whether DWR's Proof of Claim should be paid?

DWR submits that, consistent with the requirements of the Castle Rock Agreement, it gave PG&E and the Remaining Cotenants one-year advance notice that it was terminating its participation in the Agreement by letter dated July 30, 2018, prior to the Petition Date but effective

---

[2] The Remaining Cotenants are Northern California Power Agency ("NCPA") and the City of Santa Clara, doing business as Silicon Valley Power ("SVP").

3

August 1, 2019. Pursuant to the Castle Rock Agreement, DWR paid PG&E for operations and maintenance fees in advance for the year of July 1, 2019, through July 31, 2020. However, pursuant to DWR's termination rights exercised in its notice, its participation in the Castle Rock Agreement terminated effective August 1, 2019. Therefore, PG&E is required to refund DWR eleven months of overpayment for operations and maintenance, plus post-petition interest. No amounts are due from DWR for any future, estimated costs of removing the transmission line. The arbitration provisions contained in the Castle Rock Agreement do not preclude the Court from compelling payment of DWR's proof of claim.

## III.  BACKGROUND

DWR is an agency of the State of California, headquartered in Sacramento. It is responsible for monitoring, conserving, and developing California's water resources, providing public safety, and preventing property damage related to water resources. A primary responsibility of DWR is the construction, operation, and maintenance of the California State Water Project ("SWP"). The SWP is the largest state-owned, multipurpose water project and power generator in the United States. The SWP consists of an integrated network of aqueducts, pumping facilities, reservoirs, and hydroelectric facilities that deliver an average of 2.7 million acre-feet of water per year to 29 public-agency water contractors throughout California. Approximately 40% of the deliveries are used to irrigate approximately 750,000 acres of farmland and the remainder serves the water needs of almost 27 million Californians. Not only does the SWP help California manage its water supply during extremes, such as flooding and drought, but it is also a major source of hydroelectric power deliveries for the State's power grid. (AlQaser Decl. ¶2.)

### A.  DWR Terminated Its Participation in the Castle Rock Agreement, Effective August 1, 2019.

The Castle Rock Agreement is a co-tenancy agreement that became effective as to PG&E, DWR, and the Remaining Cotenants on June 1, 1984 for the purpose of constructing and co-owning a new 230-kV double circuit transmission line between Castle Rock Junction and the PG&E Lakeville Substation ("the Line"). (AlQaser Decl. ¶4, Ex. 1.)  Each cotenant owns an undivided interest in the Line. The terms of the Agreement required DWR and the other Cotenants to share

4

the initial costs of construction of the Line and associated facilities and pay annual charges for the associated facilities and the operation and maintenance of the Line in proportion to their ownership interests. (*Id*., ¶5, Ex. 1, Sections 5.0, 6.0, pp. 33-45.) The initial term of the Castle Rock Agreement extended through December 31, 2014, and continued thereafter from year to year unless terminated. (*Id*., Ex. 1, Section 14.0, p. 95.)

Section 14.3 of the Agreement clearly and unambiguously provides that a Cotenant may terminate participation in the Agreement and provides no conditions on when termination becomes effective other than the one-year advance notice.

> **Termination By A Cotenant.** Any Cotenant may, by giving one (1) year advance written notice to the other Cotenants, terminate its participation in this Agreement effective no earlier than January 1, 2015.

(AlQaser Decl. ¶6, Ex. 1, Section 14.3, p. 97.) Pursuant to Section 14.3, by letter dated July 30, 2018, and prior to PG&E filing for bankruptcy, DWR gave one-year advance written notice to PG&E and the Remaining Cotenants that it was terminating its participation in the Castle Rock Agreement, effective August 1, 2019. (*Id.*, Ex 2.) There is no language in the Agreement that gives PG&E or any of the Remaining Cotenants any discretion to reject or deny the termination or its effective date.

DWR filed a proof of claim (78104) seeking a refund for overpayment of operation and maintenance fees in the principal amount of $101,026.75, representing its prepayment for operating and maintenance expenses for 11 months. (AlQaser Decl., ¶15, Ex. 6.)

Once DWR gave its termination notice, PG&E and the Remaining Cotenants were required under Section 14.4 of the Agreement to decide whether one or more of them wished to keep operating the Line and buy DWR's interest in the Line. (AlQaser Decl. ¶7, Ex. 1, Section 14.4, p. 97.) If there is a unanimous decision to not continue operating the Line, Section 14.5 of the Agreement would apply. This section provides:

> 14.5 Termination By All Cotenants. If the remaining Cotenants determine not to continue operating the New Line, this Agreement shall terminate on the date specified in the notice. [PG&E], or its successor as operator of the New Line, shall remove the New Line, credit the net salvage value of the material, and distribute any

5

> net proceeds among the Cotenants in proportion to their Ownership Interests. If the
> removal is performed at a net loss, [PG&E], or its successor as operator of the New
> Line, shall be reimbursed by the other Cotenants for their respective shares of such
> net loss in proportion to their Ownership Interests. Each Cotenant shall be liable for
> financial obligations incurred by it prior to any termination of this Agreement.

(*Id.*, pp. 97-98.)

As noted in Section 14.5, had PG&E and the Remaining Cotenants decided not to continue operating the Line, the Agreement would terminate in its entirety on the date specified in the notice, and PG&E or its successor as operator of the Line, would be required to remove the Line, credit the net salvage value of the material and distribute any net proceeds among the Cotenants in proportion to their Ownership Interests. (AlQaser Decl., ¶13.)[3] If the removal was performed at a net loss, PG&E, or its successor as operator of the Line, would be reimbursed by the Cotenants for their respective shares of such net loss in proportion to their ownership interests. (*Id.*)

Here, PG&E and the Remaining Cotenants decided to continue operating the Line, so Section 14.5 does not apply. (AlQaser Decl. ¶13.) In this situation, because the Cotenants continue to operate the Line, Section 14.6 of the Agreement governs. (*Id.*) Section 14.6 provides:

> 14.6 Continued Operation By Cotenants. If one or more Cotenants wish to continue
> operating the New Line, the Cotenants wishing to purchase the interest(s) of the
> departing Cotenant(s) may do so effective as of the date the selling Cotenant
> terminates its participation in this Agreement. If more than one Cotenant wish to
> purchase such interest(s), they may do so in proportion to their respective Ownership
> Interests or as otherwise agreed. All interests available for purchase must be
> acquired by the purchaser(s). The sale price will be the estimated net salvage value
> of the interests purchased. The purchasing Cotenant(s) shall pay the departing
> Cotenant(s) their share of the sale price. The departing Cotenant(s) shall transfer its
> (their) interest(s) to the purchasing Cotenant(s) and shall have no more interest in or
> liability under this Agreement except with respect to financial obligations incurred
> prior to its effective date of termination. The departing Cotenant(s) shall obtain and
> provide a full release of any encumbrance of its (their) Ownership Interest prior to
> such transfer. The departing Cotenant shall be liable for all financial obligations
> incurred by it prior to its effective date of termination. The Ownership Interests of
> the remaining Cotenant(s) shall be recalculated as appropriate, under Section 2.2….

---

[3] PG&E interprets "net salvage value" as the after-tax value of the assets after subtracting removal costs, after they are taken out of service, disassembled and sold. Given the age and condition of the facilities, PG&E calculates that the removal costs would actually exceed the resale value of the facilities. Therefore, PG&E estimates that there is no salvage value associated with the Line. (AlQaser Decl. ¶13.)

6

(AlQaser Decl. ¶13, Ex. 1, p. 98.)

Section 2.2.2.5 of the Agreement states:

> If a Cotenant elects to terminate its participation in this Agreement pursuant to Article 11.0 and/or 14.0, the Ownership Interests in megawatts and in percent of the non-terminating Cotenants shall increase for those which elect to receive the Ownership Interest transferred by the terminating Cotenant. The Cotenants which receive no transferred Ownership Interest from the terminating Cotenant shall have no change in their Ownership Interests.

(AlQaser Decl. ¶13, Ex. 1, p. 15.) Because none of the Remaining Cotenants elected to receive DWR's interest, DWR's share effectively reverts back to PG&E.[4] Section 2.2.1.1 of the Agreement states:

> For [PG&E], the Ownership Interest in megawatts is equivalent to the capacity rating of the New Line minus the sum of the Ownership Interests in megawatts of the Cotenants other than [PG&E].

(AlQaser Decl. ¶13, Ex. 1, p. 11.) Section 2.2.2 further states that:

> Ownership Interests shall be adjusted as provided in this Section 2.2.2. For purposes of payment Under Article 5.0, adjustments of Ownership Interests shall be deemed to take effect on the first day of the calendar month in which the transaction or change specified in this Section 2.2.2 takes place.

(*Id.*, p. 12.) Based on Sections 2.2.1.1 and 2.2.2, as of DWR's effective termination date of August 1, 2019, DWR's Interest reverted back to PG&E because PG&E's interest is no longer calculated by subtracting DWR's interest. (AlQaser Decl. ¶13.) Therefore, PG&E's interest increased accordingly.

There is a foundational issue arising out of PG&E and the Remaining Cotenants' refusal to accept DWR's termination from the Agreement. They also contend that DWR owes them over $5 million in estimated costs to remove the Line, even though they continue to operate the Line, there are no plans to remove the Line, and removal of the line is not a viable option due to its integration into the California grid for reliability and operational use. (AlQaser Decl., ¶14.) There is no

---

[4] See also Section 2.2.2.1 which provides that a Cotenant may terminate its participation in the Agreement within 60 days of executing the Agreement if it was unsatisfied with the quality of PG&E's title to the Land Rights. In this case, the Ownership Interest of the terminating Cotenant shall revert back to PG&E, and PG&E's interest in megawatts and percentage shall increase accordingly. (AlQaser Decl., Ex.1, p. 12.)

7

authority in the Agreement to demand future removal costs from a departing Cotenant when there has been no decision by the Remaining Cotenants to discontinue operating the Line, much less demand payment of such removal costs from a cotenant before a termination can become effective. Therefore, DWR effectively terminated its participation in the Agreement and is entitled to a refund of its prepayment of operating and maintenance expenses and PG&E should be ordered to pay its claim.

**B. FERC Rejected PG&E's Proposal to Add Language to the Castle Rock Agreement Providing that DWR's Termination Would Be Effective Pending Payment of Future Removal Costs.**

On July 30, 2019, one day before DWR's termination was to become effective, PG&E filed proposed revisions to the Castle Rock Agreement with the Federal Energy Regulatory Commission ("FERC), pursuant to section 205(d) of the Federal Power Act (FPA). (AlQaser Decl. ¶8, Ex. 3.) PG&E proposed to add the following paragraph to section 14.3 of the Agreement:

> By letter dated July 30, 2018, and pursuant to Section 14.3 of the Agreement, [DWR] gave each of the Cotenants one (1) year advance notice of its desire to terminate [DWR]'s participation in the Agreement, with a requested August 1, 2019 effective date for such termination. PG&E, NCPA, and Santa Clara acknowledge [DWR]'s request to terminate its participation in the Agreement, but have rejected [DWR]'s requested withdrawal from the Agreement pending receipt of [DWR]'s payment of its proportional share of the reasonable estimated removal costs to the remaining Cotenants prior to withdrawing from the Agreement. Upon receipt of [DWR]'s payment, PG&E, NCPA and Santa Clara, as the remaining Cotenants, agree to terminate [DWR]'s participation and to file an amended agreement among the remaining Cotenants pursuant to Section 14.2 of the Agreement.

The removal costs referenced in the proposed amendment refer to the same costs incurred with removing the Line referenced in Section 14.5 above. (AlQaser Decl. ¶9.) The removal costs are estimated and have not materialized because PG&E and the Remaining Cotenants have decided to not remove the Line and may never do so. (*Id.*) In addition, only DWR would have been required to pay removal costs under PG&E's proposed amendment to the Castle Rock Agreement. PG&E also requested waiver of the Commission's prior notice requirements, claiming DWR would not be harmed, to allow the proposed revisions to the Castle Rock Agreement to become effective July 31, 2019, a day before DWR's termination was to become effective. (*Id.*)

At FERC, PG&E acknowledged DWR's request to terminate its participation in the

8

Agreement, but "rejected" DWR's request pending receipt of DWR's payment of its proportional share of the estimated future costs for removing the Line. (AlQaser Decl. ¶8.) DWR intervened and filed a protest, arguing that PG&E improperly added a new term, in the form of a "termination payment," to the Castle Rock Agreement after DWR already satisfied the termination requirements under Section 14.3. (*Id*., ¶10, Ex. 4, p. 2.)

FERC held that PG&E did not meet its burden to establish that its amendment to the Castle Rock Agreement was just and reasonable. (AlQaser Decl. ¶14, Ex. 5.) FERC found that PG&E's proposed amendment "is either an improper imposition of a new obligation on DWR without its consent, or an attempt to expressly codify a disputed obligation in the Agreement, notwithstanding that the Agreement already ensures that a departing party remains responsible for all financial obligations incurred while it was a party to the Agreement." (AlQaser Decl. ¶11, Ex. 5, ¶12, p. 4.) Although FERC reached no conclusion as to the merits of the dispute, it held that PG&E did not adequately justify its proposed changes. (*Id*.)

**C.  PG&E Objects to Paying DWR's Claim and Continues to Bill DWR for Annual Charges.**

PG&E filed for bankruptcy protection on January 29, 2019. DWR filed its proof of claim in the bankruptcy proceeding on October 18, 2019, seeking a refund for the advance payment of the annual facilities charge and operating and maintenance fees it paid PG&E for the period July 1, 2019, through July 30, 2020, based on its August 1, 2019, effective termination date from the Castle Rock Agreement. (AlQaser Decl., Ex. 6.) PG&E objects to the claim, although PG&E has yet to file any formal objections to the claim with the Court.

As noted above, PG&E incorrectly contends that DWR's termination is not effective until it pays its share of any future removal costs. However, there is no reference to any obligation to pay for any future removal costs in the Castle Rock Agreement prior to, or as a condition of, effectuating termination. DWR disputes that it has any obligation to pay for future removal costs because PG&E and the Remaining Cotenants did not decide to discontinue operating the Line and remove it in connection with DWR's termination notice. Pursuant to the terms of the Castle Rock Agreement, DWR effectively terminated its participation in the Agreement as of August 1, 2019.

9

Therefore, DWR has no role, obligation or responsibility in any future decisions made by PG&E and the Remaining Cotenants, including removing the Line. (AlQaser Decl. ¶14.) Yet, PG&E continues to insist that DWR must pay a proportional share of any future removal costs before its termination from the Agreement may become effective, even though PG&E and the Remaining Cotenants continue to operate the Line and removing the Line is not a viable option due to its integration into the California grid for reliability and operational use. (*Id.*) Based on PG&E's erroneous position, PG&E continues to bill DWR for ongoing operating and maintenance expenses and interest that it is no longer obligated to pay because it is no longer a party to the Agreement. (*Id.*)

The Court granted PG&E an extension of time until March 23, 2022, to object to DWR's Claim No. 78104. (Dkt. 11533). Pursuant to this Court's Order Approving ADR procedures (Dkt. 9148), DWR participated in a mediation with PG&E and the Remaining Cotenants, but the parties were unable to reach a resolution. (AlQaser Decl. ¶16.) The next step should be to resolve DWR's claim in the bankruptcy court pursuant to the retained jurisdiction provisions in the Plan and Confirmation Order for resolving disputes over the assumption of executory contracts and claims objections. The dispute constitutes both a Contract Assumption or Rejection Dispute and Cure Dispute that remains unresolved, as provided in paragraph 32(c) of the Confirmation Order, for which this Court is the proper forum to decide the dispute.

### D. Over Three Years After DWR's Notice of Termination, and After Utilizing the Court's Authorized ADR Procedures, PG&E Seeks to Enforce Arbitration Under the Agreement.

Rather than file any formal objections to DWR's proof of claim, PG&E and the Remaining Cotenants are now seeking to utilize terms in the Castle Rock Agreement that allow for an internal committee process and/or arbitration to resolve the underlying dispute between the parties. (AlQaser Decl. ¶17.) However, the language in the Castle Rock Agreement reveals that these provisions were intended to resolve disputes among the Cotenants while still parties to the Agreement and should not apply to resolve disputes three years after DWR has terminated its participation in the Agreement. Thus, this Court is the forum for resolution of DWR's Claim No.

78104 because it relates to the Court's jurisdiction to resolve Contract Assumption or Rejection Disputes and Cure Disputes.

## IV. ARGUMENT

It is basic bankruptcy law that a contract that was terminated pre-petition cannot be assumed in a bankruptcy case. *See In re Sigel & Co.*, 923 F.2d 142, 145 (9th Cir. 1991) (citing *Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1212 (7th Cir. 1984) ("If a contract has been terminated pre-bankruptcy, there is nothing left for the debtor to assume.").  The Debtors acknowledge this principle in their Plan in Section 8.1(a) as follows:

> (a) As of, and subject to, the occurrence of the Effective Date and the payment of any applicable Cure Amount, all executory contracts and unexpired leases of the Reorganized Debtors shall be deemed assumed, unless such executory contract or unexpired lease (i) was previously assumed or rejected by the Debtors, pursuant to a Final Order, (ii) **previously expired or terminated pursuant to its own terms** or by agreement of the parties thereto, (iii) is the subject of a motion to assume, assume and assign, or reject filed by the Debtors on or before the Confirmation Date, or (iv) is specifically designated as an executory contract or unexpired lease to be rejected on the Schedule of Rejected Contracts.

Plan at § 8.1(a) (emphasis added); *see also*, Confirmation Order ¶ 32(a)(ii) (same language).

In connection with confirmation of the Plan, the Debtors filed a Notice of Filing of Plan Supplement in support of the Plan (Dkt. 7037), which contained as Exhibit B the list of executory contracts the Debtors expected would be assumed under the Plan. The California State Agencies, including DWR, filed their objections to the list of contracts to be assumed and the proposed cure amounts. (Dkt. 7276.) In that objection, *inter alia,* the California State Agencies noted their objection that the descriptions of the purported contracts on Exhibit B were not sufficient for a contract counterparty to ascertain the document being referenced to be able to determine whether the item is an executory contract. Due to that lack of specificity, to this day it is unclear whether the Castle Rock Agreement is listed in Exhibit B as a purported contract to be assumed.[5]  Further, the Confirmation Order at paragraph 67(d) preserves any rights of a Governmental Unit to object

---

[5]   As noted above, the Plan at section 8.1(a) provides that all executory contracts to be deemed assumed unless they are rejected or were terminated.  DWR is informed and believes that the Castle Rock Agreement was not rejected.  Thus, whether the Castle Rock Agreement was listed or not is not pertinent to the analysis.

11

1    to the assumption of any executory contract (which the California State Agencies had already done

2    by Dkt. 7276). Regardless, the California State Agencies, including DWR, preserved their rights to

3    object to the assumption of any executory contract with a state agency.

4              The Plan and the Confirmation Order provide that in the event of an unresolved dispute over

5    "any …. matter pertaining to the assumption," such dispute shall be resolved by Final Order of the

6    Court, which may be entered after the Effective Date. *See* Plan §8.2(c) and Confirmation Order ¶¶

7    34(a) and (b) and 67(d) ("any such dispute shall be resolved by the Bankruptcy Court.").  Further,

8    the Plan and Confirmation Order specifically reserve the Court's jurisdiction over all matters arising

9    from or related to the implementation of the Confirmation Order and to hear any disputes involving

10   the assumption of executory contracts and the allowance of any Claims resulting therefrom. *See*

11   Plan §11.1(a); Confirmation Order ¶ 78.

12             There is now a dispute between DWR and PG&E as to whether the Castle Rock Agreement

13   was terminated and thus could not be assumed, and over the payment of DWR Claim No. 78104.

14   It is DWR's position that the Castle Rock Agreement was terminated as to DWR prior to the Petition

15   Date (but effective August 1, 2019), and that the arbitration provisions in the Agreement do not

16   apply to the resolution of Claim No. 78104 or any related claims PG&E may raise in defense about

17   the claim. DWR contends that this Court should determine the issues presented herein under its

18   retained jurisdiction and other provisions of the Plan and Confirmation Order covering disputes

19   over executory contract issues. This dispute is a Contract Assumption or Rejection Dispute that

20   remains unresolved.

21             The Court should find that DWR terminated its participation in the Castle Rock Agreement

22   such that the Agreement could not be assumed as to DWR and that PG&E must pay the

23   overpayment claim in the principal amount of $101,026.75 plus post-petition interest under the

24   Plan.

25        **A.    DWR Properly Terminated Its Participation in the Castle Rock
               Agreement.**

26

27             Section 14.3 of the Castle Rock Agreement expressly provides that any Cotenant may

28   terminate its participation in the Agreement by giving one year advance written notice to PG&E

                                                  12

and the other Cotenants. The language of Section 14.3 is clear and unambiguous. No other action is necessary.

The court's "function is to determine what, in terms and substance, is contained in the contract, not to insert what has been omitted. [Courts] do not have the power to create for the parties a contract that they did not make and cannot insert language that one party now wishes were there." *Dameron Hosp. Assn*., 229 Cal. App. 4th at 569 (quoting *Vons Companies, Inc*. *v. United States Fire Ins. Co*., 78 Cal. App. 4th 52, 58-59, 92 Cal. Rptr. 2d 597 (2000)); *Integral Dev. Corp. v. Tolat*, No. 12-CV-06575-JSW (JSC), 2016 U.S. Dist. LEXIS 187832, 2016 WL 8929073, at *6 (N.D. Cal. Dec. 23, 2016) (court's role limited to "interpret[ing] the terms of the contract, [] not to add, subtract, or vary the words of the written agreement."). [6]

DWR complied with the provisions of Section 14.3 and gave PG&E and the Remaining Cotenants one-year advance written notice on July 30, 2018 (prior to the Petition Date) that it was terminating its participation in the Castle Rock Agreement, effective August 1, 2019. Therefore, DWR properly terminated its participation in the Castle Rock Agreement prior to June 2020 when the Debtors' Plan was confirmed and executory contracts were assumed in connection with plan confirmation.

**B.    The Effective Date of DWR's Termination From the Castle Rock Agreement Was Not Contingent on Payment of Future Removal Costs.**

By demanding that DWR pay speculative or any future removal costs before its termination can become effective, PG&E and the Remaining Cotenants conflate the termination provisions in Section 14.3 with other provisions in the Castle Rock Agreement, producing a new obligation for DWR. Once DWR gave notice of termination, the Remaining Cotenants were required under the terms of the Castle Rock Agreement to decide whether to: (1) continue operating the Line and purchase DWR's ownership interest pursuant to Section 14.4, or (2) discontinue operating the Line and terminate the Castle Rock Agreement pursuant to Section 14.5. Only if PG&E and the Remaining Cotenants decided to terminate the Castle Rock Agreement (which they did not) does

---

[6] Section 16.5 of the Castle Agreement provides that it shall be interpreted, governed by, and construed under the laws of the state of California or the laws of the United States, as applicable…."

13

the sharing of removal costs become an obligation for DWR.

Despite the clarity in the Agreement as to when a Cotenant may be responsible for paying any removal costs, PG&E and the Remaining Cotenants erroneously interpret the language in Section 14.6, which states that a departing Cotenant shall be responsible for "financial obligations" incurred prior to its effective date of termination, to require DWR to make a financial contribution to PG&E and the Remaining Cotenants that reflects a proportional share of the reasonably anticipated removal costs of the Line. (See AlQaser Decl., Ex. 5, ¶11.) However, Section 14.6 does not refer to payment of any future removal costs. Removal costs were negotiated and included in the contract under Section 14.5 only for the situation where all the cotenants decided to terminate the Agreement. Section 14.6 applies when the Remaining Cotenants wish to continue operating the Line - exactly the scenario present here. In addition, because any removal of the Line is to occur sometime in the future when the Remaining Cotenants and any future cotenants decide, if ever, to terminate the Agreement, costs associated with that future removal cannot be a "financial obligation" that was "incurred" prior to the time that DWR's termination became effective within the meaning of Section 14.6.

Moreover, at the time of drafting, the parties to the Castle Rock Agreement were well aware of the meaning of future removal costs and knew how to, and did, express when such costs, and other expenses, would be owed from a Cotenant. Had the parties intended for a departing Cotenant to pay future removal costs prior to terminating its interest in the Castle Rock Agreement while the Line was still operating, they would have expressed it in the Agreement. PG&E and the Remaining Cotenants cannot escape the fact that there is no language in the Castle Rock Agreement that requires any Cotenant to make a financial contribution that reflects its proportional share of future removal costs before its participation in the Agreement can be terminated, and such a requirement should not be read into the Castle Rock Agreement. To do so would be contrary to the language in the Agreement and give PG&E and the Remaining Cotenants a windfall, at the expense of DWR.

**C.    PG&E Owes DWR $101,026.75 Plus Post-Petition Interest for Overpayments of Operation and Maintenance Charges.**

Based on DWR's effective termination date of August 1, 2019, PG&E owes DWR a refund

14

for advance payment of the annual charges and operating and maintenance fees over a period of 11 months (August 1, 2019 through July 30, 2020.) (AlQaser Decl. ¶15.) Post-petition interest is also proper based on the Plan's treatment of Utility General Unsecured Claims at section 4.23(a). Plan §4.23(a) ("The Allowed amount of any Utility General Unsecured Claim shall reflect all interest accrued from the Petition Date through the date of distribution at the Federal Judgment Rate.").

### D. The Arbitration Provisions in the Castle Rock Agreement Do Not Preclude Payment of DWR's Claim.

"Arbitration is strictly a matter of consent and 'thus is a way to resolve those disputes – but only those disputes – that the parties have agreed to submit to arbitration.'" *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 299 (2010) (citing *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989) and *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995). "A court may order arbitration of a particular dispute only where the court is satisfied that the parties agreed to arbitrate that dispute." *Id.* at 297. See also *Goldman Sachs & Co. v. City of Reno*, 747 F.3d 733, 742 (9th Cir. 2014).

When determining whether parties have agreed to submit to arbitration, the court applies general state-law principles of contract interpretation. *Mundi v. Union Sec. Life Ins. Co.*, 555 F.3d 1042, 1044 (9th Cir. 2009). Arbitration is based on a contractual agreement and therefore the court must look to the wording and scope of the arbitration clause in the parties' contract to determine its application. *Parker v. Twentieth Century-Fox Film Corp*., 118 Cal. App. 3d 895, 901 (Cal. Ct. App. 2 Dist. 1981) (citing *Freeman v. State Farm Mut. Auto Ins. Co.*, 14 Cal. 3d 473, 479 (1975)). The Court "should attempt to give effect to the parties' intentions, in light of the usual and ordinary meaning of the contractual language and the circumstances under which the agreement was made." *Victoria v. Superior Court*, 40 Cal. 3d 734, 744 (1985).

To determine whether a contractual arbitration clause covers a particular dispute, the court engages in a two-step inquiry. First, the court determines whether the arbitration clause is broad or narrow in scope and then applies the breadth of the provision to the legal claims asserted to determine whether they must be arbitrated. See *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 720-26 (9th Cir. 1999). "A 'broad' clause includes those using language such as 'any claim arising from or

15

related to this agreement' or 'arising in connection with this agreement.'" *Rice v. Downs*, 248 Cal. App. 4th 175, 186 (Cal. Ct. App. 2 Dist. 2016) (citing *Simula* at 720). A broad clause reaches every dispute between the parties and may extend to tort claims that may arise under or from the contractual relationship. *Simula* at 721. By contrast, a "narrow" clause is one that only employs language such as "arising from" or "arising out of" an agreement, excluding more broader language such as "relating to" or "in connection with." *Rice* at 186.

Section 13.2 of the Castle Rock Agreement states: "Disputes arising under this Agreement *that have not been resolved under Sections 13.1 [Submittal of Dispute to Coordinating Committee] or 15.2.3 [review by Coordinating Committee]* shall be settled through binding arbitration as provided in this Section 13.2 (emphasis added)." This language suggests that Section 13.2 is a narrow clause because it qualifies the disputes that can be settled via arbitration (i.e., those that have not been resolved by the Coordinating Committee), and that arbitration is intended to resolve disputes that arise while a cotenant is still a party to the Agreement. For example, Section 13.1 provides that any billing dispute or any other dispute arising under the Castle Rock Agreement must be submitted to a Coordinating Committee by a Cotenant involved in the dispute. The Committee will attempt to settle all disputes no later than 45 days after the dispute is submitted, unless an extension is agreed upon by the Cotenants involved in the dispute. (*Id*.) No Cotenant shall commence arbitration of any dispute until after the 45-day period. (*Id*.)

Section 15 of the Castle Rock Agreement defines the structure, function and responsibilities of the Coordinating Committee. The Committee is comprised of a Chairperson, who is a representative of PG&E, and no more than two representatives appointed by each Cotenant (Section 15.1.) The Committee serves as liaison between PG&E and the other Cotenants, and to provide a forum for discussion of a number of performance, operational and maintenance issues. (Sections 15.2.1-15.2.3.4; 15.2.4 [requests for maintenance, capital replacements, additions, betterments and changes in points of connection].)

The language in Sections 13 and 15 of the Castle Rock Agreement show that the primary purpose of the dispute resolution procedures is to resolve issues relating to billing and performance and operational issues that arise while the Cotenants are still participating in the Agreement. Such

16

provisions should not be interpreted to apply to a party that is no longer a Cotenant to the Agreement.

In addition, resolution of DWR's proof of claim and the Contract Assumption or Rejection Dispute are core issues that the Court should resolve. 28 U.S.C. § 157(b)(2)(A), (B), (C), and (O); *see also*, *Republic Underwriters Ins. Co. v. DBSI Republic, LLC (In re DBSI, Inc.)*, 409 B.R. 720, 728 (Bankr.D.Del.2009) (challenges as to the effect of orders under § 365 are core, as "the rejection and assumption and assignment of leases and executory contracts are fundamental issues of bankruptcy law unique to the Bankruptcy Code."); *see also Agent Sys., Inc. v. Capital Metro. Transp. Auth. (In re Agent Sys., Inc.)*, 289 B.R. 828, 833 (Bankr.N.D.Tex.2002) ("by filing a motion to assume the Contract, Debtor triggered this court's core jurisdiction over other proceedings dealing with the same subject matter"); *Liona Corp., N.V. v. PCH Assoc. (In re PCH Assoc.)*, 60 B.R. 870, 872–73 (S.D.N.Y.1986) (adversary proceeding to recharacterize a lease was a core claim because that issue was central to a related § 365 motion); *see also, Point Blank Solutions, Inc. v. Robbins Geller Rudman & Dowd LLP (In re Point Blank Solutions, Inc.)*, 449 B.R. 446, 450 (Bankr. D. Del. 2011) (claims that arise directly from the substantive bankruptcy law right to reject executory contracts are a fundamental issue of bankruptcy law unique to the Bankruptcy Code.).

"In core proceedings . . . the bankruptcy court, at least when it sees a conflict with bankruptcy law, has discretion to deny enforcement of an arbitration agreement." *In re Thorpe Insulation Co.*, 671 F.3d 1011, 1021 (9th Cir. 2012). "[T]he core/non-core distinction, though relevant, is not alone dispositive." (*Id.*) That is, "even in a core proceeding … a bankruptcy court has discretion to decline to enforce an otherwise applicable arbitration provision only if arbitration would conflict with the underlying purposes of the Bankruptcy Code." (*Id.*) "[T]he purposes of the Bankruptcy Code include 'centralization of disputes concerning a debtor's legal obligations' and 'protect[ing] creditors and reorganizing debtors from piecemeal litigation.'" (*Id.* at 1022.)

DWR has filed a proof of claim in the bankruptcy case. Allowing or disallowing DWR's claim raises executory contract and cure dispute issues that are unique to, and should be decided by, the bankruptcy court. The Ninth Circuit's decision in *In re Thorpe Insulation Co.* is on point:

17

Here, we agree with the bankruptcy court and the district court that the resolution of Continental's claim was a core proceeding. Continental argues that its "state law breach of contract claim" is non-core because "it is based on state law and arose outside of and independent of Thorpe's bankruptcy." Yet regardless of how Continental characterizes its claim, Continental filed a proof of claim, and Thorpe objected to the claim, so under 28 U.S.C. § 157(b)(2)(B), the allowance or disallowance of that claim was a core proceeding. *In re Thorpe Insulation Co.* at 1021 (citing Durkin v. Benedor Corp. (In re G.I. Indus. Inc.), 204 F.3d 1276, 1279-80 (9th Cir. 2000) ("The filing of a proof of claim is the prototypical situation involving the 'allowance or disallowance of claims against the estate,' a core proceeding under 28 U.S.C. § 157(b)(2))." See also *J.W. McClenahan Co. v. Mech. Techs. Corp.*, 2020 U.S. Dist. LEXIS 71064 at 3-4 (N.D. Cal. Apr. 21, 2020) ("Given that the filing of the proof of claim in the bankruptcy subjects the claim to the bankruptcy court's jurisdiction, the Court agrees that the filing extends to the interrelated actions . . .").

Under *In re Thorpe Insulation Co.*, the allowance or disallowance of DWR's claim, as a proof of claim filed against the estate, is similarly a core proceeding. See also *In re Conejo Enters., Inc.*, 96 F.3d 346, 354 (9th Cir. 1996) ("Once [a party] filed its proof of claim, it subjected its claim to the core jurisdiction of the bankruptcy court."). As such, the Court has discretion to retain jurisdiction over DWR's claim and not send adjudication of the claim to arbitration.

The Court should exercise its discretion and retain jurisdiction to resolve DWR's proof of claim, PG&E's defenses to payment of such claim, and this Contract Assumption or Rejection Dispute. Doing so is not only proper under the specific terms of the Plan and Confirmation Order, but also will promote the underlying purpose of centralization of the Debtors' legal obligations and protect DWR from piecemeal litigation. To the extent that PG&E and the Remaining Cotenants argue that DWR's termination was not effective pending payment of its proportional share of future removal costs, these issues must be resolved by this Court as part of resolving the Contract Assumption or Rejection Dispute and any objections to DWR's claim.

This Court may also find that PG&E and the Remaining Cotenants waived arbitration by waiting over three years to seek such relief, and after unsuccessfully seeking a solution at FERC to gain a litigation advantage. "[I]n the absence of legal excuse, a party's failure to timely demand arbitration results in a contractual forfeiture of the right to compel arbitration." *Platt Pacific, Inc. v. Andelson*, 6 Cal. 4th 307, 318-19 (1993).

18

1    In determining waiver, a court can consider (1) whether the party's actions are inconsistent

2    with the right to arbitrate; (2) whether the litigation machinery has been substantially invoked and

3    the parties were well into preparation of a lawsuit before the party notified the opposing party of

4    an intent to arbitrate; (3) whether a party either requested arbitration enforcement close to the trial

5    date or delayed for a long period before seeking a stay; (4) whether a defendant seeking arbitration

6    filed a counterclaim without asking for a stay of the proceedings; (5) whether important intervening

7    steps (e.g., taking advantage of judicial discovery procedures not available in arbitration) had taken

8    place; and (6) whether the delay affected, misled, or prejudiced the opposing party.

9    *Wagner Construction Co*., 41 Cal. 4th 19, 22-23 (2007).

10    PG&E and the Remaining Cotenants have not displayed a good faith belief that DWR is

11    still a party to the contract and that the arbitration provisions in the Agreement are effective or even

12    applicable, given that they had over three years to seek review through the Coordinating Committee

13    process and/or arbitration, but declined to do so. Since DWR exercised its termination rights under

14    the Agreement, PG&E filed for bankruptcy, delaying DWR's receipt of its refund for prepaid

15    operating and maintenance expenses. PG&E acted inconsistently with its right to use the dispute

16    resolution procedures in the Agreement by waiting until after FERC rejected its unilateral attempt

17    to modify the language in the Agreement to DWR's determent. Any attempt to invoke the dispute

18    resolution procedures and/or arbitration provisions in the Agreement now is prejudicial to DWR

19    because it is no longer a party to the Agreement and has been waiting for over two years for its

20    proof of claim to be resolved in the bankruptcy court.

21    **V.    CONCLUSION**

22    For the reasons set forth above, DWR seeks an order determining that: (1) DWR's cotenant

23    interest in the Castle Rock Agreement terminated on its own terms, effective August 1, 2019, based

24    on DWR's July 30, 2018, written notice to Pacific Gas & Electric Company ("PG&E") and the

25    other cotenants to the Agreement; (2) the terms of the Castle Rock Agreement do not require that

26    DWR pay for any future estimated costs of removing the transmission line before its termination

27    from the Agreement could become effective; (3) because DWR's termination of its cotenant interest

28    in the Castle Rock Agreement became effective on August 1, 2019, it is not an executory contract

19

1  that could have been assumed by Co-Debtors PG&E and PG&E Corporation in connection with

2  Plan and Confirmation Order on June 19, 2020; (4) DWR's proof of claim No. 78104 in the

3  principal amount of $101,026.75 for a refund of prepaid annual operating and maintenance

4  expenses under the Castle Rock Agreement should be paid with post-petition interest under the

5  Plan; (5) the arbitration provisions contained in the Castle Rock Agreement do not preclude the

6  Court from determining whether DWR's proof of claim should be paid; and (6) for such other and

7  further relief as the Court deems just.

8

9  Dated: February 1, 2022                    Respectfully submitted,

10                                            ROB BONTA
                                              Attorney General of California
11                                            DANETTE VALDEZ, SBN 141780
                                              ANNADEL ALMENDRAS, SBN 192064
12                                            Supervising Deputy Attorneys General

13                                            By:

14

15                                              _/s/ Paul J. Pascuzzi_
                                              PAUL J. PASCUZZI
16                                            FELDERSTEIN FITZGERALD
                                              WILLOUGHBY PASCUZZI & RIOS LLP
17                                            Attorneys for California Department of
                                              Water Resources, by and through the State
18                                            Water Project
    SF2019200301
19

20

21

22

23

24

25

26

27

28

                              **PROOF OF SERVICE**

        I, Susan R. Darms, declare:

        I am a resident of the State of California and over the age of eighteen years, and not a party

to the within action; my business address is 500 Capitol Mall, Suite 2250, Sacramento, CA 95814.

On February 1, 2022, I served the within documents:

        **CALIFORNIA DEPARTMENT OF WATER RESOURCES' MOTION FOR**
        **ORDER DETERMINING THAT THE CASTLE ROCK AGREEMENT WITH**
        **PG&E CANNOT BE ASSUMED AND THAT THE DEPARTMENT OF**
        **WATER RESOURCES' CLAIM NO. 78104 BE PAID.**

By Electronic Service only via CM/ECF.

                                                Susan R. Darms

21