ROBERT BONTA, SBN 202668
Attorney General of California
DANETTE VALDEZ, SBN 141780
ANNADEL ALMENDRAS, SBN 192064
Supervising Deputy Attorneys General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 510-3367
Fax: (415) 703-5480
Danette.Valdez@doj.ca.gov
Annadel.Almendras@doj.ca.gov

PAUL J. PASCUZZI, SBN 148810
NICHOLAS L. KOHLMEYER, SBN 299087
FELDERSTEIN FITZGERALD
WILLOUGHBY PASCUZZI & RIOS LLP
500 Capitol Mall, Suite 2250
Sacramento, CA 95814
Telephone: (916) 329-7400
Fax: (916) 329-7435
ppascuzzi@ffwplaw.com
nkohlmeyer@ffwplaw.com

Attorneys for California Department of Water
Resources, by and through the State Water Project

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| In re:<br><br>PG&E CORPORATION<br><br>- and –<br><br>PACIFIC GAS AND ELECTRIC COMPANY,<br><br>                     Debtors.<br>☐   Affects PG&E Corporation<br>☐   Affects Pacific Gas and Electric Company<br>☑   Affects both Debtors | Bankruptcy Case No. 19-30088 (DM)<br><br>Chapter 11<br><br>(Lead Case)<br><br>(Jointly Administered)<br><br>Date:   March 2, 2022<br>Time:  10:00 a.m.<br>Ctrm:  17<br>Judge:  Dennis Montali |

**DECLARATION OF GHASSAN ALQASER IN SUPPORT OF CALIFORNIA DEPARTMENT OF WATER RESOURCES' MOTION FOR ORDER DETERMINING THAT THE CASTLE ROCK AGREEMENT WITH PG&E CANNOT BE ASSUMED AND THAT THE DEPARTMENT OF WATER RESOURCES' CLAIM NO. 78104 BE PAID**

I, Ghassan AlQaser, declare as follows:

1. I am the Executive Manager of the Power and Risk Office, State Water Project ("SWP") of the California Department of Water Resources ("DWR"). I have personal knowledge of the facts set forth below, and if called and sworn as a witness, I could and would testify competently thereto.

2. DWR is an agency of the State of California, headquartered in Sacramento. It is responsible for monitoring, conserving, and developing California's water resources, providing public safety, and preventing property damage related to water resources. A primary responsibility of DWR is the construction, operation, and maintenance of the California SWP. The SWP is the largest state-owned, multipurpose water project and power generator in the United States. The SWP consists of an integrated network of aqueducts, pumping facilities, reservoirs, and hydroelectric facilities that deliver an average of 2.7 million acre-feet of water per year to 29 public-agency water contractors throughout California. Approximately 40% of the deliveries are used to irrigate approximately 750,000 acres of farmland and the remainder serves the water needs of almost 27 million Californians. Not only does the SWP help California manage its water supply during extremes, such as flooding and drought, but it is also a major source of hydroelectric power deliveries for the State's power grid

3. I am responsible for managing the SWP's Power and Risk Office ("PARO"). I have been serving in this capacity for five years and have been with DWR since 1999. I have over 40 plus years in engineering practice and hold a number of advanced engineering degrees including a Ph.D. from Colorado State University in Civil Engineering/Hydraulics. The PARO office is responsible for the long- term strategic planning and risk management of the SWP power portfolio to ensure that SWP has plans to adapt to the evolution of the energy industry in the United States and California. Driven by clean energy policies and the build out of renewable energy generation, PARO continuously performs power planning studies and assessments to develop plans on how to best reposition the SWP and its assets to achieve sustainable and effective management of SWP power portfolio and future needs.

DocuSign Envelope ID: 8D7EA87B-E181-4374-B499-3BDB6CE42F10

4.  I am familiar with the June, 1, 1984 Agreement of Cotenancy in the Castle Rock Junction-Lakeville 230-kV Transmission Line ("Castle Rock Agreement" or "Agreement") between DWR, Pacific Gas & Electric ("PG&E"), Northern California Power Agency ("NCPA") and the City of Santa Clara, doing business as Silicon Valley Power ("SVP") (NCPA and SVP are collectively referred to as, "the Remaining Cotenants"), for the purpose of constructing and co-owning a new 230-kV double circuit transmission line between Castle Rock Junction and the PG&E Lakeville Substation ("the Line"). A copy of the Agreement is attached as **Exhibit 1**.

5.  Each Cotenant owned an undivided interest in the Line. The terms of the Agreement required DWR, PG&E and the Remaining Cotenants to share the initial costs of construction of the Line and associated facilities and pay annual charges for the associated facilities and the operation and maintenance of the Line in proportion to their ownership interests. (*Id*., Ex. 1, Sections 5.0, 6.0.) The initial term of the Castle Rock Agreement extended through December 31, 2014 and continued thereafter from year to year unless terminated. (*Id*., Section 14.0, p. 95.)

6.  Pursuant to Section 14.3 of the Agreement, by letter dated July 30, 2018, and prior to PG&E filing for bankruptcy, DWR gave a one-year advance written notice to PG&E and the Remaining Cotenants that it was terminating its participation in the Castle Rock Agreement, effective August 1, 2019. A copy of the July 30, 2018 letter is attached as **Exhibit 2**.

7.  Once DWR gave its termination notice, the Remaining Cotenants were required under Section 14.4 of the Agreement to decide whether one or more of them wished to keep operating the Line and buy DWR's interest in the Line. (Ex. 1, Section 14.4, p. 97.) If the Remaining Cotenants decided not to continue operating the Line, Section 14.5 of the Agreement would apply. This section provides:

> 14.5 Termination By All Cotenants. If the remaining Cotenants determine not to continue operating the New Line, this Agreement shall terminate on the date specified in the notice. [PG&E], or its successor as operator of the New Line, shall remove the New Line, credit the net salvage value of the material, and distribute any net proceeds among the Cotenants in proportion to their Ownership Interests. If the removal is performed at a net loss, [PG&E], or its successor as operator of the New Line, shall be reimbursed by the other Cotenants for their respective shares of such net loss in proportion to their Ownership Interests. Each Cotenant shall be liable for financial obligations incurred by it prior to any termination of this Agreement.

(*Id.*, pp. 97-98.)

8. On July 30, 2019, one day before DWR's termination was to become effective, PG&E filed proposed revisions to the Castle Rock Agreement with the Federal Energy Regulatory Commission ("FERC), pursuant to section 205(d) of the Federal Power Act (FPA). A copy of PG&E's filing at FERC is attached as **Exhibit 3**. PG&E sought to revise Section 14.3 to state:

> By letter dated July 30, 2018, and pursuant to Section 14.3 of the Agreement, [DWR] gave each of the Cotenants one (1) year advance notice of its desire to terminate [DWR]'s participation in the Agreement, with a requested August 1, 2019 effective date for such termination. PG&E, NCPA, and Santa Clara acknowledge [DWR]'s request to terminate its participation in the Agreement, but have rejected [DWR]'s requested withdrawal from the Agreement pending receipt of [DWR]'s payment of its proportional share of the reasonable estimated removal costs to the remaining Cotenants prior to withdrawing from the Agreement. Upon receipt of [DWR]'s payment, PG&E, NCPA and Santa Clara, as the remaining Cotenants, agree to terminate [DWR]'s participation and to file an amended agreement among the remaining Cotenants pursuant to Section 14.2 of the Agreement.

(*Id.*, pp. 2-3.) PG&E's unilateral revisions acknowledged DWR's notice to terminate its participation in the Agreement, but "rejected" DWR's "request" pending receipt of DWR's payment of its proportional share of the estimated future costs of removing the Line. (*Id.*) Thus, encumbering DWR with an unbargained for condition for termination.

9. The removal costs referenced in PG&E's proposed amendment refer to the same costs incurred with removing the Line referenced in Section 14.5 of the Agreement. The removal costs are estimated and not actual because PG&E and the Remaining Cotenants have decided to not terminate the Line and may never do so. In addition, only DWR would have been required to pay removal costs under PG&E's proposed amendment. PG&E also requested waiver of the Commission's prior notice requirements to allow the unilaterally proposed revisions to the Agreement to become effective before DWR's termination was to become effective.

10. On August 20, 2019, DWR intervened at FERC to protest PG&E's proposed revisions to the Castle Rock Agreement. DWR contended that PG&E improperly added a new term, in the form of a "termination payment," to the Castle Rock Agreement after DWR already satisfied the

termination requirements under Section 14.3. A copy of DWR's Limited Motion to Intervene and Protest is attached as **Exhibit 4**.

11. On September 27, 2019, FERC rejected PG&E's proposed language to Section 14.3 of the Agreement. (*Id.*, ¶1.) FERC held that PG&E did not meet its burden to establish that its amendment to the Castle Rock Agreement was just and reasonable. (*Id.*, ¶12.) A copy of FERC's response is attached as **Exhibit 5**.

12. In calculating the future removal costs, PG&E interprets "net salvage value" as the after-tax value of the assets after subtracting removal costs, after they are taken out of service, disassembled and sold. Given the age and condition of the Line and associated assets, PG&E calculated that the removal costs would exceed the resale value of the assets. Therefore, PG&E estimated that there would be no salvage value associated with the Line.

13. As noted in Section 14.5 of the Agreement referenced above, had PG&E and the Remaining Cotenants decided not to continue operating the Line, the Agreement would terminate in its entirety on the date specified in DWR's notice, and PG&E or its successor as operator of the Line, would be required to remove the Line, credit the net salvage value of the material and distribute any net proceeds among the Cotenants in proportion to their Ownership Interests. If the removal was performed at a net loss, PG&E, as operator of the Line, would be reimbursed by the Cotenants for their respective shares of such net loss in proportion to their ownership interests. However, because PG&E and the Remaining Cotenants chose to continue operating the Line, Section 14.5 does not apply. Instead, Section 14.6 of the Agreement applies. This section states:

> 14.6 <u>Continued Operation By Cotenants</u>. If one or more Cotenants wish to continue operating the New Line, the Cotenants wishing to purchase the interest(s) of the departing Cotenant(s) may do so effective as of the date the selling Cotenant terminates its participation in this Agreement. If more than one Cotenant wish to purchase such interest(s), they may do so in proportion to their respective Ownership Interests or as otherwise agreed. All interests available for purchase must be acquired by the purchaser(s). The sale price will be the estimated net salvage value of the interests purchased. The purchasing Cotenant(s) shall pay the departing Cotenant(s) their share of the sale price. The departing Cotenant(s) shall transfer its (their) interest(s) to the purchasing Cotenant(s) and shall have no more interest in or liability under this Agreement except with respect to financial obligations incurred prior to its effective date of termination. The departing Cotenant(s) shall obtain and

provide a full release of any encumbrance of its (their) Ownership Interest prior to such transfer. The departing Cotenant shall be liable for all financial obligations incurred by it prior to its effective date of termination. The Ownership Interests of the remaining Cotenant(s) shall be recalculated as appropriate, under Section 2.2….

Section 2.2.2.5 of the Agreement states:

If a Cotenant elects to terminate its participation in this Agreement pursuant to Article 11.0 and/or 14.0, the Ownership Interests in megawatts and in percent of the non-terminating Cotenants shall increase for those which elect to receive the Ownership Interest transferred by the terminating Cotenant. The Cotenants which receive no transferred Ownership Interest from the terminating Cotenant shall have no change in their Ownership Interests.

Because none of the Remaining Cotenants elected to receive DWR's interest, DWR's share effectively reverted back to PG&E.[1] Section 2.2.1.1 of the Agreement states:

For [PG&E], the Ownership Interest in megawatts is equivalent to the capacity rating of the New Line minus the sum of the Ownership Interests in megawatts of the Cotenants other than [PG&E].

Section 2.2.2 further states that:

Ownership Interests shall be adjusted as provided in this Section 2.2.2. For purposes of payment Under Article 5.0, adjustments of Ownership Interests shall be deemed to take effect on the first day of the calendar month in which the transaction or change specified in this Section 2.2.2 takes place.

Based on Sections 2.2.1.1 and 2.2.2 of the Agreement, as of DWR's effective termination date of August 1, 2019, DWR's Interest reverted to PG&E because PG&E's interest is no longer calculated by subtracting DWR's interest. Therefore, PG&E's ownership interest increased accordingly.

14. PG&E and the Remaining Cotenants chose to continue operating the Line and not remove it in connection with DWR's termination notice. Pursuant to the terms of the Castle Rock Agreement, DWR effectively terminated its participation in the Agreement as of August 1, 2019. Therefore, given that the Agreement does not require payment of future removal costs by a departing cotenant if the line is still operating after that cotenant terminated participation, DWR

---

[1] See also Section 2.2.2.1 which provides that a Cotenant may terminate its participation in the Agreement within 60 days of executing the Agreement if it was unsatisfied with the quality of PG&E's title to the Land Rights. In this case, the Ownership Interest of the terminating Cotenant reverts back to PG&E, and PG&E's interest in megawatts and percentage increase accordingly.

has no role, obligation or responsibility in any future decisions made by the Remaining Cotenants, including removing the Line. Yet, PG&E continues to insist that DWR must pay a proportional share of any future removal costs, which PG&E estimates to be at over $5 million, before DWR's termination from the Agreement may become effective even though they continue to operate the Line and removal of the Line is not a viable option due to its integration into the California grid for reliability and operational use. Based on this erroneous position, PG&E continues to bill DWR for ongoing operating and maintenance expenses and interest that DWR is no longer obligated to pay because it is no longer a party to the Agreement.

15. On October 18, 2019, DWR filed its proof of claim seeking a refund of $101,026.75 for its prepaid annual operating and maintenance expenses. Based on DWR's effective termination date of August 1, 2019, PG&E owes DWR a refund for advance payment of the annual charges and operating and maintenance fees over a period of 11 months (August 1, 2019 through July 30, 2020.) A copy of DWR's proof of claim is attached as **Exhibit 6**.

16. Pursuant to this Court's Order Approving ADR Procedures, DWR agreed to participate in a mediation with PG&E and the Remaining Cotenants. The mediator held two sessions, but the parties were unable to resolve the dispute.

17. PG&E is now requesting that DWR participate in the dispute resolution procedures, including an internal committee process and arbitration, provided in the Agreement even though DWR is no longer a party to the Agreement.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: January 31, 2022 in Sacramento, California

*Ghassan AlQaser*
_____                                   _____
Ghassan AlQaser

# PROOF OF SERVICE

I, Susan R. Darms, declare:

I am a resident of the State of California and over the age of eighteen years, and not a party to the within action; my business address is 500 Capitol Mall, Suite 2250, Sacramento, CA 95814. On February 1, 2022, I served the within documents:

**DECLARATION OF GHASSAN ALQASER IN SUPPORT OF CALIFORNIA DEPARTMENT OF WATER RESOURCES' MOTION FOR ORDER DETERMINING THAT THE CASTLE ROCK AGREEMENT WITH PG&E CANNOT BE ASSUMED AND THAT THE DEPARTMENT OF WATER RESOURCES' CLAIM NO. 78104 BE PAID**

By Electronic Service only via CM/ECF.

_____
Susan R. Darms