**WEIL, GOTSHAL & MANGES LLP**
Richard W. Slack (*pro hac vice*)
(richard.slack@weil.com)
Theodore E. Tsekerides (*pro hac vice*)
(theodore.tsekerides@weil.com)
Jessica Liou (*pro hac vice*)
(jessica.liou@weil.com)
Matthew Goren (*pro hac vice*)
(matthew.goren@weil.com)
767 Fifth Avenue
New York, NY 10153-0119
Tel:     (212) 310-8000
Fax:     (212) 310-8007

**KELLER BENVENUTTI KIM LLP**
Jane Kim (#298192)
(jkim@kbkllp.com)
David A. Taylor (#247433)
(dtaylor@kbkllp.com)
Thomas B. Rupp (#278041)
(trupp@kbkllp.com)
650 California Street, Suite 1900
San Francisco, CA 94108
Tel: (415) 496-6723
Fax: (650) 636 9251

*Attorneys for Debtors and Reorganized Debtors*

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION,**<br><br>- and -<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br><br> **Debtors.** <br>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>☒ Affects both Debtors<br><br>* *ALL PAPERS SHALL BE FILED IN THE LEAD CASE, NO. 19-30088 (DM).* | Case Nos. 19-30088 (DM) (Lead Case)<br>(Jointly Administered)<br><br>**MOTION OF THE REORGANIZED DEBTORS FOR ENTRY OF AN ORDER MODIFYING PLAN INJUNCTION AND COMPELLING ARBITRATION OF CLAIM OF CALIFORNIA DEPARTMENT OF WATER RESOURCES**<br><br>Hearing Date: March 2, 2022<br>Time: 10:00 a.m. (Pacific Time)<br>Place:  **(Telephonic or Video Only)**<br>      United States Bankruptcy Court<br>      Courtroom 17, 16th Floor<br>      San Francisco, CA 94102<br><br>**Objection Deadline:**<br>**February 16, 2022, 4:00 pm (PT)** |

# TABLE OF CONTENTS

Page

I.    PRELIMINARY STATEMENT ................................................................ 2

II.   JURISDICTION ................................................................................... 4

III.  BACKGROUND ................................................................................... 4

    A.    The Bankruptcy Cases ............................................................ 4

    B.    The Cotenancy Agreement ...................................................... 5

    C.    The Transmission Service Agreement Among CDWR, NCPA And SVP ................. 7

    D.    CDWR's Attempt To Terminate Its Participation In The Cotenancy Agreement ....... 7

    E.    CDWR's Claim In PG&E Bankruptcy ................................. 9

    F.    Mediation Of CDWR Claim ................................................. 10

    G.    The Dispute Resolution And Binding Arbitration Provisions In The Cotenancy Agreement ................................................. 10

IV.  RELIEF REQUESTED ...................................................................... 12

V.   ARGUMENT AND BASIS FOR RELIEF REQUESTED ................. 12

    A.    The FAA and CAA Require the Court to Enforce the Cotenancy Agreement's Arbitration Provision ................................................. 12

    B.    CDWR's Purported Termination of the Cotenancy Agreement, Even If Effective, Does Not Terminate The Arbitration Provision .......... 14

    C.    Cause Exists to Modify The Plan Injunction To The Extent Necessary To Permit Arbitration ................................................. 16

VI.  NOTICE ........................................................................................... 18

VII. CONCLUSION ............................................................................... 19

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Brayton Purcell LLP v. Recordon & Recordon*, 2006 U.S. Dist. LEXIS 82145 (N.D. Cal. Oct. 31, 2006) ................................................................................................................................... 12

*Christensen v. Tucson Estates, Inc. (In re Tucson Estates, Inc.)*, 912 F.2d 1162 (9th Cir. 1990) ...... 16

*Cont'l Ins. Co. v. Thorpe Insulation Co. (In re Thorpe Insulation Co.)*, 671 F.3d 1011 (9th Cir. 2012) ................................................................................................................................... 12

*Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612 (2018) ................................................................. 13

*Huffman v. Hilltop Cos., LLC*, 747 F.3d 391 (6th Cir. 2014) ................................................. 15

*In re Curtis*, 40 B.R. 795 (Bankr. D. Utah 1984) ................................................................. 16, 17

*In re Plumberex Specialties Prods., Inc.*, 311 B.R. 551 (Bankr. C.D. Cal. 2004) ...................... 16

*In re SquareTwo Fin. Servs. Corp.*, 2017 Bankr. LEXIS 2570 (Bankr. S.D.N.Y. Sept. 11, 2017) .... 16

*Law Offices of John F.L. Hebb v. Ateco, Inc. (In re Ateco, Inc.)*, 2013 Bankr. LEXIS 4644 (B.A.P. 9th Cir. July 15, 2013) ............................................................................................. 12

*Litton Financial Printing Division v. NLRB*, 501 U.S. 190, 204 (1991) ..................................... 14, 15

*Rico Corp. v. Arundotech, LLC (In re Arundotech, LLC)*, 2009 Bankr. LEXIS 1705 (B.A.P. 9th Cir. May 4, 2009) .................................................................................................. 17

*Shearson/Am. Express, Inc. v. McMahon*, 482 U.S. 220 (1987) ............................................ 13

*Shivkov v. Artex Risk Sols., Inc.*, 974 F.3d 1051 (9th Cir. 2020) .......................................... 14, 15

**Statutes**

9 U.S.C. § 2 ................................................................................................................... 12

11 U.S.C. § 101(5) .......................................................................................................... 5

11 U.S.C. § 105(a) .......................................................................................................... 1, 12

11 U.S.C. § 362 .............................................................................................................. 1, 12, 16, 17

11 U.S.C. § 522(f) ........................................................................................................... 16

11 U.S.C. § 1107(a) ........................................................................................................ 4

11 U.S.C. § 1108 ............................................................................................................ 4

11 U.S.C. § 1141 ............................................................................................................ 1, 12

28 U.S.C. § 157 .............................................................................................................. 4, 12

28 U.S.C. § 1334 ............................................................................................................ 4

28 U.S.C. § 1408 ............................................................................................................ 4

28 U.S.C. § 1409 ............................................................................................................ 4

Cal. Civ. Proc. Code § 1281 ............................................................................................. 12

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Rules**

AAA Commercial Arbitration Rule 7 ................................................................ 16

Fed. R. Bankr. P. 1015(b) ............................................................................... 4

Fed. R. Bankr. P. 2002 .................................................................................. 18

Fed. R. Bankr. P. 4001 .............................................................................. 1, 12

General Order 24 (N.D. Cal.) ............................................................................ 4

N.D. Cal. Bankr. Local Rule 4001-1 ............................................................ 1, 12

N.D. Cal. Bankr. Local Rule 5011-1(a) ............................................................. 4

**Treatises**

Collier on Bankruptcy ¶ 362.10 (Richard Levin & Henry J. Sommer eds., 16th Ed.) ...................... 16

PG&E Corporation ("**PG&E Corp.**") and Pacific Gas and Electric Company (the "**Utility**"), as debtors and reorganized debtors (collectively, "**PG&E**," the "**Debtors**," or the "**Reorganized Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), hereby submit this Motion (the "**Motion**"), pursuant to sections 105(a), 362, and 1141 of title 11 of the United States Code (the "**Bankruptcy Code**"), section 2 of title 9 of the United States Code (the "**Federal Arbitration Act**" or the "**FAA**"), chapter 2 of title 9 of the California Code of Civil Procedures (the "**California Arbitration Act**" or the "**CAA**"), Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 4001-1 of the Bankruptcy Local Rules for the United States District Court for the Northern District of California (the "**Bankruptcy Local Rules**"), for entry of an order, substantially in the form attached hereto as **Exhibit A** (the "**Proposed Order**"), (i) modifying the "Plan Injunction," as established under sections 10.5 and 10.6 of the Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization Dated June 19, 2020 (as may be further modified, amended or supplemented from time to time, and together with any exhibits or scheduled thereto, the "**Plan**"), to the extent necessary to permit PG&E, Northern California Power Agency ("**NCPA**") and the City of Santa Clara, doing business as Silicon Valley Power ("**SVP**"), to commence arbitration pursuant to the arbitration provision set forth in the Cotenancy Agreement (as defined below);[1] (ii) compelling arbitration of the proof of claim [Claim No. 78104] (the "**Proof of Claim**") of the California Department of Water Resources ("**CDWR**"); and (iii) granting related relief.[2] In support of the Motion, the Reorganized Debtors submit the Declaration of Joshua S Levenberg, filed concurrently herewith (the "**Levenberg Declaration**").

---

[1] NCPA and SVP have each authorized PG&E to indicate their support for this Motion and, if the Motion is granted, have indicated that they will participate in the ordered arbitration of the dispute.

[2] The deadline for the Reorganized Debtors to object to CDWR's Proof of Claim is currently March 23, 2022. *See Order Further Extending Deadline for the Reorganized Debtors to Object to Claims and Granting Related Relief.* [Docket No. 11533]. This Motion is scheduled to be heard in advance of that deadline, and approval of this Motion and modification of the Plan Injunction would be deemed an "objection" for purposes of the Plan's definition of "Allowed," pursuant to the *Order Further Extending Deadline for the Reorganized Debtors to Object to Claims and Granting Related Relief* [Docket No. 10494]. To the extent that the Motion is continued or denied, the Reorganized Debtors request that the deadline for the Reorganized Debtors to object to the Proof of Claim be extended to permit the Reorganized Debtors sufficient time to prepare an objection.

1              **MEMORANDUM OF POINTS AND AUTHORITIES**

## I. PRELIMINARY STATEMENT

By this Motion, PG&E seeks to enforce its contractual right, which it shares with NCPA and SVP, to submit their dispute with CDWR (the fourth party to the Cotenancy Agreement) to binding arbitration, holding CDWR to the dispute resolution procedures CDWR bargained for in the Cotenancy Agreement.[3] The dispute, upon which CDWR bases its Proof of Claim, arises out of the Cotenancy Agreement. The Cotenancy Agreement contains a blanket arbitration provision broadly covering all disputes arising under the agreement. Both federal and state law mandate that the Court enforce such an agreement to arbitrate here.

The Court should not permit CDWR to avoid its contractual obligations by claiming that it terminated its participation in the Cotenancy Agreement and that the arbitration provision contained in the Cotenancy Agreement is therefore inapplicable to CDWR. Ninth Circuit precedent dictates that CDWR's claim of termination itself must be arbitrated and, even if CDWR's termination were effective – which PG&E disputes – the arbitration provision survives any such termination and accordingly must be enforced against CDWR.

Arbitration is particularly warranted here because the conflict involves not only CDWR's affirmative claim – set forth in its Proof of Claim – but also the related defenses and counter- or third-party claims of PG&E and two non-Debtor parties, NCPA and SVP, against CDWR, arising from CDWR's purported termination of its participation in the Cotenancy Agreement. All of these

---

[3] While the Reorganized Debtors were finalizing this Motion, on February 1, 2022, CDWR filed the *California Department of Water Resources' Motion for Order Determining that the Castle Rock Agreement with PG&E Cannot Be Assumed and that the Department of Water Resources' Claim No. 78104 Be Paid* [Docket No. 11887] (the "**CDWR Motion**"). By the CDWR Motion, CDWR asks the Court to make determinations with respect to the Cotenancy Agreement, CDWR's attempt to terminate the Cotenancy Agreement, and CDWR's obligation to reimburse the other Cotenants for removal costs, all of which the Reorganized Debtors submit by this Motion must be resolved through arbitration. CDWR addresses the arbitration provision in the CDWR Motion and argues that the dispute is not subject to that provision. Because the arbitrability of the dispute is a gatekeeping issue, and in order to prevent duplicative or unnecessary filings, the Reorganized Debtors respectfully submit that it is in the best interests of the parties' and would conserve the parties' and judicial resources for the Court to hear this Motion first.

claims and defenses indisputably arise under the Cotenancy Agreement and are therefore subject to the arbitration provision in that agreement.

In its Proof of Claim, CDWR seeks a "refund" of approximately $101,026.75 for twelve months of operation and maintenance costs that it paid in advance, just weeks before attempting to terminate its participation in the Cotenancy Agreement with PG&E, NCPA, and SVP. PG&E, NCPA, and SVP disagree that CDWR is owed any refund, and instead maintain that CDWR in fact must reimburse the other parties for costs associated with the termination. The dispute arises because under that Cotenancy Agreement, the four parties agreed to split all costs associated with electric transmission lines jointly-owned and utilized by the four parties since 1984, in proportion to their respective ownership interests. It appears that CDWR suddenly realized and sought to avoid its fair share of the costs associated with the electric transmission lines by purporting to terminate its participation in the Cotenancy Agreement and then attempting to offload its ownership interest in the lines – and the attendant costs – to the other parties to the Cotenancy Agreement.

The Cotenancy Agreement provides that, if a Cotenant wishes to terminate its participation in the agreement, the departing Cotenant must sell its ownership interest in the lines in exchange for the net salvage value of the transmission lines. As it turns out, under the terms of the Cotenancy Agreement, a calculation of the current value of CDWR's ownership share of the transmission lines – measured at the estimated net salvage value – is negative, because it will cost more money to remove the lines when they are ultimately decommissioned than the salvage value of the decommissioned lines and related facilities. As a result, rather than receiving money for relinquishing its ownership interests to the remaining parties, the Cotenancy Agreement requires that CDWR pay the remaining parties its proportionate share of estimated costs, including those of operation, maintenance, and removal, prior to terminating its participation in the agreement. Otherwise, contrary to the terms of the agreement and principles of equity – which require each party to bear the costs associated with the lines in proportion to its ownership share in them – CDWR

would unfairly avoid and shift its share of the costs of the lines onto the remaining parties PG&E, NCPA, and SVP.[4]

Enforcement of the parties' arbitration agreement here is both mandatory as a matter of law and also the result that best serves the parties (including the non-Debtors that are party to the agreement) and judicial economy. A claim objection alone would not resolve CDWR's responsibility to the other three parties for its pro rata share of removal costs, and CDWR's Proof of Claim cannot be adjudicated in a vacuum without resolution of that issue. The blanket arbitration provision covers all of these issues, which can be addressed in a single arbitration proceeding. This Court should hold CDWR to its bargained-for obligation to have not only the Proof of Claim, but also the related disputes, resolved through the agreement's arbitration procedures.

## II.    JURISDICTION

This Court has jurisdiction to consider these issues pursuant to 28 U.S.C. sections 157 and 1334; the *Order Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges*, General Order 24 (N.D. Cal.); and Rule 5011-1(a) of the Bankruptcy Local Rules. This is a core proceeding pursuant to 28 U.S.C. section 157(b). Venue is proper before the Court pursuant to 28 U.S.C. sections 1408 and 1409.

## III.    BACKGROUND

### A.    The Bankruptcy Cases

On January 29, 2019, the Debtors commenced voluntary cases for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of California. Prior to the Effective Date, the Debtors operated their businesses and managed their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Chapter 11 Cases are being jointly administered for procedural purposes only pursuant to Bankruptcy Rule 1015(b).

---

[4] Moreover, this arrangement, and CDWR's responsibility under it, is further underscored by the terms of a separate Transmission Service Agreement between CDWR, NCPA, and SVP (as defined below), which has not been terminated and to which PG&E is not a party.

On July 1, 2019, the Court entered the *Order Pursuant to 11 U.S.C. §§ 502(b)(9) and 105(a), Fed. R. Bankr. P. 2002, 3003(c)(3), 5005, and 9007, and L.B.R. 3003-1 (I) Establishing Deadline for Filing Proofs of Claim, (II) Establishing the Form and Manner of Notice Thereof, and (III) Approving Procedures for Providing Notice of Bar Date and Other Information to All Creditors and Potential Creditors* [Docket No. 2806] (the "**Bar Date Order**"). The Bar Date Order set October 21, 2019 (the "**Bar Date**") as the deadline to file proofs of claim (each, a "**Proof of Claim**") for prepetition claims (as defined in section 101(5) of the Bankruptcy Code), including all claims of Fire Claimants, Wildfire Subrogation Claimants, Governmental Units, customers, secured claims and priority claims against either of the Debtors.[5]

On June 20, 2020, this Court entered the Order confirming the Plan [Docket No. 8053] (the "**Confirmation Order**"). The Plan became effective on July 1, 2020 [Docket No. 8252] (the "**Effective Date**"). Among other things, the Plan and Confirmation Order provide for a permanent injunction "as of the entry of the Confirmation Order, but subject to the occurrence of the Effective Date" that applies to "all Entities who have held, hold, or may hold Claims" and prohibits, "with respect to such Claims, " the enjoined Entities from (among other things) "commencing, conducting, or continuing in any manner [any proceeding or action] of any kind . . . against or affecting, directly or indirectly, a Debtor, a Reorganized Debtor, or an estate or the property of any of the foregoing . . . ," "[e]xcept as otherwise provided in this Plan or in the Confirmation Order" (the "**Plan Injunction**"). Plan § 10.6; *see also* Confirmation Order at ¶ 52.

## B. The Cotenancy Agreement

On June 1, 1984, PG&E, CDWR, NCPA, and SVP (collectively, the "**Cotenants**") entered into the *Agreement of Cotenancy in the Castle Rock Junction-Lakeville 230-kV Transmission Line among Pacific Gas and Electric Company, State of California Department of Water Resources,*

---

[5] The Bar Date was later extended to December 31, 2019, solely with respect to unfiled, non-governmental Fire Claims [Docket No. 4672]; and separately to April 16, 2020, solely with respect to persons or entities that purchased or acquired certain of the Debtors' publicly held debt and equity securities within the limited period from April 29, 2015 through November 15, 2018, inclusive, and that may have Securities Claims based on those purchases against the Debtors [Docket No. 5943].

*Northern California Power Agency and the City of Santa Clara* (the "**Cotenancy Agreement**")[6] for the express purpose of constructing and co-owning a new 230-kV double circuit transmission line ("**New Line**") between Castle Rock Junction and the PG&E Lakeville Substation in the Geysers area. In the Cotenancy Agreement, the four Cotenants agreed to share all costs and burdens, both for construction and costs of ongoing operation, maintenance, replacement, additions, and betterments associated with the New Line, in proportion to their ownership interests in the New Line. *See* Cotenancy Agreement §§ 4 & 5.

As a general matter, until the present controversy, the Cotenants each performed under the Cotenancy Agreement without dispute. Each Cotenant paid its respective share of the initial costs for construction of the line and associated facilities. Further, since the execution of the Cotenancy Agreement and until CDWR communicated its intent to terminate, PG&E invoiced the remaining Cotenants for their proportional costs of operation and maintenance of the New Line annually, and all Cotenants made payment on such invoices.

The initial term under the Cotenancy Agreement expired on December 31, 2014. Thereafter, pursuant to Section 14.1, the Cotenancy Agreement continues from year to year unless terminated by the parties. Section 14 of the Cotenancy Agreement discusses termination of the Cotenancy Agreement. In particular, Section 14.6 contemplates that a Cotenant who intends to depart the Cotenancy Agreement and have no more interest or liability under the Cotenancy Agreement shall transfer the ownership interest to any remaining Cotenants who intend to continue operation of the New Line.

Section 14.5 of the Cotenancy Agreement addresses what happens when all of the Cotenants determine that they want to decommission and remove the line. Under the Cotenancy Agreement, in any case in which the net salvage value of the New Line is negative, as it is here, the Cotenancy Agreement requires the other Cotenants to reimburse PG&E for their respective shares of such net loss in proportion to their ownership interests in the New Line.

---

[6] A copy of the Cotenancy Agreement is attached to the Levenberg Declaration as **Exhibit 1**.

1    Any disputes arising out of the Cotenancy Agreement are to be handled in accordance with a

2    certain "Dispute Resolution and Default" provision, set forth in Section 13 of the Cotenancy

3    Agreement, which includes a mandatory binding arbitration provision.

4    **C.    The Transmission Service Agreement Among CDWR, NCPA and SVP**

5    On March 1, 1989, three of the four parties to the Cotenancy Agreement – CDWR, NCPA

6    and SVP – entered into a related agreement, the *Castle Rock – Lakeville 230 kV Transmission Line*

7    *Transmission Service Agreement Between Northern California Power Agency and the City of Santa*

8    *Clara and Department of Water Resources of the State of California* (the "**Transmission Service**

9    **Agreement**").[7]  The Transmission Service Agreement, among other things, obligates CDWR to

10   provide SVP and NCPA with the right to use an allocated share of CDWR's ownership interest in

11   the New Line (which ownership interest CDWR has through its participation in the Cotenancy

12   Agreement), and in return, for SVP to make a one-time payment to CDWR of $2,085,455 and for

13   NCPA to make a one-time payment to CDWR of $1,614,545.  *See* Transmission Service Agreement

14   at Sections 3 and 4.

15   The term of the Transmission Service Agreement is clear: "The term of this Agreement shall

16   be March 1, 1989 through December 31, 2014, or the date that *both NCPA and Santa Clara* are no

17   longer Cotenants pursuant to the Cotenancy Agreement, *whichever is later*." Transmission Service

18   Agreement at 2.0 (emphases added).  NCPA and SVP are both still Cotenants pursuant to the

19   Cotenancy Agreement. There is no provision in the Transmission Service Agreement for CDWR to

20   terminate the Agreement unilaterally. Therefore, the Transmission Service Agreement is still in force

21   and effect, including CDWR's obligation to provide NCPA and SVP the right to use an allocated

22   share of CDWR's ownership interest in the New Line.

23   **D.    CDWR's Attempt to Terminate Its Participation in the Cotenancy Agreement**

24   By letter dated July 30, 2018, and asserting Section 14.3 of the Agreement as a basis, CDWR

25   delivered to each Cotenant an advance notice of its desire to terminate its participation in the

26

27

28   [7] A copy of the Transmission Service Agreement is attached to the Levenberg Declaration as **Exhibit 2**.

Cotenancy Agreement effective August 1, 2019.[8]  PG&E, NCPA, and SVP acknowledged receipt of the notice but have rejected CDWR's requested withdrawal pending receipt by PG&E, NCPA, and SVP of CDWR's payment of its proportional share of reasonable estimated costs associated with decommissioning and removal of the New Line.

As discussed above, Section 14.6 provides that a Cotenant seeking to terminate participation in the Cotenancy Agreement will transfer its ownership interest to any remaining Cotenants.  Section 14.6 calculates the value of such ownership interest transaction as the "estimated net salvage value." In the instant case, the estimated removal costs of the New Line exceed the salvage value of the line. The Cotenants accordingly each face an ownership interest liability and have to pay additional funds to any remaining Cotenants for when the line is ultimately decommissioned and removed at the end of its useful life.  Accordingly, to exercise a conveyance and have the remaining Cotenants assume its ownership interest liability under Section 14.6, a terminating Cotenant is obligated to compensate the remaining Cotenants to whom the liability is conveyed.

As Section 14.5 states, each Cotenant shall be liable for the financial obligations incurred by it prior to any termination of this Agreement.[9]  Because Section 14.5 of the Cotenancy Agreement requires each Cotenant to bear costs in proportion to its ownership interest, and because the course of conduct of all Cotenants has followed that guiding principle under the Cotenancy Agreement since its inception until the present dispute, CDWR, as a Cotenant that desires to terminate and depart the Cotenancy Agreement, must make a financial contribution that reflects its proportional share of the reasonably anticipated removal costs of the New Line.  CDWR cannot be permitted to ignore the financial obligation it incurred to the remaining Cotenants by years of performance under the Cotenancy Agreement and merely walk away.

---

[8] A copy of CDWR's July 30, 2018 letter is attached to the Levenberg Declaration as **Exhibit 3**.

[9] Section 14.7 of the Agreement similarly states that termination by any Cotenant shall not affect rights and obligations of a continuing nature or for payment of money for transactions occurring prior to termination.

**E.     CDWR's Claim in PG&E Bankruptcy**

On October 18, 2019, CDWR filed a Proof of Claim in the Chapter 11 Cases.[10]  In its Proof of Claim, CDWR asserts that, allegedly under the terms of the Cotenancy Agreement, it "paid PG&E for Operations & Maintenance in advance for the year of July 1, 2019 through July 31, 2020. However, CDWR terminated its participation in the [Cotenancy] Agreement, effective August 1, 2019.  Therefore, PG&E is required to refund DWR $101,026.75, which represents eleven months of overpayment for Operations & Maintenance."

PG&E and the other remaining Cotenants (NCPA and SVP) disagree that CDWR has properly terminated its participation in the Agreement, because CDWR has not resolved its financial obligation to the other Cotenants.  PG&E, along with NCPA and SVP, maintains that financial reconciliation is required prior to a Cotenant's termination of its participation in the Cotenancy Agreement.  Cotenancy Agreement Sections 14.5 and 14.6 contemplate a financial reconciliation that must occur in association with, and indeed prior to, the departure of any Cotenant, and requires a calculation of whether the remaining Cotenants owe money to the departing Cotenant, or vice-versa.

That financial reconciliation has not yet happened, and because the Cotenants have calculated the net salvage value of the facilities to be negative – which CDWR does not dispute – it remains the expectation of PG&E, NCPA and SVP that CDWR will pay its proportionate share of estimated removal costs before terminating its participation in the Cotenancy Agreement.

In addition, the Transmission Service Agreement remains in effect because NCPA and SVP are still Cotenants.  Section 2 of the Transmission Service Agreement, the "Term" provision, is clear that the Transmission Service Agreement is in full force and effect until the later of "December 31, 2014 or the date that both NCPA and Santa Clara [SVP] are no longer Cotenants pursuant to the Cotenancy Agreement."  Because the Transmission Service Agreement remains in effect, meaning CDWR is still obligated to provide NCPA and SVP with the rights to use a portion of CDWR's ownership interest in the New Line (which ownership interest comes from CDWR's participation in

---

[10] A copy of the Proof of Claim is attached to the Levenberg Declaration as **Exhibit 4**.

the Cotenancy Agreement), CDWR cannot both terminate its participation in the Cotenancy Agreement *and* continue to meet its Transmission Service Agreement obligations to NCPA and SVP. For this reason, the NCPA and SVP maintain that CDWR is effectively prohibited from terminating its participation in the Cotenancy Agreement unless and until the Transmission Service Agreement is terminated.

There is no circumstance contemplated by the Cotenancy Agreement that would entitle CDWR to enjoy all of the benefits of the Cotenancy Agreement since inception of the New Line but to walk away now and leave its Cotenants holding the bag for its share of removal costs when the New Line is ultimately decommissioned. For these reasons, PG&E (along with NCPA and SVP) disputes that CDWR is owed the refund it seeks.

### F. Mediation of CDWR Claim

In an effort to resolve the dispute, the parties met on multiple occasions and discussed the terms and obligations associated with CDWR's desire to withdraw from the Cotenancy Agreement.[11] No consensus was reached.

On October 4 and November 4, 2021, PG&E, NCPA, SVP, and CDWR participated in two mediation sessions before the Honorable William J. Cahill (Ret.) (the "**Mediation**") pursuant to the procedures approved by the Court in the *Order Approving ADR and Related Procedures for Resolving General Claims*, dated September 25, 2020 [Docket No. 9148]. The Mediation concluded without the parties reaching a settlement.

### G. The Dispute Resolution and Binding Arbitration Provisions in the Cotenancy Agreement

The Cotenancy Agreement sets forth procedures for resolving disputes under the Cotenancy Agreement in two steps. First, the Cotenancy Agreement provides for the submittal of billing

---

[11] In a separate effort to resolve the issues related to CDWR's desire to depart the Cotenancy Agreement, on July 30, 2019, PG&E filed proposed revisions to the Cotenancy Agreement with the Federal Energy Regulatory Commission ("**FERC**") in FERC Docket No. ER19-2496. While NCPA and SVP intervened in support of PG&E's filing, CDWR protested the filing, and FERC reached a determination on PG&E's proposal, specifically stating that it "…reach[ed] no conclusion as to the merits of the decommissioning dispute….", leaving the present controversy unresolved. The order issued by FERC is attached to the Levenberg Declaration as **Exhibit 5**.

disputes "and any other dispute arising under this Agreement" to the Coordinating Committee (as such term is defined in the Cotenancy Agreement), comprised of representatives of each of the Cotenants, as set forth in the Cotenancy Agreement. *See* Cotenancy Agreement § 13.1. As more specifically described in the Cotenancy Agreement, the Cotenancy Agreement gives the Coordinating Committee forty-five calendar days (unless extended by agreement of the Cotenants) to attempt to settle any dispute submitted to it. *Id.*

Second, in the event that the Coordinating Committee is unable to resolve any dispute arising under the Agreement, the Cotenancy Agreement is clear that such a dispute must be settled through binding arbitration. *See* Cotenancy Agreement §13.2 ("Disputes arising under this Agreement that have not been resolved under Sections 13.1 or 15.2.3 shall be settled through binding arbitration as provided in this Section 13.2."). A disputing Cotenant must commence the arbitration within thirty calendar days after the end of the forty-five-day period described above for the Coordinating Committee to attempt to settle the dispute.

Moreover, the Cotenancy Agreement provides that the termination of any Cotenant from participation in the Cotenancy Agreement "shall not affect rights and obligations of a continuing nature or for payment of money for transactions occurring prior to termination." Cotenancy Agreement § 14.7. In other words, the obligation to arbitrate remains binding on the Cotenants even in the event of an effective termination.

Following the unsuccessful conclusion of the Mediation, PG&E, SVP, and NCPA submitted the dispute with CDWR to the Coordinating Committee on January 14, 2022.[12] Levenberg Declaration ¶ 8. That same day, the Coordinating Committee determined that the dispute could not be settled. As such, PG&E, together with SVP and NCPA, intend to commence arbitration pursuant to Section 13.2 of the Cotenancy Agreement during the thirty-day period after the expiration of the forty-five-day period described above (in other words, the parties may commence arbitration

---

[12] PG&E and the other Cotenants invited CDWR to participate in that Coordinating Committee meeting to discuss the handling of the parties' claims, but CDWR declined to attend, claiming that it was not subject to the Cotenancy Agreement.

between February 28 and March 30, 2022), subject to the Court approving the relief sought in this Motion.

## IV. RELIEF REQUESTED

By this Motion, the Reorganized Debtors seek entry of an order, pursuant to sections 105(a), 362, and 1141 of the Bankruptcy Code, section 2 of the FAA, chapter 2 of the CAA, Bankruptcy Rule 4001, and Bankruptcy Local Rule 4001-1, (i) modifying the Plan Injunction to the extent necessary to permit PG&E (together with SVP and NCPA) to submit the dispute with CDWR to binding arbitration pursuant to Section 13.2 of the Cotenancy Agreement); (ii) compelling arbitration of the Proof of Claim of CDWR; and (iii) granting related relief.

## V. ARGUMENT AND BASIS FOR RELIEF REQUESTED

### A. The FAA and CAA Require the Court to Enforce the Cotenancy Agreement's Arbitration Provision

Both the FAA and the CAA direct that courts must enforce valid, binding arbitration agreements and stay proceedings that are subject to agreements to arbitrate, "save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2; *see* Cal. Civ. Proc. Code § 1281.[13] In the Ninth Circuit, bankruptcy courts must enforce valid arbitration agreements, even in core proceedings,[14] unless a party can demonstrate that "arbitration would conflict with the underlying purposes of the Bankruptcy Code." *Cont'l Ins. Co. v. Thorpe Insulation Co. (In re Thorpe Insulation Co.)*, 671 F.3d 1011, 1021 (9th Cir. 2012). CDWR cannot make such a showing here. This standard arose out of the seminal Supreme Court decision reviewing potential conflicts between the FAA and

---

[13] In at least one decision, the Bankruptcy Appellate Panel for the Ninth Circuit found that the CAA, and not the FAA, applies to bankruptcy disputes under contracts that do not involve a maritime transaction or a contract evidencing transaction in interstate commerce. *See Law Offices of John F.L. Hebb v. Ateco, Inc. (In re Ateco, Inc.)*, 2013 Bankr. LEXIS 4644, at *15-16 (B.A.P. 9th Cir. July 15, 2013) (holding that CAA, not FAA, applied to dispute with debtor under contract that did not involve a maritime transaction or a contract evidencing transaction in interstate commerce); *see also Brayton Purcell LLP v. Recordon & Recordon*, 2006 U.S. Dist. LEXIS 82145, at *7 (N.D. Cal. Oct. 31, 2006) ("[A]pplication of the FAA is limited to arbitration provisions in (1) contracts evidencing a transaction involving interstate commerce or (2) maritime transactions."). Here, the Reorganized Debtors submit that under either the FAA or the CAA, the arbitration provision in the Cotenancy Agreement must be enforced.

[14] Congress expressly includes the "allowance or disallowance of claims against the estate" as a core proceeding. 28 U.S.C. § 157(b)(2)(B).

other federal statutes, *Shearson/Am. Express, Inc. v. McMahon*, 482 U.S. 220 (1987), in which the Supreme Court held that the FAA's mandate "may be overridden by a contrary congressional command." *Id.* at 226. The *McMahon* court identified three ways that such a contrary congressional command could be determined: (1) the text of the statute, (2) the legislative history, or (3) "an inherent conflict between arbitration and the statute's underlying purposes." *Id.* at 227. None apply here.

The FAA's mandate was underscored in a recent Supreme Court decision that rejected the argument that the FAA conflicted with the underlying purposes of a non-bankruptcy federal statute. *See Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1624 (2018) (noting an inclination to find "harmony over conflict in statutory interpretation" and finding no conflict between the FAA and the National Labor Relations Act). As the Court pointedly observed in *Epic Systems*, "[i]n many cases over many years, this Court has heard and rejected efforts to conjure conflicts between the Arbitration Act and other federal statutes. In fact, this Court has rejected *every* such effort to date…." *Id.* at 1627 (emphasis in original). This dispute is no different.

Here, the arbitration provision contained in Section 13.2 of the Cotenancy Agreement is a blanket provision that covers all "[d]isputes arising under this Agreement" that have not been resolved through the Coordinating Committee. As such, it indisputably applies to CDWR's Proof of Claim and PG&E's argument that CDWR cannot terminate its participation in the Cotenancy Agreement without first complying with its obligation under the Cotenancy Agreement to pay a pro rata share of estimated removal costs to PG&E and the remaining Cotenants.

Furthermore, the Reorganized Debtors submit that there is no inherent conflict between the underlying purposes of the Bankruptcy Code and enforcement of the arbitration provision contained in Section 13.2 of the Cotenancy Agreement. The Effective Date of the Plan occurred over 18 months ago, PG&E has reorganized and emerged from chapter 11, and the CDWR Proof of Claim involves discrete issues that will not impact the implementation of the Plan.

Accordingly, under either the FAA or the CAA, the arbitration provision in the Cotenancy Agreement must be enforced against CDWR.

**B.** **CDWR's Purported Termination of the Cotenancy Agreement, Even If Effective, Does Not Terminate The Arbitration Provision**

PG&E anticipates that CDWR will argue that because it allegedly terminated the Cotenancy Agreement, Section 13.2 of the Cotenancy Agreement does not apply to it, and CDWR cannot be compelled to arbitrate, notwithstanding the Cotenancy Agreement's mandatory binding arbitration clause. CDWR is wrong.

As discussed above, CDWR's purported termination of the Cotenancy Agreement remains ineffective. However, any dispute over the efficacy of CDWR's attempted termination is clearly a matter for arbitration pursuant to the Cotenancy Agreement. Moreover, even if CDWR had somehow terminated its participation in the Cotenancy Agreement without first resolving any amounts owed to the other Cotenants, the arbitration provision of the Cotenancy Agreement survives any such termination.

The Ninth Circuit recently adopted the well-established presumption of survival of arbitration provisions following the termination of the underlying agreement. *See Shivkov v. Artex Risk Sols., Inc.*, 974 F.3d 1051 (9th Cir. 2020). In *Shivkov*, the Ninth Circuit specifically noted that the Supreme Court had recognized a presumption in favor of the post-termination survival of arbitration provisions. *Id.* at 1060 (discussing *Litton Financial Printing Division v. NLRB*, 501 U.S. 190, 204 (1991)). Such a presumption, the Ninth Circuit underscored, can only be negated "expressly or by clear implication [for] matters and disputes arising out of the relation governed by contract." *Id.* at 1060 (alteration in original) (citing *Litton*, 501 U.S. at 204). The *Shivkov* court then observed that five sister circuits, including the First, Sixth, D.C., Eighth, and Second, had expressly applied *Litton*'s presumption to the FAA context. *Id.* at 1061.

Under the *Shivkov* analysis, the presumption in favor of post-termination survival of arbitration clauses applies to any dispute that "[has] its real source in the contract." *Id.* at 1060 (citing *Litton*, 501 U.S. at 205). Here, it is undeniable that the Cotenancy Agreement is the source of the dispute that PG&E, NCPA, and SVP have with CDWR, including the Proof of Claim and the other Cotenants' argument that CDWR must first pay its pro rata share of estimated removal costs.

CDWR cannot rebut the Ninth Circuit's presumption in favor of survival of the arbitration provision. In determining whether the parties can negate the presumption, the *Shivkov* court adopted

the Sixth Circuit's approach that "the presumption of arbitrability should not be denied for 'broadly-worded arbitration clauses' unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Id.* at 1062 (citing *Huffman v. Hilltop Cos., LLC*, 747 F.3d 391, 395 (6th Cir. 2014)). Tellingly, both the Ninth Circuit in *Shivkov* and the Sixth Circuit in *Huffman* found that the arbitration clauses at issue survived notwithstanding the absence of an express survival provision, because both courts were unable to find that the agreements at issue "expressly negate the presumption in favor of post-termination arbitration or clearly imply that the parties intended for their arbitration obligations to terminate with the Agreements." *Id.*; *see Huffman*, 747 F.3d at 398. As such, both *Shivkov* and *Huffman* concluded that, "[b]ecause 'we cannot say with certainty that the parties did not intend for the arbitration clause to survive expiration of the contract,' the parties' arbitration obligations remain intact." *Shivkov*, 974 F.3d at 1063 (citing *Huffman*, 747 F.3d at 395).

The presumption similarly cannot be negated here, particularly because, in contrast to *Shivkov* and *Huffman*, the Cotenancy Agreement actually has a survival provision that provides that "termination shall not affect rights and obligations of a continuing nature or for payment of money for transactions occurring prior to termination." Cotenancy Agreement § 14.7. Enforcement of the arbitration provision to resolve the dispute with CDWR concerning CDWR's right to a refund of payments made under the Cotenancy Agreement, as well as CDWR's obligation to pay for removal costs as a result of its purported termination, qualifies as a right or obligation that is covered by the survival provision in Section 14.7.

Given the existence of the survival provision, and in the absence of express language or clear implication that the parties intended for the arbitration provision contained in the Cotenancy Agreement to terminate upon a Cotenant's termination from participation in the Cotenancy Agreement, Ninth Circuit precedent dictates that the arbitration provision contained in Section 13.2 survives and must be enforced against CDWR.[15]

_____

[15] In any event, the Cotenants even agreed that any dispute regarding the scope of an arbitration provision, the extent of an arbitration panel's jurisdiction, and the termination, existence or validity of the Cotenancy Agreement would be determined by the arbitration panel, by explicitly agreeing to arbitrate under the Commercial Arbitration Rules of the American Arbitration Association. *See*

**C.  Cause Exists to Modify The Plan Injunction To The Extent Necessary To Permit Arbitration**

Courts apply the same principles of "cause" to requests to modify a plan injunction as are applicable to motions for relief from the automatic stay.  *See, e.g.*, *In re SquareTwo Fin. Servs. Corp.*, 2017 Bankr. LEXIS 2570, at *10-11 (Bankr. S.D.N.Y. Sept. 11, 2017).  Section 362(d)(1) of the Bankruptcy Code authorizes a court to modify or terminate the automatic stay for "cause," which "has no clear definition and is determined on a case-by-case basis."  *Christensen v. Tucson Estates, Inc. (In re Tucson Estates, Inc.)*, 912 F.2d 1162, 1166 (9th Cir. 1990) (citation omitted).  The party requesting stay relief is required to make a prima facie showing of cause under section 362(d)(1).  *See In re Plumberex Specialties Prods.*, *Inc.*, 311 B.R. 551, 557 (Bankr. C.D. Cal. 2004); Collier on Bankruptcy ¶ 362.10 (Richard Levin & Henry J. Sommer eds., 16th Ed.) (noting prima facie case required for requested relief).

Cause to modify the Plan Injunction exists here because, as discussed above, the FAA and the CAA mandate enforcement of the arbitration provision in the Cotenancy Agreement.  In the face of that mandate, the inquiry ends.  The twelve factors articulated in *In re Curtis*, 40 B.R. 795 (Bankr. D. Utah 1984),[16] which generally are used by courts to determine whether cause exists to permit an action to proceed in a non-bankruptcy forum, do not appear to be applicable where there is an

---

Cotenancy Agreement § 13.2; AAA Commercial Arbitration Rule 7. Jurisdiction ("The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim . . . . The arbitrator shall have the power to determine the existence or validity of a contract of which an arbitration clause forms a part.").

[16]     The *Curtis* factors are:  (1) whether relief will result in partial or complete resolution of issues; (2) the lack of any connection with or interference with the bankruptcy case; (3) whether the foreign proceeding involves the debtor as a fiduciary; (4) whether a specialized tribunal has been established to hear the particular cause of action and whether the tribunal has expertise to hear such cases; (5) whether the debtor's insurance carrier has assumed full financial responsibility for defending the litigation; (6) whether the action essentially involves third parties, and the debtor functions only as a bailee or conduit for the goods or proceeds in question; (7) whether the litigation in another forum would prejudice the interests of other creditors, the creditors' committee and other interested parties; (8) whether the judgment claim arising from the foreign action is subject to equitable subordination; (9) whether movant's success in the foreign proceeding would result in a judicial lien avoidable by the debtor under section 522(f); (10) the interest of judicial economy and the expeditious and economical determination of litigation for the parties; (11) whether the foreign proceedings have progressed to a point where the parties are prepared for trial; and (12) the impact of the stay on the parties and the "balance of hurt."  40 B.R. at 799-800.

1   enforceable agreement to arbitrate that does not conflict with the purposes of the Bankruptcy Code.

2   *See, e.g.*, *Rico Corp. v. Arundotech, LLC (In re Arundotech, LLC)*, 2009 Bankr. LEXIS 1705, at *20

3   (B.A.P. 9th Cir. May 4, 2009) (Carlson, J., concurring) ("In keeping with this case law [regarding

4   the FAA], bankruptcy courts resolve stay-relief motions involving arbitration by determining

5   whether arbitration is required under the Arbitration Act, rather than under the more general concept

6   of cause set forth in § 362 of the Bankruptcy Code.") (collecting cases).

7       Even if the *Curtis* factors do apply where the FAA or CAA mandate enforcement of an

8   arbitration provision, they militate in favor of modifying the Plan Injunction here.

9       The *Curtis* factors that are applicable here are:

10      (1) The relief will result in partial or complete resolution of the issues (the first

11          *Curtis* factor).

12      (2) The relief will not interfere with the bankruptcy case (the second *Curtis*

13          factor).

14      (3) There is no foreign proceeding that has progressed to the point where the

15          parties are prepared for trial (the third and eleventh *Curtis* factors).

16      (4) The relief will prevent prejudice to the interests of other creditors or

17          interested parties (the seventh *Curtis* factor).

18      (5) The interests of judicial economy and the expeditious and economical

19          determination of litigation for the parties will be served (the tenth *Curtis*

20          factor).

21      (6) There will be no meaningful impact on the stay on the parties, and denial

22          would prejudicially shift the "balance of hurt" (the twelfth *Curtis* factor).

23      Although there is no pending proceeding in a foreign tribunal regarding the dispute among

24  the parties, there is also no proceeding currently before this Court. The Reorganized Debtors have

25  not yet objected to CDWR's Proof of Claim. Moreover, an objection to CDWR's Proof of Claim

26  would be insufficient to resolve the dispute with CDWR; in addition to CDWR's affirmative claim

27  set forth in its Proof of Claim, the parties would need to file a separate adversary proceeding or other

28  motion to assert PG&E's and the other Cotenants' defenses and counterclaims regarding CDWR's

obligation to pay removal costs.  By contrast, an arbitration commenced pursuant to the Cotenancy Agreement would address all issues between CDWR and the other Cotenants in a single proceeding. As such, permitting the parties to proceed with arbitration would not lead to duplicative efforts and would serve the interests of judicial economy.

Nor does the "balance of hurt" on the parties favor a stay here.  PG&E, by this Motion, simply seeks to enforce the parties' own agreement to arbitrate.  Having expressly agreed to arbitrate all disputes under the Cotenancy Agreement, CDWR should not be permitted to use the Plan Injunction (which protects the Debtors) to escape its bargained-for obligation.  Such a result would certainly harm the parties involved – including the other Cotenants, NCPA and SVP, who are not Debtors.

Finally, because the Plan became effective in July 2020, and the Reorganized Debtors have emerged from bankruptcy, the arbitration will not interfere with the bankruptcy case or prejudice the interests of other creditors or interested parties.

Accordingly, cause exists to modify the Plan Injunction to the extent necessary to permit PG&E, NCPA, and SVP to commence arbitration proceedings against CDWR in accordance with the arbitration provision of the Cotenancy Agreement.

**VI.     NOTICE**

Notice of this Motion will be provided to: (i) the parties to the Cotenancy Agreement: CDWR, NCPA, and SVP; (ii) the Office of the U.S. Trustee for Region 17 (Attn: Andrew R. Vara, Esq. and Timothy Laffredi, Esq.); (iii) all counsel and parties receiving electronic notice through the Court's electronic case filing system; and (iv) those persons who have formally appeared in these Chapter 11 Cases and requested service pursuant to Bankruptcy Rule 2002.

The Reorganized Debtors respectfully submit that no further notice is required.  No previous request for the relief sought herein has been made by the Reorganized Debtors to this or any other Court.

## VII.    CONCLUSION

WHEREFORE the Reorganized Debtors respectfully request entry of the Proposed Order granting (i) the relief requested herein, and (ii) such other and further relief for the Reorganized Debtors as the Court may deem just and appropriate.

Dated:  February 2, 2022

**WEIL, GOTSHAL & MANGES LLP**
**KELLER BENVENUTTI KIM LLP**

*/s/ Jane Kim*
Jane Kim

*Attorneys for Debtors and Reorganized Debtors*