1

**Exhibit 1**

2

**Cotenancy Agreement**

Agreement of Cotenancy

in the

Castle Rock Junction-Lakeville 230-kV

Transmission Line

among

Pacific Gas and Electric Company

State of California
Department of Water Resources

Northern California Power Agency

City of Santa Clara

June 1, 1994

CONTENTS

|  | Recitals | 1 |
|---|---|---|
| 1.0 | Definitions . . . . . . . . . . . . . . . . . . | 2 |
|  | 1.1 | Addition and Betterment . . . . . . . | 2 |
|  | 1.2 | Associated Facilities . . . . . . . . | 2 |
|  | 1.3 | CEC . . . . . . . . . . . . . . . . . . | 3 |
|  | 1.4 | CPUC . . . . . . . . . . . . . . . . . | 3 |
|  | 1.5 | Capital Replacement . . . . . . . . . | 3 |
|  | 1.6 | Coordinating Committee . . . . . . . | 3 |
|  | 1.7 | Cost . . . . . . . . . . . . . . . . . | 3 |
|  | 1.8 | Cotenant . . . . . . . . . . . . . . | 5 |
|  | 1.9 | FERC . . . . . . . . . . . . . . . . . | 5 |
|  | 1.10 | Firm Transmission Entitlement . . . . . | 5 |
|  | 1.11 | Good Utility Practice . . . . . . . . | 5 |
|  | 1.12 | Interconnection Agreements . . . . . . | 6 |
|  | 1.13 | Lakeville - Sobrante 230-kv Line . . . | 7 |
|  | 1.14 | Land Rights . . . . . . . . . . . . . | 7 |
|  | 1.15 | Line Circuit . . . . . . . . . . . . | 7 |
|  | 1.16 | Line Circuit No. 1 . . . . . . . . . | 7 |
|  | 1.17 | Line Circuit No. 2 . . . . . . . . . | 7 |
|  | 1.18 | New Line . . . . . . . . . . . . . . | 8 |
|  | 1.19 | Operating Emergency . . . . . . . . . | 8 |

Table of Contents (continued)

|      | 1.20 | Other Circuit . . . . . . . . . . . . . | 9 |
|      | 1.21 | Other Circuit No. 1 . . . . . . . . . . | 9 |
|      | 1.22 | Other Circuit No. 2 . . . . . . . . . . | 9 |
|      | 1.23 | Ownership Interest . . . . . . . . . | 9 |
|      | 1.24 | Service Area . . . . . . . . . . . . . | 9 |
|      | 1.25 | Sharing Agreement . . . . . . . . . . | 10 |
|      | 1.26 | Willful Action . . . . . . . . . . . | 10 |
| 2.0  |      | Ownership Interests . . . . . . . . . . . | 10 |
|      | 2.1  | Undivided Interests . . . . . . . . . | 10 |
|      | 2.2  | Initial Ownership Interests and Subsequent Adjustments . . . . . . . | 11 |
|      | 2.3  | Waiver of Partition Rights . . . . . . | 16 |
|      | 2.4  | Transfer of Ownership Interests . . . . | 16 |
|      | 2.5  | Rights of Refusal . . . . . . . . . . | 18 |
|      | 2.6  | Abandonment . . . . . . . . . . . . . | 24 |
| 3.0  |      | Land Rights . . . . . . . . . . . . . . . | 24 |
|      | 3.1  | Land Rights Acquired by PGandE . . . . | 24 |
|      | 3.2  | Creation and Acquisition of Land Rights | 24 |
|      | 3.3  | Release of Lien . . . . . . . . . . . | 26 |
| 4.0  |      | Sharing Initial Construction Costs of the New Line and Associated Facilities . . . . . . . . | 27 |

|       | 4.1  | Initial Cost Estimate for the New Line | 27 |
|       | 4.2  | Cost-Sharing for the New Line . . . . . | 27 |
|       | 4.3  | Payment for the Associated Facilities . | 28 |
|       | 4.4  | Cost-Sharing for the Associated Facilities . . . . . . . . . . . . . . | 28 |
|       | 4.5  | Payments Made for the Associated Facilities . . . . . . . . . . . . . . | 29 |
|       | 4.6  | Preliminary Accounting . . . . . . . . | 29 |
|       | 4.7  | Adjustment of Capacity Rating and Final Accounting . . . . . . . . . . . . . . | 29 |
|       | 4.8  | Right to Review . . . . . . . . . . . | 30 |
|       | 4.9  | No Cost Guarantee . . . . . . . . . . | 31 |
|       | 4.10 | Expected Completion Date of Construction . . . . . . . . . . . . . | 31 |
|       | 4.11 | Consequences of Non-Timely Payments . . | 31 |
|       | 4.12 | Nature of Agreement . . . . . . . . . | 32 |
| 5.0   | Cotenants' Payments for Costs of Operation, Maintenance, Replacement, and Additions and Betterments . . . . . . . . . . . . . . . | 33 |
|       | 5.1  | Annual Costs To Be Shared . . . . . . | 33 |
|       | 5.2  | Sharing of Costs of Operating Emergencies . . . . . . . . . . . . . | 34 |
|       | 5.3  | Sharing of Costs for Operation and Maintenance of the Line Circuits . . . | 34 |
|       | 5.4  | Sharing of Costs for Operation, Maintenance, and Replacement of Associated Facilities . . . . . . . . . | 34 |

Table of Contents (continued)

Page

|  | 5.5 | Sharing of Costs for Capital Replacements and Additions and Betterments to Maintain Capacity of the New Line . . . . . . . . . . . . . . | 35 |
|  | 5.6 | Sharing of Costs for Additions and Betterments to Upgrade Capacity of the New Line . . . . . . . . . . . . . . . | 36 |
|  | 5.7 | Adjustments to Annual Payment for Associated Facilities . . . . . . . . . | 36 |
|  | 5.8 | Effective Date of Ownership Interest for Billing Purposes . . . . . . . . . . . | 37 |
| 6.0 | Billing and Payment . . . . . . . . . . . . . | | 38 |
|  | 6.1 | Billing for the Associated Facilities . | 38 |
|  | 6.2 | Billing for Operation and Maintenance of the Line Circuits . . . . . . . . . | 38 |
|  | 6.3 | Billing for Capital Replacements, Additions and Betterments and Other Expenses Under This Agreement . . . . . | 41 |
|  | 6.4 | Payment of Bills . . . . . . . . . . . | 43 |
|  | 6.5 | Right to Review . . . . . . . . . . . . | 44 |
|  | 6.6 | Applicable Interest Rate . . . . . . . | 44 |
|  | 6.7 | Billing Disputes . . . . . . . . . . . | 45 |
| 7.0 | Right of Use . . . . . . . . . . . . . . . . . | | 46 |
|  | 7.1 | Commencement of Firm Transmission Service . . . . . . . . . . . . . . . . . | 46 |
|  | 7.2 | Rights Associated with Firm Transmission Entitlement . . . . . . . . . . . . . . | 46 |

Table of Contents (continued)

7.3    Exchange of Firm Transmission
       Entitlement . . . . . . . . . . . . . . . .    48

7.4    Adverse Rate Treatment . . . . . . . .    48

7.5    Designation of Firm Transmission
       Entitlement By Cotenants Other Than
       PGandE . . . . . . . . . . . . . . . . .    49

7.6    Reimbursement of Costs for
       Redesignations Initiated By Cotenants
       Other Than PGandE . . . . . . . . . . .    51

7.7    Right to Provide Transmission Service .    51

7.8    Reconnections and Redesignations
       Initiated By PGandE . . . . . . . . . .    52

7.9    Reconnections Initiated by Cotenants
       Other Than PGandE Involving Circuits
       Operated by PGandE . . . . . . . . . .    62

7.10   Reconnections Initiated by Cotenants
       Other Than PGandE Involving Circuits
       Not Operated by PGandE . . . . . . . .    63

7.11   Reimbursement of Costs for Reconnections
       Initiated by Cotenants Other Than
       PGandE . . . . . . . . . . . . . . . . .    63

7.12   Temporary Reconnections . . . . . . . .    64

7.13   Interconnections With the Line
       Circuits . . . . . . . . . . . . . . . .    68

7.14   Transmission Losses . . . . . . . . . .    70

8.0  Curtailments . . . . . . . . . . . . . . . . . . .    71

8.1    Curtailment Before Completion of
       Lakeville-Sobrante 230-kv Line . . . .    71

Table of Contents (continued)

|      | 8.2  | Outage of a Line Circuit or Other Circuit . . . . . . . . . . . . . . . . . | 71 |
|------|------|-------------------------------------------------------------------------------|----|
|      | 8.3  | System Curtailment . . . . . . . . . | 75 |
| 9.0  |      | PGandE As Operator . . . . . . . . . . . . . . | 76 |
|      | 9.1  | Rights and Duties of PGandE as Operator | 76 |
|      | 9.2  | Rights of Cotenants Other Than PGandE . | 76 |
|      | 9.3  | Operating Emergencies . . . . . . . . | 77 |
| 10.0 |      | Additions and Betterments . . . . . . . . . | 77 |
|      | 10.1 | PGandE's Right to Make Additions and Betterments to the New Line . . . . . . | 77 |
|      | 10.2 | Right of Cotenants Other Than PGandE To Participate . . . . . . . . . . . . . | 78 |
|      | 10.3 | Additions and Betterments of More Than 300 MW . . . . . . . . . . . . . . . . | 79 |
|      | 10.4 | Right of First Refusal Regarding Additions and Betterments of More Than 300 MW . . . . . . . . . . . . . . | 79 |
| 11.0 |      | Reconstruction . . . . . . . . . . . . . . . . | 80 |
|      | 11.1 | Conditions for Automatic Reconstruction | 80 |
|      | 11.2 | Conditions for Decision Before Reconstruction . . . . . . . . . . . . | 81 |
|      | 11.3 | PGandE as the Selling Cotenant . . . . | 82 |
|      | 11.4 | Destruction of an Other Circuit . . . . | 82 |

Table of Contents (continued)

12.0  Liability and Indemnity . . . . . . . . . .  84

      12.1  Liability . . . . . . . . . . . . . . .  84

      12.2  Responsibility of Cotentants Regarding
            Damage from Electrical Disturbances . .  85

      12.3  Indemnification From Claims by
            Persons or Entities . . . . . . . . .  86

      12.4  Indemnification From Claims by
            Electric Customers  . . . . . . . . .  86

      12.5  Indemnification From Claims by
            Employees . . . . . . . . . . . . . .  87

      12.6  Willful Action  . . . . . . . . . . .  88

13.0  Dispute Resolution and Default . . . . . .  90

      13.1  Submittal of Dispute to Coordinating
            Committee . . . . . . . . . . . . . .  90

      13.2  Arbitration . . . . . . . . . . . . .  91

      13.3  Default by PGandE . . . . . . . . . .  94

14.0  Term and Termination . . . . . . . . . . .  95

      14.1  Term  . . . . . . . . . . . . . . . .  95

      14.2  Acceptance by FERC  . . . . . . . . .  96

      14.3  Termination by a Cotenant . . . . . .  97

      14.4  Decision By Cotenants to Continue
            Operation . . . . . . . . . . . . . .  97

      14.5  Termination by All Cotenants  . . . .  97

Table of Contents (continued)

Page

|      | 14.6 | Continued Operation By Cotenants . . . | 98  |
|------|------|----------------------------------------|-----|
|      | 14.7 | Effect of Termination . . . . . . . . | 99  |
| 15.0 |      | Coordinating Committee . . . . . . . . . . . | 101 |
|      | 15.1 | Structure . . . . . . . . . . . . . . | 101 |
|      | 15.2 | Functions and Responsibilities . . . . | 101 |
|      | 15.3 | Consequences of Non-Unanimous Decisions | 106 |
|      | 15.4 | Limitation of Decisions . . . . . . . | 112 |
|      | 15.5 | Committee Minutes . . . . . . . . . . | 112 |
|      | 15.6 | Limitation of Authority . . . . . . . | 113 |
|      | 15.7 | Change in Designated Representative . . | 113 |
|      | 15.8 | Expenses of Representatives . . . . . | 113 |
| 16.0 |      | General Provisions . . . . . . . . . . . . | 114 |
|      | 16.1 | Captions . . . . . . . . . . . . . . . | 114 |
|      | 16.2 | Construction of Agreement . . . . . . | 114 |
|      | 16.3 | Effect on Other Contracts . . . . . . | 114 |
|      | 16.4 | Regulatory Authority . . . . . . . . | 115 |
|      | 16.5 | Governing Law . . . . . . . . . . . . | 117 |
|      | 16.6 | Judgments and Determinations . . . . . | 118 |
|      | 16.7 | License to Install Facilities . . . . | 118 |
|      | 16.8 | No Dedication of Facilities . . . . . . | 119 |

Table Of Contents (continued)

| | | |
|---|---|---|
| 16.9 | Notices . . . . . . . . . . . . . . . . | 119 |
| 16.10 | Audits and Review of Financial Records | 121 |
| 16.11 | Relationship of Parties . . . . . . . . | 122 |
| 16.12 | Taxes . . . . . . . . . . . . . . . . . | 123 |
| 16.13 | Uncontrollable Forces . . . . . . . . . | 124 |
| 16.14 | Waiver of Rights . . . . . . . . . . . | 125 |
| 16.15 | Writings and Other Documents . . . . . | 126 |
| 16.16 | Venue . . . . . . . . . . . . . . . . . | 126 |
| 16.17 | Proprietary Information . . . . . . . . | 127 |
| 16.18 | Execution . . . . . . . . . . . . . . . | 128 |
| 16.19 | No Precedent . . . . . . . . . . . . . | 128 |
| 16.20 | Incorporation by Reference . . . . . . | 129 |

Appendix A  Location of New Line, Line Circuits, and
            Other Circuits

Appendix B  Preliminary Payment Schedule -- Castle Rock
            Junction-Lakeville Line

Appendix C  Annual Charge for the Associated Facilities

Agreement of Cotenancy
in the
Castle Rock Junction-Lakeville 230-kV
Transmission Line

THIS AGREEMENT OF COTENANCY IN THE CASTLE ROCK
JUNCTION-LAKEVILLE 230-kV TRANSMISSION LINE is entered into
as of the 1st day of June, 1984, by and between Pacific Gas
and Electric Company (PGandE), the State of California
Department of Water Resources (CDWR), the Northern
California Power Agency (NCPA) and the City of Santa Clara
(Santa Clara), (Cotenant or Cotenants), and is as follows:

## Recitals

PGandE is presently constructing on behalf of the Cotenants
a 230-kV double circuit transmission line (New Line) between
Castle Rock Junction and its Lakeville Substation in The
Geysers area.

PGandE has entered into separate Interconnection Agreements
with each of CDWR, NCPA, and Santa Clara which conferred
upon those Cotenants a right to participate in the ownership
of the New Line as tenants-in-common and such Cotenants have
exercised such rights.

The Cotenants have entered into the Sharing Agreement to allow the Cotenants other than PGandE to commence payment of their respective shares of the Cost of the New Line and to make contributions-in-aid-of-construction for the Associated Facilities in proportion to their Ownership Interests.

The Cotenants desire to set forth their rights and obligations as tenants-in-common of the New Line and for the use, operation and maintenance of the New Line, Associated Facilities, and Land Rights.

The Cotenants intend this Agreement to supercede the Sharing Agreement.

1.0 Definitions

The following terms, when used in this Agreement with initial capitalization whether in the singular or plural, shall have the following meanings.

1.1 Addition and Betterment - A capital improvement, the primary aim of which is to make the property affected more useful, more efficient, of greater durability or of greater capacity.

1.2 Associated Facilities - Equipment and facilities that are not a part of the New Line as

such but which are installed in order to integrate it with PGandE's system.

1.3     CEC - California Energy Commission or its successor agency.

1.4     CPUC - California Public Utilities Commission or its successor agency.

1.5     Capital Replacement - A retirement unit that is substituted for another such retirement unit, as the term "retirement unit" is defined in the Federal Energy Regulatory Commission List of Retirement Units for Use in Connection with Uniform System of Accounts Prescribed for Public Utilities and Licenses, or its successor document.

1.6     Coordinating Committee - The Committee formed pursuant to Article 15.0.

1.7     Cost - The costs of the appropriate Cotenant associated with the Line Circuits and Associated Facilities including, but not limited to:    all capital expenditures, expenses of operation, maintenance, administrative and general expenses, taxes, an allocation of fixed charges on general

plant and common utility plant, labor and payroll
taxes, materials and supplies, transportation, stores
and tool expenses, supervision and overheads,
depreciation, an allowance for workers' compensation,
and public liability and property damage insurance,
as determined by PGandE in accordance with the FERC
Uniform System of Accounts as may be amended or
superseded from time to time. The appropriate
components of costs, as defined herein, shall be
applied for the particular service or transaction
performed. The factor for determining PGandE's cost
of capital shall be equal to the rate of return on
investment base as most recently allowed by the FERC.
The factor for determining the cost of capital for a
Cotenant other than PGandE shall be equal to the rate
of interest payable by such Cotenant with respect to
its most· recent issue of debt securities having a
maturity of no less than five (5) years, taking into
consideration any original issue discount. No rate
of return shall be included in any charge assessed on
the portion of any facilities to the extent such
facilities are financed by one or more
contributions-in-aid-of-construction.

1.8    Cotenant - CDWR, NCPA, PGandE, Santa Clara and
any transferee that becomes a Cotenant under Section
2.4.3.

1.9    FERC - Federal Energy Regulatory Commission or
its successor agency.

1.10   Firm Transmission Entitlement - The firm
entitlement of a Cotenant to the use of transmission
capacity on a Line Circuit or Other Circuit or
combination thereof as provided in Section 7.1.

1.11   Good Utility Practice

        1.11.1 With respect to actions or inactions
        by any Cotenant other than CDWR, those
        practices, methods and equipment, including
        levels of reserves and provisions for
        contingencies, as modified from time to time,
        that are at least as good as those commonly
        used in the Service Area to operate, reliably
        and safely, electric power facilities to serve
        a utility's own customers dependably and
        economically, with due regard for the
        conservation of natural resources and the
        protection of the environment of the Service

Area; provided, that such practices, methods and equipment are not unreasonably restrictive.

1.11.2 With respect to action or inactions by CDWR, the then current practices, methods and equipment generally used by electric utilities, which operate primarily in the State of California, for the purpose of providing economic, safe and reliable service to their own customers, with due regard for the conservation of natural resources and the protection of the environment.

1.12 **Interconnection Agreements** - The Comprehensive Agreement between the State of California Department of Water Resources and PGandE executed April 22, 1982, the Interconnection Agreement between PGandE and the City of Santa Clara effective October 27, 1983, the Interconnection Agreement between PGandE and the Northern California Power Agency, City of Alameda, City of Biggs, City of Gridley, City of Healdsburg, City of Lodi, City of Lompoc, City of Palo Alto, City of Roseville, City of Ukiah and Plumas Sierra Rural Electric Cooperative effective September 14, 1983, and any interconnection agreement

between PGandE and another entity that becomes a Cotenant, as such agreements may be amended from time to time.

1.13  Lakeville-Sobrante 230-kV Line - For purposes of Article 8.0, that 230-kV transmission line and associated facilities included in "Phase II Construction" as shown in Appendix A.

1.14  Land Rights - All rights, including easements, rights-of-way, or fee title in real property necessary for the construction, use, operation, and maintenance of the New Line, and the Associated Facilities.

1.15  Line Circuit - Either Line Circuit No. 1 or Line Circuit No. 2.

1.16  Line Circuit No. 1 - The three-phase, 230-kV circuit shown in Appendix A that, as of the initial operation date of the New Line, serves PGandE's Geysers Unit No. 14.

1.17  Line Circuit No. 2 - The three-phase, 230-kV circuit shown in Appendix A that, as of the initial operation date of the New Line, serves PGandE's Geysers Unit No. 9.

1.18  New Line - The double-circuit, 230-kV transmission line now being constructed between PGandE's tower No. 0/1 at Castle Rock Junction in The Geysers area and the circuit breaker structure at Lakeville Substation shown in Appendix A. The facilities include tower No. 0/1 at Castle Rock Junction, the overhead line with bundled 2300-kcm aluminum conductors, the associated pipe-type underground circuits with 3500-kcm aluminum cables, all conductors, towers, related hardware and any Capital Replacements and Additions and Betterments thereto, but exclude the circuit breaker structure at Lakeville Substation and any Land Rights.  The New Line constitutes a portion of the Line Circuits, as shown in Appendix A.

1.19  Operating Emergency - An unplanned event, series of events, or circumstance, which requires the taking of immediate action (i) to preserve, maintain, or reestablish the safety, integrity, or operability of the Line Circuits, Other Circuits, or Associated Facilities or the facilities of any Cotenant interconnected with the Line Circuits, Other Circuits, or Associated Facilities; (ii) to protect the health or safety of employees or the public; or (iii) to prevent or minimize any significant adverse environmental effects.

1.20  Other Circuit - Either Other Circuit No. 1 or Other Circuit No. 2, or any future 230-kV transmission circuit other than the Line Circuits, which circuit is operated by PGandE in The Geysers area and interconnects with PGandE's backbone transmission system.

1.21  Other Circuit No. 1 - The three-phase, 230-kV circuit shown in Appendix A that, as of the initial operation date of the New Line connects PGandE's Geysers Unit No. 5 with PGandE's Fulton Substation.

1.22  Other Circuit No. 2 - The three-phase, 230-kV circuit shown in Appendix A that, as of the initial operation date of the New Line, connects PGandE's Geysers Unit No. 17 with PGandE's Fulton Substation.

1.23  Ownership Interest - A Cotenant's ownership share in the New Line as provided and adjusted in Section 2.2.

1.24  Service Area - That area within the exterior geographic boundaries of the several areas electrically served at retail, now or in the future, by PGandE, and those areas in northern and central California adjacent thereto.

1.25   Sharing Agreement - The Agreement for Sharing of Costs for Construction of the Castle Rock Junction-Lakeville 230-kV Transmission Line and Associated Facilities, executed as of May 21, 1984 by PGandE, CDWR, NCPA and Santa Clara.

1.26   Willful Action - Willful action as defined in Section 12.6.

## 2.0   Ownership Interests

2.1   Undivided Interests.   Each Cotenant owns an undivided interest in the New Line as a tenant-in-common as provided in this Article 2.0. Cotenants other than PGandE shall have no ownership in the Associated Facilities or the Land Rights; provided, however, that unless and until its Ownership Interest is terminated as provided in this Agreement each Cotenant shall have such rights to the benefit of the Land Rights and such rights to use the Associated Facilities as may be necessary to make use of its Firm Transmission Entitlement, pursuant to this Agreement.

2.2  Initial Ownership Interests and Subsequent Adjustments.  The initial rating of the New Line is 1,206 MW with each Line Circuit rated at 603 MW.  The initial Ownership Interest of each Cotenant is as follows, subject to adjustment as provided in this Section 2.2:

|              | Ownership Interests (Megawatts) | Ownership Interests (Percent) |
|--------------|---------------------------------|-------------------------------|
| CDWR-        | 165.0                           | 13.68                         |
| NCPA-        | 49.9                            | 4.14                          |
| PGandE-      | 931.0                           | 77.20                         |
| Santa Clara- | 60.1                            | 4.98                          |
| Total        | 1206.0                          | 100.00                        |

2.2.1  The Ownership Interests shall be determined as follows:

2.2.1.1  For PGandE, the Ownership Interest in megawatts is equivalent to the capacity rating of the New Line minus the sum of the Ownership Interests in megawatts of the Cotenants other than PGandE.

2.2.1.2  Ownership Interests in percent are determined for each

Cotenant by the following equation:

$$\text{Ownership Interest in Percent} = \frac{100 \text{ x Ownership Interest in MW}}{\text{Capacity Rating of New Line}} \ \%$$

2.2.2 Ownership Interests shall be adjusted as provided in this Section 2.2.2. For purposes of payment under Article 5.0, adjustments of Ownership Interests shall be deemed to take effect on the first day of the calendar month in which the transaction or change specified in this Section 2.2.2 takes place.

2.2.2.1 Within sixty (60) calendar days of executing this Agreement, a Cotenant may terminate its participation if unsatisfied regarding the quality of PGandE's title to the Land Rights pursuant to Section 3.2. In that case, the Ownership Interest of the terminating Cotenant shall revert to PGandE, and PGandE's Ownership Interest in megawatts and percent shall increase accordingly. The Ownership Interests of the other Cotenants that remain parties to this Agreement shall not change under this Section 2.2.2.1.

2.2.2.2 After this Agreement is executed, any Cotenant may divest itself of part or all of its Ownership Interest upon satisfaction of the standards described in Section 2.4.3. The selling Cotenant thereby reduces or eliminates its Ownership Interest in megawatts and percent, and transfers a corresponding Ownership Interest to a new or existing Cotenant. The Ownership Interests of the Cotenants that do not participate in this transfer shall not change under this Section 2.2.2.2.

2.2.2.3 Following the first two (2) years of operation of the New Line and the monitoring thereof by PGandE as operator, the capacity rating of the New Line shall be adjusted pursuant to Section 4.7. At that time, PGandE's Ownership Interest in megawatts shall change in an amount equal to such adjustment in the capacity rating. The Ownership Interest in megawatts of the other Cotenants shall not be

changed. If the capacity rating of the New Line increases, PGandE's Ownership Interest in megawatts and in percent shall increase, and the other Cotenants' Ownership Interests in percent shall decrease. If the capacity rating of the New Line decreases, PGandE's Ownership Interest in megawatts and in percent shall decrease, and the other Cotenants' Ownership Interests in percent shall increase.

2.2.2.4 If Additions and Betterments that increase the capacity rating of the New Line are made pursuant to Article 10.0, the Ownership Interests of the Cotenants may change. For the Cotenants that participate in such Additions and Betterments, each of their Ownership Interests in megawatts shall increase to the extent of such participation; their Ownership Interests in percent may change accordingly on the basis of the new capacity rating of the New Line after

-14-

the Additions and Betterments become operational. For the Cotenants that do not so participate, each of their Ownership Interests in megawatts shall not be changed, while their Ownership Interests in percent shall decrease accordingly.

2.2.2.5   If a Cotenant elects to terminate its participation in this Agreement pursuant to Articles 11.0 and/or 14.0, the Ownership Interests in megawatts and in percent of the non-terminating Cotenants shall increase for those which elect to receive the Ownership Interest transferred by the terminating Cotenant. The Cotenants which receive no transferred Ownership Interest from the terminating Cotenant shall have no change in their Ownership Interests.

2.2.3   After notice to it of facts requiring a change in any Ownership Interest under this Section 2.2, PGandE shall calculate the adjusted Ownership Interests as necessary and notify the other Cotenants of the changes.

2.3    Waiver of Partition Rights.  The Cotenants waive the right to partition the New Line.

2.4    Transfer of Ownership Interests.  Ownership Interests shall be transferrable as follows:

> 2.4.1   A Cotenant may mortgage or transfer security interests in its Ownership Interest without the consent of the other Cotenants and without the lienholder becoming liable under this Agreement.
>
> 2.4.2   To the extent not prohibited or restricted by law, including but not limited to any prohibitions or restrictions contained in any document conveying a real property interest necessary to the construction or use of the Line Circuits or Associated Facilities, a Cotenant may, subject to Section 2.5, sell, assign, or transfer its Ownership Interest or the use of that interest, provided (i) the transaction does not substantially impair the non-transferring Cotenants' rights under this Agreement; and (ii) the transferee agrees in writing prior to or concurrently with its agreement to such transaction that it shall

not use PGandE's transmission system other than the Line Circuits, Other Circuits, or Associated Facilities, as such use is authorized in this Agreement, except to the extent it is entitled to such use under a contract with PGandE or an enforceable judgment or order by a court, regulatory commission or other body of competent jurisdiction. The transferring Cotenant must notify any transferee that transmission service may not be available from PGandE beyond Lakeville or Fulton Substations, as applicable.

2.4.3 All sellers, assignors, or transferors, including those under foreclosure, shall remain liable under this Agreement except to the extent that: (i) the transfer is a complete divestiture in perpetuity of all of the rights and obligations associated with the Ownership Interest in megawatts that is being transferred; (ii) the transferee is a financially responsible entity in the judgment of the non-transferring Cotenants which judgment shall be reasonably exercised; and

-17-

(iii) the transferee assumes in writing all obligations associated with the Ownership Interest in megawatts that is being transferred. If all standards described in this Section 2.4.3 are met, such transferee shall be a Cotenant.

2.4.4 A Cotenant shall notify the members of the Coordinating Committee of the particulars of any agreement under Section 2.4.2, except agreements subject to Section 2.5, within fourteen (14) calendar days after entering into such agreement or, if CDWR is the transferring Cotenant, within fourteen (14) calendar days after approval of the Agreement by the California Department of General Services. Such Cotenant shall inform PGandE's operating center by telephone or otherwise of such agreement before it becomes effective. The procedure for notifying the Cotenants regarding agreements subject to Section 2.5 shall be in accordance with Section 2.5.6.

2.5 **Rights of Refusal.** To the extent not prohibited or restricted by law and to the extent the transaction is other than for services lasting no

more than one (1) year, including all renewals and extensions with respect to substantially similar services, and involves (i) solely transmission service, or (ii) transmission capacity in excess of that reasonably necessary to transmit any power that may be generated under the rights transferred as part of the transaction, then:

> 2.5.1 The entire transaction shall be subject to a first right of refusal by the non-transferring Cotenants to purchase or acquire the rights to be transferred at substantially the same price and under substantially the same terms or, at the election of the exercising Cotenant, under substantially more favorable terms, as those contained in a bona fide offer by another entity, including another Cotenant, which the transferring Cotenant proposes to accept. After submission of such bona fide offer to the non-transferring Cotenants for their review and until the procedures described in Section 2.5.6 are complete or until such submission is withdrawn prior to the exercise of any right of refusal under this Section 2.5, the transferring Cotenant shall have no

right to accept another offer with respect to the rights to be transferred. Said first right of refusal shall be exercisable in proportion to the Ownership Interests of the exercising Cotenants, in the ratio such Ownership Interests bear to the total Ownership Interests of all non-transferring Cotenants.

2.5.2 In the event that the transferor is a Cotenant other than PGandE and any Cotenant elects not to exercise its right of first refusal under Section 2.5.1, then PGandE shall have the right of refusal to purchase or acquire the rights which were the subject of such election.

2.5.3 In the event the transferor is PGandE and any Cotenant elects not to exercise its right of first refusal under Section 2.5.1, then the remaining non-transferring Cotenants shall have the right of refusal to purchase or acquire in proportion to the Ownership Interests of such Cotenants in the ratio such Ownership Interests bear to the total Ownership Interests of said remaining,

non-transferring Cotenant, or as otherwise agreed by the remaining non-transferring Cotenants, the rights which were the subject of such election.

2.5.4 In the event any Cotenant elects not to exercise its right of refusal under Section 2.5.2 or 2.5.3, then the remaining non-transferring Cotenants shall have the right of refusal to purchase or acquire in proportion to the Ownership Interests of such Cotenants in the ratio such Ownership Interests bear to the total Ownership Interests of said remaining, non-transferring Cotenants, or as otherwise agreed by the remaining non-transferring Cotenants, the rights which were the subject of such election. If any Cotenant fails to exercise its right of refusal under this Section 2.5.4, then the remaining non-transferring Cotenants must mutually agree to purchase or acquire all of the rights which were the subject of such election or they shall be deemed to have waived all rights of refusal with respect to the transaction in question.

2.5.5   In exercising the rights of refusal described in this Section 2.5, each Cotenant agrees not to assert any preference which may otherwise be available to it over another Cotenant.

2.5.6   The transferring Cotenant shall provide written notice and deliver a complete copy of the agreement it proposes to enter into to each other Cotenant on the same working day ("Delivery Date"). Exercise of the rights described in this Section 2.5 shall be as follows: No later than thirty (30) calendar days after the Delivery Date, or, if not a working day, no later than the first working day thereafter, each Cotenant shall meet with or otherwise communicate its decision pursuant to Section 2.5.1 to the other Cotenants, and shall confirm such decisions in writing to the other Cotenants thereafter.  No later than thirty-seven (37) calendar days after the Delivery Date, or, if not a working day, no later than the first working day thereafter, the Cotenants shall meet or otherwise communicate to the other Cotenants their decisions with regard to any

right of refusal described in Sections 2.5.2
and 2.5.3. Such decisions shall be confirmed
in writing to the other Cotenants thereafter.
No later than forty-four (44) calendar days
after the Delivery Date, or, if not a working
day, no later than the first working day
thereafter, the Cotenants shall meet or
otherwise communicate to the other Cotenants
their decisions with regard to any right of
refusal described in Section 2.5.4, or reach
the mutual agreement described in the second
sentence of Section 2.5.4, and meet or
otherwise communicate to the other Cotenants
their agreement. Such decisions or agreement
shall be confirmed in writing to the other
Cotenants thereafter. Failure by any Cotenant
to communicate any decision or agreement as
provided in this Section 2.5.6 shall be a
waiver of all rights of refusal held by such
Cotenant under this Section 2.5 with respect
to the rights to be transferred.

2.5.7    In exercising any right of refusal
described in this Section 2.5, the exercising
Cotenant must either exercise that right of
refusal with respect to all of the rights

available to it, or it shall be deemed to have waived all of its rights of refusal with respect to the transaction in question.

2.5.8   The transferring Cotenant shall deliver to the other Cotenants a copy of any agreement entered into by it which was subject to this Section 2.5.

2.6   Abandonment.  No Cotenant shall be relieved of its obligations under this Agreement by abandoning its interest.

3.0   Land Rights

3.1   Land Rights Acquired By PGandE.  PGandE has acquired Land Rights necessary for the Cotenants to make use of their Firm Transmission Entitlement as provided in Section 2.1.

3.2   Creation and Acquisition of Land Rights. PGandE's creation, acquisition, and agreement to give the other Cotenants the benefit of the Land Rights are without warranty or guarantee of any kind.  Each other Cotenant shall satisfy itself in advance as to the quality of the title and its sole remedy, if

dissatisfied, is either to terminate its participation in this Agreement or to pursue changes to such title, provided, however, that PGandE shall exercise its best efforts to secure and maintain such Land Rights as may be necessary to enable PGandE, CDWR, NCPA, and Santa Clara to use their Firm Transmission Entitlements. PGandE has reviewed the easement documents and it is PGandE's good faith judgment that there are no restrictions which would prevent CDWR, NCPA or Santa Clara from receiving the benefits of the Land Rights as provided in Section 2.1, but that there may be restrictions with respect to transfers to some other entities of the right to receive the benefits of the Land Rights.

> 3.2.1 The right of termination under this Section 3.2 is only held by CDWR, NCPA and Santa Clara, and will cease sixty (60) calendar days after the first execution of this Agreement by any such Cotenant, and if not exercised, that Cotenant shall be deemed satisfied as to such title.

> 3.2.2 In the event of any termination under this Section 3.2, each Cotenant whose participation in this Agreement is terminated

-25-

shall, in consideration of the refund described in Section 3.2.3, transfer the interests and rights it holds in the New Line, Associated Facilities and Land Rights to PGandE immediately upon the effectiveness of such termination. Such transfer shall not be subject to Section 2.5.

3.2.3 In the event of any such termination, PGandE shall refund to that Cotenant any amounts theretofore received from the terminating Cotenant with respect to the Associated Facilities and the New Line, and Ownership Interests as specified in Section 2.2 shall be adjusted as appropriate. Such refund shall be made with interest calculated as defined in Section 6.6 from the date each payment was made under Section 4.2 to the date the refund is made.

3.3 Release of Lien. PGandE shall use its best efforts to obtain a release of any lien that might have been created by its First and Refunding Mortgage, dated December 1, 1920, as amended and supplemented, with respect to the Ownership Interests of any other Cotenant, if appropriate.

4.0     Sharing Initial Construction Costs of the
        New Line and Associated Facilities

        4.1     Initial Cost Estimate for the New Line.
        PGandE currently estimates that the initial
        construction Cost of the New Line will be
        approximately $45,500,000, excluding Costs of the
        Land Rights and Associated Facilities. PGandE shall
        revise this estimate from time to time as appears
        appropriate.

        4.2     Cost-Sharing for the New Line. Subject to
        Sections 4.6 and 4.7, PGandE's share of the estimated
        initial construction Cost of the New Line is 77.2
        percent, and the other Cotenants' shares total 22.8
        percent. Payments shall be made monthly according to
        the schedule in Appendix B, with payments to cover
        the expected expenditures to be incurred in the
        pertinent month. Payments by check or wire transfer
        shall be received by PGandE not later than the first
        day of each month. If payments are not received in
        time, the provisions of Sections 4.11 and 6.4 apply.
        PGandE shall reconcile the payment schedule with the
        actual expenditures as soon as practicable after the
        receipt of such actual Cost information. PGandE
        shall make appropriate revisions in the schedule of
        payments so that the payment schedule will as much as

practicable reflect the actual amounts of money required by PGandE as such money is expended.

4.3   Payment for the Associated Facilities. Cotenants other than PGandE shall bear a share of construction Costs of the Associated Facilities, in proportion to their Ownership Interests, by making payments to PGandE as contributions-in-aid-of-construction, and shall have the right to use such Associated Facilities as provided in Section 2.1 without additional charge other than as provided in Section 5.4.

4.4   Cost-Sharing for the Associated Facilities. PGandE presently estimates that the initial construction Costs of the Associated Facilities will be approximately $2,381,700. PGandE shall revise this estimate from time to time as appears appropriate. Subject to Section 4.7, the Cotenants agree to share these Costs on the basis of the Cotenants' initial Ownership Interests as stated above in Section 2.2. Thus, the contributions of Cotenants other than PGandE were:

| | |
|---|---|
| CDWR- | $325,817 |
| Santa Clara- | 118,609 |
| NCPA- | 98,602 |

4.5    Payments Made for the Associated Facilities.
The contributions-in-aid-of-construction in the
amounts specified in Section 4.4 were paid to PGandE
on June 1, 1984.

4.6    Preliminary Accounting.    PGandE    shall,
subsequent to completion of the New Line and
Associated Facilities, provide the other Cotenants a
preliminary accounting of the actual Costs thereof to
bring the payments in line with the initial Ownership
Interest defined in Section 2.2.    Statements shall be
submitted that specify any additional payment or
reimbursement necessary to achieve the appropriate
allocation of payments by Ownership Interest based on
the methodology used to prepare Appendix B.    Such
adjustments shall include interest as provided in
Section 6.6 from the date of the final payment under
Appendix B to the date of the adjustment statement.

4.7    Adjustment of Capacity Rating and Final
Accounting.    After monitoring the operation of the
New Line for two (2) years from its date of operation
and after the final accounting for the Costs of the
New Line and Associated Facilities, PGandE shall
revise the capacity rating of the New Line and will
provide a final adjustment of Costs of the New Line

and Associated Facilities based on the methodology used to prepare Appendix B and on the revised New Line capacity rating. Each Cotenants' Ownership Interest shall be adjusted as provided in Section 2.2. Additional payments or reimbursements shall be made with interest as provided in Section 6.6, from the date of the adjustment statement in Section 4.6 to the date of the final adjustment statement prepared pursuant to this Section 4.7. The monitoring and rating of the New Line shall be done in accordance with Good Utility Practice. PGandE, as operator, has the sole right to establish the line rating. The Cotenants other than PGandE shall have the right to review the methodology and results of the line rating process. The capacity rating of the New Line after Additions and Betterments are made under Article 10.0 shall be adjusted in accordance with this Section 4.7.

4.8 Right to Review. Each Cotenant shall have the right to review the documents supporting the Costs billed in this Article 4.0, in accordance with Section 16.10, up to one (1) calendar year after receipt of the final accounting statement prepared pursuant to Section 4.7.

4.9    No Cost Guarantee. PGandE does not represent, agree, or guarantee that Costs of the New Line will not exceed its estimates by reason of price increases, human error, uncontrollable forces, or any other factor to which construction projects are subject.

4.10   Expected Completion Date of Construction. PGandE shall use its best efforts to continue constructing the New Line and Associated Facilities with a goal of completing them and putting them into full operation on or about March 1, 1985.

4.11   Consequences of Non-Timely Payments. If any Cotenant other than PGandE does not make any payment referred to in this Article 4.0 in a timely manner in accordance with Section 4.2, such Cotenant shall pay PGandE 100 percent of its share of the amount described in this Section 4.11 rather than 50 percent thereof as otherwise provided. Under existing tax law, all payments referred to in this Article 4.0 should be, in the opinion of all Cotenants, excludable from PGandE's gross income for federal, state, and/or local income tax purposes. If this turns out not to be the case and any or all of these payments are included in PGandE's gross income for

federal, state, and/or local income tax purposes, the
Cotenants other than PGandE agree to pay PGandE, in
proportion to their Ownership Interests, 50 percent
of the following amount: The amount that PGandE's
tax liability increases as a result of including any
or all of such payments (plus any payments to be made
by the other Cotenants to PGandE under this Section
4.11) in PGandE's gross income for tax purposes for
each year, over the tax liability PGandE would have
incurred in the same year without including such
payments in PGandE's gross income, such amount to be
adjusted to reflect any credits, deductions or other
tax benefits taken or to be taken by PGandE in
previous, current and future tax years for the
Ownership Interests for which such payments were
made. If after the adjustment, the amount becomes a
negative figure, PGandE shall pay 50 percent of that
amount to the other Cotenants in proportion to the
Ownership Interests of each of the other Cotenants.
No Cotenant makes any representation with respect to
these tax risks, with respect to which each Cotenant
has consulted its own tax counsel.

4.12  **Nature of Agreement.** The Cotenants intend
that this Agreement shall constitute a sharing
arrangement among the Cotenants for the cooperative

funding and construction of a new 230-kV transmission line and Associated Facilities in The Geysers area of Northern California. The Cotenants do not intend this Agreement to create a partnership for tax purposes or otherwise. If, however, any tax authority characterizes this Agreement as creating a partnership, the Cotenants hereby affirm that it is their intention, beginning with the first taxable year of the purported partnership, not to have such entity taxed as a partnership under either (a) Subchapter K of Chapter 1 of the Internal Revenue Code of 1954, as amended from time to time, or (b) comparable partnership provisions of federal, state or local tax laws. The Cotenants agree to execute such documents as may be necessary for tax purposes to effectuate this intention.

5.0   **Cotenants' Payments for Costs of Operation, Maintenance, Replacement, and Additions and Betterments.**

5.1   **Annual Costs To Be Shared.** Except as provided in Section 7.13, the Cotenants shall share the Costs of operation and maintenance, Capital Replacements, and Additions and Betterments to the Line Circuits and Associated Facilities as provided in this Article 5.0.

5.2    Sharing of Costs of Operating Emergencies.
The Cotenants shall share the Costs of Capital
Replacements associated with eliminating any
Operating Emergency in proportion to their Ownership
Interests pursuant to Section 6.3.3.

5.3    Sharing of Costs for Operation and Maintenance
of the Line Circuits.    The Cotenants other than
PGandE shall pay an annual charge, in proportion to
their Ownership Interests, for the operation and
maintenance of the Line Circuits and PGandE's
maintenance of the rights-of-way of the Line
Circuits, as provided in and billed by PGandE under
Section 6.2.    PGandE owns, operates and maintains
other 230-kV collector and tap lines that are
interconnected with the Line Circuits but separate
from them.    Such collector and tap lines are not
included as part of the Line Circuits for the
purposes of Cost sharing under this Section 5.3.

5.4    Sharing of Costs for Operation, Maintenance
and Replacement of Associated Facilities.    Cotenants
other than PGandE shall pay an annual charge to cover
the Costs of owning, operating, maintaining, and
making Capital Replacements to the Associated
Facilities, in accordance with Section 5.7 and

Appendix C. The system average rate listed in Appendix C may be adjusted not more than once in each calendar year. Billings and payments shall be in accordance with Section 6.1. PGandE may revise Appendix C subject to filing with FERC pursuant to Section 16.4.2 of this Agreement to the extent FERC has`jurisdiction.

5.5 <u>Sharing of Costs for Capital Replacements and Additions and Betterments to Maintain Capacity of the New Line</u>. Except to the extent such Costs are paid by an entity other than a Cotenant, the Cotenants shall share, in proportion to their Ownership Interests as of the date the work commences, the Costs resulting from (i) Capital Replacements to the New Line or any portion thereof; and (ii) Additions and Betterments to the New Line or Associated Facilities that do not increase the rated capacity determined pursuant to Section 4.7. Except with respect to an Operating Emergency under Section 5.2, PGandE shall (i) provide an estimate of the Costs that are expected to be incurred and (ii) bill the other Cotenants for their share of such Costs pursuant to Section 6.3. Any payments by Cotenants other than PGandE under this Section 5.5 with respect to the Associated Facilities shall be contributions-in-aid-of-construction.

5.6     Sharing of Costs for Additions and Betterments
to Upgrade Capacity of the New Line.  The Costs of
any Additions and Betterments to the New Line or
Associated Facilities under Article 10.0 shall be
shared by the Cotenants in proportion to their right
to the benefits of such Additions and Betterments as
provided in Article 10.0.  Billings and payments
shall be in accordance with Section 6.3.  Any
payments by Cotenants other than PGandE under this
Section 5.6 with respect to the Associated Facilities
shall be contributions-in-aid-of-construction.

5.7     Adjustments to Annual Payment for Associated
Facilities.  With respect to the Associated
Facilities, each Cotenant's initial capital payment,
as a contribution-in-aid-of-construction and as
adjusted pursuant to Section 4.7, is used as the
basis for determining the billing amount for the
annual charge described in Appendix C.  PGandE shall
adjust each Cotenant's capital payment for purposes
of determining such billing amount in such a manner
as to relieve the transferring Cotenant of liability
for the payment of such billing amount to the extent
Ownership Interests are transferred pursuant to
Section 2.4.3.  When such a transfer takes place and
after the Coordinating Committee is appropriately

notified pursuant to Section 2.4.4, the transferor's capital payment shall be allocated for purposes of determining such billing amount between the transferor and the transferee in proportion to their Ownership Interests after the transfer. PGandE shall also adjust each Cotenant's capital payment for purposes of determining such billing amount when Additions and Betterments are made pursuant to Sections 5.5 or 5.6. Additional capital payments by the Cotenants for such Additions and Betterments to the Associated Facilities shall be added to the Cotenants' respective capital payments made to date. Both in the case of transfers and of Additions and Betterments, the new total of the capital payments shall be used as the basis for the calculation of the Cotenants' billing amount for the annual charge pursuant to Appendix C.

5.8 **Effective Date of Ownership Interest for Billing Purposes**. Each Cotenant's share of the Costs under Sections 5.1 through 5.4 shall be in accordance with its Ownership Interest in percent as of May 1 of the year for which such Costs are billed. No retroactive adjustments will be made to reflect any adjustment in Ownership Interests after May 1 of such year.

## 6.0 Billing and Payment

6.1 Billing for the Associated Facilities. PGandE shall bill the other Cotenants an annual charge for the Associated Facilities pursuant to Section 5.4. The first annual charge billing for each Cotenant other than PGandE shall be prorated by days for the period between and including November 4, 1984 and December 31, 1984. Each calendar year thereafter, PGandE shall bill the other Cotenants for the annual charge on or before the first calendar day in June, in conjunction with the billing under Section 6.2, and the Cotenants shall pay the annual charge on or before the first calendar day in August. The bill for the last annual charge shall similarly be prorated for the portion of the calendar year during which the Agreement is in effect.

6.2 Billing for Operation and Maintenance of the Line Circuits. The Cotenants agree that, for the purposes of this Agreement, $343,000 represents, as of 1984, the basis for the calculation of annual payments (the "BCAP") to PGandE by the Cotenants other than PGandE for operation and maintenance of the Line Circuits. The Cotenants other than PGandE shall each make an annual payment to PGandE that is

calculated by multiplying the BCAP by such Cotenant's
Ownership Interest in percent. The Cotenants agree
that the BCAP for years after 1984 shall be adjusted
each year in accordance with the following published
indices (or appropriate successor indices):

Index 1 = Average Hourly Earnings for
Production or Non-Supervisory
Workers in Electric, Gas and
Sanitary Services (SIC 49) in the
State of California during the
appropriate year, as most recently
published (Bureau of Labor
Statistics, U.S. Department of
Labor, "Employment, Hours and
Earnings -- States and Areas").

Index 2 = Average value of the Producer Price
Index for Industrial Commodities
during the appropriate year, as
most recently published (Bureau of
Labor Statistics, U.S. Department
of Labor, "Producer Prices and
Price Indexes").

The basis for calculation of annual payments for
operation and maintenance ("BCAP") shall be adjusted
each year as follows:

$$BCAP_n = BCAP_{n-1} \left( 0.7 \ \frac{Index \ 1_{n-1}}{Index \ 1_{n-2}} \ + \ 0.3 \ \frac{Index \ 2_{n-1}}{Index \ 2_{n-2}} \right)$$

where n = year in which such payment occurs,
and

$$BCAP_n = \$343,000 \text{ when n= 1984.}$$

PGandE does not warrant or represent that the BCAP, as escalated, will represent its actual Costs in any given year or years. The BCAP represents a settlement between the Cotenants, does not reflect PGandE current ratemaking policy, and shall not establish a precedent with respect to any future agreement. The BCAP shall be adjusted by PGandE after consultation with the other Cotenants to reflect PGandE's estimate of any additional or reduced Costs of maintenance and operation resulting from Additions and Betterments to the Line Circuits. Disputes with respect to such additional or reduced billing amounts resulting from any Additions and Betterments shall be resolved as provided in Articles 13.0 and 15.0. The first annual billing for each Cotenant other than PGandE shall be prorated by days for the period between and including November 4, 1984 and December 31, 1984. Each calendar year thereafter, PGandE shall bill the other Cotenants annually on or before the first calendar day in June and the Cotenants shall pay the annual charge on or before the first calendar day in August. The bill for the last annual charge shall similarly be prorated for the portion of the calendar year during which this Agreement is in effect.

6.3    Billing for Capital Replacements, Additions
and Betterments and Other Expenses Under This
Agreement. PGandE shall bill the other Cotenants for
the estimated Costs associated with a given project
for Capital Replacements on the New Line, and for
Additions and Betterments to the New Line or
Associated Facilities pursuant to Sections 5.5 and
5.6. PGandE shall also bill the other Cotenants for
other expenses payable pursuant to Article 7.0 of
this Agreement.  Such bills shall be based on
PGandE's best estimate of the Costs of performing the
work.  The bill shall include a credit for the
appropriate share of the estimated net salvage value
of any retirements of any facilities replaced.

> 6.3.1    For projects with a duration of less
> than one month, the Cotenants shall make one
> lump-sum payment.  PGandE shall provide an
> estimate of Costs to the other Cotenants at
> least thirty (30) calendar days before such
> payment is due.

> 6.3.2    For projects with a duration of longer
> than one month, PGandE shall prepare a monthly
> payment schedule that reflects the estimated
> construction or other Costs as they are

expected to be incurred. At least sixty (60) calendar days before the date on which the Cotenants other than PGandE shall be required to commence payment of any Costs, PGandE shall submit to the other Cotenants: (i) its estimate of all Costs which it will incur; and (ii) a payment schedule indicating the expected monthly Costs included in the estimate and each Cotenant's monthly share of such Costs.

6.3.3    PGandE shall bill the other Cotenants for the Costs of any Capital Replacements to the New Line required as a result of an Operating Emergency.   If such Capital Replacements are to be commenced later than two (2) calendar months after the date the Operating Emergency began, the provisions of Section 6.3.2 shall apply.  Otherwise, PGandE shall bill the other Cotenants for their proportional share of such Costs as soon as practicable after the work is completed.

6.3.4    The Cotenants shall pay each amount specified in the estimate described in Section 6.3.2 on or before the first of the month for which PGandE expects to pay each such amount.

-42-

6.3.5 Within a reasonable time after the completion of the project, PGandE shall provide the other Cotenants with the final accounting of the Costs of the project. As part of such final accounting, PGandE shall adjust the Cost estimate provided in Section 6.3.1 or 6.3.2 as necessary to reflect any difference between the estimated and actual Costs of such project. PGandE shall submit a final statement to the other Cotenants specifying the payment or refund required. All adjustments shall accrue an interest charge at the rate specified in Section 6.6 from the date the final estimated payment was due to the date the adjustment is paid.

6.3.6 PGandE may agree to conduct studies under Article 7.0 on a flat-fee basis.

6.4 **Payment of Bills.** Except as otherwise provided in this Agreement, all bills shall be due and payable within thirty (30) calendar days of receipt of the bill. If any Cotenant believes there are any errors in the determination of such Costs, such Cotenant shall pay the full amount of such Costs without offset or reduction. Bills that are not paid

in full by the due date shall thereafter accrue an interest charge from the date the payment is due until the date such payment is received. The interest charge shall be compounded monthly based on the unpaid amount of the bill at an interest rate equal to the applicable first of the month reference rate as specified in Section 6.6 plus two (2) percentage points per annum, or the maximum rate permitted by law, whichever is less.

6.5 Right to Review. Up to one calendar year after receipt of the final accounting under Section 6.3.5, the Cotenants shall have the right pursuant to Section 16.10 to review the supporting documents upon which the Costs billed under Section 6.3 are determined. Disputes under Articles 5.0 and 6.0 will be resolved pursuant to Articles 13.0 and 15.0.

6.6 Applicable Interest Rate. Except as provided in Section 6.4, interest will be compounded monthly, at a rate equal to the applicable first of the month reference rate, or any successor comparable interest rate, of the San Francisco main branch of the Bank of America, N.T. and S.A., San Francisco, California, or the maximum rate allowed by law, whichever is less.

6.7    Billing Disputes.  Regardless of the existence of any dispute, all payments will be made in full pursuant to Section 6.4, until the dispute is resolved.

> 6.7.1    If any portion of a bill is disputed, the Cotenant billed shall advise PGandE, in writing, of the amount and basis for the contested portion.  PGandE and the Cotenant(s) disputing the bill shall meet within thirty (30) calendar days to review the supporting documents and attempt to agree on the adjustments that may be appropriate.    If agreement cannot be reached, the dispute shall be resolved pursuant to the procedures set forth in Article 13.0.

> 6.7.2    If the disputed amount is determined under this Agreement not to have been payable, it shall be refunded with interest, compounded monthly, at the reference rate described in Section 6.6 corresponding to the period from the date the payment was due to the date the refund is made, or at the maximum rate permitted by law during such period, whichever is less; provided, however, that if the

disputed amount is determined through arbitration to have been billed by PGandE in bad faith, it shall be refunded with interest, compounded monthly, at such reference rate plus two (2) percentage points per annum, or the maximum rate permitted by law, whichever is less.

## 7.0    Right of Use

7.1    Commencement of Firm Transmission Entitlement. Each Cotenant shall have, subject to curtailments as provided in Article 8.0, a Firm Transmission Entitlement equal to its Ownership Interest in megawatts.   Transmission service rights and limitations over PGandE's system beyond Lakeville or Fulton substations, if any, shall be as provided in separate Interconnection Agreements between PGandE and the other Cotenants.

7.2    Rights Associated With Firm Transmission Entitlement.  The Firm Transmission Entitlement, or portion thereof, of a Cotenant other than PGandE shall exist only on the specific Line Circuit or Other Circuit to which such Firm Transmission Entitlement, or portion thereof, is designated.

PGandE's Firm Transmission Entitlement shall consist of that undesignated portion of the capacity rating of the New Line and Line Circuits, as adjusted under Section 4.7, and the portion of the capacity rating of the New Line and Line Circuits designated under Section 10.4. Cotenants shall be entitled to use their Firm Transmission Entitlement, or portion thereof, on such Line Circuits or Other Circuits. As of the effective date of this Agreement with respect to such Cotenant and except as provided in Section 7.4, no Cotenant shall be required to pay a transmission charge for the use of its Firm Transmission Entitlement over the Line Circuits or Other Circuits up to its Ownership Interest in megawatts. No Firm Transmission Entitlement is transferrable in whole or in part to any other Line Circuit or Other Circuit unless a redesignation is made to that Other Circuit or Line Circuit, as provided in this Article 7.0. Any transmission by a Cotenant other than PGandE of energy or capacity over the Line Circuits or Other Circuits that is not using an equivalent portion of such Cotenant's Firm Transmission Entitlement shall be provided under the terms of such Cotenant's Interconnection Agreement or any other applicable transmission agreement. No Cotenant shall have the right to use the unused Firm

Transmission Entitlement of another Cotenant without such other Cotenant's prior authorization through its operating center or otherwise.

7.3     Exchange of Firm Transmission Entitlement.     To the extent the Firm Transmission Entitlement of a Cotenant other than PGandE is designated to an Other Circuit or is designated from an Other Circuit to a Line Circuit, that Cotenant and PGandE shall, for operating purposes, exchange, without charge to each other, equivalent amounts of transmission capacity between such Other Circuit and the Line Circuits. That Cotenant shall continue to be financially responsible for its share of Costs of the Line Circuits and Associated Facilities, pursuant to Article 5.0, in accordance with its Ownership Interest.  Except as provided in Section 7.4, the Cotenant shall not be required to pay any of the Costs of the Other Circuits.  Except for exchanges pursuant to this Section 7.3, any transaction involving the transmission capacity so exchanged shall be subject to Section 2.5.

7.4     Adverse Rate Treatment.     Sections 7.2 and 7.3 assume that PGandE will not receive any adverse rate treatment as a result of such arrangements.   If

adverse treatment does occur, PGandE may charge any disallowance or other resulting cost or loss to other individual Cotenants (i) as appropriate to any decision imposing such treatment or (ii) in proportion to their Ownership Interests as appropriate. PGandE may thereafter charge compensatory rates taking into consideration such other Cotenants' payments for operation and maintenance. Any Cotenant charged a transmission charge under this Section 7.4 with respect to the right to use its Firm Transmission Entitlement over an Other Circuit as provided in Section 7.3 may charge PGandE an equal transmission charge for PGandE's right to use any transmission capacity on the New Line exchanged therefor.

7.5  Designation of Firm Transmission Entitlement By Cotenants Other Than PGandE. The Cotenants other than PGandE agree that the Firm Transmission Entitlement of CDWR, NCPA, and Santa Clara shall be designated initially to the following Line Circuits or Other Circuits: CDWR -- 55 MW on Other Circuit No. 2 and 110 MW on Line Circuit No. 2; NCPA -- 49.9 MW on Line Circuit No. 2; and Santa Clara -- 60.1 MW on Line Circuit No. 2. Such a Cotenant may make a request to redesignate all or a part of its

Firm Transmission Entitlement from one Line Circuit
or Other Circuit to another Line Circuit or Other
Circuit, or to designate any increased Firm
Transmission Entitlement it may receive as a result
of any Addition and Betterment under Section 10.2, by
submitting its request in writing to PGandE. Such
Cotenant may make such a redesignation or designation
only to a given Line Circuit or Other Circuit which
has, connected to it, a powerplant(s) owned or
operated by such Cotenant; except that to the extent
that such Cotenant's total Firm Transmission
Entitlement exceeds the total generating capacity
which such Cotenant has connected to the Line
Circuits and Other Circuits, such Cotenant may make
such a redesignation or designation to a given Line
Circuit or Other Circuit in excess of the generating
capacity of such powerplant(s) or to a Line Circuit
or Other Circuit which does not have, connected to
it, a powerplant owned or operated by such Cotenant.
Such Cotenant shall not be entitled to any such
redesignation until at least thirty (30) calendar
days after such request. No Cotenant's Firm
Transmission Entitlement may be redesignated in whole
or in part at its request more often than twice
during each calendar year unless mutually agreed by
PGandE and the requesting Cotenant.

7.6    Reimbursement Of Costs For Redesignations
Initiated By Cotenants Other Than PGandE.  If PGandE
determines that it is necessary to study the possible
effects of a redesignation described in Section 7.5,
the requesting Cotenant shall pay all Costs of such
study pursuant to Section 6.3 and PGandE's decision
on the redesignation shall be delayed until the study
is completed.  PGandE shall complete such study
within 180 calendar days of its receipt of the
written redesignation request.  If PGandE determines
that the redesignation should be approved, the
requesting Cotenant shall pay the other Cotenants'
resulting Costs, including but not limited to any
Costs of additional reconnections to balance line
loadings, but excluding the Cost of lost generation.
If the Firm Transmission Entitlement is redesignated
from a Line Circuit to an Other Circuit, then the
provisions of Section 7.3 shall apply.  If a
reconnection is required as a result of the
redesignation, the provisions of Section 7.8 shall
apply.  Billing and payment of any Costs shall be
pursuant to Section 6.3.

7.7    Right to Provide Transmission Service.  A
Cotenant may use its Firm Transmission Entitlement to
provide transmission service for others as provided

in Sections 2.4 and 2.5, subject to the provisions of this Agreement.

7.8     Reconnections and Redesignations Initiated By PGandE.  Except as provided in other agreements between a Cotenant and PGandE, PGandE, as operator, may change the point of connection of a Cotenant's powerplant and/or redesignate all or a part of a Cotenant's Firm Transmission Entitlement from one Line Circuit or Other Circuit to another Line Circuit or Other Circuit in order best to provide for transmission of electric energy.  PGandE shall have the right to redesignate all or a portion of the Firm Transmission Entitlement of a Cotenant other than PGandE only when it determines that such action is required as a result of:  (i) the proposed new interconnection of a powerplant or unit to a Line Circuit or Other Circuit; (ii) the derating or retiring of an existing powerplant or unit connected to a Line Circuit or Other Circuit; or (iii) a request by a Cotenant other than PGandE to reconnect or redesignate under Sections 7.5, 7.9 or 7.10.

7.8.1   PGandE shall notify the members of the Coordinating Committee of any proposed reconnections or redesignations in advance of

their implementation; provided that in the event of a reconnection or redesignation required for repair, Operating Emergency, or other compelling operating purposes, PGandE shall (i) take whatever action it deems prudent and necessary, subject to the provisions of this Agreement and in accordance with Good Utility Practice, to preserve or maintain the safety, integrity and operability of the transmission system in the Service Area, and (ii) restore the system to its original configuration as soon as practicable after the occurrence that precipitated the need for the change has terminated.

7.8.2 PGandE agrees to reasonably minimize interference with transmission from other Cotenants' powerplants when reconnections are being made pursuant to Sections 7.8 and 7.9. Except during an Operating Emergency, PGandE shall coordinate line outages for reconnections with the other Cotenants and shall notify their operators regarding the specific lines involved and the times they must be cleared.

7.8.3   Except as provided in Sections 7.6, 7.8.5, and 7.11, PGandE shall pay the full Cost of any reconnection under this Section 7.8, excluding the Cost of lost generation.

7.8.4   PGandE shall notify the members of the Coordinating Committee when it determines that the powerplant of a Cotenant other than PGandE is being studied for reconnection or redesignation and solicit their comments regarding the assumptions and parameters of its study of such reconnection or redesignation.  Whenever PGandE proposes to reconnect any other Cotenant's powerplant or to redesignate such Cotenant's Firm Transmission Entitlement, it must submit its justification    for    the    proposed reconnection/redesignation plan, together with a cost estimate for the proposed work, to the members of the Coordinating Committee for review.  The study submitted shall contain:  a drawing showing the proposed reconnections including the specific circuits involved; a physical description of the reconnections; and a tentative schedule for the reconnections. The Committee shall have thirty (30) calendar

days for review of the study

7.8.4.1 When practicable, PGandE's submittal to the Coordinating Committee shall be made before such reconnection/redesignation plan is submitted to any regulatory body for approval and with sufficient time allowed for the additional review provided in Section 7.8.5.

7.8.4.2 The Coordinating Committee shall only have the right to review such justification with respect to a proposed plan in which a powerplant operated by a Cotenant other than PGandE will be reconnected, or the Firm Transmission Entitlement of a Cotenant other than PGandE will be redesignated, from one Line Circuit or Other Circuit to another Line Circuit or Other Circuit. The Cotenants, whether through the Coordinating Committee or otherwise, shall only have the right to review any such studies that involve reconnecting powerplants or redesignating the Firm Transmission Entitlement of a Cotenant other than PGandE.

-55-

7.8.4.3   In the event that PGandE proposes to reconnect a powerplant that is connected to a Line Circuit or Other Circuit to which all or a portion of the Firm Transmission Entitlement of a Cotenant other than PGandE is designated, PGandE shall redesignate the associated Firm Transmission Entitlement when making such reconnection, provided that, if PGandE determines that sufficient firm transmission capability is available, the Cotenant to be reconnected shall have the right to redesignate the associated Firm Transmission Entitlement to a given Line Circuit or Other Circuit that has, connected to it, a powerplant owned or operated by such Cotenant, up to the generating capacity of such powerplant.

7.8.4.4   In the event that PGandE proposes to redesignate all or a portion of the Firm Transmission Entitlement of a Cotenant other than PGandE without making a concurrent

reconnection, PGandE may redesignate only up to the amount of the generating capacity of any powerplant owned or operated by such Cotenant that is connected to the Line Circuit or Other Circuit to which such redesignation is made. PGandE may redesignate such Firm Transmission Entitlement in excess of the generating capacity of such powerplant(s) only to the extent that such Cotenant's total Firm Transmission Entitlement exceeds the total generating capacity which such Cotenant has connected to the Line Circuits or Other Circuits.

7.8.4.5 If a Cotenant's Firm Transmission Entitlement is redesignated to an Other Circuit under this Section 7.8.4, the provisions of Section 7.3 shall apply.

7.8.5 When a Cotenant other than PGandE has a powerplant proposed for reconnection, or Firm Transmission Entitlement proposed for

redesignation, under Section 7.8.4, any Cotenant(s) affected by such a reconnection or redesignation shall have the right to object to the reconnection/redesignation plan. Such Cotenant(s) must formally present its (or their) objections in writing to the members of the Coordinating Committee before the end of the 30-day period specified in Section 7.8.4.

> 7.8.5.1 The objecting Cotenant(s) shall have ninety (90) calendar days from the date it (they) submits its (their) notice of objection to the Coordinating Committee to jointly prepare a study that supports one alternative plan which includes, but is not limited to, the allocation among the objecting Cotenant(s) of the increased or decreased Costs described in Section 7.8.5.4. Such an alternative plan may be a recommendation not to take any action.

> 7.8.5.2 The study for an alternative reconnection plan shall contain: a drawing showing the proposed

reconnections under the alternative plan, including the specific circuits involved; a physical description of the reconnections; a tentative schedule for the reconnections; and a cost estimate for the work. The study for an alternative redesignation plan shall contain a detailed description of the proposed redesignation and a tentative schedule therefor. The study shall also contain a comparison of the alternative plan with the plan proposed by PGandE. The objecting Cotenant(s) may, at its (their) option, request that PGandE conduct the study of the alternative plan at the expense of the objecting Cotenant(s).

7.8.5.3 The objecting Cotenant(s) shall present its (their) single study to the Coordinating Committee before the end of the 90-day period, or the PGandE reconnection/redesignation plan shall be implemented. When the study is presented, the Cotenants shall then

have up to thirty (30) calendar days to review the alternative plan and the cost estimate.

7.8.5.4 If PGandE determines that the alternative proposed by the Cotenant(s) is feasible and consistent with Good Utility Practice, PGandE shall implement that alternative, subject to the conditions set forth in Section 7.8.6. The Cotenant(s) offering the alternative plan shall pay any net increase in Costs resulting from the fact that the alternative is implemented rather than PGandE's plan proposed under Section 7.8.4. Such increased Costs shall include, but not be limited to, the Costs of transmission planning or engineering studies conducted by PGandE to support the alternative before regulatory bodies, any Costs of additional reconnections to balance line loadings that would not have been required under PGandE's plan, and any increased transmission line losses

suffered by PGandE. Such increased Costs shall exclude, however, the Cost of lost generation. The Cotenants offering the alternative plan shall reach agreement with PGandE on any sharing of Costs and the billing and payment provisions no later than thirty (30) calendar days before payment is required to commence pursuant to Section 6.3. If any portion of a Cotenant's Firm Transmission Entitlement is redesignated to an Other Circuit under this Section 7.8.5, the provisions of Section 7.3 shall apply to such portion. If PGandE determines that the alternative plan is infeasible, PGandE shall, after presenting supporting material to the Coordinating Committee, have the right to implement its plan proposed under Section 7.8.4.

7.8.6 The provisions of Section 7.8.5 shall not apply if the California Energy Commission, the California Public Utilities Commission, or

any successor agency requires, through order, condition or other official action, that PGandE implement a specific reconnection plan.

7.8.7 Nothing in this Agreement shall compel any Cotenant to connect any of its facilities to any circuit that is not operated by PGandE.

7.9 Reconnections Initiated by Cotenants Other Than PGandE Involving Circuits Operated By PGandE. Except as provided in Section 7.12, if a Cotenant other than PGandE wishes to change its point of connection for one of its powerplants from one Line Circuit or Other Circuit to another Line Circuit or Other Circuit, and PGandE and the Coordinating Committee determine that the change should be made, the Cotenant may request that PGandE do so at the Cotenant's expense subject to Section 7.11. Such Cotenant shall give adequate advance written notice to allow PGandE to study the effects of such proposed reconnection. PGandE shall complete such study within 180 calendar days after its receipt of written notice.

7.10   Reconnections Initiated by Cotenants Other
Than PGandE Involving Circuits Not Operated By
PGandE.   Nothing in this Agreement will prevent a
Cotenant from changing the point of connection of one
of its powerplants to a circuit not operated by
PGandE or from such a circuit to a Line Circuit or
Other Circuit to the extent otherwise permitted by
this Agreement.   If a Cotenant requests a
reconnection to a Line Circuit or Other Circuit, such
reconnection cannot be made until PGandE, as
operator, approves it.   Such Cotenant shall give
adequate advance written notice to allow PGandE to
study the effects of such proposed reconnection.
PGandE shall complete such study within 180 calendar
days after its receipt of written notice.   The
Cotenant shall bear its own Costs of reconnecting
subject to Section 7.11.

7.11   Reimbursement Of Costs For Reconnections
Initiated By Cotenants Other Than PGandE.   Except as
provided in Section 7.12, the Cotenant making a
request to change its point of connection shall pay
the other Cotenants' resulting Costs, including but
not limited to pertinent transmission planning or
engineering studies required by PGandE, as operator,
and any Costs of additional reconnections pursuant to

Section 7.8 to balance line loadings, but excluding the Cost of lost generation. Such Cotenant shall continue to be responsible for its respective share of the Costs of the Line Circuits as provided in this Agreement, until such time as it is relieved of such obligation as provided in this Agreement, or as otherwise agreed among the Cotenants. If the point of connection is changed from a Line Circuit to an Other Circuit, then the provisions of Section 7.3 shall apply. Billing and payment of any Costs shall be pursuant to Section 6.3.

7.12    **Temporary Reconnections**. In the event that (i) a Cotenant is not using its full amount of Firm Transmission Entitlement designated to a Line Circuit or Other Circuit ("Second Circuit"), (ii) such Second Circuit is not curtailed pursuant to Article 8.0 of this Agreement, and (iii) the Cotenant owns or operates powerplants connected to a different Line Circuit or Other Circuit ("Initial Circuit"), such Cotenant may, to the extent consistent with Good Utility Practice, temporarily reconnect its powerplant from the Initial Circuit to the Second Circuit by notifying PGandE's operating center by telephone or otherwise; provided Sections 7.12.1 through 7.12.6 are each satisfied. Such Cotenant

shall as soon as practicable, terminate any temporary reconnection and reconnect to the Initial Circuit at such time as it coordinates necessary switching with PGandE's operating center and when the occurrence that precipitated the need for the temporary reconnection has terminated, but in no event later than 210 calendar days after the temporary reconnection takes place, unless such period is extended by the mutual agreement of such Cotenant and PGandE. Nothing in this Section 7.12 shall relieve such Cotenant of any obligation to pay PGandE applicable charges for transmission service under any agreement with PGandE.

> 7.12.1 PGandE shall have sixty (60) days to review the design of the equipment required for such temporary reconnection, including but not limited to any switches and protection equipment, before it is installed and shall have the right to test and retest such equipment in advance of any such temporary reconnection to ensure the continued reliability and operability of PGandE's system. When PGandE reviews such design or tests such equipment, and if it determines that the temporary reconnection and the

-65-

implementation of the temporary reconnection are consistent with Good Utility Practice and are as reliable as the connection that existed before the temporary reconnection is made, it shall approve such design or determine that such equipment has passed such test. If PGandE determines that such equipment or design is inadequate, the proposed temporary reconnection may not take place unless and until changes are made in such equipment or design by such Cotenant and PGandE determines that such changed equipment or design will prevent the proposed temporary reconnection from violating the standards contained in the previous sentence. PGandE makes no representation or warranty that any such equipment or design may be adequate. PGandE shall give adequate advance notice before testing such equipment and shall conduct the test at a mutually agreeable time.

7.12.2 Such Cotenant shall only use transmission capacity on the Second Circuit up to the sum of its Firm Transmission Entitlement designated to the Second Circuit and any transmission service purchased from a

Cotenant other than PGandE on the Second Circuit. PGandE's operating center, at its sole discretion, may approve the use by such Cotenant of additional transmission capacity from PGandE's Firm Transmission Entitlement on the Second Circuit, provided that such Cotenant shall reduce or cease, immediately upon PGandE's request through its operating center, such use of additional transmission capacity.

7.12.3 The temporary reconnection shall not impair the ability of any other Cotenant to use its Ownership Interest as provided in this Agreement.

7.12.4 No later than one (1) hour before the temporary reconnection is planned to take place, such Cotenant shall contact PGandE's operating center and obtain authorization to proceed on schedule. The temporary reconnection shall proceed consistent with Good Utility Practice and in accordance with the schedule authorized by PGandE's operating center.

7.12.5 Such Cotenant shall inform by telephone or otherwise the members of the Coordinating Committee of the temporary reconnection by the end of the next business day following PGandE's approval of the temporary reconnection.

7.12.6 The Cotenant making a request for a temporary reconnection or for PGandE's design approval or testing of any equipment under Section 7.12.1 shall pay the other Cotenants' resulting Costs, including but not limited to the Costs of pertinent engineering or planning studies conducted by PGandE to study the reconnection equipment, the Costs of any additional equipment required on PGandE's system or the system of another Cotenant and the Cost of lost generation. Billing and payment of any Costs shall be pursuant to Section 6.3.

7.13  **Interconnections With the Line Circuits**. Additional 230-kV collector and tap lines may be constructed by the Cotenants and interconnected with the Line Circuits after this Agreement becomes effective.  In the event of such an interconnection

with the New Line by a Cotenant other than PGandE,
Sections 7.13.1 through 7.13.4 shall apply.
Interconnections by Cotenants other than PGandE with
any Other Circuit or any portion of the Line Circuits
other than the New Line shall be handled in
accordance with such Cotenant's respective
Interconnection Agreement.

> 7.13.1 If a Cotenant other than PGandE
> constructs a new 230-kV collector or tap line,
> such Cotenant must obtain approval by PGandE,
> as operator, before interconnecting with the
> New Line. Such Cotenant shall give PGandE
> adequate advance written notice of such
> proposed interconnection with the New Line.
> The advance notice shall provide adequate lead
> time necessary to accomplish the
> interconnection, including but not limited to,
> such time as may be necessary for: conducting
> studies and preparing the engineering design;
> review by regulatory agencies; obtaining
> required approvals, permits and licenses;
> construction; and establishing any contractual
> arrangements between the Cotenants and third
> parties that may be necessary.

7.13.2 Any Cotenant that proposes such construction shall notify the other Cotenants of its plans.

7.13.3 Facilities or control equipment at the proposed interconnection point shall be provided, operated, and maintained in a manner to ensure the safe and reliable operation of the New Line and in accordance with Good Utility Practice.

7.13.4 The Cotenant requesting the interconnection shall be responsible for PGandE's Costs of providing the required facilities, including but not limited to transmission planning studies or engineering designs that must be completed before PGandE can grant approval. Billing and payment of any Costs shall be pursuant to Section 6.3.

7.14 **Transmission Losses.** Transmission losses over the New Line, Line Circuits or Other Circuits shall be governed by each Cotenant's respective Interconnection Agreement with PGandE.

8.0    Curtailments

8.1    Curtailment   Before   Completion   of
Lakeville-Sobrante 230-kV Line.  A Cotenant's right
to use its Firm Transmission Entitlement is subject
to curtailment in accordance with Good Utility
Practice.  Prior to the completion and full operation
of the Lakeville-Sobrante 230-kV Line, the use by any
Cotenant other than PGandE of its Firm Transmission
Entitlement shall be curtailable as provided in such
Cotenant's Interconnection Agreement with PGandE.
PGandE shall use its best efforts to complete the
Lakeville-Sobrante  230-kV  Line  on  or  before
November 30, 1985.

8.2    Outage of a Line Circuit or Other Circuit.
After the completion and full operation of the
Lakeville-Sobrante 230-kV Line, in the event of an
outage or curtailment of the capability of a Line
Circuit or Other Circuit to transmit energy, Sections
8.2.1 through 8.2.3 shall apply.  For purposes of
this Section 8.2, all of the transmission capacity of
the Line Circuits and Other Circuits, except any Firm
Transmission Entitlement of a Cotenant other than
PGandE, shall be deemed to be the designated Firm
Transmission Entitlement of PGandE.

8.2.1   PGandE shall take any action pursuant to Section 9.3 as it deems appropriate.

8.2.2   Except as provided in Article 7.0, the Cotenant's rights to the use of its Firm Transmission Entitlement shall not be transferable to another Line Circuit or Other Circuit.   The right to use Firm Transmission Entitlement designated to the curtailed Line Circuit or Other Circuit shall only be available to another unit on the curtailed Line Circuit or Other Circuit as provided in Section 8.2.3.2.

8.2.3   The following steps shall be taken until such time that the curtailed Line Circuit or Other Circuit can be restored to full capacity:

> 8.2.3.1.  Transmission by a Cotenant over the curtailed circuit in excess of its Firm Transmission Entitlement designated to such curtailed circuit, including such Cotenant's non-firm transmission, shall be curtailed first;

8.2.3.2. Thereafter, each Cotenant's right to use the Firm Transmission Entitlement (FTE) designated to the curtailed Line Circuit or Other Circuit shall be allocated on a pro-rata basis as determined by the following equation except as provided in Section 8.2.3.3:

$$A = \frac{B}{C} \times D$$

where,

A = A Cotenant's pro-rata allocation in megawatts of the then available transmission capacity on the curtailed Line Circuit or Other Circuit;

B = A Cotenant's FTE in megawatts designated to the curtailed Line Circuit or Other Circuit;

C = Sum total of each of the Cotenants' FTEs in megawatts designated to the curtailed Line Circuit or Other Circuit;

D = Then available transmission capacity in megawatts on the curtailed Line Circuit or Other Circuit.

8.2.3.3 If after applying Section 8.2.3.2, one or more Cotenants have scheduled less than their pro-rata

firm allocation (variable "A") as determined in Section 8.2.3.2, this excess allocation will be, subject to Section 8.2.3.4, reallocated among each of the remaining Cotenants which are able to use it by the following process:

$$E = A + \left(\frac{B}{F} \times G\right)$$

where,

E = A remaining Cotenant's pro-rata allocation in megawatts of the then available transmission capacity on the curtailed Line Circuit or Other Circuit including the excess allocation not used by one or more of the other Cotenants.

A and B are as defined in Section 8.2.3.2.

F = Sum total of each of the remaining Cotenants' FTEs in megawatts designated to the curtailed Line Circuit or Other Circuit.

G = Excess allocation in megawatts to be reallocated to the remaining Cotenants on the curtailed Line Circuit or Other Circuit.

The above process for determining variable "E" will be repeated as necessary in order to maximize the use

-74-

of the transmission capacity of the curtailed Line Circuit or Other Circuit, provided that no Cotenant shall have the right to exceed its FTE as assigned to the curtailed Line Circuit or Other Circuit.

8.2.3.4  If a Cotenant was not scheduled to use its full pro-rata firm allocation (variable "A") as determined in Section 8.2.3.2 when the curtailment period began, such Cotenant may schedule generation with PGandE to use up to its full allocation on the curtailed Line Circuit or Other Circuit in accordance with the scheduling procedures under its respective Interconnection Agreement.

8.3  **System Curtailment**.  The curtailment priorities established in the respective Interconnection Agreements between PGandE and the other Cotenants shall continue to apply in the event of an outage or curtailment of the capability to transmit energy on PGandE's system other than the

Line Circuits, Other Circuits and Associated Facilities.

## 9.0    PGandE as Operator

9.1    **Rights and Duties of PGandE As Operator.** PGandE, as operator, shall acquire Land Rights, construct the New Line and Associated Facilities, and manage, coordinate, operate, maintain, repair, make replacements, inspect and have access to the Line Circuits, and shall have all rights to do so, except as expressly provided in this Agreement. All work shall be done in conformance with Good Utility Practice. PGandE does not assume any fiduciary duties in its performance of this Agreement, and such performance shall not be judged by fiduciary standards.

9.2    **Rights of Cotenants Other Than PGandE.** The Cotenants other than PGandE waive all right to enter or to have anyone else enter or possess the New Line on their behalf, unless PGandE materially defaults in its obligations pursuant to Section 13.3, and agree that they have no such rights with respect to the Associated Facilities, the Line Circuits other than the New Line, and the Other Circuits; provided, that

the Cotenants other than PGandE, or such Cotenants'
designated representative, shall have the right to
inspect the New Line at reasonable times (i) upon
prior notice to PGandE of no less than two (2)
business days, (ii) when accompanied by a
representative of PGandE, and (iii) only for the
purpose of exercising their rights under this
Agreement.

9.3   Operating Emergencies.   PGandE shall take
whatever action it determines necessary to eliminate
any Operating Emergency.   PGandE shall notify the
other Cotenants' operating centers as soon as the
extent of the trouble is ascertained and inform them
regarding the Operating Emergency and the corrective
actions taken and yet to be taken.

10.0   Additions and Betterments

10.1   PGandE's Right to Make Additions and
Betterments to the New Line.   PGandE shall have the
exclusive right to make at any time Additions and
Betterments to the New Line and/or Associated
Facilities in order to increase the capacity of the
New Line or Associated Facilities, but such Additions
and Betterments shall not interfere, other than

temporarily, with the rights of the other Cotenants to the use of their Firm Transmission Entitlement.

10.2    Right of Cotenants Other Than PGandE to Participate.  FGandE shall offer in writing to the other Cotenants the right to participate in the first 300 MW of transmission capacity resulting from any such Addition and Betterment in a combined amount up to 35 percent of such Addition and Betterment, up to a maximum combined amount of 105 MW.  Said Cotenants shall have the right to participate in such combined amount according to their respective Ownership Interests in percent in the New Line, or in such other proportion agreed to by said Cotenants, on the same terms and conditions set forth in this Agreement, and shall share the Costs of the Additions and Betterments in proportion to their participation throughout the period of construction.  The Cotenants shall have ninety (90) calendar days from the date of PGandE's written offer in which to exercise this right and to notify PGandE in writing of their decision.  In the event any of said Cotenants do not wish to exercise this right, the remaining Cotenants, other than PGandE, may share the capacity subject to such unexercised right in proportion to their Ownership Interests or as otherwise agreed among

them. The Cotenants exercising this right to participate shall notify PGandE as to the amount of additional capacity each Cotenant elects to participate in. PGandE shall bill the participating Cotenants for their proportional share of Costs in accordance with Section 5.6.

10.3 <u>Additions</u> <u>and</u> <u>Betterments</u> <u>of</u> <u>More</u> <u>Than</u> <u>300</u> <u>MW</u>. Any Additions and Betterments constructed by PGandE resulting in increased capacity of the New Line or Associated Facilities over and above 300 MW shall be, at PGandE's option, for its sole use and benefit. None of the rights of refusal under Section 2.5 shall apply to transfers by PGandE of any transmission capacity created in excess of the initial 300 MW of Additions and Betterments to the New Line.

10.4 <u>Right</u> <u>of</u> <u>First</u> <u>Refusal</u> <u>Regarding</u> <u>Additions</u> <u>and</u> <u>Betterments</u> <u>of</u> <u>More</u> <u>Than</u> <u>300</u> <u>MW</u>. Should the completion of any Addition and Betterment under this Article 10.0 result in an increase of more than 300 MW in the capacity rating of the New Line, as such rating may be revised pursuant to Section 4.7, PGandE shall, upon completion of such Additions and Betterments, designate its Ownership Interest in megawatts which is not subject to the right of first

refusal under Section 2.5 to specific Line Circuits or Other Circuits subject to redesignation by PGandE no more than twice during each calendar year. PGandE shall notify the members of the Coordinating Committee thirty (30) days in advance of any such designation or redesignation.

## 11.0   Reconstruction

11.1   Conditions for Automatic Reconstruction. During the term of this Agreement, the Cotenants agree to make the Capital Replacements necessary to reconstruct and repair the New Line and Associated Facilities and to share the Cost of such reconstruction or repair in proportion to their Ownership Interests (i) if with respect to an event occurring during the first ten (10) years after the effective date of this Agreement, the Cost of such reconstruction or repair does not exceed 60 percent of the then-current replacement Cost of the New Line and Associated Facilities, or (ii) if, with respect to an event occurring after such tenth year, the Cost of such reconstruction or repair does not exceed a certain percentage (variable "P") of the then-current replacement Cost of the New Line and Associated

Facilities.  Variable "P" shall be calculated as follows:

$$P = 60 - [(3)(y-10)]$$

where  $P =$   percent of the then-current replacement Cost of the New Line and Associated Facilities;

$y =$   the number of full years that have elapsed from the effective date of this Agreement to the date the damage took place.

The rights and obligations provided in this Section 11.1 shall be specifically enforceable.


11.2  <u>Conditions</u> <u>for</u> <u>Decision</u> <u>Before</u> <u>Reconstruction</u>. If the Cost of reconstruction or repair would exceed the applicable limit specified in Section 11.1, then each Cotenant shall decide whether or not it desires to repair or reconstruct the damaged facility.  Any Cotenants desiring to repair or reconstruct such facilities, shall have the right to do so.  In the event that fewer than all Cotenants desire to repair or reconstruct the destroyed or damaged facilities, then any Cotenant that does not agree to repair or reconstruct such facilities shall sell its interest in the facilities to the Cotenant or Cotenants that desire to reconstruct such facilities.  The purchasing Cotenants shall purchase such interest in

proportion to their Ownership Interest for a price
equal to the net salvage value of the selling
Cotenant's Ownership Interest. The rights and
obligations provided in this Section 11.2 shall be
specifically enforceable.

11.3  PGandE as the Selling Cotenant. In the event
that PGandE is a selling Cotenant under Section 11.2,
it shall permit the reconstructed New Line to be
interconnected with its system for the remaining term
of this Agreement and the purchasing Cotenant(s)
shall assume PGandE's rights and obligations as
operator under this Agreement. It is the
responsibility of the purchasing Cotenant(s) to
obtain any necessary Land Rights. PGandE shall cause
the transfer of all Land Rights, licenses, permits,
or other rights of approval necessary to use and
operate the New Line, other than Land Rights
associated with any facility other than the New Line,
to the purchasing Cotenant(s) to the extent it has a
right to do so.

11.4  Destruction of an Other Circuit. In the event
of the destruction of an Other Circuit to which all
or a part of the Firm Transmission Entitlement of a
Cotenant other than PGandE is designated, and PGandE

determines not to reconstruct, the Cotenants other than PGandE, shall have the right to have PGandE, at PGandE's expense, reconnect under Section 7.8 such Contenant's powerplant(s) that is(are) connected to such Other Circuit and meet(s) one of the following characteristics:

(1)     if the combined generating capacity of such powerplant(s) is less than or equal to such Firm Transmission Entitlement, PGandE shall reconnect all such powerplant(s); or

(2)     if such Cotenant has only one such powerplant and if the generating capacity of such powerplant is greater than such Firm Transmission Entitlement, PGandE shall reconnect such powerplant; or

(3)     if such Contenant has more than one such powerplant, the combined generating capacity of which is greater than such Firm Transmission Entitlement, PGandE shall reconnect only that(those) powerplant(s) that has(have) a combined generating capacity which exceeds the Firm Transmission Entitlement designated to such Other Circuit by the least amount.

PGandE shall reconnect such qualifying powerplant(s) to one of the Line Circuits or an Other Circuit that is owned and

operated by PGandE and still in operation. If the generating capacity of the reconnected powerplant(s) exceeds such Firm Transmission Entitlement, then such Cotenant shall only operate the reconnected powerplant(s) in excess of such Firm Transmission Entitlement to the extent it has an enforceable right to transmit such excess. PGandE shall also redesignate under Section 7.8 such Firm Transmission Entitlement to the Line Circuit or Other Circuit to which such powerplant(s) has(have) been reconnected pursuant to this Section 11.4.

## 12.0    Liability and Indemnity

12.1    Liability.  Except (i) as otherwise provided in this Article 12.0, (ii) for any loss, damage, claim, cost, charge, or expense resulting from Willful Action, as defined in Section 12.6, and (iii) with respect to any contractual dispute subject to Article 13.0, no Cotenant, its directors or other governing body, officers or employees shall be liable to any other Cotenant for any loss, damage, claim, cost, charge, or expense of any kind or nature incurred by such other Cotenant (including direct, indirect or consequential loss, damage, claim, cost, charge, or expense, and whether or not resulting from the negligence of a Cotenant, its directors or other

governing body, officers, employees, or any person or entity whose negligence would be imputed to such Cotenant) from the performance or nonperformance of the obligations of a Cotenant under this Agreement (including the interruption or curtailment of any transmission of electric energy). Except (i) as otherwise provided in this Article 12.0, (ii) for any loss, damage, claim, cost, charge, or expense resulting from Willful Action, as defined in Section 12.6, and (iii) with respect to any contractual dispute subject to Article 13.0, each Cotenant releases the other Cotenants, their directors, or other governing body, officers, and employees from any such liability. With respect to any contractual dispute subject to Article 13.0, no Cotenant, its directors, or other governing body, officers or employees shall be liable to any other Cotenant for any indirect or consequential loss, damage, claim, cost, charge, or expense.

**12.2** **Responsibility** **of** **Cotenants** **Regarding** **Damage** **From** **Electrical** **Disturbances**. Each Cotenant shall be responsible for protecting its facilities from possible damage by reason of electrical disturbances or faults caused by the operation, faulty operation, or nonoperation of any other Cotenant's facilities

located in Lake, Napa or Sonoma counties, and, except for damage resulting from Willful Action, such other Cotenant shall not be liable for any such damages so caused.

12.3  Indemnification From Claims By Persons or Entities.  Except as provided in Section 12.4 or 12.5, each Cotenant shall be responsible for, and shall indemnify, to the extent permitted by law, the other Cotenants, their directors or other governing body, officers and employees from and against any liability for death, injury, loss or damage suffered or incurred by a person or entity (other than a Cotenant, its directors or other governing body, officers and employees) to the extent such death, injury, loss or damage was proximately caused by such indemnifying Cotenant in the performance or non-performance of its obligations under this Agreement.

12.4  Indemnification From Claims By Electric Customers.  Except for liability resulting from Willful Action of another Cotenant, a Cotenant whose electric customer shall make a claim or bring an action for any death, injury, loss or damage arising out of electric service to such customer, which

death, injury, loss or damage is caused by a
Cotenant's performance or nonperformance of its
obligations under this Agreement, shall indemnify and
hold harmless, to the full extent permitted by law,
the other Cotenants, their directors or other
governing body, officers and employees from and
against any liability for such death, injury, loss or
damage. For the purpose of this Article 12.0, the
term "electric customer" shall mean an electric
customer, except an electric utility system to whom
power is delivered for resale. "Electric customer"
shall also mean a member, subsidiary or substantial
owner of a Cotenant.

12.5    Indemnification From Claims By Employees.
Except for liability resulting from Willful Action of
another Cotenant, a Cotenant whose employee shall
make a claim or bring an action against another
Cotenant for any death, injury, loss or damage
arising out of a Cotenant's performance or
nonperformance of its obligations under this
Agreement, shall indemnify and hold harmless, to the
full extent permitted by law, the other Cotenants,
their directors, officers and employees for such
death, injury, loss or damage.

12.6    Willful Action.    For  the  purpose  of  this
Article 12.0, Willful Action shall be defined as:

> 12.6.1 Action  taken  or  not  taken  by  a
> Cotenant at the direction of its directors or
> other  governing  body,  officers  or  employees
> having    management    or    administrative
> responsibility affecting its performance under
> this Agreement, which action is knowingly or
> intentionally taken or failed to be taken with
> conscious  indifference  to  the  consequences
> thereof or with intent that injury or damage
> would  result  or  would  probably  result
> therefrom.

> 12.6.2 Action  taken  or  not  taken  by  a
> Cotenant at the direction of its directors or
> other  governing  body,  officers  or  employees
> having    management    or    administrative
> responsibility affecting its performance under
> this  Agreement,  which  action  has  been
> determined by final arbitration award or final
> judgment or judicial decree to be a material
> default under this Agreement and which occurs
> or continues beyond the time specified in such
> arbitration award or judicial decree for

-88-

curing such default or, if no time to cure is specified therein, occurs or continues thereafter beyond a reasonable time to cure such default.

12.6.3 Action taken or not taken by a Cotenant at the direction of its directors or other governing body, officers or employees having management or administrative responsibility affecting its performance under this Agreement, which action is knowingly or intentionally taken or failed to be taken with the knowledge that such action taken or failed to be taken is a material default under this Agreement.

12.6.4 Willful Action does not include any act or failure to act which is merely involuntary, accidental or negligent.

12.6.5 The phrase "employees having management or administrative responsibility," as used in this Article 12.0, means the employees of a Cotenant who are responsible for one or more of the executive functions of planning, organizing, coordinating, directing,

controlling and supervising such Cotenant's performance under this Agreement with responsibility for results.

## 13.0   Dispute Resolution and Default

13.1   Submittal of Dispute to Coordinating Committee. Except as provided in Section 15.3, prior to submitting such dispute to arbitration, any billing dispute which has not been resolved pursuant to the provisions of Section 6.7.1 and any other dispute arising under this Agreement must be submitted to the Coordinating Committee by a Cotenant involved in the dispute, through written notice stating the nature of the dispute. The Coordinating Committee shall attempt to settle all disputes submitted to it as soon as possible, but in no case later than forty-five (45) calendar days after the dispute is submitted, unless an extension of time is agreed to by the Cotenants involved in the dispute. Such Cotenants shall prepare and submit offers of settlement for consideration by the Coordinating Committee. No Cotenant shall commence arbitration of any dispute until after such 45-day period (as such period may be extended) has expired. If the Coordinating Committee fails to resolve any billing

dispute under Section 6.7 within such 45-day period
(as such period may be extended), and if the
disputing Cotenant has not commenced arbitration
under Section 13.2 within thirty (30) calendar days
after the end of such period, the disputing Cotenant
shall be deemed to have waived all claims with
respect to such billing dispute.

13.2   Arbitration.   Disputes arising under this
Agreement that have not been resolved under Sections
13.1 or 15.2.3 shall be settled through binding
arbitration as provided in this Section 13.2.   The
disputing Cotenant shall notify the other Cotenants
in writing that it is commencing arbitration.   The
notice shall specify which Cotenants are to be
parties to the arbitration.   Any Cotenant not so
specified may become a party to the arbitration by
written notice to the other Cotenants within ten (10)
calendar days after the notice of commencement of
arbitration.   Within thirty (30) calendar days after
the notice of commencement of arbitration, each party
to the arbitration shall prepare and provide to the
other parties to the arbitration a single proposal to
resolve the dispute.   Any Cotenant that does not
submit such a proposal ·in a timely manner shall have
waived its right to participate in the arbitration

and shall be bound by the terms of the proposal accepted by the arbitrator's decision. The parties to the arbitration shall agree on a single arbitrator with an acceptable understanding of the utility industry. If such parties to the arbitration cannot agree on an arbitrator within fifteen (15) calendar days after the notice of commencement of arbitration under this Section 13.2, the arbitrator will be selected by the American Arbitration Association within thirty (30) calendar days after such notice of commencement of arbitration. Except as otherwise provided in this Agreement, any arbitration commenced pursuant to this Section 13.2 shall be conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association. The provisions of California Code of Civil Procedures Section 1283.05 shall apply to the arbitration. Unless extended by agreement of the arbitrating Cotenants, discovery shall be completed and the hearing shall commence within thirty (30) calendar days after the Cotenants' proposals to resolve the dispute are available. Within sixty (60) calendar days after such proposals are available, unless the arbitrator requests and is granted an extension of time by the arbitrating Cotenants, the arbitrator will accept one of the proposals, and such Cotenants hereby agree to

be bound by that decision. After the decision by the arbitrator, such Cotenants shall immediately take whatever action is required to comply with the accepted proposal. Any and all expenses associated with the arbitration shall be borne by the Cotenant(s) sponsoring the rejected proposal(s). The decision of the arbitrator may be enforced by any court having jurisdiction over the Cotenant against which the decision was rendered.

13.2.1 To the extent a dispute involves the application of Good Utility Practice, the arbitrator shall determine which Cotenant's final proposal more reasonably represents Good Utility Practice. To the extent the dispute does not involve Good Utility Practice, the arbitrator shall determine which Cotenant's final proposal more reasonably applies the standards of this Agreement applicable to the dispute, or, absent standards, which Cotenant's final proposal was more reasonable. The arbitrator shall specifically consider all factors relevant to the reasonableness of the Cotenants' final proposals, including, but not limited to the facts known and the facts that should have been known to each Cotenant at the

time of action or inaction giving rise to the dispute, the amount of time available in which to act, and other factors relevant under the circumstances. Nothing contained herein shall permit the arbitrator to waive or change any of the provisions of this Agreement, including this Section 13.2. The standards of this Section 13.2.1 shall not apply to any arbitration under Section 15.3.1.4.2.

13.3 **Default By PGandE.** In the event any court, regulatory commission, or other body of competent jurisdiction determines, in a decision no longer subject to judicial review, that PGandE is in material default of its obligations under Article 9.0 in its capacity as operator of the New Line, and after failure by PGandE to cure that default within a reasonable period after receiving notice of that determination, any other Cotenant(s) so consenting may take possession of and operate the New Line for the use and benefit of the Cotenants. In such event, such other Cotenant(s) shall assume PGandE's obligations as operator under Article 9.0 provided, however, that PGandE shall continue to be liable for its proportional share of operation, maintenance, and replacement expenses of the Line Circuits and

Associated Facilities and provided further, that PGandE shall cause the transfer of all Land Rights, licenses, permits or other rights of approval necessary to use and operate the New Line, other than Land Rights associated with any facility other than the New Line, to the operating Cotenant(s) to the extent it has the right to do so. In the event of such an assumption of PGandE's obligations as operator, (i) PGandE shall have the right to use its Ownership Interest and its share of the Associated Facilities under the terms of this Agreement which apply to such use by Cotenants other than PGandE, and (ii) the operating Cotenant(s) shall have the rights and obligations of PGandE as operator under Articles 9.0 and 10.0.

14.0    <u>Term and Termination</u>

14.1    <u>Term</u>.  Except as provided in Section 14.2, this Agreement shall, upon execution by PGandE and any given other Cotenant, become effective as to such Cotenant as of June 1, 1984.  This Agreement shall be in effect for an initial term extending through December 31, 2014.  Thereafter the Cotenancy Agreement shall continue from year to year unless terminated pursuant to this Article 14.0.

-95-

14.2    Acceptance by FERC.  Any provision of this
Agreement which is filed for approval by FERC shall
become effective on the date it is accepted by FERC
for filing or such earlier date on which it is
permitted to become effective by FERC; provided, that
such provisions are expressly conditioned upon FERC's
acceptance of all such provisions, without change or
condition, and shall not become effective unless so
accepted, unless otherwise agreed by the Cotenants;
provided further, that if upon filing, FERC enters
into a hearing to determine whether such provisions
are just and reasonable, such provisions shall not
become effective until the date when an order, no
longer subject to judicial review, is issued by FERC
determining such provisions to be just and reasonable
without changes or new conditions unacceptable to any
Cotenant; provided, further, that if FERC imposes
changes or new conditions unacceptiable to any
Cotenant, the Cotenants will negotiate in good faith
to amend this Agreement to eliminate such
unacceptable changes or conditions; and provided
further that, to the extent allowed by law, nothing
in this Section 14.2 shall be construed as reducing
in any way the right of PGandE to receive from the
other Cotenants compensation for all Costs for which
any such provisions are intended to compensate
PGandE.

14.3   Termination By A Cotenant.  Any Cotenant may, by giving one (1) year advance written notice to the other Cotenants, terminate its participation in this Agreement effective no earlier than January 1, 2015.

14.4   Decision by Cotenants to Continue Operation. Should any Cotenant give notice of termination, the other Cotenants shall determine if one or more of the remaining Cotenants wish to keep operating the New Line and buy the interest of the terminating Cotenant.

14.5   Termination By All Cotenants.   If the remaining Cotenants determine not to continue operating the New Line, this Agreement shall terminate on the date specified in the notice. PGandE, or its successor as operator of the New Line, shall remove the New Line, credit the net salvage value of the material, and distribute any net proceeds among the Cotenants in proportion to their Ownership Interests.  If the removal is performed at a net loss, PGandE, or its successor as operator of the New Line, shall be reimbursed by the other Cotenants for their respective shares of such net loss in proportion to their Ownership Interests. Each Cotenant shall be liable for financial

obligations incurred by it prior to any termination of this Agreement.

14.6    Continued Operation By Cotenants.  If one or more Cotenants wish to continue operating the New Line, the Cotenant(s) wishing to purchase the interest(s) of the departing Cotenant(s) may do so effective as of the date the selling Cotenant terminates its participation in this Agreement.  If more than one Cotenant wish to purchase such interest(s), they may do so in proportion to their respective Ownership Interests or as otherwise agreed.  All interests available for purchase must be acquired by the purchaser(s).  The sale price will be the estimated net salvage value of the interests purchased.  The purchasing Cotenant(s) shall pay the departing Cotenant(s) their share of the sale price. The departing Cotenant(s) shall transfer its (their) interest(s) to the purchasing Cotenant(s) and shall have no more interest in or liability under this Agreement, except with respect to financial obligations incurred prior to its effective date of termination.  The departing Cotenant(s) shall obtain and provide a full release of any encumbrance of its(their) Ownership Interest prior to such transfer. The departing Cotenant shall be liable for all

-78-

financial obligations incurred by it prior to its effective date of termination. The Ownership Interests of the remaining Cotenant(s) shall be recalculated as appropriate, under Section 2.2. If PGandE is a departing Cotenant, the purchasing Cotenant(s) shall assume PGandE's obligations as operator under Article 9.0 and PGandE shall cause the transfer of all Land Rights, licenses, permits or other rights of approval necessary to use and operate the New Line, other than Land Rights associated with any facility other than the New Line, to the operating Cotenant(s) to the extent it has a right to do so.

14.7    <u>Effect</u> <u>of</u> <u>Termination</u>.    Upon termination of its participation in this Agreement by any Cotenant other than PGandE, PGandE and such other Cotenant shall make arrangements immediately to disconnect from the Line Circuits or Other Circuits any facilities associated with such Cotenant's use of its Firm Transmission Entitlement. Such other Cotenant shall claim no further right to have such facilities connected to PGandE's electrical system by reason of this Agreement; provided, that such other Cotenant does not by this Agreement waive any rights it may have to seek an interconnection under any applicable

law or regulation; provided further, that such other Cotenant does not by this Agreement waive any rights it may have for transmission service in accordance with the Stanislaus Commitments, its Interconnection Agreement with PGandE, or any applicable laws including the antitrust laws. For purposes of this Agreement, the Stanislaus Commitments shall be that statement of commitments by PGandE submitted to the United States Department of Justice by PGandE on April 30, 1976 and incorporated in PGandE's Diablo Canyon license, as those commitments may be amended. Such termination shall also automatically terminate with respect to such other Cotenant any tariffs or rate schedules which in whole or in part result from or incorporate this Agreement and no regulatory filings shall be required to effectuate such termination. After such termination, all rights to any regulated service under this Agreement or any such tariff or rate schedule shall cease. Such termination shall not affect rights and obligations of a continuing nature or for payment of money for transactions occurring prior to termination.

15.0  Coordinating Committee

15.1  Structure.  As a means of fostering effective cooperation and interchange of information and of providing consultation on a prompt and orderly basis among the Cotenants in connection with various administrative and technical matters which may arise from time to time, the Cotenants establish the Coordinating Committee described in this Article 15.0.  The Chairman for the Coordinating Committee shall be the representative of PGandE, as operator, and the Chairman shall be responsible for calling meetings and establishing agendas, at the Chairman's discretion, or upon the request of another Cotenant.  The Coordinating Committee shall consist of no more than two representatives appointed by each Cotenant; provided, however, that each Cotenant shall be entitled to only one vote.  Within thirty (30) days after the execution of this Cotenancy Agreement, each Cotenant shall designate its representatives on the Coordinating Committee, and notify the other Cotenants thereof.

15.2  Functions and Responsibilities.  The Coordinating Committee shall have functions and responsibilities as follows:

15.2.1 Provide liaison between PGandE and the other Cotenants with respect to the progress, performance and completion of construction work, the performance of operation and maintenance, and the progress, performance and completion of Capital Replacements and Additions and Betterments and the financial and accounting aspects thereof;

15.2.2 Consider and attempt to resolve disputes arising under this Agreement before they are submitted to arbitration as provided in Article 13.0;

15.2.3 Review and, to the extent each Cotenant in its sole discretion agrees to a given action, approve, modify or otherwise act upon recommendations of PGandE and other actions proposed by other members of the Coordinating Committee regarding the matters described in Sections 15.2.3.1 through 15.2.3.4. If, within sixty (60) calendar days (or as otherwise agreed by the Cotenants) after the proposed action is submitted by any Cotenant to the Coordinating Committee for decision, the Coordinating Committee does not

reach such an unanimous agreement with respect to any such action, then the provisions of Section 15.3 shall apply. Unless an arbitration under Section 15.3.1.4.2 is commenced within thirty (30) calendar days after PGandE's determination under Sections 15.3.1.2 and 15.3.1.3 are communicated to the other Cotenants, PGandE may take whatever action with respect to the matters described in Sections 15.2.3.1 through 15.2.3.4 that it determines appropriate under this Agreement.

15.2.3.1 Requests by Cotenants other than PGandE for maintenance on the Line Circuits additional to that otherwise performed by PGandE;

15.2.3.2 Capital Replacements to the New Line as described in Section 5.5 except with respect to Operating Emergencies under Sections 9.3 and 5.2;

15.2.3.3 Additions and Betterments to the New Line and Associated Facilities that do not increase the capacity of

those facilities, as described in Section 5.5; and

15.2.3.4 Changes in points of connection of the powerplants, and redesignations in whole or in part of the Firm Transmission Entitlement, of any Cotenant other than PGandE, as described in Sections 7.5, 7.8, 7.9 and 7.10.

15.2.4 Provide a forum for the discussion of:

15.2.4.1 Planned outages of the Line Circuits and Associated Facilities for scheduled maintenance;

15.2.4.2 Operating Emergencies on the Line Circuits and Associated Facilities as provided in Section 9.3;

15.2.4.3 PGandE's methodology, assumptions and data for establishing the New Line rating, as described in Section 4.7;

15.2.4.4 PGandE's methodology for adjusting the annual payment for the operation and maintenance charge for the Line Circuits, as described in Section 6.2;

15.2.4.5 PGandE's methodology, assumptions and data for establishing the annual ownership charge related to the Associated Facilities, as described in Section 5.4;

15.2.4.6 Information regarding easements and rights-of-way related to the New Line and Associated Facilities;

15.2.4.7 Information regarding taxes with respect to the New Line and Associated Facilities;

15.2.4.8 Transfers of interests as provided in Section 2.4 and the exercise of rights of refusal as provided in Section 2.5; and

-105-

15.2.4.9 The need for, and desirability of, replacing the New Line or Associated Facilities in the event of damage or destruction, as provided in Article 11.0, and any termination under Article 14.0.

15.3 <u>Consequences of Non-Unanimous Decisions</u>. If the Coordinating Committee does not reach an unanimous decision as described in Section 15.2.3 as to any action with respect to any matter described in Sections 15.2.3.1 through 15.2.3.4, then either Section 15.3.1 (with respect to changes in PGandE's activities) or Section 15.3.2 (with respect to disputes regarding Costs) shall govern such action.

15.3.1 If (i) any Cotenant(s) other than PGandE request(s) PGandE to alter any activity to be engaged in or proposed by PGandE with respect to any matter described in Sections 15.2.3.1 through 15.2.3.4, and PGandE does not agree that such activity should be performed as requested by such Cotenant(s), or (ii) any Cotenant(s) other than PGandE request(s) PGandE to engage· in any activity with respect to any matter described in Sections 15.2.3.1

through 15.2.3.4, and PGandE does not agree that activity should be performed at all (the "Activity"), then PGandE shall engage in the Activity upon the satisfaction of the requirements of this Section 15.3.1. Any other dispute with respect to any matter described in Section 15.2.3.1 through 15.2.3.4 shall be governed by Section 15.3.2. PGandE shall not be required to engage in the Activity unless and until each of the requirements contained in Sections 15.3.1.1 through 15.3.1.3 is met.

15.3.1.1 The requesting Cotenant or Cotenants must pay to PGandE the full Cost of the Activity as provided in Section 6.3. Such payment shall only be refundable to the extent provided in Sections 6.3 and 15.3.1.4.

15.3.1.2 PGandE must determine that the Activity is feasible, consistent with Good Utility Practice, and does not (i) decrease the safety, integrity or operability of the Line Circuits, Associated Facilities or any portion

of the PGandE system or the system of
any Cotenant, or (ii) impair the
health or safety of employees or the
public.

15.3.1.3 PGandE must determine that
it has, or has available to it,
sufficient resources to engage in the
Activity without substantially
impairing or interfering with its
other activities.

15.3.1.4 All disputes with respect to
the Activity shall be settled through
arbitration under Section 13.2. The
sole and exclusive remedies with
respect to the Activity that may be
obtained by the requesting Cotenant(s)
are described in Sections 15.3.1.4.1
and 15.3.1.4.2.

15.3.1.4.1 If it is
determined through any such
arbitration that the
performance of the Activity
would more closely represent

the standards described in Section 13.2.1 than would PGandE's decision not to engage in the Activity, then the sole and exclusive remedy of the requesting Cotenant(s) with respect to that determination shall be a partial refund or reduction of the amounts paid or to be paid by it (them) under Section 15.3.1.1. In the event of such a determination, the Cotenants shall share the Costs of the Activity allowed by the arbitration decision in proportion to their Ownership Interests.

15.3.1.4.2 If it is deter- mined through any such arbitration that PGandE's determinations under Sec- tions 15.3.1.2 and 15.3.1.3 do not satisfy the require-

ments of Section 16.6, then the sole and exclusive remedy of the requesting Cotenant(s) with respect to that determination shall be to require PGandE prospectively to engage in the Activity as requested by the requesting Cotenant(s). In the event of such a determination, the requesting Cotenant(s) shall pay PGandE the full Cost of the activity as provided in Section 6.3.

15.3.1.4.3 All disputes under Section 15.3.1.4.1 and 15.3.1.4.2 with respect to a given Activity must be arbitrated simultaneously or shall be waived by the requesting Cotenant(s).

15.3.2 If any Cotenant(s) other than PGandE disputes any Cost of any action with respect

to any matter described in Sections 15.2.3.1 through 15.2.3.4 for which the Cotenants other than PGandE are billed by PGandE on an actual cost basis (the "Action"), then the sole and exclusive remedy which may be obtained by the disputing Cotenant(s) with respect to the Action is described in Section 15.3.2.1. All such disputes shall be settled through arbitration under Section 13.2.

15.3.2.1 If it is determined through any such arbitration that an alternative to the Action proposed by the disputing Cotenant(s), including but not limited to the alternative of no action, more closely represents the standards described in Section 13.2.1 and would result in lower Costs (the "Cost Savings") than does PGandE's performance of the Action, then the arbitrator may require PGandE to make a partial or full refund of any amounts paid to PGandE for the Action by the Cotenants other than PGandE. The arbitrator's decision may take into consideration the existence of

any less expensive alternative to the Action proposed by the disputing Cotenant and the reasonableness and necessity of the Costs incurred by PGandE for the Action. Such refund shall not exceed the share of the Cost Savings corresponding to the Ownership Interest in percent of the Cotenants other than PGandE and shall be made to the Cotenants other than PGandE in proportion to their Ownership Interests.

15.4 <u>Limitation of Decisions</u>. Except as expressly provided in this Agreement, no Cotenant other than PGandE shall have any right to participate in any decision or action with respect to the operation and maintenance of, the making of Capital Replacements to, or the making of Additions and Betterments to the Line Circuits, Associated Facilities or Other Circuits.

15.5 <u>Committee Minutes</u>. A designated representative of the Committee shall prepare and distribute written minutes and records of all meetings and all actions, agreements or

determinations made by the Committee for review and comment by each representative on said Committee.

15.6    Limitation of Authority.  The Committee shall have no authority to modify any of the terms, covenants or conditions of the Interconnection Agreements or of this Cotenancy Agreement.

15.7    Change in Designated Representative.  Each Cotenant shall notify the others promptly of any change in the designation of its representative on the Committee.  A Cotenant may designate an alternate to act as its representative on the Committee in the absence of the regular member or to act on specified occasions with respect to specified matters.  Any alternate representative appearing at a Committee meeting shall be deemed to have authority to act on behalf of the Cotenant such alternate representative represents unless the Committee chairman is furnished with written notice to the contrary.

15.8    Expenses of Representatives.  Any expenses incurred by any member of the Committee in connection with such member's duties on such Committee shall be paid and borne by the Cotenant whom such member represents.

16.0   <u>General Provisions</u>

16.1   <u>Captions</u>. All titles, subject headings, and similar references in this Agreement are provided for the purpose of reference and convenience only, and are not intended to affect in any way the meaning of the contents or scope of this Agreement.

16.2   <u>Construction of Agreement</u>. Ambiguities in the wording of this Agreement shall not be construed for or against any Cotenant, but shall be construed in a manner which most accurately reflects the intent of the Cotenants.

16.3   <u>Effect on Other Contracts</u>. This Agreement supersedes and terminates the Sharing Agreement with respect to the contractual relationship thereunder between PGandE and any other Cotenant which executes this Agreement. The Cotenants agree that this Agreement implements and fully satisfies the following provisions of the Interconnection Agreements: Section 6.14 of the DWR/PGandE Comprehensive Agreement, Section 6.2.8 of the NCPA/PGandE Interconnection Agreement, and Section 6.2.10 of the Santa Clara/PGandE Interconnection Agreement. Except to the extent that this Agreement

'

specifically sets forth the rights and obligations of the Cotenants with respect to the Line Circuits, Other Circuits and Associated Facilities, nothing contained in this Agreement shall be construed as affecting or altering the rights or obligations of the Cotenants contained in the Interconnection Agreements.

16.4  Regulatory Authority.

16.4.1 To the extent that FERC has jurisdiction over any provision of this Agreement, the Cotenants shall take all reasonable action necessary to secure the approval by FERC without change of any such provision. When PGandE submits such provisions to FERC for approval, each other Cotenant shall by separate letter to FERC support without qualification such initial filing and the acceptance and approval by FERC of such provisions without change and shall state such Cotenant's concurrence with the termination procedures provided in Section 14.6 above.

16.4.2  The Cotenants agree that Sections 5.4, 5.7 and Appendix C of this Agreement may be subject to regulation by FERC. Sections 16.4.2.1 through 16.4.2.3 shall apply with respect to any such regulation by FERC. No other provision of this Agreement shall be construed as an undertaking by PGandE to provide to any other Cotenant transmission or any other service which service is subject to the jurisdiction of FERC. In the event any provision of this Agreement other than Sections 5.4, 5.7 and Appendix C is construed by FERC as being subject to its jurisdiction, the Cotenants shall meet to determine whether, in each Cotenant's sole discretion, to make amendments to this Agreement which would preserve the benefits of this Agreement to each Cotenant, but which would render the Agreement as amended outside of the jurisdiction of FERC except with respect to Sections 5.4, 5.7 and Appendix C. If the Cotenants do not so amend this Agreement, and if FERC retains jurisdiction over any provision of this Agreement, then Sections 16.4.2.1 and 16.4.2.2 shall apply with respect to each such provision.

16.4.2.1 Nothing contained in this Agreement shall be construed as affecting in any way the right of PGandE to unilaterally make application to FERC for a change in rates under Section 205 of the Federal Power Act and pursuant to FERC's rules and regulations promulgated thereunder.

16.4.2.2 Any Cotenant may unilaterally apply to FERC for changes in rates or other terms and conditions of service, to the extent subject to the jurisdiction of FERC, under Section 206 of the Federal Power Act and pursuant to FERC's rules and regulations promulgated thereunder.

16.5 <u>Governing Law</u>. This Agreement shall be interpreted, governed by, and construed under the laws of the State of California or the laws of the United States, as applicable, as if executed and to be performed wholly within the State of California, excluding any choice of law rules which would direct the application of the substantive law of another jurisdiction.

16.6    Judgments and Determinations. When the terms of this Agreement provide for an action to be made or the existence of a condition to be established based on the judgment or a determination of any Cotenant, such judgment shall be exercised and such determination shall be made consistent with good faith and fair dealing and in accordance with Good Utility Practice, and shall be neither arbitrary nor capricious.

16.7    License To Install Facilities. Provided that PGandE as operator or its successor as operator is either the First Cotenant or the Second Cotenant, each Cotenant ("First Cotenant"), upon request by any other Cotenant ("Second Cotenant") and to the extent that its rights permit, shall give to such Second Cotenant a license or licenses to construct, install, operate, maintain, inspect, test, read, check, replace and repair, upon the property of the First Cotenant other than the New Line, such facilities as are necessary for the exercise of rights created by this Agreement. The license or licenses so given shall be in form and of legal sufficiency acceptable to the Second Cotenant, shall be and remain in effect during the term of this Agreement, and shall expire coincident therewith, or for such lesser period as

may be appropriate. The Second Cotenant shall have a reasonable time after the expiration of such license or licenses in which to remove the facilities so installed or constructed.

16.8 No Dedication of Facilities. Except as expressly provided in this Agreement, any undertaking by one Cotenant to any other Cotenant under any provision of this Agreement is rendered strictly as an accommodation and shall not constitute the dedication of the electric system or any portion thereof by the undertaking Cotenant to the public or to any other Cotenant or any person or entity which is not a Cotenant, and it is understood and agreed that any such undertaking under any provisions of or resulting from this Agreement by any Cotenant shall cease upon the termination of such Cotenant's obligations under this Agreement.

16.9 Notices.

16.9.1 Any notice, demand, information, report or item otherwise required, authorized or provided for in this Agreement, shall be deemed properly given if delivered personally or sent by United States Mail, postage

16.9.1.1


To PGandE:

Vice President, Electric Operations
Pacific Gas and Electric Company
77 Beale Street
San Francisco, California  94106

and to

Chief Generation Planning Engineer
Pacific Gas and Electric Company
77 Beale Street
San Francisco, California  94106

16.9.1.2

To CDWR:

State of California
Department of Water Resources
C/O Chief - Energy Division
P.O. Box 388
Sacramento, California  95802

16.9.1.3

To NCPA:

General Manager
Northern California Power Agency
180 Cirby Way
Roseville, California  95678

16.9.1.4

To Santa Clara:

City Manager
City of Santa Clara
1500 Warburton Avenue
Santa Clara, California  95050

16.9.2  Any Cotenant may change designation of

the person who is to receive notices on its

behalf by giving the other Cotenants notice

thereof in the manner above provided in this Section 16.9.

16.9.3 Any notice of a routine character in connection with service under this Agreement or in connection with operation of facilities shall be given in such a manner as the Cotenants may determine from time to time, unless otherwise provided in this Agreement.

16.10  Audits and Review of Financial Records - Except with respect to Costs billed under Section 6.2, each Cotenant shall have the right to review the supporting documents upon which Costs billed have been determined. PGandE shall cooperate with the Cotenant to facilitate the review of the supporting documents. Each Cotenant shall also have the right to conduct an audit of the related financial records. In the event of a proposed audit, the Cotenant(s) calling for the audit shall coordinate with PGandE to minimize inconvenience to PGandE, and shall use its(their) best efforts to coordinate with the other Cotenants to reduce the number of auditors and the frequency and duration of such audits. The Cotenants may conduct one joint audit every year of the Costs billed for each project under Section 6.3. In

addition to such joint audits, any Cotenant(s) may initiate independent audits or a review of supporting documents, provided such Cotenant(s) reimburses PGandE for its administrative Costs associated with the independent audit or document review. The Cotenants right to review or audit supporting documents and financial records with respect to Costs assessed pursuant to Articles 4.0 and 5.0 shall terminate one year after PGandE provides the final accounting for such Costs pursuant to Sections 4.7 or 6.3.5, as appropriate.

16.11 <u>Relationship of Parties</u> - The covenants, obligations and liability of the Cotenants are intended to be several and not joint or joint and several, and nothing contained in this Agreement shall ever be construed to create an association, joint venture, trust or partnership, or to impose a trust or partnership obligation on or with regard to a Cotenant. Each Cotenant shall be individually responsible for its own obligations as provided in this Agreement. No Cotenant shall be under the control of or shall be deemed to control any other Cotenant.

16.12    Taxes.

16.12.1 The Cotenants shall use their best efforts to have any taxing authority imposing any taxes or assessments on property owned or used by the Cotenants in common, or any interests or rights therein, assess and levy such taxes or assessments directly against the respective Ownership Interests of each Cotenant.

16.12.2 All taxes or assessments that are ascribable to a Cotenant's Ownership Interest shall be the sole responsibility of the Cotenant to whose Ownership Interest said taxes or assessments are levied.

16.12.3 If any property taxes or other taxes or assessments are levied or assessed in a manner other than as specified in Sections 16.12.1 and 16.12.2 above, the Cotenants shall apportion such taxes and assessments and the payment thereof in accordance with the principles of Sections 16.12.1 and 16.12.2.

16.12.4 If a property or other tax is assessed or levied against PGandE for or ascribable to property owned by any other Cotenant, then PGandE shall notify such other Cotenant of such assessment or levy and thereafter such other Cotenant shall cooperate with PGandE in contesting such assessment or levy. If PGandE is required to pay such tax, then such other Cotenant shall reimburse PGandE for the amount of such assessment.

16.12.5 The provisions of this Section 16.12 shall not be construed so as to avoid the inclusion of taxes paid by PGandE as a Cost to PGandE under this Agreement. No Cotenant other than PGandE shall be responsible for any portion of real property taxes attributable to Land Rights, except as may be provided in its payments under Sections 6.1 or 6.2.

16.13 Uncontrollable Forces. No Cotenant shall be considered to be in default in the performance of any obligation under this Agreement (other than an obligation to make payment for bills rendered pursuant to this Agreement) when a failure of performance shall be the result of uncontrollable

forces. The term "uncontrollable forces" shall mean any cause or causes beyond the control of the Cotenant unable to perform such obligation, including, but not limited to, failure of or threat of failure of facilities, flood, earthquake, storm, drought, fire, pestilence, lightning and other natural catastrophes, epidemic, war, riot, civil disturbance or disobedience, sabotage, strike, lockout, labor disturbance, labor or material shortage, government priorities and restraint by court order or public authority and action or nonaction by, or inability to obtain the necessary authorizations or approvals from any governmental agency or authority, any of which by exercise of due diligence such Cotenant could not reasonably have been expected to avoid and which by exercise of due diligence it has been unable to overcome. Nothing contained in this Section 16.13 shall be construed as requiring a Cotenant to settle any strike, lockout or labor dispute in which it may be involved, or to accept any permit, certificate or other authorization which contains conditions which such Cotenant determines in its judgment are unduly burdensome.

16.14 <u>Waiver of Rights</u>. Any waiver at any time by any Cotenant of its rights with respect to a default

under this Agreement, or with respect to any other matter arising in connection with this Agreement, shall not constitute or be deemed a waiver with respect to any subsequent default or other matter arising in connection with this Agreement. Any delay short of the statutory period of limitations, in asserting or enforcing any right, shall not constitute or be deemed a waiver.

16.15 <u>Writings and Other Documents</u>. Each Cotenant agrees to execute any writing or other document reasonably necessary to effectuate the provisions of this Agreement with respect to the existence or transfer of Ownership Interests. Upon the execution of this Agreement by PGandE and any other Cotenant, PGandE agrees to prepare and deliver an instrument that confirms such Cotenant's Ownership Interest and to attach its as-built drawings of the New Line as evidence of the type and location of the facilities included in such Ownership Interest.

16.16 <u>Venue</u>. The Cotenants agree that the order of signing the Agreement shall not be taken into consideration for purposes of determining venue.

16.17  Proprietary Information.  Except as provided in Section 16.17.4, nothing in this Agreement shall require any Cotenant to make its proprietary information available to another Cotenant.

16.17.1 A Cotenant shall notify the Coordinating Committee when information requested by the Cotenants is considered proprietary.

16.17.2 To the extent such Cotenant releases such proprietary information in any form, the Cotenants receiving such information agree to the extent permitted by law:  (1) to treat such information as confidential; (2) not to disclose any such information they receive to any third party; and (3) not to use such information for any purpose other than the performance of this Agreement.

16.17.3 The Cotenants shall disclose such proprietary information to their consultants only to the extent that such consultants agree to be bound to the terms of this Section 16.17.

16.17.4 The Cotenants, their personnel and consultants shall have the right to examine, in the disclosing Cotenant's offices only, documents that contain such proprietary information and were produced to satisfy the other Cotenants' information request, but shall not have the right to obtain or make copies of such documents.

16.18 <u>Execution</u>. This Agreement may be executed by counterpart. This Agreement is entered into as of the date first hereinabove written.

16.19 <u>No Precedent</u>. The Cotenants agree that this Agreement reflects a unique situation and that its provisions shall not constitute a precedent with respect to any other agreement to be entered into by any Cotenant.

16.20 Incorporation by Reference. Appendices A, B, and C attached hereto and as may be modified from time to time by the Cotenants are incorporated by reference into this Agreement.

PACIFIC GAS AND ELECTRIC COMPANY

By: _G. A. Maneatis_

Its: __Executive Vice President__

Date: __March 11, 1985__

NORTHERN CALIFORNIA POWER AGENCY

By: _____
                General Manager

Date: __3/18/85__

STATE OF CALIFORNIA
DEPARTMENT OF WATER RESOURCES

APPROVED AS TO LEGAL
FORM AND SUFFICIENCY:

By: _____
                Director

Date: _____

By: _____
        Chief Counsel

16.20 <u>Incorporation</u> by <u>Reference</u>. Appendices A, B, and C attached hereto and as may be modified from time to time by the Cotenants are incorporated by reference into this Agreement.

PACIFIC GAS AND ELECTRIC COMPANY

NORTHERN CALIFORNIA POWER AGENCY

By:_____

By:_____
      General Manager

Its:_____

Date:_____

Date:_____

STATE OF CALIFORNIA
DEPARTMENT OF WATER RESOURCES

APPROVED AS TO LEGAL
FORM AND SUFFICIENCY:

By: _____
                 Director

By: _____
      Chief Counsel

Date: _A-17-9_____

```
FORM   POLICY   BUDGET
Department of General Services
   APPROVED

   MAY 10 1989

By      ELIZABETH YOST
```

## CALCULATION OF
## THE FINAL INSTALLATION COSTS,
## AND
## CAPITAL AMOUNTS OWED PG&E BY THE OTHER COTENANTS

Section 4.7 of the Cotenancy Agreement specifies that, after the final accounting for the costs of the Transmission Line and Associated Facilities is completed, additional payments or reimbursements shall be made. Interest is to be applied to any such payment or reimbursement pursuant to Section 6.6 of the Cotenancy Agreement.

PG&E has completed the final accounting for the Transmission Line and Associated Facilities. The preliminary construction cost estimates totalled $47,881,700 of which $45,500,000 was for the Transmission Line, and $2,381,700 was for the Associated Facilities. The final construction costs totalled $50,533,569 of which $48,293,982 was for The Transmission Line and $2,239,587 was for the Associated Facilities (see Attachment 3a for further detail). The remaining balance due PG&E for construction costs from the other Cotenants is calculated as follows:

| | |
|---|---:|
| Total Final Costs: | $50,533,569 |
| PG&E's 77.2% Ownership Share: | -39,057,395 |
| Other Cotenants' 22.71% Ownership Share | $11,476,174 |
| Payments Received by PG&E from other Cotenant's towards ownership | -11,425,983 |
| Additional Capital Contribution due PG&E from other Cotenants | $    50,191 |

The remaining amount due to PG&E from the other three Cotenants of $50,191, does not include interest. These costs are borne in proportion to the Cotenant's Ownership Interests and are explained in further detail in Attachments 3a and 3b.

The Summary Workpapers in Attachment 3a include:
1) allocation, in direct proportion to Ownership Interest for each Cotenant, of the total final costs for the Transmission Line and the Associated Facilities; 2) payments previously received by PG&E towards these costs, including interest paid; 3) the remaining balance due PG&E from the other Cotenants, with the appropriate interest applied, assuming a repayment date after August 31, 1991; and 4) related workpapers.

Without interest, the amounts owed to PG&E by the other Cotenants are:

| | |
|------|----------|
| NCPA | $ 8,516 |
| DWR | $32,135 |
| CSC | $ 9,540 |

Attachment 3b shows the interest calculations applied through August 31, 1991 to the amounts the other Cotenants owe PG&E resulting in a total principal and interest amount due of:

| | |
|------|-------------|
| NCPA | $15,004.09 |
| DWR | $56,618.72 |
| CSC | $16,808.25 |

3-2

## REVISIONS TO OWNERSHIP INTERESTS

Section 2.2 of the Cotenancy Agreement expresses each Cotenant's Ownership Interest in the Transmission Line and Associated Facilities as a percentage of the total megawatt (MW) rating of the line. Based on the Cotenants' share, in MW, of the Transmission Line, initially rated at 1,206 MW, the Ownership Interests are:

|       | Ownership Interests ||
|       | (Megawatts) | (Percent) |
|-------|-------------|-----------|
| DWR   | 165.0       | 13.68     |
| NCPA  | 49.9        | 4.14      |
| PG&E  | 931.0       | 77.20     |
| CSC   | 60.1        | 4.98      |
| Total | 1,206.0     | 100.00    |

By letters dated June 19, 1987, PG&E notified the Cotenants that the rating of the Transmission Line was revised to 1,211 MW. Pursuant to Section 4.7 of the Cotenancy Agreement, PG&E recalculated the Cotenants' Ownership Interest as a percentage of the new Transmission Line rating as rerated in 1987. The amended Cotenants' Ownership Interest using the revised Transmission Line MW Rating are:

|       | Ownership Interests ||
|       | (Megawatts) | (Percent) |
|-------|-------------|-----------|
| DWR   | 165.0       | 13.63     |
| NCPA  | 49.9        | 4.12      |
| PG&E  | 936.0       | 77.29     |
| CSC   | 60.1        | 4.96      |
| Total | 1,211.0     | 100.00    |

Case: 19-30088   Doc# 11897-1   Filed: 02/02/22   Entered: 02/02/22 17:24:46   Page
144 of 152

## CALCULATION OF REVISED ANNUAL CHARGES

Cotenants other than PG&E are assessed an annual charge to reimburse PG&E for the costs of operating, maintaining, and making capital replacements to the Associated Facilities. The initial annual payment (Variable A below) is a product of Ownership Interest and the preliminary capital costs estimate of the Associated Facilities. Both the Ownership Interests and the capital cost have been adjusted pursuant to Sections 4.7 and 5.7 of the Cotenancy Agreement which state that when PG&E makes the adjustment to reflect the final accounting, the revised capital cost shall be used in determining the annual charges. The revised capital costs are used in all calculations of annual charges from January 1, 1987 forward.

Appendix C of the Cotenancy Agreement states that each Cotenant's payment for the annual charge shall be calculated as follows:

$$P = A \times C$$

where

    P  = Annual payment

    A  = Actual dollar amount of the Cotenant's total capital payments with respect to the Associated Facilities shall be its contribution-in-aid-of-construction for the Associated Facilities made and adjusted pursuant to Sections 4.4 and 4.7 of this Agreement and any payments made for Additions or Betterments as provided in Section 5.7.

    C  = PG&E's system average rate for transmission facilities, which as of the effective date of this Agreement is 8.97%.

After the above formula was filed and accepted in FERC Docket No. ER86-364-000, both variable A and C were revised. Variable C was reduced from 8.97% to 8.41%, effective July 1, 1987, in PG&E's Tax Reform Act of 1986 filing (FERC Docket No. ER88-103-000). Variable A has been recalculated to reflect the revised capital costs, for each of the Cotenants, in accordance Section 4.7 of the Cotenancy Agreement. Both of these changes affect the Cotenant's annual charges.

Case: 19-30088   Doc# 11897-1   Filed: 02/02/22   Entered: 02/02/22 17:24:46   Page 145 of 152

Revision of Installed Costs (Variable A)

Variable A, as initially filed, was based on the initial cost estimate for the Transmission Line and the Associated Facilities. The Associated Facilities were initially estimated to cost $2,381,700. The Cotenants' shares of these construction costs were stated, in Section 4.4 of the Cotenancy Agreement to be:

A = Initial cost estimate of                                          $2,381,700
    Associated Facilities
    (used as the basis for the
    annual charge 1984-1986)

| Cotenant | Capital Payments | |
|----------|------------------|------------------|
| DWR | 325,817 | (13.68% of A) |
| NCPA | 98,602 | (4.14% of A) |
| CSC | 118,609 | (4.98% of A) |
| PG&E | 1,838,672 | (77.20% of A) |
| Total | $2,381,700 | 100% |

PG&E has completed the final accounting for the Transmission Line and Associated Facilities and the revised installed cost for the Associated Facilities is $2,239,587. Using the Ownership Interest percentages effective from the time of the Line Rerating onwards (calculated in Attachment 4 to this filing), the final installed costs for each Cotenant are as follows:

A = Final accounting cost for                                         $2,239,587
    Associated Facilities
    (used as the basis for the
    annual charge 1987 forward)

| Cotenant | Capital Payments*<br>as adjusted per final accounting | |
|----------|------------------|------------------|
| DWR | 305,256 | (13.63% of A) |
| NCPA | 92,271 | (4.12% of A) |
| CSC | 111,084 | (4.96% of A) |
| PG&E | 1,730,976 | (77.29% of A) |
| Total | $2,239,587 | 100% |

---

* The estimated amounts used for capital payments 1984-1986 were reduced beginning January 1, 1987 per the final accounting actual numbers.

Case: 19-30088   Doc# 11897-1   Filed: 02/02/22   Entered: 02/02/22 17:24:46   Page 146 of 152

## Revised Annual Charges

PG&E has recalculated the annual charges to NCPA and CSC for the Associated Facilities, incorporating: a) the July 1, 1987 change in the cost of ownership charge; and b) the final accounting costs, as divided according to the revised Ownership Interests. This calculation, with the amounts already paid and the remainder due, is shown for NCPA and CSC below:

| YEAR | (A) NCPA | (A) CSC | × | (C) = | (P) NCPA | (P) CSC |
|------|--------|---------|---|-----------|----------|---------|
| 1984 | 98,602 | 118,609 | | 8.97%* | 1,402 | 1,686 |
| 1985 | 98,602 | 118,609 | | 8.97% | 8,845 | 10,639 |
| 1986 | 98,602 | 118,609 | | 8.97% | 8,845 | 10,639 |
| 1987 | 92,271 | 111,084 | | 8.97%** | 8,016 | 9,651 |
| 1988 | 92,271 | 111,084 | | 8.41% | 7,760 | 9,342 |
| 1989 | 92,271 | 111,084 | | 8.41% | 7,760 | 9,342 |
| 1990 | 92,271 | 111,084 | | 8.41%*** | 7,760 | 9,342 |

|  |  |  |
|---|---|---|
| Total Adjusted Annual Charges for 1984-1990: | $50,388 | $60,641 |
| Total Payments Received to Date: | 44,317 | 53,351 |
| Adjusted Balance Due: | $ 6,071 | $ 7,290 |

| 1991 | 92,271 | 111,084 | | 8.41% | 7,760 | 9,342 |

|  |  |  |
|---|---|---|
| Total Balance Due as of July 1, 1991: | $13,831 | $16,632 |

---

* 1984 Annual Charge is prorated for the period between November 4, 1984-December 31, 1984 (58/366 days) pursuant to Section 6.1 of the Cotenancy Agreement.

** The calculation for the 1987 Annual Charge is based on PG&E's Rate Schedule FERC No. 97, FERC Docket No. ER88-103-000, effective July 1, 1987 which changed the rate from 8.97% to 8.41%. Therefore, an example of the formula used for the 1987 charge as prorated is: (92,271 × 8.97% × 181/365 + 92,271 × 8.41% × 184/365 = 8,016).

*** 1990 Charges were not billed by PG&E to the Cotenants.

PG&E will bill NCPA and CSC for the additional amounts owed for these annual charges, which consist of the 1990 charge after adjustments are netted out and the annual charge for 1991, once the FERC has accepted this filing.

## Annual Charges for DWR

Because DWR had not previously been a party to the Cotenancy Agreement, it has not been charged for the Associated Facilities annual charges. Annual charges for DWR incorporating: a) the July 1, 1987 change in the cost of ownership charge; and b) the final accounting costs, as

divided according to the revised Ownership Interests, are
shown below:

| YEAR | (A) | × | (C) | = | (P) |
|------|---------|---|-----------|---|--------|
| 1984 | 325,817 | | 8.97%* | | 4,631 |
| 1985 | 325,817 | | 8.97% | | 29,226 |
| 1986 | 325,817 | | 8.97% | | 29,226 |
| 1987 | 305,256 | | 8.97%** | | 26,520 |
| 1988 | 305,256 | | 8.41% | | 25,672 |
| 1989 | 305,256 | | 8.41% | | 25,672 |
| 1990 | 305,256 | | 8.41% | | 25,672 |
| 1991 | 305,256 | | 8.41% | | 25,672 |

Total Adjusted Annual Charges
due 1984-1991:                              $192,291

---

* 1984 Annual Charge is prorated for the period between November 4, 1984-December 31, 1984 (58/366 days) pursuant to Section 6.1 of the Cotenancy Agreement.

** The calculation for the 1987 Annual Charge is based on PG&E's Rate Schedule FERC No. 97, FERC Docket No. ER88-103-000, effective July 1, 1987 which changed the rate from 8.97% to 8.41%. Therefore, the formula for the 1987 charge as prorated is: (305,256 × 8.97% × 181/365 + 305,256 × 8.41% × 184/365 = 26,520).

The amounts owed PG&E by DWR including interest, for these
annual charges, shall be netted against the transmission
revenues received by PG&E from DWR for transmission services
provided over the Transmission Line prior to DWR's execution
of the Cotenancy Agreement. The interest calculations are
shown on the worksheet attached hereto as Attachment 5a.

.

## CALCULATION OF THE
## REVISED BCAP

PG&E performs routine maintenance services on the Transmission Line and the other Cotenants reimburse PG&E for their share of the Operation and Maintenance costs. For 1984, the initial year of the Transmission Lines' operation, the Cotenants agreed that the total operation and maintenance costs to be shared among all Cotenants was $343,000. This amount is the Basis for Calculation of Annual Payments (BCAP) for 1984. Using this amount as the basis, Section 6.2 of the Cotenancy Agreement provides a formula to calculate the amount of operation and maintenance cost to be shared in each future year. The formula is:

$$BCAP_n = BCAP_{n-1}\left( 0.7\ \frac{Index\ 1_{n-1}}{Index\ 1_{n-2}} + 0.3\ \frac{Index\ 2_{n-1}}{Index\ 2_{n-2}} \right)$$

where $n$ = year in which such payment occurs, and

$BCAP_n$  = \$343,000 when $_n$ = 1984

where the indices are as follows:

Index 1 = Average Hourly Earnings for Production or Non-Supervisory Workers in Electric, Gas and Sanitary Services (SIC 49) in the State of California during the appropriate year, as most recently published (Bureau of Labor Statistics, U.S. Department of Labor, "Employment, Hours and Earnings -- States and Areas").

Index 2 = Average value of the Producer Price Index for Industrial Commodities during the appropriate year, as most recently published (Bureau of Labor Statistics, U.S. Department of Labor, "Producer Prices and Price Indexes"). The Parties have agreed the appropriate index for escalation of BCAP is the "PRODUCER PRICE INDEX for INDUSTRIAL COMMODITIES; ALL COMMODITIES, EXCLUDING FUEL".

Section 6.2 of the Cotenancy Agreement specifies that these indices be used, but contemplates that these indices may not be calculated in perpetuity and allows for the use of their appropriate successor indices. For calculating the Cotenants' BCAP for the years 1984 - 1991, PG&E used Index 1 information obtained directly from the Bureau of Labor Statistics (BLS) database and 'Index 2 information obtained

6-1

from PG&E's subscription access to Data Resources
Incorporated (DRI) database. Index 1 information is no
longer accessible in the published format that was available
in 1984. Although the State of California still submits
Index 1 statistics to the BLS, this information is not
published by BLS on a regular basis. Rather, it is input in
the BLS database.

## Calculation of BCAP, 1984 - 1991

Using the formulas discussed above, PG&E has calculated the
BCAP for the years 1984 through 1991. These calculations
are shown below:

$$BCAP_n = BCAP_{n-1} \left( 0.7 \; \frac{Index \; 1_{n-1}}{Index \; 1_{n-2}} + 0.3 \; \frac{Index \; 2_{n-1}}{Index \; 2_{n-2}} \right)$$

| Year | Index 1 | Index 2 | BCAP$_n$ | BCAP$_{n-1}$ | Adjustment Factor |
|------|---------|---------|----------|----------|-------------------|
| 1982 | 13.31 | 1.000 | | | |
| 1983 | 14.30 | 1,024 | | | |
| 1984 | 15.27 | 1.054 | $343,000 | | |
| 1985 | 15.73 | 1.068 | $362,301 = $343,000 x (0.74748 + 0.30879) | | |
| 1986 | 16.91 | 1.077 | $371,385 = $362,301 x (0.72109 + 0.30398) | | |
| 1987 | 16.46 | 1.106 | $391,825 = $371,385 x (0.75251 + 0.30253) | | |
| 1988 | 18.85 | 1.165 | $387,692 = $391,825 x (0.68137 + 0.30808) | | |
| 1989 | 18.85 | 1.215 | $433,301 = $387,692 x (0.80164 + 0.31600) | | |
| 1990 | 19.50 | 1.239 | $438,880 = $433,301 x (0.70000 + 0.31288) | | |
| 1991 | | | $452,075 = $438,880 x (0.72414 + 0.30593) | | |

The supporting documents for the indices used herein are
included in this Attachment.

## Revised BCAP Billing for NCPA and CSC

The initial BCAP and the formula for calculating subsequent
BCAP values was filed and accepted in FERC Docket No. ER86-
364-000, but PG&E did not specifically request automatic
adjustment clause treatment in that filing. Based upon the
revised BCAP amounts, calculated above, and the revised
Ownership Interests (calculated in Attachment 4 of this
filing), PG&E has calculated revised BCAP payments for NCPA
and CSC, and has calculated BCAP payments for DWR,
consistent with those for the other Cotenants.

The revised BCAP payments for NCPA and CSC are shown below,
through 1991. These Cotenants have previously been billed
for BCAP payments through 1990, but the prior bills did not
rigorously apply the formulas specified in Section 6.2 of
the Cotenancy Agreement. The amounts calculated in this
Attachment reflect the correct application of the most

6-2

current indices and the change in Ownership Interests that
resulted from the re-rating of the Transmission Line.
Calculated below are the amounts due to PG&E from NCPA and
CSC for the BCAP through July of 1991:

| $Year_n$ | $BCAP_n$ | $BCAP_n \times \%$ ownership interest* | CSC (4.98%) = (4.96%) | NCPA (4.14%) 1984-1986 (4.12%) 87 forward |
|------|-----------|--------|-----------|-----------|
| 1984 | $343,000 | | $ 2,707 | $ 2,250 |
| 1985 | $362,301 | | $ 18,043 | $ 14,999 |
| 1986 | $371,385 | | $ 18,495 | $ 15,375 |
| 1987 | $391,825 | | $ 19,435 | $ 16,143 |
| 1988 | $387,692 | | $ 19,230 | $ 15,973 |
| 1989 | $433,301 | | $ 21,492 | $ 17,852 |
| 1990 | $438,880 | | $ 21,768 | $ 18,082 |

| | | |
|---|---|---|
| Total Adjusted Annual Charges<br>due 1984-1990 | $121,170 | $100,674 |
| Total Payments Received to Date: | $117,120 | $ 97,285 |
| Adjusted Balance Due**: | $ 4,050 | $ 3,389 |
| 1991    $452,075 | $ 22,423 | $ 18,625 |
| Total Balance Due as of<br>July 1, 1991: | $ 26,473 | $ 22,014 |

---

\* Percentage of the Cotenants' individual ownership interest share changed in 1987 due to the
rerating of the capacity of the Transmission Line from 1,206 MW to 1,211 MW.

\*\* These amounts do not reflect a rate increase rather it is revisions to previous erroneously
billed amounts. These balances are due because the amounts billed to the Cotenants did not
reflect the correct application of the formula specified in Section 6.2 of the Cotenancy
Agreement. In fact, the 1989 and 1990 billings did not reflect an application of the formula
at all.

## BCAP Billing for DWR

The BCAP payments for DWR are shown below. The annual
amounts shown below will be netted against the transmission
service revenues received by PG&E from DWR for DWR's use of
the Transmission Line prior to DWR's execution of the
Cotenancy Agreement. Although not done in a timely manner,
this netting shall include interest on both the BCAP
payments and the transmission payments, pursuant to Section
10.3 of the Cost-Sharing Agreement. The interest
calculations are shown on the worksheet attached hereto as
Attachment 6a.

| Year | $BCAP_n$ | $BCAP_n$ x % ownership interest* = | DWR BCAP Charges (13.68%) 1984-1986 (13.63%) 1987 forward |
|------|----------|-----------------------------------|-------------------------------------------------------------|
| 1984 | $343,000 | | $ 7,436 |
| 1985 | $362,301 | | $ 49,563 |
| 1986 | $371,385 | | $ 50,805 |
| 1987 | $391,825 | | $ 53,406 |
| 1988 | $387,692 | | $ 52,842 |
| 1989 | $433,301 | | $ 59,059 |
| 1990 | $438,880 | | $ 59,819 |
| 1991 | $452,075 | | $ 61,618 |
| Balance Due July 1, 1991: | | | $394,548 |

*   Percentage of the Cotenants' individual ownership interest share changed in 1987 due to the rerating of the capacity of the Transmission Line from 1,206 MW to 1,211 MW.

Case: 19-30088   Doc# 11897-1   Filed: 02/02/22   Entered: 02/02/22 17:24:46   Page 152 of 152