1
**WEIL, GOTSHAL & MANGES LLP**
Richard W. Slack (*pro hac vice*)
2 (richard.slack@weil.com)
Theodore E. Tsekerides (*pro hac vice*)
3 (theodore.tsekerides@weil.com)
Jessica Liou (*pro hac vice*)
4 (jessica.liou@weil.com)
Matthew Goren (*pro hac vice*)
5 (matthew.goren@weil.com)
767 Fifth Avenue
6 New York, NY 10153-0119
Tel:    (212) 310-8000
7 Fax:   (212) 310-8007

**KELLER BENVENUTTI KIM LLP**
Jane Kim (#298192)
(jkim@kbkllp.com)
David A. Taylor (#247433)
(dtaylor@kbkllp.com)
Thomas B. Rupp (#278041)
(trupp@kbkllp.com)
650 California Street, Suite 1900
San Francisco, CA 94108
Tel: (415) 496-6723
Fax: (650) 636 9251

8 *Attorneys for Debtors and Reorganized Debtors*

9              **UNITED STATES BANKRUPTCY COURT**
                **NORTHERN DISTRICT OF CALIFORNIA**
10                 **SAN FRANCISCO DIVISION**

11

12 **In re:**

13 **PG&E CORPORATION,**

14          - and -

15 **PACIFIC GAS AND ELECTRIC**
   **COMPANY,**

16

17                         **Debtors.**

18 ☐ Affects PG&E Corporation
   ☐ Affects Pacific Gas and Electric Company
19 ☒ Affects both Debtors

20 *\* ALL PAPERS SHALL BE FILED IN THE*
   *LEAD CASE, NO. 19-30088 (DM).*
21

22

23

24

25

26

27

28

Case Nos. 19-30088 (DM) (Lead Case)
(Jointly Administered)

**THE REORGANIZED DEBTORS' (I)
PRELIMINARY OPPOSITION TO
CALIFORNIA DEPARTMENT OF
WATER RESOURCES' MOTION FOR
ORDER DETERMINING THAT CASTLE
ROCK AGREEMENT WITH PG&E
CANNOT BE ASSUMED AND THAT THE
DEPARTMENT OF WATER
RESOURCES' CLAIM NO. 78104 BE PAID
AND (II) REQUEST, IN THE
ALTERNATIVE, FOR A STATUS
CONFERENCE**

[Related to Docket No. 11887]

Hearing Date: March 2, 2022
Time:  10:00 a.m. (Pacific Time)
Place:  **(Telephonic or Video Only)**
          United States Bankruptcy Court
          Courtroom 17, 16th Floor
          San Francisco, CA 94102

**Objection Deadline:
February 16, 2022, 4:00 pm (PT)**

PG&E Corporation ("**PG&E Corp.**") and Pacific Gas and Electric Company (the "**Utility**"), as debtors and reorganized debtors (collectively, "**PG&E**," the "**Debtors**," or the "**Reorganized Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), hereby submit this preliminary opposition (the "**Preliminary Opposition**") to the *California Department of Water Resources' Motion for Order Determining that the Castle Rock Agreement with PG&E Cannot Be Assumed and that the Department of Water Resources' Claim No. 78104 Be Paid* [Docket No. 11887] (the "**Motion**"), which was filed by the California Department of Water Resources ("**CDWR**"), and request, in the alternative, for a status conference.[1]

By the Motion, CDWR seeks that the Court adjudicate the parties' disputes with respect to the Cotenancy Agreement and CDWR's proof of claim [Claim No. 78104].[2] The Reorganized Debtors respectfully submit that such matters are subject to the arbitration provision set forth in the Cotenancy Agreement, and that the Motion should be denied. In the event that the Court determines that the dispute should not be sent to arbitration, the Reorganized Debtors request a status conference to establish a schedule for briefing on the merits and further proceedings.

---

[1] Northern California Power Agency ("**NCPA**") and the City of Santa Clara, doing business as Silicon Valley Power ("**SVP**"), have each authorized PG&E to indicate their support of this Preliminary Opposition and request in the alternative for a status conference. Counsel for NCPA and SVP will be available at the hearing on the Motion and the Arbitration Motion (as defined below) should the Court wish to hear from them.

[2] Capitalized terms used but not defined herein have the meanings ascribed to them in the *Motion of the Reorganized Debtors for Entry of an Order Modifying Plan Injunction and Compelling Arbitration of Claim of California Department of Water Resources* [Docket No. 11896] (the "**Arbitration Motion**").

# TABLE OF CONTENTS

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ........................................................................II

I.    PRELIMINARY STATEMENT ........................................................................ 1

II.   BACKGROUND ........................................................................ 2

III.  ARGUMENT ........................................................................ 3

   A.   The Cotenancy Agreement Mandates Arbitration of the Dispute ........................................... 3

      1.   CDWR Bears the Burden of Overcoming the Strong Public Policy in Favor of Arbitration ........................................................................ 3

      2.   The Arbitration Provision Applies to the Dispute ................................................. 4

      3.   That CDWR Purportedly Terminated Its Participation From the Cotenancy Agreement Does Not Permit It To Avoid Arbitration ........................................... 7

      4.   The Remaining Cotenants Did Not Waive Arbitration ........................................... 7

      5.   To the Extent a Question Exists as to the Scope of Arbitrability, the Parties Agreed that the Arbitrator Would Determine Arbitrability ........................................ 10

   B.   The Court Should Not Decline to Enforce the Arbitration Provision..................................... 11

   C.   In the Alternative, the Court Should Set a Status Conference to Schedule Merits Briefing and Further Proceedings ........................................................................ 13

IV.   CONCLUSION........................................................................ 13

# TABLE OF AUTHORITIES

**CASES**

*AT & T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643 (1986) ............... 5

*ATSA of California, Inc. v. Continental Insurance Co.*, 702 F.2d 172 (9th Cir. 1983) .................... 9

*Belke v. Merrill Lynch, Pierce, Fenner & Smith*, 693 F.2d 1023 (11th Cir. 1982) ........................ 8

*Brown v. E.F. Hutton & Co., Inc.*, 610 F. Supp. 76 (S.D. Fla. 1985) ...................................... 8

*Coast Plaza Doctors Hospital v. Blue Cross of California*, 83 Cal. App. 4th 677 (Ct. App. 2000) ............................................................................................................. 3, 6

*Cont'l Ins. Co. v. Thorpe Insulation Co. (In re Thorpe Insulation Co.)*, 671 F.3d 1011 (9th Cir. 2012) ............................................................................................................. 11

*First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938 (1995) ........................................... 6

*Fisher v. A.G. Becker Paribas Inc.*, 791 F.2d 691 (9th Cir. 1986) ..................................... 8, 9

*Galilea, LLC v. AGCS Marine Ins. Co.*, 879 F.3d 1052 (9th Cir. 2018) ............................... 10

*Goldman, Sachs & Co. v. City of Reno*, 747 F.3d 733 (9th Cir. 2014) ................................. 6

*Hopkins & Carley, ALC v. Thomson Elite*, No. 10-CV-05806-LHK, 2011 U.S. Dist. LEXIS 38396 (N.D. Cal. Apr. 6, 2011) ................................................................................................ 5

*Huffman Hilltop Cos., LLC*, 747 F.3d 391 (6th Cir. 2014) .................................................. 7

*Ins. Co. of N. Am. v. NGC Settlement Trust & Asbestos Claims Mgmt. Corp. (In re Nat'l Gypsum Co.)*, 118 F.3d 1056 (5th Cir. 1997) ................................................................................. 11

*Lake Communications, Inc. v. ICC Corp.*, 738 F.2d 1473 (9th Cir. 1984) ........................... 8, 9

*Momot v. Mastro*, 652 F.3d 982 (9th Cir. 2011) .............................................................. 6

*Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*, 460 U.S 1 1983. ........................... 3, 5, 8

*Oracle America, Inc. v. Myriad Group A.G.*, 724 F.3d 1069 (9th Cir. 2013) ....................... 10

*Platt Pacific Inc. v. Andelson*, 6 Cal. 4th 307 (1993) ...................................................... 8

*Repub. of Nicaragua v. Standard Fruit Co.*, 937 F.2d 469 (9th Cir. 1991).......................... 3, 5

*Rice v. Downs*, 248 Cal. App. 4th 175 (Ct. App. 2016)..................................................... 5, 6

*Shinto Shipping Co., Ltd. v. Fibrex & Shipping Co.*, 572 F.2d 132 (9th Cir. 1978)................. 8, 9

*Shivkov v. Artex Risk Sols., Inc.*, 974 F.3d 1051 (9th Cir. 2020)........................................ 7

*Simula Inc. v. Autoliv, Inc.*, 175 F.3d 716 (9th Cir. 1999) ................................................ 6

*Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*, 925 F.2d 1136 (9th Cir. 1991) ............ 5

*U.S. v. Marubeni Corp.*, 592 Fed. Appx. 642 (9th Cir. 2015) ............................................ 6

*Wynn Resorts v. Atlantic-Pacific Capital, Inc.*, 497 Fed. Appx. 740 (9th Cir. 2012) ............ 3, 5

**RULES**

AAA Commercial Arbitration Rule 1.......................................................................... 9

AAA Commercial Arbitration Rule 7.................................................................... 10, 11

AAA Commercial Arbitration Rule 52......................................................................... 9

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.  PRELIMINARY STATEMENT**

As PG&E discusses in the Arbitration Motion, which is set to be heard on the same day as the Motion, the dispute with CDWR – with respect to both CDWR's affirmative claim and CDWR's obligation to reimburse the other parties to the Cotenancy Agreement – is subject to a mandatory, binding arbitration provision.  By its Motion, CDWR seeks to have the Court determine the merits of the dispute, rather than allow it to be resolved through the arbitration procedure to which CDWR and the other parties agreed when they entered into the Cotenancy Agreement.  The Court should not permit CDWR to do an end-run around its contractual obligations to submit to arbitration.

The arbitration provision clearly applies to this dispute.  CDWR engages in legal gymnastics to argue that an arbitration clause that covers all unresolved "[d]isputes arising under this Agreement" – without qualifications – is so narrow that it does not cover a dispute about whether, *under the Cotenancy Agreement*, CDWR properly terminated its participation in the Cotenancy Agreement and/or has an obligation to reimburse the other parties for removal costs associated with the termination.  These are not tort claims or litigation unrelated to the Cotenancy Agreement that arguably may not "arise under the Agreement."  Nor does CDWR's alleged termination or PG&E's prior attempt to amend the Cotenancy Agreement before FERC relieve CDWR of the obligation to submit to arbitration.  The dispute arises under the Cotenancy Agreement and, therefore, in accordance with clear federal and state public policy in favor of arbitration, must be arbitrated.

Moreover, to the extent the Court has discretion not to enforce arbitration provisions, it should not exercise such discretion here.  CDWR is correct that the allowance or disallowance of a claim is a core proceeding.  The inquiry does not end there, however.  Under both the Supreme Court and Ninth Circuit precedent, the Court <u>must</u> find that arbitration of the dispute would conflict with the underlying purposes of the Bankruptcy Code – that, quite simply, is not the case here.  Two of the other three contract counterparties are non-debtors whose rights will be impacted by the relief CDWR requests in the Motion, and although the dispute involves some estate issues, in addition to other non-estate issues, the estate issues do not have any implications on the rest of the proceedings in

these Chapter 11 Cases, particularly as the Reorganized Debtors approach the two-year anniversary of the confirmation and consummation of the chapter 11 Plan.

PG&E submits that the question of arbitrability is a gating issue that must be decided before the parties litigate the merits of the dispute. If the Court agrees with PG&E that the Cotenancy Agreement requires that the parties submit the dispute to arbitration, there will be no need for the Court to consider the merits. In the event that the Court determines that, notwithstanding the arbitration provision contained in the Cotenancy Agreement and the impact of the dispute on the rights of non-moving, non-Debtor parties, the Court should adjudicate this dispute, only then will further proceedings be necessary before the Court on the substantive merits – including any material factual disputes and concomitant evidentiary hearings – regarding the Cotenancy Agreement, CDWR's claim thereunder, the effectiveness of CDWR's attempt to terminate its participation from the Cotenancy Agreement, the obligation of CDWR under the Cotenancy Agreement and the Transmission Service Agreement to reimburse PG&E and the remaining cotenants, and any history of the parties' performance under these agreements that may be relevant to such adjudication.

To conserve judicial resources and the parties' expense, PG&E suggested to CDWR that merits briefing was unnecessary, premature, and improper at this juncture, in this forum, because PG&E believes that those issues must be sent to arbitration in accordance with the parties' agreement. CDWR declined to agree to stay merits briefing until after the arbitrability issue had been decided. To the extent the Court concludes that the arbitration provision need not be enforced here, the Reorganized Debtors request the opportunity to supplement this Preliminary Opposition with their response to the substantive arguments raised in the Motion, and ask that the Court set a status conference to establish a schedule for such briefing on the merits and further proceedings, including, if necessary, an evidentiary hearing.

## II.  BACKGROUND

The facts relevant to the Motion are set forth in the Arbitration Motion, as supported by the Levenberg Declaration. Rather than include a duplicative recitation of facts here, PG&E incorporates the factual background in the Arbitration Motion by reference in this Preliminary Opposition and relies on the Levenberg Declaration in support of the arguments set forth here.

On February 1, 2022, CDWR filed the Motion. The following day, the Reorganized Debtors filed the Arbitration Motion, which they had been in the process of finalizing, in coordination with SVP and NCPA, when the Motion was filed. Both the Motion and the Arbitration Motion are scheduled to be heard on March 2, 2022.

After the Reorganized Debtors filed the Arbitration Motion, on February 2, 2022, counsel for the Reorganized Debtors reached out to counsel for CDWR by e-mail to suggest that briefing could be staged, such that the gateway question of arbitrability would be briefed and decided before the parties, to the extent necessary, briefed the substantive merits before the Court. On February 7, 2022, counsel for CDWR responded, declining the Reorganized Debtors' request. Accordingly, the Reorganized Debtors have no choice but to submit this Preliminary Opposition to address the issue of arbitrability and reserve their arguments with respect to the merits of the dispute.

## III. ARGUMENT

### A. The Cotenancy Agreement Mandates Arbitration of the Dispute

#### 1. CDWR Bears the Burden of Overcoming the Strong Public Policy in Favor of Arbitration

Both California and federal law evince a strong public policy in favor of arbitration – so strong, in fact, that "all doubts over the scope of an arbitration clause must be resolved in favor of arbitration." *Repub. of Nicaragua v. Standard Fruit Co.*, 937 F.2d 469, 471 (9th Cir. 1991) (emphasis added); *see also Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983) (the FAA is a "congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary"); *Coast Plaza Doctors Hospital v. Blue Cross of California*, 83 Cal. App. 4th 677, 686 (Ct. App. 2000) ("California has a strong public policy in favor of arbitration and any doubts regarding the arbitrability of a dispute are resolved in favor of arbitration.").

In light of this public policy, "the party resisting arbitration bears the burden of establishing that the arbitration agreement is inapplicable." *Wynn Resorts v. Atlantic-Pacific Capital, Inc.*, 497 Fed. Appx. 740, 742 (9th Cir. 2012). CDWR fails to meet that burden here.

### 2. The Arbitration Provision Applies to the Dispute

The arbitration provision in the Cotenancy Agreement states as follows:

> 13.2 <u>Arbitration</u>. Disputes arising under this Agreement that have not been resolved under Sections 13.1 or 15.2.3 [which provide for submission of disputes to the Coordinating Committee] shall be settled through binding arbitration as provided in this Section 13.2.

Cotenancy Agreement § 13.2.

Here, CDWR does not argue – because it cannot – that the dispute at hand does not arise under the Cotenancy Agreement. The dispute involves questions around (1) whether CDWR's attempt to terminate its participation from the Cotenancy Agreement is effective, (2) whether CDWR must reimburse the other parties for removal costs under the terms of the Cotenancy Agreement, and (3) what, if anything, CDWR is entitled to be paid in connection with its purported termination. These questions all clearly arise under the Cotenancy Agreement and, because the dispute was not resolved by the Coordinating Committee, are subject to the arbitration procedures set forth in Section 13.2.

Instead, CDWR argues that, because the arbitration provision at issue does not include the phrases "relating to" or "in connection with," it is not a "broad" clause, and that as a "narrow" clause, it can be interpreted narrowly to exclude the dispute at issue. Mot. 16. CDWR is wrong.

CDWR's argument is that the Cotenancy Agreement's arbitration provision "suggests" that it is a "narrow clause . . . intended to resolve disputes that arise while a cotenant is still a party to the Agreement." Mot. 16. CDWR contends that "the <u>primary purpose</u> of the dispute resolution procedures is to resolve issues relating to billing and performance and operational issues that arise while the Cotenants are still participating in the Agreement." Mot. 16 (emphasis added). Without citing any specific language in the Cotenancy Agreement limiting the arbitration provision, CDWR makes the leap from this asserted "primary purpose" of the provision to the conclusion that the provision does not apply to the dispute at hand. Thus, it seems that CDWR believes that, unless a dispute specifically and unambiguously relates to the primary purpose of a dispute resolution procedure, the presumption should be that the dispute is *excluded* from arbitration. That is not the law.

The presumption, in fact, is the reverse of what CDWR urges: "Where a contract contains an arbitration clause, courts apply a presumption <u>in favor of arbitrability</u> as to particular grievances . . . ." *Wynn Resorts*, 497 Fed. Appx. at 742 (emphasis added); *see also Hopkins & Carley, ALC v. Thomson Elite*, No. 10-CV-05806-LHK, 2011 U.S. Dist. LEXIS 38396, at *7 (N.D. Cal. Apr. 6, 2011) ("If a contract contains an arbitration clause, there is a presumption of arbitrability, and 'any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.'") (citing *AT & T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 650 (1986)) (citing *Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*, 925 F.2d 1136, 1139 (9th Cir. 1991)). The Supreme Court could not be clearer on this: "[A]s a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone*, 460 U.S. at 24-25.

Indeed, Judge Lucy Koh, before she was elevated to the Ninth Circuit Court of Appeals, rejected CDWR's interpretation of identical arbitration language, finding that "[t]he Court does not believe that the Ninth Circuit intended district courts to construe 'arising under' clauses so narrowly as to preclude arbitration of claims so closely related to the contract itself and the parties' performance thereunder." *Hopkins & Carley*, 2011 U.S. Dist. LEXIS 38396, at *22. In sharp contrast to the approach proposed by CDWR here, Judge Koh emphasized that courts must "[r]esolv[e] any ambiguity in favor of arbitration, as required, . . . regardless of whether Ninth Circuit or California law is applied." *Id.* at *22-23; *see also Repub. of Nicaragua*, 937 F.2d at 478-79 (noting that "[t]he scope of the clause must . . . be interpreted liberally" and finding that "commitment to arbitrate 'any and all disputes arising under the arrangements contemplated hereunder' is arguably susceptible of an interpretation that the parties agreed to arbitrate this claim" for breach of contract).

The cases CDWR relies on to support its constrained reading, Motion at 15-16, underscore the impermissibility of CDWR's proposed contractual interpretation. In *Rice v. Downs*, 248 Cal. App. 4th 175 (Ct. App. 2016), the Court of Appeal used the "broad" versus "narrow" distinction to address the question of whether an arbitration provision covering "any controversy arising out of" the agreement extended to <u>tort</u> claims: "'It has long been the rule in California that a broadly worded

arbitration clause . . . may extend to tort claims that may arise under or from the contractual relationship.'" *Id.* at 186 (citing *Coast Plaza Doctors*, 83 Cal. App. 4th at 686) (omission in original). The Court of Appeal in *Rice* concluded that the arbitration provision at issue "encompasses contractual claims and perhaps even tort claims arising from the agreement," but that tort claims unrelated to the agreement were not subject to arbitration. *Rice v. Downs*, 248 Cal. App. 4th at 190. *Simula Inc. v. Autoliv, Inc.*, 175 F.3d 716 (9th Cir. 1999), similarly involved non-contractual antitrust claims, which the Ninth Circuit nevertheless found were covered by an arbitration clause covering "[a]ll disputes arising in connection with this Agreement." *Id.* at 720. In doing so, the Ninth Circuit observed that "[t]he standard for demonstrating arbitrability is not high." *Id.* at 719. The claims at issue here are not tort or other non-contractual claims, but rather are claims that undeniably arise out of the Cotenancy Agreement.

In other words, the case law – including those cases cited by CDWR – is clear that when parties have contractually agreed to arbitrate disputes, courts are to interpret the agreement in favor of arbitration, resolving all doubts in support of arbitrability. Here, the Reorganized Debtors submit that Section 13.2 of the Cotenancy Agreement is clear that it is intended to cover all disputes under the Cotenancy Agreement, including the one at issue here. But even if there were an ambiguity, courts must "resolv[e] ambiguities as to the scope of arbitration in favor of arbitration." *U.S. v. Marubeni Corp.*, 592 Fed. Appx. 642, 643 (9th Cir. 2015) (citing *Goldman, Sachs & Co. v. City of Reno*, 747 F.3d 733, 742 (9th Cir. 2014); *see also Momot v. Mastro*, 652 F.3d 982, 987 (9th Cir. 2011) ("Given the general presumption in favor of arbitration, 'one can understand why the law would insist upon clarity before concluding that the parties did *not* want to arbitrate a related matter.'") (citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 945 (1995)) (emphasis in original). CDWR fails to carry its burden because it fails to cite any clear language excluding this dispute from the arbitration provision in Section 13.2 of the Cotenancy Agreement; in the absence of such clear language, the dispute must be sent to arbitration.

3. That CDWR Purportedly Terminated Its Participation From the Cotenancy Agreement Does Not Permit It To Avoid Arbitration

Nor does CDWR's alleged termination from the Cotenancy Agreement change this result. CDWR suggests that its attempt to terminate participation in the Cotenancy Agreement should exclude it from the reach of the arbitration provision. *See Motion* at 16-17 ("Such [arbitration] provisions should not be interpreted to apply to a party that is no longer a Cotenant to the Agreement.") As discussed in further detail in the Arbitration Motion, the Ninth Circuit recognizes a presumption in favor of the post-termination survival of arbitration provisions. *Shivkov v. Artex Risk Sols., Inc.*, 974 F.3d 1051 (9th Cir. 2020). That presumption of arbitrability can only be rebutted if "it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Id.* at 1062 (citing *Huffman Hilltop Cos., LLC*, 747 F.3d 391, 395 (6th Cir. 2014)).

Here, CDWR's argument rests on vague suppositions based on its perception of the "primary purpose of the dispute resolution procedures," but CDWR fails to point to any specific language that establishes that the arbitration provision is limited to this supposed "primary purpose" or expressly excludes disputes surrounding a Cotenant's termination from the Cotenancy Agreement from Section 13.2's arbitration procedures.

As discussed in the Arbitration Motion, the Cotenancy Agreement contains a survival provision that provides that the parties' "rights and obligations of a continuing nature or for payment of money for transactions occurring prior to termination" – such as the obligation to arbitrate disputes and CDWR's obligation to reimburse the other Cotenants – survive a party's termination. Cotenancy Agreement § 14.7. Accordingly, CDWR has failed to rebut the presumption in favor of survival of the arbitration provision and its applicability to this dispute. *See Shivkov*, 974 F.3d at 1063 ("Because 'we cannot say with certainty that the parties did not intend for the arbitration clause to survive expiration of the contract,' the parties' arbitration obligations remain intact.") (citing *Huffman*, 747 F.3d at 398).

4. The Remaining Cotenants Did Not Waive Arbitration

Finally, CDWR argues that PG&E and the other remaining Cotenants waived arbitration by waiting too long to seek such relief, and by proposing revisions to the Cotenancy Agreement in a

proceeding before the FERC. "Waiver of a contractual right to arbitration is not favored." *Fisher v. A.G. Becker Paribas Inc.*, 791 F.2d 691, 694 (9th Cir. 1986) (citing *Lake Communications, Inc. v. ICC Corp.*, 738 F.2d 1473, 1477 (9th Cir. 1984); *Shinto Shipping Co., Ltd. v. Fibrex & Shipping Co.*, 572 F.2d 1328, 1330 (9th Cir. 1978)). Similar to the construction of contractual language, allegations of waiver must be resolved in favor of arbitration, in light of the public policy favoring enforcement of arbitration agreements. *See Moses H. Cone*, 460 U.S. at 24-25; *see also Shinto Shipping*, 572 F.2d at 1330 (waiver is not favored and the facts must be viewed in light of the strong federal policy supporting arbitration agreements). Because waiver of the right to arbitration is disfavored, "any party arguing waiver of arbitration bears a heavy burden of proof." *Fisher*, 791 F.2d at 694 (citing *Belke v. Merrill Lynch, Pierce, Fenner & Smith*, 693 F.2d 1023, 1025 (11th Cir. 1982); *Brown v. E.F. Hutton & Co., Inc.*, 610 F. Supp. 76, 79 (S.D. Fla. 1985)). CDWR cannot carry that burden of proof here.

First, the case that CDWR cites in support of its waiver from the failure to timely demand arbitration, *Platt Pacific, Inc. v. Andelson*, 6 Cal. 4th 307, 318-19 (1993), is inapposite. In that case, the contract itself had a deadline by which an arbitration demand must be made, and the moving party failed to make the demand before the agreed-upon deadline. As such, the California Supreme Court made the unremarkable finding that "a contractual requirement that a party's demand for arbitration must be made within a certain time is a condition precedent to the right to arbitration." *Id.* at 321. Here, the only timeframe specified in the Cotenancy Agreement with respect to the parties' ability to invoke arbitration is that arbitration must be commenced during the thirty-day period after the expiration of the forty-five-day period during which the Coordinating Committee may attempt to settle the dispute – between February 28 and March 30, 2022. PG&E's attempt to arbitrate the dispute is therefore timely under the Cotenancy Agreement. Indeed, the Cotenancy Agreement is clear on this point: "Any delay short of the statutory period of limitations, in asserting or enforcing any right, shall not constitute or be deemed a waiver." Cotenancy Agreement § 16.14. Moreover, as described in the Arbitration Motion, the passage of time included multiple meetings among the parties to the Cotenancy Agreement to attempt to resolve consensually the issues associated with CDWR's desire to withdraw from the Cotenancy Agreement, including two

1    mediation sessions. Such actions do not indicate a waiver of other rights under the Cotenancy
2    Agreement, including the right to arbitration.

3           As for PG&E's effort to address the effect of CDWR's desired departure from the Cotenancy
4    Agreement by amending the Cotenancy Agreement and having the amendment approved by FERC,
5    such actions also did not effectuate a waiver. In the first instance, the Cotenants contractually agreed
6    that such a FERC proceeding would not constitute a waiver, by explicitly agreeing to arbitrate under
7    the Commercial Arbitration Rules of the American Arbitration Association (the "**AAA Rules**"). *See*
8    Cotenancy Agreement § 13.2 ("Except as otherwise provided in this Agreement, any arbitration
9    commenced pursuant to this Section 13.2 shall be conducted in accordance with the Commercial
10   Arbitration Rules of the American Arbitration Association."). When a contract provides for
11   arbitration under the AAA Rules, "[t]he parties shall be deemed to have made [the AAA Rules] a
12   part of their arbitration agreement." AAA Rule 1 – Agreement of Parties. Those AAA Rules state
13   that "[n]o judicial proceeding by a party relating to the subject matter of the arbitration shall be
14   deemed a waiver of the party's right to arbitrate." AAA Rule 52 – Applications to Court and
15   Exclusion of Liability. As such, PG&E's effort to amend the Cotenancy Agreement – which it could
16   only do through a FERC proceeding – is not a waiver of the parties' rights under the Cotenancy
17   Agreement, including their right to arbitrate the dispute.

18          Moreover, a party arguing that there was a waiver must prove that it was prejudiced by the
19   acts that were allegedly inconsistent with arbitration. *See Fisher*, 791 F.2d at 694 (rejecting argument
20   that party's "late assertion of its right to compel arbitration was prejudicial because [plaintiffs]
21   expended time, money, and effort on responding to pretrial motions and in preparing for trial and
22   conducted extensive discovery of the arbitrable claims"); *see also Lake Comm'ns*, 738 F.2d at
23   1477 ("More is required than action inconsistent with an arbitration provision; prejudice to the party
24   opposing arbitration must also be shown."); *ATSA of California, Inc. v. Continental Insurance Co.*,
25   702 F.2d 172, 175 (9th Cir. 1983) ("inconsistent behavior alone is not sufficient; the party opposing
26   . . . arbitration must have suffered prejudice"), *amended*, 754 F.2d 1394 (1985); *Shinto Shipping*, 572
27   F.2d at 1330) (the court "must be convinced not only that the appellee acted inconsistently with

28

that arbitration right, but that the appellant was prejudiced by this action before we can find a waiver").

Here, the FERC proceeding at issue lasted less than two months: it was filed on July 30, 2019, when PG&E proposed revisions to the Cotenancy Agreement, and FERC rejected the proposed revisions on September 27, 2019. CDWR fails to identify any specific prejudice resulting from the FERC proceeding, and certainly none sufficient to overcome the presumption disfavoring waiver.

### 5. To the Extent a Question Exists as to the Scope of Arbitrability, the Parties Agreed that the Arbitrator Would Determine Arbitrability

The Reorganized Debtors believe that the arbitrability of the dispute is clear on the face of the contract. However, if the Court is not convinced that the dispute among the parties should be arbitrated pursuant to Section 13.2 of the Cotenancy Agreement, such a determination must be made by the arbitrator and not by the Court, pursuant to the terms of the Cotenancy Agreement.

The Cotenants agreed that any dispute regarding the scope of an arbitration provision, the extent of an arbitration panel's jurisdiction, and the termination, existence or validity of the arbitration provision would be determined by the arbitration panel, by explicitly agreeing to arbitrate under the AAA Rules. *See* Cotenancy Agreement § 13.2; AAA Rule 7 – Jurisdiction ("The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim . . . . The arbitrator shall have the power to determine the existence or validity of a contract of which an arbitration clause forms a part.").

"[A]s long as an arbitration agreement is between sophisticated parties to commercial contracts, those parties shall be expected to understand that incorporation of [a certain body's] rules delegates questions of arbitrability to the arbitrator." *Oracle America, Inc. v. Myriad Group A.G.*, 724 F.3d 1069, 1074-75 (9th Cir. 2013) (observing that "[v]irtually every circuit to have considered the issue has determined that incorporation of the American Arbitration Association's (AAA) arbitration rules constitutes clear and unmistakable evidence that the parties agreed to arbitrate arbitrability" and applying such findings to UNCITRAL rules); *see also Galilea, LLC v. AGCS Marine Ins. Co.*, 879 F.3d 1052, 1061 (9th Cir. 2018) ("Because the parties here are sophisticated,

1   and because they incorporated AAA rules into their arbitration agreement, they have clearly and

2   unmistakably indicated their intent to submit arbitrability questions to an arbitrator.").

3       Here, AAA Rule 7 has "clearly and unmistakably" been incorporated into the arbitration

4   provision.  AAA Rule 7 expressly covers jurisdictional disputes including the parties to the

5   arbitration.  *See* AAA Rule 7 – Jurisdiction ("The arbitrator shall have the power to rule on his or

6   her own jurisdiction . . . .").   Therefore, to the extent there is a question as to whether this dispute is

7   arbitrable, that is a decision that the parties agreed the arbitrator should make.

8       **B.      The Court Should Not Decline to Enforce the Arbitration Provision**

9       CDWR argues that, because the allowance or disallowance of a claim is a core proceeding, the

10  Court should exercise its discretion and decline to send the dispute to arbitration.  The Reorganized

11  Debtors do not disagree that allowance or disallowance of a claim – which is one part of the dispute

12  here – is a core matter.  But that is not the sole matter at issue here.  As discussed in the Arbitration

13  Motion, the claim objection is inextricably intertwined with the issue of CDWR's responsibility to the

14  other three parties – including to two non-debtors – under both the Cotenancy Agreement and the

15  Transmission Service Agreement – to which latter agreement PG&E is not even a party.  These are

16  not core matters, and therefore are not within the Court's discretion to adjudicate when there is a valid

17  arbitration agreement.  *See Cont'l Ins. Co. v. Thorpe Insulation Co. (In re Thorpe Insulation Co.)*, 671

18  F.3d 1011, 1021 (9th Cir. 2012) ("In non-core proceedings, the bankruptcy court generally does not

19  have discretion to deny enforcement of a valid prepetition arbitration agreement.").

20      Furthermore, that a matter is a core proceeding is only the beginning of the inquiry.  As CDWR

21  itself admits, a bankruptcy court's discretion to deny enforcement of an arbitration agreement with

22  respect to a core matter is permitted "only if arbitration would conflict with the underlying purposes

23  of the Bankruptcy Code."  *Id*. (emphasis added).  "[N]ot all core bankruptcy proceedings are premised

24  on provisions of the Code that 'inherently conflict' with the Federal Arbitration Act; nor would

25  arbitration of such proceedings necessarily jeopardize the objectives of the Bankruptcy Code."  *Id.*

26  (citing *Ins. Co. of N. Am. v. NGC Settlement Trust & Asbestos Claims Mgmt. Corp. (In re Nat'l*

27  *Gypsum Co.)*, 118 F.3d 1056, 1067 (5th Cir. 1997)).  CDWR utterly fails to identify how arbitration

28  here would conflict with the underlying purposes of the Bankruptcy Code.   Instead, CDWR's

argument is that these are core issues and should not be arbitrated, because doing so would result in piecemeal litigation and disrupt "centralization of the Debtors' legal obligations." CDWR's reasoning could be applied to any core matter and the resolution of every claim filed in these Chapter 11 Cases – as such, they are not sufficient to demonstrate an inherent conflict between arbitration and the Bankruptcy Code.[3] Quite to the contrary, centralization, judicial economy, and preventing piecemeal litigation, to the extent they are appropriate factors for consideration in determining whether to compel arbitration, weigh heavily in favor of enforcing the arbitration provision under the circumstances here, to ensure that all of the inextricably intertwined disputes under both the Cotenancy Agreement and the Transmission Service Agreement are heard at once and before the same bargained-for forum.

CDWR's reliance on *Thorpe Insulation* is misplaced – in that case, the claim at issue arose from a settlement agreement that Continental Insurance alleged had been breached by the debtor's prepetition preparation of a plan of reorganization that included a section 524(g) channeling injunction trust. As such, adjudication of the claim was "'inextricably intertwined' with [Thorpe's] bankruptcy." *Id.* at 1022. It is not hard to understand why in that situation – where the substance of the claim challenged the confirmation process – the Ninth Circuit determined that arbitration would conflict with the purposes of the Bankruptcy Code.

The circumstances here could not be more different from *Thorpe*. Unlike in *Thorpe*, the chapter 11 Plan here was confirmed and consummated 20 months ago. CDWR's claim is entirely unrelated to the Plan or its administration. There is no specific bankruptcy purpose that would be served by ignoring the parties' agreement to arbitrate, particularly in light of the strong federal and state public policy favoring arbitration.

Moreover, CDWR's claim and the effectiveness of CDWR's termination from participation in the Cotenancy Agreement cannot be resolved in a vacuum, without impacting the rights of NCPA and SVP (non-moving, non-debtor parties) under both the Cotenancy Agreement and the Transmission Service Agreement (to which PG&E is not a party) – which are indisputably not core issues. It would not be appropriate to subject those non-debtor parties – who contracted to have disputes resolved by

[3] Of course, CDWR's argument ignores the numerous other claims filed in these Chapter 11 Cases for which the Court has already granted relief from the automatic stay and/or the Plan Injunction.

arbitration – to the jurisdiction of this Court, in the absence of any compelling bankruptcy concerns. On the other hand, if the non-core issues could somehow be bifurcated from the core matters at issue here, the risk of duplicative litigation and inconsistent rulings would be prejudicial to the parties. Far from avoiding piecemeal litigation, as CDWR purports, adjudicating the dispute as it relates solely to CDWR and the Reorganized Debtors and having the parties arbitrate the rest of the dispute – even if possible – would lead to potentially inconsistent, duplicative, and piecemeal litigation.

CDWR again fails to satisfy its burden here, and the entire dispute among the parties should be sent to arbitration pursuant to the parties' agreement.

### C. In the Alternative, the Court Should Set a Status Conference to Schedule Merits Briefing and Further Proceedings

The Reorganized Debtors (and NCPA and SVP) disagree, on the merits, that CDWR can terminate its participation from the Cotenancy Agreement and walk away with a refund of its operation and maintenance costs, without bearing its fair share of the removal costs of the transmission lines. However, as set forth above, the Reorganized Debtors believe that briefing on the substantive merits of the dispute is unnecessary, premature, and improper here because the dispute is subject to mandatory, binding arbitration. Although CDWR would not agree to conserve judicial resources by staying briefing on the merits until after the Court decided the gateway issue of arbitrability, the Reorganized Debtors maintain that such a staging of litigation is both appropriate and in the best interests of the parties and judicial economy. If the Court disagrees with PG&E that the dispute must be arbitrated, the Reorganized Debtors should be given the opportunity to submit separate briefing on the merits. Therefore, to the extent the Court declines to enforce the arbitration provision in the Cotenancy Agreement, the Reorganized Debtors request that the Court set a status conference to establish a schedule for briefing on the merits and further proceedings, including, if necessary, an evidentiary hearing.

## IV. CONCLUSION

WHEREFORE the Reorganized Debtors respectfully request entry of an Order (i) (a) denying the Motion and (b) granting the relief requested in the Arbitration Motion; or (ii) in the alternative, setting a status conference to establish a schedule for briefing and further proceedings on the merits;

1  and (iii) such other and further relief for the Reorganized Debtors as the Court may deem just and

2  appropriate.

3  Dated:  February 16, 2022          **WEIL, GOTSHAL & MANGES LLP**

                                          **KELLER BENVENUTTI KIM LLP**

5                                       */s/ Jane Kim*

                                     Jane Kim

6                                       *Attorneys for Debtors and Reorganized Debtors*