# EXHIBIT
# H

# Possible Soil Removal Report

## Analysis of Tower 30 & 32 Site

For:
PG&E

By:
ASEC Inc.

Final Revision 0
March 03, 2017

ASEC INC.

# Table of Contents

- Summary ........................ 3
- Plan View of Site ........................ 4
- Tower 30 – Profile View of Foundation ........................ 5
- Tower 32 – Profile View of Foundation ........................ 6
- Conclusion ........................ 7

ASECINC.

2

# Summary

- This report is based on the in-situ conditions prior to any soil removal and replacement.

- In order to determine uplift loads, in-situ loads were extracted from the PLS-CADD files for both towers and PLS-TOWER analysis was performed. The maximum uplift loads from the PLS-TOWER analysis can be found in the conclusion.

- The plan view of the site (page 4) shows the limits of future soil disturbance.

- The profile views of the tower foundations (pages 5 – 6) show foundation depth information.

- Notes:

  - Broken wire cases are for any two wires broken with 1.0 OLF.
  - GO95 intact cases have a 1.5 OLF.
  - The original drawings indicate a typical 6' stub/grillage foundation.
  - The foundation consists of a leg bolted to a stub angle and a grillage plate at the bottom. This assembly has a 1.5' diameter concrete cap set around the ground line of each leg some time after initial construction. This concrete cap protrudes above the ground as shown in the pictures and below the ground for an unverified depth (typically 12" to 18").
  - There may be degradation of the stub angles and grillage plates due to age or other factors or the soil properties may be different from what is assumed.
  - Tower 30 has been modified by adding post insulators to the top arm, moving all three phases on both circuits up, and removing the bottom arm. This modification has increased foundation loads from the original conditions.

- Assumptions:

  - The stub angle and grillage foundation are in good condition and have not corroded or been damaged.
  - The soil density is 78 lb/ft^3.
  - The angle of repose of the soil is 30°.
  - These depth of concrete below ground is shown as 12" in this report.



# Plan View of Site

## APN: 051-4813-017



296 SAINT JAMES DRIVE
PIEDMONT, CALIFORNIA

SIDEYARD

RAISED
PORCH

Main Disturbance Limits

Soil Disturbance Limits

Leg A

Leg B   T-32   Leg D

Leg C

FORMER
TENNIS
COURT

RAISED
STONE
WALLS

TREES

Leg A   Leg D

T-30

Leg B   Leg C

PAVED
DRIVEWAY

MAIN
YARD

STAIRCASE
ACCESS

TREES

TREES

TREES

GRASS
LAWN

ST JAMES DR

LEGEND:

APPROXIMATE EXTENT OF SOIL REMOVAL IN THE TOWER AREA. SOIL TO BE
REMOVED INCHES BELOW CURRENT GROUND SURFACE AND BACKFILLED.

APPROXIMATE EXTENT OF SOIL REMOVAL IN THE YARD TO 3 INCHES BELOW
GROUND SURFACE AND WILL NOT BE BACKFILLED.

APPROXIMATE EXTENT OF SOIL REMOVAL IN THE SIDE YARD TO 3 INCHES
BELOW GROUND SURFACE. AREA WILL NOT BE BACKFILLED.

APPROXIMATE EXTENT OF EXISTING SITE FEATURES.

NOTES:

1. THE FOOTPRINTS REMOVAL OR DISRUPTION OF SOIL AROUND TOWER
   FOUNDATIONS BEYOND SCOPE DEFINED IN THIS DOCUMENT.

2. ALL DISTANCES AND FIGURES ARE APPROXIMATE AND WILL BE CONFIRMED
   DURING FIELD VERIFICATION.

ASEC INC.

| MAIN YARD | | |
|---|---|---|
| | | |
| | | |
| SIDE YARD | | |
| | | |
| | | |
| TOWERS - 10 FT SETBACK | | |
| | | |
| FORMER TENNIS COURT | | |
| | | |

DATE:
SEPTEMBER 29, 2016

4

# Tower 30 – Profile View of Foundation



Grillage Plate

MAKE 4. As shown MARK "YZ".

Leg A   Leg B   Leg C   Leg D

Top of Concrete
Ground Line
Estimated Bottom of Concrete

Notes:
- Values shown on this page are estimates based on photos taken with no measurements.
- Concrete is a cap only and does not extend to the bottom of the foundation.

ΛSECINC.

5

# Tower 32 – Profile View of Foundation



Grillage Plate

MAKE 4. As shown MARK "YZ"

Notes:
- Values shown on this page are averages of measurements taken in the field.
- Concrete is a cap only and does not extend to the bottom of the foundation.

ΛSECINC.

6

# Conclusion

### Tower 30

- Maximum uplift loads for the intact loading case is 6,840 lb with 1.5 OLF and 4,560 lb with 1.0 OLF.
- Maximum uplift loads for the broken wire case (2 conductors broken) is 12,850 lb with 1.0 OLF.
- Pictures indicate that the top two conductors have been raised and arms have been retrofitted to hold post insulators. This retrofit has increased foundation loads from the original conditions.

### Tower 32

- Maximum uplift loads for the intact loading case is 5,160 lb with 1.5 OLF and 3,440 lb with 1.0 OLF.
- Maximum uplift loads for the broken wire case (2 conductors broken) is 7,450 lb with 1.0 OLF.

## General Site Instructions for Additional Soil Disturbance

It is the opinion of ASEC that no ground disturbance should occur inside of a 13' radius of the point where the tower leg intersects with the ground unless an engineered solution is obtained for that ground disturbance.

The depth of the concrete cap may vary from what is shown in this report. Do not excavate below the bottom of the concrete cap unless an engineered solution is obtained for that excavation.

ASEC INC.

7

# EXHIBIT
# I

## RE: PG&E Tower - Lights

From:  Echols, Joe (jxev@pge.com)

To:     davidaddington@fairmarketproperties.com

Date:   Monday, April 24, 2017, 10:54 AM PDT

Dear Mr. Addington,

The safety of our customers, employees and communities is our highest priority. Placing lights on the tower is an unauthorized attachment prohibited by the CPUC's General Order 95. The purpose of this rule is to prohibit any obstructions that would interfere with PG&E's electric operations.

PG&E must have full access to its tower facilities at all times. In the event of any emergency, the presence of this third-party light and electric cable would delay emergency response. The crew would be required to identify the electric source for this attachment, which would be recognized as a potential safety hazard to the crew working on the tower.  We cannot accept any delay that would hinder our restoration efforts.

In addition, merely placing the light on PG&E's tower puts your own safety at risk. Climbing on or placing ladders against the tower to attach the light could result in serious personal injury. The tower is PG&E's property and is not to be used as an aerial platform for your lighting. For all these reasons, we have once again removed the lights from the tower and ask that you not replace them or place any additional equipment on the tower.

Thank you.

Sincerely,
Joe Echols

---

**From:** David Addington [mailto:davidaddington@fairmarketproperties.com]
**Sent:** Wednesday, April 19, 2017 10:57 PM
**To:** Echols, Joe; Lishman, Nathan
**Subject:** Re: PG&E Tower - Lights

This is an EXTERNAL EMAIL. Stop and think before clicking links or opening attachments.
************************************

Dear Mr. Echols,

I appreciate your concern for my safety and that of my family.

Can you please explain the dangers that the PG&E towers pose to my family?  And how are those dangers intensified by

"Affixing energized equipment" to those towers? The LED light in question is 50 watts. Would the danger be lessened if it were 25 watts? Or greater at 100 watts? It is currently affixed with scotch tape. Does the tape as affixing agent pose a separate risk?

Your letter states that affixing energized equipment to PG&E towers is
"explicitly prohibited" but you reference and attached a CPUC rule that is not explicit and does not prohibit anything - the rule only states it is not to be construed as permitting such attachments. If such attachments are a danger or prohibitted, PG&E should move quickly to address the next tower up from mine which is festooned with engergized equipment which I bet consume some magnitudes more than 50 watts.

You further state my secuity light constitues tampering. The code defines tampering as:

 *(e) Tamper means to rearrange, injure, alter, interfere with, or otherwise to prevent from performing normal or customary function.*

In what way has my light met this standard? Has the performace of the tower(s) been deminished in some measurable way? If so, are all the PG&E towers so fragile and unsafe - or just mine? Please provide some evidence of the towers resultant loss of function.

We have any number of unresolved matters between us due to your and PG&E's failure to abide by the terms of the easement. If it is PG&E's desire to continue to have towers on my property, your energies would be better spent working to retifiy your breech than trying to gin up a breech for me.

PG&E has interfered with my use my property subject to the easement. Can anyone look at my yard conclude othwise?

If my light on the PG&E tower creates a hazard, explain the hazard. If it breaks a law, state the law. If it does neither, drop it.

My questions from my previous email are here reiterated as your response left them unanswered. Further, as I have asked repeatedly, I want a copy of the Arcadis agreement for work on my property.

Sincerley,


**David P. Addington**
*California Champs*

*Rio West Mall*
*Showdogs & Machine Coffee*
*The Warfield Theater, LLC*
415-606-6552


On Monday, April 17, 2017 2:36 PM, "Echols, Joe" <JxEv@pge.com> wrote:

Dear Mr. Addington –

The safety of our customers, employees and communities is our highest priority. Affixing energized equipment—like the lighting fixture and supply cable that you have attached—to Pacific Gas and Electric Company's (PG&E) transmission tower(s) is explicitly prohibited, and presents a safety hazard that may result in serious personal injury. **We respectfully repeat our request that**

Joe,

I disagree.

Civil Code 1882 clearly does not prohibit the light I have rested on your tower.

CPUC General Order 95 are for power line construction. As the CPUC GO 95 is long and clearly not intended for easement granters, I did not read it. If you want to point me to some key provisions, I will read them.

Do not send someone to my house. Uninvited and unwarranted persons on my property are treated as trespassers. California Penal Code - PEN § 602

**David P. Addington**
*California Champs*
*Rio West Mall*
*Showdogs & Machine Coffee*
*The Warfield Theater, LLC*
415-606-6552


On Wednesday, April 5, 2017 11:17 AM, "Echols, Joe" <JxEv@pge.com> wrote:


Mr. Addington,

It's recently brought to my attention that lights have been attached to the PG&E transmission tower(s) located on your property. Unfortunately we cannot allow these items to be placed on the tower. These items violate the Civil Code 1882, as well as CPUC General Order 95 and will need to be removed. We will be sending someone out to remove the lights attached to the tower. We ask that you refrain removing the lights yourself and from attaching anything else to the tower in the future.

Thank you,
Joe

Case: 19-30088    Doc# 12101-3    Filed: 04/01/22    Entered: 04/04/22 08:55:58    Page
13 of 27

Joe Echols

---

**From:** David Addington [mailto:davidaddington@fairmarketproperties.com]
**Sent:** Wednesday, April 12, 2017 11:43 AM
**To:** Echols, Joe; Lishman, Nathan
**Subject:** Re: PG&E Tower - Lights

This is an EXTERNAL EMAIL. Stop and think before clicking links or opening attachments.
*************************************

No response to my last email, Joe?

Will you verify that you or your agent did come onto my property and remove the light from the tower?

Further, will you agree that you or your agent made no attempt to communicate with me or any other occupant at the house regarding its removal?

Lastly, will you agree that since its removal and fully aware of my disagreement, you made no attempt to inform me or any other occupant at the house that it had been removed?

Fear not, the light was not damaged and it has been returned to its tower perch. The light has a motion sensor and is part of my home security system. For this reason and those in my previous email, I trust you will leave it undisturbed.


**David P. Addington**
*California Champs*

*Rio West Mall*
*Showdogs & Machine Coffee*
*The Warfield Theater, LLC*
415-606-6552


On Saturday, April 8, 2017 10:11 PM, David Addington <davidaddington@fairmarketproperties.com> wrote:

# EXHIBIT
# J

May 16, 2017

RE: 298 Saint James Drive

Dear PG&E Staff,

I'd like to reach a negotiated resolution to both of our disagreements without being forced to void PG&E's easement on my property.

The first disagreement being the landscaping. I think both parties will agree that PG&E is responsible for restoring Grantor's landscaping that was damaged as part of maintenance of the PG&E towers. Also, I think we can both stipulate that we entered an agreement about that landscaping which Grantee was obligated to preform work on Grantors behalf and would pay Grantor an amount estimated to complete the landscape restoration.

PG&E may claim that the work stipulated in our agreement was completed. I will claim it wasn't. While I will argue that the soil quantities removed from the site were lied about, reduced to a written report that was either fraudulent or malpractice (whatever the engineering world would deem total bullshit), new fill improperly compacted, and generally destroyed my yard. PG&E will likely argue the opposite (based on what fact set I have no idea).

PG&E's agreement with the landscape contractor, Arcadis, (Craig Divine/Mary Ann Hopkins/Alex Rothchild) should provide PG&E's position significant support, but despite asking for the agreement multiple times, it has not been sent. Is Arcadis a licensed landscape contractor in California? This contract was PG&E's subcontract to our agreement. It was made to fulfill PG&E's agreement with me and was for work on my property within and outside of the easement area. If we don't settle, I will get to see this agreement. If the agreement strengthens your position, PG&E would surely provide it as it will make settlement easier. If the agreement fails to sufficiently mirror PG&E's agreement with me, as I suspect, it is nearly irrefutable on its one face that PG&E never intended to uphold the terms of our agreement.

Here, I see only three possible next steps: 1) Make me a settlement offer that I accept; 2) provide me the Arcadis agreement and file by 6/1/17; or 3) Come get your towers off my property. (By the way, if PG&E removes the towers, the requirement to restore the landscaping remains.)

I understand that a court will likely give PG&E a chance to cure its default under most facts. It is possible, however, that the malfeasance rises to a standard requiring more than a simple landscaping cure. While a court could conclude that I have received the benefit of the bargain, I don't think it will.

The second item where we seem to have a substantial disagreement is my relationship with the physical tower structures. This relationship is not discussed expressly in the easement or in the subsequent work agreements. To my knowledge, these are the only documents effecting the Grantor and Grantee rights and obligations regarding the easement property and all improvements therein. As Grantor, I see the lack of expressed prohibitions as a clean slate where I can do as I please with, around, under, besides, across and otherwise with the towers if I create no hazard. PG&E's position is that I can do nothing as all interaction will create a hazard. Please send don't bother to send additional legal citations that do not apply or rules for public utilities. I can read the citations and I am not a public utility.

PG&E has provided no evidence of a hazard, no range of hazards, no data, study, finding of any kind to support their conclusion. In fact, on the next set of PG&E towers, where I will guess PG&E owns the land

under one tower, dozens of powered attachments can be seen only a few hundred feet from my towers. I would stipulate that hazards which can be mitigated by cash payments, like those payments likely generated by the now hazardless attachments on the next towers are not actually hazards at all.

The solutions here seem few and distinct. First, and my preferred, is you remove the towers. Take your time – say 60 or even 90 days – and their use is no longer an issue. Second, show me the science of hazard and how it is differentiated from the non-hazard on the next set of towers. Third, I am going to continue to use the towers as Grantor is allowed and PG&E's alterations of my installations will be trespass and vandalism.

Lastly, I do not want my anger at PG&E's malfeasances and the pain and suffering caused my family by PG&E's willful and wanton disregard its' duties and responsibilities to make resolving these matters more difficult than need be. To this end, please limit your communications to me alone among my family, to writing – email and USPS equally fine unless contractual obligation dictates otherwise and not in person - via agents or employees on my property – within easement or otherwise – without notification.

Sincerely,

DPA

David P. Addington
davidaddington@fairmarketproperties.com
298 Saint James Drive
Piedmont CA 94611

# EXHIBIT K

## Terminated Easement for 298 Saint James Drive

From: David Addington (davidaddington@fairmarketproperties.com)

To:   jxev@pge.com; npl2@pge.com; leah.ackerman@arcadis.com; p1a8@pge.com; m1o3@pge.com; m1t2@pge.com; d3cu@pge.com; crp0@pge.com; ljp2@pge.com; msj5@pge.com; s3hh@pge.com

Bcc:   j3addington@gmail.com; aladdington@comcast.net

Date:   Friday, June 2, 2017, 08:42 AM PDT

Dear PG&E Staff,

The Easement for 298 Saint James Drive is now terminated. The recorded easement termination documents are attached for your records.

I respectfully request that PG&E:

1) Retrieve immediately all of its property, improvements and debris from 298 Saint James Drive.

2) Obtain a City of Piedmont permit and work plan.

3) Confine all work, workers, equipment and impact to the former 60 foot easement area unless I agree in writing otherwise.

5) Complete all work as soon as reasonably possible.

6) Understand that any transmission of power across my property from this day forward is done without my permission. Any value derived from such unauthorized use of my property will be pursued where legally possible.

7) Communicate with me through someone other than Joe Echols who has repeatedly proven to be untrustworthy.

Despite PG&E's contempt for my family and property to date, I remain hopeful that our remaining interactions can be honest, respectful, productive and brief.

Sincerely,

**David P. Addington**

easement terminatino.docx.pdf
3.4MB

Recording Requested By
and When Recorded Mail to:

David P. Addington
298 Saint James Drive
Piedmont CA 94611



COUNTY OF ALAMEDA CALIFORNIA
2017119659    06/01/2017 04:19 PM
OFFICIAL RECORDS OF ALAMEDA COUNTY
STEVE MANNING
RECORDING FEE:          24.00

4    PGS

# TERMINATION OF EASEMENT

THIS TERMINATION AND EXTINGUISHMENT OF EASEMENT is made this First day June 2017, by David P. Addington, hereinafter referred to as "Grantor".

WHEREAS, Grantor is successor-in-interest to The Realty Syndicate interests in Grantor's property commonly known as 298 Saint James Drive, Piedmont CA 94611 (the "Land"), which is described in Exhibit "A" and depicted on Exhibit "B" as parcel 17.

NOW, THEREFORE,

1.    Grantor hereby terminates and extinguishes that easement as shown on the map of record and as recorded May 17, 1909 in book 1578 of Deeds, pages 189 of said county, as it relates to Grantor's property.

IN WITNESS WHEREOF, the party hereto has executed this instrument the day and year first above written.

GRANTOR:

David P. Addington

## Exhibit "A"
## Legal Description

The property in this report is situated in the State of California, County of Alameda, City of Piedmont, described as follows:

PARCEL ONE:

LOTS 112 AND 113, MAP OF ST. JAMES WOOD, FILED OCTOBER 16, 1926, MAP BOOK 10, PAGE 89, ALAMEDA COUNTY RECORDS.

PARCEL TWO:

PORTION OF LOT 114, MAP OF ST. JAMES WOOD, FILED OCTOBER 16, 1926, MAP BOOK 10, PAGE 89, ALAMEDA COUNTY RECORDS, DESCRIBED AS FOLLOWS:

BEGINNING AT THE INTERSECTION OF THE EASTERN LINE OF ST. JAMES DRIVE, WITH THE SOUTHEASTERN LINE OF LOT 114, AS SAID DRIVE AND LOT ARE SHOWN ON SAID MAP; RUNNING THENCE ALONG SAID LINE OF ST. JAMES DRIVE, BEING ALONG THE ARC OF A CIRCLE HAVING A RADIUS OF 245 FEET (THE CENTER OF WHICH CIRCLE BEARS SOUTH 82° 22 ' 46 " WEST 245 FEET DISTANT) NORTHERLY A DISTANCE OF 26.50 FEET; THENCE NORTH 56° 52 ' 55 " EAST 153.86 FEET TO THE NORTHEASTERN LINE OF LOT 114; THENCE ALONG THE LAST MENTIONED LINE SOUTH 36° 54 ' EAST 27.50 FEET; THENCE ALONG THE SAID SOUTHEASTERN LINE OF LOT 114, SOUTH 57° 53 ' 37 " WEST 165.80 FEET TO THE POINT OF BEGINNING.

A.P.N. :  051-4813-017



ASSESSOR'S MAP 51

St James Wood

Case: 19-30088    Doc# 12101-3    Filed: 04/01/22    Entered: 04/04/22 08:55:58    Page
22 of 27

# ACKNOWLEDGMENT

A notary public or other officer completing this
certificate verifies only the identity of the individual
who signed the document to which this certificate is
attached, and not the truthfulness, accuracy, or
validity of that document.

State of California
County of _____ *Alameda* )

On *June 01, 2017* before me, *Patrick Siu, Notary public*
(insert name and title of the officer)

personally appeared *David Preston Addington* ,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he/she/they executed the same in
his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the
person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing
paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

PATRICK SIU
Notary Public - California
Alameda County
Commission # 2154970
My Comm. Expires Jun 24, 2020

## RE: 298 Saint James

From: Echols, Joe (jxev@pge.com)

To: davidaddington@fairmarketproperties.com

Date: Thursday, June 15, 2017, 09:45 AM PDT

*Mr. Addington,*

*We are in receipt of your email dated June 2 in which you stated that you have terminated the easement for 298 Saint James Drive in Piedmont. Please note that a private property owner cannot unilaterally terminate an occupied easement. Accordingly, PG&E does not consider your termination of the easement to be valid and will continue to operate and maintain our existing facilities in accordance with our existing easement.  No equipment will be removed from your property.*

*Thank you,*

*Joe Echols*

---

**From:** David Addington [mailto:davidaddington@fairmarketproperties.com]
**Sent:** Tuesday, May 16, 2017 11:31 AM
**To:** Echols, Joe; Lishman, Nathan; leah.ackerman@arcadis.com; Arneson, Pat; Oakes, Matthew; Tell, Monica; Jamie Addington; Hughes, Stephen; Luis J. Pons; Portus, Colin; Jackanich, Mark; Conway, Denise
**Subject:** 298 Saint James

This is an EXTERNAL EMAIL. Stop and think before clicking links or opening attachments.
*************************************

May 16, 2017

RE: 298 Saint James Drive

Dear PG&E Staff,

I'd like to reach a negotiated resolution to both of our disagreements without being forced to void PG&E's easement on my property.

Case: 19-30088    Doc# 12101-3    Filed: 04/01/22    Entered: 04/04/22 08:55:58    Page
24 of 27

## Re: 298 Saint James

From:  David Addington (davidaddington@fairmarketproperties.com)

To:    jxev@pge.com; npl2@pge.com; p1a8@pge.com; leah.ackerman@arcadis.com; m1t2@pge.com;
       m1o3@pge.com

Bcc:   j3addington@gmail.com

Date:  Thursday, June 15, 2017, 09:05 PM PDT

Dear Echols,

Please note that a private property owner can do whatever an easement agreement allows them to do.  In the case at hand, the easement's documentation plainly empowers the Grantor to unilateral termination.  So empowered, I have terminated the easement, recorded the evidence of the termination, noticed PG&E of the termination and accept your email of this morning as confirmation of receipt of notice.

The easement in question was governed by a written and recorded document. PG&E's considerations do not change the plain meaning of that written agreement. Accordingly, all PG&E's equipment will be removed from my property.  And until it is removed, PG&E is incurring liability for its unauthorized use of my property for its own gain.

And Thank You,

**David P. Addington**
*California Champs*
*Rio West Mall*
*Showdogs & Machine Coffee*
*The Warfield Theater, LLC*
415-606-6552


On Thursday, June 15, 2017 9:45 AM, "Echols, Joe" <JxEv@pge.com> wrote:

*Mr. Addington,*

*We are in receipt of your email dated June 2 in which you stated that you have terminated the easement for 298 Saint James Drive in Piedmont. Please note that a private property owner cannot unilaterally terminate an occupied easement. Accordingly, PG&E does not consider your termination of the easement to be valid and will continue to operate and maintain our existing facilities in accordance with our existing easement.  No equipment will be removed from your property.*

*Thank you,*
*Joe Echols*

# EXHIBIT L

| Event | Date | Days in Period | Days From Termination |
|---|---|---|---|
| Easement Termination | 6/1/2017 | | |
| Bankruptcy Filing | 1/29/2019 | 607 | 607 |
| Effective date of Bankruptcy Plan | 7/1/2020 | 519 | 1,126 |
| Matter of Law Response Filing | 3/30/2022 | 637 | 1,763 |