David P. Addington
298 Saint James Drive
Piedmont, CA 94611

(415) 606-6552
david@cachamp.com

In pro per

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

In re:

PG&E CORPORATION,

-and-

PACIFIC GAS AND ELECTRIC COMPANY,

Debtors.

Affects Both Debtors

CASE NO. 219-30088 (DM)

DECLARATION IN SUPPORT OF CREDITOR DAVID P. ADDINGTON'S OPPOSITION TO DEBTORS' OBJECTION TO CLAIM OF DAVID P. ADDINGTON (CLAIM NO. 3093)

[Related to Docket No. 10673]

I, DAVID P. ADDINGTON, DECLARE:

I am a Creditor in the above-captioned case. I make this Declaration in support of my Opposition to the Debtors' Objection of my Creditors Claim (Docket No. 10673) in this Case. I have personal knowledge of the following facts and could and would competently testify to them under oath.

I dispute PG&E's assertion that I do not have the right to terminate the Easement. PG&E has unreasonably interfered with my use of my land, and the express terms of the Easement allow for termination.

1
DECLARATION OF DAVID ADDINGTON

## I. PERSONAL BACKGROUND

My name is David Preston Addington. I started working in commercial real estate in 1986 as a college student in Houston, Texas. I have bought, entitled, developed and sold commercial real estate in Georgia, Florida, Tennessee, Utah and California. I have developed an expertise in title issues and leveling sites for development.

I am married with three young children. Pending the arrival of my identical twin sons in November of 2014, we began to look for a home in Piedmont (California). After a great deal of searching, we purchased our home at 298 Saint James Drive, which had the mid-century modern design and the large yard we were looking for. We closed on 298 Saint James on November 10, 2015.

## II. PROPERTY BACKGROUND & DESCRIPTION

My Property is about thirty feet above the sidewalk, and approximately three-quarters of an acre in size. The Property was burdened by an easement from 1908 to Great Western Power in accords with which two electrical transmission towers had been built. The towers sit to the west of our house and the easement encumbers about 8000 square feet or almost our entire lawn. (EXHIBIT A)

PG&E's own diagram, at page 16 of "Exhibit F" of this Declaration shows my yard and the improvements therein before PG&E's destruction of same. As the PG&E diagram shows, we had a level concrete and asphalt "PLAY COURT" surrounded by the "MAIN YARD". As I describe below, PG&E's unreasonable refusal to let me restore my yard to a level, usable condition resulted in the termination of the Easement pursuant to its express terms.

## III. WORK AGREEMENT

On the advice of a neighbor, on April 27, 2016, I sent an email to Denise Conway of PG&E. (EXHIBIT B) In response, PG&E told me that they intended to conduct an intensive lead abatement project within the easement area.

PG&E told me that the abatement would require the removal of the topsoil – and therefore vegetation- across a large swath of our yard. PG&E asked me to obtain bids to restore my yard to my specifications. For simplicity's sake I limited my specifications, getting bids to make my

yard level and install sod and a sprinkler system. (EXHIBIT C) Since the entire yard was being leveled, we decided not to replace the Play Court, but instead to cover the entire area with grass and landscaping. PG&E decided it would undertake items one and two of the contractor's bid – removal of the Play Court and excess soil and leveling the yard - and pay me the balance which I could then hire the contractor to finish the job. (EXHIBIT D)

PG&E started work about October 24, 2016, and left November 3rd leaving my yard a decidedly more unleveled, muddy mess without a sport court to play on.

IV. **AMENDED WORK AGREEMENT AND RELEASE**

PG&E made it clear that they did not ever intend to re-level my yard and demanded that I make a plan that works with the new property contours. In an attempt to placate PG&E, I hired a landscape architect and presented PG&E with the plan (EXHIBIT E). They asked me to get the plans bid which I did but PG&E decided it would offer no more money despite the vastly higher costs.

During this same period, I am trying to make sense of what PG&E had done to my yard. (EXHIBIT F) PG&E's made it abundantly clear that it wanted to do no further work in my yard and I would be far better off re-leveling and re-landscaping my yard with my own contractor. PG&E agreed to pay me an additional $13,000, the cost associated with item 2 of the contractor's bid, and I released them from any further liability under the work agreement. (EXHIBIT G)

V. **STONEWALLED AND STYIMED**

Before beginning work around the towers, we asked PG&E for the study that guided their work resulting in the new elevations. Instead of answering the question asked, PG&E instead produced the ASEC report which - without support of any onsite investigation - introduced the requirement that the newly created contours could not be changed. (EXHIBIT H – Page 7)

PG&E thus effectively and unreasonably interfered with my and my family's use of our yard, including our prior use of it and any new use of it, by unreasonable conduct that included without limitation:

- PG&E refused to provide the agreement with their subcontractor, Arcadis.
- PG&E refused to provide any rational for changing my property contours.

- PG&E claimed it had hauled off 280 cubic yards as contracted, PG&E's report from Arcadis stated it hauled 189 cubic yards, but PG&E refused to respond to the calculations showing it hauled 40 cubic yards.
- PG&E denied ever agreeing to level the property disputing the intention of the GJR bid we attached to our agreement.
- PG&E refused to provide me a contact to get approvals on any designs for elevation changes.
- PG&E refused to conduct any on-site engineering to set a baseline for design changes.
- PG&E destroyed my yard and mandated that I cannot restore it.

## IV. FINAL STRAW

With my yard in shambles, PG&E enters my muddy property twice to take down a small light resting on a tower leg. (EXHIBIT I)  And it sent a letter, which I cannot locate as I likely tore it up, demanding that we move our trampoline.  These uses of our property were and are insignificant - bordering on immaterial.  The insignificance of these uses and PG&E's ardent assertion that the Easement prohibited them,  made it clear to me that PG&E would never act to avoid interfering with my land use, reasonability be damned.  Despite the plain language of the Easement requiring that they act reasonably, they had not, they would not, and likely are not capable of reasonably avoiding interfering in my land use.

## V. TERMINATION

I reached out to PG&E repeatedly to attempt to get some path forward to my intended land use.  In May 2017, I sent PG&E a letter making clear that without their agreement on a path forward to my intended land use I would be forced to terminate the Easement.  (EXHIBIT J)

I terminated the Easement, and upon PG&E's receipt of the recorded termination, PG&E again stated that the easement cannot be terminated. (EXHIBIT K)

## VI. POST TERMINATION

From my purchase of 298 Saint James, I have recognized that the recorded easement's text was the controlling document.  I have waited patiently for PG&E to reveal the law that

4
DECLARATION OF DAVID ADDINGTON
Case: 19-30088    Doc# 12102    Filed: 04/01/22    Entered: 04/04/22 08:58:32    Page 4 of 6

modified the Easement's recorded text making the Easement perpetual. But PG&E has never provided any such law, not even in its pending motion.

PG&E has threatened me with significant liability for holding my position. Knowing, as we all do now, that they had no legal basis for their position, they used their enormous financial and legal clout to attempt to cow me into submission without them ever turning up their cards.

## VII. CONTINUING INTERFERENCE

PG&E has willfully, knowingly, and unreasonably interfered with my land use during every one of the last one thousand seven hundred and sixty-three days. (EXHIBIT L) During this time when my twins went from 2 to 7 years old, PG&E could have worked with me to give my boys back a place to play. Instead, PG&E took every opportunity to interfere with my land use by disavowing the Easement's plain language, threatening me with legal liabilities, entering my yard without cause or notice, refusing to provide the information I have reasonably requested and, lastly, forcing me to spend hundreds of hours responding to their baseless claims.

## VIII. NEXT STEPS

On the court's confirmation that the easement is terminated, I will contract with the necessary professionals to safely implement my land use plans as I have substantial experience in site work next to and even over major power distribution facilities.

Should PG&E decide to cease its trespass for profit by transferring ownership of its assets on my property, I intend to submit my power distribution assets to California Association of Independent System Operators. ("CAISO"). I applied to join CASIO last year but PG&E objected (EXHIBIT M). CASIO can assist with a determination of what participation I might reasonably receive going forward.

This path forward respects the law and creates no additional risk or expense for the region's electrical customers.

The only remaining question would then be what PG&E owes me for its years of trespass for profit on my property and when do I get paid.

## IX. TITLE REPORTS

Attached as EXHIBIT N is an accurate copy of the Preliminary Report that was issued when I purchased the property in 2015. Exception No. 4 identifies the Easement as follows:

> GREAT WESTERN POWER COMPANY EASEMENT AS SHOWN OF THE MAP OF RECORD AS RECORDED MAY 17, 1909 IN BOOK 1578 OF THE DEEDS PAGE 189, RECORDS OF SAID COUNTY.

Attached as EXHIBIT O is an accurate copy of the Preliminary Report for my property that was issued as of October 2, 2018, after the Termination of Easement was recorded. An Exception for the Easement is not included in this Preliminary Report, which evidences that the Termination allowed the title company to delete the Easement from its title report.

I declare under penalty of perjury under the laws of the United States that the facts stated in this Declaration are true, and that this Declaration was executed on March 31, 2022 at Piedmont, California.

_____
DAVID P. ADDINGTON