Richard A. Lapping (SBN: 107496)
TRODELLA & LAPPING LLP
540 Pacific Avenue
San Francisco, CA 94133
Telephone:   (415) 399-1015
Facsimile:   (415) 651-9004
*Rich@TrodellaLapping.com*

Attorneys for Todd Greenberg

**UNITED STATES BANKRUPTCY COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| In re:<br><br>PG&E CORPORATION,<br><br>   - and -<br><br>PACIFIC GAS AND ELECTRIC COMPANY,<br><br>☐ Affects PG&E Corporation<br>☒ Affects Pacific Gas and Electric Company<br>☐ Affects both Debtors | Bankruptcy Case No. 19-30088 (DM)<br><br>Chapter 11<br><br>(Lead Case) (Jointly Administered)<br><br>**CREDITOR TODD GREENBERG'S TRIAL BRIEF RE REORGANIZED DEBTOR'S OBJECTION TO CLAIM NO. 77335**<br><br>[Related to Dkt. Nos. 9455, 9646]<br><br>Date:  June 27, 2022<br>Time:  9:00 a.m.<br>Courtroom 17 - Video<br>Judge:  Hon. Dennis Montali |

Creditor Todd Greenberg ("Greenberg") hereby submits his trial brief in support of his Claim No. 77335.

**1. Introduction.**

Claim no. 77335 concerns damage to a refrigerator, its contents, and an interior floor, located in the downstairs flat in a building owned by Greenberg's family at 47 Bolinas Road, Fairfax, CA 94930 (the "Property").  The Property has since been transferred to an LLC in which Greenberg is a member.  **Exhibit A**.  Greenberg lived in this flat at the time of the incident, but

Trodella & Lapping LLP
540 Pacific Avenue
San Francisco, CA 94133

has sinced moved into the other upstairs unit.

### 2. Greenberg's Absence

The damage to Greenberg's refrigerator occurred sometime between February 14, 2016 and Febuary 21, 2016 (the relevant time period), when Greenberg's entire family was away on vacation for Greenberg's father's 80th birthday. Greenberg's flight information establishes the dates. **Exhibit B**. During this time, an electrical surge or electrical power fluctuations—outages followed by surges—caused the starter relay in the refrigerator and freezer to fail, as diagnosed by the Appliance Repair Doctor of Alameda, California. **Exhibit FF**; **Exhibit GG**. This failure, while not affecting other refrigerator mechanicals, prevented the refrigerator and freezer from functioning, and everything inside melted and spoiled, and then leaked onto the slightly outward sloping floor, so it spread across the entire kitchen. **Exhibit II**. Upon Greenberg's return home, he discovered the horrible spoiled melted food mess and delaminated flooring.

### 3. PG&E's Denials

PG&E has denied the damage, suggesting that the refrigerator was old.

> Greenberg simply attempts to revamp the "outage" claim denied by the PG&E Claims Department in 2016 as a "fluctuation" or "surge" claim, rather than just admitting that the compressor and/or starter assembly on a 12-year old refrigerator may very likely fail on its own.

**Exhibit C**, 6:16-20. This is speculation. Greenberg will testify that the refrigerator compressor motor has never before or since failed in any respect. The demise of the starter relay which can only be due to an electric surge during his absence prevented the refrigerator from restarting. **Exhibit GG**.

PG&E also denies that its activities could have caused the surge. First, it alleges that it was not doing work in Fairfax on the dates when Greenberg was in Hawaii.

> The documents produced by PG&E conclusively establish that **no work was being conducted by PG&E** on the San Rafael 1108 Circuit (that provides power to 47 Bolinas Road) from February 14 through 21, 2016, the period during which Greenberg was out of town.

**Exhibit C**, 6:21-23 emphasis added. See also **Exhibit C**, 4:14-21 (substantially the same representation). PG&E relies on a work schedule titled "Submitted Work for February 2016" produced in response to a document request and attached as Exhibit B to a declaration by Jennifer

Dodge, its counsel.  **Exhibit D**.

Second, PG&E disingenuously has contended that it has no record of an outage on the San Rafael 1108 Circuit that it states covers Fairfax.  These denials were made in letters from PG&E responding to Greenberg's submission of the claim to PG&E in 2016.  **Exhibits E and F**.  The reason these denials are disingenuous is that they only address outage information available to PG&E but not surges.

> **Though a problem is not detected in our substation**, there can be momentary voltage disturbances due to many causes beyond the control of PG&E, such as birds, falling tree limbs, squirrels, cars striking or brushing against our poles, balloons, kites, etc.

**Exhibit E**, emphasis added.  Further,

> **When we are unable to confirm that a service interruption occurred, it is typically an indication that** there was either an internal problem with your equipment, or **there was a temporary occurrence beyond the control of PG&E that affected the service voltage delivered.** Examples of such occurrences include, but are not limited to, birds cross-phasing conductors, tree limbs making contact with conductors during windy conditions, and vehicles striking our facilities, causing a jarring sensation to the facilities.

**Exhibit F**, emphasis added.

PG&E's denials are materially false or misleading.  As Greenberg will testify, at the time of the incident, PG&E had for months had an open permit and experienced difficulties and delays on the installation of a three-phase power upgrade next door, at 31 Bolinas Road, Fairfax, and along Bolinas Road, for a newly built/being built restaurant location, which is a mixed use, commercial/residential complex that underwent an extensive renovation.  This work was not completed until April 6, 2016.  At the time, Greenberg was told by PG&E crew members that the upgrade of the power to three-phase power was the cause of one of the many power outages, fluctuations, and related surges, including when a nearby pole transformer blew.

**4.  PG&E's Denials Exposed as False**

Knowing that PG&E's claims of no work in Fairfax during the relevant period were false, Greenberg commenced the pursuit of public records from the Town of Fairfax.  **Exhibit G**.  The Town's responses led to the mention of work done by Veteran Power, a PG&E construction contractor.  **Exhibit G**, p. TG353.  Another document produced by the Town was an email from

1   David Brown, the PG&E project manager for the 31 Bolinas upgrade, to Mark Lockaby, the Town

2   of Fairfax Building Official, and Brad Schwan, the owner of 31 Bolinas. **Exhibit H**. Although

3   this exchange occurred after the relevant period, it confirms that extensive work had been

4   underway prior.

> So our electric group is working towards installing all the electric related cable and equipment in advance of energizing the new transformer and service to 31 Bolinas. . . . Brad, I know I gave you the impression that we would have the new service hotted up this week. However scheduling restraints due to the outage has pushed this activity out to March 16th.

**Exhibit H**.

Based on this information, Greenberg subpoenaed business records from Veteran Power, Inc. ("Veteran Power") concerning the work done in Fairfax during and around the relevant time period. Veteran Power duly responded and produced through counsel its electronic files on the 31 Bolinas project. Its CEO, Michael Robirds, subsequently certified under oath as the custodian of records that the produced records constituted the business records of Veteran Power. **Exhibit I**. As such, they are admissible under Rule 803(6) of the Federal Rules of Evidence.

### 5. Veteran Power's Work at 31 Bolinas Road

Veteran Power was PG&E's contractor for the 31 Bolinas project. PG&E and Veteran Power executed a Contract Work Authorization on October 26 and 27, 2015. **Exhibit J**. The 31 Bolinas project was a major upgrade to accommodate new meters and underground transformers. See proposed construction map, **Exhibit K**, and proposed Circuit Map, **Exhibit L**. Veteran Power also engaged a subcontractor to prepare a traffic control plan. **Exhibit M**. Page 4 of Exhibit M is an aerial photographic map of the project, including the location of the Property next door to 31 Bolinas Road.

The 31 Bolinas project did not go smoothly. Based on daily work reports prepared by Veteran Power, the first site visit to commence the excavation was on November 30, 2015. **Exhibit N**. The report states: "We found an unmarked encasement in the alley @ a depth of 40"(see photographs please)." In the first photograph in Exhibit N, the front entrance to the Property can be seen down the sidewalk. Veteran Power returned the next day, December 1, 2015. **Exhibit O**. The report states:

> No location was found in the alley to install new 7 box, there were too many conflicts with existing utilities. . . . PG&E needs to figure out vault placement for this job before we can make any progress.

As a result of the issues identified by Veteran Power, PG&E decided to delay the project until after the holidays in consultation with Mark Lockaby, the Fairfax Building Official and in email exchange to allow Brad Schwan, the owner, to "use his existing 400 amp service to feed the new switchgear." **Exhibit P**.

Based on documents produced by PG&E and Veteran Power, the proposed construction map and the proposed circuit map were revised. **Exhibit Q**, **Exhibit R**. Included in the revised map was a direction to move designated customers, including the Property – 47 Bolinas A and B – from one CGC to another. See **Exhibit S**, a more readable copy of the proposed circuit map. David Brown of PG&E explained what CGC refers to in his deposition, referring to **Exhibit K**:

> Q In the mapping notes in the center right here, there's references to -- it says, "Please remove the following customers from CGC," followed by a number. What does CGC stand for?
>
> A California Grid Coordinate. It's -- it's a location for the transformer. We -- we -- it's the way to map -- we -- we map our transformers.
>
> Q And what was the purpose of moving these customers to a different grid coordinate?
>
> A So the original customers on -- they -- they -- they're -- they're fed from transformers. To balance the load, we determined we had to add a new transformer because of the customers adding load and with that, we took some of the load from the -- the original transformer and moved it to the new transformer.

**Exhibit SS**, 17:8-23.

On February 9, 2016, Veteran Power returned to 31 Bolinas only to encounter a new problem. "we [started] hand digging on the sidewalk and we got about 20' away from the box and on those 20' we found two unmarked utilities." **Exhibit T**. On February 15, 2016, Veteran Power submitted a proposed change order for approval by PG&E, citing extra costs arising from "existing utilities found while potholing" and other redesign expenses. **Exhibit U.**

Also on February 15, 2016, when Greenberg was in Hawaii, Veteran Power returned to 31 Bolinas: "Today we hand dug 50' of trench at 48" deep and backfield [sic] it." **Exhibit V**. The photographs show the extent of the trenching. Id. Similar work by Veteran Power continued on February 15, 17, and 18, 2016. See photographs in **Exhibits W, X, and Y.** The Daily Job Safety

Analysis indicates that backfilling generates "loud noise Proper PPE must be used." **Exhibit W**, p. 5. See also **Exhibit V** p. 5 and **Exhibit Y**, p. 5. The project continued on February 22, 2016, along with the discovery of more unmarked utilities. **Exhibit Z.** On March 2, 2016, PG&E authorized the Veteran Power's proposed change order. **Exhibit AA.**

### 6. PG&E Discovers Defective Electrical Work at 31 Bolinas Road

As indicated in David Brown's email, **Exhibit H**, the 31 Bolinas project was set to resume with a planned outage on the evening of March 16, 2016. However, as reported by the Veteran Power Daily Report for that day, the work was cancelled because the wrong people got notified of the shut down. **Exhibit BB.** After prepping for the work, it was determined that the wrong customers were notified of the outage." **Exhibit CC.** The project was finally concluded on April 6, 2016, but not without one more mishap recorded in the Veteran Power Daily Report:

> THE WAY WHEN PGE CUT THE FEED ON THE LAST BOX IN FRONT OF 31 BOLINAS THERE WAS A STREET LIGTH [sic] GETTING FED FROM THERE BUT WHEN THEY CUT THE CABLE THERE WAS NO MORE FEED FOR IT SOMEBODY WILL HAVE TO RUN NEW CONDUIT TO THAT BOX OR REROUTE THE ABANDON ONE IN TO THE 3x5 SECONDARY BOX.

**Exhibit EE.**

After Greenberg submitted his claim to PG&E, and it was denied by Duncan Perkins, Senior Claims Investigator – Litigation and Claims in the PG&E Law Department. **Exhibit F**, supra. Afterwards, Perkins sent Greenberg an email purporting to list the outages for the Property from 4/22/15 through 4/21/16. **Exhibit DD.** **Exhibit DD** shows the details of the Company initiated planned outages on March 16, 2016 and April 6, 2016. The description of activity on March 16, 2016, which was the first known electrical work by PG&E after the Veteran Power excavations during the week of February 15, 2016 described above. In addition to the notification of the wrong customers reported by Veteran Power, **Exhibits BB and CC**, **Exhibit DD**, p. 2, describes "Improper Construction" as one of the causes of the unplanned outage, and, per Vince Castro, the foreman, that "4365 PHASING IS NG [NO GOOD] & CAUSE OF BLOWN FUSES EARLIER ON SWITCH LOG OPERATIONS." See also, **Exhibit RR**, deposition of Duncan Dear, PG&E's person most qualified to testify about **Exhibit DD**, at pages 12 through 19,

testifying as to the interpretation of this entry.

Especially noteworthy:

> Vince Castro. Do you know who that is?
>
> A. Yes. He's a crew foreman.
>
> Q. Reports 4365 phasing his NG. What's NG?
>
> A. No good.
>
> Q. And cause of blown fuses earlier on switch log operations. Can you break that down to plain English.
>
> A. So Vince got onsite and he reported that solid blade cutout 4365. That the phasing meaning A, B and C phase was not good. I don't know what was not good about it. Maybe A was switched with B. B could have been switched with C. And that was the cause of the broken fuse.

**Exhibit RR**, 15:14 to 16:1.

> On the line that says, "Cause" on the entry it says, "Company initiated. Improper construction." What does that refer to?
>
> A. Based on what I'm reading and the Ilis report, which is what we're looking at. It is due to the misphasing -- or NG phasing, no good phasing
>
> Q. And who's responsibility is it to connect those connections?
>
> A. The crew.
>
> Q. The PG&E crew?
>
> A. Or the contractor. Whoever is performing the work.
>
> Q. Up in the upper right there's a reference to construction type. It says "UG." Do you know what that stands for?
>
> A. Underground.

**Exhibit RR**, 17:19 to 18:9.

> Q. So as you understand it, this report involves underground wiring that connected to a fuse. And because it was -- because of improper construction it somehow caused [a] fuse to be blown or [a] few of them to be blown.
>
> A. Yes.
>
> MS. DODGE: Objection. Misstates testimony. You can answer.
>
> THE WITNESS: Yes.

**Exhibit RR**, 18:23 to 19:6.

It is important to keep in mind that this was the first reported PG&E activity at 31 Bolinas after the major trenching by Veteran Power at the site. Despite numerous requests, PG&E has refused to produce any work reports of its own personnel during the period February 14, 2016 through this report of March 16, 2016. The inference has to be that whatever fuses were blown, the blown fuses occurred during the same period, including the relevant time period. This comports with what the PG&E crews told Greenberg when he returned from Hawaii.

Further, PG&E admitted in two separate letters that "Though a problem **is not detected in our substation**, **there can be momentary voltage disturbances** due to many causes beyond the control of PG&E, **such as** birds, falling tree limbs, squirrels, **cars striking or brushing against our poles**, balloons, kites, etc. **Exhibit E**, emphasis added. And, authoritatively from Dustin Perkins of the legal department,

> **When we are unable to confirm that a service interruption occurred, it is typically an indication that** there was either an internal problem with your equipment, or there was a **temporary occurrence** beyond the control of PG&E **that affected the service voltage delivered.** Examples of such occurrences include, but are not limited to, birds cross-phasing conductors, **tree limbs making contact with conductors** during windy conditions, and **vehicles striking our facilities, causing a jarring sensation to the facilities**.

**Exhibit F**, emphasis added.

PG&E has objected to Greenberg's claim based on first, their false denials that any PG&E work was taking place at 31 Bolinas during the relevant period and second, their disingenuous focus on outages they purport to detect, as opposed to surges or voltage disturbances that they admit can occur without their knowledge. PG&E's admissions that cars striking or brushing against poles, or vehicles causing a jarring sensation, can be the cause of such unreported disturbances illustrates how probable it is that some negligent activity by Veteran Power when doing heavy construction next door to the Property, or PG&E's admissions that the construction and phasing at 31 Bolinas was no good, leading to blown fuses, constitutes compelling evidence that a PG&E electrical surge caused the starter relay on the refrigerator to fail. This is especially true in light of the fact that only an electrical surge could have caused the failure of the starter relay.

PG&E's denial of liability based on the absence of any record, when by its own admission such surges do not get recorded, should be rejected.

### 7. Causation

Because Greenberg was unable to directly observe what happened at the time, his evidence is necessarily circumstantial. "[T]he fact that evidence is 'circumstantial' does not mean that it cannot be 'substantial.' Relevant circumstantial evidence is admissible in California. Moreover, the trier of fact is entitled to accept persuasive circumstantial evidence even where contradicted by direct testimony." (*Hasson v. Ford Motor Co.* (1977) 19 Cal.3d 530, 548 [138 Cal.Rptr. 705, 564 P.2d 857], overruled on other grounds in *Soule v. GM Corp.* (1994) 8 Cal.4th 548 [34 Cal.Rptr.2d 607, 882 P.2d 298].) The foregoing is taken from Jury Instruction 202, in Judicial Council of California Civil Jury Instructions (CACI).

### 8. Agency

It cannot be denied that Veteran Power was PG&E's agent in this matter. "It is a settled rule of the law of agency that a principal is responsible to third persons for the ordinary contracts and obligations of his agent with third persons made in the course of the business of the agency and within the scope of the agent's powers as such, although made in the name of the agent and not purporting to be other than his own personal obligation or contract." (Daniels v. Select Portfolio Servicing, Inc. (2016) 246 Cal.App.4th 1150, 1178 [201 Cal.Rptr.3d 390].) The foregoing is taken from Jury Instruction 3701, in Judicial Council of California Civil Jury Instructions (CACI).

### 9. Damages

Greenberg seeks recovery of damages under California Civil Code Section 3333 and other applicable statutes or principles of law for all detriment to him and his real and personal property caused by the actions of PG&E. Greenberg reserves the right to present relevant evidence as to any and all elements of his damages.

The damages that Greenberg incurred as a result of PG&E's activities include the loss of the contents of Greenberg's refrigerator and freezer, significant damage to the laminate floor, subfloor, and underlayment in the downstairs kitchen, which needs to be replaced, and other costs

Trodella & Lapping LLP
540 Pacific Avenue
San Francisco, CA 94133

1  including loss rental income and relocation costs for Greenberg to move into the other unit,
2  according to proof.
3  Damages, including the cost to repair, are established by the following exhibits. The costs
4  to restore the floor have increased with the passage of time. They consist of the following:
5  Itemized contents of the refrigerator with prices. **Exhibit HH.**
6  Photographic evidence of lost food items. **Exhibit JJ.**
7  Starter relay replacement. **Exhibit KK.**
8  City Carpets estimate March 2016. **Exhibit LL.**
9  AIP Estimate March 2016. **Exhibit MM.**
10 Receipt for storage of furniture. **Exhibit NN.**
11 Photographic evidence from the Dustin Perkins file. **Exhibit OO**.
12 City Carpets estimate March 2016. **Exhibit PP.**
13 Updated and comprehensive estimate from Dennis Webb Construction. **Exhibit QQ.**

**10  Tariff Rule 14 Does Not Shield PG&E From Its Negligence**

PG&E claims that it was nowhere near the site of the power outage, but then claims without evidence that the outage was necessary, in its sole opinion, to maintain, improve, repair or expand its distribution system in order to invoke the protections of Tariff Rule 14. But, as the reported cases in PG&Es footnote 2 establish, Rule 14 requires PG&E "to exercise 'reasonable diligence and care' to furnish a continuous and sufficient supply of electricity to its customers. It further provides that PG&E shall 'not be liable for interruption or shortage or insufficiency of supply, or any loss or damage of any kind or character occasioned thereby . . . except that arising from its failure to exercise reasonable diligence.'" *Langley v. Pac. Gas & Elec. Co.*, 41 Cal. 2d 655, 660 (1953). And more recently, Magistrate Judge Spero found that Tariff Rule 14's broad exculpatory provision was ambiguous in light of the fact that "Rule 14 establishes that PG&E has a duty of reasonable diligence, and immunizes PG&E from liability for service interruptions that are *not* caused by PG&E's failure to fulfill that duty." *Tesoro Refining & Mktg. Co. LLC v. Pac. Gas & Elec. Co.*, 146 F. Supp. 3d 1170, 1183 (N.D. Cal. 2015) (emphasis in original).

## 11  Tariff Rule 2 Does Not Shield PG&E From Its Negligence

Tariff Rule 2 provides in relevant part:

> C. VOLTAGE AND FREQUENCY CONTROL (Cont'd.)
>
> 1. CUSTOMER SERVICE VOLTAGES (Cont'd.)
>
> b. Exceptions to Voltage Limits
>
> Voltage may be outside the limits specified when the variations:
>
> 1) Arise from the temporary action of the elements.
>
> 2) Are infrequent momentary fluctuations of a short duration.
>
> 3) Arise from service interruptions.
>
> 4) Arise from temporary separation of parts of the system from the main system.
>
> 5) Are from causes beyond the control of PG&E.
>
> c. It must be recognized that, because of conditions beyond the control of PG&E or customer, or both, there will be infrequent and limited periods when sustained voltages outside of the service voltage ranges will occur. Utilization equipment may not operate satisfactorily under these conditions, and protective devices may operate to protect the equipment.
>
> d. The sustained service delivery voltages are subject to minor momentary and transient voltage excursions which may occur in the normal operation of PG&E's system. Subject to the limitations of C.1.a. above, the voltage balance between phases will be maintained by PG&E as close as practicable to 2½ percent maximum deviation from the average voltage between the three phases.

Greenberg submits that none of these exceptions apply where PG&E or its contractor, negligently caused the fluctuation or surge.  This was not caused by the elements, or a momentary fluctuation, or a service interruption (according to PG&E) or a temporary separation of parts, or from a cause beyond the control of PG&E or its contractor.

Respectfully submitted.

Dated:  June 16, 2022                            TRODELLA & LAPPING LLP

                                                          By:   /s/ Richard A. Lapping
                                                                     Richard A. Lapping
                                                                     Attorneys for Todd Greenberg