1  BROWN RUDNICK LLP
   David J. Molton (SBN 262075)
2  (DMolton@brownrudnick.com)
   Eric R. Goodman (admitted pro hac vice)
3  (EGoodman@brownrudnick.com)
4  Seven Times Square
   New York, New York 10036
5  Telephone: (212) 209-4800
   Facsimile: (212) 209-4801
6
7  BROWN RUDNICK LLP
   Joel S. Miliband (SBN 077438)
8  (JMiliband@brownrudnick.com)
   2211 Michelson Drive, Seventh Floor
9  Irvine, California 92612
   Telephone: (949) 752-7100
10 Facsimile: (949) 252-1514
11 *Attorneys for Fire Victim Trustee*
12
   **UNITED STATES BANKRUPTCY COURT**
13 **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
   **SAN FRANCISCO DIVISION**
14
15

| | |
|---|---|
| **In re:** | Bankruptcy Case No. 19-30088 (DM) |
| | Chapter 11 |
| **PG&E CORPORATION,** | (Lead Case) |
| | (Jointly Administered) |
| -and- | |
| **PACIFIC GAS AND ELECTRIC COMPANY,** | **OBJECTION OF FIRE VICTIM TRUSTEE TO MOTION OF WILLIAM B. ABRAMS PURSUANT TO FED. R. BANKR. 2004 FOR ENTRY OF AN ORDER AUTHORIZING DISCOVERY AND HEARINGS REGARDING THE ADMINISTRATION OF THE FIRE VICTIM TRUST** |
| **Debtors.** | |
| ☐ **Affects PG&E Corporation** | [Relates to Docket No. 12440] |
| ☐ **Affects Pacific Gas and Electric Company** | |
| ☒ **Affects both Debtors** | **Hearing to be Determined by the Court** |
| *All papers shall be filed in the Lead Case, No. 19-30088 (DM).* | |

The Honorable John K. Trotter (Ret.), in his capacity as the Trustee of the PG&E Fire Victim Trust (respectively, the "**Trustee**" and the "**Fire Victim Trust**"), appointed and established pursuant to the Plan (as defined below), hereby objects and responds (this "**Objection**") to the *Motion of William B. Abrams Pursuant to Federal Rule of Bankruptcy Procedure 2004 for Entry of an Order Authorizing Discovery and Hearings Regarding the Administration of the Fire Victim Trust* [Docket No. 12440] (the "**Motion**"). In support of the Objection, the Trustee respectfully states as follows:

## I.    PRELIMINARY STATEMENT

The overriding focus of the Trust and the Trustee is to protect and maximize the corpus of the Trust's assets for nearly 70,000 Fire Victim claimants and to compensate those Fire Victims for their damages as quickly as possible. Through various avenues, including the Trust's website (https://www.firevictimtrust.com), letters from the Trustee to Fire Victims (all of which have been filed with this Court and/or posted on the Trust's website), and notices and releases to the public and press, the Trust has provided important information about the Trust, the status of its claims administration and other of its activities, all of which has been done while administering one of the largest and most complex post-bankruptcy trusts in this country.

The Fire Victim Trust has at all times since its inception complied with its disclosure obligations to Fire Victims and this Court. The PG&E Fire Victim Trust Agreement dated as of July 1, 2020 (the "**Trust Agreement**") governs the Trust's disclosure obligations as well as the rights of beneficiaries to request and receive information from the Trust.  There is no contested matter involving the Trust before the Court to introduce formal rules of discovery, and it is inappropriate to employ tools that are designed to elicit information from a debtor that has availed itself of the benefits of Chapter 11 such as Federal Rule of Bankruptcy Procedure 2004 ("**Rule 2004**").  Rule 2004 confines the scope of examination of an entity to "the acts, conduct, or property or to the liabilities and financial condition of the debtor, or to any matter which may affect the administration of the debtor's estate, or to the debtor's right to a discharge," none of which are involved in the pending request.

Even if it was appropriate for this Court to allow a Fire Victim to use Rule 2004 to seek information from the Fire Victim Trust on matters beyond the scope of the Trust Agreement

requirements, Mr. Abrams' requests are unduly burdensome and potentially prejudicial to the interests of Fire Victims as a whole. Mr. Abrams seeks what he described at the June 7, 2022 hearing before the Court (the "**Preliminary Hearing**") as a "process" to open the Fire Victim Trust to greater transparency to Fire Victims. Mr. Abrams apparently seeks to have produced and reviewed every contract entered into by the Trust, and every piece of information and legal, investment, and consulting advice that the Trustee, his professionals, and the duly appointed Trust Oversight Committee (the "**TOC**") have relied upon in exercising their fiduciary duties. As he described at the Preliminary Hearing, Mr. Abrams would like there to be a "change in course" for the Fire Victim Trust.[1]

Having made four unsuccessful attempts since the July 1, 2020 Effective Date of the Plan to have this Court replace the TOC,[2] Mr. Abrams now seeks, through his Motion, effectively to become a TOC member at large or Trust ombudsperson so that he may receive information and share in the exercise of the consultation and consent rights granted to the TOC under the Trust Agreement with the expressed hope of steering the Trust's decision making in accordance with his singular and personal views.

The Trustee appreciates that Mr. Abrams is dissatisfied with the Plan that was confirmed in this Bankruptcy Case and the economic settlement made on behalf of Fire Victims (as he has stated many times). That is the heart of all Mr. Abrams' filings throughout this case. However, Mr. Abrams does not contend that the Trustee is unable or unwilling to carry out the mammoth tasked placed on him by the Plan in reviewing, evaluating and adjudicating more than 242,000 distinct Fire Victim Claims in accordance with California law – claims that range from personal injury and wrongful death to complex real property, vegetation and business losses. This is because over the last two

---

[1] *See* June 7, 2022 Hr'g Tr. 31: 15-22.

[2] *See Motion for Just Treatment of Victims Through Reconstitution of TOC* [Dkt. No. 8247]; *Motion to Amend Judgment and Replace All Members of TOC and Support Efficient Trust Administration* [Dkt. No. 10715]; *Motion to Enforce Victim Trust Agreement and Replace all Members of the TOC and Support Efficient Trust Administration* [Dkt. No. 10748] and *Motion to Enforce Disclosure Requirements or Reconstitute the TOC Given New Evidence of Self-Dealing and Conflicts of Interest* [Dkt. No. 11005], all of which were denied by this Court.

3

years, the Fire Victim Trust has completed its review of approximately two-thirds of all Fire Victim Claims and has sent billions of dollars of distributions to Fire Victims. The singular focus of the Trust has been to pay Fire Victims as much as possible as quickly as possible. The "process" Mr. Abrams seeks to change clearly is working, as demonstrated by the low appellate rate: an appeal is taken for less than 1% of all claims determinations. Simply put, the paucity of appeals shows that Fire Victims, represented and unrepresented, are comfortable with the results of the claims administration process. The Trustee and Claims Administrator, and, of course, the Fire Victims themselves, have no interest in miring the Trust in twenty years of claims resolution as in *Dow Corning* or twelve years and counting as in *Lehman*. As this Court has recognized, some Fire Victims have already waited nearly seven years to be compensated for the devastation they experienced.[3]

Mr. Abrams' particular concern focuses on his distress over a specific element of the consideration received from the Debtors by the Fire Victim Trust under the Plan – the 478 million shares of common stock of PG&E Corporation ("**PG&E Stock**"), which, as the Court knows, was intended to be approximately half of the consideration provided to Fire Victims under the Plan. However, as the Court also knows, the PG&E Stock held by the Trust presents significant complexities and challenges as a publicly traded equity security.

First, the Court will recall that to safeguard the upside value (above the approximately $9 fair market value basis of the stock on the Effective Date), the Fire Victim Trust negotiated a complex exchange agreement (approved by the Court) to obtain material tax savings for the Trust.

Second, and critically, the Fire Victim Trust is a very large shareholder of one of the largest utilities in the country. The Trustee's financial advisors have consistently advised that it is critically important that the Fire Victim Trust manage its holdings in PG&E Stock carefully and responsibly so as to allow for optimal monetization at the appropriate times. The Trustee and the TOC[4] must take advice from experienced investment professionals, legal advisors and other consultants, consistent

---

[3] *See* June 7, 2022 Hr'g Tr. 37:13-18.

[4] The Trust Agreement requires that the Trustee obtain the consent of a majority of the TOC to sell PG&E Stock. *See* Trust Agreement § 2.2(f).

4

with their fiduciary duties to all Fire Victims. The Trustee's role is not to "fix" the Plan as Mr. Abrams wishes but rather, in accordance with the governing agreements and consistent with the Trustee's fiduciary duties thereunder to: (1) protect and maximize the assets conveyed to the Trust under the Plan; (2) undertake a fair, equitable, efficient claims process for hundreds of thousands of unique claims; and (3) deliver distributions to all Fire Victims in a timely manner.

Finally, the Trust Agreement vests the decision-making authority over Trust decisions and expenditures in the Trustee and expressly provides for oversight of such decisions by another body of fiduciaries – the TOC. Oversight of Trust administration is given to the TOC on behalf of all Fire Victims. This is the only way a Trust with the size and complexity of the Fire Victim Trust can be managed efficiently for the benefit of all Fire Victims. As described below, these governance foundations are set forth in the Trust Agreement. At all times since the Effective Date, the Trustee has complied fully and properly with all these provisions.

The Trustee recognizes that the Fire Victim Trust's administration is a matter of great importance to the people of California, and especially to the Fire Victims. The Trustee is supplementing the Annual Report filed on April 29, 2022, to provide a revised **Exhibit A**, which contains more detail concerning its calendar year 2021 expenditures. In addition, the Trustee has recently published on the Trust's website (https://www.firevictimtrust.com) a letter to Fire Victims that provides updates on many items identified by Mr. Abrams in his pleadings.

The balance of Mr. Abrams's requests is burdensome and prejudicial to the Fire Victim Trust and other Fire Victims in that, *inter alia*, these requests seek public disclosure of strategy, plans, advice and decisions regarding litigation, lobbying and legislative efforts under consideration. The Trustee cannot allow potential prejudice to stock monetization efforts and prosecution of assigned causes of action that can be caused by such disclosures. These functions are undertaken in accordance with the Trust Agreement with oversight of the TOC, as required and appropriate. The members of the TOC were selected and appointed in accordance with section 6.8(e) of the Court-confirmed Plan and section 6.1 of the Trust Agreement approved therewith, and The Trust and the TOC are functioning fully in accordance with the Trust Agreement, the Plan, and the Confirmation Order and Mr. Abrams' personal views opinions on Trust governance generally, and asset monetization

specifically, is neither permitted nor beneficial to Fire Victims. In addition, many of the documents sought by Mr. Abrams are privileged and the Trust reserves all rights with respect to all documents protected by attorney-client, attorney work product or other privilege.

## II.      BACKGROUND

### A.      The Chapter 11 Plan and the Trust Agreement.

On January 29, 2019 (the "**Petition Date**"), PG&E Corporation ("**PG&E Corp.**") and Pacific Gas and Electric Company ("**Utility**"), as debtors and debtors in possession (collectively, "**PG&E**" or the "**Debtors**"), commenced with the Court voluntary cases under chapter 11 of the Bankruptcy Code (the "**Chapter 11 Cases**"). On February 15, 2019, the United States Trustee appointed an Official Committee of Tort Claimants (the "**TCC**").

On December 9, 2019, the Debtor filed its Motion for entry of an Order authorizing them to enter into the *Tort Claimants RSA Motion* [Dkt. No. 5038] (the "**TCC RSA**"). The TCC RSA provided critical provisions of the Plan and included various commitments by the parties in structuring the post-effective date Trust to address Fire Victim Claims, including the composition of a Trust Oversight Committee to provide oversight to the administration of such Trust.

On June 19, 2020, the Debtors filed the *Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization dated June 19, 2020* [Dkt. No. 8048] (together with all schedules and exhibits thereto, and as further supplemented, the "**Plan**"). The Plan incorporated the terms of the TCC RSA as well as the terms of the separate *Subrogation RSA* (approved by Order dated December 19, 2019) [Dkt. No. 5173]. Over 85% of Fire Victims who submitted ballots cast ballots in favor of the Plan.[5]

On June 20, 2020, the Bankruptcy Court entered the *Order Confirming Debtors' and Shareholder Proponent's Joint Chapter 11 Plan of Reorganization Dated June 19, 2020* [Dkt. No. 8053] (the "**Confirmation Order**"). On June 29, 2020, the Trustee filed its *Notice of Appointment of Fire Victim Trust Oversight Committee in Accordance with Confirmation Order* [Dkt. No. 8195],

---

[5] *See Declaration of Christina Pullo of Prime Clerk LLC Regarding Solicitation of Votes and Tabulation of Ballots Cast with Respect to the Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization* [Dkt. No. 7507].

6

and the Effective Date of the Plan occurred on July 1, 2020. Pursuant to the Plan and Confirmation Order, the Trust Agreement became effective on the Effective Date, the Trust was established and funded with a combination of cash, stock, rights to deferred cash and causes of action (all funding, collectively, the "**Aggregate Fire Victim Consideration**"). Pursuant to the TCC RSA and the Plan, the Trust received 476,995,175 shares of PG&E Stock on the Effective Date (then worth approximately $9.03 per share) and an additional 748,415 shares of PG&E Stock on August 3, 2020 (then worth approximately $9.10 per share), for an aggregate initial value of $4,314,077,006 (the "**Initial Stock Value**").

## B. The Grantor Trust Election and Private Letter Ruling.

At the time the TCC RSA was approved by this Court, the Aggregate Fire Victim Consideration was described as having an aggregate value of approximately $13.5 billion.[6] The stock consideration, however, was not guaranteed to be valued at $6.75 billion on the Effective Date; rather the amount of shares to be delivered to the Fire Victim Trust was calculated pursuant to an agreed-to formula.[7] PG&E Stock issued to the Trust pursuant to the Plan was, of course, a critical component of the Aggregate Fire Victim Consideration. The Disclosure Statement and Disclosure Supplement identified the risks associated with the Trust being funded with PG&E Stock.[8]

---

[6] *See Debtors' Motion to Approve Tort Claimants' RSA* [Dkt. No. 5038 at 12].

[7] PG&E describes the consideration paid to the Trust in its SEC filings as:

> . . . .The Aggregate Fire Victim Consideration that has funded and will fund the Fire Victim Trust pursuant to the Plan for the benefit of holders of the Fire Victim Claims consists of (a) $5.4 billion in cash that was contributed on the Effective Date of the Plan, (b) $1.35 billion in cash consisting of (i) $758 million that was paid in cash on January 15, 2021 and (ii) the remaining balance of $592 million to be paid in cash on or before January 15, 2022, in each case pursuant to the terms of the Tax Benefits Payment Agreement (as defined below), and (c) an amount of common stock of the reorganized PG&E Corporation valued at 14.9 times Normalized Estimated Net Income (as defined in the TCC RSA), except that the Fire Victim Trust's share ownership of the reorganized PG&E Corporation would not be less than 20.9% based on the number of fully diluted shares of the reorganized PG&E Corporation outstanding as of the Effective Date of the Plan, assuming the Utility's allowed ROE as of the date of the TCC RSA. Pursuant to a stipulation approved by the Bankruptcy Court on June 12, 2020, PG&E Corporation, the Utility, the TCC, and the trustee of the Fire Victim Trust agreed that the percentage ownership of the Fire Victim Trust would be 22.19% of the outstanding shares of PG&E Corporation on the Effective Date, subject to potential adjustments

[8] *See, e.g., Disclosure Statement for Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization* [Dkt. No. 6353] at 4 ("The $6.75 billion value of the common stock of Reorganized PG&E Corp. is based on a formula (footnote continued)

Neither the Initial Stock Value nor the trading price of PG&E Stock since the Effective Date has allowed the Fire Victim Trust to monetize the PG&E Stock at the nominal value attributed to it in the TCC RSA. Managing the difference between the expectation that Fire Victims were to receive $6.75 billion in PG&E Stock and the reality of the PG&E Stock's actual value over the past two years has been a principal focus of the Trustee and the TOC. The Trustee's overriding objectives are to maximize the assets contributed to the Trust for the benefit of all Fire Victims and timely process claims so that distributions can be made. Accordingly, the Trustee and his team are always focused, within the constraints of the Trust's authority, to investigate and pursue ways to maximize the value of the Aggregate Fire Victim Consideration.

The largest publicly disclosed effort to date was the successful negotiation and consummation of the Exchange Transaction in Support of a Grantor Trust Election. On April 5, 2021, the Trustee and the Reorganized Debtors filed their *Joint Motion of Fire Victim Trustee and Reorganized Debtors Regarding Exchange Transaction in Support of a Grantor Trust Tax Election* [Dkt. No. 10497] (the "**Exchange Transaction Motion**" and the related agreement, the "**Exchange Transaction Agreement**"). Entry into the Exchange Transaction Agreement allowed the Trust to take advantage of tax savings on monetization of PG&E Stock, such that it would not have to pay taxes on the gain between the tax basis of PG&E Stock delivered to the Trust (roughly $9 per share, as noted above) and a higher sale price. At the time of the Exchange Transaction Motion, and even today, estimated tax savings benefiting all Fire Victims amount to several hundred million dollars, which value would not be available under the Plan absent entry into the Exchange Transaction Agreement. On April 29, 2021, after notice and multiple related hearings, the Court approved entry into the Exchange Transaction Agreement [Dkt. No. 10598]. The Exchange Transaction Agreement was publicly disclosed, including by posting it on the Trust's Website in accordance with the Court's direction.

---

set forth in the Tort Claimants RSA and incorporated in the Plan. The $6.75 billion value does not necessarily reflect the actual value of the stock to be held by the Fire Victim Trust on the Effective Date and thereafter. The actual value of the stock on the Effective Date and thereafter could be greater or less than the $6.75 billion based on the future trading value of the common stock of Reorganized PG&E Corp.") (bold emphasis and capitalization omitted).

Case: 19-30088    Doc# 12527    Filed: 06/21/22    Entered: 06/21/22 15:08:05    Page 8 of 33

### C. Stock Monetization to Date.

With the benefits of the Exchange Transaction Agreement in hand, the Trustee, with his professionals, advisors and in consultation and with the consent of the Trust Oversight Committee, has been executing a sell-down plan to monetize the PG&E Stock in accordance with the Trust's governing documents. On February 2, 2022, the Trustee filed its SEC Form 4 and Schedule 13 D/A announcing the January 31, 2022 sale of 40 million shares of PG&E Stock at a price of $12.09 per share through its investment advisor Morgan Stanley & Co. LLC, yielding approximately $480 million in cash to the Trust's corpus.

On April 18, 2022, the Trustee filed its SEC Form 4 and Schedule 13 D/A announcing the April 14, 2022 sale of 60 million shares of PG&E Stock at a price of $12.04 per share through its investment advisor Morgan Stanley & Co. LLC, yielding approximately $720 million in cash to the Trust's corpus.

In addition, on a regular basis, the Trustee consults with the Trust's investment professionals to anticipate additional monetization opportunities, as appropriate for the Fire Victim Trust.

The Trustee has disclosed that he and his team are exploring additional ways to maximize the value of the PG&E Stock still held by the Trust. Premature discussion of potential options may disrupt the Trustee's ability to execute them. It must be recognized that these matters concern a publicly traded equity security, and the Fire Victim Trust is a substantial holder. The Trustee, with legal advice, must carefully consider what he may or may not disclose so as not to run afoul of legal strictures pertaining to the publicly traded securities markets. In all cases, the Trustee operates with an intense focus on optimizing value for the Fire Victims while subject to obligations and restrictions imposed by governance documents, binding agreements and various regulatory agencies. The Trust has operated and disclosed its monetization decisions with respect to the PG&E Stock to the fullest extent permitted in the publicly traded securities markets in which the Trust must operate. Although some Fire Victims and certain members of the media would like to "fix" the Trust's decision-making functions, this Court will recognize that to do so would fundamentally obstruct the appropriate administration of the Trust. No further disclosures about the Trust's future monetization plans can be ordered nor would any such disclosures be beneficial to Fire Victims.

9

**D.      The Annual Reports and Claims Reports.**

On April 29, 2021, the Trustee filed its Annual Report and Claims Report for the fiscal year ending December 31, 2020 [Dkt. No. 10601] (the "**2020 Annual Report**") in accordance with the Trust Agreement. As required by Trust Agreement Section 2.2(c), the 2020 Annual Report contains the special-purpose financial statements of the Trust and was audited by BDO USA, LLP, the Trust's independent auditor. The financial statements included the assets and liabilities of the Trust as of the end of the fiscal year and the additions, deductions and cash flows for the fiscal year. The 2020 Annual Report also contains an opinion from BDO USA, LLP as to the fairness in all material respects of the special-purpose financial statements.

In response to the filing of the 2020 Annual Report, claimant Theresa McDonald filed an emergency pleading seeking information into what she believed was a $12.7 million discrepancy in cash due to the Fire Victim Trust from PG&E under the Plan [Dkt. No. 10607] (the "**McDonald Pleading**"). In response to the McDonald Pleading, the Trustee, through his professionals, met with Ms. McDonald to resolve her questions, explaining and demonstrating that all funds due from PG&E under the Plan were received and accounted for. Additionally, the Trustee filed its *Response of Fire Victim Trustee to Emergency Pleading of Theresa McDonald Seeking Explanation of Fire Victim Trust Annual Report* [Dkt. No. 10619] providing a publicly available explanation and resolution to Ms. McDonald's questions.[9]

On April 29, 2022, the Trustee filed its Annual Report and Claims Report for the fiscal year ending December 31, 2021 [Dkt. No. 12287] (the "**2021 Annual Report**") in accordance with the Trust Agreement.  As required by Trust Agreement Section 2.2(c), the 2021 Annual Report contains the special-purpose financial statements of the Trust and was audited by BDO USA, LLP, the Trust's independent auditor. The financial statements included the assets and liabilities of the Trust as of the end of the fiscal year and the additions, deductions and cash flows for the fiscal year. The 2021

---

[9] The Trustee also filed a *Notice of Errata* with respect to the fiscal year 2020 report [Dkt. No. 10745] to correct incorrectly identified "losses" to "gains" in the Annual Report.

Case: 19-30088    Doc# 12527    Filed: 06/21/22    Entered: 06/21/22 15:08:05    Page 10 of 33

Annual Report also contains an opinion from BDO USA, LLP as to the fairness in all material respects of the special-purpose financial statements.

###    E.    The Trust's Continuous Public Facing Disclosure.

In addition to informal communications with Fire Victims (or, with respect to Fire Victims represented by counsel, with counsel) such as emails and phone calls (including those regularly and routinely held by Trust professionals with Mr. Abrams), there are several significant sources through which the Fire Victim Trust, the Trustee and Claims Administrator provide information and disclosure to Fire Victims.

- **Fire Victim Trust Website** (http://www.firevictimtrust.com)**.** The Trustee and Claims Administrator maintain a comprehensive and continually updated website (the "**FVT Website**") to provide access and information to Fire Victims in accordance with Trust Agreement Section 2.2(g). The FVT Website serves two primary functions. First, it hosts the Claims Portal, which is the secure access point for represented Fire Victims (through their attorneys) and unrepresented Fire Victims to access their own claims documents and to prosecute their claims with the Claims Administration Team and the Claims Processor in accordance with the Court-approved Claims Resolution Procedures. Through the Claims Portal, Fire Victims have access to staff of the Claims Processor and Claims Administration team to respond to questions and guide Fire Victims through the process on an individual basis.

  The second function and purpose of the FVT Website is to provide information to the public. The FVT Website provides easy access to 232 Frequently Asked Questions and Answers broken into nineteen (19) different categories including the timeline for processing claims, payments, questions about pro rata payments and general information about the Trust. It also makes available to all the Trust's governing documents, information about the Trust's leadership, certain forms, an alerts section that provides information about policy decisions such as deadlines and extensions, and recent letters and communications from the Trustee and Claims Administrator. The FVT Website provides access to the Trust's reports and statistical analysis, including on the home page a rolling update on the Claims Process and

the statistical back up to demonstrate claims processing and distributions. The FVT Website also provides general contact information for questions to the Fire Victim Trust and contains a fraud reporting function. Importantly, the website uses banner alerts of recent updates and statements from the Trustee, including on matters of media and public interest.

- **Bankruptcy Case Docket.** The Trustee also provides on this Court's docket notice of certain significant actions that it seeks to take when Court approval or intervention is required or desired. For example, in connection with its prosecution of certain claims and causes of action held by the Trust for the benefit of Fire Victims, the Trust has filed discovery requests pursuant to Rule 2004 in connection with the Debtors' causes of action assigned to the Trust and/or to facilitate claims administration [10] [*e.g.,* Dkt. No. 10913]. Similarly, in prosecuting certain causes of actions against the Debtors' former Directors and Officers held for the benefit of Fire Victims, the Trust has made certain filings before the Court. *See e.g.*, *Trotter v. PG&E Corp. (In re PG&E Corp.)*, Adv. Pro. 21-03012, *Plaintiff Fire Victim Trustee's Motion to Remand or Abstain Regarding Action and Memorandum of Points and Authorities in Support Thereof*, Adv. Pro. Dkt. No. 3. As discussed above, in each case in which the Trustee has taken a significant action for which he believes Court approval may be required or desired, or for which he believes it is in the interests of Fire Victims to have a notice and an opportunity to be heard, he has filed such applications on the docket. *See, e.g.,* Exchange Transaction Motion. Finally, the Trustee has also posted certain letter updates to Fire Victims on the Court's docket [*See, e.g.*, Dkt. No. 1176 (Letter dated Sept. 1, 2021)].

- **Interviews, Press Articles, Video Interviews.** From time to time the Trustee and Claims Administrator provide media interviews either in response to requests or on their own initiative in order to provide further information and clarification to the public on issues that bear on the Trust. The Trustee has released video presentations on general trust issues,

---

[10] The Trustee's use of examination pursuant to Rule 2004, unlike Mr. Abrams' attempted use, is warranted and appropriate. In fact, the Trust stepped into the shoes of the TCC's Rule 2004 regime that was established to investigate the Debtor's claims and causes of action.

including explanations of the stock issues bearing on the trust as well as its impact on pro rata distributions.  A transcript of each of these presentations has been filed with this Court.

### F.    Mr. Abrams' Rule 2004 Interrogatories and Document Requests.

The Motion asserts that the 2021 Annual Report does not provide disclosure of the expenses of the Trust sufficient to determine whether such expenses are reasonable. As explained herein and at the Preliminary Hearing, such expenses have been determined to be reasonable by both the Trustee and the TOC in its oversight role with consent rights over the Trust's budget, and these expenses were adequately disclosed in accordance with the Trustee's obligations in duly audited financial statements.  The Motion goes far beyond seeking additional detail into the Trust's expenses and instead seeks to establish and impose a continuing formal discovery program on the Fire Victim Trust that would be divert Trust time and funds away from claim determination and payment. The Motion seeks to impose overly broad discovery obligations, requesting all documents, communications and mental impressions and decisions made or relied upon by the Trust into all matters of administration, operation, and strategy.  This information is neither necessary nor appropriate for disclosure, is burdensome to the Trustee and will require significant Trust resources. Importantly, public disclosure of the Trust's plans and strategies will impair the Trustee's ability to execute such plans or strategies and will be significantly detrimental to the objective of maximizing the value of Trust assets.

Given the Trustee's continued compliance with express terms of the Trust Agreement, the Trust's additional voluntary disclosures and the information provided herein, the Trustee submits that no further disclosures are necessary or appropriate.

## III.   OBJECTION

### A.    The Fire Victim Trust Has Complied With The Disclosure Obligations Under the Trust Agreement And Mr. Abrams Has No Additional Rights To Information.

The Fire Victim Trust is a Delaware Statutory Trust formed under the Delaware Statutory Trust Act. 12 Del. C. §§ 3801–3829.  Under the Delaware Statutory Trust Act, the rights of beneficiaries of the Trust and the rights and obligations of Trustees and an oversight committee are prescribed by the statute except as expressly modified by the Trust's governing instrument. *Id.* at § 3806.  Much like the actions of a reorganized debtor are not constrained to the obligations of a debtor-

13

in-possession once the discharge has been entered but rather are governed primarily by applicable non-bankruptcy law, consideration of the relief requested in the Motion must be made under the governing law of the Fire Victim Trust and not by reference to what would be appropriate in connection with a pre-confirmation debtor or trustee.

Trust Agreement Section 2.2(g) explicitly describes the information that Fire Victims are entitled to receive from the Trust:

> "(g) *The Trustee shall publish information of the Trust Website as he deems prudent in his or her sole discretion. The Trustee has no obligation to provide, and Beneficial Owners[11] have no right to receive, information regarding the operation of the trust except as provided in Section 2.2(c) above*.

*See* Trust Agreement, at Section 2.2(g) (emphasis added).

Trust Agreement Section 2.2(c), in turn, addresses the operational and oversight information the Trustee is required to provide to Fire Victims:

> (c) The Trustee shall timely account to the Bankruptcy Court as follows:

> (i) The Trustee shall engage a firm of independent certified public accountants (the "**Trust Accountants**") selected by the Trustee, to audit, and the Trustee shall file with the Bankruptcy Court, within one hundred and twenty (120) days following the end of the fiscal year, an annual report (the "**Annual Report**") containing special-purpose financial statements of the Trust (including without limitation, the assets and liabilities of the Trust as of the end of such fiscal year and the additions, deductions and cash flows for such fiscal year) audited by the Trust Accountants and accompanied by an opinion of such firm as to the fairness in all material respects of the special-purpose financial statements. The Trustee shall provide a copy of such Annual Report to the Claims Administrator and the TOC and shall publish it on the Trust Website when such report is filed with the Bankruptcy Court.

> (ii) In connection with the filing of the Annual Report, the Trustee shall cause to be prepared and filed with the Bankruptcy Court a report containing a summary regarding the number and type of claims disposed of during the period covered by the financial statements (the "**Claims Report**"). The Trustee shall provide a copy of the Claims Report to the Claims Administrator and the TOC and shall publish it on the Trust Website when such report is filed with the Bankruptcy Court.

*See* Trust Agreement Section 2.2(c).

---

[11] The Trust Agreement defines "Beneficial Owners" as "the holders of Class 5A-III and Class B-III Claims [HoldCo and Utility Fire Victim Claims] against the Debtors.

14

On April 29, 2022, the Trustee filed the 2021 Annual Report [Dkt. No. 12287], which followed substantially the same form 2020 Annual Report. Neither Mr. Abrams nor any other party challenged the sufficiency of the disclosures in the 2020 Annual Report. The 2021 Annual Report complies with the requirements of Trust Agreement Section 2.2(c)(i). It was prepared in accordance with appropriate accounting standards and was audited by BDO USA, LLP, an experienced and well-respected large financial accounting firm that operates in the financial field of trust work, among other complex corporate work. Critically, it was subjected to a comprehensive audit and a "clean opinion" was issued. Specifically, BDO USA, LLP stated:

> In our opinion, the accompanying special-purpose financial statements **present fairly, in all material respects**, the net claimants' equity of the Trust as of December 31, 2021 and 2020, and the results of its changes in net claimants' equity and its cash flows for the year ended December 31, 2021, and for the period from July 1, 2020 (inception) through December 31, 2020, in accordance with the basis of accounting described in Note 2 to the special-purpose financial statements (emphasis added).

As noted above, the Annual Report was filed on this Court's docket and posted to the Trust Website.

Similarly, the comprehensive Claims Report was filed on this Court's docket [Dkt. No. 12287] and posted to the Trust Website. The Trustee complied with its obligations under Trust Agreement Section 2.2(c), and as described elsewhere has complied with his discretionary disclosure authority under Section 2.2(g). Simply put, Mr. Abrams has no further rights under the Trust Agreement.

The Trust Agreement further delineates the rights and limitations on Fire Victims. In relevant part, Trust Agreement Section 1.5 provides:

> (a) To the extent required by the Act, the beneficial owners (within the meaning of the Act) of the PG&E Fire Victim Trust (the "**Beneficial Owners**") shall be the holders of the Class 5A-II and Class 5B-III Claims against the Debtors, provided that, (i) the holders of such Class 5A-III and Class 5B-II Claims as Beneficial Owners, **shall have only such rights with respect to the Fire Victim Trust and its assets as are set forth in the Trust Documents, the Plan and Confirmation Order**, and (ii) **no greater or other rights, including upon dissolution, liquidation or winding up of the Fire Victim Trust, shall be deemed to apply to the holders of such Class 5A-II( and Class 5B-III Claims in their capacity as Beneficial Owners**.

15

(b) No Beneficial Owner shall be entitled to (i) hold any title in or to the Trust Assets (which title shall be vested in the Trust) or (ii) any right to call for a partition of the Trust Assets *or to require an accounting*. For the avoidance of doubt, ***Beneficial Owners shall not have the rights comparable to shareholders of a corporation*** (other than limited liability, as provided in Section 3803(a) of the Act).

(c) Subject to giving reasonable notice, ***a Beneficial Owner may request information and documents relating to their claim from the Claims Administrator, but shall have no right to request information relating to the claims of other Beneficial Owners***.

*See* Trust Agreement Section 1.5 (emphasis added). Even when couched as disclosure and transparency, broad enough requests into operations and asset strategies are effectively demands for an accounting, which the Trust Agreement does not provide to Mr. Abrams.

These provisions, however, do not leave the Trustee without oversight or accountability, or Fire Victims without a voice in oversight and operation of a Trust that was created and held for their benefit. Although the Trust Agreement provides limitations on the rights of Fire Victims at large with respect to the administration of the Trust, it reserves the role of oversight to an additional layer of fiduciaries to Fire Victims, the TOC. Indeed, nearly all the document requests and interrogatories demanded by Mr. Abrams fall within the express oversight purview of the TOC and the exercise of their fiduciary duties to Fire Victims. Importantly, Trust Agreement Section 6.1 provides:

The TOC shall be comprised of nine (9) members ***who will represent the interests of holders of Fire Victim Claims in the administration of the Trust***. The Members of the TOC shall be appointed in accordance with the Plan[.]

*See* Trust Agreement Section 6.1 (emphasis added).

Trust Agreement Section 6.2 confers fiduciary duties on the TOC members, who have accepted those duties by agreeing to be appointed and serve on the TOC:

The members of the TOC ***shall serve in a fiduciary capacity representing current holders of Fire Victims Claims in the administration of the Trust***.

*See* Trust Agreement Section 6.2 (emphasis added).

Particularly relevant here, the TOC is expressly charged with the duty to provide oversight to the operations and Trust decisions that lay at the crux of Mr. Abrams' requests. Those charges which provide the TOC with consent rights over the Trustee's actions, are located in Trust Agreement Section 2.2(f):

16

(f)     The Trustee shall be required to obtain the consent by vote of a simple majority of the TOC pursuant to the notice and quorum requirements set forth in Section 6.6 herein to:

(vi) settle any litigation involving Trust Assets or rights relating to Trust Documents, the Plan and Confirmation Order except that the Trustee shall not be required to obtain the consent of the TOC to the extent that such settlements involve Trust Assets below a minimum threshold set by the Trustee in consultation with the TOC;

(vii) make Trust expenditures in excess of 120% of the Budget;

(viii) approve the Budget;

(ix) sell, transfer, or exchange any or all of the Trust Assets at such prices and upon such terms as the Trustee may determine proper in consultation with the Investment Advisor and consistent with the other terms of this Trust Agreement . . . ; or

(x) adopt, upon the advice of an Investment Advisor (as defined in Section 3.2(d) below), a Sell-Down Plan (as defined in Section 3.2(b) below) for New HoldCo Common Stock held by the Trust as part of the Trust Assets.

*See* Trust Agreement Section 2.2(f).

The Motion ignores the governing documents and the structure of the Trust's operations, the Trustee's authority and discretion with respect to disclosures to Fire Victims and the TOC's oversight role, which were carefully designed and approved to ensure efficiency, value maximization and appropriate functioning of the Trust. Instead, as described below, Mr. Abrams seeks to position himself as a TOC member, evaluate the information provided to the TOC and second guess the Trustee with his personal view on strategy and decision making.

**B.      Rule 2004 Examination Is Inappropriate In These Matters.**

*i.       The Requests Do Not Seek Information Within Rule 2004.*

The scope of Rule 2004 "may relate only to the acts, conduct, or property or to the liabilities and financial condition of the debtor, or to any matter which may affect the administration of the bankruptcy estate." 11 U.S.C. § 2004(b). The Supreme Court explained that examination exists "to show the condition of the estate" and "enable the court to discover its extent and whereabouts, and to come into possession of it, that the rights of creditors may be preserved," over a century ago. *Cameron v. United States*, 231 U.S. 710, 717, 34 S.Ct. 244, 246, 58 L.Ed. 448 (1914); *accord In re GHR Energy Corp.*, 35 B.R. 534 (Bankr.D.Mass.1983).

17

Courts recognize that once a plan is confirmed, the role of examination is narrowed; it is limited to disclosures that would produce "information germane to the administration of the case." *In re Cinderella Clothing Indus., Inc.*, 93 B.R. 373, 377-78 (Bankr. E.D. Pa. 1988). The *Cinderella Clothing Indus.* court explained that such administrative matters, post-effective date, is a limited universe, and would include "a motion to dismiss or convert the case, a motion to modify the plan, or a motion seeking to revoke the confirmation order." *In re Defoor Ctr., LLC*, 634 B.R. 630, 634–35 (Bankr. M.D. Fla. 2021) (*Citing Cinderella Clothing* 93 B.R. at 377-78). No such request is pending or has been made by Mr. Abrams, nor would such a request be appropriate.

The Motion requests information about the administration of a post-effective date trust established under the laws of Delaware. It does not seek information regarding matters of the estate, which were addressed on final basis through the Confirmation Order. Accordingly, the Court should not permit Mr. Abrams to employ Rule 2004 to obtain information from the Trust.

### ii. The Requests Are Unduly Burdensome And Prejudicial And Seek Information Irrelevant to Any Purported Concern Raised By Mr. Abrams

Even if this request did fit within the scope of Rule 2004, examination "may not be used for 'purposes of abuse or harassment' and it 'cannot stray into matters which are not relevant to the basic inquiry.'" *See In re Table Talk Inc.*, 51 B.R. 143, 145 (Bankr. D. Mass. 1985) (quoting *In re Mittco Inc.*, 44 B.R. 35, 36 (Bankr. E.D. Wis. 1984)). Additionally, motions for examination should balance "the competing interests of the parties, weighing the relevance of and necessity for the information sought by the examiner against the extent of inconvenience and intrusion to the witness." *In re Kreiss*, 46 B.R. 164, 165 (Bankr. E.D.N.Y. 1985).

By the Motion, Mr. Abrams seeks three general pieces of relief: (i) responses to nine (9) document requests and thirteen (13) interrogatories levied by Mr. Abrams; (ii) the establishment of a process by which other Fire Victims can submit formal discovery that requires the Trust to respond within ten (10) days; and (iii) an Order from this Court establishing a hearing for a question-and-answer session for the Trustee and the TOC. Each of these requests are unproductive, burdensome and unwarranted under the circumstances.

///

Case: 19-30088    Doc# 12527    Filed: 06/21/22    Entered: 06/21/22 15:08:05    Page 18 of 33

a.     Mr. Abrams' Requests

The first five (5) interrogatories and four (4) requests for production relate to the Trust's activity regrading lobbying, public relations expenses and regulatory activities. They seek all contracts and agreements, and all documents in any way connected to those broad activities. The Trustee believes that his recent letter to Fire Victims, the June Letter (defined below), addresses the Trust's position on relating to these three categories of activities.

The Trust incurred zero lobbying expenses in fiscal year 2021. The Trust has retained a firm for lobbying activities for fiscal year 2022 and its efforts to seek additional value through legislative action are continuing.

The Trust's press relations expenses have been disclosed in connection herewith. Media outreach and monitoring activities have been undertaken in response to the significant amount of media interest, public interest and activity surrounding the Trust. These activities include fielding and responding to inquiries from Fire Victims, legislators, press outlets, local politicians, the Governor's office and community groups.

The Fire Victim Trust's regulatory counsel's fees and expenses have also been disclosed and relate to the Trust's effort to monitor regulatory matters concerning the Reorganized Debtors, which, of course, impacts the stock price.

Disclosing contracts, agreements and supporting documents for each of these areas of work is inappropriate and will impair the Trustee's ability to execute its such plans or strategies and will be significantly detrimental to the objective of maximizing the value of Trust assets.

Mr. Abrams' sixth (6th) interrogatory and eighth (8th) document request (relating to the Trust's selected professionals to prosecute certain claims and causes of action) have been addressed in prior disclosures and again here. The Trust retained all of its third-party litigation firms through an open and public "request for proposal" interview process. After the conclusion of that process, the Trust selected counsel and retained such counsel on terms beneficial to the Trust and its beneficiaries. In addition to the fact that the retention documents are arguably privileged, further disclosure of the contracts and documents underlying such engagements is unduly burdensome and prejudicial to the

19

Fire Victim Trust and, indeed all other Fire Victims, as it would provide litigation adversaries with information that could impact the Fire Victim Trust's causes of action.

Mr. Abrams' seventh (7th) interrogatory (relating to the appointment of the TOC) has been asked and answered numerous times. *See* footnote 2, *infra*. As stated in the Trustee's other public filings and in the Plan, the Trust Oversight Committee was selected and appointed pursuant to the Court-approved TCC RSA and the Court-confirmed Plan. The Trustee and the Fire Victim Trust became effective at the same time as the TOC was appointed and the Trustee had no role in selecting the TOC.

The Trustee believes that the Annual Report filed on April 29, 2022, fulfilled the disclosure requirement under the Trust Agreement and that no additional disclosure is warranted under the Trust's governing documents. Nonetheless, the Trustee has supplemented the Annual Report with the information provided herein, the 2021 Annual Report Supplement attached hereto, and the Trustee has delivered his June Letter (defined below) published on the FVT Website which provides updates on many of the items of interest to Mr. Abrams. The Trustee believes that no further response to interrogatories eight (8) or nine (9) or to document requests five (5), six (6) and seven (7) are necessary or appropriate.

Interrogatories ten (10) through thirteen (13) are fully addressed as follows:

- The "Special Master" is a fiduciary required under California Law who approves any and all minors' compromises in conjunction with the evaluation, disallowance, resolution, settlement, and approval of any and all Fire Victim Claims in accordance with the CRP. *See* Trust Agreement § 2.1(e) (xxvii). The Hon. Ellen Sickles James (Ret.) was appointed as Special Master by *Order For Appointment Of A Special Master Pursuant To Fed. R. Civ. Proc. 53* [Dkt. No. 9721].

- The Claims Processor fees have been explained herein and are appropriate to the colossal amount of work necessary to process, review and pay the approximately 242,000 unique claims received to date.

Case: 19-30088    Doc# 12527    Filed: 06/21/22    Entered: 06/21/22 15:08:05    Page 20 of 33

- The Investment Advisors are the professionals and consultants that are necessary for the Trust to manage its liquid assets and execute in due course a sell-down plan. *See* Trust Agreement § 3.2(b).

- The Trust Disbursing Agent, another role that the Claims Processor fulfills, is the entity that makes payments to Fire Victims (or to counsel for represented Fire Victims) once their claims have been determined and such determinations accepted. *See* Trust Agreement § 4.2(a).

Any requirement to provide further documents, information, or responses with respect to these customary trust functions would be unduly burdensome and unnecessary.

With respect to document request number nine (9) (seeking agreements with the Reorganized Debtor), the Fire Victim Trust has previously disclosed the Exchange Transaction Agreement and the Registration Rights Agreement.

b. Request for Rolling Discovery from Fire Victim Trust

The Trustee believes that this request is unduly burdensome on its face and, due to the cost of compliance, economically adverse to the Fire Victims. The FVT Website contains 232 unique frequently asked questions and answers, as well as other pertinent information, announcements, updates, letters, access to the governing documents of the Trust and the Claims Portal. All Fire Victims, through their attorneys or directly themselves, can ask questions through the Claims Portal to reach the claims processing team for information on their unique claims. The Fire Victim Trust already expends a significant amount of funding to provide these resources, access and information to all Fire Victims. A formal discovery protocol untethered to the Trust Agreement requirements is unnecessary and would require a significant expenditure of Trust resources to the detriment of Fire Victims.

Moreover, questions that cannot be resolved through the FAQs, the FVT Website, or the Claims Portal are questions to which the Fire Victim Trust likely cannot provide a public or detailed comment to, such as monetization strategy with respect to a publicly traded equity security, specific legislative efforts, litigation efforts, or specific comments or responses to social media statements, inquiries, press articles or public comment. Responses to such questions could involve securities law

21

issues, ongoing negotiations, or disclose the Trust's litigation strategies and have a deleterious effect on the Trust ability to maximize assets.

c.      Request for a Zoom Hearing

The Fire Victim Trustee believes that no further hearing or town hall should be ordered by the Court, given the Trust's continued compliance with its disclosure obligations. The Trustee will of course continue to communicate with Fire Victims as necessary in the Trustee's discretion to provide them with continued and fulsome access and information.

**C.    The Trust's Voluntary Additional Disclosures Adequately Respond to the Requests.**

i.     2021 Annual Report Supplement

Contemporaneously herewith, the Trustee has filed a supplemental exhibit to the 2021 Annual Report provides additional information clarify for Fire Victims how Trust Assets are being deployed in order to deliver them timely distributions and the maximum value of the assets conferred to the Trust. The 2021 Annual Report Supplement is attached hereto as **Exhibit A**. A further explanation of the expenses follows here. The 2021 Annual Report Supplement divides the Trust's fiscal year 2021 expenditures into seven general categories. Although Mr. Abrams did not express concern into the claims administration related expenses of the Fire Victim Trust, necessarily the most complex and largest budget items, the Trustee has provided explanatory notes in connection therewith.

a.     Claims Processor Fees and Expenses

As noted in Exhibit A, this category is comprised exclusively of the fees and expenses of the Trust's Claims Processor, BrownGreer. BrownGreer is the backbone of the claims processing team of the Fire Victim Trust and their work has been crucial in getting more than two-thirds of all filed claims processed to a determination to date. In 2021, BrownGreer had 568 employees assigned to the Fire Victim Trust who worked more than 500,000 hours on trust business at a blended hourly rate of $123 an hour. BrownGreer built and maintains the online portal used to submit claims to the Trust. They assumed the responsibility for matching insurance claim files to fire victims' submissions, evaluating available insurance coverage and calculating the appropriate offset. It is BrownGreer's responsibility to track filed claims, thoroughly review all claims and supporting documents, and

22

evaluate the submission in accordance with the Claims Resolution Procedures included in the Trust Agreement. In performing that role, BrownGreer personnel have reviewed more than 50 million pages of documentation. When a claim submission is eligible, BrownGreer must calculate an award amount issue a Determination Notice. Where documentation is missing, BrownGreer will draft and send a Deficiency Notice to the claimant or their attorney. BrownGreer compiles bi-monthly funding reports and coordinates the disbursement of payments to eligible claimants, which have resulted in payments to more than 46,000 claimants to date. The BrownGreer communication team is charged with responding to questions fire victims and managing the public website, while a different unit maintains statistics regarding claims determined and supplements the Fire Victims Trust's economist as part of the Claims Administration team. At all times, BrownGreer's work is guided by the core principles of the Trust Agreement, which require fair, objective and consistent treatment of Fire Victim claims. The low rate of appeals and the positive results of two annual audits indicate that BrownGreer is performing the role of Claims Processor effectively.

### b. Claims Administrator Fees and Expenses

As noted in Exhibit A, this category is comprised of consultants and specialty firms, supporting the evaluation, review, reconsideration and appellate review of claims disputes. None of these consultants is a lobbyist, nor do they perform any such role for the Claims Administrator. These consultants and specialty firms address matters such as insurance coverage, lien resolution, personal injury evaluation, business loss assessment, economic forecasting, industry specialization (*e.g.,* building, construction, forestry, commercial structures, wineries, mobile home parks, restaurants, medical offices, golf courses, or the evaluation of unique personal or business property). These consultants and specialty firms play an important role in the development of rules and procedures that form the foundation of the Trust's claim valuation paradigm. They are experts that support the Claims Administrator's work in fairly assessing the broad range of damages articulated by Fire Victims in their claims to the Trust. No individual or firm connected to the Trust Oversight Committee is retained by the Trust in this category. The Total Fees and Expenses related to Claims Administration for the fiscal year 2021 were: $12,118,868.76.

Case: 19-30088    Doc# 12527    Filed: 06/21/22    Entered: 06/21/22 15:08:05    Page 23 of 33

### c.   Legal Fees and Expenses

As noted on Schedule A, this category includes four payees.  Brown Rudnick LLP is general counsel to the Fire Victim Trust and assists in all matters of the Trust's legal business, including contract negotiation, third party action oversight, general legal work, assistance on bankruptcy court matters, tax matters, and stock monetization issues. As noted above, during 2021, the Fire Victim Trust negotiated and entered into the Exchange Transaction Agreement with reorganized PG&E in connection with its grantor trust election.  That Agreement was negotiated and entered into to provide substantial tax savings to the Fire Victim Trust upon stock monetization. A material portion of Brown Rudnick's fees and expenses in 2021 were attributable to the negotiation and documentation of that Agreement.

The Andrews & Thornton and Greenberg Gross LLP firms were retained to analyze and identify causes of action against certain third parties with potential liability to the Fire Victim Trust in connection with the causes of action assigned to the Trust by PG&E against business consultants of PG&E.  These firms were retained pursuant to an open and public "request for proposal" and interview procedure that was conducted early on in the life of the Trust. Their engagement was structured on an hourly basis for the purpose of ascertaining the viability of causes of action against certain potential defendants.

The Court will note that the annual report contains no Trust expenditures for the Trust's legal representatives for its other third-party litigations against former PG&E directors and officer and vegetation management contractors, which firms have been disclosed in public filings on public court dockets, including, where appropriate on this Court's docket. The Trust conducted an open and public "request for proposal" and interview process with respect to those litigation efforts and selected the following firms: to represent it in such actions: Cotchett, Pitre & McCarthy LLP; Walkup, Melodia, Kelly & Schoenberger; Dreyer Babich Buccola Wood Campora LLP; Corey Luzaich de Ghetaldi & Riddle LLP; Bottini & Bottini Inc.; Andrews & Thornton LLP; Greenberg Gross LLP; and Gilbert LLP.  The Trustee believes that further disclosure of the details of such engagements may impact the Trustee's prosecution of such actions.   Significantly, none of that information would likely be discoverable to litigation adversaries in the underlying proceedings, as it is privileged.

Case: 19-30088    Doc# 12527    Filed: 06/21/22    Entered: 06/21/22 15:08:05    Page 24 of 33

Lastly, this expense category also contains an individual attorney retained by the Fire Victim Trust as Special Advisor to the Trustee, litigation consultant to coordinate and develop cross-litigation strategy for the prosecution of the inter-related and complex third-party causes of action conveyed to the Trust. This attorney acts as liaison to the Trustee with respect to third-party litigation and coordinating counsel with respect to all of the Trust's third-party litigation, and he is involved in the development of prosecution, pleading, discovery and settlement strategy with respect to the suite of litigations advanced by the Trust for Fire Victims' benefit.

### d. Financial Professional Fees and Expenses

As noted on Exhibit A, the Trust retains two financial services firms: (i) Jorstad, Inc. conducts the Trust's internal and day to day accounting, and (ii) BDO USA, LLP is the Fire Victim Trust's independent auditor in connection with the Annual Report and also provides tax return preparation and filing services. The Trust retains two Investment Advisors, (Houlihan Lokey Capital, Inc. and Morgan Stanley) whose experience and knowledge are integral services for the protection and monetization of the Trust's PG&E stock holdings. The equity capital markets firm, Morgan Stanley (for monetization of the PG&E Stock), was selected after a rigorous competitive interviewing process. Both firms were selected after consultation with the TOC. No individual or firm connected to the Trust Oversight Committee is retained by the Trust in this category.

### e. Trustee Fees and Expenses

The total compensation for Justice John K. Trotter (ret.) was $1,500,000 for fiscal year 2021.

### f. Insurance, Evidence Preservation, and Other Expenses

The bulk of expenses in this category is for evidence preservation for third-party litigation (part of the consideration provided to the Fire Victim Trust under the Plan). Two payees (Everlaw, Inc. and SafeStore, Inc.) were paid just over $1 million (or 80% of the expenses in this category); the remaining payees were paid for cyber insurance coverage, bank fees, office space (at $5,000 per month) and other incidentals. No individual or firm connected to the Trust Oversight Committee is retained by the Trust in this category.

There were no fees or expenses paid for lobbying in fiscal year 2021.

There were no fees or expenses for the Trust Oversight Committee in fiscal year 2021.

Case: 19-30088    Doc# 12527    Filed: 06/21/22    Entered: 06/21/22 15:08:05    Page 25 of 33

### g. Consultant Fees and Expenses

As noted on Exhibit A, there were three consultants in this category. First, an individual computer consultant to assist in third-party litigation support. Second, a law firm (Morgan, Lewis & Bockius LLP), which monitors provides advice to the Trustee and other professionals related to the California Public Utilities Commission and other regulatory activities involving PG&E and the Trust. Finally, a public relations firm required to organize incoming and outgoing press and media matters. No individual or firm connected to the Trust Oversight Committee is retained by the Trust in this category.

### ii. Additional Trustee Update Letter

Contemporaneous with this Objection and consistent with his discretion under Trust Agreement Section 2.2(g), the Trustee published and posted to the Trust's website an update letter to Fire Victims regarding Trust administration and activities. A full copy of the letter is attached hereto as **Exhibit B** (the "**June Letter**") and will be separately filed on the Court's docket. Like the Trustee's earlier letters to Fire Victims, the June Letter covers several topics that are germane to Fire Victims and the Trustee believes that the letter addresses many of the purported items identified by Mr. Abrams. The June Letter also describes the upcoming and imminent retirement of Justice John J. Trotter (Ret.) and the transition to Ms. Cathy Yanni as Trustee in accordance with the succession provisions of the Trust Agreement.

Specifically, the June Letter addresses the following topics: (i) Claims Administration to date; (ii) stock monetization position; (iii) the current status of Fire Victim Trust's prosecution of third-party litigation; and (iv) the status of other efforts to maximize the value of the assets in the Trust for the benefit of all Fire Victims.

*[Remainder of page intentionally blank]*

26

Case: 19-30088    Doc# 12527    Filed: 06/21/22    Entered: 06/21/22 15:08:05    Page 26 of 33

## **CONCLUSION**

WHEREFORE, for the good cause shown and reasons presented herein, the Fire Victim Trustee respectfully requests that the Court sustain this Objection, deny the Motion in its entirety and grant such other and further relief as may be just.


DATED: June 21, 2022                    BROWN RUDNICK LLP




By: */s/ Eric R. Goodman*
     Eric R. Goodman (admitted pro hac vice)
     (EGoodman@brownrudnick.com)
     David J. Molton (SBN 262075)
     (DMolton@brownrudnick.com)
     Seven Times Square
     New York, New York 10036
     Telephone:    (212) 209-4800
     Facsimile:    (212) 209-4801

     and

     Joel S. Miliband (SBN 077438)
     (JMiliband@brownrudnick.com)
     2211 Michelson Drive
     Seventh Floor
     Irvine, California 92612
     Telephone:    (949) 752-7100
     Facsimile:    (949) 252-1514

     *Attorneys for Fire Victim Trustee*

27

**EXHIBIT A**

PG&E Fire Victim Trust
Supplementary Schedule of Operating Expenses (*Revised June --, 2022*)
Year ended December 31, 2021

| | | |
|---|---|---:|
| Claims processor fees and expenses[1] | $ | 62,918,772 |
| Claims administration fees and expenses[2] | | 12,118,867 |
| Legal fees and expenses:[3] | | |

| | | | |
|---|---|--:|---:|
| Andrews & Thornton Attorneys at Law | $ | 1,047,761 | |
| Brown Rudnick LLP | | 6,459,748 | |
| Greenberg Gross LLP | | 1,518,851 | |
| Special Advisor to the Trustee, Litigation | | 791,440 | |
| *Total legal fees and expenses* | | | 9,817,800 |

Financial professional fees and expenses:

| | | | |
|---|---|--:|---:|
| Accounting, Auditing and Tax Returns[4] | $ | 333,800 | |
| Investment Advisors[5] | | 4,629,959 | |
| *Total financial professional fees and expenses* | | | 4,963,759 |

| | | |
|---|---|---:|
| Trustee fees and expenses | | 1,500,000 |
| Insurance, evidence preservation, and other expenses[6] | | 1,227,079 |
| Consultant fees and expenses: | | |

| | | | |
|---|---|--:|---:|
| Public relations firm | $ | 344,698 | |
| Morgan Lewis, CPUC monitoring | | 409,520 | |
| Computer consultant (litigation support) | | 28,631 | |
| *Total consultant fees and expenses* | | | 782,849 |

| | | |
|---|---|---:|
| Lobbying expenditures | | 0 |
| Trust Oversight Committee expenses | | 0 |
| **Total operating expenses** | **$** | **93,392,126** |

---

[1] Paid to BrownGreer for the services of 568 employees assigned to the Fire Victim Trust, and in the aggregate, they worked just over 500,000 hours on Fire Victim Trust matters at a blended hourly rate of $123 an hour.

[2] Consists of 24 unique payees: exclusively consultants and specialty firms supporting the evaluation, review, reconsideration and appellate review of claims disputes. These consultants and specialty firms address matters such as insurance coverage, lien resolution, economic forecasting, and industry specialization (e.g., private roads, building, construction, vineyards, forestry, art).

[3] The Firms Andrews & Thornton and Greenberg Gross LLP are retained in connection with third-party litigation. Brown Rudnick LLP serves as general counsel. The Individual Attorney serves as litigation and settlement counsel and liaison to the Trustee for third-party litigation.

[4] Comprised of BDO USA Ltd. and Jorstad Inc.

[5] Comprised of Morgan Stanley and Houlihan Lokey.

[6] Consists of 8 unique payees: two specialty firms are engaged in digital and physical evidence storage (representing just over $1 million or 80% of this category); the remaining payees were paid for cyber insurance coverage, bank fees, office space (at $5,000 per month) and other incidentals.

# EXHIBIT B


June 21, 2022

Dear Fire Victims:

As we approach the two-year anniversary of the creation of the Fire Victim Trust, I would like to share with you some history regarding its creation, its development, and a brief explanation of its status today.

The Trust was created after PG&E caused several fires, which damaged thousands of homes and devastated the lives of thousands of Californians. In order to resolve the potential costs of that damage, PG&E declared bankruptcy.

The Bankruptcy Court, faced with claims from not only fire victims but also from the insurers of those individuals along with claims from the federal and state entities that incurred costs fighting those fires and supplying financial aid to the victims, created two trusts. In one was channeled all of the insurance companies' claims, and in the other all of the fire victims' claims, including the federal and state agency claims. The insurance trust received $11 billion in cash to satisfy its claim of having paid $16 billion to its insureds and for maintaining an additional $4 billion in reserve. The Fire Victim Trust was funded with an oft-stated value of $13.5 billion, to be half in cash and half in new company PG&E common stock. The Plan was submitted to you for a vote and was approved by more than 85% of those who voted. PG&E emerged from bankruptcy on July 1, 2020. The $6.75 billion in cash was paid. With respect to the stock consideration, 478 million shares of PG&E stock were delivered to the Fire Victim Trust in accordance with an agreed-to formula under the Plan. At the time of that delivery, the stock was trading at approximately $9 per share. That price created a shortfall of approximately $2.4 billion less than expected, and it has lingered between $10 and $12 and closed at $9.78 as of Friday, June 17, 2022.

The Trust is a legal entity controlled by its constitutional documents, the Bankruptcy Plan, Confirmation Order, and the Trust Agreement. Section 1.2 of the Trust Agreement enumerates the Trust's purposes:

1. To assume liability for certain claims;
2. To evaluate and pay those claims on a *pro rata* basis;
3. To prosecute all assigned rights and causes of action given to the Trust; and
4. To preserve, hold, manage, monetize, and maximize the Trust's assets for use in paying the claims enumerated above.

It also provides, under Section 2.2 (General Administration), specifically subsection Section 2.2(g), the following:

> The Trustee shall publish information on the Trust Website as he deems prudent in his sole discretion. The Trustee has no obligation to provide, and Beneficial Owners have no right to receive, information regarding the operation of the trust except as provided in Section 2.2(c) above [The Annual Report].

In keeping with the Trust's directions, I will provide an update and practicable review of our activities for each of its stated purposes.

## 1. To evaluate and pay claims on a *pro rata* basis

When PG&E emerged from bankruptcy and the Trust was created, my Claims Administrator and I were its only employees. Together we began to create a system designed to allow 70,000 fire victims to make claims. It took time to build a comprehensive technical infrastructure capable of receiving, reviewing, and valuing the 250,000 unique claims asserted by those fire victims. To date, among others, we have received over 19,000 personal injury claims, over 400 death claims, in excess of 100,000 emotional distress claims, over 20,000 claims for loss of income, and over 38,000 real and personal property claims, which include the value of loss of vegetation and the cost of tree replacement.

We immediately hired the claims processing firm BrownGreer, who over time has dedicated more than 500 employees to the task of receiving, reviewing, and valuing these claims. We first had to create the electronic form to be used by all victims for their submissions. We began accepting claim forms in mid-August 2020. However, the vast majority of claims were not submitted or received until late 2020 and early 2021. In March 2021, we established values regarding the damage claims, *i.e.*, the reasonable cost of rebuilding in different areas, the range of values of lost trees, the appropriate considerations in determining the value of an emotional distress claim. We further determined to value each claim individually rather than having a schedule of values. We began to issue Determination Notices, which informed the Claimants what the value of their claims were. Because of the uncertainty regarding the number and value of outstanding claims and the unknown value of the stock, our economic advisors recommended an initial *pro rata* payment of 30% of the value determined. In the fifteen months since March 2021, we have issued approximately 30,000 Determination Notices on claim forms comprised of over 150,000 individual claims. The aggregate awards to victims total almost $10 billion. Since we now know more about the potential value of outstanding claims, our economists' expectations have allowed us to increase the *pro rata* percentage to 45%, which means that we have now authorized payments to victims totaling $4.5 billion.

Additionally, early on we recognized there were many victims in dire circumstances who needed relief more quickly than the claims process could provide. We then created the Preliminary Payment program. It requires a victim to merely identify themselves as a victim and prove that they have an eligible claim pending. The payment acted as an advance on their ultimate award. To date, 34,000 victims have received almost $900 million in advanced payments.

As of this writing, we have issued Determination Notices on nearly 70% of all claim forms. Each claim has been touched, and a portion of the remaining claims need additional information and proof.

## 2. To prosecute all assigned rights and causes of action given to the Trust

In addition to cash and stock, the Trust was also given the rights PG&E had to prosecute certain lawsuits in order to increase the corpus available to pay claims. Suits against entities who had

contracted with PG&E to perform vegetation management have been filed regarding different Fires. Those cases have now been consolidated into a master case that is actively proceeding. The lawyers prosecuting those cases on behalf of the Trust were retained pursuant to an open and public request for proposal and interview process. They will be paid only from any recovery they achieve for the Trust, so no Trust money is used to pursue these claims.

Other potential claims against large institutional third parties were assigned but with little information regarding their viability. Two law firms were hired, again after a request for proposal process, to explore and discover the potential of each and to estimate the potential cost of litigation to the Trust. They have concluded their review and have provided the Trust with legal advice as to the prosecution of claims. Any further public disclosure may be harmful to the Trust, in that it may provide information to potential defendants.

A third lawsuit against the former PG&E directors and officers is also being prosecuted. The case is hotly contested with much discovery and motion practice by the defense. The potential recovery against the defendants is limited to PG&E's available insurance policy limits.

### 3. To preserve, hold, manage, monetize, and maximize the Trust's assets

With regard to monetization, the Trust has hired Morgan Stanley to handle its cash assets with investments in Trust-required governmental instruments. We also have employed Morgan Stanley to handle two separate sales of stock, one in January 2022 of 40 million shares and another in April 2022 of 60 million shares, for a net recovery of $1.2 billion. The Trust still owns 377 million shares of PG&E stock, and we confer regularly with our financial advisors as to its status.

When the Trust was created and vested with the shares of PG&E, the stock was valued at approximately $9. While the Trust was mandated to monetize (sell) the stock, there was no provision protecting the Trust from the imposition of a capital gain tax on any profit above that $9 price. The U.S. and California capital gains tax rate are combined in excess of 40%. The Trust's lawyers, Brown Rudnick, worked tirelessly to solve this dilemma. After a detailed and technical IRS process, the Trust was able to benefit from a private letter ruling from the IRS that effectively removed all capital gain tax issues. This enhanced the Trust's assets by avoiding a tax on the prior sales that would have cost in excess of $100 million in taxes.

Brown Rudnick also was charged with the responsibility of representing the Trust in a case where certain claimants challenged the insurance deduction provision in the Trust Agreement. The claimants sought the right to abandon all reasonable efforts to recover from their insurance carriers and, instead, recover funds from the Trust that would otherwise be paid to other fire victims. The potential harm to fire victims and the workings of the Trust was readily apparent. Brown Rudnick prevailed both at the trial court level and more recently was victorious on appeal before the Ninth Circuit. If lost, the case would have dramatically changed the operation of the Trust and adversely affected the claims process.

We also are trying to maximize our Trust assets by engaging with the State of California for some type of loan, or other instrument, which allows us to complete and increase our *pro rata* payments without having to sell more shares into a down market. I think it is not appropriate to go into more

detail at this time since we have only started our discussion. We have hired a lobbyist to assist us in these discussions.

### Transition Announcement

Finally, it has been my honor and privilege to serve as the Trustee of the Fire Victim Trust since its formation on July 1, 2020. When I came out of retirement to accept this position, I promised my family I would serve for only two years. Since that time has come, I therefore will be resigning as Trustee at the close of business on June 30, 2022. Notice of my resignation was provided to the Trust Oversight Committee on March 29, 2022, in accordance with Section 5.2(b) of the Trust Agreement, and will be filed with the Bankruptcy Court in the coming days.

Throughout these past two years, we have devoted our fulltime attention to addressing the financial and other hardships of thousands of deserving fire victims. As stated above, progress has been made, but there is still more to be done. An excellent administrative team is in place, and during the past several months we have been working on a smooth transition. Claims processing will proceed without interruption and fire victims and their counsel can count on the transition being seamless.

Effective July 1, 2022, Ms. Cathy Yanni will become the new Trustee. Ms. Yanni will succeed me as Trustee in accordance with the terms of Section 5.2(d) of the Trust Agreement. In her previous role as Claims Administrator, Ms. Yanni assisted with Trust administration and directly oversaw fire victim claims resolution, including design and implementation of the claims resolution process, from establishing eligibility requirements and claims review procedures to ensuring that funds are distributed in a fair and equitable manner. She also served Fire Victims as the Administrator of the Wildfire Assistance Program. Previous to her work on behalf of Fire Victims, Ms. Yanni settled tens of thousands of cases, facilitated distribution of billions of dollars in settlement funds to Claimants, and oversaw multiple claims resolution processes. There is no one better positioned than Ms. Yanni to complete the Trustee's mandate and serve your interests. You may find more information on Ms. Yanni at the Fire Victim Trust's Website.

Finally, thank you for the opportunity to serve as the Trustee of the Fire Victim Trust these past two years. It has been a great honor and, as I now prepare to turn the page to my retirement, I wish you all the very best.

Very truly yours,

Justice John K. Trotter (Ret.), Trustee