# EXHIBIT A

**Page 1**

```
                UNITED STATES BANKRUPTCY COURT

                NORTHERN DISTRICT OF CALIFORNIA

                 SAN FRANCISCO DIVISION


In re:

PG&E CORPORATION,              Bankruptcy Case No.
                         19-30088(DM)
  and                    Chapter 11

PACIFIC GAS AND ELECTRIC          (Lead Case)
COMPANY,                   (Jointly administered)

      Debtors.
_____

   __ Affects PG&E Corporation
   X  Affects Pacific Gas and
      Electric Company
      Affects both Debtors

*All papers shall be filed in the
Lead Case, No. 19-30088(DM).
_____
```

**DEPOSITION OF TODD GREENBERG**

Taken via Zoom Video Conferencing

Friday, May 13, 2022, 1:04 p.m.

Reported by:

Melissa Slover, CSR No. 9787

**Page 2**

APPEARANCES OF COUNSEL:

For Pacific Gas and Electric Company:

LAW OFFICES OF JENNIFER L. DODGE, INC.
**BY: JENNIFER L. DODGE, ESQ.**
2512 Artesia Boulevard, Suite 300D
Redondo Beach, California 90278
(310) 371-3344
jdodgelaw@jenniferdodgelaw.com


For Creditor Todd Greenberg:

TRODELLA & LAPPING, LLP
**BY: RICHARD A. LAPPING, ESQ.**
540 Pacific Avenue
San Francisco, California 94133
(415) 399-1015
rich@trodellalapping.com

**Page 3**

EXAMINATION INDEX

TODD GREENBERG                          PAGE

  BY MS. DODGE  . . . . . . . . . . . .   5


              EXHIBIT INDEX

EXHIBIT A - ELECTRIC RULE NO. 14          118

EXHIBIT B - ELECTRIC RULE NO. 2           124

**Page 4**

Whereupon the following proceedings were had and testimony taken, to wit:

MS. REPORTER: Good afternoon. My name is Melissa Slover. I am a certified shorthand reporter licensed by the State of California. My license number is 9787. Today's date is May 13, 2022, and the time is approximately 1:04 p.m.

This is the deposition of Todd Greenberg in the matter of PG&E Corporation and Pacific Gas and Electric Company as Debtors. This case is venued in the United States Bankruptcy Court, San Francisco Division. The case number is 19-30088(DM).

Will the parties please identify themselves for the record.

MS. DODGE: Yes. Jennifer Dodge on behalf of PG&E.

MR. LAPPING: This is Richard Lapping on behalf of Mr. Greenberg.

THE WITNESS: Todd Greenberg.


**TODD GREENBERG,**

called as a witness herein, who being by me first given an oath to state the truth, was thereupon examined and interrogated as is hereinafter set forth.

EXAMINATION

BY MS. DODGE:

Q. Good afternoon, Mr. Greenberg. Can you hear me okay?

A. I can. Good afternoon.

Q. Have you ever been deposed before?

A. Yes, once.

Q. When was that, approximately?

A. Two or three years ago.

Q. In conjunction with what type of case?

A. It was a class action.

Q. Regarding what?

A. You'd have to -- I don't know, I'm not an attorney, so you would have to look at exactly what it is.

Q. Well, what was the nature of the -- who was the defendant?

A. It was a claim -- it was a claims-type thing where a product was making a claim.

Q. You were making a claim against the product?

A. It was a product labeling issue.

Q. What type of product?

A. It was a vitamin.

Q. Okay. Is that action still pending?

A. No.

5

Q. Okay. Did it settle?

A. I don't know. I'm not an attorney. It was resolved. I don't know whether it was settled. I don't know the technical terms for it.

Q. Okay. It didn't go to trial?

A. No.

Q. Okay. Where was that case venued? Where was it filed?

A. Again, I'm not an attorney. I don't know.

Q. Was it San Francisco Superior?

A. I don't know. I don't know the different courts. I don't know how to answer that question.

Q. Okay. Who was your attorney in that case?

A. Someone named -- I don't know if she goes by Patty or Patricia Siverson.

Q. I'm sure Mr. Lapping has explained to you the procedure here. I know it's been a couple of years since your deposition was taken so I'm going to go over some of the ground rules with you so we have them on the record. You understand that you're testifying here today under oath, that your answers can be read to the judge, and even though we're here in this informal -- actually, remote setting, your testimony has the same effect as if you were testifying in a court of law under penalty of perjury.

6

Do you understand that?

A. Uh-huh.

Q. You need to answer out loud.

A. Yes.

Q. Okay. And that was my next admonition is the court reporter is taking down what we say. She can only take down verbal responses as opposed to gestures like nods or shakes of the head or "um-um" or "huh-uh." If appropriate, try to say yes or no or I don't know. Say it out loud rather than making some gesture.

Does that make sense?

A. Understood.

Q. Okay. It's important for us not to speak over one another because the court reporter can only take one of us speaking at a time, so please wait for me to finish asking my question before you start your response, and then I'll wait for you to finish your response before I start my next question.

Does that make sense?

A. Understood.

Q. If you don't understand one of my questions, please let me know and I'll try to ask it in a way that makes it understandable to you. If you answer my question, I'm going to assume you understood it.

Is that fair?

7

A. Could you restate that again? I'm not sure about the assumption.

Q. If you don't understand one of my questions, please tell me that and I will try to rephrase it in a way that makes it understandable for you. But if you answer my question, I'm going to assume you understood the question.

Is that fair?

A. I don't know if it's fair, but I'll certainly answer your questions to the best of my ability as I understand them.

Q. Okay. The court reporter, as I said, is taking down everything we say today. She's going to prepare a booklet of your testimony in written form. You'll have the opportunity, once that has been prepared, to review your deposition testimony, go through it, you can make any changes or corrections that you need to make if you feel like something wasn't transcribed properly or, you know, it wasn't what you intended to say. But if you make changes of a substantive nature like changing a "yes" to a "no" in response to an important question, it can affect your credibility as a witness. It's important to try to give your best testimony here today.

Does that make sense?

A. Absolutely.

8

Q. Okay. If at any time you need a break, please let me know. We'll go off the record. We'll resume when you're ready to go. So if there's a pending question, I'm going to ask you to answer that before we take the break. If you need to talk with your attorney at any time, that's fine; however, if there is a pending question I'm going to ask that you answer that before you then go off record to speak with your attorney. Okay?

A. Uh-huh.

Q. Understood? Yes?

A. Sure, subject to counsel's objections and how he advises me.

MR. LAPPING: We understand the rule about no breaks during a pending question --

BY MS. DODGE:

Q. I don't want you to guess at responses to any of my questions, but it is acceptable for you to provide me with an estimate. The way I differentiate the two is a guess is something that you have no basis of knowledge for, like if I asked you how long is the desk in my office, you would be guessing because you've never seen it before. But if I ask you to estimate the length of the desk where you might be sitting in front of or where the computer is on right now it's right in front of you,

9

you have a basis for knowledge, it would be acceptable, then, for you to give me an estimate.

Does that make sense?

A. Certainly.

Q. Is there any reason you feel you can't testify fully and truthfully today?

A. No. Other than any potential concerns anyone might have with Friday the 13th.

Q. I did note that it was a Friday the 13th. What did you do to prepare for your deposition today, if anything?

A. I reviewed the answers that we previously provided to you with counsel and we've looked at a lot of records.

Q. When you said answers, are you referring to the responses to the written discovery, the interrogatories, request for production, and request for admissions?

A. Correct.

Q. How long did you spend preparing for your deposition?

A. I don't know the answer to that. I don't have attorneys' clocks running. I don't have that software.

Q. You don't need -- this is an example of when it's acceptable for you to give me an estimate because you have a basis for knowing. Again, it doesn't have to

10

be an exact. You could give me an estimate of the time you spent. That doesn't have to be just with talking with Mr. Lapping, it can be time you spent on your own preparing as well.

A. Are you talking since 2015?

Q. No. I'm talking since you received or since you became aware that your deposition was going to be taken today, since that time until now how much time have you spent preparing for the deposition?

A. More than I'd like to have.

Q. Can you give me an estimate?

A. Again, I need to go back and qualify this more. You're saying since I was aware that there would be a deposition?

Q. Correct.

A. So does that mean from the time that I first filed the claim in PG&E's bankruptcy.

Q. No. No. It's from the time Mr. Lapping advised you that PG&E had noticed your deposition here. I believe the notice of deposition was served, I don't know when it was, three weeks ago up until now, how much time have you spent preparing for your deposition again? It's just an estimate.

A. If you could give me the exact date. I don't have that in front of me. I know I've seen the document

11

at some point in time, but if you gave me a date I can give you a better estimate.

Q. All right. Hold on. Let me pull it up. April 6, 2022?

A. April 6, 2022. Rich, do you know when I received that if you provided that to Rich on April 6th? I would have to go back and review my record to find out when I received it, but I don't know the answer right now.

Q. Okay.

MR. LAPPING: Answer for the last seven days. How much time did you spend preparing?

THE WITNESS: Over the last seven days the large part of my time, if not prior to the last seven days, has been spent in various modes trying to provide the information that you've requested and preparing for this.

BY MS. DODGE:

Q. Okay. All right. That's fine. What is your date of birth?

A. Is this for personal identification reasons and is there a way for privacy this is not included in public records?

Q. This transcript is not filed with the Court.

A. Rich. I was born in 1964.

12

1    Q. Okay. What is your current address?
2    A. 47 Bolinas Road, Unit A, Fairfax, California
3    94930.
4    Q. Is Unit A the upper unit at the property?
5    A. Correct.
6    Q. How long have you lived at that unit?
7    A. Since July 2019.
8    Q. You've lived in the Unit A continuously since
9    July 2019 to the present; correct?
10   A. Correct.
11   Q. Where did you live prior to July 2019?
12   A. In the lower unit, which we refer to now as
13   Unit B.
14   Q. When did you first live in Unit B?
15   A. In, I believe, November of 2019.
16   Q. That was after the property was purchased?
17   A. Shortly after we purchased the property,
18   correct.
19   Q. And prior to that where did you live?
20   A. I lived in Mill Valley.
21   Q. I'm sorry. Mill Valley?
22   A. Yes, another town in Marin County called Mill
23   Valley.
24   Q. What was your address there?
25   A. 71 Oakdale Avenue in Mill Valley, 94941.

13

1    Q. How long did you live there?
2    A. Approximately seven years.
3    Q. Did you live there with anyone?
4    A. Yes.
5    Q. Who?
6    A. A number of different people depending on the
7    year. I first moved in with Chuck Doyle who lived there
8    prior to my living there. Do I need to produce the
9    names of all the people I lived with before?
10   Q. No, that's not necessary. I just wanted to
11   establish -- so that was seven years, so that would have
12   been from around 2008 to 2015 approximately?
13   A. I said approximately seven years.
14   Q. Right. I was just working my way back.
15   A. Yeah. If it helps, if you're interested in
16   this topic, I'll try to help you out -- okay. Then I
17   don't need to.
18   Q. That's okay. All right. Are you a high school
19   graduate?
20   A. Do we need to go into my education here?
21   MR. LAPPING: Yes.
22   THE WITNESS: Yes, I am a high school graduate.
23   BY MS. DODGE:
24   Q. What high school?
25   A. Redwood High School.

14

1    Q. What year did you graduate?
2    A. 1982.
3    Q. Did you attend college?
4    A. Yes, I did.
5    Q. What college?
6    A. Again, do I need to give my whole educational
7    history here? I've gone to UCLA. I've gone to San
8    Francisco State. I've gone to College of Marin. I've
9    gone to UC Berkeley. I've gone to Merritt College, and
10   I'd have to think if there's one more.
11   Q. Okay. Did you receive degrees from any of
12   those institutions?
13   A. Yes, I did. I'm not quite sure what the point
14   of this questioning is.
15   MR. LAPPING: Answer the question.
16   BY MS. DODGE:
17   Q. Can you tell me the degrees you received and
18   from which institutions?
19   A. Sure. I'm still baffled as to the relevancy to
20   the claim that this has.
21   Q. We're entitled to ask background information
22   when you're being deposed when you bring a claim when
23   you bring a lawsuit. This is just basic general
24   background information.
25   MR. LAPPING: It's okay.

15

1    THE WITNESS: So I have a degree in history and
2    business a specialization in business administration
3    from UCLA. I have -- that's a BA with a specialization.
4    BY MS. DODGE:
5    Q. Okay.
6    A. I have a degree in real estate that is an A.S.
7    degree from College of Marin. I have a degree in
8    applied accounting from College of Marin, and I have a
9    degree in computer information systems from College of
10   Marin. They're all A.S. degrees.
11   Q. That's associate of science?
12   A. I believe so.
13   Q. Okay. And what about San Francisco State?
14   A. San Francisco State, UC Berkeley, some courses
15   at College of Marin were all part of getting G.E. done
16   for UCLA.
17   Q. So did you attend those and then you finished
18   your degree at UCLA?
19   A. No, I started at UCLA.
20   Q. Okay. And then you went back to UCLA?
21   A. Yes. One summer I went to three different
22   schools throughout the week in order to get a lot of
23   G.E. requirements out of the way. I drove to Berkeley
24   and then sometimes in the evening to SF State.
25   Q. Okay. That was while you were at UCLA you were

16

1  just getting your G.E. requirements done?
2      A. That was one summer, correct.
3      Q. Okay.
4      A. Then Merritt College, I took courses in
5  horticulture there. I also took courses in real estate
6  finance at Merritt College.
7      Q. Did you receive any A.S. or any other degree
8  from Merritt?
9      A. No.
10      Q. What year did you graduate UCLA?
11      A. I'd have to go back and double-check, but I'd
12  like to say it was '93. 1993.
13      Q. Do you have any degree beyond a bachelor's, an
14  advanced degree beyond that like a master's or anything
15  like that?
16      A. No.
17      Q. All right. Can you -- again, this is again
18  general background information. Who is your current
19  employer?
20      A. I'm not working for anyone right now.
21      Q. Okay.
22      A. Unfortunately, PG&E sort of crippled me.
23      Q. Okay. When -- what was your most recent job
24  where you received compensation?
25      A. I've done a variety of independent contractor

17

1  jobs including doing some consulting work for an
2  investment manager, including Green Street Capital
3  Management. I've also done some sort of various,
4  various types of work for various contractors who needed
5  somebody who had attention to detail.
6      Q. When you say "various contractors," what type
7  of work were you doing?
8      A. Oh, some wood fence staining long ago when I
9  was in high school. I worked for The Growing Concern
10  and I did antique and antique replicas refinishing. So
11  I have some abilities with wood.
12      Q. Can you just give me since you graduated from
13  UCLA in approximately '93 can you give me the names
14  of any employers or people that you worked for from then
15  until now?
16      A. You know, I had no idea we were going to go
17  through my job history here today, so I do not have all
18  of that in front of me.
19      Q. Yeah, I don't need an exact. This is again
20  just based on your recollection, you know -- let me ask
21  this. What's -- have you ever worked for a company
22  where you received a W-2 tax form?
23      A. Sure.
24      Q. Okay. What company?
25      A. You know, again, I would have to look back --

18

1  you have to give me some time to go research this kind
2  of questioning.
3      Q. Okay. What's the longest period of time that
4  you've held a job where you were W-2'd?
5      A. Again, same answer.
6      Q. Okay. Just based on your memory, can you --
7  was there a long stretch of time? Have you worked for
8  anybody longer than five years, say?
9      A. No. Other than myself. As you ask these
10  questions I can think of some things. I can think of a
11  W-2 right away.
12      Q. Okay.
13      A. Right now that was for a period of time. I
14  worked for -- out of college I worked for a gentleman
15  who had left Bear Stearns and I helped him set up a
16  hedge fund.
17      Q. Okay.
18      A. After that I worked with my brother who was a
19  trader on the -- options trader on the Pacific Coast
20  Exchange, options exchange at the time. After that I
21  worked for Churchill Capital Management, and I ran a
22  separate pool of capitol and made a good set of returns
23  for them. After that I launched my own hedge fund.
24      Q. Okay. How long did you work for Churchill
25  Capital Management approximately? Again, this is an

19

1  estimate, it doesn't have to be an exact period of time.
2      A. Approximately a year and a half.
3      Q. You said you helped somebody who had left Bear
4  Stearns, set up a hedge fund. How long did you work
5  with him? I think you said him.
6      A. Approximately a year, year and a half,
7  somewhere in there.
8      Q. How long did you work with your brother on the
9  options trading?
10      A. Six to nine months before Churchill hired me.
11      Q. Okay. And then you set up your own hedge fund
12  after that, after you left Churchill; correct?
13      A. Yeah. While I was at Churchill I returned
14  67-point-something percent AIMR-compliant returns. We
15  did quite well for them.
16      Q. Your own hedge fund, how long did you run that
17  for?
18      A. Slightly over a year.
19      Q. What did you do after that, workwise?
20      A. Again, I'm going to state that I didn't know I
21  was going to be quizzed on my life or work life and I'm
22  puzzled when why you're asking these questions when
23  we've got a refrigerator damages claim.
24      Q. We're going to get to that. Again, this is
25  general background information. I will tell you any

20

1 deponent I depose I always go back. I go through their
2 educational and their work history. It's just -- it's
3 very standard. It's nothing special as to you. We're
4 going to get to the refrigerator claim.
5     A. Again, I'm going to answer I had no idea I was
6 going to get quizzed about the history of what I've done
7 in my life.
8     **Q. Okay. Well, maybe when we take a break if you**
9 **think of anything else after the hedge fund when we come**
10 **back on the record then you can say, you know, hey,**
11 **Ms. Dodge, I thought of a couple other jobs that I held**
12 **and we can put it in then. Okay?**
13    A. Sure.
14    **Q. All right. How many claims have you filed**
15 **against PG&E total, not limited to the refrigerator**
16 **claim -- in total regarding anything?**
17    A. Well, this is going to be to the best of my
18 recollection.
19    **Q. Right.**
20    A. There have been a lot of outages and I don't
21 know the answer to some of the food spoilage claims that
22 I submitted. You would have to research that. You have
23 better access to PG&E files than I do.
24    **Q. Are you talking about how many food spoilage**
25 **claims you've submitted you can't remember?**

                                          21

1    A. Correct.
2    **Q. Okay. Can you give me an approximate number?**
3    A. Again, I would be guessing.
4    **Q. No, you would be estimating; guessing is when**
5 **you have no basis. You were the one that filed the**
6 **claims, so you have some basis for knowing.**
7    A. Yeah, two or three. Two or three times, I
8 believe, PG&E had outages that resulted in food
9 spoilage.
10    **Q. Okay. You submitted claims for those?**
11    A. I don't recall. I think I submitted two or
12 three. I don't know.
13    **Q. What was the outcome of those claims?**
14    A. PG&E always denies it.
15    **Q. Okay. Did you follow up on any of those denied**
16 **claims? Again, I'm not including the refrigerator claim**
17 **here. I'm talking about the other ones you referenced.**
18 **Did you have follow-up on any of those to file in small**
19 **claims court or in a regular court?**
20    A. Sure. I can go into the rest, a more expansive
21 answer for you. We got stuck on a small part of this.
22 So he filed the reason I think the reason we're talking
23 today, I filed first with PG&E through to claims
24 process. There may -- again, I would have to refresh my
25 memory and search for records, but somewhere along the

                                          22

1 line there was also an instance where I tried to go
2 through some other process that PG&E has that I don't
3 recall. It had multiple forks to it. You could either
4 go informal or formal.
5       MR. LAPPING: Let me clarify. Are we talking
6 about if he filed a claim against PG&E for food spoilage
7 other than the refrigerator claim?
8       MS. DODGE: Right.
9       MR. LAPPING: You made several claims, but
10 other than in another actual context.
11       THE WITNESS: I'm not sure if I still
12 understand.
13       MR. LAPPING: Other than the refrigerator claim
14 that arose in 2016 and whatever happened to that, did
15 you ever have any other claims ever against PG&E for
16 food spoilage?
17       THE WITNESS: Yes.
18       MR. LAPPING: Okay.
19 BY MS. DODGE:
20    **Q. Right. You said two to three that you can**
21 **recall?**
22    A. That's my best guess, yes.
23    **Q. Estimate. Remember it's an estimate, not a**
24 **guess. What I'm asking -- you said those were denied;**
25 **correct, by PG&E?**

                                          23

1    A. Yes. Isn't that what you do for them?
2    **Q. Okay. I ask the questions. I'm trying to set**
3 **the basis for my next question, which is did you take**
4 **any additional action following the denial of those two**
5 **to three claims for food spoilage? Did you pursue it in**
6 **court? Did you --**
7    A. Sure, let's get to where I think you're going.
8 You mentioned something about small claim before. Let's
9 try to -- we can -- you can ask me about other things,
10 but you're -- I thought we were here today --
11       MR. LAPPING: Just answer the question as best
12 you can.
13 BY MS. DODGE:
14    **Q. Yeah. I'm not talking about the refrigerator**
15 **claim. I'm talking about you said two to three other**
16 **claims for food spoilage that were denied by PG&E. My**
17 **question to you is did you take any additional action**
18 **following the denial of those claims in court, small**
19 **claims court, another venue?**
20    A. Other than the PG&E claims process for the any
21 other PG&E -- well, for refrigerator or food spoilage, I
22 did not. In this instance to be clear.
23    **Q. Okay. We're not talking about this. We're**
24 **going to get to this one, I promise. I'm trying to**
25 **address the other ones first before we get to this one.**

                                          24

Case: 19-30088   Doc# 12539-1   Filed: 06/21/22   Entered: 06/21/22 19:26:00   Page 7
of 40

1  Okay. So you said two to three for food spoilage. Have
2  you filed any other claims besides the refrigerator
3  claim and the two to three food spoilage claims?
4  Excluding those, have you filed any other claims against
5  PG&E for anything?
6      A. There's a -- it would help if we sort of went
7  in order a little bit, but I can try to answer your
8  question the way you were asking it. PG&E, subsequent
9  to the refrigerator damages claim -- refrigerator power
10  surge power fluctuations damages claim, overlapped our
11  decision-making process by causing construction damages
12  related to a safety-based gas lines retrofit and gas
13  meters relocation project at the front and entrance of
14  the property.
15      Q. Okay. When you say "the property," you're
16  talking about 47 Bolinas; correct?
17      A. Correct.
18      Q. Okay. And how many claims did you file
19  regarding that gas retrofit project?
20      A. So there were three claims filed in the PG&E
21  bankruptcy that I believe you're aware of.
22      Q. Right. One is the refrigerator claim; correct?
23      A. Correct.
24      Q. That we're here about today. There's another
25  one regarding some construction or concrete damages;

25

1  You're not answering my question. I don't know if
2  you're not listening to it. I would either have the
3  court reporter read it back to you, or I will say it one
4  more time. The answer is yes or no. It's not an
5  explanation. It's a yes or no answer. Okay?
6      A. Uh-huh.
7      Q. My question is excluding the three claims you
8  filed in bankruptcy, the refrigerator claim, the
9  concrete claim, the tree claim, and the two to three
10  claims that you filed against PG&E regarding food
11  spoilage, excluding all of those, have you filed any
12  other claims against PG&E at any time; yes or no?
13      A. Yes.
14      Q. Okay.
15      A. As you know --
16      Q. No, not as you know. Please identify what
17  those claims are.
18      A. So prior to filing in small claims.
19          MR. LAPPING: Wait a minute. Let me make it
20  clear, Todd. She's not -- the refrigerator claim went
21  through a series of claims. Forget that. Yes. She's
22  asking any other claims.
23          THE WITNESS: Okay.
24  BY MS. DODGE:
25      Q. Yes or no. I'm asking you not the refrigerator

27

1  correct?
2      A. Correct.
3      Q. And then another one involving a tree damage;
4  correct?
5      A. Trees -- damages to heritage Redwood trees.
6  Tree trespass.
7      Q. So that's three claims you filed in the
8  bankruptcy. So now my question is excluding those three
9  claims you filed in the bankruptcy, excluding the two to
10  three food spoilage claims that you filed against PG&E,
11  have you filed any other claims against PG&E at any
12  time?
13      A. As you mentioned earlier, but I didn't really
14  get to explain because we're asking such a broad
15  question here, I went through the PG&E directed claims
16  process that landed the refrigerator power damage claim
17  if bankruptcy court. As part of that, and we've
18  explained this to you previously so I'm not quite sure
19  I'm being asked this, but as part of that PG&E claims
20  process that has been dragged out for years now, after a
21  year-plus ultimately PG&E said we're not going to pay
22  the claim but we will pay your homeowners insurance
23  deductible if you're willing to put it on your
24  homeowners insurance.
25      Q. Mr. Greenberg, I want to stop you right here.

26

1  not the property damage claims, not the food spoilage
2  claims, put all those to the side. Have you filed any
3  other claims than those?
4      A. Not that I'm aware of unless this is a trick
5  question.
6      Q. I'm not trying to trick you. I'm just trying
7  to find out if there are any other claims out there.
8  Okay. So your answer is no; correct?
9      A. No. Other than what I answered previously that
10  as part of some of these claims process at some point
11  PG&E referred me to some -- some -- maybe it was a CPUC
12  process or something that I tried to follow.
13      Q. What was the CPUC process was in relation to
14  what claim?
15      A. I would have to go back and review it.
16      Q. Was it one of the food spoilage claims?
17      A. I believe it's related to this refrigerator
18  claim. I don't know at this point. I would have to go
19  back and look.
20      Q. Okay. Did you go through any type of CPUC
21  process or contact the PUC regarding the claim?
22      A. Yes.
23      Q. Did you file something separately with the PUC?
24      A. I would have to go back and look because I was
25  new to this at the time. I was trying to get this

28

Case: 19-30088   Doc# 12539-1   Filed: 06/21/22   Entered: 06/21/22 19:26:00   Page 8
of 40

1 solved.

2    Q. Right. But it's your recollection that your

3 contact to the PUC was with regard to the refrigerator

4 claim or another claim?

5    A. That's what I think at this point in time.

6    Q. This refrigerator claim?

7    A. Yes.

8    Q. Do you recall what the outcome of your contact

9 with PUC was with regard to the refrigerator claim?

10    A. Yes, it was unsatisfactory.

11    Q. Okay. Did you receive any type of writing from

12 the PUC regarding your claim --

13    A. I received something that came back sometime

14 after initially that didn't bear any resemblance to what

15 had been discussed, it was full of errors.

16    Q. Okay. Was that something in writing from the

17 PUC in response to your complaint to them?

18    A. Again, I would have to look back and find out

19 whether it was from them or whether it was from a PG&E-

20 led program. It was a long time ago.

21    Q. Okay. But your recollection was that was

22 related to the refrigerator claim; correct?

23    A. I believe so, yes.

24    Q. All right. Now, listen carefully to my

25 question. Other than all the claims we've discussed,

                     29

1 right, and that's the refrigerator, property damage, the

2 spoiled food claims that you've filed against PG&E, have

3 you ever filed any lawsuits against PG&E? I'm

4 distinguishing between a claim where you submit that to

5 PG&E through their claims process versus a lawsuit that

6 you file in court?

7    A. Does small claims count?

8    Q. Yes.

9    A. Yes. I've answered multiple times already.

10 I've filed some small claims.

11    Q. Or which claim or claims?

12    A. I'd have to go back and look how it was worded.

13    Q. Okay. I believe you did file with regard to

14 the refrigeration claim; correct?

15    A. I think so at this point, but again, I would

16 have to go back and refresh my memory.

17    Q. I believe there's reference to that in the

18 documents we produced from the claims file. Do you

19 recall other than that small claims action any other

20 lawsuits you filed against PG&E?

21    A. Not that I can recall at the present time.

22    Q. Okay. Again, this is not limited to the

23 property where you currently reside. This is lawsuits

24 against PG&E at any time.

25    A. Again, you are asking me for a history that I

                     30

1 wasn't refreshed or prepared and haven't researched.

2    Q. Right. But I'm asking you based on your

3 recollection other than the small claims suit filed with

4 regard to the refrigerator claim, have you filed any

5 lawsuits against PG&E at any time for any reason

6 relating to anything?

7    A. Not that I can recall currently.

8    Q. Okay. Okay. That's all I'm asking. This is

9 just based on your recollection. How many -- and again,

10 I'm just asking for an estimate here. How many lawsuits

11 have you filed in your lifetime, and not just against

12 PG&E but against any entity? Again, I'm asking for your

13 best recollection and an estimate is acceptable.

14    A. Yeah. So you're counting small claims court as

15 a lawsuit?

16    Q. Yes.

17    A. So two.

18    Q. Two. Is that the small claims and then the

19 vitamin one you referred to earlier?

20    A. Correct.

21    Q. Yes?

22    A. Correct. Other than the claims that we're

23 talking about today and the property damage and the food

24 damages.

25    Q. Those are all claims. Actually, I think now

                     31

1 we're aware that you filed the lawsuit in state court,

2 this is the separate lawsuit that you filed in state

3 court in Marin County just a couple of months ago in

4 February; correct?

5    A. This is? What does this mean?

6    MR. LAPPING: She is talking about the state

7 court lawsuit.

8    THE WITNESS: Yes. There is a complaint filed

9 in state court against the PG&E contractors that PG&E

10 employed that did the damage at our property.

11 BY MS. DODGE:

12    Q. All right. So then it's not two lawsuits, it's

13 three because you didn't include that one; correct?

14    A. Correct.

15    Q. Can you think of any others?

16    A. No, not that I can think of at the moment.

17    Q. Again, like I said, if during a break something

18 pops into your head and you remember something else you

19 can go back on the record and say, hey, I thought of

20 another lawsuit. I want to update the record. Okay?

21    A. Okay.

22    Q. Have you ever been determined by any court or

23 anyone, I guess, to be a vexatious litigant? Have you

24 ever heard that term?

25    A. No, I've never been determined, as you are

                     32

1    describing, a vexatious litigant.
2        Q. Do you recall filing a claim against PG&E in
3    2012 for damages related to a stereo and receiver and
4    microwave?
5        A. 2012 was before I lived in this property.
6        Q. Correct.
7        A. Correct.
8        Q. Yes. Well, you tell me. You moved there in
9    2015, I believe?
10       A. Correct.
11       Q. Do you recall that?
12       A. I don't presently. It sounds like it's
13   something that might have happened.
14       Q. Okay. Do you recall filing a claim in 2019 for
15   spoiled food due to a power shut off safety event.
16       A. That's probably one of the claims I mentioned
17   earlier.
18       Q. Okay. Regarding the food spoilage?
19       A. Correct.
20       Q. That claim was denied; correct?
21       A. I believe so. Isn't that -- does PG&E ever pay
22   these claims?
23       Q. Mr. Greenberg, I'm asking the questions here.
24           So when you moved into the property you got
25   a -- there was a home warranty; correct?

                                                      33

1        A. Correct.
2        Q. Through Fidelity Home Warranty?
3        A. Correct. We purchased it at closing when we
4    bought the property.
5        Q. Okay. What did the home warranty cover? Was
6    it just appliances or was it more extensive than that;
7    do you recall?
8        A. You know, I think we purchased a duplex -- it
9    wasn't clear at first. They have different types of
10   policies. You could either have a single-family
11   residence or a duplex policy. I believe we purchased a
12   duplex policy or a duplex policy was purchased because I
13   am hazy on my recollection here because I think we paid
14   for some of it -- part of the agreement was the
15   seller -- it's typical in the area the seller will pay
16   for some of it. When we found out that we had to do a
17   duplex policy rather than a single-family home
18   residence, I think we had to pay for some of it. We
19   added a hot tub coverage too because I was hoping to
20   someday install a hot tub there, which still has never
21   been done.
22       Q. Okay. Did that Fidelity Home Warranty cover
23   flooring in the duplex?
24       A. Not that I'm aware of, but perhaps. I think.
25       Q. Right. I'm just asking if you know based on

                                                      34

1    your recollection. You're not sure?
2        A. Not that I'm aware of.
3        Q. Okay. But it did cover appliances; correct?
4        A. Correct.
5        Q. And then the refrigerator damage was pursuant
6    to your Appliance Repair Doctor receipt that was
7    $288.51; correct? $288.51?
8        A. I would have to look back at that receipt to
9    answer the question. That sounds approximately right.
10       Q. Right. And then I believe you paid, like, $65
11   for the service call; correct? There's a deductible you
12   have to pay for the call; right?
13       A. I do recall that there is a deductible. I
14   don't recall the exact amount that we paid for that
15   deductible. I don't recall whether we had any
16   proportional payment subsequent, but I -- yeah, we would
17   have to look into that for you.
18       Q. Did you ever submit a claim to Fidelity Home
19   Warranty for replacement of the flooring that you claim
20   was damaged by the refrigerator?
21       A. No, not that I'm aware of.
22       Q. Okay. Then did you have -- you had homeowners
23   insurance on the property; correct?
24       A. Correct.
25       Q. Who was that through?

                                                      35

1        A. I'd have to research that for you. We've
2    changed companies.
3        Q. Okay. Well, if you can -- my question is who
4    issued the homeowners policy that would have been
5    effective in 2016, so if you can check that during a
6    break and let me know that would be helpful.
7        A. I can try to get that for you during break. I
8    don't know that I can get it for you that quickly. I
9    may have to call the insurance agent.
10       Q. Do you recall what your deductible was on that
11   policy in 2016?
12       A. No. Again, these questions I would have to
13   refer to my insurance agent.
14       Q. All right. So I am going to -- I want to go
15   through your responses to discovery. Do you have
16   your -- a printed copy of your responses to the
17   interrogatory requests and request for admissions?
18       A. I do.
19       Q. Great. First of all, the dates of your trip
20   when you were away, that was February 14th through
21   February 21st, 2016; correct?
22       A. That sounds correct to me. Again, it was a
23   long time ago. I believe we've submitted my plane
24   ticket, and we've already testified about this multiple
25   times.

                                                      36

GLW & Associates
(559) 974-1914   glwassociates@att.net
Case: 19-30088   Doc# 12539-1   Filed: 06/21/22   Entered: 06/21/22 19:26:00   Page
10 of 40

Q. When you say you testified about this, I'm not really sure what you're referring to. This is your deposition. This is where you're giving testimony about this claim.

A. Oh.

Q. Okay?

A. Sorry.

Q. Just so you understand. When you say "testify," you're testifying here today. This is the first time you've testified in this matter?

MR. LAPPING: Counsel, he submitted a declaration. Is that what you mean?

THE WITNESS: That's what I'm referring to.

BY MS. DODGE:

Q. Right. I just want to make clear when he said he's done this multiple times I'm just confirming on the record those are the dates when he was away. There are documents that you have submitted. Those are the dates I just wanted to confirm that comports with your recollection?

A. Yes, but I'd refer to the documents.

Q. Okay. Well, do you have your binder? I believe it's in binder two.

MR. LAPPING: No, he doesn't have that available.

37

MS. DODGE: He doesn't have the documents you produced available?

THE WITNESS: I do not have those in front of me.

MR. LAPPING: Not as we're sitting here.

BY MS. DODGE:

Q. I think I can share my screen. I think I have them up here. Hold on. I can share my screen.

Can you see the screen I have up?

A. Yes. There's some very small pages on the left.

Q. Right. There is a larger page. Let me enlarge it. This is a document you submitted. This is Bates Number TW175. It looks like this is your Mileage Plus account. Those are the dates there right here where I'm motioning. Do you see that 2/14 or 2/21?

A. Sure do.

Q. Does that refresh your recollection those are the dates you were gone?

A. Yes. I think more accurate -- to confirm more accurate -- this should be accurate. To confirm more accurate you would probably want to look at the boarding pass that I previously submitted.

Q. Okay. All right. I'm going to stop sharing. We may go back to that because that's probably helpful.

38

Okay. Let's look at your interrogatory responses if you have that, if you have those there.

Do you have those there?

A. I do.

Q. I know you submitted some documents regarding ownership of the property. The owner of record, and I'm looking here at Interrogatory Number 1, was the Greenberg Family Trust, Roger and Mary Greenberg trustees; correct?

A. Yes, subject to whatever wording is on the official records.

Q. Right.

A. This is my relay of my understanding of --

Q. Right.

A. -- what that wording is.

Q. Okay. Roger and Mary Greenberg, are those your parents?

A. Correct.

Q. Okay. You were not a trustee at that trust; correct?

A. I was a trustee -- sorry. Pardon me. I misunderstood your question. They were the trustees and I was the beneficiary.

Q. So you were not a trustee; correct?

A. Correct.

39

Q. In terms of your occupation of the property, we've discussed this before but I want to make sure I've got this correct. When you first moved into the property you moved into the lower unit which is Unit B; correct?

A. Correct.

Q. Okay. That's the three bedroom/one bath unit?

A. Correct.

Q. And then you lived there from I think November of 2015 through July of 2019. I'm looking at your response to Interrogatory Number 2 if you want to see where I'm at.

A. I'd clarify. You said through and I believe I answered to July 2019.

Q. Okay. I'm sorry.

A. Which interrogatory number is this?

Q. Number 2.

A. Until July 2019. So I guess the word until might have made things confusing. Until means up to July 2019.

Q. So you lived there through June of 2019; correct?

A. Yes.

Q. And then in July of 2019 you moved into the upper unit, Unit A?

40

1    A. As I stated in the interrogatories, yes.
2    Q. Okay. Then you've lived in that upper unit
3 through the present; correct?
4    A. Correct.
5    Q. All right. I'm looking on now this is Page 4
6 of your interrogatory responses if you want to see where
7 I'm referring to. In the fourth or third paragraph down
8 you said the large cost to repair and the one-year delay
9 to hear back if PG&E would be paying the repairs left us
10 in limbo as to best how to proceed. What's your basis
11 for saying you didn't know what PG&E's position was for
12 one year?
13    A. We didn't hear until -- definitively until Mike
14 Barnett from PG&E on January 10th, 2017, indicated that
15 Dustin Perkins and his boss Kevin Shaw were not willing
16 to do anything, were not going to pay the claim, and
17 were only willing to pay our homeowners insurance
18 deductible.
19    Q. Okay. I'm going to share my screen again. I'm
20 looking at and I'll make this larger. This is the
21 documents that PG&E produced. This is PG&E0039.
22    A. Sure.
23    Q. Can you see my screen?
24    A. Yes.
25    Q. And it's a letter dated April 22nd, 2016 --

41

1    A. Right.
2    Q. -- from PG&E to you. It's from Dustin Perkins,
3 senior claims investigator.
4    A. Right.
5    Q. The first paragraph states we have determined
6 we cannot issue payment for your claim. This letter
7 explains our decision.
8    A. Right.
9    Q. Okay. How is that not a denial of your claim
10 in April of 2016?
11    A. Because Dustin Perkins and I continued talking
12 after that. He ultimately referred me to his boss, I
13 believe, his supervisor Kevin Shaw. Speaking with Kevin
14 Shaw took some time. As I said, it wasn't until January
15 10th in 2017 that we heard back from Mike Barnett that
16 they weren't going to change their minds but they were
17 willing to pay for our homeowners insurance deductible.
18    Q. Do you have any type of written communication
19 from Mike Barnett in January of 2017 of that
20 communication?
21    MR. LAPPING: Yes.
22    THE WITNESS: Yes. I can dig that up I can
23 find it for you. Is there some reason you're not aware
24 of this already?
25 ////

42

BY MS. DODGE:
2    Q. Mr. Greenberg, I'm asking the questions. Okay?
3 You're answering the questions. That's the process.
4    A. Okay.
5    Q. I'm not in a position to answer your questions.
6 Okay? Do you recall what your -- you don't recall what
7 your homeowners deductible was?
8    A. I answered already. No.
9    Q. Why did you decide not to submit a claim for
10 the damages through your homeowners policy?
11    A. I've already answered that in the
12 interrogatories, but I'll answer it again for you if you
13 wish. Do you?
14    Q. Yes, please do. Mr. Greenberg, let me explain
15 to you, unless your attorney objects to one of my
16 questions your job is to answer my question. It's not
17 to question why I'm asking it. Okay? If you could
18 please do me the courtesy of doing that rather than with
19 your comments. The process will go a lot faster. Okay?
20    A. Certainly. Could you please ask the question
21 again?
22    Q. Why did you decide not to submit a claim to
23 your homeowners policy for the damage you claim was
24 caused by the refrigerator, the damage to the flooring?
25    A. After we received the definitive answer on

43

1 January 10th, 2017, from PG&E we then had to communicate
2 with our insurance agent and at least one if not more
3 other insurance agents and other people and get advice
4 on how to proceed and whether or not we should submit
5 the claim via to take up PG&E's offer and to submit it
6 via our homeowners insurance. They collectively advised
7 us each in their own way that we should not submit the
8 claim to our homeowners insurance as we would stand a
9 large risk of being canceled or having to pay higher
10 rates for seven years.
11    Q. Okay. What other insurance agents did you
12 consult with besides the one from your insurance
13 company?
14    A. So it wasn't the one from my insurance company.
15 It was our independent insurance agent, Ken Baron
16 Insurance. Michael Baron.
17    Q. B-a-r-r-o-n?
18    A. A single R, I believe. I'm not positive about
19 that. He's in San Francisco.
20    Q. Okay. Anyone else?
21    (Interruption in the Zoom proceedings.)
22 BY MS. DODGE:
23    Q. We had a momentary interruption there. We'll
24 just continue on.
25    Mr. Greenberg, did you speak to anyone besides

44

1 Mike and Ken Baron regarding whether you should submit a
2 claim to your homeowners policy?
3     A. Okay. I believe it's Michael Baron, not Mike.
4     Q. Okay. Anything else?
5     A. I don't think I spoke with Ken about it. I
6 think I just spoke with Michael. I spoke with someone
7 named Gary Quan about this.
8     Q. How do you spell his last name?
9     A. Q-w -- I believe it's Q-u-a-n, I believe.
10     Q. Okay. Is he an insurance agent?
11     A. Correct.
12     Q. And he advised you not to submit a claim
13 either?
14     A. Both of them said that it was ill advised to --
15 that it was a transfer of risk from PG&E's liability
16 that we should not take on.
17     Q. All right. Your response in Interrogatory
18 Number 2 continues on that you decided to move into the
19 upper unit in July of 2019. Do you see that?
20     A. Yes.
21     Q. Okay. Why did you wait three years to move
22 into the upper unit?
23     A. Well, we had to -- everything got thrown into
24 limbo land and you have to make decisions based upon
25 multiple variables, so we had damages to that floor that

45

1 needed to be fixed at some point or that we'd like to
2 fix at some point. We had to decide whether and when I
3 was going to live in the lower unit or the upper unit,
4 and while we were waiting for PG&E to tell us what was
5 going to happen we decided to take action upstairs and
6 make upstairs -- do various renovations upstairs. That
7 was the soonest that it became available.
8     Q. You said while you were waiting for PG&E to
9 tell you what was going on?
10     A. No. As I indicated in my prior answer, it
11 wasn't until January 10th, 2017, that we had a
12 definitive answer from PG&E. It wasn't until after that
13 to combine your other questions about insurance agents
14 we had to follow-up after we had that definitive answer
15 from PG&E with insurance agents and other people to
16 discuss what we should do.
17     Q. Those discussion took two years?
18     A. No. In between when this happened we started
19 renovating upstairs. We decided to renovate upstairs.
20 So once the renovation was going on upstairs, I couldn't
21 move upstairs.
22     Q. Okay.
23     A. It was sufficiently done that I could move in
24 by July 2019.
25     Q. Okay. When you -- when the property was first

46

1 purchased back in October of 2015, were any renovations
2 done to it before you occupied the lower unit?
3     A. Not by us.
4     MR. LAPPING: Clarify the question. Do you
5 mean between the time they purchased it and the time
6 they occupied?
7     MS. DODGE: Correct.
8     THE WITNESS: Not that I recall by us.
9 BY MS. DODGE:
10     Q. So when you moved into the lower unit in
11 November of 2015, you hadn't done any sort of
12 renovations of anything in that lower unit, is that
13 correct, like replace the floor, painting, carpeting, or
14 anything like that?
15     A. That's sort of a multiple question.
16     Q. Had you done any work in the lower unit --
17 Unit B, correct? -- before you moved in in November of
18 2015?
19     A. I don't recall whether I painted it or not.
20     Q. Okay. Was the flooring replaced --
21     A. No.
22     Q. -- after you purchased it?
23     A. No.
24     Q. Okay. And the upper unit is a one bedroom/one
25 bath; correct?

47

1     A. Correct.
2     Q. Did you do any type of renovations in that unit
3 before you purchased -- sorry, not before you
4 purchased -- after you purchased but before you occupied
5 the property?
6     A. No.
7     Q. Okay. Did -- does the unit upstairs, that's
8 where you're living now; correct?
9     A. Correct.
10     Q. Okay. Did that have a refrigerator in it?
11     A. Correct.
12     Q. When was that -- when was the refrigerator put
13 in the upper unit or was there one there when you
14 purchased it?
15     A. There was one there and that was removed when
16 renovations began.
17     Q. Okay. So just to clarify. When you
18 purchased -- when the property was purchased in October
19 of 2015 there was a refrigerator in the upper unit;
20 correct?
21     A. Correct.
22     Q. Was that a working refrigerator?
23     A. Correct.
24     Q. Okay. The lower unit, did that have a
25 refrigerator?

48

1      A.  Yes.
2      Q.  Okay.  Was that a working refrigerator?
3      A.  Yes.
4      Q.  Okay.  But based on your interrogatory
5  responses, the refrigerator at issue here is one that
6  you purchased and brought to the property; correct?
7      A.  Correct.
8      Q.  Okay.  So you replaced the refrigerator that
9  was there with the refrigerator you bought in the lower
10  unit?
11      A.  Yes.  As stated, I upgraded all of the
12  appliances there.
13      Q.  Okay.  And we'll get a little bit more into
14  this, but the refrigerator that you bought, where did
15  you purchase that?
16      A.  As stated in response to your requests, I
17  purchased it from a woman who lived in San Jose.
18      Q.  Okay.  How did you find her?  What was the
19  platform you used to purchase it?
20      A.  I believe it was on Craigslist.
21      Q.  Okay.  And the refrigerator was used when you
22  purchased it?
23      A.  Yes.
24      Q.  Okay.  Do you have any idea how old the
25  refrigerator was when you purchased it?

49

1      A.  Only what we've provided you and you have the
2  model number and the serial number, but we don't know
3  when it was placed into initial service.
4      Q.  Okay.  Did you -- what was your criteria for
5  finding a refrigerator on Craigslist when you were
6  trying to upgrade the one that was there?
7      A.  I wanted a nicer one and I wanted it to look
8  good and I don't recall the full set of criteria.  But I
9  wanted to upgrade things.
10      Q.  Right.  Was it, like, a -- what was the
11  refrigerator that was there when you purchased it, what
12  was its appearance?
13      A.  It was an over-under and I think it was -- I
14  don't recall whether it was black or brown, but I wanted
15  a side by side.
16      Q.  When you say "over-under," what do you mean?
17      A.  Freezer on top, refrigerator on the bottom.
18      Q.  Okay.  And it was black or brown and you
19  wanted, like, a stainless upgraded?
20      A.  Correct.  The one that is there is not actual
21  stainless steel, but it's a stainless color.
22      Q.  Looks like that?
23      A.  Yeah.
24      Q.  Right?
25      A.  Correct.

50

1      Q.  That's the LG refrigerator at issue here?
2      A.  Yes.
3      Q.  Okay.  And did you ask the woman you purchased
4  the refrigerator from whether it had had any repairs in
5  the past?
6      A.  Yeah.  I believe we've provided you those
7  e-mails that asked her whether it was in good working
8  condition.
9      Q.  I did see that, but the written -- the e-mails
10  don't necessarily reflect whether you had any type of
11  verbal conversations with her about the refrigerator.
12  That's what I'm asking you.
13      A.  She indicated to me that it was in good working
14  condition; otherwise, I wouldn't have gone to buy it.
15      Q.  Did you ask her if it had had any repairs?
16      A.  I don't recall.  I don't recall what my verbal
17  conversations with her were however many years ago this
18  was, in 2013.
19      Q.  Okay.  So when you -- so you purchased it in
20  2013.  That was when you were living in Mill Valley?
21      A.  Correct.
22      Q.  Okay.  So then did you move the refrigerator to
23  that property?
24      A.  Correct.
25      Q.  Were you replacing a refrigerator at that

51

1  property?
2      A.  Correct.
3      Q.  How did you -- when you went to pick up the
4  refrigerator, how did you transport it to the property
5  in Mill Valley?
6      A.  You know, I don't recall how that was done at
7  this point in time.
8      Q.  Okay.  I saw there was some notations in the
9  e-mails about dollies.  Do you remember moving it
10  yourself?
11      A.  I remember making plans to go down there.  I
12  don't know who came with me.  I think in the e-mails I
13  stated that somehow I wasn't going to have somebody and
14  there was a question about whether her contractor was
15  going to be there or not.
16      Q.  Okay.  But my question is did you -- did you
17  transport it yourself either with the assistance of
18  somebody else, like, did you get a dolly and take it out
19  of her property to bring to the Mill Valley property?
20      A.  I don't know whether I was the one who took it
21  on a dolly.  I don't know what happened there at that
22  time.  It does look from my correspondence with her like
23  I went down and picked it up.  I'm not sure how we did
24  what was necessary to transport it.  I don't even recall
25  which vehicle we were in.

52

1    Q.  Okay.  Do you have a truck that you use for
2  transporting large items?
3    A.  I do have a truck.
4    Q.  And so then the refrigerator, and again, this
5  is the refrigerator at issue, that was put into service
6  at the Mill Valley property; correct?
7    A.  Initially, yes, I believe so.
8    Q.  Okay.  And then when the property, the 47
9  Bolinas property was purchased the refrigerator was
10 transported from the Mill Valley property to the 47
11 Bolinas property; correct?
12   A.  Yes, I believe so.
13   Q.  Do you recall how the refrigerator was
14 transported during that trip?
15   A.  No, I don't.
16   Q.  Did you have professional movers when you moved
17 from Mill Valley to the 47 Bolinas property?
18   A.  I don't think I did.  I'd have to go back and
19 check.  My guess is that I probably got some of the guys
20 that the movers hire that are at U-Haul.
21   Q.  To help move your things from to 47 Bolinas
22 from Mill Valley?
23   A.  Yes.
24   Q.  Were either of the units furnished when the
25 property was purchased?

                                                    53

1    A.  No.  Let me clarify.  I answered on the
2  interrogatories that some items were included as part of
3  the purchase, so I wouldn't say that they were
4  furnished.
5    Q.  But they had some items in there?
6    A.  Yeah, that sort of fit for the lower unit.
7    Q.  Okay.
8    A.  There was nothing in the upper unit, but
9  there's a very nice, size-appropriate kitchen dinette
10 table underneath a skylight that was part of the
11 purchase.
12   Q.  Okay.  So the lower unit at the time of
13 purchase in 2015, the lower unit appliancewise had a
14 refrigerator, a stove, a dishwasher?
15   A.  Yes.
16   Q.  A microwave?
17   A.  Yes -- let me think about that.  Give me a
18 little bit of time to think on that.
19   Q.  Okay.  That's fine.
20   A.  I don't recall for sure.
21   Q.  Okay.
22   A.  You know, I don't think it had a built-in
23 microwave.
24   Q.  Okay.
25   A.  Because there was a hood above the gas cooktop.

                                                    54

1    Q.  Stove?
2    A.  Yeah.
3    Q.  The upper unit when the property was purchased
4  in 2015 had a refrigerator, stove, dishwasher?
5    A.  The upper unit had a refrigerator, stove, and
6  I'm not sure about dishwasher.
7    Q.  Okay.
8    A.  It may have had one.  I don't really recall at
9  this point.
10   Q.  Okay.  The refrigerator in the upper unit that
11 was present at the time the property was purchased, can
12 you describe that to me?
13   A.  I want to say it was a white with freezer on
14 top and refrigerator below, sort of rectangular-ish.
15   Q.  Okay.  And in February of 2016 you were living
16 in the lower unit; correct?
17   A.  Correct.
18   Q.  And no one was living in the upper unit?
19   A.  Correct.
20   Q.  Okay.  And the upper unit was unfurnished?
21   A.  Correct.
22   Q.  Okay.  Were the appliances in both units
23 plugged in and working in February of 2016?
24   A.  I don't know.  I couldn't answer that for
25 upstairs.

                                                    55

1    Q.  Why not?
2    A.  Because I didn't check.  I can't confirm
3  something that I'm not aware of.
4    Q.  Okay.  When you were in -- so was your intent,
5  then, when you were in the lower unit to renovate the
6  upper unit to rent out at some point?
7    A.  Ultimately, that's the decision that we made.
8  When we bought the property it was unclear.
9    Q.  Okay.  When you were living in the lower unit
10 in, say, 2016 or 2015 you said you were aware what was
11 in the upper unit in terms of appliances.  Did you ever
12 go up to the upper unit while you were living in the
13 lower unit?
14   A.  Sure.  Yes.
15   Q.  Did you keep anything in the kitchen up there,
16 in the upper unit, food or anything like that?
17   A.  I don't recall whatsoever at this point.
18   Q.  Was that -- was that refrigerator plugged in
19 and working at the time of the purchase of the property
20 in the upper unit?
21   A.  I don't know.  I'm not aware whether it was
22 delivered to us with it plugged in or without it plugged
23 in?
24   Q.  That was a bad question.  I assume when the
25 property was inspected at the time of purchase the

                                                    56

1  inspector would go through and tell you if something
2  wasn't working; correct?
3      A. To the extent of their abilities.
4      Q. Right.
5      A. If they became aware of it, but that's an
6  assumption.
7      Q. Right. Did you have any awareness that the
8  refrigerator in the upper unit was not working at the
9  time of purchase?
10     A. I don't know -- I think it was working. I just
11 don't know whether it was plugged in or not. I'm not
12 aware that it wasn't working.
13     Q. Okay.
14     A. I'm just not aware whether it was plugged in or
15 not or on what dates it was plugged in or even at this
16 point on what dates it was removed.
17     Q. You mean when the property was renovated, the
18 upper unit; right, is that what you're talking about?
19     A. Correct.
20     Q. Okay. After you came back from your vacation
21 February 21st or 22nd, again, I'm just approximating,
22 and you found the refrigerator in the lower level -- I'm
23 sorry -- the lower unit not working and the leaking on
24 the floor, did you check the refrigerator in the upper
25 unit?

57

1      A. I don't recall whether I did or not. I think I
2  had a pretty hard time with what was going on in the
3  lower unit. I think that's what was my area of concern.
4      Q. Were any other appliances in either unit
5  besides the refrigerator affected upon your return from
6  Hawaii?
7      A. Any other -- say that again, please.
8      Q. Were there any other appliances in either unit
9  that were affected upon your return from Hawaii besides
10 the refrigerator?
11     A. Yes. Clocks had to be reset on any device that
12 had -- it was blinking on the oven clock and on the --
13 any devices that had clocks I had to reset.
14     Q. Okay. Was the dishwasher affected in the lower
15 unit?
16     A. I don't know. I'm not a forensic electrical
17 appliance specialist. I don't know. I know what had to
18 be repaired immediately, but I don't know what else was
19 affected other than I had to reset clocks that were
20 blinking.
21     Q. Okay. My question is was the dishwasher
22 working upon your return from Hawaii; yes or no?
23     A. I believe it was, yes.
24     Q. Thank you. Was your stove -- your stove is
25 gas; correct?

58

1      A. It had an electric display, and it had an
2  electric cooktop. Wait. Let's see. The stove. Sorry.
3  Your assumption or your statement is incorrect.
4      Q. You mentioned gas stove earlier. If you want
5  to clarify, go ahead.
6      A. Let me clarify. Maybe I was thinking of the
7  gas stove that is there now. At the time it was an
8  electric cooktop.
9      Q. Okay.
10     A. And I don't know, but I'm thinking that it was
11 probably also an electric burner for the oven cavity.
12 It was a glass cooktop. It was a slide in Samsung
13 range, and I believe when -- later on we changed it to a
14 gas oven, gas cooktop with an electric display.
15     Q. Okay. Upon your return from Hawaii, was the
16 electric cooktop or electric oven affected?
17     A. Yes. The light -- the display was flashing.
18     Q. Okay. Was the -- did the electric cooktop or
19 the oven, did they work upon your return from Hawaii?
20 Was their function affected?
21     A. I don't know exactly when I later tried to
22 determine that or not the next time was that I tried to
23 use that.
24     Q. So is it a fair statement that if the electric
25 cook top or electric oven had been affected that would

59

1  have been part of your claim to PG&E besides the
2  refrigerator?
3      MR. LAPPING: Are you asking him to speculate?
4  BY MS. DODGE:
5      Q. No. I'm asking him -- my question to him is
6  was the electric cook top and/or electric oven, was it
7  not working upon your return from Hawaii? Let me ask
8  that question.
9      A. It wasn't immediately apparent that it wasn't
10 not working.
11     Q. Okay. That's a double negative so it makes it
12 very confusing.
13     A. I was not aware that there was a problem other
14 than the electricity had caused it to start -- have a
15 fluctuating display.
16     Q. So you're talking about the display was
17 affected or it was flashing, but the function of the
18 electric cooktop worked; correct?
19     A. I didn't immediately test it.
20     Q. Okay. It doesn't have to be right then, but
21 did it work at some point? I assume you cooked a meal
22 at some point after you got back from Hawaii; you were
23 living there.
24     A. Yes. I wasn't aware of a reason at that point
25 in time to put it on any claim.

60

**Q. To put what on any claim?**

A. The oven range that you're asking the question about, whether the cooktop or the oven range however it's variously referred to.

**Q. Right. The reason you didn't put it on a claim was because it still worked; correct?**

A. Yes, but --

**Q. Okay. Thank you. That's my question.**

A. I didn't know there was any damage that was caused to it. It was functional so it wasn't part of the claim at that time.

**Q. Okay. And what about the appliances upstairs? Was it an electric cooktop and oven in the upstairs unit?**

A. I wasn't living up there, so I couldn't tell you.

**Q. You said you -- you were the only one living at the property. You said you did go up to the upstairs unit. At some point I'm assuming you went up to the upstairs unit when you returned from Hawaii to see if those appliances were working and functional; correct?**

A. You're making an assumption that I don't have clear recollection of. I don't know whether I did or didn't. I don't know why I would immediately do that when I had problems to deal with elsewhere.

61

**Q. I would think if you were making a claim to PG&E you would want to include everything that you possibly attributed to -- I don't know why you're looking at your attorney. I'm asking you a question.**

MR. LAPPING: Where is this question going?

MS. DODGE: I haven't even asked the question yet.

MR. LAPPING: Ask the question.

BY MS. DODGE:

**Q. Okay. I'm trying to. Did you ever check the appliances upstairs after you returned from Hawaii to see if they were working?**

A. I don't recall.

**Q. Did you ever make any attempt to rent out the upper unit from March of 2016 to July of 2019 prior to its renovation?**

A. March of 2016? Sorry. Say that question again.

**Q. Did you ever make any attempt to rent out the upper unit from March of 2016 to July of 2019 prior to its renovation?**

A. I can't recall whether we did or we didn't. As I said, things were in flux and I think there were a lot of discussions about a lot of different things, but I did not have any active advertising campaign for that

62

and I don't think that's the direction we went in.

**Q. How long did the renovation of the upper unit take?**

A. I can't answer that question precisely, but I can tell you it was done sufficiently that I was able to move in in July of 2019.

**Q. I'm asking for an estimate.**

A. I'd have to research that for you.

**Q. You're telling me today you cannot provide an estimate of time for me?**

A. I would be guessing.

**Q. So, no, it's not a guess. It's an estimate.**

A. Without reviewing records it would be a guess.

**Q. Okay. In your responses you indicate that after you moved into the upper unit you tried to rent the lower unit from July of 2019 through May of 2020 and you provided some documents regarding inquiries that you had from some prospective tenants. Do you recall that?**

MR. LAPPING: Yes, you recall.

MS. REPORTER: I can't hear you, Mr. Lapping.

MR. LAPPING: I'm trying to counsel the deponent to limit his answers.

MS. DODGE: Thank you.

BY MS. DODGE:

**Q. Were you ever successful in your attempt to**

63

rent out Unit B, the lower unit between July of 2019 through May of 2020?

A. No is the answer.

**Q. Okay. And why didn't you try to -- why were the efforts to rent out the lower unit stopped in May of 2020?**

A. Because PG&E caused additional substantive damage that has made it very difficult.

**Q. Difficult to try to rent out the lower unit?**

A. You'll see when you visit.

**Q. Okay. So that's your answer is that you stopped your efforts to rent out the unit after May of 2020 because there was additional damage that PG&E caused to the property in May of 2020?**

A. Sorry. Let me -- I'm not sure.

**Q. If you want to clarify --**

A. Where do you come up to --

**Q. -- my question -- hold on.**

A. Which interrogatory are we on?

**Q. We're not on an interrogatory, I'm just asking you questions. Okay. My question is to you previously was why did your efforts to rent out the lower unit stop in May of 2020. Your answer was because PG&E caused additional damage to the property. So my question now is what additional damage are you referring to that made**

64

1  it impossible to try to rent out the property after
2  May of 2020?
3      A. I think you're aware of those damages as part
4  of the aforementioned other two damages claims against
5  PG&E that have been filed that you were representing
6  PG&E for.
7      Q. Okay. I'm asking you to state -- again, we're
8  not here on those claims, but we're talking about rental
9  damages in this claim. And my understanding, and I want
10  to clarify this too, in this claim, in your amended
11  claim you're claiming two years of lost rents; correct?
12      A. I believe that's what is on the claim.
13      Q. Okay. What period of time are the two years
14  that you're calculating lost rents attributable to the
15  refrigeration claim?
16      A. You know, I provided all the dates and
17  information to my attorney.
18      Q. Right, but I'm asking you.
19      A. Yeah. He made the calculations, so I think
20  you'll need to discuss it with him.
21      Q. Well, that's. Rich, can you provide some input
22  here because I'm really sort of lost. I don't
23  understand the two years. Is that between July 2019 to
24  May of 2020? Is that why those documents were provided
25  is that the lost rent you were attributing to the

65

1  refrigeration claim?
2      MR. LAPPING: That's not a two-year period.
3      MS. DODGE: I know it's not. That's why I'm
4  confused.
5      MR. LAPPING: Well, he moved out in July of
6  2019.
7      MS. DODGE: To the upper unit.
8      MR. LAPPING: To the upper unit and tried to
9  rent it. They were unable to rent it. I think that
10  rounds it out to 2021/2022.
11  BY MS. DODGE:
12      Q. Okay. But he was saying that the efforts to
13  rent the property after May of 2020 he stopped trying to
14  rent it because of the additional damages that are
15  related to his two other property damage claims. I'm
16  just trying to get clarification on what two-year period
17  you're attributing to this claim, this refrigeration
18  claim?
19      MR. LAPPING: I'd have to go back and look.
20      MS. DODGE: Okay. If you can check on that and
21  let me know that would be helpful.
22      THE WITNESS: If I can add something here too.
23      MS. DODGE: Okay.
24      THE WITNESS: I believe Rich has been
25  conservative in those two years.

66

1  BY MS. DODGE:
2      Q. Okay. But I'm just reminding you we're here
3  today, the deposition is with regard to the refrigerator
4  claim not to the property damage claims. If you have
5  other claims that are attributable to that, that would
6  be handled in the state court action versus the
7  refrigerator claim which is what we're here on today.
8  Just to clarify. Okay?
9      Now, were you -- when you moved into the
10  property, was your intent at some point to live in one
11  unit and rent out the other; is that fair?
12      A. We discussed a range of possibilities. At some
13  point that became what we would do.
14      Q. Okay.
15      A. That was the idea that we would have a mortgage
16  helper.
17      Q. Okay.
18      A. We discussed a myriad of possibilities as
19  things have, you know, developed over time.
20      Q. All right. I would like to go to the documents
21  you produced yesterday. This is binder -- I'm going to
22  share my screen in a minute. This is Binder 6. I'm
23  going to share my screen right now so you can refer to
24  these documents.
25      A. Sure.

67

1      Q. Hold on. Okay. Can you see my screen?
2      A. Yeah.
3      Q. Okay. What I'd like to do is go through the
4  documents you've produced here that were produced
5  yesterday and talk about these e-mails that were
6  exchanged between you and prospective tenants and ask
7  you some questions about those. So the first one we
8  have here is, let's see, a woman named Tara Glass. Do
9  you see that?
10      A. Yes.
11      Q. It looks like she inquired about the property,
12  Unit B, in March of 2020. You exchanged some e-mails,
13  it looks like, but Tara and Tony I think was her
14  partner, they never moved into the property; correct?
15      A. Correct.
16      Q. Why did they not move into the property?
17      MR. LAPPING: Objection. Calls for
18  speculation.
19  BY MS. DODGE:
20      Q. I'm sorry. Let me rephrase that. Did Tara
21  and/or Tony ever tell you why they decided not to move
22  into the property?
23      A. I believe there's something here, but as I
24  indicated previously I'm not a mind reader, and I don't
25  know the entirety of somebody's decisions. Tara states

68

1 some reasons here.
2     **Q. Right.**
3     A. I don't know whether those were the sum total
4 of the reasons. Sometimes people are polite, sometimes
5 they don't tell you everything. Sometimes they have
6 private discussions.
7     **Q. Right. I understand all of that. It looks**
8 **like in her e-mail here she talked about the job**
9 **uncertainty, and this was when COVID was first**
10 **happening, and so she wasn't sure. Again, I'm looking**
11 **at document Bates Number TG223, and I think it goes on**
12 **to 224. Do you recall meeting Tara and Tony at the**
13 **property?**
14     A. Yes, I do.
15     **Q. They toured the downstairs property, Unit B?**
16     A. Yes.
17     **Q. Ultimately, they did not move in; correct?**
18     A. Correct.
19     **Q. Did either Tara or Tony ever tell you that the**
20 **reason they decided not to move forward was because of**
21 **the damaged flooring in Unit B?**
22     A. No. As I answered in your interrogatories --
23     **Q. My question is a yes or no answer, please.**
24     **Miss Court Reporter, can you please read it**
25 **back to Mr. Greenberg.**

69

1     (Record read.)
2     THE WITNESS: I don't recall that they ever
3 specified that.
4 BY MS. DODGE:
5     **Q. Okay. Thank you. Moving on to the next page,**
6 **TH225, this looks like somebody, a Johnny bush in August**
7 **of 2019. Do you recall meeting him at the property?**
8     A. Yes. I met him at the property numerous times.
9     **Q. Did he ever move into the property?**
10     A. No.
11     **Q. Did he tell you why?**
12     A. He's a broker, and he looks at a lot of
13 properties. I don't know why.
14     **Q. Let me ask you did John or Johnny, you referred**
15 **to him as Bush, did he ever tell you that the reason he**
16 **decided not to move forward with the property was**
17 **because of damaged flooring in Unit B?**
18     A. You know, I think he was -- I don't -- I don't
19 think he was looking. I think you're misreading this.
20 I think he was looking at it to show it as a commercial
21 live/work space and suggesting that I advertise it on
22 LoopNet. I think this was part of me looking for an
23 additional way that it might be rented out or exposing
24 the property to a wider market.
25     **Q. Okay. This description that you have on this**

70

1 **Page TG225 to 226 of the property, is that a description**
2 **that you wrote?**
3     A. Let me read it.
4     **Q. I'm going to scroll up because it goes on to**
5 **the next page.**
6     A. Thank you. Yes, it looks like my writing. I
7 haven't read the whole thing, and this was from a long
8 time ago.
9     **Q. Right. Is there any mention in that**
10 **description of stained flooring in the kitchen?**
11     A. Would you advertise negatives? Pardon me for
12 asking the question.
13     **Q. Your answer needs to be an answer,**
14 **Mr. Greenberg. My question is pending. Does this**
15 **description include a statement regarding stained**
16 **flooring in the kitchen; yes or no?**
17     MR. LAPPING: Objection. The document speaks
18 for itself.
19 BY MS. DODGE:
20     **Q. I'm scrolling down to Zuhra, I believe.**
21 **Z-u-h-r-a. TG227. This looks like it was January of**
22 **2020. It looks like they came by to look at the**
23 **property and it looks like you said there I understand**
24 **it's too small for you and you would like more light and**
25 **you put her in touch with another realtor. Is that your**

71

1 recollection?
2     A. As I'm reading it, again, as rich, Just
3 indicated the document stands for itself. Are you
4 asking --
5     **Q. I'm asking you if that's your recollection. Do**
6 **you recall meeting her?**
7     A. I met a lot of people.
8     **Q. I'm asking you if you met her, Mr. Greenberg?**
9     A. It looks like I met someone named Zuhra, if I
10 wrote her a letter and thanked her for coming by to look
11 at it. I couldn't tell you what she looked like right
12 now.
13     **Q. I wasn't asking that. All right. I'm**
14 **scrolling on to TG229. It looks like somebody named**
15 **Faris and Brianna were interested in the property. Do**
16 **you recall meeting either of them?**
17     A. I do.
18     **Q. This was January of 2020. It looks like they**
19 **did submit an application to you; is that correct?**
20     A. I believe they did.
21     **Q. Did either Faris or Brianna move into the**
22 **property?**
23     A. No. They were a new couple and they had known
24 each other for some time. This was the first time they
25 were going to be living together, and they decided

72

1  against doing it ultimately.
2      Q. Okay. Did either Faris or Brianna tell you
3  that the reason they decided not to move into Unit B was
4  because of stained flooring in the kitchen?
5      A. I don't recall whether they specifically
6  mentioned that, but they did say that they wanted to be
7  able to do their own thing and there was a little too
8  much going on there for them.
9      Q. You mean, like, the area was too busy?
10     A. No. Like there were too many things going on
11 at the property.
12     Q. Okay. Scrolling on. Okay. I'm on TG231.
13 This is an e-mail from you to someone named Marysol
14 Solano in January of 2020. Did you ever meet Marysol at
15 the property?
16     A. I don't know. It looks like -- this looks like
17 it was an inquiry where if we look at the dates -- could
18 you go back and look at the dates for Faris and Brianna?
19     Q. Looks like it was January 13th and 14th.
20     A. Yeah, it looks like they predate and I had a
21 good impression of them.
22     Q. Uh-huh.
23     A. As you indicated, I think I took an application
24 from them and so she -- it looks like from reading this
25 that they were going to take it, that they said, hey, we

                                                    73

1  want it, but then they changed their mind.
2      Q. Okay. Right. It says if as a backup if the
3  plans change I'm willing to show it to you and your
4  friends. Did you ever end up showing it to Marysol and
5  her friends?
6      A. I don't know. It's hard for me to answer some
7  of these questions without asking you questions.
8      Q. I only -- Mr. Greenberg, I just got these
9  documents late last night from your attorney. I'm not
10 going to have any additional information on them that
11 you don't have because you're the one that was
12 participating. Let me continue on. Were you going to
13 say something?
14     A. Yeah. Let me try to illustrate.
15     Q. What are you illustrating?
16     A. A little background for you on the rental
17 inquiry process.
18     Q. Okay. Is this --
19     A. There's many inquiries and many people.
20     Q. Right.
21     A. Many a time people don't get back to you, or
22 they do get back to you, or their schedules change.
23     Q. Right. Okay. So I'm on Page TG235. This is
24 an e-mail from you to someone named Adrianna in February
25 of 2020. Great to meet you earlier today. Let's move

                                                    74

1  on with the application process. Do you remember
2  meeting Adrianna at the property?
3      A. I do remember meeting her.
4      Q. Did she submit an application?
5      A. I believe she decided not to go forward.
6      Q. Did she tell you why?
7      A. I don't -- I don't recall. Again, you're
8  asking for --
9          MR. LAPPING: Stop.
10 BY MS. DODGE:
11     Q. There is an e-mail on TG236 from you to, it
12 looks like, Lesley Perez regarding an inquiry. Do you
13 recall if -- this is in February of 2020. Do you recall
14 if Leslie ever came to the property, whether she
15 scheduled a showing and came to the property?
16     A. No, I don't recall that. I don't recall that.
17 It looks like she has a different last name than Perez.
18     Q. I wasn't okay looking at that. I was going off
19 the e-mail address. TG235, this is an e-mail from Lisa
20 Sirabella to you, I'm assuming, at a Craigslist address.
21 Let me see if there's additional information on the next
22 page. Okay. So maybe that was just an inquiry. I
23 don't know if they -- do you recall meeting Lisa
24 Sirabella at the property?
25     A. Like I said, I met a lot of people.

                                                    75

1      Q. It's just a yes or no.
2      A. I don't specifically recall meeting her.
3      Q. Okay. That's fine. All right. We've got a
4  few to go through. I'd just like to finish this and we
5  can take a break. On Page TG238 there's an e-mail from
6  you to somebody named Susan regarding an inquiry. Do
7  you recall -- this was in February of 2020. Do you
8  recall if Suzanne ever came to the property?
9      A. Pardon me. Back up a little bit. It's just
10 off of --
11     Q. Craigslist?
12     A. Craigslist.
13     Q. There's her e-mail down below.
14     A. Let's see. Yeah. This is a woman who I'm not
15 sure why they were relocating, but she's a horse
16 trainer.
17     Q. Okay. Did she come to the property?
18     A. Yes.
19     Q. And did she submit an application?
20     A. I don't know whether she -- I don't recall
21 whether she submitted an application.
22     Q. Okay.
23     A. She was interested, but I don't recall why she
24 didn't want it.
25     Q. Okay. That's fine. Again, I'm trying to move

                                                    76

Case: 19-30088   Doc# 12539-1   Filed: 06/21/22   Entered: 06/21/22 19:26:00   Page
20 of 40

through these. TG239. This is an e-mail from you to somebody named Robin. I enjoyed meeting and talking with you earlier. I don't know, something about help you provided Lana and Dylan and brother Scott. Did you meet Robin at the property?

A. I believe she was another horse person.

Q. Did she submit an application?

A. No, I don't think she did.

Q. Let's see. Okay. Moving on to -- this is somebody who just wanted the property for a few months. This was in March. I think -- let me see. Let me put this in context again. I'm on TG 240. I think it's later on. I think you were looking for a one-year lease; correct?

A. Correct.

Q. Okay. These look like your responses on TG241 and 242 to I don't know what inquiries or what platform this was, somebody named Kenner Gutierrez regarding an inquiry. And the next one was Angela regarding an inquiry, both of these in March of 2020. Do you recall if either Ken or Angela came to the property to see it?

A. No, I don't recall either of them specifically.

Q. Okay. And then it looks like this is a copy of the Tara and Tony e-mails we had before so we don't need to go over that again. TG246 somebody named Mauro Perez

77

made an inquiry on the property in March of 2020. Do you recall whether Mauro ever submitted an application for the property?

A. No, I don't know whether he did or didn't. Like I said, a lot of people inquired. Some people came by. Some people didn't.

Q. Okay. That one was a shorter term. That was you saying you wanted one year. That was that series of e-mails. I think that's a copy of the same. This is TG252 somebody named Lindsay Fisher regarding an inquiry on the property. Do you recall -- this is in March of 2020. Do you recall whether you met Lindsay at the property?

A. I don't remember her.

Q. Okay. Next page, TG253, Edvin Chavez, same type of e-mail regarding an inquiry. Do you recall whether Edvin ever submitted an application for the property?

A. No, I don't recall Edvin particularly. There's the explanation for Edvin. Message delivery with a lot of stuff. I guess his e-mail was bad. I don't know what was going on there.

Q. I don't want to go off on a tangent. I want to finish moving through these. March 2020 somebody named Wyatt Walsh, again, inquiring about the property. Do

78

you recall ever meeting Wyatt at the property or him submitting an application?

A. No.

Q. This looks like this is just discussion about how to draft the advertisement. Who is Corina Rollins?

A. She runs the real estate department at College of Marin and she was my professor there.

Q. Okay.

A. And I've maintained a cordial relationship with her. She's been generous enough at various points in time to give me some counseling.

Q. Okay.

A. She's one of the first woman appraisers in California.

Q. How about this is Page TG259. Let me see if I can go down here. This is Scott Krienberg. I don't know if this is the same. Is it Scott and Matthew? I don't know if this is the same thing, or Janette. I'm confused. These are all together. This is July of 2019.

A. Yeah, it looks like it's got some generic e-mail. It's hard to tell what the reply is here. I'm not sure how he's got it loaded up whether they're single or separate e-mails.

Q. Here. If you look at TG259 and 260, there's a

79

July 1st, 2019, e-mail from Janette saying they're interested in renting, please call me or my husband Scott. It looks like below it there's an e-mail that looks like it's from Scott. Let me scroll down and see. There's a lot of reviews. Let me see if I can find a response to that one. Well, let me scroll back up to them. Do you recall whether Janette and/or Scott ever came to the property to view it?

A. You're going to have to try to refresh my memory for that. I recall receiving some various introductory letters such as this.

Q. Right. If you look at the e-mail from Scott, he says we are a family of five and I think I recall seeing somewhere in these documents that were produced that you responded back to somebody that the property was really too small for a family of five because it was 975 square feet --

A. I think that was the feedback from the larger groups of people who saw it.

Q. Okay. Let me see if I can find that. That may have been in relation to that one or something else, I'm not sure. What's this e-mail in August of 2019 to Chris -- Christopher Barrow at Foundation Homes?

A. That's a professional leasing agent or real estate agent.

80

Q. Okay. That was your effort to try to get the property out there?

A. I tried every which way to rent it.

Q. Okay. So that's those e-mails. I was wondering whether there was something about a toaster oven here. This was to somebody named Nancy who had a friend that might have been interested in leasing the property. Do you recall if Nancy's friend ever came to look at the property?

A. No, Nancy's friend never did. It was a conversation I had with her, and I provided her the link and I never heard from her friend that I'm aware of.

Q. This is about buying the toaster, I think, not the other. So I'm on Page Bates TG275. It looks like this is an e-mail from you to comadog@comcast.net?

A. That's my parents, the trustees of the Greenberg Family Trust.

Q. It's dated August 31, 2019. I'm going to blow off the property right now. What did you mean by that?

A. The leaf blower.

Q. Got it. Get rid of the leaves?

A. Correct. This is August, so it's starting to be fall.

Q. Right. Okay. You were kind of giving them a status update on your rental efforts; correct?

81

A. Yes.

Q. That's another description of the property. This here on Page TG276 you said bamboo flooring. Do you see that right here?

A. Yes.

Q. Is that the flooring that was installed when you moved in --

A. Yes.

Q. -- or was it already there?

A. Yes.

Q. Is that a bamboo flooring or is that a laminate?

A. There's a lot of different types of flooring. I'm not a flooring expert. I don't know whether you call it a laminate or bamboo flooring or what it's referred to.

Q. Okay. That's fine.

A. Okay.

Q. I'm on TG278. This is an e-mail from September of 2019 from you to somebody named Peter and Colleen. I think you're probably the best fit out of the prospective tenants who have been interested, and you talked about making some modifications, putting in a new steel vent hood and parking accommodations. Do you

82

recall meeting Peter and Colleen at the property?

A. Yes, I do.

Q. Let me finish. Did they submit an application for the property?

A. I don't know.

Q. I don't have anything here from -- that follows up on that. Oh, I'm sorry. I do. Let me go down here. On Page TG279 there's an e-mail from Peter to you, I believe. Our feeling -- I'm looking at the top of this. Our feeling by looking at the place may be a bit small of our desires which has put us on the fence. Do you recall having any discussions about that?

A. Yeah. Again, there's lots of things that are discussed --

Q. I'm talking just about the fact that it was too small or did they just e-mail it's too small and they didn't submit an application?

A. We had phone conversations.

Q. Okay.

A. We were in active discussions.

Q. Okay. But they never moved into the property; correct?

A. Correct.

Q. Okay. This looks like a follow-up to his October 2nd e-mail. This is TG281 indicating you

83

dropped the rental price and you were following up with him and Colleen. Let me scroll down and see if there's any response from them to your October 6th e-mail. No, the next one is different. Do you recall getting any type of response to this October 6 e-mail you sent to Peter?

A. I don't know specifically, you know, on that. Like I said, we were in conversation on the phone and via e-mail and you can see here it says, note, PG&E's contractor is doing work in front this coming Thursday or Friday, so any lease would likely begin 11/1/2019.

Q. Okay. Did either Peter or Colleen tell you that the reason they decided not to move forward with renting Unit B was because there was damaged or stained flooring in the kitchen?

A. I don't recall all of our conversation. I know that part of it was that PG&E had some obligations and was doing some work and part of it was timing and part of it was them weighing their options.

Q. Okay. Move to strike the last part of that answer as nonresponsive. I'm on Page TG284, this is an e-mail from Laura Gravenstein asking to set up a time to view the property in November 2019. Do you recall meeting Laura at the property? Let me scroll down and see if there's anything here. Oh, here. Okay. You

84

1  said you had a half hour.  She wasn't available.  I'll
2  call tomorrow to set up a time.  Do you recall if she
3  ever came by the property to see it?
4       A.  I don't know at this point.  I can't recall.
5  Some of these people I bounced around a lot with trying
6  to schedule.
7       Q.  That's understandable.  I'm on Page TG287, an
8  e-mail from you to -- this is Victoria and Ellen at
9  Marin Health.  I think you were looking to put ads to
10  the property somewhere at the hospital, maybe?
11       A.  Correct.  We were hoping to post it in the
12  doctors lounge.
13       Q.  Did you do that?
14       A.  I believe they did.  They told me they posted
15  it somewhere there.
16       Q.  Do you recall if you got any calls back in
17  response to those ads?
18       A.  You know, maybe you can go back and look at
19  what the posting was.  I don't know if it referred
20  people to Zillow or to Craigslist.  I'm not sure if I
21  would know.
22       Q.  Let me see if it's on here.  I think it's
23  somewhere, but it may be somewhere else.  If we come to
24  it, we can revisit that question.
25       A.  Yeah.

85

1       Q.  What about here in December of 2019, a woman
2  named Peach?
3       A.  Yes.
4       Q.  And her partner -- I don't know what her
5  partner's name is, Luke -- expressing interest in the
6  property.  Did they ever come visit the property?
7       A.  Peach did, but he didn't.
8       Q.  Okay.  Did she submit an application for the
9  property?
10       A.  I don't recall.  Somehow -- I don't think she
11  did.
12       Q.  Okay.
13       A.  I think she came and saw it and I don't think
14  he ever did.
15       Q.  Did Peach ever tell you that she decided not to
16  move forward with the property because of stained
17  flooring in the kitchen in Unit B?
18       A.  I don't recall what her parameters were.
19       Q.  I don't know what this is.  That was Adrianna.
20  That was from before.  Okay.  Bounced back.  I think
21  this is just another -- yeah.  Hold on.  I'm not really
22  sure why all this is included but there you go.
23       I'm on Page TG299, an e-mail from somebody
24  named Kayla to you -- I'm sorry from you to Kayla in
25  June of 2019, I think, you were telling her it wasn't

86

1  big enough for a family of five and it required a
2  one-year lease.  Do you recall that?
3       A.  So I think this was a leasing agent who made an
4  inquiry.
5       Q.  Here it is.
6       A.  Something similar to that.
7       Q.  Right here at the bottom of the page you
8  basically said that's too small and we need a one-year
9  lease, I believe; correct?
10       A.  I said what I said on the document.
11       Q.  Right.  Okay.  This is Janette, but I think
12  this is a copy of what we already had, Janette and
13  Scott, and we already talked about this.  Yeah, we
14  already -- this is a copy of what we already have.  We
15  went through this prior.  Okay.  We went through this.
16  Again, this is a copy.  Scroll through.  I think here at
17  the very end this might be -- this is TG 318.  Does this
18  look like -- I think this was maybe the ad you put on
19  the index cards to be posted at the hospital?
20       A.  That looks like some version.  There were
21  multiple drafts to try to fit it into different sizes.
22       Q.  Right.  And then this last page, TG319, is an
23  e-mail to somebody named Donato in March of 2020
24  regarding an inquiry.  Do you recall whether Donato ever
25  came to review the property?

87

1       A.  No, I don't recall Donato.
2       Q.  Okay.  So I'd like to take a short break, but
3  before we do, after reviewing those documents that you
4  provided in, I think it was Binder 6 of the rental
5  efforts, do you recall any prospective tenants for
6  Unit B telling you the reason they decided not to move
7  forward with Unit B was because of damaged flooring in
8  the kitchen?
9       A.  As I've answered multiple times, I have no
10  all-knowing knowledge of what and how they made their
11  decisions.
12       Q.  Right.
13       A.  There's lots of factors.
14       Q.  That's not my question.  My question was and
15  the reason I'm asking it now is because we've gone
16  through all of those documents.  Did any of the
17  prospective tenants that you met at the property tell
18  you that the reason they decided not to move forward
19  with submitting an application or moving into the
20  property was because of the damaged flooring in the
21  kitchen; yes or no?
22       A.  In part or on its own entirely?
23       MS. DODGE:  Can you read back my question,
24  please, Miss Court Reporter.
25       (Record read.)

88

Case: 19-30088   Doc# 12539-1   Filed: 06/21/22   Entered: 06/21/22 19:26:00   Page
23 of 40

**89**

BY MS. DODGE:

Q. Can you answer, please?

A. It's not a yes-or-no answer. I can't answer accurately yes or no.

Q. Why?

A. Because the answer is not specifically.

Q. Not specifically. Okay. What do you mean by that?

A. As I answered you in the interrogatories, there is a whole set of factors that somebody considered on whether or not to move into a place and I don't know how they weighed things.

Q. Mr. Greenberg, you're not listening to my question. My question is did any of the prospective tenants tell you that the reason they decided not to move forward with moving into Unit B was because of the damaged flooring in the kitchen; yes or no? I'm not asking about the tenants' thought processes, I'm asking about what they conveyed to you whether or not that was conveyed you to you; yes or no?

A. Not solely.

Q. What does that mean not solely?

A. That means there was suggestion with numerous tenants over what the living -- what the tenancy would entail and what it was going to be like living there and

**90**

what was going to -- how the spaces were going to be used, whether or not there was any future construction, what they could do with it, and the damages did get discussed and the PG&E work out front did get discussed with the people who were serious.

Q. I'm not asking about that work. I'm asking solely about the flooring in the kitchen.

A. And I'm saying that was a discussion point with some people, and I don't know what was in their mind. I did not.

Q. I didn't ask you what was in their mind, did I? I asked you what they told you. I didn't ask you to try to predict what's in their mind. I asked you what they told you. Did any of the prospective tenants tell you that the reason they decided not to move into Unit B was because of damaged flooring in the kitchen? If you refuse to answer my question, I'll just mark it and we'll have to file a motion to compel you to answer.

A. I've answered the question. I've said not specifically.

Q. It's a yes-or-no question.

A. Can you rephrase the question, please?

Q. No. That's my question. I've asked it five different times now and you're refusing to answer.

A. I'm trying to do my best to answer the

**91**

question.

Q. No. You're answering all around it and you're not answering my question. Let's take a break and you can think about it and decide if you want to answer my question, and then we'll come back and we'll resume the deposition. Let's take a 10-minute break. Let's come back at 3:30. Okay?

(Recess taken.)

BY MS. DODGE:

Q. Mr. Greenberg, do you have any type of follow-up response to the last question or would you like to clarify; otherwise, we'll move on?

A. I believe the answer is no.

Q. Thank you. When the property was purchased, was there -- it was purchased by the Greenberg Family Trust; correct?

A. Correct.

Q. Did the trust take out a mortgage for the property?

A. Rich, do we have to get into our finances?

MR. LAPPING: Yeah. Counsel, what's the relevance of that?

MS. DODGE: I want to ask about the rent and what the agreement was at the beginning of the ownership of the property.

**92**

MR. LAPPING: I think he indicated there was a mortgage earlier.

MS. DODGE: No, I've never -- no, he hasn't.

MR. LAPPING: Okay. Well --

BY MS. DODGE:

Q. Was the Greenberg Family Trust paying the mortgage on the property?

A. Are we asking about the rent or the mortgage?

Q. The mortgage as I said. The mortgage on the property.

A. The house was purchased in cash.

Q. Okay. So there was no mortgage?

A. Correct.

Q. Okay. So what was the agreement you had with your parents or the Greenberg Family Trust regarding paying rent on either unit, you yourself paying rent?

A. Sure. The agreement was that we would buy the place and evaluate and then I would pay rent in one of the units and we would rent out the other one as a "mortgage helper" so to speak.

Q. Even though there was no mortgage?

A. Do you know -- I don't want to ask you a question, but you laugh at it.

Q. I don't laugh at it. I guess -- again, I don't need to know all the financial background. I just

1 wanted to know was there an agreement like you would
2 occupy one unit and pay rent and then try to rent out
3 the other unit and act as landlord or that unit?
4     A. Ultimately, that's what we decided to do.
5     Q. Okay.
6     A. But you're likely aware from media readings and
7 perhaps -- I don't want to speculate on anything but
8 it's been a very, very challenging real estate market
9 for some time, and if you want to get a place you
10 typically need to make one of the best offers and
11 ideally make a cash offer. It's gotten worse and worse
12 over time where people have to have no contingencies and
13 it's a very challenging market.
14     Q. You're talking about the purchase of the
15 property, not the rental of the property after purchase?
16     A. That's what you were talking about.
17     Q. Yes, initially. Then I was moving into the
18 agreement after the property was purchased. Yes, I
19 understand it's a challenging real estate market. It's
20 the same everywhere in California because there's just a
21 shortage of property. Let me ask you. In your
22 interrogatories -- so when you were living -- you had
23 originally moved into the lower unit, but from November
24 of 2015 to June of 2019 were you paying any rent while
25 you were living in that unit?
                                                    93

1     A. I don't believe I paid any rent while I was in
2 that unit.
3     Q. Okay. But then you started paying rent when
4 you moved into the upstairs unit; correct?
5     A. Correct.
6     Q. Why did you start paying rent then but not
7 before?
8     A. We were formalizing -- we were -- I can't tell
9 you everything that was going on at the time, but
10 basically I had been doing multiple duties and once one
11 of the units was ready to rent I was no longer going to
12 have to do some of these duties.
13     Q. So you were in charge of trying to renovate the
14 property, during that time basically what would have
15 been your rent was waived?
16     A. No. I don't know if I agreed to that entirely.
17 I had obligations to them. It's just we had many
18 complications with the property that made it difficult.
19     Q. When you say "obligations to them," are you
20 talking about your parents?
21     A. To the trust and my parents as trustees.
22     Q. Right. Okay. Just to be clear, you've never
23 advertised the upper unit, Unit A is the upper unit; is
24 that right?
25     A. No -- yes. Pardon me.
                                                    94

1     Q. Unit A where you're living now, that's never
2 been advertised for rent at all; correct?
3     A. Not that I can recall.
4     Q. Okay. And then B which is the lower unit was
5 advertised for rent from July of -- no. Let me get my
6 dates right July of 2019 through May of 2020; correct?
7     A. Correct.
8     Q. And then you said the reason you kind of
9 stopped -- did you pull the active listings for the rent
10 in May of 2020? Were you no longer advertising the
11 lower unit for rent at that time?
12     A. I progressively pulled them.
13     Q. Okay.
14     A. Once the damages were sufficient that it
15 couldn't be rented.
16     Q. Are you talking about damages, the other
17 property damages?
18     A. That PG&E caused and PG&E's contractors caused.
19     Q. You're talking about the outside of the
20 property, not the interior; correct?
21     A. The driveway, sidewalk, and the entry area.
22     Q. Okay. I want to go back to your
23 interrogatories. Do you have those there?
24     A. Yes.
25     Q. Your interrogatory -- your response to Number
                                                    95

1 3, you said that there was uncertainty as to when you
2 would need to move out so that repairs could be
3 performed on the lower unit during the anticipated
4 three- to six-month time period of repairs. What
5 repairs are you referring to there?
6     A. I'm referring to the flooring repairs.
7     Q. So who gave you that estimate for replacing the
8 floors, three to six months?
9     A. I have submitted, I think, at least two
10 flooring estimates, one of which talks about six to
11 eight weeks. One of the contractors I talked to led me
12 to believe that it would be three or four months. Since
13 there is --
14     Q. Do these talk about -- I'm sorry. Go ahead. I
15 apologize.
16     A. So whatever time frame there is there's likely
17 a month or two on either side.
18     Q. Right. The estimates you're referring to are
19 the ones I have from City Carpets, I'm looking at TG
20 157; and I think the other one was filed as Exhibit 3 to
21 Document Number 11992 filed in the bankruptcy
22 proceeding. The City Carpets one dated March 24th,
23 2021, says that it will take six to eight weeks to get
24 the material, and then the City Carpets estimate that I
25 think that you just got -- looks like yesterday -- says
                                                    96

1 it will take eight to ten weeks to get the material.
2 Are you including that eight-to-ten week lead time to
3 get the material in the three- to six-month time period
4 for repairs?
5     A. I don't know how that was calculated other than
6 it was based upon what they indicated to us. I think
7 some of our conversations were from the time that we
8 were ready to go it would take two to three months to
9 get this going and then we calculated that after they
10 were done there would be clean up and then we would have
11 to rent it, so I think that's how that came to be.
12     Q. So the three to six months, was something that
13 that was your estimate; correct?
14     A. Based upon their input, correct.
15     Q. Okay. Now, continuing on in your response to
16 Interrogatory Number 3, you said that you decided to
17 renovate the upper unit with the agreement that you
18 would be obligated to pay full market rate of $2,500 per
19 month and would try to rent the lower unit for $3,500
20 per month. Did you ever pay $2,500 per month while you
21 were in the -- during the time you've been in the upper
22 unit?
23     A. No. As we stated elsewhere that was the plan
24 but because of the damages and because of the condition
25 we renegotiated that.

97

1     Q. Now, you renegotiated that with the trust?
2     A. Correct, with my parents.
3     Q. Okay. Are you saying the initial agreement
4 with the trust was that you would move into the upper
5 unit and pay the full market rate?
6     A. That was the idea: I wouldn't be caught up
7 spending my life dealing with damages that PG&E and PG&E
8 contractors caused.
9     Q. Right. But what I'm asking is the initial
10 agreement was that you were going to be paying $2,500 a
11 month for that upper one bed/one bath unit that you're
12 in now; correct?
13     A. Yes. Initially I was there --
14     Q. You've answered. You've answered elsewhere I
15 believe in response to Number 4 -- actually, in the end
16 of your response to Number 3 you said you paid an
17 $800-a-month rent in July of 2019 and then if you follow
18 on to your response to Number 4 you said that you paid
19 that $800 a month from July of 2019 until September of
20 2020; is that correct?
21     A. I believe so, yes.
22     Q. And in that, your response to Number 4, you
23 said that you paid that reduced rent during that time
24 period until large repair expenses and COVID income
25 limitations exhausted your funds. What large repair

98

1 expenses are you referring to there?
2     A. All that you're aware of, all the damages that
3 PG&E caused that are still not remedied.
4     Q. You said until the large repair expenses, so
5 that indicates to me that you were paying something. It
6 wasn't that you were unable to pay rent?
7     A. I've contributed a lot of money and labor
8 trying to get this fixed not to mention personal time.
9     Q. Okay. What are you referring to with COVID
10 income limitations?
11     A. I think everybody had -- not everybody, but
12 many people were challenged during COVID by not being
13 able to circulate with people, not meet with people the
14 way they could before.
15     Q. Right. But you were talking using -- you have
16 that as a reason why you stopped paying rent in
17 September of 2020. I don't understand how that -- what
18 do you mean you couldn't meet with people?
19     A. Oh, if your funds -- my funds became exhausted.
20     Q. Right.
21     A. I couldn't go meet during shelter-in-place
22 lockdowns and everyone worried about dying.
23     Q. Right. You couldn't meet what? I don't
24 follow.
25     A. It wasn't easy to go meet with people, much

99

1 less do many things.
2     Q. Are you talking about meeting with people to
3 show them the property?
4     A. No. I'm talking about other income, and I'm
5 talking about other income possibilities in combination
6 with what became a huge set of responsibilities at the
7 property that is an ongoing thing that I'm taking up my
8 time today on.
9     Q. Okay. All right. Okay. In your response to
10 Number 5 you talk about the fact that there's a shared
11 laundry utility room that both the upper and lower units
12 utilize; correct?
13     A. Correct.
14     Q. Okay. And where is that located? Is it inside
15 the lower unit but it's accessed from the outside or
16 something in-house it is accessed?
17     A. Correct. It is located -- you've asked
18 multiple questions. It's located at the left front of
19 the property adjacent to the staircase which goes to the
20 upper unit.
21     Q. Okay.
22     A. It has a separate door to it. There is a
23 passage door that remains locked that could be unlocked
24 to the lower unit but one needs to walk out from the
25 lower unit to use the laundry.

100

Q. Okay.

A. And one needs to walk out from the upper unit to use the laundry.

Q. Okay. When you moved into the -- when the property was purchased in 2015 was there a washer and dryer already there?

A. Yes.

Q. Okay. And has that been replaced?

A. No.

Q. Okay. Did either -- I mean, when you were living in the lower unit -- and now, I guess, in the upper unit -- have you used that washer and dryer for washing your clothes and drying your clothes?

A. Yes, they're shared between the upper and lower unit.

Q. And in February of 2016 was there any damage to either the washer or the dryer?

A. Not that I'm aware of.

Q. You've answered. Interrogatory Number 8, it asks you about the repairs to the refrigerator. You have December 17th, 2015. No water dispensing, referred to the service center. You can't recall what the fix was. Did you have to call a technician for that?

A. No. They told me something over the phone. I pushed some buttons or something and looked at something

101

and all of a sudden it was working again.

Q. Okay. And you have March 2nd, 2016. This is the incident in question here; correct?

A. Correct.

Q. All right. So is March 2nd -- I was a little confused on the date. I thought you returned on the 21st?

A. Sure.

Q. The service, the date of the Appliance Doctor Receipt is dated 2/25/16. Did you have a subsequent problem with the refrigerator?

A. The tech came out, he diagnosed what the issue was, and then he had to order a part that took a number of weeks to get. At some point in time it appears that I must have called LG to make my own inquiry.

Q. You called LG?

A. Yeah.

Q. Where does it say that?

A. LG Service Center is who I've called for technical support.

Q. The service tech, is that who you're referring to in that response, the LG service tech?

A. Correct. These are calls to the LG Service Center or to LG Customer Support.

Q. Okay. And then -- how did you get in touch

102

with the Appliance Repair Doctor; were you put in contact with them by LG?

A. No. By Fidelity Home Warranty Company.

Q. Okay. I'm a little confused. Your response states that the service tech had to order a replacement starter relay and returned a couple of weeks later to replace the starter relay. So I was just trying to determine how that fits in with the Appliance Repair Doctor receipt and who came out to do the -- who came out to fix the starter relay?

A. As indicated before, who came out to repair this was the Appliance Doctor person.

Q. Okay.

A. And I see what you're asking now.

Q. See where it says the service tech in the first sentence?

A. Yeah. I think I got these dates -- I don't know specifically on how these dates come up, but I think these dates came up from speaking to LG when I spoke to LG. I may have put my notes in here on what it was about.

Q. Okay. Did the service -- the technician from Appliance Repair Doctor came out to replace the starter relay; correct?

A. Correct.

103

Q. Okay. Did -- it says technician was Dr. Garranza?

A. I would have to look at that again.

Q. I'm just looking at the receipt. Did the technician that came out from the Appliance Repair Doctor give you any opinion as to what had caused the damage to the starter relay?

A. Yes. He indicated that the compressor relay was -- he showed it to me -- was burnt. He says this is from an overload.

Q. You're talking about the technician from Appliance Repair Doctor; correct?

A. Correct.

Q. Okay. Did you have the refrigerator in the lower unit, the one we're talking about, the LG, did you have it plugged into a power surge strip?

A. No.

Q. It was plugged directly into the wall?

A. Correct.

Q. Okay. And was there any type of -- I'm assuming -- did the technician have to pull the refrigerator out to access the back of the refrigerator?

A. He did.

Q. And was there any type of markings at the plug where the refrigerator was plugged into? Any type of

104

**Page 105**

1 burnt marks at the outlet itself?
2     A. No, not that I'm aware of.
3     Q. Okay. All right. So let me finish here. Back
4 on your response to Number 8, December of 2017, replaced
5 water line connector, small leak, and then it looked
6 like that same leak reoccurred in January of 2018, and
7 you ordered some connector parts. Did you fix that leak
8 yourself?
9     A. Either I did or a handy person did. I don't
10 recall at this point.
11     Q. Then June was a water filter light. Okay.
12 Since June of 2019, have you had any issues with the
13 refrigerator?
14     A. None. It's working fine today, other than the
15 items that got broken as we pulled things out to clean
16 it.
17     Q. What items are you talking about, the
18 refrigerator itself?
19     A. Yeah, you noted this before. You made some
20 comment, not today but in one of your filings.
21     Q. Oh, about the reference in the Appliance Repair
22 Doctor where it says shelves, crispers, and rails
23 broken?
24     A. Correct. Everything stunk to high heaven and
25 it still has some smell to this day.

**Page 106**

1     Q. What does that have to do with the shelves and
2 Crispers, and railing being broken?
3     A. So have you ever -- I apologize for not -- by
4 asking you questions. I don't understand when you ask
5 some of these questions.
6     Q. Are you making a claim that these items, the
7 shelves, the crispers in the refrigerator were broken
8 because of the -- because of what happened with the
9 refrigerator?
10     A. Some of these broke when I took them out to
11 clean them to try to clean the refrigerator.
12     Q. Okay. Interrogatory Number 13 asks you to
13 describe all electrical work and repair that's been
14 performed in the units at the property. You talked
15 about the refrigerator and you talked about the
16 renovation of the upper unit. Has there been any type
17 of electrical rewiring in either unit at the property?
18     A. Yes. Renovating an upper unit requires that.
19 There's all kinds of --
20     Q. It was completely rewired when it was
21 renovated, that upstairs unit?
22     A. I believe so. This was all after the damages
23 occurred.
24     Q. Okay. I would like to move on to I would like
25 to turn to Request for Admission and your responses to

**Page 107**

1 that. Do you have those there?
2     A. Yes.
3     Q. Okay. I believe in the documents you produced,
4 again, I think in RFA 9 I was asking about how old the
5 refrigerator was. You said you purchased it used. You
6 purchased it for, I believe the document stated $200;
7 correct?
8     A. That's what the documents show. I don't know
9 exactly what I paid for it. I'm thinking that's
10 probably what I paid for it.
11     Q. Okay.
12     A. Plus my gas, plus my bridge toll, plus any
13 labor I paid.
14     Q. Request for Admission Number 12 asks excluding
15 the refrigerator, no electrical items were affected by
16 at the property between February 12 and February 22.
17 You said denied, and you talked about the clocks having
18 to be reset.
19     I think we've addressed the other electrical
20 items at the property during that time. Neither the
21 washer nor the dryer was damaged during that time
22 period; correct, they both worked properly when you got
23 home from your trip?
24     A. Correct.
25     Q. I think you said the refrigerator upstairs

**Page 108**

1 you're not sure about, but you didn't have any
2 indication that it wasn't not -- that's a double
3 negative. That there was -- you didn't have any
4 indication after you returned from your trip that there
5 was any problem or issue with the refrigerator upstairs;
6 correct?
7     A. I answered somewhat differently. I said I
8 don't know. I don't know whether it was plugged in. I
9 don't know whether it was in use.
10     Q. Okay.
11     A. I don't recall whether there was any issue, but
12 there's no issue that I'm aware of.
13     Q. Okay. And I think you had already testified
14 about the electric cooktop and the stove in the lower
15 unit. Other than the time flashing, those both
16 functioned properly after you returned from your trip;
17 correct?
18     A. Yes. They were later replaced.
19     Q. Right.
20     A. The cooktop later cracked.
21     Q. But it functioned properly after you returned
22 from your trip; correct?
23     A. Sure. As I said, I'm not a forensic electrical
24 analyzing person, so I don't know what damage was caused
25 when. My claim is only for what was clear that it's the

1 refrigerator.
2      Q. Okay. In Request for Admission 13 through 15
3 asks, it says you do not possess any evidence that an
4 electrical power outage damaged the refrigerator. 14
5 asks about a power surge and 15 discusses a power
6 fluctuation. You denied all of those and said you have
7 evidence that an outage, surge, and fluctuation damaged
8 the starter relay of the refrigerator.
9         What evidence are you referring to there?
10      A. I'm going to defer to Rich to answer this.
11      Q. You can't defer to your attorney. These are
12 your responses.
13      A. But these are legal type things -- no.
14      Q. No, it's not legal. This is just asking you
15 that it's -- it says you have evidence that an outage,
16 surge, or fluctuation damaged your refrigerator. I'm
17 asking you what damage that is you're referring to --
18 I'm sorry not damage, what evidence?
19         MR. LAPPING: Maybe ask him why he thinks that
20 an electrical surge damaged his refrigerator and then
21 he'll explain.
22 BY MS. DODGE:
23      Q. Okay. Go ahead.
24      A. I'm sorry. What is your question?
25         MS. DODGE: I think your lawyer just --

                                                        109

1         MR. LAPPING: Why did you think the electrical
2 surge caused damage to the refrigerator?
3         THE WITNESS: Is that the question you wanted
4 me to answer?
5         MS. DODGE: Okay. Could the reporter read that
6 question back, please?
7         (Record read.)
8         THE WITNESS: I was told by the refrigerator
9 repairman that -- he showed me the starter relay that
10 was evidently burnt. It had burn marks on it, and he
11 told me that it is there to protect the compressor, that
12 it is a cheaper -- the element that is a sacrificial
13 element to protect the compressor. He told me and then
14 we did research online, and I've provided an eHow
15 article that states that that is the number one cause of
16 starter relay failure. So I've been told by people in
17 the field and I've been told in print on multiple areas
18 that that is the cause. There is visible evidence of
19 this component, that is there by design to protect the
20 compressor, as having been burnt.
21 BY MS. DODGE:
22      Q. Okay. Did you take any photos of the burned
23 starter relay?
24      A. I would refer you back to the original claim.
25 There may be a photo there.

                                                        110

1      Q. I did not see one. I'll represent to you that
2 I have not seen one.
3      A. Okay. I'm not sure. I think there may be one,
4 but I haven't looked at one in quite some time but I
5 thought that was part of the original submissions.
6      Q. Okay. Just in terms of the reference you're
7 talking -- the articles you've read, the eHow excerpt
8 that you attached with your claim, I believe that was
9 part of one of your binders as well. You said that's
10 the number one cause. I don't believe that's how the
11 article represents it.
12      A. Would you read it?
13      Q. Yeah. I'd like to take a look at it. Let me
14 get it. Hold on. Let me share my screen. Can you see
15 my screen?
16      A. Yeah.
17      Q. Okay. So this is the -- I think this is in
18 binder two, it's TW176, and this is a -- this is from
19 eHow, about what causes a failed refrigerator relay to
20 overload and melt from eHow. It says these relays will
21 fail or they will be tripped and will melt. This can
22 happen for a variety of reasons but there are a few that
23 are fairly common. Listed below there's electrical
24 surge.
25      A. In the number one position.

                                                        111

1      Q. Motor failure, troubleshooting, and resetting.
2 I don't see anywhere where it says electrical surge is
3 the number one cause. I'm not sure why you're
4 characterizing it that way. It simply states there are
5 a few that are fairly common and electrical surge and
6 motor failure are both listed there. Are you finding
7 that from something else?
8      A. That's in the number one position.
9      Q. So you're just assuming because it's listed
10 first that's the number one cause?
11      A. It's in combination from this and other
12 discussions or readings that I have had. I understood
13 this to be the number one cause, but --
14      Q. Right. The first sentence of that states,
15 where it's highlighted, an electrical surge can be one
16 reason that a relay will fail and overload.
17      A. Sure.
18      Q. It doesn't say it's the number one reason.
19      A. Okay.
20      Q. I didn't know if you're getting that from
21 somewhere else, and I want to make clear what the pages
22 are you actually submitted.
23      A. I would have to, you know, try to go back and
24 understand how I came to understand it was the number
25 one cause, but it is in the number one position and I

                                                        112

1  was told by the tech that it was an overloaded burnt
2  refrigerator starter compressor relay, and it did look
3  burnt.
4      **Q. Okay. Let me stop the share here. Okay.**
5  **Let's move on to RFA 16 through 19. These ask about**
6  **evidence that PG&E damaged the refrigerator, that PG&E**
7  **breached duty of care in connection with your claim, or**
8  **that PG&E was negligent. In response to all of these**
9  **you said that you have evidence that the negligent**
10 **actions of PG&E or its contractors, agents, or employees**
11 **damaged the starter relay in which turn led to the**
12 **refrigerator to stop working. What negligent actions**
13 **are you referring to in those responses? What are you**
14 **claiming PG&E did that was negligent to cause the**
15 **damage?**
16     A. So this is the sum total of a lot of different
17 evidence.
18     **Q. Okay.**
19     A. Despite what you've said that there was no work
20 going on next door, PG&E's contractor Veteran Power was
21 working next door and PG&E was working next door for
22 months. You have not yet provided us with the daily
23 work records that the judge has ordered you to provide
24 all records.
25     **Q. This is not my question. My question is what**

113

1  **actions of PG&E are you claiming are negligent? What**
2  **did PG&E do that was negligent?**
3      MR. LAPPING: Objection. Calls for a legal
4  conclusion.
5  BY MS. DODGE:
6      **Q. You're saying that PG&E was working next door**
7  **or its subcontractor was working next door, but what**
8  **specifically are you claiming they did that was**
9  **negligent to entitle you to recover damages?**
10     MR. LAPPING: Objection. Calls for a legal
11 conclusion.
12     MS. DODGE: You can answer.
13     MR. LAPPING: You can answer.
14     THE WITNESS: There is discussion in
15 correspondence, PG&E correspondence that you have not
16 provided to us that we obtained through great effort
17 from the town of Fairfax, and by having to subpoena
18 Veteran Power, the PG&E contractor of record for the
19 large multimonth electrical project that was going on
20 next door.
21 BY MS. DODGE:
22     **Q. Okay.**
23     A. There are many things in those documents that
24 indicate that there were problems with the work, that
25 there were lines cut by accident, that there were

114

1  unmarked lines, that fuses blew, that there were
2  outages. There is a lot of discussion about issues.
3  They had to redesign this project twice, at least twice.
4  There is an e-mail that states, hey, we were supposed to
5  have this hotted up on a certain date. Because of the
6  outage we're not going to be able to do that. So
7  there's an indication there were many problems, unmarked
8  utilities and things cut there and outages and blown
9  fuses and transformers and switches and this and that
10 replaced, and that there was -- they didn't know what
11 properties would be affected by even the planned
12 outages, much less the unplanned ones.
13     **Q. So that's the basis for your claim that PG&E**
14 **was negligent is what you just relayed to me?**
15     MR. LAPPING: Objection. You're asking him for
16 a legal conclusion.
17     MS. DODGE: I'm just asking him to clarify if
18 that's what the basis was.
19     MR. LAPPING: It's a continuing objection.
20 BY MS. DODGE:
21     **Q. That's fine. You can answer.**
22     A. I'm saying there is a lot of evidence that
23 there is a lot of work going on there and that there was
24 work going on there despite what you've told us during
25 the time period in question, and both before and after.

115

1  And that PG&E cut lines that they didn't know what they
2  were and caused damages.
3      **Q. They cut lines. What type of lines?**
4      A. Electrical lines.
5      **Q. To your property?**
6      A. I don't know. But in close proximity that
7  affected unknown meters in close proximity, and that
8  fuses were blown and that people around town had a lot
9  of difficulty, and the contractor and PG&E had
10 difficulty with this job.
11     **Q. Okay. But how does that affect your property?**
12     A. I just explained.
13     **Q. You just said people around town had trouble.**
14     A. Let me connect the dots for you a little bit.
15     **Q. Please.**
16     A. In one of the two electrical plans that you
17 have provided in your incomplete documents that you've
18 provided, in the notes section it describes a number of
19 properties that would be affected by this work next
20 door. That includes 47 Bolinas. By my read of it, and
21 I'm not an electrical designer or planner or any of
22 that, it indicates it was to be moved -- a bunch of
23 these were to be moved from one circuit to another
24 circuit. So that means that these properties, these
25 meters were clearly part of the work or affected by the

116

1 work going on next door at the large electrical project
2 that PG&E was in charge of for 2931 Bolinas that
3 involved an installation of three phase power for a new
4 restaurant that was yet to be opened.
5     Q. Okay. So that's the basis what you just
6 described?
7     MR. LAPPING: Again, same objection. All this
8 is asking for a legal conclusion.
9 BY MS. DODGE:
10     Q. I'll just let that stand on its own. In your
11 response to RFA 20 about the damage to the flooring, you
12 talk about Dustin Perkins acknowledged that the industry
13 and insurance standard was line of sight and not limited
14 to the kitchen area. Did he explain to you what line of
15 sight means?
16     A. Yes.
17     Q. What did he tell you?
18     A. It means anywhere that the eye -- this is my
19 recollection of what he said he --
20     Q. Right.
21     A. It may be a combination of what he said and
22 what the different flooring estimators said, but I'm
23 going to try as best to give you my understanding.
24     Q. That's fine.
25     A. As I understand it, in part with his

117

1 explanation, line of sight is where the eye travels
2 where the flooring is the same type of flooring. That
3 if you have to change one part of it and you can't match
4 it exactly if it's not available that you need to match
5 all of it so that it is the same if it was the same
6 before.
7     Q. Okay. That makes sense. Thank you for the
8 explanation. RFAs 26 through 30, these ask about Tariff
9 Rule 14 and Tariff Rule 2C. Are you familiar with those
10 rules? Have you read them?
11     A. I've seen them. I know them by name. I
12 haven't memorized them.
13     Q. Okay.
14     A. And I'm not a legal expert. I'd leave this for
15 the judge to decide.
16     Q. Okay. Okay. I'm going to share my screen. I
17 want to attach this Electric Rule Number 14 as Exhibit A
18 to the deposition. I'm going to share my screen here.
19 Can you see my screen Mr. Greenberg?
20     A. Yes, with some highlights on it.
21         (Whereupon, Deposition Exhibit A was
22         marked for identification.)
23 BY MS. DODGE:
24     Q. Yes. So in that first paragraph it
25 discusses -- well, Electric Rule Number 14 is shortage

118

1 of supply and interruption of delivery. That first
2 paragraph talks about PG&E exercising reasonable
3 diligence and care to furnish and deliver a continuous
4 and sufficient supply of electrical energy but does not
5 guarantee continuity or sufficiency of supply and that
6 PG&E will not be liable for interruption or shortage or
7 insufficiency of supply if it's caused by inevitable
8 accident, act of God, fire, strikes, riots, war any
9 other cause, except that arising from its failure to
10 exercise reasonable diligence. Have you read that
11 paragraph before?
12     A. I believe I've seen it, yes.
13     Q. Okay. I'm moving down to the third paragraph,
14 the part that's highlighted where it talks about PG&E
15 shall not be liable to any customer for any damage or
16 loss resulting from interruption due to transmission
17 constraint, allocation of transmission or intertie
18 capacity, or other transmission outage planned or
19 unplanned. Do you see that?
20     A. I'm sorry. I don't see planned or unplanned.
21     Q. I'm on the third paragraph.
22     A. I was looking at the fourth. Pardon me.
23     Q. It's highlighted.
24     A. Okay. I've read it.
25     Q. The next paragraph, the fourth paragraph that's

119

1 highlighted, and then the Number 4 that's highlighted
2 there, that PG&E maintains the right to interrupt its
3 service deliveries without liability to the customer
4 when in PG&E's sole opinion such interruption is
5 necessary for reasons including but not limited to the
6 following, and four states maintenance, improvements,
7 repairs, or expansion of PG&E's distribution system. Do
8 you see that?
9     A. Yes.
10     Q. Okay. And the work that was being done at 31
11 Bolinas, would you agree that it would call into
12 category four, maintenance, improvements, repairs, or
13 expansion of PG&E's distribution system?
14     MR. LAPPING: Objection. Calls for a legal
15 conclusion.
16     MS. DODGE: You can answer.
17     MR. LAPPING: And it assumes PG&E knows that it
18 made that surge that is now asking him if it's covered
19 by this tariff.
20     MS. DODGE: No. What I'm asking him is if the
21 work done at 31 Bolinas would fall into that category.
22     MR. LAPPING: That calls for a legal
23 conclusion. You mean with the paragraph that starts
24 before the numbered list and the Number 4 or just number
25 four --

120

1    MS. DODGE: Yeah.
2    MR. LAPPING: -- by itself.
3    MS. DODGE: I'm asking him if he understands
4    the work at 31 Bolinas to be encompassed with what's
5    listed in Number 4, maintenance, improvements, repairs,
6    or expansion of PG&E's distribution system.
7    MR. LAPPING: Again, calls for a legal
8    conclusion.
9    MS. DODGE: You can answer.
10    THE WITNESS: I don't agree with much of what
11    you're contending or saying.
12    BY MS. DODGE:
13    **Q. Okay. But did you listen to what my question**
14    **was?**
15    A. You asked me if I agree.
16    **Q. I asked you if the work that PG&E or its**
17    **subcontractor was doing at 31 Bolinas would fall within**
18    **category four in Rule 14. Do you have an answer?**
19    MR. LAPPING: What difference does it make what
20    he thinks about that? He's not an expert. He's not a
21    lawyer. This is why you have this objection. I don't
22    think it's going to lead to any admissible evidence.
23    MS. DODGE: Well, I mean, that's your
24    contention, but I can ask him if that's his
25    understanding or not.

121

1    MR. LAPPING: I am unclear whether you're
2    asking him about --
3    MS. DODGE: I'm asking him for his
4    understanding. I'm not asking for a legal conclusion.
5    The tariffs here are not drafted so they need to be
6    interpreted by an expert. The tariffs are drafted so
7    they can be interpreted and read by consumers of
8    electricity.
9    MR. LAPPING: Okay. Are you asking him whether
10    he believes that in PG&E's sole opinion such
11    interruption is necessary?
12    MS. DODGE: No. I've stated that three times
13    now. I asked him, my question specifically was would
14    you agree that the work being done by PG&E or its
15    contractors or subcontractor at 31 Bolinas Road falls
16    within the what's listed in Number 4, maintenance,
17    improvement, repairs, or expansion of PG&E's
18    distribution system.
19    MR. LAPPING: Limited like that, you can go
20    ahead and answer.
21    MS. DODGE: That's what I asked him.
22    THE WITNESS: Okay. So the final question now
23    did the --
24    MR. LAPPING: She's asking whether the work
25    that was being done by Veteran Power constituted

122

1    maintenance, improvements, repairs, or expansion of
2    PG&E's distribution system.
3    THE WITNESS: You know, I'm not expert
4    whatsoever, so I can't answer that question. I mean, is
5    there a definition of all these terms?
6    BY MS. DODGE:
7    **Q. Hold on a minute. You explained to me just**
8    **about five or ten minutes ago that PG&E -- your**
9    **understanding of what was happening at 31 Bolinas is**
10    **that PG&E was upgrading the power there to be -- I can't**
11    **remember if you said three something power; right? You**
12    **explained to me what your understanding was that they**
13    **were up upgrading the power at 31 Bolinas; correct?**
14    A. Yes. They had a new tenant moving in. The
15    power requirements of that restaurant apparently
16    required some type of "three phase power."
17    **Q. Yes.**
18    A. And redesign of all the other type things
19    there.
20    **Q. Right. So my question is is it your**
21    **understanding that that work being done there as you've**
22    **described it would fit within the terms that are listed**
23    **here in Number 4?**
24    MR. LAPPING: Continuing objection. Calls for
25    a legal conclusion, but you can go ahead and answer it.

123

1    THE WITNESS: I don't know whether I can say
2    that it's in this bucket or not. It looks like it's in
3    this bucket.
4    BY MS. DODGE:
5    **Q. I'm just asking for your understanding.**
6    MR. LAPPING: He's saying he doesn't have an
7    understanding.
8    MS. DODGE: Well, all right. That's fine.
9    You've answered.
10    Miss Court Reporter, I'll give you a copy of
11    that to attach as Exhibit A.
12    I'm going to switch now to Electric Rule Number
13    2. Description of service. I'd like to attach this as
14    Exhibit B.
15    (Whereupon, Deposition Exhibit B was
16    marked for identification.)
17    BY MS. DODGE:
18    **Q. You can still see my screen; correct?**
19    A. Yes.
20    **Q. And here on Sheet 5 under C, voltage and**
21    **frequency control. Do you see there under 1, customer**
22    **service voltages and exceptions to voltage limits in B,**
23    **that voltage may be outside the limits specified when**
24    **the variations, and 2 talks about momentary**
25    **fluctuations, 3 talks about service interruptions, 4**

124

talks about separation of parts of the system from the main system; and 5 is beyond the causes beyond the control of PG&E. Do you see that?

A. Yes.

Q. In C it states that it must be recognized that because of conditions beyond the control of PG&E or customer or both there will be infrequent and limited periods when sustained voltages outside of the service voltage ranges will occur.

Do you have an understanding as to what PG&E's obligations are to you as a customer with regard to the delivery of electricity? Again, I'm not asking for a legal opinion, I'm asking for your understanding as a PG&E customer?

A. As a layperson I have some understanding and expectation of what the parameters are, and I have quite a lot of disappointment in my area because of what goes on there.

Q. When you say "disappointment in your area," what do you mean?

A. There's been a lot of outages in my area and, in fact, the work in question that we're discussing dramatically affected the whole town when streets were shut down and merchants lost a lot of business.

Q. Okay. Right. But right now we're talking just

125

about your property and your claim regarding the refrigerator and claimed damages. I've scrolled down here on Exhibit B, Electric Rule Number 2, Sheet 6, where it talks about customer service voltages where it's continued under E. Do you see that on the screen? Let me make it a little bit larger.

E states that where the operation of the applicant's equipment requires unusually stable voltage regulation, the applicant at his own expense is responsible for installing, owning, or operating, maintaining any special or auxiliary equipment on the load side of the service delivery point as necessary by the applicant. And F follows along with that by talking about that the applicant's responsible for using whatever equipment is necessary to maintain the proper utilization voltage.

Do you have an understanding as to what that means to you as a customer? Again, I'm not asking for you in any kind of expert capacity. As a PG&E customer, do you have any kind of understanding what that means?

A. It doesn't look to me like it is meant to apply to the average customer. I understand PG&E has a wide range of customers. This wording looks like it is addressing an applicant who has equipment that requires unusually stable voltage, and that it's talking about

126

that. As I understand it, again, from my layperson's research and basic understanding, appliances are designed in each country for the power range that is typically delivered. There are different appliances for different countries. This appliance and every other appliance that is there was designed for a range that is the tariff-specified or other CPU-specified range that PG&E is supposed to be able to supply.

Q. You understand, again, as a PG&E customer that PG&E doesn't guarantee a continuous level supply of electricity? Do you understand that?

A. I understand that PG&E provides a range or is supposed to provide a range of electricity that appliances are designed for. I understand that in this case I have expert testimony or expert repair people who have said it wasn't provided in this manner and that's what caused the damage.

Q. Right. But my question was do you understand that PG&E doesn't guarantee a continuous supply of electricity at a specified range based on the tariff rules we've just reviewed?

MR. LAPPING: Objection. Calls for a legal conclusion.

MS. DODGE: Again, I'm asking in his capacity as a PG&E customer.

127

THE WITNESS: I am not an expert at the law or the tariffs, so I don't know if I can answer your question that I understand what you're stating. I've stated what I do understand.

BY MS. DODGE:

Q. You have an understanding that the tariff rules are put into place and they apply to all PG&E customers; correct?

A. I understand that there are tariff rules in place to contemplate all types of situations. It doesn't look like this applies to any of the equipment I was using.

Q. If we go back to Exhibit A, which is 14, where it talks about PG&E not guaranteeing a continuous supply of energy, you as a PG&E customer understand that you're bound by that; correct?

MR. LAPPING: Objection. Calls for a legal conclusion.

MS. DODGE: Again, I qualified it as a layperson and as -- actually, not a layperson, as a PG&E customer.

THE WITNESS: Again, I don't have legal background. I don't know what this binds me to or doesn't bind me to.

////

128

BY MS. DODGE:

Q. Okay. All right. Let me stop the share. I'm almost done. So I want to ask you currently, today, are you advertising the lower unit for rent at all on any platforms? I know we talked about after, was it May of 2020 you stopped at that time but have you resumed since that time advertising the lower unit for rent?

A. Pardon me. The screen went out. The answer is no.

Q. Okay.

A. I think that will become evidently clear to you when you visit the property.

Q. Okay. Can you state for me on the record the reason why you've not resumed efforts to rent out the lower unit?

A. Sure. PG&E has had multiple contractors out there doing gas lines -- PG&E owned gas lines and PG&E gas meters, movement and replacement work because the old ones were from 1936.

Q. Hold on. Let me just stop you there. I'm talking about now from May of 2020 to present have you made any efforts to rent or lease the lower unit? I think you're going back to before 2020 and that's not what I'm asking.

A. So as a consequence, as a direct consequence of

129

PG&E's gas line work that got done by multiple different contractors, and PG&E's failure to restore the damages done by those contractors, ultimately because PG&E left the sidewalk in a hazardous condition on either end of my driveway and affecting the 31 Bolinas property next door, ultimately after PG&E led us to believe that they were going to restore for over a year after they took almost two years from when they first started the project, and they first started the project after they commenced planning it after they identified the need three years prior to that when we first bought the property. We paid for three -- let me bring you up to speed. We waited for three years for PG&E to commence gas line replacement work that PG&E employees identified as necessary. We didn't identify it as necessary. PG&E identified it as necessary.

Then PG&E started the work. Then -- and PG&E did the work in reverse order from the agreed upon written plan. Then PG&E pulled the contractor off the job. PG&E did not return for another almost one year, and then they returned with a different contractor who did it a different way again versus the plan. That contractor said they would do all their restor -- actually, the first contractor said they were going to do their own restoration. They would do the whole job

130

lickety-split, don't worry about it.

The second contractor said PG&E was going to take care of the restoration. PG&E then acted for a year after the approximately three years after the year --

Q. You lost me.

A. So there was an approximately a three-year wait period from when PG&E was planning this project.

Q. I know that, we just went through that. What I'm asking you is you said since May -- I'm talking starting point of May of 2020, and I believe based on my familiarity with the other claims that the work at your property was done by that point?

A. No.

Q. It was not done?

A. The construction from PG&E contractors had been done.

Q. Okay. What was not done?

A. The restoration aside from a very limited area that was done incorrectly according to the MMWD employee that I spoke with by WK McLelland, otherwise, the bulk of the restoration was never done.

Q. What other restoration are you talking about? The driveway?

A. We've detailed all of that.

131

Q. That's in the other claims. Okay. So you're saying, and again, this is more properly handled in the state court action because those claims are there, but in terms of this particular claim, the refrigerator claim, you're -- and again, Rich, if you can clarify for me the two months of, you know -- I'm sorry. Not two months. The two years of rental losses you're claiming associated with the refrigerator claim and specify what those dates are that would be helpful. Okay?

MR. LAPPING: Okay.

BY MS. DODGE:

Q. But I want to make clear that those claims you're talking about, the ones you just referenced that has to do with the property damage claims not the refrigerator claim. You're saying you have not made efforts to rent or lease the property since May of 2020 due to what you contend to be the property damage claims, but it doesn't have anything to do with the refrigeration claim; correct?

A. Well, no, there's overlap.

Q. Since May of 2020?

A. Since before then.

Q. No. I just want since May of 2020. Are you making any claim that you're not able to rent the property or that you've suffered rental losses due to

132

1 the damaged flooring in the lower unit since May of 2020
2 or is that your claim that's related to the property
3 damage in the state court action?
4    A. As I said there's overlap. So as I've said, I
5 advertised up until approximately May 2020.
6    Q. Right.
7    A. But what I thought you were aware of, but maybe
8 you're not aware of, is that because PG&E ultimately
9 after leading us along for approximately a year like
10 they were going to do the restoration, ultimately told
11 us we're done there. We're not going to do any
12 restoration. After that because we and the town had
13 been waiting for PG&E to do restoration, the town
14 stepped in to remedy the hazardous sidewalk conditions.
15 And because of that combination of events and everything
16 that flowed from there, even though I had been
17 advertising the rental, I was no longer able to
18 advertise the rental because as you'll see it's in a
19 hazardous condition, if you come visit the property.
20    Q. It's in a hazardous condition right now?
21    A. Depending on how you define that. There's no
22 entry deck.
23    Q. Okay. That's related to your property damage
24 claim in the state court action?
25    A. Yes, and the overlap.

133

1    Q. I'm not understanding the overlap, though, with
2 the damaged flooring in the lower unit.
3    A. So I'll give you a couple of examples on
4 things. If somebody is doing their business and then
5 COVID happens, well, it changes things.
6    Q. Changed it for everybody.
7    A. Yeah. If I was advertising and showing the
8 property, up until then perhaps until all the postings
9 got taken down slightly beyond when the town went and
10 did the sidewalk restoration --
11    Q. Okay.
12    A. -- that situation restoration caused other
13 problems that necessitated other work. That's the
14 overlap.
15    Q. How does that overlap with the damaged flooring
16 in the lower unit?
17    A. We had a bigger problem related to the sidewalk
18 restoration --
19    Q. I know. You keep coming back to the sidewalk
20 restoration. You keep saying there's overlap. When you
21 say overlap it makes it sounds like there's overlap
22 between -- the insinuation is that you were unable or
23 you've not been able to rent the property or advertise
24 it for rent not only because of the sidewalk or outside
25 property damage but also because of the damaged

134

1 flooring. I'm trying to clarify as to whether that's
2 what you're claiming or not.
3    A. So.
4    Q. When you say overlap, I'm not concerned about
5 the property damage claims. Those are going to be dealt
6 with in a different forum. What I'm talking about is
7 the damaged flooring inside the lower unit that is
8 related to this particular claim that we're discussing
9 today.
10    A. Yes. So I thought I had already made it clear
11 that in order to do the flooring repairs I would need to
12 move out and there would need to be a three-plus,
13 perhaps three- to six-month lead time before it got
14 done.
15    Q. But you're not living in the lower unit.
16    A. I understand that.
17    Q. Okay.
18    A. But as -- rather than rely upon your future
19 visit, I'll describe that I was trying -- I was making
20 efforts to on an as-is basis, a best effort basis in
21 many different venues to rent that. Okay?
22    Q. Right.
23    A. Anyone who became seriously interested I did
24 have to as delicately as I could without having, you
25 know, it come across really bad inform them that PG&E

135

1 may be doing some work or we may have to do some
2 restoration. I was trying to get somebody to rent it.
3 I've evidenced that.
4    Q. Wait. When you say --
5    A. While I was trying to get somebody to evidence
6 it. You can answer ask your question. I can stop.
7    Q. I just wanted to clarify. You said you told
8 prospective renters that PG&E might be doing restoration
9 work. Are you talking about the restoration work
10 outside?
11    A. Outside and that we would have to do work
12 inside at some point.
13    Q. Inside the lower unit on the flooring?
14    A. This came up because different people had
15 different time frames on when they wanted to move in,
16 what their priorities were, what our priorities were,
17 the shifting information that we got from PG&E and PG&E
18 contractors.
19    Q. Uh-huh. Okay.
20    A. I'm still not making it clear.
21    Q. It's all right. I think I'm just going to
22 leave that one as is. I think we've sufficiently
23 exhausted that topic. I want to go back to -- it might
24 take a quick break to sum up. I want to go back to --
25 in fact, I'll share my screen. These are the documents

136

1  that we produced from the claims file, and this is --
2  hold on. Let me get the shared screen. PG&E0050. Can
3  you see my screen here?
4      A. Yeah. Some of it is too small to read.
5      Q. Okay I'll make it bigger. So I think you had
6  requested from Dustin Perkins or Kevin Shaw, who is cc'd
7  here, on this e-mail on PG&E0050, a list of the outages
8  that affected your premises looks like from April of
9  2015 to April of 2016, and then there's the reports for
10 the outages from November 1st, 2015. I don't know if
11 you can read these. Let me make it bigger. The first
12 one here is -- let me go in here.
13      At the bottom here is 5/8/2015 which you
14 weren't living in the property at that time; right?
15     A. Correct.
16     Q. Okay. And then the next one up here is
17 2/26/2016, and it says unknown cause. Minutes out.
18 Momentary. I think this is momentary or sustained
19 momentary. 2/26/2016 you were at the property on that
20 date; right?
21     A. I was living there. I don't know whether I was
22 at the property.
23     Q. You weren't on -- that wasn't the time you were
24 on vacation -- that doesn't fall in that time period;
25 correct?

137

1      A. Correct.
2      Q. The next one above that is 3/16/2016, which is
3  again here company initiated and momentary. It looks
4  like 109 customers affected. Then if you go down the
5  outage reports are here which let me see which one this
6  is for. 3/16 which I believe was the date that was
7  scheduled for the outage to do the work at 31 Bolinas.
8  I'm going to try to get to -- I believe you had written
9  an e-mail to PG&E regarding the outage on that date.
10 That's the small claims. I don't know where it is. I'm
11 looking for it. Hold on. Maybe it's back here. No.
12 Okay. Yeah, here it is. This is PG&E0031. This is an
13 e-mail that you wrote to Stacy Lam, L-a-m, at PG&E
14 claims department where you said, and this was
15 11:39 p.m., the power went out again today next door to
16 my residence where four PG&E trucks were working to
17 install three phase power for the building next door.
18 You said this is at least the second time since this
19 claim was filed that the power has been unexpectedly
20 cutoff and surged when restored.
21     Did any of your appliances, did the
22 refrigerator suffer any sort of damage as a result of
23 this outage on March 16th?
24     A. Not that I'm aware of, but I did have to reset
25 the clocks again.

138

1      Q. Okay. You had had the refrigerator had been --
2  the starter relay had been replaced at this point;
3  correct?
4      A. I would have to go back and see what date that
5  he had completed his repair.
6      Q. It says service date. I'm just representing to
7  you 2/25/2016.
8      A. We probably have to check with Fidelity or the
9  Appliance Doctor. As I said, he came out at least
10 twice. Once to diagnose and to order the -- find out
11 what parts he needed and then another time he came back
12 with the refrigerator starter relay to replace it.
13     Q. Okay. And let me go back to that other chart
14 of outages. It's right here. Okay. Let me make this
15 larger. Here, the last one here on the top is 4/6/2016
16 company initiated and this one looks like it was longer,
17 462 minutes out, so it was sustained as opposed to the
18 others.
19     Do you recall being at the property when the
20 power went out on April 6? Do you have a recollection
21 of that?
22     A. You know, I've been at the property a lot of
23 times when the power has gone out. We seem to be in a
24 bad power area. What went on during the time period in
25 question was not the normal PG&E outages. This was that

139

1  PG&E was doing a big project next door.
2      Q. Right. But my question is you don't have an
3  independent recollection of this longer power outage
4  here on April 6, 2016?
5      A. I would have to research --
6      Q. It doesn't jog your memory or anything?
7      A. I remember Dustin -- I remember asking Dustin
8  to provide a record of the outages. This is what he
9  came up with.
10     Q. Right.
11     A. So --
12     Q. Were you not satisfied with what he provided
13 you? These are the outage reports here.
14     A. I've subsequently learned, Jennifer -- can you
15 stop there and I'll --
16     Q. Sure. You mean on the page?
17     A. Right there.
18     Q. Oh.
19     A. When you're saying I'm not satisfied, one of
20 these it says unplanned. Okay? It says -- first it
21 says unplanned and then under cause it says company
22 initiated. So is it initiated but it was unplanned --
23 if it was company initiated, wouldn't it be planned?
24 Anyway, it's a little confusing.
25     Q. Okay.

140

A. But after company initiated it says improper
construction.

Q. Okay. So --

A. Above in details it says phasing NG. I'm
guessing here but does NG mean no good at 43/65 fuses.

**Q. I have no idea. I'm not an engineer. I can't
interpret these.**

A. Scroll down. If you scroll down here it
identifies the people doing the work.

**Q. Okay.**

A. It says Bill Jennings reports Number 1 and
Number 2 of 3 blown 30Ts to 43/65 cut outs during loop.
Open remaining fuse. It looks like 30Ts are some type
of fuse and that two out of three of the fuses were
blown.

**Q. Uh-huh. It goes on to say and tagged them so
the customers wouldn't be out of power.**

A. Yeah, but it also says up above this happened
because of improper construction.

**Q. Okay. But I think you're making -- again, I'm
not going to get into a debate with you about what the
documents mean. I mean, if you want to ask somebody
about outages and what it means, that's up to you. I
think it's not really productive for us to speculate on
what documents mean here.**

141

A. Okay.

**Q. And then -- okay. That's the one on 2/26.
This one was for 4/06. Okay. All right. Let me see --
I'm going to stop sharing video. Let me see if I've got
anything else. Let's just take, like, a quick three-
minute break, really brief three minutes. I just want
to go over my notes and see if I have anything else.
Okay?**

MR. LAPPING: Okay.

MS. DODGE: All right. Thanks.

(Recess taken.)

BY MS. DODGE:

**Q. Let's go back on the record. I just have a
couple more questions. Are you aware that LG settled a
large class action lawsuit regarding compressor related
problems with its refrigerators in 2019?**

A. No, I'm not aware of that and this is not a
compressor problem.

**Q. Did you ever check to see if your refrigerator
was one of those impacted by the settlement?**

A. As I said, I wasn't aware of the settlement.

**Q. Okay. And just to clarify. You said your
refrigerator was not plugged into a power surge or surge
protector strip; correct?**

A. Correct.

142

**Q. Were any of the other appliances in either
unit, the upper or lower unit, plugged into a surge
protector in February of 2016 while you were gone on
your trip to Hawaii?**

A. Not that I'm aware of.

**Q. Do you use a surge protector strip for, like,
when you're using a computer or anything at the
property?**

A. Yes. It's my understanding that you're
supposed to protect certain devices. The computers
particularly. It's only when you have problem
situations that you need typically to protect these
other devices. Normally they are defined for the range
of the power that is delivered.

**Q. Okay. Lastly, I want to go over, and this is
already filed in the bankruptcy proceeding, but this is
part of the amended claim. I apologize, I forgot to
pull this up. Here it is. I'm going to share my screen
again. This is -- can you see my screen?**

A. Yes.

**Q. Okay. So this is the motion to amend the
claims that was filed by your attorney in March of this
year. This is the attachment to the amendment of this
claim we're talking about here. I just wanted to go
through the itemization of damages here to make sure I**

143

understand everything. The repair refrigerator,
attached Exhibit 1, this is right here. That's the
Appliance Doctor, right, we've talked about that that's
the $288.51; correct?

A. I'm just looking at the date on the invoices.

**Q. It's hard to see. You can see right there, you
can see service date 2/25/2016.**

A. Is that the initial service date or the final
one?

**Q. I don't know because I haven't received another
receipt. I just have this one, so I don't know.**

A. Okay.

**Q. We have that. The cleanup of spoiled food for
$225, did you hire someone to clean up the spoiled food
or how did you come up with that number?**

A. I did some of it and then I most likely had
somebody also clean the place afterwards.

**Q. Okay. So is that --**

A. I had somebody at a later date after I did the
initial clean up completely as best as possible clean up
the refrigerator.

**Q. Okay. And is that what you paid them, then,
$225 to clean it up?**

A. Yes. That's the best that I was able to
compile at the time as to what those costs were.

144

1     **Q. Do you have a receipt for that clean up?**
2     A. I don't have -- I don't know. I would have to
3 go back through, check records if they're available.
4 Usually I make some kind of notation. As I said, the
5 work was split up between me and a helper that did the
6 work.
7     **Q. Is the $225, are you including in that your**
8 **own, like, labor costs for cleaning up the food or is**
9 **that what you paid to somebody else?**
10     A. You know, this was calculated a long time ago.
11 I don't know the answer right now. I can go back and
12 look to see if there's a check for $225 or if there's a
13 check for $100 and $125. I'm not sure at this moment
14 with however many years have passed by how that number
15 was derived.
16     **Q. All right. Cleaning oriental rug. Was that a**
17 **rug that was in the kitchen?**
18     A. Yes.
19     **Q. Did you send that out for cleaning to a**
20 **dry-cleaners?**
21     A. That was an estimate.
22     **Q. Did you have the rug cleaned?**
23     A. I don't think it -- I think I either dropped it
24 off and it never got done or something like that. There
25 was some complication.

                 145

1     **Q. You dropped off the rug and it never got**
2 **cleaned?**
3     A. I was talking with the guy on Miracle Mile and
4 somehow it didn't -- I don't think it got done. I don't
5 recall, but I don't think it got done. I think that was
6 an estimate to get it done.
7     **Q. All right. Do you have the rug back?**
8     A. I have the rug. You can have it if you want.
9     **Q. No, thank you. I appreciate that. Replacement**
10 **cost of spoiled food, I've seen the exhibits for that so**
11 **I don't have any questions there. The cost to repair**
12 **damage to the floor and subfloor $24,365, and I have the**
13 **receipt -- the estimate for that which I think was**
14 **filed, Exhibit 3, was that. Rental costs, and that's**
15 **we're talking about the $3,600 in the rental period for**
16 **24 months. Rich, you said you would let me know exactly**
17 **what those dates are?**
18     MR. LAPPING: Yes.
19 BY MS. DODGE:
20     **Q. Time off work to deal with clean up and**
21 **contractors, five days. Is that your own time that**
22 **you're calculating at $1,000 a day?**
23     A. I think somehow Rich and I had a conversation
24 about this before it was amended. It's his calculation.
25     **Q. This is the amended claim.**

                 146

1     A. Yes. That's what I'm referring to.
2     **Q. You said before it was amended. So you came up**
3 **with this calculation?**
4     A. For this amendment.
5     **Q. Right.**
6     A. We had a conversation about what the updated
7 would be and we determined that that was what five days
8 of my time should be worth.
9     **Q. Okay. And how did you come up with $1,000 a**
10 **day?**
11     A. I don't recall at this point how we determined
12 that, but it might be based upon my hourly work that
13 I've done for Green Street Capital Management.
14     **Q. For Green Street, what did you do for them?**
15     A. I've acted as a consultant and advisor on all
16 kinds of different investment advisor, and investment
17 issues.
18     **Q. But were you working for them as a consultant**
19 **in March of -- or February/March of 2016?**
20     A. I'd have to look back to find when the last
21 payment was that I received, but I don't think you
22 understand the scope of what PG&E has done to my
23 property, Jennifer.
24     **Q. I was trying to ask how you calculated the**
25 **$1,000 a day and whether that was the job you were doing**

                 147

1 **at that time to come up with that estimate.**
2     A. Yeah, it's based upon what I used to be able to
3 get paid when doing work for an investment advisor.
4     **Q. Okay. And when did you -- when did you most**
5 **recently work for Green Street Capital Management?**
6     A. As I just said, I would need to go back and
7 perhaps ask them to search their records to see when
8 their last payment was to me.
9     **Q. Okay. Is it accurate to say since 2016 you**
10 **have not worked for them?**
11     A. No, it's not necessarily accurate. I think
12 I've done some work for them subsequently. I just don't
13 know when the last time was. I can tell you that
14 because of the large amount of damages and complications
15 that have occurred because of PG&E's activities on the
16 property I am not able to have bandwidth to go do what I
17 used to be able to do.
18     **Q. Okay. Were you working for them on a**
19 **contractual, like a 1099 basis, Green Street?**
20     A. I was an -- I don't know what the --
21     **Q. Were you an employee or were you just an**
22 **independent contractor?**
23     A. I was just an independent contractor.
24     **Q. Okay. That's 1099. Sorry. I didn't mean -- I**
25 **should have clarified that. Okay. I don't think I have**

                 148

**anything else. Rich, do you have anything that you want to put on the record?**

MR. LAPPING: No. I'll be able to do that later.

MS. DODGE: Okay. All right. So I would like to not close the deposition completely in case I have any follow-up questions following the inspection next Tuesday. I don't anticipate that I -- I shouldn't say that. I don't know if I will or not. I don't want to state that it's complete as of today in the event we might need to have some follow-up questions based on that. I'm sorry. Let me stop sharing my screen. We can follow up after that to see if that's necessary, but for now I'm not sure how you want to handle the transcript. Again, this is under the federal rules, Melissa. I don't know if you want to -- Rich, you want the transcript to be sent to you for Mr. Greenberg to review?

MR. LAPPING: Yes.

MS. DODGE: I think we should probably have a more compressed time period for review given rather than 30 days because that puts us out until, yeah, um, let's say. What's your typical turn around?

MS. REPORTER: Approximately two weeks.

MS. DODGE: In terms of the transcript, we have

149

a trial date of June 27th and we have a discovery cutoff of May 20th. We can waive that if we need to. Maybe we could try to expedite it to some extent because of the timing. Again, it's not a rush turn around next day basis. If we could try to do that if that would be helpful. Then, Rich, you can provide your information to Melissa to send the transcript to. Then do you want to say, like, 14 days to review and make any changes necessary to the transcript. Does that work?

MR. LAPPING: Yeah, that's fine.

MS. DODGE: Okay.

MS. REPORTER: Mr. Lapping, will you be ordering a copy?

MR. LAPPING: Yes.

MS. REPORTER: So when do you wish to receive the transcript? A week, instead of two weeks?

MS. DODGE: Yes, that will be fine.

(Whereupon, the deposition proceedings were concluded at 5:14 p.m.)

150

DECLARATION UNDER PENALTY OF PERJURY

STATE OF CALIFORNIA )
                     )ss
COUNTY OF FRESNO     )

I, TODD GREENBERG, do hereby certify:

That I have read the foregoing pages _____ through _____, inclusive. I hereby state there are: (check one)

_____ no corrections.

_____ corrections per attached.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed this _____ day of _____, 2022, at _____, California.

_____
TODD GREENBERG

151

WITNESS'S CHANGES OR CORRECTIONS

NOTE: If you are adding to your testimony, print the exact words you want to add. If you are deleting from your testimony, print the exact words you want to delete. Specify with "Add" or "Delete" and sign this form.

Deposition of: TODD GREENBERG

Case Title: PG&E v. Pacific Gas and Electric

Date of Deposition: Friday, May 13, 2022

I,_____, have the following corrections to make to my deposition:

Page Line Change/Add/Delete

____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____

152

REPORTER'S CERTIFICATION

STATE OF CALIFORNIA )
                    ) ss
COUNTY OF FRESNO    )

I, Melissa Slover, CSR No. 9787, a
Certified Shorthand Reporter in and for the State of
California, County of Fresno, do hereby certify:

That the foregoing witness was by me duly
sworn; that the deposition was then taken before me at
the time and place herein set forth; that the testimony
and proceedings were reported stenographically by me and
thereafter reduced to computerized transcription under
my direction and supervision, and I hereby certify the
foregoing deposition is a full, true and correct record
of the testimony and proceedings taken at that time.

I further certify that I am neither
counsel for, nor in any way related to any party to said
action, nor in any way interested in the result or
outcome thereof.

IN WITNESS WHEREOF, I have subscribed my
name on _____, 2022.


_____
Melissa Slover, CSR No. 9787

153