1    UNITED STATES BANKRUPTCY COURT

2    NORTHERN DISTRICT OF CALIFORNIA

3    -oOo-

4  In Re:                        ) Case No. 19-30088
                                 ) Chapter 11
5  PG&E AND PACIFIC GAS AND      )
   ELECTRIC COMPANY,             ) San Francisco, California
6                                ) Monday, June 27, 2022
                     Debtor.     ) 9:00 AM
7  _____ )
                                   TRIAL RE OBJECTIONS TO CLAIMS
8                                  OF TODD GREENBERG

9              TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE DENNIS MONTALI
10            UNITED STATES BANKRUPTCY JUDGE

11  APPEARANCES (All present by video or telephone):
    For the Debtor:           JENNIFER L. DODGE, ESQ.
12                            Law Offices of Jennifer L. Dodge
                              Inc.
13                            2512 Artesia Boulevard
                              Suite 300D
14                            Redondo Beach, CA 90278
                              (310)372-3344
15
    For Todd Greenberg:       RICHARD A. LAPPING, ESQ.
16                            Trodella & Lapping LLP
                              540 Pacific Avenue
17                            San Francisco, CA 94133
                              (415)399-1015
18
    Court Recorder:           LORENA PARADA/ANKEY THOMAS
19                            United States Bankruptcy Court
                              450 Golden Gate Avenue
20                            San Francisco, CA 94102

21  Transcriber:              MICHAEL DRAKE
                              eScribers, LLC
22                            7227 N. 16th Street
                              Suite #207
23                            Phoenix, AZ 85020
                              (973)406-2250

24
    Proceedings recorded by electronic sound recording;
25  transcript provided by transcription service.

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1      SAN FRANCISCO, CALIFORNIA, MONDAY, JUNE 27, 2022, 9:00 AM

2                                    -oOo-

3          (Call to order of the Court.)

4              THE CLERK:  Court is now in session, the honorable

5      Dennis Montali presiding.  Calling the matter of PG&E

6      Corporation.  And I'll bring counsel in now, Your Honor.

7              THE COURT:  Good morning, Mr. Lapping.  Please state

8      your appearance.

9              MR. LAPPING:  Good morning, Your Honor.  Richard

10     Lapping, Trodella & Lapping LLP, appearing on behalf of Todd

11     Greenberg.

12             THE COURT:  All right.  Thank you.  Ms. Dodge?  Your

13     mic is off.

14             MS. DODGE:  Can you hear me?

15             THE COURT:  Yes, I can.

16             MS. DODGE:  Okay.  Good morning, Your Honor.  Jennifer

17     Dodge on behalf of Pacific Gas and Electric Company.

18             THE COURT:  Okay.  Thank you for your preparation and

19     being ready to go here for trial.  I presume we're ready to go.

20     I want to take a couple of housekeeping matters.

21             First, I don't know if either of you are familiar with

22     the way I like to do the exhibits, but what I want to do is

23     call first on you, Ms. Dodge, and tell me which, if any, of Mr.

24     Greenberg's exhibits on his exhibit list that you wish to

25     reserve an objection to.  And I want to make it clear, you just

escribers

(973)406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1    reserve the objection, and then I'll hear the objection when

2    the exhibit is offered.

3            So is there -- which one is on his list do you want to

4    reserve an objection to?  In which case, if you say I want to

5    reserve an objection to exhibit such-and-such, that exhibit

6    will be marked for identification only at this point.  Anything

7    you don't mention will just be treated as in evidence.  Okay?

8            MS. DODGE:  Okay.

9            THE COURT:  So let's go down the list.

10           MS. DODGE:  All right.  Mr. Lapping and I did meet and

11   confer regarding exhibits prior to today in accordance with

12   your order.

13           I think the only two that I would want to reserve

14   potential objections to are the Veteran Power records, which

15   are -- they're individually listed.

16           THE COURT:  I'll just give me the letter number.

17           MS. DODGE:  Okay.

18           THE COURT:  I mean, I have the list, but some of it I

19   don't have it matched up with the words.  So --

20           MS. DODGE:  Right.  Well, Exhibit I is the

21   certification of the Veteran Power custodian of records.

22           THE COURT:  Okay, I'll call -- Exhibit I is marked for

23   ID only at this point.

24           MS. DODGE:  Okay.

25           THE COURT:  And what's the other one?

escribers

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1          MS. DODGE:  And, well, I'm sorry.  When I said two, I

2     meant the Veteran Power records as a whole.  So it actually

3     involves more records because he marked those individually, not

4     collectively, as one exhibit.

5          THE COURT:  So which ones --

6          MS. DODGE:  The others are -- the others are Exhibit

7     N, Exhibit O.

8          THE COURT:  Okay.

9          MS. DODGE:  And the list exhibit T.

10         THE COURT:  Well, there are a bunch of ones that are

11    marked with VP.

12         MS. DODGE:  Right.

13         THE COURT:  Are you -- okay.  Now that I can see there

14    are quite a number with VP, are you is serving as to all the

15    VPs or just certain ones?

16         MS. DODGE:  Well, I have a motion in limine on the 31

17    Bolinas job as a whole.  There are certain -- some statements

18    within the Veteran Power records that could potentially be

19    hearsay within -- even though perhaps it's a business records

20    exception to hearsay.  There's some statements contained in

21    there that could be hearsay within hearsay.

22         THE COURT:  Okay.  But I'm confused.  First of all,

23    you got my ruling on the motion in limine, didn't you?

24         MS. DODGE:  Yes.

25         THE COURT:  Okay.  So I've in effect -- I've denied

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1   your motion as to Exhibit 5.

2          MS. DODGE:  Right.

3          THE COURT:  I mean, excuse me, motion 5.  But that

4   doesn't mean you can't reserve your objection.  So, once again,

5   I'm bogged down here.  You've identified I, N, O, and T.  Just

6   give me everybody on your list that you want to reserve.  And

7   I'm not going to -- I'm not going to make a ruling.  I'm just

8   going to let you preserve it for this point.

9          MS. DODGE:  Okay.  Then it would be, I think, any of

10  the ones that are marked VP.  So let's just let all of them.

11  J, K, L, M, N. O.

12         THE COURT:  Okay.  I got you.

13         MS. DODGE:  S, T, U, V, W, X, Y, Z, and then AA, BB,

14  CC, EE.  I think that's all of them.  Yes.

15         THE COURT:  Okay.  All right.  So let me just restate

16  restated again then.  Using Mr. Lapping's list, every exhibit

17  that has not been identified this morning will be treated as

18  in.  Those that are marked for ID and therefore are not in,

19  I'll just repeat them:  I, J, K, L, M, N, O, S, T, U, V, W, X,

20  Y, Z, AA, BB, CC, and EE.  Right?

21         MS. DODGE:  Correct.

22         THE COURT:  Mr. Lapping, same question for you.

23         MR. LAPPING:  Yes, Your Honor.  I think basically

24  Exhibits 8, 9, and 10 we want to reserve on.

25         THE COURT:  Okay.  One second.  8, 9, and 10, we'll

(973) operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1    call -- 8, 9, and 10 are ID.  Then I'll treat all the other

2    PG&E exhibits in evidence except 8, 9, and 10.  And to the

3    extent there's any overlap, I'm not going to worry about that.

4    Okay.

5         So don't take time during the presentation of the

6    trial to offer something in the evidence that's already in.

7    They're in unless they've been identified as ID only.

8         I want to explain at least two pieces of my ruling

9    from yesterday.  The problem I'm having with Mr. Lapping,

10   you -- and the reason I marked a motion in limine number 1 for

11   deferral, that's the QQ.  Mr. Webb, the problem is that you

12   said in your papers that you provided that to opposing counsel

13   early in the month, and six days ago you amended your proof of

14   claim and you did not amend it.  So the amended proof of claim

15   is still showing a cost damage estimate in the 30,000 range.

16        And I don't know why I should let you in effect miss a

17   deadline for exchanging exhibits but more importantly amending

18   the claim and not including the very exhibit that you want to

19   offer.  And I don't have to rule -- you don't have to argue on

20   this now.  I'll come back later to the motions.  I just wanted

21   to explain my thinking on that subject.  So, again, I'm not

22   inviting a response.  You'll have plenty of time to give me

23   your thinking and your argument.

24        Now, you also got my ruling about the convenience of

25   third-party witnesses.  I hope that's not a problem.  Does

(970) operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1    anybody have a confusion or problem about that?

2            MS. DODGE:  I'm sorry.  On which one, Your Honor?

3            THE COURT:  Well, on witnesses.  I don't want

4    witnesses having to testify and then go and then come back and

5    testify again.  This is a bench trial.  I can keep the

6    difference straight between direct and redirect and what have

7    you.  So however you wish to agree which witnesses -- and

8    remember, Mr. Greenberg is a party.  So I'm not excluding him,

9    and you call him when you want.  And I'm talking about

10   third-party witnesses in PG&E's case.  Ms. Dodge, you had asked

11   for exclusion of witnesses, but some of the witnesses are PG&E

12   representatives.  So you can exclude them if you wish.  But the

13   point is that as I understand the law in general, when a court

14   excludes witnesses, it does not exclude parties.  Again, you've

15   got a company that's got a lot of people.  And maybe there's

16   some individual.  But you're in control of who you exclude from

17   your testimony.  So I --

18           MS. DODGE:  Right.  Your Honor, my request on that

19   issue is just that in a typical trial where it would be in

20   person, if you have a witness who is going to be testifying,

21   they would be outside the courtroom rather than listening to

22   the testimony that had already been given.  I understand what

23   you mean about PG&E being a party and they would be entitled to

24   be there.

25           But again, this is Mr. Greenberg's case.  And I have

PG&E Corporation and Pacific Gas and Electric Company

1  witnesses listed that I may or may not call.  I don't know who

2  Mr. Greenberg is intending to call.

3          THE COURT:  No, no.  But Ms. Dodge, understand what

4  happens in the real world, but this is our pretend world.  And

5  the fact is I have almost no control over actually excluding a

6  witness who can click on a link and observe the testimony.  So

7  this is an honor system.  And both of you, as lawyers and

8  officers of the court, I know will honor that.  And if you have

9  a witness that you expect to call but you've committed to the

10 other side's request that witness will be excluded, you need to

11 make sure that witnesses instructed that he or she cannot even

12 listen in on the Zoom broadcast.  But we can't keep them out. I

13 mean --

14         MS. DODGE:  No, I've -- right.  I've instructed them

15 accordingly, Your Honor.

16         THE COURT:  Okay.  And Mr. Greenberg, of course, is a

17 party, and I would not exclude him unless there was some

18 compelling reason.  And I don't understand there's any reason

19 there.

20         Okay.  Again, I've done several Zoom trials, but I

21 don't know if either or both of you have.  But we'll just make

22 it make the rules as we go along.  We'll take breaks when

23 people ask for them.  I'll take a personal convenience break

24 when anybody asks or what I need to.  I probably will take a

25 midday break of -- shorter than the usual.  I was watching a

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1  Netflix show the other day, and the judge took two-hour breaks

2  during a jury trial.  I probably would take a thirty-minute

3  break during a non-jury trial.  But we'll play it by ear.  And

4  whether we conclude today or need to go to tomorrow, we'll

5  just -- remains to be seen.

6         What I'd urge you both to do is don't waste your time

7  or mine proving matters that are not relevant.  So that, for

8  example, I'll give you an example.  Greenberg Exhibit B is

9  United Airlines flight information.  I don't really think the

10 dates he went to Hawaii are in issue.  If they are, fine, but

11 I'm assuming they're not.  So that document is in evidence, but

12 it's not going to be of any probative value unless there's

13 something that I don't know.

14        Then finally, my preliminaries, I don't need opening

15 statements, but I will invite opening statements.  Mr. Lapping,

16 you have the burden of going forward.  So if you wish to make

17 an opening statement, you're free to.  And Ms. Dodge, if you

18 want to make one after that or later, again, it's up to you.

19 Just don't -- I mean, my goal here is to get your witnesses on

20 the stand and testify and get the facts out there.

21        But with that, I'm ready to begin unless either of you

22 have any preliminary questions you --

23        MS. DODGE:  I have --

24        MR. LAPPING:  Yes, Your Honor.

25        THE COURT:  Go ahead.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1      MR. LAPPING:  Mr. Lapping for Mr. Greenberg.

2      I'm calling -- planning on calling two witnesses

3  besides Mr. Greenberg.  One of them is the appliance repair

4  person who showed up back in 2016.  We tracked him down.  He

5  works during the day, so he is available to phone in around

6  noon.  And the arrangement is that I'll call him and say, okay,

7  this is it, get on the get on the line and sign in.  A similar

8  arrangement for Mr. Webb.  He is likewise on standby.  They're

9  not planning to call in until I call them and invite them in.

10      THE COURT:  Well, when you say call, they're going to

11  use a camera though, aren't they?

12      MR. LAPPING:  Only Mr. Webb.  Mr. Garandza I don't

13  think has that ability.  He'll be on the telephone.  But there

14  is a telephone option on these Zoom calls.  He calls the number

15  in San Jose.  And apparently that works.

16      THE COURT:  No, I understand.  And I understand.  And

17  again, I hadn't thought about whether it's necessary for a

18  witness to appear on the video.

19      Ms. Parada, is there a problem with that phone call?

20      THE CLERK:  Yes, Your Honor.  Because we are using

21  Webinar, there's no ability for someone that has dialed in to

22  be able to participate in the hearing.  They can listen in as

23  an attendee, but as a participant -- as a panelist, they

24  cannot.

25      THE COURT:  Well, can we call him?

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1      THE CLERK:  No, because we're using the Webinar

2  feature rather than a meeting.

3      THE COURT:  Okay.  So how you want to solve this

4  problem for Mr. Lapping's witness?  You're the courtroom

5  deputy.  Solve the problem, please.

6      MR. LAPPING:  Oh, dear.  Tough boss.

7      THE COURT:  Well, we could go off the camera and go to

8  an AT&T by phone for one -- for an interval, couldn't we?

9      THE CLERK:  We could do that, or if we continue this

10 until tomorrow, I can switch it from Webinar to meetings to

11 allow for that.

12     THE COURT:  But if this gentleman is on standby around

13 noon, we could terminate or suspend the video and do an AT&T

14 conference call.

15     Mr. Dodge, I assume you are not complaining that he's

16 going to appear by phone only, right?

17     MS. DODGE:  Well, yes.  I would prefer that he

18 appear -- I would like to see -- I mean, you're supposed to

19 have the ability to depose -- I'm sorry, to question these

20 people.  And I would like to see him via camera and not via

21 phone to be able to observe his demeanor and ask him questions

22 and all of that.

23     So in my -- from my -- based on my opinion, the

24 scheduling order is very clear that it says any witnesses that

25 are going to appear need to have some ability with a camera.  I

PG&E Corporation and Pacific Gas and Electric Company

1    don't understand why he wouldn't be able to have a camera

2    because almost all cellphones now have cameras.

3           THE COURT:  Well, my point is this.  If you and Mr.

4    Lapping didn't discuss it --

5           MS. DODGE:  We didn't.

6           THE COURT:  I mean, I wish you had discussed it ahead

7    of time.  If you didn't, Mr. Lapping, I think Ms. Dodge is --

8    she has the right to insist on that.  You can work something

9    out or --

10          MR. LAPPING:  Your Honor, I'll suggest him to use the

11   cellphone option.  She's right.  That's probably something he

12   could do.  And it won't be optimal, but it will, I'm sure, show

13   his picture.  I have to believe he's got a modern smartphone.

14   So --

15          MS. DODGE:  Unless it's a flip phone or something.

16          THE COURT:  Well, but he might have a teenage daughter

17   or son or something.  I mean, the point is, I'll accommodate

18   you during a break so you can communicate with him and get

19   something worked out.  There's got to be a way.  And I think

20   Ms. Dodge's position -- her request is reasonable.  And we'll

21   just make it work.  And if you have a problem after you've had

22   a chance to talk to him, we'll cross that bridge when it comes

23   to it.

24          MS. DODGE:  Your Honor, I have one other comment.

25          There's been discussion about this going into

PG&E Corporation and Pacific Gas and Electric Company

1    tomorrow.  And when we were setting this up, when we were

2    talking about the three claims that Mr. Greenberg had

3    originally filed, the other two got transferred to state court.

4         THE COURT:  Right.

5         MS. DODGE:  That was when we had the two-day bench

6    trial for all three of those claims.  And during the hearing, I

7    believe it was on April 12th, we specifically said that today

8    we were just going to be dealing with the refrigerator claim

9    and that it was slated for a one-day bench trial.  And that

10   would be just today.  So it could be --

11        MR. LAPPING:  Your Honor, I have no problem with that.

12   That's fine.

13        MS. DODGE:  Yeah.  I would like to -- I would like to

14   basically wrap it up today.  And that's what was said before.

15        THE COURT:  Well, so would I.  But I'm not going to --

16   I'm not going to shortchange anybody on the administration of

17   justice.  And I've presided over a lot of trials where I've

18   found that the estimates never are as long as people think they

19   are.  But every now and then we go over and we make

20   accommodations.  But again, I'm going to put that in the cross

21   the bridge when we come to it.

22        So Mr. Lapping, back to Mr. Webb.  Mr. Webb presumably

23   as a camera access without an issue.

24        MR. LAPPING:  Yes, Your Honor.

25        THE COURT:  So what do you want to -- do you want to

PG&E Corporation and Pacific Gas and Electric Company

1   just tell us all a time that we'll plan on having Mr. Webb call

2   and we'll take him out of order, regardless of whatever else

3   we're doing?  I mean, where does he fit into your sequence of

4   witnesses you're calling as the -- on your case in chief?

5           MR. LAPPING:  Well, he is the -- it pretty much comes

6   in near the end in terms of the damages.  And his testimony is

7   definitely related to Exhibit QQ, which Your Honor is having an

8   issue with.  So we should probably resolve that I guess.

9           And then if he then testifies, I can call him during a

10  break and we could set up a time, I would suggest maybe like 11

11  o'clock, and have him call, dial -- or sign in.  And we'll do

12  it right then.

13          THE COURT:  Okay.  Well, let's talk about QQ.  Again,

14  I didn't make this up, Mr. Lapping.  I got a motion in limine.

15  And I went online.  And one of the things Ms. Dodge commented

16  on was that your client hadn't amended his claim.  So over the

17  weekend, yesterday I went on the Prime Clerk cite and saw two

18  amended claims that Mr. Greenberg filed a few days ago.  The

19  other one relates to the matters that aren't here, that are

20  going to state court.

21          But the one that now has a new claim number -- I

22  assume you know it.  And if you don't know it, it's claim

23  number 108542.  That's the new number of what was 77335.  And

24  it doesn't have this new number from Webb.  So I don't know how

25  you can miss a deadline for exchanging a witness -- I mean, an

PG&E Corporation and Pacific Gas and Electric Company

1   exhibit and then rely on an amended claim that doesn't comport

2   to your replaced exhibit.

3   So again, Ms. Dodge, I'm making your argument, but is

4   this your argument?

5   MS. DODGE: Thank you. Well, Your Honor, even if Mr.

6   Lapping had filed the amended claim and included the Dennis

7   Webb estimate, we still would have the same objections because

8   we had a deadline, like you said, back in March for amending

9   claims. And that deadline -- again, we had some discussion

10   about whether it was the filing or the hearing deadline by

11   March 15th. Regardless, we allowed that to go forward. You

12   allowed him to amend his claim. And it has -- that attachment

13   to the amendment of claim number 77335 has a specific breakdown

14   of damages.

15   And again, I'm not -- this is my low tech way of

16   showing you, but there's an attachment here that has a list of

17   all of the --

18   THE COURT: See, this is my low tech way. I've got it

19   in my hand. It's --

20   MS. DODGE: Oh, perfect.

21   THE COURT: It's the --

22   MS. DODGE: Thank you. But anyway, yeah, it doesn't

23   have anything in there about this Dennis Webb estimate. And

24   then on June 6, I got an email saying, oh, here's the new

25   Dennis Webb estimate; now, the replacement of the floor is

(973) operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1  going to be 82,000 dollars when it said in the amended claim it

2  was going to be 30,000.

3          THE COURT:  And even the 30,000 is in two parts.  It's

4  24- plus 6-.

5          MS. DODGE:  Right, exactly.

6          THE COURT:  Now.  So Mr. Lapping, she's got a point.

7          MR. LAPPING:  All right.  Here's what happened.  We

8  filed a motion to amend in March, and it was granted in April,

9  I believe.  And I did not immediately file the claim only

10  simply because pressed with time and other things seem to be

11  more important.  The Court ruled that we could amend the claim

12  in the -- as I understood it in the form attached to the motion

13  in March.  And I didn't think I had any leeway to file a

14  different claim in June without revisiting and getting

15  permission to do that.

16          So I filed essentially what I had in March of 2022 and

17  which I understood the Court to have approved.  And I didn't

18  for a minute think I had the leeway to go ahead and file

19  something that varied from what I had presented to the Court.

20          THE COURT:  Well, but where did you get the leeway to

21  provide it after the deadline and a larger amount?  I mean,

22  we're at a situation where if I look at the public record,

23  there is an amended claim of six days ago, and it's 30,000

24  dollars.  But unbeknownst to me, you've exchanged with an email

25  to opposing counsel a claim that adds 50,000 dollars.  And that

of 320
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1    seems like a gotcha more than anything else.

2           MR. LAPPING:  Well, Your Honor, I basically didn't get

3    the estimate in question until June 6.  When I got it, I

4    immediately --

5           THE COURT:  I mean, that's -- there are ways around

6    that.  You get more permission.  You ask.  You get consents.

7           MR. LAPPING:  Well, I didn't think PG&E was going to

8    consent.  But I did say in the attachment to our proof of claim

9    that all amounts are estimates and subject to updating

10   according to proof.

11          THE COURT:  But what does that mean?  What does that

12   mean?

13          MR. LAPPING:  Well, it means that I've got new

14   evidence.

15          THE COURT:  But Mr. Lapping, what does that mean when

16   there's a deadline to exchange exhibits?  I mean, does this

17   mean you have another one that's going to come out for --

18   because he wants to get the driveway repaired?  I mean, you

19   had -- at some point there's got to be some finality in terms

20   of what we're trying.

21          MR. LAPPING:  One minute.

22          MS. DODGE:  And that's my argument exactly, Your

23   Honor.  I mean, every time --

24          MR. LAPPING:  the deadline --

25          MS. DODGE:  Every time we kind of put --

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1    THE COURT:  Hold on, Mr. Lapping.

2    Go ahead, Ms. Dodge.

3    MS. DODGE:  Every time we sort of put this aside and

4  we say, okay, Mr. Greenberg, your original claim was 37,000

5  dollars to the Bankruptcy Court and then the amendment all of a

6  sudden it's 123,000 dollars and that was submitted back in

7  March, April, it was, okay, you can bring that in because it

8  essentially is the same elements -- except for the lost rent,

9  which was in addition to the -- that was on the original claim,

10  but it was for four weeks and now it's for two years.  And then

11  every time we put it aside, then another -- something else

12  comes out that exponentially increases the damages again.

13    And as you said, there's got to be something where

14  there's some finality, where we say, okay, we have the claim,

15  this is what we're dealing with.  And that's what was amended.

16  And that's what was filed with the Court, like you said, a week

17  ago.  And to be fair to PG&E, we need to know what we're

18  dealing with.  And my understanding is the amendment of the

19  claim.  And then out of the blue, three weeks before trial, I

20  get this amendment -- or I'm sorry, not an amendment, but this

21  new estimate that adds 50,000 dollars to the flooring claim.  I

22  mean, it's completely unfair to PG&E to do that.

23    And it's beyond the discovery deadline.  He wasn't

24  disclosed as a witness.  My understanding is Mr. Webb has done

25  other work at the property.  And again, I don't know why Mr.

                PG&E Corporation and Pacific Gas and Electric Company

1    Greenberg decided to get a new claim from him, but I don't

2    think there's any reason why he couldn't have gotten some --

3    I'm sorry, a new estimate from him earlier.  And if they wanted

4    to amend the claim to try to bring those amounts in, they had

5    every -- they could have done it, and they didn't do it.

6              THE COURT:  You made a statement that's confusing.

7    You said that Mr. Webb wasn't disclosed as a witness, but he is

8    on the witness list.

9              MS. DODGE:  I'm sorry.  I don't mean as a witness.  I

10   meant that he wasn't disclosed during discovery.

11             THE COURT:  Okay.  But the point is, you haven't -- I

12   don't believe your motion in limine -- well, maybe it does.

13             MS. DODGE:  Yeah.  It asks that his testimony -- that

14   his testimony -- that the estimate be excluded and that his

15   testimony be excluded.

16             THE COURT:  Yeah.  I mean, I didn't know I was going

17   to get a bunch of motions in limine, and I got them in a hurry.

18   And I had to act on them in a hurry.  So --

19             MS. DODGE:  Right.

20             MR. LAPPING:  Can I make one observation, Your Honor?

21             THE COURT:  Well, I'll make one, not -- yes.  But I

22   want to make one comment first, Mr. Lapping.  I think what

23   bothers me as much as anything is not missing a deadline for

24   sending counsel an exhibit.  It's this notion now of saying,

25   well, you didn't know you could amend the claim to have this

(972) 406-8700 operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1   larger amount because you were busy back in March or April.

2   The fact is there is this amended claim that's six days old or

3   seven on the docket that's inconsistent with your exhibit.  And

4   I think she's right that if you'd filed that amended claim

5   earlier with the larger amount, I might not be so troubled by a

6   delay in sending the actual exhibit to Mr. Dodge.  But go

7   ahead, make your comment.  Then I'll make a ruling.

8           MR. LAPPING:  Okay.  First of all, in the trial

9   setting order, the deadline for exchanging exhibits was

10  originally June 13th, and by stipulation we moved it to June

11  16th.  So I did not have -- and the exhibit was duly provided

12  first a week ahead of time ahead of that schedule and then as

13  part of the exhibit submissions.  The witness was timely

14  disclosed.  The exhibit was timely provided.

15          The filing of the amended claim I think is -- falls

16  under the category of a ministerial-type act.  Ms. Dodge was

17  complaining that I hadn't filed it in May or earlier.  And it

18  was just something that I had to catch up and do.  I was not

19  intended to function as anything other than filing the claim,

20  which Your Honor allowed me to file back in an order entered in

21  April.  So --

22          THE COURT:  But there's a disconnect between the proof

23  of claim and what you now want to prove.  In other words, in

24  effect, what you're saying is please treat your claim as the

25  sixty -- or whatever the difference is, 50,000 dollars more.

PG&E Corporation and Pacific Gas and Electric Company

1    And so you had the right to amend the claim months ago.  You

2    had in hand something from Mr. Webb.  And indeed there's no

3    debate.  She's not questioning I guess about his being a

4    witness at a lower mound.  Maybe she is.  I'm a little confused

5    about that.

6         But the fact of the matter is I'm still not persuaded

7    that that it's fair to say, well, we didn't amend the claim

8    enough, but please pretend it's amended by a substantial amount

9    more.  And I do think that's the thing that's troublesome to

10   me.

11        So I'm going to go ahead and grant the motion in

12   limine on this issue.  I think that is unfair to PG&E.  Again,

13   I think -- again, I don't want to get into why something was

14   filed when it was later versus earlier.  What the thing says,

15   it doesn't say there's this additional amount.  In fact, it

16   references Exhibit 3.  And I'm looking right at it.  It says

17   Cost to repair, 24,000.  Exhibit 3, not Exhibit QQ.  So I'm

18   going to exclude and grant the motion in limine as to motion

19   number 1.

20        MS. DODGE:  Thank you, Your Honor.

21        THE COURT:  So I don't -- do you still intend to call

22   Mr. Webb for the lower amount?  Is that the plan?

23        MS. DODGE:  Your Honor, we would object to that

24   because Mr. Webb -- the estimate for the 24-, the 30,000 is

25   from -- I don't know, City Carpets or something.  It's not Mr.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1  Webb's estimate.

2  THE COURT:  Oh, okay.  I couldn't -- oh, I didn't

3  remember it that way.  Well, Mr. Lapping, that's my ruling.

4  I'm sure you don't like it, but that's the decision I'm making.

5  So let's -- I guess that means we're not going to hear

6  from Mr. Webb today.

7  MR. LAPPING:  Your Honor, in terms of how I present

8  going forward, a big chunk of this case is presented via simply

9  the exhibits that are discussed in the trial brief.  Now, Mr.

10  Mr. Greenberg has some independent testimony, and I intend to

11  call him.  And I think I'll call him first and go through his

12  testimony.  But then the balance of what we intend to present

13  is really presented through these exhibits.

14  THE COURT:  Well, in other words you're going to make

15  an argument.  I mean, you're not going to call the exhibit as a

16  witness.  So you're going to tell me that based upon Exhibit X,

17  Y and Z, this is why you think you should win.

18  MR. LAPPING:  Yes.  And when do I do that is my

19  question.

20  THE COURT:  Well, if you were in a real trial and

21  there was an objection to testimony, you would argue -- you

22  proffered the evidence.  You'd say, here, I'm offering exhibits

23  such-and-such.  And your opposing counsel would say, I object.

24  And the Court would listen to the argument and make a ruling.

25  So the answer is you make -- I mean, I think, again,

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1   we're back to the business of accommodating witnesses, even Mr.

2   Greenberg.  I'd like to get the witnesses' testimony out of the

3   way.  But if it's more productive or more efficient for you to

4   argue about the exhibits first, I'll be happy to listen to it.

5   But, I mean, for the most part, it's this Veterans Power

6   exhibits.  In fact, those are the only exhibits she's objecting

7   to.  Right?  She went through the list, and I just read all the

8   Veterans Power stuff.

9           So how do you want to present it?  Do you want to --

10  are you saying there's no witness to testify about the Veterans

11  Power exhibits?

12          MR. LAPPING:  That is correct, Your Honor.  So why

13  don't I postpone that?  And we'll start with Mr. Greenberg.

14          THE COURT:  Okay.  And then Mr. Dodge will have a

15  right to cross-examine Mr. Greenberg.  But she can also --

16  again, for Mr. Greenberg as the party, I don't mind splitting

17  up and making him testify -- or not making him -- letting him

18  testify sequentially.  But it's for the third-party witnesses

19  that I want to accommodate them.

20          So let's go ahead.  Do you want to make an opening

21  statement?

22          MR. LAPPING:  No, Your Honor, I'll.  I'll start

23  directly with the witness.

24          THE COURT:  Okay.  Let's bring Mr. Greenberg in.

25  And --

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1        MS. DODGE:  Your Honor?

2        THE COURT:  Yes?

3        MS. DODGE:  I have a short opening I'd like to

4    present.

5        THE COURT:  Oh, okay.  Go ahead.

6        MS. DODGE:  So Mr. Greenberg claims damages related to

7    an alleged power outage, surge, or fluctuation while he was

8    away on vacation from February 14th to 22n, 2016.  The claim

9    was originally denied by PG&E in 2016 because there was no

10   outage, surge, or fluctuation on the circuit that provides

11   power to the property at 47 Bolinas, which is commonly referred

12   to as San Rafael 1108.

13        The parties have conducted discovery, including

14   depositions of two PG&E employees regarding outages in 2016 and

15   the work that was done at 31 Bolinas, as well as written

16   discovery.  The evidence will show that there was no outage,

17   surge, or fluctuation on the San Rafael 1108 circuit that took

18   place during the time when Mr. Greenberg was away.

19        Moreover, even if Mr. Greenberg had shown that there

20   was some outage, surge, or fluctuation on that circuit, his

21   claim would still fail because of tariff rules 2C and 14.

22   PG&E's obligations to its customers are governed by the tariff

23   rules that are reviewed and approved by the California Public

24   Utilities Commission and have the force and effect of law like

25   a statute.  Any deviations are unlawful unless authorized by

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1    the Commission.

2         Rule 2C provides that there might be voltage limits --

3    I'm sorry.  There may be variations in voltage limits and that

4    PG&E will exercise reasonable diligence to maintain a

5    consistent frequency.  But they cannot and do not guarantee

6    that.

7         Rule 14 provides that power can be interrupted when

8    and if PG&E&E needs to maintain, improve, repair, or expand its

9    distribution system.  That rule also provides that PG&E is not

10   liable for any interruption of power unless it's caused by its

11   failure to exercise reasonable diligence.  And Rule 14 also

12   provides that PG&E is not liable for interruptions that are

13   outside or beyond its control, like birds or other objects that

14   might contact its facilities.

15        So even if Mr. Greenberg is able to prove that there

16   was some outage, surge, or fluctuation in power during the

17   relevant time period, his claim would still fail because PG&E

18   does not guarantee a steady stream of electricity, and PG&E

19   would not be able to show that -- I'm sorry.  Mr. Greenberg

20   would not be able to show that PG&E did not exercise reasonable

21   diligence if there was indeed such an interruption of power.

22        THE COURT:  But that that's an ultimate fact question

23   though, isn't it?

24        MS. DODGE:  Yeah.

25        THE COURT:  Okay.  So if Mr. Greenberg can persuade

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1    the trier of fact, yours truly, that PG&E didn't exercise

2    reasonable diligence, then perhaps he makes his case.

3              MS. DODGE:  Well, that would be if PG&E didn't

4    exercise reasonable diligence and it was some interruption in

5    power that was within the control of PG&E.

6              THE COURT:  Well, I understand.  I understand.

7              MS. DODGE:  Right.

8              THE COURT:  But I understand also from the briefs in

9    the argument that he believes that Veterans Power did something

10   incorrectly with the property next door that caused his problem

11   to happen.  So that that comes down to the ultimate question it

12   seems to me, was that reasonable diligence within their control

13   or their agent.  You don't question the contractor as agent, do

14   you?

15             MS. DODGE:  No, no, no.

16             THE COURT:  Okay.  Okay.

17             MS. DODGE:  But, I mean, you will see that the

18   evidence will show that there's nothing in the Veteran Power

19   records that shows that there was any power interruption or

20   service delivery interruption during that time period.

21             THE COURT:  Okay.  Got you.

22             MS. DODGE:  Okay.  Thank you.

23             THE COURT:  Okay.  Mr. Greenberg -- I mean, Mr.

24   Lapping, if you'd like to call Mr. Greenberg, we'll have the

25   clerk swear him in.  And --

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1          MR. LAPPING:  Right.  And he may -- I think he's

2    listening to all of this, but he may have some questions about

3    process as well, bathroom breaks, if you will, or personal --

4          THE COURT:  Well, I mean, I'll restate it to him as I

5    would for anyone.  If he wants a personal convenience break, he

6    doesn't have to tell me what the particular convenience he

7    wishes.  He just wants a break.

8          So, Ms. Parada, would you bring Mr. Greenberg in,

9    please?

10         MS. DODGE:  Does Mr. Greenberg have a camera?

11         THE COURT:  I assume he does.

12         MR. LAPPING:  He's no doubt struggling with my house

13   that I've loaned him that's left-handed.

14         THE COURT:  Well, I'm left-handed.  I'm left-handed,

15   but I use my right hand.

16         Mr. Greenberg?

17         MR. GREENBERG:  Good morning.

18         MS. DODGE:  I'm left-handed too, all of us.

19         THE COURT:  Okay.  Ms. Parada, would you please swear

20   Mr. Greenberg?

21         THE CLERK:  Please raise your right hand.

22      (Witness sworn.)

23         THE CLERK:  Thank you.  Please state your name and

24   address for the record.

25         THE WITNESS:  Todd Greenberg, 47, Bolinas Road, Unit

escribers

(973) operations@escribers.net | www.escribers.net

Greenberg - Direct

1    A, Fairfax, California 94930.

2            THE COURT:  Good morning, Mr. Greenberg.  Welcome to

3    the Bankruptcy Court.

4            Ms.  Dodge and Mr. Lapping, can you see him all right?

5    Do you want me to ask him to tilt his camera slightly down?

6            MS. DODGE:  Yeah.  If he can tilt it down.

7            THE COURT:  Yeah, there you go.

8            MS. DODGE:  That's better.

9            THE COURT:  Right about there, Mr. Greenberg.  That's

10   fine.  And you can see all three of us, right?

11           THE WITNESS:  Yes.  Thank you.

12           THE COURT:  Okay, Mr.  Lapping, you may proceed.

13   DIRECT EXAMINATION

14   BY MR. LAPPING:

15   Q.   Okay.  Mr. Greenberg, 47 Bolinas Road, Exhibit A, is

16   that -- where is that unit located?  Is that the upper or

17   lower?

18   A.   Unit A is the upper unit.  Unit B is the lower unit.

19   Q.   Okay.  In 2016, in February of 2016, where were you living?

20   A.   In February of 2016, I was living in the lower unit, which

21   at that point in time, it's a little confusing, was referred to

22   as unit A.  Unit A has traditionally been the owner's unit.

23   And that lower unit when we bought it, the prior two owners had

24   lived in the lower unit.  When I moved upstairs, we

25   redesignated the upper unit as unit A.

Greenberg - Direct

1  Q.  Can you describe the ownership of the two units that are on

2  47 Bolinas?

3  A.  Yes.  They were purchased in the name of our family trust,

4  the Greenberg Family Trust.  My parents are the trustees.  And

5  my brother, sister, and I are the beneficiaries.

6  Q.  Great.  Did you take a trip in -- there's been testimony or

7  evidence about taking a trip to Hawaii.  Can you tell me what

8  the dates of that trip was?

9  A.  Yes.  From 2/14 to 2/21.  And I believe I stayed at my

10  parents' home that evening upon our return as we were all there

11  together.  And we returned.  And I stayed the night at my

12  parents' and returned the next day on the 22nd to Fairfax.

13  Q.  Did anyone stay in your unit during your absence?

14  A.  No.  There's a locked gate.  Nobody was there other --

15  during the whole time, as far as I'm aware.

16  Q.  All right.  When you returned to your unit in Fairfax, can

17  you describe the situation that you encountered?

18  A.  Sure.  I walked in and to my surprise, the place -- I don't

19  know what the right words are here, but I'm just going to use a

20  phrase, stuck to high heaven.  It was worse than a dead animal.

21  And everything was melted down, and there were multiple colors

22  all over the floor.  And it was evident that it had been that

23  way for some time.  There was food --

24  Q.  Okay.

25  A.  Yeah, go ahead.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

Greenberg - Direct

1    Q.  Did you take any photographs?

2    A.  Yes.  And I submitted those as part of the initial claim.

3              MR. LAPPING:  Okay.  Your Honor, if I want to show him

4    an exhibit, what's the process for that?

5              THE COURT:  Well, you can share a screen or he -- does

6    he have it anyway?  I mean, you --

7              MR. LAPPING:  I don't think he has it.

8              THE COURT:  I have exhibits.  And you have exhibits.

9    You have to do a sharescreen and --

10             THE CLERK:  Yes, Your Honor.  I'll enable that now.

11             THE COURT:  So do you know how to do that, Mr.

12   Lapping?

13             MR. LAPPING:  I'm going to learn right now, Your

14   Honor.  I'm sure it can't be that daunting.

15             THE COURT:  Well, you're supposed to learn how to do

16   it.  But why doesn't your client have a copy of his own

17   exhibits?

18             MR. LAPPING:  Well, he may, but it's a photograph,

19   Your Honor.  So it's in color and requires -- I really want you

20   to see it at the same time.

21             THE COURT:  I can see it, but I don't -- Mr. Lapping,

22   I don't have to see it on the screen.  I have the exhibits.

23             MR. LAPPING:  Okay.  Well, it's Exhibit II.

24             MS. DODGE:  I'm sorry.  What's the exhibit?

25             MR. LAPPING:  II, II.

Greenberg - Direct

1    THE COURT:  Okay.  I have Exhibit II on my screen.

2    That's in evidence already.  And so you can ask Mr. Greenberg

3    what you want to ask him, but it's in evidence.  And if you

4    want to show -- if you need -- Mr. Greenberg needs to see it

5    again, you can show him on the screen.

6    MR. LAPPING:  Okay.

7    BY MR. LAPPING:

8    Q.  Well, Mr. Greenberg, this is the -- I'm showing the judge

9    the photo of the floor and the refrigerator, and it's got your

10   shoe in it.  Do you know that one?

11   A.  I suppose I -- I do.  I took a lot of photos.  In fact,

12   there were so many photos that at one point it was difficult to

13   transmit them via email because of the size.  And I believe we

14   provided them via a Dropbox folder.

15   Q.  Okay.

16   A.  I can now see this -- I can now see this picture.

17   Q.  Okay.  And you took this photo; is that right?

18   A.  I did, but it looks like that is not my issue.  I think you

19   identified that as my shoe.  I don't recognize that as my shoe.

20   I might have worn those shoes at the time, but I'm not sure

21   whether that could be somebody else in the picture.

22   THE COURT:  Well, Mr. Lapping, does this -- the shoe

23   wasn't in the refrigerator, right?  So who cares about the

24   shoe?  Why is that relevant?

25   MR. LAPPING:  I know.  It's a distraction, Your Honor.

Greenberg - Direct

1    Q.  Is this the -- as you recall the -- what the damage looked

2    like when you returned?

3    A.  Yes.  Looking at the bottom and towards underneath the

4    refrigerator and stretching across the way, I can only see part

5    of this picture because it's presenting very large.  But the

6    liquid was both underneath the refrigerator and then going to

7    the other side of the room, stretching to underneath or at the

8    dishwasher.

9             THE COURT:  Okay.  Where do I see that, Mr. Greenberg?

10            THE WITNESS:  They --

11            THE COURT:  I see an awful lot of pictures of a lot of

12   food, most of which wouldn't have leaked.  So where do I see

13   the picture of the food that goes over to the spillage that

14   went to the dishwasher?

15            THE WITNESS:  I am not -- pardon me, but I'm not

16   looking at all of those pictures.  I'm only looking at this one

17   picture, one as being presented to me.

18            MR. LAPPING:  Your Honor, it's Exhibit II and has a

19   PG&E 0022 Bates number.

20            THE COURT:  No, I have it.  I'm looking at Exhibit I.

21   And I see lots of pictures of things that are in containers.

22   And I don't see where there is spoilage that's out on the

23   floor.  But maybe I'm just not looking at the right picture.  I

24   have the entirety of Exhibit I on my screen, which is dozens of

25   pictures.  So I'm just asking a disclaimer to tell me which

Greenberg - Direct

1   image, what page.  So Mr. Lapping, do you have the actual

2   exhibit that has page numbers?

3           MR. LAPPING:  Your Honor, my Exhibit II has only one

4   page.  And it's a picture of a floor with a carpet and a shoe

5   and some liquid staining on the floor.

6           THE COURT:  Okay.  I'm looking at Exhibit II that--

7   oh, wait a minute.  Just one second.  Maybe I'm looking at the

8   wrong one.  Pardon me.  One second.  One second.  I got to

9   bring this up on the screen.

10          Okay.  I stand corrected.  I mistook II and JJ.  But

11  the photograph of II with a little bit of pinkish color in

12  front of the door of the refrigerator, that same image is in

13  one of the many images in Exhibit JJ.  Okay.  Go ahead.

14          MR. LAPPING:  Okay.  I'm going to stop sharing the

15  screen.  Let's see.  Where was I?  Okay.

16  BY MR. LAPPING:

17  Q.  Mr. Greenberg, now that you've come home and you've

18  discovered this mess, what is the first thing that you did in

19  response?

20  A.  I have no video FYI.  Somehow my video has gone blank.  I'm

21  going to lower my hand.  Can you hear me?

22          THE COURT:  I can hear you and see you, Mr. Greenberg.

23          THE WITNESS:  Oh, now I have video.  So could you

24  please repeat the question?

25  Q.  Sure.  What was the first thing you did in response to the

Greenberg - Direct

1    mess that you discovered in your unit?

2    A.  In short order, I started trying to clean it up.  And that

3    took some time.

4        And then shortly thereafter, I called Fidelity Home

5    Warranty and initiated a request for service so that whatever

6    was going on with the refrigerator could get repaired.

7        And then shortly thereafter, I made inquiries around town

8    as to what had been going on and later learned that there had

9    been a lot of problems related to the work that was occurring

10   next door for a new restaurant that was going in where they

11   were upgrading the power from apparently single-phase 400-amp

12   service to three-phase 600-amp service.

13        MS. DODGE:  I'm just going to move to strike the last

14   portion of his answer as nonresponsive and also hearsay.

15        THE COURT:  Well, I'll strike it as nonresponsive.

16   Q.  And at some point, did your warranty company provide you

17   with any relief?

18   A.  Yes.  The Fidelity arranged for the appliance repair doctor

19   to come out.  And they came out, I believe, twice, once to

20   assess the problem and then again once the part had been

21   ordered that needed to be replaced, which was a refrigerator

22   relay that had burnt.

23   Q.  Okay.  Did you get an invoice from the appliance doctor?

24   A.  Yes, I did.  And I believe we've provided that in evidence.

25   Q.  Right.  I'm showing you -- I'm putting up on the screen

Greenberg - Direct

1  Exhibit FF.  Is that visible to you?

2  A.  It is.  It's a little bit small, but it's visible.

3  Q.  Well, we can make it a little bit bigger.  How's that?

4  A.  Much better.

5  Q.  I'm getting the hang of this.  So do you recall the name of

6  the technician who came out on those occasions?

7  A.  Yes.  It's highlighted in the upper-right corner.  He was

8  referred to as Dr. Garandza.  And his full name is Alexandr

9  Garandza.

10  Q.  Okay.  Did he explain to you what had happened to the

11  refrigerator?

12  A.  Yes.  I asked him, you know --

13          MS. DODGE:  Objection.  Calls for hearsay.

14          THE WITNESS:  Would you like me to answer the

15  question?

16          THE COURT:  Yeah, you can answer it.  You're just

17  telling what he said.  That doesn't mean it proves the truth of

18  his statement.  But you can tell me what he told you, what you

19  understood.

20          THE WITNESS:  Sure.  He -- he -- I was there while he

21  did his work, and he showed me the burnt or melted refrigerator

22  relay.  And I asked him what would cause that.  And he said in

23  his experience that it's from a out-of-range voltage spike or

24  fluctuation or some other electrical disturbance that they're

25  not designed for.

(973)406-2250 | operations@escribers.net | www.escribers.net

Greenberg - Direct

1    Q.   So you actually saw the broken item?

2    A.   I did.

3    Q.   And did you see the one he replaced it with, the new one?

4    A.   Yes.  I provided a photo of the replacement part and either

5    photos or actual emails from the appliance repair doctor

6    showing the invoice, showing the part ordered, showing the

7    package of the part.  And I've reviewed my notes and other

8    emails.  And they indicate that there was a delay -- or it took

9    time for them to order the OEM replacement part for the LG

10   refrigerator.

11            THE COURT:  Well, Mr. Lapping, again, the actual

12   repair itself isn't an issue, is it?  It's not disputed that it

13   was repaired.  The question is who -- whether PG&E is culpable

14   for it.  So why do we spend any more time on this?  I mean,

15   your other witness may have expressed view as to the cause, but

16   the fact that it was replaced doesn't seem to be very much at

17   issue.

18            MR. LAPPING:  Well, Your Honor, I mean, PG&E has -- in

19   their trial brief has indicated that there were probably some

20   other cause.  And they zeroed in on things like age of the

21   refrigerator.

22            THE COURT:  But that's my point.  The cause is what

23   we're here about, not the solution.  The solution was to

24   replace the burned-out thing.  Ms. Dodge hasn't questioned that

25   this thing that is referenced on the invoice was broken and got

Greenberg - Direct

1   replaced.  She's claiming that it wasn't her client's fault.

2   You're claiming it was.  That's the issue.

3          MR. LAPPING:  Well, it wasn't clear to me that that

4   was her position.

5          THE COURT:  Well, Ms. Dodge, am I misstating

6   something?

7          MS. DODGE:  No.  We're not disputing the fact that a

8   repair took place.

9          THE COURT:  Okay.

10         MS. DODGE:  I mean, obviously, Mr. Greenberg is

11  testifying as to his conversations, which I --

12         THE COURT:  No, I understand that.  I'm just trying to

13  avoid wasting time on what -- a picture of the replacement

14  part.

15         MS. DODGE:  Yeah.  Right.  Yeah, no.  We have --

16         MR. LAPPING:  Well, Your Honor --

17         MS. DODGE:  Honestly, I've never seen the picture of

18  the replacement part, so I'm not sure what Mr. Greenberg was

19  referring to.  I don't know if it's in evidence, but I don't

20  recall seeing it.

21         MR. LAPPING:  Well, Your Honor, this is kind of

22  critical for our case.  We have to establish that this one part

23  only fails for certain reasons relating to electrical surges.

24         THE COURT:  I understand that.  I thought I was just

25  agreeing with you on that.

Greenberg - Direct

1          MR. LAPPING:  Okay.

2          THE COURT:  But a picture of the replacement part is

3     going to show why the bad one failed.  It's going to show why

4     the new one didn't fail.

5          MR. LAPPING:  Okay.  Let me move on then, Your Honor.

6     BY MR. LAPPING:

7     Q.  Mr. Greenberg, also on the repair bill, there's a reference

8     to shelves, rails, and crispers.  Do you know what the story is

9     with why that's on the invoice?

10    A.  Yes.  So --

11         MS. DODGE:  I'd just object.  It calls for

12    speculation.  But go ahead.

13         THE COURT:  Go ahead.

14    A.  Okay.  So as part of cleaning that big mess that was

15    there -- by the way, I'm -- my screen doesn't show everybody

16    right now.  It's down at the very bottom of the screen.  I'm

17    just looking at the appliance repair doctor receipt.

18         Let me back up.  So as I indicated earlier, it was a huge

19    awful mess and stunk like worse than a dead animal.  And I had

20    to try to clean it up.  And I actually received later

21    instruction from the repair technician that in order to try to

22    get the smell out, that I should wad up newspaper and fill the

23    refrigerator with newspaper to try to soak up the smell.

24         So the answer to the question on the refrigerator rails and

25    crispers being broken is that I had to pull out all of those.

Greenberg - Direct

1   And I'm not a trained repair technician for refrigerators.  And

2   in the process of doing so, some of them broke.

3       So there is a separate number on this invoice because

4   Fidelity home warranty did not want to cover the replacement of

5   those items.  They only wanted to cover what was necessary to

6   get their refrigerator functioning again.

7   Q.  Okay.  Thank you.  Did the replacement of the starter relay

8   fix the problem with the refrigerator?

9   A.  Yes, it did.  There's been no functional issue with the

10  refrigerator as far as keeping cold subsequently.

11  Q.  Okay.  And so it did return to normal operations?

12  A.  It returned to normal operations.  And there had been --

13  never been a problem with cooling prior to that either.

14  Q.  Do you still have this refrigerator?

15          MS. DODGE:  May have the strike as nonresponsive.

16          THE COURT:  Oh, it's background.  So you can -- Mr.

17  Greenberg, it doesn't matter what happened before.  You haven't

18  sued anybody for anything that happened before.  So we don't

19  have to get bogged down on that.

20  Q.  Okay.  Do you still have the refrigerator?

21  A.  I do.  It's still working to this day.

22  Q.  And do you --

23          THE COURT:  Mr. Lapping, I need to clarify something.

24  I'm confused about the invoice that was just on the screen was

25  for the electrical repair.  I didn't see anything about the

escribers
(973)406-2250 | operations@escribers.net | www.escribers.net

Greenberg - Direct

1   parts that Mr. Greenberg said he had to replace because they

2   also smelled bad, the racks.  Is that part of your damage claim

3   or not?

4          MR. LAPPING:  Yes, Your Honor.  I've got -- I think

5   I've got it back up on the screen.  And --

6          THE COURT:  Well, I'm looking at your -- I'm looking

7   at your components of your claim.  And I don't see anything

8   about replacement of refrigerator racks.  I see the 288 dollars

9   for repair of the refrigerator, which is what your invoice

10  showed, I think.  And then I see a cleanup of spoiled food and

11  cleanup of the rug and cleanup of -- replacement of spoiled

12  food.  But I don't see any item relating to racks.  So again,

13  did you just --

14         MS. DODGE:  I don't -- Your Honor, if I can interject.

15  I don't believe that repair was done.  I mean, the shelves,

16  rails, crispers broken.  I think it's if covered.  I don't

17  think that was ever done.

18         THE COURT:  But it's not part of the claim either, is

19  it?

20         MS. DODGE:  Right.  Right.

21         THE COURT:  So Mr. Lapping, why we wasting time on

22  that?

23         MR. LAPPING:  All right, Your Honor. I'll move on.

24  BY MR. LAPPING:

25  Q.  Mr. Greenberg, do you know the model number of the

(973) operations@escribers.net | www.escribers.net

Greenberg - Direct

1  refrigerator?

2  A.  I believe it appears on the invoice.  If you could bring up

3  that invoice again.  It's LRSC -- it's an LG refrigerator.  And

4  I believe it's -- I'm just pulling from memory here.

5  LRSC26922-something, but it's on the invoice, it was -- that

6  you just had up.

7  Q.  Okay.  That's fine if it's on there.

8  A.  I can find it through my documents here at my side, if you

9  wish.

10  Q.  No.  It's on the document.  That's sufficient.  Okay.

11  Let's talk about the project next door at 31 Bolinas.  You

12  observed the project when it was underway.  Is that correct?

13  A.  Yes.  I live next door.  And all the merchants and

14  residents were disrupted by this to the extent that merchants

15  apparently lost 30 percent of their revenues that holiday

16  season.

17          MS. DODGE:  Objection.

18          THE WITNESS:  There was so much traffic control.

19          THE COURT:  Okay.  Mr. Greenberg.

20          MS. DODGE:  Move to strike as nonresponsive.

21          THE COURT:  Mr. Greenberg, just answer the question.

22  Don't editorialize, please.  Your question is you observed it.

23  You observed it, period.  Nobody asked you about what other

24  people lost in terms of revenue, so don't volunteer.  That

25  doesn't help.  And it's not relevant, Mr. Greenberg.

Greenberg - Direct

1    Q.  So, Mr. Greenberg, what did you understand was the purpose

2    of the project, let's say, from the landlord or landlord or

3    owner's point of view?

4    A.  So --

5           MS. DODGE:  Wait, I'm sorry.  Can you repeat that, Mr.

6    Lapping?  I didn't hear the last part.  It cut out.

7    Q.  Mr. Greenberg, can you describe -- you know the owner of

8    the of the 31 Bolinas site.  Is that correct?

9    A.  I do.  I've met him and talked with them multiple times.  I

10   have his phone number and his email.

11   Q.  What is his name?

12   A.  His name is Brad Schwan.

13   Q.  Okay.  And what was -- do you understand why the project

14   was being done over at the 31 Bolinas property?

15   A.  Yes.  He had been renovating this mixed use but largely

16   commercial property and was trying to provide for an incoming

17   restaurant tenant where there had been no restaurant there

18   before.  And that required apparently extensive power upgrade

19   and lots of work that got delayed multiple times.  They had a

20   lot of problems over there.

21           MS. DODGE:  Objection.

22   Q.  Did you discuss those --

23           MS. DODGE:  Move to strike as nonresponsive.

24           THE COURT:  I'm going to let that in.  Again, this is

25   background and not -- and it's well-established, so I'm going

Greenberg - Direct

1    to let it in.  But again, Mr. Greenberg, you're not helping the

2    cause by adding stuff beyond what your lawyer asked you.  So

3    Mr. Lapping knows how to ask questions, but you need to limit

4    your answer to what he asked.  And he'll ask you another

5    question.  Then you can answer it and so on.

6    Q.  Mr. Greenberg, are you aware of any delays or problems that

7    occurred at the project site?

8    A.  Yes, I am.  And I'm aware of that via conversations with

9    people.  And over 200 pages of documents that we obtained via

10   three or four or five Freedom of Information Act requests to

11   the town of Fairfax, which include multiple --

12        THE COURT:  That's enough.  Mr. Greenberg, he asked

13   you if you were aware, and you said yes.  That was your answer,

14   period.

15   Q.  Okay.  Mr. Greenberg, let's -- you ultimately submitted a

16   claim to PG&E.  Is that correct?

17   A.  I did very shortly after the damage occurred.  I believe --

18   Q.  Can you describe that -- can you describe that process?

19   A.  Yes.  I -- I -- once I learned that it was indicated to be

20   PG&E-related, I called PG&E and was directed on how to make a

21   claim.  And I made the claim.  And the first person who handled

22   that was Stacy Lamm (phonetic).

23   Q.  Okay.  And did you ultimately get any conclusions from

24   Stacy Lamm?  Did she tell you that they were going to accept

25   the claim or decline it?

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

Greenberg - Direct

1   A.  I believe she issued a denial letter on 3/5/16.  And there

2   is a clause in that that talked about, you know, things that

3   might not be aware of.  And so I asked them to investigate

4   further.  And then it got reassigned to Dustin Perkins.  And

5   after Dustin Perkins, it got reassigned or taken over by his

6   boss, Kevin Shaw.  And then Kevin Shaw and I had conversations

7   for some time.  And ultimately, PG&E's Mike Barnett wrote me on

8   January 10th, 2017 that he would not pay the claim, but they

9   were willing to pay my homeowner's insurance deductible.

10  Q.  Okay.  Did you -- in your conversations -- or well, in your

11  interaction with Mr. Perkins, did he ever send you any kind of

12  a ruling on your claim in that time period?

13  A.  I believe that I got another, quote, denial letter.  He

14  sent -- he sent me outage information on 4/7/2016.  And he sent

15  some kind of denial letter on 4/22/16.  But based upon the

16  information and our conversations, as I indicated, we continued

17  talking for some time.  And ultimately his boss got involved.

18      But I was talking to Desmond Perkins about this well into

19  May.  And then I continued with Kevin Shaw.  And Kevin had

20  indicated verbally that they would take care of this.  And it

21  wasn't until January 10th, 2017 that they put it in writing

22  that they would pay the homeowner's insurance deductible.  And

23  then that led to other inquiries.

24          MS. DODGE:  I'd just object to the extent that what he

25  just testified as to what Kevin Schott told him is hearsay.

(973) 406-2250  operations@escribers.net | www.escribers.net

Greenberg - Direct

1    THE COURT:  I'm going to go ahead and let it in.  And

2  I'll overrule the objection.  Go ahead.

3  Q.  Mr. Greenberg, did you assert a claim on your homeowner's

4  insurance policy?

5  A.  No.  As I was indicating --

6  Q.  Hang on.  Why not?

7  A.  We -- once we had it in writing from NPR's Mike Barnett on

8  January 10th, 2017, we then contacted our insurance agent,

9  Michael Baron of Ken Baron Insurance in San Francisco.  And he

10  talked it through with us and advised us that it would be

11  unwise to put this claim on our homeowner's insurance because

12  it would either result in a policy cancelation or increased

13  rates for five to seven years.

14    And I got a second opinion from another insurance agent

15  named Gary Kwan (phonetic).  And I also talked with other

16  people, and I talked with my father about it.  And ultimately,

17  the consensus of opinion was that we should not do that and we

18  should instead file in small claims court.

19  Q.  All right.  Did you at some time --

20    THE COURT:  Mr. Lapping, I need to clarify something.

21  Mr. Greenberg has earlier made reference to a home warranty

22  policy, and now he's talking about homeowner's insurance.

23  need to know which -- what it was he then declined not to,

24  because in my mind, a home warranty policy is different from a

25  homeowner's policy.  And I want to know what it is that he had

(973) operations@escribers.net | www.escribers.net

Greenberg - Direct

1    and chose not to take advantage of.  Can you clarify that?

2            MR. LAPPING:  Yes.

3    Q.  Mr. Greenberg. Is the policy, your homeowner's policy, is

4    that different from your warranty policy?

5    A.  Yes, two entirely separate things.  The Fidelity National

6    quote, home warranty is essentially a pre-service agreement of

7    some sort.  And it's entirely different than homeowner's

8    insurance and two different companies.

9    Q.  And so when you called your broker to discuss whether or

10   not you should submit a claim ,that was for which policy?

11   A.  That was for the homeowner's insurance because the Fidelity

12   home warranty did not whatsoever cover -- as was explained to

13   me, but it's not even in the description, did not cover damages

14   to the flooring resulting from an appliance, you know,

15   component gone bad.

16           THE COURT:  Did Fidelity pay the 200 bucks to the

17   appliance repair company?

18           THE WITNESS:  I don't know because I'm not privy to

19   their books, but I presume that they did pay the Appliance

20   Doctor repair bill.

21           THE COURT:  Well, you haven't been billed by Appliance

22   Doctor, have you since then?

23           THE WITNESS:  Correct.

24           THE COURT:  Well, so can I assume that the Appliance

25   Doctor got paid by the warranty company?

(973) 406-2250 | operations@escribers.net | www.escribers.net

Greenberg - Direct

1    THE WITNESS:  Yes.  That is, I would think, a valid

2    assumption.

3    Q.  Mr. Greenburg, do you know whether that bill for 200 and

4    some odd dollars, was that the deductible or was that the full

5    price?

6    A.  As -- as per the invoice, I believe that was the full price

7    for the repair of the starter relay that was replaced.  I

8    believe we had to pay sixty-five dollars towards the service

9    call.  And as indicated earlier, there was an additional 600,

10   some odd dollar amount that Fidelity declined to pay for the

11   crisper shelves and rails and miscellaneous parts that got

12   damaged pulling them out to try to clean up the mess.

13   Q.  Okay.  Did you at some point move out of the lower unit?

14   A.  Yes.  While we were waiting for PG&E to give us some kind

15   of clear determination on whether or not they were going to

16   take care of this plane, we had to figure out what to do.  And

17   we met with contractors and architects.  And we decided to

18   start renovating upstairs so that I would be able to move out

19   and we would either rent it or repair it or both, depending on

20   timing.  So I moved out in July of 2019, as soon as we finished

21   renovations upstairs.

22   Q.  Okay.  And then did you try to rent the lower unit now that

23   it was vacant?

24   A.  Yes.  I -- I had an extensive marketing campaign and

25   showed it to -- fielded a lot of inquiries and showed it to a

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

Greenberg - Direct

1   lot of prospective tenants up until it was no longer able to be

2   rented in May of 2020 because of other PG&E damages.

3   Q.  Did you -- when you were renting or showing the unit to

4   prospective tenants, did the state of the floor come up in

5   conversations?

6   A.  Yes.  Depending on the tenant, we -- and what they were

7   interested in, we discussed the amount of light.  We discussed

8   the condition of the premises.  We discussed when repairs might

9   be done.  We discussed what was going out in front.  Different

10  tenants had -- or different prospective tenants had different

11  concerns, and sometimes it was more than one person.  Each of

12  those people had different concerns, but it did get discussed.

13  Q.  Now, is it your belief that you were not able to rent it at

14  least in part because of the damage?

15  A.  I believe that --

16      MS. DODGE:  Wait, I'm sorry.  Can you just clarify

17  what damage are you referring to.

18      MR. LAPPING:  The damage to the floor.

19      MS. DODGE:  Thank you.

20  A.  I -- I believe that was a contributing evident factor to

21  the overall condition of the premises which I had worked hard

22  to make look good so that the kitchen, which is in the center

23  of the unit where one has to traverse, coming and going to the

24  bathroom, to the bedroom, to the living room -- it's the heart

25  of that unit, that it did not look as good as it had before, I

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

Greenberg - Direct

1    think handicapped and the knowledge that at some point it would

2    need to be repaired is a factor that I can't speak to how

3    different prospective tenants weighed each factor.  Some of

4    them light was important.  Some of them space was important.

5    Some of them parking was important.  But it's the entirety of

6    the condition and the configuration and the pricing of a place

7    that a prospective tenant, I believe, factors into whether or

8    not they rented it.

9           MS. DODGE:  And I'd just object to that response on

10   the basis that calls for speculation.

11          THE COURT:  No.  I'll let that in.  I think that's

12   very helpful actually to hear that.  So I'll let that in.

13   Q.  Mr. Greenberg, what occurred in or about May of 2020 that

14   led you to stop trying to find a tenant?

15   A.  Sure.  So PG&E took a long time to affect repairs of

16   noncode-compliant PG&E-owned gas lines on the property, three

17   years in planning.  And then they started in late 2018.  And

18   then they started construction which was very disruptive in the

19   front.  And they didn't restore the work -- the damages that

20   were done in 2018.  And then they pulled off the job for almost

21   a year and came back in late 2019 with a different contractor

22   and did more damages and then refused to do the restoration

23   that was clearly needed, just adamantly refused after leading

24   me on for a year as if they were going to do the repairs and

25   restoration or the restoration from the construction

(973) operations@escribers.net | www.escribers.net

Greenberg - Direct

1    activities.

2        Then I had to appeal to the Chamber of Commerce and the

3    Town of Fairfax to intervene on my behalf or somehow help to

4    repair the sidewalk that was left in a hazardous condition on

5    the left and the right side.

6        While those repairs were done, in mid-April, I believe,

7    April 15th of 2020.  MMWD had to come out because there was a

8    supply side manifold leak.  And while they tried to shut the

9    old valves down, the house plumbing lines were damaged, which

10   required -- I had two plumbers out and my general contractor

11   out on an emergency basis.  And they all said, hey, we're not

12   going to touch those old lines; you have to put in new lines.

13   That meant that we had to dig all the way from the sidewalk all

14   the way to the rear of the structure and remove lots of

15   different elements.

16       So the whole place became a construction site, and it was

17   no longer safely rentable.

18           MS. DODGE:  I just moved to strike the up until April

19   15, 2020.  All of that is nonresponsive.

20           THE COURT:  Well, what it is completely nonresponsive.

21   You took -- you gave up trying to rent unit A in as a result of

22   a number of things by mid-2018; is that right?

23           MR. LAPPING:  No, by mid-2020, Your Honor, by May of

24   2020.

25           THE COURT:  Well but your damage claim is only for two

(973)406-2250  operations@escribers.net | www.escribers.net

Greenberg - Direct

1    years, right?  Your damage claim is for twenty-four months.

2    The damage occurred in 2016.  What is -- so 2016 plus two

3    months (sic) is 2018.

4            So let's start over again.  Mr. Greenberg, when did

5    you stop trying to rent Unit A?

6            THE WITNESS:  The -- if I could, for clarity sake,

7    we're speaking of trying to rent the lower unit, which is now

8    referred to --

9            THE COURT:  Mr. Greenberg, I understand.  It's what

10   you described previously as -- I'm not here having a trial

11   about damage in the upstairs unit.  When did you stop rent --

12   attempting to rent the unit that had the refrigerator leak?

13           THE WITNESS:  In May of 2020.

14           THE COURT:  Okay.  But you've only claimed two years

15   of damages.  So what is your damage claim period?  Is it --

16           MR. LAPPING:  Your Honor, let me clarify.  I think he

17   said he started immediately after in July of 2019 when he moved

18   out.  He couldn't really -- he wasn't trying to rent it while

19   he was living in it.  He started trying to rent it after he had

20   moved out.  And so that covers the period July 2019 to May

21   2020.  And that's our claim.  That's his claim.

22           THE COURT:  But that the claim is -- then I'll flip my

23   question.  Then why is he claiming more than that?

24           MR. LAPPING:  I think -- Your Honor, I guess the proof

25   is not there.  I mean, we have proof of some things and that

Greenberg - Direct

1   we're not getting in and others -- I'll let Mr. Greenberg

2   respond.

3           THE COURT:  That's fine.  You respond.  I don't want

4   to do that.  I don't mean to turn this into my examination of

5   Mr. Greenberg.  You've clarified your point, Mr. Lapping.

6   BY MR. LAPPING:

7   Q.  Mr. Greenberg, you want to explain something?

8   A.  Yes, if I may.

9       So, as I said, we made a very diligent effort to try to

10  rent out, under the circumstances, the lower unit premises.

11  And we're talking about the period of time where I tried to

12  rent it out and it did not rent out.  And then there is the

13  period of time that it would take to actually do the

14  restoration.  Once it became -- if there is nothing else going

15  on and it didn't rent and in order to enhance the rentability

16  or to cure the situation, the damages, it would take three to

17  four months, according to our general contractor and the other

18  documents that we've provided, to do those repairs.  So there's

19  a period of time where we tried to rent it as is.  We found

20  that we weren't able to.  And then there's a period of time of

21  three to four months that it would take to actually affect the

22  repairs.  And then there's overlap.

23          THE COURT:  Three to four months to do what repairs?

24          THE WITNESS:  To replace the floors and all the

25  steps -- all the steps that are required and associated with

Greenberg - Direct

1  that, which is why we have the explanation --

2      THE COURT:  Well, Mr. Greenberg, that's not -- I'm not

3  following you.  You're not testifying, are you, that it would

4  take three to four months to repair the floor in your kitchen.

5      THE WITNESS:  That is the combination of the City

6  Carpets and the Dennis Webb construction estimates as far as

7  the whole sequence of events on what's needed to do the job

8  right.

9      MS. DODGE:  But the Dennis Webb estimate is not in

10  evidence.

11      MR. LAPPING:  All right.  Let's --

12      THE COURT:  Go ahead.

13  BY MR. LAPPING:

14  Q.  Let me ask you this, Mr. Greenberg.  When you were

15  interacting with Dustin Perkins with regard to your claim, did

16  he come out and inspect your unit?

17  A.  He did.

18  Q.  Can you describe that inspection?

19  A.  Yes.  He measured all the rooms.  He informed me that he

20  would do his investigation but that the standard -- the

21  industry standard was that the flooring -- in areas in the --

22  it needs to be replaced, that it is replaced with like-kind

23  flooring in the line of sight.  So he measured all the rooms,

24  and he echoed what the different contractors had indicated that

25  the industry standard is that the flooring would replace -- be

(970) 000-0000 | operations@escribers.net | www.escribers.net

Greenberg - Direct

1  replaced in the line of sight.  And --

2  Q.  So that -- does that mean -- line of sight, describe that

3  from the standpoint of you're standing in the kitchen.  What

4  does that mean exactly?

5  A.  So as I said --

6        MS. DODGE:  I'm sorry to interrupt.  I just want to

7  interject an objection that this calls for hearsay.  Go ahead.

8        THE COURT:  I'm going to overrule it because to the

9  extent that he's telling us what Mr. Perkins said, it's more of

10 a statement by a party opponent.  So go ahead, Mr. Greenberg.

11       THE WITNESS:  Sure.  Can you ask the question again?

12 Q.  Okay.  I'm trying to understand what line of sight means

13 when you're saying --

14 A.  Sure.

15 Q.  -- from the standpoint of someone standing in your kitchen.

16 A.  Sure.  So this is my understanding of what line of sight

17 means as it has been told to me by the contractor, owner of

18 AIP, gentleman named John, by Hussein (phonetic) at City

19 Carpets, by Dennis Webb, and by our insurance agent.  Light of

20 sight --

21 Q.  And by Dustin Perkins.  Is that right?

22 A.  Yes, and by Dustin Perkins.  Line of sight means when

23 you're standing somewhere, if you were to rotate 360 degrees as

24 your eye continues, if the flooring in the other rooms is the

25 same as the flooring where you are, if it all looks contiguous,

(973) 406-2250 | operations@escribers.net | www.escribers.net

Greenberg - Direct

1    if it all looks like the same thing, the same color, same type

2    of flooring, that if you cannot match the existing flooring,

3    the rule is that you have to replace all of it so that it does

4    match.

5    Q.   Okay.  And in your unit, you can stand there in the kitchen

6    and see all those other rooms.  Is that right?

7    A.   Correct.  The kitchen is the heart of that unit.  The

8    only -- the only room in that unit that does not have that type

9    of hardwood flooring or laminate flooring is the bathroom,

10   which is tiled.

11   Q.   All right.  Did you -- let me see.  Let me get back in

12   here.  Did you have -- well, did you submit a claim of the

13   refrigerator damage in the PG&E bankruptcy?

14   A.   Yes.  After we went through the claim process as described

15   earlier and then got advised not to file with our homeowner's

16   insurance, make a claim, that it was an improper transfer of

17   risk and responsibility to us when it should have been PG&E's,

18   we then figured out how to file in small claims.  We filed in

19   small claims.  But that small claims action, which was my first

20   ever filing in small claims court, was stayed because of the

21   PG&E bankruptcy.  So then I had to figure out how to file in

22   the PG&E bankruptcy.

23   Q.   Did anybody help me with that?

24   A.   No.  No.  It was it's been quite a learning experience, all

25   of this.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

Greenberg - Direct

1    Q.  So did you at some point approach the Town of Fairfax to

2    obtain documents regarding 31 Bolinas?

3    A.  Yes.  After PG&E was, in my opinion, not forthcoming and

4    not acting responsibly, I needed to learn how to make a proper

5    public records request, Freedom of Information Act request.

6    And I had to make a series of requests that ultimately led in

7    some 200 pages of documents produced relative to the work being

8    done next door at 31 Bolinas.  Some of that is redundant email

9    chains, but there is a lot of information produced by the Town

10   of Fairfax about what was going on next door.

11   Q.  Let me see if I've got this.

12          THE COURT:  Mr. Lapping.  I think it's a good time to

13   take about a ten-minute personal convenience break for

14   everyone.  I mean, unless you're just -- I mean, you have

15   several more minutes to question Mr. Greenberg, don't you?

16          MR. LAPPING:  Yes, I do.

17          THE COURT:  Yeah.  Okay.  Let's take a ten-minute

18   break by my -- we'll make it -- actually, by my clock on my

19   computer will make 10:40.  So that gives you time to contact

20   the person from the repair -- appliance repair if you want to

21   do that.

22          So, Mr. Greenberg, we're going to turn off the camera

23   and mic.  You can do the same or leave it on.  It doesn't

24   matter.  We'll keep running.  So we're on a break.

25          (Recess from 10:26 a.m., until 11:00 a.m.)

PG&E And Pacific Gas And Electric Co

THE COURT: All right, Mr. Lapping, were you able to make any contact with the appliance person?

MR. LAPPING: Yes. He's an appliance technician. He's working in the field. And he has an Android phone, but it doesn't -- he said it doesn't have sufficient bandwidth or Internet connectivity outside of his home to do a Zoom call. And he apparently tried to do it before. So he's pretty much limited to a telephonic appearance, or he can do something this evening after work. But I know that that's not going to work for the Court.

THE COURT: Well, it's not just the Court. I mean, when does his work day end?

MR. LAPPING: I think around 5 p.m.

THE COURT: Well, I mean, it's not -- I mean, we've got my staff, opposing counsel, you. Ms. Dodge, what's your pleasure on this?

MS. DODGE: Well, again, I would stand by the pretrial order that is -- specifically says that any witness that's called to testify needs to be available with a computer or -- I don't care if it's a computer or a phone but that has camera capabilities. I'm not -- I would not agree to having his testimony entered into the record telephonically because then I don't get the chance to see his demeanor and cross him as you would a witness in a live trial.

THE COURT: Mr. --

PG&E And Pacific Gas And Electric Co

MR. LAPPING:  Can I make an offer of proof?

THE COURT:  Yes, sir.

MR. LAPPING:  Mr. Garandza would testify that he was the technician who went to the house, looked at the part, noticed that it was melted, explained that to Mr. Greenberg that it was a surge of electricity or a fluctuation that caused the device to melt, and that he replaced it and that it worked after that.

THE COURT:  Well, I mean, it seems to me that the only thing that's controversial about that is the statement that where he thinks it was the cause.  Again, we're back to where we were before.  No one questions -- Ms. Dodge doesn't question, I don't question that something broke in the refrigerator and it got replaced for 200 and some dollars.  But how this witness could testify as to the cause of it, it's out of his range, his expertise in any event.

MR. LAPPING:  Oh, no, it isn't, Your Honor.  He understands that these things don't just randomly melt.  They melt because of electricity that is surging beyond the capacity.  It's much like the fuse.  Plus we have in evidence already Exhibit GG.  Exhibit GG is an internet page that explains exactly the same thing, that would also be included in my offer for proof, that the only way this device fails or because of melting is because of the electricity getting it too high volume.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E And Pacific Gas And Electric Co

1          MS. DODGE:  And, Your Honor, if I could just quickly

2    respond.  I mean, first, there's no photo of whatever they

3    claim to be the burned or melted relay by Mr. Greenberg or this

4    technician.  I've never seen one.

5          And 2, any testimony as to what caused it, it would be

6    considered expert testimony.  And Mr. Greenberg did not

7    designate any experts to testify today at trial.

8          THE COURT:  Mr. Lapping, I'm looking at the list of

9    exhibits.  And exhibit GG is identified as internet explanation

10   of relay.  When I click on it, I get a picture of Mr.

11   Greenberg's mileage plus account.  So --

12         MR. LAPPING:  So next page, Your Honor.

13         THE COURT:  Oh.

14         MR. LAPPING:  It's something I just got bunched in.

15         MS. DODGE:  On, Your Honor, I would also -- I'm sorry,

16   I forgot to at the outset, again, belatedly object to this --

17   introduction of this GG exhibit.  I think it's an E-how page on

18   something -- or on what can cause a compressor or starter relay

19   to fail.  And there's a number of causes on there.  So Mr.

20   Lapping's -- not testimony but explanation that this was the

21   only cause is very misleading.

22         THE COURT:  Okay.  I'm still figuring out why I had to

23   look at the airlines thing, and I see a bunch of pictures of

24   models and fashion things.  And I'm trying to see -- problems

25   causing the overload relay.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E And Pacific Gas And Electric Co

1          MR. LAPPING:  It's --

2          MS. DODGE:  And, Your Honor, I would also object to

3   that the fact of testimony regarding cause, again, would be

4   properly the subject of expert testimony.  And no experts have

5   been identified or are slated to testify today.

6          THE COURT:  Ms. Dodge, I understand your point, but I

7   think what this witness probably could say is that in his

8   experience, these things melt only because of something

9   external.  They don't melt by themselves.  In other words,

10  twelve-year-old refrigerators' relays don't melt, assuming he

11  could say that.

12         MS. DODGE:  Assuming he could say that.  Right.

13  There's nothing about anything being melted on the Appliance

14  Doctor's --

15         THE COURT:  I mean, I think we all have in our own

16  experience -- maybe you've never had a refrigerator fail.  I've

17  had.  But I don't recall that it ever -- something melted

18  except maybe the ice cream, but not the relay.

19         But, Mr. Lapping, I can't ignore the fact that we have

20  procedures, and it's just the same as if we have a trial.  And

21  he was supposed to be at court, and he couldn't make it to

22  court.  You couldn't put it on.  And this notion of we're going

23  to do the court afterhours is just not okay.  You got to figure

24  out some other way to get him to do it or else you can't.  I'm

25  not going to be --

PG&E And Pacific Gas And Electric Co

1    MR. LAPPING:  Your Honor, Ms. Parada did send around a

2 notice that included a telephone linkage.  And I think we're

3 being -- I mean, it's not really the witness's demeanor and

4 credibility that are going to be at issue here.  He's simply

5 going to recount what he saw and what he observed and what he

6 told Mr. Greenberg.  This isn't very complicated stuff.  It's

7 going to --

8    THE COURT:  Okay.

9    MR. LAPPING:  -- take all of five minutes for me.

10    THE COURT:  Mr. Lapping, I'll go this far.  I will

11 allow a telephonic appearance, but I may -- after Ms. Dodge has

12 a chance to cross-examine, I may just strike it as not reliable

13 and let her ask him what she wants to ask on cross.  So you

14 need to line that up.  Is he going to be available at noon?

15 Can we do it at noon?

16    MR. LAPPING:  As far as I know, Your Honor, yes.

17    THE COURT:  Ms. Parada, should we plan on suspending

18 the Zoom at a quarter -- five minutes to 12?  And then you can

19 give Mr. Lapping and Ms. Dodge the AT&T connection or use the

20 regular AT&T call like we do normally, right?

21    THE CLERK:  Yes.

22    THE COURT:  And Mr. Greenberg should have that access

23 to so he can listen in.

24    Ms. Dodge, it's not perfect but --

25    MS. DODGE:  But, Your Honor, I would say I mean, Mr.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E And Pacific Gas And Electric Co

1    Laughing said, oh, we provided the telephone contact

2    information.  That's specifically set forth in the pretrial

3    order in the event that there's some sort of disconnection of

4    this Zoom trial that we're having today.

5         THE COURT:  Look, I'm going to give you a chance to

6    cross-examine.  And after that, I'm going to give you a chance

7    to move to strike if you want.  I suspect it's not going to be

8    necessary.

9         But Mr. Lapping, can you -- do you need to take

10   another break to communicate again, or can we get back to the

11   trial here now?

12        MR. LAPPING:  No, we left it with him that he could

13   only appear by telephone.  And so the ball's in our court to

14   contact him about that time.  And given the --

15        THE COURT:  Okay.  Hold on.

16        Ms. Parada, can you -- do you want to just resend to

17   Ms. Dodge and Mr. Lapping and Mr. Greenberg the AT&T call-in?

18   And I'll just use our regular AT&T stuff, right?

19        THE CLERK:  Yes, Your Honor.

20        THE COURT:  Okay.  So we're going to -- we're going to

21   keep this Zoom trial going, regardless of what we're doing,

22   until about five minutes to 12.  So the gentleman from

23   Appliance Doctor better be available, and he can call in.

24        Okay.  Go ahead.  Mr. Greenberg, you're still under

25   oath.  Mr. Lapping, you can continue with your questions.

Greenberg - Direct

1    MR. LAPPING:  Yes.  Thank you, Your Honor.

2    RESUMED DIRECT EXAMINATION

3    BY MR. LAPPING:

4    Q.  All right.  Mr. Greenberg, you approached the town of

5    Fairfax and obtained records from them.  Can I ask you to take

6    a look at Exhibit G as in George and I have that in front of

7    you?

8    A.  I do.  I have it here.

9    Q.  Can you tell me briefly what this -- what Exhibit G is?

10   A.  Exhibit G is an email from Michelle Gardner, who is the

11   Town of Fairfax clerk who is the person that one needs to

12   inquire with for a public records request.

13   Q.  Okay.  Is it just that or are there multiple emails?

14   A.  It's a series of emails that went on over time.  And there

15   are questions that I asked her regarding the information that I

16   was either aware of or that she had provided in earlier emails

17   asking her for additional information.  There are some key

18   elements that I can go into, if you wish.

19   Q.  Well, what were the -- what are the headlining or the most

20   important discoveries that you made through this process?

21   A.  So in some of the documents that she provided, the

22   contractor had started work.  According to Brad Mitchell at

23   Veteran Power, on 12/1/2015, on page 69 of the records -- one

24   set of records she provided to me, then on 12/2, Mandy Kumar

25   (phonetic), the planned outage coordinator, sent out a plan,

Greenberg - Direct

1    talked about a planned disruption notice.  And there was an

2    email that discussed as a temporary alternative, Brad Schwan,

3    who is the owner of 31 Bolinas, We'll use existing 400-amp

4    service to feed new switched gear.  Now the reason that's

5    important -- if you -- I can go into it if you wish --

6                MS. DODGE:  I'm sorry.  Can you refer to what page

7    you're looking?  I'm sorry.

8                THE WITNESS:  In the Town of Fairfax documents.  I

9    believe it's on page 123.

10                MS. DODGE:  I --

11                THE COURT:  Wait a minute.  I --

12                MS. DODGE:  123.  I don't see 123.

13                THE COURT:  Mr. Greenberg, hold on.

14                Mr. Lapping, you've provided a ten-page exhibit.  And

15    it's not page numbered except there's a TG, which I assume

16    stands for Todd Greenberg.  There's a TG designation at the

17    bottom of the page, but the one -- the numbers that I see don't

18    come close to what Mr. Greenberg is referring to.  So you need

19    to help me and help Ms. Dodge know what he's looking at.

20                And Mr. Greenberg, I don't want -- I don't want you

21    editorializing on what do you infer from this.  Now we're

22    talking about what these documents told you.

23                So Mr. Lapping, can you identify the portion that he's

24    looking at?

25                MR. LAPPING:  Yes.  Yes.  He was just referring -- he

Greenberg - Direct

1  was on page TG354.  And there are a series of messages that are

2  referenced there.  And the one he just referenced was

3  12/2/2015.  It's about two-thirds of the way down.  It says

4  page 123, and it references Mandy Kumar.

5          MS. DODGE:  I see it.

6          THE COURT:  So it's just the quote.  This is just a --

7  this is just a quote -- and a quote from Mr. Kumar about a

8  planned disruption.  Okay, I got it.  Go ahead, Mr. Greenberg.

9          THE WITNESS:  So the reason I was inquiring for more

10  information about that was some of the other documents that the

11  Town of Fairfax had provided indicated that the existing power

12  was deemed to be inadequate facilities.  And later David

13  Brown's deposition testimony indicated the same.  So it

14  appeared to me that based upon what the Town provided that

15  they --

16          MS. DODGE:  I'm moving to strike the -- this is your

17  interpretation of this email.  I mean, what is Mr. Lapping's

18  question?  I mean, you're here talking about this email, but

19  you're saying what you're understanding -- now you're talking

20  about David Brown's deposition.  I don't even know -- I mean,

21  just I'm objecting because you're not answering the question.

22          THE COURT:  Okay.  Mr. Lapping, you need to guide us

23  to your end.  Your client has to stop editorializing and

24  interpreting things that are in his own mind.  For now, we're

25  trying to interpret what he learned from the City of Fairfax in

Greenberg - Direct

1  these writings.  And you --

2          MR. LAPPING:  Right.

3          THE COURT:  But other than the 12/2 reference to Ms.

4  Kumar's statement, what else do you want us to learn from this?

5  BY MR. LAPPING:

6  Q.  Did you get an email from -- or uncover an email from David

7  Brown in this process?

8  A.  Yes, from David Brown and others.

9          THE COURT:  David Brown -- the question is not others.

10  The question is David Brown.

11          MR. LAPPING:  Right.  What David Brown has -- that's

12  Exhibit H, Your Honor.

13          THE COURT:  All right.  Okay.  Do you want to ask Mr.

14  Greenberg about Exhibit H?

15          MR. LAPPING:  Yes.  Let me get it on my screen.  Yes.

16  Q.  Mr. Greenberg, in an email from David Brown at PG&E to Mark

17  Lockabee (phonetic) on February 29th, 2016.  You recall that

18  one, do you not?

19  A.  I do.

20  Q.  And what was your reaction when you saw that email?

21  A.  It indicated to me that they were missing their deadline.

22  And other documents provided and tied in with that seemed to

23  indicate that they had problems going on there.

24          MS. DODGE:  Objection.  Move to strike.

25          THE COURT:  Sorry, Ms. Dodge.  Say that again.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

Greenberg - Direct

1        MS. DODGE:  I just said move to strike.

2   Nonresponsive.

3        THE COURT:  Yeah.  Mr. Lapping, again, when you ask

4   your client his interpretation, that's not helpful.  The

5   document speaks for itself.  And it was two weeks after the

6   damage to his unit.  So --

7        MR. LAPPING:  I'll circle around and close up on that,

8   Your Honor and when -- my argument because there is some

9   relevance to that.

10  Q.  And I don't know if we discussed this already.  Was there a

11  time when the 31 Bolinas site -- when the tenants moved in that

12  you're aware of, Mr. Greenberg?

13  A.  Yes.  Some of these email discussions that we received

14  indicated that Brad Schwan, the owner of 31 Bolinas, had tenant

15  lease obligations where he had to be able to move the tenants

16  in on January 15th of 2016.

17       THE COURT:  That's not responsive.  The question is

18  whether he knows that people moved in, not when there was a

19  lease obligation.  So if Mr. Lapping is willing to rephrase the

20  question.

21  Q.  Mr. Greenberg, did you happen to observe when those various

22  tenants were occupying the premises?

23  A.  Yes, on or about January 15th, mid-January, they were --

24  the new tenants were moving in.

25  Q.  Okay.

(973) 406-2250   operations@escribers.net | www.escribers.net

Greenberg - Direct

1      THE COURT:  20- --

2  Q.  Do you know when the restaurant opened?

3      MS. DODGE:  Of 2016?

4      THE COURT:  What's the relevance of any of this, Mr.

5  Lapping?  What is the relevance of what happened after the

6  damage that Mr. Greenberg of suing for?

7      MR. LAPPING:  Well, a lot of it is circumstantial.

8  And you'll see in documents that after the fact, PG&E comes

9  out, looks at this project, decided that it was done wrong,

10  that transformers were blown, that the phasing was no good, and

11  variously criticized what had been going on at 31 Bolinas

12  during the time period when Mr. Greenberg was in Hawaii.

13      THE COURT:  Okay.  Then fine.  Then let's get that

14  into the record.  Is there is there a writing in this exhibit

15  that has PG&E admitting that or can you -- one of your other

16  witnesses can do that.  But I don't think it's appropriate for

17  Mr. Greenberg to now opine on what someone else said in an

18  email and therefore draw the inference.

19      MR. LAPPING:  Right.  I just wanted to get into

20  evidence the fact that tenants moved on -- in mid-January of

21  2016 before the February incident.

22      THE COURT:  Wait a minute.

23      MR. LAPPING:  Because it affects -- it affects --

24      THE COURT:  The incident was in 2016, right?

25      MR. LAPPING:  We're talking about 2016.

(973) operations@escribers.net | www.escribers.net

Greenberg - Direct

1          THE COURT:  Well, Ms. Dodge just asked the question,

2    and I thought -- and I thought that it was the subsequent time

3    because this is all the problems after.  Let's go back and

4    clarify.

5          Mr. Greenberg, when did the tenants move in to 31

6    Bolinas?

7          THE WITNESS:  In mid-January of 2016, prior to the

8    refrigerator relay failing.

9          THE COURT:  And you saw them?  With your own eyes you

10   observed the tenants moving in?  Is that your testimony?

11         THE WITNESS:  I saw all kinds of activity that was

12   involved in in creating a restaurant and so on.

13         THE COURT:  Okay, that's fine.  I accept your

14   testimony.  Go ahead, Mr. Lapping.

15   Q.  All right.  Let's move on to the damages.  Mr. Greenberg,

16   you provided a list of the itemized contents of the

17   refrigerator, including prices for that.  Is that correct?

18   A.  I did, as I was asked to by PG&E.

19         MR. LAPPING:  Right.  And, Your Honor, I'll just point

20   out that that's I think -- that's part of his proof of claim.

21   That's a complete list.

22         Did you also provide --

23         THE COURT:  Which exhibit is it, please?

24         MR. LAPPING:  Well, it's the proof of claim.

25         THE COURT:  No.

Greenberg - Direct

1      MR. LAPPING:  The amended proof of claim.

2      THE COURT:  No.  I said, what exhibit, trial exhibit.

3  Are you saying is not in the trial exhibit?

4      MR. LAPPING:  Oh, yes, it is.  Yes.

5      THE COURT:  I 'm just asking you what the number of it

6  is.

7      MR. LAPPING:  Hang on.  I've got the -- oh,

8  specific -- Exhibit HH, Exhibit HH.

9      THE COURT:  Okay.  Thank you.

10  BY MR. LAPPING:

11  Q.  And you also, Mr. Greenberg, submitted photographic

12  evidence of the various lost food items.  Is that correct?

13  A.  I did, many photos.

14  Q.  And you -- did PG&E ask you for any estimates of the cost

15  to replace the floor?

16  A.  Yes.

17  Q.   And who did you get those estimates from?

18  A.  From someone -- I don't recall his last name, who -- a

19  contractor, business is Adventures in Production, from City

20  Carpets, and then we updated it with the Dennis Webb estimate

21  most recently.

22      MR. LAPPING:  Your Honor, I just point out that --

23  Q.  Was it Adventures in Production?

24  A.  Yes.

25  Q.  That's the AIP that's Exhibit MM.  And the City Carpets is

Greenberg - Direct

1  Exhibit LL.

2      Did you also submit a receipt for storage of the furniture?

3  A.  Yes.

4          MR. LAPPING:  And, Your Honor, I'll point out that's

5  in evidence as Exhibit NN.

6          MS. DODGE:  What storage of what furniture?  I'm

7  sorry.  And where is that on --

8  Q.  Mr. Greenberg, can you explain what you had to store?

9  A.  Sure.  So when I moved from Mill Valley to Fairfax, I

10  downsized into the lower unit, which is the bigger of the two

11  units at 47 Bolinas Road.  When I had to move out of the lower

12  unit to either rent it or repair it, I could not fit everything

13  into the upper unit.  And so I needed to get storage.

14      And so -- so this makes sense, there was no intent

15  originally to move out of the lower unit.  If this flooring

16  damage hadn't happened, we may have taken different actions

17  otherwise.  And I think to this day I would still be living in

18  a lower unit --

19          MS. DODGE:  Objection.  Calls --

20          THE COURT:  -- which is traditionally been the owner's

21  unit as I said earlier in testimony.

22          MS. DODGE:  I'll just object to the extended calls for

23  speculation.

24          THE COURT:  Okay.  I'll overrule that.  What exhibit

25  is that, Mr. Lapping?

(973) 406-2250 | operations@escribers.net | www.escribers.net

Greenberg - Direct

1        MR. LAPPING:  Coming up with it.  NN as in November.

2        THE COURT:  Okay.  But now going back going back to

3  the amendment and the proof of claim --

4        MR. LAPPING:  I see it.  It got dropped, Your Honor.

5        THE COURT:  I mean, it's very difficult to match these

6  things when I don't -- so here -- again, we have an exhibit

7  that isn't supported by the proof of claim.  Okay.

8        MR. LAPPING:  I see the problem.

9  Q.  And did you get an updated estimate, Mr. Greenberg, from

10  City Carpets?

11  A.  Yes.  I believe City Carpets has updated the estimate at

12  least two times.  And each time we had additional questions and

13  clarifications that we sought to have them answer, which

14  ultimately they couldn't answer everything, which is why we

15  reached out for a more comprehensive estimate from Dennis Webb.

16        MR. LAPPING:  Okay.  Your Honor, the latest estimate

17  we have is Exhibit PP as in Paul.

18        THE COURT:  Okay.

19        MR. LAPPING:  And that essentially adopts -- that

20  matches up with the people claim.

21        THE COURT:  Well, I don't know.  I'm looking at it,

22  PP, and it's the 30,000-doolar claim.  I don't know what to

23  match it with.

24        MR. LAPPING:  Well, there was a -- it matches with two

25  line items in the proof of claim, the estimate for the cost and

(973) 406-2250 | operations@escribers.net | www.escribers.net

Greenberg - Direct

1    then the estimated increase based on the cost of materials.

2    Lately the cost of materials --

3            THE COURT:  Okay.  So you're -- Mr. Lapping, your

4    representation is that Exhibit PP, which is in an exhibit in

5    evidence, is the detail for the two items that total -- it

6    looks like it totals 30,000 and change for cost of repair plus

7    an increase, twenty-five increase, right?

8            MR. LAPPING:  That is correct, Your Honor.

9            THE COURT:  But help me understand.  Where is the --

10   the proof of claims starts with 24,000, and then it adds a

11   twenty-five percent increase with the number of 6,091 dollars.

12   But there's no 6,091 that matches on Exhibit PP.  So I don't

13   know how to understand Exhibit PP.  And then they appear to be

14   within pennies of each other in amount, but I don't know how to

15   interpret it to get to the figures.  They don't match.

16           We'll try a different question.  Your proof of claim

17   amendment itself makes reference to Exhibit 3.  Where would I

18   find Exhibit 3 to the proof of claim in the trial exhibits?

19           MR. LAPPING:  Let me take a look here.  Well, Your

20   Honor, it's the proof a claim.  It's simply the underlying

21   pleading.  It's in the record.  I wasn't planning on using it

22   as an exhibit per se.  It's just there.

23           THE COURT:  No, no.  But, Mr. Lapping, I understand

24   that.  I'm not trying to trap you here.  I'm saying it says

25   costs to repair damage, Exhibit 3.  And I don't know where I

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

Greenberg - Direct

1   would find Exhibit 3.  Do you know where I would find Exhibit

2   3?

3            MR. LAPPING:  Are you reading in the proof of claim?

4            THE COURT:  No.  I'm reading the attachment to it.

5   There's a one-page attachment that has the total amount of your

6   proof of claim.  And --

7            MR. LAPPING:  Oh, my version goes all the way till you

8   get to a certification by Krull (phonetic) as the last page.

9   Do you have that?

10           THE COURT:  Well, no.  On my screen, or rather in hard

11   copy, I have just the one-page attachment.  If you're telling

12   me that it's part of the proof of claim, I'll take your word

13   for it.  I'm not questioning you.  But --

14           MR. LAPPING:  Yeah.  It's in there, Your Honor.  And

15   basically when you go back and look, Exhibit PP just has

16   certain increases in the line items, and it's very easy to

17   follow.  I didn't realize you didn't have a copy of Exhibit 3.

18           THE COURT:  Ms. Dodge, are you are you on board here?

19   Do you follow me?  I don't want to make Mr. -- jump on Mr.

20   Lapping if you're following this.

21           MS. DODGE:  I think there was an earlier estimate from

22   City Carpets, I think it was like a year before, that had the

23   24,000-dollar number that's listed in the amended, the

24   attachment to the amended proof of claim, which is what the

25   numbers we're looking at.  And then you've got the twenty-five

Greenberg - Direct

1   percent increase. And again, what's included in the amended

2   proof of claim is the 24,000-dollar estimate.

3           MR. LAPPING: But that is dated March 24, 2021, and

4   the prices are valid through April 15, 2021. And the proof of

5   claim is dated in March of '22. And now we have the estimate.

6   And lo and behold, it's pretty close to what they predicted it

7   would be.

8           MS. DODGE: Well, but what's the basis for the

9   twenty-five increase on that?

10          MR. LAPPING: It's very simple. There are costs of

11   materials that are changing as time goes by between March of

12   2021 and March or April -- or I guess March of 2022. And they

13   go through line-by-line and explain how they got to the 30,000

14   dollars.

15          MS. DODGE: Right. But --

16          THE COURT: Okay.

17          MS. DODGE: But the May 12th exhibit -- or the May

18   12th, 2022 is not part of your amended proof of claim.

19          MR. LAPPING: Right. But that's why we have a

20   statement in there. All amounts are estimates and subject to

21   updating according to proof.

22          THE COURT: Mr. Lapping, I think, again, we're

23   cross-purposes. I will concede that as I'm looking at my

24   computer screen, I can't look easily at the entire proof of

25   claim that Mr. Greenberg filed. And I could take a moment to

Greenberg - Direct

1    pull it up on that proof of claim and look at it.  But Ms.

2    Dodge and I are both confused by what you wanted us to learn

3    from Exhibit PP because Exhibit PP doesn't have a temporal

4    estimate of twenty-five or 6,000 dollars.  It just -- it just

5    ends at a figure that's very close to the figure that's on the

6    proof of claim.  So I'll say that again if you don't follow it.

7              MR. LAPPING:  No, I get it.  Well, look.  So a year

8    ago we had an estimate that said the cost and repair would be

9    24,000 and change and likely to have an estimated increase of

10   6,000 dollars, taking it to 30,000 dollars.  Now, we have a

11   year later, an updated estimate that comes out almost exactly

12   at 30,000 dollars as predicted in the first estimate.

13             THE COURT:  Okay.  All right.  Let's go on.  Go ahead

14   with your testimony -- or your examination.

15             MR. LAPPING:  Well, Your Honor, I think that that's

16   really what I have for this witness since you are excluding the

17   Dennis Webb estimate.

18             THE COURT:  Okay.  Ms. Dodge, do you want to take over

19   some cross-exam?

20             MS. DODGE:  Yes, Your Honor.  Thank you.

21             THE COURT:  And do you intend to call Mr. Greenberg as

22   your witness, anyway as part of your case?

23             MS. DODGE:  Well, you had indicated at the beginning

24   you'd like to just have the witness testify once.  So I'd like

25   to do my cross and then I would --

Greenberg - Cross

1          THE COURT:  No.  But I carved out a different

2   treatment from Mr. Greenberg.  I said if you want to do it

3   because Mr. Greenberg is the party and he's here, I'm not

4   trying to impose any inconvenience on him, but I wasn't going

5   to treat him as a third-party witness.  And if you want to take

6   him on cross now and then later on direct, you can do so.  It

7   may be not worth the trouble --

8          MS. DODGE:  Right.

9          THE COURT:  -- if you want to do it all at once.  It's

10  up to you.  But just clarify what you wish to do.  You want to

11  do it all at once?

12         MS. DODGE:  Yes.

13         THE COURT:  Okay.

14         MS. DODGE:  Yes.

15         THE COURT:  Okay.  Then you're now -- we'll proceed

16  then with your examination of Mr. Greenberg.

17         MS. DODGE:  Thank you,  Your Honor.

18  CROSS-EXAMINATION

19  BY MS. DODGE:

20  Q.  Mr. Greenberg, the refrigerator at issue, the one that

21  failed, you're familiar with that, correct?

22  A.  Yes, I am.

23  Q.  Okay.  And you bought that refrigerator in 2013, correct?

24  A.  I believe so, according to my research records.

25  Q.  And you bought it for 200 dollars?

(973) operations@escribers.net | www.escribers.net

Greenberg - Cross

1   A.  I believe so, according to my research records.

2   Q.  And you found that refrigerator on Craigslist, correct?

3   A.  Yes.  Same answer.

4   Q.  And you did ask the seller whether it was in good working

5   order, right?

6   A.  I did.

7   Q.  Okay.  You didn't specifically ask the seller whether there

8   had been prior repairs to the refrigerator, did you?

9   A.  I don't recall.  But I could -- I could expand on that, if

10   you wish.

11   Q.  No.  If you don't recall, you don't recall.

12   A.  I -- I -- I would not have bought it if it hadn't been

13   represented to me as having been in good working order.

14         MS. DODGE:  I move to strike is not responsive.

15         THE COURT:  Mr. Greenberg, you're not answering the

16   question.  You said -- the question is whether you would ask if

17   there had been prior repairs, not the conclusion -- the seller

18   might have said is in good working order is not the same as

19   saying whether it had any prior repairs.

20         So do you recall asking the seller if there had been

21   prior repairs on the refrigerator?

22         THE WITNESS:  I don't recall specifically.  I can tell

23   you that it is my habit to ask questions about something that I

24   would buy, but I don't recall specifically.

25         THE COURT:  Okay, then that's your testimony.

escribers
(973) 406- operations@escribers.net | www.escribers.net

Greenberg - Cross

1  Q.  All right.  Other than the issue that we're here about

2  today, the leakage, the refrigerator required other repairs,

3  correct?

4          MR. LAPPING:  Objection.  Relevance.

5          THE COURT:  Overruled.

6  Q.  You can answer, Mr. Greenberg.

7  A.  Yes.  Apparently when the refrigerator is pulled out for a

8  service, frequently that disrupts the water line connector in

9  the back.  And so there's been some connecting pieces that had

10  to be replaced.  We gave -- in discovery we provided you with a

11  full accounting of which different things got done where.  But

12  there had been zero other repairs to the cooling of the

13  refrigerator freezer.

14  Q.  Okay.  The water line connector had to be replaced,

15  correct?

16  A.  Subsequent to the servicing and having been pulled in and

17  out multiple times, yes, it did.

18  Q.  And that same leak occurred in December of 2018, correct?

19  A.  No, not necessarily the same leak.  I don't recall exactly

20  what it was, but all of it had something to do with the water

21  line or connectors, whether it was screwed tight or lined up

22  properly or something like this.

23          MS. DODGE:  Okay.  I'd like to refer to Mr.

24  Greenberg's deposition testimony.  It's not listed as an

25  exhibit, but it's being used for impeachment purposes.  Let me

escribers

(973) 406-2250 | operations@escribers.net | www.escribers.net

Greenberg - Cross

1  bring it up on the screen.

2         MR. LAPPING:  Objection.  Isn't there a process that

3  had been used to get this into evidence for impeachment?

4         THE COURT:  No.  You don't have to do impeachment in

5  advance because that's the nature of impeachment.

6         MR. LAPPING:  I thought there was a sealed process.

7         THE COURT:  A sealed process?  No.

8         MR. LAPPING:  Okay.

9         THE COURT:  Not in this case.

10        MS. DODGE:  Okay.  I'm going to share my screen.

11        Can you see my screen here?

12        THE WITNESS:  Yes.

13        THE COURT:  Yes.

14        MS. DODGE:  Okay.  Let me scroll down to your

15 testimony here.  Let me make it a little bit larger.  Okay.

16 BY MS. DODGE:

17 Q.  So here on line 3, page 105, I'm asking you about your

18 interrogatory response about repairs to the refrigerator.  And

19 you said you replaced the water line connector, small leak, and

20 then it look like that same leak reoccurred in January of 2018,

21 and you ordered some connector parts.  Do you see that?

22 A.  Yes.

23 Q.  Okay.  So you just testified that it was not the same leak.

24 A.  No, I didn't quite -- you're -- pardon me.  Respectfully, I

25 believe you're misstating things.

(973) 406-2250 | operations@escribers.net | www.escribers.net

Greenberg - Cross

1    THE COURT:  Well, how is she misstating it?

2    THE WITNESS:  Yeah.  If you could read back what I

3  said, I could provide a precise comparison.  But --

4    MS. DODGE:  Let me go to your interrogatory responses,

5  because I was just reciting that.  And I do have those as an

6  exhibit and I'll pull that up on the screen.  And this is

7  Exhibit 23, Your Honor.

8    THE COURT:  All right.

9    MS. DODGE:  All right.  Can you see my screen here?

10  Let me make it a little larger.  Okay.  Let me get to their

11  interrogatories.

12  Q.  I believe it was number 8.  Okay.  So I asked here,

13  interrogatory number 8, describe in detail all repairs to the

14  refrigerator.  And you've got your response here.  Do you see

15  that?

16  A.  Yes.

17  Q.  Okay.  And December you said you replaced the waterline

18  connector.  Small leak stopped.  And then January 10th, you

19  said same small leak, reoccurred order connector parts.  Do you

20  see that?

21  A.  Yes.

22  Q.  Okay.  And is that your same testimony here today?

23  A.  I think we're -- what you're trying to impeach me on is

24  based on a nuance here where I am trying to describe that a

25  water leak associated with the water line occurred that had

Greenberg - Cross

1  something to do with the Connector.  And I have indicated today

2  that while at one point in time a connector was replaced, at

3  another point in time, it may have been that I had to -- or

4  somebody had to adjust those lines so that they were aligned.

5  Right.  But I don't really remember at this point.

6  Q.  Okay.  But Mr. Greenberg, my question to you was did that

7  same small leak occur after you replaced the waterline

8  connector the first time, and you said, no.  So that's why I'm

9  bringing up your testimony at your deposition and your response

10  to your interrogatory.

11  A.  Okay.  I think the problem is what "same" means here.

12  Q.  Okay.

13  A.  And I'm talking about a small leak.  I'm talking about a

14  small leak somewhere in the waterline, somewhere in the

15  connection, and I'm not saying that the same part -- the same

16  connector was the issue.  I'm just saying there was a same or

17  similar small leak with the waterline.

18  Q.  Right, and that --

19  A.  If that makes any sense.

20  Q.  -- was what my -- that was what my question to you, was --

21  A.  Well, then I misunderstood it.

22  Q.  Okay.  All right.  So you would agree that it was the same

23  leak that occurred after you replaced the waterline connector

24  the first time, correct?

25  A.  Subject to my --

(973) 406- operations@escribers.net | www.escribers.net

Greenberg - Cross

1          MR. LAPPING:  Vague as to "same" at this point.

2          MS. DODGE:  Well, those are his responses.

3          THE COURT:  Listen, I'm the one that has to understand

4    this.  What I'm hearing Mr. Greenberg describe is two different

5    times where there were leaks.  The thing that we're having a

6    trial about is not a leak.  The leak is the symptom.  The cause

7    is an electrical failure.  So Ms. Dodge, if he talked about two

8    different leaks, what is the relevance to whether that has

9    anything to do with the power and the electrical failure?

10          MS. DODGE:  The relevance is as to the condition of

11    the refrigerator, Your Honor, and the fact --

12          THE COURT:  Well, it leaks.

13          MS. DODGE:  Right.  Right, and I'm --  my point is it

14    was leaking after this whole incident occurred.  I mean, not

15    just immediately after, but a year or two after that as well.

16          THE COURT:  And therefore, what?

17          MS. DODGE:  Well, it's a used refrigerator.  I'm

18    trying to -- it was manufactured in 2004.  So --

19          THE COURT:  Okay.  Got it.

20          MS. DODGE:  Okay.  So I'm going to stop sharing, so we

21    can keep things moving along.  All right.

22    Q.  And Mr. Greenberg, when you moved that refrigerator -- or

23    when you initially bought that refrigerator, you were not

24    living at the property on Bolinas, correct?

25    A.  Correct.

(973) 406-2250 | operations@escribers.net | www.escribers.net

Greenberg - Cross

1    Q.  Okay.  You were living in Mill Valley, and you -- I'm

2    sorry.  Go ahead.  You were living in Mill Valley, correct?

3    A.  Correct.

4    Q.  All right.  And you transported the refrigerator from the

5    Craigslist seller to your residence in Mill Valley yourself,

6    correct?

7    A.  I believe so.  Yes.

8    Q.  And you used a dolly or some other type of moving

9    equipment?

10   A.  I would expect so.

11   Q.  All right.  Okay --

12   A.  It's a long time ago now, but --

13   Q.  That's -- that's --

14   A.  -- I believe so.

15   Q.  Okay.  And then when you moved into the property in Bolinas

16   again then transported the refrigerator yourself, correct?

17   A.  I -- I -- sometimes, when you're moving, there's a lot of

18   things going on, but I believe so, but I --

19   Q.  Okay.  That's fine.

20   A.  -- probably had -- I probably had some help both times --

21   Q.  Okay.

22   A.  -- but I don't recall exactly who helped me and who

23   actually did what.

24   Q.  That's fine.  Okay.  And during your deposition, in a

25   little bit of detail, I had asked you whether you were aware of

Greenberg - Cross

1  any class action lawsuits regarding compressor failure in LG

2  refrigerators; do you recall that?

3  A.  I remember the question.

4  Q.  Okay.  And I believe you said that you were not aware of

5  that, correct?

6  A.  I testified that at present or something like this, I'm

7  not -- I don't recall that -- it didn't register with me at

8  that point in time.

9  Q.  Okay.  And I'd like to -- I know Mr. Lapping has an

10 objection to 8, 9, and 10, my exhibits regarding the

11 compressors, but I'd just like to refer attention to Exhibit

12 10.  Let me share the screen.

13          MR. LAPPING:  Objection, Your Honor.  May I be heard?

14          THE COURT:  Well, yeah.  I mean, you can be heard, but

15 I've got to wait until there's something on the screen.  I

16 mean, you've reserved an objection.  So Exhibit 10 is not in

17 evidence.

18          MR. LAPPING:  Well --

19          THE COURT:  So --

20          MR. LAPPING:  The problem with Exhibit 10 is it refers

21 to a class action involving a different model of refrigerator.

22          MS. DODGE:  I have Exhibit 10 up on the screen right

23 now.  Can you all see that?

24          THE COURT:  Yes.

25          MS. DODGE:  This does not -- this is not talking about

(973) 406-2250 | operations@escribers.net | www.escribers.net

Greenberg - Cross

1    a class action.  These are about the comments regarding this

2    exact model of the refrigerator as that Mr. Greenberg has and

3    the fact that it has issues with the compressor.

4           MR. LAPPING:  Objection, Your Honor.  This is an

5    anecdotal incident.  Just because one refrigerator of a mass-

6    produced refrigerator has a problem doesn't mean that another

7    refrigerator had the same problem.

8           THE COURT:  No.  That's true, and I understand.  Ms.

9    Dodge, what fact do you want to establish with this

10   testimony -- I mean, this exhibit?

11          MS. DODGE:  Well --

12          MR. LAPPING:  Also, hearsay, Your Honor.

13          THE COURT:  Yeah.  I understand.  But what's the --

14   I'll give you my acid test here.  What fact would I find that

15   in your favor with this line of questioning and this proof?

16          MS. DODGE:  When Mr. Greenberg was asked about various

17   causes -- and I believe he had attached an eHow article

18   regarding particular causes of failure of an compressor starter

19   relay -- one of the causes on there was motor failure, and this

20   is just simply to establish that the motor or compressor or

21   other components of a refrigerator that was manufactured in

22   2004 can fail, absent any type of electrical interruption.

23          THE COURT:  Well, I guess I'm willing to take that and

24   make a note of that.

25          MS. DODGE:  That's fine.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

Greenberg - Cross

1          THE COURT:  All refrigerators fail.

2          MS. DODGE:  Right.

3          THE COURT:  That doesn't mean this one failed for that

4    reason or this other person.  So --

5          MS. DODGE:  I'm sure.

6          THE COURT:  To the extent -- I'm not going to let 10

7    in at this point.

8          MS. DODGE:  Okay.  Let's see.

9          THE COURT:  I mean, if you're now offering 10, I'm

10   overruling and sustaining the objection.  It's not probative.

11   My point, it's not probative.

12         MS. DODGE:  All right.

13   BY MS. DODGE:

14   Q.  Mr. Greenberg, when you moved into -- you moved into the

15   property in approximately November of 2015?

16   A.  Correct.

17   Q.  Okay.  And it's a duplex, correct?

18   A.  Correct.  At various points in time, it's been other

19   things --

20   Q.  Okay.  That's fine.

21   A.  apparently.

22   Q.  That's fine.  Okay.  And you didn't do any type -- or when

23   I say you, you or your parents, didn't do any type of repair

24   work on the unit before you moved in after you had purchased

25   it, correct?

Greenberg - Cross

1    A.  Well, I don't think so, but I can tell you --

2    Q.  Did you replace the flooring?

3    A.  -- the property -- no.

4    Q.  Okay.  So the flooring that's there now is the flooring

5    that existed at the time you moved in, correct?

6    A.  Correct.

7    Q.  Okay.  And you didn't upgrade the wiring in the duplex, at

8    all, at the time you moved in?

9    A.  No.

10   Q.  Okay.  And going back to while you were away on vacation

11   and you returned to find the refrigerator had leaked -- I'm

12   just referencing your attention to that -- no other appliances

13   in your home had stopped working, correct?

14   A.  Well, the clock lights were flashing on those devices that

15   had, you know, had clock lights.  So it was evident that the

16   power had gone out.

17   Q.  Okay.

18   A.  And --

19   Q.  The washer --

20   A.  -- it stopped working --

21            THE COURT:  Just hold on.  What?

22            UNIDENTIFIED SPEAKER:  (Indiscernible).

23            THE COURT:  Oh, yeah.  Okay.  Bye.  I'm sorry.  Go

24   ahead.

25            MS. DODGE:  Okay.

(973) 406-2250   operations@escribers.net | www.escribers.net

Greenberg - Cross

```
1          THE COURT:  Ms. Dodge, I think I'd probably take
2    judicial notice or I know from my experience that toasters and
3    ovens and stoves usually aren't operating when you're on
4    vacation.  Refrigerators are --
5          MS. DODGE:  Right.
6          THE COURT:  -- and all these other things don't
7    normally -- aren't normally on and operating even if they're
8    plugged in, and --
9          MS. DODGE:  But there was also -- and I was going to
10   ask him --
11   Q.  There was a washer and dryer on the property, correct?
12         THE COURT:  And they don't usually run either while
13   you're in Hawaii.
14         MS. DODGE:  Not just when you're in Hawaii but away
15   from the property.
16         THE COURT:  No, but look, Mr. Greenberg just said on
17   some of his other appliances, the lights were flashes which is
18   consistent with a power outage.  I mean, I've had it happen a
19   million times in my home where the power would be out, and the
20   microwave and the oven or something, the lights will be
21   flashing, means the power was off and it came back on.  No harm
22   was done, but that's --
23         MS. DODGE:  Okay.
24         THE COURT:  -- a signal that that happened.  I'm sure
25   you've had that happen in your home.
```

Greenberg - Cross

1      MS. DODGE:  I have.

2      THE COURT:  Okay.

3      MS. DODGE:  All right.

4  BY MS. DODGE:

5  Q.  And you returned to the property on February 22nd, correct?

6  A.  Correct.

7  Q.  I'm sorry, 22nd, 2016, again we're in that year.  And Mr.

8  Lapping took you through the denial of the claim by PG&E, the

9  initial denial was Stacy Lamm, correct?

10 A.  Correct.

11 Q.  Okay.  And was it your understanding that that was based on

12 the fact that there were no outages found during that time

13 period while you were on vacation?

14 A.  My --

15     MR. LAPPING:  Objection.  The document speaks for

16 itself.

17     MS. DODGE:  I asked for his understanding.

18 Q.  What was your understanding of the denial of the claim by

19 PG&E on March 15th, 2016?

20 A.  Should I proceed?

21 Q.  Go ahead.

22     THE COURT:  Yes.

23 A.  My understanding was that Stacy Lamm's preliminary

24 investigation did not lead her to conclude that PG&E was

25 responsible.

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

Greenberg - Cross

1   Q.   Okay.  Thank you.  And you previously testified that you

2   met with Dustin Perkins who was a PG&E claims investigator at

3   your property, I believe in early April of 2016, correct?

4   A.   I did.

5   Q.   Okay.

6   A.   Yes.

7   Q.   And Mr. Perkins never told you during that visit that PG&E

8   was going to pay your claim, did he?

9   A.   No.  He --

10  Q.   You've answered my question.  Let's keep it moving.  Okay.

11  And Mr. Perkins -- I'm sorry.  Mr. Perkins sent you another

12  denial letter on April 22nd, 2016, correct?

13  A.   Could you please add clarity to this?  Your statement makes

14  a first hearing think that he sent me more than one denial

15  letter.

16  Q.   I'm sorry if that was unclear.  I was referring that it was

17  the second letter from PG&E as a whole, that Stacy Lamm sent

18  the first letter, this was Dustin Perkins' follow-up letter.

19  A.   Yes.  So --

20  Q.   Okay.

21  A.   -- this was Dustin's first letter denying the claim subject

22  to his initial investigation.

23  Q.   Okay.  And I want to --

24          MS. DODGE:  This is Exhibit 5, Your Honor.  I'm going

25  to share my screen.

(973) 406-2250 | operations@escribers.net | www.escribers.net

Greenberg - Cross

1   Q.  Can you see that?

2   A.  Yes.

3   Q.  Okay.  And this letter makes reference to the fact that Mr.

4   Perkins had reviewed the service history and found no record of

5   an electrical service interruption affecting your premises

6   between February 13th and February 27th, correct?

7            MR. LAPPING:  Objection.  The document speaks for

8   itself.  Best evidence rule, and I think the paragraph that is

9   not highlighted does indicate that things can occur that they

10  won't know about.

11           THE COURT:  Okay.  Just a second.  I was trying to

12  pull up my own copy of the actual exhibit, and I'm having a

13  little trouble getting it.  So because I'm having a little

14  trouble reading the --

15           MS. DODGE:  Maybe make it larger?  Is that better?

16           THE COURT:  No.  No, no.

17           MS. DODGE:  Oh.

18           THE COURT:  Just bear with me for a minute on what I'm

19  trying to do here.  It's just my computer is acting a little --

20  it's giving me trouble here.

21           MS. DODGE:  As they do.

22           THE COURT:  Well, no.  I'm trying to minimize your

23  screen and get my exhibit back up, and at the moment I'm having

24  a little trouble doing that.  So just one second.  Let's see if

25  I can do it here.  Here we go.  This is Exhibit 5, you said,

Greenberg - Cross

1  right?

2          MS. DODGE:  Correct.

3          THE COURT:  Okay.  So I do better pulling up my own

4  version of the exhibit, and for some reason, it doesn't want to

5  come up on the screen for one second, and I don't know why it's

6  doing that to me.  Well, yeah.  It doesn't want to let me get

7  your exhibit to open up.

8          MS. DODGE:  You can't see my screen?

9          THE COURT:  No, no.  I'm trying to tell you something

10  different.  I'm looking at -- instead of looking at the screen,

11  I'm looking at my own copy of the actual exhibits.

12          MS. DODGE:  Oh.

13          THE COURT:  And I don't think I have the right -- this

14  is your Exhibit 5, you said?

15          MS. DODGE:  Yes.

16          THE COURT:  Okay.  But what page of it?

17          MS. DODGE:  There's two pages.  I'm looking at the

18  first page.

19          THE COURT:  Oh, well, then something is really wrong

20  because I've got a twenty-five-page something or other from

21  you.  So let me find out what's going on here.  Now my Adobe

22  screen is not responding.  So Ms. Dodge, I apologize.  I'm

23  having a little operator technique here.

24          MS. DODGE:  That's all right.

25          THE COURT:  Okay.

Greenberg - Cross

1          MS. DODGE:  Well, let me ask -- can I ask Mr.

2    Greenberg a question about the letter while you're trying to

3    pull that up?

4          THE COURT:  Sure.

5          MS. DODGE:  Okay.

6    BY MS. DODGE:

7    Q.  Mr. Greenberg, the letter here indicates that Mr. Perkins

8    sent you -- or attached a copy of Electric Rule 2.C. for your

9    review; do you see that sentence in the letter?

10   A.  Where is that?  Could you point it to me?

11   Q.  I'm trying to make it larger.  It's right here.  "I've

12   attached a copy of Electric Rule 2.C. for your review."

13   A.  On my screen, it doesn't show what you're reading.

14   Q.  It doesn't?

15   A.  No.

16   Q.  It's right -- do you see the highlighted paragraph?

17   A.  Yes.  I do now.

18   Q.  Look at the last sentence.

19   A.  Yes.

20   Q.  All right.  And my question is, did you review that

21   Electric Rule 2.C. when you received this letter from Mr.

22   Perkins?

23         MR. LAPPING:  Objection.  Completeness, Your Honor.  I

24   mean, this document is incomplete if it doesn't have the

25   attachment.

Greenberg - Cross

1          THE COURT:  Can you show me that exhibit, Ms. Dodge.

2     Your Exhibit 5 on the exhibit list, it is something else.  It's

3     not what's showing on the screen.  So --

4          MR. LAPPING:  Your Honor, I have the same issue.  The

5     Exhibit 5 that I have has all these photographs and other

6     emails.

7          THE COURT:  Yeah, yeah.  So it's the exhibit list that

8     you uploaded, but we'll come back and find out where this is.

9     Your Exhibit 5 on here comes from somewhere else, but --

10          MS. DODGE:  That's odd.

11          THE COURT:  But put back on the screen the thing

12     that's in the tariffs that you were just referring to.

13          MS. DODGE:  I have it up on the screen right now.

14          THE COURT:  Well, that's funny.  I don't see it.  I

15     see the -- I'm still looking at Exhibit 5.  I don't know why I

16     can't seem to get out of that.

17          What do you see on the screen, Mr. Lapping?

18          MR. LAPPING:  I see the letter that she's talking

19     about.  It looks like it's two pages.

20          MS. DODGE:  You can't see that?  That's not coming up

21     on your screen, Your Honor?

22          THE COURT:  No.

23          MS. DODGE:  That's very odd.  I wonder if the share --

24     were you able to see the other sharescreens before, previously.

25          THE COURT:  Yeah.  I've been looking at your

escribers
(973)406-2250 | operations@escribers.net | www.escribers.net

Greenberg - Cross

1    exhibit -- your two-page thing now.  I see that you're

2    scrolling, your scrolling --

3            MS. DODGE:  Right, right, right.  Okay.  So are we --

4    can we use that?

5            THE COURT:  Yeah.  Okay.

6    BY MS. DODGE:

7    Q.  My question to Mr. Greenberg is, did you review the

8    Electric Rule 2.C. that was provided with this letter?

9            MR. LAPPING:  Same objection, Your Honor.

10           THE COURT:  Well, just -- your objection is that

11   there's something missing here, right?

12           MR. LAPPING:  Yes, Your Honor.

13           THE COURT:  But what is it that's missing?

14           MR. LAPPING:  Supposedly this attachment.

15           THE COURT:  Ms. Lodge, your highlighted language says,

16   "I have attached a copy of Electric Rule 2.C. for your review."

17   Where's the attachment?

18           MS. DODGE:  Well, Your Honor, I believe it was

19   probably inadvertently not attached to this letter, but I do

20   have Electric Rule 2.C. as an exhibit that's been admitted into

21   evidence.

22           THE COURT:  Then what's the relevance of whether Mr.

23   Greenberg reviewed it or not?  You believe the rules and the

24   tariffs exonerate your client.  He doesn't.  So what's the

25   point?  I mean --

Greenberg - Cross

1          MS. DODGE:  I want to see if he reviewed it and what

2     his understanding of it is.

3          THE COURT:  Mr. Greenberg, do you remember reviewing

4     any rule that the company sent you, tariffs?

5          THE WITNESS:  If -- there's been many, many emails and

6     conversations about this.  So I can't speak to whether or

7     not -- right now, without reviewing my actual emails whether

8     this was attached or wasn't which seems to be in question.

9          THE COURT:  But the question is that I'm asking you,

10    have you reviewed and are you familiar with Rule 2.C. or Tariff

11    2?

12         THE WITNESS:  So I have seen it.  I don't -- I haven't

13    memorized it, and I'm not an expert in these rules, and I'm not

14    an attorney.  So I understand --

15    BY MS. DODGE:

16    Q.  That's --

17         THE WITNESS:  -- it has to deal --

18    Q.  Go ahead.

19         THE WITNESS:  I understand --

20         THE COURT:  Finish your answer.

21         THE WITNESS:  I understand that PG&E is seeking some

22    shelter from this, but this, from what I've been informed of

23    seems to be an act of negligence on PG&E's part in multiple

24    ways.

25         THE COURT:  Okay.  Got it.  Let's move on.  Ms. Dodge,

escribers

(973) 406-2250 | operations@escribers.net | www.escribers.net

Greenberg - Cross

1    I'm not going to try to --

2            MS. DODGE:  Right.

3            THE COURT:  -- pin him whether he has a -- this isn't

4    a quiz on whether he knows Rule 2.C.

5            MS. DODGE:  Okay.  Let me stop sharing.

6            THE COURT:  But I think you've got to fix at some

7    point, maybe during a break, why Mr. Lapping and I are getting

8    your exhibit wrong, but we don't --

9            MS. DODGE:  Right.  I don't -- Mr. Lapping, the

10   exhibits that you have, were the ones that you downloaded from

11   the Dropbox link?

12           MR. LAPPING:  Yes.

13           MS. DODGE:  And Exhibit 5 is not coming up to be that

14   letter?

15           MR. LAPPING:  No.  It's an email with that I think Mr.

16   Greenberg sent to PG&E with all the photos.

17           MS. DODGE:  Oh, okay.  I've got to figure out what

18   happened then.

19           THE COURT:  Yeah.  So Ms. Dodge, so you know what

20   we've done, is we put into our network all of the trial

21   exhibits, and I pull up a link to our network, and it says Todd

22   Greenberg Trial, PG&E Exhibits, and there they are, numerical

23   order, but number 5, which is titled, PG&E Claims Denial, is in

24   fact a number of pictures.

25           MS. DODGE:  That's really strange, Your Honor, because

Greenberg - Cross

1  I just -- they were -- I copied them from my computer and

2  downloaded them -- or uploaded them into the Dropbox link, and

3  that was then subsequently put on a thumb drive and sent to the

4  Court.  So I'm not sure.  But then Mr. Lapping is having the

5  same issue with the numbering, so I'm not sure.  Is there a

6  total of twenty-five exhibits?

7              THE COURT:  Yes.

8              MS. DODGE:  Okay.  I don't know why the numbering is

9  off.  This is on my --

10             THE COURT:  I mean, we all have -- we're all learning

11  together.

12             MS. DODGE:  Okay.

13             MR. LAPPING:  I think Exhibits 4, 5, and 6 are

14  identical.

15             MS. DODGE:  4, 5, and 6 are identical?

16             MR. LAPPING:  Yes.

17             MS. DODGE:  4, 5, and 6 on my list are -- there's

18  eight photographs.  4 is eight photographs that were taken by

19  Dustin Perkins at the property on April 7th.  5 is the April

20  22nd denial letter.  6 is the May 5th email from Dustin Perkins

21  to Mr. Greenberg with outage reports.  Does that correspond --

22  Exhibit 6, is that the same one you have?

23             THE COURT:  If I looked at the directory, all three of

24  those exhibits are of the same size.  They're very large files,

25  40,000 KBs.  In fact, Exhibits 2, 3, 4, 5, and 6 are all very

Greenberg - Cross

1  large files, and it may be that you've just got the labeling

2  wrong, and some of them are duplicated again.

3          MS. DODGE:  Okay.  I will try to fix that during a

4  break, Your Honor.  I apologize.

5          THE COURT:  Yeah.  Let's get that -- well --

6          MS. DODGE:  Yeah.  Let's get back to --

7          THE COURT:  Ten more minutes before we have to break

8  to --

9          MS. DODGE:  Okay.

10          THE COURT:  -- (indiscernible) my phone.

11          MS. DODGE:  Okay.

12  BY MS. DODGE:

13  Q.  Mr. Greenberg, you also submitted a claim or some sort of

14  complaint to the California Public Utilities Commission

15  regarding the refrigerator, correct?

16  A.  No.  You led me -- if I can state this, in the deposition,

17  I felt like I was led -- as apparently I've been informed you

18  can do.  But you led me to say certain things that I wasn't

19  entirely agreeing with or clear on.  So if you could re -- now,

20  that I've prefaced this, please ask your question again.

21  Q.  All right.  Did you ever submit a claim or complaint to the

22  California Public Utilities Commission regarding this

23  refrigerator claim?

24  A.  So I've reviewed my records now, and contrary to what was

25  said in deposition, where I felt like you led me to say that, I

Greenberg - Cross

1   have found that I did file an informal complaint and then asked

2   that it be moved to the formal level regarding the PG&E gas

3   construction activities, but it did not apparently -- it was

4   not related to this refrigerator issue with the CPUC.

5   Q.   Okay.  So just to clarify, you did not submit a claim or

6   complaint regarding this refrigerator to the CPUC; is that

7   right?

8   A.   Not that I'm aware of.

9   Q.   Okay.  That's fine.

10  A.   I would like to clarify.

11  Q.   You did clarify.

12         THE COURT:  You did clarify. You did clarify.

13  Q.   I understand.  I got it.  Okay.  And after you got the

14  April 22nd denial letter from Dustin Perkins, at some point you

15  received an email from him in early May with outage reports for

16  your property; do you recall that?

17  A.   I do.

18  Q.   Okay.  And that -- you had requested those outage reports

19  from PG&E for I believe it was 2015 and 2016, correct?

20  A.   I had discussions with Dustin asking him for outage

21  history.  I wouldn't say -- you're putting words into my mouth.

22  I wouldn't say that I -- I can't recall at the moment what the

23  specific request was.  What I was requesting was that he

24  research what had gone on in my area, and this is what he

25  provided to me.

Greenberg - Cross

1    Q.   Okay.  In the outage reports that were attached to that

2    email -- which I would bring up except now afraid it's not

3    corresponding with the number that was on the exhibit.  But

4    this is the May 5th, 2016, email with three outage reports,

5    you've reviewed those reports, correct?

6    A.   I -- I did review the reports that he sent, but --

7    Q.   Okay.

8    A.   -- I think there may have been more than three.  I --

9    Q.   Oh, I'm sorry.  I believe -- well, there was a chart I

10   believe that had four outage reports, and again, let me see if

11   I can share my screen if this comes up.  Hold on.  Okay.  Can

12   you see my screen?

13   A.   I can see the top portion of a document --

14   Q.   Okay.

15   A.   -- from Christine Zhang and Dustin Perkins, yes.

16   Q.   Right.  And this is dated May 5th, and it's got a chart

17   here, right, that talks about -- and you ask for -- that

18   affected your premises from April 22nd, 2015 through April

19   21st, 2016; do you see that?

20   A.   This --

21   Q.   Again, I'm just -- this is point for point of reference,

22   correct?

23   A.   Correct, what?

24   Q.   Okay.  I'm just saying these are what provided -- you said

25   that there were more than three, but I'm saying you asked for

Greenberg - Cross

1    period of time before you actually occupied -- before you

2    actually owned the property because you didn't own it until

3    November of 2015, correct?

4    A.  No, not correct.  I believe you're misstating.

5    Q.  Okay.  Okay.  Well, let me --

6    A.  Can I explain?

7    Q.  Go ahead.

8         THE WITNESS:  Please, also, could I be advised on how

9    to ask a question, since Ms. Dodge previously has chastised me

10   for asking a question.

11   Q.  I didn't chastise you.  I simply said that in a deposition

12   it's  not proper for you to ask me questions.  It works the

13   other way.

14        THE COURT:  Mr. Greenberg, you have -- you can -- if

15   you're asked a question by Ms. Dodge, you can ask her to

16   clarify or restate it or something.  You can't decide to ask

17   her questions of your mind.  She is not the witness.  You're

18   the witness.  Your lawyer is very capable, and if he believes

19   that there's something that should be delved into or you should

20   have a chance to testify, he will allow -- he will ask you, and

21   you'll have a chance to testify again, but it's a one-way

22   street.  You just have to answer questions.  You don't get to

23   ask them, other than the kind of things I'm talking about,

24   please clarify or please repeat, and what have you.

25        Now, Ms. Dodge, I see on the sharescreen the Perkins'

Greenberg - Cross

1    email.  I don't -- and --

2         MS. DODGE:  And -- right.

3         THE COURT:  And you know what else?  When you scroll

4    to the top of that email, you'll see Christine Zhang.  Well,

5    her name is on the top of what is in the record as Exhibit 5,

6    which is all those pictures for some reason.  So I don't know

7    what the exhibit number is that you have on the screen, but I

8    do see it does list the --

9         MS. DODGE:  Yeah.  Right here.

10        THE COURT:  -- four -- four periods of the --

11        MS. DODGE:  If you can see here, it says Exhibit 6 on

12   the first page, and then attached to that, there's three more

13   pages that have the three outage reports.

14        THE COURT:  Okay.

15        MS. DODGE:  That's all part of Exhibit 5.

16        THE COURT:  It's time for us to put this session on

17   hold so we can get our telephone appearance.

18        Mr. Greenberg, do you have the information on how to

19   call in on the phone?

20        THE WITNESS:  No, I do not.

21        MR. LAPPING:  I got it, Your Honor.

22        THE COURT:  You got it Mr. Lapping, but --

23        MR. LAPPING:  Yes.

24        THE COURT:  -- did you send it to Mr. Greenberg?

25        MR. LAPPING:  Yes.

(973) 406-2250 | operations@escribers.net | www.escribers.net

Greenberg - Cross

1          THE COURT:  You should have an email from Mr. Lapping

2     that tells you --

3          THE CLERK:  No, Your Honor.  This is Ms. Parada.  I

4     sent it to Mr. Greenberg and all the parties.

5          THE COURT:  Okay.  So Mr. Greenberg, you should look

6     at an email from Ms. Parada, my courtroom deputy, of a little

7     while ago, and that's going to give you the call-in.  We're

8     going to put this Zoom session on suspended.  So turn off your

9     screen, and we're going to go off the record, and this will go

10    blank in effect, and we'll switch over to the AT&T call-in now,

11    and --

12         MS. DODGE:  We actually put, leave meeting, Your

13    Honor.  Do we say, leave?

14         THE COURT:  No.

15         MS. DODGE:  Or Ms. Parada, what do we do?

16         THE COURT:  Ms. Parada, we don't want her to leave the

17    meeting.  Just turn off her screen, right?

18         THE CLERK:  You can leave, and I can bring you back in

19    when we resume Zoom, or you can just mute your video and audio,

20    whatever works --

21         MS. DODGE:  Oh, okay.

22         THE CLERK:  -- with your phone.

23         MS. DODGE:  Okay.  I can mute the audio and video.

24         THE COURT:  Yeah.  Ms. Dodge, when we took the

25    personal break --

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

Garandza - Direct

1    MS. DODGE:  Right.

2    THE COURT:  -- we all just turned off our camera

3  and --

4    MS. DODGE:  Okay.  That's fine.

5    THE COURT:  -- and video.  So we'll do that, and we'll

6  reconvene here by phone in a couple minutes.

7    (Whereupon a recess was taken)

8    THE COURT:  You'll be sworn in as a witness.  And then

9  Mr. Lapping, who is the attorney for Mr. Greenberg, will have

10  questions for you.  You'll be under oath.  And Ms. Dodge, who

11  is the attorney for PG&E, will have questions for you also.

12  Can you hear me all right, and is that clear?

13    MR. GARANDZA:  Yes.

14    THE COURT:  Okay.  Ms. Parada, would you please swear

15  in Mr. Garandza?

16    (Witness sworn.)

17    THE CLERK:  Please state your name and address for the

18  record.

19    THE WITNESS:  Alexandr Garandza, 205 Campbell Avenue,

20  Vallejo, California.

21    THE COURT:  All right.  Thank you, sir.

22    Mr. Lapping, you may question the witness.

23  DIRECT EXAMINATION

24  BY MR. LAPPING:

25  Q.  Yes.  Mr. Garandza, thank you for arranging to appear here

Garandza - Direct

1  today.  I appreciate it very much.  Mr. Greenberg gave you a

2  copy of an Appliance Repair Doctor receipt dated February 25th,

3  2016.  Do you remember that document?

4  A.  Yes, I do.

5  Q.  And do you remember going out to Mr. Greenberg's house and

6  assisting him with a refrigerator issue?

7  A.  Yes.

8  Q.  And can you tell everybody what the problem was with the

9  refrigerator?

10  A.  There --

11       MS. DODGE:  Wait, wait, wait.  Hold on.  I just

12  object, to the extent that it calls for expert -- to the extent

13  that it would call for expert testimony.

14       THE COURT:  Okay.  You can answer it.  Mr. Garandza,

15  you can go ahead and answer the question, please.

16  A.  So I went to the -- to the house.  The refrigerator was not

17  working.  Specifically, the compressor was not working.  And

18  there is a start overload relay attached to the compressor, the

19  device that basically operates, starts and protects the

20  compressor.  So that relay was fried.  It was black and

21  partially melted.  So I replaced the relay, and the compressor

22  start working, and that was the fix.

23  Q.  And do you know what could have caused the starter relay or

24  the protecting device to turn black and melt?

25       MS. DODGE:  Objection.  Calls for expert --

Garandza - Direct

1    A.   I --

2         MS. DODGE:  Hold on.  Objection.  Calls for expert

3    testimony.  And Mr. Garandza was never designated as an expert.

4         THE COURT:  Okay.  I'm going to overrule the

5    objection.  Let him answer.

6         Mr. Garandza, can you answer that question?

7    A.   Okay.  So what's the question again?

8    Q.   What do you think --

9         THE COURT:  Well, you tell me, you're experienced in

10   repairing refrigerator parts; is that correct?  You've been

11   doing this for a long time?

12        MS. DODGE:  I object --

13        THE WITNESS:  Yeah --

14        MS. DODGE:  Wait, wait, wait.  Hold on.  I'm just

15   going to object to this whole line of questioning, because now

16   you're trying to qualify him as some sort of expert.  He was

17   never disclosed as an expert.

18        THE COURT:  Ms. Dodge, this is the judge asking the

19   question.  And I'm going to note your objection.  And I told

20   you I would let you move to strike later.  For now, I'm going

21   to let the witness answer the questions.  And I was simply

22   trying to establish his experience.

23        So Mr. Garandza --

24        MS. DODGE:  Oh, I didn't realize you were asking the

25   question, Your Honor.

Garandza - Direct

1        THE COURT:  That's okay.

2        MS. DODGE:  I thought it was Mr. Lapping.  This is

3   what happens when you have a call and not video, as we're

4   supposed to have, pursuant to the pre-trial order.  I

5   apologize.  Go ahead.

6        THE COURT:  Mr. Garandza, tell me how long you've been

7   in -- your experience in repairing refrigerators.

8        THE WITNESS:  I'm going to say approximately -- I

9   would say seven to ten years.

10       THE COURT:  And have you had occasion to repair

11  refrigerators in the past, before you did this repair, that had

12  a similar problem as this one?

13       THE WITNESS:  Yes, I do this kind of repairs all the

14  time.  That's my specialty.  Basically, I do all appliances,

15  but refrigeration is my, kind of, like, specialty.  So I would

16  say eighty percent of my work is refrigeration.

17       THE COURT:  Okay.  Mr. Lapping, go ahead and ask

18  whatever questions you want.  And Ms. Dodge has a continuing

19  objection.

20  Q.  Right.  Okay.  Mr. Garandza, to what do you attribute the

21  cause of the melted relay switch, blackened and melted, as you

22  describe it?

23  A.  Typically, I mean, I see this quite often, there is a

24  fluctuation -- big fluctuation in electric line, and there is -

25  - this, like, is basically protecting the compressor from

(973) 406-2250 | operations@escribers.net | www.escribers.net

Garandza - Direct

1    overload.  So when there's too much current, it's overheating

2    and raising the temperature to the point that it can melt.  So

3    typically, I would say most of the time it's fluctuation in

4    electric lines and too much current.

5    Q.  Did you detect any problems with the compressor itself?

6    A.  I checked the compressor.  Compressor itself is -- was

7    working -- I mean, compressor itself was fine.  It has a proper

8    -- I tested for continuity.  It has a proper continuity, and

9    after replacing the relay, it starts working normally and drew

10   normal amperage.  So there was no problem with the compressor

11   itself.

12           MR. LAPPING:  That's all I have, Your Honor.

13           THE COURT:  Okay.  Ms. Dodge, you may ask the

14   questions.

15           MS. DODGE:  Okay.  And I can still discuss the motion

16   to strike after I do my cross?

17           THE COURT:  You can you can deal with the motion to

18   strike after we're finished with the witness --

19           MS. DODGE:  Okay.

20           THE COURT:  -- and it's later during trial.  I'm

21   letting the witness answer questions, and then I'm going to let

22   him go back to his job and his life.

23           MS. DODGE:  Right.  Got it.  Okay.

24   CROSS-EXAMINATION

25   BY MS. DODGE:

Garandza - Cross

1  Q.  How long did you work for the Appliance Doctor, Mr.

2  Garandza?  How many years?

3  A.  Appliance -- the Doctor, I would say approximately one

4  year, because I have -- I work for many companies, and I'm kind

5  of like a subcontractor.  So I have a relationship with several

6  companies.  And sometimes I work with several companies at the

7  same time.  So whoever provides me a call, so I'm going to

8  them.

9  Q.  So you're an --

10 A.  But at that moment I was working --

11 Q.  Okay.  So you're an --

12 A.  I was working --

13 Q.  You're an independent contractor, but you work with

14 different companies.  Is that what you said?

15 A.  Yes.

16 Q.  Okay.

17 A.  At this point, when I was working with Doctor Appliance, I

18 was working for Doctor Appliance and one more company, so two

19 companies --

20 Q.  Okay.

21 A.  -- at the same time.

22 Q.  Okay.  And I believe the judge asked you how many year --

23 or what your experience was in repairing refrigerators.  You

24 said seven to ten years, correct?

25 A.  Yes.

Garandza - Cross

1   Q.  Okay.  So how many refrigerators have you repaired during

2   your career, overall, if you can give me an estimate?

3   A.  Oh, I don't count.  Typically, I have approximately six to

4   eight calls a day --

5   Q.  All right.

6   A.  -- and eighty percent of them are refrigeration.

7   Q.  Okay.  So is it fair to say you've repaired hundreds or

8   maybe thousands of refrigerators during your years of

9   experience?

10  A.  That's correct.

11  Q.  Yes?  Okay.  And you have a specific recollection of this

12  particular repair that we're talking about today?

13  A.  What do you mean?

14  Q.  Do you have a specific independent recollection of

15  performing this repair on this refrigerator?

16  A.  I'm not sure what reconnection means.

17  Q.  Okay.  Do you remember going to Mr. Greenberg's house in

18  2016, like over six years ago, and performing this particular

19  repair?

20  A.  Yes.  I keep a record of all my jobs electronically, so I

21  make a note on -- every job I'm going, I'm making note of

22  myself --

23  Q.  Right.

24  A.  -- and what I see and what happened.  So typically --

25  Q.  Okay.

(973) 406-2250 | operations@escribers.net | www.escribers.net

Garandza - Cross

1   A.  -- I supply only -- to my company, I supply only

2   information that they needed.

3   Q.  Okay.

4   A.  The rest of the notes I keep for myself so I can go to any

5   job and check it out what happened.

6   Q.  All right.  And do you have a copy of the Appliance Doctor

7   receipt there that you can reference?

8   A.  I don't have a copy of the Doctor Appliance receipt, but I

9   was supplied this receipt.  And I was able to find the records

10   in my computer.

11   Q.  All right.  And the notation on that, and if you don't have

12   it in front of you, I'll just represent to you that the

13   comments as to the repair state, and I quote, "Compressor not

14   run.  Need to replace start assembly.  Also many shelves,

15   fixtures, and rails broken".  Is that consistent --

16   A.  Yes.

17   Q.  -- with your recollection?

18   A.  That's what I have, and I have more in my notes.

19   Q.  Okay.

20   A.  Specifically, what was --

21   Q.  That --

22   A.  -- happened to the relay.

23   Q.  Okay.  That description that's on the receipt there doesn't

24   say anything about the starter relay being burned, does it?

25   A.  Typically, when I submit my information, I submit a general

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

problem and the parts that they need. That's it.

Q. Okay. Can you answer my question, please?

MR. LAPPING: Objection. The document speaks for itself.

A. So what was the question?

Q. I just read you --

MR. LAPPING: He can't remember what's on the document.

THE COURT: The document speaks for itself. You can ask him if he has any independent recollection, if you want, but I'm not going to make him remember what the document says. It's in evidence.

Q. And on the receipt, I'll represent to you as well, that there is a notation that mentions the serial number of the refrigerator. Is that something that you typically take down when you're doing a repair?

A. Typically, I take a model and serial number for any appliance.

Q. Okay. And did you have any understanding as to how old this refrigerator was?

A. Sometimes I can, sometimes not, because some of the refrigerators has a year stamp on the -- on the label. Most of them, they do not.

Q. Most of them -- I'm sorry, what?

A. Most of the refrigeration does not have a year stamped. So

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

Garandza - Cross

1    if you need to find out the year, you need to call

2    manufacturer, and they can tell you by serial number.

3    Otherwise, most of the brands, it doesn't have a --

4    Q.  Right.

5    A.  date for the manufacturing.

6    Q.  But doesn't the serial number tell you when it was

7    manufactured, in the number code?

8    A.  Serial number doesn't tell me anything.  I can call to the

9    company who -- who made this appliance, provide the serial

10   number, they can't tell me.  Otherwise, I cannot tell anything

11   by the serial number.

12   Q.  Okay.

13   A.  Each company --

14   Q.  And --

15   A.  -- has its own serial numbers --

16   Q.  Right.

17   A.  -- and its own indications.  It's a complicated system.

18   Q.  All right.  And do you have a specific independent

19   recollection of what the starter relay that was damaged in this

20   case looks like?

21   A.  What do you mean?

22   Q.  Do you have a specific independent recollection, in this

23   particular case, in this repair, that was over six years ago,

24   of what the damaged starter relay looked like?  Can you see

25   that in your mind?

Garandza - Cross

1   A.  I have it in my notes, that it was burned.  That's it.

2   Q.  Okay.  Did you take any type -- did you take any

3   photographs of the damaged starter relay?

4   A.  Well, sometimes I do, sometimes I don't.  But in this -- in

5   this situation, I don't need it.

6   Q.  Okay.  That didn't answer my question.  Did you take any

7   photographs of this starter relay in this case?

8   A.  Well, not in this particular case.

9   Q.  Okay.  Do you recall if Mr. Greenberg took any photos of

10   the damaged starter relay while you were there?

11   A.  Oh, I don't know.  I don't remember.

12   Q.  And so you removed the damaged starter relay, and you

13   replaced it with a new one, correct?

14   A.  That's right.

15   Q.  Okay.  What did you do with the old one?

16   A.  Throw it away.

17   Q.  Okay.  Mr. Greenberg didn't ask you to if he could keep it?

18   A.  If he can keep it, or I can keep it?

19   Q.  No, my question is, did he ask you -- well, let me ask this

20   question.  Did Mr. Greenberg ask you to hold on to the damaged

21   starter relay?

22   A.  You mean I -- I will keep it?

23   Q.  No.  Yeah, did he ask you, hey, don't throw the starter

24   relay away, I want you to hold on to it.  Did he ask you to

25   hold on to it?

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

Garandza - Cross

1    A.   I don't remember, honestly.

2    Q.   Okay.  And do you remember if Mr. Greenberg asked to keep

3    the damaged starter relay?

4    A.   Well, I don't remember.  Typically, I don't keep this part.

5    I either leave it in the house or throw it away in the garbage.

6    I don't collect broken parts.  They're --

7    Q.   Okay.  And do you have any --

8    A.   -- garbage.

9    Q.   -- do you have any specific independent recollection of the

10   appearance of the outlet that the refrigerator was plugged

11   into?

12   A.   There was no -- no problem with the outlet.  Typically,

13   if I have -- if I found any problem with the outlet, I indicate

14   it, like outlet is broken and owner need to call electrician,

15   or something like that.

16   Q.   All right.  Okay.  But did you see any burn marks at the

17   outlet itself?

18   A.   The outlet was fine.  Usually I make a make a note if there

19   is some problem.

20            MS. DODGE:  Okay.  All right.  That's all the

21   questions I have.

22            THE COURT:  Okay.  Thank you.

23            Mr.  Lapping, do you have any further questions?

24            MR. LAPPING:  No, I do not, Your Honor.

25            THE COURT:  Okay.  Mr. Garandza, thank you very much

PG&E and Pacific Gas And Electric Co

1  for testifying and giving us your information today.  And we're

2  going to let you go, and appreciate you being available to

3  answer these questions.  So I'll let you go, and thank you very

4  much.

5          THE WITNESS:  Okay.  So I'm going to go ahead and

6  disconnect, right?

7          THE COURT:  Yes.  Just disconnect.

8          THE WITNESS:  Okay.

9          THE COURT:  And I'm going to ask counsel to resume on

10  the Zoom, and maybe we'll talk about taking a break, but we'll

11  go back on Zoom here as soon as you can disconnect on this

12  phone call.  Bye.

13          MS. DODGE:  Okay.  Thank you.

14          THE WITNESS:  Thank you, everybody.  Bye-bye.

15          THE COURT:  Again, thank you, Mr. Garandza.

16      (Whereupon a recess was taken)

17          MS. DODGE:  Okay.

18          THE COURT:  I'm just curious, Mr. Lapping, did you

19  patch -- did you call into Mr. Garandza directly?  So he was

20  calling into --

21          MR. LAPPING:  No.  I had him tune in from my phone.

22          THE COURT:  Okay.

23          MR. LAPPING:  I just merged the call so that he didn't

24  have to figure out how to do it.

25          THE COURT:  That's fine.  And I asked it only because

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E and Pacific Gas And Electric Co

1    the way our AT&T system works, we hear it.  We can see the

2    speaker, the name of the speaker, and when he was speaking, it

3    said Lapping, and I didn't think you were impersonating him.  I

4    thought you probably had a patch.

5         MR. LAPPING:  Way beyond my skill.

6         MS. DODGE:  He's a refrigerator repair man in his

7    spare time.

8         THE COURT:  Yeah.  Mr. Lapping, can you take care of

9    Mr. Greenberg's burned light?  Seriously, gentlemen and ladies,

10   shall we take a midday break, or what's your pleasure?

11        MR. LAPPING:  That's fine with me, Your Honor.

12        MS. DODGE:  Yes.  I'd like to.

13        THE COURT:  Okay.

14        MS. DODGE:  We resume maybe at 1 or --

15        THE COURT:  Yeah.  Let's just -- I mean, I said forty-

16   five minutes before.  Are you both comfortable with that, and

17   Mr. Greenberg, is that convenient for you?

18        THE WITNESS:  Certainly

19        THE COURT:  And Mr. Lapping or Ms. Dodge, again, do

20   you have -- or no, Mr. Lapping, you've got a couple people

21   lined up for -- oh, no, we've excluded your --

22        MS. DODGE:  (Indiscernible).

23        THE COURT:  -- other witness, but yeah.  So --

24        MR. LAPPING:  I'm not going to proceed with -- we have

25   overlap.  She has witnesses, and I have the same witnesses, and

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E and Pacific Gas And Electric Co

1  I'm not intending to call them in my case-in-chief at this

2  point.  So --

3          THE COURT:  Okay.

4          MR. LAPPING:  -- I will proceed with I guess the

5  documentary evidence.

6          THE COURT:  Ms. Parada, what -- should we just do the

7  same as we did on the shorter break, just turn the cameras off

8  and leave the thing running?  Or recall?  What do you want

9  us --

10         THE CLERK:  It's up to them.  If they want to leave, I

11 can bring them back in once we resume or mute both audio and

12 video.

13         THE COURT:  Okay.  Well, Mr. Greenberg, Mr. Lapping,

14 Ms. Dodge, you all do what you want to do.  I'm just going to

15 turn my camera off, and --

16         MS. DODGE:  I'll do the (indiscernible).

17         THE COURT:  By my computer, I've got 12:16.  I'll see

18 you at 1 o'clock.

19         MR. LAPPING:  Absolutely.

20         MS. DODGE:  Thank you.

21         THE COURT:  We're in recess until then.  Thank you.

22     (Whereupon a recess was taken)

23         THE COURT:  So Mr. Lapping and Ms. Dodge, I have two

24 pieces of information for you.  Within a few minutes, you

25 should both get an email from my courtroom, my judicial

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E and Pacific Gas And Electric Co

1  assistant, Ms. Thomas.  We think we've solved the problem about

2  the confusion of your exhibits, Ms. Dodge.  It appears that the

3  Dropbox format changes.  When we download them into our

4  network, for some reason, the exhibit numbers change.

5          MS. DODGE:  Oh.

6          THE COURT:  And so I was accessing your exhibits by

7  that transfer that we've made into our network, which is we do

8  for all exhibits, and in the past, I've been cautioned against

9  using Dropbox.  There are some people in the government have

10  problems with that, but I was able to click on the Dropbox, and

11  there are your exhibits as you submitted them.

12          MS. DODGE:  Yeah.

13          THE COURT:  And Mr. Lapping, for you, during the break

14  I was able to pull up on my screen the entirety of the amended

15  claim, and indeed, what I told you before, I couldn't locate

16  Exhibits 2 -- 1, 2, and 3.  They are, in fact, attached to the

17  claim.  Exhibit 1 is the appliance doctor receipt, Exhibit 3 --

18  2, I believe is the list of stuff that Mr. Greenberg claims

19  that was ruined in the refrigerator, and 3, of course, is the

20  earlier version of the repair from the carpet company.

21          MR. LAPPING:  It's the estimate from City Carpets,

22  yes.

23          THE COURT:  Yeah.  I mean, it doesn't have that 6,000-

24  dollar adjustment, but at least for both of you, at least our

25  end, we've been able to retrieve the things that were missing

escribers
(973)406 | operations@escribers.net | www.escribers.net

PG&E and Pacific Gas And Electric Co

1   and confused.  Now, Mr. Lapping, I don't know whether you had

2   the same problem that we had of looking at Ms. Dodge's

3   exhibits, but --

4           MR. LAPPING:  I did.  I did actually have the same

5   problem.

6           THE COURT:  Yeah.  But did you go through her Dropbox

7   link, or did you do it some other way?

8           MR. LAPPING:  I used --

9           MS. DODGE:  Yeah.  Because I just clicked on the

10  Dropbox link during the break, and mine came up perfectly in

11  order.  So that -- I was puzzled as to why Mr. Lapping would

12  have a problem because it should be the same -- it was the link

13  that I sent.

14          THE COURT:  Right.

15          MS. DODGE:  Did you access it through that, Rich?

16          MR. LAPPING:  Yes.  I think what happens is something

17  happens when you download them, and I don't know whether it's a

18  bug or whatever the story is, but because I just downloaded

19  them en masse and in my download folder.  So I'll just look on

20  Dropbox.  That's easy enough.

21          MS. DODGE:  Okay.

22          MR. LAPPING:  No problem.

23          MS. DODGE:  I apologize.  I might have to look into a

24  new -- something else besides Dropbox because it's sounding

25  like it's a little bit confusing for everybody.

(973)406-2250 | operations@escribers.net | www.escribers.net

PG&E and Pacific Gas And Electric Co

1          THE COURT:  I mean, I had a problem with our internal

2    court security system in the past about Dropbox, but I mean,

3    listen, they were in the dark ages forever before we could do

4    things that we now do routinely.

5          MS. DODGE:  I know, right.

6          THE COURT:  Like Zoom.

7          MS. DODGE:  Yeah, right, exactly.

8          THE COURT:  All right.

9          MR. LAPPING:  Inspector Mullin (phonetic) introduced

10   me to Box, just Box, and that was very effective in the

11   Professional Financial Investors case.

12         MS. DODGE:  You mean, have the storage --

13         MR. LAPPING:  Yeah.

14         MS. DODGE:  -- option?  Oh, okay.  I'll check into it.

15         THE COURT:  Okay.  Mr. Greenberg, you are still under

16   oath, and we're going to resume the trial, and the portion of

17   the trial where Ms. Dodge was questioning you, and we're back

18   in order, and Mr. Lapping and Ms. Dodge, when you think it's

19   appropriate to make time to get some of the other witnesses up,

20   let's just say the word, but for now, we'll let you proceed

21   with Mr. Greenberg.

22         MS. DODGE:  All right.  Your Honor, do we want to

23   consider the issue with regarding the refrigerator technician's

24   testimony at this time?

25         THE COURT:  Well, I want to get the -- get the

PG&E and Pacific Gas And Electric Co

1    testimony of the witnesses out of the way.

2            MS. DODGE:  Okay.  I just want to make sure that

3    there's still a pending motion to strike as to the refrigerator

4    technician's testimony based on the failure to comply with

5    what's set forth in the pre-trial order, and obviously, it was

6    a little bit hard to understand him on the phone.  I couldn't

7    hear everything he was saying.  I would like to have seen his

8    demeanor when he was providing his responses with regard to

9    that he recalled specifically, and then I asked him more

10   questions, and he said, he couldn't recall that.  So anyway, I

11   just want to make sure that that objection -- or I'm sorry,

12   that pending motion to strike is still being considered.

13           THE COURT:  It's preserved, and --

14           MS. DODGE:  Thank you.

15           THE COURT:  -- preserved and unresolved.

16           MS. DODGE:  Thank you.  Okay.  All right.  So let me

17   get back to the testimony of Mr. Greenberg.

18   RESUMED CROSS-EXAMINATION

19   BY MS. DODGE:

20   Q.  I believe we were referring to -- before we took a break,

21   Mr. Greenberg, we were talking about the email that you

22   received from Mr. Perkins with the outage reports; do you

23   recall that?

24   A.  Yes.

25   Q.  Okay.  And the dates of the outage reports that were

Greenberg - Cross

1    provided to you during the time you occupied the property,

2    which would have been I think November, and I think you had

3    asked for -- this was May through April, which would cover the

4    February 2016 time frame, none of those outage reports took

5    place during the time you were away on vacation, February 14th

6    to 22nd, 2016, correct?

7              MR. LAPPING:  Objection.  The document speaks for

8    itself.

9              THE COURT:  You can answer that, Mr. Greenberg.

10   A.  Could you put the document up again, please.

11   Q.  Sure.  Hold on.  Okay.  Can you see?

12   A.  Yes, I can.  So I believe you just asked me multiple

13   questions.  Could you ask me one at a time, please?

14   Q.  Well, my question, my one question is, you received outage

15   reports from Mr. Perkins, correct?

16   A.  I did receive outage reports from Mr. Perkins, yes.

17   Q.  Okay.  And did any of those outage reports that you

18   received show an outage between February 14th and February

19   22nd, 2016?

20   A.  Can you scroll up --

21   Q.  Yes.

22   A.  -- so that I can --

23   Q.  Yes.

24   A.  -- see these dates?

25   Q.  Yeah.  That's the chart.  I can scroll to the actual

escribers
(973) operations@escribers.net | www.escribers.net

Greenberg - Cross

1    reports if you want to see those as well.

2    A.  Okay.  So the question is again, please?

3           MR. LAPPING:  Your Honor, we'll stipulate that the

4    dates she's asking about are not in this list.

5           THE COURT:  Okay.

6           MS. DODGE:  Okay.  All right.  So we'll --

7           THE WITNESS:  Could -- could I explain one thing here?

8           THE COURT:  No, not right now.  Again, we're back

9    to -- you'll have a chance to explain when Mr. Lapping

10   questions you again.

11   Q.  Okay.  One of the outages that is referenced here on March

12   16th, 2016, do you see that, right here?

13   A.  Yes.

14   Q.  Okay.  You sent an email to PG&E on that date regarding

15   that outage, didn't you?

16   A.  I believe, yes.  There was some communication.

17   Q.  Okay.  And let me just -- I'm going to switch over.  I

18   believe this is -- this is part of Exhibit 2.  This is PG&E's

19   Exhibit 2, and this page is PG&E 0031 scrolling down to it now.

20   Right here.  And can you read that -- or can you see that?

21   A.  I can see the top portion of it, yes.

22   Q.  Okay.  And that's dated March 16th, 2016, correct?

23   A.  Yes.

24   Q.  Okay.  And that's an email that you wrote to PG&E

25   referencing the fact that the power went out on that date,

Greenberg - Cross

1  correct?

2  A.  Yes.

3  Q.  Okay.  And did -- was there any -- did you have any damage

4  to any of your property or any of your appliances as a result

5  of this outage on March 16th, 2016?

6  A.  That's hard to say as far as whether it was that day or a

7  prior day because what this -- this -- apparently, PG&E uses

8  multiple descriptions of outages.  There's multiple different

9  terms, and this outage that you're asking questions about was

10 also noted in the Dustin Perkins' exhibit that you brought

11 earlier --

12 Q.  Right.

13 A.  -- and you didn't show all of that.  On the bottom part of

14 that other exhibit, there's outage reports.  Could you turn --

15 Q.  Yes.

16 A.  -- to that, so I can answer your question?

17 Q.  Yes.  I'm scrolling to those now.  Let me see.  Okay.  Here

18 is the -- this is the March 16th --

19 A.  Yes.  So -- so on this -- can you get it in the center of

20 my screen, possibly, so I can read it?

21 Q.  Okay.  I'm trying to get it all in.  Okay?

22 A.  Thank you.  So --

23 Q.  My question -- remember, my question to you is did you have

24 any property damage, or were any of your appliances at the

25 property damaged as a result of this outage on March 16, 2016?

Greenberg - Cross

1    A.   On March 16th, 2016, that outage, I'm not aware of any

2    damage that occurred on that date but --

3    Q.   Okay.

4    A.   -- what is critical --

5    Q.   No, no, no --

6    A.   -- about this --

7    Q.   -- you've answered my question, Mr. Greenberg.  You need to

8    wait for me to answer a question without volunteering

9    testimony.  Okay.  I'm just -- remember, I'm asking the

10   questions.  You need to answer them.  Okay.  I would like to

11   talk about a couple -- in fact, let me stop sharing my screen.

12   I would like to refer to a couple of other claims that you

13   submitted to PG&E regarding power outages --

14             MR. LAPPING:  Objection.  Relevance.

15             THE COURT:  I'm going to let her ask the question.

16   Can you tie -- can you connect the relevance?

17             MS. DODGE:  Yes.

18             THE COURT:  Okay.

19   Q.   Okay.  Mr. Greenberg, you filed a claim against PG&E in

20   2012 for damages you claim were caused by an outage, didn't

21   you?

22   A.   Apparently, I did, according to some records.  I do recall

23   something having happened in the past.  I didn't recall the

24   exact date, and I don't recall exactly what it was then.

25   Q.   All right.  You don't recall --

Greenberg - Cross

1    MR. LAPPING:  I'm renewing my objection.  This is

2  irrelevant.

3    THE COURT:  Well, I don't know if it's irrelevant.  So

4  I've got to wait and find out if it's irrelevant.

5  Q.  And in 2019 -- I'm sorry.  Let me back up.  In the 2012

6  claim, PG&E -- what was PG&E's -- I'm sorry --

7    MS. DODGE:  Strike that.  Let me start over.

8  Q.  PG&E denied the claim that you made in 2012, correct?

9  A.  That's what I have been informed of.  That's my

10  recollection, but I don't have clear recollection going back to

11  2012.  This was at a different address.

12  Q.  Okay.

13  A.  It's a wholly different issue than is what's at question.

14  The only thing that is relevant to this --

15  Q.  Mr. Greenberg, that's not your role to decide what's

16  relevant and what's not.  That's the Judge's role, okay?  So

17  I'm sharing my screen again, and I have a claim here that's

18  dated December 10th, 2012, and I will scroll down.  Let me make

19  it a little bit larger.  And can you see that in my screen?

20  A.  Yeah.

21  Q.  Okay.  And does this refresh your recollection about what

22  damages you were claiming during for this outage?

23  A.  I can only see three sentences and a titled line and an

24  email address is here.  So I'm --

25  Q.  Oh, all right.

(973) 406-2250 | operations@escribers.net | www.escribers.net

Greenberg - Cross

1    A.   So I'm still a little hazy on this.

2    Q.   Let me make it smaller and scroll up.  Can you read it now?

3    A.   I read the first paragraph.  It looks like a computer

4    monitor got fried.  Yes.  Okay.

5    Q.   This refreshes your recollection as to the basis --

6    A.   I'm not finished reading it, so --

7    Q.   Oh, I'm sorry.

8    A.   -- I'm still refreshing my recollection.  I can only see

9    the first one and a half --

10         THE COURT:  Mr. Greenberg, Mr. Greenberg, you've got

11   to answer the question.  Did you submit a claim to PG&E in 2012

12   for damage to a computer monitor?  That's what --

13         THE WITNESS:  Yes.  It looks like I did.

14         THE COURT:  Okay.  That's your answer.

15   Q.   Okay.  Thank you.  And let me -- and I'll continue sharing

16   my screen, and I will bring up -- hold on.  Okay.  This is PG&E

17   Exhibit 18.  Can you see that on the screen?

18   A.   I can see the first sentence and the title information.

19   Q.   Okay.  Do you recall receiving this letter from PG&E

20   denying this claim?

21   A.   I have some -- now that it's in front of me, I have some

22   dim recollection of it.

23   Q.   Okay.  And let me -- and again, does this refresh your

24   recollection as to basis of PG&E's denial of your claim?  Did

25   you have an understanding as to why they denied it?

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

Greenberg - Cross

1    A.   I must have at the time, or I must have read this at the

2    time and decided not to pursue it further.

3    Q.   Okay.  And it says here that there were palm fronds that

4    fell on to the lines during a storm; does that refresh your

5    recollection?

6    A.   Well, I -- I'm not sure that I would have any knowledge of

7    where any specific palm fonds fell on to which line.

8    Q.   Right.  No, not asking you to specifically identify the

9    palm fronds, just that you have a recollection that that was

10   the basis of PG&E's denial, correct; do you recall that?

11   A.   Well, now that I'm looking at this, as I said, I have a dim

12   recollection of having read this and there being some excuse

13   that PG&E had.

14   Q.   Okay.  And let me bring up the outage report.  This is

15   Exhibit 17, and can you see that on the screen?

16   A.   Is the outage report from 2012?

17   Q.   Correct.  Down here at the bottom, it has the date and then

18   the cause, vegetation, palm frond fell into line.

19   A.   Sure.  So --

20   Q.   Okay.

21   A.   That's somewhere else in Mill Valley.

22   Q.   Okay.  So you were not living at the 47 Bolinas address,

23   correct?

24   A.   No.  This is when I was living at 71 Oakdale Avenue, I

25   believe.

Greenberg - Cross

1    Q.   Okay.  All right --

2    A.   But again, this is no --

3    Q.   Hold on.  No, no.  You don't get to -- just let me continue

4    with my questions.  Remember, this isn't a volunteering

5    exercise of information.  Okay.  Do you recall filing a claim

6    against PG&E in 2019 regarding a power outage?

7    A.   I -- well, there's been some confusion from your prior line

8    of questioning where I was confused about claim versus a legal

9    action, and I'm not quite sure what you mean right now.

10   Q.   I'm talking about an informal claim that was submitted to

11   PG&E regarding a power outage, and again, I'm -- I'm sorry.

12   I'm sorry.  You're right.  That was confusing because of the

13   year.  Aside from this refrigerator claim, aside from any

14   property damage claims regarding the deck or the sidewalk or

15   the tree, do you recall filing a power outage claim for spoiled

16   food in your refrigerator in 2019?

17   A.   So we're -- are you -- can I ask a clarifying question?

18           THE COURT:  Well, there's not much to clarify.  So

19   I'll reask the question, did you have a claim against PG&E for

20   food damage in 2019, food damage in your refrigerator?

21           THE WITNESS:  I believe there were multiple claims at

22   multiple different times that I filed through the PG&E claims

23   process that was advertised and that I was informed of by PG&E

24   when my food spoiled, and I don't recall the exact dates of

25   those claims.

(973) 406-2250 | operations@escribers.net | www.escribers.net

Greenberg - Cross

1   Q.  Okay.  Let me share my screen again.  This is exhibit --

2   PG&E Exhibit 19.  Let me make it a bit smaller so you can see

3   more of it.  Let me ask you here down at the bottom, does this

4   appear to be your signature here?

5   A.  That looks like my signature, yes.

6   Q.  Okay.  And the date here is January 5th, 2019?

7   A.  Yes.

8           THE COURT:  I'm sorry.  I missed.  Ms. Dodge, give

9   that date again.  I can't see it.

10          MS. DODGE:  I'm sorry.  I'll make it bigger.  It's

11  really small.  January --

12          THE COURT:  Oh, January.  Okay.

13          MS. DODGE:  January 5th, 2019.

14          THE COURT:  Okay.

15  Q.  And then I will scroll back up here to the description of

16  the incident.  I'll make it larger.  And there it says, food

17  spoilage in refrigerator after four plus or minus days without

18  any power during a PG&E initiated power outage; do you recall

19  making that claim for a power outage at that time?

20  A.  Yes.  This is refreshing my memory.

21  Q.  Okay.

22  A.  PG&E had many power outages, and this was one of the worst

23  ones.

24  Q.  Okay.  And the claim that you submitted here and it's

25  attached here, you've got a list of the spoiled food here and

Greenberg - Cross

1    the list of the beverages, correct -- or beverages and food

2    here?  I'm just scrolling down.  And it's a total of $918.98;

3    do you see that?

4    A.  Yes.

5    Q.  Okay.  And the claim that you submitted, the claim that

6    we're talking about here today, the refrigerator claim, the

7    amount that you are requesting -- or that they are asking to be

8    compensated for is exactly the same amount, $918.98.  Do you

9    recall that?

10   A.  So I --

11   Q.  Did you have exactly the same food in your refrigerator at

12   that time?

13   A.  That -- that -- that's a good point.  But --

14          THE COURT:  But what's the answer?  What's the answer,

15   Mr. Greenberg?  Is it the same list?

16          THE WITNESS:  The answer is most likely, there is a

17   similarly titled document, and I submitted the wrong document.

18   And it's --

19          THE COURT:  When?

20          THE WITNESS:  What -- whenever the subsequent date

21   was -- or the same document got retitled, you know, basically

22   the layout was there for -- I probably used the same layout and

23   maybe it got saved inaccurately or didn't get retitled.  So it

24   looks like I made a mistake somewhere.

25          MS. DODGE:  Okay.

Greenberg - Cross

1          THE COURT:  My question, though, is which is the wrong

2     one, the first one or the second one?

3          THE WITNESS:  I would have to look at my computer and

4     see if there is more than one document that is still extant,

5     see if there was a labeling error and the wrong one got

6     attached, or -- I would have to research that.

7          MS. DODGE:  Okay.

8          THE COURT:  Okay.

9          THE WITNESS:  My apologies if there is any confusion

10    or if there is an error on my part.  It was not intentional.

11    BY MS. DODGE:

12    Q.  Okay.  Because I will submit to you that on the amended

13    claim, which is in the record, which I believe was filed by Mr.

14    Lapping about a week ago, that the list is identical to the one

15    that was submitted in 2019.  So the lists for 2016 and 2019 are

16    identical.  And are you saying that that was just a mistake on

17    your part?

18    A.  It appears to be so.  There was no intention to mislead

19    anyone in any way whatsoever.  It looks like it's a clerical

20    error of some sort.

21    Q.  Okay.  And PG&E denied that claim, correct?  The public

22    safety power outage, correct?

23    A.  I -- I believe so.  As I indicated in my deposition

24    testimony, PG&E has never made good on any of the damages or

25    losses that I've suffered.

(973) 406-2250 | operations@escribers.net | www.escribers.net

Greenberg - Cross

1    MS. DODGE:  Okay.  And let me just, again, share my

2    screen briefly on this.  Hold on.

3    Q.  This is Exhibit 20, and this is a letter dated January 7th,

4    2020 to you denying the claim for damages based on the public

5    safety power shutoff.  And it attaches here an outage report.

6    Do you recall receiving this letter?

7    A.  My recollection is dim, but as I indicated, my experience

8    has been that PG&E has never made good on any of the damages I

9    have suffered.

10   Q.  Okay.  But here, in this case, in terms of your claims with

11   regard to an outage, PG&E did acknowledge that an outage had

12   taken place, correct?

13   A.  Yes.  I indicated earlier that --

14   Q.  Okay.  You have answered now.

15   A.  -- apparently --

16   MS. DODGE:  You have answered my question.  Remember,

17   it's not to editorialize.  You just need to listen to what I'm

18   asking, please.  Otherwise, we're going to be here maybe until

19   tomorrow.  I hope not.  Okay.

20   Oh, am I still -- I'm sorry.  Let me stop share here.

21   Q.  I want to ask about November of 2021, which is just about a

22   little over six months ago.  You contacted PG&E, directly,

23   didn't you?

24   A.  I -- I don't know what -- what you're -- contact you're

25   referring to, but I regularly contact PG&E.  There is frequent

Greenberg - Cross

1    billing errors.  They accidentally or intentionally skip meter

2    reading.  There is all kinds of incidences and reasons for me

3    to contact PG&E.

4              MS. DODGE:  Okay.  Move to strike the remainder of the

5    response after "yes".

6              THE COURT:  Oh, that's okay.  I'll let it in.

7              MS. DODGE:  All right.

8              THE COURT:  Go ahead.

9              MS. DODGE:  Let me go to my share screen again.

10   Q.  And this is PG&E Exhibit 21.  This is an email exchange

11   between you.  Is that your email address, hedgewell@yahoo.com

12   (phonetic)?

13   A.  It is.

14   Q.  Okay.  And it looks like you are communicating with

15   somebody named Arslan Ibrahim at PG&E?

16   A.  Yes.

17   Q.  Okay.

18   A.  He was the person assigned to the case number that you

19   see --

20   Q.  Okay.

21   A.  -- in the subject line.

22   Q.  Right.  Okay.  So you emailed PG&E to request a history of

23   outages for the last -- it's six years at your current address,

24   correct?

25   A.  I -- yes.  I -- I -- I was trying to understand why there

Greenberg - Cross

1    were so many outages occurring there and get a history and --

2    Q.   Okay.   All right.

3    A.   -- initially --

4              MS. DODGE:   Okay.   Okay.   No.   No, no.   Let me ask my

5    question.   So I'm going to scroll down.   This is all part of

6    Exhibit -- I'm sorry, what does the exhibit --

7              THE COURT:   21.

8              MS. DODGE:   21.   Thank you.

9    Q.   I'm scrolling down to the fourth page here, the outages in

10   2016.   Can you see my screen?

11   A.   Yes.

12   Q.   Okay.   And the outages that are listed here in 2016, those

13   all comport exactly with the outages that were relayed to you

14   by Dustin Perkins in his email in 2016, correct?

15   A.   I would need to see them side by side to --

16   Q.   Okay.   Well, let's go through them --

17   A.   I -- can you restate that?

18   Q.   Yes.   Okay.

19             THE COURT:   Well, Ms. Dodge --

20             MS. DODGE:   Yes.

21             THE COURT:   -- I mean, you can make a representation

22   that they do.   We don't have to --

23             MS. DODGE:   Okay.

24             THE COURT:   -- waste your time.   I mean, you are

25   telling me --

Greenberg - Cross

1          MS. DODGE:  Right.

2          THE COURT:  -- the three on the bottom, right?

3          MS. DODGE:  Yeah, well, right here.  There is 3/16.

4    I'm sorry.  There is 2/26 here, and there is 3/16 and 4/6/2016.

5    And if we go back to -- and again, I'm leaving out 2015 because

6    that doesn't matter here.  I'm going back to Dustin Perkins'

7    email and that chart of outages he provided here.  And you can

8    see there it's 2/26/16, 3/16/16, and 4/6/2016.

9    Q.  So the information that was provided to you, Mr.

10   Greenberg, by Mr. Ibrahim was consistent with the outage

11   information that was provided to you by Mr. Perkins, correct?

12   A.  Again, same answer.  Unless I saw it side by side, I -- can

13   you restate the question, ask it another way?

14   Q.  I was just showing them side by side.  Let's go through

15   each one.  There is 2/26/16 here on the chart.  Do you see

16   that?

17   A.  Yes.

18   Q.  Okay.  Now, let's go back to the Dustin Perkins email.  And

19   do you see this one, 2/26/16?

20   A.  Yes.

21   Q.  Okay.  And back to Mr. Ibrahim's email and chart.  There is

22   one on 3/16/16 at 1405.  Do you see that?

23   A.  Yes.  Yes.

24   Q.  Okay.  And we go back to Mr. Perkins' email, and you have

25   316/16 at 1405 (audio interference) the same, correct?

Greenberg - Cross

1 A.   Yes.

2 Q.   Okay.  And we go back to you Mr. Ibrahim's chart, and we

3 have one here, 4/6/16 at 2216, which is 10:16 p.m.  Do you see

4 that?

5 A.   Yes.

6 Q.   Okay.  And we go back to Mr. Perkins' email, and it's

7 4/6/2016 at 2216, correct?

8 A.   Yes.  Yes.

9 Q.   Okay.  So those coincide with each other, correct?

10 A.   Yes.

11 Q.   All right.  And there were no other outages identified by

12 Mr. Ibrahim in this email in 2016, other than the ones that

13 were identified in Mr. Perkins' email, correct?

14 A.   In this email, but I had future --

15         MS. DODGE:  Okay.  No.  That was my question.  We'll

16 get to the next one in a minute.  Hold on.  Let me get what I

17 want and go to lists.

18         Okay.  And I would like to go to Exhibit 22, which is

19 a November -- well, at least the first email appears to be a

20 November 1st email exchange with, again, Mr. Ibrahim of PG&E.

21 Q.   Do you recall corresponding with Mr. Ibrahim in November of

22 2021?

23 A.   I do.

24 Q.   Okay.  And you asked Mr. Ibrahim a series of questions, and

25 I'm showing you the email thread here.  I'm just curious, why

Greenberg - Cross

1   were you asking about outages between 2010 and 2013 when you

2   didn't live at the property?

3   A.  Sure, because I was looking for a ten-year history, and on

4   the data that Arslan provided, he had indicated that his

5   initial pull of the data did not contain anything prior to 2016

6   in his initial search.  And so I thought Dustin Perkins'

7   initial search might not have included all of the outages

8   because the equipment was switched.

9       So I had to try to understand why there was a gap in the

10  data.  And Ibrahim identified that the data is dependent upon

11  the query that is made on what equipment is queried.  And given

12  that the equipment was switched here, it became evident that if

13  one doesn't search the database in the right manner, that one

14  doesn't get a complete answer, much as one, when one queries an

15  email, you may have to search many different ways to find

16  out --

17  Q.  Right.

18  A.  -- that information.

19  Q.  Okay.  So you're talking about the fact that there was a

20  transformer switch at some point?

21  A.  There were many different components that were changed,

22  transformers, switches --

23  Q.  Oh.

24  A.  -- and there is a whole list that has been presented into

25  evidence as part of that big electrical project next door.  And

Greenberg - Cross

1  so what I was --

2  Q.  Yeah.  Okay.

3  A.  -- trying to understand is whether or not what Dustin

4  initially reported to me was accurate or not.

5  Q.  And --

6  A.  And what I --

7  Q.  Hold on.  And did you confirm that what Dustin reported to

8  you was accurate?

9  A.  No.  What I confirmed from my interaction with Arslan was

10 that not all outages are reported, that some switches do not

11 report that momentary outages or outages of -- left-field

12 outages, as they are termed, of less than thirty minutes are

13 often not reported.  And so --

14 Q.  Where does --

15 A.  -- next --

16 Q.  Wait, wait.  Hold on.  Where does Ibrahim say that?

17 A.  As I -- I just stated, multiple things.

18 Q.  Yeah.

19 A.  So name one.

20 Q.  Well, you just said that -- you said that he told you that

21 PG&E's system doesn't record outages if they're less than

22 thirty minutes.  Where does it state that in the --

23 A.  No, I didn't.

24 Q.  -- email?

25 A.  Again, you are putting words into my mouth that I didn't

Greenberg - Cross

1  say.

2  Q.  Okay.  That's what I just heard.  I may have misheard it,

3  but --

4  A.  Okay.  So --

5  Q.  -- where does it state in this email that there are outages

6  that are not recorded?

7  A.  Well, and are we on the first email or second email right

8  now?

9  Q.  This is the email right here.  This is --

10  A.  The one that's -- has classification internal?

11  Q.  Okay.  Yeah.

12  A.  Okay.  So it's -- and let me go back to the first email

13  that you have that says classification public.

14  Q.  Is that the --

15  A.  And --

16  Q.  -- exhibit before?

17  A.  Correct

18  Q.  The one on the chart?  This one?

19  A.  Correct.

20  Q.  Okay.

21  A.  And he leads off by saying, hi, Todd.  Transformer T62376

22  was installed in 2016 and was the reason why it was only

23  pulling data till 2016?

24  Q.  Right.

25  A.  Before that, this address was supplied power by another

Greenberg - Cross

1    transformer, T0291.  So he had to redo -- he had to requery --

2    [quee-ry] -- however one pronounces it -- it -- the database to

3    include the new equipment.

4    Q.  Right.  But what my question to you is he acknowledges

5    there that it's a new transformer and that it was a different

6    transformer before.  But the outage history that he provided

7    you for the time period in question in 2016 is exactly the same

8    outage information that was provided to you by Dustin Perkins,

9    was it not?

10   A.  Yes, but my point is --

11   Q.  Okay.  No.  No.  You have answered my question.  I don't

12   need an editorial.  All right.

13       So it's fair to say that all of the information that you

14   got from PG&E never showed any evidence of any type of outage

15   between February 14th and February 22nd, 2016, correct?

16   A.  Hmm, let me think about that.  I -- are you the arbiter of

17   what's fair?  I wouldn't say it's fair to say.

18            THE COURT:  Mr. Greenberg.  Mr. Greenberg, I am the

19   arbiter, but in two different exhibits, Ms. Dodge has just

20   shown us the exact same data from two different individuals who

21   sent it to you at two different times, and there were no

22   outages in the subject period that you were in Hawaii while

23   your refrigerator was melted down.  So that was all she is

24   asking to reaffirm.

25            THE WITNESS:  So I --

(973) 406-2250 | operations@escribers.net | www.escribers.net

Greenberg - Cross

1       THE COURT:  So is there anything incorrect about that

2   statement?

3       THE WITNESS:  My answer is it's not fair to say

4   what's -- what one could say is that the data that was sent to

5   me by PG&E, by two different PG&E personnel, did not indicate

6   an outage.  But based upon my questioning of PG&E personnel, it

7   became apparent that not all outages are actually reported or

8   registered, particularly in nonsmart meter areas.

9       THE COURT:  Okay.  That's your perception.  But at

10  least at the moment, there is no evidence of any outage during

11  those eight days in 2016.  I'm just noting it.  I'm not asking

12  for you to answer.  That's just a note.

13      Let's move, Ms. Dodge.  on and start.

14      MS. DODGE:  Okay.  Let's move on.  All right.  Let's

15  go to -- let me stop sharing.  I want to move on to damages,

16  and then I should be done, I believe.

17  BY MS. DODGE:

18  Q.  Before I do that, your attorney asked you questions about

19  the fact that you contacted the City of Fairfax to get records

20  relating to the 31 Bolinas work.  Do you recall that?

21  A.  Yes, I do.

22  Q.  Okay.  And you never received any information from the City

23  of Fairfax regarding any type of outage between February 14th

24  and February 22nd of 2016, did you?

25  A.  Let me clarify.  First off, it's not the City of Fairfax.

Greenberg - Cross

1    It's the Town of Fairfax.

2    Q.  Yeah.

3    A.  Second, the Town of Fairfax has informed me that they do

4    not maintain outage records for -- that are PG&E-maintained

5    records and I -- that --

6    Q.  Let me clarify my question.  Did you ever receive any

7    information from the Town of Fairfax that would indicate that

8    there was any type of power outage between February 14th and

9    February 22nd, 2016?

10   A.  Can you say it one more time, please?

11   Q.  Did you ever receive any information from the Town of

12   Fairfax that there was any type of outage that would -- I'm

13   sorry, that would indicate that there was any type of power

14   outage between February 14th and February 22nd, 2016?

15   A.  I communicated with Mark Lockaby, who is the building

16   inspector and public works director, and with Garrett Toy, who

17   was the town manager at the time.  And --

18   Q.  Okay.  Mr. Greenberg, you need to listen to my question and

19   just answer that, okay.  I'm not concerned now with who you

20   communicated with the City.  I'm asking, did anybody at the

21   Town of Fairfax give you any information that would indicate

22   there was a power outage between February 14th and February

23   22nd, 2016?  Yes or no?

24   A.  I would like to state for the record that your framing of

25   questions to be a yes or no answer many a times in your

Greenberg - Cross

1    questioning of me has been inappropriate when I've previously

2    informed you that --

3            THE COURT:  Okay.  Mr. Greenberg, I'm going to

4    interrupt you.  Your lawyer knows how to interrupt if he

5    believes something is inappropriate.  He did not.  So I'm going

6    to direct you to answer the question.  And it's a yes-no

7    question.  Don't start judging or criticizing Ms. Dodge for

8    how -- you're the one who is not answering the question.  So

9    what's the answer?

10   A.  The answer is yes.  I received information leading me to

11   believe that there were power disruptions, whether one defines

12   that as an outage or other type of disturbance.

13   Q.  You received that information from the Town of Fairfax?

14   A.  Correct.  In my conversations --

15   Q.  Okay.  What information did you receive from the Town of

16   Fairfax that would lead you to believe that?

17   A.  Garrett Toy, the then-town manager told me that lots of

18   equipment was blowing, and PG&E was having a hard time with the

19   project.

20           MS. DODGE:  Okay.  I'm just going to move to strike

21   that as hearsay.

22           THE COURT:  I'll strike it.

23           MR. LAPPING:  Objection.  She opened the door for that

24   when she asked him.

25           THE COURT:  No.  He didn't answer it.

(973) operations@escribers.net | www.escribers.net

Greenberg - Cross

1          Answer it, again, Mr. Greenberg.  For that period,

2    that eight day period, do you have any indication from Fairfax

3    of any outages or disruptions in PG&E's delivery of power?

4          THE WITNESS:  Yes, I do.  I -- I -- what --

5          THE COURT:  Okay.  What specifically do you have?

6          THE WITNESS:  My conversations with Mark Lockaby and

7    Garrett Toy, town officials, led me to believe that PG&E was

8    experiencing problems and blowing equipment.

9          THE COURT:  I asked you what specifics, what

10   communication, and what dates.  You only have an eight-day

11   window.  Not generally.  Eight-day window.  What specific?  Not

12   what you led to conclude, but what these people communicated to

13   you.

14         THE WITNESS:  I'm trying to relay what they

15   communicated to me.  I don't have a recorded call.  But I would

16   not have made the claim had they not told me -- had the

17   appliance repair tech had not told me that it only happens for

18   these reasons.   Had they not told me that there were things

19   going on there, I wouldn't have made the claim.

20         THE COURT:  Okay.  Go ahead, Ms. --

21         MS. DODGE:  All right.  I'm just going to move on.

22   All right.  I want to move on to damages.

23   BY MS. DODGE:

24   Q.  Mr. Greenberg, we conducted an inspection of your property

25   on May 17th, correct?  I'm sorry, May 17th, 2022, correct?

Greenberg - Cross

1    A.  I would need to go back and check the date.  But I do

2    recall you personally conducting an inspection, along with

3    another PG&E representative, along with Rich Lapping, along

4    with -- yeah.

5    Q.  Okay.  And you recall that I took photographs and video

6    during that inspection, correct?

7    A.  I do recall that.  I do recall that you didn't ask

8    permission to do so.

9    Q.  To take photographs?  Okay.

10   A.  Or video.

11   Q.  Okay.  Well, that's part of an inspection.  Like, your

12   lawyer probably would have explained that to you but.  I just

13   want to clarify.  You lived in the lower unit, which is B --

14   and I'm just referring to it; I know you said it changed from

15   before, but it is B now -- from November of 2015 through June

16   of 2019, correct?

17   A.  Yes.

18   Q.  Okay.  And you never tried to rent out either unit, A or B,

19   at the property between March 2016 to June of 2019, correct?

20   A.  Where does the March-June -- sorry.

21   Q.  Want me to say it again?

22   A.  I'm -- I'm -- I'm unclear on these dates.

23   Q.  Okay.  My question is, you never made any efforts to rent

24   out either unit, A or B, between March of 2016 and June of

25   2019, correct?

Greenberg - Cross

1  A.  Correct.  There -- there -- they --

2  Q.  Okay.

3  A.  -- I -- there was no way to do so.

4  Q.  Okay.  You have answered my question.  All right.  And

5  then, you've testified in your deposition and your

6  interrogatory responses that you tried to rent the lower unit B

7  from July of 2019 to May of 2020, correct?

8  A.  Correct.

9  Q.  Okay.  And you didn't make efforts beyond May of 2020,

10 correct?

11 A.  It was no longer rentable at that point in time because

12 of --

13 Q.  Correct?  No, no, no.  Yes or no?  Did you make any efforts

14 past May of 2020?

15 A.  No.

16 Q.  Okay.  And the efforts that you made to rent the unit were

17 unsuccessful, correct?

18 A.  Correct.

19 Q.  All right.  And in your deposition, and we looked at

20 various email exchanges you had with potential renters of the

21 property, and I believe you testified that certain potential

22 renters came to the property, correct?

23 A.  Correct.

24 Q.  Okay.  And none of those potential renters told you that

25 the reason they decided not to rent the unit was because of any

1  damaged flooring, correct?

2  A.  Again, I'm going to state that your question is making me

3  answer something that doesn't -- as a yes or no or correct

4  question, doesn't allow me to answer the question as to what

5  was really going on.

6        MS. DODGE:  Okay.  Your Honor, can you instruct the

7  witness, please?

8        THE COURT:  Mr. Greenberg, I have instructed you a lot

9  today, and I'm going to continue to try.  But if you're not

10  following, I'm just not going to (audio interference) your

11  testimony.  Mr. Lapping knows how to rehabilitate your -- or to

12  explain if you have an explanation.  But the question that Mr.

13  Dodge asked is if any prospective tenant declined or stated a

14  reason not to rent the property because of the condition of the

15  floors.

16        So I'll ask the same question.  Did any tenant say,

17  I'd like to rent your property, except the floors are bad, or

18  words to that effect?

19  A.  Not specifically.

20        THE COURT:  Okay.

21        MS. DODGE:  Thank you.

22  Q.  And in terms of the period of time to replace the flooring,

23  did you get a time estimate from City Carpets at any time as to

24  how long it would take them to replace the flooring?  And when

25  I say replace the flooring, I mean actually show up at your

Greenberg - Cross

1  property with the laminate in hand to put it in, to put in 800

2  square feet of flooring.  Did you ever get a time estimate from

3  City Carpets or AIP to that effect?

4  A.  I -- I believe that would be contained in any of their

5  actual estimates.  And it's -- it's sort of a complex

6  calculation in that each contractor makes their estimates

7  slightly differently and words them differently and considers

8  different aspects.  And that's why we asked for more detail --

9  Q.  Okay.

10 A.  -- because City Carpets -- it wasn't clear exactly how long

11 the whole process would take.  And when we actually looked deep

12 into it, it turned out that City Carpets was excluding certain

13 things that needed to be done.  They weren't going to do touch

14 up paint.  They weren't involved with the moving.  They weren't

15 involved with a lot of things.

16     And that's why we asked for a sequence of events and a

17 comprehensive estimate from Dennis Webb so that --

18 Q.  Okay.

19 A.  -- we could be prepared for this trial.

20 Q.  Okay.  So in your interrogatory responses, you state that

21 it would require a three- to six-month period to replace the

22 flooring.  And is that your testimony today that it would take

23 three to six months to replace 800 square feet of flooring?

24 A.  The hard-pressed-for sequence of events and detailed set of

25 steps that our general contractor provided to us as our

(973) 406-2250 | operations@escribers.net | www.escribers.net

Greenberg - Cross

1   preparation for this trial indicates that it would be three to

2   four months.

3   Q.   All right.   If you're talking about the Dennis Webb

4   estimate, remember that's not in play here.   We're talking

5   about the City Carpets estimate.   Did you get a time estimate

6   from City Carpets as to when they showed up at your property

7   with the flooring, how long it would take before they were

8   done?

9   A.   There should be something on their estimate.   We sought to

10  get more details from them.   There -- there are some things

11  that are a little bit --

12  Q.   All right.

13  A.   -- confusing in their estimate --

14  Q.   Well --

15  A.   -- that we sought clarification for.

16  Q.   Okay.

17  A.   One of the things is that it's eight to ten weeks from when

18  you order --

19  Q.   Right.

20  A.   -- till they can actually do the job, and then there is

21  time required for the flooring to acclimatize, and then there

22  are subsequent repairs that need to be done, whether it's paint

23  or adjusting doors, that they wouldn't be doing.   So it was

24  somewhat unclear.

25       It was also unclear because apparently pricing has been

Greenberg - Cross

1   going up by the week, and --

2   Q.  Okay.

3   A.  -- they wouldn't be held, so --

4   Q.  Okay.  But for the instance, the eight to ten weeks that it

5   takes to get the material and get you on the schedule, are you

6   including that in your three to six months?  I mean, why would

7   you have to move out of the property during the eight to ten --

8   like, if you say, yes, I want to go forward with the job,

9   great.  They order the material.  It's going to take two months

10  for the material to get there.  There wouldn't be any need for

11  you to move out of the property at that time, correct?

12  A.  So I'm not the contractor, and I do -- and I'd like to

13  offer a detailed discussion --

14  Q.  No.

15  A.  -- of the sequence of events.

16  Q.  No, no.  No, we're not getting into a detailed discussion.

17  If it's not set forth in the estimate, it's not in your amended

18  claim.  I'm not getting into how long it takes.  I just wanted

19  to know if you got any estimate from either City Carpets or

20  AIP, which was in your original proof of claim, as to what

21  period of time it would take for them to show up at your

22  property with the laminate until the time they were done

23  installing it, of 800 square feet of flooring.

24      My question to you is, did you ever get an estimate for

25  that period of time to do the actual installation at your

1  property?  Yes or no?

2  A.  What period of time?

3  Q.  Okay.  What do I just describe to you?  From the time City

4  Carpets would show up at your property with the laminate to

5  until they were done installing it at your property, did you

6  ever get an estimate as to that period of time that they would

7  be there at your property doing the work to install the

8  flooring?

9  A.  As I indicated, there was no clear -- other than about

10  three to six months total in a combination of queries as to how

11  long it would all take.  So --

12  Q.  Okay.

13  A.  -- you need to read the estimates carefully.

14  Q.  I did read the estimates carefully, and I don't see

15  anything about three to six months.  But --

16        THE COURT:  Okay.  So Mr. Greenberg, you apparently

17  don't have an answer to Ms. Dodger's question.  So I'll take

18  that as you --

19        MS. DODGE:  Okay.  Let's just move on.

20        THE COURT:  -- don't have an --

21        MS. DODGE:  Yeah.

22        THE COURT:  You don't have an answer to that question.

23  That's your answer, is you don't have an answer.

24  Q.  Okay.  And did you ever get a flooring estimate for just

25  the kitchen floor?

(973) 406-2250 | operations@escribers.net | www.escribers.net

Greenberg - Cross

1  A.   No, because everybody --

2  Q.   Hold on.

3  A.   -- including PG&E's -- in -- that I'm aware of, that I can

4  recall at this point, including PG&E's representative Dustin

5  Perkins, told me that the industry rule was that you replaced

6  everything line of sight --

7           THE COURT:  No, you said that before --

8  A.   -- during all --

9           THE COURT:  Mr. Greenberg, you have said that before.

10  That was your testimony.  But Ms. Dodge asked you a different

11  question.

12           MS. DODGE:  Okay.

13           THE COURT:  So you don't have an estimate just for the

14  kitchen, correct?

15           THE WITNESS:  Not that I'm aware of, although --

16           THE COURT:  Okay.  Okay.

17           THE WITNESS:  Although, I -- I -- I -- I, you know,

18  haven't memorized all these estimates.  It's possible there is

19  a breakout number there.  I don't recall.

20           THE COURT:  Well, Mr. Greenberg, Ms. Dodge and I

21  haven't memorized them either.  So if you don't have an

22  estimate, that's the answer.

23           MS. DODGE:  Okay.

24           THE COURT:  Go ahead.

25           MS. DODGE:  I'd like to -- this is Exhibit 15.  This

Greenberg - Cross

1   is one of the videos that I took during the May 17, 2022,

2   inspection.  Let me share my screen.  Hold on.  Bring it back

3   up.  Hold on.  No, not Siri.  Hold on one minute.  Okay.

4   (Indiscernible).  There we go.  Okay.  And share.

5               THE COURT:  What's the --

6               MS. DODGE:  Can you see the --

7               THE COURT:  -- exhibit number?

8               MS. DODGE:  Can you see the video on my screen or not?

9               THE COURT:  Yeah.  What's the exhibit number?

10              MS. DODGE:  It's Number 15.

11              THE COURT:  Okay.  Can you see it, Mr. Greenberg?

12              THE WITNESS:  I -- I have a hazy picture in front of

13  me.

14              MS. DODGE:  Okay.

15              THE COURT:  Well, yes.  Wait till she --

16              MS. DODGE:  Okay.

17              THE COURT:  -- hits the start button.

18  BY MS. DODGE:

19  Q.  Okay.  So this is the start button, and this is a video I

20  took on May 17.

21          (Video played.)

22  Q.  And this is the kitchen we're looking at here, right?

23              Mr. Greenberg, this is the kitchen?

24  A.  Yes.  It looks like the kitchen in the lower unit.

25              THE COURT:  Now, what room is that?  Is that the --

Greenberg - Cross

1   Q.  This is one of the bedrooms, right, Mr. Greenberg?

2   A.  That is the smallest of the two or three bedrooms,

3   depending on how you count it.  It's technically three bedrooms

4   in that all the rooms have closets.

5   Q.  Right.  Okay.  So here, we're walking into another bedroom,

6   right.  No, I'm sorry.  We're still in the kitchen.  Now, we're

7   in another bedroom.  This is the largest bedroom, right?

8   A.  Correct.  That's the master bedroom.

9   Q.  Okay.  And you can see there -- I'm sorry, it's sideways --

10  that the kitchen level is at a different level, correct?  It's

11  higher?

12  A.  There is a transition.  This is an old, 1920-built home,

13  and there is lots of transitions everywhere.

14  Q.  Okay.  And this is the living room.  I apologize for the

15  sideways video, but you can see the -- okay.  We're looking at

16  the kitchen, correct?

17  A.  Yes.

18       MS. DODGE:  Okay.  All right.

19     (Video ends.)

20       MS. DODGE:  And that's that.  Okay.  Let me stop

21  sharing my screen.  Hold on.  Okay.  Just a couple more

22  questions, then I'm done.

23  Q.  On the cleanup of spoiled food that you have on your

24  amended claim, 225 dollars, do you have any receipts for that,

25  or was that just something you did yourself?

Greenberg - Cross

1    A.  I did some of it, and I'm sure I probably had somebody come

2    in subsequently to sort of clean the whole area --

3    Q.  Okay.  Do you have any --

4    A.  -- and I -- I -- I -- I'm --

5    Q.  -- receipt for that?

6    A.  Can I finish my answer?

7    Q.  I'm sorry.  Go ahead.

8    A.  I -- I -- I -- I know that I did pay a fellow named

9    Raymondo (phonetic) that also goes by Alex, to, like, do a more

10   thorough job cleaning the refrigerator.  I don't know what else

11   I had him clean, but I'm going to guess that it all got cleaned

12   multiple times.

13   Q.  All right.  And the cleaning for the oriental rug you have

14   on your amended list at 168 dollars.  And you never had that

15   cleaning done, correct?

16   A.  As I testified in deposition, I had brought it somewhere --

17   I had got an estimate.  I had brought it somewhere.  And

18   somehow -- it's my recollection that it never got done.  But

19   I'm not --

20   Q.  Okay.

21   A.  -- quite sure entirely why.

22   Q.  Okay.

23   A.  But --

24   Q.  All right.  That's fine.

25   A.  Yeah.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

Greenberg - Cross

1  Q.  Okay.

2          THE COURT:  Okay.  Ms. Dodge, let me clarify the last

3  two questions.

4          MS. DODGE:  Sure.

5          THE COURT:  The claims are small, but it's for 225

6  dollars for cleanup, spoiled food.  Now, how much spoiled food?

7  The only thing I've seen from the pictures so far is a little

8  stain in front of the refrigerator.  What spoiled food needed

9  to be cleaned up?

10          THE WITNESS:  Your Honor, it was a relatively full

11  refrigerator and freezer --

12          THE COURT:  I know, but when I looked at the picture,

13  most of the things were in containers.  So what got cleaned up

14  that need to be cleaned up?

15          THE WITNESS:  All of the refrigerator -- the contents

16  had melted down in the refrigerator and freezer and onto the

17  floor and --

18          THE COURT:  Mr. Greenberg, how does a package of Oscar

19  Mayer weenies melt down?

20          THE WITNESS:  I -- I -- I don't know how all these

21  things leak, but they did.  And there seem to be more photos

22  then somehow are being presented to you.  I'm not sure why.

23          THE COURT:  Well, let's try a different -- let's try a

24  different question.  And I understand if your power went out,

25  there was some food spoilage and maybe some things leaked, some

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

Greenberg - Cross

1    things like milk or ice cream, whatever, would happen.  But how

2    did it get outside -- to clean up spoiled food, what

3    specifically had to be cleaned up, other than opening the

4    refrigerator and take the packages and throw them in the

5    garbage?

6              THE WITNESS:  I -- it --

7              THE COURT:  What else needed to be cleaned up?

8              THE WITNESS:  The -- the unit is on a slight slant.

9    As I said before, it's built in 1920 and looks like it was

10   added on to over time --

11             THE COURT:  Okay.

12             THE WITNESS:  -- and a lot of different things.

13             THE COURT:  Okay.

14             THE WITNESS:  So the unit slopes from the refrigerator

15   to the outer perimeter of the building.  So whatever did melt

16   in the refrigerator and freezer, it flowed across the floor to

17   the dishwasher and to the baseboard on the other side.  I -- I

18   can't tell you why -- other than what you see in the

19   pictures -- why what melted the way it did.  All I can tell you

20   is that a lot of stuff melted and leaked.  And --

21             THE COURT:  Well, give me a -- give me a specific.

22   Again, I gave you an example of maybe something like ice cream

23   or milk, but how does a packaged hamburger or packaged sausages

24   leak in the first place?

25             THE WITNESS:  Sure.  So when something freezes, a

Greenberg - Cross

1   package expands.  A frozen item is larger than an unfrozen

2   item, as I understand it.  And I'm guessing, but I -- I -- it's

3   just speculation, that somehow when those things melted, that

4   there were small -- somehow those packages leaked.  You know,

5   berries is one thing.  Meat.  I don't know if you've ever had a

6   chicken --

7           THE COURT:  Well, then when the freezer came back on,

8   did the stuff then freeze?

9           THE WITNESS:  It didn't come back on is the whole

10  point.

11          THE COURT:  Okay.  I'm sorry.  It didn't come back on

12  because the relay was gone.  Okay.  And so you showed -- I saw

13  a picture where I could see the corner of a rug, but I didn't

14  see any evidence that the rug was damaged.  So what made the

15  rug needed to be cleaned?

16          THE WITNESS:  What was leaking was multicolored, sort

17  of red-colored fluid --

18          THE COURT:  Okay.

19          THE WITNESS:  -- and different colors.  And there

20  should be pictures of the rug, but it's pretty clear --

21          THE COURT:  Well, I acknowledge, sir, that there is

22  a -- one of the pictures that we were looking at earlier, I

23  think Mr. Lapping had it, there is some -- there is a picture

24  of something that's colored that seems to come from the

25  refrigerator.  I don't question that, but I couldn't tell

(973) 406-2250 | operations@escribers.net | www.escribers.net

Greenberg - Cross

1    whether it actually got into the carpet.  So your testimony is

2    that whatever leaked from the refrigerator made contact with

3    the carpet; is that right?

4          THE WITNESS:  Yes.  Much as the shirt that I'm wearing

5    today might need to be laundered for another day.

6          THE COURT:  So the rug hasn't been cleaned to this

7    day?

8          THE WITNESS:  You know, that's what I -- I -- I'm --

9    this is years ago now, and I believe there was some kind of

10   issue where the guy went on vacation, or I don't -- I'm not

11   sure that it got done.

12         THE COURT:  Well, I don't care who went on vacation.

13   Where is the rug?  Is it in your home now?

14         THE WITNESS:  Yeah, I can produce the rug.

15         THE COURT:  Does it have -- does it have a stain on it

16   or not?

17         THE WITNESS:  Yes, it does have a stain on it.

18         THE COURT:  Okay.  Ms. Dodge, go ahead with your

19   questions.

20         MS. DODGE:  Mr. Greenberg offered to give me the rug

21   during his deposition.  I declined.  Do you recall that?

22         THE COURT:  I saw that he has five pounds of frozen

23   salmon.  You might want to make an offer on the salmon.

24         MS. DODGE:  True.

25         THE COURT:  All right.  Go ahead with your questions.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1      MS. DODGE:  I think I may be done.  Yeah.  Again, it's
2  2 o'clock.  I want to keep moving on.  So I'm done with my
3  questioning of Mr. Greenberg.
4      Thank you, Mr. Greenberg.
5      THE COURT:  Mr. Lapping, do you want to take a short
6  break, or do you want to question, or do you want to have no
7  questions?  Three choices.
8      MR. LAPPING:  Right.  Short break, Your Honor.
9      THE COURT:  10 minutes enough?
10     MR. LAPPING:  Yes.
11     THE COURT:  Okay.  Personal convenience for everyone.
12 10 minutes.  I'll be back in ten.
13     MS. DODGE:  Thank you.
14     THE COURT:  Ms. Parada, you --
15     (Recess from 2:02 p.m., until 2:10 p.m.)
16     AUTOMATED VOICE SYSTEM:  This meeting is being
17 recorded.
18     THE COURT:  Okay.  Mr. Lapping, you're up.
19     MR. LAPPING:  Okay, Your Honor, just a little bit of
20 redirect.
21 REDIRECT EXAMINATION
22 BY MR. LAPPING:
23 Q.  So Mr. Greenberg, there was some testimony that there was
24 a water hose used for, I guess, ice and water on the
25 refrigerator that leaked a couple of times.  Were you at home

Greenberg - Redirect

1    when those leaks occurred?

2    A.   Yes.

3    Q.   And did you clean them up right away?

4    A.   Yes.

5    Q.   So they didn't sit there and puddle and cause any further

6    damage?

7    A.   No.

8    Q.   Okay.  So on February 22nd, you came back and discovered

9    the refrigerator was in a horrible situation, and you did what

10   you could.  At what point and how soon after did you first

11   raise this issue of outages with either Garrett Toy or Mark

12   Lockaby?

13   A.   Soon thereafter.  Within several days or immediately, I

14   started making inquiries, and I spoke with both of them,

15   definitely within the week, and other people too.

16   Q.   You mentioned -- or it was established that you did not

17   rent the lower unit or attempt to rent the lower unit from

18   March of 2016 through June of 2019.  What was going on during

19   that period that you did not attempt to rent the unit?

20   A.   I had moved there, and as I said, I downsized.  And I

21   needed a place to live.  And I didn't have the resources to

22   finance a hundred grand-plus to move out and rent another place

23   and do all the repairs.

24       And we had already, while we were waiting for PG&E to make

25   a decision and get us clarity as to what they were going to do,

Greenberg - Redirect

1   which took eleven months, we decided to renovate upstairs.  So

2   I couldn't move upstairs, and I didn't have the resources to

3   move anywhere other than stay where I was downstairs.

4   Q.  Now, you recall preparing answers to interrogatories that

5   were propounded by PG&E in -- let me see -- I'll represent I

6   think it was May of 2022, specifically May 5th of 2022?

7   A.  Sorry.  Comparing interrogatories?

8   Q.  No.  Do you recall -- yes, preparing answers to

9   interrogatories prior to that period to respond to PG&E's

10  interrogatories?

11  A.  Yes, I -- I -- I -- I do.

12  Q.  Now, in the response to interrogatory number 3, you

13  indicate that you anticipated three to six months' time period

14  for repairs.  What was that based on?

15  A.  That was based upon my conversations with the various

16  contractors and my -- their estimates and my conversations with

17  them.

18          MR. LAPPING:  All right.  I'm going to try to take

19  over the screen here and find something.  Well, let's see.  Oh,

20  here we go.

21          Oh, no.  I'm pulling up PG&E's exhibits.  That's not

22  helpful.

23          Okay.  Can everybody see this one?

24          MS. DODGE:  No.

25          THE COURT:  Well, you --

Greenberg - Redirect

1          MR. LAPPING:  No?

2          THE COURT:  Well, I mean, you can see that you're

3    clicking on something, but it doesn't come up yet.

4          MS. DODGE:  Yeah.  You can't see the photos.  It just

5    shows that you clicked on it.

6          MR. LAPPING:  Hmm.

7          MS. DODGE:  Can you move the screen?  When you do

8    share a screen, Rich, there should be an option to go to

9    another screen, if you have two.

10          MR. LAPPING:  Let me just stop the sharing and try it

11    again.

12          MS. DODGE:  There you go.

13          MR. LAPPING:  We have a winner.  Okay.

14          THE COURT:  That's the same group of pictures that we

15    saw before, right?

16          MR. LAPPING:  Yes.  If we look at the one -- there is

17    a row of them, and the one here, where -- I don't know.  Can

18    you see my cursor?

19          MS. DODGE:  Yes.

20          THE COURT:  Yes, uh-huh.

21    BY MR. LAPPING:

22    Q.  Okay.  Mr. Greenberg, what are we looking at here?

23    A.  That looks like the freezer.  It looks like the ice maker

24    up above and looks like some -- some things that were there are

25    hanging over the -- the shelves.

Greenberg - Redirect

1  Q.  Right.  And then, this lower area, it looks like something

2  has melted?

3  A.  I can't see the lower area.  Can you scroll up?  Yes.

4  Q.  Can you see this?

5  A.  That's the bottom of the -- that's the bottom of the

6  freezer, and it looks like whatever has melted has a -- a

7  reddish plum color to it.

8  Q.  Okay.  Let me get over.  And is this -- is this a -- no.

9  Is this a kind of a close up of how it looked when you first

10  got the things started to clean it out?

11  A.  Yes, that -- that -- that is after having removed whatever

12  the components are in the bottom of the freezer.  That's --

13  that's what was remaining in the freezer at that point in time.

14  Q.  Okay.  And then, here is the -- I don't know if you can see

15  it over here on the left.  This may be another shot of that.

16  A.  Sure.  So it looks like it leaked from up above.

17       MR. LAPPING:  And then, let me get out of this and get

18  into another one.  Let's see where the exhibits are.  There we

19  go.

20  Q.  And this is the outside of that, where the red --

21  A.  Sorry, what?

22  Q.  -- is pouring out of the refrigerator --

23       THE COURT:  Again, it's not coming up.

24       MS. DODGE:  No.  The photos aren't up again, Rich.

25  You need to stop the share and start over.

Greenberg - Redirect

1          MR. LAPPING:  Yes?

2          MS. DODGE:  No.  Still isn't coming up.

3          THE COURT:  Have you double-clicked on that line?

4          No.  When your cursor is -- your cursor is not visible

5     now.

6          MR. LAPPING:  Okay.

7          THE COURT:  But if you put the cursor right on the

8     line, doesn't it double-click it?  Doesn't that open it up?

9          MR. LAPPING:  Oh, here we go.

10         MS. DODGE:  There you go.

11    Q.  Okay.  And this, we talked about this earlier.  This is the

12    outside showing the leakage.  This just looks like it's coming

13    from the freezer.  And then you can see that there is moisture

14    and some sort of water running over to the rug.  Is that what

15    you see, Mr. Greenberg?

16    A.  Yes, it looks like it leaked from both the left, center,

17    and right.

18         THE COURT:  Okay.  Mr. Greenberg, is that your foot?

19         THE WITNESS:  Again, I question whether it's my foot

20    or not because I'm not too familiar with that shoe.

21         THE COURT:  Okay.  Well, regardless of who's foot it

22    is, the foot is pointing to something that's kind of reddish.

23    That's the center of the three spots, the leak, right?

24         THE WITNESS:  The center and the -- sort of -- it's

25    pointed towards the center of the freezer door.  And it --

Greenberg - Redirect

1          THE COURT:  Okay.

2          THE WITNESS:  -- looks like it breaks left and

3    right --

4          THE COURT:  And then --

5          THE WITNESS:  -- coming out of the freezer.

6          THE COURT:  -- in the upper left-hand corner of the

7    photo, is that more of the discoloration that came from the

8    refrigerator?

9          THE WITNESS:  Yes.  Yes.

10          THE COURT:  And then what -- and down and to the right

11   of the foot, all the way down to the carpet, do I understand

12   you're telling me that's the staining that kind of came from

13   the right-hand front leg of the fridge all the way down to the

14   carpet?

15          THE WITNESS:  Yes.  It looks like it had leaked out of

16   the refrigerator too.

17          THE COURT:  Okay.

18          THE WITNESS:  And different contents in different

19   compartments, right, the different things in the freezer

20   section than in the refrigerator section.

21          THE COURT:  Well, as I say, I observed earlier that an

22   awful lot of things in your refrigerator are in containers.

23   And so I don't know how it got out of the container, but I'll

24   accept that something would melt and something could do it.  I

25   don't question that stuff came out so.

of 320
(973) 406-2250 | operations@escribers.net | www.escribers.net

Greenberg - Redirect

1          MR. LAPPING:  Okay.

2          THE WITNESS:  Can I -- can I -- can I give you another

3    insight there?

4          THE COURT:  Oh, go ahead.  Yes, sir.

5          THE WITNESS:  One of -- I can't explain everything on

6    why what melted, but I can tell you that if one leaves

7    vegetables in a refrigerator for a long time, they get to be

8    quite icky, and you do get liquid that forms from them.

9          THE COURT:  I understand that.

10          THE WITNESS:  Now, I --

11          THE COURT:  I understand.  This trial isn't about what

12    you keep in your refrigerator.  It's just that there are an

13    awful lot of things that are in containers, and it's hard to

14    know what they would -- why they would leak.  I understand they

15    probably spoiled, and you had to throw them out.  That's not

16    the end --

17          MR. LAPPING:  I read somewhere that that doesn't

18    happen with cookies.

19          So let me try another one.  We're looking at the floor

20    now, and is the floor photo visible?

21          MS. DODGE:  Yes.

22          THE WITNESS:  Yeah.  I don't see the whole picture,

23    but -- and it's zoomed up close.  But --

24          MR. LAPPING:  Yeah, I'll just --

25          MS. DODGE:  -- I see a lot of it.

Greenberg - Redirect

1          MR. LAPPING:  Right.  This is Exhibit TT from our

2     exhibits.

3     BY MR. LAPPING:

4     Q.  And you took this photo; is that correct, Mr. Greenberg?

5     A.  Yes.

6     Q.  And this is in the kitchen in front of the refrigerator?

7     A.  Correct.

8     Q.  Can you describe the defects that are visible or that may

9     be observable if you're in the kitchen?

10    A.  Sure.

11         MS. DODGE:  Object to the extent the photo speaks for

12    itself, other than we don't need Mr. Greenberg's description of

13    it.

14         THE COURT:  Well, that's --

15         MR. LAPPING:  The point is the --

16         THE COURT:  I'm going to let him.  He can describe it.

17         Go ahead.  You can describe it, Mr. Greenberg.

18    A.  So the -- the laminate has lifted up and has ridges on it

19    and is starting to peel back.

20    Q.  Okay.  And when you --

21    A.  And --

22    Q.  -- walk across the floor, is there any indication that the

23    floor has been damaged?

24    A.  Yeah.  If you're in bare feet, depending on what one's

25    sensitivity is with their feet, but you can feel this and you

Greenberg - Redirect

1   can feel soft, spongy sections also.  And you can see here --

2   that picture you're on right now, you can see how it's lifting

3   up where the water penetrated at the -- or moisture penetrated

4   at the edges.  So all -- all that is -- is -- is palpable to

5   the foot or to one's hands if one gets down.

6      Now, you can see there is glare in these pictures.  And

7   that unit is very sensitive to light.  So some times of the

8   day, you see this more than others.  But if you were to feel

9   for it, you would be able to feel it.

10          THE COURT:  And you don't have any -- do you have any

11  photos of the floor before the damage?

12          THE WITNESS:  I don't believe we've submitted those

13  into evidence, but I did not buy it in this condition.

14          THE COURT:  I didn't --

15          THE WITNESS:  I do --

16          THE COURT:  I didn't ask you what you bought it in.

17  I'm asking whether -- how do I know that that is a condition

18  that is caused by the problem?  I understand the leak of the

19  coloring out the door, the stuff that you just described, but

20  the photos that I just saw, I can't tell whether there is any

21  moisture there or not.  All I can see is the kind of

22  description that you gave to.

23          THE WITNESS:  Sure.  We do have -- on my home

24  computer, I do have pictures of each room that were part of the

25  original advertisement before we bought it.  As to whether or

(973) operations@escribers.net | www.escribers.net

Greenberg - Redirect

1  not you can zoom in on the floor, but if need be, I suppose we

2  could track down the prior owner or owners and ask them what

3  condition the floor was in.  But I can represent to you that

4  the floor was in good condition prior to this happening.

5          MS. DODGE:  Objection.  Move to strike.

6          THE COURT:  Well, I'll let him -- his answer will

7  stand.

8          Go ahead, Mr. Lapping.

9          MR. LAPPING:  Mr. Greenberg, I'll go -- Let me get

10  back here and share the screen view.  I've been scrolling

11  through the photos, and you guys couldn't see them.

12          So this is a -- first of all, is the floor visible?

13          MS. DODGE:  Yes.

14          MR. LAPPING:  Okay.  This is from PG&E Exhibit 14,

15  photographs, and let's see.

16  BY MR. LAPPING:

17  Q.  I mean, over here by the wall, is there any indication of

18  damage to the floor?

19  A.  Not so much.

20          MS. DODGE:  Objection.  Objection.  Photograph speaks

21  for itself.

22          THE COURT:  No.  No, I need whatever help I can get.

23          Go ahead.  You can answer that, Mr. Greenberg.

24  A.  Not so much.  Actually, when I met with the general

25  contractor, we looked at this, and apparently the damage that

Greenberg - Redirect

1   is most noticeable, notwithstanding any moisture penetration

2   into the subfloor and wherever the water carried, is

3   approximately six foot from when you're looking at the

4   refrigerator to the right and three foot to the left.  And the

5   whole kitchen is approximately sixteen-foot long.  I don't

6   remember the -- the depth or width of the room, but I can look

7   that up for you if you want.

8   Q.  Okay.  And I'm in front of the bathroom now, which is

9   behind, to the right, into the rear of the kitchen.  And that's

10  the flooring there, right?

11  A.  Yes.

12  Q.  And is that damaged?

13  A.  It -- there is no visible damage there that I can speak to,

14  as far as related to moisture.  As I said, the floor -- the

15  floor has multiple slants to it because it's an old, 1920-built

16  place.  But in front of the refrigerator, and primarily, it

17  slants from the center of the room, or the far-interior portion

18  of the room where the refrigerator is located, out towards the

19  exterior of the building.

20  Q.  You mean towards the washing machine?

21  A.  Towards the dishwasher --

22  Q.  Dishwasher.

23  A.  -- and the sink and the rug.

24  Q.  But my question -- but my question is, is this section of

25  the floor -- is that the condition it was in before the

Greenberg - Redirect

1  incident?

2  A.  I believe so.  You know, I -- I -- I -- there is years that

3  have gone by now, so I believe it's more or less as it was,

4  other than whatever traffic's happened to the bathroom.  But --

5  Q.  Okay.

6  A.  -- I haven't taken a close look at that section.

7         THE COURT:  Mr. Lapping, can you go back to that last

8  photo, please?  I have a question.

9         MR. LAPPING:  Is it there?

10        THE COURT:  Okay.  Hold it right there.

11        Now, Mr. Greenberg, in the foreground, on the left, is

12 that the refrigerator that I see on the left?

13        THE WITNESS:  Yes.

14        THE COURT:  And in the top, that's the different color

15 to the bathroom, right?

16        THE WITNESS:  Correct.  You see the --

17        THE COURT:  Okay.

18        THE WITNESS:  -- bathroom tile at the top --

19        THE COURT:  I got it.

20        THE WITNESS:  -- of the exhibit.

21        THE COURT:  I got it.  But what's to the right, past

22 the strip?

23        THE WITNESS:  That -- that is the adjoining small

24 bedroom, the smallest of the three bedrooms.

25        THE COURT:  And your claim is what, that that floor

Greenberg - Redirect

1  should be changed also or just the floor that we see that's to

2  the left of the strip?

3  THE WITNESS:  All of the contractors indicated that

4  all the floor would be changed at once, as per industry

5  standards.

6  THE COURT:  Well, I understand that.  But what is the

7  estimate for replacing only the floor in the kitchen?

8  THE WITNESS:  I -- I don't know that we had a

9  breakout.  If there is a breakout for that, I -- I'm not aware

10  of it.

11  THE COURT:  What's the square footage of the apartment

12  entirely?

13  THE WITNESS:  It's less -- less than a thousand.  We

14  think it's about 975 square feet.

15  THE COURT:  And what's the -- and what's the square

16  footage of the bathroom and any other room that has laminate

17  rather than hardwood?

18  MS. DODGE:  This is laminate, not hardwood, just FYI.

19  THE COURT:  Okay.  What I mean is it looks like wood.

20  You're correct.  But --

21  THE WITNESS:  I -- I -- I -- I don't know the square

22  footage of the bathroom.  I know that the -- the flooring

23  contractors variably estimated between 660 and 800 square feet.

24  And in the revised City Carpets estimate and in the Dennis Webb

25  estimate, it was 800 square feet.

(973) 406-2250 | operations@escribers.net | www.escribers.net

Greenberg - Redirect

1  THE COURT: But I'm asking you what the square footage

2  of the kitchen is.

3  MS. DODGE: Your Honor, if I can just interject there.

4  The original City Carpets estimate did break it out, and I

5  believe it said that the kitchen square footage was 325 square

6  feet.

7  THE COURT: Does that seem right, Mr. Greenberg,

8  roughly? You live there. Is it roughly 325 square feet?

9  THE WITNESS: I have not done that calculation myself,

10  but it sounds approximately right. Yeah. It sounds -- I would

11  have to measure and do the calculation to -- to be able to

12  really answer the question.

13  THE COURT: Okay. So --

14  MS. DODGE: Yeah. There it is. You brought it up,

15  Rich. Yeah.

16  THE COURT: What's the exhibit number?

17  MR. LAPPING: What is this? This is --

18  MS. DODGE: I think that's the original claim, right?

19  I --

20  MR. LAPPING: Right.

21  MS. DODGE: -- can't pull it up. It's a PG&E exhibit.

22  (Audio interference) you're on the screen sharing so I can't

23  get to my --

24  MR. LAPPING: Oh, I see. It is LL.

25  MS. DODGE: Oh, that's yours. Okay. We have it too.

Greenberg - Redirect

1        THE COURT:  So.  Okay.  So it says -- so City is

2   estimating 325 square feet for 4,300 dollars.

3        THE WITNESS:  Pardon me.  I'm not seeing this.  Rich,

4   can you scroll down?

5        THE COURT:  Oh.  Oh.  Okay.  But I mean --

6        MR. LAPPING:  There.  Is that --

7        THE COURT:  -- Ms. Dodge, that's what you believe that

8   it shows because it lists four different places.  It lists the

9   office and two bedrooms and --

10       MS. DODGE:  Right.

11       THE COURT:  -- it doesn't --

12       MS. DODGE:  It doesn't --

13       THE COURT:  -- tell us the square footage of those.

14  Do we --

15       MS. DODGE:  No, it does.  It says the -- see, right

16  here, price for materials, what, 325 square feet, and then it

17  has separate for the two bedrooms and office, which are the

18  three other rooms.  Those are --

19       THE COURT:  Right.

20       MS. DODGE:  -- (indiscernible) items here.

21       THE COURT:  Okay.  But what I'm seeing here from this

22  is the kitchen represents probably sixty percent of the

23  flooring that this bid wants to cover.

24       MR. LAPPING:  That looks about right to me, Your

25  Honor.

Greenberg - Redirect

1          THE COURT:  I mean, it's not just the laminate.  It's

2    the -- at least the underlayment and the -- well, yeah.  In

3    other words, okay.  I mean, I don't want to admit to

4    (indiscernible).

5          MS. DODGE:  Right.  Right.  Yeah, and I'm talking

6    about, right, the replacement of the laminate versus taking up,

7    because I believe the laminate was just put over an old vinyl

8    flooring in the kitchen.  That's why it's at an uneven --

9          THE COURT:  Okay.  All right.

10         MS. DODGE:  -- unlevel.

11         THE COURT:  Okay.  Thank you, Mr. Lapping.  Go ahead

12   and back to any questions you want for your client.

13         MR. LAPPING:  I think that was it for me, Your Honor.

14         THE COURT:  Do you have any more examination, Ms.

15   Dodge?

16         MS. DODGE:  Yeah, just a couple, briefly.  And it's

17   actually on the same exhibit that Rich -- I'm sorry, that Mr.

18   Lapping was just on.  So let me see if I can share my screen.

19         MR. LAPPING:  How is that?  Is it back?

20         MS. DODGE:  Oh, well, no.  Let me do it, Rich, because

21   I'm going to need to pull up the same pictures.  Thank you, but

22   I think I can do it on my -- yeah, thanks.  Okay.  Hold on.

23   Okay.  Okay.  Can you see my screen here?

24         THE COURT:  Yes.

25         MR. LAPPING:  Yes.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

Greenberg - Recross

1        MS. DODGE:  Okay.  So let me just ask Mr. Greenberg a

2   couple of other questions about the floors here because I know

3   we looked at the video, but I just want to -- a couple other

4   things.

5   RECROSS-EXAMINATION

6   BY MS. DODGE:

7   Q.   This photo here, this is one of the photos I took during

8   the inspection.  Do you recognize where this is, Mr. Greenberg?

9   A.   I can't see all the picture, but I think you're got a

10  picture of the smaller of all the rooms.

11  Q.   Right, the smaller bedroom that kind of has that built-in

12  bed in it?

13  A.   Yes.

14  Q.   Okay.  And so I'm just zooming in here on the floor, and it

15  looks like there is some discoloration here.  Do you see that?

16  I don't know if you can --

17  A.   I don't see it on my screen.  I think you need to scroll

18  down for me.

19  Q.   Oh.  Can you see now?

20  A.   Yes.

21  Q.   Okay.

22  A.   Yes, I do see that.

23  Q.   And then it looks here, like this isn't exactly even, like

24  there could be some lifting here of the laminate, correct?

25  A.   Yeah.  I -- I -- I believe you're sort of going back

Greenberg - Recross

1    forensically, you know, years later.  And you can see a

2    footprint there.  And I believe, you know, there is some touch

3    up paint done.  I think, you know --

4    Q.  Okay.  All right.  Well --

5    A.  -- the path is --

6    Q.  -- let me just ask it so we can keep this moving.  A couple

7    other photos.  This next one we're on, this is also in that

8    small bedroom.  And do you see this -- can you see this large

9    gap in the middle, the laminate?

10   A.  Yes, I can.

11   Q.  Okay.

12   A.  Again, this is all forensic.  Things shift.  We've had a

13   lot of earthquakes.

14   Q.  Okay.  No, I just am asking if you can see those.  Okay.

15   Okay.  And then this picture here, this is looking, I believe,

16   from -- the bathroom is to the right here.  The kitchen, this

17   is the kitchen flooring here.  But we're looking from the

18   smaller bedroom, where I was just taking the photos, into the

19   kitchen, right, and you can see the different level?

20   A.  You are.  You can see the different level, and you can see

21   how the door and the floor slope and why the doors would need

22   to be adjusted when new flooring is installed.

23   Q.  Right.  But the flooring here, where this door is shown

24   right here, this flooring wasn't damaged, or there was no

25   moisture from the refrigerator in this area, correct?

Greenberg - Recross

1    A.  It doesn't appear to be, but the problem is --

2    Q.  Okay.

3    A.  -- we can't go out and buy the same flooring.  It

4    doesn't --

5    Q.  All right.  Okay.  Let's --

6    A.  -- exist anymore.

7    Q.  Again --

8    A.  Even though we --

9           THE COURT:  You made that point.

10          MS. DODGE:  Yeah.  Okay.  And I'm just, again,

11   scrolling through a couple other --

12          THE COURT:  Hold on.  Stop right there, Ms. Dodge.

13          MS. DODGE:  Yeah.  Um-hum.

14          THE COURT:  Come back a little bit.  No, go back.  Go

15   back up to a little --

16          MS. DODGE:  Up here?

17          THE COURT:  Yeah, keep going.  There.

18          What's that?  Is that the refrigerator --

19          MS. DODGE:  I can make that smaller.  No, no, no.  I

20   believe this is the front door.

21          THE COURT:  Oh, what is that, Mr. Greenberg?

22   Q.  Is that the front door?

23   A.  That -- that -- that is -- that is the side door and a

24   threshold that needs to have some refinishing done to it.

25   Q.  Wait.  This is the side door?

Greenberg - Recross

1    A.  That is the side door.  That is not the front door.  That

2    is the door to the left --

3    Q.  Oh, right.

4    A.  -- of the kitchen sink.  And --

5    Q.  Oh, right, right, right.  I got it.  Okay.  On this

6    picture, this lower part is the kitchen, correct, and this is

7    looking into the larger bedroom, right?

8    A.  This -- this is, I believe, the kitchen looking into the

9    bedroom.  But I do not agree with your characterization of it

10   as being lower.  I believe this is the --

11   Q.  No, I said the larger bedroom, as opposed to the one we

12   were just looking at, which is the smaller bedroom.  This is

13   the master bedroom.  We're looking from the kitchen into the

14   master bedroom here.

15   A.  I am agreeing with you --

16   Q.  Okay.

17   A.  -- that we are --

18   Q.  Okay.

19   A.  -- looking in that direction.

20   Q.  All right.

21   A.  I'm not agreeing with the lower characterization of --

22   Q.  I didn't say lower.

23   A.  -- the kitchen.

24   Q.  Okay.  So --

25   A.  Well, (indiscernible) --

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

Greenberg - Recross

1    Q.  -- my questions -- I didn't --

2    A.  -- okay.

3    Q.  Hold on.

4         THE COURT:  But what is the answer, Mr. Greenberg?  Is

5    the bedroom slightly lower than the kitchen?

6         THE WITNESS:  I believe so, yes.  I thought she was

7    saying that the kitchen was lower than the bedroom.

8         MS. DODGE:  No.

9         THE COURT:  Oh, but what I'm asking you, if I were

10   walking from your kitchen to the bedroom, what, I go over that

11   molding, and I have to step down a bit?

12        THE WITNESS:  Very slightly.

13        THE COURT:  Well, how much?

14        THE WITNESS:  I'm going to guess within an inch range,

15   plus or minus.

16        THE COURT:  Okay.

17        THE WITNESS:  Maybe -- maybe less.

18        THE COURT:  Okay.

19   Q.  Okay.  And my question here is, this is the kitchen going

20   into the master bedroom, do you see these scratches here on the

21   floor?

22   A.  Sure.  Again, this is forensic.

23   Q.  Okay.  I am asking -- just listen to my question, please.

24   This isn't an area of the kitchen where any moisture would have

25   impacted it from the refrigerator, correct?

Greenberg - Recross

1  A.  I don't know because it seems evident that the moisture got

2  underneath the laminate, and water does travel.  So I don't

3  know how far it has --

4  Q.  All right.

5  A.  -- gone.

6  Q.  But these scratches here, you're not claiming are caused by

7  the refrigerator issue, correct?

8  A.  I didn't know that I'd made any statement about those

9  previously.

10  Q.  Okay.

11  A.  I don't know what --

12  Q.  No, you didn't make any statement.  I'm just asking if

13  that -- I'm just showing the general condition of the flooring

14  at this time.

15  A.  Okay.  Yeah, the --

16      MS. DODGE:  And there, again, this is looking from the

17  master bedroom into the kitchen.  This is a better view, Your

18  Honor, just in terms of the -- you talked about whether you

19  would go down slightly and over --

20      THE COURT:  Right.

21      MS. DODGE:  -- that threshold.

22      THE COURT:  Got it.

23      MS. DODGE:  Okay.  And yeah, there is another picture.

24  And let me just scroll down.

25  Q.  Okay.  And then, this is the living room looking into the

Greenberg - Recross

1   kitchen, correct?

2   A.   Correct.  And you enter --

3   Q.   Okay.

4   A.   -- through -- you enter --

5   Q.   Okay.

6   A.   -- through the living room from the front door and then

7   walk into the kitchen, which is in the center of the unit.

8   Q.   Right.  Okay.  And this is in the kitchen, correct?

9   A.   I believe so, yes.

10  Q.   Again, there appears to be a gap here between this laminate

11  flooring.  Do you see that?

12  A.   Yes, I do.

13  Q.   Okay.

14  A.   There is lots of explanations for that.

15  Q.   Okay.  And there is a couple -- looks like chips or

16  something here in the laminate flooring.  Do you know what

17  those were caused by?

18  A.   No, I do not.  But again, this is years later.

19          THE COURT:  But you do not.  You do not know what

20  caused them.  So it's years later, but you do not know what

21  caused them.

22          MS. DODGE:  Yeah.

23          THE COURT:  That's all (indiscernible).

24          MS. DODGE:  Okay.  Let me just see if I have anything

25  else here.  That's over further in the kitchen.  Okay.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

Greenberg - Recross

1  Q.  And then this is -- so in this picture, we're looking in

2  from the office, which is the smallest room, right, into the

3  kitchen, correct?

4  A.  No, the office -- that is not correct.

5  Q.  Okay.  This isn't the --

6  A.  No, the office is -- I do not consider, and I don't think

7  measurements would bear this out, the office -- what I use as

8  an office, what the prior owner used as an art studio, what the

9  prior owners used as a kids bedroom, is actually bigger than

10  what I call the smallest bedroom that you showed --

11  Q.  Okay.

12  A.  -- pictures of at first.

13  Q.  Right.  Okay.  But this is another bedroom that's leading

14  into the kitchen, correct?

15  A.  It's another room with a closet --

16  Q.  Okay.

17  A.  -- that is technically a bedroom leading into the kitchen.

18  Q.  Okay.  All right.  And this picture right here that we're

19  looking at right here, there is quite a gap there between the

20  laminate flooring.  And this is in the small -- or office or

21  not the office bedroom, but whatever the bedroom is with the

22  closet.  Do you see that gap there?

23  A.  I do.  I also see some sort of remnants from shelving or

24  something that was installed.  Some -- yeah.

25  Q.  All right.  And again, there is another gap here.  This is,

Greenberg - Recross

1  again, taken in the office/bedroom.  And then, this is going to

2  the -- is this the washer/dryer room from that office/bedroom?

3  A.  I can't see the whole picture.  I can just see a threshold

4  and a door right now.

5          MS. DODGE:  Okay.  Let me see if I've got -- no.

6  We're going back to that one.  All right.  Well, that's all

7  right.  We'll skip that one.

8          But I see here, it looks like on the -- oh, goodness.

9  Hold on.  Did my whole -- did the whole screen just go away?

10  Yes.

11          THE COURT:  Yep.

12          MS. DODGE:  Sorry.  We're looking at your desktop.  I

13  hope you don't have any --

14          MS. DODGE:  I know.

15          THE COURT:  -- personal things there.

16          MS. DODGE:  I know.  I don't know how to get it back

17  now.  I just reduce, and now I'm trying to get it back.  Wait.

18  Oh, no.  Did I just, like, X out the whole thing?  Hold on.

19          THE COURT:  Well, maybe somebody --

20          MS. DODGE:  All right.

21          THE COURT:  -- wants us to stop looking at the

22  pictures.

23          MS. DODGE:  Oh, there we go.  They came back.  Okay.

24  Yeah.  Anyway, let me just ask one more question about this,

25  then I'm done.

Greenberg - Recross

1  Q.  Okay.  So right here in front of this doorway, there is two

2  holes, it looks like, on the floor there too, correct?

3  A.  That's what I was identifying earlier.  I don't know what

4  these are, it's just speculation on my part, but I'm guessing

5  that somebody had a shelving unit or some type of -- some type

6  of thing that was, you know, secured or mounted to the floor in

7  some way.  Some prior owner or a resident.

8  Q.  Okay.

9  A.  I don't have an explanation for that.

10  Q.  Okay.  Okay.

11  A.  I -- I received that way.

12         THE COURT:  But what do we see at the top of the

13  picture there?  Is that a door?

14         THE WITNESS:  That -- I -- I can't see the top of the

15  picture.

16         THE COURT:  Well, there.  Right there.

17         MS. DODGE:  Yeah, that's -- right there.  That goes to

18  the very top.  I believe --

19         THE WITNESS:  But my --

20         MS. DODGE:  -- you had told me, Mr. -- I would just

21  represent, I believe you had told me this was the door that

22  went into the washer and dryer room that's shared by both

23  units.

24         THE WITNESS:  If that is the door at the far end away

25  from the kitchen of the room that I use as an office --

(973) 406-2250 | operations@escribers.net | www.escribers.net

Greenberg - Recross

1          MS. DODGE:  Right.

2          THE WITNESS:  -- that door does lead to the laundry --

3          MS. DODGE:  Yeah.

4          THE WITNESS:  -- room and it --

5          MS. DODGE:  Yeah.

6          THE WITNESS:  -- is locked.

7          MS. DODGE:  Yes.  That's, I believe, where it was

8   taken.  Okay.  Let me stop the share now because I think we've

9   seen enough pictures of the floor.  Just one other quick

10  question.

11  BY MS. DODGE:

12  Q.  When you bought the property, was the upper unit habitable?

13  A.  I guess that -- that's a technical term.  There had been a

14  tenant in it prior to our buying it up and to a certain

15  point --

16  Q.  Um-hum.

17  A.  -- but it hadn't been cared for in quite some time.  So --

18  Q.  Right.  But is it --

19  A.  -- it wasn't habitable for -- for me.

20  Q.  Was it possible that you could have moved into that unit

21  before doing renovations?

22  A.  Not for me.  It -- it -- it -- it -- it really needed a lot

23  of help.

24  Q.  Okay.  But it had a -- it had a working -- a kitchen and it

25  had a working bathroom, that type of thing?

Greenberg - Recross

1    A.   Yes.

2    Q.   Okay.  That's fine.

3    A.   Things were functional, but it was very dirty.

4    Q.   Okay.

5    A.   And the same tenant had been in place there for a quite a

6    long time.  And there hadn't been any -- any care to it for --

7    Q.   Okay.

8    A.   -- quite a long time.

9            MS. DODGE:  Okay.  All right.  I don't have anything

10   else.

11           Thank you, Mr. Greenberg.

12           THE COURT:  Okay.  Mr. Lapping, I think we're done

13   here.

14           MR. LAPPING:  Yep.  Yes.

15           THE COURT:  Okay.  So what's next?

16           Mr. Greenberg, you are not -- you are free to leave,

17   but you're not on the witness stand anymore.  You're obviously

18   welcome to stay.  You're the client.

19           But Mr. Lapping, do you have another witness?

20           MR. LAPPING:  Well, I did, Your Honor.  I mean, I just

21   got -- I could offer to bring in Mr. -- what is his name --

22   Dennis Webb, who could talk about the need to do various work.

23   It wouldn't necessarily be strictly on his estimate, but he

24   would talk about -- I would offer him to prove what ought to be

25   done to repair the damage in the unit.

Greenberg - Recross

1        MS. DODGE:  Your Honor, we would again oppose that,

2    and I believe Your Honor already ruled on the motion in limine

3    regarding Mr. Webb and his estimate.

4        THE COURT:  Yeah, I did.  So.  So you're going to rest

5    your case?

6        MR. LAPPING:  Oh, no, Your Honor.

7        THE COURT:  Okay.  Okay.  Well, I understand you want

8    to argue documents.  I wasn't trying to trap you here.  I'm

9    just trying to accommodate witnesses.

10        MR. LAPPING:  Right, Your Honor.  Okay.  So I do, and

11    let's hold off on that.  We'll do that at the end.

12        THE COURT:  Do you have any other -- do you have any

13    other witnesses?

14        MR. LAPPING:  I don't have any other live witnesses.

15        THE COURT:  Well, do you have any other kind of

16    witnesses?

17        MR. LAPPING:  Well, I have documentary evidence.  I

18    have documentary evidence that's very important to this case.

19        THE COURT:  I was just distinguishing between live

20    witnesses and the other kind.

21        Ms. Dodge, do you have any witnesses to call?

22        MS. DODGE:  Yes, I have got two.  And I've just gotten

23    in touch with one.  He should be logging on.  I don't know --

24    is Ms. Parada -- I'd like to call David Brown.

25        THE COURT:  Okay.  Ms. Parada, are you with us still?

Greenberg - Recross

1          THE CLERK:  Yes, Your Honor.  I don't see he's logged

2     in just yet.

3          MS. DODGE:  Oh, he's not logged in?  All right.  Let

4     me mute my audio just for a moment, and I will call him to --

5          THE CLERK:  Oh, there he is.

6          MS. DODGE:  Oh, he is on?

7          THE CLERK:  He is here.  Yes.

8          MS. DODGE:  Okay.

9          THE CLERK:  I'll bring him in now.

10         MS. DODGE:  Thank you.

11         THE COURT:  Okay.  Mr. Brown, I see your name on the

12    screen.  Can you activate your camera and your microphone,

13    please?

14         MR. BROWN:  Very good.  Can you hear me?

15         THE COURT:  Yes, sir.  Okay.  Mr. Brown, you're about

16    to be sworn in as a witness in the PG&E-Greenberg trial.

17         Ms. Parada, would you swear in Mr. Brown?

18      (Witness sworn.)

19         THE CLERK:  Thank you.  Please state your name and

20    address for the record.

21         THE WITNESS:  David Brown.  37 Ash Avenue, Quarter

22    Madera, California --

23         THE COURT:  Thank you.

24         THE WITNESS:  -- 94925.

25         THE COURT:  Thank you, Mr. Brown.  Good afternoon.

(973) 406-2250 | operations@escribers.net | www.escribers.net

Brown - Direct

1      Ms. Dodge.

2      MS. DODGE:  Thank you, Your Honor.

3 DIRECT EXAMINATION

4 BY MS. DODGE:

5 Q.   Mr. Brown, you currently work for PG&E?

6 A.   Yes.

7 Q.   Okay.  Can you tell us your job title?

8 A.   I'm a senior new business rep with PG&E, which is

9 essentially a project coordinator.

10 Q.   Okay.  And you were the project coordinator -- or I'm

11 sorry.  Are you familiar with the work that was done by PG&E at

12 31 Bolinas in Fairfax in 2015 and 2016?

13 A.   Yes.

14 Q.   Can you give us just a brief description of the project?

15 What was being --

16 A.   At their -- sure.  At the request of the -- the property

17 owner at 31 Bolinas, they were in need to upgrade both their

18 gas and electric services to the building for the -- during the

19 remodel.

20 Q.   Okay.  And were they adding new service meters as well?

21 A.   They're increasing the size of their gas and electric

22 needs, as well as adding meters to the -- to the -- for the new

23 services.

24 Q.   Okay.  And did PG&E hire a contractor to assist it with

25 this particular project?

(973) 406-2250 | operations@escribers.net | www.escribers.net

Brown - Direct

1    A.   Yes.

2    Q.   Okay.  What contractor was that?

3    A.   Veteran Power --

4    Q.   Okay.

5    A.   -- or VPI.

6    Q.   And what was Veteran Power hired to do?

7    A.   They were the civil or trenching agent for all this

8    substructure and underground-related conduit work in support of

9    the electric.

10   Q.   So what kind of work does that entail?

11   A.   Trenching.  Excavating.  Also installing conduits and

12   utility vaults.

13   Q.   Okay.  And this job took place during 2015 and 2016,

14   correct?

15   A.   Yes.

16   Q.   Okay.  And in order to upgrade the service as requested by

17   the customer, is an outage necessary?

18   A.   An outage is necessary, yes.

19   Q.   Okay.  And how many outages happened on this particular

20   job?

21   A.   There were, I believe, two outages.  One -- one, which was

22   canceled, and then that was followed up by the one in April

23   for -- for the final connection.

24   Q.   Okay.  So in order to upgrade the service, does it require

25   a sustained a longer term outage?

(973) 406-2250 | operations@escribers.net | www.escribers.net

Brown - Direct

1    A.   It did, yes.

2    Q.   Okay.  So what was the date of the first outage that took

3    place?

4    A.   The -- the actual outage or the request for the outage?

5    Q.   I'm sorry.  Let me back up for a minute.  When was the --

6    when was the outage originally scheduled for this job?

7    A.   The original scheduling of the outage was December of 2015.

8    Q.   Okay.  And did that take place?

9    A.   No, it did not.

10   Q.   Okay.  Why not?

11   A.   When the -- the crews arrived for the excavation work, they

12   realized the size of the utility vault that we needed would not

13   fit in the space that it was originally intended to go into.

14   So as a result, they -- they canceled the outage.

15   Q.   Okay.  And did the job get sent back to estimating?

16   A.   Yes.  As a result of the original location not working,

17   they returned the job back to estimating to find a --

18           THE COURT: To do what?

19           THE WITNESS:  To find a better location for this

20   utility vault.

21           THE COURT:  Okay.

22   Q.   And I believe you said that the first outage was March

23   16th, 2016.

24   A.   Well, the first one -- the first intended one was December

25   of 2015.

Brown - Direct

1  Q.  Right.

2  A.  But as I noted, the -- the vault didn't -- the location

3  didn't work, so the second one was in March of 2016.

4  Q.  Okay.  So just to clarify, there was no outage in December

5  of 2015, correct?

6  A.  That's correct.

7  Q.  Okay.  And then the outage was scheduled to take place on

8  March 16th of 2016?

9  A.  Yes.

10 Q.  Okay.

11 A.  Yes.

12 Q.  And that was going to be the sustained outage, right, to

13 implement the new upgraded service?

14 A.  That's right.  During -- during the night.

15 Q.  Okay.  And did that take place?

16 A.  No, it did not.

17 Q.  Okay.  Why not?

18 A.  With the new location that was proposed for this utility

19 vaults the crews again ran into a conflict of an unknown

20 utility that was not marked.  It wasn't a PG&E utility.  And

21 because of the congestion in the streets, the second proposed

22 location didn't work either, so the outage had to be canceled.

23 Q.  Okay.  And the outage -- there was an outage, I think you

24 said then the sustained overnight outage was in April; is that

25 right?

Brown - Direct

1   A.  Yes, that's right.

2   Q.  Okay.  And was that when the actual upgraded service was

3   implemented?

4   A.  That's, yes, when we were able to incorporate all the new

5   facilities into our circuitry, that's when the sustained outage

6   occurred.

7   Q.  Okay.  Were there any outages on this job, the 31 Bolinas

8   job, between February 14th and February 22nd, 2016?

9   A.  No.

10  Q.  And during that same time period, to your knowledge, was

11  any work being done by PG&E on the San Rafael 1108 Circuit that

12  supplies power to those properties during that time?

13          MR. LAPPING:  Objection.  Vague and ambiguous.  This

14  description is meaningless from what I can tell.

15          THE COURT:  Okay.  Let's lay a better foundation for

16  the question to have sense.

17          THE COURT:  Mr. Lapping broke up during his objection.

18  I didn't -- did you say vague and ambiguous?

19          MR. LAPPING:  Yes.

20          THE COURT:  And I think you need to lay a foundation

21  of what that San Rafael 1108 was and --

22          MS. DODGE:  Okay.

23          THE COURT:  -- unless there's any other alternatives

24  that could have been in place.

25          MS. DODGE:  All right.  Okay.

Brown - Direct

1    Q.   Mr. Brown, I want to ask you.  Is there a difference

2    between work being done by Veteran Power and work being done by

3    PG&E in terms of what they were -- and I'm sorry.  That's a bad

4    question.  Let me back up.

5        What is the name of the circuit that provides power to 47

6    Bolinas and 31 Bolinas?

7    A.   I think, as you mentioned, it was the San Rafael, but I

8    don't remember the circuit number specifically.

9    Q.   Okay.  I'll represent it's 1108, just so you know.

10   A.   Okay.

11   Q.   Okay.  And to your knowledge, was any work being done by

12   PG&E on that particular circuit during February 14th through

13   22nd of 2016?

14   A.   Specifics of this, the work at 31 Bolinas, no.

15   Q.   Okay.

16         MS. DODGE:  I want to share my screen.  I want to show

17   you an exhibit.  This is PG&E Exhibit 7.  No, not 17.  I'm

18   sorry.  Let me back up.  It is Exhibit 11.  And I will share my

19   screen right now.  Okay.

20   Q.   Can you see my screen, Mr. Brown?

21   A.   Yes.  I can, yes.

22   Q.   Is this an email that you wrote to Mark Lockaby on February

23   29th, 2016?

24   A.   That's correct.  Yes.

25   Q.   Okay.  And the second -- and I'm sorry.  The cc to Brad

Brown - Direct

1  Schwan.  Do you see that?

2  A.  He's -- he was my customer for this project, yes.

3  Q.  Is Brad Schwan the owner of 31 Bolinas?

4  A.  I'm not sure if he's the owner, but he was my point of

5  contact throughout this project at 31 Bolinas.

6  Q.  Okay.  All right.  And the second -- your sentence there,

7  the paragraph to Brad, you make reference to an outage.  And

8  I'll just read the sentence to you.  You said that you would,

9  "have the new service hotted up this week.  However, scheduling

10 restraints due to the outage has pushed this activity out to

11 March 16th".  Do you see that?

12 A.  Yes, I do.

13 Q.  Okay.  What outage were you referring to there?

14 A.  For the second attempted outage, I was trying to have this

15 scheduled to meet his schedule, his needs, in February, but was

16 unable to, so it was never scheduled in February.  The date I

17 was given was March 16.

18 Q.  Okay.  So the outage that you're referring to there is the

19 outage that was scheduled for March 16th?

20 A.  Yes.

21 Q.  Okay.  All right.

22        MS. DODGE:  Let me stop sharing.

23 Q.  Want to ask you one other question here.

24        MS. DODGE:  And I'll share my screen in a moment.

25 Q.  This is PG&E -- or I'm sorry.  This is actually part of Mr.

Brown - Direct

1   Greenberg's exhibits.  It's a Veteran Power work report that's

2   dated April 6th.

3          MS. DODGE:  Hold on.  Let me pull it up.

4          THE COURT:  What's the number of that exhibit?

5          MS. DODGE:  EE, the daily work report.

6          Okay.  Can you see?  I'm sorry.  You can't see it,

7   because I haven't shared my screen.  Okay.

8          THE COURT:  Now, that's one that you've resisted.

9   That's only marked for identification.

10          MS. DODGE:  Right.  And I just want to ask Mr. Brown a

11   question about a sentence that is written in here.

12   Q.   There's a notation.  Can you see that, Mr. Brown?

13   A.   Yeah.  Not the -- you're at the -- if you scroll back to

14   the text.

15   Q.   Scroll up?

16   A.   Very good.

17   Q.   Can you see now?

18   A.   And maybe --

19   Q.   No?

20   A.   Maybe shrink it down a little bit, so I could see the -- up

21   a little bit, and then just shrink it down so I can see the

22   entire paragraph.

23   Q.   Okay.  Okay.

24   A.   There you go.

25   Q.   Okay.  There's a notation there about PG&E cutting the feed

Brown - Direct

1    on the box in front of 31 Bolinas with a streetlight that was

2    getting fed from there.  Do you see that?

3    A.  Yes, I do.

4    Q.  Okay.  Can you explain what that would involve or what was

5    being referenced there, to the extent you understand?

6    A.  Sure.  So the original service location for 31 Bolinas came

7    from a splice box.  Also in that splice box was a streetlight,

8    which is a city owned facility.  So when we made the conversion

9    to the new service in a new splice box, that feed to the

10   streetlight was disconnected, because the city had not run a

11   new feed to the news splice box, which is where we were to feed

12   the streetlight.

13   Q.  Okay.  And then would that be PG&E's responsibility to

14   connect that feed?

15   A.  No.  Maybe to connect the feed, yes, but not to reroute to

16   the new location.

17   Q.  Okay.  So they would disconnect the feed from the old box,

18   correct?

19   A.  Yes.

20   Q.  Okay.  And then it, as you said, the streetlight's a city

21   owned facility, correct?

22   A.  Yes, it is.

23   Q.  Okay.  And then that's not owned by PG&E?

24   A.  No.

25   Q.  Okay.

Brown - Direct

1  A.   We just make the connection for it.

2  Q.   Right.  Okay.  And what we just discussed, would that be an

3  expected part of an upgrade of power?

4  A.   Yes, to -- in order to regain service with the

5  rearrangement of facilities, it would be expected that the

6  streetlight was -- ran to the new box --

7  Q.   Okay.

8  A.   -- for us to -- for PG&E to connect.

9  Q.   And the date here, 4/6/2016, is that the date of the actual

10 outage?

11 A.   Yes.

12 Q.   Okay.

13        MS. DODGE:  All right.  I don't have any other

14 questions.

15        Oh, let me stop sharing.

16        Thank you, Mr. Brown.

17        THE COURT:  Mr. Brown --

18        THE WITNESS:  Sure.

19        THE COURT:  Just one question from me.  So do I

20 understand the only source of power to 31 and 47 Bolinas is the

21 San Rafael 1108?

22        THE WITNESS:  I believe that's right, yes.  Yes.

23        THE COURT:  And this notion of the light being

24 disconnected, that's just something that happened when it

25 happened, and then, I mean, therefore what?  I mean, it had to

Brown - Direct

1  be corrected, but it nothing to do with the service upgrade for

2  the owner at 31, right?

3          THE WITNESS:  No.  It didn't impact 31.  It just

4  impacted that streetlight that --

5          THE COURT:  That's just that --

6          THE WITNESS:  -- no longer had power.

7          THE COURT:  -- PG&E or its contractor had to put the

8  thing back together and let the city hook up its streetlight,

9  right?

10          THE WITNESS:  Right.  Or re-reroute the streetlight --

11          THE COURT:  And I'm being layman.

12          THE WITNESS:  -- to the box.

13          THE COURT:  Turn the light on.

14          THE WITNESS:  Right.  Right.

15          THE COURT:  Okay.  All right.  Mr. Lapping, do you

16  have questions for Mr. Brown?

17          MR. LAPPING:  Yes, Your Honor.

18  CROSS-EXAMINATION

19  BY MR. LAPPING:

20  Q.  So Mr. Brown, did I understand you to say that in December

21  of 2015 that there was a planned outage at 31 Bolinas Avenue?

22  A.  Yes.

23  Q.  And that was in connection with what aspect of the project?

24  A.  Well, at that point we had felt all the civil work was done

25  except for this utility vault that was going to go in during

Brown - Cross

1    that outage, so that was ideally going to be the last portion

2    of the job.

3    Q.  So when you say the civil work, you mean the construction

4    work related to the buildings, and is it correct to say that

5    the owner is obligated to basically do all the construction out

6    to the sidewalk?  Is that a correct statement?

7    A.  Yes.

8    Q.  And then --

9             MS. DODGE:  Ambiguous.

10            THE COURT:  I'm sorry.  I didn't hear the objection.

11            MS. DODGE:  I said vague and ambiguous.  He said --

12            THE COURT:  That's okay.  He answered it.

13            MS. DODGE:  Okay.

14   Q.  And then PG&E basically does the construction, or the civil

15   construction for the vault, which is, I guess, originally was

16   going to be under the sidewalk, and then became under a street,

17   and basically connects those two processes; connects the PG&E

18   grid with the owner's project at the sidewalk.  Is that a fair

19   statement?

20            MS. DODGE:  Objection.  Vague, ambiguous.  Assumes

21   facts not in evidence.

22            THE COURT:  Do you understand the question, Mr. Brown?

23            THE WITNESS:  I do, yes.

24            THE COURT:  Okay.  You can answer it.

25   A.  So yes, the customer is responsible for work on his

Brown - Cross

1    property to the street, and then PG&E essentially works in the

2    franchise or public right of way for the substructure.  So

3    there is a meeting in this splice box that I referenced before

4    of the -- that the two groups were.

5    Q.   Okay.  And do you know what day in December that the

6    project was delayed?

7            MS. DODGE:  Objection.

8    A.   I don't have --

9            MS. DODGE:  Misstates the testimony.

10           THE COURT:  Go ahead.  You can answer.

11   A.   I don't have a specific date in December that I'm --  that

12   I'm aware of or I recall.

13           MR. LAPPING:  Okay.  I'm going to share a screen here.

14   Let's see if this works.  Okay.  Can everybody see the screen?

15   Can anybody see the screen?

16           THE WITNESS:  Yes.

17           MS. DODGE:  Yes.

18           MR. LAPPING:  Okay.

19   Q.   I'll represent to you this is a daily work report from

20   Veteran Power, and it is dated somewhere along the line.

21           MS. DODGE:  Up at the top.  At the top.

22           MR. LAPPING:  Up at the top.  Thank you.

23           MS. DODGE:  There you go.

24   Q.   December 1, 2015.  Mr. Brown, could --

25           THE COURT:  Somebody's phone's ringing.

Brown - Cross

1          THE WITNESS:  Sir, it's my -- it's a spam call.

2          MS. DODGE:  Can you just hang up and --

3          THE WITNESS:  Sure.  Hold on one second.

4          THE COURT:  Oh, take the call.  It's probably your car

5     warranty.

6          MS. DODGE:  I get those all the time.

7          THE WITNESS:  Sorry about that.

8          THE COURT:  So do we all.

9          Mr. Lapping, while we're waiting, what's this exhibit

10    number?

11         MR. LAPPING:  O as in Oscar.

12         THE WITNESS:  Could you shrink the report?  I can't

13    see it.  I don't see the full page.

14         MR. LAPPING:  Okay.  Just let me do this.

15         MS. DODGE:  Well, not that small.  I can't read it.

16         MR. LAPPING:  How's that?

17         MS. DODGE:  No, that's too small.  Bigger.  There.

18    Q.  So Mr. Brown, is this the event that you described earlier

19    that basically it was identified as needing to delay the

20    project?

21    A.  Yes.

22         MS. DODGE:  Objection.  Misstates testimony.

23         Please wait for me to get my objection on the record.

24    Thank you.

25    Q.  And so this is the day that PG&E was out there and made a

Brown - Cross

1  decision not to go forward that day?

2      MS. DODGE:  Objection.  Again, misstates testimony.

3      MR. LAPPING:  All right.

4  Q.  All right.  Mr. Brown, you correct me.  What was happening

5  on December 1st from your point of view?

6      MS. DODGE:  Again --

7  A.  Well this --

8      MS. DODGE:  -- objection.  Calls for speculation.

9  You're asking him about a document that he didn't create.

10      THE COURT:  Yes, but look.  I think we're kind of

11  drifting around here, so I'll ask the question.

12      Mr. Brown, is this the reason why the planned outage

13  didn't happen in December?

14      THE WITNESS:  Yes.  This describes what I described

15  prior in -- where --

16      THE COURT:  Right.  So this is --

17      THE WITNESS:  The issue is --

18      THE COURT:  This is --

19      THE WITNESS:  -- true.

20      THE COURT:  This is Veteran Power reporting a

21  condition that prevented it and therefore prevented the outage

22  from ever even happening in December.

23      THE WITNESS:  Yes, that's correct.

24      THE COURT:  So Mr. Lapping, if we need to establish

25  anything further by this, go ahead, but I don't know what else

(973) 406-2250 | operations@escribers.net | www.escribers.net

Brown - Cross

1   is relevant, because there --

2           MR. LAPPING:  Well, I have a question.

3           THE COURT:  That's okay.

4   Q.  As you understand it, Mr. Brown, Veteran Power does

5   trenching and civil work, basically heavy construction to

6   create a space for the vault; is that correct?

7   A.  Yes.

8   Q.  So why would PG&E schedule an outage in connection with the

9   trench work?

10          MS. DODGE:  Objection.  Assumes facts not in evidence.

11  Misstates testimony.

12          THE COURT:  Well --

13          MS. DODGE:  I don't -- I don't know what the question

14  is.

15          THE COURT:  Again, can you answer the question, Mr.

16  Brown?  I don't want to get bogged down on misstating facts.

17  Do you understand the question?

18          THE WITNESS:  I do.  I do.  So any significant planned

19  outage typically takes two to three weeks to request and to be

20  approved by our -- what we call our distribution operators.  So

21  they give us a date, say, three weeks in advance.  That's your

22  power plans for that date.  And I believe three days prior they

23  have to call Underground Service Alert (USA) for us to -- and

24  other utilities to mark and locate utilities in the ground.  So

25  they wouldn't know three weeks in advance of what complex there

Brown - Cross

1    may be until a few days prior, and in this case, the night of.

2    Q.  And so the plan was for Veteran Power to come out and dig a

3    trench, and then the electricity would be shut off for some

4    period of time?

5    A.  Yes.

6    Q.  And what is accomplished?  Why is it necessary to turn off

7    the -- to have an outage, a planned outage, in connection with

8    the -- right after you dig a trench?

9    A.  Well, the -- so in this location, this is a circuit.  This

10   is the San Rafael Circuit.  We have to break the circuit by

11   intercepting it with this new piece of equipment, a

12   transformer.  So you have to deenergize that line to allow for

13   a new piece of equipment to be interconnected into the existing

14   circuit.

15   Q.  Well, was that scheduled to happen on December 1, or when

16   was that scheduled to happen?

17            MS. DODGE:  Objection.  Asked and answered.

18   A.  That was during the outage.

19            THE COURT:  Yes.  Again we're -- I mean, Mr. Lapping,

20   why?  We know it didn't happen in December.  So why are we

21   spending time on this question?

22            MR. LAPPING:  Well, because I think it's important to

23   understand that -- I'm not sure this witness understands the

24   project, or at least I didn't understand the evidence, because

25   I didn't realize that when the trenching was going on that

Brown - Cross

1    there was also a planned outage at the same time.  And that's a

2    rather significant development if there was likewise a planned

3    outage during the week of February 14th --

4             THE COURT:  But we have --

5             MR. LAPPING:  -- when they did the trenching.

6             THE COURT:  We have complete evidence, a hundred

7    percent evidence that there was no planned outage or actual

8    outage during the eight days.  So that's why I don't know why

9    we're bogged down on this.  But Mr. Brown said to me, and I'll

10   put it in layman's terms, when you have -- when you kind of --

11   when you're going to unplug the circuit to plug in a new

12   equipment, you have to have a hole in the ground to put it in.

13   So the contractor or the subcontractor digs the hole.  Somebody

14   says, okay, put this new transformer in and plug it in.  But

15   you got to unplug the system to plug it in and make it work.

16   So you can't do the new equipment until you have the trench to

17   mount it, and you don't go doing the outage until you're ready

18   to do the connection.

19            So but all of that is my story, my layman's

20   description.  But most importantly, nothing happened until

21   March, after the --

22            MR. LAPPING:  Your Honor, I was just confused by his

23   testimony that it was actually scheduled for December, before

24   they've even figured out where the vault was going to be

25   located.

Brown - Cross

1    THE COURT:  But he just got through saying that they

2    need to lead it by weeks.  And then the contractor says, we

3    can't do it, because we found this -- what's it say up on the

4    top here?  "No location was found in the alley to install the

5    new box.  There were too many conflicts."  So that, to me, in

6    layman's term, is the sub saying, we can't do the deal in

7    December, and therefore everything follows.  So there's no

8    outage, because there's no disconnect to occur.  And the same

9    is true in March.  And finally it all gets done in April.

10    Mr. Brown, have I got it right?

11    THE WITNESS:  Yes.  Now, maybe to further clarify, you

12    can't trench without an outage if it's new, but when it's

13    existing, and you're modifying that existing, that's where

14    outages typically occur.

15    THE COURT:  Okay.  Okay.  But I'm a layman.  I

16    simplified it.

17    THE WITNESS:  Yeah.

18    THE COURT:  Okay.  So Mr. Lapping, there's no outage

19    during our eight days in February.

20    MR. LAPPING:  Okay.  I stand corrected, I guess.

21    Q.  So Mr. Brown --

22    MR. LAPPING:  Let me take this down.

23    Q.  At some point did you or did PG&E authorize the conversion

24    of the project, or authorized service to all the new tenants

25    located at 31 Bolinas in mid-January?

Brown - Cross

1          MS. DODGE:  I'm just going to object.  This goes

2    beyond the scope of direct.

3          THE COURT:  That's okay.  This is all purpose

4    discovery here.  I mean examination.

5          MR. LAPPING:  Find them on my direct list, Your Honor.

6          THE COURT:  Yes.  Overruled.  Go ahead.

7          You understand the question, Mr. Brown?

8          THE WITNESS:  No.  No.  He said authorized?  Re --

9    Q.  Well, did there come a point where the service for new

10   customers at 31 Bolinas needed to be connected before the 31

11   Bolinas three-phase project had actually been completed?

12         MS. DODGE:  Objection.

13   A.  No.

14         MS. DODGE:  Unintelligible.

15         THE COURT:  Well --

16         MS. DODGE:  I don't understand.  But I don't

17   understand the question.  I'm sorry.  I missed or --

18         THE COURT:  Okay.  I'll go back to my test.

19         Mr. Brown, did you understand the question?

20         THE WITNESS:  I would ask, if you could ask again.

21         THE COURT:  Okay.

22         THE WITNESS:  I wasn't fully clear.

23         THE COURT:  Break it down.  Mr. Lapping, break it down

24   into parts, because I found it a little confusing also.

25   Q.  Well, so at some point you needed to transfer electricity.

Brown - Cross

1    Well, you needed to connect up electricity at 31 Bolinas.  It

2    was already connected; is that right?

3    A.  Yes.  Yes.

4    Q.  And there was a decision made that the load required, the

5    expected load from the new restaurant and the new customers

6    required an upgrade to three-phase power; is that right?

7    A.  A bigger service, yes.

8    Q.  A bigger service.  All right.  And the bigger service was

9    scheduled to go in initially in December, then in March, and

10   finally it went in in April; is that right?

11   A.  Yes.

12   Q.  Now, before that happened, in January of 2016, did all of

13   the new customer go in and start using electricity from the old

14   system?

15        MS. DODGE:  Objection again.  Vague, ambiguous.

16   Unintelligible.

17        THE COURT:  You understand the question?

18        THE WITNESS:  I do.

19   A.  And you know, they were still using the original power.

20   They --

21   Q.  Right.  It was a temporary --

22   A.  They didn't have the --

23   Q.  It was a temporary accommodation to allow them to use the

24   original power; is that right?

25   A.  I don't know if it's temporary.

Brown - Cross

1      MS. DODGE:  Misstates testimony.

2      THE COURT:  Okay.  I'm going to overrule the

3  objection.  He answered the question.  The old customers were

4  using the existing power until the ultimate hookup occurred in

5  April.

6      MS. DODGE:  Right.

7  A.  And I don't know if there were tenants.  I don't know what

8  tenants were in there during construction, if there were any at

9  all.  It may have been a vacant building during the remodel.

10      THE COURT:  Again, Mr. Lapping, what difference does

11  it make what the customers were doing?  The owner, the owner of

12  the property, was the PG&E party, the customer, and they were

13  doing the work for that owner.  So what difference would it

14  make what his customers were doing?

15      MR. LAPPING:  Well, Your Honor, they're all on the

16  same circuit, and the idea is to upgrade the power, because

17  it's insufficient, and yet everybody comes online and starts

18  using insufficient power, it may have caused a problem.

19      THE COURT:  Well, then ask him.  But it didn't cause

20  an outage.  So if you want to ask him if additional customers

21  on 14th of February caused a problem, go ahead and ask him.

22  Q.  Well, I mean, are you aware --

23      MR. LAPPING:  He seems to be unaware of whether the

24  customers were there or not.  And I think he can't really --

25  he'd be speculating at this point, so --

Brown - Cross

1          THE COURT:  But Mr. Lapping, we've been spending half

2     the day determining there were no outages.  None during these

3     days.

4          MR. LAPPING:  Your Honor, our case does not depend on

5     outages.

6          THE COURT:  Well, if you want to talk about

7     fluctuations or things like that, go ahead.  But the term

8     outage, we said there were none.  Ask him about something else

9     if he knows.

10          MR. LAPPING:  Well, Your Honor, he's not an expert in

11     electricity, so I'm going to pass on the witness.  That's fine

12     for me now.

13          THE COURT:  Okay.  Ms. Dodge, any further questions?

14          MS. DODGE:  I have no redirect, Your Honor.

15          THE COURT:  Okay.  Mr. Brown, thank you for joining us

16     this afternoon.  You're excused.  And you can stay if you want,

17     but you can leave if you want.

18          THE WITNESS:  Okay.  Thank you very much.

19          THE COURT:  All right.

20          MS. DODGE:  Thank you.

21          THE COURT:  All right.

22          THE WITNESS:  Right.

23          THE COURT:  Ms. Dodge, any other witnesses?

24          MS. DODGE:  Yes.  I'd like to call Dustin Perkins.

25          THE COURT:  Okay.  Ms. Parada, can you bring Mr.

Brown - Cross

1    Perkins in?

2           THE COURT:  Okay.  Mr. Perkins, let's you turn on your

3    camera and your microphone.

4           Okay.  We got a camera.

5           And good afternoon.  Welcome to the bankruptcy court.

6    Can you hear me?

7           MR. PERKINS:  I can hear you.

8           THE COURT:  Okay.  Ms. Parada, would you swear in Mr.

9    Perkins, please.

10          THE COURT:  I couldn't hear you, Mr. Perkins.

11       (Witness sworn.)

12          THE CLERK:  Thank you.  Please state your name and

13   address for the record.

14          THE WITNESS:  (Inaudible).

15          THE COURT:  I'm having trouble hearing Mr. Perkins.

16   Are the rest of you hearing him?

17          THE CLERK:  I am too.

18          Can you turn up your microphone, Mr. Perkins?  It's

19   not coming through very loudly.

20          THE WITNESS:  It's on the way out.  So I have to -- I

21   have to call in and figure out a phone put on the --

22          THE COURT:  I can't hear the witness.

23          So Mr. Lapping, can you hear him?

24          MR. LAPPING:  No, not at all, Your Honor.

25          MS. DODGE:  Do you want to stay on video and call in?

Brown - Cross

1          Is he able to do that, Ms. Parada?

2          THE WITNESS:  (Indiscernible)

3          THE CLERK:  I can hear you a little bit better now.

4          THE WITNESS:  Oh, you can?

5          THE CLERK:  Yeah, that's better.

6          THE WITNESS:  Oh.  Okay.

7          THE CLERK:  Now I can hear you.  Yeah.  Just keep

8     your --

9          THE WITNESS:  All right.

10          THE CLERK:  Keep your voice up, and I think we'll be

11     able to hear you.

12          THE WITNESS:  Okay.

13          THE CLERK:  Okay.  Thank you.

14          THE WITNESS:  So once again, my name is Dustin

15     Perkins.  My address 2391 Laylani Court, Santa Rosa, California

16     95403.

17          MS. DODGE:  Not optimal, but this shouldn't take too

18     long.

19     DIRECT EXAMINATION

20     BY MS. DODGE:

21     Q.  Mr. Perkins, what was your position with PG&E in 2016?

22     A.  I was a senior claims investigator.

23     Q.  Okay.  And you handled a claim filed by Todd Greenberg,

24     correct?

25     A.  Correct.

Perkins - Direct

1  Q.  Okay.  And what was the basis of his claim?

2  A.  Mr. Greenberg was alleging some damage to his refrigerator

3  that led to water leakage (indiscernible) floor and the kitchen

4  of his home.

5  Q.  Okay.

6       MS. DODGE:  Your Honor, can you hear, Mr. Perkins?

7       THE COURT:  It sounds like there's a lot of feedback.

8  I wonder if he's got another mic.  Two things are creating the

9  feedback.  I'm having trouble hearing him.

10      MS. DODGE:  Do you have headphones, Mr. Perkins?

11      THE WITNESS:  Let me -- I'll try to call in.  Let me

12 try to call in first, okay?  I don't have headphones.

13      MS. DODGE:  Okay.  Try -- yes.

14      Ms. Parada, is he able to call in?  He can't?

15      THE CLERK:  No.  If he disconnects and tries to

16 rejoin, maybe he'll get a better connection, but there's no way

17 to patch in a phone call to a webinar.

18      THE WITNESS:  Okay.

19      MS. DODGE:  Okay.  All right.  Let me just -- I'll try

20 and make my questions very brief, then.

21      THE WITNESS:  Okay.

22 Q.  Okay.  What type of investigation did you do to look into

23 Mr. Greenberg's claim?

24 A.  Well, I met with Mr. Greenberg to inspect the damages that

25 he was claiming to his floor.  And then I came back, and my

Perkins - Direct

1    investigation involved researching the outage history at

2    various locations to determine if there was an outage --

3            THE COURT:  And this isn't working, Ms. Dodge.

4            MS. DODGE:  I know.

5            THE COURT:  There's just too much feedback.  I think

6    it's something at Mr. Perkins' end.  If he knows if he's got a

7    second microphone it's -- and if you think he doesn't, this is

8    why we like to practice with witnesses.

9            MS. DODGE:  I know.

10           THE COURT:  Mr. Lapping, are you satisfied with this

11   quality?

12           MS. DODGE:  I can't hear it either.

13           MR. LAPPING:  No, Your Honor.

14           THE COURT:  Okay.  We got a couple of choices.  We can

15   resume later, tomorrow, which none of you wants to do.  We can

16   switch to audio, in which case it'll be the same.  Mr. Lapping

17   will complain the way you complained about the other witness,

18   but that'll work.

19           What do you suggest, Ms. Dodge?

20           MS. DODGE:  Well, I really have basically three

21   questions.  If we can -- can you understand --

22           Mr. Perkins, can you speak up very loudly and speak

23   loudly and slowly?  Try that.

24           THE COURT:  I don't think it's the speed.  It's the

25   echo.  And again, Mr. Lapping has to hear it too.

(973) 406- operations@escribers.net | www.escribers.net

Perkins - Direct

1          MS. DODGE:  Right.

2          THE COURT:  Let's try it again, Mr. Perkins.  Just say

3    something.  Just state your name again so we can see if we can

4    hear you better.

5          THE WITNESS:  My name is Dustin Perkins.

6          THE COURT:  No, your feedback.  You got echoing.  Have

7    you done Zoom before, either personal life or professional

8    life?  It's a first --

9          THE WITNESS:  (Indiscernible).

10         THE COURT:  Well, Ms. Dodge, this isn't acceptable.

11         MS. DODGE:  All right.

12         THE COURT:  So --

13         MS. DODGE:  Yes, I know it's not working.  Okay.

14         THE COURT:  So I can try tomorrow if we have to, or we

15   can do it by phone or -- those seem to be the choices.  Unless

16   you want him to log all the way out and all the way back in

17   again, but I thought we tried that.

18         MS. DODGE:  Yeah.  Let's give that one try.

19         So Mr. Perkins, can you log out and in and make sure

20   your microphone's all the way up, and maybe it's a bad

21   connection.

22         THE COURT:  Maybe the microphone is too far up.

23   Again, I've had experience with this feedback that we're

24   getting where we hear.

25         Ms. Parada, do you have any suggestions that he can

Perkins - Direct

1    try?

2        THE CLERK:  The only suggestion right now is to log

3    out and log back in, and see if that works.

4        THE COURT:  Okay.  Mr. Perkins, go ahead and --

5        MS. DODGE:  Would it be possible -- I'm wondering if

6    I -- if Mr. Perkins turned down the sound on his, and I was

7    able to call him on his cell phone, and put the cell phone next

8    to mine so you could see him talking, but then the audio would

9    be better?  Or no?

10        THE COURT:  Ms. Parada is my guru here.

11        THE CLERK:  That may work, depending on the sound of

12    the cell phone.

13        MS. DODGE:  Mr. Perkins, turn your volume all the way

14    down, and let me call you on your cell phone and see if that

15    works.  If we get feedback or something, it doesn't work, then

16    at least we've tried.  Okay.  I'm going to call you right now.

17        THE WITNESS:  Hello.

18        MS. DODGE:  Okay.  Can you hear this?

19        THE WITNESS:  Yeah.  I'm getting feed -- I'm getting

20    feedback on my end.

21        MS. DODGE:  What about the judge, and what about Mr.

22    Lapping?

23        THE COURT:  Mr. Lapping?

24        MR. LAPPING:  Yeah, I can hear a little bit of

25    feedback.  It's better.  The quality is better than it was.

Perkins - Direct

1    THE COURT:  Okay.  Let's try it.  That's the same

2  impression I have too.

3    MS. DODGE:  Let's try it.  Okay.

4  BY MS. DODGE:

5  Q.  What investigation did you conduct with regard to Mr.

6  Greenberg's claim?

7    THE WITNESS:  Oh, can you hear me?

8    MS. DODGE:  Yes.

9  A.  Okay.  So I had a personal inspection of the damages that

10  he was claiming, and then my investigation into what the cause

11  of the damages were, I went back and investigated all the

12  potential outages that may have affected his premises during

13  the time period in which he was alleging the damages occurred.

14  Q.  Okay.  And did you also go out to Mr. Greenberg's property

15  at some point to do an inspection?

16  A.  Yes.  Yeah, I met with him personally to do an inspection.

17  Q.  Okay.  And did you ever tell Mr. Greenberg that PG&E was

18  planning to pay his claim?

19  A.  No.  That would have been premature, because my inspection

20  predated my investigation into alleged outages, so why would I

21  tell him that the damages would be --

22  Q.  Okay.  Okay.

23  A.  -- would be fixed before I knew that there was actually

24  outages that affected his premises?

25  Q.  Do you recall if you ever used the terminology "line of

Perkins - Direct

1   sight" while you were out during your inspection of Mr.

2   Greenberg's property?

3   A.   No.  I don't believe I use that -- those terms.

4   Q.   Why not?

5   A.   Well, number one, it would have been premature for me to

6   talk about damages.  I was just there to, you know, investigate

7   and inspect the damages, number one.  Number two, line of sight

8   is an antiquated insurance term that used to be used by claims

9   adjusters in the past, but that's no longer a term that's used

10  in the insurance industry when determining damages.  And so

11  it's termed a uniform -- a reasonable uniform appearance now,

12  so I wouldn't have used line of sight.

13  Q.   Okay.  I would like to direct your attention to -- I'm

14  going to share my screen in just a moment -- to some

15  photographs.  One minute.

16       MS. DODGE:  This is Exhibit 4 for PG&E. I'm going to

17  share my screen.  We may make this a little bit bigger.

18  Q.   Can you see my screen here?

19  A.   Yes, I can.

20  Q.   Okay.  And are these photographs that you took during your

21  inspection on April 7th, 2016?

22  A.   Yes.

23       MS. DODGE:  I'm going to scroll down.

24  Q.   And this appears to be the inside of Mr. Greenberg's unit?

25  A.   It does.

(973) 406-2250 | operations@escribers.net | www.escribers.net

Perkins - Direct

1  Q.  Okay.

2      MS. DODGE:  I'm just enlarging here.  Front of the

3  refrigerator.  Okay.

4  Q.  Okay.  So you recognize those as photographs you took on

5  that day, yes?

6  A.  I do, yes.

7  Q.  Okay.  All right.

8      MS. DODGE:  Let me stop sharing.  One moment.  Okay.

9  Q.  And did you notice any type of visible staining on the

10  laminate flooring during your inspection?

11  A.  I don't recall any visible staining.  I do recall from, you

12  know, reviewing those photographs, you know, that last

13  photograph, it depicts some cupping that was indicative of, you

14  know, potential water damage.

15  Q.  Okay.  And you said that you checked PG&E's records

16  regarding outages during the time period when Mr. Greenberg was

17  away, correct?

18  A.  Yes.

19  Q.  Okay.  And did you find any outages affecting the property

20  during that time period from February 14th to 22nd, 2016?

21  A.  No outages affecting his premises.

22  Q.  Okay.  And did you deny the claim?

23  A.  I did.

24  Q.  Okay.

25      MS. DODGE:  And let me again share my screen.  Okay.

Perkins - Direct

1          Can you see the screen here?

2          THE WITNESS:  Yes.

3          MS. DODGE:  Okay.

4   Q.  And --

5          THE COURT:  What's the exhibit, please?

6          MS. DODGE:  This is -- I'm sorry.  Exhibit 4.

7          THE COURT:  Oh.  Still 4.

8          MS. DODGE:  No.  I mean 5.

9          THE COURT:  I mean, we were on 4 before, I thought.

10         MS. DODGE:  I'm sorry.  This is 5.  I'm sorry.  Yes, 4

11  was the photographs.  This is 5 is the letter.

12  Q.  And is this the letter --

13         MS. DODGE:  I'm scrolling down here.

14  Q.  -- that you wrote to Mr. Greenberg on April 22nd, 2016,

15  denying the claim?

16  A.  Yes.

17  Q.  Okay.  And I just want to ask you a couple of questions

18  about the letter.  You said here that you had reviewed the

19  electric service history for your premises and found no record

20  of an electric service interruption affecting the premises

21  between -- well, you have February 13th and 22nd, right?

22  A.  Correct.

23  Q.  Okay.  And you also said that you reviewed the customer

24  service records and found no calls for service related to an

25  electrical outage issue for any neighboring property in the

Perkins - Direct

1  area during that time period; is that right?

2  A.  That's correct.

3  Q.  Okay.  Is that when you're checking the circuit to see if

4  there's any outage reports?

5  A.  Well, there's -- there's two ways that -- that we would

6  investigate.  We would review the outage records for the

7  circuit, and we would also review the SmartMeter records, if

8  that particular customer has a SmartMeter, to determine if

9  there was any SmartMeter data that would indicate that there

10  was an outage.

11      But then we would also review electric field order tickets

12  to determine -- so when I'm -- when I -- the second sentence,

13  when I talk about reviewing the customer service records and

14  found no calls for service at neighboring properties, is where

15  I'm reviewing the field order tickets for electric service to

16  where a neighbor may have called complaining about fluctuating

17  voltage or something like that.  And you know, so I did not --

18  I did not identify any situations where that occurred either.

19  Q.  Okay.  And the next paragraph you talk about the fact that

20  there could be an internal problem with the equipment, or there

21  is a temporary occurrence beyond the control of PG&E that

22  affected the service voltage delivered.  And you give a couple

23  of examples of those, including --

24  A.  Correct.

25  Q.  -- birds or something else making contact with the

Perkins - Direct

1   electrical lines, correct?

2   A.   Correct.

3   Q.   Okay.  And are you familiar with Tariff Rule 2(C)?

4   A.   I am.

5   Q.   Okay.  And what is your understanding of it?

6   A.   Well, Tariff Rule 2 talks about the service delivery

7   voltages that PG&E has mandated to provide to their customers,

8   and Rule 2(C) talks specifically about the volt -- the

9   secondary voltages that are supplied to customers and

10  situations in which the voltages may be outside the prescribed

11  limits that are in Rule 2 -- in Rule 2.  And the secondary

12  voltages for residential locations that PG&E is to deliver is

13  voltages between 114 volts and 126 volts.  So as long as PG&E

14  delivers voltages within that range, then they're in compliance

15  with Rule 2.

16  Q.   Okay.

17  A.   And there are instances in which, you know, the voltages

18  are delivered outside of that range out, you know, beyond --

19  beyond the control of PG&E.  An example would be, you know, in

20  a storm or something like that where a tree branch would fall

21  and cross phase across two conductors on the circuit.  And that

22  would cause, you know, a recloser to operate, which a recloser

23  is kind of like a circuit breaker that's on the line.  That

24  would cause a recloser to operate to cause an outage, but the

25  recloser is set to close back in to test the line to see if

Perkins - Direct

1   that particular situation is clear.

2       A lot of times in storm situations that's exactly what

3   happens is, you know, a tree branch will fall on the lines.  A

4   recloser will operate, cause a brief outage, and then the

5   branch will fall off the lines, and when the recloser tests

6   back in the circuit tests fine, and power is restored.

7   Q.  Okay.  And if it causes the brief outage that you just

8   described, would that show up in PG&E's records?

9   A.  Yeah, it would not show up in PG&E's records.  The -- it

10  would only show up in PG&E's records if the outage eventually

11  was sustained, and that is typically after the third recloser

12  operation.

13  Q.  Okay.  And then are you familiar with Tariff Rule 14?

14  A.  I am.

15  Q.  Okay.  And what is your understanding of that rule?

16  A.  Well, Tariff Rule 14, it basically -- it says that PG&E

17  doesn't, you know, guarantee the supply or sufficiency of

18  electricity, and it provides PG&E -- or these tariff rules

19  apply to all utility companies within the State of California.

20  But with respect to this particular case, it would allow PG&E

21  to be able to turn off power at its discretion should it

22  determine the need and then that was a reasonable need in order

23  to do that.

24      So by maintaining the system, anything for safety purposes,

25  PG&E would be allowed to turn off the power to address that

Perkins - Direct

1   issue.

2   Q.  Okay.  And does that also apply if PG&E is working on its

3   system to maintain it, improve it, or do repairs?

4   A.  That is correct.  Rule 14 would apply in that case.

5   Q.  Okay.  And are these two tariff rules, 2 and 14, those are

6   both approved by the California Public Utilities Commission,

7   correct?

8   A.  That's correct.

9   Q.  Okay.  And what is the effect of these tariff rules?

10          THE COURT:  Well, now you're getting into legal

11  conclusions, and we know the legal argument.  You don't need to

12  have him testify to that.  We --

13          MS. DODGE:  Okay.

14          THE COURT:  That's been well established under the

15  law.

16          MS. DODGE:  Okay.  All right.  I don't think I have

17  anything else.

18          Mr. Lapping may have some follow-up questions for you,

19  Mr. Perkins.

20          THE WITNESS:  Okay.

21          THE WITNESS:  We'll see if we can hear him through,

22  though you might want to speak up, Mr. Lapping.  I'll try and

23  hold the phone close to my microphone.

24          MR. LAPPING:  Okay.  I will.  Can you hear me now?

25          THE WITNESS:  I can hear you.

1  CROSS-EXAMINATION

2  BY MR. LAPPING:

3  Q.  Okay.  Looking at PG&E Exhibit 5, there's a reference there

4  in the paragraph to vehicles striking our facilities.

5       MS. DODGE:  Wait.  Do you want to bring it up on your

6  screen, Rich, or --

7       MR. LAPPING:  Just leave it there.  You are fine.

8       MS. DODGE:  Oh, I'm on.  I'm still sharing.  I'm

9  sorry.  Okay.  Go ahead.

10  Q.  So if a vehicle strikes a facility, it potentially can

11  cause an interruption or a surge; is that right?

12  A.  It could cause a fluctuation potentially.

13  Q.  Okay.  Have you ever known of anything like that happening?

14       MS. DODGE:  Objection.  Relevance.

15       THE COURT:  That's okay.  You can answer.  You can

16  answer, Mr. Perkins.

17  A.  In my experience at PG&E that -- I am aware of instances in

18  which that happened.

19  Q.  All right.  And is the problem that it's -- in the next

20  sentence it says causing a jarring sensation to the facilities.

21  Is that the problem with cars striking electrical equipment?

22  A.  Yeah.  Like a car striking a pole would cause a jarring

23  sensation to the overhead facilities, correct.

24  Q.  Okay.  And that could result in a surge or a fluctuation?

25  A.  Potentially.

1  Q.  And it would not be detected by PG&E's records at all?

2  A.  Not unless it -- not unless it created a sustained outage.

3  Q.  And define sustained outage.

4  A.  That would be an outage that resulted after the recloser

5  operations if there was a recloser on that section of the

6  circuit.

7  Q.  Okay.  So the surge could occur, or the fluctuation could

8  occur, and you have no record of it as long as there's not a

9  sustained outage; is that right?

10  A.  That's correct.  But let me back up.  With regard to that

11  situation, and Rule 2(C) applies to circumstances beyond, you

12  know, beyond the control of PG&E.  And what you're describing

13  is a vehicle striking PG&E's facilities and causing a jarring

14  sensation would be a circumstance beyond the control of PG&E.

15  And --

16  Q.  What if it were a PG&E vehicle?

17  A.  That's quite speculative.

18  Q.  Well, no, I'm asking.

19      MS. DODGE:  I just -- objection.  Again, relevance and

20  calls for speculation.

21      THE COURT:  Well, Mr. Lapping, it seems to me that it

22  is taking a hypothetical and applying it to a legal principle

23  that doesn't apply.  We didn't have a PG&E vehicle hitting Mr.

24  Greenberg's refrigerator, so --

25      MR. LAPPING:  Okay.

Perkins - Redirect

1   Q.  Now, when did this concept of -- well, I understand that

2   the concept of reasonable uniform appearance has been enacted

3   into the insurance law in California in place of -- what is the

4   other --

5           THE COURT:  Line of sight.

6           MR. LAPPING:  Line of sight.  Yes.

7   Q.  When did that happen?

8   A.  I don't know.  You'd have to consult the Department of

9   Insurance Regulations to determine that.

10  Q.  Well, when is -- you understood that it's no longer being

11  used.  When did it stop?  When did line of sight start being --

12  stopped being used, and reasonable uniform appearance begin to

13  be used?

14          MS. DODGE:  I'll just object.  Again, this is outside

15  the scope.

16          MR. LAPPING:  Well, he said -- he testified --

17          THE COURT:  He can answer.  It's overruled.  He can

18  answer.  He can answer.

19          Go ahead, Mr. Perkins.

20  A.  I don't know the specific date.

21  Q.  How about you personally?  When did you stop using one of

22  those terms and you start using the other?

23          MS. DODGE:  Objection.  He's not here in a personal

24  capacity.

25          THE COURT:  He can answer.  He's here as the PG&E guy

Perkins - Redirect

1    who was inspecting the problem, the complaint.

2              Go ahead, Mr. Perkins, if you know.

3              MS. DODGE:  And subject asked and answered.

4              THE COURT:  Come on, Ms. Dodge.  I thought we wanted

5    to be finished this week.

6              MS. DODGE:  I do want to be done.  I mean, I --

7              THE COURT:  Okay.  You can answer, Mr. Perkins.

8    A.   I would say probably prior to 2005, because that's when I

9    started working for PG&E, and prior to that I worked in the

10   insurance industry as an adjuster, and I was aware of that term

11   prior to that.  But more specifically, I wouldn't be able to

12   answer that.

13   Q.   Okay.  And you visited Mr. Greenberg to inspect his

14   property for damages; is that correct?

15   A.   Correct.

16   Q.   And your testimony is that you didn't discuss damages with

17   him during that visit?

18             MS. DODGE:  Objection.  Misstates testimony.

19             THE COURT:  Clarify.  You can, Mr. Perkins, tell me.

20   Go ahead and answer the question, and clarify it if he

21   misstated your testimony.

22   A.   Well, we -- I inspected the damages that he was alleging,

23   so he showed me the damages to the laminate flooring.

24   Q.   Did you talk to him about the application of reasonable

25   uniform appearance?

Perkins - Redirect

1   A.   I don't recall talking to him about that.  Like I said,

2   it'd be premature for me to do that since we didn't know if we

3   would be liable or not.

4          MR. LAPPING:  Okay.  I don't have any further

5   questions, Your Honor.

6          THE COURT:  Mr. Perkins, I want to just clarify

7   something about the -- I know about the closures.  I have a

8   little experience with that.  I have my share of windy trees

9   that fall in my street.

10         Do I understand you to say if there is a brief outage,

11  and the recloser release the first time or even the second time

12  solves the problem -- the tree branch falls or the dead bird

13  falls or the car doesn't hit the pole a second time -- then

14  there's no record, and PG&E does not maintain a record of a

15  brief outage like that?  Or interruption, perhaps --

16         THE WITNESS:  No.  As part of the --

17         THE COURT:  -- a better word.

18         THE WITNESS:  As part of our databank you would have

19  to go and actually download the data directly from the recloser

20  to look at how many recloser operations there were.  But the

21  only time it would be recorded in an outage database is when

22  the recloser operated and actually locked the circuit open.

23         MR. LAPPING:  Well, I have a follow-up --

24         THE COURT:  Well, no, but to finish my point.  So if

25  the branch falls on the wire, and the power goes out for, you

Perkins - Redirect

1    know, ten seconds or fifteen seconds, and then it comes back,

2    that suggests to me that the reclosure is working and

3    everything is okay.

4          My question, though, is, is there no recorded evidence

5    in PG&E's records of that brief interruption?

6          THE WITNESS:  Not to my knowledge.  Like I said, you'd

7    have to actually have the gentleman go to the -- to the

8    recloser itself and download the data.

9          THE COURT:  Okay.  Okay.

10         Mr. Lapping, go ahead.

11   Q.  Did you or anyone at PG&E make that investigation of the

12   recloser in this situation?

13   A.  No.

14   Q.  And is the recloser, is that also referred to as a switch?

15   A.  No.  Switches and reclosers are different.

16   Q.  Okay.  Okay.

17         MR. LAPPING:  That's all I have.

18         MS. DODGE:  I have one.  I have one follow -up, or a

19   couple of follow-ups.

20   REDIRECT EXAMINATION

21   BY MS. DODGE:

22   Q.  Mr. Perkins, if there is a surge of electricity that's

23   transmitted through a circuit, would you expect it to affect

24   multiple customers?

25   A.  Yes.

Perkins - Redirect

1  Q.  Okay.  And based on that, would you expect to receive a

2  number of claims from the customers affected by that surge?

3  A.  Yes.

4  Q.  Okay.  And besides Mr. Greenberg's claim here, do you

5  recall any other claims from customers for damages in this time

6  period between February 14th and 22nd of 2016?

7  A.  No.

8  Q.  Okay.  Thank you.

9          MS. DODGE:  I have nothing else.

10         THE COURT:  Okay.

11         MR. LAPPING:  Your Honor, I move to strike the

12  testimony about whether or not he would expect to have multiple

13  customers affected.  That's an expert opinion.

14         MS. DODGE:  That's based on his experience.

15         THE COURT:  No, he's the guy that inspects things, the

16  damages.  I'll overrule that objection.

17         And thank you for your testimony, Mr. Perkins.

18         MS. DODGE:  Thank you.

19         THE COURT:  We'll let you go.  You're excused.

20         MS. DODGE:  Let me stop the share.

21         MS. DODGE:  All right.  Thank you.

22         THE COURT:  Okay.

23         MS. DODGE:  Well, we got the audio worked out.  Thank

24  you.

25         THE WITNESS:  Yeah.  All right.  Thank you.

PG&E and Pacific Gas And Electric Co

1          MS. DODGE:  Okay.

2          THE COURT:  Okay.  We've been going for almost two

3   hours.  We need a break.

4          But what's your pleasure next, Ms. Dodge, before we

5   decide to take a break?

6          MS. DODGE:  I don't have any more witnesses, Your

7   Honor.

8          THE COURT:  So the testimony phase of the trial is

9   over for both sides.

10         Agree, Mr. Lapping?

11         MR. LAPPING:  Yes, Your Honor.

12         THE COURT:  Okay.  Let's take a ten-minute break, and

13  then we'll discuss where we go from here.

14         MS. DODGE:  Okay.

15         THE COURT:  Okay?

16         MS. DODGE:  Thank you.

17         THE COURT:  Just before turn your cameras off and stay

18  alert and stay on board.

19         MR. LAPPING:  We back at 4 o'clock?

20         THE COURT:  Yeah.

21         MR. LAPPING:  Okay.

22         THE COURT:  4 o'clock.

23     (Whereupon a recess was taken)

24         THE COURT:  We can go back on the record.

25         Okay.  Mr. Lapping, you're still putting on your case-

PG&E and Pacific Gas And Electric Co

1  in-chief.  What's your pleasure?

2       MR. LAPPING:  Well, I really have to walk Your Honor

3  through --

4       THE COURT:  Hold on.  Oops.  Wait a second.  Say that

5  again.  I had unplugged -- I had plugged in some earphones.

6  Can you say it again?

7       MR. LAPPING:  I really need to walk you through the

8  exhibits in our trial brief.  I don't know that you -- and

9  comment on them.

10       So we did a document production when we found out

11  about Veteran Power, and we obtained from Veteran Power a lot

12  of documents that show all the heavy construction and trenching

13  and whatnot that they were doing.  And it's significant.

14       And our theory of the case is sort of like res ipsa

15  loquitur, which has very simple elements that what happened

16  would not have happened unless someone was negligent, that the

17  harm was caused by something that only the defendant

18  controlled, and in this case it's PG&E operating through its

19  contractor, Veteran Power, and that the plaintiff didn't do

20  anything to contribute to the damage.

21       And I think the record here is very clear that Mr.

22  Greenberg did not do anything to cause any of this damage.  He

23  was out of town.  He's forced to rely on circumstantial

24  evidence.  Initially, as we pointed out in our opposition to

25  the motions in limine, PG&E told us that there was no work

PG&E and Pacific Gas And Electric Co

1    being done on the circuit.  They've repeated that today.  But

2    that's because they're talking -- they're making a distinction

3    on electrical work, whereas our interrogatories and document

4    requests asked for any and all construction work, anything done

5    by any PG&E person, employee, subcontractor or anything.

6         So as far as -- I think it's fair to say that PG&E

7    essentially did a general denial that Veteran Power was even in

8    the vicinity during the relevant period.  And I think it's very

9    significant, because they were.  And if an automobile can

10   strike a power pole, jackhammers and all the accouterments of

11   heavy construction could likewise plausibly have caused some

12   kind of an outage or surge.

13        And Mr. Perkins just testified that they don't know

14   that.  The recloser wouldn't necessarily.  It might work, and

15   there might be a surge or a fluctuation, and PG&E would simply

16   not have any record of it.  And that's what he told -- that's

17   what PG&E told us in writing in two different exhibits.  They

18   told us in Exhibit E that it starts with Tracy Lamm.

19        "Though a problem is not detected in our substation,

20   there can be momentary voltage disturbances due to many

21   causes".  And she cites also the car striking or brushing

22   against our poles and so on.

23        And then Mr. Perkins likewise reiterates that and

24   talks about jarring sensations to the facilities.  Now he says

25   that while they would know about other people contacting them,

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E and Pacific Gas And Electric Co

1   but that's speculative.  I mean, there could be a lot of

2   reasons why a customer doesn't contact PG&E if something

3   happens, or if it's minor or whatever.  And maybe this wasn't

4   all that severe, but it was severe enough to break what in

5   essence is a circuit breaker for the refrigerator.  It's that

6   starter relay switch.

7           And we've heard testimony from the repair guy that's

8   pretty unequivocal that that's what happened.  And the article

9   that we submitted, I think it's --

10          THE COURT:  Which article?

11          MR. LAPPING:  Okay.  It's an internet article.

12          THE COURT:  I mean, I haven't reviewed all your

13  exhibits, so I just wanted to -- the internet article about the

14  LG?

15          THE COURT:  I mean, I haven't reviewed all of your

16  exhibits, so I just wanted to -- the Internet article about the

17  LG -- the people complaining about the --

18          MR. LAPPING:  No, no, no, no.  Well, that should all

19  be stricken because those are complaints about a different

20  model.

21          THE COURT:  Okay.  But I just want to know --

22          MS. DODGE:  Remember I also have an objection about

23  the exhibit that Mr. Green -- I'm sorry, Mr. Lapping is

24  referencing, the eHow article regarding causes of refrigerator

25  failure, whatever it is.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E and Pacific Gas And Electric Co

1    MR. LAPPING:  Yeah, because I even --

2    MS. DODGE:  Again, because the complaint goes to

3  expert testimony and reliability.

4    THE COURT:  I didn't want to turn this into further

5  argument.  I just wanted to know what exhibit he's referring to

6  because I --

7    MR. LAPPING:  I'm looking for it.

8    UNIDENTIFIED VOICE:  Double G.

9    MR. LAPPING:  Double G, Your Honor.  And Counsel

10 actually referred to that when she said oh, there's many

11 causes.

12    THE COURT:  Well, GG is in evidence; that was in

13 without admission.  So I mean --

14    MR. LAPPING:  Right.  And so what.  Basically it's

15 just -- look, there's two ways this could happen.  One, you

16 know, it's a surge -- and that's what our repairman said -- and

17 the other alternative is if the compressor is somehow super

18 active and drawing power from the system.  But that doesn't

19 happen when somebody's gone, the refrigerator is shut, it

20 hasn't been open for week.  You know, they don't --

21    THE COURT:  Well, wait, now you're testifying.

22    MR. LAPPING:  Well, I'm just saying it's --

23    THE COURT:  First of all --

24    MR. LAPPING:  -- just one of the three.

25    THE COURT:  First of all, he could have been gone for

PG&E and Pacific Gas And Electric Co

1    two hours.  It could have happened two hours after he left.

2    Second of all, I'll accept the argument or the contention that

3    the thing that the repair guy replaced failed.  The question

4    is -- and no one is blaming Mr. Greenberg for rigging it.  So

5    it failed.  And the question is what.  And your point about res

6    ipsa loquitur is great except it doesn't help you because this

7    is not a strict liability case.  We have standards of care.

8             And so let's assume that maybe it was a jackhammer and

9    maybe it vibrated, the jarring interruption, but how does

10   you -- have you proven that the tariff standard has been

11   violated?

12            MR. LAPPING:  Well, Your Honor, I make the argument

13   that PG&E has made a judicial admission that there was no work

14   being done at 31 Bolinas during the week of February 15th.

15   They've said that.  They said that formally in their objection

16   to the claim and they try to spin it that it's electricity

17   only.  But that, I think is a -- that's an unfair nuance.

18            And if they're not there, actively trying to expand

19   the system, trying to improve it, then it's the same as if a

20   PG&E truck runs into the pole; that was my analogy.

21            THE COURT:  Well, no.  I don't think so because --

22   well, first of all, I now remembered this morning I let Ms.

23   Dodge reserve an objection to a number of your exhibits and

24   that's still a pending objection.  But in looking at your

25   exhibit list and thinking about what I hear today, it seems to

PG&E and Pacific Gas And Electric Co

1    me what might be probative are exhibits T through Z because

2    there you have -- in those exhibits, you have every day when

3    there is a work report from somebody, and I assume it's

4    Veterans Power.  But I haven't --

5              MR. LAPPING:  Correct.

6              THE COURT:  I haven't reviewed those.

7              But is there something that you can tell me that you

8    know, of your own knowledge, that appears on any of those

9    reports that implicates somebody that -- you know, like the car

10   that hits the pole, the PG&E car?  Is it a Veteran's (sic)

11   Power car that hit the pole?  What is the proof that this falls

12   outside of the -- sort of what we'll call the presumptive --

13   well, let me rephrase it.  What is the proof that you have that

14   overcomes the presumption of Tariff 2 and Tariff 14?

15             MR. LAPPING:  Yes, Your Honor.  It is a couple things.

16   Exhibit DD.  Let me see if I've got DD up here.

17             THE COURT:  DD as in Dennis Dennis; that's --

18             MR. LAPPING:  Oh, no, no.  Not that one.  No.  Yeah,

19   that's the --

20             THE COURT:  It's an email.

21             MR. LAPPING:  Yeah, that one's worn out.

22             Well, wait a minute.  Yes, it is, it is DD.  What am I

23   saying?  DD is it.

24             THE COURT:  Okay.  Well, what will I learn from that?

25             MR. LAPPING:  Okay.  It's page -- okay.  So here's

PG&E and Pacific Gas And Electric Co

1    what happens.  There's all this work done.  And PG&E has

2    insisted that there was no electrical work done on the loop

3    during the week of February 15th.  Okay.  And for the first

4    time -- and they also insist that there's no work records that

5    are available where a PG&E employee has done any electrical

6    work.  So the first encounter that we have with PG&E and the 31

7    Bolinas project, PG&E in the electrical responsibility, is on

8    March 16th.

9         And there's a detailed report, it's I think on page 2

10   of the exhibit.  And they say -- down at the bottom, they have

11   comments that are quite interesting.  The first one is that on

12   March 16th, 2016 at 10:42 in the morning, Bill Jennings reports

13   that number 1, number 2 of 3 blown.  These are thirty transfers

14   (sic).  And basically, they had people out there testing.  They

15   had blown transformers.

16        They come out there and they find this and this --

17        THE COURT:  But this is a month after the damage.

18        MR. LAPPING:  Right, but it's the first time anybody's

19   been out to look at this.  And we called -- Mr. Perkins

20   testified they didn't check the reclosure information, so this

21   is the first time an electrical crew has visited the site.

22        And then at 1337, it says "Vince Castro reports that

23   43-65 phasing is no good"; that was the testimony, it's no

24   good.

25        THE COURT:  Slow down, slow down; you're going too

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E and Pacific Gas And Electric Co

 1  fast.  I'm trying to read this thing on the screen.  And I
 2  don't -- where's the entrance for -- oh, okay.  Okay.  This is
 3  March 16.  Vince Castro reports phasing is no good.  Okay.
 4  "And cause of blown" --
 5          MR. LAPPING:  "And cause of blown fuses earlier on
 6  switch log operations".
 7          THE COURT:  Okay.
 8          MR. LAPPING:  And we have other testimony that says
 9  they can't monitor the switches.  They don't know what the --
10  they don't provide any information.
11          MS. DODGE:  Okay.  What testimony?  Sorry.  Sort of
12  came out.
13          MR. LAPPING:  I know.  Well, David Brown testified to
14  that.  It's in his deposition.  I'll find it, but I have to
15  come back to it.  We certainly have -- we have that on the
16  record.
17          THE COURT:  And tell me again because I was trying to
18  read --
19          MR. LAPPING:  Oh, it's Exhibit --
20          THE COURT:  I was trying to pull up --
21          MR. LAPPING:  It's Exhibit -- sorry.
22          THE COURT:  Slow down.  I was trying to read what was
23  on the screen and I didn't hear what Ms. Dodge said.  What do
24  you think Mr. Brown said that helps you here on this point?
25          MR. LAPPING:  It's actually Exhibit 22.  I got to go

PG&E and Pacific Gas And Electric Co

1  to her setup.  It's Exhibit 22.  It's also Exhibit X in a

2  deposition.  And this is the one with the questions and answers

3  in red.

4         THE COURT:  Well, I don't have it yet.  I mean, I'm

5  trying to catch up with you on these screens.  And so this is a

6  PG&E exhibit?

7         MR. LAPPING:  Yes, Exhibit 22.

8         THE COURT:  Oh, this is the Ibrahim email.

9         MR. LAPPING:  Right.  Arslan Ibrahim.

10        THE COURT:  Okay.

11        MR. LAPPING:  Item 7.

12        THE COURT:  Item 7.  All right.  I'm scrolling down to

13  item 7.  Okay.  So I'm looking at item 7.  What does the --

14        MR. LAPPING:  The switches don't have outage records.

15  Counsel just asked me to prove that; I said okay.  Here it is.

16  And the way it factors in is that in this exhibit -- where were

17  we -- DD, on March 16 --

18        THE COURT:  That's where Vince says there were blown

19  fuses.

20        MR. LAPPING:  Earlier, on the switchblock operations.

21        THE COURT:  Yeah.

22        MR. LAPPING:  So something happened and it happened

23  before March 16.  And then this is the first time PG&E admits

24  to being out here, doing any electrical work.  And they had --

25  they basically got there and they said whoa -- oh, they also

PG&E and Pacific Gas And Electric Co

1    said -- higher up, they said improper construction.  You know,

2    so you've got a major -- or at least what looks to me like a

3    significant problem that PG&E encountered to cause them to

4    basically postpone the project and try again.

5          THE COURT:  Well, we know that the project was

6    postponed three times.  It was postponed in December, but

7    that's not an issue here.

8          MR. LAPPING:  No.

9          THE COURT:  And I had trouble understanding in your

10   response to the motion in limine what you meant about judicial

11   estoppel.  So you're saying that because Vince found the blown

12   fuse, therefore it's in the records of PG&E that there was an

13   outage and therefore that proves they were doing work; is that

14   your point?

15         MR. LAPPING:  Well, no.  That is not my --

16         THE COURT:  Okay.

17         MR. LAPPING:  That's not my argument.  My argument is

18   that we asked in discovery very specifically, two

19   interrogatories and one document retro request, to provide all

20   evidence of all work done by any PG&E --

21         THE COURT:  Correct, I got it.  I got it.

22         MR. LAPPING:  -- any whoever, and they come back and

23   they say there was no -- they sent us these documents about,

24   you know, the circuit and they say there was no work done on

25   the circuit.  Well, very clever.  You know, what are we

PG&E and Pacific Gas And Electric Co

1   supposed to think?

2           And as it turns out, that might be okay except Veteran

3   Power, which is a major potential factor here, was all over

4   this project for, like, ten days running, including the seven

5   days that my client was out of town.  And so I think if they're

6   going to deny that, then fine.  They weren't there.  And then

7   if they weren't there, then they don't get the benefit of

8   Tariff Rule Number 4.

9           THE COURT:  Well, their agents --

10          MS. DODGE:  If I could address the Court?

11          THE COURT:  Wait a minute.

12          Their agent was there, right?

13          MR. LAPPING:  Well, no.  PG&E has made a judicial

14  admission.  They have gone on the record saying that they were

15  not there.  They were not doing any work on that circuit.  And

16  we interpreted that, I think fairly, that they meant in the

17  City or the Town of Fairfax because that's what we specifically

18  asked them.  We said did you guys have any contractors out

19  there in Fairfax during this week.  And they said no, we

20  weren't doing any work on that circuit.

21          THE COURT:  Well, but Mr. Lapping, they weren't doing

22  work on the circuit.  They were doing work preparatory to

23  patching in and replacing something on the circuit.

24          MS. DODGE:  Right.

25          THE COURT:  Now, I'm not suggesting that you're going

PG&E and Pacific Gas And Electric Co

1    to lose on that because I said that, but it is a fact that the

2    testimony was that Veteran's (sic) was out there, doing the

3    trenches and getting the stuff ready to do the connection.

4         MR. LAPPING:  Judicial admissions operate

5    notwithstanding the fact that they are contradicted by the

6    facts.

7         THE COURT:  But what facts?  What fact was

8    contradicted?

9         MR. LAPPING:  The fact that PG&E --

10        THE COURT:  They have an agent preparing the trench

11   and locating stuff that had to be moved, but nothing was

12   happening on the circuit until March.  I'm not making light of

13   the fact that these records and particularly the thing you are

14   showing me might mean that somebody knew about the fuses.  I

15   just don't know how you make the leap to say that they lose

16   because of a judicial admission.

17        Listen.  You don't care how you win if you win, do

18   you?  The question is if they win because -- if you win because

19   Veteran's (sic) screwed up and PG&E is bound by their conduct

20   if and unless it's protected by the -- you know, by the --

21   well, I'll say the limited immunity; that's the wrong word.

22   You know what I mean, by the --

23        MR. LAPPING:  Right.

24        THE COURT:  The diligence, the best good diligence

25   type of thing.  And I'll let Ms. Dodge make the argument more

(973) 406-2250  operations@escribers.net | www.escribers.net

PG&E and Pacific Gas And Electric Co

1    fully in a minute, but my point is -- and I asked you and my

2    responsibility is to look at these Veteran Power records, and I

3    appreciate what you're saying.  Well, this is -- I'm sorry.

4    This isn't the Veteran's (sic) Power record.  This is the

5    internal PG&E record.

6               MR. LAPPING:  Well, both.

7               THE COURT:  Huh?  What?  Go ahead.

8               MR. LAPPING:  Well, I mean, that's our theory of the

9    case, is that, you know, number one, we think that because PG&E

10   declined to disclose in response to a direct -- and they played

11   hide the ball and should have disclosed Veteran Power.  We had

12   to go through all of this effort to find out all about Veteran

13   Power and what they were doing there.  Since PG&E has now

14   formally taken the position that they weren't there -- now, the

15   can quibble about whether it's on the line or in the town, but

16   we asked the question in the town.  We didn't specify

17   electrical work.  We just said anybody and everybody.  And they

18   come back and say -- they sent us five documents and say that

19   nothing was happening.

20              So we think they're stuck with that nothing is

21   happening and therefore they can't -- since they weren't there,

22   doing anything positive, which is how they qualify for the

23   Tariff Rule Number 4, they got to be expanding the system.

24   Since under their admission that didn't happen, then therefore,

25   they don't get the benefit; that's one argument.

PG&E and Pacific Gas And Electric Co

1          Second argument, assuming they were there, a couple of

2     things happened.  We have an exhibit -- which one is this?

3     I'll have to find it.  But there's a -- oh, wait a minute,

4     There's a reference to an email from David Brown.  There's an

5     email from David Brown on January 4th, 2016.  Right after this

6     January 1 mishap with the rotation of the vault and the ability

7     to do this construction.

8          THE COURT:  Okay.  What exhibit?  What number?

9          MR. LAPPING:  Okay.

10          THE COURT:  Is this one of your exhibits or theirs

11     or --

12          MR. LAPPING:  Yeah, it's one of our exhibits.  Yes,

13     absolutely.  It's -- let me find it here.

14          THE COURT:  Well, I'll find it if you give me a

15     letter.  Or maybe it's on your list.

16          MR. LAPPING:  Well, it is.

17          THE COURT:  Sure.  Is it Number H?  No.

18          MR. LAPPING:  No, no.  That's not the one.  No.

19          THE COURT:  Well, that's a Brown email; that's why I

20     asked.

21          MR. LAPPING:  Let me see if I can find it on my

22     exhibit list.  I think it's easier to look at the formal list.

23     I'm trying to look at document titles.

24          Oh, yeah, it's Exhibit P as in Paul.

25          THE COURT:  Okay.

PG&E and Pacific Gas And Electric Co

1          MR. LAPPING:  So he had --

2          THE COURT:  Let me pull it up.  Wait now just a

3     second.  I'm going to catch up with you.  Okay.  I'm going to

4     get it up on the screen.

5          Okay.  This is Brown 2, the Fairfax guy.

6          MR. LAPPING:  Right.  Right.

7          THE COURT:  Okay.

8          MR. LAPPING:  And so you know, it starts on -- well,

9     predates it.  They eventually get to the announcement that hey,

10    it's not really going forward.  This is, I guess, December 4th.

11    And but the second paragraph at the top, he's telling him -- he

12    goes, "as a temporary alternative and as we have discussed,

13    Brad Schwan will use his existing 400 amp service to feed the

14    new switch gear.  It appears that the 400 amps is adequate to

15    support the new load on an interim basis.  And he asked if

16    that's okay.

17         Another one of our theories is that they're doing this

18    whole project because the existing electrical facility is

19    inadequate for the load, meaning the amount of the electricity

20    that the new project, the restaurant and the new tenants, are

21    going to be pulling in.  What happens next?

22         In mid-January, you've got the tenants moving in.

23    You've got the restaurant opening.  You've got an admittedly

24    inadequate facility.  And you say, well, it will be okay on an

25    interim basis.  But surprise, surprise, and a couple weeks

PG&E and Pacific Gas And Electric Co

1    later, when everything's up and running, something happens, you

2    know.  And it's entirely possible that it relates to this, back

3    at this inadequate load.

4         THE COURT:  So I'm to assume -- now we clear away with

5    your pounding the pavement, shocking the thing.  And I'm going

6    to say that the only person that complained was Mr. Greenberg

7    across the street -- next door that were running the 400 amps

8    on an interim basis?  That's kind of a stretch, isn't it?

9         MR. LAPPING:  Well, I don't know, you know.

10        THE COURT:  First of all, as I said, it's not clear --

11        MR. LAPPING:  A lot of things --

12        THE COURT:  -- that there were any -- it's not clear

13   there were any tenants in --

14        MR. LAPPING:  A lot of things can happen with

15   electricity.

16        THE COURT:  Yes, I know that.

17        MR. LAPPING:  The thing is, that's --

18        THE COURT:  It's not clear there were any tenants in

19   there; that's what -- Mr. Brown didn't even tell me there were

20   any tenants there.

21        MR. LAPPING:  He didn't recall.  My client recalled.

22   We have evidence of the tenants moving in.

23        THE COURT:  He saw some activity.  I agree he had said

24   that.  But you want me to say that because tenants moved in

25   after Mr. Brown told Fairfax we can get by with the 400 amps

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E and Pacific Gas And Electric Co

1  for a while that the only thing that happened because of this

2  error in leaving the system there on an interim basis was one

3  refrigerator relay of one person in the neighborhood?  That's a

4  stretch, isn't it?

5      MR. LAPPING:  I don't know, Your Honor.  I mean, it's

6  negligent in a sense if it happened.  It's a possible source of

7  their --

8      THE COURT:  Where's the negligence?

9      MR. LAPPING:  You know, well, if it did spike and go

10  next door, then it was negligence because he admits that it was

11  inadequate.

12      THE COURT:  Well, he said it was adequate for the new

13  load on an interim basis.

14      MR. LAPPING:  But they're building a whole project

15  because the view is that it's inadequate.

16      THE COURT:  Okay.  I understand your theory.

17      MR. LAPPING:  Okay.  So I've got three theories

18  running along here.  Maybe four.  And you know, we're at a

19  disadvantage because, you know, obviously Mr. Greenberg was not

20  there to observe it.  If somebody else had a problem, it may

21  have been not enough to cause the problem.  I don't know.  So

22  you've got the --

23      THE COURT:  Well, Mr. Lapping, I've got one theory is

24  that the guy found the fuse blown on March 16th.

25      MR. LAPPING:  Right.

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E and Pacific Gas And Electric Co

1          THE COURT:  Other theory is Perkins said we can get

2     buy at 400 amps for a while.

3          MR. LAPPING:  That was David Brown, yes.

4          THE COURT:  So what's theory 3?

5          MR. LAPPING:  Veteran Power did something to guard the

6     electricity.  And then, when you see the photos of the digging,

7     it's entirely possible that somebody did something that caused

8     a momentary surge, similar to a vehicle striking a pole.  And

9     again --

10          THE COURT:  How am I supposed to --

11          MR. LAPPING:  -- this is not just anybody.  This is

12     PG&E striking the pole.

13          THE COURT:  How am I supposed to know that from a

14     photo, without explanation?  What photo do you want me to look

15     at?

16          MR. LAPPING:  All right.  Let me get a letter.  You

17     identified it.  They were basically T -- let's go with U.  U is

18     a good one.  No, no.  Not U, V.  No.  Wait a minute, W.  No,

19     no.  V. Let's go with V.  Let's start with V.  We'll start

20     there.

21          THE COURT:  Pick them both.  I'll look at both of

22     them.  I just want to know what you're looking --

23          MR. LAPPING:  Well, they're the daily work reports.

24     And so it basically says, look.  You know, "today, we dug fifty

25     feet of trench at forty-eight inches deep and backfield it".

PG&E and Pacific Gas And Electric Co

1         THE COURT:  Okay.

2         MS. DODGE:  Which one are you on?  I'm sorry.

3         THE COURT:  You're going too fast.

4         MS. DODGE:  Which exhibit?

5         MR. LAPPING:  Victor.

6         THE COURT:  Ms. Dodge, I'll let you answer, but I've

7    got to hear the answer.

8         What exhibit?

9         MR. LAPPING:  V as in Victor.

10        MS. DODGE:  Thank you.

11        THE COURT:  Okay.  Ms. Dodge, let me just pull it up

12   on screen.  And I promise I'm going to give you full time here,

13   but I --

14        MS. DODGE:  No.  I was just trying to hear what

15   exhibit it was, too.  I couldn't hear.

16        THE COURT:  Okay.  So "today, we hand dug fifty-foot

17   trench, forty-eight inch deep and backfield it".

18        MR. LAPPING:  Well, it's a typos

19        THE COURT:  He's playing football.  He's in the back

20   field.

21        Okay.  But what does that show that was negligent?

22        MR. LAPPING:  Go to page 3.

23        THE COURT:  Okay.  Okay.  I'm looking at it.

24        MR. LAPPING:  So this is like having construction.

25   These are deep holes, jackhammers, guys, you know, digging.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E and Pacific Gas And Electric Co

1    And I've got five days of activity that looks like this.

2          THE COURT:  Okay.  I didn't --

3          MR. LAPPING:  And you know, and they basically -- the

4    last page is very hard to read, but they basically talk about

5    safety precautions.  And one of the things they say is it makes

6    loud noises, you know, so we have to have headphones and such.

7          THE COURT:  I can't read that last page.

8          MR. LAPPING:  No one can.  Well, I can eventually.  I

9    mean, you know, it takes practice.  You've got to really want

10   to do it.  You know, it basically does refer to loud noises,

11   which is what construction is.

12         THE COURT:  (Indiscernible) going cuckoo.

13         MR. LAPPING:  And this is a major project that they

14   blocked off roads.

15         THE COURT:  Can you hear me now?

16         MR. LAPPING:  Yes.

17         THE COURT:  Oh, shoot.

18         MS. DODGE:  We can hear you, Your Honor.

19         THE COURT:  I've lost my connection.

20         Ms. Parada, can you hear me?

21         THE COURT REPORTER:  Yes, Your Honor.  I can hear you

22   and I can see you.

23         THE COURT:  I've lost my audio.

24         Mr. Lapping, hold up your hand if you can hear me.

25   Okay.  I  can't hear you.  Let me see if I can try it again.

PG&E and Pacific Gas And Electric Co

1      All right.  Say something again.

2              MR. LAPPING:  Okay.  Can you hear me now?

3              THE COURT:  No.  Why did I lose my sound?  Oh, God.

4      This day is getting more complicated every minute.  I can't

5      hear either of you right now, and I've got to figure out why.

6      It just conked out on me, my sound system.  I think I know how

7      to fix it, though.  Give me a minute here.

8              Can you hear me now?

9              MR. LAPPING:  Yes.

10             MS. DODGE:  Yes.

11             THE COURT:  No.  I can't hear you, though.  Say

12     something, Mr. Lapping.

13             MR. LAPPING:  Good afternoon, Your Honor.

14             THE COURT:  All right.  Say something now.

15             MR. LAPPING:  Test, test, test.

16             THE COURT:  No.  Not working.

17             MS. DODGE:  Should we log out and back in?  Ms.

18     Parada, do you think it would help if we logged out and in?

19             THE COURT REPORTER:  I think Judge Montali should

20     probably log out and rejoin.  I'll try and send him a message.

21             MS. DODGE:  Okay.  But we should stay on?

22             THE COURT REPORTER:  Yes.

23             MS. DODGE:  Okay.

24             THE COURT REPORTER:  Stay on for now, please.  Thank

25     you.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E and Pacific Gas And Electric Co

1        THE COURT:  Okay.  One of you say something now,

2   please.

3        MS. DODGE:  Hello.  Can you hear us?

4        THE COURT:  Okay.  And I can't -- I'm not getting any

5   audio.  Let's try -- Ms. Parada, I wonder if I should log off

6   and log back in again.

7        MS. DODGE:  Yes, yes.

8        THE COURT:  I'm going to try that.  Yeah, okay.  I got

9   it.  I got the text from you.  I'll try that.

10       MS. DODGE:  Great.

11       THE COURT:  Oh, God.  Well, okay.  You know what, Ms.

12  Dodge, you have a right to respond to all of this.  I'm sorry

13  about everybody having the problems today.

14       MS. DODGE:  No.

15       THE COURT:  We've all had our share.

16       MS. DODGE:  That's what happens with these remote

17  trials sometimes.

18            I just initially want to say that going back to the

19  discovery responses, these were discovery requests that were

20  propounded by Mr. Lapping back in, I believe, May of 2021.  And

21  we did object to the -- he asked for records of all activity

22  being done by PG&E in Fairfax during this time period.  And we

23  pushed back and we said wait a second; let's look at your claim

24  and what it is.  And there was -- you know, there was some

25  electrical interruption on the circuit.  And so we specifically

PG&E and Pacific Gas And Electric Co

1    stated there that we were going to provide records relating to

2    any of our activity on the circuit.  And that was why the

3    documents that we provided talked about the activity that PG&E

4    was doing.  And again, on the circuit.

5            Mr. Lapping, you know, got our responses.  There was

6    never any effort to meet and confer on that issue.  And so I

7    don't know how he is trying to now, again -- and this was my

8    whole argument in the motion of limine.  He's conflating the

9    work being done in Fairfax with the work being done on the

10   circuit.  And again, that leads to the confusion.

11           And you know, when he's trying to basically says that

12   we were trying to deceive them or basically say that we weren't

13   doing any work, that's, you know, absolutely not correct and

14   not true.  So I just want to correct that -- I'm going to say

15   misstatement.  But you know, again, if you look at the

16   discovery responses, which I believe are one of the exhibits,

17   you can see that.  And that was -- you know, that stands as is.

18           THE COURT:  But your representation to me now is that

19   as originally propounded, it asked for reference to the

20   circuit?

21           MS. DODGE:  No, no, no, no.  What I'm saying is -- and

22   in fact, I'll look back at the -- when I responded to the

23   discovery requests and -- as a whole, I said that we were going

24   to limit the scope of the documents and limit the scope of the

25   requests to the documents related to claim 77335 only.  And I

PG&E and Pacific Gas And Electric Co

1  specifically referenced what Mr. Greenberg's allegations were

2  in his claim 77335 when he was talking about the power outages

3  and surges, supposedly.  And I stated that we didn't have any

4  records of an outage on that circuit and that we were going to

5  be providing records related to that circuit.

6        THE COURT:  Okay.  But you agree now, don't you, that

7  the evidence in suggests that maybe Veteran's (sic) Power or

8  maybe PG&E, by March of 2000 -- no.  I'm sorry.  Yeah, by March

9  of 2016 knew that there had been some fuse problems.  By

10  definition, it's on the circuit.  I mean, by the -- of course

11  it has to be on the circuit because there is no other circuit.

12  And you agree with that.  Whether it was in the records that

13  were available in the company is different from what we learn

14  can be discovered more specifically, right?

15        MS. DODGE:  Right.  But when we're talking about

16  the -- and let me get to the outage reports because that is

17  what was being referred to.  Those were the outage reports that

18  were provided to Mr. Greenberg by Mr. Perkins back in 2016.  He

19  was looking at the one for March 16th --

20        THE COURT:  Right.

21        MS. DODGE:  -- and the comments made there.  This was

22  when the original outage -- or I'm sorry.  Not the original.  I

23  need to rephrase that.  The December outage didn't take place.

24  This was going to be the outage and they were doing work.  This

25  discussion reflects the work that they were doing to prep for

PG&E and Pacific Gas And Electric Co

1    the outage that night, when they went in, again, to work on the

2    circuit.  And so these records here are a description of them

3    prepping for the work.

4         And you see that in the last entry, where it talks

5    about "to make and break loop for crew work tonight at 2200".

6    And when they go in there to look at the phasing and the fuses

7    as a result of the switch log operations -- and you see at the

8    very top it talks about making a loop.  There was no -- and you

9    can see up here, 14 -- when the circuit was opened and

10   closed -- I'm sorry.  Let me back up to that.

11        THE COURT:  Yeah, I got to catch up with you.

12        MS. DODGE:  Okay.

13        THE COURT:  What exhibit are you on now?

14        MS. DODGE:  I'm sorry.  I'm on PG&E Exhibit 6, it's

15   the outage list that was sent by Mr. Perkins to Mr. Greenberg

16   back in 2016.

17        THE COURT:  Yeah, okay.

18        MS. DODGE:  And this is PGE 0051, it's the second page

19   that Mr. Lapping was just referring to.  And he was --

20        THE COURT:  Yeah, I'm just a little slow in being able

21   to pull it back up on the screen.

22        MS. DODGE:  Oh, I'm sorry.  I keep looking at it,

23   thinking I'm sharing my screen.  I can do that if that's

24   easier.

25        THE COURT:  No.  I would rather you not.  I'm looking

PG&E and Pacific Gas And Electric Co

1  at it now, so.

2  MS. DODGE:  Okay.  So this is when they are preparing

3  to do the work for the outage that night.  And they go in to

4  close it and make a loop and they're talking about the fuses.

5  This is them going in to look at the circuit and say, okay, are

6  we ready to upgrade, are we ready to go, and it talks about

7  blown fuses.

8  And you can see there that the outage that took place

9  on that date was at 1405, which is down towards the bottom,

10  where it says switch is opened by the crew.  And then it was a

11  three-minute outage, where at 1408 it was closed by the crew,

12  restoring power.

13  The loop and the blown fuses and all of that, that

14  wouldn't have had any reference to any prior outages or

15  fluctuations or anything.  This is PG&E going into the circuit

16  and again, doing work on the circuit to say hey, is it ready to

17  go, are we ready to upgrade the power.  So this isn't anything

18  where they're talking about -- and Mr. Lapping keeps making

19  these -- or Mr. Greenberg made up these arguments about well,

20  there was phasing and there were blown fuses and all of this.

21  This is just what they were going in to prepare to do the work

22  that night.  This isn't talking about blown fuses that would

23  have caused any issues in the past, so I'm not really sure

24  where that's coming from.

25  THE COURT:  Well, I don't know.  How can you say that,

actually, when the thing said there was fuses blown in the past, right?

MS. DODGE: Well, it says cause of blown fuses earlier on switch log operations. And when there's a loop with the fuses, there is no power lost because it's on a loop.

THE COURT: Well, now you're testifying.

MS. DODGE: So we're getting -- I know. We're getting into very detailed testimony.

MR. LAPPING: And I would just point out that the document was not produced until we did a motion to compel to get the file. I can't believe the document as a standalone document was not produced out of the gate.

MS. DODGE: Okay. That is not correct at all. Mr. Greenberg received this document in 2016, when he had the email from Mr. Perkins, so I don't understand --

THE COURT: Okay.

MS. DODGE: -- why he would say that he didn't have it before.

THE COURT: Ms. Dodge?

MS. DODGE: Yes?

THE COURT: Again, I'm going back to the problem we're having with your exhibits. So I'm pulling up your Dropbox.

MS. DODGE: Oh, gosh.

THE COURT: Your Dropbox link. And tell me again, using the number on there, which exhibit should I look at?

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E and Pacific Gas And Electric Co

1          MS. DODGE:  It is Exhibit 6.

2          THE COURT:  6, the email from Perkins to Greenberg?

3          MS. DODGE:  Correct, and it attaches the outage

4    reports.

5          THE COURT:  Okay.  So yeah, well, that's right.  Well,

6    that's the same outage report we looked at before --

7          MS. DODGE:  Right.

8          THE COURT:  -- that shows there was no outage.

9          MS. DODGE:  There was no outage during the time period

10   when Mr. Greenberg was away.

11         THE COURT:  Okay.  But if we scroll down --

12         MS. DODGE:  Right.

13         THE COURT:  -- and we scroll down, which is where we

14   were and this is the same thing Mr. Lapping was just talking

15   about.  March 16th.

16         MS. DODGE:  Right.

17         THE COURT:  Or 16.  Bill Jennings closed the switch.

18   Bill Jennings reports blown 30-QTs (phonetic), which I assume

19   means fuses.  I don't know what a 30-QT is.  But what do I make

20   about that?

21         MS. DODGE:  Well, you know what, if Mr. Greenberg or

22   Mr. Lapping -- they had every opportunity to call these people

23   as witnesses and depose them.  I mean, I -- you know, again,

24   what we're doing now is just speculating as to what this means

25   and honestly, it's not our burden of proof to show.  But what I

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E and Pacific Gas And Electric Co

1   will say is that this doesn't talk about there being any prior

2   outages.  He's just making that assumption by saying that he --

3          THE COURT:  Listen.  I think we have to get away from

4   the word "outage".

5          MR. LAPPING:  Yes.

6          THE COURT:  That the evidence is clear, clear, clear

7   there was no outage on these eight days.  The question is, what

8   does it mean when Vince Castro reports phasing no good, cause

9   of blown fuses earlier on switch log operations?  Well, how do

10  I know what to make of that?

11         Because I think we've got it well-established there

12  was no outage.  There was a surge or some anomaly, but not what

13  we call an outage literally, like the power's out.  Think about

14  when you are in your home and you're watching TV and the lights

15  go out.  And you go God damnit, PG&E just kicked the power out

16  on us again; that isn't necessarily what happened.  What might

17  have happened was a surge that lasted seconds, but didn't

18  restart Mr. Greenberg's blown refrigerator relay.

19         MS. DODGE:  I'm saying --

20         THE COURT:  So I can't ignore these entries by Bill

21  Jennings and Vince Castro.

22         MS. DODGE:  Right.  I'm trying to find -- because Mr.

23  Lapping actually asked Dustin Dier (phonetic) about this in his

24  deposition, and I believe he attached his -- is it here?  Yeah,

25  it's Mr. Lapping's or Greenberg's Exhibit RR, the deposition of

PG&E and Pacific Gas And Electric Co

1  Dustin Dier in condensed format.

2  THE COURT:  Okay.  Now, just a second.

3  MS. DODGE:  Let me close that out.  Hold on.

4  THE COURT:  Oh, I love these condensed formats, since

5  I can barely read them.  Okay.

6  MS. DODGE:  Okay.

7  THE COURT:  In my next life, I'm going to do jury

8  trials, so I don't have to look at exhibits.  I'll let the jury

9  do it.  Okay.  So we're --

10  MS. DODGE:  Oh, we would all like that, definitely.

11  THE COURT:  So where do I look at in the exhibit?

12  MS. DODGE:  Right.

13  THE COURT:  What page?

14  MS. DODGE:  So on page -- let's see.

15  MR. LAPPING:  I'm having trouble.  This is a Dustin

16  Dier exhibit, depot exhibit?

17  THE COURT:  It's RR.

18  MS. DODGE:  Yes, it is.  It's RR.

19  MR. LAPPING:  Oh, it's RR.  Okay.  I got it.

20  MS. DODGE:  Yes, um-hum.

21  MR. LAPPING:  Thank you.

22  MS. DODGE:  Okay.

23  THE COURT:  Okay.  What page?

24  MS. DODGE:  So if you look at -- hold on.  I'm finding

25  it.  One second.

PG&E and Pacific Gas And Electric Co

1          MR. LAPPING:  Well, no.  There are no exhibits

2    attached to Dustin Dier's --

3          MS. DODGE:  No.  I'm not looking at exhibits.  I'm

4    looking at his testimony.

5          MR. LAPPING:  Oh, okay.  All right.  Okay.

6          MS. DODGE:  You asked him about this.

7          Okay.  Hold on.  Okay.  So if you look at page 5, but

8    page 17 of his deposition because it's in this condensed

9    format --

10          THE COURT:  Okay.  One second.  I'm going to scroll up

11    to it.  It's the deposition, page 7 you said?

12          MS. DODGE:  The deposition, page 17.

13          THE COURT:  Oh, 17.  Excuse me.

14          MS. DODGE:  Yeah.

15          THE COURT:  Okay.

16          MS. DODGE:  And then if you look at lines 13 through

17    18 or 17, Mr. Lapping asked Mr. Dier:

18    "Q. At 10:42" -- and he's talking about this exhibit here

19    again, that entry, the Bill Jennings entry, "it was noted that

20    there were blown fuses.  Does that phenomenon have any effect

21    on the delivery of electricity?"

22    "A. It should not because they were in a loop."

23          THE COURT:  So this is Mr. Dier saying the loop --

24    which suggests to me that there's redundancy; you blow one

25    fuse, the other one kicks in or whatever.

PG&E and Pacific Gas And Electric Co

1          MS. DODGE:  Right.

2          THE COURT:  I don't know.  Whatever it does.

3          MS. DODGE:  Right.

4          THE COURT:  Think back to my electrical training in

5    the navy.  But okay.  But therefore what?  And therefore, you

6    think that the records that Vince took of them, Vince's

7    reference on March 16th -- although he might have referred to

8    blown fuses, it wasn't effecting the delivery of electricity?

9          MS. DODGE:  Correct.

10          THE COURT:  Well, what was it effecting, then?

11          MS. DODGE:  They show that the fuses are blown because

12    there is some phasing that needs to be corrected.  But Mr.

13    Lapping asked Mr. Dier about this and what this operation would

14    involve and he said would this have caused, you know, a power

15    outage or you know, a delivery -- an issue of not -- there

16    being previous issues with being an electrical service

17    interruption, and he answered no.

18          THE COURT:  So Mr. Lapping, your theory again, to go

19    back to your -- I understand your judicial estoppel theory.

20    But your other theory is that Veteran's (sic) Power was in

21    there in this trench and they had power equipment and they did

22    the equivalent of a car hitting a pole.  They did something

23    that was a jarring impact on an electrical line, and that

24    caused the surge in Mr. Greenberg's refrigerator?

25          MS. DODGE:  Because he's right next door, Your Honor.

PG&E and Pacific Gas And Electric Co

1    THE COURT:  No.  I understand.  I understand.  I'm not

2   pretending that, you know, he's in the next county.  I'm just

3   trying to understand it.  okay.

4    MS. DODGE:  Your Honor, if I could just go back to

5   the -- again, Mr. Lapping's argument about PG&E making a

6   judicial admission that they were not doing any work in the

7   area and therefore, Rule 14 wouldn't apply; that makes no sense

8   to me because there is no such judicial admission.  As I

9   explained, we objected to the discovery requests because we

10  felt that they were overbroad.  And we limited it based on Mr.

11  Greenberg's claim as to what he was claiming.  And we produced

12  records related to our work on the circuit.  There was never

13  any sort of admission that we were not doing work in Fairfax.

14    And Mr. Lapping had every opportunity, if he had

15  chosen to do so, to meet and confer and say no.  I think that,

16  you know, we are entitled to the records at 31 Bolinas and you

17  need to dig up all of that.

18    And you know, as a matter of fact, I mean, after Your

19  Honor had made the ruling about producing the claims file and

20  made the assumption that that would include the work records of

21  31 Bolinas, our claims file didn't include that.  I produced

22  those to Mr. Lapping because I knew we were getting close to

23  trial and I said look.  These are the records we have.  Here

24  they are.  And you know, you can have whatever you need because

25  we have nothing to hide.  So there's no sort of judicial

PG&E and Pacific Gas And Electric Co

1  admission here, and I'm not really understanding what his

2  theory is based on.  Again, like I said, we objected.  We

3  limited what we felt the discovery requests -- we felt they

4  were overbroad.  We responded.  And again, he's had all of

5  these records.

6       And still, there's nothing in any of the Veteran Power

7  records.  All they talk about is trenching and backfilling.

8  There's no notation from February 15th, I think, in their daily

9  work reports through February 22nd where it talks about oh my

10  gosh, we hit a conduit, we hit a line, we hit something and it

11  disrupted the power.  So I don't really understand this whole

12  negligence argument.

13       And then you just say, oh, they were doing heavy

14  construction and it might have caused a surge.  I mean, to me,

15  it's completely speculative.  And like you said, the rez ipsa

16  argument doesn't work here because this isn't a strict

17  liability issue.

18       THE COURT:  Okay.  Well, I need to just pause for a

19  minute here.  Ms. Dodge, why -- and tell me again why you think

20  I shouldn't at least let into evidence the Veteran's (sic)

21  Power documents?  I mean, you identified them today.  The way

22  the hearing went today, we've had to switch gears a lot of

23  times and you both have been very cooperative and very

24  professional about it.  I appreciate your good work for your

25  clients.  But why is it should I -- why should I not allow all

PG&E and Pacific Gas And Electric Co

1    the VP exhibits into evidence?

2         MS. DODGE:  In terms of them being an exception to the

3    hearsay rule as business records, I don't necessarily have an

4    issue with that.  But there are things within the records

5    where, like, for instance, there's -- and I need to pull it up.

6    One of the records, I think it's the one on 4 or 6, where it

7    says, oh, PG&E told us that so-and-so.  And that's basically

8    hearsay within hearsay and I don't understand why it's

9    necessary.

10        THE COURT:  And why isn't it an admission of a party?

11        MS. DODGE:  But it wasn't -- this is -- hold on.  Let

12   me find the document.

13        THE COURT:  Well, if PG&E told us such-and-such, your

14   argument is it's hearsay within hearsay.

15        MS. DODGE:  Right.

16        THE COURT:  Well, I'm not sure that it is hearsay

17   within hearsay if it's an admission of a party.  I mean, right?

18   Isn't there an admission of a party?

19        MS. DODGE:  I mean, again, I wasn't going to make

20   really a major issue of this because I didn't believe that it

21   was even really a consequential fact, in terms of what the, you

22   know, PG&E told us that, you know, they need to find or they

23   need to get a smaller vault for the sidewalk or something like

24   that.  So to me, I just thought, you know, again, I would like

25   to try to streamline and simplify issues here.

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E and Pacific Gas And Electric Co

1       But what I don't understand is why we wouldn't have

2   somebody from Veteran Power here testifying as to the records

3   and the person, you know, who was in charge of this saying hey,

4   this is what we did and all of that, in terms of we're just

5   relying on these records in terms of trenching and backfilling.

6   And okay, this is -- anyway, that's --

7       THE COURT:  But if some guy's working in the trench

8   and he's driving one of these big jackhammers, he's not going

9   to know that the house next door had a refrigerator crap out on

10  him, so what's the point?  I mean, what do you think the

11  Veteran's (sic) Power person would say if they saw --

12      MS. DODGE:  They would have known.  They would have

13  known if they had hit some sort of connection or something that

14  would have caused some sort of electrical interruption.  I

15  mean, I don't think --

16      THE COURT:  Well, presumably, yes.  I agree if they --

17  hitting something with an electrical interruption.

18      MS. DODGE:  Right.

19      THE COURT:  But so we're back to the car hitting the

20  tree or the jackhammer hitting the ground.  And Mr. Lapping

21  wants me to find that that falls outside of the protection of

22  the tariffs.  You want to say no.  You know, it just goes with

23  the territory.  I mean, it's --

24      MS. DODGE:  Okay.  So they're jackhammering to do the

25  trenching in order to install this customer upgrade.

PG&E and Pacific Gas And Electric Co

1          THE COURT:  Or they're digging or they're

2     jackhammering it out.

3          MS. DODGE:  Right.  Digging or --

4          THE COURT:  They're doing heavy duty stuff, right?

5          MS. DODGE:  Right.  Exactly.

6          THE COURT:  Okay.

7          MS. DODGE:  They're trenching.  They're digging.  And

8     we know it's heavy duty stuff.

9          So they're jackhammering, doing whatever.  How is that

10    negligence on the part of PG&E or its contractor when they're

11    just doing the work that's necessary to install a customer's

12    upgraded service?  How is that negligent?

13         THE COURT:  Well, it's not technically negligence,

14    it's whatever the words of the tariff is, right.  Reasonable

15    diligence.

16         MS. DODGE:  Right.

17         THE COURT:  Isn't that term?

18         MS. DODGE:  How is that not reasonable due diligence?

19    I mean, basically this --

20         THE COURT:  Reasonable diligence.

21         MS. DODGE:  Right.  This just boils down to the fact

22    that Mr. Greenberg is upset that they had the street, you know,

23    torn up to do this customer's upgrade of service.  And he felt

24    like it took too long.  He went on vacation.  Came back.  His

25    refrigerator wasn't working, and therefore, it must have been

PG&E and Pacific Gas And Electric Co

1   PG&E's fault, the same way it is with everything that goes

2   wrong at his property, so.

3           THE COURT:  No.  I understand.  And listen, we cut

4   away all the crap about the delays and the December.  And if

5   this job had no flaws and Veteran's (sic) was trenching and

6   they were replacing these switches and they had a scheduled

7   outage, Mr. Greenberg maybe still suffered something that cost

8   him the damage that he -- leaving aside how much of his damage.

9   There's no question that he had some damage.  The question is

10  whether PG&E has to be responsible for it.  And so I think to

11  some extent, this is a lot of sort of collateral stuff to talk

12  about what happened in December and what happened in April.

13          What happened in my mind is what happened between

14  February 14th, Valentine's Day, and Presidents' Day or

15  Lincoln's birthday or George Washington's birthday, whoever's

16  birthday it was.  And it comes down to something went wrong.

17  You know, you don't like the expertise of the guy who does the

18  work, but to me, he certainly knows his job and impressed me

19  that he knows what he's doing.  And I think about a thing that

20  I had burn out in a refrigerator once and how I got it fixed.

21  And it comes down to is PG&E liable because it falls outside of

22  the normal cost of doing business here.  Mr. Lapping says yes,

23  you say no.

24          MS. DODGE:  Right.

25          THE COURT:  And none of us -- the three of us -- know

PG&E and Pacific Gas And Electric Co

1    what actually caused the problem.  And Mr. Lapping wants me to

2    draw the inference that this thing didn't fail by itself and

3    therefore, it failed because whatever Veteran's (sic) Power did

4    in those eight days did it.

5              Right, Mr. Lapping?  That's really what you're -- I

6    mean, I understand your judicial argument, judicial estoppel

7    argument and I'm not --

8              MR. LAPPING:  That's my fastball, Your Honor.

9              THE COURT:  Huh?  What?

10             MR. LAPPING:  That's my fastball.

11             THE COURT:  Yeah, that's your fastball.  Okay.

12             MS. DODGE:  And Your Honor, I just want to point out,

13   too, that -- I mean, I don't know if you are, you know,

14   planning to take this under submission, but you know, that we

15   also haven't addressed the fact that the refrigerator

16   technician was not available to testify.  And I'm not trying

17   to, you know, harp upon some sort of technicality in the

18   pre-trial scheduling order, but again, he wasn't disclosed

19   until, well, again, after discovery.  He was on the exhibit --

20   I'm sorry -- on the witness list, but you know, we had no

21   chance to talk to him.  We didn't even get a chance to observe

22   his demeanor.  And when I started asking him more pointed and

23   direct questions about what he remembered about that date, all

24   of a sudden, he couldn't recall and I don't remember and I

25   don't remember what the outlet looked like, and all of that.

PG&E and Pacific Gas And Electric Co

1    THE COURT:  Do you want me to make him produce him?

2    You want him -- want me to make him come back and testify?

3    MS. DODGE:  No.

4    THE COURT:  Okay.

5    MS. DODGE:  I want to be done.  I think Mr. Lapping

6    does, too.

7    THE COURT:  Well, I know.  But I've been giving you

8    both compliments for representing your clients.  Well, I would

9    like to be done, too, but my job is to do what I'm supposed to

10   do, based on the evidence.

11        I'll tell you what I'm going to do.  Well, first of

12   all, yes, I am going to take it under submission.  How can I

13   possibly understand these exhibits?  Particularly when I think,

14   in my mind, we've come through the -- well, listen.  If I

15   decide that Mr. Lapping's judicial argument is right, you lose.

16   Out you go.  80,000 bucks or 120,000 bucks.  If I decide that

17   you're right, Ms. Dodge, there's no -- they didn't carry their

18   burden of proof, then we're done.  There's no damage, period.

19   No recovery.  But I have to go back and take some time to look

20   at the video again.

21        For the record, though, I'm going to overrule your

22   objections to all the -- what I'll call the VP exhibits and let

23   them into evidence.  And according to my notes from this

24   morning, they were all the VP exhibits plus your exhibit I,

25   which is TG unnumbered.  And that's a just a certification from

PG&E and Pacific Gas And Electric Co

1   Veteran's (sic) Power; that's kind of a no-brainer.  That's

2   kind of up there, like --

3           MS. DODGE:  Right.  Right, yeah, I'm not --

4           THE COURT:  You know, like Mr. Greenberg's United

5   Airlines ticket.

6           MS. DODGE:  Right.

7           THE COURT:  Equally probative, so.

8           MS. DODGE:  Right.  But I did also, Your Honor -- and

9   again, belatedly, but I did have an objection to Exhibit GG,

10  which is the internet -- Mr. Greenberg's GG, which is his -- I

11  don't know, eHow article on causes of refrigerator failure.

12  Again --

13          THE COURT:  Yeah, why don't I --

14          MS. DODGE:  On the basis that that, again, calls for

15  expert testimony and no experts were identified here.

16          THE COURT:  No.  You did.  And for some reason, I

17  guess -- you know what, I don't remember.  This morning when I

18  was checking off exhibits you reserved an objection to, I

19  didn't mark it.  That doesn't mean you didn't say it.

20          MR. LAPPING:  And she did not, Your Honor.

21          MS. DODGE:  I did.  Well, I did --

22          MR. LAPPING:  She didn't oppose that; she did not.

23          MS. DODGE:  I did it belatedly, I'm sorry.  Once it

24  came up, when we were talking about the causes.  I forgot, I

25  apologize, initially.

PG&E and Pacific Gas And Electric Co

1    THE COURT:  Again, I put that in the category of what

2    difference does it make.  It's not going to make -- it's not

3    going to turn my decision and I'm not going to rely on an

4    internet explanation of the relay failures, so.

5    MS. DODGE:  Okay.

6    THE COURT:  Mr. Lapping, even though she did let it

7    in, this isn't supposed to be punishment.  So I will let all of

8    her exhibits -- all of your exhibits in.  And therefore, I'm

9    overruling the objection to the ones that were identified this

10   morning.

11   The open issues on the motion in limine, to the extent

12   that they're still pending -- to me, as part of what I'm going

13   to consider, I'm going to consider the lost rent damages.  And

14   you know, the motion in limine generally, of course, is for

15   juries.  It's some judges.  And I am one of them.  I tend to

16   feel that motions in limine are useful.  I think they're less

17   useful when you have a bench trial on Zoom.

18   I mean, to me, I think back on my own experience of

19   having an expert witness like an appraiser or some other expert

20   come to court, come in, pay for parking, come in and sit there,

21   and then be told you have to leave because you're not

22   qualified.  And then you have to explain that not qualified

23   doesn't mean you're not qualified, it just means you're not

24   qualified as an expert.  And it's embarrassing.

25   And I think I learned early as a judge to try to be

PG&E and Pacific Gas And Electric Co

1  more understanding and let people adjust their schedules.  And

2  some people who aren't professional witnesses get nervous about

3  testifying, and there's all sorts of anxieties.  So I kind of

4  take motions in limine as, you know, helpful, but you can see I

5  only dealt with two of them definitively.

6      So I'm going to treat the -- well, 2, 3, and 5 are the

7  ones that weren't dealt with, and --

8      MS. DODGE:  Well, you dealt with 5.

9      THE COURT:  Oh, yeah, I did.  I did.  I did deal with

10 5.  Yeah, so.

11     MS. DODGE:  And you did deal with 3 as well.

12     THE COURT:  Yeah.

13     MS. DODGE:  You granted that.

14     THE COURT:  I did.  I did, so.

15     MS. DODGE:  And 1.

16     THE COURT:  Correct.  Okay.  The other two stand

17 submitted.

18     I appreciate and I want to thank you both.  Your

19 clients, I don't know if they bailed out on you.  Mr. Greenberg

20 may have left, but --

21     MR. LAPPING:  Oh, he's still here.

22     THE COURT:  Oh, he's still here?  Okay.

23     MR. LAPPING:  Yeah.

24     THE COURT:  But I want to thank folks.  Tell Mr.

25 Greenberg and any PG&E representatives that your lawyers have

PG&E and Pacific Gas And Electric Co

1    done an excellent job under difficult circumstances in a -- not

2    the kind of case we get in the bankruptcy court every day.  And

3    you both acted in the highest professional standards of

4    professionalism and courtesy and moving the ball forward.

5         So it's in my hands now.  The matter stands submitted.

6    I'm not sure how I'm going to go issue a ruling, whether I

7    decide to call you in an oral ruling or do it in a more

8    detailed manner, I will do it.  But I'm not going to rush it

9    because I want to take time to review what I need to review.

10        So unless either of you want to add anything further,

11   we'll call it a day and I'll wish you a nice evening.

12        MS. DODGE:  Okay.  Thank you, Your Honor.

13        THE COURT:  Mr. Lapping, anything further?

14        MR. LAPPING:  Same to you.

15        THE COURT:  Okay.  M.s Dodge?

16        MS. DODGE:  Thank you, Your Honor.

17        THE COURT:  Okay.  Thank you both for your patience

18   and your hard work.

19        And I'll thank Ms. Thomas and Ms. Parada for putting

20   in a long day with me.

21        MR. LAPPING:  Yes, thank you for all of the --

22        THE COURT:  I'm going to go take a break.  I might

23   have an adult beverage here in a little while.

24        MR. LAPPING:  Right away.

25        THE COURT:  A nice evening.  Bye.

(973) 406- operations@escribers.net | www.escribers.net

PG&E and Pacific Gas And Electric Co

1 (Whereupon these proceedings were concluded at 5:04 PM)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1                       I N D E X

2    WITNESS             EXAMINATION BY        PAGE

3    Todd Greenberg      Mr. Lapping           28

4    Todd Greenberg      Mr. Lapping           63

5    Todd Greenberg      Ms. Dodge             77

6    Alexandr Garandza   Mr. Lapping           106

7    Alexandr Garandza   Ms. Dodge             110

8    Todd Greenberg      Ms. Dodge             124

9    Todd Greenberg      Mr. Lapping           164

10   Todd Greenberg      Ms. Dodge             181

11   David Brown         Ms. Dodge             195

12   David Brown         Mr. Lapping           205

13   Dustin Perkins      Ms. Dodge             219

14   Dustin Perkins      Mr. Lapping           232

15   Dustin Perkins      Ms. Dodge             237

16

17

18   RULINGS:                                  PAGE LINE

19   Motion in limine is granted.              21    11

20   Motion in limine is granted.              282   16

21

22

23

24

25

1              C E R T I F I C A T I O N

2

3    I, Michael Drake, certify that the foregoing transcript is a

4    true and accurate record of the proceedings.

5

6

7

8    _____

9    /s/ MICHAEL DRAKE, CER-513, CET-513

10

11   eScribers

12   7227 N. 16th Street, Suite #207

13   Phoenix, AZ 85020

14

15   Date:  June 29, 2022

16

17

18

19

20

21

22

23

24

25

(973) 406-2250 | operations@escribers.net | www.escribers.net

**$**

**$918.98 (2)**
134:2,8

**[**

**[quee-ry] (1)**
144:2

**A**

**AA (2)**
5:13,20
**ability (5)**
10:13,21;11:19,25;
253:6
**able (25)**
10:22;11:21;12:1;
25:15,19,20;47:8;48:1,
3;67:15;95:24;113:9;
121:10,14,25;173:9;
178:11;199:4;219:1,
11;220:14;223:7;
230:21;235:11;264:20
**above (2)**
167:24;168:16
**absence (1)**
29:3
**absent (1)**
86:22
**Absolutely (3)**
120:19;253:13;
262:13
**accept (4)**
43:4;69:13;170:24;
244:2
**acceptable (1)**
222:10
**access (3)**
13:23;61:22;122:15
**accessing (1)**
121:6
**accidentally (1)**
137:1
**acclimatize (1)**
153:21
**accommodate (3)**
12:17;23:19;193:9
**accommodating (1)**
23:1
**accommodation (1)**
215:23
**accommodations (1)**
13:20
**accomplished (1)**
211:6
**accordance (1)**
3:11
**according (8)**
17:10;52:7;63:22;
75:21;77:24;78:1;

128:22;279:23
**accordingly (1)**
8:15
**account (1)**
59:11
**accounting (1)**
79:11
**accouterments (1)**
241:10
**accurate (2)**
142:4,8
**acid (1)**
86:14
**acknowledge (2)**
136:11;162:21
**acknowledges (1)**
144:4
**across (5)**
32:4;161:16;172:22;
229:21;255:7
**act (4)**
19:18;20:16;56:5;
97:23
**acted (1)**
283:3
**acting (2)**
56:4;92:19
**action (5)**
55:9;85:1,21;86:1;
132:9
**actions (1)**
71:16
**activate (1)**
194:12
**active (1)**
243:18
**actively (1)**
244:18
**activities (2)**
50:1;101:3
**activity (7)**
69:11;201:10;
255:23;259:1;261:21;
262:2,3
**actual (14)**
20:6;33:1;36:1,5;
92:12;93:11;97:7;
125:25;152:5;154:25;
197:4;199:2;204:9;
212:7
**actually (32)**
4:2;8:5;36:1;49:2;
52:1,3;56:8;84:23;
103:1,2;105:12;122:4;
145:7;151:25;152:11;
153:20;163:1;174:24;
180:17;188:9;201:25;
212:23;214:11;224:23;
236:19,22;237:7;
243:10;247:25;266:1;
268:23;278:1
**adamantly (1)**
49:3

**add (2)**
91:13;283:10
**added (1)**
161:10
**adding (3)**
43:2;195:20,22
**addition (1)**
18:9
**additional (5)**
21:15;47:9;63:17;
72:12;216:20
**address (13)**
27:24;106:17;
129:11,24;131:22;
137:11,23;143:25;
194:20;218:13;219:15;
230:25;250:10
**addressed (1)**
278:15
**adds (3)**
16:25;18:21;73:10
**adequate (2)**
254:14;256:12
**adjoining (1)**
176:23
**adjust (2)**
82:4;282:1
**adjusted (1)**
182:22
**adjuster (1)**
235:10
**adjusters (1)**
225:9
**adjusting (1)**
153:23
**adjustment (1)**
121:24
**administration (1)**
13:16
**admission (12)**
243:13;244:13;
250:14;251:16;252:24;
272:6,8,13;273:1;
274:10,17,18
**admissions (1)**
251:4
**admit (1)**
180:3
**admits (2)**
248:23;256:10
**admitted (1)**
96:20
**admittedly (1)**
254:23
**admitting (1)**
68:15
**Adobe (1)**
93:21
**adopts (1)**
72:19
**adult (1)**
283:23
**advance (3)**

80:5;210:21,25
**advantage (1)**
46:1
**Adventures (2)**
70:19,23
**advertised (1)**
132:23
**advertisement (1)**
173:25
**advised (2)**
55:5;103:8
**affect (3)**
49:5;52:1;237:23
**affected (6)**
102:18;224:12,24;
228:22;238:2,13
**affecting (4)**
92:5;226:19,21;
227:20
**affects (2)**
68:23,23
**afraid (1)**
102:2
**afterhours (1)**
60:23
**afternoon (4)**
194:25;217:16;
218:5;260:13
**again (134)**
5:4,16;6:21;7:5,14,
25;8:20;9:18;10:17;
13:20;14:13;15:3,9,15;
18:12,25;21:12,13;
22:25;23:16;31:5;36:1;
39:6;40:2;41:3;42:4;
43:1;51:4;54:1;59:16;
60:3;62:10;66:25;67:3;
72:6;75:1,22;76:6;
84:16;90:7;100:2,20;
102:10,21;103:21;
108:7;118:15;119:19;
125:10;126:2,8,10;
129:17;130:23;132:2,
11;133:1,9;136:1;
137:9;139:5,12;
140:20;142:25;148:1;
149:21;151:2;161:22;
164:1;167:11;168:23,
24;169:19;182:12;
183:7,10;185:22;
186:16;187:10,18;
188:25;189:1;193:1;
198:19;209:2,6;
210:15;211:19;214:20;
215:15;216:10;219:14;
221:25;222:2,3,17,23;
226:25;233:19;234:14;
240:5,6;243:2;247:17;
249:4;257:9;259:25;
260:1;261:6;262:4,7,
10,15;264:1;265:16;
266:21,24;267:23;
268:16;270:19;271:18;

272:5;273:2,4,19;
274:19,24;278:18,19;
279:20;280:9,12,14;
281:1
**against (5)**
121:8;128:19;132:6,
19;241:22
**agent (6)**
26:13,13;45:4,8;
54:9;196:7;250:12;
251:10
**agents (1)**
250:9
**ages (1)**
123:3
**ago (13)**
6:13;14:18;16:23;
18:17;21:1;76:8;84:12;
105:7;112:18;115:23;
135:14;136:22;163:9
**agree (8)**
7:7;82:22;184:9;
239:10;255:23;263:6,
12;275:16
**agreeing (4)**
37:5;100:19;184:15,
21
**agreement (1)**
46:6
**ahead (54)**
9:25;12:6;16:18;
18:2;20:7,12,12;21:11;
23:20;24:5;29:5;33:3;
38:2,3;45:1,2;53:2;
54:7;62:24;65:8;69:14;
76:13;84:2;88:24;
90:21;97:18;103:7;
107:15;109:5,17;
118:5;137:8;148:20;
156:24;159:7;163:18,
25;171:4;172:17;
174:8,23;180:11;
207:10;209:25;214:6;
216:21;217:7;223:4;
232:9;234:19;235:2,
20;237:10;252:7
**AIP (4)**
54:8;70:25;152:3;
154:20
**Airlines (3)**
9:9;59:23;280:5
**Alert (2)**
210:23;239:18
**Alex (1)**
159:9
**Alexandr (2)**
35:8;106:19
**aligned (1)**
82:4
**allegations (1)**
263:1
**alleged (2)**
24:7;224:20

Case: 19-30088    Doc# 12576    Filed: 07/01/22    Entered: 07/01/22 07:05:33    Page 287
of 320

**alleging (3)**
220:2;224:13;235:22
**alley (1)**
213:4
**allow (8)**
11:11;61:11;103:20;
151:4;211:12;215:23;
230:20;273:25
**allowed (4)**
15:11,12;20:20;
230:25
**almost (4)**
8:5;12:2;76:11;
239:2
**along (7)**
8:22;83:21;149:2,3,
3;207:20;256:18
**alternative (4)**
64:2;243:17;254:12
**alternatives (1)**
199:23
**although (3)**
156:15,17;271:7
**ambiguous (6)**
199:13,18;206:9,11,
20;215:15
**amend (8)**
6:14;15:12;16:8,11;
19:4,25;21:1,7
**amended (23)**
6:13,14;14:16,18;
15:1,6;16:1,23;18:15;
20:2,4,15;21:8;70:1;
74:23,24;75:1,18;
121:14;135:12;154:17;
158:24;159:14
**amending (2)**
6:17;15:8
**amendment (7)**
15:13;18:5,18,20,20;
72:3;73:17
**amount (12)**
16:21;20:1,5;21:8,
15,22;48:7;73:14;74:5;
134:7,8;254:19
**amounts (3)**
17:9;19:4;75:20
**amp (1)**
254:13
**amperage (1)**
110:10
**amps (4)**
254:14;255:7,25;
257:2
**analogy (1)**
244:20
**anecdotal (1)**
86:5
**animal (1)**
38:9
**announcement (1)**
254:9
**anomaly (1)**

268:12
**answered (11)**
91:10;128:7;136:14,
16;144:11;150:4;
206:12;211:17;216:3;
235:3;271:17
**anticipated (1)**
166:13
**antiquated (1)**
225:8
**anxieties (1)**
282:3
**anymore (2)**
183:6;192:17
**apartment (1)**
177:11
**apologies (1)**
135:9
**apologize (6)**
93:22;100:4;109:5;
122:23;158:14;280:25
**apparent (1)**
145:7
**apparently (14)**
10:15;34:1;41:5;
42:8;79:7;87:21;
100:17;101:3;127:7;
128:22;136:15;153:25;
155:16;174:25
**appeal (1)**
50:2
**appear (9)**
10:18;11:16,18,25;
62:13;73:13;106:25;
133:4;183:1
**appearance (8)**
2:8;61:11;104:17;
117:10;225:11;234:2,
12;235:25
**appeared (1)**
65:14
**appearing (1)**
2:10
**appears (8)**
41:2;121:2;135:18;
140:19;187:10;225:24;
245:8;254:14
**appliance (23)**
10:3;34:3,8;36:5;
38:7;46:1,4,4,7,9;
60:13;62:23;107:2;
111:1,3,17,18;113:6,8;
114:18;115:9;121:17;
148:17
**appliances (5)**
88:12;89:17;109:14;
127:4,24
**application (1)**
235:24
**applies (1)**
233:11
**apply (5)**
230:19;231:2,4;

233:23;272:7
**applying (1)**
233:22
**appraiser (1)**
281:19
**appreciate (5)**
107:1;118:2;252:3;
273:24;282:18
**approach (1)**
56:1
**approached (1)**
63:4
**appropriate (2)**
68:16;123:19
**approved (4)**
16:17;24:23;210:20;
231:6
**approximately (7)**
87:15;109:8;111:3;
112:3;175:3,5;178:10
**April (26)**
13:7;16:8;18:7;20:1,
21;50:7,8;75:4,12;
91:3,12;99:19,19;
101:14;102:18,18;
125:3;196:22;198:24;
202:2;213:9;215:10;
216:5;225:21;227:14;
277:12
**arbiter (2)**
144:16,19
**architects (1)**
47:7
**area (8)**
101:24;159:2;168:1,
3;182:25;185:24;
228:1;272:7
**areas (2)**
53:1;145:8
**argue (4)**
6:19;22:21;23:4;
193:8
**argument (25)**
6:23;15:3,4;17:22;
22:15,24;26:9;67:8;
231:11;243:5;244:2,
12;249:17,17;251:25;
252:25;253:1;262:8;
272:5;273:12,16;
274:14;278:6,7;279:15
**arguments (1)**
265:19
**around (7)**
10:5;11:12;17:5;
34:7;61:1;67:7;209:11
**arranged (1)**
34:8
**arrangement (2)**
10:6,8
**arranging (1)**
106:25
**arrived (1)**
197:11

**Arslan (4)**
137:15;141:4;142:9;
248:9
**art (1)**
188:8
**article (8)**
86:17;242:8,10,11,
13,16,24;280:11
**Ash (1)**
194:21
**aside (3)**
18:3,11;132:13,13;
277:8
**aspect (1)**
205:23
**aspects (1)**
152:8
**assembly (1)**
113:14
**assert (1)**
45:3
**assigned (1)**
137:18
**assist (1)**
195:24
**assistant (1)**
121:1
**assisting (1)**
107:6
**associated (2)**
52:5;81:25
**assume (9)**
11:15;14:22;27:11;
46:4;64:15;244:8;
245:3;255:4;267:18
**Assumes (2)**
206:20;210:10
**assuming (4)**
9:11;60:10,12;253:1
**assumption (3)**
47:2;268:2;272:20
**AT&T (8)**
11:8,13;61:19,20;
62:17,18;105:10;119:1
**attached (15)**
16:12;86:17;94:8,12;
96:16,19;97:8;102:1;
104:12;107:18;121:16;
133:25;135:6;268:24;
270:2
**attaches (2)**
136:5;267:3
**attachment (10)**
15:12,16;17:8;74:4,
5,11,24;94:25;96:14,17
**attempt (2)**
165:17,19
**attempted (1)**
201:14
**attempting (1)**
51:2
**attendee (1)**
10:23

**attention (3)**
85:11;88:12;225:13
**attorney (3)**
97:14;106:9,11;
145:18
**attribute (1)**
109:20
**audio (12)**
105:19,23;120:11;
139:25;151:10;178:22;
194:4;221:16;223:8;
238:23;259:23;261:5
**authorize (1)**
213:23
**authorized (3)**
24:25;213:24;214:8
**AUTOMATED (1)**
164:16
**automobile (1)**
241:9
**available (7)**
10:5;61:14;62:23;
118:2;246:5;263:13;
278:16
**Avenue (4)**
106:19;131:24;
194:21;205:21
**avoid (1)**
37:3
**aware (18)**
29:5;43:3,6,8;44:3;
63:16;67:12;84:25;
85:4;101:8;128:1;
156:3,15;177:9;
207:12;216:22;232:17;
235:10
**away (17)**
24:8,18;88:10;89:14;
116:16,24;117:5;
125:5;165:3;189:9;
190:24;226:17;255:4;
267:10;268:3;277:4;
283:24
**awful (4)**
32:1;38:9;170:22;
171:13

**B**

**back (106)**
6:20;7:4;10:4;13:22;
15:8;18:6;20:1,20;
23:1;38:8;40:5;49:1;
55:1;62:10;69:3;72:2,
2;74:15;79:9;81:2;
88:10;89:21;92:23;
95:8,11;100:6;105:18;
110:22;118:11;120:11;
123:17;124:17;126:8;
129:5,10;133:15;
139:5,6,18,21,24;
140:2,6;143:12;149:1;
157:2;162:7,9,11;

Case: 19-30088    Doc# 12576    Filed: 07/01/22    Entered: 07/01/22 07:05:33    Page 288
of 320

164:12;165:8;172:19;
174:10;176:7;180:12,
19;181:25;183:14,14,
15;189:6,16,17,23;
197:5,15,17;200:4,18;
202:13;205:8;214:18;
220:25;222:16;223:3;
224:11;229:25;230:6;
233:10;237:1;239:19,
24;247:15;249:22;
252:18;255:2;258:19;
260:17;261:6,18,20,23;
262:22;263:18;264:10,
16,21;266:21;271:4,
19;272:4;275:19;
276:24;279:2,19;
281:18
**backfield (2)**
257:25;258:17
**backfilling (2)**
273:7;275:5
**background (2)**
39:6;42:5
**bad (6)**
38:3;40:2;46:5;
151:17;200:3;222:20
**bailed (1)**
282:19
**balance (1)**
22:12
**ball (2)**
252:11;283:4
**ball's (1)**
62:13
**Bankruptcy (7)**
18:5;28:3;55:1,2,3;
218:5;283:2
**bare (1)**
172:24
**barely (1)**
269:5
**Barnett (2)**
44:7;45:7
**Baron (2)**
45:9,9
**baseboard (1)**
161:17
**based (17)**
11:23;22:16;44:5;
65:14;73:1;81:24;
90:11;124:4;136:4;
145:6;166:14,15;
238:1,14;272:10;
273:2;279:10
**basically (28)**
5:23;13:14;17:2;
74:15;107:19;109:14,
25;134:21;206:5,14,
17;208:19;210:5;
221:20;230:16;243:14;
246:14;248:25;249:4;
257:17,24;259:3,4,10;
262:11,12;274:7;

276:19
**basis (12)**
50:1;75:8;130:5,24;
131:10;220:1;254:15,
25;255:8;256:2,13;
280:14
**Bates (1)**
32:9
**bathroom (11)**
27:3;48:4;55:9;
175:8;176:4,15,18;
177:16,22;182:16;
191:25
**BB (2)**
5:13,20
**bear (2)**
92:18;188:7
**became (7)**
50:6;52:4;141:12;
145:7;206:16
**bed (1)**
181:12
**bedroom (26)**
48:4;158:5,7,7,8;
176:24;181:11;182:8,
18;184:7,9,11,12,13,
14;185:5,7,10,20;
186:17;188:9,10,13,17,
21,21
**bedrooms (6)**
158:1,2,3;176:24;
179:9,17
**begin (2)**
9:21;234:12
**beginning (1)**
76:23
**behalf (3)**
2:10,17;50:3
**behind (1)**
175:9
**behold (1)**
75:6
**belatedly (3)**
59:16;280:9,23
**belief (1)**
48:3
**believes (3)**
26:9;103:18;147:5
**bench (2)**
7:5;13:5,9;281:17
**beneficiaries (1)**
29:5
**benefit (2)**
250:7;252:25
**berries (1)**
162:5
**besides (3)**
10:3;122:24;238:4
**Best (2)**
92:8;251:24
**better (16)**
28:8;35:4;62:23;
92:15;93:3;186:17;

197:19;199:15;219:3,
5;220:16;222:4;223:9,
25,25;236:17
**beverage (1)**
283:23
**beverages (2)**
134:1,1
**beyond (12)**
18:23;25:13;43:2;
119:5;150:9;214:2;
228:21;229:18,19;
233:11,12,14
**bid (1)**
179:23
**big (5)**
22:8;38:4;109:24;
141:25;275:8
**bigger (9)**
35:3;71:10;133:10;
188:9;208:17;215:7,8,
8;225:17
**bill (7)**
38:7;47:3;246:12;
267:17,18;268:20;
270:19
**billed (1)**
46:1
**billing (1)**
137:1
**bird (1)**
236:12
**birds (2)**
25:13;228:25
**birthday (3)**
277:15,15,16
**bit (18)**
33:1;35:2,3;80:15;
84:25;122:25;124:6;
129:19;133:2;153:11;
164:19;183:14;185:11;
202:20,21;219:3;
223:24;225:17
**black (2)**
107:20,24
**blackened (1)**
109:21
**blaming (1)**
244:4
**blank (1)**
105:10
**blocked (1)**
259:14
**blow (1)**
270:24
**blowing (2)**
147:18;148:8
**blown (20)**
68:10;246:13,15;
247:4,5;248:18;
249:11;256:24;265:7,
13,20,22;266:1,3;
267:18;268:9,18;
270:20;271:8,11

**blue (1)**
18:19
**board (2)**
74:18;239:18
**bogged (4)**
5:5;59:9;210:16;
212:9
**boils (1)**
276:21
**Bolinas (41)**
4:17;24:11,15;27:25;
28:5;29:2;41:1;42:4,8;
56:2,8;64:3;67:11,14;
68:11;69:6;71:11;
83:24;84:15;131:22;
145:20;195:12,17;
199:7;200:6,6,14;
201:3,5;203:1,6;
204:20;205:21;213:25;
214:10,11;215:1;
244:14;246:7;272:16,
21
**books (1)**
46:9
**boss (3)**
11:6;44:6,7
**both (25)**
8:7,21;9:6;32:6;
47:9;76:2;84:20;
119:16;120:11,25;
121:24;165:14;169:16;
190:2;195:17;231:6;
239:9;252:6;257:21,
21;273:23;279:8;
282:18;283:3,17
**bothers (1)**
19:23
**bottom (12)**
32:3;38:6;64:17;
127:13;131:17;133:3;
139:2;168:5,5,12;
246:10;265:9
**bought (8)**
28:3;77:23,25;78:12;
83:23;173:16,25;
191:12
**bound (1)**
251:19
**Box (12)**
123:10,10;203:1,7,7,
9,11,17;204:6;205:12;
207:3;213:5
**Brad (8)**
42:2;63:22;64:2;
67:14;200:25;201:3,7;
254:13
**branch (5)**
229:20;230:3,5;
236:12,25
**brands (1)**
115:3
**break (33)**
8:23,25;9:3;12:18;

14:10;27:5,7;56:3,4,8;
62:10;98:7;100:4,7;
105:25;118:10;119:10;
120:7;121:13;122:10;
124:20;164:6,8;178:4;
211:10;214:23,23;
239:3,5,12;242:4;
264:5;283:22
**breakdown (1)**
15:13
**breaker (2)**
229:23;242:5
**breakout (3)**
156:19;177:9,9
**breaks (4)**
8:22;9:1;27:3;170:2
**bridge (2)**
12:22;13:21
**brief (10)**
22:9;36:9;195:14;
220:20;230:4,7;
236:10,15;237:5;240:8
**briefly (3)**
63:9;136:2;180:16
**briefs (1)**
26:8
**bring (18)**
2:6;18:7;19:4;23:24;
27:8;33:9;41:2;80:1;
102:2;105:18;120:11;
130:16;131:14;157:2;
192:21;194:9;217:25;
232:5
**bringing (1)**
82:9
**broadcast (1)**
8:12
**broke (2)**
39:2;199:17
**broken (7)**
36:1,5;38:5;40:6;
113:15;117:6,14
**broker (1)**
46:9
**brother (1)**
29:5
**brought (4)**
127:10;159:16,17;
178:14
**Brown (44)**
66:7,8,9,10,11,16;
193:24;194:11,14,15,
17,21,25;195:5;200:1,
20;202:10,12;204:16,
17;205:16,20;206:22;
207:24;208:18;209:4,
12;210:4,16;212:9;
213:10,21;214:7,19;
217:15;247:13,24;
253:4,5,19;254:5;
255:19,25;257:3
**Brown's (2)**
65:13,20

Min-U-Script®
eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net
(3) backfield - Brown's
Page 289

Case: 19-30088    Doc# 12576    Filed: 07/01/22    Entered: 07/01/22 07:05:33    Page 289
of 320

**brushing (1)**
241:21
**bucks (3)**
46:6;279:16,16
**bug (1)**
122:18
**building (6)**
146:15;161:15;
175:19;195:18;216:9;
256:14
**buildings (1)**
206:4
**built (1)**
161:9
**built-in (1)**
181:11
**bunch (3)**
4:10;19:17;59:23
**bunched (1)**
59:14
**burden (3)**
9:16;267:25;279:18
**burn (2)**
117:16;277:20
**burned (4)**
59:3;113:24;116:1;
119:9
**burned-out (1)**
36:4
**burnt (2)**
34:2;35:1
**business (6)**
4:19;23:1;70:19;
195:8;274:3;277:22
**busy (1)**
20:1
**button (2)**
157:17,19
**buy (4)**
78:24;173:13;183:3;
257:2
**buying (1)**
191:14
**Bye (3)**
88:23;118:12;283:25
**Bye-bye (1)**
118:14

**C**

**calculation (3)**
152:6;178:9,11
**CALIFORNIA (11)**
2:1;24:23;28:1;
100:14;22;106:20;
194:22;219:15;230:19;
231:6;234:3
**Call (63)**
2:3,23;3:22;6:1;7:9;
8:1,2,9;10:6,9,9,10,19,
25;11:14;14:1,9,11;
21:21;22:11,11,15;
26:24;47:9;61:20;

62:23;76:21;104:19;
107:13;109:3;111:7;
115:1,8;117:14;
118:12,19,23;120:1;
148:15;188:10;193:21,
24;194:4;208:1,4;
210:20,23;217:24;
218:21,25;220:11,12,
14,17;223:7,14,16;
245:12;267:22;268:13;
279:22;283:7,11
**called (4)**
34:4;46:9;228:16;
246:19
**call-in (3)**
62:17;105:7,10
**Calling (5)**
2:5;10:2,2;14:4;
118:20
**calls (16)**
10:14,14;35:3;38:1;
54:7;71:19,22;107:12,
25;108:2;112:4;209:8;
227:24;228:14;233:20;
280:14
**came (17)**
34:9;35:6;49:1;
89:21;122:10;150:22;
162:7;165:8;170:7,12,
25;189:23;203:6;
220:25;247:12;276:24;
280:24
**camera (14)**
10:11;11:7,20,25;
12:1;13:23;27:10;28:5;
56:2;106:2;120:15;
194:12;218:3,4
**cameras (3)**
12:2;120:7;239:17
**campaign (1)**
47:4
**Campbell (1)**
106:19
**Can (297)**
2:14,15;4:13;7:5,12;
8:6;10:22,25;11:10;
12:8,18;14:9,25;18:7;
19:20;23:15;25:7,25;
28:4,6;29:1,6,7;30:1,5;
31:2,5,6,6;32:4;33:1,2;
35:3,6,8;39:6;40:4;
41:8;42:5,7;43:5,8,8;
46:1,4;48:6;53:8;54:1;
55:5;56:3;59:18;61:15,
18,23;62:9,10,16,23,
25;63:5,9,18;64:5,6,23;
68:15,16;71:8;77:6;
78:22;79:6;80:11;81:9;
83:21;85:14,23;86:22;
88:1;92:1,9,25;94:1;
95:1;96:4;100:16,18;
102:11,11,13;103:6,14,
15;104:11,17;105:18,

18,19,23;106:12;107:8,
14,15;108:6;110:2,15,
17,17;112:2;113:4,7;
114:2,9,21;115:2,8,24;
116:18,18;118:11;
119:1,8;120:11;125:9,
11,12,20,22,25;126:20,
20,21;127:16,19,20;
128:16,16;129:19,23;
130:2,8,17,18;131:15;
132:17;133:2;138:10,
17,21;139:7,12;
146:10;151:6;153:20;
156:3;157:6,8,11;
158:9,15;159:6;
161:19;163:14;166:23;
167:2,7,17;168:3,4,14;
169:13;171:2,2,2,6;
172:8,16,17,25;173:1,
1,2,6,21;174:1,3,22,23;
175:6,13;176:7;178:3;
179:4;180:18,22,23;
181:16,19;182:1,6,8,
10,14,19,20,20;183:19;
189:3;194:12,14;
195:7,14;199:14;
200:20,21;202:6,12,17,
21;203:4;206:24;
207:10,14,15;208:2;
210:15;217:16,17,25;
218:6,7,18,23;219:3,4,
7;220:6;221:14,15,21,
21,22;222:3,3,14,15,
19,25;223:18,24;
224:7;225:18,19;
227:1;231:21,24,25;
232:10,15,15;234:17,
17,18,25;235:7,19;
239:24;240:6;241:9,
20;245:7;252:15;
253:21;255:14,25;
257:1;259:8,8,15,18,
20,21,22,24,25;260:2,
8;261:3;262:17;
263:14;264:9,23;
265:8,25;269:5;
272:24;279:12;282:4
**cancelation (1)**
45:2
**canceled (3)**
196:22;197:14;
198:22
**capable (1)**
103:18
**capacity (1)**
234:24
**car (9)**
208:4;232:22;
236:13;241:21;245:9,
10,11;271:22;275:19
**care (6)**
47:6;119:8;163:12;
192:6;244:7;251:17

18,19,23;106:12;107:8,
14,15;108:6;110:2,15,
17,17;112:2;113:4,7;
114:2,9,21;115:2,8,24;
116:18,18;118:11;
119:1,8;120:11;125:9,
11,12,20,22,25;126:20,
20,21;127:16,19,20;
**cared (1)**
191:17
**career (1)**
112:2
**carefully (2)**
155:13,14
**cares (1)**
31:3
**carpet (6)**
33:4;121:20;163:1,3;
170:11,14
**Carpets (19)**
21:25;53:6;54:9;
70:20,25;72:10,11;
74:22;121:21;151:23;
152:3,10,12;153:5,6;
154:19;155:4;177:24;
178:4
**carried (1)**
175:2
**carry (1)**
279:17
**cars (1)**
232:21
**carved (1)**
77:1
**case (28)**
3:4;7:10,25;14:4;
22:8;26:2;37:2;76:22;
80:9;115:20,23;116:7,
8;123:11;136:10;
137:18;193:5,18;
211:1;217:4;221:16;
230:20;231:4;240:14,
18;244:7;252:9;283:2
**case- (1)**
239:25
**case-in-chief (1)**
120:1
**Castro (4)**
246:22;247:3;268:8,
21
**catch (4)**
20:18;248:5;254:3;
264:11
**category (2)**
20:16;281:1
**cause (27)**
35:2;36:2,5;43:2;
59:18,21;60:3;83:6;
109:21;131:18;165:5;
216:19;224:10;229:22,
24,24;230:4;232:11,12,
22;240:22;247:4,5;
249:3;256:21;266:3;
268:8
**caused (21)**
25:10;26:10;59:5;
107:23;128:20;173:18;
186:6;187:17,20,21;
216:18,21;240:17;
241:11;257:7;265:23;
271:14,24;273:14;

275:14;278:1
**causes (10)**
59:19;86:17,18,19;
230:7;241:21;242:24;
243:11;280:11,24
**causing (5)**
59:25;232:20;233:13
**cautioned (1)**
121:8
**CC (3)**
5:14,20;200:25
**cell (4)**
223:7,7,12,14
**cellphone (1)**
12:11
**cellphones (1)**
12:2
**center (8)**
48:2;127:19;169:16,
23,24,25;175:17;187:7
**certain (8)**
4:15,17;37:3;74:16;
100:18;150:21;152:12;
191:14
**Certainly (3)**
119:18;247:15;
277:18
**certification (3)**
3:21;74:8;279:25
**chains (1)**
56:9
**Chamber (1)**
50:2
**chance (9)**
12:22;61:12;62:5,6;
103:20,21;126:9;
278:21,21
**change (3)**
73:6;76:9;121:4
**changed (4)**
141:21;149:14;
177:1,4
**changes (1)**
121:3
**changing (1)**
75:11
**characterization (2)**
184:9,21
**charge (1)**
275:3
**chart (8)**
102:9,16;125:25;
139:7,15,21;140:2;
143:18
**chastise (1)**
103:11
**chastised (1)**
103:9
**check (4)**
113:5;123:14;149:1;
246:20
**checked (2)**
110:6;226:15

Case: 19-30088     Doc# 12576     Filed: 07/01/22     Entered: 07/01/22 07:05:33     Page 290
of 320

**checking (2)**
228:3;280:18
**chicken (1)**
162:6
**chief (1)**
14:4
**chips (1)**
187:15
**choices (3)**
164:7;221:14;222:15
**chose (1)**
46:1
**chosen (1)**
272:15
**Christine (2)**
102:15;104:4
**chunk (1)**
22:8
**circle (1)**
67:7
**circuit (46)**
24:10,17,20;199:11;
200:5,8,12;211:9,10,
10,14;212:11;216:16;
228:3,7;229:21,23;
230:6;233:6;236:22;
237:23;241:1;242:5;
249:24,25;250:15,20,
22,23;251:12;261:25;
262:2,4,10,20;263:4,5,
10,11,11;264:2,9;
265:5,15,16;272:12
**circuitry (1)**
199:5
**circumstance (1)**
233:14
**circumstances (2)**
233:11;283:1
**circumstantial (2)**
68:7;240:23
**cite (1)**
14:17
**cites (1)**
241:21
**City (30)**
21:25;53:5;54:8;
65:25;70:19,25;72:10,
11;74:22;121:21;
145:19,22,25;146:20;
151:23;152:3,10,12;
153:5,6;154:19;155:3;
177:24;178:4;179:1;
203:8,10,20;205:8;
250:17
**civil (5)**
196:7;205:24;206:3,
14;210:5
**claim (133)**
6:14,14,18;13:8;
14:16,21,22;15:1,6,12,
13;16:1,9,11,14,23,25;
17:8;18:4,9,14,19,21;
19:1,4,25;20:2,4,15,19,

23,24;21:1,7;24:8,21;
25:17;30:2;40:2,7,8;
43:1,1,5,6;44:2,8;45:1,
3;50:5;51:1,1,1,2,5;
53:5;55:2,4,6;59:3;
69:20,24;70:1;72:3,7,
20,22,25;73:16,18,20;
74:3,6,12,24;75:2,5,18,
25;76:1,6;90:8,18;
91:8,21;100:13,21,23;
101:5;121:15,17;
128:19,20;129:6,8,17;
130:11,20,24;132:5,8,
10,13,15,19;133:19,24;
134:5,5,6;135:13,21;
136:4;148:16,19;
154:18,20;158:24;
176:25;178:18;219:23;
220:1,23;224:6,18;
226:22;227:15;238:4;
244:16;261:23;262:25;
263:2;272:11
**claimed (1)**
51:4
**claiming (8)**
37:1,2;51:3;129:22;
186:6;220:25;224:10;
272:11
**claims (26)**
13:2,6;14:18;15:9;
24:6;45:8;55:8,9,9;
73:10;91:2;98:23;
121:18;128:12;132:14,
21,22,25;136:10;
160:5;219:22;225:8;
238:2,5;272:19,21
**clarification (1)**
153:15
**clarifications (1)**
72:13
**clarified (1)**
52:5
**clarify (23)**
39:3;46:1;48:6;51:6;
69:4;77:10;101:5,10,
11,12,12;103:16,24;
132:18;145:25;146:6;
149:13;160:2;198:4;
213:11;235:19,20;
236:6
**clarifying (1)**
132:17
**clarity (3)**
51:6;91:13;165:25
**class (3)**
85:1,21;86:1
**classification (2)**
143:10,13
**clause (1)**
44:2
**clean (7)**
34:2;47:2;159:2,11;
161:2;165:3;168:10

**cleaned (8)**
159:11;160:9,13,14;
161:3,7;162:15;163:6
**cleaning (4)**
38:4;159:10,13,15
**cleanup (4)**
40:1,1;158:23;160:6
**clear (20)**
2:25;11:24;37:3;
47:5;100:19;106:12;
129:10;152:10;155:9;
162:20;214:22;230:1;
240:21;255:4,10,12,18;
268:6,6,6
**clearly (1)**
49:3
**clerical (1)**
135:19
**CLERK (31)**
2:4;10:20;11:1,9;
14:17;26:25;27:21,23;
61:21;62:19;63:11;
105:3,18,22;106:17;
120:10;194:1,5,7,9,19;
218:12,17;219:3,5,7,
10,13;220:15;223:2,11
**clever (1)**
249:25
**click (3)**
8:6;59:10;121:10
**clicked (2)**
122:9;167:5
**clicking (1)**
167:3
**client (9)**
14:16;30:6;65:23;
67:4;96:24;180:12;
192:18;250:5;255:21
**clients (3)**
273:25;279:8;282:19
**client's (1)**
37:1
**clock (3)**
56:8;88:14,15
**close (12)**
64:18;67:7;75:6;
76:5;168:9;171:23;
176:6;229:25;231:23;
265:4;269:3;272:22
**closed (3)**
264:10;265:11;
267:17
**closet (2)**
188:15,22
**closets (1)**
158:4
**closures (1)**
236:7
**code (1)**
115:7
**coincide (1)**
140:9
**collateral (1)**

277:11
**collect (1)**
117:6
**collectively (1)**
4:4
**color (5)**
30:9;33:1;55:1;
168:7;176:14
**colored (1)**
162:24
**coloring (1)**
173:19
**colors (2)**
29:1;162:19
**combination (2)**
53:5;155:10
**comfortable (1)**
119:16
**coming (10)**
48:3;72:1;95:20;
98:13;168:23;169:2,
12;170:5;218:19;
265:24
**comment (4)**
12:24;19:22;20:7;
240:9
**commented (1)**
14:15
**comments (4)**
86:1;113:13;246:11;
263:21
**Commerce (1)**
50:2
**commercial (1)**
42:6
**Commission (5)**
24:24;25:1;100:14,
22;231:6
**committed (1)**
8:9
**commonly (1)**
24:11
**communicate (2)**
12:18;62:10
**communicated (4)**
146:15,20;148:12,15
**communicating (1)**
137:14
**communication (2)**
126:16;148:10
**companies (7)**
46:8;111:4,6,6,14,
19;230:19
**Company (12)**
2:17;7:15;34:6;46:5,
7;97:4;111:18;113:1;
115:9,13;121:20;
263:13
**Comparing (1)**
166:7
**comparison (1)**
81:3
**compartments (1)**

170:19
**compel (1)**
266:10
**compelling (1)**
8:18
**compensated (1)**
134:8
**complain (1)**
221:17
**complained (2)**
221:17;255:6
**complaining (4)**
11:15;20:17;228:16;
242:17
**complaint (6)**
100:14,21;101:1,6;
235:1;243:2
**complaints (1)**
242:19
**complete (3)**
69:21;141:14;212:6
**completed (1)**
214:11
**completely (2)**
18:22;273:15
**Completeness (1)**
94:23
**complex (2)**
152:5;210:25
**compliance (1)**
229:14
**complicated (3)**
61:6;115:17;260:4
**compliments (1)**
279:8
**comply (1)**
124:4
**component (1)**
46:5
**components (4)**
40:7;86:21;141:21;
168:12
**comport (2)**
15:1;138:13
**comprehensive (2)**
72:15;152:17
**compressor (17)**
59:18;85:1;86:3,18,
20;107:17,18,20,21;
109:25;110:5,6,6,7,10;
113:13;243:17
**compressors (1)**
85:11
**computer (10)**
56:9;75:24;92:19;
99:1;113:10;120:17;
130:3,12;135:3;173:24
**concede (1)**
75:23
**concept (2)**
234:1,2
**concerned (1)**
146:19

Case: 19-30088     Doc# 12576     Filed: 07/01/22     Entered: 07/01/22 07:05:33     Page 291
of 320

**concerns (2)**
48:1,2
**conclude (3)**
9:4;90:24;148:12
**concluded (1)**
284:1
**conclusion (1)**
78:17
**conclusions (2)**
43:3;231:11
**condensed (5)**
269:1,4;270:8
**condition (13)**
48:1,8;49:6;50:4;
83:10;151:14;173:13,
17;174:3,4;175:25;
186:13;209:21
**conduct (2)**
224:5;251:19
**conducted (2)**
24:13;148:24
**conducting (1)**
149:2
**conductors (1)**
229:21
**conduit (2)**
196:8;273:10
**conduits (1)**
196:11
**confer (3)**
3:11;262:6;272:15
**conference (1)**
11:14
**configuration (1)**
49:6
**confirm (1)**
142:7
**confirmed (1)**
142:9
**conflating (1)**
262:8
**conflict (1)**
198:19
**conflicts (1)**
213:5
**confused (7)**
4:22;21:4;39:4;76:2;
122:1;132:8;212:22
**confusing (6)**
19:6;28:1;122:25;
132:12;153:13;214:24
**confusion (5)**
7:1;121:2;132:7;
135:9;262:10
**congestion (1)**
198:21
**conked (1)**
260:6
**connect (5)**
128:16;203:14,15;
204:8;215:1
**connected (2)**
214:10;215:2

**connecting (1)**
79:9
**connection (13)**
61:19;82:15;196:23;
204:1;205:23;210:8;
211:7;212:18;220:16;
222:21;251:3;259:19;
275:13
**connector (11)**
79:8,14;80:19,21;
81:18,19;82:1,2,8,16,
23
**connectors (1)**
79:21
**connects (2)**
206:17,17
**consensus (1)**
45:7
**consent (1)**
17:8
**consents (1)**
17:6
**consequential (1)**
274:21
**consider (4)**
123:23;188:6;
281:13,13
**considered (2)**
59:6;124:12
**considers (1)**
152:7
**consistent (4)**
25:5;89:18;113:15;
139:10
**construction (19)**
49:5,8;50:6;53:6;
101:3;206:3,5,14,15;
210:5;216:8;240:12;
241:4,11;249:1;253:7;
258:24;259:11;273:14
**consult (1)**
234:8
**contact (11)**
25:14;56:9;62:1,14;
136:24;25;137:3;
163:2;201:5;228:25;
242:2
**contacted (3)**
45:8;136:22;145:19
**contacting (1)**
241:25
**contain (1)**
141:5
**contained (2)**
4:20;152:4
**container (1)**
170:23
**containers (4)**
32:1;160:13;170:22;
171:13
**contention (1)**
244:2
**contents (3)**

**contiguous (1)**
54:5
**continue (5)**
11:9;62:25;130:15;
132:3;151:9
**continued (2)**
44:6,9
**continues (1)**
54:4
**continuing (1)**
109:18
**continuity (2)**
110:8,8
**contractor (18)**
26:13;49:1;52:7;
54:7;63:22;70:19;
111:13;152:6,25;
154:12;174:25;195:24;
196:2;205:7;212:13;
213:2;240:19;276:10
**contractors (6)**
47:7;53:4;166:16;
177:3,23;250:18
**contradicted (2)**
251:5,8
**contrary (1)**
100:24
**contribute (1)**
240:20
**control (10)**
7:16;8:5;25:13;26:5,
12;41:8;228:21;
229:19;233:12,14
**controlled (1)**
240:18
**convenience (6)**
6:24;8:23;27:5,6;
56:3;164:11
**convenient (1)**
119:17
**conversations (10)**
37:1;43:8;44:6,6;
48:5;97:6;147:14;
148:6;166:15,16
**conversion (2)**
203:8;213:23
**cookies (1)**
171:18
**cooling (2)**
39:3;79:12
**cooperative (1)**
273:23
**coordinator (3)**
63:25;195:9,10
**copied (1)**
99:1
**copy (11)**
30:6;74:11,17;92:12;
93:11;94:8,12;96:16;
107:2;113:6,8
**corner (3)**
35:7;162:13;170:6

**Corporation (1)**
2:6
**corrected (3)**
205:1;213:20;271:12
**correspond (1)**
99:21
**corresponding (2)**
102:3;140:21
**cost (10)**
6:15;21:17;70:14;
72:25;73:1,2,6;76:8;
277:7,22
**costs (5)**
73:25;75:10
**counsel (8)**
2:6;6:12;16:25;
19:24;22:23;118:9;
243:9;248:15
**count (2)**
112:3;158:3
**county (1)**
272:2
**couple (20)**
2:20;106:6;119:20;
128:11,12;158:21;
164:25;180:16;181:2,
3;182:6;183:11;
187:15;221:14;227:17;
228:22;237:19;245:15;
253:1;254:25
**course (4)**
8:16;121:19;263:10;
281:14
**Court (758)**
2:3,4,7,12,15,18;3:9,
16,18,22,25;4:5,8,10,
13,22,25;5:3,12,15,22,
25;7:3,13;8:3,8,16;
9:25;10:10,16,25;11:3,
7,12;12:3,6,16;13:3,4,
15,25;14:13,20;15:18,
21;16:3,6,11,17,19,20;
17:5,11,15;18:1,5,16;
19:6,11,16,21;20:22;
21:21;22:2,14,20,24;
23:14,24;24:2,5;25:22,
25;26:6,8,16,21,23;
27:4,11,14,19;28:2,2,3,
7,9;30:1,1,5,5,8;31:1,2;
32:1,9;33:2,6;34:5;
35:6;36:1,2;37:2,4,5,9;
38:2,3;39:3,6;40:1,6,8;
41:1,9;42:4;43:2;45:1,
8;46:1,4,6;49:1;50:5;
51:2,4,9;52:3,3;53:2,2;
54:8;56:2,7;59:8,13,
22;60:6,15,21,22,23;
61:8,10,17,22;62:5,13,
15,20;64:11,13;65:6,
22;66:3,9,13,25;67:3,
17;68:1,4,13,22,24;
69:1,9,13,23,25;70:2,5,
9;71:20,24;72:2,5,18,

**Corporation (1)**
21;73:3,9,23;74:4,10,
18;75:16,22;76:13,18,
21;77:1,9,13,15;78:15,
25;79:5;80:4,7,9,13;
81:1,8;83:3,12,16,19;
85:14,19,24;86:8,13,
23;87:1,3,6,9;88:21,23;
89:1,6,12,16,24;90:2,
22;92:11,16,18,22;
93:3,9,13,16,19,25;
94:4;95:1,7,11,14,22,
25;96:5,10,13,15,22;
97:3,9,20,25;98:3,6,19;
99:4,7,10,23;100:5,7,
10;101:12;103:14;
104:3,10,14,16,22,24;
105:1,5,14,16,24;
106:2,5,8,14,21;
107:14;108:4,9,18;
109:1,6,10,17;110:13,
17,20;114:9;117:22,
25;118:7,9,15,18,22,
25;119:8,13,15,19,23;
120:3,6,13,17,21,23;
121:6,13,23;122:6,14;
123:1,2,6,8,15,25;
124:13,15;125:9;
126:5,8;128:15,18;
129:3;130:10,14;
132:18;133:8,12,14;
134:14,19;135:1,8;
137:6,8;138:7,19,21,
24;139:2;144:18;
145:1,9;147:3,22,25;
148:5,9,20;151:8,20;
155:16,20,22;156:7,9,
13,16,20,24;157:5,7,9,
11,15,17,25;160:2,5,
12,18,23;161:7,11,13,
21;162:7,11,18,21;
163:6,12,15,18,22,25;
164:5,9,11,14,18;
166:25;167:2,14,20;
168:23;169:3,7,18,21;
170:1,4,6,10,17,21;
171:9,4,11;172:14,16;
173:10,14,16;174:6,22;
176:7,10,14,17,19,21,
25;177:6,11,15,19;
178:1,7,13,16;179:1,5,
7,11,13,19,21;180:1,9,
11,14,24;183:9,12,14,
17,21;185:4,9,13,16,
18;186:20,22;187:19,
23;189:11,15,19,21;
190:12,16;192:12,15;
193:4,7,12,15,19,25;
194:11,15,23,25;
197:18,21;199:15,17,
20,23;202:4,8;204:17,
19,23;205:5,7,11,13,
15;206:10,12,22,24;
207:10,25;208:4,8;

Case: 19-30088     Doc# 12576     Filed: 07/01/22     Entered: 07/01/22 07:05:33     Page 292
of 320

209:10,16,18,20,24;
210:3,12,15;211:19;
212:4,6;213:1,15,18;
214:3,6,15,18,21,23;
215:17;216:2,10,19;
217:1,6,13,15,19,21,23,
25;218:2,5,8,10,15,22;
219:15;220:7;221:3,5,
10,14,24;222:2,6,10,
12,14,22;223:4,10,23;
224:1;227:5,7,9;
231:10,14;232:15;
233:21;234:5,17,25;
235:4,7,19;236:6,17,
24;237:9;238:10,15,19,
22;239:2,8,12,15,17,
20,22,24;240:4;242:10,
12,15,21;243:4,12,21,
23,25;244:21;245:6,17,
20,24;246:17,25;247:7,
17,20,22;248:4,8,10,
12,18,21;249:5,9,16,
21;250:9,10,11,23,25;
251:7,10,24;252:7;
253:8,10,14,17,19,25;
254:2,7;255:4,10,12,
16,18,23;256:8,12,16,
23;257:1,4,10,13,21;
258:1,3,6,11,16,19,23;
259:2,7,12,15,17,19,21,
23;260:3,11,14,16,19,
22,24;261:1,4,8,11,15;
262:18;263:6,20;
264:11,13,17,20,25;
265:25;266:6,16,19,21,
24;267:2,5,8,11,13,17;
268:3,6,20;269:2,4,7,
11,13,17,23;270:10,13,
15,23;271:2,4,10,18;
272:1;273:18;274:10,
13,16;275:7,16,19;
276:1,4,6,13,17,20;
277:3,25;278:9,11;
279:1,4,7;280:4,7,13,
16;281:1,6,20;282:9,
12,14,16,22,24;283:2,
13,15,17,22,25
**courtesy (1)**
283:4
**courtroom (4)**
7:21;11:4;105:6;
120:25
**cover (6)**
39:4,5;46:2,3;125:3;
179:23
**covered (1)**
40:6
**CPUC (2)**
101:4,6
**Craigslist (2)**
78:2;84:5
**crap (2)**
275:9;277:4

**cream (3)**
60:18;161:1,22
**create (2)**
209:9;210:6
**created (1)**
233:2
**creating (2)**
69:12;220:8
**credibility (1)**
61:4
**crew (4)**
246:21;264:5;
265:10,11
**crews (2)**
197:11;198:19
**crisper (1)**
47:1
**crispers (3)**
38:5,8;40:6
**critical (2)**
37:2;128:4
**criticized (1)**
68:11
**criticizing (1)**
147:7
**cross (7)**
12:22;13:20;61:13;
76:25;77:6;110:16;
229:21
**cross-exam (1)**
76:19
**CROSS-EXAMINATION (5)**
77:18;110:24;
124:18;205:18;232:1
**cross-examine (3)**
23:15;61:12;62:6
**cross-purposes (1)**
75:23
**cuckoo (1)**
259:12
**culpable (1)**
36:3
**cupping (1)**
226:13
**cure (1)**
52:6
**curious (2)**
118:18;140:25
**current (3)**
110:1,4;137:23
**currently (1)**
195:5
**cursor (4)**
167:18;169:4,4,7
**custodian (1)**
3:21
**customer (10)**
196:17;201:2;
206:25;215:13;216:12;
227:23;228:8,13;
242:2;275:25
**customers (14)**
24:22;214:10;215:5;

216:3,11,14,20,24;
229:7,9;237:24;238:2,
5,13
**customer's (2)**
276:11,23
**cut (2)**
42:6;277:3
**cutting (1)**
202:25

# D

**daily (4)**
202:5;207:19;
257:23;273:8
**damage (39)**
6:15;32:1;40:2;43:7;
48:4,7,8;50:5;51:1,1,2,
5;55:3;67:6;68:6;
71:16;73:25;127:3,24;
128:2;130:12;132:14,
20,20;165:6;173:11;
174:18,25;175:13;
192:25;220:2;226:14;
240:20,22;246:17;
277:8,8,9;279:18
**damaged (15)**
47:2;50:9;115:19,24;
116:3,10,12,20;117:3;
127:25;151:1;162:14;
172:23;175:12;182:24
**damages (33)**
14:6;15:14;18:12;
24:6;46:3;48:2;49:2,9;
51:5;52:6;69:15;
128:20;129:22;135:24;
136:4,8;145:15;
148:22;220:24;224:9,
11,13,21;225:6,7,10;
235:14,16,22,23;238:5,
16;281:13
**damnit (1)**
268:15
**dark (1)**
123:3
**data (10)**
141:4,5,10,10;
143:23;144:20;145:4;
228:9;236:19;237:8
**databank (1)**
236:18
**database (3)**
141:13;144:2;236:21
**date (20)**
115:5;126:14,25;
128:2,24;131:17;
133:6,9;134:20;149:1;
197:2;201:16;204:9,9;
207:11;210:21,22;
234:20;265:9;278:23
**dated (9)**
75:3,5;102:16;107:2;
126:22;129:18;136:3;

202:2;207:20
**dates (8)**
9:10;29:8;124:25;
125:24;126:4;132:24;
148:10;149:22
**daughter (1)**
12:16
**daunting (1)**
30:4
**David (14)**
65:12,20;66:6,8,9,10,
11,16;193:24;194:21;
247:13;253:4,5;257:3
**day (24)**
9:1;10:5;29:2;39:1;
71:17;112:4;127:6,7;
148:2;163:5,7;173:8;
205:5;208:25;209:1;
217:2;226:5;245:2;
260:4;277:14,14;
283:2,11,20
**days (17)**
6:13;14:18;16:23;
20:2;133:17;145:11;
165:13;210:22;211:1;
212:8;213:19;217:3;
250:4,5;259:1;268:7;
278:4
**DD (6)**
245:16,16,17,22,23;
248:17
**dead (2)**
38:9;236:12
**deadline (12)**
6:17;14:25;15:8,9,
10;16:21;17:16,24;
18:23;19:23;20:9;
66:21
**deal (5)**
97:17;110:17;213:6;
282:9,11
**dealing (3)**
13:8;18:15,18
**dealt (3)**
282:5,7,8
**dear (1)**
11:6
**debate (1)**
21:3
**deceive (1)**
262:12
**December (23)**
79:18;81:17;129:18;
197:7,24;198:4;
205:20;207:5,11,24;
209:5,13,22;211:15,20;
212:23;213:7;215:9;
249:6;254:10;263:23;
277:4,12
**decide (6)**
103:16;129:15;
239:5;279:15,16;283:7
**decided (6)**

19:1;47:7;68:9;
131:2;150:25;166:1
**decision (5)**
22:4;165:25;209:1;
215:4;281:3
**deck (1)**
132:14
**decline (1)**
43:5
**declined (4)**
45:3;151:13;163:21;
252:10
**deductible (3)**
44:2,9;47:4
**deemed (1)**
65:12
**deenergize (1)**
211:12
**deep (4)**
152:11;257:25;
258:17,25
**defects (1)**
172:8
**defendant (1)**
240:17
**deferral (1)**
6:11
**define (1)**
233:3
**defines (1)**
147:11
**definitely (3)**
14:7;165:15;269:10
**definition (1)**
263:10
**definitively (1)**
282:5
**degrees (1)**
54:3
**delay (3)**
20:6;36:8;208:19
**delayed (2)**
42:9;207:6
**delays (2)**
43:6;277:4
**deliver (1)**
229:12
**delivered (2)**
228:22;229:18
**delivers (1)**
229:14
**delivery (6)**
26:20;148:3;229:6;
270:21;271:8,15
**delved (1)**
103:19
**demeanor (1)**
11:21;61:3;124:8;
278:22
**denial (14)**
44:1,3,5;90:8,9,18;
91:12,14;98:23;99:20;
101:14;130:24;131:10;

Case: 19-30088    Doc# 12576    Filed: 07/01/22    Entered: 07/01/22 07:05:33    Page 293
of 320

241:7
denied (5)
    4:25;24:9;129:8;
    130:25;135:21
Dennis (16)
    2:5;15:6,23,25;53:6,
    9;54:9;70:20;72:15;
    76:17;152:17;153:3;
    177:24;192:22;245:17,
    17
deny (2)
    226:22;250:6
denying (4)
    91:21;130:20;136:4;
    227:15
Department (1)
    234:8
depend (1)
    217:4
dependent (1)
    141:10
depending (5)
    47:9;48:6;158:3;
    172:24;223:11
depicts (1)
    226:13
depose (2)
    11:19;267:23
deposition (20)
    65:13,20;79:24;82:9;
    84:24;100:16,25;
    103:11;135:23;150:5,
    19;159:16;163:21;
    247:14;248:2;268:24,
    25;270:8,11,12
depositions (1)
    24:14
depot (1)
    269:16
depth (1)
    175:6
deputy (2)
    11:5;105:6
describe (15)
    29:1;7;42:7;43:8,8;
    53:8;54:2;81:13,24;
    83:4;109:22;155:3;
    172:8,16,17
described (5)
    55:4;173:19;208:18;
    209:14;230:8
describes (1)
    209:14
describing (1)
    233:12
description (9)
    46:3;113:23;133:15;
    172:12;173:22;195:14;
    199:14;212:20;264:2
descriptions (1)
    127:8
designate (1)
    59:7

designated (1)
    108:3
designation (1)
    64:16
designed (1)
    35:5
desktop (1)
    189:12
Desmond (1)
    44:8
detail (4)
    73:5;81:13;84:25;
    152:8
detailed (6)
    152:24;154:13,16;
    246:9;266:8;283:8
details (1)
    153:10
detect (1)
    110:5
detected (2)
    233:1;241:19
determination (1)
    47:5
determine (5)
    221:2;228:8,12;
    230:22;234:9
determining (2)
    217:2;225:10
development (1)
    212:2
deviations (1)
    24:25
device (2)
    107:19,24
devices (1)
    88:14
dial (1)
    14:11
dialed (1)
    10:21
Dier (6)
    268:23;269:1,16;
    270:17,23;271:13
Dier's (1)
    270:2
difference (6)
    7:6;20:25;200:1;
    216:10,13;281:2
different (49)
    16:14;45:4;46:4,7,8;
    48:2,9;49:1,3;50:5;
    53:4;71:16;73:16;77:1;
    79:11;83:4,8;85:21;
    93:10;111:14;127:8;
    129:11,13;132:22;
    141:15,21;144:5,19,20,
    21;145:5;152:8;
    156:10;158:10;160:23,
    24;161:12;162:19;
    170:18,18,19;176:14;
    179:8;182:19,20;
    237:15;241:17;242:19;

263:13
differently (2)
    152:7,7
difficult (3)
    31:2;72:5;283:1
dig (4)
    50:3;211:2,8;272:17
digging (5)
    257:6;258:25;276:1,
    3,7
digs (1)
    212:13
diligence (11)
    25:4,11,21;26:2,4,
    12;251:24,24;276:15,
    18,20
diligent (1)
    52:9
dim (3)
    130:22;131:11;136:7
direct (13)
    7:6;28:3;63:2;77:6;
    106:23;147:6;195:3;
    214:2,5;219:19;
    225:13;252:10;278:23
direction (1)
    184:19
directly (4)
    23:23;118:19;
    136:22;236:19
director (1)
    146:16
directory (1)
    99:23
dirty (1)
    192:3
disadvantage (1)
    256:19
disclaimer (1)
    32:5
disclose (1)
    252:10
disclosed (7)
    18:24;19:7,10;20:14;
    108:17;252:11;278:18
discoloration (2)
    170:7;181:15
disconnect (6)
    20:22;118:6,7,11;
    203:17;213:8
disconnected (2)
    203:10;204:24
disconnection (1)
    62:3
disconnects (1)
    220:15
discovered (4)
    33:8;34:1;165:8;
    263:14
discoveries (1)
    63:20
discovery (14)
    18:23;19:10;24:13,

16;79:10;214:4;
    249:18;261:19,19;
    262:16,23;272:9;
    273:3;278:19
discretion (1)
    230:21
discuss (6)
    12:4;42:2;46:9;
    110:15;235:16;239:13
discussed (11)
    12:6;22:9;48:2,7,7,8,
    9;64:2;67:10;204:2;
    254:12
discussion (5)
    12:25;15:9;154:13,
    16;263:25
discussions (2)
    67:13;101:20
dishwasher (5)
    32:4,8;161:17;
    175:21,22
disputed (1)
    36:2
disputing (1)
    37:7
disrupted (2)
    41:4;273:11
disruption (2)
    64:1;65:8
disruptions (2)
    147:11;148:3
disruptive (1)
    49:8
disrupts (1)
    79:8
distinction (1)
    241:2
distinguishing (1)
    193:19
distraction (1)
    31:5
distribution (2)
    25:9;210:20
disturbance (2)
    35:4;147:12
disturbances (1)
    241:20
docket (1)
    20:3
doctor (15)
    34:3,8;36:5;38:7;
    46:2,5;62:23;107:2;
    111:1,3,17,18;113:6,8;
    121:17
Doctor's (1)
    60:14
document (27)
    9:11;67:5;90:15;
    92:7;94:24;102:13;
    107:3;114:3,8,9,11;
    125:7,10;134:17,17,21;
    135:4;209:9;240:10;
    241:3;249:19;253:23;

266:10,11,12,14;
    274:12
documentary (3)
    120:5;193:17,18
documents (19)
    41:8;43:9;52:8;56:2,
    7;63:21;64:8,22;65:10;
    66:22;68:8;193:8;
    240:12;249:23;252:18;
    262:3,24,25;273:21
Dodge (586)
    2:12,14,16,17,23;3:8,
    10,17,20,24;4:1,6,9,12,
    16,24;5:2,9,13,21;7:2,
    10,18;8:3,14;9:17,23;
    11:15,17;12:5,7,15,24;
    13:5,13;14:15;15:3,5,
    20,22;16:5;17:22,25;
    18:2,3;19:9,13,19;20:6,
    16;21:20,23;23:14;
    24:1,3,6;25:24;26:3,7,
    15,17,22;27:10,18;
    28:4,6,8;30:4,34:3;
    35:3;36:4;37:5,5,7,7;
    38:1;39:5;40:4;41:7;
    42:1,3,5;44:4;48:6,9;
    49:9;50:8;53:9;54:6;
    59:1,15;60:2,6,12;
    61:11,19,24,25;62:17;
    64:6,10,12,19;65:5,16;
    66:24,25;67:1;68:3;
    69:1;71:6,19,22;74:18,
    21;75:8,15,17;76:2,18,
    20,23;77:8,12,14,17,
    19;78:14;79:23;80:10,
    14,16;81:4,9;83:2,7,10,
    13,17,20;85:22,25;
    86:9,11,16,25;87:2,5,8,
    12,13;88:25;89:1,5,9,
    14,23;90:1,3,4,17;
    91:24;92:15,17,21;
    93:2,8,12,15,17,22,24;
    94:1,5,6;95:1,10,13,20,
    23;96:3,6,18;97:1,15,
    25;98:2,5,9,13,17,19,
    25;99:8,12,15,17;
    100:3,6,9,11,12;103:9,
    15,25;104:2,9,11,15;
    105:12,15,21,23,24;
    106:1,4,10;107:11,25;
    108:2,12,14,18,24;
    109:2,18;110:13,15,19,
    23,25;117:20;118:13,
    17;119:6,12,14,19,22;
    120:14,16,20,23;121:2,
    5,12;122:9,13,23;
    123:5,7,12,14,17,18,
    22;124:2,14,16,19;
    126:6;128:17;129:7;
    133:8,10,13;134:25;
    135:7,11;136:1,16;
    137:4,7,9;138:4,8,19,
    20,23;139:1,3;140:15;

Min-U-Script®

Case: 19-30088    Doc# 12576    Filed: 07/01/22    Entered: 07/01/22 07:05:33    Page 294
of 320

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(8) denied - Dodge

144:19;145:13,14,17;
147:7,20;148:21,23;
151:6,13,21;155:19,21;
156:10,12,20,23,25;
157:6,8,10,14,16,18;
158:18,20;160:2,4;
163:18,20,24;164:1,13;
166:24;167:4,7,12,19;
168:24;169:2,10;
171:21,25;172:11;
174:5,13,20;177:18;
178:3,14,18,21,25;
179:7,10,12,15,20;
180:5,10,15,16,20;
181:1,6;183:10,12,13,
16,19;185:8;186:16,21,
23;187:22,24;189:5,12,
14,16,20,23;190:17,20;
191:1,3,5,7,11;192:9;
193:1,21,22;194:3,6,8,
10;195:1,2,4;199:22,
25;200:16;201:22,24;
202:3,5,10;204:13;
206:9,11,13,20;207:7,
9,17,21,23;208:2,6,15,
17,22;209:2,6,8;
210:10,13;211:17;
214:1,12,14,16;215:15;
216:1,6;217:13,14,20,
23,24;218:25;219:17,
20;220:6,10,13,19;
221:3,4,9,12,19,20;
222:1,10,11,13,18;
223:5,13,18,21;224:3,
4,8;225:16,23;226:2,8,
25;227:3,6,8,10,13;
231:13,16;232:5,8,14;
233:19;234:14,23;
235:3,4,6,18;237:18,
21;238:9,14,18,20,21,
23;239:1,4,6,14,16;
242:22;243:2;244:23;
247:11,23;250:10,24;
251:25;258:2,4,6,10,
11,14;259:18;260:10,
17,21,23;261:3,7,10,
12,14,16;262:21;
263:15,21;264:12,14,
18,22;265:2;266:3,7,
13,17,19,20,23;267:1,
3,7,9,12,16,21;268:19,
22;269:3,6,10,12,14,
18,20,22,24;270:3,6,
12,14,16;271:1,3,9,11,
25;272:4;273:19;
274:2,11,15,19;275:12,
18,24;276:3,5,7,16,18,
21;277:24;278:12;
279:3,5,17;280:3,6,8,
14,21,23;281:5;282:8,
11,13,15;283:12,15,16
**Dodger's (1)**
155:17

**Dodge's (2)**
12:20;122:2
**dollar (1)**
121:24
**dollars (21)**
16:1,24,25;18:5,6,
21;20:25;40:8;47:4,8;
73:11;75:14;76:4,10,
10,12;77:25;158:24;
159:14;160:6;179:2
**dolly (1)**
84:8
**done (56)**
8:20;18:24;19:5;
24:15;40:5,7;42:4;
48:9;50:6;56:8;68:9;
79:11;89:22;98:20;
145:16;152:13;153:8,
22;154:22;155:5;
158:22;159:15,18;
163:11;164:1,2;178:9;
182:3;183:24;189:25;
192:12,25;195:11;
199:11;200:2,2,11;
205:24;213:9;222:7;
235:6;241:1,4;244:14;
246:1,2,5;249:20,24;
261:22;262:9,9;279:5,
9,18;283:1
**doors (2)**
153:23;182:21
**doorway (1)**
190:1
**Double (2)**
243:8,9
**double-click (1)**
169:8
**double-clicked (1)**
169:3
**doubt (1)**
27:12
**down (55)**
3:9;5:5;10:4;26:11;
28:5,6;29:1;38:6;39:9;
50:9;65:3;80:14;
114:15;126:19;129:18;
131:17;133:3;134:2;
138:5,9;144:23;
160:16,19;170:10,11,
13;173:5;174:2;179:4;
181:18;185:11;186:19,
24;202:20,21;210:16;
212:9;213:22;214:23,
23;223:6,14;225:23;

227:13;246:10,25,25;
247:22;248:12;265:9;
267:11,13;276:21;
277:16,21
**download (5)**
121:3;122:17,19;
236:19;237:8
**downloaded (3)**
98:10;99:2;122:18
**downsized (2)**
71:10;165:20
**downstairs (1)**
166:3
**dozens (1)**
32:4
**Dr (1)**
35:8
**draw (2)**
68:18;278:2
**drawing (1)**
243:18
**drew (1)**
110:9
**drifting (1)**
209:11
**drive (1)**
99:3
**driveway (1)**
17:18
**driving (1)**
275:8
**Dropbox (13)**
31:4;98:11;99:2;
121:3,9,10;122:6,10,
20,24;123:2;266:22,24
**dropped (1)**
72:4
**dryer (2)**
89:11;190:22
**due (3)**
201:10;241:20;
276:18
**dug (2)**
257:24;258:16
**duly (1)**
20:11
**duplex (2)**
87:17;88:7
**duplicated (1)**
100:2
**during (67)**
6:5;9:2,3;10:5;
12:18;13:6;14:9;19:10;
24:18;25:16;26:20;
29:3,5;68:12;84:24;
90:12;91:7;98:7;100:3;
110:20;112:1,8;
121:13;122:10;125:1,
5;129:22;131:4;
133:18;145:10;149:6;
154:7;156:8;157:1;
163:21;165:18;181:7;
195:18;196:13;198:14,

14;199:10,12,17;
200:12;205:25;211:18;
212:3,8;213:19;216:8,
9;217:2;224:12;225:1,
20;226:10,16,20;
228:1;235:17;241:8;
244:14;246:3;250:19;
261:22;267:9
**Dustin (28)**
44:4,5;53:5;54:1,2;
91:2,18;99:19,20;
101:14,20;102:15;
127:10;138:14;139:6,
18;141:6;142:3,7;
144:8;156:4;217:24;
219:14;222:5;268:23;
269:1,15;270:2
**Dustin's (1)**
91:21
**duty (2)**
276:4,8

# E

**ear (1)**
9:3
**earlier (23)**
19:3;20:5,17;21:14;
38:8;45:1;47:9;55:5;
63:16;71:21;74:21;
121:20;127:11;136:13;
162:22;169:11;170:21;
190:3;208:18;247:5;
248:20;266:3;268:9
**early (4)**
6:13;91:3;101:15;
281:25
**earphones (1)**
240:5
**earthquakes (1)**
182:13
**easier (2)**
253:22;264:24
**easily (1)**
75:24
**easy (2)**
74:16;122:20
**echo (1)**
221:25
**echoed (1)**
53:4
**echoing (1)**
222:6
**edges (1)**
173:4
**editorial (1)**
144:12
**editorialize (2)**
41:2;136:17
**editorializing (2)**
64:21;65:23
**EE (3)**
5:14,20;202:5

14;199:10,12,17;
200:12;205:25;211:18;
212:3,8;213:19;216:8,
9;217:2;224:12;225:1,
20;226:10,16,20;
228:1;235:17;241:8;
244:14;246:3;250:19;
261:22;267:9
**effect (9)**
4:25;6:16;20:24;
24:24;105:10;151:18;
152:3;231:9;270:20
**effecting (2)**
271:8,10
**effective (1)**
123:10
**efficient (1)**
23:3
**effort (7)**
52:9;252:12;262:6
**efforts (4)**
149:23;150:9,13,16
**eHow (3)**
86:17;242:24;280:11
**E-how (1)**
59:17
**eight (12)**
99:18,18;112:4;
145:11;148:2;153:17;
154:4,7;212:8;213:19;
268:7;278:4
**eight-day (2)**
148:10,11
**eighty (2)**
109:16;112:6
**either (23)**
2:21;8:21;9:21;36:4;
39:3;40:8;45:2;47:9;
63:16;71:12;89:12;
117:5;149:18,24;
154:19;156:21;165:11;
198:22;221:12;222:7;
228:18;260:5;283:10
**Electric (16)**
2:17;94:8,12,21;
96:8,16,20;109:24;
110:4;195:18,21;
196:9;227:19,20;
228:11,15
**electrical (25)**
35:4;37:3;39:5;83:7,
9;86:22;92:5;141:25;
227:25;229:1;232:21;
241:3;246:2,5,7,21;
248:24;252:17;254:18;
261:25;271:4,16,23;
275:14,17
**electrician (1)**
117:14
**electricity (14)**
25:18;211:3;214:25;
215:1,13;217:11;
230:18;237:22;244:16;
254:19;255:15;257:6;
270:21;271:8
**electronically (1)**
112:20
**elements (4)**
18:8;50:5;63:18;
240:15
**eleven (1)**

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

166:1

**else (23)**
14:2;17:1;18:11;
31:1;52:4;60:24;66:4;
68:17;95:2,9;104:3;
122:24;131:21;159:10;
161:7;187:25;192:10;
209:25;217:8;228:25;
231:17;238:9;256:20

**email (58)**
15:24;16:24;31:3;
56:8;63:10;64:2;65:17,
18;66:6,6,16,20;67:13;
68:18;98:15;99:20;
101:15;102:2,4;104:1,
4;105:1,6;120:25;
124:21;126:14,24;
129:24;137:10,11;
138:14;139:7,18,21,24;
140:6,12,13,14,19,20,
25;141:15;142:24;
143:5,7,7,9,12;150:20;
200:22;245:20;248:8;
253:4,5,19;266:14;
267:2

**emailed (1)**
137:22

**emails (8)**
36:5,8;63:13,14,16;
95:6;97:5,7

**embarrassing (1)**
281:24

**emergency (1)**
50:1

**employee (2)**
241:5;246:5

**employees (1)**
24:14

**en (1)**
122:19

**enacted (1)**
234:2

**encounter (1)**
246:6

**encountered (2)**
29:7;249:3

**end (8)**
14:6;65:23;121:25;
171:16;190:24;193:11;
221:6;223:20

**ends (2)**
76:5;158:19

**enhance (1)**
52:5

**enlarging (1)**
226:2

**enough (7)**
21:8;43:2;122:20;
164:9;191:9;242:4;
256:21

**entail (1)**
196:10

**enter (2)**

187:2,4

**entered (1)**
20:20

**entire (2)**
75:24;202:22

**entirely (7)**
46:5,7;100:19;
159:21;177:12;255:2;
257:7

**entirety (3)**
32:4;49:5;121:14

**entitled (1)**
7:23;272:16

**entrance (1)**
247:2

**entries (1)**
268:20

**entry (3)**
264:4;270:19,19

**Equally (1)**
280:7

**equipment (14)**
84:9;141:8,11,12;
144:3;147:18;148:8;
211:11,13;212:12,16;
228:20;232:21;271:21

**equivalent (1)**
271:22

**error (4)**
135:5,10,20;256:2

**errors (1)**
137:1

**essence (1)**
242:5

**essentially (7)**
16:16;18:8;46:6;
72:19;195:9;207:1;
241:7

**establish (5)**
37:2;86:9,20;108:22;
209:24

**established (2)**
165:16;231:14

**estimate (49)**
6:15;15:7,23,25;
17:3;18:21;19:3,14;
21:24;22:1;53:9;70:20;
72:9,11,15,16,25;
74:21;75:2,5;76:4,8,11,
12,17;112:2;121:21;
151:23;152:2,17;
153:4,5,5,9,13;154:17,
19,24;155:6,24;156:13,
22;159:17;177:7,24,
25;178:4;192:23;193:3

**estimated (3)**
73:1;76:9;177:23

**estimates (12)**
13:18;17:9;53:6;
70:14,17;75:20;152:5,
6;155:13,14;156:18;
166:16

**estimating (3)**

179:2;197:15,17

**estoppel (3)**
249:11;271:19;278:6

**even (21)**
4:19;8:11;15:5;16:3;
23:1;24:19;25:15;46:3;
65:20;89:7;181:23;
183:8;209:22;212:24;
236:11;241:7;243:1;
255:19;274:21;278:21;
281:6

**evening (2)**
283:11,25

**event (2)**
62:3;208:18

**events (4)**
53:7;152:16,24;
154:15

**eventually (3)**
230:10;254:9;259:8

**everybody (11)**
5:6;38:5;107:8;
118:14;122:25;156:1;
166:23;207:14;216:17;
252:17;261:13

**everyone (2)**
56:4;164:11

**everything's (1)**
255:1

**everywhere (1)**
158:13

**evidence (46)**
3:7;6:2,6;9:11;
17:14;22:22;24:16;
26:18;29:7;31:2,3;
34:4;37:9;68:20;70:12;
71:5;73:5;80:3;85:17;
92:8;96:21;114:12;
120:5;141:25;144:14;
145:10;162:14;173:13;
193:17,18;206:21;
210:10;211:24;212:6,
7;237:4;240:24;
243:12;249:20;255:22;
263:7;268:6;273:20;
274:1;279:10,23

**evident (4)**
29:2;88:15;141:12;
186:1

**exact (4)**
86:2;128:24;132:24;
144:20

**exactly (16)**
16:5;17:22;54:4;
76:11;79:19;84:22;
123:7;128:24;134:8,
11;138:13;144:7;
152:10;181:23;230:2;
276:5

**EXAMINATION (12)**
28:3;52:4;63:2;
76:14;77:16;106:23;
164:21;180:14;195:3;

179:2;197:15,17

**example (4)**
9:8,8;161:22;229:19

**examples (1)**
228:23

**Excavating (1)**
196:11

**excavation (1)**
197:11

**excellent (1)**
283:1

**except (9)**
6:2;18:8;60:18;
64:15;102:2;151:17;
205:25;244:6;250:2

**exception (2)**
4:20;274:2

**exchange (3)**
17:16;137:10;140:20

**exchanged (1)**
16:24

**exchanges (1)**
150:20

**exchanging (3)**
6:17;14:25;20:9

**exclude (5)**
7:12,14,16;8:17;
21:18

**excluded (4)**
8:10;19:14,15;
119:21

**excludes (1)**
7:14

**excluding (4)**
7:8;8:5;76:16;
152:12

**exclusion (1)**
7:11

**excuse (3)**
5:3;131:12;270:13

**excused (2)**
217:16;238:19

**exercise (6)**
25:4,11,20;26:1,4;
132:5

**exhibit (176)**
2:24;3:2,5,5,20,22;
4:4,6,7,9;5:1,16;6:18;
9:8;14:7;15:1,2;19:24;
20:3,6,11,13,14;21:16,
17,17;22:15,16;28:5;
30:3,4,4;31:1;32:4,8;
33:2,3,3,6;35:1;59:9,
17;63:6,9,10;64:14;
66:12,14;68:14;69:23;
70:2,2,3,8,8,25;71:1,5,
24;72:6,17;73:4,4,4,12,
13,17,18,22,25;74:1,1,
15,17;75:17;76:3,3;
79:25;81:6,7;85:11,16,
20,22;86:10;91:24;
92:12,23,25;93:4,7,14;
95:1,2,2,5,7,9,15;96:1,

214:4;219:19;237:20

20;98:8,13;99:22;
102:3;104:5,7,11,15;
121:4,17,17;126:18,19;
127:10,14;130:17;
131:15;133:1,2;136:3;
137:10;138:6,6;
140:18;143:16;156:25;
157:7,9;172:1;174:14;
176:20;178:16,21;
180:17;200:17,17,18;
202:4;208:9;225:16;
227:5,6;232:3;241:18;
242:23;243:5;244:25;
245:16;246:10;247:19,
21,25;248:1,1,6,7,16;
253:2,8,22,24;258:4,8,
15;264:13,14;266:25;
267:1;268:25;269:11,
16,16;270:18;278:19;
279:24;280:9

**exhibits (62)**
2:22,24;3:11;5:24;
6:2,17;17:16;20:9;
22:9,13,22;23:4,6,6,11;
30:2,7,8,8;59:9;73:18;
85:10;93:11;98:10,21,
22;99:6,13,24,25;
121:2,6,8,11,16;122:3;
144:19;166:21;168:18;
172:2;202:1;240:8;
241:17;242:13,16;
244:23;245:1,2;
253:10,12;262:16;
266:22;269:8;270:1,3;
274:1;279:13,22,24;
280:18;281:8,8

**exist (1)**
183:6

**existed (1)**
88:5

**existing (9)**
55:2;64:3;65:11;
211:13;213:13,13;
216:4;254:13,18

**exonerate (1)**
96:24

**expand (3)**
25:8;78:9;244:18

**expanding (1)**
252:23

**expands (1)**
162:1

**expect (5)**
8:9;84:10;237:23;
238:1,12

**expected (3)**
204:3,5;215:5

**experience (15)**
35:3;55:4;60:8,16;
89:2;108:22;109:7;
111:23;112:9;136:7;
222:23;232:17;236:8;
238:14;281:18

Case: 19-30088    Doc# 12576    Filed: 07/01/22    Entered: 07/01/22 07:05:33    Page 296
of 320

experienced (1)
108:9
experiencing (1)
148:8
expert (17)
59:6;60:4;97:13;
107:12,13,25;108:2,3,
16,17;217:10;238:13;
243:3;280:15;281:19,
19,24
expertise (1)
277:17
experts (3)
59:7;60:4;280:15
explain (12)
6:8,21;52:7;71:8;
75:13;103:6;126:7,9;
151:12;171:5;203:4;
281:22
explained (3)
46:2;149:12;272:9
explanation (7)
53:1;59:9,20;151:12;
190:9;257:14;281:4
explanations (1)
187:14
exponentially (1)
18:12
expressed (1)
36:5
extant (1)
135:4
extended (1)
71:22
extensive (2)
42:8;47:4
extent (11)
6:3;41:4;44:4;54:9;
87:6;107:12,12;
172:11;203:5;277:11;
281:11
exterior (1)
175:19
external (1)
60:9
eye (1)
54:4
eyes (1)
69:9

# F

facilities (9)
25:14;65:12;199:5;
204:5;232:4,20,23;
233:13;241:24
facility (5)
203:8;21;232:10;
254:18,24
fact (38)
8:5;20:2;21:6,15;
23:6;25:22;26:1;31:1;
36:6;37:7;60:3,19;

68:8,20;83:11;86:3,9,
14;90:12;92:3;98:24;
99:25;121:16;126:25;
128:11;141:19;145:19;
228:19;251:1,5,7,9,13;
262:22;272:18;274:21;
276:21;278:15
factor (3)
49:2,3;250:3
factors (2)
49:7;248:16
facts (6)
9:20;206:21;210:10,
16;251:6,7
fail (8)
24:21;25:17;38:4;
59:19;60:16;86:22;
87:1;278:2
failed (6)
38:3;77:21;87:3;
244:3,5;278:3
failing (1)
69:8
fails (1)
37:3
failure (9)
25:11;83:7,9;85:1;
86:18,19;124:4;
242:25;280:11
failures (1)
281:4
fair (9)
18:17;21:7;112:7;
144:13,17,17;145:3;
206:18;241:6
Fairfax (31)
28:1;29:2,6;43:1;
50:3;56:1;63:5,11;
64:8;65:11,25;71:9;
145:19,23,25;146:1,3,
7,12,21;147:13,16;
148:2;195:12;250:17,
19;254:5;255:25;
261:22;262:9;272:13
fairly (1)
250:16
fall (4)
229:20;230:3,5;
236:9
falls (7)
20:15;236:12,13,25;
245:11;275:21;277:21
familiar (7)
2:21;77:21;97:10;
169:20;195:11;229:3;
230:13
family (2)
29:3,4
far (11)
29:5;53:6;61:10,16;
127:6;160:7;175:14;
186:3;190:24;222:22;
241:6

far-interior (1)
175:17
fashion (1)
59:24
fast (2)
247:1;258:3
fastball (3)
278:8,10,11
father (1)
45:6
fault (2)
37:1;277:1
favor (1)
86:15
feature (1)
11:2
February (40)
24:8;28:9;66:17;
68:21;90:5;92:6,6;
107:2;125:4,5,18,18;
144:15,15;145:23,24;
146:8,9,14,14,22,22;
165:8;199:8,8;200:12,
22;201:15,16;212:3;
213:19;216:21;226:20;
227:21;238:6;244:14;
246:3;273:8,9;277:14
fed (1)
203:2
feed (10)
64:4;202:25;203:9,
11,11,14,15,17;223:19;
254:13
feedback (8)
220:7,9;221:5;222:6,
23;223:15,20,25
feel (5)
172:25;173:1,8,9;
281:16
feet (13)
152:2,23;154:23;
172:24,25;177:14,23,
25;178:6,8;179:2,16;
257:25
fell (3)
131:4,7,18
fellow (1)
159:8
felt (7)
100:17,25;205:24;
272:10;273:3,3;276:23
few (3)
14:18;120:24;211:1
FF (1)
35:1
Fidelity (6)
34:4,8;39:4;46:1,5,6
field (3)
228:11,15;258:20
fielded (1)
47:5
fifteen (1)
237:1

fifty (1)
257:24
fifty-foot (1)
258:16
figure (9)
47:6;55:1;60:23;
76:5,5;98:17;118:24;
218:21;260:5
figured (2)
55:8;212:24
figures (1)
73:15
figuring (1)
59:22
file (12)
16:9,13,18;20:20;
45:8;55:1,5,8;101:1;
266:11;272:19,21
filed (15)
13:3;14:18;15:6;
16:8,16;18:16;20:4,17;
21:14;55:8;75:25;
128:19;132:22;135:13;
219:23
files (2)
99:24;100:1
filing (5)
15:10;20:15,19;
132:5,15
fill (1)
38:2
final (1)
196:23
finality (2)
17:19;18:14
finally (3)
9:14;213:9;215:10
finance (1)
165:22
Financial (1)
123:11
find (29)
41:8;49:4;73:18;
74:1,1;86:14;88:11;
93:21;95:8;113:9;
115:1;129:4;141:15;
166:19;197:17,19;
214:5;226:19;246:16;
247:14;252:12;253:3,
13,14,21;268:22;
274:12,22;275:21
finding (1)
269:24
fine (23)
9:10;13:12;41:7;
52:3;68:13;69:13;
84:19,24;86:25;87:20,
22;101:9;106:4;110:7;
117:18;118:25;119:11;
159:24;192:2;217:11;
230:6;232:7;250:6
Finish (3)
97:20;159:6;236:24

finished (3)
110:18;130:6;235:5
First (52)
2:21,23;4:22;19:22;
20:8,12;22:11;23:4;
33:5,8;43:1;55:9;59:2;
76:12;82:8,24;91:14,
18,21;93:18;104:12;
130:3,9,18;135:2;
140:19;143:7,12;
145:25;161:24;165:10;
168:9;174:12;188:12;
197:2,22,24,24;220:12;
222:8;236:11;243:23,
25;244:22;246:3,6,11,
18,21;248:23;255:10;
279:11
fit (3)
14:3;71:12;197:13
five (8)
45:3;61:9,18;62:22;
119:16;163:22;252:18;
259:1
fix (5)
39:8;98:6;100:3;
107:22;260:7
fixed (2)
224:23;277:20
fixtures (1)
113:15
flashes (1)
89:17
flashing (2)
88:14;89:21
flaws (1)
277:5
flight (1)
9:9
flip (2)
12:15;51:2
floor (38)
15:25;29:2;31:9;
32:3;33:4,5;48:4,8;
53:4;70:15;155:25;
160:17;161:16;171:19,
20;172:22,23;173:11;
174:1,3,4,12,18;
175:14,15,25;176:25;
177:1,4,7;181:14;
182:21;185:21;190:2,
6;191:9;220:3,25
flooring (42)
18:21;46:4;53:1,3,5;
54:4,5;55:2,2,9,9;
71:15;88:2,4,4;151:1,
22,24,25;152:2,22,23;
153:7,21;154:23;
155:8,24;175:10;
177:22;179:23;180:8;
182:17,22,23,24;183:3;
186:13;187:11,16;
188:20;226:10;235:23
floors (4)

Case: 19-30088    Doc# 12576    Filed: 07/01/22    Entered: 07/01/22 07:05:33    Page 297
of 320

52:4;151:15,17;
181:2
**flowed (1)**
161:16
**fluctuating (1)**
228:16
**fluctuation (13)**
24:7,10,17,20;25:16;
35:4;109:24,24;110:3;
232:12,24;233:7;
241:15
**fluctuations (2)**
217:7;265:15
**fluid (1)**
162:17
**folder (2)**
31:4;122:19
**folks (1)**
282:24
**follow (4)**
74:17,19;76:6;
237:18
**followed (1)**
196:22
**following (3)**
53:3;74:20;151:10
**follows (1)**
213:7
**follow-up (3)**
91:18;231:18;236:23
**follow-ups (1)**
237:19
**fonds (1)**
131:7
**food (19)**
29:3;32:2,3;40:2;
70:12;132:16,20,20,24;
133:16,25;134:1,11;
158:23;160:6,6,8,25;
161:2
**foot (8)**
169:18,19,21,22;
170:11;173:5;175:3,4
**footage (6)**
177:11,16,22;178:1,
5;179:13
**football (1)**
258:19
**footprint (1)**
182:2
**force (1)**
24:24
**forced (1)**
240:23
**foreground (1)**
176:11
**forensic (2)**
182:12;185:22
**forensically (1)**
182:1
**forever (1)**
123:3
**forgot (2)**

59:16;280:24
**form (1)**
16:12
**formal (2)**
101:2;253:22
**formally (2)**
244:15;252:14
**format (3)**
121:3;269:1;270:9
**formats (1)**
269:4
**forms (1)**
171:8
**forth (3)**
62:2;124:5;154:17
**forthcoming (1)**
56:3
**forty- (1)**
119:15
**forty-eight (2)**
257:25;258:17
**forward (7)**
9:16;15:11;22:8;
154:8;209:1;254:10;
283:4
**found (16)**
13:18;52:9;78:2;
90:12;92:4;101:1;
117:13;213:3,4;
214:24;227:19,24;
228:14;240:10;249:11;
256:24
**foundation (2)**
199:15,20
**four (12)**
18:10;52:1,3,7;53:4;
102:10;104:10,10;
133:17;153:2;179:8;
256:18
**fourth (1)**
138:9
**frame (1)**
125:4
**framing (1)**
146:24
**franchise (1)**
207:2
**FRANCISCO (2)**
2:1;45:9
**free (2)**
9:17;192:16
**Freedom (1)**
56:5
**freeze (1)**
162:8
**freezer (13)**
79:13;160:11,16;
161:16;162:7;167:23;
168:6,12,13;169:13,25;
170:5,19
**freezes (1)**
161:25
**frequency (1)**

25:5
**frequent (1)**
136:25
**frequently (1)**
79:8
**fridge (1)**
170:13
**fried (2)**
107:20;130:4
**frond (1)**
131:18
**fronds (2)**
131:3,9
**front (19)**
33:2;48:9;49:9;63:6;
113:12;130:21;157:12;
160:8;170:13;172:6;
175:8,16;183:20,22;
184:1;187:6;190:1;
203:1;226:2
**frozen (2)**
162:1;163:22
**full (7)**
35:8;47:4,6;79:11;
160:10;208:13;258:12
**fully (2)**
214:22;252:1
**function (1)**
20:19
**functional (2)**
39:9;192:3
**functioning (1)**
39:6
**funny (1)**
95:14
**furniture (2)**
71:2,6
**further (12)**
44:4;117:23;131:2;
165:5;187:25;209:25;
213:11;217:13;236:4;
243:4;283:10,13
**fuse (4)**
249:12;256:24;
263:9;270:25
**fuses (17)**
247:5;248:19;
251:14;264:6;265:4,7,
13,20,22;266:1,3,5;
267:19;268:9;270:20;
271:8,11
**future (1)**
140:14
**FYI (1)**
177:18

**G**

**gap (6)**
141:9;182:9;187:10;
188:19,22,25
**Garandza (17)**
10:12;35:8,9;106:13,

15,19,25;107:14;108:3,
6,23;109:6,20;111:2;
117:25;118:15,19
**garbage (3)**
117:5,8;161:5
**Gardner (1)**
63:10
**Garrett (2)**
146:16;147:17;
148:7;165:11
**Gary (1)**
45:5
**Gas (5)**
2:17;49:6;101:2;
195:18,21
**gate (2)**
29:4;266:12
**gave (5)**
50:1;79:10;107:1;
161:22;173:22
**gear (2)**
64:4;254:14
**gears (1)**
273:22
**general (7)**
7:13;52:7;113:25;
152:25;174:24;186:13;
241:7
**generally (2)**
148:11;281:14
**gentleman (4)**
11:12;54:8;62:22;
237:7
**gentlemen (1)**
119:9
**George (2)**
63:6;277:15
**gets (2)**
173:5;213:9
**GG (5)**
59:9,17;243:12;
280:9,10
**given (4)**
7:22;62:14;141:11;
201:17
**gives (1)**
56:9
**giving (3)**
92:20;118:1;279:7
**glare (1)**
173:6
**goal (1)**
9:19
**God (3)**
260:3;261:11;268:15
**goes (11)**
32:3;74:7;75:11;
159:9;190:17;214:1;
236:25;243:2;254:12;
275:22;277:1
**Good (28)**
2:7,9,16;27:17;28:2;
48:2,5;56:2;68:10;

78:4,13,18;134:13;
135:24;136:8;174:4;
194:14,25;202:16;
218:5;246:23,24;
247:3;251:24;257:18;
260:13;268:8;273:24
**goodness (1)**
189:8
**gosh (2)**
266:23;273:10
**gotcha (1)**
17:1
**governed (1)**
24:22
**government (1)**
121:9
**grand-plus (1)**
165:22
**grant (2)**
21:11,18
**granted (2)**
16:8;282:13
**Great (4)**
29:6;154:9;244:6;
261:10
**Green (1)**
242:23
**Greenberg (197)**
2:11;7:8;8:2,16;9:8;
10:1,3;13:2;14:18;
18:4;19:1;22:10;23:2,
13,15,16,24;24:6,18,
19;25:15,19,25;26:23,
24;27:8,10,16,17,20,
25;28:2,5,9,29:4;31:2,
4,8;32:9;33:2,7;37:8;
38:7;39:7;40:1,5;41:1,
5,9;42:1,7;43:1,2,5,6;
45:1,3,46:3;49:3;51:4,
9;52:1,5,7;53:2,4;56:2,
5;59:3,6;61:6,22;
62:17,24;63:4;64:13,
16,18,20;65:8;66:14,
16;67:12,21;68:6,12,
17;69:5,15;70:11;71:8;
72:9;75:25;76:21;77:2,
3,16,20;78:15;79:6;
82:6;83:4,22;86:2,16;
87:14;89:16;94:2,7;
96:7,23;97:3;98:16,22;
99:21;100:13;103:14;
104:18,24;105:4,5;
106:9;107:1;116:9,17,
20;117:2;119:17;
120:13;121:18;123:15,
21;124:17,21;125:9;
128:7,19;129:15;
130:10,10;134:15;
139:10;144:18,18;
146:18;147:3;148:1,
24;151:8;155:16;
156:9,20;157:11,23;
158:1;160:18;163:20;

Case: 19-30088    Doc# 12576    Filed: 07/01/22    Entered: 07/01/22 07:05:33    Page 298
of 320

164:3,4,23;167:22;
169:15,18;172:4,17;
174:9,23;176:11;
178:7;181:1,8;183:21;
185:4;192:11,16;
219:23;220:2,24;
224:17;226:16;227:14;
235:13;240:22;244:4;
255:6;256:19;263:18;
264:15;265:19;266:14;
267:2,10,21;276:22;
277:7;282:19,25

**Greenberg's (23)**
2:24;7:25;59:11;
79:24;107:5;112:17;
119:9;172:12;220:1;
220:23;224:6,14;
225:2,24;233:24;
238:4;263:1;268:18,
25;271:24;272:11;
280:4,10

**Greenburg (1)**
47:3

**grid (1)**
206:18

**ground (3)**
210:24;212:12;
275:20

**group (1)**
167:14

**groups (1)**
207:4

**guarantee (3)**
25:5,18;230:17

**guard (1)**
257:5

**guess (15)**
14:8;21:3;22:5;51:4;
75:12;86:23;120:4;
159:11;164:24;185:14;
191:13;206:15;213:20;
254:10;280:17

**guessing (2)**
162:2;190:4

**guide (1)**
65:22

**guru (1)**
223:10

**guy (8)**
163:10;234:25;
238:15;242:7;244:3;
254:5;256:24;277:17

**guys (3)**
174:11;250:18;
258:25

**guy's (1)**
275:7

**H**

**habit (1)**
78:23

**habitable (2)**

191:12,19

**half (2)**
130:9;217:1

**hamburger (1)**
161:23

**hand (8)**
15:19;21:2;27:15,21;
33:1;152:1;258:16;
259:24

**handicapped (1)**
49:1

**handled (2)**
43:1;219:23

**hands (2)**
173:5;283:5

**hang (4)**
35:5;45:6;70:7;
208:2

**hanging (1)**
167:25

**happen (15)**
26:11;67:21;89:18,
25;161:1;171:18;
209:13;211:15,16,20;
234:7;243:15,19;
252:24;255:14

**happened (33)**
16:7;39:7,8;68:5;
71:16;89:24;98:18;
112:24;113:5,22;
128:23;176:4;196:19;
204:24,25;212:20;
215:12;232:18;240:15,
16;242:8;244:1;
248:22,22;253:2;
256:1,6;268:16,17;
277:12,12,13,13

**happening (7)**
174:4;209:4,22;
232:13;251:12;252:19,
21

**happens (11)**
8:4;109:3;122:16,17;
148:17;230:3;242:3;
246:1;254:21;255:1;
261:16

**happy (1)**
23:4

**hard (8)**
48:1;74:10;124:6;
127:6;147:18;171:13;
259:4;283:18

**hard-pressed-for (1)**
152:24

**hardwood (3)**
55:9;177:17,18

**harm (2)**
89:21;240:17

**harp (1)**
278:17

**Hawaii (6)**
9:10;29:7;68:12;
89:13,14;144:22

**hazardous (1)**
50:4

**hazy (2)**
130:1;157:12

**headlining (1)**
63:19

**headphones (3)**
220:10,12;259:6

**hear (47)**
2:14;3:1;22:5;33:1,
2;42:6;49:2;106:12;
119:1;124:7;194:14;
206:10;218:6,7,10,22,
23;219:3,7,11;220:6;
221:12,25;222:4,24;
223:18,24;224:7;
231:21,24,25;244:25;
247:23;258:7,14,15;
259:15,18,20,21,24,25;
260:2,5,8,11;261:3

**heard (4)**
85:13,14;143:2;
242:7

**hearing (9)**
10:22;13:6;15:10;
83:4;91:14;218:15,16;
220:9;273:22

**hearsay (17)**
4:19,20,21,21;34:4;
35:3;44:5;54:7;86:12;
147:21;274:3,8,8,14,
14,16,17

**heart (2)**
48:4;55:7

**heavy (6)**
210:5;240:12;
241:11;273:13;276:4,8

**hedgewell@yahoocom (1)**
137:11

**held (1)**
154:3

**Hello (2)**
223:17;261:3

**help (11)**
41:5;50:3;55:3;
64:19,19;73:9;84:20;
174:22;191:23;244:6;
260:18

**helped (1)**
84:22

**helpful (4)**
49:2;67:4;166:22;
282:4

**helping (1)**
43:1

**helps (1)**
247:24

**here's (3)**
15:24;16:7;245:25

**hey (5)**
50:1;116:23;254:9;
265:16;275:3

**HH (2)**

70:8,8

**hi (1)**
143:21

**hide (2)**
252:11;272:25

**higher (2)**
158:11;249:1

**highest (1)**
283:3

**highlighted (4)**
35:7;92:9;94:16;
96:15

**hire (1)**
195:24

**hired (1)**
196:6

**history (8)**
92:4;101:21;137:22;
138:1;141:3;144:6;
221:1;227:19

**hit (6)**
236:13;245:11;
273:10,10,10;275:13

**hits (2)**
157:17;245:10

**hitting (5)**
233:23;271:22;
275:17,19,20

**Hmm (2)**
144:16;167:6

**Hold (40)**
18:1;62:15;64:13;
88:21;102:11;104:17;
107:11;108:2,14;
116:20,24,25;125:11;
130:16;132:3;136:2;
140:16;142:7,16;
156:2;157:2,3,3;
158:21;176:10;180:22;
183:12;185:3;189:9,
18;193:11;202:3;
208:3;231:23;240:4;
259:24;269:3,24;
270:7;274:11

**hole (2)**
212:12,13

**holes (2)**
190:2;258:25

**holiday (1)**
41:5

**home (16)**
33:7;34:4;39:4;45:1,
4;46:2,6;88:13;89:19,
25;158:12;163:13;
164:25;173:23;220:4;
268:14

**homeowner's (10)**
44:2,9;45:1,2,3,5;
46:1,3,7;55:5

**Honestly (3)**
37:7;117:1;267:25

**Honor (134)**
2:6,9,16;5:23;7:2,18;

8:7,8,15;9:24;10:20;
12:10,24;13:11,24;
14:7;15:5;17:2,23;
19:20;20:20;21:20,23;
22:7;23:12,22;24:1;
30:3,4,9;31:5;32:8;
33:3;36:8;37:1,6;38:5;
40:3,4,4;9;31:5;52:4,6;
59:1,12,15;60:2;61:1,
16,25;62:19;63:1;
66:12;67:8;69:19;
70:22;71:4;72:4,16;
73:8;20;74:14;76:15,
20;77:17;81:7;83:11;
85:13;86:4,12;91:24;
94:23;95:4,21;96:9,12,
18;98:25;100:4;
104:21;105:3,13;
108:25;110:12;117:24;
119:11;123:22;126:3;
151:6;160:10;164:8,
19;178:3;179:25;
180:13;186:18;192:20;
193:1,2,6,10;194:1;
195:2;205:17;212:22;
214:5;216:15;217:4,
10,14;218:24;220:6;
221:13;236:5;238:11;
239:7,11;240:2;243:9;
244:12;245:15;256:5;
259:18,21;260:13;
271:25;272:4,19;
278:8,12;280:8,20;
283:12,16

**honorable (1)**
2:4

**hook (1)**
205:8

**hookup (1)**
216:4

**hope (3)**
6:25;136:19;189:13

**horrible (1)**
165:9

**hose (1)**
164:24

**hotted (1)**
201:9

**hours (3)**
239:3;244:1,1

**house (7)**
27:12;50:9;107:5,16;
112:17;117:5;275:9

**housekeeping (1)**
2:20

**How's (2)**
35:3;208:16

**huge (1)**
38:8

**Huh (2)**
252:7;278:9

**hundred (2)**
165:22;212:6

Case: 19-30088    Doc# 12576    Filed: 07/01/22    Entered: 07/01/22 07:05:33    Page 299
of 320

**hundreds (1)**
112:7
**hurry (2)**
19:17,18
**Hussein (1)**
54:8
**hypothetical (1)**
233:22

# I

**Ibrahim (10)**
137:15;139:10;
140:12,20,21,24;
141:10;142:16;248:8,9
**Ibrahim's (2)**
139:21;140:2
**ice (5)**
60:18;161:1,22;
164:24;167:23
**icky (1)**
171:8
**ID (4)**
3:23;5:18;6:1,7
**idea (1)**
216:16
**ideally (1)**
206:1
**identical (4)**
99:14,15;135:14,16
**identification (2)**
3:6;202:9
**identified (14)**
5:5,17;6:7;31:9;
59:9;60:5;140:11,13;
141:10;208:19;257:17;
273:21;280:15;281:9
**identify (3)**
64:23;131:8;228:18
**identifying (1)**
190:3
**ignore (2)**
60:19;268:20
**II (8)**
30:3,5,5;31:1;32:8;
33:1,3,6
**image (2)**
33:1,2
**images (1)**
33:3
**immediately (5)**
16:9;17:4;51:7;
83:15;165:13
**immunity (1)**
251:21
**impact (2)**
205:3;271:23
**impacted (2)**
185:25;205:4
**impeach (1)**
81:23
**impeachment (4)**
79:25;80:3,4,5

**impersonating (1)**
119:3
**implement (1)**
198:13
**implemented (1)**
199:3
**implicates (1)**
245:9
**important (8)**
16:11;49:4,4,5;
63:20;64:5;193:18;
211:22
**importantly (2)**
6:17;212:20
**impose (1)**
77:4
**impressed (1)**
277:18
**impression (1)**
224:2
**improper (2)**
55:6;249:1
**improve (3)**
25:8;231:3;244:19
**inaccurately (1)**
134:23
**inadequate (6)**
65:12;254:19,24;
255:3;256:11,15
**inadvertently (1)**
96:19
**inappropriate (2)**
147:1,5
**Inaudible (1)**
218:14
**inch (2)**
185:14;258:17
**inches (1)**
257:25
**in-chief (1)**
240:1
**incidences (1)**
137:2
**incident (6)**
68:21,24;83:14;86:5;
133:16;176:1
**include (4)**
43:1;144:3;272:20,
21
**included (4)**
15:6;61:2;75:1;
141:7
**including (8)**
6:18;24:13;69:17;
154:6;156:3,4;228:23;
250:4
**incoming (1)**
42:6
**incomplete (1)**
94:24
**inconsistent (1)**
20:3
**inconvenience (1)**

77:4
**incorporate (1)**
199:4
**incorrect (1)**
145:1
**incorrectly (1)**
26:10
**increase (7)**
73:1,7,7,11;75:1,9;
76:9
**increased (1)**
45:2
**increases (2)**
18:12;74:16
**increasing (1)**
195:21
**indeed (3)**
21:2;25:21;121:15
**independent (7)**
22:10;111:13;
112:14;114:10;115:18,
22;117:9
**indicate (10)**
36:8;66:23;92:9;
117:13;145:5;146:7,
13,21;166:13;228:9
**indicated (18)**
36:9;38:8;43:9;44:6;
47:9;53:4;65:11,13;
66:21;67:14;76:23;
82:1;135:23;136:7,13;
141:4;155:9;177:3
**indicates (2)**
94:7;153:1
**indicating (1)**
45:5
**indication (3)**
148:2;172:22;174:17
**indications (1)**
115:17
**indicative (1)**
226:13
**Indiscernible (13)**
88:22;100:10;
119:22;120:16;157:4;
179:20;180:4;184:25;
187:23;219:2;220:3;
222:9;259:12
**individual (1)**
7:16
**individually (2)**
3:15;4:3
**individuals (1)**
144:20
**industry (6)**
53:1,5;156:5;177:4;
225:10;235:10
**infer (1)**
64:21
**inference (2)**
68:18;278:2
**informal (1)**
101:1;132:10

**information (30)**
9:9;44:4,6;56:5,9;
62:2;63:15,17;65:10;
104:18;113:2,25;
118:1;120:24;130:18;
132:5;139:9,11;
141:18;144:8,13;
145:22;146:7,11,21;
147:10,13,15;246:20;
247:10
**informed (7)**
53:9;97:22;100:17;
129:9;132:23;146:3;
147:2
**initial (6)**
30:2;90:9;91:22;
141:5,6,7
**initially (7)**
83:23;138:3;142:4;
215:9;240:24;261:18;
280:25
**initiated (2)**
34:5;133:18
**inquire (1)**
63:12
**inquiries (4)**
34:7;44:3;47:5;
165:14
**inquiring (1)**
65:9
**inside (1)**
225:24
**insight (1)**
171:3
**insist (2)**
12:8;246:4
**insisted (1)**
246:2
**inspect (4)**
53:6;220:24;225:7;
235:13
**inspected (1)**
235:22
**inspecting (1)**
235:1
**inspection (14)**
53:8;148:24;149:2,6,
11;157:2;181:8;224:9,
15,16,19;225:1,21;
226:10
**Inspector (2)**
123:9;146:16
**inspects (1)**
238:15
**install (4)**
155:7;213:4;275:25;
276:11
**installation (1)**
154:25
**installed (3)**
143:22;182:22;
188:24
**installing (3)**

154:23;155:5;196:11
**instance (2)**
154:4;274:5
**instances (2)**
229:17;232:17
**instead (2)**
45:8;93:10
**instruct (1)**
151:6
**instructed (3)**
8:11,14;151:8
**instruction (1)**
38:1
**insufficient (2)**
216:17,18
**insurance (17)**
44:2,9;45:1,2,4,4,8,9;
46:1,8;54:9;55:6;
225:8,10;234:3,9;
235:10
**intend (4)**
21:21;22:10,12;
76:21
**intended (3)**
20:19;197:13,24
**intending (2)**
8:2;120:1
**intent (1)**
71:14
**intention (1)**
135:18
**intentional (1)**
135:10
**intentionally (1)**
137:1
**interacting (1)**
53:5
**interaction (2)**
44:1;142:9
**intercepting (1)**
211:11
**interconnected (1)**
211:13
**interested (1)**
48:7
**interesting (1)**
246:11
**interference (3)**
139:25;151:10;
178:22
**interim (3)**
254:15,25;255:8;
256:2,13
**interject (3)**
40:4;54:7;178:3
**internal (4)**
123:1;143:10;
228:20;252:5
**internet (6)**
59:9;242:11,13,16;
280:10;281:4
**interpret (1)**
65:25;73:15

Case: 19-30088    Doc# 12576    Filed: 07/01/22    Entered: 07/01/22 07:05:33    Page 300
of 320

**interpretation (2)**
65:17;67:4
**interpreted (1)**
250:16
**interpreting (1)**
65:24
**interrogatories (7)**
81:11;166:4,7,9,10;
241:3;249:19
**interrogatory (7)**
80:18;81:4,13;82:10;
150:6;152:20;166:12
**interrupt (3)**
54:6;147:4,4
**interrupted (1)**
25:7
**interruption (16)**
25:10,21;26:4,19,20;
86:22;92:5;227:20;
232:11;236:15;237:5;
244:9;261:25;271:17;
275:14,17
**interruptions (1)**
25:12
**interval (1)**
11:8
**intervene (1)**
50:3
**into (70)**
12:25;14:3;21:13;
44:8;49:7;52:4;63:18;
64:5;68:14,19;71:10,
13;80:3;84:15;87:14,
14;96:20;98:20;99:2;
101:21;103:19;117:11;
118:19,20;121:3,7;
122:23;123:14;131:18;
141:24;142:25;152:12;
154:16,18;158:5;
163:1;168:18;173:13;
175:2,9;182:18;184:7,
8,13;185:20;186:17,
25;187:7;188:2,14,17;
190:22;191:20;197:13;
198:19;199:5;211:13;
214:24;220:22;224:10,
20;231:10;234:3;
243:4;244:20;265:15;
266:8;273:20;274:1;
279:23
**introduced (1)**
123:9
**introduction (1)**
59:17
**investigate (3)**
44:3;225:6;228:6
**investigated (1)**
224:11
**investigation (8)**
90:24;91:22;220:22;
221:1;224:5,10,20;
237:11
**investigator (2)**

91:2;219:22
**Investors (1)**
123:11
**invite (2)**
9:15;10:9
**inviting (1)**
6:22
**invoice (11)**
34:3;36:5,6;38:9;
39:3,4;40:9;41:2,3,5;
47:6
**involve (2)**
203:4;271:14
**involved (5)**
44:7;69:12;152:14,
15;221:1
**involves (1)**
4:3
**involving (1)**
85:21
**ipsa (3)**
240:14;244:6;273:15
**irrelevant (3)**
129:2,3,4
**issue (33)**
7:19;9:10;13:23;
14:8;21:12;31:8;36:2,
7;37:2;39:9;61:4;
77:20;79:1;82:16;95:4;
99:5;101:4;107:6;
123:23;129:13;163:10;
165:11;186:7;209:17;
227:25;231:1;249:7;
262:6;271:15;273:17;
274:4,20;283:6
**issued (1)**
44:1
**issues (5)**
86:3;265:23;271:16;
274:25;281:11
**item (8)**
36:1;40:2;162:1,2;
248:11,12,13,13
**itemized (1)**
69:16
**items (6)**
39:5;70:12;72:25;
73:5;74:16;179:20

**J**

**jackhammer (2)**
244:8;275:20
**jackhammering (3)**
275:24;276:2,9
**jackhammers (3)**
241:10;258:25;275:8
**January (15)**
44:1,8;45:8;67:16,
23;80:20;81:18;133:6,
11,12,13;136:3;
215:12;253:5,6
**jarring (6)**

232:20,22;233:13;
241:24;244:9;271:23
**Jennifer (1)**
2:16
**Jennings (5)**
246:12;267:17,18;
268:21;270:19
**JJ (1)**
33:3
**job (21)**
4:17;53:7;110:22;
112:21;113:5;153:20;
154:8;159:10;195:7;
196:13,20;197:6,15,17;
199:7,8;206:2;277:5,
18;279:9;283:1
**jobs (1)**
112:20
**John (1)**
54:8
**joining (1)**
217:15
**Jose (1)**
10:15
**judge (7)**
9:1;31:8;108:18;
111:22;223:21;260:19;
281:25
**judges (1)**
281:15
**Judge's (1)**
129:14
**judging (1)**
147:7
**judicial (14)**
89:2;120:25;244:13;
249:10;250:13;251:4,
16;271:19;272:6,8,25;
278:6,6;279:15
**July (2)**
51:7;150:7
**jump (1)**
74:19
**JUNE (10)**
2:1;15:24;16:14;
17:3;20:10,10;149:15,
19,24;165:18
**juries (1)**
281:15
**jury (3)**
9:2;269:7,8
**justice (1)**
13:17

**K**

**KBs (1)**
99:25
**keep (21)**
7:5;8:12;56:4;62:21;
83:21;91:10;112:20;
113:4;116:17,18,18,22;
117:2,4;164:2;171:12;

182:6;183:17;219:7,
10;264:22
**keeps (1)**
265:18
**Ken (1)**
45:9
**Kevin (5)**
44:5,6,6,9,9
**key (1)**
63:17
**kicked (1)**
268:15
**kicks (1)**
270:25
**kids (1)**
188:9
**kind (27)**
17:25;37:1;44:1,5;
47:4;103:23;109:13,
15;111:4;163:9;168:9;
169:22;170:12;173:21;
181:11;193:15,20;
196:10;209:10;212:10;
229:23;241:12;255:8;
280:1,2;282:3;283:2
**kinds (2)**
69:11;137:2
**kitchen (47)**
48:2;53:4;54:3,5;
55:5,7;155:25;156:14;
157:22,23,24;158:6,10,
16;172:6,9;175:5,9;
177:7;178:2,5;179:22;
180:8;182:16,17,19;
184:4,6,8,13,23;185:5,
7,10,19,24;186:17;
187:1,7,8,25;188:3,14,
17;190:25;191:24;
220:3
**knew (4)**
224:23;251:14;
263:9;272:22
**knowledge (6)**
49:1;131:6;199:10;
200:11;237:6;245:8
**known (3)**
232:13;275:12,13
**knows (9)**
43:3;67:18;98:4;
147:4;151:11;217:9;
221:6;277:18,19
**Krull (1)**
74:8
**Kumar (3)**
63:24;65:4,7
**Kumar's (1)**
66:4
**Kwan (1)**
45:5

**L**

**label (1)**

114:22
**labeling (2)**
100:1;135:5
**ladies (1)**
119:9
**laminate (18)**
55:9;152:1;154:22;
155:4;172:18;177:16,
18;180:1,6,7;181:24;
182:9;186:2;187:10,
16;188:20;226:10;
235:23
**Lamm (3)**
43:2,4;90:9;91:17;
241:18
**Lamm's (1)**
90:23
**landlord (2)**
42:2,2
**language (1)**
96:15
**Lapping (450)**
2:7,9,10,10;3:10;
5:22,23;6:9;9:15,24;
10:1,1,12;11:6;12:4,7,
10;13:11,22,24;14:5,
14;15:6;16:6,7;17:2,7,
13,15,21,24;18:1;
19:20,22;20:8;22:3,7,
27:1,12;28:2,4,4;30:1,
2,3,3,3,5,7,8;31:2,5,6,7;
32:8;33:1,3,4,6;36:1,8;
37:1,3,6;38:1,5,6;39:3;
40:1,3,4,4;42:6;43:3;
46:2;48:8;50:3;51:4,6;
52:5,6;53:1,3;56:2,6;
59:8,12,14;60:1,19;
61:1,9,10,16,19;62:9,
12,17,25;63:1,3;64:14,
23,25;65:22;66:2,5,11,
15;67:3,7,19;68:5,7,19,
23,25;69:14,19,24;
70:1,4,7,10,22;71:4,25;
72:1,4,8,16,19,24;73:3,
8,19,23;74:3,7,14,20;
75:3,10,19,22;76:7,15;
79:4;80:2,6,8;83:1;
85:9,13,18,20;86:4,12;
90:8;15;92:7;94:23;
95:4,17,18;96:9,12,14;
98:7,9,12,15;99:4,13,
16;104:21,22,23,25;
105:1;106:9,22,24;
109:2,17;110:12;
114:3,7;117:23,24;
118:18,21,23;119:3,5,
8,11,19,20,24;120:4,
13,19,23;121:13,21;
122:1,4,8,11,16,22;
123:9,13,18;125:7;
126:3,9;128:14;129:1;
135:14;147:23;149:3;

Case: 19-30088    Doc# 12576    Filed: 07/01/22    Entered: 07/01/22 07:05:33    Page 301
of 320

151:11;162:23;164:5,
8,10,18,19,22;166:18;
167:1,6,10,13,16,21;
168:17;169:1,6,9;
171:1,17,24;172:1,3,
15;174:8,9,14,16;
176:7,9;178:17,20,24;
179:6,24;180:11,13,18,
19,25;192:12,14,19,20;
193:6,10,14,17;199:13,
17,19;205:15,17,19;
207:13,18,22;208:9,11,
14,16;209:3,24;210:2;
211:19,22;212:5,22;
213:18,20,22;214:5,23;
216:10,15,23;217:1,4,
10;218:23,24;221:10,
13,16,25;223:22,23,24;
231:18,22,24;232:2,7;
233:21,25;234:6,16;
236:4,23;237:10,17;
238:11;239:10,11,19,
21,25;240:2,7;242:11,
18,23;243:1,7,9,14,22,
24;244:12;245:5,15,18,
21,25;246:18;247:5,8,
13,19,21,25;248:7,9,
11,14,20,22;249:8,15,
17,22;250:13,21;251:4,
9,23;252:6,8;253:9,12,
16,18,21;254:1,6,8;
255:9,11,14,17,21;
256:5,9,14,17,23,25;
257:3,5,11,16,23;
258:5,9,18,22,24;
259:3,8,13,16,24;
260:2,9,12,13,15;
261:20;262:5;264:19;
265:18;266:9;267:14,
22;268:5,23;269:15,19,
21;270:1,5,17;271:13,
18;272:14,22;275:20;
277:22;278:1,5,8,10;
279:5;280:20,22;
281:6;282:21,23;
283:13,14,21,24

**Lapping's (7)**
5:16;11:4;59:20;
65:17;268:25;272:5;
279:15

**large (4)**
32:5;99:24;100:1;
182:8

**largely (1)**
42:5

**larger (12)**
16:21;20:1,5;80:15;
81:10;92:15;94:11;
129:19;133:16;162:1;
184:7,11

**largest (1)**
158:7

**last (13)**

34:3;42:6;70:18;
74:8;94:18;137:23;
160:2;176:7;206:1;
226:12;259:4,7;264:4

**lasted (1)**
268:17

**late (2)**
49:1,7

**Lately (1)**
73:2

**later (14)**
6:20;9:18;21:14;
34:8;65:12;76:11;77:6;
108:20;110:20;182:1;
187:18,20;221:15;
255:1

**latest (1)**
72:16

**Laughing (1)**
62:1

**laundered (1)**
163:5

**laundry (1)**
191:2

**law (4)**
7:13;24:24;231:15;
234:3

**lawsuits (1)**
85:1

**lawyer (4)**
43:2;103:18;147:4;
149:12

**lawyers (2)**
8:7;282:25

**lay (2)**
199:15,20

**Laylani (1)**
219:15

**layman (2)**
205:11;213:15

**layman's (1)**
212:10,19;213:6

**layout (2)**
134:22,22

**lead (4)**
90:24;147:16;191:2;
213:2

**leading (4)**
49:3;147:10;188:13,
17

**leads (2)**
143:21;262:10

**leak (22)**
50:8;51:2;79:18,19;
80:19,20,23;81:18,19,
25;82:7,13,14,17,23;
83:6,6;160:21;161:24;
169:23;171:14;173:18

**leakage (3)**
79:2;169:12;220:3

**leaked (10)**
32:2;88:11;160:25;
161:20;162:4;163:2;

164:25;168:16;169:16;
170:15

**leaking (2)**
83:14;162:16

**leaks (4)**
83:5,8,12;165:1

**leap (1)**
251:15

**learn (7)**
30:3,5;56:4;66:4;
76:2;245:24;263:13

**learned (4)**
34:8;43:9;65:25;
281:25

**learning (2)**
55:4;99:10

**lease (2)**
67:15,19

**least (7)**
6:8;48:4;72:12;
121:24,24;140:19;
145:10;180:2;211:24;
223:16;249:2;273:20

**leave (12)**
56:3;105:12,13,16,
18;117:5;120:8,10;
192:16;217:17;232:7;
281:21

**leaves (1)**
171:6

**leaving (3)**
139:5;256:2;277:8

**led (10)**
44:3;49:4;56:6;
100:16,17,18,25;148:7,
12;220:3

**leeway (3)**
16:13,18,20

**left (13)**
50:4,5;62:12;168:15;
169:16;170:2;175:4;
176:11,12;177:2;
184:2;244:1;282:20

**left-field (1)**
142:11

**left-hand (1)**
170:6

**left-handed (4)**
27:13,14,14,18

**leg (1)**
170:13

**legal (4)**
132:8;231:10,11;
233:22

**less (7)**
142:12,21;176:3;
177:13,13;185:17;
281:16

**letter (29)**
3:16;44:1,3,5;91:12,
15,17,18,18,21;92:3;
94:2,7,9,21;95:18;96:8,
19;98:14;99:20;

101:14;130:19;136:3,
6;227:11,12,18;
253:15;257:16

**letting (2)**
23:17;110:21

**level (5)**
101:2;158:10,10;
182:19,20

**LG (5)**
36:9;41:3;85:1;
242:14,17

**liability (2)**
244:7;273:17

**liable (4)**
25:10,12;236:3;
277:21

**life (4)**
110:22;222:7,8;
269:7

**lifted (1)**
172:18

**lifting (2)**
173:2;181:24

**light (8)**
48:7;49:4;54:9;
119:9;173:7;204:23;
205:13;251:12

**lights (5)**
88:14,15;89:17,20;
268:14

**like-kind (1)**
53:2

**likely (2)**
76:9;134:16

**likewise (4)**
10:8;212:2;241:11,
23

**limine (16)**
4:16,23;6:10;14:14;
19:12,17;21:12,18;
193:2;240:25;249:10;
262:8;281:11,14,16;
282:4

**limit (3)**
43:3;262:24,24

**limited (3)**
251:21;272:10;273:3

**limits (3)**
25:2,3;229:11

**Lincoln's (1)**
277:15

**line (40)**
10:7;53:3;54:1,2,2,2,
6;61:14;72:25;74:16;
79:8,14,21;80:17,19;
81:25;86:15;108:15;
109:24;129:23;131:7,
18;132:7;137:21;
156:6;169:3,8;207:20;
211:12;224:25;225:7,
12;229:23,25;234:5,6,
11;252:15;271:23;
273:10

**line-by-line (1)**
75:13

**lined (2)**
79:21;119:21

**lines (11)**
49:6;50:2,2,9;82:4;
110:4;131:4;229:1;
230:3,5;270:16

**link (8)**
8:6;98:11,21;99:2;
122:7,10,12;266:24

**linkage (1)**
61:2

**liquid (3)**
32:6;33:5;171:8

**list (32)**
2:24;3:3,9,18;4:9;
5:6,16;15:16;19:8;
23:7;59:8;69:16,21;
95:2;7;99:17;104:8;
121:18;126:4;133:25;
134:1,15;135:14;
141:24;159:14;214:5;
244:25;253:15,22,22;
264:15;278:20

**listed (5)**
3:15;8:1;74:23;
79:24;138:12

**listen (14)**
8:12;10:22;22:24;
23:4;61:23;83:3;123:3;
136:17;146:18;185:23;
251:17;268:3;277:3;
279:14

**listening (2)**
7:21;27:2

**lists (4)**
135:15;140:17;
179:8,8

**literally (1)**
268:13

**little (33)**
21:4;28:1;33:1;35:2,
3;80:15;81:10;84:25;
92:13,13,19,24;93:23;
105:6;122:25;124:6;
129:19;130:1;136:22;
153:11;160:7;164:19;
183:14,15;202:20,21;
214:24;219:3;223:24;
225:17;236:8;264:20;
283:23

**live (6)**
41:3;141:2;165:21;
178:8;193:14,19

**lived (2)**
28:4;149:13

**living (12)**
28:9;48:4;51:9;
71:17;83:24;84:1,2;
131:22,24;158:14;
186:25;187:6

**LL (2)**

Min-U-Script®

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(16) Lapping's - LL

Case: 19-30088    Doc# 12576    Filed: 07/01/22    Entered: 07/01/22 07:05:33    Page 302
of 320

71:1;178:24
**LLP (1)**
2:10
**lo (1)**
75:6
**load (6)**
215:4,5;254:15,19;
255:3;256:13
**loaned (1)**
27:13
**locate (2)**
121:15;210:24
**located (4)**
28:6;175:18;212:25;
213:25
**locating (1)**
251:11
**location (9)**
197:16,19;198:2,18,
22;203:6,16;211:9;
213:4
**locations (2)**
221:2;229:12
**Lockabee (1)**
66:17
**Lockaby (4)**
146:15;148:6;
165:12;200:22
**locked (4)**
29:4;191:6;236:22
**Lodge (1)**
96:15
**log (12)**
222:16,19;223:2,3;
247:6;260:17,20;
261:5,6;264:7;266:4;
268:9
**logged (3)**
194:1,3;260:18
**logging (1)**
193:23
**long (20)**
13:18;49:5;84:12;
108:11;109:6;111:1;
151:24;152:10;153:7;
154:18;155:11;171:7;
175:5;192:6,8;219:18;
229:13;233:8;276:24;
283:20
**longer (7)**
48:1;50:7;150:11;
196:25;205:6;225:9;
234:10
**look (45)**
16:22;48:2,5;59:23;
62:5;63:6;73:19;74:15;
75:24;76:1,7;80:20;
89:16;94:18;105:5;
122:19,23;135:3;
167:16;175:6;176:6;
209:10;220:22;236:20;
243:15;246:19;252:2;
253:22,23;257:14,21,

24;261:23;262:15,22;
264:6;265:5;266:25;
269:8,11,24;270:7,16;
272:23;279:19
**looked (11)**
32:1;99:23;115:24;
150:19;152:11;160:12;
168:9;174:25;181:3;
267:6;278:25
**looking (56)**
21:16;32:3,3,6,6;
33:6,7;38:7;40:6,6;
59:8;64:7;19,24;72:21;
74:25;75:23;93:10,10,
11,17;95:15,25;122:2;
131:11;141:3;157:22;
158:15;162:22;167:22;
171:19;175:3;182:15,
17;184:7,8,12,13,19;
186:16,25;188:1,19;
189:12,21;232:3;
243:7;244:24;248:13;
257:22;258:23;263:19;
264:22,25;270:3,4
**looks (34)**
31:8;54:5;55:1;68:9;
73:6;95:19;115:20;
130:3,13;133:5;
134:24;135:19;137:14;
157:24;161:9;167:23,
23,24;168:1,6,16;
169:12,16;170:2,15;
177:19;179:24;181:15,
23;187:15;189:8;
190:2;249:2;259:1
**loop (9)**
246:2;264:5,8;265:4,
13;266:4,5;270:22,23
**loquitur (2)**
240:15;244:6
**lose (4)**
251:1,15;260:3;
279:15
**losses (1)**
135:25
**lost (8)**
18:8;41:4,5;70:12;
259:19,23;266:5;
281:13
**lot (28)**
7:15;13:17;31:1;
32:1,1;34:9;47:5;48:1;
56:9;68:7;84:17;151:8;
152:15;161:12,20;
170:22;171:13,25;
182:13;191:22;220:7;
230:2;240:11;242:1;
255:11,14;273:22;
277:11
**lots (6)**
32:1;42:9;50:4;
147:17;158:13;187:14
**loud (2)**

259:6,10
**loudly (3)**
218:19;221:22,23
**love (1)**
269:4
**low (2)**
15:15,18
**lower (27)**
21:4,22;28:3,4,7,8;
33:1;47:2,3;51:7;
71:10,11,15,18;149:13;
150:6;157:24;165:17,
17;168:1,3;184:6,10,
21,22;185:5,7
**LRSC (1)**
41:3
**LRSC26922-something (1)**
41:5

## M

**machine (1)**
175:20
**Madera (1)**
194:22
**maintain (5)**
25:4,8;146:4;231:3;
236:14
**maintaining (1)**
230:24
**major (4)**
249:2;250:3;259:13;
274:20
**maker (1)**
167:23
**makes (9)**
26:2;71:14;73:17;
82:19;91:13;92:3;
152:6;259:5;272:7
**making (15)**
15:3;22:4;23:17,17;
112:21;133:19;151:2;
165:14;228:25;241:2;
251:12;264:8;265:18;
268:2;272:5
**man (1)**
119:6
**manager (2)**
146:17;147:17
**mandated (1)**
229:7
**Mandy (2)**
63:24;65:4
**manifold (1)**
50:8
**manner (2)**
141:13;283:8
**manufactured (3)**
83:18;86:21;115:7
**manufacturer (1)**
115:2
**manufacturing (1)**
115:5

**many (20)**
31:2;33:3;70:13;
97:5,5;111:2,4,22;
112:1;113:14;133:22;
138:1;141:15,21;
146:25;196:19;213:5;
236:20;241:20;243:10
**March (43)**
15:8,11;16:8,13,16;
18:7;20:1;75:3,5,11,12,
12;90:19;126:11,22;
127:5,18,25;128:1;
149:19,24;165:18;
197:22;198:3,8;
201:11,17,19;212:21;
213:9;215:9;246:8,12;
247:3;248:17,23;
251:12;256:24;263:8,
8,19;267:15;271:7
**March-June (1)**
149:20
**Mark (7)**
66:16;146:15;148:6;
165:11;200:22;210:24;
280:19
**marked (9)**
3:6,22;4:3,11;5:10,
18;6:10;198:20;202:9
**marketing (1)**
47:4
**marks (1)**
117:16
**mass- (1)**
86:5
**masse (1)**
122:19
**master (5)**
158:8;184:13,14;
185:20;186:17
**match (5)**
55:2,4;72:5,23;73:15
**matched (1)**
3:19
**matches (3)**
72:20,24;73:12
**material (3)**
154:5,9,10
**materials (4)**
73:1,2;75:11;179:16
**matter (7)**
2:5;21:6;39:7;56:4;
139:6;272:18;283:5
**matters (3)**
2:20;9:7;14:19
**may (59)**
8:1,1;20:17;25:3;
27:1,2;28:2;30:8;36:5;
39:5;44:9;48:2;49:3;
50:3;51:3;52:8;61:11,
12;71:16;75:17,17;
77:7;82:3;85:13;99:20;
100:1;101:15;102:4,8,
16;106:22;110:13;

125:3;141:15;143:2;
148:25,25;150:7,9,14;
157:1,20;164:1;166:6,
6;168:15;172:8;211:1;
216:9,18;223:11;
224:12;225:17;228:16;
229:10;231:18;256:20;
261:20;282:20
**maybe (35)**
7:15;14:10;19:12;
21:4;32:3;33:7;60:16,
18;92:15;98:7;112:8;
118:10;119:14;134:23;
136:18;160:25;161:22;
185:17,17;189:19;
202:18,20;203:15;
213:11;220:16;222:20,
22;242:3;244:8,9;
253:15;256:18;263:7,
8;277:7
**Mayer (1)**
160:19
**mean (118)**
3:18;5:3,4;7:23;
8:13;9:19;11:18;12:6,
17;14:3,25;16:21;17:5,
11,12,15,16,17,18,23;
18:22;19:9,16;22:15,
25;23:5;26:17,23;27:4;
30:6;35:7;36:4,8;40:5;
51:5;52:4;54:2,4;56:4,
4;59:2;60:15;61:3,25;
65:17,18,20;72:5;
83:14;85:14,16;86:6,
10;87:3,9;89:18;94:24;
96:25;99:10;109:23;
110:7;112:13;115:21;
116:22;119:15;121:23;
123:1,2,12;132:9;
138:21,24;151:25;
154:6;167:2;174:17;
175:20;177:19;179:5;
180:1,3;192:20;
204:25,25;206:3;
211:19;214:4;216:22;
227:8,9;235:6;242:1,
12,15;243:13;248:4;
251:14,22;252:8;
256:5;259:9;263:10;
267:23;268:8;272:18;
273:14,21;274:17,19;
275:10,15,23;276:19;
278:6,13;280:19;
281:18,23
**meaning (1)**
254:19
**meaningless (1)**
199:14
**means (11)**
17:13;22:5;54:2,2,7;
82:11;89:21;112:16;
267:19,24;281:23
**meant (5)**

Case: 19-30088    Doc# 12576    Filed: 07/01/22    Entered: 07/01/22 07:05:33    Page 303
of 320

4:2;19:10;50:3;
249:10;250:16
**measure (1)**
178:11
**measured (2)**
53:3,9
**measurements (1)**
188:7
**Meat (1)**
162:5
**meet (4)**
3:10;201:15;262:6;
272:15
**meeting (5)**
11:2;105:12,17;
164:16;207:3
**meetings (1)**
11:10
**melt (8)**
60:8,9,10;107:24;
110:2;160:19;161:15;
170:24
**melted (16)**
29:1;35:1;59:3;
60:13,17;107:21;
109:21,21;144:23;
160:16;161:19,20;
162:3;168:2,6;171:6
**memorized (3)**
97:13;156:18,21
**memory (2)**
41:4;133:20
**mention (1)**
3:7
**mentioned (2)**
165:16;200:7
**mentions (1)**
114:14
**merchants (2)**
41:3,4
**merged (1)**
118:23
**mess (5)**
33:8;34:1;38:4,9;
47:2
**message (1)**
260:20
**messages (1)**
65:1
**met (6)**
42:9;47:7;91:2;
174:24;220:24;224:16
**meter (2)**
137:1;145:8
**meters (2)**
195:20,22
**mic (3)**
2:13;56:3;220:8
**Michael (1)**
45:9
**Michelle (1)**
63:10
**microphone (6)**

194:12;218:3,18;
221:7;222:22;231:23
**microphone's (1)**
222:20
**microwave (1)**
89:20
**mid-2018 (1)**
50:2
**mid-2020 (1)**
50:3
**mid-April (1)**
50:6
**midday (2)**
8:25;119:10
**middle (1)**
182:9
**mid-January (5)**
67:23;68:20;69:7;
213:25;254:22
**might (21)**
12:16;20:5;25:2,14;
44:3;48:8;78:18;
122:23;141:7;163:5,
23;231:22;241:14,15;
245:1;250:2;251:14;
268:16;271:7;273:14;
283:22
**Mike (2)**
44:7;45:7
**mileage (1)**
59:11
**milk (2)**
161:1,23
**Mill (5)**
71:9;84:1,2,5;131:21
**million (1)**
89:19
**mind (7)**
23:16;45:4;65:24;
103:17;115:25;277:13;
279:14
**mine (3)**
9:7;122:10;223:8
**minimize (1)**
92:22
**ministerial-type (1)**
20:16
**minor (1)**
242:3
**minus (2)**
133:17;185:15
**minute (18)**
16:18;17:21;33:7;
64:11;68:22;92:18;
140:16;157:3;197:5;
225:15;245:22;250:11;
252:1;253:3;257:18;
260:4,7;273:19
**minutes (12)**
56:5;61:9,18;62:22;
100:7;106:6;119:16;
120:24;142:12,22;
164:9,12

miscellaneous (1)
47:1
**mishap (1)**
253:6
**misheard (1)**
143:2
**mislead (1)**
135:18
**misleading (1)**
59:21
**miss (2)**
6:16;14:25
**missed (2)**
133:8;214:17
**missing (5)**
19:23;66:21;96:11,
13;121:25
**misstated (1)**
235:21
**misstatement (1)**
262:15
**Misstates (6)**
207:9;208:22;209:2;
210:11;216:1;235:18
**misstating (5)**
37:5;80:25;81:1;
103:4;210:16
**mistake (2)**
134:24;135:16
**misunderstood (1)**
82:21
**Mitchell (1)**
63:22
**mixed (1)**
42:5
**MM (1)**
70:25
**MMWD (1)**
50:7
**model (5)**
40:5;85:21;86:2;
114:17;242:20
**models (1)**
59:24
**modern (1)**
12:13
**modifying (1)**
213:13
**moisture (8)**
169:13;173:3,21;
175:1,14;182:25;
185:24;186:1
**molding (1)**
185:11
**moment (9)**
75:25;92:23;101:22;
111:10;145:10;194:4;
201:24;225:14;226:8
**momentary (3)**
142:11;241:20;257:8
**MONDAY (1)**
2:1
**monitor (3)**

130:4,12;247:9
**Montali (2)**
2:5;260:19
**month (2)**
6:13;246:17
**months (15)**
21:1;51:1,3;52:1,3,7;
53:4;136:22;152:23;
153:2;154:6,9;155:10,
15;166:1
**months' (1)**
166:13
**more (46)**
4:3;6:17;16:11;17:1,
6;20:25;21:9;23:3,3;
36:4;48:1;49:2;51:3;
54:9;56:5;65:9;72:15;
91:14;100:7;102:8,25;
104:12;111:18;113:18;
124:9;133:3;135:4;
146:10;152:8;153:10;
158:21;159:9;160:21;
170:7;173:8;176:3;
180:14;189:24;235:11;
239:6;251:25;260:4;
263:14;278:22;282:1;
283:7
**Moreover (1)**
24:19
**morning (11)**
2:7,9,16;5:17;27:17;
28:2;244:22;246:12;
279:24;280:17;281:10
**most (13)**
23:5;32:2;63:19;
70:21;110:3;114:22,
24,25;115:3;134:16;
160:13;175:1;212:20
**motion (22)**
4:16,23;5:1,3;6:10;
14:14;16:8,12;19:12;
21:11,18,18;110:15,17;
124:3,12;193:2;
249:10;262:8;266:10;
281:11,14
**motions (5)**
6:20;19:17;240:25;
281:16;282:4
**motor (2)**
86:19,20
**mound (1)**
21:4
**mount (1)**
212:17
**mounted (1)**
190:6
**mouth (2)**
101:21;142:25
**move (3)**
34:3;38:5;40:3;42:3;
47:3,8;62:7;66:24;
67:1,15;69:5,15;71:11,
15;78:14;97:25;

108:20;137:4;145:13,
14,15;147:20;148:21,
22;154:7,11;155:19;
165:22;166:2,3;167:7;
174:5;238:11
**moved (20)**
20:10;28:4;50:8;
51:7;67:11,18;68:20;
71:9;83:22;84:15;
87:14,14,24;88:5,8;
101:2;165:20;191:20;
251:11;255:24
**moving (13)**
65:16;67:24;69:10;
83:21;84:8,17;91:10;
152:14;164:2;182:6;
254:22;255:22;283:4
**much (20)**
14:5;19:23;35:4;
36:6;41:8;107:1;110:1,
4;117:25;118:4;
132:18;141:14;160:6;
163:4;174:19,24;
185:13;217:18;221:5;
277:8
**Mullin (1)**
123:9
**multicolored (1)**
162:16
**multiple (17)**
29:1;42:9,9;43:1;
63:13;79:17;97:23;
125:12;127:8,8;
132:21,22;142:17;
159:12;175:15;237:24;
238:12
**must (3)**
131:1,1;276:25
**mute (4)**
105:19,23;120:11;
194:4
**myself (3)**
112:22;113:4;178:9

---

**N**

**name (19)**
27:23;29:3;35:5,8;
42:1,2;70:18;104:5;
106:17;119:2;142:19;
192:21;194:11,19;
200:5;218:12;219:14;
222:3,5
**named (4)**
45:5;54:8;137:15;
159:8
**National (1)**
46:5
**nature (1)**
80:5
**navy (1)**
271:5
**near (1)**

Case: 19-30088    Doc# 12576    Filed: 07/01/22    Entered: 07/01/22 07:05:33    Page 304
of 320

14:6
**necessarily (5)**
79:19;192:23;
241:14;268:16;274:3
**necessary (8)**
10:17;39:5;62:8;
196:17;18;211:6;
274:9;276:11
**need (58)**
8:10,24;9:4,14;
11:25;18:17;31:4;39:3;
43:3;45:3;49:2;61:14;
62:9;64:18;65:22;
113:14;114:1;115:1,1;
116:5;117:14;128:7,
10;136:17;138:15;
144:12;146:18;149:1;
153:22;154:10;155:13;
160:14;163:5;168:25;
172:12;174:1,22;
180:21;181:17;182:21;
192:22;195:17;199:20;
209:24;213:2;230:22,
22;231:11;239:3;
240:7;263:23;272:17,
24;273:18;274:5,22,
23;283:9
**needed (16)**
34:1;49:3;53:7;56:4;
71:13;113:2;152:13;
160:8;161:7;162:15;
165:21;191:22;197:12;
214:10,25;215:1
**needing (1)**
208:19
**needs (8)**
25:8;31:4;53:2;
63:11;183:24;195:22;
201:15;271:12
**negligence (6)**
97:23;256:8,10;
273:12;276:10,13
**negligent (4)**
240:16;256:6;
258:21;276:12
**neighbor (1)**
228:16
**neighborhood (1)**
256:3
**neighboring (2)**
227:25;228:14
**nervous (1)**
282:2
**Netflix (1)**
9:1
**network (4)**
98:20,21;121:4,7
**new (47)**
14:21,23,24;15:24;
17:13;18:21;19:1,3;
36:3;38:4;50:2;64:4;
67:24;116:13;122:24;
144:3,5;182:22;195:8,

20,22;198:13,18;
199:4;201:9;203:9,9,
11,16;204:6;211:11,
13;212:11,14,16;213:5,
12,24;214:9;215:5,5,
13;254:14,15,20,20;
256:12
**news (1)**
203:11
**newspaper (2)**
38:2,3
**next (22)**
26:10;29:2;41:1,3;
56:8;59:12;140:16;
141:25;142:15;182:7;
192:15;223:7;228:19;
232:19;239:4;254:21;
255:7;256:10;269:7;
271:25;272:2;275:9
**nice (2)**
283:11,25
**night (6)**
29:1;198:14;211:1;
264:1;265:3,22
**NN (2)**
71:5;72:1
**Nobody (2)**
29:4;41:3
**no-brainer (1)**
280:1
**noises (2)**
259:6,10
**noncode-compliant (1)**
49:6
**none (6)**
125:4;150:24;217:2,
8;221:15;277:25
**non-jury (1)**
9:3
**nonresponsive (6)**
34:4,5;39:5;42:3;
50:9;67:2
**nonsmart (1)**
145:8
**noon (4)**
10:6;11:13;61:14,15
**normal (1)**
39:1,2;110:10;
277:22
**normally (4)**
61:20;89:7,7;110:9
**notation (5)**
113:11;114:14;
202:12,25;273:8
**note (6)**
86:24;108:19;
112:21,21;117:18;
145:12
**noted (3)**
127:10;198:2;270:19
**notes (5)**
36:7;113:4,18;116:1;
279:23

**notice (4)**
61:2;64:1;89:2;
226:9
**noticeable (1)**
175:1
**noting (1)**
145:11
**notion (3)**
19:24;60:22;204:23
**notwithstanding (2)**
175:1;251:5
**November (9)**
72:1;87:15;103:3;
125:2;136:21;140:19,
20,21;149:15
**NPR's (1)**
45:7
**nuance (2)**
81:24;244:17
**number (55)**
3:16;4:14;6:10;
10:14;14:21,23,23,24;
15:13;21:19;32:9;39:3;
40:5;50:2;59:19;70:5;
73:11;74:23;81:12,13;
98:23,24;102:3;104:7;
114:14,17;115:2,6,7,8,
10,11;137:18;156:19;
157:7,9,10;166:12;
178:16;200:8;202:4;
208:10;225:5,7,7;
238:2;244:23;246:13,
13;250:8;252:9,23;
253:8,17;266:25
**numbered (1)**
64:15
**numbering (2)**
99:5,8
**numbers (5)**
33:2;64:17;74:25;
115:15;121:4
**numerical (1)**
98:22

## O

**Oakdale (1)**
131:24
**oath (3)**
62:25;106:10;123:16
**object (15)**
21:23;22:23;38:1;
44:4;49:9;59:16;60:2;
71:22;107:12;108:12,
15;172:11;214:1;
234:14;261:21
**objected (2)**
272:9;273:2
**objecting (2)**
23:6;65:21
**objection (66)**
2:25;3:1,1,4,5;5:4;
22:21;35:3;41:7;42:1;

45:2;54:7;66:24;71:19;
79:4;80:2;85:10,13,16;
86:4;87:10;90:15;92:7;
94:23;96:9,10;107:25;
108:2,5,19;109:19;
114:3;124:11;125:7;
128:14;129:1;147:23;
174:5,20,20;199:13,17;
206:10,20;207:7;
208:22,23;209:2,8;
210:10;211:17;214:12;
215:15;216:3;232:14;
233:19;234:23;235:18;
238:16;242:22;244:15,
23,24;280:9,18;281:9
**objections (3)**
3:14;15:7;279:22
**objects (1)**
25:13
**obligated (1)**
206:5
**obligation (1)**
67:19
**obligations (2)**
24:22;67:15
**observable (1)**
172:9
**observation (1)**
19:20
**observe (5)**
8:6;11:21;67:21;
256:20;278:21
**observed (6)**
41:2,2,3;61:5;69:10;
170:21
**obtain (1)**
56:2
**obtained (2)**
43:9;63:5;240:11
**obviously (3)**
124:5;192:17;256:19
**occasion (1)**
109:10
**occasions (1)**
35:6
**occupied (2)**
103:1;125:1
**occupying (1)**
67:22
**occur (6)**
82:7;92:9;213:8,14;
233:7,8
**occurred (14)**
43:7,7;49:3;51:2;
79:18;81:25;82:23;
83:14;128:2;165:1;
199:6;216:4;224:13;
228:18
**occurrence (1)**
228:21
**occurring (2)**
34:9;138:1
**o'clock (5)**

14:11;120:18;164:2;
239:19,22
**odd (3)**
47:4;95:10,23
**OEM (1)**
36:9
**off (23)**
2:13;11:7;56:2;
89:21;99:9;105:8,9,17;
106:2;120:7,15;
143:21;145:25;193:11;
211:3,6;230:5,21,25;
239:17;259:14;261:5;
280:18
**offer (6)**
6:6,19;154:13;
163:23;192:21,24
**offered (2)**
3:2;163:20
**offering (2)**
22:22;87:9
**office (10)**
179:9,17;188:2,4,6,7,
8,20,21;190:25
**office/bedroom (2)**
189:1,2
**officers (1)**
8:8
**officials (1)**
148:7
**often (2)**
109:23;142:13
**old (11)**
20:2;50:2,9;114:19;
116:15;158:12;175:15;
180:7;203:17;215:13;
216:3
**once (13)**
5:4;34:9;43:9;45:7;
52:4;76:24;77:9,11;
120:11;177:4;219:14;
277:20;280:23
**one (157)**
3:3,25;4:4;5:25;7:2;
9:18;10:3;11:8;12:24;
14:15,19,21;17:17,21;
19:20,21,22;31:2;32:6,
7;33:3,3,7,8,8,8;36:3,3;
37:2;38:3,4;48:1,3;
59:4;63:11,23;64:17;
65:2;66:18;68:15;
77:20;82:2;83:3;86:5,
19;87:3;91:14;92:24;
93:5;99:22;109:12;
111:3,18;116:13,15;
125:13,14;126:7,11;
130:9;133:22;135:2,2,
2,4,5,14;139:15,19,22;
140:3,16;141:13,13,14,
14;142:19;143:10,18,
18;144:2;145:4;
146:10;147:8,11;
153:17;157:1,3;158:1;

Min-U-Script®

Case: 19-30088    Doc# 12576    Filed: 07/01/22    Entered: 07/01/22 07:05:33    Page 305
of 320

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(19) necessarily - one

162:5,22;166:23;
167:16,17;168:18;
171:5,6,19;173:5;
181:7;182:7;184:11;
189:6,7,24;191:9;
193:23;196:21,21,22;
197:24,24;198:3;
201:23;202:8;204:19;
208:3;222:18;225:5,7,
15;226:8;234:21;
237:18,18;243:15,24;
244:4;245:18;246:11;
248:2;249:19;252:9,
25;253:2,10,12,18;
254:17;256:2,3,23;
257:18;258:2;259:5,8;
261:1;262:16;263:19;
269:25;270:10,24,25;
274:6,6;275:8;281:15
**one-day (1)**
13:9
**one-page (2)**
74:5,11
**ones (9)**
4:5,10,15;5:10;
98:10;133:23;140:12;
281:9;282:7
**one's (3)**
172:24;173:5;245:21
**one-way (1)**
103:21
**online (2)**
14:15;216:17
**only (42)**
3:6,13,23;6:7;10:12;
11:16;16:9;23:6;32:4,
6;33:3;37:3;39:5;50:5;
51:4;55:8,8;59:21;
60:8;62:13;113:1,1;
118:25;129:14,23;
130:8;143:22;148:10,
17;160:7;177:7;202:9;
204:20;223:2;230:10;
236:21;240:17;244:17;
255:6;256:1;262:25;
282:5
**onto (1)**
160:16
**oOo- (1)**
2:2
**Oops (1)**
240:4
**open (5)**
93:7;169:8;236:22;
243:20;281:11
**opened (4)**
68:2;147:23;264:9;
265:10
**opening (7)**
9:14,15,17;23:20;
24:3;161:3;254:23
**operate (4)**
229:22,24;230:4;

251:4
**operated (1)**
236:22
**operates (1)**
107:19
**operating (3)**
89:3,7;240:18
**operation (2)**
230:12;271:13
**operations (9)**
39:1,2;233:5;236:20;
247:6;248:20;264:7;
266:4;268:9
**operator (1)**
93:23
**operators (1)**
210:20
**opine (1)**
68:17
**opinion (5)**
11:23;45:4,7;56:3;
238:13
**opportunity (2)**
267:22;272:14
**oppose (2)**
193:1;280:22
**opposed (1)**
184:11
**opposing (3)**
6:12;16:25;22:23
**opposition (1)**
240:24
**optimal (2)**
12:12;219:17
**option (4)**
10:14;12:11;123:14;
167:8
**oral (1)**
283:7
**order (30)**
2:3;3:12;11:24;14:2;
20:9,20;34:2;36:9;
38:1;52:5;62:3;78:5,
13,18;81:19;98:23;
109:4;122:11;123:18;
124:5;153:18;154:9;
196:16,24;204:4;
228:11,15;230:22;
275:25;278:18
**ordered (3)**
34:1;36:6;80:21
**oriental (1)**
159:13
**original (13)**
18:4,9;154:20;
173:25;178:4,18;
197:7,16;203:6;
215:19,24;263:22,22
**originally (8)**
13:3;20:10;24:9;
71:15;197:6,13;
206:15;262:19
**Oscar (2)**

160:18;208:11
**others (6)**
4:6,6;52:1;66:8,9;
173:8
**otherwise (4)**
71:17;115:3,10;
136:18
**ought (1)**
192:24
**out (125)**
8:12;9:20;12:9,19;
14:2;17:17;18:12,19;
23:2;32:2;34:9,9;35:6;
38:2,5;42:6;47:2,3,6,8;
48:9;50:1,7;51:8;52:2,
2;53:6;55:1,8;59:22;
60:24;63:25;68:9;
69:20;70:22;71:4,11,
15;72:15;76:11;77:1;
79:7,17;88:16;89:19;
93:21;95:8,16;98:17;
107:5;113:5;115:1;
118:24;124:1;126:25;
129:4;139:5;141:16;
149:18,24;152:12;
154:7,11;160:24;
165:22;168:10,17,22;
170:5,15,23,25;171:15;
173:19;175:18;178:4;
183:3;188:7;189:18;
201:10;206:5;208:25;
211:2;212:24;218:20,
21;222:16,19;223:3;
224:14;225:1;229:18;
236:25;238:23;240:10,
23,24;245:21;246:14,
16,19;247:12;248:24;
250:2,5,18;251:2;
252:12;260:5,6,17,18,
20;266:9,12;268:13,15,
15;269:3;275:9;276:2;
277:20;278:12;279:16;
282:19
**outage (140)**
24:7,10,16,20;25:16;
44:4;63:25;89:18;
99:21;101:15,18,20;
102:1,4,10;104:13;
124:22,25;125:4,14,16,
17,18;126:15;127:5,9,
14,25;128:1,20;
129:22;131:14,16;
132:6,11,15;133:18,19;
135:22;136:5,11,11;
139:10;144:6,8,14;
145:6,10,23;146:4,8,
12,14,22;147:12;
196:17,18,25;197:2,4,
4,6,7,14,22;198:4,7,12,
22,23,23,24;199:5;
201:7,10,13,14,18,19;
204:10;205:21;206:1;
209:12,21;210:8,19;

211:7,7,18;212:1,3,7,8,
17;213:8,12,18;
216:20;217:8;221:1,2;
227:25;228:4,6,10;
229:24;230:4,7,10;
233:2,3,4,9;236:10,15,
21;241:12;248:14;
249:13;263:4,16,17,22,
23,24;264:1,15;265:3,
8,11;267:3,6,8,9;268:4,
7,12,13;271:15;277:7
**outages (40)**
24:14;90:12;126:11;
127:8;128:13;133:22;
137:23;138:1,9,12,13;
139:7;140:11;141:1,7;
142:10,11,11,12,21;
143:5;144:22;145:7;
148:3;165:11;196:19,
21;199:7;213:14;
217:2,5;224:12,20,24;
226:16,19,21;263:2;
265:14;268:2
**outer (1)**
161:15
**outlet (7)**
117:10,12,13,14,17,
18;278:25
**out-of-range (1)**
35:3
**outset (1)**
59:16
**outside (11)**
7:21;25:13;161:2;
168:20;169:12;229:10,
18;234:14;245:12;
275:21;277:21
**oven (1)**
89:20
**ovens (1)**
89:3
**over (32)**
8:5;13:17,19;14:16;
29:2;32:3;42:4;43:9;
44:5;51:4;63:14;76:18;
105:10;112:18;115:23;
126:17;129:7;136:22;
161:10;166:19;167:25;
168:8,15,25;169:14;
174:17;180:7;185:10;
186:19;187:25;239:9;
250:3
**overall (2)**
48:1;112:2
**overbroad (2)**
272:10;273:4
**overcomes (1)**
245:14
**overhead (1)**
232:23
**overheating (1)**
110:1
**overlap (3)**

6:3;52:2;119:25
**overload (3)**
59:25;107:18;110:1
**overnight (1)**
198:24
**overrule (7)**
45:2;54:8;71:24;
108:4;216:2;238:16;
279:21
**Overruled (3)**
79:5;214:6;234:17
**overruling (1)**
87:10;281:9
**own (12)**
30:6;60:15;65:24;
69:9;92:12;93:3,11;
103:2;115:15,17;
245:8;281:18
**owned (4)**
103:2;203:8,21,23
**owner (16)**
42:7;54:7;64:3;
67:14;117:14;174:2;
188:8;190:7;195:17;
201:3,4;205:2;206:5;
216:11,11,13
**owners (3)**
28:3;174:2;188:9
**owner's (4)**
28:2;42:3;71:20;
206:18
**ownership (1)**
29:1

**P**

**Pacific (1)**
2:17
**package (3)**
36:7;160:18;162:1
**packaged (2)**
161:23,23
**packages (2)**
161:4;162:4
**page (33)**
33:1,2,4;59:12,17;
63:23;64:6,9,15,17;
65:1,4;74:8;80:17;
93:16,18;104:12;
126:19;138:9;208:13;
245:25;246:9;258:22;
259:4,7;264:18;
269:13,14,23;270:7,8,
11,12
**pages (5)**
43:9;56:7;93:17;
95:19;104:13
**paid (1)**
46:5
**paint (3)**
152:14;153:22;182:3
**palm (4)**
131:3,7,9,18

Case: 19-30088    Doc# 12576    Filed: 07/01/22    Entered: 07/01/22 07:05:33    Page 306
of 320

**palpable (1)**
173:4
**panelist (1)**
10:23
**papers (1)**
6:12
**Parada (26)**
10:19;27:8,19;61:1,
17;62:16;105:3,6,15,
16;106:14;120:6;
164:14;193:24,25;
194:17;217:25;218:8;
219:1;220:14;222:25;
223:10;259:20;260:18;
261:5;283:19
**paragraph (8)**
92:8;94:16;130:3;
201:7;202:22;228:19;
232:4;254:11
**pardon (4)**
32:5;33:8;80:24;
179:3
**parents (2)**
29:4;87:23
**parents' (1)**
29:2
**parking (2)**
49:5;281:20
**part (41)**
20:13;23:5;30:2;
32:4;36:4,6,7,9;37:2,4,
8;38:2,4;40:2,8;42:6;
48:4;69:20;74:12;
75:18;76:22;82:15;
97:23;104:15;117:4;
126:18;127:13;135:10,
17;138:5;141:25;
149:11;173:24;184:6;
190:4;201:25;204:3;
236:16,18;276:10;
281:12
**partially (1)**
107:21
**participant (1)**
10:23
**participate (1)**
10:22
**particular (12)**
27:6;86:18;112:12,
18;115:23;116:8;
195:25;196:19;200:12;
228:8;230:1,20
**particularly (3)**
145:8;251:13;279:13
**parties (3)**
7:14;24:13;105:4
**parts (9)**
16:3;40:1;47:1;
80:21;81:19;108:10;
114:1;117:6;214:24
**party (9)**
7:8,23;8:17;23:16;
77:3;216:12;274:10,

17,18
**pass (1)**
217:11
**past (9)**
109:11;121:8;123:2;
128:23;150:14;176:21;
225:9;265:23;266:2
**patch (3)**
118:19;119:4;220:17
**patching (1)**
250:23
**path (1)**
182:5
**patience (1)**
283:17
**Paul (2)**
72:17;253:24
**pause (1)**
273:18
**pavement (1)**
255:5
**pay (10)**
44:2,8,9;46:6,9;47:8;
91:8;159:8;224:18;
281:20
**peel (1)**
172:19
**pending (4)**
124:3,12;244:24;
281:12
**penetrated (2)**
173:3,3
**penetration (1)**
175:1
**pennies (1)**
73:14
**people (20)**
7:15;8:23;11:20;
13:18;41:4;43:9;45:6;
48:2;67:18;72:20;
119:20;121:9;148:12;
165:15;241:25;242:17;
246:14;267:22;282:1,2
**per (3)**
47:6;73:22;177:4
**percent (7)**
41:5;73:11;75:1;
109:16;112:6;179:22;
212:7
**perception (1)**
145:9
**perfect (2)**
15:20;61:24
**perfectly (1)**
122:10
**performing (2)**
112:15,18
**perhaps (3)**
4:19;26:2;236:15
**perimeter (1)**
161:15
**period (36)**
25:17;26:20;41:3;

43:4;44:2;51:5;52:1,3,
9;68:12;90:13;103:1;
144:7,22;148:1,2;
151:22;152:21;154:21,
25;155:2,6;165:19;
166:9,13;199:10;
211:4;224:13;226:16,
20;228:1;238:6;241:8;
261:22;267:9;279:18
**periods (1)**
104:10
**Perkins (63)**
44:1,4,5,8;53:5;54:1,
2,9;91:2,7,11,11;92:4;
94:7,22;99:19,20;
101:14;102:15;124:22;
125:15,16;138:14;
139:11,18;144:8;
156:5;217:24;218:1,2,
7,9,10,15,18;219:15,
21;220:6,10;221:22;
222:2,5,19;223:4,6,13;
231:19;232:16;234:19;
235:2,7,19;236:6;
237:22;238:17;241:13,
23;246:19;257:1;
263:18;264:15;266:15;
267:2
**Perkins' (9)**
91:18;103:25;
127:10;139:6,24;
140:6,13;141:6;221:6
**permission (3)**
16:15;17:6;149:8
**person (12)**
7:20;10:4;43:1;48:1;
63:11;87:4;137:18;
241:5;255:6;256:3;
275:3,11
**personal (10)**
8:23;27:3,5;56:3;
105:25;164:11;189:15;
222:7;224:9;234:23
**personally (3)**
149:2;224:16;234:21
**personnel (2)**
145:5,6
**persuade (1)**
25:25
**persuaded (1)**
21:6
**PG&E (174)**
2:5;6:2;7:11,23;
17:7;18:17,22;21:12;
24:9,14;25:4,9,12,17,
18,20;26:1,3,5;32:9;
36:3,8;43:6;47:4;48:2;
49:5;55:1,2,3;56:3;
66:16;68:8,15;69:18;
70:14;90:8,19,24;91:2,
7,17;97:21;98:16,22,
23;101:2,19;106:11;
126:14,19,24;127:7;

128:13,19;129:6,8;
130:11,16,19;131:13;
132:6,11,19,22,23;
133:2,18,22;135:21,24;
136:8,11,22,25;137:3,
10,15,22;140:20;
144:14;145:5,5,6;
147:18;148:7;149:3;
165:24;166:5;174:14;
178:21;195:5,8,11,24;
198:20;199:11;200:3,
12,17;201:25;202:25;
203:23;204:8;205:7;
206:14,17;207:1;
208:25;210:8;213:23;
216:12;219:21;224:17;
225:16;228:21;229:7,
12,13,19;230:16,18,20,
25;231:2;232:3,17;
233:12,14,16,23;
234:25;235:9;236:14;
237:11;240:18,25;
241:5,6,15,17;242:2;
243:13,20;245:10;
246:1,5,6,7;248:6,23;
249:3,12,20;250:13;
251:9,19;252:5,9,13;
257:12;261:22;262:3;
263:8;264:14;265:15;
268:15;272:5;274:7,
13,22;276:10;277:10,
21;282:25
**PG&E&E (1)**
25:8
**PG&E-Greenberg (1)**
194:16
**PG&E-maintained (1)**
146:4
**PG&E-owned (1)**
49:6
**PG&E's (24)**
7:10;24:22;44:7;
55:7;97:23;126:18;
129:6;130:24;131:10;
142:21;148:3;156:3,4;
166:9,21;203:13;
226:15;230:8,9,10;
233:1,13;237:5;277:1
**PGE (1)**
264:18
**phase (2)**
229:21;239:8
**phasing (7)**
68:10;246:23;247:3;
264:6;265:20;268:8;
271:12
**phenomenon (1)**
270:20
**phone (21)**
10:5;19;11:8,16,21;
12:15;100:10;104:19;
105:22;106:6;118:12,
21;124:6;218:21;

220:17;222:15;223:7,
7,12,14,23;231:23
**phone's (1)**
207:25
**phonetic (11)**
43:2;45:5;54:8;
63:25;66:17;74:8;
123:9;137:12;159:9;
267:18;268:23
**photo (12)**
31:7,9;36:4;59:2;
170:7;171:20;172:4,
11;176:8;181:7;
257:14,14
**photograph (4)**
30:8;33:1;174:20;
226:13
**photographic (1)**
70:11
**photographs (14)**
30:1;95:5;99:18,18;
116:3,7;149:5,9;
174:15;225:15,20;
226:4,12;227:11
**photos (16)**
31:1,2;36:5;70:13;
98:16;116:9;160:21;
167:4;168:24;173:11,
20;174:11;181:7;
182:7,18;257:6
**Pick (1)**
257:21
**picture (28)**
12:13;31:1,6;32:3,3,
5,7;33:4;37:3,7;38:2;
59:10;157:12;160:12;
162:13,23;171:22;
173:2;181:9,10;
182:15;184:6;186:23;
188:1,18;189:3;
190:13,15
**pictures (18)**
32:1,1,5,6;59:23;
98:24;104:6;160:7;
161:19;162:20,22;
167:14;173:6,24;
180:21;188:12;189:22;
191:9
**piece (2)**
211:11,13
**pieces (3)**
6:8;79:9;120:24
**pin (1)**
98:3
**pinkish (1)**
33:1
**place (21)**
24:18;29:8;37:8;
49:6;50:6;125:5;
136:12;161:24;165:21,
22;175:16;192:5;
196:13;197:3,8;198:7,
15;199:24;234:3;

Case: 19-30088    Doc# 12576    Filed: 07/01/22    Entered: 07/01/22 07:05:33    Page 307
of 320

263:23;265:8
**places (1)**
  179:8
**plaintiff (1)**
  240:19
**plan (3)**
  14:1;21:22;61:17;
  63:25;211:2
**plane (1)**
  47:6
**planned (10)**
  63:25;64:1;65:8;
  205:21;209:12;210:18;
  211:7;212:1,2,7
**planning (6)**
  10:2,9;49:7;73:21;
  224:18;278:14
**plans (1)**
  210:22
**plausibly (1)**
  241:11
**play (2)**
  9:3;153:4
**played (2)**
  157:21;252:10
**playing (1)**
  258:19
**pleading (1)**
  73:21
**Please (36)**
  2:7;11:5;20:24;21:8;
  27:9,19,21,23;33:4;
  41:2;69:23;91:13;
  100:20;103:8,24,24;
  106:14,17;107:15;
  114:2;125:10,13;
  126:2;136:18;146:10;
  151:7;176:8;185:23;
  194:13,19;208:23;
  218:9,12;227:5;
  260:24;261:2
**pleasure (3)**
  119:10;239:4;240:1
**plenty (1)**
  6:22
**plug (3)**
  212:11,14,15
**plugged (3)**
  89:8;117:10;240:5
**plum (1)**
  168:7
**plumbing (1)**
  50:9
**plus (7)**
  16:4;51:2;59:11;
  73:6;133:17;185:15;
  279:24
**pm (4)**
  140:3;164:15,15;
  284:1
**point (66)**
  3:6,23;5:8;7:13;12:3,
  17;16:6;17:19;19:11;

28:1;31:2;34:6;36:2;
42:3;47:3;49:1;52:5;
56:1;60:6;69:19;70:22;
71:4;82:2,3,5;83:1,13;
85:8;87:7,11;94:10;
96:25;98:7;101:14;
102:21,21;110:2;
111:17;120:2;134:13;
141:20;144:10;150:11;
156:4;162:10;165:10;
168:13;172:15;183:9;
191:15;201:4;205:24;
209:5;213:23;214:9,
25;216:25;224:15;
236:24;244:5;247:24;
249:14;252:1;266:9;
275:10;278:12
**pointed (3)**
  169:25;240:24;
  278:22
**pointing (1)**
  169:22
**points (1)**
  87:18
**pole (9)**
  232:22;236:13;
  241:10;244:20;245:10,
  11;257:8,12;271:22
**poles (1)**
  241:22
**policy (8)**
  45:2,2,4,4,5;46:3,3,4
**portion (7)**
  34:4;64:23;102:13;
  123:16;126:21;175:17;
  206:1
**position (4)**
  12:20;37:4;219:21;
  252:14
**positive (1)**
  252:22
**possible (6)**
  156:18;191:20;
  223:5;255:2;256:6;
  257:7
**possibly (2)**
  127:20;279:13
**postpone (2)**
  23:13;249:4
**postponed (2)**
  249:6,6
**potential (7)**
  3:14;150:20,21,24;
  224:12;226:14;250:3
**potentially (4)**
  4:18;232:10,12,25
**pounding (1)**
  255:5
**pounds (1)**
  163:22
**pouring (1)**
  168:22
**Power (98)**

3:14,21;4:2,18;23:5,
8,11;24:7,11;25:7,10,
16,21;26:5,9,18,19;
34:1;42:8;63:23;65:11;
83:9;88:16;89:18,19,
21;126:25;128:13;
132:6,11,15;133:18,18,
19,22;135:22;136:5;
143:25;146:8,13,22;
147:11;148:3;160:24;
196:3,6;199:12;200:2,
5;202:1;204:3,20;
205:6;207:20;209:20;
210:4,22;211:2;215:6,
19,24;216:4,16,18;
230:6,21,25;236:25;
240:11,11,19;241:7,10;
243:18;245:4,11;
250:3;252:2,4,11,13;
257:5;263:2,7;265:12,
17;266:5;268:15;
271:14,20,21;273:6,11,
21;275:2,11;278:3;
280:1
**power's (1)**
  268:13
**PP (8)**
  72:17,22;73:4,12,13;
  74:15;76:3,3
**practice (2)**
  221:8;259:9
**precautions (1)**
  259:5
**precise (1)**
  81:3
**predated (1)**
  224:20
**predates (1)**
  254:9
**predicted (2)**
  75:6;76:12
**prefaced (1)**
  100:20
**prefer (1)**
  11:17
**preliminaries (1)**
  9:14
**preliminary (2)**
  9:22;90:23
**premature (3)**
  224:19;225:5;236:2
**premises (10)**
  48:1,8;67:22;92:5;
  102:18;224:12,24;
  226:21;227:19,20
**prep (1)**
  263:25
**preparation (2)**
  2:18;153:1
**preparatory (1)**
  250:22
**prepare (1)**
  265:21

**prepared (1)**
  152:19
**preparing (4)**
  166:4,8;251:10;
  265:2
**prepping (1)**
  264:3
**prescribed (1)**
  229:10
**present (5)**
  22:7,12;23:9;24:4;
  85:6
**presentation (1)**
  6:5
**presented (6)**
  16:19;22:8,13;32:7;
  141:24;160:22
**presenting (1)**
  32:5
**preserve (1)**
  5:8
**preserved (2)**
  124:13,15
**pre-service (1)**
  46:6
**presided (1)**
  13:17
**Presidents' (1)**
  277:14
**presiding (1)**
  2:5
**pressed (1)**
  16:10
**presumably (2)**
  13:22;275:16
**presume (2)**
  2:19;46:9
**presumption (1)**
  245:14
**presumptive (1)**
  245:12
**pretend (2)**
  8:4;21:8
**pretending (1)**
  272:2
**pretrial (1)**
  62:2
**pre-trial (2)**
  109:4;124:5;278:18
**pretty (4)**
  14:5;75:6;162:20;
  242:8
**prevented (2)**
  209:21,21
**previous (1)**
  271:16
**previously (5)**
  91:1;95:24;103:9;
  147:1;186:9
**price (3)**
  47:5,6;179:16
**prices (2)**
  69:17;75:4

**pricing (2)**
  49:6;153:25
**primarily (1)**
  175:16
**Prime (1)**
  14:17
**principle (1)**
  233:22
**prior (26)**
  3:11;28:3;39:3;69:7;
  78:8,17,19,21;127:7;
  132:7;141:5;166:9;
  174:2,4;188:8,9;190:7;
  191:14;209:15;210:22;
  211:1;235:8,9,11;
  265:14;268:1
**privy (1)**
  46:8
**probably (19)**
  8:24;9:2;12:11;14:8;
  36:9;60:7;84:20,20;
  89:1;96:19;119:4;
  134:22;149:12;159:1;
  171:15;179:22;208:4;
  235:8;260:20
**probative (5)**
  9:12;87:10,11;245:1;
  280:7
**problem (45)**
  6:9,11,25;7:1;10:19;
  11:4,5;12:21;13:11;
  26:10;39:3,8;72:8;
  82:11;85:20;86:6,7;
  107:8;109:12;110:10;
  114:1;117:12,13,19;
  121:1;122:2,5,12,22;
  123:1;173:18;183:1;
  216:18,21;228:20;
  232:19,21;235:1;
  236:12;241:19;249:3;
  256:20,21;266:21;
  278:1
**problems (10)**
  34:9;43:6;59:24;
  66:23;69:3;110:5;
  121:10;148:8;261:13;
  263:9
**procedures (1)**
  60:20
**proceed (6)**
  28:2;77:15;90:20;
  119:24;120:4;123:20
**proceedings (1)**
  284:1
**process (12)**
  27:3;30:4;39:2;43:8;
  55:4;63:20;66:7;80:2,
  6,7;132:23;152:11
**processes (1)**
  206:17
**produce (2)**
  163:14;279:1
**produced (7)**

Case: 19-30088    Doc# 12576    Filed: 07/01/22    Entered: 07/01/22 07:05:33    Page 308
of 320

56:7,9;86:6;266:10,
12;272:11,21
**producing (1)**
272:19
**Production (3)**
70:19,23;240:10
**productive (1)**
23:3
**Professional (5)**
123:11;222:7;
273:24;282:2;283:3
**professionalism (1)**
283:4
**proffered (1)**
22:22
**project (29)**
41:1,2;42:2,3;43:7;
68:9;141:25;147:19;
195:9,10,14,25;201:2,
5;205:23;206:18;
207:6;208:20;211:24;
213:24;214:11;246:7;
249:4,5;250:4;254:18,
20;256:14;259:13
**promise (1)**
258:12
**pronounces (1)**
144:2
**proof (34)**
6:13,14;17:8,10;
20:22;51:4,5;69:20,24;
70:1;72:3,7,25;73:10,
16,18,20;74:3,6,12,24;
75:2,4,18,21,24;76:1,6;
86:15;154:20;245:11,
13;267:25;279:18
**proper (4)**
56:4;103:12;110:7,8
**properly (2)**
60:4;79:22
**properties (2)**
199:12;228:14
**property (48)**
18:25;24:11;26:10;
42:4,6;49:6;83:24;
84:15;87:15;88:3;
89:11,15;90:5;91:3;
99:19;101:16;103:2;
125:1;127:4,24,25;
132:14;141:2;148:24;
149:19;150:21,22;
151:14,17;152:1;
153:6;154:7,11,22;
155:1,4,5,7;191:12;
195:16;207:1;216:12;
224:14;225:2;226:19;
227:25;235:14;277:2
**proposed (2)**
198:18,21
**propounded (3)**
166:5;261:20;262:19
**prospective (5)**
48:1,4;49:3,7;151:13

**protected (1)**
251:20
**protecting (2)**
107:24;109:25
**protection (1)**
275:21
**protects (1)**
107:19
**prove (4)**
20:23;25:15;192:24;
248:15
**proven (1)**
244:10
**proves (2)**
35:7;249:13
**provide (10)**
16:21;34:6;42:6;
69:22;81:3;115:9;
229:7;247:10;249:19;
262:1
**provided (30)**
6:12;20:11,14;31:4;
34:4;36:4;52:8;62:1;
63:16,21,24;64:14;
65:11,14;66:22;69:16;
79:10;96:8;101:25;
102:24;125:1;139:7,9,
11;141:4;144:6,8;
152:25;262:3;263:18
**provides (8)**
24:10;25:2,7,9,12;
111:7;200:5;230:18
**providing (2)**
124:8;263:5
**proving (1)**
9:7
**public (12)**
16:22;24:23;56:5;
63:12;100:14,22;
135:21;136:4;143:13;
146:16;207:2;231:6
**puddle (1)**
165:5
**pull (16)**
38:5;76:1;81:6;
92:12;94:3;98:21;
121:14;141:5;178:21;
180:21;202:3;247:20;
254:2;258:11;264:21;
274:5
**pulled (2)**
79:7,16
**pulling (7)**
41:4;47:2;93:3;
143:23;166:21;254:21;
266:22
**punishment (1)**
281:7
**purchased (2)**
29:3;87:24
**purpose (2)**
42:1;214:3
**purposes (2)**

79:25;230:24
**pursuant (1)**
109:4
**pursue (1)**
131:2
**pushed (2)**
201:10;261:23
**put (26)**
13:20;17:25;18:3,11;
44:1;45:1;50:2;60:22;
95:11;98:20;99:3;
104:16;105:8,12;
125:10;152:1,1;169:7;
180:7;205:7;212:10,
12,14;218:21;223:7;
281:1
**putting (5)**
34:5;101:21;142:25;
239:25;283:19
**puzzled (1)**
122:11

## Q

**QQ (4)**
6:11;14:7,13;21:17
**qualified (4)**
281:22,22,23,24
**qualify (2)**
108:16;252:22
**quality (2)**
221:11;223:25
**quarter (2)**
61:18;194:21
**queried (1)**
141:11
**queries (2)**
141:14;155:10
**query (1)**
141:11
**quibble (1)**
252:15
**quick (1)**
191:9
**quickly (1)**
59:1
**quite (13)**
4:14;55:4;80:24;
109:23;132:9;159:21;
171:8;188:19;191:17;
192:5,8;233:17;246:11
**quiz (1)**
98:4
**quote (6)**
44:3;46:6;65:6,7,7;
113:13

## R

**racks (3)**
40:2,2,8
**Rafael (7)**
24:12,17;199:11,21;

200:7;204:21;211:10
**rails (5)**
38:4,8;40:6;47:1;
113:15
**raise (2)**
27:21;165:11
**raising (1)**
110:2
**ran (2)**
198:19;204:6
**range (4)**
6:15;185:14;229:14,
18
**rates (1)**
45:3
**rather (6)**
7:21;11:2;74:10;
177:17;212:2;264:25
**Raymondo (1)**
159:9
**re (2)**
100:19;214:8
**reached (1)**
72:15
**reaction (1)**
66:20
**read (20)**
23:7;81:2;114:6;
126:20;127:20;130:2,
3;131:1,12;155:13,14;
171:17;201:8;208:15;
247:1,18,22;259:4,7;
269:5
**reading (6)**
74:3,4;92:14;94:13;
130:6;137:2
**ready (9)**
2:19,19;9:21;212:17;
251:3;265:6,6,16,17
**reaffirm (1)**
144:24
**real (2)**
8:4;22:20
**realize (3)**
74:17;108:24;211:25
**realized (1)**
197:12
**really (25)**
9:9;22:13;30:9;51:8;
61:3;76:16;82:5;93:19;
98:25;133:11;151:5;
178:12;191:22;216:24;
221:20;240:2,7;
254:10;259:9;265:23;
273:1,11;274:20,21;
278:5
**rear (2)**
50:4;175:9
**rearrangement (1)**
204:5
**reask (1)**
132:19
**reason (15)**

6:10;8:18,18;19:2;
64:4;65:9;87:4;93:4;
104:6;121:4;143:22;
150:25;151:14;209:12;
280:16
**reasonable (15)**
12:20;25:4,11,20;
26:2,4,12;225:11;
230:22;234:2,12;
235:24;276:14,18,20
**reasons (4)**
37:3;137:2;148:18;
242:2
**reassigned (2)**
44:4,5
**recall (52)**
32:1;35:5;60:17;
66:17;70:18;78:9,11,
11,20,22,24;79:19;
84:2;85:2,7;101:16,
22;116:9;120:8;
124:10,23;128:22,23,
24,25;130:19;131:10;
132:5,15,24;133:18;
134:9;136:6;140:21;
145:20;149:2,5,7,7;
156:4,19;163:21;
166:4,8;207:12;
224:25;226:11,11;
236:1;238:5;255:21;
278:24
**recalled (2)**
124:9;255:21
**receipt (10)**
38:7;71:2;107:2;
113:7,8,9,23;114:13;
121:17;159:5
**receipts (1)**
158:24
**receive (5)**
125:16;146:6,11;
147:15;238:1
**received (11)**
67:13;94:21;101:15;
124:22;125:14,18;
145:22;147:10,13;
190:11;266:14
**receiving (2)**
130:19;136:6
**recently (1)**
70:21
**Recess (7)**
56:5;106:7;118:16;
120:21,22;164:15;
239:23
**reciting (1)**
81:5
**recloser (17)**
229:22,22,24,25;
230:4,5,11;233:4,5;
236:11,19,20,22;237:8,
12,14;241:14
**reclosers (1)**

Case: 19-30088    Doc# 12576    Filed: 07/01/22    Entered: 07/01/22 07:05:33    Page 309
of 320

237:15
**reclosure (2)**
237:2;246:20
**recognize (3)**
31:9;181:8;226:4
**recollection (19)**
112:11,14;113:17;
114:10;115:19,22;
117:9;129:10,10,21;
130:5,8,22,24;131:5,9,
12;136:7;159:18
**reconnection (1)**
112:16
**reconvene (1)**
106:6
**record (27)**
16:22;27:24;68:14;
73:21;92:4;104:5;
105:9;106:18;112:20;
135:13;142:21;146:24;
194:20;208:23;218:13;
227:19;233:8;236:14,
14;239:24;240:21;
241:16;247:16;250:14;
252:4,5;279:21
**recorded (5)**
143:6;148:15;
164:17;236:21;237:4
**records (53)**
3:14,21;4:2,3,18,19;
26:19;56:5;63:5,12,23,
24;77:24;78:1;100:24;
113:9;128:22;145:19;
146:4,5;226:15;
227:24;228:6,7,13;
230:8,9,10;233:1;
237:5;246:4;248:14;
249:12;251:13;252:2;
261:21;262:1;263:4,5,
12;264:2;271:6;
272:12,16,20,23;273:5,
7;274:3,4,6;275:2,5
**recount (1)**
61:5
**recovery (1)**
279:19
RECROSS-EXAMINATION (1)
181:5
**red (2)**
168:20;248:3
**red-colored (1)**
162:17
**reddish (2)**
168:7;169:22
**redesignated (1)**
28:5
**redirect (5)**
7:6;164:20,21;
217:14;237:20
**redo (1)**
144:1
**reduce (1)**
189:17

**redundancy (1)**
270:24
**redundant (1)**
56:8
**refer (5)**
64:6;79:23;85:11;
128:12;259:10
**reference (13)**
38:7;45:1;66:3;
73:17;92:3;102:21;
113:7;201:7;232:3;
253:4;262:19;265:14;
271:7
**referenced (7)**
36:5;65:2,2;126:11;
203:5;207:3;263:1
**references (1)**
21:16;65:4
**referencing (3)**
88:12;126:25;242:24
**referred (8)**
24:11;28:1;35:8;
51:8;237:14;243:10;
263:17;271:7
**referring (13)**
37:9;48:7;64:18,25;
91:16;95:12;124:20;
136:25;149:14;201:13,
18;243:5;264:19
**refers (1)**
85:20
**refinishing (1)**
183:24
**reflects (1)**
263:25
**refresh (3)**
129:21;130:23;131:4
**refreshes (1)**
130:5
**refreshing (2)**
130:8;133:20
**refrigeration (4)**
109:15,16;112:6;
114:25
**refrigerator (113)**
13:8;31:3,9;32:4,6;
33:2;34:1,6;35:1,1;
36:1;38:3,4;39:4,6,8;
40:8,9;41:1,3;51:2;
55:3;60:16;69:8,17;
77:20,23;78:2,8,21;
79:2,7,13;80:18;81:14;
83:11,17,22,23;84:4,
16;85:21;86:2,5,6,7,21;
88:11;100:15,23;
101:4,6;107:6,9,16;
108:10;112:15;114:15,
20;117:10;119:6;
121:19;123:23;124:3;
132:13,16,20;133:17;
134:6,11;144:23;
159:10;160:8,11,15,16;
161:4,14,16;162:25;

163:2;164:25;165:9;
168:22;170:8,16,20,22;
171:7,12;172:6;175:4,
16,18;176:12;182:25;
183:18;185:25;186:7;
220:2;226:3;233:24;
242:5,24;243:19;
256:3;268:18;271:24;
275:9;276:25;277:20;
278:15;280:11
**refrigerators (10)**
39:1;85:2;87:1;89:4;
109:7,11;111:23;
112:1,8;114:22
**refrigerators' (1)**
60:10
**refused (2)**
49:2,3
**regain (1)**
204:4
**regard (5)**
53:5;124:8;136:11;
224:5;233:10
**regarding (23)**
3:11;24:14;56:2;
60:3;63:15;85:1,10;
86:1,18;100:15,22;
101:2,6;123:23;
126:14;128:13;132:6,
11,14;145:23;193:3;
226:16;242:24
**regardless (4)**
14:2;15:11;62:21;
169:21
**register (1)**
85:7
**registered (1)**
145:8
**regular (2)**
61:20;62:18
**regularly (1)**
136:25
**Regulations (1)**
234:9
**rehabilitate (1)**
151:11
**reiterates (1)**
241:23
**rejoin (2)**
220:16;260:20
**related (10)**
14:7;24:6;34:9;
101:4;175:14;206:4;
227:24;262:25;263:5;
272:12
**relates (2)**
14:19;255:2
**relating (4)**
37:3;40:2;145:20;
262:1
**relationship (1)**
111:5
**relative (1)**

56:7
**relatively (1)**
160:10
**relay (34)**
34:2;35:2;39:7;47:7;
59:3,10,18,25;60:18;
69:8;86:19;107:18,20,
21,23;109:21;110:9;
113:22,24;115:19,24;
116:3,7,10,12,21,24;
117:3;148:14;162:12;
242:6;256:3;268:18;
281:4
**relayed (1)**
138:13
**relays (1)**
60:10
**release (1)**
236:11
**relevance (11)**
67:9;68:4,5;79:4;
83:8,10;96:22;128:14,
16;232:14;233:19
**relevant (8)**
9:7;25:17;31:4;41:5;
129:14,16;210:1;241:8
**reliability (1)**
243:3
**reliable (1)**
61:12
**relief (1)**
34:7
**rely (3)**
15:1;240:23;281:3
**relying (1)**
275:5
**remainder (1)**
137:4
**remaining (1)**
168:13
**remains (1)**
9:5
**remember (25)**
7:8;22:3;82:5;85:3;
97:3;107:3,5;112:17;
114:7,11;116:11;
117:1,2,4;127:23;
128:9;132:4;136:16;
153:4;175:6;200:8;
242:22;278:24,25;
280:17
**remembered (2)**
244:22;278:23
**remnants (1)**
188:23
**remodel (2)**
195:19;216:9
**remote (1)**
261:16
**remove (1)**
50:4
**removed (2)**
116:12;168:11

**renewing (1)**
129:1
**renovate (1)**
166:1
**renovating (2)**
42:5;47:8
**renovations (2)**
47:1;191:21
**rent (28)**
18:8;47:2,9;48:3;
50:1;51:1,2,5,7,8,9;
52:2,2,5,9;71:12;
149:18,23;150:6,16,25;
151:14,17;165:17,17,
19,22;281:13
**rentability (1)**
52:5
**rentable (2)**
50:7;150:11
**rented (2)**
48:2;49:8
**renters (3)**
150:20,22,24
**renting (1)**
48:3
**reoccurred (2)**
80:20;81:19
**rep (1)**
195:8
**repair (39)**
10:3;21:17;25:8;
34:8;36:2,5;37:8;38:1,
7,7;39:1,5;40:5,9;46:7;
47:7,9;50:4;53:4;
71:12;73:6,25;76:8;
87:23;107:2;109:10,
11;112:12,15,19;
113:13;114:16;115:23;
119:6;121:20;148:17;
192:25;242:7;244:3
**repaired (6)**
17:18;34:6;36:3;
49:2;112:1,7
**repairing (3)**
108:10;109:7;111:23
**repairman (1)**
243:16
**repairs (20)**
48:8;49:4,5;50:6;
52:2,3,8;78:8,17,19,21;
79:2,12;80:18;81:13;
109:13;153:22;165:23;
166:14;231:3
**repeat (4)**
5:19;33:4;42:5;
103:24
**repeated (1)**
241:1
**rephrase (3)**
67:19;245:13;263:23
**replace (13)**
36:4;40:1;52:4;53:5;
55:3;70:15;88:2;

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

113:14;151:22,24,25;
152:21,23
**replaced (20)**
15:2;34:1;36:3,6;
37:1;47:7;53:2,2;54:1;
79:10,14;80:19;81:17;
82:2,7,23;107:21;
116:13;156:5;244:3
**replacement (11)**
15:25;36:4,9;37:3,8;
38:2;39:4,7;40:1,8;
180:6
**replacing (4)**
110:9;177:7;250:23;
277:6
**report (11)**
131:14,16;136:5;
142:11;202:1,5;
207:19;208:12;245:3;
246:9;267:6
**reported (5)**
142:4,7,10,13;145:7
**REPORTER (4)**
259:21;260:19,22,24
**reporting (1)**
209:20
**reports (29)**
99:21;101:15,18;
102:1,4,5,6,10;104:13;
124:22,25;125:4,15,16,
17;126:1;127:14;
228:4;245:9;246:12,
22;247:3;257:23;
263:16,17;267:4,18;
268:8;273:9
**represent (7)**
113:12;114:13;
166:5;174:3;190:21;
200:9;207:19
**representation (3)**
73:4;138:21;262:18
**representative (2)**
149:3;156:4
**representatives (2)**
7:12;282:25
**represented (1)**
78:13
**representing (1)**
279:8
**represents (1)**
179:22
**requery (1)**
144:1
**request (13)**
7:18;8:10;12:20;
34:5;56:5,5;63:12;
101:23;137:22;195:16;
197:4;210:19;249:19
**requested (2)**
101:18;196:16
**requesting (2)**
101:23;134:7
**requests (7)**

56:6;241:4;261:19;
262:23,25;272:9;273:3
**require (2)**
152:21;196:24
**required (6)**
42:8;52:5;79:2;
153:21;215:4,6
**requires (1)**
30:9
**re-reroute (1)**
205:10
**reroute (1)**
203:15
**res (2)**
240:14;244:5
**research (4)**
77:24;78:1;101:24;
135:6
**researching (1)**
221:1
**resend (1)**
62:16
**reserve (9)**
2:25;3:1,4,5,13;5:4,
6,24;244:23
**reserved (2)**
85:16;280:18
**residence (1)**
84:5
**resident (1)**
190:7
**residential (1)**
229:12
**residents (1)**
41:4
**resisted (1)**
202:8
**resolve (1)**
14:8
**resources (2)**
165:21;166:2
**respect (1)**
230:20
**Respectfully (1)**
80:24
**respond (5)**
52:2,3;59:2;166:9;
261:12
**responded (1)**
262:22;273:4
**responding (1)**
93:22
**response (11)**
6:22;33:5,9;49:9;
80:18;81:14;82:9;
137:5;166:12;249:10;
252:10
**responses (8)**
81:4;83:2;124:8;
150:6;152:20;261:19;
262:5,16
**responsibility (4)**
55:7;203:13;246:7;

252:2
**responsible (3)**
90:25;206:25;277:10
**responsibly (1)**
56:4
**responsive (2)**
67:17;78:14
**rest (3)**
113:4;193:4;218:16
**restart (1)**
268:18
**restate (5)**
5:15;27:4;103:16;
138:17;139:13
**restated (1)**
5:16
**restaurant (7)**
42:7,7;68:2;69:12;
215:5;254:20,23
**restoration (4)**
49:2,5,5;52:4
**restore (1)**
49:9
**restored (1)**
230:6
**restoring (1)**
265:12
**restraints (1)**
201:10
**result (8)**
45:2;50:1;127:4,25;
197:14,16;232:24;
264:7
**resulted (1)**
233:4
**resulting (1)**
46:4
**resume (6)**
105:19;118:9;
119:14;120:11;123:16;
221:15
**RESUMED (2)**
63:2;124:18
**retitled (2)**
134:21,23
**retrieve (1)**
121:25
**retro (1)**
249:19
**return (1)**
39:1
**returned (8)**
29:1,2,6;32:2;39:2;
88:11;90:5;197:17
**revenue (1)**
41:4
**revenues (1)**
41:5
**review (11)**
94:9,12,20;96:7,16;
102:6;228:6,7,11;
283:9,9
**reviewed (13)**

24:23;36:7;92:4;
96:23;97:1,10;100:24;
102:5;227:18,23;
242:12,15;245:6
**reviewing (5)**
97:3,7;226:12;
228:13,15
**revised (1)**
177:24
**revisiting (1)**
16:14
**rez (1)**
273:15
**Rich (9)**
122:15;149:3;167:8;
168:24;178:15;179:3;
180:17,20;232:6
**Richard (1)**
2:9
**ridges (1)**
172:18
**rigging (1)**
244:4
**right (330)**
2:12;3:10,20;4:12;
5:2,15,20;7:18;8:14;
11:16;12:8,11;13:4;
14:12;16:5,7;19:19;
20:4;21:1,16;23:7,15;
26:7;27:1,15,21;28:4,
9;29:6,9;30:3;31:3,7;
32:3;34:5;37:5;38:6;
40:3;45:9;50:2,5;51:1;
53:1,8;54:1;55:1,6;
60:1;61:20;62:18;
63:4;66:2,11,13;68:19,
24;69:15,19;73:7;
75:15,19;76:13;77:8;
78:5;79:1;81:8,9;82:5,
18,22;83:13,13,21;
84:4,11;85:22;87:2,12;
89:5;90:3;93:1,13,24;
94:11,16,20;95:13;
96:3,3,3,11;97:7;98:2,
9;100:21;101:7;
102:16,17;104:2,9;
105:17;106:1,12,21;
109:20;110:23;112:5,
23;113:6,11;115:4,16,
18;116:14;117:16,20;
118:6;122:14;123:5,7,
8,22;124:16;126:6,8,
12,20;127:12;128:25;
129:25;131:8;132:1,9,
12;137:7,22;138:2;
139:1,2,3;140:11;
141:13,17;143:7,9,24;
144:4,12;145:14;
148:21,22;150:4,19;
153:3,12,19;157:22;
158:1,5,6,7,18;159:13,
24;163:3,25;164:8;
165:3;166:18;167:15;

168:1;169:7,17,23;
170:3,10,19;172:1;
173:2;175:4,9,10;
176:10,15,21;178:7,10,
18,20;179:10,15,19,24;
180:5,5,6,9;181:11;
182:4,16,19,23,24;
183:5,12;184:3,5,5,5,7,
20;186:4,20;187:8;
188:2,13,18,18,19,25;
189:4,6,7,20;190:1,16,
17;191:1,18;192:9;
193:10;194:3;198:1,
12,14,25;199:1,25;
200:19;201:6,21;
202:10;204:2,13,22;
205:2,9,10,14,14,15;
207:2;209:3,4,16;
211:8;213:10;215:2,6,
8,10,21,24;216:6;
217:19,21,22;219:9;
220:19;222:1,11;
223:2,16;226:7;
227:21;228:1;231:16;
232:11,19;233:9;
238:21,25;243:14;
246:18;248:9,12;
250:12,24;251:23;
253:5;254:6,6;256:25;
257:16;260:1,5,14;
261:12;263:14,15,20;
266:2;267:5,7,12,16;
268:22;269:12;270:5;
271:1,3,25;274:15,17;
275:18;276:3,4,5,14,
16,21;277:24;278:5;
279:15,17;280:3,3,6,8;
283:24
**right-hand (1)**
170:13
**ringing (1)**
207:25
**risk (1)**
55:7
**Road (3)**
27:25;28:5;71:11
**roads (1)**
259:14
**role (2)**
129:15,16
**room (18)**
32:7;48:4;55:8;
157:25;158:14;173:24;
175:6,17,18;177:16;
186:25;187:6;188:2,
15;189:2;190:22,25;
191:4
**rooms (7)**
53:3,9;54:4;55:6;
158:4;179:18;181:10
**Rosa (1)**
219:15
**rotate (1)**

Case: 19-30088    Doc# 12576    Filed: 07/01/22    Entered: 07/01/22 07:05:33    Page 311
of 320

54:3
**rotation (1)**
253:6
**roughly (2)**
178:8,8
**routinely (1)**
123:4
**row (1)**
167:17
**RR (4)**
268:25;269:17,18,19
**rug (12)**
40:1;159:13;162:13,
14,15,20;163:6,13,14,
20;169:14;175:23
**ruined (1)**
121:19
**rule (32)**
6:19;25:2,7,9,11;
55:3;92:8;94:8,12,21;
96:8,16,20;97:4,10;
98:4;156:5;229:3,6,8,
11,11,15;230:13,15,16;
231:4;233:11;250:8;
252:23;272:7;274:3
**ruled (2)**
16:11;193:2
**rules (8)**
8:22;24:21,23;96:23;
97:13;230:18;231:5,9
**ruling (11)**
4:23;5:7;6:8,24;
20:7;22:3,24;44:2;
272:19;283:6,7
**run (3)**
89:12;113:14;203:10
**running (7)**
56:4;120:8;169:14;
250:4;255:1,7;256:18
**runs (1)**
244:20
**rush (1)**
283:8

# S

**safely (1)**
50:7
**safety (4)**
135:22;136:5;
230:24;259:5
**sake (1)**
51:6
**salmon (2)**
163:23,23
**same (65)**
5:22;15:7;18:8;33:2;
54:5;55:1,1,1;56:3;
60:20;65:13;78:3,18;
79:18,19;80:20,23;
81:19,22;82:7,11,15,
15,16,22;83:1;86:7;
95:4;96:9;99:5,22,24;

111:7,21;119:25;
120:7;122:2,4,12;
134:8,11,15,21,22;
139:12,25;144:7,20;
151:16;167:14;180:17,
21;183:3;192:5;
199:10;212:1;213:8;
216:16;221:16;224:1;
244:19;267:6,14;
277:1;283:14
**SAN (10)**
2:1;10:15;24:12,17;
45:9;199:11,21;200:7;
204:21;211:10
**Santa (1)**
219:15
**satisfied (1)**
221:10
**sausages (1)**
161:23
**saved (1)**
134:23
**saw (13)**
14:17;36:1;61:5;
66:20;69:9,11;139:12;
162:12;163:22;167:15;
173:20;255:23;275:11
**saying (29)**
15:24;19:24;20:24;
23:10;54:3;65:19;70:3;
73:24;78:19;82:15,16;
102:24,25;124:7;
135:16;143:21;185:7;
213:1,6;243:22;
245:23;249:11;250:14;
252:3;262:21;268:2,
19;270:23;275:3
**schedule (4)**
20:12;154:5;201:15;
210:8
**scheduled (10)**
197:6;198:7;201:15,
16,19;211:15,16;
212:23;215:9;277:6
**schedules (1)**
282:1
**scheduling (4)**
11:24;197:7;201:9;
278:18
**Schott (1)**
44:5
**Schwan (6)**
42:2;64:2;67:14;
201:1,3;254:13
**scope (4)**
214:2;234:15;
262:24,24
**scratches (2)**
185:20;186:6
**screen (86)**
30:2,5;31:1,5;32:4;
33:5,9;34:5;38:5,6;
39:4;40:5;66:15;74:10;

75:24;80:1,10,11;81:6,
9;85:12,15,22;91:25;
92:23;93:5,8,10,22;
94:13;95:3,11,13,17,
21;102:11,12;104:7;
105:9,17;121:14;
127:20;128:11;129:17,
19;130:16,17;131:15;
133:1;136:2;137:9;
138:10;157:2,8;
158:21;166:19;167:7,
8,9;174:10;178:22;
180:18,23;181:17;
189:9;194:12;200:16,
19,20;201:24;202:7;
207:13,14,15;225:14,
17,18;226:25;227:1;
232:6;247:1,23;254:4;
258:12;264:21,23
**screens (1)**
248:5
**screwed (2)**
79:21;251:19
**scroll (18)**
80:14;104:3;125:20,
25;129:18;130:2;
133:15;138:5;168:3;
179:4;181:17;186:24;
202:13,15;225:23;
267:11,13;270:10
**scrolling (10)**
96:2,2;126:19;
127:17;134:2;138:9;
174:10;183:11;227:13;
248:12
**se (1)**
73:22
**sealed (2)**
80:6,7
**search (4)**
141:6,7,13,15
**season (1)**
41:6
**second (32)**
5:25;33:7,8,8;45:4;
91:17;92:11,24;93:5;
135:2;143:7;146:3;
198:3,21;200:25;
201:6,14;208:3;221:7;
228:12;236:11,13;
240:4;244:2;253:1;
254:3,11;261:23;
264:18;269:2,25;
270:10
**secondary (2)**
229:9,11
**seconds (3)**
237:1,1;268:17
**section (5)**
170:20,20;175:24;
176:6;233:5
**sections (1)**
173:1

**secured (1)**
190:6
**security (1)**
123:2
**seeing (2)**
179:3,21
**seeking (1)**
97:21
**seem (6)**
16:10;36:6;95:16;
160:21;178:7;222:15
**seemed (1)**
66:22
**seems (9)**
17:1;26:12;97:8,23;
162:24;186:1;216:23;
233:21;244:25
**seller (5)**
78:4,7,17,20;84:5
**send (4)**
44:1;61:1;104:24;
260:20
**sending (2)**
19:24;20:6
**senior (2)**
195:8;219:22
**sensation (3)**
232:20,23;233:14
**sensations (1)**
241:24
**sense (5)**
71:14;82:19;199:16;
256:6;272:7
**sensitive (1)**
173:7
**sensitivity (1)**
172:25
**sent (21)**
44:4,4,4;63:25;
91:11,14,17;94:8;97:4;
98:16;99:3;102:6;
105:4;122:13;126:14;
144:21;145:4;197:15;
249:23;252:18;264:15
**sentence (8)**
94:9,18;130:18;
201:6,8;202:11;
228:12;232:20
**sentences (1)**
129:23
**separate (3)**
39:3;46:5;179:17
**sequence (5)**
14:3;53:7;152:16,24;
154:15
**sequentially (1)**
23:18
**serial (8)**
114:14,17;115:2,6,8,
9,11,15
**series (4)**
56:6;63:14;65:1;
140:24

**Seriously (1)**
119:9
**service (38)**
26:20;34:2,2,5;47:8;
64:4;79:8;92:4,5;
195:20;196:16,24;
198:13;199:2;201:9;
203:6,9;204:4;205:1;
210:23;213:24;214:9;
215:7,8,8;227:19,20,
24,24;228:13,14,15,22;
229:6;254:13;271:16;
276:12,23
**services (2)**
195:18,23
**servicing (1)**
79:16
**serving (1)**
4:14
**session (3)**
2:4;104:16;105:8
**set (7)**
14:10;62:2;63:24;
124:5;152:24;154:17;
229:25
**setting (2)**
13:1;20:9
**setup (1)**
248:1
**seven (5)**
20:3;45:3;109:9;
111:24;250:4
**several (5)**
8:20;56:5;111:5,6;
165:13
**severe (2)**
242:4,4
**shall (1)**
119:10
**share (27)**
30:5;80:10;85:12;
91:25;95:23;102:11;
133:1;136:1,20;137:9;
157:2,4;167:8;168:25;
174:10;180:18;191:8;
200:16,18;201:24;
207:13;225:14,17;
226:25;236:8;238:20;
261:15
**shared (2)**
190:22;202:7
**sharescreen (2)**
30:9;103:25
**sharescreens (1)**
95:24
**sharing (15)**
33:4;83:20;98:5;
128:11;129:17;130:15;
145:15;158:21;167:10;
178:22;201:22;204:15;
226:8;232:8;264:23
**Shaw (3)**
44:6,6,9

Case: 19-30088    Doc# 12576    Filed: 07/01/22    Entered: 07/01/22 07:05:33    Page 312
of 320

**shelter (1)**
97:22
**shelves (5)**
38:8;40:5;47:1;
113:14;167:25
**shelving (2)**
188:23;190:5
**shift (1)**
182:12
**shirt (1)**
163:4
**shocking (1)**
255:5
**shoe (6)**
31:2,4,9,9;33:4;
169:20
**shoot (1)**
259:17
**short (4)**
24:3;34:2;164:5,8
**shortchange (1)**
13:16
**shorter (2)**
8:25;120:7
**shortly (3)**
34:4,7;43:7
**shot (1)**
168:15
**show (27)**
9:1;12:12;24:16;
25:19,20;26:18;30:3;
31:4,5;38:3,3,5;94:13;
95:1;125:18;127:13;
151:25;154:21;155:4;
200:16;230:8,9,10;
240:12;258:21;267:25;
271:11
**showed (9)**
10:4;35:1;47:5,5;
144:14;153:6;162:12;
188:10;235:23
**showing (14)**
6:15;15:16;31:8;
34:5;36:6,6,6;48:3;
95:3;139:14;140:25;
169:12;186:13;251:14
**shown (3)**
24:19;144:20;182:23
**shows (4)**
26:19;167:5;179:8;
267:8
**shrink (3)**
202:20,21;208:12
**shut (3)**
50:8;211:3;243:19
**shutoff (1)**
136:5
**sic (13)**
51:3;245:10;246:14;
251:2,19;252:4;263:7;
271:20;273:20;275:11;
277:5;278:3;280:1
**side (14)**

32:7;41:8;50:5,8;
138:15,15;139:12,12,
14,14;161:17;183:23,
25;184:1
**sides (1)**
239:9
**side's (1)**
8:10
**sidewalk (7)**
50:3,4;132:14;206:6,
16,18;274:23
**sideways (2)**
158:9,15
**sight (13)**
53:3;54:1,2,2,2,6;
156:6;225:1.7,12;
234:5,6,11
**sign (2)**
10:7;14:11
**signal (1)**
89:24
**signature (2)**
133:4,5
**significant (5)**
210:18;212:2;
240:13;241:9;249:3
**similar (4)**
10:7;82:17;109:12;
257:8
**similarly (1)**
134:17
**simple (2)**
75:10;240:15
**simplified (1)**
213:16
**simplify (1)**
274:25
**simply (8)**
16:10;22:8;61:4;
73:20;86:20;103:11;
108:21;241:15
**single-phase (1)**
34:1
**sink (2)**
175:23;184:4
**Siri (1)**
157:3
**sister (1)**
29:5
**sit (2)**
165:5;281:20
**site (5)**
42:8;43:7;50:6;
67:11;246:21
**situation (8)**
16:22;29:7;52:6;
116:5;165:9;230:1;
233:11;237:12
**situations (3)**
228:18;229:10;230:2
**six (14)**
6:13;16:23;20:2;
112:3,18;115:23;

136:22;137:23;152:23;
154:6;155:10,15;
166:13;175:3
**six-month (1)**
152:21
**sixteen-foot (1)**
175:5
**sixty (2)**
20:25;179:22
**sixty-five (1)**
47:8
**size (4)**
31:3;99:24;195:21;
197:12
**skill (1)**
119:5
**skip (2)**
137:1;189:7
**slant (1)**
161:8
**slants (2)**
175:15,17
**slated (2)**
13:9;60:5
**slight (1)**
161:8
**slightly (5)**
28:5;152:7;185:5,12;
186:19
**slope (1)**
182:21
**slopes (1)**
161:14
**slow (4)**
246:25,25;247:22;
264:20
**slowly (1)**
221:23
**small (20)**
35:2;45:8;55:8,9,9;
80:19;81:18,19;82:7,
13,14,17;133:11;
160:5;162:4;176:23;
182:8;188:20;208:15,
17
**smaller (8)**
130:2;133:2;181:10,
11;182:18;183:19;
184:12;274:23
**smallest (4)**
158:2;176:24;188:2,
10
**SmartMeter (3)**
228:7,8,9
**smartphone (1)**
12:13
**smell (2)**
38:2,3
**smelled (1)**
40:2
**soak (1)**
38:3
**so-and-so (1)**

274:7
**soft (1)**
173:1
**solution (2)**
36:3,3
**solve (2)**
11:3,5
**solved (1)**
121:1
**solves (1)**
236:12
**somebody (13)**
31:1;82:4;137:15;
159:1;189:19;190:5;
212:13;245:3,9;
251:14;256:20;257:7;
275:2
**Somebody's (2)**
207:25;243:19
**somehow (6)**
50:3;159:18;160:22;
162:3,4;243:17
**someone (5)**
10:21;54:5;68:17;
70:18;240:16
**sometimes (8)**
48:1;84:17;111:6;
114:21,21;116:4,4;
261:17
**somewhat (1)**
153:24
**somewhere (10)**
54:3;82:14,14;95:9;
131:21;134:24;159:16,
17;171:17;207:20
**son (1)**
12:17
**soon (3)**
118:11;165:10,13
**sorry (73)**
4:1;7:2;11:19;18:20;
19:3,9;25:3,19;30:4;
42:5;48:6;54:6;59:15;
64:6,7;66:25;71:7;
84:2;88:23;90:7;91:11,
16;102:9;114:24;
124:11;129:5,6;130:7;
132:11,12;133:8,10;
136:20;138:6;139:4;
146:13;148:25;149:20;
158:6,9;159:7;162:11;
166:7;168:21;180:17;
189:12;195:11;197:5;
200:3,18,25;201:25;
202:6;206:10;208:7;
214:17;227:6,10,10;
232:9;242:23;247:11,
21;252:3;258:2;
261:12;263:8,22;
264:10,14,22;278:20;
280:23
**sort (22)**
18:3;46:7;62:3;

100:13;108:16;135:20;
152:5;159:2;162:16;
169:14,24;181:25;
188:23;240:14;245:12;
247:11;272:13,25;
275:13,14;277:11;
278:17
**sorts (1)**
282:3
**sought (3)**
72:13;153:9,15
**sound (4)**
223:6,11;260:3,6
**sounding (1)**
122:24
**sounds (3)**
178:10,10;220:7
**source (2)**
204:20;256:6
**space (3)**
49:4;197:13;210:6
**spam (1)**
208:1
**spare (1)**
119:7
**speak (6)**
49:2;97:6;175:13;
221:22,22;231:22
**SPEAKER (3)**
88:22;119:2,2
**speaking (2)**
51:7;119:2
**speaks (8)**
67:5;90:15;92:7;
114:3,9;125:7;172:11;
174:20
**specialty (2)**
109:14,15
**specific (13)**
15:13;70:8;101:23;
112:11,14;115:18,22;
117:9;131:7;148:11;
161:21;207:11;234:20
**specifically (21)**
13:7;62:2;78:7,22,
24;107:17;113:20;
124:9;131:8;148:5;
151:19;161:3;166:6;
200:8;229:8;235:11;
249:18;250:17;261:25;
263:1,14
**specifics (2)**
148:9;200:14
**specify (1)**
252:16
**speculating (2)**
216:25;267:24
**speculation (6)**
38:2;71:23;162:3;
190:4;209:8;233:20
**speculative (3)**
233:17;242:1;273:15
**speed (1)**

Case: 19-30088    Doc# 12576    Filed: 07/01/22    Entered: 07/01/22 07:05:33    Page 313
of 320

221:24
**spend (1)**
36:4
**spending (2)**
211:21;217:1
**spike (2)**
35:3;256:9
**spillage (1)**
32:3
**spin (1)**
244:16
**splice (5)**
203:7,7,9,11;207:3
**splitting (1)**
23:16
**spoilage (3)**
32:2;133:17;160:25
**spoiled (10)**
40:1;132:15,24;
133:25;158:23;160:6,
6,8;161:2;171:15
**spoke (1)**
165:14
**spongy (1)**
173:1
**spots (1)**
169:23
**square (6)**
152:2,23;154:23;
177:11,14,15,21,23,25;
178:1,5,5,8;179:2,13,
16
**Stacy (5)**
43:2,4;90:9,23;91:17
**stain (3)**
160:8;163:15,17
**staining (4)**
33:5;170:12;226:9,
11
**stamp (1)**
114:22
**stamped (1)**
114:25
**stand (6)**
9:20;55:5;174:7;
192:17;213:20;282:16
**standalone (1)**
266:11
**standard (3)**
53:1,5;244:10
**standards (3)**
177:5;244:7;283:3
**standby (2)**
10:8;11:12
**standing (3)**
54:3,3,5
**standpoint (2)**
54:3,5
**stands (3)**
64:16;262:17;283:5
**start (18)**
23:13,22;47:8;51:4;
107:18,22;113:14;

129:7;145:13;147:7;
157:17,19;168:25;
215:13;234:11,22;
257:19,19
**started (10)**
34:2;49:7,8;51:7,9;
63:22;165:14;168:10;
235:9;278:22
**starter (16)**
39:7;47:7;59:18;
86:18;107:23;113:24;
115:19,24;116:3,7,10,
12,21,23;117:3;242:6
**starting (1)**
172:19
**starts (6)**
73:10;107:19;110:9;
216:17;241:18;254:8
**state (17)**
2:7;13:3;14:20;
27:23;48:4;100:16;
106:17;113:13;142:22;
143:5;146:24;151:2;
152:20;194:19;218:12;
222:3;230:19
**stated (4)**
142:17;151:13;
262:1;263:3
**statement (12)**
9:17;19:6;23:21;
35:8;66:4;75:20;91:13;
145:2;186:8,12;206:6,
19
**statements (4)**
4:17,20;9:15,15
**statute (1)**
24:25
**stay (9)**
29:3;166:3;192:18;
217:16;218:25;239:17,
18;260:21,24
**stayed (2)**
29:1,9
**steady (1)**
25:18
**step (1)**
185:11
**steps (3)**
52:5,5;152:25
**still (33)**
6:15;15:7;21:6,21;
24:21;25:17;39:1,4;
59:22;62:24;71:17;
95:15;110:15;123:15;
124:3,12;130:1,8;
135:4;136:20;158:6;
169:3;193:25;215:19;
227:7;232:8;239:25;
244:24;273:6;277:7;
281:12;282:21,22
**stipulate (1)**
126:3
**stipulation (1)**

20:10
**stop (22)**
33:4;49:4;51:1,5;
65:23;83:20;98:5;
128:11;136:20;145:15;
158:20;167:10;168:25;
183:12;189:21;191:8;
201:22;204:15;226:8;
234:11,21;238:20
**stopped (4)**
81:18;88:13,20;
234:12
**storage (4)**
71:2,6,13;123:12
**store (1)**
71:8
**storm (3)**
131:4;229:20;230:2
**story (3)**
38:8;122:18;212:19
**stoves (1)**
89:3
**straight (1)**
7:6
**strange (1)**
98:25
**stream (1)**
25:18
**streamline (1)**
274:25
**street (6)**
103:22;206:16;
207:1;236:9;255:7;
276:22
**streetlight (8)**
203:1,7,10,12;204:6;
205:4,8,10
**streetlight's (1)**
203:20
**streets (1)**
198:21
**stretch (2)**
255:8;256:4
**stretching (2)**
32:4,7
**stricken (1)**
242:19
**strict (2)**
244:7;273:16
**strictly (1)**
192:23
**strike (23)**
34:3,5;39:5;42:3;
50:8;61:12;62:7;65:16;
66:24;67:1;78:14;
108:20;110:16,18;
124:3,12;129:7;137:4;
147:20,22;174:5;
238:11;241:10
**strikes (1)**
232:10
**striking (7)**
232:4,21,22;233:13;

241:21;257:8,12
**strip (2)**
176:22;177:2
**structure (1)**
50:4
**struggling (1)**
27:12
**stuck (1)**
252:20
**studio (1)**
188:8
**stuff (14)**
23:8;43:2;61:6;
62:18;121:18;161:20;
162:8;170:25;173:19;
251:3,11;276:4,8;
277:11
**stunk (1)**
38:9
**sub (1)**
213:6
**subcontractor (3)**
111:5;212:13;241:5
**subfloor (1)**
175:2
**subject (9)**
6:21;17:9;60:4;
75:20;82:25;91:21;
137:21;144:22;235:3
**submission (2)**
278:14;279:12
**submissions (1)**
20:13
**submit (8)**
55:2;71:2;100:21;
101:5;113:25,25;
130:11;135:12
**submitted (16)**
18:6;30:2;43:5;
70:11;100:13;121:11;
128:13;132:10;133:24;
134:5,17;135:15;
173:12;242:9;282:17;
283:5
**subsequent (4)**
69:2;79:16;134:20;
153:22
**subsequently (2)**
99:3;159:2
**substantial (1)**
21:8
**substation (1)**
241:19
**substructure (2)**
196:8;207:2
**such-and-such (3)**
3:5;22:23;274:13
**sudden (2)**
18:6;278:24
**sued (1)**
39:8
**suffered (3)**
135:25;136:9;277:7

**sufficiency (1)**
230:17
**suggest (3)**
12:10;14:10;221:19
**suggesting (1)**
250:25
**suggestion (1)**
223:2
**suggestions (1)**
222:25
**suggests (3)**
237:2;263:7;270:24
**suing (1)**
68:6
**super (1)**
243:17
**supplied (3)**
113:9;143:25;229:9
**supplies (1)**
199:12
**supply (4)**
50:8;113:1,1;230:17
**support (2)**
196:8;254:15
**supported (1)**
72:7
**suppose (2)**
31:1;174:1
**supposed (9)**
11:18;30:5;60:21;
109:4;250:1;257:10,
13;279:9;281:7
**Supposedly (2)**
96:14;263:3
**sure (46)**
8:11;12:12;22:4;
29:8;30:4;33:5;37:8;
49:5;54:1,4,6;71:9;
87:5;89:24;94:4;99:4,
5;112:16;124:2,11;
125:11;131:6,19;
132:9;141:3;159:1,21;
160:4,22;161:25;
163:11;168:16;172:10;
173:23;185:22;195:16;
201:4;203:6;204:18;
208:3;211:23;222:19;
253:17;265:23;274:16;
283:6
**surge (18)**
24:7,10,17,20;25:16;
232:11,24;233:7;
237:22;238:2;241:12,
15;243:16;257:8;
268:12,17;271:24;
273:14
**surges (2)**
37:3;263:3
**surprise (3)**
29:8;254:25,25
**suspect (1)**
62:7
**suspend (1)**

11:13
**suspended (1)**
105:8
**suspending (1)**
61:17
**sustained (8)**
196:25;198:12,24;
199:5;230:11;233:2,3,
9
**sustaining (1)**
87:10
**swear (5)**
26:25;27:19;106:14;
194:17;218:8
**switch (16)**
11:10;105:10;
109:21;126:17;141:20;
221:16;237:14;242:6;
247:6;254:14;264:7;
265:10;266:4;267:17;
268:9;273:22
**switchblock (1)**
248:20
**switched (3)**
64:4;141:8,12
**switches (6)**
141:22;142:10;
237:15;247:9;248:14;
277:6
**sworn (6)**
27:22;106:8,16;
194:16,18;218:11
**symptom (1)**
83:6
**system (16)**
8:7;25:9;115:17;
119:1;123:2;142:21;
164:16;212:15;215:14;
230:24;231:3;243:18;
244:19;252:23;256:2;
260:6

**T**

**T0291 (1)**
144:1
**T62376 (1)**
143:21
**talk (17)**
12:22;14:13;41:1;
118:10;128:11;192:22,
24;217:6;225:6;
228:13,19;235:24;
259:4;268:1;273:7;
277:11;278:21
**talked (9)**
42:9;44:2;45:5,6;
64:1;83:7;169:11;
186:18;262:3
**talking (34)**
7:9;13:2;44:7,8;
45:2;52:1;64:22;65:18,
19;68:25;82:13,13;

85:25;95:18;103:23;
112:12;124:21;132:10;
134:6;141:19;153:3,4;
180:5;223:8;236:1;
241:2;263:2,15;265:4,
18,22;267:14;270:18;
280:24
**talks (8)**
102:17;229:6,8;
241:24;264:4,8;265:6;
273:9
**tariff (16)**
24:21,22;97:10;
229:3,6;230:13,16,18;
231:5,9;244:10;
245:14,14;250:8;
252:23;276:14
**tariffs (4)**
95:12;96:24;97:4;
275:22
**tech (3)**
15:15,18;148:17
**technical (1)**
191:13
**technicality (1)**
278:17
**technically (3)**
158:3;188:17;276:13
**technician (5)**
35:6;38:1;39:1;59:4;
278:16
**technician's (2)**
123:23;124:4
**technique (1)**
93:23
**teenage (1)**
12:16
**telephone (6)**
10:13,14;61:2;62:1,
13;104:17
**telephonic (1)**
61:11
**telling (6)**
35:7;54:9;74:11;
138:25;170:12;254:11
**tells (1)**
105:2
**temperature (1)**
110:2
**temporal (1)**
76:3
**temporary (6)**
64:2;215:21,23,25;
228:21;254:12
**Ten (9)**
100:7;109:9;111:24;
153:17;154:4,7;
164:12;237:1;250:4
**tenant (9)**
42:7;48:6;49:4,7;
67:14;151:13,16;
191:14;192:5
**tenants (20)**

48:1,4;49:3;67:11,
15,22,24;68:20;69:5,
10;213:24;216:7,8;
254:20,22;255:13,18,
20,22,24
**tend (1)**
281:15
**ten-minute (3)**
56:3,7;239:12
**ten-page (1)**
64:14
**ten-year (1)**
141:3
**term (8)**
191:13;196:25;
213:6;217:7;225:8,9;
235:10;276:17
**termed (2)**
142:12;225:11
**terminate (1)**
11:13
**terminology (1)**
224:25
**terms (16)**
14:6;17:19;22:7;
41:4;127:9;136:10;
151:22;186:18;200:3;
212:10;225:3;234:22;
274:2,21;275:4,5
**territory (1)**
275:23
**test (6)**
86:14;214:18;
229:25;260:15,15,15
**tested (1)**
110:8
**testified (11)**
44:5;80:23;85:6;
91:1;150:5,21;159:16;
234:16;241:13;246:20;
247:13
**testifies (1)**
14:9
**testify (14)**
7:4,5;9:20;23:10,17,
18;59:7;60:5;76:24;
103:20,21;231:12;
278:16;279:2
**testifying (8)**
7:20;37:1;53:3;
118:1;243:21;266:6;
275:2;282:3
**testimony (62)**
7:17,22;8:6;14:6;
19:13,14,15;22:10,12,
21;23:2;29:6;59:5,6,
20;60:3,4;65:13;69:10,
14;71:21;76:14;78:25;
79:24;80:15;81:22;
82:9;86:10;107:13;
108:3;123:24;124:1,4,
17;128:9;135:24;
151:11;152:22;156:10;

163:1;164:23;207:9;
208:22;209:2;210:11;
212:23;216:1;235:16,
18,21;238:12,17;
239:8;242:7;243:3;
246:23;247:8,11;
251:2;266:8;270:4;
280:15
**testing (1)**
246:14
**tests (2)**
230:5,6
**TG (3)**
64:15,16;279:25
**TG354 (1)**
65:1
**thanks (1)**
180:22
**that- (1)**
33:6
**that'll (1)**
221:18
**theirs (1)**
253:10
**then-town (1)**
147:17
**theories (2)**
254:17;256:17
**theory (10)**
240:14;252:8;
256:16,23;257:1,4;
271:18,19,20;273:2
**thereafter (3)**
34:4,7;165:13
**therefore (16)**
5:18;68:18;83:16;
204:25;209:21;213:7;
249:12,13;252:21,24;
271:5,5;272:7;276:25;
278:3;281:8
**thinking (4)**
6:21,23;244:25;
264:23
**third (3)**
230:11
**third-party (4)**
6:25;7:10;23:18;
77:5
**thirty (3)**
142:12,22;246:13
**thirty-minute (1)**
9:2
**Thomas (2)**
121:1;283:19
**thorough (1)**
159:10
**though (12)**
4:19;10:11;25:23;
135:1;183:8;231:22;
237:4;241:19;260:7,
11;279:21;281:6
**thought (13)**
10:17;37:4;69:2,2,

80:6;109:2;119:4;
141:6;185:6;222:17;
227:9;235:4;274:24
**thousand (1)**
177:13
**thousands (1)**
112:8
**thread (1)**
140:25
**three (38)**
13:2,6;18:19;49:6;
52:1,3,6;53:4;99:23;
102:4,8,25;104:12,13;
129:23;139:2;152:23;
153:1;154:6;155:10,
15;158:2,3;164:7;
166:13;169:23;175:4;
176:24;179:18;210:19,
21,22,25;221:20;
243:24;249:6;256:17;
277:25
**three- (1)**
152:21
**three-minute (1)**
265:11
**three-phase (3)**
34:2;214:11;215:6
**threshold (3)**
183:24;186:21;189:3
**throughout (1)**
201:5
**Throw (5)**
116:16,23;117:5;
161:4;171:15
**thumb (1)**
99:3
**ticket (1)**
280:5
**tickets (2)**
228:11,15
**tie (1)**
128:16
**tied (1)**
66:22
**tight (1)**
79:21
**tile (1)**
176:18
**till (4)**
74:7;143:23;153:20;
157:15
**tilt (2)**
28:5,6
**timely (2)**
20:13,14
**times (16)**
42:9,9;72:12;79:17;
83:5;84:20;89:19;
132:22;144:21;146:25;
159:12;164:25;173:7;
230:2;249:6;273:23
**title (2)**
130:18;195:7

Case: 19-30088    Doc# 12576    Filed: 07/01/22    Entered: 07/01/22 07:05:33    Page 315
of 320

**titled (3)**
98:23;129:23;134:17
**titles (1)**
253:23
**toasters (1)**
89:2
**today (26)**
3:11;9:4;13:7,10,14;
22:6;59:7;60:5;62:4;
79:2;81:22;82:1;107:1;
112:12;118:1;134:6;
151:9;152:22;163:5;
241:1;244:25;257:24;
258:16;261:13;273:21,
22
**Todd (6)**
2:10;27:25;64:16;
98:21;143:21;219:23
**together (3)**
29:1;99:11;205:8
**told (26)**
35:8;44:5;54:7;61:6;
64:22;91:7;108:19;
121:15;142:20;147:17;
148:16,17,18;150:24;
156:5;190:20,21;
240:25;241:16,17,18;
255:25;274:7,13,22;
281:21
**tomorrow (6)**
9:4;11:10;13:1;
136:19;221:15;222:14
**tonight (1)**
264:5
**took (27)**
9:1;24:17;31:1,7;
34:3;36:8;37:8;49:5;
50:1;90:8;105:24;
116:9;124:20;125:4;
149:5;157:1,20;166:1;
172:4;181:7;196:13;
197:2;225:20;226:4;
265:8;271:6;276:24
**top (15)**
102:13;104:4,5;
126:21;176:14,18;
190:12,14,18;207:21,
21,22;213:4;254:11;
264:8
**torn (1)**
276:23
**total (5)**
73:5;74:5;99:6;
134:2;155:10
**totals (1)**
73:6
**touch (4)**
50:2;152:13;182:2;
193:23
**Tough (1)**
11:6
**towards (7)**
32:3;47:8;169:25;

175:18,20,21;265:9
**town (24)**
34:7;43:1;50:3;56:1,
9;63:4,11;64:8;65:11,
14;146:1,3,7,11,17,21;
147:13,15;148:7;
240:23;250:5,17;
252:15,16
**Toy (4)**
146:16;147:17;
148:7;165:11
**track (1)**
174:2
**tracked (1)**
10:4
**Tracy (1)**
241:18
**traditionally (2)**
28:2;71:20
**traffic (1)**
41:8
**traffic's (1)**
176:4
**trained (1)**
39:1
**training (1)**
271:4
**transfer (3)**
55:6;121:7;214:25
**transferred (1)**
13:3
**transfers (1)**
246:13
**transformer (7)**
141:20;143:21;
144:1,5,6;211:12;
212:14
**transformers (3)**
68:10;141:22;246:15
**transition (1)**
158:12
**transitions (1)**
158:13
**transmit (1)**
31:3
**transmitted (1)**
237:23
**transported (2)**
84:4,16
**trap (2)**
73:24;193:8
**travel (1)**
186:2
**traverse (1)**
48:3
**treat (4)**
6:1;20:24;77:5;
282:6
**treated (2)**
3:7;5:17
**treatment (1)**
77:2
**tree (5)**

132:15;229:20;
230:3;236:12;275:20
**trees (1)**
236:8
**trench (10)**
210:9;211:3,8;
212:16;213:12;251:10;
257:25;258:17;271:21;
275:7
**trenches (1)**
251:3
**trenching (11)**
196:7,11;210:5;
211:25;212:5;240:12;
273:7;275:5,25;276:7;
277:5
**trial (35)**
2:19;6:6;7:5,19;9:2,
3;13:6,9;18:19;20:8;
22:9,20;36:9;59:7;
60:20;62:4,11,21;70:2,
3;73:18;83:6;98:20,22;
110:20;123:16,17;
152:19;153:1;171:11;
194:16;239:8;240:8;
272:23;281:17
**trials (4)**
8:20;13:17;261:17;
269:8
**tried (7)**
50:8;52:1,9;149:18;
150:6;222:17;223:16
**trier (1)**
26:1
**tries (1)**
220:15
**trip (3)**
29:6,7,8
**Trodella (1)**
2:10
**trouble (9)**
77:7;92:13,14,20,24;
218:15;220:9;249:9;
269:15
**troubled (1)**
20:5
**troublesome (1)**
21:9
**truck (1)**
244:20
**true (5)**
86:8;163:24;209:19;
213:9;262:14
**truly (1)**
26:1
**trust (2)**
29:3,4
**trustees (1)**
29:4
**truth (1)**
35:7
**try (37)**
19:4;38:1,3;47:2,2,

52:9;73:16;98:1;100:3;
141:9;151:9;160:23,
23;166:18;167:10;
171:19;220:11,12,13,
19;221:23;222:2,14,
18;223:1;224:1,3;
231:22;244:16;249:4;
250:20;260:20;261:5,
8,9;274:25;281:25
**trying (49)**
17:20;34:2;37:2;
42:6;49:4;50:1;51:5,7,
8,9;54:2;59:24;65:25;
73:24;77:4;81:23,24;
83:18;92:11,19,22;
93:9;94:2,11;108:16,
22;127:21;137:25;
142:3;148:14;189:17;
193:8,9;201:14;
244:18,19;247:1,17,20,
22;248:5;253:23;
258:14;262:7,11,12;
268:22;272:3;278:16
**TT (1)**
172:1
**tune (1)**
118:21
**turn (18)**
52:4;56:2;105:8,17;
107:24;120:7,15;
127:14;205:13;211:6;
218:2,18;223:13;
230:21,25;239:17;
243:4;281:3
**turned (3)**
106:2;152:12;223:6
**turns (1)**
250:2
**TV (1)**
268:14
**twelve-year-old (1)**
60:10
**twenty-five (6)**
73:7,11;74:25;75:9;
76:4;99:6
**twenty-five-page (1)**
93:20
**twenty-four (1)**
51:1
**twice (1)**
34:9
**two (57)**
3:13;4:1;6:8;10:2;
13:3;14:17;16:3;18:10;
24:14;28:3;29:1;46:5,
8;50:5;51:2,4;67:5;
71:10;72:12,24;73:5;
83:4,7,15;93:17;95:19;
111:18;120:23;144:19,
20,21;145:5;154:9;
158:2;160:3;167:9;
179:9,17;190:1;
193:22;196:21;206:17;

207:4;210:19;220:8;
225:7;228:5;229:21;
231:5;239:2;241:17;
243:15;244:1,1;
249:18;282:5,16
**two-day (1)**
13:5
**two-hour (1)**
9:1
**two-page (1)**
96:1
**two-thirds (1)**
65:3
**type (19)**
55:1,8;84:8;86:22;
87:22,23;116:2;
144:14;145:23;146:8,
12,13;147:12;190:5,5;
191:25;220:22;226:9;
251:25
**typical (1)**
7:19
**Typically (12)**
109:23;110:3;112:3,
24;113:25;114:15,17;
117:4,12;210:19;
213:14;230:11
**typos (1)**
258:18

**U**

**ultimate (3)**
25:22;26:11;216:4
**ultimately (7)**
43:3,5;44:7,7;45:6;
56:6;72:14
**Um-hum (3)**
183:13;191:16;
269:20
**unable (1)**
201:16
**unaware (1)**
216:23
**unbeknownst (1)**
16:24
**unclear (4)**
91:16;149:22;
153:24,25
**uncover (1)**
66:6
**under (11)**
20:16;62:24;106:10;
123:15;206:16,16;
231:14;252:24;278:14;
279:12;283:1
**Underground (1)**
210:23
**underground-related (1)**
196:8
**underlayment (1)**
180:2
**underlying (1)**

Case: 19-30088    Doc# 12576    Filed: 07/01/22    Entered: 07/01/22 07:05:33    Page 316
of 320

73:20

**underneath (4)**
32:3,6,7;186:2

**understands (1)**
211:23

**understood (4)**
16:12,17;35:9;
234:10

**underway (1)**
41:2

**unequivocal (1)**
242:8

**uneven (1)**
180:8

**unfair (3)**
18:22;21:12;244:17

**unfrozen (1)**
162:1

**UNIDENTIFIED (2)**
88:22;243:8

**uniform (5)**
225:11,11;234:2,12;
235:25

**Unintelligible (2)**
214:14;215:16

**Unit (57)**
27:25;28:2,2,2,3,4,5,
5,6,8,8,8,8;29:3,6;34:1;
47:2,3;48:3,3,5;50:1;
51:1,2,5,7;53:6;55:5,7,
8;67:6;71:10,12,13,15,
18,21;87:24;149:13,18,
24;150:6,16,25;
157:24;161:8,14;
165:17,17,19;173:7;
187:7;190:5;191:12,
20;192:25;225:24

**United (2)**
9:9;280:4

**units (3)**
29:1;71:11;190:23

**unknown (1)**
198:19

**unlawful (1)**
24:25

**unless (16)**
6:7;8:17;9:12,21;
12:15;24:25;25:10;
56:4;139:12;199:23;
222:15;233:2,2;
240:16;251:20;283:10

**unlevel (1)**
180:10

**unnumbered (1)**
279:25

**unplug (2)**
212:11,15

**unplugged (1)**
240:5

**unresolved (1)**
124:15

**unsuccessful (1)**
150:17

**unwise (1)**
45:1

**up (145)**
3:19;9:18;10:4;13:1,
14;14:10,14,20:18;
23:17;33:9;34:2,5;
38:2,3,8;40:5;41:2,6;
47:2;48:1,4;50:1,8;
61:14;67:7;72:1,20;
76:1;77:10;79:21;80:1;
81:6;82:9;85:22;92:12,
23;93:3,5,7;94:3;
95:13,20;98:13,21;
102:2,11;119:21;
120:10;121:14;122:10;
123:19;125:10,20;
129:5;130:2,16;
131:14;133:15;151:25;
152:14;153:6;154:1,
21;155:4;157:3;160:9,
13,14;161:2,3,7;
164:18;165:3;166:21;
167:3,24;168:3,9,16,
23,24;169:2,8;171:23;
172:18;173:3;175:7;
178:14,21;180:6,21;
182:3;183:15,16;
191:14;196:22;197:5;
199:17;200:4,18;
201:9;202:3,15,20;
205:8;207:21,22;
208:2;213:3;215:1;
218:18;219:10;221:22;
222:20,22;230:8,9,10;
231:22;232:5;233:10;
237:18;245:16;247:20;
248:5;249:1;251:19;
254:2,3,4;255:1;
258:11;259:24;264:9,
10,11,21;265:19;
266:22;270:10;272:17;
274:5;276:23;280:2,24

**updated (4)**
70:20;72:9,11;76:11

**updating (2)**
17:9;75:21

**upgrade (13)**
42:8;88:7;195:17;
196:16,24;204:3;
205:1;215:6;216:16;
265:6,17;275:25;
276:23

**upgraded (3)**
198:13;199:2;276:12

**upgrading (1)**
34:1

**uploaded (2)**
95:8;99:2

**upon (7)**
22:16;44:5;65:14;
141:10;145:6;166:15;
278:17

**upper (6)**

28:5,6,8;71:13;
170:6;191:12

**upper-right (1)**
35:7

**upset (1)**
276:22

**upstairs (6)**
28:4;47:1,8;51:1;
166:1,2

**urge (1)**
9:6

**USA (1)**
210:23

**use (14)**
10:11;12:10;27:15;
29:9;42:5;61:19;62:18;
64:3;96:4;188:7;
190:25;215:23;225:3;
254:13

**used (17)**
79:25;80:3;83:17;
84:8;122:8;134:22;
164:24;188:8,9;
224:25;225:8,8,9,12;
234:11,12,13

**useful (2)**
281:16,17

**uses (1)**
127:7

**Using (12)**
5:16;10:20;11:1;
73:21;121:9;215:13,
19;216:4,18;234:21,
22;266:25

**usual (1)**
8:25

**usually (3)**
89:3,12;117:18

**Utilities (6)**
24:24;100:14,22;
210:24,24;231:6

**utility (8)**
196:12;197:12,20;
198:18,20,20;205:25;
230:19

---

**V**

**vacant (2)**
47:3;216:9

**vacation (8)**
24:8;88:10;89:4;
90:13;125:5;163:10,
12;276:24

**Vague (6)**
83:1;199:13,18;
206:11,20;215:15

**Valentine's (1)**
277:14

**valid (2)**
47:1;75:4

**Vallejo (1)**
106:20

**Valley (5)**
71:9;84:1,2,5;131:21

**value (1)**
9:12

**valves (1)**
50:9

**variably (1)**
177:23

**variations (1)**
25:3

**varied (1)**
16:19

**various (8)**
67:21;70:12;86:16;
87:18;150:20;166:15;
192:22;221:2

**variously (1)**
68:11

**vault (9)**
197:12,20;198:2;
205:25;206:15;210:6;
212:24;253:6;274:23

**vaults (2)**
196:12;198:19

**vegetables (1)**
171:7

**vegetation (1)**
131:18

**vehicle (5)**
232:10;233:13,16,
23;257:8

**vehicles (1)**
232:4

**version (3)**
74:7;93:4;121:20

**versus (3)**
21:14;132:8;180:6

**Veteran (25)**
3:14,21;4:2,18;
26:18;63:23;196:3,6;
200:2;202:1;207:20;
209:20;210:4;211:2;
240:11,11,19;241:7;
250:2;252:2,11,12;
257:5;273:6;275:2

**Veterans (5)**
23:5,8,10;26:9;245:4

**Veteran's (11)**
245:10;251:2,19;
252:4;263:7;271:20;
273:20;275:11;277:5;
278:3;280:1

**via (7)**
11:20,20;22:8;31:3,
4;43:8,9

**vibrated (1)**
244:9

**vicinity (1)**
241:8

**Victor (2)**
258:5,9

**video (18)**
10:18;11:13;33:3;

105:19,23;106:5;
109:3;120:12;149:5,
10;157:8,19,21;158:15,
19;181:3;218:25;
279:20

**videos (1)**
157:1

**view (6)**
36:5;42:3;174:10;
186:17;209:5;256:15

**Vince (7)**
246:22;247:3;
248:18;249:11;268:8,
21;271:6

**Vince's (1)**
271:6

**vinyl (1)**
180:7

**violated (1)**
244:11

**visible (9)**
35:1,2;169:4;171:20;
172:8;174:12;175:13;
226:9,11

**visit (2)**
91:7;235:17

**visited (2)**
235:13;246:21

**VOICE (3)**
164:16;219:10;243:8

**volt (1)**
229:8

**voltage (6)**
25:2,3;35:3;228:17,
22;241:20

**voltages (7)**
229:7,9,10,12,13,14,
17

**volts (2)**
229:13,13

**volume (1)**
223:13

**volunteer (1)**
41:4

**volunteering (2)**
128:8;132:4

**VP (6)**
4:11,14;5:10;274:1;
279:22,24

**VPI (1)**
196:5

**VPs (1)**
4:15

---

**W**

**wad (1)**
38:2

**wait (29)**
33:7;42:5;48:6;
64:11;68:2;85:15;
107:11,11,11;108:14,
14,14;128:8;129:4;

Case: 19-30088    Doc# 12576    Filed: 07/01/22    Entered: 07/01/22 07:05:33    Page 317
of 320

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

142:16,16;157:15;
183:25;189:17;208:23;
232:5;240:4;243:21;
245:22;250:11;253:3;
254:2;257:18;261:23
**waiting (3)**
47:4;165:24;208:9
**walk (4)**
172:22;187:7;240:2,
7
**walked (1)**
29:8
**walking (2)**
158:5;185:10
**wall (1)**
174:17
**wants (9)**
17:18;27:5,7;61:13;
179:23;189:21;221:15;
275:21;278:1
**Warranty (10)**
34:5,6;39:4;45:1,4;
46:2,4,5,6;208:5
**washer (3)**
88:19;89:11;190:22
**washer/dryer (1)**
189:2
**washing (1)**
175:20
**Washington's (1)**
277:15
**waste (2)**
9:6;138:24
**wasting (2)**
37:3;40:1
**watching (2)**
8:25;268:14
**water (14)**
79:8,14,20;80:19;
81:25,25;164:24,24;
169:14;173:3;175:2;
186:2;220:3;226:14
**waterline (5)**
81:17;82:7,14,17,23
**way (38)**
2:22;12:19;15:15,18;
22:3;23:3;29:3;32:4;
38:5;50:3,4;60:24;
65:3;74:7;103:13;
119:1,5;122:7;124:1;
135:19;139:13;150:3;
161:19;170:11,13;
190:7,11;207:2;
218:20;220:16;221:17;
222:16,16,20;223:13;
248:16;273:21;277:1
**ways (5)**
17:5;97:24;141:15;
228:5;243:15
**wearing (1)**
163:4
**Webb (27)**
6:11;10:8,12;13:22,

22;14:1,24;15:7,23,25;
18:24;19:7;21:2,22,24;
22:6;53:6,9;54:9;
70:20;72:15;76:17;
152:17;153:3;177:24;
192:22;193:3
**Webb's (1)**
22:1
**Webinar (4)**
10:21;11:1,10;
220:17
**week (12)**
18:16;20:12;135:14;
154:1;165:15;201:9;
212:3;235:5;243:20;
244:14;246:3;250:19
**weekend (1)**
14:17
**weeks (10)**
18:10,19;67:5;
153:17;154:4;210:19,
21,25;213:2;254:25
**weenies (1)**
160:19
**weighed (1)**
49:3
**Welcome (3)**
28:2;192:18;218:5
**well-established (2)**
42:5;268:11
**weren't (11)**
152:13,14,14;250:6,
7,20,21;252:14,21;
262:12;282:7
**whatnot (1)**
240:13
**what's (41)**
3:25;30:4,4;53:7;
68:4;75:1,8;86:13;
93:21;95:3;96:22,24;
108:7;114:7;119:10;
124:5;129:13,15,16;
134:14,14;144:17;
145:4;147:9;157:5,9;
176:21;177:11,15,15;
178:16;183:18;192:15;
202:4;208:9;213:3;
227:5;239:4;240:1;
257:4;275:10
**whatsoever (2)**
46:2;135:19
**whenever (1)**
134:20
**whereas (1)**
241:3
**Where's (3)**
96:17;247:2;256:8
**Whereupon (5)**
106:7;118:16;
120:22;239:23;284:1
**wherever (1)**
175:2
**whoa (1)**

248:25
**whoever's (1)**
277:15
**whole (23)**
4:2,17;29:5;50:6;
53:7;83:14;91:17;
108:15;141:24;152:11;
159:2;162:9;171:22;
175:5;189:3,9,9,18;
254:18;256:14;262:8,
23;273:11
**wholly (1)**
129:13
**who's (1)**
169:21
**width (1)**
175:6
**willing (1)**
44:9;67:19;86:23
**win (5)**
22:17;251:17,17,18,
18
**window (2)**
148:11,11
**windy (1)**
236:8
**winner (1)**
167:13
**wire (1)**
236:25
**wiring (1)**
88:7
**wish (11)**
2:24;7:7,12;9:16;
12:6;41:9;63:18;64:5;
77:10;78:10;283:11
**wishes (1)**
27:7
**within (16)**
4:18,19,21;26:5,12;
73:14;120:24;165:13,
15;185:14;229:14;
230:19;274:4,8,14,17
**without (8)**
13:23;16:14;97:7;
128:8;133:17;213:12;
243:13;257:14
**witness (198)**
7:20;8:6,9,10;10:18;
11:4;14:25;18:24;19:7,
8,9;20:13;21:4;22:16;
23:10,23;27:22,25;
28:1;32:5;33:3;35:4;
36:5;41:8;46:3,8;47:1;
51:3,6;52:4;53:5;54:1;
60:7;64:8;65:9;69:7,
11;76:16,22,24;77:5;
78:22;80:12;81:2;97:5,
12,17,19,21;103:8,17,
18;104:20;106:8,16,19,
22;108:13,21;109:8,
13;110:18,21;118:5,8,
14;119:18,23;126:7;

130:13;132:21;134:16,
20;135:3,9;144:25;
145:3;148:4,6,14;
151:7;156:15,17;
157:12;160:10,15,20;
161:6,8,12,14,25;
162:9,16,19;163:4,8,
14,17;169:19,24;170:2,
5,9,15,18;171:2,5,10,
22;173:12,15,23;
176:13,16,18,20,23;
177:3,8,13,21;178:9;
179:3;185:6,12,14,17;
190:14,19,24;191:2,4,
6;192:17,19;194:16,18,
21,24;197:19;204:18,
22;205:3,6,10,12,14;
206:23;207:16;208:1,
3,7,12;209:14,17,19,
23;210:18;211:23;
213:11,17;214:8,20,22;
215:18;217:11,18,22;
218:11,14,20,22;219:2,
4,6,9,12,14;220:11,18,
21;221:17;222:5,9;
223:17,19;224:7;
227:2;231:20,21,25;
236:16,18;237:6;
238:25;278:20;281:19
**witnesses (32)**
6:25;7:3,4,7,10,11,
11,14;8:1,11;9:19;
10:2;11:24;14:4;23:1,
18;68:16;119:25,25;
123:19;124:1;193:9,
13,14,16,20,21;217:23;
221:8;239:6;267:23;
282:2
**witnesses' (1)**
23:2
**witness's (1)**
61:3
**wonder (3)**
95:23;220:8;261:5
**wondering (1)**
223:5
**wood (1)**
177:19
**word (5)**
74:12;123:20;
236:17;251:21;268:4
**words (11)**
3:19;20:23;22:14;
29:9;60:9;101:21;
142:25;151:18;152:7;
180:3;276:14
**work (86)**
12:8,21;18:25;24:15;
34:9;35:1;42:9;49:9;
56:7;63:22;87:24;
109:16;111:1,4,6,13;
145:20;155:7;192:22;
195:5,11;196:8,10,

197:11;198:3,22;
199:11;200:2,2,11,14;
202:1,5;205:24;206:3,
4,25;207:19;210:5,9;
212:15;216:13;221:18;
223:11,15;240:25;
241:3,4,14;244:13;
245:3;246:1,2,4,6;
248:24;249:13,20,24;
250:15,20,22,22;
252:17;257:23;262:9,
9,13;263:24,25;264:1,
3,5;265:3,16,21;272:6,
12,13,20;273:9;276:4,
24;276:11;277:18;283:18
**worked (4)**
12:19;48:1;235:9;
238:23
**working (26)**
39:1;78:4,13,18;
88:13,20;107:17,17,22;
110:7,9;111:10,12,17,
18;191:24,25;197:16;
221:3;222:13;231:2;
235:9;237:2;260:16;
275:7;276:25
**works (10)**
10:5,15;103:12;
105:20;119:1;146:16;
207:1,14;223:3,15
**world (2)**
8:4,4
**worn (1)**
245:21
**worry (1)**
6:3
**worse (1)**
38:9
**worst (1)**
133:22
**worth (1)**
77:7
**wrap (1)**
13:14
**writing (4)**
44:1;45:7;68:14;
241:17
**writings (1)**
66:1
**written (2)**
24:15;202:11
**wrong (11)**
33:8;68:9;93:19;
98:8;100:2;134:17;
135:1,5;251:21;277:2,
16
**wrote (4)**
44:7;126:24;200:22;
227:14

---

**Y**

---

**year (13)**

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

Case: 19-30088    Doc# 12576    Filed: 07/01/22    Entered: 07/01/22 07:05:33    Page 318
of 320

49:1,4;74:22;76:7,
11;83:15;90:7;111:4,
22;114:22,25;115:1;
132:13
**years (17)**
18:10;45:3;49:7;
51:1,4;109:9;111:2,24;
112:8,18;115:23;
137:23;163:9;176:2;
182:1;187:18,20
**Yep (2)**
189:11;192:14
**yes-no (1)**
147:6
**yesterday (2)**
6:9;14:17

### Z

**zero (1)**
79:12
**Zhang (2)**
102:15;104:4
**Zoom (14)**
8:12,20;10:14;61:18;
62:4,21;105:8,19;
118:10,11;123:6;
174:1;222:7;281:17
**zoomed (1)**
171:23
**zooming (1)**
181:14

### 0

**0022 (1)**
32:9
**0031 (1)**
126:19
**0051 (1)**
264:18

### 1

**1 (11)**
6:10;21:19;119:14;
120:18;121:16,17;
207:24;211:15;246:13;
253:6;282:15
**10 (13)**
5:24,25;6:1,2;85:10,
12,16,20,22;87:6,9;
164:9,12
**10:16 (1)**
140:3
**10:26 (1)**
56:5
**10:40 (1)**
56:9
**10:42 (2)**
246:12;270:18
**105 (1)**
80:17

**108542 (1)**
14:23
**10th (5)**
44:1,8;45:8;81:18;
129:18
**11 (2)**
14:10;200:18
**11:00 (1)**
56:5
**1108 (6)**
24:12,17;199:11,21;
200:9;204:21
**114 (1)**
229:13
**12 (2)**
61:18;62:22
**12/1/2015 (1)**
63:23
**12/2 (2)**
63:24;66:3
**12/2/2015 (1)**
65:3
**12:16 (1)**
120:17
**120,000 (1)**
279:16
**123 (4)**
64:9,12,12;65:4
**123,000 (1)**
18:6
**126 (1)**
229:13
**12th (1)**
13:7;75:17,18
**13 (1)**
270:16
**1337 (1)**
246:22
**13th (3)**
20:10;92:6;227:21
**14 (11)**
24:21;25:7,11;
174:14;230:13,16;
231:4,5;245:14;264:9;
272:7
**1405 (3)**
139:22,25;265:9
**1408 (1)**
265:11
**14th (15)**
24:8;125:5,18;
144:15;145:23;146:8,
14,22;199:8;200:12;
212:3;216:21;226:20;
238:6;277:14
**15 (4)**
50:9;75:4;156:25;
157:10
**15th (8)**
15:11;50:7;67:16,23;
90:19;244:14;246:3;
273:8
**16 (6)**

127:25;201:17;
247:3;248:17,23;
267:17
**168 (1)**
159:14
**16th (16)**
20:11;126:12,22;
127:5,18;128:1;
197:23;198:8;201:11,
19;246:8,12;256:24;
263:19;267:15;271:7
**17 (8)**
131:15;157:1,20;
200:17;270:8,12,13,17
**17th (2)**
148:25,25
**18 (2)**
130:17;270:17
**19 (1)**
133:2
**1920 (1)**
161:9
**1920-built (2)**
158:12;175:15
**1st (2)**
140:20;209:5

### 2

**2 (19)**
59:5;97:11;99:25;
121:16,16,18;126:18,
19;164:2;229:6,11,11,
15;231:5;245:14;
246:9,13;254:5;282:6
**2/14 (1)**
29:9
**2/21 (1)**
29:9
**2/26 (1)**
139:4
**2/26/16 (3)**
139:8,15,19
**2:02 (1)**
164:15
**2:10 (1)**
164:15
**20 (1)**
136:3
**20- (1)**
68:1
**200 (5)**
43:9;46:6;47:3;56:7;
77:25
**2000 (1)**
263:8
**2004 (2)**
83:18;86:22
**2005 (1)**
235:8
**2010 (1)**
141:1
**2012 (7)**

128:20;129:5,8,11,
18;130:11;131:16
**2013 (2)**
77:23;141:1
**2015 (13)**
87:15;101:19;
102:18;103:3;139:5;
149:15;195:12;196:13;
197:7,25;198:5;
205:21;207:24
**2016 (70)**
10:4;24:8,9,14;28:9,
9;51:2,2;66:17;67:16;
68:3,21,24,25;69:7;
90:7,19;91:3,12;
101:19;102:4,19;
107:3;112:18;125:4,6,
19;126:12,22;127:5,
25;128:1;135:15;
138:10,12,14;140:12;
141:5;143:22,23;
144:7,15;145:11,24;
146:9,14,23;149:19,24;
165:18;195:12;196:13;
197:23;198:3,8;199:8;
200:13,23;215:12;
219:21;225:21;226:20;
227:14;238:6;246:12;
253:5;263:9,18;
264:16;266:14
**2017 (3)**
44:1,8;45:8
**2018 (4)**
49:7;51:3;79:18;
80:20
**2019 (15)**
49:1;51:7;129:5;
132:6,16,20;133:6,13;
135:15,15;149:16,19,
25;150:7;165:18
**2020 (11)**
48:2;49:3;50:4,7,9;
51:1,3;136:4;150:7,9,
14
**2021 (6)**
75:3,4,12;136:21;
140:22;261:20
**2022 (8)**
2:1;16:16;75:12,18;
148:25;157:1;166:6,6
**205 (1)**
106:19
**21 (3)**
137:10;138:7,8
**21st (1)**
102:19
**22 (5)**
75:5;140:18;247:25;
248:1,7
**2200 (1)**
264:5
**2216 (2)**
140:3,7

**225 (2)**
158:24;160:5
**22n (1)**
24:8
**22nd (22)**
29:2;90:5,7;91:12;
99:20;101:14;102:18;
125:6,19;144:15;
145:24;146:9,14,23;
165:8;199:8;200:13;
226:20;227:14,21;
238:6;273:9
**23 (1)**
81:7
**2391 (1)**
219:15
**24 (1)**
75:3
**24- (2)**
16:4;21:24
**24,000 (3)**
21:17;73:10;76:9
**24,000-dollar (2)**
74:23;75:2
**25th (1)**
107:2
**27 (1)**
2:1
**27th (1)**
92:6
**288 (1)**
40:8
**29th (2)**
66:17;200:23
**2C (13)**
24:21;25:2;94:8,12,
21;96:8,16,20;97:10;
98:4;229:3,8;233:11

### 3

**3 (19)**
21:16,17;73:17,18,
25;74:1,2,17;80:17;
99:25;121:16,17,19;
166:12;246:13;257:4;
258:22;282:6,11
**3/16 (2)**
139:3,4
**3/16/16 (2)**
139:8,22
**3/5/16 (1)**
44:1
**30 (1)**
41:5
**30,000 (9)**
6:15;16:2,3,23;
21:24;73:6;75:13;
76:10,12
**30,000-doolar (1)**
72:22
**30-QT (1)**
267:19

**30-QTs (1)**
    267:18
**31 (34)**
    4:16;24:15;41:1;
    42:4,8;56:2,8;64:3;
    67:11,14;68:11;69:5;
    145:20;195:12,17;
    199:7;200:6,14;201:3,
    5;203:1,6;204:20;
    205:2,3,21;213:25;
    214:10,10;215:1;
    244:14;246:6;272:16,
    21
**316/16 (1)**
    139:25
**325 (4)**
    178:5,8;179:2,16
**360 (1)**
    54:3
**37 (1)**
    194:21
**37,000 (1)**
    18:4

---

**4**

---

**4 (15)**
    99:13,15,17,18,25;
    225:16;227:6,7,9,10;
    239:19,22;250:8;
    252:23;274:6
**4,300 (1)**
    179:2
**4/22/16 (1)**
    44:5
**4/6/16 (1)**
    140:3
**4/6/2016 (4)**
    139:4,8;140:7;204:9
**4/7/2016 (1)**
    44:4
**40,000 (1)**
    99:25
**400 (5)**
    254:13,14;255:7,25;
    257:2
**400-amp (2)**
    34:1;64:3
**43-65 (1)**
    246:23
**47 (8)**
    24:11;27:25;28:5;
    29:2;71:11;131:22;
    200:5;204:20
**4th (2)**
    253:5;254:10

---

**5**

---

**5 (26)**
    5:1,3;91:24;92:25;
    93:14;95:2,5,9,15;
    98:13,23;99:13,15,17,

19,25;104:5,15;227:8,
    10,11;232:3;270:7;
    282:6,8,10
**5:04 (1)**
    284:1
**50,000 (3)**
    16:25;18:21;20:25
**5th (6)**
    99:20;102:4,16;
    133:6,13;166:6

---

**6**

---

**6 (13)**
    15:24;17:3;99:13,15,
    17,20,22,25;104:11;
    264:14;267:1,2;274:6
**6- (1)**
    16:4
**6,000 (2)**
    76:4,10
**6,000- (1)**
    121:23
**6,091 (2)**
    73:11,12
**600 (1)**
    47:9
**600-amp (1)**
    34:2
**660 (1)**
    177:23
**69 (1)**
    63:23
**6th (1)**
    202:2

---

**7**

---

**7 (6)**
    200:17;248:11,12,
    13,13;270:11
**71 (1)**
    131:24
**77335 (4)**
    14:23;15:13;262:25;
    263:2
**7th (3)**
    99:19;136:3;225:21

---

**8**

---

**8 (7)**
    5:24,25;6:1,2;81:12,
    13;85:10
**80,000 (1)**
    279:16
**800 (5)**
    152:1,23;154:23;
    177:23,25
**82,000 (1)**
    16:1

---

**9**

---

**9 (5)**
    5:24,25;6:1,2;85:10
**9:00 (1)**
    2:1
**94925 (1)**
    194:24
**94930 (1)**
    28:1
**95403 (1)**
    219:16
**975 (1)**
    177:14

Case: 19-30088    Doc# 12576    Filed: 07/01/22    Entered: 07/01/22 07:05:33    Page 320
of 320