William B. Abrams
end2endconsulting@gmail.com
2041 Stagecoach Rd.
Santa Rosa, CA, 95404
Tel: 707 397 5727

*Pro Se Claimant and*

*Party to California Public Utilities Commission Proceeding I.15-08-019 to Determine whether Pacific Gas and Electric Company and PG&E's Corporation's Organizational Culture and Governance Prioritizes Safety*

*Party to California Public Utilities Commission Proceeding A.20-06-011 which is the Application of Pacific Gas and Electric Company for Approval of Regionalization Proposal*

*Party to California Public Utilities Commission Proceeding R.18-10-007 which is the Order Instituting Rulemaking to Implement Electric Utility Wildfire Mitigation Plans Pursuant to Senate Bill 901*

**FILED**
JUL 06 2022
U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| In re:<br><br>PG&E CORPORATION,<br><br>-and-<br><br>PACIFIC GAS AND ELECTRIC COMPANY,<br><br>Debtors.<br><br>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>☒ Affects both Debtors<br><br>* *All papers shall be filed in the lead case, No. 19-30088 (DM)* | Bankr. Case No. 19-30088 (DM)<br>Chapter 11<br>(Lead Case)<br>(Jointly Administrated)<br><br>**WILLIAM B. ABRAMS REPLY TO THE OBJECTION OF THE FIRE VICTIM TRUSTEE PURSUANT TO FED. R. BANKR. 2004 FOR ENTRY OF AN ORDER AUTHORIZING DISCOVERY AND HEARINGS REGARDING THE ADMINISTRATION OF THE FIRE VICTIM TRUST**<br><br>[Relates to Dkt. 12440, 12527]<br>**Hearing If Order Granted:**<br>To Be Determined by the Court |

Case: 19-30088    Doc# 12593    Filed: 07/06/22    Entered: 07/06/22 14:28:01    Page 1 of 18

William B. Abrams ("**Abrams**") as a Pro Se Claimant, hereby submits this Reply (the "**Reply**") to support discovery of the Fire Victim Trust ("**Trust**" or "**FVT**") pursuant to Federal Rule of Bankruptcy Procedure 2004 and local Bankruptcy Rule 2004-1(a) and in response to the "*Objection of the Fire Victim Trustee to Motion of William B. Abrams Pursuant to Fed. R. Bankr. 2004 For Entry of an Order Authorizing Discovery and Hearings Regarding the Administration of the Fire Victim Trust*" [Dkt. 12527] ("**Objection**" or "**Trustee Objection**"). Additionally, this reply provides further support for the "*Motion of William B. Abrams Pursuant to Federal Rule of Bankruptcy Procedure 2004 for Entry of an Order Authorizing Discovery and Hearings Regarding the Administration of the Fire Victim Trust*" [Dkt. 12440] ("**Motion for Trust Discovery**").

## I. PRELIMINARY STATEMENT

The Trustee has stated that "*The overriding focus of the Trust and the Trustee is to protect and maximize the corpus of the Trust's assets for nearly 70,000 Fire Victim claimants and to compensate those Fire Victims for their damages as quickly as possible.*"[1] However, there is alarming "conduct" and a growing number of "acts" by the Trustee and others acting on behalf of the Fire Victim Trust that provide more than sufficient "good cause" for a fulsome discovery process pursuant to Bankruptcy Rule 2004. Unfortunately, the objections put forward by the Trustee further demonstrate a pattern of Trust representatives talking about how they value transparency within the confines of the Bankruptcy Court hearing room while actions and statements outside the hearing room demonstrate quite the opposite. The manner in which the Trustee has framed these objections should also call into question for the Court and victims, the degree to which exculpations, nondisclosure terms and the reliance upon Delaware Trust Law protections were designed to circumvent Federal Bankruptcy Law and undermine the interests of victims who rely upon the Fire Victim Trust to rebuild their homes and their lives.

The Court should consider the filed objections of the Trustee and the Trustee's unwillingness to provide even the most basic disclosures within the context of how the Trustee responded to the

---

[1] See *Objection of the Fire Victim Trustee to Motion of William B. Abrams Pursuant to Fed. R. Bankr. 2004 For Entry of an Order Authorizing Discovery and Hearings Regarding the Administration of the Fire Victim Trust* [Dkt. 12527], pg. 2 (lines 8-10).

Butte County Board of Supervisors after my motion for Trust Discovery was filed with the Court. Within the voicemail which was published by the Chico Enterprise Record, the Trustee stated the following:

> *"Mr. Ring, this is Justice Trotter, the trustee of the Fire Victims Trust. I'm calling in response to that offensive, uninformed political statement that you people sent to me. I'm not interested in dealing with you based on what you've put out. If you really want to know anything about the trust, I would assume, like everybody else, you would call and ask rather than coming to uninformed, slanderous conclusions. I have 400 people that work on this trust that are working very, very hard to accomplish a very difficult and (pause) and so when and if you get to that point, I'll talk to you. But I'm not going to engage based on that nonsense that's in your letter. Thank you."*

Subsequent to this voicemail, Justice Trotter produced on FVT letterhead and assumingly with Fire Victim Trust money a letter which was posted to the Fire Victim Trust portal largely hurling insults at the duly elected officials of Butte County and defending his professional reputation. This letter included the accusatory statement that *"they are politicians late to the party but looking to be relevant"* and that they unfairly *"accuse me of arrogance and unprofessionalism."* I bring this up within the context of my reply not to take sides and/or to evaluate the veracity of the statements by the Butte County Supervisors or the Trustee but to point out that the Trustee prioritized the defense of his professional reputation rather than using this as an opportunity to openly answer valid questions regarding the administration, management and oversight of the Trust. This public exchange by the Trustee certainly provides a window for the Court and victims to understand the priorities of the Trustee and provides good cause for discovery to ascertain whether or not FVT resources are similarly diverted to prioritize the defense of those affiliated with the Trust over those of victims. The Court and victims may also grow to understand whether or not this type of dismissive treatment is typical of how victims are treated who do not have the same stature and authority as the County Supervisors.

Moreover, the Court should note that within the context of the Objection to the Motion for Discovery, the Trustee chose to announce his resignation even though, by his own account, he noticed the Trust Oversight Committee ("**TOC**") over 3 months ago in March, 2022. The fact that neither the Trustee nor the Trust Oversight Committee felt it important to inform victims regarding this leadership transition until this Motion for Trust Discovery prompted them to do so, further demonstrates a pattern of prioritizing the interests of Trust representatives over the interests of victims. Given this delay, are victims to assume that this resignation notice was properly provided in

keeping with Section 5.2(b) of the Fire Victim Trust Agreement that states "*The Trustee may resign at any time before the end of his or her term by written notice to the TOC*" or shall we consider that this notice was to avoid disclosures through this motion that might trigger Section 5.2(c) of the Trust Agreement that states the following:

> "*The Trustee may be removed on application to the Court of Exclusive Jurisdiction, preceded by the Supermajority Vote of the TOC, in the event that the Trustee becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence, or for other good cause. Such good cause shall mean fraud, self-dealing, intentional misrepresentation, or willful misconduct.*"[2]

**I want to make it clear that I am not alleging any misconduct on the part of the Trustee.** However, this ill-timed announcement within the context of the Trustee's Objection is directly relevant in that it further demonstrates that victims have "good cause" to seek Trust discovery remedies pursuant to Bankruptcy Rule 2004.

Additionally, important context to consider as we contemplate the Trustee Objection is to understand the degree to which mass tort and personal injury attorneys have maneuvered on all sides of this case and within formal committees (TCC, Fire Claimant Professionals, TOC) to benefit from the disposition of the Fire Victim Trust. These same firms have largely been selected to lead major litigation efforts on behalf of victims through what the Trustee calls an "open and public competitive bid process." I will describe later in my reply that there is more than enough "good cause" to engage in thorough discovery around these issues of contract awards to question whether or not these contracts were indeed awarded by "competitive bidding" or simply awarded to attorneys that want to advance their own financial interests which may be detrimental to the interests of victims seeking just settlements. Victims deserve discovery to explore whether or not the "acts" and "conduct" of the Trustee and these contracted agents were or were not "reasonable" and pursued in "good-faith" as required by the Fire Victim Trust Agreement and applicable law. **To be clear, as a pro se claimant, I am not looking to relitigate or somehow overturn plan confirmation. However, I urge the Court not to disregard or discount the fact that the structure of the Trust was largely designed and developed by the same parties that now control the oversight of the FVT and have the most to be gained by the actions of the Trust and their contracted agents.**

---

[2] See Fire Victim Trust Agreement, pg. 5 Section 5(b) and Section 5(c)

Additionally, it is important to note that it seems that the Trustee's objections are designed to distract from these core issues and to grasp at unwarranted protections including leveraging irrelevant precedent from 1914 and an overreliance upon Delaware Trust Law protections to circumvent Federal Bankruptcy Law and victim's rights and remedies pursuant to US Bankruptcy Rule 2004. The Court is very aware that unlike within traditional civil litigation, obtaining discovery in a bankruptcy proceeding does not require the existence of a dispute. **Any party in interest** may file a motion asking the court to order a Rule 2004 examination to obtain information on the "**acts, conduct**, or property or to the liabilities and financial condition of the debtor, or to **any matter which may affect the administration of the debtor's estate, or to the debtor's right to a discharge.**" Fed. R. Bankr. P. 2004(b) (emphasis added). It would seem in this case that the Trustee would like the Court to believe that this rule should apply to "any party" except victims. I urge the Court to reject this notion and instead afford victims the same rights and remedies as other parties with regards to this discovery process. The Court must protect victims in this case and within future cases from the type of unequal treatment that the Trustee promotes.

I will now proceed to address some of the Trustee objections that largely attempt to mischaracterize and misstate my intentions in a seeming attempt to distract from the very matter of fact and sound legal basis that I demonstrated within the Motion for Trust Discovery. Respectfully, please consider the following reply that directly addresses certain objections put forward by the Trustee:

## II. Reply to the Trustee's Preliminary Statement

The Trustee, within the preliminary statement of the Objection, attempts to conflate my prior motions and mischaracterize my engagement within this case. Therefore, I must respond accordingly to set the record straight. During the June 7, 2022 prehearing regarding this motion, Trustee counsel stated "*I know he's been in front of Your Honor at least 27 times on objections or motions... What we're looking at here is an effort having not necessarily been successful in that, an effort on his part, to actually place himself almost as a TOC member, in terms of, you know, supervision or oversight of the trust.*" The implication here and within other statements within the Trustee Objection appears to be asking the Court to set aside my motion and discount my actions as attempts to gain personal advantage. Quite to the contrary, if you evaluate my motions and related objections within this case, I think the Court will find that my papers have proven to be well-founded given what has transpired

since plan confirmation and that they pertain to very separate and discrete issues. This motion is separate and apart from those other 27 good faith motions and objections that Trustee Counsel referenced which were designed to correct the Debtor's pattern of causing catastrophic fires and to remedy the Fire Victim Trust's ill-formed structural issues that now plague us post-confirmation. These pro se efforts were achieved at considerable personal cost and developed to directly address many critical issues including but not limited to (1) efforts to ensure that the eventual plan would reorganize the Debtor to address wildfire risks and to dissuade them from their continued "reckless", "negligent" and "criminal" acts which continue to cause substantial public harms and (2) efforts to support the Court's goals to ensure current and future victims are "made whole" and would be able to receive just, fair and timely settlements. It is also important to note that all of these efforts were achieved while I received personal attacks and threats by certain well-financed and influential parties within this case. I am certainly not the lone victim that has fought for these rights and remedies. Many victims have voiced their concerns on social media, within press reports, protested outside PG&E headquarters and wrote to elected officials like the Butte County Supervisors hoping that someone or anyone would intervene and come to their aid.

I appreciate that this Court is not in a position to remedy all these issues and I am certainly not asking the Court to revisit pre-confirmation decisions. That said, given the unfortunate disposition of the Fire Victim Trust, the Trustee and Trustee representatives are left scrambling to lobby, cajole and otherwise engage to make good on "made whole" and other trust administration priorities outside the strict parameters of the Fire Victim Trust Agreement. I urge the Court to prioritize transparency as a post-confirmation virtue. We now must do all we can within the parameters of Bankruptcy Rule 2004 to ensure that victims are made aware of acts, conduct and in some cases contracts and other documents associated with the Trust which **may have been unduly leveraged** by certain parties to further other interests that do not align with those of victims who are supposed to be the primary beneficiaries of the Fire Victim Trust. We must be able to exercise the discovery rights afforded to us under Bankruptcy Rule 2004 to understand the following 3 categories of information:

1) **Trust Oversight and Litigation Activities** – Victims require discovery rights (hearings, interrogatories and documents) related to the Trust activities that relied upon the mass tort and personal injury attorneys that have served in any official capacity within this case including TCC counsel, TCC attorney representatives, Fire

Claimant Professionals and Trust Oversight Committee Members. Victims need to assess whether or not actions were achieved in good faith or if they were unduly influenced by parties motivated by financial gain detrimental to the interests of victims.

2) **Lobbyist Activities** – Victims require reasonable discovery (hearings, interrogatories and documents) related to lobbying activities. Current and past lobbyists of the FVT have engaged in activities detrimental to the interests of victims and have undisclosed financial ties with members of the Trust Oversight Committee and others core parties influencing the disposition of the Fire Victim Trust. These activities and the seeming disregard for the "open and public competitive bidding process" that the Trustee touts provide good cause to inquire regarding the "acts" and "conduct" related to these activities. Victims should be afforded the rights and remedies to understand the degree to which the interests of official members of core committees were prioritized over the interest of victims through these lobbying activities.

3) **Administrative and Litigation Expenses** – The Trustee has still not shared basic information that would allow victims to understand the degree to which they will be made whole to further the rebuilding of their homes and their lives. Discovery must be granted by the Court so that victims understand the numerator (total claims) and denominator (total funds available) after Trust expenses. This case was sold to victims as a "made whole" 100 cents on the dollar case and the Trustee has had more than a sufficient amount of time to provide unvarnished details regarding this equation fundamental to the expectations that victims voted upon within this plan. The Trustee's statements within his Objection that victims decipher and infer these numbers by combing through the docket is disingenuous and dismissive of the victims and their families that rely on this information for their post-fire recovery. The financial terms associated with the derivative claims and all litigation related to contracts performed on behalf of the Trust need to be provided to victims to ascertain if these Trust induced financial incentives are aligned with their interests in the fair and just administration of the FVT.

These categories of information are core to the stated objectives of the Trustee yet instead of providing transparency around these activities the Trustee has been defensive, accusatory and misleading when reasonable inquiry is pursued. While Trustee responses to victims are generally not made public with the rare exception of certain letters sent to the Court, we have seen the frightening response to the Butte County Supervisors. The fact that these interactions were made public provides a glimpse at the predisposition and general attitude of the Trustee when open and honest inquiry is received by Trust leadership. Indeed, victims are left with very little information regarding core Trust activities to evaluate whether or not these actions were "reasonable" and pursued in "good faith" as the Fire Victim Trust Agreement requires. Moreover, the Trustee seems to wrongly equate the amount of appeals to the relative satisfaction of victims with the administration of the Trust by stating:

> *"There is no contested matter involving the Trust before the Court to introduce formal rules of discovery, and it is inappropriate to employ tools that are designed to elicit information from a debtor that has availed itself of the benefits of Chapter 11 such as Federal Rule of Bankruptcy Procedure 2004"*[3]

**However, the Court is very aware that Bankruptcy Rule 2004 does not require a dispute and indeed should be leveraged to avoid litigation.** Considering that the TCC and Fire Claimant Professionals negotiated to ensure victims did not get judicial review, it is not surprising that there are few contested matters before the court despite the extreme dissatisfaction and outright anger among many victims. It could reasonably be argued that the Trust exposes itself to claims of fraud if it does not fully disclose through the Bankruptcy Rule 2004 discovery process. Among other objectives, it is my hope that if through discovery the Trustee is able to demonstrate that the Trust actions are "reasonable" and in "good faith" that this would largely mitigate exposure of the Trust to protracted litigation that might arise based on allegations of fraud or gross misconduct that could further delay just settlements for victims.

The Trustee also mischaracterized my motion and statements within the prehearing as *"Mr. Abrams' requests are unduly burdensome and potentially prejudicial to the interests of Fire Victims as a whole... As he described at the Preliminary Hearing, Mr. Abrams would like there to be a*

---

[3] See *Objection of the Fire Victim Trustee to Motion of William B. Abrams Pursuant to Fed. R. Bankr. 2004 For Entry of an Order Authorizing Discovery and Hearings Regarding the Administration of the Fire Victim Trust* [Dkt. 12527], pg. 2 (lines 19-22).

*"change in course" for the Fire Victim Trust."*[4] However, as I stated within the prehearing *"I wouldn't say that what I put forward is broad or narrow. I've just put forward a process that has been used by the court, and by the trust in the past, to make sure it was manageable and I am not putting bounds on this. This is not for Will Abrams, this is for victims."* Later during the prehearing, I also made it very clear that *"It's important to ask: are these actions reasonable and **IF they're not**, the trust should change course."* I don't think anyone could take a contrary position. If through discovery Trustee and Trustee directed "acts" and "conduct" are reasonable than of course they should be pursued and conversely if they are demonstrably not reasonable it would be absolutely appropriate to change course.

Simultaneously, the Trustee seems to indicate that their primary objection to the discovery process is a timing issue by stating that *"The balance of Mr. Abrams's requests is burdensome and prejudicial to the Fire Victim Trust and other Fire Victims in that, inter alia, these requests seek public disclosure of strategy, plans, advice and decisions regarding litigation, lobbying and legislative efforts under consideration. The Trustee cannot allow potential prejudice to stock monetization efforts and prosecution of assigned causes of action that can be caused by such disclosures."*[5] If these limitations exist for particular documents that might be requested by a victim and/or that answers to certain interrogatories might interfere with this undisclosed strategy, then these should be made available by the Trust at such time that the public disclosure of these documents will not interfere with such actions. As an example, if the Trustee objects to discovery related to a contract to advance particular litigation then surely that contract should be made available to the beneficiaries of the Trust at such a point that this litigation concludes. Certainly, there are legitimate grounds for certain documents and information not to be released. However, these objections should not have an indefinite time horizon unless there are proprietary concerns that the Trustee has not mentioned within his objections. Otherwise, objections to the discovery of particular documents and/or for a particular piece of information should only be sustained up and until the release of that

---

[4] See *Objection of the Fire Victim Trustee to Motion of William B. Abrams Pursuant to Fed. R. Bankr. 2004 For Entry of an Order Authorizing Discovery and Hearings Regarding the Administration of the Fire Victim Trust* [Dkt. 12527], pg. 3 (lines 7-9).
[5] See *Objection of the Fire Victim Trustee to Motion of William B. Abrams Pursuant to Fed. R. Bankr. 2004 For Entry of an Order Authorizing Discovery and Hearings Regarding the Administration of the Fire Victim Trust* [Dkt. 12527], pg. 5 (lines 19-23).

information would no longer interfere with reasonable and good-faith actions of the Trustee and his designees.

### III. Reply to "The Trust's Continuous Public Facing Disclosure"

Within the Trustee Objection, the Trustee references a number of well-developed communication vehicles that the Trust relies upon to communicate with Fire Victims.[6] This extensive list of communication vehicles within the filed objection only serves to demonstrate that managing the discovery process would not be burdensome or costly but just fold into their existing communications structure. The Motion for Trust Discovery outlines the manner and relative ease with which these vehicles could be leveraged to make relevant documents and information available to the beneficiaries of the Trust.

Moreover, the Court should not be swayed by the argument that somehow the number of communications and/or the number of communication vehicles deployed by the Trust equates to transparency. As I have outlined prior, these communications have largely been focused on defending Trust actions rather than on informing victims regarding even basic information that would allow them to budget and otherwise plan for their personal fire recovery efforts. As an example, the Court spent a lot of time during the disclosure statement hearings pressing the Debtor and the Tort Claimant Committee ("**TCC**") Counsel to provide a total dollar estimate of the valid claims to ascertain whether or not the $13.5B would be sufficient for victims to be "made whole." Neither the Debtor nor the TCC seemed interested in releasing information at that time although both parties had created their own estimates of these claims. Now, here we are two years after plan confirmation and the Trustee still has not provided that critical number even though the 400 plus staff have certainly had sufficient time to produce a reasonable estimate so victims will have a better understanding about whether or not they can reasonably expect a payout close to the determination amount. If there is any doubt that the expectation was "made whole" plus other rights and remedies to be afforded to victims

---

[6] See *Objection of the Fire Victim Trustee to Motion of William B. Abrams Pursuant to Fed. R. Bankr. 2004 For Entry of an Order Authorizing Discovery and Hearings Regarding the Administration of the Fire Victim Trust* [Dkt. 12527], pg. 11-12.

with the confirmed plan, I would point the Court to the words of Robert Julian, TCC Counsel as stated during the plan confirmation hearing:

> *"And Your Honor asked us the rhetorical question in one of those hearings, isn't that stock the indubitable equivalent of cash? The indubitable equivalent, Your Honor, is going to come up in this oral argument today several times because although I know you are borrowing a bankruptcy term of art from cash collateral disputes; I understood your point..."*
>
> *"I will tell you that one of the issues raised is that some of the parties -- you know, they think they're smarter than Mr. Orsini and me -- they want an estimation order that just says 13.5 on it. And Mr. Richardson and I and Mr. Orsini, we correctly note that the true value here is **not just 13.5 of cash and stock but it's cash and stock**, it's the assigned claims, it's the assigned rights, it the assigned policies, **a whole bundle of rights which have great value.**"*[7] (emphasis added)

So, it is clear that the designed benefits of the Trust were *"not just"* the $13.5B value but *"a whole bundle of rights"* and *"assigned policies."* Victims should certainly be afforded discovery remedies to understand if these rights and protections were reasonably administered in good faith by the Trustee and Trust representatives acting on behalf of the Trustee. However, the Trust to date still withholds information that would allow any victim the opportunity to understand if these rights and policies were reasonably delivered and/or if these policies have been designed first and foremost to hide the actions of certain parties benefiting from the acts and conduct of the Trustee. I want to remind the Court that Mr. Molton on behalf of the Trustee negotiated what might be called extreme protections which were questioned at the time by the Court. Here are some statements made to the Court by Mr. Molton regarding their efforts to maximize the protections for the Trustee, The Claims Administrator and others that act on behalf of the Trust:

> "Mr. MOLTON: *"In there, they have a release of the trust, but they don't have a release of the trustee, the claims administrator, and the claims administrator and the trustee's advisors, all of which, Judge, in a case like this is an unremarkable ask from the government. So it's a different sort of release, and it's one that we're asking for from every other fire victim claimant. And I do want to note that –* THE COURT: *Is that true? Now let me clarify that. So, an individual who has a 5,000 dollar minor damage claim, who is going to get 5,000 or 4,000 or whatever, will sign a similar release in favor of Justice Trotter and Ms. Yanni –* MR. MOLTON: *Yes.* THE COURT: *-- and everybody else –* MR. MOLTON: *Yes, it's –* THE COURT: *-- on that –* MR. MOLTON: *Yes, Judge. There are two different sort of releases appended to the trust agreement. I believe, one is for entities, and one is for individuals, but*

---
[7] See US Bankruptcy Confirmation Hearing Transcript, Case #19-30088 (DM), June 5, 2020, pg. 135 (lines 14-22), pg. 174 (lines 18-25)

*they contain the same release of the indemnified trust parties which includes his Honor Justice Trotter, as well as Kathy Yanni, and their advisors."*[8]

Given that these well negotiated and very broad protections and exculpations were ardently argued and secured within sections 5.4 and 5.7 of the Trust Agreement for the "Trust Indemnified Parties" including the "*Trustee, Delaware Trustee, TOC, Claims Administrator, Special Master or their respective members, officers, employees, agents, consultants, lawyers, advisors, or professionals*" the Trustee should not be afraid and should welcome a complete discovery process in accordance with Bankruptcy Rule 2004.[9] The Court should note that these same parties that fought tirelessly to secure these protections for "Trust Indemnified Parties" advocated against even basic protections for victims like judicial review that would have provided victims with appropriate recourse for unjust settlement determinations and/or provided them with a judicial pathway in the event that unjust management and administration of their Trust and associated settlements could be demonstrated. **Indeed, it seems that the majority of judicial remedies were stripped away from victims by those parties and official committees representing their interests except for those associated with Bankruptcy Rule 2004.**

IV. **Reply to the Trustee's Objection that "The Fire Victim Trust Has Complied with the Disclosure Obligations Under the Trust Agreement and Mr. Abrams has no Additional Rights to Information."**

This argument that somehow the appointment of the Trust Oversight Committee negates or disqualifies victims from exercising their discovery rights lacks any merit. Similarly, the Trustee objection claiming that the financial audit and "clean opinion" should somehow prevent victims from seeking discovery is baseless given that victims have zero insight into this process and that this audit seems to have only included a review of a discrete set of financial documents. Moreover, the fact that the Trustee objections grasp at Delaware Trust Law provisions to circumvent Federal Bankruptcy Law is disappointing particularly given the ironclad exculpations and protections they successfully negotiated for everyone imaginable associated with Trust management, administration and oversight while leaving victims like me exposed. This expressed effort of the Trustee to afford victims with the least amount of rights and remedies while they hide behind Delaware Trust Law should be identified

---

[8] See US Bankruptcy Confirmation Hearing Transcript, Case #19-30088 (DM), June 5, 2020, pg. 135 (lines 14-22), pg. 30 (lines 1-17)
[9] See Fire Victim Trust Agreement, Section 5.4 and Section 5.7 (pg. 15-27)

by the Court as a desperate effort to avoid scrutiny. Additionally, the Court should keep in mind that many of the individuals that serve on the TOC are the same parties that negotiated these protections and devised the structure of the Trust that seems to require extraordinary actions beyond those contemplated by the Court and articulated within the Trust Agreement to monetize the victim stock and fairly compensate victims.

### V. Reply to the Trustee's Objection that "The Trust's Voluntary Additional Disclosures Adequately Respond to the Requests."

These "additional disclosures" don't seem to be intended by the Trustee to address the issues raised within the Motion for Trust Discovery. However, this information does lead to more questions and not less that are deserving of discovery pursuant to Bankruptcy Rule 2004. The Trustee describes that "***an open and public*** *... request for proposal ... and interview process with respect to those litigation efforts and selected the following firms: to represent it in such actions: Cotchett, Pitre & McCarthy LLP; Walkup, Melodia, Kelly & Schoenberger; Dreyer Babich Buccola Wood Campora LLP; Corey Luzaich de Ghetaldi & Riddle LLP; Bottini & Bottini Inc.; Andrews & Thornton LLP; Greenberg Gross LLP; and Gilbert LLP*" (emphasis added).[10] However, the majority of these selected firms also happen to serve as members of the TOC and many are the same mass tort and personal injury attorneys that were among the official Fire Claimant Professionals that devised the $13.5B settlement agreement for victims. This at the very least provides "good cause" to afford victims discovery rights to ascertain if indeed this was an "open and public" process that was "reasonable" and pursued in "good faith" in accordance with the Trust Agreement. Simply stated, the coincidental nature of these contract awards to the very attorneys that have the most to gain from how this litigation is pursued or not pursued is at the very least deserving of discovery. The fact that certain contingency fee contracts awarded to TOC members to pursue derivative claims were "not intended to make up for any shortfalls in the compensation fund"[11] but have nevertheless been

---

[10] See *Objection of the Fire Victim Trustee to Motion of William B. Abrams Pursuant to Fed. R. Bankr. 2004 For Entry of an Order Authorizing Discovery and Hearings Regarding the Administration of the Fire Victim Trust* [Dkt. 12527], pg. 24 (lines 21-28).
[11] See Courthouse News, February 24, 2021 https://www.courthousenews.com/fire-victim-trust-sues-former-pge-executives-and-directors/

prioritized by the Trustee for PR efforts and associated expenses through Zumado Public Relations should be an additional line of inquiry worthy of further discovery.[12]

It is also relevant for the Court's consideration that Mr. Campora, President, Mr. Pitre, Tresurer and Mr. Kelly, Secretary just so happen to be the Officers of the Up From the Ashes Coalition ("**UFTA**") who employed Mr. Patrick McCallum to lobby for the AB1054 legislation and then proceeded to successfully negotiate their appointment to the TOC. The Court and victims should remember that it was their lobbying for this legislation that prevented victims associated with this case from accessing the California Wildfire Fund which was made available to all other wildfire survivors and forced victims to vote before the AB1054 June 30th deadline. This same lobbyist was then employed by the Trustee through the advice of the TOC to go back to the same legislators in an attempt to undo the very provisions they fought to include within the original legislation. This lobbyist was certainly a counterintuitive choice regardless of the subsequent criminal allegations that pushed the Trustee to sever ties.

Compounding these issues, the replacement lobbyist that was hired by the Trustee is Darby Kernan who just so happens to be the other primary lobbyist that partnered with Mr. McCallum around this same AB1054 legislative effort. I know this because I had correspondence with Mr. McCallum and Ms. Kernan leading up the passage of AB1054 advising them that the provisions they were fighting to include within the bill were detrimental to the interests of the victims whom they claimed to represent. Mr. McCallum's prior work as an education sector lobbyist and Ms. Kernan's prior work representing the California State Association of Counties (CSAC) that lists their "Premier Member" and "Platinum Sponsor" as PG&E made them the best candidates to represent PG&E victim's at the California State Capitol? There are over 1,800 registered California State lobbyists. The Trustee expects the Court and victims to believe that these two lobbyists were chosen through an "open, public and competitive bid process?" Why were these lobbyists selected after the Trustee was made aware of the fact that the International Brotherhood of Electrical Works (IBEW) filed a complaint against UFTA stating that they are "*a front organization created to conceal the identities of law firms who do not want the public to know they are paying lobbyists to persuade the government to preserve billions of dollars in legal fees... the public has a right to determine if UFTA*

---

[12] See Zumado Press Release within Business Wire, February 24, 2021, https://www.businesswire.com/news/home/20210224005907/en/PGE-Fire-Victim-Trust-Sues-PGE-Executives-and-Officers-for-Causing-Devastating-Northern-California-Wildfires

*is nothing more than a means for a group of trial lawyers to profit off the tragic fires, one part of a public misinformation campaign conducted while hiding their identities behind UFTA... Trial lawyers are paying a seasoned lobbyist to wage an influence campaign on their behalf and using UFTA as a front company to conceal their involvement while their lobbyist publicly misrepresents the nature of that front company as an association of fire victims."[13]* **I want to make it clear that I am not reiterating these facts to request further reconsideration of my Motion to Reconstitute the Fire Victim Trust Oversight Committee. However, the fact that I made these issues and financial ties known to the Trustee and he still proceeded to make these hiring decisions certainly should provide "good cause" to ask questions and request documents related to these decisions.**

## SUMMARY AND CONCLUSION

It will be important context for the Court to consider that over a year ago a bipartisan group of California lawmakers on behalf of their victim constituents sent a letter to the California State Attorney General requesting a probe into the Fire Victim Trust.[14] Therefore, this notion that the Trustee puts forward within his objection that victims are "comfortable" with the claims administration and that somehow my motion is not representative of larger and growing concerns should be flatly dismissed. This letter sent by these concerned lawmakers was sent over a year ago and the issues they raise are still not remedied. Within this letter they rightly state *"Fire survivors have already been victimized once by a negligent utility and the trustees of this massive settlement are ushering in a further injustice... efforts must be focused on holding the trust accountable."*

These issues described within this letter have only grown and been compounded over the past year through the conduct and acts directed by the Trustee. Now, I would like to directly address the Court's statement *"that's your theory, and I don't know if you're wrong or right. But again, what is the court supposed to do..."* I would like to address this valid and substantive question in two parts. First, I would like to clarify for the Court's consideration that this motion for discovery is not based upon my "theory" but based upon facts that clearly provide good cause to grant broad discovery

---

[13] See *William B. Abrams Motion to Enforce Disclosure Requirements or Reconstitute the Fire Victim Trust Oversight Committee Given New Evidence of Self Dealing and Conflicts of Interest Pursuant to U.S.C. §§ 327(a) AND BANKRUPTCY RULE 2014* [Dkt. 11005] (Exhibit E)

[14] See "RE: Special Fire Victim Trust" Letter to Attorney General Rob Bonta, May 21, 2021, https://www.documentcloud.org/documents/20791380-special-victims-trust-ag-letter-legislature-5212021#document/p1

rights pursuant to Bankruptcy Rule 2004. I am not outlining theories for the Court to consider but merely demonstrating that certain facts clearly provide good cause to support this discovery process. It is a fact and not a theory that certain mass tort and personal injury attorneys including those represented on the TOC have had an inordinate amount of influence over the design and execution of the Fire Victim Trust. It is a fact and not a theory that these same mass tort attorneys were awarded contracts and have the potential to reap huge financial benefits from both the fire victim claim determinations AND the settlements that might be produced from FVT derivative claims. It is a fact that the lobbyist hired by the FVT was previously hired by influential TOC members to negotiate legislation that prevented victims from accessing the California Wildfire Fund to makeup the Trust shortfall. It is a fact that the Trustee has made statements in direct contradiction to the stated goals of the confirmed plan including the apparent belief that it was never the intent to make victims whole. It is a fact that the Trustee fought for broad protections and exculpations for himself, the TOC and other managers and directors of the Fire Victim Trust and now seeks to further strip victims of their rights and remedies pursuant to Bankruptcy Rule 2004 despite the fact that fire victims were prevented by these same attorneys from seeking judicial review. **I am NOT arguing that these facts standing on their own constitute wrongdoing or somehow demonstrate bad faith. However, it is clear that these fact patterns and the manner in which the Trustee provided notice of his resignation provide more than sufficient "good cause" to seek discovery to ascertain the degree to which the Trustee and others employed by the Fire Victim Trust have engaged in reasonable "conduct" and "good faith" acts in keeping with both the Fire Victim Trust Agreement and applicable law.** The Trustee's efforts pre and post confirmation to avoid these types of disclosures should not dissuade the Court. The Trustee's untenable position that "all parties" except victims deserve these rights and remedies should not stand. Despite the clear intent of Bankruptcy Rule 2004 to provide broad discovery rights including "fishing expeditions" and in response to the prehearing suggestions of the Court, I narrowed my discovery request to the following three categories described in more detail within the preliminary statement section of these papers:

1) Trust Oversight and Litigation Activities

2) Lobbyist Activities

3) Administrative and Litigation Expenses

Note that to seek a good faith compromise with the Trustee, I dropped from this list my request for discovery regarding the Trustee's regulatory engagement that has not produced any recognizable action or remedy beneficial to victims. This apparent boondoggle does deserve added scrutiny but I will withdraw it from inclusion within this discovery request.

Now, I would like to respond to the "what is the court supposed to do?" question that was asked of me within the June 7, 2022 prehearing. My response to this question is that the Court and indeed victims like me should withhold judgement regarding the "acts and conduct" of the Trustee and Trust representatives until such time as discovery sheds additional light on the fact patterns that I have outlined above. I believe that the next steps for the Court will be clear if we let the facts be properly disclosed "without fear or prejudice." It is my sincere hope that through proper discovery victims will gain renewed confidence in the acts and conduct of Trustee and in so doing we will be better able to collectively support ongoing Trust efforts and rally support for remedies to the $13.5B Trust shortfall.

However, if upon the conclusion of the discovery process pursuant to Bankruptcy Rule 2004, the Court and victims find that certain Trust "acts and conduct" were not "reasonable" and not done in "good faith" in accordance with the Trust Agreement, I am confident that the Court will order that the Trustee and other Trust representatives devise and implement reasonable remedies to avoid potential protracted litigation grounded in allegations of widespread fraud or other discovered misconduct. As I stated in the prehearing, the Court should not prejudge the merits of a particular question or piece of discovery to short-circuit or curtail a discovery process. The Court should not presuppose that myself or other victims will ask for information that is out of bounds but allow the discovery process pursuant to Bankruptcy Rule 2004 to proceed. Perhaps, Mr. Kelly stated the importance of the Court's role during post-confirmation Trust oversight most clearly when during the plan confirmation hearing two years ago he stated:

> *"We should not confuse efforts with results. Putting a lot of time and effort into a plan to protect the individual victims which cannot be executed will be a failure. **Whether the plan looks good on paper is irrelevant if in execution, it results in a failure to compensate the heirs of those burned to death and the thousands of homeowners, renters, small business owners, and community members who have been forced to accept fifty percent of their gross compensation in stock. That stock value must be safeguarded by this Court and maximized if the plan is to succeed.** Thomas Edison said, "Having a vision for what you want is not enough. Vision without execution is a hallucination." The reorganization plan that makes promises which cannot be kept or which are not kept and which is structured in a*

*way that invites failure in the execution is not a plan that should be confirmed. This Court betrays the individual fire victims by approving and confirming a plan which permits the debtor to carry out stock sales by its financial backers, institutional investors, and backstop parties before the victims or which delays the victims' ability to liquidate their stock at optimal value when the trust actually needs the money.* **The moms and dads, brothers and sisters, aunts and uncles who have lost loved ones as well as their homes, businesses, and treasured possessions are entitled to have this Court do everything in its power to make the goals stated by Mr. Karotkin a reality.**"[15] (emphasis added)

Although this statement was made prior to plan confirmation, the sentiment is arguably more important now than it was when Mr. Kelly rightly argued it before the Court. It is the execution of the plan that is of paramount importance to ensure the rights and remedies afforded to victims are protected. The Court must permit complete discovery pursuant to Bankruptcy Rule 2004 to ensure the promises made during confirmation are not just a bad "*hallucination*" for victims. Was this plan designed by certain parties to allow post-confirmation unjust and bad faith actions to advance the short-term financial interests of certain parties? The Court has jurisdiction over the Fire Victim Trust and I am confident that the Court will order the Trustee to administer prudent remedies if wrongdoing should be exposed through the Court ordered discovery process. Collectively, we should do all we can post-confirmation to ensure that the well-intentioned efforts of the Court to protect victim interests through the confirmation of the plan are not undone by the very parties that meticulously devised their own exculpations and procedural loopholes while undermining due process for victims.

Dated: July 6, 2022

Respectfully submitted,

/s/ William B. Abrams

William B. Abrams
Pro Se Claimant

---

[15] See US Bankruptcy Confirmation Hearing Transcript, Case #19-30088 (DM), June 5, 2020, pg. 42-43