

Signed and Filed: August 2, 2022

_____
**DENNIS MONTALI**
**U.S. Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re: | ) Bankruptcy Case |
| | ) No. 19-30088-DM |
| PG&E CORPORATION, | ) |
| | ) Chapter 11 |
|         - and - | ) |
| | ) Jointly Administered |
| PACIFIC GAS AND ELECTRIC COMPANY, | ) |
| | ) |
|       Reorganized Debtors. | ) |
| | ) |
| ☐ Affects PG&E Corporation | ) |
| ☐ Affects Pacific Gas and | ) |
|      Electric Company | ) |
| ☒ Affects both Debtors | ) |
| | ) |
| * *All papers shall be filed in* | ) |
| *the Lead Case, No. 19-30088 (DM).* | ) |
| | ) |
| | ) |
| | ) |

**ORDER ON MOTION OF WILLIAM B. ABRAMS AUTHORIZING DISCOVERY REGARDING ADMINISTRATION OF THE FIRE VICTIM TRUST**

I.   INTRODUCTION

The court has considered the *Motion of William B. Abrams Pursuant to Federal Rule of Bankruptcy Procedure 2004 for Entry of an Order Authorizing Discovery and Hearings Regarding the Administration of The Fire Victim Trust* (Dkt. 12440) ("Motion");

-1-

the *Objection of Fire Victim Trustee to Motion of William B. Abrams Pursuant to Federal Rule of Bankruptcy Procedure 2004 for Entry of an Order Authorizing Discovery and Hearings Regarding the Administration of The Fire Victim Trust* (Dkt. 12527) ("Objection"); the *William B. Abrams Reply to the Objection of Fire Victim Trustee Pursuant to Federal Rule of Bankruptcy Procedure 2004 for Entry of an Order Authorizing Discovery and Hearings Regarding the Administration of The Fire Victim Trust* (Dkt. 12593) ("Reply"); and the arguments of the parties presented at a hearing on June 7, 2022.

For the reasons explained below, the court will grant in part and deny in part the Motion by directing the Trustee to answer specific questions prompted by the Motion and the Reply, but now posed by the court, and to provide documents as directed.

II. BACKGROUND

As this court has stated before, the above-captioned bankruptcy cases were and are among the most complex in U.S. bankruptcy history, involving "difficult legal, financial, practical, and personal issues." (Dkt. 8005, p. 1). The cases were filed to manage a massive amount of damage claims stemming from devastating wildfires that occurred between 2015 and 2018, including the 2018 Camp fire, for which one of the Debtors has been held criminally liable.[1] On October 28, 2019, with the

---

[1] See Ivan Penn and Peter Eavis, *PG&E Pleads Guilty to 84 Counts of Manslaughter in Camp Fire Case*, N.Y. TIMES (June 16, 2020), https://www.nytimes.com/2020/06/16/business/energy-environment/pge-camp-fire-california-wildfires.html)

-2-

stakes heightened by the deadline set forth by Assembly Bill 1054, the court entered an *Order Appointing Mediator* (Dkt. 4499). Mediator Retired Bankruptcy Judge Randall J. Newsome conducted a lengthy mediation among the Debtors and various stakeholders, including the Tort Claimants Committee ("TCC") and Consenting Fire Victim Professionals.

The mediation, combined with a multitude of contested hearings, culminated in the *Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization Dated June 19, 2020* ("Plan") (Dkt. 8048). The court confirmed the Plan on June 20, 2020 (Dkt. 8053). A key component of the Plan is the Fire Victim Trust Agreement ("Trust Agreement") (Dkt. 8057) which established the Fire Victim Trust ("FVT") and Fire Victim Claims Resolution Procedures ("CRP"). The Trust Agreement approved the selection of Retired Justice John K. Trotter as the Trustee for the FVT and Cathy Yanni as Claims Administrator for the FVT, both of whom had been previously employed by the court (Dkt. 6760) to aid in formulation of the claims resolutions procedures that would eventually become part of the Trust Agreement and CRP. The Trust Agreement also established the Fire Victim Trust Oversight Committee ("TOC"), consisting of members selected and appointed by the TCC and the Consenting Fire Claimants Professionals.

Pursuant to the Plan, the Debtors contributed to the FVT $6.75 billion in cash and $6.75 billion in the reorganized Debtors' common stock, which the Trustee and Claims Administrator manage and administer for the benefit of the fire victim claimants ("Beneficial Owners").

-3-

Now, over two years later, the value of the stock contributed to the FVT has not maintained the expected level the parties hoped for and the Plan contemplated. The resulting shortfall, combined with Trust administrative expenses and a lengthy and complicated distribution process for claimants, some of whom are fire victims who are years into this unfortunate situation without any recompense, has understandably led to questions regarding the management of the FVT. Justice Trotter has since retired from the position of Trustee, replaced by Ms. Yanni as of July 1, 2022. Both the former and current Trustee have maintained that the FVT has been as transparent with claimants, as the terms of the Trust Agreement dictate.

The Motion, supported by various letters to the court by other claimants, both individuals (e.g., Dkt. 12657) and counties alike (Dkts. 12609, 12670), indicates to this court that there should be more visibility in a process meant to protect those most damaged by the very events that sparked this bankruptcy.

It should not go unnoticed, and the court acknowledges, that the former Trustee and the present Trustee, and their professionals and support staff, have accomplished an impressive record of progress in the two years of the Trust. This has occurred in the midst of an unprecedented worldwide pandemic under trying circumstances. Billions of dollars have been paid from the Trust so far to tens of thousands Beneficial Owners; the review of highly complex claims asserting dozens of types of fact situations and theories of recovery as proceeded; the administration of a thoughtful and comprehensive claims review

-4-

and re-review process has been implemented and has worked apparently without many difficulties.  In a perfect world there would have been no wildfires.  Next to that, all of the claims would have been paid by now and the stock value would have soared.  But this is not that fantasy situation.  It is a real world tragedy being dealt with in a reasonable manner with impressive albeit imperfect results.

Despite the criticisms of Mr. Abrams and others, the progress has been impressive.  In particular, the court notes the following from the Trustee's letter of June 21, 2022 (Dkt 12527, pp 30-33):  nearly $10 Billion of claim Determination Notices issued (30,000 in number involving over 150,000 claims), resulting in payments of nearly $4.5 Billion to Beneficial Owners, and representing a 45% recovery for those parties.  Add to that almost $900,000 in advances for 34,000 particular Beneficial Owners.  These are very impressive results in just two years given all of the complications.

In that context, and with the recognition that things could be better, the court has concluded that some additional information, albeit minimal, is needed and should be required from the Trustee.  This is not notwithstanding the Trustee's observation regarding Section 2.2(g) of the controlling provision of the Trust Agreement: "The Trustee has no obligation to provide, and the Beneficial Owners have no right to receive, information regarding the operation of the trust except as provided in the Annual Report."

-5-

III. AUTHORITY OF THE COURT AND FEDERAL RULE OF BANKRUPTCY
     PROCEDURE 2004

Article 1.6 of the Trust Agreement, entitled Jurisdiction, begins by reciting that this court "shall have exclusive jurisdiction with respect to any action relating to or arising out of the Trust. . . ." The last sentence of Article 1.6 makes clear that its provisions shall not affect, impair, alter, modify or supersede the procedures contained in the CRP, and nothing in this order purports to do that. Rather, this order simply facilitates a flow of information from the Trustee dealing with three specific matters of interest to all Beneficial Owners in order to clarify and expand upon the following three topics: trust oversight and litigation activities; lobbyist activities; and administrative and litigation expenses.

More specifically, Federal Rule of Bankruptcy Procedure 2004 remains available as a vehicle for that exchange of information. The Trustee's Objection at page 17-18, not surprisingly argues that after confirmation of the Plan, that rule limits what can be disclosed. But the court cannot take seriously the Trustee's attempt to shut off access via Rule 2004 when, as pointed out by Mr. Abrams, he has himself invoked that very rule when he sought discovery from Adventist Healthcare System/West et al. and PricewaterhouseCoopers LLP. See Abrams' Motion at page 10, citing Dkts. 11145 and 11556 in this court's order in Dkt. 11652: "While the CRP does not incorporate Rule 2004, it does not exclude use of that rule either."

In any event, the court is satisfied that under its inherent powers, and particularly in light of the enormous

-6-

public interest in informing thousands of Beneficial Owners about specific aspects of the Trust, there is ample justification and authority for the court to direct the Trustee in the manner described below.

IV. DISCUSSION

It is important to emphasize what is not fair game for Mr. Abrams to seek from this court, and what is not dealt with by this order. First, nothing is sought from the Trustee as to the disposition of any particular claim administered in the FVT nor the very complicated procedures promulgated via the CRP that deals with the valuation, and ultimately allowance or disallowance in whole or part of any particular claim. Further, there is nothing about the Trustee's receipt of the cash contributed to the Trust by the Reorganized Debtor under the Plan, nor the original or present value of the stock consideration, including the Trustee's management and control over that stock.

Also excluded are any inquiries that predate the effective date of the Plan and the Trust (July 1, 2020) such as the events that predated the California Legislature's enactment of AB1054; the conduct or composition of the TCC and the Consenting Fire Claims Professionals.

Also excluded is any examination or discussion of the circumstances that permitted a small number of fire victim claimants to have access to judicial review of their situation after the administration of their claims by the Trustee, to the exclusion of such access by the vast majority of fire claimants.

–7–

What is preserved for examination pursuant to this order are the following three discrete areas identified by Mr. Abrams as the trust oversight and litigation activities; lobbyist activities; and administration and litigation expenses.

Mr. Abrams' Motion sets forth several pages of forms drawn from interrogatories and requests for information that include numerous definitions, lengthy instructions, a detailed section entitled Manner of Production, and then thirteen enumerated requests for information and nine enumerated requests for production.

The court believes such a comprehensive sweeping and broad form of request of discovery is inappropriate for a variety of reasons, not the least of which is that Mr. Abrams is really acting on his own behalf and is not empowered to act on behalf of other fire victims. Further, Mr. Abrams is not some sort of ombudsman or would-be inspector general, entitled to oversee and second guess the activities of the Trustee. The fire victims overwhelmingly voted to accept the Plan and all of what followed, viz., an independent trust charged with administering the fund for its Beneficial Owners, with very little interference or oversight from others, including this court. The Trust and the broad authority of the Trustee was not designed or conceived to be micro-managed or second-guessed by third parties.

In addition, while the court is willing to require the Trustee to provide some specific responses and particular documents, it will not pretend that it would be appropriate to mirror the type of discovery that is common for extremely

-8-

complex and far-reaching discovery.  Thus, Mr. Abrams multi-page
discovery request will be replaced by the court's own direction
to the Trustee to provide discrete responses and specific
documents.

V.   REQUIRED RESPONSES BY THE TRUSTEE

No later than September 6, 2022, the Trustee is to file
written responses to the following questions and to post on the
FVT website, and file with the court, copies of the relevant
documents referred to below.

A. **Questions regarding Lobbying Activities.**

1. Explain why the Trustee did not use the "request for
   proposal" procedure as utilized in the selection of
   professionals to prosecute the assigned claims.

2. Identify the firm retained by the Trustee for lobbying
   activities for fiscal year 2022 and explain how that
   firm was selected, whether there was any competitive
   open and public request for proposal or similar
   procedure implemented.

3. Identify any firm or person retained for lobbying
   activities for fiscal year 2021, even though the Trust
   had reported that it incurred no such lobbying
   expenses during that year.  Explain how that firm or
   person was selected, whether there was any competitive
   open and public request for proposal or similar
   procedure implemented.

4. Provide a list of bills or legislative hearings where
   the Trustee's designated lobbyist gave testimony or
   engaged in efforts to further the interest of PG&E

-9-

fire victims, specifically explaining how those
activities furthered the efforts on behalf of those
victims.

B. **Questions regarding Selection of Professionals.**

In the Objection, the Trustee stated as follows:

"The Trust retained all of its third-party
litigation firms through an open and
public 'request for proposal' interview
process."[2] (Dkt. 12527, at 19:23-24)

1. Identify the particulars of that "request for
proposal", including when and to who it promulgated,
what responses were received and from whom; and the
name of each counsel or firm selected by the Trustee
and subsequently retained.

2. For every such counsel so retained, post a copy of the
retention agreement pertaining to that counsel.

3. Identify specifically any such contracts awarded to
any member of the TOC.

C. **Questions regarding Status of Assigned Claims[3].**

Generally, the Assigned Claims fall into three categories:
suits against third parties who contracted with Debtors to
perform vegetative management; claims against large
institutional third parties; and claims (limited to insurance
policy limits) against former officers and directors of Debtors.

The court appreciates the need for confidentiality that
would seem necessary to protect the interests of the Trust and

---

[2]  The Trustee repeated his description of this "proposal and
interview" process in his June 21, 2022 letter.
[3]  *See* Plan, Section 1.8, defining Assigned Rights and Causes of
Action ("Assigned Claims").

-10-

would likely aid potential defendants if disclosed.  For that reason, the court will limit the extent of what the Trustee must disclose about any of the Assigned Claims.

> 1. Identify any Assigned Claim that has been finally resolved by judgment, arbitration, mediation or otherwise.  Name the party, a brief summary of the outcome, the gross amount of realized, the cost in attorneys' fees and expenses of the effort, and the net result of the benefit to the Trust.
>
> 2. For any such completed matter, the Trustee should post on the FVT website any agreement, order, or other document memorializing the outcome.  If the Trustee believes any provision must or should be kept confidential, he should file a request with the court to permit the filing of a redacted version of such a document and the court will review the unredacted version *in camera* and issue an appropriate order.

## VI.  CONCLUSION

For the reasons explained above, the Motion is GRANTED, in part, and DENIED, in part.

**\*\*END OF ORDER\*\***

-11-

**COURT SERVICE LIST**

William B. Abrams
1519 Branch Owl Place
Santa Rosa, CA 94509

-12-