William B. Abrams
end2endconsulting@gmail.com
2041 Stagecoach Rd.
Santa Rosa, CA, 95404
Tel: 707 397 5727



**FILED**

**AUG 18 2022**

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

*Pro Se Fire Victim Claimant and Party to related proceedings before the California Public Utilities Commission and the California Office of Energy Infrastructure Safety*

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

In re:

PG&E CORPORATION,

    -and-

PACIFIC GAS AND ELECTRIC
COMPANY,

          Debtors.

☐ Affects PG&E Corporation
☐ Affects Pacific Gas and Electric Company
☑ Affects both Debtors

\* *All papers shall be filed in the lead case, No. 19-30088 (DM)*

Bankr. Case No. 19-30088 (DM)
Chapter 11
(Lead Case)
(Jointly Administrated)

**MOTION OF WILLIAM B. ABRAMS PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 2004 FOR ENTRY OF AN ORDER AUTHORIZING DISCOVERY AND HEARINGS REGARDING THE ACTS AND CONDUCT OF JAMS NEUTRALS GIVEN NEW EVIDENCE**

**Response Deadline:**

September 13, 2022 (Pacific Time)

**Hearing If Order Granted:**

September 27, 2022 (Pacific Time) or as determined by the Court

## PRELIMINARY STATEMENT

William B. Abrams ("**Abrams**") as a Pro Se Claimant, hereby submits this Motion (the "**Motion**" or "**Motion for Additional Discovery**") pursuant to Federal Rule of Bankruptcy Procedure 2004 and Local Bankruptcy Rule 2004-1(a), seeking entry of an order authorizing broad discovery and associated hearings regarding any and all acts influenced, directed or overseen by the Honorable John K. Trotter (Ret.) (the "**Former Trustee**"), Cathy Yanni (the "**Current Trustee**") before or during their service as the Trustee of The Fire Victim Trust (the "**Trust**" and "**FVT**"). Given Justice Trotter's leadership position within JAMS Inc. ("**JAMS**"), this discovery should include the acts and conduct initiated or overseen by other JAMS "neutrals" that had and continue to maintain an inordinate role within this case and serve in official capacities to negotiate, structure, manage and administer the FVT. The recent reporting within the LA Times regarding the role of Justice Trotter and JAMS Inc. combined with new information related to Cathy Yanni and other JAMS roles in prior cases provide more than sufficient "good cause" for broad discovery to understand the degree to which the Fire Victim's settlement and associated Fire Victim Trust Agreement (the "**Trust Agreement**") were unduly influenced and potentially undermined by the role of JAMS in coordination with other core parties within this case.

**This new evidence provided through the LA Times reporting was unknown to the Court when it issued the "*Order on Motion of William B. Abrams Authorizing Discovery Regarding Administration of the Fire Victim Trust*" [Dkt. 12682]. This reporting was released hours after the Court order was issued so the ramifications of this new evidence could not have been incorporated within the order at that time.** However, the discovery "exclusions" that were specifically referenced within that order coincide with the core areas within this case overseen by Justice Trotter and other JAMS neutrals. **Now, given this new evidence, we must broaden the discovery to ensure that the "*multifaceted victimization of injured people*" referred to by Chief Justice Tani Cantil-Sakauye regarding the influences of JAMS has not undermined the well-intentioned efforts of this Court to ensure fair and just outcomes.**[1] The Court need not rely upon the next external investigation and subsequent reporting to produce the type of transparency and

---

[1] See LA Times, "Shocking' Tom Girardi scandal shows need for legal reforms, California Chief Justice says, August 9, 2022, https://www.latimes.com/california/story/2022-08-09/chief-justice-calls-for-new-regulation-of-private-judging-in-light-of-girardi-scandal

accountability that victims deserve. The rights and remedies to expose potential "bad-faith acts and conduct" within this case are available to the court pursuant to Bankruptcy Rule 2004 and through the "inherent powers" and "exclusive jurisdiction" referenced in prior Court orders.

Despite the nondisclosure terms, "confidentiality protocols" [Dkt. 3405, 7670] and other provisions designed to keep sunlight away from the negotiated settlements overseen by JAMS, victims must be afforded the rights and remedies to reasonably ascertain the degree to which their stock-infused settlement, the Fire Victim Trust Agreement and the Fire Victim Claims Resolution Procedures (the "**CRP**") may have been undermined by undisclosed financial agreements between parties through the active facilitation or passive accommodation of JAMS "neutrals". Abrams requests that the Court enter an order (*see* **Exhibit A** (proposed order)) authorizing service of the additional discovery requests in the form attached hereto as **Exhibit B** on the Current Trustee, Former Trustee and other JAMS neutrals. In support of this Motion, Abrams relies on the *Declaration of William B. Abrams in Support of the Motion of William B. Abrams Pursuant to Federal Rule of Bankruptcy Procedure 2004 for Entry of an Order Authorizing Discovery and Hearings regarding the Acts and Conduct of JAMS Neutrals given new evidence* (the "**Abrams Declaration**") filed contemporaneously herewith, and respectfully states as follows:

## JURISDICTION

This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, the Order Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges, General Order 24 (N.D. Cal.), Rule 2004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), Rule 2004-1(a) of the Bankruptcy Local Rules for the United States District Court for the Northern District of California (the "**Bankruptcy Local Rules**"), Paragraph 18 and Paragraph 78 of the Confirmation Order, Section 6.7 and Section 11.1 of the Plan, and Section 1.6 and Section 8.20 of the Fire Victim Trust Agreement. Under Section 11.1(u) of the Plan, the Court retained jurisdiction "[t]o hear and determine disputes arising in connection with or related to the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, any transactions or payments contemplated herein, or any agreement, instrument, or other document governing or relating to any of the foregoing," "[t]o take any action and issue such orders as may be necessary to construe, enforce, implement, execute, and consummate the Plan or to maintain the integrity of the Plan following consummation," "[t]o

hear and determine any rights, claims, or Causes of Action held by or accruing to ... the Fire Victim Trust **pursuant to the Bankruptcy Code or any federal or state statute or legal theory**," and "[t]o hear and determine any dispute involving the Wildfire Trusts, including but not limited to the interpretation of the Wildfire Trust Agreements." Plan at § 11.1(i), (k), (t) & (u).[2]

Section 1.6 of the Fire Victim Trust Agreement provides that the "Bankruptcy Court shall have **exclusive jurisdiction** with respect to any action relating to or arising out of the [Fire Victim] Trust." Section 8.20 of the Fire Victim Trust Agreement provides that the "provisions of the Trust Documents shall be enforced by the [Bankruptcy Court]." This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409. (emphasis added)

## **BACKGROUND**

1. On January 29, 2019 (the "**Petition Date**"), PG&E Corporation ("**PG&E Corp.**") and Pacific Gas and Electric Company ("**Utility**"), as debtors and debtors in possession (collectively, "**PG&E**" or the "**Debtors**"), commenced with the Court voluntary cases under chapter 11 of the Bankruptcy Code (the "**Chapter 11 Cases**"). On February 12, 2019, the United States Trustee appointed the Official Committee of Unsecured Creditors (the "**Creditors Committee**"). On February 15, 2019, the United States Trustee appointed an Official Committee of Tort Claimants (the "**TCC**"). Pursuant to the Confirmation Order entered by this Court on June 20, 2020, PG&E's Plan was approved and confirmed under section 1129 of the Bankruptcy Code.

---

[2] Under Section 11.1 of the Plan, the Court also retained "jurisdiction ... of all matters arising under, arising out of, or related to the Chapter 11 Cases and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes: ... (c) [t]o ensure that distributions to holders of Allowed Claims are accomplished as provided herein; (d) [t]o consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim, including any Administrative Expense Claims; ... (m) [t]o determine such other matters and for such other purposes as may be provided in the Confirmation Order; ... (p) [t]o hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code; ... (r) [t]o determine any other matters or adjudicate any disputes that may arise in connection with or are related to the Plan, the Disclosure Statement, the Confirmation Order, the Plan Supplement, or any document related to the foregoing ... (v) [t]o hear any other matter not inconsistent with the Bankruptcy Code."

2.      On July 1, 2020 the PG&E Fire Victim Trust Agreement was effective and implements certain of the terms of the Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization Dated June 19, 2020.  The FVT Agreement Section 5.8(b) states *"The Trustee may retain and **reasonably compensate** the Trust Professionals, the cost of which shall be paid as a Trust Expense, subject to the terms of this Trust Agreement, including the Budget.*  The Fire Victim Trust Agreement Section 6.2 states *"The members of the TOC shall serve in a fiduciary capacity representing current holders of Fire Victim Claims in the administration of the Trust. **The TOC shall not have any fiduciary duties or responsibilities to any party other than holders of Fire Victim Claims**, provided that the TOC shall be entitled to the protections and limitations of duties provided for herein even with respect to the holders of Fire Victim Claims."*  Subsequently, on June 29, 2020 Attorneys for the Trustee and the Trust Claims Administrator filed the *"Notice of Appointment of Fire Victim Trust Oversight Committee in Accordance with Confirmation Order [Dkt. No. 8053] Filed by Fire Victim Trustee"* [Dkt. 8195]. (emphasis added)

3.      On April 14, 2020, Cathy Yanni, JAMS Neutral was appointed as the Claims Administrator through the *"ORDER GRANTING APPLICATION OF THE OFFICIAL COMMITTEE OF TORT CLAIMANTS PURSUANT TO 11 U.S.C. §§ 1103 AND 363 AND FED. R. BANKR. P. 2014 AND 5002 TO RETAIN AND EMPLOY CATHY YANNI AS CLAIMS ADMINISTRATOR NUNC PRO TUNC TO JANUARY 13, 2020"*.  This order stated in part that "This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this Order.  For the avoidance of doubt, during the pendency of these Cases, the Court shall have exclusive jurisdiction over the retention of Ms. Yanni and any other person or entity retained by Ms. Yanni as authorized herein in connection with this retention and Order.

4.      Viggo Boserup, Owner, JAMS Chairman of the Board was appointed as the Appeals Coordinator for the Fire Victim Trust.  Mr. Boserup along with other JAMS appointed panel of "neutrals" were selected by Justice Trotter to oversee the appeals process for victims except for 3 victims that were provided judicial review through the July 1, 2020 *"Order on the Joint Statement of the TCC, Trustee, Debra Grassgreen and Karl Knight, and Eric and Julie Carlson, Joined, In Part, By Mary Wallace, Regarding Unresolved Objections to the Fire Victim Claims Resolution Procedures"* [Dkt. 8235].

5.  On December 3, 2020, Ellen Sickle James, JAMS Neutral was appointed as the Special Master of the Fire Victim Trust through the "*Order for Appointment of a Special Master Pursuant to Fed. R. Civ. Proc. 53*" [Dkt. 9721]. This order stated that "*The Special Master shall have the authority to take appropriate measures in compliance with the terms of the Plan, Confirmation Order, Trust Documents and applicable law **to perform her/his duties fairly and efficiently**, to regulate all proceedings before her and to issue orders necessary to discharge the duties and responsibilities conferred on her. See Fed. R. Civ. P. 53(c)(1)*." (emphasis added)

6.  On May 23, 2022, I filed and served the "*Motion of William B. Abrams Pursuant to Federal Rules of Bankruptcy Procedure 2004 for Entry of an Order Authorizing Discovery and Hearings Regarding the Administration of The Fire Victim Trust*" [Dkt. 12440] (the "**Motion for Trust Discovery**"). This motion requested the Court's approval for discovery procedures (hearings and interrogatories) for victims given certain actions and conduct of Justice Trotter in his capacity as Trustee as well as the actions and conduct of his designees. This call for transparency and accountability was joined by the Butte County Board of Supervisors [Dkt. 12609], the Sonoma County Board of Supervisors [Dkt. 12670] and other PG&E wildfire survivors.

7.  On June 7, 2022, there was a prehearing in which the merits of the case were not argued and that point was reiterated by Mr. Molton stating "*Clearly, and I read your honor's order and your honor's directive this morning that your honor does not want us getting into merits or discussion of merits today.*" However, it was also stated by the Court that "*I don't want to mislead you, I'm not going to rule out that perhaps the possibility that the trustee is going to have to sit and be asked questions by Mr. Abrams.*" [Dkt. 12495].

8.  On June 21, 2022, the Trustee filed the "*OBJECTION OF FIRE VICTIM TRUSTEE TO MOTION OF WILLIAM B. ABRAMS PURSUANT TO FED. R. BANKR. 2004 FOR ENTRY OF AN ORDER AUTHORIZING DISCOVERY AND HEARINGS REGARDING THE ADMINISTRATION OF THE FIRE VICTIM TRUST*" [Dkt. 12527]. Within this objection, the Trustee cited Delaware Trust Law as well as exculpations and other protections negotiated prior to plan confirmation as justification for why the Trustee should not have to provide discovery pursuant to Bankruptcy Rule 2004. In closing the Objection stated "*The Fire Victim Trustee respectfully requests that the Court sustain this Objection, deny the Motion in its entirety and grant such other and further relief as may be just.*" Additionally, within this Objection the Trustee announced the "***imminent retirement of***

*Justice John J. Trotter (Ret.) and the transition to Ms. Cathy Yanni as Trustee in accordance with the succession provisions of the Trust Agreement.*" (emphasis added)

9.      On July 6, 2022, I filed in accordance with the Court's order the *"William B. Abrams Reply to the Objection of the Fire Victim Trustee Pursuant to Fed. R. Bankr. 2004 for Entry of an Order Authorizing Discovery and Hearings Regarding the Administration of the Fire Victim Trust"* [Dkt. 12593]. Within this Reply I stated that "*these "additional disclosures" don't seem to be intended by the Trustee to address the issues raised within the Motion for Trust Discovery. However, this information does lead to more questions and not less that are deserving of discovery pursuant to Bankruptcy Rule 2004"* and concluded that "*it is clear that these fact patterns and the manner in which the Trustee provided notice of his resignation provide more than sufficient "good cause" to seek discovery to ascertain the degree to which the Trustee and others employed by the Fire Victim Trust have engaged in reasonable "conduct" and "good faith" acts in keeping with both the Fire Victim Trust Agreement and applicable law."*

10.     On August 2, 2022, the Court issued the "*Order on Motion of William B. Abrams Authorizing Discovery Regarding Administration of the Fire Victim Trust*" (the "**Discovery Order**") [Dkt. 12682]. Within this order, the Court exercised and reiterated its authority related to Article 1.6 of the Trust agreement stating that "*this Court shall have exclusive jurisdiction with respect to any action relating to or arising out of the Trust...*" The order continued by stating that "*What is preserved for examination pursuant to this order are the following three discrete areas identified by Mr. Abrams as the trust oversight and litigation activities; lobbyist activities; and administration and litigation expenses.*" Also, within this order the Court made clear that "***More specifically, Federal Rule of Bankruptcy Procedure 2004 remains available as a vehicle for that exchange of information.***" (emphasis added)

Based upon this Court order indicating that "*Federal Rule of Bankruptcy Procedure 2004 remains available as a vehicle for that exchange of information*" and in light of new evidence related to the "acts and conduct" of Justice Trotter and other JAMS neutrals, I respectfully put forward the following arguments in support of this discovery motion:

# ARGUMENT

## I. Good Cause to Broaden Discovery: JAMS and Role of Justice Trotter, Trustee (former)

The recent reporting within the LA Times was called "shocking" by Chief Justice Tani Cantil-Sakauye and should similarly set off alarm bells for this Court to consider relative to the role of Justice Trotter and other JAMS "neutrals" that have been placed in almost every key role that dictated the negotiation process and terms of the $13.5B settlement as well as the subsequent structure and disposition of the Settlement Agreement, Trust Agreement and related claims resolution procedures.[3] It is inarguable that the appointment of these neutrals has been secured at the request of those parties (Debtor, Shareholders, Bondholders, TCC and certain Fire Claimant Professionals) that have the most to financially gain from the disposition and treatment of victim claims within this case. The following excerpts from this LA Times reporting should be considered a call-to-action for the Court to provide broad discovery pursuant to Bankruptcy Rule 2004:

> "Yet in the years that followed, Girardi diverted money Trotter was hired to safeguard for purposes that were highly questionable and even, in the recent assessment of one federal judge, "a crime..." Retired judges, including Trotter, played prominent roles in administering large settlements from which Girardi is accused of stealing money. **Several worked for Irvine-based JAMS...** In some instances examined by The Times, it is not clear that the retired judges knew Girardi was **using them as a shield to fend off scrutiny**, such as a 2018 letter in which he blamed delays in paying clients on Trotter's heart problems. But in others, **there is evidence the retired judges were aware of misconduct allegations and assisted him anyway...** Trotter at the time was handling one of Girardi's cases: an approximately $66-million settlement with the maker of the diabetes drug Rezulin. The terms were confidential, but Trotter's role had been spelled out in a 2005 court order appointing him "special referee" for the settlement... "It doesn't make any sense," said forensic accountant Steve Franklin, who had examined records in the cancer survivors' litigation. **"They are treating it like a slush fund..." "How did this go for so long without being discovered?"** asked UC Irvine Law School professor Carrie Menkel-Meadow, who has worked as a mediator and written extensively on ethics and mass tort settlements... It is unclear what Trotter's physical condition was at the time or whether he knew of Girardi's letters to clients. **Within months, Trotter had a new job with enormous responsibility: serving as the trustee of the multibillion-dollar trust for Northern California wildfire victims.** " (emphasis added)

Respectfully, I would ask the Court to consider this question asked by Professor Menkel-Meadow ("how did this go for so long without being discovered?") as central to consider in the context of this

---

[3] See Los Angeles Times, "Tom Girardi's Epic Corruption exposes the secretive world of private judges", August 4, 2022, https://www.latimes.com/california/story/2022-08-04/tom-girardi-erika-corruption-private-judges#:~:text=Tom%20Girardi's%20epic%20corruption%20exposes,corner%20of%20the%20legal%20world

motion. Unfortunately, The Trust Agreement, whether intentionally or not, seems structured to conceal bad-faith actions and to protect those that devised the agreement through broad exculpations and other indemnifications. This leaves Bankruptcy Rule 2004 as the least intrusive remedy available to victim claimants and other parties to ascertain whether similar injustices as were found within this LA Times reporting are being fomented behind closed doors within this case and under the direction and/or facilitation of these JAMS neutrals. All other remedies to identify and correct bad-faith acts and conduct would jeopardize the plan and other aspects of the case which is not the intent of this motion.

**That said, I want to make it clear to the Court that I am not alleging a crime has been committed within this case or that the prior actions and conduct of Justice Trotter constitute a crime.** Those issues are not for me or this Court to consider. **However, the legal basis for Bankruptcy Rule 2004 is not "beyond a reasonable doubt" but simply "good cause" for discovery.** Indeed, the purpose of seeking remedies pursuant to Bankruptcy Rule 2004 are often to avoid protracted litigation that could further jeopardize the confirmed plan itself. It is inarguable that the factual basis described within the LA Times reporting related to prior conduct and acts of Justice Trotter and other JAMS neutrals provides more than sufficient "good cause" to seek broader discovery than previously identified within the August 2, 2022 Discovery Order. Furthermore, the Court should consider the fact that the timing of Justice Trotter's resignation announcement coincided with the timing of the LA Times investigations and was only days after the Court stated in the prehearing that *"I'm not going to rule out that perhaps the possibility that the trustee is going to have to sit and be asked questions by Mr. Abrams."* Given this statement by the Court, it is important to note that Justice Trotter indicated that he noticed the Trust Oversight Committee regarding his resignation in March, 2022 but never informed victims or announced to the public these leadership changes until responding to the subsequent Discovery Motion in July, 2022 when the LA Times reporting was imminent. Therefore, it is reasonable for the Court to consider whether Justice Trotter's public resignation announcement may have been precipitated by a concern that broader discovery hearings might shed light on "acts" and "conduct" within this case that were similar in nature to those outlined within the LA Times reporting.

## II. Good Cause to Broaden Discovery: Cathy Yanni, JAMS Neutral and Current Trustee

The evidence outlined and the implications described within the LA Times reporting provide more than sufficient "good cause" for broad discovery pursuant to Bankruptcy Rule 2004. However, there is more evidence as well as a pattern of mismanagement and related influence of JAMS neutrals which should prompt supplemental discovery within this case. The Court should consider the Ethicon, Inc. Pelvic Repair System Products Liability Litigation (the "**Pelvic Mesh Litigation**") where Cathy Yanni was Special Master and Skikos, Crawford, Skikos & Joseph were lead Plaintiffs' Counsel.[4] Within this case it was found that "*The lawyers asked the MDL judge to appoint over 40 private entities to help them: special masters, claim administrators, escrow agents, external review specialists, and lien-resolution groups. But costs were rarely disclosed. Of all the appointments, only one special master's fee was sporadically divulged, and it varied, which meant that some mesh plaintiffs had to pay more for the same person to perform the same service than others... To "appeal" whatever amount Cathy Yanni first awarded, a plaintiff always had to pay $2,000, but her initial review in one settlement cost $300 per claim plus $10,000 per calendar quarter, in another she charged $350 per claim, and in yet a third, claim review cost a flat $300.*" Another party to this case Stephen A. Sheller, stated that "*it must be readily evident to any reasonable fact-finder that the FCC's Petition is nothing more than a "smoking gun" admission by its authors and by its supporting proponents, that the FCC has been, unfortunately, hijacked by a small band of profiteers, outrageously demanding unsupervised use of the Common Benefit Fund as their personal ATM.*"[5]

Indeed, one of the participants reflected on the manner in which the funds were managed and overseen by Ms. Yanni and stated "*The system is bought and sold, victims are revictimized, it's a shame on all those puppets who profit from these harmed ladies.*"[6] This negligent manner and pattern where "costs were rarely disclosed" but Ms. Yanni's charges were disparate, inconsistent and/or arbitrary should be of concern to the Court in this case necessitating broader discovery pursuant to Bankruptcy Rule 2004. This Pelvic Mesh Litigation recently ended with a group of

---

[4] See IN RE: Ethicon, Inc. Pelvic Repair System Products Liability Litigation (MDL No. 2327, Pretrial Order No. 349 (ORDER APPOINTING CATHY YANNI AS SETTLEMENT MASTER FOR PRIVATE SETTLEMENT AGREEMENTS BETWEEN ETHICON AND CERTAIN PLAINTIFFS' COUNSEL) and Pretrial Order 253), https://www.wvsd.uscourts.gov/mdl/ethicon/index.html
[5] See Case 2:12-md-02327, Document 7483, Filed 01/18/19, https://images.law.com/contrib/content/uploads/documents/292/39410/Mesh-Sheller-opposition.pdf
[6] See "Perceptions of Justice in Multi-Jurisdictional Litigation", Elizabeth Chamblee Birch and Margaret S. Williams, August 6, 2022, pg. 55, https://fingfx.thomsonreuters.com/gfx/legaldocs/lgpdwmymevo/SSRN-id3900527%20(1).pdf

women who received approximately $8B in settlements filing suit against their attorneys for improperly enriching themselves with excessive fees.[7] It is exactly this type of litigation that we should look to avoid in this case through a fulsome discovery process pursuant to Bankruptcy Rule 2004. As the Court is aware, Ms. Yanni, JAMS neutral assumed the role of Trustee when Justice Trotter unceremoniously resigned and Mr. Steven Skikos, currently serves as a Trust Oversight Committee Member. Important and relative to this motion, Mr. Skikos nor any other Trust Oversight Committee member, Tort Claimant Committee member attorney or Fire Claimant Professional has disclosed any business, professional or personal relationships with Ms. Yanni, Justice Trotter or any other JAMS Neutral that may have led to biased acts and/or conduct within this case among those that were appointed as "neutrals."

**III. Good Cause for Broader Discovery: JAMS "neutrals" hired for pivotal roles**

Clearly, the Court and PG&E victims have good reason to be concerned and have more than enough "good cause" to engage in broad discovery pursuant to Bankruptcy Rule 2004. Even with the most generous interpretation of the aforementioned acts and conduct, the former and current Trustees have at a minimum engaged in a troubling pattern of negligent oversight of victim claims cloaked in undisclosed terms and a general lack of transparency. Moreover, the broad use of JAMS contracts within the Girardi case, Pelvic Mesh Litigation and other cases demonstrates that there is likely a pattern of JAMS "neutrals" being leveraged by certain parties (1) to hide unjust treatment of victims and/or (2) to unfairly manipulate financial benefit structures to disadvantage victims and/or (3) to circumvent justice, fairness and the equitable application of the law to advance the financial interests of a few well-connected and influential parties. The California State Bar Association in response to the Girardi and JAMS scandal stated that "*there does not appear to be an overarching regulatory framework for private judging or mediation.*"[8] Given this lack of "regulatory framework," victims must rely upon this Court to ensure greater transparency and discovery pursuant to Bankruptcy Rule 2004.

---

[7] See New York Times, Women Who Sued Makers of Pelvic Mesh are Suing Their Own Lawyers Too", June 14, 2019, https://www.nytimes.com/2019/06/14/business/pelvic-mesh-surgery-litigation.html

[8] See LA Times, "Shocking' Tom Girardi scandal shows need for legal reforms, California Chief Justice says, August 9, 2022, https://www.latimes.com/california/story/2022-08-09/chief-justice-calls-for-new-regulation-of-private-judging-in-light-of-girardi-scandal

Moreover, the Court should keep in mind that Justice Trotter is not just one of the many JAMS neutrals but is one of the founding members of JAMS, Inc. and provided much of the direction and management of that organization. Also, Justice Trotter's role within this case did not start when he became Trustee as he was employed and had a significant role in driving the plan well before confirmation. Consider the following statement made by Justice Trotter through his presentation to victims in May, 2021 [Dkt. 10654]:

> "*in April -- I think it was April -- we struck a deal with PG&E that they would pay tranches of money that would be used to pay claims processing, and in April I was still part-time, I was an advisor, I was learning more about it, I was helping your lawyers write the rules by which the Trust would be governed, the claims resolution processes.*"[9]

Here we see that Justice Trotter was not some neutral arbitrator but one of the primary drivers that "struck a deal with PG&E" and had a leading role in "the rules by which the Trust would be governed" and the "claims resolution processes." Given this substantial role within the case and his leadership role within JAMS, it would certainly not be sufficient to limit discovery just to his role as Trustee. By his own words, Justice Trotter is one of the individuals who "struck a deal" with PG&E and shaped the financial terms which are now undermining victims "made whole" settlement.

Inarguably, JAMS has been leveraged by parties representing the interests of victims to hide the most consequential aspects of this case beyond the view of the Court and PG&E victims. Here are just a few of the significant roles held by JAMS neutrals within this case:

- **Hon. Randall Newsome (Ret.), JAMS Mediator** – Judge Newsome's responsibilities included overseeing mediation and negotiations of the Fire Victim settlement and the appointment of Mikal Watts and three other chief negotiators that turned away from an all-cash offer for victims to a stock-infused settlement that protects certain institutional utility investors.[10] This was all negotiated based upon the Mediation Confidentiality Protocol (the "**Protocol**") [Dkt. 7670] to ensure victims would have little insight before they were required to vote on the plan. Even the unresolved status of the registration rights agreement (stock rules) was intentionally kept away from victims so the stock risks that represented 50% of

---

[9] See "*NOTICE OF FILING OF TRANSCRIPT OF STATUS OF TRUST DISTRIBUTION VIDEO PRESENTATION BY JUSTICE JOHN TROTTER (RET.), TRUSTEE OF THE PG&E FIRE VICTIM TRUST*", May 17, 2021 [Dkt. 10654]

[10] See "Trial: A Guide from Start to Finish", Section "About the Authors", Mikal Watts and Sawnie A. McEntire, American Bar Association, May 7, 2021

their settlement was unknowable to inform the victim vote. These JAMS led negotiations also led to the dismissal of the PG&E Tubbs Fire civil case for an undisclosed settlement amount to benefit a handful of attorneys and their clients.

- **Hon. Jay Gandhi (Ret.), JAMS Mediator** – Judge Gandhi's role included the negotiated $1B Settlement of the North Bay Fires among 14 public entities with various claims from the 2015 Butte Fire, the 2017 North Bay Fires and the 2018 Camp Fire. The settlement agreement remains undisclosed.

- **Viggo Bosserup Esq., JAMS Chairman of the Board** – Mr. Bosserup was selected as the "Appeals Coordinator" for the Fire Victim Trust. All victims wishing to appeal their settlement determinations are subject to Mr. Bosserup's oversight and other JAMS "neutrals" and prevented from seeking judicial review even if their settlements are perceived as unjust or unfair. This is true for all ~70,000 victims except for the three victims that were afforded judicial review [Dkt. 8235].

- **Hon. Ellen Sickles James (Ret.), JAMS Neutral** – Judge James was selected as the "Special Master" to oversee all claims related to minors and persons with disabilities.

- **Other JAMS Mediators** – JAMS has been leveraged throughout the case including but not limited to **each and every mediator forming the "Panel of Mediators for Standard Mediations"** as follows:
    - o  **Hon. Wynne S. Carvill (Ret.)**
    - o  **Hon. Catherine A. Gallagher (Ret.)**
    - o  **Patricia K. Gillette, Esq.**
    - o  **Hon. Ken M. Kawaichi (Ret.)**
    - o  **Hon. Risë Jones Pichon (Ret.)**

The extensive use of JAMS Inc. "neutrals" within this case should provide the Court and victims with considerable concern given the role of Justice Trotter and Cathy Yanni within this case. The hiring process and contractual terms related to these JAMS neutrals should be provided through this discovery process pursuant to Bankruptcy Rule 2004. In particular, the role of Justice Trotter, Mr. Bosserup and Ms. Yanni in the selection process and negotiated contracts of these neutrals should be understood.

Moreover, it will be important for the Court to consider that Justice Trotter and other JAMS Neutrals seem to have blurred the lines between when they were "neutral" and when they were an "advisor" representing the interests of victims and/or other parties within this case. As an example, it is very unclear (1) when Justice Trotter was acting within his "advisor" capacity and/or (2) when he was acting as a neutral and/or (3) when he was representing the interests of victims and/or (4) when he was representing a particular party or parties within this case. In May of 2021, Justice Trotter stated that *"we struck a deal with PG&E"* and *"I was an advisor... I was helping **your lawyers** write the rules by which the Trust would be governed, the claims resolution processes."*[11] It is very unclear when or if that "advisor" engagement ended and at which point he became a "neutral" or a Trustee. It is also unclear given that his audience for this video was all ~70,000 victims who he was referring to when he stated "your lawyers." Given the different disclosure requirements of attorneys representing victim clients as a fiduciary, this timing is particularly important for the Court to consider. To whatever extent the video put forward by Justice Trotter was meant to explain who he represents pursuant to American Bar Association ("**ABA**") Rule 2.5.3(b), it was completely insufficient for victims to understand when and how he represented their interests or other interests within this case.

Consider the fact that Justice Trotter appears to have been designing contractual terms for his own benefit and the benefit of JAMS Inc. shareholders while he was representing victims and their attorneys. This raises significant questions and concerns regarding his role and the apparent biased representation. On the one hand, as a JAMS shareholder and future Trustee, he is trying to gain the most protections for himself and his corporation while increasing profitability for himself and JAMS Inc. On the other hand, as an "advisor" for victim attorneys, he should be working to design a Trust Agreement and Claims Resolution Procedures that protects victims and furthers the financial interests of victims. What is absolutely clear from even a cursory read of the Trust Agreement and Claims Resolution Procedures is that Justice Trotter while engaged as an "advisor" successfully obtained very broad exculpations, indemnifications and other protections for himself as "Trustee" and for other JAMS Inc. officers and employees while stripping away similar protections for victims. As an example, consider section 5.4(a) of the PG&E Fire Victim Trust Agreement which states:

---

[11] See *"NOTICE OF FILING OF TRANSCRIPT OF STATUS OF TRUST DISTRIBUTION VIDEO PRESENTATION BY JUSTICE JOHN TROTTER (RET.), TRUSTEE OF THE PG&E FIRE VICTIM TRUST"*, May 17, 2021 [Dkt. 10654]

**FVT Agreement Section 5.4(a)** – "*None of the Trustee, Delaware Trustee, TOC, Claims Administrator, Special Master or their respective members, officers, employees, agents, consultants, lawyers, advisors, or professionals (collectively, the "**Trust Indemnified Parties**" with each being a "**Trust Indemnified Party**") shall be liable for any damages arising out of the creation, operation, administration, enforcement, or termination of the Trust, except in the case of such Trust Indemnified Party's willful misconduct, bad faith or fraud as established by a Final Order.*"

Now, compare these protections to those stripped away from victims as beneficiaries of the Trust:

**FVT Agreement Section 5.4(c)** – "*To the extent that, at law or in equity, the Trust Indemnified Parties have duties (including fiduciary duties) or liability related thereto, to the Trust or the Beneficiaries, it is hereby understood an agreed by the parties hereto and the Beneficiaries **that such duties and liabilities are eliminated to the fullest extent permitted by applicable law**" (emphasis added)

**The Court should consider that the purpose within this motion of pointing out these terms within the Fire Victim Trust Agreement is not to vacate or otherwise amend the agreement.** This illustration is done solely to point out that when Justice Trotter and potentially other JAMS Neutrals were in the role of "advisor" for victims and victim attorneys they devised terms that benefited JAMS Inc. shareholders and employees and undermined or "eliminated" protections for the PG&E victims they were later charged to protect. Given the prior acts and conduct of JAMS Neutrals and other evidence described within this motion, the undisclosed relationships and incentives that drove these imbalances must now be included within discovery requests pursuant to Bankruptcy Rule 2004.

Moreover, the extent to which other JAMS neutrals and JAMS shareholders have past financial or business relationships with members of the Trust Oversight Committee (the "**TOC**"), Tort Claimant Committee (the "**TCC**"), Fire Claimant Professionals, PG&E investors and many other parties that have significant financial interests within this case has not been disclosed. Nevertheless, it is clear that these relationships are substantial and Justice Trotter's statement to victims that "*I didn't know all of them* [victim attorneys] *but I knew some of them*" certainly is insufficient disclosure to ascertain the degree to which certain parties may have been collaborating with JAMS Neutrals to advance their collective financial interests at the expense of PG&E Fire Victims.[12] That said, it is absolutely clear that JAMS Inc. shareholders such as Justice Trotter, Mr.

---

[12] See "*NOTICE OF FILING OF TRANSCRIPT OF STATUS OF TRUST DISTRIBUTION VIDEO PRESENTATION BY JUSTICE JOHN TROTTER (RET.), TRUSTEE OF THE PG&E FIRE VICTIM TRUST*", May 17, 2021 [Dkt. 10654]

Bosserup and other "neutrals" have a significant financial stake in the outcome of mediation assignments beyond their undisclosed contractual obligations. As a private corporation, JAMS Inc. benefits financially from every neutral assigned to this case in terms of the volume of business and ensuring that certain parties are satisfied and will provide repeat business.

Indeed, JAMS shareholders like Justice Trotter and Mr. Bosserup have a substantially imbalanced incentive structure and may therefore hold significant biases to ensure that certain attorneys within this case are awarded more generous settlements as compared to other attorneys who are less likely to drive repeat business to JAMS. Despite this imbalanced incentive structure, it is absolutely clear that throughout the Trust Agreement, Claims Resolution Procedures and other claims related documents, that there are significant indemnifications, exculpations and other provisions that would allow and even encourage the disposal of "equitable powers" to provide uneven and unfair claims determinations in favor of clients represented by attorneys in a position to provide repeat business for JAMS Inc. **The impact of these financial relationships was not foreseeable by the Court prior to the LA Times reporting. However, now that these issues are known, I respectfully request that the Court order additional discovery to understand the extent to which these neutrals drove or influenced decisions that may have financially benefited certain attorneys, institutional utility investors and JAMS shareholders to the detriment of victims. Certainly, the matters described within this motion provide more than sufficient "good cause" for discovery and disclosures pursuant to Bankruptcy Rule 2004.**

## RELIEF REQUESTED

By this Motion, Abrams requests entry of an order, pursuant to Bankruptcy Rule 2004:

1. authorizing Abrams and other PG&E victims with claims to serve discovery in the form attached hereto as **Exhibit B** on JAMS Inc. neutrals associated with this case (the "**Requests**") and ensure that these requests are posted to the Fire Victim Trust portal for review by PG&E victims holding claims;

2. authorizing JAMS neutrals or their designee(s) to respond to victim discovery requests within ten (10) days of receipt of the Requests and, the JAMS neutrals shall be directed to

either (i) produce, on a rolling basis, all non-privileged documents and written responses to the Requests, or (ii) file all objections and/or responses to the Requests with this Court.

3. authorizing Abrams and other PG&E victims with claims to hold a hearing on Tuesday September 27, 2022 via zoom so that victims may ask questions and get answers from the Current Trustee, Former Trustee and other JAMS neutrals regarding their selection/hiring process, contractual terms and associated financial incentives.

The form and function of the relief requested including **Exhibit B** information requests, definitions and instructions mirror and are of like manner and wording as those within the "*Motion of the Fire Victim Trustee Pursuant to Federal Rule of Bankruptcy Procedure 2004 for Entry of an Order Authorizing Discovery From Adventist Health System/West and Adventist Health Feather River and Service of a Subpoena on Factory Mutual Insurance Company*" [Dkt. 11556] filed by Brown Rudnick, LLP on behalf of the Fire Victim Trustee. **This was done with an abundance of caution to ensure consistency with similar requests submitted to this Court and to ensure I was following the proper procedure given the prior instructions of the Court for Pro Se claimants.**

## BASIS FOR RELIEF REQUESTED

Bankruptcy Rule 2004(a) states that on "***motion of any party*** *in interest, the court may order the examination of any entity.*" Fed. R. Bankr. P. 2004(a). The scope of an examination sought under Rule 2004(b) may relate to "***the acts, conduct***, or property or to the liabilities and financial condition of the debtor, or to **any matter which may affect the administration of the debtor's estate**, or to the debtor's right to a discharge." Fed. R. Bankr. P. 2004(b) (emphasis added).

The granting of a motion under Rule 2004 is within the "ultimate discretion" of the Court. *In re Art & Architecture Books of 21st Century*, No. 2:13-BK-14135, 2019 WL 9243053, at *6 (Bankr. C.D. Cal. Dec. 6, 2019) (quoting *In re Int'l Fibercom, Inc.*, 283 B.R. 290, 292-93 (Bankr. D. Ariz. 2002)). **Bankruptcy Rule 2004 allows considerable leeway for all manner of so-called "fishing expedition[s]" if there is a reasonable nexus to the debtor and the administration of the debtor's case.** *In re Mastro*, 585 B.R. 587, 597 (B.A.P. 9th Cir. 2018) (quoting *In re Subpoena*

*Duces Tecum*, 461 B.R. 823, 829 (Bankr. C.D. Cal. 2011)). Any third party who has a relationship with the debtor may be made subject to a Rule 2004 investigation. *Mastro*, 585 B.R. at 597 (citing *In re Fin. Corp. of Am.*, 119 B.R. 728, 733 (Bankr. C.D. Cal. 1990)) (emphasis added).

Here, Abrams seeks discovery from JAMS neutrals to obtain complete disclosures of the contractual relationships and associated financial incentives of JAMS neutrals that may have undermined the value of the Fire Victim Trust and associated victim settlement determinations. Abrams seeks this discovery to ensure transparency and accountability of the JAMS neutrals relative to their engagement as mediators, arbitrators, trustees, special masters, appeals coordinators and other roles influencing, directing or overseeing the financial settlement terms for victims. This includes but is not limited to the role JAMS may have played (1) to drive away from a cash offer to a half stock settlement and (2) to vacate the Tubbs Fire civil case for an undisclosed settlement amount and (3) to structure and subsequently manage the Fire Victim Trust to unfairly advantage PG&E utility investors and those attorneys that may hold undisclosed financial conflicts. This will also provide PG&E Victims with the information necessary to evaluate the degree to which the Trustee(s) and other assigned Trust employed neutrals may have acted reasonably with respect to their court approved settlement funds.

Furthermore, Abrams relies upon the August 2, 2022 Court *"Order on Motion of William B. Abrams Authorizing Discovery Regarding Administration of the Fire Victim Trust"* (the **"Discovery Order"**) [Dkt. 12682]. Within this order, the Court exercised and reiterated its authority related to Article 1.6 of the Trust agreement stating that *"this Court shall have exclusive jurisdiction with respect to any action relating to or arising out of the Trust..."* The order concluded by stating that *"More specifically, Federal Rule of Bankruptcy Procedure 2004 remains available as a vehicle for that exchange of information."* (emphasis added)

///

## CONCLUSION

The LA Times reporting and subsequent statements from Chief Justice Tani Cantil-Sakauye, The State Bar of California, State Senator Tom Umber should be seen as a call-to-action for this Court and very supportive of the type of discovery sought through this motion related to the role of Justice Trotter and JAMS neutrals within this consequential case.[13] The inconvenient timing associated with this information coming out only hours after the prior Discovery Order should not dissuade the Court from taking further actions pursuant to Bankruptcy Rule 2004 given that the prior order thoughtfully stated that the "Federal rule... remains available." Certainly, I understand that as a pro se claimant without the benefit of a law degree, I am less than an ideal author and messenger for this motion. The Court has made this point clear on several occasions and other parties have layered on personal threats to further dissuade me from engaging within this case. However, when attorneys on core committees and other legal and financial experts within this case are bound by sweeping and liberally applied confidentiality protocols and nondisclosure terms even after TCC members resign on "moral grounds", this leaves victims like me with little recourse to seek justice and fair outcomes.

I urge and plead with the Court to not let certain well-monied and influential parties within this case push justice aside to make way for short-term financial gains on the backs of victims. When "neutral" mediators, trustees, claims administrators, appeals coordinators, special masters, appeal panel members and others are all pulled from the same corporation by the same attorneys, the potential for corruption is undoubtedly heightened. Of course, when some of these "neutrals" are also shareholders within that corporation and are able to hide the terms of their agreements from public view, the potential for widespread bad-faith "acts" and "conduct" may overwhelm even the most diligent court processes and legislated safeguards. However, the Court need not rely upon this logic given the evidence presented within the recent LA Times reporting along with the related "acts and conduct" I have outlined within this motion.

The legal basis for the relief requested within this Motion has been asserted by the Trustee and affirmed within the *Order on Motion of William B. Abrams Authorizing Discovery Regarding Administration of the Fire Victim Trust*" [Dkt. 12682]. Prior orders from the Court have made it clear

---

[13] See LA Times, "Shocking' Tom Girardi scandal shows need for legal reforms, California Chief Justice says, August 9, 2022, https://www.latimes.com/california/story/2022-08-09/chief-justice-calls-for-new-regulation-of-private-judging-in-light-of-girardi-scandal

that Bankruptcy Rule 2004 should apply as an appropriate tool and put to work particularly for those parties without judicial review. Therefore, Abrams respectfully requests that the Court take notice of the Motion and enter an order to approve (1) hearings and related discovery in substantially the form as **Exhibit A**, and (2) granting other relief requested herein, and/or (3) such other and further relief as may be just.

Dated:  August 17, 2022

Respectfully submitted,

William B. Abrams
Pro Se Claimant

# EXHIBIT A

PROPOSED ORDER

William B. Abrams
end2endconsulting@gmail.com
2041 Stagecoach Rd.
Santa Rosa, CA, 95404
Tel: 707 397 5727

*Pro Se Fire Victim Claimant and Party to related proceedings before the California Public Utilities Commission and the California Office of Energy Infrastructure Safety*

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

In re:

PG&E CORPORATION,

    -and-

PACIFIC GAS AND ELECTRIC COMPANY,

        Debtors.

  ☐ Affects PG&E Corporation
  ☐ Affects Pacific Gas and Electric Company
  ☑ Affects both Debtors

\* *All papers shall be filed in the lead case, No. 19-30088 (DM)*

Bankr. Case No. 19-30088 (DM)
Chapter 11
(Lead Case)
(Jointly Administrated)

**ORDER GRANTING MOTION OF WILLIAM B. ABRAMS PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 2004 FOR ENTRY OF AN ORDER AUTHORIZING DISCOVERY AND HEARINGS REGARDING THE ACTS AND CONDUCT OF JAMS NEUTRALS GIVEN NEW EVIDENCE**

Upon the Motion, dated August 17, 2022 (the "**Motion**"),[14] of William B. Abrams ("**Abrams**"), pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Local Bankruptcy Rule 2004-1(a), for entry of an order authorizing discovery from the Honorable John K. Trotter (Ret.), in his capacity as the Fire Victim Trustee (the "**Former Trustee**"), Cathy Yanni, in her capacity as Fire Victim Trustee (the "**Current Trustee**"), Honorable Randall Newsome (Ret.), in his capacity as Mediator (the "**Fire Victim Settlement Mediator**") and any other JAMS Inc. neutrals that have engaged within this case collectively referred to as JAMS Neutrals (the "**JAMS Neutrals**").

This Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334, the Order Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges, General Order 24 (N.D. Cal.), and Rule 5011-1(a) of the Bankruptcy Local Rules for the United States District Court for the Northern District of California, Paragraph 18 and Paragraph 78 of the Confirmation Order, Section 6.7 and Section 11.1 of the Plan; and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having reviewed the Motion; the Court having reviewed the proposed form of discovery attached to the Motion as **Exhibit B;** this Court having determined that the legal and factual basis set forth in the Motion establish just cause for the relief granted therein; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERD THAT**:

1.      The Motion is granted as provided herein.

2.      PG&E Fire Victims are authorized to serve discovery in the form attached to the Motion as **Exhibit B** on the Former Trustee, the Current Trustee, Fire Victim Settlement Mediator, and any other JAMS Neutrals that have engaged within this case affecting victim settlements.

3.      Abrams and the Current Trustee shall set a hearing on or about September 27, 2022 so that PG&E Victims may ask questions and get answers from the Former Trustee, the Current Trustee, Fire Victim Settlement Mediator, and any other JAMS Neutrals that have engaged within this case regarding their acts and conduct that affected any and all contracts, negotiations, settlements and agreements effecting PG&E victims.  PG&E victims must submit questions to be answered by these JAMS Neutrals no later than September 15, 2022 and be posted to the Fire Victim Trust Portal.

4.      The Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this Order.

---

[14] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

5.     This Order is without prejudice to PG&E Fire Victim's right to file further motions seeking additional documents pursuant to Bankruptcy Rule 2004 or any other applicable law.

** END OF ORDER **

# EXHIBIT B

FORM OF DISCOVERY REQUESTS

William B. Abrams
end2endconsulting@gmail.com
2041 Stagecoach Rd.
Santa Rosa, CA, 95404
Tel: 707 397 5727

*Pro Se Fire Victim Claimant and Party to related proceedings before the California Public Utilities Commission and the California Office of Energy Infrastructure Safety*

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| In re:<br><br>PG&E CORPORATION,<br><br>    -and-<br><br>PACIFIC GAS AND ELECTRIC COMPANY,<br>               Debtors.<br><br>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>☑ Affects both Debtors<br><br>\* *All papers shall be filed in the lead case, No. 19-30088 (DM)* | Bankr. Case No. 19-30088 (DM)<br>Chapter 11<br>(Lead Case)<br>(Jointly Administrated)<br><br><br>**WILLIAM B. ABRAMS FIRST SET OF REQUESTS FOR INFORMATION, FIRST SET OF INTERROGATORIES, AND FIRST SET OF DOCUMENT REQUESTS TO JAMS NEUTRALS** |

Pursuant to Rules 26, 33, 34 and 36 of the Federal Rules of Civil Procedure (the "Civil Rules"), Rules 2004, 9014, 7026, 7033, 7034 and 7036 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), William B. Abrams, pro se Claimant, ("Abrams"), submits the following requests for information (the "Requests for Information"), interrogatories (the "Interrogatories"), and requests for production of documents (the "Requests for Production"). Please, post all responses to the Requests for Information and Requests for Production to the Fire Victim Trust Portal for all victims to be able to view and analyze, within ten (10) days of the service of the Requests for Information. Abrams further requests that the Former Trustee, the Current Trustee, Fire Victim Settlement Mediator, Joint Local Governments Mediator, Appeals Coordinator, Special Master, the Panel of Mediators and any other JAMS Neutrals to whom requests are directed respond to the Interrogatories in accordance with Civil Rules 33 and 36.

## **DEFINITIONS**

The term "JAMS Acts" or "JAMS Actions" shall mean any actions of the Former Trustee, the Current Trustee, Fire Victim Settlement Mediator, Joint Local Governments Mediator, Appeals Coordinator, Special Master, the Panel of Mediators and/or any other JAMS Neutrals.

The term "Former Trustee" shall mean the Honorable John K. Trotter (Ret.) and as otherwise defined within the Chapter 11 Plan and in the PG&E Fire Victim Trust Agreement.

The term "Current Trustee" shall mean Cathy Yanni and as otherwise defined within the Chapter 11 Plan and in the PG&E Fire Victim Trust Agreement.

The term "Fire Victim Settlement Mediator" shall mean Honorable Randall Newsome (Ret.).

The term "Joint Local Governments Mediator" shall mean Honorable Jay Gandhi (Ret.).

The term "Appeals Coordinator" shall mean, Viggo Bosserup Esq.

The term "Special Master" shall mean Honorable Ellen Sickles James (Ret.) and as otherwise defined within the Chapter 11 Plan and in the PG&E Fire Victim Trust Agreement.

The term "Panel of Mediators" shall mean Honorable Wynne S. Carvill (Ret.), Honorable Catherine A. Gallagher (Ret.), Patricia K. Gillette, Esq., Honorable Ken M. Kawaichi (Ret.) and Hon. Risë Jones Pichon (Ret.) and any other JAMS Inc. neutrals jointly or severally who served on a Panel of Mediators, Complex Panel, Claimant Appeals Panel or on any other panel associated with this case.

The term "JAMS Neutral" shall mean any and all individuals current or past and associated with JAMS Inc. that were hired or have otherwise engaged in any way within this case affecting victim interests within this case jointly or severally. This includes but is not limited to the Former Trustee, Current Trustee, Claims Administrators, Fire Victim Settlement Mediator, Joint Local Governments Mediator, Appeals Coordinator, Special Master and any individual serving on the Panel of Mediators.

The term "Tort Claimant Committee" ("**TCC**") shall mean any current or past members jointly or severally who served on the Fire Victim Tort Claimant Committee.

The term "Tort Claimant Committee Counsel" ("**TCC Counsel**") shall mean BakerHostetler LLP serving in the capacity of attorney for the Tort Claimant Committee jointly or severally.

The term "Fire Claimant Professional" shall mean any current or past attorney that has engaged as an official Fire Claimant Professional within this case.

The term "Trust Oversight Committee" ("**TOC**") shall mean any current or past member jointly or severally who served on the PG&E Fire Victim Trust Oversight Committee.

The term "Trust Lobbyist" shall mean any agent, contractor, employee, attorney, officer, director, representative or TOC member that acted in an official or unofficial capacity representing the interests of Trustee, Trust Administrator, the PG&E Fire Victim Trust and/or Trust Oversight Committee member(s) to any and all government agencies including Local, State or Federal staff, employees, elected officials, regulators or others employed by or on behalf of government agencies.

The term "Claim" shall mean any PG&E victim claim administered or reviewed through the PG&E Fire Victim Trust.

The term "Bankruptcy Court" shall mean the United States Bankruptcy Court for the Northern District of California.

The term "Chapter 11 Cases" or the "PG&E Bankruptcy Case" shall mean the chapter 11 cases commenced by PG&E Corporation and Pacific Gas and Electric Company in the Bankruptcy Court, Case No. 19-30088.

The term "Chapter 11 Plan" shall mean the Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization Dated June 19, 2020 [Docket No. 8048] confirmed by order of the Bankruptcy Court in the Chapter 11 Cases.

The term "Communications" shall mean all inquiries, discussions, conversations, negotiations, agreements, understandings, meetings, telephone conversations, letters, notes, telegrams, correspondence, memoranda, emails, facsimile transmissions, or other forms of verbal, written, mechanical, or electronic disclosure, in Your actual or constructive control or custody or in the control or custody of any current or former affiliates, representatives or advisors.

The term "concerning" means relating to, evidencing, supporting, negating, refuting, embodying, containing, memorializing, comprising, reflecting, analyzing, constituting, describing, identifying, referring to, referencing, discussing, indicating, connected with or otherwise pertaining in any way, in whole or in part, to the subject matter being referenced.

The term "Documents" shall mean any writings, recordings, electronic files and mails, or photographs, whether original or duplicate, as defined in Federal Rule of Evidence 1001 and Federal Rule of Civil Procedure 34(a), inclusively, including (but not limited to) all documents and information in Your possession, custody, or control, and includes: all and any written, recorded, or graphic material, however produced or reproduced, minutes, summaries, memoranda, transcripts, tapes, or other voice recordings, and all other documents and tangible things, including booklets, brochures, pamphlets, circulars, notices, periodicals, papers, records, contracts, agreements, photographs, minutes, memoranda, messages, appraisals, analyses, reports, files, interoffice memoranda, or interoffice communications of any description, calculations, invoices, accounting

entries, diary entries, calendars, inventory sheets, ledgers, correspondence, emails, phone recordings, instant messages, text messages, telegrams, advertisements, press releases, notes, letters, diaries, working papers, schedules, projections, graphs, charts, films, tapes, print-outs, and all other data, whether recorded by electronic or other means, and all drafts thereof. If a Document was prepared in several copies, or if additional copies were thereafter made, and if any such copies are not identical in all respects or are no longer identical by reason of subsequent notation or modification of any kind whatsoever, including notes on the front or back, in the margins, or on any of the pages thereof, then each such non-identical copy is a separate Document and must be produced. When examples of categories or types of Documents are given in a particular Request for Production by use of phrases such as "including," this shall always be interpreted as being for illustrative purposes only (*i.e.*, to be understood as "including without limitation") and in no way limits or narrows the scope of any Request for Production. "Documents" always includes Communications, whether so stated in a particular Request for Production or not.

The term "Fire Victim Trust" shall have the same meaning as that term is used in the Chapter 11 Plan.

The term "Fires" shall have the same meaning as that term is used in the Chapter 11 Plan related to the PG&E wildfires in 2015, 2017, 2018.

The term "Fire Victim Trust Agreement" shall have the same meaning as that term is used in the Chapter 11 Plan.

The term "Fire Victim Claims Resolution Procedures" ("**CRP**") shall have the same meaning as that term is used in the Chapter 11 Plan and in the PG&E Fire Victim Trust Agreement.

The term "Trust Expenses" shall have the same meaning as that term used in the PG&E Fire Victim Trust Agreement include fees and expenses incurred in pursuing the Trust Assets, administering the Trust, managing the Trust Assets, and making distributions in accordance with the Trust Documents, the Plan and the Confirmation Order.

The term "TCC Expenses" shall include fees and expenses incurred by or for the Fire Victim Tort Claimant Committee or their members jointly or severally in their capacity as Tort Claimant Committee Members.

The term "TOC Expenses" shall include fees and expenses incurred by or for the Fire Victim Trust Oversight Committee or their members jointly or severally in their capacity as Trust Oversight Committee Members.

The term "Claims Administrator" shall have the same meaning as that term used in the Chapter 11 Plan and in the PG&E Fire Victim Trust Agreement.

The term "Claims Processor" shall have the same meaning as that term used in the Chapter 11 Plan and in the PG&E Fire Victim Trust Agreement.

The term "Trustee Designee" shall mean any employee, contractor or any other assigned individual acting conducting themselves jointly or severally on behalf of the Trustee.

The term "TCC Designee" shall mean any employee, contractor or any other assigned individual acting or conducting themselves on behalf of the Trust Oversight Committee or Trust Oversight Committee Member jointly or severally.

The term "Trust Representative" shall be any individual that was employed or contracted with the PG&E Fire Victim Trust including but not limited to the Trustee, Claims Administrator, Claims Processors and members of the Trust Oversight Committee (TOC) that represented the interests of the PG&E Fire Victim Trust in an official or unofficial capacity to any party or individual.

The term "Investment Guidelines" shall have the same meaning as that term used in the Chapter 11 Plan and in Exhibit 6 of the PG&E Fire Victim Trust Agreement.

The term "Sell-Down Plan" shall have the same meaning as that term used in the Chapter 11 Plan and PG&E Fire Victim Trust Agreement and involves liquidating some or all of the stock.

The term "Investment Advisor" shall have the same meaning as that term used in the Chapter 11 Plan and PG&E Fire Victim Trust Agreement. This includes individual(s) that have assessed the levels of investment risks and advised the Trust or Trustee in making investment decisions.

The term "Trust Disbursing Agent" shall have the same meaning as that term used in the Chapter 11 Plan and PG&E Fire Victim Trust Agreement.

The term "Proof of Claim" shall mean the Proof of Claim (Fire Claim Related) filed by any PG&E Fire Victim in the Chapter 11 Cases of PG&E Corporation and Pacific Gas and Electric Company.

Global Policy.

The terms "You" or "Your" and variants thereof mean Trustee or Trustee Designee(s).

## INSTRUCTIONS

These instructions are consistent in form and wording as the "*Motion of the Fire Victim Trustee Pursuant to Federal Rule of Bankruptcy Procedure 2004 for Entry of an Order Authorizing Discovery From Adventist Health System/West and Adventist Health Feather River and Service of a Subpoena on Factory Mutual Insurance Company*" [Dkt. 11556] filed by Brown Rudnick, LLP on behalf of the Fire Victim Trustee. **This was done with an abundance of caution to ensure consistency with similar requests submitted to this Court on behalf of the Trustee and to ensure the process was within the scope of existing FVT processes.** The preceding Definitions apply to each of these Instructions, and for purposes of these Requests for Information, Interrogatories, and Requests for Production, the following Instructions shall be followed:

1.     All responses shall comply with the requirements of the Civil Rules and the Bankruptcy Rules.

2.     Unless otherwise stated in a specific Request for Information, Interrogatory, or Request for Production herein, the relevant time period shall be the period from January 29, 2019 which is the date the Debtor filed the "Voluntary Petition for Non-Individuals Filing for Bankruptcy" [Dkt. 1] to the present.

3.     These Requests for Information, Interrogatories and Requests for Production shall be deemed continuing in nature. In the event you become aware of additional information related to Requests for Information, Interrogatories or Requests for Production, those should be promptly produced.

4.     Produce all documents and all other materials in Your actual or constructive possession, custody, or control including in the possession, custody, or control of current or former employees, officers, directors, agents, agents' representatives, consultants, contractors, vendors, or any fiduciary or other third parties, wherever those Documents and materials are maintained, including on personal computers, PDAs, wireless devices, local area networks, application-based communications services (including, without limitation, Facebook Messenger, Instant Bloomberg, WeChat, Skype, KakaoTalk, WhatsApp, Signal, iMessage, etc.), web-based file hosting services (including without limitation, Dropbox, Box, Apple iCloud, Google Drive, Hightail, etc.), or web-based email systems such as Gmail, Yahoo, etc.

5.     You must produce all Documents in Your possession, custody, or control, whether maintained in electronic or paper form and whether located on hardware owned and maintained by You or hardware owned and/or maintained by a third party that stores data on Your behalf. You must produce all such Documents even if they were deleted or in draft form. Without limitation, hardware where such data may be stored includes: servers; desktop, laptop, or tablet computers; cell and smart phones; PDA devices; scanners, fax machines, and copying machines; and mobile storage devices, such as thumb or external hard drives. Electronically stored Documents include any computerized data or content stored on electromagnetic media. Without limitation, types of electronically stored Documents include email, voicemail, instant messages, intranet and internet system data, telephone and cellular telephone calling records, data compilations, spreadsheets, word processing Documents, images, databases, digital photocopier memory, and any other information stored in memory storage devices.

6.     Documents not otherwise responsive to these Requests for Production should be produced: (a) if such Documents mention, discuss, refer to, explain, or concern one or more Documents that are called for by these Requests for Production; (b) if such Documents are attached to, enclosed with, or accompany Documents called for by these Requests for Production; or (c) if such Documents constitute routing slips, transmittal memoranda or letters, comments, evaluations, or similar materials.

7.     Documents attached to each other should not be separated; separate Documents should not be attached to each other.

8.     Documents should include all exhibits, appendices, linked Documents, or otherwise appended Documents that are referenced in, attached to, included with, or are a part of the requested Documents.

9. If any Document, or any part thereof, is not produced based on a claim of attorney-client privilege, work-product protection, or any other privilege, then in answer to such Request for Production or part thereof, for each such Document, You must:

    a) Identify the type, title and subject matter of the Document;

    b) State the place, date, and manner of preparation of the Document;

    c) Identify all authors, addressees, and recipients of the Document, including information about such persons to assess the privilege asserted; and

    d) Identify the legal privilege(s) and the factual basis for the claim.

10. Documents should not contain redactions unless such redactions are made to protect information subject to the attorney-client privilege and/or work-product doctrine. In the event any Documents are produced with redactions, a log setting forth the information requested in Instruction 9 above must be provided.

11. To the extent a Document sought herein was at one time, but is no longer, in Your actual or constructive possession, custody, or control, state whether it: (a) is missing or lost; (b) has been destroyed; (c) has been transferred to others; and/or (d) has been otherwise disposed of. In each instance, identify the Document, state the time period during which it was maintained, state the circumstance and date surrounding authorization for such disposition, identify each person having knowledge of the circumstances of the disposition, and identify each person who had possession, custody, or control of the Document. Documents prepared prior to, but which relate or refer to, the time period covered by these Requests for Production are to be identified and produced.

12. If You object to any of these Requests for Information, Interrogatories, or Requests for Production, state in writing with specificity the grounds of Your objections. Any ground not stated shall be waived. If You object to a particular portion of any Request for Information, Interrogatory, or Request for Production, You shall respond to any other portions of such Request for Information, Interrogatory, or Request for Production as to which there is no objection and state with specificity the grounds of the objection.

13. The fact that an investigation is continuing or that discovery is incomplete shall not be a justification for failing to respond to these Requests for Information, Interrogatories, or Requests for Production based on the knowledge or information that You possess at the time You respond to these Requests for Information, Interrogatories, or Requests for Production. If an investigation is continuing or discovery is not complete with respect to the matter inquired into by any Request for Information, Interrogatory, or Request for Production, so state in Your response to that Request for Information, Interrogatory, or Request for Production.

14. If the identity of Documents responding to a Request for Production is not known, then that lack of knowledge must be specifically indicated in the response. If any information requested is not in Your possession, but is known or believed to be in the possession of another person or entity, then identify that person or entity and state the basis of Your belief or knowledge that the requested information is in such person's or entity's possession.

15.     If You deny knowledge or information sufficient to answer an Interrogatory (or any part thereof), provide the name and address of each person known or believed to have such knowledge. Identify each person who assisted or participated in preparing and/or supplying any of the information given in answer to these Interrogatories.

## **MANNER OF PRODUCTION**

1.     Document Production and Storage: All Documents produced by or received by JAMS Neutrals in relation to this case shall be made available to all PG&E victims by posting to the Fire Victim Trust Portal within the "Documents" section of that site.  These shall be uploaded to the portal in searchable PDFA format or single-page 300 dpi-resolution group IV TIF format ("tiff"), along with appropriately formatted industry-standard database load files and accompanied by true and correct copies or representations of unaltered attendant metadata. Where Documents are produced in tiff format, each Document shall be produced along with a multi-page, Document-level searchable text file ("searchable text") as rendered by an industry-standard text extraction program in the case of electronic originals, or by an industry-standard Optical Character Recognition ("ocr") program in the case of scanned paper Documents.  Database load files shall consist of: (i) a comma-delimited values (".dat") file containing: production Document identifier information, data designed to preserve "parent and child" relationships within Document "families," reasonably accessible and properly preserved metadata (or bibliographic coding in the case of paper Documents), custodian or Document source information; and (ii) an Opticon (".opt") file to facilitate the loading of tiff images.  Load files should be provided in a root-level folder named "Data," images shall be provided within a root level "Images" folder containing reasonably structured subfolders, and searchable text files shall be provided in a single root-level "Text" folder.

2.     Electronic Documents and Display:  Documents and other responsive data or materials created, stored, or displayed on electronic or electro-magnetic media shall be produced in the order in which the Documents are or were stored in the ordinary course of business, including all reasonably accessible metadata, custodian or Document source information, and searchable text as to allow email correspondence to Abrams and appropriate posting to the Fire Victim Trust Portal, through a reasonable and modest effort, to fairly, accurately, and completely access, search, display, comprehend, and assess the Documents' true and original content.

3.     Emails and Attachments, and Other Email Account-Related Documents: All Documents and accompanying metadata created and/or stored in the ordinary course of business within commercial, off-the-shelf email systems including but not limited to Microsoft ExchangeTM, Lotus NotesTM, or Novell GroupwiseTM shall be produced in tiff format, accompanying metadata, and searchable text files or, alternately, in a format that fairly, accurately, and completely represents each Document in such a manner as to make the Document(s) reasonably useable, manageable, and comprehendible by PG&E Fire Victims and accessible from the PG&E Fire Victim Trust Portal.

4.     Documents and Data Created or Stored in or by Structured Electronic Databases, Spreadsheets and Non-Standard File Types:  With the exclusion of email and email account-related Documents and data, all Documents and accompanying metadata created and/or stored in structured electronic databases or files shall be produced in a format that enables the PG&E Fire Victims to reasonably manage and import those Documents from the Fire Victim Trust Portal into a useable,

coherent database. Documents must be accompanied by reasonably detailed documentation explaining the Documents' content and format including but not limited to data dictionaries and diagrams. Some acceptable formats, if and only if provided with definitive file(s), table(s), and field-level schemas include:

    a)  XML format file(s);

    b)  Microsoft SQL database(s);

    c)  Access database(s); and/or

    d)  fixed or variable length ASCII delimited files.

      5.    <u>Spreadsheets, Multimedia, and Non-Standard File Types</u>:  All Documents generated or stored in software such as Microsoft Excel or other commercially available spreadsheet, database and/or statistical programs, as well as any multimedia files such as audio or video, shall be made available on the PG&E Fire Victim Portal and produced in their native format, along with an accompanying placeholder image in tiff format indicating a native file has been produced. A "Nativelink" entry shall be included in the .dat load file indicating the relative file path to each native file on the production media. To the extent You have other file types that do not readily or easily and accurately convert to tiff and searchable text, You may elect to produce those files in native format subject to the other requirements listed herein. Native files may be produced within a separate root-level folder structure on deliverable media entitled "Natives."

      6.    <u>"Other" Electronic Documents</u>:  All other Documents and accompanying metadata and embedded data created or stored in unstructured files generated by commercially available software systems (excluding emails, structured electronic databases, spreadsheets, or multimedia) such as, but not limited to, word processing files (such as Microsoft Word), image files (such as Adobe .pdf files and other formats), and text files shall be uploaded to the Fire Victim Trust Portal and produced in tiff and searchable text format in the order the files are or were stored in the ordinary course of business.

      7.    <u>Paper Documents</u>: Documents originally created or stored on paper shall be produced in tiff format and uploaded to the Fire Victim Trust Portal. Relationships between Documents shall be identified within the Relativity .dat file utilizing document identifier numbers to express parent Document/child attachment boundaries, folder boundaries, and other groupings.  In addition, the searchable text of each Document shall be provided as a multi-page text file as provided for by these Requests for Production.

      8.    <u>Document Redactions</u>:  Consistent with the "Order on Motion of William B. Abrams Authorizing Discovery Regarding Administration of the Fire Victim Trust" [Dkt. 12682] if a JAMS Neutral believes *"any provision must or should be kept confidential, he should file a request with the court to permit the filing of a redacted version of such a document and the court will review the unredacted version in camera and issue an appropriate order."*  Any and all redactions should be described and justified when documents are posted to the Fire Victim Trust Portal in such a manner as to make the redaction(s) reasonably accessible, and comprehendible by PG&E Fire Victims.

# REQUESTS FOR INFORMATION AND INTERROGATORIES

**A. Questions and Interrogatories for all JAMS Neutrals**

1.  When were you initially engaged by active parties within the Pacific Gas and Electric Company Bankruptcy Proceeding (Case# 19-30088(DM)? Describe that initial engagement including the parties involved and any discussions regarding your role and responsibilities within the case.

    RESPONSE:

2.  When did you execute contact(s) with any parties within the Pacific Gas and Electric Company Bankruptcy Proceeding (Case# 19-30088(DM)? Outline the terms of the that agreement and the basis for compensation relative to that agreement?

    RESPONSE:

3.  Describe and disclose any existing or past financial relationships with any of the parties engaged within the PG&E Bankruptcy Case, including, but not limited to any prior representation of any of the parties, their counsel and witnesses. If financial relationships(s) are indicated, describe the nature of those financial relationships (client, customer, contractor, partner, etc.), the structure of those relationships (shareholder, loan holder, debtor, creditor, etc.) and the manner in which those financial relationships may be likely to affect impartiality or which might reasonably create an appearance of partiality or bias.

    RESPONSE:

4.  Describe and disclose any existing or past business or professional relationships with any of the parties engaged within the PG&E Bankruptcy Case, including, but not limited to any prior representation of any of the parties, their counsel and witnesses. If business or professional relationships(s) are indicated, describe the nature of those relationships (client, customer, contractor, partner, etc.) and the manner in which those business or professional relationships are likely to affect impartiality or which might reasonably create an appearance of partiality or bias.

    RESPONSE:

5.  Describe and disclose any existing or past personal interests with any of the parties engaged within the PG&E Bankruptcy Case beyond the explicit terms within the agreement you indicated in Question #2. If personal interest(s) are indicated, describe the basis of those personal interests and the manner in which those personal interests may be likely to affect impartiality or which might reasonably create an appearance of partiality or bias.

    RESPONSE:

6. Describe and disclose any existing or past social relationship with any of the parties engaged within the PG&E Bankruptcy Case, including, but not limited to any of the parties, their counsel and witnesses. If social relationships(s) are indicated, describe the nature of those relationships (relative, friend, etc.) and the manner in which those business or professional relationships may be likely to affect impartiality or which might reasonably create an appearance of partiality or bias.

RESPONSE:

7. Describe and disclose any other source of bias or prejudice concerning a person or institution which is likely to affect impartiality or which might reasonably create an appearance of partiality or bias. If any source(s) of bias or prejudice are indicated, describe the nature of those biases and prejudices and the manner in which those sources might bias or prejudice this PG&E Bankruptcy Case and/or affect the decisions and disposition of this case, claimant settlements and the associated Chapter 11 Plan. Indicate how these sources might reasonably create an appearance of partiality or bias among PG&E Victims or other parties within this case.

RESPONSE:

8. Are you a shareholder in JAMS Inc.? Explain that compensation structure and any other incentive structures to encourage repeat business and profit sharing for which you are engaged.

RESPONSE:

B. Additional Questions and Interrogatories for the Former Trustee, Hon. Justice Trotter (Ret.)

1. Within the "Notice of Filing of Transcript of Status of Trust Distribution Video Presentation by Justice John Trotter (Ret.), Trustee of the PG&E Fire Victim Trust.", May 17, 2021 [Dkt. 10654] you indicated that you were employed by certain parties on a part-time basis perhaps as early as April as an "advisor." Indicate the date you executed that hiring agreement, the date you were first employed or contracted and the date you were otherwise engaged by any party associated with the PG&E Bankruptcy Case.

RESPONSE:

2. Within the "Notice of Filing of Transcript of Status of Trust Distribution Video Presentation by Justice John Trotter (Ret.), Trustee of the PG&E Fire Victim Trust.", May 17, 2021 [Dkt. 10654] you indicated that you were employed by certain parties on a part-time basis perhaps as early as April as an "advisor." Indicate the date that your contract or employment as an "advisor" was terminated.

RESPONSE:

3. What roles and duties did you assume and/or were assigned within the PG&E Bankruptcy Case prior to your appointment as Trustee of the Fire Victim Trust?

RESPONSE:

4. Within recent LA Times reporting, it was indicated that "*Girardi diverted money Trotter was hired to safeguard for the purposes that were highly questionable and even, in the recent assessment of one federal judge, "a crime.*" What precautions did you take within the PG&E Bankruptcy Case to ensure that money was not "diverted" in a similar manner?

   RESPONSE:

5. Within recent LA Times reporting, it was indicated that "*he dipped into the settlement account again and again for supposed case expenses, sometimes writing multiple seven-figure checks to his law firm in the same week.*" Are you aware of any similar "supposed case expenses" within this case and what have you done differently within this case to ensure similar acts and conduct are not undermining the Fire Victim Trust and associated settlements of PG&E Fire Victims?

   RESPONSE

6. What was your specific role in recruiting or hiring other JAMS Neutrals within the PG&E Bankruptcy Case? Describe your role in these activities and specify how you contributed to and/or managed the hiring processes?

   RESPONSE:

7. Within the recent LA Times reporting it was indicated that "*The company that Trotter built [JAMS Inc.] employs more than 400 arbitrators in 29 locations*" and later stated that "*although he retired from JAMS five years ago, Trotter said he remains a shareholder.*" Given that a goal of a shareholder is to increase shareholder return by driving repeat business, how do you ensure those shareholder financial incentives don't interfere with your perceived "equitable powers" and other authorities as advisor and Trustee?

   RESPONSE:

8. As Trustee of the Fire Victim Trust, how did you foster or encourage disclosures of relationships that might reasonably create an appearance of partiality or bias?

   RESPONSE:

9. When did you provide notice of your resignation as Trustee to the Trust Oversight Committee?

   RESPONSE:

10. What was the date you learned of the potential investigations into your role within the Girardi case?

    RESPONSE:

11. Why did you not inform PG&E Fire Victims regarding your resignation from the PG&E Fire Victim Trust until months after you informed the Trust Oversight Committee?

    RESPONSE:

**C. Additional Questions and Interrogatories for Hon. Randall Newsome (Ret.), Mediator**

1. What was the selection process for appointing Mikal Watts and three other negotiators on behalf of the Tort Claimant Committee and Fire Claimant Professionals? Describe the basis for these appointments and the degree to which this was a competitive and open process. Additionally, indicate the names of the other three negotiators.

   RESPONSE:

2. Given the disclosure requirements associated with the California Bar Association's Rules of professional conduct (Rules 1.7(b), 1.4.1(a) and 1.8.6) and your duties as a neutral mediator, how did you respond when you learned that Mikal Watts stated that he had received an undisclosed line of credit from PG&E investors including those engaged within the negotiations you oversaw?

   RESPONSE:

3. Given the reporting in KQED, Bloomberg News and from other sources indicating that Mikal Watts stated that he received a line of credit with sources that included funding from PG&E investors close to the negotiations, how did you respond to ensure that the other three negotiators you appointed did not have similar financial conflicts that drove the negotiations away from an all-cash offer to the half-stock settlement?

   RESPONSE:

## **REQUESTS FOR PRODUCTION FROM ALL JAMS NEUTRALS\***

1. All documents that support or refute Your responses to the foregoing Requests for Information and Interrogatories.

   RESPONSE:

2. All contracts and agreements produced and/or executed by you and/or on your behalf with any party within the PG&E Bankruptcy Case.

   RESPONSE:

3. All financial agreements, contracts, loans, lines of credit from any party within the PG&E Bankruptcy Case as well as financial agreements by or with any PG&E investor that has a financial stake in the outcome of this PG&E Bankruptcy Case.

   RESPONSE:

4. All disclosures that you provided to Fire Victim Claimants regarding financial, business, professional, personal or social relationships.

   RESPONSE:

## REQUESTS FOR PRODUCTION FROM HON. JUSTICE TROTTER (RET.)*

1. Notice of resignation as Trustee and as provided to the PG&E Fire Victim Trust Oversight Committee.

2. All communications and correspondence related to or mentioning your resignation as Trustee to members of the Trust Oversight Committee, JAMS Neutrals and/or any other party within the PG&E Bankruptcy Case.

**\*NOTE REITERATED FROM ABOVE:** Consistent with the "Order on Motion of William B. Abrams Authorizing Discovery Regarding Administration of the Fire Victim Trust" [Dkt. 12682] if a JAMS Neutral believes "*any provision must or should be kept confidential, he should file a request with the court to permit the filing of a redacted version of such a document and the court will review the unredacted version in camera and issue an appropriate order.*" Any and all redactions should be described and justified when documents are posted to the Fire Victim Trust Portal in such a manner as to make the redaction(s) reasonably accessible, and comprehendible by PG&E Fire Victims.

Dated: August 17, 2022

Submitted by,

William B. Abrams
Pro Se Claimant