1  WEIL, GOTSHAL & MANGES LLP
   Richard W. Slack (*pro hac vice*)
2  (richard.slack@weil.com)
   Jessica Liou (*pro hac vice*)
3  (jessica.liou@weil.com)
   Matthew Goren (*pro hac vice*)
4  (matthew.goren@weil.com)
   767 Fifth Avenue
5  New York, NY 10153-0119
   Tel: 212 310 8000
6  Fax: 212 310 8007

7  KELLER BENVENUTTI KIM LLP
   Jane Kim (#298192)
8  (jkim@kbkllp.com)
   David A. Taylor (#247433)
9  (dtaylor@kbkllp.com)
   Thomas B. Rupp (#278041)
10 (trupp@kbkllp.com)
   650 California Street, Suite 1900
11 San Francisco, CA 94108
   Tel: (415) 496-6723
12 Fax: (415) 636-9251

13 *Attorneys for Debtors and Reorganized Debtors*

14                **UNITED STATES BANKRUPTCY COURT**
                  **NORTHERN DISTRICT OF CALIFORNIA**
15                      **SAN FRANCISCO DIVISION**

16 | | |
   |---|---|
17 | **In re:** | Chapter 11 Case No. 19-30088 (DM) |
   | | (Lead Case) |
   | | (Jointly Administered) |
18 | **PG&E CORPORATION,** | |
19 | - and - | **REORGANIZED DEBTORS' MOTION FOR** |
   | | **ENTRY OF AN ORDER (I) APPROVING** |
   | | **SETTLEMENTS RESOLVING DISPUTES WITH** |
20 | **PACIFIC GAS AND ELECTRIC** | **CERTAIN INSURERS, AND (II) GRANTING** |
   | **COMPANY,** | **RELATED RELIEF** |
21 | **Debtors.** | Date:   October 27, 2022 |
   | | Time:   11:00 a.m. (Pacific Time) |
22 | ☐ Affects PG&E Corporation | Place:  (Tele/Videoconference Only) |
   | ☐ Affects Pacific Gas and Electric | United States Bankruptcy Court |
23 | Company | Courtroom 17, 16th Floor |
   | ☒ Affects both Debtors | San Francisco, CA 94102 |
24 | | |
25 | *\* All papers shall be filed in the Lead* | **Obj. Deadline: October 20, 2022, 4:00 p.m. (Pacific** |
   | *Case, No. 19-30088 (DM).* | **Time)** |
26

27

28

PG&E Corporation and Pacific Gas and Electric Company (together, "**PG&E**," the "**Debtors**," or the "**Reorganized Debtors**," as applicable), hereby submit this motion (the "**Motion**"), pursuant to sections 363(b) and 105(a) of title 11 of the United States Code (the "**Bankruptcy Code**") and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), for entry of an order: (i) approving the settlements, by and among the Reorganized Debtors and certain of PG&E's insurance carriers, annexed as **Exhibits A and B** (the "**Insurance Settlements**") to the contemporaneously filed Declaration of Richard W. Slack (the "**Slack Declaration**"); and (ii) granting related relief.

In support of the Motion, the Reorganized Debtors submit: (i) the Declaration of John R. Simon (the "**Simon Declaration**"); and (ii) the Declaration of David B. Goodwin (the "**Goodwin Declaration**"), filed contemporaneously herewith. A proposed form of order granting the relief requested herein is annexed as **Exhibit C** (the "**Insurance Settlements Proposed Order**") to the Slack Declaration.

ii

# Table of Contents

                                                                                                                 **Page**

I. PRELIMINARY STATEMENT ..................................................................................1

II. JURISDICTION ....................................................................................................4

III. BACKGROUND ....................................................................................................4

    A. The D&O Policies and the Arbitration ......................................................4

    B. The D&O Action and the Plan ..................................................................6

    C. The Securities Litigation............................................................................8

    D. The Securities Claims ................................................................................9

IV. NEGOTIATION OF THE INSURANCE SETTLEMENTS ..............................11

V. MATERIAL TERMS OF THE INSURANCE AND D&O ACTION SETTLEMENTS .......11

    A. Insurance Settlements ..............................................................................11

    B. D&O Action Settlement ..........................................................................14

VI. BASIS FOR RELIEF REQUESTED ..............................................................16

    A. The Insurance Settlements are in the Best Interests of the Debtors' Estates and Should be Approved Pursuant to Bankruptcy Rule 9019 ..........................................16

        1. The Probability of Success in Litigation................................................18

        2. Potential Difficulties in Collecting Any Judgment........................................19

        3. The Complexity and Expense of Any Litigation ............................................19

        4. The Interests of Creditors........................................................................20

    B. The Insurance Settlements are a Sound Exercise of the Debtors' Business Judgment and Should be Approved........................................21

VII. NOTICE..............................................................................................................22

**<u>TABLE OF AUTHORITIES</u>**

**Page(s)**

**Cases**

*In re Alaska Fishing Adventure, LLC*,
   594 B.R. 883 (Bankr. D. Alaska 2018).................................................................22

*In re Am. Bldg. Storage, LLC*,
   2007 WL 7532281 (B.A.P. 9th Cir. Apr. 2, 2007) ..............................................19

*In re ASARCO, L.L.C.*,
   650 F.3d 593 (5th Cir. 2011) ...............................................................................21

*City Sanitation v. Allied Waste Servs. of Mass., LLC (In re Am. Cartage, Inc.)*,
   656 F.3d 82 (1st Cir. 2011).................................................................................16

*Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*,
   60 B.R. 612 (Bankr. S.D.N.Y. 1986) ..............................................................21, 22

*In re Integrated Res., Inc.*
   147 B.R. 650 (S.D.N.Y. 1992).............................................................................22

*Johnson v. Quantum Learning Network, Inc.*,
   2017 WL 747462 (N.D. Cal. Feb. 27, 2017) .......................................................18

*In re Laser Realty, Inc. v. Fernandez (In re Fernandez)*,
   2009 WL 2913685 (Bankr. D.P.R. Mar. 31, 2009) ...............................................18

*In re Lionel Corp.*,
   722 F.2d 1063 (2d Cir. 1983)...............................................................................21

*Martin v. Kane (In re A&C Props.)*,
   784 F.2d 1377 (9th Cir. 1986) .........................................................................16, 17

*In re Montgomery Ward Holding Corp.*,
   242 B.R. 147 (D. Del. 1999)................................................................................21

*Myers v. Martin (In re Martin)*,
   91 F.3d 389 (3d Cir. 1996)...................................................................................19

*Nellis v. Shugrue*,
   165 B.R. 115 (S.D.N.Y. 1994).............................................................................17

*Officers for Justice v. Civil Serv. Comm'n of City & Cnty. of San Francisco*,
   688 F.2d 615 (9th Cir. 1982) ...........................................................................19, 21

*In re Open Med. Inst., Inc.*,
   639 B.R. 169 (B.A.P. 9th Cir. 2022)....................................................................18

*In re Pac. Gas & Elec. Co.*,
  304 B.R. 395 (Bankr. N.D. Cal. 2004) ...............................................................17, 20

*In re Schmitt*,
  215 B.R. 417 (B.A.P. 9th Cir. 1997) ...............................................................................18

*In re Waksberg*,
  2014 WL 5285648 (B.A.P. 9th Cir. Oct. 15, 2014) ........................................................19

*In re Walter*,
  83 B.R. 14 (B.A.P. 9th Cir. 1988) ...................................................................................21

**Statutes**

11 U.S.C. § 105(a) ................................................................................................... ii, 21

11 U.S.C. § 363(b) ............................................................................................... ii, 21, 22

28 U.S.C. § 157(b) ...........................................................................................................4

28 U.S.C. § 1334 ..............................................................................................................4

28 U.S.C. §§ 1408 ............................................................................................................4

28 U.S.C. §§ 1409 ............................................................................................................4

**Other Authorities**

Fed. R. Bankr. P.  2002 ...................................................................................................22

Fed. R. Bankr. P. 9019 .............................................................................. ii, 16, 18, 23

Bankr. Local Rule 5011-1(a) ............................................................................................4

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I. PRELIMINARY STATEMENT[1]

Through this Motion, the Reorganized Debtors seek this Court's approval of the Insurance Settlements, which resolve nearly all the disputes in an ongoing arbitration with respect to certain of PG&E's insurance carriers relating to PG&E's 2017 and 2018 directors and officers liability insurance policies (the "**D&O Policies**"). The Insurance Settlements were heavily and carefully negotiated over a significant amount of time and were reached with the help of an experienced mediator. Each of the Insurance Settlements requires as a condition to its effectiveness that this Court approve its terms. The Insurance Settlements will allow the Reorganized Debtors to implement the settlement with the PG&E Fire Victim Trust (the "**FVT**") of certain claims that were assigned by the Debtors to the FVT pursuant to the Plan (the "**FVT Claims**") that are being pursued in the case captioned *Trotter v. Williams, et al.*, Lead Case No. CGC-17-562591 (S.F. Super. Ct.) (the "**D&O Action**"). Under the Plan, the FVT Claims can only be paid from "Side B" insurance proceeds, which proceeds will be paid to the FVT only after the Insurance Settlements become effective.

In addition, the Reorganized Debtors believe that the Insurance Settlements will aid in the potential resolution of claims asserted in the action entitled *In re PG&E Corp. Securities Litigation*, No. 5:18-cv-03509-EJD (N.D. Cal.) (the "**Securities Litigation**") and the separate proofs of claim filed in the Chapter 11 Cases by the holders of the Debtors' debt and equity securities holders ("**Securities Claims**"). Although there is no current settlement of these securities claims, the resolution of the dispute with certain of PG&E's insurance carriers provides certainty of the availability of insurance proceeds to cover a meaningful portion of a potential settlement of those claims.

The D&O Policies provide coverage both to PG&E's directors and officers and to PG&E itself, up to the total annual limits of liability of $200 million for each year, which limits apply to

---

[1] Capitalized terms used but not herein defined have the meanings ascribed to them in the Insurance Settlements or the *Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization dated June 19, 2020* [Docket No. 8048] (together with all exhibits and schedules thereto and as may be modified, supplemented, or amended from time to time, the "**Plan**"), as applicable.

aggregate defense costs, settlements, and judgments covered under the D&O Policies. PG&E sought coverage under the D&O Policies for various potential liabilities arising from, among other things, the FVT Claims, the Securities Litigation, and the Securities Claims, including indemnification claims for costs and potential liabilities incurred by the Debtors' former directors and officers.[2]

The insurance carriers that issued the D&O Policies (collectively, the "**D&O Insurers**") have taken the position that the claims arising out of the 2017 North Bay Fires and the claims arising out of the 2018 Camp Fire all share a "common nexus," such that all of the claims fall exclusively within PG&E's 2017 tower of D&O Policies (the "**2017 Tower**") and do not trigger the additional $200 million in directors and officers coverage provided by PG&E's 2018 tower of D&O Policies (the "**2018 Tower**"). As the Court is aware, PG&E disagrees with the D&O Insurers' position and, pursuant to the mandatory dispute resolution procedures set forth in the 2017 Tower and 2018 Tower D&O Policies, commenced a confidential arbitration (the "**Arbitration**") to seek a ruling that the claims arising out of the 2018 Camp Fire fall within PG&E's 2018 Tower. The Arbitration has been stayed pending approval of the Insurance Settlements.

The Insurance Settlements will resolve the claims asserted in the Arbitration by the Reorganized Debtors against the Settling Insurers (as defined below).[3] Under the Insurance Settlements, the Settling Insurers have agreed to pay an aggregate of $272 million under the D&O Policies ($200 million under the 2017 Tower and $72 million under the 2018 Tower) to resolve the Arbitration.[4] In exchange, the Reorganized Debtors and the individual insureds have agreed to release the Settling Insurers from all further claims under the 2017 Tower and under the D&O

---

[2] Defendants Lewis Chew, Fred J. Fowler, Maryellen C. Herringer, Richard C. Kelly, Roger H. Kimmel, Richard A. Meserve, Forrest E. Miller, Eric D. Mullins, Rosendo G. Parra, Barbara L. Rambo, Anne Shen Smith, and Barry Lawson Williams (collectively, the "**D&O Action Director Defendants**"); Defendants Kevin Dasso, Anthony F. Earley, Jr., Patrick M. Hogan, Christopher P. Johns, Gregg L. Lemler, Steve E. Malnight, and Geisha J. Williams (collectively, the "**D&O Action Officer Defendants**," and together with the D&O Action Director Defendants, the "**D&O Action Defendants**").

[3] As discussed below, the Insurance Settlements do not resolve disputes with respect to four of the 2018 Tower D&O Policies.

[4] The D&O Insurers have declined to settle claims under four of the D&O Policies in the 2018 Tower, with total limits of liability of $40 million.

Policies in the 2018 Tower that are the subject of the Insurance Settlements, and to request dismissal of the Arbitration against the Settling Insurers with respect to the D&O Policies that are the subject of the Insurance Settlements.

Approving the Insurance Settlements is in the best interests of the Debtors' estates because it will allow the parties to finally resolve various costly and protracted proceedings. As noted above, approving the Insurance Settlements will allow the Reorganized Debtors to implement an agreement with the FVT (the "**D&O Action Settlement**"), pursuant to which the FVT will receive $117 million from the Insurance Settlements to resolve the claims that the FVT is pursuing against PG&E's former directors and officers in the D&O Action. A copy of the D&O Action Settlement is attached as **<u>Exhibit D</u>** to the Slack Declaration. Pursuant to the Plan, the D&O Action Settlement amount must be paid solely from any insurance proceeds available under the D&O Policies' "Side B" coverage. Although the D&O Action Settlement is not conditioned upon obtaining Court approval, that settlement is conditioned upon this Court's approval of the Insurance Settlements. More importantly, the Insurance Settlements provide the Reorganized Debtors and their stakeholders, including the FVT, with certainty as to the minimum amount of insurance proceeds available to satisfy the FVT Claims in the D&O Action (and potentially to settle the Securities Litigation and Securities Claims).

Entry into the Insurance Settlements is a reasonable and appropriate exercise of the Reorganized Debtors' business judgment. By entering into the Insurance Settlements, the Reorganized Debtors will eliminate significant potential liabilities and ongoing and potential future costs in the Arbitration and the D&O Action. Moreover, even if the Reorganized Debtors (or the D&O Action Defendants) were to prevail in each of these disputes, the costs of ongoing litigation over the FVT Claims would inevitably erode the D&O Policies' limits of liability to the detriment of the Reorganized Debtors and the FVT, whose assigned right to pursue the claims in the D&O Action is capped under the Plan to the extent of any remaining Side B Coverage available under the D&O Policies. Thus, the Insurance Settlements will allow the Reorganized Debtors to avoid further substantial expenses.

Accordingly, the Reorganized Debtors respectfully request that the Court grant this Motion and approve the Insurance Settlements.

## II. JURISDICTION

This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334, the *Order Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges, General Order 24* (N.D. Cal. Feb. 22, 2016), and Rule 5011-1(a) of the Bankruptcy Local Rules for the United States District Court for the Northern District of California. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## III. BACKGROUND

### A. The D&O Policies and the Arbitration

PG&E purchased the D&O Policies that comprise the 2017 Tower and the 2018 Tower and has rights to certain insurance proceeds under those D&O Policies. Each of the D&O Policies is written on a "claim first made" basis and, generally speaking, covers: (i) PG&E's former directors and officers, for any non-indemnifiable losses incurred in their capacity as officers or directors of PG&E (the "**Side A Coverage**"); (ii) PG&E, for any losses arising from the indemnification obligations it owes to the directors and officers for claims against them (the "**Side B Coverage**"); and (iii) PG&E, for any losses it incurs as a result of securities claims made directly against PG&E (sometimes referred to as entity liability coverage) (the "**Side C Coverage**"). Goodwin Declaration ¶ 3.

The shared coverage available under each year of the D&O Policies is subject to an *aggregate* limit of liability of a total of $200 million for each D&O Policy year, such that when proceeds are paid out under any of Side A, Side B, or Side C, the total remaining shared coverage available under that year of D&O Policies is reduced by the amount of that payment. *Id.* ¶ 4. Thus, any payment made under any of the Side A, Side B, or Side C Coverages reduces the coverage that is available under all sides of the respective D&O Policy year from which those proceeds are drawn. In total, the two years of D&O Policies with Side A, Side B, and Side C Coverage provide for an aggregate of $400 million in total limits of liability.

PG&E submitted timely claims under both towers of the D&O Policies to cover defense costs and potential liabilities arising from the allegations in the Amended Complaint (defined and discussed below). However, the D&O Insurers took the position that the claims asserted in the Amended Complaint do not trigger coverage under the 2018 Tower, contending that the claims all share a "common nexus" and arise out of the 2017 North Bay Fires. PG&E disagreed with that position and, pursuant to the mandatory dispute resolution procedures set forth in the D&O Policies, the parties actively engaged in an arbitration proceeding before a panel of experienced arbitrators. Among other things, the parties to the Arbitration briefed and argued to the panel whether claims made in the Securities Litigation and/or the D&O Action were deemed first made only during the policy period of the 2017 Tower or also contained claims that could be deemed first made during the policy period of the 2018 Tower and thus triggered both years of D&O Policies. PG&E, with the concurrence of the insurers, subsequently requested that the arbitration panel withhold issuance of any award while the parties engaged in settlement discussions.

PG&E now has reached settlement agreements with all insurers in the 2017 Tower and insurers issuing certain of the D&O Policies in the 2018 Tower (the "**Settling Insurers**"). Under the settlements, the Settling Insurers have agreed to pay an aggregate of $272 million under their respective D&O Policies, which encompass both the 2017 Tower D&O Policies and all but four of the 2018 Tower D&O Policies. The Settling Insurers have agreed to make this payment to resolve PG&E's claims for coverage and to fund the settlement of the D&O Action, to fund any settlement of the Securities Litigation and the Securities Claims, and to fund certain defense fees and expenses PG&E has incurred in connection with the D&O Action, Securities Litigation and the Securities Claims. PG&E and the individual insureds have agreed under the Insurance Settlements to release all insurance claims against the Settling Insurers for the 2017 Tower and 2018 Tower (apart from claims under the four D&O Policies that are not included in the settlements (the "**Non-Settling Policies**")) related to the Securities Litigation, the Securities Claims, the D&O Action, and the other matters noticed in the Insurance Settlements, as well as PG&E's related defense costs.

The Insurance Settlements are contingent on this Court's approval. The parties have informed the arbitrators of the Insurance Settlements and have requested that they stay the

Arbitration until this Court rules on the Motion to approve the Insurance Settlements. The parties have further agreed to request that, if this Court grants the Motion and the Insurance Settlements become effective and this Court's order approving the Insurance Settlements becomes final, the arbitrators dismiss with prejudice the claims PG&E and the individual insureds asserted against the Settling Insurers in the Arbitration with respect to the D&O Policies covered by the Insurance Settlements. The Arbitration will continue with respect to the Non-Settling Policies that certain insurers have chosen not to settle and the Arbitration therefore will re-commence with respect to $40 million of the $200 million available insurance in the 2018 Tower. If the Reorganized Debtors are successful in the arbitration against the insurance carriers that issued the Non-Settling Policies, there would be up to an additional $40 million available to the Reorganized Debtors to, among other things, contribute to a settlement of the Securities Litigation and Securities Claims.

## B.    The D&O Action and the Plan

On November 20, 2017, the Firemen's Retirement System of St. Louis filed the D&O Action in the Superior Court of California, San Francisco County. *See Stockholder Derivative Complaint for Breach of Fiduciary Duties and Unjust Enrichment*, D&O Action (the "**D&O Action Initial Complaint**"). The D&O Action Initial Complaint alleged two causes of action, breach of fiduciary duty and unjust enrichment, against certain individual officers and directors of the Debtors, with the Debtors themselves as nominal defendants. *Id.* The D&O Action Initial Complaint alleged that the individual officers and directors violated their fiduciary duties and unjustly enriched themselves by disseminating inaccurate information to shareholders, failing to correct misconduct, allowing the Debtors to avoid safety regulations and fail to perform proper maintenance, resulting in damages to the Debtors in connection with the 2017 North Bay Fires. *Id.* at 1-2. Other shareholders subsequently filed additional directors and officers actions, some of which were consolidated in a single proceeding, before the San Francisco Superior Court.

By Order dated June 20, 2020 [Docket No. 8053], the Court confirmed the Plan. The Plan became effective on July 1, 2020 [Dkt. No. 8252] (the "**Plan Effective Date**"). Pursuant to the Plan, the Reorganized Debtors may object to claims until the later of (i) one hundred and eighty (180) days after the Plan Effective Date and (ii) such later date as may be fixed by the Court for

cause shown.  *See* Plan § 7.1.  By Order dated May 19, 2022 [Dkt. No. 12432], the Court extended the deadline for the Reorganized Debtors to object to claims to December 19, 2022, without prejudice to the Reorganized Debtors' right to seek additional extensions thereof.  The Plan further vests the Reorganized Debtors with the discretion and authority to compromise, settle, otherwise resolve, or withdraw any objections to Disputed Claims.  *See* Plan § 7.2.

As set forth in Section 6.7 of the Plan, the FVT was established to, among other purposes, administer, process, settle, resolve, satisfy, and pay certain claims arising out of the 2015 Butte Fire, the 2017 North Bay Fires, and the 2018 Camp Fire, (collectively, the "**Fires**"), and prosecute or settle the Assigned Rights and Causes of Action (as defined in Section 1.8 of the Plan).  The Assigned Rights and Causes of Action included "any and all rights, claims, causes of action, and defenses related thereto relating directly or indirectly to any of the Fires that the Debtors may have against . . . former directors and officers of the Debtors solely to the extent of any directors and officers' Side B Insurance Coverage."

On February 24, 2021, the FVT filed its first amended complaint and, on November 18, 2021, filed its second amended complaint in the D&O Action.  *See Second Amended Complaint,* D&O Action (the "**D&O Action Amended Complaint**").[5]  The D&O Action Amended Complaint alleges two causes of action against the D&O Action Defendants, both for breach of fiduciary duty, one in connection with the 2017 North Bay Fires and the other in connection with the 2018 Camp Fire.  D&O Action Amended Complaint at 1-4.  In March 2022, the D&O Action Defendants filed motions for summary judgment, which were set to be heard on May 27, 2022.

Although the Reorganized Debtors are not defendants in the D&O Action, the Plan provides that recoveries on the D&O Action can only come from insurance proceeds from the Side B coverage of the D&O Policies, which policies are assets of the Reorganized Debtors.  *See* Plan § 8.7.  Moreover, because the D&O Policies have finite limits of liability, any insurance proceeds used to settle the D&O Action would then not be available to settle Securities Claims filed in the

---

[5] Although the D&O Action was originally filed by a third-party plaintiff, the FVT took control of the consolidated D&O Action as a result of the Plan's assignment of the causes of action.  Under the terms of the D&O Action Settlement, the sole remaining non-consolidated directors and officers action will be dismissed with prejudice.

7

Chapter 11 Cases or to resolve the Securities Litigation (and the potential indemnity claims arising from continued litigation of and/or resolution of those claims).  Thus, the Reorganized Debtors have a strong and necessary interest in the settlement of the D&O Action.

On May 11, 2022, the court presiding over the D&O Action held a status conference and stayed all proceedings until May 23, 2022, in light of the tentative settlement that the parties had reached.  On May 31, 2022, pursuant to a stipulation and proposed order, the court indefinitely stayed the action pending the finalization and execution of the D&O Action Settlement.

### C.  The Securities Litigation

In June 2018, two purported securities class actions, entitled *David C. Weston v. PG&E Corporation, et al.* and *Jon Paul Moretti v. PG&E Corporation, et al.*, were filed in the United States District Court for the Northern District of California (the "**District Court**").  These actions alleged that PG&E, as well as certain of its then-current and former officers and directors, made material misrepresentations and omissions in various PG&E public disclosures related to, among other things, vegetation management and other issues connected to the 2017 North Bay Fires in violation of the federal securities laws.  On September 10, 2018, both of the actions were consolidated as the Securities Litigation, and the Public Employees Retirement Association of New Mexico ("**PERA**") was appointed as lead plaintiff.  The Securities Litigation was automatically stayed against the Debtors on January 29, 2019, when the Debtors commenced the Chapter 11 Cases.  On February 22, 2019, a third purported securities class action was filed, entitled *York County on behalf of the York County Retirement Fund, et al. v. Rambo, et al.*, which also alleged securities violations against certain then-current and former officers and directors of PG&E, as well as the underwriters of four public offerings of notes from 2016 to 2018.  On May 7, 2019, this action was also consolidated into the Securities Litigation.

On May 28, 2019, PERA filed the *Third Amended Consolidated Class Action Complaint* in the Securities Litigation on behalf of a yet uncertified class of all persons and entities who, during the period from April 29, 2015 through November 15, 2018, both dates inclusive (the "**Class Period**"), purchased or otherwise acquired publicly traded PG&E securities.  *See* Securities

Case: 19-30088    Doc# 13015    Filed: 09/29/22    Entered: 09/29/22 16:37:28    Page 13 of 28

Litigation Dkt. No. 121 (the "**Amended Complaint**").[6]  The Amended Complaint alleges that the Debtors, as well as certain of the Debtors' prepetition officers and directors and underwriters, violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder by allegedly making material misrepresentations and omissions in various PG&E public disclosures related to, among other things, vegetation management and other issues connected to the 2017 North Bay Fires.  *See* Amended Complaint ¶¶ 17-23.  The Amended Complaint also asserts claims under Sections 11 and 15 of the Securities Act of 1933 against certain of the Debtors' prepetition officers, directors, and underwriters based on alleged material misrepresentations and omissions in connection with the note offerings related to, among other things, the Debtors' vegetation management and wildfire safety measures.  *See* Amended Complaint ¶¶ 498-505.[7]  The Amended Complaint also includes claims concerning equipment management and other issues connected with the 2018 Camp Fire.  *See* Amended Complaint ¶¶ 33-38.

On October 4, 2019, the non-debtor defendants (certain directors and officers of the Debtors and underwriters) in the Securities Litigation (collectively, the "**Non-Debtor Securities Defendants**") moved to dismiss all of the claims asserted in the Amended Complaint.  *See* Securities Litigation, Dkt. Nos. 148, 155.  On April 29, 2021, the District Court indicated that it intended to stay the Securities Litigation pending resolution of the Securities Claims in the Chapter 11 Cases pursuant to the Securities Claims Procedures (as defined below) adopted by this Court.  *See* Securities Litigation Dkt. No. 198.  PERA opposed a stay of the Securities Litigation.  The District Court has not further ruled on its intention to stay the Securities Litigation, certified any proposed class, or decided the pending motions to dismiss.

### D.    The Securities Claims

As this Court is aware, approximately 8,768 Securities Claims were filed, on a proof of claim form approved by the Court, seeking to recover damages for alleged losses relating to prepetition

---

[6] The named plaintiffs in the Securities Litigation are PERA, York County on behalf of the County of York Retirement Fund, City of Warren Police and Fire Retirement System, and Mid-Jersey Trucking Industry & Local No. 701 Pension Fund.

[7] The Amended Complaint does not name the Debtors as defendants; it states, however, that the Debtors would have been named as defendants but for the automatic stay.  *See* Amended Complaint ¶¶ 509–10.

purchases of the Debtors' debt and equity securities as a result of alleged inadequate or fraudulent disclosures or non-disclosures of information during the Class Period (holders of such claims, "**Securities Claimants**"). Securities Claimants filed proofs of claim against the Debtors which on their face seek approximately $8.7 billion.

On September 1, 2020, the Reorganized Debtors filed a motion [Dkt. No. 8964] to establish certain procedures designed to aid in the resolution of the Securities Claims (the "**Securities Claims Procedures**"). The Court entered an order approving the Securities Claims Procedures on January 25, 2021. *See* Dkt. No. 10015. The Securities Claims Procedures authorize the Reorganized Debtors to, among other things: (i) request the trading information necessary to assess the viability and calculate the potential amount of any allowed claims under the federal securities laws for each Securities Claim; (ii) exchange settlement offers and counteroffers with Securities Claimants and their representatives; (iii) submit Securities Claims to mandatory, non-binding mediation; and/or (iv) object to certain groups of Securities Claims on an omnibus basis. *See, e.g.*, Dkt. No. 10015, Ex. A.

As explained in previous filings and updates filed with the Bankruptcy Court, the Reorganized Debtors have endeavored to obtain complete, transaction-level data for each alleged Securities Claim. *See, e.g.*, *Second Securities Claims Status Report* (Apr. 5, 2022) [Dkt. No. 12114] (the "**Second Securities Claims Status Report**"). For certain of those Securities Claimants that submitted complete trading information and worked with the Reorganized Debtors' claims and noticing agent to resolve all discrepancies, the Reorganized Debtors were able to begin making individual settlement offers earlier this year. As detailed in the Second Securities Claims Status Report, the Reorganized Debtors have utilized the Securities Claims Procedures to make significant progress in addressing Securities Claims filed against the Debtors. Currently, the Reorganized Debtors have expunged (through objection or settlement) approximately 1,800 claims, representing approximately $946 million in face amount of those claims. The settlement process under the Securities Claims Procedures has been effective in resolving Securities Claims and reducing and avoiding litigation and related costs and expenses for both the Reorganized Debtors and Securities Claimants.

Although the Securities Claims Procedures process has proven to be effective, thousands of Securities Claims remain unresolved.

## IV. NEGOTIATION OF THE INSURANCE SETTLEMENTS

In February 2022, in pursuit of, among other things, a resolution of the Arbitration and FVT Claims, the parties retained an experienced mediator and scheduled several formal mediation sessions. *See* Goodwin Declaration ¶ 11. In advance of the mediation sessions, the parties conferred and exchanged information among themselves and also submitted detailed mediation statements and exhibits to the mediator. *Id*. With the mediator's active participation and assistance, and extensive arm's-length negotiations over the course of several months, the parties were ultimately able to reach the Insurance Settlements and the D&O Action Settlement. *Id*.

## V. MATERIAL TERMS OF THE INSURANCE AND D&O ACTION SETTLEMENTS

The principal terms of the Insurance Settlements and D&O Action Settlement are summarized below.[8]

### A. Insurance Settlements[9]

| Settlement Overview | The Insurance Settlements consist of two separate but related settlements with the D&O Insurers and involve all but four of PG&E's D&O Policies. The first is between the Reorganized Debtors and insurers that either issued coverage in both the 2017 Tower and the 2018 Tower or only in the 2018 Tower (the "**First Insurance Settlement**"). The second is between the Reorganized Debtors and the settling insurance carriers that are only in the 2017 Tower (the "**Second Insurance Settlement**"). The terms of the First Insurance Settlement and Second Insurance Settlement are very similar. The key difference, described more fully below, is that the First Insurance Settlement resolves all of the claims under the 2018 Tower apart from four of the 2018 Tower policies, totaling $40 million in coverage, and the Second Insurance Settlement resolves the claims of all four of the D&O Insurers that are only in the 2017 Tower. Collectively, the First Insurance |
|---|---|

---

[8] These summaries are qualified in their entirety by reference to the provisions of each of the Insurance Settlements and the D&O Action Settlement, as applicable. To the extent that any discrepancies exist between the summaries described in this Motion and the terms of the Insurance Settlements or the D&O Action Settlement, the terms of the Insurance Settlements and the D&O Action Settlement, as applicable, shall govern.

[9] Capitalized terms used in this section but not herein defined have the meanings ascribed to such terms in the Insurance Settlements.

| | | Settlement and Second Insurance Settlement constitute the Insurance Settlements. |
|---|---|---|
| | **Effective Date** | The Insurance Settlements become effective upon the Court's approval of the Insurance Settlements in the Chapter 11 Cases. |
| | | If the Court's approval of the Insurance Settlements is reversed in a final order, the Insurance Settlements will become void *ab initio,* the parties will be restored to all rights and obligations prior to executing the Insurance Settlements, and PG&E will direct that any insurance payment be returned to the Settling Insurers within thirty days of the reversal order becoming final, with PG&E paying any unpaid balance within fifteen days of notification. |
| | **Payment by Insurers** | **Aggregate Payment** |
| | | The Settling Insurers shall pay an aggregate $272 million to the Reorganized Debtors as follows: $200 million from the 2017 Tower, representing the entire available coverage under that tower; and $72 million from the 2018 Tower, out of the $160 million in coverage settled of the under the 2018 Tower (which in total provides $200 million in coverage).[10] The Settling Insurers therefore have agreed to pay 100% of the 2017 Policies and 45% of the $160 million represented by the Settling Insurers in the 2018 tower. The $40 million of the 2018 Tower that is not settling reflects the amounts insured under the Non-Settling Policies.[11] The D&O Insurers issuing the Non-Settling Policies ("**Non-Settling Insurers**") and PG&E will therefore continue to arbitrate their dispute over coverage with respect to the total of $40 million in limits under those policies. The amounts to be paid by each Settling Insurer is detailed in a schedule set forth in the Insurance Settlements (the "**Payment Schedule**"). |
| | | **Most Favored Nations Provision** |
| | | • If the Reorganized Debtors, the D&O Action Defendants, and the Non-Debtor Securities Defendants (collectively, the "**Insureds**") agree in a settlement to accept payment from a Non-Settling Insurer in the 2018 Tower, then the payments owed by the Settling Insurers under the First Insurance Settlement under |

---

[10] The insurers settling as part of the 2018 Tower are: Associated Electric & Gas Insurance Services Limited, Swiss Re Corporate Solutions America Insurance Corporation, f/k/a North American Specialty Insurance Company, Great Lakes Insurance SE, Endurance Risk Solutions Assurance Co., Berkley Insurance Company, Allianz Global Risks US Insurance Company ("**Allianz**") (with respect to the seventh layer excess policy), Continental Casualty Company, Twin City Fire Insurance Company, Argonaut Insurance Company, and Energy Insurance Mutual Limited.

[11] The Non-Settling Policies are: Lloyd's Syndicate Barbican D&O US Consortium 2018 9679 BAR 1955 (with respect to the eighth layer excess policy), Starr Indemnity & Liability Company (with respect to the eleventh layer excess policy), Allianz (with respect to the twelfth layer excess policy), and Houston Casualty Company (with respect to the thirteenth layer excess policy).

12

the 2018 Tower will be reduced to the lowest percentage of policy limits that any Non-Settling Insurer is paying under its Non-Settling Policy (the "**Reduced Payment**"), in which case the Payment Schedule amounts as to the 2018 Tower D&O Policies shall automatically be amended to the Reduced Payment and, if the original payment amount had already been made, then the Reorganized Debtors would pay to each Settling Insurer with a 2018 Tower D&O Policy the difference between said amount and the amount of the Reduced Payment.

- This provision does not apply if the Insureds agree to voluntarily accept payment from a Non-Settling Insurer: (i) in satisfaction of an Arbitration Award in the current Arbitration for an amount that implicates less than the remaining limits of liability of the 2018 Tower D&O Policies, or (ii) after an award is issued in the Arbitration in favor of the Insureds on certain cross-motions submitted to the arbitration panel on October 7, 2021.

- The provision does not affect the $200 million in payments that certain of the Settling Insurers agreed to pay the Reorganized Debtors under the 2017 Tower.

| | |
|---|---|
| | **Related Settlements** |
| | The Insureds will use reasonable efforts to complete settlements of the Securities Litigation (including the Securities Claims) and the D&O Action with respect to PG&E securities. The Insurance Settlements are binding upon the occurrence of the Effective Date regardless of whether such settlements become final. |
| **Exhaustion of Policies** | If the Insurance Settlements are approved and become final, the 2017 Tower and the 2018 Tower D&O Policies with the Settling Insurers will be exhausted and there will be no insurance proceeds available for any additional claims against those policies. In addition, if PG&E is successful in the Arbitration against the four Non-Settling Policies, any funds it recovers may potentially (but need not) be used to reimburse itself for settlement payments and fees and expenses in connection with the Securities Litigation and the Securities Claims. |
| **Mutual Releases** | **2017 Insurer Releases** |
| | Upon payment by the Settling Insurers as provided under the Insurance Settlements, the Insureds shall release, acquit, remise, and discharge the 2017 Tower D&O Insurers from any and all claims, disputes, costs and demands under their respective 2017 Tower D&O Policies, including but not limited to any extra-contractual or claims of bad faith, based upon, arising out of or relating to any, some, and/or all of the following: (1) the matters noticed in the Insurance Settlements (the "**Noticed Matters**"), (2) defense costs incurred in connection with the Noticed Matters, (3) the acts, failures to act, omissions, misrepresentations, statements, misstatements, facts, events, or occurrences alleged or which |

could have been alleged in the Noticed Matters; (4) wildfires that occurred on or before May 20, 2020 (subparts (1) through (4) above are collectively referred to as the "**Released Matters**"); and (5) the 2017 Tower D&O Policies, including without limitation any allegation that any Settling Insurer breached any obligation under the 2017 Tower D&O Policies.

**2018 Insurer Releases**

Upon payment by the Settling Insurers as provided under the Insurance Settlements, the Insureds release, acquit, remise, and discharge the 2018 Tower D&O Insurers from any and all claims, disputes, controversies, fees, costs and demands under the 2018 Tower D&O Policies (excepting any claims for breach of the Insurance Settlements and not including the Non-Settling Policies), including but not limited to any extra-contractual claims or claims of bad faith, based upon, arising out of or relating to any, some, and/or all of the following: (1) the Released Matters; and (2) the 2018 Tower D&O Policies, including without limitation any allegation that the 2018 Tower D&O Insurers breached any obligation under the 2018 Tower D&O Policies.

**Insured Releases**

Upon payment by the Settling Insurers as provided for under the Insurance Settlements, the Settling Insurers shall release, acquit, remise, and discharge the Insureds from any and all claims, disputes, controversies, fees, costs and demands under the 2017 Tower D&O Policies and the 2018 Tower D&O Policies (excepting any claims for breach of the Insurance Settlements and not including the Non-Settling Policies) including but not limited to any extra-contractual or claims of bad faith, based upon, arising out of or relating to any, some, and/or all of the following: (1) the Released Matters; (2) the D&O Policies that were the subject of the Insurance Settlements, including without limitation any allegation that any Insured breached any obligation under such D&O Policies; and (3) based upon, arising out of or relating to any rights to recoup the payments made pursuant to the Insurance Settlements, other than as provided in the payment reduction provision of the First Insurance Settlement.

**B.   D&O Action Settlement**[12]

| D&O Action Settling Parties | The parties to the D&O Action Settlement Agreement include: |
|---|---|

---

[12] Capitalized terms used in this section but not herein defined have the meanings ascribed to such terms in the D&O Action Settlement.

| | |
|---|---|
| | (i)      The FVT; |
| | (ii)      The D&O Action Defendants; and |
| | (iii)      The Reorganized Debtors. |
| **Effective Date** | The D&O Action Settlement Effective Date shall be the date on which all of the following conditions have been satisfied: <br><br> 1. Full execution of the D&O Action Settlement by the D&O Action Settlement Parties; <br><br> 2. An order from the Court approving a settlement by and between PG&E and its insurance carriers; and <br><br> 3. Dismissal of *Hagberg v. Chew*, Case No. CGC-19-573190 (S.F. Super. Ct.). |
| **Payment Source** | Payment for the D&O Action Settlement shall come solely from proceeds from Side B Insurance Coverage, as defined in the Plan. None of the Settlement Amount is being paid by the Reorganized Debtors and the D&O Defendants shall have no personal responsibility or liability for the D&O Action Settlement Amount. |
| **Settlement Amount and Releases** | **D&O Action Settlement Amount** <br><br> In full and final settlement of the D&O Action, the FVT shall receive a total lump sum of $117,000,000 solely from insurance proceeds within 30 business days of the D&O Action Settlement Effective Date. |
| | **Release of Claims** <br><br> Effective upon receipt of the Settlement Amount, the FVT, on behalf of itself and Customary Related Parties, shall release the D&O Action Defendants, PG&E, the Settling Insurers,[13] and all of their respective Customary Related Parties, from any and all claims (including unknown claims) which are or were held at any point from the beginning of time to the Effective Date, arising out of, relating to, or in connection with (i) the rights, claims, and causes of action that PG&E assigned to the FVT under the Plan that were or could have been pursued against the D&O Action Defendants, including but not limited to the facts, transactions, acts, occurrences, statements, representations, and/or omissions that were or could have been asserted in the D&O Action; and (ii) any claims related to the pursuit and/or defense of the D&O Action, including but not limited to claims for malicious prosecution, litigation sanctions, breach or violation of the Plan, or breach of PG&E's assignment of claims or the implied covenant of good faith and fair dealing in connection therewith. |

---

[13] This release will only apply to the 2017 Tower and the 2018 Tower D&O Policies and not to any other insurance policies.

| **D&O-PG&E Release** | The D&O Action Defendants will agree with PG&E to a specific release of PG&E for claims regarding the FVT's claims that are being released in this Agreement, other than the D&O Action Defendants' claims for fees and expenses in connection with the D&O Action. This release is not intended to and will not supersede any other indemnification rights or limit any other present or future claims by the D&O Action Defendants for indemnification by PG&E. |
|---|---|

## VI. BASIS FOR RELIEF REQUESTED

### A. The Insurance Settlements are in the Best Interests of the Debtors' Estates and Should be Approved Pursuant to Bankruptcy Rule 9019

Bankruptcy Rule 9019(a) provides that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise and settlement." Fed. R. Bankr. P. 9019(a). Compromises and settlements are normal and welcomed occurrences in chapter 11 because they allow a debtor and its creditors to avoid the financial and other burdens associated with litigation over contentious issues and expedite the administration of the bankruptcy estate. *See Martin v. Kane (In re A&C Props.)*, 784 F.2d 1377, 1380-81 (9th Cir. 1986). The decision to approve a particular compromise lies within the sound discretion of the Court. *Id.* A proposed compromise and settlement should be approved when it is "fair and equitable" and "in the best interest of the [debtor's] estate." *Id.* at 1381.

The standard for approval of settlements under Bankruptcy Rule 9019 is deferential to the debtor's judgment and merely requires a court to ensure that the settlement does not fall below the lowest point in the range of reasonableness in terms of benefits to the estate. *See City Sanitation v. Allied Waste Servs. of Mass., LLC (In re Am. Cartage, Inc.)*, 656 F.3d 82, 91-92 (1st Cir. 2011) ("The task of both the bankruptcy court and any reviewing court is to canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness . . . If a trustee chooses to accept a less munificent sum for a good reason (say, to avoid potentially costly litigation), his judgment is entitled to some deference.") (*citing In re Thompson*, 965 F.2d 1136, 1145 (1st Cir. 1992)); *Nellis v. Shugrue*, 165 B.R. 115, 123 (S.D.N.Y. 1994) (a court need not be aware of or decide the particulars of each individual claim resolved by the settlement or "assess the minutia of each and every claim;" rather, a court "need only canvass the issues and see whether the settlement falls 'below the lowest point in the range of reasonableness'") (quoting *In re W.T. Grant Co.*, 699

F.2d 599, 608 (2d Cir. 1983)); *In re Pac. Gas & Elec. Co.*, 304 B.R. 395, 417 (Bankr. N.D. Cal. 2004) ("It has been held that the court's proper role is 'to canvas the issues and see whether the settlement falls below the lowest point in the range of reasonableness.'") (quoting *In re Drexel Burnham Lambert Group, Inc.,* 134 B.R. 493, 496–97 (Bankr.S.D.N.Y.1991)).

Courts in the Ninth Circuit consider four factors in determining whether a settlement should be approved: "(1) the probability of success in litigation, with due consideration for the uncertainty in fact and law; (2) the difficulties, if any, to be encountered in the matter of collecting any litigated judgment; (3) the complexity and likely duration of the litigation and any attendant expense, inconvenience, and delay; and (4) the paramount interest of the creditors and the proper deference to their reasonable views." *In re A&C Props.*, 784 F.2d at 1380. It is not necessary that the conclusions reached in the consideration of each of the above factors support the settlement, but taken as a whole, the conclusions must favor the approval of the settlement. *See In re Pac. Gas & Elec. Co.*, 304 B.R. at 417 (citing *In re WCI Cable, Inc.*, 282 B.R. 457, 473-74 (Bankr. D. Or. 2002)).

The Insurance Settlements are a significant achievement. The Insurance Settlements represent a reasonable compromise of a dispute that has been the subject of an extensive arbitration between the Reorganized Debtors and the D&O Insurers that has been pending for nearly two and a half years. Although the Reorganized Debtors are confident in their position regarding the Arbitration, substantial uncertainties still exist, and it is possible that the Reorganized Debtors could arbitrate and obtain less than the total of $272 million that is being paid by the Settling Insurers under the 2017 and 2018 D&O Policies.

More importantly, the timing of the Insurance Settlements and the certainty of being paid at least $272 million under the D&O Policies allowed the Reorganized Debtors to be able to reach the D&O Action Settlement and to seek further reasonable settlements with respect to the Securities Litigation and Securities Claims. Absent approval of the Insurance Settlements, the conditions necessary to effectuate the D&O Action Settlement will not occur, and the Reorganized Debtors will not have certainty of a minimum amount of money to resolve the Securities Litigation and Securities Claims.

Each of the factors that courts consider in connection with a request to approve a settlement under Bankruptcy Rule 9019 weigh heavily in favor of approving the Insurance Settlements, as set forth below.

### 1. The Probability of Success in Litigation

In evaluating the probability of success, the Court need not conduct a "mini-trial on the merits" of these disputes. *In re Schmitt*, 215 B.R. 417, 423 (B.A.P. 9th Cir. 1997). Rather, the Court should defer to the Reorganized Debtors' assessment of the probability of success and risks of further litigation. *See, e.g.*, *In re Open Med. Inst., Inc.*, 639 B.R. 169, 183 (B.A.P. 9th Cir. 2022) (affirming approval of settlement agreement where bankruptcy court "agreed with the Trustee's assessment" and "described the odds of success as a 'coin flip'").

The Insurance Settlements were heavily negotiated and, accordingly, recognize and appropriately take into account the risk of an adverse outcome in the Arbitration. Although the Reorganized Debtors are confident in their position, arbitration is inherently unpredictable and uncertain, which favors settlement. *See Johnson v. Quantum Learning Network, Inc.*, 2017 WL 747462, at *1 (N.D. Cal. Feb. 27, 2017) ("Courts have noted that uncertainty favors approval of a settlement.") (citing *Browning v. Yahoo! Inc.*, 2007 WL 4105971, at *10 (N.D. Cal. Nov. 16, 2007); *In re Laser Realty, Inc. v. Fernandez (In re Fernandez)*, 2009 WL 2913685, at *3 (Bankr. D.P.R. Mar. 31, 2009) ("The Court concludes that the uncertainty of the litigation between the debtors and Citibank weighs heavily in favor of the approval of the Settlement Agreement.").

The Reorganized Debtors, with the assistance of, and after receiving advice from, their counsel and other advisors, carefully considered the risks, complexity, and expense associated with continuing the Arbitration, and they determined in their business judgment that resolving the Arbitration as provided in the Insurance Settlements is reasonable and in the best interests of the Debtors' estates. *See* Simon Declaration ¶¶ 7-11. Moreover, the availability of a minimum of $72 million in insurance proceeds from the 2018 Tower would substantially reduce the amount of cash or other consideration that the Reorganized Debtors would need to pay in any settlement of the Securities Litigation and the Securities Claims. Thus, the Reorganized Debtors properly considered not only the direct benefits of resolving the Arbitration, but also the benefits of resolving, and

potentially resolving, various other interrelated proceedings. *Officers for Justice v. Civil Serv. Comm'n of City & Cnty. of San Francisco*, 688 F.2d 615, 628 (9th Cir. 1982) ("It is the complete package taken as a whole, rather than the individual component parts, that must be examined for overall fairness.").

### 2. *Potential Difficulties in Collecting Any Judgment*

The Reorganized Debtors expect that the D&O Insurers likely would be able to pay any amounts ultimately awarded by the panel in the Arbitration. However, the Reorganized Debtors also consider prompt receipt of the settlement amounts from the Settling Insurers to be critical to the timely settlement of the FVT Claims, as well as to any future settlements of the Securities Litigation and the Securities Claims, and believe this outweighs the fact that any arbitration award eventually issued against the Settling Insurers would likely be fully collectable.

### 3. *The Complexity and Expense of Any Litigation*

Compromises are favored precisely to "minimize litigation and expedite the administration of a bankruptcy estate." *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996). Multiple courts within the Ninth Circuit have found that expensive, contentious litigation weighs in favor of compromise, even after trial has commenced. *See In re Am. Bldg. Storage, LLC*, 2007 WL 7532281, at *6 (B.A.P. 9th Cir. Apr. 2, 2007) ("Likewise, the factor of 'complexity' and 'expense' of litigation weighs in favor of the settlement. The record shows that the litigation was highly contentious, and the second phase of the trial had not even been set yet."); *In re Waksberg*, 2014 WL 5285648, at *10 (B.A.P. 9th Cir. Oct. 15, 2014) (finding that this factor favored settlement when there "already had been very time consuming and extremely costly" litigation and would require further expense and time to resolve).

The Insurance Settlements will similarly serve to reduce litigation and arbitration, minimize expense, and expedite the administration of the estate. While the initial phase of the Arbitration is nearly complete, approval of the Insurance Settlements is a condition precedent for the Reorganized Debtors' entry into the D&O Action Settlement, which is itself a complex case that has proven to be expensive. While the ultimate recovery on the FVT Claims can only come from insurance proceeds, the expenses of the litigation largely fall on the Reorganized Debtors. Indeed, much of

the discovery in that action is of the Reorganized Debtors and has been borne by the Reorganized Debtors either directly or indirectly as a result of potential indemnification obligations.

In addition, if the Reorganized Debtors are able to settle the Securities Litigation and the Securities Claims as facilitated by the Insurance Settlements, the Reorganized Debtors would avoid the cost and expense of further securities litigation in two courts – the District Court in the case of the Securities Litigation and this Court in connection with the proof of claim process – where the Reorganized Debtors would otherwise expect to incur significant cost. Indeed, any future discovery in either forum would almost certainly also focus on the Debtors and the Reorganized Debtors, including testimony from many current and former PG&E officers and employees.

Entry into the Insurance Settlements will therefore save the time, expense and risk associated with further litigation in the Arbitration and the D&O Action. This factor thus favors approval of the Insurance Settlements.

### 4. The Interests of Creditors

This factor also supports approval of the Insurance Settlements. Approval of the Insurance Settlements will expedite distribution of insurance proceeds to the FVT – whose beneficiaries comprise a significant constituency of the Debtors' creditors – and ensure that it receives a recovery on the claims that it was assigned under the Plan and has been pursuing in the D&O Action. Specifically, approving the Insurance Agreements will allow the Reorganized Debtors and FVT to effectuate the D&O Action Settlement, under which the FVT will receive $117 million in insurance proceeds.

Although the PG&E Plan paid creditors in full, and thus the benefit to creditors under the Plan other than the fire claimants and the FVT is neutral, the Insurance Settlements are in the best interests of the Reorganized Debtors and their economic stakeholders. *See In re Pac. Gas and Elec. Co.*, 304 B.R. at 417 (holding the fourth *A & C Properties* factor favored approval of settlement where objecting creditors were paid in full); *see also Officers for Justice*, 688 F.2d at 628 ("It is the complete package taken as a whole, rather than the individual component parts, that must be examined for overall fairness.").

In the Reorganized Debtors' business judgment, the Insurance Settlements are fair, reasonable, and equitable, and in the Reorganized Debtors' best interests. They should thus be approved.

### B. The Insurance Settlements are a Sound Exercise of the Debtors' Business Judgment and Should be Approved

The Court should approve the Insurance Settlements because the Insurance Settlements fall well within the Reorganized Debtors' sound business judgment. As set forth in the Simon Declaration, the Reorganized Debtors carefully considered the Insurance Settlements and weighed the cost and benefits of continuing the Arbitration. In making that decision, the Reorganized Debtors obtained advice from experienced counsel. After receiving that advice, the Reorganized Debtors determined that sound business justifications exist to enter into the Insurance Settlements.

Section 363(b) of the Bankruptcy Code provides, in pertinent part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Section 105(a) of the Bankruptcy Code further provides that the "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Together, these sections of the Bankruptcy Code provide the Court with ample authority and discretion to grant the relief requested herein. *See In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983); *In re Walter*, 83 B.R. 14, 17 (B.A.P. 9th Cir. 1988) ("The bankruptcy court has considerable discretion in deciding whether to approve or disapprove the use of estate property by a debtor in possession, in the light of sound business justification."); *In re ASARCO, L.L.C.*, 650 F.3d 593, 601 (5th Cir. 2011) ("The business judgment standard in section 363 is flexible and encourages discretion."); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (use of assets outside the ordinary course of business permitted if "sound business purpose justifies such actions"); *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct.").

Once a debtor articulates a valid business justification under section 363 of the Bankruptcy Code, a presumption arises that the debtor's decision was made on an informed basis, in good faith, and in the honest belief that the action was in the best interest of the company. *See In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (noting that business judgment principles apply in the chapter 11 context and that "[c]ourts are loath to interfere with corporate decisions absent a showing of bad faith, self-interest, or gross negligence"); *In re Alaska Fishing Adventure, LLC*, 594 B.R. 883, 889 (Bankr. D. Alaska 2018) (noting in the section 363(b) context that "a bankruptcy court should determine only whether the trustee's judgment was reasonable and whether a sound business justification exists supporting the sale and its terms") (internal quotation marks omitted); *In re Johns-Manville Corp.*, 60 B.R. at 615–16 ("[T]he Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions"). Thus, if a debtor's actions satisfy the business judgment rule, then the transactions in question should be approved under section 363(b)(1) of the Bankruptcy Code.

For all the reasons discussed above, the Reorganized Debtors' actions here easily meet this requirement and, therefore, the Insurance Settlements should be approved.

## VII. NOTICE

Notice of this Motion will be provided to (i) the Office of the United States Trustee for Region 17 (Attn: Andrew Vara, Esq. and Timothy Laffredi, Esq.); (ii) the Settling Insurers; (iii) the FVT; (iv) the D&O Action Defendants; (v) all counsel and parties receiving electronic notice through the Court's electronic case filing system; and (vi) those persons who have formally appeared in these Chapter 11 Cases and requested service pursuant to Bankruptcy Rule 2002. The Reorganized Debtors respectfully submit that no further notice is required.

No previous request for the relief sought herein has been made by the Reorganized Debtors to this or any other court.

WHEREFORE the Reorganized Debtors respectfully request entry of an order granting (i) the relief requested herein as a sound exercise of the Reorganized Debtors' business judgment, appropriate under Bankruptcy Rule 9019, and in the best interests of the Debtors' estates, creditors,

shareholders, and all other parties in interest, and (ii) such other and further relief as the Court may

deem just and appropriate.


Dated: September 29, 2022

**WEIL, GOTSHAL & MANGES LLP**

**KELLER BENVENUTTI KIM LLP**


By:  *s/ Richard W. Slack*
      Richard W. Slack

*Attorneys for Debtors and Reorganized Debtors*
