BROWN RUDNICK LLP
David J. Molton (SBN 262075)
(DMolton@brownrudnick.com)
Eric R. Goodman (admitted pro hac vice)
(EGoodman@brownrudnick.com)
Seven Times Square
New York, New York 10036
Telephone: (212) 209-4800
Facsimile: (212) 209-4801

BROWN RUDNICK LLP
Joel S. Miliband (SBN 077438)
(JMiliband@brownrudnick.com)
2211 Michelson Drive, Seventh Floor
Irvine, California 92612
Telephone: (949) 752-7100
Facsimile: (949) 252-1514

*Attorneys for Fire Victim Trustee*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

**In re:**

**PG&E CORPORATION,**

-and-

**PACIFIC GAS AND ELECTRIC COMPANY,**

**Debtors.**

☐ **Affects PG&E Corporation**
☐ **Affects Pacific Gas and Electric Company**
☒ **Affects both Debtors**

**All papers shall be filed in the Lead Case, No. 19-30088 (DM).*

Bankruptcy Case No. 3:19-bk-030088 (DM)
Chapter 11
(Lead Case)
(Jointly Administered)

**OBJECTION OF FIRE VICTIM TRUSTEE TO MOTION OF WILLIAM B. ABRAMS PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 2004 FOR ENTRY OF AN ORDER AUTHORIZING DISCOVERY AND HEARINGS REGARDING THE ACTS AND CONDUCT OF JAMS NEUTRALS GIVEN NEW EVIDENCE**

[Relates to Docket No. 12766]

**Hearing to be Determined by the Court**

Case: 19-30088 Doc# 13035 Filed: 10/03/22 Entered: 10/03/22 11:57:17 Page 1 of 44

## TABLE OF CONTENTS

Page

MEMORANDUM OF POINTS AND AUTHORITIES ....................2

I. PRELIMINARY STATEMENT ....................2

II. BACKGROUND ....................3

A. The Chapter 11 Plan and the Establishment of the Fire Victim Trust. ....................3

B. Mr. Abrams's Repeated Requests for Broad Discovery Under Rule 2004. ....................5

C. Mr. Abrams's Statements Regarding Trustee Cathy Yanni. ....................9

D. JAMS' Services to the Fire Victim Trust. ....................10

III. OBJECTION ....................13

A. The Expanded Discovery Motion Should be Denied Because the Allegations are Contrary to the Trust's Accomplishments. ....................13

B. The Expanded Discovery Motion Should be Denied Because Mr. Abrams Has Not Shown Any Cause, and His Resort to Innuendo, Mischaracterization and Inaccurate Hearsay Cannot be Not a Sufficient Basis for the Discovery Sought. ....................14

CONCLUSION ....................18

Case: 19-30088 Doc# 13035 Filed: 10/03/22 Entered: 10/03/22 11:57:17 Page 2 of 44

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Federal Nat. Mortg. Ass'n v. Cobb*,
738 F.Supp. 1220 (N.D. Ind. 1990) ........ 2

*Hildebrandt v. Veneman*
233 F.R.D. 183 (D.D.C. 2005) ........ 2

*Pigford v. Veneman*,
225 F.R.D. 54 (D.D.C. 2005*)* ........ 2

**Federal Statutes**

*11 U.S.C.*
*§ 363* ........ 4
*§ 1103* ........ 4
§ 2004 ........ 2, 5, 6, 9, 16

Case: 19-30088 Doc# 13035 Filed: 10/03/22 Entered: 10/03/22 11:57:17 Page 3 of 44

Cathy Yanni, in her capacity as the Trustee[1] (the "**Trustee Yanni**") of the PG&E Fire Victim Trust (the "**Trust**," and its beneficiaries, the **"Fire Victims"**), hereby submits this objection (the "**Objection**") to the *Motion of William B. Abrams Pursuant to Federal Rule of Bankruptcy Procedure 2004 for Entry of an Order Authorizing Discovery and Hearings Regarding the Acts and Conduct of JAMS Neutrals Given New Evidence* [Docket No. 12766] (the "**Expanded Discovery Motion**"). In support of the Objection, Trustee Yanni respectfully states as follows:

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I. PRELIMINARY STATEMENT

The Expanded Discovery Motion seeks broad and unprecedented Rule 2004 discovery from numerous individuals who have not yet been properly served by Mr. Abrams and makes unfounded, specious allegations regarding an even larger group of individuals and entities. In the face of these ubiquitous, baseless, non-germane and conspiratorial allegations,[2] Trustee Yanni can and only does respond through this Objection on behalf of herself and the Trust. Other targets, who may not properly be before the Court, may be disinclined to step into Mr. Abrams's "field of fire" without proper service or process. But, given the utter lack of merit in the Expanded Discovery Motion, they should not have to, nor should their silence be attributed as acceptance of the inferences, innuendo, and allegations replete in the Expanded Discovery Motion.

The Expanded Discovery Motion does not set forth any evidence – new or otherwise – that establishes cause to expand discovery beyond the disclosure outlined in the Court's *Order on Motion of William B. Abrams Authorizing Discovery Regarding Administration of the Fire Victim Trust*

---

[1] As the Court is aware, prior to Ms. Yanni becoming the Successor Trustee pursuant to the terms of the Fire Victim Trust Agreement, the Honorable John K. Trotter (Ret.) served as Trustee of the Fire Victim Trust. Accordingly, "Trustee Yanni" is used herein to describe actions taken by Cathy Yanni in her capacity as Trustee of the Fire Victim Trust and "Trustee Trotter" is used to describe actions taken by Justice Trotter in his capacity as Trustee of the Fire Victim Trust.

[2] In cases with similarly scandalous and groundless accusations, courts have determined it necessary to strike the offensive pleadings or portions thereof, and this Court should not show any reticence in doing so here. See, e.g., *Hildebrandt v. Veneman* 233 F.R.D. 183 (D.D.C. 2005); *Pigford v. Veneman*, 225 F.R.D. 54 (D.D.C. 2005*); Federal Nat. Mortg. Ass'n v. Cobb,* 738 F.Supp. 1220 (N.D. Ind. 1990).

[Docket No. 12682] (the "Initial **Discovery Order**"). Instead, the pleading is being used as a vehicle to republish a sensational and inaccurate "newspaper report with no foundation" [Sept. 13, 2022 Hr'g Tr. 34:7-8 (comment of the Court)] and other inadmissible hearsay far removed from these cases, all in an attempt to question the integrity of individuals and entities (both the Trust and JAMS) and sow public doubt and discord without regard to the veracity of the allegations or their connection to the Trust and the Trust's operation. As the Trust's counsel stated during the September 13, 2022 hearing before the Court, Mr. Abrams makes no allegation (let alone offer any evidence) of any misdeeds or wrongdoing by or at the Trust, and instead resorts only to innuendo and unfounded inferences to support his motion. *See* Sept. 13, 2022 Hr'g Tr. 51:16-18 ("There's not a single allegation in the papers submitted that anything wrong has actually occurred at the Trust or in connection with the Trust."). While this Objection provides information necessary to correct the false and misleading allegations in the Expanded Discovery Motion that concern Trustee Yanni and the Trust, Trustee Yanni submits that Mr. Abrams's irresponsible (and arguably sanctionable) compilation of baseless accusations and innuendo fails to establish cause for any of the requested discovery and that no further disclosure from Trustee Yanni, the Trust, and the Trust's agents is warranted or appropriate.

## II. BACKGROUND

### A. The Chapter 11 Plan and the Establishment of the Fire Victim Trust.

On January 29, 2019 (the "**Petition Date**"), PG&E Corporation ("**PG&E Corp.**") and Pacific Gas and Electric Company ("**Utility**"), as debtors and debtors in possession (collectively, "**PG&E**" or the "**Debtors**"), commenced with the Court voluntary cases (the "**Bankruptcy Cases**") under chapter 11 of the Bankruptcy Code. On February 15, 2019, the United States Trustee appointed an Official Committee of Tort Claimants (the "**TCC**") to represent the interests of Fire Victims in the Bankruptcy Cases.

On December 9, 2019, the Debtors filed their *Tort Claimants RSA Motion* [Dkt. No. 5038] which sought entry of an order authorizing the Debtors and the TCC to enter into and perform under the Restructuring Support Agreement dated December 6, 2019 (the "**TCC RSA**"). The TCC RSA provided critical provisions of the Plan (defined below) and included various commitments by the parties to represent the interests of Fire Victims in the post-effective date Trust, including granting

Case: 19-30088 Doc# 13035 Filed: 10/03/22 Entered: 10/03/22 11:57:17 Page 5 of 44

representatives of Fire Victims approval rights with respect to certain definitive documents related to the Plan[3] and the appointment of a Trust Oversight Committee (the "**TOC**").[4] On December 19, 2019, the Bankruptcy Court entered an order granting the *Tort Claimants RSA Motion* and authorizing the TCC RSA. [Dkt. No. 5174].

On April 14, 2020, the Bankruptcy Court entered the *Order Granting Application of the Official Committee of Tort Claimants Pursuant to 11 U.S.C. §§ 1103 and 363 and Fed. R. Bankr. P. 2014 and 5002 to Retain and Employ Cathy Yanni as Claims Administrator Nunc Pro Tunc to January 13, 2020* [Dkt. No. 6759] and the *Order Granting Application of the Official Committee of Tort Claimants Pursuant to 11 U.S.C. §§ 1103 and 363 and Fed. R. Bankr. P. 2014 and 5002 to Retain and Employ Hon. John K. Trotter (Ret.) as Trustee Nunc Pro Tunc to January 13, 2020* [Dkt. No. 6760], which granted the TCC's applications to retain and employ Ms. Yanni as Claims Administrator of the Fire Victim Trust[5] and the Honorable John K. Trotter as trustee of the Fire Victim Trust, both effective as of January 13, 2020.

On June 19, 2020, the Debtors filed the *Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization dated June 19, 2020* [Dkt. No. 8048] (as may be modified, supplemented, or

---

[3] The term sheet appended to the TCC RSA provides that "All definitive documents relating to the Plan, capitalization, equity and debt financing shall be in form and substance reasonably acceptable to the Plan Proponents and the Requisite Consenting Fire Claimant Professionals."

[4] Plan Section 6.8(e) provides that "[t]he Fire Victim Trust Oversight Committee shall be appointed on the Effective Date. The Fire Victim Trust Oversight Committee shall consist of members selected and appointed by the Consenting Fire Claimant Professionals and the Tort Claimants Committee. The rights and responsibilities of the Fire Victim Trust Oversight Committee shall be set forth in the Fire Victim Trust Agreement."

[5] Prior to her appointment as Claims Administrator, Ms. Yanni served as the Administrator of the Wildfire Assistance Program in the Bankruptcy Cases, having been jointly selected by the Debtors, the Creditors Committee, and the TCC, and approved by this Court by order dated June 5, 2019. *See Supplemental Order (A) Approving Appointment of Administrator and Establishing Guidelines for the Wildfire Assistance Program and (B) Granting Related Relief* [Dkt. No. 2409].

Case: 19-30088 Doc# 13035 Filed: 10/03/22 Entered: 10/03/22 11:57:17 Page 6 of 44

amended from time to time, and together with all schedules and exhibits thereto, the "**Plan**"). Over 85% of Fire Victims who submitted ballots voted in favor of the Plan.[6]

On June 20, 2020, the Bankruptcy Court entered the *Order Confirming Debtors' and Shareholder Proponent's Joint Chapter 11 Plan of Reorganization Dated June 19, 2020* [Dkt. No. 8053] (the "**Confirmation Order**"). On June 29, 2020, Trustee Trotter filed the *Notice of Appointment of Fire Victim Trust Oversight Committee in Accordance with Confirmation Order* [Dkt. No. 8195], and the Effective Date of the Plan occurred on July 1, 2020. Pursuant to the Plan and Confirmation Order, the PG&E Fire Victim Trust Agreement dated as of July 1, 2020 (the "**Trust Agreement**") became effective on the Effective Date, and the Trust was established and funded with a combination of cash, stock, rights to deferred cash, and causes of action.

Consistent with Justice Trotter's commitment to his family that he would serve as Trustee for only two years, Justice Trotter resigned as Trustee of the Fire Victim Trust effective as of the close of business on June 30, 2022. *See Letter from Trustee of the Fire Victim Trust*, filed on the docket as Exhibit A to the *Notice of Filing of Letter to Fire Victims on Behalf of the Fire Victim Trust* [Dkt. No. 12528] and posted on the Fire Victim Trust website (www.firevictimtrust.com). On July 1, 2022, Ms. Yanni became the Successor Trustee of the Trust pursuant to Section 5.2(d) of the Trust Agreement. [Dkt. No. 8750-1].

**B. Mr. Abrams's Repeated Requests for Broad Discovery Under Rule 2004.**

On May 23, 2022, Mr. Abrams filed the *Motion of William B. Abrams Pursuant to Federal Rule of Bankruptcy Procedure 2004 for Entry of an Order Authorizing Discovery and Hearings Regarding the Administration of the Fire Victim Trust* [Dkt. No. 12440] (the "**Initial Discovery Motion**"). The Court held a preliminary hearing regarding the Initial Discovery Motion on June 7, 2022. Pursuant to the Court's direction at the June 7, 2022 hearing, Trustee Trotter filed the *Objection of Fire Victim Trustee to Motion of William B. Abrams Pursuant to Fed. R. Bankr. 2004*

---

[6] *See Declaration of Christina Pullo of Prime Clerk LLC Regarding Solicitation of Votes and Tabulation of Ballots Cast with Respect to the Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization* [Dkt. No. 7507].

*for Entry of an Order Authorizing Discovery and Hearings Regarding the Administration of the Fire Victim Trust* [Dkt. No. 12527] (the "**Initial Discovery Objection**") on June 21, 2022 and contemporaneously filed a supplemental exhibit to the 2021 Annual Report providing additional detail regarding information contained in the 2021 Annual Report.  On July 6, 2022, Mr. Abrams filed the *William B. Abrams Reply to the Objection of the Fire Victim Trustee Pursuant to Fed. R. Bankr. 2004 for Entry of an Order Authorizing Discovery and Hearings Regarding the Administration of the Fire Victim Trust* [Dkt. No. 12593] (the "**Abrams Reply**").

After considering the Initial Discovery Motion, the Initial Discovery Objection, the Abrams Reply and the statements presented to the Court at the June 7, 2022 hearing, the Court entered the Initial Discovery Order on August 2, 2022.  The Initial Discovery Order denied the Initial Discovery Motion in part and granted it in part by, *inter alia*, directing the Trust to post a copy of the retention agreement pertaining to each third-party litigation firm retained by the Trust through the "request for proposal" interview process described in the Initial Discovery Objection.

On August 18, 2022, Mr. Abrams filed the Expanded Discovery Motion,[7] along with a supporting declaration [Dkt. No. 12767] (the "**Abrams Declaration**").

On August 24, 2022, Trustee Yanni filed a *Motion of the Fire Victim Trustee to File Redacted Versions of Certain Retention Agreements Until Litigation Related to Such Retention Agreements is Finally Resolved* [Dkt. No. 12871] (the "**Litigation Redaction Motion**").  On August 29, 2022, the Court entered the *Order Granting Motion of the Fire Victim Trustee to File Redacted Versions of*

---

[7] Unfortunately, it does not appear that resolution of the Expanded Discovery Motion will end Mr. Abrams's attempts to gain wildly broad discovery in the hope of proving his apparent conspiracy theories regarding the Trust. On September 22, 2022, Mr. Abrams filed the *Motion of William B. Abrams to Federal Rule of Bankruptcy Procedure 2004 for Entry of an Order Authorizing Discovery and Hearings Regarding Debtors' Acts, Conduct and Agreements That May Obstruct or Limit the Just and Fair Management of the Fire Victim Trust* [Dkt. No. 12995] and the *Declaration of William B. Abrams in Support of the Motion of William B. Abrams to Federal Rule of Bankruptcy Procedure 2004 for Entry of an Order Authorizing Discovery and Hearings Regarding Debtors' Acts, Conduct and Agreements That May Obstruct or Limit the Just and Fair Management of the Fire Victim Trust* [Dkt. No. 12996].   On September 26, 2022, the Court entered the *Order Directing Reorganized Debtors to Respond To Motion Filed by William B. Abrams*, directing the Reorganized Debtors to file any opposition they may have to the motion at Docket No. 12995 no later than October 12, 2022.

Case: 19-30088    Doc# 13035    Filed: 10/03/22    Entered: 10/03/22 11:57:17    Page 8 of 44

*Certain Retention Agreements Until Litigation Related to Such Retention Agreements is Finally Resolved* [Dkt. No. 12884] (the "**Litigation Redaction Order**"), granting the Litigation Redaction Motion after *in camera* review of the retention agreements subsequently filed on the Court's docket in response to the Initial Discovery Order.

On August 29, 2022, the Trust and the Reorganized Debtors filed the *Reorganized Debtors and Fire Victim Trust's Joint Ex Parte Motion to Extend, In Part, Deadline to Comply with Order on Motion of William B. Abrams Authorizing Discovery Regarding Administration of the Fire Victim Trust* [Dkt. No. 12887] (the "**Joint Motion**"), the *Joint Ex Parte Motion to File Redacted Version of Reorganized Debtors and Fire Victim Trust's Joint Ex Parte Motion to Extend, In Part, Deadline to Comply with Order on Motion of William B. Abrams Authorizing Discovery Regarding Administration of the Fire Victim Trust* [Dkt. No. 12889] (the "**Joint Motion for Redaction**") and the *Declaration of Robin J. Reilly in Support of Reorganized Debtors and Fire Victim Trust's Joint Ex Parte Motion to Extend, In Part, Deadline to Comply with Order on Motion of William B. Abrams Authorizing Discovery Regarding Administration of the Fire Victim Trust* [Dkt. No. 12890]. On August 31, 2022 the Court entered orders granting both the Joint Motion for Redaction and the Joint Motion. [Dkts. No. 12898 and 12899].

On September 1, 2022, Mr. Abrams filed a *Motion for Reconsideration and Related Relief from the Order Granting Motion of the Fire Victim Trustee to File Redacted Versions of Certain Retention Agreements Until Litigation Related to Such Retention Agreements is Finally Resolved and Pursuant to Federal Rule of Civil Procedure 59(e)* [Dkt. No. 12916] (the "**Reconsideration Motion**") and supporting declaration [Dkt. No. 12917]. On September 6, 2022, the Court entered the *Order on Motion for Reconsideration* [Dkt. No. 12929] (the "**Reconsideration Order**").

On September 6, 2022, Trustee Yanni filed the *Fire Victim Trustee's Responses in Connection with the Court's August 2, 2022 Discovery Order* [Dkt. No. 12931], answering the Court's specific questions and providing copies of the requested retention agreements, temporarily redacted as authorized by the Litigation Redaction Order.

The Court held a preliminary hearing regarding the Expanded Discovery Motion on September 13, 2022.

On September 15, 2022, Trustee Yanni filed the *Fire Victim Trustee's Disclosures Directed by September 6, 2022 Order on Motion for Reconsideration* [Dkt. No. 12972] pursuant to the Reconsideration Order.[8] On September 27, 2022, the Court entered the Order Denying Motion for Reconsideration [Dkt. No. 13008].

On September 29, 2022, the Reorganized Debtors filed the *Reorganized Debtors' Motion for Entry of an Order (I) Approving Settlements Resolving Disputes with Certain Insurers, and (II) Granting Related Relief* [Dkt. No. 13015]. Also on September 29, 2022, the Trust filed the *Fire Victim Trust's Notice of Filing D&O Settlement Agreement* [Dkt. No. 13020] to provide an unredacted copy of the Settlement and Release Agreement by and among the Trustee, certain former directors and officers of PG&E, and the Debtors.

On September 30, 2022, the Trust filed the *Fire Victim Trust's Notice of Filing D&O Firms' Engagement Letter* [Dkt. No. 13024] to provide an unredacted copy of the Engagement Letter between the Trust and the law firms it engaged in connection with potential claims against certain former directors and officers of PG&E. The D&O Settlement Agreement and D&O Firms' Engagement Letter Fire Victim Trust are in the process of being posted on the Fire Victim Trust website and will be available for viewing on the website by the close of business on October 3, 2022.

Trustee Yanni respectfully submits this objection pursuant to the Court's direction at the September 13, 2022 hearing.

---

[8] Counsel for Trustee Yanni interpreted the Reconsideration Order, which was specifically directed only to the Court's Litigation Redaction Order (and not to the Court's earlier Initial Discovery Order, the relief granted thereby and Trustee Yanni's other disclosures made pursuant thereto), as directing Trustee Yanni to respond to the Reconsideration Motion by (1) explaining why she thought it necessary to redact the name and other identifying information about the FVT's "Authorized Agent" in the Retention Agreements (rather than providing arguments to support the redaction of the identity, Trustee Yanni decided to disclose Mr. Kelly's identity in the spirit of transparency), and (2) filing any agreements between the Trust and the Authorized Agent, including any provisions for compensation (which Trustee Yanni did by attaching a copy of the Mr. Kelly's engagement letter and explaining that it is the only agreement between the Trust and the Authorized Agent). Trustee Yanni was not attempting to avoid addressing the other points raised in the Motion for Reconsideration, which Trustee Yanni's counsel interpreted as a misunderstanding of the process outlined in the *Procedures for Filing Redacted or Sealed Confidential or Highly Sensitive Documents* adopted by the United States Bankruptcy Court for the Northern District of California rather than an argument to which Trustee Yanni needed to respond.

Case: 19-30088 Doc# 13035 Filed: 10/03/22 Entered: 10/03/22 11:57:17 Page 10 of 44

**C. Mr. Abrams's Statements Regarding Trustee Cathy Yanni.**

In the Expanded Discovery Motion, Mr. Abrams makes numerous statements about Trustee Yanni which are untrue or misleading. These deceptive insinuations harm Fire Victims by undermining their faith in the work of the Trustee and detracting from the objectively positive results the Trust has achieved to date. For that reason alone, it is necessary to refute Abrams's gross misrepresentations.

Perhaps the most insidious fabrication in Abrams's brief is that Trustee Yanni somehow mismanaged funds in her work on a prior matter. Mr. Abrams refers to Trustee Yanni's appointment as Special Master in connection with the *In re Ethicon, Inc. Pelvic Repair System Products Liability Litigation* (the "**Pelvic Mesh Litigation**").[9] Expanded Discovery Motion at 10. This is particularly outrageous because Ms. Yanni never, at any point during her work in the Pelvic Mesh engagement, had custody or control over settlement funds. In the Pelvic Mesh Litigation, Ms. Yanni was selected by the parties and appointed by that MDL's supervising United States District Court Judge, The Hon. Joseph R. Goodwin (S.D.W. Va.), to mediate settlements between plaintiffs and corporate pharmaceutical defendants. Additionally, Ms. Yanni was asked to evaluate injuries suffered by plaintiffs and assign compensation amounts to individual cases based on their severity. She performed these tasks effectively and with great compassion for the injured plaintiffs she served. During her work on the Pelvic Mesh Litigation, Ms. Yanni did not at any time manage or oversee payments, nor was she involved in the allocation of common benefit attorneys' fees. For Mr. Abrams to suggest that she did is intentionally dishonest.

Next, Mr. Abrams implies that a lawsuit by a group of Pelvic Mesh plaintiffs against their attorney had some relation to Ms. Yanni. He makes this inference by referring to an article in the

---

[9] Allegations made in the Expanded Discovery Motion are further addressed in *The Partial Response of Steven J. Skikos, Esq. to William B. Abrams' Motion Pursuant to Federal Rule of Bankruptcy Procedure 2004 for Entry of Order Authorizing Discovery and Hearings Regarding the Acts and Conduct of Jams Neutrals Given New Evidence* and the *Response of Former Trustee John K. Trotter to Motion of William B. Abrams Pursuant to Federal Rule of Bankruptcy Procedure 2004 for Entry of an Order Authorizing Discovery and Hearings Regarding the Acts and Conducts of JAMS Neutrals Given New Evidence*, filed contemporaneously herewith.

Case: 19-30088 Doc# 13035 Filed: 10/03/22 Entered: 10/03/22 11:57:17 Page 11 of 44

New York Times and a pleading in the Pelvic Mesh Litigation. In reality, neither the New York Times article or the Sheller pleading cited by Mr. Abrams contains any mention of Ms. Yanni, nor do they touch on any aspect of her work in the Pelvic Mesh Litigation. Mr. Abrams's attempt to connect Trustee Yanni to the issues described in these documents is deliberately misleading.

Finally, Abrams alleges that fees charged by Ms. Yanni during her work on the Pelvic Mesh Litigation were arbitrary or inconsistent, implying that she tried to conceal the costs associated with her work. The opposite is true. During her service as Special Master in the Pelvic Mesh Litigation, the fees and costs were regularly referenced in appointment orders, those same costs were determined to be reasonable by Judge Goodwin, and a final accounting was provided to plaintiffs in their ultimate settlement statements.[10]

In each instance cited above, Mr. Abrams makes reckless if not knowingly false and unfounded accusations to malign Trustee Yanni as part of an attempt to generate suspicion and undermine her role in and work for the Fire Victim Trust. Each of his allegations are provably false. More importantly, they have absolutely nothing to do with the Fire Victim Trust and merely serve to distract from the diligent work done to date under Ms. Yanni's leadership (both as Claims Administrator and now as Trustee). Mr. Abrams should be required to withdraw his outrageous misrepresentations regarding Trustee Yanni and the others whose reputations the Expanded Discovery Motion attempts to discredit and those pleadings should be struck from the docket. *See* note 2 *supra*.

**D. <u>JAMS' Services to the Fire Victim Trust</u>.**

The Trust retained JAMS to provide skilled professionals to fulfill the roles of Special Master, Appeals Officer and Neutrals, each as defined in the Trust Agreement.

Ms. Yanni is not an employee of JAMS but a shareholder and an independent contractor. JAMS provides administrative services for all independent contractors, including Ms. Yanni. Prior to assuming the role of Trustee, Ms. Yanni participated in a profit-sharing agreement whereby JAMS

---

[10] *See* Pretrial Order Nos. 236, 253, 257, 274, 284, 287, 335, and 349, available at https://www.wvsd.uscourts.gov/mdl/ethicon/orders.html.

Case: 19-30088 Doc# 13035 Filed: 10/03/22 Entered: 10/03/22 11:57:17 Page 12 of 44

shareholders received a deferred distribution of earnings, typically three years after the income was actually generated. That is, a JAMS profit computation for the year 2017 instead of being paid in the year immediately following, 2018, would typically be distributed to JAMS shareholders in the year 2021. Effective July 1, 2022, when Ms. Yanni became the Trustee and henceforth for the duration of her services to the Trust, she agreed to waive all rights to participate in the JAMS profit-sharing agreement. Thus, Ms. Yanni will not receive any profit-sharing distributions from JAMS earned during the entire the period she serves as Trustee.

Mr. Abrams misstates the roles of many of the individuals listed in the Expanded Discovery Motion, characterizing as "neutrals" individuals who have never served as Neutrals (as that term is defined in Section 7.1 of the Trust Agreement) and other individuals who have never had any involvement in claims administration for the Trust:

- **Hon. Randall Newsome (Ret.)** – Judge Newsome was appointed by Judge Montali on October 28, 2019, to serve as a mediator with respect to issues pertaining to the reorganization plan in the Bankruptcy Cases.[11] Later Judge Newsome served as an appellate Neutral for the Trust, where he decided one appeal. Judge Newsome resigned from JAMS on December 31, 2021. Judge Newsome has no role in the administration of the Fire Victim Trust.
- **Hon. Jay Gandhi (Ret.)** – Judge Gandhi was selected by all counsel to serve as a mediator in connection with the pre-confirmation settlement of the claims of 14 public entities arising from the 2015 Butte Fire, the 2017 North Bay Fires, and the 2018 Camp Fire. Judge Gandhi was then selected by all counsel to serve as a mediator in connection with certain third-party causes of action to the Trust.[12] Judge Gandhi has no role in the administration of the Fire Victim Trust.

---

[11] *See Order Appointing Mediator* [Dkt. No. 4499].

[12] This mediation is ongoing and sensitive in nature. The resolution of these causes of action will be disclosed once final, as directed by the Initial Discovery Order.

- **Viggo Boserup, Esq.** – Mr. Boserup serves as the Appeals Officer (also referred to as the Appeals Coordinator) for the Trust. In this role, Mr. Boserup reviews and evaluates claimants' appeals from Determinations to determine whether a given appeal should be assigned to a complex panel of Neutrals, or, alternatively, a non-complex panel of Neutrals. Thereafter, each appeal is randomly assigned to a Neutral. Mr. Boserup has no oversight role or involvement in the Claims Administration process.
- **Hon. Ellen S. James (Ret.)** – Judge James was appointed by the Honorable Haywood S. Gilliam, Jr., United States District Court Judge, to serve as Special Master on behalf of minors and incapacitated adults.[13] Judge James approves all minors' compromises in conjunction with the evaluation, disallowance, resolution, settlement, and approval of any and all Fire Victim Claims in accordance with the CRP. *See* Trust Agreement § 2.1(e)(xxvii). Judge James has no oversight role or involvement in the Claims Administration process
- **"Other JAMS Mediators"** – The Trust does not have a "Panel of Mediators for Standard Mediations" as Mr. Abrams asserts. None of the following individuals named by Mr. Abrams have served as Neutrals or otherwise been involved in the Claims Administration process:
    - Hon. Wynn S. Carvill (Ret.)
    - Hon. Catherine A. Gallagher (Ret.)
    - Patricia K. Gillette, Esq.
    - Hon. Ken M. Kawaichi (Ret.)
    - Hon. Risë Jones Pichon (Ret.)

Neutrals associated with JAMS have limited roles with the Trust that are narrowly focused on the appellate review of claims. Very few claims have even required an appeal, as more than 99% have been resolved by the claims process. To date, only 166 Claims Questionnaires have been

[13] *See Order for Appointment of a Special Master Pursuant to Fed. R. Civ. Proc. 53* [Dkt. No. 9721].

Case: 19-30088 Doc# 13035 Filed: 10/03/22 Entered: 10/03/22 11:57:17 Page 14 of 44

appealed, which represents no more than 0.7% of all those adjudicated. Out of over 54,000 Fire Victims who have received Determination Notices, only a handful have had any occasion to interact with any Neutral in their appeal of a claim. In his Expanded Discovery Motion, Mr. Abrams greatly exaggerates the role that JAMS Neutrals play in the administration of the Fire Victim Trust.

## III. OBJECTION

### A. The Expanded Discovery Motion Should be Denied Because the Allegations are Contrary to the Trust's Accomplishments.

The allegations, hearsay, innuendo, and inferences set forth in the Expanded Discovery Motion depict an imagined story of shirked duties and deceit to the detriment of Fire Victims. But the undeniable facts of the claims distribution process thus far tell a far different story. Indeed, this Court has recognized the impressive work being done by the Trust with respect to claims administration.[14] Thus, the Court should deny the far-reaching relief requested in the Expanded Discovery Motion because Trustee Yanni and other Trust professionals are fulfilling the Trust goals of protecting and maximizing the corpus of the Trust for the benefit of nearly 70,000 Fire Victim claimants and compensating Fire Victims for their injuries as equitably and efficiently as possible. Unlike most mass tort bankruptcy cases that address no more than a few types of claims, this case involves many distinct and different types of claims, including wrongful death, personal injury, emotional distress, real property damage, and business loss. Trustee Yanni is administering one of the most complicated victim compensation programs in history. Unlike many post-confirmation mass tort trusts, the Fire Victim Trust was not provided distribution procedures with a matrix of claim values, factors, and rules. Instead, the Claims Resolution Procedures charged the Trustee and Claims Administrator with developing evaluation protocols that result in fair and reasonable compensation

---

[14] See, e.g., Initial Discovery Order 4:19-24 and 5:8-9 ("It should not go unnoticed, and the court acknowledges, that the former Trustee and the present Trustee, and their professionals and support staff, have accomplished an impressive record of progress in the two years of the Trust. This has occurred in the midst of an unprecedented worldwide pandemic under trying circumstances. . . Despite the criticisms of Mr. Abrams and others, the progress has been impressive.")

of almost 70,000 Fire Victims. The result of the tens of thousands of hours of work by hundreds of people to launch the Trust and administer claims as quickly as possible is simply astounding:

- Approximately **36,000 Claims Questionnaires** have been submitted by Fire Victim claimants. Those filings advance nearly **240,000 unique claims**, each one of which requires adjudication by the Trust.
- **Over $5 billion** has been paid to Fire Victims with approximately **49,000 Fire Victims** having received compensation.
- The Trust has issued **Determination Notices for 82%** of submitted Claims Questionnaires.
- **99.3% of all Determination Notices** to date have been resolved without an appeal.

These numbers belie Mr. Abrams's unfounded charges against the Trust and its Administration. Granting the far-reaching discovery that Mr. Abrams requests would serve only to undermine the efficient operation of the Trust and slow the distribution of payments to Fire Victims.

**B. The Expanded Discovery Motion Should be Denied Because Mr. Abrams Has Not Shown Any Cause, and His Resort to Innuendo, Mischaracterization and Inaccurate Hearsay Cannot be Not a Sufficient Basis for the Discovery Sought.**

Mr. Abrams has not shown *any* cause for the broad discovery requested in the Expanded Discovery Motion, much less *good* cause. As one of its sources of "new evidence," the Expanded Discovery Motion relies upon a *Los Angeles Times* article on matters related to disgraced attorney Tom Girardi, which Mr. Abrams found necessary to misquote in order to connect it to the Trust.[15] The Expanded Discovery Motion also relies upon a law review article advocating for MDL reform, and citations to filings by disgruntled plaintiffs' attorneys in matters unrelated to the Bankruptcy

---

[15] For example, Mr. Abrams claims that discovery requests should be expanded "to ensure that the 'multifaceted victimization of injured people' referred to by Chief Justice Tani Cantil Sakauye regarding the influences of JAMS has not undermined the well-intentioned efforts of this Court to ensure fair and just outcomes." The actual quote from the Chief Justice in the article cited by Mr. Abrams has nothing to do with JAMS or anyone involved with the Fire Victim Trust: "Cantil-Sakauye, the chief justice, lamented the 'multifaceted victimization of injured people' in the Girardi case." *See* https://www.latimes.com/california/story/2022-08-09/chief-justice-calls-for-new-regulation-of-private-judging-in-light-of-girardi-scandal.

Cases or any individual retained by the Trust or involved in the administration of Fire Victim Claims.[16] Again, the Expanded Discovery Motion does not contain a single allegation that anything improper has actually occurred at the Trust or in connection with the Trust. Instead, Mr. Abrams attempts to convince the Court to grant his requested relief solely because he was able to dredge up reports of nefarious dealings by an attorney having no connection to the Bankruptcy Cases or the

---

[16] Mr. Abrams also cites a select excerpt from Trustee Trotter's May 2021 presentation to Fire Victims as support for his claim that that "Justice Trotter is one of the individuals who 'struck a deal' with PG&E and shaped the financial terms which are now undermining victims [sic] 'made whole' settlement." Expanded Discovery Motion at 12. Mr. Abrams quotes Trustee Trotter as stating that "in April -- I think it was April [2020, i.e., before Plan confirmation] -- we struck a deal with PG&E that they would pay tranches of money that would be used to pay claims processing, and in April I was still part-time, I was an advisor, I was learning more about it, I was helping your lawyers write the rules by which the Trust would be governed, the claims resolution processes." *Id.* The earlier part of the quote, which Mr. Abrams fails to disclose, sets the fuller context: "A group of lawyers had gotten together and gone to PG&E and said, you know, we want to hire Justice Trotter, we want to hire a claims administrator named Cathy Yanni to help us begin to put together the process that will ultimately be the methodology by which we resolve these cases. Now PG&E had no obligation to pay any money at that time. They were still in bankruptcy and the Trust hadn't been funded yet, but they did work out a deal where some pre-funding was arranged, and I don't have the details about that but in April. . ." *See Notice of Filing of Transcript of Status of Trust Distribution Video Presentation by Justice John Trotter (Ret.), Trustee of the PG&E Fire Victim Trust* [Dkt. No. 10654] (attached hereto as **Exhibit 1**) at 3:8-24. In light of this context – *i.e.*, at a time prior to the Effective Date of the Plan, when the Plan documents, including the Claims Resolution Procedures, were still not yet final and were being reviewed and commented on by all the Plan parties, and when the plaintiff parties to the TCC RSA had consent and approval rights over such documents (*see* note 3 *supra*) – it was neither remarkable nor improper for Justice Trotter (who received his pre-Effective Date appointment [Dkt. No. 6760]) to provide assistance and advice regarding claims resolution procedures to the parties who had approval rights over the final documents setting forth such procedures. Indeed, the Court's approval of the pre-Effective Date appointments of Justice Trotter and Ms. Yanni and funding was critical to enable the Trust, when it went effective, to be in a position to receive, administer and pay Fire Victim claims as promptly as possible after the Effective Date of the Plan. Moreover, as part of the applications to employ Justice Trotter as Trustee and Ms. Yanni as Claims Administrator, publicly filed with this Court on April 13, 2020, the TCC expressly disclosed that Justice Trotter and Ms. Yanni had "been working since January 13, 2020 to develop the Trust and CRP and [had] started the process of claims analysis." *See* Dkt. No. 6746 at ¶ 15. *See also* Dkt. No. 5726 at ¶ 13 (TCC sought retention of Justice Trotter "*nunc pro tunc* to January 13, 2020, shortly after Justice Trotter began doing substantive work."); Dkt. No. 5723 at ¶ 12 (TCC sought retention of Ms. Yanni "*nunc pro tunc* to January 13, 2020, shortly after Ms. Yanni began doing substantive work."). Mr. Abrams's insinuations that Justice Trotter was part of the negotiation of economic terms of the deals undergirding the Plan or that the actual administration of claims by the Trust was somehow delegated to plaintiff lawyers are simply false and misleading.

Case: 19-30088 Doc# 13035 Filed: 10/03/22 Entered: 10/03/22 11:57:17 Page 17 of 44

Trust. Mr. Abrams asks for authority to pursue what the Court described as discovery of "incredible breadth . . . under a procedure that is almost unprecedented"[17] just in case there is the most remote possibility – although he does not mean to imply that there actually has been – that an individual or entity with any tie to the Trust could have engaged in similar behavior. Rule 2004 is not so broad as to allow it to be abused to enable discovery based on a sensational hypothetical and unfounded hyperbole.[18]

**C. <u>The Broad and Unwarranted Discovery Sought by Abrams's Expanded Discovery Motion Should be Denied Because the Costs Thereof Consume Trust Funds that Would Otherwise be Paid to Fire Victims</u>.**

Mr. Abrams has sought relief from the Court with respect to the Trust more often than any other party in the Bankruptcy Cases.[19] Over the past two-plus years since the inception of the Trust, the Trustee has given Mr. Abrams access to the Trust's professionals in an effort to address his inquiries and concerns. In recent months, however, Mr. Abrams's refusal to accept the Trust's responses[20] to his inquiries has developed into a conspiracy theory fueled by sensational news reports and social media posts. The cost to the Trust, especially of responding to Mr. Abrams's many filings and appearing in Court, is substantial and growing. More importantly, Mr. Abrams is diverting the attention of the Trustee and other Trust professionals from the important business of adjudicating claims and making payments to Fire Victims who badly need compensation.

The Trust should not have to bear the cost of the baseless and unprecedented "broad discovery" sought by the Expanded Discovery Motion, particularly when such costs would deplete

---

[17] *See* Sept. 13, 2022 Hr'g Tr. 44:19-24.

[18] *See* 11 U.S.C. § 2004(b) (The scope of Rule 2004 "may relate only to the acts, conduct, or property or to the liabilities and financial condition of the debtor, or to any matter which may affect the administration of the bankruptcy estate.").

[19] *See* Table of Abrams Filings attached hereto as **<u>Exhibit 2</u>**.

[20] For example, Mr. Abrams has refused to accept (1) that the Trust should not act in a manner that might negatively impact the value of the stock, and (2) that the Trust cannot discuss plans regarding the disposition of stock with anyone other than its retained financial advisors and professionals and, when appropriate, the TOC in accordance with the Trust Agreement.

Trust dollars that would otherwise be paid to Fire Victims. In addition to the costs associated with seeking discovery from the Trust, the Trust is responsible for costs and expenses that would be borne by many of the individuals at whom Mr. Abrams directs his motion.[21]

Contrary to Mr. Abrams's assertion that he is "not engaged in activities to undermine the value of the Fire Victim Trust or to slow the Trust administration process,"[22] the Expanded Discovery Motion and similar filings are doing just that. Moreover, the constant unfounded attacks from Mr. Abrams undermine the public's confidence in the Trust's administration of claims. This traumatizes Fire Victims anew by subverting their faith in the system that is earnestly working to compensate them. The Court should not condone the continued imposition of unnecessary and unwarranted expenses on Trust assets to the detriment of Fire Victims, nor the further drain of Trust administration resources that would otherwise be devoted to accelerating the distribution of funds to Fire Victims.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

[21] As is standard for businesses, trusts and other entities that retain and employ individuals to act on their behalf, the Trust indemnifies the Trustee, TOC, Claims Administrator, Special Master, Neutrals and others in their performance of their duties to the Trust. *See* Trust Agreement §§ 5.7 and 7.5.

[22] *See* Abrams Declaration at 2.

Case: 19-30088 Doc# 13035 Filed: 10/03/22 Entered: 10/03/22 11:57:17 Page 19 of 44

## **CONCLUSION**

WHEREFORE, for the good cause shown and reasons presented herein, the Fire Victim Trustee respectfully requests that the Court sustain this Objection, deny the Expanded Discovery Motion, and grant such other and further relief as may be just, including requiring Mr. Abrams to withdraw his salacious pleadings and/or striking those pleadings.

DATED: October 3, 2022

BROWN RUDNICK LLP

By: */s/ Eric R. Goodman*

Eric R. Goodman (admitted pro hac vice)
(EGoodman@brownrudnick.com)
David J. Molton (SBN 262075)
(DMolton@brownrudnick.com)
Seven Times Square
New York, New York 10036
Telephone: (212) 209-4800
Facsimile: (212) 209-4801

and

Joel S. Miliband (SBN 077438)
(JMiliband@brownrudnick.com)
2211 Michelson Drive
Seventh Floor
Irvine, California 92612
Telephone: (949) 752-7100
Facsimile: (949) 252-1514

*Attorneys for Fire Victim Trustee*

**EXHIBIT 1**

**Notice of Filing of Transcript of Status of Trust Distribution Video Presentation by Justice John Trotter (Ret.), Trustee of the PG&E Fire Victim Trust**

Case: 19-30088 Doc# 13035 Filed: 10/03/22 Entered: 10/03/22 11:57:17 Page 21 of 44

BROWN RUDNICK LLP
David J. Molton (SBN 262075)
(DMolton@brownrudnick.com)
Seven Times Square
New York, New York 10036
Telephone: (212) 209-4800
Facsimile: (212) 209-4801

BROWN RUDNICK LLP
Joel S. Miliband (SBN 077438)
(JMiliband@brownrudnick.com)
2211 Michelson Drive, Seventh Floor
Irvine, California 92612
Telephone: (949) 752-7100
Facsimile: (949) 252-1514

*Attorneys for Fire Victim Trustee*

**UNITED STATES BANKRUPTCY COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION**<br><br>**-and-**<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br><br>**Debtors.**<br><br>□ Affects PG&E Corporation<br>□ Affects Pacific Gas and Electric Company<br>■ Affects both Debtors<br><br>**All papers shall be filed in the Lead Case, No. 19-30088 (DM)* | Bankruptcy Case No. 19-30088 (DM)<br><br>Chapter 11<br>Lead Case, Jointly Administered<br><br>**NOTICE OF FILING OF TRANSCRIPT OF STATUS OF TRUST DISTRIBUTION VIDEO PRESENTATION BY JUSTICE JOHN TROTTER (RET.), TRUSTEE OF THE PG&E FIRE VICTIM TRUST** |

/ / /

/ / /

/ / /

/ / /

TO FIRE VICTIMS AND ALL OTHER INTERESTED PARTIES:

PLEASE TAKE NOTICE that The Honorable John K. Trotter (Ret.) in his capacity as the Fire Victim Trustee, has filed a transcript (the "**Transcript**") of his video presentation to Fire Victims on the Status of Trust Distribution (the "**Trustee Video Presentation**"). The Transcript is attached hereto as Exhibit A. The Trustee Video Presentation is available on the Fire Victim Trust Website at www.firevictimtrust.com.

DATED: May 17, 2021         BROWN RUDNICK LLP

By:   /s/ JOEL S. MILIBAND
       Joel S. Miliband (SBN 077438)
       (JMiliband@brownrudnick.com)
       2211 Michelson Drive
       Seventh Floor
       Irvine, California 92612
       Telephone:     (949) 752-7100
       Facsimile:     (949) 252-1514

       and

       BROWN RUDNICK LLP
       David J. Molton (SBN 262075)
       (DMolton@brownrudnick.com)
       Seven Times Square
       New York, New York 10036
       Telephone:     (212) 209-4800
       Facsimile:     (212) 209-4801

       *Counsel for Fire Victim Trustee*

EXHIBIT “A”

Case: 19-30088 Doc# 13035 Filed: 10/13/22 Entered: 10/13/22 10:57:53 Page 24
of 44

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

-oOo-

| | | |
|---|---|---|
| In Re:<br><br>PG&E CORPORATION AND PACIFIC GAS AND ELECTRIC COMPANY,<br><br>Debtors.<br>___________________________ | ) | Case No. 19-30088<br>Chapter 11 |

TRANSCRIPT OF VIDEO-RECORDED

*STATUS OF TRUST DISTRIBUTION*

Justice John Trotter (Ret.)

Trustee of the PG&E Fire Victim Trust

Transcribed By:
TERRI NESTORE
CSR No. 5614, RPR, CRR

JUSTICE TROTTER: Good afternoon. My name is Justice John Trotter and I'm the trustee for your Fire Victims Trust. I know you've heard my name but you haven't met me before, so I'd like to introduce myself.

Even though my name is John, I've been known by "Jack" my entire life. I'm a retired judge.

So let me give you a little background about myself. I was a lawyer and then a trial court judge on the Superior Court in Orange County.

After that, I was elevated to the appellate court and at first, I was an assistant justice on the Court of Appeal and then finally I became the presiding justice.

And then after that I became the administrative presiding justice. And so I had a lot of administrative exposure, duties, et cetera.

Then I retired from the bench and I had always held the belief that cases should be settled outside of court sooner, rather than later, and 98 percent of all cases settle anyway, so why not try to do it sooner.

So I left the court and started or went with a firm and helped start a company called JAMS. When I was with JAMS, I handled cases involving mass torts, and a mass tort is where the court or some other entity lumps together groups of cases and tries to resolve them as one.

It's hard to do. It requires a special

technique, special approach, and that's kind of what your Trust is. It isn't a mass tort but it's a collection of individual cases that need to be resolved. And I've done that before and I'm here to help you do that again.

So that's the reason I think that I'm in the position I'm in now, handling your Trust. I do have the background and have done it for a very long time.

A group of lawyers had gotten together and gone to PG&E and said, you know, we want to hire Justice Trotter, we want to hire a claims administrator named Cathy Yanni to help us begin to put together the process that will ultimately be the methodology by which we resolve these cases.

Now PG&E had no obligation to pay any money at that time. They were still in bankruptcy and the Trust hadn't been funded yet, but they did work out a deal where some pre-funding was arranged, and I don't have the details about that but in April -- I think it was April -- we struck a deal with PG&E that they would pay tranches of money that would be used to pay claims processing, and in April I was still part-time, I was an advisor, I was learning more about it, I was helping your lawyers write the rules by which the Trust would be governed, the claims resolution processes.

So I know there was some concern about the

accuracy and the amount of money that was paid early, was it accounted for. I can guarantee you that PG&E did not pay one nickel more than they were required. They got credit for the amount of money that they prepaid, and that's all a matter of record.

So as I got to know your lawyers, I became impressed with their deep feeling about this case. You know, lawyers represent clients and sometimes they know them well, sometimes they don't. Sometimes they're really involved, sometimes less so. I had never seen a group of lawyers who were so committed to what they were doing on behalf of their clients as this group, and I didn't know all of them but I knew some of them. They really felt your pain as much as they could, and that impressed me.

And so as I got further into it, they asked me if I would become the trustee, and so I gave it some thought and what really was the moving factor for me was the depth of feeling that your lawyers had for your case.

So I said okay, I'd do that.

So I retired from JAMS. I quit a job that I'd had for over 30 years and I went to work for the Trust. I'm a full-time employee, I have no other work. I've given up all my other work, I've retired from JAMS, and I'm on a salary. It's a very gracious salary and it's very adequate, and the amount is recorded with the court.

My rate of pay is far less than what I was charging as a consultant with JAMS.

And let me just add to that that there are no 40-hour weeks with the Trust. We have dedicated, hardworking people that are working at least ten hours a day. We have conferences over the weekend.

So it's a full-time job.

And I'm happy to be doing it because I too now have the zeal that your lawyers have with regard to the justification of your case and the reasons why you should be treated so well and so quickly.

But I do want to share with you a lot of information that I have and a lot of the reasons why this Trust and this -- and the application of the Trust and the way we're doing business is so different than other cases.

The uniqueness of this case, of course, involves bankruptcy. In the usual case, obviously there's no bankruptcy. The bankruptcy changed the whole dynamic here. Usually, in litigation, there are two sides.

There's the plaintiff and the defendant.

The plaintiff makes a claim and the defendant investigates that claim to see if it's valid and to see if they want to pay it.

The defendant in this case, had they not gone bankrupt, was Pacific Gas & Electric. The bankruptcy

occurred in January of 2019.

When bankruptcy occurs all litigation is stayed, and so the defendant, Pacific Gas & Electric, never got to hear the specific details of all your claims.

There were some generalized values that were given under rules of bankruptcy but the specific valuation that we need here, that specific information was never obtained by PG&E because of bankruptcy, as they would have in a normal case.

The Trust, we came into existence July 1st, 2000 -- I mean 2020. I keep saying 2000. 2020. So we've been in existence, what, ten months now. And when we came into existence, we were an empty vessel.

So we had to create a system that paralleled the court system, that would value your case fairly, give you the feeling that at least you were heard, so that your case was individually appreciated, looked at, evaluated, and paid.

So we had to set up that system and we had to set it up for 71,000 of you. That's how many claimants are in this Trust. We had to set it up for the number of claims you had, which total each of you have -- most of you have more than one claim.

We have over 250,000 separate claims.

So the enormity of this case is what also makes

it different. It was in bankruptcy and it's huge.

It's the largest trust, I've been told, in the history of California.

And so the claims process involves two distinct components; one is intake and the other is evaluation, and let's talk a little bit about intake.

The Trust, as I said, came into existence in July. In the middle of August, we said okay, we're open for you to submit your claim, and claims started to come in. They come in in the form of a claims questionnaire.

Now, more than one person can be on a claims questionnaire. Your family, mom and dad, and the kids, they can all be on one claims questionnaire.

We have -- I have to go look at my notes here, but I think we have 40,000 claims questionnaires.

These numbers I'm giving you are approximate.

So we have 40,000 claims questionnaires that represent 71,000 people. We put a deadline on it.

You had to get your claim questionnaire to us by the end of February of this year.

So we have 40,000 claims questionnaires. 26,000 of them came in in the month of February. That's just the claim form. That's just the claim form.

This is what we have to consider.

We have 45,830 structures of all different types

and kinds; houses, et cetera. Included in those we have 51 wineries, we have 50 mobile home parks, we have hundreds and hundreds of mobile homes. We have golf courses, we have a hospital and a clinic that burned. We have over 60 medical offices that have burned.

So we have a whole variety of types of structures that have been destroyed in this fire. Each one of them has to be evaluated. So let me go back.

Claim comes in, the claim form, then the documents supporting it come in. Then that claim is ready to be reviewed. There aren't a lot of those, but there are some. And of the ones that are ready to be reviewed, we have found that almost half, 43 percent, have one component of the validation of the claim missing, so we can't value it. It's not ready to be valued because all the supporting document hasn't been provided.

So that's where we are.

You have this giant amount of claims that came in, 26,000 came in just a couple of months ago. The documents supporting them are now flooding in, and those claims are getting fleshed out.

I don't know the number that are complete. I don't have that information. But as they're complete, they're being looked at, and as they're being looked at, almost 50 percent of them are deficient -- and that's not

a criticism, it just shows you how hard it is not only on our part, but on your part to give us the information.

There's a second very important part of this process, and that is valuation. And this is very difficult because as the trustee, I owe each one of you the same duty and if I were to pay Mr. Jones more than his claim was worth, I'm using your money. This is communal money. There's a defined amount.

In a mass tort in a claims process, to speed things up, you try to create default amounts and by that I mean there's an amount that we will pay on a certain claim that all you have to do is be under that amount on that claim, provide the backup for it and it will be paid. If it's over that amount, we have to look at it.

And the same is true with the rebuild.

So what we've done, believe it or not, is created a system that has created the rebuild values as best we can assess them by ZIP code in all of the burn fires.

Now, can you imagine how many ZIP codes that is?

And even within that ZIP code, there are variances. You may have had the most expensive house on the block, you may have had the most -- least expensive house on the block. So we have to account for that.

But we have a model that has a default amount that in ZIP code XYZ, if your rebuild cost doesn't exceed

Case: 19-30088 Doc# 10656 Filed: 05/07/21 Entered: 05/07/21 11:37:57 Page 12 of 24

this amount of money, it will automatically be approved because that's what our model says is reasonable.

It isn't infinite and it isn't perfect and we look at each case. If it's below that, we don't have to look at it, and the reason we did that is we wanted to speed things up. If it's over that, we have to look at it because we're spending everybody's money on your case.

You may be right that you're entitled to an amount above that but -- so that's what we provide the claims adjuster, the claims processor, is that model.

It took a long time, a lot of money, a lot of effort to build that model but we have it and that's -- so things are going to start to go more quickly.

We have default numbers on lots of things -- not everything, but a whole bunch of them.

The other way that valuation differs from intake is that I then, and the Trust becomes -- we step into the shoes of the defendant. Remember, if this wasn't a bankruptcy, you'd be suing PG&E and they would be questioning your values.

The hardest decision I had to make when I became trustee was whether or not I was going to hire a defense firm to represent the Trust and all of these transactions with you as to value.

If there were no bankruptcy, PG&E would have had

an army of lawyers out there questioning your values, up and down, in and out, but I decided that -- I didn't like the idea of using your money to hire someone to defeat your claim, so I didn't hire a defense firm.

That made it harder for the Trust, when it comes to valuation, because I can't just automatically accept everything you tell us. It has to be checked out, when we're trying to make sure that we're not overspending, that we're making sure that everybody is proving their case to a certain degree. The quantum of proof is much less than if you were in a courtroom, but there still has to be some quantum of proof.

So that's the valuation process.

So I have to value these cases and I need help in doing that. So here's the staff that I currently have to help me do that: I have Cathy Yanni, who is my claims administrator, who is a wonderful, wonderful claims administrator. She's done this for years, she's highly efficient, extremely capable and extremely competent.

And assisting her is the law firm of BrownGreer. And so from BrownGreer I have 136 claims review -- I have almost 300 people. I have 136 claim reviewers. I have over 60 programmers. That's 60 people that have created -- I like to think of it as the blueprints. You build a house, you get one of the plans, the blueprint.

Well, the programmers created the blueprints for the process that we're using for the intake. They helped us create the models that give us value.

We have great oversight. We have an oversight committee that did an audit. I'm very, very conscious of that. I'm trying to keep this within one percent and, you know, I've done a lot of trusts -- not a lot of trusts -- I've done a lot of mass torts and what the budgets are, one percent is very low. I don't know if I'm going to be able to keep that, but I'm going to try.

If I hire more people, the overhead goes up. If I don't hire more people, it takes longer to get the money out. That's the push and pull that I'm always in, and I'm trying to find the right balance as we go forward.

What we want to do is to, as best we can, is replicate the conditions you would have and the experience you would have if you were in the court system.

We can't get you in the court system, but if you were in the court system, you would have the right to appeal, and we created that right in our Trust.

Your lawyers were very concerned about whether, if you got an award and you were unhappy with it, what could you do? So we created a system that allows you to appeal that, just as if you were in the court system.

It's a different type of appeal because it's

one-sided. We have hired, contracted with 33 retired judges and we've trained them.

So after you get your award, which is as we talked about earlier is broken down, you can appeal any one of those claims and it goes in front of a retired judge in what we call a de novo setting, that means brand new. You start over again.

We want you to be assured that you're going to be fully heard, not just by a claims processor, but if it's a claims processor that produces a result you're unhappy with, you get to go in front of a retired judge and tell them your story as to what you think it should have been, why, what your lawyer can argue for, and there's no limits and it's free and it's your right under the Trust agreement.

We don't in any way doubt what you've been through. We can't -- we can only imagine it because we haven't gone through it. Your lawyers have convinced me that this is the most heartbreaking case that they've ever seen and I'm certain -- I certainly believe that. So we're working as hard as we can to get this done.

But I wanted you to understand some of the issues that we face. They're real. I can't change them. The Trust didn't have anything to do with the settlement. We didn't create the settlement. The Trust had nothing to do

with the amount of money or the bankruptcy. We're dealing the hand we were dealt and we're doing it the best we can.

We're still walking uphill on this. We're not near the top yet. We're making progress. We're getting there. When we get to the top and go down the other side, it will go much more quickly, but I do have some numbers that I think I can give you that show that we have made some progress.

We've issued 752 determination notices with a value of $513 million. That's a half a billion dollars worth of determination notices.

Now remember, you're only getting paid 30 percent of that, so what you're actually getting paid isn't that but that's how much has been determined in value.

We started a process earlier, again -- I'm running out of time -- but we call it preliminary payments where, because of your need, all you had to do was file an application and we paid you up to $25,000.

We paid $122 million under that program.

We paid 71 -- I think it's $71 million on a pro rata basis. We've got 752 determination notices out there. You have to say you want that, then we pay it.

That hasn't happened yet, but it's up to you; tell us you want the money, and we'll pay it.

This is what we've paid so far and again, I'm

proud of it. I'm sad that it isn't more but I'm proud that we've been able to do this in this short period of time.

We have -- and again, maybe I haven't explained this. The way you find out what you're entitled to is you get what's called a determination notice. It determines the value of all your claims, lumps it into one sum and says: Here is your claim. It's worth a million dollars.

Now, if you want to know what's behind that, what are the values on each individual claims, all you have to do is ask and that's provided. If you have five claims, they all added up to a million dollars, you get the determination notice of a million dollars.

Then you can accept it or you can appeal it.

I'm going to come back in a week or so and do another taping, so get your questions in before that, and in that other taping I'm going to talk about pro rata, why am I only getting 30 percent. That needs to be explained to you and I don't think we've done a very good job of doing that yet.

And I'm going to also talk to you about the problem that we have with the stock and monetizing it.

In order to pay you money, we have to turn the stock into cash and we haven't been able to do that yet, and I want to talk to you about that.

So I'm going to come back and tape those two things in the next couple of weeks and that will be released to you as soon as it's done.

So I hope... I hope this has been helpful.

You know, there was a recent newspaper article that kind of questioned what we were doing and it really bothered me because I felt it gave you more to worry about; that you're worried about whether the Trust is wasting your money, et cetera, et cetera.

It seemed to say, without saying, that in these first few months we've only paid out this little amount of money, but look at all the money that the Trust has spent.

Well, they're not comparable. You know, you've built houses, especially those of you that are in the process of doing it now. You know that in building a house, you pay as you go along. That's what we're doing.

We're building the process by which you're going to get paid.

I would think you'd be concerned if we weren't spending money, if we weren't hiring 300 people to help resolve your claims. That's when you should worry.

But I didn't want you to misunderstand what we're doing. We're rounding the corner but as I said earlier, we're still walking uphill. This is a very, very, very tough project, but we're doing our best and I just want

you to be able to have confidence in us that we're working for you, because we are.

(End of recording.)

C E R T I F I C A T E

I, TERRI NESTORE, Certified Shorthand Reporter/ Transcriptionist, do hereby certify that I was authorized to transcribe the foregoing recorded proceeding, and that the transcript is a true and accurate transcription of my shorthand notes, to the best of my ability, taken while listening to the provided recording.

I further certify that I am not of counsel or attorney for either or any of the parties to said proceedings, nor in any way interested in the events of this cause, and that I am not related to any of the parties thereto.

Dated this 16th day of May, 2021.

________________________
TERRI NESTORE, CSR 5614, RPR, CRR

**EXHIBIT 2**

**Table of Abrams Filings to Which Trust has Replied**

**FILINGS BY WILLIAM B. ABRAMS IN THE CHAPTER 11 CASES TO WHICH THE FIRE VICTIM TRUST HAS RESPONDED**

| Date | Docket | Title | Disposition |
|---|---|---|---|
| June 16, 2020 | 7974 | Motion to Reconsider Order Approving Joint Stipulation re: Reg Rights Agreement | Overruled |
| June 19, 2020 | 8045 | Opposition to Second Revised Draft Proposed Findings of Fact, Conclusions of Law and Confirmation Order | Overruled |
| July 1, 2020 | 8247 | Motion for Just Treatment of Victims Through Reconstitution of TOC | Denied[1] |
| May 26, 2021 | 10715 | Motion to Amend Judgment and Replace All Members of TOC and Support Efficient Trust Administration | Denied |
| June 6, 2021 | 10748 | Motion to Enforce Victim Trust Agreement and Replace all Members of the TOC and Support Efficient Trust Administration | Denied |
| August 2, 2021 | 11005 | Motion to Enforce Disclosure Requirements or Reconstitute the TOC Given New Evidence of Self- Dealing and Conflicts of Interest | Denied |
| May 23, 2022 | 12440 | Motion for an Order Authorizing Discovery and Hearings Regarding the Administration of the Fire Victim Trust | Granted in Part and Denied in Part |
| July 6, 2022 | 12593 | Reply to the Objection of the Fire Victim Trustee Pursuant to Fed. R. Bankr. 2004 for Entry of an Order Authorizing Discovery and Hearings Regarding the Administration of the Fire Victim Trust | Underlying Motion Granted in Part and Denied in Part |
| August 18, 2022 | 12766 | Motion of William B. Abrams Pursuant to Federal Rule of Bankruptcy Procedure 2004 for Entry of an Order Authorizing Discovery and Hearings Regarding the Acts and Conduct of JAMS Neutrals Given New Evidence | Pending |
| September 1, 2022 | 12916 | Motion for Reconsideration and Related Relief from the Order Granting Motion of the Fire Victim Trustee to File Redacted Versions of Certain Retention Agreements Until Litigation Related to Such Retention Agreements is Finally Resolved and Pursuant to Federal Rule of Civil Procedure 59(e) | Denied |
| September 22, 2022 | 12995 | Motion of William B. Abrams Pursuant to Federal Rule of Bankruptcy Procedure 2004 for Entry of an Order Authorizing Discovery and Hearings Regarding Debtors Acts, Conduct and Agreements that May Obstruct or Limit the Just and Fair Management of the Fire Victim Trust | Pending |

[1] Treated, along *Emergency Pleading Requesting Reconsideration of the Identification of Parties who Timely Objected to the Fire Victims Claims Resolution Procedure* [Dkt. No. 8137] as a motion for reconsideration. See *Order Denying Motions for Reconsideration* [Dkt. No. 8478].