# EXHIBIT 8

1          UNITED STATES BANKRUPTCY COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3                    -oOo-

4    In Re:                        ) Case No. 19-30088
                                   ) Chapter 11
5    PG&E CORPORATION AND PACIFIC  )
     GAS AND ELECTRIC COMPANY,     ) San Francisco, California
6                                  ) Wednesday, November 18, 2020
                    Debtors.       ) 10:30 AM
7    _____  )
                                     SECURITIES LEAN PLAINTIFF'S
8                                    MOTION TO APPLY BANKRUPTCY
                                     RULE 7023 AND CERTIFY A
9                                    LIMITED CLASS [9152]

10                                   REORGANIZED DEBTORS' MOTION
                                     TO APPROVE SECURITIES ADR AND
11                                   RELATED PROCEDURES FOR
                                     RESOLVING SUBORDINATED
12                                   SECURITIES CLAIMS [8964]

13               TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE DENNIS MONTALI
14             UNITED STATES BANKRUPTCY JUDGE

15   APPEARANCES (Via Zoom):
     For the Debtor:          STEPHEN KAROTKIN, ESQ.
16                            RICHARD W. SLACK, ESQ.
                              JACK NOLAN, ESQ.
17                            Weil, Gotshal & Manges LLP
                              767 Fifth Avenue
18                            New York, NY 10153
                              (212)310-8000
19
     For PERA:                MICHAEL P. CANTY, ESQ.
20                            THOMAS A. DUBBS, ESQ.
                              Labaton Sucharow LLP
21                            140 Broadway
                              New York, NY 10005
22                            (212)907-0700

23   For PERA:                MICHAEL S. ETKIN, ESQ.
                              Lowenstein Sandler LLP
24                            One Lowenstein Drive
                              Roseland, NJ 07068
25                            (973)597-2500

escribers
(973) operations@escribers.net | www.escribers.net

For Chevron Master Pension  PHILIP S. WARDEN, ESQ.
Trust and Chevron UK  Pillsbury Winthrop Shaw Pittman
Pension Plan:  LLP
  Four Embarcadero Center
  22nd Floor
  San Francisco, CA 94111-5998
  (415)983-1000

For MML Investment  KIZZY L. JARASHOW, ESQ.
Advisors, LLC:  Goodwin Proctor
  620 Eighth Avenue
  The New York Times Building
  New York, NY 10018
  (212)813-8800

For The State of Oregon:  JENNIFER FELDSHER, ESQ.
  Morgan, Lewis & Bockius, LLP
  101 Park Avenue
  New York, NY 10178-0060
  (212)309-6000

Also Present:  Michael Lange, SVP
  Financial Recovery Technologies

Court Recorder:  LORENA PARADA/ANKEY THOMAS
  United States Bankruptcy
  Court
  450 Golden Gate Avenue
  San Francisco, CA 94102

Transcriber:  LINDA FERRARA
  eScribers, LLC
  7227 N. 16th Street
  Suite #207
  Phoenix, AZ 85020
  (973)406-2250

Proceedings recorded by electronic sound recording;
transcript provided by transcription service.

PG&E Corporation and Pacific Gas and Electric Company

SAN FRANCISCO, CALIFORNIA, WEDNESDAY, NOVEMBER 18, 2020,

10:30 AM

-oOo-

1

2

3

4     (Call to order of the Court.)

5          THE CLERK:  Calling the matter of PG&E Corporation.

6     One moment while I bring in Mr. Slack.

7          MR. SLACK:  Good morning.

8          THE COURT:  Good morning, Mr. Slack.

9          MR. SLACK:  Give me one second.

10          THE COURT:  You've still got your Ernie Banks poster

11     up.

12          MR. SLACK:  Yes.  Hold on.

13          THE COURT:  So Ms. Parada, is anyone else coming in at

14     this point, Mr. Etkin or someone else coming in?

15          THE CLERK:  Who would you like me to bring me in now,

16     Your Honor?

17          THE COURT:  Oh, no.  We don't have to bring anyone in

18     but Mr. Etkin, or someone from the --

19          THE CLERK:  I'm bringing in Mr. Karotkin, and Your

20     Honor you seem to be frozen.

21          THE COURT:  (Audio interference).

22          THE CLERK:  Your Honor, you're -- one moment, counsel.

23     It appears we've lost Judge Montali's connection.

24          THE COURT:  Ms. Parada?

25          THE CLERK:  Yes, Your Honor.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1    THE COURT:  Mr. Slack?  Yeah, I don't know.  I had a

2 perfect signal at the start of the hearing.  All right.

3    Ms. Parada, why don't you call the case?

4    THE CLERK:  Calling the matter of PG&E Corporation.

5 One moment, Your Honor, while I bring in Mr. Nolan and Mr.

6 Etkin.

7    THE COURT:  Mr. Etkin, good morning.

8    MR. ETKIN:  Good morning, Your Honor.  I believe Mr.

9 Dubbs is going to be handling the argument, Your Honor, and I

10 assume that he's on, but --

11    THE COURT:  Well, we'll bring him.

12    MR. ETKIN:  -- I don't know whether it's in order.

13    THE COURT:  We're going to start with Mr. Slack.  So

14 we'll bring in him.

15    Ms. Parada, bring Mr. Dubbs in.  For everyone on the

16 call, I want to say that I don't know why I had trouble this

17 morning, but yesterday in the neighborhood, or in the area, the

18 East Bay, somebody ran into a pole, and a pole caught on fire,

19 and 5,000 Comcast customers had their fiber optic cable

20 connections connected cut.  So it wasn't my operator technique,

21 and I apologize, but I didn't cause it.

22    So Mr. Slack and Mr. Etkin, I presume you got the

23 order about the timing.  Are you ready to go and reserve your

24 time for response, Mr. Slack?

25    MR. SLACK:  Yes, so I would like to reserve eight

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1  minutes for a response.

2     THE COURT:  Okay.  And Mr. Karotkin, are you going to

3  just monitor or are you going to participate?

4     MR. KAROTKIN:  Maybe both.

5     THE COURT:  Okay.  Mr. Slack, again, I'll repeat for

6  all of your sake and everyone listening, I have been through

7  volumes and volumes of papers and, of course, I have the

8  history, and so I really mean it when I say I want you to help

9  me figure out from a practical point of view what to do.

10     So with that, Mr. Slack, we'll start you, and you've

11  got thirty minutes, of which you're going to reserve eight.

12     MR. SLACK:  Yes, Your Honor.  Thank you.  So good

13  afternoon, at least from New York, Your Honor.  Richard Slack,

14  Weil, Gotshal & Manges for the reorganized debtors.

15     And I'd like to start by answering one of your

16  questions, which is the likely timetable for settlement under

17  the reorganized debtors' proposed procedures.  And although the

18  objectors try to paint the procedures as complicated, they're

19  actually very simple, and these are similar to the procedures

20  Your Honor has already approved for other proofs of claim in

21  the case, and in numerous other cases that we've cited.

22     Your Honor, with your permission, I'd like to ask my

23  colleague, Mr. Nolan, to put up our sort of timing chart for

24  you.

25     THE COURT:  This is part of the demonstrative that he

PG&E Corporation and Pacific Gas and Electric Company

1    filed yesterday, right?

2        MR. SLACK:  It is.  Your Honor, it's our demonstrative

3    number 2, and the first page of that.

4        THE COURT:  Yeah, I have the -- oh, wait a minute,

5    demonstrative number 2.  I've got a demonstrative number -- oh,

6    okay.  All right.  I'm on there with you.

7        MR. SLACK:  Yeah.

8        THE COURT:  I've got a hard copy also.

9        MR. SLACK:  Great.  So Your Honor -- if you could go

10   to the next page, Jack -- the first step in our procedure is

11   getting the trading information to know who knows -- who owns

12   what, and to be able to size up the amount of the claims.  And

13   as PERA recognizes, this fundamental, easily furnished

14   information is going to have to be provided under any

15   circumstances.  It's just a question of when it gets provided,

16   and what we would say, Your Honor, is that it's absolutely

17   critical to know what the size of the claims are before you go

18   in and mediate.  So from our perspective, this is an easy part

19   of this.  We're prepared to send out the information request

20   promptly after approval, and we should be able to have that

21   information within forty-five to sixty days, and that's the

22   first step.

23        And shortly thereafter, Your Honor, we'd be able to

24   send out settlement letters, again explaining in simple terms

25   of procedures to most claimants with an offer, and those offers

PG&E Corporation and Pacific Gas and Electric Company

1  can go out before any party expends any money on expensive

2  litigation, or discovery on the merits.

3           So within literally a couple of months, the debtors

4  can have settlement offers out to most claimants.  And at the

5  same time, Your Honor, we would bring omnibus objections on

6  purely procedural or facial issues, such as duplicative claims,

7  untimely claims, shares sold before corrective disclosures, to

8  clean up the claims docket as occurs in every case.  These

9  aren't substantive merits objections as PERA asserts.

10          THE COURT:  Well, there may be --

11          MR. SLACK:  That means --

12          THE COURT:  -- they're essentially what we've been

13 doing in the main case, right?

14          MR. SLACK:  They are, Your Honor.

15          THE COURT:  You've got twenty-four sets of omnibus

16 objections.

17          MR. SLACK:  That's exactly right, Your Honor.  So it's

18 cleanup.  And if Your Honor then decides that some of these

19 claims are valid, then we'd send out additional offers at that

20 time, and we would expect that mediation is only going to be

21 necessary for a small number of claims.  We expect that most

22 claims can be resolved without mediation, as is our experience

23 with other cases in similar situations.  So again, just with --

24          THE COURT:  But Mr. Slack, I pointed out that from

25 your own papers, thirty percent of the claimants put enough

PG&E Corporation and Pacific Gas and Electric Company

1    information.  Why can't you already, as soon as we start, if we

2    go this way, go with at least the procedural objections right

3    out of the box?  And why did the -- by my calculation, if

4    there's thirty percent of 7,000, that's over 2,000 claims that

5    have gotten enough information already.  So why do you have to

6    go back again with that 2,000 claims?

7         MR. SLACK:  So Your Honor, both good questions.  So we

8    completely agree that the omnibus objections can be going on

9    contemporaneous with getting more information.  So the omnibus

10   objections don't have to wait, at least starting that process.

11   So we completely agree with you.

12        And as for the thirty percent, and just to be clear

13   about it, Mr. Keeble (phonetic) in his declaration was talking

14   about one particular type of information that we need.  So it

15   certainly is possible that out of that thirty percent, there

16   are other -- you know, part of that thirty percent didn't, for

17   example, provide all information on let's say whether it's a

18   trade, or whether it's a sale -- or a purchase or a sale.

19        But what we would tell Your Honor, because we're

20   sensitive to your question, is that we would be prepared to go

21   through the proofs of claim, and make sure that we're not

22   asking somebody who has provided complete information, in all

23   those respects, to provide the information again.

24        So we would undertake that, and we would only ask the

25   people who haven't provided complete information to provide

PG&E Corporation and Pacific Gas and Electric Company

1  information in a sense, under these procedures, and we would,

2  because it's going to be important to put this in a database,

3  and because -- and as Your Honor can see, we've set up a

4  database, is we would then input that information, the people

5  who provided complete information, into the database.

6        THE COURT:  Okay.

7        MR. SLACK:  And so Your Honor, literally within a

8  couple of months, we expect the settlement process to begin,

9  and to be fruitful.  And while that settlement process is going

10  on, it allows certain merits issues, certainly, to be addressed

11  by the district court, without the risk of any inconsistent

12  rulings between this court, and the district court, because

13  under our proposal, all of the merits issues, so that there's

14  no discovery, there's no expense, all the merits issues are put

15  off until we can see whether we can make real progress, which

16  we expect to do under the settlement procedures.

17        THE COURT:  Well, one of the things that I can't

18  figure out, and I have no control over the district court, but

19  by my calculation, the motion to dismiss has been under

20  submission for nine months, and so what -- I mean, where does

21  our process conflict with the district court?

22        MR. SLACK:  It would --

23        THE COURT:  In other words, if a settlement -- let's

24  say a claimant provides the information, you send him an offer,

25  and the offer is accepted, doesn't the person get a check, or

PG&E Corporation and Pacific Gas and Electric Company

1  if it's a shareholder, get essentially stock, and we're done,

2  or does the whole thing depend upon the district court getting

3  resolved?

4  MR. SLACK:  No, Your Honor, you hit it on the nose.

5  If we send out settlement offers, and they're accepted, those

6  can be instituted, people can get money immediately, and you

7  don't have to wait for the district court to make any kinds of

8  merits decisions.

9  So the point of the conflict, Your Honor, is it's our

10  view that under PERA's procedures, PERA is asking that this

11  court make merits determinations earlier than we would.  And in

12  that circumstance, it's possible that Your Honor would be

13  making merits decisions that are potentially in conflict with

14  the district court.  And we think one of the advantages to our

15  procedures is that it's purely procedural settlement issues up

16  front and we defer the merits issues until after the settlement

17  process, if there are any remaining.

18  THE COURT:  Yeah, but I'm still confused.  Let's

19  suppose we have a claimant who filed a claim for 100,000

20  dollars, not a -- I'm not talking about a little tiny one --

21  MR. SLACK:  Yep.

22  THE COURT:  -- and the company offers that claimant

23  60,000, 30,000, it doesn't matter, 30,000, and the claimant

24  says okay, I'll take it, that claimant gets 30,000 dollars.  I

25  presume that claimant can still preserve its claim against

PG&E Corporation and Pacific Gas and Electric Company

1    third parties, officers and directors.  But what is the

2    connection between that process and the bankruptcy court, and

3    whatever happens, whenever it happens, and the district court?

4         MR. SLACK:  Under our procedures, there is none in

5    that process.  That's exactly our point.  We do not --

6         THE COURT:  So if the claimant --

7         MR. SLACK:  -- believe there's any conflict.

8         THE COURT:  Okay.  So if the claimant says, no, thank

9    you, I don't want your 30,000 dollars, then under your

10   proposal, it goes to various levels of mediation, but still is

11   independent of the district court, right?

12        MR. SLACK:  Under our procedures, we believe that it's

13   entirely independent of the district court.  At some point,

14   Your Honor, here's the only point I'd make, let's assume that

15   down the road Your Honor does have to deal with one or more

16   claims on the merits, under our procedures, we believe that

17   we've given the district court time to issue its rulings on the

18   merit, and that could impact Your Honor's decisions on the

19   merits later on.  But our procedures, right, as we try to

20   settle these cases, Your Honor, is not in conflict at all with

21   the district court, and what the district court's doing.

22        THE COURT:  Okay.  So if I can turn it around to you,

23   my hypothetical claimant takes the 30,000, and he's gone, and

24   if he has a claim that he wishes to pursue against officers and

25   directors, that's for another day, and another court, and

PG&E Corporation and Pacific Gas and Electric Company

1    another judge. But if the claimant says no, thank you, and

2    goes through one or two rounds of mediation without a

3    resolution, then he's in the queue to be dealt with on a merits

4    matter, and that might be relevant, depending upon whatever

5    happens in the district court; is that correct?

6           MR. SLACK: I think that's right, Your Honor. I would

7    say it the following way, is that at the end of our process, to

8    the extent there's a few claims that are remaining, Your Honor

9    may be asked to decide the merits. And what we would suggest

10   at that time is some type of collective action, much like what

11   Your Honor did with the post-petition interest issue where

12   there were thousands of people who had that issue as well. We

13   worked out a representative process to resolve that, and we

14   would assume that we would be able to do the same thing down

15   the road if we needed to here.

16          THE COURT: Well, I appreciate your optimism, Mr.

17   Slack, after the procedure you said there will just be a few

18   claims left, that's nice to know. Okay. Go ahead.

19          MR. SLACK: Your Honor, and what PERA is proposing, is

20   a long, drawn-out process, but the most important thing about

21   this, Your Honor, is that they want to front load more issues,

22   more substantive issues, which is going to delay getting

23   settlements. And if you look at the slides they put in, they

24   admit that they're not going to be able to get settlements.

25   It's going to take four to six months on the back end. They're

PG&E Corporation and Pacific Gas and Electric Company

1    not going to be able to get settlement money out for people for

2    a year or more, and that's only if there's a settlement, which

3    as Your Honor knows, with PERA, the parties had an opportunity

4    to talk, and have talked, and it's not disclosing anything to

5    say that obviously there's no settlement.  So this in some ways

6    is just a -- their proposal is a perpetuation of the

7    unsuccessful status quo.

8         And Your Honor what I would say is the question is why

9    is PERA making the 7023 proposal that they're making, and it's

10   important to take a step back and consider what this is really

11   all about.  PERA is currently, as you know, the lead plaintiff

12   in the uncertified federal class action, and that suit is now

13   only against the officers and directors and underwriters.

14   So -- and the underwriters are only defendants on the Section

15   11 claim.

16        So for the former equity holders, the only defendants

17   are the directors and officers, as the debtors are obviously no

18   longer a part of that case.  So without the company in the

19   case, the money available to PERA, and the federal putative

20   class is for all practical purposes, the insurance, the D&O

21   insurance, and the plaintiff's lawyers don't make their living

22   by going after the houses of individuals.  So that's not a

23   realistic way of recovering on these claims.

24        So the only recovery is the insurance, and there is,

25   in fact, 400 million dollars' worth of insurance, and so that

escribers
operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1    insurance is shared not only with the federal class action that

2    there are already plaintiffs on, but the debtors in resolving

3    any claims in the bankruptcy that we're talking about now, as

4    well as competing claims by the fire trust on account of the

5    derivative claim.  So you have a pot of insurance.

6         And while there is a company indemnity to the officers

7    and directors, if the district court action goes to judgment

8    and the plaintiffs win, the law does not allow the company to

9    indemnify the securities violations as a matter of public

10   policy.  So again, for all practical purposes, in the district

11   court securities action, the insurance is all that's available.

12        THE COURT:  Again, why is that relevant to my decision

13   here on whether to let the company go its own way in a more

14   traditional bankruptcy procedure, rather than the way PERA

15   argues for it here?  Because if they win here, they recover

16   from the debtor cash, if it's equity -- I mean, if it's

17   preferred stock, and equity if it's equity.

18        MR. SLACK:  It's a question I was just about to

19   answer, Your Honor --

20        THE COURT:  Okay.

21        MR. SLACK:  -- which is what that means is that PERA

22   has every incentive in to preserve that insurance for the

23   district court action, and particularly for the claimants who

24   are part of the putative class in the district court, but did

25   not file proofs of claim here in the Chapter 11 case.  And in

PG&E Corporation and Pacific Gas and Electric Company

1    order to do that, PERA needs to make sure that the reorganized

2    debtors do not settle claims in the bankruptcy which could

3    reduce insurance, or take the plaintiffs out of the federal

4    action putative class.

5         And so let's be clear, there's nothing wrong with PERA

6    as the lead plaintiff in that case taking that position here in

7    the bankruptcy.  But the point still remains, Your Honor, that

8    they're trying to act as a class representative of two

9    different classes that have competing interests; for example,

10   with respect to that insurance.  And let's take the issue of

11   recoveries here in the insurance.

12        THE COURT:  Well, wait, I'm going to interrupt you

13   because I --

14        MR. SLACK:  Yes.

15        THE COURT:  -- kept you on a short time limit --

16        MR. SLACK:  Yes.

17        THE COURT:  -- and what you've said is pretty much an

18   argument to your opposition to the 723 motion.  I need to know

19   why I should grant the debtors' ADR motion, and that's what we

20   spent some time talking about.

21        So again, I realize -- I thought about merging these

22   two together, and I knew that the same lawyers would be

23   probably making the main arguments, but at least conceptually,

24   I have to think about it.  Because frankly, Mr. Slack, I'm not

25   a hundred percent convinced that I couldn't do this

PG&E Corporation and Pacific Gas and Electric Company

1  sequentially.  I could try your procedure, and if you're right,

2  only a few remain, that's one thing, but what if 5,000 remain,

3  I might decide to go to plan B under the Rule 723 motion.

4          So go back to --

5          MR. SLACK:  Okay.

6          THE COURT:  Just tell me what else you need me to

7  focus on for the ADR motion.

8          MR. SLACK:  Okay.  Let me -- and by the way, Your

9  Honor, I think that what you hit on is something which is

10  important, which is letting the debtor have its shot at these

11  procedures, which again are very typical, and in their business

12  judgment, is the most efficient way for the estates to proceed,

13  is the way to go.  You can always revisit this issue.  We don't

14  think it's the right mechanism, but you can always revisit it

15  sequentially as Your Honor said.

16          THE COURT:  Well, but my point is maybe it isn't the

17  right mechanism, and maybe yours is an alternative but maybe

18  yours won't work because maybe --

19          MR. SLACK:  And Your Honor, I think we --

20          THE COURT:  -- fifteen people accepted --

21          MR. SLACK:  -- think it's going to work.

22          THE COURT:  -- and 6,000 will reject it.

23          MR. SLACK:  So I guess I would say this, Your Honor,

24  is the one advantage -- and we're confident based on precedent

25  that this is going to work, but what I would say Your Honor is

PG&E Corporation and Pacific Gas and Electric Company

1    is that if, in fact, we are able to go and settle, even with

2    thousands of claimants, and we think it's going to be many more

3    than that, each one of those claimants is going to get an

4    immediate payment, consensually, voluntarily.  It's not going

5    to be a -- they're not going to be denied that settlement

6    because PERA is the gatekeeper for a settlement.

7         So at the very least, Your Honor, you're going to have

8    consensual settlements where claimants, and likely thousands

9    and thousands of them, are going to have consensual settlements

10   with immediate recoveries.

11        THE COURT:  So if it's --

12        MR. SLACK:  And we think it --

13        THE COURT:  -- an equity, if it's a class 10(b)(2),

14   whatever it is, do they get their shares of stock under the

15   formula, as soon as they accept, or promptly after they accept?

16        MR. SLACK:  Yeah, so Your Honor, we would be certainly

17   able to both provide potential cash, and also stock offers

18   because as Your Honor knows, the insurance money comes out

19   first to cash, and then whatever is left would go in stock.  So

20   we think the parties are free to make offers both in cash and

21   stock, and you're absolutely right, that if we made an offer in

22   stock, that stock could come out immediately.

23        THE COURT:  Okay.  So let's make sure we're clear on

24   that.  Let's go back to my hypothetical.

25        MR. SLACK:  Okay.

escribers
operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1    THE COURT: We've got 100,000 dollar investment by

2  somebody who bought the common stock under the formula, under

3  the plan, that translates based upon the timing to 500 shares.

4  So -- or whatever it would be if it were litigated, but if the

5  company says we'll settle with you, and we'll give you 400

6  shares if you accept, and the guy says yes, that person

7  promptly gets his 400 shares, and we're done with that claim,

8  right?

9    MR. SLACK: That's right.

10    THE COURT: Okay.

11    MR. SLACK: That's right, Your Honor, done.

12    THE COURT: Okay.

13    MR. SLACK: So Your Honor, a couple of other points

14  that I think are -- I just want to give the Court some

15  assurance that those people who didn't say hey, we just want to

16  blow this up, and actually gave us comments on our procedures.

17  As Your Honor knows in the reply, we made a number of changes

18  and edits in order to make them, and be responsive to the

19  comments we got in. And again, these are listed in our papers,

20  so I won't go through them, but I --

21    THE COURT: Well, I just wanted to be aware of

22  something, this is something that has been one of my favorite

23  subjects throughout this case. Mr. Karotkin heard me say this

24  many times. Sometimes it's difficult for me to prepare a

25  motion when all the answers are found in a proposed order. And

PG&E Corporation and Pacific Gas and Electric Company

1    so I get this long, thorough reply brief, but I also am told

2    that I can read a ninety-page proposed order, and that isn't

3    the easiest thing to do under the time frame, and on a small

4    screen.  And so I have no idea what the proposed order says at

5    this point.  So I'm dealing with concepts, and I -- you don't

6    have to respond to that, that's just a fact.

7                MR. SLACK:  Well, I guess, Your Honor, what I would

8    say is that in response to comments that we got, we provide for

9    the Court's approval on notice, the proposed panel of qualified

10   mediators, so --

11               THE COURT:  And that's not a big deal.

12               MR. SLACK:  Right, but I'm saying we've made a number

13   of changes in response to comments that -- we provided

14   additional time for some of the papers that would come in in

15   mediation.  We've clarified the mediator's authority to

16   terminate an ADR.  But again, there were people who had very

17   specific comments.  We've been responsive to that.  So I just

18   want the Court to be aware that we have made a number of

19   changes to the procedures to deal with specific comments.

20               THE COURT:  No, I am aware of that.  Why don't you --

21   unless you want to add something more now, why don't you just

22   reserve the rest of your time, and do you want to --

23               MR. SLACK:  Okay.  Your Honor, I will do that.

24               THE COURT:  Okay.

25               MR. SLACK:  Thank you.

PG&E Corporation and Pacific Gas and Electric Company

1      MR. ETKIN:  Mr. Etkin, are you going to share the job

2  with your colleague, or is this all on you today?

3      MR. ETKIN:  I think it's actually all on my colleague.

4      THE COURT:  Okay.

5      MR. ETKIN:  I'll assume the Karotkin position of maybe

6  I'll sit back, maybe I won't.

7      THE COURT:  Should we take you off the screen?  Do you

8  want to stay on?

9      MR. ETKIN:  Yeah, you can take me off the screen, Your

10 Honor, and I'm assuming bring Mr. Dubbs in --

11     THE COURT:  Okay.  All right.

12     MR. ETKIN:  -- from Labaton.

13     THE COURT:  Mr. Dubbs ready to come in?

14     THE CLERK:  Your Honor, I don't see Mr. Dubbs has

15 joined.

16     THE COURT:  Well --

17     THE CLERK:  I don't see him as a list of attendees.

18     THE COURT:  Mr. --

19     MR. ETKIN:  Is Mr. Canty on the phone, on the line?

20     THE COURT:  Well, let's ask --

21     THE CLERK:  Mr. Michael Canty is an attendee.

22     MR. ETKIN:  Could you bring him --

23     THE CLERK:  Shall I bring him?

24     MR. ETKIN:  Would you please, Ms. Parada?

25     THE CLERK:  Yes, one moment.

eScribers
operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1          THE COURT:  Well, I just want to make sure.  If Mr.

2   Dubbs is not on the line, we won't -- obviously, we can't bring

3   you in, so Mr. Canty --

4          MR. ETKIN:  Mr. Canty is Mr. Dubbs' partner, so --

5          THE COURT:  Mr. Canty, you might be the relief pitcher

6   in the -- Mr. Slack likes baseball, so under the new baseball

7   rules, you come in as a relief pitcher, you have to pitch to

8   three batters, right?  Okay.

9          MR. ETKIN:  I apologize for the confusion, Your Honor.

10          THE COURT:  Listen, I'm the master of confusion this

11   week, even though I didn't --

12          MR. ETKIN:  I know.

13          THE COURT:  -- hit the pole and knock the thing down.

14   Mr. Canty, I can see your name.  You need to unmute your mic,

15   and operate -- activate your camera.  Okay.  Mr. Canty?

16          MR. CANTY:  Your Honor, I just rejoined.  I don't have

17   anything to add.

18          THE COURT:  Who is speaking, Mr. Canty?

19          MR. CANTY:  Yes, Your Honor.  For some reason, it

20   brought me into the room.  Zoom rebooted me.  I don't --

21          THE COURT:  You're in.  I can see you.  I can barely

22   see you, but I can hear you, and see you.  So you're presenting

23   the argument, I believe, in response --

24          MR. CANTY:  Mr. Dubbs is actually presenting the

25   argument.

PG&E Corporation and Pacific Gas and Electric Company

1    THE COURT:  But he's not here.

2    MR. ETKIN:  He's not on the line, Michael.

3    MR. CANTY:  Okay.  Let me see if I can get a hold of

4  him and --

5    THE COURT:  Well, we can't do that.  I just -- one of

6  you has to make the argument, or submit it on the papers.  I

7  just can't keep everybody waiting while we go looking for

8  somebody.  It's just like the courtroom.

9    MR. CANTY:  I understand, Judge.  I know he's been

10  emailing me trying to join.  If you could give me one moment.

11  I'm certainly happy to make the argument if he is unavailable,

12  but --

13    THE COURT:  Well, let me ask Ms. Parada again, have

14  you heard from Mr. Canty yet -- I'm sorry, Mr. Dubbs, yet?

15    THE CLERK:  No, Your Honor.  I'm searching the

16  attendees list, and he's not there.

17    MR. CANTY:  Your Honor?

18    THE CLERK:  If he's logged in a different name, he

19  could raise his hand.

20    THE COURT:  Mr. Dubbs, raise your hand if you wish to

21  be identified, otherwise we -- well, Mr. Canty, I'm just going

22  to have to -- I apologize.  I mean, I'm sorry, it's not

23  something I'm blaming you for, I just can't keep everybody

24  waiting.

25    MR. CANTY:  Understood, Your Honor.  I know that

PG&E Corporation and Pacific Gas and Electric Company

1    you've allotted time.

2            THE COURT:  I've looked at -- Mr. Canty, I've read the

3    briefs a lot.  So you saw my questions and you also heard, I

4    presume you heard Mr. Slack's argument.  So tell me why their

5    system won't work.

6            THE CLERK:  Excuse me, Your Honor?

7            THE COURT:  Yes.

8            THE CLERK:  I have a hand raised.  It's not an -- it's

9    not an identified number, name.  It's just numbers.  Would you

10   like me to bring that attendee in?

11           THE COURT:  Okay.  There's someone with a number

12   550594.  If you are a member of the bar and prepared to argue

13   in place of Mr. Dubbs, we'll bring you in.  If you are anyone

14   else, you will be tossed out in short order.  So bring 550694

15   in, Ms. Parada.

16           THE CLERK:  Yes, Your Honor.

17           MR. CANTY:  Your Honor, my understanding is that Mr.

18   Dubbs is identified as iPad 39.  I don't know if there's

19   somebody in the audience --

20           THE COURT:  I have no idea.

21           MR. CANTY:  Ms. Parada --

22           THE COURT:  He knows how to raise his hand.

23           MR. DUBBS:  Your Honor, can you see me?

24           MR. CANTY:  There's Mr. Dubbs.

25           THE COURT:  All right, who is 550694?

PG&E Corporation and Pacific Gas and Electric Company

1          MR. DUBBS:  That's Mr. Dubbs.  I'm sorry I don't have

2     my name on it.  That's an antique mistake.  But I'm prepared to

3     give the argument right away.

4          THE COURT:  All right, you're up.

5          MR. DUBBS:  May I have --

6          THE COURT:  But hold on, hold on.  Ms. Parada, let's

7     take Mr. Etkin and Mr. Canty out.  It's not --

8          THE CLERK:  Yes, Your Honor.

9          THE COURT:  -- nothing personal.  And Mr. Karotkin, I

10    presume you want to stay on, so we'll leave you there.  You can

11    also -- all right.

12         MR. DUBBS:  And Your Honor, may we let in Ms. Maker

13    (phonetic), from Mr. Etkin's firm, who can help me with

14    demonstratives?

15         THE COURT:  Yes, do we have her?

16         THE CLERK:  Yes.

17         THE COURT:  Okay.  We will do that.

18         THE CLERK:  Yes, I will.

19         THE COURT:  All right, go ahead, Mr. Dubbs.

20         MR. DUBBS:  Thank you, Your Honor.  And I apologize

21    for the confusion.  In terms of reserving time, I have asked --

22         THE COURT:  You don't really have a reserve time on

23    the response.  This is the motion for the company.

24         MR. DUBBS:  Fine.  I had been asked to indicate --

25         THE COURT:  You have thirty minutes.

operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1    MR. DUBBS:  -- that certain people would like to

2    address the Court.  We can address that later.

3    THE COURT:  You've got thirty minutes for your

4    argument.

5    MR. DUBBS:  Very good.  Thank you, Your Honor.  I

6    disagree with a number of things Mr. Slack said, not

7    surprisingly.  But I think it's best to deal with those in the

8    second part of the argument, because I want to address myself

9    to where I think Your Honor was going in your order of the

10   other day, which is namely, if we are right, how is this thing

11   going to really work?  And that's the question --

12   THE COURT:  Well, that's -- again, Mr. Dubbs, that's

13   part of your motion.

14   MR. DUBBS:  I know.  Well, I am responding to their

15   motion of saying why they're wrong and why we're better.

16   THE COURT:  All right.

17   MR. DUBBS:  So to that end, I'd like to put on the

18   first slide and go from there.

19   THE COURT:  Yes.

20   MR. DUBBS:  If I may, Ms. --

21   THE COURT:  Ms. Maker, you don't need to be on the

22   screen.  If you want to be on the screen, that's all right, but

23   you don't need to be.  You can put up the slides and we'll take

24   it from there.  Okay, go ahead.

25   MR. DUBBS:  Okay, so we know we have 7,000 claims.

PG&E Corporation and Pacific Gas and Electric Company

1    And we have, as Your Honor has read the papers, but just to

2    recap, we say that mediation of the various damages, the

3    various nine drops, which is what determines the damages in a

4    10b-5 action.  And we must keep in mind, we are litigating 10b-

5    5 claims.  Those certain issues can be mediated all together.

6    And they are basically damages issues.  They may deal with

7    truth on the market issues, which is essentially damages

8    issues.  They may deal with causation issues, in terms of

9    damages, and all of those things can be dealt with in a

10   mediation.

11        We do not want to litigate any more than my colleagues

12   on the other side do and their suggestion to the contrary, we

13   reject.  Now, is there another way to do it that might be

14   slightly more effective, rather than just sending it all to one

15   big mediator?  But remember, the question before the mediator

16   is nine questions.  What were the damages on nine different

17   occasions?  You then find -- after you determine what those

18   nine damages numbers are via mediation -- you then, and this is

19   strictly arithmetic, you then pour them through the sieve of

20   the 510(b) conversion numbers that are already in the plan, or

21   the order following the plan.  And what results from that

22   process is you have, for every day in the class period, you

23   have a number.

24        You then overlay that number onto the information that

25   you have, and I'll get into that in a minute, and you then have

PG&E Corporation and Pacific Gas and Electric Company

1    a number of shares that each person gets based upon their

2    damages.  Everybody gets treated the same.  There are no

3    secret --

4            THE COURT:  Mr. Dubbs, but that assumes that you

5    are -- you win on the merits.  A mediation is to weigh the

6    choices and, perhaps, compromise it.  And --

7            MR. DUBBS:  Well --

8            THE COURT:  -- a particular claimant might only be in

9    one of the drops.  So going back to the hypothetical, maybe

10   before you logged in, if we have a claimant that has a 100,000-

11   dollar claim because he sold his shares on drop two, and he's

12   offered 30,000 or 3,000 or 300 dollars, he can accept it.  And

13   if he accepts it, we're done.  And if he wants to mediate it,

14   it's mediated one-on-one.  What's wrong with that?

15           MR. DUBBS:  What's wrong with that is that he's really

16   not mediating in that sense.  We are mediating what that person

17   would get if he proved liability, which is essentially what the

18   mediation that the other side proposes.  If he doesn't like

19   that, if he says, I can get more than X dollars per share, then

20   he is -- he can go his own way.  But at that point, as I will

21   show, he is climbing uphill because we have done an analysis

22   and a quantification of every day in the class period and what

23   people who bought it at certain times would get in that class

24   period.  So it is a universal table, a universal matrix of what

25   everyone would get.  It is not individual mediations by people

PG&E Corporation and Pacific Gas and Electric Company

1 who were unrepresented.

2 So we get nine numbers and we pour those through the

3 conversion factors and we get a number for every day in the

4 class period. The other --

5 THE COURT: Well, tell me if I'm misunderstanding

6 something. It seems to me that, again, this sounds more like

7 your procedure. But a mediator will be the mediator and you,

8 let's say if you are the lawyer representing the class

9 plaintiffs, you will argue and propose why your number is

10 better. And somebody representing the company on the other

11 side will argue why his or her number is better. And the

12 mediator will do what they do all the time and try to get a

13 consensus on your side and the other side.

14 That's what I understand to be the case in the world

15 where you live, the way class actions are resolved. But this

16 is a bankruptcy, where we already have a claims objection

17 process in place. So I'm not -- you've got to convince me why

18 we should -- I should scrap that procedure. At least to try it

19 first. You heard Mr. Slack concede that maybe his proposals

20 will not be productive and maybe we'll have to go to some sort

21 of a class later. But what's wrong with trying it -- be an

22 advocate here, but tell me why it's detrimental to the class

23 members to go with the company's proposal here?

24 MR. DUBBS: Because many of the people who will be

25 given offers to will not be represented, will not have the

PG&E Corporation and Pacific Gas and Electric Company

1    tools to analyze whether it's a good offer or a bad offer, will

2    have no idea what their damages could be if they fought or if

3    they didn't fight.  They're going to pick off a lot of small

4    fish and they're probably going to give premiums to some big

5    fish.  That is not equity --

6            THE COURT:  What is wrong with that?  As a

7    philosophical matter, what is wrong with a negotiation and a

8    compromise?  I'm having trouble --

9            MR. DUBBS:  There's nothing --

10           THE COURT:  We just had 150 million people vote and

11   they voted.  Whether they voted intelligently or emotionally,

12   they voted.  So why shouldn't I just let 7,000 people or some

13   subset of them make a choice first, before I take it away from

14   them and tell them that I'm going to let you do it for them?

15           MR. DUBBS:  Because the people who voted recently had

16   information.  We could debate endlessly how good the

17   information was.

18           THE COURT:  No, we can't --

19           MR. DUBBS:  We had -- they had information.  They had

20   debates.  They had a lot of things.  We have to think about

21   many of the smaller shareholders in PG&E.  They don't know

22   anything about securities law damages.  They don't have a clue

23   what's going on.  All they know is they lost money in the

24   market and they need help and they need some framework to get

25   this in some sort of a comprehensive form.  That is what class

PG&E Corporation and Pacific Gas and Electric Company

1   actions do, because you have people who have an incentive to

2   recover for them.  They have an --

3        THE COURT:  But Mr. Dubbs, again, I'm -- you're back

4   in your world, instead of my world and Mr. Slack's world.  That

5   is true.  What you described is clearly what I understand to be

6   the way class actions work.  But this is not.  That's why

7   you're trying, for the second time, to persuade me to use the

8   class action process when Mr. Slack and the company would like

9   to suggest a more traditional bankruptcy process.

10       And your argument is, well, some of these people will

11  be picked off as rubes.  Well, maybe they will be.  But they

12  also will be given a chance up front to get money.  And they

13  can make that decision, can't they?  We don't -- this isn't a

14  paternalistic society.  We say, would you like some money or

15  not?

16       MR. DUBBS:  Well, it's not a paternalistic society,

17  but built into the process, as I understand it, is an attempt

18  to be at least equitable and even-handed, to the extent that

19  one can.  If one tries and fails and somebody's a rube, well,

20  fine.  So be it.  Tough luck for them.  But they have to have

21  the information and they have to have some view of what is

22  equitable and what other people are getting.

23       And people read polls and people can argue endlessly

24  about are you voting because you think your next door neighbor

25  is going to vote?  Well, that's information.  It may be right.

PG&E Corporation and Pacific Gas and Electric Company

1　It may be wrong.  But it's information.  These people have zero

2　information.  And they're being --

3　　　　THE COURT:  But Mr. Dubbs, what they -- they don't

4　have zero information, because they know that they lost money.

5　I know if I bought stock at sixty-five dollars and sold it at

6　twenty that something went wrong.  And I have a procedure that

7　I've already placed in place, without any serious objection,

8　that deals with 12,000 claimants that lost money and there is a

9　mediation offer and acceptance process underway -- just getting

10　underway.

11　　　　We have, in -- for the fire victims, a similar

12　procedure that's being done away from the court.  And why

13　should people that invested in stock have a different kind of

14　option, at least for openers?  I still have to be persuaded

15　more effectively than why that -- why I should at least avoid

16　and take away at least that option, at least for the first try

17　at resolving some of these things.

18　　　　MR. DUBBS:  Well for openers, because in the stock

19　case, as opposed to someone who was a fire victim -- and I

20　don't mean to speak for every fire victim -- but the fire

21　victim knows that a fire burned down their cabin and maybe they

22　were hurt.

23　　　　THE COURT:  Right.

24　　　　MR. DUBBS:  What the stockholder doesn't know is they

25　don't know to what extent -- let's say they lost ten dollars

PG&E Corporation and Pacific Gas and Electric Company

1    per share.  They don't know whether that ten dollars was caused

2    not at all, by statements of the company that became public

3    that were false, or it became -- the stock went down because

4    there was news of a fire or some blend of the two.

5         And that is the difference, that they don't know the

6    different causes of what caused their stock to lose.  And they

7    will never know, because they don't have the resources --

8         THE COURT:  But don't the 7,000 people who filed

9    claims know that they got a special notice from the bankruptcy

10   court that said you may have damages because of stock and if

11   you had -- if you fit within the dates from 2015 to 2018 and

12   you can demonstrate that your shares or your stock dropped,

13   file a claim.  Now, 7,000 people got the message that they

14   could assert a claim and they did.

15        MR. DUBBS:  Well, asserting a claim and knowing the

16   strength of the claim and what one should take or not take are

17   two totally different things, with all due respect.

18        The other point, if we could have the next slide, is

19   under our procedure, we have the ability and, we think, the

20   opportunity to get rid of all 7,000 claims.  They are not going

21   to get rid of 7,000 claims in six months.

22        THE COURT:  But you've conceded that it may be

23   appropriate to have me exercise my discretion and permit an

24   opt-out of your otherwise so-called mandatory class.

25        MR. DUBBS:  That is correct.  And having --

PG&E Corporation and Pacific Gas and Electric Company

1    THE COURT:  Well, you won't -- you might not get rid

2  of 7,000 claims in one fell swoop.  You might get rid of some

3  or a lot, but you won't necessarily get rid of the ones that

4  want to fight their own battle.

5    MR. DUBBS:  The number of claimants who fight their

6  own battle in securities cases, if it's five percent, it's a

7  lot.  And most of those people, once they understand the

8  process and once they understand that you have negotiated the

9  nine dates, which are the nine dates that drive the damages,

10  and that you've negotiated those fairly, then they're going to

11  think twice and more often than not -- more often than not,

12  people say let me back into the class.  And I say that as one

13  of the people who, in the Worldcom Securities case, litigated a

14  half a billion dollar -- when that was real money -- opt-out

15  case for a big bank.  But they had special facts and they were

16  prepared to invest.

17    Most people aren't in that role when they opt-out.

18  They want to get ten percent more than the class.  And if they

19  don't think they can, they opt back in.  So the idea that this

20  is going to -- there's no track record of massive opt-outs in

21  these kinds of cases that upset the apple cart.

22    May we have the next couple slides and go through

23  these real quick and maybe it would help?  Ms. Maker

24  (phonetic)?  So we have nine alleged drops.  The bottom line is

25  we try to get shares for each day.  Next slide, please?  After

PG&E Corporation and Pacific Gas and Electric Company

1  you get that, then the rest is done by computer.  That is

2  why --

3          THE COURT:  No, I understand that.  But it still

4  requires the basic concession by the company that they are

5  liable for anything.

6          MR. DUBBS:  Well, they don't go --

7          THE COURT:  This is -- we have to --

8          MR. DUBBS:  -- into any mediation with the theory -- I

9  mean, if they think they're going into 7,000 mediations

10  thinking they're not going to pay a penny, I mean, this whole

11  thing is --

12          THE COURT:  No, no, no.  That isn't what I meant.

13  What I meant is that the company has said repeatedly that they

14  haven't admitted to any liability.  Now obviously, I wasn't

15  born yesterday, either.  But I understand the computer matches

16  the matrix and the calculation.  So that statement resolved

17  easily determines shares per claimant, but that doesn't say

18  anything about easily determined, definitive missed liability

19  to the claimants.  You still have to mediate the basic,

20  fundamental economic issue, right?

21          MR. DUBBS:  If you want to send the whole thing to a

22  mediator to have the merits incorporated into those nine

23  numbers, you can do that.  And a lot of places do that.  My

24  assumption was that they didn't want to -- by they, I meant

25  PG&E -- did not want to have a fight endlessly about merits.

eScribers
operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1   But we could have a fight about merits or a mediation about

2   merits.  But guess what, it would be one fight about merits,

3   one fight about merits in front of a sophisticated mediator.

4   And then that judgment would be incorporated into those nine

5   numbers.

6        THE COURT:  I understand.  But again, we're going

7   around in circles, because all the matrixes and formulas and

8   steps are meaningless until the company admits liability in the

9   first place, or does so -- mediates and concedes, right?  And

10  so you might have your formula say this is what we think every

11  credit or every claimant will get, based upon the day that he

12  or she sold the stock or bought the stock.  But that would,

13  then, be the basis on which you compromise it to some other

14  number, wouldn't it?

15       MR. DUBBS:  Yes, but --

16       THE COURT:  The company isn't going to just roll over

17  and said, we're liable, just tell us how much we owe.

18       MR. DUBBS:  That's true.  But what would happen is, as

19  follows, in the real world.  Okay, let's assume that we've

20  figured out what the dollar damages per drop are.  And PG&E

21  says, you know what, we didn't cause the fires that happened

22  around then.  That was lightning.  We have no liability.

23       There would be a discussion.  And there would be a

24  debit to whatever number applies -- whichever those nine

25  numbers applies.

PG&E Corporation and Pacific Gas and Electric Company

1          THE COURT:  Right.

2          MR. DUBBS:  There are other drops where, with all due

3    respect, we would say they're going to have a much tougher

4    climb on liability.  And then the credit would be a lot less.

5          THE COURT:  Right.

6          MR. DUBBS:  That would be worked out.

7          THE COURT:  That's right.  It would be worked out at

8    the -- it would be worked out through the mediation --

9          MR. DUBBS:  Yes.

10         THE COURT:  -- and at the end of the day, out would go

11   the notice of the class, saying we've cut a deal.  We've

12   negotiated.  If you accept this, this is what you're going to

13   get.  And there'll be a hearing.

14         MR. DUBBS:  Well --

15         THE COURT:  I know -- you know what happens better

16   than I, but I know what happens.

17         MR. DUBBS:  No, no, no.  But the point is you end up

18   with incorporating the merits, incorporating -- by merits, I'm

19   also talking about alternative causes, all kinds of other

20   stuff.  You end up with nine numbers and then it's arithmetic.

21   And they can say yes or no, that's right, after that.

22         But guess -- what's the difference?  The difference is

23   they're represented.  They have somebody at the table who can

24   talk to PG&E and talk to Mr. Slack about why his merits

25   arguments are so, so lousy, or he has a little bit of a case,

PG&E Corporation and Pacific Gas and Electric Company

1    so we'll give him a credit.

2           All these other people sitting out there, they're

3    going to get offered a few bucks and they're going to say, give

4    us more information, and they're going to say, it's not worth

5    it.  So you know, where does the equity come into this?

6           If they get the information and then they say they

7    don't like it, for whatever reason, fine.  They've had their

8    day in court.  This procedure of theirs, which is totally one-

9    sided, does not give them any representation, doesn't

10   accomplish that.

11          Now, let's go to the next slide and I'm finishing up.

12   We can get this done in six months to settlement.  That's

13   opposed to setting up checks, but to settlement.

14          THE COURT:  Well, wait.  Excuse me, six months from

15   when?

16          MR. DUBBS:  Six months from the selection of the

17   mediator.

18          THE COURT:  But Mr. Dubbs, how would this process

19   correlate with whatever's going to happen at the district

20   court?  Separate?

21          MR. DUBBS:  It's totally separate.

22          THE COURT:  Okay.

23          MR. DUBBS:  And I don't see -- I really don't

24   understand their arguments under -- I mean, maybe we can come

25   up with some bizarre law school hypotheticals, but they're on

PG&E Corporation and Pacific Gas and Electric Company

1    separate tracks.

2          THE COURT:  Okay.  Listen, I'm the master of bizarre

3    hypotheticals.  So this Court, meaning me, I select, with

4    input, the nationally-recognized mediator is Ms. So-and-so.

5          MR. DUBBS:  Right.

6          THE COURT:  Then what happens?

7          MR. DUBBS:  Then what happens is we meet with a

8    mediator and we then have a fork in the road. I won't quote

9    Yogi Berra, but there's a fork in the road and then the Court

10   has to make a decision, because there are a couple of decisions

11   that Mr. Slack alluded to, which would be helpful to decide up

12   front.

13         THE COURT:  Right.

14         MR. DUBBS:  Particularly, what we're calling bulk

15   claims.  Are bulk claims legal or not legal?  PGE wants to know

16   this, even though they really -- they say they don't, because

17   they want to see what the exposure is.  We know that there

18   are -- we know for a fact that there are two billion dollars of

19   liquidated claims in so-called bulk claims and there may be

20   more.  We don't know.  But it's a big number.  So someone has

21   to decide, somewhere around along the line, are bulk claims in

22   the pot or are they not in the pot?

23         Now, while that's being decided by you, we're not just

24   stopping the train.  We're going to send notice to the class,

25   explaining this whole process and how it's going to work so

eScribers
operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1  that they are informed.  And we're also going to, if there's

2  missing trading data -- now, Mr. Slack sort of modified what

3  they were going to do.  Standard procedure is your people look

4  at the trading data.  If there's a hole in the trading data,

5  you send them a letter.  You call them up and fill the hole.

6  You don't ask them for everything all over again.  All it does

7  is scare them -- scare the hell out of them, okay?  So if we

8  decide -- if Your Honor decides, let's decide bulk claims, we

9  say that's six weeks.

10         May we have the next slide, please?  That information,

11  that decision on bulk claims goes into the mediator's tent.

12  And that permits the mediator to have an idea of what the total

13  exposure is.  And then we go into what we've just had a long

14  discussion about, which is the mediation of the nine dates and

15  the tradeoffs that go with it.  And we say three months for

16  that.  It may be --

17         THE COURT:  (Indiscernible) that could be three

18  months --

19         MR. DUBBS:  It may be less than that.

20         THE COURT:  Yeah, it could --

21         MR. DUBBS:  Well, it may be less than that.  I don't

22  know.

23         THE COURT:  No, I understand.  I understand your

24  point.  Okay.

25         MR. DUBBS:  I mean, that's -- and then we have it

　　　　　PG&E Corporation and Pacific Gas and Electric Company

1　settled, okay?  Then we will have -- the bet is that after that

2　six months, there are going to be more of those 7,000 claims

3　that are effectively dealt with than under our colleague's

4　proposal, okay?

5　　　　　Next slide, please?  So we want fair and equitable

6　treatment.  We want to avoid litigation.  And we can minimize

7　opt-outs, if you have a damages formula and people are forced

8　to say, can I really do much better?  Do I really want to go

9　and spend $200,000 with a damages analysis?

10　　　　　THE COURT:  Well --

11　　　　　MR. DUBBS:  And 99 out of 100 times, it's no.

12　　　　　THE COURT:  I think you've already answered my

13　question, but one of the questions that I had as I read the

14　briefs and read some of the cases on this, and particularly the

15　question of whether under this particular rule that's at play

16　here, I -- under what circumstances do I express the discretion

17　to permit the opt-outs.  I take it that takes place somewhere

18　down the road.  In other words, after -- what, after the

19　mediation has happened, I then decide whether to permit opt-

20　outs?

21　　　　　MR. DUBBS:  Generally speaking, there are two

22　opportunities to opt-out.  When you are given the first notice

23　that there's a class action and a notice of this is how it's

24　going to work, somebody can say, I want no part of it.  I opt

25　out.  There are very few of those.

PG&E Corporation and Pacific Gas and Electric Company

1    THE COURT:  Well, no, I'm aware of that.  I mean, I

2    get them in the mail every now and then about somebody that

3    wants to give me $4.95 for something I bought five years ago.

4    But does that apply here, too?  In other words, we are in the

5    situation where post-confirmation with a finite group of known

6    claimants, you've asked that I activate this Rule 723 subset.

7    And so are there two options -- two decision times or

8    only one for the people to opt-out under these circumstances?

9    MR. DUBBS:  There are two.

10   THE COURT:  Okay.

11   MR. DUBBS:  When they first find out about it and if

12   they say, no, I don't want to have anything to do with it.  I

13   want to call up Mr. Slack and talk to Mr. Slack or do whatever

14   the hell they want.

15   THE COURT:  Right.

16   MR. DUBBS:  That's option 1.  That's at the beginning.

17   At the end, when they know what they're going to get, or

18   they're going to at least know the matrix of what they're going

19   to get, they have a second alternative to opt-out.  And then,

20   they can opt out and sail their own course.

21   THE COURT:  Okay.  Mr. Dubbs, under the time -- I

22   appreciate very much the way you've teed it up this way.  But

23   I'm going to stick with the general time parameters.  So you're

24   just about out of time.  Why don't you hit the final points you

25   want to make and then --

PG&E Corporation and Pacific Gas and Electric Company

1     MR. DUBBS:  Can I hit my final slide and then --

2     THE COURT:  Sure.  Sure.  And I have the slides.  I'm

3 looking at them here, anyway, yeah.

4     MR. DUBBS:  Fine.  Okay.  We don't think, for the

5 reasons -- and you've heard argument on this, so this is,

6 concededly, a bit repetitive.  There are pluses and minuses to

7 both formulations.  But if you look at the next to last bullet

8 point, their own statistics indicate that under their

9 formulation, they are only going to get rid of maybe half,

10 maybe more of these -- this group -- I was hesitating to say

11 class, this group, via their mechanism.

12     And then what do you do?  Our proposal has the strong

13 chance of getting rid of many, many more.

14     THE COURT:  No, I understand.  What is the source for

15 the statement about they'd only have -- there'd only be 3,000

16 left?  Again, something in their document?

17     MR. DUBBS:  Well, they quoted a statistic in their

18 brief from -- that mediations were successful X percent of the

19 time.  And I believe it was the Northern District of California

20 analysis.  But I will stand corrected.  Mr. Slack would know

21 better than I.

22     THE COURT:  You think it's in the reply brief?

23     MR. DUBBS:  Yes, I do, Your Honor.

24     THE COURT:  Okay, okay.  All right.  Thank you very

25 much, Mr. Dubbs.  I appreciate your arguments.  I'm going to

PG&E Corporation and Pacific Gas and Electric Company

1    let Mr. Slack have his closing eight minutes and then we'll

2    switch to the other motion.  I'll probably hear back from you

3    again in a few minutes.

4         Mr. Slack.

5         MR. SLACK:  Your Honor, thank you.  Just a couple of

6    points in response.  I may or may not use my eight minutes,

7    depending on what kind of questions you have, Your Honor.  But,

8    you know, one thing which I heard is, you know, the mediation

9    is going to be this -- is going to be this mediation about

10   damages in eight drops.  We don't agree that, you know, you can

11   go into a mediation and just talk about -- talk about damages.

12   We -- you know, we don't think that that's going to be a

13   productive way of mediating.

14        And what I would tell you, Your Honor, is as I

15   mentioned, we've already mediated with PERA, okay?  The idea

16   that we're going to be put back in and do the same thing over

17   again, there's not any expectation that it's going to be any

18   more successful the second time.  And I'm not giving any --

19        THE COURT:  Well, maybe they're tough mediators.

20        MR. SLACK:  We clearly -- we clearly haven't -- and

21   we've had an excellent mediator.  Not just a good mediator,

22   we've had an excellent mediator.  So you know, that process has

23   already been tried.

24        The second point, Your Honor --

25        THE COURT:  Mr. Slack, is that reason enough to -- I

PG&E Corporation and Pacific Gas and Electric Company

1    mean, isn't that -- you know, isn't that a compliment here?  Is

2    he damned by faint praise?  I mean, it's -- are they --

3            MR. SLACK:  Well, I guess I would -- I guess --

4            THE COURT:  He's tough.  He's tough.

5            MR. SLACK:  I guess what I would say, Your Honor, is

6    that our proposal allows individual claimants who have filed

7    proofs of claim who got a notice -- this is not -- and this is

8    a very fundamental difference here of what -- of what I think

9    Mr. Dubbs is talking about.  This is not a punitive class

10   action where you have absent shareholders.  This is a situation

11   very different, and it's a bankruptcy situation where people

12   have actually filed proofs of claim.  Hundreds if not thousands

13   of them have filed those proofs of claim with their own

14   counsel.

15          And the idea that we are going to displace the

16   judgment of individuals who have taken the time to file proofs

17   of claim on their claims -- they've said I have a claim, I was

18   injured.  The idea that we are going to displace their counsel

19   and them and their judgment for Pera's judgment is just not

20   appropriate.  Those people very well may have different views

21   of their claims, the strengths.  They may have different

22   desires in terms of, you know, whether they want to settle now,

23   whether they want to fight it out.

24          But each of the individuals is not an absent class

25   member in a punitive class.  It's a very -- it's a very --

PG&E Corporation and Pacific Gas and Electric Company

1    THE COURT:  Well, Mr. Slack, that being said, I think

2    Mr. Etkin or Mr. Dubbs calculated, what, thirty-seven joinders

3    to their motion.  I mean, that's -- I forget if that was the

4    number, but that's an unusually high number in a bankruptcy,

5    even as complex as this one is.  It seems to me that thirty-

6    seven, or whatever the count is, saw fit with their lawyers to

7    join Pera rather than your side.

8    MR. SLACK:  I think you have to look --

9    THE COURT:  So I mean, you can't ignore them.

10   MR. SLACK:  I think you have to look at -- you have

11   to -- well, I think you have to look at that in perspective in

12   two different ways.  Number 1, that's less than one-half of one

13   percent of the class.  And all of those were cookie cutters.

14   So we don't know the -- you know, they went out, they had a

15   form and they agreed to sign it.  And you talk about whether we

16   know whether people knew what they were doing.  The fact is is

17   that --

18   THE COURT:  Well, hold on.  Hold on, Mr. Slack.

19   MR. SLACK:  I'm just saying, Your Honor, you have

20   cookie cutters, you know, less than one-half of one percent.

21   The other way to look at it is --

22   THE COURT:  Mr. Slack -- Mr. Slack --

23   MR. SLACK:  -- ninety --

24   THE COURT:  -- that means ninety-nine-and-a-half

25   percent didn't do anything.  How many cookie cutters did you

PG&E Corporation and Pacific Gas and Electric Company

1   line up?

2          MR. SLACK:  Well, I'll tell you what, Your Honor, we

3   didn't --

4          THE COURT:  One, and they didn't allow it.

5          MR. SLACK:  -- have to because they didn't affect.

6          THE COURT:  I mean, Balcos (phonetic) -- Balcos bailed

7   out on you with a stipulation.

8          MR. SLACK:  But the point is, is that we got no

9   objections.  I think, as you know, Your Honor, the fact is is

10  that we had ninety-nine and a -- you know, .5 percent that

11  didn't object to our procedure's motion, and each of them got

12  notice, because we gave it to them.  And here's the difference,

13  in the 7023, they're trying to displace each of those people

14  from -- you know, from having their own judgment.  None of them

15  got notice, right?  So they did not go give notice to the

16  claimant, so they're trying to represent these claimants and

17  displace their judgment without having given them notice of

18  their 7023 motion.

19         Your Honor, I guess I would say, you know, only one

20  other thing and then I'll see if Mr. Karotkin has -- wants to

21  use a couple of the minutes, which is with respect to the 3,000

22  number, that's only the ones that end up getting mediated.  We

23  expect that most of these are going to get done just by getting

24  settlement offers.  And so we think the number that's actually

25  going to be mediated is a -- is a very small number.

PG&E Corporation and Pacific Gas and Electric Company

1    You know, we think it's going to be done with offers

2    and counter-offers, then you'll have mediations.  And this is a

3    very, very high percentage when you go through that, that

4    process that we think -- that we ultimately think is going to

5    get resolved.  So that --

6    THE COURT:  Now, Mr. Slack, when -- Mr. Slack, when

7    Mr. Dubbs was looking at that slide and I asked him what was

8    the source for the reference to the -- to the 3,000 mediations

9    left, was that -- do you remember, is that in your reply brief?

10   Or do you remember where I can --

11   MR. SLACK:  Yeah, we -- yeah, so if you look at --

12   THE COURT:  Do you --

13   MR. SLACK:  I don't have the page, but I can get it

14   for you before we get off.

15   THE COURT:  No, I can get it.  It's just in the reply

16   brief, right?

17   MR. SLACK:  I believe it's in the reply where we talk

18   about the efficacy of mediations, not -- not --

19   THE COURT:  Okay.

20   MR. SLACK:  It doesn't include sort of the offer and

21   acceptance -- the offer and acceptance piece.

22   THE COURT:  No, you don't need to look at it for me.

23   I'm not -- I'll do it.  Okay.  Any further thing from you?

24   MR. SLACK:  Your Honor -- Your Honor, since I just --

25   I just got a message that it's -- the reply at pages 12 to 13,

escribers
operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1   so there you go.

2          THE COURT:  Okay.  Thanks.

3          Mr. Karotkin, you unmuted yourself.  Does that mean

4   you want to get your last word?

5          MR. KAROTKIN:  Just a few minutes, Your Honor.  Thank

6   you.  Stephen Karotkin, Weil, Gotshal, and Manges for the

7   Reorganized Debtors.  I think what I found very curious was Mr.

8   Dubbs saying that the Claimants don't know anything about their

9   damages; he has no basis to say that.  It's rank speculation.

10  These people -- these 7,000 people, many of which were

11  sophisticated financial institutions, filed claims under

12  penalty of perjury asserting damages.  And for him to stand up

13  before this Court and say they don't know what they're doing,

14  or they -- they're unsophisticated is pure rank speculation.

15         And he has absolutely no idea, more rank speculation,

16  as to how many would opt out, again, at the end of the day,

17  Your Honor, after this other procedure they're suggesting has

18  been going on for months and months and months and months and

19  months, and he says don't worry about it, Judge, there's not

20  going to be any opt-outs.  Well, we already know there's going

21  to be one big, big opt-out at five percent with his Bile Post

22  (phonetic).

23         And I think, Your Honor, you put your finger on it at

24  the beginning of this hearing.

25         THE COURT:  Well, no.  No.  That misstatement was

PG&E Corporation and Pacific Gas and Electric Company

1    made.  Bile Post only gets to opt out if I'm persuaded to let

2    there be an opt out option.

3        MR. KAROTKIN:  Okay.  Well, we can address the ability

4    to opt out later in any event.  But again, you know, Bile Post

5    acting in their self-interest clearly made a deal with Pera to

6    avoid this issue.  Okay.  But you said at the beginning of the

7    hearing, you put your finger on it, the debtors are doing a

8    traditional bankruptcy procedure.  Traditional; it's been done

9    in many, many other cases.  Let us try it.  As you said, let us

10   try it.  If it doesn't work or we're crazy and wrong, you can

11   always revisit this issue.  And that's the appropriate way to

12   proceed in a bankruptcy case where claimants have actually

13   filed claims, Your Honor, after you insisted, over Pera's

14   objection, that they get notice of the (indiscernible).  Thank

15   you.

16       THE COURT:  Okay.  Matter -- well, the debtor's ADR

17   motion is submitted.  We're going to switch to the Pera's 7023

18   motion.  Are we going to -- is this the same argument?  I mean,

19   Mr. Dubbs, are you going to present the argument, or --

20       MR. DUBBS:  Your Honor, I'm going to present the

21   argument and I'm going to try to not be duplicative.

22       THE COURT:  And are you sharing it with anyone else?

23       MR. DUBBS:  No.  But -- well, I take that back.

24   There's several people who have asked that we yield time to,

25   and so to that extent, I'm sharing time with them.  I'm not

PG&E Corporation and Pacific Gas and Electric Company

1    sharing it with Mr. Etkin or any of my colleagues.

2         THE COURT:  Okay.  How -- all right.  So you have

3    thirty minutes.  How much time do you want to reserve?  And how

4    much -- and then how do you want to share it so we can -- so I

5    can have people in and out?  We don't -- you know I don't like

6    to leave people in the -- on the screen if they're not going to

7    be speaking.  So --

8         MR. DUBBS:  Absolutely.  So --

9         THE COURT:  But we -- how much -- how much do you want

10   to reserve for reply?

11        MR. DUBBS:  I want to reserve fifteen minutes for

12   reply, and I have been asked to give -- Pillsbury has asked for

13   two minutes to address issues on behalf of Chevron.  Goodwin

14   Procter has asked for two minutes to respond to issues on

15   behalf of Mass Mutual.  Morgan Lewis has asked for a minute and

16   a half to address issues for Oregon Public Pension Funds, and

17   there's a Mr. Mike Lange who would like a minute after that.

18        THE COURT:  Okay.  Well, so Mr. Dubbs, I think you're

19   not leaving yourself much time for opening, but I realize these

20   would overlap here, so I -- by my count, it's two, four, six,

21   seven, about eight -- so you have about eight minutes --

22   eight -- again, I'm not a precise timekeeper.  So you have

23   eight to ten now, and then, Ms. Parada, in due course, will

24   bring in, I guess it's Mr. Warden for Chevron.  I don't have

25   the names of the counsel appearing for the other three, but

PG&E Corporation and Pacific Gas and Electric Company

1   they can give you their heads up and raise their hand if they

2   wish to be brought into the room in about ten minutes.  So go

3   ahead, Mr. Dubbs.  Thank you.

4           MR. DUBBS:  Thank you, Your Honor.  You're the last

5   person, and I'm probably one of the least adequate persons to

6   talk about Musicland, so I'm just going to let that -- let that

7   pass, other than we're talking about the third Musicland factor

8   and that I understand one has to structure the chaos of an

9   argument somehow, but I think that blends into what the

10  prior -- the prior discussion.  And Your Honor's going to have

11  to make a decision as to whether this is going to help the

12  administration of the estate or not.

13          I think Mr. --

14          THE COURT:  Okay.  You know, what, Mr. Dubbs, you've

15  really got to help me with the question, though, of whether

16  this is in conflict with the matter before the district court

17  now on your appeal.

18          MR. DUBBS:  I will -- I was about to get to that.

19          THE COURT:  Okay.

20          MR. DUBBS:  The answer is it is not because it deals

21  with a totally different subject.  It is not in any way; you

22  have jurisdiction and in no way is it by any doctrine that one

23  wants to invoke, law of the case, res judicata, you name it,

24  because the factual predicates are different, there is no

25  conflict.

PG&E Corporation and Pacific Gas and Electric Company

1          However, more practically, if Your Honor indicates

2    that part or all of this matter before the Court today will

3    proceed as a class, we will withdraw that appeal and dismiss it

4    with prejudice.

5          THE COURT:  Well, okay.  I was going to ask you if

6    you're familiar with the indicative ruling concept, and it's

7    basically the same.  I mean, your representation is what --

8    what -- is what is it.  I'll leave it at that.  Okay.  Fine.

9          MR. DUBBS:  I think my representation is binding.

10         THE COURT:  Yeah, I do -- I do, too.

11         MR. DUBBS:  And there's a Supreme Court case that says

12   that.  So I have to live with that one way or the other.

13         THE COURT:  I will tell you, I believe that, although

14   the pleadings that I've looked at in the district court are

15   perhaps a little unclear, at least the Debtor argues that it's

16   interlocutory appeal, and if it's interlocutory appeal, the

17   district court has not taken jurisdiction from me yet because

18   it hasn't acted on that.  And if the district judge said I

19   treat it as interlocutory and deny, then by definition, there's

20   no jurisdictional issue.  And if the district judge says I

21   grant it, then maybe there's a jurisdictional issue.  But okay,

22   I got your point.  Go ahead.

23         MR. DUBBS:  I -- I agree, but rather than win on

24   the -- on those interesting points of jurisdictional conflict,

25   we're interested in getting a class to represent these people

PG&E Corporation and Pacific Gas and Electric Company

1   who it -- it bears reminding, started off as a class and a

2   group within the district court and then moved over here, and

3   we have stayed with them to try to make sure that their rights

4   are -- are vindicated.

5           So I -- as to the appeal, I think that deals with the

6   appeal as a 7023 in Musicland.  The Court is in a better

7   position on that than anyone else, if not on Earth, at least in

8   this courtroom, to -- to decide that -- that issue.  And so the

9   real issue becomes if you have -- if you get through 7023, can

10  you certify this as a class.  And our pleadings are very

11  thorough, and I will just summarize them this way, there are

12  many roads to Rome.  And we have taken one that has been less

13  traveled, but is still a viable road to Rome.  And that's what

14  these cases, some of which didn't come down yesterday, that's

15  what our expert synthesis of it says.

16          And between Rule 23, and particularly (c)(4), which

17  permits great discretion for issue classing, that permits the

18  Court to get where it wants to go if it is inclined to agree

19  with our -- our prior analysis.

20          The other thing, the flipside of Mr. Slack's argument

21  or one of his arguments, about, well, you know, give us six

22  months, is give us six months and see how we do.  And if -- if

23  we get a mediation with a well-known mediator with a little arm

24  twisting on both sides, we think that we will show more.

25          The point that Mr. Slack raised -- and I'm not going

PG&E Corporation and Pacific Gas and Electric Company

1   to dwell on this, but I'm just -- it's part of the atmosphere,

2   Mr. Slack says we have mediated with them before.  We have not.

3   We were mediating with the DNO carriers and the insurance

4   people.  There is 200 million dollars worth of insurance and

5   our friends, the fire victims, have claimed all of it.  So

6   there is no insurance for these shareholders.  There is a -- as

7   of right now, there is what we can get from the estate.

8           And Mr. Karotkin says, and I admire Mr. Karotkin's

9   experience and the Weil, Gotshal firm's bankruptcy reputation

10  is stellar, but the one thing I do know is this is not the

11  ordinary bankruptcy, because in the ordinary bankruptcy there's

12  not enough to pour down to the equity, so we're not having this

13  discussion.

14          MR. KAROTKIN:  No, it's not an ordinary class action

15  either, so --

16          MR. DUBBS:  Right, it's not an ordinary class action.

17  We're not arguing it's an ordinary class action.  What we're

18  arguing is that the basic framework and machinery that is used

19  a hundred times a year to deal with class actions in terms of

20  getting information, getting damages, and all of that, that is

21  worth something.  And Your Honor is going to say to me, oh, but

22  that doesn't take into account the merits.

23          THE COURT:  No, but Mr. Slack likes to tell me several

24  times about other bankruptcy courts that have done this.  Do

25  you know of any other district court class actions that have

PG&E Corporation and Pacific Gas and Electric Company

1    done these specialized things in a bankruptcy?  In other words,

2    has -- has this model been happen -- occurred in a prior

3    bankruptcy class action?  Or is this a first?

4              MR. DUBBS:  The --

5              THE COURT:  Huh?

6              MR. DUBBS:  Depending, if I understand it, the framing

7    of the question and the answer is no.  What I do know is that

8    Mr. Slack presented to the Court on their initial motion and

9    asked us to rely on the Lehman Brothers settlement structure,

10   which was a securities case, which was a bankruptcy case, but

11   was different because it dealt with derivatives and each one of

12   these derivatives was a little different.  Whereas the --

13             THE COURT:  Well, it wasn't solvent either.  It wasn't

14   solvent, as I recall.

15             MR. DUBBS:  And it wasn't -- it wasn't solvent.  Well,

16   it had a solvency issue and it also had an issue that the

17   underlying widget that people were arguing about was different

18   very much from claimant to claimant.  Whereas here, the stock

19   is effectively fungible.  What it was bought and sold for is

20   different, but the stock is called the stock.

21             THE COURT:  That's -- I -- I agree with you, and this

22   is not like a wild fire.  It's not like a toxic substance.  But

23   the fact of the matter is in a solvent bankruptcy, it is sort

24   of new ground to try something -- when the traditional claim

25   resolution process has worked in lots and lots of bankruptcies,

PG&E Corporation and Pacific Gas and Electric Company

1  which include, by the way, negotiated, medicated outcomes.  So

2  go ahead.  You --

3       MR. DUBBS:  What -- well, I guess in that sense, I'm

4  asking you to be brave, but I'm asking you to be brave under

5  the -- under certain circumstances.  What this Court did at the

6  beginning of the case was put a primacy on speed, because the

7  legislature put a gun to everybody's head for that billion

8  dollars, and it worked.  And everybody got their act together,

9  and there was a little arm twisting, but we all got it

10 together.

11      Now I would respectfully submit we should take our

12 foot off the accelerator a little bit and think about equity.

13 And those people who have lawyers that Mr. Slack talks about,

14 like this whole group of people out there, this mass of people

15 who have lawyers, they can opt out if Your Honor wants them to

16 opt out.  Or they're going to say -- or they're going to say,

17 you know what, let's see how this class does and then we'll opt

18 out if we don't like it, which is more likely what happens,

19 ninety-nine out of a hundred times in securities class actions.

20      So with that thought, I think that a little less

21 speed, a little bit more equity, and a little bit more emphasis

22 on let's solve the whole problem or as much of the problem as

23 we can.  And the odds of settling 7,000 in a class context, I

24 would respectfully submit are better than individual

25 mediations, individual offers to people who may or may not be

PG&E Corporation and Pacific Gas and Electric Company

1    represented and may or may not be -- know what's going on.

2            Okay.  So you knock off 1,000 of those.  You knock off

3    1,000 here.  You're still going to end up with a heck of a lot.

4            THE COURT:  Okay.  Mr. Dubbs, let's --

5            MR. DUBBS:  I've run out of time.  I --

6            THE COURT:  I'm going to reserve for your rebuttal and

7    closing argument, about fifteen minutes.

8            Ms. Parada, let's take Mr. Etkin and Mr. Nolan off and

9    bring in Mr. Warden, and I presume you have the names of the

10   other counsel who are going to make a brief argument.  I'm

11   going to hold them to the time limits that we have said.

12           MR. Karotkin, I'll assume you want to stay on the

13   screen, and I know Mr. Slack will.  So Mr. --

14           MS. PARADA:  Yes, Your Honor.

15           THE COURT:  -- Dubbs, we'll keep you on the screen too

16   if you want.  You can always turn your camera off if you want.

17           MR. DUBBS:  That's okay.  Yeah, keep me on and --

18           MS. PARADA:  Your Honor, I'm bringing in Mr. Warden.

19   And any other counsel that wishes to appear should raise their

20   hand.

21           THE COURT:  Okay.  Mr. Warden, while you're waiting,

22   please unmute your mic and activate your camera.

23           MR. WARDEN:  Your Honor, I've unmuted.  I don't know

24   if the video is working.

25           THE COURT:  You haven't turned your camera on, but

PG&E Corporation and Pacific Gas and Electric Company

1   hold on.  Just state your appearance, Mr. Warden.

2          MR. WARDEN:  Your Honor, I'm Philip Warden from

3   Pillsbury for Chevron Pension Fund and the Chevron UK Pension

4   Fund.

5          THE COURT:  Okay.  Mr. Lange, are you -- you need to

6   activate your camera and unmute your mic.  If you don't want to

7   be on camera, you don't need to be.

8          And Ms. Parada, did you have anyone else?

9          Oh, Ms. Jarashow.  Bring them in.  Okay.

10         Ms. Jarashow, why don't you state your appearance?

11   Unmute your mic, please?

12         MS. JARASHOW:  Good afternoon, Your Honor.  Kizzy

13   Jarashow from Goodwin Procter on behalf of MML Investment

14   Advisers.

15         THE COURT:  And Ms. Feldsher, is that -- do I have

16   your name right?

17         MS. FELDSHER:  Yes, Your Honor.  Jennifer Feldsher for

18   Morgan, Lewis for the State of Oregon.

19         THE COURT:  Okay.  I'm -- I'm -- I'll give you each

20   two minutes in order.

21         So Mr. Warden, you should go first, and if I don't get

22   to see you, I'll listen to you.

23         MR. WARDEN:  Your Honor, I was just on another Zoom

24   call this morning, and it worked fine.  But --

25         THE COURT:  Well, I can't help you there.

PG&E Corporation and Pacific Gas and Electric Company

1    MR. WARDEN:  Yes, sir.  Let me be brief.  I think --

2    THE COURT:  You have to be brief.

3    MR. WARDEN:  I promise.  I promise.  Your Honor,

4    paragraph 3 of your order of yesterday I think captures the

5    real essence of what I think is fair here with respect to the

6    ADR motion.  You say what assures the Court that security fraud

7    claimants will know and understand the consequences of their

8    choice of the offers of settlement, so will they know?  No.  Is

9    there any mechanism for them to communicate across the 7,000 or

10   so people?  No.  Is it -- is there going to be an evenhanded

11   procedure?  I don't think so because people aren't in

12   communication and there's no leadership.  There's no central

13   repository of knowledge.

14       And Mr. Dubbs points out, and I know enough about 34

15   cases to respect and agree that that is a very specialized area

16   and will -- even people that filed detailed proofs of claim, as

17   we did, does that mean we have made the analysis of the nine

18   drops, and then hung numbers on them, and then are prepared to

19   understand all of the risks and all of the downsides and accept

20   some kind of sensible, amicable, negotiated resolution?  No.

21   So I think that under the circumstances, the best we can do is

22   try to go with a nationally recognized mediator who will

23   perform the analysis, create the nine drops, do the analysis.

24   It can be negotiated.  There will, I presume, be some sort of

25   notice to claimants that, look, here's what we've done, there

PG&E Corporation and Pacific Gas and Electric Company

1    are arguments both ways, but we've applied a lot of

2    intelligence and expertise and experience to this process and

3    here are your options.  To me, that is much more evenhanded and

4    fair.  And I think Your Honor's paragraph 3 speaks directly to

5    it.  How can 7,000 individuals operating independently,

6    independent steaming, how can they possibly come up with

7    consistent arguments.

8           And just finally, you said, well, what if somebody is

9    a rube.  Well, Your Honor, there's no reason for that.  There's

10   no reason that somebody who has a 100,000-dollar claim should

11   take five cents on the dollar, when somebody else who has, as

12   my client has, almost 20 million dollars on the line, would

13   hold out for a lot more.  Why can't it be uniform?  I think

14   that's the key word.

15          THE COURT:  Okay.

16          MR. WARDEN:  Uniform.  And well --

17          THE COURT:  Time's up, Mr. Warden.  Thank you very

18   much.

19          Mr. Lange, you need to -- you're next.  So just unmute

20   your mic, please.

21          MR. LANGE:  Thank you, Your Honor.  My name is Mike

22   Lange.  I'm senior vice president for Worldwide Litigation at

23   Financial Recovery Technologies.  FRT is a technology company

24   that provides claim filing services for institutional

25   investors.  And about half of our clients, we are one of the

PG&E Corporation and Pacific Gas and Electric Company

1    firms that move to intervene and join in the objections to the

2    Debtor's proposed process for resolving the claims.

3         With powers of attorney from each of our clients, we

4    submitted claim forms before the bar date for forty-two

5    clients, with more than a billion dollars in damages.  These

6    included eleven public and private employee retirement systems.

7    Between these and the other financial service firms for whom

8    we've filed, this represents the savings and retirement monies

9    for thousands of employees, retirees, and fellow citizens.

10   These are real people with meaningful losses.

11        We've reviewed the pleadings.  We've heard the

12   arguments today.  And on behalf of our clients, we urge the

13   Court to reject the Debtor's proposed plan as unfair and

14   inequitable.  It uses a divide and conquer strategy that

15   requires each claimant to separately fight for their rights on

16   common questions and issues.  It creates a series of procedural

17   hurdles and legal traps that have no bearing on the merits of

18   their claims but will have the result of winnowing down those

19   claims or eliminating them by attrition.

20        Their proposed process, I think, is resource intensive

21   and inefficient for both the Court and parties.  It will

22   greatly extend the duration of these proceedings and creates

23   the risk, if not the certainty, of inconsistent outcomes for

24   similarly situated claimants.

25        We urge instead that the Court grant the motion to

PG&E Corporation and Pacific Gas and Electric Company

1    certify the class.  Doing so --

2           THE COURT:  Okay.

3           MR. LANGE:  -- will enable the client -- them to speak

4    with and negotiate with one voice, stand on equal footing with

5    the Debtor, and permit questions common to all of them to be

6    resolved once in an efficient way with consistent application

7    and fair outcomes.  Thank you, Your Honor.

8           THE COURT:  Thank you, Mr. Lange.

9           Ms. Jarashow, it's your turn.

10          MS. JARASHOW:  Thank you, Your Honor.  Again, Kizzy

11   Jarashow from Goodwin Procter on behalf of MML Investment

12   Advisers and certain of its funds.  Your Honor asked earlier

13   why the procedures for resolution of the recission and damage

14   claims should be any different from procedures for fire

15   victims.  In my opinion, it all comes down to the issue of

16   measuring damages, which is not at all as straightforward for

17   securities law claims as it is for fire damage claims.

18          THE COURT:  Wait, will you say that again, please?

19          MS. JARASHOW:  The -- that the issue of measuring

20   damages is not as straightforward.  I'm sorry, are you having

21   trouble hearing me, Your Honor?

22          THE COURT:  No.  I can hear you.

23          MS. JARASHOW:  Okay, great.

24          THE COURT:  You mean not as straightforward on the

25   fire claims?

PG&E Corporation and Pacific Gas and Electric Company

1    MS. JARASHOW:  Not as straightforward for securities

2   law.

3    THE COURT:  Okay.  Well, why not?  You have an

4   investment date.  You bought the stock or you sold the stock.

5   That's a little more precise than if your house burned down.

6    MS. JARASHOW:  Yes.  But again -- and I'm not a

7   securities law expert, but you will have to determine whether

8   or not there's -- there are appropriate damages resulting from

9   that stock sale.  And that issue of damage methodology should

10   be addressed up front prior to engaging in months of ongoing

11   settlement discussions and mediation and incurrence of cost by

12   all parties associated with that.

13    THE COURT:  Okay.

14    MS. JARASHOW:  And so I know the Debtors have said

15   today that they're going to send settlement offers to Claimants

16   shortly after they receive trading information.  But like I

17   just said, I don't see how the Debtors can realistically settle

18   any claims until we've landed on an appropriate methodology for

19   valuing damages.

20    THE COURT:  Well, what's wrong with --

21    MS. JARASHOW:  Respectfully, I believe --

22    THE COURT:  -- what's wrong with the traditional offer

23   and acceptance?

24    MS. JARASHOW:  What is that offer going to be based

25   off of?

PG&E Corporation and Pacific Gas and Electric Company

1        THE COURT:  Does it matter?

2        MS. JARASHOW:  I think it does.

3        THE COURT:  I've heard -- Mr. Dubbs argued about we

4   should slow down.  Now, keep in mind that the bankruptcy's up

5   to its two-year anniversary in January, and therefore, a lot of

6   the victims who lost their investments, lost them several years

7   ago.  And if one of them is offered an amount that he or she is

8   willing to accept, then the check's in the mail.  What's wrong

9   with that?

10       MS. JARASHOW:  What is wrong with that is similar to

11  what Mr. Lange and Mr. Warden stated and Mr. Dubbs stated

12  earlier, is that these smaller mom and pop investors may very

13  well be motivated by a short-term gain, when --

14       THE COURT:  What's wrong with that?

15       MS. JARASHOW:  Nothing wrong with that if they want

16  to.  And they certainly have the right to.  But if we allow the

17  issue of damage methodology to be addressed up front, then they

18  can have a more informed basis upon which to make their

19  decision.

20       THE COURT:  Okay.  I've got you.  Thank you.  Oh, you

21  have -- did you want to say something else?

22       MS. JARASHOW:  Yeah.  Just one final note, Your Honor.

23  I believe Mr. Slack confirmed earlier, but I just want to make

24  sure that in the event that the Court does approve the

25  procedures motion, claimants like my clients, who provided all

PG&E Corporation and Pacific Gas and Electric Company

1    required trading history, will be excluded from any additional

2    information request and not be forced to spend time and money

3    to submit that information yet again.

4          THE COURT:  And Mr. Slack can respond to that.  But

5    wait until it's his turn to do so.  Okay.  Thank you, Ms.

6    Jarashow.

7          Ms. Feldsher?

8          MS. FELDSHER:  Thank you, Your Honor.  Jennifer

9    Feldsher for Morgan Lewis on behalf of the State of Oregon for

10   its public employee retirement funds.  Your Honor, I think the

11   key things that we've heard this morning that I would highlight

12   as neither approach seems to preclude the other.  So in either

13   way, the Court can take an offramp if it doesn't work and go

14   with the other approach.  So the question is how do we decide

15   which one to start out with.  And obviously, the Court is going

16   to make that determination.

17         But I would just like to point out that the suggestion

18   that it's likely that the Debtors are going to make good offers

19   right out of the gate such that everybody's going to accept

20   offers, I would welcome that and I look forward to finding that

21   in my mailbox.  But, one, the Debtors didn't reach out to ask

22   any opinions even after we filed the joinder, perhaps because

23   they thought I received the cookie cutter one.  But I think

24   they know me better than that.

25         And the second is, I think when you look at their

PG&E Corporation and Pacific Gas and Electric Company

1    procedures, it belies the notion, Your Honor, that that is

2    what's going to happen.  And the reason I say that is as

3    follows:  The first is, we filed proofs of claim on behalf of

4    the State of Oregon.  We spent an extensive amount of time

5    doing that.  These were not regular proofs of claim.  These

6    were not traditional proofs of claim.  They required extensive

7    information, including separately listing in chronological

8    order from April 29th, 2015 to November 15th, 2018, every

9    purchase, every sale, your ending holdings.  This was not

10   information that certainly my funds had easily available to

11   them.  And our firm spent an extensive amount of time.  And our

12   clients incurred an extensive amount of expenses having us

13   complete all of that information to ensure we didn't foot

14   fault.

15         So when you look at that, and you have procedures that

16   now say we don't care what you submitted, we haven't even

17   really looked at it, we want you now to submit it all again,

18   but now we'd like you to go out to July 1, 2020, I don't know

19   the significance of July 1, 2020, but if you don't, you foot

20   faulted and even though you filed a proof of claim on time,

21   you're out, it's problematic.

22         And it really goes to the heart of Your Honor's

23   statements about why can't we try the traditional approach.

24   We're happy to get paid sooner rather than later.  But when you

25   look at these processes, they are a hundred percent geared and

PG&E Corporation and Pacific Gas and Electric Company

1   designed to knock people out of the gate.

2          I have no way of knowing why the Debtors are asking

3   now for information on July 1, 2020.  Why they aren't taking

4   the information I provided already and telling me what's

5   missing, because that's what's required under 502.  Our claim

6   is -- our client's claim is valid, unless there's an objection

7   to it.  There has been no objection to it.

8          But now we're being asked to submit new information.

9   The question is why.  And what's the process for allowing my

10  client to speak up and say, we don't agree, you don't need

11  information until July 1, 2020, Debtors, and we shouldn't have

12  to provide it without losing our claim.  That's really the

13  problem.  There's nothing in the ADR that allows -- that I

14  could see -- and maybe I'm not reading it, I'm happy to be

15  proven wrong.

16         I'm heartened to hear Mr. Slack say today that they

17  aren't going to make people refile information.  The question

18  is if they don't live up to that, what's the recourse?  How do

19  I speak up?  How does my client speak up without losing their

20  claims?  And if we have to speak up, then you're incurring

21  costs again.  And then you look at it and say, why are we

22  making individuals incur all of these expenses?  Why are the

23  procedures designed to foot fault everybody rather than get

24  them a settlement offer as quickly as possible and get them

25  settled and moved away?  And if those procedures are onerous,

PG&E Corporation and Pacific Gas and Electric Company

1  then do we start with a more collective process, which is

2  what's being proposed by PERA?  And if it doesn't work in a

3  collective format, can't we just offramp back to individual

4  offers at that point?  It's all about cost and expenses.

5        So I think I'm over my minute and a half, Your Honor.

6  But of course, if you have any questions, I would be glad to

7  answer them.

8        THE COURT:  I just -- my only question is that you

9  must play a lot of tennis with the reference to the foot fault.

10  No.  I appreciate your --

11        MS. FELDSHER:  I have a fourteen year old that is on

12  that path, Your Honor.  So we live, breathe and eat, sleep and

13  spend all of my cash on tennis.  Yes.

14        THE COURT:  No, I appreciate your comments and your

15  thoughts.  And I don't need to hear anything else.  So I'm

16  going to --

17        MS. FELDSHER:  Thank you, Your Honor.

18        THE COURT:  -- switch now to Mr. Slack.  I'm going to

19  tell -- ask Ms. Parada to take Mr. Lange, Ms. Feldsher, Mr.

20  Warden, and Ms. Jarashow off the camera and off the screen.

21        And Mr. Slack, you have thirty minutes.

22        MR. LANGE:  Your Honor, if I could have -- I know it's

23  not my turn.  But there's something I forgot to say.  And in

24  fairness to Mr. Slack, he may want to respond.  It will take

25  fifteen seconds.

PG&E Corporation and Pacific Gas and Electric Company

1    THE COURT:  Okay.  Go ahead.

2    MR. LANGE:  We have said in our briefs, some might say

3    ad nauseum, that we needed a skilled mediator in this area.

4    And one of those would be Layn Phillips, who was already

5    mediating.  And Mr. Slack referred to him earlier, which is why

6    I asked.  There are others such as --

7    THE COURT:  I don't think you should name people.  I'm

8    aware of Layn Phillips' reputation.  But I don't -- at this

9    point, I don't think it's appropriate for you --

10   MR. LANGE:  Fair enough.

11   THE COURT:  -- to give any names.

12   MR. LANGE:  Very good.  All right.  Thank you.

13   THE COURT:  I was -- I must have heard the phrase

14   "nationally recognized" half a dozen times.  And I was trying

15   to think if I could come up with someone no one's ever heard of

16   who was very experienced anyway, and pick that person.  But --

17   no, but I -- okay.

18   So Mr. Slack, I'm going to turn to you.  But I want

19   you specifically to tell me whether you want more time to file

20   something in response to Prof. Bratt's declaration.

21   MR. SLACK:  Your Honor, our view there is that,

22   obviously, it's a legal expert, which is inappropriate.  I

23   don't think, Your Honor, it's appropriate.  And I don't think

24   we'd have the desire to go and get another law professor to

25   essentially write a legal brief.  But, Your Honor, I would

PG&E Corporation and Pacific Gas and Electric Company

1   suggest that if you're not going to strike it, we would be

2   happy to put in a brief that essentially responds to it -- a

3   short brief that responds to it, which --

4           THE COURT:  No.  I don't want to do that.  My point is

5   you made -- you complained that the Bratt declaration showed up

6   and we had a law professor on a reply brief giving me advice.

7   And I'm willing to let you file a dueling law professor's

8   statement if you want.  I don't think it's necessary.  I am not

9   going to be making findings of fact in the traditional sense.

10          So I think it's perfectly okay for a Court to ask for

11  a little guidance from experts.  And if you have an expert who

12  has a different take on it, I would let you have time to do

13  that.  But I don't want another brief because the other side

14  will want to file another brief.

15          So before we end today, you tell me whether you want

16  two weeks to file a declaration.  If not --

17          MR. SLACK:  Okay.

18          THE COURT:  -- I'm going to take it submitted.  Okay.

19          MR. SLACK:  We'll do that.  Your Honor, one other

20  comment before I start my time.  I think what happened here is

21  at the start of Mr. Dubbs' argument on the procedures motion, I

22  think he was about to say he wanted to split his time with the

23  folks that just spoke.  And I -- because I think every one of

24  them really spoke about the procedures motion and not the 7023,

25  which we've already --

PG&E Corporation and Pacific Gas and Electric Company

1            THE COURT:  Yeah.

2            MR. SLACK:  -- which we've already dealt with.  So

3     what I guess I would ask is a little flexibility.  I'm not -- I

4     don't think we have a lot to say to the folks.  But all of that

5     really should have gone with the procedures motion.  And I'd

6     ask for a little leeway just in case we run over, which I very

7     well may not.

8            THE COURT:  Yeah.  I have to say, I take a little of

9     the blame.  I debated merging them altogether and knew that

10    we'd have some overlap.  So you have the flexibility.

11           MR. SLACK:  Thank you, Your Honor.  I guess starting

12    out, Your Honor, with respect to the comments that we got

13    really on the ADR procedures, what I would say is a couple of

14    things.  Number one, Your Honor -- and I think this is

15    important.  Anybody who wants to hire PERA as their counsel,

16    and to sort of join in them representing them in settlement

17    offers or mediation, can do that.  So to the extent --

18           THE COURT:  You don't mean PERA.  You mean Mr. Dubbs'

19    firm or one of the law firms.

20           MR. SLACK:  Right.  But I'm saying they can join

21    together.  PERA's counsel can be hired.  And they can act.  So

22    anybody who wants to do that can call Mr. Dubbs, and Mr. Dubbs

23    can represent them in connection with this process.  It's our

24    view, Your Honor, that as we talked about, it really is not a

25    separate -- this is not your classic class action.  And the

PG&E Corporation and Pacific Gas and Electric Company

1    folks here did file proofs of claim, as Mr. Karotkin said.  And

2    so I think that point is really the most important.

3          As to the question about information -- and I think

4    what's important here, Your Honor, is that while there were

5    folks that put in extensive information with respect to the

6    class period, as we put in our papers, the securities law has

7    very particular periods in which you need information in order

8    to know damages.  And one of those, for example, on the

9    equity -- and this is all in our papers, so I won't repeat

10   it -- is there's what's called a ninety-day bounce back.  So

11   you have to look at the trading in equity ninety days after the

12   class period.

13         We did not get that information from the vast majority

14   of people.  And so that's just one example where people could

15   have very well provided information, but it's not sufficient

16   for purposes of calculating damages under the securities laws.

17   And I won't be belabor it again, it's in our papers.

18         THE COURT:  But it's not -- Mr. Slack, if you let --

19   let's take an example.  I'm going to look in my -- Ms.

20   Feldsher.  So if you send her a letter and said I need more

21   information on the ninety-day lookback, isn't that all you

22   need?  Why do you have to tell her she has to do an entire new

23   proof of claim?  It's like everything else.  You correctly

24   cited my decision in Heath about informal inquiries for

25   information without going through the formal claim objection.

PG&E Corporation and Pacific Gas and Electric Company

1   But a little informal letter to opposing counsel that says,

2   give me this -- some more information seems to go a long way,

3   right?  (Indiscernible).

4           MR. SLACK:  We don't disagree, Your Honor.  I mean, I

5   would say that one of the things that is most beneficial about

6   the information that we're seeking and the way we're seeking it

7   is we did set up a website with easy dropdowns.  It's a very

8   simple process.  And having the information in one database is

9   just a very -- both convenient as well as allows them the

10  ability to do the kind of calculations that need to be done.

11  So that was the point of this.  And obviously, there are a lot

12  of people -- a lot of folks that we would need information

13  from.  So it's a very simple process.  It's not going to be

14  burdensome given the way that the menus work online.

15          THE COURT:  No, I'm not saying -- Ms. Parada, I see

16  Mr. Nolan raised his hand again.

17          MS. PARADA:  Yes, Your Honor.

18          THE COURT:  So we can bring him in.  I presume he

19  wants to do something with Mr. Dubbs.

20          But go ahead, Mr. Slack.

21          MR. SLACK:  No.  Mr. Nolan is going to clear up a

22  couple of our slides for 7023.

23          THE COURT:  I mean, I'm sorry.  I had Mr. Nolan

24  identified with his opponent.  My error.  Okay.  He's coming

25  back in here.

PG&E Corporation and Pacific Gas and Electric Company

1      MR. SLACK:  So Your Honor, I'm going to turn to the

2  7023 motion.  And really, you know, PERA's renewed 7023 motion

3  is an attempt to put a square peg into a round hole.  It

4  doesn't work and it can't work.  Now, on the merits, PERA'S

5  tried to shoehorn the securities claims in two provisions of

6  Rule 23(b)(1) that simply do not and cannot apply.  And why did

7  they do that?  I mean, that's sort of the question.  Once you

8  understand that, you understand how -- why that was done, why

9  this really doesn't work, and why it's, again, a square peg

10  into a round hole.  Because as their law professor points out,

11  securities cases are typically certified using 23(b)(3).  The

12  reason they couldn't do that here and the reason they decided

13  not to is that -- under the Supreme Court authority, that

14  usually takes six to eight months of discovery and very, very

15  active expert testimony in order to have a 23(b)(3) class.  And

16  so that would have put this process out, obviously, eight to

17  twelve months potentially.  So they didn't do that.

18      So what did they do?  They said, okay, Judge, now we

19  want to use 23(b)(1)(a) and 23(b)(1)(b) even though there has

20  never been a class certified for a group that has actually

21  filed proofs of claim.  There has never been a class used when

22  they've allowed opt-outs to anyone who wants to be an opt-out.

23  In order words, these provisions have never been used this way,

24  period, and there's a reason for that.  The reason is is that,

25  again, it's a square peg in a round hole.

escribers
operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1          Now, Mr. Dubbs dealt with the jurisdictional issue and

2   I take that he is saying he's willing to dismiss the appeal if

3   the Court grants it.  I do want to make one point, Your Honor,

4   which is that their appeal of your prior order was based on the

5   idea that it was a final order.  They did not make a

6   application for --

7          THE COURT:  No, I know.  That --

8          MR. SLACK:  -- an interlocutory.

9          THE COURT:  But that doesn't -- then Mr. Slack, that

10  doesn't make it a final order.  I mean, there are cases all

11  over the place that misidentified something as a final order

12  when it isn't or the reverse.

13         MR. SLACK:  Sure.

14         THE COURT:  There are interlocutory orders that are as

15  final as can be.  And the appellate court straightened that out

16  a lot.

17         MR. SLACK:  Yeah, I completely agree with you, Your

18  Honor.  But I just wanted to point out that it was raised as a

19  final order by -- by PERA.

20         THE COURT:  I know.  But you raised it in your

21  opposition as interlocutory, but you didn't file a motion to

22  dismiss.  I --

23         MR. SLACK:  We did raise that issue on appeal, Your

24  Honor.  You are correct.

25         THE COURT:  I know.  But you didn't move to dismiss,

PG&E Corporation and Pacific Gas and Electric Company

1     so.

2           MR. SLACK:  No.

3           THE COURT:  And that's okay.  I'm glad you didn't.

4     But the point is that it would seem to me that you would have

5     made your motion to dismiss on the ground that it's moot, but

6     it doesn't matter.  Mr. Dubbs made the representation and he's

7     an officer of the court and I believe him.  Unless the district

8     judge issues a ruling tomorrow or the next day, if I make a

9     ruling here that grants the 7023 motion here, Mr. Dubbs said

10    he'll withdraw that appeal.  So I take him at his word.

11          And if I go the other way, I'll leave it to you to

12    figure out what to do about the appeal.

13          MR. SLACK:  Right.  Your Honor, so let me turn to the

14    Rule 23(b)(1)(a) first.  This provision, and as you see in our

15    slides up there, is not available for a claim for damages which

16    is plainly what is sought here despite PERA's tortured attempt

17    to now say the relief sought is equitable.  And indeed, after

18    making no mention in its motion of seeking any purported

19    equitable relief on claims, PERA changed its arguments on reply

20    and now, apparently, recognizes that 23(b)(1)(a) cannot be used

21    for damages and argues in its reply that it's seeking equitable

22    relief, not damages.  And this argument is beyond absurd.  The

23    PERA complaint in the securities litigation, which they based

24    their proof of claim on, seeks damages.  The problem with

25    that --

PG&E Corporation and Pacific Gas and Electric Company

1    THE COURT:  You have to concede one thing, don't you?

2    Because we've already discussed this is probably the first case

3    of a solvent estate where we have to merge the 7023 concepts

4    with a claims process and then complicate it further by 5-10B

5    (sic).  So 5-10b doesn't give money to the winners in the

6    equity class.  It gives them something other than money.  Now,

7    you can say that stock is not an equitable remedy, and I'll

8    agree with you it might be -- isn't traditionally, but it's not

9    money either.

10    MR. SLACK:  Well, actually, Your Honor, I want to take

11    a little issue with that.  Because I don't think that's quite

12    right.

13    THE COURT:  Okay.

14    MR. SLACK:  I think, Your Honor, what happened here is

15    that Your Honor will decide if there is an allowed claim, and

16    that will be a dollar amount.  That will be a damages dollar

17    amount of an allowed claim.

18    THE COURT:  Right.

19    MR. SLACK:  And that is all Your Honor has to decide

20    is a damage amount.  Because then what happens under the plan,

21    Your Honor, is that the plan converts that, and that's the

22    language that Your Honor used at both the confirmation hearing

23    and otherwise.  The plan then converts that damage amount,

24    which is an allowed claim, which is the same as any traditional

25    allowed claim, into a number of shares.  It's a conversion.

PG&E Corporation and Pacific Gas and Electric Company

1    But --

2         THE COURT:  Yeah.  But Mr. Slack, I'm sorry to

3    interrupt you.  The plan doesn't do it; the code does it.  And

4    so if Mr. Warden has a twenty million dollar claim in class 10

5    and ends up getting stock and, God forbid, the companies goes

6    insolvent and the stock becomes worthless, the dollar claim

7    becomes worthless.

8         Now, obviously, we're not anticipating that.  But you

9    can't just say -- I mean, I will concede the point that giving

10   someone stock having a current market value is almost the

11   equivalent of cash, but it is something other than cash.  And

12   it gives you something that has some risk attached to it that's

13   different from cash.

14        MR. SLACK:  What I would say is, Your Honor, is that

15   the -- again, what Your Honor is deciding is the amount of an

16   allowed claim, which is a damage amount --

17        THE COURT:  Yeah.

18        MR. SLACK:  -- under the securities laws.  In other

19   words, there's no question at the end of the day, if you were

20   to take PERA's claim and you were to litigate just PERA's

21   claim, what you would do is you would apply the damage

22   provisions in the securities laws.

23        THE COURT:  Yeah, I know.

24        MR. SLACK:  And you would come out with an allowed

25   claim.  And the plan -- as Your Honor said and you're

PG&E Corporation and Pacific Gas and Electric Company

1    absolutely right -- would then convert that allowed claim, that

2    damage number, into a number of shares.  So no question about

3    that.

4         But there is absolutely no question, Your Honor, that

5    what's going to happen here is that this is all about damages

6    and coming to an allowed claim under traditional bankruptcy

7    laws using damage numbers.  And --

8         THE COURT:  Okay.  I understand your point.  And your

9    point is that's why you think that 23(b)(1)(a) is simply not an

10   option and PERA's attempt to characterize it as equitable is

11   just not persuasive.

12        MR. SLACK:  That is correct, Your Honor.  What I would

13   say, Your Honor, is that when you look at -- when you look at

14   the treatise that they cite, which is Newburg, there is no

15   reported cases of securities cases certified under 23(b)(1)(a)

16   in this century.  And that's because securities claims are for

17   damages under the securities laws.  So it's clear that these

18   are damage claims.

19        The second point, Your Honor, about 23(b)(1)(a) claims

20   is that -- and we talked a little bit about this but it's

21   really important here -- the entire idea of a class under

22   23(b)(1)(a) -- and if you could put up the 23(b)(1)(a)

23   language, please, back a couple of slides -- the key here is it

24   doesn't talk about incompatible outcomes.  It's really

25   important what this goes to.  It's incompatible standards of

PG&E Corporation and Pacific Gas and Electric Company

1    conduct for the party opposing the class. And that's why that

2    language is traditional equitable. It's used in equitable

3    situations where the issue is the conduct of the party opposing

4    the class. It doesn't speak to -- and if you look at the

5    Zinser case -- it doesn't speak to different outcomes for

6    damages, right. The Zinser case, which is the 9th Circuit,

7    said specifically that certification under 23(b)(1)(a),

8    "Requires more than a risk that separate judgment would oblige

9    the opposing party to pay damages to some class members, but

10   not others or to pay them different amounts".

11        The point being that this is not about damages and not

12   about -- has nothing to do with whether people could get

13   different amount of damages. In fact, the 9th Circuit has said

14   that this rule cannot be used that way. So with respect to the

15   opt-out, of course the whole idea -- because you're talking

16   about incompatible standards of conduct -- the idea is is that

17   this is a mandatory class. What that means is is that you

18   typically shouldn't have opt-outs. And again, the Newburg

19   treatise, which is cited repeatedly by Mr. Dubbs, makes it very

20   clear. And this is a quote from Newburg: "If an individual

21   could opt out of a Rule 23(b)(1) case, that would destroy the

22   entire purpose of aggregation". And here -- and here's the

23   point. There's not a single case -- not a single case cited by

24   Mr. Dubbs where anyone has allowed general opt-outs to these.

25   There's only one case, and it's under 23(b)(1)(b), where

PG&E Corporation and Pacific Gas and Electric Company

1    there's even a single opt-out in that case, which is the county

2    case, which is both cited by Mr. Dubbs in his papers.  In the

3    County of Suffolk case, which we have here, there was one

4    claimant and they allowed a single claimant who had its own

5    issues to opt out.  And what did the court say about

6    recognizing the policy that a district court usually should not

7    allow a 23(b)(1)(b) class member to opt out.  There is simply

8    no authority to allow opt-outs, and zero authority to allow

9    everybody to opt out, because the whole purpose of these

10   provisions are to not have opt-outs and to have consistent

11   standards of conduct for the defendant.  It has nothing to do

12   with how much is paid.

13         So Your Honor, I'd like to turn to 23(b)(1)(b), which

14   is what you would think of as the limited fund provision.  And

15   again, this is a classic square peg in a round hole because

16   this is not a limited fund case.  Rather, the plan provides

17   that all claims are allowed to receive a specified

18   distribution.  As Your Honor knows, there are cases where

19   there's a pot plan, right?  You have a certain amount of money

20   and the treatment provides for a rateable distribution of a

21   specified fund.  This is not the case.  In fact, if it were

22   treated as a limited fund, it would be in breach of the -- in

23   breach of the plan.  And that's because the plan here

24   specifically provides that all claims get a specified

25   distribution.

escribers
operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1   So here, if the Court were to accept the limited fund

2   idea, it would actually be in violation of the plan.  And in

3   that instance, you would have a situation where the plan

4   wouldn't have and shouldn't have been feasible.  But PERA

5   didn't raise that argument, and its attempt to recharacterize

6   plan treatment as a limited fund has to be rejected.

7   Your Honor, the other thing is that if you look at the

8   amount of stock which the company has, again, there is enough

9   to satisfy any claim in order of many multiples of what could

10  even possibly be conceivable here.  In their papers -- in their

11  opening papers, PERA suggested there were only 600 million

12  shares available.  We provided a declaration from the transfer

13  agent that there's 1.5 billion shares.  When you run that

14  through the formula, it's enough for as much as a hundred

15  billion dollars in damages here.  And so there just simply is

16  not a limited fund as a matter of fact.  So the limited fund

17  idea here, really, there's no response to whatsoever.

18  And in terms of opt-outs, I just made the point.  And

19  the point I made on opt-outs, if you, in fact, have a limited

20  fund, is the same under 23(b)(1)(b) as it is under 23(b)(1)(a).

21  And again, I cited the Newburg case.  The Newburg case said

22  that an opt-out of any 23(b)(1) case, which includes (a) and

23  (b), would destroy the entire purpose of aggregation.  And

24  again, not a single case -- not a single case in the history of

25  this where they have allowed anybody to go and opt out.

PG&E Corporation and Pacific Gas and Electric Company

1    Your Honor, there's sort of that old adage that I'm
2    sure you've heard a thousand times.  That when the law's not on
3    your side, argue the facts.  When the facts aren't on your
4    side, argue the law.  Well, PERA has a new corollary to that.
5    And that adage is when neither the facts or the law are on your
6    side, hire a legal expert to create new law, tell the court
7    what it should be.  And that's what happened here.

8    And it's telling, Your Honor, because they should have
9    just filed a brief.  If the law was on their side, they should
10   have filed a brief.  Instead, what they did, was they went out
11   where there was absolutely no support under the law and asked a
12   professor to try to tell the Court what the law is, and we
13   think that's pretty telling as to whether or not the law here
14   is actually on the side of being able to certify a class here.

15   THE COURT:  Okay.  You're just about -- you're just
16   about up.

17   MR. SLACK:  Okay.  Let me say, Your Honor, I started
18   talking about conflicts, and I want to make sure we talk about
19   a very particular conflict, and I'll spend two minutes on that
20   because I think it's important, Your Honor.  And that is that
21   if you look at, Your Honor, what's going on with the insurance
22   and PERA's position on insurance, PERA's taken the position in
23   its appeal papers and otherwise, that the debtors aren't
24   allowed to use insurance to pay for claims in the bankruptcy.

25   Now that's a position that makes a lot of sense if

PG&E Corporation and Pacific Gas and Electric Company

1    you're PERA because you're trying to preserve the insurance for

2    the class action, but that makes absolutely no sense for any

3    claimant in the bankruptcy.  There is absolutely no reason why

4    a claimant in the bankruptcy wouldn't want funds immediately in

5    cash.  And the idea that PERA is taking a position that we

6    completely disagree with and, Your Honor, may remember this

7    from the hearing that we had in confirmation, the judge made it

8    very -- you made it very clear that people could get cash, and

9    what they didn't get in cash, they would get in stock.  And so

10   this is going to be, if PERA presses it, a litigated issue.

11   And PERA has a conflict of interest because its interests with

12   respect to that insurance as lead plaintiff in one class is

13   directly opposite to what would be the interest of a claimant

14   in the bankruptcy because any claimant in the bankruptcy who

15   has an equity claim would want that.  And that is the paradigm,

16   the epitome of a potential conflict.

17         The other thing, Your Honor, is that PERA's trying to

18   represent two classes at the same time.  And what I could tell

19   you is that there are situations where PERA may very well have

20   conflicting interests in both that case and this case, we're

21   trying to represent debt and equity in the same case.  Now we

22   lay these out in our papers.  And the point, Your Honor, is

23   courts -- and we cite the cases in our papers, courts have a

24   heightened sense of conflicts when it comes to counsel.  And

25   we've cited a couple of cases that said the Court not only

PG&E Corporation and Pacific Gas and Electric Company

1    should avoid conflicts, but the appearance of conflicts.  There

2    are both actual conflicts here and appearances of conflicts

3    that absolutely prevent PERA from being class counsel for two

4    separate classes.  And there's not a single case that they've

5    cited where a class counsel on one case has been permitted in

6    this circumstance to represent another case.

7            THE COURT:  Okay.

8            MR. SLACK:  Your Honor --

9            THE COURT:  I'm going to cut you off.

10           MR. SLACK:  Okay.

11           THE COURT:  That will be one -- do you want the two

12   weeks to file a declaration of an expert or not?

13           MR. SLACK:  Your Honor, if my choice is getting an

14   expert to tell you what the law is, I don't want to do that.  I

15   would respond if you gave us the opportunity, but I don't have

16   any interest in having an expert --

17           THE COURT:  Okay.

18           MR. SLACK:  -- to tell you what the law is.

19           THE COURT:  I got it.  Okay.  Thank you.

20           MR. KAROTKIN:  Your Honor?  Your Honor, could I have

21   two minutes, please?

22           THE COURT:  No.  No.  I've got -- I'm overloaded, so

23   I'm sorry Mr. Karotkin, your partner has done a good job.

24           MR. KAROTKIN:  How about one minute?

25           THE COURT:  How about thirty seconds?

PG&E Corporation and Pacific Gas and Electric Company

1    MR. KAROTKIN:  How about thirty seconds.  Okay.  First

2  of all, you raised the concern in one of your questions about

3  people understanding the procedures.  What we would propose,

4  Your Honor, is submitting to the Court on notice almost like a

5  mini-disclosure statement in connection with the offer and

6  acceptance procedures, as well as the mediation.  People can

7  look at it.  People can comment on it.  So it will be very

8  certain that people who aren't subject to our process will

9  clearly understand what's going on.

10    I'd like to also -- with respect to Ms. Feldsher's

11  concerns with foot faults, number one, I'm sorry that she felt

12  an imposition that her client had to provide information like

13  all other clients who support the claim, but two responses.  If

14  you read the procedures, there are three or four opportunities

15  to avoid a foot fault.  And more importantly, there is no

16  automatic disallowance of a claim, no automatic disallowance.

17  It's all up to you, Your Honor, at the end of the day.  People

18  can have multiple chances, and do have multiple chances to

19  supply the information.  And as we said, we will go through the

20  claims to make sure that to the extent someone has provided

21  information, we will not, ask Ms. Feldsher or her clients to

22  duplicate that to avoid any burden.

23    THE COURT:  Okay.  Let me go back and say this then

24  once again.  I think an automatic disallowance would probably

25  be in violation of the Code and the Supreme Court teaching in

PG&E Corporation and Pacific Gas and Electric Company

1    Pacific Gas & Electric Co. v. Travelers, and so I can't ignore

2    that decision, and I am glad you clarified it.  As I told you,

3    I haven't worked my way through the proposed order and

4    procedures.

5              MR. KAROTKIN:  But Your Honor --

6              THE COURT:  But to go back to --

7              MR. KAROTKIN:  -- there are least three or four

8    opportunities --

9              THE COURT:  No, I got it.

10             MR. KAROTKIN:  -- for them to --

11             THE COURT:  Mr. Karotkin, back to your first point.

12   You're proposing that you would draft and circulate a form of a

13   disclosure document that would accompany, what, the offers and

14   acceptance process?

15             MR. KAROTKIN:  Yes.

16             THE COURT:  Okay.

17             MR. KAROTKIN:  And also describe how that works, as

18   well as if it didn't work, any subsequent mediation.

19             THE COURT:  Okay.  I even -- I gave you a heads-up

20   about that in my order about we don't have a disclosure

21   statement now, and I think you're inviting me to take you upon

22   that.  Okay, I got it.

23             MR. KAROTKIN:  Yeah, I remember you yelled at me about

24   my first disclosure statement.

25             THE COURT:  You used your thirty seconds effectively.

PG&E Corporation and Pacific Gas and Electric Company

1          MR. KAROTKIN:  Okay.

2          THE COURT:  Okay.  Mr. Dubbs, you're the closer, for

3     fifteen minutes, if you want.

4          MR. DUBBS:  Thank you, Your Honor.  I will try to be

5     quick.

6          THE COURT:  It's up to you.  Don't feel pressured.

7          MR. DUBBS:  Well, the -- Mr. Karotkin's comment is of

8     a number where they are trying to clean up and make less

9     onerous what was designed, and I under -- or that were designed

10    to deter and make relatively difficult, the submission of claim

11    forms because, granted, on the securities side you have to show

12    when the trading was, but you don't have to have gone through

13    all the amount of rigmarole that they ask for, number one.

14          Number two, in order to -- if the issue -- if the goal

15    is to have an informed electorate, to borrow a phrase or to

16    extrapolate Your Honor's metaphor slightly, you can't do it

17    solely by having PG&E, who has an axe to grind, give them a

18    disclosure statement.  These people need a lawyer, and some of

19    them have lawyers, if they want to have a lawyer, they can opt-

20    out but they need a lawyer to level the playing field.

21          Now what Mr. Slack knows about the conflicts and

22    potential conflicts is, I don't want to go there.  There are no

23    potential conflicts.  Conflicts have to be actual conflicts in

24    the class action arena under Rule 23, number one.

25          Number two, if it's not clear by now, I don't know

PG&E Corporation and Pacific Gas and Electric Company

1    what it is, we are fighting as hard as we can go get all of the

2    claimants as much money as possible, both in the district court

3    and here.  That is not a conflict.

4            THE COURT:  Well, but --

5            MR. DUBBS:  That is --

6            THE COURT:  -- Mr. Dubbs, do you take the position

7    that the debtor, not the defendants in the district court, but

8    our corporate debtor, can't pay the claimants in this class

9    with insurance money?

10           MR. DUBBS:  It raises a very tricky insurance issue.

11   And under our position, the way the clause reads, there's a

12   priority of payments clause which has to be litigated, which

13   raises a problem that doesn't let them do it now.  Now, if

14   that's litigated, and they win, sure they can pay cash.

15           THE COURT:  But isn't that the --

16           MR. DUBBS:  And they could pay --

17           THE COURT:  -- but isn't that between the company and

18   the insurer?

19           MR. DUBBS:  Yeah.

20           THE COURT:  If Mr. Slack calls --

21           MR. DUBBS:  Yeah.

22           THE COURT:  -- up and he says, here, claimant X is

23   entitled to 100,000, cut him a check, and the insurance company

24   says we don't have to, that solves that problem, doesn't it?

25           MR. DUBBS:  It does solve that problem, and if we

PG&E Corporation and Pacific Gas and Electric Company

1  write a letter to the insurance company saying you can't do

2  this under the policy, well, then everybody is on notice as to

3  what their positions are.  So that's --

4          THE COURT:  Well, but if the --

5          MR. DUBBS:  -- fine.

6          THE COURT:  -- claimant's been promised 100,000

7  dollars and the insurer won't pay, I assume that means the

8  company is going to have to pay it --

9          MR. DUBBS:  Well --

10          THE COURT:  -- and but why would I get involved in the

11  dispute between the company and the insurance company as to who

12  has to pay the claimant?

13          MR. DUBBS:  You won't be because if these people are

14  half as sophisticated as they come across, they're going to say

15  we're going to try to get you cash, but we may have to pay you

16  in shares because there's some uncertainty on this issue.

17          THE COURT:  Well, Mr. Dubbs --

18          MR. DUBBS:  Or --

19          THE COURT:  -- you're --

20          MR. DUBBS:  -- if they sign a piece of paying saying

21  we're paying you a hundred bucks cash, whatever come -- we're

22  paying you a hundred bucks in cash for receipt or for a

23  release, and there's a problem with the insurance company, then

24  they've got to take it out of their coffers, yes.

25          THE COURT:  Well, but you don't care if they take it

escribers
operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1    out of their coffers.  If the --

2            MR. DUBBS:  Well, I do care if they take it out of

3    their coffers because the insurance companies take the view

4    that there's one pot, and once that pot is exhausted, it can't

5    be used to indemnify or pay for the officers and directors.

6            THE COURT:  Okay, but my --

7            MR. DUBBS:  So to --

8            THE COURT:  -- point is that under the offer, and

9    acceptance alternative, or the mediation alternative, if I go

10   with the company's proposal, the claimant who is given an offer

11   is given an offer presumably in cash.  And if the claimant says

12   okay, give me the cash, then the company better deliver the

13   cash, and how they deliver the cash is none of my business or

14   the claimant's business, so --

15           MR. DUBBS:  We would agree with that limited

16   observation.

17           THE COURT:  Okay.

18           MR. DUBBS:  It's not your problem.

19           THE COURT:  Okay.

20           MR. DUBBS:  It may be a big problem, but it is not

21   your problem.

22           THE COURT:  Okay.

23           MR. DUBBS:  We covered the opt-outs.  Please look at

24   the Drexel case, which was a limited fund case.   On the

25   limited fund, the limited fund issue is, at this point, an

PG&E Corporation and Pacific Gas and Electric Company

1  issue of burden shifting, and burden of persuasion.  We put

2  forward a prima facie case that there was a limited fund.  They

3  said no, and they presented an expert who came up with some

4  hypotheticals.

5       What we thought was going to happen, and indeed what

6  should've happened is their CFO, the very articulate gentleman

7  who testified at the hearing, I forget his name, I apologize to

8  him, he could've said what was in the S-3, which is in one of

9  our footnotes, that says we have all these other obligations.

10  We have obligations to the fire people, we have other

11  obligations.  We're not telling you what all the other

12  obligations are.  So as the record stands right now, we don't

13  know whether there's a limited fund.  All we know is we said

14  there's not a limited fund.  They say we don't agree with your

15  arithmetic, and our expert does this arithmetic, and says

16  there's a gazillion dollars.  There's sit down, and shut up.

17  So that's that.

18       As to the other issues, the bulk claim issue does --

19  is sort of a cloud over this whole thing because neither side

20  can really figure out its liability without it.  Some of these

21  other issues, I think are more, you could go either -- you

22  could argue them either way, but that one is the tough one.

23  And the gentleman who testified, if you have a billion dollars

24  in bulk claims, and the position of PG&E is that's one claim,

25  or no claim, that's throwing a billion dollars of claims out of

PG&E Corporation and Pacific Gas and Electric Company

1   the window, and I would respectfully submit that is something

2   that does require at least judicial scrutiny before --

3           THE COURT:  Well, but Mr. Dubbs, I think again in what

4   I'll call my tentative -- it really wasn't a tentative, but the

5   order that I issued, I think I even -- let me just look and see

6   what I said, I believe I even said, but not the bulk claims.  I

7   said why should the Court permit the omnibus objection

8   procedures to apply at all to failure to comply, bulks claims

9   or truth in the market?

10          And so if I say that if I go with the ADR procedure,

11  it's not going to apply to the bulk claims.  It seems to me I

12  can invite the company to file an objection to the claim filed

13  on -- by a bulk claimant, and therefore, you will have judicial

14  determination.  You will have a court determination, can that

15  person file a bulk claim or not.  And it could be litigated to

16  the Ninth Circuit, if necessary, but the point is it could be

17  teed up.  And if I excluded it from the ADR procedure, then I

18  don't think there's any risk that you're worried about there.

19          MR. DUBBS:  Well, I hope that's the case.

20          THE COURT:  Well, that's what I -- I mean, maybe I was

21  too quick in my summary --

22          MR. DUBBS:  It --

23          THE COURT:  -- but that's what I meant in paragraph 2

24  of my order, and I took bulk claim, truth in the market, and

25  failure to comply, and Mr. Karotkin has conceded the point on

PG&E Corporation and Pacific Gas and Electric Company

1    the failure to comply.  In other words, and this comes back to

2    the objection by counsel, nobody is going to have their claim

3    tossed out because they haven't complied with a questionnaire

4    that the company has sent them.  The Supreme Court has said how

5    you get rid of claims, it's called objection to claim.

6              MR. DUBBS:  Well, perhaps I was --

7              THE COURT:  There's a lot better than the other

8    alternative, so that for example, for the fire victims in the

9    fire aspect of this case, those claims will be determined under

10   the procedures to the fire trust, not through the Court with

11   very minor exceptions.

12             MR. DUBBS:  I was a little confused because the sort

13   of reading it in the spirit of, I guess it's ejusdem generis,

14   bulk claims and truth in the market, are sort of apples and

15   oranges, and --

16             THE COURT:  I know.  I know that, and it was just a

17   list, and a persimmon is the failure to comply with procedure.

18   I had three things in the fruit salad here, to say I wasn't

19   really happy to have it happen that way.

20             I mean, let me give it back to you.  Am I not correct,

21   the bulk claim issue is what do you do with a claim filed by

22   one entity on behalf of multiple claimants?

23             MR. DUBBS:  That's how I understand the issue.

24             THE COURT:  Right, and that's how I understand it.

25   And so if somebody says here is a claim for 200 investments or

PG&E Corporation and Pacific Gas and Electric Company

1    investors, there might be an objection to say that's not -- you

2    don't have the right to assert that claim, and that's why I

3    might have to decide that, or some court will have to decide

4    it.  But anyway, let's go ahead and let you finish up.

5              MR. DUBBS:  Yes.

6              THE COURT:  You're just about done.

7              MR. DUBBS:  Well --

8              THE COURT:  Long morning.

9              MR. DUBBS:  That's fine, and that's why we sort of

10   created the off-rank -- offramp for that individual problem.

11   The truth in the market as our colloquy before indicated, that

12   is more the gist of what a mediator would put into the mix in

13   determining what the value of these nine drops was.

14             THE COURT:  Well, I may have over-understood something

15   that Mr. Slack said in his reply because maybe he said it, and

16   I shouldn't have gone there, and that he said we aren't dealing

17   with the truth in the market under the omnibus procedure.  And

18   so I think that was consistent.  And so when I just put it in

19   there another way saying we're not going to deal with it under

20   this procedure.  So anyway.

21             MR. DUBBS:  Well, I took it, because I would be

22   shocked if someone didn't use one of the classic defenses,

23   which is not a "merits" defense in the sense of did PG&E do bad

24   conduct, but is a defense to what is going on in the

25   marketplace and does that mitigate or lower damages.  And so I

PG&E Corporation and Pacific Gas and Electric Company

1  view that as part and parcel of what a mediator would do in

2  making the stew of what ends up being those nine numbers.

3         THE COURT:  No, but I am agreeing with you I think.

4  And what if the mediation is unsuccessful, and under your

5  scheme, the case went to trial?  The truth in the market would

6  be a defense that would be tried on the merits, right?

7         MR. DUBBS:  Generally, these cases are bifurcated

8  between liability and damages but assuming no bifurcation, yes,

9  that would be part of the evidentiary presentation that the

10  experts would make.

11         THE COURT:  Okay.  That was the impression I got too.

12  That was my -- okay, never mind.  I got it.

13         MR. DUBBS:  Okay.

14         THE COURT:  Final thoughts?

15         MR. DUBBS:  My final thought is, is this different

16  than what they portrayed as doing it the usual way?  Yes, but

17  this is an unusual set of circumstances where you have

18  substantial amounts of money flowing down to the equity level,

19  so I am not sure doing it the old way necessarily works.  Or at

20  the very least, should be reexamined particularly in light of

21  the 7,000 claims because I suspect, I am may be wrong, I will

22  buy Mr. Slack a drink and talk about how I actually saw Ernie

23  Banks at Wrigley Field, and they're not going to rid of 7,000

24  claims doing it this way, I bet.  I hope I'm wrong for the sake

25  of the estate, but it's highly, highly unlikely.

PG&E Corporation and Pacific Gas and Electric Company

1    Thank you very much for the time.

2    THE COURT:  Mr. Dubbs, I don't want to compare ages,

3    but I saw Ernie Banks at Wrigley Field, but I also saw him hit

4    the first homerun at Candlestick Park in San Francisco and he

5    beat the Giants, and I have been mad at him ever since.

6    Thank you, Mr. Slack, and Mr. Dubbs, and --

7    MR. SLACK:  Your Honor, if I could make two points

8    very quickly, I would appreciate it.

9    THE COURT:  Only if it's baseball related.

10    MR. SLACK:  No, they're not, but I will try to think

11    of a baseball-related comment.

12    Two comments.  And I think it was my fault, I think

13    there's a misperception, Your Honor, of the insurance issue

14    because it's not an issue between the debtors and the insurers.

15    The issue is that the -- that PERA is taking a position that

16    the plan -- that the plan -- prevents the debtors from using

17    insurance money to pay these claims, and so it's not an issue

18    that's between the insurers and the debtors.  It's an issue

19    that PARA is the only one raising which is that the plan

20    prevents it.  And our position, Your Honor, is that if you are

21    a claimant who has a securities claim, you are going to be able

22    to want us to use insurance and cash in order to pay that.

23    And what Mr. Dubbs is taking a position, because of

24    his unique position in the district court case, is that somehow

25    we can't use insurance money or cash to pay those claims.  So

PG&E Corporation and Pacific Gas and Electric Company

1   that is a direct conflict, it's not a hypothetical conflict,

2   they've actually taken that position on the appeal.  And what I

3   would tell you, Your Honor, is it's not hypothetical.  So

4   that's point number one.

5          Point number two, Your Honor, is and I just want to

6   make sure that it doesn't going unnoticed, what Mr. Dubbs said,

7   I don't actually think he's right about this, but here's what

8   he said.  He said we don't know if there's a limited fund.  If

9   they don't know, and it's their motion that there's a limited

10  fund, they lose.  But what I will tell you, Your Honor, is that

11  we put in the transfer agent that said there was a

12  million-and-a-half available shares.  All we did was the math

13  through the formula.  If you do the math through the formula,

14  that would allow up to 100 billion in damages.  You don't --

15  there's no hypothetical situation, it was just literally math.

16  And so there is no limited fund here, Your Honor.

17         Those are the two points, and I didn't get a baseball

18  reference before I finished, but those are my two points.

19         THE COURT:  Okay.

20         MR. DUBBS:  Okay, Your Honor, there's one response to

21  that.  We made a prima facie case there was a limited fund.

22  They did not respond by saying what are the encumbrances on all

23  the assets.  The transfer agent doesn't have knowledge of that.

24  She's not competent to do that.  Yes, she can testify as to how

25  many shares of stock are floating around, but she can't testify

PG&E Corporation and Pacific Gas and Electric Company

1   as to the encumbrance.  And as to the conflict, it's totally

2   illusory.

3           THE COURT:  Okay.  I got it.  You've briefed it

4   thoroughly.  The ball's in my court.  That's a -- I guess

5   that's a basketball metaphor.  So thank you, Mr. Dubbs.  Thank

6   you, Mr. Slack.  Thank you, Ms. Parada and Ms. Thomas.  The

7   matter stands submitted, and I am going to conclude the

8   hearing.

9           MR. SLACK:  Thank you for your time, Your Honor.

10          THE COURT:  Thank you for your time, too.

11      (Whereupon these proceedings were concluded)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T I O N

I, Linda Ferrara, certify that the foregoing transcript is a
true and accurate record of the proceedings.

_____

/s/ LINDA FERRARA, CET-656

eScribers

7227 N. 16th Street, Suite #207

Phoenix, AZ 85020

Date:  November 19, 2020

## $

**$200,000 (1)**
40:9
**$4.95 (1)**
41:3

## A

**ability (3)**
32:19;49:3;73:10
**able (10)**
6:12,20,23;12:14,24;
13:1;17:1,17;83:14;
97:21
**absent (2)**
44:10,24
**absolutely (10)**
6:16;17:21;48:15;
50:8;79:1,4;83:11;
84:2,3;85:3
**absurd (1)**
76:22
**accelerator (1)**
56:12
**accept (9)**
17:15,15;18:6;27:12;
36:12;59:19;64:8;
65:19;82:1
**acceptance (7)**
31:9;47:21,21;63:23;
86:6;87:14;91:9
**accepted (3)**
9:25;10:5;16:20
**accepts (1)**
27:13
**accompany (1)**
87:13
**accomplish (1)**
37:10
**account (2)**
14:4;54:22
**across (1)**
59:9;90:14
**act (3)**
15:8;56:8;71:21
**acted (1)**
52:18
**acting (1)**
49:5
**action (18)**
12:10;13:12;14:1,7,
11,23;15:4;26:4;30:8;
40:23;44:10;54:14,16,
17;55:3;71:25;84:2;
88:24
**actions (6)**
28:15;30:1,6;54:19,
25;56:19
**activate (4)**
21:15;41:6;57:22;
58:6

**active (1)**
74:15
**actual (2)**
85:2;88:23
**actually (14)**
5:19;18:16;20:3;
21:24;44:12;46:24;
49:12;74:20;77:10;
82:2;83:14;96:22;98:2,
7
**ad (1)**
69:3
**adage (2)**
83:1,5
**add (2)**
19:21;21:17
**additional (3)**
7:19;19:14;65:1
**address (6)**
25:2,2,8;49:3;50:13,
16
**addressed (3)**
9:10;63:10;64:17
**adequate (1)**
51:5
**administration (1)**
51:12
**admire (1)**
54:8
**admit (1)**
12:24
**admits (1)**
35:8
**admitted (1)**
34:14
**ADR (9)**
15:19;16:7;19:16;
49:16;59:6;67:13;
71:13;93:10,17
**advantage (1)**
16:24
**advantages (1)**
10:14
**advice (1)**
70:6
**Advisers (2)**
58:14;62:12
**advocate (1)**
28:22
**affect (1)**
46:5
**afternoon (2)**
5:13;58:12
**again (41)**
5:5;6:24;7:23;8:6,
23;14:10,12;15:21;
16:11;18:19;19:16;
22:13;25:12;28:6;30:3;
35:6;39:6;42:16;43:3,
17;48:16;49:4;50:22;
62:10,18;63:6;65:3;
66:17;67:21;72:17;
73:16;74:9,25;78:15;

80:18;81:15;82:8,21,
24;86:24;93:3
**against (3)**
10:25;11:24;13:13
**agent (3)**
82:13;98:11,23
**ages (1)**
97:2
**aggregation (2)**
80:22;82:23
**ago (2)**
41:3;64:7
**agree (12)**
8:8,11;43:10;52:23;
53:18;55:21;59:15;
67:10;75:17;77:8;
91:15;92:14
**agreed (1)**
45:15
**agreeing (1)**
96:3
**ahead (9)**
12:18;24:19;25:24;
51:3;52:22;56:2;69:1;
73:20;95:4
**alleged (1)**
33:24
**allotted (1)**
23:1
**allow (7)**
14:8;46:4;64:16;
81:7,8,8;98:14
**allowed (14)**
74:22;77:15,17,24,
25;78:16,24;79:1,6;
80:24;81:4,17;82:25;
83:24
**allowing (1)**
67:9
**allows (4)**
9:10;44:6;67:13;
73:9
**alluded (1)**
38:11
**almost (3)**
60:12;78:10;86:4
**along (1)**
38:21
**alternative (6)**
16:17;36:19;41:19;
91:9,9;94:8
**although (2)**
5:17;52:13
**altogether (1)**
71:9
**always (4)**
16:13,14;49:11;
57:16
**amicable (1)**
59:20
**amount (15)**
6:12;64:7;66:4,11,
12;77:16,17,20,23;

78:15,16;80:13;81:19;
82:8;88:13
**amounts (2)**
80:10;96:18
**analysis (7)**
27:21;40:9;42:20;
53:19;59:17,23,23
**analyze (1)**
29:1
**anniversary (1)**
64:5
**answered (1)**
40:12
**anticipating (1)**
78:8
**antique (1)**
24:2
**apologize (5)**
4:21;21:9;22:22;
24:20;92:7
**apparently (1)**
76:20
**appeal (13)**
51:17;52:3,16,16;
53:5,6;75:2,4,23;76:10,
12;83:23;98:2
**appear (1)**
57:19
**appearance (3)**
58:1,10;85:1
**appearances (1)**
85:2
**appearing (1)**
50:25
**appears (1)**
3:23
**appellate (1)**
75:15
**apple (1)**
33:21
**apples (1)**
94:14
**application (2)**
62:6;75:6
**applied (1)**
60:1
**applies (2)**
35:24,25
**apply (5)**
41:4;74:6;78:21;
93:8,11
**appreciate (6)**
12:16;41:22;42:25;
68:10,14;97:8
**approach (3)**
65:12,14;66:23
**appropriate (7)**
32:23;44:20;49:11;
63:8,18;69:9,23
**approval (2)**
6:20;19:9
**approve (1)**
64:24

**approved (1)**
5:20
**April (1)**
66:8
**area (3)**
4:17;59:15;69:3
**arena (1)**
88:24
**argue (7)**
23:12;28:9,11;30:23;
83:3,4;92:22
**argued (1)**
64:3
**argues (3)**
14:15;52:15;76:21
**arguing (3)**
54:17,18;55:17
**argument (22)**
4:9;15:18;21:23,25;
22:6,11;23:4;24:3;
25:4,8;30:10;42:5;
49:18,19,21;51:9;
53:20;57:7,10;70:21;
76:22;82:5
**arguments (9)**
15:23;36:25;37:24;
42:25;53:21;60:1,7;
61:12;76:19
**arithmetic (4)**
26:19;36:20;92:15,
15
**arm (2)**
53:23;56:9
**around (5)**
11:22;35:7,22;38:21;
98:25
**articulate (1)**
92:6
**aspect (1)**
94:9
**assert (2)**
32:14;95:2
**asserting (2)**
32:15;48:12
**asserts (1)**
7:9
**assets (1)**
98:23
**associated (1)**
63:12
**assume (7)**
4:10;11:14;12:14;
20:5;35:19;57:12;90:7
**assumes (1)**
27:4
**assuming (1)**
20:10;96:8
**assumption (1)**
34:24
**assurance (1)**
18:15
**assures (1)**
59:6

**atmosphere (1)**
54:1
**attached (1)**
78:12
**attempt (5)**
30:17;74:3;76:16;
79:10;82:5
**attendee (2)**
20:21;23:10
**attendees (2)**
20:17;22:16
**attorney (1)**
61:3
**attrition (1)**
61:19
**audience (1)**
23:19
**Audio (1)**
3:21
**authority (4)**
19:15;74:13;81:8,8
**automatic (3)**
86:16,16,24
**available (6)**
13:19;14:11;66:10;
76:15;82:12;98:12
**avoid (6)**
31:15;40:6;49:6;
85:1;86:15,22
**aware (5)**
18:21;19:18,20;41:1;
69:8
**away (5)**
24:3;29:13;31:12,16;
67:25
**axe (1)**
88:17

**B**

**back (22)**
8:6;12:25;13:10;
16:4;17:24;20:6;27:9;
30:3;33:12,19;43:2,16;
49:23;68:3;72:10;
73:25;79:23;86:23;
87:6,11;94:1,20
**bad (2)**
29:1;95:23
**bailed (1)**
46:6
**Balcos (2)**
46:6,6
**ball's (1)**
99:4
**bank (1)**
33:15
**bankruptcies (1)**
55:25
**bankruptcy (26)**
11:2;14:3,14;15:2,7;
28:16;30:9;32:9;44:11;
45:4;49:8,12;54:9,11,

11,24;55:1,3,10,23;
79:6;83:24;84:3,4,14,
14
**bankruptcy's (1)**
64:4
**Banks (3)**
3:10;96:23;97:3
**bar (2)**
23:12;61:4
**barely (1)**
21:21
**baseball (4)**
21:6,6;97:9;98:17
**baseball-related (1)**
97:11
**based (7)**
16:24;18:3;27:1;
35:11;63:24;75:4;
76:23
**basic (3)**
34:4,19;54:18
**basically (2)**
26:6;52:7
**basis (3)**
35:13;48:9;64:18
**basketball (1)**
99:5
**batters (1)**
21:8
**battle (2)**
33:4,6
**Bay (1)**
4:18
**bearing (1)**
61:17
**bears (1)**
53:1
**beat (1)**
97:5
**became (2)**
32:2,3
**becomes (3)**
53:9;78:6,7
**begin (1)**
9:8
**beginning (4)**
41:16;48:24;49:6;
56:6
**behalf (8)**
50:13,15;58:13;
61:12;62:11;65:9;66:3;
94:22
**belabor (1)**
72:17
**belies (1)**
66:1
**beneficial (1)**
73:5
**Berra (1)**
38:9
**best (2)**
25:7;59:21
**bet (2)**

40:1;96:24
**better (11)**
25:15;28:10,11;
36:15;40:8;42:21;53:6;
56:24;65:24;91:12;
94:7
**beyond (1)**
76:22
**bifurcated (1)**
96:7
**bifurcation (1)**
96:8
**big (8)**
19:11;26:15;29:4;
33:15;38:20;48:21,21;
91:20
**Bile (3)**
48:21;49:1,4
**billion (9)**
33:14;38:18;56:7;
61:5;82:13,15;92:23,
25;98:14
**binding (1)**
52:9
**bit (6)**
36:25;42:6;56:12,21,
21;79:20
**bizarre (2)**
37:25;38:2
**blame (1)**
71:9
**blaming (1)**
22:23
**blend (1)**
32:4
**blends (1)**
51:9
**blow (1)**
18:16
**born (1)**
34:15
**borrow (1)**
88:15
**both (14)**
5:4;8:7;17:17,20;
42:7;53:24;60:1;61:21;
73:9;77:22;81:2;84:20;
85:2;89:2
**bottom (1)**
33:24
**bought (7)**
18:2;27:23;31:5;
35:12;41:3;55:19;63:4
**bounce (1)**
72:10
**box (1)**
8:3
**Bratt (1)**
70:5
**Bratt's (1)**
69:20
**brave (1)**
56:4,4

**breach (2)**
81:22,23
**breathe (1)**
68:12
**brief (16)**
19:1;42:18,22;47:9,
16;57:10;59:1,2;69:25;
70:2,3,6,13,14;83:9,10
**briefed (1)**
99:3
**briefs (3)**
23:3;40:14;69:2
**bring (19)**
3:6,15,17;4:5,11,14,
15;7:5;20:10,22,23;
21:2;23:10,13,14;
50:24;57:9;58:9;73:18
**bringing (2)**
3:19;57:18
**Brothers (1)**
55:9
**brought (2)**
21:20;51:2
**bucks (3)**
37:3;90:21,22
**built (1)**
30:17
**bulk (15)**
38:14,15,19,21;39:8,
11;92:18,24;93:6,11,
13,15,24;94:14,21
**bulks (1)**
93:8
**bullet (1)**
42:7
**burden (3)**
86:22;92:1,1
**burdensome (1)**
73:14
**burned (2)**
31:21;63:5
**business (3)**
16:11;91:13,14
**buy (1)**
96:22

**C**

**c4 (1)**
53:16
**cabin (1)**
31:21
**cable (1)**
4:19
**calculated (1)**
45:2
**calculating (1)**
72:16
**calculation (3)**
8:3;9:19;34:16
**calculations (1)**
73:10
**CALIFORNIA (2)**

3:1;42:19
**Call (8)**
3:4;4:3,16;39:5;
41:13;58:24;71:22;
93:4
**called (3)**
55:20;72:10;94:5
**Calling (3)**
3:5;4:4;38:14
**calls (1)**
89:20
**came (1)**
92:3
**camera (7)**
21:15;57:16,22,25;
58:6,7;68:20
**can (87)**
7:1,4,22;8:8;9:3,15,
15;10:6,6,25;11:22;
16:13,14;19:2;20:9;
21:14,21,21,22;22:3;
23:23;24:10,13;25:2,
23;26:5,9;27:12,19,20;
30:13,19,23;32:12;
33:19;34:23;36:21,23;
37:12,24;40:6,8,24;
41:20;42:1;43:10;
47:10,13,15;49:3,10;
50:4,5;51:1;53:9;54:7;
56:15,23;57:16;59:21,
24;60:5,6;62:22;63:17;
64:18;65:4,13;71:17,
20,21,21,22,23;73:18;
75:15;77:7;86:6,7,18;
88:19;89:1,14;92:20;
93:12,14;98:24
**Candlestick (1)**
97:4
**Canty (22)**
20:19,21;21:3,4,5,14,
15,16,18,19,24;22:3,9,
14,17,21,25;23:2,17,
21,24;24:7
**captures (1)**
59:4
**care (3)**
66:16;90:25;91:2
**carriers (1)**
54:3
**cart (1)**
33:21
**case (52)**
4:3;5:21;7:8,13;
13:18,19;14:25;15:6;
18:23;28:14;31:19;
33:13,15;36:25;49:12;
51:23;52:11;55:10,10;
56:6;71:6;77:2;80:5,6,
21,23,23,25;81:1,2,3,
16,21;82:21,21,22,24,
24;84:20,20,21;85:4,5,
6;91:24,24;92:2;93:19;
94:9;96:5;97:24;98:21

Case: 19-30088    Doc# 9534-1 Filed: 11/18/20   Entered: 11/18/20 15:47:45    Page 42
of 118

**cases (17)**
5:21;7:23;11:20;
33:6,21;40:14;49:9;
53:14;59:15;74:11;
75:10;79:15,15;81:18;
84:23,25;96:7
**cash (21)**
14:16;17:17,19,20;
68:13;78:11,11,13;
84:5,8,9;89:14;90:15,
21,22;91:11,12,13,13;
97:22,25
**caught (1)**
4:18
**causation (1)**
26:8
**cause (2)**
4:21;35:21
**caused (2)**
32:1,6
**causes (2)**
32:6;36:19
**central (1)**
59:12
**cents (1)**
60:11
**century (1)**
79:16
**certain (8)**
9:10;25:1;26:5;
27:23;56:5;62:12;
81:19;86:8
**certainly (6)**
8:15;9:10;17:16;
22:11;64:16;66:10
**certainty (1)**
61:23
**certification (1)**
80:7
**certified (3)**
74:11,20;79:15
**certify (3)**
53:10;62:1;83:14
**CFO (1)**
92:6
**chance (2)**
30:12;42:13
**chances (2)**
86:18,18
**changed (1)**
76:19
**changes (3)**
18:17;19:13,19
**chaos (1)**
51:8
**Chapter (1)**
14:25
**characterize (1)**
79:10
**chart (1)**
5:23
**check (2)**
9:25;89:23

**checks (1)**
37:13
**check's (1)**
64:8
**Chevron (4)**
50:13,24;58:3,3
**choice (3)**
29:13;59:8;85:13
**choices (1)**
27:6
**chronological (1)**
66:7
**circles (1)**
35:7
**Circuit (3)**
80:6,13;93:16
**circulate (1)**
87:12
**circumstance (2)**
10:12;85:6
**circumstances (6)**
6:15;40:16;41:8;
56:5;59:21;96:17
**cite (2)**
79:14;84:23
**cited (8)**
5:21;72:24;80:19,23;
81:2;82:21;84:25;85:5
**citizens (1)**
61:9
**claim (67)**
5:20;8:21;10:19,25;
11:24;13:15;14:5,25;
18:7;27:11;32:13,14,
15,16;44:7,12,13,17,
17;55:24;59:16;60:10,
24;61:4;66:3,5,6,20;
67:5,6,12;72:1,23,25;
74:21;76:15,24;77:15,
17,24,25;78:4,6,16,20,
21,25;79:1,6;82:9;
84:15;86:13,16;88:10;
92:18,24,25;93:12,15,
24;94:2,5,21,21,25;
95:2;97:21
**claimant (30)**
9:24;10:19,22,23,24,
25;11:6,8,23;12:1;
27:8,10;34:17;35:11;
46:16;55:18,18;61:15;
81:4,4;84:3,4,13,14;
89:22;90:12;91:10,11;
93:13;97:21
**claimants (23)**
6:25;7:4,25;14:23;
17:2,3,8;31:8;33:5;
34:19;41:6;44:6;46:16;
48:8;49:12;59:7,25;
61:24;63:15;64:25;
89:2,8;94:22
**claimant's (2)**
90:6;91:14
**claimed (1)**

54:5
**claims (67)**
6:12,17;7:6,7,8,19,
21,22;8:4,6;11:16;
12:8,18;13:23;14:3,4;
15:2;25:25;26:5;28:16;
32:9,20,21;33:2;38:15,
15,19,19,21;39:8,11;
40:2;44:17,21;48:11;
49:13;61:2,18,19;
62:14,17,17,25;63:18;
67:20;74:5;76:19;77:4;
79:16,18,19;81:17,24;
83:24;86:20;92:24,25;
93:6,8,11;94:5,9,14;
96:21,24;97:17,25
**clarified (2)**
19:15;87:2
**class (64)**
13:12,20;14:1,24;
15:4,8;17:13;26:22;
27:22,23;28:4,8,15,21,
22;29:25;30:6,8;32:24;
33:12,18;36:11;38:24;
40:23;42:11;44:9,24,
25;45:13;52:3,25;53:1,
10;54:14,16,17,19,25;
55:3;56:17,19,23;62:1;
71:25;72:6,12;74:15,
20,21;77:6;78:4;79:21;
80:1,4,9,17;81:7;
83:14;84:2,12;85:3,5;
88:24;89:8
**classes (3)**
15:9;84:18;85:4
**classic (3)**
71:25;81:15;95:22
**classing (1)**
53:17
**clause (2)**
89:11,12
**clean (2)**
7:8;88:8
**cleanup (1)**
7:18
**clear (8)**
8:12;15:5;17:23;
73:21;79:17;80:20;
84:8;88:25
**clearly (5)**
30:5;43:20,20;49:5;
86:9
**CLERK (19)**
3:5,15,19,22,25;4:4;
20:14,17,21,23,25;
22:15,18;23:6,8,16;
24:8,16,18
**client (5)**
60:12;62:3;67:10,19;
86:12
**clients (8)**
60:25;61:3,5,12;
64:25;66:12;86:13,21

**client's (1)**
67:6
**climb (1)**
36:4
**climbing (1)**
27:21
**closer (1)**
88:2
**closing (2)**
43:1;57:7
**cloud (1)**
92:19
**clue (1)**
29:22
**Co (1)**
87:1
**code (2)**
78:3;86:25
**coffers (3)**
90:24;91:1,3
**colleague (3)**
5:23;20:2,3
**colleagues (2)**
26:11;50:1
**colleague's (1)**
40:3
**collective (3)**
12:10;68:1,3
**colloquy (1)**
95:11
**Comcast (1)**
4:19
**coming (4)**
3:13,14;73:24;79:6
**comment (4)**
70:20;86:7;88:7;
97:11
**comments (9)**
18:16,19;19:8,13,17,
19;68:14;71:12;97:12
**common (3)**
18:2;61:16;62:5
**communicate (1)**
59:9
**communication (1)**
59:12
**companies (2)**
78:5;91:3
**company (26)**
10:22;13:18;14:6,8,
13;18:5;24:23;28:10;
30:8;32:2;34:4,13;
35:8,16;60:23;82:8;
89:17,23;90:1,8,11,11,
23;91:12;93:12;94:4
**company's (2)**
28:23;91:10
**compare (1)**
97:2
**competent (1)**
98:24
**competing (2)**
14:4;15:9

**complained (1)**
70:5
**complaint (1)**
76:23
**complete (4)**
8:22,25;9:5;66:13
**completely (4)**
8:8,11;75:17;84:6
**complex (1)**
45:5
**complicate (1)**
77:4
**complicated (1)**
5:18
**complied (1)**
94:3
**compliment (1)**
44:1
**comply (4)**
93:8,25;94:1,17
**comprehensive (1)**
29:25
**compromise (3)**
27:6;29:8;35:13
**computer (2)**
34:1,15
**concede (3)**
28:19;77:1;78:9
**conceded (2)**
32:22;93:25
**concededly (1)**
42:6
**concedes (1)**
35:9
**conceivable (1)**
82:10
**concept (1)**
52:6
**concepts (2)**
19:5;77:3
**conceptually (1)**
15:23
**concern (1)**
86:2
**concerns (1)**
86:11
**concession (1)**
34:4
**conclude (1)**
99:7
**concluded (1)**
99:11
**conduct (5)**
80:1,3,16;81:11;
95:24
**confident (1)**
16:24
**confirmation (2)**
77:22;84:7
**confirmed (1)**
64:23
**conflict (15)**
9:21;10:9,13;11:7,

Case: 19-30088    Doc# 9535-4    Filed: 11/19/20    Entered: 11/19/20 15:47:45    Page
104 of 118

20;51:16,25;52:24;
83:19;84:11,16;89:3;
98:1,1;99:1
**conflicting (1)**
84:20
**conflicts (11)**
83:18;84:24;85:1,1,
2,2;88:21,22,23,23,23
**confused (2)**
10:18;94:12
**confusion (3)**
21:9,10;24:21
**connected (1)**
4:20
**connection (4)**
3:23;11:2;71:23;
86:5
**connections (1)**
4:20
**conquer (1)**
61:14
**consensual (2)**
17:8,9
**consensually (1)**
17:4
**consensus (1)**
28:13
**consequences (1)**
59:7
**consider (1)**
13:10
**consistent (4)**
60:7;62:6;81:10;
95:18
**contemporaneous (1)**
8:9
**context (1)**
56:23
**contrary (1)**
26:12
**control (1)**
9:18
**convenient (1)**
73:9
**conversion (3)**
26:20;28:3;77:25
**convert (1)**
79:1
**converts (2)**
77:21,23
**convince (1)**
28:17
**convinced (1)**
15:25
**cookie (4)**
45:13,20,25;65:23
**copy (1)**
6:8
**corollary (1)**
83:4
**corporate (1)**
89:8
**Corporation (2)**

3:5;4:4
**corrected (1)**
42:20
**corrective (1)**
7:7
**correctly (1)**
72:23
**correlate (1)**
37:19
**cost (2)**
63:11;68:4
**costs (1)**
67:21
**counsel (13)**
3:22;44:14,18;50:25;
57:10,19;71:15,21;
73:1;84:24;85:3,5;94:2
**count (2)**
45:6;50:20
**counter-offers (1)**
47:2
**county (2)**
81:1,3
**couple (11)**
7:3;9:8;18:13;33:22;
38:10;43:5;46:21;
71:13;73:22;79:23;
84:25
**course (5)**
5:7;41:20;50:23;
68:6;80:15
**Court (333)**
3:4,8,10,13,17,21,24;
4:1,7,11,13;5:2,5,25;
6:4,8;7:10,12,15,24;
9:6,11,12,12,17,18,21,
23;10:2,7,11,14,18,22;
11:2,3,6,8,11,13,17,21,
22,25;12:5,16;14:7,11,
12,20,23,24;15:12,15,
17;16:6,16,20,22;
17:11,13,23;18:1,10,
12,14,21;19:11,18,20,
24;20:4,7,11,13,16,18,
20;21:1,5,10,13,18,21;
22:1,5,13,20;23:2,7,11,
20,22,25;24:4,6,9,15,
17,19,22,25;25:2,3,12,
16,19,21;27:4,8;28:5;
29:6,10,18;30:3;31:3,
12,23;32:8,10,22;33:1;
34:3,7,12;35:6,16;36:1,
5,7,10,15;37:8,14,18,
20,22;38:2,3,6,9,13;
39:17,20,23;40:10,12;
41:1,10,15,21;42:2,14,
22,24;43:19,25;44:4;
45:1,9,18,22,24;46:4,6;
47:6,12,15,19,22;48:2,
13,25;49:16,22;50:2,9,
18;51:14,16,19;52:2,5,
10,11,13,14,17;53:2,6,
18;54:23,25;55:5,8,13,

21;56:5;57:4,6,15,21,
25;58:5,15,19,25;59:2,
6;60:15,17;61:13,21,
25;62:2,8,18,22,24;
63:3,13,20,22;64:1,3,
14,20,24;65:4,13,15;
68:8,14,18;69:1,7,11,
13;70:4,10,18;71:1,8,
18;72:18;73:15,18,23;
74:13;75:3,7,9,14,15,
20,25;76:3,7;77:1,13,
18;78:2,17,23;79:8;
81:5,6;82:1;83:6,12,
15;84:25;85:7,9,11,17,
19,22,25;86:4,23,25;
87:6,9,11,16,19,25;
88:2,6;89:2,4,6,7,15,
17,20,22;90:4,6,10,17,
19,25;91:6,8,17,19,22;
93:3,7,14,20,23;94:4,7,
10,16,24;95:3,6,8,14;
96:3,11,14;97:2,9,24;
98:19;99:3,4,10
**courtroom (2)**
22:8;53:8
**courts (3)**
54:24;84:23,23
**court's (2)**
11:21;19:9
**covered (1)**
91:23
**crazy (1)**
49:10
**create (2)**
59:23;83:6
**created (1)**
95:10
**creates (2)**
61:16,22
**credit (3)**
35:11;36:4;37:1
**critical (1)**
6:17
**curious (1)**
48:7
**current (1)**
78:10
**currently (1)**
13:11
**customers (1)**
4:19
**cut (4)**
4:20;36:11;85:9;
89:23
**cutter (1)**
65:23
**cutters (3)**
45:13,20,25

**D**

**D&O (1)**
13:20

**damage (11)**
62:13,17;63:9;64:17;
77:20,23;78:16,21;
79:2,7,18
**damages (42)**
26:2,3,6,7,9,16,18;
27:2;29:2,22;32:10;
33:9;35:20;40:7,9;
43:10,11;48:9,12;
54:20;61:5;62:16,20;
63:8,19;72:8,16;76:15,
21,22,24;77:16;79:5,
17;80:6,9,11,13;82:15;
95:25;96:8;98:14
**damned (1)**
44:2
**data (3)**
39:2,4,4
**database (4)**
9:2,4,5;73:8
**date (2)**
61:4;63:4
**dates (2)**
32:11;33:9,9;39:14
**day (13)**
11:25;25:10;26:22;
27:22;28:3;33:25;
35:11;36:10;37:8;
48:16;76:8;78:19;
86:17
**days (2)**
6:21;72:11
**deal (10)**
11:15;19:11,19;25:7;
26:6,8;36:11;49:5;
54:19;95:19
**dealing (2)**
19:5;95:16
**deals (3)**
31:8;51:20;53:5
**dealt (6)**
12:3;26:9;40:3;
55:11;71:2;75:1
**debate (1)**
29:16
**debated (1)**
71:9
**debates (1)**
29:20
**debit (1)**
35:24
**debt (1)**
84:21
**debtor (6)**
14:16;16:10;52:15;
62:5;89:7,8
**debtors (17)**
5:14;7:3;13:17;14:2;
15:2;48:7;49:7;63:14,
17;65:18,21;67:2,11;
83:23;97:14,16,18
**debtors' (2)**
5:17;15:19

**debtor's (3)**
49:16;61:2,13
**decide (1)**
12:9;16:3;38:11,21;
39:8,8;40:19;53:8;
65:14;77:15,19;95:3,3
**decided (2)**
38:23;74:12
**decides (2)**
7:18;39:8
**deciding (1)**
78:15
**decision (9)**
14:12;30:13;38:10;
39:11;41:7;51:11;
64:19;72:24;87:2
**decisions (4)**
10:8;13;11:18;38:10
**declaration (6)**
8:13;69:20;70:5,16;
82:12;85:12
**defendant (1)**
81:11
**defendants (3)**
13:14,16;89:7
**defense (3)**
95:23,24;96:6
**defenses (1)**
95:22
**defer (1)**
10:16
**definition (1)**
52:19
**definitive (1)**
34:18
**delay (1)**
12:22
**deliver (2)**
91:12,13
**demonstrate (1)**
32:12
**demonstrative (4)**
5:25;6:2,5,5
**demonstratives (1)**
24:14
**denied (1)**
17:5
**deny (1)**
52:19
**depend (1)**
10:2
**depending (3)**
12:4;43:7;55:6
**derivative (1)**
14:5
**derivatives (2)**
55:11,12
**describe (1)**
87:17
**described (1)**
30:5
**designed (4)**
67:1,23;88:9,9

Case: 19-30088    Doc# 9538-4    Filed: 11/20/20    Entered: 11/20/20 15:47:45    Page 45
of 118

**desire (1)**
69:24
**desires (1)**
44:22
**despite (1)**
76:16
**destroy (2)**
80:21;82:23
**detailed (1)**
59:16
**deter (1)**
88:10
**determination (3)**
65:16;93:14,14
**determinations (1)**
10:11
**determine (2)**
26:17;63:7
**determined (1)**
34:18;94:9
**determines (2)**
26:3;34:17
**determining (1)**
95:13
**detrimental (1)**
28:22
**difference (5)**
32:5;36:22,22;44:8;
46:12
**different (23)**
15:9;22:18;26:16;
31:13;32:6,17;44:11,
20,21;45:12;51:21,24;
55:11,12,17,20;62:14;
70:12;78:13;80:5,10,
13;96:15
**difficult (2)**
18:24;88:10
**direct (1)**
98:1
**directly (2)**
60:4;84:13
**directors (6)**
11:1,25;13:13,17;
14:7;91:5
**disagree (3)**
25:6;73:4;84:6
**disallowance (3)**
86:16,16,24
**disclosing (1)**
13:4
**disclosure (4)**
87:13,20,24;88:18
**disclosures (1)**
7:7
**discovery (3)**
7:2;9:14;74:14
**discretion (3)**
32:23;40:16;53:17
**discussed (1)**
77:2
**discussion (4)**
35:23;39:14;51:10;

54:13
**discussions (1)**
63:11
**dismiss (6)**
9:19;52:3;75:2,22,
25;76:5
**displace (4)**
44:15,18;46:13,17
**dispute (1)**
90:11
**distribution (3)**
81:18,20,25
**district (32)**
9:11,12,18,21;10:2,7,
14;11:3,11,13,17,21,
21;12:5;14:7,10,23,24;
37:19;42:19;51:16;
52:14,17,18,20;53:2;
54:25;76:7;81:6;89:2,
7;97:24
**divide (1)**
61:14
**DNO (1)**
54:3
**docket (1)**
7:8
**doctrine (1)**
51:22
**document (2)**
42:16;87:13
**dollar (9)**
18:1;27:11;33:14;
35:20;60:11;77:16,16;
78:4,6
**dollars (18)**
10:20,24;11:9;27:12,
19;31:5,25;32:1;38:18;
54:4;56:8;60:12;61:5;
82:15;90:7;92:16,23,
25
**dollars' (1)**
13:25
**done (18)**
10:1;18:7,11;27:13,
21;31:12;34:1;37:12;
46:23;47:1;49:8;54:24;
55:1;59:25;73:10;74:8;
85:23;95:6
**door (1)**
30:24
**down (14)**
11:15;12:14;21:13;
31:21;32:3;40:18;
53:14;54:12;61:18;
62:15;63:5;64:4;92:16;
96:18
**downsides (1)**
59:19
**dozen (1)**
69:14
**draft (1)**
87:12
**drawn-out (1)**

12:20
**Drexel (1)**
91:24
**drink (1)**
96:22
**drive (1)**
33:9
**drop (2)**
27:11;35:20
**dropdowns (1)**
73:7
**dropped (1)**
32:12
**drops (8)**
26:3;27:9;33:24;
36:2;43:10;59:18,23;
95:13
**Dubbs (153)**
4:9,15;20:10,13,14;
21:2,24;22:14,20;
23:13,18,23,24;24:1,1,
5,12,19,20,24;25:1,5,
12,14,17,20,25;27:4,7,
15;28:24;29:9,15,19;
30:3,16;31:3,18,24;
32:15,25;33:5;34:6,8,
21;35:15,18;36:2,6,9,
14,17;37:16,18,21,23;
38:5,7,14;39:19,21,25;
40:11,21;41:9,11,16,
21;42:1,4,17,23,25;
44:9;45:2;47:7;48:8;
49:19,20,23;50:8,11,
18;51:3,4,14,18,20;
52:9,11,23;54:16;55:4,
6,15;56:3;57:4,5,15,17;
59:14;64:3,11;71:22,
22;73:19;75:1;76:6,9;
80:19,24;81:2;88:2,4,
7;89:5,6,10,16,19,21,
25;90:5,9,13,17,18,20;
91:2,7,15,18,20,23;
93:3,19,22;94:6,12,23;
95:5,7,9,21;96:7,13,15;
97:2,6,23;98:6,20;99:5
**Dubbs' (3)**
21:4;70:21;71:18
**due (3)**
32:17;36:2;50:23
**dueling (1)**
70:7
**duplicate (1)**
86:22
**duplicative (2)**
7:6;49:21
**duration (1)**
61:22
**dwell (1)**
54:1

**E**

**earlier (5)**

10:11;62:12;64:12,
23;69:5
**Earth (1)**
53:7
**easiest (1)**
19:3
**easily (4)**
6:13;34:17,18;66:10
**East (1)**
4:18
**easy (2)**
6:18;73:7
**eat (1)**
68:12
**economic (1)**
34:20
**edits (1)**
18:18
**effective (1)**
26:14
**effectively (4)**
31:15;40:3;55:19;
87:25
**efficacy (1)**
47:18
**efficient (2)**
16:12;62:6
**eight (11)**
4:25;5:11;43:1,6,10;
50:21,21,22,23;74:14,
16
**either (7)**
34:15;54:15;55:13;
65:12;77:9;92:21,22
**ejusdem (1)**
94:13
**electorate (1)**
88:15
**Electric (1)**
87:1
**eleven (1)**
61:6
**eliminating (1)**
61:19
**else (11)**
3:13,14;16:6;23:14;
49:22;53:7;58:8;60:11;
64:21;68:15;72:23
**emailing (1)**
22:10
**emotionally (1)**
29:11
**emphasis (1)**
56:21
**employee (2)**
61:6;65:10
**employees (1)**
61:9
**enable (1)**
62:3
**encumbrance (1)**
99:1
**encumbrances (1)**

98:22
**end (13)**
12:7,25;25:17;36:10,
17,20;41:17;46:22;
48:16;57:3;70:15;
78:19;86:17
**ending (1)**
66:9
**endlessly (3)**
29:16;30:23;34:25
**ends (2)**
78:5;96:2
**engaging (1)**
63:10
**enough (8)**
7:25;8:5;43:25;
54:12;59:14;69:10;
82:8,14
**ensure (1)**
66:13
**entire (4)**
72:22;79:21;80:22;
82:23
**entirely (1)**
11:13
**entitled (1)**
89:23
**entity (1)**
94:22
**epitome (1)**
84:16
**equal (1)**
62:4
**equitable (10)**
30:18,22;40:5;76:17,
19,21;77:7;79:10;80:2,
2
**equity (16)**
13:16;14:16,17,17;
17:13;29:5;37:5;54:12;
56:12,21;72:9,11;77:6;
84:15,21;96:18
**equivalent (1)**
78:11
**Ernie (3)**
3:10;96:22;97:3
**error (1)**
73:24
**essence (1)**
59:5
**essentially (6)**
7:12;10:1;26:7;
27:17;69:25;70:2
**estate (4)**
51:12;54:7;77:3;
96:25
**estates (1)**
16:12
**Etkin (24)**
3:14,18;4:6,7,8,12,
22;20:1,1,3,5,9,12,19,
22,24;21:4,9,12;22:2;
24:7;45:2;50:1;57:8

Case: 19-30088    Doc# 9538-4    Filed 11/18/20    Entered 11/18/20 15:47:48    Page 105
of 118

**Etkin's (1)**
  24:13
**even (14)**
  17:1;21:11;38:16;
  45:5;59:16;65:22;
  66:16,20;74:19;81:1;
  82:10;87:19;93:5,6
**evenhanded (2)**
  59:10;60:3
**even-handed (1)**
  30:18
**event (2)**
  49:4;64:24
**everybody (7)**
  22:7,23;27:2;56:8;
  67:23;81:9;90:2
**everybody's (2)**
  56:7;65:19
**everyone (3)**
  4:15;5:6;27:25
**evidentiary (1)**
  96:9
**exactly (2)**
  7:17;11:5
**example (6)**
  8:17;15:9;72:8,14,
  19;94:8
**excellent (2)**
  43:21,22
**exceptions (1)**
  94:11
**excluded (2)**
  65:1;93:17
**Excuse (2)**
  23:6;37:14
**exercise (1)**
  32:23
**exhausted (1)**
  91:4
**expect (5)**
  7:20;21:9:8,16;46:23
**expectation (1)**
  43:17
**expends (1)**
  7:1
**expense (1)**
  9:14
**expenses (3)**
  66:12;67:22;68:4
**expensive (1)**
  7:1
**experience (3)**
  7:22;54:9;60:2
**experienced (1)**
  69:16
**expert (11)**
  53:15;63:7;69:22;
  70:11;74:15;83:6;
  85:12,14,16;92:3,15
**expertise (1)**
  60:2
**experts (2)**
  70:11;96:10

**explaining (2)**
  6:24;38:25
**exposure (1)**
  38:17;39:13
**express (1)**
  40:16
**extend (1)**
  61:22
**extensive (5)**
  66:4,6,11,12;72:5
**extent (6)**
  12:8;30:18;31:25;
  49:25;71:17;86:20
**extrapolate (1)**
  88:16

**F**

**facial (1)**
  7:6
**facie (2)**
  92:2;98:21
**fact (12)**
  13:25;17:1;19:6;
  38:18;45:16;46:9;
  55:23;70:9;80:13;
  81:21;82:16,19
**factor (1)**
  51:7
**factors (1)**
  28:3
**facts (4)**
  33:15;83:3,3,5
**factual (1)**
  51:24
**fails (1)**
  30:19
**failure (4)**
  93:8,25;94:1,17
**faint (1)**
  44:2
**fair (5)**
  40:5;59:5;60:4;62:7;
  69:10
**fairly (1)**
  33:10
**fairness (1)**
  68:24
**false (1)**
  32:3
**familiar (1)**
  52:6
**fault (5)**
  66:14;67:23;68:9;
  86:15;97:12
**faulted (1)**
  66:20
**faults (1)**
  86:11
**favorite (1)**
  18:22
**feasible (1)**
  82:4

**federal (4)**
  13:12,19;14:1;15:3
**feel (1)**
  88:6
**Feldsher (11)**
  58:15,17,17;65:7,8,
  9;68:11,17,19;72:20;
  86:21
**Feldsher's (1)**
  86:10
**fell (1)**
  33:2
**fellow (1)**
  61:9
**felt (1)**
  86:11
**few (7)**
  12:8,17;16:2;37:3;
  40:25;43:3;48:5
**fiber (1)**
  4:19
**field (3)**
  88:20;96:23;97:3
**fifteen (5)**
  16:20;50:11;57:7;
  68:25;88:3
**fight (9)**
  29:3;33:4,5;34:25;
  35:1,2,3;44:23;61:15
**fighting (1)**
  89:1
**figure (4)**
  5:9;9:18;76:12;
  92:20
**figured (1)**
  35:20
**file (12)**
  14:25;32:13;44:16;
  69:19;70:7,14,16;72:1;
  75:21;85:12;93:12,15
**filed (18)**
  6:1;10:19;32:8;44:6,
  12,13;48:11;49:13;
  59:16;61:8;65:22;66:3,
  20;74:21;83:9,10;
  93:12;94:21
**filing (1)**
  60:24
**fill (1)**
  39:5
**final (10)**
  41:24;42:1;64:22;
  75:5,10,11,15,19;
  96:14,15
**finally (1)**
  60:8
**financial (3)**
  48:11;60:23;61:7
**find (2)**
  26:17;41:11
**finding (1)**
  65:20
**findings (1)**

  70:9
**Fine (8)**
  24:24;30:20;37:7;
  42:4;52:8;58:24;90:5;
  95:9
**finger (2)**
  48:23;49:7
**finish (1)**
  95:4
**finished (1)**
  98:18
**finishing (1)**
  37:11
**finite (1)**
  41:5
**fire (17)**
  4:18;14:4;31:11,19,
  20,20,21;32:4;54:5;
  55:22;62:14,17,25;
  92:10;94:8,9,10
**fires (1)**
  35:21
**firm (3)**
  24:13;66:11;71:19
**firms (3)**
  61:1,7;71:19
**firm's (1)**
  54:9
**first (20)**
  6:3,10,22;17:19;
  25:18;28:19;29:13;
  31:16;35:9;40:22;
  41:11;55:3;58:21;66:3;
  76:14;77:2;86:1;87:11,
  24;97:4
**fish (2)**
  29:4,5
**fit (2)**
  32:11;45:6
**five (4)**
  33:6;41:3;48:21;
  60:11
**flexibility (2)**
  71:3,10
**flipside (1)**
  53:20
**floating (1)**
  98:25
**flowing (1)**
  96:18
**focus (1)**
  16:7
**folks (5)**
  70:23;71:4;72:1,5;
  73:12
**following (2)**
  12:7;26:21
**follows (2)**
  35:19;66:3
**foot (7)**
  56:12;66:13,19;
  67:23;68:9;86:11,15
**footing (1)**

  62:4
**footnotes (1)**
  92:9
**forbid (1)**
  78:5
**forced (2)**
  40:7;65:2
**forget (2)**
  45:3;92:7
**forgot (1)**
  68:23
**fork (2)**
  38:8,9
**form (3)**
  29:25;45:15;87:12
**formal (1)**
  72:25
**format (2)**
  68:3
**former (1)**
  13:16
**forms (2)**
  61:4;88:11
**formula (2)**
  17:15;18:2;35:10;
  40:7;82:14;98:13,13
**formulas (1)**
  35:7
**formulation (1)**
  42:9
**formulations (1)**
  42:7
**forty-five (1)**
  6:21
**forty-two (1)**
  61:4
**forward (2)**
  65:20;92:2
**fought (1)**
  29:2
**found (2)**
  18:25;48:7
**four (4)**
  12:25;50:20;86:14;
  87:7
**fourteen (1)**
  68:11
**frame (1)**
  19:3
**framework (2)**
  29:24;54:18
**framing (1)**
  55:6
**FRANCISCO (2)**
  3:1;97:4
**frankly (1)**
  15:24
**fraud (1)**
  59:6
**free (1)**
  17:20
**friends (1)**
  54:5

Case: 19-30088    Doc# 9534-4 Filed: 11/18/20    Entered: 11/18/20 15:47:45    Page 106
of 118

**front (7)**
  10:16;12:21;30:12;
  35:3;38:12;63:10;
  64:17
**frozen (1)**
  3:20
**FRT (1)**
  60:23
**fruit (1)**
  94:18
**fruitful (1)**
  9:9
**Fund (21)**
  58:3,4;81:14,16,21,
  22;82:1,6,16,16,20;
  91:24,25,25;92:3,13,
  14;98:8,10,16,21
**fundamental (2)**
  6:13;34:20;44:8
**Funds (5)**
  50:16;62:12;65:10;
  66:10;84:4
**fungible (1)**
  55:19
**furnished (1)**
  6:13
**further (2)**
  47:23;77:4

**G**

**gain (1)**
  64:13
**Gas (1)**
  87:1
**gate (2)**
  65:19;67:1
**gatekeeper (1)**
  17:6
**gave (4)**
  18:16;46:12;85:15;
  87:19
**gazillion (1)**
  92:16
**geared (1)**
  66:25
**general (2)**
  41:23;80:24
**Generally (2)**
  40:21;96:7
**generis (1)**
  94:13
**gentleman (2)**
  92:6,23
**gets (6)**
  6:15;10:24;18:7;
  27:1,2;49:1
**Giants (1)**
  97:5
**gist (1)**
  95:12
**given (8)**
  11:17;28:25;30:12;

**40:22;46:17;73:14;**
  91:10,11
**gives (2)**
  77:6;78:12
**giving (3)**
  43:18;70:6;78:9
**glad (3)**
  68:6;76:3;87:2
**goal (1)**
  88:14
**God (1)**
  78:5
**goes (7)**
  11:10;12:2;14:7;
  39:11;66:22;78:5;
  79:25
**Good (14)**
  3:7,8;4:7,8;5:12;8:7;
  25:5;29:1,16;43:21;
  58:12;65:18;69:12;
  85:23
**Goodwin (3)**
  50:13;58:13;62:11
**Gotshal (3)**
  5:14;48:6;54:9
**grant (3)**
  15:19;52:21;61:25
**granted (1)**
  88:11
**grants (2)**
  75:3;76:9
**Great (3)**
  6:9;53:17;62:23
**greatly (1)**
  61:22
**grind (1)**
  88:17
**ground (2)**
  55:24;76:5
**group (6)**
  41:5;42:10,11;53:2;
  56:14;74:20
**guess (14)**
  16:23;19:7;35:2;
  36:22;44:3,3,5;46:19;
  50:24;56:3;71:3,11;
  94:13;99:4
**guidance (1)**
  70:11
**gun (1)**
  56:7
**guy (1)**
  18:6

**H**

**half (7)**
  33:14;42:9;50:16;
  60:25;68:5;69:14;
  90:14
**hand (7)**
  22:19,20;23:8,22;
  51:1;57:20;73:16

**handling (1)**
  4:9
**happen (7)**
  35:18;37:19;55:2;
  66:2;79:5;92:5;94:19
**happened (6)**
  35:21;40:19;70:20;
  77:14;83:7;92:6
**happens (9)**
  11:3,3;12:5;36:15,
  16;38:6,7;56:18;77:20
**happy (5)**
  22:11;66:24;67:14;
  70:2;94:19
**hard (2)**
  6:8;89:1
**head (1)**
  56:7
**heads (1)**
  51:1
**heads-up (1)**
  87:19
**hear (5)**
  21:22;43:2;62:22;
  67:16;68:15
**heard (15)**
  18:23;22:14;23:3,4;
  28:19;42:5;43:8;61:11;
  64:3;65:11;69:13,15;
  83:2
**hearing (9)**
  4:2;36:13;48:24;
  49:7;62:21;77:22;84:7;
  92:7;99:8
**heart (1)**
  66:22
**heartened (1)**
  67:16
**Heath (1)**
  72:24
**heck (1)**
  57:3
**heightened (1)**
  84:24
**hell (2)**
  39:7;41:14
**help (7)**
  5:8;24:13;29:24;
  33:23;51:11,15;58:25
**helpful (1)**
  38:11
**here's (5)**
  11:14;46:12;59:25;
  80:22;98:7
**hesitating (1)**
  42:10
**hey (1)**
  18:15
**high (2)**
  45:4;47:3
**highlight (1)**
  65:11
**highly (2)**

**96:25,25**
**hire (2)**
  71:15;83:6
**hired (1)**
  71:21
**history (3)**
  5:8;65:1;82:24
**hit (6)**
  10:4;16:9;21:13;
  41:24;42:1;97:3
**Hold (9)**
  3:12;22:3;24:6,6;
  45:18,18;57:11;58:1;
  60:13
**holders (1)**
  13:16
**holdings (1)**
  66:9
**hole (6)**
  39:4,5;74:3,10,25;
  81:15
**homerun (1)**
  97:4
**Honor (170)**
  3:16,20,22,25;4:5,8,
  9;5:12,13,20,22;6:2,9,
  16,23;7:5,14,17,18;8:7,
  19;9:3,7;10:4,9,12;
  11:14,15,20;12:6,8,11,
  19,21;13:3,8;14:19;
  15:7;16:9,15,19,23,25;
  17:7,16,18;18:11,13,
  17;19:7,23;20:10,14;
  21:9,16,19;22:15,17,
  25;23:6,16,17,23;24:8,
  12,20;25:5,9;26:1;
  39:8;42:23;43:5,7,14,
  24;44:5;45:19;46:2,9,
  19;47:24,24;48:5,17,
  23;49:13,20;51:4;52:1;
  54:21;56:15;57:14,18,
  23;58:2,12,17,23;59:3;
  60:9,21;62:7,10,12,21;
  64:22;65:8,10;66:1;
  68:5,12,17,22;69:21,
  23,25;70:19;71:11,12,
  14,24;72:4;73:4,17;
  74:1;75:3,18,24;76:13;
  77:10,14,15,19,21,22;
  78:14,15,25;79:4,12,
  13,19;81:13,18;82:7;
  83:1,8,17,20,21;84:6,
  17,22;85:8,13,20,20;
  86:4,17;87:5;88:4;
  97:7,13,20;98:3,5,10,
  16,20;99:9
**Honor's (5)**
  11:18;51:10;60:4;
  66:22;88:16
**hope (2)**
  93:19;96:24
**house (1)**
  63:5

**houses (1)**
  13:22
**Huh (1)**
  55:5
**hundred (7)**
  15:25;54:19;56:19;
  66:25;82:14;90:21,22
**Hundreds (1)**
  44:12
**hung (1)**
  59:18
**hurdles (1)**
  61:17
**hurt (1)**
  31:22
**hypothetical (6)**
  11:23;17:24;27:9;
  98:1,3,15
**hypotheticals (3)**
  37:25;38:3;92:4

**I**

**idea (16)**
  19:4;23:20;29:2;
  33:19;39:12;43:15;
  44:15,18;48:15;75:5;
  79:21;80:15,16;82:2,
  17;84:5
**identified (4)**
  22:21;23:9,18;73:24
**ignore (2)**
  45:9;87:1
**illusory (1)**
  99:2
**immediate (2)**
  17:4,10
**immediately (3)**
  10:6;17:22;84:4
**impact (1)**
  11:18
**important (10)**
  9:2;12:20;13:10;
  16:10;71:15;72:2,4;
  79:21,25;83:20
**importantly (1)**
  86:15
**imposition (1)**
  86:12
**impression (1)**
  96:11
**inappropriate (1)**
  69:22
**incentive (2)**
  14:22;30:1
**inclined (1)**
  53:18
**include (2)**
  47:20;56:1
**included (1)**
  61:6
**includes (1)**
  82:22

Case: 19-30088   Doc# 9538-4  Filed: 11/20/20  Entered: 11/20/20 12:47:45  Page 4a
of 118  Page
108 of 118

**including (1)**
66:7
**incompatible (3)**
79:24,25;80:16
**inconsistent (2)**
9:11;61:23
**incorporated (2)**
34:22;35:4
**incorporating (2)**
36:18,18
**incur (1)**
67:22
**incurred (1)**
66:12
**incurrence (1)**
63:11
**incurring (1)**
67:20
**indeed (2)**
76:17;92:5
**indemnify (2)**
14:9;91:5
**indemnity (1)**
14:6
**independent (3)**
11:11,13;60:6
**independently (1)**
60:5
**indicate (2)**
24:24;42:8
**indicated (1)**
95:11
**indicates (1)**
52:1
**indicative (1)**
52:6
**Indiscernible (3)**
39:17;49:14;73:3
**individual (7)**
27:25;44:6;56:24,25;
68:3;80:20;95:10
**individuals (5)**
13:22;44:16,24;60:5;
67:22
**inefficient (1)**
61:21
**inequitable (1)**
61:14
**informal (2)**
72:24;73:1
**information (54)**
6:11,14,19,21;8:1,5,
9,14,17,22,23,25;9:1,4,
5,24;26:24;29:16,17,
19;30:21,25;31:1,2,4;
37:4,6;39:10;54:20;
63:16;65:2,3;66:7,10,
13;67:3,4,8,11,17;72:3,
5,7,13,15,21,25;73:2,6,
8,12;86:12,19,21
**informed (3)**
39:1;64:18;88:15
**initial (1)**

**55:8**
**injured (1)**
44:18
**input (2)**
9:4;38:4
**inquiries (1)**
72:24
**insisted (1)**
49:13
**insolvent (1)**
78:6
**instance (1)**
82:3
**instead (3)**
30:4;61:25;83:10
**instituted (1)**
10:6
**institutional (1)**
60:24
**institutions (1)**
48:11
**insurance (31)**
13:20,21,24,25;14:1,
5,11,22;15:3,10,11;
17:18;54:3,4,6;83:21,
22,24;84:1,12;89:9,10,
23;90:1,11,23;91:3;
97:13,17,22,25
**insurer (1)**
89:18;90:7
**insurers (2)**
97:14,18
**intelligence (1)**
60:2
**intelligently (1)**
29:11
**intensive (1)**
61:20
**interest (4)**
12:11;84:11,13;
85:16
**interested (1)**
52:25
**interesting (1)**
52:24
**interests (3)**
15:9;84:11,20
**interference (1)**
3:21
**interlocutory (6)**
52:16,16,19;75:8,14,
21
**interrupt (2)**
15:12;78:3
**intervene (1)**
61:1
**into (22)**
4:18;9:5;21:20;
26:25;30:17;33:12;
34:8,9,22;35:4;37:5;
39:11,13;43:11;51:2,9;
54:22;74:3,10;77:25;
79:2;95:12

**invest (1)**
33:16
**invested (1)**
31:13
**investment (4)**
18:1;58:13;62:11;
63:4
**investments (2)**
64:6;94:25
**investors (3)**
60:25;64:12;95:1
**invite (1)**
93:12
**inviting (1)**
87:21
**invoke (1)**
51:23
**involved (1)**
90:10
**iPad (1)**
23:18
**issue (37)**
11:17;12:11,12;
15:10;16:13;34:20;
49:6,11;52:20,21;53:8,
9,17;55:16,16;62:15,
19;63:9;64:17;75:1,23;
77:11;80:3;84:10;
88:14;89:10;90:16;
91:25;92:1,18;94:21,
23;97:13,14,15,17,18
**issued (1)**
93:5
**issues (21)**
7:6;9:10,13,14;
10:15,16;12:21,22;
26:5,6,7,8,8;50:13,14,
16;61:16;76:8;81:5;
92:18,21

**J**

**Jack (1)**
6:10
**January (1)**
64:5
**Jarashow (20)**
58:9,10,12,13;62:9,
10,11,19,23;63:1,6,14,
21,24;64:2,10,15,22;
65:6;68:20
**Jennifer (2)**
58:17;65:8
**job (2)**
20:1;85:23
**join (5)**
22:10;45:7;61:1;
71:16,20
**joinder (1)**
65:22
**joinders (1)**
45:2
**joined (1)**

20:15
**Judge (9)**
3:23;12:1;22:9;
48:19;52:18,20;74:18;
76:8;84:7
**judgment (9)**
14:7;16:12;35:4;
44:16,19,19;46:14,17;
80:8
**judicata (1)**
51:23
**judicial (2)**
93:2,13
**July (3)**
66:18,19;67:3,11
**jurisdiction (2)**
51:22;52:17
**jurisdictional (4)**
52:20,21,24;75:1

**K**

**Karotkin (28)**
3:19;5:2,4;18:23;
20:5;24:9;46:20;48:3,
5,6;49:3;54:8,14;
57:12;72:1;85:20,23,
24;86:1;87:5,7,10,11,
15,17,23;88:1;93:25
**Karotkin's (2)**
54:8;88:7
**Keeble (1)**
8:13
**keep (6)**
22:7;23;26:4;57:15,
17;64:4
**kept (1)**
15:15
**key (3)**
60:14;65:11;79:23
**kind (4)**
31:13;43:7;59:20;
73:10
**kinds (2)**
10:7;33:21;36:19
**Kizzy (2)**
58:12;62:10
**knew (3)**
15:22;45:16;71:9
**knock (2)**
21:13;57:2,2;67:1
**knowing (2)**
32:15;67:2
**knowledge (2)**
59:13;98:23
**known (1)**
41:5
**knows (8)**
6:11;13:3;17:18;
18:17;23:22;31:21;
81:18;88:21

20:12
**landed (1)**
63:18
**Lange (13)**
50:17;58:5;60:19,21,
22;62:3,8;64:11;68:19,
22;69:2,10,12
**language (4)**
77:22;79:23;80:2
**last (3)**
42:7;48:4;51:4
**later (5)**
11:19;25:2;28:21;
49:4;66:24
**law (22)**
14:8;29:22;37:25;
51:23;62:17;63:2,7;
69:24;70:6,7;71:19;
72:6;74:10;83:4,5,6,9,
11,12,13;85:14,18
**laws (5)**
72:16;78:18,22;79:7,
17
**law's (1)**
83:2
**lawyer (4)**
28:8;88:18,19,20
**lawyers (6)**
13:21;15:22;45:6;
56:13,15;88:19
**lay (1)**
84:22
**Layn (2)**
69:4,8
**lead (3)**
13:11;15:6;84:12
**leadership (1)**
59:12
**least (18)**
5:13;8:2,10;15:23;
17:7;28:18;30:18;
31:14,15,16,16;41:18;
51:5;52:15;53:7;87:7;
93:2;96:20
**leave (4)**
24:10;50:6;52:8;
76:11
**leaving (1)**
50:19
**leeway (1)**
71:6
**left (4)**
12:18;17:19;42:16;
47:9
**legal (6)**
38:15,15;61:17;
69:22,25;83:6
**legislature (1)**
56:7

**L**

**Labaton (1)**

Min-U-Script®

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(8) including - legislature

Case: 19-30088    Doc# 9538-4   Filed: 11/12/20    Entered: 11/12/20 15:47:45    Page 68
of 118

109 of 118

**Lehman (1)**
55:9
**less (8)**
36:4;39:19,21;45:12,
20;53:12;56:20;88:8
**letter (1)**
39:5;72:20;73:1;
90:1
**letters (1)**
6:24
**letting (1)**
16:10
**level (2)**
88:20;96:18
**levels (1)**
11:10
**Lewis (3)**
50:15;58:18;65:9
**liability (8)**
27:17;34:14,18;35:8,
22;36:4;92:20;96:8
**liable (2)**
34:5;35:17
**light (1)**
96:20
**lightning (1)**
35:22
**likely (4)**
5:16;17:8;56:18;
65:18
**likes (2)**
21:6;54:23
**limit (1)**
15:15
**limited (19)**
81:14,16,22;82:1,6,
16,16,19;91:15,24,25,
25;92:2,13,14;98:8,9,
12
**limits (1)**
57:11
**line (7)**
20:19;21:2;22:2;
33:24;38:21;46:1;
60:12
**liquidated (1)**
38:19
**list (3)**
20:17;22:16;94:17
**listed (1)**
18:19
**Listen (3)**
21:10;38:2;58:22
**listening (1)**
5:6
**listing (1)**
66:7
**literally (3)**
7:3;9:7;98:15
**litigate (2)**
26:11;78:20
**litigated (6)**
18:4;33:13;84:10;

89:12,14;93:15
**litigating (1)**
26:4
**litigation (4)**
7:2;40:6;60:22;
76:23
**little (19)**
10:20;36:25;52:15;
53:23;55:12;56:9,12,
20,21,21;63:5;70:11;
71:3,6,8;73:1;77:11;
79:20;94:12
**live (4)**
28:15;52:12;67:18;
68:12
**living (1)**
13:21
**load (1)**
12:21
**logged (2)**
22:18;27:10
**long (5)**
12:20;19:1;39:13;
73:2;95:8
**longer (1)**
13:18
**look (25)**
12:23;39:3;42:7;
45:8,10,11,21;47:11,
22;59:25;65:20,25;
66:15,25;67:21;72:11,
19;79:13,13;80:4;82:7;
83:21;86:7;91:23;93:5
**lookback (1)**
72:21
**looked (3)**
23:2;52:14;66:17
**looking (3)**
22:7;42:3;47:7
**lose (2)**
32:6;98:10
**losing (2)**
67:12,19
**losses (1)**
61:10
**lost (7)**
3:23;29:23;31:4,8,
25;64:6,6
**lot (18)**
23:3;29:3,20;33:3,7;
34:23;36:4;57:3;60:1,
13;64:5;68:9;71:4;
73:11,12;75:16;83:25;
94:7
**lots (2)**
55:25,25
**lousy (1)**
36:25
**lower (1)**
95:25
**luck (1)**
30:20

## M

**machinery (1)**
54:18
**mad (1)**
97:5
**mail (2)**
41:2;64:8
**mailbox (1)**
65:21
**main (2)**
7:13;15:23
**majority (1)**
72:13
**Maker (3)**
24:12;25:21;33:23
**makes (3)**
80:19;83:25;84:2
**making (8)**
10:13;13:9,9;15:23;
67:22;70:9;76:18;96:2
**mandatory (2)**
32:24;80:17
**Manges (2)**
5:14;48:6
**many (14)**
17:2;18:24;28:24;
29:21;42:13,13;45:25;
48:10,16;49:9,9;53:12;
82:9;98:25
**market (9)**
26:7;29:24;78:10;
93:9,24;94:14;95:11,
17;96:5
**marketplace (1)**
95:25
**Mass (2)**
50:15;56:14
**massive (1)**
33:20
**master (2)**
21:10;38:2
**matches (1)**
34:15
**math (3)**
98:12,13,15
**matrix (3)**
27:24;34:16;41:18
**matrixes (1)**
35:7
**matter (14)**
3:5;4:4;10:23;12:4;
14:9;29:7;49:16;51:16;
52:2;55:23;64:1;76:6;
82:16;99:7
**may (34)**
7:10;12:9;24:5,12;
25:20;26:6,8;30:25;
31:1;32:10,22;33:22;
38:19;39:10,16,19,21;
43:6,6;44:20,21;56:25,
25;57:1,1;64:12;68:24;

71:7;84:6,19;90:15;
91:20;95:14;96:21
**Maybe (21)**
5:4;16:16,17,17,18;
20:5,6;27:9;28:19,20;
30:11;31:21;33:23;
37:24;42:9,10;43:19;
52:21;67:14;93:20;
95:15
**mean (29)**
5:8;9:20;14:16;
22:22;31:20;34:9,10;
37:24;39:25;41:1;44:1,
2;45:3,9;46:6;48:3;
49:18;52:7;59:17;
62:24;71:18,18;73:4,
23;74:7;75:10;78:9;
93:20;94:20
**meaning (1)**
38:3
**meaningful (1)**
61:10
**meaningless (1)**
35:8
**means (5)**
7:11;14:21;45:24;
80:17;90:7
**meant (4)**
34:12,13,24;93:23
**measuring (2)**
62:16,19
**mechanism (4)**
16:14,17;42:11;59:9
**mediate (3)**
6:18;27:13;34:19
**mediated (6)**
26:5;27:14;43:15;
46:22,25;54:2
**mediates (1)**
35:9
**mediating (5)**
27:16,16;43:13;54:3;
69:5
**mediation (26)**
7:20,22;11:10;12:2;
19:15;26:2,10,18;27:5,
18;31:9;34:8;35:1;
36:8;39:14;40:19;43:8,
9,11;53:23;63:11;
71:17;86:6;87:18;91:9;
96:4
**mediations (7)**
27:25;34:9;42:18;
47:2,8,18;56:25
**mediator (19)**
26:15,15;28:7,7,12;
34:22;35:3;37:17;38:4,
8;39:12;43:21,21,22;
53:23;59:22;69:3;
95:12;96:1
**mediators (2)**
19:10;43:19
**mediator's (2)**

19:15;39:11
**medicated (1)**
56:1
**meet (1)**
38:7
**member (3)**
23:12;44:25;81:7
**members (2)**
28:23;80:9
**mention (1)**
76:18
**mentioned (1)**
43:15
**menus (1)**
73:14
**merge (1)**
77:3
**merging (2)**
15:21;71:9
**merit (1)**
11:18
**merits (28)**
7:2,9,9;10,13,14;
10:8,11,13,16;11:16,
19;12:3,9;27:5;34:22,
25;35:1,2,2,3;36:18,18,
24;54:22;61:17;74:4;
95:23;96:6
**message (2)**
32:13;47:25
**metaphor (2)**
88:16;99:5
**methodology (3)**
63:9,18;64:17
**mic (5)**
21:14;57:22;58:6,11;
60:20
**Michael (2)**
20:21;22:2
**might (12)**
12:4;16:3;21:5;
26:13;27:8;33:1,2;
35:10;69:2;77:8;95:1,3
**Mike (2)**
50:17;60:21
**million (6)**
13:25;29:10;54:4;
60:12;78:4;82:11
**million-and-a-half (1)**
98:12
**mind (3)**
26:4;64:4;96:12
**mini-disclosure (1)**
86:5
**minimize (1)**
40:6
**minor (1)**
94:11
**minuses (1)**
42:6
**minute (6)**
6:4;26:25;50:15,17;
68:5;85:24

Case: 19-30088    Doc# 9538-4    Filed: 11/20/20    Entered: 11/20/20 15:47:44    Page 110 of 118

**minutes (21)**
5:1,11;24:25;25:3;
43:1,3,6;46:21;48:5;
50:3,11,13,14,21;51:2;
57:7;58:20;68:21;
83:19;85:21;88:3
**misidentified (1)**
75:11
**misperception (1)**
97:13
**missed (1)**
34:18
**missing (2)**
39:2;67:5
**misstatement (1)**
48:25
**mistake (1)**
24:2
**misunderstanding (1)**
28:5
**mitigate (1)**
95:25
**mix (1)**
95:12
**MML (2)**
58:13;62:11
**model (1)**
55:2
**modified (1)**
39:2
**mom (1)**
64:12
**moment (5)**
3:6,22;4:5;20:25;
22:10
**money (21)**
7:1;10:6;13:1,19;
17:18;29:23;30:12,14;
31:4,8;33:14;65:2;
77:5,6,9;81:19;89:2,9;
96:18;97:17,25
**monies (1)**
61:8
**monitor (1)**
5:3
**Montali's (1)**
3:23
**months (21)**
7:3;9:8,20;12:25;
32:21;37:12,14,16;
39:15,18;40:2;48:18,
18,18,18,19;53:22,22;
63:10;74:14,17
**moot (1)**
76:5
**more (42)**
8:9;11:15;12:21,22;
13:2;14:13;17:2;19:21;
26:11,14;27:19;28:6;
30:9;31:15;33:11,11,
18;37:4;38:20;40:2;
42:10,13;43:18;48:15;
52:1;53:24;56:18,21,

21;60:3,13;61:5;63:5;
64:18;68:1;69:19;
72:20;73:2;80:8;86:15;
92:21;95:12
**Morgan (3)**
50:15;58:18;65:9
**morning (8)**
3:7,8;4:7,8,17;58:24;
65:11;95:8
**most (10)**
6:25;7:4,21;12:20;
16:12;33:7,17;46:23;
72:2;73:5
**motion (29)**
9:19;15:18,19;16:3,
7;18:25;24:23;25:13,
15;43:2;45:3;46:11,18;
49:17,18;55:8;59:6;
61:25;64:25;70:21,24;
71:5;74:2,2;75:21;
76:5,9,18;98:9
**motivated (1)**
64:13
**move (2)**
61:1;75:25
**moved (2)**
53:2;67:25
**much (20)**
12:10;15:17;35:17;
36:3;40:8;41:22;42:25;
50:3,4,9,9,19;55:18;
56:22;60:3,18;81:12;
82:14;89:2;97:1
**multiple (3)**
86:18,18;94:22
**multiples (1)**
82:9
**Musicland (3)**
51:6;7;53:6
**must (3)**
26:4;68:9;69:13
**Mutual (1)**
50:15
**myself (1)**
25:8

**N**

**name (9)**
21:14;22:18;23:9;
24:2;51:23;58:16;
60:21;69:7;92:7
**namely (1)**
25:10
**names (3)**
50:25;57:9;69:11
**nationally (2)**
59:22;69:14
**nationally-recognized (1)**
38:4
**nauseum (1)**
69:3
**necessarily (2)**

33:3;96:19
**necessary (3)**
7:21;70:8;93:16
**need (21)**
8:14;15:18;16:6;
21:14;25:21,23;29:24,
24;47:22;58:5,7;60:19;
67:10;68:15;72:7,20,
22;73:10,12;88:18,20
**needed (2)**
12:15;69:3
**needs (1)**
15:1
**negotiate (1)**
62:4
**negotiated (6)**
33:8,10;36:12;56:1;
59:20,24
**negotiation (1)**
29:7
**neighbor (1)**
30:24
**neighborhood (1)**
4:17
**neither (3)**
65:12;83:5;92:19
**New (7)**
5:13;21:6;55:24;
67:8;72:22;83:4,6
**Newburg (5)**
79:14;80:18,20;
82:21,21
**news (1)**
32:4
**next (11)**
6:10;30:24;32:18;
33:22,25;37:11;39:10;
40:5;42:7;60:19;76:8
**nice (1)**
12:18
**nine (18)**
9:20;26:3,16,16,18;
28:2;33:9,9,24;34:22;
35:4,24;36:20;39:14;
59:17,23;95:13;96:2
**ninety (2)**
45:23;72:11
**ninety-day (2)**
72:10,21
**ninety-nine (2)**
46:10;56:19
**ninety-nine-and-a-half (1)**
45:24
**ninety-page (1)**
19:2
**Ninth (1)**
93:16
**nobody (1)**
94:2
**Nolan (6)**
4:5;5:23;57:8;73:16,
21,23
**none (3)**

11:4;46:14;91:13
**Northern (1)**
42:19
**nose (1)**
10:4
**note (1)**
64:22
**notice (15)**
19:9;32:9;36:11;
38:24;40:22,23;44:7;
46:12,15,15,17;49:14;
59:25;86:4;90:2
**notion (1)**
66:1
**NOVEMBER (2)**
3:1;66:8
**number (38)**
6:3,5,5;7:21;18:17;
19:12,18;23:9,11;25:6;
26:23,24;27:1;28:3,9,
11;33:5;35:14,24;
38:20;45:4,4,12;46:22,
24,25;71:14;77:25;
79:2,2;86:11;88:8,13,
14,24,25;98:4,5
**numbers (11)**
23:9;26:18,20;28:2;
34:23;35:5,25;36:20;
59:18;79:7;96:2
**numerous (1)**
5:21

**O**

**object (1)**
46:11
**objection (11)**
28:16;31:7;49:14;
67:6,7;72:25;93:7,12;
94:2,5;95:1
**objections (8)**
7:5,9,16;8:2,8,10;
46:9;61:1
**objectors (1)**
5:18
**obligations (4)**
92:9,10,11,12
**oblige (1)**
80:8
**observation (1)**
91:16
**obviously (9)**
13:5,17;21:2;34:14;
65:15;69:22;73:11;
74:16;78:8
**occasions (1)**
26:17
**occurred (1)**
55:2
**occurs (1)**
7:8
**odds (1)**
56:23

**off (16)**
9:15;20:7,9;29:3;
30:11;47:14;53:1;
56:12;57:2,2,8,16;
63:25;68:20,20;85:9
**offer (16)**
6:25;9:24,25;17:21;
29:1,1;31:9;47:20,21;
63:22,24;67:24;86:5;
91:8,10,11
**offered (1)**
27:12;37:3;64:7
**offers (18)**
6:25;7:4,19;10:5,22;
17:17,20;28:25;46:24;
47:1;56:25;59:8;63:15;
65:18,20;68:4;71:17;
87:13
**officer (1)**
76:7
**officers (6)**
11:1;24;13:13,17;
14:6;91:5
**offramp (3)**
65:13;68:3;95:10
**off-rank (1)**
95:10
**often (2)**
33:11,11
**old (3)**
68:11;83:1;96:19
**omnibus (6)**
7:5,15;8:8,9;93:7;
95:17
**once (6)**
33:7,8;62:6;74:7;
86:24;91:4
**One (82)**
3:6,9,22;4:5;5:15;
8:14;9:17;10:14,20;
11:15;12:2;16:2,24;
17:3:18:22;20:25;22:5,
10;26:14;27:9;30:19,
19;32:16;33:2,12;35:2,
3;40:13;41:8;43:8;
45:5,12,20;46:4,19;
48:21;51:5,8,22;52:12;
53:12,21;54:10;55:11;
60:25;62:4;64:7,22;
65:15,21,23;69:4;
70:19,23;71:14,19;
72:8,14;73:5,8;75:3;
77:1;80:25;81:3;84:12;
85:5,11,24;86:2,11;
88:13,24;91:4;92:8,22,
22,24;94:22;95:22;
97:19;98:4,20
**one- (1)**
37:8
**one-half (2)**
45:12,20
**one-on-one (1)**
27:14

Case: 19-30088    Doc# 9538-4   Filed: 11/20/20   Entered: 11/20/20 12:44:45   Page 110
of 118

**onerous (2)**
67:25;88:9
**ones (2)**
33:3;46:22
**one's (1)**
69:15
**ongoing (1)**
63:10
**online (1)**
73:14
**only (24)**
7:20;8:24;11:14;
13:2,13,14,16,24;14:1;
16:2;27:8;41:8;42:9,
15,15;46:19,22;49:1;
68:8;80:25;82:11;
84:25;97:9,19
**onto (1)**
26:24
**oOo- (1)**
3:3
**openers (2)**
31:14,18
**opening (1)**
50:19;82:11
**operate (1)**
21:15
**operating (1)**
60:5
**operator (1)**
4:20
**opinion (1)**
62:15
**opinions (1)**
65:22
**opponent (1)**
73:24
**opportunities (3)**
40:22;86:14;87:8
**opportunity (3)**
13:3;32:20;85:15
**opposed (2)**
31:19;37:13
**opposing (1)**
73:1;80:1,3,9
**opposite (1)**
84:13
**opposition (2)**
15:18;75:21
**opt (15)**
33:19;40:24;41:20;
48:16;49:1,2,4;56:15,
16,17;80:21;81:5,7,9;
82:25
**opt- (2)**
40:19;88:19
**optic (1)**
4:19
**optimism (1)**
12:16
**option (5)**
31:14,16;41:16;49:2;
79:10

**options (2)**
41:7;60:3
**opt-out (11)**
32:24;33:14,17;
40:22;41:8,19;48:21;
74:22;80:15;81:1;
82:22
**opt-outs (12)**
33:20;40:7,17;48:20;
74:22;80:18,24;81:8,
10;82:18,19;91:23
**oranges (1)**
94:15
**order (29)**
3:4;4:12,23;15:1;
18:18,25;19:2,4;23:14;
25:9;26:21;58:20;59:4;
66:8;72:7;74:15,23;
75:4,5,10,11,19;82:9;
87:3,20;88:14;93:5,24;
97:22
**orders (1)**
75:14
**ordinary (5)**
54:11,11,14,16,17
**Oregon (4)**
50:16;58:18;65:9;
66:4
**others (2)**
69:6;80:10
**otherwise (4)**
22:21;32:24;77:23;
83:23
**out (74)**
5:9;6:19,24;7:1,4,19,
24;8:3,15;9:18;10:5;
12:13;13:1;15:3;17:18,
22;23:14;24:7;35:20;
36:6,7,8,10;37:2;39:7;
40:11,25;41:11,20,24;
44:23;45:14;46:7;
48:16;49:1,2,4;50:5;
56:14,15,16,18,19;
57:5;59:14;60:13;
65:15,17,19,21;66:18,
21;67:1;71:12;74:10,
16;75:15,18;76:12;
78:24;80:21;81:5,7,9;
82:25;83:10;84:22;
88:20;90:24;91:1,2;
92:20,25;94:3
**outcomes (5)**
56:1;61:23;62:7;
79:24;80:5
**outs (1)**
40:20
**over (11)**
8:4;9:18;35:16;39:6;
43:16;49:13;53:2;68:5;
71:6;75:11;92:19
**overlap (2)**
50:20;71:10
**overlay (1)**

26:24
**overloaded (1)**
85:22
**over-understood (1)**
95:14
**owe (1)**
35:17
**own (10)**
7:25;14:13;27:20;
33:4,6;41:20;42:8;
44:13;46:14;81:4
**owns (1)**
6:11

**P**

**Pacific (1)**
87:1
**page (3)**
6:3,10;47:13
**pages (1)**
47:25
**paid (2)**
66:24;81:12
**paint (1)**
5:18
**panel (1)**
19:9
**papers (15)**
5:7;7:25;18:19;
19:14;22:6;26:1;72:6,
9,17;81:2;82:10,11;
83:23;84:22,23
**PARA (1)**
97:19
**Parada (18)**
3:13,24;4:3,15;
20:24;22:13;23:15,21;
24:6;50:23;57:8,14,18;
58:8;68:19;73:15,17;
99:6
**paradigm (1)**
84:15
**paragraph (3)**
59:4;60:4;93:23
**parameters (1)**
41:23
**parcel (1)**
96:1
**Park (1)**
97:4
**part (12)**
5:25;6:18;8:16;
13:18;14:24;25:8,13;
40:24;52:2;54:1;96:1,9
**participate (1)**
5:3
**particular (5)**
8:14;27:8;40:15;
72:7;83:19
**particularly (5)**
14:23;38:14;40:14;
53:16;96:20

**parties (5)**
11:1;13:3;17:20;
61:21;63:12
**partner (2)**
21:4;85:23
**party (4)**
7:1;80:1,3,9
**pass (1)**
51:7
**paternalistic (2)**
30:14,16
**path (1)**
68:12
**pay (15)**
34:10;80:9,10;83:24;
89:8,14,16;90:7,8,12,
15;91:5;97:17,22,25
**paying (3)**
90:20,21,22
**payment (1)**
17:4
**payments (1)**
89:12
**peg (4)**
74:3,9,25;81:15
**penalty (1)**
48:12
**penny (1)**
34:10
**Pension (3)**
50:16;58:3,3
**people (68)**
8:25;9:4;10:6;12:12;
13:1;16:20;18:15;
19:16;25:1;27:23,25;
28:24;29:10,12,15;
30:1,10,22,23,23;31:1,
13;32:8,13;33:7,12,13,
17;37:2;39:3;40:7;
41:8;44:11,20;45:16;
46:13;48:10,10;49:24;
50:5,6;52:25;54:4;
55:17;56:13,14,14,25;
59:10,11,16;61:10;
67:1,17;69:7;72:14,14;
73:12;80:12;84:8;86:3,
6,7,8,17;88:18;90:13;
92:10
**per (4)**
27:19;32:1;34:17;
35:20
**PERA (32)**
6:13;7:9;10:10;
12:19;13:3,9,11,19;
14:14,21;15:1,5;17:6;
43:15;45:7;49:5;68:2;
71:15,18;75:19;76:19,
23;82:4,11;83:4;84:1,
5,10,11,19;85:3;97:15
**PERA's (14)**
10:10;44:19;49:13,
17;71:21;74:2,4;76:16;
78:20,20;79:10;83:22,

22;84:17
**percent (15)**
7:25;8:4,12,15,16;
15:25;33:6,18;42:18;
45:13,20,25;46:10;
48:21;66:25
**percentage (1)**
47:3
**perfect (1)**
4:2
**perfectly (1)**
70:10
**perform (1)**
59:23
**perhaps (4)**
27:6;52:15;65:22;
94:6
**period (7)**
26:22;27:22,24;28:4;
72:6,12;74:24
**periods (1)**
72:7
**perjury (1)**
48:12
**permission (1)**
5:22
**permit (5)**
32:23;40:17,19;62:5;
93:7
**permits (3)**
39:12;53:17,17
**permitted (1)**
85:5
**perpetuation (1)**
13:6
**persimmon (1)**
94:17
**person (7)**
9:25;18:6;27:1,16;
51:5;69:16;93:15
**personal (1)**
24:9
**persons (1)**
51:5
**perspective (2)**
6:18;45:11
**persuade (1)**
30:7
**persuaded (2)**
31:14;49:1
**persuasion (1)**
92:1
**persuasive (1)**
79:11
**PG&E (9)**
3:5;4:4;29:21;34:25;
35:20;36:24;88:17;
92:24;95:23
**PGE (1)**
38:15
**Philip (1)**
58:2
**Phillips (1)**

Case: 19-30088    Doc# 9538-4   Filed: 11/20/20    Entered: 11/20/20 15:42:45    Page 121
of 118

69:4

**Phillips' (1)**
69:8

**philosophical (1)**
29:7

**phone (1)**
20:19

**phonetic (5)**
8:13;24:13;33:24;
46:6;48:22

**phrase (2)**
69:13;88:15

**pick (2)**
29:3;69:16

**picked (1)**
30:11

**piece (2)**
47:21;90:20

**Pillsbury (1)**
50:12;58:3

**pitch (1)**
21:7

**pitcher (2)**
21:5,7

**place (6)**
23:13;28:17;31:7;
35:9;40:17;75:11

**placed (1)**
31:7

**places (1)**
34:23

**plainly (1)**
76:16

**plaintiff (3)**
13:11;15:6;84:12

**plaintiffs (4)**
14:2,8;15:3;28:9

**plaintiff's (1)**
13:21

**plan (20)**
16:3;18:3;26:20,21;
61:13;77:20,21,23;
78:3,25;81:16,19,23,
23;82:2,3,6;97:16,16,
19

**play (2)**
40:15;68:9

**playing (1)**
88:20

**pleadings (3)**
52:14;53:10;61:11

**please (11)**
20:24;33:25;39:10;
40:5;57:22;58:11;
60:20;62:18;79:23;
85:21;91:23

**pluses (1)**
42:6

**point (43)**
3:14;5:9;10:9;11:5,
13,14;15:7;16:16;19:5;
27:20;32:18;36:17;
39:24;42:8;43:24;46:8;

52:22;53:25;65:17;
68:4;69:9;70:4;72:2;
73:11;75:3,18;76:4;
78:9;79:8,9,19;80:11,
23;82:18,19;84:22;
87:11;91:8,25;93:16,
25;98:4,5

**pointed (1)**
7:24

**points (9)**
18:13;41:24;43:6;
52:24;59:14;74:10;
97:7;98:17,18

**pole (3)**
4:18,18;21:13

**policy (3)**
14:10;81:6;90:2

**polls (1)**
30:23

**pop (1)**
64:12

**portrayed (1)**
96:16

**position (15)**
15:6;20:5;53:7;
83:22,22,25;84:5;89:6,
11;92:24;97:15,20,23,
24;98:2

**positions (1)**
90:3

**possible (4)**
8:15;10:12;67:24;
89:2

**possibly (2)**
60:6;82:10

**Post (3)**
48:21;49:1,4

**post-confirmation (1)**
41:5

**poster (1)**
3:10

**post-petition (1)**
12:11

**pot (6)**
14:5;38:22,22;81:19;
91:4,4

**potential (4)**
17:17;84:16;88:22,
23

**potentially (2)**
10:13;74:17

**pour (3)**
26:19;28:2;54:12

**powers (1)**
61:3

**practical (3)**
5:9;13:20;14:10

**practically (1)**
52:1

**praise (1)**
44:2

**precedent (1)**
16:24

**precise (2)**
50:22;63:5

**preclude (1)**
65:12

**predicates (1)**
51:24

**preferred (1)**
14:17

**prejudice (1)**
52:4

**premiums (1)**
29:4

**prepare (1)**
18:24

**prepared (6)**
6:19;8:20;23:12;
24:2;33:16;59:18

**present (2)**
49:19,20

**presentation (1)**
96:9

**presented (2)**
55:8;92:3

**presenting (1)**
21:22,24

**preserve (1)**
10:25;14:22;84:1

**president (1)**
60:22

**presses (1)**
84:10

**pressured (1)**
88:6

**presumably (1)**
91:11

**presume (7)**
4:22;10:25;23:4;
24:10;57:9;59:24;
73:18

**pretty (2)**
15:17;83:13

**prevent (1)**
85:3

**prevents (2)**
97:16,20

**prima (2)**
92:2;98:21

**primacy (1)**
56:6

**prior (6)**
51:10,10;53:19;55:2;
63:10;75:4

**priority (1)**
89:12

**private (1)**
61:6

**probably (6)**
15:23;29:4;43:2;
51:5;77:2;86:24

**problem (12)**
56:22,22;67:13;
76:24;89:13,24,25;
90:23;91:18,20,21;

95:10

**problematic (1)**
66:21

**procedural (4)**
7:6;8:2;10:15;61:16

**procedure (19)**
6:10;12:17;14:14;
16:1;28:7,18;31:6,12;
32:19;37:8;39:3;48:17;
49:8;59:11;93:10,17;
94:17;95:17,20

**procedures (32)**
5:17,18,19;6:25;9:1,
16;10:10,15;11:4,12,
16,19;16:11;18:16;
19:19;62:13,14;64:25;
66:1,15;67:23,25;
70:21,24;71:5,13;86:3,
6,14;87:4;93:8;94:10

**procedure's (1)**
46:11

**proceed (3)**
16:12;49:12;52:3

**proceedings (2)**
61:22;99:11

**process (34)**
8:10;9:8,9,21;10:17;
11:2,5;12:7,13,20;
26:22;28:17;30:8,9,17;
31:9;33:8;37:18;38:25;
43:22;47:4;55:25;60:2;
61:2,20;67:9;68:1;
71:23;73:8,13;74:16;
77:4;86:8;87:14

**processes (1)**
66:25

**Procter (3)**
50:14;58:13;62:11

**productive (1)**
28:20;43:13

**Prof (1)**
69:20

**professor (4)**
69:24;70:6;74:10;
83:12

**professor's (1)**
70:7

**progress (1)**
9:15

**promise (2)**
59:3,3

**promised (1)**
90:6

**promptly (3)**
6:20;17:15;18:7

**proof (3)**
66:20;72:23;76:24

**proofs (13)**
5:20;8:21;14:25;
44:7,12,13,16;59:16;
66:3,5,6;72:1;74:21

**proposal (9)**
9:13;11:10;13:6,9;

28:23;40:4;42:12;44:6;
91:10

**proposals (1)**
28:19

**propose (2)**
28:9;86:3

**proposed (10)**
5:17;18:25;19:2,4,9;
61:2,13,20;68:2;87:3

**proposes (1)**
27:18

**proposing (1)**
12:19;87:12

**proved (1)**
27:17

**proven (1)**
67:15

**provide (7)**
8:17,23,25;17:17;
19:8;67:12;86:12

**provided (11)**
6:14,15;8:22,25;9:5;
19:13;64:25;67:4;
72:15;82:12;86:20

**provides (5)**
9:24;60:24;81:16,20,
24

**provision (2)**
76:14;81:14

**provisions (4)**
74:5,23;78:22;81:10

**public (5)**
14:9;32:2;50:16;
61:6;65:10

**punitive (2)**
44:9,25

**purchase (2)**
8:18;66:9

**pure (1)**
48:14

**purely (2)**
7:6;10:15

**purported (1)**
76:18

**purpose (3)**
80:22;81:9;82:23

**purposes (3)**
13:20;14:10;72:16

**pursue (1)**
11:24

**put (22)**
5:23;7:25;9:2,14;
12:23;25:17,23;43:16;
48:23;49:7;56:6,7;
70:2;72:5,6;74:3,16;
79:22;92:1;95:12,18;
98:11

**putative (3)**
13:19;14:24;15:4

---

**Q**

**qualified (1)**

Case: 19-30088    Doc# 9533-4    Filed 11/23/20    Entered 11/23/20 12:47:45    Page 1
of 118

19:9
**quantification (1)**
27:22
**questionnaire (1)**
94:3
**queue (1)**
12:3
**quick (1)**
33:23;88:5;93:21
**quickly (2)**
67:24;97:8
**quite (1)**
77:11
**quo (1)**
13:7
**quote (2)**
38:8;80:20
**quoted (1)**
42:17

# R

**raise (7)**
22:19,20;23:22;51:1;
57:19;75:23;82:5
**raised (6)**
23:8;53:25;73:16;
75:18,20;86:2
**raises (2)**
89:10,13
**raising (1)**
97:19
**ran (1)**
4:18
**rank (3)**
48:9,14,15
**rateable (1)**
81:20
**rather (7)**
14:14;26:14;45:7;
52:23;66:24;67:23;
81:16
**reach (1)**
65:21
**read (7)**
19:2;23:2;26:1;
30:23;40:13,14;86:14
**reading (2)**
67:14;94:13
**reads (1)**
89:11
**ready (2)**
4:23;20:13
**real (7)**
9:15;33:14,23;35:19;
53:9;59:5;61:10
**realistic (1)**
13:23
**realistically (1)**
63:17
**realize (2)**
15:21;50:19
**really (26)**

5:8;13:10;24:22;
25:11;27:15;37:23;
38:16;40:8,8;51:15;
66:17,22;67:12;70:24;
71:5,13,24;72:2;74:2,
9;79:21,24;82:17;
92:20;93:4;94:19
**reason (11)**
21:19;37:7;43:25;
60:9,10;66:2;74:12,12,
24,24;84:3
**reasons (1)**
42:5
**rebooted (1)**
21:20
**rebuttal (1)**
57:6
**recall (1)**
55:14
**recap (1)**
26:2
**receipt (1)**
90:22
**receive (2)**
63:16;81:17
**received (1)**
65:23
**recently (1)**
29:15
**recharacterize (1)**
82:5
**recission (1)**
62:13
**recognized (2)**
59:22;69:14
**recognizes (2)**
6:13;76:20
**recognizing (1)**
81:6
**record (2)**
33:20;92:12
**recourse (1)**
67:18
**recover (2)**
14:15;30:2
**recoveries (2)**
15:11;17:10
**recovering (1)**
13:23
**recovery (2)**
13:24;60:23
**reduce (1)**
15:3
**reexamined (1)**
96:20
**reference (3)**
47:8;68:9;98:18
**referred (1)**
69:5
**refile (1)**
67:17
**regular (1)**
66:5

**reject (3)**
16:22;26:13;61:13
**rejected (1)**
82:6
**rejoined (1)**
21:16
**related (1)**
97:9
**relatively (1)**
88:10
**release (1)**
90:23
**relevant (2)**
12:4;14:12
**relief (5)**
21:5,7;76:17,19,22
**rely (1)**
55:9
**remain (2)**
16:2,2
**remaining (2)**
10:17;12:8
**remains (1)**
15:7
**remedy (1)**
77:7
**remember (5)**
26:15;47:9,10;84:6;
87:23
**reminding (1)**
53:1
**renewed (1)**
74:2
**reorganized (4)**
5:14,17;15:1;48:7
**repeat (2)**
5:5;72:9
**repeatedly (2)**
34:13;80:19
**repetitive (1)**
42:6
**reply (13)**
18:17;19:1;42:22;
47:9,15,17,25;50:10,
12;70:6;76:19,21;
95:15
**reported (1)**
79:15
**repository (1)**
59:13
**represent (6)**
46:16;52:25;71:23;
84:18,21;85:6
**representation (4)**
37:9;52:7,9;76:6
**representative (2)**
12:13;15:8
**represented (3)**
28:25;36:23;57:1
**representing (3)**
28:8,10;71:16
**represents (1)**
61:8

**reputation (2)**
54:9;69:8
**request (2)**
6:19;65:2
**require (1)**
93:2
**required (3)**
65:1;66:6;67:5
**requires (1)**
34:4;61:15;80:8
**res (1)**
51:23
**reserve (9)**
4:23,25;5:11;19:22;
24:22;50:3,10,11;57:6
**reserving (1)**
24:21
**resolution (4)**
12:3;55:25;59:20;
62:13
**resolve (1)**
12:13
**resolved (6)**
7:22;10:3;28:15;
34:16;47:5;62:6
**resolving (3)**
14:2;31:17;61:2
**resource (1)**
61:20
**resources (1)**
32:7
**respect (11)**
15:10;32:17;36:3;
46:21;59:5,15;71:12;
72:5;80:14;84:12;
86:10
**respectfully (4)**
56:11,24;63:21;93:1
**respects (1)**
8:23
**respond (6)**
19:6;50:14;65:4;
68:24;85:15;98:22
**responding (1)**
25:14
**responds (2)**
70:2,3
**response (10)**
4:24;5:1;19:8,13;
21:23;24:23;43:6;
69:20;82:17;98:20
**responses (1)**
86:13
**responsive (2)**
18:18;19:17
**rest (2)**
19:22;34:1
**result (1)**
61:18
**resulting (1)**
63:8
**results (1)**
26:21

**retirees (1)**
61:9
**retirement (3)**
61:6,8;65:10
**reverse (1)**
75:12
**reviewed (1)**
61:11
**revisit (3)**
16:13,14;49:11
**Richard (1)**
5:13
**rid (9)**
32:20,21;33:1,2,3;
42:9,13;94:5;96:23
**right (61)**
4:2;6:1,6;7:13,17;
8:2;11:11,19;12:6;
16:1,14,17;17:21;18:8,
9,11;19:12;20:11;21:8;
23:25;24:3,4,11,19;
25:10,16,22;30:25;
31:23;34:20;35:9;36:1,
5,7,21;38:5,13;41:15;
42:24;46:15;47:16;
50:2;54:7,16;58:16;
64:16;65:19;69:12;
71:20;73:3;76:13;
77:12,18;79:1;80:6;
81:19;92:12;94:24;
95:2;96:6;98:7
**rights (2)**
53:3;61:15
**rigmarole (1)**
88:13
**risk (5)**
9:11;61:23;78:12;
80:8;93:18
**risks (1)**
59:19
**road (6)**
11:15;12:15;38:8,9;
40:18;53:13
**roads (1)**
53:12
**role (1)**
33:17
**roll (1)**
35:16
**Rome (2)**
53:12,13
**room (2)**
21:20;51:2
**round (4)**
74:3,10,25;81:15
**rounds (1)**
12:2
**rube (2)**
30:19;60:9
**rubes (1)**
30:11
**Rule (9)**
16:3;40:15;41:6;

Case: 19-30088    Doc# 9538    Filed: 11/18/20    Entered: 11/18/20 15:47:45    Page 113
of 118

53:16;74:6;76:14;
80:14,21;88:24
**rules (1)**
21:7
**ruling (3)**
52:6;76:8,9
**rulings (2)**
9:12;11:17
**run (3)**
57:5;71:6;82:13

## S

**S-3 (1)**
92:8
**sail (1)**
41:20
**sake (2)**
5:6;96:24
**salad (1)**
94:18
**sale (4)**
8:18,18;63:9;66:9
**same (11)**
7:5;12:14;15:22;
27:2;43:16;49:18;52:7;
77:24;82:20;84:18,21
**SAN (2)**
3:1;97:4
**satisfy (1)**
82:9
**savings (1)**
61:8
**saw (5)**
23:3;45:6;96:22;
97:3,3
**saying (12)**
19:12;25:15;36:11;
45:19;48:8;71:20;
73:15;75:2;90:1,20;
95:19;98:22
**scare (2)**
39:7,7
**scheme (1)**
96:5
**school (1)**
37:25
**scrap (1)**
28:18
**screen (9)**
19:4;20:7,9;25:22,
22;50:6;57:13,15;
68:20
**scrutiny (1)**
93:2
**searching (1)**
22:15
**second (8)**
3:9;25:8;30:7;41:19;
43:18,24;65:25;79:19
**seconds (4)**
68:25;85:25;86:1;
87:25

**secret (1)**
27:3
**Section (1)**
13:14
**securities (22)**
14:9,11;29:22;33:6,
13;55:10;56:19;62:17;
63:1,7;72:6,16;74:5,
11;76:23;78:18,22;
79:15,16,17;88:11;
97:21
**security (1)**
59:6
**seeking (4)**
73:6,6;76:18,21
**seeks (1)**
76:24
**seem (2)**
3:20;76:4
**seems (5)**
28:6;45:5;65:12;
73:2;93:11
**select (1)**
38:3
**selection (1)**
37:16
**self-interest (1)**
49:5
**send (10)**
6:19,24;7:19;9:24;
10:5;34:21;38:24;39:5;
63:15;72:20
**sending (1)**
26:14
**senior (1)**
60:22
**sense (8)**
9:1;27:16;56:3;70:9;
83:25;84:2,24;95:23
**sensible (1)**
59:20
**sensitive (1)**
8:20
**sent (1)**
94:4
**Separate (6)**
37:20,21;38:1;71:25;
80:8;85:4
**separately (2)**
61:15;66:7
**sequentially (2)**
16:1,15
**series (1)**
61:16
**serious (1)**
31:7
**service (1)**
61:7
**services (1)**
60:24
**set (3)**
9:3;73:7;96:17
**sets (1)**

7:15
**setting (1)**
37:13
**settle (6)**
11:20;15:2;17:1;
18:5;44:22;63:17
**settled (2)**
40:1;67:25
**settlement (24)**
5:16;6:24;7:4;9:8,9,
16,23;10:5,15,16;13:1,
2,5;17:5,6;37:12,13;
46:24;55:9;59:8;63:11,
15;67:24;71:16
**settlements (4)**
12:23,24;17:8,9
**settling (1)**
56:23
**seven (2)**
45:6;50:21
**several (3)**
49:24;54:23;64:6
**Shall (1)**
20:23
**share (4)**
20:1;27:19;32:1;
50:4
**shared (1)**
14:1
**shareholder (1)**
10:1
**shareholders (3)**
29:21;44:10;54:6
**shares (17)**
7:7;17:14;18:3,6,7;
27:1,11;32:12;33:25;
34:17;77:25;79:2;
82:12,13;90:16;98:12,
25
**sharing (3)**
49:22,25;50:1
**shifting (1)**
92:1
**shocked (1)**
95:22
**shoehorn (1)**
74:5
**short (3)**
15:15;23:14;70:3
**shortly (2)**
6:23;63:16
**short-term (1)**
64:13
**shot (1)**
16:10
**show (3)**
27:21;53:24;88:11
**showed (1)**
70:5
**shut (1)**
92:16
**sic (1)**
77:5

**side (14)**
26:12;27:18;28:11,
13,13;45:7;70:13;83:3,
4,6,9,14;88:11;92:19
**sided (1)**
37:9
**sides (1)**
53:24
**sieve (1)**
26:19
**sign (2)**
45:15;90:20
**signal (1)**
4:2
**significance (1)**
66:19
**similar (4)**
5:19;7:23;31:11;
64:10
**similarly (1)**
61:24
**simple (4)**
5:19;6:24;73:8,13
**simply (4)**
74:6;79:9;81:7;
82:15
**single (7)**
80:23,23;81:1,4;
82:24,24;85:4
**sit (2)**
20:6;92:16
**sitting (1)**
37:2
**situated (1)**
61:24
**situation (5)**
41:5;44:10,11;82:3;
98:15
**situations (3)**
7:23;80:3;84:19
**six (11)**
12:25;32:21;37:12,
14,16;39:9;40:2;50:20;
53:21,22;74:14
**sixty (1)**
6:21
**sixty-five (1)**
31:5
**size (2)**
6:12,17
**skilled (1)**
69:3
**Slack (141)**
3:6,7,8,9,12;4:1,13,
22,24,25;5:5,10,12,13;
6:2,7,9;7:11,14,17,24;
8:7;9:7,22;10:4,21;
11:4,7,12;12:6,17,19;
14:18,21;15:14,16,24;
16:5,8,19,21,23;17:12,
16,25;18:9,11,13;19:7,
12,23,25;21:6;25:6;
28:19;30:8;36:24;

38:11;39:2;41:13,13;
42:20;43:1,4,5,20,25;
44:3,5;45:1,8,10,18,19,
22,22,23;46:2,5,8;47:6,
6,11,13,17,20,24;
53:25;54:2,23;55:8;
56:13;57:13;64:23;
65:4;67:16;68:18,21,
24;69:5,18,21;70:17,
19;71:2,11,20;72:18;
73:4,20,21;74:1;75:8,9,
13,17,23;76:2,13;
77:10,14,19;78:2,14,
18,24;79:12;83:17;
85:8,10,13,18;88:21;
89:20;95:19;96:22;
97:6,7,10;99:6,9
**Slack's (3)**
23:4;30:4;53:20
**sleep (1)**
68:12
**slide (8)**
25:18;32:18;33:25;
37:11;39:10;40:5;42:1;
47:7
**slides (5)**
12:23;25:23;33:22;
42:2;73:22;76:15;
79:23
**slightly (2)**
26:14;88:16
**slow (1)**
64:4
**small (4)**
7:21;19:3;29:3;
46:25
**smaller (2)**
29:21;64:12
**So-and-so (1)**
38:4
**so-called (2)**
32:24;38:19
**society (2)**
30:14,16
**sold (6)**
7:7;27:11;31:5;
35:12;55:19;63:4
**solely (1)**
88:17
**solve (2)**
56:22;89:25
**solvency (1)**
55:16
**solvent (5)**
55:13,14,15,23;77:3
**solves (1)**
89:24
**somebody (13)**
4:18;8:22;18:2;22:8;
23:19;28:10;36:23;
40:24;41:2;60:8,10,11;
94:25
**somebody's (1)**

Case: 19-30088    Doc# 9538-4 Filed 11/18/20    Entered 11/19/20 12:44:45    Page 4
of 118

30:19
**somehow (2)**
51:9;97:24
**someone (9)**
3:14,18;23:11;31:19;
38:20;69:15;78:10;
86:20;95:22
**Sometimes (1)**
18:24
**somewhere (2)**
38:21;40:17
**soon (2)**
8:1;17:15
**sooner (1)**
66:24
**sophisticated (3)**
35:3;48:11;90:14
**sorry (8)**
22:14,22;24:1;62:20;
73:23;78:2;85:23;
86:11
**sort (14)**
5:23;28:20;29:25;
39:2;47:20;55:23;
59:24;71:16;74:7;83:1;
92:19;94:12,14;95:9
**sought (2)**
76:16,17
**sounds (1)**
28:6
**source (2)**
42:14;47:8
**speak (8)**
31:20;62:3;67:10,19,
19,20;80:4,5
**speaking (3)**
21:18;40:21;50:7
**speaks (1)**
60:4
**special (2)**
32:9;33:15
**specialized (2)**
55:1;59:15
**specific (2)**
19:17,19
**specifically (3)**
69:19;80:7;81:24
**specified (3)**
81:17,21,24
**speculation (3)**
48:9,14,15
**speed (2)**
56:6,21
**spend (4)**
40:9;65:2;68:13;
83:19
**spent (3)**
15:20;66:4,11
**spirit (1)**
94:13
**split (1)**
70:22
**spoke (2)**

70:23,24
**square (4)**
74:3,9,25;81:15
**stand (3)**
42:20;48:12;62:4
**Standard (1)**
39:3
**standards (3)**
79:25;80:16;81:11
**stands (2)**
92:12;99:7
**start (9)**
4:2,13;5:10,15;8:1;
65:15;68:1;70:20,21
**started (2)**
53:1;83:17
**starting (2)**
8:10;71:11
**state (5)**
58:1,10,18;65:9;66:4
**stated (2)**
64:11,11
**statement (7)**
34:16;42:15;70:8;
86:5;87:21,24;88:18
**statements (2)**
32:2;66:23
**statistic (1)**
42:17
**statistics (1)**
42:8
**status (1)**
13:7
**stay (3)**
20:8;24:10;57:12
**stayed (1)**
53:3
**steaming (1)**
60:6
**stellar (1)**
54:10
**step (3)**
6:10,22;13:10
**Stephen (1)**
48:6
**steps (1)**
35:8
**stew (1)**
96:2
**stick (1)**
41:23
**still (10)**
3:10;10:18,25;11:10;
15:7;31:14;34:3,19;
53:13;57:3
**stipulation (1)**
46:7
**stock (31)**
10:1;14:17;17:14,17,
19,21,22,22;18:2;31:5,
13,18;32:3,6,10,12;
35:12,12;55:18,20,20;
63:4,4,9;77:7;78:5,6,

10;82:8;84:9;98:25
**stockholder (1)**
31:24
**stopping (1)**
38:24
**straightened (1)**
75:15
**straightforward (4)**
62:16,20,24;63:1
**strategy (1)**
61:14
**strength (1)**
32:16
**strengths (1)**
44:21
**strictly (1)**
26:19
**strike (1)**
70:1
**strong (1)**
42:12
**structure (2)**
51:8;55:9
**stuff (1)**
36:20
**subject (2)**
51:21;86:8
**subjects (1)**
18:23
**submission (2)**
9:20;88:10
**submit (7)**
22:6;56:11,24;65:3;
66:17;67:8;93:1
**submitted (5)**
49:17;61:4;66:16;
70:18;99:7
**submitting (1)**
86:4
**subsequent (1)**
87:18
**subset (2)**
29:13;41:6
**substance (1)**
55:22
**substantial (1)**
96:18
**substantive (2)**
7:9;12:22
**successful (2)**
42:18;43:18
**sufficient (1)**
72:15
**Suffolk (1)**
81:3
**suggest (3)**
12:9;30:9;70:1
**suggested (1)**
82:11
**suggesting (1)**
48:17
**suggestion (2)**
26:12;65:17

**suit (1)**
13:12
**summarize (1)**
53:11
**summary (1)**
93:21
**supply (1)**
86:19
**support (2)**
83:11;86:13
**suppose (1)**
10:19
**Supreme (4)**
52:11;74:13;86:25;
94:4
**sure (15)**
8:21;15:1;17:23;
21:1;42:2,2;53:3;
64:24;75:13;83:2,18;
86:20;89:14;96:19;
98:6
**surprisingly (1)**
25:7
**suspect (1)**
96:21
**switch (1)**
43:2;49:17;68:18
**swoop (1)**
33:2
**synthesis (1)**
53:15
**system (1)**
23:5
**systems (1)**
61:6

**T**

**table (2)**
27:24;36:23
**talk (2)**
13:4;36:24,24;41:13;
43:11,11;45:15;47:17;
51:6;79:24;83:18;
96:22
**talked (3)**
13:4;71:24;79:20
**talking (9)**
8:13;10:20;14:3;
15:20;36:19;44:9;51:7;
80:15;83:18
**talks (1)**
56:13
**teaching (1)**
86:25
**technique (1)**
4:20
**Technologies (1)**
60:23
**technology (1)**
60:23
**teed (2)**
41:22;93:17

**telling (1)**
67:4;83:8,13;92:11
**ten (5)**
31:25;32:1;33:18;
50:23;51:2
**tennis (2)**
68:9,13
**tent (1)**
39:11
**tentative (2)**
93:4,4
**terminate (1)**
19:16
**terms (6)**
6:24;24:21;26:8;
44:22;54:19;82:18
**testified (2)**
92:7,23
**testify (2)**
98:24,25
**testimony (1)**
74:15
**Thanks (1)**
48:2
**theirs (1)**
37:8
**theory (1)**
34:8
**thereafter (1)**
6:23
**there'd (1)**
42:15
**therefore (2)**
64:5;93:13
**there'll (1)**
36:13
**thinking (1)**
34:10
**third (2)**
11:1;51:7
**thirty (13)**
5:11;7:25;8:4,12,15,
16;24:25;25:3;50:3;
68:21;85:25;86:1;
87:25
**thirty- (1)**
45:5
**thirty-seven (1)**
45:2
**Thomas (1)**
99:6
**thorough (2)**
19:1;53:11
**thoroughly (1)**
99:4
**though (5)**
21:11;38:16;51:15;
66:20;74:19
**thought (5)**
15:21;56:20;65:23;
92:5;96:15
**thoughts (2)**
68:15;96:14

Case: 19-30088    Doc# 9538-4    Filed 11/18/20    Entered 11/19/20 12:44:45    Page 116
of 118

**thousand (1)**
83:2
**thousands (6)**
12:12;17:2,8,9;
44:12;61:9
**three (7)**
21:8;39:15,17;50:25;
86:14;87:7;94:18
**throughout (1)**
18:23
**throwing (1)**
92:25
**timekeeper (1)**
50:22
**times (9)**
18:24;27:23;40:11;
41:7;54:19,24;56:19;
69:14;83:2
**Time's (1)**
60:17
**timetable (1)**
5:16
**timing (3)**
4:23;5:23;18:3
**tiny (1)**
10:20
**today (6)**
20:2;52:2;61:12;
63:15;67:16;70:15
**together (5)**
15:22;26:5;56:8,10;
71:21
**told (2)**
19:1;87:2
**tomorrow (1)**
76:8
**took (2)**
93:24;95:21
**tools (1)**
29:1
**tortured (1)**
76:16
**tossed (2)**
23:14;94:3
**total (1)**
39:12
**totally (5)**
32:17;37:8,21;51:21;
99:1
**Tough (5)**
30:20;43:19;44:4,4;
92:22
**tougher (1)**
36:3
**toxic (1)**
55:22
**track (1)**
33:20
**tracks (1)**
38:1
**trade (1)**
8:18
**tradeoffs (1)**

39:15
**trading (8)**
6:11;39:2,4,4;63:16;
65:1;72:11;88:12
**traditional (12)**
14:14;30:9;49:8,8;
55:24;63:22;66:6,23;
70:9;77:24;79:6;80:2
**traditionally (1)**
77:8
**train (1)**
38:24
**transfer (3)**
82:12;98:11,23
**translates (1)**
18:3
**traps (1)**
61:17
**traveled (1)**
53:13
**Travelers (1)**
87:1
**treat (1)**
52:19
**treated (2)**
27:2;81:22
**treatise (2)**
79:14;80:19
**treatment (3)**
40:6;81:20;82:6
**trial (1)**
96:5
**tricky (1)**
89:10
**tried (3)**
43:23;74:5;96:6
**tries (1)**
30:19
**trouble (3)**
4:16;29:8;62:21
**true (3)**
30:5;35:18
**trust (2)**
14:4;94:10
**truth (7)**
26:7;93:9,24;94:14;
95:11,17;96:5
**try (18)**
5:18;11:19;16:1;
28:12,18;31:16;33:25;
49:9,10,21;53:3;55:24;
59:22;66:23;83:12;
88:4;90:15;97:10
**trying (11)**
15:8;22:10;28:21;
30:7;46:13,16;69:14;
84:1,17,21;88:8
**turn (9)**
11:22;57:16;62:9;
65:5;68:23;69:18;74:1;
76:13;81:13
**turned (1)**
57:25

**twelve (1)**
74:17
**twenty (2)**
31:6;78:4
**twenty-four (1)**
7:15
**twice (1)**
33:11
**twisting (2)**
53:24;56:9
**two (31)**
12:2;15:8,22;27:11;
32:4,17;38:18;40:21;
41:7,7,9;45:12;50:13,
14,20;58:20;70:16;
74:5;83:19;84:18;85:3,
11,21;86:13;88:14,25;
97:7,12;98:5,17,18
**two-year (1)**
64:5
**type (2)**
8:14;12:10
**typical (1)**
16:11
**typically (2)**
74:11;80:18

**U**

**UK (1)**
58:3
**ultimately (1)**
47:4
**unavailable (1)**
22:11
**uncertainty (1)**
90:16
**uncertified (1)**
13:12
**unclear (1)**
52:15
**under (52)**
5:16;6:14;9:1,13,16,
19;10:10;11:4,9,12,16;
16:3;17:14;18:2,2;
19:3;21:6;32:19;37:24;
40:3,15,16;41:8,21;
42:8;48:11;56:4,5;
59:21;67:5;72:16;
74:13;77:20;78:18;
79:6,15,17,21;80:7,25;
82:20,20;83:11;88:9,
24;89:11;90:2;91:8;
94:9;95:17,19;96:4
**underlying (1)**
55:17
**Understood (1)**
22:25
**undertake (1)**
8:24
**underway (2)**
31:9,10
**underwriters (2)**

13:13,14
**unfair (1)**
61:13
**uniform (2)**
60:13,16
**unique (1)**
97:24
**universal (2)**
27:24,24
**unless (3)**
19:21;67:6;76:7
**unlikely (1)**
96:25
**unmute (5)**
21:14;57:22;58:6,11;
60:19
**unmuted (2)**
48:3;57:23
**unnoticed (1)**
98:6
**unrepresented (1)**
28:1
**unsophisticated (1)**
48:14
**unsuccessful (2)**
13:7;96:4
**untimely (1)**
7:7
**unusual (1)**
96:17
**unusually (1)**
45:4
**up (52)**
3:11;5:23;6:12;7:8;
9:3;10:15;18:16;24:4;
25:23;30:12;36:17,20;
37:11,13,25;38:11;
39:5;41:13,22;46:1,22;
48:12;51:1;57:3;60:6,
17;63:10;64:4,17;
67:10,18,19,19,20;
69:15;70:5;73:7,21;
76:15;78:5;79:22;
83:16;86:17;88:6,8;
89:22;92:3,16;93:17;
95:4;96:2;98:14
**uphill (1)**
27:21
**upon (7)**
10:2;12:4;18:3;27:1;
35:11;64:18;87:21
**upset (1)**
33:21
**urge (2)**
61:12,25
**use (8)**
30:7;43:6;46:21;
74:19;83:24;95:22;
97:22,25
**used (9)**
54:18;74:21,23;
76:20;77:22;80:2,14;
87:25;91:5

**uses (1)**
61:14
**using (3)**
74:11;79:7;97:16
**usual (1)**
96:16
**usually (2)**
74:14;81:6

**V**

**valid (2)**
7:19;67:6
**value (2)**
78:10;95:13
**valuing (1)**
63:19
**various (3)**
11:10;26:2,3
**vast (1)**
72:13
**via (2)**
26:18;42:11
**viable (1)**
53:13
**vice (1)**
60:22
**victim (3)**
31:19,20,21
**victims (5)**
31:11;54:5;62:15;
64:6;94:8
**video (1)**
57:24
**view (7)**
5:9;10:10;30:21;
69:21;71:24;91:3;96:1
**views (1)**
44:20
**vindicated (1)**
53:4
**violation (2)**
82:2;86:25
**violations (1)**
14:9
**voice (1)**
62:4
**volumes (2)**
5:7,7
**voluntarily (1)**
17:4
**vote (2)**
29:10;30:25
**voted (4)**
29:11,11,12,15
**voting (1)**
30:24

**W**

**wait (7)**
6:4;8:10;10:7;15:12;
37:14;62:18;65:5

Min-U-Script®

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(16) thousand - wait

Case: 19-30088    Doc# 9534-1    Filed: 11/18/20    Entered: 11/18/20 15:44:48    Page 115
of 118

Case: 19-30088    Doc# 9534    Filed: 11/18/20    Entered: 11/18/20 15:42:46    Page 145
of 148

Case: 19-30088    Doc# 9532-4    Filed: 11/12/20    Entered: 11/12/20 22:44:15    Page 117
of 118

**waiting (3)**
22:7,24;57:21
**wants (11)**
27:13;38:15;41:3;
46:20;51:23;53:18;
56:15;71:15,22;73:19;
74:22
**Warden (17)**
50:24;57:9,18,21,23;
58:1,2,2,21,23;59:1,3;
60:16,17;64:11;68:20;
78:4
**way (39)**
8:2;12:7;13:23;
14:13,14;16:8,12,13;
26:13;27:20;28:15;
30:6;41:22,22;43:13;
45:21;49:11;51:21,22;
52:12;53:11;56:1;62:6;
65:13;67:2;73:2,6,14;
74:23;76:11;80:14;
87:3;89:11;92:22;
94:19;95:19;96:16,19,
24
**ways (3)**
13:5;45:12;60:1
**website (1)**
73:7
**WEDNESDAY (1)**
3:1
**week (1)**
21:11
**weeks (3)**
39:9;70:16;85:12
**weigh (1)**
27:5
**Weil (3)**
5:14;48:6;54:9
**welcome (1)**
65:20
**well-known (1)**
53:23
**whatever's (1)**
37:19
**What's (21)**
27:14,15;28:21;
29:23;36:22;57:1;
63:20,22;64:8,14;66:2;
67:4,5,9,18;68:2;72:4,
10;79:5;83:21;86:9
**whatsoever (1)**
82:17
**whenever (1)**
11:3
**Whereas (2)**
55:12,18
**Whereupon (1)**
99:11
**whichever (1)**
35:24
**whole (9)**
10:2;34:10,21;38:25;
56:14,22;80:15;81:9;

92:19
**widget (1)**
55:17
**wild (1)**
55:22
**willing (3)**
64:8;70:7;75:2
**win (5)**
14:8,15;27:5;52:23;
89:14
**window (1)**
93:1
**winners (1)**
77:5
**winnowing (1)**
61:18
**wish (2)**
22:20;51:2
**wishes (2)**
11:24;57:19
**withdraw (2)**
52:3;76:10
**within (5)**
6:21;7:3;9:7;32:11;
53:2
**without (10)**
7:22;9:11;12:2;
13:18;31:7;46:17;
67:12,19;72:25;92:20
**word (3)**
48:4;60:14;76:10
**words (7)**
9:23;40:18;41:4;
55:1;74:23;78:19;94:1
**work (16)**
16:18,21,25;23:5;
25:11;30:6;38:25;
40:24;49:10;65:13;
68:2;73:14;74:4,4,9;
87:18
**worked (8)**
12:13;36:6,7,8;
55:25;56:8;58:24;87:3
**working (1)**
57:24
**works (2)**
87:17;96:19
**world (5)**
28:14;30:4,4,4;35:19
**Worldcom (1)**
33:13
**Worldwide (1)**
60:22
**worried (1)**
93:18
**worry (1)**
48:19
**worth (4)**
13:25;37:4;54:4,21
**worthless (2)**
78:6,7
**Wrigley (2)**
96:23;97:3

**write (2)**
69:25;90:1
**wrong (19)**
15:5;25:15;27:14,15;
28:21;29:6,7;31:1,6;
49:10;63:20,22;64:8,
10,14,15;67:15;96:21,
24

**Y**

**year (3)**
13:2;54:19;68:11
**years (3)**
41:3;64:6
**yelled (1)**
87:23
**Yep (1)**
10:21
**yesterday (5)**
4:17;6:1;34:15;
53:14;59:4
**yield (1)**
49:24
**Yogi (1)**
38:9
**York (1)**
5:13

**Z**

**zero (3)**
31:1,4;81:8
**Zinser (2)**
80:5,6
**Zoom (2)**
21:20;58:23

**1**

**1 (6)**
41:16;45:12;66:18,
19;67:3,11
**1,000 (2)**
57:2,3
**1.5 (1)**
82:13
**10 (1)**
78:4
**100 (2)**
40:11;98:14
**100,000 (4)**
10:19;18:1;89:23;
90:6
**100,000- (1)**
27:10
**100,000-dollar (1)**
60:10
**10b- (1)**
26:4
**10b2 (1)**
17:13
**10b-5 (1)**

26:4
**11 (2)**
13:15;14:25
**12 (1)**
47:25
**12,000 (1)**
31:8
**13 (1)**
47:25
**150 (1)**
29:10
**15th (1)**
66:8
**18 (1)**
3:1

**2**

**2 (3)**
6:3,5;93:23
**2,000 (2)**
8:4,6
**20 (1)**
60:12
**200 (2)**
54:4;94:25
**2015 (2)**
32:11;66:8
**2018 (2)**
32:11;66:8
**2020 (5)**
3:1;66:18,19;67:3,11
**23 (2)**
53:16;88:24
**23b1 (3)**
74:6;80:21;82:22
**23b1a (10)**
74:19;76:14,20;79:9,
15,19,22,22;80:7;82:20
**23b1b (5)**
74:19;80:25;81:7,13;
82:20
**23b3 (2)**
74:11,15
**29th (1)**
66:8

**3**

**3 (2)**
59:4;60:4
**3,000 (4)**
27:12;42:15;46:21;
47:8
**30,000 (6)**
10:23,23,24;11:9,23;
27:12
**300 (1)**
27:12
**34 (1)**
59:14
**39 (1)**
23:18

**4**

**400 (3)**
13:25;18:5,7

**5**

**5 (2)**
26:5;46:10
**5,000 (2)**
4:19;16:2
**500 (1)**
18:3
**502 (1)**
67:5
**510b (1)**
26:20
**5-10B (2)**
77:4,5
**550594 (1)**
23:12
**550694 (2)**
23:14,25

**6**

**6,000 (1)**
16:22
**60,000 (1)**
10:23
**600 (1)**
82:11

**7**

**7,000 (16)**
8:4;25:25;29:12;
32:8,13,20,21;33:2;
34:9;40:2;48:10;56:23;
59:9;60:5;96:21,23
**7023 (12)**
13:9;46:13,18;49:17;
53:6,9;70:24;73:22;
74:2,2;76:9;77:3
**723 (3)**
15:18;16:3;41:6

**9**

**99 (1)**
40:11
**9th (2)**
80:6,13

Case: 19-30088    Doc# 9538-4    Filed 11/19/20    Entered 11/19/20 12:44:45    Page
118 of 118