William B. Abrams
end2endconsulting@gmail.com
2041 Stagecoach Rd.
Santa Rosa, CA, 95404
Tel: 707 397 5727

*Pro Se Fire Victim Claimant and Party to related proceedings before the California Public Utilities Commission and the California Office of Energy Infrastructure Safety*

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

In re:

PG&E CORPORATION,

     -and-

PACIFIC GAS AND ELECTRIC
COMPANY,

              Debtors.

☐ Affects PG&E Corporation
☐ Affects Pacific Gas and Electric Company
☑ Affects both Debtors

\* *All papers shall be filed in the lead case, No. 19-30088 (DM)*

Bankr. Case No. 19-30088 (DM)
Chapter 11
(Lead Case)
(Jointly Administered)

**MOTION OF WILLIAM B. ABRAMS PURSUANT TO BANKRUPTCY RULE 5004 AND 28 U.S.C. SECTION 144 AND 455 AND BANKR. LOCAL RULE 3-14 FOR ENTRY OF AN ORDER AUTHORIZING THE RECUSAL OF THE HONORABLE DENNIS MONTALI**

**Response Deadline:**

November 30, 2022 (Pacific Time)

**Hearing If Order Granted:**

December 13, 2022 (Pacific Time) or as determined by the Court

## PRELIMINARY STATEMENT

Pursuant to Bankruptcy Rule 5004, 28 U.S.C. §§ 144 and 455 and Bankr. Local Rule 3-14, William B. Abrams ("**Abrams**"), as a pro se claimant, respectfully moves to recuse the Honorable Dennis Montali ("**Judge Montali**") from presiding over any further proceedings in this action and for other and further relief as the Court deems just and proper. In support, Abrams submits the "Jurisdiction and Memorandum of Law" dated November 15, 2022, which is incorporated below, the proposed order (Exhibit A) and the "Affidavit of William B. Abrams in Support of Motion of William B. Abrams Pursuant to Bankruptcy Rule 5004 and U.S.C. Section 144 and 455 and Bankr. Local Rule 3-14 for Entry of an Order Authorizing the Recusal of the Honorable Dennis Montali" which is filed contemporaneously with this motion.

As described herein, the Hon. Judge Montali holds "personal biases" and "prejudices" that may reasonably be considered as having interfered with the just administration of this case. The relationships that led to these reasonably perceived biases and prejudices were referenced by the Press Democrat on October 6, 2022 reporting "*How most – but not all – fire victims gave up the right to challenge their compensation in court*" and are described with more detail within this Motion.[1] It is clear that a reasonable person with knowledge of the facts would question Judge Montali's impartiality within this case. Therefore, the Court should consider the extent to which these biases prevented Judge Montali from impartially deliberating and ruling upon motions regarding judicial review, disclosure requirements and discovery issues which are central to justice for fire victims and other parties within this case. Moreover, the Court should consider the degree to which the denial of disclosures and discovery rights continues to undermine the manner in which the Court exercises its authority related to Article 1.6 of the Trust agreement stating that "*this Court shall have exclusive jurisdiction with respect to any action relating to or arising out of the Trust…*" The specific evidence of biases, prejudices and conflicts will be detailed within this "*Motion of William B. Abrams Pursuant to 28 U.S.C. Section 144 and 455 for Entry of an Order Authorizing the Recusal of the Honorable Dennis Montali*" (the "**Motion**" or "**Recusal Motion**"). However, the mere fact that

---

[1] See Press Democrat, October 6, 2022, "How Most -but not all – Fire Victims Gave up the Right to Challenge their Compensation in Court", https://www.pressdemocrat.com/article/news/how-most-but-not-all-fire-victims-gave-up-the-right-to-challenge-their/

Judge Montali holds personal relationships with all but one of the individual fire victims that received the rights and remedies for judicial review certainly should lead us to "reasonably question" the Court's "impartiality" and ability to deliver justice within this case.

This Motion for Recusal puts forward evidence that Karl Knight and Debra Grassgreen (husband and wife) (the "**Knight Family**") as well as Eric and Julie Carlson (husband and wife) (the "**Carlson Family**") had and hold relationships with Hon. Judge Montali, hosted honorary events for Judge Montali, were given exclusive access to certain undisclosed documents and were granted other advantages that allowed them to secure judicial review rights and remedies through the Court. Importantly, no other victims were given these financial and judicial advantages other than these claimants with ties to Judge Montali. Clearly, these relationships should have been disclosed by Judge Montali and led him to recuse himself from ruling on any issues related to judicial review. **That said, it is important to state that the duty to disclose these relationships rests solely upon Judge Montali and not these four victim claimants.** As a point of fact, all other 70,000+ victims were denied judicial review by Judge Montali despite Abrams' repeated motions to ensure the equitable application of these rights by the Court. These motions, including the "*William B. Abrams Motion for Just Treatment of Victims through the Fire Victim Trust Oversight Committee and Equitable Application of the Judicial Review Provisions Pursuant to U.S.C. §§ 1123(A)(4)*" [Dkt. 8247], were denied without hearing including related motions calling for disclosures and discovery.

Additionally, and as later described within this Motion, the fact pattern stemming from these judicial review decisions is reasonably perceived as having led to unfair Court defined process constraints, scheduling imbalances and a general lack of due process for victims particularly as it relates to central issues of disclosure and discovery. Abrams, PG&E victims and other reasonable people with knowledge of the facts certainly have good cause to question the degree to which Judge Montali's biases and prejudices may have led and may continue to lead to rulings lacking impartiality. After considering the evidence presented within this motion, the Court should recognize more than sufficient grounds for Judge Montali to be recused from this case so henceforth PG&E victims may be more assured that justice will be administered through The United States Bankruptcy Court.

Judge Montali should recuse himself from this case pursuant to 28 U.S.C. § 455(a) which states "*any justice, judge, or magistrate judge of the United States **shall disqualify** himself in any proceeding **in which his impartiality might reasonably be questioned**"* and/or should recuse himself

pursuant to 28 U.S.C. § 455(b)(1) which states "*he **shall also disqualify himself**... where he has a personal bias*" (emphasis added). However, if Hon. Judge Montali does not recuse himself, he should be recused pursuant to 28 U.S.C. § 144 which states: "*Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, **such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.***" (emphasis added). Here, people with knowledge of the facts will reasonably question the degree to which Judge Montali holds a personal bias against Abrams and other victims and in favor of certain parties that would prefer that laws regarding disclosures and discovery are not enforced by the Court. Without a doubt and through this lack of enforcement, certain parties were more readily able to execute confidential agreements and gain undisclosed financial advantage hidden from view of PG&E victims and the public. Therefore, it is reasonable to question the degree to which certain parties continue to gain financial advantage due to Judge Montali's perceived predisposition to rule against disclosure and discovery motions that rely upon laws that might also be leveraged to shed light on Judge Montali's relationships relative to judicial review. The laws which were not enforced and/or inequitably applied by the Court include but are not limited to Bankruptcy Rule 2019, Bankruptcy Rule 2014, 11 U.S.C. Section 1123(a)4 and Section 1125(b). Additionally, it is reasonable for the Court and parties to consider the extent to which these biases may have prejudiced decisions related to the confirmation of the "Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization Dated June 19, 2020" [Dkt. 8048] (the "**Plan**") pursuant to 11 U.S.C. Sections 1126 and 1127 given that plan confirmation requires "*disclosures under Section 1125.*"[2]

In accordance with Section 11.1 of the Plan, "***the Bankruptcy Court shall retain jurisdiction (without prejudice** to the rights of any Entity to assert that jurisdiction is exclusive) of all matter arising under, arising out of, or related to the Chapter 11 Cases and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code*" (emphasis added). This includes but is not limited to jurisdiction over Article XI of the Plan to (1) "*hear and determine any dispute involving the Wildfire Trusts, including but not limited to the interpretation of the Wildfire Trust Agreements,*" and (2) "*hear and determine any application to modify the Plan*" and (3) "*enter a final*

---

[2] See 11 U.S.C § 1126(b)(2) and 11 U.S.C § 1127(f)(2) "*The plan, as modified, shall become the plan only after there has been disclosure under section 1125*"

*decree closing the Chapter 11 Cases.*"[3]  Given that the Court "*shall retain jurisdiction without prejudice*" in this manner, the recusal of Judge Montali is warranted given that his impartiality is reasonably questioned relative to the treatment of PG&E Victims and the fair execution of the Plan.

## JURISDICTION AND MEMORANDUM OF LAW

This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, the Order Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges, General Order 24 (N.D. Cal.), Rule 2004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), Rule 2004-1(a) of the Bankruptcy Local Rules for the United States District Court for the Northern District of California (the "**Bankruptcy Local Rules**"), Paragraph 18 and Paragraph 78 of the Confirmation Order, Section 6.7 and Section 11.1 of the Plan, and Section 1.6 and Section 8.20 of the Fire Victim Trust Agreement.  Under Section 11.1(u) of the Plan, the Court retained jurisdiction "[t]o hear and determine disputes arising in connection with or related to the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, any transactions or payments contemplated herein, or any agreement, instrument, or other document governing or relating to any of the foregoing," "[t]o take any action and issue such orders as may be necessary to construe, enforce, implement, execute, and consummate the Plan or to maintain the integrity of the Plan following consummation," "[t]o hear and determine any rights, claims, or Causes of Action held by or accruing to ... the Fire Victim Trust pursuant to the Bankruptcy Code or any federal or state statute or legal theory," and "[t]o hear and determine any dispute involving the Wildfire Trusts, including but not limited to the interpretation of the Wildfire Trust Agreements." Plan at § 11.1(i), (k), (t) & (u).[4]

---

[3] See "Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization Dated June 19, 2020", June 20, 2020, [Dkt. 8053-1] pg. 83-85

[4] Under Section 11.1 of the Plan, the Court also retained "jurisdiction ... of all matters arising under, arising out of, or related to the Chapter 11 Cases and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes: ... (c) [t]o ensure that distributions to holders of Allowed Claims are accomplished as provided herein; (d) [t]o consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim, including any Administrative Expense Claims; ... (m) [t]o determine such other matters and for such other purposes as may be provided in the Confirmation Order; ... (p) [t]o hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code; ... (r) [t]o determine any other matters or adjudicate any disputes that may arise in connection with or are related to the Plan, the Disclosure

The Court also has an obligation to consider this matter pursuant to Bankruptcy Rule 5004(a) which states "*Disqualification of Judge. A bankruptcy judge shall be governed by 28 U.S.C. §455, and disqualified from presiding over the proceeding or contested matter in which the disqualifying circumstances arises or, if appropriate, shall be disqualified from presiding over the case.*" Victim claimants like Abrams have the fundamental right to a fair and impartial proceeding. To maintain public confidence in the judiciary and ensure fairness to the parties, it is essential that a judge presiding over a case avoid the appearance of partiality or bias. Typically, cases are randomly assigned to a judge in US district courts. However, it appears within this case that the Debtors requested Judge Montali through the "Notice of Related Cases Pursuant to B.L.R. 1015-1" [Dkt. 3]. Regardless, judges are sometimes assigned to the case but should not preside over it because there may reasonably be an appearance of partiality and generally recuse themselves *sua sponte*. However, if the judge does not do this and parties learn of facts of the case that require it, they may seek to disqualify the judge by filing a motion to recuse or disqualify the judge.

Recusal is required when any circumstance creates an appearance of partiality, even when actual bias may not exist (AT&T Mobility LLC v. Yeager 2015 WL 4460715, at *4 (E.D. Cal. Jul. 21, 2015), citing Preston v. U.S., 923 F.2d 731, 734 (9th Cir. 1991)). If the decision to recuse is close, judges should recuse themselves (In re Chevron USA, Inc., 121 F.3d 163, 165 (5th Cir. 1997); Prince v. Irons, 2020 WL 3051897, at *2 (E.D. La. June 8, 2020)). A judge's apparent partiality based on an extrajudicial source provides a stronger support for a motion to recuse under Section 455(a) than if based on facts that have arisen during litigation (see Bell v. Johnson, 404 F.3d 997, 1005 (6th Cir. 2005)). When evaluating a motion to recuse, courts apply an objective standard and determine whether a reasonable person with knowledge of all the facts of the case would doubt the judge's impartiality (*Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 860 (1988); *Archdiocese of New Orleans Indemnity*, 2021 WL 4460465, at *4).

If a judge has, or appears to have, personal bias or prejudice against a party, that party may move for the judge's recusal (28 U.S.C. §§ 144 and 455(b)(1)). Generally, the alleged bias or prejudice must stem from an extrajudicial source (*Liteky*, 510 U.S. at 550, 554-55). When the judge's

---

Statement, the Confirmation Order, the Plan Supplement, or any document related to the foregoing ... (v) [t]o hear any other matter not inconsistent with the Bankruptcy Code."

alleged bias or prejudice does not arise from an extrajudicial source, a party may still seek recusal when the judge demonstrates a high level of favoritism or antagonism towards a party (*Cohea v. Grannis*, 2015 WL 1729860, at *1 (E.D. Cal. Apr. 15, 2015)).  Similar to a motion to recuse brought under Section 455(a), courts apply an objective standard to determine whether a reasonable person with knowledge of all the facts of the case would determine the judge was biased (*Grove Fresh Distribs., Inc. v. John Labatt, Ltd.*, 299 F.3d 635, 640 (7th Cir. 2002)).  Parties may seek recusal under Section 455(a) simultaneously with recusal under Sections 144 and 455(b)(1) (*Lyman v. City of Albany*, 597 F. Supp. 2d 301, 311 (N.D.N.Y. 2009)).

Here, the Honorable Dennis Montali has jurisdiction to consider his recusal pursuant to 28 U.S.C. § 455(a), 28 U.S.C. § 455(b) and/or 28 U.S.C. § 144.  However, Judge Montali does not have jurisdiction to consider a waiver from parties related to 28 U.S.C. § 455(a) or 28 U.S.C. § 455(b) given that 28 U.S.C. § 455(e) states that "***no justice, judge or magistrate judge shall accept from the parties to the proceeding a waiver of any ground for disqualification enumerated in subsection (b)***. *Where the ground for disqualification arises only under subsection (a), waiver may be accepted provided it is preceded by a full disclosure on the record of the basis for disqualification*" (emphasis added).  Additionally, the Court should consider United Stated District Court Northern District of California Local Rule 3-14, which states that "*Whenever an affidavit of bias or prejudice directed at a Judge of this Court is filed pursuant to 28 U.S.C. § 144, and the Judge has determined not to recuse him or herself and found that the affidavit is neither legally insufficient nor interposed for delay, **the Judge shall refer the request for disqualification to the Clerk for random assignment to another Judge***" (emphasis added).

## BACKGROUND AND FACTUAL BASIS FOR RECUSAL

1.     On June 15, 2005 an American Bankruptcy Institute event was held with "*a delightful evening of wine tasting, featuring smaller production wines and specialty foods where… **Bankruptcy Judges Dennis Montali and Randy Newsome (N.D. Calif.) attended… Debra Grassgreen** of the San Francisco office of Pachulski, Stang, Ziehl, Young, Jones and Weintrab PC chaired the local host committee along with… **Eric Carlson** (Giuliani Capital Advisors).*"[5]  It appears that only these PG&E victims (Mr. Carlson of the Carlson Family and Ms. Grassgreen of the Knight Family) chaired

---

[5] See American Bankruptcy Institute, "From the Director Journal Article July/August 2005", "San Francisco Members Enjoy Wine Tasting", https://www.abi.org/abi-journal/from-the-director-julaug-2005

and hosted events for Judge Montali and Judge Newsome (See Exhibit B).  It does not appear that Judge Montali disclosed these relationships with Ms. Grassgreen or Mr. Carlson before or after deliberating and ruling upon the judicial review rights and remedies to these select victims.

2.     On February 7, 2006 there was an "Order Published" and made public associated with the Imperial Capital Bank Bankruptcy Case.  Here, Abrams notes that Eric Carlson was the Managing Director of Imperial Capital Bank and this case was stated as "before Judge Montali" within this order (see Exhibit C).[6]  It does not appear that Judge Montali disclosed this relationship with Mr. Carlson before or after providing judicial review rights and remedies to these select victims.  Abrams, as a pro se claimant is not privy to court dockets and other electronic records and was only able to access this particular document through a publicly available online search.

3.     Mr. Carlson and Ms. Grassgreen have worked together in prior bankruptcy cases including within the Solyndra Bankruptcy (In re Solyndra LLC, US Bankruptcy Court, District of Delaware Case#11-12799) where Mr. Carlson was Solyndra's "Company Advisor" and Ms. Grassgreen was "Solyndra's Bankruptcy Lawyer."[7]  Ms. Grassgreen has represented core parties within other bankruptcy cases presided over by Judge Montali including the 2015 Exigen Inc. case representing the Trustee and the 2016 RDIO Inc. case serving as the "Committee Counsel."[8]  Most recently, Ms. Grassgreen represented Blue Earth Inc. as the debtor which was presided over by Judge Montali with the latest filing in April, 2021 overlapping with the PG&E Bankruptcy Case.[9]  It also appears that Mr. Carlson was the Financial Advisor for the Debtor during the 2001 PG&E Bankruptcy before Judge Montali (See Exhibit D).[10]  **Abrams is unaware of the extent to which Mr. Carlson and Ms. Grassgreen have had other cases before Judge Montali beyond those described within this Motion.  Similarly, Abrams is unaware of the depth of these relationships given the limited publicly available information and the lack of disclosure from Judge Montali.**

---

[6] See Case#01-04624-TUC-JMM, Order Published February 7, 2006
[7] See "Solyndra Fails to Garner Bids for Sale", Reuters News, January 17, 2012, https://www.reuters.com/article/solyndra-idUSL1E8CI0EF20120118, See "Solyndra Leaders Ahead of Government Won't Get Full Recovery", Bloomberg October 17, 2012, https://www.bloomberg.com/news/articles/2012-10-17/solyndra-lenders-ahead-of-government-won-t-recover-fully?leadSource=uverify%20wall
[8] See Case#13-32281, Exigen Inc., https://www.plainsite.org/dockets/1vceeoqia8/california-northern-bankruptcy-court/exigen-usa-inc/, Case#3:15-bk-31430, RDIO Inc., Nov. 16, 2015, https://www.inforuptcy.com/browse-filings/california-northern-bankruptcy-court/3:15-bk-31430/bankruptcy-case-rdio-inc
[9] See Case#3:16-bk-30296, Blue Earth, Inc., March 21, 2016, https://www.bkalerts.com/recent-bankruptcy-cases/california-northern-bankruptcy-court/3:16-bk-30296/bankruptcy-case-blue-earth-inc
[10] See Bankruptcy Case No. 01-30923-DM, Voluntary Chapter 11 Petition Date, April 6, 2001, http://bankrupt.com/pacificgas.txt

**However, it is very clear that these relationships were substantial and certainly enough for Abrams and other parties to reasonably perceive that biases and prejudices drove key Court decisions.**

4.     On October 24, 2012 Judge Montali and Ms. Grassgreen served as two of the five panelists in "Almost Everything You Wanted to Know About Individual Chapter 11 Cases" at the "86th Annual Conference of Bankruptcy Judges" in San Diego, California.[11]  Abrams is unaware the extent to which Judge Montali has worked with Ms. Grassgreen on bankruptcy related panels, boards, committees or in other capacities.  It does not appear that Judge Montali disclosed the extent of this relationship with Ms. Grassgreen before or after providing judicial review rights and remedies to these select victims.

5.     On January 29, 2019 (the "**Petition Date**"), PG&E Corporation ("**PG&E Corp.**") and Pacific Gas and Electric Company ("**Utility**"), as debtors and debtors in possession (collectively, "**PG&E**" or the "**Debtors**"), commenced with the Court voluntary cases under chapter 11 of the Bankruptcy Code (the "**Chapter 11 Cases**").  **On this same date and in conjunction with petition, the Debtors filed the "Notice of Related Cases Pursuant to B.L.R. 1015-1" [Dkt. 3] in which they requested that Judge Montali be assigned to the case** by stating *The Debtors submit that the 2001 Case and the 2019 Cases are related cases, as defined by Rule 1015-1 of the Bankruptcy Local Rules for the United States District Court for the Northern District of California, and assignment to a single judge would promote efficient administration of the estates and avoid conflicting and inconsistent rulings.*"  **Given this Notice and related statements, it is reasonable to assume that the Debtors and other core parties that benefited from and were satisfied with the rulings in the 2001 case (Case# 01-30923-DM) petitioned to have Judge Montali assigned to avoid "inconsistent" rulings.**  On February 12, 2019, the United States Trustee appointed the Official Committee of Unsecured Creditors (the "**Creditors Committee**").  On February 15, 2019, the United States Trustee appointed an Official Committee of Tort Claimants (the "**TCC**").  Pursuant to the Confirmation Order entered by this Court on June 20, 2020, PG&E's Plan was approved and confirmed under section 1129 of the Bankruptcy Code.

---

[11] See Online Brochure "86th Annual Conference of Bankruptcy Judges", October 24-27, 2012, https://www.pszjlaw.com/media/event/435_2012%20NCBJ%20BROCHURE.pdf

6.      On February 6, 2020 The Court filed the "Order Establishing Scheduling for Disclosure Statement Approval and Plan Confirmation" [Dkt. 5673].  Subsequently on February 11, 2020 the Court filed the "Amended Order Establishing Schedule for Disclosure Statement Approval and Plan Confirmation" [Dkt. 5732].  Within these Court orders it established March 6, 2020 as the "*Deadline for any other parties (e.g., parties other than the Core Parties) to file and serve any Disclosure Statement or Solicitation Objections, which shall be in short, concise bullet points*" and established March 10, 2020 as the "*Deadline to file substantially final forms of each of the Fire Victim Trust Agreement and the Fire Victim Claims Resolution Procedures.*"  While many objection deadlines were established within these orders, nowhere within these orders did it identify dates for objections to Claims Resolution Procedures or indicate that an objection to this Claims Resolution Procedure would be the basis for judicial review considerations.  However, on March 6, 2020, Abrams filed the "William B. Abrams Objection Pursuant to 11 U.S.C §§ 1129(A) and U.S.C. §§ 1125 to proposes disclosure statement for Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization" [Dkt. 6151] and within these papers stated a number of objections to the Claims Resolution Procedures based on the summary referenced therein.  **Abrams and other victims that filed objections to Trust documents and Claims Resolution Procedures and advocated for equitable access for judicial review rather than personal exceptions were not afforded judicial review rights and remedies.**

7.      On April 20, 2020 Abrams filed the "*William B. Abrams Motion to Designate Improperly Solicited Votes Pursuant to 11 U.S.C. §§ 1125(b) and 1126(e) and Bankruptcy Rule 2019*" [Dkt. 6799] which was joined by many parties including those Tort Claimant Committee Members that resigned on "moral grounds."  Within this Motion, Abrams provided clear evidence that Mikal Watts received a line of credit from PG&E investors in direct violation of Bankruptcy Rule 2019, 11 U.S.C. 1125 as well as other laws and bar association rules requiring disclosures of financial conflicts.  Within this motion Abrams attached a transcript from a December 8, 2019 meeting where Mr. Watts described a "line of credit" that was funded by many investors with adverse interests to victims including Centerbridge LLP.  At the time Mr. Watts indicated that he received $100M from these sources but later, after Plan confirmation, contradicted that statement to indicate

that it was closer to "$400M of access" but that he refinanced "to clean it all up."[12]  Judge Montali set the schedule for this Motion through the "Order Shortening Time for Hearing on Motion to Designate" [Dkt. 7049] and provided time for responses from other parties **but did not afford Abrams the opportunity to provide a response by stating "no replies are to be filed."**  Given the evidence presented in the Motion and associated joinders, **Judge Montali could have ordered disclosures or discovery to find out the extent to which financial conflicts may have undermined the victim vote, the eventual plan of restructuring or the Fire Victim Trust but did not.**  Within this same motion, Abrams provided clear evidence of false advertising from victim attorneys' push for a "yes" vote on the Plan including advertisements that stated *"we alone have the power to decide whether to force PG&E to pay the $13.5 billion or to risk little or no payment at all."*[13]  **Despite this clear evidence of false statements and their impact on victim justice, the Court did not order disclosures or discovery or any change in course to correct these falsehoods** and better inform victims regarding the implications of their vote.  This motion was denied.

8.    On May 15, 2020, there was a hearing held on a number of matters including judicial review.  Within this hearing Judge Montali stated the following:

> *"Is there anything in the plan or the disclosure statement that tells the thousands and thousands of people that were solicited, by the way, it doesn't matter what you do, we're going to stick this down your throat under 9019(b)"*[14]

In response to this question, Mr. MacConaghy on behalf of the Official Committee of Tort Claimants stated *"Well, 9019(b) isn't referenced..."*  **It was clear from this statement and others during the hearing that both the Court and core parties were well aware that victims were not informed and indeed were not told in any way that "we're going to stick this [settlements without judicial review] down your throat under 9019(b)."**  It was also never made clear to victims if or how they

---

[12] See KQED *"Attorney for PG&E Fire Victims Funded by Wall Street Firms He's Negotiating Against"*, April 25, 2020 and *"Sharks Are Circling Again': With Wildfires Come Lawyers, and Previous Survivors Have a Warning"*, September 8, 2021

[13] See Dkt. 6799, Exhibit C: "ParadisePost.com Ad to vote and Force PG&E to pay the $13.5B", Joseph Earley, April 16, 2020

[14] See Dkt. 7416, Transcript May 15, 2020, "Hearing on Stipulation by and Among the Plan Proponents, The official Committee of Tort Claimants, The Adventist Health Claimants, The Paradise Related Entities, AT&T, and Comcast Regarding Fire Victim Trust Documents Issues Filed by Adventist Health Systems/West and Feather River Hospital", pg. 57-58, filed May 19, 2020

could secure judicial review. Coincidentally, on the very same May 15, 2020 date as this hearing, Karl Knight on behalf of the Knight Family and Madoc Farms LLC filed the "Statement of Non-Consent to Limited Aspect of Claims Resolution Procedures" [Dkt. 7366] and noted the "*Court's statements on the record at the hearing on May 15, 2020 on certain business claimant's objections to the trust documents, the Court indicated that **one outcome could be** that the Court finds that only those parties that timely objected to confirmation of the Plan would retain such a right of review*." (emphasis added). **This oblique reference to a potential "outcome" that "could be" used to limit judicial review is not referenced within the prior court orders and not known to other victims as an option for obtaining rights and remedies for judicial review relative to their claims.** It is certainly reasonable to question how this one party that has a relationship with Judge Montali was able to ascertain this and file this statement of non-consent on the same day as the hearing.

9.     On June 15, 2020 Fire Claimants Debra Grassgreen and Karl Knight, on their own behalf and on behalf of their minor son, (the "**Knight Family**") filed the "*Notice of Unresolved Objection of Debra Grassgreen and Karl Knight to Claims Resolution Procedures.*" [Dkt. 7963]. Within this Notice the Knight Family stated "*Following a request to review the trust documents, on Friday, June 12, 2020, **the Trustee shared a draft of the revised CRP as a confidential settlement communication.** The Knight Family believes that the current version of the CRP is **inconsistent with the Court's prior ruling regarding judicial review** of claims. **The draft CRP was provided under Federal Rule of Evidence 408 and, to date, the TCC and Trustee have not authorized the Knight Family to disclose** the objectionable provision*" (emphasis added). It appears that at no time was this "*draft of the revised CRP*" authorized by the Court, the Trustee or the TCC to be shared with other individual fire victims other than the Knight Family which clearly provided significant advantages to the Knight Family. Abrams is unaware if this draft was also provided to the Carlson Family given the prior relationship identified between the Knight Family and Carlson Family. **However, it is clear that the timing of this exclusive view of core draft documents provided the Knight Family and the Carlson Family with distinct advantages over all other victims within this case.**

10.     On June 16, 2020, Mary Kim Wallace filed the "*Objection to the Plan and Reservation of Rights of, by and for Mary Kim Wallace*" [Dkt.7969] in which she advocated for equitable treatment for victims by stating "*I lack understanding of the technical aspects of any of the proposed promises made by PG&E… No reasonable person would agree to a plan that is so complex*

*and full of legalese that they could not possibly understand what they have agreed to…. That is a breach of fiduciary duty as they were in a position of trust to not throw us under the bus… **I object that many of the agreements in this plan were made in secret and without full disclosure to the fire victims***" (emphasis added). Despite this objection and the clear evidence of inequitable access to key pieces of information, Judge Montali never ordered further disclosures or set a schedule to ensure victims had a defined process to request judicial review. Certainly, the impartiality of Judge Montali "might reasonably be questioned" pursuant to 28 U.S.C. Section 455, given the lack of due process afforded to victims and that the relationships held by Judge Montali with the only other two parties who were granted judicial review were never disclosed.

11. On June 22, 2020 the "**Joint Statement of the TCC, Trustee, Debra Grassgreen and Karl Knight, and Eric and Julie Carlson Regarding Unresolved Objections to the Fire Victim Claims Resolution Procedures**" (the "**Joint Statement**") was filed with the Court [Dkt. 8074]. Within this Joint Statement it stated "*the TCC and the Trustee **secretly put in place a series of procedural hurdles and substantive alterations in an effort to effectively eviscerate the judicial review mandated by this Court**…It was only after the filings outlining the ongoing disputes between the Business Claimants and the Trust, that it became evident that there was **an entirely undisclosed framework being negotiated** to address these issues.*" Within Exhibit 2 of this Joint Statement is an email exchange between the Knight Family, the Debtors' counsel and TCC counsel and there is a statement from Mr. Knight on page 43 that states "***I do not believe that we need to ask other parties if they have an objection to having judicial review of our claims… The ambiguity arises from the fact that the Court considered the objection of a handful of parties on this issue before the deadline had passed for others to file objections on the very same basis***" (emphasis added). Furthermore, within the section "Carlson Family Opinion" on pg. 10-11 it states "*the Trust has not even begun its work yet and we have serious concerns about the motivations of the parties in charge, including the attorneys that compose the Trust Oversight Committee.*" **At this time, only these parties (the Carlson Family and the Knight Family) were made aware of these "*procedural hurdles, substantive alterations*" and were made aware of the "*entirely undisclosed framework being negotiated.*"** It is clear that these two parties were well aware that no other victims were provided with information concerning (1) "procedural hurdles," (2) "substantive alterations" and (3) an "entirely undisclosed framework" that would allow them to substantively object to the Claims Resolution Procedures if this was indeed the path to secure judicial review. However, it is apparent

that this Court provided "ambiguity" ensured that procedural steps for judicial review and document access would only be available to these two parties that have a relationship with Judge Montali. Of course, Judge Montali could have ordered equitable access to these documents and set a schedule outlining the path to secure judicial review but did not. Certainly, this provides further evidence that the impartiality of Judge Montali "might reasonably be questioned" pursuant to 28 U.S.C. Section 455 given that disclosures and discovery remain impediments for just outcomes and fair settlements for victims. **Abrams wants to unequivocally state that no fault or blame should be assigned to the Knight Family or the Carlson Family as ensuring a fair and impartial judicial process was not their responsibility. However, it is reasonable to question why Judge Montali did not disclose these relationships and provided impartial rulings regarding the means and mode of acquiring equitable access to judicial review.**

12. On June 24, 2020 there was a "***Status Conference Regarding Response Joint Statement Of The TCC, Trustee, Debra Grassgreen And Karl Knight, And Eric And Julie Carlson Regarding Unresolved Objections To The Fire Victim Claims Resolution Procedures Filed by John Trotter***" [Dkt. 8108]. Within this Status Conference the Court stated "*Well I have to tell you Mr. Molton… I was really frankly quite distressed by what I read in this joint statement. I mean I couldn't believe that for a total of **no more than 5 adults and maybe 1 child**… but for a handful of people this has become this major problem. I am just stunned that the Trustee and the Trustee's counsel have taken such a hard line and I'm just simply not going to tolerate it. There is not going to be a delay in the judicial review… I was stunned further by the statement that the Trustee might be distracted by this little sideshow of these 5 fire victims.*" Following, the Court went beyond the requests submitted by these joint parties seeking judicial review by stating "*they can seek judicial review wherever they choose.*" No other victims were afforded these rights and remedies other than the select few victims holding undisclosed relationships with Judge Montali bar one. Again, it is reasonable to question whether these statements and the manner in which Judge Montali deliberated and ruled regarding judicial review was biased in favor of these select victims with whom he held a relationship and conversely biased against the vast majority of victims. If the relationships between Judge Montali and these handful of victims were known at the time of this hearing, it is reasonable to conclude that victims would have perceived the manner in which Judge Montali deliberated as biased and prejudicial. Now, that these relationships are evidenced through this Motion, the Court should consider that reasonable people with knowledge of these facts would perceive these decisions and

related decisions preventing disclosures and discovery as biased against the vast majority of victims within this case that rely upon transparent and equitably applied judicial processes and procedures to achieve just outcomes.

13.     On July 1, 2020 Abrams filed the "*William B. Abrams Motion for Just Treatment of Victims through The Reconstitution of the Fire Victim Trust Oversight Committee and Equitable Application of the Judicial Review Provisions Pursuant to U.S.C. §§ 1123(A)(4).*" [Dkt. 8247] which was denied by the Court without hearing through the "*Order Denying Motions for Reconsideration*" [Dkt. 8478] which stated that "*both Ms. McDonald and Mr. Abrams take issue with the lack of judicial review afforded to **their claims***" when it was clear from the motion that Abrams sought the "***equitable** application of judicial review*" for **all** victim claimants and was not seeking an exception for his own claims (emphasis added). Also, on July 1, 2020 the Court issued the "*Order on the Joint Statement of the TCC, Trustee, Debra Grassgreen and Karl Knight, and Eric and Julie Carlson, Joined in Part, By Mary Wallace, Regarding Unresolved Objections to Fire Victim Claims Resolution Procedures*" [Dkt. 8235]. This order concluded that "Upon fully exhausting the dispute resolution process set forth in Section VIII of the CRP, any of Debra Grassgreen and Karl Knight (and their minor child), Eric and Julie Carlson and Mary Kim Wallace (each of the foregoing Claimants, an "**Individual Eligible Claimant**") may reject the Trustee Determination awarded." This denial of the "equitable application of judicial review" and the approval of these special judicial review provisions for the two victim claimants that have and hold a relationship with Judge Montali plus one other victim is certainly enough reason on its own for victims to reasonably question Judge Montali's impartiality regarding these decisions. It is clear that Ms. McDonald, Mr. Abrams and other victims that objected to the Trust documents, disclosures and claims resolution procedures were not afforded judicial review rights and remedies. The impartiality of Judge Montali is reasonably questioned by Abrams given the apparent biased rulings in favor of victims that have a relationship with Judge Montali. Judge Montali's rulings might also be reasonably perceived as biased and in favor of core parties that have taken strident positions against disclosures and discovery throughout this case given that many of these same parties (Victim Trustee, TCC, etc.) did not seek equitably applied judicial review for the vast majority of victims.

14.     On May 26, 2021 Abrams filed the "*William B. Abrams Motion to Amend Judgement and Replace All the Members of the Fire Victim Trust Oversight Committee and to Support Efficient*

*Trust Administration Pursuant to U.S.C. §§ 1123(A)(4) and Bankruptcy Rule 9023 and 9024*" [Dkt. 10715]. Within this motion Abrams stated "*In addition to the reconstitution of the TOC, I recommend that the court broaden the amount of judicial review made available to victim claimants. I believe this is an additional and necessary step given that **so many victims have lost confidence in the trust administration process and the associated lack of transparency**. I recommend that the Trustee and the court seek **a more equitable formula to grant victim access to additional judicial review**"* (emphasis added). **This motion was once again denied on June 1, 2021 by the Court without hearing** through the "*Order Denying Motion by William B. Abrams and Request by Kenneth Roy Viney*" [Dkt. 10738] due to a lack of "*complying with substantive and procedural requirements.*" Within the Court's ruling, there was no mention of Judge Montali's relationship with members of the Knight Family or the Carlson Family. Certainly, Judge Montali's "impartiality might reasonably be questioned" relative to this ruling given that all claimants bar one that received judicial review have a relationship with Judge Montali. Following, it is also reasonable to question the degree to which Judge Montali has a bias against Abrams and in favor of those parties that would prefer to have disclosure laws not enforced by the Court.

15.     In response to this order on June 6, 2021 and to adhere to the "procedural requirements" defined and reiterated by the Court, Abrams filed the "*William B. Abrams Motion to Enforce the Victim Trust Agreement and Replace All Members of the Fire Victim Trust Oversight Committee and to Support Efficient Trust Administration Pursuant to U.S.C. §§ 1123(a)(4) and Fire Victim Trust Agreement Section 6.2*" [Dkt. 10748] and associated declaration [Dkt. 10750] and Memorandum of Points and Authorities [Dkt.10751]. This motion was denied on June 10, 2021 through the "*Order Denying William B. Abrams' Motion to Enforce The Victim Trust Agreement and Replace All Members of the Fire Victim Trust Oversight Committee, Etc.*" [Dkt. 10768]. Within this order it stated "*Nothing is added for the court to know if or whether it could or should do anything about these actions, or inactions, or whether they are relevant at all.*" However, the order then later appears to contradict this by stating "*in conclusion, Mr. Abrams asks the court to assign new members of the TOC "**who are willing to adhere to Bankruptcy Rule 2019 and fully disclose any conflicts they may have…" and wants to make sure no members have any financial interest in this case to avoid real or perceived bias.** On top of that, Mr. Abrams recommends that the Fire Victim Trustee and the court seek a **more equitable formula for fire victims' access to judicial review of victims' claims** and other criteria that he mentions… The Motion to Enforce is DENIED. The matter*

*is DROPPED from the July 13, 2021, calendar. The court will not set for further hearing any similar motion Mr. Abrams decides to file unless he first requests permission from the court to do so after a preliminary review of what he wants and his basis for doing so*" (emphasis added). Within the Court's ruling, there was no mention of Judge Montali's relationship with members of the Knight Family or the Carlson Family. Certainly, Judge Montali's "impartiality might reasonably be questioned" related to this ruling on judicial review given that all claimants bar one that received judicial review have a relationship with Judge Montali. If the Court did order disclosures from members of the TCC, TOC and Fire Clamant professionals as Abrams requested, it is reasonable to assume that these same parties would in turn file papers requesting Judge Montali to disclose his similarly undisclosed relationships. This reasonably perceived consequence of Court ordered disclosures is also a reason to question whether Judge Montali denied disclosures and discovery to avoid similar disclosures of his own relationships. Certainly, this continued pattern provides a reasonable basis for Abrams and other victims to question Judge Montali's impartiality pursuant to U.S.C. 455 relative to the ongoing and exclusive jurisdiction and oversight of the Fire Victim Trust as well as other matters relative to the Plan.

16.     In an effort to follow the Court's direction, Abrams requested this special "permission from the court" through filing the "*William B. Abrams Motion to Enforce Disclosure Requirements or Reconstitute the Fire Victim Trust Oversight Committee Given New Evidence of Self Dealing and Conflicts of Interest Pursuant to §§ U.S.C. 327(a) and Bankruptcy Rule 2014*" [Dkt. 11005] on August 2, 2021. Following this motion on August 11, 2021, Abrams filed the "*Ex Parte Motion of William B. Abrams Pursuant to B.L.R. 9006-1 Requesting Order Shortening Time for Hearing on William B. Abrams Motion to Enforce Disclosure Requirements or Reconstitute the Fire Victim Trust Oversight Committee Given New Evidence of Self Dealing and Conflicts of Interest Pursuant to U.S.C. §§ 327(a) and Bankruptcy Rule 2014*" [Dkt. 11051]. Within this Motion Abrams stated that "*importantly, this motion and the required disclosures should speed the administration of the Fire Victim Trust and increase the flow of compensation to victims. **That said, every day that goes by without these disclosures causes additional harm to the Fire Victim Trust and the PG&E victims themselves***" (emphasis added).

17.     On August 17, 2021 a hearing was held and Abrams was the only party ordered to appear [Dkt. 11071]. Within this hearing the Court rather than allowing Abrams the opportunity to

speak characterized his engagement within this case as "*one man's obsession with wrongs that he wants to right*" and further stated that "*he is cautioned that further filings lacking in merit may indeed result in monetary sanctions under rule 9011 or otherwise if this conduct is repeated*" (emphasis added). Additionally, the Court stated that "*the bulk of his third attack is a sweeping criticism of Governor Newsom, the California Legislature...*" when my motion took exactly the opposite position that "*actions of these UFTA "coalition members" were a **disservice to** Governor Newsom and the California Legislature who **I believe made an honest attempt to strike a difficult balance between the interests of victims in this case with the broader safety and security interests for our communities***"[15] (emphasis added). When Abrams was permitted by the Court to make a "brief statement" at the conclusion of the hearing, Judge Montali proceeded to ask the Court Clerk to cut off Abrams microphone preventing this correction of the record. However, the Court did emphasize that Abrams has not "been rude or impolite to the Court." It is also reasonable to question the degree to which Judge Montali's mischaracterizations relative to Abrams' papers and warning of sanctions were driven by biases held against Abrams and other victims calling for disclosures and in favor of those parties that would prefer to have disclosure requirements not enforced by the Court. Moreover, it is reasonable for Abrams and other victims to question the impartiality of Judge Montali's decisions to deny this and other motions for discovery and disclosures as they may reasonably be perceived as biased to prevent similar disclosures of his own relationships. That said, Judge Montali correctly characterized Abrams as pursuing "wrongs he wants to right" as that has always been Abrams' motivation behind his papers and other engagement within the Court. The fact that parties, especially victims, looking to "right wrongs" within this bankruptcy case seem to be particularly reviled by certain core parties continues to be a source of sadness and consternation for Abrams and many victims that have engaged in good faith and at great personal cost despite their lack of legal training.

18.     On May 23, 2022, Abrams filed and served the "*Motion of William B. Abrams Pursuant to Federal Rules of Bankruptcy Procedure 2004 for Entry of an Order Authorizing Discovery and Hearings Regarding the Administration of The Fire Victim Trust*" [Dkt. 12440] (the

---

[15] See "Ex Parte Motion of William B. Abrams Pursuant to B.L.R. 9006-1 Requesting Order Shortening Time for Hearing on William B. Abrams Motion to Enforce Disclosure Requirements or Reconstitute the Fire Victim Trust Oversight Committee Given New Evidence of Self Dealing and Conflicts of Interest Pursuant to U.S.C. §§ 327(a) and Bankruptcy Rule 2014" [Dkt. 11051], pg. 4.

"**Motion for Trust Discovery**"). This motion requested the Court's approval for discovery procedures (hearings and interrogatories) for victims given certain actions and conduct of Justice Trotter in his capacity as Trustee as well as the actions and conduct of his designees. This call for transparency and accountability was joined by the Butte County Board of Supervisors [Dkt. 12609], the Sonoma County Board of Supervisors [Dkt. 12670] and other PG&E wildfire survivors. Subsequently, on June 7, 2022, a **preliminary** hearing was held regarding the Motion for Trust Discovery. Abrams was precluded from arguing the merits of the Motion for Discovery. Within this preliminary hearing, this fact was reiterated by Mr. Molton, counsel for the Trustee by stating "*Clearly, and I read your honor's order and your honor's directive this morning that your honor does not want us getting into merits or discussion of merits today.*" [Dkt. 12495].

19.     On June 21, 2022, the Trustee filed the "*Objection of Fire Victim Trustee to Motion of William B. Abrams Pursuant to Fed. R. Bankr. 2004 for Entry of an Order Authorizing Discovery and Hearings Regarding the Administration of the Fire Victim Trust*" [Dkt. 12527]. Within this objection, the Trustee cited Delaware Trust Law as well as exculpations and other protections negotiated prior to Plan confirmation as justification for why the Trustee should not have to provide discovery and disclosures pursuant to Bankruptcy Rule 2004. In closing the Objection stated "*The Fire Victim Trustee respectfully requests that the Court sustain this Objection, deny the Motion in its entirety and grant such other and further relief as may be just.*" Additionally, within this Objection the Trustee announced the "***imminent retirement of Justice John J. Trotter (Ret.) and the transition to Ms. Cathy Yanni as Trustee** in accordance with the succession provisions of the Trust Agreement*" (emphasis added). In response to this objection, Abrams filed the "*William B. Abrams Reply to the Objection of the Fire Victim Trustee Pursuant to Fed. R. Bankr. 2004 for Entry of an Order Authorizing Discovery and Hearings Regarding the Administration of the Fire Victim Trust*" [Dkt. 12593] on July 6, 2022. Within this reply Abrams stated that "*these "additional disclosures" don't seem to be intended by the Trustee to address the issues raised within the Motion for Trust Discovery. However, this information **does lead to more questions and not less that are deserving of discovery pursuant to Bankruptcy Rule 2004**" and concluded that "*it is clear that these fact patterns and the manner in which the Trustee provided notice of his resignation provide more than sufficient "good cause" to seek discovery to ascertain the degree to which the Trustee and others employed by the Fire Victim Trust have engaged in reasonable "conduct" and "good faith" acts in keeping with both the Fire Victim Trust Agreement and applicable law.*"

20.    On August 2, 2022, the Court issued the "*Order on Motion of William B. Abrams Authorizing Discovery Regarding Administration of the Fire Victim Trust*" (the "**Discovery Order**") [Dkt. 12682]. Within this order, the Court exercised and reiterated its authority related to Article 1.6 of the Trust agreement stating that "*this Court shall have exclusive jurisdiction with respect to any action relating to or arising out of the Trust…*" The Court also pointed to actions and actors protected by confidentiality protocols by stating "*Mediator Retired Bankruptcy Judge Randall J. Newsome conducted a lengthy mediation…*"[16] **Importantly, although the Abrams Motion for Discovery did not seek discovery related to judicial review the Court made it a point to Order the following:**

> "*Also excluded is any examination or discussion of the circumstances that permitted a small number of fire victim claimants to have access to judicial review of their situation after the administration of their claims by the Trustee, to the exclusion of such access by the vast majority of fire claimants.*"[17]

Judge Montali concluded the Order by taking away Abrams' "multi-page discovery request" and replaced it with "the court's own direction."[18] Judge Montali's impartiality is reasonably questioned relative to this decision regarding discovery given that it seems reasonable that Judge Montali ruled to prevent discovery that might have led to exposing his relationships with the handful of claimants that got judicial review. Additionally, it is also reasonable to question the degree to which Judge Montali has a bias against Abrams and other victims requesting these discovery rights and in favor of those parties like the Trustee that would prefer to not disclose agreements and financial incentives that may be undermining the efficacy of the Fire Victim Trust.

21.    On August 18, 2022, Abrams filed the "*Motion of William B. Abrams Pursuant to Federal Rule of Bankruptcy Procedure 2004 for Entry of an Order Authorizing Discovery and Hearings Regarding the Acts and Conduct of JAMS Neutrals Given New Evidence*" [Dkt. 12766]. Within this Motion, Abrams points out clear biases, prejudices and potential conflicts of interests among many JAMS neutrals associated with this case. Furthermore, Abrams states that "it is clear that these relationships are substantial and Justice Trotter's statement to victims that "*I didn't know*

---

[16] See "*Order on Motion of William B. Abrams Authorizing Discovery Regarding Administration of the Fire Victim Trust*", page 3 [Dkt. 12683].

[17] See "*Order on Motion of William B. Abrams Authorizing Discovery Regarding Administration of the Fire Victim Trust*", page 7 [Dkt. 12683].

[18] See "*Order on Motion of William B. Abrams Authorizing Discovery Regarding Administration of the Fire Victim Trust*", page 9 [Dkt. 12683].

*all of them* [victim attorneys] *but I knew some of them*" certainly is insufficient disclosure to ascertain the degree to which certain parties may have been collaborating with JAMS Neutrals to advance their collective financial interests at the expense of PG&E Fire Victims."[19]  Specifically, called out within this motion was the role of Viggo Bosserup Esq. by stating "***All victims wishing to appeal their settlement determinations are subject to Mr. Bosserup's oversight and other JAMS "neutrals" and prevented from seeking judicial review even if their settlements are perceived as unjust or unfair. This is true for all ~70,000 victims except for the three victims that were afforded judicial review.***" This Motion prompted the August 23, 2022 "Order Setting Preliminary Hearing" [Dkt. 12802] which stated "*the court wishes to hear from the Fire Victim Trust (the "Trust"), at a preliminary status conference before it directs the Trust to file any substantive response to the Motion and **before it directs responses to discovery requested by Mr. Abrams***" (emphasis added).

22.     On August 24, 2022 and in response to the Discovery Order, the Trustee filed the "*Motion of the Fire Victim Trustee to File Redacted Versions of Certain Retention Agreements Until Litigation Related to Such Retention Agreements is Finally Resolved*" [Dkt. 12871] and the "*Redacted Documents to the Motion of the Fire Victim Trustee to File Redacted Versions of Certain Retention Agreements Until Litigation Related to Such Retention Agreements is Finally Resolved*" [Dkt. 12874].  **This motion provided no response deadline and was expediently approved by the Court only three business days later** on August 29, 2022 through the "*Order Granting Motion of the Fire Victim Trustee to File Redacted Versions of Certain Retention Agreements Until Litigation Related to Such Retention Agreements is Finally Resolved*" [Dkt. 12884].  Subsequently and also on August 29, 2022, The Debtor and the Trustee jointly filed the "*Joint Ex Parte Motion to File Redacted Version of the Reorganized Debtors and Fire Victim Trust's Joint Ex Parte Motion to Extend, In Part, Deadline to Comply with Order on Motion of William B. Abrams Authorizing Discovery Regarding Administration of the Fire Victim Trust*" [Dkt. 12889].  **This motion indicated no response deadline and was approved by the Court only two days later** on August 31, 2022, through the "*Order Granting Reorganized Debtors and Fire Victim Trust's Joint Ex Parte Motion to Extend, In Part, Deadline to Comply with Order on Motion of William B. Abrams Authorizing*

---

[19] See "*Motion of William B. Abrams Pursuant to Federal Rule of Bankruptcy Procedure 2004 for Entry of an Order Authorizing Discovery and Hearings Regarding the Acts and Conduct of JAMS Neutrals Given New Evidence*" [Dkt. 12766], pg. 15 and the "*Notice of Filing of Transcript of Status of Status of Trust Distribution Video Presentation by Justice John Trotter (Ret.), Trustee of the PG&E Fire Victim Trust*", May 17, 2021 [Dkt. 10654]

*Discovery Regarding Administration of the Fire Victim Trust*" [Dkt. 12898] along with **same-day approval of the redacted agreements** through the "*Order Granting Joint Ex Parte Motion to File Redacted Version of Reorganized Debtors and Fire Victim Trust's Joint Ex Parte Motion to Extend, in part, Deadline to Comply with Order on Motion of William B. Abrams Authorizing Discovery Regarding Administration of the Fire Victim Trust*" [Dkt. 12899]. **The expedient rulings that effectively prevented substantive objections combined with other Court scheduling actions undermining due process rights may reasonably be perceived by Abrams and others as biased against those parties seeking discovery and disclosures and in favor of parties seeking Court protections from discovery and disclosures.**

23.     On September 1, 2022 and in response to these expedited Court orders approving the Trustee and Debtor motions and redacted documents [Dkt. 1288, 1289], Abrams filed the "*Motion of William B. Abrams for Reconsideration and Related Relief from the Order Granting Motion of the Fire Victim Trustee to File Redacted Versions of Certain Retention Agreements until Litigation Related to such Retention Agreements is Finally Resolved and Pursuant to Federal Rule of Civil Procedure 59(e)*" [Dkt. 12916]. Within this motion Abrams stated that the recent motions from the Trustee "*deliberately or not undermined the due process rights of victims*" and were in direct contradiction with the prior Discovery Order. This motion also requested six specific remedies including (1) hearings so victims could argue their case (2) **disclosures of the names of individuals representing the Trust** (3) Requests for Proposals (RFPs) referenced within these redacted agreements (4) **disclosures related to the net benefit or loss to the value of the Fire Victim Trust** (5) amendments to the retention agreements and (6) an order to ensure response deadlines would be stated with future Trustee motions so the due process rights of victims would not be undermined. On September 6, 2022, the Court issued the "Order on Motion for Reconsideration" [Dkt. 12929]. This order required the Trustee to respond by September 16, 2022 but limited the required response to only address the name of the "Authorized Agent" and agreements with the Authorized Agent. Subsequently, on September 27, 2022 the Court issued the "Order Denying Motion for Reconsideration" [Dkt. 13008] noting that "*Unfortunately and inexplicably, the* [Trustee] *Response fails to address any other part of the Motion for Reconsideration as directed*" but concluded by stating "*The court is satisfied that there is no basis for reconsideration of its previous decision to allow certain redactions of information provided by the FVT. Accordingly, the Motion for Reconsideration is DENIED.*" Here, we see that regardless of the response or lack of response from

parties to address discovery and disclosure requests, Judge Montali has ruled in favor of those that are against the type of discovery and disclosures that would allow victims to understand the financial incentive structures for core parties within this case. Moreover, Abrams and other victims "might reasonably question" Judge Montali's impartiality and these rulings denying discovery as designed to prevent the type of discovery and disclosures that might have led to exposing his relationships with the handful of claimants that got judicial review.

24. On September 13, 2022, a Preliminary Hearing was held and Abrams expressed that "*Every victim is subjected to this* [claims resolution] *process to put money in their pocket, to rebuild their house, to get compensation for their lives… This is central to the dollars and there are very few victims, as the court knows and as Mr. Molton knows, that were provided **judicial review**. So even if*" at which point Judge Montali interjected and stated "*I don't want to revisit that, because they all were given a chance and five of them chose... It wasn't something arbitrary. It wasn't the luck of the draw. Those five people came, they squawked and they were herd. So, what? therefore what?"* Abrams in response to this question stated "*one of the remedies that I think should be considered by the court and **I'll save this for my reply is that given all these things, if the Trust isn't going to be forthcoming and fully disclose what all these financial incentives are for these people and these appeals process, then victims should have a judicial review process** so that if they have perceived injustices with their settlement, that they can also come to the court*" (emphasis added). Following this preliminary hearing, on September 13, 2022, the Court issued an order setting a schedule that prevented Abrams from filing responses to any objections and ordering parties to respond to the Motion for JAMS Discovery. On October 3, 2022 Cathy Yanni, Trustee, Justice Trotter, Former Trustee and Mr. Skikos, Trust Oversight Committee Member all filed objections reasonably perceived as mischaracterizing Abrams actions and motivations. On October 21, 2022, without the opportunity to provide a reply or given the opportunity to be heard regarding the merits of the Motion, Judge Montali issued the "Memorandum Decision Regarding William B. Abrams' Requests for Discovery Under Federal Rule of Bankruptcy Procedure 2004" [Dkt. 13105]. Within this decision all of Abrams discovery requests were denied and the order went further to provide the Trustee with an opportunity to provide an open-ended declaration which was subsequently filed on October 26, 2024. This declaration avoided all of the substantive questions within the Motion of JAMS Discovery and gave a cursory overview of documents already filed by the Trustee and the Former Trustee.

25.     On September 22, 2022 Abrams filed the "Motion of William B. Abrams Pursuant to Federal Rule of Bankruptcy Procedure 2004 for Entry of an Order Authorizing Discovery and Hearings regarding Debtors Acts, Conduct and Agreements that may Obstruct or Limit the Just and Fair Management of the Fire Victim Trust" [Dkt. 12995]. This was followed by many letters in support from fellow PG&E Victims and a Supplemental Statement on September 26, 20022 [Dkt. 13000]. Within this Motion Abrams presented evidence and significant good cause for discovery including but not limited to (1) a pattern of PG&E seemingly obstructing the actions of the Fire Victim Trust including through exercising provisions within the Restructuring Support Agreement (2) statements from a Trust Oversight Committee Member (3) communication patterns associated with the Fire Victim Trust PR firms (4) PG&E's inflated valuation of the Fire Victim Trust stock (5) PG&E's misrepresentations of backstop commitments (6) PG&E's engagement relative to the registration rights agreement (7) PG&E engagement at the California Public Utilities Commission detrimental to the Fire Victim Trust and (8) a pattern of inexplicable inaction by the Fire Victim Trust to make up the Fire Victim Trust shortfall. Following this motion, Judge Montali issued the "*Order Directing Reorganized Debtors to Respond to Motion Filed by William B. Abrams*" [Dkt. 13005]. **Again, through this order, Judge Montali set a schedule denying Abrams the right to respond and not providing any hearing where Abrams would be able to argue his motion** stating "*No reply is to be filed by Mr. Abrams and his suggested dates for a response by October 3, 2022, and a hearing on October 11, 2022, are vacated.*" This was followed by the "Reorganized Debtors' Objection to Motion of William B. Abrams Pursuant to Federal Rule of Bankruptcy Procedure 2004 for Entry of an Order Authorizing Discovery and Hearings Regarding Debtors' Acts, Conduct and Agreements that may Obstruct or Limit the Just and Fair Management of the Fire Victim Trust" [Dkt. 13065]. Within this objection, the Debtors did not address any of the evidence presented within the Motion for Debtor Discovery. Instead they made a process argument that Abrams should be denied discovery because "in essence, the relief sought by Mr. Abrams is an examination of a non-party in a dispute regarding Mr. Abrams' dissatisfaction with the management of the Fire Victim Trust and its perceived inactions. As a general discovery rule, parties to a dispute should "*obtain discovery from one another before burdening non-parties with discovery requests*." This statement by the Debtors is clearly designed to misinform given that the Court and the Debtors were very aware that Abrams submitted requests to meet and confer in keeping with "Rules of Judge Montali's Court." However, all of these requests for meetings were denied and the rules of the Court related to the further

resolution of discovery disputes were denied for Abrams while permitted for other parties within the case.[20]  The Court defined schedules, processes and rulings denying discovery and disclosures may reasonably be perceived by Abrams and other victims as lacking impartiality and driven by biases in favor of those parties that benefit from nondisclosure terms, protective orders and Court approved exculpations as well as the few parties with whom Judge Montali has a relationship.

## **RELIEF REQUESTED**

It is absolutely clear that "reasonable people with knowledge of the facts" that led to decisions regarding judicial review, disclosures and discovery would question Judge Montali's impartiality pursuant to 28 U.S.C. Section 455(a) which states "*Any justice, judge or magistrate judge of the United States shall disqualify himself in any proceeding in which his **impartiality might reasonably be questioned***" (emphasis added).  Here, it is clear from the facts regarding the relationships Judge Montali had and holds with certain parties and the manner in which judicial review was granted to these parties that there is a strong basis to question the impartiality of Judge Montali within this case.  There are ongoing motions and other matters before the Court where it is reasonable to question the degree to which Judge Montali's biases will continue to play a role within the Court's rulings and through the Court's oversight roles and responsibilities pursuant to Section 1.6 and 8.20 of the Fire Victim Trust Agreement.  Most importantly, the impartiality of Judge Montali and related biases are reasonably questioned relative to his enforcement of Section 11.1(u) of the Plan which states the following:

> "[t]o hear and determine disputes arising in connection with or related to the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, any transactions or payments contemplated herein, or any agreement, instrument, or other document governing or relating to any of the foregoing," "[t]o take any action and issue such orders as may be necessary to construe, enforce, implement, execute, and consummate the Plan or to maintain the integrity of the Plan following consummation,"

---

[20] See "Order Denying Request for Telephone Conference RE Discovery Dispute" [Dkt. 13044], October 4, 2022

PG&E victims must rely upon the US Bankruptcy Court and associated processes and procedures which are designed to provide just and fair treatment under the law. Given the profound imbalance of power and financial resources favoring the Debtors, shareholder proponents, certain attorneys and other influential core parties within the case, **individual victims more than any other class are reliant upon the Court to ensure these power imbalances don't allow parties to trample on the rights of victims.** Unfortunately, and sadly, it seems clear that these same financially advantaged parties have overly relied upon Court ordered protections, confidentiality protocols and undisclosed terms that have the effect of keeping victims in the dark. If "sunlight is the best disinfectant," what types of infections have festered through a lack of sunlight and the Court ordered shade within this case?

Given the facts presented within this Motion, it is clear that "reasonable people with knowledge of the facts might reasonably question" why Judge Montali granted broad protections and upheld rights and remedies that overwhelmingly favored the powerful and financially influential parties within this case while striping away rights and remedies from victims like Abrams including those afforded through judicial review. Indeed, it seems that at every turn within this case, Judge Montali chose not to meaningfully enforce Bankruptcy laws, Federal laws and State laws that require disclosures of conflicts and ensure processes for reasonable discovery. Following, it is reasonable to believe that certain parties confident in this lack of judicial enforcement and motivated by undisclosed financial incentives have been able to maneuver without fear of discovery or disclosures. Does this type of judicial environment lead to just outcomes? Basic information including but not limited to the names of mediators, mediation terms, Trust cost structures, inverse condemnation costs levied against the Trust, financial incentive structures of victim attorneys, Debtor imposed Trust constraints and the financial agreements attorneys have with certain utility investors have all been withheld from victims and the public. Abrams and other victims in good faith have asked for and looked for any logical, reasonable and/or innocent rationale for why this information has been withheld but Court imposed impediments made this pursuit impossible. There is absolutely no ethically or legally sound reason to withhold so much critical information from victims.

**After this long pursuit for reasonable discovery and disclosures, Abrams and other victims have now learned that Judge Montali has not disclosed relationships core to how judicial review is administered and reasonably question the extent to which this lack of disclosure has led to the Court's curtailment of disclosures and discovery from certain core**

**parties. Without a doubt this lack of transparency undermines justice within this case.**
Therefore, Abrams is compelled to put forward this motion and propose the following relief so victims can be more assured that the Plan, the Trust and their financial settlements will receive impartial judicial oversight in accordance with applicable laws and in the furtherance of justice:

1) **Recusal by Judge Montali –** Judge Montali should recuse himself pursuant to 28 U.S.C. § 455(a) which states "*any justice, judge, or magistrate judge of the United States **shall disqualify** himself in any proceeding **in which his impartiality might reasonably be questioned**" and/or should recuse himself pursuant to 28 U.S.C. § 455(b)(1) which states "he **shall also disqualify himself**… where he has a personal bias*" (emphasis added).

2) **Recusal of Judge Montali by the Court -** If Judge Montali does not recuse himself in accordance with 28 U.S.C. § 455, he should be recused pursuant to 28 U.S.C. § 144 which states: "*Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, **such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding**" (emphasis added).

Here, Abrams reasonably believes that Judge Montali holds a personal bias against Abrams and other victims seeking disclosures and discovery while favoring parties with adverse interests to victims motivated to not disclose certain financial incentive structures and associated relationships. Abrams has filed a "timely and sufficient affidavit" and pursuant to Northern District of California Local Rule 3-14 respectfully requests that the Judge "refer the request for disqualification to the Clerk for random assignment to another Judge." The assignment of another judge is requested through this Motion to hear any and all matters "necessary to enforce the Plan or to maintain the integrity of the plan." Moreover, as soon as is practical for the Court, Judge Montali should be recused and replaced with another judge to provide oversight of the Fire Victim Trust pursuant to Section 1.6 and 8.20 of the Fire Victim Trust Agreement.

## <u>CONCLUSION</u>

PG&E Victims and all parties in this case are entitled to a fair and impartial proceeding, and that goal can only be accomplished through an impartial judge. Therefore, Abrams prepared and filed this Motion for Recusal at the earliest practicable opportunity based upon recent press reports, online research and information provided by other victims within this case which exposed the relationships Judge Montali did not disclose relative to the aforementioned parties that were granted judicial review. The evidence collected and provided through this Motion provides Abrams with a significant and reasonable basis to question Judge Montali's biases and impartiality relative to past, present and future (1) decisions regarding the enforcement of disclosure laws (2) decisions regarding discovery (3) oversight of the Fire Victim Trust and (4) enforcement related to the integrity of the Plan. Sadly, Abrams feels compelled to file this Motion for Recusal and has good cause to fear that Abrams and other victims will not be able to receive fair and impartial hearings, judgements and due process while Judge Montali presides over this case. Furthermore, Abrams feels compelled to file this Motion to support public confidence and trust in the courts from which he and other victims rely. Abrams requests that he Court consider the clear pattern described within this Motion that reasonably shows how Judge Montali acted upon biases and relationships that he holds which in turn may reasonably be perceived as having biased his rulings relative to disclosures, discovery and other aspects of this case. Therefore, Abrams respectfully requests that this Motion for Recusal be granted and the Honorable Dennis Montali be recused from presiding over this case as soon as practicable and replaced with another Judge.

Dated: November 15, 2022

Respectfully submitted,

William B. Abrams
Pro Se Claimant

**EXHIBIT A**

PROPOSED ORDER

William B. Abrams
end2endconsulting@gmail.com
2041 Stagecoach Rd.
Santa Rosa, CA, 95404
Tel: 707 397 5727

*Pro Se Fire Victim Claimant and Party to related proceedings before the California Public Utilities Commission and the California Office of Energy Infrastructure Safety*

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| In re:<br><br>PG&E CORPORATION,<br><br>    -and-<br><br>PACIFIC GAS AND ELECTRIC COMPANY,<br>           Debtors.<br><br>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>☑ Affects both Debtors<br><br>\* *All papers shall be filed in the lead case, No. 19-30088 (DM)* | Bankr. Case No. 19-30088 (DM)<br>Chapter 11<br>(Lead Case)<br>(Jointly Administrated)<br><br><br>**ORDER GRANTING MOTION OF WILLIAM B. ABRAMS PURSUANT TO BANKRUPTCY RULE 5004 AND 28 U.S.C. SECTION 144 AND 455 AND BANKR. LOCAL RULE 3-14 FOR ENTRY OF AN ORDER AUTHORIZING THE RECUSAL OF THE HONORABLE DENNIS MONTALI** |

Upon the "Motion of William B. Abrams Pursuant to Bankruptcy Rule 5004 and 28 U.S.C. Section 144 and 455 and Bankr. Local Rule 3-14 for Entry of an Order Authorizing the Recusal of the Honorable Dennis Montali", dated November 15, 2022 (the "**Motion**"),[21] of William B. Abrams ("**Abrams**") for the recusal of the Honorable Dennis Montali and pursuant to Bankruptcy Rule 5004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), U.S.C. Section 144 and 455 and Local Bankruptcy Rule 3-14, the following order is issued.

This Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334, the Order Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges, General Order 24 (N.D. Cal.), and Rule 5011-1(a) of the Bankruptcy Local Rules for the United States District Court for the Northern District of California, Paragraph 18 and Paragraph 78 of the Confirmation Order, Section 6.7 and Section 11.1 of the Plan; and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having reviewed the Motion; the Court having reviewed the associated Affidavit; this Court having determined that the legal and factual basis set forth in the Motion establish just cause for the relief granted therein; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERD THAT**:

1.      Abrams' Motion is granted as provided herein.

2.      Judge Montali does recuse himself and hereby requests that the Court reassign the case to another Judge.

3.      The Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this Order.

4.      This Order is without prejudice to PG&E Fire Victim's right to file further motions for recusal pursuant to Bankruptcy Rule 5004 or any other applicable law.

** END OF ORDER **

---

[21] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

**EXHIBIT B**

# EXHIBIT B

 **Help Center**

AMERICAN
BANKRUPTCY
INSTITUTE

≡

## From the Director Jul/Aug 2005

**Journal Issue:** Jul/Aug 2005

**Column Name:** Director's Column

**Journal Article:**

**San Francisco Members Enjoy Wine Tasting**

Nearly 100 ABI members from the San Francisco area networked during a delightful evening of wine tasting, featuring smaller production wines and specialty foods, on June 15. Bankruptcy Judges **Dennis Montali** and **Randy Newsome** (N.D. Calif.) also attended. **Debra Grassgreen** of the San Francisco office of Pachulski, Stang, Ziehl, Young, Jones & Weintraub PC chaired the local host committee, along with **Randy Michelson** (Bingham McCutchen LLP), **Robert Eisenbach** (Cooley Godward LLP) and **Eric Carlson** (Giuliani Capital Advisors). Other event sponsoring firms included Deloitte, GE Commercial Finance, Goldberg Stinnett Meyers & Davis PC, Heller Ehrman LLP, Howard Rice Nemerovski, et al., Kornfield Paul & Nyberg PC, McNutt & Litteneker LLP, Murray & Murray PC, St. James Law PC, Sedgwick Detert Moran & Arnold LLP, Sugarman & Co. LLP, White & Case LLP and Visa USA. Previous member outreach social events were held in Cleveland, Seattle and San Antonio, major cities where there are a high number of ABI members but no local conference program nearby. Plans are underway for other outreach events in St. Louis, Orlando, Boston and Dallas.

///

**Deputy Executive Director Named**

Ann vom Eigen has joined the ABI staff as Deputy Executive Director & General Counsel. Ann comes to ABI from the American Land Title Association (ALTA), where she served as legislative and regulatory counsel since 1991. For ALTA, she directed legislative advocacy activities on real estate, banking, bankruptcy and other issues at both the federal and state level, as well as with the administration. Ann has extensive experience in legal and legislative campaigns for the financial services industry, including strategic relations and communications. She was previously associate legislative and general counsel at the Mortgage Bankers Association, following several years as a professional staff member on both the Senate Environment and Budget Committees and as a policy analyst at the Office of Management and Budget. A native of Wisconsin, Ann holds degrees from Tufts (B.S.) and Harvard (M.A.), and a law degree from Georgetown. She was selected after a search by a national recruiting service and a comprehensive review process, including interviews by the ABI management committee. "We are delighted to have someone of Ann's experience, energy and vision in this new deputy position," said Executive Director Sam Gerdano. "She's the ideal fit for our aggressive plans to do more educational outreach to Capitol Hill and the national media." ABI President John Penn added, "Ann was our top choice from several well-qualified candidates. We're extremely pleased to add her substantial experience to our growing professional staff."

**Coming Soon: New Membership Directory**

The 2005-06 edition of the *ABI Membership Directory* will soon be available for purchase. It will be available online or by calling ABI at (703) 739-0800. Members will receive a complimentary copy of the new directory on CD-rom in a forthcoming issue of the *ABI Journal*. Copies of the current edition are still available at a reduced price.

**ABI Membership Breaks 11,000!**

ABI membership passed the 11,000 mark in May, just 17 months after reaching the 10,000-member milestone in January 2004. Through June, nearly 1,300 new members joined and more than 4,600 have renewed their membership this year.

///

### New Staff Announcements

Larissa Mendes has joined the staff as an assistant in the Membership Department. She was promoted from an intern position. Larissa is the first contact for new membership inquiries, and she will be responsible for processing renewals, administering the Career Center and other duties. She is a 2003 graduate of George Mason University with a B.A. in communications. Emily Gaines has been promoted to Membership Specialist in the department. Lissa Hurwitz joined the staff as Strategic Communications Manager as part of our communications department. She will handle ABI's comprehensive outreach efforts with the business and general press. She has 15 years of experience in public affairs and external communications in the corporate and nonprofit environments as a consultant, writer and editor. She has a B.A. in communications from the University of Michigan. Rali Mileva will shift her focus from communications to ABI's growing marketing program for industry and nonindustry partners. Karim Guirguis has been promoted to Manager of Online Technology, from the position of Webmaster, reflecting his increased responsibility for ABI's distance-learning delivery system.

### Catherine Crier to Speak at ABI's Author Luncheon at NCBJ

Best-selling author, Emmy Award-winning journalist and current Court TV anchor Catherine Crier will speak at ABI's annual author luncheon during this year's meeting of the National Conference of Bankruptcy Judges (NCBJ), Nov. 4 in San Antonio. Crier, who's first book, *The Case Against Lawyers*, was a *New York Times* best-seller in 2002, also holds the distinction of being the youngest state judge ever to be elected in Texas. She will sign copies of her latest book, *A Deadly Game: The Untold Story of the Scott Peterson Investigation*, after her presentation. Crier joins other famed authors keynoting the ABI luncheon, following Bob Woodward, Christopher Buckley, Scott Turow and Doris Kearns Goodwin, among others. This event will sell out, so make plans with the NCBJ to attend. Register online at **http://www.ncbj.org**.

**Journal Date:** Friday, July 1, 2005

///

© American Bankruptcy Institute. All rights reserved. ABI is a (501)(c)(3) non-profit business (52-1295453)

**EXHIBIT C**

Exhibit C

**FILED**

ORDERED PUBLISHED

FEB 07 2006

HAROLD S. MARENUS, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

**UNITED STATES BANKRUPTCY APPELLATE PANEL**

**OF THE NINTH CIRCUIT**

| | |
|---|---|
| In re: | BAP No.   AZ-05-1169-CMoS |
| KEVIN H. CONCANNON and TERRY B. CONCANNON, | Bk. No.   01-04624-TUC-JMM |
| Debtors. | |
| KEVIN H. CONCANNON; TERRY B. CONCANNON, | |
| Appellants, | |
| v. | **O P I N I O N** |
| IMPERIAL CAPITAL BANK, a California corporation, | |
| Appellee. | |

Argued and Submitted on January 20, 2006
at Phoenix, Arizona

Filed - February 7, 2006

Appeal from the United States Bankruptcy Court
for the District of Arizona

Honorable James M. Marlar, Bankruptcy Judge, Presiding.

_____

Before:  CARROLL[1], MONTALI and SMITH, Bankruptcy Judges.

_____

[1] Honorable Peter H. Carroll, Bankruptcy Judge for the Central District of California, sitting by designation.

-1-

CARROLL, Bankruptcy Judge.

**INTRODUCTION**

When Imperial Capital Bank ("Imperial") sought relief from the automatic stay to foreclose its judgment lien, Kevin and Terry Concannon ("Debtors") defended the motion in their chapter 7 bankruptcy case by seeking a valuation of their rental real property encumbered by the lien and avoidance of Imperial's lien pursuant to 11 U.S.C. §§ 506(a) and (d).[2]  The bankruptcy court granted Imperial's motion and lifted the stay, but in so doing, valued Imperial's secured claim at zero pursuant to § 506.  At Imperial's request, the bankruptcy court then amended its decision by deleting its valuation of Imperial's secured claim and ruling that Imperial's lien would pass through bankruptcy unimpaired. Debtors timely appealed.

We affirm.

**FACTS**

On January 2, 1997, The Manning House, L.L.C., an Arizona Limited Liability Company ("Manning House") executed a promissory note to Imperial in the original principal sum of $1,880,000 ("Note").  As part of the transaction, Debtors each signed a Continuing Guaranty of Payment and Performance dated January 2, 1997 (collectively, "Guaranties"), guaranteeing payment of the Manning House Note and any subsequent loan advances made by

---

[2] Unless otherwise indicated, all chapter and section references are to the unamended Bankruptcy Code, 11 U.S.C. §§ 101-1330, in effect when this case was filed, and prior to the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA").  Rule references are to the Federal Rules of Bankruptcy Procedure (Fed. R. Bankr. P.), Rules 1001-9036.

-2-

Imperial to Manning House.  On November 6, 1997, Manning House obtained an additional advance of funds from Imperial in the amount of $385,000 ("Additional Advance").

On September 11, 1998, Manning House filed a voluntary chapter 11 petition in Case No. 98-03968-TUC-LO, styled <u>In re Manning House, L.L.C., Debtor</u>, in the United States Bankruptcy Court, District of Arizona, Tucson Division.[3]  Shortly thereafter, Imperial demanded payment by Debtors of the Manning House Note and Additional Advance.  When Debtors defaulted under their Guaranties, Imperial commenced an action in the Superior Court of Arizona, County of Pima, to enforce the Guaranties and caused a writ of attachment to be levied by the Pima County Sheriff on certain rental real property owned by the Debtors located in Tucson, Arizona ("Farr Property").  Thereafter, Imperial obtained a judgment against the Debtors in the amount of $2,472,371.23, and recorded its judgment with the Pima County Recorder's Office on April 12, 2001.

On October 17, 2001, Debtors filed their voluntary petition for liquidation under chapter 7 of the Code.  Debtors did not claim an exemption in the Farr Property,[4] and received a discharge on March 5, 2002.  On August 4, 2004, Imperial filed a Motion for Relief from Automatic Stay ("Motion") seeking authority to

_____

[3] The Manning House bankruptcy case was later transferred to the United States Bankruptcy Court, District of Arizona, Phoenix Division.

[4] Because a homestead exemption was not claimed in the Farr Property, Debtors have not alleged that Imperial's nonconsensual judgment lien should be avoided under § 522(f)(1) to the extent that it impairs an exemption to which they are entitled under § 522(b).

-3-

exercise its state law execution remedies against the Farr Property to collect its judgment. On November 8, 2004, the bankruptcy court commenced a hearing on Imperial's Motion, but converted the matter to an adversary proceeding for the purpose of determining the validity, extent and priority of Imperial's lien on the Farr Property. Fed. R. Bankr. P. 7001(2). Besides Imperial's judgment lien, the Farr Property was further encumbered by (1) a deed of trust in favor of Western Financial Bank in the amount of $131,250 recorded January 5, 1999; (2) a lien in the amount of $28,250 in favor of Donald L. Vath, recorded February 3, 1999; (3) a judgment lien in the amount of $8,864 in favor of Ralph Raub, recorded May 16, 2001, and (4) another judgment lien in the amount of $417, recorded June 15, 2001.

On January 11, 2005, the bankruptcy court conducted an evidentiary hearing on the validity, extent, and priority of Imperial's lien. At the conclusion of the hearing, Imperial was granted leave to file a supplemental brief on the issue of whether it was entitled as a judgment creditor to foreclose on the Farr Property. Imperial's supplemental brief was filed on January 18, 2005.

On January 24, 2005, the bankruptcy court issued a Memorandum Decision ("Memorandum") granting Imperial's Motion, lifting the stay, and valuing Imperial's secured claim at zero pursuant to § 506. In so holding, the court determined that the Farr Property had a value of $159,825, but that Imperial's lien was junior to senior liens totaling $168,364. Based on § 506, the court concluded that Imperial's secured claim as to the Farr Property was wholly unsecured.

-4-

On January 31, 2005, Imperial filed a Motion to Alter or Amend the Court's Memorandum Decision Dated 1/24/05 ("Motion to Amend") arguing that the valuation of liens under § 506 is not permitted in chapter 7 cases.  On February 11, 2005, Debtors filed a response in opposition to Imperial's Motion to Amend asserting that Imperial had "offered nothing new to justify altering or amending" the court's earlier ruling.  After a hearing on February 18, 2005, the bankruptcy court issued an Order on April 8, 2005, granting Imperial's Motion to Amend.  In its Order, the court declined to change that portion of its Memorandum lifting the automatic stay, but deleted from its Memorandum any discussion of the valuation of Imperial's lien, stating that "Imperial's secured lien will pass through bankruptcy unaffected."

## ISSUE

Whether the bankruptcy court erred in its determination that § 506(d) cannot be used by a chapter 7 debtor to strip off a wholly unsecured nonconsensual lien.

## JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. § 1334 and 28 U.S.C. § 157(a), (b)(1), and (b)(2)(A), (B), (G) and (K).  We have jurisdiction under 28 U.S.C. § 158(c)(1).

## STANDARD OF REVIEW

Whether § 506(d) can be used by a chapter 7 debtor to strip off a wholly unsecured nonconsensual lien is a question of law.  Therefore, we review the bankruptcy court's conclusions of law and interpretation of the Bankruptcy Code de novo.  Bunyan v. United States (In re Bunyan), 354 F.3d 1149, 1150 (9th Cir. 2004); Tanzi v. Comerica Bank – California (In re Tanzi), 297 B.R. 607, 610

-5-

(9th Cir. BAP 2003).

**DISCUSSION**

Section 506 of the Bankruptcy Code[5] governs the determination and treatment of secured claims in bankruptcy cases. Shook v. CBIC (In re Shook), 278 B.R. 815, 822 (9th Cir. BAP 2002). Because a claim is secured only by the value of the property to which the lien is attached, an undersecured claim may be bifurcated under § 506(a), leaving a creditor with a secured claim to the extent of the value of the collateral and an unsecured claim as to the deficiency. See, e.g., United States v. Ron Pair Enters, Inc., 489 U.S. 235, 239 (1989) (stating that § 506(a) "provides that a claim is secured only to the extent of the value of the property on which the lien is fixed; the remainder of that

---

[5] Section 506 provides, in pertinent part:

(a) An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to set off is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest. . . .
(d) To the extent that a lien secures a claim against the debtor that is not an allowed secured claim, such lien is void, unless–
    (1) such claim was disallowed only under section 502(b)(5) or 502(e) of this title; or
    (2) such claim is not an allowed secured claim due only to the failure of any entity to file a proof of such claim under section 501 of this title.

11 U.S.C. § 506(a) & (d).

-6-

claim is considered unsecured"); <u>Shook</u>, 278 B.R. at 822 (observing that § 506(a) permits "bifurcation of an allowed claim into its secured and unsecured components according to the value of the collateral").

Prior to <u>Dewsnup v. Timm</u>, 502 U.S. 410 (1992), there was a split among the circuits on the issue of whether a chapter 7 debtor could use § 506(d) to "strip down"[6] an undersecured mortgage lien to a value judicially determined under § 506(a). <u>Compare Gaglia v. First Fed. Sav. & Loan Ass'n</u>, 889 F.2d 1304, 1308 (3d Cir. 1990), <u>Folendore v. U.S. Small Business Admin. (In re Folendore)</u>, 862 F.2d 1537, 1539 (11th Cir. 1989), <u>and Lindsey v. Fed. Land Bank of St. Louis (In re Lindsey)</u>, 823 F.2d 189, 191 (7th Cir. 1987) (recognizing a chapter 7 debtor's ability to void liens under § 506(d)), <u>with Dewsnup v. Timm (In re Dewsnup)</u>, 908 F.2d 588, 593 (10th Cir. 1990), <u>aff'd</u>, 502 U.S. 410 (1992) (opining that lien avoidance under § 506(d) "gives debtors much more than the 'fresh start' to which they are entitled"). In <u>Dewsnup</u>, the United States Supreme Court held that a chapter 7 debtor may not invoke § 506(d) to "strip down" an undersecured mortgage to the value of the collateral determined under § 506(a), stating:

> [W]e hold that § 506(d) does not allow petitioner to 'strip down' respondents' lien, because respondents' claim is secured by a lien and has been fully allowed pursuant to § 502.

502 U.S. at 417. The Supreme Court reasoned that liens pass

---

[6] The term "strip down" is used where the inferior mortgage is partially secured whereas "strip off" is used where the junior mortgage is totally unsecured. <u>In re Fitzmaurice</u>, 248 B.R. 356, 357 n.2 (Bankr. W.D. Mo. 2000).

-7-

through bankruptcy unaffected, and that mortgagees and mortgagors bargain for a consensual lien which stays with the real property until foreclosure, resulting in the creditor benefitting from any increase in the value of the property. <u>Id.</u> In so holding, the court stated:

> We think . . . that the creditor's lien stays with the real property until the foreclosure. That is what was bargained for by the mortgagor and the mortgagee. The voidness language sensibly applies only to the security aspect of the lien and then only to the real deficiency in the security. Any increase over the judicially determined valuation during bankruptcy rightly accrues to the benefit of the creditor, not to the benefit of the debtor and not to the benefit of other unsecured creditors whose claims have been allowed and who had nothing to do with the mortgagor-mortgagee bargain.

<u>Id.</u>[7]

---

[7] In prohibiting lien stripping in chapter 7 cases, the Supreme Court in <u>Dewsnup</u> made no distinction between consensual and nonconsensual liens. 502 U.S. at 417 (stating that "we are not convinced that Congress intended to depart from the pre-Code rule that liens pass through bankruptcy unaffected"). The court also explained that such a prohibition was consistent with established practice prior to enactment of the Code, stating:

> Apart from reorganization proceedings, no provision of the pre-Code statute permitted involuntary reduction of the amount of a creditor's lien for any reason other than payment on the debt. . . . Congress must have enacted the Code with a full understanding of this practice. When Congress amends the bankruptcy laws, it does not write "on a clean slate." Furthermore, this Court has been reluctant to accept arguments that would interpret the Code, however vague the particular language under consideration might be, to effect a major change in pre-Code practice that is not the subject of at least some discussion in the legislative history. Of course, where the language is unambiguous, silence in the legislative history cannot be controlling. But, given the ambiguity here, to attribute to Congress the intention to grant a debtor the broad new remedy against allowed claims to the extent that they become "unsecured" for purposes of § 506(a) without the new remedy's being mentioned somewhere in the Code itself or in the annals of Congress is not plausible, in our view,
> (continued...)

-8-

In <u>Laskin v. First Nat'l Bank of Keystone (In re Laskin)</u>, 222 B.R. 872 (9th Cir. BAP 1998), we found <u>Dewsnup</u>'s reasoning equally applicable in cases where debtors seek to strip off <u>wholly</u> unsecured consensual liens, stating that:

> <u>Dewsnup</u> teaches that, unless and until there is a claims allowance process, there is no predicate for voiding a lien under § 506(d). Absent either a disposition of the putative collateral or valuation of the secured claim for plan confirmation in Chapter 11, 12 or 13, there is simply no basis on which to avoid a lien under § 506(d).

<u>Id.</u> at 876.[8] <u>Cf.</u> <u>Zimmer v. PSB Lending Corp. (In re Zimmer)</u>, 313 F.3d 1220, 1222 (9th Cir. 2002) (holding that a wholly unsecured lien on debtor's primary residence is not protected by the antimodification clause of § 1322(b)(2) and may be avoided in a chapter 13 case). We expressly declined to follow <u>Yi v. Citibank (Md.), N.A. (In re Yi)</u>, 219 B.R. 394 (E.D. Va. 1998) and <u>Howard v. Nat'l Westminster Bank (In re Howard)</u>, 184 B.R. 644 (Bankr.

---

[7](...continued)
and is contrary to basic bankruptcy principles.

<u>Id.</u> at 418-20 (citations omitted).

[8] The Ninth Circuit later observed in <u>Enewally v. Washington Mut. Bank (In re Enewally)</u>:

> The rationales advanced in the <u>Dewsnup</u> opinion for prohibiting lien stripping in Chapter 7 bankruptcies, however, have little relevance in the context of rehabilitative bankruptcy proceedings under Chapters 11, 12 and 13, where lien stripping is expressly and broadly permitted, subject only to very minor qualifications. The legislative history of the Code makes clear that lien stripping is permitted in the reorganization chapters.

368 F.3d 1165, 1170 (9th Cir. 2004), citing <u>Bartee v. Tara Colony Homeowners Ass'n (In re Bartee)</u>, 212 F.3d 277, 291 n.21 (5th Cir. 2000) (quoting Jane Kaufman Winn, <u>Lien Stripping After Nobleman</u>, 27 Loy. L.A. L. Rev. 541, 554-55 (1994)).

-9-

E.D.N.Y. 1995) cited by Debtors, noting that:

> In neither Howard nor Yi does the court indicate whether there was any prior claim allowance proceeding. Both conclude that, since there was no equity to which the lien in question could attach and there could be no secured claim under § 506(a), the lien could therefore be avoided under § 506(d). With all respect to those courts, we think that analysis reverses the statutory process.

Laskin, 222 B.R. at 876. As we stated in Laskin, "[s]ection 506 was intended to facilitate valuation and disposition of property in the reorganization chapters of the Code, not to confer an additional avoiding power on a chapter 7 debtor." Id. at 876 (citing Oregon v. Lange (In re Lange), 120 B.R. 132, 135 (9th Cir. BAP 1990)); see Shook, 278 B.R. at 822. We are bound by our prior decision in Laskin. See, e.g., Salomon N. Am. v. Knupfer (In re Wind N' Wave), 328 B.R. 176, 181 (9th Cir. BAP 2005) (stating that "we regard ourselves as bound by our prior decisions"); Ball v. Payco-Gen. Am. Credits, Inc. (In re Ball), 185 B.R. 595, 597 (9th Cir. BAP 1995) (stating that "[w]e will not overrule our prior rulings unless a Ninth Circuit Court of Appeals decision, Supreme Court decision or subsequent legislation has undermined those rulings").

Since Dewsnup, lien stripping has not been permitted in chapter 7 cases. Enewally, 368 F.3d at 1169. See, e.g., Talbert v. City Mortgage Servs. (In re Talbert), 344 F.3d 555, 562 (6th Cir. 2003) (concluding that "a Chapter 7 debtor may not use 11 U.S.C. § 506 to 'strip off' an allowed junior lien where the senior lien exceeds the fair market value of the real property"); Ryan v. Homecomings Fin. Network, 253 F.3d 778, 783 (4th Cir. 2001) (holding that "an allowed unsecured consensual lien may not be stripped off in a Chapter 7 proceeding pursuant to the

-10-

provisions of 11 U.S.C. §§ 506(a) and (d)").

Debtors attempt to distinguish <u>Laskin</u> by arguing that <u>Dewsnup</u> and its progeny apply only to <u>consensual</u> liens. Debtors reason that Imperial's wholly unsecured judgment lien may be stripped off simply because it is <u>nonconsensual</u>. This is a distinction without a difference.

Lien stripping in chapter 7 cases is inconsistent with the purpose and policy of § 506 which, as we observed in <u>Laskin</u>, was "to facilitate valuation and disposition of property in the reorganization chapters of the Code." <u>Laskin</u>, 222 B.R. at 876. Furthermore, the majority of courts addressing this issue have applied <u>Dewsnup</u> to both consensual and nonconsensual liens in chapter 7 bankruptcy cases. <u>See, e.g.</u>, <u>Boring v. Promistar Bank</u>, 312 B.R. 789, 797 (W.D. Pa. 2004) (citing <u>Laskin</u> and holding § 506(d) may not be used in chapter 7 to strip off an allowed judicial lien); <u>Crossroads of Hillsville v. Payne</u>, 179 B.R. 486, 491 (W.D. Va. 1995) (holding that <u>Dewsnup</u>'s prohibition against lien stripping barred a chapter 7 debtor from avoiding a wholly unsecured judgment lien under § 506(d)); <u>Warner v. United States (In re Warner)</u>, 146 B.R. 253, 256 (N.D. Cal. 1992) (reversing a bankruptcy court's decision permitting a chapter 7 debtor to strip down an undersecured federal tax lien under §506(d)); <u>Swiatek v. Pagliaro (In re Swiatek)</u>, 231 B.R. 26, 29 (Bankr. D. Del. 1999) (holding that <u>Dewsnup</u> applied to prohibit the avoidance of nonconsensual liens, and observing that "[t]he <u>in rem</u> aspect of a judgment is equally as viable in the context of a nonconsensual lien as in that of a consensual one"); <u>Esler v. Orix Credit Alliance (In re Esler)</u>, 165 B.R. 583, 584 (Bankr. D. Md. 1994)

-11-

(observing that Dewsnup "is equally applicable to consensual and non-consensual liens"); In re Doviak, 161 B.R. 379, 381 (Bankr. E.D. Tex. 1993) (rejecting debtors' argument that Dewsnup applies only to consensual liens, and denying debtors' motion to strip down an undersecured federal tax lien); Rombach v. United States (In re Rombach), 159 B.R. 311, 314 (Bankr. C.D. Cal. 1993) (concluding that Dewsnup prohibits debtors "from stripping down the undersecured portion of a non-consensual lien"). See generally 4 Collier on Bankruptcy ¶ 506.06[1][b], at 506-147 (15th ed. rev. 2005).

Debtors point to Warthen v. Smith (In re Smith), 247 B.R. 191 (W.D. Va. 2000), aff'd, 243 F.3d 540 (4th Cir. 2001) (mem.), cert. denied, 532 U.S. 1052 (2001), claiming that the stripping of nonconsensual liens in chapter 7 cases is permissible in the Fourth Circuit. However, the Smith decision turned on the value of the collateral at issue in the case, not the nature of the lien sought to be avoided.[9] More importantly, the district court in Smith based its interpretation of § 506(d) on the reasoning of Howard and Yi, which were rejected by this court. Id. at 195-96. Although Smith was affirmed without an opinion, the Fourth Circuit in Ryan later that year not only declined to follow Smith, but effectively abrogated the decision by embracing this court's reasoning in Laskin and specifically holding that an allowed

---

[9] Indeed, the Smith court observed that "[t]he precedent in the Western District is to apply the Dewsnup holding to both consensual and non-consensual liens." 247 B.R. at 195. Construing Dewsnup as prohibiting only the stripping down of undersecured liens, the district court in Smith affirmed a bankruptcy court's decision permitting a chapter 7 debtor to strip off a wholly unsecured judgment lien against his one-half interest in certain nonexempt real property. Id. at 196.

-12-

1  unsecured consensual junior lien may not be stripped off in a

2  chapter 7 case pursuant to § 506(a) and (d), stating:

3          We are aware . . . that some courts are not in
        agreement with this analysis of Dewsnup.  See Yi v.
4       Citibank, 219 B.R. 394, 397 (E.D. Va. 1998) (Chapter 7
        debtor's proceeding--"Because Citibank's lien is wholly
5       unsecured, by definition it cannot be an 'allowed
        secured claim.'  From this it inexorably follows that
6       the lien is void." (citing Howard, 184 B.R. at 644)); In
        re Smith, 247 B.R. 191 (W.D. Va. 2000); Farha v. First
7       American Title Ins., 246 B.R. 547, 549 (Bankr. E.D.
        Mich. 2000) (where claim is unsecured rather than
8       undersecured "there is no allowed secured claim under
        § 506(a)); Zempel v. Household Finance Corp., 244 B.R.
9       625 (Bankr. W.D. Ky. 1999) (same).

10         Other courts have concluded, as do we, that a
        Chapter 7 debtor may not use § 506(d) to strip off an
11      allowed, wholly unsecured consensual junior lien from
        real property.
12

13  253 F.3d at 782-83 (emphasis added).

14      Finally, Hoekstra v. United States (In re Hoekstra), 255 B.R.

15  285 (E.D. Va. 2000) cited by Debtors is neither dispositive nor

16  controlling.  In that case, the district court reversed the

17  bankruptcy court's decision based on Yi authorizing a chapter 7

18  debtor to strip off a wholly unsecured tax lien, noting the

19  "Dewsnup Court's clear prohibition against 'stripping down'

20  liens."  Id. at 292.  Under no circumstances do either Smith or

21  Hoekstra compel us to conclude that Dewsnup is inapplicable where

22  the lien sought to be avoided in chapter 7 is nonconsensual.  To

23  the extent Smith has any remaining precedential value, it is not

24  binding on this court.

25                          **CONCLUSION**

26      Not only have the authorities cited by Debtors either been

27  rejected by this court or essentially overruled, but the majority

28  of cases addressing this issue support the conclusion that Dewsnup

                              -13-

prohibits the stripping of both consensual and nonconsensual liens
in chapter 7 cases.  It is undisputed that Imperial's claim is
allowed pursuant to § 502 and is secured by a judgment lien
against the Farr Property.  Imperial's lien does not impair an
exemption to which the Debtors are entitled under § 522(b).
Whether or not the value of the Farr Property is sufficient to
cover Imperial's claim, <u>Dewsnup</u> prohibits Debtors from utilizing
§ 506(a) and (d) to strip off Imperial's judgment lien.  The
bankruptcy court did not err in determining that § 506(d) cannot
be used by a chapter 7 debtor to strip off a wholly unsecured
nonconsensual lien.  Accordingly, the bankruptcy court's order
granting Imperial's motion to revise its Memorandum, deleting the
valuation of the Farr Property and permitting Imperial's judgment
lien to pass through bankruptcy unaffected is **AFFIRMED.**

Case: 19-30088   Doc# 13260   Filed: 11/17/22   Entered: 11/17/22 09:34:12   Page 51
of 74

1   **EXHIBIT D**

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit D

```
================================================================
PACIFIC GAS BANKRUPTCY NEWS                    Issue Number 1
----------------------------------------------------------------
Copyright 2001 (ISSN XXXX-XXXX)                April 7, 2001
----------------------------------------------------------------
Bankruptcy Creditors' Service, Inc., 609-392-0900  FAX 609-392-0040
----------------------------------------------------------------
PACIFIC GAS BANKRUPTCY NEWS is published by Bankruptcy Creditors'
Service, Inc., 24 Perdicaris Place, Trenton, New Jersey 08618,
On an ad hoc basis (generally every 10 to 20 days) as significant
activity occurs in the Debtor's chapter 11 cases.  Each issue is
prepared by Peter A. Chapman, Editor.  Subscription rate is US$45
per issue.  Reproduction or e-mail redistribution of PACIFIC GAS
BANKRUPTCY NEWS is prohibited without permission.
================================================================


                     IN THIS ISSUE
                     -------------


[00000] HOW TO ORDER A SUBSCRIPTION TO PACIFIC GAS BANKRUPTCY NEWS
[00001] DESCRIPTION & OVERVIEW OF PACIFIC GAS & ELECTRIC COMPANY
[00002] CONSOLIDATED BALANCE SHEET AS OF SEPTEMBER 30, 2000
[00003] COMPANY'S PRESS RELEASE CONCERNING CHAPTER 11 FILING
[00004] DEBTOR'S CHAPTER 11 DATABASE
[00005] LISTING OF THE DEBTOR'S 20 LARGEST UNSECURED CREDITORS
[00006] DEBTOR'S MOTION TO HONOR WAGE & SALARY OBLIGATIONS
[00007] DEBTOR'S MOTION TO CONTINUE USING CURRENT BUSINESS FORMS
[00008] DEBTOR'S MOTION TO CONTINUE USING EXISTING BANK ACCOUNTS
[00009] WHO'S JUDGE MONTALI AND HOW DOES HIS COURTROOM WORK?


                   KEY DATE CALENDAR
                   -----------------


04/06/01 Voluntary Petition Date

04/21/01 Deadline for filing Schedules of Assets and Liabilities
04/21/01 Deadline for filing Statement of Financial Affairs
04/21/01 Deadline for filing Lists of Leases and Contracts
04/26/01 Deadline to provide Utilities with adequate assurance
06/05/01 Deadline to make decisions about lease dispositions
07/05/01 Deadline to removal actions pursuant to F.R.B.P. 9027
08/04/01 Expiration of Debtor's Exclusive Plan Proposal Period
10/30/01 Expiration of Debtor's Exclusive Solicitation Period
04/06/03 Deadline for Debtor's Commencement of Avoidance Actions

  <None>  Organizational Meeting with UST to form Committees
  <None>  Bar Date for filing Proofs of Claim
  <None>  First Meeting of Creditors pursuant to 11 USC Sec. 341


----------------------------------------------------------------
[00000] HOW TO ORDER A SUBSCRIPTION TO PACIFIC GAS BANKRUPTCY NEWS
----------------------------------------------------------------

PACIFIC GAS BANKRUPTCY NEWS is distributed to paying subscribers by
```

electronic mail.  New issues are published on an ad hoc basis as significant activity occurs (generally every 10 to 20 days) in the Debtor's chapter 11 case.  The subscription rate is $45 per issue. Newsletters are delivered via e-mail; invoices, transmitted with each newsletter issue, arrive by fax.  Distribution to multiple individuals at the same firm is provided at no additional charge; folks outside of your firm should set-up and pay for their own subscriptions.  Subscriptions may be canceled at any time without further obligation.

To continue receiving PACIFIC GAS BANKRUPTCY NEWS, please complete the form below and return it by fax or e-mail to:

> Bankruptcy Creditors' Service, Inc.
> 24 Perdicaris Place
> Trenton, NJ 08618
> Telephone (609) 392-0900
> Fax (609) 392-0040
> E-mail: peter@bankrupt.com

We have published similar newsletters tracking billion-dollar insolvency proceedings since 1990.  Currently, we provide similar coverage about the chapter 11 cases involving Owens Corning, Armstrong World Industries, LTV, Wheeling-Pittsburgh, W.R. Grace & Co., Safety-Kleen, Bridge Information Services, ICG Communications, Lernout & Hauspie & Dictaphone, Fruit of the Loom, Pillowtex, Imperial Sugar, Vlasic Foods, The Loewen Group International, Inc., Harnischfeger Industries, Inc., Vencor, Inc., Sun Healthcare Group, Inc., Mariner Post-Acute & Mariner Health, and Integrated Health Services.

==================================================================

       [   ]  YES!  Please enter my personal subscription to
              PACIFIC GAS BANKRUPTCY NEWS.


      Name:
              ----------------------------------------------


      Firm:
              ----------------------------------------------


   Address:
              ----------------------------------------------


              ----------------------------------------------


     Phone:
              ----------------------------------------------


       Fax:
              ----------------------------------------------


    E-Mail:
              ----------------------------------------------

2

```
----------------------------------------------------------------
[00001] DESCRIPTION & OVERVIEW OF PACIFIC GAS & ELECTRIC COMPANY
----------------------------------------------------------------
```

Pacific Gas and Electric Company
77 Beale Street
P.O. Box 7442
San Francisco, CA 94120
Telephone (415) 973-7000
http://www.pge.com

Pacific Gas and Electric Company, a wholly-owned subsidiary of PG&E
Corporation (NYSE:PCG), is one of the largest combination natural
gas and electric utilities in the United States.  Nearly 20,000
employees carry out PG&E's primary business -- the transmission
and delivery of energy.  PG&E provides natural gas and electric
service to approximately 12 million people in Northern and Central
California -- about one in every 20 Americans.  The utility's
service area covers 70,000 square miles, stretching from Eureka in
the north to Bakersfield in the south, and from the Pacific Ocean
in the west to the Sierra Nevada in the east

Last year, PG&E obtained power from five sources:

        35% from conventional hydroelectric powerhouses;
        28% from Diablo Canyon, a nuclear power plant;
        16% from the Helms Pumped Storage Powerhouse;
        14% purchased from independent producers and other utilities;
         7% from fossil-fueled plants.

delivered that power to:

        4,500,000 electric customer accounts and
        3,700,000 gas customer accounts

using:

        131,000 circuit miles of electric lines; and
         43,000 miles of natural gas pipelines.

                        *    *    *

                    Electrical Services
                in the Pre-Deregulation Era

Prior to 1998, PG&E provided integrated electric services,
consisting of generating, transmitting and distributing electricity
to its retail customers.  Specifically, PG&E generated electricity
by means of natural gas-fueled, hydroelectric and nuclear power
plants that it built and operated; it purchased electricity from
third-party producers or re-sellers; it transmitted such generated
and purchased electricity via transmission grids, portions of which
it owned; and it distributed that electricity to end-use customers

Case: 19-30088   Doc# 13260   Filed: 11/17/22   Entered: 11/17/22 09:34:12   Page 55
of 74

through power lines located throughout its local markets.  These
integrated or "bundled" electric services were regulated by the
California Public Utilities Commission (the "CPUC").

During this period, PG&E built and operated power plants with the
expectation that it could recover those generation-related
investment costs over many years (together with a fair rate of
return) in rates it charged to its customers, pursuant to the
fundamental regulatory compact between the State and utility
shareholders.  Hence, retail rates during this period included a
component for recovery of PG&E's generation-related investments.

### The Implementation of Deregulation

In 1996, the California Legislature enacted Assembly Bill 1890,
("AB 1890") which restructured the state electric industry by
mandating that electric services be unbundled, and by mandating
that wholesale markets be opened up to competition by January 1,
1998.  AB 1890 generally codified a market structure prescribed by
the CPUC in its December 1995 Preferred Policy Decision (the "1995
Policy Decision").

In its 1995 Policy Decision, the CPUC provided PG&E strong
financial disincentives for remaining in the power generation
business.  Pursuant to those disincentives, and after CPUC
approval, PG&E divested many of its electric generation power
plants over time.

### The Wholesale Power Market:
### The ISO and the PX

Under the restructuring brought about by AB 1890 and the 1995
Policy Decision, PG&E was no longer permitted to provide power
directly to its bundled service customers.  Instead, PG&E was
required to sell its power into the wholesale electric power market
at market prices (e.g., power that it either generated or obtained
under power purchase agreements that it had entered into with third
parties prior to the industry restructuring (so-called pre-existing
power purchase agreements, or "PPAs")), and then purchase from the
electric wholesale market the power that it needed to serve its
bundled customers.  The wholesale electric power market is
regulated by the Federal Energy Regulatory Commission ("FERC"), and
therefore is subject to federal, not state, jurisdiction.  These
wholesale transactions took place through two newly-created
entities brought about by AB 1890 and the 1995 Policy Decision,
both of which are regulated by FERC: the California Power Exchange
("PX"), which was charged with responsibility for creating a
central market for the purchase and sale of wholesale electricity,
and the Independent System Operator ("ISO"), which was charged with
responsibility for managing the State's electricity transmission
grid.  (The PX filed for bankruptcy on March 9, 2001 due in
significant part to the current financial pressures facing the
utilities, and is no longer an active participant in the California
wholesale electricity markets.)

Pursuant to AB 1890 and the 1995 Policy Decision, PG&E was required
each day to sell electricity it generated that day (or obtained

Case: 19-30088   Doc# 13260   Filed: 11/17/22   Entered: 11/17/22 09:34:12   Page 56
of 74

through its pre-existing PPAs), at FERC-authorized market rates, through daily auctions for wholesale electricity conducted by the PX, and through the real-time energy market managed by the ISO. And PG&E was required each day to purchase the electricity it needed to serve its bundled customers (again, at FERC-authorized market rates), through daily auctions for wholesale electricity conducted by the PX, and through the real-time energy market managed by the ISO. It was required to make those electricity purchases through the PX and ISO at the wholesale prices established by the PX and the ISO, without modification, and regardless of price.

The PX and the ISO set their respective prices under FERC-authorized, market-based price-setting mechanisms for wholesale power. The PX billed PG&E for the costs of electricity PG&E purchased from the PX. The PX also billed PG&E for the amounts that the ISO billed the PX for electricity that the ISO procured on a real-time basis to meet the needs of the PX.

In general, since the outset of the electric industry restructuring, PG&E has been a net purchaser of power from the wholesale markets; in other words, has been purchasing more wholesale power than it supplies. Furthermore, as it has divested significant amounts of its power generation assets over time, that net has increased.

Among the entities with whom PG&E has pre-existing power purchase agreements, or "PPAs," are so-called Qualifying Facility ("QF") generators. For the most part, the amounts that PG&E is required to pay to QFs under pre-existing agreements for energy deliveries are based upon prices that are tied to volatile natural gas or spot wholesale electric market indices.

### The Rate Freeze and Transition Costs

The architects of the electricity industry restructuring recognized that some of the utilities' past generation-related investments might not be recoverable in market prices in a competitive market. Therefore, at the same time that it created a framework to encourage greater competition among wholesale electricity suppliers, AB 1890 also created a statutorily-defined "transition period" during which time retail rates would remain frozen at levels thought to be sufficient to enable utilities an opportunity to recover these historic costs (so-called "transition costs"), over and above their operating costs and a reasonable rate of return.

At the time that AB 1890 was enacted, PG&E had billions in unrecovered historic or "transition" costs, which included costs such as investments to construct power generating facilities, payments owed to third party suppliers under PPAs, pension benefits, and other expenses associated with the transition period. AB 1890 "froze" PG&E's electric retail rates, regardless of the wholesale price of electricity. It did so for residential and small commercial customers at a level 10 percent below those in effect on June 10, 1996 (which reduction was financed through rate reduction bonds), and for other customers at the level in effect on

that date. At the time that AB 1890 was enacted, however, it was widely expected that the utilities' wholesale power costs would decline, and that the difference between their operating costs and the frozen rates would contribute to the utilities' collection of their transition costs.

The foregoing frozen rates remained in effect until January 4, 2001, when the CPUC raised electric retail rates by 1 cent per kilowatt hour. On March 27, 2001, the CPUC stated it would raise electric retail rates by, on average, an additional 3 cents per kilowatt hour, but it has not yet implemented that rate increase, and is not expected to do so before June 1, 2001. Despite these recent rate increases, however, the CPUC also determined, and continues to hold, that the AB 1890 rate freeze remains in effect.

### The Wholesale Electricity Crisis

In the summer of 2000, a combination of market conditions beyond PG&E's control created sharp increases in the wholesale prices PG&E was being charged by the PX, and indirectly by the ISO, for its electric power purchases. Prices have never returned to their previous levels and have remained substantially above their pre-summer 2000 levels ever since.

On one single day, December 13, 2000, the total cost incurred for energy procured within California exceeded the total cost incurred during several entire months in 1999.

In December 2000, procurement costs for wholesale electricity escalated to an average of approximately $330 per megawatt hour, a level approximately eight times higher than that in December 1999. The average spot market price of wholesale electricity has remained over $250 per megawatt hour for most of the period January 2001 through March 2001.

The impact on PG&E of these increases in the PX and ISO "spot markets" was magnified by regulations, described above, that the CPUC had adopted following the passage of AB 1890 requiring PG&E to purchase most of its electricity from the PX's highly volatile spot market at market clearing prices, or indirectly from the ISO's real time market. Initially, those regulations gave PG&E no latitude to enter into long-term bilateral contracts, a mechanism that would have enabled PG&E to hedge against the volatility in the PX and ISO spot markets.

In late 1999, the CPUC authorized PG&E to enter into a limited volume of hedging contracts through the PX (so-called "block-forward" contracts), but PG&E's ability to take advantage of that was constrained by a lack of liquidity in such contracts, as well as by constraints the CPUC placed on their use. Months later, in August 2000, after prices on the spot markets had continued to rise dramatically, the CPUC granted PG&E authority to enter into long-term bilateral agreements. But that step afforded PG&E little relief, in part because the CPUC did not articulate any substantive guidance or standards for what it considered to be reasonable terms, leaving PG&E to guess at what costs the CPUC might later determine to be recoverable. The CPUC also has never authorized

PG&E to use financial instruments to hedge against wholesale electric price volatility. In short, the CPUC provided PG&E with an inadequate ability to hedge against the dramatic price increases in the wholesale spot markets, which persist to this date.

To give some indication of the magnitude of the revenue shortfalls facing PG&E, at the beginning of 2001 the rate that PG&E was permitted to charge its retail customers for the electrical energy component of retail rates was approximately $54 per megawatt hour, based upon the rate freeze imposed by AB 1890. ($10 per megawatt hour is the equivalent of 1 cent per kilowatt hour.) On January 4, 2001, the CPUC approved an interim rate of 1 cent per kilowatt hour, which increased the electrical energy component of PG&E's retail rates to $64 per megawatt hour. At the same time, the average December 2000 "spot market" price was more than five times that level, $330 dollars per megawatt hour.

On March 27, 2001, the CPUC approved an additional average increase of 3 cents per kilowatt hour, but also indicated that it does not anticipate implementing this increase until June 2001, at the earliest. Once implemented, this 3-cent increase would bring the electrical energy component of PG&E's retail rates to $94 per megawatt hour. Although the CPUC has granted these recent increases, it has refused to establish or implement rates that would allow PG&E to recover its ongoing costs of providing service to its customers.

As a result of the substantial ongoing shortfall (which began in June 2000) between PG&E's ongoing electricity procurement costs, on the one hand, and the rates that it has been authorized to charge its customers, on the other, PG&E has been unable to borrow money to finance its operating deficit. Moreover, most wholesale electric providers have not only refused to agree to sell power directly to PG&E, but also have refused-unless compelled by court order-to sell power to the ISO and others who might resell power to PG&E, and whose ability to pay for the power may be contingent upon receiving payment from PG&E.

The State of California, through the California Department of Water Resources ("CDWR"), has begun to purchase wholesale electric power to be provided directly to electric customers in PG&E's service territory. (Southern California Edison Company ("SCE") faces much the same circumstances as PG&E, and CDWR is also purchasing power to be provided to electric customers in SCE's service territory. Although the circumstances surrounding San Diego Gas and Electric Company's ("SDG&E") rates are somewhat different, CDWR is purchasing power to be provided to electric customers in SDG&E's service territory, as well.) These CDWR activities were first authorized in the Governor's Emergency Proclamation issued by Governor Davis on January 17, 2001, then for a very limited period of time through enactment of Senate Bill 7 ("SB 7x") adopted in the First 2001-2002 Extraordinary Session of the California Legislature, and finally on an ongoing basis through enactment of AB 1x, adopted by the California Legislature on February 1, 2001.

PG&E's "net short position" is the difference between the amount of electric power PG&E can provide through the generation facilities

7

it owns and the PPAs it holds, on the one hand, and the amount of electric power demanded by PG&E's bundled service customers, on the other. Although CDWR has acknowledged that AB 1x authorizes it to purchase sufficient electricity to meet PG&E's net short position, and PG&E believes that AB 1x requires CDWR to do so, to date CDWR has not made it a practice to purchase sufficient electricity to meet PG&E's net short position.

For the most part, the ISO has been purchasing the remaining wholesale electric power necessary to meet PG&E's net short position. PG&E does not know what representations the ISO is making to suppliers as to how they will be paid for this power. On occasion, the ISO has not purchased sufficient electricity to cover the net short position, resulting in blackouts in PG&E's service territory, as was the case on March 19-20, 2001 and January 17-18, 2001.

On February 14, 2001, FERC issued an order stating that the ISO cannot exempt PG&E from the ISO's requirements that those obtaining electric power through the ISO must be "creditworthy." PG&E does not meet the ISO's definition of creditworthy. It is PG&E's position that the ISO cannot purchase wholesale electric power on PG&E's behalf, to be paid for by PG&E. The ISO has informed PG&E that it will continue to bill PG&E for these amounts. Therefore, there has been significant disagreement over who is ultimately responsible for paying for the wholesale power the ISO is purchasing to meet the remainder of PG&E's net short position not being met by direct CDWR purchases.

Under CPUC decisions interpreting the legislation authorizing CDWR to purchase power to meet PG&E's net open position, PG&E is currently obligated to forward to CDWR, on a daily basis, a proportion of the revenues PG&E receives from the generation component of its retail electric rates. There is a lag between the day on which CDWR purchases power and customers consume that power, and the time that PG&E receives payment for the consumed power. The CPUC's adopted approach requires PG&E to forward amounts to CDWR for power supplied by CDWR approximately when PG&E receives the revenues, which is several weeks after CDWR provides the power. The proportion of PG&E's generation-related revenues that PG&E is required to forward to CDWR is the proportion of the power supplied by CDWR as compared to the total power consumed by PG&E's bundled service customers.

### The Resulting Liquidity Crisis

The disparity between PG&E's wholesale power costs and the frozen retail rates has resulted in a staggering financial shortfall. As of the end of December, 2000, PG&E had accumulated over $6.6 billion in costs for which no provision has been made for recovery from PG&E's electric customers through retail rates. Of this unrecovered amount, more than $4 billion was paid or is still payable to third party wholesale electric providers. The unrecovered amount, or "shortfall," has continued to grow. PG&E has taken all possible steps to preserve its ability to purchase electricity and has borrowed almost $3 billion to finance its operating deficit.

In addition to such borrowing, PG&E has accrued obligations to the PX, ISO, CDWR, QFs and Energy Service Providers (entities which sell retail electric power to end-users of electricity in PG&E's service territory), among others, totaling more than $4.4 billion to date. Of these accrued liabilities to energy trade creditors, PG&E has already defaulted on approximately $2..7 billion. As described below, PG&E has also defaulted on payments to commercial banks and commercial paper holders totaling $1.8 billion, resulting in total defaults to date of $4.5 billion.

Further, PG&E's financial condition continues to deteriorate. Its generation-related revenues are approximately $410 million per month, and will rise to approximately $600 million per month if the CPUC institutes the 3 cent per kilowatt hour rate increase it decided to adopt on March 27, 2001. Under the CPUC's current requirements, PG&E estimates it is obligated to make payments of approximately $200 million per month to its QFs, and approximately $145 million per month to CDWR. The amount per kilowatt hour to be paid to CDWR is scheduled to increase by 3 cents on May 12, 2001, regardless of whether the CPUC has implemented the 3 cent increase in retail rates by that time, increasing the amount that would paid to CDWR to approximately $210 million per month. PG&E's ongoing operating costs for its own generation facilities and non-QF PPAs are approximately $110 million per month. Further, the ISO has stated it intends to continue to bill PG&E for purchases it is making. ISO bills to PG&E for the first quarter of 2001 are estimated to exceed $1.1 billion, and are expected to average approximately $200 million for the remainder of 2001. Thus, PG&E's obligations for generation-related costs are very likely to continue to exceed its revenues from the generation-related component of its electric retail rates.

PG&E is party to two revolving unsecured credit facilities, with a combined borrowing capacity of $1.85 billion. In January of 2001, the lenders terminated their commitment under both facilities. By that time, the Company already had borrowed $938 million under one of the facilities to fund payoffs of maturing commercial paper (which $938 million remains outstanding). The effect of the credit facility termination was to deprive PG&E of an additional $912 million in borrowing capacity. As a consequence of the termination of the revolving credit facilities, PG&E defaulted on $873 million in commercial paper obligations that matured earlier this year.

At March 29, 2001, cash reserves were $2.6 billion. If the Company were current with all payments to its creditors (including the $938 million balance of its bank loans), its cash position would be negative $1.8 billion. Through April 30, 2001, the Company expects to have an aggregate of approximately $1.5 billion of additional claimed obligations that will become due and payable, including an estimated (1) $550 million to the ISO, (2) $340 million to QFs, and (3) $470 million to suppliers of natural gas. Through December 2001 an additional $1.4 billion of the Company's outstanding debt will mature.

In sum, PG&E does not have the cash on hand to pay its obligations, it cannot borrow the cash to do so, and it anticipates that the

9

obligations it continues to incur will grow faster than the
revenues it anticipates it will receive.

---
[00002] CONSOLIDATED BALANCE SHEET AS OF SEPTEMBER 30, 2000
---

PACIFIC GAS AND ELECTRIC COMPANY
CONDENSED CONSOLIDATED BALANCE SHEET
September 30, 2000

```
ASSETS
Current assets
Cash and cash equivalents                    $      68,000,000
Short-term investments                              242,000,000
Accounts receivable, net                          1,327,000,000
Inventories                                         283,000,000
Prepayments                                          56,000,000
Income tax receivable                               295,000,000
                                             ------------------
Total current assets                              2,271,000,000

Property, plant, and equipment
Electric                                         15,718,000,000
Gas                                               7,483,000,000
Construction work in progress                       228,000,000
                                             ------------------
Total property, plant, and equipment
   (at original cost)                            23,429,000,000
Accumulated depreciation and decommissioning    (10,616,000,000)
                                             ------------------
Property, plant, and equipment, net              12,813,000,000

Other noncurrent assets
Regulatory assets                                 6,650,000,000
Nuclear decommissioning funds                     1,385,000,000
Other                                             1,064,000,000
                                             ----------------
Total noncurrent assets                           9,099,000,000
                                             ----------------
TOTAL ASSETS                                  $ 24,183,000,000
                                             ================

LIABILITIES AND EQUITY
Current liabilities
Short-term borrowings                        $     917,000,000
Current portion of long-term debt                   399,000,000
Current portion of rate reduction bonds             290,000,000
Accounts payable
    Trade creditors                               1,859,000,000
    Related parties                                  27,000,000
    Regulatory balancing accounts                    24,000,000
    Other                                           347,000,000
Deferred income taxes                                10,000,000
Other                                               644,000,000
```

```
                                          ----------------
Total current liabilities                    4,517,000,000

Noncurrent liabilities
Long-term debt                               4,866,000,000
Rate reduction bonds                         1,817,000,000
Deferred income taxes                        2,991,000,000
Deferred tax credits                           161,000,000
Other                                        3,606,000,000
                                          ----------------
Total noncurrent liabilities                13,441,000,000

Preferred stock with mandatory redemption
    Provisions 6.30% and 6.57%, outstanding
    5,500,000 shares, due 2002-2009            137,000,000
Company obligated mandatorily redeemable
    preferred securities of trust holding
    solely utility subordinated debentures
    7.90%, 12,000,000 shares due 2025          300,000,000

Stockholders' equity
Preferred stock without mandatory redemption
    provisions
       Nonredeemable - 5% to 6%,
           outstanding 5,784,825 shares        145,000,000
       Redeemable - 4.36% to 7.04%,
           outstanding 5,973,456 shares        142,000,000
Common stock, $5 par value, authorized
    800,000,000 shares, issued 321,314,760 shares  1,606,000,000
Common stock held by subsidiary, at cost,
    19,481,213 shares                         (475,000,000)
Additional paid in capital                   1,971,000,000
Reinvested earnings                          2,399,000,000
                                          ----------------
Total stockholders' equity                   5,788,000,000
                                          ----------------
TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY $ 24,183,000,000
                                          ================
```

----------------------------------------------------------------
[00003] COMPANY'S PRESS RELEASE CONCERNING CHAPTER 11 FILING
----------------------------------------------------------------

     SAN FRANCISCO, California -- April 6, 2001 -- Pacific Gas and
Electric Company, the utility unit of PG&E Corporation (NYSE: PCG),
today filed for reorganization under Chapter 11 of the U.S.
Bankruptcy Code in San Francisco bankruptcy court. The company said
it is taking this action in light of its unreimbursed energy costs
which are now increasing by more than $300 million per month,
continuing CPUC decisions that economically disadvantage the
company, and the now unmistakable fact that negotiations with
Governor Gray Davis and his representatives are going nowhere.

     Neither PG&E Corporation nor any of its other subsidiaries,
including its National Energy Group, have filed for Chapter 11

Case: 19-30088   Doc# 13260   Filed: 11/17/22   Entered: 11/17/22 09:34:12   Page 63
of 74

reorganization or are affected by the utility's filing.

"We chose to file for Chapter 11 reorganization affirmatively because we expect the court will provide the venue needed to reach a solution, which thus far the State and the State's regulators have been unable to achieve," said Robert D. Glynn, Jr., Chairman of Pacific Gas and Electric Company. "The regulatory and political processes have failed us, and now we are turning to the court."

Glynn added, "Our objective is to move through the Chapter 11 reorganization process as quickly as possible, without disruption to our operations or inconvenience to our customers. Throughout this crisis, our 20,000 employees have been and remain committed to providing safe and reliable service to the 13 million Californians who depend on us to deliver their gas and electricity."

Pacific Gas and Electric Company decided to file for the protection of Chapter 11 primarily due to:

-- Failure by the state to assume the full procurement responsibility for Pacific Gas and Electric's "net open position" as was provided under AB1X. This has the result of increasing financial exposure to unreimbursed wholesale energy procurement costs, which the utility estimates to be approximately $300 million or more per month.

-- The impact of actions by the California Public Utilities Commission (CPUC) on March 27, 2001, and April 3, 2001, that created new payment obligations for the company and undermined its ability to return to financial viability.

-- Lack of progress in negotiations with the state to provide recovery of $9 billion in wholesale power purchases made by the utility since June 2000, which have not been recoverable in frozen rates.

-- The adoption by the CPUC of an illegal and retroactive accounting change that would appear to eliminate our true uncollected wholesale costs.

"In addition, despite Pacific Gas & Electric's best efforts to work with the State of California to reach a consensual, responsible, fair and comprehensive solution to California's energy crisis, no agreement has been reached with the Governor and the Governor's representatives have dramatically slowed the pace and the progress of discussions over the past month.

"Furthermore since last fall, we have filed comprehensive plans for resolving this matter with the CPUC, but they have not acted affirmatively on them," said Glynn.

On October 4, 2000, Pacific Gas and Electric sought emergency rate action by the CPUC. In November 2000, we filed our rate stabilization plan, which, if adopted, would have increased electric prices by an initial 25 percent, compared with the 46 percent recently adopted by the CPUC. Neither request was acted upon. Had the state acted at that time:

Case: 19-30088   Doc# 13260   Filed: 11/17/22   Entered: 11/17/22 09:34:12   Page 64 of 74

  -- Pacific Gas and Electric would have been kept creditworthy;

  -- Pacific Gas and Electric would have been able to enter into
     long-term power purchase contracts at prices lower than those
     announced by the state;

  -- The state would not have had to almost exhaust the state's
     budget surplus by spending billions of dollars to purchase
     power for the utility's customers;

  -- The state would not now need to issue billions of dollars in
     bonds to cover these power purchases; and

  -- The state would not now be advancing a proposal to spend
     billions of dollars to purchase the state's three
     investor-owned utility's electric transmission systems.

"This year, the state has spent more than $3 billion on power purchases and, with the CPUC, has arranged to be reimbursed for these expenses," noted Glynn. "In contrast, since June Pacific Gas and Electric Company has spent $9 billion in excess of revenues to pay for power for its customers and exhausted its ability to continue borrowing, but there has been no progress on a plan to reimburse it for those expenditures as provided by law.

"Statements by the Governor and other public officials since last September gave us reason to believe that a solution could be reached outside the context of Chapter 11 that would restore the utility's financial viability and enable it to meet its financial obligations equitably. However, these statements have not been followed up by constructive actions, and a reorganization in Chapter 11 is now the most feasible means of resolution."

The utility will utilize existing resources to continue operating its business during bankruptcy, including paying vendors and suppliers in full for goods and services received after the filing. The utility will pay electric commodity suppliers as provided by law. The utility intends to continue normal electric and gas transmission and distribution functions during the Chapter 11 process. Employees will continue to be paid. Health care plans and other benefits for employees and most retirees will continue. The utility's qualified retirement plans for retirees and vested employees are fully funded and protected by federal law.


-------------------------------------------------------------------
[00004] DEBTOR'S CHAPTER 11 DATABASE
-------------------------------------------------------------------

Debtor: Pacific Gas and Electric Company

Bankruptcy Case No.: 01-30923-DM

Voluntary Chapter 11 Petition Date: April 6, 2001

Case: 19-30088   Doc# 13260   Filed: 11/17/22   Entered: 11/17/22 09:34:12   Page 65 of 74

```
Court:    United States Bankruptcy Court
          Northern District of California
          San Francisco Division
          235 Pine Street, 19th Floor
          San Francisco, CA, 94014
          Telephone (415) 268-2375

Judge:    The Honorable Dennis Montali

Circuit: Ninth

Debtor's Counsel:  James L. Lopes, Esq.
                   William J. Lafferty, Esq.
                   Jeffrey L. Schaffer, Esq.
                   Janet A. Nexon, Esq.
                   Jerome B. Falk, Jr., Esq.
                   Gary M. Kaplan, Esq.
                   Steven E. Schon, Esq.
                   Clara J. Shin, Esq.
                   Amy E. Margolin, Esq.
                   Peter J. Drobac, Esq.
                   Sarah M. King, Esq.
                   Howard, Rice, Nemerovski, Canady, Falk & Rabkin
                   7th Floor, Three Embarcadero Center
                   San Francisco, California 94111
                   Telephone (415) 434-1600
                   Fax (415) 217-5910

Debtor's Financial Advisor: Martin Nachimson
                            Managing Director
                            E&Y Capital Advisors LLC
                            1133 Avenue of the Americas
                            New York, NY 10036

                                    and

                            Eric Carlson
                            Managing Director
                            E&Y Capital Advisors LLC
                            1451 California Avenue
                            Palo Alto, CA 94304

Noticing Agent: Robert L. Berger & Associates, Inc.
                17525 Ventura Boulevard, Ste. 200
                Encino, California 91316

U.S. Trustee:  Office of the United States Trustee for Region 17
               250 Montgomery Street
               Suite 1010
               San Francisco, CA 94104-3410
               (415) 705-3300


-----------------------------------------------------------------
[00005] LISTING OF THE DEBTOR'S 20 LARGEST UNSECURED CREDITORS
-----------------------------------------------------------------
```

Case: 19-30088   Doc# 13260   Filed: 11/17/22   Entered: 11/17/22 09:34:12   Page 66 of 74

| Entity | Nature Of Claim | Claim Amount |
| ------ | --------------- | ------------ |
| The Bank of New York, as Indenture Trustee 101 Barclay St. - 21W New York, NY 10286 Tel:(212)815-5763 Fax:(212)815-5917 | Floating Rate Notes Due 2001 Senior Notes Due 2005 Medium Term Notes, Series B, C & D | $ 2,207,250,000 |
| California Power Exchange 100 E. Freemont Ave. Bldg. A9 Alhambra, CA 91803-4737 Tel:(626)537-3144 Fax:(626)537-3191 | Power Purchases | $ 1,966,000,000 |
| Bankers Trust Co., as Indenture Trustee 4 Albany St. 4th Floor New York, NY 10006 Tel:(212)250-6378 Fax:(212)250-6727 | Refunding Revenue bonds 1997 Series A-C, 1996 Series A-F | $ 1,302,100,000 |
| California Independent System Operator P.O. Box 639024 Folsom, CA 95630-9017 Tel:(916)351-4450 Fax:(916)351-3350 | Power Purchases and Grid Fees | $ 1,228,800,000 |
| Bank of America, N.A. 555 California St. 12th Flr. San Francisco, CA 54104-1502 Tel:(415)622-3456 Fax:(415)622-6632 | Unsecured Revolver | $ 938,461,000 |
| U.S. Bank, as Indenture Trustee P.O. Box 64111 Saint Paul, MN 55164-0111 Tel:(651)244-8311 Fax:(651)244-1433 | Pollution Control Bonds, 1992 Series B, 1993 Series A-B | $ 310,000,000 |
| Calpine Gilroy Cogeneration, L.P. San Jose, CA 94586 Tel:(925)600-2005 Fax:(925)600-8924 | Power Purchases | $ 57,928,385 |
| Calpine Greanleaf, Inc. 465 California St. #600 San Francisco, CA 94104 Tel:(925)445-8000 Fax:(925)500-8924 | Power Purchases | $ 49,452,611 |

Case: 19-30088   Doc# 13260   Filed: 11/17/22   Entered: 11/17/22 09:34:12   Page 67 of 74

```
Crocket Cogen, a Georgia      Power Purchases    $ 48,400,572
Limited Partnership
195 S. LaSalle St.
Chicago, IL 60603
Fax:(619)615-7663


Calpine King City Cogen LLC  Power Purchases    $ 45,706,378
San Jose, CA 94568
Tel:(925)600-2005
Fax:(925)600-8924


El Paso Merchant Energy Gas  Power Purchases    $ 40,147,245
2500 City West Blvd. Ste.1400
Houston, TX 77042
Tel:(713)420-4985
Fax:(713)420-2108



GMF Power Systems, L.P.      Power Purchases    $ 40,122,073
Tel:(925)427-1041
Fax:(925)427-0414


Geysers Power Company, LLC   Power Purchases    $ 32,867,878
Tel:(925)600-2061
Fax:(925)600-8924


BP Energy Company            Gas Purchases      $ 29,523,530
Houston, TX 77079
Tel:(281)366-6277
Fax:(281)366-5925


Enron Canada Corporation     Gas Purchases      $ 28,210,551
Tel:(403)974-6931
Fax:(403)974-6795


Chevron U.S.A. Production Co. Gas Purchases     $ 24,718,334
P.O. Box 840659
Dallas, TX 75284-0659
Tel:(972)702-0019
Fax:(461)392-2990


Sempra Energy Trading Corp.  Gas Purchases      $ 23,849,455
Stamford, CT 06902
Tel:(203)355-5607
Fax:(203)355-5001


Calpine Pittsburgh           Power Purchases    $ 22,576,506
Power Plant
50 W San Francisco St.
San Jose, CA 95113
Tel:(408)995-5115
Fax:(408)995-0505


Wheelabrator Shasta Energy   Power Purchases    $ 21,506,087
Co., Inc.
Anderson, CA 96007
Tel:(530)365-9172
```

Case: 19-30088   Doc# 13260   Filed: 11/17/22   Entered: 11/17/22 09:34:12   Page 68
of 74

```
Fax:(530)365-2035

Sierra Pacific Industries    Power Purchases    $ 19,800,248
Anderson, CA 96007
Tel:(530)378-8000
Fax:(530)378-8242
```

------------------------------------------------------------------
[00006] DEBTOR'S MOTION TO HONOR WAGE & SALARY OBLIGATIONS
------------------------------------------------------------------

The Debtor's 19,978 Employees are vital to daily operations,
maintaining positive employee morale is important, and the
reorganization effort will fail if PG&E loses its valuable
employees, Russell M. Jackson, Vice President of Human Resources
for Pacific Gas and Electric Company, tells the Court.  A loss of
personnel due to an interruption in the payment of employee wages
and benefits will jeopardize the Debtor's operation and
reorganization efforts, the steady supply of energy, and public
health and safety, PG&E says.  In fact, the Company continues, in
this particular chapter 11 case, the loss of key personnel due to
sagging employee morale may also result in irreparable harm to
public health and safety.  Each blackout carries with it the
possibility of such tragedies as fires due to overturned candles or
collisions due to the loss of traffic lights, in addition to the
inevitable disruption in the economy.  A reduction in the number of
experienced linemen dedicated to preventing and repairing gas leaks
could lead to disastrous results, as well.  The public interest,
accordingly, requires that the Debtor be allowed to pay pre-
petition compensation and benefits to aid employee retention and
hasten the Debtor's recovery.

Faced with the need to issue payroll checks immediately for wage
and salary obligations incurred during the latest two-week period
and because certain employees don't promptly cash each paycheck
they receive, the Debtor sought and obtained an emergency order
from Judge Montali authorizing the Company to (A) issue payroll
checks on account of accrued pre-petition wage and salary
obligations and (B) move money between their bank accounts as
necessary to fund those paychecks.  Additionally, Judge Montali
directs each Bank on which a payroll check is drawn to honor all
payroll checks.

Specifically, the Debtor sought and obtained permission to honor
these pre-petition wage, salary and benefit obligations owed to
their Employees:

```
                                                   Number of
     Type of Employee Obligation      Amount Owed  Employees
     --------------------------       -----------  ---------
     PRE-PETITION EMPLOYEE COMPENSATION
        International Brotherhood of
           Electrical Workers, Local 1245
           and International Union of
           Security Officers Members    $36,111,700   12,300
```

```
Administrative & Technical             695,100        415
Engineering & Scientists Union       4,335,700      1,530
Diablo Canyon Workers
    (included in IBEW amount)           468,800        210
Management                           8,809,600      5,500
Officers                               134,700         23
                                   -----------     ------
                                   $50,555,600     19,978

EMPLOYER TAXES                      $3,870,497

EMPLOYEE BENEFIT OBLIGATIONS
    Medical insurance              $19,627,584
    Dental insurance                2,000,000
    Vision insurance                  605,800
    Reimbursement accounts            229,059
    Group life insurance            2,675,857
    Short-term disability and
       Workers' compensation        3,341,956
    Long-term disability              440,000
    Savings Fund Plan and
       Retirement Savings Plan      1,851,019
    Vacation payout                 1,500,000
    Employee assistance program        89,000
    Adoption reimbursement             2,083
    Child care                        134,000
    Tuition Refund Program            478,741
    Business expense reimbursements 1,400,000
                                   -----------
                                   $34,375,099
                                   -----------
         TOTAL                     $88,301,196
                                   ===========
```

James L. Lopes, Esq., at Howard, Rice, Nemerovski, Canady, Falk &
Rabkin, advised Judge Montali at the First Day Hearing that, on
average, no single employee is owed more than the $4,300 priority
accorded to employee compensation claims under 11 U.S.C. Sec. 507.

PG&E does not seek to liquidate its operations, Mr. Lopes told
Judge Montali Friday afternoon.  "Rather, the Debtor seeks to avail
itself of the protection and flexibility provided by the bankruptcy
laws to weather the current regulatory impasse.  In order to keep
the lights on, however, the Debtor must retain its current work
force.  The Debtor therefore seeks this Court's permission to honor
its pre-petition obligations to its employees in order to prevent
employee defection and to implement a seamless transition."

Nothing in this request, the Debtor makes clear and Judge Montali
confirms, contemplates an assumption nor precludes a rejection of
any agreement or policy that may be considered an executory
contract.

----------------------------------------------------------------
[00007] DEBTOR'S MOTION TO CONTINUE USING CURRENT BUSINESS FORMS

Case: 19-30088   Doc# 13260   Filed: 11/17/22   Entered: 11/17/22 09:34:12   Page 70
of 74

```
----------------------------------------------------------------
```

At the Debtor's behest, Judge Montali granted PG&E authority
to continue using their existing supplies of business forms
(including, but not limited to, letterhead, purchase orders,
invoices, contracts and checks), without the need to follow the
United States Trustee's operating guideline that all business
forms used by a chapter 11 debtor bear a "debtor-in-possession"
legend.  Parties doing business with the Debtor undoubtedly will
be aware, Judge Montali observed, as a result of the size and
notoriety of the Debtor and this case, of PG&E's status
as a chapter 11 debtor-in-possession.  Changing Business Forms
immediately would be expensive and burdensome to the Debtor's
estate and extremely disruptive to daily business operations.
Accordingly, until existing stock is depleted, the
Debtor may continue using their prepetition business forms.

```
----------------------------------------------------------------
[00008] DEBTOR'S MOTION TO CONTINUE USING EXISTING BANK ACCOUNTS
----------------------------------------------------------------
```

PG&E reminds the Court that the Office of the United States
Trustee has established certain operating guidelines for debtors-
in-possession in order to supervise the administration of chapter
11 cases.  These guidelines require chapter 11 debtors to, among
other things: (a) close all existing bank accounts and open new
debtor-in-possession bank accounts; (b) establish one debtor-in-
possession account for all estate monies required for the payment
of taxes, including payroll taxes; and (c) maintain a separate
debtor-in-possession account for cash collateral.

Kent M. Harvey, PG&E's Senior Vice President-Chief Financial
Officer, Controller and Treasurer, tells the Court that the U.S.
Trustee's guidelines won't work in this chapter 11 case.  PG&E uses
35 bank accounts through which the company manages cash receipts,
disbursements, investments for their corporate enterprise.  The
Debtor routinely deposits, withdraws and otherwise transfers funds
to, from and between such accounts by various methods including
check, wire transfer, automated clearing house transfer and
electronic funds transfer. In addition, the Debtor generates
thousands of accounts payable and payroll checks per month from the
Bank Accounts, along with various wire transfers.

The Debtor seeks a waiver of the United States Trustee's
requirement that the Bank Accounts be closed and that new
postpetition bank accounts be opened.  If the Guidelines were
enforced in this case, these requirements would cause enormous
and unnecessary disruption in the Debtor's businesses and would
significantly impair their efforts to reorganize.

Mr. Harvey explains that the Debtor's Bank Accounts are part of
a carefully constructed and highly automated Cash Management
System that ensures the Debtor's ability to efficiently monitor
and control all of their cash receipts and disbursements.
Consequently, closing the existing Bank Accounts and opening new

Case: 19-30088   Doc# 13260   Filed: 11/17/22   Entered: 11/17/22 09:34:12   Page 71
of 74

accounts inevitably would result in delays in payments to
administrative creditors and employees, severely impeding the
Debtor's ability to ensure as smooth a transition
into chapter 11 as possible and, in turn, jeopardizing the
Debtor's efforts to successfully confirm a reorganization plan.
Additionally, requiring the Debtor to replace its Bank Accounts
would impose a daunting administrative burden.  Finally, because
the Debtor's disbursement systems are integrated with their banks
to allow for automatic bank reconciliations, replacing the Bank
Accounts would require systemic changes which would be difficult
to implement.

Accordingly, the Debtor requests that its pre-petition Bank
Accounts be deemed to be debtor-in-possession accounts, and that
the Company be permitted to maintain and continue use, in the
same manner and with the same account numbers, styles and
document forms as those employed prepetition, be authorized,
subject to a prohibition against honoring prepetition checks
without specific authorization from this Court.

Recognizing the need for relief from the U.S. Trustee's
Guidelines in a billion-dollar chapter 11 case, and noting that
in other cases of this size, courts have routinely recognized
that the strict enforcement of bank account closing requirements
does not serve the rehabilitative purposes of chapter 11, Judge
Montali granted the Debtor's Motion in all respects.  To the extent
that any funds in any PG&E Bank Account are subject to a valid
right of set-off by any Bank, Judge Montali directs, that Bank will
be granted an administrative priority in an amount equal to the
extent the Debtor uses those funds.  Additionally, Judge Montali
held at the First Day Hearing, all rights of these Banks to assert
an entitlement to a replacement lien to the extent any funds are
used are fully preserved.


-----------------------------------------------------------------
[00009] WHO'S JUDGE MONTALI AND HOW DOES HIS COURTROOM WORK?
-----------------------------------------------------------------

Bankruptcy Judge Dennis Montali was appointed a bankruptcy judge to
the Northern District of California on April 23, 1993.  Prior to
his appointment he worked as an associate, then partner, at
Rothschild, Phelan & Montali in San Francisco (1968-80); a partner,
in the law firm of Dinkelspiel, Pelavin, Steefel & Levitt (1980);
and a partner at Pillsbury, Madison & Sutro (1981-93).

Judge Montali earned his B.A. from the University of Notre Dame in
1961 and was awarded a J.D. from the University of California at
Berkeley in 1968.

Judge Montali was on active duty in the United States Naval Reserve
from 1961-65; served in various officer positions in two United
States Navy destroyers; and voluntarily returned to active duty
from June to August 1966 to serve as an instructor at the United
States Navy Reserve Officers Candidate School in Newport, Rhode
Island.

Judge Montali is a member of the Editorial Advisory Board, American Bankruptcy Law Journal; former member, National Bankruptcy Conference; fellow, American College of Bankruptcy; former chair, San Francisco Bar Association, Commercial Law and Bankruptcy Section; former member, Bankruptcy Advisory Committee, Northern District of California; former member, Debtor/Creditor and Bankruptcy Subcommittee, Business Law Section, State Bar of California; and Judicial Conference Committee on the Administration of the Bankruptcy System.

Judge Montali enforces certain Courtroom Decorum rules:

     1. Recording devices and cameras of any kind are not allowed in the courtroom or in the hallways surrounding the courtroom.

     2. Cell phones and pagers must remain off at all times. Anyone whose cell phone or pager rings or who uses his or her cell phone while in the courtroom or hallways surrounding the courtroom will be escorted from the premises.

     3. Laptops may be used but all sound must be turned off.

     4. No talking is allowed while court is in session.

     5. No gum, food or drink is allowed in the courtroom.

     6. Due to restrictions imposed by the codes of judicial conduct, neither judges nor court staff are allowed to discuss the merits or substance of the case outside the context of the hearing. No member of the media or the public shall direct any queries to the judge, court staff or the parties while court is in session.

*     *     *

Hearings for the week of April 9th will be held at 235 Pine Street, 22nd floor, San Francisco, CA.  Attorneys planning to appear must pre-register as soon as practicable by e-mailing your name, your firm and the party you represent to Hearings@canb.uscourts.gov. Emergency registration will be available one hour prior to the hearing. Due to the large number of attorneys expected, it will be essential that all attorneys pre-register.

To accommodate an anticipated influx of interested media and public, seating, which is limited, will be available on a pre-registration, first come-first served basis. Anyone interested in attending the hearing should pre-register by e-mailing your name, organization, phone and fax number to Hearings@canb.uscourts.gov or you may register the day of the hearing beginning one hour prior to the hearing.

*** End of Issue No. 1 ***

-------------------------------------------------------------------------

Case: 19-30088   Doc# 13260   Filed: 11/17/22   Entered: 11/17/22 09:34:12   Page 73 of 74

```
Peter A. Chapman          peter@bankrupt.com          http://bankrupt.com
------------------------------------------------------------------------
Recommended Reading: "Debtors and Creditors in America: Insolvency,
Imprisonment for Debt, and Bankruptcy, 1607 - 1900."  You'll learn things
about bankruptcy you never knew.  Order your copy of this title today at
http://www.amazon.com/exec/obidos/ASIN/189312214X/internetbankrupt
------------------------------------------------------------------------
```