# <u>EXHIBIT B</u>

## POC Supplement

DOCS_LA:345735.7 08142/039

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

## United States Bankruptcy Court, Northern District of California

**Fill in this information to identify the case (Select only one Debtor per claim form):**

☒ PG&E Corporation (19-30088)

☐ Pacific Gas and Electric Company (19-30089)

# Rescission or Damage Claim Proof of Claim

**This form is for purchasers of the Debtors' publicly traded debt and/or equity securities listed on Annex A during the period from April 29, 2015 through November 15, 2018, inclusive, who are asserting claims against the Debtors for rescission or damages under the securities laws and Section 510(b) of the Bankruptcy Code. Read the instructions before filing this Rescission or Damage Claim Proof of Claim Form.**

> THIS FORM IS TO BE USED <u>ONLY</u> FOR CLAIMANTS THAT PURCHASED OR ACQUIRED THE DEBTORS' PUBLICLY TRADED DEBT AND/OR EQUITY SECURITIES LISTED ON ANNEX A FROM APRIL 29, 2015 THROUGH NOVEMBER 15, 2018 TO ASSERT CLAIMS FOR RESCISSION OR DAMAGES UNDER THE SECURITIES LAWS AND SECTION 510(b) OF THE BANKRUPTCY CODE AND NOT ANY OTHER CLAIMS.
>
> DO <u>NOT</u> USE THIS FORM TO ASSERT A CLAIM IF YOU DID NOT PURCHASE OR ACQUIRE PUBLICLY TRADED DEBT OR EQUITY SECURITIES OF THE DEBTORS FROM APRIL 29, 2015 THROUGH NOVEMBER 15, 2018 AND YOUR CLAIM IS BASED SOLELY ON YOUR CURRENT AND CONTINUOUS OWNERSHIP OF SUCH SECURITIES.

**Filers must leave out or partially redact SSNs/TINs/birthdates/names of minors/full account numbers**. Attach redacted copies of any documents that support the claim. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of January 29, 2019, the date these Chapter 11 Cases were filed. For purposes of this form, "creditor" means the beneficial owner of the securities that form the basis of the claim.**

| **Part 1: Identify the Claim** | |
|---|---|
| 1. Who is the current creditor? | Baupost Group Securities, L.L.C. (See Addendum.)<br>Name of the current creditor (the person or entity to be paid for this claim)<br><br>Other names the creditor used with the Debtor _____ |
| 2. Has this claim been acquired from someone else? | ☒ No<br>☐ Yes. From whom? _____ |
| 3. Are you asserting a Claim for rescission or damages under the securities laws and Section 510(b) of the Bankruptcy Code? | <u>Check the box below to indicate whether you are asserting a claim for rescission or damages under the securities laws and section 510(b) of the Bankruptcy Code, arising from the purchase and/or acquisition of the Debtors' publicly traded debt and/or equity securities during the period from April 29, 2015 through November 15, 2018. You are directed to check only one box below:</u><br><br>☐ Debt Securities;<br><br>☒ Equity Securities; or<br><br>☐ Debt Securities and Equity Securities<br><br>**Please also check all applicable CUSIP(s) on Annex A, Part I (attached hereto) for the equity or debt securities to which this Proof of Claim applies (hereinafter "the Securities"). If you purchased/acquired multiple CUSIPs, you must make additional copies of Annex A, Part II, so that you submit a <u>separate</u> corresponding Annex A, Part II for each CUSIP, with the requested documentation.**<br><br>**In addition to completing this Rescission or Damage Claim Proof of Claim Form, including checking the appropriate boxes on Annex A, Part I and providing the detail in Annex A, Part II, you are also required to attach to this Rescission or Damage Claim Proof of Claim Form any applicable detail regarding your purchases/acquisition of the securities from April 29, 2015 through November 15, 2018.**<br><br>**Once you have completed Annex A, Part I and Part II, please affix them to this Rescission or Damage Claim Proof of Claim Form. If you are submitting your Proof of Claim electronically, you will be asked to scan all Annex A, Part I and Part II and supporting documentation. If you have numerous transactions to report in Annex A, Part II, Claimants with more than 100 transactions in the Debtors' securities may contact Prime Clerk for instructions on how to file** |

Rescission or Damage Claim Proof of Claim | Page 1

| 4. | **Where should notices and payments to the creditor be sent?**<br><br>Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | Where should notices to the creditor be sent?<br><br>The Baupost Group, L.L.C.<br>10 St. James Avenue, 17th Fl<br>Boston, MA 02116<br><br>Contact phone   (617) 210-8300<br>Contact email   pcgpublicteam@baupost.com | Where should payments to the creditor be sent? (if different)<br><br>*As separately directed by the creditor<br><br><br>Contact phone _____<br>Contact email _____ |
|---|---|---|---|

| 5. | **Does this claim amend one already filed?** | ☐ No<br>☒ Yes.  Claim number on court claims registry (if known) 100269 & 100309       Filed on   04/15/2020<br>                                                                     MM  / DD   / YYYY |
|---|---|---|

| 6. | **Do you know if anyone else has filed a proof of claim for this claim?** | ☒ No<br>☐ Yes. Who made the earlier filing? _____ |
|---|---|---|

---

**Part 2:**   **Give Information About the Claim as of January 29, 2019**

| 7. | **Do you have any number you use to identify the debtor?** | ☒ No<br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____ |
|---|---|---|

| 8. | **How much is the claim?** | $ To be determined     . **Does this amount include interest or other charges?**<br>    ☒ No<br>    ☐ Yes. Attach statement itemizing interest, fees, expenses, or other<br>             charges required by Bankruptcy Rule 3001(c)(2)(A). |
|---|---|---|

| 9. | **Is all or part of the claim secured?** | ☒ No<br>☐ Yes. The claim is secured by a lien on property.<br><br>    **Nature of property:**<br>    ☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*<br>    ☐ Motor vehicle<br>    ☐ Other. Describe: _____<br><br>    **Basis for perfection:** _____<br>    Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)<br><br>    **Value of property:**                $_____<br>    **Amount of the claim that is secured:**   $_____<br>    **Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured<br>                                           amounts should match the amount in line 7.)<br><br>    **Amount necessary to cure any default as of the date of the petition:**   $_____<br><br>    **Annual Interest Rate** (when case was filed)_____%<br>    ☐ Fixed<br>    ☐ Variable |
|---|---|---|

| 10. | **Is this claim subject to a right of setoff?** | ☒ No<br>☐ Yes. Identify the property: _____ |
|---|---|---|

DocuSign Envelope ID: 3F860B3A-6CCB-4862-9051-A56E2398F8E1

**Part 3: Sign Below**

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Check the appropriate box:

☒ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date ___12/28/2022___ (mm/dd/yyyy)

DocuSigned by:

_1A5EB41E56CA46A..._
Signature

**Print the name of the person who is completing and signing this claim:**

| Name | Frederick H. Fogel | | |
|---|---|---|---|
| | First name | Middle name | Last name |
| Title | Partner | | |
| Company | Baupost Group Securities, L.L.C. | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | 10 St. James Avenue, 17th Floor | | |
| | Number    Street | | |
| | Boston | MA | 02116 |
| | City | State | ZIP Code |
| Contact phone | (617) 210-8300 | Email | pcgpublicteam@baupost.com |

*IF SUBMITTING YOUR RESCISSION OR DAMAGE CLAIM PROOF OF CLAIM THROUGH PRIME CLERK'S ELECTRONIC PORTAL, THIS ANNEX (ALONG WITH ALL OTHER SUPPORTING DOCUMENTATION) WILL NEED TO BE SCANNED AND UPLOADED*

# Annex A
## Part I

**Check all relevant boxes below. If you purchased multiple CUSIPs, you must make additional copies of Part II.**

| Check One Box Below | Issuer of Securities | Securities Description | CUSIP Number | ISIN Number |
|---|---|---|---|---|
| ☑ | PG&E Corp | Common Stock (including any contract options related thereto) | 69331C108 | US69331C1080 |
| ☐ | Pacific Gas & Electric Co | Preferred 4.36 PERP/CALL | 694308883 | US6943088830 |
| ☐ | Pacific Gas & Electric Co | Preferred 4.5 PERP/CALL | 694308800 | US6943088004 |
| ☐ | Pacific Gas & Electric Co | Preferred 4.8 PERP/CALL | 694308701 | US6943087014 |
| ☐ | Pacific Gas & Electric Co | Preferred 5 PERP/CALL | 694308503 | US6943085034 |
| ☐ | Pacific Gas & Electric Co | Preferred 5 PERP/CALL | 694308602 | US6943086024 |
| ☐ | Pacific Gas & Electric Co | Preferred 5 PERPETUAL | 694308404 | US6943084045 |
| ☐ | Pacific Gas & Electric Co | Preferred 5.5 PERPETUAL | 694308305 | US6943083054 |
| ☐ | Pacific Gas & Electric Co | Preferred 6% Dividend PERPETUAL | 694308206 | US6943082064 |
| ☐ | Pacific Gas & Electric Co | 0.45835% due 5/11/2015 | 694308HJ9 | US694308HJ92 |
| ☐ | Pacific Gas & Electric Co | 1.51778% due 11/30/2017 | 694308HQ3 | US694308HQ36 |
| ☐ | Pacific Gas & Electric Co | 2.45% due 8/15/2022 | 694308HB6 | US694308HB66 |
| ☐ | Pacific Gas & Electric Co | 2.54138% due 11/28/2018 | 694308HU4 | US694308HU48 |
| ☐ | Pacific Gas & Electric Co | 2.54138% due 11/28/2018 | 694308HT7 | US694308HT74 |
| ☐ | Pacific Gas & Electric Co | 2.54138% due 11/28/2018 | U69430AD5 | USU69430AD52 |
| ☐ | Pacific Gas & Electric Co | 2.95% due 3/1/2026 | 694308HP5 | US694308HP52 |
| ☐ | Pacific Gas & Electric Co | 3.25% due 6/15/2023 | 694308HC4 | US694308HC40 |
| ☐ | Pacific Gas & Electric Co | 3.25% due 9/15/2021 | 694308GW1 | US694308GW13 |
| ☐ | Pacific Gas & Electric Co | 3.3% due 12/1/2027 | 694308HW0 | US694308HW04 |
| ☐ | Pacific Gas & Electric Co | 3.3% due 12/1/2027 | U69430AE3 | USU69430AE36 |
| ☐ | Pacific Gas & Electric Co | 3.3% due 12/1/2027 | 694308HV2 | US694308HV21 |
| ☐ | Pacific Gas & Electric Co | 3.3% due 3/15/2027 | 694308HS9 | US694308HS91 |
| ☐ | Pacific Gas & Electric Co | 3.4% due 8/15/2024 | 694308HK6 | US694308HK65 |
| ☐ | Pacific Gas & Electric Co | 3.5% due 10/1/2020 | 694308GT8 | US694308GT83 |
| ☐ | Pacific Gas & Electric Co | 3.5% due 6/15/2025 | 694308HM2 | US694308HM22 |
| ☐ | Pacific Gas & Electric Co | 3.75% due 2/15/2024 | 694308HG5 | US694308HG53 |
| ☐ | Pacific Gas & Electric Co | 3.75% due 8/15/2042 | 694308HA8 | US694308HA83 |
| ☐ | Pacific Gas & Electric Co | 3.85% due 11/15/2023 | 694308HE0 | US694308HE06 |
| ☐ | Pacific Gas & Electric Co | 3.95% due 12/1/2047 | 694308HY6 | US694308HY69 |
| ☐ | Pacific Gas & Electric Co | 3.95% due 12/1/2047 | 694308HX8 | US694308HX86 |
| ☐ | Pacific Gas & Electric Co | 3.95% due 12/1/2047 | U69430AF0 | USU69430AF01 |
| ☐ | Pacific Gas & Electric Co | 4% due 12/1/2046 | 694308HR1 | US694308HR19 |
| ☐ | Pacific Gas & Electric Co | 4.25% due 3/15/2046 | 694308HN0 | US694308HN05 |
| ☐ | Pacific Gas & Electric Co | 4.25% due 5/15/2021 | 694308GV3 | US694308GV30 |
| ☐ | Pacific Gas & Electric Co | 4.25% due 8/1/2023 | 694308HZ3 | US694308HZ35 |
| ☐ | Pacific Gas & Electric Co | 4.25% due 8/1/2023 | U69430AG8 | USU69430AG83 |
| ☐ | Pacific Gas & Electric Co | 4.3% due 3/15/2045 | 694308HL4 | US694308HL49 |
| ☐ | Pacific Gas & Electric Co | 4.45% due 4/15/2042 | 694308GZ4 | US694308GZ44 |
| ☐ | Pacific Gas & Electric Co | 4.5% due 12/15/2041 | 694308GY7 | US694308GY78 |
| ☐ | Pacific Gas & Electric Co | 4.6% due 6/15/2043 | 694308HD2 | US694308HD23 |
| ☐ | Pacific Gas & Electric Co | 4.65% due 8/1/2028 | 694308JA6 | US694308JA65 |
| ☐ | Pacific Gas & Electric Co | 4.65% due 8/1/2028 | U69430AH6 | USU69430AH66 |

*IF SUBMITTING YOUR RECSISSION OR DAMAGE CLAIM THROUGH PRIME CLERK'S ELECTRONIC PORTAL, THIS ANNEX (ALONG WITH ALL OTHER SUPPORTING DOCUMENTATION) WILL NEED TO BE SCANNED AND UPLOADED*

| Check One Box Below | Issuer of Securities | Securities Description | CUSIP Number | ISIN Number |
|---|---|---|---|---|
| ☐ | Pacific Gas & Electric Co | 4.75% due 2/15/2044 | 694308HH3 | US694308HH37 |
| ☐ | Pacific Gas & Electric Co | 5.125% due 11/15/2043 | 694308HF7 | US694308HF70 |
| ☐ | Pacific Gas & Electric Co | 5.4% due 1/15/2040 | 694308GS0 | US694308GS01 |
| ☐ | Pacific Gas & Electric Co | 5.625% due 11/30/2017 | 694308GL5 | US694308GL57 |
| ☐ | Pacific Gas & Electric Co | 5.8% due 3/1/2037 | 694308GJ0 | US694308GJ02 |
| ☐ | Pacific Gas & Electric Co | 5.8% due 3/1/2037 | 694308GK7 | US694308GK74 |
| ☐ | Pacific Gas & Electric Co | 6.05% due 3/1/2034 | 694308GE1 | US694308GE15 |
| ☐ | Pacific Gas & Electric Co | 6.05% due 3/1/2034 | 694308GH4 | US694308GH46 |
| ☐ | Pacific Gas & Electric Co | 6.25% due 3/1/2039 | 694308GQ4 | US694308GQ45 |
| ☐ | Pacific Gas & Electric Co | 6.35% due 2/15/2038 | 694308GM3 | US694308GM31 |
| ☐ | Pacific Gas & Electric Co | 6.75% due 10/1/2023 | 694308EY9 | US694308EY96 |
| ☐ | Pacific Gas & Electric Co | 6.75% due 10/1/2023 | 694308EZ6 | US694308EZ61 |
| ☐ | Pacific Gas & Electric Co | 7.05% due 3/1/2024 | 694308FB8 | US694308FB84 |
| ☐ | Pacific Gas & Electric Co | 7.05% due 3/1/2024 | 694308FP7 | US694308FP70 |
| ☐ | Pacific Gas & Electric Co | 7.25% due 3/1/2026 | 694308EM5 | US694308EM58 |
| ☐ | Pacific Gas & Electric Co | 7.25% due 3/1/2026 | 694308ET0 | US694308ET02 |
| ☐ | Pacific Gas & Electric Co | 7.25% due 3/1/2026 | 694308FQ5 | US694308FQ53 |
| ☐ | Pacific Gas & Electric Co | 7.25% due 3/1/2026 | 694308FY8 | US694308FY87 |
| ☐ | Pacific Gas & Electric Co | 7.25% due 8/1/2026 | 694308EV5 | US694308EV57 |
| ☐ | Pacific Gas & Electric Co | 7.25% due 8/1/2026 | 694308FF9 | US694308FF98 |
| ☐ | Pacific Gas & Electric Co | 7.25% due 8/1/2026 | 694308EX1 | US694308EX14 |
| ☐ | Pacific Gas & Electric Co | 7.25% due 8/1/2026 | 694308FR3 | US694308FR37 |
| ☐ | Pacific Gas & Electric Co | 7.25% due 8/1/2026 | 694308FZ5 | US694308FZ52 |
| ☐ | Pacific Gas & Electric Co | 8% due 10/1/2025 | 694308EP8 | US694308EP89 |
| ☐ | Pacific Gas & Electric Co | 8% due 10/1/2025 | 694308EL7 | US694308EL75 |
| ☐ | Pacific Gas & Electric Co | 8% due 10/1/2025 | 694308FM4 | US694308FM40 |
| ☐ | Pacific Gas & Electric Co | 8% due 10/1/2025 | 694308FG7 | US694308FG71 |
| ☐ | Pacific Gas & Electric Co | 8% due 10/1/2025 | 694308EK9 | US694308EK92 |
| ☐ | Pacific Gas & Electric Co | 8.25% due 10/15/2018 | 694308GN1 | US694308GN14 |
| ☐ | Pacific Gas & Electric Co | 8.25% due 11/1/2022 | 694308EQ6 | US694308EQ62 |
| ☐ | Pacific Gas & Electric Co | 8.25% due 11/1/2022 | 694308EG8 | US694308EG80 |
| ☐ | Pacific Gas & Electric Co | 8.25% due 11/1/2022 | 694308EN3 | US694308EN32 |
| ☐ | Pacific Gas & Electric Co | 8.25% due 11/1/2022 | 694308FJ1 | US694308FJ11 |
| ☐ | Pacific Gas & Electric Co | 8.25% due 11/1/2022 | 694308FW2 | US694308FW22 |
| ☐ | Pacific Gas & Electric Co | 8.375% due 5/1/2025 | 694308EF0 | US694308EF08 |
| ☐ | Pacific Gas & Electric Co | 8.375% due 5/1/2025 | 694308EJ2 | US694308EJ20 |
| ☐ | Pacific Gas & Electric Co | 8.375% due 5/1/2025 | 694308FX0 | US694308FX05 |
| ☐ | Pacific Gas & Electric Co | 8.8% due 5/1/2024 | 694308DV6 | US694308DV66 |
| ☐ | CA DEV VAR-A-PACIFIC | Municipal Bond ADJ% due 11/1/2026 | 13033WG31 | |
| ☐ | CA DEV VAR-B-PACIFIC | Municipal Bond ADJ% due 11/1/2026 | 13033WG49 | |
| ☐ | CA DEV VAR-C-PACIFIC | Municipal Bond due 12/1/2016 | 13033WG56 | |
| ☐ | CA ECON-VAR-RF-3/14 | Municipal Bond due 12/1/2018 | 13033WG23 | |
| ☐ | CA ECON-VAR-RF-D-3/11 | Municipal Bond due 12/1/2016 | 13033WF73 | |
| ☐ | CA ECON-VAR-RF-E-3/11 | Municipal Bond ADJ% due 11/1/2026 | 13033WF81 | |
| ☐ | CA ECON-VAR-RF-F-3/12 | Municipal Bond ADJ% due 11/1/2026 | 13033WF99 | |
| ☐ | CA INFRA ECON DEV-F | Municipal Bond 1.75% due 11/1/2026 | 13034ASX9 | US13034ASX99 |
| ☐ | CA INFRA REF-GAS-F | Municipal Bond 3.75% due 11/1/2026 | 13033WU84 | |
| ☐ | CA INFRA VAR-A-PACIFI | Municipal Bond ADJ% due 11/1/2026 | 13033WRZ8 | |

*IF SUBMITTING YOUR RECSISSION OR DAMAGE CLAIM THROUGH PRIME CLERK'S ELECTRONIC PORTAL,*
*THIS ANNEX (ALONG WITH ALL OTHER SUPPORTING DOCUMENTATION) WILL NEED TO BE SCANNED AND UPLOADED*

| Check One Box Below | Issuer of Securities | Securities Description | CUSIP Number | ISIN Number |
|---|---|---|---|---|
| ☐ | CA INFRA VAR-B-PACIFI | Municipal Bond ADJ% due 11/1/2026 | 13033WSA2 | |
| ☐ | CA INFRA VAR-C-PACIFI | Municipal Bond due 12/1/2016 | 13033WSB0 | |
| ☐ | CA INFRA VAR-D-PACIFI | Municipal Bond due 12/1/2016 | 13033WSC8 | |
| ☐ | CA INFRA VAR-E-PACIFI | Municipal Bond due 12/1/2016 | 13033WSD6 | |
| ☐ | CA INFRA VAR-F-PACIFI | Municipal Bond ADJ% due 11/1/2026 | 13033WSE4 | |
| ☐ | CA INFRA VAR-GAS-PACIFI | Municipal Bond due 12/1/2018 | 13033WU92 | |
| ☐ | CA INFRA VAR-G-PACIFI | Municipal Bond due 12/1/2018 | 13033WSF1 | |
| ☐ | CA INFRA VAR-PACIFIC | Municipal Bond ADJ% due 11/1/2026 | 13033WW33 | |
| ☐ | CA INFRA VAR-PACIFIC | Municipal Bond due 12/1/2016 | 13033WW41 | |
| ☐ | CA INFRA VAR-PACIFIC | Municipal Bond due 12/1/2016 | 13033WW58 | |
| ☐ | CA INFRA VAR-REF-PACI | Municipal Bond ADJ% due 11/1/2026 | 13033WW25 | |
| ☐ | CA INFRA-RF-C-PACIFIC | Municipal Bond due 12/1/2016 | 13033W3G6 | |
| ☐ | CA INFRA-RF-D-PACIFIC | Municipal Bond due 12/1/2016 | 13033W3K7 | |
| ☐ | CA INFRA-RF-E-PACIFIC | Municipal Bond 2.25% due 11/1/2026 | 13033W3Z4 | |
| ☐ | CA INFRA-RF-VAR-A-PAC | Municipal Bond 3.75% due 11/1/2026 | 13033W3H4 | US13033W3H41 |
| ☐ | CA INFR-VR-RF-B-PACIF | Municipal Bond 3.75% due 11/1/2026 | 13033W3J0 | US13033W3J07 |
| ☐ | CA PCR DLY PAPER-PACI | Municipal Bond 4% due 11/1/2026 | 130534XA3 | US130534XA35 |
| ☐ | CA PCR DLY-PAC-E-CONV | Municipal Bond 3.5% due 11/1/2026 | 130534XX3 | US130534XX38 |
| ☐ | CA PCR DLY-REF-F-PACI | Municipal Bond 3.25% due 11/1/2026 | 130534XD7 | US130534XD73 |
| ☐ | CA PCR DLY-REF-G-PACI | Municipal Bond ADJ% due 2/1/2016 | 130534XE5 | |
| ☐ | CA PCR VAR CAPCO MADR | Municipal Bond ADJ% due 9/1/2019 | 130535BA4 | US130535BA48 |
| ☐ | CA PCR VAR-REF-B-PACI | Municipal Bond 3.5% due 11/1/2026 | 130534XL9 | US130534XL99 |
| ☐ | CA PCR-REF-A-PAC | Municipal Bond 5.35% due 12/1/2016 | 130534WY2 | |
| ☐ | CA POLLT-PAC GAS-REMK | Municipal Bond 4.75% due 12/1/2023 | 130534A83 | |
| ☐ | CA POLLT-PAC GAS-REMK | Municipal Bond 4.75% due 12/1/2023 | 130534B66 | |
| ☐ | CA POLLT-PAC GAS-REMK | Municipal Bond 4.75% due 12/1/2023 | 130534A91 | |
| ☐ | CA POLLUTN-REF-A-PACI | Municipal Bond 3.5% due 12/1/2023 | 130534ZP8 | |
| ☐ | CA POLLUTN-REF-B-PACI | Municipal Bond 3.5% due 12/1/2023 | 130534ZQ6 | |
| ☐ | CA POLLUTN-REF-C-PACI | Municipal Bond 3.5% due 12/1/2023 | 130534ZR4 | US130534ZR42 |
| ☐ | CA POLLUTN-REF-D-PACI | Municipal Bond 3.5% due 12/1/2023 | 130534ZS2 | |
| ☐ | CA POOLT-PAC GAS-REMK | Municipal Bond 4.75% due 12/1/2023 | 130534B25 | |
| ☐ | CA POOLT-PCS GAS REMK | Municipal Bond 4.75% due 12/1/2023 | 130534B33 | |
| ☐ | CALIFORNIA ST INFRAST | Municipal Bond 1.75% due 11/1/2026 | 13034ASZ4 | US13034ASZ48 |
| ☐ | NEVADA IRR YUBA PAC | Municipal Bond 3.75% due 7/1/2013 | 641321BT0 | |
| ☐ | SOLANO IRR DIST DIV 1 | Municipal Bond 9.15% due 1/1/2020 | 834125AN6 | US834125AN62 |
| ☐ | SOLANO IRR DIST DIV 2 | Municipal Bond 9.25% due 1/1/2020 | 834125AM8 | US834125AM89 |
| ☐ | SOLANO IRR REF-MONTIC | Municipal Bond 5.47% due 1/1/2020 | 834125BC9 | US834125BC98 |
| ☐ | SOLANO IRR-REF-MONTIC | Municipal Bond 5.29% due 1/1/2016 | 834125AY2 | |
| ☐ | SOLANO IRR-UNREF-#2 | Municipal Bond 9.15% due 1/1/2020 | 834125BF2 | |
| ☐ | SOLANO IRR-UNREF-#2 | Municipal Bond 9.25% due 1/1/2020 | 834125BG0 | US834125BG03 |

| CUSIP (Provide a Separate Tab for Each CUSIP): | 69331C108 | Beginning position held as of opening of trading on April 29, 2015 (if none, enter "0 shares" or "$0"): | 0 shares | Ending position held as of the close of trading on November 15, 2018 (if none, enter "0 shares" or "$0"): | 18,006,139 shares |

**Transaction Detail (Provide one row for each transaction for the above CUSIP between April 29, 2015 and November 15, 2018)**

| Purchase or Sale | Transaction Date (Purchase/Acquisition or Sale) (mm/dd/yyyy) | Number of Shares or Amount of Notes (in dollars) | Price per Share / Note | Total Cost (excluding Commissions, Taxes, and Fees) |
|---|---|---|---|---|
| Purchase | 2/9/2018 | 17,500 | $37.9117 | $663,454.75 |
| Purchase | 2/9/2018 | 17,000 | $37.8865 | $644,070.50 |
| Purchase | 2/9/2018 | 101,700 | $37.8050 | $3,844,768.50 |
| Purchase | 2/9/2018 | 26,800 | $37.9180 | $1,016,202.40 |
| Purchase | 2/9/2018 | 35,300 | $37.8471 | $1,336,002.63 |
| Purchase | 2/9/2018 | 38,101 | $37.9170 | $1,444,675.62 |
| Purchase | 2/9/2018 | 207,921 | $37.9011 | $7,880,434.61 |
| Purchase | 2/9/2018 | 16,977 | $37.8424 | $642,450.42 |
| Purchase | 2/9/2018 | 11,100 | $37.8919 | $420,600.09 |
| Purchase | 2/12/2018 | 10,416 | $38.4291 | $400,277.51 |
| Purchase | 2/12/2018 | 1,000 | $38.4340 | $38,434.00 |
| Purchase | 2/12/2018 | 5,984 | $38.4764 | $230,242.78 |
| Purchase | 2/12/2018 | 4,800 | $38.4322 | $184,474.56 |
| Purchase | 2/12/2018 | 1,800 | $38.4619 | $69,231.42 |
| Purchase | 2/12/2018 | 1,100 | $38.4682 | $42,315.02 |
| Purchase | 2/12/2018 | 24,900 | $38.5000 | $958,650.00 |
| Purchase | 2/12/2018 | 100,000 | $38.4850 | $3,848,500.00 |
| Purchase | 2/20/2018 | 122,464 | $39.9810 | $4,896,233.18 |
| Purchase | 2/20/2018 | 366,700 | $40.0812 | $14,697,776.04 |
| Purchase | 2/20/2018 | 78,650 | $39.8352 | $3,133,038.48 |
| Purchase | 2/20/2018 | 25,300 | $40.0318 | $1,012,804.54 |
| Purchase | 2/20/2018 | 6,000 | $39.8659 | $239,195.40 |
| Purchase | 2/20/2018 | 14,600 | $39.9055 | $582,620.30 |
| Purchase | 2/20/2018 | 50,051 | $39.9346 | $1,998,766.66 |
| Purchase | 2/20/2018 | 2,500 | $39.9234 | $99,808.50 |
| Purchase | 2/21/2018 | 41,100 | $40.3800 | $1,659,618.00 |
| Purchase | 2/21/2018 | 268,500 | $40.3538 | $10,834,995.30 |
| Purchase | 2/21/2018 | 11,000 | $40.3376 | $443,713.60 |
| Purchase | 2/21/2018 | 32,700 | $40.2296 | $1,315,507.92 |
| Purchase | 2/21/2018 | 5,600 | $40.0591 | $224,330.96 |
| Purchase | 2/21/2018 | 5,500 | $40.3777 | $222,077.35 |
| Purchase | 2/21/2018 | 1,100 | $40.3545 | $44,389.95 |
| Purchase | 2/21/2018 | 600,000 | $40.0410 | $24,024,600.00 |

| Purchase or Sale | Transaction Date (Purchase/Acquisition or Sale) (mm/dd/yyyy) | Number of Shares or Amount of Notes (in dollars) | Price per Share / Note | Total Cost (excluding Commissions, Taxes, and Fees) |
|---|---|---|---|---|
| Purchase | 2/22/2018 | 4,300 | $40.1908 | $172,820.44 |
| Purchase | 2/22/2018 | 375,000 | $40.0906 | $15,033,975.00 |
| Purchase | 2/22/2018 | 20,000 | $39.9900 | $799,800.00 |
| Purchase | 2/22/2018 | 16,400 | $40.1235 | $658,025.40 |
| Purchase | 2/22/2018 | 30,004 | $40.0247 | $1,200,901.10 |
| Purchase | 2/22/2018 | 10,422 | $40.0793 | $417,706.46 |
| Purchase | 2/22/2018 | 4,900 | $40.0704 | $196,344.96 |
| Purchase | 2/22/2018 | 3,410 | $40.1018 | $136,747.14 |
| Purchase | 2/22/2018 | 183,100 | $39.9905 | $7,322,260.55 |
| Purchase | 2/23/2018 | 2,600 | $40.9481 | $106,465.06 |
| Purchase | 2/23/2018 | 39,229 | $40.8545 | $1,602,681.18 |
| Purchase | 2/23/2018 | 18,400 | $40.8000 | $750,720.00 |
| Purchase | 2/23/2018 | 4,900 | $40.5858 | $198,870.42 |
| Purchase | 2/23/2018 | 30,371 | $40.6648 | $1,235,030.64 |
| Purchase | 2/23/2018 | 2,800 | $40.9945 | $114,784.60 |
| Purchase | 2/28/2018 | 1,242 | $40.3275 | $50,086.76 |
| Purchase | 2/28/2018 | 25,000 | $40.2200 | $1,005,500.00 |
| Purchase | 2/28/2018 | 340 | $40.3750 | $13,727.50 |
| Purchase | 2/28/2018 | 400 | $40.4925 | $16,197.00 |
| Purchase | 2/28/2018 | 300 | $40.4933 | $12,147.99 |
| Purchase | 2/28/2018 | 100 | $40.4650 | $4,046.50 |
| Purchase | 3/5/2018 | 119,300 | $40.3696 | $4,816,093.28 |
| Purchase | 3/5/2018 | 3,090 | $40.4612 | $125,025.11 |
| Purchase | 3/5/2018 | 100 | $40.4800 | $4,048.00 |
| Purchase | 3/5/2018 | 100 | $40.4800 | $4,048.00 |
| Purchase | 5/8/2018 | 100 | $42.4950 | $4,249.50 |
| Purchase | 5/8/2018 | 300 | $42.4950 | $12,748.50 |
| Purchase | 5/8/2018 | 1,000 | $42.5000 | $42,500.00 |
| Purchase | 5/9/2018 | 10,000 | $42.4950 | $424,950.00 |
| Purchase | 5/9/2018 | 4,200 | $42.4746 | $178,393.32 |
| Purchase | 5/9/2018 | 285,000 | $42.4596 | $12,100,986.00 |
| Purchase | 5/16/2018 | 397,016 | $42.5000 | $16,873,180.00 |
| Purchase | 5/16/2018 | 23,957 | $42.4747 | $1,017,566.39 |
| Purchase | 5/16/2018 | 4,755 | $42.4911 | $202,045.18 |
| Purchase | 5/16/2018 | 300 | $42.4950 | $12,748.50 |
| Purchase | 5/16/2018 | 19,100 | $42.5000 | $811,750.00 |
| Purchase | 5/16/2018 | 104,300 | $42.4737 | $4,430,006.91 |
| Purchase | 5/17/2018 | 266,000 | $42.4500 | $11,291,700.00 |

| Purchase or Sale | Transaction Date (Purchase/Acquisition or Sale) (mm/dd/yyyy) | Number of Shares or Amount of Notes (in dollars) | Price per Share / Note | Total Cost (excluding Commissions, Taxes, and Fees) |
|---|---|---|---|---|
| Purchase | 5/17/2018 | 194,300 | $42.2700 | $8,213,061.00 |
| Purchase | 5/17/2018 | 1,016 | $42.2151 | $42,890.54 |
| Purchase | 5/17/2018 | 38,684 | $42.3662 | $1,638,894.08 |
| Sale | 7/3/2018 | 7,700 | $44.2480 | $340,709.60 |
| Sale | 7/3/2018 | 142,200 | $44.0750 | $6,267,465.00 |
| Sale | 7/3/2018 | 84,426 | $44.2049 | $3,732,042.89 |
| Sale | 7/3/2018 | 7,800 | $44.0090 | $343,270.20 |
| Sale | 7/5/2018 | 169,000 | $43.9800 | $7,432,620.00 |
| Sale | 7/5/2018 | 201,820 | $43.9960 | $8,879,272.72 |
| Sale | 7/5/2018 | 153,900 | $43.7847 | $6,738,465.33 |
| Sale | 7/5/2018 | 14,754 | $43.9090 | $647,833.39 |
| Sale | 7/5/2018 | 2,500 | $43.8976 | $109,744.00 |
| Sale | 7/5/2018 | 50,000 | $44.1800 | $2,209,000.00 |
| Sale | 7/5/2018 | 4,600 | $44.0576 | $202,664.96 |
| Purchase | 7/17/2018 | 838,700 | $42.6709 | $35,788,083.83 |
| Purchase | 7/25/2018 | 300,000 | $42.8524 | $12,855,720.00 |
| Purchase | 7/25/2018 | 13,056 | $42.8078 | $558,898.64 |
| Purchase | 7/25/2018 | 27,650 | $42.6298 | $1,178,713.97 |
| Purchase | 7/25/2018 | 2,600 | $42.7412 | $111,127.12 |
| Purchase | 7/25/2018 | 21,700 | $42.6829 | $926,218.93 |
| Purchase | 7/25/2018 | 60,981 | $42.6064 | $2,598,180.88 |
| Purchase | 7/25/2018 | 6,900 | $42.7000 | $294,630.00 |
| Purchase | 7/25/2018 | 12,700 | $42.9698 | $545,716.46 |
| Purchase | 7/26/2018 | 12,100 | $42.9609 | $519,826.89 |
| Purchase | 7/26/2018 | 900 | $42.8939 | $38,604.51 |
| Purchase | 7/26/2018 | 100 | $42.8550 | $4,285.50 |
| Purchase | 7/26/2018 | 8,962 | $42.8866 | $384,349.71 |
| Purchase | 7/26/2018 | 100 | $42.9500 | $4,295.00 |
| Purchase | 7/30/2018 | 32,600 | $42.8776 | $1,397,809.76 |
| Purchase | 7/30/2018 | 15,000 | $42.9700 | $644,550.00 |
| Purchase | 7/30/2018 | 23,808 | $42.9320 | $1,022,125.06 |
| Purchase | 7/30/2018 | 49,373 | $42.9232 | $2,119,247.15 |
| Purchase | 7/30/2018 | 6,000 | $42.9260 | $257,556.00 |
| Purchase | 7/30/2018 | 121,560 | $42.9300 | $5,218,570.80 |
| Purchase | 7/31/2018 | 1,000 | $43.0000 | $43,000.00 |
| Purchase | 7/31/2018 | 200 | $42.9600 | $8,592.00 |
| Purchase | 7/31/2018 | 300 | $42.9500 | $12,885.00 |
| Purchase | 7/31/2018 | 2,600 | $42.9838 | $111,757.88 |

| Purchase or Sale | Transaction Date (Purchase/Acquisition or Sale) (mm/dd/yyyy) | Number of Shares or Amount of Notes (in dollars) | Price per Share / Note | Total Cost (excluding Commissions, Taxes, and Fees) |
|---|---|---|---|---|
| Purchase | 7/31/2018 | 83,000 | $42.9535 | $3,565,140.50 |
| Purchase | 7/31/2018 | 51,000 | $42.9950 | $2,192,745.00 |
| Purchase | 8/1/2018 | 32,100 | $42.8381 | $1,375,103.01 |
| Purchase | 8/1/2018 | 4,600 | $42.4600 | $195,316.00 |
| Purchase | 8/1/2018 | 39,115 | $42.4115 | $1,658,925.82 |
| Purchase | 8/1/2018 | 634,700 | $42.3762 | $26,896,174.14 |
| Purchase | 8/1/2018 | 1,000 | $41.7300 | $41,730.00 |
| Purchase | 8/1/2018 | 9,600 | $42.3690 | $406,742.40 |
| Purchase | 8/1/2018 | 16,816 | $42.4446 | $713,748.39 |
| Purchase | 8/1/2018 | 407,879 | $42.2706 | $17,241,290.06 |
| Purchase | 8/9/2018 | 37,565 | $43.7422 | $1,643,175.74 |
| Purchase | 8/9/2018 | 44,700 | $43.7766 | $1,956,814.02 |
| Purchase | 8/9/2018 | 2,700 | $43.9037 | $118,539.99 |
| Purchase | 8/9/2018 | 2,600 | $43.7115 | $113,649.90 |
| Purchase | 8/9/2018 | 238,778 | $43.9137 | $10,485,625.46 |
| Purchase | 8/9/2018 | 2,800 | $43.9264 | $122,993.92 |
| Purchase | 8/9/2018 | 180,000 | $43.8409 | $7,891,362.00 |
| Purchase | 8/10/2018 | 198,982 | $42.9086 | $8,538,039.05 |
| Purchase | 8/10/2018 | 1,445,000 | $42.8881 | $61,973,304.50 |
| Purchase | 8/10/2018 | 708,857 | $42.7635 | $30,313,206.32 |
| Purchase | 8/10/2018 | 19,600 | $42.8650 | $840,154.00 |
| Purchase | 8/10/2018 | 41,718 | $42.8689 | $1,788,404.77 |
| Purchase | 8/10/2018 | 63,100 | $42.9899 | $2,712,662.69 |
| Purchase | 8/10/2018 | 5,900 | $42.9137 | $253,190.83 |
| Purchase | 8/10/2018 | 7,700 | $42.8551 | $329,984.27 |
| Purchase | 8/13/2018 | 34,700 | $42.7658 | $1,483,973.26 |
| Purchase | 8/13/2018 | 662,369 | $42.7431 | $28,311,704.40 |
| Purchase | 8/13/2018 | 1,100 | $42.7050 | $46,975.50 |
| Purchase | 8/13/2018 | 8,900 | $42.7566 | $380,533.74 |
| Purchase | 8/13/2018 | 27,400 | $42.7450 | $1,171,213.00 |
| Purchase | 8/13/2018 | 839,700 | $42.7466 | $35,894,320.02 |
| Purchase | 8/14/2018 | 600,000 | $42.9897 | $25,793,820.00 |
| Purchase | 8/14/2018 | 118,300 | $42.8474 | $5,068,847.42 |
| Purchase | 8/14/2018 | 162,543 | $42.9671 | $6,984,001.34 |
| Purchase | 8/14/2018 | 76,382 | $43.0154 | $3,285,602.28 |
| Purchase | 8/14/2018 | 100,000 | $42.8400 | $4,284,000.00 |
| Purchase | 8/14/2018 | 46,175 | $42.7826 | $1,975,486.56 |
| Purchase | 8/14/2018 | 3,500 | $42.9481 | $150,318.35 |

| Purchase or Sale | Transaction Date (Purchase/Acquisition or Sale) (mm/dd/yyyy) | Number of Shares or Amount of Notes (in dollars) | Price per Share / Note | Total Cost (excluding Commissions, Taxes, and Fees) |
|---|---|---|---|---|
| Purchase | 8/14/2018 | 500 | $43.0000 | $21,500.00 |
| Purchase | 8/14/2018 | 1,000 | $43.0100 | $43,010.00 |
| Purchase | 8/14/2018 | 300 | $42.7900 | $12,837.00 |
| Purchase | 8/15/2018 | 1,100 | $43.4123 | $47,753.53 |
| Purchase | 8/15/2018 | 33,000 | $43.4517 | $1,433,906.10 |
| Purchase | 8/15/2018 | 200 | $43.4000 | $8,680.00 |
| Purchase | 8/15/2018 | 45,500 | $43.4415 | $1,976,588.25 |
| Purchase | 8/15/2018 | 25,000 | $43.3200 | $1,083,000.00 |
| Purchase | 8/15/2018 | 26,600 | $43.2966 | $1,151,689.56 |
| Purchase | 8/15/2018 | 57,900 | $43.3986 | $2,512,778.94 |
| Purchase | 8/15/2018 | 49,087 | $43.2102 | $2,121,059.09 |
| Purchase | 8/20/2018 | 1,201,300 | $43.9795 | $52,832,573.35 |
| Purchase | 8/22/2018 | 34,500 | $44.4085 | $1,532,093.25 |
| Purchase | 8/22/2018 | 14,600 | $44.4357 | $648,761.22 |
| Purchase | 8/22/2018 | 15,100 | $44.4313 | $670,912.63 |
| Purchase | 8/22/2018 | 4,200 | $44.4702 | $186,774.84 |
| Purchase | 8/22/2018 | 4,100 | $44.4213 | $182,127.33 |
| Purchase | 8/23/2018 | 232,357 | $44.1269 | $10,253,194.10 |
| Purchase | 8/23/2018 | 489,424 | $44.1819 | $21,623,682.23 |
| Purchase | 8/23/2018 | 39,500 | $44.0576 | $1,740,275.20 |
| Purchase | 8/23/2018 | 51,500 | $44.0297 | $2,267,529.55 |
| Purchase | 8/23/2018 | 100,000 | $43.9500 | $4,395,000.00 |
| Purchase | 8/23/2018 | 5,300 | $43.9696 | $233,038.88 |
| Purchase | 8/23/2018 | 400 | $43.9600 | $17,584.00 |
| Purchase | 8/23/2018 | 17,500 | $44.4950 | $778,662.50 |
| Purchase | 8/24/2018 | 22,800 | $42.8050 | $975,954.00 |
| Purchase | 8/24/2018 | 650,000 | $42.8489 | $27,851,785.00 |
| Purchase | 8/24/2018 | 56,700 | $42.7950 | $2,426,476.50 |
| Purchase | 8/24/2018 | 1,000 | $42.7600 | $42,760.00 |
| Purchase | 8/24/2018 | 400 | $42.7600 | $17,104.00 |
| Purchase | 8/24/2018 | 13,300 | $42.7914 | $569,125.62 |
| Purchase | 8/24/2018 | 280,000 | $43.3035 | $12,124,980.00 |
| Purchase | 8/24/2018 | 83,400 | $43.6010 | $3,636,323.40 |
| Purchase | 8/24/2018 | 5,563 | $43.1770 | $240,193.65 |
| Purchase | 8/27/2018 | 2,700 | $43.6967 | $117,981.09 |
| Purchase | 8/27/2018 | 32,900 | $43.6478 | $1,436,012.62 |
| Purchase | 8/27/2018 | 95,172 | $43.6912 | $4,158,178.89 |
| Purchase | 8/27/2018 | 22,400 | $43.2526 | $968,858.24 |

| Purchase or Sale | Transaction Date (Purchase/Acquisition or Sale) (mm/dd/yyyy) | Number of Shares or Amount of Notes (in dollars) | Price per Share / Note | Total Cost (excluding Commissions, Taxes, and Fees) |
|---|---|---|---|---|
| Purchase | 8/27/2018 | 36,500 | $43.6182 | $1,592,064.30 |
| Purchase | 8/27/2018 | 44,700 | $43.5435 | $1,946,394.45 |
| Purchase | 8/27/2018 | 54,628 | $43.5968 | $2,381,605.99 |
| Purchase | 8/27/2018 | 21,988 | $43.2497 | $950,974.40 |
| Purchase | 8/27/2018 | 192,500 | $43.6442 | $8,401,508.50 |
| Purchase | 8/28/2018 | 145 | $44.4950 | $6,451.78 |
| Purchase | 8/28/2018 | 2,400 | $44.4950 | $106,788.00 |
| Purchase | 8/28/2018 | 10,800 | $44.5000 | $480,600.00 |
| Purchase | 8/28/2018 | 2,200 | $44.4555 | $97,802.10 |
| Purchase | 8/28/2018 | 19,900 | $44.5000 | $885,550.00 |
| Purchase | 9/7/2018 | 300 | $45.6900 | $13,707.00 |
| Purchase | 9/7/2018 | 200 | $45.6800 | $9,136.00 |
| Purchase | 9/7/2018 | 95,571 | $45.6784 | $4,365,530.37 |
| Purchase | 9/7/2018 | 82,693 | $45.5665 | $3,768,030.58 |
| Purchase | 9/7/2018 | 17,800 | $45.6831 | $813,159.18 |
| Purchase | 9/7/2018 | 60,100 | $45.6605 | $2,744,196.05 |
| Purchase | 9/7/2018 | 103,500 | $45.2300 | $4,681,305.00 |
| Purchase | 9/18/2018 | 200,000 | $47.1870 | $9,437,400.00 |
| Purchase | 9/18/2018 | 400 | $47.1488 | $18,859.52 |
| Purchase | 9/18/2018 | 15,131 | $47.1285 | $713,101.33 |
| Purchase | 9/19/2018 | 9,400 | $46.7904 | $439,829.76 |
| Purchase | 9/19/2018 | 3,400 | $46.7491 | $158,946.94 |
| Purchase | 9/19/2018 | 2,400 | $46.7746 | $112,259.04 |
| Purchase | 9/19/2018 | 49,700 | $46.6616 | $2,319,081.52 |
| Purchase | 9/19/2018 | 47,375 | $46.6608 | $2,210,555.40 |
| Purchase | 9/19/2018 | 120,600 | $46.7784 | $5,641,475.04 |
| Purchase | 9/19/2018 | 852,105 | $46.8542 | $39,924,698.09 |
| Purchase | 9/19/2018 | 153,294 | $46.6849 | $7,156,515.06 |
| Purchase | 9/20/2018 | 200 | $46.8150 | $9,363.00 |
| Purchase | 9/20/2018 | 400 | $46.7225 | $18,689.00 |
| Purchase | 9/20/2018 | 867 | $46.7335 | $40,517.94 |
| Purchase | 9/20/2018 | 1,650 | $46.8592 | $77,317.68 |
| Purchase | 9/20/2018 | 543,078 | $46.8308 | $25,432,777.20 |
| Sale | 9/21/2018 | 275,334 | $46.9075 | $12,915,229.61 |
| Purchase | 9/26/2018 | 48,800 | $45.3738 | $2,214,241.44 |
| Purchase | 9/26/2018 | 15,236 | $45.2951 | $690,116.14 |
| Purchase | 9/26/2018 | 25,000 | $45.1600 | $1,129,000.00 |
| Purchase | 9/26/2018 | 12,800 | $45.2133 | $578,730.24 |

| Purchase or Sale | Transaction Date (Purchase/Acquisition or Sale) (mm/dd/yyyy) | Number of Shares or Amount of Notes (in dollars) | Price per Share / Note | Total Cost (excluding Commissions, Taxes, and Fees) |
|---|---|---|---|---|
| Purchase | 9/26/2018 | 5,700 | $45.2094 | $257,693.58 |
| Purchase | 9/26/2018 | 900 | $45.3000 | $40,770.00 |
| Purchase | 9/26/2018 | 23,600 | $45.2750 | $1,068,490.00 |
| Purchase | 9/27/2018 | 453,900 | $45.1810 | $20,507,655.90 |
| Purchase | 9/28/2018 | 25,891 | $45.6964 | $1,183,125.49 |
| Purchase | 10/1/2018 | 400 | $45.4400 | $18,176.00 |
| Purchase | 10/1/2018 | 51,100 | $45.4612 | $2,323,067.32 |
| Purchase | 10/1/2018 | 2,500 | $45.5076 | $113,769.00 |
| Purchase | 10/1/2018 | 131,404 | $45.5872 | $5,990,340.43 |
| Purchase | 10/1/2018 | 2,400 | $45.5667 | $109,360.08 |
| Sale | 11/15/2018 | 426,085 | $21.4249 | $9,128,840.90 |
| Sale | 11/15/2018 | 71,100 | $20.5526 | $1,461,291.50 |
| Sale | 11/15/2018 | 286,770 | $20.5797 | $5,901,638.14 |
| Sale | 11/15/2018 | 115,400 | $20.3935 | $2,353,405.50 |
| Sale | 11/15/2018 | 12,600 | $20.1798 | $254,265.00 |
| Sale | 11/15/2018 | 3,500 | $20.1900 | $70,665.00 |
| Sale | 11/15/2018 | 126,100 | $20.7547 | $2,617,166.00 |
| Sale | 11/15/2018 | 32,500 | $20.0621 | $652,017.50 |
| Sale | 11/15/2018 | 87,400 | $20.2773 | $1,772,240.00 |

<u>Note</u>:  Documentation supporting the transactions listed in this Annex A, Part II is set forth in Schedule 1, which is appended hereto.

**Schedule 1**

**Documentation for Purchase and Sale Transactions Set Forth in Annex A Part II**

| Trade Id | Trans Type | Trade Date | Settle Date | Investment Symbol | Quantity | Price | DTC Number(s) |
|---|---|---|---|---|---|---|---|
| 115487 | Buy Long | 2/9/2018 | 2/13/2018 | PCG | 11,100.00 | 37.8919 | 590280782 |
| 115486 | Buy Long | 2/9/2018 | 2/13/2018 | PCG | 16,977.00 | 37.8424 | 465415954 |
| 115479 | Buy Long | 2/9/2018 | 2/13/2018 | PCG | 17,500.00 | 37.9117 | 490256234 |
| 115484 | Buy Long | 2/9/2018 | 2/13/2018 | PCG | 38,101.00 | 37.917 | 564959296 |
| 115481 | Buy Long | 2/9/2018 | 2/13/2018 | PCG | 101,700.00 | 37.805 | 395696557 |
| 115483 | Buy Long | 2/9/2018 | 2/13/2018 | PCG | 35,300.00 | 37.8471 | 809062837 |
| 115485 | Buy Long | 2/9/2018 | 2/13/2018 | PCG | 207,921.00 | 37.9011 | 395637938 |
| 115480 | Buy Long | 2/9/2018 | 2/13/2018 | PCG | 17,000.00 | 37.8865 | 564981470 |
| 115482 | Buy Long | 2/9/2018 | 2/13/2018 | PCG | 26,800.00 | 37.918 | 490267648 |
| 115528 | Buy Long | 2/12/2018 | 2/14/2018 | PCG | 1,100.00 | 38.4682 | 324009766 |
| 115530 | Buy Long | 2/12/2018 | 2/14/2018 | PCG | 100,000.00 | 38.485 | 439709577 |
| 115529 | Buy Long | 2/12/2018 | 2/14/2018 | PCG | 24,900.00 | 38.50 | 515934384 |
| 115527 | Buy Long | 2/12/2018 | 2/14/2018 | PCG | 1,800.00 | 38.4619 | 439703635 |
| 115525 | Buy Long | 2/12/2018 | 2/14/2018 | PCG | 5,984.00 | 38.4764 | 515920260 |
| 115524 | Buy Long | 2/12/2018 | 2/14/2018 | PCG | 1,000.00 | 38.434 | 90249914 |
| 115526 | Buy Long | 2/12/2018 | 2/14/2018 | PCG | 4,800.00 | 38.4322 | 395760469 |
| 115523 | Buy Long | 2/12/2018 | 2/14/2018 | PCG | 10,416.00 | 38.4291 | 540725436 |
| 115739 | Buy Long | 2/20/2018 | 2/22/2018 | PCG | 6,000.00 | 39.8659 | 541353312 |
| 115736 | Buy Long | 2/20/2018 | 2/22/2018 | PCG | 366,700.00 | 40.0812 | 324646278 |
| 115740 | Buy Long | 2/20/2018 | 2/22/2018 | PCG | 14,600.00 | 39.9055 | 516539237 |
| 115741 | Buy Long | 2/20/2018 | 2/22/2018 | PCG | 50,051.00 | 39.9346 | 516536196 |
| 115735 | Buy Long | 2/20/2018 | 2/22/2018 | PCG | 122,464.00 | 39.981 | 090675989 |
| 115742 | Buy Long | 2/20/2018 | 2/22/2018 | PCG | 2,500.00 | 39.9234 | 090675989 |
| 115738 | Buy Long | 2/20/2018 | 2/22/2018 | PCG | 25,300.00 | 40.0318 | 491074973 |

| Trade Id | Trans Type | Trade Date | Settle Date | Investment Symbol | Quantity | Price | DTC Number(s) |
|----------|-----------|-----------|-------------|-------------------|----------|-------|---------------|
| 115737 | Buy Long | 2/20/2018 | 2/22/2018 | PCG | 78,650.00 | 39.8352 | 565733984 |
| 115782 | Buy Long | 2/21/2018 | 2/23/2018 | PCG | 268,500.00 | 40.3538 | 516626726 |
| 115785 | Buy Long | 2/21/2018 | 2/23/2018 | PCG | 5,600.00 | 40.0591 | 541414511 |
| 115786 | Buy Long | 2/21/2018 | 2/23/2018 | PCG | 5,500.00 | 40.3777 | 541409181 |
| 115781 | Buy Long | 2/21/2018 | 2/23/2018 | PCG | 41,100.00 | 40.38 | 466262891 |
| 115784 | Buy Long | 2/21/2018 | 2/23/2018 | PCG | 32,700.00 | 40.2296 | 164656525 |
| 115788 | Buy Long | 2/21/2018 | 2/23/2018 | PCG | 600,000.00 | 40.041 | 417119475 |
| 115783 | Buy Long | 2/21/2018 | 2/23/2018 | PCG | 11,000.00 | 40.3376 | 466205351 |
| 115787 | Buy Long | 2/21/2018 | 2/23/2018 | PCG | 1,100.00 | 40.3545 | 491156152 |
| 115828 | Buy Long | 2/22/2018 | 2/26/2018 | PCG | 3,410.00 | 40.1018 | 417238645 |
| 115829 | Buy Long | 2/22/2018 | 2/26/2018 | PCG | 183,100.00 | 39.9905 | 440544474 |
| 115827 | Buy Long | 2/22/2018 | 2/26/2018 | PCG | 4,900.00 | 40.0704 | 591162352 |
| 115825 | Buy Long | 2/22/2018 | 2/26/2018 | PCG | 30,004.00 | 40.0247 | 466308019 |
| 115823 | Buy Long | 2/22/2018 | 2/26/2018 | PCG | 20,000.00 | 39.99 | 440583417 |
| 115821 | Buy Long | 2/22/2018 | 2/26/2018 | PCG | 4,300.00 | 40.1908 | 090758025 |
| 115822 | Buy Long | 2/22/2018 | 2/26/2018 | PCG | 375,000.00 | 40.0906 | 516714021, 516714018, 516714006 |
| 115824 | Buy Long | 2/22/2018 | 2/26/2018 | PCG | 16,400.00 | 40.1235 | 565900222 |
| 115826 | Buy Long | 2/22/2018 | 2/26/2018 | PCG | 10,422.00 | 40.0793 | 516735767 |
| 115858 | Buy Long | 2/23/2018 | 2/27/2018 | PCG | 18,400.00 | 40.80 | 417326241 |
| 115860 | Buy Long | 2/23/2018 | 2/27/2018 | PCG | 30,371.00 | 40.6648 | 440633947 |
| 115857 | Buy Long | 2/23/2018 | 2/27/2018 | PCG | 39,229.00 | 40.8545 | 164851517 |
| 115861 | Buy Long | 2/23/2018 | 2/27/2018 | PCG | 2,800.00 | 40.9945 | 164851517 |
| 115859 | Buy Long | 2/23/2018 | 2/27/2018 | PCG | 4,900.00 | 40.5858 | 591256089 |
| 115856 | Buy Long | 2/23/2018 | 2/27/2018 | PCG | 2,600.00 | 40.9481 | 491348514 |
| 115968 | Buy Long | 2/28/2018 | 3/2/2018 | PCG | 25,000.00 | 40.22 | 541916470 |
| 115970 | Buy Long | 2/28/2018 | 3/2/2018 | PCG | 400.00 | 40.4925 | 325249822 |

Case: 19-30088    Doc# 13393-2    Filed: 12/28/22    Entered: 12/28/22 14:40:39    Page 16 of 50

| Trade Id | Trans Type | Trade Date | Settle Date | Investment Symbol | Quantity | Price | DTC Number(s) |
|---|---|---|---|---|---|---|---|
| 115969 | Buy Long | 2/28/2018 | 3/2/2018 | PCG | 340.00 | 40.375 | 491617919 |
| 115971 | Buy Long | 2/28/2018 | 3/2/2018 | PCG | 300.00 | 40.4933 | 792497123 |
| 115972 | Buy Long | 2/28/2018 | 3/2/2018 | PCG | 100.00 | 40.465 | 517150066 |
| 115967 | Buy Long | 2/28/2018 | 3/2/2018 | PCG | 1,242.00 | 40.3275 | 491643756 |
| 116072 | Buy Long | 3/5/2018 | 3/7/2018 | PCG | 119,300.00 | 40.3696 | 352172287 |
| 116074 | Buy Long | 3/5/2018 | 3/7/2018 | PCG | 100.00 | 40.48 | 566584118 |
| 116073 | Buy Long | 3/5/2018 | 3/7/2018 | PCG | 3,090.00 | 40.4612 | 397207331 |
| 116075 | Buy Long | 3/5/2018 | 3/7/2018 | PCG | 100.00 | 40.48 | 810063231 |
| 118349 | Buy Long | 5/8/2018 | 5/10/2018 | PCG | 300.00 | 42.495 | 495932611 |
| 118352 | Buy Long | 5/8/2018 | 5/10/2018 | PCG | 1,000.00 | 42.50 | 813030543 |
| 118348 | Buy Long | 5/8/2018 | 5/10/2018 | PCG | 100.00 | 42.495 | 356110818 |
| 118424 | Buy Long | 5/9/2018 | 5/11/2018 | PCG | 285,000.00 | 42.4596 | 570654106 |
| 118423 | Buy Long | 5/9/2018 | 5/11/2018 | PCG | 4,200.00 | 42.4746 | 329620045 |
| 118422 | Buy Long | 5/9/2018 | 5/11/2018 | PCG | 10,000.00 | 42.495 | 329613434 |
| 118673 | Buy Long | 5/16/2018 | 5/18/2018 | PCG | 104,300.00 | 42.4737 | 445618624 |
| 118668 | Buy Long | 5/16/2018 | 5/18/2018 | PCG | 397,016.00 | 42.50 | 521898532 |
| 118670 | Buy Long | 5/16/2018 | 5/18/2018 | PCG | 4,755.00 | 42.4911 | 496449286 |
| 118669 | Buy Long | 5/16/2018 | 5/18/2018 | PCG | 23,957.00 | 42.4747 | 813438822 |
| 118671 | Buy Long | 5/16/2018 | 5/18/2018 | PCG | 300.00 | 42.495 | 813438822 |
| 118672 | Buy Long | 5/16/2018 | 5/18/2018 | PCG | 19,100.00 | 42.50 | 422487565 |
| 118726 | Buy Long | 5/17/2018 | 5/21/2018 | PCG | 194,300.00 | 42.27 | 496558035 |
| 118724 | Buy Long | 5/17/2018 | 5/21/2018 | PCG | 266,000.00 | 42.45 | 596375486 |
| 118727 | Buy Long | 5/17/2018 | 5/21/2018 | PCG | 1,016.00 | 42.2151 | 522071923 |
| 118728 | Buy Long | 5/17/2018 | 5/21/2018 | PCG | 38,684.00 | 42.3662 | 996739601 |
| 120620 | Sell Long | 7/3/2018 | 7/6/2018 | PCG | (142,200.00) | 44.075 | 499533675 |
| 120622 | Sell Long | 7/3/2018 | 7/6/2018 | PCG | (84,426.00) | 44.2049 | 474608571 |
| 120619 | Sell Long | 7/3/2018 | 7/6/2018 | PCG | (7,700.00) | 44.248 | 574244581 |
| 120623 | Sell Long | 7/3/2018 | 7/6/2018 | PCG | (7,800.00) | 44.009 | 574274058 |

Case: 19-30088    Doc# 13393-2    Filed: 12/28/22    Entered: 12/28/22 14:40:39    Page 17 of 50

| Trade Id | Trans Type | Trade Date | Settle Date | Investment Symbol | Quantity | Price | DTC Number(s) |
|---|---|---|---|---|---|---|---|
| 120669 | Sell Long | 7/5/2018 | 7/9/2018 | PCG | (153,900.00) | 43.7847 | 549834815 |
| 120673 | Sell Long | 7/5/2018 | 7/9/2018 | PCG | (4,600.00) | 44.0576 | 574327101 |
| 120668 | Sell Long | 7/5/2018 | 7/9/2018 | PCG | (201,820.00) | 43.996 | 549809722 |
| 120671 | Sell Long | 7/5/2018 | 7/9/2018 | PCG | (2,500.00) | 43.8976 | 998925016 |
| 120672 | Sell Long | 7/5/2018 | 7/9/2018 | PCG | (50,000.00) | 44.18 | 998925016 |
| 120667 | Sell Long | 7/5/2018 | 7/9/2018 | PCG | (169,000.00) | 43.98 | 400804994 |
| 120670 | Sell Long | 7/5/2018 | 7/9/2018 | PCG | (14,754.00) | 43.909 | 599662630 |
| 120952 | Buy Long | 7/17/2018 | 7/19/2018 | PCG | 838,700.00 | 42.6709 | 575418920 |
| 121623 | Buy Long | 7/25/2018 | 7/27/2018 | PCG | 6,900.00 | 42.70 | 449990426 |
| 121617 | Buy Long | 7/25/2018 | 7/27/2018 | PCG | 300,000.00 | 42.8524 | 550540641 |
| 121624 | Buy Long | 7/25/2018 | 7/27/2018 | PCG | 12,700.00 | 42.9698 | 450952121 |
| 121619 | Buy Long | 7/25/2018 | 7/27/2018 | PCG | 27,650.00 | 42.6298 | 550536299 |
| 121618 | Buy Long | 7/25/2018 | 7/27/2018 | PCG | 13,056.00 | 42.8078 | 97541713 |
| 121620 | Buy Long | 7/25/2018 | 7/27/2018 | PCG | 2,600.00 | 42.7412 | 97541713 |
| 121621 | Buy Long | 7/25/2018 | 7/27/2018 | PCG | 21,700.00 | 42.6829 | 360991829 |
| 121622 | Buy Long | 7/25/2018 | 7/27/2018 | PCG | 60,981.00 | 42.6064 | 450965567 |
| 121701 | Buy Long | 7/26/2018 | 7/30/2018 | PCG | 8,962.00 | 42.8866 | 334624337 |
| 121698 | Buy Long | 7/26/2018 | 7/30/2018 | PCG | 900.00 | 42.8939 | 334616509 |
| 121702 | Buy Long | 7/26/2018 | 7/30/2018 | PCG | 100.00 | 42.95 | 386179172 |
| 121697 | Buy Long | 7/26/2018 | 7/30/2018 | PCG | 12,100.00 | 42.9609 | 386191839 |
| 121700 | Buy Long | 7/26/2018 | 7/30/2018 | PCG | 100.00 | 42.855 | 501410929 |
| 121807 | Buy Long | 7/30/2018 | 8/1/2018 | PCG | 15,000.00 | 42.97 | 451238098 |
| 121811 | Buy Long | 7/30/2018 | 8/1/2018 | PCG | 121,560.00 | 42.93 | 476021480, 476021476, 476021475 |
| 121810 | Buy Long | 7/30/2018 | 8/1/2018 | PCG | 6,000.00 | 42.926 | 526282972 |
| 121809 | Buy Long | 7/30/2018 | 8/1/2018 | PCG | 49,373.00 | 42.9232 | 501586731 |
| 121806 | Buy Long | 7/30/2018 | 8/1/2018 | PCG | 32,600.00 | 42.8776 | 451239562 |

4

| Trade Id | Trans Type | Trade Date | Settle Date | Investment Symbol | Quantity | Price | DTC Number(s) |
|---|---|---|---|---|---|---|---|
| 121808 | Buy Long | 7/30/2018 | 8/1/2018 | PCG | 23,808.00 | 42.932 | 576132715 |
| 121845 | Buy Long | 7/31/2018 | 8/2/2018 | PCG | 51,000.00 | 42.995 | 451345208 |
| 121842 | Buy Long | 7/31/2018 | 8/2/2018 | PCG | 300.00 | 42.95 | 402399452 |
| 121844 | Buy Long | 7/31/2018 | 8/2/2018 | PCG | 83,000.00 | 42.9535 | 526379110 |
| 121841 | Buy Long | 7/31/2018 | 8/2/2018 | PCG | 200.00 | 42.96 | 798859091 |
| 121843 | Buy Long | 7/31/2018 | 8/2/2018 | PCG | 2,600.00 | 42.9838 | 361353695 |
| 121840 | Buy Long | 7/31/2018 | 8/2/2018 | PCG | 1,000.00 | 43.00 | 402427486 |
| 121880 | Buy Long | 8/1/2018 | 8/3/2018 | PCG | 634,700.00 | 42.3762 | 451441452 |
| 121884 | Buy Long | 8/1/2018 | 8/3/2018 | PCG | 407,879.00 | 42.2706 | 402494271 |
| 121878 | Buy Long | 8/1/2018 | 8/3/2018 | PCG | 4,600.00 | 42.46 | 386540935 |
| 121879 | Buy Long | 8/1/2018 | 8/3/2018 | PCG | 39,115.00 | 42.4115 | 402492119 |
| 121881 | Buy Long | 8/1/2018 | 8/3/2018 | PCG | 1,000.00 | 41.73 | 476173855, 476173842 |
| 121877 | Buy Long | 8/1/2018 | 8/3/2018 | PCG | 32,100.00 | 42.8381 | 900155441 |
| 121882 | Buy Long | 8/1/2018 | 8/3/2018 | PCG | 9,600.00 | 42.369 | 425503541 |
| 121883 | Buy Long | 8/1/2018 | 8/3/2018 | PCG | 16,816.00 | 42.4446 | 526503881 |
| 122110 | Buy Long | 8/9/2018 | 8/13/2018 | PCG | 2,800.00 | 43.9264 | 426040513 |
| 122109 | Buy Long | 8/9/2018 | 8/13/2018 | PCG | 238,778.00 | 43.9137 | 387102657 |
| 122107 | Buy Long | 8/9/2018 | 8/13/2018 | PCG | 2,700.00 | 43.9037 | 502314674, 426030201, 426019163, 387097740, 335451981 |
| 122108 | Buy Long | 8/9/2018 | 8/13/2018 | PCG | 2,600.00 | 43.7115 | 900549049 |
| 122111 | Buy Long | 8/9/2018 | 8/13/2018 | PCG | 180,000.00 | 43.8409 | 576853599 |
| 122106 | Buy Long | 8/9/2018 | 8/13/2018 | PCG | 44,700.00 | 43.7766 | 426058991 |
| 122105 | Buy Long | 8/9/2018 | 8/13/2018 | PCG | 37,565.00 | 43.7422 | 551522436 |
| 122162 | Buy Long | 8/10/2018 | 8/14/2018 | PCG | 1,445,000.00 | 42.8881 | 527144314 |

Case: 19-30088    Doc# 13393-2    Filed: 12/28/22    Entered: 12/28/22 14:40:39    Page 19 of 50

| Trade Id | Trans Type | Trade Date | Settle Date | Investment Symbol | Quantity | Price | DTC Number(s) |
|---|---|---|---|---|---|---|---|
| 122164 | Buy Long | 8/10/2018 | 8/14/2018 | PCG | 19,600.00 | 42.865 | 527144578 |
| 122168 | Buy Long | 8/10/2018 | 8/14/2018 | PCG | 7,700.00 | 42.8551 | 335536401 |
| 122161 | Buy Long | 8/10/2018 | 8/14/2018 | PCG | 198,982.00 | 42.9086 | 403116776 |
| 122167 | Buy Long | 8/10/2018 | 8/14/2018 | PCG | 5,900.00 | 42.9137 | 476780393, 476780387, 476774009, 362013433, 362007084, 362006847, 362006840, 362006790, 335527060, 335526083 |
| 122163 | Buy Long | 8/10/2018 | 8/14/2018 | PCG | 708,857.00 | 42.7635 | 502405024 |
| 122166 | Buy Long | 8/10/2018 | 8/14/2018 | PCG | 63,100.00 | 42.9899 | 476801879 |
| 122165 | Buy Long | 8/10/2018 | 8/14/2018 | PCG | 41,718.00 | 42.8689 | 403138546 |
| 122203 | Buy Long | 8/13/2018 | 8/15/2018 | PCG | 839,700.00 | 42.7466 | 362127869 |
| 122199 | Buy Long | 8/13/2018 | 8/15/2018 | PCG | 662,369.00 | 42.7431 | 362127242 |
| 122201 | Buy Long | 8/13/2018 | 8/15/2018 | PCG | 8,900.00 | 42.7566 | 387247012 |
| 122202 | Buy Long | 8/13/2018 | 8/15/2018 | PCG | 27,400.00 | 42.745 | 426205858 |
| 122200 | Buy Long | 8/13/2018 | 8/15/2018 | PCG | 1,100.00 | 42.705 | 476872173 |
| 122198 | Buy Long | 8/13/2018 | 8/15/2018 | PCG | 34,700.00 | 42.7658 | 362137029 |
| 122239 | Buy Long | 8/14/2018 | 8/16/2018 | PCG | 118,300.00 | 42.8474 | 362241668 |
| 122240 | Buy Long | 8/14/2018 | 8/16/2018 | PCG | 162,543.00 | 42.9671 | 502614468 |
| 122245 | Buy Long | 8/14/2018 | 8/16/2018 | PCG | 500.00 | 43.00 | 577105648 |
| 122241 | Buy Long | 8/14/2018 | 8/16/2018 | PCG | 76,382.00 | 43.0154 | 426315480 |
| 122246 | Buy Long | 8/14/2018 | 8/16/2018 | PCG | 1,000.00 | 43.01 | 452241205, 452241152 |
| 122242 | Buy Long | 8/14/2018 | 8/16/2018 | PCG | 100,000.00 | 42.84 | 799431154 |
| 122247 | Buy Long | 8/14/2018 | 8/16/2018 | PCG | 300.00 | 42.79 | 799431154 |

Case: 19-30088   Doc# 13393-2   Filed: 12/28/22   Entered: 12/28/22 14:40:39   Page 20 of 50

| Trade Id | Trans Type | Trade Date | Settle Date | Investment Symbol | Quantity | Price | DTC Number(s) |
|---|---|---|---|---|---|---|---|
| 122238 | Buy Long | 8/14/2018 | 8/16/2018 | PCG | 600,000.00 | 42.9897 | 476937673 |
| 122244 | Buy Long | 8/14/2018 | 8/16/2018 | PCG | 3,500.00 | 42.9481 | 452262013 |
| 122243 | Buy Long | 8/14/2018 | 8/16/2018 | PCG | 46,175.00 | 42.7826 | 502618177 |
| 122278 | Buy Long | 8/15/2018 | 8/17/2018 | PCG | 45,500.00 | 43.4415 | 362360744 |
| 122279 | Buy Long | 8/15/2018 | 8/17/2018 | PCG | 25,000.00 | 43.32 | 335790504 |
| 122275 | Buy Long | 8/15/2018 | 8/17/2018 | PCG | 1,100.00 | 43.4123 | 527393203 |
| 122281 | Buy Long | 8/15/2018 | 8/17/2018 | PCG | 57,900.00 | 43.3986 | 335777993 |
| 122276 | Buy Long | 8/15/2018 | 8/17/2018 | PCG | 33,000.00 | 43.4517 | 551840210, 551840181, 527388532 |
| 122277 | Buy Long | 8/15/2018 | 8/17/2018 | PCG | 200.00 | 43.40 | 98411954 |
| 122280 | Buy Long | 8/15/2018 | 8/17/2018 | PCG | 26,600.00 | 43.2966 | 502694520 |
| 122283 | Buy Long | 8/15/2018 | 8/17/2018 | PCG | 49,087.00 | 43.2102 | 502698587 |
| 122357 | Buy Long | 8/20/2018 | 8/22/2018 | PCG | 1,201,300.00 | 43.9795 | 403785919 |
| 122411 | Buy Long | 8/22/2018 | 8/24/2018 | PCG | 34,500.00 | 44.4085 | 527928162 |
| 122414 | Buy Long | 8/22/2018 | 8/24/2018 | PCG | 4,200.00 | 44.4702 | 577731531, 577731525, 577731524, 426957014, 387954273, 387954271 |
| 122413 | Buy Long | 8/22/2018 | 8/24/2018 | PCG | 15,100.00 | 44.4313 | 799845660 |
| 122412 | Buy Long | 8/22/2018 | 8/24/2018 | PCG | 14,600.00 | 44.4357 | 552499118 |
| 122415 | Buy Long | 8/22/2018 | 8/24/2018 | PCG | 4,100.00 | 44.4213 | 403934549 |
| 122454 | Buy Long | 8/23/2018 | 8/27/2018 | PCG | 51,500.00 | 44.0297 | 528029356 |
| 122458 | Buy Long | 8/23/2018 | 8/27/2018 | PCG | 17,500.00 | 44.495 | 528030238 |
| 122456 | Buy Long | 8/23/2018 | 8/27/2018 | PCG | 5,300.00 | 43.9696 | 362999334 |
| 122451 | Buy Long | 8/23/2018 | 8/27/2018 | PCG | 489,424.00 | 44.1819 | 452970684 |
| 122455 | Buy Long | 8/23/2018 | 8/27/2018 | PCG | 100,000.00 | 43.95 | 427038426 |

Case: 19-30088    Doc# 13393-2    Filed: 12/28/22    Entered: 12/28/22 14:40:39    Page
21 of 50

| Trade Id | Trans Type | Trade Date | Settle Date | Investment Symbol | Quantity | Price | DTC Number(s) |
|---|---|---|---|---|---|---|---|
| 122457 | Buy Long | 8/23/2018 | 8/27/2018 | PCG | 400.00 | 43.96 | 98755670 |
| 122453 | Buy Long | 8/23/2018 | 8/27/2018 | PCG | 39,500.00 | 44.0576 | 452981106 |
| 122450 | Buy Long | 8/23/2018 | 8/27/2018 | PCG | 232,357.00 | 44.1269 | 388064354 |
| 122484 | Buy Long | 8/24/2018 | 8/28/2018 | PCG | 22,800.00 | 42.805 | 528093080 |
| 122491 | Buy Long | 8/24/2018 | 8/28/2018 | PCG | 83,400.00 | 43.601 | 528093080 |
| 122485 | Buy Long | 8/24/2018 | 8/28/2018 | PCG | 650,000.00 | 42.8489 | 336476541, 336476537, 336476505 |
| 122488 | Buy Long | 8/24/2018 | 8/28/2018 | PCG | 400.00 | 42.76 | 528082455 |
| 122486 | Buy Long | 8/24/2018 | 8/28/2018 | PCG | 56,700.00 | 42.795 | 363075567 |
| 122492 | Buy Long | 8/24/2018 | 8/28/2018 | PCG | 5,563.00 | 43.177 | 363075567 |
| 122487 | Buy Long | 8/24/2018 | 8/28/2018 | PCG | 1,000.00 | 42.76 | 388114862 |
| 122490 | Buy Long | 8/24/2018 | 8/28/2018 | PCG | 280,000.00 | 43.3035 | 477788567 |
| 122489 | Buy Long | 8/24/2018 | 8/28/2018 | PCG | 13,300.00 | 42.7914 | 528097508 |
| 122539 | Buy Long | 8/27/2018 | 8/29/2018 | PCG | 192,500.00 | 43.6442 | 453148035 |
| 122535 | Buy Long | 8/27/2018 | 8/29/2018 | PCG | 36,500.00 | 43.6182 | 453147389 |
| 122538 | Buy Long | 8/27/2018 | 8/29/2018 | PCG | 21,988.00 | 43.2497 | 336533942 |
| 122531 | Buy Long | 8/27/2018 | 8/29/2018 | PCG | 2,700.00 | 43.6967 | 336536776 |
| 122533 | Buy Long | 8/27/2018 | 8/29/2018 | PCG | 95,172.00 | 43.6912 | 453123758 |
| 122534 | Buy Long | 8/27/2018 | 8/29/2018 | PCG | 22,400.00 | 43.2526 | 427180887, 388192313, 388191540, 388191474 |
| 122532 | Buy Long | 8/27/2018 | 8/29/2018 | PCG | 32,900.00 | 43.6478 | 901397256 |
| 122536 | Buy Long | 8/27/2018 | 8/29/2018 | PCG | 44,700.00 | 43.5435 | 388225489 |
| 122537 | Buy Long | 8/27/2018 | 8/29/2018 | PCG | 54,628.00 | 43.5968 | 427216067 |
| 122584 | Buy Long | 8/28/2018 | 8/30/2018 | PCG | 19,900.00 | 44.50 | 477971224 |
| 122582 | Buy Long | 8/28/2018 | 8/30/2018 | PCG | 10,800.00 | 44.50 | 477970744 |
| 122581 | Buy Long | 8/28/2018 | 8/30/2018 | PCG | 2,400.00 | 44.495 | 552805622 |

Case: 19-30088    Doc# 13393-2    Filed: 12/28/22    Entered: 12/28/22 14:40:39    Page 22 of 50

| Trade Id | Trans Type | Trade Date | Settle Date | Investment Symbol | Quantity | Price | DTC Number(s) |
|---|---|---|---|---|---|---|---|
| 122583 | Buy Long | 8/28/2018 | 8/30/2018 | PCG | 2,200.00 | 44.4555 | 528272504 |
| 122580 | Buy Long | 8/28/2018 | 8/30/2018 | PCG | 145.00 | 44.495 | 477976666 |
| 122869 | Buy Long | 9/7/2018 | 9/11/2018 | PCG | 103,500.00 | 45.23 | 700602447 |
| 122866 | Buy Long | 9/7/2018 | 9/11/2018 | PCG | 60,100.00 | 45.6605 | 553446972 |
| 122861 | Buy Long | 9/7/2018 | 9/11/2018 | PCG | 300.00 | 45.69 | 388889112 |
| 122863 | Buy Long | 9/7/2018 | 9/11/2018 | PCG | 95,571.00 | 45.6784 | 553431222 |
| 122862 | Buy Long | 9/7/2018 | 9/11/2018 | PCG | 200.00 | 45.68 | 99310919 |
| 122865 | Buy Long | 9/7/2018 | 9/11/2018 | PCG | 17,800.00 | 45.6831 | 404812613 |
| 122864 | Buy Long | 9/7/2018 | 9/11/2018 | PCG | 82,693.00 | 45.5665 | 553472358 |
| 123285 | Buy Long | 9/18/2018 | 9/20/2018 | PCG | 15,131.00 | 47.1285 | 479184917 |
| 123283 | Buy Long | 9/18/2018 | 9/20/2018 | PCG | 200,000.00 | 47.187 | 579264217 |
| 123284 | Buy Long | 9/18/2018 | 9/20/2018 | PCG | 400.00 | 47.1488 | 389562052 |
| 123331 | Buy Long | 9/19/2018 | 9/21/2018 | PCG | 49,700.00 | 46.6616 | 902557527 |
| 123329 | Buy Long | 9/19/2018 | 9/21/2018 | PCG | 3,400.00 | 46.7491 | 554111453 |
| 123335 | Buy Long | 9/19/2018 | 9/21/2018 | PCG | 153,294.00 | 46.6849 | 529535592 |
| 123330 | Buy Long | 9/19/2018 | 9/21/2018 | PCG | 2,400.00 | 46.7746 | 529517681, 529517660, 337926435, 337923385 |
| 123328 | Buy Long | 9/19/2018 | 9/21/2018 | PCG | 9,400.00 | 46.7904 | 819671072 |
| 123334 | Buy Long | 9/19/2018 | 9/21/2018 | PCG | 852,105.00 | 46.8542 | 504780350, 504780345 |
| 123333 | Buy Long | 9/19/2018 | 9/21/2018 | PCG | 120,600.00 | 46.7784 | 529548846 |
| 123332 | Buy Long | 9/19/2018 | 9/21/2018 | PCG | 47,375.00 | 46.6608 | 364596429 |
| 123385 | Buy Long | 9/20/2018 | 9/24/2018 | PCG | 200.00 | 46.815 | 389719277 |
| 123388 | Buy Long | 9/20/2018 | 9/24/2018 | PCG | 1,650.00 | 46.8592 | 504866479 |
| 123389 | Buy Long | 9/20/2018 | 9/24/2018 | PCG | 543,078.00 | 46.8308 | 529617712 |
| 123386 | Buy Long | 9/20/2018 | 9/24/2018 | PCG | 400.00 | 46.7225 | 529636643 |
| 123387 | Buy Long | 9/20/2018 | 9/24/2018 | PCG | 867.00 | 46.7335 | 454612568 |

Case: 19-30088    Doc# 13393-2    Filed: 12/28/22    Entered: 12/28/22 14:40:39    Page 23 of 50

| Trade Id | Trans Type | Trade Date | Settle Date | Investment Symbol | Quantity | Price | DTC Number(s) |
|----------|-----------|------------|-------------|-------------------|----------|-------|---------------|
| 123437 | Sell Long | 9/21/2018 | 9/25/2018 | PCG | (275,334.00) | 46.9075 | 389823472 |
| 123790 | Buy Long | 9/26/2018 | 9/28/2018 | PCG | 23,600.00 | 45.275 | 820108850 |
| 123789 | Buy Long | 9/26/2018 | 9/28/2018 | PCG | 900.00 | 45.30 | 365041793 |
| 123787 | Buy Long | 9/26/2018 | 9/28/2018 | PCG | 12,800.00 | 45.2133 | 455003614 |
| 123784 | Buy Long | 9/26/2018 | 9/28/2018 | PCG | 48,800.00 | 45.3738 | 902943860 |
| 123786 | Buy Long | 9/26/2018 | 9/28/2018 | PCG | 25,000.00 | 45.16 | 902943860 |
| 123788 | Buy Long | 9/26/2018 | 9/28/2018 | PCG | 5,700.00 | 45.2094 | 428993720 |
| 123785 | Buy Long | 9/26/2018 | 9/28/2018 | PCG | 15,236.00 | 45.2951 | 455028518 |
| 123831 | Buy Long | 9/27/2018 | 10/1/2018 | PCG | 453,900.00 | 45.181 | 820198075 |
| 123888 | Buy Long | 9/28/2018 | 10/2/2018 | PCG | 25,891.00 | 45.6964 | 701637490 |
| 123952 | Buy Long | 10/1/2018 | 10/3/2018 | PCG | 2,500.00 | 45.5076 | 390374187 |
| 123954 | Buy Long | 10/1/2018 | 10/3/2018 | PCG | 2,400.00 | 45.5667 | 406243114, 338731995 |
| 123950 | Buy Long | 10/1/2018 | 10/3/2018 | PCG | 400.00 | 45.44 | 820345738 |
| 123953 | Buy Long | 10/1/2018 | 10/3/2018 | PCG | 131,404.00 | 45.5872 | 820345738 |
| 123951 | Buy Long | 10/1/2018 | 10/3/2018 | PCG | 51,100.00 | 45.4612 | 505541759 |
| 126346 | Sell Long | 11/15/2018 | 11/19/2018 | PCG | (115,400.00) | 20.39346187 | 341939937 |
| 126347 | Sell Long | 11/15/2018 | 11/19/2018 | PCG | (12,600.00) | 20.17976191 | 409364341 |
| 126349 | Sell Long | 11/15/2018 | 11/19/2018 | PCG | (126,100.00) | 20.75468676 | 823497095 |
| 126345 | Sell Long | 11/15/2018 | 11/19/2018 | PCG | (286,770.00) | 20.57969153 | 583229554 |
| 126348 | Sell Long | 11/15/2018 | 11/19/2018 | PCG | (3,500.00) | 20.19 | 533395729 |
| 126350 | Sell Long | 11/15/2018 | 11/19/2018 | PCG | (32,500.00) | 20.06207692 | 704243436 |
| 126343 | Sell Long | 11/15/2018 | 11/19/2018 | PCG | (426,085.00) | 21.42492905 | 704243436 |
| 126344 | Sell Long | 11/15/2018 | 11/19/2018 | PCG | (71,100.00) | 20.55262307 | 368359054 |
| 126351 | Sell Long | 11/15/2018 | 11/19/2018 | PCG | (87,400.00) | 20.27734554 | 393545693 |

Case: 19-30088    Doc# 13393-2    Filed: 12/28/22    Entered: 12/28/22 14:40:39    Page 24 of 50

## ADDENDUM TO SUPPLEMENTAL PROOF OF CLAIM NO. 100269

1.      This Addendum to Supplemental Proof of Claim (the "Addendum") is filed by Baupost Group Securities, L.L.C. (the "Claimant"), on behalf of itself and as trading nominee for the Baupost-Managed Funds,[1] for obligations owing to Claimant and the Baupost-Managed Funds by Debtors under the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq*. This Proof of Claim amends claim number 100269, which was filed on April 15, 2020 (the "2020 POC"), and refiled in duplicate as claim number 100309.[2]

2.      Claimant adopts and incorporates in full herein the allegations of the 2020 POC, including but not limited to the allegations set forth in the Third Amended Consolidated Class Action Complaint for Violation of the Federal of Securities Law filed in *In re PG&E Corp. Securities Litigation*, Civil Action No. 3:18-cv-03509-EJD (N.D. Cal.) [Dkt. No. 121] (the "TAC"), which was incorporated by reference into the 2020 POC (and annexed thereto as Exhibit A).

---

[1]  Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in Claimant's "Addendum to Rescission of Damage Claim Proof of Claim" forms filed in connection with the 2020 POC (as defined herein).

[2]  As set forth in the 2020 POC:

> Claimant purchased and acquired the equity securities that are the subject of this Proof of Claim as a trading nominee for the Baupost-Managed Funds, which are the beneficial owners of such equity securities. The Court's Order (i) Denying Securities Lead Plaintiff's Motion to Apply Bankruptcy Rule 7023 to Class Proof of Claim and (ii) Extending Bar Date for Certain Holders of Securities Claims for Rescission or Damages, dated February 27, 2020 [Dkt. No. 5943] authorizes "those persons or entities (the 'Securities Claimants') that purchased or acquired the Debtors' publicly traded debt and/or equity securities" to file a Rescission or Damage Claim Proof of Claim Form, either directly or through "an authorized agent or attorney."

3.      Claimant has continued to investigate the factual and legal bases of the claims asserted in the 2020 POC.  Based on that investigation, which remains ongoing, Claimant files this Addendum to elaborate on the claims set forth in the 2020 POC and the TAC and to provide additional details concerning the misconduct by Debtors alleged in the 2020 POC and the TAC.[3]

4.      The 2020 POC incorporated allegations in the TAC that, between April 29, 2015 and November 15, 2018 (the "Relevant Period"), Debtors made materially false statements that "misled investors about PG&E's wildfire safety practices, including [its] representations of achieving full legal compliance and investing in safety, notwithstanding the Company's numerous and widespread violations of powerline safety regulations" and, thereby, artificially inflated the value of Debtors' securities during the Relevant Period.  TAC ¶¶ 1, 321.[4]  Specifically, the TAC alleges that:

> Investors and analysts were focused on the Company's compliance with wildfire-related safety regulations during the [Relevant] Period. With an eye towards artificially inflating its share price, PG&E responded to this interest with false and misleading reassurances that PG&E was in compliance with safety regulations.  PG&E also significantly raised its quarterly dividend during the Class Period, repeatedly touting that such a move was based, in part, on its success in ensuring safety.

*Id*. ¶ 188.  The TAC enumerates 19 false or materially misleading statements by Debtors concerning their safety practices, *id*. ¶¶ 194-316, and describes a pattern of serial misrepresentations and misleadingly incomplete disclosures whereby "[e]ven as the truth began

---

[3]  This Addendum does not change the amount sought by the 2020 POC, but, as set forth in Section IV, below, Claimant reserves the right to modify the amount of its claim at such time as may be appropriate.

[4]  "PG&E" is defined in the TAC to mean both Debtors—*i.e.*, PG&E Corporation ("PCG") and Pacific Gas and Electric Company (the "Utility").  TAC at 1.

2

to emerge about PG&E's insufficient safety practices" because of reports finding Debtors responsible for catastrophic wildfires, "PG&E continued to falsely insist on its compliance" and "doubled down on misinformation in order to build up the public perception of its safety and compliance" and to "conceal[] the true extent to which [Debtors] w[ere] exposed to massive liability for causing further wildfires, thereby significantly inflating [PCG's] share price." *Id*. ¶¶ 5-6, 31. The TAC further alleges that the October 2017 North Bay Fires and the November 2018 Camp Fire occurred during the Relevant Period and that these fires "incited a series of investigations, which . . . revealed PG&E's gross deficiencies in the area of safety compliance," contrary to Debtors' "public statements that it complied with California and federal safety regulations." *Id*. ¶ 2. The TAC identified nine partial corrective disclosures that dissipated a portion of the artificial inflation in the market price of Debtors' securities and alleges that, after each of these partial corrective disclosures, PCG's share price fell. *Id*. ¶¶ 328-389.

5. "As a result of [these] wrongful acts and omissions" by Debtors, the TAC alleges that there was a "precipitous decline in the market value of" Debtors' securities when "the truth started to emerge"—including "the truth regarding PG&E's responsibility for the Camp Fire"— which caused Claimant, the Baupost-Managed Funds, and other holders of Debtors' securities to "suffer[] significant losses and damages." *See id*. ¶¶ 321, 364, 390. Accordingly, the TAC asserts that Debtors violated Section 10(b) of the Exchange Act and Rule 10b-5 by, among other things "disseminat[ing] or approv[ing] the false statements [alleged], which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." *Id*. ¶¶ 471-480. The TAC also asserts causes of action against PCG for (i) "controlling person" liability under Section 20(a) of the Exchange Act as a result of "participat[ing] in the unlawful conduct

3

alleged which artificially inflated the market price of PG&E securities," *id*. ¶¶ 481-486, and (ii) liability under Section 10(b) and Rule 10b-5 as the "alter ago" of the Utility, *id*. ¶¶ 492-495.[5]

6.      This Addendum elaborates on and amplifies the allegations in the 2020 POC and TAC concerning Debtors' pattern of misrepresentations and incomplete, misleading disclosures about their safety practices, specifically with respect to the 2018 Camp Fire. The 2020 POC and TAC contain extensive factual allegations that Debtors' inspection, safety, and maintenance failures, particularly with respect to high-voltage transmission lines and towers, including the Utility's failure to follow its own power shutoff protocol, caused the Camp Fire. *See generally id*. ¶¶ 33-38, 130-76, 190-93. Indeed, Debtors acknowledged to the Court that the TAC "includes claims concerning equipment management and other issues connected with the 2018 Camp Fire." *Reorganized Debtors' Motion for Entry of an Order (I) Approving Settlements Resolving Disputes with Certain Insurers, and (II) Granting Related Relief* [Dkt. No. 13015] at 9 (citing TAC ¶¶ 33-38).

7.      This Addendum details seven additional misstatements by Debtors—all of which occurred during the Relevant Period—in which Debtors made public materially false statements about their safety practices concerning, and their investment in, their electrical transmission and distribution system, including but not limited to the inspection, maintenance, hardening, and replacement of high-voltage transmission lines and other equipment in their electrical infrastructure, as well as their compliance with regulatory requirements concerning the safe operation of their electrical transmission and distribution system (the "Additional Misstatements"). As with the misstatements described in the TAC, these additional "materially

---

[5] This Addendum does not assert any new causes of action against Debtors but, as set forth in Section IV, below, Claimant reserves the right to assert additional causes of action at such time as may be appropriate.

4

false and misleading statements assuring investors of the Company's compliance with California safety regulations" concealed "the true risks leading to the Camp Fire," including that Debtors were "not sufficiently prioritizing safety."  TAC ¶¶ 37-38.[6]

## I.      The Camp Fire Was the Result of Debtors' Inadequate Safety Practices with Respect to Their High-Voltage Transmission Lines

8.      The Camp Fire was the "most destructive and deadliest wildfire in California history . . . burning 153,336 acres, destroying 18,804 structures, [ ] killing at least 85 people," and causing an estimated $13 billion in injuries.  *Id*. ¶ 133.  The TAC alleges that Debtors "[were] responsible for the Camp Fire, which began when a PG&E electrical tower—carrying a high-voltage 115 kilovolt transmission line—failed."  *Id*. ¶ 190.

### A.      As Alleged in the TAC, Debtors' Failures to Appropriately Maintain, Replace, and Inspect High-Voltage Transmission Equipment on the Caribou-Palermo Line Caused the Camp Fire

9.      The TAC contains numerous factual allegations concerning Debtors' responsibility for the Camp Fire and explaining the role that Debtors' inadequate safety and maintenance practices with respect to the equipment on their high-voltage transmission lines played in causing the Camp Fire.  *See, e.g.*, *id.* at 34 ("The Camp Fire's First Ignition Point Was Caused by PG&E Safety Violations.").  For example, the TAC alleges that:

a. A May 15, 2019 California Department of Forestry and Fire Protection ("Cal Fire") "news release confirm[ed] that its investigation had 'determined that the Camp Fire was caused by electrical transmission lines owned and operated by Pacific Gas and Electric[].'"  *Id*. ¶ 190; *see also id*. ¶¶ 113-14.

---

[6]  The Additional Misstatements—which are set out in Section II, below—are drawn from public statements on Debtors' website, transcripts of Debtors' earnings calls, and various regulatory filings, including Debtors' submissions to the California Public Utilities Commission ("CPUC") and the Federal Energy Regulatory Commission ("FERC").

b. "PG&E's Caribou-Palermo transmission powerline was originally built in 1919, and was responsible for causing the first ignition point of the Camp Fire." *Id*. ¶ 130.

c. "The Camp Fire began when a PG&E electrical tower, carrying a high-voltage 115 kilovolt transmission line, failed." *Id*. ¶ 34; *see also id*. ¶ 114.

a. At the first ignition point—which Debtors identified as tower number ":27/222"—Debtors observed "the separation of a suspension insulator, meant to support a transposition jumper, from an arm on the tower" as well as "a broken C-hook attached to the separated suspension insulator that once connected the suspension insulator to a tower arm" and which "showed signs of wear." *Id*. ¶ 118.[7]

b. "PG&E knew, but concealed, that [the Caribou-Palermo] powerline had dangerously deteriorated. In December 2012, five steel towers supporting the Caribou-Palermo transmission line collapsed due to windy conditions. In a July 16, 2013 letter to the CPUC, PG&E proposed replacing the five collapsed towers, and one additional tower, on the Caribou-Palermo line . . . near the first Camp Fire ignition point." *Id*. ¶ 131.

c. "The rest of the aging towers on the line, including the tower alleged to have started the Camp Fire, were not replaced during that project. The age of these remaining towers created a strong, undisclosed risk that corrosion, metal fatigue, or other age-related factors would fail to support transmission line cables and cause wildfires. Indeed, the relevant tower included uninsulated 'jumper' lines used to switch currents between transmission lines, making the risk of fire even greater." *Id*. ¶ 132.

d. "'[I]nternal Company documents showed that in December 2012 five aging towers along the Caribou-Palermo transmission line had collapsed, and a 2014 internal Company email stated that "the likelihood of failed structures happening is high'**—a risk PG&E concealed from the public." *Id*. ¶ 136 (emphasis in original).

e. "A November 1, 2016 PG&E document detailed the failure of necessary hardware along the [Caribou-Palermo] transmission line, with a support hook snapping off during routine painting. PG&E documents internally acknowledged that the supports 'had been compromised through corrosion.'" *Id*. ¶ 137.

---

[7] "PG&E has also acknowledged a second ignition point for the Camp Fire that exhibited damaged and downed poles, vegetation on top of downed wires, and other signs of safety violations." *Id*. Debtors' "failure to remove such vegetation violated California Public Resources Code Section 4293, and its failure to maintain the integrity of its poles and towers violated California Public Utilities Code Section 451." *Id*. ¶ 35.

f.  A March 18, 2019 article in *The New York Times* "discussed an internal Company email, sent long before the Camp Fire, which noted that a group of structures including the transmission tower implicated in the Camp Fire, Tower :27/222, were at risk of collapse due to their age and windy conditions in the area. Indeed, the Company noted that corrosion on another tower in the vicinity was so severe that it had endangered crews attempting to repair it. The Company's own guidelines had warned that the **tower was a quarter-century past its useful life**, yet PG&E failed to repair or replace the aging tower." *Id*. ¶ 134 (emphasis in original).

g.  "Despite the internal acknowledgment that the Caribou-Palermo lines were in need of repair and posed a significant risk of collapse, PG&E never had the lines fixed. Instead, the Company reasoned that any collapse would not impact a sufficient number of customers to warrant the repairs and that the risks would be mitigated because any fire may be extinguished by rain. Tragically, needed repairs were never undertaken, and the Caribou-Palermo line caused the first ignition point of the Camp Fire in 2018. . . . Accordingly, PG&E had actual knowledge about the safety violations that caused the Camp Fire, months if not years in advance." *Id*. ¶¶ 138-39.

10.  The TAC also details how Debtors' failure to appropriately inspect their high-voltage transmission infrastructure, specifically the towers on the Caribou-Palermo line, contributed to the ignition of the Camp Fire. For example:

a.  "PG&E had not inspected Tower :27/222 since August 2014, and prior to that, not since 2009, pursuant to an internal policy whereby 'Steel structures on PG&E's 115 kV transmission lines, such as Tower :27/222, are subject to maintenance patrols annually and detailed inspections every five years.' PG&E has admitted that an aerial patrol is not an inspection, as it is only '[d]uring a detailed inspection of a transmission line' that 'PG&E personnel are instructed to look for and document abnormalities or circumstances that will negatively impact safety, reliability, or asset life.'" *Id*. ¶ 118.

b.  Debtors submitted a new wildfire mitigation plan to the CPUC in February 2019 (the "2019 Mitigation Plan")—after the Camp Fire—and "the dramatic expansion of safety practices and expenditures in PG&E's 2019 Mitigation Plan confirms the inadequacy of PG&E's prior activities." Specifically, the 2019 Mitigation Plan "stated that the Company would substantially increase its inspections. Instead of just routinely inspecting 517,500 electricity distribution poles, PG&E would also commit to conducting 'enhanced inspections' of 685,000 electricity distribution poles in High Fire Threat Districts 'in addition to routine inspections' over the course of just 'five months.' (Emphasis original.) 'Enhanced Inspection' was described as 'includ[ing] ground inspections, drone and helicopter inspections where needed, and climbing inspections of every transmission tower,' implying such

measures had not been undertaken in the past.  Similarly, for its electricity transmission structures, PG&E committed to conducting enhanced inspections for 40,600 structures in addition to 76,000 routine inspections (up from 9,400 and 76,000, respectively)." *Id*. ¶ 182.

B.  The Findings in the Butte County District Attorney's
Report Provide Greater Detail Concerning Debtors'
Maintenance and Inspection Failures that Caused the Camp Fire

11.  On June 16, 2020—following the filing of the TAC and the filing of the 2020 POC—the Butte County District Attorney released *The Camp Fire Public Report:  A Summary of the Camp Fire Investigation* (the "Butte Report").[8]  The Butte Report was issued shortly after a grand jury in Butte County returned an indictment charging the Utility with "unlawfully and recklessly causing the Camp Fire as a result of its gross negligence in maintaining its power line" and the Utility pleaded guilty.  Butte Report at 3.  The Butte Report summarized the Butte County District Attorney's investigation into whether there "was sufficient evidence to convict PG&E of its criminal behavior which lead [*sic*] to the Camp Fire" and was used to establish the factual basis for the Utility's plea of guilty to 84 counts of involuntary manslaughter and one count of unlawfully causing a fire.  *Id*. at 3-4, 80-81.

12.  The Butte Report sheds additional light on Debtors' failures to properly inspect, maintain, and replace equipment on their high-voltage transmission lines and on how Debtors' inadequate safety practices with respect to electrical transmission and distribution system caused the Camp Fire.

13.  Amplifying the allegation in the TAC concerning the broken C hook on tower :27/222, TAC ¶ 118, as well as the TAC's allegation that "PG&E knew, but concealed,

---

[8]  The Butte Report is available at:  https://www.buttecounty.net/Portals/30/CFReport/PGE-THE-CAMP-FIRE-PUBLIC-REPORT.pdf?ver=2020-06-15-190515-977.  The TAC had noted that "since determining that PG&E is responsible for the Camp Fire, Cal Fire ha[d] forwarded its investigative report to the Butte County District Attorney."  TAC ¶ 192; *see also id*. ¶¶ 113, 132.

that" equipment on the Caribou-Palermo line "had dangerously deteriorated," *see, e.g.*, *id*. ¶ 131,

the Butte Report includes the following detailed findings:

a.  Cal Fire determined that the first ignition point of Camp Fire was "the dry brush below Tower 27/222 of the Caribou-Palermo line," and that the fire began when "a C hook that linked an insulator string connected to the jumper conductor to the transposition arm of the tower failed, allowing the energized jumper conductor to make contact with the steel tower structure. The ensuing electrical arcing between the jumper conductor and steel tower structure caused the aluminum strands of the conductor to melt as well as a portion of the steel tower structure. The molten aluminum and steel fell to the brush covered ground at the base of the steel tower structure. This molten metal ignited the dry brush." Butte Report at 9.

b.  Cal Fire found that many of the components on towers of the Caribou-Palermo line, including Tower 27/222 and the C hook that broke, dated from the original construction of the line, between 1919 and 1921, and had not been replaced. Specifically, "the insulator string hanging from the C hook that broke on November 8, 2018 was an original 1921 insulator." Further, "with the exception of add-on hanger brackets which were added to the ends of the transposition arms to replace worn hanger holes, the transposition components on Tower 27/222, including the transposition arms, C hooks, insulator strings and jumper conductor[s], were original components in service since 1921." *Id*. at 18-19, 82.

c.  With respect to the specific "C hook" that failed—*i.e.*, broke—and caused the ignition of the Camp Fire, investigators found (i)"that as a result of rotational body on body wear"—caused by movement in the wind—"the edge of the hanger holes had cut a channel into" the C hook and that "the channel had cut approximately 14/16 into the hook before the remaining metal broke under the weight of the insulator string and jumper conductor," (ii) "substantial wear" on the bolted-on hanger hole plate of the left-phase transposition arm "where the broken hook had hung," and (iii) a "channel" worn into the right-phase C hook"—which had not failed—"where it hung from the bolted-on hanger plate hole of that transposition arm" which was "similar to the channel cut into the broken left phase C hook." *Id*. at 19-20, 22.

d.  Investigators found spaces between C hooks and hanger holes indicative of substantial wear on three other towers on the Caribou-Palermo line. *Id*. at 20.

e.  Investigators found that, at Tower 27/222 and at least one other tower on the Caribou-Palermo line, the C hooks hung from "bolted-on hanger plate holes [that] had been added to the transposition arms," instead of the original hanger holes, indicating Debtors' awareness of wear on the C hooks and hanger holes. *Id*. at 20-21, 31.

9

f. By at least 1987, Debtors had knowledge of wear on the C hooks and hanger holes on their transmission infrastructure when photographs in the "PG&E Laboratory Test Report" documented worn C hooks and hanger holes on transmission towers. *Id*. at 24, 78, 83. In 2011 and again in 2018, workers on Debtors' transmission line crews observed similar wear on hanger holes. In 2011, a Utility engineer noted in an email that "[i]t appears that there is a groove cutting into the plate probably caused by years of rubbing between the c-hook and the plate." And in 2018, a Utility lab report found that the wear was "attributed to wind-driven swinging of the insulators" and opined that the "useful life of the hanger plates" was 97-100 years. *Id*. at 78, 83-84.

g. Debtors were aware of the age of the equipment on the Caribou-Palermo line and introduced a "Deteriorated Transmission Equipment Replacement Program" in 2007, but apparently never funded the program. *Id*. at 33.

h. By 2007, an engineer employed by Debtors sought $800,000 in funding "for preliminary engineering and purchase of long lead-time material to replace conductor and tower structures on a section of the Caribou-Palermo line," noting that "[t]he probability of . . . failure ***is imminent*** due to the age of both the towers and the conductor." *Id*. at 34 (emphasis added). After removing language about "the prediction of imminent failure," Debtors' Electric Asset Strategy Division approved the project with a reduced funding amount. Between 2007 and 2009, Debtors conducted "engineering studies of the proposed new tower sites and preparatory work, including building a road to allow access to the proposed new tower sites," but canceled the project "due to Asset Management's reprioritization." *Id*. at 34-35.

i. Debtors reduced the budget allocated to inspection, repair, and maintenance of transmission equipment in the years leading up to the Camp Fire. *Id*. at 50.

14. The Butte Report also provides additional details corroborating the allegations in the TAC concerning Debtors' inadequate inspection of the Caribou-Palermo line and their other high-voltage transmission equipment. *See* TAC ¶¶ 118, 182. According to the Butte Report:

a. Debtors changed their inspection and patrol policies over the decade preceding the Camp Fire and "drastically reduced the frequency and thoroughness of inspections." *Id*. at 23-25.

i. Under Debtors' 1987 policy, "the Caribou-Palermo line was required to be patrolled three times each year: one ground patrol and two aerial patrols." The policy also required "climbing inspections of five percent of the tower structures per year; and an infrared patrol every five years." *Id*.

10

ii.  Under policy changes that Debtors made in 1995, "[t]he Caribou-Palermo line was reduced from three patrol/inspections (one ground/two aerial) per year to one ground inspection every 24 months and one aerial inspection every 24 months. Required routine climbing inspections were eliminated." *Id.* at 24.

iii.  Under Debtors' Electric Transmission Preventative Maintenance Manual ("ETPM")—which went into effect in 2005—the Caribou-Palermo line was further "reduced to only being inspected once every five years and patrolled once per year in non-inspection years." *Id.* at 25.

iv.  Although they did not further revise the relevant portions of the ETPM between 2005 and the Camp Fire, in 2013 Debtors "considered further reducing the frequency of inspections and patrols." *Id.* at 26.

v.  Despite making these revisions to the patrol/inspection policy, Debtors' ETPM acknowledged that "the best position to view insulators and hardware is aerial inspection (not patrol), ground inspection above 10', and climbing inspection." *Id.*

b.  Although the ETPM was intended to "reduce the potential for component failure and facility damage and facilitate a proactive approach to repairing or replacing identified, abnormal components," Debtors' actual inspections and patrols of the Caribou-Palermo line did not comply with the already-lowered ETPM standards. *Id.* at 23, 26, 37. This was particularly true "in low population density mountainous areas," such as where the Camp Fire began. *Id.* at 47.

i.  Debtors sought to cut costs associated with inspections/patrols "by reducing the thoroughness of the inspections and patrols," specifically by "reducing the amount of time budgeted for the inspections and patrols" and tying salary incentives to staying within reduced inspection and patrol budgets. *Id.* at 27-28, 50.

ii.  In 2005, Debtors eliminated the direct training of the employees responsible for inspecting and patrolling transmission lines. All of Debtors' employees who "inspected or patrolled the Caribou-Palermo line since the publication of the ETPM in 2005 . . . denied having receiv[ed] any formal training on how to perform an inspection or patrol," including in "assessing wear." Their training was "limited to filling out reporting forms and notifications for any issues" and the "only training on how to perform an inspection or patrol was via informal mentoring by other, more experienced" employees. *Id.* at 28-30.

11

iii. "[B]y 2007 the inspections and patrols of the Caribou-Palermo line were being conducted by inexperienced, untrained and unqualified [employees]. Both of the "Detailed Ground Inspections (2009 and 2014) and seven of the ten Annual Air Patrols on the Caribou Palermo [line] were completed by [employees] who had little or no prior transmission experience, and no formal training on performing inspections and patrols." This violated the ETPM, which required employees to "be thoroughly familiar with all of the facilities, equipment, safety rules and procedures associated with the facilities and equipment." Specifically, "[b]ecause of their lack of knowledge, experience, and training," the employees inspecting the Caribou-Palermo line "could not have been expected to identify the wear" on C hooks and hanger holes. *Id.* at 30.

iv. The last "Detailed Ground Inspection" of the Caribou-Palermo line prior to the Camp Fire occurred in 2014 and, from 2015 to the Camp Fire in 2018, the line was only subject to annual aerial patrols, *id.* at 37—which were inadequate. PG&E employees "denied it was possible to assess the wear on the C hooks and hanger holes during a detailed ground inspection" or "during aerial patrols." Moreover, such inspections were inconsistent with the ETPM's guidance that "[o]nly climbing inspections or lifted bucket inspections above 10 feet in the air would give the appropriate best view for assessment of insulators and their connectors." *Id.*

v. The linemen who assisted in the inspections of the Caribou-Palermo line had not been trained on performing inspections and patrols and did not conduct their inspections under the supervision of a trained, experienced troubleman. Instead, the linemen and troubleman divided the line into sections and each independently inspected his own section. *Id.* at 38.

vi. "[B]etween 2001 and 2018 aerial patrol by helicopter was the primary method of inspection and patrol for the Caribou-Palermo line. . . . [T]he thoroughness of the aerial patrols declined through the years." For example, patrol flight time declined from 10 hours for the 2001 patrol to between 3.2 and 7.6 hours for patrols from 2011 to 2018. Employees characterized patrols with such flight times as "'fly bys' not patrols or inspections" and reported that they were "only confirming the structures and components were 'standing upright.'" They also stated that it would not be "possible to see and assess the wear on the C-hooks and hanger holes during aerial patrols." *Id.* at 40-41.

vii. The ETPM required climbing inspection upon certain specific triggers, such as component defects or failures, high fire hazard, and equipment failures caused by storms. But, in practice, Debtors

12

treated this requirement as discretionary and did not order climbing inspections even when multiple triggers had occurred.  *Id*. at 41-43.

viii.  While 80 towers on the Caribou-Palermo line were subjected to climbing inspections in September and October 2018, those inspections were deficient.  They failed to detect defects on numerous towers that were later identified in December 2018 wildfire-related inspections.  *Id*. at 43.

ix.  After the Camp Fire, Debtors initiated wildfire-related climbing inspections on the Caribou-Palermo line and other similar transmission lines.  Those inspections "identified thousands of conditions requiring repairs on PG&E's system that had not been previously identified."  *Id*. at 44.

c.  After "the failure of a connector on a jumper line" on a Caribou-Palermo line tower caused the Rock Fire in September 2008, Debtors "did not conduct climbing or aerial inspections on other Caribou-Palermo line towers with similar connectors."  *Id*. at 35.

d.  After five towers on the Caribou-Palermo line fell in 2012 windstorm, Debtors failed to perform a formal "Root Cause Analysis" and, despite being advised to do so, never inspected the foundations of other towers on the line for signs of "uplift," which contributed to the tower collapses.  *Id*. at 36.

e.  After a painting crew broke a J hook on a Caribou-Palermo line tower in 2016, Debtors reported that "about 20% of the thickness of the bolt had been compromised through corrosion."  Nonetheless, "the failure of the J hook did not cause inspections of J hooks in other similar towers."  *Id*.

f.  "Despite the fact the towers of the Caribou-Palermo line were routinely subjected to winds at or near their design criteria, PG&E never inspected or tested any of the towers or components for wind damage."  *Id*. at 72.

15.  Thus, the allegations in the TAC—as amplified and corroborated by the evidence summarized in the Butte Report—demonstrate that Debtors' inadequate safety practices with respect to their inspection, maintenance, and replacement of their high-voltage transmission infrastructure caused the Camp Fire.

**II.**   **Debtors Made Multiple Misstatements—As Alleged in Both the TAC and This Addendum—Concerning Their Safety Practices with Respect to Powerlines Prior to the Camp Fire**

16.   The TAC alleges that Debtors made numerous materially false and misleading statements amount their safety practices, including their inspection of powerlines and compliance with regulatory standards, including:

a.   Misstatement No. 2:  An October 6, 2015 Corporate Responsibility and Sustainability Report, which states:  "Each year, PG&E's Vegetation Management department . . . inspects every mile of power line in our service area for public safety. . . . We do so in compliance with relevant laws."  TAC ¶ 197.

b.   Misstatement No. 11:  A November 2, 2017 conference call with analysts to discuss Debtors' financial results for the third quarter of 2017, in which Debtors' then-President and COO, Nickolas Stavropoulos, stated:  "We inspect all of our overhead lines every year, and we do second patrols in high fire danger areas at least twice a year. In some areas, we do as often as 4x a year."  *Id.* ¶ 264.

c.   Misstatement No. 13:  A May 25, 2018 press release, which stated that Debtors "[i]ncreased foot and aerial patrols along power lines in high fire-risk areas."  *Id.* ¶ 280.

d.   Misstatement No. 14:  A June 8, 2018 press release, which stated that "under PG&E's industry-leading Vegetation Management Program, we inspect and monitor every PG&E overhead electric transmission and distribution line each year, with some locations patrolled multiple times."  *Id.* ¶ 287.

e.   Misstatement No. 17:  An October 9, 2018 press release, which stated that Debtors "are continuing to focus on implementing additional precautionary measures intended to further reduce wildfire threats, such as working to remove and reduce dangerous vegetation, improving weather forecasting, upgrading emergency response warnings, [and] making lines and poles stronger in high fire threat areas[.]"  *Id.* ¶ 303.

17.   Defendants made additional materially false statements during the Relevant Period concerning their power line safety practices.  These seven Additional Misstatements are set forth below.

### A. The Additional Misstatements

#### 1. *January 8, 2018 – Misstatement No. 12-A*[9]

18.     In August 2015, the CPUC issued an Order Instituting Investigation ("OII") into whether Debtors' organizational culture and governance adequately prioritized safety.  On January 8, 2018 Debtors submitted prepared testimony as part of the OII proceedings. In his written testimony, Nickolas Stavropoulos, the Utility's then-President and COO, stated:

> On the electric system, infrastructure investment has also been extensive over the last five years, including replacement of over 700 miles of overhead distribution conductor, 49 miles of underground distribution cable, 40 miles of network cable, and over 4,300 manhole cover replacements with venting covers, as well as installing or replacing over 700 miles of transmission line.

#### 2. *March 22, 2018 – Misstatement No. 12-B*

19.     On March 22, 2018, Debtors issued a press release announcing their Community Wildfire Safety Program.[10]  Among other things, the press release stated that the program focused on "doing more over the long term to harden the electric system to help reduce wildfire threats and to keep customers safe," including by "investing in stronger, coated power lines, spacing lines farther apart to prevent line-on-line contact during wind storms, and replacing wood poles with non-wood poles in the coming years."

20.     The press released also stated that Debtors were "[a]ugmenting [their] already rigorous vegetation management practices based on the High Fire-Threat District map adopted in January 2018 by the California Public Utilities Commission."

---

[9]  The numbering of the Additional Misstatements set forth in this Addendum is intended to organize and present such misstatements in chronological order relative to the misstatements alleged in paragraphs 194 through 316 of the TAC.

[10]  The press release is available at:  https://investor.pgecorp.com/news-events/press-releases/press-release-details/2018/In-Advance-of-2018-Wildfire-Season-PGE-Takes-Action-with-Comprehensive-Community-Wildfire-Safety-Program/default.aspx.

### 3. March 27, 2018 – Misstatement No. 12-C

21.     On March 27, 2018, Debtors issued a press release concerning their supposed efforts to mitigate wildfire risks.[11]  The press release stated the following:

> Under PG&E's industry-leading Vegetation Management Program, the company ***inspects and monitors every PG&E overhead electric transmission and distribution line each year, with some locations patrolled multiple times***.

(Emphasis added.)

### 4. May 3, 2018 – Misstatement No. 12-D

22.     During a May 3, 2018 conference call with analysts concerning Debtors' financial results for the first quarter of 2018,[12] Debtor's then-CEO, Geisha Williams, stated the following:

> We have more than doubled our annual spend to manage vegetation from roughly $190 million in 2013 to $440 million in 2017 and ***we increased the frequency of our patrols, particularly in high fire threat areas***, but the new normal needs new solutions. To that end, we recently announced our Community Wildfire Safety Program.

(Emphasis added.)

### 5. October 1, 2018 – Misstatement No. 16-A

23.     On October 1, 2018, Debtors submitted an application to FERC for revisions to their "Transmission Owner Tariff."  Exhibit 3 to that filing was written testimony (in question and answer form) by David P. Gabbard, who was the Utility's Senior Director of Transmission Asset Management, concerning Transmission Risk Management and Project Management Improvements."  Gabbard's testimony states:

---

[11] The press release is available at:  https://investor.pgecorp.com/news-events/press-releases/press-release-details/2018/PGE-Working-to-Reduce-Wildfire-Risks-by-Increasing-Distances-Between-Trees-and-Power-Lines-and-Reducing-Fuels/default.aspx.

[12]  The transcript of this call is available at:  https://seekingalpha.com/article/4169513-pg-and-e-pcg-q1-2018-results-earnings-call-transcript.

Q.      How is PG&E reducing transmission overhead conductor risk?

A.      PG&E is currently implementing four mitigations to reduce overhead conductor risk.  The first two mitigations revolve around equipment replacement work: additional overhead conductor replacement and additional insulator replacement.  Replacing additional conductors and insulators reduces the likelihood that those conductors and insulators will fail, therefore reducing the likelihood that those failures will lead to transmission wires down.

. . .

Q.      Describe the Tower Replacement Program and how that will address the Transmission Risk.

A.      The Tower Replacement Program is established to manage the replacement of steel structures that have reached the end of their useful lives.  The program targets replacement of deteriorated structures where repair is either less cost effective or not feasible.

**6.     *October 1, 2018 – Misstatement No. 16-B***

24.      As part of the same FERC application, Jessica Tsang, a Principal

Regulatory Analyst at the Utility, submitted written testimony concerning Debtors' Transmission

and Maintenance Operation Expenses.  Her testimony states:

Q.      Please describe the allocation of expenses in Account 561 – Load Dispatching.

A.      This account includes expenses incurred for operating the transmission system safely, reliably, and ***in compliance with all applicable rules, standards and regulations***.  Some examples of activities for which expenses are incurred include:

> • Monitoring, assessing, and operating the power system and individual facilities in real-time to maintain safe and reliable operation of the transmission system;

. . .

Q.      Please describe the allocation of expenses in Account 563 – Overhead Line Expenses.

A.      This account includes expenses incurred for operating overhead transmission lines. Some examples of activities for which expenses are incurred include:

17

> • Patrolling and inspecting assets to identify any potential safety and reliability issues;
>
> . . .
>
> Q.     Please describe the allocation of expenses in Account 571 – Maintenance of Overhead Lines.
>
> A.     This account includes expenses incurred for maintaining overhead transmission plant.  Some examples of activities for which expenses are incurred include:
>
> > • Preventative and corrective maintenance of steel and wood support structures;

(Emphasis added.)

### 7.     *November 5, 2018 – Misstatement No. 18-A*

25.     During a November 5, 2018 conference call concerning Debtors' financial performance for the third quarter of 2018l,[13] which occurred just days before the ignition of the Camp Fire, PG&E's then-CEO Geisha Williams stated the following:

> We also have our public safety power shut off program that I mentioned earlier, and we'll of course only utilize this as a last resort in the most extreme forecasted weather conditions.  *All of these efforts are in addition to our ongoing pole maintenance and visual and infrared inspections of our assets*.  We plan to continue patrolling our poles at frequencies within high fire threat areas beyond the compliance requirements in place in California. Collectively, this is an integrated comprehensive program to further reduce risk across our high fire threat areas.

(Emphasis added.)

### B.     The Additional Misstatements Were Materially False and Misleading When Made

26.     The Additional Misstatements were materially false and misleading when Debtors made them for several reasons.

---

[13] The transcript of this call is available at:  https://www.nasdaq.com/articles/pge-corp-pcg-q3-2018-earnings-conference-call-transcript-2018-11-05.

27.     **First**, the Additional Misstatements were materially false and/or misleading because they created a false impression that Debtors were sufficiently investing in their electrical system infrastructure, including by replacing equipment that was antiquated, worn, or otherwise at or near the end of its useful life. *See* Additional Misstatement Nos. 12-A, 12-B, 16-A, and 16-B. But, as the Butte Report concluded, Debtors were "employing a run to failure strategy on the entirety of the Caribou-Big Bend section of the Caribou-Palermo line" at the time the statement was made. Butte Report at 60. Further, (i) Debtors had known, since at least 1987, that C hooks and hanger holes on their transmission infrastructure were worn because of "wind-driven swinging of the insulators" and that the hanger plates were approaching the end of their useful lives, *id*. at 24, 78, 83-84; (ii) Debtors were aware of the advanced age of the equipment on the Caribou-Palermo line and introduced a "Deteriorated Transmission Equipment Replacement Program" in 2007, but apparently never funded the program, *id.* at 33; (iii) Debtors approved (albeit at reduced funding) a project to "replace conductor and tower structures on a section of the Caribou-Palermo line" because "[t]he probability of . . . failure *is imminent* due to the age of both the towers and the conductor," but canceled the project in 2009, *id*. at 34-35; (iv) Debtors reduced the budget allocated to inspection, repair, and maintenance of transmission equipment in the years leading up to the Camp Fire, *id*. at 50; (v) after five towers on the Caribou-Palermo line fell in 2012, Debtors proposed replacing the collapsed towers, and one additional tower, but did not replace the remaining towers despite their age and acknowledgements in internal documents that "the likelihood of failed structures happening is high," TAC ¶¶ 131-32, 136; and (vi) internal documents from prior to the Camp Fire, including in 2016, "detailed the failure of necessary hardware along the [Caribou-Palermo] transmission line," warned that at least one tower was over a quarter-century past its useful life, and acknowledged that "the Caribou-Palermo lines were in need of repair and posed a significant risk

of collapse," but Debtors did not replace the tower or otherwise adequately repair the equipment on the line, *id.* ¶¶ 134, 137-39.

28. ***Second***, the Additional Misstatements were materially false and/or misleading because they created a false impression that Debtors employed robust vegetation management practices that complied with applicable regulations. *See* Additional Misstatement Nos. 12-B, 12-C, and 12-D. On the contrary, as alleged in the TAC, (i) "[i]nvestigations into the causes of the Camp Fire . . . uncovered evidence that it was caused by PG&E violating California Public Resources Code Section 4293 and California Public Utilities Code Section 451, among other safety regulations," which, among other things, mandate the safe operation of electrical utilities and prescribe clearances between powerlines and vegetation and the removal of dead and decadent trees that might contact powerlines, *id.* ¶¶ 56, 59, 288; and (ii) it "has been documented that PG&E actually knew that it was not in compliance with relevant safety laws" and admitted in federal criminal probation proceedings before U.S. District Judge Alsup "that as of June 2017, there were 3,962 unworked trees which PG&E had identified in 2016 as hazardous with the potential to 'fall into or otherwise impact the conductors, towers or guy wires before the next inspection cycle,'" *id.* ¶ 292.

29. ***Third***, the Additional Misstatements were materially false and/or misleading because they created a false impression that Debtors were performing frequent and rigorous inspections of powerlines in areas prone to fire. *See* Additional Misstatement Nos. 12-C, 12-D, 16-B, and 18-A. On the contrary, at the time the statement was made, Debtors had not inspected Tower :27/222 of the Caribou-Palermo transmission line since August 2014 and "[t]his lack of annual inspection contributed to Tower :27/222's failure on November 8, 2018, which was part of the Camp Fire's first ignition point." TAC ¶¶ 203, 268.

Case: 19-30088   Doc# 13393-2   Filed: 12/28/22   Entered: 12/28/22 14:40:39   Page 44 of 50

30. Moreover, these Additional Misstatements materially omitted the facts that:

a. over the preceding decades Debtors changed their policies to decrease the frequency and thoroughness of powerline inspections and patrols;

b. Debtors' actual inspections and patrols of the Caribou-Palermo line and other lines "in low population density mountainous areas" did not comply with their ETPM policy;

c. Debtors reduced the time budgeted for inspections and patrols;

d. Debtors eliminated formal training on inspections and patrols;

e. Debtors reduced the flight time of aerial patrols, so that they were mere "fly bys" that could "only confirm[] the structures and components were 'standing upright;'"

f. transmission line inspections and patrols were conducted by employees who "could not have been expected to identify the wear" on C hooks and hanger holes;

g. the aerial patrols and ground inspections that Debtors conducted on the century-old Caribou-Palermo line could not assess wear on C hooks and hanger holes;

h. climbing inspections were, contrary to Debtors' policy, treated as discretionary;

i. despite the fact that towers on the Caribou-Palermo line were subject to high wind, Debtors never inspected them for wind damage,

j. Debtors did not conduct inspections of similar equipment following failures of transmission line components on Caribou-Palermo line towers; and

k. after five towers on the Caribou-Palermo line fell in 2012, Debtors failed to perform a formal "Root Cause Analysis" and, despite being advised to do so, never inspected the foundations of other towers on the line for signs of "uplift," which contributed to the tower collapses.

See Butte Report at 23-30, 35-37, 40-43, 50, 72.

31. Because of the foregoing deficiencies in Debtors' inspection practices, these Additional Misstatements were also materially false and/or misleading because they

created a false impression that Debtors' transmission line inspection regime complied with their ETPM, *id*. at 37, and with CPUC regulations, such as General Order 165, which requires a utility to "conduct inspections of its distribution facilities, as necessary, to ensure reliable, high quality, and safe operation" and CPUC General Order 95, which details safety standards for powerlines and infrastructure, including requirements intended to guard against corrosion on towers. *See* TAC ¶¶ 164-65.

32.    When the falsity of Debtors' statements came to light—including through the corrective disclosures described in the TAC—and the undisclosed and under-disclosed risks associated with Debtors' woefully inadequate practices with respect to maintaining and replacing equipment on their high-voltage transmission lines, managing vegetation around powerlines, and inspecting equipment on their high-voltage transmission lines materialized, including in the form of the Camp Fire, there was a dramatic drop in the market value of PCG's common stock from almost $48 per share on November 8, 2018 to $17.74 on November 16, 2018, *see id*. ¶¶ 355, 387.

**III.    Debtors Made the Additional Misstatements with Scienter**

33.    As alleged in the TAC, Debtors "either knew the material, adverse facts about PG&E's lack of safety undermining and contradicting their public representations, or were culpably reckless in avoiding knowledge of and/or disregarding that reality" and, consequently, made those misstatements with scienter. *Id*. ¶ 391.

34.    Debtors claimed that safety is their "core business," and as such, was the "focus" of their senior officers. *Id*. ¶ 397; *see also id*. ¶¶ 398-403 (noting representations by Debtors' senior officers that "they closely monitored PG&E's critically important safety and compliance"). Indeed, Debtors stated that they "maintained a database of inspection data to document the condition of [PG&E's] power lines, which provided [PG&E] personnel with ready access to information about instances of noncompliance with state safety regulations," and they

Case: 19-30088    Doc# 13393-2    Filed: 12/28/22    Entered: 12/28/22 14:40:39    Page 46 of 50

"repeatedly touted the culture among [PG&E's] lower-level employees that encouraged reporting safety problems up the chain of management." *Id*. ¶¶ 420, 426-29.

35. Accordingly, "the persistence of [Debtors'] safety violations cannot be attributed to their being unknown. Rather, such problems persisted because of what [Debtors] did—or failed to do—to mitigate safety problems once they were reported." *Id*. ¶ 430.

36. With respect to Debtors' materially false statements concerning their transmission line inspection and patrol regime, at the times those misstatements were made, Debtors either knew, or were culpably reckless in not knowing, that:

    a. Their actual inspections and patrols of the Caribou-Palermo line and other lines "in low population density mountainous areas" did not comply with their ETPM policy;

    b. They had reduced the frequency, thoroughness, and time budgeted for inspections and patrols of transmission lines;

    c. They had eliminated formal training on inspections and patrols of transmission lines;

    d. Their transmission lines were being inspected or patrolled using methods that "could not have been expected to identify the wear" on C hooks and hanger holes despite the advanced aged and known wear on such equipment; and

    e. Their inspections of transmission lines could not have complied with CPUC regulations, such as General Order 165, which requires a utility to "conduct inspections of its distribution facilities, as necessary, to ensure reliable, high quality, and safe operation" and CPUC General Order 95, which details safety standards for powerlines and infrastructure, including requirements intended to guard against corrosion on towers.

*See* TAC ¶¶ 164-65; Butte Report at 23-30, 35-37, 40-43, 50, 72.

37. With respect to Debtors' materially false statements concerning their maintenance, repair, and replacement practices for their high voltage transmission line equipment, at the times those misstatements were made, Debtors either knew, or were culpably reckless in not knowing, that:

a. They were "employing a run to failure strategy on the entirety of the Caribou-Big Bend section of the Caribou-Palermo line;"

b. C hooks and hanger holes on their transmission infrastructure were worn because of "wind-driven swinging of the insulators" that the hanger plates were approaching the end of their useful lives;

c. They never funded the "Deteriorated Transmission Equipment Replacement Program," despite knowledge of the advanced age of the equipment on the Caribou-Palermo line;

d. They cancelled a project to "replace conductor and tower structures on a section of the Caribou-Palermo line" despite "[t]he probability of . . . failure [being] *imminent* due to the age of both the towers and the conductor;"

e. They reduced the budget allocated to inspection, repair, and maintenance of transmission equipment in the years leading up to the Camp Fire; and

f. They did not replace towers or make adequate repairs to the Caribou-Palermo line despite acknowledgements in internal documents that "the likelihood of failed structures happening is high," and that "the Caribou-Palermo lines were in need of repair and posed a significant risk of collapse."

*See* TAC ¶¶ 131-32, 134, 136-39; Butte Report at 24, 33-35, 50, 60, 78, 83-84.

38.     And, with respect to Debtors' materially false statements concerning their vegetation management practices, as alleged in the TAC, at the times those misstatements were made, Debtors "actually knew that [they] [were] not in compliance with relevant safety laws" and admitted in federal criminal probation proceedings before the Honorable William Alsup of the U.S. District Court for the Northern District of California "that as of June 2017, there were 3,962 unworked trees which PG&E had identified in 2016 as hazardous with the potential to 'fall into or otherwise impact the conductors, towers or guy wires before the next inspection cycle,'" TAC ¶ 292.

## IV.    Reservation of Rights

39.     Claimant reserves the right to further amend and/or supplement its Supplemental Proof of Claim (including this Addendum) at any time, including after any bar date, in any manner, and/or to file additional proofs of claim for any additional claims which

may be based on the same or additional documents or grounds of liability, or based on additional facts learned following further investigation.

40. Except to the extent the 2020 POC is amended hereby, the filing of this Supplemental Proof of Claim (including this Addendum) shall be without prejudice to any previous, contemporaneous, or future claims made by or on behalf of Claimant against Debtors or any of their officers, directors, employees, agents, affiliates, or successors in this or any other proceeding. In executing and filing this Supplemental Proof of Claim (including this Addendum), Claimant does not waive (and this Supplemental Proof of Claim and Addendum shall not be deemed or construed to waive) any claims or right to assert any claims, or preserve any remedies, including setoff and recoupment, that Claimant has against Debtors or any of their officers, directors, employees, agents, affiliates, or successors, whether arising from or related to the matters described herein or otherwise.

41. The filing of this Supplemental Proof of Claim (including this Addendum) is not and shall not be deemed or construed as: (a) a waiver or release of Claimant's rights against any person, entity, or property; (b) a consent by Claimant to the jurisdiction of this Court or any other court with respect to proceedings, if any, commenced in any case against or otherwise involving Claimant; (c) a waiver or release of Claimant's right to trial by jury in this Court or any other court in any proceeding as to any and all matters so triable herein, whether or not the same be designated legal or private rights or in any case, controversy, or proceeding related hereto, notwithstanding the designation or not of such matters as "core proceedings" pursuant to 28 U.S.C. § 157(b)(2), and whether such jury trial right is pursuant to statute or the U.S. Constitution; (d) a consent by Claimant to a jury trial in this Court or any other court in any proceeding as to any and all matters so triable herein or in any case, controversy, or proceeding related hereto, pursuant to 28 U.S.C. § 157(e) or otherwise; (e) a waiver or release of Claimant's

right to have any and all final orders in any and all non-core matters or proceedings entered only after *de novo* review by a U.S. District Court Judge or, if applicable, the U.S. Court of Appeals for the Ninth Circuit; (f) a waiver of the right to move to withdraw the reference with respect to the subject matter of this Supplemental Proof of Claim (including this Addendum), any objection thereto or other proceeding which may be commenced in this case against or otherwise involving Claimant; or (g) an election of remedies.

      42.    All notices regarding this Proof of Claim should be sent to:

The Baupost Group, L.L.C.
10 St. James Avenue, 17th Floor
Boston, Massachusetts 02116
Attn: Frederick H. Fogel, Esq.
Phone:  (617) 210-8300
Email:  pcgpublicteam@baupost.com

Case: 19-30088   Doc# 13393-2   Filed: 12/28/22   Entered: 12/28/22 14:40:39   Page 50 of 50