William B. Abrams
end2endconsulting@gmail.com
2041 Stagecoach Rd.
Santa Rosa, CA, 95404
Tel: 707 397 5727

*Pro Se Fire Victim Claimant and Party to related proceedings before the California Public Utilities Commission and the California Office of Energy Infrastructure Safety*

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF CALIFORNIA
# SAN FRANCISCO DIVISION

In re:

PG&E CORPORATION,

    -and-

PACIFIC GAS AND ELECTRIC COMPANY,

        Debtors.

☐ Affects PG&E Corporation
☐ Affects Pacific Gas and Electric Company
☒ Affects both Debtors

\* All papers shall be filed in the lead case, No. 19-30088 (DM)

Bankr. Case No. 19-30088 (DM)
Chapter 11
(Lead Case)
(Jointly Administered)

**RESPONSE OF WILLIAM B. ABRAMS TO MOTION FOR ORDER DEEMING BAUPOST GROUP SECURITIES, L.L.C.'S SUPPLEMENT TO ITS PROOFS OF RESCISSION OR DAMAGE CLAIMS TIMELY**

Related to: Dkt. 13393

William B. Abrams ("**Abrams**") as a PG&E victim, ratepayer and customer, submits this response ("**Response**") to the December 28, 2022 "Motion for Order Deeming Baupost Group Securities, LLC's Supplement to Its Proofs of Rescission or Damage Claims Timely" (the "**Motion**" or "**Baupost Motion**") [Dkt. 13392]. This Response is filed in opposition to this Motion and in accordance with the December 28, 2022 "Notice of Hearing on Motion for Order Deeming Baupost Group Securities, L.L.C.'s Supplement to Its Proofs of Rescission or Damage Claims Timely" [Dkt. 13394] and associated Court ordered procedures and schedule. In support, Abrams submits the "Declaration of William B. Abrams in Support of the Response of William B. Abrams to Motion for Order Deeming Baupost Group Securities, L.L.C.'s Supplement to its Proofs of Rescission or Damage Claims Timely" which is filed contemporaneously with this Response.

## PRELIMINARY STATEMENT

Baupost Group Securities, L.L.C.'s ("**Baupost**") POC Supplement associated with this Motion accurately identifies some of the many "*material misstatements and non-disclosures*" of the Debtor that were not known to the Court or core parties at the time the original Baupost claim was filed. However, the Motion mistakenly attributes this "*pattern of misstatements and incomplete disclosures about their safety practices*" as uniquely injurious to Baupost. This otherwise well-founded and highly substantiated Motion neglects to consider the unjust effects to victims, ratepayers and the residents residing in Pacific Gas and Electric Company ("**PG&E**") service territory. Yes, as the Baupost Motion highlights, it is an undeniable fact that the Debtor withheld, distorted and misrepresented critical pieces of information to "*artificially inflate*" the perceived value of their stock which in turn undermined just claims and associated claims resolutions procedures. The Debtor certainly understood the strategic significance of withholding and obfuscating key parts of their safety record which would blunt additional and significant damage claims from victims, ratepayers, residents and hedge funds like Baupost.

Baupost's attempt to reshape and assert that these Debtor transgressions should only be reserved as evidence suitable to further their damage claims is misplaced and improper. In accordance with the "Absolute Priority Rule," the direct injuries and associated claims of ratepayers, customer and victims must come before those asserted through the Baupost Motion. Therefore, as a

prudent and just alternative to the remedies described by Baupost, the Court should consider how the "*pattern of misstatements and incomplete disclosures about their safety practices*" identified within the Motion should precipitate Court ordered processes for victims, ratepayers and residents living within PG&E service territory to supplement their existing claims or to file new claims **without negatively impacting the corpus of the Trust**. These classes of claimants should be afforded the opportunity to assess and file damage claims based upon this new evidence put forward by Baupost and made available through subsequent findings such as those associated with the Envista Forensics "Root Cause Analyses."[1] Moreover, the Court should consider that it would be patently unfair and unjust for Baupost to claim damages from these Debtor "misstatements and non-disclosures" without similar remedies being afforded to victims and ratepayers. Indeed, Baupost's POC supplement lists and exposes additional categories of damages that were not disclosed to the Tort Claimant Committee ("**TCC**"), accounted for through the Fire Victim Trust ("**FVT**") or addressed through the current victim Claims Resolutions Procedures ("**CRP**"). Therefore, the Court should consider the addition of the following three categories of Victim, Ratepayer and Resident Damage Claims given what Baupost correctly identifies as the strategic withholding of this information by the Debtor:

1. **Ratepayer Damage Claims (billing for erroneous costs) –** It is now apparent that customers of PG&E paid for the Debtors' misrepresented and misdirected wildfire mitigation activities as well as other Debtor falsehoods through increased rates over a substantial period of time. Certainly, these damages were incurred by ratepayers during the same "Relevant Period" (April, 2015 through November, 2018) identified within the Baupost Motion and through much of the preceding time-period. The Camp Fire Report referenced within the Baupost Motion combined with the other evidence provided herein including the aforementioned Envista Forensics Root Cause Analyses leave little room to doubt that Debtor provided falsehoods and misstatements damaged ratepayers and victims of the PG&E fires. It is also important to note that these damages were unknown to the Court before the "Memorandum Decision on Motion to Appoint a Ratepayers' Committee" [Dkt. 2245] which stated that "*ratepayers do not have a "claim" for which separate representation by a committee is necessary and will enter therefore an order denying the TURN Motion.*" If the Debtor had disclosed to the Court these prior "material misrepresentations and non-disclosures," Abrams

---

[1] See July 6, 2022, Envista Forensics "Root Cause Analyses", https://www.cpuc.ca.gov/-/media/cpuc-website/divisions/safety-policy-division/reports/root-cause-analyses-of-the-2017-18-wildfires_070622.pdf

is confident that the Court would have arrived at a different decision and afforded ratepayers the opportunity for representation within this case. Until such time as these remedies for ratepayer claims are provided by the Court without negatively impacting victim claims, the Baupost Motion should be denied as it incorrectly and unjustly characterizes these injuries as unique to their claims.

2. **Resident Damage Claims (insurance scarcity and property values)** – The clearly evident effects of the Debtors' falsehoods, misrepresentations and incomplete disclosures during the Baupost described "Relevant Period" have driven hikes in resident insurance rates and general insurance scarcity across PG&E territory and particularly within the PG&E defined High Fire Threat Districts ("**HFTD**") where residents are now subjected to a lack of insurance as carriers increasingly deny insurance to those who rebuild within these PG&E service areas. Baupost correctly indicates within their Motion that these "*misstatements*" and "*incomplete disclosures*" were not known at the time they filed their claim but neglect to mention that these misstatements about the PG&E safety practices were also not known to insurance carriers who subsequently denied or increased rates for residents residing within PG&E territory when the lack of PG&E wildfire mitigation became apparent due to the release of the Camp Fire Report referenced by Baupost and the subsequent Envista Forensics Root Cause Analyses which was issued on July 6, 2022.[2] Due to PG&E "misrepresentations" and a lack of disclosure, residents bought and built homes under the false impression that they would have reasonable insurance. When the PG&E veil of nondisclosures was lifted through these outside reports, insurance carriers began to rerate and otherwise deny insurance within certain communities where homes were now recognized as riskier due to the sunlight shining on the Debtors' strategic miscommunications and false representations of their wildfire mitigation practices. Now that the Court and the public are aware of the evidence provided within these reports and supporting resident damage claims, the Court should provide a process for residents to file valid claims. Until such time as these remedies are provided by the Court, the Baupost Motion should be denied as it incorrectly and unjustly characterizes these injuries as unique to their claims.

---

[2] See July 6, 2022, Envista Forensics "Root Cause Analyses", https://www.cpuc.ca.gov/-/media/cpuc-website/divisions/safety-policy-division/reports/root-cause-analyses-of-the-2017-18-wildfires_070622.pdf

3. **Supplements to Victim Damage Claims (PG&E erroneous stock valuation)** – The overinflated stock valuation provided by the Debtor to victims misinformed their vote on the Plan and was exposed as a ruse through the Baupost Motion outlining the "*pattern of misstatements and incomplete disclosures*" and the Envista Forensics Root Cause Analysis.[3] Baupost correctly describes "*stock prices that were artificially inflated by Debtors' misleading statements.*" However, the Court must consider that this artificially over-inflated stock price described by Baupost also materially and substantially led to misrepresentations of the "Fire Victim Equity Value" for victims. Baupost's Motion that attempts to reserve these "misstatements and non-disclosures" as uniquely injurious to their stock position but not the forced stock position of PG&E wildfire victims is unjustified and particularly insulting to those victims like Abrams awaiting their determination and settlement funds. The Camp Fire Report referenced through the Motion and the Envista Forensics Root Cause Analyses further expose this pattern which should be considered by the Court. Now that this Baupost described "pattern" has been exposed, the Court and the Trustee should consider a supplemental process for victims to file damage claims related to these Debtor misrepresentations **in a manner that will not negatively affect the corpus of the Trust or the expedient processing of claims through the existing claims resolutions procedures**. Until such time as these remedies are provided by the Court, the Baupost Motion should be denied as it incorrectly and unjustly characterizes these injuries as unique to their claims.

## INTRODUCTION

The claim supplements referenced through the Baupost Motion should be subordinate to all of the claim supplements referenced above (victim, ratepayer and resident). However, the Court and all parties should appreciate that the Baupost Motion correctly states the following:

> "*The TAC enumerates 19 misstatements by Debtors concerning their safety practices and describes a pattern of serial misrepresentations and misleadingly incomplete disclosures whereby "[e]ven as the truth began to emerge about PG&E's insufficient safety practices" because of reports finding Debtors responsible for catastrophic wildfires, "PG&E continued to falsely insist on its compliance" and "doubled down on misinformation in order to build up*

---

[3] See July 6, 2022, Envista Forensics "Root Cause Analyses", https://www.cpuc.ca.gov/-/media/cpuc-website/divisions/safety-policy-division/reports/root-cause-analyses-of-the-2017-18-wildfires_070622.pdf

*the public perception of its safety and compliance" and to "conceal the true extent to which [Debtors] w[ere] exposed to massive liability for causing further wildfires, thereby significantly inflating [PCG's] share price… "As a result of [these] wrongful acts and omissions" by Debtors, the TAC alleges that there was a "precipitous decline in the market value of" Debtors' securities when "the truth started to emerge"—including "the truth regarding PG&E's responsibility for the Camp Fire"—which caused Baupost (including certain funds it manages) and other holders of Debtors' securities to "suffer[] significant losses and damages."*

Indeed, Baupost correctly points out that the newly exposed "*wrongful acts and omissions*" made available through the Camp Fire Report and other independent audits did cause a "*precipitous decline in the market value of the Debtors' securities.*" However, this misguided Motion then directs the Court to prioritize the effects of this evidence on their claims over and above the claims of residents, ratepayers and victims who deserve similar Court remedies. Baupost through omission or neglect appears to ask the Court to disregard the impacts of these newly exposed "wrongful acts and omissions" on (1) the over-inflated and fancifully advertised "Fire Victim Equity Value" for victims, (2) the devaluing of resident property and insurance scarcity in PG&E service territory and (3) the impact on customer billing up to and including the Baupost described "Relevant Period." The Court should not accept this reprioritization of damage claims as a prudent path towards justice or just settlements within this case.

Furthermore, the Court must consider the Debtors' convenient timing of when and how "*the truth started to emerge*" through these public facing reports, AFTER the PG&E overinflated stock valuation led to the "$13.5B Trust" misrepresentations, AFTER the victim vote on the Plan and AFTER the assignment of a ratepayer committee had been denied by the Court. The fact that the Debtors did not disclose these "*wrongful acts and omissions*" BEFORE the Plan was confirmed is a material issue that must be remedied by the Court and not just for savvy and well-resourced hedge funds like Baupost. Given this newly presented evidence provided through the Baupost Motion and supplemented herein, Abrams respectfully asks the Court to ensure that victims, ratepayers and residents, as vulnerable and underrepresented parties within this case, are provided with reasonable processes and remedies to supplement their claims and/or to file new claims as outlined above without undermining the value or impeding the administration of the Fire Victim Trust.

# ARGUMENT

The Baupost Motion calls attention to supplemental damages associated with the timing between when they purchased the stock and when PG&E's misstatements were made public and exposed as falsehoods through the following:

> "...having purchased (net of sales) over 18 million shares of PG&E Corporation common stock... at prices that were artificially inflated because of Debtors' material misstatements and non-disclosures concerning their safety practices, and who later suffered significant losses when the value of those securities fell as the falsity of Debtors' grossly deficient safety practices materialized in the form of the 2017 North Bay Fires and the 2018 Camp Fire."

Through this introductory statement, Baupost seems to want to carve out their shares that were "*artificially inflated because of Debtors' material misstatements and nondisclosures*" but fails to recognize or expect the same treatment for the shares that were misrepresented as 50% of the victim settlement to the Tort Claimant Committee ("**TCC**"). This type of inequitable treatment proposed through the Baupost Motion should not be tolerated by the Court. The Court should recognize that these Debtor driven falsehoods also came before victims voted upon the Plan and were only corrected after the misinformation campaign drove victims to accept stock as part of their fanciful $13.5B deal. Important to note that on March 2, 2020, Abrams filed the "William B. Abrams Objection Pursuant to 11 U.S.C. §§ 1129(A) and U.S.C. §§ 1125 to Proposed Disclosure Statement for Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization" [Dkt. 6151]. Within this Objection, Abrams proposed the following amended language that would have informed victims about the Baupost described PG&E safety record and related financial risks:

> "The criminal convictions, neglected infrastructure and lack of measurable wildfire mitigation contributed to PG&E entering into Chapter 11. These matters remain largely unresolved and represent outstanding liabilities and risks that victims need to consider as they evaluate this plan."[4]

This proposed amendment and other proposed supplements to the victim disclosure statement were uniformly opposed by the Debtor and these efforts are consistent with their other efforts to keep information about their propensity to start catastrophic fires out of public view. This is particularly important as it would be wrong to assume that victims were informed of these stock related risks as

---

[4] See March 6, 2020 "William B. Abrams Objection Pursuant to 11 U.S.C. Section 1129(a) and U.S.C. Section 1125 to Proposed Disclosure Statement for Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization.", Dkt. 6151, https://restructuring.ra.kroll.com/pge/Home-DownloadPDF?id1=MzM1MDc5&id2=-1

has been incorrectly asserted by the Debtor and other parties. When a savvy investor like Baupost with all of their resources is correctly asserting that they were not adequately informed about these stock risks, where does this leave victims? Who is representing victim interests relative to their "*artificially inflated*" stock position? The Court should ensure that the claims and interests of residents, ratepayers and victims are not unduly subordinated to those of Baupost and other well-represented investors. Certainly, these more vulnerable parties must receive the same rights and remedies that Baupost asserts within this Motion.

Abrams supports Baupost's assertions that the Debtors' strategically placed wildfire mitigation related deceptions, safety related misrepresentations and other misinformation negatively impacted share price. This correctly described "pattern" of corporate miscommunications is consistent with other Debtor activities both before and during Baupost's "Relevant Period" where there was a coordinated effort to falsify safety records from 2012 through 2017 (PG&E "Locate and Mark") and coincides with other incidents (after Baupost's "Relevant Period") where a contractor "*falsified some records on underground and overhead assets in 2020 and 2021*."[5] The Court and parties should consider that this well-established "pattern" demonstrates that the Debtor's understood the negative correlation between increases in their public-facing disclosures regarding their safety practices with a decrease in share price. Therefore, Baupost correctly states that the nondisclosures and misstatements prior to the release of the Camp Fire Report are particularly injurious and deserving of additional consideration relative to Damage Claims.

One additional source of evidence regarding the Debtors' nondisclosures, misstatements and distortions regarding their safety record is the July 6, 2022 release of the "Envista Root Cause Analyses" that was ordered by Judge Alsup as a condition of PG&E probation.[6] In stark contrast to the Debtor's misstated safety record leading to the over-inflated valuation of the PG&E stock, this report demonstrates that PG&E did not prioritize wildfire mitigation in High Fire Threat Districts ("**HFTDs**"). Residents, ratepayers and victims of their fires chose to reside within these HFTD areas

---

[5] See NBC Bay Area, "PG&E Scrambles to Make Up for 3,000 Potentially "Falsified Electrical Inspections", November 24, 2021, https://www.nbcbayarea.com/investigations/pge-scrambles-to-make-up-for-3000-potentially-falsified-electrical-inspections/2740817/ and January 17, 2020, "CPUC Responds to Settlement Agreement for PG&E Violations in Safeguarding its Underground Infrastructure", https://www.cpuc.ca.gov/news-and-updates/all-news/cpuc-responds-to-settlement-agreement-for-pge-violations July 13, 2022 "Critics Say PG&E Fire Prevention Plan Prioritized Executive Bonuses Over Safety", https://www.nbcbayarea.com/investigations/pge-fire-risk-lines-firestorm/2943935/

[6] See July 6, 2022, Envista Forensics "Root Cause Analyses", https://www.cpuc.ca.gov/-/media/cpuc-website/divisions/safety-policy-division/reports/root-cause-analyses-of-the-2017-18-wildfires_070622.pdf

under the false notion that PG&E was taking the necessary steps to mitigate the risks of catastrophic wildfire ignitions. This report identifies other issues that should have been disclosed prior to plan confirmation including the fact that none of the power lines that ignited 16 of the PG&E North Bay fires were assessed by the Debtor as "problematic or high risk" before the fires occurred. These findings, if provided by the Debtor to claimants through proper disclosures and prior to plan confirmation, would have allowed victims, ratepayers and residents the opportunity to account for these issues while assessing (1) the errant stock-infused "$13.5B deal," (2) the impact of these disclosures on energy bills and rates, (3) the impact to the value of their home including the relative effect on insurance rates and (4) the impact on claims from hedge funds like Baupost and those of other parties. Regrettably and unjustly, the Debtor chose to not disclose this information in a timely manner and instead chose the path of providing "*material misstatements and nondisclosures*" to guard against higher damage claims from victims, residents, ratepayers and investors.

Of course, this "*pattern of misstatements and incomplete disclosures about their safety practices*" had a profound impact on this case and the deliberations of the Court. To understand the context more fully, it is important for the Court to consider the strategic manner in which the Debtor actively worked to ensure their mischaracterized and distorted safety record never was considered within this case and never would be disclosed to claimants until after the Plan was confirmed. Here are some examples of the Debtor's actions that were designed to prevent sufficient disclosures that might allow potential claimants the opportunity to understand the impacts of their wildfire mitigation lapses and poor safety record on their claims including but not limited to the value of PCG stock, insurance availability in HFTDs, property value and erroneous utility rate increases:

- **Lack of Debtor Disclosure -** On March 2, 2020, Abrams filed the "William B. Abrams Objection Pursuant to 11 U.S.C. §§ 1129(A) and U.S.C. §§ 1125 to Proposed Disclosure Statement for Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization" [Dkt. 6151]. Within this Objection, Abrams proposed to add the following language: "*The Debtors have provided no evidence how through this plan of restructuring that they have reoriented their company to provide safe and reliable service*… **THESE FINANCIAL INTERESTS ARE INEXTRICABLY LINKED TO THE DEGREE TO WHICH PG&E WILL BE ABLE TO SUCCESSFULLY MITIGATE RISKS AND PROVIDE SAFE AND RELIABLE SERVICE.**" Not

only did the Debtor object to the inclusion of this type of language that might have otherwise informed victims but they made strategic efforts to distort their safety record within the disclosure statement. Indeed, despite Abrams request within this Objection to strike the following language, the Debtors kept it within the victim disclosure statement to apparently mischaracterize the impact of their safety record on the value of the Fire Victim Trust. This appears to be an attempt to overstate their safety record so victims would be ill-informed regarding the real risks that the Trust would be unable to satisfy victim claims: "*Over the past several months, the Debtors and their advisors have worked diligently with their… positioned to deliver safe and reliable service to its customers.*"

- **Lack of Disclosure through Debtor Witnesses** – Abrams was the only party to put forward a witness list that included PG&E executives that could directly testify to the safety record of the Debtor. The May 20, 2020 "Amended Witness and Exhibit List of William B. Abrams" [Dkt. 7500] listed Deborah Powell, Vice President of Asset and Risk Management Community Wildfire Safety, Andrew Vesey, CEO of PG&E Utility and Julie Kane, Senior Vice President and Chief Ethics and Compliance Officer. These proposed witnesses with direct responsibility and knowledge of PG&E safety and wildfire mitigation activities were adamantly opposed by the Debtor. These witnesses could have shed light on exactly the same issues brought out through the Baupost Motion and further evidenced within this Response if these requests were accepted by the Debtor. Instead the Debtor chose a path which ensured that their safety record would not be subjected to scrutiny within the Plan confirmation hearings.

- **Misrepresentation of Stock Value** – On June 16, 2020 Abrams filed the "William B. Abrams Motion for Reconsideration and Relief from the Orders Pursuant to U.S.C. §§ 363(b) and 105(a) and Bankruptcy Rule 9024 Approving the Parties Joint Stipulation Regarding the Registration Rights Agreement and Related Agreements of the Fire Victim Trust" [Dkt. 7974]. Here Abrams pointed out that "*The misdirected reliance on $2.2 normalized net income and the 14.9x multiple without reasonable disagreement is in point-of-fact an overinflated valuation of the stock and remains unaddressed in this registration rights agreement… the only shareholders that benefit*

*from these contorted arrangements are the current shareholders…*" If the Debtor properly disclosed their safety record and revealed their misstatements as exposed through the Camp Fire Report and the Envista Forensics Root Cause Analyses, the Tort Claimant Committee might not have taken the overinflated stock valuation at face value and might have insisted on a more accurate valuation of the Debtors stock as a component of the PG&E Fire Victim settlement agreement.

- **Lack of Consideration Regarding the Camp Fire Report –** On June 19, 2020 days after the Camp Fire Report was issued, Abrams filed the "William B. Abrams Opposition to the Notice of Filing of Second Revised Draft Proposed Findings of Fact, Conclusions of Law, and Order Confirming Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization Given June 16 Summary of the Camp Fire Investigation by the Butte County District Attorney Referencing Material issues for Plan Confirmation" [Dkt. 8045]. This motion stated in-part "*that a summary of the investigation into the PG&E Camp Fire entitled "The Camp Fire Public Report, A Summary of The Camp Fire Investigation" was issued on June 16, 2020 by the Butte County District Attorney that directly references a reliance upon this proceeding and matters unresolved in the current Draft Plan of Reorganization proposed by the Debtors.*" Abrams specifically requested that this report be taken into consideration by the Court and parties like Baupost but it was not considered despite the support it received through the "Joinder by Certain Fire Victims to (1) William B. Abrams Opposition (Dkt. 8045); and (2) Gowins Objection to Final Report (Dkt. 8034)" [Dkt. 8056].

## CONCLUSION

Baupost's Motion and POC Supplement identifies important amendments and supplements to damage claims for all parties to consider and correctly states the following:

*"Baupost incurred these losses because it purchased PCG common stock at prices that were artificially inflated by Debtors' misleading statements regarding their safety practices, but the share price later plummeted when the falsity of Debtors' earlier representations about their safety practices came to light."*

Indeed, the evidence is clear that the Debtor misrepresented and distorted their safety record and the value of their stock to preclude certain reasonable and just claims as described within this Response. However, the Court should ensure that PG&E victim claims are not unfairly subordinated to the Baupost claims and that victims are afforded the same rights and remedies as described by this savvy investor. Baupost's "*post-bar date amendments to proofs of claim for the purpose of describing existing claims*" should only be granted if these same types of amendments are permitted for victims that were injured due to the same "*pattern of misstatements and incomplete disclosures*" described by Baupost and that are further substantiated through this Response and within the court ordered "Envista Forensics Root Cause Analyses." Additionally, it will be important for ratepayers and residents within PG&E service territory to have a defined process for filing additional claims given this new evidence and without negatively affecting the corpus of the Trust or slowing the current claims resolution process. Baupost, victims, ratepayers, residents and the Court were kept in the dark by the Debtor through "*material misstatements and nondisclosures*" and through an "*artificially inflated*" stock valuation. This darkness surrounding the Debtors' safety record was somewhat illuminated after Plan confirmation but not in time to allow certain parties to properly categorize and value their claims. This added light should compel the Court to ensure that victims, ratepayers and residents are provided with supplemental claims resolution procedures to amend their claims or to file additional claims based upon this "pattern" BEFORE Baupost is granted the remedies requested within the Motion.

Executed on January 11, 2023, at Santa Rosa, CA.

Respectfully submitted,

William B. Abrams
Pro Se Claimant